## 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                          )
     Plaintiff,                         )
                                         )
VS.                                      )
                                         )
ERIC H. HOLDER, JR. in his               )
official capacity as Attorney            )
General of the United States,            )
     Defendant,                         )
                                         )
ERIC KENNIE, et al,                      )
                                         )
     Defendant-Intervenors,             )
                                         )
TEXAS STATE CONFERENCE OF                )   CASE NO. 1:12-CV-00128
NAACP BRANCHES,                          )   (RMC-DST-RLW)
                                         )   Three-Judge Court
     Defendant-Intervenors,             )
                                         )
TEXAS LEAGUE OF YOUNG VOTERS             )
EDUCATION FUND, et al,                   )
                                         )
     Defendant-Intervenors,             )
                                         )
TEXAS LEGISLATIVE BLACK                  )
CAUCUS, et al,                           )
                                         )
     Defendant-Intervenors,             )
                                         )
VICTORIA RODRIGUEZ, et al.,              )
                                         )
     Defendant-Intervenors.             )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF
ANN McGEEHAN
MAY 31, 2012

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## 2

ORAL DEPOSITION OF ANN McGEEHAN, produced as a witness at the instance of the Defendant, was duly sworn, was taken in the above-styled and numbered cause on the MAY 31, 2012, from 9:45 a.m. to 6:50 p.m., before Chris Carpenter, CSR, in and for the State of Texas, reported by machine shorthand, at the offices of DECHERT, LLP, 300 W. 6th Street, Suite 2010, Austin, Texas 78701, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

## 3

A P P E A R A N C E S

FOR THE PLAINTIFF, STATE OF TEXAS:

    Adam Mortara
    BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
    Courthouse Place
    54 West Hubbard Street, Suite 300
    Chicago, IL 60654
    (312) 494-4469
    adam.mortara@bartlit-beck.com
    Jay Dyre
    ATTORNEY GENERAL OF THE STATE OF TEXAS
    209 West 14th Street
    8th Floor
    Austin, TX 78701
    (512) 936-1307
    anne.wilson@texasattorneygeneral.gov

FOR THE DEFENDANT, HOLDER, ET AL:

    Elizabeth S. Westfall
    Daniel Freeman
    Maria Rios
    U.S. DEPARTMENT OF JUSTICE
    950 Pennsylvania Avenue, NW
    NWB - Room 7202
    Washington, DC 20530
    (202) 305-7766
    elizabeth.westfall@usdoj.gov

FOR THE DEFENDANT-INTERVENOR TEXAS STATE CONFERENCE OF
NAACP BRANCHES AND THE MEXICAN AMERICAN LEGISLATIVE
CAUCUS:

    Ezra D. Rosenberg
    DECHERT, LLP
    Suite 500
    902 Carnegie Center
    Princeton, NJ  08540-6531
    (609) 955-3200
    ezra.rosenberg@dechert.com

## 4

FOR THE MALDEF INTERVENORS:

    Nina Perales
    Janine Lopez
    Luis Figueroa
    MALDEF
    110 Broadway Street, Suite 300
    San Antonio, TX  78205
    (210) 224-5476
    nperales@maldef.org

FOR THE TEXAS LEAGUE OF YOUNG VOTERS EDUCATION FUND
INTERVENORS:

    Adam M. Harris
    Brian Chen (law clerk)
    FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, LLP
    One New York Plaza
    New York, New York 10004
    (212) 859-8953
    adam.harris@friedfrank.com

Also present:
    Juan Carlos Ibarra, The Advancment Project



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

5

1
2   Appearances.........................................3
3   ANN McGEEHAN
        Examination by Ms. Westfall.................7
        Examination by Ms. Perales...............211
4
    Signature and Changes...........................297
5
    Reporter's Certificate............................299
6

        U.S. EXHIBITS
7
    NO. DESCRIPTION                    PAGE MARKED
8
    280  Revised Privilege Log, May 11, 2012        34
9
    281  Supplemented Privilege Log, May 21, 2012   38
10
    282  Amended Notice of Deposition               62
11
    283  House Committee on Elections Subcommittee  88
12       on Verification Voters, March 17, 2005
13   284  Excerpt of Transcript of Senate Committee  116
         on State Affairs, April 30, 2007 (House
14       Bill 218 Public Hearing)
15   285  Texas Legislature Online History, SB 362   134
16   286  Houston Chronicle Article:  Voter ID Fight 145
         Appears Certain In Texas
17
     287  Transcript Excerpt of Senate Committee of  164
18       the Whole, Jan. 25, 2011
19   288  Excerpt of Transcript of Select Committee  184
         on Voter Identification, March 1, 2011
20
         INTERVENOR RODRIGUEZ EXHIBITS
21
     R-1  Election Line Weekly Article, Dec 15, 2011  212
22
     R-2  Transcript Excerpt of Committee on          228
23       Elections Meeting, 6/14/10
24   R-3  SOS Andrade Memo, March 6, 2009             247
25   R-4  SOS Andrade Letter, July 25, 2011           252

6

1    R-5  Senator Ellis Letter, Oct. 27, 2011        259
2    R-6  Senate Journal, March 18, 2009             264
3    R-7  E-Mail Chain, Sept. 15, 2011               266
4    R-8  McGeehan Letter, Sept. 7, 2011             268
5    R-9  McGeehan Letter, Oct. 4, 2011              272
6    R-10 McGeehan Letter, Oct. 27, 2011             274
7    R-11 SOS Letter, Jan. 6, 2012                   279
8    R-12 SOS Letter, Jan. 12, 2012                  279
9    R-13 HAVA Request For Proposal Number 12111     288
10   R-14 Eligibility for Election Identification    291
         Certificate
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

7

1            ANN McGEEHAN,
2    having been first duly sworn to testify the truth, the
3    whole truth, and nothing but the truth, testified as
4    follows:
5            EXAMINATION
6    BY MS. WESTFALL:
7        Q.  Good morning, Ms. McGeehan.  How are you?
8        A.  Good.
9        Q.  Could you state and spell your name for the
10   record, please?
11       A.  Ann McGeehan, A-n-n, M-c-G-e-e-h-a-n.
12       Q.  Thank you.  My name is Elizabeth Westfall.  I
13   represent the Attorney General in this action.
14           I'm going to allow others around the table
15   to introduce themselves.
16           MR. FREEMAN:  Dan Freeman on behalf of the
17   Attorney General.
18           MS. RIOS:  Maria H. Rios on behalf of the
19   Attorney General.
20           MS. PERALES:  Nina Perales with MALDEF.
21           MS. LOPEZ:  Janine Lopez with MALDEF.
22           MR. FIGUEROA:  Luis Figueroa with MALDEF.
23           MR. HARRIS:  I'm Adam Harris with Fried,
24   Frank, Harris, Shiver & Jacobson, LLP, on behalf of
25   Defendant Intervenor Texas League of Young Voter

8

1    Education Fund, and with me is law clerk Brian Chen.
2            MR. IBARRA:  Juan Carlos Ibarra with the
3    Advancement Project.
4            MR. DYER:  I'm Jay Dyer with the State of
5    Texas.
6            MR. MORTARA:  Adam Mortara for the State
7    of Texas and the witness.
8        Q.  (By Ms. Westfall) Ms. McGeehan, have you had
9    your deposition taken before?
10       A.  Yes.
11       Q.  So I'm going to go through some ground rules
12   just in case you have forgotten the grounds rules for
13   having your deposition taken.
14       A.  Okay.
15       Q.  You're here to testify today truthfully,
16   accurately, and completely.  The court reporter will
17   prepare a transcript of everything that is said today,
18   so you must listen for me to ask my question and wait
19   for me to ask my question before you give your answer.
20   Okay?
21       A.  Uh-huh.
22       Q.  And because there is a transcription of this
23   deposition, please don't say "uh-huh," "nuh-uh" or shake
24   your head.
25       A.  Yes.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Ann McGeehan

May 31, 2012

## 9

1    Q.   Otherwise, it will be difficult to read it on
2  the transcript.  Okay?
3    A.   Yes.
4    Q.   I will try to ask you clear questions, but if
5  you don't understand a question that I ask, please ask
6  me for an explanation.  Okay?
7    A.   Uh-huh, yes.
8    Q.   If you wish to stop and take a break, that's
9  fine, but if I have a question pending, I'd ask that you
10  go ahead and answer it first before you take a break.
11  All right?
12    A.   Okay.
13    Q.   You understand that you're oath, and you may be
14  subject to penalty of perjury for giving false or
15  misleading testimony today?
16    A.   Yes.
17    Q.   And do you understand these instructions?
18    A.   Yes.
19    Q.   Are you on any medication today that would
20  affect your ability to testify truthfully?
21    A.   No.
22    Q.   Is there any reason why you can't testify
23  truthfully and accurately today?
24    A.   No.
25    Q.   During this deposition, I may use the terms

## 10

1  voter ID and photo ID interchangeably.  I want you to
2  interpret them broadly to mean a requirement that a
3  voter present a form of identification, whether it has a
4  photo on them or otherwise, when voting in person before
5  being able to vote by regular ballot.  Is that okay?
6    A.   Well, that may be confusing, as far as current
7  law, as far as what identification.  When you use that
8  term, are you talking about what's required under the SB
9  14 or what was required before?
10    Q.   I will try to be as precise as possible, but I
11  may say photo ID when, in fact, it's a voter ID that is
12  not necessarily requiring photo form of identification.
13  I will try to be precise, and if you're confused about
14  my question, please ask me, and I'll clarify.
15    A.   Okay.
16    Q.   But I may use the terms interchangeably, and I
17  just want you to interpret them broadly, okay?
18    A.   Okay.
19    Q.   Great.  When I refer to the Division, I will be
20  referring to the Election Division of the Secretary of
21  State for Texas, okay?
22    A.   Okay.
23    Q.   And if I refer to the Secretary of State, I
24  mean the Secretary of State for the state of Texas,
25  okay?

## 11

1    A.   Right.
2    Q.   When I also refer to the term minority voters,
3  I'm going to be referring to voters who are not White or
4  not Anglo.  Do you understand?
5    A.   Okay.
6    Q.   Great.  Are you represented by counsel today?
7    A.   Yes.
8    Q.   Who is that?
9    A.   Adam Motara.
10    Q.   How many times have you been deposed before?
11    A.   Multiple times.
12    Q.   Okay.
13    A.   Yeah.  I can't remember exactly.
14    Q.   Were any of them in your professional capacity?
15    A.   All of them were in my professional, when I was
16  at the Secretary of State's Office.
17    Q.   Very good.  Have you testified in court before?
18    A.   Yes.
19    Q.   How many times?
20    A.   Multiple times.
21    Q.   And were these all election cases you were
22  involved in?
23    A.   Yes.
24    Q.   When were you most recently deposed?
25    A.   Let me see.  I need to think about that for a

## 12

1  second.  I don't -- probably in 2008, in May of 2008, on
2  a lawsuit against the Secretary of State and the State
3  of Texas, Ray versus the State of Texas.
4    Q.   Great.  And was that a state court matter?
5    A.   It was federal.
6    Q.   Okay.  Very good.
7        What did you do to prepare for your
8  deposition today?
9    A.   I had two meetings with Adam Mortara and Jay
10  Dyer to generally discuss the deposition.
11    Q.   Who was present in that meeting besides those
12  two gentlemen and yourself?
13    A.   Just those two people.
14    Q.   Did you review any documents in advance of this
15  deposition?
16        MR. MORTARA:  You can answer that question
17  yes or no.
18    A.   Yes.
19    Q.   (By Ms. Westfall) Could you tell me the general
20  nature of the documents.
21        MR. MORTARA:  Don't answer that question.
22        MS. WESTFALL:  Are you instructing the
23  witness not to answer based on privilege?
24        MR. MORTARA:  Yes.
25        MS. WESTFALL:  Because I'm trying to ask



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 13

1  questions about a privilege log, Mr. Mortara.
2           MR. MORTARA:  Yes.  I am instructing the
3  witness not to answer the question.
4        Q.  (By Ms. Westfall) Other than your attorneys,
5  did you speak with anyone about your deposition today?
6        A.  Only to inform my current employers that I'd be
7  out.
8        Q.  Did you bring any notes or documents with you
9  today?
10       A.  No.
11       Q.  Can you tell me where you went to college?
12       A.  University of Texas at Austin.
13       Q.  What year did you graduate?
14       A.  '86.
15       Q.  And did you get any education after that time?
16       A.  I went to law school and graduated in August of
17  '88, U.T. law School.
18       Q.  Thank you.  Are you licensed to practice law?
19       A.  Yes.
20       Q.  Where are you licensed?
21       A.  Texas.  Only Texas.
22       Q.  Could you tell me your first job out of law
23  school?
24       A.  I worked for a solo practitioner attorney in
25  Houston, Ernest Ortiz, for about a year.

## 14

1        Q.  Did you find employment after that time?
2        A.  Yes.  I went from there to the Secretary of
3  State's Office in September of '89.
4        Q.  When you were working for that practitioner,
5  did you do any election law?
6        A.  No.
7        Q.  And what was your first position with the
8  Elections Division?
9        A.  I was a staff attorney.
10       Q.  What year did you have that -- did you start
11  that position?
12       A.  September of 1989.
13       Q.  What were your responsibilities in that
14  position?
15       A.  We provided legal advice to election officials
16  across the state.  There's a toll free number.  We
17  provided advice via phone, letter.  We prepared
18  submissions to the Justice Department, presented at
19  conferences to educate Election officials.
20       Q.  What was your role in preparing submissions to
21  the Justice Department?
22       A.  As a staff attorney, I would do the initial
23  draft, and then it would go up for review.  I didn't
24  sign those.
25       Q.  When is the last time you voted?

## 15

1        A.  The May 12th city election.
2        Q.  Did you vote in person?
3        A.  Yes.
4        Q.  How far is your polling place from your house?
5        A.  Maybe a mile.
6        Q.  Do you usually vote in person?
7        A.  Yes.
8        Q.  Have you ever witnessed anyone try to
9  impersonate another voter while you have been voting?
10       A.  No.
11       Q.  Have you ever witnessed a noncitizen voting
12  while you've been voting?
13       A.  Not that I'm aware of.
14       Q.  Have you ever challenged a voter's eligibility
15  to vote?
16       A.  No.
17       Q.  Is there a time when you were promoted in the
18  Elections Division after you had the staff attorney
19  position?
20       A.  Yes.
21       Q.  When was that?
22       A.  In July of 1991, I was promoted to director of
23  the Legal section.
24       Q.  Could you describe your responsibilities in
25  that capacity?

## 16

1        A.  I managed the attorneys, which there were
2  between, you know, five and seven attorneys there.  And
3  was, you know, in charge of the submissions, most of the
4  written correspondence that came out of the Legal
5  Division or the Elections Division itself.  I was
6  responsible for testifying at legislative committees,
7  assisting with any litigation, things of that nature.
8        Q.  Were you ultimately responsible for all
9  submissions that were submitted pursuant to Section 5 of
10  the Voting Rights Act?
11       A.  Not as the legal director, because those were
12  signed by the director of the Elections Division.  But
13  we prepared them to -- you know, for his signature.
14       Q.  But you didn't -- you weren't responsible for
15  certain types of submissions; is that right?  You were
16  responsible for all submissions?
17       A.  Right.
18       Q.  Could you describe your particular specific
19  role as legal director as it pertained to submissions
20  under Section 5?
21       A.  Well, it was my responsibility to ensure that
22  we had a process set up to identify all the bills that
23  would require submission, to assign them, and then make
24  sure they were done timely.
25       Q.  Did you have any other responsibilities in



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 17

1   addition to testifying in Section 5 submissions in your
2   role as legal director?
3        A.   Yeah.  I mean, the Legal section provided legal
4   advice to all divisions, so, you know, distributing
5   election funds.  The division distributed state funds.
6   Then later on, we distributed federal funds.  Voter
7   registration issues.  Primary finance issues.  Basically
8   providing legal advice for all the different divisions
9   within the sections within the Elections Division.
10       Q.   And what are the other sections within the
11  Elections Division?
12       A.   They were voter registration, special projects,
13  which I guess would include voter education, election
14  night returns, canvassing, election administration,
15  designing forms, election inspectors, sending out
16  election inspectors to the field, and then the election
17  funds management section, which is sending out state
18  funds to local election officials.
19       Q.   And what percentage of your time as legal
20  director, while you were legal director, was spent on
21  Section 5 submissions?
22       A.   Well, you know, it totally followed the pattern
23  of legislation, so in an odd-numbered year, the summer
24  months, would be heavy, and it usually would, you know,
25  dribble into the fall as well.

## 18

1        Q.   Did you assist, as legal director, in
2   developing election bills in state legislature?
3        A.   I wouldn't say we assisted, you know, because
4   we are not a legislative body.  But we would serve as a
5   resource, so if questions came up.  Generally, someone
6   from our office would attend every House Elections
7   Committee meeting as a resource, and then also for any
8   election-related bills that would come up in Senate
9   State Affairs, we would usually have a witness there to
10  be available as a resource.
11       Q.   What was your role with regard to those
12  activities?
13       A.   My role would be to make sure that we had
14  somebody, either myself or somebody else, at one of
15  those hearings.
16       Q.   Was it often you --
17       A.   Yes.
18       Q.   -- who attended?  How often would you attend as
19  opposed to a staff person?
20       A.   Well, now, I was only legal director for -- I
21  was legal director from 1991 to 1995, so -- and it was
22  1991 after the legislative session, so it was just two
23  legislative sessions, '93 and '95.  And so in that time,
24  it was maybe me half of the time, our director of
25  elections maybe another quarter of the time, and then

## 19

1   our director of election administration another quarter
2   of the time.  Something like that.
3        Q.   Who was the election director at that time?
4        A.   Tom Harrison.
5        Q.   Did you, in that capacity as legal director,
6   also development legislative priorities for the
7   Division?
8        A.   No.  Now, depending on the Secretary of State
9   in office, sometimes certain Secretaries would ask for
10  ideas, more from a policy point of view, and then the
11  Secretary would vet that.  That would be sort of one
12  approach.  Then also, the chair of the House Elections
13  Committee would also contact us sometimes and say do you
14  all have any clean-up legislation that you recommend?
15  Anything we can do to make things work better.  And so
16  we would also develop the list of clean-up legislation.
17  But as the legal director, that was channeled more
18  through Tom Harrison, the director then.
19       Q.   Thank you.
20            Was there a time that you were promoted
21  from legal director to another position in the Division?
22       A.   Yes.  In September of 1995, I was promoted to
23  director of the Elections Division.
24       Q.   Could you describe, generally, those
25  responsibilities?

## 20

1        A.   Those responsibilities were, you know,
2   basically being in charge of the entire division and
3   making sure that all of the sections that I mentioned
4   before were, you know, operating as they should.
5            The big change, I guess, is that I had
6   more direct contact with our executive staff, with the
7   Secretary directly and Assistant Secretary general
8   counsel.
9        Q.   Who did you report to directly in that
10  position?
11       A.   There would be changes through different
12  administrations.  Every administration has a different
13  style.  Generally, I would report to the Secretary and
14  the Assistant Secretary.
15       Q.   How many staff people did you have under you?
16       A.   Between, you know, through the years, probably
17  between 30 and 38.
18       Q.   And did your role include preparing submissions
19  under Section 5 of the Voting Rights Act?
20       A.   Yes.  I mean, I oversaw that process.  Again,
21  they originated through the Legal Division, but
22  ultimately, they came through me, and I would read them
23  and sign them.
24       Q.   Did you review every single one that was
25  submitted to the Justice Department?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Ann McGeehan

May 31, 2012

## 21

1    A.   If I signed it, I did.  I was out on maternity
2  leave a couple of times, things like that.  But overall,
3  most of them, I did.
4    Q.   Could you describe your other responsibilities,
5  besides advising the Division, supervising staff,
6  reviewing Section 5 submissions, as Election Division
7  director.
8    A.   I monitored legislation closely.  You know, I
9  had various folks tracking bills and writing up bill
10  analyses.  I would read those.  Again, I was sort of the
11  point of contact for legislative matters, as far as
12  being a witness at committee hearings.
13        I would be the point of contact on any
14  election-related litigation.  I work closely with our
15  Legal Division to prepare memoranda to counties
16  instructing on new laws, and then also was responsible
17  for coordinating any -- for instance, if a law passed
18  that gave the Secretary of State new duties or we had to
19  adopt a rule, I would be in charge of kind of
20  coordinating that effort.
21    Q.   Thank you.  So you develop legislative
22  priorities for the Election Division?
23    A.   No.  I mean -- you know, as I said before, we
24  didn't -- we're not a legislative body, so if we were
25  asked, we would provide a list of clean-up legislation.

## 22

1  If the Secretary of State asked for advice on possible
2  policy, which didn't happen very much, but then we could
3  give the Secretary of State ideas on policy changes.
4    Q.   Was the Secretary of State the entity that
5  promoted an affirmative legislative agenda regarding
6  election bills with the Legislature?
7    A.   Yes, but that depended on the Secretary and
8  whether they wanted to or not.
9    Q.   Would you support the Secretary of State in
10  creating that legislative agenda if did it occur?
11    A.   If they asked for our advice.
12    Q.   But otherwise, is it your testimony today that
13  the Election Division did not have an affirmative
14  legislative agenda?
15    A.   Correct.  We don't.
16    Q.   And by clean-up legislation, you mean sort of
17  technical corrections --
18    A.   Yes.
19    Q.   -- to the election code are the types of things
20  you would provide --
21    A.   Right.
22    Q.   -- to the Legislature; is that correct?
23    A.   Correct.  Correct.
24    Q.   Thank you.  When it did occur that the
25  Secretary of State asked the Elections Division for

## 23

1  guidance or thoughts on policy, did you consult with any
2  other offices or branches of the Executive Branch in
3  developing policy thoughts on election law?
4    A.   The Legislature didn't usually the contact us
5  directly on policy issues.
6    Q.   But if the Secretary of State was developing a
7  legislative agenda and sought your input, would you, in
8  turn, for example, seek suggestion or guidance from the
9  Governor's Office?
10    A.   No.
11    Q.   Or would you seek any suggestion or guidance
12  from the Lieutenant Governor's office?
13    A.   No.
14    Q.   Were there times when any of the technical
15  corrections that the Elections Division wanted to
16  advance with the Legislature would conflict with
17  legislation that the Secretary of State wanted to
18  advance?
19    A.   No.
20    Q.   Were the interests usually aligned?
21    A.   It was very -- and it hasn't happened
22  recently.  It was fairly rare for a Secretary of State
23  to be, sort of, proactive on the policy side.
24    Q.   When did that last happen?
25    A.   I think it was Tony Garza in -- which was -- he

## 24

1  left in '97.
2    Q.   And in your role as a director of the Elections
3  Division, were you ever called to testify before the
4  State Legislature?
5    A.   Yes.
6    Q.   Were you called as a resource witness?
7    A.   Yes.
8    Q.   Were you always called as a resource witness?
9    A.   Yes.
10    Q.   Did you ever come to the testify for or against
11  any legislation while you served?
12    A.   No.  I always checked the "Resource Only" box.
13    Q.   What committees did you testify before in the
14  State Legislature?
15    A.   The House Elections Committee, Senate State
16  Affairs, and then occasionally another committee, like
17  the House Committee on Veterans Affairs.  There may have
18  been another Senate committee, but that would be the
19  exception to the rule.
20    Q.   Was it ordinary, in your experience, for either
21  the House Elections Committee or the Senate State
22  Affairs Committee to, to not seek the Division's advice
23  or thoughts or input on election bills, or would they
24  ordinarily seek the advice of the Elections Division on
25  bills?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 25

1    A.  Before they were filed?
2    Q.  Either before or during.  Let's start with
3  before.
4          MR. MORTARA:  I want to caution the
5  witness not to disclose communications with any
6  particular legislators.  You can answer the question
7  generally.
8          MS. WESTFALL:  Are you asserting a
9  privilege in that regard, Mr. Mortara?
10         MR. MORTARA:  Legislative privilege.
11         MS. WESTFALL:  I believe the court ruled,
12 on May 28th, that any communications that an agency has
13 or information that is provided to a legislator is not
14 privileged.  Are we in disagreement with that?
15         MR. MORTARA:  The information is not
16 privileged.  Who it was provided to, when it was
17 provided, and what information was provided to what
18 legislator is.
19         MS. WESTFALL:  I strongly -- I take strong
20 issue with that and disagree.  And there are many
21 rulings, which I have before me, in which the court has
22 indicated and ordered Texas to allow the United States
23 to examine witnesses to create -- on foundational
24 questions and to create a privilege log, so...
25         MR. MORTARA:  I'm not changing my

## 26

1  instruction.  You can answer the question generally.  Do
2  not answer it with respect to specific legislators.
3          And with me, a list of legislators of
4  Texas we believe have waived legislative privilege, and
5  if you want, we can mark it, and she can answer the
6  question with respect to those that have waived.
7          MS. WESTFALL:  We may have to -- I will
8  consider whether we're going to have -- we're going to
9  keep going for now on the record and do an examination.
10         We may need to suspend this and call the
11 court, because I have in front of me a bunch of orders
12 allowing me to ask foundational questions.  And I think
13 -- I would ask that you reconsider your instruction to
14 your witness.  Is there a response, Mr. Mortara?
15         MR. MORTARA:  No.
16         THE WITNESS:  Can you restate the
17 question, please?
18         MS. WESTFALL:  Why don't we have the court
19 reporter read back, please, since we had an extensive
20 colloquy.
21         (Requested portion read back by the court
22 reporter.)
23    A.  Generally, not before.  Generally, bills were
24 filed and nobody would, you know, run them through our
25 office.  There are probably a few exceptions to that,

## 27

1  but generally not.
2    Q.  (By Ms. Westfall) Do you remember any of the
3  exceptions in which they contacted the Division before
4  filing an election bill?
5          MR. MORTARA:  You can answer this question
6  with the subject matter of the bill or the specific
7  bill, if you recollect a specific bill, but no more.
8    A.  I'm trying to remember.  They were usually
9  small, technical bills, and I'm trying to think.  One
10 that I can recall related to when the early voting
11 ballot board could convene, and there was a desire to
12 let them start earlier so that they could get their work
13 done before election day.
14    Q.  (By Ms. Westfall) Why did they contact you in
15 that instance before they filed?
16    A.  I think that the sponsor was trying to make
17 sure that it didn't conflict with any other laws in the
18 election code and the timings.
19    Q.  When did that occur?
20    A.  That was probably maybe five or seven years
21 ago.  Generally, not.
22    Q.  And was it your experience that when an
23 election bill was filed, that the sponsor of the
24 committee usually contacted the Division to seek
25 guidance or input on the bill?

## 28

1          MR. MORTARA:  You can answer that question
2  yes or no.
3    A.  No.  Generally, no.
4          MS. WESTFALL:  Mr. Mortara, are you going
5  to be instructing the witness on how to answer my
6  questions moving forward, because that is not a
7  privilege issue.  You're directing her --
8          MR. MORTARA:  It is a privilege issue.
9          MS. WESTFALL:  You're directing her to
10 answer yes or no, and I'm asking:  Are you interfering
11 with my examination today, because I'm going to make my
12 record on this issue.
13         MR. MORTARA:  It's a privilege issue,
14 Ms. Westfall.
15         MS. WESTFALL:  Then assert the privilege.
16 Then assert the privilege.  Go ahead and make a speech.
17         MR. MORTARA:  You can answer that question
18 yes or no because of legislative privilege.
19         MS. WESTFALL:  It's answered, so let me go
20 on to my next question.
21    Q.  (By Ms. Westfall) Do you have an attorney-
22 client relationship with anyone in the government, while
23 you were employed with the Division?
24    A.  Yes.  When I was at the Elections Division, I
25 was -- well, while I was director of the Legal Section,



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

| 29 | 31 |
|---|---|
| 1  I think I had the attorney-client privilege.  As | 1  the Elections Division? |
| 2  director of the Elections Division, my legal advice to | 2      A.  Yes. |
| 3  the Secretary and the Executive Division would be | 3      Q.  When was that? |
| 4  considered privileged. | 4      A.  That was in November of 2011, last November. |
| 5      Q.  And who exactly were your clients?  You said | 5      Q.  What prompted that decision? |
| 6  the Secretary of State, and anyone else? | 6      A.  I was offered another job at the Texas County |
| 7      A.  Secretary of State, Deputy Secretary of State | 7  District Retirement System. |
| 8  or assistant.  That title has changed through the years, | 8      Q.  Did you play any role in selecting your |
| 9  but the number two person.  General counsel.  That's | 9  successor as the head of the Division? |
| 10  sort of the general folks in our Executive Division. | 10      A.  No. |
| 11      Q.  And did this relationship cover all -- | 11      Q.  And what is your title now at the retirement |
| 12      A.  Communications director, I guess, too.  Sorry. | 12  system? |
| 13      Q.  The communications director was also a client? | 13      A.  I'm Assistant General Counsel. |
| 14      A.  I would -- I would think that -- sometimes they | 14      Q.  Is that a state agency? |
| 15  would all be together in a meeting, so I would think | 15      A.  They're not a state agency.  They're a |
| 16  they would -- my conversations would be privileged as | 16  governmental body created by the State Legislature.  I'm |
| 17  well. | 17  still figuring out what rules they fall under. |
| 18      Q.  Were you an attorney -- or did you have that | 18      Q.  What are your responsibilities as assistant |
| 19  relationship in all aspects of your employment and | 19  general counsel? |
| 20  interactions with the Secretary of State, Deputy | 20      A.  I'm responsible for providing general legal |
| 21  Secretary of State, general counsel, or were there | 21  advice on, really, all matters affecting the system, |
| 22  certain aspects of your relationship and | 22  including administration of the benefits, open records |
| 23  responsibilities for those individuals that were not | 23  issues, open meetings issues, personnel issues, getting |
| 24  attorney-client protected communications, in your view? | 24  into federal tax issues, because we're very much |
| 25      A.  Sometimes, it's to hard to draw that line, but | 25  regulated by the Internal Revenue Code. |

| 30 | 32 |
|---|---|
| 1  obviously, a lot of what I did was administrative as | 1      Q.  How many staff do you have? |
| 2  well, so... | 2      A.  I don't oversee any staff. |
| 3      Q.  And how did you differentiate between the times | 3      Q.  Who do you report to? |
| 4  when you were providing attorney-client advice to those | 4      A.  I report to Tom Harrison, who is the general |
| 5  individuals and when you were not, in your mind? | 5  counsel there. |
| 6      A.  I don't know that I actually made a conscious | 6      Q.  And why did you take this position? |
| 7  decision at the time, you know. | 7      A.  It was -- it was a good opportunity.  Tom |
| 8      Q.  Did you have an attorney-client relationship | 8  Harrison contacted me.  He is looking to retire, and he |
| 9  with state legislators? | 9  contacted me and it would be -- it was a real good fit, |
| 10      A.  I don't think so. | 10  so it was a good opportunity. |
| 11      Q.  Did you -- | 11      Q.  Do you remain in contact with the Elections |
| 12      A.  I'm not a litigation attorney, so... | 12  Division? |
| 13      Q.  Did you have an attorney-client relationship | 13      A.  Occasionally.  I sent them a note, to a few |
| 14  with county election officials? | 14  folks to wish them well on Tuesday, but nothing major. |
| 15      A.  No. | 15      Q.  Are you -- who in touch -- who are you in touch |
| 16      Q.  Did you have an attorney-client relationship | 16  with at the Division still? |
| 17  with the Department of Public Safety? | 17      A.  I occasionally talk to Elizabeth Winn, who's |
| 18      A.  No. | 18  the legal director, not very much.  Melanie Best, who's |
| 19      Q.  Did you have an attorney-client relationship | 19  a staff attorney.  Melanie Best, B-e-s-t.  Dan Glotzer. |
| 20  with the Governor's office? | 20  I speak with the secretary from time to time, Hope |
| 21      A.  I don't think so. | 21  Andrade, and then several folks -- that -- that's |
| 22      Q.  You have an attorney-client relationship with | 22  probably about it. |
| 23  the Lieutenant Governor's Office? | 23      Q.  Are you asserting any privileges today? |
| 24      A.  No. | 24      A.  I am asserting privileges on any legal advice I |
| 25      Q.  Is there a time when you stopped working for | 25  may have given the Secretary or the Secretary executive |



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

33

1  staff, and then any legislative privileges that members
2  of the Legislature have asserted, I follow those.
3      Q.  When did you first start -- strike that.
4          When did you first discuss asserting
5  privileges in this litigation?
6          MR. MORTARA:  Don't answer that question.
7  Attorney-client privilege.
8          MS. WESTFALL:  When?
9          MR. MORTARA:  Yeah, because it presumes
10  that she discussed it.
11      Q.  (By Ms. Westfall) Did you discuss asserting
12  privileges in this litigation?
13          MR. MORTARA:  Don't answer that question.
14  Attorney-client privilege.
15      Q.  (By Ms. Westfall) Are you asserting attorney-
16  client privilege with anyone other than the Secretary of
17  State, the Assistant Secretary of State, the general
18  counsel?  Is that the full list?
19      A.  I believe so.
20          MR. MORTARA:  For the witness's benefit,
21  the Office the Attorney General is representing you for
22  purposes of this case, and you have an attorney-client
23  relationship with the Office of Attorney General.
24          MS. WESTFALL:  Could you please mark this
25  as U.S. 280.

34

1          (Exhibit 280 marked for identification)
2      Q.  (By Ms. Westfall) You have been handed what's
3  been marked U.S. 280.
4          We, unfortunately, only have one copy for
5  the Defendant Intervenors, or two?  Great.  Thank you.
6          Do you recognize this?
7      A.  No.
8      Q.  I will assert to you -- and I'm sure your
9  counsel will not disagree -- that this is the privilege
10  log that has been produced in this litigation, and it is
11  an excerpt of several copies -- several pages pertaining
12  to the Secretary of State's privilege log that was
13  produced on May 11th, by the State of Texas.
14          MR. MORTARA:  Elizabeth, just for the
15  record, is this the most recent one?  I know they've
16  been --
17          MS. WESTFALL:  No, it's not.  No, it's
18  not.  It's --
19          MR. MORTARA:  Do you know if the most
20  recent one has changed the entries you're about to
21  discuss with Ms. McGeehan?
22          MS. WESTFALL:  No, it has not.  There have
23  been -- they've been produced the seriatim.
24      Q.  (By Ms. Westfall) So this is selected pages,
25  and I'm going to direct your attention to some of the

35

1  pages, and just ask you a few questions about it.
2          Turning your attention to Page 298, which
3  is three pages in Exhibit 280, do you see at the top
4  of the page, the second entry down, it indicates a
5  communication when Ms. Elizabeth Winn and Skipper
6  Wallace?
7      A.  Uh-huh, yes.
8      Q.  And do you see that it indicates basis for
9  withholding attorney-client privilege?
10      A.  Yes.
11      Q.  Who is Skipper Wallace?
12      A.  Skipper Wallace is the -- at one time, he was
13  the legislative coordinator for the state Republican
14  Party, and he's also a county chair.
15      Q.  And to your knowledge, does he have an
16  attorney-client relationship with Ms. Winn?
17      A.  Not to my knowledge.
18      Q.  And turning to your attention to the bottom of
19  the page, the last entry, Texas 00019424.  Do you see
20  that entry?
21      A.  Yes.
22      Q.  And do you see that you are listed as the
23  author of that document?
24      A.  Yes.
25      Q.  Do you remember this document?

36

1      A.  No, not -- I don't know which it would be.
2      Q.  Could you tell me who Matt Creel is?
3      A.  Matt Creel, he's a legislative staffer for
4  Representative Van Taylor.
5      Q.  And who was John Sepehri?
6      A.  John Sepehri was our general counsel -- was the
7  Secretary of State general counsel for several years.
8      Q.  Turning your attention to the next page, 299,
9  in Exhibit 290, do you see the first entry, Texas
10  00019425?
11      A.  Yes.
12      Q.  And do you see it lists you as the author?
13      A.  Yes.
14      Q.  And Secretary of State Wilson; is that correct?
15      A.  Yes.
16      Q.  Was this also sent to anyone in the Department
17  of Public Safety?
18      A.  I'll not recollecting what this is.  Internal
19  DPS memo to Secretary of State, from SOS attorney
20  regarding voter registration file maintenance.  I'm
21  sorry.  What was your question?
22      Q.  Do you recall whether this was sent to the
23  Department of Public Safety?  They're a recipient, or
24  were they copied or --
25      A.  I don't think so, but I'm not entirely sure



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Ann McGeehan                                                              May 31, 2012

## 37

1   what it is.  But if it's what I think it is, it was not
2   sent to DPS.
3        Q.  Thank you.  And two entries down at Texas
4   00019433, do you see that entry?
5        A.  Yes.
6        Q.  And do you see it's a communication from you to
7   the voter registrars, elections administrators and
8   county clerks?
9        A.  Yes.
10       Q.  And I believe it was your testimony earlier
11  that you do not have an attorney-client relationship
12  with any of those individuals; is that correct?
13       A.  That's my understanding.
14       Q.  Turning your attention to Page 419 of
15  Exhibit 280, which a few pages in.  Do you see the top
16  entry at Texas 00030611?
17       A.  Yes.
18       Q.  And do you see you are the author of a document
19  that went to Kathleen Murphy and others?
20       A.  Yes.
21       Q.  Who is Kathleen Murphy?
22       A.  She's an attorney at DPS.
23       Q.  Who is Phillip Adkins?
24       A.  He's the general counsel at DPS.
25       Q.  And who is Duncan Fox?

## 38

1        A.  He's an attorney at DPS.
2        Q.  And likewise, is it your understanding that you
3   do not have an attorney-client relationship with these
4   individuals at DPS?
5        A.  I don't think so.
6        Q.  Turning your attention to Page 465 of this
7   document, do you see two entries down at Texas 00039547?
8        A.  Yes.
9        Q.  There is another document in which you were
10  listed as the author to the same individuals at DPS?
11       A.  Yes.
12       Q.  And likewise, is it your understanding that you
13  do not have an attorney-client relationship with
14  individuals at DPS as to this document?
15       A.  That's my understanding.
16       Q.  Thank you.
17       A.  But to be honest, I don't know if they can
18  assert that as -- but anyway, that's my understanding.
19       Q.  Thank you for your testimony.
20       MS. WESTFALL:  Could you mark this as
21  Exhibit U.S. 281.
22       (Exhibit 281 marked for identification.)
23       Q.  (By Mr. Sells)  You have been handed what's been
24  marked U.S. 281.  Do you recognize this document?
25       A.  No.

## 39

1        Q.  I will assert to you that it is a supplemented
2   privilege log submitted that was produced in this
3   litigation the State of Texas on May 21st, pertaining to
4   e-mail.
5        Could I direct your attention to -- and
6   it's excerpted a number of pages.  But could I turn your
7   attention to the second page of Exhibit 281, which is
8   page 25 of the log.  And if you look at the last entry
9   at Texas 00078190, do you see that?
10       A.  Yes.
11       Q.  Do you see that it lists you as the author of a
12  document?
13       A.  Yes.
14       Q.  Do you remember this document?
15       A.  No.
16       Q.  Who was Steve Schar?
17       A.  He was the clerk of the House Elections
18  Committee.
19       Q.  Did he work for Mr. Bonnen?
20       A.  In 2009, he did not.  He was -- he worked for
21  Chairman Smith.
22       Q.  And is it your understanding that you do not
23  have an attorney-client relationship with Mr. Schar?
24       A.  Right.  But I would with John Sepehri.  Yeah.
25       Q.  Turning your attention to Page 387 of this

## 40

1   document, the second entry down, do you see Texas
2   00092554?
3        A.  Yes.
4        Q.  Who is Amber Hausenfluck?
5        A.  She is a legislative staffer for Senator Van de
6   Putte.
7        Q.  And Senator Van de Putte was an opponent of
8   Senate Bill 14; is that correct?
9        A.  I think so.
10       Q.  Turning your attention to Page 419 of Exhibit
11  281, two up from the bottom, do you see Texas 00097288?
12       A.  Yes.
13       Q.  And do you see it does not list an author?
14       A.  Yes.
15       Q.  Do you recall seeing this document?  Are you
16  familiar with this document based on the description
17  here in this log?
18       A.  Correspondence from Secretary of State Andrade
19  and Deputy Shorter to legislators regarding voter ID
20  questions.  I am not sure.  I mean, I am not sure,
21  because I don't know what date -- I'm not sure what that
22  would be.
23       Q.  Thank you.  Turning your attention to Page 540
24  of this document, do you see Texas 00107677?
25       A.  Yes.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 41

1  Q. Could you take a look at this entry and let me
2  know when you've read the description.
3  A. (Reading documents.) Okay. I've looked at it.
4  Q. Do you recall which legislators made this
5  request?
6  MR. MORTARA: Just one second. You may
7  answer that question if the legislator's name appears on
8  this list that I am handing you of legislators that have
9  waived legislative privilege. And you may not answer
10  that question if the legislator's name does not appear
11  on that list. And the basis is legislative privilege.
12  A. And your question was who --
13  MR. MORTARA: Actually, withdrawn. You
14  may answer that question. You may answer that question.
15  You may answer that question irrespective of the
16  legislator. And I withdraw the objection. I'm sorry,
17  Ms. McGeehan.
18  THE WITNESS: Okay.
19  A. My recollection is that -- and your question is
20  what? I'm sorry.
21  Q. (By Mr. Sells) Which legislator requested
22  advice referenced in this entry?
23  A. Okay. My recollection was that this came out
24  of a question that was asked during the Senate hearing
25  on Senate Bill 14, and I think it was Senator Williams.

## 42

1  It might have been Senator Fraser. But one of the two
2  of them asked the question.
3  Q. Thank you.
4  MS. WESTFALL: Mr. Mortara, what is that
5  document that you handed the witness?
6  MR. MORTARA: If you want to mark it, we
7  can. It is our best efforts to assemble a list of
8  legislators that have waived privilege.
9  MS. WESTFALL: Okay. No, I don't want to
10  mark it.
11  MR. MORTARA: For the purposes of giving
12  Ms. McGeehan a guide, when you ask questions did a --
13  for instance, if you ask a question, did a legislator
14  ask you how many voters lacked identification, she can
15  answer that question with respect to some and not
16  others, and this is our best effort to get that
17  information into an easy way, versus me repeating a long
18  objection. So for purposes of the record, I'll just
19  read the list into the record and take one minute.
20  Alvarado, Anchia, Chisum, Davis, Dukes,
21  Dutton, Eiland, Ellis, Gallego, Harper-Brown, Hartnett,
22  Hinojosa, Hochberg, Lucio, Martinez, Martinez-Fischer,
23  Naishtat, Strama, Turner, Van de Putte, Veasey, Vo,
24  Walle, West, Zaffirini.
25  MS. WESTFALL: Is it your understanding

## 43

1  that these individuals have waived? Have they invoked
2  privilege? What are you asserting this list is?
3  MR. MORTARA: Waived. These are the
4  individuals that have waived privilege.
5  MS. WESTFALL: And is it your position
6  that you need not affirmatively invoke privilege with
7  regard to legislative privilege?
8  MR. MORTARA: It is the legislator's
9  privilege to waive; and therefore, if the State of Texas
10  is not aware that the legislator has waived privilege,
11  then Ms. McGeehan cannot waive it for the legislator,
12  and I will instruct her not to answer.
13  If counsel, anybody, has information that
14  another legislator has waived privilege and can produce
15  that in writing, we can add that legislator's name to
16  the list. We, by no means, necessarily think the list
17  is exhaustive with respect to all legislators' intent.
18  This is what we could confirm in writing.
19  MS. WESTFALL: All right. We'll discuss
20  that at a break, Mr. Mortara.
21  Q. (By Ms. Westfall) Ms. McGeehan, are you
22  familiar with Section 5 of the Voting Rights Act?
23  A. Yes.
24  Q. What is your understanding of Section 5's
25  requirements?

## 44

1  A. That any change impacting voting needs to be
2  precleared by the Justice Department or precleared by
3  the District Court in Columbia before it can be
4  implemented in Texas.
5  Q. What is your understanding of the legal
6  requirement involved in preclearance? What's the
7  standard?
8  A. That the state has to show that it's not going
9  to have a disparate impact on minority voters.
10  Q. Is there any other requirement under Section 5?
11  A. I believe also that there was no intent to
12  discriminate against minority voters.
13  Q. Could you tell me what type of voting changes
14  Section 5 applies to?
15  A. Just everything.
16  Q. It certainly applies to more voting changes
17  than just redistricting; isn't that right?
18  A. Yes.
19  Q. And does the analysis of legislative purpose or
20  intent differ based on the type of voting change, or is
21  it the same legal standard that applies to all voting
22  changes?
23  A. I think it's the same legal standard for all
24  changes.
25  Q. And you testified earlier, when we were talking



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Ann McGeehan                                              May 31, 2012

---

**45**

1   about your job history, that you prepared submissions
2   and reviewed submissions that were sent to the U.S.
3   Department of Justice; is that right?
4       A.   Yes.
5       Q.   How many were you involved in, approximately,
6   during the course of your employment with the Division?
7       A.   Hundreds and hundreds, you know.  There's --
8   usually, we would submit at least a hundred bills a
9   session, so... You know, so how many sessions, you
10  know.  So probably about a thousand.
11      Q.   What types of information, as a general matter,
12  did you submit with preclearance submissions?
13      A.   What general subjects?
14      Q.   What types of information did you submit in
15  support of your submission, as a general matter?
16      A.   As a general matter, we would write up a
17  description of the bill.  We followed the Code of
18  Federal Regulations, pretty well tried to track, you
19  know, the required elements of the submission, tried to
20  be responsive to those, and would generally supply, try
21  a supply at least two minority contacts that could be
22  contacted on the change.
23      Q.   Anything else as a general matter?
24      A.   As a general matter, no.
25      Q.   Were you ever involved with a Section 5

**46**

1   submission that drew a request from the Attorney General
2   for more information?
3       A.   Yes.
4       Q.   How many times did that happen?
5       A.   Maybe ten.
6       Q.   What types of voting changes were involved?
7       A.   There were some questions regarding creation
8   of district courts in the '90s.  When we implemented the
9   National Voter Registration Act, we got, I think, an
10  additional information request on certain issues.
11  Redistricting would usually generate that.  And then
12  recently, there was a water -- or I think it was a water
13  district bill that generated an additional information
14  request.
15      Q.   And could you speak generally as to what
16  actions you would take upon receipt of a request for
17  more information from the Justice Department?
18      MR. MORTARA:  Ms. McGeehan, you can answer
19  the question generally, but remember, in some instances,
20  you may have been acting within the scope of your role
21  as an attorney.  And so I admonish you to observe that
22  there's an attorney-client privilege where you believe
23  one to exist.
24      Q.   (By Ms. Westfall) Okay.  And certainly, I'm not
25  seeking any information that would touch upon attorney-

**47**

1   client communications.
2       A.   Well, my role would be to coordinate the
3   response, review it, and generally we would need to
4   contact the sponsor to get some of the additional
5   detail.
6       Q.   Were you ever involved in a Section 5
7   submission that drew an objection from the Justice
8   Department?
9       A.   Yes.
10      Q.   Which ones were those?
11      A.   In the '90s, there was an objection on the
12  national -- our implementation of the National Voter
13  Registration Act.  It was later withdrawn.  But there
14  was an objection regarding having agency staff check the
15  citizenship status of applicants before they could
16  register.  There was a -- I believe it was a water
17  district bill that got an objection maybe in 2007.
18  There may have been a couple of others.
19      Q.   With regard to the NVRA registration issue you
20  just described, when that submission drew an objection,
21  what actions did you take following that objection, or
22  what additional information did you supply to the
23  Justice Department, if any?
24      A.   After the objection?
25      Q.   Yes.

**48**

1       A.   I believe that the Secretary wrote a letter at
2   that point.  And I honestly don't recall the details of
3   that.  I may have been involved in that.  That may be
4   privileged, I don't know, but...
5       Q.   Are you familiar with the term Spanish surname
6   analysis?
7       A.   Yes.
8       Q.   Could you define that for us.
9       A.   The Elections Division, I think, since the mid
10  '80s, had used a list of Spanish surnames that we've
11  obtained from the Census Department, and we run that
12  against the list of -- statewide list of registered
13  voters to identify Hispanic voters or voters with
14  Hispanic surnames.
15      Q.   And are you familiar the omission comission
16  corrective aspect of that analysis?
17      A.   I don't understand what you mean by that.
18      Q.   Is there any corrective analysis goes along
19  with the Spanish surname analysis that you could testify
20  about today?
21      A.   I still don't understand what you're asking.
22      Q.   Is there anything that accounts for someone who
23  would -- false positives -- someone, for example, who
24  would -- who would not be of Hispanic origin who married
25  -- a woman who married someone who had a Hispanic last

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Ann McGeehan                                                    May 31, 2012

---

**49**

1  name, and actually that individual, that woman, for
2  example, is not herself Hispanic? Would there be
3  anything that would correct for falsely counting her as
4  someone of Hispanic origin, notwithstanding that she
5  wasn't Hispanic, that is involved in Spanish surname
6  analysis?
7      A.  That the Secretary of State's Office uses --
8      Q.  Yes.
9      A.  -- in addition to the Spanish surname?  No.  I
10 mean, we use -- my recollection is, that we used the
11 Spanish surname list due to an agreement with the
12 Justice Department, that was entered into the mid '80s,
13 regarding sending out notice of Constitutional
14 amendment.  So we are following the practice that's
15 precleared.
16     Q.  I see.  How many times have you used a Spanish
17 surname analysis in conjunction with -- or how many
18 times did you in conjunction with submitting a voting
19 change for preclearance?
20     A.  We routinely used it to -- in describing the
21 geographic area that was impacted, we would usually send
22 voter registration data, including a breakdown of
23 Hispanic surname as well.
24     Q.  So if you had a hundred bills a session, how
25 many would involve Spanish surname analysis?

---

**50**

1      A.  Generally, only those bills that affected
2  discreet portions of the state, we would provide that
3  analysis on.  But if it was a bill of statewide
4  applicability, just a change in a law that affects
5  everybody, we generally didn't supply any specific data
6  on voter registration statistics.
7      Q.  So you can never remember, sitting here today,
8  a time, with a statewide change, where you did a Spanish
9  surname analysis?
10     A.  Redistricting is kind of a whole different
11 animal, so not talking about redistricting, but just
12 sort of a -- like the bill I mentioned earlier
13 to change the time period when the early ballot board
14 could meet, we would submit that, and we would not
15 provide any detailed analysis about the number of
16 registered voters in the state or the number of Spanish
17 surname voters.
18     Q.  I see.  But you just testified that it was
19 routine that you use this analysis, correct?
20     A.  Yeah, but depending on the submission.  So if
21 it's a -- I mean, probably half the bills that go up are
22 a creation of a special district that comprise only a
23 portion of the state.  That would be the kind of bill
24 that we would include voter registration detail.
25     Q.  I see.  But there's nothing that would prevent

---

**51**

1  you from doing it for statewide changes, is there?
2      A.  No.
3      Q.  Because you do it all the time, right?
4      A.  Right.  It's public information.
5      Q.  And did you use it to comply with -- with state
6  law for the staffing of precincts, for example?  Did you
7  do Spanish surname with regard to staffing of precincts
8  with --
9      A.  We did.
10     Q.  -- Spanish-speaking poll workers?
11     A.  Yes.  We started to do that in maybe 2003, '4,
12 something around -- around that time, whereas basically,
13 just to help the county election officials identify
14 those precincts that would need Spanish-speaking poll
15 workers.  We went ahead and shared the results of our
16 Spanish surname list to help them identify precincts.
17     Q.  Outside of Section 5, does the state also use
18 Spanish surname analysis for other purposes?
19     A.  You know, the primary purpose was for purposes
20 of sending out the written notice for the constitutional
21 amendment election.  We did start to using it to help
22 the counties identify Spanish surnames.  It's available
23 as a request, when someone requests information.  So if
24 somebody wants a copy of the voter registration
25 database, they can request it with the Spanish surname

---

**52**

1  flag.  I don't recall, at this point, any other time
2  that the Secretary of State used that data for Spanish
3  surname.
4      Q.  Was it at all used for redistricting to advise
5  a Hispanic legislator that they would be able to be
6  elected in a new district?
7          MR. MORTARA:  Ms. McGeehan, you can answer
8  that question with respect to the --
9          Ms. Westfall, the problem I have with this
10 question is, it incorporates within the question the
11 positive advice that he would get elected or she would
12 get elected.  And then the additional problem is, we
13 have waivers here for voter ID purposes, and I'm not
14 sure we have waivers for other purposes.
15         And so I think the general question, did
16 you ever give advice to a legislator about the
17 likelihood of a Hispanic legislator getting elected is a
18 yes or a no, because that's subject matter privilege
19 log.  Beyond that, I think I'd have to assert
20 legislative privilege for everyone, because I'm not
21 aware of waivers that go beyond voter ID.  Do you --
22         MS. WESTFALL:  Okay.  You have a different
23 conception of how legislative privilege works, because
24 you're saying it has to be waived rather than invoked,
25 so we are looking at privilege differently.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

| 53 | 55 |
|---|---|

**53**

1    MR. MORTARA:  Okay.
2    MS. WESTFALL:  Secondly, you're
3  anticipating a question I haven't asked, because I
4  haven't asked the identity of any particular Hispanic
5  legislator.  I'm asking her as a general matter.  So I'm
6  not understanding your objection.
7    MR. MORTARA:  Because your question
8  incorporates the positive, which is, did you tell a
9  Hispanic legislator he or she would could get elected,
10  which is the positive, which would never appear on a
11  privilege log.  What would appear on a privilege log is
12  the subject of communication about election prospects.
13    MS. WESTFALL:  I'm not invading any
14  privilege.  I'm not following why, since there's no
15  identity or no -- there's no individual.  This is a
16  general question that I'm posing, and I object to your
17  instructing the witness to answer yes or no.
18    MR. MORTARA:  I'm not instructing her.
19  I'm saying you cannot answer the question the way it's
20  been posed.
21    Q.  (By Ms. Westfall) Is the Spanish surname
22  analysis conducted within the Division, or is it
23  conducted by a central data office?
24    A.  It is conducted within -- not in the Elections
25  Division, but in the IT department, information

**54**

1  technology department, of the Secretary of State's
2  Office.
3    Q.  What was your experience with the accuracy of
4  surname analysis?
5    A.  It was pretty mixed.  We would get a lot of
6  complaints from people who felt that -- again, the main
7  purpose of it was sending out the notices for
8  constitutional amendment elections.  So sometimes folks
9  would receive one of those and they didn't speak Spanish
10  and they got mad, or sometimes they did speak Spanish
11  and they got mad, because they didn't want to be
12  profiled.  So yes, we had some concerns that it may not
13  be a hundred percent reliable.  But that was our --
14  those were basically the rules that we played by, as
15  were precleared by the Justice Department.
16    Q.  And was that -- concerns by constituents who
17  erroneously received materials in Spanish or vice versa,
18  was that the sum total of your concerns about the
19  accuracy of the analysis?
20    A.  Well, in that it represented that some people
21  may be identified that don't speak Spanish or people who
22  do speak Spanish are not included in that list, so it's
23  not a perfect list of identifying Spanish-speaking
24  voters.
25    Q.  How many complaints, sitting here today, are

**55**

1  you aware of with regard to what you just testified to?
2    A.  We would get many complaints.  Maybe 50 or more
3  after a mail-out.
4    Q.  What --
5    A.  Some of them were people complaining because
6  they didn't think the state should be sending out mail-
7  outs in Spanish.  So just lots of different complaints.
8    Q.  Okay.  But just focusing on issues pertaining
9  to the accuracy of the Spanish surname analysis, what --
10  could you give a kind of a percentage of how many
11  complaints you would get when you sent out one of these
12  mailings that related to accuracy of the analysis?
13    A.  You know, it's hard to answer that, because
14  most of the complaints we got were sort of emotional
15  reactions, so I don't know that they were -- really,
16  those complaints weren't centered so much on the
17  accuracy of the data.
18    Q.  So it's your testimony that there were not
19  complaints about the accuracy of the data, and that
20  there were -- these were emotional responses related to
21  a different issue?
22    A.  I think the only complaints we ever got, and I
23  don't know that we got them in writing, but sometimes we
24  could would get feedback from county election officials
25  that felt that the lists were not necessarily reflective

**56**

1  of Spanish-speaking communities, so that if they had to
2  appoint a number of polling place officials, that they
3  would express that didn't necessarily represent the
4  community, and that that might not be the best way of
5  identifying where to appoint Spanish-speaking clerks.
6    Q.  So other than what you've just testified to, is
7  there -- is there any other facts that you can testify
8  to about concerns with the accuracy of the analysis, or
9  was it kind of anecdotal complaints?
10    A.  Yeah.  I mean, we -- those were the complaints
11  we got.  Let's put it that way.
12    Q.  And based on your experience in the Division,
13  you don't have any fundamental concerns about the
14  accuracy of the analysis; is that right?
15    A.  Well, we're not data specialists.  I mean, we
16  are implementers, and we follow the law.  So that's what
17  we did.  It really...
18    Q.  Based on your administration experience, did
19  you believe it was, on the whole, accurate?
20    A.  It was my thought that it was probably the best
21  way we had of identifying Spanish-speaking folks, but I
22  knew it wasn't perfect.
23    Q.  Thank you.  And I believe you testified earlier
24  that as part of your responsibilities when you were at
25  the Division, you worked with legislators and staff to



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 57

1  provide them with advice pertaining to election laws,
2  right?
3      A.  Uh-huh, yes.
4      Q.  Did you serve as a resource to the Legislature
5  in the development of election bills, other than what
6  you have testified to earlier?
7      A.  Not so much in the development of the bill, but
8  after the bill was filed and if it was going to be heard
9  in a committee, that's where we would generally step in
10 and offer advice.
11     Q.  When it was heard in committee, what types of
12 information did the Division provide to either the
13 committee or individual legislators?
14     A.  Usually, it was just an explanation of how it
15 worked within the framework of existing election law.
16     Q.  Would you describe that as technical advice?
17     A.  For the most part, technical advice.
18     Q.  Was there any other advice you provided besides
19 technical advice?
20     A.  No.  I mean, generally we did not provide
21 policy advice.  That was not what we would do.
22     Q.  But besides technical advice as to how a bill
23 would work relative to the election law, did you talk
24 about -- or did you provide advice on how it could be --
25 how it would actually be implemented if enacted?

## 58

1      A.  Yes.  They would ask us questions like that.
2      Q.  Are there any other categories of advice,
3  besides how a bill would be, how a law -- a bill, if
4  enacted, would be implemented and how it sort of fit in
5  the election code that you would provide to committees
6  or legislators?
7      A.  Sometimes they might ask for data, and we would
8  supply data, you know, Hispanic surname voters or other
9  information that we might collect at the Secretary of
10 State's Office.  You know, kinds of voting systems used,
11 things like that.  So we also would provide just raw
12 data that we had.
13     Q.  Anything else you can think of sitting here
14 today?
15     A.  I think that -- that covers it.
16     Q.  And with regard to bills subject to Section 5,
17 does the Legislature, in your experience, take any
18 special steps, as a general matter, to ensure that an
19 election bill will be precleared by the Justice
20 Department or by a court?
21         MR. MORTARA:  You can answer if you know,
22 and if the -- you can answer if you know and if
23 answering would not disclose the content of any
24 communications with any legislator that is not on that
25 list.  Do you understand?

## 59

1         THE WITNESS:  Uh-huh.
2         MS. WESTFALL:  I'm asking her as a general
3  matter, not as pertaining to any particular legislator,
4  Mr. Mortara.
5      A.  My experience that is most legislators
6  understand the mandate of Section 5 and keep that in
7  mind when they propose legislation, and know that's part
8  the process.
9      Q.  (By Ms. Westfall) How do you know that?
10     A.  Well, for -- I mean, for the time I worked
11 there, the Secretary of State's Office routinely
12 contacted sponsors, after a bill passed, seeking
13 assistance in locating minority contacts.  So for one
14 thing, for 20-plus years, our office has always
15 solicited that information, so...
16     Q.  Outside of the minority contact issue, would
17 legislators generally do anything in crafting their
18 legislation to ensure that it would meet the two legal
19 prongs that you just testified about earlier pertaining
20 to Section 5?
21         MR. MORTARA:  Objection, foundation.
22         THE WITNESS:  Sorry, you're objecting?
23         MR. MORTARA:  You may answer the
24 question.
25         THE WITNESS:  Oh, okay.

## 60

1      A.  I mean, I don't -- I don't really know what the
2  legislative process is.  I mean, I presume they're aware
3  of the law.  I don't know what the detailed -- we didn't
4  work on drafting bills.
5      Q.  (By Ms. Westfall) Do you know whether, as a
6  general matter, legislators would conduct any factual
7  analysis to ensure that there would not be retrogressive
8  effect on minority voters when they were drafting bills?
9      A.  I don't know.
10     Q.  Do you know whether legislators would take any
11 steps to ensure that there was no discriminatory purpose
12 in crafting election laws?
13     A.  I don't know.
14     Q.  And with regard to voting changes subject to
15 Section 5 that are administrative in nature, did the
16 Division take any steps, as a general matter, to ensure
17 that rules, regulations, other procedures that the
18 Division created would comply with Section 5?
19     A.  Yes.  I mean, yeah.
20     Q.  Can you describe what procedures you would take
21 to accomplish that?
22     A.  I don't know that we had any procedures per se,
23 but I think it -- you know, we worked intimately with
24 Section 5, and so that would be part of our analysis,
25 and anything we did -- anything relating to voting, that



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Ann McGeehan                                                        May 31, 2012

---

### 61

1  would be in our minds.  But I don't know -- we didn't
2  have a checklist per se.
3      Q.  But would you make sure that if you were
4  putting out a rule, would you think "I want to make sure
5  this is not going to have a retrogressive effect because
6  I'm going to have problems"?  Would you foresee the
7  Section 5 process, in other words?
8      A.  Yes, and how it would impact all voters.  I
9  mean, that was always a part of what the Elections
10  Division is charged to do per statute.  So yes, we would
11  keep that in mind if we were -- anything we did,
12  creating a form or issuing a directive or adopting a
13  rule.
14      Q.  Can you think of a time when you did any
15  factual analysis of any rule or regulation or anything
16  administratively you did to ensure that it would not run
17  into problems with Section 5?
18      A.  Factual analysis meaning doing some sort of
19  investigation?
20      Q.  Yes.
21      A.  No, we didn't -- we didn't have resources for
22  that sort of thing.
23      Q.  And did you take any steps to ensure within the
24  Division that your rules and regulations were not
25  adopted or promulgated with a discriminatory purpose?

### 62

1      A.  I mean, we were -- I have to think how to
2  answer that question, because it's kind of like obeying
3  the law.  And so it was -- I think it -- it was inherent
4  as part of our responsibilities to make sure that
5  anything we did was fair to all voters, including
6  complying with Section 5 of the Voting Rights Act.
7          MR. MORTARA:  Ms. Westfall, we've been
8  going for over an hour.  I don't need a break.  But if
9  Chris or Ms. McGeehan need a break, I just wanted to
10  advise Ms. McGeehan that she doesn't have to wait for
11  you to call a break if she wants one.
12          MS. WESTFALL:  Certainly.  No.  I advised
13  Ms. McGeehan if she needs a break.  Do you need a break,
14  Ms. McGeehan?
15          THE WITNESS:  Actually, I would like a
16  break.
17          MS. WESTFALL:  Go ahead and take a break.
18  We're at a good point.
19          THE WITNESS:  Thank you.
20          (Recess from 10:54 a.m. to 11:18 a.m.)
21          (Exhibit 282 marked for identification.)
22      Q.  (By Ms. Westfall)  You've been handed what's
23  marked as U.S. 282.  Have you seen this document before?
24      A.  I don't think I've seen this one.  I think I
25  saw the original notice of deposition.

### 63

1      Q.  Great.  And this is the notice of your
2  deposition for today; is that right?
3      A.  Yes.
4      Q.  Turning your attention to the list of documents
5  on -- at Attachment A, three pages in, do you see that?
6      A.  Yes.
7      Q.  Did you undertake a search for documents
8  responsive to these list of documents today?
9      A.  I did, but all of these documents would be at
10  the Secretary of State's Office.  So --
11      Q.  Did you take any documents with you related to
12  the voter ID or photo ID when you left --
13      A.  No.
14      Q.  -- the employment of the Election Division?
15      A.  I did not.
16      Q.  I'm sorry.  I just want to make sure that we're
17  not talking over each other.
18      A.  Sorry.
19      Q.  You anticipated my long question.  Thank you.
20          So did you have any work-related
21  communications on your home computer?
22      A.  No.
23      Q.  Or in your home office files?
24      A.  No.
25      Q.  And you did not take any files when you left

### 64

1  the Division; is that right?
2      A.  I did not.
3      Q.  Did you do any -- conduct any work on your
4  personal e-mail?
5      A.  No.
6      Q.  So you have not searched for these documents;
7  is that correct, because this --
8      A.  I don't have custody of them.
9      Q.  They belong to your former employer; is that
10  right?
11      A.  Yes.  That's right.
12      Q.  Okay.  All right.
13          MS. WESTFALL:  Mr. Mortara, are you aware
14  of whether the documents listed in the schedule have you
15  been produced?
16          MR. MORTARA:  No.  I am not personally
17  aware.  I have no reason to believe that they have not,
18  and if you need a break, I can confer with
19  Mr. Sweeten or send an e-mail to the team and get you
20  that confirmation e-mail.
21          MS. WESTFALL:  Thank you.
22          MR. MORTARA:  I have no reason to believe
23  that they have not.
24          MS. WESTFALL:  Thank you.
25      Q.  (By Ms. Westfall)  Ms. McGeehan, have you



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

|  | 65 |
|---|---|

1  attended professional conferences at which photo ID was
2  discussed?
3      A.  Yes.
4      Q.  Which ones?
5      A.  Well, the -- the Secretary of State conference
6  for election officials, we routinely discuss new
7  legislation, so Senate Bill 14 was discussed at that
8  2011 conference.  It may have been discussed in past
9  conferences when we do a recap of legislation just to
10  simply say that it did not pass.  But in 2011, it was on
11  the agenda.
12     Q.  Where was that conference held?
13     A.  It was held in Austin at the Renaissance Hotel
14  by the Arboretum.
15     Q.  Did you speak at that conference?
16     A.  Yes.
17     Q.  What month in 2011?
18     A.  It was either July or August.  I don't remember
19  right now.  It was a summer conference.
20     Q.  And was this a statewide meeting or a
21  nationwide meeting of secretaries of state?
22     A.  This was a statewide meeting of county election
23  officials in Texas.
24     Q.  Did you prepare written remarks for that
25  meeting?

|  | 66 |
|---|---|

1      A.  I usually would do an outline of my comments.
2      Q.  Did you retain a copy of those remarks?
3      A.  I do not have it.  It might be on the computer
4  at SOS.
5      Q.  Thank you.  Have you ever presented remarks at
6  a conference, at any other conference at which you spoke
7  about photo ID or voter ID?
8      A.  Again, just to get back, this was one of the
9  initial points is, you know, photo ID -- I mean, photo
10  ID clearly relates to Senate Bill 14, because photo ID
11  is not required under current law.  But current law
12  requires some form of ID.  Some people use the term
13  "voter ID," which may not mean photo ID.  So, routinely,
14  at our Secretary of State's seminars, we would discuss
15  the law which requires some form of voter identification
16  in order to vote.
17     Q.  I see.  Between the period of 2005 and when you
18  left the Division, did you speak about photo ID laws,
19  either proposed or enacted, at any conferences, other
20  than the one you just testified to?
21     A.  We probably discussed it in 2009 as part of the
22  recap.  At a seminar that occurs after a legislative
23  session, we do a legislative summary.  So I'm sure we
24  probably mentioned it and the fact that it did not
25  pass.  But it wouldn't have been a lengthy discussion.

|  | 67 |
|---|---|

1      Q.  Did you prepare written remarks for that?
2      A.  Probably had an outline for '07.
3          MS. WESTFALL:  And, Mr. Mortara, I would
4  ask that to the extent those documents are responsive to
5  our document request, which I believe they are, we would
6  request that they be produced if they have not already
7  been produced.
8          MR. MORTARA:  I think that they have, but
9  if you want to follow up with correspondence to confirm,
10  we will.
11         MS. WESTFALL:  Thank you.
12     Q.  (By Ms. Westfall)  Have you ever had any
13  conversations with any county election official in Texas
14  in which that individual indicated a need for photo ID?
15     A.  Yes.
16     Q.  Which official?
17     A.  Joy Streeter in Comal County.  There may have
18  been other ones, but that's one that comes to mind.
19  There may have been -- there may have been other county
20  officials as well, but --
21     Q.  And when did Ms. Streeter talk to you?
22     A.  It was probably -- well, it was at the
23  legislature before a hearing or during a hearing,
24  something like that, a conversation when we were both
25  getting ready to testify at a hearing.

|  | 68 |
|---|---|

1      Q.  Do you recall what year that was?
2      A.  I don't remember if it was '09 or 2011.  I
3  don't really remember which one, but it was one of
4  those.
5      Q.  Can you describe the substance of the
6  conversation?
7      A.  No.  It was a passing remark, and I usually
8  don't engage in policy discussions with folks, so...
9      Q.  Did she indicate any basis for her support for
10  photo ID?
11     A.  No.  Like I said, I didn't really engage in the
12  conversation, and it was really a comment she made.
13     Q.  How long was the conversation?
14     A.  It was very short.
15     Q.  Did she simply express support for photo ID?
16     A.  Yes.
17     Q.  Did she give you any indication of why she
18  supported photo ID?
19     A.  I don't really remember, to be honest with
20  you.  I don't remember the details of the conversation.
21     Q.  And sitting here today, do you remember any
22  other similar conversations with county election
23  officials about a need for photo ID other than
24  Ms. Streeter?
25     A.  There may have been similar kind of comments



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Ann McGeehan                                              May 31, 2012

---

### 69

1   made by officials, but again, we would tend to steer
2   away from any sort of perceived partisan-type issues.
3       Q.   But I'm not asking about whether you responded
4   or agreed or disagreed.  I'm asking about the existence
5   of your knowledge of support from county officials?
6       A.   And what I'm saying is there may have been
7   other officials that made similar comments.  I don't
8   really remember them, because we would generally try not
9   to have those kind of conversations.
10      Q.   Thank you for your testimony.
11           What is the system under state law for
12  determining how to verify the identity of a voter?
13      A.   And I'm going to ask to clarify.  Verify the
14  identity of a voter presenting themselves at the polling
15  place and not talking about as registering to vote?
16      Q.   Let's start with at the polling place.
17      A.   The current law is that a voter is required to
18  show their certificate, their voter registration
19  certificate, or if they don't have a voter registration
20  certificate, then they can present another form of ID.
21  And there's a fairly long list.  And because I don't do
22  this every day anymore, I don't really have it off the
23  top of my head anymore, so...
24      Q.   What happens if a voter doesn't have either the
25  voter registration card or one of those forms of ID at

### 70

1   the polls on election day?
2       A.   Then they -- they're given the opportunity to
3   vote a provisional ballot.
4       Q.   Does the voter need --
5       A.   I believe.  I'm pretty sure that's right.  And
6   that's -- you see, that's the problem; I haven't been
7   doing this for six months, but I'm fairly certain --
8   yes, that's case.  If a voter does not have any form of
9   ID, then they're given the opportunity to vote a
10  provisional ballot.
11      Q.   Does the voter need to take any additional
12  steps to ensure the provisional ballot will be counted?
13      A.   There's really not much the voter can do,
14  actually, because if they don't have ID, even though
15  they're given the opportunity to vote a provisional
16  ballot, it will not be counted, because they didn't
17  provide any identification at the polls.
18      Q.   Are you certain that it's not the case under
19  state law that election officials will consult the
20  records to determine whether to count the provisional
21  ballot, and if the signature on the provisional ballot
22  envelope matches the registration record, that that
23  provisional ballot will be counted?
24      A.   That's not what the law says.
25      Q.   Tell me what --

### 71

1       A.   They can do a search like that to find evidence
2   if a voter is registered to vote.  But if they have not
3   presented a form of ID, then they're allowed to count
4   that ballot.  There's no way to cure that under current
5   law.
6       Q.   I see.  And of the forms of ID that are
7   acceptable at the polls today, do many of them include
8   nonphoto IDs?
9       A.   Yes.
10      Q.   And are they kind of similar to the forms of
11  photo ID that are acceptable and listed under the Help
12  America Vote Act, i.e., utility bills, government
13  correspondence, et cetera?  Is it a large wide range?
14      A.   Yeah.  I think it's about 11 or 12 items.
15      Q.   And when you register to vote, the county
16  election official will mail you a copy of your voter
17  registration card under current law; is that correct?
18      A.   Yes.
19      Q.   And if the voter doesn't have a voter
20  registration card at the polls on election day and
21  presents one of these forms of ID from a wide range of
22  forms of ID, that voter may vote a regular ballot; is
23  that right?
24      A.   That's right.
25      Q.   Are you aware of any reports of a voter

### 72

1   registration card being stolen in the mail from a voter?
2       A.   Reports or information reported to the
3   Secretary of State's office?
4       Q.   Let's -- I would say reports, generally, have
5   you ever heard about that?
6       A.   There may -- I mean, I may have heard something
7   like that said at a hearing.  I don't believe we have
8   it -- that when I was at the Secretary of State's
9   office, we had anybody file anything with our office
10  indicating that.
11      Q.   So you've never investigated any of those
12  claims, to your knowledge, while employed with the
13  Division?
14      A.   Well, actually, I take that back.  I think we
15  did have a -- I think we did have an allegation, a
16  written complaint that voter registration certificates
17  were stolen.
18      Q.   Who made that complaint?
19      A.   I don't remember, but I believe we referred it
20  to the Attorney General for investigation.
21      Q.   When was that complaint made?
22      A.   In the last four years.  I don't remember
23  exactly.
24      Q.   Did it pertain to one card or more than one
25  card?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Ann McGeehan                                          May 31, 2012

---

**73**

1     A.  It was several cards.
2     Q.  A handful of cards?
3     A.  It was a bunch of cards.  It was a bunch of
4  voter registration certificates.  I don't remember all
5  the details, but --
6     Q.  Do you know whether any prosecutions arose from
7  that?
8     A.  I don't know.
9     Q.  And where were those cards alleged to have been
10 stolen?
11    A.  I think they were stolen out of someone's car
12 or -- I don't remember all the details.  I think it was
13 in relation to a primary.  It may have been the --
14 either the 2008 primary or the 2010 primary.  And to be
15 honest, my memory is fuzzy on that.
16    Q.  Is it possible that you're referring to voter
17 registration applications and not cards?
18    A.  No, these were certificates.  These were voter
19 registration certificates.
20    Q.  That were -- had been in the custody of a
21 county election official; is that right?
22    A.  I don't remember the line of custody, but yeah,
23 I -- initially, they came out of a county office, and I
24 don't really remember -- I don't remember the details.
25    Q.  Did you yourself have any involvement in the

---

**74**

1  development of the current system for identifying a
2  voter at the polls on election day under the Texas
3  election code?
4     A.  The -- I think the only role that I may have
5  played is in, when the Help America Vote Act passed,
6  was -- you know, advising the legislature on how to
7  integrate that federal law into the Texas state law,
8  including what a voter has to present at the polls, if
9  it is a voter that the state has not been able to
10 confirm their voter -- their driver's license number or
11 Social Security number under HAVA.
12    Q.  I see.  And how long has the current system for
13 identifying voters at the poll been in place in Texas?
14    A.  My recollection is that in either 1997 or 1999,
15 one of those sessions, the legislature passed the
16 requirement to affirmatively require some form of ID,
17 this list that we talked about.  Prior to that time, a
18 voter didn't have to show anything.  That was in either
19 '97 or '99.  In 2003, the legislature passed -- I
20 believe it was 2003, the legislature passed a bill to
21 implement HAVA, which I don't think really changed that
22 list.
23         It may be more in Secretary of State rules
24 and procedures where the interaction between confirming
25 a voter's identity on the voter registration process and

---

**75**

1  how that impacts the voter registration list, that may
2  not be in the law, per se, that may be more through
3  directives issued by the Secretary of State.
4     Q.  I see.  And to your knowledge, was the Help
5  America Vote Act and its set of IDs contained therein,
6  was that in part based on the list under -- that existed
7  under Texas law at the time?
8     A.  Did Congress base their list?
9     Q.  (Nodding head yes.)
10    A.  I don't know.
11    Q.  Is the current system for identifying a voter
12 at the polls effective in identifying voters in your
13 opinion?
14    A.  Effective in terms of?
15    Q.  Does it do the job?  Does it, in fact, ensure
16 identification of voters at the polls?
17    A.  That's a difficult question for me to
18 answer.  I mean, we -- we advise county officials on the
19 rules to follow.  We don't do any investigation, or
20 Secretary of State's Office doesn't do any investigation
21 to double-check that.
22    Q.  To your knowledge, is it -- is the current
23 system not effective, and does it fail to identify
24 voters at the polls?
25    A.  You know, as -- when I was a state employee,

---

**76**

1  it's my duty to implement the law.  It's not my duty to
2  make policy judgments on what's good and what's not
3  good.
4     Q.  But you worked for the Election Division, did
5  you not?
6     A.  Yes.
7     Q.  And you received complaints or information
8  about the effectiveness of systems --
9     A.  We would routinely --
10    Q.  -- because you administered the law, correct?
11    A.  Right.  I guess the deal is, we routinely
12 received complaints from both sides.  It's always a
13 balance between access to the ballot and making sure the
14 election process is secure and maintaining integrity.
15 So it's always that battle.  And so we hear from folks
16 on both edges of those issues.  And so, generally, we
17 don't get into those.  Generally, what we look at is are
18 the laws being followed as the legislature has passed
19 them as they have been precleared by the Justice
20 Department.
21    Q.  I understand.
22    A.  It's not our role to judge.
23    Q.  I understand.  I'm not asking you to take a
24 policy position based on your past position with the
25 Election Division.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Ann McGeehan                                                    May 31, 2012

---

## 77

1       Let me ask you another question:  Do you
2    have any facts or information that you could testify
3    today that would indicate that the current system has
4    failed in any instance to identify a voter at the polls?
5       A.   We've been asked that question in legislative
6    committee meetings and we've provided data.  You know, I
7    don't have the numbers at my fingertips on that.
8       Q.   Okay.  And we will talk about your testimony a
9    little bit later today.  I understand your testimony
10   before the hearings in the Senate and the House, and
11   otherwise.  But outside of that testimony, is there any
12   other set of facts or information that you can provide
13   to us today about how the current system has failed to
14   identify voter at the polls on election day?
15      A.   No.  I don't think so.
16      Q.   Do you recall that in 2000, you were quoted in
17   the Dallas morning news?
18      A.   In 2000?
19      Q.   In 2000.  To the effect -- and we can use an
20   exhibit if that would help to refresh your
21   recollection -- that in the polling place you have a lot
22   of measures in place to protect the integrity of the
23   ballot but voting at home has none of those safeguards.
24   Do you remember that?
25      A.   Yes, I do.

---

## 78

1       Q.   What did you mean when you said there are a lot
2    of measures in place in a polling place to protect the
3    integrity of a ballot?  What measures?
4       A.   Well, it's a public setting, and you've got,
5    you know, representatives of the government essentially
6    administering the voting process.  And you may have poll
7    watchers present and other voters present, and state law
8    controls, as opposed to a voter voting by mail in the
9    privacy of his or her home, and you don't have those
10   safeguards.
11      Q.   And how do those safeguards you've just
12   described and testified to protect the integrity of the
13   ballot in the polling place?
14      A.   Well, I mean, the intent of those laws is to
15   make sure that only, you know, eligible voters vote,
16   that they vote one ballot, and that, also, that their
17   rights are protected.  So I guess that's how.
18      Q.   Thank you.
19          How are those safeguards absent when
20   you're voting from home?
21      A.   There's nobody from the -- the entity holding
22   the election is not present.  You don't have any
23   representatives of that entity.  And so there have been
24   occasions where voters can be targeted, especially
25   elderly voters, where, you know, there are attempts to

---

## 79

1    manipulate their vote.
2       Q.   Are you aware of any issues or concerns about
3    fraud that have arisen from mail-in ballot procedures in
4    the state of Texas?
5       A.   Yes.  And in 2003, the legislature passed a
6    fairly significant bill to try to address some of those
7    issues where, you know, more signatures are required for
8    anybody who assists the voter, requests a ballot, and
9    you have to put their name and address and sign it.  And
10   I believe the AG has prosecuted some of those that where
11   those signatures were not provided.
12          And I don't know that any legislation was
13   enacted in 2011.  I think there was a report issued
14   after the 2009 session on the issue of mail -- mail-in
15   voting and concerns about mail-in voting.
16      Q.   Since the legislature enacted that law in 2003,
17   are you aware of any convictions for voter fraud based on
18   the mail-in votes?
19      A.   Yes.  I believe there have been several through
20   the Attorney General's Office.
21      Q.   Do you know the number?
22      A.   I don't know the number.
23      Q.   And who would know that?
24      A.   I think the -- someone in the Attorney
25   General's Office would have that data.

---

## 80

1       Q.   When did you first hear any support for
2    enacting a photo ID law in the state of Texas?
3          MR. MORTARA:  Ms. McGeehan, although the
4    question doesn't call for it, it's broad enough to cover
5    communications you may have had with legislators that
6    are not on this list, and I just admonish you in that
7    regard.
8          And, Ms. Westfall, totally happy at
9    this point for that to be a standing instruction,
10   because your question is really not in that area anyway,
11   if you're okay with that?
12          MS. WESTFALL:  A standing objection?
13          MR. MORTARA:  My point is:  Your question,
14   as broad as it is, would include a communication between
15   Ms. McGeehan and, for instance, Senator Tommy Williams,
16   where Tommy Williams --
17          MS. WESTFALL:  My question was when.  It's
18   a date question.
19          MR. MORTARA:  Oh, I'm sorry.  I thought
20   you said something else.
21          MS. WESTFALL:  When, when -- no.  Listen
22   to my question.
23          MR. MORTARA:  Okay.  Well, let's go
24   ahead with when.
25          MS. WESTFALL:  Let's read back the

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Ann McGeehan                                                          May 31, 2012

## 81

1  question.
2        MR. MORTARA:  When is fine.
3        MS. WESTFALL:  When is fine.
4        Q.  (By Ms. Westfall)  When did you first hear
5  about any support for enacting photo ID with voter
6  identification requirement in Texas?
7        A.  I think -- I mean, I don't know that I can give
8  you a date certain.  I am thinking it began to be
9  discussed in kind of around the same type as HAVA.
10  There was a Carter Baker report that talked about it,
11  and I don't know if that was maybe 2003, 2004, around
12  that time frame.
13        Q.  How did you learn about it?
14        A.  I really don't remember.  It may have been
15  through that Carter Barker report.
16        Q.  Do you know who was supporting photo ID in the
17  State of Texas?
18        A.  Lots of people supported it.  So --
19        Q.  Where was it stemming from?
20        MR. MORTARA:  Objection to foundation.
21        Q.  (By Ms. Westfall)  You may answer.
22        A.  I mean, just generally, it was more of a
23  Republican issue, I guess, Republican party issue.
24        Q.  Do you think that photo ID is motivated in part
25  by partisan concerns?

## 82

1        MR. MORTARA:  Objection, form of the
2  question.
3        Q.  (By Ms. Westfall)  You may answer.
4        A.  That may be part of it.  It seems to enter into
5  just about everything else.  So --
6        Q.  Was there a time when you were employed in the
7  Election Division that the Division first became
8  involved in the issue of photo ID legislation?
9        A.  I'm sure when the bill -- when a bill was
10  introduced, we would have been involved as far as having
11  to analyze the bill and possibly testify.
12        Q.  Do you recall what year that was?
13        A.  No.
14        Q.  And how were you -- what -- strike that.
15        Are you familiar with House Bill 1706 from
16  2005, introduced by Representative Denny?
17        A.  I don't remember it right now.  I mean, I might
18  be able to refresh my memory.
19        Q.  Why don't we do that.
20        MS. WESTFALL:  Could you mark this --
21  actually, this has been previously marked, Chris, as --
22  Court Reporter, as Exhibit 44.  Could you mark that for
23  the witness.
24        Q.  (By Ms. Westfall)  You've been handed what's
25  been previously been marked as U.S. 44.  Could you take

## 83

1  a look at this document and let me know if you recognize
2  it?
3        A.  You know, I don't really remember it too well,
4  but I'm sure at one point I -- you know.  This is 2005?
5        Q.  Turning your attention to the last page of this
6  exhibit on Page 10.
7        A.  Uh-huh.
8        Q.  If you look at Section 13, that might refresh
9  your recollection.
10        A.  Yeah.  Okay.  Okay.
11        Q.  Do you remember having any involvement with
12  this legislation at all?
13        A.  Not really.
14        Q.  Do you recall whether the Secretary of State or
15  Election Division took any public position on HB 1706?
16        A.  The Secretary of State -- well, I'm trying to
17  remember if -- who was Secretary of State in 2005.  The
18  Secretary of State may have taken a position on this
19  issue.  The Elections Division did not.
20        Q.  Do you know what the Secretary of State's
21  position on 1706 was?
22        A.  Let me just think.  Who was Secretary of State
23  in 2005?  Actually, I don't think anybody did, not in
24  2005.  Sorry.  I don't think there was any public
25  position.

## 84

1        Q.  Are you aware of whether the Division was
2  involved in the development of drafting of HB 1706?
3        A.  I don't think we were.
4        Q.  Are you aware of the source of the legislative
5  language for 1706?
6        A.  No.
7        Q.  Are you aware of whether the Division provided
8  any facts or information to any House or Senate
9  committee related to the HB 1706?
10        A.  I don't have any memory of that.
11        Q.  Turn your attention to the section of the
12  legislation of HB 1706 at Page 4.  Do you see where it
13  lists Section 63.0101, Documentation of Proof of
14  Identification?
15        A.  Yes.
16        Q.  Could you take a look at the forms of ID and
17  let me know when you've had a chance to review them?
18        A.  (Witness complies.)  Yes.  I've reviewed it
19  now.
20        Q.  Thank you.  And HB 1706 includes both photo ID
21  and nonphoto ID; is that correct?
22        A.  Yes.
23        Q.  And also includes photo ID cards issued by
24  county elections administrators or clerks; is that
25  correct?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Ann McGeehan                                                    May 31, 2012

---

## 85

1    A.   Yes.
2    Q.   Do you know how inclusion of that ID arose in
3  this bill?
4    A.   I do not.
5    Q.   Did you have any communications with any county
6  clerks about that provision?
7    A.   I don't recall any conversation about that with
8  this bill.
9    Q.   Did you provide any technical guidance to the
10 legislature about how photo ID cards involving county
11 clerks would be administered?
12   A.   Not with this bill.
13   Q.   And do you see that one of the forms of ID is
14 military identification cards?
15   A.   Yes.
16   Q.   Do you know what forms of cards or types of
17 cards that category of ID would encompass?
18   A.   Yes.
19   Q.   Could you describe that list?
20   A.   List of military identification cards?
21   Q.   Yes.
22   A.   I don't think it's a list. I -- you know, and
23 to be honest, I probably can't completely answer that
24 question because we were -- because that's one of the
25 permitted forms of ID under Senate Bill 14, and because

## 86

1  the Secretary of State's Office was in the process of
2  preparing to implement that bill. That was something we
3  were looking into as to what all would be included under
4  military identification card.
5    Q.   Do you recall whether your office or you were
6  involved in any discussion in 2005 about what forms of
7  military ID would be encompassed in this definition?
8    A.   No. I don't even remember this being heard in
9  committee. It may have been, but I don't think it got
10 very far.
11   Q.   Did you hear any concerns from bill opponents
12 of HB 1706 from the standpoint of the Division?
13   A.   I don't really recall and -- you know, because
14 several of these sessions are kind of merging together,
15 so I don't remember this one specifically.
16   Q.   And do you recall the Division having received
17 any requests for information from the legislature
18 regarding HB 1706?
19   A.   I don't recall any.
20   Q.   Are you aware of any attempt to determine the
21 impact of HB 1706 on minority voters?
22   A.   No.
23   Q.   In advance of the 2005 legislative session, did
24 either the Division or the Secretary of State develop
25 legislative priorities for that session?

## 87

1    A.   In advance of the 2005 session?
2    Q.   Yes.
3    A.   I'm -- I'm fairly certain we developed a list
4  of cleanup legislation, but that would be technical type
5  things, not policy issues.
6    Q.   Were you involved in development of that
7  agenda?
8    A.   Yes.
9    Q.   Did it include support for a photo ID law?
10   A.   No.
11   Q.   Why not?
12   A.   That's a policy issue. That wouldn't be
13 something we would include in a cleanup list.
14   Q.   Why do you describe it as a policy issue?
15   A.   Because it's a matter for the legislature to
16 the address. What we saw our role is on technical
17 cleanup legislation is to make the existing laws work
18 better within the existing framework, not make what I
19 term "policy changes" on how and what the law provides.
20   Q.   In other words, if you saw something that was
21 not working or if county clerks complained to you about
22 something that was not working, you would not advocate
23 for that as the Division, is that your testimony today?
24   A.   It would depend what the issue was. You know,
25 if it was -- again, and our general counsel would be

## 88

1  involved in that decision, as well, as to what was
2  policy and what was cleanup.
3    Q.   But was there -- were there times when county
4  officials said we need this to be changed, and it wasn't
5  a technical change, and you advocated for that change in
6  the Division?
7    A.   No. I don't think so. I think if a county
8  official brought something to our attention that was a
9  policy issue, we would say, "Hey, you know, this is
10 something you all need to go out on your own, and you
11 need to lobby for on your own. We can't do that." If
12 it was something we saw as a technical correction type
13 thing, we would often include it in our list of cleanup
14 legislation.
15   Q.   Did -- to your knowledge, did the legislature
16 hold hearings on HB 1706?
17   A.   You know, I really just can't remember. They
18 may have. She was -- I believe that Mary Denny was the
19 chair of the committee so probably there was a hearing.
20 I just don't have a clear memory of it.
21       MS. WESTFALL:   Could you mark this as 283?
22       (Exhibit 283 marked for identification.)
23   Q.   (By Ms. Westfall) You've been handed what's
24 been marked U.S. 283. Do you recognize this document?
25   A.   No. Well, I mean, I'm reading it. I haven't



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Ann McGeehan                                                    May 31, 2012

---

89

1   seen it before if that's what you're asking.
2       Q.   Do you see that it refers to a House Committee
3   on Elections Subcommittee hearing in March 2005?
4       A.   Yes.
5       Q.   And I will represent to you, and I'm sure your
6   counsel will not disagree, that this is an excerpt of a
7   hearing at which you were available and made some
8   remarks, which I can turn your attention to page --
9   Bates Stamp Number TX_00212131, or within the document,
10  Page 102, where you were introduced by Chairman Bohac.
11  Do you see that?
12      A.   No, I'm sorry.
13      Q.   Perhaps your counsel can assist you.
14      A.   Oh, I'm sorry.  Okay.  I'm sorry.  I'm there
15  now.
16      Q.   Certainly.  Can you take a look at your remarks
17  and let me know when you've had a chance to look at
18  them?
19      A.   (Witness complies.)  Okay.
20      Q.   Can you describe your role at the House hearing
21  in March 2005?
22      A.   It looks like I was explaining the HAVA
23  requirement to -- that would -- that was really just in
24  existence for a couple of years, that if a voter
25  registered to vote for the first time in Texas, and I'm

---

90

1   -- I have to refresh my memory on what the rules was
2   again.  Sorry.  Like I said, I'm getting rusty on this
3   stuff.  So --
4       Q.   Take your time.
5       A.   Yes.  I'm sorry.  Because it related to the
6   HAVA requirement, that before the state had the
7   statewide database in place and had set up a system to
8   verify the driver's license number or Social Security
9   number, first time -- a voter who registered to vote for
10  the first time had to present ID at the polls, or they
11  could enclose it when they registered to vote.  They
12  could enclose the copy of their ID when they registered
13  to vote.
14      Q.   And is it your view, based on your experience
15  in the Elections Division, that that is an effective way
16  of confirming a voter's identity?
17      A.   We only did it for a couple of years, because
18  that HAVA -- the state can't get away with that
19  forever.  So it was a sort of an interim solution until
20  the state could implement the state-wide voter
21  registration system.
22      Q.   To your knowledge, was that effective during
23  that interim period you've just testified to in
24  identifying voters at the polls and for registration?
25      A.   I don't really have any -- any data to really

---

91

1   make a judgment on that.
2       Q.   Do you have any information that it wasn't
3   effective?
4       A.   No.  It wasn't -- it wasn't in effect very
5   long, so I don't have much experience with it to really
6   make a judgment as to how effective it was.
7       Q.   But based on that brief duration when it was in
8   effect, do you have any facts or information indicating
9   that it wasn't effective?
10      A.   No.  I don't think either way.  I don't have
11  much of an opinion on that.
12      Q.   I was asking for facts.  Do you have any facts?
13      A.   I don't have any facts on it.
14      Q.   Thank you for your testimony.
15           Could you describe every rule, law or
16  procedure currently in place to verify the identity,
17  citizenship and eligibility of a voter applicant, in a
18  general sense, but --
19      A.   The question relates to someone applying to
20  register to vote?
21      Q.   Correct.
22      A.   And could you restate your question again
23  for --
24      Q.   Certainly.  Could you describe every rule, law
25  or procedure currently in place for verifying the

---

92

1   identity, citizenship and eligibility of a voter
2   applicant?
3           MR. MORTARA:  And you will be graded on
4   your response.
5           MS. WESTFALL:  Pardon?
6           MR. MORTARA:  And you will be graded on
7   your response.
8       A.   I mean, that is a very big question, and
9   there's a lot of components to it.  And specifically,
10  you're asking for U.S. citizenship?  I'm sorry to
11  make --
12      Q.   (By Ms. Westfall)  Identity --
13      A.   Identity.
14      Q.   -- and eligibility under Texas law to register
15  to vote, how does Texas confirm those things when an
16  individual attempts to register to vote?
17      A.   Basically, the only thing that -- you know, and
18  it kind of depends on at what point in time, but when a
19  person applies to register to vote --
20      Q.   Currently?
21      A.   -- currently, the only element that's actually
22  verified or attempted to be verified by the state is the
23  identity based on the driver's license number they
24  provide or the last four digits of their Social Security
25  number.  The state does not verify citizenship upfront

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 93

```
1   or overall eligibility.
2            There are processes in place once a voter
3   is registered so, you know, to keep the rolls clean, so
4   where there are checks against felons and, you know,
5   mental incapacity, you know, abstracts.  And then
6   there's our routine, you know, mass mail renewal voter
7   registration certificate that helps finding issues if
8   someone has moved and are no longer eligible.
9            But the upfront process of registering to
10  vote, you know, the process is the county reviews the
11  application, makes sure all the boxes are filled in.
12       Q.  And the applicant -- not to interrupt you.
13       A.  Yeah.
14       Q.  My apologies.  But the applicant signs under
15  penalty of law --
16       A.  Right.  That's correct.
17       Q.  -- that they're affirming certain
18  information --
19       A.  The information.
20       Q.  -- about their eligibility; is that correct?
21       A.  Yes, that's correct.
22       Q.  So that's one rule in place; is that right?
23  And that's codified under Texas law?
24       A.  Yes.
25       Q.  Thank you.  I'm sorry for interrupting.  Go
```

### 94

```
1   ahead.
2        A.  The application doesn't come to the state
3   first.  It goes to the county voter registrar.  The
4   county voter registrar reviews it first, makes sure the
5   address they're providing is in the county.  So in that
6   sense, they look at the address, but they don't confirm
7   whether somebody actually lives there or not.
8        Q.  They make sure that it's an address that
9   exists?
10       A.  That exists in their county.  If it's in
11  another county, they send it to another county.
12           And then it goes to the state for the
13  state to verify the identification number that's been
14  provided.  So, you know, anyway, so that's the process
15  of becoming registered.
16           And then after the fact, there are some
17  routine checks to make sure that the rolls remain clean,
18  so they're checked against, you know, database of
19  deceased persons, felons.
20           And on the U.S. citizenship issue, if a
21  person claims they're not eligible for jury service
22  because they're not citizens, then that should trigger a
23  process where they are sent a letter requesting them to
24  confirm that they are, in fact -- actually, they have to
25  show proof of citizenship at that point, and that's one
```

### 95

```
1   way to keep -- to have a check on citizenship.
2        Q.  Great.  Thank you.
3            Could you describe the rules in place to
4   determine whether a voter who requests an absentee
5   ballot or mail-in ballot is a registered eligible voter?
6        A.  The basic rules are that they -- the voter has
7   to submit a written request.  They have to state a valid
8   reason for voting by mail.  And there are only
9   four.  The early voting clerk reviews that, and the only
10  thing they can really verify is if they state they're
11  over 65, they can check the voter registration rolls,
12  but they can't verify if they're disabled or if they're
13  out of the county.  You know, the other eligibility
14  criteria is if you're in jail but otherwise eligible to
15  vote.
16       Q.  So, in other words, a voter submits a form
17  swearing that he or she is registered and that there is
18  a reason --
19       A.  Right.
20       Q.  -- to submit the mail-in ballot?
21       A.  (Witness nods head yes.)
22       Q.  Are there any other checks in place for
23  verifying that voter who is seeking an absentee ballot?
24       A.  Not at that point.
25       Q.  Are there any other checks at any other points?
```

### 96

```
1        A.  When -- when the ballot comes back in and when
2   the early voting ballot board reviews the ballot, they
3   basically review it again, making sure it's a valid
4   reason.  They might check the date of birth.  They
5   compare signatures on the application to the actual
6   voted ballot.  And that's about it.  If they were
7   required to sign a statement of residence, that would
8   have to be included, and they would have to check for
9   that.
10       Q.  Thank you.  Do you recall whether a photo ID
11  bill was introduced in the 2007 session?
12       A.  I think it probably was.
13       Q.  Do you know the number?
14       A.  No.
15       Q.  And by the way, before we get to 2007, do you
16  know what happened -- did any photo ID bill pass in the
17  legislature in 2005?
18       A.  No.
19       Q.  Do you know why?
20       A.  I don't remember.  I don't really have a very
21  good memory of that 2005 session on that issue.
22       Q.  I'm going to hand you what's been previously
23  marked as Exhibit 28.
24           You've been handed what's been marked,
25  previously marked as Exhibit 28.  Do you recognize this
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Ann McGeehan                                                    May 31, 2012

---

97

1   exhibit?
2       A.   Yes.
3       Q.   What is it?
4       A.   It is House Bill 218 from the 2007 session.
5       Q.   Do you know who in particular drafted 218?
6       A.   I think the primary sponsor was Representative
7   Brown, but I could be wrong on that.  So I don't really
8   know.
9       Q.   Do you know the source of the legislative
10  language --
11      A.   No.
12      Q.   -- for HB 218?
13      A.   Well, other than Texas Legislative Council.
14      Q.   Do you know who at the council drafted it?
15      A.   No.
16      Q.   Do you have a guess?
17      A.   They generally have certain attorneys that, you
18  know, have certain subject matter expertise.
19      Q.   Do you think it would have been Jennifer
20  Jackson?
21      A.   It could have been, but I don't know.
22      Q.   Are you familiar with the provisions of HB 218?
23      A.   I would have to refresh my memory.
24      Q.   Would you like a chance to do so?
25      A.   Yes.

---

98

1       Q.   Particularly drawing your attention to the
2   forms of ID listed at Page 9 of this document.
3       A.   Okay.  (Witness reading.)  Okay.
4       Q.   Have you had a chance to review the forms of
5   ID?
6       A.   Yes.
7       Q.   Could you describe them for me?
8       A.   A driver's license that hasn't expired, issued
9   by the Texas Department of Public Safety.  A U.S.
10  military identification card that contains the person's
11  photograph.  A valid employee identification card that
12  contains -- you know what, I'm missing some pages.
13  Here.  That's why.  Yeah, that's why, because there's --
14  yeah.
15      Q.   May I have that exhibit?
16      A.   Yeah.
17          MS. WESTFALL:  Mr. Mortara, could I see
18  your copy of the exhibit to see if there are errors all
19  around?  If it is acceptable to you, could I examine
20  with your copy, Mr. Mortara?
21          MR. MORTARA:  Yes.  It is completely
22  acceptable.
23          MS. WESTFALL:  Thank you.  I'm delighted
24  to hear that.
25          MR. MORTARA:  I'm delighted to tell you.

---

99

1          MS. WESTFALL:  Off the record for one
2   minute.
3          (Brief discussion off the record.)
4       Q.   (By Ms. Westfall)  Ms. McGeehan, do you now
5   have an exhibit that is complete?
6       A.   Yes.
7       Q.   Could you describe the forms of ID that are
8   listed in Exhibit 28, House Bill 218?
9       A.   I guess there's two lists.  There's a list of
10  acceptable photo identification, and then there's a list
11  of nonphoto identification.
12      Q.   Does it appear, based on your review, that this
13  list is similar to HB 1706, to which you just testified,
14  the previous exhibit that you looked at from 2005?
15      A.   Yeah.  I think it's similar.  I think there's
16  -- well, I'd have to compare it, but -- can I compare
17  it?
18      Q.   Certainly.
19      A.   Because I think it might have had the same
20  problem.
21      Q.   What is the problem?
22      A.   Well, I just want to make sure that they both
23  have the same issue that you present one form of photo
24  ID or two forms of nonphoto.
25      Q.   Why do you describe that as a problem?  Is it

---

100

1   difficult to administer?
2       A.   No.  I meant I was afraid that 1706 was a
3   partial copy like the other one was.
4       Q.   I see.  I see.
5       A.   I'm sorry.  I guess they look similar.
6       Q.   Are they essentially the same?
7       A.   Yes.  Yes.
8       Q.   Do you know whether any of this language came
9   from the Lieutenant Governor's office?
10      A.   I don't know.
11      Q.   Do you know whether any of it came from outside
12  the Texas legislature?
13      A.   I don't know.
14      Q.   And do you know whether any of it came from the
15  Governor's office?
16      A.   I don't know.
17      Q.   Did the Secretary of State or the Election
18  Division take a public position on HB 218?
19      A.   I think the Secretary of State at that time was
20  Roger Williams.  He may have.  I -- but the Elections
21  Division did not.
22      Q.   Do you recall that secretary -- Secretary of
23  State Williams made a public comment about photo ID not
24  likely increasing the level of voter turnout?  Do you
25  recall that statement?

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

| 101 | 103 |
|---|---|

**101**

1  A.  No.
2  Q.  Do you know whether he held that belief?
3  A.  I -- I don't know if he held that belief.  I
4  don't remember that, him saying that.
5  Q.  Do you agree with that sentiment?
6  A.  Whether requiring voter ID would increase voter
7  turnout?
8  Q.  Will not increase voter turnout?
9  A.  The statement is requiring voter ID will not
10  increase voter turnout?
11  Q.  Correct.
12  A.  I don't know that I would agree with that.
13  Q.  Do you think it will increase voter turnout?
14  A.  I don't know that anyone knows what increases
15  voter turnout.  And a lot of bills that were designed to
16  increase voter turnout have not.  So I don't know that
17  it's -- I think that I agree with that statement.
18  Q.  Is it your testimony that you can't predict
19  whether it will increase voter turnout?
20  A.  That's true.  I couldn't predict whether it
21  would increase voter turnout.
22  Q.  Did you or the Division play any role in the
23  development of drafting of HB 218?
24  A.  No.  I don't believe we did.
25  Q.  Did anyone in the legislature or legislative

**102**

1  counsel contact the Elections Division concerning HB
2  218?
3  A.  Did anybody in the legislation or where else?
4  Q.  Legislative counsel, the TLC.
5  A.  Probably.
6  Q.  Do you remember that happening?
7  A.  I don't know if it was for this year or another
8  year, but they would contact us on a bill like -- like
9  this, that's making a lot of changes to the election
10  code.
11  Q.  I guess I'm trying to figure out with just --
12  just with regard -- turning your attention just with
13  regard to HB 218, do you recall such communications?
14  A.  I don't specifically recall them, but that
15  doesn't mean they didn't happen.
16  Q.  Do you think it would have, based on your
17  experience at the Division, it would have been likely
18  that either the legislature, a member of committee staff
19  and/or the Legislative Counsel would have contacted the
20  Elections Division about --
21  A.  Yes.  I think that would be likely.
22  Q.  And I believe you just testified that they
23  ordinarily would when there were changes to the code as
24  significant, expansive, substantial, as the ones
25  contained in this HB 218; is that correct?

**103**

1  A.  Yes.
2  Q.  Do you recall whether the -- whether the
3  Division provided any information to the legislature
4  concerning HB 218?
5  A.  Information as in data or?
6  Q.  Data, factual analysis, any information broadly
7  defined.
8  A.  We -- we probably testified as a resource on
9  the bill.  I don't recall any other data being exchanged
10  in 2007.
11  Q.  Do you recall any requests for information?
12  A.  Well, I take that back.  The House Elections
13  Committee may have asked for data in 2007 related to
14  some of these -- some of the issues related to voter
15  registration.
16  Q.  And by that you mean specifically?
17  A.  Well, and I'm -- again, I am confusing the
18  sessions.  I don't really remember if it was 2007 or
19  2009, but the House Elections -- House Elections
20  Committee, at least one or both of those sessions, asked
21  questions regarding the number of registered voters, who
22  registers with driver's license, who registers with
23  Social Security number, and I believe these were
24  questions that were asked at organizational meeting of
25  the House Elections Committee.

**104**

1  Q.  Was that in the public record in the hearing?
2  A.  Yes.
3  Q.  Did any staff ask you separately for that
4  information, or was it simply confined to the public
5  record?
6  MR. MORTARA:  Ms. McGeehan, if the
7  specific information is part of the question, which I'm
8  not clear it is.
9  Is the question any information or the
10  specific set of information that Ms. McGeehan just
11  discussed?  Ms. Westfall, I need you to clarify the
12  question.
13  MS. WESTFALL:  Could you repeat back the
14  question?
15  MR. MORTARA:  The question just said any
16  information.
17  MS. WESTFALL:  Could you repeat back the
18  question?
19  (Requested portion read back by the court
20  reporter.)
21  Q.  (By Ms. Westfall)  I was referring back to
22  information about the number of registered voters who
23  registered with a driver's license or Social Security
24  number.
25  MR. MORTARA:  You may not answer that



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Ann McGeehan                                                    May 31, 2012

---

### 105

1    question with respect to any legislator not on this list
2    or their staff.  You may answer it with respect to these
3    legislators.
4        A.  Right.  What I'm remembering are questions that
5    Representative Anchia asked at the hearing, but again, I
6    am a little bit fuzzy on whether that was '07 or '09.
7    And it's possible one of his staff members called back
8    to clarify.  I don't think so.  I think the requests
9    were coming directly from Representative Anchia.
10       Q.  Do you recall any -- was Representative Anchia
11   opposed to HB 218?
12       A.  Yes.
13       Q.  Aware you aware of any other requests from any
14   other members who were opposed to HB 218 for requests
15   for information?
16           MR. MORTARA:  Again, you may answer with
17   respect to the legislators on this list and not others.
18           MS. WESTFALL:  Are you taking the position
19   that the Attorney General is representing bill opponents
20   who are not on that list?
21           MR. MORTARA:  No.
22           MS. WESTFALL:  Because that seems to be
23   contrary to the position that's been taken in this
24   litigation previously.
25           MR. MORTARA:  The position the State is

---

### 106

1    taking is that Ms. McGeehan may not inadvertently or
2    intentionally breach a legislator's privilege, unless
3    that legislator has affirmatively waived the privilege.
4    And since Ms. McGeehan does not hold the privilege, she
5    cannot act to break the privilege.  And therefore, she
6    may only answer, not with respect to whether something
7    opposed the bill or supported the bill, but with respect
8    to whether that legislator has affirmatively waived
9    privilege with respect to voter ID issues.  That list is
10   in front of her, and she answer with respect to
11   representatives on that list.
12           MS. WESTFALL:  I just want to represent on
13   the record that your cocounsel early in this litigation
14   indicated that the office of the Texas Attorney General
15   does not represent bill opponents and that we could
16   freely contact bill opponents.  So, therefore, which is
17   -- which is related to this very issue, and I take
18   strong issue with your assertion that only individuals
19   on this list are folks that she can testify to.  There
20   are other legislators who are bill opponents.
21           MR. MORTARA:  I don't think there's any
22   inconsistency here, Elizabeth.  You may freely contact
23   any legislator you want, who oppose the bill, and ask
24   them if they're willing to waive their privilege.
25   Absolutely, go right ahead.  Ms. McGeehan is not one of

---

### 107

1    those people.  She is instead someone who may have had
2    conversations with legislators, and she cannot waive a
3    legislator's privilege for that legislator.  That's why
4    she may only answer with respect to the list of names I
5    put in front of her.
6            MS. WESTFALL:  Okay.  We can discuss this
7    further in a break.
8        Q.  (By Ms. Westfall)  Other than
9    Representative Anchia -- first of all, are you following
10   the advice of counsel on this privilege issue?
11       A.  I'm trying to.  Yes.
12       Q.  Are there any other representatives besides
13   Representative Anchia who contacted the Division about
14   or had any communications with the Division about HB
15   218?
16           MR. MORTARA:  You may answer that question
17   completely without any limitation whatsoever.
18       A.  In 2007?
19       Q.  (By Ms. Westfall)  Yes.
20       A.  2007 session.  I really don't recall anyone
21   other than representative Anchia requesting specific
22   data on House Bill 218.
23       Q.  Did you have any other communications, or are
24   you aware of any communications between the Division and
25   anyone else in the government outside of the legislature

---

### 108

1    concerning HB 218?
2        A.  In state government but not in the state
3    legislature --
4        Q.  Correct.
5        A.  -- about 218?  I don't recall any.
6        Q.  Do you recall any communications with the
7    Governor's office?
8        A.  No.
9        Q.  Do you recall any conversations with the
10   Lieutenant Governor's office?
11       A.  No.
12       Q.  Did the Division receive any request to conduct
13   any analysis of HB 218?
14       A.  We didn't receive any requests to analyze.
15       Q.  Did you nevertheless conduct any analysis?
16       A.  Yes.  It's our standard procedure to analyze
17   any election-related bill, and we -- well, attorneys
18   will do a bill analysis so that we can be prepared if
19   that bill is heard in committee.
20       Q.  Can you describe that bill analysis procedure?
21       A.  It's usually assigned to an attorney to do a
22   bill analysis, you know, kind of summarize the bill.  It
23   goes to the legal director to review.  Then it goes to
24   me.  Or it would go to me.  And then sometimes, you
25   know, depending on our general counsel, sometimes they

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 109

1   would want to see those.  Sometimes not.
2       Q.  Can you tell me, generally, what factors the
3   analysis considers?
4       A.  Fiscal impact is a standard, because every
5   state agency has to analyze the bill as a fiscal
6   impact.  We would analyze it whether it required
7   submission preclearance, effective date -- those are the
8   some of the standard things.  But, you know, the heart
9   of it was really just a summary of what the bill did.
10      Q.  With regard to preclearance, does the analysis
11  generally include any indication of steps that should be
12  taken to ensure that the increase of likelihood that the
13  bill would be precleared if enacted?
14      A.  No.  It's really intended to identify,
15  basically, that's the beginning of our list to determine
16  what needs to get precleared.
17      Q.  Did the Division receive any requests to
18  determine who among registered voters did not possess
19  the required forms of ID?
20      A.  Did the bill possess?
21      Q.  Did the Division receive any requests to
22  determine who among registered voters did not have the
23  form of ID?
24          MR. MORTARA:  Ms. McGeehan, you may not --
25  you may -- you may not answer that question with respect

## 110

1   to legislators that do not appear on this list or their
2   staff.  You may answer the question with respect to the
3   legislators that do appear on this list or their staff
4   or anyone else that is not the Lieutenant Governor or
5   Governor or legislators that appear not on this list.
6           And Ms. Westfall, for clarification,
7   my problem is that you've included more in there than
8   just what would be on the privilege log.
9           MS. WESTFALL:  I understand.  I'm making
10  my record.  You are too.
11      Q.  (By Ms. Westfall)  You may answer.  Are you
12  following the advice of counsel?
13      A.  Oh, no.  I'm trying to think of what the answer
14  is.  I think that in -- as best as I can remember, I
15  believe it was only Representative Anchia that requested
16  that kind of information.
17      Q.  Does any -- any of your answer, in part, are
18  you asserting privilege over any information and not
19  providing it to us in this deposition?
20          MR. MORTARA:  I'm instructing you not to
21  answer with respect to legislators that do not appear on
22  this list or Lieutenant Governor or the Governor.
23      A.  Okay.
24      Q.  (By Ms. Westfall)  Mr. Anchia is on that list,
25  is he not?

## 111

1       A.  Yeah.  So he's waived.
2       Q.  I want to know whether you are asserting
3   privilege over any part of your answer pursuant to your
4   counsel's advice?
5           MR. MORTARA:  Ms. Westfall, the problem I
6   have is Ms. McGeehan does not assert privilege.  I'm
7   giving her instructions to maintain legislative
8   privilege.  So she doesn't assert privilege, because
9   she's not the holder.
10          MS. WESTFALL:  I understand.
11          MR. MORTARA:  So I have a problem with
12  your question in that it implies that Ms. McGeehan gets
13  to decide, which she does not.
14          MS. WESTFALL:  I certainly -- I understand
15  your position on that.  You've made it clear for the
16  record.  What I want to know is -- what I'm trying to
17  elicit from her is whether there's any reason for us to
18  consider to moving to compel a response further if there
19  is any privileged material to which we are not entitled
20  to examine the witness during this deposition.
21          MR. MORTARA:  Yes.  And I have instructed
22  her not to answer your question, this particular
23  question, with respect to legislators that do not appear
24  on the list in front of her, the Lieutenant Governor or
25  the Governor.  And along as she follows my

## 112

1   instruction --
2           MS. WESTFALL:  Including the Lieutenant
3   Governor and Governor?
4           MR. MORTARA:  Yes.
5           MS. WESTFALL:  Is that what you just
6   said?
7           MR. MORTARA:  Yes.  As far as I know --
8           MS. WESTFALL:  I don't think the Governor
9   is a legislator.
10          MR. MORTARA:  -- he's maintained a
11  privilege with the Governor that would be deliberative
12  process if he communicates with the Secretary of State.
13  That's the Governor's deliberative process .
14          MS. WESTFALL:  So this a new privilege
15  that's being asserted in this litigation -- I mean in
16  this deposition?
17          MR. MORTARA:  Isn't this the one that we
18  just filed briefs on like last night?
19          MS. WESTFALL:  We just -- I examined the
20  witness this morning about privileges that she's
21  asserting.  Are you now asserting deliberative process?
22          MR. MORTARA:  Yeah, this is the Governor's
23  privilege, deliberative process, not hers.  I'm not
24  asserting her deliberative process privilege.  The
25  Governor has a deliberative process privilege.  If,



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

113

1   hypothetically, the Governor were to ask somebody at the
2   Secretary of State's Office, "Tell me how to do A, B and
3   C," that is within the Governor's deliberative process
4   privilege, as I understand it's being litigated right
5   now.  If Mr. Freeman wants to correct me, he can, but I
6   believe that is within that -- and again, I agree with
7   what Mr. Freeman just whispered:  The actual facts, the
8   actual information is not privileged.  As the example I
9   used when we were off the record earlier, lawyer sends
10  the client e-mail, "We have a problem."  Attached to the
11  e-mail is a document.  The document is not privileged;
12  it is factual.  It must be produced.  But the underlying
13  communication is privileged.  That's the position the
14  State's taking and will continue to take it unless, off
15  the record, Mr. Freeman wants to tell me that's not the
16  current subject of motions that are subjudiciary on the
17  Governor's deliberative process privilege.
18           MS. WESTFALL:  No, you can direct the
19  questions to me.  I'm aware of the briefing on this
20  case.
21           MR. MORTARA:  Okay.
22           MS. WESTFALL:  I'm the lead counsel so --
23  we're briefing it.
24       Q.  (By Ms. Westfall)  Are you aware, Ms. McGeehan,
25  of any attempt to determine the impact of HB 218 on

---

114

1   minority voters?
2       A.  I'm not aware.
3       Q.  Are you aware of any communication about the
4   impact of HB 218 on minority voters?
5       A.  I'm sorry?
6       Q.  Are you aware of any communications?  My first
7   question was about attempts, and you said no.  My second
8   question is about communications, about the impact of HB
9   218 on minority voters.
10      A.  There was probably testimony at the hearing on
11  that point.
12      Q.  Outside of that testimony, are you aware of any
13  other communications concerning the impact of HB 218 on
14  minority voters?
15      A.  Not that I recall.
16      Q.  In advance of the 2007 legislative session, did
17  the Division or the Secretary of State develop
18  legislative priorities for the session?
19      A.  I'm certain we developed a list of cleanup
20  legislation like, you know, we usually do.
21      Q.  Were you involved in the development of that
22  agenda?
23      A.  Yes.
24      Q.  Did the priorities include photo ID?
25      A.  No.

---

115

1       Q.  And why did it not?
2       A.  We consider that a policy issue that we would
3   not be making recommendations on.
4       Q.  And I believe you testified earlier that HB
5   1706 allowed a form of photo ID by county election
6   officials and HB 218 does not; is that correct?
7       A.  I'm sure that's right.  I just -- I don't see
8   that in here.  So I agree that it does not appear to
9   authorize that.
10      Q.  Do you know why it wasn't included as a form of
11  ID in HB 218?
12      A.  No.
13      Q.  Are you aware of any communications regarding
14  the exclusion of this form of photo ID from HB 218?
15      A.  No.
16      Q.  Are you aware of any communications between the
17  legislature and county election officials regarding HB
18  218?
19      A.  No.
20      Q.  Did the legislature hold hearings on HB 218?
21      A.  I'm pretty sure they did.
22      Q.  And were you invited to testify?
23      A.  I'm sure I was.
24      Q.  Did you accept this invitation?
25      A.  I'm you sure I did, yeah.

---

116

1       Q.  In what capacity did you testify?
2       A.  As a resource witness.
3           MR. MORTARA:  Ms. Westfall, we've hit
4   another over-an-hour period.  I don't know if you want
5   to do lunch, or Ms. McGeehan wants to do lunch, but I
6   know Chris probably needs a break.
7           MS. WESTFALL:  Certainly.  We will do
8   lunch.  Well, you know what, why don't we get through a
9   little bit more.  Can you wait ten more minutes more?
10  Get through the hearing so we can finish up this line.
11           Could you mark this as 284?
12           (Exhibit 284 marked for identification.)
13      Q.  (By Ms. Westfall)  You've been handed what's
14  been marked 284.  Do you recognize this document?
15      A.  Yes.
16      Q.  What is it?
17      A.  It is a transcript of the Senate State Affairs
18  Committee hearing on April 30th.
19      Q.  Directing your attention -- and this, for the
20  record, is an excerpt of the hearing transcript focusing
21  on your remarks at that hearing.  I'm sure your counsel
22  won't disagree with that representation.
23           If I could turn your attention to Page 99
24  of this transcript, and it is Bates stamped
25  TX_00213364.  Do you see that?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Ann McGeehan                                              May 31, 2012

---

### 117

1    A.  Yes.
2    Q.  That's where the exchange begins between you
3  and Senator Van de Putte.  Do you see that?
4    A.  Yes.
5    Q.  And I believe you testified in response to
6  questions from Senator Van de Putte that in the past
7  four years, the Division had not received any complaints
8  about voter impersonation; is that correct?
9    A.  Let me take a second to read it here.
10   Q.  Certainly.  Certainly.
11   A.  (Witness reading.)  Okay.  Yes.  That's -- I
12  reviewed my testimony with Senator Van de Putte.
13   Q.  And you did -- and you testified that the
14  Division had not received any complaints about voter
15  impersonation in the previous four years --
16   A.  Yes.
17   Q.  -- prior to your testimony; is that right?
18   A.  That's correct.
19   Q.  Apart from this testimony at the hearing, did
20  you or the Division provide anyone with additional
21  information about complaints of voter impersonation?
22   A.  I don't think so.
23   Q.  And do you see that on the next page, Page 101
24  of this exhibit, that you had an exchange with Senator
25  Lucio?

---

### 118

1    A.  Yes.
2    Q.  Do you see that in response to a question from
3  Senator Lucio, that there's no law that holds election
4  judges accountable for failing -- that there is no law
5  holding election judges accountable for failing to
6  report voter impersonation?  Do you see that?
7    A.  Let me just take a second to read that.
8    Q.  On Page 101.
9    A.  (Witness reading.)  Yes, I see that.
10   Q.  Do you have any facts or information for
11  believing that the fact that there is no such law
12  accounts for the absence of complaints of voter
13  impersonation that the Election Division has received?
14   A.  Complaints from election judges, you mean?
15   Q.  The fact that there's no law holding election
16  judges accountable for not reporting voter
17  impersonation?
18   A.  And whether that -- the lack of that -- not
19  having that law, whether that impacts on?
20   Q.  The number of reported allegations of in-person
21  voter impersonation that the Division has received?
22   A.  I -- I don't think that would have much of an
23  impact.
24   Q.  Turning your attention to Page 104 of Exhibit
25  284, do you see that you had an exchange with Senator

---

### 119

1  Ellis?
2    A.  Yes.  I'm going to just read that here real
3  quickly.
4    Q.  Certainly.  Let me know when you've had a
5  chance to take a look at it.
6    A.  (Witness reading.)  Okay.  I've read that.
7    Q.  Do you see that Senator Ellis asked you whether
8  the Division had any discussions about policy
9  initiatives to find voter fraud?  Right?
10   A.  Yes.
11   Q.  And in response you indicated that your office
12  for the past couple of years had been focusing on
13  implementation of HAVA; is that correct?
14   A.  That's correct.
15   Q.  Is it fair to say that voter impersonation was
16  not the focus of the Division in 2007?
17   A.  Yes.
18   Q.  And the Division had not made research on voter
19  impersonation a priority that year?
20   A.  Right.
21   Q.  And the Division, as a general matter, has
22  limited resources, correct?
23   A.  Yes.
24   Q.  And why had the Division decided not to devote
25  resources towards the issue of voter impersonation in

---

### 120

1  2007?
2    A.  We hadn't been directed to.  It was no law
3  requiring us to study it, or we were trying to comply
4  with the laws on the books.
5    Q.  Was it also because it wasn't much of a
6  problem?
7    A.  I couldn't say that.
8    Q.  Do you have any facts to indicate anything to
9  the contrary?
10       MR. MORTARA:  Objection, form.
11   Q.  (By Ms. Westfall)  You may answer.
12   A.  I don't have any facts on that.
13       MS. WESTFALL:  Thank you.  Okay.  Let's
14  take a break now.  I think it's a good breaking point.
15       (Lunch recess from 12:36 to 1:36 p.m.)
16   Q.  (By Mr. Westfall) Before the break, we were
17  discussing HB 218.  Were you aware of whether any of the
18  supporters of HB 218 argued that the bill would prevent
19  noncitizens from voting?
20   A.  I don't recall that.
21   Q.  Do you recall hearing that Representative
22  Brown, Betty Brown stated on the House Floor that the
23  bill was designed to keep illegal aliens, noncitizens,
24  and other people otherwise not qualified from voting?
25   A.  I don't recall that.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Ann McGeehan                                                          May 31, 2012

---

**121**

1    Q.   Are you aware that Lieutenant Governor Dewhurst
2  argued in 2007 that photo ID laws would prevent
3  noncitizens from voting?
4    A.   No.
5    Q.   And based on your knowledge of the election
6  code, would to HB 218, if enacted, prevent noncitizens
7  from voting?
8    A.   You know, only if they couldn't present the
9  forms of ID that are required.
10   Q.   In other words, it wouldn't -- to your
11  knowledge, it would not prevent noncitizens from voting?
12   A.   Well, unless a noncitizen was unable to obtain
13  one of these forms of ID.
14   Q.   But that would not be particularized to having
15  the status of being a noncitizen; is that correct?  That
16  would be related to whether they had ID, allowable ID in
17  HB 218?
18   A.   Right.  That was my point.  If, as being a
19  noncitizen, they were unable to obtain one of kinds
20  forms of ID.
21   Q.   Thank you.
22       Are you aware of whether a noncitizen can
23  obtain a Texas driver's license?
24   A.   My understanding is that a person has to have
25  legal residence in the state, so a noncitizen who is

---

**122**

1  here legally could get a driver's license is my
2  understanding.
3    Q.   And is it your understanding that a noncitizen
4  could obtain a concealed handgun license?
5    A.   I don't know.
6    Q.   Could a noncitizen obtain a military ID?
7    A.   I don't think so, but I don't know the answer
8  to that.
9    Q.   If a noncitizen became registered to vote, a
10  photo ID requirement for voting would not prevent that
11  person from voting; is that right?
12   A.   Well, again, I think it would relate to what ID
13  was required, and if a noncitizen was unable to obtain
14  one of the forms of ID, then that, I guess, would
15  prevent them from voting.
16   Q.   And assuming they were able to obtain one of
17  those forms of ID, a photo ID would not prevent that
18  individual from voting; is that right?
19   A.   That's right, if they had one of the permitted
20  forms of ID.
21   Q.   There has been deposition testimony in this
22  case that enacting photo ID law requiring voters to
23  present photo ID at the polls would deter ineligible
24  voters from attempting to register to vote.  Do you have
25  any facts or information that would support that

---

**123**

1  statement?
2    A.   No.
3    Q.   Would you agree that if the prevention of
4  noncitizen voting was a purpose of HB 218, that, in
5  fact, HB 218 would not be serving that purpose?
6       MR. MORTARA:  Objection, calls for
7  speculation.
8    Q.   (By Ms. Westfall) You may answer.
9    A.   The question is, if the purpose of 218 was to
10  prevent noncitizens from voting?
11   Q.   Would HB 218, in fact, serve that purpose?
12   A.   To the extent that a noncitizen was unable to
13  obtain one of the forms of ID, then it would help
14  accomplish that purpose.
15   Q.   And not to any other extent; is that right?
16   A.   To my understanding, uh-huh.
17   Q.   Would you say that there is not a nexus between
18  photo ID requirements imposed at the polls on election
19  day and preventing noncitizens from voting on the basis
20  of their citizenship status?
21   A.   I don't recall there being -- at least the
22  hearings that I was present at, I don't recall there
23  being a lot of testimony on that.  Whether, you know,
24  the overall concept of having tighter requirements at
25  the polls, whether that would discourage voter fraud

---

**124**

1  overall, you know, that's possible.  I don't know.
2    Q.   Do you have any facts to support that
3  supposition?
4    A.   Which supposition?
5    Q.   The one that you just testified to, that
6  stricter --
7    A.   Having more stricter?  No.
8    Q.   Are you familiar with the Crawford decision
9  issued by the U.S. Supreme Court in 2008?
10   A.   Yes.
11   Q.   Did you review that decision when it was
12  issued?
13   A.   I did.  It was a while ago, but I did read it.
14   Q.   Was it in 2008 when it was issued?
15   A.   Yes.
16   Q.   Do you believe it impacted the ability of
17  states to craft photo ID laws?
18   A.   Impacted how?  As far as constricted or --
19   Q.   Do you think it had any ability or any effect
20  on the ability of states to craft and enact photo ID
21  laws?
22   A.   I would say yes.
23   Q.   How?
24   A.   I think that it -- by ruling that there were no
25  federal constitutional issues, that sort of freed up

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

125

1    that as an argument at the state level.
2        Q.   Do you believe it impacted the ability of
3    states covered by Section 5 of the Voting Rights Acts to
4    obtain preclearance of a photo ID law?
5        A.   I think it probably has some bearing, but the
6    state, you know, still has to obtain Section 5
7    preclearance. It's not -- you still need to go through
8    the process, even though the Crawford case was decided.
9        Q.   What is your understanding of the bearing that
10   it has on Section 5?
11       A.   Well, I don't know that it has a direct impact
12   on the Section 5 process.
13       Q.   When you were at the Elections Division in
14   2008, when the opinion was issued, did your change your
15   procedures at all, with regard to Section 5 submissions,
16   as a result of the Crawford decision?
17       A.   No.
18       Q.   After Crawford, do you believe that states
19   covered by Section 5 of the Voting Rights Act need not
20   conduct any analysis of the impact of photo ID laws on
21   minority voters?
22       A.   No.
23       Q.   And why do you say that?
24       A.   I don't think the Crawford case spoke to
25   Section 5 issues.

---

126

1        Q.   Did you ever communicate that view to the State
2    Legislature?
3        A.   No.
4             MR. MORTARA:   Again, you may answer the
5    question with respect to public hearings.
6        A.   Publicly, yes, I have not.
7             MR. MORTARA:   And with respect to the
8    legislators on this list, but not with respect to
9    legislators not on this list.
10            MS. WESTFALL:   I was examining the witness
11   about facts and information she provided in the Election
12   Division. Are you still objecting --
13            MR. MORTARA:   Yes.
14            MS. WESTFALL:   -- to that question?
15            MR. MORTARA:   Yes.
16       Q.   (By Ms. Westfall) Was there a photo ID bill
17   introduced in the Senate in 2009?
18       A.   Yes.
19       Q.   Do you remember the bill number?
20       A.   No.
21       Q.   I'm going to hand you what's been previously
22   marked as U.S. Exhibit 29.
23            You have been handed what's been
24   previously marked U.S. Exhibit 29. Do you recognize
25   this exhibit?

---

127

1        A.   Yes.
2        Q.   What is it?
3        A.   Senate Bill 362 from 2009.
4        Q.   Do you know who it was introduced by?
5        A.   Senator Fraser, I believe.
6        Q.   Could you describe the -- could you describe
7    the forms of ID that are allowable under Senate Bill
8    362? And I would direct your attention to Page 5 of
9    Exhibit 29.
10       A.   Okay. Okay. It permitted one form of
11   identification, as listed in 63.0101A, and 0101A was
12   photo identification including driver's license,
13   military identification card, U.S. citizenship
14   certificate, passport, license to carry a concealed
15   handgun, and also a valid identification card that
16   contains a person's photograph and is issued by an
17   agency of the federal government or of the state
18   government.
19            And then also permitted, as proof of
20   identity, two forms of nonphoto ID, I think, and that
21   would include the voter registration certificate,
22   official mail from a governmental entity with the
23   person's address, a certified copy of birth
24   certificate, U.S. citizenship papers, a certified copy
25   of a person's marriage or divorce decree, court records

---

128

1    of a person's adoption, name change or sex change,
2    identification card issued to a person by the state or
3    the United States for obtaining public benefits,
4    including veterans' benefits, Medicaid or Medicare, a
5    temporary driving permit, pilot's license, library card,
6    or a hunting or fishing license.
7        Q.   Thank you. And to your knowledge, does this
8    include student IDs in the list of acceptable photo IDs?
9    Drawing your attention to cards issued by agencies or
10   institutions or political subdivisions of the state.
11       A.   Is that under the second list?
12       Q.   It's under the first.
13       A.   The first list?
14       Q.   Uh-huh.
15       A.   Yeah, I think that would probably include it,
16   from a public university.
17       Q.   And in comparing Exhibit 28, HB 218, with
18   Senate Bill 362, does it appear that for the most part,
19   the two bills are relatively similar in terms of
20   allowable ID?
21       A.   Yes.
22       Q.   Did the Secretary of State or Elections
23   Division take a public position on Senate Bill 362?
24       A.   No.
25       Q.   Were you or the Division involved in the



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

129

1    development or drafting of Senate Bill 362?
2        A.   Not as it was filed.
3        Q.   After it was filed, were you involved?
4        A.   Yes.
5        Q.   So why did you say not as it was filed?  What
6    did you mean?
7        A.   Nobody -- this was not -- before it was filed,
8    nobody asked us to review it or comment on it on
9    anything.
10       Q.   Thank you for your testimony.
11            Was there a time after it was filed that
12   the Division was asked to provide any assistance or
13   guidance with Senate Bill 362?
14       A.   This may be covered by the legislative
15   privilege.
16            MR. MORTARA:  You can answer with respect
17   to legislators on the list and not with respect to
18   others.  That's a standing instruction.  If you can
19   state that, when you're answering the question, that
20   will make things move faster and allow Ms. Westfall to
21   get through her questions, but otherwise, I can --
22       A.   I guess the communication that I had -- well,
23   there were some communications that were at public
24   committee meetings, and any other communications that I
25   might have had, I probably can't testify to.

---

130

1        Q.   So you're asserting privilege over those other
2    communications; is that correct?
3        A.   Yes.
4        Q.   Could you tell me what information you provided
5    in response to those inquiries, what factual information
6    you provided?
7            MR. MORTARA:  Ms. McGeehan, what
8    Ms. Westfall is getting at is, without disclosing
9    anything else about the communication, you can testify
10   about what information the Secretary of State had about
11   Senate Bill 362.  You cannot testify as to whom you
12   communicated that information, and if that person's name
13   is not on this list.  Do you understand?
14            THE WITNESS:  Uh-huh, right.
15            MR. MORTARA:  So you can testify as to
16   what information the Secretary of State or you or the
17   Elections Division had on Senate Bill 362.
18       A.   During the session, our office provided
19   information concerning, again, sort of, technical
20   information on how to make certain processes work within
21   the election code and how if other sections needed to be
22   amended in order to make this law work.
23       Q.   (By Ms. Westfall) Was that kind of conforming
24   technical amendments?
25       A.   Yes.

---

131

1        Q.   Is that how you would describe them?  And could
2    you tell me what particular sections of the code you
3    provided information on, from a subject matter-wise, not
4    the particulars.
5        A.   I think it was generally provisions in
6    Chapter 64 concerning what a voter presents and
7    technical changes on, you know, a voter who doesn't have
8    a certificate and what they have to present and issues
9    like that.  I'm thinking it was mostly Chapter 64-type
10   issues.
11       Q.   That related to the forms of ID or provisional
12   ballots or --
13       A.   To how ID relates to qualifying a voter.  So
14   Chapter 64 talks about accepting a voter for voting and
15   we provided some information on how to, you know,
16   integrate this new requirement into those existing
17   requirements.
18       Q.   Is there any other information that you
19   supplied concerning Senate Bill 362?
20            MR. MORTARA:  And again, with my prior
21   instruction.
22            THE WITNESS:  Uh-huh.
23       A.   There were again, you know, public hearings.
24   Representative Anchia may have asked for additional --
25   for data in 2009.  I think he did.  And I think that's

---

132

1    about it.
2        Q.   (By Ms. Westfall)  When did you provide this
3    information to the Senate?  At what point in the
4    legislative process?
5        A.   Which -- which information?
6        Q.   The technical information that you just
7    testified about.
8        A.   That was later in the session, like maybe
9    April.
10       Q.   Was that after --
11       A.   After it had passed the Senate and it was in
12   the House.
13       Q.   Were there any exchanges of documents between
14   you and the -- between the Division and the Senate
15   pertaining to those technical corrections or technical
16   advice or information?
17       A.   No, I don't think so.
18       Q.   How did you communicate that information you
19   just testified about?
20       A.   We met.
21       Q.   How many people were at that meeting?
22       A.   I think four.
23       Q.   Was Legislative Council at that meeting, the
24   Texas Legislative Council?
25       A.   No, I don't -- I don't think so.  I don't

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

133

1    remember, to be honest with you.
2        Q.  Was it only staff and legislators?
3        A.  They may have been brought in on the phone, the
4    Legislative Council.
5        Q.  Was that the sole meeting that you had with
6    anyone in the Legislature or any -- strike that.
7            Was that the sole communication that you
8    had with the Legislature about SB 362?
9        A.  No.
10       Q.  When was the next communication you had with
11   the Senate about 362?
12       A.  There was probably an earlier privileged
13   conversation, actually, that I --
14       Q.  Was that before the bill was filed?
15       A.  No, but it was before the bill was heard in the
16   Senate.
17       Q.  And was that meeting with staff and members of
18   the Senate?
19           MR. MORTARA:  You could say who the
20   meeting was with.  You can identify the participants of
21   the meeting.
22           THE WITNESS:  The category, not the names,
23   or the names?
24           MR. MORTARA:  You can identify the people
25   by their names, who were present at the privileged

134

1    meeting that you're referring to.  You can identify
2    their names and you can identify when it happened, and
3    you've already identified the subject matter as being
4    Senate Bill 362.  So you answer Ms. Westfall's question,
5    which is broadly getting to who was there.
6        Q.  (By Ms. Westfall) Who was at the meeting?
7        A.  Me, Elizabeth Winn, Senator Fraser, Janice
8    McCoy, and John Sepehri.
9        Q.  Was that the first meeting you had about 362
10   with anyone in the Senate?
11       A.  Yes, I think so.
12       Q.  And that was before the Senate heard --
13       A.  Heard the bill.
14       Q.  -- the bill?
15       A.  (Witness nods head yes.)
16           MS. WESTFALL:  Would you mark this as 285?
17   Thank you.
18           (Exhibit 285 marked for identification.)
19       Q.  (By Ms. Westfall) You have been handed what's
20   been marked U.S. 285.  Do you recognize this document?
21       A.  Yes.  I guess it's just showing the bill
22   history of Senate Bill 362.
23       Q.  And turning your attention to the second page,
24   can you see that the bill was filed in December 2008?
25       A.  Yes.

135

1        Q.  Ann when was it considered by the Senate?
2        A.  Considered for public hearing on March 10th,
3    2009.
4        Q.  Was it your testimony that you met with Senator
5    Fraser, Ms. McCoy, and Ms. Winn before March 10th?
6        A.  Yes.
7        Q.  Could you tell me the general nature of that
8    communication?
9            MR. MORTARA:  Ms. McGeehan, you have
10   already told her the general nature of the
11   communication, you're not to say anything beyond it
12   was about Senate Bill 362.
13       Q.  (By Ms. Westfall) Did you provide any
14   information to Senate Fraser or Ms. McCoy after that
15   meeting?
16           MR. MORTARA:  You may answer that question
17   yes or no, and to clarify it for the record the reason
18   is privileged.  And if you want to keep --
19           Generally, the reason that I'm saying
20   these things is privilege.  Do you want to keep me
21   saying that on the record?  It's up to you,
22   Ms. Westfall.
23           MS. WESTFALL:  You can have a standing
24   objection, as long as your witness understands it.  But
25   I'm asking her about factual information, so I think I

136

1    should be able to examine her on that.
2            MR. MORTARA:  I think it's a yes or no,
3    and I'm just trying to make sure that you just answer
4    the question yes or no.
5        A.  Did we provide any other information to --
6        Q.  (By Ms. Westfall) Following that meeting before
7    March 10th, 2009, with Senator Fraser and Ms. McCoy and
8    Ms. Winn.
9        A.  No.
10       Q.  Did you provide them with any documentation or
11   analysis after that meeting?
12       A.  I did not.
13       Q.  Did Ms. Winn?
14       A.  She did not either.
15       Q.  Did you have any communications with anyone on
16   the Governor --
17       A.  At least I don't think -- I honestly don't
18   remember if we did.  I don't think we did.
19       Q.  Did you have any communications with anyone in
20   the Governor's Office about Senate Bill 362?
21       A.  No.
22       Q.  Did you have any communications with anyone in
23   the Lieutenant Governor's Office about Senate Bill 362?
24       A.  No.
25       Q.  Did any of the bill's opponents contact you,



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

137

1  outside of the hearing process, about Senate Bill 362?
2      A.   I don't think so.
3      Q.   And besides the meeting that you had with
4  Ms. McCoy, Senator Fraser, Ms. Winn, before March 10th,
5  2009, and this subsequent meeting that you had, was it
6  with the same people?
7      A.   No.
8      Q.   Who was it with?  I'm talking about the meeting
9  in April.
10     A.   That was with -- on the -- that was after it
11  passed the Senate, and it was with Chairman Smith's
12  staff that was in charge of this bill.  His first name
13  is -- Travis Richmond is his name.  It's Travis
14  Richmond, me, John Sepehri.  Steven Schar may have been
15  there.  I don't remember that well.  And Elizabeth Winn
16  might have been there.  I don't remember if she was
17  there or not.  And that was the conversation where we
18  may have brought in Leg Council.
19     Q.   Were there any other meetings that you had with
20  any other legislators or their staff about Senate Bill
21  362?
22     A.   I don't think so.
23     Q.   And getting back to my previous question:  Did
24  any of --
25     A.   Well, let me think.  No, there weren't.

---

138

1      Q.   Did any of the bill's opponents contact you or
2  anyone in the Division about Senate Bill 362?
3      A.   I don't remember it, if they did.
4      Q.   Did the Division receive any request to conduct
5  any analysis of Senate Bill 362, other than what you
6  have already testified to?
7           MR. MORTARA:  You may answer that question
8  with respect to the legislators on this list, not with
9  respect to other legislators.
10     A.   Representative Anchia, I believe, asked similar
11  questions in 2009 that he asked in 2007, and so we
12  provided that data to him and to the whole House
13  Elections Committee.
14     Q.   (By Ms. Westfall) What did Representative
15  Anchia ask for?
16     A.   He asked for, you know, voter registration
17  numbers.  He asked for the number of voters that
18  registered with driver's license as opposed to social
19  security number.  He asked for information about the
20  number of referrals we had made to the Attorney
21  General's Office for election code for criminal
22  violations.  He may have asked -- well, there may have
23  been one or two other questions on there, but that was
24  the big part of it, I think.
25     Q.   Did he make that request in writing?

---

139

1      A.   No.
2      Q.   Did you respond in writing?
3      A.   Yes, I think we did.
4      Q.   And in response to my question about whether
5  any of the bill's opponents have contacted the Division
6  about Senate Bill 362, you have just testified, did you
7  not, that Representative Anchia made a request, and your
8  counsel advised you not to testify to the extent any of
9  the information was privileged, were you asserting
10  privilege in that response in part?
11          MR. MORTARA:  Ms. Westfall, I think my
12  instruction speaks for itself.
13          Again, Ms. McGeehan, it's not your
14  privilege to assert.  My instruction to you is:  Don't
15  answer the question with respect to legislators that do
16  not appear on this list.
17     A.   I think I answered the question.
18     Q.   (By Ms. Westfall) Okay.  Did the Division --
19  other than what you have just testified to in terms of
20  Representative Anchia, did the Division receive any
21  request to determine who among registers voters did not
22  possess the forms of allowable ID under Senate Bill 362?
23          MR. MORTARA:  The same instruction:  Only
24  with respect to these legislators and not others.
25     Q.   (By Ms. Westfall) Can you answer?

---

140

1      A.   Well, none of these legislators, other than
2  Representative Anchia, asked for that information.
3      Q.   Are you aware of any attempt to determine the
4  impact of Senate Bill 362 on minority voters?
5           MR. MORTARA:  You may answer that
6  question, if you can, with respect to communications you
7  had with these legislators, public hearings, but not
8  with respect to nonpublic communications you had with
9  legislators that are not on this list, the Governor's
10  Office or the Lieutenant Governor's Office.
11          MS. WESTFALL:  I would request that you
12  withdraw that objection.  My question was:  Are you
13  aware of any attempt to determine the impact of Senate
14  Bill 362 on minority voters.  I did not ask about
15  communications.
16          MR. MORTARA:  You can answer the question
17  yes or no.  I think the witness has already testified
18  that she --
19     A.   I mean, at the hearing, there were witnesses on
20  both sides on that point.  So, I mean, that's what I'm
21  aware of.  When it was heard on the Senate Floor, I
22  believe there were witnesses that testified to that.
23     Q.   (By Ms. Westfall) Are you aware of -- when you
24  say there were witnesses on both sides, you're saying
25  there were bill supporters who attempted to determine



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Ann McGeehan                                                    May 31, 2012

---

### 141

1    the impact of Senate Bill 362 on minority voters, or is
2    it limited to bill opponents?
3        A.   I don't know if all the witnesses stated that
4    they were opposed to it, but in particular, I'm trying
5    to remember the name of the -- generally, I think they
6    were affiliated with the bill's opponents.
7        Q.   Thank you.  In advance of the 2009 legislative
8    session, did the Division or the Secretary of State
9    develop legislative priorities for the session.
10       A.   For 2009?
11       Q.   Yes.
12       A.   Yes.
13       Q.   Were you involved in the development of that
14   agenda?
15       A.   Yes.
16       Q.   Did the priorities include photo ID?
17       A.   No.
18       Q.   And why didn't they?
19       A.   Because we only prepare recommendations on
20   technical issues, not policy issues.
21       Q.   Do you know which committee Senate Bill 362 was
22   referred to when it was filed in the Senate?
23       A.   I think it was heard by Committee of the Whole.
24       Q.   And what is your understanding of why that
25   referral occurred?

### 142

1        A.   To be honest, I forget.  I know there was a
2    reason.  I don't really remember exactly what it was.
3        Q.   Would Senate Bill 362 ordinarily have been
4    handled by State Affairs?
5        A.   Yes, probably.
6        Q.   And who is in charge in the Senate of referring
7    bills to particular committees?
8        A.   Well, I believe the Lieutenant Governor.
9        Q.   Do you know whether Senate Bill 362 was
10   referred to the Committee of the Whole in order to
11   ensure that it would receive expedited consideration by
12   the Senate?
13           MR. MORTARA:  Objection, foundation.
14       Q.   (By Ms. Westfall) You may answer.
15       A.   I really don't remember what the precise reason
16   was in '09.
17       Q.   Did it strike you as unusual that it had been
18   referred to the Committee of the Whole at the time?
19       A.   It was unusual.
20       Q.   Do you know whether the Lieutenant Governor has
21   any additional powers in the Committee of the Whole that
22   he doesn't have when the bill is in another -- being
23   heard before another committee?
24       A.   I'm really not an expert on the legislative
25   process, so I don't want -- I would be guessing.

### 143

1        Q.   Do you know whether the Lieutenant Governor
2    referred Senate Bill 36 to the Committee of the Whole so
3    that he could play an more active role in managing the
4    bill in committee?
5        A.   I don't know.
6            MS. WESTFALL:  Bear with me for one
7    minute.  Can we take a short break?
8            MR. MORTARA:  Sure.
9            MS. WESTFALL:  Thank you.  Let's go off
10   the record for one sec.
11           (Recess in place from 2:08 to 2:09 p.m.)
12       Q.   (By Ms. Westfall) Do you know whether the
13   Committee of the Whole held a hearing on Senate Bill
14   362?
15       A.   When?
16       Q.   Whether it did hold a hearing?
17       A.   Yes, they did.
18       Q.   Did you give testimony at that hearing?
19       A.   No.
20       Q.   Do you know whether the hearing occurred around
21   March 10th, 2009?
22       A.   That sounds right.
23       Q.   Are you aware -- did you read the transcript or
24   hear any reports about that hearing, from any of your
25   colleagues or otherwise?

### 144

1        A.   I watched portions of it.
2        Q.   Are you aware that during the hearing, the
3    bill's sponsor, Senator Fraser, was asked whether an
4    analysis of the racial -- analysis of voters without a
5    driver's license had been conducted?
6        A.   I don't remember that.
7        Q.   Following the hearing in March 2009, did the
8    Division submit any analysis of the racial composition
9    of voters who don't have a Texas driver's license to any
10   members of the Legislature or the Lieutenant Governor's
11   Office?
12       A.   No.
13       Q.   Did it surprise you that -- strike that.
14           At any time after the hearing, did the
15   Division conduct or attempt to conduct an analysis of
16   the racial composition of voters who do not have a Texas
17   driver's license?
18       A.   No.
19       Q.   Was Senate Bill 362 enacted by the Legislature?
20       A.   No.
21       Q.   What happened to it?
22       A.   It passed the Senate.  It did not get out of
23   the House, as I recall.
24       Q.   In 2010, did the House Elections Committee hold
25   a hearing about voter ID in the interim session?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

145

1      A.  I know they held -- in 2010?  They probably
2  did.  I don't remember exactly, to be honest with you.
3      Q.  Did Representative Smith chair that hearing?
4      A.  I believe so.  Yeah, I'm starting to remember
5  it a little bit.
6      Q.  Did you testify at that panel?
7      A.  I probably did, yeah.
8      Q.  Did you testify that the Division had referred
9  24 election code cases for possible prosecution in the
10  past two years?  Does that sound familiar?
11      A.  That sounds familiar.
12      Q.  And that was as of 2010; is that correct?
13      A.  If they had asked for that information, I would
14  have pulled what we had, and that sounds about right.
15      Q.  And of those 24, did you testify that two had
16  involved voter impersonation allegations?
17      A.  You know, I don't have a super clear memory of
18  it, but that sounds about right.
19          MS. WESTFALL:  Could you mark this?
20          (Exhibit 286 marked for identification.)
21      Q.  (By Ms. Westfall) You've been handed what's
22  been marked U.S. 286.  Do you recognize this document?
23      A.  Yes.  It appears to be an article from the
24  Houston Chronicle.
25      Q.  And if you see at the bottom of Exhibit 286, it

146

1  refers to your testimony before that panel.  Do you see
2  that?
3      A.  Yes.
4      Q.  Could you take a look at that and let me know
5  when you've read the sentences?
6      A.  Yes, I have finished reading it.
7      Q.  And does it indicate that you had referred 24
8  election code cases for possible prosecution in the past
9  two years as of the date of this testimony; is that
10  right?
11      A.  Yes.
12      Q.  And that two had involved voter impersonation
13  allegations; is that correct?
14      A.  Right.
15      Q.  And that more than 20 million votes had been
16  cast in Texas general elections since 2002; is that
17  right?
18      A.  That's what it says.
19      Q.  Is this article accurate about what you
20  testified to before the panel?
21      A.  It probably is.  I just -- I don't remember,
22  you know, everything I testified to on that.  But I have
23  no reason to think it's not -- not an accurate summary.
24      Q.  In 2010, did you have any other information
25  about voter impersonation allegations that you conveyed

147

1  to law makers outside of this hearing?
2      A.  No.
3      Q.  Were these two allegations the sum total of
4  voter impersonation you were aware of in 2010?
5      A.  I believe so.
6      Q.  Are you aware of whether either of those two
7  voters you testified about in 2010 were ultimately
8  convicted of voter impersonation?
9      A.  I don't know.
10      Q.  Who would know?
11      A.  The Attorney General's Office.
12      Q.  Before the 2011 session, were there any other
13  photo ID bills, in addition to the ones to which you
14  have testified about today, that you're familiar with?
15      A.  No, I don't think so.
16      Q.  Did you have any involvement in any other
17  drafting, development, or analysis of any other photo ID
18  bills that were introduced in either the House or Senate
19  before 2011 that you haven't already testified about?
20      A.  I don't think so.
21      Q.  Was a voter ID bill introduced in the Senate in
22  2011?
23      A.  Yes.
24      Q.  Was it Senate Bill 14?
25      A.  Yes.

148

1      Q.  Did Senator Fraser introduce it?
2      A.  Yes.
3      Q.  He testified in deposition in this case that he
4  started to work on Senate Bill 14 on May 31st, 2009.
5  Was there a time that you learned about Senate Bill 14
6  being developed?
7      A.  No.  I mean, not -- I learned of it when it was
8  filed.
9      Q.  So you did not see a draft of Senate Bill 14
10  before it was filed?
11      A.  No.
12      Q.  Are you aware of whether the Division provided
13  any comments on Senate Bill 14 on drafts before it was
14  filed?
15          MR. MORTARA:  Ms. McGeehan, you may answer
16  that question with respect to public comments, with
17  respect to communications with legislators on this list,
18  but not with respect to Senator Fraser or any legislator
19  that is not on this list, the Governor Lieutenant or
20  Governor.
21          THE WITNESS:  Whether there were or were
22  not?
23          MR. MORTARA:  You can answer that question
24  whether there or not with respect to these people.
25          THE WITNESS:  These folks, yeah.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

**149**

1    A.  Then I guess I can only say that there were no
2  conversations with these folks.
3    Q.  (By Ms. Westfall) Thank you.
4        As to legislators not on that list, how
5  many conversations about Senate Bill 14, before it was
6  filed, are you aware of?
7        MR. MORTARA:  You can answer that
8  question.
9    A.  Before Senate Bill 14 was filed?  I'm not aware
10 of any.
11   Q.  (By Ms. Westfall) Are you aware of any written
12 communications about Senate Bill 14 between the Division
13 and anyone in the Legislature before it was filed?
14   A.  No.
15   Q.  Did the Division receive any requests for any
16 information related to photo ID before Senate Bill 14
17 was filed?
18   A.  I don't think so.
19   Q.  Did the Division independently conduct any
20 research related to photo ID before Senate Bill 14 was
21 filed?
22   A.  No.
23   Q.  You have been handed what's been previously
24 marked as United States 81.  Do you recognize this
25 document?

---

**150**

1    A.  Yes.
2    Q.  What is it?
3    A.  It's Senate Bill 14.
4    Q.  Are you familiar with the provisions of Senate
5  Bill 14 as -- and is this -- strike that.
6        Is this the version that was filed, do you
7  know, as opposed to engrossed?
8    A.  Right.  It looks like the one that was filed.
9    Q.  Could you review the forms of identification
10 provided in the bill, Senate Bill 14 as filed, and let
11 me know when you've had chances to do so?  I will direct
12 your attention to Page 8.
13       MR. MORTARA:  Ms. Westfall, I wrote the
14 number down wrong.  What is it?
15       MS. WESTFALL:  It's 81, previously marked.
16       MR. MORTARA:  Thank you.
17   A.  Okay.  It requires photo identification
18 including -- which includes a driver's license or a
19 personal ID card issued by DPS, that has not expired; a
20 U.S. military identification card that contains the
21 person's photograph and has not expired; a United States
22 citizenship certificate that contains the person's
23 photograph, or a United States passport that has not
24 expired.
25   Q.  (By Ms. Westfall) And could you compare how

---

**151**

1  this compares to Senate Bill 14 as filed with the forms
2  of allowable ID under Senate Bill 32?
3    A.  Senate Bill 14 requires photo ID, whereas the
4  prior versions permitted photo ID or two forms of
5  nonphoto ID.
6    Q.  And would you describe that as a significant
7  change in the legislation between 362 and 14?
8    A.  Yes.
9    Q.  Do you know why Senate Bill 14 didn't allow for
10 use of nonphoto IDs?
11   A.  No.
12   Q.  Do you know why Senate Bill 14 only allows for
13 the use of unexpired IDs?
14   A.  No.
15   Q.  Do you know why the forms of ID have been
16 significantly reduced between Senate Bill 362 and Senate
17 Bill 14 as filed?
18   A.  No.
19   Q.  Are you aware of any forms of ID that the
20 Legislature or the bill's sponsor considered including
21 in Senate Bill 14 that were not included?
22       MR. MORTARA:  Ms. McGeehan, you can answer
23 that question yes or no.  It's fine.
24       I'm sorry for interrupting, Ms. Westfall.
25   A.  No.

---

**152**

1    Q.  (By Ms. Westfall) Are you aware of whether the
2  Legislature considered allowing expired forms of ID?
3    A.  I'm not aware.
4    Q.  Are you aware of whether the Legislature
5  considered allowing forms of ID that had been expired
6  two years prior to the election?
7    A.  I'm not aware.
8    Q.  Are you aware of any communications with anyone
9  in the Legislature about the use of expired forms of
10 photo ID?
11   A.  No.
12   Q.  If a photo ID is expired but was validly
13 issued, why doesn't that prove or doesn't that prove
14 that the person is the same person on the ID, in your
15 view?
16   A.  Could you restate that question?
17   Q.  Certainly.  That was -- it's after lunch.
18       If a photo ID is expired but was validly
19 issued, does that prove the person is the same person
20 who appears on the ID?
21   A.  Yes.
22   Q.  How often do you have to go to get your
23 pictures taken in Texas for your driver's license?
24   A.  It could be as little as every six years --
25 well, the driver's licenses expire in six years.  I



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

| 153 | 155 |
|-----|-----|
| 1   think if you have good record, it can be extended<br>2   another six years.<br>3        Q.   Is it possible also to renew your driver's<br>4   license by mail in Texas?<br>5        A.   You can do that once, I think, and then you<br>6   have to go in person the next time.<br>7        Q.   And so how long would that be?<br>8        A.   I think the maximum would be 12 years.<br>9        Q.   Under Senate Bill 14 as filed, how many forms<br>10  of military ID would be acceptable?<br>11       A.   Just a military identification card.<br>12       Q.   What does that consist of?<br>13       A.   It needs to be a current identification card<br>14  issued by the U.S. military to somebody who is in --<br>15  who's in the military.<br>16       Q.   Would that include active duty?  Inactive<br>17  duty?  Family members of military?<br>18       A.   I don't think it includes --<br>19       Q.   Retirees, et cetera?<br>20       A.   You know, it's been a little while since I<br>21  looked at this, and, you know, we were in process -- the<br>22  Secretary of State's Office was in the process of trying<br>23  to educate, you know, and develop training.  I don't<br>24  think it included family members, and I think it had to<br>25  include somebody who was a current member of the | 1        Q.   I see.  In November 2011; is that correct?<br>2        A.   Right.<br>3        Q.   Did you have any communications with anyone in<br>4   the Legislature about which forms of military ID this<br>5   provision would encompass?<br>6        A.   I guess to the extent that they're not on this<br>7   list, it would be privileged.<br>8            MR. MORTARA:  I think the way Ms. Westfall<br>9   has framed the question, you can answer, with respect to<br>10  all legislators, yes or no.<br>11           THE WITNESS:  Okay.<br>12       A.   Yes.<br>13       Q.   (By Ms. Westfall) When did that communication<br>14  occur?<br>15       A.   It occurred after I made a statement at a<br>16  seminar when asked about what constitutes U.S. military<br>17  identification cards.<br>18       Q.   Was that after the signing of the bill in May<br>19  of 2011?<br>20       A.   Yes.<br>21       Q.   You didn't have any communications about what<br>22  would constitute a military ID before the bill was<br>23  signed; is that right?<br>24       A.   Correct. |
| **154** | **156** |
| 1   military.<br>2        Q.   How do you have that?  What's the basis of your<br>3   understanding?<br>4        A.   Well, you know, there were a lot of questions<br>5   that came up regarding veterans, veteran ID cards, and<br>6   I'm not sure what decision ultimately the Secretary of<br>7   State's Office came down on that, as far as whether<br>8   that would be included or not.<br>9        Q.   Does this bill provide the Secretary of State<br>10  with rule making authority?<br>11       A.   I know we had to develop the training<br>12  materials.  Yeah, it does have -- there is some rule<br>13  making authority in here.<br>14       Q.   And does that rule making authority enable you<br>15  to define the term military ID, or is it with regard to<br>16  other portions of the bill?<br>17       A.   I believe it was in regard the other portions<br>18  of the bill.<br>19       Q.   So how would military ID be defined?<br>20       A.   Well, I mean, that's -- that's the point.  When<br>21  we would -- when the Secretary of State would be<br>22  developing the training instructions, we would have to<br>23  figure out a way how to explain that.  But that occurred<br>24  after -- or, you know, that was occurring as I was<br>25  leaving. | 1        Q.   What is a citizenship certificate?<br>2        A.   My understanding, that's something a court<br>3   would issue to someone who had obtained citizenship<br>4   status.  But again, you know, when I left, it was sort<br>5   of still early days in developing how these items would<br>6   be described and explained.<br>7        Q.   Did you have any communications with anyone in<br>8   the Legislature about defining that term or<br>9   understanding what that meant before the bill was signed<br>10  in May of 2011?<br>11       A.   No.<br>12       Q.   Do you know how much it costs to obtain a<br>13  citizenship certificate?<br>14       A.   No.<br>15       Q.   Do you know how much it costs to get a<br>16  replacement certificate?<br>17       A.   No.<br>18       Q.   Do you know how long it takes to get a<br>19  replacement certificate?<br>20       A.   A replacement U.S. citizenship certificate?<br>21       Q.   Correct.  I'm using the shorthand.  Thank you.<br>22       A.   Yeah.  Yeah.  No, I don't.<br>23       Q.   Do you know how much it costs to obtain a U.S.<br>24  passport?<br>25       A.   I got one a couple of years ago, and I think it |



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

157

1  was about 80 dollars.
2      Q.  Do you know what documents you have to provide
3  to get one?
4      A.  Generally.
5      Q.  Could you tell me what they are?
6      A.  Proof of your birth, I think.  I'm not an
7  expert on it.  I got one myself a couple of years ago.
8      Q.  Are you familiar with the Georgia and Indiana
9  photo ID laws?
10     A.  Not really.
11     Q.  Have you ever reviewed those statutes?
12     A.  No.
13     Q.  Did you see any, read any, or hear any summary
14  of those laws?
15     A.  I have probably read about those laws.
16     Q.  Are you aware of whether Senate Bill 14 and the
17  Georgia photo ID law are similar or dissimilar?
18     A.  I'm not aware.
19     Q.  Did you have any communications with anyone in
20  the Legislature or the Lieutenant Governor's Office
21  about the Georgia photo ID law?
22     A.  No.
23         MR. MORTARA:  You can answer that question
24  with respect to everyone.
25         THE WITNESS:  Okay.

---

158

1      Q.  (By Ms. Westfall) Are you aware of any
2  communications or discussions within the Legislature
3  about advancing a photo ID bill that adhered more
4  closely to the Georgia law than Senate Bill 14 as filed?
5         MR. MORTARA:  You can answer that with
6  respect to public communications with the legislators on
7  this list.
8      A.  I did not have a conversation with any of these
9  legislators on that issue.
10     Q.  (By Ms. Westfall) Are you aware that the
11  Georgia photo ID law allows for the use of expired IDs?
12     A.  No.
13     Q.  Are you aware that the Georgia photo ID law
14  allows the use of valid employee cards --
15     A.  No.
16     Q.  -- issued by a state or federal agency?
17     A.  No.
18     Q.  Are you aware that the Georgia photo ID law
19  allows for the use of photo ID issued by any entity of
20  the United States or Georgia or another state entity?
21     A.  No.
22     Q.  And are you familiar with the Indiana photo ID
23  law?
24     A.  No.
25     Q.  Are you aware of any discussion within the

---

159

1  legislator about advancing a photo ID law that was
2  modeled on Indiana's law?
3         MR. MORTARA:  You may answer the question
4  with respect to the legislators on the list and not
5  others.
6      A.  I'm not aware of any conversation with these
7  legislators.
8      Q.  (By Ms. Westfall) Do you know what the term
9  "legislative emergency" means within the Texas
10  Legislature?
11     A.  I don't know the definition.
12     Q.  Could you tell me generally what it means?
13     A.  I think it is -- again, I'm sort of guessing,
14  but I believe it's when the Governor declares that an
15  emergency exists that requires prompt legislative
16  action.
17     Q.  Was photo voter ID declared to be an
18  legislative emergency?
19     A.  I believe it was.
20     Q.  And when did you first learn about this?
21     A.  When it was reported in the media.
22     Q.  Did the Secretary of State or Election Division
23  request this designation?
24     A.  No.
25     Q.  And did the legislative emergency -- was it

---

160

1  declared sometime in January 2011?
2      A.  That sounds right.
3      Q.  Did your office receive any notice of this
4  declaration before it occurred?
5      A.  No.
6      Q.  Do you know why Governor Perry designated voter
7  ID as a legislative emergency?
8      A.  No.
9      Q.  Are you aware of any election law having been
10  designated as an emergency prior to photo ID in January
11  of 2011?
12     A.  No.
13     Q.  Do you know what the consequences are
14  legislatively when a bill is declared an emergency --
15     A.  No, I don't.
16     Q.  Must the Legislature consider the issue within
17  the first 60 days of session?
18     A.  I don't know.  That might be the case, but I
19  don't know the rules.
20     Q.  Do you know why Senate Bill 14 needed to be
21  considered in the first 60 days of the Legislature?
22     A.  No.  I mean, I can assume it's because it was
23  declared an emergency, but I'm not familiar with those
24  rules.
25     Q.  But do you know why there was urgency in

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Ann McGeehan                                                    May 31, 2012

| 161 |
| --- |

1    considering photo ID --
2        A.   No.
3        Q.   -- in 2011?  Can you identify, as you're
4    sitting here -- well, actually, can you identify
5    anything related to the administration of elections in
6    the state of Texas that would have necessitated the
7    Legislature to consider voter ID within the first 60
8    days of the session in 2011?
9        A.   I don't know of any.
10       Q.   And you were, at the time, the director of the
11   Elections Division, correct?
12       A.   Uh-huh, yes.
13       Q.   So you would probably be the best person to
14   know if there was any emergency related to the
15   administration of elections that would have prompted
16   that; is that right?
17       A.   Well, you know, that's the Governor's role.
18   That's not the Elections Division's role.  So I can't
19   speak for what was in the Governor's mind.
20       Q.   Certainly.  But you would know what would be
21   happening, in terms of voting and elections in the state
22   of Texas in 2011 in January; would you not?
23       A.   To the extent that I ever would be, but I'm
24   just saying that as far as the role of declaring or
25   determining what's an emergency for legislative

| 162 |
| --- |

1    purposes, that's not a role the Elections Division has
2    any -- we don't have a role that.
3        Q.   Certainly.  And maybe I'm not being clear in my
4    question.  I'm asking whether you would be the best
5    person to know, as of January 2011, whether there was
6    any situation related to the administration of elections
7    that would have required emergency action on photo ID?
8        A.   No, I wouldn't say that.  I mean, I think the
9    state law puts that authority with the Governor to make
10   those determinations.
11       Q.   And you think the Governor is the person who
12   knows the most about election administration in the
13   state?
14       A.   State law says he's the person with the power
15   to make those determinations.
16       Q.   As to emergency designations?
17       A.   Correct.
18       Q.   Is that your testimony?
19       A.   Yes.
20       Q.   But I'm asking whether -- who is the person
21   with knowledge, the most knowledge of the administration
22   of elections in the state of Texas in the government?
23   Would that be the Elections Division?
24       A.   As far as what the rules are, that would be --
25   yes, that would be probably the Elections Division in

| 163 |
| --- |

1    the Secretary of State's Office.  As to what's happening
2    outside, not necessarily.
3        Q.   Thank you.
4            Do you know how Governor Perry made this
5    decision to declare it an legislative emergency?
6        A.   No.
7        Q.   Was Senate Bill 14 referred to the Committee of
8    the Whole Senate?
9        A.   Yes.
10       Q.   Do you know why it was referred to the
11   Committee of the Whole?
12       A.   I think it was for similar reasons as '07, but
13   I don't know for sure.
14       Q.   Did you mean '09?
15       A.   I'm sorry.  '09.  Yes.  '09.
16       Q.   And do you know what those reasons were?
17       A.   No.
18       Q.   In other words, your testimony is that it
19   followed the same procedural course that it did in 2009?
20       A.   That's my understanding, that it followed the
21   same course as '09, and was heard by Committee of the
22   Whole.  I don't know why.
23       Q.   Did you testify before the Committee of the
24   Whole Senate on January 25th, 2011?
25       A.   Yes.  That sounds right.

| 164 |
| --- |

1        Q.   Did you appear as a resource witness?
2        A.   Yes.
3            MS. WESTFALL:  Could you mark this as 287.
4            (Exhibit 287 marked for identification.)
5        Q.   (By Ms. Westfall)  You have been handed what's
6    been marked as U.S. Exhibit 287.  Do you recognize this?
7        A.   Yes.
8        Q.   What is it?
9        A.   It appears to be a transcript of at least some
10   of my testimony during the Senate hearing for Senate
11   Bill 14.
12       Q.   And I will represent to you that this is an
13   excerpt of the transcript from the Committee of the
14   Whole Senate on January 25th, 2011, that contains your
15   remarks.  And if you could take a look at the exhibit
16   and let me know when you've had a chance to review the
17   questions and answers to which you were responding, and
18   I'll direct you to a page in one moment.
19       A.   Okay.  (Reading documents.)  Okay.
20       Q.   Turning your attention to Page 444 of the
21   transcript, which is Texas 00000800, do you see that
22   questions were posed from Senator Wendy Davis?
23       A.   Yes.
24       Q.   And she was asking you, was she not, questions
25   related to persons who filled out a voter registration



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

165

1    application who indicated neither a driver's license
2    number nor a social security number; is that correct?
3        A.   Right.
4        Q.   Do you recall the analysis that you conducted
5    in that regard?
6        A.   I think she was asking for a percentage of
7    people, I don't think I had that, a percent figure with
8    me at the time, so I gave her the raw numbers.
9        Q.   Do you recall that you had analyzed the numbers
10   after enactment of the Help America Vote Act, and
11   applicants were required to supply either a driver's
12   license number or a social security number, and
13   analysis of persons who supplied neither.  Is that the
14   analysis that you conducted?
15       A.   Yes.  It looks -- yes.  I answered that, since
16   January 1st, 2006 through December 31st, 2010, 2.3
17   million -- oh, no.  2.3 million provided driver's
18   license number.  As far as the number that didn't fill
19   out either one -- well, you know, there's a couple of
20   questions in here because we had -- you know, we,
21   obviously, had data before 2006 as well.  And so even
22   before it was required, people voluntarily provided
23   driver's license numbers.
24       Q.   Right.  And the analysis that you just
25   described concerning persons between January 1st, 2006

---

166

1    and 2011 who had not supplied either a driver's license
2    or a social security number when they registered?
3        A.   Uh-huh.
4        Q.   Who asked you to conduct that analysis?
5        A.   I think that was information that we had
6    previously supplied to Representative Anchia, and so I
7    think we were updating it for the 2011 session.
8        Q.   Could you indicate your testimony as to what
9    your analysis found in terms of the numbers of people
10   who had registered without either of those numbers?  And
11   I would direct your attention to Page 445 of the
12   excerpt, Texas 00000801, the top of the page.
13       A.   Oh, okay.  Sorry, I almost missed it.
14            So, it looks like I responded that since
15   2006, the number of people that provided neither one was
16   34,506.
17       Q.   And had Representative Anchia asked you to
18   update this analysis after Senate Bill 14 was filed, or
19   did you do it on your own?
20       A.   I think we did that on our own.
21       Q.   And why did you do it?
22       A.   We expected we would get asked.
23       Q.   When did you conduct that analysis?
24       A.   Shortly before the Senate hearing.
25       Q.   So you simply updated the numbers after the

---

167

1    bill was filed in January and before the hearing; is
2    that correct?
3        A.   Yeah.  I think, sort of, to be prepared for
4    this hearing, we updated those numbers.
5        Q.   Did you have any conversations with anyone in
6    the Legislature, other than Representative Anchia, about
7    this analysis?
8        A.   No.
9        Q.   And can you explain why you focused on the date
10   range of January 1st, 2006 and December 31st, 2010.
11       A.   Because prior to that time, they weren't -- it
12   was not required, so that was sort of a useful
13   statistic.  Since it had been required, this was the
14   number of folks that weren't able to provide IT.
15       Q.   Did you also, as part of that analysis, review
16   the entire state voter file to determine which voters
17   had a social security number and which -- or who had
18   voluntarily provided a social security number?
19       A.   Right.  Yes.
20       Q.   And which voters had voluntarily provided a
21   driver's license number?
22       A.   We did.
23       Q.   When did you conduct that analysis?
24       A.   I believe we did it in 2009 pursuant -- or
25   2007, or maybe both, pursuant to Representative Anchia's

---

168

1    request, and then we updated that in preparation of this
2    2011 hearing.
3        Q.   Did you likewise conduct that analysis in
4    January 2011?
5        A.   Yes.
6        Q.   And what number did you find, based on that
7    analysis, of persons who had not supplied either a
8    social security number or a driver's license number?
9        A.   The number was 690,887.
10       Q.   And I believe you just testified that, that
11   before January 1st, 2006, voter applicants could
12   voluntarily supply that information.
13       A.   Right.
14       Q.   So what is the implication of the fact that
15   voters were only supplying that information voluntarily,
16   in terms of the numbers of people who are indicated not
17   to have those forms of ID in the voter file?
18       A.   It would mean that there could be people who
19   were registered to vote before 2006 that didn't provide
20   a driver's license number or a social security number,
21   but might, in fact, have them.
22       Q.   And as of the date of this hearing, January
23   25th, 2011, is the sum total of all the analyses that
24   the Division had undertaken to determine which voters in
25   the state's voter registration database did not have a

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

169

1   form of photo ID allowable under Senate Bill 14 or its
2   predecessors, is that what you testified to?
3       A.   Yes.
4       Q.   You hadn't conducted any other analysis?
5       A.   Correct.
6       Q.   Is that correct?
7       A.   Yes.
8       Q.   Is there any analysis that you did not publicly
9   disclose that you had conducted?
10      A.   No.
11      Q.   On the day of the Senate hearing on Senate Bill
12  14, did Senator Williams ask you to conduct additional
13  analysis of which registered voters did not have
14  driver's license?  And I would refer you to your
15  testimony at Page 446.
16      A.   Yes.
17      Q.   What did he ask you to investigate or analyze?
18      A.   I thought he publicly asked us a question, but
19  here on Page 446, I am sort of repeating what he asked.
20  And I believe he asked us to see if we could do any
21  analysis to get -- to look at these numbers a little
22  more closely and compare them against the driver's
23  license database to see if we could get a better handle
24  on the number of voters that didn't have driver's
25  licenses or personal ID numbers.

---

170

1       Q.   Was that the first time that Senator Williams
2   had asked you to do that?
3       A.   Yes.
4       Q.   Had anyone asked you to do that type of match
5   before January 25th, 2011?
6           MR. MORTARA:  You may not answer that
7   question with respect to nonpublic requests made by
8   legislators not on the list.
9       Q.   (By Ms. Westfall) Do you have any testimony?
10      A.   Nobody on this list asked us to do that before
11  this hearing.
12      Q.   Turning your attention to Page 489, of your
13  remarks before the Senate.  Tell me when you're there.
14      A.   Okay.  I'm there.
15      Q.   Do you see Senator Williams asks you some
16  questions, halfway through the page?
17      A.   Okay.
18      Q.   And is he asking you, or making reference to
19  having talked earlier with you about cross-referencing
20  driver's license and voter registration?  Do you see
21  that on to the next page?
22      A.   Yeah.  He asked how it was coming along.
23      Q.   And he had just asked you earlier in the day?
24      A.   Yes.
25      Q.   Is that right?

---

171

1       A.   Right.
2       Q.   And so he wanted a status report hours later?
3       A.   Right.
4       Q.   Is that correct?
5       A.   Yes.
6       Q.   And he indicates there he only asked you today;
7   is that right?
8       A.   Right.
9       Q.   So he's referring to conversations he had with
10  you that day?
11      A.   Correct.
12      Q.   And in response, you indicated that you were
13  having difficulty with matching, is that correct, and
14  there were some IT issues?
15      A.   Yes.
16      Q.   What were the difficulties you were having in
17  conducting that match?
18      A.   Well, I think we needed to develop what the
19  matching criteria was going to be and just comparing the
20  data.  I mean, we had go through our IT department to,
21  you know, set that up.  So at this point in time, I
22  really had no idea how long that was going to take.
23      Q.   I see.  So in terms of matching criteria, what
24  do you mean?
25      A.   To -- you know, to determine what data fields

---

172

1   to match on between the voter database and the driver
2   database.  And, you know, would it be on first name,
3   last name, middle name, date of birth, county, address,
4   you know, what would be the exact criteria.
5       Q.   And prior to January 25th, 2011, had you given
6   any thought to how you would do that matching criteria?
7       A.   No.
8       Q.   Other than the matching criteria, you said
9   there were other IT issues involved; is that right?
10      A.   Right.
11      Q.   Could you describe those?
12      A.   Well, and I'm not a technical person, but, you
13  know, the format -- the data is in different formats, so
14  comparing the SOS data with the DPS data, sometimes
15  there are issues on making sure we can match up the
16  data.  Again, that's not my area of expertise.
17      Q.   And were you foreseeing that being a problem?
18      A.   It usually is a problem, so...
19      Q.   And had you had any communications or meetings
20  with the Department of Public Safety, prior to January
21  2011, about conducting that type of match?
22      A.   No.
23      Q.   Had you had any meetings with DPS about
24  matching criteria?
25      A.   Not on -- the only time we had -- we have met



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Ann McGeehan                                                          May 31, 2012

---

### 173

1  with DPS on matching criteria for purposes of HAVA and
2  verifying driver's license numbers for HAVA purposes.
3      Q.  But for purposes of determining who in your
4  voter registration database has driver's licenses, you
5  had not?
6      A.  We had not done that.
7      Q.  And had you not as of January 25th, 2011 --
8      A.  Correct.
9      Q.  -- because you just had received that request
10 from Senator Williams that day; is that right?
11     A.  That's right.
12     Q.  Was there a time, after January 25th, 2011,
13 that you provided Senator Williams, or any other
14 legislator or the Lieutenant Governor, with information,
15 factual analysis related to matching of the voter
16 registration and driver's license database?
17         MR. MORTARA:  You may answer that
18 question.
19     A.  No.
20     Q.  (By Ms. Westfall) Do you recall that during
21 this hearing, the Senate hearing, you also had a
22 colloquy with Senator Davis about whether the Secretary
23 of State gathers demographic information about voters by
24 race, gender, disability, and age?
25     A.  I vaguely remember that.

---

### 174

1      Q.  And I'll direct your attention to Page 460, if
2  you could take a look at your testimony and let me know
3  when you've had an opportunity to review it.
4      A.  (Reading documents.) Okay.
5      Q.  How did you respond to Senator Davis's inquiry
6  about whether the Secretary of State gathers demographic
7  information about voters by race, gender, disability,
8  and age?
9      A.  I explained what data we had, which is gender.
10 That used to be a required field on the voter
11 registration application.  So we have some information
12 on gender, but I guess I said since 1995, it was
13 optional, so it's not complete.  And on age, obviously,
14 we have that data, because that's required, birth date
15 is required.  And then on ethnicity, I explained that we
16 didn't collect any information regarding race, and that
17 the only tool we had was the Hispanic surname list to
18 identify voters with Hispanic surnames.
19     Q.  And did Senator Davis further ask you how the
20 Secretary of State would be able to respond to questions
21 about whether Senate Bill 14 disproportionately impacts
22 minority voters?  Directing your attention to Page 461.
23 Do you see that?
24     A.  Yes.
25     Q.  And what was your response?

---

### 175

1      A.  I explained what current process was and what
2  information we had access to, and that if the
3  Legislature wanted to establish a process, that we could
4  collect it, we'd have to change the voter registration
5  application to collect that data.
6      Q.  And your testimony, in short, was that you were
7  able to do Spanish surname analysis; is that correct?
8      A.  Correct.
9      Q.  And that that was the sum total of what you
10 were currently able to do?
11     A.  Right.
12     Q.  Was there any other method of identifying the
13 race of a voter in the Texas voter database that you did
14 not testify about in the Senate hearing on January 25th,
15 2011?
16     A.  No.
17     Q.  And do you recall that at the conclusion of
18 Senator Davis's colloquy with you, she opined that
19 information about the impact of Senate Bill 14 on
20 minority voters was important for review under Section
21 5, correct?
22     A.  Yes.
23     Q.  Subsequent to this hearing, did the Division
24 undertake any analysis of the impact of Senate Bill 14
25 on minority voters?

---

### 176

1      A.  Pursuant to a request from the Justice
2  Department, we did.
3      Q.  Prior to that time?
4      A.  Prior to that time, we did not.
5      Q.  And why was -- when was that response to the
6  Justice Department?
7      A.  I think we submitted the bill in maybe the
8  middle of June or the end of June.
9      Q.  Was it July?
10     A.  That sounds right.
11     Q.  And when did you submit information about the
12 impact on minority voters to the Justice Department, to
13 the best of your recollection?
14     A.  Probably August or September.
15     Q.  And when was the bill signed into law?  Was it
16 May 2011?
17     A.  I don't really remember.  It probably was.  I
18 don't remember exactly.  Oh, it might be on that list
19 of --
20     Q.  I'm going to hand you what's been previously
21 marked as Exhibit 8.  You've been handed what's been
22 previously marked as U.S. Exhibit 8.  Do you recognize
23 this document?
24     A.  Yes.
25     Q.  What is it?

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 177

1    A.   It looks like the bill history on Senate
2    Bill 14.
3    Q.   Does this refresh your recollection -- or could
4    you refer to U.S. Exhibit 8 to refresh your recollection
5    as to when Senate Bill 14 was --
6    A.   I think I can, if I can read it right.  Yes.
7    Okay.  It was signed by the Governor on May 27th.
8    Q.   Why did the Division not undertake an analysis
9    of the racial impact of Senate Bill 14 prior to
10   receiving a request from the Justice Department, when
11   Ms. Davis had requested this information of you in
12   January 2011?
13   A.   She requested how could we -- I mean, her
14   question, I thought, was looking into the future, how
15   would we be able to analyze the impact on voters if we
16   didn't collect data on race at the time of voter
17   registration, and I explained that that would require a
18   legislative change, and nobody changed the law to
19   accomplish that.
20   Q.   So was it your feeling that you could not
21   conduct that analysis absent a change in state law?
22   A.   We generally don't conduct -- the Secretary
23   State's Office does not usually conduct investigations
24   or, sort of, analyses of that sort, as a general rule.
25   Q.   But state legislators had requested that

---

### 178

1    information of your office, had they not, Representative
2    Anchia and Senator Davis; is that correct?
3    A.   We responded to every request they made.
4    Nobody asked for that particular data of racial
5    breakdowns of voters who didn't have driver's licenses
6    or personal identification cards.
7    Q.   Is it your testimony Ms. Davis was not seeking
8    that information?
9    A.   That's not how I understood her question and
10   that's not how I answered her question.
11   Q.   Okay.
12   A.   She never followed up.
13   Q.   I see.  But you testified earlier that you had
14   involvement in hundreds and hundreds of Section 5
15   submissions, correct?
16   A.   Yes.
17   Q.   So did you that believe you would ultimately,
18   if the law was enacted and signed by the Governor, need
19   as part of the Section 5 process to provide that
20   information to the Justice Department?
21   A.   We didn't include in it our initial submission,
22   so I guess we didn't feel like it was required.
23   Q.   And why not?
24   A.   I think we provided, sort of, the standard
25   information in our initial submission regarding number

---

### 179

1    of registered voters, and I don't think we felt like we
2    possessed the information as to how -- how many voters
3    really didn't have the forms of ID and how to break them
4    down by race.
5    Q.   Are you familiar with the amendments offered in
6    the Senate during consideration of Senate Bill 14?
7    A.   Somewhat.
8         MS. WESTFALL:  Could you mark this as 47.
9    Q.   (By Ms. Westfall) You have been handed what's
10   been previously marked as Exhibit 47.  Do you recognize
11   this document?
12   A.   Yes.  Senate Journal from January 26th.
13   Q.   Turning your attention to Page 130 of this
14   document, do you see it references an amendment offered
15   by Senator Ellis?
16   A.   Yes.
17   Q.   Did Senator Ellis introduce an amendment that
18   would have required the Secretary of State to conduct a
19   study that would have included information about the
20   number of eligible voters who were from prevented from
21   voting or had to vote provisionally because of lack of
22   ID and an analysis of those voters based on race?
23   A.   Okay.  That's what this says.
24   Q.   Did the Division -- are you aware of this
25   amendment?

---

### 180

1    A.   I don't remember this amendment.  It was
2    probably offered during deliberation.  I don't think it
3    got approved.  Maybe it did.
4    Q.   Turning your attention to the bottom of
5    Page 130, do you see that it indicates --
6    A.   It was tabled.
7    Q.   -- it was tabled?
8    A.   Okay.
9    Q.   And does that mean it was not approved; is that
10   right?
11   A.   That's my understanding.
12   Q.   Did the Division take a position on this
13   amendment?
14   A.   No.
15   Q.   Were you involved in any communications
16   regarding this amendment?
17   A.   No.
18   Q.   Do you know why this amendment was tabled?
19   A.   No.
20   Q.   Are you aware of any concerns or communications
21   that such a study, as required by the Floor Amendment
22   Number 30, would show that minorities are
23   disproportionately impacted by Senate Bill 14?
24   A.   We never saw this.  I think this was just
25   offered during the Floor debate, so it never --

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

**181**

1    Q.  Uh-huh.  Okay.
2    A.  So I'm not familiar with it.
3    Q.  Fair enough.  Thank you for your testimony.
4        I believe you testified earlier that you
5    conducted Spanish surname analysis as a matter of
6    course; is that right?
7    A.  Right.
8    Q.  Is there a reason why the Division did not
9    conduct such an analysis, Spanish surname analysis of
10   the voters without driver's licenses between January
11   2011 and the time you provided it to the Justice
12   Department in the fall of '11?
13   A.  Well, I mean, one reason is nobody asked us to.
14   Q.  Are there any other reasons?
15   A.  We don't -- you know, as a general policy,
16   Elections Division does not generally use that list for
17   any purpose other than sending out that notice.  It's
18   not something we use to qualify voters or -- and then as
19   we discussed earlier this morning, we send it out to
20   county officials for purposes of helping them place
21   Spanish-speaking poll workers, but...
22   Q.  Is it your testimony that in 2011, not a single
23   bill opponent ever asked you for that information?
24   A.  I don't recall any of these people --
25       MR. MORTARA:  Yeah, just this list.

---

**182**

1    A.  Yeah.  I don't recall any of these legislators
2    asking for that information.
3    Q.  (By Ms. Westfall) Are you aware of any
4    communications regarding Senate Bill 14 and Spanish
5    surname analysis?
6        MR. MORTARA:  You can answer that question
7    with respect to everyone in the world.
8    A.  During session or --
9    Q.  (By Ms. Westfall) In 2011.  Before the bill --
10   strike that.
11       Do you recall any such communications
12   involving Senate Bill 14 and Spanish surname analysis
13   between January 1st, 2011 and when the bill was signed
14   in May 2011?
15   A.  No.
16       MS. WESTFALL:  Sure.  Let's take a break.
17       (Recess from 3:02 to 3:27 p.m.)
18   Q.  (By Ms. Westfall)  When did the Senate pass
19   Senate Bill 14?
20   A.  I don't remember.  It's probably on this list.
21   Q.  You can refer back to Exhibit 8.
22   A.  It looks like was January 26th; is that right?
23   Q.  Was it passed within about two weeks of having
24   been filed in the Senate?
25   A.  Yeah.  And it was filed on January 12th, and it

---

**183**

1    passed on January 26th.
2    Q.  Is it fairly unusual to pass a bill in two
3    weeks in January at the beginning of a session?
4    A.  I don't really know, to be honest.
5    Q.  Do you recall other bills that were passed that
6    early in the Senate in January?
7    A.  I don't recall any, but I don't track them all
8    either.
9    Q.  Can you recall any other election bill other
10   than Senate Bill 14 that was part of a Governor's
11   emergency call?
12   A.  I believe there were several issues in that
13   emergency call.
14   Q.  But I'm referring you to -- do you recall any
15   emergency call that included another election bill in
16   previous sessions?
17   A.  No.
18   Q.  Did you testify before the House select
19   committee on voter identification and voter fraud on
20   Senate Bill 14?
21   A.  Yes.
22   Q.  Did you testify on March 2, 2011?
23   A.  I don't remember the date.  I don't see it on
24   here.  I guess it was probably a different bill.  It was
25   probably maybe the House -- well, I don't remember.

---

**184**

1    Q.  After the Senate passed Senate Bill 14, did it
2    go to the house?
3    A.  Yes.
4        MS. WESTFALL:  Could you please mark this
5    as 288?
6        (Exhibit 288 marked for identification.)
7    Q.  (By Ms. Westfall)  Do you recognize this
8    document?
9    A.  Yes.  It appears to be a transcript of
10   testimony before the Select Committee on Voter
11   Identification and Voter ID fraud on March 1st.
12   Q.  And I'll represent to you that this is an
13   excerpt of the transcript pertaining to your remarks --
14   A.  Okay.
15   Q.  -- at that hearing.
16   A.  Okay.
17   Q.  Did you appear as a resource witness?
18   A.  Yes.
19   Q.  And turning your attention to Page 290 of the
20   testimony.  Are you there?
21   A.  Yes.
22   Q.  Do you see that there's a question from an
23   unidentified representative as to whether you've done a
24   match to determine whether folks in the drivers -- in
25   the voter registration database have driver's licenses?

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Ann McGeehan                                                    May 31, 2012

---

185

1    A.  Let me take just a quick second to read.
2    Q.  Certainly.
3    A.  (Witness reading.)  Okay.  Sorry.
4    Q.  Sure.  No, that's okay.
5        Did you testify in response to the
6  question about whether a match had been done with the
7  voter registration database and the DPS driver's license
8  database to determine who did not have driver's
9  licenses?
10   A.  Yes.
11   Q.  And what was your response to that question?
12   A.  My response was that we were looking into that
13 at the time, so on March 1st, we were still working on
14 trying to make that comparison.
15   Q.  And you had -- you testified earlier that you
16 had been asked by Senator Williams on January 25th,
17 2001, to engage in that match and comparison; is that
18 correct?
19   A.  That's correct.
20   Q.  And can you describe the process that you
21 undertook in January to attempt to conduct that match?
22   A.  We -- we were looking at what would be the
23 matching criteria, you know, how tight of a match would
24 it be, and those sorts of issues.
25   Q.  And as of March 1st, that process was still

---

186

1  pending, and you haven't been able to determine the
2  universe of voters without driver's licenses; is that
3  correct?
4    A.  Correct.
5    Q.  And why the delay in conducting the match?
6    A.  I think we were looking for sort of, you know,
7  guidance on what matching criteria to use.
8    Q.  Who were you seeking that guidance from?
9    A.  Probably from our executive -- from executive
10 management within Secretary of State's Office.
11   Q.  And who would that be specifically?
12   A.  That would be our deputy secretary and our
13 general counsel.
14   Q.  Is it your testimony that they weren't
15 providing you with the guidance that you needed to
16 conduct the match?
17   A.  I think we were sort of, you know, looking for
18 the -- for them to say yes, okay, this is fine, let's
19 release it.
20   Q.  I see.  So you had conducted the analysis, but
21 you hadn't released it; is that correct?
22   A.  We hadn't sort of had it approved or, you know,
23 okayed to release outside the office.
24   Q.  Who in particular did not let you release that
25 information?

---

187

1    A.  Well, I don't know that we were prohibited, it
2  was -- but it would be up to -- it would be up to the
3  executive management to be the ones to release something
4  like that.
5    Q.  And who by name is that person or persons?
6    A.  That would be Coby Shorter, who was -- who is
7  the deputy, and John Sepehri, who's the general counsel.
8    Q.  When did you, from your perspective, complete
9  this matching analysis, what date?
10   A.  I don't really remember exactly when.
11   Q.  Was in it the month of February?
12   A.  It could have been February or March, but I
13 don't remember exactly.
14   Q.  Was it before or after this hearing on March
15 1st?
16   A.  I don't remember.
17   Q.  Were you -- does your testimony here on March
18 1st on Page 290 refresh your recollection as to when you
19 completed the match?
20   A.  I can't really tell if we had completed it here
21 or not.
22   Q.  It's conceivable that you had done the match in
23 February, but it was not authorized to be released at
24 that time; is that right?
25   A.  Right.  And when I say "authorized to be

---

188

1  released," you know, I don't know if our executive
2  management had a chance to review it, if they felt
3  confident about it.
4    Q.  Was there concerns about the accuracy of the
5  match?
6    A.  I think so.  I think they wanted to make sure
7  that anything we released was accurate.
8    Q.  Was there any concern about the number of
9  voters who were unmatched and releasing that information
10 to the public?
11   A.  Not that I'm aware of.
12   Q.  Was the number that was in that analysis about
13 800,000 people that were unmatched?
14   A.  I don't really remember.  I was thinking it was
15 around 700,000, but I don't have a clear memory of that.
16   Q.  Was there any concern you're aware of that
17 releasing that number in February of 2007 could
18 potentially jeopardize enactment of the bill?
19   A.  Not that I'm aware of.
20   Q.  Do you know whether anyone directed executive
21 management not to release that information?
22   A.  Not that I'm aware of.
23   Q.  Do you know whether that match and those
24 numbers changed significantly from February 2011 to the
25 time that you released that information to the Justice

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Ann McGeehan                                                    May 31, 2012

---

189

1   Department in the fall of 2011?
2       A.  I don't think they did.
3       Q.  And to your knowledge, did you learn after the
4   match was conducted in February or March, 2011, of any
5   errors that caused there to be a change in the analysis?
6       A.  Between March --
7       Q.  And whenever -- you testified -- I believe you
8   testified that this match was probably conducted in
9   February or March 2011; is that right?
10      A.  Right.
11      Q.  And did you become aware, subsequent to that
12  time, of any errors in the analysis or the matching
13  process, or was it basically final as of that date,
14  although not released?
15      A.  I don't think we changed it much from what we
16  did.  I mean, I think there were some judgments as to
17  which criteria to use, and I don't think we changed that
18  much from when we did pull it to send to the Justice
19  Department.
20      Q.  Did you at any time between the time that you
21  did that match -- and you believe it was February or
22  March of 2011?
23      A.  That sounds about right.
24      Q.  Did you conduct a Spanish surname analysis on
25  that information, those unmatched voters?

---

190

1       A.  Not during the session.  We did that after we
2   provided it to the Justice Department.
3       Q.  Did you have any reason to believe based on the
4   universe of voters you had identified, the 700,000
5   voters, that they would be disproportionately minority
6   voters?
7       A.  No.
8       Q.  Who was aware of the fact that that analysis
9   had occurred in February or March 2011 besides you in
10  your office?
11      A.  In my office within the Secretary of State's
12  Office?
13      Q.  Yes.
14      A.  It would have been me and our voter
15  registration director, who is in the Elections Division,
16  and then in our IT department, one of the programmers,
17  and his supervisor, and our IT director, and then the
18  Deputy Secretary of State and the general counsel.
19      Q.  Did you at any time provide that analysis from
20  February or March of 2011 to anyone in the legislature?
21          MR. MORTARA:  You may answer that question
22  only with respect to the legislators listed on the
23  sheet.
24          MS. WESTFALL:  Wait a minute.  It's
25  providing factual information to the legislature --

---

191

1           MR. MORTARA:  Specifically about the
2   Court's order, Elizabeth.  The Court's order says the
3   information is not privileged.  The analysis exists.
4   What I understand the Court's order to mean is that we
5   must produce it to you if it exists, not that we have to
6   tell you with whom it is shared.  That is exactly what
7   the last two sentences of that order means.  We disagree
8   about that.
9           Don't answer the question except with
10  respect to these legislators.
11      A.  We didn't release it to any of those
12  legislators.
13      Q.  (By Ms. Westfall)  Would it have been
14  relatively easy to do a Spanish surname analysis on that
15  list of 700,000 voters in February and March of 2011?
16      A.  Yes.  I mean, I say that.  Our IT department
17  might not agree with that.
18      Q.  Fair point.  Did you or the Division play any
19  role in the consideration by the Conference Committee of
20  Senate Bill 14?
21      A.  No, not in the Conference Committee.
22      Q.  Are you aware of any changes made to provisions
23  of Senate Bill 14 in Conference Committee that involved
24  voter education?
25      A.  I don't recall that.  It may be the case, but I

---

192

1   didn't remember that changing in Conference Committee.
2       Q.  Was there a provision removed in conference
3   that would have targeted voter ed -- voter education,
4   pardon me, to low-income and minority voters?
5       A.  I don't remember that.  That may have been -- I
6   mean, I don't dispute it.  I don't have a clear memory
7   of that.
8       Q.  Do you have any reason to believe that voters
9   without allowable forms of ID under Senate Bill 14 are
10  disproportionately low-income or minor voters?
11      A.  I do not.
12      Q.  Did the -- strike that.
13          Did the Division provide any data or
14  information to any member of the Conference Committee
15  about voter education to low-income voters?
16      A.  No.
17      Q.  Was the Conference Committee report adopted by
18  both chambers?
19      A.  Yes.
20      Q.  I'm going to hand you what has been -- whoops,
21  sorry.  You've been handed what's been previously marked
22  as U.S. 5.  Do you recognize this?
23      A.  Yes.
24      Q.  What is it?
25      A.  This is the signed enrolled version of Senate

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 193

1  Bill 14.

2    Q.  Turning your attention to the list of allowable

3  IDs, do you see that at Page 9?

4    A.  Yes.

5    Q.  Could you take a look at the allowable forms of

6  ID and let me know when you've had a chance to do so?

7    A.  Yes.

8    Q.  Can you describe for me the forms of ID that

9  are different in the engrossed version of the bill,

10  Exhibit 5, than in the filed bill?

11    A.  I believe that the difference is that a new

12  form of ID was authorized and it created an election

13  identification certificate that would be issued by the

14  Department of Public Safety.  I think that's the only

15  change.  And maybe the expiration date.  I don't know if

16  that's the same as in the original bill as to when -- I

17  don't remember.  I think that's the main change.

18    Q.  Do you know whether the license to carry a

19  concealed handgun was added as an allowable form of ID?

20    A.  Yeah.  But I thought that got added in the

21  Senate, but maybe not.

22    Q.  Do you know the circumstances by which the

23  license to carry a concealed handgun were included in

24  Senate Bill 14?

25    A.  No.

## 194

1    Q.  Do you know the racial composition of persons

2  who hold those licenses?

3    A.  No.

4    Q.  Have you had any conversations or

5  communications about holders of those licenses might be

6  disproportionately White?

7        MR. MORTARA:  Ms. McGeehan, you may answer

8  that question with respect to everybody in the entire

9  world except legislators, Lieutenant Governor and his

10  staff, Governor and his staff, legislative staff not

11  appearing on this list.

12    A.  I have not heard any conversations on that with

13  any of these legislators or any other people other than

14  the legislators not on the list or the Governor's office

15  or Lieutenant Governor.

16    Q.  (By Ms. Westfall)  Do you know why Senate Bill

17  14, as engrossed, did not allow the use of student IDs?

18    A.  No.

19    Q.  Were student IDs allowed as an allowable form

20  of ID in previous iterations of photo ID in Texas?

21    A.  I believe that we saw it in the 2009 bill.

22    Q.  Do you know what had changed between 2009 and

23  2011 that caused the legislature to remove that

24  provision?

25    A.  I don't know.

## 195

1    Q.  Have you -- were you aware of any concern that

2  failure to include these forms of ID, notwithstanding

3  their inclusion in previous bills, could

4  disproportionately impact minority voters?

5    A.  Not including student IDs?  No.

6    Q.  Any concern that it might create an appearance

7  that the law was enacted with a discriminatory purpose

8  to remove that form of ID from the bill?

9    A.  No.

10    Q.  Are you aware of any analysis to determine the

11  effect of excluding student IDs as a form of allowable

12  ID under Senate Bill 14?

13        MR. MORTARA:  Again, Ms. McGeehan, for all

14  these questions, are you aware, but please keep in mind

15  not to give testimony about legislators, Governor's

16  office, Lieutenant Governor's office, not appearing on

17  the list.

18    A.  I'm not aware of any communications with these

19  legislators, general public, not making any comments as

20  to the other legislators that haven't waived their

21  privilege, and the Governor's office and Lieutenant

22  Governor's office on student IDs in any studies.

23    Q.  (By Ms. Westfall)  Do you know why tribal ID

24  was not included as an allowable form of ID in Senate

25  Bill 14?

## 196

1    A.  No.

2    Q.  Was it in the -- is it in the Georgia photo ID

3  of law that tribal ID --

4    A.  I don't know.  I don't know.

5    Q.  How did the exception for persons with

6  disabilities come to be included in Senate Bill 14?

7        MR. MORTARA:  Objection, foundation.

8    Q.  (By Ms. Westfall)  You may answer.

9    A.  I'm not sure if I remember all the -- you know,

10  all the iterations of that.

11    Q.  I'll turn your attention --

12    A.  Okay.

13    Q.  -- to the first page of the Act, if you want to

14  review it, and let me know when you've had a chance to

15  take a look at it.

16    A.  (Witness reading.)  Right.  Yeah.  This is how

17  it ended up, but I couldn't really explain how this got

18  here.

19    Q.  What was the purpose of this provision?

20    A.  I believe it was to exempt persons with

21  disabilities from the requirement of presenting a photo

22  ID, and they would have to make application with the

23  voter registrar to prove that up and obtain the

24  exemption.

25    Q.  Was this provision in the filed bill?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Ann McGeehan                                                May 31, 2012

---

### 197

1    A.  I don't think so.

2    Q.  And at whose request was this provision added?

3    A.  I don't know -- or I don't remember.

4    Q.  Can you describe the provisions of Senate Bill

5    14 as engrossed pertaining to administration of the ID

6    requirement at the polls?

7    A.  Explain how it would be administered at the

8    polls?

9    Q.  As required by the bill.

10    A.  The new requirement bill?

11    Q.  Yes.

12    A.  It would -- I believe, as best I can remember,

13    and of course, this is somewhat qualified, because the

14    Secretary of State is probably still in the process of,

15    you know, fully developing some of these processes, but

16    essentially, all voters who voted in person who had not

17    received the disability exemption and who were not over

18    the age of 70, I think as of the date of this bill,

19    would be required to present one of these forms of photo

20    identification.

21         If they didn't, then they could vote a

22    provisional ballot, and they would have a certain amount

23    of time to go back to the voter registrar's office and

24    present after -- after they voted, they could go to the

25    voter registrar's office and present one of these forms

### 198

1    of ID later, within five days or something like that.

2         There were -- I believe there was also two

3    sort of exemptions for voters that had a religious

4    objection.  I may have to refresh my memory on this.

5    Q.  Certainly.

6    A.  (Witness reading)  Okay.  Yeah.  They could --

7    they -- they -- they would vote a provisional ballot and

8    then if they came in I believe after the election and

9    executed an affidavit stating that they had either a

10    religious objection to being photographed or that they

11    had, you know, been a victim of a natural disaster, and

12    because of that natural disaster, they didn't have any

13    identification.

14    Q.  So when you talk about administration of the ID

15    requirement at the polls, are you talking about the --

16    what the Secretary of State and Election Division

17    promulgated in terms of rules and procedures, or are you

18    talking about the bill itself?

19    A.  Just then I was, I guess, talking about the

20    basic requirement.  The bill also requires the Secretary

21    of State to do training of poll workers, training of

22    voters.  I think we had to develop rules on -- to give

23    guidance to poll workers on how to accept voters

24    regarding how similar the name on the photo ID has to be

25    to the name on the list of registered voters.

### 199

1    Q.  Do you know why Senate Bill 14 did not provide

2    more specificity about how poll workers should determine

3    whether a voter had presented an ID that proved their

4    identity?

5    A.  No.

6    Q.  Do you think the bill should have provided more

7    specificity in that regard?

8    A.  Well, I guess from the Secretary of State's

9    point of view, it would have been nice if they had done

10    that.  It would have been one less thing that the

11    Secretary of State's Office had to do.

12    Q.  And do you believe that it's a very important

13    part of the bill to determine -- to instruct poll

14    workers as to how to administer this ID requirement at

15    the polls?

16    A.  Yes.

17    Q.  Because if they don't understand how to

18    determine someone's identity, it could be misapplied and

19    disenfranchise a voter; isn't that right?

20    A.  Yes.

21    Q.  I believe you testified about the provisional

22    ballot requirements.  In essence, the provisional ballot

23    requirements do not provide much in the way of

24    mitigation of the photo ID requirements; isn't that

25    right?

### 200

1    A.  Well, you know, I think that's kind of an

2    opinion question.  Some folks would argue there's more

3    protection, because you can come back in and fix it.

4    Whereas under current law, you can't do that.

5    Q.  Can you point me to a particular part of the

6    election code that require -- that says that provisional

7    ballots under current law will not be counted if you

8    don't have any of those wide range of forms of ID?

9    A.  I believe it's in an administrative rule that

10    the Secretary of State's Office adopted and precleared,

11    where it sets out the rules for processing provisional

12    ballots according to the various voting systems.

13    Q.  Under -- but nonetheless, under the current

14    law, you can present a very broad range of IDs compared

15    to the IDs that are allowable under Senate Bill 14;

16    isn't that right?

17    A.  Yes.  Senate Bill 14 only permits photo IDs.

18    Q.  Right.

19    A.  And current law does not.

20    Q.  Right.  And in terms of the provisional ballot

21    provision of Senate Bill 14, unless you can cast a

22    provisional ballot, but if you don't have that

23    appropriate form of photo ID and return within six days

24    to present it to the office, your provisional ballot

25    will not be counted, except unless very limited



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Ann McGeehan                                                    May 31, 2012

## 201

1  circumstances; is that right?
2      A.  That's right.
3      Q.  And is it your understanding under the bill
4  that you must return in person within six days to prove
5  your identity in order to ensure that your provisional
6  ballot will be counted?
7      A.  That's my understanding.
8      Q.  Is that within the bill, or is that pursuant to
9  an administrative regulation or rule?
10     A.  That was my understanding as of the time I left
11 the Secretary of State's Office.  They may have later
12 provided guidance on that.  I'm not aware if they have.
13     Q.  Does Senate Bill 14 include a provision for
14 voter education?
15     A.  Yes.
16     Q.  Could you describe the voter education
17 provisions, generally speaking, in the bill?
18     A.  I think it's in Section 5 of the bill that says
19 the Secretary of State -- anyway, it sets up several
20 mandates for Secretary of State and county officials
21 that specifically requires the Secretary of State to
22 conduct a statewide effort to educate voters regarding
23 the identification requirements.
24     Q.  And so the education requirements advise voters
25 of the need or will advise if this law is precleared of

## 202

1  the need to get ID, but it doesn't in any way reduce any
2  burden that a voter might need to undergo to get an
3  election identification certificate or a form of
4  allowable ID; isn't that right?
5      A.  Right.  This is purely an educational effort.
6      Q.  Did you have any concerns that without
7  guidance, poll workers might inconsistently administer
8  the photo ID law?
9      A.  Sure.  I mean, that's a danger with all
10 election laws.  So --
11     Q.  And were you concerned that inconsistent
12 administration of photo ID requirements might fall
13 disproportionately on minority voters?
14     A.  I had no -- I did not have that as a specific
15 concern.
16     Q.  In deposition testimony in this case, there
17 have been a number of purposes that witnesses have
18 talked about in terms of the purpose of SB-14, and I'm
19 going to ask you a few questions about purposes of the
20 bill.  Some witnesses have testified, and I believe that
21 this was in the submission letter along with the
22 preclearance submission for SB-14, which you signed,
23 that it would promote election integrity.  Do you
24 remember that --
25     A.  Uh-huh.

## 203

1      Q.  -- purpose?
2      A.  Yes.
3      Q.  Are you aware of any voters in the state of
4  Texas who did not vote because they were concerned that
5  voter fraud would cancel out or dilute their vote?
6      A.  I don't know that for a fact.
7      Q.  Would a registered voter who had voted in
8  previous elections but did not have a form of photo ID
9  and who could not vote by regular ballot experience a
10 loss of confidence in the election system under SB-14?
11     A.  Can you repeat that?
12     Q.  Certainly.  It was a confusing questioning.
13 It's late in the day.  I will withdraw that question.
14         Is it possible that if a registered voter
15 did not have a form of photo ID, and he appeared at the
16 polls to vote and had to vote by provisional ballot,
17 that he might lose confidence in the election system?
18     A.  It's possible.
19     Q.  Are you familiar with any academic studies
20 concerning who has the necessary or allowable forms of
21 photo ID under this law?
22     A.  Under Senate Bill 14?
23     Q.  Yes.
24     A.  No.
25     Q.  Are you aware of any academic studies

## 204

1  concerning who has allowable forms of ID, photo ID,
2  under the Georgia photo ID law or the Indiana photo ID
3  law?
4      A.  No.
5      Q.  Is one of the purposes of Senate Bill 14
6  deterring ineligible voters from registering to vote?
7      A.  I think it could be, because I know that one of
8  the -- you know, one of the stated goals was to overall
9  bring confidence in the system and perceptions of
10 integrity in the system so, to that extent, it could
11 prevent that from occurring.
12     Q.  Do you agree that that purpose would be served
13 by SB-14?
14     A.  For regarding registering to vote or just
15 overall confidence?
16     Q.  Overall confidence.
17     A.  Yes.  I think that --
18     Q.  What is the basis of your belief?
19     A.  As I started to say earlier, I think all
20 election laws is kind of a balance between access to the
21 polls and keeping the election secure and maintaining
22 integrity.  And so to the extent that people feel like
23 there are not enough safeguards, if you tighten it up a
24 little bit, as long as you're not impacting access, and
25 that's the legislative process, they're always sort of



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 205

1  adjusting those rules.
2      Q.  And are you aware of groups or people who do
3  not -- who feel that there are not enough safeguards in
4  proving one's identity at the polls on election day
5  besides the sponsors of the bill?
6      A.  You mean under current law, meaning before
7  Senate Bill 14?
8      Q.  Correct.
9      A.  Yes.
10     Q.  Who are those people?
11     A.  I think they're many members of the
12  legislature.
13     Q.  Outside of the legislature, who believes that
14  we do not have enough safeguards in proving voter's
15  identity at the polls on election day in the state of
16  Texas?
17     A.  I think there are fair numbers of folks who
18  believe that, and we get -- we would receive e-mails and
19  letters from people that, you know, felt the rules
20  should be tighter.
21     Q.  Are you aware of any academic studies,
22  generally, about who has access to photo ID?
23     A.  Not really.  We may have cited to one or two in
24  that original submission letter, but I'm not personally
25  aware of those studies.

## 206

1      Q.  Do you know whether you need to be a U.S.
2  citizen to obtain a license to carry a concealed weapon
3  in Texas?
4      A.  I don't know.
5      Q.  Can you describe the election identification
6  certificate provision of Senate Bill 14?
7      A.  It requires DPS to develop a new form of -- to
8  develop an election identification certificate that
9  could be issued to persons that didn't have -- that were
10  registered voters or who -- either they were registered
11  or they were eligible to be registered, and they
12  submitted registration right there at the DPS office.
13         And it has to be free.  And it can only be
14  used for purposes of voting.  Can't be used like a
15  regular personal identification certificate issued by
16  DPS.
17     Q.  Was the Division involved in developing this
18  provision at all?
19     A.  No.
20     Q.  Did you do any analysis of this provision?
21     A.  No.
22     Q.  Did you do any drafting of this provision?
23     A.  No.
24     Q.  Are you aware of any communications between the
25  Division and anyone related to this provision?

## 207

1        MR. MORTARA:  Ms. McGeehan, my earlier
2  instruction remains.  You can answer.
3      A.  You mean before it was put in the bill --
4      Q.  (By Ms. Westfall)  I mean at all --
5      A.  -- or after the bill?
6      Q.  -- at any time?
7      A.  We were not aware of it until it -- until after
8  the Conference Committee.  After the Conference
9  Committee, we began to work with DPS to figure out a way
10  to start to implement it.
11     Q.  Can you describe that?
12     A.  We had several meetings to kind of work through
13  the requirements.  DPS, I think they sent us a prototype
14  of what it would look like, what they were preparing.
15  Again, that was kind of ongoing as I left, so I didn't
16  see the end of that.
17     Q.  As you sit here today, can you list for me
18  every single purpose that you can think of for the
19  enactment of Senate Bill 14?
20     A.  Every single purpose?
21     Q.  Yes.
22     A.  I think it was the stated purposes were to
23  increase confidence in the election process, curb
24  election fraud.  Those are the main ones I can think of.
25     Q.  As to curbing fraud, the only fraud it could

## 208

1  conceivably address is in-person voter impersonation; is
2  that correct?
3      A.  I think that's the main fraud.  You know, the
4  legislature may have had other reasons, but I don't
5  know, but those are the ones I recall being discussed.
6      Q.  But as to fraud, in-person voter impersonation
7  is the only fraud that this bill could conceivably
8  address.  Is that your testimony?
9      A.  I would need to think through that.  I mean,
10  maybe there are other frauds that showing a photo ID may
11  mitigate against.
12     Q.  Sitting here today, can you identify any other
13  fraud besides in-person voter impersonation?
14     A.  I can't think of anything else right now.
15     Q.  All right.  Can you think of any other facts or
16  information about how -- that you haven't already
17  testified about today, as to how Senate Bill 14 would
18  increase voter confidence?
19     A.  I think if people trust the system, they're
20  more likely to participate in it.  And if they sense
21  that ineligible people are voting, they may be less
22  likely to participate.  So --
23     Q.  Are there any facts to support that thesis that
24  you can tell us about today or testify about today?
25     A.  I guess that's just my perception.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 209

1    Q.   And you -- I believe you testified that those
2    are the two stated reasons for Senate Bill 14?
3    A.   That I recall.  That I recall.
4    Q.   Are there any unstated purpose of Senate Bill
5    14 that you can identify today?
6    A.   No.
7         MR. MORTARA:  And remember my earlier
8    instructions.
9    A.   No.  Not to the extent that anybody on this
10   list has mentioned any.
11   Q.   Are you aware of any unstated purposes, the
12   existence of unstated purposes --
13   A.   No.
14   Q.   -- for Senate Bill 14?
15   A.   No.
16   Q.   Was any part of the purpose of Senate Bill 14
17   to decrease the number of Hispanic voters participating
18   in elections in Texas?
19   A.   I don't think so.
20   Q.   Was any part of the purpose of Senate Bill 14
21   to decrease the number of any other groups of minority
22   voters participating in elections?
23   A.   I don't think so.
24   Q.   Was any part of the purpose of Senate Bill 14
25   for partisan purposes?

## 210

1    A.   There may have been partisan purposes, because
2    there usually is in everything.
3    Q.   Do you have any --
4    A.   I don't know any facts.
5    Q.   Do you have any facts to support that?
6    A.   No.
7    Q.   Did the purpose of photo ID in Texas, the
8    legislative purpose, evolve over time and between
9    sessions?
10   A.   Not that I'm aware of.
11   Q.   Was the -- was photo ID advanced to turn on
12   citizen voting during one session and then that was less
13   emphasized during subsequent sessions of the
14   legislature?
15   A.   Not that I recall.
16   Q.   At any time since the passage -- since the
17   enactment of SB-14, have you come to believe it was
18   passed with a discriminatory purpose?
19   A.   No.
20   Q.   At any time since the passage of Senate Bill
21   14, have you come to believe that Senate Bill 14 will
22   have a retrogressive effect on minority voters?
23   A.   No.
24   Q.   If called to trial, will you testify that
25   Senate Bill 14 has no discriminatory purpose?

## 211

1    A.   Yes.
2    Q.   And if called to trial, will you testify that
3    Senate Bill 14 has no discriminatory effect?
4    A.   Yes, based on the information I know.
5         MS. WESTFALL:  I will take a quick break
6    and then I'll pass you over to my cocounsel.
7         THE WITNESS:  Okay.
8         (Recess from  4:09 to 4:25 p.m.)
9    Q.   (By Ms. Westfall)  Ms. McGeehan, do you agree
10   that Hispanic surnamed voters are less likely to have
11   the forms of allowable photo ID under SB 14?
12   A.   No.  I mean, I don't have any reason to say
13   that.
14        MS. WESTFALL:  Okay.  Thank you.  I have
15   no other questions at this time.  We're going to keep
16   the deposition open pending resolution of some of our
17   disputes about privilege.
18        Thank you for your time.
19        THE WITNESS:  Thank you.
20        EXAMINATION
21   BY MS. PERALES:
22   Q.   Good afternoon, Ms. McGeehan.
23   A.   Hello.
24   Q.   My name is Nina Perales, and I represent the
25   Rodriguez Defendant Intervenors in this case.  All of

## 212

1    the instructions and advice that Ms. Westfall gave you
2    will continue between you and I; is that all right?
3    A.   Yes.
4    Q.   Is it also okay if I use the term "Latino" and
5    "Hispanic" interchangeably?
6    A.   Yes.
7    Q.   Thank you.
8         MS. PERALES:  I'd like to start by marking
9    the news article.  Now, does anybody know how we're
10   doing the marking?  Is it just whichever party is
11   marking it, so I can mark this as 1?
12        MR. MORTARA:  That's fine.
13        MS. PERALES:  I'd like to mark this
14   Rodriguez 1.
15        (Rodriguez 1 marked for identification.)
16        (Discussion off the record.)
17   Q.   Ms. McGeehan, I'm handing you what has been
18   marked Rodriguez 1, and I will represent to you it's an
19   article from Election Line Weekly from December 15.  And
20   I believe this in the time period shortly after you
21   announced that you would be moving on from the Secretary
22   of State's Office?
23   A.   Yes.
24   Q.   Did you ever see this article?
25   A.   I did, yeah.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

213

1    Q.   It's a wonderful article.
2    A.   It is.
3    Q.   I wanted to put it in the record because I
4    think everything in it is true.
5    A.   Thank you.
6    Q.   And I wanted the record to reflect your
7    outstanding service to Secretary of State's Office for
8    many, many years.
9    A.   Well, thank you.  Appreciate that.
10   Q.   Ms. Westfall went over your background, which
11   this article does an excellent job of summarizing your
12   background and your education, and so I don't think we
13   need to go over any more because you've covered that
14   very well.
15        MR. MORTARA:  I'd like to put in the
16   record that the State of Texas whole-heartedly agrees
17   with everything that Ms. Perales just said.
18        THE WITNESS:  Well, thank you.  Can we end
19   right now?
20        MS. PERALES:  Would be a great way to end,
21   but I do have a few more questions.
22        THE WITNESS:  Okay.
23   Q.   (By Ms. Perales)  You testified earlier you are
24   the Assistant General Counsel at the Texas county and
25   District Retirement System.  And you described this as

214

1    sort of a quasi-governmental entity; is that right?
2    A.   Well, it is a governmental body per
3    statute.  But it -- we receive no state funds, so we're
4    not a state agency.  We don't get an appropriation.
5    Q.   So would it be correct to say, then, that you
6    no longer are employed by the State of Texas?
7    A.   That's correct.
8    Q.   I wanted to talk with you a little bit about
9    the benchmark system that we have right now for voter
10   ID.  I think you went over most of this with
11   Ms. Westfall with respect to the current requirement to
12   show either the voter certificate or photo ID or
13   nonphoto ID, correct?
14   A.   I think we did.
15   Q.   Can you just walk me carefully through what
16   happens if a voter presents themselves for voting at the
17   polls on election day and has none of the described
18   forms of identification?  Is it correct to say that that
19   voter could vote a provisional ballot on that day?
20   A.   Yes.
21   Q.   And then what would the voter have to do
22   subsequent in order to have that ballot counted?  Would
23   the voter come back and cure, or is there a signature
24   verification that goes on back at the county to make
25   sure that ballot could be counted?

215

1    A.   Under current law?
2    Q.   Under current law?
3    A.   Under current law, if a voter provided no ID
4    when they voted provisionally, there is no way to cure
5    that.  The ballot may not be counted.
6    Q.   And under what circumstances would it be
7    counted?
8    A.   If a voter voted a provisional ballot for
9    another reason, for instance, they might not be on the
10   list of registered voters or they vote in the wrong
11   precinct, something like that, then there may be ways
12   where, you know, there may have been some sort of
13   administrative mistake and their name just never made it
14   to the list of registered voters.  In that, the voter
15   registrar may be able to find that out by looking at DPS
16   records or other records.  And in that event, then the
17   ballot could be counted if the county voter registrar
18   can confirm that they were registered in the right
19   precinct.
20   Q.   Would under those circumstances, would the
21   voter have shown ID then?
22   A.   Yes.
23   Q.   So is it your testimony that if the voter shows
24   no form of acceptable ID under current law, and votes a
25   provisional ballot, there is not a mechanism to allow

216

1    that ballot to be counted either through a signature
2    verification at the county or later presentation of ID?
3    A.   That's right.
4    Q.   Thank you.
5        I wanted to ask you some questions about
6    U.S. citizens and some of the types of voter ID that are
7    described in SB 14.  Our conversation is going to be a
8    little bit disjointed because I'm bouncing around and
9    going in-between some of the questions I have for you
10   now.
11   A.   Okay.
12   Q.   You mentioned that you are aware that non-U.S.
13   citizen legal residents can receive a Texas driver's
14   license, correct?
15   A.   Yes.
16   Q.   All right.  And that would also be true for a
17   Texas identification card from DPS?
18   A.   Yes.
19   Q.   All right.  And you would agree with me that
20   legal permanent resident immigrants can serve in the
21   U.S. military, don't you?
22   A.   I believe that's correct.
23   Q.   And thus, they would have a military ID,
24   correct?
25   A.   Correct.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

217

1    Q.  All right.  Did the Secretary of State's Office
2    generate any information or conduct any analysis during
3    the pendency of SB 14 on whether non-U.S. citizens could
4    obtain the forms of ID set out in SB 14?
5        A.  No.
6        Q.  You know a lot about the driver's license, how
7    long it's valid for, and many other things.  So I'm
8    curious why the Secretary of State's Office would not
9    have made even an inquiry into whether or not
10   non-citizens could obtain the types of ID in SB 14.  Can
11   you help me understand that?
12       A.  I mean, we didn't -- we didn't have a reason to
13   necessarily.  I mean, it was still pending legislation.
14   I don't know that we would have had the information to
15   make that kind of an analysis anyway.
16       Q.  Couldn't you have looked up the --
17       A.  Oh, I'm sorry.  As far as who's -- if
18   non-citizens, yeah.
19       Q.  So, for example, Texas law sets out the
20   requirements for obtaining a concealed handgun license.
21   Did your office make any inquiry into whether
22   non-citizens could obtain a concealed handgun license?
23       A.  We did not.
24       Q.  I'm going to ask you a question now about a
25   citizenship certificate.  Do you know what that document

218

1    is?
2        A.  I think I have seen one.  I'm not very familiar
3    with them.  No.
4        Q.  Are you aware that they can be issued by the
5    citizenship and immigration service as opposed to a
6    federal court?
7        A.  I probably knew that at one point, but I'm not
8    very familiar with that process.
9        Q.  Did your office undertake any examination of
10   the nature of a citizenship certificate or how you get
11   it or what it looks like during the pendency of SB 14?
12       A.  Not during Senate Bill 14.
13       Q.  Did your office make any inquiry with respect
14   to citizenship certificates during the pendency of prior
15   bills?
16       A.  I believe we did look into that, and it was
17   either 2007 or 2009, I think, based on a legislator's
18   questions to us.
19       Q.  Now, with respect to SB 14, which requires a
20   photo, did your office make any examination whether a
21   citizenship certificate has a photo on it?
22       A.  For SB 14?
23       Q.  Yeah.
24       A.  No.
25       Q.  Are you aware that a U.S. certificate of

219

1    citizenship does not have a photo on it?
2        A.  No.
3        Q.  Do you know whether a U.S. certificate of
4    citizenship is different from a naturalization
5    certificate?
6        A.  I think they're -- I believe there are
7    differences, but I -- I think we looked -- like I said,
8    we looked into it a little bit in either '07 or '09 on
9    some of those issues.  I don't think we did any analysis
10   on that in 2011 for purposes of the Senate Bill 14.
11       Q.  So when you -- when your office was preparing
12   the bill analysis for SB 14, then would it be correct to
13   say that in the preparation of that bill analysis, your
14   office did not, for example, look into whether the
15   stated acceptable documents had photographs in them or
16   how readily obtainable they were?
17       A.  We did not.
18       Q.  You'd -- you mentioned earlier several times
19   that your office is concerned with sort of technical
20   matters of the law and particularly implementation.  Did
21   your bill analysis of SB 14 undertake an examination of
22   how SB 14 might be implemented from the perspective of
23   individual voters being able to use any of the stated
24   forms of ID as acceptable photo ID?
25       A.  No.

220

1        Q.  I'd like to go back to your testimony in 2005,
2    and I will give it to you --
3        A.  Okay.
4        Q.  -- so that you can refresh your recollection,
5    and that is Exhibit U.S. 283.  Do you have --
6        A.  I think I have it.
7        Q.  -- U.S. 283?  You might not have the right
8    pages then.  I wanted to direct you to pages --oh, yes,
9    103 and 104.  It's the very end maybe.
10       A.  Oh, okay.
11       Q.  I also thought that maybe all the pages weren't
12   there.
13       A.  Oh, okay.
14       Q.  Okay.  In 103 and 104, you're talking about --
15   you're clearing something up about HAVA.
16       A.  Right.
17       Q.  And you mentioned earlier in your testimony
18   that the requirement to present identification at the
19   time of first voting for a voter who registered by mail
20   would disappear at some point, and you used the word
21   "disappear" here in your testimony.  And I wanted to
22   make sure I understood, because you also mentioned that
23   you only used this requirement for a couple of years.
24   Is this requirement that you described in HAVA to
25   provide ID at the time of first voting, is that still in



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

221

1  effect in Texas?
2      A.  Not this exact process.  Because we have a
3  statewide database.  But there -- but now that we have
4  implemented that statewide database, where we verify
5  driver's license and Social Security number, in the
6  event that the State can't verify a voter's -- a voter
7  applicant's driver's license number, it goes back to the
8  county with a message saying state can't confirm the
9  identity, and if it comes from DPS, we send that county
10 the underlying DPS record.
11     If the county -- you know, sometimes the
12 county can look at the DPS record and see that there was
13 a typo, and then they can add it back in and submit it
14 to the state, and if we're able to verify it, that voter
15 gets registered.
16     If the county looks -- and we're all
17 assuming this is rejected -- or a DPS, a voter that's
18 submitted a driver's license number.  If the county sees
19 no data entry, then they send a notice of incomplete to
20 the voter saying "State couldn't verify you.  Please
21 resubmit."  If a voter submits it again, and it goes --
22 and the county submits and it goes through and it gets
23 approved, then they're registered.  If it's submitted
24 again, and the state still can't confirm the identity,
25 then that voter is registered to vote, but they get

---

222

1  flagged as having to provide ID when they show up to
2  vote.  So that's the process that's used today.
3      Q.  Does the statewide voter database check against
4  the Social Security database?
5      A.  Yes.
6      Q.  So if somebody provided the last four digits of
7  the Social, but no driver's license, you would run the
8  check that way?
9      A.  We would run the check that way.  It's almost
10 the same process.  The only difference is, is we don't
11 get any reason from Social Security as to why the record
12 didn't match.  So we can only send back to the county if
13 it didn't match.
14     Q.  All right.  So as opposed to every person who
15 registered by mail having to show ID at the polls for
16 first-time voting, it would be a smaller number of
17 people who you could not match through the database, the
18 statewide database?
19     A.  Correct.
20     Q.  And I'm curious why you were mentioning this
21 during your testimony.  Were you explaining to the
22 legislature that there already was a photo ID
23 requirement in place, were you trying to give them some
24 context?
25     A.  Oh, you were called for this hearing too.

---

223

1      Q.  I was?
2      A.  Yes.  You're on Page 35.
3      Q.  Oh, well, let's -- we won't talk about that
4  part (laughing).
5          MR. MORTARA:  Ms. Perales loves making
6  herself a fact witness as well.
7      A.  I think I was responding to a specific
8  question, but these are excerpts, so it's hard to --
9      Q.  (By Ms. Perales)  It starts, you get -- you're
10 called up on Page 102.  Do you have Page 102 there?
11     A.  Yes.
12     Q.  And you kind of start right away with that, so
13 I suppose maybe they were mentioning it before.
14     A.  Yeah.  Because it goes from Page 36 to 102, so
15 there may have been some sort of discussion.  I'm not
16 sure what it was.  But Representative Bohac, Chairman
17 Bohac is saying that "she" -- that I will have some
18 enlightening testimony for us.  So I don't know.  We
19 would have to look at those.
20     Q.  Were you trying to make the point that the ID
21 requirement under HAVA allowed the voter to either
22 present the ID at the polls on election day or mail it
23 in so there were some alternatives there?
24     A.  You know, I really don't know.  March of 2005
25 was still early in implementation of HAVA.  And this was

---

224

1  a subcommittee on verification of voters.  I'm not
2  sure.  I don't know why I jumped right into that.  I
3  don't know what the previous question was.  I'm not sure
4  of the context.
5      Q.  Is your statewide voter database, does it have
6  a name, like a nickname?
7      A.  Yes.  It's called "Team."
8      Q.  It's called Team, yes?
9      A.  (Witness nods head yes.)
10     Q.  I have a question for you about Team.  What
11 happens when someone registers and Team cannot get a hit
12 on this person either in Social Security or in the
13 driver's license, DPS database, is that then the
14 circumstance that you described previously, you would
15 return that information to the county?
16     A.  Yes.
17     Q.  And to your knowledge, do all counties send out
18 notices to people in that situation asking them to
19 resubmit?
20     A.  They're required to.
21     Q.  I wanted to ask you some questions about
22 2009.  During the 2009 session when the voter ID bill
23 was pending in the House, the chairman was Todd Smith,
24 Representative Todd Smith.
25     A.  Right.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 225

1    Q.   Are you familiar with any facts around Chairman
2    Smith's efforts to get a bill passed in the House, some
3    of his proposals?
4        A.   I'm probably familiar with some of them.  I
5    think he was trying to hear as many suggestions, hearing
6    from lots of different folks on.
7        Q.   Do you remember whether Chairman Smith rolled
8    out a proposed substitute at any point?
9        A.   I'm sure he did.  I don't remember them all,
10   but --
11       Q.   Do you remember a proposal by Chairman Smith
12   that would increase funding for voter education and
13   voter registration as part of the voter ID bill?
14       A.   I don't remember that.  I -- it may have been
15   in there, but I have forgotten that.
16       Q.   Now, at this point in 2009, there is some talk
17   about potential disparate impact of the voter ID as it
18   was being proposed at that time.  And you had some
19   conversations with Ms. Westfall about Spanish surname
20   registered voters, and I want to put that aside for
21   now.
22           And I want to ask whether the Secretary of
23   State generated any information or analysis on whether
24   there were classes of persons who might have less access
25   to the ID required by the bill, whether that be groups

## 226

1    of people based on age, either youth or age, an older
2    age, or income or race.  Do you remember making any
3    inquiry, your office making any inquiry or generating
4    any information like that?
5        A.   I don't recall us doing that.
6        Q.   So, for example, with respect to accepting
7    student IDs as voter ID, do you recall whether your
8    office looked into whether accepting student IDs might
9    ameliorate students and young people, in general,
10   otherwise not having access to acceptable ID?
11       A.   I don't remember doing any research on that.
12       Q.   Okay.  And the same with elderly people that
13   might live in nursing homes, did your office ever look
14   into or make any analysis or generate any information on
15   their access to ID?
16       A.   I don't think so.
17       Q.   In 2009, did you have any internal
18   conversations at the Secretary of State's Office about
19   assessing potential disparate impact on the basis of
20   race of the voter ID bill that was being proposed at
21   that time?
22           MR. MORTARA:  Ms. McGeehan, the question
23   is unobjectionable, but I remind you on the attorney-
24   client privilege within the Secretary of State's Office,
25   to the extent that anything you did is protected by

## 227

1    that; you should self-police the attorney-client
2    privilege.
3        Q.   (By Ms. Perales)  So as long as it wasn't a
4    conversation with the four people that you mentioned
5    earlier, the Secretary, who might not have been Hope
6    Andrade in 2009.
7        A.   I think it was, she was.
8        Q.   So put aside the Secretary, Deputy Secretary,
9    communications and general counsel, I'd like to know
10   about your conversations or your communications with
11   e-mail, conversations inside the Secretary of State's
12   Office about potential disparate impact on the basis of
13   race or whether you needed to look into that?
14       A.   I don't recall any.
15       Q.   At this point, by 2009, you are getting
16   questions during hearings about potential racial impact
17   though; isn't that correct?
18       A.   I don't know that I received that question.
19       Q.   But were you present in hearings where this
20   issue was starting to be discussed --
21       A.   Yes.
22       Q.   -- by other witnesses, by members of the
23   legislature --
24       A.   Yes.
25       Q.   -- including Ralph Anchia?

## 228

1        A.   Yes.
2        Q.   But do you not recall any conversations inside
3    the Secretary of State's Office that are not privileged,
4    sort of peer to peer.
5        A.   Uh-huh.
6        Q.   Involving looking into potential racial
7    disparate impact?
8        A.   No.
9        Q.   I'd like to go to 2010 in the interim.
10           MS. PERALES:  Okay.  Here's a question for
11   United States.  We have the transcript of the interim
12   Elections Committee meeting in June of 2010.  Do you
13   happen to know the number for that exhibit so we can
14   refer to it?
15           MS. WESTFALL:  We didn't use that exhibit.
16           MS. PERALES:  You didn't use that exhibit?
17   I'd like to mark this Rodriguez 2, please.
18           (Rodriguez 2 marked for identification.)
19       Q.   (By Ms. Perales)  I'm handing you what has been
20   marked Rodriguez 2.  Happy to say we're already in 2010.
21       A.   Good.
22       Q.   If you would turn with me to Pages 36 and 37.
23   Starts near the top with "Good morning, I'm Ann
24   McGeehan."
25       A.   Okay.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Ann McGeehan                                                May 31, 2012

---

### 229

1  Q.  So we've got you at the beginning of your
2  testimony.
3      A.  Okay.
4      Q.  At the second paragraph, you talk about a 50
5  state chart survey, and you say it's in your packet.
6      A.  Right.
7      Q.  Do you know whether -- I mean, is this -- do
8  you know whether this was ever disclosed by the state in
9  discovery in this case?
10     A.  I don't know.
11         MR. MORTARA:  You know better than to ask
12  me.
13         MS. PERALES:  I'm not going to ask you.
14  I'll stick with the answer I got from the witness, and
15  I'll follow up later.
16     Q.  (By Ms. Perales)  And that was all I was going
17  to ask you about 2010.
18     A.  Okay.
19     Q.  Let's go to U.S. Exhibit 288.  It's a House
20  hearing transcript.  Thank you.
21     A.  Okay.  March 1st, 2011.
22     Q.  Correct.  And turn with me to Page 313, if you
23  may.  It starts -- there's a back and forth going on
24  here.  And I'd like to have you read it from 310, Page
25  310, just to get a better of sense of what's going on

---

### 230

1  there.
2      A.  Okay.
3      Q.  On Page 310, near towards the bottom of the
4  page, Representative Anchia starts to talk to you about
5  what he called a "vote saving affidavit approach," and
6  I'd like you to read through your comments on 313 just
7  to yourself.
8      A.  Okay.  (Witness reading.)  Okay.  So through
9  313?
10     Q.  Yes.
11         And so what you're basically talking about
12  here, would it be correct to say then is what we would
13  call a "bypass affidavit," or an affidavit in which the
14  person swears to their identity and is then permitted to
15  vote in lieu of providing photo ID; is that correct?
16     A.  Right.
17     Q.  And you say "We could" -- "We could look at."
18  On Page 13, you say "We could look at what some of the
19  other states have done."  And you mentioned Michigan.
20  Representative Anchia mentions Ohio.  You say you might
21  have heard Florida.  I'm curious whether you ever --
22  your office ever looked into that, whether or not an
23  affidavit could serve as a way to allow someone to vote
24  who lacked ID?
25     A.  We did in 2009 a little bit, but I think that's

---

### 231

1  covered under this privilege.
2      Q.  Okay.  So I think I can ask you about
3  information that you have generated as opposed to
4  communications.
5          MR. MORTARA:  You can ask about -- she can
6  you about information that you generated.
7      A.  Uh-huh.
8          MR. MORTARA:  She cannot ask about to whom
9  you communicated it, because that would be revealing a
10  communication.  But she can ask what information you
11  generated.
12     A.  Okay.
13     Q.  (By Ms. Perales)  I will ask about the
14  information that you generated.
15     A.  Okay.
16     Q.  Can you describe for me the information that
17  you generated when you looked into this question?
18     A.  I think that in 2009, the question came up
19  about essentially this, like some sort of bypass
20  affidavit that could be used.  And we were asked to look
21  at Michigan -- or I don't remember if we were directed
22  or we had to look that up and find out which states had
23  that, but we did look at that -- an affidavit process
24  that a person who didn't have an ID could use.
25     Q.  And what type of -- in what form did the

---

### 232

1  information -- in what form did you embody the
2  information?  Did you create a memo, or did you write
3  any of this down?
4      A.  I -- I know I contacted Michigan, and I
5  contacted Florida, and I think I got -- either they told
6  me their law.  I looked it up online.  I -- and that's
7  what I did.
8      Q.  Okay.  And did you write -- make any notes
9  about the information that you were learning, or did you
10  prepare an e-mail?
11     A.  I don't remember if I put it in an e-mail or if
12  it was in a phone conversation.  I don't remember.  And
13  I think by the time we got the information, the need for
14  the information had sort of -- wasn't as -- people
15  weren't asking about it as much as they were.
16     Q.  Once you gathered the information, did you form
17  a conclusion that a bypass affidavit would lead to voter
18  fraud?
19     A.  What I -- what I obtained from the information
20  I got from Michigan and Florida was that they thought it
21  was a pretty good process.  Although, I think I've read
22  that Michigan is trying to change that law now.  So --
23     Q.  You mentioned this was in 2009.
24     A.  Yes.
25     Q.  So at the time that you gathered the

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Ann McGeehan                                                      May 31, 2012

---

233

1    information, you understood that those states felt
2    positively about their affidavit bypass.  Did you gather
3    any information suggesting that the affidavit bypass
4    would increase voter fraud?
5        A.   We didn't really do much with it.  I mean, we
6    basically found out what -- what their process was.  We
7    didn't do any further analysis on it.
8        Q.   And you learned that they felt good about their
9    process?
10       A.   I know that the Florida director felt positive
11   about the process, and I don't know if he came to
12   testify or there was -- at some point, there was a
13   discussion that he might come and testify in one of the
14   hearings.
15       Q.   And did you learn any information at that time
16   that the bypass affidavit process would lead to
17   increased voter fraud?
18       A.   No.
19       Q.   Could you go in the same transcript to Page
20   285?  The transcript that we're holding here.
21       A.   Okay.
22       Q.   Oh, let me ask you one last question.  Since
23   your testimony that we were just talking about was in
24   2011, did you make any further investigation of bypass
25   affidavit in 2011 after being asked about it in the

---

234

1    legislature, in the hearing?
2        A.   No.
3        Q.   Is there any particular reason you did not
4    generate more information about affidavit bypass in 2011
5    after being asked about it in the hearing?
6        A.   I guess the impression I got was it was sort of
7    an idea that was suggested at the hearing but that I
8    don't know that any -- I didn't think anyone directly
9    asked us to look into it or give them any information on
10   it.
11       Q.   On Page 285, you are talking about the fiscal
12   note for SB 14.  And going from Page 284 to 285, is it
13   correct that you testified in a hearing that your fiscal
14   note assumes training and voter education for one
15   election cycle; is that correct?
16       A.   Yes.  For the 2012 cycle.
17       Q.   And so the fiscal note did not contemplate any
18   further voter education or training in terms of how much
19   money it was describing?
20       A.   Right.
21       Q.   I have a question about this, the HAVA funds
22   being used for voter education on SB 14, and it's later
23   in my outline, but I figure we could just get to it now.
24       A.   Okay.
25       Q.   I understand that Secretary of State Andrade

---

235

1    wrote a letter to Senator Ellis, I believe, saying that
2    she had received assurances from the U.S. Election
3    Assistance Commission that HAVA funds could be used for
4    voter education on SB 14.  Do you recall that?
5        A.   Yes.
6        Q.   And did you make similar assurances when you
7    testified in the legislature that the EAC HAVA funds
8    could cover voter education for SB 14?
9        A.   I probably did, and I don't know if that was
10   before the letter -- before Secretary Andrade wrote hat
11   letter or not.
12       Q.   Did you have any direct communications with the
13   EAC, the Election Assistance Commission on this topic?
14       A.   I did.
15       Q.   Can you tell me about that, those
16   communications?
17       A.   I spoke with Tom Wilke, who was the director of
18   the Election Assistance Commission, and asked him that
19   question.  And -- over the phone.  And he answered.  And
20   he pointed me in the direction of I think an opinion
21   they had written for the state of Indiana.  I think it
22   was Indiana.  He called me back a day or two later,
23   after the letter from Secretary Andrade had gone out and
24   said he wasn't authorized to give that advice over the
25   phone.  So --

---

236

1        Q.   Did you ever receive a letter or any
2    correspondence in writing from Mr. Wilke or anybody else
3    at the EAC on the topic?
4        A.   Yes.  I think he actually ended up sending a
5    letter saying that they would have to direct that to
6    their general counsel, or something along those lines.
7        Q.   Do you know whether they ever did direct that
8    question to their general counsel?
9        A.   I don't know.  I don't think we ever got -- I
10   don't think we ever received a letter from their general
11   counsel on that, that I recall.
12       Q.   So sitting here today, do you know the answer
13   to the question, whether HAVA funds could be used for
14   voter education for SB 14?
15       A.   It was my understanding that they could and
16   that they had been used for voter education in other
17   states.
18       Q.   But with respect to the prospective use of HAVA
19   funds, given that you have nothing in writing from the
20   EAC, and Mr. Wilke essentially verbally retracted what
21   he had told you before, saying he was not authorized --
22       A.   Well, he just said he couldn't say one way or
23   the other.  But I mean, even if we hadn't had that
24   conversation, there were opinions on the EAC website
25   that authorized other states to use their HAVA funds to

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

237

1    educate on voter ID.
2        Q.  So would it be fair to say then that you feel
3    confident today that EAC HAVA funds could be used for
4    voter education on SB 14?
5        A.  Yes.
6        Q.  We talked earlier that in 2009, your office did
7    not make an inquiry into the impact of the proposed
8    voter ID law at that time on special classes of persons
9    such as the very young or the very old.  I'm wondering
10   whether you looked into those questions during the 2005
11   session or the 2007 session, what efforts your office
12   may have made to generate information about the impact
13   of voter ID on special classes of persons?
14       A.  We did not do any analysis like that in 2005 or
15   2007.
16       Q.  Did you have any conversations internally that
17   were not privileged, within the Secretary of State's
18   Office in 2005 or 2007, about generating information or
19   inquiring or doing an analysis into the potential impact
20   of a voter ID law on special classes of persons?
21       A.  No.
22       Q.  So, for example, nobody -- none of the staff
23   attorneys came up to you and said, "We got another voter
24   ID bill on the horizon.  I think our bill analysis ought
25   to include the potential impact on certain groups of

238

1    people"?
2        A.  No.
3        Q.  You testified earlier that in February or March
4    of 2011, your office undertook an effort to try to match
5    registered voters without ID with your Spanish surname
6    registered voters; is that correct?
7        A.  Yes.  Wait, no, I'm sorry.  We -- not with
8    Spanish surname.
9        Q.  Okay.
10       A.  In February or March, we tried to do the
11   comparison of drivers that didn't have driver's license
12   on file with the DPS database to see if we could find
13   additional voters, how many voters didn't have driver's
14   license or ID identification number.
15       Q.  Okay.  I understand.  So the Spanish surname
16   registered voter part was not a part of the picture yet
17   at that time?
18       A.  That's correct.
19       Q.  And that was the analysis that you created and
20   then waited for approval from your executive committee
21   to be able to release that information?
22       A.  Right.
23       Q.  Okay.  And at what point did you receive that
24   approval and were able to release that analysis?
25       A.  We didn't -- we -- I didn't get any instruction

239

1    to release that during session.  And so I guess -- and I
2    guess nobody was breaking down the door to ask for it,
3    so it just kind of sat there for a while.
4        Q.  All right.  And did you then release it in
5    response to a request by DOJ?
6        A.  Yes.
7        Q.  And would you use -- I think you said earlier
8    that it was essentially the same analysis?
9        A.  I believe it was, as far as the process that we
10   used to pull the data in the February, March time frame
11   was pretty much what we did in August or September,
12   whenever we pulled it for the Justice Department.
13       Q.  I see.  So you used the same methodology but
14   you did the poll as of a later date?
15       A.  Yes.
16       Q.  Now, the Secretary of State routinely
17   provides -- you testified earlier on this, routinely
18   provides data on Spanish surnamed registered voters;
19   that's correct?
20       A.  Yes.
21       Q.  And I'm certainly familiar with that.  We've
22   been one of those groups that requested the information
23   and received it.
24       A.  Okay.
25       Q.  So I'm familiar with that a little bit.  Isn't

240

1    it true that following a general election, the Secretary
2    of State typically updates its Spanish surnamed
3    registered voter data, or do you do that live?
4        A.  We -- we do it more frequently now with the
5    statewide system.  It used to be that we did it at
6    designated times of the year.  But with Team, you can do
7    it, you know, I think you can do it pretty much whenever
8    you want to.  It's easier, I think.
9        Q.  And the Secretary of State does post the
10   information about Spanish surnamed registered voters on
11   its website, correct?
12       A.  I don't know if we do or not.
13       Q.  When you put in your election returns, do you
14   recall whether you ever put in Spanish surnamed
15   registered voters?
16       A.  I don't think so.  No, I don't think we do.
17       Q.  Okay.  So would you say that you update your
18   information on Spanish surnamed registered voters
19   statewide at least twice a year?
20       A.  Well, I -- actually, I think anybody can -- can
21   request a copy of the, you know, the file of registered
22   voters and can request to have the flag.  So, I mean,
23   it's available any day somebody asks for it.  I think
24   for sort of having the data ready if we get a press call
25   or something like that, we do it; I think we do it once



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Ann McGeehan                                              May 31, 2012

---

### 241

1  a month.
2      Q.  All right.  So because you have Spanish surname
3  registered voters readily available for your total voter
4  roll, I'm curious why once you did your analysis in
5  February and March of 2011, attempting to identify
6  registered voters who did not have a DPS ID, why at that
7  point you didn't simply run the flags and look?  Because
8  you already had the data for your statewide voter role.
9  All you needed was to run the data for the persons you
10  had identified as not having a DPS ID.  Why didn't you
11  do it?
12     A.  I guess nobody thought to do it.
13     Q.  Were you ever instructed not to do it?
14     A.  No.
15     Q.  Okay.  Did it ever occur to you to do it, and
16  this is a different question whether anybody asked you
17  to do it?
18     A.  It really didn't.  I mean, you know, during a
19  legislative session, it's just very busy, so it did not
20  occur to me to do it.  So I can only speak for myself.
21     Q.  Okay.  But you had been through the '09
22  session.
23     A.  Yes.
24     Q.  And at this point you're in the '11 session.
25     A.  Right.

### 242

1      Q.  And you're sitting through these legislative
2  hearings on voter ID.  And at every hearing, you're
3  hearing witnesses say this is going to have a disparate
4  racial impact; isn't that correct?
5      A.  Yes.  At least by members of the legislature,
6  nobody else.
7      Q.  And witnesses as well; isn't that correct?
8      A.  In some hearings.
9      Q.  Tell me the ways in which the Secretary of
10  State's Office would receive allegations of election
11  fraud.
12     A.  We could get them via e-mail, phone calls,
13  written correspondence.
14     Q.  And what do you know about the office or the
15  special investigation unit that was set up by the
16  Attorney General's Office to look into voter fraud?
17     A.  What do I know about it?  I -- at some point in
18  the -- you know, the -- maybe around 2005 or '06, I know
19  that they got more staff, so they were, you know, more
20  -- had more resources to investigate election fraud.  So
21  we -- around that time, you know, it was decided that we
22  would just send any credible allegation of election
23  fraud, whether it was for electioneering or, you know,
24  intimidating a voter, whatever it might be, we would
25  send it over.

### 243

1      Q.  And so you began to forward complaints about
2  voter fraud to the special investigation unit of the
3  AG's office around 2005 or 2006?
4      A.  Oh, no.  We always had made referrals based on
5  criminal -- allegations of criminal violations.  In the
6  early 2000s, we did not send over electioneering
7  violations or misdemeanors, things like that, because
8  they didn't have the staff.  And they said, you know,
9  please, we can't investigate.  So, but they got more
10  staff, and we were directed to just send over any
11  credible allegations of fraud.
12     Q.  And how would you determine that an allegation
13  was credible?  What was your criteria for deciding
14  whether something was worth sending on to the AG's
15  Office?
16     A.  Generally, they would have to provide some sort
17  of specific facts.  They couldn't just say, you know,
18  "We think this election is crooked.  Investigate."  They
19  would have to provide something specific.  Not
20  necessarily provide any proof, but state something and
21  there -- and it would be required to be in writing.  We
22  wouldn't take something over the phone.
23     Q.  Would you require something to be notarized?
24     A.  No.
25     Q.  Would you require it to be signed if it came in

### 244

1  by e-mail and it was credible?
2      A.  No.
3      Q.  All right.  What was your understanding of what
4  the special investigation unit of AG's office would do
5  with these allegations?
6      A.  I -- I know they had investigators that would
7  investigate.  And then I guess at a certain point, they
8  would turn it over to prosecutors.  But we didn't --
9  once we sent it over, we didn't really have any regular
10  communication on that.
11     Q.  I saw that in one of your hearing testimony
12  transcripts that you testified that you were unaware of
13  the ultimate disposition --
14     A.  Correct.
15     Q.  -- of some of these complaints.
16     A.  Right.  We didn't -- we wouldn't necessarily
17  know if they were going to prosecute someone or not.
18     Q.  Did there ever come a time when your office
19  decided to check back in on some of these allegations
20  that had been made and find out from the special
21  investigation unit what had happened to these
22  complaints?
23     A.  I think we had discussed a process to kind of
24  have sort of regular updates, but it -- we never really
25  got very far with that.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

245

1    Q.   So today, do you have any more information
2    about the disposition of these complaints than you did
3    when you were testifying in the legislature?
4    A.   No.
5    Q.   Do you know whether documenting election fraud
6    became a higher priority at some point for the special
7    investigation unit at the AG's office?
8    A.   I don't know.  I mean, like -- I know that they
9    got more resources so they dedicated more folks to
10   it.  That's about all I know on that.
11          MS. PERALES:  Can we have Exhibit U.S.
12   284?
13   Q.   (By Ms. Perales)  Do you have Exhibit U.S. 284?
14   A.   Here it is.
15   Q.   Okay.  Oh, it's very small.  Do you have Page
16   99 in there?  If not, I'll give you the bigger
17   transcript.
18   A.   Okay.  Yes.  I have Page 99.
19   Q.   Okay.  So down at the bottom, Senator
20   Van de Putte asks you, "How many complaints have you had
21   about voter impersonation?"  Is it correct that you
22   testified, "We have not had any"?
23   A.   Yes.
24   Q.   Okay.  And then let's go to June 14,
25   2010.  This is Rodriguez --

---

246

1    A.   2?
2    Q.   It's Rodriguez 2.  Thank you.  Can you turn to
3    Page 46?
4    A.   Yes.
5    Q.   Okey-dokey.  Oops.  You're talking on Page 46.
6    If you can look back to Page 45, you start talking about
7    -- you start giving your answer, and is it correct to
8    say that on June 14, 2010, in the paragraph near the
9    bottom, you say, of the 24 referrals that you made to
10   the Attorney General, at least two of them involve
11   allegations of voter impersonation.
12   A.   I'm sorry.  On what page?
13   Q.   46.
14   A.   46.
15   Q.   It's in the second full paragraph.
16   A.   Okay.  Yeah.  I see that now.
17   Q.   You testified you've made 24 referrals over the
18   past two years, and you said "two of them," and then you
19   said, "at least two of them involve allegations of voter
20   impersonation."
21   A.   Uh-huh.  Yes.
22   Q.   And that was your testimony?
23   A.   Yes.
24   Q.   Was it two or was it more than two?
25   A.   I said it was two.  Maybe in my head I thought

---

247

1    -- I don't know.  I don't remember now what they all
2    were, but -- let me see what the exact question they
3    asked me.
4          Well, that's what I said.  Maybe -- I
5    don't know.  Maybe some of the referrals may have sort
6    of some general allegations, and it's possible once the
7    AG does their investigation, they may uncover other
8    violations.  But probably just on the face of it, two of
9    them clearly involve that as an allegation.  And I think
10   we provided copies of all this to the committee too.
11   Q.   Do you know if the state produced those
12   documents in discovery?
13   A.   I don't know.
14   Q.   I'm going to give you one more document.  This
15   is the March 6th memo.
16          (Rodriguez 3 marked for identification.)
17   Q.   (By Ms. Perales)  Ms. McGeehan, the court
18   reporter has handed you what has been marked Rodriguez
19   Deposition Exhibit 3.  Do you recognize this as a memo
20   from Secretary of State Hope Andrade to members of the
21   House Committee on Elections dated March 6, 2009?
22   A.   Yes.
23   Q.   Okay.  I'd like you to turn with me to Page 2,
24   where there's a section about complaints received
25   concerning election-related crimes (vote fraud).  Do you

---

248

1    see this?
2    A.   Yes.
3    Q.   By the way, did you write this document?
4    A.   I -- yes, I think I did.  I'm sure other people
5    helped, but I think I was the primary author.
6    Q.   Okay.  Do you recall anyone ever making
7    suggestions that you change the document from one draft
8    to the other?
9    A.   I'm sure that I -- most likely, I wrote the
10   initial draft, and then it was sent to the executive
11   department for review, and they probably did make
12   changes.
13   Q.   Okay.  So in this paragraph about -- on Page 2,
14   let's see, somewhere in here you say you have received
15   -- okay.  It's a dense paragraph, but maybe about a
16   third of the way in.
17   A.   Yeah.  I can't believe we provided it this way,
18   but maybe we did.  It looks kind of like -- anyway.
19   Q.   It says, "Of those complaints, of the written
20   complaints received, several alleged multiple instances
21   of voter impersonation complaints clearly involve
22   allegations of voter impersonation."
23          And here the word "several" is used.  And
24   the time frame, I believe, is since September 1, 2007.
25   So that would be about a year and a half between 2007

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 249

1  and 2009. I'm having a hard time meshing that number
2  several with your other testimony in -- well, in 2005,
3  you had received no complaints, and then in 2010, you
4  said you received two complaint between 2009 and 2010.
5      A.  Well, is the difference that they're talking
6  about complaints here and in the other, it's talking
7  about referrals to the AG.
8      Q.  I see. I see. So that helps me with my next
9  question. Do you recall whether you ever forwarded to
10 the Attorney General's Office for investigation any
11 complaints that arose from the City of Taft?
12     A.  Well, I guess we did. This is dated March of
13 2009. City of Taft, City of Progreso, and something in
14 Harris County.
15     Q.  But you were mentioning to me before that not
16 all of the complaints go on to the Attorney's General's
17 Office. They have to be sufficiently specific to be
18 investigated.
19     A.  Right.
20     Q.  Do you recall whether any of the complaints
21 from Taft, Progreso or Harris County were sufficiently
22 detailed or even gave enough information that they could
23 be investigated?
24     A.  I think those were. I mean, I believe we did
25 make referrals to the AG on those. You know, it could

## 250

1  be -- well, I don't know.
2      Q.  Do you remember attaching copies or putting
3  together with this memo copies of the complaints?
4  Because it says in the next couple of sentences, "Copies
5  of all written complaints are enclosed." Do you
6  remember other things being with this memo such as
7  copies of the complaints?
8      A.  I think there were. Yes.
9      Q.  Do you know if that was ever produced by the
10 state in discovery?
11     A.  I don't know.
12     Q.  On the next page, the third page, the very top,
13 in all caps, is --
14     A.  This is not a final. I don't know where this
15 came from, but yeah, this does -- I know this did not go
16 out to the committee like that. I can just tell you
17 that for sure.
18     Q.  I don't know. Maybe the executive office made
19 changes after you wrote a beautiful draft. I can't say
20 either. But did I want to ask you about the paragraph
21 at the top. "Question for Ann," it says. "Do these
22 figures in the attachments I reviewed reflect all
23 instances of complaints the office received for all
24 elections since September 27, whether primary, local or
25 otherwise?" Do you know where that question came from?

## 251

1      A.  That probably came from John Sepehri, who was
2  the general counsel.
3      Q.  And do you ever remember providing an answer to
4  that question?
5      A.  I'm sure I did provide an answer.
6      Q.  Okay. Do you remember what the answer was?
7      A.  I think it did. I mean, I think it did,
8  because I think that's the question that Representative
9  Anchia asked us, so... And it would have included all.
10 We wouldn't have --
11     Q.  Do you remember whether the complaints from
12 Taft and Progreso were related to local elections?
13     A.  Progreso was related to local elections. I
14 think it was school district and city. Taft, I don't
15 really remember what that was.
16     Q.  Okay. So would it be fair to say then that
17 John is asking you here, the general counsel for the
18 Secretary of State, asking you here to make sure you put
19 in everything you had?
20     A.  Yes.
21          THE COURT REPORTER:  Is it okay if we take
22 a short break?
23          MS. PERALES:  Yes.
24          (Recess from 5:27 to 5:36 p.m.)
25          MS. PERALES:  I marked Rodriguez 4. Did I

## 252

1  give it to you?
2          THE WITNESS:  No.
3          MS. PERALES:  I did not. Can you please
4  mark this.
5          (Rodriguez Exhibit 4 marked for
6  identification.)
7      Q.  (By Ms. Perales) Ms. McGeehan, I'm handing what
8  has been marked Rodriguez 4. Do you recognize this
9  document?
10     A.  Yes.
11     Q.  And what is the document?
12     A.  It is the State submission of Senate Bill 14,
13 the letter submission. I guess we -- okay. It's the
14 whole submission.
15     Q.  I hope it is.
16     A.  Yeah.
17     Q.  Okay. If you wouldn't mind turning with me to
18 Page 10, paragraph N as is "Nancy." You state here,
19 "The Act does not have the intent and will not have the
20 affect the diluting voting strength of any racial or
21 linguistic minority." And you also state that the Act
22 will not affect members at any racial or linguistic
23 minority differently from the way the general public is
24 affected." Do you see that language?
25     A.  Yes.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

ESQUIRE
DEPOSITION SOLUTIONS

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 253

1      Q.  Can you give me the factual basis that you had
2  for making that statement?
3      A.  That was the opinion of the office based on the
4  information we had, and there's a discussion beneath
5  that paragraph or further discussion in N that sets out
6  a legal analysis of that.
7      Q.  I see it.  Putting aside the legal analysis,
8  are you able to identify any specific facts that formed
9  the basis of your statement in the first paragraph of
10  Section N?
11      A.  Well, essentially, this is a standard clause
12  that we put in most of our submissions.  This may have
13  been tweaked a little bit on this one, but we almost
14  always have this sentence in every submission.  So
15  unless we have specific information that there is a
16  discriminatory intent or a discriminatory impact, we
17  will put this -- these statements in the submission.
18      Q.  I understand, and I have seen this type of
19  statement before in other submissions.  I understand
20  it's something of a boilerplate.
21      A.  Yes.
22      Q.  But here, I need an answer directly to my
23  question whether you had any facts supporting the
24  statements in the first paragraph of N at the time of
25  the submission.

## 254

1      A.  I had no facts that showed that the Act would
2  have -- that the Act would affect members of a racial or
3  linguistic minority differently from the way the general
4  public was affected.
5      Q.  Did you have any facts that the Act would not
6  affect members of any racial or linguistic minority
7  differently?
8      A.  No.
9      Q.  Did you have any fact showing that the Act did
10  not have the intent of diluting the voting strength of
11  any racial or linguistic minority?
12      A.  No, I did not have any fact, factual
13  information that the Act had the intent of diluting the
14  voting strength of any racial or linguistic minority.
15      Q.  Would it be correct to say that you didn't have
16  any facts one way or the other with respect to the
17  effect of Senate Bill 14 on racial and linguistic
18  minorities?
19      A.  Yes.  I think that's fair.
20      Q.  You signed the submission; is that correct?
21      A.  Yes.
22      Q.  Did you prepare it?
23      A.  It was -- the initial draft was by one of the
24  attorneys in the Division, and then it went through
25  Elizabeth.  I looked at it.  It went to John Sepehri,

## 255

1  and John may have sent it to some other folks.
2      Q.  And then eventually, it made its way back to
3  you?
4      A.  Yes.
5      Q.  All right.  And do you always read it through
6  and make sure it's all you before you sign it and send
7  it off?
8      A.  Well, I mean, it wasn't all me, but I felt
9  comfortable signing it.
10      Q.  Why did you put Larry Gonzalez and Aaron Pena
11  as contacts in the -- I guess you'd call it the second
12  to last page.  It actually looks like there's three
13  contacts:  Aaron Pena, Larry Gonzales, and Jose
14  Aliseda.  Why did you put those three people?
15      A.  Actually, John Sepehri made that decision as to
16  which -- as to who he would list as the minority
17  contacts.
18      Q.  I see.  So this is typically racial minority
19  persons?
20      A.  Yes.
21      Q.  Are there any African Americans on this list?
22      A.  No.
23      Q.  Do you know of any African Americans who were
24  -- who spoke or testified on the bill?
25      A.  For the bill?

## 256

1      Q.  For or against.
2      A.  For or against.  I don't recall any African
3  American legislators testifying for the bill.
4      Q.  Do you remember some in opposition?
5      A.  Yes.
6      Q.  Okay.  And with respect to Latinos, because
7  these three guys are Latinos; is that right?
8      A.  Yes.
9      Q.  They were all for the bill?
10      A.  I know that Representative Pena and
11  Representative Jose were.  I don't know about Gonzales,
12  Representative Gonzales.  I guess he was.  He was a
13  co-sponsor, so...
14      Q.  Yes, he was a co-sponsor, so we're assuming he
15  voted for the bill he co-sponsored?
16      A.  Yes.
17      Q.  And so these three names that you chose to give
18  to DOJ, these three Latinos did not oppose the bill; is
19  that correct?
20      A.  That's my understanding.
21      Q.  Okay.  So the decision was made by the general
22  counsel to put three Latinos, no African Americans, and
23  only people who supported the bill?
24      A.  Yes.  And generally, that's what we do is, put
25  down the names of people that are supportive of the



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 257

1    bill.
2        Q.  Did you have any communications with
3    legislators or anyone in the Office of the Lieutenant
4    Governor during the period of time that this submission
5    was being prepared and following passage of SB 14?
6        MR. MORTARA:  I'm sorry.  Can you read
7    back the question, Chris?  I just have make sure I have
8    no privilege instruction.
9        (Requested portion was read back by the
10   court reporter.)
11       MR. MORTARA:  You can answer that question
12   yes or no.
13       A.  I did not.
14       Q.  (By Ms. Perales) Do you know whether anybody in
15   your office had the communications with anybody in the
16   Legislature or the Lieutenant Governor's Office during
17   the preparation of this submission and following passage
18   of SB 14?
19       A.  I'm not aware of any.
20       Q.  Okay.  Would that answer be same with respect
21   to with some of the subsequent correspondence that you
22   had DOJ?
23       A.  Regarding if there were any conversation with
24   the Lieutenant Governor's Office or the Legislature?
25       Q.  Correct.

## 258

1        A.  That's correct.  I'm not aware of any
2    communications.
3        Q.  All right.  So while all this significant
4    amount of back and forth is going on between you and the
5    Department of Justice, and you're trying to provide more
6    information in response to their requests for more
7    information, who did you turn to, to navigate through
8    this if not anybody in the Legislature or the Lieutenant
9    Governor's Office?
10       A.  I think our -- from my perspective, we were
11   more in contact with the AG's Office, and that's
12   probably privileged, at that point, with the Attorney
13   General's Office --
14       Q.  Uh-huh.
15       A.  -- on how to respond to Justice Department.
16       Q.  Well, you weren't the client of the Attorney
17   General.
18       MR. MORTARA:  No, but the Attorney General
19   represents the State, and the Attorney General is the
20   lawyer for the entire state, including the Secretary of
21   State when they ask for legal advice from the Attorney
22   General's Office, so it's privileged.
23       Q.  (By Ms. Perales) So you asked the Attorney
24   General's Office for legal advice?
25       A.  Yes.

## 259

1        Q.  Was there -- did you have communications with
2    the Attorney General's Office that was not a request for
3    legal advice?
4        A.  No.  I think -- I think it would be considered
5    legal advice as far as getting the Act precleared.
6        Q.  Uh-huh.  Would you send factual information to
7    the Attorney General's Office from time to time during
8    the course of the back and forth with DOJ on the
9    Section 5 submission?
10       MR. MORTARA:  You can answer that question
11   yes or no, Ms. McGeehan.
12       A.  Yes.
13       Q.  (By Ms. Perales) Do you know whether that
14   factual information was produced in discovery?
15       A.  I don't know what was produced in discovery.
16       Q.  I'm sorry I keep asking that question.
17       A.  That's okay.  Okay.  Yeah.
18       Q.  But I have to get it on the record.  I don't
19   mean to be a pest about that.  Okay.
20       MS. PERALES:  I'd like mark this Rodriguez
21   5, please.
22       (Rodriguez Exhibit 5 marked for
23   identification.)
24       Q.  (By Ms. Perales) Do you recognize the first
25   page of this document as a letter from Senator Ellis to

## 260

1    you dated October 27th, 2011.
2        A.  Yeah.  I need to refresh my memory on
3    this. (Reading document.) okay.  I have looked at it.
4        Q.  Do you recognize the first document, that's the
5    first page, printed double-sided, as a letter to you
6    from Senator Ellis?
7        A.  Yes.
8        Q.  Do you recognize the second document as an
9    attachment to that letter which is a letter from state
10   demographer Lloyd Potter?
11       A.  Yes.
12       Q.  I'm going to ask you a couple of questions
13   about this.  Were you involved in the meeting between
14   the Secretary of State's Office and Dr. Potter, the
15   state demographer, about the methodology for deriving
16   the number of registered voters in Texas by race and
17   Spanish surname that might lack ID?
18       A.  Yes.
19       Q.  Okay.  And is it correct to say, then, that in
20   this meeting with Dr. Potter, you discussed your
21   methodology for coming up with this number, and he
22   discussed his ideas?
23       A.  Yes.
24       Q.  Did Dr. Potter make any suggestions about the
25   methodology that should be used?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Ann McGeehan                                          May 31, 2012

261

1    A.  As best as I can remember the meeting,
2  Dr. Potter, you know, ran through a couple possible ways
3  that they might be able to do the analysis.  And I think
4  when he heard of the information that DPS had -- and I
5  think in the meantime -- okay.  We had already gotten
6  the request from DOJ asking -- I'm just trying to get
7  the time line straight in my head.
8       Okay.  So we had already had received the
9  Justice -- so the Justice Department had probably
10  already asked us to be looking at the -- or comparing
11  the DPS race data.  So we were starting to analyze what
12  we could do with that.  And I think once we shared that
13  with Dr. Potter, I think he decided that might be more
14  fruitful than the kinds of analysis that he could do
15  with the census information and things like that.
16    Q.  Did Dr. Potter make any suggestions or offer
17  something he thought you all should be doing that you
18  decided not to do?
19    A.  I don't remember that.
20    Q.  When you had your conversation with Dr. Potter,
21  was it only about race, or was it also about trying to
22  look at Spanish surname?
23    A.  I think it also was about race.  Spanish
24  surname or -- could you restate your question, please?
25    Q.  Well, I understand from your previous testimony

262

1  that when you were looking at trying to identify Spanish
2  surnamed registered voters who might lack ID --
3    A.  Uh-huh.
4    Q.  -- that you were comparing your registered
5  voters with DPS and looking at their Spanish surnamed
6  people; is that right?  Or you were just looking at all
7  the Spanish surnamed flagged people in your database,
8  and the ones you could not find in DPS?
9    A.  Well, and I remember we didn't -- we didn't do
10  any analysis of DPS data -- and I'm just trying to build
11  a timeline here.  We sent the Justice Department the
12  data on the voters that we could identify that didn't
13  have a driver's license.  The Justice Department came
14  back and said, oh, but we know that DPS has information
15  on the driver's race.  Can you run that information
16  against your voter information?  And that request, I
17  think, came in around the same time as this letter from
18  the demographer, or the request from Senator Ellis.  And
19  I'm not sure how DPS -- how they identified race in
20  their data.
21    Q.  Uh-huh.  Okay.  So with respect to Spanish
22  surname, you could always have run -- once you figured
23  out who was in the voter database who you couldn't find
24  in DPS, which is possibly a list of people who lack
25  voter ID, you could always have looked at that group of

263

1  people for what percentage of them were Spanish
2  surnamed; you didn't need to look at DPS's race data to
3  figure that out?  In fact, they weren't even in the DPS
4  database, correct?
5    A.  Well, and we sent that to the Justice
6  Department in September.  We did that --
7    Q.  With the Spanish surname information?
8    A.  Yes.
9    Q.  Okay.  And so this is -- these letters that
10  we're looking at in Rodriguez 5 have more to do with an
11  attempt to figure out the race of the people who might
12  not have ID?
13    A.  Yes.
14    Q.  So at this point, you've got the Spanish
15  surname figured out.
16    A.  We've got the Spanish surname data figured out.
17    Q.  Okay.
18    A.  Right, and then the Justice Department asked us
19  to, sort of, see if we could further analyze the voter
20  data by comparing it to the DPS data with the --
21  whatever racial classifications they had.
22    Q.  And at that time, were you looking at Hispanic
23  as a racial classification, or had you stopped looking
24  at Hispanics?
25    A.  Well, DPS had that as a -- as a category, so we

264

1  looked at it.  Now, that was on -- that was just
2  beginning, and I left the agency before that analysis
3  had concluded.
4    Q.  Okay.
5       MS. PERALES:  Can we look at the March 18,
6  '09 House Journal.  I would like to mark this as
7  Rodriguez 6.
8       (Rodriguez Exhibit 6 marked for
9  identification.)
10    Q.  (By Ms. Perales) The court reporter has handed
11  you what has been marked Rodriguez 6.  And do you
12  recognize this as the Senate Journal from March 18,
13  2009?
14    A.  Yes.
15    Q.  Turn with me to Page 591 if you would, which is
16  tail end of a letter that actually begins on the first
17  page, from Deputy Secretary of State Colby Shorter, III.
18    A.  Yes.  And it's really Coby, not Colby.
19    Q.  Coby.
20    A.  Coby.  His real name.
21    Q.  So this is a letter from Mr. Shorter, and he --
22  you have previously described the position of Deputy
23  Secretary of State as somebody in the executive office;
24  is that right?
25    A.  They're basically number two.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

---

265

1   Q.   The number two, right below Hope Andrade; is
2   that right?
3   A.   That's right.
4   Q.   If you would turn with me to Page 591, there is
5   a question on that page:  "Does the Secretary of State
6   track the racial status of registered voters?  If not,
7   how will the state prove that Senate Bill 362 does not
8   have an adverse impact on the minority voters when the
9   state submits the bill for preclearance."  Do you see
10  that question?
11  A.   Yes.
12  Q.   And is it correct, if you look at the second
13  paragraph, every submission to the U.S. Department of
14  Justice?  Do you see that second paragraph there?
15  A.   Yes?
16  Q.   The third sentence, do you see where it says,
17  "A similar effort to obtain such demographics may be
18  required for a voter identification bill."  Do you see
19  that there?
20  A.   Yes, I do.
21  Q.   So would it be fair to say, then, that the
22  number two person at the Secretary of State's Office, in
23  March of 2009, was informing the Legislature that an
24  effort would have to be made when attempting to preclear
25  a voter ID bill to identify the demographics of

---

266

1   registered voters?
2   A.   Yeah.  He said it may be required.  He offered
3   it, but...
4   Q.   Okay.  So would it be fair to say, then, and
5   your office knew, in 2009, that having to get
6   demographics on registered voters might be a part of the
7   preclearance process for showing that a voter ID bill
8   complied with Section 5?
9   A.   Yes, I mean, Deputy Shorter's answer mentioned
10  that, so...
11  Q.   Okay.
12  MS. PERALES:  I'd like to mark this,
13  please.
14      (Rodriguez Exhibit 7 marked for
15  identification.)
16  Q.   (By Ms. Perales) The court reporter has handed
17  you what has been marked Rodriguez Deposition
18  Exhibit 7.  And do you recognize this as some e-mail
19  communication between yourself and a staffer for Senator
20  Van de Putte?
21  A.   Yes.
22  Q.   And is it fair to say that in your September
23  15th e-mail, 2011, to Amber Hausenfluck, you are
24  discussing the possibility that DOJ will ask for racial
25  breakdowns of data regarding which voters do not have a

---

267

1   Texas driver's license or ID?
2   A.   Yes.  That's what I said.
3   Q.   How did you know that it was possible that the
4   U.S. DOJ would ask for that, if the letter asking for it
5   didn't come in until September 23rd?
6   A.   Well, Amber -- Amber's original question to me,
7   or she's referencing -- she is referencing a request
8   from Senator Gallegos's office, I think.  Well, I don't
9   really know who Debbie is.  But in any event, I mean,
10  what we did -- I think it started out at Senator
11  Gallegos's office, they asked a question about, you
12  know, the number the voters that didn't have driver's
13  license or personal ID numbers issued by DPS, and I
14  think we had just sent that to Justice Department.
15  Q.   Uh-huh.
16  A.   And so it was public information, and I sent it
17  to Senator Gallegos's office.  He must have sent it to
18  Senator Van de Putte's office.  And I think once it was
19  out there, then the question was, have you broken this
20  down by Hispanic surname.  So once other people were
21  asking the question, it seemed natural that DOJ might
22  ask that question, so...
23  Q.   Is it your testimony that it did not occur to
24  you that DOJ would ask for breakdowns by Spanish
25  surname before it was suggested to you by the staffer in

---

268

1   an e-mail?
2   A.   I don't think it did.  I don't think they
3   specifically asked for it when they asked for the data.
4   Q.   DOJ, you mean?
5   A.   DOJ.
6   Q.   Okay.  I understand.  DOJ didn't ask for the
7   data until they asked for it --
8   A.   Right.
9   Q.   -- around September 23rd.  But is it your
10  testimony that it did not occur to you that the Justice
11  Department would ask for that kind of information prior
12  to September 14th, when it was suggested by a Senate
13  staffer?
14  A.   I don't remember it -- I mean, it seems obvious
15  now, but I don't recall it coming to me or asking our IT
16  department to do it.
17  Q.   And so you don't recall it occurring to you?
18  A.   No.
19  Q.   Okay.
20  MS. PERALES:  Mark this Rodriguez 8.
21      (Rodriguez Exhibit 8 marked for
22  identification.)
23  Q.   (By Ms. Perales) The court reporter has handed
24  you what has been marked Deposition Exhibit Rodriguez
25  8.  Do you recognize this as a September 7, 2011 letter

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

269

1  from you to Chris Herren at the Department of Justice?
2      A.  Yes.
3      Q.  In the very last sentence of your letter you
4  say, "The percentage --" and by there you were talking
5  about registered voters who have a Texas driver's
6  license or I.D. card -- "it's very likely to be higher
7  since we used stringent matching criteria to arrive at
8  this figure."  Do you see that last sentence there?
9      A.  I'm sorry.  On the first page?
10     Q.  No, last --
11     A.  On the last page.
12     Q.  Last sentence, last page.
13     A.  Yes.
14     Q.  All right.  Did you perform any analysis in
15  your office comparing or exploring the degree to which
16  your matching criteria would be under inclusive?
17     A.  Well, we knew that it would be, because when we
18  have to verify driver's license numbers for purposes of
19  getting a voter registered, we knew that a match on
20  first name, last name -- and let me refresh my memory
21  here.  Last name, first name and date of birth tends to
22  produce fewer matches.
23     Q.  Than what?
24     A.  Than if we did last name and first initial.
25  And I would need to refresh my memory.  But we have a --

---

270

1  first names frequently don't match exactly, because you
2  may -- I may be Annie in one database and Ann in another
3  or whatever.  And I know that we didn't have any
4  flexibility with the matching criteria with Social
5  Security Administration, because that was set out and
6  it's the same nationwide, but we were able to work
7  the -- on our matching criteria for verifying voters for
8  voter applicants.
9      Q.  Uh-huh.  And when you verify somebody who is
10  applying to register to vote, you do use the matching
11  criteria, last name, first name, date of birth; is that
12  right?
13     A.  Well, we match on the driver's license number,
14  so I don't think we use the full first name.
15     Q.  Okay.
16     A.  I would -- I would need to refresh my memory,
17  but I think that -- I don't think we require an exact
18  match on first name.
19     Q.  Do you have any studies in the Secretary of
20  State's Office showing the under inclusiveness of a last
21  name, first name, date of birth matching criteria or the
22  potential errors of just using last name, first initial
23  date of birth?  Do you have any, sort of, empirical
24  evidence regarding the -- what you call, you know, or
25  what you suggest is an under inclusive methodology here?

---

271

1      A.  I don't know that we have any empirical data.
2  I know that went we met with DPS to set up the process
3  to verify the driver's license numbers for purposes of
4  complying with HAVA, we met with their folks and
5  discussed matching criteria, and this issue came up.  I
6  don't think we have any studies or anything of that
7  nature.
8      Q.  And you chose not to use a match on the
9  driver's license number when you were producing this
10  data for DOJ?  You chose to use last name, first name,
11  date of birth?  Don't you have the driver's license
12  number in the voter registration database?
13     A.  Well, but this is for -- these were for the
14  folks that didn't have a driver's license.
15     Q.  Oh, okay.  That's right.
16     A.  That's why we had to do it that way.
17     Q.  So you have a completely different methodology
18  for confirming identity in your statewide database for
19  voter applicants than you did for your DOJ submission?
20     A.  Yes.
21     Q.  Because you couldn't match on the driver's
22  license number?
23     A.  Right.
24     Q.  But so putting aside your conversations with
25  DPS on matching voter applicants, do you have any

---

272

1  empirical data with respect to the either over or under
2  inclusive nature of trying to match last name, first
3  name and date of birth?
4      A.  The only other evidence we would have of that
5  is the different rates of verifying drivers' licenses
6  against the rate of verifying the last four digits of
7  the social security number, and there's a higher rate of
8  rejects on social security number.  And so it's been our
9  conclusion that that's due to the stricter matching
10  criteria for social security.
11     Q.  But you just said that when you're matching a
12  driver's license number, you're not using last name,
13  first name, and date of birth.
14     A.  Right.  But we have to do that for social --
15  what I'm saying is, for the social security number
16  match, it's similar to this.  It's first name and last
17  name.  We don't do that when we verify with the DPS
18  data.
19     Q.  And so you get a closer match when you can
20  match up driver's license numbers than when you are
21  looking at names and date of birth?
22     A.  Yes, exactly.
23     Q.  Okay.
24         (Rodriguez Exhibit 9 marked for
25  identification.)

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

273

1    Q.  (By Ms. Perales) The court reporter has handed
2  you what has been marked Rodriguez Deposition Exhibit
3  9.  Do you recognize this as a letter from you to Chris
4  Herren at the DOJ?
5    A.  Yes.
6    Q.  And dated October 4, 2011?
7    A.  Yes.
8    Q.  Is it with this letter that you produced to DOJ
9  for the first time an attempt to identify the number of
10 Spanish-surnamed persons who are not matched in the DPS
11 records for driver's license and Texas ID?
12   A.  Well, let me look at the letter.  I mean, I
13 thought we provided it before this, but I could be
14 wrong.
15   Q.  Take a look at Page 4 and paragraph number --
16 well, it's got a number in front of it, 5, and
17 specifically 5B.
18   A.  5B, okay.  Oh, okay.  I guess we sent it with
19 this letter, then.  It looks like we sent them an Excel
20 spreadsheet or something.
21   Q.  And so if you sent DOJ this information on
22 October 4th, can you give me a sense of when you
23 generated this information for the first time?  And by
24 that I mean, trying to identify, within the 605,576
25 registered voters who the state advise do not have a

274

1  Texas driver's license or personal ID card, the number
2  of people who are Spanish surnamed?  Would you have done
3  it shortly before October 4th or a little bit earlier
4  than that?
5    A.  Well, I don't remember when we received the
6  request for additional -- for additional information
7  from the Justice Department, but it probably have been
8  -- and I'm --
9    Q.  I think it was September 23rd.
10   A.  Okay.  So it would have been sometime between
11 September 23rd and, you know, before this -- before
12 October 4th.
13   Q.  Already.  So less than two weeks?
14   A.  Yeah.
15   Q.  Okay.
16     MS. PERALES:  Please mark this.
17     (Rodriguez Exhibit 10 marked for
18 identification.)
19   Q.  (By Ms. Perales) You have been handed what has
20 been marked Rodriguez Deposition Exhibit 10.  Do you
21 recognize this as a letter from you dated October 27,
22 2011, to Jennifer Maranzano from the DOJ?
23   A.  Yes.
24   Q.  I can only imagine that -- I mean, this is --
25 what is this, three weeks?  A little bit over three

275

1  weeks following the provision of the Spanish surname
2  information; is that correct?
3    A.  Right.
4    Q.  I just can only -- reading through these,
5  honestly, it just seemed like -- it was just very
6  stressful.  I have to say.  That's not a question, so
7  you don't have say anything in response to that.
8         But I did want to ask you whether, when
9  you're talking about racial classification data in your
10 October 27th letter, whether you're talking about
11 something different than identifying Spanish-surnamed
12 registered voters?
13   A.  Yes.
14   Q.  So when you're talking about Hispanics in the
15 DPS database being an obvious under count, but can you
16 explain why you think there was an obvious under count
17 of Hispanics in the DPS database?
18   A.  Well, we knew -- and I don't have those -- we
19 knew that they -- it was a very low number of Hispanics
20 in the driver's database, like, you know, 5 or 6
21 percent, and so we knew that had to be wrong.  So we had
22 some concerns about, you know, how reliable the data
23 was.  And I think that's -- I think we try to say that
24 in this letter, that there are limitations with the
25 data.

276

1    Q.  Do you know if DPS ever tried to update its
2  Hispanic numbers by running a Spanish surname search?
3    A.  No.  I mean, I don't know.
4    Q.  Okay.  I'm going to ask you now about Spanish
5  surname voter registration in the Secretary of State's
6  data, the stuff that I know about.
7    A.  Okay.
8    Q.  You had mentioned earlier in your testimony
9  that from time to time, you would pull information about
10 Spanish-surnamed registered voters with respect to a
11 jurisdiction when doing a Section 5 preclearance
12 submission.
13   A.  Yes.
14   Q.  And you mentioned some local jurisdictions that
15 you would pull that information for.  Do you remember
16 pulling or providing Spanish-surnamed registered voter
17 information to DOJ when you submitted, in 1998, the
18 statewide change to fill judicial vacancies with
19 the Hardberger versus Angelini decision; do you remember
20 that?  1998?
21   A.  I remember that whole decision and all of that,
22 but I don't remember if we included it.  We may have.
23   Q.  Do you remember getting an objection?
24   A.  Oh, yes.  I do remember that.  Yes.
25   Q.  Okay.  All right.  So moving back from the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Ann McGeehan                                                          May 31, 2012

## 277

1   objection, do you remember the objection letter talking
2   about the fact you had provided them information on
3   Spanish surname voter registration for the --
4       A.   The letter from the Justice Department?
5       Q.   Yes.  Do you remember the Justice Department
6   letter of objection referring to Spanish surname
7   registered voter data?
8       A.   No, I don't remember that part of the letter.
9       Q.   Okay.  But if it did, it would have come from
10  the Secretary of State, right?
11      A.   Yes.
12      Q.   Now, redistricting, which you called another
13  animal, is one in which also prepared Section 5
14  submissions, correct?
15      A.   Yes.  Sometimes, unless it went straight to
16  court or something.
17      Q.   And when you prepared submissions,
18  administrative submissions for redistricting, you
19  routinely provide Spanish surname registered voter data
20  for the state and for individual districts, correct?
21      A.   Yes.  Yes.
22      Q.   And, in fact, you are the source of Spanish
23  surname registered voter data for the Texas Legislative
24  Council when they build their redistricting database;
25  yes?

## 278

1       A.   Yes.
2       Q.   And their GIS system?
3       A.   Yes.  That's my understanding.
4       Q.   You were very careful earlier in your testimony
5   when you talked about Spanish surname registered voters
6   and some of the complaints that you had received, to
7   talk about Spanish speaking.  And I appreciated your
8   carefulness in this, because you talked about people who
9   complained to your office because they had received
10  mailers in Spanish; is that right?
11      A.   Right.
12      Q.   And they would tell you, "I'm not Spanish
13  speaking," correct?
14      A.   Right.
15      Q.   Okay.  Is it possible to be Hispanic and not
16  Spanish speaking?
17      A.   Yes.
18      Q.   So it could have been that you correctly
19  identified this person as a Spanish surnamed person and
20  even an Hispanic person, but they didn't speak Spanish?
21      A.   Yes, that could happen.
22      Q.   Okay.  And so speaking Spanish is not the same
23  as being Hispanic, is it?
24      A.   No.
25      Q.   And, in fact, nonHispanic people speak Spanish,

## 279

1   too.
2       A.   Right.  Right.
3       Q.   Mr. Mortara aside.
4           MR. MORTARA:  But his wife does speak
5   Spanish and is, as far as Mr. Mortara knows, not
6   Hispanic.
7       Q.   (By Ms. Perales) Have you seen any study on the
8   accuracy of your identification of Spanish surnamed
9   registered voters with respect to being able to identify
10  Hispanic voters in Texas?
11      A.   No.
12      Q.   Okay.
13          MS. PERALES:  Please mark these two.
14          (Rodriguez Exhibits 11 and 12 marked for
15  identification.)
16      Q.   (By Ms. Perales) If you wouldn't mind looking
17  at Rodriguez Deposition Exhibits 11 and 12 for me.
18      A.   Okay.
19      Q.   I want to ask you about the January 6th letter
20  first.  Do you recognize this as another letter to the
21  Department of Justice?
22      A.   Yes.
23      Q.   Okay.
24      A.   Well, it's not signed, but...
25      Q.   That's right.  And if you wouldn't mind

## 280

1   checking and seeing that the January 12th letter is
2   signed by Keith Ingram.
3       A.   Yes.
4       Q.   Okay.  And did Keith Ingram become director of
5   Elections after you left or before you left?
6       A.   After I left.
7       Q.   And what happened to Elizabeth Winn?
8       A.   She was acting director for a while, and then
9   when Keith was named or came on board, she went back to
10  her duties as director of the Legal section.
11      Q.   Who took your place when you left?
12      A.   Well, Elizabeth basically would wore two hats.
13  I think she acting director of the Division and also
14  director of the Legal section.
15      Q.   What is her title now?
16      A.   I believe it's Director of Legal section.
17      Q.   Okay.
18      A.   But, I mean, maybe it's changed, but that's
19  what it was before I left.
20      Q.   All right.  So from what I can figure out --
21  well, first of all, let me ask you:  Did you draft the
22  January 6th letter that we're looking after here before
23  you left?
24      A.   I don't think so, but I will look at it.  I did
25  not write this letter.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

<table>
<tr><td>

**281**

1    Q.   It doesn't sound like you, but I had to ask.
2         Let me point you to the language on Page 2
3    of the letter you're holding from January 6th.  There
4    are some bullet points, and I want you to look at bullet
5    point 5.  Look at bullet point 5 that starts with, "Use
6    of Hispanic surname."
7    A.   Okay.
8    Q.   When you were at the Secretary of State's
9    Office, did you ever write or offer the opinion that use
10   of the Hispanic surname is an unreliable methodology for
11   the purpose of this exercise, which we can understand is
12   identifying Hispanics?
13   A.   No.  And I think we -- had I offered this
14   earlier with Ms. Westfall, also, that's it -- you know,
15   we know it's not a perfect process, but, you know, it
16   was our belief at the time that it was -- it was
17   probably the only available tool we had to try and
18   identify Spanish surname voters, Hispanic voters.  And
19   furthermore, it was also pursuant to an agreement with
20   the Justice Department as sort of an authorized way to
21   identify Hispanic voters.
22   Q.   And the courts accept it as such in
23   redistricting litigation, don't they?
24   A.   Yes.
25   Q.   Okay.  And now if you look with me in the

</td><td>

**283**

1    fact that I have reviewed, you know, some of these
2    documents where I stated that we made referrals to the
3    AG maybe twice on voter impersonation, and that may have
4    been based on somebody like another person's analysis of
5    all the complaints.
6    Q.   So you don't know of a specific incident, other
7    than the one in Harris County involving the son using
8    his father's voter certificate?  Because you can
9    impersonate a voter with other documents, under the
10   current law, besides the voter certificate; yes?
11   A.   Right.
12   Q.   Okay.  So with respect only to the use of the
13   voter certificate, is it correct to say, then, that you
14   were only aware of one incident that you heard of where
15   a son used the voter certificate of his father to vote?
16   A.   Well, I think it would be fair to say that
17   that's a specific fact scenario that I specifically
18   remember.  But I also feel comfortable saying that we
19   had some -- you know, at least two complaints where that
20   was an allegation.  I don't remember the underlying
21   facts under those allegations.
22   Q.   So what -- do you remember those two cases
23   solving allegations of the use of a voter certificate?
24   A.   I don't remember precisely.  And voter
25   impersonation, I mean, that's not really an offense

</td></tr>
<tr><td>

**282**

1    January 12th letter, which looks a lot like the January
2    6th letter, if you go to the fifth bullet point again on
3    Page 2, you'll see it says, "Hispanic surname analysis
4    is an imprecise substitute for accurate racial data."
5         Do you have any idea why the language was
6    changed from "unreliable" to "imprecise"?
7    A.   I don't know.
8    Q.   Did you work on editing any form of this
9    letter --
10   A.   No.
11   Q.   -- before you left?
12   A.   No.
13   Q.   Are you familiar with -- are you familiar with
14   any incident in which an individual presented, for
15   voting, the voter certificate of a different individual
16   in order to impersonate that voter?
17   A.   I think there was a case in Houston where
18   somebody, I think a son, showed his deceased father's
19   certificate or something along those lines.
20   Q.   Other than the incident that you heard of
21   involving a son presenting a certificate of his father,
22   are you aware of any other incidents in which one
23   individual used the voter certificate of a person in
24   order to vote?
25   A.   I can't recall any right now, except for the

</td><td>

**284**

1    under the Election Code.  So, when we were asked to
2    analyze that, we'd have to sort of look at the
3    complaints and say, well, does that fit under this
4    category, which was sort of a category that's not really
5    defined.  We know what it means, but...
6    Q.   I understand.  But what you're saying is that
7    with specific reference to one person using another
8    person's voter certificate, that exact document, you can
9    recall one specific incident involving a son voting with
10   his deceased father's certificate and that you recall
11   other voter impersonation compliant, two other, in which
12   the certificate might or might not have been involved?
13   A.   Yes.
14   Q.   And can you think of a valid reason to remove
15   the voter certificate from the list of acceptable ID for
16   voting?
17   A.   You know, I can only speculate that the
18   Legislature felt it was important to have a photo ID, so
19   since the certificate doesn't have a photo, they didn't
20   feel like that was strong enough.
21   Q.   Okay. I understand.  And for so many years, you
22   had to defer to the policy decisions of the
23   Legislature.  But I want to ask you whether you, based
24   on your 20-plus years in the Secretary of State's Office
25   and your familiarity with one very specific incident

</td></tr>
</table>



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Ann McGeehan                                                    May 31, 2012

---

285

1    involving the improper use of a voter certificate by a
2    son to vote for his deceased father, whether you can
3    think of a valid reason, based in reality, and I'll be
4    more specific here, to prevent voter fraud by removing
5    the voter certificate from the list of acceptable ID for
6    voting?
7        A.  You know, as director of Elections, you know,
8    my duty was to implement the law, and, you know, it's
9    not my duty to the second guess the law.  And so for
10   photo ID, the stated intent was that this is going to,
11   you know, strengthen the voter laws.  It's going to, you
12   know, increase confidence in the process because there's
13   going to be an affirmative identification at the polls.
14       So in that sense, the certificate alone
15   probably doesn't meet that goal.  You know, I'm not the
16   Legislature, so, you know, so I guess that's my answer,
17   if you let me get away with that.
18       Q.  (By Ms. Perales) I won't.  I have to object as
19   nonresponsive, because I'm asking for your opinion, and
20   maybe the first and last time I'll ask.  I mean, I have
21   to ask you for your opinion.  And you spent many, many
22   years in the Office.  If there's anybody in the state of
23   Texas who is an expert on the operation of elections and
24   all things surrounding elections, including the
25   acceptance of voters for voting, it's you.

---

286

1        A.  My opinion is, I think both sides of the issue
2    are a little exaggerated and overstated and the truth is
3    probably somewhere in the middle.
4        Q.  And so with respect to your opinions
5    specifically on the removal of the voter certificate
6    from the list of ID that should be presented for voting,
7    can you think of a reason, based in reality, to remove
8    the voter certificate from the list of ID in order to
9    prevent voter fraud?
10       A.  Well, I mean, as a practical matter, what we
11   hear from election officials is most voters don't
12   present it anyway.
13       Q.  So is there a reason to remove it, in your
14   opinion?
15       A.  I mean, it's hard to examine that without
16   knowing that -- if the mandate is photo ID, then there's
17   a reason to remove it.
18       Q.  All right.  But putting aside SB 14, our
19   current law, which we have a voter ID law in Texas,
20   includes the voter certificate as a form of ID for
21   voting, and you testified you can think of one very
22   specific incident in which a son used his father's voter
23   certificate after his father passed away to vote in his
24   place.  Knowing everything you do about Texas election
25   administration, and this one very specific incident and

---

287

1    two other possible incidents where you don't know
2    whether the certificate was involved --
3        A.  Right.
4        Q.  -- what is your opinion or do you have -- well,
5    I'm not going to ask the other opinion, because you'll
6    tell me you don't.  But in your opinion, is there a
7    valid reason, based in reality, to remove the voter
8    certificate from the list of acceptable ID in order to
9    prevent fraud?
10       MR. MORTARA:  Objection, asked and
11   answered.
12       Q.  (By Ms. Perales) It's a yes or no question, and
13   so I need a yes or no answer.
14       A.  Yes.  I think there would be a reason if the
15   stated goal is to increase confidence in the process and
16   to ensure the public that people aren't voting
17   fraudulently, whether it really happened in reality or
18   not aside, but if the thought is we want to promote
19   confidence in the process and the rules in the system,
20   then, yes, I think that some folks might feel more
21   confident about voting if they knew that only these
22   governmental photo IDs are allowed at the polling place.
23       Q.  Have you had received any complaints from
24   voters who said they lacked confidence in the system
25   because the voter certificate could be used for voter

---

288

1    identification?
2        A.  No.
3        MS. PERALES:  These are my last questions,
4    the Dechert folder.
5        (Rodriguez Exhibit 13 marked for
6    identification.)
7        Q.  (By Ms. Perales) You have been handed what the
8    court reporter has marked Rodriguez Deposition Exhibit
9    13.  I'm going to ask my last questions of you regarding
10   the Public Education Plan under HAVA.
11       A.  Okay.
12       Q.  Did you, when you were at the Secretary of
13   State's Office, work on the current Public Education
14   Plan?
15       A.  I gave some feedback on this RFP, but I was not
16   the primary author or driver of it.
17       Q.  Was the Public Education Plan developed
18   in-house at the Secretary of State?
19       A.  The request for a proposal was.
20       Q.  Okay.  And when you say request for a proposal,
21   you mean Rodriguez Deposition Exhibit 13, yes?
22       A.  Yes.
23       Q.  Okay.  And what's the difference between the
24   RFP and the Public Education Plan under Senate Bill 14,
25   because I noticed you made a distinction, so I wasn't

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

289

1    sure.
2        A.  Well, I mean, the RFP is -- basically, it's
3    asking for proposals to help the Secretary of State
4    develop a statewide voter education program.  So the
5    actual voter education program is going to be different
6    than this.  This is just sort of setting out, sort of,
7    the minimum requirements that the office wanted to see
8    in responses.
9        Q.  Okay.  And so the responses to the request for
10   proposal would be, in essence, this is how it should
11   look, the Public Education Plan should look?
12       A.  I don't think we had a preconceived notion as
13   to how it would look.  I mean, we had certain
14   requirements we wanted see them meet, but I think they
15   were also looking for creative solutions as to how to
16   get the word out and educate voters.
17       Q.  Okay.  You were still at the Secretary of State
18   when the deadline arrived for responses --
19       A.  Yes.
20       Q.  -- to the RFP; yes?
21       A.  Yes.
22       Q.  How many proposals did the Secretary of State
23   receive in response to this RFP?
24       A.  I don't know.  I mean, I helped, or at some
25   point, I reviewed this document, but I did not see any

290

1    of the responses that came in.
2        Q.  So would you be able to answer any questions
3    regarding whether the proposals that the Secretary of
4    State received included plans designed to target African
5    Americans or Hispanic communities?
6        A.  I couldn't answer any of those questions.
7        Q.  Do you know whether a proposal has been
8    selected as a result of this RFP?
9        A.  I think it has, because I noticed on the
10   website that the Secretary had sort of picked off a new
11   kind of an education tour, and I presume that's part of
12   this.  But I don't know for sure.
13       Q.  Okay.  Do you know whether any legislators
14   encouraged the Secretary of State's Office to select a
15   particular proposal or contractor?
16       A.  I don't know.
17           MR. MORTARA:  Well --
18           MS. PERALES:  It's not legislative.
19           MR. MORTARA:  Yeah.  Sorry.
20       A.  No, I don't know.
21       Q.  (By Ms. Perales)  Okay.  I'm going off that
22   topic now.
23           Do you know anything about the substance
24   of the proposal that was selected?
25       A.  No.

291

1        Q.  There are some BIC regulations, the Texas
2    Administrative Code 37 15.181 through .185.  Does this
3    sound familiar to you?
4        A.  Yeah, maybe, on the procurement process or --
5        Q.  I'm looking now.
6        A.  Okay.
7        Q.  With respect to the proposal that was selected,
8    which we think there's been a proposal selected, who at
9    the Secretary of State's Office would be most
10   knowledgeable about the contents of the proposals and
11   the proposal that was ultimately selected?
12       A.  Probably the communications director.
13       Q.  Okay.  Eligibility for Election Identification
14   Certificate.  We have to let the court reporter mark it.
15           (Rodriguez Exhibit 14 marked for
16   identification.)
17       Q.  (By Ms. Perales)  The court reporter has handed
18   you what has been marked Rodriguez Depo Exhibit 14.
19   It's selections from the Texas Administrative Code on
20   Eligibility For Election Identification
21   Certificate.  Did you work on these regulations?
22       A.  These are the DPS's regulations it looks like?
23       Q.  Yes, having to do with this new election
24   identification certificate under SB 14.
25       A.  I may have seen a draft of these.

292

1        Q.  Do you know which agency did the first draft?
2        A.  DPS.
3        Q.  Okay.  So you might have seen a draft of this
4    somewhere along the line?
5        A.  Yeah.  I think they were asking for some
6    feedback.
7        Q.  Do you remember providing any feedback?
8        A.  I believe we did.
9        Q.  Do you remember when all of this occurred?
10       A.  Well, I don't -- I know that -- I think it was
11   in September or maybe October, that we met with DPS to
12   discuss these rules.  I don't know that I ever saw what
13   they actually proposed in the register.
14       Q.  Uh-huh.
15       A.  So it says it was effective December 13th, so
16   they probably proposed it sometime in October, but
17   that's what I know.
18       Q.  Do you know the source of the suggestion
19   involving fingerprints?  Did that come from the
20   Secretary of State?
21       A.  No, that did not come from the Secretary of
22   State.  I'm trying to find that, where that is.
23       Q.  I know.  I am, too.  But it's in here
24   somewhere.
25       A.  Yeah.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

293

1      Q.  Do you remember adding items to this long list
2   of supporting identification under 15.182?  And do you
3   remember in your comments from the Secretary of State's
4   Office adding additional documents that you thought
5   should be used in order to support the application for
6   an election identification card?
7      A.  No.  I think they were following their -- the
8   process for obtaining an personal identification number,
9   as I recall.
10     Q.  Okay.  I found the fingerprints.  It's in
11  15.183.  The applicant must provide fingerprints in
12  order to get an election identification card.  You don't
13  remember that coming from the Secretary of State?
14     A.  No.
15     Q.  Do you remember having any conversations about
16  that requirement?
17     A.  Yes.
18     Q.  And tell me what those conversations were.
19         THE WITNESS:  Is there any privilege on
20  this?
21     Q.  Who is the conversations with?  Was it DPS?
22     A.  It was DPS.  Okay.
23         MR. MORTARA:  I mean, you and DPS may
24  share a conversation, but, for instance also included
25  OAG on legal advice, that would be privileged.  DPS

294

1   would have the same lawyer.  If you and DPS were just
2   having conversations about what to do with respect to
3   these regulations, and you don't think you were giving
4   legal advice, you can answer.
5          MS. PERALES:  She doesn't have an
6   attorney- client relationship with DPS.
7          MR. MORTARA:  That will be common interest
8   between her and DPS Lawyers.  So, for instance, they can
9   have a common legal interest and coordinate, just like
10  you get to talk to the Justice Department.  You have a
11  common interest, and that's -- I don't get to discover
12  what you're saying to the Justice Department.
13         So if it was legal advice that you and DPS
14  lawyers were coordinating on, you can't answer.  If it's
15  not legal advice, you can answer.
16     Q.  (By Ms. Perales) Well, let me first ask you
17  then who you had the communication with at DPS regarding
18  the fingerprints?
19     A.  It was DPS general counsel, and kind of their
20  government relations person.  I don't know what her
21  title is exactly.  I think the director or the assistant
22  director of the driver's license department.  And one or
23  two other people from DPS.  And I think John Sepehri was
24  present and Elizabeth Winn was present.
25         MR. MORTARA:  And just further

295

1   clarification.  If these conversations were not
2   ultimately for the purpose of you rendering shared legal
3   advice between DPS and yourself to your client, the
4   Secretary of State or the executive body thereof, you
5   may answer.  If it's part of that process, you may not,
6   about the substance of this communication.
7      Q.  (By Ms. Perales) So was the substance of the
8   communication to DPS for the purpose of giving legal
9   advice to your executive office and your boss, the
10  Secretary of State?
11     A.  I think it was for the purpose of giving some
12  legal advice to DPS.
13         MR. MORTARA:  I think you can't answer
14  that.
15         THE WITNESS:  Can or cannot?
16         MR. MORTARA:  Cannot.
17     Q.  (By Ms. Perales) If you just said it was a
18  stupid idea, I think that counts.
19     A.  As legal advice?
20     Q.  Not legal advice.  As not legal advice.
21         MR. MORTARA:  Things can be stupid because
22  they are not legal.
23         MS. PERALES:  That's true.  Very true.
24  Okay.
25         I'd like to take a one-minute break.

296

1          (Recess from 6:45 p.m. to 6:48 p.m.)
2          MS. PERALES:  So we are back on the
3   record.
4          All right.  I reserve the remainder my
5   questions for the time of trial.  I pass the witness to
6   Mr. Mortara.
7          MR. MORTARA:  No questions.
8          MS. PERALES:  That's it.  The deposition
9   is concluded.
10         (Signature reserved.)
11         (Deposition concluded at 6:50 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 297

CHANGES AND SIGNATURE
RE: TEXAS VS. HOLDER, ET AL
PAGE  LINE  CHANGE      REASON

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

I, ANN McGEEHAN, have read the foregoing deposition
and hereby affix my signature that same is true and
correct, except as noted above.

_____
ANN McGEEHAN

## 298

THE STATE OF _____)

COUNTY OF _____)

Before me, _____, on this day
personally appeared ANN McGEEHAN, known to me (or proved
to me under oath or through _____
(description of identity card or other document) to be
the person whose name is subscribed to the foregoing
instrument and acknowledged to me that they executed the
same for the purposes and consideration therein
expressed.

Given under my hand and seal of office
this _____ day of _____, 2012.

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF _____

## 299

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,             )
                           )
        Plaintiff,          )
                           )
VS.                         )
                           )
ERIC H. HOLDER, JR. in his  )
official capacity as Attorney )
General of the United States, )
                           )
        Defendant,          )
                           )
ERIC KENNIE, et al,         )
                           )
        Defendant-Intervenors, )
                           )
TEXAS STATE CONFERENCE OF   )  CASE NO. 1:12-CV-00128
NAACP BRANCHES,             )  (RMC-DST-RLW)
                           )  Three-Judge Court
        Defendant-Intervenors, )
                           )
TEXAS LEAGUE OF YOUNG VOTERS )
EDUCATION FUND, et al,      )
                           )
        Defendant-Intervenors, )
                           )
TEXAS LEGISLATIVE BLACK     )
CAUCUS, et al,              )
                           )
        Defendant-Intervenors, )
                           )
VICTORIA RODRIGUEZ, et al., )
                           )
        Defendant-Intervenors. )

REPORTER'S CERTIFICATION
DEPOSITION OF ANN McGEEHAN
MAY 31, 2012

I, Chris Carpenter, Certified Shorthand Reporter in
and for the State of Texas, hereby certify to the
following:
    That the witness, ANN McGEEHAN, was duly sworn by

## 300

the officer and that the transcript of the oral
deposition is a true record of the testimony given by
the witness;
    That the deposition transcript was submitted on the
_____ day of _____, 2012, to the witness or to the
attorney for the witness for examination, signature and
return to _____, by
_____, 2012; and if returned, the original
transcript will forwarded to Elizabeth Westfall, the
custodial attorney;
    That the amount of time used by each party at the
deposition is as follows:
    Ms. Westfall: 4 hours, 34 minutes
    Ms. Perales:  2 hours, 13 minutes
    I further certify that I am neither counsel for,
related to, nor employed by any of the parties or
attorneys in the action in which this proceeding was
taken, and further that I am not financially or
otherwise interested in the outcome of the action.
    Certified to by me this 2nd day of June, 2012.

_Chris Carpenter_

Chris Carpenter, Texas CSR 1151
Expiration Date: 12/31/2012
100 Congress Avenue, Suite 2000
Austin, TX  78701
(512)328-5557
Firm Registration No. 283



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com