## 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS          )
                        )
                        )
VS.                     )   NO. 12-CV-128
                        )   (DST, RMC, RLW)
                        )
ERIC H. HOLDER, JR.,    )
In his official         )
Capacity as Attorney    )
General of the United   )
States, ET AL           )

********************************************************
ORAL DEPOSITION OF MAJOR FORREST MITCHELL
********************************************************

ANSWERS AND DEPOSITION OF MAJOR FORREST MITCHELL, a
witness called by the United States taken before Janalyn
Reeves, Certified Shorthand Reporter for the State of
Texas, on the 15th day of June, 2012, between the hours
of 9:30 a.m. and 5:46 p.m., in the offices the United
States Department of Justice, 816 Congress Street, Suite
1000, Austin, Texas, pursuant to the agreement of
counsel for the respective parties as hereinafter set
forth.

## 2

### A P P E A R A N C E S

FOR THE PLAINTIFF, STATE OF TEXAS:
    OFFICE OF THE ATTORNEY GENERAL:
    By:  MR. PATRICK SWEETEN
        - and -
        MR. REYNOLDS BRISSENDEN
    209 West 14th Street
    Austin, Texas  78701
    PH: (512) 936-6432

FOR THE DEFENDANT:
    DEPARTMENT OF JUSTICE
    By:  MR. BRUCE GEAR
        - and -
        MR. VICTOR WILLIAMSON
    950 Pennsylvania Avenue, NW
    Room 7161 NWB
    Washington, DC  20530
    PH: (202) 305-0185

FOR THE INTEVENORS:
    DECHERT, LLP
    By:  MR. EZRA ROSENBERG
    902 Carnegie Center
    Suite 500
    Princeton, New Jersey 08540
    Ph:  (609)) 955-3259

## 3

INDEX
                                                PAGE
Appearances                                  2
MAJOR FORREST MITCHELL
    Examination by Mr. Gear Maranzano ....    5
    Clarifying Examination by Mr. Rosenberg   146
    Further Examination by Mr. Gear.......    147
    Examination by Mr. Rosenberg..........    210
    Examination by Mr. Sweeten............    215
    Further Examination by Mr. Gear.......    225
    Further Examination by Mr. Rosenberg..    238

Signature and Changes                        245
Reporter's Certificate                       247

## 4

                    EXHIBITS
NO.     DESCRIPTION              PAGE
580     Notice of Deposition     16
581     Letter               20
582     Objections and to Notice     27
583     Election Code Prosecution    59
584     Press Release            98
585     Spreadsheet              99
586     Press Release            108
587     Press Release            109
588     Press Release            115
589     Press Release            120
590     Press Release            128
591     Report               177
592     Article              177
593     Article              196
594     Resource Witness Testimony    204
595     Document             205



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 5

1       MAJOR FORREST MITCHELL,
2   having being first duly sworn, testified as follows:
3           EXAMINATION
4   BY MR. GEAR:
5       Q.  This is the deposition of Major Forrest Mitchell
6   in the matter of Texas V Holder, US DC for DC docket No.
7   1:11 CV 128.  Good morning, Major Mitchell.
8       A.  Good morning.
9       Q.  Could you state your name and spell your name for
10  the record?
11      A.  My name is Forrest Mitchell, F-O-R-R-E-S-T,
12  M-I-T-C-H-E-L-L.
13      Q.  My name is Bruce Gear.  I'm with the Department
14  of Justice.  I represent Eric Holder who is the United
15  States Attorney General.  And could everybody else
16  introduce themselves?
17      MR. SWEETEN:  Patrick Sweeten with the Texas
18  Attorney General's office on the behalf of the State of
19  Texas and on behalf of the witness, Forrest Mitchell.
20      MR. BRISSENDEN:  Reynolds Brissenden for the
21  State of Texas and the witness.
22      MR. ROSENBERG:  Ezra Rosenberg from
23  Dechert LLP representing the Legislative Conference of
24  NAACP branches and the Mexican American legislative
25  caucus.

## 6

1       MR. WILLIAMSON:  Victor Williamson from the
2   US Department of Justice.
3   BY MR. GEAR:
4       Q.  Now, you've been sworn in under oath.  You
5   understand that you've been sworn in?
6       A.  Yes, sir.
7       Q.  That you are under oath.  That you're here today
8   to provide testimony and that you're expected to testify
9   completely and as fully as possible.  You understand
10  that?
11      A.  Yes, sir, I do.
12      Q.  Okay.  So I just want to start off with a couple
13  of ground rules so that we understand exactly what we're
14  doing.  I'm going to be asking you questions.  You're
15  going to be providing the answers and so it's very
16  important that during the course of the deposition you
17  allow me to get out my question and then I will allow
18  you to get out your answer completely and fully.  And at
19  anytime during this deposition if you believe you recall
20  something or you stated something in accurately, let me
21  know and I'll allow do you correct that on the record.
22  Do you understand?
23      A.  Yes, sir.
24      Q.  Okay.  You know, so it's important that you allow
25  me to finish my questions and I'll allow you to finish

## 7

1   your answers.  It's important to answer verbally because
2   a nonverbal answer is hard to catch on a record and the
3   court reporter needs to hear your response.  Do you
4   understand that?
5       A.  Yes, sir.
6       Q.  Okay.  So -- which may happen during this
7   deposition if I ask you a question you don't understand,
8   then, you know, don't hesitate to ask me to repeat it or
9   don't hesitate to ask me to try to restate it so that
10  you can understand it.  This is my opportunity to
11  understand what you know.  So I'm going to be asking you a
12  lot of questions, none of them are intended to be
13  personal.  It's intended to get to exactly that, what do
14  you know.  Do you understand that?
15      A.  Yes, sir.
16      Q.  All right.  Is there any reason you think you may
17  not be able to answer completely and truthfully today?
18      A.  No, sir.
19      Q.  Are you taking any type of drugs or medication
20  that may affect your ability to understand the questions
21  that I ask or provide answers today?
22      A.  No, sir.
23      Q.  At any point during this deposition, if you would
24  like to take a break, just what I would ask you to do is
25  work through the question that's before you, complete

## 8

1   that, let me know that you need to take a break and then
2   I'll allow you do to that.  Is that understandable?
3       A.  Yes, sir.
4       Q.  Okay.  And what may happen during the course of
5   this deposition, there may be objections, there may be
6   discussions between the attorneys.  I just ask that if
7   there's a question before you that you answer that
8   question unless you're directed otherwise by your
9   attorney.  Do you understand that?
10      A.  Yes, sir.
11      Q.  Okay.  Now, during the course of this deposition,
12  we're going to be talking about voter ID, photo ID.  And
13  I would ask that you consider those terms
14  interchangeably throughout this deposition.  I want you
15  to interpret those terms broadly, to mean that the
16  requirement that a voter present a form of
17  identification, whether it has a photo or otherwise,
18  when voting in person before being permitted to vote
19  with a regular ballot.  Do you understand that?
20      A.  Yes, sir.
21      Q.  If I refer to you, I'm asking you a question
22  about you as a member of the special investigations unit
23  of the law enforcement division of the office of the
24  Texas Attorney General's office.  Do you understand
25  that?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 9

1    A. Yes, sir.
2    Q. Okay. If I refer to you, I'm also including any
3  staff that you may supervise, but before your attorney
4  objects to this because we've gone down this road
5  before, I am going to do my best during the course of
6  this deposition to identify when I'm referring to you in
7  your capacity in the special investigations unit or when
8  I'm broadening that definition to include others that
9  may be underneath you or within your office. Do you
10 understand that?
11   A. Yes, sir.
12   Q. Okay. If I say the Texas Attorney General, I
13 mean the Attorney General Greg Abbott. Do you
14 understand that?
15   A. Yes, sir.
16   Q. All right. And we may, as we get into this
17 deposition, we may be talking about the special
18 investigations unit or the office of the attorney
19 general I may use those interchangeably. So would you
20 mind if I use the term SIU for the special
21 investigations unit at times and would you understand
22 that?
23   A. That would be fine, sir. Yes, I will.
24   Q. Okay. So do you understand everything that we've
25 talked about so far?

## 10

1    A. Yes, sir, I do.
2    Q. All right. And are you represented by counsel
3  today?
4    A. Yes, sir.
5    Q. And who is your counsel?
6    A. Patrick Sweeny and -- I'm sorry.
7       MR. BRISSENDEN: Reynolds.
8    A. Reynolds.
9    Q. Have you ever been deposed before?
10   A. No, sir. This is the first time.
11   Q. Have you ever provided testimony at trial?
12   A. Yes, sir.
13   Q. And I know you're an investigator and you
14 probably have provided quite a bit of testimony. But
15 generally, talk to me and tell me about what type of
16 testimony you provided in the past?
17   A. Well, for the first year -- first eight years
18 with the Texas Attorney General's office I worked in the
19 prosecutor assistance division. And one of my charges
20 was to investigate capital murder cases which occurred
21 in the State of Texas. And so I would testify about my
22 investigative work on those kinds of cases.
23   Q. And those dealt specifically with capital murder
24 cases?
25   A. Yes, sir. During that time I also worked other

## 11

1  types of cases including public integrity cases, fraud
2  cases, other index crimes and I would testify in
3  criminal proceedings about whatever investigative work
4  that I had done on those cases.
5    Q. And you said, "during your first eight years"?
6    A. Correct.
7    Q. How long have you been with the office of the
8  attorney general?
9    A. In September I will have been there 15 years.
10   Q. 15 years. Okay. So after your first eight
11 years, where did you go?
12   A. I became the lieutenant of the special
13 investigations unit.
14   Q. And that was what time period?
15   A. In 2005.
16   Q. And the title you just told me you became the?
17   A. I became the lieutenant.
18   Q. Lieutenant. And was that the lead investigator?
19   A. No. It was a supervisory position.
20   Q. Supervisor. Okay. So let's focus on 2005. We
21 were still talking about the types of testimony you may
22 have provided. So from 2005 forward, have you been
23 involved in trials where you provided testimony under
24 oath?
25   A. I haven't really testified much up until 2010.

## 12

1    Q. 2010. Okay. And in 2010 can you tell me a
2  little bit about that testimony?
3    A. Yes, sir. I was one of the investigators who
4  assisted on the YFZ case, which occurred out in
5  Schleicher County.
6    Q. YFZ?
7    A. YFZ.
8    Q. Is that short for something else?
9    A. Yearning for Zion.
10   Q. Yearning for Zion, okay. And tell me a little
11 bit about that case?
12   A. That was a case involving men who had married
13 under age women and had fathered children with those
14 under age women. And had married multiple women in
15 Schleicher County.
16   Q. And so as I understand your testimony, that did
17 not involve election code violations?
18   A. No, sir.
19   Q. Something completely different?
20   A. Yes, sir.
21   Q. Have you testified on any matters that involved
22 election code violations?
23   A. No, sir.
24   Q. So other than the YFZ in 2010, have you provided
25 any other testimony at trial, 2005 forward?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 13

1    A. There was one other case that I testified in, but
2  it was in a suppression hearing.
3    Q. And when you say suppression hearing, what do you
4  mean?
5    A. It was a suppression hearing on a search warrant
6  that was run.
7    Q. And did that have anything to do with election
8  code violations?
9    A. No, sir.
10   Q. And for the record, what was the issue on the
11 suppression hearing?
12   A. The scope of the search warrant and items seized.
13   Q. And you had to appear in court and provide
14 testimony?
15   A. Yes, sir.
16   Q. And about what time period was that?
17   A. I would say it's -- it was either 2006 or 2007.
18   Q. Okay.  And just so I'm clear now, from 2005
19 forward, I've asked you if you've provided any testimony
20 regarding election code violations.  I believe the
21 answer has been no?
22   A. That's correct, sir.
23   Q. Okay.  All right.  And so what did you do to
24 prepare for the deposition today?
25   A. I reviewed my spread sheets that I prepared.

## 14

1    Q. Okay.  And were you -- did you review those with
2  anyone else present?
3    A. I reviewed those with counsel here.
4    Q. Anyone else?
5    A. Huh-uh.  Oh, I'm sorry.  John McKenzie as well.
6    Q. John McKenzie is also counsel?
7    A. Yes, sir.
8    Q. When did you review the spread sheets?
9    A. Last night and part of last week.
10   Q. Did you have any other material with you while
11 reviewing the spread sheets?
12   A. Well, yes.  Indictments and judgments and
13 sentences.
14   Q. And did you produce the indictments, judgments
15 and sentences to your counsel?
16   A. Yes, sir.
17   Q. And when did you produce those?
18   A. I believe last week.
19   Q. And any other material that you reviewed while
20 looking at the spread sheets?
21   A. Are we talking about preparing or providing
22 discovery?
23   Q. Well, let's start with preparing for the
24 deposition.
25   A. No, it was just really the spread sheets.

## 15

1    Q. In addition to the indictments, judgments and
2  statements?
3    A. Yes.
4    Q. Okay.  And when you were talking about preparing
5  or discovery, what were you referencing?
6    A. The discovery order asked for all documents
7  dealing with voter fraud.
8    Q. Okay.  And what did you do in response to the
9  discovery?
10   A. I reviewed my personal e-mail, my work e-mail and
11 documents that I had electronically saved on our
12 network.
13   Q. Did you produce any of those to your attorney?
14   A. Yes, sir.
15   Q. And when did you produce those?
16   A. It's been an ongoing process.  I started
17 producing them early part of last week.
18     MR. GEAR:  Patrick, do you know if these
19 have been produced to us at this point?
20     MR. SWEETEN:  I know that we produced
21 sentences, judgments, indictments, his spread sheet,
22 everything that was discussed there.  And I think what
23 we've set forth in our objections, whatever we've set
24 forth in our objections we produced all that.
25     MR. GEAR:  Okay.  Because I don't actually

## 16

1  recall ever seeing any e-mails.
2      MR. SWEETEN:  I can check on that at a
3  break.
4  BY MR. GEAR:
5    Q. So we talked about, and we'll get into that a
6  little bit later, but we talked about documents that you
7  reviewed in response to the discovery.  Anything else
8  that you may have reviewed?
9    A. I can't think of anything else right now.
10   Q. Okay.
11     (Exhibit No. 580 was marked.)
12 BY MR. GEAR:
13   Q. I'm showing you what's been marked as
14 Exhibit 580.  I ask you to just take a look at that.
15     MR. SWEETEN:  I would note for the record,
16 that the Attorney General has filed objections and
17 responses to these.
18 BY MR. GEAR:
19   Q. Just let me know when you've had a chance to look
20 at it.
21   A. Yes, sir.  Okay, sir.
22   Q. All right.  I turn your attention to what I
23 believe is Page 5, they're unnumbered, but it starts
24 with documents.  Do you see that?
25   A. Yes, sir.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 17

1  Q. Okay. And have you reviewed this before, this
2  document?
3  A. I do not believe I've seen the one for June 15th.
4  Q. All right. You saw an earlier version?
5  A. Yes, sir.
6  Q. And you reviewed the earlier version?
7  A. Yes, sir.
8  Q. Would you say that this is substantially similar
9  but for the date, June 15th?
10  A. Yes, sir, it looks similar.
11  Q. Okay. So directing your attention to paragraph 1
12  under documents, it indicates all documents and
13  communications including but not limited to those among
14  and between the office of the Texas Attorney General.
15  And I goes on to say more. Do you see that paragraph
16  that I'm referring to?
17  A. Yes, sir.
18  Q. What, if anything, did you do to respond to
19  paragraph 1?
20  A. Knowing that --
21  MR. SWEETEN: Hold on a minute. When you're
22  answering the question don't reveal communications that
23  you've had with attorneys of our office. Okay? So
24  don't reveal matters of attorney/client privilege. But
25  you can answer otherwise.

## 18

1  BY MR. GEAR:
2  Q. And I'm not asking you to reveal communications
3  at this point. I'm just asking you what, if anything,
4  you or anyone else in your office did to determine if
5  there were responsive documents to paragraph 1?
6  A. Reviewed my saved files to see if I had anything
7  responsive to SB 14.
8  Q. Did you have any documents that were responsive
9  to paragraph 1, communications including but not limited
10  to the office of the Secretary of State, division of
11  elections, members of the Texas Legislature?
12  A. Yes, sir. I mean, I didn't have anything
13  responsive to that.
14  MR. SWEETEN: Bruce, let me just tell you
15  I've gotten an e-mail from counsel. You asked about, I
16  think there was one remaining document or type of
17  documents you asked about, which was e-mails. I just
18  got an e-mail that indicated that was uploaded last
19  night. So we have produced some e-mails to you from
20  Mitchell and then all the other areas that we talked
21  about have been provided.
22  MR. GEAR: Do you know about what time they
23  were uploaded?
24  MR. SWEETEN: I don't have that. The
25  attorney was communicating with us in another one of

## 19

1  these depositions. And so he just indicated it was
2  produced to us last night. I don't have the time.
3  MR. GEAR: Okay.
4  BY MR. GEAR:
5  Q. All right. And so I believe your response was
6  that you did not have documents responsive to paragraph
7  No. 1 when it came to communications between the
8  attorney general's office, Secretary of State's office;
9  is that correct?
10  A. Yes, sir.
11  Q. And you also indicated that you did not have
12  documents responsive to the members of the Texas
13  legislature; is that correct?
14  MR. SWEETEN: I'm sorry.
15  BY MR. GEAR:
16  Q. Paragraph 1; is that correct?
17  A. No, sir, I don't have any responsive documents to
18  that.
19  MR. SWEETEN: Bruce, I think it's fair to
20  show him his responses when you're going through these.
21  We formally responded to this and I think it would be
22  helpful to him and I think it would make this go faster
23  if you provide him a copy of how we responded because we
24  have listed some documents.
25  BY MR. GEAR:

## 20

1  Q. Did you prepare any written response to this
2  notice of deposition?
3  A. I think I prepared an e-mail that said, yes, no,
4  yes, no, yes, no.
5  MR. SWEETEN: Don't reveal the subject of
6  any e-mails you sent to me or John or Mr. Bruce. Okay?
7  BY MR. GEAR:
8  Q. Did your assistant prepare any written
9  communication or document to the Department of Justice?
10  A. No.
11  (Exhibit No. 581 was marked.)
12  BY MR. GEAR:
13  Q. I'm showing you what's been marked as
14  Exhibit 581. I'll give you a chance to look at that.
15  A. Okay.
16  Q. Have you seen Exhibit 581 before?
17  A. No, sir.
18  Q. Did you assist in preparing Exhibit 581?
19  MR. SWEETEN: Do you mean the actual
20  drafting? He's not going to talk about communications
21  we've had regarding documents. So he's not going to
22  answer substantive communications you've had. If you're
23  asking about the drafting, I'll let him answer questions
24  as posed.
25  BY MR. GEAR:



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

21

1  Q. You indicated that you sent an e-mail saying yes,
2  no, yes, no in response to the notice of depositions and
3  I don't want do you get into privileged communication
4  with your counsel. But was that e-mail sent to your
5  counsel?
6  A. Yes, sir.
7  Q. And when was that e-mail sent?
8  A. Sometime last week.
9  Q. And who was it sent to?
10 A. John McKenzie.
11 Q. Turning your attention to Page 2, last full
12 paragraph where it indicates, "Mr. Mitchell will produce
13 the -- to the Department of Justice convictions and
14 indictments for voter fraud for the time period
15 identified in Exhibit A to Mr. Mitchell's notice by
16 6:00 p.m. on June 8, 2012." It also goes on to say
17 that, "Mr. Mitchell will produce another spread sheet,
18 redacted of personal identifying information, for the
19 309 voter fraud investigations that he maintains in the
20 ordinary course of duties." Do you see that?
21 A. Yes, sir.
22 Q. It also indicates that, "we continue to assert
23 our objections as to the production of over 10,000 pages
24 of largely irrelevant documents and maintain our belief
25 that a request calling for such as production far

---

23

1  A. Correct.
2  Q. Okay. What else would it include?
3  A. It also could include affidavits from
4  complainants --
5  Q. Okay.
6  A. Who forwarded that information to whatever
7  referral agency. It may contain documents such as voter
8  registration records or mail-in ballot applications or
9  poll place combination forms.
10 Q. And those documents would have come from the?
11 A. Referring agency.
12 Q. Referring agency. Okay. Anything else that
13 would be in the files, generally?
14 A. In the entire case file would be investigative
15 work product, such as interviews of witnesses.
16 Q. Notes?
17 A. Notes. Suspect interviews, audio recordings,
18 personal identifying information of witnesses or
19 suspects contacted, additional election records
20 obtained. And each one will generally contain an open
21 case form and a closed case form, along with any sorts
22 of court pleadings such as, indictments or information
23 or the final disposition of the case.
24 Q. Okay. And do you agree with what's stated here
25 that these would be irrelevant; in particular,

---

22

1  exceeds the scope of discovery." Do you see that?
2  A. Yes, sir.
3  Q. Now, when you talk about "10,000 pages of
4  irrelevant documents," can you give me an idea of what
5  you're actually referring to?
6  A. Case files.
7  Q. And those are case files that regard the spread
8  sheets that you've provided to the defendant, Eric
9  Holder, in this case?
10 A. Yes, sir.
11 Q. And those case files include conviction records,
12 if any?
13 A. Correct.
14 Q. They include testimony, if any?
15 A. I do not believe the case files would include
16 testimony.
17 Q. Okay. Why don't we do it this way. Generally
18 what would the case files include?
19 A. The case file would generally contain a referral
20 document from an outside agency.
21 Q. Okay.
22 A. Such as the Secretary of State's office, a local
23 district attorney's office or county attorney's office.
24 Q. Which would initiate the action in the attorney
25 general's office?

---

24

1  irrelevant to understanding your spread sheet?
2  MR. SWEETEN: That's communication that we
3  provided to you on behalf of the witness. He's not
4  going to comment on what he thinks of the words on the
5  page.
6  MR. GEAR: Well, I'm asking you --
7  MR. SWEETEN: That's a legal term.
8  "Relevance" is a legal term. We're his legal counsel.
9  We represent Mr. -- Major Mitchell. And we provided to
10 you what our belief and his position is. That
11 continues to be his position for you to ask him to
12 characterize our legal interpretation of his words would
13 invade the attorney/client privilege and frankly, is
14 irrelevant. We're representing him in this case. So I
15 object to the question.
16 BY MR. GEAR:
17 Q. You can answer.
18 A. Can you repeat that, sir.
19 Q. Can you read back?
20 (Requested question was read.)
21 MR. SWEETEN: Objection; calls for a legal
22 conclusion. Objection; relevance. You can go ahead and
23 answer.
24 A. There are many documents in these case files that
25 don't deal with SB 14 at all.

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 25

1    Q. But they deal with the issue of -- in this case
2  referring to your spread sheet, which we'll get to
3  later, refer to the issue of voter fraud?
4    A. In the broad sense, yes.
5    Q. Well, they're from the referring agency, correct?
6    A. Correct.
7    Q. And they're regarding election code violations?
8    A. Correct.
9    Q. And in that, when you say, "the broad sense,"
10 they're referring to election code violations referred
11 from a particular agency?
12   A. Correct.
13   Q. To the attorney general's office?
14   A. Yes, sir.
15   Q. And did you complete your answer?  I'm sorry.
16   A. I apologize.
17   Q. You were answering and I interrupted you, I
18 think.  So were you able to complete your answer on
19 that?
20   A. The large volume of documents deals with all of
21 the election code referrals that this office has
22 received over the years.
23   Q. Okay.  And am I understanding correctly that
24 there's also and off-site location where files are
25 maintained?

## 26

1    A. Multiple.
2    Q. Okay.  And did you search those off-site
3  locations in response to the notice of deposition?
4    A. Electronically.
5    Q. So they are both electronic files and paper
6  files.  Is that your testimony?
7    A. Yes, sir.  If I could clarify?
8    Q. Sure, please.
9    A. We have a case management system and what we did
10 was try to determine the location of the closed case
11 files, all of the election code case files which are
12 maintained off-site.
13   Q. So it's the closed case files that are maintained
14 off-site?
15   A. Yes, sir.  If I could clarify that as well?
16   Q. Please.
17   A. Due to the large volume of documents, some open
18 case files require that we store them off-site as well.
19   Q. So they're both open and closed files?  And would
20 all those -- would the information in those files be
21 maintained both by paper and electronically?
22   A. Only a small portion is maintained
23 electronically.
24   Q. Okay.  And so my original question was, did you
25 search those files in response to the notice of

## 27

1  deposition, you indicated electronically, correct?
2    A. Correct.
3    Q. So am I -- is it fair to say that you did not
4  search the paper files to determine if there were any
5  responsive documents?
6    A. I did not search paper files.
7    Q. Okay.  And I want to be clear on this when I'm
8  saying "you," I mean you or anyone else within your
9  office?
10   A. Correct.
11     (Exhibit No. 582 was marked.)
12 BY MR. GEAR:
13   Q. Okay.  I'm showing you what's been marked as
14 Exhibit 582.  I'll give you a chance to take a look at
15 that.  Have you had a chance to look at Exhibit 582?
16   A. Yes, sir.
17   Q. And have you seen that exhibit before?
18   A. Yes, sir.
19   Q. Did you assist in preparing the answers on
20 Exhibit 582?
21   A. Can you explain, "prepare"?
22   Q. Did you provide any input on Exhibit 582?
23     MR. SWEETEN:  Don't reveal anything you said
24 to us, not one word.  You can just say if you've had any
25 effort in drafting that or not and this's all -- that's

## 28

1  all we're going to give them.
2    A. I did not provide any effort in drafting this
3  document.
4    Q. (By Mr. Gear)  Okay.  And that -- okay.  Your
5  counsel referred to a document that would provide a
6  clearer understanding of what you did to respond to the
7  notice of deposition.  Would that be the document
8  that --
9      MR. SWEETEN:  Feel free to review the
10 document to the extent you need to.
11 BY MR. GEAR:
12   Q. I mean, if your testimony is that you didn't
13 provide any assistance or input into the drafting of
14 that particular document, I understand that and we can
15 move on.  Is that your testimony?
16     MR. SWEETEN:  No.  What I said earlier is I
17 think it would be fair if you're going to ask him about
18 the categories of documents that you show him the
19 official responses that we submitted to you a week ago.
20 And so he's -- now that he has that in front of him, I'm
21 going to advise him to review it to the extent he needs
22 to in order to answer your question.
23   A. I apologize, again.  Can you restate your
24 question one more time?
25   Q. Well, let me actually ask you a different



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

29

1    question.  Did you search open files as you've testified
2    to in response to the notice of deposition?
3        A.  No, I did not.
4        Q.  So I'm trying to understand where files are
5    maintained in your office.  I understand there's an
6    off-site location that contains both open and closed
7    files.  In your -- in your physical office where you
8    work on a day-to-day basis, can you describe to me the
9    file system there?
10       A.  Investigators who work in the special
11   investigations unit will have a case file at their
12   actual desk.
13       Q.  And is that paper, is that electronic or both?
14       A.  It would be predominantly a paper file.  There
15   will also be an electronic report that is maintained
16   through our report writing system.
17       Q.  And so in addition to the paper file on your
18   desk, you would have a computer, is my understanding?
19       A.  Yes.
20       Q.  Okay.  Where your electronic files would be
21   maintained?
22       A.  Yes, sir.
23       Q.  And when I asked you, did you search the open
24   files, let me include that to the -- the question to ask
25   you, did you search the paper files that you maintain in

---

30

1    your office?
2        A.  Yes, sir.
3        Q.  And those would be open files, closed files or
4    both?
5        A.  Both.
6        Q.  And I believe you also testified that you
7    searched your electronic files?
8        A.  Yes, sir.
9        Q.  And would those contain the open files?
10       A.  And when I say "open," it could be a case that
11   has not been finally adjudicated so it could include
12   that, yes.
13       Q.  Could "open" mean anything else because I would
14   like to understand what you mean by open?
15       A.  We consider a case still open if it's still
16   pending trial and there's not been a final disposition
17   in the case.  And so electronically I would look for
18   indictments, for instance.
19       Q.  Is there a record retention policy in your
20   office?
21       A.  I believe so, yes.
22       Q.  Do you know what that is?
23       A.  Well, it depends on the category of file.
24       Q.  Well, when we're talking about election code
25   violations, are we talking about -- are we always

---

31

1    talking about a criminal investigation?
2        A.  Yes, sir.
3        Q.  So in terms of criminal investigations, is there
4    a retention policy in your office?
5        A.  Yes.
6            MR. SWEETEN:  Are you asking about SIU or
7    are you asking about the office of the Attorney General?
8            MR. GEAR:  And that's a good point.
9    BY MR. GEAR:
10       Q.  So let's talk about the SIU first.  Is there a
11   specific retention policy for criminal investigations,
12   the files in your office?
13       A.  Our policy is that once the case is closed and
14   adjudicated or closed unfounded, that the files are
15   given to our records manager.
16       Q.  And who is your records manager?
17       A.  For SIU the records manager would be Sherry
18   Patke.
19       Q.  Can you spell the last name for me?
20       A.  P-A-T-K-E.
21       Q.  And once they've reached the final adjudication,
22   I believe that's how you stated it, what would Sherry do
23   with the files?
24       A.  Sherry would update our mainframe system and then
25   prepare the files for storage.

---

32

1        Q.  And when you talk about updating the mainframe
2    system, what do you mean by that?
3        A.  Each of our cases is -- each case is assigned a
4    case number through our OAG mainframe.  And each case
5    has a status, open/closed.  And so upon receiving the
6    file, she will update the mainframe to indicate the case
7    is closed.
8        Q.  Okay.  And so when we're talking about a file, do
9    those files include e-mail communications?
10       A.  Only if that e-mail was printed by the
11   investigator.
12       Q.  Do they include correspondence?
13       A.  Yes.
14       Q.  I believe you testified that they would include
15   the investigator's notes?
16       A.  Yes.
17       Q.  Would they include any other type of analysis or
18   report?
19       A.  They would include a narrative report of the
20   investigation.
21       Q.  Generally, any other documents that you would
22   find in one of these files?
23       A.  These files contain lots of documentary items.
24       Q.  Okay.  So once there's a final adjudication, you
25   indicated Sherry would upload it to the mainframe --



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

### 33

1  update it to the mainframe.  And then would they be sent
2  to the off-site location?
3      A.  Just the status is updated in mainframe.
4      Q.  Okay.
5      A.  All the documentary files are placed in a box or
6  boxes.  And prepared for long-term storage.
7      Q.  And long-term storage is as we talked about at
8  off-site locations?
9      A.  We keep them in our division for a short period
10  of time.
11     Q.  Is there a determination that certain time period
12  that you keep them there?
13     A.  I don't really know what that is.
14     Q.  And after that short period of time what happens?
15     A.  They're sent to, I believe, a warehouse.
16     Q.  And so you indicated there were multiple
17  locations.  Can you tell me how many different locations
18  there are off-site?
19     A.  I do not know how many warehouses we have for the
20  State records system.
21     Q.  Okay.
22     A.  We do have a couple of cases that have large
23  volumes of documentary evidence or records.  And we have
24  those stored in off-site location.  That would be just
25  one location.

---

### 35

1      Q.  Okay.  So as I understand your testimony, you
2  have an undergraduate degree in criminal justice?
3      A.  Yes, sir.
4      Q.  And do you currently hold a master's in any
5  field?
6      A.  No, sir.
7      Q.  Okay.  Any other education generally?
8      A.  Well, yes, sir.  I attended basic peace officer
9  academy in 1993 through the San Antonio College in
10  San Antonio, Texas.  And then over the course of my
11  20 years of public service, I have taken many
12  investigative courses.
13     Q.  Continuing education?
14     A.  Yes, sir.
15     Q.  I understand that.  So you do not hold a law
16  license, correct?
17     A.  No, sir, I do not.
18     Q.  Are there any privileges that you're asserting
19  today?
20         MR. SWEETEN:  I'll assert the privileges as
21  they may come up.  It depends on what you ask him.  If
22  you ask him about his doctor/patient relationship, we'll
23  assert the privilege there.  With respect to -- he's
24  going to assert as to any attorney/client privilege.
25  There also may be occasion wherein the event it comes

---

### 34

1      Q.  And what's the name of that location, if you
2  know?
3      A.  I don't really know the name of it.
4      Q.  Is it here in Austin?
5      A.  Yes, sir, it is.
6      Q.  Okay.  Let me change the subject for a minute and
7  talk about your background.  Could you tell me what your
8  educational background is?
9      A.  I graduated from Southwest Texas State University
10  in 1997 with a bachelor's degree in criminal justice and
11  a minor in sociology.  And then I have attended graduate
12  level courses at the University of Virginia at the FBI
13  academy and then also through Sam Houston State
14  University in Huntsville Texas for the leadership
15  command college.
16     Q.  So the graduate level courses, what was the
17  subject matter of the study?
18     A.  I attended the 233rd FBI national academy in
19  Quantico, VA in 2008.  And while you're attending the
20  academy, you can take graduate level classes through
21  University of Virginia.  I took courses in
22  organizational communication.  I took courses in
23  intelligence, in law enforcement, organizational change,
24  ethics and integrity in law enforcement and forensics
25  for supervisor?

---

### 36

1  up, the law investigatory privilege.  And that's a
2  privilege that would -- if in the event he were asked to
3  reveal a law enforcement investigatory technique, that
4  we would assert as to that.  Otherwise, it will depend
5  on the questions that are asked.  Thus far, he hasn't
6  asserted any privilege other than the discussions he's
7  had with us.
8  BY MR. GEAR:
9      Q.  I promise you I won't ask you about your
10  doctor/client privilege?
11         MR. SWEETEN:  That was sort of in gest.
12         MR. GEAR:  I know.
13  BY MR. GEAR:
14     Q.  Are you a member of any organizations?
15     A.  Currently I'm a member of the FBI national
16  academy graduate.
17     Q.  Anything else?
18     A.  No, sir.
19     Q.  Have you ever heard of the Austin Area Chapter
20  Association of Certified Fraud Examiners?
21     A.  Yes, sir, I have.
22     Q.  Is that an organization with a membership?
23     A.  Yes, sir.
24     Q.  Are you a member of that organization?
25     A.  No, sir.

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

## 37

1    Q. Have you ever presented for that organization,
2  provided any speeches, information related to what you
3  do in the office of the Attorney General?
4    A. Yes, sir.
5    Q. Okay. Do you know how often you do presentations
6  in front of this organization?
7    A. I believe I've done two presentations for the
8  Austin chapter.
9    Q. And do you recall when those presentations were?
10   A. They were a few years ago.
11   Q. General time period?
12   A. I would say between 2006 and maybe 2010.
13   Q. And you indicated that that particular
14  organization, The Association of Certified Fraud
15  Examiners, has a membership?
16   A. Yes, sir.
17   Q. Okay. And have you ever been a member?
18   A. I don't believe -- no, I have not.
19   Q. All right. Any other -- let's talk a little bit
20  about your work experience. So you indicated that
21  you're currently with the SIU division. Can we walk
22  that back a little bit and tell me about your work
23  experience?
24   A. Well, if I could clarify, I now also supervise
25  the fugitive apprehension unit or the sex apprehension

## 38

1  unit as well. Those are the two units that I'm
2  responsible for supervising, SIU and the fugitive
3  apprehension unit.
4    Q. And just briefly, for the fugitive apprehension
5  unit, when did you become a supervisor?
6    A. May 1st.
7    Q. Does that have anything to do with election code
8  violations?
9    A. No, sir.
10   Q. Okay. So turning your attention back to the SIU,
11  when did you become a supervisor there?
12   A. In 2005.
13   Q. And prior to 2005, were you in the office of the
14  Attorney General?
15   A. Yes, I was.
16   Q. And can you tell me a little bit about what you
17  did prior to 2005?
18   A. I was hired with the Texas Attorney General's
19  office the Fall of 1997. I was an investigator assigned
20  to the prosecutor assistance division in special
21  investigations for -- I'm sorry. From 1997 to 2003, I
22  worked in that division. As I stated previously, a good
23  portion of that was working on capital murder
24  investigations throughout the state. We also did other
25  types of investigations at the request of local district

## 39

1  county attorneys. These could be any kind of case from
2  an aggravated robbery to a public integrity
3  investigation.
4    Q. When you say, "public integrity," what are you
5  referring to?
6    A. This -- a typical case would involve a local
7  official who could be in law enforcement or an elected
8  official or an appointed official who engages in any
9  kind of criminal misconduct associated with their office
10  or while in office.
11   Q. So you were with -- you were with this particular
12  division from 1997 to 2003, correct?
13   A. With an exception of about two and a half weeks.
14  I left the office of the Attorney General and went to
15  the Texas Department of Insurance for about two and a
16  half weeks.
17   Q. And the Texas Department of Insurance has nothing
18  to do with election code violations?
19   A. That's correct.
20   Q. All right. And so let's just focus on the 1997
21  to 2003.
22   A. Okay.
23   Q. Did you -- did you ever have an occasion during
24  that time period to work on election code violation
25  referrals, allegations?

## 40

1    A. One.
2    Q. One. Can you tell me about that?
3    A. There was -- and I can't give you the date. But
4  it was when I came on as a new investigator, there was
5  an allegation of election misconduct in the handling of
6  ballot boxes in Liberty County.
7    Q. Do you recall who was the alleged wrong doer in
8  that case?
9    A. No, sir, I don't.
10   Q. Do you recall any specifics about the
11  investigation?
12   A. No, sir. By the time I got the case the statute
13  of limitations expired.
14   Q. And the overall allegation was, could you say
15  that again?
16   A. I believe the handling of the ballot boxes.
17   Q. Was that misconduct by an official?
18   A. I don't remember.
19   Q. Is it fair to say that -- that the one case that
20  you dealt with between 1997 and 2003 did not deal with
21  voter impersonation?
22   A. Yes, sir, that's fair.
23   Q. So between 2003 to 2005, what responsibilities
24  did you have within the attorney general's office?
25   A. I was assigned as a long-term case investigator.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 41

1    Q.  And tell me what the responsibilities are and
2  what division you were in?
3    A.  In 2003, all of the investigators with the office
4  of the Attorney General merged into the criminal
5  investigations division.  Previously we had been
6  assigned to specific divisions that handled specific
7  types of cases.  The prosecutor assistance division did
8  any type of case that a local district or county
9  attorney needed assistance on or had been recused in.
10  And so again, I could work any type of case.  And there
11  were other divisions that had like financial crimes,
12  they had investigators as well.  And the cyber crimes
13  was another particular unit.  In 2003 all of the
14  investigators were merged into one division focusing the
15  same in units of specialization.
16    Q.  Okay.  So I think I understand that.  So between
17  2003 and 2005, did you ever have an occasion to work on
18  an election code violation case?
19    A.  In mid-2005 I did when I became the lieutenant.
20    Q.  And when you say, "when you became the
21  lieutenant," were you part of the SIU at this time?
22    A.  Yes, sir.
23    Q.  So between 2003, 2005 until you became the
24  lieutenant in the SIU, you did not work on any election
25  code violation cases?

## 42

1    A.  That's correct.
2    Q.  Okay.  So let's move forward then, regarding --
3  actually, I would like to back up.  I'm sorry.  You were
4  talking about the records that are maintained in your
5  office.  Do the electronic records contain scans of
6  every hard copy document in storage?
7    A.  No, sir.
8    Q.  They do not.  Moving forward to 2005 when you
9  became the lieutenant in the SIU, how did you become the
10  lieutenant for that particular position?
11    A.  I believe we submitted our names for
12  consideration and the supervisor of the division
13  reviewed memos and our personnel files and then made a
14  selection.
15    Q.  And who did you submit your -- did you say letter
16  of recommendation?  I'm sorry.
17    A.  I'm sorry.  We submitted our names for
18  consideration and we submitted those to David Boatright.
19    Q.  David Boatright.  And who is David Boatright?
20    A.  He was the division chief at the time and was
21  later my Major.
22    Q.  And he was the division chief for the SIU?
23    A.  For the entire criminal investigations division.
24    Q.  And obviously you were selected?
25    A.  Yes, sir.

## 43

1    Q.  So when you were selected, was that automatically
2  a supervisory position?
3    A.  Yes, sir.
4    Q.  And I believe you said you held the rank of
5  lieutenant?
6    A.  Yes, sir.  If I could clarify?
7    Q.  Please.
8    A.  It was an investigator supervisor.  Because we're
9  so small, I still had to work some cases.
10    Q.  So in 2005 you became the investigative
11  supervisor.  Can you tell me how many people you
12  supervised, if any?
13    A.  I think it was a small group of maybe -- it
14  varied over the years.  But anywhere between 8 and 12.
15    Q.  And we're talking about 2005 at this point?
16    A.  Yes, sir.
17    Q.  Between 8 and 12.  Can you tell me generally what
18  the responsibility of the -- were they all
19  investigators?
20    A.  Yes, sir.
21    Q.  Of the investigators you supervised, what was
22  their responsibility?
23    A.  What was their responsibility or mine?
24    Q.  What was their responsibility?
25    A.  To conduct investigations that were referred to

## 44

1  our office.
2    Q.  And am I accurate to say that the SIU does not
3  only deal with election code violations, it deals with a
4  broad variety of different violations?
5    A.  That would be accurate.  We deal with a wide
6  variety of criminal investigations.
7    Q.  And generally, can you tell me the types of
8  investigations that the SIU deals with?
9    A.  Public integrity, election violations, white
10  color crimes such as fraud.  And are you talking 2005 or
11  all the way to present, now?
12    Q.  Let's start off in 2005, just so we're clear.
13  When you started off in 2005, what was the
14  responsibility of the SIU?
15    A.  I would say fraud, election fraud, public
16  integrity and whatever type of case needed additional
17  investigative assistance.  An example, around that time
18  there were many death penalty cases that were under
19  review for consideration of mental retardation.  So some
20  of our investigators had to go back and examine those
21  cases to determine whether or not there was evidence of
22  mental retardation.
23    Q.  Okay.  So you started off as a lieutenant.  Can
24  you tell me how -- the time periods of which you gained
25  your promotion to a different rank?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 45

1   A. I was promoted to captain of the special
2   investigations unit in, I believe the Fall of 2007.
3   Q. And you just recently became a major?
4   A. Yes, sir.
5   Q. In 2012?
6   A. Yes, sir.
7   Q. And I believe, off the record you said May of
8   2012?
9   A. Yes, sir, May of 2012.
10  Q. Now, does the increase in rank does that give you
11  any additional responsibility?
12  A. Yes, sir.
13  Q. It does. Okay. So as a lieutenant in the SIU,
14  can you tell me what your identified responsibilities
15  were?
16  A. Was to supervise the daily and weekly
17  investigative activity of the investigators in my unit.
18  That would include reviewing case reports, and providing
19  them assistance or guidance as needed. In many cases, I
20  would also actually accompany the investigators out into
21  the field if they needed additional manpower.
22  Q. Would you sign off on the case reports? Was that
23  part of your responsibility?
24  A. Either I would or my captain at the time.
25  Q. Who was your captain at the time?

## 46

1   A. In 2005 it would be Greg Lucus.
2   Q. Is he still there with you now?
3   A. Yes.
4   Q. Still a captain?
5   A. Yes. He is not a part of the special
6   investigations unit, however.
7   Q. From 2005 to the present, has the size of the
8   investigators underneath you changed?
9   A. Substantially.
10  Q. Okay. And so I understand in 2005 there were
11  between 10 to 12. Can you tell me how the growth has
12  occurred within your office?
13  A. Well, I believe it was in 2008, the money
14  laundering unit was absorbed into the special
15  investigations unit. And that area of responsibility
16  was added.
17  Q. How many investigators came along with that?
18  A. I would say about eight or nine.
19  Q. Any other units that have been absorbed into the
20  SIU?
21  A. Also the -- what we call the criminal litigation
22  unit, which would be the group of investigators who
23  assist prosecutors in the prosecution of cases. That's
24  about six.
25  Q. About six. Any other units?

## 47

1   A. I have a group that is assigned to the joint
2   terrorism task force. And that has a ranged between two
3   and three employees.
4   Q. So is that it? Are there any other units?
5   A. Well, in May of 2012, I also was added to the --
6   the fugitive apprehension was added to my
7   responsibility.
8   Q. And they were absorbed into the SIU?
9   A. No, sir, it's a separate group, but it's about 24
10  or 25 employees.
11  Q. Okay. Do their responsibilities cross over?
12  A. No, sir, they do not.
13  Q. Okay. So if my calculations are correct, there
14  are approximately 30 investigators underneath you from
15  the various units that have been absorbed?
16  A. I think it would be a more accurate statement to
17  say between -- I think there's 40 commissioned state
18  police officers in special investigations unit and about
19  24 in the fugitive apprehension unit.
20  Q. So 40 in SIU?
21  A. Correct.
22  Q. And you said "commissioned police officers," what
23  does that mean?
24  A. Investigators who are commissioned through the
25  State law enforcement.

## 48

1   Q. And they all carry badges?
2   A. Yes, sir.
3   Q. They are police officers?
4   A. Yes, sir.
5   Q. Okay. And you indicated that there was a captain
6   underneath you. Did you say Greg Russ?
7   A. I'm sorry. His name -- he is not part of my
8   unit. But he was my captain back in 2005.
9   Q. Okay. Do you have -- I'm trying to understand
10  the structure. I know you've got 40 commissioned police
11  officers, investigators that work underneath you and
12  that you supervise. Is there another structure? Are
13  there other managers within your unit?
14  A. Yes, sir there are.
15  Q. Okay.
16  A. There are two captains.
17  Q. Two captains.
18  A. One for the special investigations unit and one
19  for the sex offender apprehension unit, fugitive unit.
20  Q. And the name of the captain that's in the SIU
21  unit?
22  A. Would be Daniel Guajardo.
23  Q. And Daniel reports directly to you?
24  A. That is correct, sir.
25  Q. What about the other captain?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

### 49

1  A. He reports to me as well. And his name is Bruce
2  Cook.
3  Q. Does Bruce Cook's responsibilities cross over
4  into the SIU unit?
5  A. No, sir.
6  Q. Okay. So as I understand the structure of the
7  SIU, you are the lead investigator, the supervisor.
8  There's one captain, Daniel?
9  A. Guajardo.
10  Q. Guajardo. And then there are 40 police officers,
11  investigators that are underneath you, correct?
12  A. Yes, sir.
13  Q. Okay. And do you have general staff that
14  assists, supports -- support staff?
15  A. Yes, we do.
16  Q. And generally how large is your support staff?
17  A. I believe we have four auditors.
18  Q. What does that mean, "auditors"?
19  A. These are, in some cases they're CFEs or CPAs who
20  assist in the investigation that we conduct. They're
21  noncommissioned personnel.
22  Q. CPA's?
23  A. Certified public accountants.
24  Q. Accountants. They would be assisting with
25  white-collar crimes?

### 50

1  A. Correct.
2  Q. Okay. Do you have any other support staff that
3  would actually go out into the field? And I'm just
4  speaking specifically about the election code violations
5  to assist with investigations?
6  A. No. Civilians wouldn't go in the field.
7  Q. Okay. What are the names of the auditors?
8  A. Kyle Swihart, Roxanne Mendoza, Rebeka Rutland,
9  Kim Holderread.
10  Q. And would any of the individuals that you just
11  mentioned, would they be involved in election code
12  violations?
13  A. The only way they would be involved in election
14  code violations is if we were conducting an
15  investigation of campaign finance violations or the
16  improper use of government monies for political
17  purposes.
18  Q. Have you had those types of investigations within
19  your office?
20  A. Yes, sir.
21  Q. All right. And can you tell me how many of those
22  types of investigations you've conducted within your
23  office?
24  A. I would -- to give you a firm number I would have
25  the review my spread sheet. But if I were to hazard a

### 51

1  guess it would be half a dozen or so.
2  Q. One more time focusing on your promotion, what is
3  the process of moving from lieutenant to major? What is
4  the process that you had to go through for your
5  promotions?
6  A. We generally prepare a memo involving our core
7  competencies in the identified areas for the position.
8  And this could be a two to three page memorandum, along
9  with a resume. And then there is a board review.
10  Q. Okay. And after each board review, you're told
11  of the determination, if you've been promoted. Would
12  that be fair to say?
13  A. Yes, sir. You are scored by the board and then
14  you're advised of the promotion.
15  Q. Okay. And so you indicated previously that there
16  are additional responsibilities that are added with each
17  promotion. So as a major, is there any other
18  responsibilities that we haven't discussed here? I
19  mean, I understand the structure of your office. I
20  understand that there have been units that have been
21  added to your office. Is there anything else that is
22  of -- that I should know about the structure or your
23  responsibilities?
24  A. Since I've been promoted to major, I think one of
25  the more substantial responsibilities is now budget, is

### 52

1  dealing with budgets and hiring.
2  Q. And when you say budgets, generally what do you
3  mean by that?
4  A. Both general revenue funding and then grants that
5  we may have through the attorney general's office.
6  Q. Okay. So again, I understand the structure of
7  your office now, but what is the special investigations
8  unit? What are the specific responsibilities of that
9  unit?
10  A. Currently there is an election team, a fraud
11  team, a public integrity team, a human trafficking team,
12  a financial investigations team, a money laundering team
13  and a prosecution assistance team. There is also a
14  group of auditors who assist those different teams and a
15  group of analysts who assist those teams.
16  Q. And what are the responsibilities of the
17  analysts?
18  A. The analysts would assist investigators in
19  obtaining contact information regarding witnesses.
20  Q. Do they help maintain the files?
21  A. No.
22  Q. Is it the investigator's responsibility to
23  maintain the individual file?
24  A. Yes, until it's finally done.
25  Q. Okay. And then at that point it would go to



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

53

1    Sherry, if I understand correctly?
2        A. Yes, sir it would.
3        Q. Okay. What else do the analysts do? You said
4    they assist with contact information?
5        A. They would help prepare any kind of charts, if
6    there were any kind of charts developed. They would
7    search criminal history information.
8        Q. And they're civilians, correct?
9        A. Yes, sir, that's correct.
10       Q. All right. And so out of all these teams that
11   you have described, which ones would deal with election
12   code violations?
13       A. Just the elections team.
14       Q. So you have an elections team and a fraud team.
15   Does the fraud team deal with election code violations?
16       A. If I could clarify?
17       Q. Sure.
18       A. It depends on the volume of cases that we have or
19   the volume of work required for any of the
20   investigations.
21       Q. Okay.
22       A. I would have a public integrity investigator
23   assist the elections team or I could have a human
24   trafficker investigator assist so long as it's not
25   prohibited by their grants or anything like that.

---

54

1        Q. Okay.
2        A. So there have been some investigations which have
3    required more investigators than what are currently
4    assigned to the elections team.
5        Q. So as I understand it, the area of concentration
6    for the elections team is election code violations?
7        A. Correct.
8        Q. But other teams can assist when necessary or
9    individuals from those teams?
10       A. Yes, sir.
11       Q. How many individuals do you have working on the
12   elections team?
13       A. I think there are three right now.
14       Q. Three. And who are those individuals?
15       A. It would be Stormy Jackson, Wayne Rubio and
16   Jeanette. I'm sorry. Oh, gosh.
17       Q. Take your time. That's a lot of people you
18   supervise.
19       A. It's Jeanette, I can't remember her -- I'm sorry.
20   Jeanette -- Josephine Smith.
21       Q. And did any of these individuals, Jackson, Rubio
22   or Smith, assist you in searching documents for the
23   notice of deposition?
24       A. No. The only instruction I gave them was to get
25   their investigative files in order.

---

55

1        Q. And that's both paper and electronic?
2        A. I just said investigative case files.
3        Q. Okay. And what does that mean?
4        A. It would mean their actual paper files.
5        Q. Okay. That would not include the electronic
6    files -- strike that. Do they maintain electronic
7    files?
8        A. Through our case reporting system.
9        Q. When was the special investigations unit formed?
10       A. I believe in June of 2005.
11       Q. And how was it formed?
12       A. I don't know.
13       Q. Why was it formed?
14       A. I don't really know.
15       Q. Was it in response to any particular concerns
16   that you're aware of?
17       A. I don't know.
18       Q. Was it the subject of a grant?
19       A. At some point in time, SIU has had, and still
20   does today, have investigators who are grant funded
21   positions.
22       Q. Where would those grants come from?
23       A. I don't know much about the grants reporting back
24   in 2005, but I do know that the grants that we currently
25   have are typically through the governor's office.

---

56

1        Q. Do you know the amount of the grants that have
2    come from the governor's office?
3        A. In total or the ones we currently -- the ones we
4    currently have.
5        Q. Are you aware of the grant coming from the
6    governor's office in 2005?
7        A. Yes, I'm somewhat aware of it.
8        Q. What was the amount of that grant?
9        A. I would say it's in excess of probably a million
10   dollars.
11       Q. A million dollars. And when you say "in total,"
12   do you mean that there have been a series of grants from
13   the governor's office?
14       A. Yes. Because we also have grants that are
15   through the -- for instance, an example would be the
16   HIDTA task forces.
17       Q. HIDTA stands for?
18       A. High intensity drug trafficking area.
19       Q. Okay.
20       A. So we have grants through there.
21       Q. Okay. So let me see if I can ask this in a way
22   that it makes sense. In total, how much in the form of
23   grants from the governor have been dedicated to the SIU
24   division?
25       A. I don't think I have that answer.

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Major Forrest Mitchell                                    June 15, 2012

---

### 57

1      Q. In total, how much in grants from the governor's
2  office have been dedicated to dealing with the issue of
3  election code violation?
4      A. It would only be a portion of the grants that we
5  receive.
6      Q. Okay. And can you give me a general total as to
7  what we're talking about?
8      A. Well, in -- if I could. In 2005, I think we did
9  get a Burns Grant from the governor's office. And
10 that's the grant I think that was in excess of a million
11 dollars.
12     Q. Okay.
13     A. Out of that grant the OAG hired a number of
14 investigators. A portion of which served in the special
15 investigations unit.
16     Q. Now, when these grants are issued, is there an
17 indication of the purpose or the reason for the grants?
18     A. Yes.
19     Q. Okay. And so you talked about the Burns Grant in
20 2005. What was the reason for the Burns Grant?
21     A. To conduct criminal investigations. I believe,
22 if my memory is correct, it was for money laundering,
23 sex offender apprehension, cyber crimes, public
24 integrity and election code violations and white-collar
25 crimes.

---

### 58

1      Q. So it was not just election code. It was a
2  series of different responsibilities that the SIU had at
3  the time.
4      A. I'm sorry. Could you restate that one more time?
5      Q. Sure. The grant that was in excess of a million
6  dollars was -- was that for the SIU unit or was that for
7  the OAG's office in general, and it was disbursed
8  amongst the various units?
9      A. It was a grant for the entire criminal
10 investigations division and it was disbursed between the
11 various units.
12     Q. Okay. Can you tell me, either specifically or
13 generally, how much money has been dedicated to election
14 code violations in the State of Texas at this point?
15 And I'm talking about the SIU unit.
16     A. I really don't have that number.
17     Q. You give me a general ball park?
18     A. I believe we only had that grant for one or
19 two years.
20     Q. Okay.
21     A. And I want to say that -- my memory is that about
22 $90,000 of that grant was used for the investigation and
23 prosecution of election code offenses.
24     Q. And you're talking about the 2005 grant?
25     A. Yes, sir.

---

### 59

1         (Exhibit No. 583 was marked.)
2  BY MR. GEAR:
3      Q. I'm showing you what's been marked as Exhibit 583
4  and I'll give you a chance to take a look at that.
5      A. Okay, sir.
6      Q. Okay. Have you seen this document before, sir?
7      A. No, sir.
8      Q. Okay. Can you tell me what it?
9      A. It is titled election code -- election code
10 resolve prosecutions by the office of the Attorney
11 General.
12     Q. Okay. And can you tell me what this is in
13 reference to?
14     A. It indicates the number of cases, criminal
15 investigation division case hours, criminal prosecution
16 division case hours, criminal investigation division
17 cost, criminal prosecutions division cost and then a
18 combined cost.
19     Q. And have you prepare add similar form in
20 functions of your duties?
21     A. No, sir.
22     Q. This indicates -- and if you look at the bottom
23 right-hand corner, it indicates January 25, 2011. Do
24 you see that?
25     A. Yes, sir.

---

### 60

1      Q. And it says, "as of January 25, 2011?"
2      A. Yes, sir.
3      Q. So as of January 25, 2011 it indicates that -- up
4  at the top, "resolved prosecutions." Do you see that?
5      A. Yes, sir.
6      Q. And it says, "number of cases." Do you see that?
7      A. Yes, sir.
8      Q. And what's that number of cases?
9      A. 62.
10     Q. And would that be accurate as of January 25,
11 2011?
12     A. I believe that would be representative of that
13 time.
14     Q. It says, "criminal investigation division case
15 hours." And do you see the number there?
16     A. Yes, sir.
17     Q. And how many number -- what is that number?
18     A. 10,649.
19     Q. Do you believe that that would be accurate
20 representation?
21     A. I don't know if that number deals with just those
22 specific prosecutions or if it's actually larger.
23     Q. And when you say, "specific prosecutions," you're
24 talking about if it just deals with election code
25 violations?

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

| 61 | 63 |
|---|---|
| 1   A. Yes, sir. | 1   investigation division costs." Do you see that? |
| 2   Q. Okay. So it could be more or it could be less, | 2   A. Yes, sir. |
| 3   if I understand your testimony? | 3   Q. And what is that cost? |
| 4   A. Correct. | 4   A. $792,217. |
| 5   Q. Do you know who prepared -- who prepared this | 5   Q. Okay. And then, the next line is, "criminal |
| 6   form? | 6   prosecution division cost." Do you see that? |
| 7   A. I don't know who prepared the form. | 7   A. Yes, sir. |
| 8   Q. Do you know who would be responsible for | 8   Q. All right. And do you see what the number is? |
| 9   preparing this form? | 9   A. $483,258. |
| 10   A. I believe it would be our budget or accounting | 10   Q. And the combined cost of both? |
| 11   division. | 11   A. $1.275475. |
| 12   Q. Okay. And if I understood your testimony, you | 12   Q. All right. And then in -- at the bottom of this |
| 13   are now in charge of budgeting aspects? | 13   sheet it indicates, "statistics on this sheet relate to |
| 14   A. No, sir, not completely. We have a budget and | 14   election code prosecutions during the Abbott |
| 15   accounting division and I would work with them on | 15   Administration as of January 21, 2010," correct? |
| 16   various issues. | 16   A. Yes, sir. That's what it says. |
| 17   Q. Does that have a supervisor? | 17   Q. Okay. And so it also includes a total direct |
| 18   A. Budget has a supervisor and I think accounting | 18   expense such as travel, court cost and other case fees. |
| 19   has a supervisor as well. | 19   Do you see that? |
| 20   Q. And who would that supervisor be for budgeting, | 20   A. Yes, sir. |
| 21   first? | 21   Q. All right. Any reason to dispute the numbers |
| 22   A. I've met a lot of new people in the last month | 22   that are indicated on this exhibit? |
| 23   and a half. I don't know who's in charge of the budget | 23   A. No, sir. |
| 24   right now. | 24   Q. All right. Do you know how much has been |
| 25   Q. Okay. And the other division that you -- | 25   expended for election code violation prosecutions from |

| 62 | 64 |
|---|---|
| 1   A. The other would be accounting division. | 1   January of 2010 to the present? |
| 2   Q. And do you know who the supervisor for accounting | 2   A. No, sir, I do not. |
| 3   is? | 3   Q. So what is the purpose of the, I believe you |
| 4   A. I believe that's Greg Herbert. | 4   said, "election team," what is the purpose of the |
| 5   Q. Greg Herbert. Okay. All right. So essentially | 5   election team? |
| 6   this goes through -- and again, the title of this | 6   A. The elections team responsibility would be to |
| 7   document is election code resolve prosecutions. And it | 7   conduct criminal allegations of election code offenses. |
| 8   goes through number of cases, the number of hours, | 8   These are typically referred by the Secretary of State, |
| 9   criminal prosecution division case hours. Why would | 9   local, district county attorneys, local elections |
| 10   that be distinguished between investigation division | 10   administrators or local law enforcement. |
| 11   case hours and prosecution division case hours? | 11   Q. Okay. And I believe I asked you this before, but |
| 12   A. I believe internally within the OAG they have | 12   let me make it more specific to the elections team. Was |
| 13   divided budgets. | 13   the elections team formed in response to any concerns |
| 14   Q. Okay. And so who would be the supervisor of the | 14   that you're aware of? |
| 15   budget division in 2011, if you know? | 15   A. It's my understanding that since 1985 the office |
| 16   A. I don't know. | 16   of the Attorney General has had jurisdiction in election |
| 17   Q. It says, "combined CID, CPD hours." Do you know | 17   code offenses or concurrent jurisdiction. So the office |
| 18   what that stands for? | 18   of the Attorney General conducts those kinds of |
| 19   A. Combined CID and CPD hours I believe would | 19   investigations. |
| 20   represent a total of the hours worked by the criminal | 20   Q. And do you have knowledge of election code |
| 21   investigations division or the criminal prosecutions | 21   prosecutions, investigations going back to 1985? |
| 22   division. | 22   A. No, sir, I do not. |
| 23   Q. Okay. And that number is 16,952? | 23   Q. Would those records be maintained somewhere? |
| 24   A. Yes, sir. | 24   A. I don't know what the records retention is for |
| 25   Q. And then its goes on to indicate, "criminal | 25   those. |



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Major Forrest Mitchell                                              June 15, 2012

---

65

1      Q.  How far back does your knowledge extend?
2      A.  I would say it goes back to, I think, 2002.
3      Q.  Are you aware of any voter impersonation
4  investigations, prosecutions, that occurred prior to
5  2002?
6      A.  No, sir.
7      Q.  You talked a little bit about the jurisdiction of
8  the SIU.  What jurisdiction does the special
9  investigations unit have in the State of Texas?
10     A.  Do you mean specifically towards elections or in
11  the broader sense?
12     Q.  Elections.
13     A.  Chapter 273 of the Texas Elections Code discusses
14  the investigations of election code violations.  If you
15  have a single jurisdictional election, the jurisdiction
16  may rest with the local district or county attorney.  If
17  you have multi-jurisdictional elections, then the
18  jurisdiction may rest with the Texas Attorney General's
19  office.  Chapter 273 authorizes the Texas Attorney
20  General's office to conduct investigations and
21  prosecutions of either type, working in conjunction with
22  local DAs or law enforcement.
23     Q.  So when you say, "it authorizes them," does that
24  mean they have direct jurisdiction?
25     A.  Yes, I believe the statutory language says they

---

66

1  have concurrent jurisdiction.
2      Q.  Are they authorized to take the lead on any of
3  these particular investigations, prosecutions?
4      A.  I believe that in the case of
5  multi-jurisdictional elections, the answer would be yes.
6      Q.  All right.  And I believe you've answered this in
7  a general way.  Does the SIU prosecute the cases that it
8  investigates?
9      A.  Oh, no, sir.
10     Q.  So let's talk about that structure a little bit.
11  Your unit, the SIU, conducts the investigations.  How
12  does it then, shift to the prosecution stage?
13     A.  At the completion of our investigation, we would
14  prepare an investigative packet with statements,
15  reports, supporting documentation, it could be recorded
16  interviews, those kinds of things.  And that would be
17  presented to the local district attorney, county
18  attorney or to the criminal prosecutions division.
19     Q.  And did you produce these election investigation
20  packets to your attorney, to your attorney in this case?
21     A.  In the scope of this?
22     Q.  Yes.
23     A.  No.
24     Q.  All right.  And you said something in your
25  answer, and I want to kind of flesh that out a little

---

67

1  bit.  The investigations packet would be then, turned
2  over to -- can you go through those again for me?
3      A.  It would be either the criminal prosecutions
4  division, or a local district or county attorney.
5      Q.  Okay.  And so the criminal prosecutions division
6  is within the office of the Attorney General, correct?
7      A.  Yes, sir.
8      Q.  Okay.  And they would be the ones that would be
9  primarily responsible for prosecutions within your
10  office, the OAG's office?
11     A.  Unless it was the joint prosecution with the
12  local DA.
13     Q.  Okay.  And is there a supervisor in the criminal
14  prosecutions division?
15     A.  Yes, sir.
16     Q.  And do you know who that is?
17     A.  Adrian McFarland.
18     Q.  And how long -- and is that a he or she?
19     A.  It's a she.
20     Q.  And do you know how long Ms. McFarland has been
21  the director of that -- of the criminal prosecution
22  division?
23     A.  I don't know.
24     Q.  So other than providing the investigations
25  packet, are there communications regarding -- that

---

68

1  you're -- the SIU would engage in regarding the contents
2  of the investigations package?  I'm talking about with
3  the criminal prosecutions division.  How does the
4  package get delivered?  I mean, is there -- is it simply
5  the package is prepared and passed off and that's the
6  end of your role?  Do you understand what I'm trying to
7  ask you?
8      A.  Yes, sir.
9      Q.  Okay.
10     A.  And I would have to say it depends.  Over the
11  years it has changed.  And it does not end our role.
12  Frequently, the prosecutors identify additional
13  witnesses they want interviewed or additional documents
14  they want obtained.  And so they might ask the
15  investigators to do additional work.
16     Q.  So is it fair to say the investigator would stay
17  with the case through the prosecution, the process of
18  prosecution to assist when necessary?
19     A.  Ideally, yes.
20     Q.  Okay.  Are the investigators called to testify at
21  all in these election code violation prosecutions?
22     A.  Yes, sir.
23     Q.  Have you ever been called to testify during any
24  of the election code prosecutions?
25     A.  I have been subpoenaed, however, never had to

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

### 69

1  testify.
2      Q. How often has that happened, subpoenaed?
3      A. I would say once or twice -- I would say twice.
4      Q. Do you recall the specific case?
5      A. It would be the State of Texas versus Anita
6  Baeza.
7      Q. BI?
8      A. B-A-E-Z-A.
9      Q. Okay.
10     A. There was another case that was -- I don't
11  remember the defendant's name, but it was out of Hidalgo
12  County and was prosecuted in Brooks County?
13     Q. Do you remember the time period on that one?
14     A. I would say it was probably a case we
15  investigated in 2008 or 2009. I was summons down
16  probably about 2010.
17         MR. GEAR: We've been going for a while. Do
18  you guys want to take a break?
19         THE WITNESS: Yes, please.
20         MR. GEAR: Let's take a little short break.
21  Ten minutes.
22         MR. SWEETEN: That's fine.
23         (Brief recess.)
24  BY MR. GEAR:
25     Q. Back on the record. We talked a little bit about

### 71

1  registration applications. And consequently, when the
2  voters went to the polls, they weren't allowed to vote.
3  So our office worked on the investigation of the
4  potential criminal misconduct for unlawfully rejecting
5  voters. But we also assisted the Department of Justice,
6  I think it was a civil rights division, in the analysis
7  of the data regarding the voter registration and what --
8  why voters weren't processed properly and what were the
9  reasons. So many were -- because the address wasn't
10  complete, so many didn't provide necessary -- so we did
11  a statistical analysis during that investigation, which
12  was then used, I believe civilly in action by the
13  Department of Justice against Waller County.
14     Q. So your overall responsibilities in SIU have also
15  involved both communications and in conjunction with
16  working with the Department of Justice?
17     A. Occasionally, yes.
18     Q. So for the vast majority of the criminal
19  investigations, what is the standard that these cases
20  would ultimately have to be prosecuted by? Is it beyond
21  a reasonable doubt?
22     A. Yes, sir.
23     Q. Okay. So it's also fair to say that just because
24  you receive a referral does not mean that that person is
25  guilty of what the allegation is. There's an

### 70

1  what the -- actually we talked a lot about what the SIU
2  does, what their responsibilities are. I just wanted to
3  circle back to get a clear understanding, the SIU
4  conducts criminal investigations?
5      A. For the most part, yes.
6      Q. And let's narrow that even more and talk about
7  election code violations. Are those always criminal
8  investigations?
9          MR. SWEETEN: That he conducted?
10  BY MR. GEAR:
11     Q. The SIU that you conduct as a supervisor?
12     A. I would say the vast majority are criminal.
13     Q. And when you say, "vast majority," the other
14  portion of it, when would that cross over, or why would
15  that cross over into the civil realm?
16     A. Can I give you an example?
17     Q. Please.
18     A. We were referred a criminal case from the
19  Secretary of State's office from Waller County and it
20  involved allegations of voters not being allowed to vote
21  in an election. I think it was the 2006 general
22  election. And there's a particular university there
23  named Prairie View University, Prairie View A&M
24  University. And there were allegations that the
25  elections department did not process their voter

### 72

1  investigation and until proven guilty, it's simply a
2  referral?
3      A. That's correct.
4      Q. Okay. And so we spoke a little bit about fraud
5  in the State of Texas. So I would like to define that a
6  little bit more. How do you define voter fraud?
7          MR. SWEETEN: Do -- let me make sure I'm
8  clear. Do you mean how does the SIU? Because that was
9  in your definition.
10         MR. GEAR: Yes. Yes.
11         MR. SWEETEN: Okay.
12     A. We would define it as a violation of election
13  code offenses or other penal code offenses associated
14  with elections.
15     Q. (By Mr. Gear) And there are two chapters that
16  deal with election code violations, if I'm correct or
17  multiple?
18     A. Oh, no. Yeah, there's multiple chapters that
19  deal with violations.
20     Q. Okay. Let me try my hand at this. Chapter 68
21  deals with what type of election code violations?
22     A. I don't think chapter 68 deals with election code
23  violations. 64 deals with some.
24     Q. 64?
25     A. 63, 84, 86, 253, and I know there are others.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

73

1      Q.  And I'm not going to ask you to identify and
2   define each of these chapters.  Which of these chapters
3   deals with voter impersonation?
4      A.  That would be the -- it could potentially be the
5   voter registration.  And that would be in, I believe
6   Chapter 13.  And then also, it could also be during the
7   early voting which is covered in 86 or 84.  And it also
8   could be during a poll place violation which is, I think
9   in 64.
10     Q.  You said 86 or 84?
11     A.  Yes, sir.  I'm not sure I know -- I'm not sure I
12  remember perfectly.
13     Q.  Okay.
14     A.  If I could just say that we have different
15  categories.  We have early voting.  We have -- which
16  early voting also includes mail-in ballot.  And then, we
17  also have poll place violations.
18     Q.  And poll place violations would be chapter 64, if
19  I understood you correctly?
20     A.  Some of the early voting can also involve poll
21  place violations.  But I think predominantly 64 is poll
22  place.
23     Q.  Okay.  So early voting involves both by mail and
24  poll place?
25     A.  Yes, sir.

74

1      Q.  Okay.  And I threw out the term "voter
2   impersonation."  What is voter impersonation?  How do
3   you define that?
4      A.  Voter impersonation is either someone who is not
5   registered to vote or has -- is registered to vote and
6   has already voted and using somebody else's voters
7   registration certificate to vote again.
8      Q.  When you say, "not register to vote," what do you
9   mean by that?
10     A.  This could be a person who has not gone through
11  the process of registering to vote, but is using
12  somebody else's certificate to vote.
13     Q.  So the underlying premise, for lack of better
14  words, is they are using somebody else's identity to
15  cast a ballot?
16     A.  Correct.
17     Q.  Now, are you familiar at all with SB 14?
18     A.  Some of it.
19     Q.  Were you involved in any communications during
20  the legislative debates on SB 14?
21     A.  No, I wasn't involved in the communication.
22     Q.  Okay.  And let me be more specific on that.  Were
23  you involved in, for instance, communicating with the
24  governor's office regarding voter ID during the
25  legislative debates on SB 14?

75

1      A.  No, sir.
2      Q.  All right.  And again, were you involved in any
3   communication with any of the State agencies regarding
4   SB 14 during the legislative debates?
5      A.  No, sir.
6      Q.  And so how did you become familiar with SB 14?
7      A.  One of our responsibilities at the attorney
8   general's office is to review, you know, statutes.
9      Q.  Okay.
10     A.  So obviously, as kind of a criminal investigator
11  with -- that's charged with the responsibility of
12  looking at election laws, I looked at that one.
13     Q.  And so when you say, "review statutes," can you
14  tell me what you mean.  And specifically in terms of
15  voter ID legislation or SB 14, what would -- what would
16  your responsibility be in that respect?
17     A.  Just reviewing the proposed statutes.
18     Q.  Do you provide an analysis?  Do you provide a
19  summary of the -- of your review of SB 14?
20     A.  No.  I did not.
21     Q.  So help me understand.  Other than it being a
22  provision that deals with election code, what other
23  reasons would you have to look at it?
24     A.  And this is more broad.  In some cases we are
25  asked to do a bill analysis and assess a fiscal impact.

76

1      Q.  Were you asked to do a bill analysis for SB 14?
2      A.  No, sir.
3      Q.  Was anyone within your office asked to do a bill
4   analysis?
5      A.  I don't know.
6      Q.  Is that something that you would generally do
7   for -- let me narrow this down so it's easier.  Would
8   that be something that your office has done in the past
9   for voter ID legislation?
10     A.  I don't know if we have been asked to do that.
11     Q.  Who would be the entity that would make that
12  request?
13     A.  I believe it would come from our governmental
14  relations division.
15     Q.  And where is that division located within the
16  structure of the government?
17     A.  I mean, it would be within the intergovernmental
18  relations division within the office of the attorney
19  general.
20     Q.  Okay.  And so tell me a little bit about that
21  particular division, what do they do?
22     A.  They deal with other branches of State
23  government.
24     Q.  Specifically as it relates to voter ID
25  legislation, what would they -- what would their



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

77

1  responsibilities be?
2      A. They would serve as a liaison, I believe, between
3  the legislative branch and the office of the attorney
4  general. But I don't know their specific -- their
5  specific duties.
6      Q. So the intergovernmental division?
7      A. Intergovernmental relations division.
8      Q. Relations division. Did you have any
9  communications with that division regarding SB 14?
10     A. I don't believe so.
11     Q. And when I say, "you," I mean anyone within the
12  SIU. Are you aware of anyone who had communications
13  with the intergovernmental division?
14     A. Like I said, I would like to make a
15  clarification.
16     Q. Sure.
17     A. I think I may have been asked to provide my
18  spread sheets, at some point in time.
19     Q. And who asked you to provide the spread sheets?
20     A. I don't remember if it was my division chief or
21  someone within the intergovernmental relations division.
22     Q. Did you provide the spread sheets?
23     A. Yes, sir.
24     Q. When did you provide the spread sheets?
25     A. I routinely update those on about a monthly

---

78

1  basis. So I just provided them as requested.
2      Q. Okay. So help me understand. You said, "you
3  provide them as requested." You testified that you
4  recall being asked to provide your spread sheets,
5  correct?
6      A. Uh-huh.
7      Q. Were you asked to provide them on a monthly
8  basis?
9      A. I generally am asked almost on a monthly basis to
10  provide these. It could be for a public information
11  request. It could be a specific legislative request
12  or...
13     Q. Do you track who makes a request for your spread
14  sheets?
15     A. I don't. I -- public information request would
16  be tracked through our public information officer.
17     Q. What about request from legislatures?
18     A. Do I track that?
19     Q. Do you track that? "You," being you or your
20  office staff in your office?
21     A. Well, I would believe that the intergovernmental
22  relations division would track it.
23     Q. Do you track from your office, SIU, how many
24  times you produce the spread sheet?
25     A. No.

---

79

1      Q. Are you aware of any legislators that the spread
2  sheet had been provided to?
3      A. Yes.
4      Q. All right. And who was your spread sheet
5  provided to?
6          MR. SWEETEN: Okay. Here we're getting into
7  a potential area of privilege. I think the court's
8  order has said the transmission of information is fine,
9  but as to the identity of a legislator it -- he wouldn't
10  reveal that. So I think that would be subject to the
11  court's order on privilege.
12         MR. GEAR: And that's not my understanding
13  of the court's order. I think we've been asking,
14  generally through all these depositions the who, what,
15  when, where. It's the substance of that communication
16  that may be privileged.
17         MR. SWEETEN: Yeah.
18         MR. GEAR: Is my understanding.
19         MR. SWEETEN: But I think there's a separate
20  issue on -- and Risa and I discussed this yesterday. I
21  believe it is on Page 7 of the court's order. That
22  would prevent -- let me see if I can find that. Let me
23  go off the record.
24         MR. GEAR: Go ahead.
25         (Discussion off the record.)

---

80

1  BY MR. GEAR:
2      Q. So off the record we had a brief discussion of
3  privilege. There's been a determination that the
4  individual who requested the spread sheet from you has
5  waived that privilege. So let me go back to the
6  question. What was the name of the legislator that
7  requested the spread sheet?
8      A. First let me say that I don't communicate
9  directly with them at all. They communicate through our
10  intergovernmental relations division.
11     Q. Okay.
12     A. I was advised that Representative, I think his
13  name is Raphael Anchia, requested the spread sheet.
14     Q. Did you receive that request by e-mail? How does
15  that request come to you?
16     A. I don't specifically recall exactly how that one
17  request came in. It could have been through e-mail. It
18  could have been on the phone. I could have been
19  directed by my division chief. Most times it's either
20  on the phone or by e-mail.
21     Q. Do you recall when that request was made?
22     A. He's requested my spread sheets multiple times so
23  I don't know.
24     Q. Well, let's kind of break that down. Can you
25  give me a general time period for when he's requested



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

### 81

1    your spread sheets?
2        A.  He's requested updates on election
3    investigations.  I think dating back to like 2006 and
4    2007, all the way to the present.
5        Q.  Did you ever have any direct contact or
6    communication with Representative Anchia?
7        A.  No, sir.
8        Q.  Did anyone within your office have any direct
9    contact or communication with Representative Anchia
10   regarding the spread sheets?
11       A.  I don't know.
12       Q.  How would you produce those spread sheets to
13   Representative Anchia?
14       A.  I would send them electronically, via e-mail.  In
15   a PDF format.
16       Q.  Did you search your electronic files for any
17   e-mails dealing with your communications or dealing with
18   the production of the spread sheets that were given to
19   Representative Anchia?
20       A.  Yes, sir.
21       Q.  Did you find those?
22       A.  I found some.
23       Q.  And did you produce those to your attorney?
24       A.  Yes.
25       Q.  And are you aware of whether or not your office,

---

### 82

1    the SIU, or the attorney general's office for that
2    matter, had any communications with Representative
3    Anchia regarding SB 14?
4        A.  I did not have any communication with
5    Representative Anchia and I do not believe that anybody
6    in the special investigations unit had any
7    communications with Representative Anchia.
8        Q.  Are you aware of any communications with the
9    OAG's office with Representative Anchia?
10       A.  Yes, I am aware of communications between the two
11   offices.
12       Q.  Regarding SB 14?
13           MR. SWEETEN:  Don't speculate.  If you don't
14   know.
15       A.  I don't know for sure.
16       Q.  (By Mr. Gear) Do you know when that communication
17   took place?  Was it during the legislative session,
18   2011?
19       A.  Yes, sir, I believe so.
20       Q.  Do you know who initiated that communication?
21       A.  No, sir.
22       Q.  Do you know who that communication was with out
23   of the OAG's office?
24       A.  Again, it would be someone in our
25   intergovernmental relations division.  And potentially

---

### 83

1    also our public information division.
2        Q.  Are you aware of any communication with
3    Representative Anchia regarding any voter ID
4    legislation?  And I'm talking about from the SIU
5    division.
6        A.  Can you say that one more time?
7        Q.  Are you aware of any communication from the SIU
8    division, and of the -- from either you or any of your
9    staff to Representative Anchia regarding any of the
10   voter ID legislation.
11       A.  We don't communicate with the representatives.
12       Q.  So the answer to that is no?
13       A.  No.
14       Q.  Are you aware of any communications from the
15   intergovernmental -- is it special division?
16       A.  Intergovernmental relations division.
17       Q.  Relations division with Representative Anchia
18   regarding any of the voter ID legislation?
19           MR. SWEETEN:  Objection; asked and answered.
20   Go ahead.
21   BY MR. GEAR:
22       Q.  You can answer.
23       A.  I don't know.
24       Q.  Was that it?
25       A.  Yeah.  I don't know.

---

### 84

1        Q.  Okay.  Can you tell me what version of the spread
2    sheet was produced to Representative Anchia?
3        A.  The most current at the time.  As I said, I
4    update it monthly or as new referrals come in or as we
5    obtain new indictments new or judgments and sentences, I
6    update them at that time.
7        Q.  And when you say, "at the time," I'm trying to
8    get an idea of the time frame you're talking about here.
9    It was during the 2011 legislative session?
10       A.  I'm sorry.  What 2000 what.
11       Q.  '11 I believe you said?
12       A.  Yes, sir.  2011.
13       Q.  Okay.  And you said there were also periods prior
14   to that.  I think you said 2006, 2007, that you provided
15   him, "you," being your spread sheet has been provided to
16   Representative Anchia?
17       A.  If I could clarify?
18       Q.  Please do.
19       A.  Back in 2006 and 2007 it wasn't -- it wasn't a
20   spread sheet.  It was just a little summary of where we
21   got our referrals from.
22       Q.  Okay.  Did you produce that to your attorneys?
23       A.  Yes, sir.
24       Q.  Any other representatives or senators that you're
25   aware of that received a copy of the spread sheet?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

85

1    A. Not that I recall.
2       Q. So I was asking you about voter impersonation.
3    And I believe you said that was -- one of which was at
4    the poles.  And it was under Chapter 64.  Chapter 64,
5    does it cover more than just voter impersonation?
6       A. Yes, sir.
7       Q. Can you give me a general idea of the types of
8    violations covered under chapter 64?
9       A. 64 contains the illegal voting statute, which
10   there are four different types of illegal voting in the
11   State of Texas.
12          THE REPORTER:  Are you saying legal or
13   illegal?
14      A. Illegal, sorry.  Chapter 64 contains the four
15   different types of illegal voting.  It also contains
16   other provisions such as unlawful assistance and
17   prohibited conduct in polling places, such as
18   electioneering, lawyering, I believe candidate in a
19   polling place.
20      Q. When you say, "illegal voting," can you identify
21   that a little bit more?
22      A. Yes, sir.  There are different elements to
23   illegal voting.
24      Q. Okay.
25      A. One form of illegal voting is voter

---

86

1    impersonation.
2       Q. Okay.
3       A. Another form of illegal voting is a person who
4    votes more than once in an election.  Another type is a
5    person who is ineligible for election.  And the final
6    type is a person who marks a ballot contrary to the
7    instructions of the voter.
8       Q. So based on your familiarity with SB 14, what
9    type of violation would be covered under SB 14, the
10   provisions of SB 14?
11      A. The voter impersonation.
12      Q. Anything else?
13      A. I think that would be it.
14      Q. Has the Texas Attorney General made investigating
15   voter fraud one of his top priorities?
16      A. It is one of the -- on of our investigative
17   functions in our office.
18      Q. And the question was, is it a priority within
19   your office?
20      A. As much as any other priority.  And we have
21   multiple priorities.
22      Q. So is your answer, yes, it is one of the AG's
23   priorities?
24      A. I would say yes.
25          MR. SWEETEN:  Objection; asked and answered.

---

87

1    BY MR. GEAR:
2       Q. Can you tell me how long it's been one of the
3    priorities of the Texas Attorney General?
4       A. That, I don't know.
5       Q. Investigating election code violations, is it one
6    of the primary responsibilities of the special
7    investigation unit?
8       A. It's one of the investigative responsibilities of
9    the special investigations unit.
10      Q. But it would be the primary responsibility of the
11   elections team?
12      A. Correct.
13      Q. I want to change your focus about the referral
14   process and how that actually comes into the attorney
15   general's office.  Is there a provision of the Texas
16   election code that allows -- that sets out the process
17   for referrals?
18      A. Yes, sir, there are.
19      Q. And can you tell me generally what those are?
20      A. There's -- it's found in two places in the Texas
21   election code.  One indicates a direct referral from the
22   elections administrator themselves.  If they have reason
23   to believe that a voter has committed illegal voting.
24      Q. Okay.
25      A. The second is found in chapter 273 of the

---

88

1    election code, which talks about the investigations of
2    election code violations.  And it indicates that the
3    Secretary of State may refer a case to our office.  It
4    indicates that two voters themselves who file an
5    affidavit, sworn affidavit, can refer to our office.
6    And also local district attorneys and county attorneys
7    can file it with our office.
8       Q. So let me just kind of summarize that, if I can.
9    So there are referrals that come from the Secretary of
10   State's office?
11      A. That's correct.
12      Q. There are referrals that come from citizens and
13   local election officials?
14      A. Yes.
15      Q. There are referrals that come from law
16   enforcement agencies?
17      A. Yes.
18      Q. Including local DA's or local prosecutors?
19      A. Yes, sir.
20      Q. Are -- SIU, are they limited to election codes in
21   the State of Texas?  Do they investigate outside of the
22   state?
23      A. Oh, no, sir.
24      Q. So other than what we've just summarized about
25   how referrals come in, are there any other ways that



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 89

1   referrals could be received by the OAG's office?
2      A.  No, sir.
3      Q.  And who in the OAG's office is in charge of
4   receiving and maintaining election code violation
5   referrals?
6      A.  It depends on the source of the referral.
7      Q.  So there are various sources that you've
8   testified to?
9      A.  Correct.
10      Q.  So is there a different person responsible for
11   each source of referral?
12      A.  Yes, sir.  If it comes from the Secretary of
13   State's office, it currently goes to the director of law
14   enforcement.  If it comes from a local DA or prosecutor,
15   it would generally go to the criminal prosecutions
16   division.  If it comes from a direct referral from law
17   enforcement agency, it could come to the director of law
18   enforcement or it could come in to our peace officer
19   liaison.
20      Q.  Do you supervise all of these various entities?
21      A.  No.
22      Q.  Would you know when a referral has come into the
23   OAG's office?  Is there a way for you to keep track of
24   the various forms of referrals?
25      A.  Yes, sir.

## 90

1      Q.  And how do you do that?
2      A.  Through the spread sheet.
3      Q.  Okay.  And so who actually maintains that spread
4   sheet?
5      A.  I do.
6      Q.  So in order to maintain that spread sheet, if it
7   comes in, for instance through the director of law
8   enforcement, how would you actually know it came into
9   the office?
10      A.  He provides it to me.
11      Q.  Okay.  And so that's what I was trying to get at.
12   So there are various entities or sources that it would
13   come to.  They provide you with an electronic version of
14   the referral or do they provide you with paper copy or
15   both?
16      A.  I would say sometimes both.  They definitely
17   provide me with a written copy.
18      Q.  And is there a specific process in your office
19   for making sure you're provided with copies of the
20   referrals that come in?
21      A.  Yes, sir.
22      Q.  And what is that process?
23      A.  We have an internal computer system which is
24   called Webpass, which tracts referrals.
25      Q.  Webpass?

## 91

1      A.  Yes, sir, W-E-B-P-A-S-S.
2      Q.  Is there a specific program that you use to
3   maintain the spread sheet?
4      A.  I maintain the spread sheet through Excel.
5      Q.  Excel.  Does anyone else, or is anyone else
6   responsible within your office that maintains the spread
7   sheet?
8      A.  No, I'm the one who maintains the spread sheet.
9      Q.  And you've been doing that since 2005?
10      A.  No.  I want to say 2007, 2008, somewhere around
11   there.
12      Q.  So when you talked about Representative Anchia
13   back in 2006, that wouldn't have been the spread sheet
14   in the version that you're currently maintaining?
15      A.  That's correct.
16      Q.  And I believe you indicated -- I believe you
17   indicated that it was a summary.  And can you describe
18   what that summary would have looked like?
19      A.  Yes, sir.  It was a -- I believe it was a
20   WordPerfect document.  And it would identify the county
21   of the offense, the referral source, and then the
22   allegation.
23      Q.  At some point, was your spread sheet updated to
24   include violations from 2002?
25      A.  Yes.

## 92

1      Q.  And when did that happen?
2      A.  I would say the spread sheet, the information we
3   obtained on the 2002 cases, was probably around 2005.
4      Q.  I'm not sure I understand your testimony now,
5   because you said in 2000 -- 2006 when there was
6   communication with Representative Anchia there was no
7   spread sheet in the current form, correct?
8      A.  Correct.
9      Q.  And so that would have been in the form of a
10   WordPerfect summary of referrals that have come into the
11   OAG's office.  Is that fair to say?
12      A.  Yes, sir.
13      Q.  Okay.  And so you believe that -- now you're
14   saying that in 2005, the spread sheet would have been
15   updated?
16      A.  If I could clarify.
17      Q.  Please.
18      A.  I found -- or obtained the information in 2005
19   about the 2002 cases, but it was for a different
20   purpose.
21      Q.  And what was that purpose?
22      A.  It was to identify the geographical regions in
23   Texas that had election code violations.
24      Q.  And when you say you, "found or obtained the
25   information," what do you mean by that?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 93

1      A.  I queried our mainframe system to determine the
2  election cases that we had on file.
3      Q.  And why were you trying to determine the
4  geographical area of violations?
5      A.  To conduct -- to do a geographic analysis to
6  determine where we would conduct training.
7      Q.  Okay.  And we'll get into the training a little
8  bit later.
9      A.  Yes, sir.
10      Q.  So I think I understand the process by which
11  referrals come into your office.  They come into
12  different sections depending on the source of the
13  referral, correct?
14      A.  Yes, sir.
15      Q.  Is there a specific individual that conducts the
16  intake of these referrals?  Does that make sense?
17      A.  There are different people conducting the intake,
18  depending on where the referral source is.
19      Q.  And you've testified to that already, correct?
20      A.  When it comes -- when it's identified as an
21  election violation referral, it comes to me and then I
22  conduct an intake.
23      Q.  And what is your intake process?
24      A.  I obtain and review the referral packet and I
25  identify the county of the offense, the election

## 94

1  involved, the referral and the nature of the
2  allegation.
3      Q.  And you also update your spread sheet, as I
4  understand it?
5      A.  That's correct.
6      Q.  Do referrals -- are they automatically given a
7  complaint number or a tracking number?
8      A.  They are given -- yes, they are given what we
9  call a call for service number.
10      Q.  And at that point, are they considered an
11  official investigation or is that just simply to track
12  the file as it moves through the system?
13      A.  It's to track the file.
14      Q.  Are there -- is it -- has it occurred within
15  your office where a referral has been given a call for
16  service number, but it didn't actually generate into an
17  official investigation?
18      A.  Yes, sir.
19      Q.  Who makes the actual decision to investigate or
20  not to investigate?
21      A.  It's a multi-person decision.
22      Q.  Help me understand it.
23      A.  Okay.  The division chief or the major is
24  required to approve it.
25      Q.  Is that you?

## 95

1      A.  That would be me now.  The captain, the
2  lieutenant, and then the director of law enforcement as
3  well.
4      Q.  So does that occur during a meeting or is there
5  e-mail communication that's passed between the
6  individuals you just testified about?  How is that
7  decision actually made?
8      A.  It's generally meetings.
9      Q.  Okay.  And so is that a weekly meeting, monthly
10  meeting, how do these meetings occur?
11      A.  Generally as referrals come in.
12      Q.  Okay.  Do you wait until you have a certain
13  number of referrals or is it each referral?
14      A.  It's generally each referral.
15      Q.  All right.  And so during this meeting what is
16  actually discussed regarding the referral?
17      A.  The first thing that's discussed and evaluated is
18  what -- what kind of offenses are they.  We have a
19  practice that some of the referrals that we get are
20  class C misdemeanors.
21      Q.  Okay.
22      A.  And those are fine-only offenses.  And all
23  election cases are labor intensive and so we generally
24  discuss the fact that this is a class C misdemeanor and
25  so we don't investigate those.

## 96

1      Q.  And who would investigate the class C
2  misdemeanors, if anyone?
3      A.  The local jurisdictions like sheriff's
4  departments, police departments, local county attorneys.
5      Q.  So is there a determination made at that meeting
6  whether or not to refer it back to the referring source?
7      A.  Right.  If we determine that it's a class C
8  misdemeanor then we will say we do not have the
9  resources to investigate this.  Suggest contacting your
10  county attorney or local law enforcement officials.
11      Q.  Does your spread sheet indicate which ones are
12  referred back or whether there was a determination not
13  to investigate?
14      A.  No, sir.
15      Q.  Do you keep a separate tracking system of what
16  has been closed, essentially in your office and referred
17  back to the referring source?
18      A.  Webpass may have that indication in it.
19      Q.  Did you produce that information to your
20  attorney?
21      A.  No, I did not.
22      Q.  So as I understand it, Webpass would indicate the
23  determination on how that case would be handled within
24  the OAG's office or the SIU's office; is that correct?
25      A.  If we advised that we were not going to



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

97

1   investigate a class C misdemeanor, yes.
2       Q.  Okay.  Once it's referred back, is there any
3   additional tracking down by your office?
4       A.  No, sir.
5       Q.  Does the Texas OAG's office ever initiate its own
6   investigations of alleged election code violations?
7       A.  No, sir.
8       A.  It's 100 percent referral based?
9       A.  It is referral driven.
10      Q.  Are the referrals in the Texas OAG's office or
11  the SIU maintained by subject matter or category?
12      A.  No, sir.
13      Q.  Are they maintained by county or by agency
14  referring agency?
15      A.  We generally maintain them by county and whether
16  or not there's SOS referrals or whether or not they're
17  other referrals.
18      Q.  Is it possible to search within your mainframe
19  database to determine the exact number of referrals from
20  the SOS, for instance?
21      A.  Yes, sir.
22      Q.  And then it -- if I understood you correctly, the
23  other search would be for others.  And is it possible to
24  determine the other source for referrals?
25      A.  Yes, sir.

98

1       Q.  Okay.
2       A.  If I could clarify?
3       Q.  Please.
4       A.  The ability to search all of the election
5   violations will require like a -- it will just
6   categorize it as an election violation and I will have
7   to go through manually and determine whether or not it
8   was an SOS or a other referral.
9       Q.  So it would require manual search?
10      A.  Right.
11      Q.  Okay.
12          (Exhibit No. 584 was marked.)
13  BY MR. GEAR:
14      Q.  I've shown you what has been marked as
15  Exhibit 584.  Take your time and take a look at this.
16      A.  Yes, sir.
17      Q.  So first of all, I want to see if -- have you
18  reviewed these types of documents before?
19      A.  These types of documents, but not specifically
20  this document.
21      Q.  Okay.  And what is this?
22      A.  This is a -- I would call this a press release.
23      Q.  And it comes directly out of the attorney
24  general's office?
25      A.  That's correct.

99

1       Q.  All right.  And when I say the attorney general,
2   I mean Greg Abbott in 2005?
3       A.  Yes, sir.
4       Q.  Okay.  And do you see the date on this, Friday
5   June 3, 2005?
6       A.  Yes, sir.
7       Q.  All right.  This indicates -- actually let me do
8   something else just to make this go a little smoother.
9   You've testified routinely about the existence of a
10  spread sheet, correct?
11      A.  Yes, sir.
12      Q.  All right.  Let me mark this, please.
13          (Exhibit No. 585 was marked.)
14  BY MR. GEAR:
15      Q.  I'm showing you what's been marked as
16  Exhibit 585.  And I just asked you to take a look at
17  that and identify it for the record, please.
18          MR. SWEETEN:  Bruce, can I get a copy of
19  that?
20          MR. GEAR:  I do not have an extra copy of
21  that.  I don't not, sorry.  I can make a copy if you
22  want to do that.
23          MR. SWEETEN:  Let's just do it at the break.
24  BY MR. GEAR:
25      Q.  Is this the spread sheet that you've been

100

1   referring to?  And to be fair, this may be a series of
2   spread sheets and I'm just trying to understand what
3   exactly they are.
4       A.  If you could just give me a moment.
5       Q.  Sure.
6       A.  Yes, sir.  They appear to be the spread sheet
7   I've been referencing.
8       Q.  Okay.  Now, are all of these maintained by you,
9   created by you?
10      A.  Yes, sir.
11      Q.  And this would be a version that was if I'm
12  correct, and correct me if I'm wrong, that was printed
13  in 2012.  Do you see the date on the bottom of the
14  spread sheet?
15      A.  Yes, sir.
16      Q.  And to be accurate, it was March 12th of 2012?
17      A.  Yes, sir.
18      Q.  And there's also another version here that was
19  printed on March 9th of 2012.  And it would be the
20  election code referrals to the office of the attorney
21  general August 2002 to the present.  Do you see that
22  particular version they I'm talking about?
23      A.  Yes, sir.
24      Q.  And would these have been printed by you?
25      A.  They would be electronically published by me.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

101

1    Q.  Okay.  And when you say, "electronically
2  published," do you publish these spread sheets on any
3  particular system?  Do you make them publicly available?
4    A.  If I could explain?
5    Q.  Sure.
6    A.  I maintain an Excel spread sheet that has three
7  different books.  One book is specifically for
8  referrals.  One book is specifically for prosecution
9  resolved.  And one book is for charges pending.  And
10  then I publish to a PDF any one of those three books or
11  a combination of all three or all three.
12    Q.  And when you say, "publish to a PDF," where does
13  that go?
14    A.  It could go to somebody in our open records
15  division who has requested a copy.  It could go to our
16  intergovernmental relations division.
17    Q.  So if a news agency wanted a copy of your spread
18  sheets, then that would be published and released to the
19  news agency?
20    A.  Yes, sir.
21    Q.  Okay.  When news -- have news agencies made
22  request for your spread sheets in the past?
23    A.  Yes, sir.
24    Q.  And other than the spread sheet, do you provide
25  them with any additional information?

102

1    A.  No, sir.
2    Q.  So it's generally the spread sheet that is
3  publicly released when requested?
4    A.  Yeah.  If I could clarify.
5    Q.  Please.
6    A.  Unless they specifically asked for another
7  document, such as a charging instrument or indictment or
8  judgments or sentence.
9    Q.  And those --
10    A.  In some cases they do ask for those as well as
11  the spread sheets.
12    Q.  Okay.  All right.  So now you have your spread
13  sheet in front of you that you've identified.  And let
14  me actually clarify something.  You said there were
15  three different versions of the spread sheet or three
16  different books:  The referrals, the prosecutions and
17  pending.  Can you identify for me, are there three
18  different versions here or three different books or is
19  this all from one of these versions of the spread sheets
20  that you have testified?
21    A.  This is one spread sheet which contains three
22  books.
23    Q.  Okay.  And so looking at the spread sheet, it
24  starts with TX 000056816.  Could you -- I'm trying to
25  get you to identify the books for me that are contained

103

1  within the spread sheet?
2    A.  Referral TX 0056816, contains the charges pending
3  resolution.
4    Q.  And how far does that -- how many pages is that?
5    A.  It's two-pages, sir.
6    Q.  Okay.  So the next set of spread sheet would be
7  TX 0056818.  And that indicates election code referrals
8  to the office of the attorney general, prosecutions
9  resolved.  Is that accurate?
10    A.  My Bates stamp is cut off on that.  But this
11  document contains the prosecutions resolved.
12    Q.  And how many pages is that?
13    A.  Contains five pages, sir.
14    Q.  Okay.  And then the -- there's another spread
15  sheet that indicates on -- starts with TX 0056823.  It
16  indicates on the top, election code referrals to the
17  office of the attorney general, August 2002 to the
18  present.  Do you see that one?
19    A.  Yes, sir.
20    Q.  And which one would this represent?
21    A.  This one represents the referrals.
22    Q.  And so I see that this is 2002 to 2012.  Is that
23  accurate?
24    A.  Yes, sir.
25    Q.  So during the 2011 session, this would not have

104

1  been the spread sheet that was provided to
2  Representative Anchia?
3    A.  Yes, that would be incorrect.
4    Q.  That would be incorrect?
5    A.  I'm sorry.  This would not be the spread sheet
6  that was provided to Representative Anchia.
7    Q.  It would have only included the 2011 referrals?
8    A.  Up to the most current, at the time of the
9  request.
10    Q.  And I believe I asked you and I'm sorry if I did,
11  do you recall when you provided him a copy -- there were
12  multiple occasions, but in 2011, do you recall the time
13  period you provided to him these spread sheets?
14    A.  It may have preceded the legislative session and
15  it would have -- but we can provide him continuous
16  updates.  So he made multiple request.
17    Q.  And you said, "it may have preceded the
18  legislative session."  Could it have been during the
19  legislative session?
20    A.  Yes, sir.
21    Q.  Okay.  All right.  Do you know if he got a copy
22  of the March 12, 2012 version?
23    A.  I don't know.
24    Q.  You don't know.  Okay.  So turning your attention
25  back to Exhibit 584, I believe, which is the press



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

| 105 | 107 |
|---|---|

**105**

1  release from Attorney General Greg Abbott.  It indicates
2  on here that the attorney general's office announced the
3  first indictments for alleged voter fraud in Texas.
4  Would 2005 be the -- be the time period in which the
5  first indictments were issued from regarding voter
6  fraud?
7      A.  I don't know that.
8      Q.  Okay.  And 2005 would have been when you came on
9  board for the SIU?
10     A.  That's correct.
11     Q.  Do you know how these press releases are created,
12  how they're generated?
13         MR. SWEETEN:  Objection; calls for
14  speculation.
15  BY MR. GEAR:
16     Q.  Go ahead.  Do you know how?
17     A.  No, not really.
18     Q.  Okay.  Are you involved in the information that's
19  contained within this particular press release?
20     A.  No.
21     Q.  Would you ever be asked for information prior to
22  the release of these particular press releases?
23     A.  Occasionally, yes.
24     Q.  So the information that these -- that at least
25  the 2005 press release is addressing, is election code

**107**

1  ballot or carrier envelope of another.
2      Q.  And that's indicated in the press release as
3  well, Exhibit 584?
4      A.  In the press release it does not indicate that he
5  has plead guilty.  It only indicates that he has been
6  charged with possession of a mail-in ballot.
7      Q.  And just so that we clarify this as we move
8  along, would this have been chapter 64 or would it have
9  been a different chapter?
10     A.  This would have been chapter 86 or 84.
11     Q.  And that would not have involved voter
12  impersonation, correct?
13     A.  No, it would not have involved voter
14  impersonation.
15     Q.  There is a second indictment that's discussed
16  here on May 27, Beeville resident, Melva Kay Ponce, do
17  you see that?
18     A.  Yes, sir, I do.
19     Q.  And generally, can you tell me, does this
20  allegation involve voter impersonation?
21     A.  Yes, sir, it does.
22     Q.  And looking at Exhibit 584, can you explain to me
23  what the facts are?
24     A.  Melva Kay Ponce utilized her mother's mail-in
25  ballot to cast a vote in the 2004 general election.

**106**

1  violations, correct?
2      A.  Yes, sir, it is.
3      Q.  And would you have provided information regarding
4  these election code violations?
5      A.  Not for this press release.
6      Q.  Okay.  So the first violation that's referenced
7  in here is the Hardeman County, Precinct 1, Commissioner
8  Johnny Akers, do you see that?
9      A.  Yes, sir, I do.
10     Q.  All right.  And looking at Exhibit 585, which is
11  your spread sheet, do you see that referenced in --
12  within your spread sheet?
13     A.  Yes, sir, I do.
14     Q.  And specifically turning your attention to
15  TX 0056818, is that the page that you're looking at?
16     A.  Again, the Bates stamp is cut off on this one.
17  But it is Page 1 of the prosecutions resolved.
18     Q.  All right.  And can you tell me what happened
19  with the -- what were the facts of the Johnny Akers
20  case?
21     A.  He was -- the allegation is that he was handling
22  mail-in ballots during the course of the election.  And
23  he was charged with six counts of possession of official
24  ballot or carrier envelope of another.  And then he
25  plead guilty to one count of possession of an official

**108**

1      Q.  So that's a by mail violation?
2      A.  It's a by mail voter impersonation, yes, sir.
3      Q.  Would that have been covered under the provisions
4  of SB 14?  Would it have been prevented if SB 14 was in
5  place?
6      A.  No, sir.
7          (Exhibit No. 586 was marked.)
8  BY MR. GEAR:
9      Q.  Just so I'm clear, both Akers and Ponce dealt
10  with by mail ballot fraud?
11     A.  Yes, sir.
12     Q.  I'm showing you what's been marked as
13  Exhibit 586.  And take your time and take a look at
14  that.  Generally, just so we can move along, you
15  indicated that Mr. Akers plead to the charge?
16     A.  Yes, sir.
17     Q.  Do you know what he plead to?
18     A.  Plead guilty to one count of possession of
19  official ballot or carrier envelope of another.
20     Q.  And the Exhibit I just handed you, the press
21  release from Greg Abbott indicates what he plead to?
22     A.  Yes, sir.
23     Q.  Okay.  And again, just so I'm clear on the
24  record, this is another press release from the attorney
25  general's office?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

### 109

1    A.  Yes, sir.
2    Q.  And the date of the press release is
3  November 7th, 2005?
4    A.  Yes, sir.
5    Q.  All right.
6        (Exhibit No. 587 was marked.)
7  BY MR. GEAR:
8    Q.  All right.  So I'm showing you what's been marked
9  as Exhibit 587.  Take your time and then identify what
10  it is for me, please.
11    A.  Okay, sir.
12    Q.  Can you identify that for me, please?
13    A.  This appears to be a press release regarding
14  indictments against four Nueces County voters.
15    Q.  And the date of the press release?
16    A.  Would be December 19, 2005.
17    Q.  Okay.  And it indicates who was indicted within
18  the press release?
19    A.  Yes, sir, it does.
20    Q.  And can you tell me who was indicted?
21    A.  Elida Garza Flores, Isabel Rios Gonzales,
22  Josefina Marinas Suarez and Virginia Ramos Garza.
23    Q.  And so either looking at your spread sheet or at
24  Exhibit 587, can you tell me what the facts of that
25  indictment were?

### 110

1    A.  Okay.  This case was a 2005 school district
2  election.  And it would have been referred to our office
3  by the Secretary of State's office.  And it involved
4  mail-in ballot fraud.  And when I mean mail-in ballot
5  fraud, it involves the unlawful handling of the mail-in
6  ballots and also unlawful assistance in assisting the
7  voter in the preparation of those ballots or the
8  application to obtain those ballots.
9    Q.  So if I'm correct, this would not have been
10  chapter 64, which deals with voter impersonation,
11  correct?
12    A.  It potentially could have been.
13    Q.  Turning your attention to Exhibit 587, do you see
14  where it says the indictments apply to violations of
15  chapter 86?
16    A.  Yes.
17    Q.  Any reason to dispute that?
18    A.  No, sir.
19    Q.  Okay.  And turning to your spread sheet, do you
20  see those individuals indicated on your spread sheet?
21    A.  Yes, sir, I do.
22    Q.  And can you tell me, ultimately, what the
23  determination was on these cases, were they resolved?
24    A.  Yes, they were resolved.  Virginia Ramos Garza
25  accepted a one-year pretrial diversion, which involved

### 111

1  12 months of community supervision.  Elida Garza Flores
2  also accepted a one-year pre-trial diversion in which
3  she received 12 months of community supervision.
4  Isabel Lisa Rios Gonzalez pleaded no contest to two
5  counts of possession of an official ballot or carrier
6  envelop of another, and received one-year deferred
7  adjudication.
8    Q.  All right.  And so I want to ask you, there's a
9  couple of things that you said that I didn't completely
10  understand.  A class C or class E misdemeanor, what does
11  that actually mean?
12    A.  We have three claims of misdemeanor offenses in
13  the State of Texas.  We have a class C misdemeanor, a
14  class B misdemeanor and a class A misdemeanor.  A class
15  C is punishable by fine only.  And I believe the fine is
16  $500 or less.  A class B is punishable by up to six
17  months in a county correctional facility and a fine, I
18  think $2,000 or less.  And then a class A misdemeanor is
19  punishable by up to one year in a county correctional
20  facility and a fine of $4,000 or less.
21    Q.  So class C and class E, they non-criminal
22  offenses?
23    A.  We don't have a class E.  Class B, as in Brava.
24    Q.  Okay.  Class B, is that a non-criminal offense?
25    A.  No, sir, that's a criminal offense.

### 112

1    Q.  So focusing on class C then, you previously
2  testified that if there was a determination that it was
3  a class C offense, it would be referred back to the
4  referring agency?
5    A.  Yes, sir.
6    Q.  So would that then, be a non-criminal offense or
7  is it just -- you tell me.
8    A.  It's a criminal offense.  However, it's only
9  punish able by fine only.
10    Q.  Okay.  Would that be considered an ordinance
11  under Texas law?
12    A.  Ordinances passed by city councils or county
13  commissioner's courts are also potential class C's only.
14  They don't involve jail time.
15    Q.  And those would also be referred back if they
16  came to your office?
17    A.  We wouldn't investigate municipal or county
18  ordinances.
19    Q.  Okay.  But local election officials could refer
20  various allegations to you regarding election code
21  violations; isn't that correct?
22    A.  Local officials could refer election cases to us.
23    Q.  Okay.  Do they ever refer allegations that would
24  fall under the class C or ordinance type violations?
25    A.  Yes, they do.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

| 113 | 115 |
|---|---|

### 113

1  Q.  Okay.  And those would not be investigated by
2  your office?
3  A.  Not now, no.
4  Q.  Okay.  When you say, "not now," let me understand
5  that.  Was there ever a time when you actually
6  investigated class C or ordinance-type violations?
7  A.  When -- in some of these referrals that come into
8  our office, they include a whole host of allegations.
9  Q.  Okay.  Including class Cs?
10  A.  Including class Cs.  And so if we were already
11  there investigating other offenses, we would address the
12  class C, but we would not initiate a case just off of a
13  class C.
14  Q.  Okay.  That's understandable.  All right.  And so
15  turning back to, I believe it's Exhibit 587, with the
16  four indictments, that was indictments for chapter 86,
17  and that's by mail ballot or fraud; is that correct?
18  A.  That's correct.
19  Q.  And that would not have included voter
20  impersonation?
21  A.  It potentially could have.
22  Q.  But again, the press release indicates that the
23  violations apply to chapter 86?
24  A.  The press release does say that they were
25  indicted for mail-in ballot, yes.

### 115

1  on two counts of possession of an official ballot or
2  carrier envelope of another, received one year
3  adjudication, a $500 fine and 12 months community
4  supervision.  Josefina Suarez also pled guilty to one
5  count of illegally possession of an official ballot or
6  carrier envelope of another, received one year
7  adjudication, a $500 fine and was sentenced to 12 months
8  community supervision.
9  Q.  What does deferred -- retrial diversion mean?
10  A.  Pretrial diversion is an agreement between the
11  defense attorney and the prosecuting attorney to some
12  sort of alternative punishment without any finding of
13  guilt.
14  Q.  So in the case of Ms. Garza, Ms. Flores,
15  Ms. Gonzales, there was no finding of guilt?
16  A.  With Garza and Flores, they both accepted a
17  pretrial diversion so there was no court finding.
18  Q.  And then for Ms. Gonzales?
19  A.  She plead no contest.
20  Q.  Which is not an admission of guilt, correct?
21  A.  Correct.
22  Q.  And for Ms. Suarez, she pled guilty?
23  A.  That's correct.
24      (Exhibit No. 588 was marked.)
25  BY MR. GEAR:

| 114 | 116 |
|---|---|

### 114

1  Q.  And so when you keep -- you testified several
2  times that it potentially could have.  What do you mean
3  by that?
4  A.  I mean that one of the schemes of conduct that we
5  have seen in mail-in ballot fraud, and examples by
6  Melva Kay Ponce, is that she impersonated her mother.
7  And some cases, some of the mail-in ballot case that we
8  examined, campaign workers will obtain a blank ballot
9  from the voter and then cast those ballots as if they
10  were the voter.
11  Q.  And again, that's through the by mail ballot
12  system?
13  A.  That is correct.
14  Q.  And that would not have, as I understand your
15  testimony, been covered by -- if SB 14 was implemented?
16      MR. SWEETEN:  Objection; calls for
17  speculation.
18  A.  That is also correct.
19  Q.  (By Mr. Gear)  And your answer was?
20  A.  No, it would not.
21  Q.  Okay.  And I'm sorry if I got off track.  Can you
22  tell me, did you testify to what the conviction was, if
23  any?
24  A.  I got the -- I got the first two down.  The final
25  two Isabel Lisa Rice Gonzales pled no contest.  And was,

### 116

1  Q.  Showing you what's been marked as 588.  Take your
2  time and then identify that document for me, please.
3  A.  Okay, sir.  This document appears to be a press
4  release that was issued in Friday -- on Friday
5  January 13, 2006 by the office of the attorney general.
6  Q.  Okay.  And do you see the individual who was
7  indicted in this press release?
8  A.  Yes, sir, I do.
9  Q.  You say the name for the record?
10  A.  There were actually two persons indicted in this
11  case.  That would be Anita Baeza and Trinidad
12  Villalobos.
13  Q.  Okay.  So starting with Ms. Baeza, indicates that
14  she's a 68-year old mother of the sheriff's officer
15  candidate Jeffery Baeza.  Can you tell me what the
16  allegation is for her?
17  A.  This move involved mail-in ballot fraud.
18  Q.  And I just say for the record, you refer to your
19  spread sheet?
20  A.  Correct.
21  Q.  So again, this is mail-in ballot fraud?
22  A.  Yes, sir.  In the 2006 primary election.  No.
23  I'm sorry.  Incorrect.  The 2004 primary election.
24  Q.  And there was another individual that you
25  indicated, Villalobos?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 117

1     A. Yes, sir. Trinidad Villalobos.
2     Q. And can you tell me what the allegation for that
3  was?
4     A. Also mail-in ballot fraud.
5     Q. From the same election?
6     A. Referring to my spread sheet, it was the 2004
7  primary election yes, sir.
8     Q. So both were the 2004 primary election. Can you
9  tell me generally what the allegations of this
10  indictment were?
11     A. This again, goes to persons who were assisting in
12  the application for mail-in ballots during the early
13  voting in that election. And then also, once early
14  voting started assisted in either the completion of the
15  ballot or the handling of the ballot.
16     Q. And if I'm correct, these would have been under
17  chapter 86, dealing with mail-in ballot fraud?
18     A. Yes, sir 86006.
19     Q. And do you know what the outcome of these
20  indictments were?
21     A. Trinidad Villalobos was found guilty by a jury on
22  four counts of possession of mail-in ballot or carrier
23  of another. She received ten days in jail. And she was
24  sentenced to six months of probation. And then Anita
25  Baeza accepted six months of pretrial diversion.

## 118

1     Q. And again, neither of those dealt with voter
2  impersonation. Or let me put it a different way so it's
3  easier for you to understand, perhaps. Both of those
4  dealt with chapter 86 of the election codes?
5     A. Yes, sir, that's what they were charged with.
6     Q. And neither of them pled to a charge of voter
7  impersonation?
8     A. That's correct, sir.
9     Q. Okay. It also says at the bottom of, I believe
10  Exhibit 588, that in December, four individuals were
11  indicted for illegally possessing and transporting
12  election ballots following the 2005 ISD election in, is
13  it Nueces County?
14     A. Yes, sir, that's correct.
15     Q. And that's what we've previously referred to in
16  your testimony?
17     A. Yes, sir, the 2005 Robstown independent school
18  district election. On the chart, it's listed as the
19  2005 school district election.
20     Q. Okay. And it also says, the paragraph underneath
21  that attorney general obtained a guilty plea from Bee
22  County woman accused of voter fraud. And the Bee County
23  woman this is referring to would be Melva Ponce, is that
24  accurate?
25     A. Yes, sir. Melva Kay Ponce.

## 119

1     Q. Okay. So far is, it fair to say that all of
2  these violations dealt with by mail ballot fraud?
3        MR. SWEETEN: Objection; asked and answered.
4  Objection; compound. You can answer.
5     A. These all involved mail-in ballot fraud, which
6  could potentially involve voter impersonation.
7     Q. You keep indicating that, but these were charged
8  under chapter 86, correct?
9        MR. SWEETEN: Objection; argumentative.
10  BY MR. GEAR:
11     Q. Well, were they charged under chapter 86?
12     A. They were charged under chapter 86. Yes, sir.
13     Q. Chapter 86 does not include voter impersonation,
14  correct?
15     A. Well Melva Kay Ponce was charged with voter
16  impersonation.
17     Q. But it was through the by mail ballot system?
18     A. That's correct.
19     Q. And again, I believe you testified that that
20  would not have been prevented if SB 14 was in place?
21        MR. SWEETEN: Objection; calls for
22  speculation.
23  BY MR. GEAR:
24     Q. You can answer.
25     A. I don't believe it would have.

## 120

1        (Exhibit No. 589 was marked.)
2  BY MR. GEAR:
3     Q. Showing you what's been marked as Exhibit 589.
4  Take a second to look at this, please.
5     A. Okay, sir.
6     Q. Can you tell me what this?
7     A. Sir, appears to be a press release issued by the
8  Texas Attorney General's office regarding a training
9  initiative our office was conducting.
10     Q. And the date of the press release?
11     A. Wednesday January 25, 2006.
12     Q. And before we talk about this, I would like to
13  talk about your spread sheet. From -- the SIU was
14  established in 2005, correct?
15     A. Yes, sir.
16     Q. And what month in 2005?
17     A. I want to say June.
18     Q. June of 2005. So between June 2005 to
19  January 25th of 2006, how many referrals did the OAG's
20  office receive?
21     A. I'm sorry. Could you repeat that one more time?
22     Q. Between June of 2005, the establishment of SIU,
23  to January of 2006, the date of this press release, how
24  many referrals were received by the OAG office? And can
25  you tell that based on your spread sheet?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Major Forrest Mitchell                                    June 15, 2012

---

## 121

1    A.  Yes, sir I could tell the referral that we
2  received from the SOS.
3    Q.  Okay.  And how many referrals were those?
4    A.  To January 2006?
5    Q.  Yes, sir.
6    A.  Six, sir, in the Secretary of State's office.
7    Q.  And I believe that you said -- do one of these
8  spread sheets show the other referrals?
9    A.  Yes, sir, it does.
10    Q.  And which portion of the spread sheet or which
11  Bates stamp number would that be?
12    A.  My Bates stamp number is partially cut off.
13    Q.  And I apologize for that.
14    A.  But it would start on Page 6 with a title heading
15  selection code referrals of the office of the
16  attorney general -- August 2, 2002 to present.
17    Q.  What's the Bates stamp number on the bottom?
18    A.  I have, it starts with TX 0005682.
19    Q.  And the top is election code referrals to the
20  office of the attorney general, prosecutions revolved,
21  or am I looking at the wrong one?
22    A.  I believe you're looking at the wrong one.  It
23  would be election code referrals to the office of the
24  attorney general, August 2, 2002 to the present, Page 6.
25  It was published 3/9/2012.

## 123

1  sources.
2    Q.  Eight?
3    A.  Eight.
4    Q.  Okay.  Turning your attention back to 589,
5  indicates that, "the Attorney General Greg Abbott
6  launches initiative training -- training initiative to
7  identify, prosecute, prevent voter fraud."  Was that
8  initiative launched in 2005 or was it launched in 2006?
9    A.  It was initiated in late 2005 and finalized in
10  the first part of 2006.
11    Q.  Okay.  And so the initiative -- what did the
12  initiative involve?  And you can refer to 589 if you
13  would like to.
14    A.  It involved developing, first of all, identifying
15  geographical regions in the State of Texas where the
16  office had previously investigated and prosecuted
17  allegations of election misconduct.  It involved the
18  development of a law enforcement outreach training
19  program.  And then it involved scheduling and conducting
20  training to law enforcement officers in Texas.
21    Q.  Before we get into the various categories, were
22  there training materials produced or created as a result
23  of this initiative?
24    A.  Yes, sir.
25    Q.  And were those training materials specific to the

## 122

1    Q.  All right.  And so I believe your testimony was
2  there were six referrals from the Secretary of State's
3  office.  Between that time period, how many from other
4  sources?
5    A.  I wouldn't be able to determine this off the
6  spread sheet.
7    Q.  How would you make that determination then?
8    A.  I would have to go back and look at the call for
9  service.
10    Q.  Okay.  Does this give you a general ball park of
11  the number of referrals?
12    A.  I would say yes, because there were only two
13  elections that occurred in -- based off this document in
14  2005.
15    Q.  Okay.  And so how many referrals are we talking
16  about then, in a general ball park basically?
17    A.  It would be two.
18    Q.  Two.  So we're talking about a total of seven
19  referrals from the date of the establishment of the SIU
20  to the date of this press release, which is January 25,
21  2006.  Is that fair to say?
22    A.  I believe I said there were six referrals from
23  the Secretary of State's office.
24    Q.  Okay.
25    A.  And then there appears to be two from other

## 124

1  different agencies that you were focusing on or was
2  there just one general training -- source of training
3  material?
4    A.  Just one source of training.
5    Q.  Okay.  And were these training materials turned
6  over or provided to the different agencies that the
7  training was conducted?
8    A.  I believe a -- I believe a copy of the PowerPoint
9  presentation would have been provided as an instructor
10  note -- or class notes.
11    Q.  Who created the PowerPoint presentation?
12    A.  It was a combined effort of multiple
13  investigators.
14    Q.  Including yourself?
15    A.  Yes.
16    Q.  Were you in charge of the ultimate message or the
17  material that was produced in the PowerPoint
18  presentation?
19    A.  No, I was not in charge at the time.
20    Q.  Now, this training initiative in Exhibit 589, it
21  indicates that it targeted 44 key counties that either
22  have a history of voter fraud or the population of which
23  exceeds 100,000.  Do you see that?
24    A.  Yes, sir.
25    Q.  Can you tell me, as of this date, how many

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

### 125

1    different counties have been provided training by the
2    attorney general's office?
3        A.  As of today's date?
4        Q.  As of today's date.
5        A.  I couldn't -- I don't know.
6        Q.  More than 44 counties?
7        A.  I don't recall.
8        Q.  Okay.  And just to be fair, and I'm trying to
9    understand this initiative.  You were the lead
10   investigator of the supervisor of the SIU, correct?
11       A.  At the time I was the lieutenant and Greg Lucus
12   was the captain over the unit.
13       Q.  Okay.  Would you have been involved in any
14   aspects of the training?
15       A.  Yes, I was involved in some of the training.
16       Q.  And that would have been to go out into the field
17   and provide the training?
18       A.  Yes, sir.
19       Q.  All right.  And how many investigators were
20   involved in providing training?
21       A.  I don't recall.
22       Q.  Do you have a general idea of the number of
23   investigators?
24       A.  It would just be a guess.  And it would be,
25   perhaps ten.

---

### 127

1    Through the SIU or through the OAG's office, was there a
2    training established for local election officials?
3        A.  No, sir.
4        Q.  Do you see in the fourth paragraph again, where
5    it's talking about 44 key counties including 18 cities
6    where the attorney general has previously investigated
7    or prosecuted alleged election code violations, do you
8    see that paragraph?
9        A.  Yes, sir.
10       Q.  The 44 counties contain 78 percent of eligible
11   registered voters in Texas.  Do you see that?
12       A.  Yes, sir.
13       Q.  Any reason to dispute that?
14       A.  No, sir.
15       Q.  Underneath it indicates that, "earlier this
16   month, two Reeves County women were indicted on charges
17   of illegally possessing an transporting election ballots
18   of several voters."  Do you see that?
19       A.  Yes, sir.
20       Q.  Looking at your spread sheet, can you identify
21   who the two women were?
22       A.  That would be Anita Baeza and Trinidad
23   Villalobos.
24       Q.  And you testified to that already, correct?
25       A.  Yes, sir.

---

### 126

1        Q.  Okay.  And so when we're talking about 44
2    counties and populations of 100,000 or more, can you
3    tell me the different types of agencies that were
4    targeted?
5        A.  We conducted a total of, I believe, approximately
6    80 presentations through out the state.  And in those
7    presentations would have been police departments,
8    sheriff's departments, Texas highway patrol, local
9    district attorney investigators or county attorney
10   investigators or anybody who was a Texas peace officer.
11       Q.  Would that have involved local DAs or local
12   county attorneys as well?
13       A.  Yes, sir.
14       Q.  What about election officials?
15       A.  No, sir.
16       Q.  So local election officials were not invited to
17   the training?
18       A.  This was a TCLEOSE, which is our State law
19   enforcement regulatory agency.  It was designed to be a
20   peace officer presentation for training on election code
21   offenses.
22       Q.  Was there a training initiative established for
23   local election officials?
24       A.  No, not that I'm aware of.
25       Q.  Okay.  And maybe I should be clearer on that.

---

### 128

1        Q.  Okay.  So is this training initiative still in
2    place?
3        A.  No, sir.
4        Q.  And I believe I asked you what the number of
5    counties that actually received training was, and I
6    can't recall your answer?
7        A.  I don't recall.
8        Q.  And so generally would it have been -- how long
9    did this training initiative last?
10       A.  About a month.
11       Q.  Were there any other versions of this training
12   initiative that were put in place after this particular
13   training initiative?  We're talking about, I believe
14   between 2005 and 2006.
15       A.  No, sir.
16       Q.  And the answer is no, no other training?
17       A.  No other training initiatives.
18       Q.  Okay.
19           (Exhibit No. 590 was marked.)
20   BY MR. GEAR:
21       Q.  Go ahead and take a look at Exhibit 590.  When
22   you've had a chance we'll talk about it.
23       A.  Okay, sir.
24       Q.  Okay.  The fourth paragraph, "and the fraud
25   continues since last summer.  My office has been



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

129

1    involved in several voter fraud cases across the state."
2    Are there any -- from 2002 to 2006, March 1st 2006 the
3    date of this article, are there any additional voter
4    fraud prosecutions or convictions that you're aware of,
5    based on this spread sheet?
6        A. I think there were three additional persons
7    charged with election misconduct.
8        Q. And which three are you referring to?
9        A. Willie Howard Ray, Jamillah Johnson and Melinda
10   Hunter.
11       Q. And they're in -- is it Bowie County?
12       A. Bowie County.
13       Q. Bowie County.  Thank you.  So let's talk about
14   them real quick.  Can you tell me what the allegation
15   for Willie Ray, Jamillah Johnson and Melinda Hunter are?
16       A. Yes, sir.  This case was referred by the
17   Secretary of State's office.
18       Q. Okay.
19       A. It involved the 2004 primary election.  And the
20   allegations were unlawfully obstructing a poll watcher,
21   unlawfully witnessing the application of more than one
22   application, unlawful assistance, security of ballots,
23   ballot boxes and envelopes.
24       Q. And would this have been a charge under chapter
25   86 or chapter 64?

---

130

1        A. These -- the allegations involved multiple
2    chapters of the Texas election code.
3        Q. Okay.  And would any of these allegations have
4    involved a charge of voter impersonation?
5        A. The mail-in ballot applications and the unlawful
6    assistance could lead to potential illegal voting
7    charges under chapter 64.  However, only charges that were filed
8    were under chapter 86.
9        Q. Okay.  So is it fair to say there were no charges
10   filed under chapter 64 for any of the individuals who
11   were indicted that you just identified?
12       A. That is correct.
13       Q. And ultimately, was there a conviction?
14       A. Willie Ray pled to one count of possession of an
15   official ballot or carrier envelope of another, which is
16   a class B misdemeanor.  She received a fine.  I'm sorry.
17   I'm having a hard time reading it.
18       Q. It's small print.
19       A. And then Jamillah Johnson was -- received
20   six months deferred adjudication and a $200 fine.
21       Q. And again, that's not a criminal conviction?
22       A. No.  For the purpose it's not a final conviction.
23       Q. Okay.
24       A. And then Melinda Hunter received six months
25   pretrial diversion.

---

131

1        Q. And again, these were by mail ballot violations?
2        A. Yes, sir, 86006 is possession of a mail-in
3    ballot.
4        Q. Turning your attention back to Exhibit 590, there
5    are a number of different discussions of indictments
6    here.  Reeves County, the mother of the 2004 primary
7    candidate I believe you already testified that, correct?
8        A. Yes, sir.
9        Q. Nueces County, the four women allegedly targeting
10   elderly voters during last year's local school board
11   election, I believe you testified to that?
12       A. Yes, sir.
13       Q. Hardeman County commissioner pled guilty to
14   illegally collecting mail-in ballots during the 2004
15   election.  And that would have been Johnny Wayne Akers,
16   correct, for Hardeman County?
17       A. Yes, sir.
18           MR. SWEETEN:  Bruce, we're getting close to
19   1:15, so if you get to a logical stopping point.
20           MR. GEAR:  Did you want to go to 1:30?
21           MR. SWEETEN:  Well, we were going to try
22   to -- we've got to be somewhere at 1:30.  It's short,
23   but yeah.  Just, I mean, I don't want to stop you I'm
24   just letting you know.
25           MR. GEAR:  I'll finish this and then we can

---

132

1    take a break.
2            MR. SWEETEN:  Sure.  That's fine.
3    BY MR. GEAR:
4        Q. There's another indication here about, "I know
5    local prosecutor's are dealing with voter fraud, too.
6    The week before Christmas."  And they talk about
7    Hidalgo.  Did I pronounce that correct?
8        A. Yes, sir.  Hidalgo County.
9        Q. "Hidalgo County district attorney's office
10   obtained indictments against nine people in connection
11   with the McAllen City election in May of 2005."  Would
12   that be included on your spread sheet?
13       A. No, sir.  It's included on our spread sheet in
14   referrals.
15       Q. Okay.
16       A. But not in prosecutions.
17       Q. So is this one that you would have worked in
18   conjunction with the local prosecutor.  How does that
19   work?
20       A. Yes, sir.  The Secretary of State's office
21   referred it to us, as well as the Texas Ranger assigned
22   to that jurisdiction.  And then also the district
23   attorney.  So all three requested assistance.
24       Q. Okay.  Can you tell me on the referrals where
25   these nine individuals would be identified?

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

### 133

1      A. I would only have listed it once.
2      Q. Okay.
3      A. And it would be listed on Page 1 of election code
4   referrals to the office of the attorney general,
5   August 2007 to present. And it would be Page 1. And it
6   would be Hidalgo 2005 municipal election with the SOS
7   date of 6/16/2005. And the office was method of
8   returning marked ballot, unlawful assistance and
9   assisting voter.
10      Q. And that would have included the nine individuals
11   that the allegations pertained to?
12      A. Yes, sir.
13      Q. And this is -- the allegation at least is, method
14   of returning marked ballots, unlawful assistance,
15   assisting voter, illegal voting. Can you tell me what
16   the result of these allegations were?
17      A. I believe nine defendants were charged with a
18   variety of those offenses.
19      Q. Okay.
20      A. By the grand jury. They were indicted. And the
21   district attorney prosecuted that case.
22      Q. Go ahead.
23      A. I believe each of the indictments were
24   subsequently dismissed by the local district attorney in
25   the interest of justice or for insufficient evidence.

### 134

1      Q. Okay. So there were no convictions regarding
2   this matter?
3      A. I don't believe so.
4      Q. Okay.
5          MR. GEAR: I think this is a good place to
6   stop.
7          MR. SWEETEN: Okay. Very good.
8          (Brief recess.)
9   BY MR. GEAR:
10      Q. Back on the record. Back from lunch. All right.
11   I think we ended with Exhibit 590, which takes us up to
12   March 1st of 2006. So I just want to ask you some
13   general questions about your spread sheet. From 2002 to
14   March 1st of 2006, how many referrals, total, were
15   received in the office of the Attorney General?
16      A. From 2002 to 2006?
17      Q. Yes, sir.
18      A. 18 SOS referrals.
19      Q. And what about other?
20      A. That's not going to be as good of a number
21   because I can only distinguish elections prior to 2006,
22   so on the others, it would be two elections.
23      Q. So 20 referrals between 2002 to 2006. Is that a
24   fair estimate?
25      A. Yes, sir.

### 135

1      Q. Okay. Out of those 20 referrals -- and that
2   would have included referrals from the Secretary of
3   State's office, as well as other sources as you've
4   testified here. How many of those dealt with voter
5   impersonation?
6      A. The one that I can definitely say dealt with
7   voter impersonation would be Melva Kay Ponce, through
8   Bee County.
9      Q. And we've talked about that, correct?
10      A. Yes, sir. On the other cases that involved
11   mail-in ballot fraud, there were no other persons
12   charged with voter impersonation.
13      Q. Okay. Which leads me to my next question
14   between -- other than Ms. Ponce who, I understand your
15   testimony about. Between 2002 and 2006, were there any
16   charges of voter impersonation?
17      A. No, sir.
18      Q. Were there any investigations of voter
19   impersonation?
20      A. When we examine allegations of mail-in ballot
21   fraud, we sometimes have allegations that the voter
22   didn't cast the mail-in ballot and that someone assisted
23   them with their mail-in ballot or took their blank
24   mail-in ballot. So there are potential cases that were
25   there.

### 136

1      Q. And those, again, would have been under
2   chapter 86, not chapter 64 because they're dealing with
3   mail-in ballots?
4      A. If you had a suspect who assisted a voter with
5   the mail-in ballot application and also the completion
6   of the ballot, and marked the ballot contrary to the
7   voter's intent or marked the ballot as if they were
8   themselves the voter as in the case of Melva Kay Ponce,
9   that would be under 64.
10      Q. Okay. And again, the question I have for you is,
11   that would have fallen under the by mail ballot system,
12   however?
13      A. Yes. You can commit illegal voting by -- you can
14   commit illegal voting by -- in the early voting mail-in
15   ballot portion, early voting polling place or actually
16   on election day itself.
17      Q. Okay. And so from 2002 to 2006 dealing with
18   early voting at the polling place, were there any
19   charges, referrals or allegations of voter
20   impersonation?
21      A. No, sir.
22      Q. Were there any prosecutions of voter
23   impersonation, either early voting, by mail ballot or at
24   the polling place between 2002 and 2006?
25      A. By our office or the State of Texas as a whole?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

### 137

1    Q. Start with your office.
2    A. No, sir.
3    Q. Are you aware of any in the State of Texas as a
4    whole?
5    A. No, sir. Our data only represents what was
6    referred to the Attorney General's office.
7    Q. Okay. And as I understand your testimony, the
8    referrals come from a variety of sources?
9    A. That's correct.
10   Q. So going forward from 2006 to the end of 2011,
11   can you tell me how many referrals you received in your
12   office between 2006 to 2011?
13   A. If you give me just a moment.
14   Q. Sure. I know it's going to take a little time.
15   Just for the record, I would indicate that the witness
16   is referring to his spread sheet.
17   A. Did you say the end date was 2011?
18   Q. Yes, sir.
19   A. 100 from the Secretary of State's office.
20   Q. And other?
21   A. Okay. Since 2006, we each received approximately
22   160 allegations of misconduct in elections in that time
23   frame.
24   Q. Total?
25   A. 168 from other sources outside of the SOS.

---

### 139

1    A. Yes, sir, I believe so.
2    Q. Did I state that right, because I'm just trying
3    to make sure I'm clear on it?
4    A. There are some, if I may clarify?
5    Q. Please.
6    A. There are some elections, which I'm unable the
7    determine exactly what election actually it involved.
8    There were complaints about unspecified elections. And
9    I did not include those.
10   Q. Okay. And where in the spread sheet are you
11   referring to?
12   A. If you would look at Page 11 of the election code
13   referrals office of the Attorney General, 2002 to the
14   present.
15   Q. Okay.
16   A. Undetermined in Nueces County, undetermined in
17   Duval County.
18   Q. I see what you're referring to. So there are two
19   referrals that are undetermined?
20   A. Well, on other pages there are as well, sir.
21   Q. Why don't you go ahead and add those in as well.
22   As far as referrals are concerned. I see one on
23   Page 10.
24   A. Looks like it would be, maybe five.
25   Q. Five?

---

### 138

1        MR. ROSENBERG: 168?
2    A. 168.
3    Q. So total would be, if I'm counting correctly, 268
4    referrals between 2006 to 2011. Is that yes?
5    A. Of elections from that time frame -- in that time
6    frame, yes, sir.
7    Q. And I assume you -- counting on your spread sheet
8    you counted to the end of 2011?
9    A. I counted to 2010, 2009, 2008, 2007 elections.
10   Q. And you counted 2011 elections, correct?
11   A. The -- on the other category in the other sources
12   outside of the SOS, we didn't have any in 2011.
13   Q. Okay. Did you have any in 2011 for SOS?
14   A. Yes, sir. But I didn't count those.
15   Q. You did not count those. Go ahead and count
16   those as well?
17   A. Eight SOS referrals in 2011.
18   Q. So what does that take our total to, 268 plus
19   eight?
20   A. 268 plus eight?
21   Q. Uh-huh.
22   A. 276.
23   Q. 276. And that would represent all of the
24   referrals from any source to the OAG's office from 2006
25   to the end of 2011?

---

### 140

1    A. Yes, sir.
2    Q. So adding those five to the 276, what is your
3    total?
4    A. It would be 281.
5    Q. So the 281 referrals, as I understand it,
6    represent all of the referrals from any source from 2006
7    to 2011, including undetermined election dates?
8    A. That were received by the Texas Attorney
9    General's office, yes, sir.
10   Q. Okay. Out of those 281, can you tell me how in
11   were actually investigated?
12   A. I can tell you that when I reviewed the number of
13   investigations that we conducted in the period from 2004
14   to present, the number is 186.
15   Q. The present, including 2012?
16   A. Correct, sir.
17   Q. Okay. So let's go with that for a minute. You
18   said from 2002 or 2004 to the present?
19   A. 2004 to the present.
20   Q. Okay. So from 2004 to the present, kind of
21   throws off our other estimate of referrals, but there
22   have been 186 that have been investigated?
23   A. Yes, sir.
24   Q. How many of those have resulted in -- of the 186
25   resulted in charges?

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

| 141 | 143 |
|---|---|
| 1  A. We referred 62 cases for prosecution. | 1  ineligible voter.  In other cases, especially those that |
| 2  Q.  Out of the 186 from 2004 to the present, how many | 2  are referred to the DA or other persons, they don't |
| 3  of those referrals dealt with voter impersonation? | 3  break that down in the referral document.  So this is |
| 4  A.  I have to go and count them on the spread sheet. | 4  created off that referral document. |
| 5  Q.  Please do. | 5  Q.  Okay.  So trying to move forward from the |
| 6      MR. SWEETEN:  Can you read the question back | 6  referral, because we're talking about 2004 to the |
| 7  while he's doing that? | 7  present, correct? |
| 8      (Requested question was read.) | 8  A.  Yes, sir. |
| 9  BY MR. GEAR: | 9  Q.  At some point is there a charging decision from |
| 10  Q.  I should be clear, how many of those were | 10  the OAG's office? |
| 11  allegations of voter impersonation? | 11  A.  Yes, sir. |
| 12      MR. SWEETEN:  Same thing.  Do you understand | 12  Q.  How many of the -- this might be one step before |
| 13  what he wants? | 13  that.  But how many of the 186 referrals were |
| 14  A.  Of the prosecutions? | 14  investigated as voter impersonation?  And let me narrow |
| 15  Q.  (By Mr. Gear) Of the -- of the 186 that were | 15  that down even farther.  Were investigated as voter |
| 16  received as -- I'm sorry.  I'm confused myself now. | 16  impersonation at the polling place.  Can you identify |
| 17      MR. SWEETEN:  Investigations. | 17  that? |
| 18  BY MR. GEAR: | 18  A.  I can identify that the defendants who have been |
| 19  Q.  Yeah.  Of the 186 investigations, how many of | 19  charged for that are Jack Carol Crowder out of Harris |
| 20  those were allegations of voter impersonation? | 20  County.  Reyna Almanza out of Hidalgo County.  Lorenzo |
| 21  A.  On the spread sheet that I maintain, voter | 21  Antonio Almanza out of Hidalgo County.  And I believe |
| 22  impersonation is included in the allegation of illegal | 22  Mary Comparin out of Bexar County. |
| 23  voting.  I would have to go through and count those as | 23  Q.  So as I understand your testimony, there are four |
| 24  well. | 24  individuals that have been charged with voter |
| 25  Q.  Help me understand when you're talking about | 25  impersonation between -- are you limiting this testimony |

| 142 | 144 |
|---|---|
| 1  "illegal voting," that's under chapter 64? | 1  to 2004 to the present or are you going from 2002 to the |
| 2  A.  Yes, sir. | 2  present? |
| 3  Q.  And chapter 64 has a multitude of different | 3  A.  I'm going to from 2004 to the present. |
| 4  potential violations. | 4  Q.  Okay.  And so since we're going down this road, |
| 5  A.  Yes, sir. | 5  were there any charged with voter impersonation at the |
| 6  Q.  And is illegal voting a general term or is it a | 6  polling place between 2002 to the present?  And I |
| 7  specific allegation. | 7  understand there are four that you already identified. |
| 8  A.  It is a -- it is an offense title that includes | 8  So I'm trying to get the total number of individuals |
| 9  four different elements of -- four different ways to | 9  that were charged with voter impersonation at the |
| 10  commit that offense title. | 10  polling place between 2002 to the present. |
| 11  Q.  Okay.  Is there any way to distinguish between | 11  A.  Of the cases that were referred to our office and |
| 12  allegations of illegal voting versus allegations of | 12  the Attorney General's office, yes.  I believe there are |
| 13  voter impersonation? | 13  four. |
| 14      MR. SWEETEN:  On the spread sheet, Bruce? | 14  Q.  Okay. |
| 15      MR. GEAR:  Well, I'm asking him in general. | 15  A.  Total. |
| 16  BY MR. GEAR: | 16  Q.  And those are the four you just identified? |
| 17  Q.  I'm just trying to understand how this is | 17  A.  Yes, sir. |
| 18  inputted. | 18  Q.  Would you say that the majority of the referrals |
| 19  A.  It only is inputted if that clearly is | 19  that come to your office are based on the by mail ballot |
| 20  articulated in the referral source.  In many cases, the | 20  system? |
| 21  Secretary of State's office just refers a case to us and | 21  A.  I wouldn't say majority, no. |
| 22  says here is an allegation of -- a violation of 64012, | 22  Q.  What percentage would you say? |
| 23  illegal voting.  And some other referrals they break it | 23  A.  I know that illegal voting represents -- I'm |
| 24  down exactly how the offense is committed, either | 24  sorry.  I did the numbers.  I remember that 133 of the |
| 25  through voter impersonation, voting twice, being an | 25  Secretary of State's referrals, approximately 60 dealt |



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

---

145

1    with illegal voting of any type.
2         Q.  That's out of the 186 referrals?
3         A.  Well, the 133 would be part of the 186.
4         Q.  Okay.  Let's see if we can clarify this.
5         A.  Sorry.
6         Q.  We're getting into the numbers now.  So you said
7    133 and 186 would be part -- 133 would be part of 186.
8    What time period are we talking about?
9         A.  Of the spread sheet, would be 2002 to present.
10        Q.  And so the total number of referrals between 2002
11   to the present that were received by the OAG's office
12   would have been what number?
13        A.  The total number of SOS referrals in that time
14   frame was 133.
15        Q.  Okay.  And that's where the 133 came from.  And
16   then the total number of other referrals?
17        A.  I believe that number was 2 --
18        Q.  You gave me a number earlier of 276?
19        A.  Yeah.  That would be pretty close.
20        MR. SWEETEN:  I'm sorry.  What is 276?
21        MR. ROSENBERG:  Can we clear this up or
22   we'll go crazy.
23        MR. GEAR:  Yeah, I know.  Right.  I know.
24        MR. ROSENBERG:  Do you mind if I just -- to
25   get the numbers here's --

---

146

1        MR. SWEETEN:  I don't mind.
2        MR. GEAR:  Go ahead.  That's fine.
3        CLARIFYING EXAMINATION.
4    BY MR. ROSENBERG:
5         Q.  The 133 include -- from the Secretary of State,
6    includes 100 from 2006 to 2011; am I correct?  Just from
7    the Secretary of State.
8         A.  I believe the question earlier was 2006 to
9    present or to 2011?
10        MR. GEAR:  Yes.
11        A.  And I think that number I gave was, I believe
12   100.
13        Q.  (By Mr. Rosenberg)  Right.  The 133 is from 2002
14   to the present just from the Secretary of State?
15        A.  I believe that's correct, sir.
16        Q.  There were an additional 178 referrals that
17   weren't from the Secretary of State from 2002 forward,
18   which were based on two between 2002 and 2006?
19        A.  In 2005 there were two referrals from another
20   source.
21        Q.  168 between 2006 and 2011.  Non-referrals -- let
22   me say, not from the Secretary of State, not referrals
23   from the Secretary of State.
24        A.  As I can determine.
25        Q.  Eight from the 2011 election?

---

147

1         A.  Those would be SOS referrals.
2         Q.  Those were within the SOS.  Okay.  And five that
3    were undetermined?
4         A.  Yes, sir, I believe so.
5         Q.  So the total referrals from 2002 to 2000 -- to
6    date are 301?
7         A.  The number that I have in my head is, I think
8    around 320.
9         Q.  Okay.  So we're missing some.  That's the best I
10   can do.  I turn it back.
11        MR. SWEETEN:  Ezra, you were supposed to
12   clear this up.
13        BY MR. ROSENBERG:  I tried.  I tried.
14        FURTHER EXAMINATION
15   BY MR. GEAR:
16        Q.  So 320 is the number that is in your head, would
17   represent all referrals from any source that were
18   received from the OAG's office.  Is that accurate?
19        A.  One more time.  I'm sorry.
20        Q.  The 320 number that you said you had in your head
21   would be reflective of all of the referrals from any
22   source that were received by the OAG's office regarding
23   election code violations?
24        A.  Yes, sir.
25        Q.  And that would have been from 2002 to the

---

148

1    present, 2012?
2         A.  Yes, sir.
3         Q.  And so let's start from there since we've got
4    that number down.  So we've got 320 total referrals.  Of
5    those 320, how many were investigated?
6         A.  That's where the number -- I have to clarify.  I
7    have 186 investigations from 2004 to present.  And the
8    reason for that is the report system that we used.  I'm
9    able to query our report system that only goes back to
10   2004.
11        Q.  So then based on your testimony, is it fair to
12   say that you do not know the number of investigations
13   between 2002 up to 2004?  Let me ask that a different
14   way.  Are there files maintained somewhere that would
15   tell us what happened between 2002 and 2004 regarding
16   referrals?
17        A.  I believe that the records retention for election
18   code offense, I believe is like five years.  And so I
19   only can give you a number of the number of
20   investigations that we conducted based on our report
21   writing system that goes from 2004 to present.
22        Q.  So again, not to belabor the point, I'm just
23   trying to make sure I understand your testimony.  If I
24   was to ask you or anyone within your office to go back
25   and look at either electronic files or paper files for



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

### 149

1  investigations between 2002 to 2004, you would not be
2  able to do that?
3      A. I don't know.
4      Q. Is it fair to say that in preparation for this
5  deposition you didn't look at any files, either
6  electronic or paper, between 2002 up to 2004?
7      A. I was able to query all of our election cases
8  which was through our system -- which showed me cases
9  from 2004 to present.
10     Q. So is that a yes or no?  I'm sorry.
11     A. I did not look at any files -- investigative case
12  files from 2002 to present -- or to 2004.
13     Q. So we're still working with the 320 number, which
14  would be reflective of 2004 to the present, correct?
15     A. No.  Actually that number would be -- that time
16  frame -- the 320 encompasses --
17     Q. 2002?
18     A. 2002 to the present.
19     Q. Now, I'm sorry.  I talked over you.  That was
20  2002 to the present?
21     A. Yes, sir.
22     Q. I think we're getting there.  All right.  So of
23  the 320 referrals from all sources to the OAG's office
24  from 2002 to the present, how many of those were
25  investigated?

### 151

1      Q. Which would be a reason not to charge?
2      A. That's correct.
3      Q. Okay.  So -- and now you've used the term "those
4  are the four, "and you're talking about Mr. Crowder,
5  Mary Comparin and can you remind me of the other two
6  names?
7      A. Reyna Almanza and Lorenzo Antonio Almanza.  I
8  think his name was junior.
9      Q. Okay.  Let's first start with Mr. Crowder.  Can
10  you tell me when that investigation occurred?  For the
11  record, the witness is referring to his spread sheet.
12  And I just direct your attention to Page 3 of the Texas
13  code of referrals to the office of Attorney General
14  prosecutions resolved, Bates stamped TX 00056820.  I
15  believe it's the third.
16     A. Right.  This case was referred to our office by
17  the Secretary of State's office.
18     Q. And when was it referred?
19     A. It would have been -- the SOS document date was
20  1/14/09.  I mean, the date of the referral from the
21  Secretary of State's office was January 14, 2009.
22     Q. 2009.  What election --
23     A. I'm sorry.
24     Q. Go ahead.
25     A. It involved the 2008 and 2000 -- primary and

### 150

1      A. I believe 186.
2      Q. Okay.  Of those 186 referrals that were
3  investigated from 2002 to the present, how many of those
4  dealt with voter impersonation at the polling place?
5      A. I can clearly identify four.
6      Q. And you've done that already on the record?
7      A. Yes, sir.
8      Q. Other than those four, are you aware of any
9  others?
10     MR. SWEETEN:  And you're asking allegations,
11  just so I'm clear.
12     MR. GEAR:  No.  I'm asking about
13  investigations.
14     MR. SWEETEN:  Investigations.  Okay.
15     A. There are more.  But those four are the ones that
16  were charged.  I do not know the number off the top of
17  my head for the other ones that weren't charged.
18     Q. (By Mr. Gear)  And as we've -- as you've
19  testified before, that a referral can come into your
20  office and not result in a charge, correct?
21     A. That's correct.
22     Q. And that they can come in your office and not be
23  supported by, either the facts of the law, would that be
24  accurate?
25     A. That's correct.

### 152

1  general elections.
2      Q. From the spread sheet referring to Page 3, I see
3  it indicates the primary election.  Where do you pick up
4  the general election?
5      A. Because that's the actual election that he was
6  charged for illegally voting in and impersonating in.
7      Q. In the general election?
8      A. The actual referral indicates there were deceased
9  voters voting both the general and primary elections.
10     Q. And is that indicated in the spread sheet?
11     A. It's indicated -- yes, sir.  In the referral
12  spread sheet.
13     Q. And which page is that?
14     A. That would be Page 3 of the referral sheet,
15  spread sheet.
16     Q. Can you tell me which --
17     A. The -- eight from the bottom.  And it says,
18  "Harris 2008, primary and general elections, 1/14/09,
19  deceased voters voting."
20     Q. And how do you know that this deals with
21  Mr. Crowder?
22     A. Because that -- I just know that that's the
23  referral that we got which we initiated the
24  investigation at which Jack Carol Crowder was
25  subsequently charged.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

## 153

1  Q.  Okay.  And so can you tell me what the facts are
2  for that case?
3  A.  A group of citizens had obtained voter
4  registration records and then compared that to the
5  actual voting records in those two elections.  And they
6  had come up with a list of names that they suspected
7  were potential dead persons voting.  They then presented
8  that information to the Secretary of State's office who
9  evaluated and then sent it to us for investigation.
10  Q.  And the group of citizens that you're referring
11  to?
12  A.  I'm sorry.  I don't know their name.
13  Q.  Was it an actual group that made this referral or
14  was it -- or are you just referring to that, generally a
15  group of citizens?
16  A.  I believe the SOS referral itself actually says
17  the name of the group.
18  Q.  Is that indicated anywhere in your spread sheet?
19  A.  No, sir.
20  Q.  Do you know if that name would have been the King
21  Street Patriots?
22  A.  No, I don't believe that was it.
23  Q.  But as you sit here today, you don't know the
24  name of the group?
25        MR. SWEETEN:  Objection' asked and answered.

## 154

1        A.  No, sir, I do not know the name of the group.
2  Q.  (By Mr. Gear)  So they conducted their own, I
3  guess informal investigation, and referred it on to the
4  Secretary of State's office.  Can you tell me what the
5  facts are of the case?
6  A.  Yes, I can.  Jack Carol Crowder -- Jack Carol
7  Crowder's father died preceding the election and his
8  son, Jack Carol Crowder also, used his voter
9  registration card to vote in that election.  The
10  investigation revealed that at no time did Jack Carol
11  Crowder attempt to register to vote, either through the
12  signing up for his Texas driver's license or by actually
13  completing a voter registration card.  And he was
14  interviewed and advised that he didn't complete a voter
15  registration card.  He thought that he had asked to be
16  registered on his Texas driver's license.
17  Q.  So let me flesh out the facts now.  Jack Carol
18  Crowder, the individual who voted, has the same last
19  name as his father who was deceased?
20  A.  That is correct.
21  Q.  And the same first name as well?
22  A.  That's correct.
23  Q.  Is there any difference in the Jack Carol
24  Crowder, Jr., Jack Carol Crowder the third --
25  A.  I think Jack Carol Crowder the actual suspect is

## 155

1  the third.
2  Q.  Okay.  And do you know if the father has -- what
3  is the suffix on his last name?
4  A.  I don't remember.
5  Q.  Okay.  And you said that he presented some form
6  of identification when he voted?
7  A.  No, sir.  He presented his deceased father's
8  voter registration certificate.
9  Q.  And is that indicated anywhere here on your
10  spread sheet?
11  A.  No, sir.
12  Q.  And how would I know -- how would I determine
13  exactly what happened on the day of that election?  Are
14  there documents, reports that are available that would
15  clarify that?
16  A.  Yes, sir.  The combination form that was used at
17  the polling place indicates the kind of documentation
18  that the voter used to sign up at the polling place.  It
19  generally indicates if they presented a voter
20  registration certificate or some other form of ID.  I
21  believe the charging document itself, the indictment
22  that Jack Carol Crowder -- it actually mentions that he
23  used his father's voter registration certificate to cast
24  a ballot in that election as well.
25  Q.  Did you actually conduct this investigation?

## 156

1  A.  No, but I assisted in it.
2  Q.  What was the basis of the group believing or
3  attempting to determine that Mr. Crowder may have been
4  using a deceased voter certificate, in this case his
5  father's?
6  A.  I don't know what the group -- or why they did
7  what they did.
8  Q.  And he was ultimately indicted?
9  A.  Yes, sir.
10  Q.  What was he indicted for?
11  A.  The Harris County district attorney's office
12  indicted him for illegal voting, for impersonating his
13  deceased father.
14  Q.  Was there a resolution to the case?
15  A.  Yes, sir, there was.
16  Q.  And what was the resolution?
17  A.  He pled guilty to one count of fraudulent use of
18  identifying information and received one-year deferred
19  adjudication and a $200 fine.
20  Q.  Fraudulent use of -- did you say of information?
21  A.  Fraudulent use of identifying information.
22  Q.  What chapter would that have been under?
23  A.  That's actually in our Texas penal code.
24  Q.  And can you explain that for those of us who
25  don't know?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

### 157

1    A.  Yes, sir.  If a person possesses identifying
2  information of another and uses it with intent to harm
3  or defraud, they can be charged under the penal code as
4  well.  And identifying information under Texas law would
5  be a unique identifying number to that person, such as a
6  Texas driver's license, voter identification number, a
7  Texas voter ID, a social security number or a date of
8  birth.
9    Q.  So as I understand it, there was no conviction
10  under chapter 64, which as I understand it, identifies
11  voter impersonation?
12    A.  No, sir.  He pled guilty to possession and use of
13  identifying information.
14    Q.  And again, would that have been under chapter 64?
15    A.  No, sir.  That's a penal code offense.
16    Q.  This may be a silly question, but I'm just trying
17  to understand the range of this.  What would be the
18  basis of pleading under the penal code versus pleading
19  under the election code?
20    A.  It would be speculation on my part.  I don't know
21  why Harris County made the decision to reduce the
22  offense.  But illegal voting is a third degree felony
23  and -- which is punishable by up to two to 10 years in
24  the State penitentiary.  And a person who has no
25  criminal history whatsoever, might be charged for a

### 158

1  lesser offense for reduced punishment based on the fact
2  that they had no prior criminal history?
3    Q.  Okay.  So it was the result of a plea agreement,
4  essentially?
5    A.  I believe so, yes, sir.
6    Q.  Do you know what the punishment or the penalty
7  was for his violation?
8    A.  He pled to one year deferred adjudication and a
9  $200 fine.  So with that one year deferred adjudication
10  he probably had to report to a community supervision
11  department for the period of a year.
12    Q.  So the deferred adjudication means there was no
13  actual conviction?
14    A.  At the successful completion of a deferred
15  adjudication there's no final conviction; that's
16  correct.
17    Q.  Did he successfully complete his period of
18  deferred adjudication?
19    A.  I'm sorry.  I don't know that, standing here
20  today.  I don't know.
21    Q.  If he didn't successfully complete it, what would
22  have happened?
23    A.  If he didn't successfully complete it, he would
24  have been adjudicated and he could be forced to serve
25  the entire year in the county jail.

### 159

1    Q.  Are you aware of whether or not Mr. Crowder ended
2  up serving any time in jail?
3    A.  I'm not aware.
4    Q.  So the end result in this is, if I understand
5  your testimony, if he successfully completed the
6  deferred adjudication, then he would not have been
7  convicted of a crime?
8    A.  That's correct.
9    Q.  You also said Mary Comparin.  Can you tell me,
10  based on your spread sheet, when that referral came into
11  the office?
12    A.  This referral is going to be found in the other
13  category, as it was referred by law enforcement.  And so
14  I don't have a date in the spread sheet that says the
15  actual date of the referral.
16    Q.  What page are you referring to, if any?
17    A.  If you'll just give me a moment I'll look for it.
18    Q.  Sure.
19    A.  I believe I'm referring to Page 9 of the election
20  code referrals of the office of Attorney General, 2002
21  to present.  That says, "Bexar multiple primary and
22  general elections, other illegal voting."
23    Q.  And again, how do you know that this particular
24  referral deals with Mary Comparin?
25    A.  Because the DPS trooper who discovered this case

### 160

1  referred it directly to me.
2    Q.  Which county did this come out of?
3    A.  Bexar County.
4    Q.  And again, we don't know which election?
5    A.  It was multiple elections.
6    Q.  Do you know the year of these elections?
7    A.  If I could explain the facts, I probably could.
8    Q.  Go ahead, please.
9    A.  Mary Comparin was discovered by the Texas
10  Department of public safety, as through the Texas
11  driver's license image system had developed multiple
12  identities in her own name.  And the DPS trooper who
13  discovered this also discovered that in the -- those
14  identities, she was voting in multiple elections.  Every
15  election that basically took place she would vote two to
16  three times.
17    Q.  You're saying, "every election that took place."
18  I'm trying to understand the time frame in which you're
19  talking about.  Do you know the elections she allegedly
20  voted in?  And I understand the spread sheet to say,
21  "multiple primary and general elections."  But do you
22  know the actual elections that she allegedly voted in?
23    A.  I know what we charged her for.  And I believe it
24  was the -- based off the spread sheet, she was charged
25  for voting in the 2008 general election.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

161

1    Q.  You said, "2008 general"?
2    A.  Yes.
3    Q.  And you refer to your spread sheet.  Do you see
4  Ms. Comparin's name on here anywhere?
5    A.  Yes, sir.  It's on Page 1 of charges pending
6  resolution.
7    Q.  Would this charge still be pending at this point?
8    A.  Yes, sir, it is.
9    Q.  And she was charged with illegal voting?
10   A.  Yes, sir, in that election.
11   Q.  And is this set for trial?  Can you tell me where
12  it is in the process?
13   A.  I think she's currently been found by the court
14  as -- I don't know exactly the term.  But she's --
15   Q.  Give it a shot.
16   A.  Mentally incompetent.
17   Q.  That would be a legal term.  Do you know if this
18  case -- if there's any intention to proceed to trial in
19  this case?
20   A.  I think that we have to -- the State has to find
21  that she is competent through a court before it can
22  proceed to trial.  I think they have regular settings to
23  determine that.
24   Q.  And have you gone through that process?
25   A.  I personally haven't.  But I believe that the

---

162

1  prosecutor assigned has.
2    Q.  What was the end result of that?
3    A.  I think she's been found incompetent.
4        MR. SWEETEN:  Bruce, I'm going to, at this
5  point, I'm going to designate any discussion of an
6  active case, Ms. Comparin's case as under the protective
7  order, just this section related to questioning on her.
8  BY MR. GEAR:
9    Q.  Let's move forward to the next -- there's two
10  left, correct?
11   A.  Yes, sir, I believe so.
12   Q.  And did you say Almanza?
13   A.  Almanza.
14   Q.  Almanza.  Can you tell me when that referral came
15  into your office?
16   A.  I believe it was in 2009.
17   Q.  Can you tell me what page you're referring to on
18  your spread sheet?
19   A.  It would be Page 10 of the election code
20  referrals of the office of the Attorney General, 2002 to
21  the present.  And it would be the first entry, Hidalgo
22  2009 school district election, voter -- illegal voting.
23   Q.  Is this case still pending?
24   A.  There are actually two cases.  One of the cases
25  is pending.

---

163

1    Q.  Okay.  Well, let's break that out.  You said
2  there's two cases.  Did both of them deal with the 2009
3  school district election?
4    A.  Yes, sir, they did.
5    Q.  And they both deal with Mr. Almanza?
6    A.  Lorenzo Antonio Almanza, Jr.
7    Q.  Junior, okay.
8    A.  And his mother, Reyna Almanza.
9    Q.  And what are the facts for that case or those
10  cases, I guess properly stated?
11   A.  Lorenzo Almanza and his mother went into the
12  Progresso school district to vote in that election.
13  Lorenzo Almanza had already voted days prior to that
14  election and used his brother's voter registration
15  certificate to cast a second ballot in that election.
16  His brother was an ineligible voter because he was
17  incarcerated in San Antonio for a felony offense at the
18  time.
19       Upon presenting the card to the elections
20  official, a poll watcher who was present recognized the
21  name of the person who was presenting themselves to vote
22  with the card and said that's not that person.  The
23  election judge actually contacted the county elections
24  department to determine what to do because he wasn't
25  familiar what to do in such a circumstance.  And the

---

164

1  elections department told the election judge at the
2  polling place, since he's presented a lawful voting
3  registration certificate he must be allowed to vote.
4        The poll watcher was emphatic that he wasn't the
5  person and Reyna Almanza, the mother, interjected
6  herself and vouched for his identity as being Lorenzo
7  Antonio -- or Orlando Almanza, his brother.
8    Q.  So Reyna Almanza, the mother, has not been
9  charged with voter impersonation?
10   A.  No.  She was charged as a party to and illegal
11  voting impersonation.
12   Q.  So as far as -- as far as Mr. Almanza, that's
13  still an allegation at this point, correct?
14   A.  Yes, sir.  He was indicted and he is currently
15  awaiting trial.
16   Q.  Do you know the trial date?
17   A.  No, sir.  He was subsequently rearrested for a
18  federal violation.  And so I think he's in the custody
19  of the US government at this time.
20   Q.  Is there a scheduled trial date that you're aware
21  of?
22   A.  No, not that I'm aware of.
23   Q.  When you say, "he's in the custody of the US
24  government," is he in state, out of state?
25   A.  I believe he is, the last check I heard, he was

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

| 165 | 167 |
|---|---|
| 1 in the South Texas federal detention facility. | 1   A. She was convicted by a jury in Brooks County on |
| 2   MR. SWEETEN: Again, because this is an open | 2 November 16, 2011 and sentenced to two years in prison, |
| 3 case, I'm going to designate this portion of the | 3 which was suspended for five years of probation. And as |
| 4 testimony, the specifics about it as eyes only, | 4 a condition of the punishment, she was ordered to serve |
| 5 protective order. | 5 90 days in jail, and as a condition of the probation |
| 6 BY MR. GEAR: | 6 just pay $313 in court costs. |
| 7   Q. At this point I think we went through all four. | 7   Q. Which page of the spread sheet are you referring |
| 8 But let me just if back to the mother. And her first | 8 to? |
| 9 name, again, was? | 9   A. I'm referring to the election code referrals |
| 10   A. Reyna Almanza. | 10 office of the Attorney General's prosecution resolve. |
| 11   Q. Okay. So she was charged as a party to, but did | 11 And I'm referring to Page 4, Reyna Almanza is the third |
| 12 not actually, based on the allegations, cast a vote in | 12 from the bottom. |
| 13 someone else's name. Is that accurate? | 13   Q. I apologize. Can you tell me the facts of this |
| 14   A. Yes. She did not cast a ballot in that election. | 14 case? |
| 15   Q. She didn't vote at all in that election? | 15   A. That is the mother who interjected herself on |
| 16   A. I don't know at this time, sir. | 16 behalf of her son who was committing the voter |
| 17   Q. Did she attempt to vote at all during that | 17 impersonation. |
| 18 election? | 18   Q. And she was charged as party to? |
| 19   A. I'm not sure she's a US citizen. | 19   A. Yes, sir. And if I may clarify one thing. |
| 20   Q. I don't know if that answers the question. Are | 20   Q. Please. |
| 21 you aware of whether or not she attempted to vote? | 21   A. I left off Delores McMillian. She, too, was |
| 22   A. I didn't look. I don't know. | 22 charged with voter impersonation or attempted voter |
| 23   Q. So in summary, I believe you said the total from | 23 impersonation. |
| 24 2002 to the present is 320 referrals, correct? | 24   Q. And she appears on Page 4 of your spread sheet |
| 25   A. Yes, sir, I believe that's correct. | 25 for -- |

| 166 | 168 |
|---|---|
| 1   Q. And out of those 320 referrals, there have been | 1   A. Yes, sir. |
| 2 four charges of voter impersonation at the polls, if I | 2   Q. Prosecutions resolved? |
| 3 understand your testimony correctly? | 3   A. Yes, sir. |
| 4   A. Yes, sir. I believe there have been four charges | 4   Q. Can you tell me, just so we're clear, Delores |
| 5 at the polling place. | 5 McMillian, was the election that the referral came from |
| 6   Q. And actually, one of those charges was a party | 6 is the 2010 primary election? |
| 7 to, and that person did not, in fact, attempt to cast a | 7   A. In Dallas County. Correct, sir. |
| 8 ballot as you know, as you sit here? | 8   Q. In Dallas County. Actually, Dallas |
| 9   A. I don't know if she did or not. | 9 County/Rockwell as I see it here? |
| 10   Q. Out of the four charges, how many convictions | 10   A. The two counties, under Texas State law, when you |
| 11 have there been for voter impersonation at the poles? | 11 prosecute an election code offense, you can take it to |
| 12   MR. SWEETEN: Does that include pleas or are | 12 an adjoining county. |
| 13 you talking about convictions only by jury? | 13   Q. Okay. And so can you tell me exactly what the |
| 14   MR. GEAR: Let's make it a general question | 14 charges were for Delores McMillian? |
| 15 including pleas. | 15   A. She was charged for attempted voter imperson -- |
| 16 BY MR. GEAR: | 16 she was charged for attempted illegal voting, voter |
| 17   Q. How many of the four charges have actually | 17 impersonation. |
| 18 resulted in a conviction, including a plea of voter | 18   Q. All right. And can you tell me what the facts of |
| 19 impersonation at the polling place? | 19 this case are? |
| 20   A. The only person that comes to mind is Reyna | 20   A. Delores McMillian and her mother, who is now |
| 21 Almanza as voter impersonation. | 21 deceased, are both elections officials working at a |
| 22   Q. Has that gone to trial? | 22 polling place in Dallas County during that election. |
| 23   A. Oh, yes, sir. | 23 Both Delores and her mother used other voter's |
| 24   Q. What was the result of that trial? I'm sorry. I | 24 information to cast ballots on behalf of those -- on |
| 25 might have glazed over that one? | 25 behalf of these other people. |



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

169

1    Q.  Are we talking about at the polls or by mail?
2    A.  At the polls.
3    Q.  Okay.  I'm not clear on the facts.  You say,
4    "they used other people's information to cast ballots at
5    the poles."  Can you clarify that for me?
6    A.  Yes.  Their voter -- their voter registration
7    numbers.
8    Q.  And how did they -- how did they do this?
9    A.  I don't know off the top of my head.
10   Q.  Is there a file that would clarify that?
11   A.  Yes, sir.  There's an investigative file that
12   would be able to clarify that.
13   Q.  And was there a plea in this case?
14   A.  Yes, sir, I believe so.
15   Q.  And what was the plea?
16   A.  She pled guilty to one count of attempted illegal
17   voting and served -- was sentenced to one year probation
18   and paid $227 in court costs.
19   Q.  So you said they used other people's voter
20   registration -- their registration information.  Am I
21   saying that correctly?
22   A.  Yes, sir, I believe so.
23   Q.  How many people are we talking about that were
24   involved in this?
25   A.  I believe Delores used one person's identity.

---

170

1    And I do not remember how many her deceased mother used.
2    She died during the course of the investigation.
3    Q.  So that allegation was never proven?
4    A.  She was never charged for it.
5    Q.  Do we know the name of the voter that Delores
6    allegedly used?
7    A.  I don't know the name today.
8    Q.  Do you know how she obtained the voter
9    registration information or the voter's information?
10   A.  I'm sorry.  I don't know right now.
11   Q.  And when you say, "attempted illegal voting," do
12   you know if she actually cast a ballot?
13   A.  It was actually stopped by a fellow elections
14   worker.
15   Q.  And can you tell me the facts behind that?
16   A.  No, sir, I can't.  Other than to say that I
17   believe the other elections worker discovered that these
18   names appeared on the list prior to the opening of the
19   polling place.
20   Q.  When you say, "the list," are you talking about
21   the voter registration polls?
22   A.  No, sir.  The combination form at each polling
23   place.  And in Texas when a voter presents themselves to
24   vote, there is a combination form which election
25   officials complete and then the voter has to sign.  And

---

171

1    you either have to provide the certificate or some other
2    form of identification for that purpose.  So I'm
3    referring to the combination form.
4    Q.  So in the case where you have an election
5    official using -- impersonating another voter, is that
6    something that would be prevented by -- if SB 14 was
7    implemented?
8         MR. SWEETEN:  Objection; calls for
9    speculation.  You can answer.
10   BY MR. GEAR:
11   Q.  You can answer.
12   A.  I don't know.
13   Q.  But when you've got the election official who is
14   in charge of attempting to identify and prevent voter
15   impersonation, actually engaging in the voter
16   impersonation, who, if anyone, is left to prevent that
17   from happening?
18        MR. SWEETEN:  Same objection.
19   A.  I don't really know.
20   Q.  (By Mr. Gear)  Delores pled guilty to illegal
21   voting.  Do you know what chapter she entered a plea
22   under?
23   A.  64012.
24   Q.  So was the ultimate conviction voter
25   impersonation?

---

172

1    A.  It's attempted illegal voting, voter
2    impersonation.  I'm sorry.  If I could clarify.  The
3    judgments -- the judgments sometimes say the entire
4    title of the offense or sometimes just give the title.
5    In other words, illegal voting chapter 64012.  Didn't
6    break it down to Section 1, an ineligible voter,
7    Section 2, voting twice in an election, Section 3,
8    marking a ballot contrary.  So I believe the judgment
9    says attempted illegal voting.
10   Q.  Are there any of the four that you've actually
11   identified here today that actually have a judgment that
12   indicates voter impersonation?
13   A.  I would have to looking back at the judgments and
14   sentence.
15   Q.  Of the five.  I'm sorry.  Of the five you added
16   additional?
17   A.  I'm sorry, sir.  I would have to go back and look
18   at the judgments and sentences.
19   Q.  So as you sit here today, you don't know?
20   A.  Yes, sir.
21   Q.  Why don't we take a quick break if you don't
22   mind?
23        MR. SWEETEN:  In the break, can we get a
24   copy of this?  So I can look at it, too.
25        MR. GEAR:  Sure.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

173

1      (Brief recess.)
2    BY MR. GEAR:
3      Q.  Back on the record.  Does the OAG's office have
4    primary jurisdiction or direct jurisdiction over voter
5    impersonation cases?
6      A.  I believe it has, going back to what I kind of
7    testified earlier, it depends on the type of election
8    that's conducted.  A single jurisdiction versus a
9    multi-jurisdiction case.  I think the attorney general's
10   office, under the Texas election code, can advise a
11   district attorney that they would be conducting the
12   prosecution.  I think that the attorney general's
13   office, under the chapter 273, can direct a DA or county
14   attorney to assist in the prosecution of the case as
15   well.
16     Q.  So as I understand your testimony, out of all of
17   the referrals that have been received by the OAG's
18   office, there have been five that were in some form
19   voter impersonation?
20     A.  Yes, sir.
21     Q.  At the poles; is that correct?
22     A.  Yes, sir.
23     Q.  Are you aware of any investigations of voter
24   impersonation that did not -- that were not referred to
25   the OAG's office?

---

174

1      A.  Yeah.  I'm only aware of cases that were referred
2    to our office.
3      Q.  And again, when we're talking about referrals,
4    we're talking about from multiple sources?
5      A.  Yes, sir.
6      Q.  Including police departments, correct?
7      A.  Yes, sir.
8      Q.  Local election officials?
9      A.  Yes, sir.
10     Q.  Local DA's and prosecutor's?
11     A.  Yes, sir.
12     Q.  Are you aware of any convictions of voter
13   impersonation other than the five cases that we've --
14   you've talked about here today, on the record?
15     A.  Yeah.  I don't really think there is a way to
16   know because I don't think -- you know, DA's offices
17   across the state don't report their -- don't report
18   their prosecutions to our office.  So I don't know any
19   other cases in Texas.
20     Q.  Well, let me explore that for a second.  At some
21   point there was an initiative that reached out to at
22   least 44 different counties or populations over 100,000
23   or more, correct?
24     A.  Yes, sir.
25     Q.  And did you -- "you," meaning your office.  Did

---

175

1    you create a referral system with the 44 different
2    counties?  Did you set up a way to communicate with them
3    regarding voter fraud in the State of Texas?
4      A.  If my memory serves me correctly, we took a look
5    at the referrals that our office had and then looked at
6    them geographically and divided the state based upon the
7    council of government divisions.  Because our hope was
8    to utilize the council of governments to help facilitate
9    the training.
10     Q.  And so just so I'm clear, on the record, "the
11   council of governments," what is that?
12     A.  Council of government is -- I don't know if it's
13   an actual political subdivision of the State.  But it is
14   a -- it is a group of counties and municipalities that
15   work together through a council of governments to share
16   resources.
17     Q.  And when you talked -- or when you discussed the
18   initiative, was there any specific training given to the
19   council of governments?
20     A.  No.  When I mentioned the council of governments,
21   we were hoping to -- council of governments provide a
22   lot of law enforcement training throughout the state.
23   And many of them actually have their own police
24   academies.
25     Q.  Okay.

---

176

1      A.  Which are State subsidized.  So we were hoping to
2    utilize their academies to help facilitate the training.
3      Q.  And did you?
4      A.  Yes, sir.
5      Q.  So as you sit here today, other than the five
6    that you've testified about, the five voter
7    impersonation cases that you've testified about, you're
8    unaware of any others?
9      A.  Yes, sir.  I don't have any knowledge of any
10   cases that the local DA's have prosecuted.
11     Q.  Have you attempted to determine if there's been
12   any prosecutions by local DA's regarding voter
13   impersonation claims?
14     A.  No, sir.
15     Q.  Have you attempted, and "you," being your office,
16   have you attempted to set up a system by which the local
17   DA's and prosecutors report to your office regarding
18   voter claims in general?
19     A.  No, sir, not that I'm aware of.  I would say that
20   it's statutorily required that if a DA's office is going
21   to do an investigation, that they notice the Secretary
22   of State's office if it involves a case.
23     Q.  Okay.  And so when the Secretary of State's
24   office is noticed, that may, in fact, result in a
25   referral to your office?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

177

1      A.  No, it wouldn't.
2      Q.  Can you tell me what the process is?
3      A.  If a local DA advises the Secretary of State's
4   office that they're going to investigate and prosecute a
5   case, it wouldn't generate a referral.  Because we limit
6   to those cases that -- the SOS, I believe, would refer a
7   case to us if the local jurisdiction wasn't going to
8   handle it.
9      Q.  Would -- I understand that it may not necessarily
10  generate a referral.  Would it generate communication
11  between the Secretary of State's office and your office
12  regarding that potential prosecution?
13     A.  No, sir, I don't believe so.
14         (Exhibit No. 591-592 was marked.)
15  BY MR. GEAR:
16     Q.  I'm showing you what's been marked as
17  Exhibit 591.  Take a look at it and then once you've had
18  a chance to review it, we can talk about it.
19     A.  Do you want me to read the whole thing.
20     Q.  No.  And actually, why don't I ask you the
21  question.  Have you seen this report before?
22     A.  No, sir.
23     Q.  Do you know what this is?
24     A.  It's titled the House Committee on elections
25  Texas House of representative interim report.  A report

---

178

1   to the Texas House of -- to the House of
2   Representatives, 81st Legislature.
3      Q.  And I direct your attention to Page 37, where it
4   says prosecution rates and fraud in Texas.
5         MR. SWEETEN:  Counsel, is this excerpted.
6   This isn't the full thing; is that right.
7         MR. GEAR:  I do not believe it's the full
8   thing.
9         MR. SWEETEN:  So we've got an excerpted.
10  Okay.  Page 37, now.  Is that what you said.
11        MR. GEAR:  Yes.
12  BY MR. GEAR:
13     Q.  Who is Eric Nichols?
14     A.  Eric Nichols used to be the deputy for the office
15  of the Attorney General.
16     Q.  Have you ever had any communications with Eric
17  Nichols regarding voter fraud?
18     A.  Oh, yes, sir.  He would have been my supervisor.
19  He supervised all criminal justice divisions within the
20  office of the attorney general.
21     Q.  And he supervised prosecutions of voter fraud
22  claims?
23     A.  Yes, sir.
24     Q.  And when would he have been your supervisor, if
25  you can give me the dates?

---

179

1      A.  I believe he would have been the Deputy Attorney
2   General for the office of the attorney general from 2010
3   to 2007, is my best guess.
4      Q.  Were you aware that he provided testimony in 2008
5   before the House Committee on elections?
6      A.  I wasn't aware that he provided testimony to the
7   House Committee.
8      Q.  Were you aware that he provided testimony
9   regarding prosecution rates of voter fraud in the State
10  of Texas?
11     A.  I know that he provided testimony to the Senate
12  Committee in 2009.
13     Q.  Okay.  Not so much asking you about the -- have
14  you seen this document.  I really want to focus on the
15  substance of his testimony and ask you a few questions
16  about that.  On the -- in the second paragraph,
17  prosecution rates and fraud in Texas, do you see where
18  it says, "that what the committee found is most election
19  fraud happened in Texas occurs with the absentee or
20  mail-in ballot system."  Do you agree with that
21  statement?
22     A.  I would -- actually, I don't know that I can
23  totally agree with that statement.
24     Q.  Why not?
25     A.  Because that's just the offenses that we have

---

180

1   detected and prosecuted.
2      Q.  So specifically dealing with referrals to the
3   OAG's office, would you agree that the majority of the
4   referrals deal with the by mail ballot system?  And I
5   understand that there could be a variety of violations
6   within that system.
7      A.  To me, a majority means more than 50 percent.
8   And I don't know that the main-in ballot fraud
9   represents 50 percent or more of our election code
10  referrals.  I do believe that it is a significant
11  portion of the referrals.
12     Q.  Well and you -- you maintain the spread sheets?
13     A.  Yes, sir.
14     Q.  You update it whenever a referral comes in, and I
15  believe you testified to monthly?
16     A.  Yes, sir.
17     Q.  If you looked at your spread sheet, could you
18  tell me what percentage of the cases involved deal with
19  the by mail ballot system?
20     A.  Yeah.  I could go through and do a quick analysis
21  or an analysis.  I don't know how quick.
22     Q.  Well, in looking at your spread sheet, could you
23  give me a general number, percentage?
24     A.  I would say it's probably close to 50 percent.
25  It's not a majority, but it's close.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 181

1  Q.  Okay.  And so the other 50 percent, what would
2  you say that...
3  A.  That comprises illegal voting as a whole.  And
4  then other types of poll place violations.  And then
5  election misconduct by actual elections officials,
6  campaign finance violations, those kinds of things.
7  Q.  So the charge of voter impersonation at the
8  polling place, what percentage would you say that makes
9  up of the 320 referrals that you've received in the
10  OAG's office?
11  A.  A small portion.
12  Q.  Five to be exact?
13  A.  Five.
14  Q.  Do you see the very next paragraph, "another
15  highly controversial topic brought up during the hearing
16  was the debate of whether or not illegal aliens or
17  illegal non-citizens were voting?"  And again, that's
18  Page 37.
19  A.  Yes, sir.
20  Q.  Were you aware of this controversy?
21  A.  Yes, sir.
22  Q.  Were you involved in any communications regarding
23  the controversy that illegal aliens -- illegal
24  non-citizens were voting?
25  A.  Could you repeat that one more time?

## 182

1  Q.  Were you involved in any communications regarding
2  the controversy as to whether or not illegal aliens or
3  legal non-citizens were voting?
4  MR. SWEETEN:  Objection; foundation.
5  Objection; scope.  Go ahead.  You can answer.
6  A.  I guess you would have to ask me communications
7  with who.
8  Q.  (By Mr. Gear)  Well, and that's why I
9  intentionally stated it broadly.  To find out if you
10  were first involved in any communications regarding this
11  topic.  And then if it will help, I will narrow that
12  down.
13  A.  Our investigations have revealed non-citizens and
14  illegal aliens casting ballots in elections.
15  Q.  Okay.  And so based on your referrals, can you
16  tell me, out of the 320, how many dealt with
17  non-citizens voting or illegal non-citizens voting?
18  A.  I do know that -- I do know that in the Dallas
19  2010 election that was referred to our office from the
20  Secretary of State, there was a non-citizen who voted in
21  that election.  I do know that in the Debra Briseno
22  case, which is a prosecution, that there were
23  non-citizens who voted in that election.  I am also
24  aware that in the Hidalgo County elections that there
25  were non-citizens who voted in those elections as well.

## 183

1  Q.  And Hidalgo County, what time period are we
2  talking about?
3  A.  I want to say that was the 2008 time frame.
4  Q.  Let's start with Hidalgo County 2008.  Is that
5  reflected in your spread sheet?
6  A.  I believe that would be on Page 3 of the election
7  code referrals office of Attorney General 2002 to
8  present.  And I believe it would be Hidalgo County
9  2008 municipal election, unlawfully rejecting voters,
10  illegal voting and unlawfully accepting voters.
11  Q.  What are the facts of that case?
12  A.  That was the City of Progresso municipal
13  election.  And our office assisted a portion of the
14  investigation that was conducted by the local district
15  attorney's office.
16  Q.  What did the facts show?
17  A.  I believe there was a Mexican national who voted
18  in that election.
19  Q.  And who was that, based on your spread sheet?
20  A.  It's not one of our prosecutions.  We just
21  assisted in the investigation.  It's not reflected in
22  our spread sheet.
23  Q.  And what was the end result of -- first of all,
24  was that referred to your office?
25  A.  It was referred to our office.  However, the

## 184

1  district attorney's office was prosecuting it already.
2  Q.  Did you work in conjunction with the district
3  attorney's office on that investigation?
4  A.  Yes, sir.  We helped out on the mail-in ballot
5  portion of that case because many of the mail-in ballots
6  were outside Hidalgo County.  We assisted them in
7  interviewing voters and checking addresses in other
8  parts of Texas.
9  Q.  So again, and I'm sorry.  I'm trying to
10  understand what the facts are of this case.  So did this
11  case deal with a mail-in ballot system, if you know?
12  A.  That I don't know.  The ADA, I believe, told me
13  that a non-citizen had voted in the election.  I don't
14  think she clarified whether it was in person voting or
15  mail-in ballot fraud.
16  Q.  And that was the allegation.  Was there a
17  conviction in this case?
18  A.  I down know.
19  Q.  Were these cases dismissed?
20  A.  I don't know.
21  Q.  So as you sit here today, you don't know if -- do
22  you know if those went into prosecution?
23  A.  Yes, sir.  I believe that -- I don't know for
24  sure.
25  Q.  And as you sit here today, you don't know the



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

### 185

1   extent of the facts involving those cases, correct?

2     A.  No, sir.  I only know a portion of the case.

3     Q.  And they would not be reflected in your spread

4   sheet?

5     A.  No, sir.

6     Q.  All right.  Let's see.  The other case that you

7   mentioned was Dallas County in 2010?

8     A.  Yes, sir.

9     Q.  Was that referred to the OAG's office?

10     A.  Yes, sir it was.

11     Q.  And can you show me on the spread sheet where

12   that is?

13     A.  That would be on Page 4 of the election code

14   referrals of the office of the Attorney General 2002 to

15   the present.  It would be, I believe was sixth case

16   down.  And it says, "Dallas 2010 primary elections.

17   Unlawfully obstructing watcher.  Illegal voting,

18   unlawful assistance, failure to witness application,

19   unlawfully witnessing more than one application.

20   Providing false information on application, possession

21   of mail-in ballots.  Unlawful assistance in bribery."

22   And the referral date was 4/20/2010.

23     Q.  So I see it here.  I don't see any names

24   indicated on Page 4, as you're testifying to.  Would it

25   be in any other portion of your spread sheet?

---

### 186

1     A.  No, sir.  She was not prosecuted.

2     Q.  So the allegation was not substantiated?

3     A.  No, sir.  She is a non-citizen.  However, we

4   didn't think that she had the mens rea.  Because someone

5   led her to believe that as a resident she could vote in

6   an election.

7     Q.  So tell me what the facts are.  What did you

8   find?  Did you investigate the case?

9     A.  I didn't personally.  But one of my investigators

10   did.

11     Q.  And who was the investigator?

12     A.  Sergeant Jennifer Bloodworth.

13     Q.  And can you tell me what the facts of the

14   investigation found?

15     A.  Specific to that non-citizen or generally as a

16   whole?  Because it's a substantial case.

17     Q.  Let's talk about the substantial case.  And we're

18   talking about, just so this is clear, we're talking

19   about Dallas County, the 2010 primary election, correct?

20     A.  Yes, sir.

21     Q.  And there was one individual that was ultimately

22   investigated?

23     A.  No, sir.  There were multiple individuals that

24   were investigated.  And those -- many of those

25   individuals are indicated in the prosecution's and

---

### 187

1   charges pending spread sheet.

2     Q.  Okay.  So you seem to have in mind one

3   individual?

4     A.  Yes, sir.

5     Q.  And you mentioned mens rea, which is, did not

6   have the intent, essentially?

7     A.  Correct.

8     Q.  Okay.  Can you tell me what the facts -- the

9   overall facts are of the case that you're talking about?

10     A.  Yes, sir.  She was approached by someone who was

11   canvassing her neighborhood.  And she wasn't certain

12   about when the time frame was, but that person assisted

13   her in the completion of a mail-in ballot application --

14   I'm sorry.  Correction.  Of a voter registration

15   certificate.

16     Q.  Okay.

17     A.  And on that voter registration certificate,

18   indicated that she had checked she was US citizen when

19   indeed she was not.  So therefore, the elections office

20   processed her voter registration application and she was

21   issued a voter registration certificate.  And so she had

22   voted in an election.

23     Q.  And when you say that "she did not have the men

24   rea," can you tell me what you mean in the context of

25   the facts?

---

### 188

1     A.  Yes, sir.  The actual person who helped her

2   register was a deputy voter registrar who was sworn by

3   the county to help her -- to help voters fill out their

4   registration cards.

5     Q.  Okay.

6     A.  And the deputy voter registrar checked that she

7   was a US citizen and told her that she could vote.  And

8   so she believed she actually could vote in an election.

9     Q.  Do you know the name of the deputy registrar?

10     A.  No, sir, I do not.

11     Q.  And now, you seem to suggest that there were

12   other individuals involved in this?

13     A.  Yes, sir.  This case was one of the largest cases

14   that we have investigated over the years.  It had

15   multiple allegations.  And we charged multiple

16   defendants, Delores McMillian was part of this referral.

17     Q.  Okay.  And you've testified to Ms. McMillian?

18     A.  Correct.  Another defendant in the spread sheet

19   who was identified during that investigation was Sylvia

20   Medrano, whose case is currently pending?

21     Q.  And that would be on page -- the first page of

22   the exhibit?

23     A.  Yes, sir.

24     Q.  And Sylvia Medrano was charged with what?

25     A.  Seven counts of illegal voting, ineligible voter.

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

## 189

1    Q. And would this be by absentee ballot?
2    A. I don't know for sure.
3    Q. Well, tell me what you know about the facts for
4    Sylvia Medrano.
5    A. This case involves a very contentious justice of
6    the peace election in the Dallas County area. I think
7    the election was decided by a little more than 100
8    votes. And a long serving justice of the peace was --
9    lost the election to a challenger. The investigation
10   revealed that many people who were family members and
11   friends of the challenger had just changed their voter
12   registration to addresses within the precinct for the
13   purposes of registering to vote in just that election
14   and to cast ballots.
15   Q. But as you sit here today, you don't know if it
16   was ballots by mail or ballots cast in person?
17   A. I don't know specifically which voters cast in
18   person. I do remember that a number of the family
19   members went together to the polling place on the same
20   day and voted in that precinct.
21   Q. And again, looking at the spread sheet, the
22   charges are unlawfully obstructing a watcher, what does
23   that mean?
24   A. A poll watcher is allowed to witness the
25   activity. And I think each candidate who's running for

## 190

1    office in Texas can designate a poll watcher. And it is
2    a criminal offense in the State of Texas for an
3    elections official to obstruct the poll watcher from
4    generally observing what kind of conduct is occur.
5    Q. Sylvia Mendrano was an election official?
6    A. No, sir, I don't believe so.
7    Q. Was she a candidate?
8    A. I don't believe she was a candidate in that
9    election.
10   Q. But she's charged with unlawfully obstructing a
11   watcher?
12   A. No, sir. I think you're looking at the
13   allegation portion and not the actual charge.
14   Q. Sure. But as I understood your testimony,
15   unlawfully obstructing a watcher is generally a charge
16   or allegation that's levied against an election
17   official?
18   A. Yes, sir. If I would clarify.
19   Q. Please.
20   A. When -- the design of the spread sheet is that we
21   take all of the allegations that are contained in the
22   referral for that specific election. So the spread
23   sheet shows all of the allegations that were lodged in
24   that case or in that referral.
25   Q. Against the individual?

## 191

1    A. Against -- in that election. And then what we do
2    is we actually show that the actual charge -- I guess
3    maybe I'm not making myself clear.
4    Q. Well, if I understood you correctly, you're
5    telling me that there may be multiple defendants -- and
6    we'll stay with Sylvia Medrano for a second. There may
7    be multiple defendants in the allegations. Are all of
8    the potential charges against all of the defendants?
9    A. No, sir.
10   Q. Okay. Then I didn't understand you.
11   A. If I can kind of explain the mechanics of how I
12   do it. You know, I do have three books in the Excel
13   spread sheet. And as somebody is charged, I cut and
14   paste all of the allegations contained in the referral
15   into the charging book so that it shows the county and
16   all of the allegations that were in that election. And
17   then the election itself and then the cause number of a
18   charging instrument. And then the actual charge.
19   Q. So ultimately she was charged with four counts of
20   illegal voting. Sorry. Looking at the wrong one. She
21   was charged with seven counts of illegal voting?
22   A. Yes, sir.
23   Q. And you're not -- as you testify today, you're
24   not saying that she voted seven times in a polling
25   place?

## 192

1    A. I don't know how many times that she voted in a
2    polling place.
3    Q. Is it fair to say that this charge is addressing
4    the issue of by mail ballots?
5    A. I don't know if it was a poll place violation, in
6    person voting or mail-in ballots.
7    Q. You don't know.
8    A. Not off the top of my head, no, sir?
9    Q. I believe you also said Ms. Briseno?
10   A. Yes, sir.
11   Q. Can you tell me what the facts of that were?
12   A. This case was referred to our office by the
13   district attorney of, I believe it was Lavaca County.
14   Q. Port Lavaca?
15   A. Port Lavaca. And he requested investigative
16   assistance from our office in determining allegations of
17   illegal voting and misconduct in the election. It was a
18   very heated contested election. And I think three
19   candidates emerged with a very close margin in that
20   election. I think there were about 19 votes that
21   separated the three candidates. And I think Debra
22   Briseno was the winning candidate.
23   Q. Can you tell me what the facts of the case are?
24   A. Debra Briseno signed up as a deputy voter
25   registrar. So she assisted in the voter registration of



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

193

1  citizens in the county.  She additionally registered
2  non-citizens to vote during that election and informed
3  them that they could indeed vote in that election
4  despite the fact that they were not citizens in the US.
5      Q.  And Ms. Briseno was the only one charged in that
6  case?
7      A.  That's correct.
8      Q.  And was there a determination as to why not to
9  charge the non-citizens who had registered?
10     A.  Again, you have a person who is sworn as a deputy
11  voter registrar by the elections department who the
12  voters -- the non-citizens perceived to be as a
13  representative of the government.  At the time, she was
14  actually a city council person for the City of Port
15  Lavaca.  So these voters believed that what they were
16  telling -- what she was telling them, that they could
17  vote in the election, they took at face value.
18     Q.  And again, in this case there would have been no
19  mens rea?
20     A.  I believe that is why they were not charged in
21  this case.
22     Q.  Okay and so I believe we've gone through the
23  cases where non-citizens were alleged to have voted,
24  Dallas 2010, Ms. Briseno and Hidalgo County.  Were there
25  any others that you're aware of on these spread sheets?

194

1      A.  I remember a case in Culberson County where
2  allegations were made, but they were unsubstantiated.
3      Q.  Did that result in an investigation?
4      A.  Yes it did.
5      Q.  Did it result in any charges?
6      A.  No, sir, it did not.
7      Q.  So other than the -- the three distinct cases,
8  Dallas County, Ms. Briseno and Hidalgo, are you aware of
9  any others?
10     A.  No, sir.  Not that resulted in criminal charges.
11     Q.  So out of the 320 referrals that came into your
12  office, are you aware of any others that alleged
13  non-citizens voting?
14     A.  Not of the cases that were referred to our
15  office.
16     Q.  Referring back to the 2008 report, page -- Page
17  37, paragraph 3, after prosecution rates and fraud in
18  Texas, it says, "through talking with our county
19  election officials and other experts the committee found
20  the chance of a legal alien -- of an illegal alien
21  actually voting are very slim."  Based on your
22  experience as an investigator who's been in the OAG's
23  office for -- since prior to 2005 and been with the SIU
24  the entire time of its creation, would you agree with
25  this statement?

195

1      MR. SWEETEN:  Can you read the question
2  back?
3  BY MR. GEAR:
4      Q.  And I can try to pose it again.  It was kind of a
5  long, run-on question.  Would you agree that based on
6  your experience in the -- as an investigator and
7  supervisor in the SIU, would you agree that the chance
8  of an illegal alien actually voting in an election in
9  the State of Texas, are very slim?
10     MR. SWEETEN:  Objection; calls for
11  speculation.  You can answer.
12     A.  I don't believe it's very slim.  It all depends
13  on the motivation to do so.  Through my investigations
14  over the years that I have worked with the Texas
15  Attorney General's office, it has come to our attention
16  that in some elections officials have told us, people
17  working in the voter registration departments, that
18  non-citizens have gotten voter identification cards to
19  try to develop -- to try to validate -- to validate
20  themselves inside Texas or the United States.  That it
21  is one of the precursor documents that they can obtain
22  to try to obtain other things like a Texas driver's
23  license, so they can remain here illegally.
24     So it really depends on the motivation.  If the
25  motivation to obtain a voter registration certificate is

196

1  simply to try to get documents, then I would say it is
2  not very likely.  But our investigations have also
3  revealed in certain areas of the state, that voters are
4  paid to vote.  And they might be persuaded to vote in an
5  election.
6      Q.  (By Mr. Gear)  Okay.  And so let me break that
7  down a little bit, because my question was voting.  Is
8  the chance slim?  So I understand your testimony that
9  there may be other motivations for them to obtain a
10  voter registration card.  But in your experience in the
11  SIU and based on the referrals that you've seen, is the
12  occurrence of an illegal alien or illegal non-citizen,
13  is that type of referral rare to your office?
14     A.  When I look at the 320 referrals that we have,
15  the allegations of a non-citizens voting in an election,
16  the number is small.
17     Q.  And "small," meaning three distinct cases that
18  you've identified here on the record?
19     A.  Yes, sir.  I can think of three to come in mind.
20     (Exhibit No. 593 was marked.)
21  BY MR. GEAR:
22     Q.  Let me know when you've had a chance to review
23  the document.
24     A.  Yes, sir.
25     Q.  Can you tell me what this is?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

### 197

1    A. This appears to be an article out of the Dallas
2  Morning News. It's dated May 18, 2008, and it's titled
3  Abbott GOP Pressing For Required Photo ID.
4    Q. Do you see the paragraph that indicates,
5  "Republicans say that the mere possibility of illegal
6  voting merits changes. Particularly with the rising
7  illegal immigration population and that the photo ID
8  requirement is not onerous." Do you see that?
9    A. I'm sorry. Okay. Yes, sir, I see that.
10    Q. As a supervisor in the SIU, were you aware of any
11  debate regarding the rise of -- rising illegal immigrant
12  population in reference to photo ID?
13    A. You mean globally as a --
14    Q. State of Texas.
15    A. As a citizen of the State of Texas or...
16    Q. Yes. Well, no. As your -- as the supervisor in
17  the SIU, were you aware of this debate?
18        MR. SWEETEN: Assumes facts not in evidence.
19  Objection.
20    A. I'm aware of the debate as a whole of this issue.
21  But not in the special investigations unit.
22    Q. (By Mr. Gear) Were you involved in any
23  communications with either the Attorney General or the
24  Secretary of State's office that -- where the topic of
25  rising illegal immigrant population was the topic of

---

### 198

1  discussion?
2    A. No, sir.
3    Q. During the consideration of the referrals or
4  investigations, were you ever asked to give special
5  attention or focus on illegal aliens or non-citizens
6  voting?
7    A. No, sir. I was never asked to give any special
8  consideration to that. At some point in time, I had
9  been asked, "Hey, are there any cases on your spread
10  sheet?" And in those circumstances I identified the
11  ones on the spread sheet, as I have done today.
12    Q. Who made this request?
13    A. I don't remember.
14    Q. Well, let's see if we can flesh this out. When
15  were you asked to identify these types of cases on your
16  spread sheet?
17    A. I don't remember.
18    Q. Was it during the 2011 legislative session?
19    A. I couldn't say for certain.
20    Q. Was it by a legislator?
21    A. Oh, no, sir.
22    Q. Was it by someone in the Secretary of State's
23  office?
24    A. I don't believe so, no.
25    Q. Do you recall which office the request came from?

---

### 199

1    A. I would believe it came from -- internally within
2  the law enforcement division.
3    Q. Internally from which division?
4    A. Well, the special -- I would say that it came
5  from either my division chief or my, at the time, who
6  would have been Major Boatright or the Deputy Attorney
7  General for criminal justice Eric Nichols.
8    Q. Do you know what the reason for that request was?
9    A. No, sir.
10    Q. And did you respond to that request?
11    A. I would presume so, yes.
12        (Exhibit No. 593 was marked.)
13  BY MR. GEAR:
14    Q. I'm showing you what's been marked as Exhibit 593
15  and give you a chance to look at that. Have you had a
16  chance to review the document?
17    A. I'm almost done. Sorry.
18    Q. Take your time.
19    A. Okay, sir.
20    Q. Can you tell me what this is?
21    A. This document appears to be a clipping of the
22  Dallas Morning News, dated May 18, 2008. And it is
23  titled AG Fails to Uncover Major Voting Fraud.
24    Q. Have you seen this newspaper article before?
25    A. Not to my memory.

---

### 200

1    Q. Focusing on the article itself, by May 18, 2008
2  it indicates that, "Mr. Abbott has prosecuted 26 cases."
3  Would that be accurate based on your spread sheet?
4    A. I think about that time that would be pretty
5  close.
6    Q. Okay. Is it also accurate to say that in 18 of
7  the 26 cases the voters were eligible voters with -- the
8  votes were properly cast and no vote was changed, 18 of
9  the 26?
10    A. I do know that no vote was changed, but I don't
11  know that it was properly cast.
12    Q. It also goes on to say, "but people who collected
13  the ballots for mail-in were prosecuted." Would that be
14  fair to say?
15    A. Yes, sir. If I could clarify.
16    Q. Please.
17    A. If someone assists in the completion of a mail-in
18  ballot, someone assists the voter, fails to sign as
19  assisting the voter and -- or possesses the ballot, they
20  would be prosecuted for the position of the ballot or
21  carrier of envelope of another. Many of these cases
22  also involve unlawful assistance. And if a voter was
23  unlawfully assisted in the completion of a mail-in
24  ballot or any other type of ballot, under State law that
25  ballot would be stricken.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Major Forrest Mitchell                                    June 15, 2012

---

201

1      Q.  Okay.  And it says, in 593, that "the State law
2  makes it a crime to carrier someone else's filled out
3  ballot to the ballot box."  Is that fair?
4      A.  It is a crime unless they identify themselves on
5  the carrier envelope.
6      Q.  Unless the carrier puts his or her own name on
7  the -- and address on the envelope?
8      A.  Yes, sir.  I believe there are also defenses to
9  prosecution to that.
10     Q.  In the middle column of Exhibit 593, I think it's
11 the third paragraph in the bottom, "when an attorney
12 general makes certain cases a priority, you can dispatch
13 investigators, assign teams of State lawyers and direct
14 millions of dollars from federal grants and the agency
15 budget, such assistance helps bolster action in counties
16 especially where local prosecutor's lack the resources."
17 Is that a fair statement?  And let me -- why don't you
18 strike that.  Is it accurate that when an attorney
19 general, in this case Attorney General Abbott, makes
20 voter fraud a priority, he can do the types of things
21 described here?
22         MR. SWEETEN:  Assumes facts not in evidence.
23 Calls for speculation.  Objection.
24 BY MR. GEAR:
25     Q.  Well, let me see if I can come at that a little

---

202

1  bit differently then.  Is it accurate to say that
2  Attorney Abbott dispatched investigators throughout the
3  state to root out and prosecute voter fraud cases?
4      A.  No, I wouldn't say that's an accurate statement.
5      Q.  What would you say is an accurate statement?
6      A.  I would say that our office receives referrals
7  from third parties, such as the Secretary of State or
8  the DA's offices or local law enforcement, asking us to
9  help them in the investigation of election code
10 violations.  And that we have a group of investigators
11 who perform their duty in that regard.
12     Q.  Does he have an authority to assign teams of
13 State lawyers?
14         MR. SWEETEN:  Objection; calls for
15 speculation.  You can answer.
16     A.  I don't think the Attorney General would direct
17 the assignment of prosecutor's to cases.  I think that
18 we have a number of prosecutor's within our office who
19 handle a wide variety of cases, some which include
20 election cases.
21     Q.  (By Mr. Gear)  Is it accurate in this article
22 that there was a $1.4 million federal crime fighting
23 grant?
24     A.  As I think I previously discussed in my
25 testimony, I think the criminal investigations division,

---

203

1  just the criminal investigations division, got a $1.4
2  million grant.  And of that grant, a portion of
3  investigators were hired and the special investigations
4  unit, the money laundering unit, the cyber crimes unit
5  and the fugitive apprehension unit.
6      Q.  Previously you testified to a case regarding
7  Hidalgo County.  If you look at paragraph 3, second
8  paragraph I believe, from the top, it says, "in another
9  case, three Hidalgo County women were indicted on
10 charges.  They illegal assisted elderly voters and
11 mishandled the mail-in ballots in 2005, McAllen mayor's
12 race."  Was that the Hidalgo case that you were
13 referencing that was handled by a different agency?
14     A.  No.  This is actually a different case.
15     Q.  It is a different case?
16     A.  Yes, sir.  And I think in that case there were --
17         MR. SWEETEN:  Just answer his question.
18     A.  I'm sorry.
19     Q.  (By Mr. Gear)  And the answer was this is a
20 different case?
21     A.  This is a different case.
22     Q.  And in this case in 2005, the judge dismissed the
23 allegations.  Is that accurate?
24     A.  Yes, sir, I believe so.
25     Q.  And is this particular case referenced in your

---

204

1  spread sheet?
2      A.  Yes, sir.  It's referenced in the referrals.
3      Q.  I think I'm almost done.  Let me kind of go
4  through my notes here?
5      A.  Yes, sir.
6      Q.  Are you aware of any testimony during the 2011
7  legislative session where SB 14 was discussed where your
8  spread sheet was the topic of discussion?
9      A.  I believe I was present when Deputy Director
10 David Maxwell testified, but I don't recall which
11 session -- which House.
12     Q.  And he testified in 2011?
13     A.  Yes, sir, I believe so.
14         (Exhibit No. 594 was marked.)
15 BY MR. GEAR:
16     Q.  I'm going to show you what's been marked as
17 Exhibit 594 and give you a chance to look at that.  You
18 indicated that David Maxwell provided testimony.  And
19 the question is, is that what you were referring to?
20     A.  Yes, sir, I believe so.
21     Q.  Do you see any reference to a spread sheet in his
22 testimony, more specifically, to your spread sheet?
23     A.  I don't see anything that says my spread sheet.
24     Q.  Okay.  Does anything he testified to in 2011
25 change any of the answers that you gave here today?

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

205

1      A. No, sir, I don't believe so.
2           MR. SWEETEN:  I'm going to object to the
3      question as compound.  But he's answered it.
4           (Exhibit No. 595 was marked.)
5      BY MR. GEAR:
6      Q. Did you still want the take some time to review
7      that?
8      A. I don't believe Mr. Maxwell's testimony will
9      change my testimony.
10     Q. Okay.  Take some time to review that exhibit and
11     then we can talk about it.
12     A. This one right here, sir?
13     Q. Yes.  And specifically, just so we can move this
14     forward a little bit, I think it's Page 7, do you see
15     your name indicated?
16     A. Yes, sir, I do.
17     Q. Have you seen this document before?
18     A. No, sir.
19     Q. And for the record, this is the plaintiffs
20     supplemental initial disclosures pursuant to federal
21     rules of civil procedure 26 A.  Were you involved in any
22     aspect of preparing this particular document?
23     A. No, sir.
24     Q. All right.  And I ask you, did you see your name
25     indicated in it under, I believe No. 12, it indicates

206

1      Captain Forrest Mitchell.  That's actually Major
2      Mitchell at this point, correct?
3      A. Yes, sir.
4      Q. All right.  And it says, "Captain Mitchell is a
5      member of the special investigations unit of the law
6      enforcement division of the office of the Texas Attorney
7      General," which is accurate, correct?
8      A. Yes, sir.
9      Q. "Captain Mitchell or Major Mitchell, has
10     knowledge regarding election fraud in the State of
11     Texas."  Other than the testimony that you provided
12     today, is there any additional knowledge that may be
13     relevant to voter fraud in the State of Texas?
14          MR. SWEETEN:  Counsel, I'm going to the
15     object to the question as vague.  We've provided a
16     description of his areas of testimony.  Obviously you've
17     had the opportunity to, now for six hours, to question
18     him on that.  We intend to ask him questions, and in
19     relation to the substance of the matters here.  So I
20     think the question is -- I think it's unfair.
21          MR. GEAR:  I withdraw the question.
22     BY MR. GEAR:
23     Q. Other than what you've testified to here today,
24     are you aware of any other cases of voter impersonation
25     in the State of Texas?

207

1      A. No.  I'm only aware of the ones that were
2      referred to our office.
3      Q. Other than what you testified to here today, are
4      you aware of any other cases where the allegation was
5      illegal aliens or illegal non-citizens voting?
6      A. No, sir.
7      Q. Other than what you testified to here today, are
8      you aware of any other investigations regarding voter
9      impersonation?
10     A. Could you repeat that one more time?
11     Q. Other than what you testified to here today, are
12     you aware of any other investigations involving voter
13     impersonation in the State of Texas?
14     A. I am aware of one.
15     Q. And what would that be?
16     A. I read an article about a case that's ongoing now
17     in Tarrant County where the -- a son used his father's
18     voter registration card to cast a ballot in an election.
19     But I just read that in the open source newspaper.
20     Q. So you gained that knowledge from the newspaper?
21     A. Uh-huh.
22     Q. Has any allegation been referred to the OAG's
23     office?
24     A. No, sir.  That's being conducted by the Tarrant
25     County district attorney's office.

208

1      Q. Has there been any communication with the Tarrant
2      County district attorney's office regarding that
3      allegation?
4      A. No, I haven't talked to them at all.
5      Q. Do you know the name of the alleged?
6      A. No, sir, I'm sorry.
7      Q. Perpetrator, for lack of a better word?
8      A. No, sir, I'm sorry.
9      Q. Do you know the election that it allegedly
10     occurred?
11     A. I want to say it was this primary election.
12     Q. 2012?
13     A. Uh-huh.
14     Q. And that occurred on?
15     A. I think it would be May 29th.
16     Q. May 29 primary election.  And other than what you
17     read from the newspaper, are you aware of any other
18     facts pertaining to that?
19     A. No, sir.
20     Q. Can you investigate alleged voter fraud without a
21     referral?
22     A. The Texas election code does say that if we had
23     reason to believe that a violation occurred, that the
24     attorney general's office could investigate.
25     Q. Have you ever investigated a voter fraud case



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Major Forrest Mitchell                                              June 15, 2012

## 209

1    without an official referral?

2      A.  No, sir.  We generally -- we request a referral

3    before we initiate an investigation.

4      Q.  Have you requested a referral for the case which

5    you just referenced?

6      A.  No, sir.

7      Q.  Other than what you testified today, are you

8    aware of any prosecutions for voter impersonation in the

9    State of Texas?

10     A.  I believe the DA has indicted that case in

11   Tarrant County, the one I said regarded voter

12   impersonation.

13     Q.  Is the OAG's office involved in that case in any

14   aspect?

15     A.  No, sir.

16     Q.  I believe you testified that you have not

17   requested a referral?

18     A.  No, sir.

19     Q.  Why not request a referral for that particular

20   case?

21     A.  Because we have plenty of work to do on our own.

22     Q.  Fair answer.  I think I am done.

23         MR. GEAR:  And I will pass the questioning

24   to Ezra.

25         MR. ROSENBERG:  Thanks.

## 210

1         EXAMINATION

2   BY MR. ROSENBERG:

3     Q.  And I will be very short, Major.  Thanks for your

4   time today.

5     A.  Yes, sir.

6     Q.  Just a couple of questions.  You testified that

7   statutorily required for the district attorneys to

8   notice the Secretary of State when they are charging

9   someone with election fraud.  Is that what the

10   requirement is?

11     A.  I believe the statutory language says if they are

12   going to initiate an investigation of prosecution.

13     Q.  And I think you also testified then, that the

14   Secretary of State maintains a list of those instances

15   when it has been notified?

16     A.  I don't remember that.

17     Q.  Have you ever seen a list that's maintained by

18   the Secretary of State of investigations that were

19   initiated by the district attorney?

20     A.  No, I've never seen such a list.

21     Q.  Do you know if any such list has been produced in

22   this litigation?

23     A.  No, sir, I do not.

24     Q.  Other than the spread sheet that you maintained,

25   have you ever created any reports related to voter

## 211

1   fraud?

2     A.  As I previously testified, sir, preceding the --

3   preceding the creation of the spread sheet, I was

4   required to produce a WordPerfect document that talked

5   about the types of cases that we would referred and the

6   referral sources and the allegations contained.

7     Q.  And has that document been produced in this

8   litigation?

9     A.  I provided it to counsel.

10     Q.  Other than that WordPerfect document, have you

11   ever created any other report related to voter fraud?

12     A.  No, sir.

13     Q.  Have you ever done any specific analysis of in

14   person voter fraud, other than the spread sheet and the

15   WordPerfect document?

16     A.  One time in, I want to say 2006, I looked at the

17   incidents of mail-in -- not mail-in ballot fraud, but

18   the proportion of mail-in ballots received by a county.

19     Q.  And what was your purpose in doing that?

20     A.  I wanted to see what the typical average is in

21   the State of Texas for an elections office to receive --

22   for the number of registered voters to the number of

23   mail-in ballots cast.

24     Q.  Did you draw any conclusions in that report?

25     A.  If memory serves me correctly, I think it was,

## 212

1   the average county might receive two to three percent of

2   their registered voters for mail-in applications.

3     Q.  Did you break down that percentage by any

4   demographics?

5     A.  No.

6     Q.  Other than that report and the spread sheet and

7   the WordPerfect document, have you done any specific

8   analysis of in person voter fraud?

9     A.  No, sir.

10     Q.  Have you ever been asked to do any specific

11   analysis of in person voter fraud?

12     A.  No, sir.

13     Q.  To your knowledge, has anyone in your office ever

14   been asked to do any specific analysis of in person

15   voter fraud?

16     A.  No, sir.

17     Q.  To your knowledge, has anyone in your office ever

18   been asked to do an analysis of how various forms of

19   voter identification would affect the level of voter

20   fraud?

21     A.  No, sir.

22     Q.  I would like to talk, very briefly about the four

23   instances of voters who tried to impersonate -- who are

24   alleged to have tried to impersonate others.  And by

25   that -- I said four.  You can correct me if I'm wrong.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 213

1  As I understand it, it is only four instances of persons
2  trying to impersonate others.  The fifth person was
3  charged with trying to help one of these four people
4  impersonate someone else.  Is that correct?
5      A. That's correct.
6      Q. So it is four instances where a person tried to
7  impersonate someone else.  One of those instances was
8  McMillian.  And as I understand that, that was an
9  election official; is that correct, McMillian?
10     A. Yes, sir.  Delores McMillian was an elections
11 worker in Dallas County.
12     Q. And somehow, prior to the polls opening, she had
13 somehow signed herself up as someone else?
14     A. Yes, sir, that's my understanding.
15     Q. So that wasn't a situation where
16 Delores McMillian walked into the polling place and
17 pretended, to the election official, that she was
18 someone else; is that correct?  She was basically
19 cooking the books because she was the election official
20 herself, right?
21     A. My understanding is that she marked that voter on
22 the ballot before the polls were even opened.
23     Q. Without having to interact with any other
24 election official, right?
25     A. I believe that she was interacting with her

## 214

1  mother who was doing the same thing.
2      Q. So it's not a situation where she presented an
3  identification to someone and said I'm someone else.
4  She just manufactured this along with her mother because
5  she was the election official, correct?
6      A. That's my understanding, yes, sir.
7      Q. Now, you also talk about a Mary Comparin.  And
8  did you say that that was a situation where
9  Ms. Comparin, and I know this is -- I've only,
10 Mr. Sweeten, because it's a company situation.  But
11 she's alleged to have gotten, I think you used the term
12 "various images of driver's licenses, et cetera?"
13     A. It's my understanding that Mary Comparin had
14 obtained three or four Texas driver's licenses in
15 different names.
16     Q. With her photo on them?
17     A. Yes, sir.
18     Q. So if she were to produce those driver's licenses
19 at the polling place, the photo would match her face,
20 correct?
21     A. Yes, sir.
22     Q. So SB 14 would not really help that situation; is
23 that correct?
24         MR. SWEETEN:  Objection; calls for legal
25 conclusions, speculation.  But you can answer.

## 215

1      A. It depends on whether she used her voter
2  registration certificate to come to the polling place to
3  cast her ballot, or whether she used her Texas driver's
4  license.  That suspect had obtained four different voter
5  registrations that were mailed to her residence.
6      Q. (By Mr. Rosenberg)  Right.  But for terms of the
7  photo ID that she had, there was three different photos
8  of her, but under three different names; is that
9  correct?
10     A. Yes.  She had three different IDs in different
11 names.
12     Q. Are you aware of anyone more knowledgeable than
13 yourself in the SUI or the OAG who has knowledge of
14 voter fraud?
15     A. No, sir.
16     Q. I didn't think so.
17         MR. ROSENBERG:  And I think I don't have any
18 further questions.
19         MR. SWEETEN:  I'm probably going to have a
20 short redirect.  So I'm going to speak with counsel
21 about it so let's take about a 5-minute break.
22         (Brief recess.)
23         EXAMINATION
24 BY MR. SWEETEN:
25     Q. Major Mitchell, you have been asked a number of

## 216

1  questions today about voter fraud.  And I want to ask
2  you a few questions based upon your experience as an
3  investigator.  What types of cases do you work on in
4  addition to voter fraud?
5          MR. GEAR:  I just object; asked and
6  answered.  But go ahead.
7      A. Currently, I don't do any investigations myself.
8  I'm just a supervisor investigator at this point in
9  time.  But historically, I have worked capital murder
10 investigations, public integrity investigations, money
11 laundering investigations, fraud investigations.
12 Citizen investigation, administrative investigations.
13 And a wide variety of criminal offense.
14     Q. (By Mr. Sweeten)  How long have you worked
15 specifically on the issue of investigating voter fraud
16 as part of the many things you do?
17     A. I would say since 2005.
18     Q. Now, with respect to the issue of in person voter
19 fraud, can you tell us how difficult is in person voter
20 fraud to defect as a general matter?
21     A. It is incredibly difficult to detect.
22     Q. Why is that?
23     A. Because the only way that -- it's my experience
24 that the only way that you would detect in person voter
25 fraud is if someone inside the polling place personally



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 217

1  knows the person who's presenting the fraudulent voter
2  registration certificate.  And additionally, there is an
3  absence of a positive identification in that regard, in
4  that it's difficult, many times when we get these cases
5  referred to us, that they are coming months after the
6  fact.  And many cases, it could be there's already
7  another election that has taken place.
8          And when I interview witnesses or any one of my
9  investigators interview witnesses it's very difficult
10 for voters to identify a potential suspect, if there was
11 one, through conventional photo line-ups or that regard.
12 So it is very hard to detect unless someone in the
13 actual polling place knows that person personally.
14     Q.  Okay.  How difficult is in person voting fraud to
15 detect as compared to other types of crimes, such as
16 white-color crime that you investigate?
17         MR. ROSENBERG:  I'm going to object to form.
18         MR. GEAR:  I would object; calls for
19 speculation.
20 BY MR. SWEETEN:
21     Q.  Just based upon your experience as an officer,
22 can you compare as far as detecting in person voter
23 fraud, how it compares to other types of crimes that you
24 investigate?
25         MR. SWEETEN:  I will also object to

## 218

1  relevance.
2          MR. ROSENBERG:  And compound.  Go ahead.
3      A.  I believe that in person voter fraud is very
4  difficult to detect in comparison to other cases because
5  in other cases I have, in many cases, forensic evidence
6  that I can rely upon to detect a potential suspect that
7  do not exist in in person voter fraud.
8      Q.  (By Mr. Sweeten)  Okay.  Now, when we talked --
9  we talked about, I think to a large degree, about the
10 sources of referrals that the office of attorney general
11 received.  You talked about referrals from the Secretary
12 of State from local election officials and from local
13 law enforcements.  Let me ask you, when the district
14 attorney's office is prosecuting an election fraud case,
15 do you -- are you aware of that?  Are you made aware of
16 that?
17     A.  Not necessarily.
18     Q.  Okay.  And in the three most popular counties in
19 the State of Texas would Harris County.  When the Harris
20 County DA prosecutes a voter fraud case, is that
21 something you're made aware of?
22     A.  No, sir.
23     Q.  Do you have any access to statistics about how
24 often voter fraud is prosecuted by that agency?
25     A.  No, sir.

## 219

1      Q.  What about the Harris County attorney, same set
2  of questions.  Are you given the -- do you have access
3  to data regarding how much in person voter fraud they
4  prosecute in a given year?
5      A.  No, sir.
6      Q.  Are you necessarily made aware of any in person
7  voter fraud case that's occurring by the Harris County
8  attorney?
9      A.  No, sir.
10     Q.  What about Bexar County?  What about the Bexar
11 County district attorney.  Are you made aware
12 specifically of instances of in person voter fraud or
13 prosecutions?
14         MR. GEAR:  Are you saying bare or bared.
15         MR. SWEETEN:  Its' B-E-X-A-R, Bexar.  It's
16 San Antonio.
17     A.  No, sir.
18     Q.  (By Mr. Sweeten)  Okay.  With -- if the -- if a
19 county attorney prosecutes a case of voter fraud, are
20 you made aware of that?
21     A.  No, sir.
22     Q.  How about Dallas County, same question, are you
23 made aware when the Dallas County district attorney is
24 prosecuting a case of in person voter fraud?
25     A.  No, sir.

## 220

1      Q.  Do you have access to statistics related to that?
2      A.  No, sir.
3      Q.  What about if a county attorney is prosecuting a
4  case, do you have access to that information?
5      A.  No, sir.
6      Q.  Data regarding that?
7      A.  No, sir.
8      Q.  What about as to any other county in the State of
9  Texas, do you go automatically -- are you given data
10 regarding those prosecutions?
11     A.  No, sir.
12     Q.  Now, we've talked about other prosecutorial
13 entities within the State of Texas that prosecute.  Are
14 there other law enforcement agencies that prosecute in
15 person voter fraud?
16     A.  I believe there could be more.
17     Q.  Okay.  Does the federal -- does federal law
18 enforcement refer or do they investigate allegations of
19 voter fraud?
20     A.  I believe the FBI and the Department of Justice
21 could investigate allegations of in person voter fraud
22 if it was a national election.
23     Q.  From 2002 through 2011, did any federal law
24 enforcement agency refer any cases to your office?
25     A.  Would you repeat that one more time?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Major Forrest Mitchell                                    June 15, 2012

---

221

1   Q.  From 2002 through 2011, did any federal law
2   enforcement agency refer any voter fraud cases to your
3   office?
4   A.  No, sir, not voter fraud.
5   Q.  Does your spread sheet include any cases
6   investigated by federal law enforcement officials?
7   A.  No, sir.
8   Q.  Does your spread sheet include any entries
9   related to district attorneys or county attorneys that
10  have prosecuted voter fraud?
11  A.  Only the ones that we cooperated with or assisted
12  them on the investigation.
13  Q.  Okay.  If you wanted to find out what federal law
14  enforcement agencies have prosecuted voter fraud in this
15  State, who would you ask?
16  A.  I would think I would have to ask the four
17  different US districts department of justice.
18  Q.  Does -- let me ask you the question.  Does the
19  fact that the office of the attorney general, and you
20  testified earlier that the office of the attorney
21  general received approximately 320 referrals from 2002
22  to the present for alleged election code violations.  Do
23  you recall that testimony?
24  A.  Yes, sir, I do.
25  Q.  Does the fact that your list contains 320

---

222

1   entries, does that mean since 2002 there have been 320
2   voter fraud cases in Texas?
3        MR. ROSENBERG:  Objection; leading.
4   BY MR. SWEETEN:
5   Q.  Does it mean that?
6        MR. GEAR:  Same objection.
7        MR. ROSENBERG:  Same objections.
8   BY MR. SWEETEN:
9   Q.  You can answer.
10  A.  I do not believe that the 320 referrals listed on
11  my spread sheets are representative of the actual
12  misconduct that's occurring in the State of Texas.  I
13  believe that there's many that go undetected.
14  Q.  And so is it your belief that in addition to the
15  320 referrals, what is your belief as to whether there
16  are additional cases of voter fraud that go undetected?
17  A.  I believe that there are cases of voter fraud
18  that go undetected and unreported.
19  Q.  Okay.  Let me ask you, does the fact that the
20  office of attorney general receive more referrals
21  related to mail-in voting fraud, meaning that it is any
22  less serious of -- actually that it's less serious a
23  crime than mail-in ballot fraud?
24       MR. ROSENBERG:  Objection; leading.
25       MR. GEAR:  Objection; leading.

---

223

1   A.  I'm sorry.  Could you restate the question?
2   Q.  (By Mr. Sweeten)  Yeah.  Does the fact that the
3   office of the attorney general received 3 -- I think you
4   testified, received more mail-in ballot fraud
5   allegations and referrals than in person mail-in
6   referrals, does that make it a less serious crime under
7   the Texas statutes of the penal code?
8        MR. ROSENBERG:  Same objection; leading.
9        MR. GEAR:  Also same objection.
10  A.  No, sir.
11  Q.  (By Mr. Sweeten)  In your experience as a law
12  enforcement officer, does increasing the severity of
13  criminal penalties act as a deterrent to those intends
14  to commit a criminal act?
15  A.  Yes, sir I believe so.
16  Q.  Does Senate Bill 14 increase criminal penalties
17  for attempts?
18  A.  Yes, sir I believe it does.
19  Q.  And what about for actual voter fraud?
20  A.  I think it increases the penalty.
21  Q.  Between mail-in voter fraud and in person voting
22  fraud, which of those two crimes is, as an investigator
23  more difficult to investigate?
24       MR. GEAR:  Objection; vague.  Objection;
25  calls for speculation.

---

224

1   BY MR. SWEETEN:
2   Q.  You can answer.
3   A.  It has been my experience that the most difficult
4   case to investigate would be in person voter fraud.
5   Q.  I'm going to read a statement to you and I'm
6   going to ask you if you agree with this.  "The well
7   publicized fact that voter registration lists
8   fraudulent, deceased or otherwise invalid names
9   undermines the public confidence in the electoral
10  process that is the life blood of Democratic
11  institutions."  As your experience as an investigator,
12  would you agree with this statement?
13       MR. ROSENBERG:  Objection; leading.
14       MR. GEAR:  Same objection.
15  BY MR. SWEETEN:
16  Q.  Would you agree with this statement?
17  A.  I absolutely believe so.
18  Q.  "Particularly given that in person voter fraud is
19  difficult to detect without rigorous ID requirements and
20  that as a practical matter, it is important for the
21  State to deter and not just detect and punish voter
22  fraud."  Do you agree that, the first part of that, that
23  in person voter fraud is difficult to detect without
24  rigorous ID requirements?
25       MR. ROSENBERG:  Objection; extraordinarily

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

**225**

1  leading.

2      MR. GEAR:  Objection; leading.

3      A.  I believe that in person voter fraud is difficult

4  to detect absent a photo ID requirement.

5      Q.  (By Mr. Sweeten)  Is that statement consistent or

6  inconsistent with your experience?

7      MR. ROSENBERG:  Same objection.

8      MR. GEAR:  Same objection.

9      A.  I believe that that statement is consistent with

10  my experience.

11      MR. ROSENBERG:  Why don't we take a couple

12  of minutes and we'll probably have a little redirect or

13  recross.

14      MR. GEAR:  We will have a redirect.

15      (Brief recess.)

16      FURTHER EXAMINATION

17  BY MR. GEAR:

18      Q.  You were asked a question by your counsel

19  regarding whether or not SB 14, the penalties in SB 14,

20  would act as a deterrent to voter fraud.  Do you recall

21  those questions?

22      A.  Yes, sir, I do.

23      Q.  Do you believe that the current laws as they are

24  in the State of Texas act as a deterrent to voter fraud?

25      A.  I believe they act as somewhat of a deterrent.

---

**226**

1      Q.  Do you believe that the current laws are

2  sufficient to act as a deterrent to voter fraud?

3      A.  It is my opinion that I believe that they're

4  insufficient in the penalty to deter voter fraud.

5      Q.  And what are the current penalties as they are

6  for voter fraud in the State of Texas?

7      A.  Currently an attempt is -- an attempt to commit

8  voter fraud or voter impersonation as characterized

9  would be a class A misdemeanor, which is punishable by

10  only up to a year in jail and a fine of $4,000.

11      Q.  And an actual act of voting -- voter

12  impersonation?

13      A.  I believe it's only, and I believe right now it's

14  only a third degree penalty.  Only two to three years in

15  the State of Texas and up to a $10,000 fine.

16      Q.  You're saying only two to 10 years.  Would you

17  consider that a significant amount of time for the act

18  of voter impersonation?

19      A.  And this is my opinion.  We have a statute in the

20  State of Texas which says that if you tamper with an

21  electronic voting device, in other words an electronic

22  E-machine, that is a first degree felony which is punish

23  able by up to five to 99.  I think tampering with an

24  electronic voting machine or illegal voting, in my mind

25  are not dissimilar.  So I think it should be more

---

**227**

1  severe.

2      Q.  So are you suggesting that a voter who commits

3  voter impersonation at the polls should be subject to up

4  to 99 years in prison?

5      A.  I think that's a very serious offense and that

6  elections in Texas are decided, in some cases, in small

7  rural jurisdictions by a handful of votes and just one

8  vote can swing an election.

9      Q.  Under the current law, non-citizens if they

10  voted, there's an enhancer penalty, correct?

11      A.  I can't remember all the laws.  I don't recall

12  that specific one right now.

13      Q.  Are the penalties specific to non-citizens

14  voting?

15      A.  I would think it would be just under 64012, which

16  would be illegal voting.

17      Q.  If a non-citizen represents that they're a

18  citizen when they register to vote, is there an

19  additional penalty to that?

20      A.  Yes, sir.  There is an offense for providing

21  false information on the voter registration application.

22      Q.  That would be perjury, correct?

23      A.  Under the Texas election code it could be

24  prosecuted either way.  As perjury or the false

25  statement on the voter registration application.

---

**228**

1      Q.  And that would be an additional penalty to the

2  other penalties you've discussed?

3      A.  Yes, sir.

4      Q.  And a voter, a non-citizen, who votes at a

5  polling place would also be subject to deportation if

6  they were discovered?

7      A.  It's my understanding that the only way someone

8  would be deported at this time is if they were convicted

9  of a felony criminal offense.

10      Q.  And what are you basing that on?

11      A.  Articles I've read in the newspaper.

12      Q.  So as the supervisor for the SIU, are you aware

13  of what the penalties are for an illegal alien or

14  non-citizen voting?  And that would be an illegal

15  non-citizen voting.

16      A.  Federally or State?

17      Q.  State.

18      A.  I would think it would be -- I don't know exactly

19  what the penalties are.  I believe illegal voting is a

20  third degree felony.

21      Q.  And you mentioned federal.  There are additional

22  federal penalties for illegal aliens voting.  Would that

23  be correct?

24      A.  I don't know, sir.

25      Q.  You were asked a question about whether or not

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

229

1   you knew if there were additional allegations or
2   investigations of voter fraud in Harris County, Dallas
3   County, Bexar County.  Do you recall that testimony?
4      A.  Yes, sir, I do.
5      Q.  In fact, you received, you being the office of
6   the attorney general, has received referrals from all of
7   those counties, Harris County, Dallas and Bexar County;
8   isn't that correct?
9      A.  I do not think we have received any referrals
10  from the district attorney's office in Dallas County.
11  We have received allegations -- we have received
12  referrals from the Secretary of State referencing Dallas
13  elections.
14     Q.  And the initiative that you engaged in to train
15  various, I believe you said peace officers, that
16  included Harris, Dallas and Bexar County?
17     A.  I don't recall the exact specific locations that
18  we trained.  I do know that we enlisted the support of
19  the councils of government in geographical areas.  I
20  don't remember if Dallas or Houston were specific
21  locations that we trained.  I do know that we trained
22  all over Texas.
23     Q.  Specifically cities that had 100,000 or more?
24     A.  No, we trained in locations that were actually
25  even smaller than that.  The training that I personally

230

1   conducted was in deep East Texas, Smith County and Bowie
2   County.
3      Q.  Now, you've relied on your spread sheet for
4   various aspects of voter fraud in the State of Texas;
5   isn't that correct?
6      A.  Yes, sir, I have.
7      Q.  In fact, you relied on that to determine the
8   geographical areas of the violations were occurring in.
9   I believe that was your testimony?
10     A.  Yes, sir.
11     Q.  And so as you sit here today, you're aware of 320
12  referrals that came to the office of the Attorney
13  General, correct?
14     A.  Yes, sir.
15     Q.  And I believe I asked you during the initial part
16  of your testimony whether or not you were aware of any
17  other allegations of voter impersonation or
18  investigations of voter impersonation in the State of
19  Texas and I believe your answer was no; is that correct?
20         MR. SWEETEN:  I think that misstates the
21  testimony.
22  BY MR. GEAR:
23     Q.  Well, are you aware of any other investigations
24  of voter impersonation in the State of Texas, other than
25  the ones that have been investigated by the attorney

231

1   general's office?
2      A.  I believe I mentioned the fact that I was aware
3   of one that occurred in Tarrant County as well.
4      Q.  Other than Tarrant County?
5      A.  No, sir.
6      Q.  So your opinion that there are many and they are
7   undirected is just that, an opinion; is that correct?
8      A.  Yes, sir it is an opinion based upon
9   investigation that we've conducted and witnesses we've
10  interviewed and allegations that we've reviewed.
11     Q.  And based on investigations that you've
12  conducted, you would have pursued those if the facts and
13  the law warranted a charge of voter impersonation.  Is
14  that fair to say?
15         MR. SWEETEN:  Objection; compound.
16     A.  There are many reasons why we may not pursue
17  allegations or prosecute somebody for voter
18  impersonation.  We have the proof of -- we have the
19  burden of proof of beyond the reasonable doubt.
20     Q.  (By Mr. Gear)  Correct, because it's a criminal
21  offense.
22     A.  And there are cases where we may not have felt
23  that we had proof beyond the reasonable doubt to
24  prosecute somebody.
25     Q.  Are there cases that you believed you had proof

232

1   beyond a reasonable doubt that you determined not to
2   prosecute?
3      A.  No.  I don't believe that we had proof beyond a
4   reasonable doubt that we chose not to prosecute.
5      Q.  And as you sit here today, are you aware of
6   any -- are you aware of any cases that have not been
7   prosecuted for voter impersonation that should have
8   been?
9      A.  No, sir.
10     Q.  You were asked a question about the federal law
11  enforcement having the ability to prosecute voter
12  impersonation and investigating and prosecute voter
13  impersonation in the State of Texas.  Do you recall that
14  question?
15     A.  Yes, sir.
16     Q.  Are you aware of any investigations conducted by
17  federal law enforcement between 2002 and 2012 that
18  involved voter impersonation?
19     A.  Yes, sir, I'm aware that in the Dallas 2010
20  investigation that the FBI was also involved.
21     Q.  And you've testified to that particular case in
22  2010, correct?
23     A.  Yes, sir.
24     Q.  In any event, would you agree that if there was
25  federal investigation in the State of Texas that they



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

233

1    would communicate with the State of Texas Attorney
2    General before conducting an investigation in your
3    jurisdiction?
4            MR. SWEETEN:  Objection; it calls for
5    speculation.
6    BY MR. GEAR:
7       Q.  Well, I mean, based on your experience as a
8    supervisor, a police officer, the supervisor of the SIU,
9    are you aware of any cases where the federal government
10   has investigated without first informing you of the
11   investigation?
12      A.  No, I'm not aware of any.  I would hope that the
13   FBI would communicate with us.  But I know that that's
14   not always the case.
15      Q.  Regarding your opinion that there are cases that
16   have gone undetected, which investigations, if any, are
17   you referring to and which witnesses are you referring
18   to that lead you to this opinion?
19           MR. SWEETEN:  Objection; compound.
20   BY MR. GEAR:
21      Q.  Well, let's start with investigations.  Are you
22   aware of any investigations that lead you to the opinion
23   that there are cases that have gone undetected?
24      A.  I believe that there was a case in Progresso
25   which is Hidalgo County.

234

1       Q.  Does that appear on your spread sheet?
2       A.  Yes.
3       Q.  And can you show me where it appears on your
4    spread sheet?
5       A.  I believe it appears on Page 3 of election code
6    referrals, office of the attorney general, August 2002
7    to present.  It is approximately.
8       Q.  What was the date of the alleged election?
9       A.  It was the 2008 municipal election.
10      Q.  What are the facts of that case?
11      A.  This is a case that was referred to our office,
12   but also the local district attorney, I believe, got the
13   referral as well.
14      Q.  Okay.  And what are the facts of the case?
15      A.  We had witnesses who informed us that some
16   suspects were outside of the polling place and that they
17   were handing out voter registration cards to vote, to go
18   cast votes in that election.
19      Q.  Those were the allegations?
20      A.  Those were the allegations.
21      Q.  Did your office handle the investigation?
22      A.  We investigated that, yes.
23      Q.  What was the outcome of that investigation?
24      A.  No criminal charges were filed.
25      Q.  And what was the reason no criminal charges were

235

1    filed?
2       A.  The witness who gave us that information had
3    inconsistent statements between interviews.
4       Q.  Are there any other cases that you're basing your
5    opinion on, the opinion that there are cases that go
6    undetected?
7       A.  Well, if I could go back to the Harris County
8    case from the 2008 primary election, which I previously
9    testified to.
10      Q.  Can you tell me which case that is, who was
11   involved in that?
12      A.  That would be Jack Carol Crowder.
13      Q.  Okay.  Mr. Crowder who was ultimately convicted?
14      A.  Yes, sir.
15      Q.  Based on a plea?
16      A.  Yes, sir.  The group that did the analysis
17   comparing Harris County voters to deceased voters had --
18   and I don't remember the exact number, but I want the
19   say it was hundreds, if not thousands of voters who they
20   believed were deceased and who actually voted.
21      Q.  Did you investigate that?
22      A.  We could only -- we only have the resources to
23   investigate a small portion of that allegation.
24      Q.  Other than Mr. Crowder, are there any other open
25   investigations on your spread sheet?  Were there any

236

1    other investigations based on what the group presented
2    on your spread sheet?
3       A.  No.  I mean.
4       Q.  So you're saying hundreds if not thousands of
5    possible dead people that have voted, wouldn't that be
6    something that your office would investigate?
7       A.  I only have a limited number of investigators and
8    the ability to investigate all of the names on that list
9    was not feasible.
10      Q.  And isn't it a fact that there are people who
11   have passed away that are still on a voter registration
12   role and that's not -- that's because the roles have not
13   been updated to remove them?
14      A.  One of the difficulties in the State of Texas is
15   that there are multiple jurisdictions that have voter --
16   each county has their own voter registration department.
17   It could be based as an election office or it could be
18   based in a county clerk's office to handle the voter
19   registration.  So there's 254 different ways.  Not all
20   of them share the same systems.  And it's my experience
21   as an investigator, that many of the counties, the way
22   they purge their roles of deceased voters is by looking
23   at obituaries.  And in some cases they obtain their social
24   security death index, which could take months to do if
25   that's what they're relying on.  So there could be a



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

### 237

1    number of voters who are deceased.
2        Q. So ultimately, the answer to my question is yes?
3        A. Yes, sir.
4        Q. And the fact that there is a person who is
5    deceased on the voter registration role does not mean
6    that there is an incident of voter fraud, does not
7    necessarily mean that there's any type of fraud going
8    on?
9        A. Well, there's the opportunity for fraud.
10       Q. You said that you based your opinion that there
11   are undetected cases on speaking with witnesses, can you
12   name the witnesses who you're referring to?
13       A. No, I don't know their names today.
14       Q. And they would have been in connection with the
15   group that you've been speaking about?
16       A. No.  I was mentioning witnesses down in the
17   Progresso case.
18       Q. And you've testified about that case, correct?
19       A. Yes, sir.
20       MR. GEAR:  I don't think I have any further
21   questions.  I am going to leave the deposition open.
22       MR. SWEETEN:  I have a few follow-ups.
23       MR. ROSENBERG:  If you're going to go I'll
24   go after you.
25       MR. SWEETEN:  Okay.  That's fine.

### 238

1        MR. ROSENBERG:  You go first.
2        BY MR. ROSENBERG:  It's your turn and then I
3    get it back.  Go ahead.
4        FURTHER EXAMINATION.
5    BY MR. ROSENBERG:
6        Q. Major, just because a crime may be difficult to
7    detect doesn't mean the crime has necessarily been
8    committed, does it.
9        A. I'm sorry.  Would you repeat that one more time?
10       Q. Sure.  Just because a crime may be difficult to
11   detect doesn't mean that it's being committed, does it?
12       A. That's correct.
13       Q. Okay.  And also you testified in response to
14   questions from Mr. Sweeten about the fact that he didn't
15   have access to the data from other counties, correct?
16       A. That's correct.
17       Q. But you have no basis upon which to quantify any
18   additional instances of in person voter impersonation,
19   other than those which you testified today, correct?
20       A. I have no other means to identify additional
21   cases.
22       Q. And you would also agree, wouldn't you, that if a
23   crime, in fact, even if it were difficult to detect
24   became more prevalent, the more prevalent it became the
25   more easy it would be to detect it.  Isn't that a fact?

### 239

1        MR. SWEETEN:  Objection; calls for
2    speculation.
3        A. I don't believe just because it's prevalent that
4    it's easier to detect.
5        Q. (By Mr. Rosenberg)  The more prevalent it
6    becomes, isn't this what happens in your police work,
7    that more people know about things, more people talk
8    about things.  More people may know the person who walks
9    into a polling place, isn't that likely to happen if it
10   were very much more prevalent and than it is according
11   to your statistics?
12       MR. SWEETEN:  Objection; assumes facts not
13   in evidence.  Objection; calls for speculation.  You can
14   answer.
15       A. I believe that even if it's more prevalent in a
16   jurisdiction like Harris County or Dallas County or
17   Bexar County that it would still be very difficult to
18   defect because the key to detecting voter impersonation
19   fraud is that someone in the polling place must be able
20   to identify the person whose name appears in the voter
21   registration certificate as the system is currently
22   designed.
23       Q. (By Mr. Rosenberg)  And the more prevalent in
24   person voter fraud was, the more likely it would be that
25   someone would be identifying someone; isn't that

### 240

1    correct?
2        MR. SWEETEN:  Same objection.
3    BY MR. ROSENBERG:
4        Q. Common sense tells you that.
5        A. I don't believe so because there is a limited
6    number of people inside the polling place.  It's limited
7    to the number of election officials working there and
8    limited to pole watchers who are there.
9        Q. That's correct, but the more people there are the
10   more likely there are going to be connections.  Isn't
11   that just a matter of common sense?
12       MR. SWEETEN:  Same objection.  And asked and
13   answered, by the way.
14       A. You're talking about polling places which process
15   thousands of people a day for elections.  And absent
16   some sort of ID requirement, it would -- the likelihood
17   that they themselves know the voters representing
18   themselves is very slim.  In fact, some elections
19   officials I don't think even necessarily work or live in
20   the precincts where they're assigned.
21       Q. (By Mr. Rosenberg)  But the more it happens, the
22   more likely it is people would recognize people, isn't
23   that correct?
24       MR. SWEETEN:  Asked and answered.
25   Objection.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

241

1      A. I don't believe that's case.
2      Q. (By Mr. Rosenberg) Let me ask another question.
3    You have no basis on which to say whether there's one
4    more instance of in person voter fraud or five more;
5    isn't that correct?
6         MR. SWEETEN: Objection; argumentative.
7      A. I believe with a fact that we have thousands of
8    people who are deceased on our pole lists, who every
9    year voter registration cards get mailed out, I believe
10   that's an incredible opportunity to commit fraud and
11   that the government has a responsibility to stop that.
12     Q. (By Mr. Rosenberg) But you have no basis upon
13   which to quantify it whatsoever?
14        MR. SWEETEN: Objection; asked and answered.
15   Objection; argumentative.
16     A. The basis I would have to argue that would be
17   that we know there are thousands and tens of thousands
18   of deceased voters on our roles in the State of Texas
19   and that opportunity exist.
20     Q. (By Mr. Rosenberg) But you cannot identify any
21   instances of voter fraud, other than those that you've
22   identified in your in person voter fraud, other than
23   those you've identified in your spread sheet?
24        MR. SWEETEN: Objection; asked and answered.
25   Go ahead. Objection; argumentative.

---

242

1      A. It's a very difficult crime to detect.
2         BY MR. ROSENBERG: Pass to Mr. Sweeten.
3         MR. SWEETEN: I have no further question
4    thank you.
5         MR. GEAR: Again, I'm going to hold this
6    deposition open.
7         MR. SWEETEN: Let's talk about that. What
8    you're talking about. What is your specific complaint,
9    Mr. Gear.
10        MR. GEAR: Well, my specific complaint is
11   that your client has testified on numerous occasions
12   during this deposition that there are other documents
13   that are available that may provide support to his
14   testimony. Those documents, as I know, have not been
15   produced. And there are multiple documents that we have
16   gone through. I believe I have a right to hold this
17   deposition open based on that. And that's what I intend
18   to do.
19        MR. SWEETEN: Well, let me give you a brief
20   response on the record.
21        MR. GEAR: Sure.
22        MR. SWEETEN: First of all, you requested
23   documents from us and I -- your request has been
24   objected to, both in the request to produce which was
25   answered on March 30th where we objected that it was

---

243

1    overly broad, unduly burdensome. And then we also have
2    requested to the deposition notice. I'll also say that
3    we have offered the Department of Justice and we've
4    provided you the indictments, the convictions, we
5    provided you a stack of documents. You have not --
6    we've also attempted to discuss with you and your office
7    in particular, the -- what it is specifically you're
8    looking for because if you're request really is that you
9    want every single case file underlying the 320
10   investigations on this spread sheet, it is an
11   extraordinarily difficult request based upon those
12   documents. I have not gotten any sense from you-all
13   that you want anything less than everything, and so
14   we've objected we're standing by that objection. We
15   stand ready to discuss the matter if with you. In light
16   of -- if you want to discuss this issue, we will do
17   that. But we've provided you -- and we've maintained
18   our objection throughout and we still maintain that
19   objection based upon the breadth of the request that
20   have been made.
21        MR. GEAR: And I respect that. And part of
22   that conversation has been with me. And part of that
23   conversation has essentially said -- asked me to
24   identify what I believe I need in response to the spread
25   sheet and I've said I could not do that. I believe I

---

244

1    said that both in writing and orally. And again,
2    there's no need to argue this much farther on the
3    record.
4         MR. SWEETEN: I agree.
5         MR. GEAR: But I intend on holding this
6    deposition open.
7         MR. SWEETEN: Okay. We can go off the
8    record.
9         (Deposition concluded)

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Major Forrest Mitchell                                    June 15, 2012

## 245

CHANGES AND SIGNATURE
RE: STATE OF TEXAS VS. HOLDER

PAGE   LINE   CHANGE          REASON

---

## 247

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS      )
                    )
VS.                 ) NO. 12-CV-128
                    ) (DST, RMC, RLW)
                    )
ERIC H. HOLDER, JR.,  )
In his official       )
Capacity as Attorney  )
General of the United )
States, ET AL         )

*******************************************

CERTIFICATE FROM THE
ORAL DEPOSITION OF
MAJOR FORREST MITCHELL
JUNE 15, 2012

*******************************************

I, Janalyn Reeves, a Certified Shorthand Reporter
in and for the State of Texas, do hereby certify that
the foregoing deposition is a full, true and correct
transcript;
    That the foregoing deposition of MAJOR FORREST
MITCHELL, the Witness, hereinbefore named was at the
time named, taken by me in stenograph on June 15, 2012,
the said Witness having been by me first duly cautioned
and sworn to tell the truth, the whole truth, and
nothing but the truth, and the same were thereafter
reduced to typewriting by me or under my direction.  The
charge for the completed deposition is $_____ due
from Defendant.
    () That pursuant to the Federal Rules of Civil

---

## 246

    I, MAJOR FORREST MITCHELL, have read the
foregoing deposition and hereby affix my signature that
same is true and correct, except as noted above.

             MAJOR FORREST MITCHELL
THE STATE OF TEXAS      )
                        )
COUNTY OF _____  )
    Before me, _____, on this day
personally appeared MAJOR FORREST MITCHELL, known to me
(or proved to me under oath or through
(description of identity card or other document) to be
the person whose name is subscribed to the foregoing
instrument and acknowledged to me that they executed the
same for the purposes and consideration therein
expressed.
    Given under my hand and seal of office this _____
day of          ,    .

             NOTARY PUBLIC IN AND FOR
             THE STATE OF

---

## 248

Procedure, the Witness shall have 30 days after being
notified by certified mail, return receipt requested, by
the deposition officer that the original deposition
transcript is available in her office for review and
signature by the Witness and if any corrections made are
attached hereto;
    () That by agreement of counsel, a reading condensed
copy of the deposition transcript along with the
full-size original changes and Signature Sheet has been
sent to_____ on_____ for review and
signature within 30 days and if any corrections returned
are attached hereto;
    () That by agreement of counsel, the deposition
officer is instructed to release the original deposition
transcript to_____ on_____, for review and
signature, and the deposition officer is thereafter
released of any further responsibility with regard to
the original.
    () That the Witness shall have thirty (30) days for
review and signature of the original transcript and if
any corrections returned are attached hereto.
    () That the signed transcript () was () was not
received from the Witness within 30 days.
    () That the examination and signature of the Witness
is waived by the Witness and the parties;



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

249

1       That the amount of time used by each party at the
2   deposition is as follows:
3       Mr. Bruce Gear - 5 hours 46 minutes
4       Mr. Ezra Rosenberg - 16 minutes
5       Mr. Patrick Sweeten - 14 minutes
6    I further certify that I am neither counsel for,
7   related to, nor employed by any of the parties in the
8   action in which this proceeding was taken, and further
9   that I am not financially or otherwise interested in the
10  outcome of the action.
11       WITNESS MY HAND, this the _____ day
12  of _____ A.D. 20__.
13       _____
        JANALYN REEVES
14       Cert. No. 3631
         Expires Dec. 12
15       100 Congress Avenue
         Suite 220
16       Austin, Texas  78701
         (512)634-1980
17       Firm Registration No. 283
18
19
20
21
22
23
24
25



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com