## 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                    )
            Plaintiff,             )
                                   )
V.                                 )
                                   )
ERIC H. HOLDER, JR.,               )
in his official capacity           )
as Attorney General of             )
the United States,                 )
            Defendant.              )
                                   )
ERIC KENNIE, et al.,               )
            Defendant-Intervenors, )
                                   )
TEXAS STATE CONFERENCE             )  CASE NO. 1:12-CV-00128
OF NAACP BRANCHES, et al.,         )  (RMC-DST-RLW)
            Defendant-intervenors, )  Three-Judge Court
                                   )
TEXAS LEAGUE OF YOUNG              )
VOTERS EDUCATION FUND, et al.,     )
            Defendant-Intervenors, )
                                   )
TEXAS LEGISLATIVE BLACK            )
CAUCUS, et al.,                    )
            Defendant-Intervenors, )
                                   )
VICTORIA RODRIGUEZ, et al.,        )
            Defendant-Intervenors. )

_____

ORAL DEPOSITION OF
RICHARD PARSONS
JUNE 14, 2012

_____

        ORAL DEPOSITION OF RICHARD PARSONS, produced as a
witness at the instance of the Defendant-Intervenors, and duly
sworn, was taken in the above-styled and numbered cause on the
14th day June, 2012, from 2:06 p.m. to 5:23 p.m., before Amy C.
Kofron, CSR in and for the State of Texas, reported by machine
shorthand, at the offices of Dechert, 300 West 6th Street,
Austin, Texas, pursuant to the Federal Rules of Civil Procedure
and the provisions stated on the record or attached hereto.

## 2

A P P E A R A N C E S

FOR THE PLAINTIFF:
Mr. Reynolds Brissenden
OFFICE OF THE ATTORNEY GENERAL OF TEXAS
P.O. Box 12548
Austin, Texas 78711-2548

FOR THE DEFENDANT:
Ms. Elizabeth Westfall
Ms. Michelle McLeod
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue NW
NWB Room 7203
Washington, DC 20530

FOR THE DEFENDANT-INTERVENORS, TEXAS
STATE CONFERENCE OF NAACP BRANCHES AND
MEXICAN AMERICAN LEGAL CAUCUS:
Mr. Ian Vandewalker, via phone
Ms. Myrna Perez, via phone
THE BRENNAN CENTER FOR JUSTICE
AT NYU LAW SCHOOL
161 Avenue of the Americas, Floor 12
New York, New York 10013-1205

Also Present:
Ms. Lindsey Stencel
Mr. Nick Riley, via phone

## 3

INDEX

Appearances. . . . . . . . .                          2
RICHARD PARSONS
    Examination by Mr. Vandewalker. . .           4
    Examination by Ms. Westfall. ..              77
Signature and Changes. . . .                     96
Reporter's Certificate. . .          98

EXHIBITS
NO.  DESCRIPTION                                PAGE
1    Request for Proposal                       10
2    Account Tracking                           16
3    Burson-Marsteller Invoice                  17
4    Burson-Marsteller Invoice                  20
5    Burson-Marsteller Invoice                  21
6    Account Tracking                           22
7    Burson-Marsteller documents               46
8    Affidavit of Keith Ingram                  58
9    Excerpts of Deposition of Keith Ingram     59
560  Secretary of State article                 81

## 4

1       RICHARD PARSONS,
2  having been first duly sworn, testified as follows:
3            EXAMINATION
4  BY MR. VANDEWALKER:
5       Q.  Good afternoon, Mr. Parsons.  My name is Ian
6  Vandewalker.  I represent the defendant-intervenors in this
7  matter, the Texas State Conference of NAACP and Mexican American
8  Legislative Caucus.
9            Thank you for coming to appear for this deposition
10 today.  And I also thank you for your patience in advance.  With
11 the phone setup, I wasn't able to make it there for the
12 deposition.  I apologize for that, but hopefully we won't have
13 any communications problems on the phone.  Can you hear me all
14 right?
15      A.  Yes, I can.
16      Q.  Okay.  Thank you.  Could you just state and spell your
17 full name for the record.
18      A.  Richard Daniel Parsons, R-i-c-h-a-r-d, Daniel,
19 D-a-n-i-e-l, Parsons, P-a-r-s-o-n-s.
20      Q.  Thank you.  And are you represented by counsel today?
21      A.  Yes.
22      Q.  And who is your attorney?
23      A.  Reynolds -- what was your last name?
24         MR. BRISSENDEN:  Brissenden.
25      A.  Reynolds Brissenden.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 5

1    Q.  And who is your current employer?
2    A.  State of Texas.
3    Q.  Have you ever been deposed before?
4    A.  No.
5    Q.  Okay.  I am going to go through some sort of ground
6    rules, basic instructions to help things go smoothly today.  You
7    are under oath and are required to answer all questions
8    truthfully and to the best of your knowledge; do you understand
9    that?
10   A.  Yes.
11   Q.  If you don't fully hear a question, please ask me to
12   repeat it.  Will you do that?
13   A.  Yes.
14   Q.  And if you don't understand a question, please tell me
15   so.  Will you do that?
16   A.  Yes.
17   Q.  Thank you.  And also, especially because there's some
18   unnaturalness to the conversation because I'm on the phone,
19   please wait for me to complete my question before you start your
20   answer.  Will you do that?
21   A.  Yes.
22   Q.  And also please answer all questions verbally so that
23   the court reporter can get it down rather with gestures.
24   Will you do that?
25   A.  Yes.

## 6

1    Q.  Are you taking any medication today that would prevent
2    you from giving true and accurate answers to my questions?
3    A.  No.
4    Q.  Is there any other circumstance you're aware of that
5    would prevent you from giving true and accurate answers to my
6    questions today?
7    A.  No.
8    Q.  Did you do anything to prepare for today's deposition?
9    A.  Yes.
10   Q.  What did you do?
11   A.  Looked back at some of the documents that I provided
12   as a result of this notice of deposition and got some updated
13   information from my contact at the vendor for the voter
14   education program.
15   Q.  And what's the name of that vendor?
16   A.  Burson-Marsteller.
17   Q.  Thank you.  Did you talk to anybody else in
18   preparation for today's deposition?
19   A.  I spoke with the attorneys from the Attorney General's
20   office.
21   Q.  Okay.  And do you know which attorney it was?
22   A.  Yes.
23   Q.  And who were they?
24   A.  Reynolds, Brooke.  What's her last name?  Paup?
25   Brooke Paup and Jay Dyer.

## 7

1    Q.  Okay.  You currently work for the Texas Secretary of
2    State's office?
3    A.  Yes.
4    Q.  And how long have you worked for the Secretary of
5    State's office?
6    A.  Since mid September of 2011.  I don't know the exact
7    date that I began employment there.
8    Q.  That's fine.  Thank you.
9    A.  Excuse me.  Since mid, late September.  I don't
10   remember the exact date.
11   Q.  Okay.  What is your official title at the Secretary of
12   State's office?
13   A.  Director of Communications.
14   Q.  And is that the position that you've held since
15   September of 2011?
16   A.  Yes.
17   Q.  What did you do for a living prior to working for the
18   Secretary of State's office?
19   A.  Prior to joining the Secretary of State's office I
20   worked for a private communications agency in Austin.
21   Q.  And as Director of Communications for the Secretary of
22   State's office, what are your official duties?
23   A.  Media relations, speech preparation, press release
24   writing, anything that generally has to do with external
25   communications and some internal communications.

## 8

1    Q.  Do you typically oversee the Secretary of State's
2    voter education initiatives?
3    A.  I do -- I oversee the current one.
4    Q.  Right.  Okay.  Thank you.  And you oversee the
5    Secretary of State's efforts to train poll workers?
6    A.  I'm sorry.  Could you repeat that.
7    Q.  Do you oversee the Secretary of State's efforts to
8    train poll workers?
9    A.  No.
10   Q.  Okay.  Does the Secretary of State's office have any
11   plans to carry out, as a general matter, any statewide voter
12   education initiatives in 2012?
13   A.  Yes.
14   Q.  Does the Secretary of State's office -- could you,
15   just as a general matter, tell me what is the purpose of the
16   voter education initiative in 2012?
17       MR. BRISSENDEN:  Objection, vague.
18       MR. VANDEWALKER:  You can answer, if you
19   understand the question.
20   A.  To provide resources and information for voters and
21   voting age population to understand the voter registration
22   process, the election process and how to participate in that
23   process.
24   Q.  Is the Make Your Mark on Texas voter education plan
25   the voter education initiative for the Secretary of State for



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 9

1   this year?
2       A.  Yes.
3       Q.  Are there any other statewide voter education
4   initiatives planned for 2012?
5       A.  Not formally in the, I guess, scope of the Make Your
6   Mark on Texas program.  But we are constantly answering
7   questions and providing whatever resources we can to anyone who
8   needs them.
9       Q.  And just to clarify, you mean questions from voters?
10      A.  Voters, media, interest groups.
11      Q.  Did the Secretary of State hire a vendor to design the
12  Make Your Mark on Texas plan?
13      A.  Yes.
14      Q.  And is that Burson-Marsteller that you mentioned
15  earlier, is that the vendor in question?
16      A.  Yes.
17      Q.  How did the Secretary of State's office select
18  Burson-Marsteller to design the voter education plan?
19      A.  An RFP was let under whatever rules and regulations
20  are required by state procurement process.  Several companies
21  responded, submitted proposals.  Those proposals were scored by
22  an internal team.  Then the three highest scoring companies were
23  invited in for oral presentations.  Then following the oral
24  presentations the team discussed the presentations and voted on
25  the vendor to select.

## 11

1   No. 12111 in part responds to that by asking for a vendor to
2   help with educating voters about photo ID requirements?
3       A.  Yes.
4       Q.  And are you aware of any other RFPs, other than
5   No. 12111, that would respond to the requirements to voters
6   about photo ID requirements?
7       A.  No.
8       Q.  Who drafted RFP No. 12111?
9       A.  I don't know.
10      Q.  Do you know when it was drafted?
11      A.  Generally, last year.
12      Q.  And do you know when last year?
13      A.  Not specifically.
14      Q.  Do you know when it was issued?
15      A.  I don't know the date, but the general time frame.
16      Q.  And when was it issued?
17      A.  I believe it was issued in October 2011.
18      Q.  And how many voter education plan proposals did the
19  Secretary of State's office receive in response to this RFP?
20      A.  As I recall, it was fewer than ten.
21      Q.  Were you a part of the process to select the vendor
22  from those proposals?
23      A.  Yes.
24      Q.  Do you -- did any of those proposals specifically
25  include plans designed to target African American communities?

## 10

1       MR. VANDEWALKER:  Okay.  And if I could ask
2   Ms. Stelcen to find the exhibit that's titled Request For
3   Proposal No. 12111.
4       MS. STELCEN:  I'm going to hand it to the court
5   reporter to mark as Parsons Exhibit 1.
6       MR. VANDEWALKER:  Thank you.
7       (Exhibit No. 1 marked)
8       MS. STELCEN:  Okay.
9       Q.  Okay.  Mr. Parsons, is this the RFP that you were
10  referring to just now?
11      A.  It looks like it.
12      Q.  If you want to take a second to read through it to
13  make sure that you have identified it, that's okay.
14      A.  Yes.  This looks like it, yeah.  Yes.
15      Q.  To your knowledge, did the Secretary of State issue
16  any other RFPs other than No. 12111 to solicit proposals for
17  voter education plans related to S.B. 14?
18      A.  Not since this one.
19      Q.  Do you know if there were any before this one?
20      A.  Can you clarify that.
21      Q.  Is it your understanding that S.B. 14 requires the
22  Secretary of State to educate voters about photo ID requirements
23  for voting?
24      A.  Yes.
25      Q.  And is it your understanding that request -- RFP

## 12

1       A.  Pardon me?
2       Q.  Did any of those proposals specifically include plans
3   designed to target African American communities?
4       A.  I don't remember the specifics of the plans that we
5   received.
6       Q.  Do you remember if any of them included plans
7   specifically designed to -- strike that.
8       Were there rating or selection criteria used to
9   differentiate the proposals from each other?
10      A.  Yes.
11      Q.  And what were those criteria?
12      A.  There were several.  I don't recall them section by
13  section.
14      Q.  Do you remember any of them?
15      A.  No.
16      Q.  Do you recall if those criteria involve treating as a
17  positive whether the plan targeted African American voters?
18      A.  I don't recall.
19      Q.  Do you recall whether those criteria treated as a
20  positive including plans to target Latino voters?
21      A.  I don't recall.
22      Q.  Who else was on the team that selected the vendor for
23  this RFP?
24      A.  Jordy Keith, who at the time was Deputy Communications
25  Director; John Sepehri, who at the time was general counsel for



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 13

1 the Secretary of State's office; and Louri O'Leary, who was and
2 is currently administration in the Elections division; and
3 Leticia Salazar.
4     Q.   Thank you.  And when was the decision made to select
5 Burson-Marsteller?
6     A.   I believe it was made in December.
7     Q.   And why did your office select Burson-Marstetler as
8 the vendor?
9     A.   I can only speak to why they scored -- or why I
10 personally felt they were the best company.
11    Q.   Okay.  Why did you think they were the best company?
12    A.   I thought their creative was good.  I thought they
13 presented the most flexibility with regard to implementing --
14 developing and implementing an education program, whether it was
15 focused on -- whether Senate Bill 14 got precleared or whether
16 it didn't.  And they had done this -- they had experience with
17 similar voter education programs in Texas and at least a couple
18 of other states that I don't recall what those states were.
19    Q.   And how did they show the flexibility that you
20 mentioned?
21    A.   Their campaign -- in my estimation, their campaign
22 could easily be implemented to educate voters generally and
23 specifically on any new photo identification requirements in --
24 as required by Senate Bill 14.  And if -- at the time if Senate
25 Bill 14 did not get preclearance could be shifted to a general

## 15

1 but I don't recall the specifics of the discussion.
2     Q.   Do you recall any of the context of that discussion?
3 Did they mention what client that kind of work might have been
4 done for?
5     A.   I don't recall the specifics.
6     Q.   Do you recall them communicating that they had
7 extensive experience in that area?
8     A.   No, I don't recall that.
9     Q.   How much money does the Secretary of State's office
10 plan to spend on the Make Your Mark on Texas plan?
11    A.   As the RFP lays out, proposers should assume a total
12 budget of no more than $3 million.
13    Q.   Do you know if that, in fact, is the budget for the
14 Make Your Mark on Texas plan?
15    A.   I would direct you again to the language in the RFP,
16 that the proposer should assume a budget of no more than
17 $3 million.
18    Q.   So that says what the parameters of the RFP is.  What
19 I'm trying to ask is what is the Secretary of State's actual
20 budgeting decision about the Make Your Mark on Texas plan?  Do
21 you know if $3 million is, in fact, what's budgeted for the Make
22 Your Mark on Texas plan?
23    A.   I know that it's consistent with what's in the RFP.
24         MR. VANDEWALKER:  Okay.  If I could again have
25 Ms. Stelcen's help to introduce Exhibit Bates No. Texas 298674.

## 14

1 voter education program very easily.
2     Q.   And how would they do that shifting?  What would the
3 -- how did their proposal prove to you that they could do that
4 kind of shifting?
5     A.   Their concepts could be used in either informing on
6 the regulation or requirements of Senate Bill 14 or they could
7 be used in a general voter education engagement message.
8     Q.   Did any legislators encourage anyone in the Secretary
9 of State's office to select Burson-Marsteller?
10    A.   No, none that I'm aware of.
11    Q.   Did anyone from the governor's office encourage your
12 office to select Burson-Marsteller?
13    A.   No, none that I'm aware of.
14    Q.   Did anyone in the Lt. Governor's office encourage your
15 office to select Burson-Marsteller?
16    A.   No, none that I'm aware of.
17    Q.   To your knowledge, does Burson-Marsteller have any
18 experience targeting non-white or non-Anglo communities of
19 voters?
20         MR. BRISSENDEN:  Objection, vague.
21         Yeah.  Can you be more specific or re-ask.
22    Q.   To your knowledge, has Burson-Marsteller engaged in
23 public education campaigns that are targeted to non-white or
24 non-Anglo communities in the past?
25    A.   As I recall, there was discussion of that with them,

## 16

1 Document has at the top Secretary of State/State of Texas then a
2 code and Account Tracking through March 31st 2012.
3         MS. STELCEN:  I'm going to have the court
4 reporter mark this as Parsons Exhibit 2.
5         (Exhibit No. 2 marked)
6         MS. STELCEN:  And it's been placed in front of
7 Mr. Parsons.
8         MR. VANDEWALKER:  Thank you.
9     Q.   Mr. Parsons, are you familiar with this document?
10    A.   Yep.  Yes.  Sorry.
11    Q.   Thank you.  And what is it?
12    A.   It's a statement of account tracking.
13    Q.   So if I could direct your attention to the small box
14 on the top left.  It says there "Budget" and then next to the
15 budget entry it says 3 million.  Do you know what that refers
16 to?
17    A.   The budget for the Make Your Mark program.
18    Q.   Okay.  And -- so I'm -- just to get the lingo down so
19 we can refer to this later, would you call this an account
20 tracking document?
21    A.   That's what it says it is at the top.
22    Q.   Okay.  And is it your understanding that this document
23 shows a total amount expended as of a certain date?
24    A.   That's correct.
25    Q.   And what is that date?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 17

1    A.  March 31st, 2012.
2    Q.  Okay.  And how much has been expended as of March
3    31st, 2012?
4    A.  According to this document, just under $1.2 million.
5    Q.  Okay.  And that leaves just obviously, according to
6    math and the document, about $1.8 million out of the $3 million;
7    is that correct?
8    A.  Yes.
9        MR. VANDEWALKER:  Okay.  Thank you.  If we could
10   turn to another exhibit.  It begins with Bates Stamp Texas
11   298635.
12       MS. STELCEN:  Okay.  I'm going to have the court
13   reporter mark it as Parsons Exhibit 3.
14       MR. VANDEWALKER:  Thank you.
15           (Exhibit No. 3 marked)
16       MS. STELCEN:  And Exhibit 3 has been placed in
17   front of the witness.
18   Q.  So Mr. Parsons, are you familiar with this document?
19   A.  Yes.
20   Q.  And could you tell me what it is?
21   A.  It's an invoice from Burson-Marsteller.
22   Q.  And what date is the invoice?
23   A.  February 15th.
24   Q.  And what is the total due on the invoice?
25   A.  $40,065.

## 18

1    Q.  Is that amount reflected in the account tracking
2    document that we've discussed just now?
3    A.  I don't know.
4    Q.  If you were going to find out, what would you do?
5    A.  I would call Burson and ask them.
6    Q.  What would you ask them?
7    A.  The question you just asked, I guess.
8    Q.  Okay.  I understand the account tracking document to
9    be a document internal to the Secretary of State's office,
10   keeping track of expenditures.  So I'm not sure how
11   Burson-Marsteller would know what is or is not included in that
12   document.
13       MR. BRISSENDEN:  Objection, argumentative.
14       MR. VANDEWALKER:  You can answer.
15       MR. BRISSENDEN:  There's no question pending.
16       MR. VANDEWALKER:  There is a question pending.  I
17   would ask the court reporter to read it back, please.
18           (Requested portion read by reporter)
19       MR. VANDEWALKER:  I apologize.  You're right.
20   There is not a question pending.
21   Q.  How would Burson-Marsteller know what is or is not
22   included in the account tracking document which is an internal
23   document of the Secretary of State?
24       MR. BRISSENDEN:  Objection, speculation.
25       If you know, you may answer.

## 19

1    A.  Well, it would appear that the invoice is reflected in
2    the tracking document, now that I've had a chance to look at it.
3    Q.  Okay.  And how do you know the invoice is reflected in
4    the tracking document?
5    A.  I didn't say I knew.  I said it would appear.
6    Q.  What makes it appear that the invoice is reflected in
7    the tracking document?
8    A.  The total amount on the front of the invoice is in the
9    column under January 12th.
10   Q.  And why would an invoice dated February 15th appear
11   under a column marked January 12th?
12   A.  I don't know.
13   Q.  Is this, the account tracking document, the kind of
14   thing that you see in your day-to-day duties at the Secretary of
15   State's office?
16   A.  Not day to day.
17   Q.  Do you ever see something like this at the Secretary
18   of State's office?
19   A.  Yes.
20   Q.  Do you know how the account tracking document was
21   generated?
22   A.  It was generated by Burson-Marsteller.
23   Q.  Do you know how this document came to be produced to
24   the attorneys for the State of Texas and ultimately to us?
25   A.  I believe I turned it over in response to the Notice

## 20

1    of Deposition.
2    Q.  Okay.  And can you say -- where did it ultimately come
3    from?  Where did you get it before that?
4    A.  Burson-Marsteller.
5        MR. VANDEWALKER:  Okay.  If I could move on to
6    another exhibit.  This one begins at Bates Stamp 298642.
7        MS. STELCEN:  Okay.  I'm going to have the court
8    reporter mark this as Parsons Exhibit 4.
9            (Exhibit No. 4 marked)
10       MS. STELCEN:  And the exhibit has been placed in
11   front of Mr. Parsons.
12       MR. VANDEWALKER:  Thank you.
13   Q.  Mr. Parsons, are you familiar with this document?
14   A.  Yes.
15   Q.  And what is it?
16   A.  An invoice from Burson-Marsteller.
17   Q.  And what's the date on the invoice?
18   A.  March 16th.
19   Q.  And what is the total amount due?
20   A.  $895,268.94.
21   Q.  Thank you.  And is this -- is that total amount due
22   reflected in the account tracking document?
23   A.  Yes.
24   Q.  And what leads you to say -- how do you know that it
25   is?  I'm sorry.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 21

1      A.  The corresponding total is in the February 12th
2  column.
3          MR. VANDEWALKER:  Okay.  If we could move on to
4  another exhibit.  This one starts at Bates Stamp 298666.
5          MS. STELCEN:  I'm going to have the court
6  reporter mark this as Parsons Exhibit 5.
7          (Exhibit No. 5 marked)
8          MS. STELCEN:  And the exhibit has been placed in
9  front of Mr. Parsons.
10     Q.  Mr. Parsons, are you familiar with this document?
11     A.  Yes.
12     Q.  And what is it?
13     A.  An invoice from Burson-Marsteller.
14     Q.  And what's the date?
15     A.  April 20th.
16     Q.  And what is the total amount due?
17     A.  $263,948.42.
18     Q.  And do you know if this is reflected in the accounts
19  tracking document?
20     A.  Yes, it appears to be.
21         MR. VANDEWALKER:  Okay.  I'm going to turn to
22  another Exhibit.  I'm not sure if I grouped this one right when
23  I sent it to Ms. Stelcen, but the Bates range that I want to
24  look at is Texas 298649 and 650.
25         MS. STELCEN:  We have it.  It's just part of a

## 22

1  larger set.  So I'm going have it marked as Exhibit 6, Parsons
2  Exhibit 6.
3          (Exhibit No. 6 marked)
4          MS. STELCEN:  And if you could just repeat the
5  Bates page you would like the witness to review.
6          MR. VANDEWALKER:  Sure.  It is a two-page range,
7  298649 and the following page, which ends in 50.
8      Q.  Have you found the page range?
9      A.  Yes.
10     Q.  Okay.  Thank you.  And are you familiar with this
11  document?
12     A.  Yes.
13     Q.  And what is it?
14     A.  It's an invoice from TKO Advertising.
15     Q.  Okay.  And what's the date on the invoice?
16     A.  March 5th.
17     Q.  Thank you.  And what is the total on the invoice?  I
18  believe it's on the second page of the two-page range.
19     A.  It's hard to read, but it looks like 6 -- you know
20  what?  I can't really read that total.  It's either 638,237.76
21  or it could be 838,000.  I can't really read it.
22     Q.  Okay.  And is that amount reflected in the account
23  tracking document?
24         MR. BRISSENDEN:  Just for clarification, there's
25  two exhibits in front of the witness that are account tracking

## 23

1  documents, Exhibit 2 and Exhibit 6, the first page.
2          MR. VANDEWALKER:  I apologize.  I'm talking about
3  Exhibit 2 that we have been referring back to as the account
4  tracking document.
5      Q.  Is the amount reflected on the TKO invoice also
6  reflected in the account tracking document for expenditures
7  through March 31st?
8      A.  I believe it is, but I don't know.
9      Q.  And what leads you to say that you believe it is?
10     A.  Because I believe, as I recall, this is part of the
11  paid media for Phase 1, the paid media buy.
12     Q.  I see.  And what's the amount on the account tracking
13  document Exhibit 2 for paid media, Phase 1?
14     A.  I'm sorry.  Could you ask that again, please.
15     Q.  What amount does the account tracking document,
16  Exhibit 2, show as the amount for the paid media Phase 1 that
17  you just referred to?
18     A.  There's four different amounts -- three different
19  amounts.  One amount is in two different columns.
20     Q.  Okay.  And what are those amounts?  I'm asking about
21  expenditures.
22     A.  Expenditures.  $701,237.76.
23     Q.  Okay.  So a different and larger number than the
24  amount on the TKO invoice that we were talking about; is that
25  right?

## 24

1      A.  What's your question?
2      Q.  Is that a different amount than the amount on the TKO
3  invoice that we were talking about?
4      A.  Yes.
5      Q.  And I'm just trying to understand.  You believe that
6  the TKO invoice is reflected in that amount?
7      A.  Yes.
8      Q.  And what is that based on?
9      A.  That is the purchase of advertising time.  TKO was
10  responsible for putting our paid advertising in markets around
11  the state, in media markets around the state.
12     Q.  Thank you.  And if you could turn to what should be
13  the next page in the last exhibit you've got, the Texas -- the
14  Bates No. is Texas 298651.  And tell me if you're familiar with
15  that document.
16     A.  Yes.
17     Q.  What is it?
18     A.  An invoice from TKO Advertising.
19     Q.  What is the date of the invoice?
20     A.  February 29th.
21     Q.  And how much is the total invoice amount?
22     A.  $110,000.
23     Q.  Is that amount reflected in the account tracking
24  document showing expenditures through March 31st?
25     A.  Yes, I believe so.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Richard Parsons

June 14, 2012

## 25

1    Q.   And what leads you to believe so?
2    A.   Because these were all services that were provided by
3  TKO within the time frame included on the Burson account
4  tracking.
5    Q.   Okay.  Can you find the amount that the TKO invoice is
6  for in the account tracking document?
7    A.   Not the exact amount of the invoice.  Not directly
8  from invoice to invoice.
9    Q.   If I could direct your attention to the next page in
10  that same exhibit, Bates No. Texas 298652.  Do you recognize
11  this document?
12   A.   Okay.  I've found it.
13   Q.   Do you recognize this document?
14   A.   Yes.
15   Q.   What is it?
16   A.   An invoice.
17   Q.   What company is the invoice from?
18   A.   Penn Schoen and Berland Associates.
19   Q.   What is the date on the invoice?
20   A.   March 13th.
21   Q.   Thank you.  And what is the total amount invoiced?
22   A.   $45,000.
23   Q.   Is that amount reflected in the account tracking
24  document showing expenditures through March 31st?
25   A.   Yes.

## 26

1    Q.   How do you know?
2    A.   Because it says this invoice was for research, and
3  there's a category on the Burson account tracking that
4  corresponds with this and the amount.
5    Q.   Thank you.  Of the $3 million that's budgeted for
6  voter education in 2012, how much of that will come from federal
7  funds?
8    A.   My understanding is all of it.
9    Q.   And is that money associated with the Help America
10  Vote Act or HAVA?
11   A.   That's my understanding.
12   Q.   Has your office confirmed that HAVA funds can be spent
13  on voter education related to photo ID requirements under
14  S.B. 14?
15   A.   That's not my role.
16   Q.   So are you saying you don't know one way or the other?
17  Am I correct?
18   A.   I'm saying that's not my role.
19   Q.   Well, the question is has your office confirmed that
20  HAVA funds can be spent on voter education related to photo ID
21  requirements under S.B. 14?
22   A.   That's not my role.
23   Q.   I'm not asking what your role is.  I'm asking what the
24  Secretary of State's office has or has not done, to your
25  knowledge.

## 27

1    A.   I don't know what each person in the Secretary of
2  State's Office does on a day-to-day basis.
3    Q.   Okay.  So if I understand you correctly, your answer
4  is you don't know whether or not the Secretary of State's office
5  has confirmed that HAVA funds can be spent on educating voters
6  about photo ID requirements; is that correct?
7    A.   That is not correct.
8    Q.   So if you do know, is the answer yes or no?
9         I'm sorry.  I don't know if the phone has cut out.  I
10  haven't heard an answer.
11   A.   No.  I'm sorry.  I haven't -- could you restate the
12  question, please.
13   Q.   Sure.  Has the Secretary of State's office confirmed
14  that HAVA funds can be spent on voter education related to the
15  photo ID requirement under S.B. 14?
16        MR. BRISSENDEN:  Objection, vague.
17        To the extent you know.
18   A.   I don't know what has been done to research that.
19   Q.   Do you know who would know?
20   A.   I'm sorry?
21   Q.   Do you know who would know the answer to that
22  question?
23   A.   Someone in the Elections division most likely.
24   Q.   Would Keith Ingram know the answer to that question?
25   A.   I don't know.

## 28

1    Q.   Okay.  We've talked some about budgeting for the Make
2  Your Mark on Texas plan.  I want to focus specifically on
3  efforts to educate voters about the photo ID requirements under
4  S.B. 14.  How much does the Secretary of State plan to spend on
5  its efforts to educate voters about the photo ID requirements
6  under S.B. 14?
7    A.   That would be part of the Make Your Mark on Texas
8  program which is -- which currently assumes a budget of $3
9  million.
10   Q.   There is a portion of that $3 million that has been
11  reserved for educating voters about the photo ID requirement
12  under S.B. 14?
13   A.   Educating voters on requirements on photo ID
14  requirements within Senate Bill 14 would be part of the voter
15  education plan, but let me be clear it would not be limited to
16  that $3 million.  There is much that this office would do
17  outside the specific scope of that program.
18   Q.   Like what?  What would the office do outside of Make
19  Your Mark on Texas?
20   A.   Media engagement, op eds, online communications,
21  things of that nature that do not fall specifically under Make
22  Your Mark on Texas but are general day-to-day communications
23  from the Secretary of State's office.
24   Q.   Okay.  So if we could take those one by one.  What
25  does media engagement mean?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 29

1     A.   It means creating media opportunities to promote the
2  message, whether it's Senate Bill 14 or some other initiative.
3  It means answering media questions as they come into our office.
4     Q.   And how much is budgeted for media engagement?
5     A.   It's our day-to-day -- it's part of my day-to-day
6  duties.
7        Excuse me.  I have a question.  Are you asking within
8  the Make Your Mark on Texas program or outside of the Make Your
9  Mark on Texas program?  You didn't clarify.
10    Q.   Sure.  I am trying to understand -- you mentioned that
11 several things would be done outside of the Make Your Mark on
12 Texas plan to inform voters about the photo ID requirement, and
13 I want to understand what those things are.
14    A.   Okay.  Yeah.
15    Q.   So I think we're on the same page.  The first thing
16 you mentioned was media engagement.  And the next thing you
17 mentioned was op eds.  What activity specifically does that
18 involve?
19    A.   Writing opinion pieces to place in newspapers and
20 publications around the state with information explaining
21 whatever we need to explain to voters.
22    Q.   And what media outlets will those op eds appear in?
23    A.   Whichever ones we ask to run it and who choose to run
24 it.
25    Q.   And how much is budgeted for this activity of writing

## 30

1  op eds?
2     A.   Part of my day-to-day activities.
3     Q.   Will you personally be writing these op eds?
4     A.   I have written some in the past.
5     Q.   Do you plan to write op eds about the photo ID
6  requirement under S.B. 14 if it's precleared?
7     A.   It's certainly possible.
8     Q.   Okay.  The third thing you mentioned is online
9  communications.  What does that mean?
10    A.   We have a -- we have two web sites that we maintain
11 that are resources for voters for all Texans, which we can put
12 information up that's important to voters.
13    Q.   And so I understand, we're talking about activities
14 outside of the Make Your Mark on Texas plan.  So you're saying
15 that there are things that you put up on the Secretary of
16 State's web site that are outside of that plan; is that correct?
17    A.   That's correct.
18    Q.   And what kinds of things will be on your web site
19 having to do with photo ID requirements that are not part of
20 Make Your Mark on Texas?
21    A.   That would be speculative.
22    Q.   Do you have a plan to use web site content other than
23 Make Your Mark on Texas to inform voters about photo ID
24 requirements?
25    A.   Not a specific plan.

## 31

1     Q.   And have you consulted with anyone in the Elections
2  division about these efforts to inform voters that are outside
3  of the Make Your Mark on Texas plan?
4     A.   Not sure I understand your question.
5     Q.   So we're talking about the things that your office
6  might do that are separate from the Make Your Mark on Texas plan
7  to educate voters about photo ID requirements.  Have you
8  coordinated with the Elections division on those activities?
9     A.   Not at this time.
10    Q.   Do you plan to?
11    A.   If it were appropriate.
12    Q.   Does the Secretary of State's office have a plan to
13 continue educating voters about the photo ID requirement under
14 S.B. 14 if it's precleared after the November 2012 election?
15    A.   Say that again, please.
16    Q.   I think that was a confusing question.  I apologize
17 and I will try to reformulate it.
18       We've talked about the Secretary of State's efforts --
19 plan to educate voters about the photo ID requirement under
20 S.B. 14 if it's precleared in 2012.  What I want to know is will
21 there be any efforts to educate voters about those requirements
22 after 2012?
23    A.   I'm sorry.  You broke up.  What was the very last part
24 of your question?  You broke up.
25    Q.   I'm sorry.  I want to know about efforts to educate

## 32

1  voters about photo ID requirements after November 2012.
2     A.   Our current focus is in preparation for the November
3  6, 2012 election.
4     Q.   So there is not currently a plan to engage in voter
5  education after November 2012?
6     A.   As I said, our current focus is on voter education
7  prior to the November 6, 2012 general election.
8     Q.   Does the Make Your Mark on Texas plan include any
9  voter education after November 2012?
10    A.   I believe the contract runs through January of 2013,
11 but I'm not certain of that.
12    Q.   Okay.  We've talked about the Secretary of State's
13 plan to notify voters that they will need photo ID in order to
14 vote if S.B. 14 is precleared.  What else will voters be
15 informed of related to S.B. 14's photo ID requirements?
16    A.   Say that again, please.
17    Q.   Sure.  What else, other than the fact that they will
18 need photo ID to vote if S.B. 14 is precleared, will voters be
19 informed of related to S.B. 14's photo ID requirements?
20    A.   We would want to let voters know what forms of ID
21 would be acceptable.  We would certainly want to let voters know
22 that the Department of Public Safety is -- would be in a
23 position to issue free election identification cards and how to
24 obtain one of those election identification cards.
25    Q.   And how will the Secretary of State inform voters



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Richard Parsons

June 14, 2012

## 33

1  about how to get the election identification certificates?
2      A.  It could be -- we haven't held our planning meetings
3  yet for the fall campaign, but those strategies could include
4  paid advertising through online broadcasts or print, media
5  engagement and online messages on our web sites and social media
6  sites.
7      Q.  And what will the content of those messages be?
8      A.  Again, we haven't held our planning strategy session
9  for the fall campaign yet, but they would generally be what I
10  just discussed.
11      Q.  When do you think those planning sessions will be?
12      A.  Within the next few weeks.
13      Q.  Will those -- if S.B. 14 is precleared and -- will the
14  efforts to inform voters about where to get photo ID be designed
15  to target minority communities?
16          MR. BRISSENDEN:  Objection, vague.
17      A.  Can you be more specific.
18      Q.  Will there be any effort to target voter education
19  efforts regarding how to get acceptable forms of ID under
20  S.B. 14 to minority communities?
21      A.  Yes.
22      Q.  And what will those efforts be?
23      A.  They would include -- they would possibly include one
24  or all of the strategies that we plan to employ, including
25  online broadcasts, possibly print paid advertising, proactive

## 34

1  media engagement and online social media, mobile and online
2  social media.
3      Q.  And how would each of those media be targeted to
4  minority communities?
5      A.  Can you be a little more specific.
6      Q.  Well, let's take an example.  I'm sorry.  I don't
7  think I remember the entire list.  Did you mention television
8  advertising?
9      A.  Yes, sir.
10      Q.  So how would you ensure, if you created a television
11  ad, that it reached minority communities?
12      A.  All our ads are in Spanish and English.  And the
13  vendor who places the advertising uses data that is commonly and
14  widely used to target specific audiences, to reach specific
15  audiences.
16      Q.  Have you seen that data?
17      A.  I have seen some of it, but it's been months since
18  I've seen it, but I have seen some of it.
19      Q.  And could you just say, how does that targeting
20  happen?  I mean, what does that mean in practice for -- again,
21  take the example of a television ad?
22      A.  I'm sorry.  What's your question?
23      Q.  Well, you said the vendor uses data.  What I want to
24  know is how does data translate into a practical effort to
25  target a minority community?

## 35

1      A.  As I understand it, there are some TV shows, some TV
2  stations, some cable channels that have high viewership among
3  certain populations, and you can target ads to play on those
4  programs, those channels or those stations to run during periods
5  of high viewership among whatever targeted population you wish.
6      Q.  So it's your understanding that Burson-Marsteller is
7  able -- has information about what shows, what channels
8  minorities are more likely to watch; is that correct?
9      A.  That's correct.
10      Q.  Have you seen that information?
11      A.  I've seen some of it.
12      Q.  And which shows are minorities more likely to watch?
13      A.  I don't have that in front of me.
14      Q.  Is that part of the documents that you reviewed and
15  provided to your attorneys to produce to us?
16      A.  I don't have those documents.
17      Q.  Did you ever have those documents?
18      A.  I've seen documents that have that, but I've never had
19  them in my possession, that I recall.
20      Q.  How did you see them?
21      A.  In a meeting.
22      Q.  In a meeting with whom?
23      A.  With Burson staff.  Maybe with TKO Advertising staff.
24  I don't remember who exactly was there.
25      Q.  But you didn't get a copy of any information about how

## 36

1  advertising would be targeted to minority communities?
2      A.  I don't have a copy.
3      Q.  Is that correct?
4      A.  That's correct.  I don't have a copy.  It may have
5  been a Power Point.  I don't recall.
6      Q.  The information that you saw, was it specific to the
7  question of how someone who doesn't have an acceptable form of
8  ID under S.B. 14 would go about acquiring that?
9          MR. BRISSENDEN:  Objection, vague.
10      A.  Can you repeat that, please.
11      Q.  The information that you saw about targeting minority
12  communities, was it specifically directed at an effort to inform
13  voters who don't have an acceptable form of ID under S.B. 14 how
14  to get one?
15          MR. BRISSENDEN:  Same objection.
16      A.  Can you be more specific.
17      Q.  Was the information that you saw about targeting
18  minority communities specific to any content that would be in
19  the advertisement?
20      A.  As I recall, it was specific to -- it wasn't specific
21  to content.  It was more on how to best reach specific
22  populations.
23      Q.  Do you recall when this meeting where you saw this
24  data was?
25      A.  As I recall, it was in one of our conference rooms.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 37

1     Q. And do you know what date?
2     A. No.
3     Q. Do you remember what month?
4     A. It was -- I'd be speculating. I can't remember.
5     Q. Was it after Burson-Marsteller was hired?
6     A. Yes.
7     Q. Have any specific web sites designed to inform voters
8 about photo ID requirements under S.B. 14 been designed yet?
9     A. Say that again, please.
10     Q. Have any web sites designed to inform voters about
11 photo ID requirements under S.B. 14 been designed yet?
12     MR. BRISSENDEN: For clarification, are you
13 referring to web sites designed by the Secretary of State's
14 office or from somebody else?
15     MR. VANDEWALKER: I'm referring to any web sites.
16 That would include both the Secretary of State's office and
17 anybody else.
18     A. No web site has been designed specifically for the
19 purposes of educating on SB-14. We have in place a voter
20 resources web site called VoteTexas.gov and that would be used
21 as a resource to educate voters if Senate Bill 14 is precleared.
22     Q. And so how will it be used if S.B. 14 is precleared?
23     A. We will put the information on there necessary for
24 voters relevant to any requirements within Senate Bill 14.
25     Q. Has that content been drafted yet?

## 38

1     A. No.
2     Q. Do you know when it will be?
3     A. No. We're not permitted to implement Senate Bill 14.
4 Drafting content would be implementing Senate Bill 14.
5     Q. Do you know how long it will take to draft that
6 content?
7     A. Virtually no time.
8     Q. Will you consult with the Elections division on that
9 content before it is posted?
10     A. I would expect so.
11     Q. Will you consult with lawyers for the Secretary of
12 State's office before that content is posted?
13     A. I would expect so.
14     Q. And do you know how long that will take?
15     A. Virtually no time.
16     Q. Do you have any plans to insure that that content is
17 understandable to the average voter?
18     A. Say it again, please.
19     Q. Do you have any plans to insure that that content --
20 the content that will inform voters about the photo ID
21 requirement under S.B. 14 is understandable to the average
22 voter?
23     MR. BRISSENDEN: Objection, vague.
24     A. Can you be more specific, please.
25     Q. Do you have any plans to test whether the language

## 39

1 about photo ID requirements under S.B. 14 would be effective at
2 informing voters about those requirements?
3     A. Not at this time.
4     Q. Do you contemplate conducting such testing in the
5 future?
6     A. Not at this time.
7     Q. Will the content informing voters about photo ID
8 requirements under S.B. 14 also be available in Spanish?
9     A. Of course.
10     Q. Do you have any plans to test whether the Spanish
11 language will be effective to inform Spanish speaking voters
12 about photo ID requirements under S.B. 14?
13     MR. BRISSENDEN: Objection, vague.
14     A. Can you re-ask that.
15     Q. Do you have any plans to test whether the Spanish
16 language to inform voters about photo ID requirements under
17 S.B. 14 will be effective in communicating with Spanish speaking
18 voters?
19     MR. BRISSENDEN: Same objection.
20     A. Can you be more specific.
21     Q. Do you have any plans to test how effective your web
22 content will be at reaching voters who speak only Spanish?
23     A. Not at this time. But all of our Spanish language
24 content goes through approval by Spanish speakers. It's not
25 auto generated by some software program. It's approved by

## 40

1 Spanish speakers to insure that it's understandable.
2     Q. Are the Spanish speakers that you just mentioned
3 people who work in the Elections division?
4     A. Yes, I believe so.
5     Q. So would you say that they're people who have a
6 greater understanding than the average person about voting
7 issues?
8     MR. BRISSENDEN: Objection, vague, calls for
9 speculation.
10     A. Can you ask that again, please.
11     Q. I'm just trying to understand. The people you have
12 reviewing Spanish language content are not lay people? They're
13 employees who work on elections every day?
14     A. Yes, I believe that's correct.
15     Q. Do you know what percentage of Latinos have internet
16 access?
17     A. I believe in some of the research the Burson -- well,
18 that would be speculation. I don't know.
19     Q. Do you know if it's greater or less than the
20 percentage of Anglos who have internet access?
21     A. I don't.
22     Q. Do you know what percentage of African Americans have
23 internet access?
24     A. I don't.
25     Q. Do you know if the percentage of African Americans who



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 41

1    have internet access is greater or less than the percentage of
2    whites who have internet access?
3        A. I don't.
4        Q. Do you know what percentage of low-income Texans have
5    internet access?
6        A. I don't.
7        Q. What's the basis for thinking that the internet will
8    be an effective way to reach African American communities about
9    the photo ID requirements of S.B. 14?
10           MR. BRISSENDEN: Objection, vague.
11       A. Can you ask that again, please.
12       Q. What is the Secretary of State's office's basis for
13   thinking that internet web sites will be an effective way to
14   reach African American communities to inform them about photo ID
15   requirements?
16       A. Because of information provided by Burson-Marsteller,
17   both statistically and anecdotally, growth among all
18   populations, including Hispanics and African Americans regarding
19   internet use is growing rapidly, very rapidly.
20       Q. It's growing rapidly compared to what?
21       A. Compared to what it was in the past.
22       Q. Do you know if the internet use relative to white,
23   Anglo people -- I'm sorry. Strike that.
24           Do you know if it's -- despite growing rapidly, if
25   it's more or less than white internet usage?

## 42

1            MR. BRISSENDEN: Objection, vague.
2        A. Can you restate your question, please.
3        Q. So you said that internet usage among both African
4    Americans and Latinos is growing rapidly. Do you know if it is
5    greater or less than white internet usage?
6        A. Anecdotally, my understanding is it's less, but I
7    don't know that for a fact.
8        Q. Did the data that you said Burson-Marsteller provided
9    you offer any information about disparities among different
10   racial and ethnic groups with respect to internet access?
11       A. I don't recall. Anecdotally, I recall that their
12   information showed that Hispanics were the fastest -- among the
13   fastest, if not the fastest growing population for internet use.
14       Q. Does the education plan -- does the plan to educate
15   voters about the photo ID requirements under S.B. 14 depend on
16   mailers or direct mailings?
17       A. There were no direct mailings in the first phase, and
18   we have not finalized our strategy for the second phase. So I
19   can't say that it will or will not be used.
20       Q. Could you just tell me what the date range for the
21   second phase is.
22       A. Be more specific, please.
23       Q. Okay. I don't know what the second phase means.
24       A. Sorry. Second phase means after the primary.
25       Q. I see. Thank you.

## 43

1        A. Targeting the general election.
2        Q. I see. And has the primary happened yet?
3        A. Yes.
4        Q. So we're in the second phase; is that correct?
5        A. That's correct.
6        Q. Okay. But the strategy has not been decided yet
7    regarding whether or not mailers will be used; is that correct?
8        A. That's correct.
9        Q. Do you know when the strategy will be finalized?
10           MR. BRISSENDEN: Objection, vague.
11       A. Can you be more specific, please.
12       Q. Well, the strategy isn't final yet, right?
13       A. Correct.
14       Q. Do you know when it will become final?
15           MR. BRISSENDEN: Same objection. Are you
16   referring to the direct mailings or overall?
17       Q. I'm sorry. I'm referring to overall, the entire
18   strategy.
19       A. I don't have a specific date. We'll be meeting in the
20   next few weeks. We'll have a -- any strategy is subject to
21   change or amendment at any time based on any number of factors.
22   But we would -- right now our working plan is to begin ramping
23   up our voter education effort for November 6th in August, early
24   August.
25       Q. And in order to implement strategy by early August,

## 44

1    when will you need to make decisions about what those strategies
2    will be?
3        A. Next few weeks, month or so.
4        Q. Do you know how long it would take to design mailers
5    before they would be ready to send out?
6        A. We could have a mailer designed in ten minutes.
7        Q. Does that include a mailer that would be designed to
8    inform voters about the photo ID requirement under S.B. 14?
9        A. Certainly.
10       Q. Would you need to consult with the Elections division
11   about such mail?
12       A. I think that would be wise to consult with them.
13       Q. Would you need to consult with other lawyers in the
14   Secretary of State's office about a mailer?
15       A. I think it would be prudent to.
16       Q. And could all of that consultation happen in ten
17   minutes?
18       A. Yes.
19       Q. And what about translation into Spanish? Could that
20   happen in ten minutes?
21       A. Yes.
22       Q. And how would you direct such mailers? Where would
23   you get your list of addresses from?
24       A. I'm not sure I follow you.
25       Q. Well, if you were going to send out a mailing, you



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 45

1    would need addresses to send it to; is that correct?
2        A.  Yes.
3        Q.  And where would you get a list of addresses?
4        A.  Who do you contemplate sending these mailers to?
5        Q.  That what I'm asking you.
6        A.  You asked about sending mailers.  I don't know who
7    you're going to send out mailers to.  I mean, we can do it.
8    You're asking if we can.  Yes, we can.  We can do it quickly.
9    But I don't know who you want us to send them to.
10       Q.  I'm trying to understand what the Secretary of State's
11   plan is to inform voters about photo ID requirements under
12   S.B. 14 and whether that might include mailers.  If it did, who
13   would you send mailers to?
14       A.  That would be -- under the scenario under which you're
15   describing, I guess that would be registered voters.
16       Q.  Does the Secretary of State receive any discounts or
17   exemptions on postage that would allow it to avoid paying the
18   full postage costs for mailings?
19       A.  I don't know.
20       Q.  Do you know who would know?
21       A.  I don't.
22       Q.  Okay.  Does the plan to educate voters about photo ID
23   requirements under S.B. 14 make use of newspaper ads?
24       A.  That's a possible strategy.
25       Q.  But am I correct in understanding it's not one that

### 46

1    you're currently planning to do?
2        A.  It's not in the current plan, no.
3        MR. VANDEWALKER:  I apologize.  I should have
4    said earlier breaks should be, it's my firm belief, at the
5    control of the witness.  And I didn't say that, and I haven't
6    offered you a break so far.  So I'm going to take this
7    opportunity to take a five- to ten-minute break.
8        THE WITNESS:  I'd appreciate that.
9        (Recess from  3:37 p.m. to 3:48 p.m.)
10       Q.  I would like to take a look at the color exhibit,
11   please.
12       (Exhibit No. 7 marked)
13       MS. STENCEL:  And the court reporter has marked
14   this as Parsons Exhibit No. 7.  And Mr. Parsons has the exhibit.
15       MR. VANDEWALKER:  Thank you.
16       MR. BRISSENDEN:  And Ian, just for the record, so
17   the record is clear, Exhibit 7 in color is the document I
18   believe that you had asked Ms. Salazar about that was not in
19   color.  And we have, between the two depositions, gotten a copy
20   in color for you.
21       MR. VANDEWALKER:  Yes, that's right.  And I very
22   much appreciate the quick turnaround on that from the State of
23   Texas.  Thank you.
24       Q.  Mr. Parsons, have you seen this document before?
25       A.  Yes.

### 47

1        Q.  And what is it?
2        A.  It's survey research on voter attitudes and some
3    message ad concepts.
4        Q.  And is this document what you base your beliefs that
5    Burson-Marsteller will target minority communities on?
6        MR. BRISSENDEN:  Objection, vague.
7        Q.  Can you be more specific, please.
8        Q.  So you said earlier that you think that
9    Burson-Marsteller had data about how to target minority
10   communities in a public education plan.  I'm wondering if this
11   document is your evidence that that's true?
12       MR. BRISSENDEN:  Same objection.
13       A.  Could you again restate your question, please.
14       MR. VANDEWALKER:  I'll ask the court reporter to
15   read it back, please.
16       (Requested portion was read by the reporter)
17       MR. BRISSENDEN:  Same objection.  Also, to the
18   extent it mischaracterizes the witness' prior testimony, I also
19   object.
20       A.  Can you restate again, please.
21       Q.  I'll try a different question.  Do you believe
22   Burson-Marsteller has the ability to target minority communities
23   in a public education plan?
24       A.  Yes.
25       Q.  Why do you think that's true?

### 48

1        A.  Because of their experience on past campaigns and
2    their demonstrated knowledge of public relations in advertising
3    engagement and data that they have communicated to me.
4        Q.  Okay.  What other past campaigns are you referring to?
5        A.  As I said, they've done -- in previous years they
6    conducted a similar voter education campaign for the Secretary
7    of State's office, before I was part of the Secretary of State's
8    office.  And they've done other voter -- similar voter education
9    or voter outreach campaigns in other states, but I do not recall
10   which states those are.
11       Q.  And what about those campaigns involve targeting
12   minority communities?
13       A.  It's my understanding that that was part of the --
14   that that was part of those campaigns.
15       Q.  Have you seen documents relating to those campaigns?
16       A.  I have seen some -- I don't know if they're briefs or
17   synopsis of past campaigns, but I've seen some of that.  Not as
18   it specifically relates to minority outreach.  Just campaigns in
19   general.
20       Q.  You also mentioned data that Burson-Marsteller has
21   related to targeting minority communities.  What data is that?
22       MR. BRISSENDEN:  Objection, asked and
23   answered.
24       A.  Can you restate that, please.
25       MR. VANDEWALKER:  I'll ask the court reporter to



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 49

1  read it back.
2             (Requested portion read by reporter)
3             MR. BRISSENDEN:  Same objection.
4      A.  Can you be more specific.
5      Q.  Well, I'm trying to -- you used the word "data" in
6  responses to one of my questions, and I just want to know what
7  you meant by the word "data" when you said Burson-Marsteller has
8  data that helps them reach minority communities?
9      A.  I thought we already discussed that when we discussed
10 paid advertising, where they have statistics and data that help
11 them target specific television shows, radio stations, online
12 shows, online web sites that have predominantly or high usage by
13 minority communities.
14     Q.  And is the exhibit that was last presented to you an
15 example of that data?
16     A.  No.
17     Q.  So did you provide any of the data that you're
18 referring to to the attorneys for the State of Texas to produce
19 to defendant intervenors?
20     A.  No. We already discussed that.  I don't have it.
21     Q.  But you remember seeing it at some point in the past?
22             MR. BRISSENDEN:  Objection, asked and answered.
23     Can you restate that.
24             MR. VANDEWALKER:  Withdrawn.
25     Q.  If I could ask you to turn to what is marked as Page

## 50

1  14 of this exhibit.  It's a page that reads Voters are
2  unfamiliar with VOTEXAS.org at the top.
3      A.  Okay.
4      Q.  And the bottom box says, "Have you visited VOTEXAS.org
5  and the Secretary of State's web site for information about the
6  voting process."  And the far left pie chart, could you tell me
7  what percentage of people have visited one of those web sites?
8      A.  18 percent.
9      Q.  Do you know how many page views the web site for the
10 Secretary of State's office gets in any given day?
11     A.  Not off the top of my head.  I can get that
12 information, but I don't have it off the top of my head.
13     Q.  Do you think if only 18 percent of people surveyed
14 used those web sites that that's a good way of informing people
15 about what they need to do to vote?
16             MR. BRISSENDEN:  Objection, vague.
17     Can you restate your question, please.
18     Q.  Do you think if only 18 percent of people visited the
19 Secretary of State's web site that that is going to be a way
20 that will be effective in informing voters about the
21 requirements to vote?
22             MR. BRISSENDEN:  Objection, vague and assumes
23     facts not in evidence.
24     Can you restate or be more specific.
25     Q.  If you wanted to inform voters of something, would you

## 51

1  depend on a medium that only 18 percent of voters actually
2  access?
3             MR. BRISSENDEN:  Same objection.  Assumes facts not in
4      evidence.
5      A.  Can you ask that any differently?
6      Q.  How effective will a medium that only reaches 18
7  percent of voters be?
8             MR. BRISSENDEN:  Same objection.
9      If you know, you can answer.
10             MR. VANDEWALKER:  You can answer if you
11     understand the question.
12     A.  I think using the internet and online resources is
13 absolutely a strong tool to inform voters.
14     Q.  Even a web site that only 18 percent of voters go to?
15             MR. BRISSENDEN:  Same objection.
16     A.  The VOTEXAS.org web site does not exist anymore.
17 We've refreshed and updated.
18     Q.  Did you earlier testify that the Secretary of State
19 will use VOTEXAS.org as part of this year's voter education
20 plan?
21     A.  I did not.
22     Q.  Okay.  Is VOTEXAS.org different from VoteTexas.gov?
23     A.  VOTEXAS.org was the previous iteration of the web
24 site.  We've changed the URL address to VoteTexas.gov because I
25 believe it is more intuitive and easier for people to find as a

## 52

1  resource.
2      Q.  In your experience in communications, does changing
3  the URL or address of a web site usually increase the number of
4  hits?
5             MR. BRISSENDEN:  Objection, vague.  Calls for
6      speculation.
7      A.  Can you be a little more specific.
8      Q.  Why do you think VoteTexas.gov is a better web address
9  than VOTEXAS.org?
10     A.  Because last fall, in preparation for the November
11 2011 constitutional amendment election in Texas, I would
12 frequently receive media inquiries about various election issues
13 related to the constitutional amendment election.  When I would
14 direct reporters, whom I believed to be informed about the
15 process, to go to VOTEXAS.org so I could point them to their
16 answers, intuitively they would type in VoteTexas.org which is a
17 URL that is not owned by the Secretary of State's
18 office, which made very clear to me that VOTEXAS.org was not
19 intuitive or user friendly.  And so we immediately began the
20 process to change the URL to make it, one, more intuitive and,
21 two, change the .org to .gov because, as I suspected and survey
22 information later confirmed, that government is the most trusted
23 resource for voter information.
24             So, yes, I believe changing the URL will enhance
25 the usability and accessibility of the web site.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 53

1    Q.  If you could turn to Page 19 of this exhibit, the
2  slide entitled Web Sites and media are most used source of voter
3  information.
4    A.  Okay.  I'm there.  Sorry.  I'm there.
5    Q.  Thank you.  If I could just direct you to the second
6  group of columns there that says Media.  What does media mean,
7  as it's used here?
8    MR. BRISSENDEN:  Objection, calls for
9  speculation.
10    A.  I can tell you what it means to me.
11    Q.  Okay.  What does it mean to you?
12    A.  Traditional sources such as newspapers, periodicals,
13  television, radio, and I guess their online equivalents as well.
14    Q.  Okay.  And in looking to the fourth column labeled
15  Advertising, what does advertising mean, as used here?
16    A.  As I understand it, it would be ads placed in
17  different forms of media:  Online, broadcast, print.
18    Q.  Okay.  Thank you.  And if we could look at the first
19  group of columns here that's labeled Web Sites.  The far left
20  column -- I don't know what color to call this.  I'll call it
21  orange -- says that all Texas voters, as I understand it.  And
22  what percentage of Texas voters have answered the question, when
23  seeking out information or news about voting in your community
24  that they find the information on web sites?
25    A.  67 percent.

## 54

1    Q.  And so then is it your understanding that over 30
2  percent of Texas voters don't use web sites to seek out
3  information they need about voting?
4    MR. BRISSENDEN:  Objection, vague.  Calls for
5  speculation.
6    A.  It's my understanding that 67 percent do.
7    Q.  And in that group of columns, the far right column,
8  which seems to be black, is Hispanic voters.  What percentage of
9  Hispanic voters use web sites?
10    A.  53 percent.
11    Q.  And do you see on this chart any representation of
12  what percentages of African Americans use different sources for
13  information they need about voting?
14    A.  No.
15    Q.  And just look towards the middle of the column --
16  group of columns marked Social Networking Sites, what percentage
17  of Hispanics, according to this, use social networking sites?
18    A.  13 percent.
19    Q.  And what percentage of 18- to 24-year-olds use social
20  networking sites?
21    A.  24 percent.
22    Q.  And do you know what the racial composition of the 18-
23  to 24-year-old group in this survey is?
24    A.  I do not.
25    Q.  Do you know if it has -- do you have any reason to

## 55

1  believe that the 24 percent doesn't include all racial
2  identities combined in that age range?
3    A.  Can you say that again, please.
4    Q.  Do you have any reason to believe that, as reflected
5  in this chart, the 18- to 24-year-old group doesn't include all
6  races?
7    MR. BRISSENDEN:  Objection, calls for
8  speculation.
9    To the extent you know, you may answer.
10    A.  Can you restate that.  I'm not clear on what you're
11  asking.
12    MR. VANDEWALKER:  Withdrawn.
13    Q.  Do you see any information on the group of columns
14  related to social networking sites about what percentage of
15  African Americans use that as a source of information they need?
16    A.  No.
17    Q.  Any information about African Americans anywhere on
18  this page?
19    A.  No.
20    Q.  Turning to now Page 21.  A slide titled Voters
21  find the process fair and accessible.
22    A.  Yes, I'm there.
23    Q.  Thank you.  Okay.  So the question here that was asked
24  of respondents was, "Do you believe that the voting process is
25  fair and accessible to all Texans?"  And if I could direct your

## 56

1  attention under the big color, the first column, "Texas
2  Voters," what is the most commonly given reason that Texans --
3  that some people said they do not believe the voting process is
4  fair and accessible to all Texans?
5    MR. BRISSENDEN:  Objection, vague.
6    A.  Can you say that again, please.
7    Q.  So the bottom of this page describes the people who
8  said no, they don't believe the voting process is fair and
9  accessible to all Texans and the reason they gave.  The column
10  all the way to the left gives a list of reasons.  Could you tell
11  me which of those reasons is the most commonly given, has the
12  highest percentage of respondents?
13    MR. BRISSENDEN:  Objection, vague, to the extent
14  it mischaracterizes the information.
15    Q.  Do you understand the question?
16    A.  Not really.
17    Q.  Okay.  The lower half of the box on this page says, in
18  a smaller box, "If no, why do you believe that the voting
19  process is not fair and accessible to all Texans?"  Do you see
20  that?
21    A.  Yes.
22    Q.  And then underneath it is a series of columns broken
23  down.  The far left column is labeled "Texas Voters".  Do you
24  see that?
25    A.  Yes.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 57

1    Q.  Underneath "Texas Voters" it shows the top three
2  reasons that people gave that they believe that the voting
3  process is not fair and accessible to all Texans.  Do you see
4  that?
5    A.  Yes.
6    Q.  What is the most -- which one of those has the highest
7  percentage next to that?
8    A.  "Documentation".
9    Q.  Thanks. If we could turn back --
10    May I add something to my answer?
11    Q.  Yes.
12    A.  I don't know if that means -- if "Documentation" means
13  that -- that could mean -- I don't know what that means in terms
14  of what documentation people are or are not required to show.
15  It simply says "Documentation".  It doesn't say whether it's
16  pertaining to what they are or are not required to show.
17    Q.  Thank you.  If I could direct you now to Page 15 in
18  the same document?
19    A.  What page?
20    Q.  Page 15, please.
21    So Page 15 is labeled at the top Voter Registration
22  and Driver's License Most Popular Forms of ID.  And the question
23  asked was, when you vote, what do you bring with you to your
24  polling place -- or voting location -- excuse me.
25    The second row says, driver's license issued by the

## 58

1  Texas Department of Public Safety.
2    What percentage of Texas voters brought their driver's
3  license, according to this?
4    A.  64 percent.  Yeah, 64 percent.
5    MR. VANDEWALKER:  Thank you.  Okay.  I'd like to
6  introduce another exhibit, if I could.  It's the affidavit of
7  Keith Ingram.
8    MS. STENCEL:  Mark this as Exhibit 8.
9    (Exhibit No. 8 marked)
10    MS. STENCEL:  The court reporter has marked this
11  as Parsons Exhibit 8, and I am providing it to the witness now.
12    Q.  Mr. Parsons, when you get a chance to look at it, have
13  you seen this exhibit before?
14    A.  Reynolds had it in his hand, but I didn't look at it.
15  So, yes, I've seen it, but I haven't read this.
16    Q.  Okay.  Sure.  That's perfectly all right.
17    I believe you mentioned Keith Ingram before, but if
18  you could just tell me, who is Keith Ingram.
19    A.  Director of Elections.
20    Q.  And is that a post within the Secretary of State's
21  office?
22    A.  Yes. Sorry.  Yes.
23    Q.  Thank you.  That's quite all right.  Just for the
24  record.
25    If I could direct you to Page 3, specifically

## 59

1  Paragraph 7.
2    A.  Okay.
3    Q.  And I would appreciate it if you would just take
4  however long you need to read Paragraph 7.
5    A.  Okay.
6    Q.  Paragraph 7 makes a contrast between a basic
7  education program and a complete program.  What's the difference
8  between those two?
9    A.  I don't know necessarily what they are to Keith or
10  what the difference is as stated here.
11    MR. VANDEWALKER:  Okay.  If I could just skip to
12  another exhibit quickly.  This is portions of Keith's Ingram's
13  deposition, which actually says at the top Brian Ingram.
14    MS. STELCEN:  Can you hold on one moment while I
15  grab that?
16    MR. VANDEWALKER:  Of course.
17    MS. STELCEN:  I'll have the court reporter mark
18  this as Parsons Exhibit 9.
19    (Exhibit No. 9 marked)
20    MS. STELCEN:  And the exhibit's been placed in
21  front of the witness.
22    MR. VANDEWALKER:  Thank you.
23    Q.  Mr. Parsons, have you ever seen this document before?
24    A.  No.
25    Q.  So as I mentioned before, this is the transcript of

## 60

1  the deposition of Brian Keith Ingram.  Do you understand Brian
2  Keith Ingram to be the same Keith Ingram we were talking about a
3  moment ago?
4    MR. BRISSENDEN:  Just so the record is clear,
5  Exhibit 9 are three pages of the transcript of Mr. Ingram's
6  deposition as opposed to the entire transcript.
7    MR. VANDEWALKER:  That's absolutely right.  This
8  is a very short excerpt.
9    A.  I didn't know his first name was Brian.  So I'm going
10  to take your word for it.
11    Q.  Okay.  Yeah.  Since I took this deposition, in part, I
12  can represent to you with every confidence that this is the same
13  Keith Ingram that you were talking about from the Secretary of
14  State's office.
15    So if I could direct you to the -- it may be the last
16  page in the little excerpt you have.  The pages in question are
17  actually, if you see in the little box pages, 251 to 252.
18    A.  Okay.  I'm there.
19    Q.  Just for the sake of time, I'm going to read
20  this.  I take it back.
21    I am going to ask you to read, starting on Page 251.
22  The last question is kind of a long paragraph.  If you could
23  just start reading there and continue into -- right.  It starts
24  on Line 17 of that page.  If you can continue reading into the
25  next page.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 61

1  A.  How far into the next page?

2  Q.  I would say please read until Line 7 in the next page.

3  A.  Okay.  "If I could just direct you to Paragraph 7.
4  You say that, 'In order to have a basic education program the
5  Secretary of State's office would need a final decision by
6  August 15th,'  and then you contrast that with a complete
7  education program which would need a decision by no later than
8  July 6th.  I wonder if you could tell me: What's the difference
9  between a basic program and a complete program?"

10      Answer:  "I cannot.  That would be a Rich Parsons
11  question."

12      Question:  "Could you turn to the next page and tell
13  me: Did you sign this affidavit?"

14      Answer:  "I did."

15      Question:  "And so when you signed this affidavit did
16  you understand what Paragraph 7 meant?"

17      Answer:  "I understand that it's what Rich told me."

18  Q.  Thank you.  So could you explain to me why Keith
19  Ingram said that you told him to say that there's a difference
20  between a complete education program and a basic program?

21      MR. BRISSENDEN:  To the extent that requires
22  speculation on the part of Keith's mental thought processes,
23  I'll object.  You may answer.

24  A.  I don't know that I told him to say anything.  That's
25  your speculation.  To the extent --

## 62

1  Q.  Do you recall having -- I'm sorry.

2  A.  To the extent there might have been any conversation,
3  I can tell you what, to me, differentiates a complete versus a
4  basic education program.

5  Q.  Do you recall talking to Keith Ingram about different
6  kinds of education plans and the timing of the preclearance of
7  S.B. 14?

8  A.  I have a recollection of conversations, but I don't
9  have a recollection of exactly what was said.

10  Q.  Do you recall Keith Ingram telling -- discussing with
11  you an affidavit that he was going to sign?

12  A.  Yes.

13  Q.  And do you recall talking about, with respect to that
14  affidavit, what education plan the Secretary of State would be
15  able to put out?

16  A.  Vaguely.  Like I said, I don't remember the -- I don't
17  remember what was said, the words exchanged.

18  Q.  So as you sit here today, do you understand what Keith
19  Ingram meant when he said -- when he made a distinction between
20  a basic education program and a complete program?

21  A.  If it's based on a conversation we had, then I know
22  what my differentiation would be, but I don't know -- I guess,
23  reading this, if he says it's based on a conversation we had, I
24  know what I would differentiate it as.

25  Q.  Okay.  What do you think the difference is?

## 63

1  A.  To me -- I speak only for me -- the difference would
2  be education campaign essentially run out of my office, by me,
3  using press releases, earned media, op eds potentially, and
4  community visits as best that we could do it with the limited
5  resources that I have.

6  Q.  I'm sorry.  Is what you just described -- which one of
7  the options is what you just described?

8  A.  The basic.

9  Q.  Okay.  And what would a complete education plan look
10  like?

11  A.  Paid advertising, coordinated community events,
12  coordinated community outreach, more coordinated community
13  visits, targeted advertising, I guess, within the overall
14  advertising, things like that.  A more formally planned
15  campaign.

16  Q.  Okay.  With that understanding in mind and seeing that
17  in Keith Ingram's affidavit he said that a complete program
18  would not be possible unless there were a final decision before
19  no later than July 6th, do you agree that the complete education
20  program that you just described is not possible if there's no
21  final decision on preclearance before July 6th?

22  A.  Based -- having done the primary voter education
23  campaign, from the experience there, I can see that we can move
24  very quickly on a coordinated campaign.

25  Q.  I'm sorry.  I'm not sure I understand.  Is your answer

## 64

1  that it is possible to have what you described as a complete
2  program, even if the decision comes after July 6th?

3  A.  Yes.

4  Q.  So if I understand you correctly, you're saying that
5  what Keith Ingram said in Paragraph 7 is false?

6  A.  No, that's not correct.

7  Q.  What do you understand Keith Ingram to have said in
8  his affidavit about whether a complete program is possible?

9      MR. BRISSENDEN:  Objection, asked and answered,
10  calls for speculation.

11      To the extent you can answer the question, you
12  may.

13  A.  "In order to have a basic education program in place
14  to have a successful November 2012 election season, the
15  Secretary of State's office would need to have a final decision
16  by August 15, 2012; however, to have a complete program that
17  would mirror what our Texas voters, counties and local entities
18  have become accustomed to, we would need to have a final
19  decision no later than July 6."

20      That's what I understand him to say.

21  Q.  Do you think that statement is true or false?

22      MR. BRISSENDEN:  Objection, calls for speculation
23  as to what Mr. Ingram meant when he said it or stated it in his
24  affidavit.  The question is conclusory.

25      To the extent you have information or are able to



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 65

1  answer, you may.
2      A.  He signed the affidavit.  It's sworn and subscribed on
3  March 22nd.  And what I'm saying is, based on my experience in
4  April and May with the first phase of our campaign and having
5  seen how quickly we can move on all aspects of that campaign,
6  now I can say confidently that we could move quickly on Phase 2.
7  This affidavit was given before the bulk of the primary phase
8  was run.  And now with experience running that, I'm much better
9  informed on how to run Phase 2.
10     Q.  The voter education effort in the primary, did that
11  involve educating voters about photo ID requirements under
12  S.B. 14?
13     A.  No.  Well, we're not permitted to educate voters on
14  the photo identification requirements in Senate Bill 14 because
15  it has not been precleared by the Department of Justice.
16  Therefore, anything we would do to educate on Senate Bill 14
17  would be implementation of a law we're not permitted to
18  implement, and we don't want to violate the law.
19     Q.  So your experience with the primary is different from
20  what would be contemplated after preclearance, in that it had
21  nothing to do with photo ID requirements?
22     A.  We did educate voters that no photo ID was necessary
23  in the primary election.  That was a core message of every
24  community engagement, media engagement stop we did.  So we did
25  educate that no photo ID would be required.

## 66

1      Q.  So it didn't include -- it didn't need to include any
2  information about how to go and get photo ID because that wasn't
3  a component of the law at that time?
4      A.  We weren't -- we did not want to be in violation of
5  the law, so we did not educate voters on the requirements within
6  Senate Bill 14.
7      Q.  So the education that would be required after S.B. 14
8  was precleared would necessarily be different from the kind of
9  education you were doing for the primary?
10     A.  Not substantially.
11     Q.  What do you mean by substantially?
12     A.  I anticipate the difference would be now you would be
13  required to provide photo ID when you vote, educate voters on
14  what is permissible and educate voters on how to obtain an
15  election identification card if they did not have ID that was
16  permissible under Senate Bill 14.  That's not substantially
17  different.
18     Q.  And after the Secretary of State's office has spent
19  over a million dollars to educate voters pursuant to a plan that
20  doesn't include information about -- the information that
21  they're required to bring photo ID, you now think that it will
22  be not substantially different to educate voters with a plan
23  that will have to include the opposite message?
24     A.  Can you be more clear on your question, please.
25     Q.  So the Secretary of State's office has already spent

## 67

1  over a million dollars, as we talked about earlier, on its voter
2  education plan, a plan that you just said included telling
3  people they don't have to bring photo ID to the polls.  Now
4  we're talking about, after preclearance, a plan that will have
5  to tell people the exact opposite of that.  How can that not be
6  substantially different?
7          MR. BRISSENDEN:  Objection, argumentative.
8      A.  It's telling people you do and telling them what it is
9  and how to get it if they don't have it.
10     Q.  Which are all different messages than the primary
11  voter education campaign.
12     A.  And I've just communicated those messages to you,
13  simply and understandably.
14     Q.  Is what you just said going to be the sum and
15  substance of the content of the voter education plan concerning
16  photo ID requirements under S.B. 14?
17     A.  No.
18     Q.  So do you acknowledge that you did not just
19  communicate everything to me that a voter would need to know
20  under S.B. 14?
21          MR. BRISSENDEN:  Objection, vague and
22  argumentative.
23     A.  I communicated a summarization.
24     Q.  Okay.  If we could look back at Paragraph 7 in Keith
25  Ingram's affidavit.  The first part of that sentence before the

## 68

1  semicolon says, "In order to have a basic education program in
2  place to have a successful 2012 election season, the Secretary
3  of State's office would need to have a final decision by August
4  15th."
5          If there is not a final decision on preclearance until
6  August 31st, does that mean that not even a basic education
7  program will be possible?
8          MR. BRISSENDEN:  Objection to the extent that
9  calls for speculation.
10          To the extent you have knowledge and are able to
11  answer the question, you may do so.
12     A.  We will execute a successful education program
13  regardless of when a decision is made.
14     Q.  How do you define success?
15     A.  We will identify the appropriate message or messages
16  and then we will communicate that through the strategies that
17  we've discussed here today to as many, if not all, registered
18  voters in Texas.
19     Q.  And how will you know if you've achieved that goal?
20          MR. BRISSENDEN:  Same objection.
21          To the extent you have knowledge and you're able
22  to answer, you may do so.
23     A.  In a literal sense, there's no way to know that you've
24  reached every single voter.  In a practical and literal sense
25  there's no way to know you've reached every single voter.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 69

1    Q.  Are there any ways to measure success?  Has
2    Burson-Marsteller ever -- are there any ways to measure success?
3    A.  Yes.
4    Q.  What are those ways?
5    A.  Well, one way is to measure the impressions that
6    you've made through various strategies to reach Texas voters or
7    Texans, general speaking.
8    Q.  Do you have plans to measure impressions for the plan
9    to educate voters about photo ID requirements under S.B. 14?
10   A.  Yes.
11   Q.  Do you know how much that will cost?
12   A.  It will use the remainder of the budget.  Wait.
13   Excuse me.  Can you be clear.  Are you asking how much it will
14   cost to measure or how much it will cost -- the education
15   program will cost?  I don't know what you're asking.
16   Q.  How much it will cost to measure the impressions of
17   the education plan?
18   A.  That's within the budget.
19   Q.  I'm sorry.  I don't understand.  What does that mean,
20   it's within the budget.
21   A.  That's part of the service provided within the
22   contract.
23   Q.  How much is budgeted for it in the budget?
24   A.  I don't recall.
25   Q.  Is there a line item budget for the voter education

## 70

1    plan?
2         MR. BRISSENDEN:  Objection, vague.
3    A.  That's the whole budget.  That's the whole contract.
4    Q.  Have you given that to your attorney to produce to the
5    defendant intervenors?
6    A.  I think I gave the -- I think I gave the contract to
7    y'all.  I gave him whatever I had that was responsive.  I think
8    the contract was in there.
9    Q.  And that contract's -- just so I understand --
10   includes a line item budget that shows how much will be spent on
11   measuring impressions?
12   A.  I haven't looked at the contract in some time.  So I
13   don't recall exactly how it would be categorized.
14   Q.  But the contract that we're talking about does include
15   a line item budget; is that correct?
16   A.  I don't recall exactly what's in the contract from
17   line to line.
18   Q.  Then how do you know that there's an amount budgeted
19   to measure --
20   A.  Pardon me?
21   Q.  How do you know there's an amount budgeted to measure
22   impressions?
23   A.  Because it was discussed and they've measured
24   impressions for the first phase.
25   Q.  Do you know -- how much did measuring impressions cost

## 71

1    for the first phase?
2    A.  I don't know.  It was part of the budget overall.
3    Q.  We talked earlier about an account tracking document
4    from Burson-Marsteller that lists expenditures up through March
5    31st.  Does Burson-Marsteller provide you with those on a
6    regular basis?
7    A.  Somewhat, yes.
8    Q.  Is it a monthly basis?
9    A.  I don't recall.
10   Q.  Do you know if there is one that's more recent than
11   March 31st, 2012?
12   A.  I don't know.
13   Q.  The contract that you mentioned that includes line
14   item budget amounts, is that -- does that show only the amounts
15   that are budgeted and not the amounts that have been spent?
16   A.  Can you ask that again, please.
17   Q.  Strike that.
18        Is there a document that shows how much has been spent
19   out of the total budget for the voter education plan for 2012?
20   A.  I have not seen that document, if there is.
21   Q.  How do you keep track of how much has been spent?
22   A.  They send invoices and tracking reports.  I review
23   them.  Our purchasing procurement people review them.  If we
24   have questions, we ask Burson to clarify.  And that's the
25   process.

## 72

1    Q.  So the account tracking document that we looked at
2    earlier shows spending through March 31st, which was over two
3    months ago, and the primary election has happened since then.
4    Do you have any document that would show how much was spent up
5    through the primary election?
6    A.  I don't.  If I've seen it, I may have forwarded it to
7    procurement.
8    Q.  Do you know if such a document exists?
9    A.  Not off the top of my head, no.  I don't believe we've
10   been invoiced yet through May.
11   Q.  Have you been invoiced through April?
12   A.  I believe we have.
13   Q.  Do you have April invoices?
14        THE WITNESS:  Isn't that one of the ones I turned
15   over?
16        MR. BRISSENDEN:  For the record, I believe
17   Exhibit 5 has an invoice date of April 20th.
18        MR. VANDEWALKER:  Okay.  It's my understanding
19   that Exhibit 5 shows spending through March 31st.
20        THE WITNESS:  Can you repeat that.
21        It's my understanding that Exhibit 5 shows spending
22   through March 31st; is that correct?
23        MR. BRISSENDEN:  You're referring to the invoice?
24        MR. VANDEWALKER:  I'm referring to the account
25   tracking document.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Richard Parsons

June 14, 2012

### 73

1   MS. STELCEN:  You're referring to Exhibit 2, Ian.
2   MR. VANDEWALKER:  I apologize.  Exhibit 2.
3   You're right.
4   THE WITNESS:  So where are we?
5   Q.  My question is does Exhibit 2 show spending up to
6   March 31st and not after?
7   A.  Yes.
8   Q.  And is there a similar document that shows spending
9   after March 31st?
10   A.  It's likely, but I didn't have it, so I didn't have
11   anything to turn over.
12   Q.  How many -- strike that.
13   Turning back to Keith Ingram's affidavit.  In
14   Paragraph 7, he says in order to have a basic education program
15   the Secretary of State's office would need a final decision by
16   August 15th.  If a final decision isn't reached until August
17   31st, will the education program have less of an impact?
18   A.  No.
19   Q.  Why not?
20   A.  Because a generally held belief in public relations
21   and advertising is that if you promote or advertise too early,
22   by the time it's important, it will be forgotten.  If you wait
23   too late, it won't have the impact.  That gives -- did you say
24   -- what date did you say?
25   Q.  August 15th versus August 31st.

### 74

1   A.  That would leave two months.  That would leave two
2   full months for the program.
3   Q.  Was that belief -- generally held belief in
4   communication also generally held in March, when Keith Ingram
5   submitted this affidavit?
6   MR. BRISSENDEN:  Objection, vague.
7   A.  I would think so.
8   Q.  Do you know why Keith Ingram said that it would be
9   impossible to have a basic education program in place if there
10   weren't a decision by August 15th?
11   MR. BRISSENDEN:  Objection, calls for
12   speculation.  I believe we've covered this.  Asked and answered.
13   A.  Can you ask that again.
14   Q.  Do you know why Keith Ingram said it would be
15   impossible to have a basic education program in place unless
16   there was a decision by August 15th?
17   MR. BRISSENDEN:  Same objection.
18   Mischaracterizes the statement.  I don't believe he says it's
19   impossible.
20   A.  If he says it was a Rich Parsons' question, then if
21   it's up to me, I would say prior -- not prior to -- that
22   affidavit, again, was signed in mid March or so.  And having had
23   the experience of conducting the primary phase, I have a much
24   better understanding of -- and -- much better understanding of
25   what pieces we would have in place and how best to conduct the

### 75

1   program.  I have not conducted a voter education program prior
2   to this.  So it's much -- that experience is invaluable in
3   preparing for Phase 2.
4   Q.  So if, as you said earlier, August 31st would not have
5   -- a decision by August 31st would not cause the plan to have
6   less of an impact than August 15th.  Was that also true if the
7   decision were delayed another two weeks, to September 15th?
8   A.  I would simply say that regardless of when there is a
9   decision, we will conduct a successful campaign.
10   Q.  If there was a decision on November 5th, would you
11   conduct a successful campaign?
12   A.  To the best of our abilities, yes.
13   Q.  What does success mean in that context?
14   A.  That would be speculative.
15   Q.  You used the word successful campaign.  I want to
16   understand what you meant by successful campaign that would be
17   conducted in less than one day.
18   MR. BRISSENDEN:  Objection, vague, argumentative.
19   A.  In one day, it may be a successful campaign could be a
20   press release.  We would do everything in our ability to
21   communicate that to the voters, everything in our ability.
22   Q.  So do you define success by how many voters you reach
23   with your message?
24   MR. BRISSENDEN:  Objection, asked and answered.
25   I believe we've covered this.

### 76

1   A.  Can you ask that again.
2   Q.  Do you define success according to how many voters you
3   reach with your message?
4   A.  That is one way to calculate success.
5   Q.  How many voters would a press release on November 5th
6   reach?
7   A.  I don't know.
8   Q.  But it would be successful; is that correct?
9   MR. BRISSENDEN:  Objection, vague and
10   argumentative.
11   You don't have to answer.
12   Q.  Do you understand the question?
13   MR. BRISSENDEN:  I've instructed him not to
14   answer.  It's argumentative and I believe at this point you're
15   badgering the witness.
16   MR. VANDERWALKER:  I'm just trying to understand
17   what it means that it's possible to have a successful campaign
18   that starts on November 5th for an election that happens
19   November 6th.  I want to understand what success means.
20   MR. BRISSENDEN:  We've been here all afternoon,
21   and he has been answering your questions.  We've already gone
22   over what is a successful campaign.  He's provided you with
23   testimony about how they would measure that in terms of
24   impressions.  I believe he's answered the question.  At this
25   point I think your questioning is argumentative.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

## 77

1    MR. VANDEWALKER: Defendant intervenors have no
2  further questions.
3    EXAMINATION
4  BY MS. WESTFALL:
5    Q. Mr. Parsons, my name is Elizabeth Westfall. I
6  represent the Attorney General in this action. I'm just going
7  to ask you a few questions and not keep you here too much
8  longer.
9    A. Am I going to get home to see my baby go to bed?
10   Q. Yes. Unfortunately, I won't.
11   I believe you testified you've been the Director of
12 Communications since September 2011; is that correct?
13   A. Yes.
14   Q. Have you drafted any internal or external
15 communications related to voter ID, including Senate Bill 14,
16 since you've been employed with the Secretary of State's office?
17   MR. BRISSENDEN: Are you asking the witness about
18 topics outside of his work on poll worker training or voter
19 education efforts?
20   Q. Do you understand the question?
21   A. Can you state it again.
22   Q. Have you drafted any internal or external
23 communications related to voter ID, including Senate Bill 14,
24 since you've been employed with the Secretary of State's office?
25   A. I understand the question.

## 78

1    MR. BRISSENDEN: To the extent that that's in the
2  context of your work in the Secretary of State's office
3  pertaining to voter education efforts, you may answer.
4    A. Yes.
5    Q. Could you describe those communications?
6    A. E-mails. Press releases.
7    Q. Did the Secretary of State --
8    A. -- things like that.
9    Q. I'm sorry. I interrupted you. Anything else?
10   A. I'm trying to think of what else there would be.
11 That's what I would have drafted.
12   Q. So e-mails and press releases related to Senate Bill
13 14 or voter ID; is that correct?
14   MR. BRISSENDEN: Again, to the extent that that
15 is work that was part of your roll in terms of voter education
16 efforts.
17   A. Yes.
18   MS. WESTFALL: Are you instructing him not to
19 answer outside of voter education?
20   MR. BRISSENDEN: That is what we're here to
21 discuss, voter education efforts and poll worker training.
22   MS. WESTFALL: For the record I would like to
23 state, for the purposes of this deposition as I did for
24 Ms. Salazar's, that the Attorney General was never a party to
25 any agreement about limiting the topics and scope of this

## 79

1  deposition. This has not been a deposition noticed pursuant to
2  30(b)(6).
3    Mr. Rosenberg forwarded to me an e-mail
4  communication on June 8 between counsel for the State, counsel
5  for the defendant intervenors discussing the nature of the
6  depositions today. Counsel for the Attorney General was not
7  party to that e-mail correspondence or to any phone call between
8  counsel for the defendant intervenor and counsel for the State
9  that preceded that e-mail. Therefore, we do not -- we take
10 strong objection with your instruction to this witness not to
11 answer questions that are plainly relevant.
12   Is there any other basis under which you're
13 asserting and instructing this witness not to answer other than
14 that which you just described?
15   MR. BRISSENDEN: Are you asking me -- first of
16 all, I'm not going to be examined here today during this
17 deposition, because I'm not the witness.
18   MS. WESTFALL: You're not the witness, but I'd
19 like to understand your objections.
20   MR. BRISSENDEN: And we have had this dialogue
21 back and forth this morning and this afternoon as a part of
22 Ms. Salazar's deposition, and I would reallege and incorporate
23 by reference all of the statements that were made in that
24 deposition and assert them here as a part of this deposition.
25   MS. WESTFALL: I would likewise incorporate my

## 80

1  responses to your objections but add again that we now have
2  documentation from Mr. Rosenberg that the Attorney General's
3  counsel was not included in any such discussions about limiting
4  this deposition or topics therein.
5    So I'm going to ask some questions for the
6  record, and you can make your objections as you see fit. We
7  take strong disagreement and think it is contrary to the Federal
8  Rules of Civil Procedure 30(c)(2) for you to instruct the
9  witness not to answer questions on the basis on which you
10 asserted. So I'll proceed with questions, unless you have
11 further objection.
12   MR. BRISSENDEN: I understand your position.
13 Notice of deposition was by defendant intervenors. And we have
14 presented the witness here today based upon and contingent upon
15 the agreement and understanding that these would be the limited
16 topics that would be discussed, voter education efforts, poll
17 worker training, and the intended areas of inquiry that were
18 listed in the notice of deposition pertaining to the document
19 requests. And at this point I'm not authorized to allow the
20 witness to answer questions beyond the scope of those topics.
21   Q. Did the Secretary of State take a public position on
22 voter ID that you're aware of?
23   MR. BRISSENDEN: Objection, instruct you not to
24 answer.
25   Q. Did the Secretary of State take a public position on



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

81

1    Senate Bill 14?
2         MR. BRISSENDEN:  Same objection.  Instruct you not to
3    answer.
4         Q.  Are you following the advice of counsel?
5         A.  Yes.  Sorry.
6         MS. WESTFALL:  Could you mark this.  Let's do
7    560.
8              (Exhibit No. U.S. 560 marked)
9         Q.  You've been handed what's been marked U.S. Exhibit
10   560.  Do you recognize this document?
11        A.  Yes.
12        Q.  What is it?
13        MR. BRISSENDEN:  To the extent that Exhibit 560
14   contains content or was part of your effort to educate voters,
15   I'm going to allow you to answer.  To the extent that this
16   document was prepared -- to the extent you have knowledge aside
17   from efforts to educate voters with regards to S.B. 14, I'd
18   instruct you not to answer.
19        Q.  So I believe you testified you recognize this
20   document, correct?
21        A.  Yes.
22        Q.  And what is this document?
23        A.  It's a press release issued March 12th.  I believe
24   that's the day that the Department of Justice notified Texas
25   that it was not going to preclear Senate Bill 14.

---

82

1         Q.  Did you draft this document?
2         A.  Yes.
3         Q.  Did you speak with anyone in the Secretary of State's
4    office in drafting this document?
5         A.  I'm sure I did.
6         Q.  Did you speak with the Secretary Andrade?
7         A.  Yes.
8         Q.  Can you describe that conversation that you had with
9    the Secretary?
10        MR. BRISSENDEN:  Again, my instruction to you
11   would be the same.  To the extent that this is a document that
12   was prepared as part of the Secretary of State's and your
13   office's voter education efforts and that was the purpose of the
14   document, you may do so.  To the extent that the document and
15   the conversations that you had with Secretary were not part of
16   voter education efforts, I would instruct you not to answer.
17        Q.  This press release describing the Secretary's position
18   and the comments on the Justice Department's refusal to preclear
19   S.B. 14 was public education, was it not?
20        A.  The intent of this was to inform voters that photo ID
21   would not be in effect for the May 29th -- or the May 2012
22   primary elections, nor would it be in effect for the May 12th
23   uniform elections, and to remind voters and the media what would
24   be permissible, that current law would be essentially in effect.
25        Q.  So getting back to your conversation with Secretary

---

83

1    Andrade, could you describe what she told you that informed what
2    you put in this press release?
3         A.  I don't recall what was said.
4         Q.  Can you describe what you asked of her?
5         A.  I told her, I guess -- as I recall, I told her that we
6    would be putting out a press release to announce that the
7    Department of Justice had declined preclearance and that we
8    needed to let people know -- let voters know that Senate Bill 14
9    and the photo ID's requirements within that bill would not be in
10   effect for any of the May elections.
11        Q.  Is it your practice when you have a quote from the
12   Secretary to run that language by her, to seek her authorization
13   for a press release?
14        A.  Generally, but not always.
15        Q.  Do you recall preparing a draft of this press release
16   and presenting it to the Secretary to seek her approval on the
17   language in the press release?
18        A.  Yes.
19        Q.  Did she approve the language in this press release?
20        MR. BRISSENDEN:  Objection to the extent it calls
21   for speculation.
22        MS. WESTFALL:  You may answer.
23        A.  Yes.
24        Q.  Did she approve the quote from -- that is listed in
25   this press release?

---

84

1         MR. BRISSENDEN:  Again, my instruction would be
2    the same and instruct you accordingly.  And also to the extent
3    the question calls for speculation, I would object.
4         MS. WESTFALL:  You may answer.
5         A.  Can you ask it again.
6         Q.  Certainly.  Did the Secretary authorize this quote
7    from her that you've put in the release?  Did she review that
8    language?
9         MR. BRISSENDEN:  Same objection, same
10   instruction.
11        MS. WESTFALL:  You may answer.
12        A.  Yes.
13        Q.  Did you see in the release at the first paragraph that
14   it indicates that Senate Bill 14 was designed for voter fraud
15   prevention?
16        A.  Yes.
17        Q.  Do you know why you indicated in this press release
18   that Senate Bill 14 was designed for voter fraud prevention?
19        MR. BRISSENDEN:  I'm going to object at this time
20   to the extent that it requires -- that we're going beyond the
21   topic of just voter education efforts in general and we're now
22   delving into thought processes, opinions as to Senate Bill 14
23   and purposes that are stated there, and instruct you not to
24   answer.
25        MS. WESTFALL:  Mr. Brissenden, Mr. Parsons

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 85

1  is not an elected official. I'm not asking him about any
2  communications with any particular legislators. He has just
3  testified that the purpose of this press release was to educate
4  voters. I would ask you to withdraw your instruction to your
5  witness not to answer that question.
6      MR. BRISSENDEN: At this time I'm not asserting a
7  legislative privilege. I am, based upon the scope of the
8  deposition that we were -- that we had agreed to, that this
9  would be about voter education efforts and poll worker training
10  and implementation of S.B. 14 and not inquiry as to the purpose
11  of S.B. 14.
12      MS. WESTFALL: Well, even under --
13      MR. BRISSENDEN: With that instruction, on that
14  basis, I'm going to instruct you not to answer.
15      MS. WESTFALL: Even under that, your own logic,
16  with which I take strong issue, the witness has just testified
17  that this press release was to advise voters the ID that they
18  needed for the primary elections and to explain why they needed
19  that type of certain ID and why the status quo remained in place
20  as opposed to new ID requirements that the legislature had
21  passed in 2011. So I think even under your reasoning, I may ask
22  the witness questions about the substance of this press release.
23  And I take strong issue with your instruction and ask you to
24  reconsider your instruction.
25      MR. BRISSENDEN: And as I read the press release,

## 86

1  there's a portion of it that is dealing with preclearance
2  process, the administrative preclearance process and comments
3  about the purpose of S.B. 14, as opposed to the bottom half of
4  the document that talks about voter ID requirements of S.B. 14
5  and educating voters about the bill and educating them about
6  which IDs would be required or not required for purposes of the
7  May 29th primary. And so I don't believe that my position is in
8  the least bit contrary.
9      MS. WESTFALL: I disagree.
10      MR. BRISSENDEN: I understand. And with that, on
11  that basis, I would instruct you not to answer.
12      Q. Do you know what the purpose of Senate Bill 14 was?
13      MR. BRISSENDEN: Objection, instruct you not to
14  answer.
15      Q. Do you see that in the first paragraph of the press
16  release you wrote that Senate Bill 14 requires voters in Texas
17  to provide certain government issued photo ID when voting to
18  help insure positive identification at the polls? Do you see
19  that?
20      MR. BRISSENDEN: You can answer as to whether you
21  see that or not in the document.
22      A. Yes, I do see that.
23      Q. Do you know why it is needed -- why S.B. 14 was needed
24  to help insure positive identification at the polls?
25      MR. BRISSENDEN: Same objection. Instruct you

## 87

1  not to answer.
2      Q. Are you aware of any facts that indicate the current
3  system for identifying voters at the polls is insufficient and
4  that additional measures like Senate Bill 14 are needed?
5      MR. BRISSENDEN: Same objection. Instruct you
6  not to answer.
7      Q. Do you see that the second paragraph indicates that
8  Secretary of State Andrade was extremely disappointed or
9  disappointing -- I guess the decision was disappointing not to
10  preclear the law?
11      A. Yes, I see that.
12      Q. Do you see that language?
13      A. Yes, ma'am.
14      Q. Why was Secretary Andrade disappointed about the
15  decision?
16      MR. BRISSENDEN: Same objection. Instruct you
17  not to answer at this time.
18      Q. Do you see that it refers to matching separate sets of
19  data that were provided to the Justice Department in Paragraph
20  2?
21      A. Yes.
22      Q. Are you aware of the existence of any more accurate
23  information that Texas -- about which -- about which particular
24  Texans do not currently possess allowable forms of ID under
25  Senate Bill 14?

## 88

1      MR. BRISSENDEN: Objection, instruct you not to
2  answer.
3      Q. Are you aware of the existence of any more accurate
4  information about which Texans disaggregated by race do not
5  currently possess the allowable forms of photo ID under Senate
6  Bill 14?
7      MR. BRISSENDEN: Objection, instruct you not to
8  answer.
9      Q. And do you see at the bottom half of the page that it
10  indicates that current law will apply to the May 12th and 29th
11  primary elections?
12      A. Yes.
13      Q. And that that current law, as it pertains to
14  identifying voters at the polls on election day; is that right?
15  It refers to the current law as it pertains to voter
16  identification at the polls; is that correct?
17      A. Yes.
18      Q. And I believe you testified earlier that you were
19  advising voters and informing them that the current system will
20  remain in place for the primary elections; is that right?
21      MR. BRISSENDEN: You may answer.
22      A. Yes.
23      Q. Since the time of this press release on March 12th,
24  did the State of Texas administer primary elections on May 12th
25  and May 29th, 2012?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 89

1       A.  Can you ask that again.
2       Q.  Certainly.  Were there elections in Texas on May 12th,
3   2012?
4       A.  Yes.
5       Q.  Were there elections in Texas on May 29th, 2012?
6       A.  Yes.
7       Q.  Are you aware of any problems that occurred during
8   those elections in identifying voters at the polls?
9           MR. BRISSENDEN:  To the extent that you have
10  knowledge or information as a part of your efforts to educate
11  voters, then part of the voter education program, I'm going to
12  allow you to answer that.
13          To the extent that that involves information,
14  work that you did not pertaining to your voter education efforts
15  in the office, I'd instruct you not to answer.
16          MS. WESTFALL:  Can you answer the question?
17      A.  I'm not aware of any.
18      Q.  So you're not aware of any problems in identifying
19  voters at the polls in the primary elections in 2012; is that
20  correct?
21      A.  That's correct.
22      Q.  Are you aware of any reports of in-person voter
23  impersonation that were reported during the administration of
24  either of those elections?
25          MR. BRISSENDEN:  My instruction would be the

## 90

1   same.  I think at this point we're getting for afield from voter
2   education efforts and talking and focussing more on voter fraud.
3   Instruct you not to answer.
4       Q.  After the May 29 primary election, did Secretary
5   Andrade release any sort of communication talking about how the
6   election went from an administration standpoint?
7       A.  Can you be more specific.
8       Q.  Certainly.
9           Did Secretary Andrade indicate in any sort of
10  communication that the May 29th election was run smoothly?
11          MR. BRISSENDEN:  My instruction to you would be
12  the same.
13          MS. WESTFALL:  What is the instruction?
14          MR. BRISSENDEN:  To the extent that you have
15  knowledge or information about that as part of your work in
16  discussing or pertaining to your voter education efforts, if
17  there was such a press release for purposes of educating voters,
18  you may answer.
19          To the extent that -- if there was a press
20  release and that was for some other purpose, then I instruct you
21  not to answer.
22      Q.  Can you answer the question?
23      A.  No.
24      Q.  There was no such communication about the May 29
25  election?  Is that your testimony?

## 91

1           MR. BRISSENDEN:  Same instruction.
2       A.  Based on the context of what he's instructing me.
3       Q.  Have you received any inquiries from the media about
4   the number of Texans without the allowable forms of ID under
5   Senate Bill 14?
6           MR. BRISSENDEN:  Objection, instruct you not to
7   answer.
8       Q.  Are you going to follow your counsel's advice?
9       A.  Yes.
10      Q.  What information or data have you supplied to the
11  media related to Senate Bill 14 since you have started working
12  for the Secretary of State's office?
13          MR. BRISSENDEN:  To the extent that that question
14  pertains to knowledge or information that you have that you
15  released to the media for purposes of the offices of the State's
16  voter education efforts, I'm going to allow you to answer.
17          To the extent that there was press releases or
18  information provided that was beyond the scope or aside from
19  purposes of voter education efforts and for purposes of
20  educating voters, I'd instruct you not to answer.
21      A.  We have information on our web site of the number of
22  registered voters by county and statewide.  I provided that to
23  some media.
24      Q.  Have you supplied to the media any information or
25  analysis the Secretary of State has done about the number of

## 92

1   registered voters who do not have allowable forms of ID under
2   Senate Bill 14?
3           MR. BRISSENDEN:  Objection, instruct you not to
4   answer.
5           MS. WESTFALL:  That's public education, even
6   under your rubric.  That should be a permissible question.
7           MR. BRISSENDEN:  In terms of your asking about
8   data --
9           MS. WESTFALL:  It's being provided to the media
10  as public education.  I think the media is an outlet for public
11  education, is it not?
12          MR. BRISSENDEN:  Not necessarily.  Not for
13  purposes of releasing data as it pertains to the preclearance
14  process.  It may not have been for purposes of educating voters.
15  So with that caveat, instruct you not to answer.
16          MS. WESTFALL:  You think the media just holds on
17  to the information for the sake of itself?  I take strong issue
18  with your instruction.  Maybe this will be considered at a later
19  date by other people.  So we'll let it --
20          MR. BRISSENDEN:  I'm trying to work with you and
21  trying to have the witness answer some of your questions
22  pursuant to the agreement that was reached about --
23          MS. WESTFALL:  To which we were not a party.
24          MR. BRISSENDEN:  And I'm trying to work with you
25  allowing him to answer some of the questions here today.  It's



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 93

1  not that I'm not -- being unreasonable.  I'm just -- this was
2  the agreement that was reached and that was our understanding
3  for purposes of presenting Mr. Parsons here on such short
4  notice.
5          THE WITNESS:  Can I take another break?
6          MS. WESTFALL:  Certainly.
7              (Recess)
8      Q.  Mr. Parsons, sitting here today, if a member of the
9  press asks you for the number of Texans who don't have an
10 allowable form of ID under Senate Bill 14, what would you tell
11 them?
12         MR. BRISSENDEN:  Objection, instruct you not to
13 answer.
14     Q.  Have you asked anyone in your office for that
15 information since you've been employed with the Secretary of
16 State since September 2011?
17         MR. BRISSENDEN:  Objection, instruct you not to
18 answer.
19     Q.  Sitting here today, if a member of the press asked you
20 for the number of minority voters in Texas who don't have a form
21 of allowable ID under Senate Bill 14, what would you tell them?
22         MR. BRISSENDEN:  Same objection.  Same
23 instruction.
24     Q.  Are you following the advice of counsel?
25     A.  Yes.

## 94

1      Q.  For all of the questions I just asked?
2      A.  Yes, ma'am.
3      Q.  Have you asked anyone in your office for the number of
4  minority voters in Texas who don't have a form of allowable ID
5  under Senate Bill 14?
6          MR. BRISSENDEN:  Same objection and same
7  instruction.
8      Q.  Are you following your counsel's advice?
9      A.  Yes, ma'am.
10     Q.  Has anyone in your office directed you not to answer
11 questions from the media related to the number of Texans who
12 don't have the number of forms of allowable ID under Senate Bill
13 14?
14         MR. BRISSENDEN:  Same objection and same
15 instruction.
16     Q.  Are you following your counsel's advice?
17     A.  Yes, ma'am.
18         MS. WESTFALL:  I will leave this deposition open
19 for the time being, given the disagreements about the scope of
20 the examination.
21         Thank you for your time.
22         MR. VANDEWALKER:  Thank you for your time,
23 Mr. Parsons.  The defendant intervenors have no further
24 questions.
25         MR. BRISSENDEN:  And just I want to make the

## 95

1  record clear that the State of Texas has not absolutely refused
2  to allow Mr. Parsons to appear for deposition, answer these
3  questions in another setting.  The position has been that, for
4  purposes of today in this deposition, as was noticed by the
5  defendant intervenors, the topics that have been discussed today
6  in his deposition were to be limited, and that was the
7  understanding.  So, just want the record to be clear for that.
8          MS. WESTFALL:  My disagreement, strong
9  disagreement, with your position and your instructions to your
10 witness, which I think are in violation of the Federal Rules,
11 remain.
12         (Deposition concluded at 5:23 p.m.)

## 96

1              CHANGES AND SIGNATURE
2
3  WITNESS NAME_____ DATE OF DEPOSITION_____
4  PAGE LINE   CHANGE      REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 97

1    I, RICHARD PARSONS, have read the foregoing deposition
2    and hereby affix my signature that same is true and correct,
3    except as noted above.
4
5
6                    _____
                     RICHARD PARSONS
7
8
9    THE STATE OF TEXAS  )
10   COUNTY OF TRAVIS  )
11          Before me,_____, on this day personally
12   appeared RICHARD PARSONS known to me (or proved to me under oath
13   of through_____) (description of identity card or other
14   document) to be the person whose name is subscribed to the
15   foregoing instrument and acknowledged to me that they executed
16   the same for the purposes and consideration therein expressed.
17          Given under my hand and seal of office this_____
18   day of _____.
19
20
21
                     NOTARY PUBLIC IN AND FOR
22                   THE STATE OF
23
24
25

## 99

1    witness for examination, signature and return to me
2    by_____;
3          That the amount of time used by each party at the
4    deposition is as follows:
5          Mr. Vandewalker - 02:40
6          Mr. Westfall - 00:30
7          That pursuant to information given to the
8    deposition officer at the time said testimony was taken the
9    following includes counsel for all parties of record:
10         Mr. Brissenden, Attorney for Plaintiff
           Ms. Westfall, Attorney for Defendant
11         Mr. Vandewalker, Attorney for Defendant-Intervenor
12         I further certify that I am neither counsel for,
13   related to, nor employed by any of the parties or attorneys in
14   the action in which this proceeding was taken, and further that
15   I am not financially or otherwise interested in the outcome of
16   the action.
17         Certified to by me this_____day of_____, 2012.
18
19
20         _____
21         Amy C. Kofron, Texas CSR #6352
           Expiration Date: 12/31/2013
22         Esquire Deposition Solutions
           100 Congress Avenue, Suite 2020
23         Austin, Texas 78701
24
25

## 98

1              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLUMBIA
2
3    STATE OF TEXAS,          )
          Plaintiff,          )
4                             )
     V.                       )
5                             )
     ERIC H. HOLDER, JR.,     )
6    in his official capacity )
     as Attorney General of   )
7    the United States,       )
          Defendant.          )
8                             )
     ERIC KENNIE, et al.,     )
9        Defendant-Intervenors,  )
                              )
10   TEXAS STATE CONFERENCE   )  CASE NO. 1:12-CV-00128
     OF NAACP BRANCHES, et al.,  )  (RMC-DST-RLW)
11       Defendant-intervenors,  )  Three-Judge Court
                              )
12   TEXAS LEAGUE OF YOUNG    )
     VOTERS EDUCATION FUND, et al., )
13       Defendant-Intervenors,  )
                              )
14   TEXAS LEGISLATIVE BLACK  )
     CAUCUS, et al.,          )
15       Defendant-Intervenors,  )
                              )
16   VICTORIA RODRIGUEZ, et al., )
         Defendant-Intervenors.  )
17           REPORTER'S CERTIFICATION
         DEPOSITION OF RICHARD PARSONS
18                June 14, 2012
19   I, Amy C. Kofron, Certified Shorthand Reporter in
20   and for the State of Texas, hereby certify to the following:
21          That the witness, RICHARD PARSONS, was duly sworn
22   by the officer and that the transcript of the oral deposition is
23   a true record of the testimony given by the witness;
24          That the deposition transcript was submitted
25   on_____ to the witness or to the attorney for the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com