## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                      )
                                     )
        Plaintiff,                   )
                                     )
VS.                                  )
                                     )
ERIC H. HOLDER, JR. in his           )
official capacity as Attorney        )
General of the United States,        )
                                     )
        Defendant,                   )
                                     )
ERIC KENNIE, et al,                  )
                                     )
        Defendant-Intervenors,       )
                                     )
TEXAS STATE CONFERENCE OF            )   CASE NO. 1:12-CV-00128
NAACP BRANCHES,                      )   (RMC-DST-RLW)
                                     )   Three-Judge Court
        Defendant-Intervenors,       )
                                     )
TEXAS LEAGUE OF YOUNG VOTERS         )
EDUCATION FUND, et al,               )
                                     )
        Defendant-Intervenors,       )
                                     )
TEXAS LEGISLATIVE BLACK              )
CAUCUS, et al,                       )
                                     )
        Defendant-Intervenors,       )
                                     )
VICTORIA RODRIGUEZ, et al.,          )
                                     )
        Defendant-Intervenors.       )

*****************************************
         ORAL DEPOSITION OF
       SENATOR DAN PATRICK
          MAY 30, 2012
*****************************************

## Page 2

1       ORAL DEPOSITION OF SENATOR DAN PATRICK, produced as

2   a witness at the instance of the Defendant, was duly

3   sworn, was taken in the above-styled and numbered cause

4   on the MAY 30, 2012, from 11:39 a.m. to 7:23 p.m.,

5   before Chris Carpenter, CSR, in and for the State of

6   Texas, reported by machine shorthand, at the offices of

7   DECHERT, LLP, 300 W. 6th Street, Suite 2010, Austin,

8   Texas 78701, pursuant to the Federal Rules of Civil

9   Procedure and the provisions stated on the record or

10  attached hereto.

## Page 3

1           A P P E A R A N C E S
2   FOR THE PLAINTIFF, STATE OF TEXAS:
3       Patrick K. Sweeten
        OFFICE OF THE ATTORNEY GENERAL OF TEXAS
4       P.O. Box 12548
        Austin, TX  78711-2548
5
        209 West 14th Street
6       8th Floor
        Austin, TX  78701
7       (512) 936-1307
        patrick.sweeten@texasattorneygeneral.gov
8
9   FOR THE DEFENDANT, HOLDER, ET AL:
10      Spencer Fisher
        Bruce Gear
        Michelle McLeod
11      U.S. DEPARTMENT OF JUSTICE
        950 Pennsylvania Avenue, NW
12      NWB - Room 7202
        Washington, DC  20530
13      (202) 305-7766
        spencer.fisher@usdoj.gov
14      bruce.gear@usdoj.gov
15
        FOR THE KENNIE INTERVENORS:
16
        Chad W. Dunn
17      BRAZIL & DUNN, LLP
        4201 Cypress Creek Parkway
18      Suite 530
        Houston, TX  77068
19      (281) 580-6310
        chad@braziландdunn.com
20
        FOR THE DEFENDANT INTERVENORS NAACP AND MALC:
21
        Amy L. Rudd
22      DECHERT, LLP
        300 W. 6th Street, Suite 2010
23      Austin, Texas 78701
        (512) 394-3000
24      amy.rudd@dechert.com
25

## Page 4

1               INDEX
2   Appearances,.......................................3
3   SENATOR DAN PATRICK
4       Examination by Mr. Spencer................5
        Examination by Mr. Dunn.................197
5       Further Examination by Mr. Spencer......213
6   Signature and Changes..........................300
7   Reporter's Certificate.........................302
8               EXHIBITS
9   NO. DESCRIPTION                    PAGE MARKED
10  160  Amended Notice of Deposition        19
11  161  Transcript Excerpt, March 11, 2009       93
12  162  Transcript Excerpt, March 11, 2009      111
13  163  Texas Legislature Online History, SB 362    121
14  164  Senator Patrick Letter to Constituents,     123
        Fall 2010
15
    165  LexisNexis Name Search              155
16
    166  Texas Senate Staff Services Excerpt Senate  186
17       Bill 14, Jan. 26, 2011
18  167  Texas Senate Staff Services Excerpt Senate  194
        Bill 14, Jan. 26, 2011
19
    170  Senate Rules Adopted by 82nd Legislature,   223
20       Jan. 19, 2011
21  171  Capitol View, 82nd Legislative Session,     234
        Jan. 26, 2011
22
    173  Senator Patrick Letter to Constituents,     262
23       80th Legislature
24  174  Houston Chronicle Article, May 19, 2011     264
25  175  Texas Observer Article, June 15, 2007       271



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

**5**

1    176   American Stateman Article, May 18, 2007    275
2    177   Senator Patrick Letter, Fall of 2008       286

---

**7**

1    Q.  Good morning, Senator.
2    A.  Good morning.
3    Q.  If you could state your name and spell your
4    name for the record.
5    A.  Dan Patrick, P-a-t-r-i-c-k.
6    Q.  We'll just first start off with some ground
7    rules for today.  Please testify truthfully, accurately,
8    and completely when answering my questions.
9         The court reporter, Mr. Carpenter here,
10   will prepare a transcript of everything that's said
11   today.  You must respond to my questions verbally, so no
12   head shaking, and that's for the purposes of the
13   transcript.  Is that clear?
14   A.  Yes.
15   Q.  Okay.  Please wait for me to finish my
16   questions before you answer, and I will do the same for
17   you, and that way, it will be easier to read the
18   transcript.  Is that okay?
19   A.  Yes.
20   Q.  And I'll try to ask you clear questions at all
21   times.  If you don't understand a question, please let
22   me know.  Okay?
23   A.  Yes.
24   Q.  If you wish to stop and take a break, please
25   tell me, and I will try to accommodate you.  It just

---

**6**

1         THE REPORTER:  The time on the record is
2    11:39.  Could everybody here make announcements and your
3    affiliations?
4         MR. SWEETEN:  Patrick Sweeten from the
5    Texas Attorney General's Office on behalf of the State
6    of Texas and on behalf the witness, Senator Patrick.
7         MR. FISHER:  Spencer Fisher representing
8    the Attorney General of the United States.
9         MR. GEAR:  Bruce Gear representing the
10   Attorney General of the United States.
11        MS. McLEOD:  Michelle McLeod representing
12   the Attorney General of the United States.
13        MR. DUNN:  Chad Dunn representing the
14   Defendant Kennie Intervenors.
15        MS. RUDD:  Amy Rudd representing the
16   Defendant Intervenors NAACP and MALC.
17        MR. McKENZIE:  John McKenzie from the
18   Texas Attorney General's Office representing the State
19   of Texas and the witness.
20        DAN PATRICK,
21   having been first duly sworn to testify the truth, the
22   whole truth, and nothing but the truth, testified as
23   follows:
24        EXAMINATION
25   BY MR. FISHER:

---

**8**

1    depends on where we are in the questioning, but as soon
2    as we get to the next stopping point, I will do so.  Is
3    that okay?
4    A.  Yes.
5    Q.  So just remember that you're under oath, and
6    you may be subject to the penalty of perjury for giving
7    false or misleading testimony today, just like at a
8    trial.  Is that clear?
9    A.  Yes.
10   Q.  Do you understand all of the ground rules and
11   instructions?
12   A.  Yes.
13   Q.  Do you have any questions about any of them?
14   A.  No.
15   Q.  Are you on any medication today that would
16   affect your ability to testify?
17   A.  No.
18   Q.  Is there any reason why you cannot testify
19   truthfully and accurately today?
20   A.  No.
21   Q.  So I might use the terms "voter ID" and "photo
22   ID" interchangeably during this deposition.  I want you
23   to interpret the term broadly to mean a requirement that
24   a voter present a form of identification, whether it has
25   a photo on it or otherwise, when voting in person before

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Dan Patrick                                    May 30, 2012

---

9

1  being permitted to vote by regular ballot.  Do you
2  understand?
3      A.  Yes.
4      Q.  And when I refer to you, I'm asking you a
5  question about you in your capacity as a member of the
6  Texas State Senate.  Is that clear?
7      A.  Yes.
8      Q.  And when I refer to the term "minority voters,"
9  I mean voters who are nonWhite and nonAnglo.  Do you
10 understand?
11     A.  Yes.
12     Q.  Okay.  Are you represented by counsel today?
13     A.  Yes.
14     Q.  And who is that?
15     A.  The representatives from the Attorney General's
16 Office, who are friends of mine are present in the room.
17     Q.  And just another note, just to back up on the
18 ground rules.  When I refer to you, I might also be
19 referring to your staff.  So in your capacity as a State
20 Senator, so please try to answer questions with the
21 knowledge of what your staff does as well.
22         MR. SWEETEN:  Spencer, I think, you know,
23 with respect to that instruction, I think that's going
24 to be very difficult for him to do.  I would ask that we
25 just use the common use of the term "you," because

---

10

1  otherwise, if you're asking -- if you're using that
2  term, you could be -- by your own definition, could be
3  asking about members of the staff, about what they --
4  what they may have done.  So I would ask that you
5  specify the term "you," if you're asking about Senator
6  Patrick, and, you know, I think he's going to use the
7  common, ordinary meaning of the term "you" --
8          MR. FISHER:  I'll do my best --
9          MR. SWEETEN:  -- during the deposition.
10 Okay.  I'm not trying to fight with you.
11         MR. FISHER:  Is that fine?
12         MR. SWEETEN:  I think that's potentially
13 very confusing to do it that way, and I've expressed
14 that to others.
15         MR. FISHER:  I'll do my best on that
16 issue, if that's okay.
17         MR. SWEETEN:  Thank you.
18     Q.  (By Mr. Fisher) Senator, have you ever been
19 deposed before?
20     A.  Yes.
21     Q.  Okay.  How many times?
22     A.  I believe just once.
23     Q.  Just once?
24     A.  I believe.
25     Q.  And do you remember the case name?

---

11

1      A.  I do not.
2      Q.  What was the nature of the proceedings?
3      A.  You know, it was -- we were dealing with a
4  legal issue involving a person that I was doing business
5  with.
6      Q.  And where -- what court was that in?
7      A.  It was in a private attorney's firm.
8      Q.  Okay.  The deposition was in a private
9  attorney's firm?
10     A.  Yes.
11     Q.  What court was the case before?
12     A.  I don't know.
13     Q.  Is it federal or state court?
14     A.  I do not recall.
15     Q.  Have you ever testified in court before?
16     A.  Yes.
17     Q.  A number of times?
18     A.  I can only remember once right now.
19     Q.  So one time?  Is that your answer?
20     A.  That I remember today.
21     Q.  And the nature of those proceedings?
22     A.  It was a criminal charge that was filed.
23     Q.  Okay.  A criminal charge filed against who?
24     A.  I don't remember the person's name at this
25 point.  It's been 20 years.  Someone who struck me, and

---

12

1  they were charged.
2      Q.  Okay.  So you were in a defendant in that case?
3      A.  Yes.
4      Q.  Do you remember the case --
5      A.  No.  Wait.  No, no, no, no.
6          MR. SWEETEN:  I think he's saying he was a
7  witness.
8      A.  Yeah, I was a -- no, I was the person struck.
9      Q.  Okay.
10         MR. SWEETEN:  He was the victim.
11     A.  I was the victim, yes.
12     Q.  (By Mr. Fisher) Okay.  And I'm assuming that
13 was, then, probably a state case; is that correct?
14     A.  It may have been a city or a county case.  I
15 don't recall.
16     Q.  State or local?
17     A.  State or local, yeah.
18     Q.  Have you ever personally been a party in a
19 lawsuit?
20     A.  I can't -- you know, I can't -- let me just
21 make sure here.  That I brought -- let me -- a
22 clarification.  That I was sued or brought suit?
23     Q.  A party would be either.
24     A.  Right.  I can't -- I can't -- I can't remember
25 anything specific today.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 13

1    Q.  Okay.  If anything comes to mind during the
2  course of the deposition, you let me know, okay?
3    A.  I will.  I can't -- you know, I just -- I can't
4  remember today.
5    Q.  Have you ever been involved in a case where the
6  State of Texas was a plaintiff or a defendant?
7    A.  Not to my knowledge.
8    Q.  So what did you to prepare for today's
9  deposition?
10    A.  Not a lot.
11    Q.  Not a lot meaning nothing?
12    A.  There were request for some e-mails that your
13  office made, so I complied with that order to the best
14  of my ability.
15    Q.  Did you meet with your attorney?
16    A.  I had -- I did have a meeting.
17    Q.  And who was that?
18    A.  That was Matt and Stacey.
19    Q.  Okay.  And they're from?
20    A.  The Attorney General's Office.
21    Q.  Now, you mentioned e-mails.  Did you review any
22  documents?
23    A.  I -- I looked at -- I went through the e-mails
24  that you requested, so --
25    Q.  Okay.

## 14

1    A.  -- yes.
2    Q.  And that was it, the e-mails?
3    A.  When I met with Matt and Stacey, I may have
4  looked at something.  I don't -- I don't recall.  I may
5  have, but I can't recall.
6    Q.  So it's possible you looked at something else
7  beyond the e-mails?
8    A.  It's possible, but I don't -- I don't recall.
9    Q.  And when did you meet with Matt and Stacey?
10    A.  I don't know the exact date.
11    Q.  Was it a week ago?
12    A.  Within the last 30 days.
13    Q.  So you met with Matt and Stacey within the past
14  30 days?
15    A.  Yes.
16    Q.  Is that correct?
17    A.  Correct.
18    Q.  And you don't remember what you looked at when
19  you met with Matt and Stacey as far as documentation?
20    A.  I do not -- I do not recall.
21    Q.  Other than your attorneys, did you speak to
22  anyone about your deposition today?
23    A.  I have spoken with Patrick.
24    Q.  Okay.  Was there anyone else present at the
25  time of that conversation?

## 15

1    A.  It was a telephone conversation.  I believe
2  there may have been someone else in the room, but my
3  conversation was with Patrick and --
4    Q.  So who else was in the room?
5    A.  I think it was a lady named Brooke who asked me
6  a question.
7    Q.  A lady named Brooke.  And was Brooke with
8  Patrick's office or your office?
9    A.  With Patrick's office.
10    Q.  Have you spoken to anyone other than your
11  attorneys about this case?
12    A.  With the exception of telling my wife where I
13  was going and what I was doing and maybe another person
14  that I was in Austin today in a deposition, but nothing
15  on an official basis.
16    Q.  Just to clarify, is Patrick your attorney for
17  this deposition?
18    A.  Yes.
19    Q.  Did you speak to Senator Troy Fraser about this
20  deposition?
21    A.  No.
22    Q.  Did you speak to Senator Troy Fraser about his
23  deposition?
24    A.  No.
25    Q.  Did you bring any notes or documents with you

## 16

1  today?
2    A.  No.
3    Q.  Is it your understanding that as a state
4  legislator, you may invoke what's called the Legislative
5  Privilege?
6    A.  Yes.
7    Q.  Have you asserted that privilege over any
8  documents or other materials in your possession or in
9  the possession of your staff that relate to Texas Senate
10  Bill 14?
11    A.  I don't know that I've asserted that privilege
12  previously or not.
13    MR. SWEETEN:  I'll just -- Spencer --
14    MR. FISHER:  We can go off the record if
15  you want.
16    MR. SWEETEN:  No, it's fine.  On the
17  privilege log, I think that we have produced documents
18  that we didn't feel were privileged, and then we
19  designated those that we believe are subject to
20  privilege, so...
21    Q.  (BY MR. FISHER) You understand that due to an
22  assertion of privilege, the Office of the Attorney
23  General for the State of Texas has withheld certain
24  documents that potentially might be in your possession
25  that relate to SB 14?


Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Dan Patrick                                                          May 30, 2012

---

17

1    A.  I'm not aware specifically of that.
2    Q.  Do you understand that the Office of the
3    Attorney General for the State of Texas has not produced
4    some documents to the United States in this litigation
5    on the basis of that privilege?
6    A.  I have no firsthand knowledge of that.
7    Q.  So no one has informed about the contours or
8    requirements of the legislative privilege; is that
9    correct.
10         MR. SWEETEN:  You're asking him matters
11   that would require to him to reveal the substance of
12   conversations that he and I have had, and so I'm going
13   to instruct you not to answer on the basis of attorney-
14   client privilege.
15   Q.  (By Mr. Fisher) Do you continue to assert a
16   legislative privilege over documents related to SB 14?
17   A.  For clarification, and I have to ask Patrick
18   this question, I don't know that we've asserted --
19   Q.  Well, now, hold on.  Patrick can give you
20   information about issues related to privilege today.  To
21   the extent that you need to ask him about privilege
22   issues, you can go off the record and have a
23   conversation with him.  That's fine.
24   A.  Okay.
25   Q.  But, you know, with regard to legislative

---

18

1    privilege, if you have no knowledge about legislative
2    privilege, then that would be your answer.  But I'm just
3    asking if you --
4    A.  Would you ask the question again?
5    Q.  Sure.  To the extent that you have asserted a
6    legislative privilege over documents in your possession,
7    do you continue to assert that legislative privilege
8    today over documents related to SB 14 in your
9    possession?
10   A.  I am asserting legislative privilege where it's
11   appropriate.
12   Q.  Will you be invoking legislative privilege over
13   your testimony today that relates to SB 14?
14   A.  Where it is appropriate.
15   Q.  Will you be invoking legislative privilege over
16   testimony today that relates to other voter photo
17   identification bills considered by the Texas
18   Legislature?
19   A.  Where it is appropriate.
20   Q.  Are you asserting legislative privilege on your
21   attorney's advice?
22         MR. SWEETEN:  I think your question is
23   asking him about discussions that the two of us have.
24   He's indicated he is asserting legislative privilege,
25   and it is my duty to inform him of the boundaries of

---

19

1    said privilege, and I will do so today.
2    Q.  Are you willing to waive your privilege in
3    response to any particular questions that I ask during
4    today's deposition?
5    A.  No.
6    Q.  Okay.  If you change your mind, will you let me
7    know?
8    A.  Yes.
9    Q.  Okay.  I'm going to hand you what's going to be
10   marked as Exhibit 160.
11         (Exhibit 160 marked for identification.)
12   Q.  (By Mr. Fisher) All right.  Senator Patrick, I
13   hand you a seven-page document entitled Notice of
14   Deposition -- Amended Notice of Deposition.  Have you
15   seen this document before?
16   A.  I don't recall seeing this specific document.
17   Q.  So I'll direct your attention to the second
18   page, and you'll see your name is highlighted there.
19   A.  Okay.
20   Q.  Do you see that?
21   A.  The inside?  This (indicating)?
22   Q.  Yes.
23   A.  Okay.  Yeah.
24   Q.  Let me direct your attention further to
25   Attachment A, which should show up on the third page of

---

20

1    the document.  And I know yours is double-sided.  I'll
2    go ahead and let you take a look at that and the
3    documents that are described in Attachment A, and please
4    let me know after you've taken a look at that
5    information.
6    A.  Is there something specific, or do you want me
7    to read the three pages back and front?
8    Q.  Let me direct your attention to Number 5.  So
9    go ahead and take a look at Paragraph 5.
10        MR. SWEETEN:  Are we on the documents?
11        MR. FISHER:  We're on the documents, yes.
12        THE WITNESS:  Definition and Instructions?
13        MR. SWEETEN:  No.  It's this one, the
14   documents.
15   A.  All right.
16   Q.  (By Mr. Fisher) Did you get a chance to take a
17   look at that, Senator?
18   A.  Yes.
19   Q.  Did you or anyone in your office search for
20   documents responsive to Paragraph 5 of the document's
21   header?
22   A.  We searched documents according to the request
23   that your office made.
24   Q.  And what's your understanding about what that
25   request was?

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 21

1  A.  There were -- my recollection is, the request
2  was for e-mails that contained certain words that
3  related to voter ID.
4  Q.  Okay.  So e-mails that contained words related
5  to voter ID; is that correct?
6  A.  Yes.
7  Q.  And is that different than what we see here in
8  Paragraph 5 of the Amended Notice of Deposition?
9  A.  This says all documents and communications.
10  Right now, what I recall is e-mails, but it may have
11  been all documents and communications.
12  Q.  What may have been all documents and
13  communications?
14  A.  Your request, what I -- what I searched.
15  Q.  Okay.  But a minute ago, you said that the
16  request that you responded to was e-mails that contained
17  words related to voter ID; is that correct?
18  A.  For me.  And it may have been -- it may have
19  been for any communications.  I can't recall exactly
20  what the request was, but I complied with it to the best
21  of my ability.
22  Q.  Okay.  So you complied to a request, correct?
23  A.  A request.
24  Q.  But you are not sure if that request is the
25  same information that's listed in Paragraph 5 here?

## 22

1  A.  Could I tell you for certain?  No.  It may have
2  been.  It may have been.
3  Q.  Let's move on to Paragraph 8.
4  A.  Okay.
5  Q.  Did you have a chance to take a look at that?
6  A.  Yes.
7  Q.  Did anyone in your office search for documents
8  in response to Paragraph 8?
9  A.  I can't speak to my office on that issue.
10  Q.  Are you not aware of any searches that your
11  office did?
12  A.  I'm aware that my office searched e-mails, and
13  I believe any communications between myself and staff.
14  Q.  But Paragraph 8 here describes public
15  statements --
16  A.  I don't know.
17  Q.  -- you or your --
18  A.  Yeah.  I don't -- I don't know --
19  Q.  Senator, if I could just hold on for one
20  second.  When I'm speaking, please let me --
21  A.  Sure.
22  Q.  -- finish.
23  A.  Yeah.
24  Q.  And then when I finish, you can answer.  But
25  it's the only way we can get a transcript that anyone

## 23

1  can make any sense of.
2  A.  Sure.
3  Q.  Paragraph 8 says, "All public statements you or
4  your staff have made about SB 14 or SB 362, 81st
5  Legislature, HB 218, 80th Legislature, HB 1706, 79th
6  Legislature, or photo voter identification."
7  Now, you mentioned e-mails, other
8  documents, but I didn't hear public statements in any of
9  that.  So is it fair to say that you did not search, or
10  your office did not search, for this information?
11  A.  I don't know -- I don't know what my office did
12  regarding public statements.
13  Q.  Let's move on to Paragraph 11.  I'll ask you to
14  take a look at that.
15  A.  I've read it.
16  Q.  Okay.  Did you or anyone in your office search
17  for documents in response to Paragraph 11?
18  A.  I searched my e-mails for the words that were
19  communicated from your office and anything relating to
20  voter ID that --
21  Q.  Who in your office conducts this type of
22  search?
23  A.  I believe that Logan Spence, who is my chief of
24  staff, headed that up.
25  Q.  I'm sorry.  Could you repeat the name?

## 24

1  A.  Logan Spence.
2  Q.  And did Logan Spence conduct the search for
3  e-mails or anything related to voter ID, which is the
4  search you have said that was conducted?
5  A.  I believe he did.
6  Q.  You believe he did?  Are you sure that he did?
7  A.  He told me that he did.
8  Q.  Is there a person in your legislative office
9  who maintains records?
10  A.  Not one person specifically.
11  Q.  Does your office maintain records?
12  A.  Each person in the office keeps the files they
13  think are important on a legislative issue.
14  Q.  There is a retention policy in your office?
15  A.  No.
16  Q.  So to the extent there is a retention policy,
17  it's each person keeps the files they think are
18  important; is that correct?
19  A.  Yes.
20  Q.  How are the records maintained?
21  A.  I'm not specifically sure if each person keeps
22  it on a computer file or if they print it out and put it
23  in a folder.
24  Q.  Do you archive e-mails?
25  A.  I believe, but not certain, that e-mails by



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 25

1  staff members are erased on some type of regular basis,
2  but I'm not certain.
3    Q.  Is there any requirement, as a member of the
4  Texas Legislature, that you hang on to certain e-mails?
5    A.  I don't use -- no, there is none, not to my
6  knowledge.  I mean, not to my knowledge.  If there's a
7  policy, I'm not aware of it.
8    Q.  What about correspondence?
9    A.  Can you repeat the question?
10    Q.  What about correspondence?
11    A.  No.  What about correspondence?
12    Q.  How are records in your office maintained with
13  regard to correspondence?
14    A.  It depends on the type of correspondence.
15    Q.  Constituent correspondence.
16    A.  There is a system that does, to my knowledge,
17  maintain the correspondence we get from constituents.
18    Q.  Is that system a part of the Texas Legislature,
19  or is it a part of your office?
20    A.  I believe it's a part of the Legislature.
21    Q.  What about your responses to that constituent
22  correspondence?
23    A.  I'm not involved directly in that, but I
24  believe we keep that record.  I'm not certain, but I
25  believe we do.

## 26

1    Q.  And is there some kind of policy that's at play
2  in keeping that?
3    A.  Not for my office specifically, but I'm not
4  sure of this legislative computer system.  In that -- in
5  that respect, I don't know how long they are kept or
6  what is kept.
7    Q.  Have you told your staff to keep certain
8  correspondence, for instance, constituent
9  correspondence?
10    A.  Not that I recall.
11    Q.  So no instructions to your staff to hang on to
12  constituent correspondence?
13    A.  Not from me specifically.
14    Q.  And no instructions from you to retain your
15  responses to constituent correspondence?
16    A.  Repeat that again.
17    Q.  Are there any instructions from you to your
18  staff to retain your responses to constituent
19  correspondence?
20    A.  I'm sure on occasion I may have said, "Let's be
21  sure we keep that," but I don't have a specific
22  policy.  I'm going to back to the issue that there may
23  be -- and I'm not even certain of this -- there may be a
24  state system that keeps everything, but I'm not certain.
25    Q.  But you're not aware of that?

## 27

1    A.  I'm just not certain.  I'm aware there might
2  be, but I'm not certain if there is.
3    Q.  What about speeches, the speeches you give,
4  drafts of speeches, are those maintained in your office?
5    A.  I seldom write speeches.
6    Q.  Who writes speeches?
7    A.  I write, probably, all of my speeches.  98
8  percent of them.
9    Q.  What about reports, reports on legislation,
10  pending legislation, are those maintained in your
11  office?
12    A.  I would assume that some are for some
13  legislation, but I couldn't be certain of how much is
14  maintained.
15    Q.  So is it fair to say that you don't know what
16  records are maintained in your office and what records
17  are not maintained in your office?
18    A.  That would be fair to say.
19    Q.  Is there any off-site location where some
20  records in your office are stored?
21    A.  Off site being away from the Capitol?
22    Q.  Outside of your office.
23    A.  State records?
24    Q.  Yes.
25    A.  I'm not aware of any.

## 28

1    Q.  So the records that your office does maintain
2  are located in your office at the Texas Legislature at
3  the Capitol?
4    A.  The -- yes, with the exception that I may have
5  some files that, that I keep that, that I might take
6  home, and may be legislation that I take home to read.
7  It could be a booklet that I take home to read.  With
8  that exception, I'm not aware of any other.
9    Q.  So going back to Exhibit 160, did you look at
10  any of the files that might be at your home that were
11  responsive to any of the document requests in the
12  amended notice?
13    A.  Yeah, I did.
14    Q.  What's your educational background?
15    A.  I have a bachelor's degree in English.
16    Q.  From where?
17    A.  The University of Maryland in Baltimore County.
18    Q.  And how long have you served in the Senate?
19    A.  I have served four and a half -- five and a
20  half years.
21    Q.  And you were first elected in what year?
22    A.  I was elected in November of 2006.
23    Q.  What geographic areas are within your Senate
24  district?  Well, first of all -- strike that.
25    What senate district do you represent?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 29

1    A.  Seven.
2    Q.  And what geographic areas are within your
3  district?
4    A.  That is West Harris County.
5    Q.  Do you know, roughly, the total population of
6  West Harris County?
7    A.  My Senate District, before redistricting, was
8  the largest in the state, 1,015,000 constituents.
9    Q.  Are you aware of the racial demographics of the
10  district that you serve, District 7?
11    A.  I have a general knowledge.
12    Q.  What's that general knowledge?
13    A.  I believe that the African American and Latino
14  population is approximately 39 percent of the district.
15    Q.  And that would be the Latino and African
16  American population combined is 39 percent of the
17  district; is that correct?
18    A.  Let me correct that.  I don't know that that's
19  the population or the registered voters.  I remember
20  seeing a number of black and Hispanic, 39, but I don't
21  know if that's population or registered voters.
22    Q.  Do you serve on any committees in the Texas
23  Senate?
24    A.  Yes.
25    Q.  Which ones?

## 30

1    A.  Finance, Sunset, Education, Redistricting,
2  Criminal Justice, Health and Human Services,
3  Intergovernmental Relations, Subcommittee on School
4  Charters, School Vouchers, Flooding and -- the
5  Subcommittee on Flooding and Drainage.  I think that's
6  it.
7    Q.  Can you describe the Sunset Committee for me?
8    A.  The Sunset Committee, which I am brand new to
9  and haven't attended my first hearing, is -- reviews the
10  agencies in our government on a 12-year cycle.
11    Q.  Have you sponsored any election related or
12  voter-related bills?
13    A.  In a specific committee or in general?
14    Q.  In general.
15    A.  I'd have to check my record.
16    Q.  Have you co-sponsored any election related or
17  voter-related bills?
18    A.  I was a co-author, I believe, on the photo
19  voter ID bill.
20    Q.  And by photo voter ID bill, you mean?
21    A.  I mean --
22    Q.  Which one?
23    A.  I believe on the one that passed in 2011.  I'm
24  not sure about 2009.  I may have been.  I don't recall.
25  Or maybe that was 2007.  I don't recall.

## 31

1    Q.  So the one that passed in 2011, is that SB 14?
2  Senate Bill 14?
3    A.  If that's what the record indicates.
4    Q.  So you don't remember right now if you were the
5  co-author of Senate Bill 14?
6    A.  I believe I was.  But I have cast 13,000 votes
7  in three sessions, so you'd have to show me -- I don't
8  want to testify to something and not be absolutely
9  correct.  I believe I was, but if you show me the
10  document, I'd be happy to say yes.
11    Q.  Is there a difference between casting a vote
12  and co-authoring a bill?
13    A.  Yes.
14    Q.  And what's the difference?
15    A.  You may cast a vote and not be a sponsor or a
16  co-author, an author of the bill.  Usually, if you are a
17  sponsor, co-author, author of a bill, you're going to
18  cast a vote for it.
19    Q.  How many bills have you authored or
20  co-authored?
21    A.  I'd have to check the record, but a significant
22  number of bills.
23    Q.  Anywhere near 13,000?
24    A.  No.
25    Q.  How many bills have you sponsored or

## 32

1  co-sponsored?
2    A.  I'd have to check the record.
3    Q.  Anywhere near 13,000?
4    A.  No.
5    Q.  And so you don't remember if in 2011 you
6  co-sponsored or co-authored Senate Bill 14; is that
7  correct?
8    A.  No.  What I think my testimony was, and is:  I
9  believe I did co-sponsor.  But the point I'm trying to
10  make is that we -- I cast a lot of votes.  We probably
11  passed 1500 bills.  So if you're asking me the specific
12  number, I don't want to testify to a number if I'm not
13  sure.  If you're asking me did I co-sponsor the photo
14  voter ID or co-author, actually, I believe I co-authored
15  it.  If you want to show me Senate Bill 14, that's what
16  I'm not sure.  I don't know the number.
17    Q.  We'll get to that.
18    A.  Okay.
19    Q.  But I just want to make it clear that you don't
20  know for sure, sitting right now without taking a look
21  at anything, if you did co-author or co-sponsor Senate
22  Bill 14?
23    A.  No.  I believe I co-authored the photo voter
24  ID.
25    Q.  You believe?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

33

1     A.   Yeah.  I feel -- I feel I was a co-author on
2  the bill.  What I'm not sure, show me the bill number,
3  and I'm happy to answer that question.  If the photo
4  voter ID bill was Senate Bill 14, then I was a
5  co-author.  I just want to be sure that the bill and the
6  number match.
7     Q.   Any signature or prominent initiatives on your
8  behalf as a member of the Texas Senate?
9     A.   On what issue?
10    Q.   Any issue.
11    A.   Yes.
12    Q.   What?
13    A.   I passed legislation to place "In God We Trust"
14 in the Senate.  I passed legislation to place "Under
15 God" in our state pledge.  I passed legislation to
16 reduce taxes on small business.  I passed legislation
17 regarding a woman's right to know dealing with
18 sonograms.  I passed -- the question was significant
19 legislation?
20    Q.   Any signature or prominent initiatives.
21    A.   Every legislator believes every bill they pass
22 is prominent.  It's important to someone.  But in
23 significance, I passed a bill requiring generator backup
24 for water systems in the case of emergencies.  I passed
25 legislation allowing people to fly an a American flag in

34

1  their yards.  I probably passed and sponsored and
2  co-authored, you know, a hundred-plus bills.  But as we
3  sit here this morning, those are the ones I would think
4  would be signature legislation.
5     Q.   Do you know how many bills you sponsored or
6  co-sponsored in 2011?
7     A.   I don't.
8     Q.   Do you know how many bills you authored or
9  co-authored in 2011?
10    A.   That I co-authored or authored or that passed
11 that I authored?
12    Q.   That you co-authored or authored.
13    A.   Probably over 60, but I'd have to check the
14 record.  Not that passed, but that -- you know, that I
15 authored or co-authored, that we submitted legislation.
16    Q.   Are you familiar with the American Legislative
17 Exchange Council?
18    A.   Is that ALEC?
19    Q.   Yes.
20    A.   Yes.
21    Q.   What is it?
22    A.   Well, that I'm not sure.  It's an organization
23 that holds meetings every year or every other year, I'm
24 not sure, to discuss legislative policy.
25    Q.   Do you know where it's based?

35

1     A.   I do not.
2     Q.   Do you know what these discussions on
3  legislative policy concern?
4     A.   The only issue that I'm aware of was the
5  property tax issue that I took interest in.  I'm not
6  aware of their -- that's the one I recall.
7     Q.   Have you ever gone to any meetings, ALEC
8  meetings?
9     A.   I attended one meeting in 2007.
10    Q.   And where was that?
11    A.   In Boston.
12    Q.   Are you a member of ALEC?
13    A.   I don't believe so.
14    Q.   What was discussed at the meeting in 2007 in
15 Boston?
16    A.   The only thing I recall was going to a property
17 tax seminar.
18    Q.   Is it possible there were other things
19 discussed at that meeting?
20    A.   At the property tax seminar or in the general
21 meeting?
22    Q.   Was it termed a property tax seminar?
23    A.   The meetings, they usually have break-out
24 groups, and you pick the ones you want to attend.  So I
25 don't remember what other ones were.  The meeting that I

36

1  was interested in attending was property taxes, and
2  that's what I recall.
3     Q.   How many days was the meeting in 2007 in
4  Boston?
5     A.   I'm not sure.  Two or three possibly.
6     Q.   And the only thing you recall from that is a
7  break-out session on property tax; is that correct?
8     A.   For me, that's the only thing I recall.
9     Q.   What do you mean by "for me"?
10    A.   That's the only one I recall attending.
11    Q.   So you were there for two or three days in
12 Boston in 2007, and went to one break-out session on
13 property tax; is that correct?
14    A.   To the best of my knowledge.
15    Q.   Did you ever receive any documents from ALEC
16 related to voter ID?
17    A.   I don't recall.
18    Q.   Have you received any assistance from ALEC in
19 relation to other legislative matters?
20    A.   Not that I recall.
21    Q.   Do you receive e-mail from ALEC?
22    A.   Not that I recall.
23    Q.   Newsletters?
24    A.   Not that I recall.
25    Q.   Advertisements?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 37

1    A.  With the exception of possible notice about
2  future meetings, I don't recall anything specifically.
3    Q.  Are there any other groups you belong to
4  because of your membership in the Texas Legislature?
5        MR. SWEETEN:  Objection to the question as
6  vague.  You can answer.
7        MR. FISHER:  I'll stay with the question.
8        MR. SWEETEN:  All right.
9    A.  Could you define that, when you mean group?
10   Q.  (By Mr. Fisher) Because of your membership in
11 the Texas Legislature, are you a member of any groups?
12       MR. SWEETEN:  Same objection.
13   A.  Okay.  I'm just confused.
14   Q.  (By Mr. Fisher) To the extent that you received
15 e-mails from ALEC, did you produce those?
16   A.  I don't believe I received any e-mails from
17 ALEC.
18   Q.  You don't believe you received any e-mails or
19 you didn't receive any e-mails from ALEC?
20   A.  I don't believe I did.
21   Q.  Are you familiar with the National Conference
22 of State Legislators?
23   A.  Does that have an acronym as well?
24   Q.  It does.
25   A.  What is that?

## 38

1    Q.  NCSL.
2    A.  You know what, let me correct -- I have those
3  two confused.  The -- I'll have to check the record.  I
4  think the Boston meeting was NCSL.  Let me correct the
5  record.  That was NCSL.  I'm sorry.
6    Q.  Okay.  So the meeting you attended in 2007 in
7  Boston was an NCSL meeting, not an ALEC meeting; is that
8  correct?
9    A.  That's what I believe.  In a following date, I
10 can double check the record, but I have those two
11 confused, yes.  I think it was an NCSL meeting.
12   Q.  So is it fair to say you've never been to a
13 meeting sponsored by ALEC?
14   A.  The ALEC meeting I attended.  I've only been to
15 two, so I had them reversed.  I attended an ALEC meeting
16 in, I believe was Atlanta, Georgia.
17   Q.  And what was the subject of that meeting?
18   A.  Their general meeting.
19   Q.  How many days was that meeting?
20   A.  I think I was there two, but I don't recall how
21 long the meeting was.
22   Q.  Were there any issues of voter ID discussed
23 during that meeting?
24   A.  Not that I recall.  And for the record, I think
25 that was 2009.  It wasn't the same year as NCSL.

## 39

1    Q.  Okay.  So in 2007, you attended a meeting of
2  NCSL in Boston, and in 2009, you attended a meeting of
3  ALEC in Atlanta, Georgia, their general meeting?
4    A.  Yes.  I'd have to confirm the record of the
5  date, but I believe that's the case.
6    Q.  And at the general meeting in 2009, what kinds
7  of topics were discussed?
8    A.  I do not recall.
9    Q.  Was the topic of voter fraud discussed at that
10 meeting?
11   A.  I do not recall.
12   Q.  Can you identify the staff members by name and
13 title that work for you?  And you mentioned Logan
14 Spence.
15   A.  Yes.  John Gibbs, legislative director.  Kate
16 Pigg, with two Gs.  Marian Wallace.  Suzanne, with a Z,
17 Tomlin.  Tina Posten.  These are current members?  Is
18 the question current members who work for me?
19   Q.  The question was:  Identify staff members by
20 name and title who work for you.
21   A.  Okay.  And Amy Peck.
22   Q.  So some of the staff members that you
23 mentioned, I guess the last three or four you didn't
24 give a title for.
25   A.  Amy Peck is my district director.  She works in

## 40

1  my Houston office.  The other people work in my Austin
2  office.  But they don't have a -- in my view, they don't
3  have a specific title.  They handle a specific area, but
4  they don't have a title.
5    Q.  So what are their responsibilities?
6    A.  Marian Wallace oversees education, primarily.
7  They may have other duties, but that's her primary
8  function.  Suzanne Tomlin, her primary function is
9  health and human services.  John Gibbs I identified as
10 my legislative director.  And Tina Posten keeps my
11 schedule and maintains, the office manager.  Kate Pigg
12 is over criminal justice issues.  These are primary.
13 They all do different things, but that's their primary
14 function.
15   Q.  And Logan Spence?
16   A.  He's my chief of staff.
17   Q.  Have all of these staff worked continuously for
18 you since your election --
19   A.  No.
20   Q.  -- in 2006?
21   A.  Sorry.  Not all of them.
22   Q.  Who of your staff has worked on voter ID issues
23 or bills?
24   A.  I'm not certain -- I'm not certain of who
25 worked on that issue.  I'd have to check the record.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 41

1   Q.  Okay.  Has Logan Spence worked on those issues?
2   A.  As he worked directly on the issues, I don't
3   know.  I'm sure he has been -- as chief of staff, he
4   oversees pretty much everything that we do.  So I don't
5   have certain knowledge, but I'm making the assumption he
6   has worked on that issue.
7   Q.  Has John Gibbs worked on voter ID issues or
8   bills?
9   A.  I'm not certain.
10   Q.  Has Kate Pigg worked on voter ID issues or
11   bills?
12   A.  I think so.  She may have been the key person
13   on that, but I'd have to check the record.
14   Q.  Is there anyone else that might have been a key
15   person on that?
16   A.  I don't think so, but I'm not certain.
17   Q.  Has Marian Wallace worked on any voter ID
18   issues or bills?
19   A.  Not that I recall.
20   Q.  Suzanne Tomlin?
21   A.  Not that I recall.
22   Q.  Has Amy Peck worked on any voter ID issues or
23   bills?
24   A.  She doesn't work directly with legislation.
25   Q.  How often do you communicate with your staff

### 42

1   when you're in session?
2   A.  Every day.
3   Q.  Do you communicate --
4   A.  Most days.  Let me correct the record.  Most
5   days.
6   Q.  Do you communicate with your staff by e-mail?
7   A.  During session?
8   Q.  The question was:  How often do you communicate
9   with your staff when you're in session?  Do you
10   communicate with your staff by e-mail?
11   A.  Okay.  I'm, in my head, linking those two
12   questions together.  So are they not linked together?
13   Q.  Do you communicate with your staff by e-mail
14   when you're in session?
15   A.  Yes.
16   Q.  Is that through a government account?
17   A.  To say never may not be accurate, but I seldom
18   use my government account.
19   Q.  So do you communicate with your staff by e-mail
20   when you're in session through your personal account?
21   A.  Yes.
22   Q.  Do you use a BlackBerry to communicate with
23   your staff while you're in session?
24   A.  An iPhone.
25   Q.  Do you communicate with your staff on

### 43

1   nonlegislative matters when you're in session as well?
2   A.  I'm sure.
3   Q.  Through what means?
4   A.  Conversation, the telephone, e-mail, text.
5   Q.  How often do you communicate with other
6   legislators?
7   A.  That's a broad question.  Over what period of
8   time?  During session?
9   Q.  How often do you communicate with other
10   legislators when you're in session?
11   A.  With certain legislators -- it varies day to
12   day, obviously.  But on a daily basis with some
13   legislators and other days -- I've always -- when we're
14   in session, I'm always having a conversation or having
15   some communication with a legislator, but it might be
16   you today and someone else tomorrow.
17   Q.  How often do you communicate with the Governor
18   when you're in session?
19   A.  Well, in-person basis?  On a personal basis?
20   Q.  The question is:  How often do you communicate
21   with the Governor when you're in session?
22   A.  Infrequently.
23   Q.  Infrequently meaning?
24   A.  Can you define -- ask me the question again.
25   Q.  How often do you communicate with the Governor

### 44

1   when you're in legislative session?
2   A.  Is that -- does that include when I see him in
3   the hall and say, "Hello, how are you doing"?
4   Q.  Yes.
5   A.  Well, that would be hard to define, because I
6   don't remember how often I see him in the hall or in the
7   chamber.  So that would be -- I see him frequently.  So
8   I would correct my answer to frequently if that includes
9   seeing him in the hallway or saying hello.
10   Q.  How often do you communicate with the
11   Lieutenant Governor during legislative session?
12   A.  Virtually every day.
13   Q.  How often do you communicate with the staff of
14   the Governor during legislative session?
15   A.  Personally infrequently.
16   Q.  How often do you communicate with the staff of
17   the Lieutenant Governor during legislative session?
18   A.  On a regular basis.
19   Q.  Do you personally communicate with the staff of
20   the Lieutenant Governor during legislative session?
21   A.  Yes.  Certain members of the staff.
22   Q.  By what means do you communicate with the staff
23   of the Lieutenant Governor during legislative session?
24   A.  I would say it's, to the best of my knowledge,
25   almost always in person or occasionally on the



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 45

1   telephone.
2       Q.   Are you employed in a capacity other than as a
3   Texas State Senator?
4       A.   Yes.
5       Q.   And what is that?
6       A.   I'm owner/operator of a radio station.  Patrick
7   Broadcasting would be the name of one.  Dallas
8   Broadcasting would be the name of two.
9       Q.   So as the owner/operator, is it fair to say
10  that you are the employer?
11      A.   Yes.
12      Q.   And what are your responsibilities as the owner
13  and operator of Patrick Broadcasting and --
14      A.   I'm responsible for the day to day -- I have
15  employees who work day-to-day, obviously, who carry out
16  various functions.  But as the owner/operator, I'm
17  responsible for making a profit.
18      Q.   How long have you been an owner/operator of
19  Patrick Broadcasting?
20      A.   I have to check the record for the exact date,
21  but I believe two years.
22      Q.   And before that?
23      A.   Before that, I was owner/operator of Houston
24  Broadcasting.
25      Q.   And for how long?

## 46

1       A.   I'd have to check the record, but approximately
2   ten years.
3       Q.   When you last renewed your driver's license,
4   where did you go to have that done?
5       A.   Hmm.  That's an interesting question.  I don't
6   remember.
7       Q.   Have you renewed your driver's license in the
8   past five years?
9       A.   I've renewed it, but I couldn't tell you
10  exactly when.
11      Q.   You don't know how you renewed your driver's
12  license?
13      A.   I -- I just recently, because I moved, renewed
14  it online.  I do recall that.  I was thinking in person,
15  as you phrased the question.
16      Q.   Do you have a copy of your birth certificate?
17      A.   I believe I do.  I'm not certain, but I believe
18  I do.
19      Q.   If you didn't have a copy of your birth
20  certificate, do you know where you would go to get one?
21      A.   I couldn't tell you exactly today, but I could
22  ascertain that information.
23      Q.   Is it fair to say you don't know where you
24  would go to get a copy of your birth certificate as you
25  sit here today?

## 47

1       A.   I would go to the record department of the City
2   of Baltimore, but I couldn't give the exact address or
3   phone number.
4       Q.   Do you have any idea how much it would cost to
5   get a replacement of your birth certificate?
6       A.   I do not.
7       Q.   Do you have any idea how long it would take?
8       A.   I do not.
9       Q.   When is the last time that you voted?
10      A.   A couple of weeks ago.
11      Q.   And how did you vote?
12      A.   In person.
13      Q.   How far is the polling place from your home?
14      A.   Well, it's early voting, so there's a polling
15  place very close to my home.  But in early voting, you
16  can vote anywhere.  The place I voted was closer to my
17  office than my home.  So maybe 15 miles.  But I could
18  have voted within two miles.
19      Q.   Do you usually vote in person?
20      A.   Yes.
21      Q.   Do you prefer to vote in person?
22      A.   Yes.
23      Q.   Do you have any experience related to election
24  law?
25      A.   Not specifically.

## 48

1       Q.   Do you have any experience related to election
2   administration?
3       A.   Not specifically.
4       Q.   Have you ever volunteered as a poll worker?
5       A.   I don't recall.  I don't believe so.
6       Q.   Have you ever monitored the polls as a member
7   of a political party?
8       A.   I have not monitored the polls.
9       Q.   Have you ever witnessed any problems in a
10  polling place?
11      A.   Not to my knowledge.
12      Q.   Ever witness anyone trying to impersonate
13  another voter?
14      A.   No.
15      Q.   Are you familiar with Section 5 of the Voting
16  Rights Act?
17      A.   Not specifically.
18      Q.   "Not specifically" means you've never heard of
19  Section 5 of the Voting Rights Act before?
20      A.   I've heard of Section 5, but I couldn't tell
21  you specifically, unless I read it, exactly what it
22  says.
23      Q.   So I'm not asking exactly what it says.
24      A.   Okay.
25      Q.   What I asked is:  Are you familiar with



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 49

1  Section 5 of the Voting Rights Act?
2        MR. SWEETEN:  Objection, argumentative.
3  Go ahead and answer.
4     A.  Yeah.  Again, I would have to have my memory
5  refreshed on it.
6     Q.  (By Mr. Fisher) Do you know what the Voting
7  Rights Act is?
8     A.  You would have to show me a document so that I
9  can look at it.
10    Q.  So sitting here today, you have no knowledge of
11 the Voting Rights Act; is that right?
12    A.  I cannot tell you specifically what's in the
13 Act.
14    Q.  Do you know the general purpose of the Voting
15 Rights Act?
16    A.  I would have to look at the history on that.
17    Q.  So sitting here today, you have no knowledge of
18 the general purpose of the Voting Rights Act?
19    A.  My knowledge of the Voting Rights Act is that
20 it is implemented for a certain number of states because
21 of what the federal government deemed important at a
22 certain point in time.
23    Q.  What's your understanding of what the federal
24 government deemed important?
25    A.  I couldn't tell you specifically what the

## 50

1  government was thinking at a certain point in time and
2  why they deemed it important.  But obviously, the Voting
3  Rights Act was implemented for a specific reason by the
4  federal government at a specific time.
5     Q.  And you're not aware of that reason?
6     A.  I couldn't tell you what the government's
7  specific reason.  My general knowledge would tell me
8  that the federal government was concerned about voting
9  irregularities at a certain point in time.
10    Q.  What do you mean by voting irregularities?
11    A.  You asked me the question of what I believed
12 that to be, and that was my answer.
13    Q.  That was your answer, but my next question is:
14 What do you believe the meaning of voting
15 irregularities, as you used the term, meant?
16    A.  My impression is that it -- that the federal
17 government, at some point, believed that some people
18 were not allowed to vote at a certain point in history.
19    Q.  And at what point did the federal government
20 believe this?
21    A.  That, I don't know.
22    Q.  Has the federal government stopped believing
23 this?
24    A.  I can't tell you what the federal government
25 believes or doesn't believe.

## 51

1     Q.  Yes, but you've testified today that the
2  federal government had a belief about voting
3  irregularities, and so I'm asking:  At what point did
4  that belief end, if at all?
5        MR. SWEETEN:  Objection, vague.
6     Q.  (BY MR. FISHER) You can answer.
7     A.  I don't know.
8     Q.  Does Texas have a history of what you term
9  voting irregularities?
10    A.  Not that I'm aware of.
11    Q.  Is Texas covered by Section 5?
12    A.  Yes.
13    Q.  How does the legislature ensure that election
14 laws comply with Section 5?
15       MR. SWEETEN:  I'm going to, at this point
16 go ahead and instruct Senator Patrick, who has asserted
17 his legislative privilege today, about the contours of
18 legislative privilege.
19       In answering your questions today, do not
20 reveal thoughts, mental impressions, opinions, or
21 motivations about legislation or in furtherance of
22 legislative process, including Senate Bill 14.
23       Also, do not reveal today communications
24 that you've had with legislators, legislative staff,
25 state agencies, the Texas Legislative Council, or

## 52

1  constituents.
2        If you can answer that question without
3  revealing that information, you can do so.
4        Also, just so you understand, my
5  instruction does not -- and you are free to include
6  matters of public record, including committee hearings,
7  Floor proceedings, in providing answers.
8        THE WITNESS:  Okay.
9     A.  What was the question?
10       MR. SWEETEN:  Would you mind reading back
11 the question?
12       (The requested portion was read back by
13 the court reporter.)
14    A.  I don't know.
15    Q.  (By Mr. Fisher) Has Texas ever denied the right
16 to vote to any of its citizens, to your knowledge?
17    A.  No.
18    Q.  Do you seek legal advice before voting on
19 election-related legislation?
20    A.  Repeat that question.
21    Q.  Do you seek legal advice before voting on
22 election-elated legislation?
23       MR. SWEETEN:  You can answer whether or
24 not you seek legal advice.  Don't answer the substance
25 of any communications regarding that.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Dan Patrick                                           May 30, 2012

---

### 53

1    A.  I'm just thinking -- I'm just trying to answer
2  honestly if I have or not.  Just say that one more time
3  for me, Spencer.
4    Q.  (By Mr. Fisher) Do you seek legal advice before
5  voting on election-related legislation?
6    A.  Do I seek legal advice before voting on
7  legislation?  Not to my knowledge.
8    Q.  Does your staff seek legal advice before you
9  make a vote on election-related legislation and provide
10  you advice?
11    A.  I can't speak to what my staff may or may not
12  do.
13    Q.  Do you receive any legal advice on election-
14  related legislation to ensure compliance with Section 5
15  before you vote on election-related legislation?
16    A.  Not to my knowledge.
17    Q.  Did you receive any legal advice from the Texas
18  Legislative Council on those matters?
19    A.  Not that I recall.
20    Q.  Did you receive any legal advice on Senate Bill
21  14 to ensure its compliance with Section 5?
22    A.  Not that I recall.
23    Q.  Do you receive bill analysis before making
24  votes on election-related legislation?
25    A.  Yes.

### 54

1    Q.  Did you receive bill analysis before making a
2  vote on Senate Bill 14?
3    A.  I can't specifically recall that situation, but
4  I would assume I did.
5    Q.  Did this bill analysis concern compliance with
6  Section 5?
7    A.  I don't remember.
8    Q.  Have you received any communications regarding
9  Senate Bill 14 in 2012?
10    A.  Well, obviously, I received communications from
11  your office to look into the bill.
12    Q.  Have you received any communications from your
13  staff regarding Senate Bill 14 in 2012?
14    A.  Yes.
15    Q.  When was that?
16    A.  I don't recall specifically.
17    Q.  From who?
18    A.  I believe Logan Spence.
19    Q.  Did Logan Spence provide a bill analysis of
20  Senate Bill 14 in 2012?
21    A.  Not that I recall.  What I'm referring is, he
22  communicated to me on this bill, based on the request
23  from your office, to search our documents.  That's the
24  -- you asked a broad question, have I talked to my staff
25  about this bill, and that's what I recall.  I don't

### 55

1  recall anything beyond that.
2    Q.  So when would that have occurred then?
3    A.  I'm not sure of the exact date.  Whenever your
4  office made the first request.  I'm not sure when that
5  was.
6    Q.  What's Texas's current system for determining
7  how to verify the identity of a voter?
8    A.  Would you repeat that?
9    Q.  What is the Texas's current system for
10  determining how to verify the identity of a voter?
11    A.  I would have to look at the specific law.
12    Q.  So as we sit here today, you do not know Texas
13  state law regarding the verification of the identity of
14  a voter; is that correct?
15    A.  If you ask me specifically do I know the state
16  law word for word, sentence by sentence, I do not.
17    Q.  I'm not asking you if you know specifically
18  word by word, sentence by sentence.  Do you know the
19  current system for determining how to verify the
20  identity of a voter in Texas?
21        MR. SWEETEN:  Objection, asked and
22  answered.
23    A.  I do not know specifically line for line,
24  sentence by sentence, what that law is.
25    Q.  (By Mr. Fisher) Do you know generally Texas's

### 56

1  current system for determining how to identify a voter?
2    A.  Yes.
3    Q.  Okay.  What is it?
4    A.  They verify your address.
5    Q.  How do they do that?
6    A.  By some form of identification.
7    Q.  What type of identification?
8    A.  Something that would have your address.
9    Q.  Anything else?
10    A.  If someone doesn't have verification of the
11  address, they are still able to vote.
12    Q.  How do they do that?
13    A.  Simply vote.
14    Q.  So your testimony here today is that under
15  current state law, a voter has to verify their address
16  with something that has their address, but if they don't
17  have that, then they still vote.  Is that correct?
18    A.  No.  My testimony is, I don't state law
19  specifically.  You asked me the question generally.  I
20  answered the question in general.
21    Q.  So you don't know the requirements of Texas
22  State law concerning how to verify the identity of a
23  voter?
24    A.  I have already answered that question.
25    Q.  Do you believe that the system that Texas uses



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Dan Patrick                                           May 30, 2012

---

## 57

1  to verify the identity of a voter prevents voter fraud?
2      MR. SWEETEN: I'm going to interpose an
3  objection with respect to legislative privilege.
4      First of all, don't reveal thoughts,
5  mental impressions or opinions, or motivations about
6  legislation, including Senate Bill 14, and don't reveal
7  communications with legislators, legislative staff,
8  state agencies, the Texas Leg Council or constituents in
9  answering this question. To the extent you can answer
10 the question based upon matters of the public record,
11 you can do so.
12     A. I assert legislative privilege on that, I
13 believe.
14     Q. (By Mr. Fisher) What is voter ID fraud?
15     MR. SWEETEN: You can answer.
16     A. Voter fraud would be someone who is not
17 eligible to vote or impersonating another person.
18 Voting multiple times.
19     Q. (By Mr. Fisher) Do you believe this happens in
20 Texas?
21     A. I assert legislative intent on what I believe.
22     MR. SWEETEN: You can answer as to right
23 now, as you're sitting here, do you believe voter fraud
24 occurs in Texas. But in answering the question, don't
25 reveal your thoughts or mental impressions about

## 58

1  legislation. So you can answer as you are sitting here.
2      A. Do I believe it occurs? Yes.
3      Q. (By Mr. Fisher) What do you believe occurs?
4      MR. SWEETEN: The same instruction. To
5  the extent you can answer without revealing your mental
6  impressions, thoughts, opinions, motivations about
7  legislation, or in furtherance of the legislative
8  process, you can answer.
9      THE WITNESS: Can you repeat the question,
10 please?
11     MR. FISHER: I'll strike the last
12 question.
13     Q. (By Mr. Fisher) Just summarizing, you said
14 voter fraud is someone impersonating someone else or
15 voting multiple times. Is there anything else?
16     A. Or if they're not eligible to vote.
17     Q. If not eligible to vote.
18     A. If they're not a registered voter.
19     Q. And do you know of any specific instances of
20 any of these types of voter fraud that you've
21 identified: Someone impersonating someone else, someone
22 voting multiple times, or someone voting who is not
23 eligible to vote happening in Texas?
24     A. I don't have a -- I don't have specific
25 knowledge.

## 59

1      Q. Do you have any general knowledge about that?
2      MR. SWEETEN: Senator Patrick, with
3  respect to the matter of legislative privilege, don't
4  reveal in your answer your thoughts, your mental
5  impressions, your motivations about legislation. To the
6  extent you can answer the question without doing so,
7  with respect to referring to the matters of the public
8  record, you can.
9      A. Say that again.
10     Q. (By Mr. Fisher) Do you have any general
11 knowledge about someone impersonating another voter,
12 someone voting multiple times, or someone who is not
13 eligible to vote, voting in Texas?
14     MR. SWEETEN: The same instruction.
15     A. That would be legislative privilege on what I
16 believe is the -- on general knowledge.
17     Q. (By Mr. Fisher) Have you heard of any
18 allegations of someone doing any of those types of
19 things?
20     MR. SWEETEN: Again, you can answer to the
21 extent that you're not revealing your thoughts, mental
22 impressions, opinions, or motivations about legislation,
23 or communications that you had with legislators or staff
24 members, any other.
25     A. Repeat the question.

## 60

1      MR. FISHER: Can you repeat the question?
2      (The requested portion read back by the
3  court reporter.)
4      A. I assert my general -- I mean, my legislative
5  privilege.
6      Q. (By Mr. Fisher) So you assert your legislative
7  privilege over whether you've heard allegations about
8  someone impersonating another voter, someone voting
9  multiple times, or someone voting who is not eligible to
10 vote; is that correct?
11     A. Yes.
12     Q. Are you aware of any complaints regarding
13 someone impersonating another voter, someone voting
14 multiple times, or someone who is not eligible to vote,
15 voting in Texas, to your office?
16     MR. SWEETEN: The same objection. The
17 same instruction.
18     A. I assert my legislative privilege.
19     Q. (By Mr. Fisher) Are you aware of any
20 convictions in the state of Texas for any of those three
21 types of activities?
22     MR. SWEETEN: The same instruction. If
23 you can answer based upon the public record --
24     A. Yeah, I believe -- I believe there is -- I
25 believe there is public record that I have read that



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 61

1    there have been convictions.
2        Q.   (By Mr. Fisher) Are you aware of any of the
3    specifics of those convictions?
4        A.   I am not.
5        Q.   Do you believe that Texas's current system has
6    prevented voter fraud, as you have defined it here today
7    in your testimony?
8        MR. SWEETEN:  I'm going to again instruct
9    you:  With respect to the legislative privilege, do not
10   reveal thoughts, mental impressions, opinions,
11   motivation about legislation or in furtherance of the
12   legislative process, nor conversations with legislators,
13   the Leg staff, state agencies, Texas Leg Council, or
14   constituents.  You can answer the question to the extent
15   you are not revealing that information.
16       A.   Yeah.  I assert the privilege legislative
17   privilege on that.
18       Q.   (By Mr. Fisher) So you assert legislative
19   privilege over whether Texas's current system for
20   identifying a voter has prevented voter fraud, as you
21   have defined it today in your testimony; is that
22   correct?
23       A.   Yes.
24       Q.   When did you first hear about any support for
25   enacting a voter identification requirement in Texas?

## 62

1        MR. SWEETEN:  Same instruction.
2        A.   Yeah.  I assert legislative privilege.
3        MR. SWEETEN:  You can refer to matters of
4    the public record or matters that are not part of that.
5        A.   I don't recall anything on the public record,
6    so I just don't recall whenever I first read something
7    or saw something on that.
8        Q.   (By Mr. Fisher) Do you remember hearing
9    anything in the public about enacting voter -- photo
10   voter identification in Texas?
11       MR. SWEETEN:  You can answer.
12       A.   Yeah.  I'm sure I have.
13       Q.   (By Mr. Fisher) And what were the circumstances
14   of that?
15       A.   I don't recall.
16       MR. FISHER:  We're at a good stopping
17   point.  Let's take ten minutes.  I've got one o'clock.
18       (Recess from 1:00 p.m. to 1:16 p.m.)
19       Q.   (By Mr. Fisher) Okay.  Senator Patrick, do you
20   recall voter ID legislation in 2009 in the Senate?
21       MR. SWEETEN:  You may answer that
22   question.
23       A.   Yeah, you know, I recall it but, you know,
24   vaguely.  I do recall it.
25       Q.   (By Mr. Fisher) I'm going to hand you what's

## 63

1    been marked previously as Exhibit 29.  Okay.  Does this
2    document look familiar to you?
3        A.   Yeah.  I mean, it's -- it's legislation that
4    I've seen before, yeah.
5        Q.   Okay.  So this is a nine page document with a
6    notation, SB Number 362 in the upper right-hand corner.
7        A.   Okay.
8        Q.   Does this -- is this the bill concerning voter
9    ID that was introduced in 2009 in the Senate?
10       A.   It appears to be.
11       Q.   When did you first hear about SB 362?
12       A.   Boy, I don't remember.
13       Q.   Were you involved in the development of SB 362?
14       A.   I don't think so.
15       Q.   Were you the co-sponsor of SB 362?
16       A.   I'd have to check the record.  I would assume I
17   was but I'd have to check the record.
18       Q.   Were you a co-author of SB 362?
19       A.   It would have -- if I was one of the two, it
20   would be an author.  Because if it's a Senate bill that
21   originates, you're an author; if it's a House bill that
22   originates, you're a sponsor.  You can't be both.  So if
23   I was one, I would have been a co-author.  I'd have to
24   check the record.
25       Q.   Were you involved in developing the language in

## 64

1    SB 362?
2        A.   I don't believe I was.  I don't recall.
3        Q.   So you don't believe you participated in the
4    development of any of the language in SB 362?
5        A.   It's possible I could have, so I can't say with
6    certainty that I did not, but I don't believe I was
7    involved in it.
8        Q.   When SB 362 was being considered by the Senate,
9    did you have any communications with other legislators
10   about it?
11       MR. SWEETEN:  You can answer as to whether
12   or not you had communications.  Don't reveal the
13   substance of those however.
14       A.   I -- I'm sure I did.  I mean, I'm sure there
15   were --
16       Q.   (By Mr. Fisher) Do you remember any of those
17   conversations?
18       A.   I don't.
19       Q.   Did you have communications with any of the
20   staff of other legislators during the time that SB 362
21   was being considered by the Senate?
22       MR. SWEETEN:  Same instruction.
23       A.   I don't think so.  Could have, but I don't
24   think so.
25       Q.   (By Mr. Fisher) Did you have communications



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 65

1    with officials or legislators from any other states
2    about SB 362 when the Texas Senate was considering the
3    bill?
4        A.  I don't think so.
5        Q.  You don't think so, meaning you did or you
6    didn't?
7        A.  I don't believe I did.  With certainty could I
8    say I didn't, but I don't believe.  I don't remember
9    anything specific.
10       Q.  Any communications with anyone in Georgia?
11       A.  I don't recall that.
12       Q.  Any communications with anyone in Indiana?
13       A.  I feel certain the answer is no.
14       Q.  Any communications with interest groups?
15       A.  Do you want to define that?  Or is that just a
16   broad spectrum of -- there are all kind of groups.
17       Q.  To the extent you can answer, answer the
18   questions, please.
19           MR. SWEETEN:  And you can answer the
20   question so the extent you understand it.
21           THE WITNESS:  Yeah.
22           MR. SWEETEN:  But don't reveal the
23   substance of communication.  He's simply asking were
24   there communications.
25           THE WITNESS:  Yeah.

## 66

1            MR. SWEETEN:  You can answer that.
2        A.  It's -- it's possible I could have talked to a
3    group, but I don't -- I don't recall anything
4    specifically.  But like I say, with certainty, that I
5    didn't ever have a conversation with someone.
6        Q.  (By Mr. Fisher) Did you have any communications
7    with groups representing minority voters?
8        A.  Again, I can't recall specifically any
9    communication with any group.  Could have happened but I
10   don't recall it.
11       Q.  Do you remember SB 362?
12       A.  Not -- not specifically.  You know, I mean, not
13   clearly.
14       Q.  So the matters that SB 362 addresses, meaning
15   voter ID are not that important to you; is that
16   correct?
17           MR. SWEETEN:  Objection,
18   argumentative.  Also you're asking him to reveal
19   thoughts, mental impressions, opinions, motivations
20   about legislation.  As to whether or not it's important
21   to him is a -- is a question that would clearly impact
22   that.  So I'm not going to -- I'm going you instruct him
23   not to answer the question based on legislative
24   privilege.
25       A.  Yeah, I assert legislative privilege.

## 67

1        Q.  (By Mr. Fisher) Are you asserting legislative
2    privilege on the advice of your counsel with regard to
3    that last question?
4            THE WITNESS:  I can?
5            MR. SWEETEN:  Yeah.
6        A.  I assert legislative privilege on the -- on the
7    question that you asked.
8        Q.  (By Mr. Fisher) Is voter ID an issue you that
9    consider important?
10           MR. SWEETEN:  Same objection.  Same
11   instruction.
12           Don't answer the question.  Legislative
13   privilege.
14       A.  I assert legislative privilege.
15       Q.  So you assert legislative privilege over
16   whether you consider voter ID to be an important issue?
17           MR. SWEETEN:  Your question asks that he
18   reveal his thoughts, mental impressions, opinions,
19   motivation about legislation regarding SB 362 or in
20   furtherance of the legislative process.  As such, it
21   is -- it is --he's asking for matters that are clearly
22   afforded privilege under the legislative privilege.
23       Q.  (By Mr. Fisher) Senator, you're asserting
24   legislative privilege over that question?
25       A.  Yes.

## 68

1        Q.  Is that on the advice of your counsel?
2        A.  Yes.  And I believe that's appropriate for me
3    to do.
4        Q.  SB 362 aside, is voter ID an important issue
5    for you as a Texas State Senator?
6            MR. SWEETEN:  Okay.  As you are sitting
7    here today, you can answer just that question as you're
8    sitting here today; but don't reveal matters of
9    privilege
10       A.  Okay.  Repeat the question.  Sorry, I don't
11   mean to -- but just -- I want to be sure I get this
12   right.
13           MR. FISHER:  Can you repeat the question,
14   please.  Thank you.
15           (The requested portion was read by the court
16   reporter.)
17       A.  Yes.
18       Q.  (By Mr. Fisher) SB 362 was considered in 2009;
19   is that correct?
20       A.  Yes.
21       Q.  And the subject matter of SB 362 was voter ID;
22   is that correct?
23       A.  Yes.
24       Q.  And as you sit here today, you testified that
25   voter ID is an important issue to you; is that correct?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 69

1    A.  Yes.

2    Q.  But you've also stated, as you sit here today,

3  that you can't recall any the specifics about SB 362; is

4  that correct?

5    A.  Consider -- considering that was about 3,000

6  bills ago, yes, I can't recall the specifics of it.

7    Q.  As you sit here today, how many issues do you

8  consider to be important to you as a Texas State

9  Senator?

10      MR. SWEETEN:  Objection, vague.

11      You can answer.

12    A.  Do you want to define that?

13    Q.  (By Mr. Fisher) Is it less than 3,000?

14    A.  Yes.

15    Q.  Roughly, how many?

16    A.  There are dozens of issues that are important

17  to me.

18    Q.  Do you take a particular interest in the bills

19  that address issues that are important to you?

20    A.  It depends on the issue, you know.  What is the

21  -- when you say take an interest, obviously you take an

22  interest.  You try to take an interest in

23  everything.  But there's -- there's only so much time

24  you can spend on any one issue.  There are limitations,

25  so...

## 70

1    Q.  So you said you try to take an interest in

2  everything.  Do you take an interest in things that are

3  your legislative priorities more so than other things?

4    A.  I -- take an interest in legislative

5  priorities, first, that -- that I write.  I didn't write

6  this bill.

7    Q.  You testified earlier you were not sure if you

8  authored this bill.  Is that still your testimony now?

9    A.  I think, you have to check the record.  I think

10  you asked if I co-authored.  I definitely didn't author

11  the bill.  I think your question was did I co-sponsor or

12  co-author and I clarified difference.  I'd have to check

13  the record.  I believe I co-authored it but I'd have to

14  check the record.  But I didn't author it.  I didn't

15  write it.

16    Q.  Did you support SB 362?

17    A.  Yes.

18    Q.  Did you vote for SB 362?

19      MR. SWEETEN:  You can answer.

20    A.  Yes.

21    Q.  (By Mr. Fisher) Did you have communications

22  with anyone about the forms of ID that were included in

23  SB 362?

24      MR. SWEETEN:  You can answer the question

25  as phrased.  Don't reveal the substance of the

## 71

1  communication, just the general subject matter.  Go

2  ahead.

3    A.  Yeah, I don't -- I don't recall, specifically,

4  going back three years ago.

5    Q.  (By Mr. Fisher) But it is your testimony that

6  voter identification is a priority issue for you as a

7  Texas State Senator as you sit here today; is that

8  correct?

9    A.  Yes.

10    Q.  And you don't remember if you had

11  communications with anyone about the forms of

12  identification included in the voter identification bill

13  in 2009; is that correct?

14      MR. SWEETEN:  Objection asked and

15  answered.  Objection, argumentative.

16      Go ahead.  You can answer.

17    A.  Yeah, I honestly can't recall the specific

18  conversations.  That's three years ago, about one of

19  hundreds of thousands of bills that we look at.

20    Q.  (By Mr. Fisher) Did you analyze or direct

21  anyone to analyze which registered voters did not

22  possess one of the required forms of identification

23  identified in SB 362?

24      MR. SWEETEN:  Do not answer the question.

25  He's asking matters that are protected by the

## 72

1  legislative privilege.

2    A.  I assert legislative privilege.

3    Q.  (By Mr. Fisher) Are you asserting legislative

4  privilege on the advice of your counsel with regard to

5  that question?

6    A.  Yes.

7    Q.  Did you read any research or analysis of voter

8  ID to assist you in your determination about whether to

9  support SB 362 or not?

10      MR. SWEETEN:  Okay.  Do not reveal

11  thoughts, mental impressions, opinions or motivations

12  about legislation or in furtherance of legislative

13  process.  His question clearly would, and I instruct you

14  not to the answer based on legislative privilege.

15    A.  I assert legislative privilege.

16    Q.  (By Mr. Fisher) Did you make a decision whether

17  to support or not support SB 362 at some point?

18    A.  Did I make a decision?  Yes.

19    Q.  Prior to making that decision, what did you

20  think was important to guide your determination --

21      MR. SWEETEN:  Do not answer --

22    Q.  (By Mr. Fisher) -- about whether to support or

23  not support SB 362?

24      MR. SWEETEN:  Objection, legislative

25  privilege.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Dan Patrick                                      May 30, 2012

| 73 | 75 |
|---|---|

**73**

1    Instruct you not to answer.
2    A.  Yeah, I assert legislative privilege.
3    Q.  (By Mr. Fisher) Did you conduct or instruct
4  anyone to conduct an analysis of the impact of SB 362 on
5  minority voters?
6    MR. SWEETEN:  Objection, calls for matters
7  subject to legislative privilege.
8    Instruct not to answer.
9    A.  I assert legislative privilege.
10    Q.  (By Mr. Fisher) Are you asserting legislative
11  privilege on the advice of your counsel with regard to
12  that question?
13    A.  Correct.
14    Q.  We discussed Section 5 of the Voting Rights Act
15  earlier.  If SB 362 had passed, would it have been
16  subject to the requirements of Section 5 of the Voting
17  Rights Act?
18    A.  I can't answer that specifically.
19    Q.  So you don't know if a bill like SB 362
20  concerning voter ID would be covered by Section 5 of the
21  Voting Rights Act; is that correct?
22    MR. SWEETEN:  Objection, vague.
23    Go ahead.  You can answer that question.
24    A.  Yeah, I assert legislative privilege on what I
25  thought at the time.

**74**

1    Q.  (By Mr. Fisher) Do bills concerning voter ID
2  identification remain subject to the requirements of
3  Section 5 of the Voting Rights Act today?
4    MR. SWEETEN:  Can you read that back.  I
5  missed first part.
6    A.  Yeah, I missed that too a little bit.
7    (The requested portion was read by the
8  court reporter.)
9    MR. SWEETEN:  Objection, asked and
10  answered.
11    I'm going to let you answer the question.
12    A.  Yeah, I'm a little unclear on that question if
13  you want to maybe rephrase it, take another shot at it.
14  I'm not sure I really understand that question.
15    Q.  (By Mr. Fisher) Are voter ID bills covered by
16  Section 5?
17    A.  Are voter IDs?  I could not give the legal
18  answer on that.
19    Q.  Can you give me a non-legal answer on that?
20    A.  I would assert privilege on what I think about
21  that issue.
22    Q.  So you're asserting legislative privilege over
23  whether voter identification bills are covered by
24  Section 5 of the Voting Rights Act, is that correct, as
25  you sit here today?

**75**

1    MR. SWEETEN:  Well, hold on a minute.  As
2  you're sitting here today, you can answer his question
3  as to whether or not voter ID bills are covered by that
4  as far as you know, but don't reveal matters of your
5  thought process as you were working on these -- this
6  legislation.
7    A.  I mean, I believe -- I believe they are.
8    Q.  (By Mr. Fisher) So if SB 362 had been passed,
9  would it have been subject to the requirements of
10  Section 5?
11    MR. SWEETEN:  I think that's been asked
12  and answered, but go ahead.
13    A.  I mean, I believe that it would have been.
14    Q.  (By Mr. Fisher) All right.  So we'll turn your
15  attention the Exhibit SB 362 which you have in front of
16  you.
17    A.  Okay.
18    Q.  It's a nine -- as I mentioned, nine-page
19  document with notation SB 362 in the upper right-hand
20  corner.  And I'd like to turn your attention to, if
21  you'll look at the bottom, there are page numbers, Page
22  3 of the exhibit.
23    A.  All right.
24    Q.  And that's Section 6, Section 63.001.
25    MR. SWEETEN:  Spencer, right here.  Are

**76**

1  you talking about Section 6?
2    MR. FISHER:  Correct.
3    A.  Page 3, Section 6, I have it.
4    Q.  (By Mr. Fisher) So please take a look at that.
5    MR. SWEETEN:  Caution the witness to
6  review the document.
7    A.  Okay.  I read it.
8    Q.  (By Mr. Fisher) What forms of identification
9  would have been allowed under SB 362?
10    A.  I do not recall.
11    Q.  Considering the document that's in front of you
12  identifying what forms of identification are permitted
13  under SB 362, does that change your answer?
14    A.  Can you show me where that is?
15    Q.  Section 6 -- Section 6 -- 63.001 B, "On
16  offering to vote, a voter must present to an election
17  officer at the polling place either:  1, One form of
18  identification listed in Section 63.0101 A; or 2, two
19  different forms of identification listed in Section
20  63.001 B."
21    A.  I -- I don't see the list.  What am I missing?
22    Q.  Well, Senator, it seems that the forms of
23  identification are incorporated by reference by this
24  section.  Does that seem correct to you?
25    MR. SWEETEN:  You can answer based on the



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

77

1    text of the bill that's in front of you.
2        A.  You're -- I don't see the forms listed in here
3    unless I'm looking at something different.
4        Q.  (By Mr. Fisher) Senator, when bills lay out
5    lists of things required, do they often incorporate --
6    are they incorporated by reference in other parts of the
7    bill?
8        A.  Yes.
9        Q.  Okay.  In the piece of the bill that you're
10   looking at here, does it seem to reference other
11   sections of the bill that do lay out the forms of
12   identification that are allowed?
13           MR. SWEETEN:  Read it carefully.
14       A.  Yes, listed in 63.0101.
15       Q.  (By Mr. Fisher) Okay.  So turning to Page 5.
16       A.  Okay.
17       Q.  63.0101 A.
18       A.  Okay.
19       Q.  The following documentation is an acceptable
20   form of photo identification under this chapter.  Would
21   you please read --
22       A.  Sure.
23       Q.  -- the sections after that.
24       A.  Sure.
25       Q.  And that would be 1, 2, 3, 4 --

78

1        A.  Okay.  I'm sorry, I was confused --
2        Q.  -- 5 and 6.
3        A.  -- on there.  Okay.
4        Q.  So what forms of identification would have been
5    allowed under SB 362?
6        A.  As I'm reading the legislation:  A driver's
7    license or a public identification card issued by the
8    Department of Public Safety, a certificate that contains
9    the person's photograph of citizenship, a concealed-
10   carry license, a person's photograph on a valid ID by an
11   agency or institution of the federal government, agency
12   institution or political subdivision of the state, also
13   a voter registration certificate or an official mail
14   address to the person, the birth certificate,
15   citizenship, court records on adoption, identification
16   card issued by a person of government entity, a
17   temporary driving permit, a pilot's license, a library
18   card, a hunting and fishing license.  I'm reading this
19   quickly but it would appear.
20       Q.  Okay.  And if we can reference the section I
21   showed you first, I think you'll see that one form of
22   identification under Section A is permitted, or two
23   forms of identification under Section B are permitted;
24   is that correct?
25       A.  Correct.

79

1        Q.  While SB 362 was being considered by the
2    Senate, did you consider proposing any additional forms
3    of identification, either to Section A or Section B,
4    photo or non-photo, identification?
5            MR. SWEETEN:  Objection, based on
6    legislative.
7            I would ask -- it would require you to
8    reveal thoughts, mental impressions, opinions,
9    motivations about legislation or in furtherance of the
10   legislative process of which that's legislative
11   privilege.  You can refer to matters of the public
12   record to answer.
13       A.  The public record that I offered, you can ask
14   me if I can answer, but I don't recall.
15       Q.  (By Mr. Fisher) What was the purpose of SB 362?
16           MR. SWEETEN:  You can answer as to the
17   general purpose, and in that regard I'm going to pull
18   out the Court Order.
19           The Court has ordered that the privilege
20   does not protect testimony with respect to the general
21   purpose or the purpose of a legislature as a whole in
22   enacting Senate Bill 14 as opposed to the subjective
23   intent.
24           So you can testify as to, to the extent
25   you know, as to the general purpose of the enactment of

80

1    the legislation.
2        A.  The purpose of the legislation was to protect
3    the integrity of the ballot box.
4        Q.  (By Mr. Fisher) And what does it mean to
5    protect the integrity of the ballot box?
6        A.  That people who vote are who they say they are,
7    and are registered, legal voters.
8        Q.  In 2009, was there people -- was there a
9    particular problem with people voting who were not who
10   they said they were or not legally registered voters?
11           MR. SWEETEN:  To the extent this question
12   asks you to reveal your thoughts, your mental
13   impressions, your opinions, motivation about legislation
14   or in furtherance of the legislative process or
15   communications that we've outlined previously, don't
16   reveal that information.
17       A.  I would assert legislative privilege.
18       Q.  (By Mr. Fisher) Are you asserting legislative
19   privilege over that question on the advice of your
20   counsel?
21       A.  Yes.  Yes, I am.
22       Q.  Are you aware of any public debate about
23   whether, in 2009, there was a particular problem with
24   voters voting who were not who they said they were, or
25   voters voting who were not legally eligible to vote?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

81

1          MR. SWEETEN:  You can answer the question
2    as phrased.
3       A.   Yeah, there was debate on the Senate Floor.
4    So, yes.
5       Q.   (By Mr. Fisher) How does the language of SB 362
6    prevent voters voting who are not who they say they are
7    or not eligible, legally eligible to vote?
8          MR. SWEETEN:  Objection.  The question
9    calls for you reveal matters subject to the legislative
10   privilege and require you to reveal your thoughts,
11   mental impressions, opinions and motivation about
12   legislation; therefore, I instruct you not to answer the
13   question.
14      A.   I assert legislative privilege.
15      Q.   (By Mr. Fisher) As you're looking at the
16   language -- as you're sitting here today looking at the
17   language of this bill sitting before you --
18      A.   Uh-huh.
19      Q.   -- how does the language of this bill remedy
20   the two problems you've just identified, that being,
21   voters voting who are not who they say they are, and
22   voters voting who are not legally eligible to vote?
23          MR. SWEETEN:  I think you're asking him to
24   reveal his thoughts, mental impressions, opinions about
25   legislation; therefore, I think that's a matter of

82

1    legislative privilege.
2       A.   I assert legislative privilege.
3       Q.   (By Mr. Fisher) Are you asserting legislative
4    privilege on the advice of your counsel in response to
5    that question?
6       A.   I'm asserting it on what I believe are my
7    rights.
8       Q.   Has your counsel advised you not to answer that
9    question based on legislative privilege?
10          MR. SWEETEN:  The record reflects what my
11   advice was, so.
12      A.   Yeah, I didn't hear him say that in that
13   particular question.  I didn't hear him advise me not to
14   answer that question.
15      Q.   (By Mr. Fisher) Is there any evidence in 2009
16   that the particular problems you've identified existed?
17          MR. SWEETEN:  To the extent that question
18   would require you to reveal your thoughts, your mental
19   impressions, opinions or motivation about legislation,
20   that matter would be legislatively privileged;
21   therefore, I object based upon that, and instruct you
22   not to answer on that basis.  In the event that you --
23   there are matters that you can testify that do not
24   invade the privilege, you can do so, on matters of
25   public record.

83

1       A.   I'm not aware of anything on the public record
2    and I would assert legislative on anything that's not.
3       Q.   (By Mr. Fisher) Did anyone contact your office
4    to alert you of evidence of any of the problems that
5    you've identified that would have been remedied by SB
6    362?
7          MR. SWEETEN:  I'm going to object.  I
8    think that if you're asking whether or not he had
9    communications, I'm going freely allow him to answer
10   that question.  But what you have -- the way you've
11   prefaced that question, I think you're asking a
12   specific -- more than a general subject matter
13   description of the conversation, so I would object to
14   that question.
15          However, Spencer, I will work with you.
16   If you want to ask, you know, questions of, you know,
17   that where it's not as loaded with the subject matter,
18   you're free to ask Senator Patrick.
19      Q.   (By Mr. Fisher) Did anyone communicate with
20   your office -- first of all, are you asserting
21   legislative privilege in response to my last question?
22      A.   Yes.
23      Q.   Is that on the advice of your counsel?
24      A.   Yes.
25      Q.   Did anyone contact your office, communicate

84

1    with your office, regarding the issues concerning
2    protecting the integrity of the ballot box?
3          MR. SWEETEN:  I'll -- I'll let you answer
4    the question.  Just yes or no.
5       A.   Yeah.  I'm sure they did.  I don't know the
6    specifics, but...
7       Q.   (By Mr. Fisher) Do you know who contacted you?
8       A.   No.
9       Q.   Do you know when?
10      A.   No.
11      Q.   How would SB 362 have been more effective in
12   presenting -- preventing in-person voter fraud than the
13   current practice?
14          MR. SWEETEN:  Is that the end of the
15   question?
16          I'm going to instruct you, as legislative
17   privilege that will require you to reveal your thoughts,
18   your mental impressions, your opinions or motivations
19   about legislation; therefore, instruct you not to
20   answer.
21      A.   I assert legislative privilege on the advice of
22   my attorney.
23      Q.   (By Mr. Fisher) So as you sit here today
24   looking at the language of SB 362 which is sitting in
25   front of you, can you tell me how this language would be



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

85

1    more effective in preventing voter impersonation than
2    what is currently in practice in Texas?
3        MR. SWEETEN:  Same objection.  That calls
4    for you to reveal your mental impressions, opinions,
5    motivations about legislation.  It's a matter of
6    legislative privilege.
7        A.  I will assert legislative on advice of my
8    attorney.
9        Q.  (By Mr. Fisher) Who were the main proponents of
10   SB 362?
11       MR. SWEETEN:  You can -- you can answer
12   that question.
13       A.  Yeah, I believe Senator Fraser was the author.
14       Q.  (By Mr. Fisher) Did you speak to Senator Fraser
15   about the bill?
16       A.  I would assert legislative on that.
17       Q.  Did you have a communication with Senator
18   Fraser about SB 362 at any time?
19       MR. SWEETEN:  Hold -- hold on.  You can
20   answer whether a communication occurred, the means of
21   communication, the date.  You can answer that, just
22   don't reveal the substance of the communication.
23       A.  Yeah.  The only thing I recall, specifically,
24   would have been a conversation.  You know, we talked
25   about it.  I don't -- I don't recall anything beyond

---

86

1    that.  Could have happened, but I don't recall that.
2        Q.  (By Mr. Fisher) So you're not certain if you
3    had a conversation with Senator Fraser; is that correct?
4        A.  I'm certain I had a conversation with Senator
5    Fraser on the bill at some point.  I do not recall any
6    other communication.
7        Q.  Was there anyone else present during that
8    conversation?
9        A.  That, I -- I couldn't tell you.  It been three
10   and a half years ago.  I don't recall if someone was
11   standing there in the room or not.
12       Q.  Was SB 362 a priority for others in the Texas
13   government, aside from Senator Fraser?
14       MR. SWEETEN:  You can -- you can refer to
15   matters of the public record in answering this
16   question.  Don't reveal specific communications you've
17   had with any legislators, staff, or other groups.
18       A.  Yeah.  I think it would be fair to say on the
19   -- you know, on the public record, you know, various
20   officials have stated their -- their support of this
21   legislation.
22       Q.  (By Mr. Fisher) Various officials like you?
23       A.  I think the -- I think the Governor has been on
24   public record in support of it.
25       Q.  Did you have any communications with the

---

87

1    Governor about SB 362?
2        A.  Not that I recall.
3        Q.  Did you have any communications with
4    legislators who opposed SB 362?
5        MR. SWEETEN:  You can answer as phrased.
6        A.  Yeah, you know, I don't recall anything
7    specific about it but I'm sure, you know, there was a
8    conversation on the Floor at some point or...
9        Q.  (By Mr. Fisher) So you did have communications
10   with legislators who opposed SB 362 --
11       A.  I couldn't tell you specifics --
12       Q.  Let me -- let me finish my question before you
13   answer.
14       You did have communications with
15   legislators who opposed SB 362; is that correct?
16       A.  I do not recall a specific conversation, but
17   I'm sure a conversation probably took place.
18       Q.  Who were the main opponents to SB 362?
19       A.  Every Democrat in the Texas Senate.
20       Q.  Are you aware of why they opposed SB 362?
21       MR. SWEETEN:  You can answer the
22   question.  You can refer to matters of the public
23   record.  Don't reveal communications you've had with any
24   individual senators, legislative staff, State agencies,
25   Texas Legislative Council, constituents.

---

88

1        A.  Yeah, I would assert legislative privilege on
2    those conversations.  And I'm not aware of specifically
3    anything anyone said publicly.  I'm sure they have
4    spoken out against it, but I don't -- I don't know of
5    anything specifically.
6        Q.  (By Mr. Fisher) So just to summarize:  You're
7    not aware of why those who opposed, and as you mentioned
8    every Democrat in the Senate opposed SB 362, and you're
9    not aware of why they opposed it; is that correct?
10       MR. SWEETEN:  Objection to the extent that
11   it would it call for him to reveal communications with
12   legislators on legislative staff.
13       Once again, you can refer to matters on
14   the public record in answering that question.
15       A.  Yeah, I assert legislative privilege on the
16   personal conversation and I just don't recall specifics
17   about --
18       Q.  (By Mr. Fisher) Are you aware of any public
19   debate regarding that issue?
20       MR. SWEETEN:  You can answer.
21       A.  Yeah, I'm aware of public debate on the issue
22   but not specifics of it.
23       Q.  (By Mr. Fisher) Do you know how the minority
24   members of the Senate felt about SB 362?
25       MR. SWEETEN:  Don't reveal any



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Dan Patrick                                              May 30, 2012

|||
|---|---|

89

1    communications you've had with legislators or
2    legislative staff in answering this question.  You can
3    reveal further matters of the public record in doing so.
4        A.  Yeah, on the record, based on their objection
5    on the Senate Floor, they were not supportive of the
6    bill.
7        Q.  (By Mr. Fisher) So you've stated that every
8    Democrat in the Texas Senate was opposed to SB 362.
9    You've stated that the minority members of the Texas
10   Senate were opposed to SB 362.  Why do you think there
11   was such strong opposition to SB 362?
12       MR. SWEETEN:  Don't reveal communications
13   you've had with those individuals.  You can further
14   answer to the public record.
15       Also, the question calls for speculation.
16       A.  Yeah, I -- yeah, I'm not going to speculate.
17       Q.  (By Mr. Fisher) Speculation's fine.  That's
18   what we're here for.
19       MR. SWEETEN:  No, we're not here for
20   speculation.
21       A.  I'm not going to speculate on why they would be
22   opposed to it.  I mean, I -- and I -- and I would assert
23   legislative privilege on any conversations we've had
24   about it.
25       Q.  (By Mr. Fisher) Do you place any significance

90

1    on the unified opposition of all minority members in
2    the Senate to SB 362?
3        A.  Can you read that question back?  I don't know
4    that I heard the whole thing.
5        Q.  Do you place any significance on the unified
6    opposition of all minority members in the Senate to SB
7    362?
8        MR. SWEETEN:  Yeah, that would require you
9    to reveal your thoughts, mental impressions, opinions or
10   motivations about legislation, specifically here 362;
11   therefore, it calls for matters of -- also it could
12   reveal -- require you to reveal communication.  So I'm
13   going to instruct you not to answer on the basis of
14   legislative privilege.
15       A.  On the advice of counsel, I assert legislative
16   privilege.
17       Q.  (By Mr. Fisher) What was your role during the
18   Floor consideration of SB 362?
19       MR. SWEETEN:  Are you talking about his
20   public role?
21       MR. FISHER:  Yes.
22       MR. SWEETEN:  He can testify about his
23   public role.
24       A.  As I best recall, it's been some time, I
25   believe we had 26 hours of testimony.  I believe my

91

1    public role -- and the record would reflect my public
2    role.  I believe it was limited to asking a question
3    potentially of a witness.  But I -- the record would
4    reflect whatever my public role was.  It was not
5    significant.
6        Q.  (By Mr. Fisher) During the Floor consideration
7    of SB 362, do you remember anyone raising concerns about
8    its impact on minority voters?
9        MR. SWEETEN:  You can answer.  It's about
10   the Floor consideration, public.
11       A.  Yes, I -- I don't recall the specifics, but I
12   think in general that would -- would have been the
13   objection.
14       Q.  (By Mr. Fisher) Do you remember -- what would
15   have been the objection?
16       A.  What you just said, that the objection on the
17   record on the Senate Floor was the concern by the
18   Democrats who opposed the bill, that it would impact
19   certain voters.  I don't remember the specifics but.
20       Q.  Minority voters; is that correct?
21       A.  Yeah, I -- I would -- the record would reflect
22   that, but I think that would probably be an accurate
23   statement that that's what the record would reflect --
24   would reflect.
25       Q.  What was your response to those concerns?

92

1        MR. SWEETEN:  If you're talking about his
2    public response on the Floor, he can answer that.  As
3    far as his response with respect to the legislation, he
4    -- that would be privileged, so.
5        A.  You'd have to check the record, but I -- again,
6    I think out of the 26 hours on the record, I -- I don't
7    think I participated more than maybe 10 minutes.  And I
8    think that was an answer to your question.  I stand to
9    be corrected if the record -- if the record reflects my
10   memory differently.  But I didn't have a role of any
11   significance whatsoever in the debate on the Floor.
12       Q.  (By Mr. Fisher) Did you have a reaction to
13   those concerns?
14       MR. SWEETEN:  Yeah, don't reveal your
15   thoughts, your mental impressions, your opinions or
16   motivations about legislation.
17       THE WITNESS:  Yeah.
18       MR. SWEETEN:  That's legislatively
19   privileged.
20       A.  Yeah, I would assert legislative privilege on
21   that.
22       Q.  (By Mr. Fisher) If you have unified opposition
23   of minority members of the Senate and Democratic members
24   of the Senate with regard to a bill, does that give you
25   any pause with regard to your support of that bill?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Dan Patrick                                                              May 30, 2012

---

93

1    MR. SWEETEN: Yeah, I think you're asking
2 him to reveal his mental impressions, his thoughts, his
3 opinions, or motivation about legislation and I think
4 that's subject to the legislative privilege.
5    Instruct you not to answer.
6    A. Yeah, I assert legislative on the advice of
7 counsel.
8    Q. (By Mr. Fisher) I'm going to hand you what will
9 be marked Exhibit 161.
10    (Exhibit 161 marked for identification.)
11    Q. (By Mr. Fisher) So it's a three -- three-page
12 document titled "Transcript of Proceedings before the
13 Senate of the State of Texas, 81st Legislature,
14 Committee of the Whole." And that's the first
15 page. And this is an excerpted document, so you have
16 Pages 646 through 653. The date on it is March 11,
17 2009; is that correct?
18    A. Yes.
19    Q. Do you recognize this document?
20    A. I haven't seen this before but I recognize
21 documents similar to this transcript.
22    Q. Do you remember the hearing that this document
23 memorialized?
24    A. I do.
25    Q. Okay. If I could direct your attention to the

---

94

1 second page of the document, on Page 648, and you'll see
2 your name there. And if you could read your response
3 contained there, please.
4    A. Okay, let me read it. I'm going to read it
5 from the top so I can see what led into this.
6    Q. Oh, please.
7    A. (Reading) How far do you want me to read?
8    Q. Just page -- I just wanted to read after your
9 name on 648. To extent you need more context, that's
10 fine.
11    A. Yeah, I do. I wanted to see what the context
12 was. Okay.
13    Q. Are you ready, Senator?
14    A. No. I'm just now reading my -- if you'd give
15 me a moment. Okay, I haven't read it all, but I'm ready
16 to -- if you want to ask me something.
17    Q. Do you remember making the statement, "Let me
18 -- excuse me, I didn't ask that question. The question
19 was our last witness clearly indicated proof that people
20 voted on behalf of dead people. So don't sit there and
21 say there's been no evidence."
22    A. I didn't remember it until I read it here. But
23 I think this accurately reflects my earlier testimony
24 that of 26 hours I was not much of a participant. This
25 probably lasted about two minutes, so. I didn't recall

---

95

1 it specifically but do I recall this -- I do recall this
2 witness.
3    Q. Well, let me be clear, this isn't the entire
4 transcript of the hearing. This is a portion of it --
5    A. Right.
6    Q. -- so this might not reflect all of your
7 participation in the hearing. Understood?
8    A. Yes. I believe it does, but the record would
9 reflect that.
10    Q. Did you have any additional evidence outside of
11 the context of this hearing that people voted on behalf
12 of dead people?
13    MR. SWEETEN: Yeah, that would require him
14 to reveal his thoughts, mental impressions, opinions or
15 motivations about the legislation. So a matter of
16 legislative privilege.
17    A. Yeah, I -- I assert legislative privilege on
18 that.
19    Q. (By Mr. Fisher) Okay, you're asserting
20 legislative privilege on the advice of your counsel with
21 regard to that question?
22    MR. SWEETEN: You can refer to matters on
23 the public record, but don't reveal privileged matters.
24    A. Yeah.
25    Q. Had you done any studies or analysis of this

---

96

1 matter of people voting on behalf of dead people?
2    MR. SWEETEN: Same objection.
3    Don't reveal your thoughts, mental
4 impressions, opinions or motivations about legislation
5 or communications that were outlined previously. Those
6 are matters subjective to legislative privilege.
7    A. Not that I recall.
8    Q. (By Mr. Fisher) So your answer is not that you
9 recall --
10    A. Yeah, I --
11    Q. -- as far as studies and analysis of the
12 matter; is that correct?
13    MR. SWEETEN: Well, my instruction is
14 don't reveal matters that are subject to the legislative
15 privilege. You're thoughts, mental impressions,
16 opinions or motivations about legislation. Okay?
17    THE WITNESS: Yeah.
18    A. Yeah, I don't recall doing a study on that
19 issue.
20    Q. (By Mr. Fisher) Outside of the context of the
21 witness that you have mentioned here, in your testimony,
22 do you recall anything else in the public record of this
23 hearing supporting the fact that people voted on behalf
24 of dead people?
25    MR. SWEETEN: He can answer because --

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

**97**

1    A.  Yeah, I don't -- I don't recall even who the
2  witness was before this that we were talking about, but
3  that's what I recall.  I mean, I'm looking at the
4  record.
5    Q.  (By Mr. Fisher)  What you recall is this -- is
6  this one witness you referred to here; is that correct?
7    A.  Correct.
8    Q.  Do you recall anything beyond this one witness
9  that you referred to here?
10        MR. SWEETEN:  On the public record?
11        MR. FISHER:  Correct.
12        MR. SWEETEN:  Okay.  You can answer.
13    A.  Yeah, I don't.
14    Q.  (By Mr. Fisher)  You do not?
15    A.  Nuh-uh.
16    Q.  Had you ever heard of any investigations for
17  this type of activity, that is, people voting on behalf
18  of dead people?
19        MR. SWEETEN:  Okay.  If the question would
20  ask you to reveal any communications you've had with
21  senators, legislative staff or other members, don't
22  reveal that.  Also don't reveal thoughts, mental
23  impressions, opinions or motivations about legislation
24  in answering the question.  You can refer to matters of
25  the public record.

---

**98**

1    A.  Yeah.  Your question was?  I'm sorry, I hate to
2  make you repeat it, but...
3    Q.  (By Mr. Fisher)  Had you heard of any
4  investigations for this type of activity, that is,
5  people voting on behalf of dead people?
6        MR. SWEETEN:  Same instruction.
7    A.  Not that I recall.
8    Q.  (By Mr. Fisher)  So you had not heard of any
9  public information regarding investigations into people
10  voting on behalf of dead people?
11    A.  Not that I recall.
12    Q.  Convictions for that type of activity?
13        MR. SWEETEN:  Object --
14    Q.  (By Mr. Fisher)  And convictions are public
15  knowledge.
16        MR. SWEETEN:  Objection to the question.
17  Again, you can refer to matters of the
18  public record but don't reveal your thoughts, your
19  mental impressions about legislation or communications
20  you've had.  Those are subject to the privilege.
21    Q.  (By Mr. Fisher)  Just to clarify, Senator, I
22  asked about convictions.  So a conviction would be
23  something that's part of the public record.
24        MR. SWEETEN:  Well, but you're asking him
25  did he consider convictions.  And that reveals his

---

**99**

1  mental impressions and opinions.  So, again, he can
2  testify as to what was on the public record, what was
3  stated.
4        But don't reveal your mental impressions
5  or thought process with respect to that.
6        THE WITNESS:  Right.
7    A.  And I did not hear you say "consider," so.
8    Q.  (By Mr. Fisher)  That's because I didn't.
9        Senator, have you heard of any convictions
10  of this type of activity of people voting on behalf of
11  dead people?
12        MR. SWEETEN:  You can refer to matters of
13  the public record.
14    A.  Yeah, earlier I testified that I believed there
15  was something on the public record about conviction, but
16  I can't -- I think I also testified that I didn't know
17  exactly what that public record was.  So, I can't recall
18  specifically the issue that you just asked me about.
19    Q.  (By Mr. Fisher)  So if we turn to Page -- and
20  this is the same exhibit that's been marked as 161.  If
21  we turn to Page 651, Senator, which is the third page of
22  this document.
23    A.  Yes, I see it, uh-huh.
24    Q.  And you'll see your name on Page 651 and I'd
25  like to read what's after your name there and then to

---

**100**

1  the extent that you need to read any more to provide you
2  context, then please -- please do that as well.
3    A.  (Reading)  Yes.  Okay, I've read it.
4    Q.  Okay.  So to the extent that your statement
5  "Oh, I can -- oh, I can assure you I meet with hundreds,
6  thousands, I talk with them, I know my district, I'm
7  very well connected to the people in my district.  And
8  the seniors of my district, who are members of the AARP,
9  support this bill.  Thank you."
10        Did you really speak to hundreds or
11  thousands of constituents about SB 362?
12        MR. SWEETEN:  If -- I think you're
13  misstating the -- the record.  So misstates the facts
14  and assumes facts not in evidence in the question.
15        You can reveal whether or not you had
16  communications with individuals.  Don't reveal the
17  substance of those if they're constituents.
18        THE WITNESS:  Right.
19    A.  Your question, do -- have I met with hundreds
20  or thousands?
21    Q.  (By Mr. Fisher)  Let's start with thousands.
22  Did you meet with thousands of constituents in which the
23  issue of SB 362 came up?
24    A.  I think that would be a fairly accurate
25  statement because I'm involved in -- in a number of



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 101

1    events.  I can't tell you when and where but, I mean,
2    events where large numbers of people show up and I
3    represent a district of a million people.  And I do lots
4    of speeches and talk to people.  And lots of times
5    there's two hundred in a group, and you do two of those
6    a week.  So I think that's an accurate statement that,
7    over time, I've met with hundreds of thousands --
8    hundreds -- not of thousands -- hundreds or thousands of
9    people over a period of time.  I think that's close to
10   accurate.
11       Q.  So if you could explain this statement further,
12   are you saying that these thousands that you've met with
13   express support for SB 362?
14           MR. SWEETEN:  You can reveal whether or
15   not you've had communications with constituents.  I'm
16   going to let you do that.  But to the extent he's asking
17   you to reveal your mental impressions, your thoughts, or
18   opinions about legislation, you know, don't do that or
19   -- or the specifics of communications that you've had
20   with individuals.  So do you understand the instruction?
21           THE WITNESS:  Yes.
22           MR. SWEETEN:  Okay.
23           THE WITNESS:  I hope so.
24       A.  I think I can answer this clearly.  That this
25   issue is strongly supported by the people that I

## 102

1    represent in Senate District 7, when I have met with
2    them.
3        Q.  And by "issue," you mean?
4        A.  Photo voter ID.
5        Q.  (By Mr. Fisher) Photo voter ID, you said was an
6    issue that's strongly supported by the members of your
7    District 7.  Is that specific to SB 362 or
8    is that as a general matter?
9            MR. SWEETEN:  The question asks you
10   matters that are subject to the legislative privilege.
11   Because what he's asking you is to characterize whether
12   there's support for a specific bill.  You can testify as
13   to whether you had communications.  I've allowed that to
14   go on.  But I don't want you to testify as to general
15   support or your legislative thought process as you're
16   working a bill.  So you can answer to the extent you're
17   not, you know, discussing support.  You can talk about
18   whether you've had conversations with individuals.
19           That's how I believe that's subject to the
20   legislative privilege.
21       A.  I assert legislative on the specific bill in
22   terms of -- of what people have said.
23       Q.  (By Mr. Fisher) But, Senator, right now we're
24   talking about a public statement with regard to SB 362;
25   is that correct?

## 103

1        A.  A public statement?  You're talking about this?
2        Q.  I'm talking about Exhibit 161 --
3        A.  Correct.
4        Q.  -- and your statement that I directed you to on
5    Page 651; is that right?
6        A.  Correct.
7        Q.  Okay.  And in this statement you say, "I meet
8    with hundreds, thousands, I talk with them, I know my
9    district, I'm very well connected to the people in my
10   district.  And the seniors of my district, who are
11   members of the AARP, support this bill.  Thank you."  Is
12   that correct?  Did I read the language correctly?
13       A.  You're correct.
14       Q.  Did you speak with thousands of constituents
15   about SB 362?
16           MR. SWEETEN:  Objection, asked and
17   answered.
18           You can answer.
19       A.  Yeah, I did not speak to thousands,
20   specifically, on this bill.  I have spoken to hundreds
21   or thousands of my constituents over time.
22       Q.  And those hundreds and thousands support SB
23   362; is that correct?
24       A.  At the time when this bill was the legislation
25   to address the issue of photo voter ID, there was

## 104

1    support for that issue.  People don't know what a bill
2    number is.  People don't know specific legislation.  But
3    they support the issue.
4        Q.  Did you conduct a survey of the members in your
5    district on this matter?
6            MR. SWEETEN:  Objection.  I think that
7    calls for him to reveal his mental impressions,
8    opinions, motivation about legislation or in furtherance
9    of the legislative process.  And I think this matter is
10   legislative.
11           He can, again, let him discuss whether or
12   not he's had conversations, that's fine.
13       A.  Yeah.  There may or may not be a public
14   statement or question or poll.  I don't recall
15   specifically if I have done that or not.  Could be.  I
16   just -- I don't -- I don't know.  From time to time we
17   poll people, it's public record, but I can't tell you
18   what year and what question.
19       Q.  (By Mr. Fisher) Do you have the records
20   regarding the communications you had with hundreds,
21   thousands of people in your district who support or
22   supported SB 362?
23           MR. SWEETEN:  You can answer as to whether
24   or not you have records.
25       A.  Yeah.  If we asked that question in a poll, we



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

105

1    would have a record of that.
2        Q.   (By Mr. Fisher) Did you speak to any seniors
3    who did not support this bill?
4            MR. SWEETEN:  You can answer.
5        A.   Not that I recall.
6        Q.   (By Mr. Fisher) So you've spoken to hundreds
7    and thousands of people in your district and not one has
8    expressed a dissenting voice regarding this bill?
9            MR. SWEETEN:  Objection, the question is
10   not limited to time, scope.
11       A.   Yeah.
12       Q.   (By Mr. Fisher) When SB 362 was being
13   considered -- let me rephrase.
14       A.   And let me be clear when I say that I speak to
15   hundreds or thousands, that is not a personal one-on-one
16   conversation, that's a group presentation.  It may be
17   personal conversations but it's primarily speeches and
18   going to meetings and where you don't specifically talk
19   to every person.  So I do not recall.  I do not recall.
20   It could have happened.  I don't recall a person ever
21   coming to me and not being supportive of that.
22       Q.   When you meet with large groups of people,
23   meaning hundreds or thousand of people, how do you know
24   that they support what it is that you're discussing?
25       A.   They usually tell me, applaud, say they don't

---

106

1    support it.  I mean, it's like any other communication
2    in life when you speak to group, they usually indicate
3    their preference.
4        Q.   Is it fair to say in a large group setting like
5    that, you would be unsure if there was someone who
6    didn't support the bill sitting in the meeting?
7        A.   That's -- that would always be possible.
8        Q.   So is it fair to say that your statement on
9    Page 651 is either a mischaracterization of a -- it's a
10   -- is a mischaracterization of the facts?
11       A.   No, because I don't recall anyone that ever
12   being -- not supportive of it.  I don't recall that.
13       Q.   But you said that the support that you
14   described here is based upon meetings with large groups
15   of individuals; is that correct?
16       A.   Yes.
17       Q.   And the support that you've described here is
18   not based upon one-on-one meetings with hundreds and
19   thousands of your constituents; is that correct?
20           MR. SWEETEN:  That mischaracterizes his
21   testimony.
22           But go ahead.  You can answer it.
23           THE WITNESS:  How did it mischaracterize
24   my testimony?
25           MR. SWEETEN:  Well, you -- you go ahead

---

107

1    and answer to the extent.
2            MR. FISHER:  Yeah.
3            MR. SWEETEN:  That's just my objection to
4    the question.  I think it mischaracterizes what -- the
5    testimony.
6            But you go ahead and answer to the extent
7    you can answer.
8        A.   I meet with small/large groups of people that
9    total up hundreds or thousands.  During that period of
10   time, I do not recall.  It could have been, but I don't
11   recall any significant or any objection to this
12   legislation, I just don't recall it.
13       Q.   (By Mr. Fisher) But if you're meeting a large
14   group of people, how would that -- how would such an
15   objection be lodged?
16       A.   Someone would say they object.
17       Q.   Has that ever happened before?
18       A.   As I said, I don't recall anyone ever raising
19   their hand or coming up to me afterwards and saying,
20   "Senator, I don't support this bill."  I just don't
21   recall.
22       Q.   Has that happened in the context of other
23   bills?
24       A.   Oh, yes.  Yes.
25       Q.   So in this bill, you never did encounter

---

108

1    opposition during a large group meeting, but in other
2    contexts, you have; is that correct?
3        A.   Yes.
4        Q.   Did you speak specifically to any racial
5    minorities in your district with regard to SB 362?
6            MR. SWEETEN:  You can answer as to whether
7    you spoke with.
8        A.   Did I speak to the issue of racial minorities
9    or to racial minorities?
10       Q.   (By Mr. Fisher) Did you speak to racial
11   minorities in your district with regard to the issue of
12   SB 362?
13       A.   People are invited to our meeting, I don't -- I
14   don't look at the audience to see the makeup of the
15   audience, so I would assume, yes, and that's the best
16   way I can answer that question.
17       Q.   Is it fair to say, then, that you didn't
18   specifically seek out racial minorities to speak to
19   about the issue of the SB 362?
20           MR. SWEETEN:  You're asking about his
21   thought processes and his mental impressions and
22   opinions, motivations about legislation or in
23   furtherance of legislative processes to whether he
24   sought out someone.  So I think that that implicates
25   matters of legislative privilege.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Dan Patrick                                    May 30, 2012

## 109

1   Q.   (By Mr. Fisher) Senator?
2   A.   I'm just -- I'm trying to think how to answer
3   your question.
4        MR. SWEETEN:  Yeah, I'm -- I'm going to
5   object to --
6   A.   Yeah, I -- I think I would assert privilege --
7        MR. SWEETEN:  -- and I instruct you not to
8   answer.
9   Q.   (By Mr. Fisher) Are you asserting on the basis
10  of advice from your counsel?
11  A.   Yes.
12       MR. SWEETEN:  And just to be clear:  He
13  will answer whether or not he's had specific -- and I
14  think he has had specific discussions with my minority
15  voters.  He can testify about whether communications
16  occurred, means, date.
17  Q.   (By Mr. Fisher) Did any of the seniors you
18  identified in your statement tell you they might not
19  have the kinds of identification required by SB 362?
20       MR. SWEETEN:  I'm sorry.  Can you -- can
21  you read the question back, please?
22       (Requested portion was read back by the
23  court reporter.)
24       MR. SWEETEN:  Yeah, I think you're asking
25  about specific conversations he had with constituents.

## 110

1   I think that is covered by the legislative privilege.
2        I instruct you not to answer to the
3   specifics.
4        If you want to ask about the general
5   subject matter which is something the Court has allowed,
6   I'll allow him to do that.
7   A.   I'll assert legislative privilege on the advice
8   of counsel.
9   Q.   (By Mr. Fisher) Did you have any general
10  conversations with seniors regarding the types of
11  identification required by SB 362?
12       MR. SWEETEN:  You can answer as phrased.
13  A.   I don't recall that I went down the list of
14  specific identification under the bill.  That I don't
15  recall.
16  Q.   (By Mr. Fisher) Would it surprise you if
17  seniors in your district did not have the identification
18  required by SB 362?
19       MR. SWEETEN:  You're now asking his -- to
20  reveal his thoughts, his mental impressions, his
21  opinions, motivation about legislation and the
22  legislative process.
23       Therefore, I'm going instruct you that
24  that is a matter covered by legislative privilege.
25  A.   Then I would assert legislative privilege.

## 111

1   Q.   (By Mr. Fisher) Did you have any meetings with
2   minority groups concerning SB 362?
3        MR. SWEETEN:  You can answer as phrased.
4   A.   I do not recall having any specific meetings on
5   Senate Bill 362 with any group.
6   Q.   (By Mr. Fisher) I'm going to hand you the next
7   exhibit which will be 162.
8        (Exhibit 162 marked for identification.)
9   Q.   (By Mr. Fisher) So this is a similar three-page
10  document, similar to the last one you looked at, titled
11  "Transcript of Proceedings before the State -- Senate of
12  the State of Texas, 81st Legislature, Committee of the
13  Whole Senate," and this is excerpted Pages 694 through
14  701.
15  A.   Okay.
16  Q.   So do you remember the portion of the hearing
17  that this -- that this document memorializes?
18  A.   This, I don't remember but I'll have to...
19  Q.   Okay.  I'll direct your attention to Page 697,
20  please.
21  A.   All right.
22  Q.   And you'll see that you have a response there,
23  where you start out by saying, "Thank you,
24  Mr. Chairman."
25  A.   Yes, I see that.

## 112

1   Q.   You see that?
2   A.   Uh-huh.
3   Q.   Okay.  Would you take a look at that for me.
4   A.   Yeah.  Let me read that.  (Reading.)  Yes, I
5   have read it.
6   Q.   (By Mr. Fisher)  So at the time you were
7   considering SB 362, did you have any specific examples
8   of someone actually doing what you've described on Page
9   697?
10       MR. SWEETEN:  Okay.  Don't reveal your
11  thoughts, mental impressions, opinions or motivation
12  about legislation or the legislative process.  Don't
13  reveal communications you've had with legislators,
14  legislative staff, TLC, state agencies or constituents
15  in answering the question.  You can refer to matters of
16  the public record.
17  A.   Yeah, I don't -- I don't recall.
18  Q.   (By Mr. Fisher) Are you asserting legislative
19  privilege over that question, or you don't recall an
20  answer?  You don't recall an answer to the question?
21  A.   I don't -- I don't recall.  I mean, I'm
22  answering the question.  I -- I just don't recall.
23  Q.   So you don't recall any support for your
24  statement on Page 697; is that correct?
25       MR. SWEETEN:  Objection.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 113

1    It calls for you to reveal matters subject
2  to the legislative privilege.  I instruct you only to
3  answer with respect to the matters of the public record.
4    A.  So I'll assert legislative privilege.  I
5  answered your question.
6    Q.  (By Mr. Fisher) Are you aware of any cases like
7  this ever happening in Texas, based on public
8  information?
9    MR. SWEETEN:  Same objection.
10    You can refer to matters of the public
11  record though.
12    A.  Yeah, I'll assert legislative privilege on
13  that.
14    Q.  (By Mr. Fisher) So you'll assert legislative
15  privilege over whether you're aware of any public
16  information that supports your statement on Page 697 of
17  this transcript; is that correct?
18    MR. SWEETEN:  Again, you know, with
19  respect to the legislative privilege, don't reveal
20  thoughts, mental impressions, your motivation about
21  legislation or the legislative process.  You can answer
22  with respect to matters that are on the public record.
23    A.  Yeah, I think you said public record the second
24  time.  I'm not so sure you said it in the question the
25  first time.  So if you want to just clarify.

## 114

1    MR. FISHER:  Can you read it back, please.
2    (The requested portion was read by the
3  court reporter.)
4    A.  Okay, I -- I did not recall you saying public
5  statement in your first question.  If you're asking me
6  do I recall anything that's a public statement, I don't
7  recall a public statement.
8    Q.  (By Mr. Fisher) Are you aware of any public
9  information that supports your statement on page 697?
10    MR. SWEETEN:  Same objection as to
11  legislative privilege.
12    Don't reveal matters subject to the
13  legislative privilege.  You can reveal matters that are
14  -- are within the public record.
15    A.  Yeah.  I don't recall -- I don't recall
16  anything on the public record.
17    Q.  (By Mr. Fisher) Are you aware of any
18  convictions for the type of activity that you described
19  on Page 697 of this transcript?
20    MR. SWEETEN:  Same instruction.
21    A.  Yeah, and I've answered this question before
22  that I'm aware, in general, that there's been a public
23  statement about convictions but I'm -- I'm not aware
24  specifically of what those convictions were for.
25    Q.  (By Mr. Fisher) So you mentioned in this

## 115

1  statement you say -- actually, let's move on.
2    Let's move on to Page 698.  If you could
3  take a look at your statement on Page 698.
4    A.  All right.
5    Q.  So your statement, "The last part of the
6  question, if you had registrations in the same precinct,
7  you could go back over a period of multiple days if you
8  are willing to take that risk and vote.  So a person
9  could vote more than once.  I mean, it's not an extreme
10  thought that someone could register under several
11  different names."
12    You mentioned taking a risk.  What would
13  that risk be?
14    MR. SWEETEN:  Wait a minute.  You're
15  asking -- are you reading still?  You mentioned taking a
16  risk, or is that a question?
17    MR. FISHER:  It's a quote from the
18  document.
19    MR. SWEETEN:  Okay.  He -- he can testify
20  about matters on the public record.  He's not going to
21  reveal, based upon the legislative privilege, his
22  thoughts or his mental impressions about this
23  legislation or his opinions about it or his motivation
24  about the legislation.  That's subject to the
25  legislative privilege.

## 116

1    I instruct you not to reveal that
2  information.  You can refer to matters of the public
3  record.
4    A.  I assert public privilege -- I mean,
5  legislative privilege.
6    Q.  (By Mr. Fisher) Legislative privilege over
7  that?
8    A.  Yeah.
9    Q.  So, on the public record, you say, "willing to
10  take that risk and vote."  And you assert legislative
11  privilege over what that risk is; is that correct?
12    MR. SWEETEN:  That's correct because he's
13  -- you're asking him more than what's on the public
14  record, to reveal his thoughts and mental impressions
15  about legislation.  So he can -- he'll answer as to
16  whether something occurred on the public record.  He can
17  refer to the public record.  But he's not going to
18  reveal his mental impressions or thoughts that came up
19  through the legislative process.  And you're asking him
20  to do that.
21    And I instruct not to answer based on
22  legislative privilege.
23    A.  At request of counsel, legislative -- I assert
24  legislative privilege.
25    Q.  (By Mr. Fisher) What does taking a risk mean to



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 117

1   you, Senator?
2       MR. SWEETEN:  Same objection as to -- in
3   the context of this statement or if you're asking him to
4   explain this statement.  That is my instruction, that
5   it's legislative privilege.
6       If you want to ask as a general matter, as
7   he's sitting here, not involved with this legislation,
8   what is taking a risk to him, I'll allow him to answer
9   that question.
10      A.  Taking a risk would be doing something illegal.
11      Q.  (By Mr. Fisher) Is there a criminal penalty for
12  the type of activity you describe on Page 698?
13      A.  I'm not aware if it's criminal or civil or what
14  the penalty is, but there is penalty to the best of my
15  knowledge, under the law.  I'd have to look at the law
16  of voting illegally.
17      Q.  So under the law as it currently stands, there
18  is a criminal or civil penalty for the type of activity
19  you've described on Page 697 and 698 of this transcript;
20  is that correct?
21      A.  I believe that to be true, but I'd have to look
22  at the law.
23      Q.  Did you receive any complaints concerning this
24  type of activity, the type of activity you've described
25  on Page 697 or 698?

## 118

1       MR. SWEETEN:  Don't reveal your
2   legislative --
3       THE WITNESS:  Yeah.
4       MR. SWEETEN:  -- processes or specific
5   subject matters of conversation.  You can -- you can
6   testify as to whether a communication occurred.
7       A.  Yeah, I -- I don't -- may have but I don't
8   recall.  I just I don't recall.
9       Q.  (By Mr. Fisher) Anything from election
10  officials, local election officials in your district?
11      MR. SWEETEN:  You can reveal
12  communications.
13      A.  May have but I don't -- I don't recall.
14      Q.  (By Mr. Fisher) Anything from constituents in
15  your district?
16      A.  May have, but I don't recall.  I just don't
17  recall, but I may have.
18      Q.  You've mentioned some knowledge in the public
19  record about voter fraud in the State of Texas.  Are you
20  aware of any incidence of in-person voter fraud in the
21  state of Texas in the last twenty years based upon the
22  public record?
23      MR. SWEETEN:  You can answer as phrased.
24      A.  My -- my answer remains the same to that.  I
25  believe -- I believe that I have read in the news -- in

## 119

1   the news that there have been convictions of people who
2   have committed voter fraud, whether it's in the last
3   twenty years or not I cannot tell you the last date, but
4   I believe there have been convictions.
5       Q.  (By Mr. Fisher) But you're not aware --
6       A.  Yeah, I can't tell you, specifically, but I
7   believe I've read that, I believe.
8       Q.  Are you aware of any incidents of mail-in
9   ballot fraud that have occurred in the state of Texas in
10  the last twenty years?
11      MR. SWEETEN:  Don't reveal thoughts,
12  impressions, motivations about legislation or
13  communications you've had with any of the groups you've
14  outlined previously in answering this question.  You can
15  refer to matters the public record.
16      A.  Again, I want to go back the public record.  I
17  believe I've read that there have been convictions, but
18  I could not tell you what they're specifically about.
19      Q.  (By Mr. Fisher) And by "read," you mean reading
20  something in the newspaper or elsewhere?  What -- what
21  documents are you describing?
22      A.  I just -- I can't recall exactly but seems to
23  me I've read somewhere.
24      Q.  Any testimony in the public debate that you're
25  aware of?  Testimony in the Senate?

## 120

1       A.  I don't recall if that's -- that's where I
2   heard it or read it.  I just don't recall.
3       I'm going to get some ice and keep
4   talking.
5       MR. SWEETEN:  Go ahead.
6       Q.  (By Mr. Fisher) Senator, what was your role in
7   trying to get SB 362 passed?
8       MR. SWEETEN:  Yeah, I think the question
9   asks to him the reveal mental impressions, opinions,
10  motivations about legislation in furtherance of the
11  legislative process, as well as communications that he's
12  had with legislators or legislative staff and any other
13  groups and individuals.
14      You can refer to matters of the public
15  record.
16      A.  You know, my public record is that I voted in
17  favor of it.
18      Q.  (By Mr. Fisher) Did you have any role, once SB
19  362 was referred to the House, in ensuring it's passage?
20      MR. SWEETEN:  Same objection.  Calls for
21  matters of legislative privilege.
22      You can testify about matters of the
23  public record.
24      A.  Yeah.  I don't think there's any public record
25  of that.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

---

121

1      Q.   (By Mr. Fisher) What happened to SB 362 in the
2  House?
3          MR. SWEETEN:  You can testify about that.
4      A.   I can't -- I don't recall exactly what the path
5  of the bill was, if it passed or -- I just don't recall
6  if it passed, you'll have to show me the record.
7          (Exhibit 163 marked for identification.)
8      Q.   (By Mr. Fisher) So I've handed you a document
9  that's going to be Exhibit 163.  Upper left-hand corner,
10 "Texas Legislature Online History, Bill SB 362,
11 Legislative Session 81 R."
12         Does this give the legislative history of
13 SB 362?
14     A.   Yes, sir.
15     Q.   And based upon this, Senator, can you tell me
16 what happened to SB 362 in the House?
17     A.   It would appear -- looking back here to make
18 sure I'm reading this correctly.  Committee report was
19 printed and distributed on 5-14.  It was reportedly --
20 it was reported favorably without amendments on
21 5-11.  Okay.  Let me review this for a moment.
22         By reading this, it would appear it never
23 got to the Floor for a vote.  I don't know that that's
24 correct, because I have to get more information beyond
25 what happened on 5-23, but it was considered in

---

122

1  calendars, it was placed on the major state calendar,
2  but that's where this record ends.
3      Q.   Are you aware that SB 362 ever passed the
4  House?
5      A.   I don't -- I don't recall.
6      Q.   Did SB 362 become law in Texas?
7      A.   This was the 2009 bill, correct?  It did not
8  become law.
9      Q.   Did you support -- fully support SB 362?
10         MR. SWEETEN:  You can testify about
11 matters of the public record.
12     A.   I voted for it.
13     Q.   Was it a disappointment for you that it did not
14 pass and become law in the state of Texas?
15         MR. SWEETEN:  I'm going to -- I think that
16 asks for him to reveal his thoughts and mental
17 impressions about legislation --
18     A.   Yeah, I'll -- yeah, assert legislative
19 privilege.
20     Q.   (By Mr. Fisher) Sitting here today, what is
21 your opinion of SB 362 as a bill?
22         MR. SWEETEN:  I'm going instruct you not
23 to answer as phrased, the question.
24     A.   I assert legislative privilege on advice of
25 counsel.

---

123

1          MR. FISHER:  Let's stop here.
2          MR. SWEETEN:  Okay.
3          (Recess from 2:35 to 3:01 p.m.)
4      Q.   (By Mr. Fisher)  Senator Patrick, I'm going to
5  hand you what will be marked as Exhibit 164.
6          (Exhibit 164 marked for identification.)
7      Q.   (By Mr.Fisher)  So Exhibit 164, it says "Texas
8  Senator Dan Patrick, Fall 2010," on the top of it.  And
9  Senator Patrick, do you recognize this document?
10     A.   Yes.  Uh-huh.
11     Q.   And so what purpose was this document created
12 for?
13     A.   It's a way for me to communicate with my
14 constituents.
15     Q.   So what portions of this document did you write
16 or create?
17     A.   I -- I usually write the opening page.
18     Q.   Okay.
19     A.   And then I edit other -- my staff contributes,
20 and I go back and edit the material.
21     Q.   So if you go back and edit the material, is it
22 fair to say that you review it for accuracy; is that
23 correct?
24     A.   Yes.
25     Q.   And do you believe that this document was

---

124

1  accurate when it was created?
2      A.   Always to the best of our ability.  Doesn't
3  mean we don't make errors, but always attempt to be
4  accurate.
5      Q.   And to whom you would expect this would be
6  circulated?
7      A.   This -- let me see which one this is.  This
8  goes to all registered voters in the district.  We are
9  allowed under Senate -- I'm making sure this is the
10 right one.  To send out one correspondence a year, and
11 so it -- I'm just making sure this is the right one.
12 Yeah.  I believe this was the correspondence for that
13 year.
14     Q.   Do you have a shorthand that you use to refer
15 to this document, and that's for the purposes of this
16 deposition, would this be considered a newsletter; is
17 that correct?
18     A.   Let's call it a newsletter.
19     Q.   Because we have newsletters from other years,
20 as well, but unless you tell me, I'm going to assume
21 that your answers stand for all of the newsletters that
22 you produce, whether it's fall of 2010 or another year;
23 is that fair?
24     A.   It's fair in the general context, but if it's
25 something specific, then we would need to --



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

## 125

1    Q.   If you need to make a specific amendment to
2  your statements about reviewing and editing newsletters,
3  please let me know in the context of another newsletter.
4    A.   Okay.
5    Q.   So I direct your attention to the second page
6  of this document, and it says --
7    A.   Yes.
8    Q.   -- "Key Policy Initiatives for the 2011
9  Session."
10    A.   Yes.
11    Q.   And you'll notice that one of these is voter
12  ID.  If you could read that paragraph there, please?
13    A.   (Witness reading.)  Okay.  I've read it.
14    Q.   Okay.  And what does that paragraph describe?
15    A.   It describes the fact that Senate bill in 2009
16  which I'm -- I guess was Senate Bill 362, did not pass
17  in the House, as we looked earlier on the record when we
18  looked at the House record.
19         And then in 2011, we must take up the
20  fight for increased election integrity.  What it says
21  here.  And that this issue is supported by over 70
22  percent of Texans.  And that I will, you know, fight
23  just as hard to protect the integrity of our electoral
24  process in 2011.
25    Q.   Okay.  You're basically reading --

## 126

1    A.   Yes.
2    Q.   -- the document?
3    A.   Yes.
4    Q.   Is it fair to say that taking up the fight for
5  increased election integrity was a priority of yours in
6  the 2011 session?
7    A.   It was a priority for the people, and so
8  therefore, it was a priority of mine.
9    Q.   But so we have four items listed under "Key
10  Policy Initiatives for the 2011 Session."  We have
11  immigration, voter ID, sonogram and school finance
12  reform.  So is it fair to say that these four were the
13  key issues for you for the 2011 session?
14    A.   Yes.
15    Q.   You mention that you fought hard to pass the
16  voter identification bill out of the Senate, and as you
17  just stated, you are referring to SB 362 there in
18  2009.  And that ultimately it died in the House.  Was
19  that a disappointment for you?
20    MR. SWEETEN:  I think you're asking him to
21  reveal his mental impressions, opinions, motivation
22  about legislation.  He can answer as to what his -- with
23  respect to the statement in the public statement that
24  was made, but in answering questions, don't reveal your
25  thoughts about the legislation or legislative process.

## 127

1    A.   Yeah.  I would assert legislative privilege.
2  It reads clearly.
3    Q.   (By Mr. Fisher)  What did you want the folks
4  that you were circulating this newsletter to, to take
5  away from your discussion of voter ID in this paragraph?
6    A.   That this bill is important.
7    Q.   What bill, Senator?
8    A.   That the voter ID bill is important to them,
9  it's important to me, and I will try to pass it.
10    Q.   And by voter ID bill, are you referring to SB
11  362, Senator?
12    A.   Well, in the future, it would be a different --
13  it could take a different form.  It could be a Senate
14  bill.  It could be a House bill.  But that a bill that
15  would address the issue of photo ID would be an
16  important bill.
17    Q.   Senator Patrick, were you involved in the
18  development of SB 14 in the 2011 session?
19    A.   I was not.
20    Q.   You were not involved in the development of SB
21  14; is that correct?
22    A.   Correct.  Not -- let me -- not in any
23  substantial way whatsoever.
24    Q.   Were you the author of SB 14?
25    A.   I'd have to check the record if I was a -- I'd

## 128

1  have to check the record.  We have several
2  classifications, as I mentioned earlier, author, joint
3  author, coauthor, sponsor, cosponsor, so I'd have to
4  check the record.  I was either, I believe, either a
5  joint author or a coauthor.
6    Q.   Would it surprise you if you were the author of
7  SB 14?
8    A.   Yes.  That would surprise me.
9    Q.   Would it surprise you if you were a cosponsor
10  of SB 14?
11    A.   Yes.  Because I don't think that would be the
12  accurate description.
13    Q.   What does an author of a bill in the Senate do?
14    A.   The author of a bill is generally recognized as
15  the -- is the primary person behind the legislation who
16  writes the legislation, who -- who shepherds the
17  legislation through the process, who files -- the author
18  is usually the person who files the bill.
19         Some bills have one author.  Some bills
20  have -- it's usually joint authors.  I'd have to check
21  the rules.  I don't think you can have two authors on a
22  bill.  I think there's one author and joint authors.
23  That's why I would be surprised because it's Troy
24  Fraser's bill.  But I may have been a joint author or
25  coauthor.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Dan Patrick

May 30, 2012

---

### 129

1    Q.  So your testimony is that you might have been a
2    joint author or a coauthor of SB 14; is that correct?
3    A.  I believe I was one of the two, but I'd have to
4    check the record.
5    Q.  Didn't you just say that it would surprise you
6    if you were an author of SB 14; is that correct?
7    A.  I interpreted your question directly as the
8    author.  You didn't ask me if it would surprise me if I
9    was a joint author or coauthor, but you asked me if I
10   would be surprised if I was an author.  And I would be
11   surprised if I were just an author.
12   Q.  I'm going to hand you what's been marked
13   previously as Exhibit 8.  And I'm going to hand that to
14   you now.
15   A.  Sure.
16   Q.  If you could take a look at the designations
17   here.  So in the upper left-hand corner, we have "Texas
18   Legislature Online History, Bill SB 14, Legislative
19   Session 82-R."  And Senator, if you would look at
20   author, is your name listed there as an author of SB 14?
21   A.  It is.  I think this is incorrect.  I could be
22   wrong.  There may have been a special exception for this
23   that I don't recall allowing everyone to be an
24   author.  But normally, you would have an author and
25   everyone else would be a coauthor.  But I could be

### 130

1    wrong.  If the record reflects that everyone was listed
2    as an author, I did not recall that.
3    Q.  Senator, do you recall something special
4    happening with SB 14 whereby more than one senator was
5    allowed to be an author?
6    A.  I don't recall that.  If I did, I would have
7    testified to that.  So, even now that I see this, it
8    doesn't refresh my memory.
9    Q.  So you're listed as an author of SB 14 in this
10   exhibit; is that correct?
11   A.  Yes.  Uh-huh.
12   Q.  Do you remember being involved in the drafting
13   of the bill's language to any extent?
14   A.  I was not involved in the -- to the best of my
15   knowledge, I was not involved in the drafting of the
16   legislation.
17   Q.  So is it fair to say that the designation of
18   you as an author of SB 14 is misleading?
19   MR. SWEETEN:  On this sheet?
20   A.  Yeah.  Yeah.  This -- this sheet shows as an
21   author, and it may have been.  I just don't recall that
22   they made a special provision to allow everyone to be
23   author.  But when I think of an author of the bill, it's
24   the person who writes it and files it.  The original
25   person is what I think of the author.  And so that would

### 131

1    have been Senator Fraser.  But if there was a special
2    accommodation made so that everyone could be author,
3    then that may have been made.  I just didn't remember
4    that.
5    Q.  (By Mr. Fisher)  Did you seek a special
6    accommodation with regard to SB 14's authorship?
7    MR. SWEETEN:  You can testify about
8    matters of the public records, or if there's a matter.
9    A.  Yeah.  I would assert legislative privilege on
10   that.  By I stand on my testimony, I just don't recall.
11   This is somewhat surprising that everyone is listed as
12   an author to me.
13   Q.  (By Mr. Fisher)  So do you see SB 14, as you're
14   looking at it now, with regard to the legislative
15   history as being different from other bills with regard
16   to the authorship?
17   A.  If everyone was listed as an author, that is --
18   that is different from the norm.
19   Q.  Can you look at the cosponsor designation, and
20   is your name listed there?
21   A.  No, because sponsors would be House members.
22   I'm sorry, Senator, I said the cosponsor.
23   A.  Yes.  And I said no, because they're all House
24   members, so I'm not listed there.
25   For the record, which could be helpful, if

### 132

1    a bill originates in a chamber, you're the author or
2    coauthor.  And then when you pick it up on the other
3    side, you're the sponsor.  So if it had originated in
4    the House, the House would be the author, so we would be
5    the sponsors.
6    So it originated in the Senate, it's a
7    Senate bill, so that's why we were authors or coauthors
8    or joint authors.
9    Q.  So your testimony today is that you played no
10   role in the development of the language contained in SB
11   14; is that correct?
12   MR. SWEETEN:  Wait.  Hold on a minute.  I
13   think you asked him did he draft, and I let him testify
14   as to whether he had the physical act of drafting the
15   bill.  Now you're asking him about the role, and I think
16   now you're asking about what role he had in the process
17   which could implicate communications with legislators,
18   staff, state agencies, Leg Council, constituents, and
19   reveal his mental impressions, motivations or opinions
20   about legislation.  So to the extent that's
21   legislatively privileged, don't answer that question.
22   But to the extent that you can answer based on matters
23   of the public record, you can do so.
24   A.  Yeah.  I played no significant role in drafting
25   or crafting the bill, to the best of my knowledge.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

133

1    Q.  (By Mr. Fisher)  Were you aware that the State
2 of Texas has identified you as someone who could testify
3 to the development of SB 14?
4    A.  I was not aware of that.
5    Q.  Did you have any communications about SB 14
6 with other legislators who had authored past photo ID
7 bills?
8         MR. SWEETEN:  You can answer if there was
9 a communication.
10   A.  Yeah.  I don't -- I don't recall that.
11   Q.  (By Mr. Fisher)  What about staff, any
12 communication with other legislators' staff who had
13 authored past photo ID bills?
14   A.  Yeah.  I don't recall that.  I have very little
15 interaction of staff of other senators.
16   Q.  Did you at one point decide to support SB 14?
17   A.  Yes.
18   Q.  And prior to that, did you consider past photo
19 ID bills in the Texas legislature?
20        MR. SWEETEN:  I think the question asks
21 him to reveal his mental impressions, his mental
22 process, motivations about legislation.  I think that
23 would be legislatively privileged.
24   A.  Assert legislative privilege.
25   Q.  (By Mr. Fisher)  Is that on the advice of your

---

135

1 election officials in Austin about SB 14?
2    A.  I don't think so.
3    Q.  So you've testified that you didn't have any
4 communications with other legislators who had authored
5 past photo ID bills, other -- their staff, other
6 legislators from other states, interest groups, minority
7 groups, groups representing minority voters, officials
8 in the executive branch or any local election officials
9 about SB 14; is that right?
10        MR. SWEETEN:  Objection, asked and
11 answered, but go ahead.
12   A.  To the best of my recollection, I -- that is an
13 accurate statement.
14   Q.  (By Mr. Fisher)  So what did you consider
15 before deciding whether to support or not support SB 14?
16        MR. SWEETEN:  Don't answer that.  That's a
17 matter that's subject to the legislative
18 privilege.  You're asking him to reveal your mental
19 impressions, opinions, motivations about legislation and
20 communications.
21   A.  Advice of the counsel, I assert legislative
22 privilege.
23   Q.  (By Mr. Fisher)  In drafting SB 14, did you or
24 your staff review any reports or studies?
25        MR. SWEETEN:  Objection.  That asks for

---

134

1 counsel, Senator?
2    A.  Yes, it is.
3    Q.  Did you have any communications with officials
4 or legislators from other states about SB 14?
5         MR. SWEETEN:  You can answer as to whether
6 you had communication.
7    A.  Not -- not to my knowledge.  I don't recall
8 that.
9    Q.  (By Mr. Fisher)  Did you have communications
10 concerning SB 14 with any interest groups?
11   A.  Not that I recall.
12   Q.  Did you have communications regarding SB 14
13 with any groups representing minority voters?
14   A.  Not that I recall.
15   Q.  Did you have communications about SB 14 with
16 any officials in the executive branch?
17   A.  I don't -- I don't recall.  It's possible, but
18 I don't recall anything specific.
19   Q.  Did you have communications with any local
20 election officials about SB 14?
21   A.  Local being Austin or local being Houston?
22   Q.  Did you have any communications with local
23 election officials in your district about SB 14?
24   A.  I don't think so.
25   Q.  Did you have communications with any local

---

136

1 your mental impressions, opinions, motivations about
2 legislation and the legislative process.  So I'm going
3 to instruct you not to answer based on legislative
4 privilege.
5    A.  Yes, on advice of counsel, I assert legislative
6 privilege.
7    Q.  (By Mr. Fisher)  When was SB 14 signed into
8 law?
9    A.  I'd have to look at the record.  I don't know.
10   Q.  Please feel free to take a look at the exhibit,
11 Exhibit 8 that I just handed you.
12   A.  Okay.  (Witness reading.)  Okay.  There you go.
13 5/27/2011.
14   Q.  And did you vote for SB 14?
15   A.  Yes, I did.
16   Q.  To your knowledge, has the Secretary of State
17 enforced SB 14 after being passed into law?
18   A.  I do not believe it has been implemented.
19   Q.  Have any county election officials enforced SB
20 14?
21   A.  Not to my knowledge.
22   Q.  Are you aware of any problems or fraud, based
23 upon the public record, based on the fact that SB 14 has
24 not become law?
25   A.  We just had our election yesterday so I'm not

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Dan Patrick                                          May 30, 2012

---

### 137

1     aware of anything.
2         Q.   Do you recall what forms of identification are
3     permitted by SB 14?
4         A.   I'd have to -- I'd have to look.
5         Q.   I'm going to hand you what's previously been
6     marked as Exhibit 5.   It's a 17-page document with a
7     notation of SB 14 in the upper right-hand corner.
8         A.   Okay.
9         Q.   And Senator, do you recognize this document?
10    Just take a look at the front page here.   You can also
11    look at the last page that will tell you what version of
12    the bill this is.
13        A.   Yes.
14        Q.   Do you recognize this document, Senator?
15        A.   I -- it appears to be the SB 14.   Yes.
16        Q.   And is this the copy of the legislation that
17    you were listed as an author of?
18        A.   I haven't read every page of this, but I'm
19    assuming that it is.
20        Q.   So if you turn to what is Page 9 of the
21    document, and that's Section 14, Section 63.0101.
22        A.   Yes.   Okay.
23        Q.   And what does this section set out, Senator?
24        A.   Sets out the type of identification that would
25    be an acceptable form.

---

### 138

1         Q.   And what types are those, Senator?
2         A.   Driver's license, election identification
3     certificate or personal identification card issued to
4     the person by the Department of Public Safety that has
5     not expired nor 160 days.   And the United States
6     military ID or that has not expired prior to 60
7     days.   Citizenship certificate that contains a person's
8     photograph like a passport.   License to carry
9     concealed.   And that's what I see.
10        Q.   Did you have any communications with anyone
11    about the forms of identification included in this
12    section?
13        A.   Yes.
14        Q.   And when did you have those conversations?
15        A.   Sometime during the discussion of the bill.
16        Q.   And who are these communications with?
17        A.   The one I'm thinking of is, if my memory is
18    correct, I could be wrong, was Senator Hinojosa.
19        Q.   And was this the discussion in person, via
20    phone, via e-mail?   What was the form?
21        A.   I think it was in person.
22        Q.   Was there anyone else present during this
23    discussion?
24        A.   I don't recall.
25        Q.   And the substance of your conversation with

---

### 139

1     Senator Hinojosa regarding the forms of ID allowable by
2     Section 14?
3         MR. SWEETEN:   Can you read that question
4     back?
5         (Requested portion read back by the court
6     reporter.)
7         MR. SWEETEN:   Objection.   That calls for
8     matters subject to legislative privilege.   Don't reveal
9     the substance of any communications you had with Senator
10    Hinojosa.
11        A.   Advice of counsel, assert legislative
12    privilege.
13        Q.   (By Mr. Fisher)   Senator, how much does it cost
14    to obtain a U.S. passport?   Are you aware of that?
15        A.   I'm not.
16        Q.   Are you aware of the percentage of Texans that
17    have a passport?
18        A.   I'm not.
19        Q.   Are you aware of the Democrat -- demographic
20    makeup of Texans that have a passport?
21        A.   I'm not.
22        Q.   Senator, how often do military IDs expire?
23        A.   I don't know.
24        Q.   Do they expire more or less often than driver's
25    licenses?

---

### 140

1         A.   I don't know.
2         Q.   Where do members of the military have their IDs
3     made?
4         A.   I don't know.
5         Q.   Do members of the military often have Texas
6     driver's licenses?
7         A.   I don't know.
8         Q.   Are you aware of any information on this such
9     as studies or analysis?
10        MR. SWEETEN:   Yeah.   Don't reveal any
11    communications you had or thoughts, mental impressions,
12    opinions, motivations about legislation.   Those are
13    subject to the legislative privilege.
14        A.   Yeah.   I don't recall.
15        Q.   (By Mr. Fisher)   Do you know the number of
16    Texas registered voters that have a military ID?
17        MR. SWEETEN:   Same objection.   With
18    respect to your thoughts, mental impressions, opinions,
19    motivations about legislation, or in furtherance of the
20    legislative process, don't reveal those.   Those are
21    subject to the legislative privilege.   Also, don't
22    reveal communications you had with state agencies, Texas
23    Leg Council, legislators, legislative staff, or
24    constituents.   In answering this question, you can refer
25    to matters of the public record.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 141

1     A.  Yeah.  I don't know.
2     Q.  (By Mr. Fisher)  Did you conduct any analysis
3  as to how many registered voters possessed the required
4  forms of ID required by Section 14 of SB 14?
5           MR. SWEETEN:  Same objection, calls for
6  matters of legislative privilege.  Don't answer except
7  for the extent you can refer to the matters of the
8  public record.
9     A.  Yeah.  I would assert legislative privilege on
10  advice of counsel.
11     Q.  (By Mr. Fisher)  Did you analyze or direct
12  anyone to analyze which registered voters did not
13  possess the required forms of ID required in SB 14?
14           MR. SWEETEN:  Same instruction.  Same
15  instruction.
16     A.  Yeah.  I would assert legislative privilege at
17  the advice of counsel.
18     Q.  (By Mr. Fisher)  Did you read any public
19  information that assisted you in evaluating the forms of
20  identification required by SB 14?
21           MR. SWEETEN:  I'm going to object to the
22  question.  I think it calls for him to reveal his
23  thoughts, his mental impressions, process, opinions,
24  motivation about legislation.  And I think to the extent
25  that I think that's legislative privilege, but if you

## 142

1  can answer to the extent that you can refer to matters
2  that aren't subject to the privilege.
3     A.  Yeah.  I'm sure I've read something in the
4  public domain somewhere about the issue.  I couldn't
5  tell you specifically what it was.
6     Q.  (By Mr. Fisher)  What you read in the public
7  domain, did it mention the impact of SB 14 and the
8  requirements of identification on minority voters?
9     A.  I don't recall.
10     Q.  Did you or your staff conduct any analysis to
11  determine if minority voters could be disproportionately
12  less likely to possess the forms of ID required in SB
13  14?
14           MR. SWEETEN:  Objection.  Legislative
15  privilege.  Don't answer the question.
16     A.  Yeah.  I would assert legislative privilege.
17     Q.  (By Mr. Fisher)  And is that on the advice of
18  your counsel, Senator?
19     A.  Yes, it is.
20     Q.  Under SB 14, in SB 14, you're listed as the
21  author; is that correct, Senator?
22     A.  It is based on the document you presented to
23  me.
24     Q.  Under SB 14, who would be verifying the
25  identity of a voter?

## 143

1           MR. SWEETEN:  You can refer to the
2  specific Texas Senate Bill 14 in answering the
3  question.  Don't reveal your thoughts, mental
4  impressions about the legislation itself.
5     A.  Yeah.  I'd have to read -- I'd have to read the
6  bill, specifically, what it says.
7     Q.  (By Mr. Fisher)  Please do, Senator.  There's
8  not -- it's not very long.
9     A.  You want me to read the whole bill?  It will
10  take us a while.  It is 16 pages.  If you have a
11  specific point you want to refer to, I'm happy to review
12  it.
13     Q.  Senator, I just want to know who would be
14  verifying the identity of a voter under SB 14?
15     A.  At the time of voting or a final arbiter of a
16  decision if it were in dispute?
17     Q.  At the time of voting, Senator.
18     A.  Okay.  Let me look and see if I can find the
19  wording.  Without being able to speed read 16 pages, we
20  do have designated people in polling places where there
21  are likely to be judges, who -- people sign in to vote.
22  So it would be the people at the polling place who would
23  verify.
24     Q.  Senator, do you think it's important --
25     A.  Let me just finish that.  Whoever those workers

## 144

1  might be.
2     Q.  Do you think it's important -- an important
3  part of the process, as far as the identification
4  required by SB 14, when that identification is actually
5  verified?
6           MR. SWEETEN:  I think that calls for his
7  thoughts, mental impressions or opinions about
8  legislation.  I'm going to instruct him not to answer.
9     A.  Yeah.  I would assert legislative privilege on
10  my own on that one.
11     Q.  (By Mr. Fisher)  So if we turn to Section 9,
12  and then flip it over a page to Section C.
13     A.  Which is what page actually?
14     Q.  It ended up being Page 5.
15     A.  Okay.
16     Q.  On the presentation of the documentation
17  required under Subsection B, would you read that
18  paragraph there, please?
19     A.  On the presentation -- okay.  I've read that.
20           MR. SWEETEN:  Do you want him to read it
21  out loud, Spencer?
22           MR. FISHER:  Sure.
23     A.  On presentation -- you want me to read it?
24     Q.  (By Mr. Fisher)  Absolutely.
25     A.  "On presentation of the documentation required



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

145

1  under Subsection B, an election officer shall determine
2  whether the voter's name on the documentation is on the
3  list of registered voters for the precinct.  If in
4  making a determination under this subsection, the
5  election officer determines under standards adopted by
6  the Secretary of State that the voter's name on
7  documentation is substantially similar to but does not
8  match exactly with the name on the list, the voter shall
9  be accepted for voting under Subsection D if the voter
10 submits an affidavit stating that the voter is the
11 person on the list of registered voters."
12     Q.  And you can go ahead and read D.
13     A.  "If as determined under Subsection C, the
14 voter's name is on the precinct list of registered
15 voters and the voter's identity can be verified from
16 documentation presented under Subsection B, the voter
17 shall be accepted for voting."  Continue?
18     Q.  That's enough, Senator.
19     A.  All right.
20     Q.  Do you feel that this issue is central to
21 whether SB 14 would be a successful bill?
22          MR. SWEETEN:  I'm going to object.  I
23 think that calls for his mental impressions and thoughts
24 about the bill, and I think that's a matter subject to
25 the legislative privilege.  I instruct you not to answer

---

146

1  the question.
2     A.  Yeah.  I assert legislative privilege on advice
3  of counsel.
4     Q.  (By Mr. Fisher)  So, Senator, let me get your
5  thinking on something here.  If a person shows up to a
6  polling place with a driver's license and the name does
7  not match the registration role, what happens?
8          MR. SWEETEN:  You're saying under the
9  Texas Senate Bill 14 as currently written?
10          MR. FISHER:  The bill we're looking at.
11     A.  Say that again.  If a person --
12     Q.  (By Mr. Fisher)  As I said, let me get your
13 thinking on something here.  If a person shows up to a
14 polling place with a driver's license where the name
15 does not match the name on the registration roll, what
16 happens?
17     A.  I would have to refer back to the bill and see
18 what the law says.
19     Q.  Okay.  Let's go back.
20     A.  All right.  Where do we want to go back to,
21 Page 5?
22     Q.  I think that's where you'll find the answer.
23     A.  And your question, could you read back the
24 question for me?
25          (Requested portion read back by the court

---

147

1  reporter.)
2     A.  I'm rereading.  Well, it says here that if it
3  doesn't match but they have a name that's similar, and
4  they submit an affidavit, the voter would be accepted
5  for voting.
6     Q.  (By Mr. Fisher)  So based upon this, Senator,
7  how far off do the names have to be, or how similar do
8  the names have to be?
9          MR. SWEETEN:  You're asking him based on
10 the text of the bill?
11     Q.  (By Mr. Fisher)  Based on the text of the
12 bill.
13     A.  The bill does not address that.
14     Q.  Was there any thinking about this issue when
15 this legislation was considered?
16          MR. SWEETEN:  Objection.  Don't reveal
17 your thoughts, mental impressions or opinions about the
18 bill that was subject to the legislative privilege.  I
19 instruct you not to answer that question, unless to the
20 extent it was expressed in the matter of public record.
21     A.  Yeah.  I assert legislative privilege on the
22 advice of counsel.
23     Q.  (By Mr. Fisher)  Senator, do you know if the
24 name on your driver's license matches the name on your
25 voter registration card?

---

148

1     A.  Do I know for certain that it does?  I'm not
2  sure if it includes first, middle and last.  So I do not
3  know for certain that it would be very similar.
4     Q.  Could the names on your driver's license and
5  your voter registration card be substantially different?
6     A.  Be substantially different?  Not that I'm aware
7  of.
8     Q.  Is it possible that the last name on your
9  driver's license and the last name on your voter
10 registration card are different?
11     A.  Anything is possible, but I'm not aware.
12     Q.  Why would that be possible in your case,
13 Senator?
14          MR. SWEETEN:  Objection, calls for
15 speculation.  Go ahead.  You can answer.
16     A.  When you say "it's possible," anything is
17 possible.
18     Q.  (By Mr. Fisher)  Well, Senator, have you
19 changed your name in the past 15 years?
20     A.  Yes.
21     Q.  So it's possible, then, in the act of changing
22 your name, that the name on your driver's license and
23 the name on your voter registration card are no longer
24 the same, correct?
25     A.  No longer the same that it was before I changed

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

149

1    it?
2        Q.   No.  No longer the same as in they have the
3    same name on both documents.
4        A.   Today?
5        Q.   Yes, today, Senator.
6        A.   I don't know.  I mean, I'd have to verify that.
7        Q.   So you would have to do research with regard to
8    your own voter registration and your own driver's
9    license to determine if you're eligible to vote under SB
10   14; is that correct?
11       A.   I would not call it research.  I'd have to look
12   at my driver's license and look at my voter ID card.
13       Q.   As we sit here today, Senator, do you know if
14   you're eligible to vote under SB 14?
15       A.   I believe I'm eligible to vote.
16       Q.   Are you certain that you're eligible to vote
17   under SB 14, Senator?
18       A.   I believe I'm eligible to vote.
19       Q.   Would you be surprised if you were not eligible
20   to vote under SB 14, Senator?
21       A.   I would be surprised.
22       Q.   Given the fact that you've changed your name in
23   the past 15 years, is it at least possible that you're
24   not eligible to vote under SB 14?
25       A.   Anything is possible.

---

150

1        Q.   For someone that doesn't change their name, is
2    it possible that they're not eligible to vote under SB
3    14?
4        A.   Anything, when you say "is possible," anything
5    is possible.
6        Q.   If someone has a voter registration card and a
7    driver's license issued to them under the same name, and
8    they do not change their name, are they eligible to vote
9    under SB 14?
10       A.   I'm sorry.  Say that again.
11            (Requested portion read back by the court
12   reporter.)
13            MR. SWEETEN:  Under the Texas Senate Bill
14   14, right?  Is that the question?
15       Q.   (By Mr. Fisher)  The question is the question.
16   If you need clarification, Senator, please ask.
17       A.   If a person has a driver's license and the same
18   name is on the driver's license as is on the voter
19   registration card, and they have a photo ID, yes, they'd
20   be able to vote.
21       Q.   But if a person changes their name, and for any
22   reason, meaning marriage, or the fact that they changed
23   their name, is it possible that that voter would no
24   longer be able to vote under the terms of SB 14?
25       A.   I -- I couldn't address a specific, and again,

---

151

1    you're using the word "possible."
2        Q.   I'm not asking you to address a specific,
3    Senator.  I'm giving you a general, and I can't make it
4    any more general than that.
5        A.   Okay.
6        Q.   The question about eligibility to vote under SB
7    14, and we can make it more specific with regard to your
8    own circumstance, but generally, if someone changes
9    their name, is it possible that they're no longer able
10   to vote under the terms of SB 14 because their license
11   no longer matches their voter registration card, the
12   names on those two documents?
13       A.   I -- I believe that the law, and I would check
14   the record to be certain, that when you change your
15   name, you have to change your license within 30 days.
16       Q.   But that doesn't change your voter registration
17   card; is that correct, Senator?
18       A.   You can make a change on that as well.
19       Q.   But for a voter who has not made that change,
20   Senator, would their license and their voter
21   registration card then have different names on them?
22       A.   I'd have to know the specific situation, the
23   time line, what happened.  You're asking me about a
24   hypothetical, could something happen, is it possible?
25   Hypotheticals are -- hypotheticals are tough to answer

---

152

1    and possibles are always possible.
2        Q.   Well, hypotheticals, I think this is a very
3    specific hypothetical, Senator, and we can make it more
4    specific if you want about your own situation.
5        A.   Yeah.
6        Q.   Have you changed your name, Senator?  I'll
7    repeat the question.
8        A.   Yes.
9            MR. SWEETEN:  Objection, asked and
10   answered.
11       A.   Yeah.
12       Q.   (By Mr. Fisher)  Are you certain that your
13   voter registration name and the name on your driver's
14   license are the same name that you would be eligible to
15   vote under SB 14?
16            MR. SWEETEN:  Objection, asked and
17   answered.
18       A.   Yeah.  Asked and answered.
19       Q.   (By Mr. Fisher)  That's not an answer, Senator.
20       A.   You asked -- I think you included the word
21   "substantially" before.  Would there be a substantial
22   difference between my --
23       Q.   It doesn't matter what I asked before,
24   Senator.  This is the question on the table, and we can
25   read it back if you want.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 153

1    MR. SWEETEN:  Objection, asked and
2  answered.  Object, argumentative.  But you can answer to
3  the extent you can answer.
4    A.  Sure.  You can ask again.
5    MR. FISHER:  Can you read it back?
6    (Requested portion read back by the court
7  reporter.)
8    A.  I believe they're the same, but --
9    Q.  (By Mr. Fisher)  The question is not whether
10  you believe, Senator.  The question is, are you
11  certain?
12    MR. SWEETEN:  Objection, asked and
13  answered.  Objection, argumentative.
14    A.  I've answered.  I believe they're the same.
15    Q.  (By Mr. Fisher)  That's not an answer to my
16  question, Senator.  The question is:  Are you certain
17  that they are the same?
18    MR. SWEETEN:  Same --
19    Q.  (By Mr. Fisher)  Sitting here today.
20    MR. SWEETEN:  -- objection.  Same
21  objection.
22    MR. FISHER:  I'm not getting an answer to
23  my question, Counsel.
24    MR. SWEETEN:  I think he's answered the
25  question.  He's trying to do so.

## 154

1    A.  I believe they're the same.
2    Q.  (By Mr. Fisher)  Senator, you're either certain
3  or you're not certain.  Are you certain that they're the
4  same and that you would be eligible to vote under SB 14?
5    MR. SWEETEN:  Objection, argumentative.
6  Objection, asked and answered.
7    A.  I'm just trying to -- I'm trying to -- you
8  know, just remember looking at both.  I believe they're
9  the same.  You know.
10    Q.  Would it surprise you if they were different,
11  Senator?
12    A.  If they were different at all?
13    Q.  Would it surprise you that the last name on
14  your voter registration was different than the last name
15  on your license?
16    A.  That would surprise me.
17    MR. FISHER:  Take a break here.
18    THE WITNESS:  Okay.
19    (Recess from 3:43 to 3:54 p.m.)
20    Q.  (By Mr. Fisher)  So Senator, referring back to
21  the question that I asked previously about your
22  knowledge of the name that appears on your voter
23  registration and your driver's license.  And you said
24  that you believe that they're the same; is that correct?
25    A.  I did.

## 155

1    Q.  If I can hand you, at this time, Exhibit 165.
2    (Exhibit 165 marked for identification.)
3    Q.  (By Mr. Fisher)  And so Exhibit 165 is a
4  LexisNexis search, and if you would turn to the second
5  page.
6    A.  Uh-huh.
7    Q.  You'll see the Texas voter registration
8  information.
9    A.  Okay.
10    Q.  And I believe this search is of you; is that
11  correct, Senator?
12    A.  Yes.
13    Q.  And on the second page, can you tell me what it
14  says underneath Registrant Information Name, and this is
15  under Texas Voter Registration.
16    MR. SWEETEN:  Can you tell me what you are
17  looking at, Counsel?
18    MR. FISHER:  The second page.
19    MR. SWEETEN:  Uh-huh.
20    MR. FISHER:  Which is Voter Registration,
21  so that would be the first item on the second page.
22    MR. SWEETEN:  Okay.
23    Q.  (By Mr. Fisher)  And we see Number 1 is Texas
24  Voter Registration, Registrant Information, and what
25  does it say next to Name, Senator?

## 156

1    A.  Goeb, Danny.
2    Q.  Okay.  And how that is spelled?  Could you
3  spell that for me?
4    A.  This is not accurate, but this -- my
5  registration is correct.  My registration matches my
6  driver's license today.  This is from --
7    Q.  Senator, did you check that during the break,
8  or how do you know that information?  Because in your
9  testimony previously, you said you were not certain or
10  you believed.
11    A.  Well, yeah, I wasn't certain, so I made sure I
12  was correct.  And the reason I said I believed is
13  because I just voted and I just looked at my
14  registration card two weeks ago.  And my registration
15  card matches my driver's license, Patrick, Dan Goeb.
16    Q.  And did you change your Texas voter
17  registration sometime after you changed your name,
18  Senator?
19    A.  You know, I must have.  I must have because
20  it's correct.
21    Q.  And how did you go about doing that, Senator?
22    A.  I don't recall.  I changed my name in 2004, so
23  it was eight years ago, and I don't recall the procedure
24  that I did that.
25    Q.  But you did have to go and -- you did -- strike



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Dan Patrick                                      May 30, 2012

---

## 157

1  that.  You did go and change your name with regard to
2  your Texas voter registration; is that correct?
3      A.  Yes, apparently.  I mean, apparently I did,
4  because it's correct.
5      Q.  And you're not aware of what you did to do
6  that, correct?
7      A.  You know, I don't recall if back in 2004, if it
8  was online or in person, you know.  I don't recall.  But
9  it happens all the time, because people get married all
10 the time and change their names.
11     Q.  So it's your testimony that you changed the
12 name on your voter registration in 2004; is that
13 correct?
14     A.  I don't know when I changed it, but it
15 accurately -- it's accurate today, and to my knowledge,
16 it's been accurate.
17     Q.  Did you change it at some point in the last two
18 weeks?
19     A.  No.  I moved in December of 2011, and when you
20 move, you have, I think, 30 days under the law, I stand
21 to be corrected, to change your driver's license to
22 reflect your new address, which I did.  I have a new
23 driver's license.  And then you go online and apply for
24 a new voter registration card to reflect your new
25 address so you can vote in the right precinct.  And

---

## 158

1  because of redistricting, those voter registration cards
2  were not sent out until that issue was resolved.
3      Q.  Senator, do all the members of your district
4  have access to the Internet?
5      A.  I -- I don't know.
6      Q.  Was the passage of SB 14 a priority for you.
7  Senator?
8      A.  It was a priority for me as stated in the
9  public record, yeah.
10     Q.  And what was the purpose of SB 14?
11         MR. SWEETEN:  You can testify as to the
12 understanding of the purpose of SB.
13     A.  To ensure the integrity of the ballot box.
14     Q.  (By Mr. Fisher) And in your opinion, would the
15 integrity of the ballot box be ensured by presenting a
16 photo ID before receiving a ballot?
17         MR. SWEETEN:  He's testified to the
18 purpose, and now I think you're asking specifics about
19 the bill and him to reveal his thoughts, mental
20 impressions or opinions.  I've let him answer as to the
21 purpose of the bill.  I think to the extent that you're
22 going to ask specific his mental impressions about the
23 bill, that I think that that would be a subject of
24 legislative privilege.  But to the extent you can answer
25 without evading privilege, you can do so.

---

## 159

1      A.  The purpose of the bill is to ensure the
2  integrity of the voting process, of the ballot box.
3      Q.  (By Mr. Fisher) Well, Senator, we just spent,
4  you know, a few minutes talking about a situation where
5  someone who changes their name as you did, could have a
6  voter registration card that's different from the one
7  on their driver's license, and does that, for some
8  reason, impact the integrity of the ballot box?
9          MR. SWEETEN:  Don't reveal your thoughts,
10 mental impressions, opinions, motivations about the
11 legislation.  That is protected by the legislative
12 privilege.
13     A.  Yeah.  I think I would assert legislative
14 privilege on that.
15     Q.  (By Mr. Fisher) Are you asserting legislative
16 privilege in the answer to that question on the advice
17 of your counsel?
18     A.  Yes.
19     Q.  Was the passage of SB 14 a priority for anyone
20 outside of Texas government?
21     A.  I can't get into the minds of what is a
22 priority or not a priority of people.
23         MR. SWEETEN:  Objection, speculation.
24     Q.  (By Mr. Fisher) Were there any interest groups,
25 that you're aware of, that were interested in the

---

## 160

1  passage of SB 14?
2      A.  I think on the public record, although I can't
3  name a specific place that I read or heard, I think it's
4  -- there has been public statements of people who
5  support.
6      Q.  Do you remember those people?
7      A.  I can't remember specifics, but, you know,
8  obviously, I've read it, heard it, and seen it, am aware
9  of it.
10     Q.  Was the passage of SB 14 a priority for any
11 minority groups in Texas?
12         MR. SWEETEN:  Objection, calls for
13 speculation.
14     A.  You know, I don't know.
15     Q.  (By Mr. Fisher) Did you have any communications
16 with groups that supported the passage of SB 14?
17         MR. SWEETEN:  You can answer as phrased.
18     A.  Can you repeat that?
19     Q.  (By Mr. Fisher) Sure.  Did you have any
20 communications with groups that advocated for the
21 passage of SB 14?
22     A.  In a broad sense, if I'm speaking to groups and
23 they're in support of the bill, then, yes.  I, you know,
24 I spoke to groups, and that would be a form of
25 communication.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 161

1    Q.  So the communications you're talking about
2  would be speeches you gave to large groups of people; is
3  that correct?
4    A.  Or it could be -- you know, it could be
5  sometimes you speak to a group of 25 people.  But, yes.
6  And if there were any other communications, I don't
7  recall anything specific.
8    Q.  Do you have any names of anyone that was
9  present during these communications?
10    A.  Outside of what I submitted to you that you
11  requested, or your office requested about correspondence
12  and those people would have names on there, because I
13  did submit some, I can't recall, you know, specifically
14  who all those were from.
15    Q.  So you've talked about the purpose of SB 14.
16  Was any part of the purpose of SB 14 to decrease the
17  number of Hispanics voters?
18    MR. SWEETEN:  You can answer as to the
19  purpose of the bill.
20    A.  The specific purpose of the bill was to protect
21  the integrity of the ballot box.
22    Q.  (By Mr. Fisher) Was any part of the purpose of
23  SB 14 to decrease the number of any other group of
24  minority voters from voting?
25    A.  The purpose of the bill was to protect the

## 162

1  integrity of the ballot box.
2    Q.  Was any part of the purpose of SB 14 to
3  discriminate in any way against any group of minority
4  voters?
5    A.  The purpose of the bill was to protect the
6  integrity of the ballot box.
7    Q.  Was any part of the purpose of SB 14 for
8  partisan purposes?
9    A.  The purpose of the bill was to protect the
10  integrity of the ballot box.
11    Q.  Did the purpose of photo identification in
12  Texas remain the same between SB 362 and SB 14?
13    A.  I would have to go back and do a bill
14  comparison.  From what we read in the record today, and
15  I'd have to go back and do a bill comparison, it looks
16  like 11 was somewhat different than SB 362.
17    Q.  Bill -- SB 362 and SB 14 --
18    A.  I mean 14.  Did I say 11?  I'm sorry.
19    Q.  SB 362 and SB 14 may be different, but the
20  question is:  Were the purposes of the bills the same?
21  Were the purposes of SB 362 and SB 14 the same?
22    A.  Yes.
23    Q.  Senator, could you describe all public
24  communications from your office about the purposes of
25  SB 14?

## 163

1    A.  Can I describe all -- all public information?
2    Q.  Communications from your office about the
3  purpose of SB 14.
4    A.  Boy, that's a hard question, because I don't
5  know all the public information disseminated.  But the
6  purpose would be to protect the integrity of the ballot
7  box.  To the best of my knowledge that -- you know
8  that's what we...
9    Q.  Any meetings with constituents at which you
10  were present where the purpose of SB 14 was discussed?
11    A.  I don't -- could have been, but I don't think
12  so, because Senate 14, you know, I didn't see it until
13  we were in session, and once I get in session, I don't
14  have that much interaction with the constituents because
15  I'm in Austin.  So could someone have come to my office
16  and talked and about it?  Possibly, but I don't recall.
17    Q.  Any meetings with the Lieutenant Governor?
18    A.  I don't -- maybe in a general meeting, yes, I'm
19  sure, but I don't remember a specific meeting.
20    Q.  Any meetings with the Governor?
21    A.  I don't recall any meetings with the Governor
22  on this bill.
23    Q.  Any conversations with other senators who
24  opposed SB 14 regarding the purpose of SB 14, that you
25  have previously identified?

## 164

1    MR. SWEETEN:  You can answer about any
2  conversations.  Don't reveal the substance.
3    A.  Okay.  I'm sure there were discussions.  I
4  referred to one earlier today, specifically with Senator
5  Hinojosa, that I believe I had.  But I don't -- beyond
6  that, outside of generic conversations with other
7  senators who were opposed to the bill, I don't have any.
8    Q.  (By Mr. Fisher) And who were the main opponents
9  to SB 14?
10    A.  There weren't any main opponents.  They were
11  just all the Democrats in the Senate who were opposed,
12  not one more than the other.
13    Q.  And what's your understanding of why they were
14  opposed to SB 14?
15    MR. SWEETEN:  In answering this question,
16  don't reveal specific communications with legislators or
17  legislative staff.
18    A.  Yeah, I can't speculate on that one.
19    Q.  (By Mr. Fisher) Any knowledge of public
20  statements by what you termed as all the Democrats --
21    A.  Right.
22    Q.  -- with regard to why they opposed to SB 14?
23    MR. SWEETEN:  You can answer as phrased.
24    A.  Yeah, I don't -- I don't recall.  I mean, maybe
25  I read something, but I don't recall anything



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Dan Patrick                                          May 30, 2012

---

165

1    specifically.
2        Q.   (By Mr. Fisher) Why was SB 14 a better way to
3    accomplish the purpose that you've identified than
4    current practice in Texas?
5            MR. SWEETEN:  Don't reveal your thoughts,
6    mental impressions, opinions, motivations about
7    legislation, in furtherance of the legislative process,
8    nor in the communications we've outlined previously.
9    Those would be matters subject to the legislative
10   privilege.  I instruct you not to answer to the extent
11   your answer would reveal those.
12       A.   Yeah.  I'll assert legislative privilege.
13       Q.   (By Mr. Fisher) And is that on the advice of
14   your counsel?
15       A.   That's just on my own.
16       Q.   You supported, and you've testified earlier
17   that you supported SB 362; is that correct?
18       A.   Yes.
19       Q.   Okay.  So if you would take a look at SB 362,
20   which I think you already have as an exhibit, it's --
21       A.   162?
22       Q.   It's previously marked.
23       A.   162, I think.  You said Senate Bill 362?
24       Q.   Correct.
25       A.   I think it's Exhibit 162 is one that I have,

---

166

1    and another one is 161.
2        Q.   Those are both transcripts, Senator.
3        A.   Okay.  Sorry.
4        Q.   I wanted you to look at the actual bill, and I
5    believe it's right there.  Underneath.  And it's 29
6    previously marked, and then you'll have Exhibit 5, which
7    is SB 14.
8        A.   Okay.  I've got two 362s, so I assume they're
9    the same.
10       Q.   So Senator, we have Exhibit 5, which is SB 14,
11   previously marked, and we have Exhibit 29, which is
12   SB 362, and that's also been previously marked, and
13   we've taken a look at these.  We've looked at the photo
14   identification requirements of both bills; is that
15   correct?
16       A.   Yes.
17       Q.   And if you would turn to those now.  And I can
18   help you get there if you need me to.
19       A.   I think I remember on the first one.  Okay.
20   That starts on Page 6, I believe, on Exhibit 29, and on
21   page --
22       Q.   Actually, Senator, it starts on Page 5 of 29.
23       A.   Okay.
24       Q.   And Page 9 of Exhibit 5.
25       A.   All right.

---

167

1        Q.   And if you would take a look at these two
2    sections, please, and its Section 14 of Exhibit 5 and
3    Section 10 of Exhibit 29.
4        A.   All right.
5        Q.   And they both start out, I believe, with the
6    same language.  "The following documentation is an
7    acceptable form of photo identification under this
8    chapter."  And if you would take a look at those forms
9    of identification that are allowed, please.
10       A.   Okay.
11       Q.   Do you notice any differences between the forms
12   of identification that are allowed by each bill?
13           MR. SWEETEN:  You can answer based on the
14   text of the bill.
15       A.   Yes.  I'll have to go through it step by step.
16       Q.   (By Mr. Fisher) With regard to Item Number 1,
17   what differences do you note between the two bills with
18   regard to Item Number 1?
19       A.   In the bill, Senate Bill 14, the language says,
20   "Has not expired no earlier than 60 days before date of
21   presentation."  362 said "two years."
22       Q.   And you supported Senate Bill 362; is that
23   correct, Senator?
24           MR. SWEETEN:  You can testify about
25   matters of the public record.

---

168

1        A.   Yeah, I did.
2        Q.   (By Mr. Fisher) And was Senate Bill 362, with
3    regard to the expiration of a driver's license, an
4    inferior way to carry out the purpose which you've
5    identified as ensuring the integrity of the ballot box?
6        A.   I would assert legislative privilege.
7            MR. SWEETEN:  Objection, legislative
8    privilege.
9        Q.   (By Mr. Fisher) We can move on to -- Senator,
10   on Exhibit 29, why don't you go ahead and read Number 6,
11   and I'll read it.  "A valid identification card that
12   contains the person's photograph and is issued by an
13   agency or institution of the federal government or an
14   agency, institution, or political subdivision of this
15   state."  And let me ask you if you see any similar
16   language in SB 14?
17       A.   Is it just on Page 10 only, or is there more?
18       Q.   Regarding the acceptable forms of
19   identification --
20       A.   Right.  Right.
21       Q.   -- under SB 14, I think you're looking at Page
22   9 and 10 of Exhibit 5, Senator.
23       A.   I don't -- I don't see that.
24       Q.   So what changed between 2009 and 2011 that made
25   these forms of identification acceptable under SB 362,

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Dan Patrick                                            May 30, 2012

---

### 169

1  but not acceptable under SB 14?
2          MR. SWEETEN:  Objection, legislative
3  privilege.
4      A.  Yeah.  I would assert legislative privilege.
5      Q.  (By Mr. Fisher) And how would allowing these
6  forms of ID prevent the goal of ensuring the integrity
7  of the ballot box from being met?
8          MR. SWEETEN:  Same objection.
9      A.  I'll assert legislative privilege.
10     Q.  (By Mr. Fisher) And is that on the advice of
11  your counsel, Senator?
12     A.  Yes.
13     Q.  Senator, if I could have you take a look at
14  Exhibit 5, SB 14.  Do you see any provision for nonphoto
15  identification as was permitted under SB 362, which
16  we've discussed previously?
17     A.  Yeah, let me look.  I'm just reading it
18  carefully.  I'd have to, maybe, take a few more minutes
19  and read it, but it would appear that if you didn't have
20  a photo ID, you can cast a provisional ballot, but I'd
21  have to go back and do an analysis.
22     Q.  Is it fair to say that the provisions regarding
23  nonphoto identification that were included in 362
24  meaning -- and we did the cross-referencing where we
25  showed that two forms of identification under Section B

### 170

1  of 362, is it fair to say that that information is not
2  present in SB 14?
3      A.  Based on this document and the legislation,
4  yes.
5      Q.  And what changed between 2009 and 2011 that
6  made two forms of nonphoto ID acceptable as an option in
7  2009, but not in 2011?
8          MR. SWEETEN:  Objection, legislative
9  privilege.
10     A.  Yeah, I would assert legislative privilege on
11  advice of counsel.
12     Q.  (By Mr. Fisher) But you supported SB 362 based
13  upon your previous testimony in 2009, correct?
14         MR. SWEETEN:  Objection, asked and
15  answered, but you can answer.
16     A.  Yes.
17     Q.  (By Mr. Fisher) And at that time, did you feel
18  that SB 362 accomplished its purpose?
19     A.  I would assert legislative privilege.
20         MR. SWEETEN:  Yeah.  Objection,
21  legislative privilege.
22     A.  On advice of counsel.
23     Q.  (By Mr. Fisher) Senator, SB 14 provides for
24  what's called an election identification certificate.
25  Do you know what that is?

### 171

1      A.  I'd have to go back and read what that is.  I
2  don't --
3      Q.  Well, Senator, you were listed as an author of
4  this bill.  I understand that that might have been a
5  special circumstance in this case, but you don't know
6  what an election identification certificate is; is that
7  correct?
8          MR. SWEETEN:  Objection, argumentative.
9      A.  I would have to go back and read exactly what
10  it is.
11     Q.  (By Mr. Fisher) And you voted to support this
12  bill; is that correct?
13     A.  Yes, I did.
14     Q.  Senator, are you familiar with the Indiana
15  identification requirements?
16     A.  Vaguely.
17     Q.  Are you aware of any public records regarding
18  what changed between SB 362 and SB 14 concerning the
19  allowable forms of identification?
20         MR. SWEETEN:  You're asking about matters
21  of the public records?
22     A.  Yeah.  I don't recall being aware of anything.
23     Q.  (By Mr. Fisher) And you said you were vaguely
24  familiar with the Indiana identification rights; is that
25  correct?

### 172

1      A.  You know, in fact, I'm going to correct the
2  record.  I'm not even sure I'm aware of the Indiana
3  law.  I may have read something on it, but in the back
4  of my memory somewhere, but I don't recall anything
5  specific.
6      Q.  Did you conduct any analysis of photo
7  identification laws in other states prior to authoring
8  or supporting SB 14?
9          MR. SWEETEN:  Objection, legislative
10  privilege.
11     A.  Yeah, assert legislative privilege on advice of
12  counsel.
13     Q.  (By Mr. Fisher) Are you aware of the photo
14  identification requirements required in Georgia?
15         MR. SWEETEN:  You can answer as to whether
16  you're aware as you're sitting here.
17     A.  Yeah.  Again, I may have read something
18  somewhere, but nothing specifically.
19     Q.  (By Mr. Fisher) Did you ever do a side-by-side
20  comparison of the bills at work in Georgia or Indiana
21  and the proposed legislation of SB 14 in Texas?
22         MR. SWEETEN:  Objection, legislative
23  privilege.
24     A.  I assert the legislative privilege on advice of
25  counsel.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Dan Patrick                                    May 30, 2012

---

173

1    Q.   (By Mr. Fisher) Where did you read any
2  communications about -- you just mentioned you read
3  something about the Indiana law.  Where did you read
4  that?
5    A.   I was just trying to answer the question
6  honestly, that I probably read something or something
7  vaguely, but I don't have any specifics of where I read
8  it or where it was or who wrote it.  I just don't
9  recall.
10   Q.   Do you consider legislation in other states
11 prior to authoring or supporting legislation that's
12 being proposed in Texas?
13      MR. SWEETEN:  Objection, calls for matters
14 of legislative privilege.
15   A.   Yeah.  I'll assert legislative privilege on
16 advice of counsel.
17   Q.   (By Mr. Fisher) In your work as a senator, a
18 Texas State Senator, do you think that it's important
19 that the laws that you pass have proved successful in
20 other states?
21      MR. SWEETEN:  In answering the question,
22 don't reveal your thoughts and mental impressions about
23 any specific piece of legislation, including 362 or
24 Senate Bill 14 or others discussed.  You can answer as a
25 general matter that question as you're sitting here, but

---

174

1  don't reveal matters of privilege as to a specific bill.
2    A.   Yeah.  In general, I'm curious, but -- but I'm
3  interested, but it doesn't -- it doesn't necessarily
4  guide me to support or not to support legislation.
5    Q.   (By Mr. Fisher) So as a senator, as a Texas
6  State Senator, whether legislation has been successful
7  in other states does not guide your decision about
8  whether to support it in Texas; is that correct?
9       MR. SWEETEN:  Objection, asked and
10 answered.  Also, objection to the extent it seeks
11 matters or reveals his mental impressions, thought
12 process, and the legislative process as to any bills.
13 But to the extent it does not do so, you can answer as
14 you're sitting here.
15   A.   Yeah.  I would assert legislative privilege on
16 my thought process on making those decisions.
17   Q.   (By Mr. Fisher) Okay.  Senator, I'm going to
18 hand you what's been marked previously as Exhibit 47.
19   A.   Okay.
20   Q.   So Exhibit 47, it's titled Senate Journal, 82nd
21 Legislature, Regular Session, and it's dated January
22 26th, 2011.  Is that correct, Senator?
23   A.   Yes, sir.
24   Q.   So I'm going to turn your attention to what on
25 the document -- if you look at the upper right-hand

---

175

1  corner, you'll see pages numbers?
2    A.   Okay.
3    Q.   And obviously, those page numbers don't
4  correspond to the number of pages.
5    A.   Right.
6    Q.   But if you would take a look at Page 138, and
7  you'll see, towards the bottom of Page 138, you'll see
8  Floor Amendment 15.
9    A.   Uh-huh.
10      MR. SWEETEN:  What?  Did you say 138?
11      MR. FISHER:  Correct.
12      MR. SWEETEN:  Okay.
13   Q.   (By Mr. Fisher) 138.  Floor Amendment 15.
14   A.   Right.
15   Q.   And if you would take a look at that.
16   A.   Floor Amendment Number 15?
17   Q.   Correct.
18   A.   Okay.
19   Q.   And let me know after you've had a chance.
20   A.   Okay.  I'm reading it.  Okay.  I'm ready to
21 take your questions.
22   Q.   Floor Amendment 15 describes an amendment
23 offered by Senator Davis; is that correct?
24   A.   Yes, sir.  Yes.  Uh-huh.
25   Q.   And could you describe that amendment for me?

---

176

1    A.   I'll read what it says here.  "A driver's
2  license or personal identification card issued to the
3  person by the Department of Public Safety that has not
4  --" and then I don't know if she crossed it through or
5  it was crossed through.  It's a little confusing to read
6  these after the fact who did what crossing out.
7         " -- expired or has expired after the day
8  of the most recent general election."  And then it looks
9  like cross out after "United States military," and then
10 a cross out "birth certificate or other documents."  To
11 be very honest with you, it's a little confusing who did
12 the crossing out here, but I'm not so sure what this
13 amendment was trying to accomplish in reading it today.
14   Q.   Well, how did you vote on the amendment at the
15 time, Senator?
16   A.   I voted against.  I voted that we -- voted to
17 table.  I have to see here.  I voted -- this can be
18 confusing also.  I voted, "Yes, to table."
19   Q.   To table the amendment; is that correct?
20   A.   Yes.  Correct.
21   Q.   And what does it mean to table an amendment,
22 Senator?
23   A.   That means to not allow it to come to the floor
24 for a vote.
25   Q.   And if you look at Section 1 of this amendment

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 177

1  offered by Senator Davis.
2     A.  Right.
3     Q.  And I understand your contention that it is
4  somewhat confusing.  But if we look at the last line
5  there, and I guess the "That has not expired," where it
6  has "expired" after date of the most recent general
7  election, is that different than what SB 14 ended up
8  looking like, based on what we've looked at here today?
9     A.  I don't know.  I mean...
10    Q.  Well, you can took a look, Senator, at SB 14,
11 and I think you'll find that it's -- there is some
12 mention in there of 60 days as an expiration?
13    A.  Oh, yes.  Okay.  I recall that.  Yes.
14    Q.  Actually, does this amendment, Senator, look
15 like more like 362, a bill which you also supported?
16    A.  No, it doesn't look similar to that, because
17 Senate Bill 362, I think, if I go back from memory, said
18 something about two years, so this would be not be
19 similar to --
20    Q.  How often are general elections held in Texas?
21    A.  Every two years.
22    Q.  And what does the language here say about the
23 expiration dates of the identification?
24    A.  "The most recent general election."
25    Q.  Is it fair to say that this is similar to

---

### 178

1  SB 362, as far as the expiration date, if general
2  elections are held every two years?
3     A.  I'd have to go back and do an exact
4  comparison.  They're similar in time.
5     Q.  So what was the purpose of your vote to table
6  an amendment that reflects something that you supported
7  in 362?
8         MR. SWEETEN:  Objection.  Don't reveal --
9  don't answer the question.  It calls for matters subject
10 to the legislative privilege.
11    A.  Yeah.  I assert legislative privilege.
12    Q.  (By Mr. Fisher) And how would this amendment
13 have interfered with the goals in enacting SB 14?
14        MR. SWEETEN:  Same objection, legislative
15 privilege.  Don't answer the question.
16    A.  Right.  I assert legislative privilege on the
17 advice of counsel.
18    Q.  (By Mr. Fisher) Sitting here today, do you have
19 any concerns about not including this amendment in
20 SB 14?
21        MR. SWEETEN:  Same objection, legislative
22 privilege.
23    A.  Yeah.  I assert legislative privilege on advice
24 of counsel.
25    Q.  (By Mr. Fisher) All right.  Senator, if we

---

### 179

1  could turn to Page 130, and that would be in the upper
2  left-hand corner of this page, 130.
3     A.  Okay.
4     Q.  And this one is pretty much all contained on
5  the same page here.  It starts with, "Senator Ellis
6  offered the following amendments of the bill," and I'm
7  referencing Floor Amendment 30.
8     A.  All right.
9     Q.  And you can go ahead and take a look at that,
10 and let me know after you've had a chance to take a look
11 at that, Senator.
12    A.  I've read it, or glanced through it.
13    Q.  So is it fair to say that Senator Ellis
14 introduced an amendment that would have required the
15 Secretary of State to conduct a study, and that
16 study would have included information about the number
17 of eligible voters who are prevented from voting or had
18 to vote provisionally because of a lack of an ID, and an
19 analysis of this group by race, as well as an analysis
20 of the impact on racial and ethnic minorities?
21    A.  I believe that is a fair representation of his
22 amendment.
23    Q.  And how did you vote on this amendment,
24 Senator?
25    A.  I voted to table the amendment.

---

### 180

1     Q.  And what was the purpose of your vote to table
2  this amendment?
3         MR. SWEETEN:  Don't answer the question.
4  It calls for matters subject to the legislative
5  privilege.
6     A.  I assert legislative privilege on advice of
7  counsel.
8     Q.  (By Mr. Fisher) And how would this --
9  conducting this study have interfered with your stated
10 goals in enacting SB 14?
11        MR. SWEETEN:  Same objection.  It calls
12 for matters of legislative privilege.
13    A.  I assert legislative privilege.
14    Q.  (By Mr. Fisher) And is that on the advice of
15 your counsel?
16    A.  Yes, it is.
17    Q.  Do you have any concerns about not conducting
18 such a study, Senator, as you sit here today?
19        MR. SWEETEN:  Same objection.  It calls
20 for matters of legislative privilege, that is, thoughts
21 and mental impressions about the bill.
22    A.  Yeah.  Legislative -- assert legislative intent
23 on advice the counsel.
24    Q.  (By Mr. Fisher) Were you concerned that such a
25 study would show that minorities are disproportionately



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

181

1  impacted by SB 14?
2          MR. SWEETEN:  Same objection.  It calls
3  for matters of legislative privilege.
4      A.  Assert legislative privilege on the advice of
5  counsel.
6      Q.  (By Mr. Fisher) Senator, do you remember the
7  Floor consideration of SB 14 at all?
8          MR. SWEETEN:  You can answer at phrased.
9      A.  Yeah, not much of it.
10     Q.  (By Mr. Fisher) And was your role during the
11 Floor consideration of SB 14?
12     A.  My role in SB 14, my primary role was, I
13 believe, offering an amendment to the bill.  There may
14 have been -- you know, if I look at the record, I may
15 recall something else.  Once again, we spend a lot of
16 time on the Floor, so I don't remember every bill, every
17 instance.  But do I remember -- I believe I remember
18 that correctly.
19     Q.  Do you remember any concerns raised about
20 SB 14's impact on minority voters?
21         MR. SWEETEN:  You're asking about on the
22 Floor?
23         MR. FISHER:  Correct.
24         MR. SWEETEN:  You can answer as phrased.
25     A.  Yeah, in general, you know, those are

---

182

1  objections by members who opposed the bill.
2      Q.  (By Mr. Fisher) And who were those members?
3      A.  Our -- I don't know that every Democrat said
4  it, but various Democrats.
5      Q.  And what were those concerns?
6      A.  I don't recall specifically.
7      Q.  Were they concerns about the impact of SB 14 on
8  minority voters?  Is that fair to say as a general
9  matter?
10     A.  That's probably fair to say on a general
11 matter.
12     Q.  Was part of your role -- and you are listed as
13 an author of SB 14, and we have discussed how that --
14     A.  Right.
15     Q.  -- how that might not have been, you know,
16 completely applicable in this case.  But was part of
17 your role to answer any questions about the bill?
18     A.  No.
19     Q.  And you did say that you offered
20 amendments during the Floor debate of SB 14; is that
21 correct?
22     A.  I think I offered an amendment.
23     Q.  Okay.  If we can turn to Page 123, and you'll
24 see Floor Amendment 18.
25     A.  All right.

---

183

1      Q.  And this bill says, "Senator Hinojosa offered
2  the following amendment to the bill," but your name is
3  listed at the bottom as well.
4      A.  Yes.  Yes.
5      Q.  And so was this amendment offered by you and
6  Senator Hinojosa?
7      A.  It was.
8      Q.  And what was the purpose of this amendment?
9          MR. SWEETEN:  Don't discuss matters
10 subject to the legislative privilege, including your
11 mental impressions about legislation.
12     A.  Right.  This --
13         MR. SWEETEN:  You can reveal matters of
14 the public record, but do not discuss your mental
15 impressions or thoughts or opinions.
16     A.  Yeah.  On the -- there's -- I'm sure there's a
17 public record of the reasons that Senator Hinojosa
18 gave.  I don't know if I spoke on this or not.
19 Sometimes out of time and just senatorial respect, he
20 was the author of the amendment, and I was the co-author
21 of the amendment, so he may have been the only one to
22 speak on the bill.  And whatever he said would have been
23 the record.  I don't know if I spoke on the bill or not.
24 I don't remember.
25     Q.  Well, just looking at it, I mean, what was the,

---

184

1  on its face, the purpose of this amendment?
2      A.  The amendment says that if you have a license
3  to carry a concealed handgun, that that would be a form
4  of photo ID that you could use to vote.
5      Q.  Okay.  And so then it's fair to say that this
6  was an addition to the forms of photo identification
7  that were previously allowable under SB 14?
8      A.  Yes.  It was -- I thought, yeah, it was a form
9  of a change.
10     Q.  So it was an addition.  It expanded the
11 universe of photo identification that was acceptable
12 under SB 14; is that fair?
13     A.  Yes, sir.
14     Q.  And do you know the racial composition of
15 license to carry a concealed handgun license holders?
16         MR. SWEETEN:  In answering the question,
17 don't reveal conversations you've had with state
18 agencies, other legislators, legislative staff, state
19 departments, you know, within the state of Texas, or
20 your mental impressions or thoughts about the bill.
21     A.  Yeah.  I don't have the numbers on that.
22     Q.  (By Mr. Fisher) Are you aware of whether any
23 staff or legislator investigated the racial composition
24 of folks that carried a concealed handgun license?
25         MR. SWEETEN:  Same objection.  It calls

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 185

1 for matters subject to the legislative privilege.
2      A.  Yeah, I'm not aware if that happened.
3      Q.  (By Mr. Fisher) There was -- did you have any
4 communications with anyone concerning the composition of
5 concealed handgun license holders, as far as racial
6 composition?
7          MR. SWEETEN:  You can answer if you had a
8 conversation.  You can identify one way or the other if
9 you did or didn't.
10      A.  Yeah.  I don't -- I don't recall that
11 conversation.  I don't recall a conversation on that.  I
12 think earlier I testified -- you asked me if I had a
13 conversation about this bill, and I said without talking
14 about the conversation, I referred to Senator Hinojosa.
15 He's a Democrat.  I'm a Republican.  We both have a
16 concealed carry license, so -- but I don't recall any --
17 you know, anything beyond that.
18      Q.  (By Mr. Fisher) Before supporting this
19 amendment, were you aware of the number of concealed
20 handgun license holders in Texas
21          MR. SWEETEN:  Objection, calls for matters
22 subject to the legislative privilege, including his
23 mental thoughts and impressions about legislation or
24 communications that he with the designated individuals
25 we have discussed today.

### 186

1      A.  Yeah.  I would assert legislative privilege.
2      Q.  (By Mr. Fisher) And is that one the advice of
3 your counsel, Senator?
4      A.  Yes.
5      Q.  Okay.
6          MR. FISHER:  Well, I'd would like to offer
7 at this time Exhibit 166.
8          (Exhibit 166 marked for identification.)
9      Q.  (By Mr. Fisher) So Exhibit 166, we have the
10 Texas Senate Staff Services, 82nd Legislative Session,
11 Excerpts Senate Bill 14, January 26th 2011; is that
12 correct?
13      A.  Yes, sir.
14      Q.  And if you'd take a look at the third page of
15 this document, and it is, at the top, Page 7, but it's
16 the third page of this excerpt.
17      A.  Yes.
18      Q.  And so it is hard to tell from the transcript
19 here, but either you or Senator Hinojosa answers with a
20 number of licensed -- concealed handgun license
21 holders.  So we have Senator Ellis who says, "You don't
22 know, do you?"  Senator Hinojosa says, "About four."
23 Senator Ellis says, "Senator Patrick," and then we see
24 "450 --" "inaudible overlapping conversation, inaudible
25 background conversation --" "About 415,000."  "Inaudible

### 187

1 background conversation."  "Yeah, about 400,000
2 roughly."  And then Senator Hinojosa.  "About 415,000."
3          So, after the word, "Senator Patrick," do
4 you remember, was that you offering the number of
5 concealed handgun license holders?
6      A.  To try to answer your question as accurately as
7 I can, if you go back to the previous page, I spoke
8 briefly, and I think earlier testimony I suggested -- I
9 didn't remember until I read it -- that usually you --
10 professional courtesy to the author of the amendment.
11 And so I simply stood up on the Floor and thanked
12 Senator Hinojosa, and then I said, "Thank you, Senator.
13 Appreciate it, thank you," which would indicate I turned
14 off my microphone and sat down.  And then Senator Ellis
15 was recognized by the Chair.  So I would not have been
16 on mic, because we press a button to speak, and once you
17 conclude your conversation, you turn your button off and
18 sit down.  So, there would have been no reason for me to
19 still be standing with my mic on the Floor, so I don't
20 believe that was me.
21      Q.  Well, Senator Patrick, I mean, that seems
22 exactly what happened here.  I mean, we have Senator
23 Ellis talking, then we have some inaudible background
24 conversation, and someone offering a number of 415,000.
25      A.  Right.

### 188

1      Q.  And from your reading of this transcript, do
2 you believe that wasn't you that you offered that
3 number?
4      A.  I couldn't be certain, to use an earlier word.
5 I don't think that was me.  I think Senator Ellis is
6 probably look at me sitting down and just saying --
7 because, Senator Hinojosa would have been standing the
8 whole time.  And once you finish, you sit down.  You
9 don't stand behind your desk, so I don't think that was
10 me.
11      Q.  If it wasn't you, Senator Patrick, who was it?
12      A.  It could have been Senator Hinojosa.  I mean, I
13 just don't know.  I just don't know.  It looks like he
14 -- it looks like he started to answer the question, and
15 then it looked he finished answering the question.
16      Q.  Do you think it was important to know the
17 number of holders of a concealed handgun license before
18 offering this amendment?
19          MR. SWEETEN:  Objection, it calls for
20 matters of legislative privilege.
21      A.  Yeah.  I would assert legislative privilege.
22      Q.  (By Mr. Fisher) Well, it's being asked for in
23 the public record by Senator Ellis.  Do you think
24 Senator Ellis thought it important to know this number?
25 He does ask for the number.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

189

1      MR. SWEETEN:  Objection, calls for
2  speculation.
3      A.  Yeah, I can't speculate on that.
4      Q.  (By Mr. Fisher) Just based on what's in front
5  of you, Senator, does it look like Senator Ellis asked a
6  question about the number license to carry holders?
7      MR. SWEETEN:  You can answer that question
8  as phrased.
9      A.  Yes.  Yes, it did.
10      Q.  (BY MR. FISHER) And you said earlier you didn't
11  know the number of registered voters that did not
12  possess one of the required forms of ID identified in
13  SB 14, or did you assert privilege to the answer to that
14  question?
15      MR. SWEETEN:  Objection.  That calls for
16  matters subject to the legislative privilege, the
17  thoughts, mental impressions, opinions about legislation
18  or analysis.
19      A.  Yeah, I believe we asserted privilege.  You'd
20  have to go back, but I believe we asserted legislative
21  privilege.
22      Q.  (By Mr. Fisher) So in response to a question
23  about the number of registered voters that did not
24  possess one of the required forms of ID identified in
25  SB 14, you asserted legislative privilege, but we did

190

1  discuss the fact that you voted to table an amendment
2  that would have required a study by the Secretary of
3  State regarding the number of racial and ethnic
4  minorities without ID; is that correct?
5      MR. SWEETEN:  You can testify about
6  what --
7      A.  Yeah.  The public record would indicate that.
8  You are correct.
9      Q.  (BY MR. FISHER) And do you find any
10  inconsistency, as you sit here today, with the fact that
11  a study was not -- you voted to table an amendment that
12  would have required a study regarding the number of
13  racial and ethnic minorities without ID, yet offered an
14  amendment to increase the number of voters who could
15  show ID with a license to carry a concealed handgun
16  license?
17      MR. SWEETEN:  Senator Patrick, don't
18  reveal your thoughts, mental impressions, or opinions
19  about legislation or the legislative process in
20  answering this question, nor conversations that we've
21  discussed.
22      A.  Yeah.  I would assert my legislative privilege
23  on that.
24      Q.  (By Mr. Fisher) And that's on the advice of
25  your counsel?

191

1      A.  Yeah.
2      Q.  And so, Senator, we do have Senator Ellis
3  clearly asking a question about the number of
4  individuals that would have been covered by your
5  amendment; is that correct?
6      A.  Yes.
7      Q.  And yet you voted to table an amendment that
8  would have potentially revealed numbers of voters that
9  did not have other forms of ID encompassed within SB 14;
10  is that correct?
11      MR. SWEETEN:  Objection, compound.
12  Objection, asked and answered.
13      A.  Yes.  I mean -- sorry.
14      MR. SWEETEN:  You can answer it.  I think
15  you've answered it.
16      A.  Yeah.  I think I've answered it.  I'm sorry.
17      Q.  (By Mr. Fisher) I'm sorry, Senator.  What was
18  the answer?
19      A.  I got distracted.  I'm sorry.  I turned my
20  phone off.  Sorry.
21      MR. SWEETEN:  Yeah.  I mean, we can do it
22  again, but I think the record -- he said, and I think
23  we're done.  But whatever you want to do.
24      MR. FISHER:  Can we reread the question,
25  please.

192

1      (The requested portion was read back by
2  the court reporter.)
3      A.  Yes.  Yeah, I voted against -- I voted to table
4  the amendment.
5      Q.  (BY MR. FISHER) Senator, how did the exception
6  for individuals with disabilities come to be included in
7  SB 14?
8      MR. SWEETEN:  Don't reveal matters that
9  are your thought processes, mental impressions about the
10  bill.  That is a matter of legislative privilege.
11      A.  Yeah.  I assert legislative privilege on the
12  advice of counsel.
13      Q.  (By Mr. Fisher) Did you offer an amendment that
14  included an exception for individuals with disabilities
15  under SB 14?
16      MR. SWEETEN:  You can testify.  That's a
17  matter of public record.
18      A.  Yes.
19      Q.  (By Mr. Fisher) Okay.  If you would turn to
20  page 133 of Exhibit 47, which is the big Senate Journal
21  with all the amendments that we were recently looking
22  at.
23      A.  Okay.  Page 147?
24      Q.  Page 133.
25      A.  All right.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

193

1    Q.   And it starts with, "Senator Patrick offered
2  the following amendment to the bill."  If you could take
3  a look at that, please.
4    A.   Okay.  "Senator Patrick."  Okay.  I'm good.
5    Q.   And was this an exception for individuals with
6  disabilities under SB 14?  Is that a fair
7  characterization of this amendment?
8    A.   It was an amendment for the exception with
9  certain people with disabilities.  Not all, but some.
10   Q.   And what were the circumstances under which
11 this exception was written into SB 14?
12        MR. SWEETEN:  I'm going to object.  I
13 think it calls for his mental impression, thoughts,
14 opinions, motivation regarding legislation and reveals
15 matters subject to legislative privilege.
16   Q.   (By Mr. Fisher) Senator?
17   A.   Yeah.  I would certainly assert privilege.
18   Q.   On the advice of your counsel?  Yes?
19   A.   Yes, sir.
20   Q.   What was the purpose of this amendment,
21 Senator?
22   A.   It -- what it says here in the record, that an
23 applicant who wishes to receive an exemption on the
24 basis of a disability for the requirements of Section
25 63.001 must include a certificate from a physician that

---

194

1  has a disability as defined by Section 21.002 of the
2  Labor Code, and --
3    Q.   Senator, are you reading from the bill right
4  now?
5    A.   Yes, I am.
6    Q.   And what's the general purpose of this
7  amendment, Senator, an amendment you offered?
8    A.   Yeah.  The purpose of the amendment is what it
9  says here in the Journal, it includes and states what
10 the purpose is.
11   Q.   So I give you Exhibit 167.
12        (Exhibit 167 marked for identification.)
13   Q.   (By Mr. Fisher) Exhibit 167 is a similar
14 transcript that reads, "Texas Senate Staff Services,
15 82nd Legislative Session."
16   A.   Okay.
17   Q.   "Senate Bill 14, January 26, 2011."  Is that a
18 fair characterization, Senator?
19   A.   Yes, sir.
20   Q.   So if you take a look at the second page of
21 this document, you'll see your name, and this is after
22 the president has said the Chair recognizes Senator
23 Patrick to explain Floor Amendment 35.  If you would
24 take a look at that paragraph after your name, Senator,
25 please.

---

195

1    A.   Yes, I have.
2    Q.   Does this change your recollection about the
3  purpose of the amendment you offered concerning
4  individuals with disabilities?
5    A.   Well, it doesn't change my view.  I was just
6  trying to answer your question accurately last time,
7  that the amendment spells out, it says what it says, and
8  I -- you know, I haven't read this or seen before today,
9  so I don't remember exactly what I said, you know, over
10 a year ago.
11   Q.   Do you remember that this hearing took place,
12 Senator?
13   A.   Oh, yes.  I mean, yeah, these are my words,
14 but, I mean, I didn't remember specifically until
15 reading here what I said.
16   Q.   Senator, if you look about halfway down, maybe
17 just a little more than halfway, you'll a sentence that
18 starts, "They can, of course, vote by mail, as they do
19 now, by checking off the box, but many members of our
20 community of the disabled will actually want to go vote,
21 but it could be a burden to receive, to go get that
22 photo if they don't have one."  Do you see that
23 sentence?
24   A.   Yes, sir.
25   Q.   So why would it be a burden for an individual

---

196

1  described herein to get a photo ID?
2        MR. SWEETEN:  Don't reveal matters of
3  legislative privilege.  You can answer based upon on the
4  public record.
5    A.   Yeah.  That -- you know, the public record
6  speaks for itself.
7    Q.   (By Mr. Fisher) Senator, how could it be a
8  burden for anyone to get a photo ID, as you have
9  indicated here in this public statement, that it could
10 be a burden to receive, to go and get that photo ID if
11 they don't have one?
12        MR. SWEETEN:  You can testify about
13 matters of the public record, but don't reveal matters
14 that are subject to the legislative privilege, including
15 your thoughts, mental impressions, opinions about
16 pending legislation, including Senate Bill 14.
17   A.   Okay.  Yeah.  I assert legislative privilege
18 because it does apply to my thinking behind that.  So on
19 advice of counsel, legislative privilege.
20   Q.   (By Mr. Fisher) Senator, you're not going to
21 answer questions about a public statement you made on
22 the record regarding an amendment you to Senate Bill 14;
23 is that correct?
24        MR. SWEETEN:  Let's be clear.  He is
25 answering questions about what's on the record, and I

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

197

1  will allow him to continue to do so, but he's not going
2  to reveal his thoughts, mental impressions, opinions,
3  motivations about legislation.  That's subject to the
4  privilege.
5        A.   I assert legislative privilege on advice of
6  counsel.
7        Q.   (By Mr. Fisher) As a general matter, how could
8  it be a burden for someone who is disabled to go and get
9  a photo ID from a DPS location in Texas?
10        MR. SWEETEN:  Same objection.  Same
11  instruction.
12        A.   I assert legislative privilege on advice of
13  counsel.
14        Q.   (By Mr. Fisher) As we sit here today, this
15  amendment aside and SB 14 aside, how could it be a
16  burden for someone who is disabled to get a photo ID?
17        MR. SWEETEN:  Same -- oh, wait.  You're
18  asking him, as we're sitting here today and not in the
19  context of legislation?
20        MR. FISHER:  Correct.
21        MR. SWEETEN:  Okay.  You can answer to the
22  extent you would not be revealing matters of legislative
23  privilege in doing so.
24        THE WITNESS:  I'd like to ask my -- I'd
25  like to ask counsel a question, if I may.

---

198

1        MR. FISHER:  We can go off the record.
2        (Recess from 4:50 p.m. to 4:59 p.m.)
3        (Pending question read back by court
4  reporter.)
5        MR. SWEETEN:  I'm going to object to the
6  extent the question is calling for matters subject to
7  the legislative privilege.  It could include his
8  opinions, mental impressions about any legislation.  So
9  I would instruct him not to answer on that basis,
10  because I think you're asking him to reveal his thought
11  processes about Senate Bill 14.
12        A.   So I would assert legislative privilege on my
13  thought process.
14        Q.   (By Mr. Fisher)  You're asserting based on the
15  advice of your counsel, Senator?
16        A.   Yes, sir.
17        Q.   At this time, I will turn it over to the
18  defendant intervener who'll ask you questions.
19        MR. SWEETEN:  Are you passing the witness,
20  Spencer?
21        MR. DUNN:  No, he's not, and I hope you
22  can accommodate me.  But he's just going to let me do
23  about 20 minutes and then we'll be done, and then he'll
24  continue, because I have to leave early today.
25        MR. SWEETEN:  Chad, we'll accommodate

---

199

1  you.  It's not a big deal.
2        MR. DUNN:  Okay
3              EXAMINATION
4  BY MR. DUNN:
5        Q.   Senator, my name is Chad Dunn.  I represent
6  Defendant Intervenors, a group of individuals that are
7  called the Kennie Intervenors.  But all of the
8  intervenors in this case have agreed that one lawyer
9  will get together at least at most depositions and do
10  the questions for intervenors, so I sort of represent
11  all of them, I suppose, in the next few minutes just in
12  asking you questions.
13        A.   Okay.
14        Q.   I do want you to understand upfront that the
15  questions I'm going to ask only relate to the public
16  record.  And I'll try to demonstrate that in each
17  question.  But in none of my questions do I want you to
18  get into any legislatively privileged materials, okay?
19  I just want to talk about what's in the public record
20  and what you recall, all right?
21        But first just a little bit about your
22  office and your election and district.  Your district, I
23  believe, you said was West, Northwest Harris County; is
24  that right?
25        A.   West Harris County, not Northwest.

---

200

1        Q.   And for our judges who may not know, that's the
2  Houston -- that's the county that Houston's in; is that
3  right?
4        A.   Correct.
5        Q.   All right.  How would you describe the racial
6  makeup of that district?
7        A.   I think I've testified to that earlier.  I was
8  not sure if that, if my answer was based on registered
9  voters or the population of the district, because I
10  don't recall.  But I believe I've seen a document or
11  something in writing that 39 percent of Senate District
12  7, again, I don't know if that's people or registered
13  voters, are Black and Hispanic.
14        Q.   Do you -- are there areas or pockets of your
15  district that have a higher degree of Latino or African-
16  American population?
17        A.   Yeah, not to my knowledge.
18        Q.   Is it fair to say that your district is a
19  predominantly Anglo district, at least in terms of those
20  that control the outcome of the election?
21        A.   You know, I don't know that I would
22  characterize that.  I don't look -- I don't look at the
23  racial makeup of people who vote for me or vote against
24  me.
25        Q.   Do you see a number of Latinos and African-

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 201

1  Americans at political events you go to?
2      A.  I see a greater number of Latinos than I see
3  African-Americans.  And I believe, again, looking back
4  at the documentation, that there are more -- of that 39
5  percent, more than half are Latino; can't be certain of
6  that, but that seems to be.  It's not a large African-
7  American population in the district.
8      Q.  Do you have some what you would consider to be
9  key or large, whether it's donors or supporters or
10 activists on your behalf who are Latino or African-
11 American?
12     A.  You know, with the Latino population, you don't
13 always know someone is Latino, you know.  Not
14 necessarily by name, not necessarily by appearance.  So
15 I really don't have the answer to that question.
16     Q.  Well, could you name for us, for example, a
17 donor yours that's African-American or Latino?
18     A.  The Latinos I really couldn't because I -- you
19 know, I just don't know.  There may be some people who
20 are Latino that I'm not aware of and some people who I
21 thought may be Latino who are not.  I just don't know.
22         African-Americans, because the population
23 is relatively small in the district, I'm trying to
24 think.  There are some, but I just can't remember
25 their -- I can't remember their name.

## 202

1      Q.  Would you describe your district as largely
2  suburban?
3      A.  Yeah.  I -- I believe under the new
4  redistricting, I'd have to verify the new number.  But
5  previously, it was about 20 percent Houston and 80
6  percent unincorporated Harris County.  So mostly
7  suburban.
8      Q.  Senator, before you got into the Senate, you
9  worked in radio, and you've testified that.  I'm not
10 going to try and cover that again.  You were and have
11 been for quite some time a radio host; is that correct?
12     A.  Correct.
13     Q.  And would be it fair to describe that your
14 activities of a radio host were in support of
15 conservative, politically conservative positions?
16     A.  Correct.
17     Q.  In fact, I think you've described yourself
18 publicly as, you know, one of the more conservative
19 members of the legislature; is that fair?
20     A.  Correct.
21     Q.  And you haven't been shy about talking about
22 the support you have for conservative and very
23 conservative initiatives; is that true?
24     A.  Correct.
25     Q.  Is it true that in Texas, anyway, in your

## 203

1  experience dealing with minorities in your district,
2  that minority citizens are supportive or not supportive
3  of conservative policies?
4      A.  Would you repeat that?
5      Q.  Sure.  In your experience in your district with
6  the minority population you've described earlier that
7  you've interacted with and represent, is it your
8  experience that that minority population supports
9  conservative causes that you often support?
10     A.  I think many do, and that would be indicative
11 of the fact that in a general election, I receive close
12 to 70 percent of the vote.
13     Q.  And so have you ever done any sort of figuring
14 or analysis to figure out in the 30 percent, roughly,
15 that don't support you, how much of them are made up of
16 Latino or African-American citizens?
17     A.  I don't know.
18     Q.  That could be all minority citizens.  It could
19 be all Anglo or a mix.  You don't -- you're not really
20 sure.
21     A.  It wouldn't be all of any one group.  It would
22 be a mixture of all groups.
23     Q.  All right.  When you prepare your election
24 campaign -- and let's see, you ran for Senate in 2008?
25     A.  2000 -- began my campaign 2005 for the 2006

## 204

1  primary general election.
2      Q.  You had quite a contested Republican primary as
3  I recall; is that true?
4      A.  I think there were 3 other candidates.
5      Q.  And at least two of the other candidates were
6  elected officials.
7      A.  They were House members.
8      Q.  State House members?
9      A.  Chairmen.
10     Q.  And who represented that area?
11     A.  Well, a Senate district is --
12     Q.  Part of the areas.
13     A.  Yeah.  They represented smaller pieces of the
14 area.
15     Q.  Sure.  One of the things that allowed you to
16 have success, and I'm not down-playing any of the
17 reasons that you had success, but one of the reasons was
18 your exposure on the radio; would you agree?
19     A.  I would agree that -- actually, I would
20 disagree, because I'd be, again, the campaign, and most
21 people said I may listen to you on the radio, but why
22 should I vote for you?
23     Q.  Okay.
24     A.  So I had to convince people that I was the
25 right guy.  Obviously, I had name ID, but my opponents



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 205

1  outspent me and also had name ID.
2      Q.  In that election, one of the ways you were able
3  to defeat the other elected officials who were running
4  against you was to emphasize how conservative you vote
5  and the conservative policies you support; is that true?
6      A.  Correct.
7      Q.  Since you joined the Senate, you have led a
8  number of initiatives that to make the Senate more
9  conservative.
10     A.  Correct.
11     Q.  In fact, one of the more recent examples, I
12 believe, is you have requested that in the event the
13 Lieutenant Governor is elected to Senate, the United
14 States Senate, and resigns, you want just the Republican
15 caucus to vote for the replacement Lieutenant Governor;
16 is that true?
17     A.  Or at least the majority.
18     Q.  I beg your pardon?
19     A.  Or the majority of the Republican caucus.
20     Q.  I see.  But in other words, you want
21 Republicans to decide who the Lieutenant Governor would
22 be to the exclusion of the Democrats?
23     A.  Not to the exclusion but to the majority.
24 There are currently 19 Republicans and 12 Democrats.
25 And my public statements have been that at least a

## 206

1  majority.  In fact, I recently said it would be good if
2  there were 11 or 12 Republicans and 3 or 4 Democrats.
3  That would be a nice -- you know, could be more
4  Republicans, but it would be nice to have a mix, but it
5  should be a majority in my view.
6      Q.  Well, one of the proposals you've thrown out is
7  the Republicans should caucus alone, agree on a
8  Lieutenant Governor candidate, and then have the vote in
9  the chamber with the rest of the senators.  Was that not
10 your proposal?
11     A.  I -- I think my proposal, my most recent
12 conversations on the record have been that I would like
13 to see the Republicans select a candidate.  And if -- in
14 fact, I remember specifically saying it, because it was
15 a televised interview, but you know, if it's 12
16 Republicans and 3 Democrats or 4 Democrats, and that
17 would be a positive thing.
18     Q.  Now, in the Texas Senate, the only members who
19 are of Latino or African-American descent are Democrats;
20 is that true?
21     A.  In the Texas Senate?
22     Q.  Yes, sir.
23     A.  I just want to be sure.  There are no African-
24 American Republican senators.  I'm trying to -- do we
25 have any Latino senators?  I don't believe so.

## 207

1      Q.  All right.  When you -- when the Senate
2  considers measures, it typically has to have 21-votes in
3  order to take one out of order; is that right?
4      A.  Correct.
5      Q.  And there's been a lot of testimony about
6  this.  I'm not going to try to cover it here with you,
7  but would it be okay if I called out the 21-vote rule?
8      A.  Yes.
9      Q.  All right.  With respect to the 21-vote rule,
10 how many times in your service, and if you remember from
11 before your service, has that rule been overruled or
12 sort of stepped around on a piece of legislation?
13     A.  I -- I don't know how many times previous to me
14 joining the Senate, but during special session, which we
15 had one last session, the 21-vote rule absolutely was
16 not in play on any bill.  So it happens on certain
17 pieces of legislation in the regular session at times,
18 and then in special sessions, we don't invoke it.
19         And I -- and I believe from history, stand
20 to be corrected, that the precedent was set when
21 Democrats controlled the Senate, and there was a special
22 session, that they did not invoke the 21 rule on special
23 session.  And both Democrats and Republicans have
24 majorities or -- or Lieutenant Governors have -- have
25 put the 21-vote rule aside at various times.

## 208

1      Q.  This -- this most recent special session that
2  you discussed, that -- the priority during that session
3  was a congressional redistricting; was it not, the
4  special session?
5      A.  No, it was not.
6      Q.  The most recent special session?
7      A.  No, it was not a priority.  It was part of it,
8  but was not the priority.
9      Q.  Other than this Senate Bill 14 and whatever
10 came up in that special session, can you recall any
11 other examples when the 21-vote rule was adjusted or
12 altered?
13     A.  I'm sorry.  Would you repeat that question?
14     Q.  Sure.  Other than Senate Bill 14 and this
15 special session you just mentioned, during your service,
16 do you know of any particular bill or measure that was
17 decided without the 21-vote rule?
18     A.  I don't recall.  There might have been one or
19 two, but I don't, I don't think so, but I don't recall.
20     Q.  You would agree that it's rare?
21     A.  Yes.
22     Q.  All right.  I think I've got about eight
23 minutes.  I promise to stay within it.
24         Now, have you responded to any complaints
25 by constituents that concern photo ID or voter fraud?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 209

1  MR. SWEETEN:  You can testify as to
2  whether or not you've responded to those.
3     A.  I personal -- are you talking about in writing
4  or verbally or --
5     Q.  (By Mr. Dunn)  Sure.  Have you called a
6  constituent, sent an e-mail or sent a letter that spoke
7  about voter fraud or photo ID?
8     A.  Addressing a complaint?
9     Q.  Yes, sir.
10    A.  To the best of my knowledge, I have not
11 personally.  Doesn't mean I didn't, but to the best of
12 my knowledge.  And my staff may have because, you know,
13 we get -- we get people who contact us, and my staff
14 will directly deal, you know, handle that.  So is it
15 possible my staff responded in some way reflecting my
16 position, simply saying the Senator supports this bill?
17 That, I couldn't testify to.  But I don't believe I have
18 personally -- could have happened, but I don't -- I
19 don't believe so.
20    Q.  Now, Senator, there's some issues that you have
21 to deal with constituent responses all the time about.
22 I'm sure you get contact maybe about ObamaCare, for
23 example.
24    A.  Sure.
25    Q.  You hear a great deal about them from your

## 210

1  constituents.  Is that true, there are a few issues that
2  you hear about and have to deal with all the time?
3     A.  Sure.  I don't normally respond directly unless
4  it's a unique situation.
5     Q.  Uh-huh.
6     A.  Because there's just not time in the day.
7     Q.  I understand.
8     A.  But the staff will get those issues and
9  respond.
10    Q.  In the course of your campaigns, have you done
11 anything to target the minority community in your
12 district to get their support?
13    A.  Yes.
14    Q.  What are those things?
15    A.  There is a -- there's a gentleman named Bill
16 Calhoun, I may have that name wrong, but I think that's
17 the correct name.  I just got to -- I just got a note
18 from him the other day, as a matter of fact, who
19 represents African-Americans, and so, you know, we have
20 met on a couple of occasions.  Been supportive of his
21 organization for outreach.  It's an outreach group for
22 African-Americans.  I, early on, when I was first
23 elected, I sat down with a group of Hispanic leaders.  A
24 gentleman named Reggie Gonzalez was a leader of an
25 outreach program for Latinos.  And both of those were --

## 211

1  tend to be conservative Latino groups and conservative
2  African-Americans.
3        But I also within the last six or eight
4  months, in the past, I've attended an all-Spanish-
5  speaking or primarily Spanish-speaking chamber of
6  commerce that I was invited to because I thought it was
7  important to go.  And I met with -- and my wife and I
8  stayed the full evening.  Had a great time.  Made some
9  good contacts with people.
10       And then I attended the Hispanic -- I
11 think it's called the Hispanic Chamber of Houston.  They
12 have a legislative awareness or appreciative --
13 legislative appreciation day.  And it's primarily
14 Democrat legislators who attend, but I attended.  And I
15 met the president, and I invited the president to come
16 and visit with me.  And within the last six months, the
17 president of the chamber and another person, I forget,
18 came to my Senate office and met with me.  And this is a
19 primarily Democrat-supported group.  And we -- we had a
20 long discussion on how we could work together to -- for
21 the betterment of Texas for Latinos, Anglos, African-
22 Americans, so I really work hard at that, because I
23 think it's really important.
24    Q.  Have you carried any legislation at the request
25 of Latino or African-American communities?

## 212

1     A.  To my knowledge, I've never been asked.  And
2  maybe that will manifest itself in the next session
3  after kind of beginning these -- these conversations.
4  But I don't think I've ever been asked, and I don't
5  think I've ever done that.
6     Q.  In the campaigns that you have run and that
7  you've assisted other friends of yours in the running of
8  their campaigns, did you become aware that an outcome of
9  an election was questioned because of potential voter
10 fraud?
11    A.  That I've run?
12    Q.  Yeah.
13    A.  Not that I've run, and -- and I can't speak to
14 the others.  Don't know.
15    Q.  Now, you -- you were asked a few questions
16 about Section 5 of the Voting Rights Act, and so I think
17 Section 5 means that certain government states, before
18 they can implement an election change, have to give
19 preclearance either from a court or Department of
20 Justice.  Does sound about --
21    A.  Yes.
22    Q.  -- the way you understand it?
23    A.  Sounds about the way I understand it.
24    Q.  So I assume that you've handled and worked on a
25 number of election-related measures since you've been in


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

213

1   the Senate?
2       A.   Some.
3       Q.   Okay.  When you work on a -- whether it's
4   voting on it or offering one, supporting one in
5   committee, do you give consideration as to how it would
6   get approved in the Section 5 process?
7           MR. SWEETEN:  Don't reveal your thoughts,
8   mental impressions, motivations, opinions about
9   legislation, or in furtherance of the legislative
10  process.  I think that calls for matters subject to
11  legislative privilege.
12      A.   Yeah.  I would assert legislative privilege on
13  that question.
14      Q.   (By Mr. Dunn)  Have you ever participated in
15  communicating with the Department of Justice in
16  furtherance of obtaining preclearance on a piece of
17  legislation?
18          MR. SWEETEN:  You can answer the question.
19      A.   Yeah.  I don't think we have.  I haven't
20  directly, to my -- except dealing with this issue here.
21      Q.   (By Mr. Dunn)  Do you have a person on staff
22  that you consider to be your point person for Section 5
23  that sort of analyzes those issues for you?
24      A.   Not really.
25      Q.   Do you -- are you familiar with racial -- this

214

1   is my last area of inquiry.  Are you familiar with
2   racially polarized voting?  Do you understand that term?
3       A.   No.
4       Q.   So without using that term, is it your belief
5   and experience representing a Senate district in Texas
6   that, in general, Anglos vote for Republicans , and in
7   general, Latinos and African-Americans vote for
8   Democrats?
9       A.   Excuse me.  In general, I think the public data
10  would show that a large percentage of African-Americans
11  vote for Democrats.  I don't know that it is as
12  predominant from the Latino community.  But again, the
13  public data would indicate more Latinos vote Democrats
14  than Republicans, but I don't think it's -- I'm not --
15  it's not predominant.
16      Q.   Do you think there's something different about
17  the minority population in your district in terms of how
18  it performs for political parties compared to other
19  parts of the state?
20      A.   I don't know that.
21      Q.   That's not something that you've worked on in
22  teams of preparing your campaign and getting out your
23  message for reelection?
24      A.   You know, I -- not specifically.  The issues
25  that I -- that I focus on are issues that are -- are

215

1   positive for the entire community.  I don't look at an
2   issue to just benefit one group or another group.  If
3   it's a tax issue.  If it's a transportation issue.  My
4   passion is education.  Education impacts -- in fact, our
5   public schools have a large segment of the minority
6   population.  So I might argue that a lot of what I
7   actually focus my time on is I believe positively
8   impacts minority community.
9           MR. DUNN:  All right.  Senator, I thank
10  you for the time.  I thank the Department of Justice for
11  letting me go out of order.
12          THE WITNESS:  All right.  I will tell
13  Logan hello.
14          MR. DUNN:  All right.  I hope you do.
15          FURTHER EXAMINATION
16  BY MR. FISHER:
17      Q.   All right.  So, Senator, turning back, I know
18  we just touched on this.  If you could clarify the
19  21-vote rule.  Could you just give me a quick definition
20  of the 21-vote rule?
21      A.   Yeah.  It's not a law.  It's just a rule that
22  the Senate -- senators, 31 senators vote on.  And it has
23  been a long-held tradition, that it takes 21-votes to
24  bring a bill to the floor.  It only requires 16 votes to
25  pass.  It takes a two-thirds majority to bring a bill to

216

1   the floor.
2       Q.   Have you also heard this is referred to as the
3   two-thirds rule, the same --
4       A.   Yes.
5       Q.   -- essential thing you just described?
6       A.   Yes.
7       Q.   I'm going to hand you what's going to be marked
8   as Exhibit 168.
9           (Exhibit 168 marked for identification.)
10      Q.   (By Mr. Fisher)  Exhibit 168 says "Senate
11  Journal, 81st Legislature, Regular Session, Austin,
12  Texas."  And then we've got "Second Day, Wednesday,
13  January 14, 2009"; is that correct?
14      A.   Yes, sir.
15      Q.   If we could turn to what would be page, in the
16  upper right-hand corner, designated as 23 of this
17  exhibit, but it's page 3 of the actual excerpt.
18      A.   Yes.
19      Q.   If you would take a look at the middle there,
20  you'll see "Special Orders Rule 5.11," and then we've
21  got A, B, C and D.  Do you see that, Senator?
22      A.   Yes.
23      Q.   And do you recognize this?
24      A.   It's 2009.  Yes.  I mean, I recognize it.
25      Q.   Okay.  What is it?


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 217

1    A.   It's a resolution -- when you say what is it?
2  It's just a resolution.  A little distracting with the
3  drummer out there.  Forgive me for all of us, not just
4  me, I'm sure.  A bill or resolution.
5    Q.   We are in Austin.
6    A.   Yeah, the Music Capital.  (Witness reading.)
7  Okay.  I've read it.  It's a special -- it's a special
8  order.
9    Q.   Would this rule have been in operation during
10 consideration of SB-362, which we've previously
11 discussed, which was brought to the floor in 2009?
12   A.   I can't exactly recall, but it may have.  It
13 may well have been.
14   Q.   And so if you look at Section D, and I'll go
15 ahead and read that.  "Notwithstanding Subsection A, a
16 bill or resolution relating to voter identification
17 requirements reported favorably from the Committee of
18 the Whole Senate may be set aside as a special order for
19 a time at least 24 hours after the motion is adopted by
20 a majority of the members of the Senate."  And so can
21 you tell me how this provision operated?
22   A.   I have to think through this.
23   Q.   And if you need to, go ahead and reference
24 5.11A, which says "Any bill, resolution or other measure
25 made on any day be made a special order for a future

## 218

1  time of the session by an affirmative vote of two-thirds
2  of the members present."  Is that I guess what we would
3  term the proverbial two-thirds or 21-vote rule Section
4  A?
5    A.   I have to go back and kind of wrap my arms
6  around this.  When we're in session for six months, you
7  know, I've got the rules down pat, backwards and
8  forwards.  When I'm away for 12 months, I have to go
9  back and remember, revisit.
10   Q.   Well, Senator, let me ask you, is the
11 two-thirds rule and getting rid of the two-thirds rule,
12 has that been something that you have advocated for in
13 the past?
14   A.   I've advocated for reducing it from two-thirds
15 to 60 percent.
16   Q.   And that would be a three-fifths rule,
17 essentially, is that what you propose?
18   A.   It would take it from 21 to 19, true.
19   Q.   But Senator, has this been a priority for you
20 in the past, issues with regard to what we've termed the
21 two-thirds rule or 21-vote rule here today?
22        MR. SWEETEN:  You testified about matters
23 that you've publicly expressed.
24   A.   Publicly, yeah, it's a priority for me.
25   Q.   (By Mr. Fisher)  So Section D, what does that

## 219

1  do to the two-thirds Rule or the 21-vote rule, Section D
2  of Rule 5.11 that we're looking at here?
3    A.   And I would want to go back and make sure I'm
4  saying this correctly, because again, I don't have the
5  rule, Senate rule book in front of me, but I believe
6  what this does, this sets aside that 21-vote rule.
7    Q.   And it sets aside specifically for a bill or
8  resolution relating to voter identification
9  requirements; is that correct?
10   A.   Correct.
11   Q.   And is it true that you pushed through this
12 rule's change along with Senator Williams in 2009?
13   A.   Senator Williams, I think, was the lead on it.
14 I don't recall my involvement in it or not.  If you have
15 a record that would reflect that, I'm happy to look at
16 that.
17   Q.   We'll mark Exhibit 169.  Exhibit 169 will be
18 Houston Chronicle article dated January 18, 2009.
19       (Exhibit 169 marked for identification.)
20   Q.   (By Mr. Fisher)  And I'll direct your attention
21 to the end of the first paragraph here where it says
22 "Republican Senators led by Tommy," and we do a cut-off
23 here, and I apologize for that," of the Woodlands and
24 Dan Patrick of Houston pushed through rules to suspend a
25 normal two-thirds margin needed to bring legislation to

## 220

1  the Senate Floor.  The only issue to which the change
2  would apply is voter ID." And then if we move on, you'll
3  see more information about that.  Does this seem like a
4  fair characterization of what happened here?
5    A.   You know, I don't know if it's a fair
6  characterization, because the media doesn't always get
7  it right.  And I don't remember -- it didn't take two
8  people to push it through.  It just took one, and Tommy
9  took the lead on it.  But if there's something on the
10 record that I had a role in that, then that will, you
11 know, help me remember better.  But I just -- I don't
12 have any problem with it.  I'm just saying I don't
13 remember taking an active role in that.
14   Q.   Is pushing aside the two-thirds rule, as a
15 general matter, something that you support?  And you
16 have testified previously that you're in favor --
17   A.   Yeah.  I --
18   Q.   -- if there would be a 60 percent or three-
19 fifths rule?
20   A.   Yeah.  Yeah.  It is.
21   Q.   And in this case, you supported something a
22 little different than that in that it's not -- it's not
23 a change of the two-thirds rule.  It's essentially a
24 carve-out from the two-thirds rule for voter
25 identification requirements; is that correct?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

221

1    A.  Yes, sir.
2    Q.  And what was the purpose of specifying a carve-
3  out for voter identification requirements of the
4  two-thirds rule?
5         MR. SWEETEN:  Don't reveal your thoughts,
6  mental impressions or opinions or motivation about
7  legislation --
8    A.  Okay.  Yeah.  I would --
9         MR. SWEETEN:  -- in answering.
10   A.  I would assert legislative privilege.
11   Q.  (By Mr. Fisher)  You'll assert legislative
12  privilege over on the advice of your counsel over the
13  purpose of Rule 5.11D on page 23 of the exhibit we just
14  marked; is that correct?
15        MR. SWEETEN:  Let's be clear.  The
16  question was not what is the purpose of 5.11.  The
17  purpose was why as to that specific legislation.  So if
18  you want to ask him the general purpose of Senate
19  Resolution 14 -- or actually, I'm sorry.  Strike that.
20  Rule 5.111, I'll let him answer as to the purpose of the
21  bill.
22   Q.  (By Mr. Fisher)  I'll rephrase.  What was the
23  purpose of Rule 5.11D, carving out voter identification
24  requirements from the two-thirds or 21 rule that we've
25  talked about?

---

222

1    A.  To set aside the 21-vote rule to take up voter
2  ID.
3    Q.  So prior to 2009, when Rule 5.11 included this
4  carve-out under Subsection D, had there ever been an
5  area of legislation carved out from the two-thirds rule
6  before, to your knowledge?
7    A.  To my knowledge, we -- and you're saying prior
8  to 2009, so I --
9    Q.  Prior to 2009.
10   A.  I can't remember.  I think we had a special
11  session after -- I could be wrong, but it's been set
12  aside for special session.  Was it set aside?  I was
13  only there for one session before this, so I don't
14  recall in '07 if we did it or not.  We might have.  I
15  just don't remember.
16   Q.  And you've referenced this previously in your
17  testimony about the two-thirds or 21-vote rule being
18  abrogated for special sessions.
19   A.  Yeah.
20   Q.  Is that with regard to specific categories of
21  the legislation?
22   A.  Yes, because of a special session, we can only
23  take up what is on the emergency call.  So we can't take
24  up any legislation.  So the Governor puts certain items
25  on the emergency call.  So, in essence, when you set

---

223

1  aside the 21-vote rule in special session, it does apply
2  to specific legislation.
3    Q.  During a regular session, are you aware of any
4  carve-outs similar to what we see in Rule 5.11D
5  regarding voter identification requirements?
6    A.  I'm not -- could have happened, but I'm not
7  aware.
8    Q.  And the two-thirds rule is a rule that you have
9  written about or expressed an interest in; is that
10  correct?
11   A.  Yes, sir.
12   Q.  And so you're someone who would be
13  knowledgeable about the two-thirds rule and whether it's
14  been set aside in the past; is that correct?
15   A.  Yes.  Uh-huh.
16   Q.  And in fact, you are in favor of setting aside
17  the two-thirds rule as you've testified here today; is
18  that right?
19   A.  Yes.
20   Q.  Okay.  Would we'll have Exhibit 170 --
21   A.  Well, let me rephrase that.  I'm in favor of
22  reducing it to 60 percent.
23        (Exhibit 170 marked for identification.)
24   Q.  (By Mr. Fisher)  Senator, I'm going to hand you
25  Exhibit 170.  And Exhibit 170 says "Senate Rules Adopted

---

224

1  by 82nd Legislature, January 19, 2011.  Senate
2  Resolution Number 36."
3         And so if we turn to the second page of
4  this document, which has 24 in the lower left-hand
5  corner, again, you'll see Rule 5.11.  You'll see A, B, C
6  and D.  Can you compare that to the other exhibit I gave
7  you and tell me if those are the same.
8    A.  Which?
9    Q.  Previous exhibit which was Exhibit 168.
10   A.  Compare those two.  And what do you want me to
11  compare?
12   Q.  Rule 5.11 under the terms "Special Orders" in
13  both exhibits, does that look the seam, A, B, C and D?
14  Particularly Sections A and D.
15   A.  (Witness reading.)  I'm just reading it.  They
16  look -- they do.  Unless I'm missing something you see
17  that I'm not, but they look similar.
18   Q.  No.  I believe they are the same, Senator.  Was
19  the carve-out in Section D, was that reauthorized, to
20  your knowledge, in 2011?  Is that what we're seeing
21  here, a reauthorization?
22   A.  I believe it was, but I would have to have the
23  record reflect that.
24   Q.  Would SB-362 have passed the Senate if Rule
25  5.11D had not been in place?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 225

1       MR. SWEETEN:  Objection.  I think you're
2   calling for his mental impressions, opinions,
3   motivations --
4       MR. FISHER:  We can count the votes.  This
5   is a matter of math.
6       A.  Okay.
7       Q.  (By Mr. Fisher)  Would SB-362 have passed the
8   Senate if the two-thirds rule had not been suspended.
9   Meaning, did you have more than two-thirds of the vote
10  to pass SB-362?
11      MR. SWEETEN:  As phrased, I'm fine with
12  the question, if you're asking about the votes that were
13  cast on 362.
14      A.  You're also asking me to speculate because
15  votes do change.  Probable -- it probably would not have
16  passed, because I don't know that votes would have
17  changed, but -- but you can believe me, votes change.
18      Q.  Would a bill like SB-14 ordinarily be brought
19  only to the floor with a vote of two-thirds of the
20  Senate?  Meaning, in the absence of Rule 5.11D that I
21  just handed you, which is part of the Senate rules
22  exhibit from 2011?
23      MR. SWEETEN:  You're asking about as the
24  Senate as a general matter?
25      MR. FISHER:  As a general matter.

## 226

1       MR. SWEETEN:  As a procedural
2   question.  Yeah, you can answer.
3       A.  As a general matter, unless you have 21-votes
4   on any bill, it does not come to the floor.
5       Q.  So the answer is "yes," Senator; is that
6   correct?
7       A.  I think the answer to your question is "yes,"
8   if the question is, would it -- was it a negative
9   question, would it not have come to the floor?
10      Q.  No.  Senator, would a bill like SB-214
11  ordinarily be brought to the floor only with a vote of
12  two-thirds of the Senate, in the absence of Rule 5.11D,
13  which is the carve-out for a specific category of voter
14  identification?
15      A.  Maybe it's late in the day.  I'm getting
16  tired.  But you confused me, because I would think the
17  answer would be "no," but you said the answer would be
18  "yes."  So maybe you better read that question to me
19  again so I get it right.
20      Q.  Does it normally -- I'll rephrase.
21      A.  Okay.  Sorry.
22      Q.  A bill like SB-14.
23      A.  Right.
24      Q.  We're talking about a regular session of the
25  Senate so we're excluding special sessions.

## 227

1       A.  Okay.
2       Q.  Would it normally take a vote of two-thirds --
3       A.  Oh, okay.
4       Q.  -- of senators present to bring that to the
5   floor?
6       A.  I understand.
7       MR. SWEETEN:  And you can answer as a
8   general matter --
9       A.  Yes.
10      MR. SWEETEN:  -- about general Senate
11  procedure.
12      A.  Yes.  Okay.  I understand.
13      Q.  (By Mr. Fisher)  Okay.  So your answer is
14  "yes."  So Rule 5.11D carved out based on the subject
15  matter of the legislation SB-14 from that usual
16  requirement; is that correct?
17      A.  Yes.
18      Q.  Why is the support, and I know you don't
19  necessarily support the rule, but why is the support of
20  two-thirds of senators required for most bills?
21      MR. SWEETEN:  Currently, now, as a matter
22  of Senate procedure, you can answer.
23      A.  Why is it?  Did you say why is it?
24      Q.  (By Mr. Fisher)  Yes, Senator, why is the
25  support of two-thirds of senators required for most

## 228

1   bills?
2       A.  I actually think that was -- I assert
3   legislative privilege asking me the "why," because --
4       MR. SWEETEN:  Yeah.  I think if -- he's
5   asking you about your mental impressions or opinions or
6   motivations about legislation, or in particular, the why
7   of the bill.  I do think that that potentially
8   implicates legislative privilege.  So I think that's my
9   instruction.
10      A.  Yeah.  The way to rephrase it, but the way you
11  ask it, I would assert it.
12      Q.  (By Mr. Fisher)  So, Senator, are you asserting
13  legislative privilege on the advice of your counsel in
14  response to the last question that I asked?
15      A.  Yes.
16      Q.  As a general matter of procedure in the Texas
17  State Senate, why is there a requirement that two-thirds
18  of the senators present vote to bring a bill to the
19  floor?
20      A.  I'll try to answer this without asserting
21  legislative privilege.  The why is because that's what
22  the senators vote on.  That's the rule.
23      Q.  Is there a history behind it, Senator?  This is
24  an issue that I know you care about.
25      A.  Yeah.  Sure.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

---

## 229

1    Q.   It's an issue that you have written about.
2    A.   Yes.  There is a history.  There is a history.
3    Q.   What's the history, Senator?
4    A.   The history, which I've spoken about on the
5    record, on the Senate floor I believe, is -- was when
6    Texas was primarily a one-party state when it was all
7    Democrats.  And you just couldn't have any member
8    bringing a bill to the floor who wanted to bring a bill
9    to the floor.  You had to have some kind of order.
10          And so at some point in the past, I
11   believe it was under Governor Shivers in 1951 where this
12   really became an issue, I'm just remembering, been a
13   couple of years since I've talked about this
14   specifically.  The Democrats started invoking the rule,
15   because they had to have a way to bring a bill to the
16   floor.  That's the best of my memory.
17          Of course, I wasn't there then.  But
18   history would indicate it was meant for really a
19   one-party system as a way to funnel bills to the floor
20   so you didn't have chaos of all the legislation.
21          And then as, you know, 30 or 40 years
22   later when we became more of a bipartisan state, you
23   know, as late as the '90s, I think we only had three
24   Republicans in the Senate, or in the late '80s.  As
25   Republicans grew, it really was -- it was an issue that

## 230

1    the Democrats controlled always.  And then as
2    Republicans grew, it became -- it did become an issue of
3    kind of a bipartisan issue over the last several years.
4          And so that's kind of the history of it.
5    And I -- I don't believe it works for a -- for a -- I
6    believe it worked well maybe for the Democrats for a
7    one-party system, but it's difficult for two parties to
8    -- because two-thirds is a very high threshold.
9    Q.   Is it fair that it requires a general consensus
10   on legislation so you've mentioned one party, but now
11   that the legislature is more evenly split, does it
12   require some kind of consensus on legislation before
13   it's brought to the floor?
14   A.   It does require consensus, but two-thirds is a
15   very high threshold consensus.  And our founding fathers
16   spoke about that as well.
17   Q.   And what did you mean, you mentioned a minute
18   ago, "bipartisan issue," so what did you mean when
19   describing it as a bipartisan issue?  Do you mean it
20   affects both parties?  Is that what you mean?
21   A.   I'm not sure how I -- how I said that.  How did
22   I say that?  I don't want to make you go back there.
23   I'm not sure how I said that.
24   Q.   Did you -- do you mean that as -- you were
25   describing how the Texas legislature of the Senate has

## 231

1    become more bipartisan, meaning there's been more
2    Republicans --
3    A.   Yeah.  There are more Republicans .  And if you
4    look at -- and if you look at all of the votes that are
5    cast on the Senate floor, the vast majority have passed
6    with 28, 29 votes, and there's bipartisanship, both
7    parties, on many bills.
8    Q.   Was that the case with SB-14?
9    A.   Was not the case with SB-14.
10   Q.   So what was the purpose of adopting Rule 5.11D
11   in 2011?
12          MR. SWEETEN:  He's asked and answered that
13   question.  Objection, asked and answered.
14   Q.   (By Mr. Fisher)  You can still answer, Senator.
15   A.   Purpose was to pass a bill that would ensure
16   the integrity of the ballot box.
17   Q.   So Rule 5.11D, based upon your testimony, was
18   in place to ensure the passage of SB-14; is that
19   correct?
20          MR. SWEETEN:  Objection, asked and
21   answered.  You can answer again.
22   A.   Yeah.  The purpose of the exception to 5.11 was
23   to pass a bill that would ensure the integrity of the
24   ballot box.
25   Q.   And the bill would not have passed without

## 232

1    5.11D, I mean, that's the logical consequence of your
2    answer, correct?
3          MR. SWEETEN:  Objection, calls for
4    speculation.  Go ahead.
5    A.   Yeah.  Yeah.  I -- you know, as I said, it is
6    speculation.  I think it is fair to say that you're
7    correct, it may not have passed.  Doesn't mean it
8    wouldn't have passed, but you're -- I think that's a
9    fair --
10   Q.   Can you think of any other consensus
11   legislation in a similarly situated legislation that has
12   received the same kind of carve-out as we see in Rule
13   5.11D in Texas?
14          MR. SWEETEN:  Objection, asked and
15   answered.
16   Q.   (By Mr. Fisher)  You can still answer, Senator.
17   A.   Yeah.  I think I've -- I think I've answered
18   that question.
19   Q.   Is the answer "no"?  Is that what your
20   testimony has been?
21   A.   I think my testimony has been in special
22   session, we do it, and those bills in special session
23   are --
24   Q.   We're not talking about a special session.
25          MR. SWEETEN:  No, no, no.  Let him finish



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 233

1  his answer.  He can finish his answer.
2      A.  Again, the special session, those rules are
3  important, too, so it has that.
4      Q.  In regular session, Senator, are you aware of
5  any other bills that have been given the same treatment
6  as SB-14 and Rule 5.D11D?
7          MR. SWEETEN:  Same objection.  Asked and
8  answered multiple times.
9      A.  Yeah.  Yeah.  I've answered it.
10     Q.  (By Mr. Fisher)  And your answer is "no"; is
11  that correct, Senator?
12     A.  I said I didn't -- I think my answer was I
13  don't recall any specific.  Might have been.  I don't
14  recall.
15     Q.  Did you have any communications with anyone
16  about the suspension of the two-thirds rule in 5.11D?
17         MR. SWEETEN:  You can reveal whether or
18  not you had a conversation.  Do not reveal the substance
19  of the conversation.
20     A.  Sure.  Yeah.  Yes, I had a conversation.
21     Q.  And who were those conversations with?
22     A.  Would have been with senators from both
23  parties.
24     Q.  And when did those conversations occur?
25     A.  I couldn't tell you exactly, but it would have

---

### 234

1  been prior to this -- to this special order, because it
2  was a topic of discussion.
3      Q.  Do you remember the other senators involved
4  that you had discussions with?
5      A.  I can't tell you specifically.  I -- I don't
6  know if it was to Senator Williams about it or
7  not.  Probably did.  Beyond that, I really can't
8  speak.  Everyone was talking about it so I think pretty
9  much.
10     Q.  Okay.  Senator, I'm going to hand you what's
11  been marked as Exhibit 171.
12        (Exhibit 171 marked for identification.)
13     A.  Okay.
14     Q.  (By Mr. Fisher)  And this is titled "Capitol
15  View, 82nd Legislative Session, Senator Dan Patrick,
16  Your Voice From Senate District 7, January 26, 2011."
17     A.  All right.
18     Q.  And if you remember, we had a discussion
19  earlier, and I asked you a series of questions about a
20  newsletter, and so those were whether you recognized the
21  document, the purpose of the document was created for.
22     A.  Right.
23     Q.  Would any of your answers change with regard to
24  this as opposed to a newsletter?  Do you have more or
25  less involvement in the creation of this advice than the

---

### 235

1  newsletter?
2      A.  I have -- I don't write this as much, but I
3  do -- I do look at it before it's sent out.
4      Q.  And what's the purpose of this document,
5  "Capital View, 82nd Legislative Session"?
6      A.  To disseminate information to the district on
7  what's going on.
8      Q.  And is this sent out to all of your
9  constituents; is that correct?
10     A.  No, this is different.  What we had before was
11  a newsletter that is distributed to all registered
12  voters that the state actually pays for the postage.
13  We're allowed to do that once a year.  This is a
14  campaign e-blast.  It's not an actual -- the other is an
15  actual letter.  This is a campaign e-blast that we send
16  out to whoever sends their e-mail.  So if we have
17  their e-mail, we send it out.
18     Q.  Okay.  Thank you, Senator, for explaining the
19  difference.  If you look at -- and this is entitled
20  "2/3rds Rule Change."
21     A.  Yes.
22     Q.  "2/3rds Rule Challenge" -- I'm sorry -- "Gains
23  Ground Once More."
24     A.  Right.
25     Q.  You look about halfway down.  "Four years ago I

---

### 236

1  stood alone," and this is I'm assuming you?
2      A.  Yeah.
3      Q.  "This year, Senator John Carona stood with me
4  on the Senate floor in opposition to the two-thirds
5  rule.  Several other senators also placed objections in
6  the Senate Journal.  We did set aside the two-thirds
7  rule on voter ID.  That's a big victory, but I want
8  total change."  Do you see that there?
9      A.  Yes.
10     Q.  And did you review that before it was sent out
11  to your constituents?
12     A.  I don't remember specifically if I did, but I
13  feel sure I did.
14     Q.  And what did you mean to convey by this
15  statement?
16     A.  Just to let the people who received this
17  e-blast know what had happened concerning the two-thirds
18  rule in general and specifically on voter ID.
19     Q.  And so why do you oppose the two-thirds rule if
20  you -- that's asked and answered.  Fair enough.
21         In your statement, you note that you stood
22  alone in opposition to the two-thirds rule; is that
23  correct?
24     A.  Correct.
25     Q.  So then does that mean as a logical consequence

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

237

1    that other senators disagree with you on this point?
2          MR. SWEETEN:  Don't reveal specific
3    communications that you had with senators.
4       A.  Well, standing alone -- standing alone would
5    indicate that, at that time in 2007, I was alone.
6       Q.  (By Mr. Fisher)  And obviously, since the
7    Senate actually has a majority of Republicans, many
8    Republicans do not support your view of the two-thirds
9    rule as well; is that correct?
10         MR. SWEETEN:  Are you asking now?  And
11   also, don't reveal communications you've had.
12      Q.  (By Mr. Fisher)  We can ask as far as 2007 and
13   then now, if there's been any change.  But in 2007,
14   since you do say you stood alone, there must have been
15   other folks from your party that didn't agree with your
16   position in the two-thirds rule; is that correct?
17         MR. SWEETEN:  You can answer the question
18   based upon matters of the public record.  Don't reveal
19   specific communications you had with senators or Senate
20   staff.
21      A.  I'm trying to think how to answer this
22   accurately and not -- I'm not alone any more in my view.
23      Q.  (By Mr. Fisher)  Okay.  But in 2007, you said
24   you stood alone, and this was something that you
25   proposed.  You've described your reasons for opposing

---

238

1    the two-thirds rule, which I almost asked you about
2    again, but I realized you've answered that question.
3       A.  Right.
4       Q.  So my question is, since you did stand alone,
5    there were obviously many other senators that disagreed
6    with you; is that s fair characterization?
7       A.  There -- yeah, not all senators disagreed.
8    Just because you don't stand up and speak out doesn't
9    mean you don't agree.  Sometimes you are alone.  But it
10   would be fair to say in 2007, the majority did not
11   agree, did not agree with me.
12      Q.  And in 2009, we see that many senators joined
13   with you in setting aside the two-thirds rule with
14   regard to SB-362; is that correct?
15      A.  Correct.
16      Q.  And in 2011, we see that many senators joined
17   with you in setting aside the two-thirds rule with
18   regard to SB-14; is that correct?
19      A.  Correct.
20      Q.  Have you ever brought up making a change to the
21   two-thirds rule?  And I know you support it.  Have you
22   brought up legislation to make a change to the
23   two-thirds rule as a hole?
24      A.  It wouldn't actually be legislation, because
25   it's just a rule that we vote on as a Committee of the

---

239

1    Whole.  So --
2       Q.  Have you brought up such a change to the
3    Committee of the Whole?
4       A.  Yes, I have.
5       Q.  And what happened when you brought that up?
6       A.  It was --
7          MR. SWEETEN:  You can testify about
8    matters of public record.
9       A.  Well, this Committee of the Whole, not a public
10   record.
11         MR. SWEETEN:  Okay.
12      A.  It's private caucus.
13         MR. SWEETEN:  Okay, well --
14      A.  It's a caucus --
15         MR. SWEETEN:  You can testify about
16   matters of public record, public statements, and, but
17   don't reveal matters that are subject to privilege,
18   which would include communications with senators.
19      A.  I have to assert -- in the definition of how
20   that's, you know, since it's not public record, I'd have
21   to assert.
22      Q.  (By Mr. Fisher)  Are you asserting legislative
23   privilege on the advice of your counsel, Senator?
24      A.  Yes.
25      Q.  I'm going to hand you what will be marked as

---

240

1    Exhibit 172, and this is an article from the San Antonio
2    Express News dated January 20th, 2011.
3          (Exhibit 172 marked for identification.)
4       Q.  (By Mr. Fisher)  Is that a correct
5    characterization of this article, Senator?
6       A.  Yes.
7       Q.  And if you read what is the second paragraph
8    and the third paragraph, we see "The Senate voted 18-11,
9    largely along party lines, to keep in place the rules
10   that required a two-thirds super majority vote for a
11   bill to reach the floor for debate.  State Senator Dan
12   Patrick, Republican from Houston, tried as he has in
13   previous sessions to dump the longstanding Senate
14   tradition saying the two-thirds rule requiring approval
15   from at least 21 of the 31 senators gives the minority
16   party excessive power of the majority"; is that correct?
17      A.  Yes.
18      Q.  And so you've acknowledged that you don't have
19   the votes to make a broad-sweeping change to the
20   two-thirds rule; is that correct?
21      A.  Correct.
22      Q.  But other senators did join with you in 2009 to
23   make a change to the two-thirds rule with regard to
24   SB-362; is that correct?
25      A.  They joined with Senator Williams and myself,

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 241

1  yes.
2      Q.  And senators joined with you to make a change
3  to the two-thirds rule with regard to SB-14 in 2011; is
4  that correct?
5      A.  And Senator Williams, correct.
6      Q.  Yet some of these same senators, it would seem,
7  by a logical conclusion have not joined with you to make
8  a broad change to the two-thirds rule with regard to
9  legislation, all legislation being brought before the
10  Texas State Senate; is that correct?
11      A.  I believe that's correct.
12          (Recess from 5:50 to 6:02 p.m.)
13      Q.  (By Mr. Fisher) All right.  So if we could
14  return back to the record.
15          Senator, you mentioned -- you did mention
16  the founding fathers and you mentioned with regard to
17  wanting to make a move to a three-fifths rule instead of
18  two-thirds rule, and I just wanted to get your reaction
19  on that issue.
20          Why a three-fifths rule instead of a
21  two-thirds rule?
22          MR. SWEETEN:  You can reveal matters of
23  the public record, public speeches you have given on the
24  issue.
25      A.  Yeah.  The public speech I gave on the Floor,

## 242

1  paraphrasing, was that the founding fathers considered,
2  when writing the Constitution, should Congress be a
3  simple majority or a two-thirds.  And Madison and
4  Washington and others suggested that it should be a
5  simple majority, for a variety of reasons.  And so
6  Congress does -- you know, people forget about it, but
7  Congress passes bills on a simple majority.  In the
8  Senate, they pass bills on a simple majority, which have
9  the 60 vote, which is 60 percent cloture vote.  So, in
10  the Senate, in the Texas Senate, I thought 19 of 31,
11  which is close to 60 percent -- you can round it off
12  higher or lower -- would mirror the U.S. Senate vote.
13  That's the number I pegged.
14          And I've been very clear, in that
15  discussion on the Floor, that it's regardless of
16  Democrats or Republicans have the majority of members.
17      Q.  And how many members are Republicans in the
18  Senate at this point in time?
19      A.  It's 19-11.  19 Republicans.
20      Q.  Okay.  And so you would, at this point, that
21  would constitute enough senators that are Republicans so
22  that legislation could be brought to the Floor by
23  Republicans only; is that correct?
24      A.  Right.  It's just a happenstance of numbers
25  today, because that will change over time.

## 243

1      Q.  But as we mentioned, I mean, at this point in
2  time, you don't have the support to make such a change;
3  is that right?
4          MR. SWEETEN:  Objection.  Don't reveal
5  communications you've had with legislators or staff
6  members.
7      A.  Yeah.
8      Q.  (By Mr. Fisher) So if we could return back to
9  the previous exhibit, but we talked about, you
10  know, your statements that at this time, you don't have
11  the support to make a change to the two-thirds rule; is
12  that correct?
13      A.  I think the public record would reflect that.
14      Q.  So if I could get you to return to a previous
15  exhibit, and this was the Senate Journal, 81st
16  Legislature, Regular Session, 2009.
17      A.  Okay.
18      Q.  And the exhibit number --
19      A.  168?  Is that it?
20          MR. SWEETEN:  I think it's 47.  Is this
21  it, 47?
22          MR. FISHER:  2009.
23      A.  Yes.  January 14th, 2009.
24      Q.  (By Mr. Fisher) Correct.
25          MR. SWEETEN:  You guys are ahead of me.

## 244

1  Hold on now.
2      Q.  (By Mr. Fisher) So in previously referencing
3  this document, we talked about Page 23, and we talked
4  about Rule 5.11 A, B, C, and D?
5      A.  Yes.
6      Q.  Were there amendments offered -- at the time
7  that this language was placed in the Senate Journal,
8  were there amendments offered contemporaneously?
9      A.  I don't remember.
10      Q.  Okay.  Well, if we turn to Floor Amendment
11  Number 1, which is on Page 25 of the document in upper
12  right-hand corner.
13      A.  Okay.
14      Q.  And take a look at that Floor Amendment
15  Number 1 for me, please.
16      A.  Yes, I see.
17      Q.  And does that look like an amendment to the
18  language that was on Page 23, Rule 5.11 A, B, C, and
19  D.?  Does that look like an amendment to that language?
20      A.  Yes.
21      Q.  Okay.  And did Senator Ellis introduce this
22  amendment?
23      A.  Yes.
24      Q.  And how does it look like this amendment would
25  have worked, based on the language in 1 and 2 under



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Senator Dan Patrick                                                    May 30, 2012

---

### 245

1    "Amend SR 14 as followed"?
2         A.  It would have taken voter identification
3    requirements out, and in its place put "Protecting
4    families through insurance rate regulation and
5    foreclosure prevention."
6         Q.  And what was your vote on this amendment?
7         A.  It was a vote to table, and I voted to table.
8         Q.  And we've established earlier that you do not
9    support the two-thirds rule.  We've just discussed you
10   support a three-fifths rule that's more in line with the
11   operation of the U.S. Senate; is that correct?
12        A.  Yes.
13        Q.  Yet you voted to table this amendment, which
14   would have expanded the universe of legislation that was
15   not subject to the two-thirds rule; is that correct?
16        A.  It would not -- that's not correct.  This is --
17   if you read this closely, this would not have expanded.
18   This would have replaced voter ID.
19        Q.  Well, Senator, it would have replaced the
20   language of voter ID identification requirements, but
21   that aside, it would have expanded the amount of
22   legislation not subject to the two-thirds rule, correct?
23   It might be a different subject matter, but would it
24   have expanded the type of legislation not subject to the
25   two-thirds rule?

---

### 246

1         MR. SWEETEN:  You can answer based on the
2    text.
3         A.  Yeah.  Based on the text, I just -- I just read
4    it differently.  Expanding it would have been -- in
5    Senator Ellis's amendment, it would have been adding
6    another bill.
7         Q.  (By Mr. Fisher) Okay.  Well, let's move to
8    Floor Amendment Number 2.  Can you look at that
9    amendment for me?
10        A.  Sure.  Okay.
11        Q.  And that was offered by Senator Uresti; is that
12   correct?
13        A.  Yes.  Yes.
14        Q.  And can you read -- can you read the language
15   after Number 1?
16        A.  Do you want me to read after Number 1 or
17   Number 2?  You were talking about Uresti.  Did you mean
18   Number 2?
19        Q.  It's Floor Amendment Number 2, and then we have
20   a Number 1 --
21        A.  Oh, Number 1, I see.
22        Q.  -- on Page 2.
23        A.  Got you.
24        Q.  "Amend Modification 1 after voter
25   identification requirements by inserting the following:

---

### 247

1    We're increasing veterans' benefits."
2         And then we have Number 2 on Page 2,
3    "Amend Modification 2 after voter identification
4    requirements by inserting the following:  We're
5    increasing veterans' benefits."
6         Now, Senator, I know you've done a lot of
7    work in the area of supporting veterans; is that
8    correct?
9         A.  Yes.
10        Q.  Would this have expanded the sphere of
11   legislation not subject to the two-thirds rule to
12   include legislation regarding increasing veterans'
13   benefits?
14        MR. SWEETEN:  You can answer based on the
15   text of the document.
16        A.  Yes.
17        Q.  (By Mr. Fisher) And unlike the previous
18   amendment where you said that you had some concerns that
19   it would not have expanded the amount of legislation not
20   subject to the two-thirds rule, would this have expanded
21   the amount of legislation not subject to the two-thirds
22   rule?
23        A.  Yes.
24        Q.  And is that because it has the word "or" in it?
25        A.  Yes.

---

### 248

1         Q.  And how did you vote on this amendment,
2    Senator?
3         A.  I voted to table.
4         Q.  So your testimony is that you voted to table an
5    amendment that would have increased the amount of
6    legislation not subject to the two-thirds rule; is that
7    correct?
8         A.  Yes.
9         Q.  And it would have allowed for the consideration
10   of bills addressing veterans' benefits to not be subject
11   to the two-thirds rule; is that right?
12        A.  Yes.
13        Q.  Is voter ID legislation more or less important,
14   in your view, than increasing veterans' benefits?
15        MR. SWEETEN:  Don't answer the question to
16   the extent it asks you to reveal your thoughts and
17   mental impressions about legislation or communications.
18        A.  Yeah.  I assert legislative --
19        MR. SWEETEN:  -- privilege.
20        A.  -- privilege -- it's been a long day -- on the
21   advice of counsel.
22        Q.  (By Mr. Fisher) Are you asserting legislative
23   privilege on the advice of your counsel?
24        A.  Yes, I am.
25        Q.  Do you think increasing veterans' benefits is

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 249

1  an important goal of legislation?
2          MR. SWEETEN:  The same objection.  It
3  calls for matters subject to the legislative privilege.
4      A.  I assert legislative privilege on the advice of
5  counsel.
6      Q.  (By Mr. Fisher) Have you done work in support
7  of veterans and veterans' groups in your capacity as a
8  Texas State Senator?
9      A.  Yes.
10         MR. SWEETEN:  Yeah.  You can answer that
11  to the extent you're not revealing legislation or
12  matters related to your opinions or thoughts on
13  legislation.  To the extent that your question is not
14  calling for matters subject to legislative privilege, he
15  can answer the question.  I think he did, so...
16     Q.  (By Mr. Fisher) Senator, what kind of work have
17  you done on behalf of veterans?
18         MR. SWEETEN:  Same instruction.
19     A.   I passed a bill this past session that became a
20  constitutional amendment that would allow the wives of
21  deceased veterans or 100 percent disabled, to maintain
22  their property tax exemption, the property tax exemption
23  they have when they were alive.
24         I have passed a bill last session, I
25  believe it was last session, that would allow a veteran

## 250

1  to fly a American, Texas, or military flag in their
2  backyard, and that homeowners' associations could not
3  restrict their right to do so.
4          I have co-sponsored or co-authored,
5  depending on where the bill originated, a series of
6  bills dealing with veterans on other issues.
7      Q.  Well, thank you for your testimony on that,
8  Senator, and let me just say, as a member of the
9  military, I do appreciate that work.
10     A.  Thank you for your service.
11     Q.  But I have to ask you here and just based upon
12  your testimony, when given the opportunity to vote for
13  something as a non -- as someone who doesn't support the
14  two-thirds rule as a general matter --
15     A.  Right.
16     Q.  -- and when asked to vote for a bill, an
17  amendment that would allow for the amendment of a series of
18  bills which increased veterans' benefits to not be bound
19  by the two-thirds rule and you voted to table that
20  amendment, I have to ask for the purpose of your vote in
21  that situation.
22         MR. SWEETEN:  I'm going to object.  You're
23  asking for matters subject to the legislative privilege,
24  his thoughts, opinions about legislation, specific
25  legislative, and I would instruct you not to answer

## 251

1  based upon legislative privilege.
2      A.  I assert legislative privilege on advice of
3  counsel.
4      Q.  (BY MR. FISHER) Are you aware that there were
5  other senators that were upset by the procedural change
6  prior to SB 14 being passed?  And by procedural change,
7  I mean what we've looked at in Rule 5.11D.
8          MR. SWEETEN:  Don't reveal matters subject
9  to the legislative privilege, including communications
10  with senators or senators' staffs.  But to the extent
11  you can refer to matters of the public record, you can
12  do so.
13     A.  Yeah.  I think there was public record where
14  certain members were not happy.
15     Q.  (By Mr. Fisher) And I'll hand you what's been
16  previously marked as Exhibit 45, and it's a declaration
17  of Carlos Uresti.  And who is Carlos Uresti, Senator?
18     A.  He's a State Senator.
19     Q.  Okay.  So it's a four-page document entitled
20  Declaration of Carlos Uresti.  And on the last page,
21  you'll see it's dated April 9, 2012.  And if you could
22  turn Page 10 on the second page, and then Page 11 on the
23  third page, and go ahead and read those paragraphs for
24  me.
25     A.  Okay.  Where do you want me to begin?

## 252

1      Q.  Number 10, which is on the second page, and
2  Number 11 -- move on to Number 11 on the third page, and
3  just read those two paragraphs.
4      A.  "In 2011, the Senate majority exempted SB 14
5  outright from requiring support of two-thirds of the
6  Senate.  In other words, the requirement that at least
7  21 senators agree on SB 14 before it could be called up
8  for debate on the Senate Floor was waived.  Requiring
9  --" Number 11.  "Requiring two-thirds of the Senate to
10  support a bill is basic, foundational rule of the
11  senate, which was highly unusual to waive, especially
12  when the waiver was only applied to one bill.  Of the
13  thousands of bills awaiting debate on the Senate Floor,
14  the two-thirds rule was only waived for SB 14 and was
15  applied to all other pending Senate bills."
16     Q.  Do you have a different view than Senator
17  Uresti concerning whether this was highly unusual
18  activity?
19         MR. SWEETEN:  Caution the witness, don't
20  reveal matters subject to the legislative privilege,
21  including your mental impressions, thoughts or
22  discussions with other senators, but to the extent you
23  can answer this question without doing so, you can, or
24  based upon matters of the public record.
25     A.  Just -- I'm thinking of your question



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 253

1    here.  You asked me do I have a different -- I believe
2    -- I believe what he has written is -- is -- it's
3    opinionated, but -- but it's factual.
4        Q.  (By Mr. Fisher) Okay.  So it was highly unusual
5    for SB 14 to be considered without two-thirds vote of
6    the Senate before being considered on the Senate Floor?
7        A.  Well, you know, I'm going to correct the
8    record, because it's really more of opinion, and I don't
9    want to speculate on opinion.  So I would assert my
10   legislative privilege on this, because you're asking me
11   to give an opinion, and I'm not going to get involved in
12   that.
13           MR. SWEETEN:  And his mental -- yeah.
14       Q.  (By Mr. Fisher) Do you agree that the
15   two-thirds rule is a basic foundational rule of the
16   Senate?
17           MR. SWEETEN:  Don't get into your thoughts
18   or opinions about legislative --
19       A.  Yeah.  I have to waive -- I have to waive --
20           MR. SWEETEN:  You can discuss matters of
21   public record, speeches on issues.
22       A.  On public record, I think we've gone over this
23   a lot.  I don't see it as a foundational...
24       Q.  (By Mr. Fisher) It is fair to say that this
25   wasn't the usual procedure, correct?

## 254

1        A.  It is fair to say that.
2        Q.  Was SB 362 considered by any Senate committees?
3        A.  I don't -- you know, I just don't recall SB 62,
4    if it was or if it was not.
5        Q.  Was SB 14 considered by any Senate committees?
6        A.  By the Committee of the Whole.
7        Q.  And is the unusual for a bill to be considered
8    only by the Committee of the Whole and not by another
9    committee?  As you mentioned, you know, way back in the
10   beginning of your testimony, all the committees you
11   serve on.
12       A.  Yeah.
13       Q.  Is it unusual for a bill to not be considered
14   by one of those committees before being considered by
15   the Committee of the Whole?
16       A.  That would be accurate.
17       Q.  Do you recall any other bill being filed in the
18   Committee of the Whole without going to a separate
19   committee first?
20       A.  I can't recall one.  There may have been one,
21   but I don't recall one.  I think there may have been a
22   circumstance, but I can't -- it doesn't come to mind
23   right now, outside of the special session.
24       Q.  What does it mean for a bill have an emergency
25   designation?

## 255

1        A.  A bill that has an emergency designation
2    indicates that the Governor considers it a priority.
3        Q.  And how did SB 14 come to receive emergency
4    designation?
5            MR. SWEETEN:  Objection, calls for
6    speculation.  You can testify as to matters of public
7    record.
8        A.  Yeah.  You know, I assert senatorial privilege
9    on that, on the advice of counsel.
10       Q.  (By Mr. Fisher) If we could turn back to --
11           MR. SWEETEN:  Let me, for the record,
12   objection, legislative privilege.
13       Q.  (By Mr. Fisher) Let's turn back to Exhibit
14   Capitol View, 82nd Legislation Session, and that was
15   your document that went out to constituents.
16       A.  Okay.  All right.  170-something, I believe
17   this is it.
18       Q.  And that's 171?  Exhibit 171?
19       A.  Right.
20       Q.  And if you notice, on the last page of the
21   first -- I'm sorry -- the last line of the first page
22   and leading over into the second page, we have, "An
23   emergency bill is simply a bill that be acted upon
24   within the first 60 days of the session.  Bills are not
25   normally allowed to be voted on the Floor until the end

## 256

1    of filing."  And you're referencing here, it's under the
2    subheading of Sonogram Senate Bill 16, which you
3    referenced earlier is a bill that you supported.  So how
4    did you go about getting emergency designation for the
5    sonogram bill?
6            MR. SWEETEN:  Don't reveal matters subject
7    to legislative privilege, including communications or
8    your thought process or mental impressions regarding
9    legislation in answering the question.  You can discuss
10   matters of the public record.
11       A.  Yeah.  I would assert legislative privilege on
12   that.
13       Q.  (By Mr. Fisher) Can you tell me how emergency
14   bills are attained?
15           MR. SWEETEN:  If that's a matter of public
16   record, you can answer that question.
17       A.  Yeah.  I don't think that that's a matter of
18   public record.
19       Q.  (By Mr. Fisher) Well, Senator, we've got a
20   newsletter here of -- you know, with -- I guess a little
21   different than a newsletter, but a communication to your
22   constituents, essentially trumpeting your success in
23   getting emergency designation for a bill that you
24   supported.  And so my question is:  How did you get to
25   receive that emergency designation?  You have informed



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

**257**

1  your constituents that you got it for this bill,
2  correct?
3      MR. SWEETEN:  Okay.  But what you're
4  asking him is to reveal conversations he may have had,
5  his thoughts, mental impressions about legislation.  To
6  the extent that he would have to do that, that is a
7  matter subject to the legislative privilege.  To the
8  extent you don't have to reveal those, you can answer
9  the question.
10      A.  Yeah.  I would have -- you know, the -- I think
11  the fact is, I was able to get emergency legislation.
12  But beyond that -- or designation.  Beyond that would be
13  an area where I think I would have to assert legislative
14  privilege.
15      Q.  (By Mr. Fisher) Did you have communications
16  with the Governor's Office about this?
17      MR. SWEETEN:  You're -- I want to make
18  sure I'm clear on the question, because I'm going to let
19  him allow -- I'm going to allow him to discuss
20  communications and whether communications occurred.  But
21  are you asking in the context of the sonogram bill?
22      Q.  (By Mr. Fisher) In the context of the sonogram
23  bill, did you have communications with the Governor's
24  Office concerning the emergency designation?
25      MR. SWEETEN:  You can answer whether you

---

**258**

1  had conversations.
2      A.  Yes, I did.
3      Q.  (By Mr. Fisher) And what kind; written, verbal?
4      A.  I believe it was limited to verbal.
5      Q.  And who initiated these conversations?
6      A.  I believe I did.
7      Q.  And returning to SB 14, why did SB 14 need to
8  be considered in the first 60 days of the Legislature?
9      A.  That would be speculation.
10      MR. SWEETEN:  Yeah, that calls for his
11  mental impressions, thoughts, opinions about legislation
12  and thus, it would be subject to the legislative
13  privilege.
14      A.  Yeah, I assert legislative privilege.
15      Q.  (By Mr. Fisher) After giving emergency
16  designation, does a bill automatically get considered in
17  60 days?
18      MR. SWEETEN:  You can answer the effect of
19  emergency legislation.
20      A.  It doesn't automatically get considered.  It's
21  eligible to be considered.
22      Q.  (By Mr. Fisher) Is this something that happens
23  regularly?
24      A.  That's a broad definition of the word
25  "regularly."  It is -- and again, you have to check the

---

**259**

1  historical records.  I don't have those front of me.
2  But it seems to me that every session, or nearly every
3  session, there are bills that are designated as
4  emergency legislation.  It's not an uncommon occurrence
5  to begin a session with an emergency legislation.
6      Q.  Is it unusual for the Senate to pass
7  legislation in the first two weeks of a session?
8      A.  It is unusual in the context of the total
9  bills, but it's not unusual in the context of emergency
10  bills.
11      Q.  And were you pleased with the fact that your
12  sonogram bill was designated as emergency legislation?
13      MR. SWEETEN:  Don't reveal your mental
14  impressions, thoughts about legislation in answering the
15  question.
16      A.  Yeah.  I would assert legislative privilege.
17      Q.  (By Mr. Fisher) But you did want to inform your
18  constituents about that fact, correct?
19      A.  Yes.
20      Q.  You wanted to let them know that it was -- that
21  the sonogram bill was being considered on an emergency
22  basis; is that correct?
23      A.  Yes.
24      Q.  And so it was something noteworthy you wanted
25  your constituents to know about; is that right?

---

**260**

1      A.  Yes.
2      Q.  So he we could take a look at what was
3  previously marked as Exhibit 45, again, the declaration
4  of Senator Uresti.
5      A.  Okay.
6      Q.  And I'll have you look at 6 and 7 of that
7  declaration now.
8      A.  Okay.  I'm looking at it.
9      Q.  Just let me know when you're done reading
10  Paragraph 6 and 7, please.
11      A.  Okay.  Let me walk right through it.
12      (Reading documents.) I have read it.
13      Q.  So these paragraphs are describing what
14  occurred prior to a vote on HB 218; is that correct?
15      A.  Yes, sir.
16      Q.  Do you remember what HB 218 was?
17      A.  I didn't until I read -- read it here.
18      Q.  And what was HB 218?
19      A.  HB, standing for House Bill 218 was the photo
20  identification bill in 2007.
21      Q.  And do you dispute any of the facts in
22  Paragraph 6 or 7 concerning the attempt to pass HB 218
23  in Senator Uresti's absence?
24      MR. SWEETEN:  Okay.  Hold on a minute.  In
25  answering the question, don't reveal conversations that



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 261

1   you've had with other legislators, legislative staff, or
2   matters subject to the legislative privilege.
3       A.   The answer is, I have no knowledge of the facts
4   as he has laid those out here.
5       Q.   (By Mr. Fisher) Did you take a position on
6   HB 218?  Did you support HB 218?
7       A.   Yes.
8       Q.   Were you surprised that HB 218 did not pass the
9   Senate?
10      A.   I would --
11          MR. SWEETEN:  Hold on a minute.  You're
12  asking for his thoughts and mental impressions about a
13  bill.  I think that calls for matters subject to the
14  legislative privilege.  You can ask him if he voted for
15  it and about public matters related to it.
16      Q.   (By Mr. Fisher) Was HB 218 a good bill in your
17  opinion and did you support it?
18          MR. SWEETEN:  Don't answer as to your
19  opinions about pending legislation or mental
20  impressions.  It's subject to the legislative privilege.
21      A.   I assert legislative privilege on that aspect
22  the question.  I did vote for it.
23          MR. SWEETEN:  And objection, compound.
24      Q.   (By Mr. Fisher) Was there a vote taken on
25  HB 218, Senator?

## 262

1       A.   Yes.
2          (Exhibit 173 marked for identification.)
3       Q.   Let me hand you what's been marked Exhibit 173.
4   And this is a similar newsletter describing
5   accomplishments of the 80th Session of the Texas
6   Legislature.
7       A.   Yes.
8       Q.   And I'll direct your attention to
9   "Disappointments of the 80th Legislature."
10      A.   Yes.
11      Q.   And we have Electoral Integrity, under which
12  there's some discussion of HB 218, and this is on the
13  third page.
14      A.   Yes.
15      Q.   So does this, you know, change your opinion
16  about whether you were disappointed that HB 218 did not
17  pass the Senate?  This public statement, I might add.
18          MR. SWEETEN:  Okay.  Well, let me first
19  say that I'm going to object to the question and the
20  preface of it.  I think it misstates his testimony about
21  disappointment.  I think we assert a privilege as to his
22  personal feelings with respect to that.
23          He can answer questions about a public
24  statement made, but in answering those questions about a
25  public statement made, don't reveal your thoughts and

## 263

1   mental impressions about legislation.  Okay?  So you can
2   answer as to the words here.
3       A.   Do you want to rephrase that or --
4       Q.   (By Mr. Fisher) When I asked whether you were
5   disappointed that HB 218 did not pass the Senate, you
6   asserted legislative privilege.  I am now asking a
7   public document, where, underneath the title,
8   Disappointments of the 80th Legislature, there is a
9   reference to HB 218.  And I'm asking whether you were
10  disappointed that HB 218 did not pass the Senate based
11  upon this public record.
12          MR. SWEETEN:  You can refer to matters on
13  the public record, including this.
14      A.   Yeah.  My newsletter would -- says what it
15  says.  The inability to pass HB 218 is listed under
16  Disappointments of the 80th Legislature.
17      Q.   (By Mr. Fisher) Do you remember the vote on
18  HB 218, Senator?
19      A.   Do you mean the vote total or how it went down?
20      Q.   The vote that took place on the Senate Floor.
21      A.   For clarification, do you mean what the number
22  was or how it went down?
23      Q.   Do you remember the circumstances of the vote
24  on HB 218 on the Senate Floor, Senator?
25      A.   Vaguely, but do I remember.  I do remember it.

## 264

1   I do remember it.
2       Q.   I'm going to hand you what I'll mark as
3   Exhibit 174.
4          (Exhibit 174 marked for identification.)
5       Q.   (By Mr. Fisher) This is a Houston Chronicle
6   article from May 19th, 2011.  And I'll direct your
7   attention to the second page, at the end of the second
8   page of the document, which -- there's a sentence that
9   starts, "On the first day."
10      A.   Oh, I'm sorry.  On the second page?
11      Q.   Correct.
12          MR. SWEETEN:  Yeah.  It's right down here.
13      A.   Okay.
14      Q.   (By Mr. Fisher) And so we have, "On the first
15  of the session, Senator Dan Patrick, Republican,
16  Houston, tried to kill the rule arguing that it stifles
17  debate.  This once again underscores why the two-thirds
18  rule has outlived its time, Patrick said Friday. 'This
19  should never have come to this.  Our concern is for
20  Mario's recovery.  No one wants to be put in a position
21  that makes it seem like we're taking advantage of
22  someone's health to pass a bill.'"  And then underneath
23  Bad Timing, there's another reference to you there where
24  it says, "Patrick said Dewhurst is now in the position
25  of looking unsympathetic to Gallegos's situation for



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 265

1 failing to pass a bill Republicans strongly support."
2 Do you remember these statements?
3     A.  I don't remember them, but I'm reading them, so
4 they were made a long time ago.
5     Q.  Do you have any disagreement with the substance
6 of these statements that are attributed to you?
7     A.  No.
8     Q.  And what did you mean by taking advantage of
9 someone's health to pass a bill?
10     MR. SWEETEN:  You can answer to the extent
11 that this is a matter of public record.  Don't reveal
12 thoughts, opinions, mental impressions about
13 legislation, though.  But you can answer.
14     A.  Yes.  I think the statement, as I read it, and
15 I haven't seen it for a long time, accurately reflects
16 the situation.
17     Q.  (By Mr. Fisher) And what was the situation,
18 Senator?
19     A.  That because of the 21 vote rule, the -- and in
20 2007, we had 20 Republicans, not 19.  So if one Democrat
21 was missing, then, if memory serves me right, we would
22 be able to pass it.  There's a sliding scale of the 21
23 vote rule.  You don't need 21 if less than 31 senators
24 are there.  But I forget where the break point is.
25     So, the point is that if Mario wasn't

## 266

1 there, we, apparently, this is from memory, would have
2 had enough votes to pass the bill.  And so my statement
3 reflects that, you know, no one -- you know, I say here,
4 no one wants to be put in a position that it looks like
5 you're taking advantage of someone's health because if
6 Mario, who was recovering from kidney -- I think he had
7 a kidney replacement -- was recovering, and if he is not
8 there, that's what the statement says.
9     Q.  And why would that have made someone look
10 unsympathetic?
11     MR. SWEETEN:  Don't reveal specific mental
12 impressions you have about legislation.  You can discuss
13 matters of the public record or public statements
14 regarding this without revealing those.
15     A.  Yeah.  I mean, the statement speaks for
16 itself.  You know, everyone knew that Mario was ill, and
17 I think the statement speaks for itself, that it says
18 what it says.  It's pretty clear to me.
19     Q.  (By Mr. Fisher) And based upon Exhibit 45,
20 which is the declaration of Senator Uresti, was he also
21 sick at the time that HB 218 was brought to the Floor of
22 the Senate?
23     A.  I didn't know that at the time.  You know, I
24 discovered that after the fact.  There --
25     MR. SWEETEN:  Yeah, just answer his

## 267

1 question, which is did --
2     A.  Yeah, I didn't know it.  Yeah, I didn't know at
3 the time.
4     Q.  (By Mr. Fisher) Do you remember the
5 circumstances of HB 218 being brought to the Floor of
6 the Senate for a vote?
7     MR. SWEETEN:  Don't reveal communications
8 you've had with legislators, legislators' staff or your
9 mental impressions, but you can answer to the extent --
10     THE WITNESS:  Yeah.  I mean, I'll
11 remember.  Sorry, I didn't mean to speak over you.
12     Q.  (By Mr. Fisher) And what is Senator Uresti's
13 race, to your knowledge?
14     A.  Latino.
15     Q.  And what is Senator Gallegos's race, to your
16 knowledge?
17     A.  Latino.
18     Q.  And you're aware of the areas of Texas that
19 they represent?
20     A.  Yes.
21     Q.  Did you have any concerns about holding the a
22 vote on photo ID when a Hispanic member of the Senate
23 was sick and not on the Senate Floor?
24     MR. SWEETEN:  Did he mention concerns?  Is
25 that what you said.

## 268

1     MR. FISHER:  Yes.  Did he have any
2 concerns.
3     MR. SWEETEN:  Yeah.  I think you're asking
4 for his mental impression, and I think would be subject
5 to the legislative privilege.  It's about legislation
6 and his concerns and thought process.
7     A.  Yeah.  I would assert legislative privilege on
8 advice of counsel.
9     Q.  (By Mr. Fisher) Do you remember there being a
10 calendar change to bring HB 218 to the Floor?
11     A.  I don't remember that.  I just read that in
12 Senator Uresti's exhibit.  But I don't remember that.
13     Q.  Did you have any concerns about holding a vote
14 on HB 28, given the constituencies that the Senators
15 represent?
16     MR. SWEETEN:  That calls for his mental
17 impressions and is subject to the legislative privilege.
18     A.  And I assert legislative privilege on advice of
19 counsel.
20     Q.  (By Mr. Fisher) And was there a vote
21 eventually taken on HB 218 in the Senate?
22     MR. SWEETEN:  You can answer.
23     A.  Yes.
24     Q.  (By Mr. Fisher) And how many votes were taken?
25     A.  I believe there were two votes.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

269

1      Q.   And when HB 218 first went to the Senate Floor
2   for a vote, were any senators absent?
3      A.   Yes.
4      Q.   And who was that?
5      A.   Senator Uresti, and I believe Senator Hegar.
6      Q.   And do you remember Lieutenant Governor
7   Dewhurst issuing a letter concerning this situation
8   after the votes were taken on HB 218?
9      A.   I don't remember that.
10     Q.   I'll hand you what's previously been marked as
11  Exhibit 3.  And this is titled Texas Weekly, the Week in
12  the Rearview Mirror, and this describes -- I'll let you
13  take a look at it, Senator, but it describes a letter
14  from Lieutenant Governor Dewhurst.
15         MR. SWEETEN:  I caution the witness to
16  review the document.
17     A.   Yeah, I am.  Yeah.  Let me read this.
18         (Reading document.) Is this whole thing a
19  letter?  I'm not -- here's Dewhurst.
20     Q.   (By Mr. Fisher) I think if you take a look,
21  Senator, you'll notice that a letter -- a draft of the
22  letter is included here, as well as a second letter that
23  was issued by Lieutenant Governor Dewhurst soon after
24  the issuance of the first letter, I believe the next
25  day.  And if you'll take a look at the second page of

270

1   the document, you'll see that the paragraph that starts,
2   "The Lieutenant Governor disavowed his earlier statement
3   about the voter ID bill issued while the Senate was
4   caucusing on that subject on whether 11 senators should
5   be allowed to block a vote on it.  He says he didn't
6   authorize the earlier statement.  Here is his new
7   version with the cover letter."  And so everything
8   previous to that paragraph is the old letter and
9   everything that's under it is describing, you know, an
10  issue with that previous letter.
11         Do you remember these letters from Senator
12  -- from Lieutenant Governor Dewhurst creating any issues
13  in the Senate with other senators?
14         MR. SWEETEN:  Don't reveal communications
15  with senators or senate staff.
16     A.   Yeah, I invoke the legislative privilege on
17  advice of counsel.
18     Q.   (By Mr. Fisher) Do you remember your reaction
19  to these letters by Lieutenant Governor Dewhurst around
20  the time of the passage of HB 218?
21         MR. SWEETEN:  Object, based on legislative
22  privilege.  You're asking him to reveal his thoughts,
23  mental impressions about matters affecting legislation.
24     A.   I invoke the legislative privilege.
25     Q.   (By Mr. Fisher) Do you remember any public

271

1   debate about these issues in the Senate, the votes that
2   were taken on HB 218?
3          MR. SWEETEN:  You can answer as phrased.
4      A.   Yes.
5      Q.   (By Mr. Fisher) And do you remember what that
6   public debate concerned?
7      A.   I don't remember the specifics.
8      Q.   So I'll introduce Exhibit 175.  This is a Texas
9   Observer article from June 15th, 2007.
10         (Exhibit 175 marked for identification.)
11     Q.   (By Mr. Fisher) And I'll direct your attention
12  to the third page.  And if you look before the
13  subheading says, "Controlling Craddick's Crashes," and
14  there's two paragraphs before.
15     A.   Let me get to the right page.  Hold on.
16     Q.   Uh-huh.
17     A.   Okay.
18     Q.   And so we have, "The next day, Dewhurst's
19  office released an angry letter calling Senate Democrats
20  unAmerican and Senator Whitmire tried to make himself a
21  victim.  Dewhurst then insisted he hadn't authorized the
22  letter and that a staffer had written it.  The Senate
23  took a day off so they could caucus privately.  Members
24  sent three delegates to Dewhurst's office for an airing
25  of grievances."  Do you remember that private caucus

272

1   happening?
2      A.   I don't know.
3      Q.   "For the next week or so, the Lieutenant
4   Governor avoided the dais in the Senate chamber.  In a
5   meeting with reporters after the session, Dewhurst
6   claimed victory for everything positive that came out of
7   it, but with a pained look on his face, he carefully
8   explained that he'd just rather not get into the voter
9   ID debacle.  Freshman Republican Senator Dan Patrick, a
10  conservative Houston radio talk show host --" "radio
11  host, who also might challenge Dewhurst for the
12  Governorship in 2010, was less reserved."  Quote, "'If
13  you're going to run a play, you better make you sure you
14  run it right,' he told the Observer.  'We're the ones in
15  charge.  We have no excuses.'"
16         So this article discuss the two Dewhurst
17  letters --
18     A.   Uh-huh.
19     Q.   -- that we had talked about in the context of
20  Exhibit 3; is that right?
21     A.   Yes.
22     Q.   And it discusses the votes that were taken on
23  HB 218, correct?
24     A.   I still haven't read this entire thing, so, if
25  that's what it discusses, that would be accurate.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

273

1    Q.   And what did you mean by, "If you're going to
2  run a play, you better make sure you run it right"?
3         MR. SWEETEN:  You can answer to the extent
4  that you're not revealing matters subject to the
5  legislative privilege, including the communications we
6  discussed or your mental impressions or thoughts about a
7  bill.
8    A.   Yeah.  The truth is, I had forgotten all about
9  these things until you brought them to my attention.  I
10 had forgotten about the letters.  I hadn't even thought
11 about it for almost six years.  So, you know, again, it
12 says if you're going to run a play, you better make sure
13 you run it right.
14   Q.   Are you reading from the exhibit, Senator?
15   A.   Yes, sir.
16   Q.   Do you have any further explanation of what you
17 meant by this quote?
18        MR. SWEETEN:  The same instruction.
19   A.   Yeah, I would assert legislative privilege.  I
20 think it speaks for itself, but I would assert
21 legislative privilege on advice the counsel.
22   Q.   (By Mr. Fisher)  So you'll assert legislative
23 privilege over a public statement you made to a
24 newspaper regarding Lieutenant Governor Dewhurst's
25 issuance of letters about the votes on HB 218; is that

274

1  correct?
2         MR. SWEETEN:  I want to make sure the
3  record is clear.  What my instruction is, that to the
4  extent that your providing an answer to this question
5  would require you to reveal thoughts, mental impressions
6  about a bill, don't do so.
7         THE WITNESS:  Okay.
8         MR. SWEETEN:  You can answer about matters
9  of the public record or public speeches, but don't
10 reveal those thoughts or mental impressions about a
11 bill.  Just so that's clear, that instruction, and so
12 your application of that instruction is clear.
13   A.   So if you're asking me what I did mean by that?
14   Q.   (By Mr. Fisher)  That's the question, Senator.
15   A.   As it applies to that bill or --
16   Q.   As it applies to the votes that were taken on
17 HB 218, which were the subject of Lieutenant Governor
18 Dewhurst's letter.
19   A.   Okay.  I'm trying to answer your question for
20 you without violating my legislative privilege.
21        The fact that we didn't pass the bill
22 means we didn't pass the bill.  And, you know, I don't
23 remember that exact quote five and a half years later,
24 but that's what I was talking about.
25   Q.   What play was trying to be run, Senator?

275

1         MR. SWEETEN:  Don't reveal matters subject
2  to the legislative privilege.
3    A.   Yeah.
4         MR. SWEETEN:  Including conversations or
5  thoughts or mental impressions.
6    A.   Yeah.  I mean, I would assert legislative
7  privilege on that.
8    Q.   (By Mr. Fisher)  Well, was it a Hail Mary?  Was
9  it an end around the rules?  What kind of play are we
10 talking about here?
11        MR. SWEETEN:  The same objection.  Same
12 instruction.
13   A.   Yeah.  I would invoke legislative privilege on
14 advice of counsel.
15   Q.   (By Mr. Fisher)  Let me introduce Exhibit 176,
16 and this is an article from the -- I believe it's the
17 Austin American-Statesman, and this is May 18th, 2007.
18        (Exhibit 176 marked for identification.)
19   Q.   (By Mr. Fisher)  And you'll have to look -- and
20 I know it's small writing.  I apologize for that.
21        About two-thirds of the way down the page,
22 we have a paragraph that begins, "Some Republicans."
23 And it says, "Some Republicans, particularly Senator Dan
24 Patrick, Republican of Houston, said the gentlemen's
25 agreements and the Lieutenant Governor uses to promote

276

1  harmony hurt Republicans on core issues such as voter ID
2  identification. 'I believe there is a consensus among
3  some senators that we either ought to follow the rules
4  all the time or ignore them all the time,' Patrick said.
5  Patrick, one the few senators who agreed to analyze the
6  past couple days said Dewhurst has opened himself to
7  leadership questions because he has discussed running
8  for Governor. 'I think he reacted the way he did,
9  because he was challenged on what I think is a
10 definitive issue,' Patrick said.  'He was challenged,
11 and he blinked by allowing the second vote.  The
12 Democrats won this round.'"
13        So what did you mean by, "I believe there
14 is a consensus among some senators that we either ought
15 to follow the rules all the time or ignore them all the
16 time"?
17        MR. SWEETEN:  You can answer with respect
18 to matters of the public record, public statements
19 made.  Do not reveal thoughts, mental impressions about
20 legislation or communications that you've had regarding
21 this issue.
22   A.   Yeah.  I would invoke the legislative privilege
23 on this, when your question -- the statement speaks for
24 itself.
25   Q.   (By Mr. Fisher)  Is that on the advice of



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Dan Patrick                                              May 30, 2012

---

277

1   counsel, Senator --
2       A.  Yes.
3       Q.  -- you're invoking legislative privilege?
4       A.  Yes.
5           MR. SWEETEN:  And let me clarify, whenever
6   I said communications, I mean the communications that
7   I've outlined as the day has progressed, which are
8   constituents, representatives, legislative staff, state
9   agencies, and the Legislative Council.  I'm trying to
10  make sure my instruction was clear.
11          MR. FISHER:  But just to be clear, the
12  communication we're talking about here is a quote from
13  Senator Patrick that appears in the news article.
14          MR. SWEETEN:  And he can testify about the
15  quote, but not to the extent that it reveals his
16  thoughts, mental impressions about legislation.  So I'm
17  going to let him answer that, except to the extent that
18  it reveals those.
19      Q.  (By Mr. Fisher) Well, let me rephrase.
20  Senator, were the rules not being followed when HB 218
21  was passed?
22          MR. SWEETEN:  Same instruction.
23      A.  Yes, the rules were being followed.
24      Q.  (By Mr. Fisher) So what did you mean by,
25  "Either we ought to follow the rules all the time or

---

278

1   ignore them all of the time"?
2           MR. SWEETEN:  The same instruction.
3       A.  Yeah.  I'll assert legislative privilege.
4       Q.  (By Mr. Fisher) So you assert legislative
5   privilege to describe what it is that you mean by a
6   public statement; is that correct?
7       A.  No.  I think the public statement speaks for
8   itself.
9       Q.  And you won't go any further to explain what it
10  is you meant by that language that appears in the
11  newspaper article; is that correct, Senator?
12      A.  First of all, I don't remember.  Again, I'm
13  going back -- you're going back almost six years ago and
14  asking me to remember, and, you know, I haven't seen
15  this statement in a long time, and, you know, in the
16  context of the time, I'm not sure.
17      Q.  Senator, at the time that HB 218 was brought to
18  a vote -- and I think that based upon all that we have
19  talked about, the testimony that we have talked about
20  today, there was a -- would you agree that it was an
21  unusual situation?
22          MR. SWEETEN:  Objection to the question as
23  vague.  I'm sorry, what --
24          MR. FISHER:  I'll rephrase.
25      Q.  (By Mr. Fisher) Was it a newsworthy event?

---

279

1   We've seen many articles talking about what happened
2   during the passage of 218, the two votes that were
3   taken, the letters by Lieutenant Governor Dewhurst.  I
4   know this was six years ago, but is this a usual event?
5   Does this happen every legislative session?
6       A.  No.
7       Q.  Do you think the rules of the Texas State
8   Senate should be ignored?  Are you -- are you one that
9   believes they ought to be followed or ignored all the
10  time?
11          MR. SWEETEN:  Objection.  I think you're
12  asking for his mental impressions about specific
13  legislation, and I think those are subject to the
14  legislative privilege.  His own personal beliefs about
15  legislation are privileged.
16      A.  Yeah, I would assert legislative privilege on
17  the advice of counsel.
18      Q.  (By Mr. Fisher) Do you think the Senates rules
19  should be followed?
20      A.  Which Senate rule?
21      Q.  Do you think that the rules regarding when a
22  bill can be brought to the Floor of the Senate should be
23  followed?
24      A.  I think the rules that are in place at a given
25  time should be followed.

---

280

1       Q.  Well, let me get your thinking on something,
2   Senator.  If a Senator is out sick or a Senator is
3   unable to come to the Floor of the Senate to take a
4   vote, should the Senate take a vote on the bill in that
5   instance?
6           MR. SWEETEN:  Are you asking in the
7   context of this specific instance, or are you asking as
8   a general matter?
9           MR. FISHER:  I'm asking to get the
10  Senator's thinking on whether a vote should be taken on
11  a bill when a senator,for whatever reason, is not
12  present on the Senate Floor.
13          MR. SWEETEN:  Objection to the question as
14  vague.  And, I mean, to the extent you're discussing
15  this Senate Bill 218, I think that would be a matter
16  subject to the legislative privilege.  To the extent you
17  can reveal your answer without violating legislative
18  privilege, you can do so.
19      A.  Okay.  I can answer without revealing.
20          And the facts are that this is a common
21  occurrence, which usually occurs later in session.  The
22  members of the Senate are older.  They have student --
23  they have children graduating from high school or
24  college or grandchildren or weddings, and there have
25  been a number of senators who have missed those events

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Dan Patrick                                    May 30, 2012

---

281

1  to be on the Senate Floor because votes can be taken if
2  they're not there.  The Senate cannot operate, and get
3  the job done in the amount of time we have, if every
4  time a senator is missing, for whatever reason, that,
5  stop everything, we can't vote today on this.
6       Q.  (By Mr. Fisher) Well, Senator, I know you pride
7  yourself on voting on every bill.  Has a vote ever been
8  taken in your absence on the Senate Floor?
9            MR. SWEETEN:  You can answer as a factual
10 matter.
11      A.  Yeah.  I don't think I've ever missed -- I
12 think I've missed eight votes out of 13,000, and never
13 -- never a priority piece of legislation or -- those
14 votes may have been on -- I'm not sure how many votes
15 I've missed, but I don't miss a day.
16      Q.  (By Mr. Fisher) Are you aware of votes being
17 taken while senators -- and you mentioned in your
18 testimony senators being away for weddings and other
19 things that happen.  Are you aware of votes being taken
20 when senators are actually in the Capitol and just not
21 in the Senate chamber?
22      A.  I have no knowledge of that.  No, I really
23 don't know?
24      Q.  So you're not aware that that's ever happened
25 before?

---

282

1            MR. SWEETEN:  Objection, asked and
2  answered.
3       A.  Yeah, I just don't -- I just don't know.
4       Q.  (By Mr. Fisher) You don't know, or are you
5  aware of it ever happening before?
6            MR. SWEETEN:  Objection, asked and
7  answered.
8       A.  I've answered your question.
9       Q.  (By Mr. Fisher) Did it happen in the context of
10 HB 218, based upon the declaration of Senator Uresti?
11           MR. SWEETEN:  Objection.  I think he's
12 already testified about this issue.  And so I think
13 you're plowing the same ground you plowed.  I think he's
14 already testified about -- you had him read the specific
15 paragraphs that he claimed, and now you're asking it
16 again.  I think this is becoming -- I mean, you're
17 asking the same questions over and over.
18           I'm going to let you answer it this time,
19 but, I mean, to the extent you're not revealing any
20 matters of privilege, including conversations with any
21 senators, you can answer to the extent you know.
22      A.  Do you mind just repeating that?  I'm sorry.
23           MR. SWEETEN:  We can have him read it.
24           MR. FISHER:  Can you read the last
25 question, please?

---

283

1            MR. SWEETEN:  Before my objections.
2            (The requested portion was read back by
3  the court reporter.)
4       A.  Which I said I had no knowledge, and then you
5  asked --
6       Q.  (By Mr. Fisher) I asked:  Did it happen in the
7  context of HB 218?
8       A.  I believe my earlier testimony this afternoon
9  was that I believe Senator Uresti and Senator Hegar were
10 not on the Floor.  I'm not certain of that, but I
11 believe that.
12      Q.  Are you aware of Senator Whitmire not being on
13 the Floor during the vote on HB 218?
14      A.  I was not aware at the time, but was made aware
15 after the fact.
16      Q.  Is it unusual for a senator to be checked in,
17 meaning -- and you described senators being away for
18 weddings and just not present, given the large amount of
19 bills that are considered by the Senate; is that
20 correct?  Is that your testimony?
21      A.  Yeah.  It's not frequent, but there are people
22 who are away at various times for various personal
23 reasons.
24      Q.  Is it unusual for a senator to be checked in to
25 the Senate Floor, meaning they are present, but just not

---

284

1  physically in the chamber for votes to be taking place?
2       A.  That actually happens on a -- I don't know,
3  frequent may be a broad use of the word.  But it does
4  happen, particularly at the end of session, because we
5  could be meeting with a constituent in our office.  We
6  are often over at the House chamber, you know, trying to
7  get a bill passed.  You know, we're doing lots of
8  things.  So legislation does move and bills do pass with
9  less than all the senators.  In fact, there are times
10 when less than half the senators are on the Floor when
11 legislation is moving.  So that happens.
12      Q.  But you pride yourself on this not happening to
13 you; is that right, Senator?
14      A.  I do.
15           MR. FISHER:  We can either continue or we
16 can take a quick break?
17           (Recess from 6:57 to 7:02 p.m.)
18      Q.  (By Mr. Fisher) Senator Patrick, is illegal
19 immigration one of the main policy issues you focus on
20 in the Senate?
21      A.  Yes.
22      Q.  And you said it's one of the main concerns of
23 the citizens of your district, District 7; is that
24 correct?
25      A.  Yes.

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Dan Patrick                                          May 30, 2012

---

### 285

1    Q.   And you've introduced bills on this issue in
2   areas concerning sanctuary cities and other areas; is
3   that right?
4    A.   Yes.
5    Q.   And one of these issues was an amendment
6   requiring anyone getting a Texas driver's license to
7   prove they are in the country legally; is that correct?
8    A.   I don't remember it as of today, but if that's
9   the record, then... I have a lot of legislation, so, you
10  know, if that's what you have, then that would be
11  correct.
12   Q.   And was part of the purpose the SB 14 to
13  prevent noncitizens from voting?
14       MR. SWEETEN:  Objection, asked and
15  answered.  He's already provided his answer on the
16  purpose.  You asked him a tremendous number of questions
17  on that issue.
18   Q.   (By Mr. Fisher) You can answer, Senator.
19       MR. SWEETEN:  You can answer the question.
20   A.   Well, the purpose is to protect the integrity
21  of the ballot box.
22   Q.   (By Mr. Fisher) And does protecting the
23  integrity of the ballot box include protecting the
24  ballot box from votes by noncitizens?
25   A.   If you are protecting the integrity of ballot

---

### 286

1   box, then only people who are legally eligible to vote
2   would be able to vote.
3    Q.   So I'm going to give you another exhibit.
4       (Exhibit 177 marked for identification.)
5    Q.   (By Mr. Fisher) And it's 177.  This is Texas
6   Senator Dan Patrick, Fall of 2008.  And this is one of
7   the, you said, newsletters that is paid for, I guess, by
8   the Legislature that you're able to send out to your
9   constituents; is that right?
10   A.   I believe so.
11   Q.   And this differs from the previous exhibit, the
12  Capitol View, which was the e-mail blast?
13   A.   Correct.
14   Q.   But this is something you said earlier that you
15  do review the contents of before it goes out; is that
16  right?
17   A.   Correct.
18   Q.   And so underneath the heading, Texas Lags
19  Behind the World in Voting Integrity on Page 3?
20   A.   Yes, sir.
21   Q.   We have, "Today all that is needed to vote is a
22  voter registration card.  Unfortunately, photo
23  identification is not required to receive a registration
24  card.  After reviewing voter registrations in Texas for
25  2007, the State Auditor identified 49,049 registered

---

### 287

1   voters who may be ineligible to vote.  Of this number,
2   23,114 were possible felons, and 23,576 may be deceased.
3       Since 1992, Harris County Tax Assessor-
4   Collector, and Voter Registrar Paul Bettencourt has
5   cancelled 3,742 registered voters for noncitizenship."
6       So with regard to the cancellation of
7   registered voters for noncitizenship, how would the
8   requirements of SB 14 prevent those types of citizens
9   from voting?
10       MR. SWEETEN:  Objection.  You're asking
11  for his mental thoughts and impressions about pending
12  legislation.  As such, that would be legislatively
13  privileged.  He can answer questions about what's --
14  about this specific public statement, but to the extent
15  that you would ask him to reveal those mental
16  impressions or opinions or thoughts or communications,
17  that would be a matter of legislative privilege.
18       So you can answer to the extent you can do
19  so without revealing matters of privilege.
20   A.   I would assert legislative privilege.
21   Q.   (By Mr. Fisher) And is that on the advice of
22  your attorney?
23   A.   Yeah.
24   Q.   So you've said that the purpose of SB 14, just
25  to reiterate, was to protect the integrity of the ballot

---

### 288

1   box.  We have here, under Voter Integrity, a concern
2   about a cancellation by the voter registrar of Harris
3   County of the registered voters for noncitizenship.
4       So is it fair to say that this was part of
5   the ambit of voter integrity, noncitizenship?
6       MR. SWEETEN:  I'm going to object to the
7   question as calling for matters subject to the
8   legislative privilege.  You're asking him to reveal
9   thoughts, mental impressions, opinions or motivations
10  about legislation or in furtherance of the legislative
11  process.  To do so invades the legislative privilege.
12  So I'm going to instruct you not to answer to the extent
13  that you would have to so reveal those opinions and
14  thoughts.  You can answer as to the specific public
15  statement, but don't reveal your thoughts about
16  legislation.
17   A.   Yeah.  I assert legislative privilege on the
18  advice of counsel.
19   Q.   (By Mr. Fisher) Would noncitizens voting impact
20  vote integrity?  Based upon your statement here, the
21  fact that it's contained under a heading called "Texas
22  Lags Behind the World in Voter Integrity" is the fact
23  that noncitizens were cancelled as registered voters, is
24  that something that impacts voter integrity?
25       MR. SWEETEN:  The same objection as to

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

289

1   legislative privilege.  Also objection, vague.
2       A.   I assert legislative privilege based on the
3   advice of counsel.
4       Q.   (By Mr. Fisher) Can a noncitizen receive a
5   driver's license in Texas at this time?
6            MR. SWEETEN:  You can answer as a factual
7   matter.
8       A.   I'd have to go back and look at the law.  There
9   may have been some changes to that.
10      Q.   (By Mr. Fisher) Well, did you ever propose an
11  amendment that required anyone getting a Texas driver's
12  license to prove they're in the country legally?
13           MR. SWEETEN:  You can testify as to
14  matters of public record.
15      A.   Yeah.  If that is the public record, then I
16  did.  Again, I know it may seem obvious to you, but
17  hundreds and hundreds and hundreds of bills and
18  amendments, I cannot remember every specific thing.  So
19  when you show it to me, if you have it, it helps refresh
20  my memory.
21      Q.   (By Mr. Fisher) But illegal immigration is one
22  of main areas of focus in your work as a Texas State
23  Senator; is that correct?
24      A.   Yes.
25      Q.   And we mentioned, it's one of the main concerns

290

1   of your citizens, so it's an area that you propose
2   legislation in and actively work in; is that right?
3       A.   Yes.
4       Q.   Let's turn to Exhibit 5, and that's SB 14.
5       A.   Okay.
6       Q.   So again, looking at the text of the bill,
7   Section 14, which we discussed previously.
8       A.   I'm not there yet.
9       Q.   And I'll let you take a look at Page 9 again,
10  which we've discussed, and this is Documentation of
11  Proof of Identification.
12      A.   Okay.
13      Q.   In any of those Documentation of Proof of
14  Identification, can you tell me how it is that a
15  noncitizen would be prevented from voting?
16           MR. SWEETEN:  You can answer as to the
17  text of the bill.
18      A.   You asked me how a -- can you read that back
19  for me, please?
20           (Requested portion read back by the court
21  reporter.)
22           MR. SWEETEN:  Don't reveal matters of
23  legislative privilege, including your mental thoughts,
24  impressions, investigation regarding legislation.  But
25  you can testify as to the text of the bill and specific

291

1   provisions.
2       A.   Well, I can only refer back to what the bill
3   says.
4       Q.   (By Mr. Fisher) Well, Senator, you're a
5   resident of Texas; is that correct?
6       A.   Yes, I am.
7       Q.   Have you ever served in the military?
8       A.   I have not.
9       Q.   Do you know if you have to be a citizen to get
10  a military identification card?
11      A.   I don't know.
12      Q.   Do you know if you have to be a citizen to get
13  a license to carry a concealed handgun in Texas?
14      A.   You know, I'd have to go back and look at the
15  law.  I believe you do, but I'd have to look at the law.
16      Q.   And we discussed the fact that you're not sure
17  about a Texas driver's license, whether you need to be a
18  citizen to get a Texas driver's license; is that right?
19      A.   Yeah.  I'm not sure of the status of that at
20  this moment in time.
21      Q.   But it's possible you could be a noncitizen and
22  get a Texas driver's license; is that right?
23      A.   Legally or illegally?
24      Q.   Legally.
25      A.   Yeah.  I'm not -- again, I'm just not advised

292

1   on that.  I'd have to look at the law.
2       Q.   Is it legally possible for someone to have a
3   military identification card and not be a citizen?
4       A.   I don't know how to answer that.  I don't know.
5       Q.   Do we have noncitizens serving in the United
6   States's military?
7       A.   I believe we do, but I'd have to have that
8   verified by it federal government.
9       Q.   Do you know if any of your constituents are
10  members of military that are noncitizens?
11      A.   I don't know.
12      Q.   And veterans' issues is one of the issues you
13  pay attention to; is that correct?
14      A.   Yes.
15      Q.   Are you aware of any legislators making
16  statements about illegal immigrants voting in Texas?
17           MR. SWEETEN:  Don't reveal communications
18  you've had with legislators or legislative staff.  You
19  can reveal matters of the public record.
20      A.   Yeah.  I'm not specifically aware.  I don't
21  recall anything as we sit here.
22      Q.   (By Mr. Fisher) Have you ever heard of a Texas
23  State legislators who voted in favor of SB 14 say that
24  would it prevent illegal immigrants from voting?
25           MR. SWEETEN:  The same instruction.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Dan Patrick                                                     May 30, 2012

---

293

1     A.  Yeah, I just don't recall.
2     Q.  (By Mr. Fisher) Have you ever heard of a Texas
3  legislator who voted in favor of SB 14 say it would
4  prevent a legitimately registered voter from voting in
5  Texas?
6          MR. SWEETEN:  The same instruction.
7     A.  Yeah, I don't recall.
8     Q.  (By Mr. Fisher) Have you ever heard of a Texas
9  legislator who voted in favor of SB 14 say it would
10  prevent racial or ethnic minorities from voting in
11  Texas?
12          MR. SWEETEN:  The same objection.  Same
13  instruction.  Go ahead.
14     A.  Yeah.  We're talking about on the public
15  record?  That's what I thought all this was prefaced
16  by.  That's what I thought the first question was.
17          MR. SWEETEN:  Okay.  And what I'm -- my
18  instruction is, just don't reveal communications you've
19  had with legislators or legislative staff in answering
20  these questions.  You can refer to matters of the public
21  record.
22     A.  Yeah.  On the public record, not that I recall.
23     Q.  (By Mr. Fisher) Well, do you know of any -- did
24  you have any private conversations with any Texas State
25  legislators who said that SB 14 would prevent racial or

---

294

1  ethnic minorities from voting in Texas, either those who
2  have favored or opposed the bill?
3          MR. SWEETEN:  You're asking about the
4  substance of the communication and that he had.  If you
5  could just not load, front end load the question with
6  the subject matter and ask about more of a general
7  subject matter, which is what the court has said that he
8  can answer, I'll allow him to answer it.  But as
9  phrased, I think you're --
10     Q.  (By Mr. Fisher) Did you have conversations with
11  other senators about SB 14?
12          MR. SWEETEN:  You can answer.
13     A.  Yes.
14     Q.  (By Mr. Fisher) Did any of those conversations
15  address whether SB 14 would prevent a legitimately
16  registered voter from voting in Texas?
17     A.  I don't recall.
18     Q.  Were any of those statements concerning an
19  issue about illegal immigrants voting in Texas
20  elections?
21     A.  I don't recall.
22     Q.  Are you aware of any allegations in the public
23  record that SB 14 attempted to play on people's fears of
24  illegal immigrants voting in Texas elections?
25     A.  Public statements?  Yeah, I'm not aware.

---

295

1     Q.  Have you had conversations with anyone
2  concerning the identity of a noncitizen who voted in a
3  Texas election?
4          MR. SWEETEN:  You can answer if you had
5  conversations.
6     A.  If I've conversations about a --
7     Q.  (By Mr. Fisher) A noncitizen voting in Texas
8  elections.
9     A.  I'm trying to think.  Excuse me.  I'm tired.
10  I'm trying to focus on the question and get it right.
11  It's possible someone has brought it up to me, but
12  specifically, I can't remember anything at this moment.
13  But it's possible.
14     Q.  Have you heard a registered voter state that he
15  or she is not going to vote because they are concerned
16  their vote will be diluted by illegitimate votes?
17     A.  Again, I can't remember anything specifically
18  if someone has said that.  It's possible.
19     Q.  So it's possible that someone has said that to
20  you, but nothing comes to mind at this moment?
21     A.  Nothing comes to mind specifically.
22     Q.  Do you believe that SB 14 has put a burden on
23  voting beyond what already existed?
24          MR. SWEETEN:  Don't answer if your
25  thoughts, mental impressions, opinions, and motivations

---

296

1  about legislation, including Senate Bill 14.
2     A.  I assert legislative privilege on advice of
3  counsel.
4     Q.  (By Mr. Fisher) Does it require a voter to do
5  more than they were required to do under Texas law as it
6  was before SB 14 was passed?
7          MR. SWEETEN:  I think the question asks
8  for him to reveal thoughts, mental impressions,
9  opinions, and motivations about legislation.  You're
10  asking him to compare and contrast and reveal those
11  thoughts in that question.
12     A.  Yeah.  I would assert legislative privilege.
13          MR. SWEETEN:  You can rely on the specific
14  text of the bill, if you want to -- I mean...
15     Q.  (By Mr. Fisher) Well, looking -- you do have
16  Exhibit 5 open before you, Senator, so just looking at
17  the bill, does it place additional requirements upon
18  voting beyond which were there previous to SB 14?  Does
19  it add things?
20     A.  Yes.
21     Q.  Were you concerned that these additional things
22  might disproportionately impact minority voters?
23          MR. SWEETEN:  Don't answer the question.
24  It asks for matters of legislative privilege, including
25  your thoughts, mental impressions, opinions and

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Senator Dan Patrick                                    May 30, 2012

---

297

1    motivation about legislation.
2        A.   I assert legislative privilege.
3        Q.   (By Mr. Fisher) And is that based upon the
4    advice of your counsel?
5        A.   Yes.
6        Q.   Did you ever have discussions about whether
7    SB 14 might disproportionately impact minority voters
8    with anyone?
9        A.   Nothing specific that I recall.
10       Q.   When you supported SB 14 -- and we talked about
11   your listing as an author -- did you believe you had an
12   obligation, pursuant to Section 5 of the Voting Rights
13   Act, to determine whether it might have an impact on
14   minority voters?
15           MR. SWEETEN:  Objection, calls for matters
16   subject to the legislative privilege, including your
17   thoughts, mental impressions, opinions and motivations
18   about legislation.  Instruct you not to answer the
19   question.
20       A.   I assert legislative privilege based on my
21   attorneys advice.
22       Q.   (By Mr. Fisher) So as you sit here today, do
23   you believe that SB 14 might disproportionately impact
24   minority voters?
25           MR. SWEETEN:  The same objection.  You're

---

298

1    asking him to reveal his thoughts, mental impressions,
2    opinions, motivation about legislation, or in
3    furtherance of the legislative process, including SB 14.
4        A.   I assert legislative privilege based on the
5    advice of counsel.
6        Q.   (By Mr. Fisher) At any time since the passage
7    of SB 14, have you come to believe it was passed with a
8    discriminatory purpose?
9            MR. SWEETEN:  Do not reveal your thoughts,
10   mental impressions, opinions, and motivations about
11   legislation.  So to the extent that the question asks
12   you to reveal those thoughts, don't answer it.  But if
13   it does not, then you can provide that answer.
14       A.   Excuse me.  I assert legislative privilege on
15   the advice of counsel.
16       Q.   (By Mr. Fisher) And at any time since the
17   passage of SB 14, have you come to believe that it will
18   have a retrogressive effect on minority voters?
19           MR. SWEETEN:  The same objection and
20   instruction.  You can answer to the extent you're not
21   revealing thoughts, mental impressions, opinions and
22   motivation about the legislation, including specifically
23   Senate Bill 14.
24       A.   I assert legislative privilege on the advice of
25   counsel.

---

299

1            MR. FISHER:  So we'll take a quick break
2    here, very quick, and we'll return back on the record.
3            MR. SWEETEN:  Okay.  Do you mind if we
4    just stay here?
5            MR. FISHER:  No, not at all.
6        Q.   (By Mr. Fisher) All right, Senator.  We're
7    back.
8        A.   Okay.
9        Q.   During the public debate on SB 14, do you
10   remember anyone from the Secretary of State's Office
11   testifying?
12       A.   I don't remember.  I think they might have, but
13   I don't recall.
14       Q.   Do you recall at any time anyone identifying
15   how many voters might not have the required ID required
16   by SB 14 to vote?
17       A.   I don't recall that.
18           MR. FISHER:  So at this time, we'll
19   conclude.  We'll keep the deposition open as we have in
20   the past.
21           MR. SWEETEN:  Based on the --
22           MR. FISHER:  Based on the pending ruling
23   of the court.
24           MR. SWEETEN:  Pending rulings of privilege
25   and scope.  Okay.

---

300

1            MR. FISHER:  Yeah.
2            MR. SWEETEN:  I have no questions.  I will
3    reserve questions to Senator Patrick at the time of
4    trial.
5            THE WITNESS:  Okay.
6            (Signature reserved.)
7            (Deposition concluded at 7:23 p.m.)

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Dan Patrick                                                    May 30, 2012

## 301

1  CHANGES AND SIGNATURE
2  RE: TEXAS VS. HOLDER, ET AL
3  PAGE LINE  CHANGE       REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20    I, SENATOR DAN PATRICK, have read the foregoing
21 deposition and hereby affix my signature that same is
22 true and correct, except as noted above.
23
24    _____
25    SENATOR DAN PATRICK

## 302

1  THE STATE OF _____)
2  COUNTY OF_____)
3
4       Before me,_____, on this day
5  personally appeared SENATOR DAN PATRICK, known to me (or
6  proved to me under oath or through_____
7  (description of identity card or other document) to be
8  the person whose name is subscribed to the foregoing
9  instrument and acknowledged to me that they executed the
10 same for the purposes and consideration therein
11 expressed.
12       Given under my hand and seal of office
13 this_____day of _____, 2012.
14
15
16    _____
17    NOTARY PUBLIC IN AND FOR
17    THE STATE OF _____
18
19
20
21
22
23
24
25

## 303

1         IN THE UNITED STATES DISTRICT COURT
2            FOR THE DISTRICT OF COLUMBIA
3  STATE OF TEXAS,        )
                          )
4        Plaintiff,       )
                          )
5  VS.                    )
                          )
6  ERIC H. HOLDER, JR. in his )
   official capacity as Attorney )
   General of the United States, )
7                          )
8        Defendant,        )
                          )
   ERIC KENNIE, et al,    )
9                          )
   Defendant-Intervenors,  )
10
   TEXAS STATE CONFERENCE OF  ) CASE NO. 1:12-CV-00128
11 NAACP BRANCHES,        )  (RMC-DST-RLW)
                          ) Three-Judge Court
12 Defendant-Intervenors,  )
13 TEXAS LEAGUE OF YOUNG VOTERS )
   EDUCATION FUND, et al,  )
14                          )
   Defendant-Intervenors,  )
15 TEXAS LEGISLATIVE BLACK )
16 CAUCUS, et al,          )
17    Defendant-Intervenors,  )
18 VICTORIA RODRIGUEZ, et al., )
19    Defendant-Intervenors.  )
20        REPORTER'S CERTIFICATION
          DEPOSITION OF SENATOR DAN PATRICK
          MAY 30, 2012
21    I, Chris Carpenter, Certified Shorthand Reporter in
22 and for the State of Texas, hereby certify to the
23 following:
24
25    That the witness, SENATOR DAN PATRICK, was duly

## 304

1  sworn by the officer and that the transcript of the oral
2  deposition is a true record of the testimony given by
3  the witness;
4       That the deposition transcript was submitted on the
5  _____day of _____, 2012, to the witness or to the
6  attorney for the witness for examination, signature and
7  return to_____, by
8  _____, 2012; and if returned, the original
9  transcript will forwarded to Spencer Fisher, the
10 custodial attorney;
11      That the amount of time used by each party at the
12 deposition is as follows:
13    Mr. Spencer: 6 hours, 8 minutes
14    Mr. Dunn: 20 minutes
15    I further certify that I am neither counsel for,
16 related to, nor employed by any of the parties or
17 attorneys in the action in which this proceeding was
18 taken, and further that I am not financially or
19 otherwise interested in the outcome of the action.
20    Certified to by me this 1st day of June, 2012.
21
22    _____
      Chris Carpenter, Texas CSR 1151
23    Expiration Date: 12/31/2012
      100 Congress Avenue, Suite 2000
24    Austin, TX 78701
      (512)328-5557
25    Firm Registration No. 283



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com