## 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                      )
                                     )
          Plaintiff,                 )
                                     )
VS.                                  )
                                     )
ERIC H. HOLDER, JR. in his           )
official capacity as Attorney        )
General of the United States,        )
                                     )
          Defendant,                 )
                                     )
ERIC KENNIE, et al,                  )
                                     )
          Defendant-Intervenors,     )
                                     )
TEXAS STATE CONFERENCE OF            )  CASE NO. 1:12-CV-00128
NAACP BRANCHES,                      )  (RMC-DST-RLW)
                                     )  Three-Judge Court
          Defendant-Intervenors,     )
                                     )
TEXAS LEAGUE OF YOUNG VOTERS         )
EDUCATION FUND, et al,               )
                                     )
          Defendant-Intervenors,     )
                                     )
TEXAS LEGISLATIVE BLACK              )
CAUCUS, et al,                       )
                                     )
          Defendant-Intervenors,     )
                                     )
VICTORIA RODRIGUEZ, et al.,          )
                                     )
          Defendant-Intervenors.     )

**************************************
          ORAL DEPOSITION OF
          JULIA RATHGEBER
          MAY 29, 2012
**************************************

## 2

1       ORAL DEPOSITION OF JULIA RATHGEBER, produced as a
2  witness at the instance of the Defendant, was duly
3  sworn, was taken in the above-styled and numbered cause
4  on the MAY 29, 2012, from 8:21 a.m. to 4:21 p.m., before
5  Chris Carpenter, CSR, in and for the State of Texas,
6  reported by machine shorthand, at the offices of The
7  United States Attorney's Office, 816 Congress Avenue,
8  Suite 1000, Austin, Texas 78701, pursuant to the Federal
9  Rules of Civil Procedure and the provisions stated on
10 the record or attached hereto.

## 3

1
2
3            A P P E A R A N C E S
4  FOR THE PLAINTIFF, STATE OF TEXAS:
5       Matthew Frederick
        Stacey Napier
6       OFFICE OF THE ATTORNEY GENERAL OF TEXAS
        P.O. Box 12548
7       Austin, TX 78711-2548
8       209 West 14th Street
        8th Floor
9       Austin, TX 78701
        (512) 936-1307
10      matthew.frederick@texasattorneygeneral.gov
        stacey.napier@texasattorneygeneral.gov
11
     FOR THE DEFENDANT, HOLDER, ET AL:
12
        Risa Berkower
13      Spencer Fisher
        Ernest McFarland
14      Elizabeth S. Westfall
        Jennifer Maranzano
15      Bruce Gear
        Michelle McLeod
16      U.S. DEPARTMENT OF JUSTICE
        950 Pennsylvania Avenue, NW
17      NWB - Room 7202
        Washington, DC 20530
18      (202) 305-7766
        risa.berkower@usdoj.gov
19      spencer.fisher@usdoj.gov
20  FOR THE DEFENDANT-INTERVENOR TEXAS STATE CONFERENCE OF
     NAACP BRANCHES AND THE MEXICAN AMERICAN LEGISLATIVE
21  CAUCUS:
22      Ezra D. Rosenberg
        DECHERT, LLP
23      Suite 500
        902 Carnegie Center
24      Princeton, NJ 08540-6531
        (609) 955-3200
25      ezra.rosenberg@dechert.com

## 4

1  FOR THE TEXAS LEAGUE OF YOUNG VOTERS EDUCATION FUND
     INTERVENORS:
2
3       Adam M. Harris
        FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, LLP
4       One New York Plaza
        New York, New York 10004
5       (212) 859-8953
        adam.harris@friedfrank.com
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 5

INDEX

Appearances.........................................3

JULIA RATHGEBER
   Examination by Ms. Berkower...............8
   Examination by Mr. Harris...............329

Signature and Changes...........................340

Reporter's Certificate..........................342

EXHIBITS

NO. DESCRIPTION                           PAGE MARKED

5    SB No. 14                               221

28   HB No. 218                              100

29   SB No. 362                              150

33   Senate Journal, March 18, 2009      183

44   HB No. 1706                             90

100  Amended Notice of Deposition           16

101  Texas Legislature Online History, Bill HB   95
     1706
102  Texas Legislature Online History, Bill HB   125
     218

103  Texas Weekly Article, The Week in the      140
     Rearview Mirror
104  Dallas News. com Article, Jan. 14, 2009    166
105  Senate Rules, Jan. 14, 2009                167
106  Texas Legislature Online History Bill SB   190
     362

107  Dewhurst Letter, Jan. 20, 2011            212

108  Lt. Governor Dewhurst Statement Regarding  213
     Governor Perry's Emergency Call, 1-20-2010

## 6

109  Senate Rules, Jan. 19, 2011                291
110  Senate Journal, Jan. 24, 2011              292
111  Lt. Dewhurst Statement Regarding Passage   302
     of Voter ID

112  Fact Check Printout                        310

113  Press Release, March 12, 2012              311

114  Draft Talking Points for Voter ID Bill     313
     Signing, May 27, 2011
115  Talking Points (82R)                       315
116  Indiana Law                                317
117  Georgia Law                                317
118  E-Mail, March 12, 2012                     322
119  Voter ID Overview                          324
120  Standard of Review By Department of        328
     Justice

## 7

1    (At 8:21 a.m.)

2    (Witness sworn.)

3    THE REPORTER:  Could everybody here make

4  announcements and your affiliations.

5    MS. BERKOWER:  Risa Berkower for the

6  Attorney General Eric Holder.

7    MR. FISHER:  Spencer Fisher for the

8  Attorney General Eric Holder.

9    MR. McFARLAND:  Ernest McFarland for the

10  United States.

11    MR. ROSENBERG:  Ezra Rosenberg from

12  Dechert LLP for the Texas State Conference of NAACP

13  Branches and the Mexican American Legislative Caucus.

14    MR. HARRIS:  Adam Harris from Fried,

15  Frank, Harris, Shriver & Jacobson, LLP, for the Texas

16  League of Young Voters Education Fund, Defendant

17  Intervenors.

18    MR. GEAR:  Bruce Gear for the Attorney

19  General.

20    MS. NAPIER:  Stacey Napier for the

21  Attorney General, Texas Attorney General.

22    MR. FREDERICK:  Matthew Frederick for the

23  State of Texas.

24    MS. RATHGEBER:  Julia Rathgeber,

25  Lieutenant Governor's Office.

## 8

1    MS. MARANZANO:  Jennifer Maranzano for the

2  Attorney General Eric Holder.

3    MS. WESTFALL:  Elizabeth Westfall for the

4  Attorney General.

5    MS. McLEOD:  Michelle McLeod for the

6  Attorney General.

7    JULIA RATHGEBER,

8  having been first duly sworn to testify the truth, the

9  whole truth, and nothing but the truth, testified as

10  follows:

11    EXAMINATION

12  By MS. BERKOWER:

13    Q.  Good morning.

14    A.  Good morning.

15    Q.  This is the deposition of Julia Rathgeber.  Is

16  that the correct pronunciation?

17    A.  "Rath-gaber," but that's okay.

18    Q.  "Gaber," okay.  In the case State of Texas

19  versus Holder, Case Number 12-CV-128 in the U.S.

20  District Court for the District of Columbia.  My name is

21  Risa Berkower, as you just heard.

22    Can you give us your full name, please?

23    A.  Julia Jeffrey Rathgeber.

24    Q.  Have you ever been known by other names?

25    A.  My maiden name, but that's it.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

9

1    Q.   Which is?
2    A.   Jeffrey.
3    Q.   Okay.  Are you represented here by counsel
4  today?
5    A.   Yes, I am.
6    Q.   Who is that?
7    A.   Matt and Stacey.
8    Q.   And when did that representation begin?
9    A.   I don't know.  January.  Whenever we got sued.
10   Q.   Okay.
11   A.   I guess.
12   Q.   So earlier this year?
13   A.   Yeah.  Whenever I got notice is when they
14  started taking interest in my position.
15   Q.   So at the beginning of this lawsuit?
16   A.   Yes.
17   Q.   Okay.  You've been placed under oath, so it's
18  important to testify truthfully, accurately, and
19  completely.  And the court reporter will prepare a
20  transcript of everything that's said today.  So in order
21  to create as clear a transcript as possible, please
22  respond to my questions verbally.  No head shaking or
23  nodding.  And please wait for me to finish the question
24  before you answer, and I'll do the same when you're
25  answering.

10

1    A.   Okay.
2    Q.   I'll try to ask you clear questions.  If you
3  don't understand a question, let me know, then you can
4  interrupt.  If you wish to stop and take a break, please
5  tell me, and I'll try to accommodate you, but we're
6  under a very tight schedule today, as you know, so we'll
7  try to keep our breaks relatively short.  I think that
8  we are under the understanding that you needed to leave
9  by 3:30.
10   A.   Yes.
11   Q.   So we're going to keep that in mind as we go
12  through.
13        From time to time, your lawyer may make an
14  objection, or lawyers, as the case may be.  If they are
15  making their objections for the record, unless they
16  instruct you not to answer the question, you can go
17  ahead and answer anyway.  If they counsel you not to
18  answer or to answer only to the extent that information
19  is not privileged, please clarify for the record whether
20  or not you're answering or not answering completely
21  based on his instruction, just so it's clear for the
22  record.
23   A.   Okay.
24   Q.   Does that make sense?
25   A.   I think so.

11

1    Q.   I think in the past, he has interposed an
2  objection based on privilege.  So just to be clear, if
3  you're not going to answer, say, "I'm following the
4  instruction; it's privileged."
5    A.   Okay.
6    Q.   Do you understand these instructions?
7    A.   Yes.
8    Q.   Okay.  Do you have any questions about any of
9  them?
10   A.   Not so far.
11   Q.   Are you on any medication today that would
12  affect your ability to testify?
13   A.   No, I'm not.
14   Q.   Is there any reason why you can't testify
15  truthfully and accurately today?
16   A.   No.
17   Q.   So I may use some shorthand today.  If I use
18  the term Lieutenant Governor, I'm referring to
19  Lieutenant Governor David Dewhurst or anyone who is
20  acting as an agent on his behalf.
21        I may use the terms voter ID and photo ID
22  interchangeably during the deposition.  I want you to
23  interpret the term broadly to mean a requirement that a
24  voter present a form of identification, whether it has a
25  photo or otherwise, when voting in person before being

12

1  permitted to vote by regular ballot.  Does that make
2  sense?
3    A.   Yes.
4    Q.   When I refer to the terms "minority voters," I
5  mean voters who are not White, nonAnglo.  Do you
6  understand these terms?
7    A.   Yes.
8    Q.   If you have any questions about what I mean,
9  either now or any time, just ask.
10        So have you ever been deposed before?
11   A.   Yes.
12   Q.   How many times?
13   A.   I think once or twice.
14   Q.   Do you remember the case names?
15   A.   No.
16   Q.   Do you remember what kind of case it was?
17   A.   Family business.
18   Q.   Do you remember what court it was in?
19   A.   No.
20   Q.   State court or federal court?
21   A.   State.
22   Q.   Here in Texas?
23   A.   Yes.
24   Q.   Have you ever been a party in litigation?
25   A.   Yes.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

## 13

1  Q.  How many times?

2  A.  Once or twice.

3  Q.  Do you remember the nature of the proceeding?

4  A.  A family land dispute, yes.

5  Q.  Okay.  And --

6  A.  State court.

7  Q.  State court?  Do you remember the case names?

8  A.  No.

9  Q.  Okay.  Have you ever personally been the

10 plaintiff or a defendant in a lawsuit?

11 A.  I've been part of a group, yes, for family land

12 deals.

13 Q.  Okay.  Who were you suing or defending against?

14 A.  Family who wanted different parts of the land.

15 Q.  Okay.  Have you ever been involved in a case

16 where the State of Texas was the plaintiff or defendant?

17 A.  No.

18 Q.  What did you do to prepare for today's

19 deposition?

20 A.  I met with the AG's Office attorney, and I

21 looked through my e-mails that were submitted to the

22 AG's Office, and I re-read Senate Bill 14 briefly.  I

23 mean, just quickly.

24 Q.  Any other documents you looked at before

25 today's deposition?

## 14

1  A.  That's it.  E-mails.  The bill.  That's it.

2  Q.  And when you said you met with the attorneys

3  from the AG's Office, who in particular did you mean?

4  A.  Matt and Stacey.

5  Q.  Was anybody else present when you had that

6  meeting?

7  A.  No.  Sometimes people would walk in and walk

8  out, but they were the only ones in the meeting.

9  Q.  Who were those people; do you remember?

10 A.  No.

11 Q.  People that you work with?

12 A.  No.  People from the AG's Office picking up a

13 document or leaving, or, you know, that kind of thing.

14 Q.  Okay.  How long did you meet with Stacey and

15 Matt?

16 A.  Less than an hour, 30, 45 minutes.

17 Q.  Other than your lawyers, did you speak to

18 anybody about your deposition today?

19 A.  My whole office knows where I am.  I mean, we

20 put down where we are, so yes.

21 Q.  Did you speak to the Lieutenant Governor about

22 your deposition today?

23 A.  He has a note that I'm going to be here today,

24 because otherwise, I'm sure he would be calling.

25 Q.  Okay.  But didn't you speak to him directly

## 15

1  about it?

2  A.  You know, I may have, but I don't -- I don't

3  think so.  I -- I don't think so.

4  Q.  Okay.  Anyone else in your office that you may

5  have spoken with about the deposition?

6  A.  Not about the contents of the deposition, only

7  that I would be here today.

8  Q.  So just scheduling?

9  A.  Yes.

10 Q.  And who was it that you spoke with, if you

11 remember?

12 A.  Oh, everybody in our office knows where I am

13 today.

14 Q.  Okay.  Have you spoken to anyone other than

15 your lawyers about this case?

16 A.  My husband.

17 Q.  When did you talk to him about it?

18 A.  He's aware of where I am, too.

19 Q.  Anyone else on the Lieutenant Governor's staff

20 that you haven't mentioned already?

21 A.  No.  I -- I would say, honestly, everybody in

22 the office knows that I will be here today, and -- but

23 we didn't have a discussion over the subject matter of

24 the deposition, just scheduling.

25 Q.  Okay.  Did you bring any documents or notes

## 16

1  with you today?

2  A.  I have a file, but it's mostly work-related

3  stuff.

4  Q.  What --

5  A.  It's not voter ID stuff.  It's things that I

6  was going to do if we have some down time.

7  Q.  Oh, okay.

8  MS. BERKOWER:  So I'm going to hand to the

9  court reporter so I mark this or do you?

10 THE REPORTER:  Either one.

11 MS. BERKOWER:  I think this is actually

12 100.

13 (Exhibit 100 marked for identification.)

14 Q.  (By Ms. Berkower) Do you recognize this?

15 A.  Oh, yeah.

16 Q.  What is it?

17 A.  It's my notice of deposition.

18 Q.  Can I direct your attention to Attachment A,

19 please?

20 A.  Sure.

21 Q.  Did you undertake a search for these documents?

22 A.  Yes, I did.

23 Q.  What did you do?

24 A.  I received instructions from Stacey Napier of

25 the AG's Office to search our records, my personal



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 17

1  records, for a specific set of search terms, and I did
2  that search according to the requirements that she gave
3  me. And then I printed out of all those e-mails and
4  gave them to our general counsel, who then gave them to
5  the AG's Office,
6      Q. Where specifically did you look?
7      A. On my computer.
8      Q. Did you look in other -- are there other files
9  kept in the office?
10      A. I have some paper files, but usually after a
11  legislative session, I get rid of them, and so I did
12  check to make sure I didn't have a voter ID file, but I
13  didn't. So we have a lot of paper, and so I tend to get
14  rid of that kind of stuff and keep the electronic
15  copies.
16      Q. When you say you got rid of it, is there
17  another filing area that you keep these files or --
18      A. No.
19      Q. You just throw them out?
20      A. Yes. Once the legislation has gone through the
21  system, it's no longer relevant.
22      Q. Okay. And what exactly did you find when you
23  searched?
24      A. Oh, I don't know. I think about 20 e-mails
25  that involved the search terms that I was provided by

## 18

1  Stacey Napier.
2      Q. What were those search terms, if you remember?
3      A. I don't remember. They were technical terms
4  that incorporated all of the words that you requested in
5  these documents on the under the list of the 1, 2, 3s.
6      Q. And did you say you conducted the search
7  yourself?
8      A. Yes, I did.
9      Q. So if you can direct your attention to Item 1
10  in Attachment A. It says -- it asks for all documents
11  and communications, including, but not limited to, those
12  among and between the Office of the Governor, the Office
13  of the Lieutenant Governor, members of the Texas
14  Legislature, the Texas Legislative Council, and other
15  Texas state executive offices and agencies, concerning
16  any or all reasons, justifications, rationales,
17  interests, or purposes in enacting SB 14.
18      Did you search for those documents?
19      A. Yes, ma'am, I did.
20      Q. Did you find any?
21      A. I'm not -- I don't remember. I'm assuming that
22  I found some documents relating to Senate Bill 14,
23  because I did put them together and give them to our
24  general counsel.
25      Q. And directing your attention to Item 2, if you

## 19

1  can read that. Did you search for those documents?
2      A. Yes, I did.
3      Q. Did you find anything responsive?
4      A. I don't think I did find anything about a
5  legislative emergency, other than we may have a copy of
6  the proclamation that we provided to the -- the
7  Governor's proclamation that we provided to the AG's
8  Office.
9      Q. And directing your attention to Item 3, did you
10  search for those documents?
11      A. Yes, I did.
12      Q. Did you find anything responsive?
13      A. Yes. I think there were some -- some e-mails
14  relating to -- to the drafting of Senate Bill 14.
15      Q. What did you do with them?
16      A. Provided them to our general counsel, who then
17  gave them to the AG's Office.
18      Q. And Item 6, can you direct your attention to
19  that one, please. Did you search for those documents?
20      A. Yes, I did.
21      Q. Did you find anything responsive?
22      A. I would assume so, yes.
23      Q. What did you do with them?
24      A. Gave them to my general counsel, who gave them
25  to the AG's Office.

## 20

1      Q. And again, were these all electronic files?
2      A. Yes.
3      Q. Directing your attention to Item 11.
4      A. I don't remember any on the implementation of
5  Senate Bill 14.
6      Q. Okay.
7      A. I did do the search, however.
8      Q. Okay. And with regard to Item 11, which is
9  related to any and all alternatives to SB 14 or
10  amendments to SB 14, did you search for those documents?
11      A. Yes, I did.
12      Q. Did you find anything responsive?
13      A. I don't remember.
14      Q. Okay. If you did find anything responsive,
15  what did you do with them?
16      A. I provided them to our general counsel who gave
17  them to the AG's Office.
18      Q. And then with regard to Item 12, turning your
19  attention to that one, did you search for anything in
20  Item 12?
21      A. Yes.
22      Q. Did you find anything responsive?
23      A. I think there was a newspaper article, yes.
24      Q. Just that one news article?
25      A. That's all I remember.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

21

1    Q.   What did you do with it?
2    A.   Provided it to my general counsel, who gave
3  them to the Attorney General's Office.
4    Q.   Can you tell me a little bit your educational
5  background?
6    A.   Yes.  Did you want to know where I went to
7  college?
8    Q.   Yes, please.
9    A.   I went to U.T.  I graduated from the Plan II
10 Honors Program.  I went to the University of Texas Law
11 School and graduated in 1990.  I took the bar.  I passed
12 the bar.  I'm inactive right now.
13   Q.   Okay.
14   A.   I don't practice.
15   Q.   Okay.  What is your current job title?
16   A.   Deputy Chief of Staff and Policy Director for
17 the Lieutenant Governor.
18   Q.   What was your job prior to your current job?
19   A.   Policy director for the Lieutenant Governor.
20   Q.   And what about before that?
21   A.   I worked at General Land Office, where I did --
22 I actually did the Homeland Security report, because the
23 week I joined the General Land Office, I was supposed to
24 do water quality planning, and the Lieutenant Governor,
25 then the Commissioner of the General Land Office, was

22

1  named Chair of the Task Force on Homeland Security, and
2  they needed a staff person to work on it.  So instead of
3  doing water quality, I did homeland security.
4    Q.   Do you have any -- and any other legal jobs?
5    A.   Yeah.  I worked at the Texas Commission on
6  Environmental Quality for three years, and I did work on
7  a number of legislative issues.  And then prior to that,
8  I worked for the Lieutenant Governor and the Senate,
9  then Lieutenant Governor Bullock, doing essentially what
10 I do now, policy research.
11   Q.   Okay.  I think I probably went about this the
12 wrong way.  Since you graduated law school, can you just
13 list the jobs you've had and the years you had them?
14   A.   That might have been easier.
15        Okay.  I left law school and joined the
16 Texas Senate, where I worked at the Senate Research
17 Center and also for the Lieutenant Governor, then
18 Lieutenant Governor Bob Bullock; I worked there for
19 eight years.
20        Went to the Texas Commission on
21 Environmental Quality, was there for three years, did
22 strategic planning, which is air quality planning, the
23 water quality planning, and waste quality planning.
24        I left there and went to the General Land
25 Office, where I was supposed to do water quality

23

1  planning and did homeland security instead.
2        Then I moved from the General Land Office,
3  after a year and a half time with the Lieutenant
4  Governor, as he was elected, and moved into my current
5  position, which has expanded since I've been there.
6    Q.   Okay.  So how long have you had your current
7  position?
8    A.   Since 2003, when he became Lieutenant Governor
9  but it expanded in 2009, I guess, when I became Deputy
10 Chief of Staff.
11   Q.   Okay.  Do you have any experience related to
12 election law?
13   A.   Other than the legislation that comes through
14 our office related to election, election law, that's the
15 only -- the only experience I have.
16   Q.   Do you have any experience related to election
17 administration?
18   A.   No.
19   Q.   Have you ever volunteered as a poll worker?
20   A.   No.
21   Q.   Have you ever witnessed any problems when you
22 were at the polls as a -- well, let me back up.
23        Do you vote here in Texas?
24   A.   Yes.
25   Q.   When was last time that you voted?

24

1    A.   Oh, gosh, last week, two weeks ago, week and a
2  half ago.  I don't know.  About a week ago.
3    Q.   Okay.
4    A.   I early voted for this election.
5    Q.   Have you ever witnessed any problems at the
6  polls when you were voting there?
7    A.   No.
8    Q.   Have you ever witnessed anyone try to
9  impersonate another voter?
10   A.   Not that I'm aware of.
11   Q.   How far is your polling site from your house?
12   A.   Well, I usually vote at my Randalls, which is
13 about two miles from my house.  My actual polling site
14 is at a school that's about a mile and a half from my
15 house.  And frequently, I vote at the Sam Houston
16 Building which across the street from the Capitol.  So I
17 would say Randalls was the most frequent voting place,
18 then probably the Sam Houston Building, and then my
19 actual polling.  I almost never vote on actual election
20 day.
21   Q.   So you usually vote early voting?
22   A.   Yes.
23   Q.   Do you ever vote by mail?
24   A.   I have, but it's been since I was in college,
25 when I was registered to vote in my hometown.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                          MAY 29, 2012

---

25

1  Q.  What are your current responsibilities for
2  Lieutenant Governor Dewhurst?
3  A.  Oh, goodness.  I manage most of the human
4  resources issues in our office.  I prepare and ensure
5  that the appropriate briefing materials are prepared for
6  the Lieutenant Governor's meetings and coordinate the
7  policy staff in their preparation for him.  I coordinate
8  -- I coordinate functions within our office to ensure
9  that the appropriate people are working on the
10 appropriate issues.  I prepare the briefing materials
11 for the legislative session, so the bill books that are
12 put together for the Lieutenant Governor's review before
13 he hears a bill on the Floor.  I don't prepare all that
14 information, but I coordinate its preparation.
15 Q.  Do you ever assist with issues that may be
16 taken up by the Legislature?
17 A.  Yes.
18 Q.  What is your -- what do you with regard to
19 those issues?
20 A.  It varies depending on the issue.  I frequently
21 prepare background materials that explains what the
22 issue is, summarizes the material, ask the appropriate
23 policy staff to summarize material, prepare briefing
24 booklets that include all of the paperwork necessary for
25 legislation, which includes things like the fiscal note

---

26

1  and the bill analysis, and ensures that the appropriate
2  version of the bill is prepared for the Senate Floor.
3  I occasionally write amendments when
4  people need help drafting an amendment.  I talk to the
5  senators if they don't understand or need a summary or
6  preparation on a different -- on whatever issue is
7  coming up before them.  I think that about covers it.
8  Q.  Do you have any areas that you focus on?
9  A.  No.
10 Q.  Did you work on voter ID?
11 A.  Yes, I did.
12 Q.  Who else in the Lieutenant Governor's worked on
13 voter ID, or worked on voter ID?
14 A.  Bryan Hebert was the policy person who was
15 primarily responsible for the issue, and he's no longer
16 with our office.  I'm sure you know.  He was the lead
17 person on the -- on the legislation and did most of the
18 work on it.  I helped coordinate the materials for the
19 Lieutenant Governor in preparation for hearing the bill
20 on the Floor.  Blaine Brunson helped coordinate with the
21 senators about hearing the bill, and then our general
22 counsel has coordinated materials on this issue with
23 regard to this lawsuit.
24 Q.  Are there certain legislative issues in which
25 the Lieutenant Governor is especially interested?

---

27

1  MR. FREDERICK:  I'm going to object here.
2  As everybody probably expects, I will be objecting on
3  privilege to any questions that seek to discover the
4  Lieutenant Governor or his staff's thought process,
5  mental impressions, or opinions about pending
6  legislation.
7  Also, we'll object to any questions that
8  seek the substance of communications between the
9  Lieutenant Governor and his staff about pending
10 legislation or communications between the Lieutenant
11 Governor's Office and other legislators or their staff,
12 state agencies, the Texas Legislative Council or
13 constituents.
14 So to the extent you can answer without
15 revealing thought process, mental impressions, or
16 privileged communications, you may do so.  But
17 otherwise, I instruct you not to answer on the basis of
18 privilege.
19 THE WITNESS:  Okay.
20 Q.  (By Ms. Berkower) Do you want to hear the
21 question again?
22 A.  Yes.
23 Q.  Are there certain legislative issues in which
24 the Lieutenant Governor is especially interested?
25 MR. FREDERICK:  The same objection.

---

28

1  A.  I think I've been instructed not to answer;
2  however, I would say the Lieutenant Governor has always
3  been very focused on the budget.
4  MS. BERKOWER:  So you're not going to let
5  her answer the yes-or-no question whether there are
6  certain issues that he is interested in, without getting
7  into which those are?
8  MR. FREDERICK:  No, I didn't say
9  that.  She can answer a yes-or-no question.
10 A.  Yes, the budget.
11 Q.  (By Ms. Berkower) What's your role with regard
12 to issues that he is especially interested in?
13 A.  My role doesn't change dramatically for
14 priority issues, although I have never focused on the
15 budget, because we have specific staff that work on
16 budget issues.
17 Q.  Was voter ID one of the issues in which the
18 Lieutenant Governor was especially interested?
19 MR. FREDERICK:  I object on the basis
20 privilege.  To the extent she is asking a yes or a no
21 question, you may answer if you know, but don't reveal
22 the Lieutenant Governor's thought process or any
23 privileged communications.
24 A.  I don't know.  I think he was interested in
25 handling it professionally, handling the issue

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

### 29

1  professionally.
2      Q.  (By Ms. Berkower) Do you know of any public
3  statements that he made in which he expressed it as a
4  priority of his?
5      A.  Not that I remember.
6      Q.  When the Lieutenant Governor takes an interest
7  in a particular legislative issue, do you assist with
8  legislative drafting?
9      A.  Yes.
10     Q.  Do you assist with committee work?
11     A.  No, not usually.
12     Q.  Why not?
13     A.  Because the committees do that.
14     Q.  Do you assist with ensuring passage of that
15  particular bill, whatever it may be?
16     A.  What did you do mean by ensuring passage?  I
17  make sure all the materials are necessary for the bill
18  to be heard on the floor.
19     Q.  Well, I think -- I guess what I meant is, when
20  the Lieutenant Governor takes an interest in a
21  particular legislative issue, do you assist him in
22  ensuring that that -- whatever bill it is that he is
23  behind, gets passed?
24         MR. FREDERICK:  Objection, vague, and
25  object to the extent it assumes facts not in evidence,

### 30

1  but you may answer if you can.
2      A.  We -- we ensure that we prepare the materials
3  in the best way that we know how in order to handle an
4  issue professionally, and to that extent yes, we do.
5      Q.  (By Ms. Berkower) I guess to follow up on
6  that:  What do you mean by to handle a bill
7  professionally?
8      A.  To ensure that nothing falls through the cracks
9  that we have.  Every document that we need, that
10  everything has been filed according to the rules of the
11  Texas Senate; that the pieces are in order, in order to
12  hear a piece of legislation.
13     Q.  And when you say you have every document you
14  need, what documents are those?
15     A.  The bills, according to the Senate rules, are
16  required to have a package in order to be heard on the
17  floor, and that package includes the appropriate version
18  of the bill, that has been filed appropriately,
19  including a fiscal note and a bill analysis.
20     Q.  What does the bill analysis usually contain,
21  just as a general matter?
22     A.  A summary statement of any piece of
23  legislation, and then a section-by-section summary of
24  that, that piece of legislation.
25     Q.  Does the analysis usually get into the effect

### 31

1  that the bill may have?
2      A.  Sometimes the summary section, which is
3  provided by the bill's sponsor or author, does talk
4  about that.  But we don't write that material, so it
5  depends on what the senators submit.
6      Q.  And in a case where there is some sort of
7  analysis or research or other study conducted with
8  regard to the effect of the bill, is that something that
9  would be included?
10     A.  It depends on whether or not it's in the rules.
11  So some of the rules require there -- criminal justice
12  bills are required to have a criminal justice policy
13  statement associated with them.  So that would be part
14  the materials that are submitted.
15     Q.  What about election-related bills?
16     A.  I'm not aware of any additional materials that
17  have to happen.  I think that happens after the fact
18  when it goes through you.
19     Q.  Sorry?  What was the last thing you said?
20     A.  When we go through voter bills, frequently,
21  they have to go to the federal government for Voting
22  Rights Act.
23     Q.  Oh, okay.  You mean for preclearance?
24     A.  Yes.
25     Q.  So what type of additional work gets done when

### 32

1  bill needs to get precleared?
2      A.  Nothing at the time.  That happens after the
3  bill happens.
4      Q.  So before the bill is passed, you don't focus
5  on anything; you don't conduct any research or anything
6  that might be useful when you send it for preclearance?
7         MR. FREDERICK:  Object as vague.  Object,
8  assumes facts not in evidence.  And I also object on
9  privilege to the extent that it calls for thought
10  process, mental impressions, or privileged
11  communications.
12         If you can answer, you may.
13     A.  I don't remember anything we did to prepare
14  this piece of legislation for preclearance.
15     Q.  (By Ms. Berkower) Did you consider the
16  preclearance factors when you were working on the bill?
17     A.  I did not.
18     Q.  Do you know if anybody else did?
19     A.  I don't know.
20     Q.  Did it come up at all when you discussed the
21  bill?
22         MR. FREDERICK:  Objection.  To the extent
23  this calls for internal communications in the Lieutenant
24  Governor's Office about pending legislation, I will
25  instruct you not to answer this question.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 33

1      A.  I will not answer this question then.
2      Q.  (By Ms. Berkower) Okay.  As a general matter
3  for election-related bills, is it something that's
4  discussed?
5          MR. FREDERICK:  Objection, vague.
6      I don't remember it.
7      Q.  (By Ms. Berkower) So for any election-related
8  bill that's come before the -- before you in your time
9  working for the Lieutenant Governor, you don't remember
10  any discussions about preclearance prior to the bill's
11  passage?
12          MR. FREDERICK:  Object.  Misstates prior
13  testimony.  You may answer if you can.
14      A.  The discussion of preclearance would have
15  happened at the committee level, and I don't handle the
16  committee level.  So it may have been discussed during
17  the committee hearing, and I don't remember it.
18      Q.  (By Ms. Berkower) What about when a bill is in
19  the Committee of the Whole?
20      A.  It may have been discussed in the committee,
21  and I didn't -- I don't remember it.
22      Q.  Okay.  So when the Lieutenant Governor takes an
23  interest in a particular legislative issue, do you
24  communicate with other legislators about the issue?
25      A.  Yes.

## 34

1      Q.  Do you ever communicate with the Governor's
2  Office?
3      A.  Yes.
4      ==Q.  Do you ever handle public relations or anything==
5  ==of that sort for the Lieutenant Governor?==
6      ==A.  Not really.  I will fact check a quote to==
7  ==ensure that it's accurate, but I don't prepare the==
8  ==public relations materials.==
9      ==Q.  Do you communicate with any interest groups?==
10      ==A.  If they want to come and talk to our office,==
11  ==yes.==
12      ==Q.  Do you ever talk to constituents?==
13      ==A.  Yes.==
14      ==Q.  In any given legislative session, how many==
15  ==bills does the Lieutenant Governor contribute to==
16  ==drafting?==
17      ==A.  Oh, Lord.  More than he should.  I really -- he==
18  ==doesn't draft as many as he discusses with the==
19  ==senators.==  I would say that drafting, he participates in
20  maybe 20 bills.  But amendments, he may participate in
21  up to 200 bills.
22      Q.  How does he decide which bills that he
23  contributes to drafting?
24          MR. FREDERICK:  Object on the basis of
25  privilege.  It calls for his thought process, and I

## 35

1  instruct you not to answer.
2      A.  I will not answer that question.
3      Q.  (By Ms. Berkower) Does he only contribute to
4  drafting for bills that are a priority for him?
5      A.  No.
6          MR. FREDERICK:  Objection.
7      Q.  (By Ms. Berkower) Are you not answering based
8  on advice of counsel?
9      A.  Yeah.  No.  The answer is no.
10      Q.  The answer is no, he contributes to other
11  bills, too?
12      A.  Yes.
13      Q.  Okay.  What is your role in the drafting?
14      A.  It varies by the piece of legislation, and
15  typically, I don't have a role with drafting.  The
16  policy person handling that specific issue handles it,
17  but sometimes I will assist if somebody is really busy.
18      Q.  Do you review drafts when other people are --
19      A.  Yes.
20      Q.  What is your role, generally, when the
21  Lieutenant Governor may vote on a bill?
22      A.  He hasn't voted very often, so I don't think
23  I've had a role, other than preparing the materials that
24  we would prepare for any bill.
25      Q.  You said he hasn't voted very often?  On the

## 36

1  occasions where he did vote, did you provide him with
2  any advice on how to vote?
3      A.  No.
4      Q.  Did anybody in your office?
5      A.  Not that I'm aware of.
6      Q.  Do you remember when exactly he voted?
7          MR. FREDERICK:  I'll object, vague, but
8  you can answer.
9      A.  I think he's voted maybe three times since he's
10  been Lieutenant Governor.  One was a gaming bill.  One
11  was this bill.  And I don't remember the third one, but
12  maybe it was school finance.
13      Q.  (By Ms. Berkower) How did he decide when he was
14  going to vote?
15          MR. FREDERICK:  Objection.  It calls for
16  internal thought process.  I instruct you not to answer
17  on the basis of privilege.
18      A.  I will not answer that.
19      Q.  (By Ms. Berkower) Have you ever drafted lists
20  of priorities, priority -- sorry.  I'll start over.
21          Have you ever drafted lists of policy
22  priorities for the Lieutenant Governor?
23      A.  Yes.
24      Q.  When did you do that?
25      A.  Every session, he gives a speech on his policy



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 37

1    priorities, and we talk to him, and then I write them
2    down.
3        Q.   What were the Lieutenant Governor's legislative
4    priorities in --
5            MR. FREDERICK:  I'll object only to the
6    extent this calls for you to reveal the Lieutenant
7    Governor's thought process or mental impressions about
8    any pending legislation or the contents of privileged
9    communications.  But if you can answer without revealing
10   that, you may do so.
11       A.   Governor Dewhurst always has the budget as the
12   number one priority, balancing the budget.  And beyond
13   that, he works with the senators to determine what he'd
14   like to -- what they would like to accomplish and what
15   he would like to accomplish, and then we develop a
16   master list of major issues for the legislative
17   session.  They may not be his priorities.  They may be
18   senatorial priorities, but he works with the senators to
19   get various topics accomplished.
20       Q.   (By Ms. Berkower) Do you ever draft speeches
21   for the Lieutenant Governor?
22       A.   Not often, no.
23       Q.   When have you drafted speeches?
24       A.   Oh, I edit speeches from time to time to ensure
25   that they are factually correct, but I don't draft them.

### 38

1        Q.   Do you remember which speeches you've edited?
2        A.   No.
3        Q.   Did you ever work on speeches concerning voter
4    ID?
5        A.   Not that I remember.
6        Q.   Did you ever draft talking points for the
7    Lieutenant Governor?
8        A.   No.  Oh, not on this topic.
9        Q.   Have you on other topics?
10       A.   Yes.
11       Q.   Which topics?
12       A.   I know I have coordinated with the staff on a
13   number of topics, including the budget and -- oh, I
14   don't know, we -- I mostly fact check other people's
15   materials.
16       Q.   So do you review the talking points before they
17   go out?
18       A.   Half the time, yes.
19       Q.   Do you ever draft press releases for the
20   Lieutenant Governor?
21       A.   No, I never have.
22       Q.   How many staff does the Lieutenant Governor
23   have?
24       A.   It varies during session and off of session.
25   Right now, I believe we have 26.

### 39

1        Q.   Oh, wow.  Can you group them into general --
2    I'm not going to ask you to name all of them.
3        A.   Okay.  We have a communications group that
4    handles all of our correspondence, and they work with
5    the press people.  The correspondence people and the
6    press people work with our communications director, and
7    they write the speeches and the letters and that sort of
8    thing.
9            Then we have policy staff that are divided
10   by issue area, and there are about 13 of those.
11           The budget has its own little policy team,
12   and we have two or three people who work on budget full
13   time, and then other people who work on segments of the
14   budget.  What else do we have?  We have administrative
15   staff, and I believe that's about it.
16       Q.   So you said that you have policy staff divided
17   by issue area?
18       A.   Yes.
19       Q.   Was one where certain of the staff members
20   assigned to voter ID issues?
21       A.   Yes, Bryan handles voter issues.  Bryan Hebert.
22       Q.   Anybody else?
23       A.   Maybe Frank Battle, but mostly Bryan.
24       Q.   And what was his role with regard to that
25   issue?

### 40

1        A.   He was the policy staff that handles elections
2    law.
3        Q.   And how did you -- were you involved, then,
4    when he would -- with the -- were you involved with his
5    efforts on voter ID?
6        A.   I don't know what you mean by that.  I
7    supervised him.
8        Q.   When he was working on voter ID, what was your
9    role?
10       A.   I supervised Bryan Hebert.
11       Q.   How frequently did you talk to him or
12   communicate with him about the issue?
13       A.   I talked to all of the policy staff every day
14   during the legislative session to ensure that I'm aware
15   of what it is they're doing and if they need any help or
16   direction from the Lieutenant Governor or they need to
17   talk to him about any specific issue.  That's part of my
18   role.
19       Q.   What about when the legislature isn't in
20   session?
21           MR. FREDERICK:  Object to the form, but
22   you may answer.
23       A.   What -- what are you asking?
24       Q.   (By Ms. Berkower) Well, okay.  Does the policy
25   staff ever continue working on an issue when the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

## 41

1   legislature is not in session?
2       A.  Typically, they work on the interim committee
3   charges, so there are different issues that the
4   Lieutenant Governor has charged the interim committees
5   to consider.  So those would be in preparation of
6   legislation for the next legislative session.  But they
7   don't work on things we already passed.
8       Q.  So my next question might sound a little silly.
9   Are there any privileges you are asserting today?
10      A.  Yep.
11      Q.  Can you list all of them?
12      A.  Nope.  I'm sure that there's legislative
13  privilege that's the number one privilege, but I don't
14  know what else we may be asserting today.
15      Q.  Are you asserting attorney-client privilege
16  today?
17      A.  Yes.
18      Q.  In what way?
19      A.  I think when the issue arises, we'll know it.
20      Q.  Do you have an attorney-client relationship
21  with Mr. Dewhurst?
22      A.  No.
23      Q.  Does anybody else in the Lieutenant Governor's
24  Office?
25      A.  I think his general counsel does, yes.

## 42

1       Q.  How are documents maintained in your office?
2       A.  Mostly electronically.  We do have paper files
3   of all of our correspondence.
4       Q.  Is anybody responsible for record retention?
5       A.  Yes.  Our general counsel is, but that's been
6   distributed to the appropriate policy staff.
7       Q.  Do you have a specific retention policy for the
8   office?
9       A.  Yes, we do.
10      Q.  What is it?
11      A.  Oh, there's a records retention law, and we
12  abide by that law.  Actually, we're supposed to keep
13  materials, and there are specific timelines required,
14  and, I don't know, we -- we follow the law.
15      Q.  That's Texas State law?
16      A.  Uh-huh.
17      Q.  Where are your paper files maintained?
18      A.  In boxes in the Capitol.
19      Q.  And where are your electronic files maintained?
20      A.  On individuals' computers handled by the Texas
21  Legislative Council.
22      Q.  Do you have like a server?  Are the computers
23  networked?
24      A.  Yes.
25      Q.  Is there a specific drive in which electronic

## 43

1   files are maintained?
2       A.  We have shared files.  We have individual
3   files.  They are all maintained by the Texas Legislative
4   Council.
5       Q.  Are there any records maintained in any other
6   locations, such as a storage facility?
7       A.  Not that I'm aware of.  We may have stored some
8   of the early correspondence if we were running out of
9   storage space, but that would have been at the library
10  in archives, if they are.  I don't think we've sent them
11  over there, but we may have.
12      Q.  Does the Lieutenant Governor have more than one
13  office?
14      A.  Yes.  But not as Lieutenant Governor.  He has
15  his personal offices.
16      Q.  And does he have also a campaign office?
17      A.  Yes.
18      Q.  Do you know how the records are maintained at
19  any of the other offices?
20      A.  No idea.
21      Q.  Do you maintain any files specific to --
22  specific to the particular pieces of legislation?
23      A.  During a legislative session, I do.
24      Q.  What do you do with those files after the
25  legislative session?

## 44

1       A.  I throw them out.
2       Q.  Do you throw them out regardless of whether a
3   bill as successful or not?
4       A.  Frequently, yes.
5       Q.  With regard to SB 14 in particular, did you
6   consider whether it would be helpful or necessary to
7   retain your file to assist with the Section 5
8   submission?
9           MR. FREDERICK:  Objection.  Calls for
10  internal thought process, mental impressions.  Instruct
11  you not to answer on the basis of privilege.
12      A.  I will not answer then.
13      Q.  (By Ms. Berkower) Do you maintain -- have you
14  ever archived e-mail concerning particular legislation?
15      A.  Yes.
16      Q.  Have you archived any e-mail concerning
17  legislation relating to election matters?
18      A.  Yes, when directed to do so by the Attorney
19  General's Office as a result of this lawsuit.
20      Q.  Oh, but prior to this lawsuit?
21      A.  No.
22      Q.  It's our fault.
23          Do you have more than one government
24  e-mail account?
25      A.  No.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                              MAY 29, 2012

---

**45**

1    Q.  How often do you communicate with the
2  Lieutenant Governor?
3    A.  During session, every day, several times a
4  day.  During the interim, every other day.
5    Q.  How do you usually communicate with him?
6    A.  On the -- well, in person during session.  On
7  the telephone if he's not in the office.
8    Q.  Does the Lieutenant Governor ever use e-mail?
9    A.  Rarely.
10    Q.  When he does use e-mail, does he use an
11  official government account?
12    A.  Not typically.
13    Q.  He uses a personal account?
14    A.  Yes, or he'll have his secretary send us
15  something.
16    Q.  Oh.  Does he have an official government
17  BlackBerry?
18    A.  No.
19    Q.  Or a Smartphone of any kind?
20    A.  No.
21    Q.  Does he ever use text messaging?
22    A.  I have text messaged him, but I don't think he
23  has text messaged me.
24    Q.  And when you sent him these text messages, do
25  you send it to his -- an official government-issued

---

**46**

1  phone or a personal phone?
2    A.  Personal phone.
3    Q.  How often do you communicate with other members
4  of the Executive Branch?
5    A.  During session, at least once a week.  Not in
6  session, maybe once a month.
7    Q.  How do you communicate with them?
8    A.  It depends on the issues.  Sometimes we'll have
9  a meeting and visit.  Sometimes we'll call each other.
10  Sometimes we'll e-mail and have lunch.
11    Q.  How often do you communicate with members of
12  the Legislature?
13    A.  During session, every day.  Outside of the
14  session, once a week.  One of them once a week.
15    Q.  How often -- what is the means in which you
16  communicate with them?
17    A.  Typically, they come visit.
18    Q.  And when I say the legislators, I meant their
19  staff as well.  I should have said or their staff.  How
20  often do you communicate with members of the
21  legislators' staff?
22    A.  Every day.
23    Q.  And how do you communicate with them?
24    A.  E-mail or -- during the interim, we -- we
25  typically just visit.

---

**47**

1    Q.  And I meant to ask the same question with
2  regard to the Executive Branch, too.  How often do you
3  communicate with other members of the Executive Branch's
4  staff?
5    A.  Maybe once a week during session.  Maybe once a
6  month outside of session.
7    Q.  What's the means of communication with them?
8    A.  Typically a telephone call.
9    Q.  How often does the Lieutenant Governor
10  communicate directly with legislators?
11    A.  I don't know, but frequently.  Every day during
12  session, frequently.  And then outside of session, I
13  don't know how frequently, but he does call them.
14    Q.  Does the Lieutenant Governor communicate
15  directly with the staff members of other legislators?
16    A.  Rarely, but yes.
17    Q.  What means does he use to communicate with
18  them?
19    A.  Meetings or telephone calls.
20    Q.  What about the Governor's Office; how often
21  does the Lieutenant Governor communicate directly with
22  the Governor's Office?
23    A.  I don't know.  I would say once a week during
24  session.  They have Wednesday morning breakfasts, so
25  that's a visit.  And then outside of session, maybe once

---

**48**

1  a month, depending on the issue.  When Governor Perry
2  was traveling, we spoke with him nearly every day.
3    Q.  What is the general means of communication with
4  the Governor's Office?
5    A.  Typically a telephone call or a visit.
6    Q.  In your time working for the Lieutenant
7  Governor, has he ever promised anyone he would
8  prioritize certain --
9        (Interruption by noise outside conference
10  room.)
11        I'll start that question over.  I guess
12  actually I'll go back one question.
13        When the Lieutenant Governor communicates
14  directly with -- when the Lieutenant Governor
15  communicates directly with the Governor's Office, who
16  does he speak with?
17    A.  Usually the Governor.
18    Q.  Any staff members?
19    A.  I'm sure he has, depending on the issue, but
20  typically he just calls Governor Perry.
21    Q.  So the meetings you described when -- when I
22  asked you the question before about the Lieutenant
23  Governor's communications with the Governor's Office,
24  you meant he was speaking directly with the Governor?
25    A.  Yes.  I'm sure he has spoken with his chief

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 49

1  staff as well.  But yes, typically.
2      Q.  In your time working for the Lieutenant
3  Governor, has he ever promised anyone he would
4  prioritize certain legislative issues?
5          MR. FREDERICK:  I'll object to the extent
6  this calls for privileged communications.  But if you
7  can answer without revealing privileged communications,
8  you may do so.
9          MS. BERKOWER:  Well, I think, actually,
10  promises concerning legislation are not privileged.
11          MR. FREDERICK:  I think it would depend on
12  the person to whom the promise was made.  I mean,
13  "promise" can be a vague term, so I think a discussion
14  between a legislator and the Lieutenant Governor can be
15  construed, potentially, as a promise if there is an
16  indication that he wants to pass certain legislation.
17  So to the extent this question calls for
18  communications between the Lieutenant Governor and his
19  own staff or other legislators or staff about pending
20  legislation, then I would instruct you not to
21  answer.  But if you can answer without revealing that,
22  you may do so.
23      A.  I don't know how to answer that question
24  outside of saying that Governor Dewhurst does work with
25  senators to help them pass their legislative packages.

## 50

1      Q.  (By Ms. Berkower) Well, I guess I also meant it
2  with regard to people outside the Legislature, including
3  the Governor's Office or constituents or outside groups
4  or interest groups of any sort.
5      A.  I think Governor Dewhurst does like, enjoy
6  working with people to try and help them achieve their
7  objectives.  And I think to the extent that that
8  qualifies as working together to achieve an objective,
9  that's -- that he is willing to do that.
10      Q.  So to your knowledge, though, has he ever
11  promised anyone, outside the other legislators or anyone
12  in your office, that he would prioritize certain
13  legislation?
14      A.  I'm having a problem with the word
15  "promise."  I think he would be willing to say, "Let me
16  work with you to achieve your objectives."  But that's
17  different than saying, "I promise I will do something
18  for you."
19      Q.  Did the legislative issues on which he wanted
20  to help others achieve their legislative objective
21  include voter ID issues?
22          MR. FREDERICK:  I'll object to the extent
23  this calls for what the Lieutenant Governor wanted.
24  That would be his thought process and mental
25  impressions.  I will instruct you not to answer on the

## 51

1  basis of privilege.
2      A.  I won't answer that question.
3      Q.  (By Ms. Berkower) What about immigration
4  issues; has he ever promised he would prioritize certain
5  -- he would -- excuse me.  I'll start over that
6  question.
7          Has he ever promised anyone he would
8  prioritize immigration issues?
9          MR. FREDERICK:  The same objection based
10  on privilege.  Don't reveal communications between the
11  Lieutenant Governor and legislators or their staff or
12  his own thought process.  But to the extent that you may
13  answer without revealing those, you can do so.
14      A.  I think he has told people he would help them
15  or work with them to achieve their objectives.
16      Q.  (By Ms. Berkower) Including on immigration
17  issues?
18      A.  Yes.
19      Q.  Including on voter ID issues?
20      A.  I think --
21          MR. FREDERICK:  The same objection, but
22  you may answer.
23      A.  I think so.
24      Q.  (By Ms. Berkower) While you have worked for the
25  Lieutenant Governor, how many election-related bills

## 52

1  have you been involved in?
2      A.  Oh, I have no idea -- no idea.
3      Q.  A guess?
4      A.  I have really no idea.  We had the Help America
5  Vote Act.  We've had all kinds of mail-in ballot bills.
6  We've had -- I have no idea.  Up to a hundred maybe?
7      Q.  Going back a step, when you said the Governor
8  works with senators to work on their objectives and he
9  talks to them about their priorities, does he work with
10  all senators to work on their objectives?
11      A.  Yes, he does.
12      Q.  How does he ensure that he works with all
13  senators?
14      A.  They want to work with him.  He has meetings
15  with everyone.  He has meetings with the chairs on
16  Monday nights and the vice chairs on Tuesday nights so
17  he has talked to all the Senate, on Mondays and
18  Tuesdays, about the upcoming issues of the week.  That's
19  during the Legislative session.  During an interim, he
20  typically just waits until they call him and asks for
21  help.
22      Q.  If a particular legislator wanted to be in
23  touch with the Lieutenant Governor about a particular
24  issue, what would they do to get his attention?
25      A.  Typically, they walk, during session, to the



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 53

1  podium and talk to him about it, or they call him.  They
2  all have his cell phone numbers, and sometimes they just
3  come visit.
4      Q.  Does he work with the minority senators on
5  their objectives?
6      A.  Yes.
7      Q.  Does he work with senators of both parties on
8  their objectives?
9      A.  Yes.
10     Q.  In the time that you have worked for Lieutenant
11  Governor, how many immigration-related bills have you
12  been involved in?
13     A.  Again, I have no idea.
14     Q.  More than ten?
15     A.  More than ten.
16     Q.  More than 20?
17     A.  Probably.
18     Q.  More than --
19     A.  I think of immigration as having a very broad
20  description.  That would include the budget that handles
21  a lot of immigration-related issues.  He refers all the
22  bills, so even if he hasn't worked on a bill, he has
23  referred it to a committee.  I would say probably more
24  than 20 immigration-related bills have been referred to
25  committee.

---

### 54

1      Q.  Okay.  Are you familiar with Section 5 of the
2  Voting Rights Act?
3      A.  Not really familiar.  I'm aware of what it is.
4      Q.  Well, what is your understanding of the
5  requirements of Section 5?
6      A.  I'm not a voting rights expert by any stretch
7  of the imagination, but my understanding is the intent
8  is to rectify a historical underrepresentation of
9  minorities in the voting process in Texas and seven
10  other states, I think, but...
11     Q.  How do you ensure that an election-related
12  change to the law complies with Section 5?
13        MR. FREDERICK:  We'll object.  To the
14  extent this calls for thought process, mental
15  impressions, or communications within the Lieutenant
16  Governor's Office or with legislators, I instruct you
17  not to answer on the basis of privilege.
18     A.  Okay.  I cannot answer that question.
19     Q.  (By Ms. Berkower) I'll take one step back.  Do
20  you, just as a yes-or-no matter, ensure that an
21  election-related change to the law complies with
22  Section 5?
23     A.  No.
24     Q.  Do you believe that compliance with the Voting
25  Rights Act is important?

---

### 55

1        MR. FREDERICK:  Objection, relevance.
2      Q.  (By Ms. Berkower) You may answer.
3      A.  My personal belief or my professional belief?
4  I mean, what are you asking me?
5      Q.  I guess both.
6      A.  I think we should comply with federal law, yes.
7      Q.  That's your professional belief?
8      A.  And my personal belief.
9      Q.  Does the Lieutenant Governor believe that
10  compliance with the Voting Rights Act is important?
11        MR. FREDERICK:  Objection, calls for --
12  objection, relevance.  Objection, privilege.  I would
13  instruct you not to answer on the basis of privilege.
14     A.  I can't answer that.
15     Q.  (By Ms. Berkower) Do you or the Lieutenant
16  Governor receive any legal advice on election-related
17  matters before the Senate with regard to Section 5
18  compliance?
19     A.  I do think there was testimony in the Committee
20  of the Whole hearing on Section 5 compliance.
21     Q.  What about legal advice; do you receive legal
22  advice on Section 5 compliance?
23        MR. FREDERICK:  I would object to the -- I
24  would object on the basis of attorney-client privilege.
25        To the extent this already presumes the

---

### 56

1  content of communication with a lawyer, I would instruct
2  you not to answer on the basis of attorney-client
3  privilege.
4      A.  Okay.  I can't answer that.
5        MS. BERKOWER:  Well, I think we're allowed
6  to ask some foundational questions, so I'll go into
7  that.
8        MR. FREDERICK:  You may ask foundational
9  questions, but my objection to that is that it assumes
10  the content of the communication, so I believe that it's
11  going beyond the mere foundational question.
12        MS. BERKOWER:  Okay.  But the subject
13  matter of an attorney-client conversation is a
14  permissible foundation question.
15        MR. FREDERICK:  If you want to ask it
16  again, I'll consider it.
17        MS. BERKOWER:  Okay.
18     Q.  (By Ms. Berkower) Do you receive legal advice
19  on election-related matters before the Senate?
20        MR. FREDERICK:  I will instruct you not to
21  reveal specific substance of any conversation.  However,
22  to the extent that you can answer based on general
23  subject matter, you may do so.
24     A.  I don't remember any communications outside of
25  the testimony that was on the Senate floor and the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

57

1    Committee of the Whole.
2        Q.   (By Ms. Berkower) So you did not receive any
3    legal advice on election-related matters before the
4    Senate?
5            MR. FREDERICK:  Objection, misstates prior
6    testimony.
7        A.   I don't remember.
8        Q.   (By Ms. Berkower) You don't remember receiving
9    any such legal advice?
10       A.   No.
11       Q.   Have you or the Lieutenant Governor ever had
12   discussions with other legislators concerning
13   preclearance?
14           MR. FREDERICK:  Again, I'll instruct you
15   not to reveal the substance of a communication.  But to
16   the extent this only calls for general subject matter on
17   whether the conversation happened, you may answer.
18       A.   We have had some conversations about
19   preclearance.
20       Q.   (By Ms. Berkower) Do you remember with who?
21       A.   No, but the issue was redistricting, not
22   voting -- voter ID.
23       Q.   Do you recall ever speaking with Senator
24   Williams or someone from his office about preclearance
25   of election-related matters?

---

58

1            MR. FREDERICK:  Same objection and
2    instruction, but you can answer whether the conversation
3    happened.
4        A.   I don't -- I don't remember it.
5        Q.   (By Ms. Berkower) Are you generally familiar
6    with the Senate rules in effect from sessions between
7    2005 and 2011?
8        A.   Generally.
9        Q.   Are you generally familiar with the Texas State
10   Constitution?
11       A.   No.
12       Q.   You know it's long?
13       A.   Yes.
14       Q.   Are you generally familiar with the parts of
15   the Texas State Constitution that relate to the
16   Lieutenant Governor's responsibilities and duties?
17       A.   Yes, generally.
18       Q.   Can you describe, in general terms, the
19   difference between the Lieutenant Governor's executive
20   and legislative duties?
21       A.   Well, the Lieutenant Governor is a member of
22   the Executive Branch, but at the same time, he serves as
23   President of the Senate.  And then the Legislature, the
24   Texas Senate, through their rules, chooses to give him
25   additional legislative powers.

---

59

1        Q.   What are the Lieutenant Governor's executive
2    functions?
3        A.   Should the Governor be out of state, he assumes
4    the responsibilities of the Governor and -- or
5    incapacitated, I guess, out of state and incapacitated,
6    he would assume the responsibilities of Lieutenant
7    Governor.  He serves as the chair of the Senate, and he
8    makes some appointments that's not in the Constitution.
9        Q.   So what -- is that all of the Lieutenant
10   Governor's executive functions?
11       A.   That the priorities, yeah.
12       Q.   What are the Lieutenant Governor's legislative
13   duties?
14       A.   Most of his legislative duties stem from the
15   Senate rules and not from the Constitution.  The
16   Constitution just says he is President of the
17   Senate.  But the Senate rules allow him to refer all
18   bills to committee, to set up committees, to name
19   committee chairs, to determine when bills are heard on
20   the Senate floor subject to the requirements of the
21   Senate rules.
22       Q.   Can you explain a little bit more about what
23   you just said about how he determines when bills are
24   heard on the Senate floor?  What do you mean by that?
25       A.   The Senate rules set out the process for

---

60

1    hearing bills on the Senate floor.  And the senators
2    have chosen to use an alternative system that
3    incorporates the rules in some parts and doesn't in
4    other parts.  The senators, before a bill can be heard
5    on the Senate floor, need to have the package of
6    materials, that I referenced earlier, that go with the
7    bill, the actual language of the bill, the fiscal note,
8    the bill analysis, all the pieces that need to be there
9    for the legislative package.  So that's subject to the
10   Senate rules.  That package has to be together.
11           And if that package is together, the
12   senators then place their bills on the Notice of
13   Intent.  The Notice of Intent is sort of outside the
14   rules.  It functions as a list of bills that
15   senators intend to or would like to bring up during the
16   next period of time.  The senators have five bills that
17   they can place on Intent each day.  At that point, the
18   bill needs to be on that Intent calendar for two days
19   before the Lieutenant Governor can bring it up for
20   hearing.  And at that point, he typically asks the
21   senators, "Are you ready to go on your bill?  Is it time
22   to be heard?"  And the Senator will say yes or no, I'm
23   ready or I'm not ready.  Let's wait another day.
24       Q.   So with regard to when the bill is brought up
25   for a hearing, does the Lieutenant Governor have



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                      MAY 29, 2012

---

## 61

1   discretion as to when it will get brought up?

2      A.  Yes.  Subject to the materials being prepared

3   that need to be prepared in order for the bill to be

4   ready for hearing.

5      Q.  Who makes the final decision about when the

6   bill is ready for a hearing?

7      A.  It's a joint decision between the senator and

8   the Lieutenant Governor.  The senator asks the

9   Lieutenant Governor to hear the bill, and then the

10   Lieutenant Governor chooses what order they are heard

11   in, once he has received the request.

12      Q.  Once the Lieutenant Governor gets the request

13   from the senator, does he have discretion to deny the

14   request?

15      A.  Yes.

16      Q.  How does that work?

17      A.  He doesn't bring it up for hearing, the bill up

18   for hearing.

19      Q.  So even if the senator asks for the hearing,

20   the Lieutenant Governor can say no?

21      A.  Yes.

22      Q.  Does that ever happen?

23      A.  It has, I think, yes.

24      Q.  When has that happened?

25      A.  I don't remember.  Sometimes the senators don't

## 62

1   have sufficient number of votes to suspend the rules in

2   order to hear the bill, and so the Lieutenant Governor

3   will not bring that bill up so that the senator isn't

4   embarrassed.

5      MR. FREDERICK:  Risa, we've been going

6   about an hour.  When you get to a stopping point, can we

7   take a short break?

8      MS. BERKOWER:  Yeah.  Sure.  Maybe like

9   five minutes or so.

10      Q.  (By Ms. Berkower) Can you explain, just give a

11   little more detail what questions of order are and how

12   he rules on them?

13      MR. FREDERICK:  Objection, vague.

14      MS. BERKOWER:  Sorry.  I'll restate that.

15      Q.  (By Ms. Berkower) You said that the Lieutenant

16   Governor will rule on questions of order that come up

17   when he is presiding; is that correct?

18      A.  I didn't say that, but he can.  Points of

19   order, yes.

20      Q.  How does he do that?

21      A.  He works with the parliamentarian to make a

22   ruling on questions as they come up.

23      Q.  So does he receive advice from the

24   parliamentarian?

25      A.  Yes.

## 63

1      Q.  Is he required to follow that advice?

2      A.  I don't think so.

3      Q.  Does the Lieutenant Governor sign all bills and

4   joint resolutions?

5      A.  Yes.  Typically, after they are finalized, yes.

6      Q.  Does he have any discretion in signing those?

7      A.  I guess he does, yes.

8      Q.  Has he ever not signed a bill or a resolution?

9      A.  Not that I'm aware of.

10      Q.  When the Senate is meeting in the Committee of

11   the Whole, does the Lieutenant Governor have the right

12   to debate and vote on all questions?

13      A.  Yes.

14      Q.  What is the Lieutenant Governor's role in the

15   Senate considering a bill on the legislative floor?

16      A.  What's that again?

17      Q.  Sorry.  I got distracted.

18      What is the Lieutenant Governor's rule

19   when the Senate is considering a bill outside of

20   committee?

21      A.  On the Senate floor?

22      Q.  Yes.

23      A.  He presides over the Senate.

24      Q.  And what are his powers when he is doing that?

25      A.  He can bring up a bill.  He can recognize a

## 64

1   senator or not recognize a senator.  He can -- I don't

2   know.  He can choose to stop the debate at any time, but

3   it's not a -- I think that about covers what he can do.

4      Q.  Has he ever chosen to stop a debate on his own?

5      A.  Not that I can think of.

6      Q.  Has he ever chosen not to recognize certain

7   senators?

8      A.  I can't think of a situation.

9      Q.  Is there anything -- can you explain the

10   difference between what the Lieutenant Governor's role

11   is when bills are being considered on the floor and what

12   other senators do when the bill is being considered --

13   when a bill is being considered on the Senate floor?

14      MR. FREDERICK:  Objection, vague.

15      Q.  (By Ms. Berkower) Do you understand the

16   question?

17      A.  Probably not, but do you want to give it a shot

18   again?

19      Q.  Okay.  I'll start over.

20      Can the Lieutenant Governor vote and

21   debate on all questions when bills are being considered

22   on the Senate floor?

23      A.  No.

24      Q.  Why not?

25      A.  Because he's presiding over the Senate.  He

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

65

1    doesn't function as a senator.
2        Q.  Can the Lieutenant Governor introduce
3    legislation?
4        A.  No.
5        Q.  Can he introduce legislation in the Committee
6    of the Whole?
7        A.  I've never thought about it.  I guess he
8    could.  But no, I don't think so, because he would have
9    to file legislation before they're in the Committee of
10   the Whole.  So I don't think he could introduce
11   legislation.
12       Q.  Can he introduce amendments?
13       A.  Yes, I think he could, but I'm not certain.
14   Yeah, I think he could, if he's functioning as a Senator
15   in the Committee of the Whole.
16       Q.  So you just said when he's functioning as a
17   senator.
18       A.  Well, in a senatorial role in the Committee of
19   the Whole.  He would not be able to file legislation at
20   that point, so he would not be able to introduce a new
21   bill, but he might be able to introduce an amendment.  I
22   just never thought about it.
23       Q.  So has he, to your knowledge, ever introduced
24   an amendment?
25       A.  No, he has not.

66

1        Q.  So to make sure I understand, when a bill is
2    filed --
3        A.  Uh-huh.
4        Q.  -- that's not something the Lieutenant Governor
5    has the power to do?
6        A.  That's correct.
7        Q.  Can the Lieutenant Governor introduce
8    amendments to a bill when it's not in the Committee of
9    the Whole?
10       A.  No.
11       Q.  And the Lieutenant Governor decides when a bill
12   will be referred to the Committee of the Whole; is that
13   correct?
14       A.  Yes.
15       Q.  In fact, he decides where all bills get sent?
16       A.  Yes.
17       Q.  How does he make those decisions?
18           MR. FREDERICK:  I'll object to the extent
19   that calls for the Lieutenant Governor's thought
20   process, mental impressions, or any communications with
21   his staff or other legislators.
22           If you can answer without revealing any of
23   those matters, you may do so.
24       A.  Typically, they're referred by subject matter
25   to the appropriate subject matter committee, but that's

67

1    not bound by the rules.
2        Q.  (By Ms. Berkower) What types of -- are there
3    specific subject matters that are considered generally
4    by the Committee of the Whole?
5        A.  No.
6        Q.  So how does the decision get made to refer a
7    bill to the Committee of the Whole?
8            MR. FREDERICK:  The same instruction based
9    on privilege.  Don't reveal thoughts or mental
10   impressions or communications with staff or
11   legislators.  But if you can answer generally without
12   revealing those, you may do so.
13       A.  My impression is that the Committee of the
14   Whole is used when the Lieutenant Governor wants to
15   ensure that the entire Senate hears the same
16   information, has the opportunity to question the same
17   witnesses, and has the benefit of hearing the public
18   testimony on an issue.  And it's a fairness issue of
19   making sure that everybody hears the same info.
20       Q.  (By Ms. Berkower) Is it also fair to say the
21   Lieutenant Governor has a bigger role when the Senate is
22   meeting in the Committee of the Whole?
23       A.  No, I don't think that's the case.
24       Q.  A bigger role as a legislator even?
25       A.  I don't think so.  In my opinion, it's more

68

1    powerful to determine when a bill is heard rather than
2    discussing it on the floor.
3        Q.  Does the Lieutenant Governor --
4            MS. BERKOWER:  Actually, maybe this is a
5    good place to take break.
6            MR. FREDERICK:  Okay.  Sure.
7            (Recess from 9:30 a.m. to 9:43 a.m.)
8        Q.  (By Ms. Berkower) So I think before we took the
9    break, we were talking about the Lieutenant Governor's
10   role in the Senate.  So just to continue on that
11   subject.
12           So the Lieutenant Governor cannot
13   introduce legislation at any time; is that correct?
14       A.  That's correct.
15       Q.  Does his office develop legislation for other
16   members to introduce?
17       A.  We work with the members' staff, yes, to
18   introduce legislation.
19       Q.  Do you do original legislative drafting?
20       A.  We have, yes.
21       Q.  Did you do an original legislative drafting for
22   any of the voter ID laws?
23       A.  No.
24       Q.  Who did that; do you know?
25       A.  I'm assuming the Senator Fraser's office



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 69

1  drafted Senate Bill 14, or their -- had it drafted from
2  Leg Council.
3      Q.   In addition to the ability to introduce
4  legislation, are there other powers that members of the
5  Senate have that the Lieutenant Governor does not have?
6      A.   Yes.
7      Q.   What?
8      A.   The debate on bills.  He can't debate a bill on
9  the floor.  He can't offer amendments on the floor.  He
10 can't vote on the rules, the Senate rules.
11     Q.   Can he vote on bills outside of the Committee
12 of the Whole unless there's a tie?
13     A.   Only if there's a tie.
14     Q.   Since you have been working for Lieutenant
15 Governor Dewhurst, have you assisted with developing
16 legislation?
17     A.   Yes.
18     Q.   Describe that process.
19     A.   It varies by subject matter and by the senators
20 involved.  It will run the gamut from me asking, "Do you
21 need help drafting," to, "Here's some concepts we'd like
22 incorporated in a piece of legislation.  We had these
23 drafted.  Would you be willing to introduce a bill with
24 these concepts in it?"  So, and everything in between.
25     Q.   So when you say that you have a bill -- when

---

### 70

1  the Lieutenant Governor asks a senator to introduce a
2  bill with certain concepts in it --
3      A.   Uh-huh.
4      Q.   -- how far along in the development process is
5  that legislation, generally?
6      A.   Oh, it can be fully drafted.  I mean, we can
7  ask for drafts of bills, and we have.  Typically, we
8  don't.  It's usually a much more collaborative process,
9  where maybe our staff is an expert on a tax issue, on a
10 school finance bill, and so we have drafted the tax
11 portion of it, but not the school finance portion of
12 it.  So typically, it's a collaborative process where
13 everybody divvies up portions of the concept and
14 determines -- they do their part of it.
15     Q.   How do you decide which senators to work with
16 when you want to introduce legislation?
17         MR. FREDERICK:  I'll object.  I don't
18 think she's asking for privileged matters, but I'll just
19 caution you not to reveal the substance of
20 communications or the thought process about how to work
21 with them.  But you can answer if you can do so without
22 revealing that.
23     A.   Typically, the senators have told Governor
24 Dewhurst various issues that they're interested in, and
25 so he works with the senators on those issues or with

---

### 71

1  the chairs of the committees that typically handle those
2  issues.
3      Q.   (By Ms. Berkower) Can you explain a little more
4  how your office interacts with the TLC in developing
5  legislation?
6          MR. FREDERICK:  Objection, vague, but you
7  can answer.
8      A.   I was going to ask you:  What do you mean by
9  that?
10     Q.   (By Ms. Berkower) Well, do you -- does your
11 office interact with the Texas Legislative Council to
12 develop legislation?
13     A.   Yes.  They are the technical drafters, and so
14 if we ask to have something drafted, we ask them to
15 draft it.  And they are the official drafting agency,
16 and then we would share that draft with whoever was
17 planning to carry the legislation associated with that
18 draft.
19     Q.   So does the TLC work on all drafts then?
20     A.   Yes.  They are supposed to.  Occasionally, we
21 have amendments or different pieces of bills that may
22 not be drafted by the Texas Legislative Council.  But
23 the bills themselves are supposed to be drafted by the
24 Texas Legislative Council.
25     Q.   Does the Lieutenant Governor play a role in

---

### 72

1  deciding who will carry a bill in the Senate?
2      A.   The senators have complete power over what they
3  carry and what they don't carry, but he has asked
4  senators to carry various pieces of legislation.
5      Q.   When has he done that?
6      A.   Oh, I don't know.  A variety of times.
7  Sometimes it's necessary to -- and school finance is a
8  perfect example -- to divide up larger areas of
9  legislation or larger issues so that one person isn't
10 carrying the entire package.  That's typically done with
11 Sunset bills, so that each member of the Sunset
12 Commission can carry a different Sunset bill, so that's
13 it's not one member carrying all of the bills and having
14 to answer all the questions associated with them.
15     Q.   What's a Sunset bill?
16     A.   Oh, sorry.
17     Q.   That's okay.
18     A.   We have a statutory process in Texas where
19 every agency is supposed to go through the Sunset
20 process every 12 years.  There's a scheduling bill that
21 actually sets forth which agencies go in.  But that's
22 too many details for you.
23         The Sunset process, each legislative
24 session designates a series of agencies going through
25 Sunset, which is the process by which the Sunset



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

73

1  Commission determines whether or not they should be
2  continued for another 12 years.  And right now, I think
3  we have 24 agencies going through the Sunset process.
4  So there has to be legislation next session to continue
5  those agencies or they die.  And so Governor Dewhurst
6  works with the commission members to determine who
7  carries what, and, typically, that's done by just their
8  interest areas.
9      Q.  Do you ever oversee research for particular
10  areas of legislation?
11      A.  Yes.
12      Q.  When you have done that?
13      A.  That's part of my job.
14      Q.  Well, any particular areas?
15      A.  Every piece of legislation.  If we need
16  additional information associated with it, I'll ask the
17  policy person to find it or I'll find it.
18      Q.  What about for voter ID bills?
19      A.  I don't remember any additional information
20  that I requested.  I know that Bryan Hebert was actively
21  working with Senator Fraser's office to develop whatever
22  background materials they needed.
23      Q.  And you said that sometimes the senators will
24  come to the Lieutenant Governor and say they're
25  interested in a particular issue.

---

74

1      A.  Yes.
2      Q.  Did any senator come to the Lieutenant Governor
3  about their interests in voter ID issues?
4          MR. FREDERICK:  I'll object on the basis
5  of privilege.  I believe the question calls for the
6  substance of a privileged communication.  I instruct you
7  not to answer on the basis legislative privilege.
8      A.  Okay.  I can't answer that question.
9      Q.  (By Ms. Berkower) Okay.  What about, for the
10  record, immigration issues?
11          MR. FREDERICK:  Objection, vague.  Are you
12  asking if --
13          MS. BERKOWER:  I'm asking if any senators
14  told the Lieutenant Governor about an interest they had
15  in carrying immigration legislation.
16          MR. FREDERICK:  The same objection and
17  instruction not to answer on the basis of privilege.
18      A.  Okay.  I can't answer that question.
19      Q.  (By Ms. Berkower) Okay.  Do you ever develop or
20  contribute to the Lieutenant Governor's legislative
21  agenda?
22      A.  Yes.
23      Q.  How do you do that?
24      A.  I ask what he's interested in accomplishing
25  each session, and then I work with our policy staff to

---

75

1  determine if those issues are being developed through
2  legislation by senators, or if we need to develop
3  additional research or drafts on any given issue.
4      Q.  Was voter ID ever one of the issues that he
5  wanted to establish as a legislative priority?
6          MR. FREDERICK:  I'll object on the basis
7  it calls for the Lieutenant Governor's mental
8  impressions and thought process, and I instruct you not
9  to answer on the basis of legislative privilege.
10      A.  Okay.  I can't answer that question.
11      Q.  (By Ms. Berkower) About how many legislative
12  priorities does the Lieutenant Governor have in any
13  given year?
14      A.  Typically, he withholds about 20 bills, the
15  lower, the first 20 bills, and those are his priority
16  issue areas.
17      Q.  How do you ensure that his agenda gets carried
18  out every legislative session?
19      A.  Through a variety of actions.  Sometimes I work
20  with senators.  Sometimes I work with the senators'
21  staff.  Sometimes it's a process that's happening
22  anyway, and so we just make sure that the process is
23  completed.  The typical example of that would be the
24  budget process.  There's already a process in place for
25  developing the budget.  We just make sure we monitor it

---

76

1  and that it incorporates his priorities.
2      Q.  Is there anything specific that you do to try
3  and get bills passed that are a legislative priority for
4  the Lieutenant Governor?
5          MR. FREDERICK:  I would object only to the
6  extent that answering would require you to reveal the
7  Lieutenant Governor's thought process or his privileged
8  communications.  But to the extent you can answer
9  without doing that, you may.
10      A.  I mean, again, it's a -- it runs the gamut of
11  talking with the senators, asking them if they have a
12  problem with a given piece of legislation, and if so, if
13  there's something we can do to address that problem.
14  Again, sometimes I meet with their staff to incorporate
15  something that they would like to incorporate in the
16  legislation.
17      Q.  (By Ms. Berkower) Is there any -- in what ways
18  do you reach out to those other senators?
19      A.  I go talk to them.  Is that what you're asking?
20      Q.  I guess so.
21      A.  Okay.
22      Q.  I guess I'll rephrase it, too.
23          Do you ever take efforts to see if certain
24  senators have concerns about a particular bill?
25      A.  Yes.  I'll ask them.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                                    MAY 29, 2012

---

### 77

1    Q.   Do you ask all 31 senators?
2    A.   I typically ask the Senator who is carrying the
3    piece of legislation if they have 21 votes in order to
4    suspend the rules and hear the bill.  If they have the
5    21 votes, then I don't walk around and ask.  Or if we
6    feel like the Senator doesn't know whether or not they
7    have the 21 votes, then sometimes we will go around and
8    ask the senators.
9    Q.   Something I should have asked you before:  Can
10   the Lieutenant Governor sit on any committees?
11   A.   No, not unless it's the Committee of the Whole.
12   Q.   What is his role with regard to committees
13   other than the Committee of the Whole?
14   A.   He designates the chair of the committees and
15   the membership of the committees.  The standing
16   committees are in the rules, and those standing
17   committees have a specific number.  They are listed by
18   title, and they have a specific number of senators by
19   each committee.  So long as he abides by that number
20   listed in the Senate rules and keeps those committees
21   that are listed in the Senate rules, he can put anybody
22   he wants to on those committees and as chair of those
23   committees.
24   Q.   But he can't put himself on those committees,
25   can he?

### 78

1    A.   No, he can't.
2    Q.   And he can't vote in those committees?
3    A.   That's correct.  Just the Committee of the
4    Whole.
5    Q.   How does he decide who to appoint to different
6    committees?
7         MR. FREDERICK:  I'll object only to the
8    extent that it calls for his own thought process.
9         But to the extent you can answer without
10   revealing that or a privileged communication, you may do
11   so.
12   A.   He asks the senators what committees they want
13   to be on.
14   Q.   (By Ms. Berkower) How does he decide where to
15   assign the bills to which committees?
16        MR. FREDERICK:  Same instruction.
17   A.   Typically, it follows issue areas.  And while
18   we don't have specific jurisdiction for committees, like
19   they do on the federal level, he has full flexibility to
20   send anything anywhere.  Typically, we follow the
21   unspoken jurisdiction of the committees.
22   Q.   (By Ms. Berkower) Do the chairs of the
23   committees ever make requests to have bills sent to
24   their --
25   A.   Oh, yes.

### 79

1    Q.   -- committee?
2    A.   Yes.
3    Q.   When does that happen?
4    A.   Regularly, during session.
5    Q.   Is there ever a dispute over which committee a
6    bill should go to?
7    A.   Absolutely.
8    Q.   How are those resolved?
9    A.   Governor Dewhurst makes up his made and decides
10   which way to send them.
11   Q.   What factors does he consider?
12        MR. FREDERICK:  I'll object to the extent
13   this calls for the Lieutenant Governor's thought process
14   and mental impressions and potentially communications
15   within the office.  If you can answer generally without
16   revealing privileged matters, you may do so.
17   A.   You know, typically, it's done by
18   jurisdiction.  But an example would be an economic
19   development bill that dealt with pollution control
20   equipment.  It could go to Natural Resources because it
21   deals with pollution control.  It could go to Economic
22   Development because it's economic development.  And so
23   he will take whatever factors he takes into account and
24   determine whether or not it goes to the Natural
25   Resources or Economic Development.

### 80

1    Q.   Were there any such disputes with regard to any
2    of the voter ID bills?
3    A.   Not that I'm aware of.
4    Q.   Is there any other substantive role that this
5    lieutenant governor plays in the Senate that you haven't
6    already mentioned?
7    A.   Okay.  There's committees, bills, referrals,
8    appointment of conference committees.
9    Q.   How does that work?
10   A.   After a bill is heard in one house and then
11   sent to the other house, and the other house makes
12   changes in that legislation, the senators and the house
13   members can choose whether they want to go to conference
14   and have conference committees that work out those
15   changes so that the two bills match, or -- and that they
16   decide on what that would look like, or the originating
17   house can choose to concur in the other house's
18   amendments, in which case, we don't have to go to
19   conference committee, we just accept the changes, and
20   the senators then re-vote on that, as do the House
21   members, actually.
22        If it goes to conference committees, he
23   determines the content of the conference committee
24   according to the rules; still it needs to have two
25   members of the committee of origin of that legislation.

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                                              MAY 29, 2012

## 81

1  So he determines who's on the conference committee, and
2  he determines when he's going to recognize conference
3  committee reports and concurrences.  I think that's
4  about it.
5      Q.  Any other substantive role you haven't
6  discussed yet?
7      A.  Appointments.  He has several appointments he
8  makes.  I'd say he makes about 200 appointments.
9      Q.  Any other substantive role in the Senate?
10     A.  Not that I can think of.
11     Q.  And the appointments you're referring to are
12  part of his Executive Branch duties, right?
13     A.  Yes.  Typically.
14     Q.  Does the Lieutenant Governor engage in public
15  relations?
16     A.  Well, does he give speeches?  Is that what
17  you're asking?
18     Q.  Does he put out press releases?
19     A.  Oh, yes.  Okay.
20     Q.  Who is in charge of that in the years actuaries
21  2010 to 2011?
22     A.  Let's see.  2011, Mike Walz came on.  He's our
23  communications director.
24     Q.  What about in 2010?
25     A.  I think Rich Parsons was.

## 82

1      Q.  Does the Lieutenant Governor communicate with
2  any interest groups?
3      A.  Oh, sure.  Yes.
4      Q.  Who was in charge of that in 2010 and 2011?
5      A.  Well, he is.  People send in meeting requests,
6  that he meets with them according to his schedule.
7      Q.  Who did he meet with during that time, what
8  interest groups?
9      A.  Oh, probably thousands of them.  Honestly, over
10  -- well over hundreds.
11     Q.  Did he meet with any relating specifically to
12  voter ID?
13     A.  I don't remember, but I would imagine so.
14     Q.  So you don't remember any particular interest
15  groups that he met with about voter ID?
16     A.  I want to say he met with MALDEF, but I don't
17  remember.
18     Q.  Any others?
19     A.  Maybe NAACP was in with MALDEF, but I don't
20  remember.
21     Q.  Did you attend that meeting?
22     A.  I don't remember.
23     Q.  Are you familiar with the group the American
24  Legislative Exchange Council, or ALEC?
25     A.  Yes.

## 83

1      Q.  What is it?
2      A.  I'm aware that it exists.  That's about as far
3  as I am aware.  I have not been an ALEC meeting.  It's a
4  legislative conference of -- it's a conference on the --
5  on the national level of legislative -- that legislative
6  staff and legislators can attend.  They put on
7  conferences.  They prepare briefing materials.
8      Q.  Do you know if any other members or staff of
9  the Lieutenant Governor's Office are members of ALEC?
10     A.  I'm not aware of anyone.
11     Q.  What about members of the Texas Legislature?
12         MR. FREDERICK:  Objection, vague.
13     Q.  (By Ms. Berkower) Do you know of any --
14     A.  Are they members of ALEC?
15     Q.  Yes.
16     A.  I don't -- I don't know.
17     Q.  Did you ever receive -- did your office ever
18  receive any documents from ALEC related to voter ID?
19     A.  I don't remember voter ID.  We do receive
20  documents from them from time to time.
21     Q.  Did ALEC offer you any technical assistance on
22  voter ID legislation?
23     A.  Not that I'm aware of.
24     Q.  Did you solicit any such assistance yourself
25  from ALEC?

## 84

1      A.  No.
2      Q.  Are you familiar with the National Conference
3  of State Legislators?
4      A.  Yes, I am.
5      Q.  Have you attended any meetings?
6      A.  Yes, I have.  It's been a while, but yes.
7      Q.  Do you remember when it was, though?
8      A.  Oh, let's say -- I would say I've probably been
9  to five of their conferences in the '90s, and one of
10  their drafting conferences and also in the 1990s.  And I
11  have not to be an NCSL conference since the Lieutenant
12  Governor was elected in 2003.
13     Q.  Are there any other groups that focus on policy
14  advice or assistance to legislators that you belong to?
15     A.  I don't know if we pay the Council of State
16  Governments and the Southern Legislative Conference, but
17  both of them provide research materials, but I don't
18  know if we pay in to those.
19     Q.  Did you receive any research materials from
20  either of those groups with regard to voter ID?
21     A.  Not that I'm aware of.
22     Q.  Do you know, what is Texas's current system for
23  determining how to verify the identity -- excuse me --
24  verify the identity of a voter?
25     A.  I mean, the current law before the voter ID



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 85

1  legislation?
2      Q.  Yes.
3      A.  Like what we're under right now?
4      Q.  Yes.
5      A.  I mean, you have to register to vote, and
6  beyond that, as long as you show up with your voter
7  registration card, you can vote.
8      Q.  What happens, do you know, if the voter shows
9  up without their certificate?
10     A.  I do that all of time.  And so I used my
11 driver's license, and then I have to swear that I am me,
12 and then I am registered.  They check my name and
13 address against a voter registration roll.  And I have
14 to swear that I am me and that I am from that location.
15     Q.  Are there problems with the system, in your
16 view?
17     A.  I think it's not the most secure system we
18 could have.
19     Q.  Why not?
20     A.  Because there's no photo identification
21 associated with it.
22     Q.  You mean the person could show up just with the
23 voter registration certificate, and that would be
24 enough?
25     A.  Yes.

## 86

1      Q.  Any other problems with the current system?
2      A.  I think you can show up with your electric
3  bill, and you don't have to even show up with a driver's
4  license, and then swear that you are you and that you
5  you're the person on the voter ID roll.
6      Q.  And that's a problem with the current system,
7  in your view?
8      A.  I think it is.  If you've got three Bill Jones,
9  how do you know which one it is?
10     Q.  I'm sorry; what?
11     A.  If you've got three people showing up, and they
12 say, "I'm Bill Jones," how do you know which Bill Jones
13 it is, if you don't have some kind of photo reference to
14 the person?
15     Q.  I think we talk about bills so much, in my
16 mind, it's all under a name.
17     A.  Oh, I'm sorry.  William Jones, okay?
18     Q.  I understand.  Okay.
19     A.  I'm sorry.
20     Q.  In your view, has the system failed to prevent
21 in-person voter fraud?
22         MR. FREDERICK:  Objection, relevance.  You
23 may answer.
24     A.  In my opinion, it's not very safe.  I mean, not
25 secure.

## 87

1      Q.  (By Ms. Berkower) Has it failed, though, in
2  your view?
3      A.  I believe there's been some testimony on voter
4  fraud, yes.  But I have no personal experience with it.
5      Q.  Do you know of convictions for voter fraud that
6  have been -- any recent convictions for voter fraud?
7      A.  I think there have been some in South Texas,
8  but I am not certain about that.
9      Q.  Were those for in-person impersonation?
10     A.  I'm just -- I don't remember.
11     Q.  Were they for mail fraud?  Sorry.  Mail-in
12 voter fraud?
13     A.  I know there were some for mail-in voter
14 fraud.  I'm not certain whether or not there were some
15 from -- and it seems to me Harris County had some as
16 well, some issues with voter fraud.
17     Q.  So aside from the problems with the current
18 system of verifying a voter's identity that you've
19 already identified, are there any other problems that
20 you know of with the current system?
21     A.  Well, I think more people should vote.  There's
22 a lot of voter apathy, but that's not really what we're
23 here to talk about.
24     Q.  What was the original impetus for voter ID in
25 Texas, given the law that's already in place?

## 88

1          MR. FREDERICK:  Object on the basis of
2  privilege to the extent this calls for the Lieutenant
3  Governor's thought process or mental impressions or any
4  communications in the office or that he or his staff had
5  with other legislators, state agencies, the Texas
6  Legislative Council or constituents.  If you can answer
7  without revealing those matters, you may do so.
8      A.  If you're asking me the purpose of a voter ID
9  bill, it would be to protect the integrity of the voting
10 system and reduce the opportunity for voter fraud.
11     Q.  (By Ms. Berkower) I think I mean more just the
12 original impetus.  Was there a rash of problems that
13 were made public?  Were there certain convictions?  Was
14 there a public outcry?  Anything of that nature.
15         MR. FREDERICK:  The same instruction, but
16 you may answer subject to that.
17     A.  My memory is, there was a real sense that part
18 of the voter apathy was lack of voter confidence in the
19 system.  And so I think to the extent that the
20 Legislature was considering improving the election
21 process by protecting its integrity, it would increase
22 voting by making people feel better about it.
23     Q.  (By Ms. Berkower) Why do you think people
24 didn't believe the system was secure enough?
25         MR. FREDERICK:  Objection, calls for



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

89

1   speculation, but you may answer.
2       A.   I think that's speculative, but I have to
3   present my driver's license to write a check, so I don't
4   think it's too much to ask people to have an ID in order
5   to vote.
6       Q.   (By Ms. Berkower) But do you think that the
7   fact that you don't currently need an ID to vote erodes
8   confidence in the system?
9           MR. FREDERICK:  Objection, relevance, but
10  you may answer.
11      A.   Personally, I think so, yes.
12      Q.   (By Ms. Berkower) Was there any study or
13  analysis that you know of that showed voting apathy was
14  linked to a lack of confidence in the system for this
15  reason, the reasons you identified?
16      A.   I want to say there was, but I don't remember.
17  I really don't remember.
18      Q.   When was Senate Bill 14 signed into law?
19      A.   Governor Perry signed it, I think, late May of
20  2011.
21      Q.   Have there been elections held in Texas since
22  the law was signed in May of 2011?
23      A.   Oh, yeah.  One a day.
24      Q.   Was SB 14 enforced in those elections?
25      A.   No.

---

90

1       Q.   Are you aware of any in-person voter fraud that
2   occurred in any of the elections held since the bill was
3   signed?
4       A.   Not personally.
5       Q.   Was there a time when a voter ID was first
6   introduced into the Texas Legislature?
7           MR. FREDERICK:  Objection, vague, but you
8   can answer.
9       Q.   (By Ms. Berkower) In 2005.  How about that?
10      A.   Oh, yeah.  Well, I know one was introduced in
11  '5 and '7 and '9 and '11, so...
12      Q.   Do you remember which bill was introduced in
13  2005?
14      A.   It was a House Bill, 1706.  It's on this, right
15  here (indicating).
16      Q.   It was indeed 1706.  I have what I think we've
17  previously marked as Exhibit 44 in prior depositions.
18          (Exhibit 44 remarked for this deposition.)
19      Q.   (By Ms. Berkower) Do you recognize this?
20      A.   I don't remember this bill at all.  I know we
21  got it late in the session, but I just don't -- I
22  haven't reread it.
23      Q.   Do you want to take a quick look at it?
24      A.   I feel like I'm wasting your time by reading
25  the whole thing.  Do you want to ask a question?

---

91

1       Q.   Okay.  Well, yeah, I'll ask you specific
2   questions about it.
3           So first, just as a general matter, do you
4   know what this is?
5       A.   Yes, it's a --
6       Q.   What is it?
7       A.   -- a voter ID bill.
8       Q.   Which one is it?
9       A.   House Bill 1706.
10      Q.   Do you know who sponsored it?
11      A.   Well, it says -- oh, who sponsored it?  I think
12  it was Fraser.
13      Q.   I guess --
14      A.   They authored it as Denny, Pitts, Woolley,
15  Nixon, Bohac, and others.
16      Q.   Okay.  Are you familiar with the forms of
17  allowable ID under Senate Bill 14?
18      A.   Yes.
19      Q.   What are they?
20      A.   There's roughly five of them.  DPS ID, driver's
21  license, an election certificate, a military ID, a
22  concealed carry license, a passport, and a citizenship
23  certificate, whatever that is.
24      Q.   So if you turn to Page 4 of this exhibit.
25      A.   Uh-huh.

---

92

1       Q.   And you see the Section 63.0101, Documentation
2   of Proof of Identification, is this the section of the
3   bill that lists the forms of allowable ID?
4       A.   It is for this bill, yes.
5       Q.   For this bill.  Under this bill, are the forms
6   of allowable ID different from those under Senate Bill
7   14?
8       A.   Yes.
9       Q.   How are they different?
10      A.   It allows a student ID, an ID issued by an
11  employer of the person in ordinary course of business --
12  or somebody's business, an ID card issued by the state
13  agency, and a county election administrator ID.  I
14  believe that's all of them.
15      Q.   Does it permit a driver's license that had
16  expired within the last two years?
17      A.   Oh, yes, uh-huh.
18      Q.   And does it also permit a voter to present two
19  forms of nonphoto ID to vote?  I think that may be on
20  Page 5 towards the bottom.
21      A.   Yes, I see it.  Uh-huh, yes.
22      Q.   As to any of these forms of identification, do
23  you know the purpose in including those forms of ID in
24  House Bill 1706?
25      A.   No, I don't.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

93

1      Q.   Do you know why nonphoto ID was included?
2           MR. FREDERICK:  Object.  Object to that
3   question on the basis of relevance and privilege to the
4   extent it calls for anyone's thought process for
5   including anything, it's privileged.  But if you can
6   answer without revealing that, you can do so.
7      A.   I don't.  I don't remember this bill.
8      Q.   (By Ms. Berkower) Do you know if nonphoto ID
9   was included out of concern for Section 5 preclearance?
10     A.   I don't.
11     Q.   Were you or anyone in the Lieutenant Governor's
12  office involved in the development or drafting of this
13  bill?
14     A.   Not that I'm aware of, no.
15     Q.   Are you aware of any communications related to
16  the drafting or development of this bill?
17     A.   No.  We did refer to it to committee, but
18  that's it.
19     Q.   Are you aware of the source of any of the
20  legislative language in this bill?
21     A.   No.
22     Q.   Do you remember anything about the legislators'
23  consideration of this bill after it was filed?  I'm
24  sorry, the Senate's consideration of this bill after it
25  was filed?

94

1      A.   I know that we got it late in the session.  It
2   was in May, and we referred it to the Senate State
3   Affairs Committee.  And beyond that, I don't remember
4   anything else.
5      Q.   Why was it referred to the Senate State Affairs
6   Committee and not the Committee of the Whole?
7           MR. FREDERICK:  Object to the extent that
8   it calls for thought process or mental impressions of
9   the Lieutenant Governor or his staff or any
10  communications with legislators or state agencies.
11          I would instruct you not to answer on the
12  basis of privilege.  However, if you can answer without
13  revealing privileged matters, you may do so.
14     A.   I don't remember discussions of this bill, but
15  typically, elections bills go to the Senate State
16  Affairs Committee.
17     Q.   (By Ms. Berkower) Why is it that they typically
18  go to the State Affairs Committee?
19     A.   Because Governor Dewhurst has determined that
20  that's where he will send election bills.
21     Q.   And he made decision to assign the bill to the
22  State Affairs Committee?
23     A.   Yes.
24     Q.   When the bill is in the State Affairs
25  Committee, the Lieutenant Governor can't vote on it,

95

1   right?
2      A.   That's correct.
3      Q.   Can he call meetings of the State Affairs
4   Committee?
5      A.   No, he can't.
6      Q.   He can't preside over it either, can he?
7      A.   No.
8      Q.   And he can't introduce amendments either?
9      A.   That's correct?
10     Q.   So when the bill is in the State Affairs
11  Committee, what is the role of Lieutenant Governor?
12     A.   There's not a role.
13     Q.   Why did the Senate State Affairs -- well, do
14  you remember what happened to it when it went to the
15  State Affairs Committee?
16     A.   No.  I'm sorry.
17     Q.   Actually, I can help you with that.  I think I
18  have what we can mark as -- and this is where it gets a
19  little tricky -- 101.
20          (Exhibit 101 marked for identification.)
21     Look at that.  It did come in May.
22     Q.   (By Ms. Berkower) So now, after looking at this
23  exhibit, do you remember what happened to the bill?
24     A.   No, I really don't.
25     Q.   Well, if you look at the history, does it look

96

1   like it ever made it out of the State Affairs Committee?
2      A.   No, it did not.
3      Q.   Do you know why the State Affairs Committee did
4   not move the bill?
5      A.   No, I do not.
6      Q.   Is it possible it was too late in the session?
7      A.   It is possible.
8      Q.   Do you know if the Lieutenant Governor took a
9   public position on HB 1706?
10     A.   Not that I remember.
11     Q.   Did the Lieutenant Governor or anyone in his
12  office have any communications with anybody about
13  HB 1706?
14     A.   He would have referred it to the committee, but
15  other than that, no, I'm not aware of any.
16     Q.   Are you aware of any analysis conducted by the
17  Lieutenant Governor's office concerning HB 1706?
18     A.   No.
19          MR. FREDERICK:  Object on the basis of
20  privilege.
21          To the extent you can answer yes or no,
22  you can answer.
23     A.   No, I'm not aware of any.
24     Q.   (By Ms. Berkower) Are you aware of any analysis
25  conducted by anyone in the Legislature related to HB



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 97

1  1706?

2       MR. FREDERICK:  The same instruction.

3       A.  I'm sure that the House conducted their own

4  research and put together their own briefing materials,

5  but I'm not aware of that, of those materials.

6       Q.  (By Ms. Berkower) Are you aware of any attempt

7  to determine who among registered voters did not possess

8  the forms of identification required by HB 1706?

9       MR. FREDERICK:  I'll object on the basis

10  of privilege to the extent it calls for communications

11  or thought processes of the Lieutenant Governor.  But to

12  the extent it calls for a yes or a no answer of what you

13  were aware of, you may answer it.

14       A.  I'm not aware of it.

15       Q.  (By Ms. Berkower) Are you aware of any attempt

16  to determine the impact of HB 170 on minority voters?

17       MR. FREDERICK:  The same objection and

18  instruction.

19       A.  I'm not aware of it.

20       Q.  (By Ms. Berkower) Sitting here today, do you

21  have an opinion on this bill?

22       MR. FREDERICK:  Objection, relevance.

23  Objection, vague.

24       A.  Not really.

25       Q.  (By Ms. Berkower) Do you know what the purpose

### 98

1  of the bill's authors were in introducing HB 1706?

2       A.  No.

3       Q.  In your view, as someone knowledgeable about

4  voter ID, would this bill, if enacted today, have

5  accomplished the purposes that you identified earlier as

6  -- actually, I'll start that question over.

7       In your view, as someone with knowledge on

8  voter ID, would this bill have improved public

9  confidence in elections?

10       MR. FREDERICK:  Objection.  It calls for

11  speculation.

12       A.  I think it would have improved the current

13  system, but it doesn't improve it to the level that

14  Senate Bill 14 does.

15       Q.  (By Ms. Berkower) Why not?

16       A.  Because it's not a totally photo ID bill.

17  There's no way of checking to see if your Bill or

18  William Jones is the same person.

19       Q.  How does the narrowing of the forms of ID

20  further public confidence in elections?

21       MR. FREDERICK:  Object only to the extent

22  this calls for you to reveal the thoughts processes of

23  the Lieutenant Governor or any privileged

24  communications.  To the extent this is seeking your

25  knowledge only, you may answer if you can.

### 99

1       A.  Personally, I think we live in a society where

2  the accepted identification process is a photo ID, and I

3  think that -- I mean, for everything like boarding an

4  airplane or writing a check, you have to have a photo

5  ID.  So, I don't think it's too much to ask to have a

6  photo ID to vote.

7       Q.  (By Ms. Berkower) Is it a fundamental right to

8  board a plane?

9       A.  No.

10       Q.  Is it fundamental right to write a check?

11       MR. FREDERICK:  Objection, it calls for a

12  conclusion.  You can answer if you know the answer.

13       A.  I don't think so.

14       Q.  (By Ms. Berkower) Do you know of any other

15  fundamental rights that require photo ID?

16       MR. FREDERICK:  Objection.  It calls for

17  speculation.  It calls for a legal conclusion and

18  relevance.

19       You may answer if you can.

20       A.  I'm not aware of any.

21       Q.  (By Ms. Berkower) Is voting a fundamental

22  right?

23       MR. FREDERICK:  Objection, it calls for a

24  legal opinion or conclusion.

25       You may answer.

### 100

1       A.  I think -- I think in a democracy, it is.

2       Q.  (By Ms. Berkower) And not in other forms of

3  government?

4       A.  Well, if you're a Communist, you're not

5  really.  I mean it's a different social structure.

6       Q.  I guess I mean under the U.S. Constitution, is

7  voting a fundamental right?

8       MR. FREDERICK:  The same objection.

9       You may answer, if you can.

10       A.  From my personal opinion, it is.

11       Q.  (By Ms. Berkower) Do you know if there was a

12  photo ID bill introduced in the next legislative session

13  in 2007?

14       A.  Yes, there was.

15       Q.  Do you remember which one it was?

16       A.  That House Bill 218.

17       Q.  Yes.  I have an exhibit to prove it.

18       MS. BERKOWER:  We'll mark this -- this was

19  actually Exhibit 28 from a previous deposition.

20       (Exhibit 28 remarked for this deposition.)

21       MS. BERKOWER:  Matt, do you have enough

22  copies of that now?

23       MR. FREDERICK:  Yeah.  My records

24  retention policy is very strict on these.

25       MS. BERKOWER:  (Laughing) Okay.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 101

1  Q. (By Ms. Berkower) Do you recognize this?
2  A. Yeah. I didn't read this in preparation of
3  today's meeting, no.
4  Q. Just from looking at it now, do you know what
5  it is?
6  A. Yes.
7  Q. What is it?
8  A. It's a voter ID bill from 2007, House Bill 218
9  by Brown of Kaufman, Berman, Bohac, Riddle and others.
10  Q. Are you familiar with its provisions?
11  A. Only superficially, but not really.
12  Q. Did I give you the wrong version?
13  A. Do you want to look at this one?
14  Q. I'm going to direct you to a certain page in a
15  second. So turning to Page 9 of the exhibit, does it
16  appear that HB 218, for the most part, follows HB 1706
17  with regard to the acceptable forms of ID for voting?
18  MR. FREDERICK: To ask if you -- have you
19  specified what version of HB 218 this is?
20  MS. BERKOWER: I thought -- have I?
21  MR. FREDERICK: I mean, do we know?
22  MS. BERKOWER: I think this is the final
23  version that was -- oh, can we go off the record for a
24  second?
25  (Brief discussion off the record.)

---

### 102

1  Q. (By Ms. Berkower) Are you familiar with the
2  Supreme Court's decision in Crawford versus Marion
3  County Board of Elections?
4  A. No, I'm not familiar with that.
5  Q. Do you remember the Supreme Court issuing a
6  decision about voter ID?
7  A. Yes. I seem to remember they did.
8  Q. Do you remember which states voter ID law was
9  at issue?
10  A. Was it Georgia?
11  Q. It may have been Indiana?
12  A. Was it Indiana? Okay.
13  Q. Do you remember when the opinion was issued?
14  A. No, I don't.
15  Q. Do you remember discussing it with anybody?
16  A. Yes. I know that I did with Bryan Hebert.
17  Q. Anybody else?
18  A. He provided that information to Governor
19  Dewhurst, so I may have said -- I put information on his
20  FYI list, so...
21  Q. What did he tell you about it?
22  A. My memory is --
23  MR. FREDERICK: Objection, vague.
24  Q. (By Ms. Berkower) What did Bryan Hebert tell
25  you about the Supreme Court decision?

---

### 103

1  MR. FREDERICK: I also object on the basis
2  of legislation privilege.
3  To the extent this calls for
4  communications between you and another staff member
5  about pending legislation, I would instruct you not to
6  answer the question on the basis of privilege.
7  THE WITNESS: So don't answer it at all?
8  MR. FREDERICK: Yeah. I instruct you not
9  to answer the question.
10  THE WITNESS: Okay.
11  Q. (By Ms. Berkower) So you're going to follow --
12  A. Yeah.
13  Q. Do you remember if you believed it impacted the
14  states' ability to craft voter -- photo ID laws?
15  MR. FREDERICK: Objection, relevance.
16  A. I don't remember.
17  Q. (By Ms. Berkower) Did you that believe it
18  impacted the states' ability to obtain preclearance of a
19  voter ID law?
20  MR. FREDERICK: Objection, relevance.
21  A. I don't remember.
22  Q. (By Ms. Berkower) Are you aware of any
23  communications between the Lieutenant Governor's Office
24  and officials in Indiana regarding its photo ID law or
25  the Crawford decision?

---

### 104

1  A. When we had the testimony on Senate Bill 14,
2  someone from Indiana was asked to come and provide
3  testimony to the Committee on the Whole. I don't
4  remember that person's name. But someone came from
5  Indiana. So it was after the fact, not as a result of
6  the fact case.
7  Q. Are you aware of any communications between the
8  Lieutenant Governor's Office and officials in Indiana
9  regarding the burden imposed on Indiana voters by their
10  voter ID law?
11  A. Not outside of requesting their expert
12  testimony for the hearing of the Committee of the Whole
13  on Senate Bill 14.
14  Q. After the Crawford decision was issued, did you
15  discuss plans to introduce subsequent voter ID
16  legislation?
17  MR. FREDERICK: Objection, vague. Also
18  object to the extent it's asking about communications
19  between the Lieutenant Governor, his staff, or other
20  legislators.
21  I instruct you not to answer on the basis
22  of privilege.
23  THE WITNESS: Okay.
24  MR. FREDERICK: But it's not -- I would
25  object as vague because it's not clear with whom the

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 105

1  conversations occurred.
2          MS. BERKOWER:  I'll rephrase the question.
3      Q.  (By Ms. Berkower) After the Crawford decision
4  was issued, did you discuss plans to introduce
5  subsequent voter ID legislation with anyone in the
6  Lieutenant Governor's Office?
7          MR. FREDERICK:  Object on the basis of
8  legislative privilege, and instruct you not to answer.
9      A.  Okay.  I won't answer that, then.
10      Q.  (By Ms. Berkower) Did you discuss plans to
11  introduce subsequent voter ID legislation with the
12  Lieutenant Governor after the Crawford decision?
13          MR. FREDERICK:  Objection, legislative
14  privilege.  Instruct you not to answer.
15      A.  Okay.  I won't answer that.
16      Q.  (By Ms. Berkower) Did you discuss plans to
17  introduce subsequent voter ID legislation after the
18  Crawford decision with other legislators or their staff?
19          MR. FREDERICK:  Objection, legislative
20  privilege.  Instruct you not to answer.
21      A.  I won't answer that then.
22      Q.  (By Ms. Berkower) After the 2007 legislative
23  session, do you remember if there is discussion of an
24  interim charge on voter ID?
25      A.  I think we did have one during that interim.  I

## 106

1  know we've had at least one interim charge on voter ID.
2  I just don't remember if it was after the 2007 session
3  or after the 2009 session.
4      Q.  And can you explain just quickly what an
5  interim charge is?
6      A.  Yes.  The Lieutenant Governor sends out
7  instructions to committees for their research during the
8  interim in preparation of legislation.  Sometimes it's
9  in preparation of legislation.  Sometimes it just is an
10  issue that needs to be discussed for the state as a
11  whole.
12      Q.  So the interim charge goes to a particular
13  committee then?
14      A.  Yes.
15      Q.  Which committee did it go to for purposes of
16  voter ID?
17      A.  I just don't remember which interim it was, but
18  it would have gone to State Affairs.
19      Q.  Who was in favor of having an interim charge
20  for voter ID?
21          MR. FREDERICK:  Objection.  To the extent
22  it calls for mental impressions of the Lieutenant
23  Governor or any legislator, I instruct you not to answer
24  on the basis of privilege.
25      A.  Okay.  I can't answer that, then.

## 107

1      Q.  (By Ms. Berkower) Do you know if the Governor
2  was in favor of having an interim charge for voter ID?
3          MR. FREDERICK:  Objection, legislative
4  privilege.  I instruct you not to answer.
5          MS. BERKOWER:  I just asked if she knew if
6  the Governor was in favor.  I didn't ask whether he was
7  or not.
8          MR. FREDERICK:  If you can ask it again,
9  I'll permit the yes-or-no answer.
10      Q.  (By Ms. Berkower) Do you know if the Governor
11  -- wait.  Can you repeat that back, what I asked before?
12  Oh, I know.  I can ask myself.
13          Do you know if the Governor was in favor
14  of having an interim charge for voter ID?
15          MR. FREDERICK:  Object on the basis of --
16      A.  No, I don't know.
17      Q.  (By Ms. Berkower) Do you know if the Lieutenant
18  Governor was in favor of having an interim charge for
19  voter ID?
20          MR. FREDERICK:  The same objection.  You
21  may answer whether or not you knew.
22      A.  At one point, he wanted to have a charge,
23  because he issued a charge.  I just don't remember if it
24  was in 2000 -- after the 2007 session or after the 2009
25  session.

## 108

1      Q.  (By Ms. Berkower) And do you know if the
2  Lieutenant Governor was in favor of having the charge?
3          MR. FREDERICK:  The same objection, but
4  you may answer the specific question.
5      A.  He wouldn't issue the charge if he didn't
6  believe it should be studied.
7      Q.  (By Ms. Berkower) And the Lieutenant Governor
8  issues the charge?
9      A.  Yes.
10      Q.  Okay.  Do you know why an interim charge was
11  issued for voter ID?
12          MR. FREDERICK:  Objection.  It calls for
13  legislative privilege matters, and I instruct you not to
14  answer.
15      A.  Okay.  I can't answer that.
16          MS. BERKOWER:  To be clear, I just asked
17  if she knew why, not why.
18      Q.  (By Ms. Berkower) Do you know why an interim
19  charge was considered for voter ID?
20          MR. FREDERICK:  I'll object on the basis
21  of privilege and instruct you that you may answer the
22  specific question whether or not you know why, but do
23  not reveal anyone's thought process or communications as
24  to why.
25      A.  Yes.  I know why.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

---

### 109

1  Q.  (By Ms. Berkower) Can you say why?
2      MR. FREDERICK:  Objection, legislative
3  privilege.
4      Instruct you not to answer the question.
5  A.  No.
6  Q.  (By Ms. Berkower) And to be clear, the case I
7  was referring to, the Supreme Court case on the Indiana
8  voter ID law, the citation for that is 553 U.S. 181.
9  A.  Okay.
10 Q.  Does that change your answers in any way?
11 A.  No.
12 Q.  Okay.  So going back to House Bill 218, I think
13 this is the engrossed version.
14 A.  Okay.
15 Q.  Do you recognize it as that?
16 A.  I don't know, but I'm okay if you tell me it
17 is.
18 Q.  Do you know who authored this bill?
19 A.  Brown of Kaufman, Berman, Bohac, Riddle, and
20 others.
21 Q.  Are you familiar with its provisions?
22 A.  Only cursorily.
23 Q.  I think turning to Page 9 of the exhibit,
24 Section 63.0101.  Can you review that section?
25 A.  Okay.  (Reading documents.) Okay.

---

### 111

1  A.  Okay.  Yes.
2  Q.  Any other differences, substantive differences
3  that you see?
4  A.  No, but I haven't referenced them.  Should I do
5  that?
6  Q.  Sure.  You can.
7  A.  I don't see any other differences.
8  Q.  Did you or anyone in the Lieutenant Governor's
9  Office play any role in the development of HB 218?
10 A.  No.
11 Q.  Were you present at any meetings during the
12 development or drafting of HB 218?
13 A.  No, I wasn't.
14 Q.  Are you aware of who in particular drafted
15 HB 218?
16 A.  No.
17 Q.  Do you know of any concerns about Section 5
18 preclearance with regard to HB 218?
19 A.  No.
20 Q.  Do you know if concerns about Section 5
21 preclearance impacted any of the bill's provisions?
22 A.  Not that I'm aware of.
23 Q.  Do you know if that's why nonphoto ID was
24 included in the bill?
25 A.  No.

---

### 110

1  Q.  So we had discussed earlier House Bill 1706.
2  Now that you've reviewed the provisions in House Bill
3  218, does it appear that, for the most part, follows
4  House Bill 1706 with regard to acceptable forms of voter
5  ID?
6  A.  Yes.
7      MR. FREDERICK:  Objection, vague, but you
8  can answer.
9  A.  Yes, for the most part.
10 Q.  (By Ms. Berkower) Are there any differences?
11 A.  Yes.  There are some drafting differences.
12 Q.  Any substantive differences in the types of ID
13 that are accepted?
14 A.  I haven't cross-checked them.  I don't -- I
15 don't see any major differences.
16 Q.  I think if you recall, House Bill 1706 allowed
17 a form of photo ID issued by county election officials.
18 A.  Okay.
19 Q.  Do you see that as an acceptable form of ID in
20 House Bill 218?
21 A.  Sometimes you argue that a county is a
22 political subdivision of the state, so under Subsection
23 8, it could be possible, but it's not the same.
24 Q.  It's not specifically listed in this bill the
25 way it was in House Bill 1706?

---

### 112

1  Q.  Are you aware of any concerns raised during the
2  development, drafting, or consideration of HB 218 about
3  the impact that it would have on Hispanic voters?
4      MR. FREDERICK:  Objection.  To the extent
5  it calls for communications or thought processes of the
6  Lieutenant Governor or any legislator, I instruct you
7  not to answer.  However, to the extent this question
8  just asked whether or not you know, you may answer.
9  A.  I'm not aware of it.
10 Q.  (By Ms. Berkower) You're not aware of any such
11 concerns?
12 A.  No.
13 Q.  Are you aware of any such concerns with regard
14 to the impact the bill might have had on black voters?
15     MR. FREDERICK:  The same instruction.
16 A.  No.
17 Q.  (By Ms. Berkower) You're not aware of any?
18 A.  I'm not aware of any.
19 Q.  What about any concerns raised during the
20 development, drafting, or consideration of the bill that
21 it might have on other minority voters?
22 A.  I'm not aware of any.
23     MR. FREDERICK:  The same objection.
24 Q.  (By Ms. Berkower) Are you aware of any analysis
25 conducted to determine the impact of the bill on racial

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

113

1    or ethnic minorities?
2         MR. FREDERICK:  The same instruction.  I
3    instruct you not to reveal the substance of any
4    analysis, but you may answer the question whether or not
5    you were aware.
6         A.  I'm not aware of any.
7         Q.  (By Ms. Berkower) Did you monitor consideration
8    of HB 218 in the House?
9         A.  No.
10        Q.  Did you learn of any concerns raised about the
11   bill during its consideration in the House?
12        MR. FREDERICK:  The same instruction.  You
13   may answer whether or not you --
14        A.  No.
15        Q.  (By Ms. Berkower) You did not learn of any such
16   concerns?
17        A.  No.
18        Q.  I think -- do you know Janice McCoy?
19        A.  Yes.
20        Q.  Who is she?
21        A.  She is chief of staff for Senator Fraser.
22        Q.  Two weeks ago, in her deposition, she testified
23   that she had had one or two dozen conversations with the
24   Lieutenant Governor's Office about HB 218, including
25   with the person who staffed the affairs for the

---

114

1    Lieutenant Governor.  Was that you?
2         A.  No.
3         Q.  Do you know who it was?
4         A.  I think it was Bryan, but it may not have been.
5         Q.  If it wasn't him, do you know who it may have
6    been?
7         A.  No.
8         Q.  Do you know if Senator Fraser met with the
9    Lieutenant Governor's Office and indicated that he
10   wanted to sponsor HB 218 in the Senate?
11        MR. FREDERICK:  Objection, and instruct
12   you not to answer on the basis of legislative privilege,
13   because this question calls for the substance of a
14   communication.  I will instruct you not to answer.
15        A.  Okay.  I can't answer that.
16        MS. BERKOWER:  Senator Fraser testified
17   that he had such a meeting.  Are you still going to
18   assert privilege?
19        MR. FREDERICK:  I mean, that -- I don't
20   recall that testimony.  If you want to introduce it as
21   an exhibit here, that's fine, we'll talk about it.  But
22   otherwise, I'll instruct her not to answer.
23        Q.  (By Ms. Berkower) Do you know why Senator
24   Fraser had an interest in voter ID?
25        MR. FREDERICK:  Objection, assumes facts

---

115

1    not in evidence and calls for speculation.  But I also
2    instruct you, based on privilege, not to answer if it
3    requires you to reveal thought processes or any
4    privileged communications.
5         A.  I don't know why.
6         Q.  (By Ms. Berkower) Do you know if he did have an
7    interest in voter ID?
8         MR. FREDERICK:  The same objection, but
9    you may answer whether or not you knew.
10        A.  I assume so.  He carried it four times.
11        Q.  (By Ms. Berkower) With regard to why he had an
12   interest, are you --
13        A.  No, I'm not aware of why he had an interest.
14   Or three times, I guess.  He didn't carry it four times.
15        Q.  Ms. McCoy testified, in her deposition, that
16   she and a staff person from the Lieutenant Governor's
17   Office generally spoke about the process of moving HB
18   218 in the Senate.  Did she speak with you?
19        MR. FREDERICK:  Objection, assumes facts
20   not in evidence.  You may answer if you can.
21        A.  I don't remember that.
22        Q.  (By Ms. Berkower) Do you remember talking to
23   Ms. McCoy at all about HB 218?
24        A.  Not really, no.
25        Q.  Ms. McCoy testified that she never had any

---

116

1    discussions with anyone in the Lieutenant Governor's
2    Office about the impact of HB 218 on minority voters.
3    To your knowledge, is that accurate?
4         MR. FREDERICK:  Objection, assumes facts
5    not in evidence.  You may answer whether or not you
6    believe it's accurate.
7         A.  I think that's accurate.
8         Q.  (By Ms. Berkower) Are you aware of any
9    communications considering the impact of HB 218 on
10   minority voters?
11        MR. FREDERICK:  Objection.
12        A.  I'm not aware of any.
13        Q.  (By Ms. Berkower) I should have added to end of
14   that question.  I'll start that one over.
15        A.  Okay.
16        Q.  Are you aware of any communications within the
17   Lieutenant Governor's Office concerning the impact of HB
18   218 on minority voters?
19        MR. FREDERICK:  I'll object and instruct
20   you not to reveal the substance of any communication,
21   but as to the existence of the communication, you may
22   answer a question.
23        A.  I don't remember any.
24        Q.  (By Ms. Berkower) Are you aware of any
25   communications outside the Lieutenant Governor's Office

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

### 117

1    concerning the impact of HB 218 on minority voters?
2         MR. FREDERICK:  The same instruction.  You
3    may answer as to the existence of a communication.
4         A.  I know there was testimony in the State Affairs
5    Committee on the bill, but I don't remember the
6    substance of the testimony.
7         Q.  (By Ms. Berkower) Testimony about the impact on
8    minority voters?
9         MR. FREDERICK:  Objection, vague.
10   Objection, form.
11        Q.  (By Ms. Berkower) When you say you're aware of
12   communications concerning the impact of HB 218 on
13   minority voters outside the Lieutenant Governor's
14   Office, and you referred to testimony on the Floor.
15        A.  No, it wasn't on the Floor.
16        Q.  Oh.
17        It was in the Senate State Affairs Committee
18   and I don't remember the substance of the testimony, but
19   I do think that there was some testimony on -- public
20   opinion on that issue.
21        Q.  Are you aware of any communications in the
22   Governor's Office concerning the impact of HB 218 on
23   minority voters?
24        MR. FREDERICK:  Objection.  I'll object on
25   the basis of legislative privilege.  You may answer to

### 118

1    whether or not you're aware.
2         A.  No, I'm not aware of it.
3         Q.  (By Ms. Berkower) Are you aware of any
4    communications from election officials that led -- are
5    you aware of any communications from election officials
6    concerning HB 218?
7         A.  Again, I know there was testimony in the Senate
8    State Affairs Committee, but I am not aware of the
9    substance of that testimony.
10        Q.  Did the Lieutenant Governor's Office have any
11   communications with election officials concerning
12   HB 218?
13        MR. FREDERICK:  I'll object and instruct
14   you not to reveal the substance, but you may answer
15   about the existence of a communication.
16        A.  I'm not aware of any.
17        Q.  (By Ms. Berkower) Are you aware that the
18   Secretary of State, at the time, Roger Williams, said he
19   wasn't sure if a photo ID bill would improve turnout?
20        MR. FREDERICK:  Objection.  It assumes
21   facts not in evidence.
22        A.  I'm not aware of that.
23        Q.  (By Ms. Berkower) What is the party affiliation
24   of Roger Williams?
25        A.  He's running for a congressional seat as a

### 119

1    Republican, so I assume he's a Republican.  He's
2    currently running as a Republican, so I assume he's a
3    Republican.
4         Q.  And you said -- I'm sorry.  I missed what you
5    said.  You said you were not aware that he said that
6    voter ID --
7         A.  I was not aware of that.
8         Q.  What were the purposes of HB 218's authors in
9    introducing it?
10        A.  I'm not aware of their purpose.
11        Q.  Do you know if HB 218, in part, was designed to
12   prevent noncitizens from voting?
13        A.  I'm not aware of that.
14        Q.  Do you know -- are you aware of Representative
15   Betty Brown stating on the House Floor that the bill
16   was, quote, "designed to keep illegal aliens,
17   noncitizens, and other people otherwise not qualified
18   from voting"?
19        A.  No.  I'm not aware of that.
20        Q.  Do you know if HB 218 would have prevented
21   noncitizen voting?
22        MR. FREDERICK:  Objection, calls for
23   speculation.
24        A.  I'm not aware of it anyway.
25        Q.  (By Ms. Berkower) You don't know if HB 218

### 120

1    would have prevented noncitizen voting?
2         MR. FREDERICK:  Objection, asked and
3    answered.  Objection, calls for speculation.
4         You can answer.
5         A.  I'm not aware of it, no.
6         Q.  (By Ms. Berkower) Can a noncitizen obtain a
7    driver's license in Texas?
8         MR. FREDERICK:  Objection, calls for
9    speculation.  You may answer.
10        A.  Not under the current DPS rules for issuing a
11   driver's license.
12        Q.  (By Ms. Berkower) What are the current DPS
13   rules for issuing a driver's license?
14        A.  I don't know the specifics, but you have to
15   show citizenship in order to get a driver's license now.
16        Q.  So lawful residents who are not citizens cannot
17   get driver's licenses?
18        A.  Oh, I'm sorry.  Yeah, you can if you're -- I
19   thought you were asking about illegal immigrants.  But
20   legal immigrants would be appropriate visa requirements,
21   or whatever they need from the federal government, can
22   receive driver's licenses.
23        Q.  Can noncitizens obtain concealed handgun
24   licenses in Texas?
25        A.  I think so, if they have the proper



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                    MAY 29, 2012

---

121

1   documentation for meeting all of the other requirements
2   of concealed carry.  You have to have mental status, and
3   they have to show legal residence here.
4       Q.  Can noncitizens obtain military ID?
5       A.  I'm not aware of whether or not they can.  I
6   would assume they cannot.
7       Q.  Even if they are lawful residents?
8       A.  Well, if they're lawful residents, yes, if they
9   have that.
10      Q.  So just to be clear, for noncitizens who are
11  lawfully within the United States --
12      A.  Right.
13      Q.  -- can they obtain a driver's license in Texas?
14      A.  Yes, they can.  If you show lawful residence.
15      Q.  What about concealed handgun license?
16          MR. FREDERICK:  Objection, form.  You may
17  answer.
18      A.  I think you can, if you show lawful residence.
19      Q.  (By Ms. Berkower) Can lawfully -- can
20  noncitizens who are lawfully in the United States obtain
21  military ID?
22      A.  I assume so.  I don't know.
23      Q.  Would you agree that if the prevention of
24  noncitizens voting was a purpose of HB 218, that in
25  fact, HB 218 would not serve that purpose?

---

122

1           MR. FREDERICK:  Objection, calls for
2   speculation.
3       A.  I don't know.
4       Q.  (By Ms. Berkower) Well, what don't you know?
5       A.  I don't know whether or not it would achieve
6   that purpose.
7       Q.  Why not?
8           MR. FREDERICK:  Objection, form.
9   Objection, vague.  Objection, calls for speculation.
10  You may answer.
11      A.  I haven't gone through the specifics of the
12  legislation to determine if you went through each of
13  those requirements to determine.  But I assume if you
14  are lawfully in the United States, that you can get a
15  concealed carry permit and you can vote.
16      Q.  (By Ms. Berkower) So just because you get
17  concealed carry permit --
18      A.  Or a military ID or a driver's license.
19      Q.  -- you still may be a noncitizen?
20      A.  Yes.
21      Q.  So how does showing a driver's license or a
22  military ID or a concealed carry license ensure that the
23  person who shows up at the polls is actually a citizen?
24          MR. FREDERICK:  Objection, calls for
25  speculation.  You may answer if you can.

---

123

1       A.  My understanding is that on a driver's license,
2   it shows whether or not you are a legal resident.  It
3   says Visa or it says -- it is noted on the document.  I
4   don't know about military IDs, and I don't know about
5   concealed carry permits.  But it's my understanding the
6   ID itself says whether or not you're a legal resident.
7       Q.  (By Ms. Berkower) Versus a citizen?
8       A.  Yes.
9       Q.  After the House passed HB 218, was it
10  considered by the Senate?
11      A.  Yes, it was.
12      Q.  Do you know which --
13      A.  Well, it was referred to committee in the
14  Senate.
15      Q.  Which committee is that?
16      A.  State Affairs.
17      Q.  Did the Lieutenant Governor make that committee
18  assignment?
19      A.  Yes, he did.
20      Q.  Do you remember who was on the committee?
21      A.  No.  I remember the chair of the committee.
22      Q.  Who was that?
23      A.  Senator Duncan.
24      Q.  And the Lieutenant Governor assigned him to be
25  the chair?

---

124

1       A.  Yes.
2       Q.  Did the committee hold hearings on HB 218?
3       A.  Yes, they did.
4       Q.  Since the Lieutenant Governor is not on the
5   committee, can he call witnesses?
6       A.  No.
7       Q.  Was he involved with choosing which witnesses
8   would be called?
9       A.  Not that I remember, no.
10      Q.  Is he ever involved with choosing which
11  witnesses will be called in the committee?
12          MR. FREDERICK:  Objection, vague.  You may
13  answer.
14      A.  Yes, he is.
15      Q.  (By Ms. Berkower) When?
16          MR. FREDERICK:  The same objection.  You
17  may answer.
18      A.  When the committee asks for some help.
19      Q.  (By Ms. Berkower) Did that ever happen with
20  regard to voter ID?
21      A.  Yes.  On Senate Bill 14, I know we were asked,
22  "Can you help make some of the calls to get people here
23  to speak to the Committee of the Whole?"
24      Q.  Any other of the voter ID bills?
25      A.  Not that I remember.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

125

1    Q.   So do you know how the witnesses were selected
2  for purposes of testifying about HB 218 in the State
3  Affairs Committee?
4    A.   No, I'm not.
5    Q.   Do you know if the bill was amended in the
6  committee?
7    A.   I don't remember.
8    Q.   Maybe I can help with that.
9        I think what we have what will be
10 Exhibit 102.
11       (Exhibit 102 marked for identification.)
12   Q.   (By Ms. Berkower) What is this?
13   A.   Okay.  This is the legislative tracking history
14 for House Bill 218.
15   Q.   After -- can you review this, please?
16   A.   Sure.  The bill was substituted.
17   Q.   What does that mean?
18   A.   That means that there were some changes made to
19 it, and they were rolled into an entirely new bill,
20 which was then prepared and distributed to the whole
21 Senate.
22   Q.   Do you know what those changes were?
23   A.   No, I'm not aware of them.
24   Q.   After the committee considered it, was it voted
25 out of the committee?

---

126

1    A.   Yes.
2    Q.   Do you remember that vote?
3    A.   I remember it occurred.  I don't remember the
4  details.
5    Q.   Do you remember if it was voted out on party
6  lines?
7    A.   I don't remember.  Wait, I can look.  It looks
8  like it was.
9    Q.   Did HB 218 require the support of two-thirds of
10 senators to bring it to the Floor for a vote?
11   A.   Yes, it did.
12   Q.   Why is that?
13   A.   Because the Senate rules require the senators
14 to follow the regular order of business, which is set
15 out in the rules as an order, in order to hear bills in.
16       The senators typically suspend the regular
17 order of business by a two-thirds vote, which is
18 required by the rules, in order to hear bills out of
19 that order.  This bill would have been taken out of
20 order and -- well, let's just fast forward through the
21 questions -- it failed to suspend the two-thirds rule,
22 so it could not be taken out of the regular order of
23 business.
24   Q.   So to be clear, if the two-thirds rule --
25   A.   It's not a rule.

---

127

1    Q.   -- to suspend -- if senators had to consider
2  every bill in order --
3    A.   Uh-huh.
4    Q.   -- then they would -- if they had priorities of
5  certain bills, they'd have to vote on everything else in
6  front of it in line before they could get to that
7  particular bill.  Is that --
8    A.   That's correct.  So it's actually a suspension
9  of a rule, not a rule.
10   Q.   I see.  Is it used commonly?
11   A.   Yes.
12   Q.   Why two-thirds?
13   A.   That's what the senators chose to put in the
14 Senate rules as being the required vote count for a
15 suspension of those rules.
16   Q.   Do you know why two-thirds is the number that's
17 chosen?
18   A.   No, I don't.  The senators choose it.
19   Q.   Do you know the purpose of the rule?
20   A.   Well, the purpose of the rule is to allow the
21 senators not to abide by the regular order of business
22 so that they can step outside of the regular order of
23 business and hear what they want to hear when they want
24 to hear it, subject to some other rules.
25   Q.   Janice McCoy testified in her deposition that

---

128

1  the purpose of the rule is to get general consensus on
2  bills before they're voted on.  Do you agree with that?
3        MR. FREDERICK:  Objection, assumes facts
4  not in evidence.
5        You may answer.
6    A.   To me, there's a difference between why the
7  senators allow that measure in the Senate rules and the
8  purpose of the rule itself.  I mean, the rule allows for
9  a suspension of the regular order of business, and it's
10 so that you can take up bills.  Now, the reason why that
11 rule was in the Senate rules to allow that suspension is
12 the senators' business, and the senators may have chosen
13 to have that rule because they want to promote
14 consensus.  But the rule itself, it allows suspension of
15 the rules by a two-thirds vote is there -- the purpose
16 of that is to suspend the other rules.
17   Q.   (By Ms. Berkower) And the purpose of that is
18 basically get things done, correct?
19   A.   Yes.  Right.
20   Q.   Otherwise, a bill that has -- that's divisive
21 could potentially hold up all other bills; is that
22 accurate?
23   A.   That's correct, but the motivation for senators
24 putting that rule in their rules that allows for a
25 suspension is something I wouldn't know.  What that rule

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

129

1    does is a factual situation of, it allows you to suspend
2    other rules.
3        Q.   Do you agree that another factual consequence
4    of the rule is that it requires, generally, consensus on
5    bills before they're voted on out of order?
6        A.   I personally feel that way, yes.
7        Q.   Janice McCoy testified in her deposition that
8    most bills are brought to a vote by using the two-thirds
9    rule.
10       A.   That's correct.
11       Q.   What was the partisan composition of the Senate
12   in 2007?
13       A.   Oh, I don't remember.  Was it 20 Republicans
14   and 11 Democrats?  I just don't remember.
15       Q.   Do you remember how many of the Democrats
16   opposed 218?
17       A.   No, I don't.
18       Q.   If all of the Democrats were present on the
19   Floor to vote against a bill, could they block
20   legislation subject to the two-thirds rule?
21       A.   Yes.
22       Q.   Did the Lieutenant Governor attempt to get
23   House Bill 218 brought to the Senate Floor for a vote?
24       A.   Yes, he did.
25       Q.   What's his role exactly when a bill is brought

---

130

1    the Senate Floor?
2        A.   The Senator asks him to bring the bill to the
3    Floor for discussion and a vote, and he does so when he
4    chooses to do so.
5        Q.   So another senator has to make a motion to
6    bring it up for a vote?
7        A.   Yes.  The Lieutenant Governor cannot call up a
8    bill by himself.
9        Q.   And the Lieutenant Governor's merely rules on
10   the motion from the other senator?
11       A.   Well, the senator who is sponsoring or
12   authoring the legislation has to ask publicly "may I be
13   recognized on" blah, blah, blah.
14       Q.   And the Lieutenant Governor rules on his
15   request?
16       A.   Recognizes him for hearing on the bill, or her.
17       Q.   Does the Lieutenant Governor have any
18   discretion to grant or deny the senator's request?
19       A.   Yes.
20       Q.   What is that discretion?
21       A.   He can choose not to recognize the senator.
22       Q.   Does that ever happen?
23       A.   It has from time to time.
24       Q.   Why has that happened?
25          MR. FREDERICK:  Objection to the extent it

---

131

1    calls for the Lieutenant Governor's reasons for doing
2    something, and I instruct you not to answer.  If you
3    know -- if you can answer without revealing that or a
4    privileged communication, you can do so.
5        A.   To a certain extent, I can't answer this
6    question, to some extent I can.  And sometimes the
7    senator doesn't have the 21 votes and doesn't know the
8    senator doesn't have the 21 votes.  And so sometimes the
9    Lieutenant Governor won't recognize the senator on the
10   bill because he knows it will not suspend.
11       Q.   (By Ms. Berkower) Is it ever the case that the
12   Lieutenant Governor won't recognize a senator because he
13   doesn't want the bill to be brought to a vote?
14          MR. FREDERICK:  Objection, calls for the
15   Lieutenant Governor's thought process, mental
16   impressions.
17          I instruct you not to answer.
18       A.   I can't answer that.
19       Q.   (By Ms. Berkower) When the bill is brought to
20   the -- when a bill is brought to the Floor of the
21   Senate, the Lieutenant Governor can't participate in
22   debate, can he?
23       A.   Not unless he is a member of the Committee of
24   the Whole.
25       Q.   Is his role primarily procedural when he's

---

132

1    presiding over the Senate Floor?
2        A.   Yes.
3        Q.   And can he vote if there's not a tie?
4        A.   No.
5        Q.   Can you describe the circumstances under which
6    HB 218 was brought to the Senate Floor?
7          MR. FREDERICK:  I'll object only to the
8    extent it calls for mental impressions or privileged
9    communications.  If you can generally describe the
10   circumstances without revealing that, you may.
11       A.   I don't.  I don't really know what you're
12   asking.  I'm sorry.
13       Q.   (By Ms. Berkower) Okay.  That's fine.
14          Were you present in any meetings or
15   conversations the Lieutenant Governor held concerning
16   the timing of the vote on HB 218?
17       A.   I'm sure I was, but I don't remember any formal
18   meetings.  I remember the bill coming out of committee
19   and then being put on the Intent calendar, and then
20   beyond that, I don't really remember the process.  The
21   end of May is -- or middle of May is really a busy time
22   in the Senate, and I don't remember any formal meetings
23   on this issue.
24       Q.   With regard to the circumstances under which
25   HB 218 was brought to the Floor, is the Lieutenant

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

### 133

1 Governor the best person who would know what those
2 circumstances were?
3       MR. FREDERICK:  I'll object that this
4 calls for speculation.  I object to relevance as well.
5       A.  I would suggest that the person who can bring
6 up the bill, who is the bill's sponsor, is the best
7 person to ask about the timing of when it was brought
8 up, because they have to request to bring up the bill.
9       Q.  (By Ms. Berkower) Are you aware of any
10 conversation between Senator Uresti and any member of
11 the Senate the day before the vote?
12      A.  Yes, I'm aware that Senator Uresti told people
13 and told the Lieutenant Governor he was not feeling
14 well.
15      Q.  When the Lieutenant Governor called a vote to
16 bring HB 218 to the Senate for a vote, how many senators
17 were present?
18      A.  I don't remember.
19      Q.  Do you remember if anyone was not present?
20      A.  I think Senator Uresti was not present at the
21 first at the time of the vote.
22      Q.  Why not?
23      MR. FREDERICK:  Objection, calls for
24 speculation.  You can answer if you know.
25      Q.  (By Ms. Berkower) Do you remember why?

### 134

1       A.  I think he was sick, but I don't know that for
2 a fact.
3       Q.  So why was the vote held when not all members
4 were there?
5       MR. FREDERICK:  Objection.  I'll object on
6 the basis of legislative privilege and instruct you not
7 to answer the question.
8       A.  Okay.  I can't answer that question.
9       Q.  (By Ms. Berkower) Janice McCoy testified in her
10 deposition that each HB 218 was brought to the Floor at
11 a time when it was known that, quote, a particular
12 senator was absent and that this -- unquote, and that
13 this meant the bill would pass.  That's from her
14 deposition at Page 70, if you wanted to look at it.  Do
15 you agree with that statement?
16      MR. FREDERICK:  Object, assumes facts not
17 in evidence and object to relevance.  But you can answer
18 if you can.
19      A.  Again, the senator is the person who chooses
20 when he wishes to bring up the bill, and so it may have
21 been relevant for Senator Fraser to ask at that time.
22      The rules contemplate that not all
23 senators are on the Floor at all times, and the rules
24 contemplate a quorum and what constitutes a quorum, and
25 they require a quorum for votes, but nothing more than a

### 135

1 quorum for votes.
2       Q.  (By Ms. Berkower) So does it happen that
3 senators will bring particular bills up for a vote at a
4 time that they know it's more likely to pass given other
5 senators' absence?
6       A.  Yes.
7       Q.  When does that happen?
8       A.  Well, it happens from time to time, depending
9 on what the senators want to accomplish.  It's their
10 bills, and they can choose to bring up a bill or not
11 bring up a bill.
12      Q.  Can you remember any specific instances?
13      MR. FREDERICK:  Objection, vague.
14      Q.  (By Ms. Berkower) Do you understand the
15 question?
16      A.  I think so.  I can't recall any at the moment,
17 but it does happen from time to time.
18      Q.  In May 2007, were you or the Lieutenant
19 Governor aware of any concerns that HB 218s would
20 disproportionately harm minority voters?
21      MR. FREDERICK:  I'll object on the basis
22 of legislative privilege, to the extent this calls for
23 the Lieutenant Governor's or your thought process.
24 However, you may answer as to the question whether or
25 not you were aware.

### 136

1       A.  No, I was not aware.
2       Q.  (By Ms. Berkower) Was the Lieutenant Governor
3 aware of any such concerns?  The same objection.
4       MR. FREDERICK:  The same objection.
5       A.  I don't know.
6       Q.  (By Ms. Berkower) Is the Lieutenant Governor
7 the only person who could answer that question?
8       MR. FREDERICK:  Objection, calls for
9 speculation.
10      A.  I don't know.
11      Q.  (By Ms. Berkower) Do you know if the Lieutenant
12 Governor would know if he was aware, in May 2007, of any
13 concerns raised about HB 218?
14      A.  I don't know.  He may not remember.
15      Q.  Assuming he remembered -- forget that.
16      Do you know why the vote on HB 218 was
17 held when not all members are present?
18      MR. FREDERICK:  Objection, calls for
19 speculation and objection, calls for legislative
20 privilege.
21      If you can answer based on something other
22 than internal thought processes or privileged
23 communications, you may do so.
24      A.  No.
25      Q.  (By Ms. Berkower) You don't know why?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

| 137 |
| --- |

1    A.  No.
2    Q.  What is Senator Uresti's race?
3        MR. FREDERICK:  Objection, relevance.
4    (By Ms. Berkower) You can answer.
5    A.  He's -- it depends on if you use census data,
6    he's of Hispanic background, Anglo.
7    Q.  (By Ms. Berkower) What part of Texas does he
8    represent?
9    A.  Oh, he's got a huge district.  West of
10   San Antonio.
11   Q.  What's the racial composition of his
12   constituents?
13       MR. FREDERICK:  Objection, relevance.
14   A.  I have no idea.
15   Q.  (By Ms. Berkower) Do you know if it's largely
16   minority?
17       MR. FREDERICK:  Same objection.
18   A.  I don't know.
19   Q.  (By Ms. Berkower) Did the Lieutenant Governor
20   have concerns about holding a vote when a Hispanic
21   member of the Senate was sick, given the constituency
22   that he represented and the concerns raised about the
23   impact of the bill on minority voters?
24       MR. FREDERICK:  Objection, compound.
25   Objection, legislative privilege.  I instruct you not to

| 139 |
| --- |

1    Q.  Did the Senate take any further action on
2    HB 218?
3    A.  Yes.  They authorized another co-sponsor.
4    Q.  What happened next?
5    A.  Nothing.
6    Q.  Why not?
7        MR. FREDERICK:  Objection, calls for
8    speculation.  Objection to the extent it calls for
9    mental impressions or privileged communications.
10       If you know and can answer without
11   revealing privileged matters, you may do so.
12   A.  I think it's because Senator Fraser didn't ask
13   to bring it back up again.
14   Q.  (By Ms. Berkower) Do you know why he didn't ask
15   to bring it back up?
16       MR. FREDERICK:  Objection, legislative
17   privilege and instruct you not to answer.
18       MS. BERKOWER:  I just asked if she knew
19   why.
20       MR. FREDERICK:  Okay.  If you want to ask
21   her again.
22   Q.  (By Ms. Berkower) Do you know why Senator
23   Fraser did not seek to bring it back for a vote?
24       MR. FREDERICK:  I'll object on the basis
25   of privilege, only to the extent it calls for what his

| 138 |
| --- |

1    answer.
2    A.  I can't answer that.
3    Q.  (By Ms. Berkower) Can you think of any other
4    instance when a vote was held, when a member of the
5    Senate was sick, with the intention to pass a bill in
6    the senator's absence?
7        MR. FREDERICK:  Objection, relevance.
8        You may answer if you can.
9    A.  I am certain it has happened, but I can't think
10   of an occasion.
11   Q.  (By Ms. Berkower) Was a request made to verify
12   the vote on HB 218?
13   A.  Yes.
14   Q.  Do you remember the circumstances?
15   A.  Senator Uresti returned to the Senate Floor.
16   Q.  Do you remember if there was a motion to
17   suspend the regular order of business?
18   A.  Yes.
19   Q.  Did that motion fail or pass?
20   A.  It failed.
21   Q.  Do you remember why?
22   A.  It didn't receive 21 votes.
23   Q.  Is that because Senator Uresti managed to
24   return to the Senate in time for the vote?
25   A.  Yes.

| 140 |
| --- |

1    understanding was, but as to whether or not you know,
2    you may answer.
3    A.  I think I know, yes.
4    Q.  (By Ms. Berkower) Can you say why?
5        MR. FREDERICK:  Objection, legislative
6    privilege.  Instruct you not to answer.
7    A.  No, I can't.
8    Q.  (By Ms. Berkower) Were there any communications
9    within the Lieutenant Governor's Office about HB 218
10   after it failed to pass the Senate?
11       MR. FREDERICK:  I don't think that I will
12   object and caution you:  I don't believe that this
13   question calls for privileged communications, so I would
14   just caution you not to reveal the substance of any
15   communication within the Lieutenant Governor's Office.
16   A.  I don't -- I don't remember any.
17   Q.  (By Ms. Berkower) Do you remember any
18   communications between you or anyone else in the
19   Lieutenant Governor's Office and any legislators after
20   HB 218 did not pass the Senate?
21       MR. FREDERICK:  Objection, vague, and the
22   same instruction on privilege.
23   A.  Yeah.  I don't remember any.
24   Q.  Okay.  I have what is going to be Exhibit 103.
25       (Exhibit 103 marked for identification.)



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 141

1    Q. (By Ms. Berkower) Do you recognize this?
2    A. No, I'm not familiar with it.
3    Q. Okay. Take a second to review it.
4    A. (Viewing documents.) Okay.
5    Q. Are you familiar with this article?
6    A. I don't remember it. Honestly, I don't.
7    Q. Do you remember the letter referenced in the
8    article?
9    A. I remember checking some facts and some talking
10   points, but I don't remember the draft of the letter.
11   Q. And this would be a letter that Lieutenant
12   Governor David Dewhurst sent to the Senate concerning
13   HB 218?
14   A. Uh-huh. Yes, I assume so.
15   Q. So you did not work on drafting this letter?
16   A. No. I may have fact checked it, but I didn't
17   draft it.
18   Q. Do you know who would have drafted the letter?
19   A. I really don't remember.
20   Q. Do you remember when it was written?
21   A. Well, it says the day after, so I'm assuming
22   it's May 16th, because it says the day after Senate
23   consideration.
24   Q. In the letter, Lieutenant Governor Dewhurst
25   asserted that photo ID requirements will prevent voting

---

### 142

1    by persons who are not U.S. citizens; is that correct?
2    A. Yes, it appears to be.
3    Q. The letter also asserts that a number of types
4    of IDs that are not photo IDs are enough to establish
5    identity; is that correct?
6    A. I'm not certain that's what it says. It says
7    that that's what's in the legislation. It doesn't say
8    that's enough to establish identity.
9    Q. Okay. Well, it says House Bill 218, and this
10   is -- I'm reading now, I guess, from Lieutenant
11   Governor's letter. "House Bill 218 was amended to allow
12   voters to present other forms of identification, such as
13   a military ID, a valid employee ID, citizenship
14   certificate, passport, student ID card issued by a
15   public college or university, handgun permit, utility
16   bill, bank statement, pay stub, mail from a government
17   entity, marriage license, birth certificate, adoption
18   certificate, pilot's license, hunting license, or even a
19   library card. What's so hard about this?"
20   A. Right. But it doesn't say that all of those
21   are a sure fire form of identification. It just says
22   that that's what's in the bill -- I mean, House Bill 218
23   says.
24   Q. But doesn't it imply that those are appropriate
25   forms of ID for voters?

---

### 143

1    MR. FREDERICK: Objection, calls for
2    speculation.
3    Q. (By Ms. Berkower) You can answer.
4    A. I think it implies that that's what the bill
5    contained. It doesn't say these are sufficient to
6    constitute identification.
7    Q. Well, then he goes on to say, "Seriously, how
8    can any American argue that this requirement is too
9    onerous? I can only conclude that the senators who
10   voted to block consideration of House Bill 218 did so
11   not because it's good public policy, but because they
12   don't believe in the basic American principle of One
13   Person, One Vote. Doesn't that imply that the IDs that
14   were listed in the previous paragraph would have ensured
15   the basic American principle of One Person, One Vote?"
16   MR. FREDERICK: Objection, calls for
17   speculation. Objection, assumes facts not in evidence.
18   A. I think this is his personal opinion, and I
19   can't speak to that.
20   Q. (By Ms. Berkower) Is he the only person who can
21   speak to his personal opinion?
22   MR. FREDERICK: Objection, this calls for
23   speculation and assumes facts not in evidence.
24   A. I assume so.
25   Q. (By Ms. Berkower) Can you explain how any of

---

### 144

1    the IDs listed here would prevent noncitizens from
2    voting?
3    MR. FREDERICK: Objection, calls for
4    speculation.
5    Q. (By Ms. Berkower) You may answer.
6    A. Well, as I said earlier, a passport would keep
7    a noncitizen from voting because you have -- if you're
8    not a citizen, you don't get a U.S. passport. You have
9    a foreign passport with a U.S. Visa or something, so
10   that would prohibit a noncitizen from voting. Again, I
11   think that a driver's license has a note on it whether
12   or not you're a citizen.
13   Q. Well, what about a valid employee ID?
14   MR. FREDERICK: Objection, form.
15   A. I wouldn't know whether or not they included
16   citizenship on an employee ID.
17   Q. (By Ms. Berkower) What about a student card
18   issued by a public college or university?
19   MR. FREDERICK: Objection, form.
20   A. Well, again, I don't know whether or not they
21   include citizenship on that.
22   Q. (By Ms. Berkower) What about a utility bill,
23   bank statement, pay stub, or mail from a government
24   entity?
25   MR. FREDERICK: Objection, compound.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

145

1    Objection, form.
2        A.  I don't know why a utility bill, bank
3    statement, pay stub would have citizenship on it, but
4    mail from a government entity may.
5        Q.  (By Ms. Berkower) What about a pilot's license,
6    hunting license, or a library card?
7            MR. FREDERICK:  Objection, vague.
8    Objection, compound.
9        A.  I'm not aware of pilots' licenses.  I'm
10   understanding that they have been changed substantially
11   since 9-11, and that they do, at least in some places,
12   show citizenship.  But again, I'm not aware of
13   citizenship on a hunting license or a library card.
14       Q.  (By Ms. Berkower) Do you have a library card?
15       A.  I have had one.
16           MR. FREDERICK:  Objection, relevance.
17       A.  Yes.
18       Q.  (By Ms. Berkower) Is your citizenship listed on
19   it?
20       A.  No.
21       Q.  So this article, Exhibit 103, indicates that
22   the Lieutenant Governor issued a second letter
23   retracting the first letter.  Do you remember that
24   happening?
25       A.  No, I really don't.

146

1        Q.  The letter, the initial letter created a lot of
2    fallout in the Senate.  Do you remember that?
3        A.  I know people were upset after the voter ID.
4        Q.  Why were they upset?
5            MR. FREDERICK:  Objection.  To the extent
6    it calls for the thought process and mental impressions,
7    I instruct you not to answer.  But if you can do so
8    without revealing that, you may answer.
9        A.  My understanding is that the Senate doesn't
10   typically like partisan votes, and therefore, they were
11   not happy about voting on partisan lines.
12       Q.  (By Ms. Berkower) They were not happy about
13   voting on partisan lines on the rule to -- the vote to
14   suspend the two-thirds rule?  Is that what you're
15   referring to?
16       A.  I think, yes.
17       Q.  Is that the only reason they were unhappy?
18           MR. FREDERICK:  Objection, speculation.
19   Objection to the extent it calls for the thought process
20   and mental impressions or privileged communications, I
21   would instruct you not to answer.  But if can do so
22   without revealing that.
23       A.  I really don't know.
24       Q.  (By Ms. Berkower) Was there a time when the
25   senator came to the -- sorry.  I'll start again.

147

1            Was there a time when the Lieutenant
2    Governor came to the conclusion that photo ID would
3    prevent noncitizens from voting?
4            MR. FREDERICK:  Objection to the extent
5    this calls for what the Lieutenant Governor believed, I
6    would instruct you not to answer based on privilege.
7    However, to the extent it just calls for your knowledge
8    of whether or not there was a time, you may answer.
9        A.  I'm not aware of it.
10       Q.  (By Ms. Berkower) Were you ever a part of any
11   discussions with the Lieutenant Governor concerning
12   whether photo ID would prevent noncitizens from voting?
13       A.  I don't remember being part of a conversation
14   on that issue.
15       Q.  Do you know if any such conversations existed
16   between the Lieutenant Governor and others?
17       A.  I do not.
18       Q.  Would the Lieutenant Governor be the best
19   person to answer that question?
20           MR. FREDERICK:  Objection, calls for
21   speculation.
22       A.  I assume so.
23       Q.  (By Ms. Berkower) Is there a connection between
24   the photo ID bill -- the photo ID bills that the Senate
25   has considered and the growth of the noncitizen

148

1    population in Texas?
2            MR. FREDERICK:  Objection.
3        A.  Not that I'm aware of.
4        Q.  (By Ms. Berkower) Have you heard this assertion
5    before?
6        A.  No, I don't think I have.
7        Q.  Exhibit 103 referenced individuals being
8    removing from voters' lists after having voted.  Are you
9    aware of whether any of these individuals were
10   Lieutenant Governor mentioned were convicted of
11   committing an election-related crime?
12       A.  I think there were some convictions, but I'm
13   not aware of where.  I just remember reading newspaper
14   articles about them.
15       Q.  You don't remember who in particular was
16   prosecuted?
17       A.  No.  I think someone in South Texas and maybe
18   someone in Harris County.
19       Q.  And you don't remember the crimes they were
20   prosecuted for?
21       A.  No.  The information that I received would have
22   come from a newspaper article.
23       Q.  Okay.  Was a photo ID bill filed in the Senate
24   in 2009?
25       A.  Yes.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 149

1    Q.  Is there a reason the photo ID bill originated
2  in the Senate in 2009 and not the House as it had
3  previously done?
4        MR. FREDERICK:  Objection, calls for
5  speculation.  I'll object also on the legislative
6  privilege to the extent that it would involve any
7  privileged matter or thought process.  If you can answer
8  without revealing privileged matters, you may.
9    A.  I don't think I can answer that question.
10    Q.  (By Ms. Berkower) Did the Lieutenant Governor
11  have any role in the decision to have the photo ID bill
12  originate in the Senate and not the House?
13        MR. FREDERICK:  We'll object on privilege
14  and instruct you not to reveal the substance of any
15  communication or any mental impression or thought
16  process of the Lieutenant Governor.  But to the extent
17  it calls for whether or not he had any involvement, you
18  may answer.
19    A.  Yes, I think so.
20    Q.  (By Ms. Berkower) What role was that?
21        MR. FREDERICK:  The same objection and
22  instruction.  Do not reveal the substance of any
23  confidential communication or the Lieutenant Governor's
24  thought process.
25    A.  I can't answer that question.

### 150

1    Q.  Okay.  Exhibit 29.
2        (Exhibit 29 marked for this deposition.)
3    A.  And do we know which version of this one this
4  one is?  Is this as filed or is this --
5    Q.  I think this is as filed.
6    A.  Okay.
7    Q.  Do you recognize this?
8    A.  Yes, I do.
9    Q.  Is this the bill you referred to as introduced
10  in 2009 on voter ID?
11    A.  Yes.
12    Q.  Who introduced it?
13    A.  Senator Fraser.
14    Q.  And what's the bill number?
15    A.  Senate Bill 362.
16    Q.  Do you know what forms of ID would have been
17  permitted under Senate Bill 362?
18    A.  I don't remember.
19    Q.  I think if you turn to Page 5, that might
20  help.
21    A.  Okay.
22    Q.  What forms of ID would have been allowed under
23  Senate Bill 362?
24    A.  This appears to be identical to -- what was the
25  last one -- Senate Bill -- House Bill 218, as

### 151

1  engrossed.  Is that correct?  I think that's correct.
2    Q.  So in comparing House Bill 218 and Senate Bill
3  362, does it appear that it, for the most part, follows
4  House Bill 218?
5    A.  Yes.
6    Q.  I think do you -- do you know if student IDs
7  are still permitted under Senate Bill 362?
8    A.  It doesn't appear that they are.  No, they're
9  not.  There's several of them missing here.
10    Q.  There's several what?
11    A.  I'm going to go through.  Employee card is no
12  longer included, no student ID, and neither is the
13  employee card.
14    Q.  Okay.  Anything else?
15    A.  I don't see it.
16    Q.  Is it possible that student IDs would still be
17  included, although not expressly, as an institution of
18  the state under part --
19    A.  It is possible, but only for public
20  institutions, not private higher ed.
21    Q.  Was photo ID a part of the Lieutenant
22  Governor's legislative agenda for 2009?
23    A.  Yes.
24    Q.  Were you or anyone in the Lieutenant Governor's
25  Office involved in the drafting or development of

### 152

1  SB 362?
2    A.  Not at the as-filed stage.
3    Q.  When were you involved?
4    A.  Our staff people assisted in any drafting of
5  amendments, and so Bryan would have been involved.
6    Q.  Just with amendments?
7    A.  I think so, yes.
8    Q.  So do you know who drafted SB 362?
9    A.  No, I don't.  I assume it was a Texas
10  Legislative Council employee.
11    Q.  In conjunction with Senator Fraser?
12    A.  Yes.
13    Q.  Were there any communications with you or
14  anyone in the Lieutenant Governor's Office with Senator
15  Fraser or his office concerning the drafting or
16  development of SB 362?
17        MR. FREDERICK:  Objection, compound.
18    A.  Not prior to filing the legislation.
19    Q.  (By Ms. Berkower) Senator Fraser testified in
20  his deposition that in essence, he took HB 218 and filed
21  it the following session.  Would you agree with that
22  assessment?
23        MR. FREDERICK:  Objection, assumes facts
24  not in evidence.  It calls for speculation.  You may
25  answer if you can.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

153

1        A.   With -- the drafts are not identical, so there
2    are some changes.  I would assume he used 218 as the
3    basis, but there are some differences.
4        Q.   (By Ms. Berkower) The ones you just described a
5    minute ago?
6        A.   Yes.  There may be more.  I didn't double
7    check.  The whole front page is different.
8        Q.   Are you aware of any other source of any of the
9    legislative language in SB 362?
10        A.   No, I'm not.
11        Q.   Are you aware of whether or not the Legislature
12    considered including any additional forms of
13    identification in SB 362?
14        MR. FREDERICK:  I object and instruct you
15    that you may answer the specific question of whether or
16    not you are aware.  I caution you not to reveal any
17    legislators' thought process or any communication with a
18    legislator.
19        A.   I'm not aware of any additional forms.
20        Q.   (By Ms. Berkower) Are you aware of any analysis
21    about which registered voters did not possess one of the
22    required forms of ID identified in SB 362?
23        MR. FREDERICK:  Objection, legislative
24    privilege.  You may answer the specific question of
25    whether or not you were aware.  Do not reveal the

---

154

1    contents of any communication or anyone's thought
2    process.
3        A.   I'm not aware of it.
4        Q.   (By Ms. Berkower) Not aware of any such
5    analysis?
6        A.   I'm not aware of it.
7        Q.   Did you conduct or instruct anyone else to
8    conduct an analysis of the impact of SB 362 on minority
9    voters?
10        MR. FREDERICK:  Objection, legislative
11    privilege and instruct you not to answer.
12        A.   I can't answer that.
13        Q.   (By Ms. Berkower) If SB 362 had been passed and
14    been signed into law, would it have been subject to the
15    requirements of the Voting Rights Acts, Section 5?
16        A.   As I understand the Voting Rights Act, yes, it
17    would.
18        Q.   Did anyone ever direct you not to analyze the
19    impact of SB 362 on minority voters?
20        A.   No.
21        MR. FREDERICK:  Objection, legislative
22    privilege and instruct you not to answer.
23        Q.   (By Ms. Berkower) Is it fair to say that your
24    office was in very close contact with Janice McCoy
25    during the development of SB 362 and while the -- well,

---

155

1    just leave it at that.
2        MR. FREDERICK:  Objection, vague.
3        A.   After the filing of it, yes.  Not prior to the
4    filing of the legislation.
5        Q.   (By Ms. Berkower) So not during the development
6    of the bill?
7        A.   No, not that I remember.
8        Q.   Janice McCoy testified in her deposition that
9    she spoke with your office on a daily basis as SB 362
10    was being developed.  Do you remember that at all?
11        MR. FREDERICK:  Objection, it assumes
12    facts not in evidence.
13        A.   She didn't talk to me before filing it.
14        Q.   (By Ms. Berkower) After she filed it, did she
15    talk to you regularly?
16        A.   I have a problem with "regularly," but yes, we
17    had -- we did talk about the legislation.
18        Q.   About how frequently?
19        A.   When we were getting ready to refer the bill
20    and hear the bill, I would talk to her, but it was not a
21    regular -- I mean, I don't think you can say once a
22    week, because it might have been once a week and then
23    three times in one day.  And so it wasn't a rhythmic
24    kind of communication.
25        Q.   So did the frequency of your contact with her

---

156

1    or Senator Fraser's office depend on whether a committee
2    or the full Senate was going to actively consider
3    SB 362?
4        A.   I would say it was more about, do we have all
5    of the paperwork necessary.  Have you talked to all of
6    the senators.  Have you -- more procedural questions and
7    comments, which we typically do with all legislation,
8    working with senators to get their legislative packages
9    passed.
10        Q.   So she would contact you concerning procedural
11    matters?
12        A.   Yes.  We have all our paperwork.  We're ready
13    to go now.  That sort of thing.
14        Q.   Did she contact you about the substance of the
15    bill?
16        MR. FREDERICK:  I'll object only to the
17    extent it would call for the substance of your
18    conversations, but as to whether or not she did, you may
19    answer.
20        A.   Not prior to filing the legislation.  We may
21    have had conversations about amendments after -- as the
22    bill was going through the process.
23        Q.   (By Ms. Berkower) What were those
24    conversations?
25        MR. FREDERICK:  We'll object on the basis

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

157

1  of legislative privilege and instruct you not to answer.
2       A.  I can't answer that question.
3       Q.  (By Ms. Berkower) But these were -- to be
4  clear, these are substantive conversations as well as
5  procedural conversations?
6       A.  Yes, I think so.
7       Q.  Outside of the communications between the
8  Lieutenant Governor's Office and Senator Fraser's
9  office, are you aware of any other communications that
10 your office had during the development or drafting of
11 SB 362?
12           MR. FREDERICK:  Objection, vague.  You may
13 answer.
14      A.  I'm not aware of any draft -- any conversations
15 during drafting.  I think there were conversations with
16 other offices during the development of the bill.
17      Q.  (By Ms. Berkower) In your opinion, do you
18 believe that states covered by Section 5 of the Voting
19 Rights Act need not conduct any analysis of the impact
20 of photo voter ID laws on minority voters?
21           MR. FREDERICK:  Objection, relevance.
22      A.  I don't -- I don't see that as a requirement
23 for the states to do that, but I'm not an expert on the
24 Voting Rights Act either.
25      Q.  (By Ms. Berkower) Did the Supreme Court's

158

1  decision in the Indiana voter ID case change your view
2  on that?
3           MR. FREDERICK:  Objection, relevance.
4       A.  No.
5       Q.  (By Ms. Berkower) Does your answer explain why
6  the public record contains no indication of any serious
7  effort to determine the impact of SB 362 on minority
8  voters?
9           MR. FREDERICK:  Objection, assumes facts
10 not in evidence.  Objection, relevance, and objection,
11 argumentative.
12      A.  In the normal course of business of handling
13 legislation on the Senate Floor, that would not
14 typically be one of the things that we accomplished or
15 did in our office.
16      Q.  (By Ms. Berkower) Do you know if anybody else
17 would generally look into those issues?
18      A.  I'm not aware of it.
19      Q.  What was the purpose or purposes of SB 362?
20           MR. FREDERICK:  We'll object and caution
21 you that based on legislative privilege and to the
22 extent that you have an understanding of the general
23 purpose of the bill, you may answer the question.
24 However, I will instruct you not to answer, on the basis
25 of legislative privilege, the extent it would require

159

1  you to reveal anyone's specific motivation for the bill
2  or subjective personal intent.  But subject to that, you
3  may answer.
4       A.  It's my understanding that it was designed to
5  protect the integrity of the election system and ensure
6  that we uphold One Person, One Vote.
7       Q.  (By Ms. Berkower) How did it do that?
8       A.  It required at least stronger identification
9  than the current system for voting.
10      Q.  And was the law designed to target any
11 particular problem?
12      A.  Not that I'm aware of.
13      Q.  Was it designed to target in-person voter
14 impersonation?
15      A.  I think that was part of the justification for
16 the bill, yes.
17      Q.  What was the rest of the justification for the
18 bill?
19      A.  Again, to enhance voter confidence in the
20 system.
21      Q.  And how did it do that?
22      A.  I think by making people feel like their vote
23 mattered and that it was an honest vote with a system
24 that had integrity.
25      Q.  How did it make them feel that their vote

160

1  mattered?
2       A.  I think that it counted as their one vote, and
3  that they knew that they were the person voting because
4  there was some additional ID required.  That's my
5  personal opinion.
6       Q.  So requiring some additional ID improved voter
7  confidence?
8       A.  I believe so.
9       Q.  Is there anything else that the law targeted?
10 Any other problems?
11      A.  Not that I'm aware of.  There was additional
12 education requirements, but that's -- I think that's
13 always a good thing.
14      Q.  Did the law target mail-in voter fraud?
15      A.  Not that I'm aware of.
16      Q.  Why not?
17           MR. FREDERICK:  Objection, legislative
18 privilege and instruct you not to answer.
19      A.  I can't answer that.
20      Q.  (By Ms. Berkower) Senator Fraser testified in
21 his deposition that before he filed SB 362, he gave
22 notice to your office.  Is that accurate?
23           MR. FREDERICK:  Objection, assumes facts
24 not in evidence.  You may answer.
25      A.  I seem to remember him calling to say he was



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

161

1   filing voter ID legislation, yes.
2       Q.  (By Ms. Berkower) Why did he do that?
3           MR. FREDERICK:  Objection, legislative
4   privilege.  Instruct you not to answer.
5       A.  I can't answer that.
6       Q.  (By Ms. Berkower) Were you involved in the
7   conversation when Senator Fraser called the Lieutenant
8   Governor's Office about filing SB 362?
9       A.  I think I was.
10      Q.  Do you remember the conversation?
11      A.  No.
12      Q.  Do you remember if Senator Fraser indicated why
13  he was filing SB 362?
14      A.  No.
15      Q.  Had Senator Fraser promised the Lieutenant
16  Governor that he would file SB 362?
17      A.  Not that I'm aware of.
18      Q.  Did the Lieutenant Governor ask Senator Fraser
19  to file SB 362?
20          MR. FREDERICK:  Objection, legislative
21  privilege.  Instruct you not to answer.
22      A.  I can't answer that one.
23      Q.  (By Ms. Berkower) Senator Fraser testified in
24  his deposition that he had an in-person meeting with the
25  Lieutenant Governor in his office regarding allowing --

---

162

1   regarding whether or not nonphoto ID should be included
2   in SB 362.  Do you know if that meeting occurred?
3           MR. FREDERICK:  Objection, it assumes
4   facts not in evidence.  You may answer.
5       A.  I don't know whether or not the meeting
6   occurred.  I assume so.
7       Q.  (By Ms. Berkower) Do you know if you prepared
8   the Lieutenant Governor for the meeting?
9       A.  No.
10      Q.  Did you ever have any communications with
11  legislators who opposed SB 362 regarding the purpose of
12  SB 362?
13          MR. FREDERICK:  I'll object on the basis
14  privilege and instruct you that you may answer the
15  specific question of whether you had conversations, but
16  do not reveal the substance of those conversations.
17      A.  I don't remember conversations on Senate Bill
18  362.
19      Q.  (By Ms. Berkower) Conversations with?
20      A.  With senators who opposed the legislation or
21  the purpose of the legislation.
22      Q.  (By Ms. Berkower) So you don't remember any
23  conversations with legislators who opposed 362?
24          MR. FREDERICK:  Objection, asked and
25  answered.  You may answer.

---

163

1       A.  I had conversations about amendments that
2   senators didn't like, but not about the purpose of
3   Senate Bill 362.
4       Q.  (By Ms. Berkower) Do you remember who the main
5   opponents were to SB 362?
6       A.  My memory was that the Democratic senators
7   opposed the legislation.
8       Q.  Were there any outside groups that opposed
9   SB 362?
10      A.  I'm sure there were.  I did not meet with them.
11      Q.  Do you know why the Democratic legislators were
12  opposed to SB 362?
13          MR. FREDERICK:  I'll object on the basis
14  of legislative privilege and instruct you not to answer
15  to the extent that you learned the purpose through a
16  confidential communication.
17          MS. BERKOWER:  Well, I just asked if she
18  knew why -- if she knew why they were opposed.  I didn't
19  ask what the substance of their opposition was.
20          MR. FREDERICK:  Well, I'll instruct you
21  not to reveal the substance of any opposition, but as to
22  whether or not you know, you may answer.
23      A.  No, I don't know.
24      Q.  (By Ms. Berkower) Why they were opposed?
25      A.  Why they were opposed.

---

164

1       Q.  Do you know of any election officials who were
2   opposed to SB 362?
3       A.  I remember questions about implementation and
4   timeline and cost, but I don't remember strong
5   opposition by elections officials.
6       Q.  Do you remember if anyone in the Executive
7   Branch opposed SB 362?
8       A.  I remember concerns about implementation and
9   cost and that sort of thing, but it was implementation
10  related, not opposition to the concept.
11      Q.  Did you take any steps with regard to any of
12  these concerns?
13      A.  Yes.
14      Q.  What did you do?
15          MR. FREDERICK:  I'll object on the basis
16  of legislative privilege and instruct you not to answer
17  the question.
18      A.  Okay.  I can't answer that.
19      Q.  (By Ms. Berkower) Did the Lieutenant Governor's
20  Office play a role in securing passage of SB 362 in the
21  Senate?
22      A.  Yes, insofar as he recognized the senator, he
23  referred it to the committee, he handled the procedural
24  requirements necessary to get the bill passed.
25      Q.  Did he do anything behind the scenes?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 165

1    MR. FREDERICK: Objection, vague.
2    A.   Yeah. I'm going to have to have some more.
3  What do you mean by that?
4    Q.   (By Ms. Berkower) Okay. Did the Lieutenant
5  Governor's Office play a role in attempting to secure
6  passage of SB 362 in the Senate outside of his
7  procedural role as President of the Senate?
8    MR. FREDERICK: I object on the basis of
9  legislative privilege to the extent that it would reveal
10  any nonpublic role, thought process, or private
11  communications.
12    To the extent you can answer generally
13  without revealing that, you may do so.
14    A.   Generally, yes.
15    Q.   (By Ms. Berkower) What was that role?
16    MR. FREDERICK: The same objection and
17  instruction.
18    A.   I can't answer that question.
19    Q.   (By Ms. Berkower) What procedures did the
20  Lieutenant Governor use to ensure that SB 362 would pass
21  the Senate?
22    MR. FREDERICK: I object on the basis of
23  privilege to the extent -- I also object on vagueness.
24  But to the extent this seeks nonpublic communications or
25  actions by the Lieutenant Governor, I instruct you not

---

### 166

1  to answer on the basis of privilege.
2    A.   I think that the Lieutenant Governor followed
3  the rules, the Senate rules, as he is allowed to do, in
4  order to have the legislation heard in committee and
5  then passed on the Senate Floor.
6    Q.   Anything else that he did?
7    MR. FREDERICK: The same instruction and
8  objection.
9    A.   Not that I'm aware of.
10    MS. BERKOWER: Do y'all want to take a
11  five-minute break?
12    MR. FREDERICK: Sure.
13    (Recess from 11:46 a.m. to 11:54 a.m.)
14    Q.   (By Ms. Berkower) So we were talking about SB
15  362 now, in 2009. I guess I have what will be Exhibit
16  104.
17    (Exhibit 104 marked for identification.)
18    Q.   (By Ms. Berkower) Do you know what this is?
19    A.   I'm not familiar with the article.
20    Q.   Is it -- does it appear to be an article from
21  the Dallas Morning News dated January 14, 2009?
22    A.   Yes.
23    Q.   Turning your attention to the fifth and sixth
24  paragraph, can you read those, please?
25    A.   Yes.

---

### 167

1    Q.   Or actually, fourth, fifth, and sixth.
2    A.   (Reading to herself.)
3    Q.   Have you looked at those?
4    A.   Yes.
5    Q.   The article quotes the Lieutenant Governor as
6  saying, "As far as I know, I don't think the two-thirds
7  rule is going to change," in that -- in the 2009
8  legislative session.
9    Do you remember the Lieutenant Governor
10  saying that?
11    A.   No, I don't.
12    Q.   Do you know why he said that?
13    A.   No, I don't.
14    Q.   Would he be the best person to confirm whether
15  he said that and explain why he said that?
16    MR. FREDERICK: Objection, calls for
17  speculation.
18    A.   I assume so.
19    Q.   (By Ms. Berkower) All right.
20    MS. BERKOWER: I have what's going to be
21  Exhibit 105, I guess. Some of these copies are not as
22  good as the others.
23    Thank you.
24    (Exhibit 105 marked for identification.)
25    Q.   (By Ms. Berkower) Can you turn your attention

---

### 168

1  -- well what is this, first?
2    A.   It appears to be a -- the resolution adopting
3  the Senate rules.
4    Q.   Which legislative session is that?
5    A.   For the 2009 session, 81st Legislature.
6    Q.   Can you turn to Rule 5.11.
7    A.   Okay.
8    Q.   Do you know how this provision was adopted in
9  the 2009 Senate rules?
10    A.   The senator's caucus decide on their rules and
11  then bring them to the Floor for adoption and full
12  hearing with the resolution, so I assume they wrote it.
13    Q.   Do you know the circumstances for adopting this
14  particular rule?
15    A.   No. I wasn't in the caucus.
16    Q.   Did you hear anything about it afterwards?
17    MR. FREDERICK: Objection on legislative
18  privilege.
19    Don't reveal the substance of any
20  communication with the legislator or the Lieutenant
21  Governor. Asking the specific question of whether or
22  not you heard anything, you may answer that.
23    A.   Yes, I did.
24    Q.   What was that -- what was it that you heard?
25    MR. FREDERICK: Objection, legislative



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 169

1    privilege.
2             Instruct you not to answer.
3       A.  I can't answer that.
4       Q.  (By Ms. Berkower) Is this the two-thirds rule
5    that we were talking about earlier?
6       A.  Yes.  It -- it is or it's part of it.  Yes.
7       Q.  For purposes of the 2009 legislature?
8       A.  Yes.
9       Q.  Turning your attention to Part D of the rule,
10   can you read that to yourself.
11      A.  Yes.
12      Q.  What does this section do?
13      A.  It allows the Senate to go in to the Committee
14   of the Whole and then set a special order by a majority
15   vote of the Senate and not the two-thirds vote.
16      Q.  Does it allow that for any type of legislation?
17      A.  It is specifically for voter identification
18   requirements.
19      Q.  So what's the effect of this section of the
20   rule?
21      A.  The effect is to allow a special treatment of
22   voter identification legislation.
23      Q.  Why did the rule do that?
24          MR. FREDERICK:  Objection.  Calls for --
25   calls for speculation.  Objection, legislative

---

### 170

1    privilege.
2             Instruct you not to answer.
3       A.  Okay.  I can't answer that.
4       Q.  What was the purpose of exempting voter ID
5    requirements from the rule?
6           MR. FREDERICK:  Same objection.
7             Instruct you not to answer.
8       A.  I can't answer that.
9       Q.  (By Ms. Berkower) Isn't it true that the rule
10   was only changed for purposes of passing a voter ID law?
11          MR. FREDERICK:  Objection, legislative
12   privilege.
13            Instruct you not to answer.
14      A.  I can't answer that.
15      Q.  (By Ms. Berkower) Do you know if the -- why was
16   there special treatment for voter ID law?
17          MR. FREDERICK:  Objection, calls for
18   speculation.  Object to the extent it calls for -- to
19   the extent this question calls for thought processes or
20   confidential privileged communications.
21            I would instruct you not to answer.  So
22   unless you can do so without revealing privileged
23   matters, I'll instruct you not to answer.
24      A.  The senators vote on their rules, not the
25   Lieutenant Governor, and they choose how they want to

---

### 171

1    handle legislation.
2       Q.  (By Ms. Berkower) Okay.  Well, I guess, you
3    used the term "it gives special treatment to voter ID
4    legislation."  So I was wondering what you meant by
5    "special treatment."
6       A.  It requires a different vote count than the
7    remainder of the bills that go through -- that step
8    outside of the regular order of business.
9       Q.  Are you aware of any discussions among members
10   of the legislature to make the rule specific to exempt
11   voter ID from the two-thirds requirement?
12          MR. FREDERICK:  Object, and instruct you
13   not to reveal the substance of any communications but
14   you may answer whether or not you are aware.
15      A.  Yes, I am aware.
16      Q.  What was the substance of those communications?
17          MR. FREDERICK:  Object on the basis of
18   legislative privilege, and instruct you not to answer.
19      A.  I can't answer that.
20      Q.  (By Ms. Berkower) Was the Lieutenant Governor
21   involved any of those communications?
22      A.  Yes.
23      Q.  What was his involvement in those
24   communications?
25          MR. FREDERICK:  Object on legislative

---

### 172

1    privilege to the extent it calls for you to reveal the
2    substance of any conversation between the Lieutenant
3    Governor and another legislator or staff.
4       A.  I can't answer that.
5       Q.  (By Ms. Berkower) Who specifically was involved
6    in those conversations?
7       A.  My memory is that Senator Whitmire, Senator
8    Williams -- well, at least a half dozen senators came to
9    tell the Lieutenant Governor they were changing the
10   rules on this issue.
11      Q.  Why did they come to tell him that?
12          MR. FREDERICK:  Objection, calls for
13   speculation, and object on privilege to the extent it
14   calls for their thought process.
15            If you know why independently of that, you
16   may answer.
17      A.  Typically, give him a courtesy telling him when
18   they're changing their rules.
19      Q.  (By Ms. Berkower) You mean changing the rules
20   from the rules from the previous legislative session?
21      A.  Yeah.  Anytime they change the rules.
22      Q.  Can they change the rules midway through the
23   legislative session?
24      A.  Yes, I think they can.
25      Q.  Do you know of any time that's happened?

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

### 173

1    A.  Not that I can think of.
2    Q.  Were you involved in the meeting when the
3  senators came to tell the Lieutenant Governor that they
4  were going to change the rules for voter identification?
5    A.  Not after letting them in the room.
6    Q.  Did you discuss that conversation with the
7  Lieutenant Governor after they left?
8    A.  Yes, I think I did.
9    Q.  What did the Lieutenant Governor tell you?
10       MR. FREDERICK:  Objection, legislative
11  privilege.
12       Instruct you not to answer.
13    A.  I can't answer that.
14    Q.  (By Ms. Berkower) Did the Lieutenant Governor
15  favor the rule change?
16       MR. FREDERICK:  Objection, legislative
17  privilege.
18       Instruct you not to answer.
19    A.  I can't answer that.
20    Q.  (By Ms. Berkower) Do you know if the Lieutenant
21  Governor had a position on the rule change?
22    A.  Yes.
23    Q.  What was that position?
24       MR. FREDERICK:  Objection, legislative
25  privilege.

### 174

1       Instruct you not to answer.
2    Q.  (By Ms. Berkower) How many other times has the
3  two-thirds rule been suspended during the time in which
4  you've worked in this -- for the Lieutenant Governor?
5    A.  Oh, thousands of times.  It's -- the suspension
6  of the -- wait a minute, let me make sure I understand
7  the question.  How many times have the senators voted to
8  suspend the regular order of business?  So it's a -- are
9  you asking how many times they're using the two-thirds
10  rule or let me ask -- will you --
11    Q.  I can restate.  Sorry.
12    A.  Yes.
13    Q.  Do you know of any other instances in which a
14  particular type of legislation was specifically exempted
15  from the two-thirds requirement by the Senate rules?
16    A.  Yes.  In the history of the Senate, I know it's
17  been done for re-districting at some point, I don't
18  remember when.  But that's my memory, it's been done for
19  re-districting.
20    Q.  Do you know when it was re-done for
21  re-districting?
22    A.  No, I don't remember.
23    Q.  Was it done in the past five years for
24  re-districting?
25    A.  My guess is no.  Probably the last twenty

### 175

1  years.
2    Q.  Okay.  Are you aware of any public statement
3  that was made by any legislator regarding why the rule
4  was changed for the class of voter ID legislation?
5    A.  Not that I remember.
6    Q.  Are you aware of any public statement made by
7  the Lieutenant Governor regarding why the rule was
8  changed?
9    A.  No.  Other than this Dallas Morning News
10  article that you gave me.
11    Q.  Would SB 362 have passed the Senate if it had
12  not adopted Rule 5.11 as contained in the 2009 Senate
13  rules?
14       MR. FREDERICK:  Objection, calls for
15  speculation.
16    Q.  (By Ms. Berkower) You may answer.
17    A.  I don't remember the exact vote count but I
18  think that it was along party lines and therefore would
19  not have met the two-thirds rule.  That doesn't mean
20  that it couldn't have gone through the regular order of
21  business and been handled that way.
22    Q.  Using a two-thirds majority, you mean?
23    A.  No.  You don't have to.  You can go in the
24  regular order of business.
25    Q.  Oh, okay.  Given that was Number 362, is that a

### 176

1  realistic option?
2    A.  Honestly, if you sat there and gaveled through
3  the whole thing, it's possible.
4    Q.  Have you seen that happen before?
5    A.  Not in the Senate.
6    Q.  Where --
7    A.  You do sometimes in the House.
8    Q.  Are you aware of any other communications
9  related to any other real modifications to the 2009
10  Senate rules with regard to voter ID bills?
11    A.  Not that I remember.
12    Q.  Was SB 362 considered by any Senate committees?
13    A.  Yes.
14    Q.  Which one?
15    A.  It went to the Committee of the Whole.
16    Q.  Is that the usual procedure?
17       MR. FREDERICK:  Objection, vague;
18  objection, form.
19    A.  It's a usual procedure to send the bill to
20  committee.
21    Q.  (By Ms. Berkower) Why did the bill get sent
22  directly the Committee of the Whole?
23       MR. FREDERICK:  Objection to the extent it
24  calls for the Lieutenant Governor or any legislator's
25  thought process or any privileged communications.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

177

```
1            I instruct you not to answer.  If you know
2    independent of that and can answer without revealing it,
3    you may answer.
4         A.   The Lieutenant Governor chose to send it to the
5    Committee of the Whole.  It is consistent with the Rule
6    D, and predictable from the senators because they put it
7    in their rules.
8         Q.   (By Ms. Berkower) Uh-huh.
9         A.   So, one could argue that he was following the
10   rules.
11        Q.   You mean the rules directed him to send it?
12        A.   They don't directly direct him to, however, the
13   pathway is pretty clear right here.
14        Q.   So the senators themselves indicated they
15   wanted it as part of the rule for voter ID legislation
16   to be considered primarily by the Committee of the
17   Whole?
18        A.   The senators wrote that rule not the Lieutenant
19   Governor.
20        Q.   Under the rules, did the Senate -- did the --
21   excuse me -- the Lieutenant Governor have the authority
22   to refer voter ID legislation to other committees?
23        A.   Yes, he did.
24        Q.   But he still chose to refer it to the Committee
25   of the Whole?
```

---

179

```
1            MR. FREDERICK:  Objection, misstates prior
2    testimony.
3            You may answer.
4         A.   I did not say that.  I think the senators
5    contemplated that bill going to the Committee of the
6    Whole, but it doesn't direct him to send it to the
7    Committee of the Whole.  The rule does not --
8         Q.   Do you know why -- oh, excuse me.
9            Do you know why the senators might have
10   wanted the bill to go straight to the Committee of the
11   Whole?
12           MR. FREDERICK:  Objection, calls for
13   speculation.  Objection to the extent it calls for the
14   thought process of any legislator.
15           You may, however, answer the specific
16   question whether or not you know why.
17        A.   I don't know why.
18        Q.   (By Ms. Berkower) What was the purpose of
19   assigning SB 362 to the Committee of the Whole?
20           MR. FREDERICK:  I'll object to the extent
21   it calls for any legislator or Lieutenant Governor's
22   thought process or any privileged communications.
23           But if you can identify a purpose without
24   revealing that, you may do so.
25        A.   Generally, the Lieutenant Governor sends a bill
```

---

178

```
1         A.   Yes, he did.
2         Q.   Why didn't it go to the State Affairs
3    Committee?
4            MR. FREDERICK:  Objection, legislative
5    privilege.
6            Instruct you not to answer, unless you can
7    do so without revealing mental impressions, thought
8    process, or privileged communications.
9         A.   I don't think I answer that.
10        Q.   (By Ms. Berkower) Ms. McCoy said in her
11   deposition it was unusual for a bill to go straight to
12   the Committee of the Whole.  Do you agree with that?
13           MR. FREDERICK:  Objection, relevance.
14   Objection, assumes facts not this evidence.
15           You may answer.
16        A.   The Committee of the Whole is unusual, however,
17   it is used when the Lieutenant Governor wants to ensure
18   that all 31 senators hear the same information, the same
19   testimony, the same public input, and that was the case
20   with this legislation as it had been with other
21   legislation during his time as Lieutenant Governor.
22        Q.   (By Ms. Berkower) I thought you said, though,
23   that the senators indicated that they wanted it to go
24   straight to the Committee of the Whole through passing
25   Rule 5.11?
```

---

180

```
1    to the Committee of the Whole when he wants to ensure
2    that all 31 senators have the exact same access to the
3    exact same information, the exact same testimony, that
4    exact same opportunity to ask witnesses questions, which
5    is not the case when it goes to a smaller committee.
6    And when he wants to sure -- make sure that everybody
7    has the same information access, it's a fairness issue.
8         Q.   (By Ms. Berkower) Do you know why he thought it
9    was important for SB 362 to go to the Committee of the
10   Whole?
11           MR. FREDERICK:  Objection, to the extent
12   it calls for his -- the Lieutenant Governor's thought
13   process.
14           You may, however, answer the specific
15   question whether or not you know why.
16        A.   I don't know why.
17        Q.   (By Ms. Berkower) What was the Lieutenant
18   Governor's role during the consideration of SB 362 when
19   it was before the Committee of the Whole?
20        A.   The procedure for going in to the Committee of
21   the Whole means that -- requires that the Lieutenant
22   Governor steps down from the dais and actually functions
23   as one the senators.  And so then another senator
24   manages the Committee of the Whole and that senator is
25   designated by the Lieutenant Governor.  And the
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

181

1   Lieutenant Governor can act as a senator or committee
2   member for the period of consideration under the
3   Committee of the Whole.
4      Q.   You said he can act?
5      A.   Uh-huh.
6      Q.   Does the senator who is now on the dais get to
7   act as a full senator?
8      A.   Yes, I think so.
9      Q.   So that senator doesn't lose any of his powers?
10     A.   No, I don't think so.  No.
11     Q.   How is a hearing organized for when the Senate
12  is meeting in the Committee of the Whole?  Who calls the
13  meeting?
14     A.   Oh, well, the Lieutenant Governor has to refer
15  the bill to the Committee of the Whole.  At that point,
16  then he has to designate somebody to chair the Committee
17  of the Whole.  Next the Chair of the Committee of the
18  Whole has to call the Senate in to the committee and
19  they have to adopt rules for -- to operate under, for
20  the purposes of the committee.  And then they conduct a
21  regular committee hearing.
22     Q.   How does -- who decides which witnesses are
23  heard from?
24     A.   I guess it's a responsibility of the Chair of
25  the committee, but the senators were asked who they'd

---

182

1   like to have testimony -- testify and, of course,
2   there's public testimony so anybody who wanted to come
3   speak, can.
4      Q.   When the Senate is meeting as the Committee of
5   the Whole, does that mean the Lieutenant Governor also
6   gets to call witnesses?
7      A.   You know, "call witnesses" is a not a term we
8   typically use.
9      Q.   Invite witnesses?
10     A.   Typically, it's the Chair of the Committee that
11  determines what witnesses are invited and not the
12  members of the Committee that ask witnesses.  But we did
13  help call people to come testify.
14     Q.   For SB 362?
15     A.   I know we did with 14, I don't know if we did
16  with 362.
17     Q.   Does Lieutenant Governor get to recommend
18  certain witnesses when the Senate is meeting in the
19  Committee of the Whole?
20     A.   I think all senators can recommend.
21     Q.   But it's at the discretion of whoever's
22  presiding whether or not to call them?
23     A.   I think that's correct.
24     Q.   Do you know if any witnesses from groups
25  representing minority voters were heard from on SB 362?

---

183

1      A.   Yes, I believe so.
2      Q.   Were you personally involved in selecting any
3   witnesses who testified with regard to SB 362?
4      A.   Not that I remember.
5      Q.   Did you attend the committee meeting for the
6   Committee of the Whole for SB 362?
7      A.   Parts of it, yes.  I was in and out.
8      Q.   Do you remember it?
9      A.   Vaguely.
10     Q.   During the debate on SB 362, did anyone raise
11  concerns about its impact on minority voters?
12     A.   I don't remember that.  They could have.
13     Q.   But you don't remember any?
14     A.   I don't remember the testimony.
15     Q.   Do you remember if the Lieutenant Governor
16  responded in any way to concerns raised about the impact
17  on minority voters?
18     A.   Not that I remember.
19     Q.   Do you know if SB 362 changed at all in
20  response to concerns about its impact on minority
21  voters?
22     A.   I don't remember it.
23          MS. BERKOWER:  I guess this is going to be
24  Exhibit 33 previously marked.
25          (Exhibit 33 remarked for this deposition.)

---

184

1      Q.   (By Ms. Berkower) Do you know what this is?
2      A.   It's the Senate Journal for Wednesday March 18,
3   2009.
4      Q.   Do you remember if you were in attendance that
5   day?
6      A.   Typically, I'm on and off the Floor lots and
7   lots of times during the course of the day, so I'm sure
8   I was present but not on the Floor the whole time.  I
9   know I was at work that day.
10     Q.   How do you know that?
11     A.   Because I didn't ever miss a day of the
12  session.
13     Q.   That's a good way to remember.
14     A.   Yes.
15     Q.   Can you turn your attention to Page 591,
16  please.  Do you see there's something, an entry that
17  says it's the Statement Regarding Votes Cast on Senate
18  Bill 362?
19     A.   Yes.
20     Q.   Do you remember this statement?
21     A.   No, I don't.
22     Q.   Do you know what it is now that you have
23  reviewed it?
24     A.   Yes.
25     Q.   What is it?

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 185

1     A.   It's a statement that Senator West submitted on
2  behalf of -- one, two, three, four, five, six, seven,
3  eight, nine -- ten democratic senators.
4     Q.   And does the statement specify that eight of
5  those democratic senators are ethnic minorities?
6     A.   Yes.
7     Q.   What was the content of this statement?
8     A.   He opposed the -- Senator West authored the
9  statement opposing the process for handling the voter ID
10 legislation.
11    Q.   Does the statement note that all of the ethnic
12 minorities in the Senate opposed that bill?
13    A.   Yes.
14    Q.   Why do you think these senators felt the need
15 to submit, for the record, a statement that all racial
16 and ethnic minorities voted against the voter ID
17 legislation?
18         MR. FREDERICK:  Objection, calls for
19 speculation.  Objection, based on privilege, to the
20 extent that this would call for you to reveal the
21 substance of any conversation with one of these
22 senators.
23    A.   I don't know.
24    Q.   (By Ms. Berkower) What is your opinion of their
25 unified opposition to SB 362?

## 186

1          MR. FREDERICK:  Objection, relevance.
2     A.   We frequently have votes where members disagree
3  with the -- with the way -- with a bill.  So we
4  frequently have a non-unanimous bill.  It happens.
5     Q.   (By Ms. Berkower) Do you ever have a bill where
6  all of the ethnic minorities of the Senate vote together
7  with and submit a statement that they all voted against
8  this particular legislation together?
9          THE WITNESS:  You want to say --
10         MR. FREDERICK:  Object, relevance.
11         But you may answer.
12    A.   I am -- I am sure that we have had numerous
13 bills where all minorities voted against them.  However,
14 the statement in the Journal is unusual.
15    Q.   (By Ms. Berkower) Do you -- did you believe
16 that these senators' concerns about the impact of the
17 bill on minority voters was genuine?
18         MR. FREDERICK:  Objection.  Objection,
19 relevance and objection based on legislative privilege.
20 I instruct you not to answer the question.
21         MS. BERKOWER:  Well, I just asked if she
22 believed that their concerns were genuine.
23         MR. FREDERICK:  Well, to the extent,
24 that's asking for her thought process at the time while
25 the bill is pending, as member of the Lieutenant

## 187

1  Governor's staff, I believe that's privileged.
2          I would instruct her not to answer.
3     A.   I can't answer that.
4     Q.   (By Ms. Berkower) Do you have an opinion as to
5  whether or not these senators' opposition was genuine?
6          MR. FREDERICK:  Objection,
7  relevance.  Same objection on privilege.
8          Instruct you not to answer.
9     A.   Sorry, I can't answer that.
10         MS. BERKOWER:  I just asked if she has an
11 opinion, not what it was.
12         MR. FREDERICK:  But you're asking the same
13 thing.  I mean, you're asking for an opinion.
14         MS. BERKOWER:  I said, "Do you have an
15 opinion concerning whether these minority senators'
16 concerns were genuine," not "what was your opinion."
17         MR. FREDERICK:  Fair enough.  I will
18 object on the grounds of relevance.
19         But you may answer the question whether or
20 not you have an opinion.
21    A.   I don't have an opinion about whether or not
22 their concerns as expressed in this statement are
23 legitimate or that they believed in them.
24    Q.   (By Ms. Berkower) Do you believe they were
25 acting in good faith in raising concerns about the

## 188

1  impact of the bill on minority voters?
2          MR. FREDERICK:  Objection, relevance.
3  Objection, legislative privilege.
4          Instruct you not to answer.
5     A.   I can't answer that.
6     Q.   (By Ms. Berkower) Did you have any concerns
7  that if the state did not respond to these minority
8  senators' concerns, it might threaten the preclearance
9  of SB 362?
10         MR. FREDERICK:  Objection, relevance.
11 Objection, legislative privilege.
12         Instruct you not to answer.
13    A.   I can't answer that.
14         MS. BERKOWER:  I just asked if she had
15 concerns, not what the concerns were.
16         MR. FREDERICK:  Yeah.  I'll stick to the
17 instruction.  I mean, the question implies the substance
18 of the concerns, so answering would reveal the substance
19 of her thought process.
20         So I'll instruct you not to answer the
21 question on the basis of legislative privilege.
22    Q.   (By Ms. Berkower) Are you going to answer?
23    A.   No.
24    Q.   Was it true that some legislators and members
25 of the public stayed up all night during consideration



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

### 189

1  of SB 362?
2      A.  Yes.
3      Q.  Why do you think there was such strong
4  opposition to SB 362?
5          MR. FREDERICK:  Objection, relevance.
6      Q.  (By Ms. Berkower) You may answer.
7      A.  I think, at the point -- at this point in the
8  legislative session, after several versions of this
9  legislation, that the -- that both parties were actively
10 opposed -- you know, working the members, but I did not
11 participate in any of that -- those conversations.  It
12 was my impression that both the Democratic Party and the
13 Republican Party were pushing their members to vote
14 accordingly.
15     Q.  When you said "working the members," what do
16 you mean by that?
17     A.  Contacting them to ask them to vote either for
18 the legislation or against the legislation.
19     Q.  And when you say the Democratic Party and
20 Republican Party, do you mean the Democratic Party of
21 Texas and the Republican Party of Texas?
22     A.  Yes.
23     Q.  Anybody else?
24     A.  Not that I'm aware of.
25     Q.  Do you know why the parties were asking their

### 190

1  members to vote in a particular way?
2          MR. FREDERICK:  Objection, calls for
3  speculation.
4          You may answer.
5      A.  I do not know.
6      Q.  (By Ms. Berkower) Were there any amendments to
7  the SB 362 during the Senate Floor consideration?
8      A.  I don't remember.
9          (Exhibit 106 marked for identification.)
10     Q.  (By Ms. Berkower) Do you know what this is?
11     A.  Yes.
12     Q.  What is it?
13     A.  This is the legislative history for Senate Bill
14 362.
15     Q.  Does it refresh your memory as to whether or
16 not there are any amendments to SB 362 during Floor
17 consideration?
18     A.  Yes.  This reported favorably without
19 amendments, so, yes.  No, now, I remember.  They did not
20 amend it in committee, they said they would offer
21 amendments on the Floor.
22     Q.  Do you remember any amendments that were made
23 on the Floor?
24     A.  I know that there are a group of them
25 submitted, and they were distributed to the senators in

### 191

1  advance.  And I just don't remember what they all were,
2  but, yes.
3      Q.  Did any of them get included, do you know?
4      A.  Yes, obviously.  It's listed here.
5      Q.  Do you know which ones got included?
6      A.  No.  I don't remember what the amendments did.
7      Q.  Do you know if any of the amendments addressed
8  concerns of minority legislators and minority voters?
9          MR. FREDERICK:  Object on the basis of
10 privilege.
11         But you may answer whether or not you
12 know.
13     A.  I just don't remember the amendments.  No, I
14 don't know.
15     Q.  (By Ms. Berkower) Did you have any role once SB
16 362 was referred to the house?
17     A.  No.
18     Q.  Did the Lieutenant Governor?
19     A.  No.  He may have told the Speaker it was on its
20 way, but beyond that, no.
21     Q.  Does the Lieutenant Governor usually have a
22 role in Senate bills that get sent to the House?
23     A.  No.
24     Q.  What happened to SB 362 in the House?
25     A.  The vote was considered in public hearing and

### 192

1  then it was sent to calendars and it was placed on the
2  major state calendar, but it was the very end of the
3  session, and so the bill died.  It was not heard on the
4  House Floor.
5      Q.  So just to close a loop:  With the exception of
6  SB 362, are you aware of any other election-related
7  bills that the Lieutenant Governor referred directly to
8  the Committee of the Whole?
9          MR. FREDERICK:  Objection, vague.
10         But you may answer.
11     A.  I don't remember any election-related bills.  I
12 know there was school finance that went.  Maybe some tax
13 stuff went to the Committee of the Whole.  But I don't
14 remember elections.
15     Q.  (By Ms. Berkower) And how common or uncommon is
16 it for a bill to be referred directly to the Committee
17 of the Whole?
18     A.  It's -- it's not common but it is done.
19     Q.  In what circumstances is it usually done?
20     A.  As I answered earlier, when for some reason or
21 another the Lieutenant Governor feels it's important for
22 all of the senators to have the same information at the
23 same time and have the opportunity to examine all the
24 witnesses, which does not happen in a committee process
25 where not all senators are present on the committee.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

193

1        MS. BERKOWER:  I think we can take a lunch
2    break now if you guys want.
3        MR. FREDERICK:  Sure.
4        MS. BERKOWER:  Like a half hour.
5        Go off the record.
6        (Recess from 12:26 p.m. to 1:06 p.m.)
7    Q.   (By Ms. Berkower) Okay.  So just a couple more
8    questions about SB 362.
9    A.   Okay.
10   Q.   And then we'll move on.  Do you know of any
11   communications regarding SB 362 and the adverse impact
12   it may have on minority voters?
13       MR. FREDERICK:  Object to the extent it
14   calls for the substance of communications based on
15   legislative privilege.
16       But as to the question of whether or not
17   you're aware, you may answer.
18   A.   Communications with -- on -- not that I
19   remember.
20   Q.   (By Ms. Berkower) Who is Jennifer Fagan?
21   A.   She is the committee coordinator.  She's in
22   charge of the State Affairs Committee.
23   Q.   Is she a lawyer?
24   A.   Yes, I believe she is.
25   Q.   Does she work for a particular legislator?

194

1    A.   Yes, she works for Senator Duncan.
2    Q.   So does she have a dual role as an employee of
3    the committee or she just works for him and he's on the
4    committee?
5    A.   He's the chair of the committee and she works
6    for him.  So she is his staff person that manages the
7    committee.
8    Q.   Oh, okay.  So do you know if anyone else in the
9    Lieutenant Governor's Office had communications with her
10   or anybody else concerning the impact that SB 362 may
11   have had on minority voters?
12       MR. FREDERICK:  I'll object to the extent
13   it calls for the substance of the communication, but to
14   the extent it asks whether you were aware, you may
15   answer.
16   A.   I'm not aware of the communication.
17   Q.   (By Ms. Berkower) What, if any, steps did --
18   were taken by the Lieutenant Governor's Office in 2009
19   to determine if HB 362 had an adverse impact on minority
20   voters?
21       MR. FREDERICK:  Objection, legislative
22   privilege.
23       Instruct you not to answer.
24   A.   I can't answer that.
25   Q.   (By Ms. Berkower) Okay.  After the 2009

195

1    legislative session ended, were you involved in any
2    discussions concerning plans to introduce another voter
3    ID bill in the next legislative session?
4    A.   I probably should have looked this up.  I don't
5    remember if we charged State Affairs with studying voter
6    ID after the 2007 session or after the 2009 session.  We
7    did it one of those times and I just didn't double
8    check, so it could be.  I mean, I don't remember if that
9    was after the 7 session or the 9 session.
10   Q.   And when you say "you charged the State Affairs
11   Committee," what do you mean by that?
12   A.   The Lieutenant Governor issued an interim
13   committee charge to the State Affairs Committee asking
14   them to study voter ID.  It's a longer charge than that,
15   but that's the substance of it.
16   Q.   Is the idea that the State Affairs Committee
17   would have some sort of recommendation at the end?
18   A.   Yes.  All interim committee charges are issued
19   with the assumption that the committees will make
20   recommendations or issue a statement that there doesn't
21   need to be any change to the law.
22   Q.   Do they ever draft the actual legislation
23   themselves?
24   A.   Yes.
25   Q.   So is it possible that at the end of the

196

1    interim charge, the committee would have some sort of
2    new piece of legislation to introduce?
3    A.   That's the purpose of interim committee
4    charges, is that, if there's an opportunity to prepare
5    materials during the interim when people are not really
6    busy and that -- that staff work and the background
7    research is done during that period of time.
8    Q.   Okay.  How -- and how does the Lieutenant
9    Governor decide which committee will be studying a
10   particular issue?
11       MR. FREDERICK:  Objection, privilege to
12   the extent it calls for his thought process.
13       But if you can answer, generally, without
14   revealing that, you may do so.
15   A.   Generally, he sends charges related to a
16   subject matter to the committee that would deal with
17   that subject matter if legislation was filed on that
18   issue.
19   Q.   (By Ms. Berkower) Has the Committee of the
20   Whole ever been given an interim charge?
21   A.   No, not that I'm aware of.
22   Q.   Why not?
23       MR. FREDERICK:  Objection, calls for
24   speculation.  And I'll object that it calls for
25   privileged matter.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

197

1       But if you can answer without revealing
2   that, you may answer.
3       A.  The Committee of the Whole doesn't have
4   standing staff.  It's not a standing committee that
5   operates during every session and, therefore, there's no
6   one there to manage any background research during an
7   interim.
8       Q.  (By Ms. Berkower) So if -- if the Committee of
9   the Whole considered a bill during the regular session,
10  would the Lieutenant Governor then have to decide to
11  assign an interim charge to a different committee?
12      A.  No.  I assume he has the ability to charge the
13  Committee of the Whole with studying something as well.
14  It's not prohibited in the rules.
15      Q.  But it's never happened, to your knowledge?
16      A.  Not to my knowledge.
17      Q.  And doesn't sound like it would be very
18  practical?
19      A.  That's my thought.
20      Q.  So after the 2009 legislative session ended,
21  did you speak to anyone else in the Lieutenant
22  Governor's Office about a subsequent voter ID bill to be
23  introduced in the next legislative session?
24      A.  Not that I remember.  Unless it was an interim
25  committee charge during that time.  I'm sorry, I didn't

---

198

1   check.
2       Q.  Do you know if you discussed any news articles
3   with other legislative -- sorry -- lieutenant Governor's
4   staff members about voter ID during that interim period?
5       A.  I remember reading quite a few news article
6   following the session on voter ID, but I don't know that
7   our staff gave them to me.  It my have been I just read
8   them in the clips or -- just because I read that kind
9   stuff or read legislative issues in the clips.
10      Q.  What do you remember reading about voter ID?
11      A.  I know there were a series of articles.  Some
12  of them mentioned the polling data where the public was
13  generally, like, 70 percent favorable on the voter ID
14  legislation.  I remember articles that were
15  pro-supportive of voter ID and articles that were
16  opposed to voter ID initiatives.  That's generally all I
17  remember.
18      Q.  Do you remember the details of any of the
19  arguments in favor or against voter ID?
20      A.  Not that I can attribute to a specific news
21  article.
22      Q.  Generally, what were the arguments in favor or
23  against?
24      MR. FREDERICK:  Object to relevance.
25      Q.  (By Ms. Berkower) If you remember.

---

199

1       A.  Yeah, I mean, during the course of looking at
2   all the voter ID bills, I think there's, besides the
3   people who have been proponents of legislation have said
4   we need to have a process that ensures the integrity of
5   the voting process, One Person, One Vote, and you know
6   that the person making the vote is the person whose name
7   is on the voter registration rolls, and that that
8   enhances the integrity of the process.  And then
9   opponents to the process have generically said not
10  everybody has an ID; therefore, we shouldn't keep them
11  from voting just because they don't have an ID.
12      Q.  Did any of these arguments impact your views on
13  any futures voter ID legislation that may be introduced?
14      MR. FREDERICK:  Objection, legislative
15  privilege.
16      Instruct you not to answer.
17      MS. BERKOWER:  I asked if it impacted, not
18  how it impacted.
19      MR. FREDERICK:  Can you ask the question
20  again, please.
21      Q.  (By Ms. Berkower) I said did any of the news
22  articles -- or in so many words I said.  Did any of the
23  news articles impact your views on any future voter ID
24  legislation that may be introduced?
25      MR. FREDERICK:  Same objection.

---

200

1       You can answer whether or not they did.
2       A.  Not that I remember.  But I don't think my
3   personal views are relevant.  I don't sponsor or author
4   legislation.
5       Q.  (By Ms. Berkower) But you advise the Lieutenant
6   Governor on legislation, don't you?
7       A.  Mostly I provide him the information, pros and
8   cons, and he makes up his own mind.
9       Q.  But if you do research and you supervise the
10  research, don't you gather it together and pick what you
11  think is most relevant and provide that to him?
12      MR. FREDERICK:  Objection, assumes facts
13  not in evidence.
14      A.  We do provide him briefing materials on a
15  regular basis.  But he makes up his own mind how he
16  feels about issues.
17      Q.  (By Ms. Berkower) So is he the only one we can
18  ask about his views on issues?
19      MR. FREDERICK:  Objection, relevance.
20  Objection, calls for speculation.
21      A.  I wouldn't presume to talk for him.
22      Q.  (By Ms. Berkower) Is he the only person who can
23  speak for him?
24      A.  I would assume so, yes.
25      Q.  Did you speak to any legislators or their staff

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER

MAY 29, 2012

---

## 201

1    in the interim period between the 2009 and 2011
2    legislative sessions about voter ID?
3        A.   If that's when we did the interim charge, I
4    would have; but I just don't remember if it was between
5    7 -- after the 7th session or after the 9 session.
6        Q.   During the interim charge that you're thinking
7    about, do you remember who you spoke with?
8        A.   I would have spoken with the committee staff,
9    probably Senator Duncan as well.
10       Q.   Which committee staff?
11       A.   Senate State Affairs.
12       Q.   Why?  Is that the because they were charged
13   with the --
14       A.   Yes.
15       Q.   Do you remember what was discussed?
16           MR. FREDERICK:  Objection.  Object on the
17   basis of privilege.
18           You may identify the general subject
19   matter of the discussion but you may not reveal the
20   substance of any conversation with the staff member or
21   legislator.
22       A.   Typically when I talk to people, Governor
23   Dewhurst typically issues well over a hundred charges
24   out to all of the committees, typically, in late January
25   or early February, following the legislative session.

---

## 202

1    And at that point, then the committees all call and go,
2    "Who asked are for this?  Who asked for that?  What do
3    you want us to do on this?  How do you -- do we have to
4    have more hearings than one hearing?  Can we have more?
5    What do we need to do?  Is there something else you're
6    thinking about this?  Can you give us additional
7    information?"  I have those kinds of conversations with
8    people all the time and those would have been consistent
9    with what -- conversations I would have had for all of
10   the charges that went out to any committee.
11       Q.   Do you know of any decisions that were made
12   concerning introduction of voter ID legislation in the
13   2011 legislative session before the session started?
14       A.   No.  Senator Fraser did that.
15       Q.   So you were not involved in any decisions about
16   the introduction of voter ID legislation prior to the
17   2011 legislative session?
18       A.   I was not.
19       Q.   Was there a photo ID bill introduced in the
20   Senate in 2011?
21       A.   Yes, there was.
22       Q.   Was it SB 14?
23       A.   Yes.
24       Q.   Did Senator Fraser introduce it?
25       A.   Yes.

---

## 203

1        Q.   He testified in his deposition that he started
2    to work on it on May 31, 2009.  Do you know if that's
3    accurate?
4            MR. FREDERICK:  Objection, assumes facts
5    not in evidence.
6        A.   I don't -- I don't know.
7        Q.   (By Ms. Berkower) Did Lieutenant Governor or
8    anyone in his office have any conversations prior to May
9    31, 2009 about SB 14?
10       A.   No, not that I'm aware of.
11       Q.   Did Lieutenant Governor or anyone in his office
12   have any conversations after May 31, 2009 about SB 14
13   before it was introduced?
14       A.   Yes, but I need to clarify:  Senator Fraser
15   introduced a piece of legislation in November, I believe
16   it was November of -- prior to the 2011 session.  So it
17   would have been November 2010.  And then he refiled that
18   piece of legislation as Senate Bill 14.
19           Governor Dewhurst had reserved the number
20   Senate Bill 14 and so Senator Fraser chose what he was
21   going to file, filed it, and then refiled that same
22   piece of legislation as Senate Bill 14.
23           So after the original filing of the voter
24   ID legislation, and before it was refiled as Senate Bill
25   14, he had a conversation with Governor Dewhurst who

---

## 204

1    gave it the number 14, Senate Bill 14.
2        Q.   Okay.  So just to make sure I understand.  You
3    can -- a senator can introduce -- can file legislation
4    before the opening of the legislative session?
5        A.   Yes.
6        Q.   What happens after that?
7        A.   Okay.
8            MR. FREDERICK:  Objection, vague.
9        A.   Can you ask me better?
10       Q.   Well, I'm sorry, sorry.  I can.
11           Why did he need to refile it?
12       A.   He didn't have to refile it.  But the fact that
13   it had a low bill number is an indicator that it is a
14   priority for the legislative session.
15       Q.   Okay.  So when he filed it in November 2010,
16   did have a low bill number?
17       A.   No.  And that's why he refiled it --
18       Q.   Oh.
19       A.   -- as Senate Bill 14.  He -- the senators --
20   the Lieutenant Governor reserves the first 20 bill
21   numbers, sometimes 25, and then he hands them out to
22   senators for specific types of bills.  Sometimes the
23   senators ask for them as priority bill numbers and
24   sometimes the Lieutenant Governor asks them to file
25   legislation on a given topic.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 205

1    This was a case of Senator Fraser filed
2  what he wanted to file and Governor Dewhurst asked him
3  to refile it, again, as another bill number.
4    Q.   So the 1 through 25 are reserved for --
5    A.   1 through 20.
6    Q.   -- legislative priorities?
7    A.   Yes.
8    Q.   And Senator Fraser asked Lieutenant Governor
9  Dewhurst if he could --
10   A.   Use one of those numbers.
11   Q.   -- use one of those numbers reserved for
12 legislative priorities?
13   A.   Yes.
14   Q.   Do you know if Lieutenant Governor Dewhurst
15 spoke with Senator Fraser before he first filed the bill
16 in November 2010?
17   A.   I don't think he did.  I'm not aware of that
18 conversation.
19   Q.   So was the Lieutenant Governor involved in any
20 development of the bill before it was filed in November
21 2010?
22   A.   No.  I don't remember that.
23   Q.   Was anyone else in your office?
24   A.   I don't -- I don't think so.
25   Q.   If someone was, who would have person have

## 206

1  been?
2    A.   Probably Bryan Hebert.
3    Q.   Were you?
4    A.   I was not.
5    Q.   How did SB 14 come to be designated as
6  emergency legislation?
7    A.   The Governor gets to decide what he determines
8  to be legislative emergencies.
9    Q.   Does Lieutenant Governor have a role in that
10 process?
11   A.   No, he doesn't.
12   Q.   Does he ever talk to the Governor before
13 legislative emergencies are designated?
14   A.   Well, he talks to the Governor frequently, and
15 I think the Governor's Office gave us a heads up they
16 were about to do it, but they didn't ask us should we do
17 that.  They typically do give us some short period of
18 time heads up before it hits the press.
19   Q.   Do you know how the Governor's Office decides
20 which pieces of legislation will be designated as
21 emergency legislation?
22   A.   No, I don't.
23   Q.   Do you know if the Lieutenant Governor asked
24 for a voter ID to be given that designation?
25   A.   No, I don't.

## 207

1    Q.   What are the consequences for a bill to have
2  this designation?
3    MR. FREDERICK:  Objection, vague.
4    Q.   (By Ms. Berkower) What are the consequences for
5  a bill to be deemed emergency legislation -- legislative
6  emergency?
7    A.   The rules allow a bill to be heard on the
8  Senate Floor in advance of the 60-day deadline, if it's
9  designated emergency by the Governor.
10   Q.   Does it automatically get considered within the
11 first 60 days?
12   A.   No.
13   Q.   It's just permitted?
14   A.   Yes.
15   Q.   Did you have communications with Senator
16 Fraser's staff about the emergency -- about the
17 emergency designation?
18   A.   I don't remember it, but it -- but I could
19 have.
20   Q.   Do you know if Bryan Hebert had any such
21 communications with Senator Fraser's staff?
22   A.   I don't.
23   Q.   Do you know if Blaine Brunson had any
24 communications with Senator Fraser's staff about the
25 emergency designation?

## 208

1    A.   I don't.
2    Q.   Do you know if the Lieutenant Governor sent
3  Senator Fraser a letter on January 20th concerning SB
4  14?
5    A.   I don't remember a letter.
6    Q.   If he did, would you have drafted it?
7    A.   No.  I probably would not have drafted it.
8    Q.   Who would have drafted it?
9    A.   Maybe Bryan, maybe -- maybe Blaine.
10   Q.   Is this something you would have reviewed
11 before it went out?
12   A.   Maybe for any kind of -- if there required any
13 fact checking in the letter, I could have.
14   Q.   Is reserving a number for legislation common?
15   A.   Yes.  It's a tradition, yes.
16   Q.   What do you mean by "it's a tradition"?
17   A.   It's been done by at least -- I've worked for
18 two Lieutenant Governors and both of them did it.
19   Q.   Every legislative session?
20   A.   Every legislative session that I'm aware of.
21   Q.   How did -- does the Lieutenant Governor
22 generally save some of the numbers for his own
23 priorities and permit senators to request some for their
24 priorities; is that how it works?
25   A.   Yes.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

### 209

1    Q.   So the Lieutenant Governor would have to
2    coordinate with senators because he can't introduce
3    legislation himself, so he would have to know it's
4    coming, right?
5    A.   Well, in order for them to use one of those
6    numbers, they would have to ask him for that number or
7    he would have to say, "I'll give you this number if
8    you'll file this..."  So, yes, there has to be some
9    communication.
10   Q.   So when he says, "I'll give you this number if
11   you file this bill," does Lieutenant Governor ever draft
12   the bill for that legislature?
13   A.   Yes, we have done so.  It's typically in a
14   limited -- in -- it's typically for something we've been
15   working on through the interim with the Senator's Office
16   and we have helped, as I described earlier, draft
17   portions of the legislation.
18        In complicated legislation, you divvy up
19   the articles and say, "Okay, you handle this part and
20   draft it, and I'll handle this part and draft it, and
21   we'll work it out."  So we may have done that sort of
22   work.
23   Q.   So for SB 14, Lieutenant Governor must have
24   known that Senator Fraser was going to file something?
25   A.   File Senate Bill 14.  Yes, he did know that.

### 210

1    Q.   How did he know that?
2    A.   Because he, Senator Fraser, would not have been
3    able to use Senate Bill 14 without Governor Dewhurst's
4    permission.
5    Q.   So did Governor Dewhurst decide after November
6    2010, when Senator Fraser first filed the bill, that he
7    was going to choose that particular bill to get the low
8    number that he had reserved?
9    A.   I don't think I understand the question.
10   Q.   Well, you said that no one from your office had
11   had communications with Senator Fraser before he filed
12   the bill in November 2010, right?
13   A.   Yeah, I don't -- I don't remember
14   conversations.  We could have had conversations but we
15   did not pre-approve his -- the content of that
16   legislation.
17   Q.   So Senator Fraser filed the bill --
18   A.   Right.
19   Q.   -- and then it must have come to Lieutenant
20   Governor Dewhurst's attention at some point?
21   A.   Yeah, they're all filed publicly.
22   Q.   They're all filed publicly?
23   A.   Yes.
24   Q.   So he reviewed it and he decided that that
25   would be something he would ask Senator Fraser to refile

### 211

1    and he would give it the number he reserved?
2    A.   Or it could have happened that Senator Fraser
3    asked to refile it as a low bill number.
4    Q.   Okay.  Do you know which of those two --
5    A.   I don't.
6    Q.   -- things happened?
7    A.   I don't remember which -- which way it would
8    have happened.
9    Q.   Do you know who would remember?
10   A.   Probably Senator Fraser.
11   Q.   Would the Lieutenant Governor remember?
12   A.   He may.
13   Q.   Why did Senate Bill 14 need to be considered in
14   the first 60 days of the legislature?
15        MR. FREDERICK:  Objection, assumption of
16   facts not in evidence.
17   A.   The Governor gets to determine that.
18   Q.   (By Ms. Berkower) But you said that just
19   because something's a legislative emergency means it can
20   be considered in the first 60 days but it doesn't have
21   to be considered in the first 60 days?
22   A.   That's correct.
23   Q.   So why did Senate Bill 14 need to be considered
24   in the first 60 days?
25        MR. FREDERICK:  Same objection.

### 212

1        You can answer.
2    A.   Generally, the legislature tries to do what the
3    Governor asked them to do.
4    Q.   (By Ms. Berkower) What was the urgency for
5    voter ID legislation?
6    A.   I don't know.  You'll have to ask Governor
7    Perry.
8    Q.   Was the introduction or -- sorry.  Was the
9    designation of voter ID legislation as emergency, a
10   legislative emergency, a procedural tactic designed to
11   ensure passage by preventing bill opponents from slowing
12   down consideration and bleeding out the legislative
13   clock?
14        MR. FREDERICK:  Objection, argumentative.
15   A.   I don't know.  You'll have to ask Governor
16   Perry.
17        (Exhibit 107 marked for identification.)
18   Q.   (By Ms. Berkower) Have you seen this letter
19   before?
20   A.   Yes, I have.
21   Q.   Did you draft this letter?
22   A.   No.
23   Q.   How have you seen this letter before?
24   A.   Well, Governor Dewhurst sent it.  I remember
25   it's his notice to tell everybody what was going to



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

## 213

1    happen in the -- in the legislative process.
2         Q.   Do you know who drafted the letter?
3         A.   No.  I'm sure it was several of us, but
4    Governor Dewhurst probably drafted it.  I do remember
5    this letter.  And the same letter went out to each of
6    the senators.
7         Q.   So the last paragraph of the letter references
8    a draft resolution outlining the procedures for the
9    Committee of the Whole?
10        A.   Uh-huh.
11        Q.   Do you remember what those were?
12        A.   I don't -- I don't remember the specifics, but
13   that's -- that's pretty traditional when you've got a
14   committee hearing.  They have to adopt the rules that
15   the committee will operator under.  And so I'm sure
16   that's what that's referencing is this is -- this is how
17   we're going to run the business.
18        Q.   Do you know if those procedures were adopted in
19   full or if any changes were made?
20        A.   I don't -- I don't remember any changes.
21             (Exhibit 108 marked for identification.)
22        Q.   (By Ms. Berkower) Do you know what this is?
23        A.   I can read it.  Yes.
24        Q.   Did you draft this?
25        A.   No, I did not.

## 214

1         Q.   Do you remember this being released?
2         A.   Vaguely.  I remember a statement.  I would not
3    have been able to tell you what it said.
4         Q.   Is this a press release that Lieutenant
5    Governor Dewhurst issued regarding the designation of
6    voter ID legislation as emergency legislation?
7         A.   Yes.
8         Q.   Can you read the last paragraph of the press
9    release.
10        A.   Yes.
11        Q.   It says, "Texans have fought and died for the
12   principle of 'One Person, One Vote' and Republicans,
13   Independents and Democrats all agree that we must uphold
14   the integrity of our elections."  What is that -- what
15   does the reference to "One Person, One Vote" mean?
16        A.   Well --
17             MR. FREDERICK:  Objection, calls for
18   speculation.
19        A.   I don't know what he was thinking when he gave
20   that quote, specifically, but I think it's fair to say
21   that Texans have historically fought for the ability to
22   vote.
23        Q.   (By Ms. Berkower) Why is there a need to
24   protect One Person, One Vote at this particular time
25   that this was released?

## 215

1             MR. FREDERICK:  Objection, calls for
2    speculation, assumes facts not in evidence.
3         A.   I don't think there is a need just for the
4    period of time this was issued.  I think we should
5    always hope to have an election system with integrity
6    that preserves One Person, One Vote.
7         Q.   (By Ms. Berkower) At the time this was
8    released, though, was there a special need to protect
9    One Person, One Vote, that wasn't already being met?
10        A.   I don't know.
11        Q.   What was the threat that existed to One Person,
12   One Vote at the time that this was released?
13             MR. FREDERICK:  Objection, calls for
14   speculation.  Objection, calls for facts not in
15   evidence.
16        A.   I don't --
17             MR. FREDERICK:  I'm sorry, go ahead.
18        A.   I don't know that there -- there was a specific
19   threat.  I do think there was a perception that we could
20   make our voting system much more reliable and -- and
21   uphold the integrity of one person and one vote.
22        Q.   Well, what was the basis for saying there's a
23   need to uphold the integrity of the elections?
24             MR. FREDERICK:  Objection, calls for
25   speculation.

## 216

1         A.   I think current law does not require a thorough
2    process for identifying to ensure -- identifying voters,
3    and this statement implies that legislation would
4    enhance that ability to ensure that one person is
5    actually registered to vote, and does vote, and not
6    somebody else voting for that person.
7         Q.   (By Ms. Berkower) Are you aware of the notice
8    that the Lieutenant Governor gave to senators of the
9    convening of the Committee of the Whole?
10        A.   This letter, yes.
11        Q.   Do you know how much notice Lieutenant Governor
12   gave to senators of convening the Committee of the
13   Whole?
14        A.   It appears to be four or five days.
15        Q.   Are you aware of how this notice was delivered
16   to senators?
17        A.   I can tell you how, typically, we deliver a
18   notice like this.
19        Q.   How?
20        A.   We would have copies of the letters hand-
21   delivered to each of the senators with a signature sheet
22   to show that each of the senators' offices received
23   it.  Sometimes we put them on their desks on the Senate
24   Floor as well.  And then we'll mail a copy as well.
25        Q.   Do you ever slip notes -- slip the letter under



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 217

1  the door of the senators after hours?
2      A.  We do, but on a letter where it's a notice-type
3  letter, we would go back and make sure that there is
4  somebody signing for the letter.
5      Q.  Do you know if that's what happened in this
6  case?
7      A.  I am not aware.  We also fax them out to their
8  district and capital offices frequently.
9      Q.  You want to review this?  I'm not going to
10  introduce it as an exhibit but you can just take a look
11  and see if that refreshes your memory at all.
12          MS. BERKOWER:  I have a copy for you,
13  Matt.
14      Q.  (By Ms. Berkower) Are you done looking at the
15  letter?
16      A.  Yes.
17      Q.  Does this refresh your recollection as to
18  whether or not notice was slipped under the door of
19  senators after hours?
20      A.  Not really, no.  I don't know that that's what
21  happened.
22      Q.  Do you remember -- does this refresh your
23  recollection -- excuse me.  Does this refresh your
24  recollection as to whether senators had been excused
25  from being present in the Capital on the day that the

## 218

1  bill was going to be considered?
2      A.  That's not what this says.  This says they were
3  -- they left town on Thursday, not that they were
4  excused the next -- the 24th.
5      Q.  I think in the second paragraph it says he did
6  after the Senate -- the Senate unanimously passed
7  Senator Whitmire's resolution respectfully --
8  specifically authorizing all senators to be absent from
9  the Capital until Monday afternoon.
10      A.  Yes.  But you said on the day when the voter ID
11  was going to be heard, and they were not.
12      Q.  Well, they were excused from being absent until
13  Monday afternoon.
14          MR. FREDERICK:  Objection, form.  Is there
15  a question?
16      Q.  (By Ms. Berkower) Wasn't voter ID going to be
17  considered on Monday?
18      A.  Well, yes, but they're excused until Monday
19  afternoon.  That means they can be there on Monday.
20      Q.  Was there anything in the notice that
21  Lieutenant Governor sent that said the consideration of
22  SB 14 would be after everyone had returned on Monday
23  afternoon?
24      A.  No, but there was nothing that said otherwise.
25      Q.  But if they wanted to be sure -- if senators

## 219

1  wanted to be sure they would be -- they would be present
2  for consideration of SB 14, wouldn't they have to come
3  in on Monday?
4          MR. FREDERICK:  Objection, argumentative.
5  Objection, assumes facts not in evidence.
6      A.  Well, yes, but they are coming in.  They're
7  excused until Monday afternoon.
8      Q.  (By Ms. Berkower) But the SB 14 could have been
9  considered Monday morning; isn't that true?
10          MR. FREDERICK:  Objection, assumes facts
11  not in evidence.  Objection, relevance.
12      A.  I suppose so, but it's not -- this -- Senator
13  Whitmire's resolution, I would need to look at the words
14  of it, specifically.  But that's from excused for being
15  absent from the Senate Floor.  It does not reference
16  being absent from a Committee of the Whole.  They're two
17  different functions in the Senate.
18          So there were committee hearings happening
19  during the weekend and other committees were happening.
20  So this committee is treated the same way that other
21  committees were.
22      Q.  But doesn't the Committee of the Whole require
23  all the senators to be present?
24      A.  No, it doesn't require all the senators to be
25  present.  It's a committee meeting, it requires a simple

## 220

1  majority.
2      Q.  Are you aware that this -- that the procedure
3  for consideration of SB 14 differed from the notice
4  given in 2009 when senators were given more time to
5  prepare?
6          MR. FREDERICK:  Objection, assumes facts
7  not in evidence.
8      A.  Yeah, I would have to check those.  I don't
9  remember the timing.  I mean, I can read what she wrote
10  in her letter, I'd just need to check that.
11      Q.  (By Ms. Berkower) Well, what about from the
12  bill history.  I think you have that in front of you.
13  Could you look at the bill history and figure out if
14  there was more time given to prepare?
15      A.  From?
16      Q.  In 2009.
17          MR. FREDERICK:  Objection, vague.
18      A.  Well, there's a longer period of time between
19  the date it was referred to the Committee of the Whole
20  and the day that it was schedule for public hearing.
21      Q.  Do you know why a shorter time was allotted in
22  2011 than in 2009?
23          MR. FREDERICK:  Objection, assumes facts
24  not in evidence and calls for speculation.  I object on
25  basis of privilege to the extent this calls for



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

221

1   Lieutenant Governor or any legislator's thought process
2   or any privileged communications.
3          MS. BERKOWER:  I asked if she knew why
4   not, not why.
5          MR. FREDERICK:  Same objection.
6          If you can answer only the question of
7   whether or not you know why, you may do so.  But do not
8   reveal any privileged matters.
9       A.  I'm not -- I'm not privileged to know exactly
10  why.  So, no.
11      Q.  You don't know why?
12      A.  I don't know why.
13      Q.  Do you have any guess as to why?
14         MR. FREDERICK:  Objection, calls for
15  speculation.
16      A.  Yes.
17         MR. FREDERICK:  Relevance.
18      A.  But I'm not going to answer that.
19      Q.  (By Ms. Berkower) On the ground of privilege?
20      A.  On the ground of privilege.
21      Q.  Okay.
22         MS. BERKOWER:  This is Exhibit 5.
23         (Exhibit 5 remarked for this deposition.)
24      Q.  (By Ms. Berkower) Okay.
25      A.  This is as filed?

222

1       Q.  I believe so.  Oh, yeah, turn to the last
2   page.  I think that may answer your question.
3       A.  Okay.  Thank you.  Oh, this says finally
4   passed.
5       Q.  Do you recognize this?
6       A.  Well, yes.
7       Q.  What is it?
8       A.  It's Senate Bill 14 --
9       Q.  Are you familiar --
10      A.  -- as enrolled.
11      Q.  Are you familiar with its provisions?
12      A.  Yes, generally.
13      Q.  Could you compare SB 362 and SB 14, please?
14         MR. FREDERICK:  Objection, vague.
15      Q.  (By Ms. Berkower) Let's get them both out.
16  I'll go through questions with you.
17      A.  Here we go.
18      Q.  Turning to Section 63.0101, I think it's on
19  Page 9 in SB 14, and 5 on 362.  Can you compare any
20  differences in the forms of ID permitted in SB 14?
21      A.  Yes.
22      Q.  What are those?
23         MR. FREDERICK:  Objection, vague.
24  Objection, form.
25         You may answer, if you can answer.

223

1       A.  Okay.  The expirations have changed from two
2   years to 60 days and that's generally consistent through
3   the legislation.  And it allows for a concealed handgun
4   license that is expired for 60 days.
5       Q.  (By Ms. Berkower) Does SB 14 permit the use of
6   an ID issued by a federal agency?
7       A.  No, except for the federal government and
8   military ID.
9       Q.  Does SB 14 permit a voter to use an ID issued
10  by a Texas State agency, institution, or political
11  subdivision?
12      A.  No, it does not, except for those issued by the
13  DPS for concealed handgun licenses.
14      Q.  And driver's licenses?
15      A.  And driver's licenses, yes.
16      Q.  Does SB 14 permit any non-photo identification
17  to be used?
18      A.  No, it does not.
19      Q.  Does SB 362, turning to Page 7 of SB 362,
20  permit the use of identification cards used by a person
21  for obtaining public benefits including veterans
22  benefits, Medicaid or Medicare?
23      A.  No, it does not.  It does allow an exemption
24  for people who've been designated with a disability by
25  the federal government and veterans administration --

224

1       Q.  Well, I'm sorry to interrupt you.  I think I
2   was asking you does SB 362 allow -- allow a voter to use
3   a public benefits card, including a card issued by the
4   United States for veterans benefits, Medicaid or
5   Medicare, as one form of non-photo identification that's
6   permitted?
7       A.  Yes, it does.
8       Q.  And does SB 362 permit the use of a utility
9   bill, bank statement, government check, paycheck, or
10  other government document as a form of non-photo ID?
11  That's on Page 6.  There's a --
12      A.  Is it -- okay.
13      Q.  There on the bottom.
14      A.  Okay.  Then, yes.
15      Q.  Does SB 14 permit either of those forms of ID
16  to be used?
17      A.  No, it does not.
18      Q.  Does it permit any non-photo ID to be used?
19         MR. FREDERICK:  Objection, asked and
20  answered.
21         You may answer.
22      A.  No, it does not.  But it does allow provisional
23  voting for people who have a religious objection to
24  photography, consistently use that objection.
25      Q.  Why did the forms of permitted IDs change



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

225

1    between Senate Bill 362 and Senate Bill 14?
2         MR. FREDERICK:  Objection, legislative
3    privilege.
4         I instruct you not answer.
5         I also object on relevance grounds.
6    Q.  (By Ms. Berkower) What's the justification --
7    are you going to answer?
8    A.  No.
9    Q.  What's the justification for any change in the
10   form of permitted IDs?
11        MR. FREDERICK:  Objection, legislative
12   privilege.
13        Instruct you not to answer.
14   Q.  (By Ms. Berkower) Are you going to answer?
15   A.  No.
16   Q.  Why was non-photo ID no longer included as a
17   way voters could verify their identify in SB 14?
18        MR. FREDERICK:  Objection, legislative
19   privilege.
20        Instruct you not to answer.
21   A.  I won't answer that.
22   Q.  (By Ms. Berkower) Why was -- why is the -- for
23   purposes of expired ID, why does it have to be within 60
24   days of presentation?
25        MR. FREDERICK:  Objection, legislative

---

226

1    privilege.
2         Instruct you not to answer.
3    A.  I won't answer that, no.
4    Q.  (By Ms. Berkower) In your view, do any of these
5    changes to SB 14 make it a better bill than SB 362 --
6         MR. FREDERICK:  Object --
7    Q.  (By Ms. Berkower) -- for purposes of
8    accomplishing -- sorry, I lost my train of thought.
9    I'll start over.
10        Does the change in -- do any of these
11   changes between SB 362 and SB 14 make it more likely --
12   I'll ask something different.
13        Do you view these changes as a substantial
14   difference from the prior bills on voter ID filed in
15   2005, 2007 and 2009?
16        MR. FREDERICK:  Objection, relevance.
17   Objection, vague.
18   A.  Yes, I do.
19   Q.  (By Ms. Berkower) How are these substantial
20   changes?
21        MR. FREDERICK:  Objection, relevance.
22   Objection, vague.
23   A.  362 allowed non-photo ID.  14 only allows photo
24   ID except for some exceptions.
25   Q.  (By Ms. Berkower) What's the purpose of these

---

227

1    changes?
2         MR. FREDERICK:  Objection, legislative
3    privilege.
4         Instruct you not to answer.
5    A.  I won't answer that.
6    Q.  (By Ms. Berkower) Were you involved in
7    developing SB 14?
8    A.  I was involved with amendments to Senate Bill
9    14, but not in the original legislation.
10   Q.  Is that because Senator Fraser developed it
11   himself and filed it in November 2010?
12   A.  Yes.
13   Q.  Are you aware that the State of Texas in this
14   litigation identified you as someone who was involved in
15   developing SB 14?
16        MR. FREDERICK:  Objection, assumes facts
17   not in evidence.
18   A.  Yes.
19   Q.  (By Ms. Berkower) So how were you involved in
20   developing SB 14?
21   A.  Well, I just said I helped with amendments to
22   -- developing, to me, maybe I don't understand the
23   question.  It's different between the original filed
24   version of the bill and the actual bill as enrolled.
25   And this did go through some changes.  And I did help

---

228

1    make sure that the -- the documents were processed
2    appropriately from the committee stage to the Floor
3    stage, and then over to the House.  And then went
4    through the appropriate procedures for the Conference
5    Committee and ensuring that the appropriate paperwork
6    was done for the entire process.
7    Q.  That was your complete role in developing SB
8    14?
9    A.  Yes.  And ensuring that the Lieutenant Governor
10   was briefed on all of the issues and ensured that, you
11   know, people who needed information and copies of
12   amendments, got them.  Awful lot of procedural work.
13   Q.  Did you draft any of the amendments to SB 14?
14   A.  No, I did not personally draft any of them.
15   Q.  Who drafted them?
16   A.  I don't know.  Legislative counsel would have
17   drafted some.  Individual members drafted their own
18   amendments, or were responsible for them.  And our staff
19   could have helped draft some if they need to -- needed
20   help.
21   Q.  Did you say early that the Lieutenant Governor
22   has never actually introduced an amendment to a bill?
23   A.  I've never known him to, that I remember.
24   Q.  So when you said you worked on drafting
25   amendments, were you working -- who were you working

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

### 229

1  for?
2      A.  The senators frequently ask us to help draft
3  amendments.
4      Q.  Do you remember which senators you worked with?
5      A.  Senator Fraser, primarily.
6      Q.  How many amendments did you draft?
7      A.  I didn't draft any directly.  I watched, you
8  know, the process and ensured that the amendments --
9  quite frequently, an amendment will be submitted that
10  doesn't match the line number and the paragraph number
11  necessary to amend the appropriate place in the
12  legislation.  So we'll check those amendments and ensure
13  that they're accurate.  And we do that quite frequently
14  with legislation just to make sure the amendment falls
15  in the right place.
16      Q.  Did you ever use any models -- model
17  legislation from interest groups when you were working
18  on amendments?
19      A.  No.
20      Q.  Who else in your office was involved in
21  drafting and developing either the bill or any of its
22  amendments?
23      A.  Bryan Hebert.
24      Q.  Was he involved with Senator Fraser's office
25  before the bill was filed?

### 230

1      A.  I don't remember if he was involved before the
2  November 2010 filing, but he was involved after that.
3      Q.  How was he involved?
4      A.  He worked with their staff to see if there were
5  any support information they needed, any assistance they
6  need, and kept the Lieutenant Governor informed of the
7  contents of the legislation.
8      Q.  Did he ever consult with you about any
9  questions that arose during that process?
10      A.  Yes.
11      Q.  What did he ask you?
12          MR. FREDERICK:  Objection, legislative
13  privilege.
14          Instruct you not to answer.
15      A.  I can't answer that.
16      Q.  (By Ms. Berkower) At the time you were in --
17  well, during the development of SB 14, did you have any
18  communications about SB 14 with other current or former
19  legislators that had offered past voter ID bills?
20          MR. FREDERICK:  Objection, vague.
21          You can answer.
22      A.  Can you rephrase that?
23      Q.  (By Ms. Berkower) Sure.  Did you ever consult
24  with current or former legislators who had offered past
25  voter ID bills during the time that you worked on SB 14?

### 231

1      A.  Senator Fraser carried them all over in the
2  Senate with the exception of the first one that was not
3  picked up.  So, no, we only worked with his office.
4      Q.  Anyone from the House?
5      A.  No.  But Bryan Hebert may have been involved
6  with -- with them.
7      Q.  When you would talk to -- when your office
8  would communicate with Senator Fraser about SB 14, how
9  would you communicate with them?
10      A.  Mostly talked to him in person or to Janice
11  McCoy.
12      Q.  Did you have phone calls?
13      A.  Yes.
14      Q.  E-mails?
15      A.  Actually I don't remember any e-mails.
16      Q.  Did you speak with anybody else from Senator
17  Fraser's office other than him and Janice McCoy?
18      A.  Not unless I was calling to leave a message for
19  one of them to call me back.
20      Q.  Was what the substance of your communications?
21          MR. FREDERICK:  Objection, legislative
22  privilege.  Objection, vague.
23          I instruct you not to answer based on
24  privilege.
25      A.  Okay.  I can't answer that.

### 232

1      Q.  Did you communicate with officials or
2  legislators from other states about SB 14?
3      A.  When we were looking for people to testify in
4  the Committee of the Whole, we did call someone from
5  Indiana to do testimony.  And, you know, I made one of
6  those telephone calls.
7      Q.  You called the person from Indiana?
8      A.  Yeah, I called their office.  I wasn't the one
9  that was a primary contact for them though.
10      Q.  Who was the primary contact?
11      A.  I think Bryan ended up being the person, but we
12  were all just trying to help.
13      Q.  Did you communicate with anyone in Georgia?
14      A.  Not that I remember.
15      Q.  Did anyone else in your office?
16      A.  They could have.
17      Q.  Did you ever actually speak to the person from
18  Indiana?
19      A.  When he came to testify, yes.
20      Q.  What was the nature of your conversation?
21      A.  Oh, I think he was concerned about what we
22  thought that the Senate really wanted to hear.  And, I
23  mean, I remember having conversations about, "Tell them
24  how you implemented your legislation and if there were
25  any good things or any bad things about it or any

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com



ESQUIRE
DEPOSITION SOLUTIONS

233

1 problems." And out of -- the point was to get somebody
2 who had actually made voter ID legislation work, to talk
3 about what was necessary in order to work it in
4 Texas. So that if we had an opportunity to change the
5 legislation to make it easier to implement or more
6 effective, that we made those changes.
7     Q. So did he focus primarily on how to implement
8 the law?
9     A. That's my memory, yes.
10    Q. Did you talk to him about any other topics
11 relating to voter ID?
12    A. I don't remember that.
13    Q. What did he tell you about how to implement the
14 law?
15    A. Oh, I don't remember the specifics. But I do
16 remember ensuring that there was sufficient voter
17 education in the legislation, and ensuring that -- that
18 we had funding in place to help the people who needed to
19 train the poll workers. And I think there was just an
20 awful lot of discussion of adequate training for
21 everyone and adequate notice for everyone.
22    Q. Does SB 14 provide for training of poll
23 workers?
24    A. Yes.
25    Q. Does it provide money for training the poll

234

1 workers?
2     A. The bill itself doesn't but that happened
3 through different -- through the budget process.
4     Q. Was any money allotted --
5     A. Yes.
6     Q. -- for poll worker training?
7     A. I don't remember how it was divvied up but I
8 know there was money associated with the cost of the
9 implementation of this legislation and part of it had to
10 do with training and notice requirements for people.
11    Q. Do you know how much money was set aside for
12 training and notice requirements?
13    A. I don't remember. I remember the total cost
14 was about 2 million dollars.
15    Q. Do you know how much money was allotted in
16 Indiana for similar efforts?
17    A. No.
18    Q. Do you have any sense of how much media time 2
19 million dollars can buy state-wide in Texas?
20    A. No.
21    Q. Do you know whether more money has been
22 allotted for other educational -- voter education
23 efforts in past years in Texas?
24    A. I know that there is quite a lot of money that
25 flows through the Help America Vote Act for education

235

1 for voters, but I don't know how much money that is.
2     Q. Did you have any discussion about whether 2
3 million dollars would be enough money to provided
4 adequate education both for voters and for poll worker
5 training?
6     A. My memory is that the Secretary of State
7 testified that it was.
8     Q. Did you communicate about SB 14 with any
9 interest group?
10    A. I don't remember, personally, communicating
11 with them. I know we received letters and I know that
12 interest groups testified during the Committee of the
13 Whole process.
14    Q. Did you have any communications with any groups
15 representing minority voters?
16    A. Yes.
17    Q. Who were they?
18    A. I'm trying to remember. MALDEF. Lulac, I
19 would assume. Seems like the League of Women Voters
20 also sent us a letter.
21    Q. So when you said -- when I -- to be more
22 specific, did you ever meet with any of those groups, or
23 anyone from your office meet with anyone from those
24 groups?
25    A. At some point we have. I just don't remember

236

1 when.
2     Q. What was the substance of what was discussed?
3        MS. BERKOWER: Object on the basis of
4 legislative privilege.
5        I instruct you not to answer.
6     A. Okay. I can't answer that.
7     Q. (By Ms. Berkower) Did you have communications
8 about SB 14 with constituents?
9     A. Yes.
10    Q. When did you have those communications?
11    A. We received quite a lot of letters on this
12 issue, pro and con.
13    Q. What do the letters in favor generally say?
14    A. Generally, that they expect the legislature to
15 pass voter ID.
16    Q. And you said you also received communications
17 from opponents of voter ID?
18    A. Yes.
19    Q. What were those opponents saying?
20    A. Just, generally, that the letters feel that --
21 or the letter writers feel that voter ID would
22 disenfranchise voters.
23    Q. Did you get any calls or e-mails from
24 constituents about voter ID?
25    A. Our e-mail system I think of as our


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

### 237

1  correspondence system, so, yes, that would happen
2  through the same process.  I, personally, did not
3  received any separate e-mails associated with that.
4      Q.  How did your office respond to communications
5  from constituents?
6      A.  We -- we respond with a letter.
7      Q.  Did you suggest or make any changes to the bill
8  based on input you got from constituents?
9      A.  I know that there were some changes made on the
10 Floor that -- on -- during Senate deliberation of
11 legislation, that was based on information that they
12 heard during the Committee of the Whole process.
13     Q.  What were those?
14     A.  I know there were some details associated with
15 free IDs -- voter ID -- I mean, the DPS allowing for
16 free voting IDs and how that would be handled.  Those
17 changes happen on the Floor and not in the Committee of
18 the Whole, though.
19     Q.  And that was in response to testimony or in
20 response to concerns raised by constituents?
21     A.  Well, they're the same.  Testimony is typically
22 from constituents as well.  I know that was part of the
23 discussion at some point.
24     Q.  Well, you said that there were also people
25 coming from out of state to testify?

### 238

1      A.  Yes.  But we had an awful lot of testimony from
2  people from in state as well.
3      Q.  Did you have communications about SB 14 with
4  any officials in the government -- sorry, Governor's
5  Office?
6      A.  Like I said, I know that they called to tell us
7  they were going to issue an emergency order with voter
8  ID in it but that was like immediately before issuing
9  it.  Other than that, I'm not aware of it.
10         Like I said, the Governor and the Speaker
11 and the Lieutenant Governor have weekly breakfasts, and
12 I'm sure they discussed the fact that that was going to
13 be an item coming up, at that breakfast, but I was not
14 there at the breakfast.
15     Q.  So if we wanted to know about any
16 communications about SB 14 between the Lieutenant
17 Governor and the Governor, would we need to ask either
18 the Lieutenant Governor or the Governor?
19     A.  Yes.
20         MR. FREDERICK:  Objection, calls for
21 speculation.
22     Q.  (By Ms. Berkower) Did you have communications
23 with state or local election officials about SB 14?
24     A.  Yes.
25     Q.  Who?

### 239

1      A.  Let's see.  We talked to the Secretary of
2  State's Office, to Coby Shorter.  And I want to say that
3  we did have communications with some of the local
4  election officials about what would be required for
5  training and what sort of needs they might have to
6  implement the legislation.
7      Q.  Do you remember which local election officials
8  you spoke with?
9      A.  No.
10     Q.  Do you remember what counties they were from?
11     A.  I know we talked to someone from Harris
12 County.  I don't remember beyond that.
13     Q.  Was it George Hammerline?
14     A.  I remember that name, but I can't remember the
15 conversation.
16     Q.  Was it Skipper Wallace?
17     A.  I know we've talked to Skipper Wallace, yes.
18     Q.  What was the nature of your conversation with
19 the person you mentioned from the State, Colby?
20     A.  Coby Shorter is an Assistant Secretary of State
21 and he would have asked him, "How much money do you
22 need?  What kind of implementation efforts need to
23 happen?"  The Secretary of State's Office manages the
24 election for the state.
25     Q.  What did he tell you?

### 240

1          MR. FREDERICK:  I'm going to object.
2          And just caution you to not to reveal the
3  substance of any communication with the Secretary of
4  State's Office --
5          THE WITNESS:  Okay.
6          MR. FREDERICK:  -- directly involving
7  pending legislation.  You may, however, identify the
8  general subject matter of your conversations.
9      A.  Well, I think I already did.  What we would
10 have talked to them about is, "What do you need in order
11 to implement this?"  They were the people who developed
12 the fiscal note, or the request for the fiscal note, in
13 order to fund this.
14     Q.  Did you, for the Lieutenant Governor, exchange
15 any drafts of SB 14 or amendments with anyone?
16     A.  Prior to the amendments being heard on the
17 Floor, I think they asked the senators if they wanted to
18 distribute a packet.  And if the senators would like to
19 submit their amendments in advance, we put them in order
20 of where they fall in the bill and then distributed
21 those to the senators.  That was immediately prior to
22 the hearing on the Floor.  And it wasn't mandatory, it
23 was just an efficiency issue.
24         So we would have gathered the amendments
25 if they chose to submit them, put them into a packet in



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 241

1    order, and then distributed them out to the senators.
2    But that would not have been a public document that we
3    shared with other people.
4        Q.  It was just for senators and --
5        A.  Yes.
6        Q.  -- for their reference.
7        A.  It was an efficiency issue.
8        Q.  Other than that, did you ever exchange any
9    drafts of SB 14 amendments with anyone?
10       A.  Not that I remember other than -- Senator
11   Fraser had some amendments and I think we shared it at
12   those amendments in advance.  Just as courtesy, he gave
13   us a copy of the amendments.
14       Q.  Did you make any changes to those amendments?
15       A.  Not that I remember.
16       Q.  Did SB 14 change during the drafting process?
17       A.  Okay.
18          MR. FREDERICK:  Objection, vague.
19       A.  Yeah, I -- it was drafted, filed, and then it's
20   not the drafting process, it's the legislative process.
21       Q.  Did SB 14 change during the legislative
22   process?
23       A.  Yes, it did.  It was amended.
24       Q.  In what ways was it amended?
25       A.  I don't remember the details of all the

## 242

1    amendments but I know there were some amendments that
2    dealt with the -- with the ID -- the free IDs.  I do --
3    that's my memory.  The process for -- for getting a free
4    ID and when you qualified for a free ID.  And then later
5    it changed in the House to remove one of the exemptions
6    for people over 70.  It changed that exemption to be
7    under certain situations.
8        Q.  And during the legislative process, did the
9    Lieutenant Governor, or anyone in his office, review any
10   reports or studies relating to voter ID identification?
11          MR. FREDERICK:  Objection.  I'm going to
12   object on the basis of privilege to the extent this
13   would ask you to reveal the substance of any
14   studies.  As to the specific question of whether anyone
15   did or did not review studies, you may answer
16       A.  I don't remember any studies.  I just don't
17   remember any studies.
18       Q.  (By Ms. Berkower) Did you consider including
19   any additional forms of ID in SB 14?
20          MR. FREDERICK:  Objection, relevance.
21   Objections, legislative privilege.
22          I instruct you not to answer that
23   question.
24       A.  I can't answer that question.
25       Q.  (By Ms. Berkower) You can't say yes or no?

## 243

1          MS. BERKOWER:  Matt?
2          MR. FREDERICK:  Yeah, I'm going stick to
3    the instruction on that one.
4        Q.  (By Ms. Berkower) Well, okay.  Did you consider
5    which forms of ID would be acceptable under SB 14?
6        A.  The Senate debated some additional forms of ID
7    publicly as amendments were offered.  But that's
8    different from me personally considering some additional
9    options for ID.
10       Q.  What about the Lieutenant Governor?
11          MR. FREDERICK:  Objection, vague.
12   Objection, form.  Also object on the basis of privilege.
13          And instruct you not to answer.
14          MS. BERKOWER:  I can re-ask.
15          MR. FREDERICK:  Okay.
16       Q.  (By Ms. Berkower) Do you know if the Lieutenant
17   Governor considered which forms of ID would be permitted
18   under SB 14?
19          MR. FREDERICK:  Object on the basis of
20   privilege.
21          You can answer the specific question
22   whether you know or not.  But do not reveal any of the
23   Lieutenant Governor's thought process or any
24   communications with him.
25       A.  He was certainly aware of the debate on

## 244

1    different options because he was presiding over the
2    Senate as that public debate took place.  But he doesn't
3    make amendments to legislation.
4        Q.  (By Ms. Berkower) If your photo ID has expired
5    but was validly issued, why doesn't that prove the
6    person is the same person on the ID?
7          MR. FREDERICK:  Objection, calls for
8    speculation.  Objection, argumentative.  And objection,
9    based on legislative privilege.
10          I would instruct you not to answer on the
11   basis of privilege.
12       A.  Okay, I can't answer that.
13       Q.  What about in your personal experience?
14          MR. FREDERICK:  Objection, vague.
15   Objection, form.  Objection, relevance.
16          You can answer if you understand the
17   question.
18       Q.  (By Ms. Berkower) Do you want me to repeat it?
19       A.  No, I just want to bring up whether or not
20   anybody had a fake ID in college.  People change over a
21   period of time.  They age, you look different.  It's why
22   we have to redo our driver's licenses.  That's why we
23   have to redo our passports.
24       Q.  Okay.  So an expired license gives rise to
25   fraud, is that your --



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

## 245

1    A.  Yes, after a period of time.  People change.
2    Q.  But an unexpired license doesn't run that risk?
3         MR. FREDERICK:  Objection, misstates prior
4    testimony, form.
5    Q.  (By Ms. Berkower) Does having an unexpired
6    license reduce the risk that it will be -- reduce the
7    risk of fraud?
8         MR. FREDERICK:  Objection, relevance.
9    Objection, calls for speculation.  I would also object
10   on the basis of privilege to the extent it calls for any
11   thought process about pending legislation.
12        THE WITNESS:  Uh-huh.
13        MR. FREDERICK:  But if you can answer
14   without revealing that, you may do so.
15   A.  Personally, I think a new ID is more designed
16   -- more likely to look like the person who applied for
17   it than an old ID.
18   Q.  Are fakes IDs generally expired?
19        MR. FREDERICK:  Objection, relevance.
20   A.  I don't know.
21        MR. FREDERICK:  Calls for speculation.
22   A.  I don't know.
23   Q.  (By Ms. Berkower) How often in Texas do you
24   have to get your picture taken for a driver's license?
25   A.  Oh, let me think.  I know that you're supposed

## 246

1    to redo your driver's license every six years.  You are
2    not allowed to waive the photo requirement unless you're
3    over, I think, 18 or 19 -- 19, I believe, is correct.
4    And then you can only waive it one time.  So I would
5    think 12 years is the maximum.
6    Q.  That you can go before you have to have your
7    picture taken?
8    A.  That's my understanding, but I'm not absolutely
9    certain about that.
10   Q.  Can't you renew your driver's license by mail
11   though?
12   A.  Yes and online.
13   Q.  And driver's licenses are valid for a period of
14   years, right?
15   A.  Six years, yes.  That's my memory.  Unless
16   you're like a provisional voter, like, a 16 year-old --
17   I mean younger driver like a 16 year-old or 15 year-
18   old, then those last for a shorter period of time.
19   Q.  Did you conduct any analysis, or anyone in your
20   office conduct any analysis as to how many registered
21   voters possess the required forms of ID required by SB
22   14.
23        MR. FREDERICK:  Objection, legislative
24   privilege.
25        I'm instructing not to answer.

## 247

1    A.  I'm sorry, I can't answer that.
2    Q.  (By Ms. Berkower) Did you conduct any analysis
3    to determine if minority voters would be
4    disproportionately less likely to perform -- possess the
5    forms of ID required in SB 14?
6         MR. FREDERICK:  Objection, legislative
7    privilege.
8         Instruct you not to answer.
9    A.  Sorry, I can't answer that.
10   Q.  (By Ms. Berkower) Janice McCoy testified in her
11   deposition that there were no studies at all that
12   analyzed who has an ID for purpose of SB 14, either
13   public or private?  Do you agree with that?
14        MR. FREDERICK:  Objection, assumes facts
15   not in evidence.  Objection, relevance.  Objection,
16   calls for speculation.
17        You may answer if you can.
18   A.  I'm not aware of any reports.
19   Q.  (By Ms. Berkower) That analyzed who has an ID
20   for purposes of SB 14?
21   A.  Yes.
22   Q.  What is a military ID?
23   A.  My understanding is that it's an ID issued to
24   people who served in the military.  Issued by the
25   federal government to people who have served in the

## 248

1    military.
2    Q.  Do you know how many different forms of
3    military ID there are?
4    A.  No, I don't.
5    Q.  Do you know how many different forms of
6    military ID are acceptable under SB 14?
7    A.  I think it's a generic military ID, so it would
8    be all of them.
9    Q.  Do you know whether the U.S. Military issues
10   IDs to non-citizens?
11   A.  No, I don't.
12   Q.  Do you know if the number of military IDs that
13   are acceptable under SB 14 is more or less than the
14   number of student IDs that would have been acceptable
15   under HB 218?
16        MR. FREDERICK:  Objection, relevance.
17   Objection, calls for speculation.
18   A.  I don't -- I don't know the numbers.
19   Q.  (By Ms. Berkower) Have you ever seen a military
20   -- a U.S. Military ID?
21   A.  Yes, I have.
22   Q.  Which one have you seen?
23   A.  While working on homeland security report, we
24   toured a number of military installations spaces,
25   different things, and I've seen plenty of military IDs



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

249

1  clipped on people or are used to get us into areas of
2  the military base.
3      Q.  Did you know that the U.S. Military issues IDs
4  to contractors?
5      A.  No.
6          MR. FREDERICK:  Objection, assumes facts
7  not in evidence.
8          You can answer.
9      A.  I was unaware of that.
10     Q.  (By Ms. Berkower) What is a citizenship
11 certificate?
12     A.  I don't know.
13     Q.  Do you know how much it cost to obtain one?
14     A.  No.
15     Q.  Have you ever seen one?
16     A.  No.
17     Q.  Do you know how much a replacement would cost?
18     A.  No.
19     Q.  Do you know what it might take to get a
20 replacement?
21     A.  I've applied for a passport recently, well, a
22 few years ago, and I remember there's a line for
23 citizenship certificates.  And I don't remember the
24 price, but it seems like it was 30 dollars.  I don't
25 remember.

---

250

1      Q.  Do you know how long it might take to get a
2  replacement citizenship certificate?
3      A.  No.
4      Q.  How much did it cost to get a U.S. passport
5  when you got one?
6      A.  I think I paid 70 dollars because I had it
7  expedited.
8      Q.  Do you know what documents you need to get a
9  passport?
10     A.  Yes.  I typically use my existing passport and
11 showed that to them again but I've also taken my
12 daughter in and it required both parents to sign a form
13 saying that she was our child and a birth certificate
14 and a social security card.
15     Q.  What was the purpose of removing from SB 14 the
16 option for a voter to show non-photo ID?
17         MR. FREDERICK:  Objection, legislative
18 privilege.
19         Instruct not to answer.
20     A.  I can't answer that.
21     Q.  (By Ms. Berkower) Who made the decision to
22 remove non-photo ID from SB 14?
23     A.  The bill sponsor, bill author.
24     Q.  Would that be Senator Fraser?
25     A.  Yes.

---

251

1      Q.  Did the Lieutenant Governor contribute to that
2  decision in any way?
3      A.  In the initial filing, I don't think so.  In
4  the Senate Bill 14 filing, I do think so.  I mean, I
5  think he -- he agreed to allow that to be filed as it --
6  as it was originally filed.
7      Q.  So if the Lieutenant Governor had wanted to
8  include non-photo ID, would he have done something about
9  it?
10         MR. FREDERICK:  Objection, calls for
11 speculation.
12     A.  He could have.
13     Q.  (By Ms. Berkower) Do you think he would have if
14 he had wanted to include non-photo ID in the bill?
15         MR. FREDERICK:  Objection, calls for
16 speculation.
17     A.  I don't know.
18     Q.  (By Ms. Berkower) Would you have advised him
19 to?
20         MR. FREDERICK:  Objection, relevance.
21 Objection, calls for speculation.
22     A.  Not typically.  On something he knows an awful
23 lot about, that wasn't necessary.
24     Q.  How does the Lieutenant Governor know an awful
25 lot about voter ID?

---

252

1          MR. FREDERICK:  Objection, legislative
2  privilege.
3          Instruct you not to answer.
4      A.  I'm sorry, I can't answer that.
5      Q.  (By Ms. Berkower) What changed between 2009 and
6  2011 that made two forms of non-photo ID an acceptable
7  option in 2009 but not in 2011?
8          MR. FREDERICK:  Objection, argumentative.
9  Objection, assumes facts not in evidence.  Also object
10 on the basis of legislative privilege.
11         Instruct you not to answer the question.
12     A.  I'm sorry, I can't answer that.
13     Q.  (By Ms. Berkower) You can't even answer about
14 public things, public evidence that -- of changes?
15         MS. BERKOWER:  Matt?
16         MR. FREDERICK:  If you want to rephrase
17 the question, I can alter my instruction.
18     Q.  (By Ms. Berkower) Okay.  Do you know of any
19 evidence that two forms of non-photo ID is no longer
20 enough in 2011?
21         MR. FREDERICK:  Objection, vague.
22 Objection, assumes facts not in evidence.  Objection,
23 argumentative.  Also object on the basis of privilege.
24         Instruct you not to answer except to the
25 extent that you can answer the specific question without

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

| 253 |
|---|

1   revealing privilege.
2       A.  I'm not aware.  I'm not aware of what changed.
3       Q.  (By Ms. Berkower) You're not aware of what
4   changed between 2009 and 2011?
5       A.  No.
6       Q.  Janice McCoy testified in her deposition that
7   what had happened between 2009 and 2011 was that things
8   had worked out well in Indiana and Georgia.  Do you
9   agree with that statement?
10      MR. FREDERICK:  Objection, assumes facts
11  not in evidence.  Objection, relevance.  Objection to
12  the extent it calls for thought process or privileged
13  communications.
14      To the extent you can answer without
15  revealing privileged matters, you can do so.
16      A.  I think that's -- Janice is in a position to
17  say how Senator Fraser was feeling when he filed the
18  legislation, and as such, I'm sure she's correct that's
19  what Senator Fraser was thinking.  But it's irrelevant
20  for the purposes of what I know.
21      Q.  (By Ms. Berkower) Do you know the purpose of
22  not allowing non-photo ID in SB 14?
23      MR. FREDERICK:  Objection on the basis of
24  legislative privilege and instruct you not to answer to
25  the extent it's a yes or no question.  Whether you know

| 254 |
|---|

1   the purpose, you may answer only to that extent.
2       A.  Yes, I think I know the purpose.
3       Q.  What is the purpose?
4       MR. FREDERICK:  Objection, legislative
5   privilege.
6       Instruct you not to answer.
7       A.  I can't answer that.
8       Q.  (By Ms. Berkower) What was the purpose of
9   removing from SB 14 the option for a voter to show a
10  state- or federal-issued photo ID as SB 362 allowed?
11      MR. FREDERICK:  Objection, legislative
12  privilege.
13      Instruct you not to answer.
14      A.  I can't answer that.
15      Q.  Do you know the purpose of removing those forms
16  of ID from SB 14?
17      MR. FREDERICK:  Object on the basis of
18  privilege.  Also object on relevance.
19      To the extent it's a yes or no question
20  whether you know, you may answer only to that extent.
21      A.  No, I don't know.
22      Q.  (By Ms. Berkower) Do you know of discussions
23  concerning the types of ID that would be permitted under
24  SB 14?
25      MR. FREDERICK:  Objection, vague.  Object

| 255 |
|---|

1   on the basis of privilege to the extent it calls for the
2   substance of any discussion.
3       You may answer only to the extent whether
4   you do know or do not know of such discussions.
5       A.  Can you restate the question?  I'm sorry.
6       Q.  Yes.  Yes.
7       MS. BERKOWER:  Actually, can you read it
8   back?
9       A.  I'm sorry.
10      (The requested portion was read by the
11  court reporter.)
12      MR. FREDERICK:  Same objection.
13      A.  Yeah, I think there was discussion after the
14  filing of the initial bill in November, and before the
15  filing of Senate Bill 14.
16      Q.  (By Ms. Berkower) Is this discussion between
17  the Lieutenant Governor or staff members and
18  legislators?
19      A.  Yes.
20      Q.  Which legislators?
21      A.  Senator Fraser.
22      Q.  Any others?
23      A.  Not that I'm aware of.
24      Q.  Were there also internal discussions in the
25  Lieutenant Governor's Office?

| 256 |
|---|

1       A.  I -- I think we briefed Governor Dewhurst on
2   the filing of Senator Fraser's original legislation to
3   the extent that happened, yes.
4       Q.  How would allowing the forms of ID permitted in
5   SB 362 prevent the goals of SB 14 from being met?
6       MR. FREDERICK:  Objection to the extent it
7   seeks her opinion.  I object on the grounds of
8   relevance.  Otherwise, I object on the grounds of
9   legislative privilege and would instruct you not to
10  answer.
11      A.  Okay, I can't answer that.
12      Q.  (By Ms. Berkower) Are you aware that the
13  Indiana photo ID allows for a wider range of IDs than SB
14  14 permits?
15      MR. FREDERICK:  Objection, assumes facts
16  not in evidence.
17      You may answer.
18      A.  I remember it having some additional forms of
19  ID but I don't remember what they are.
20      Q.  (By Ms. Berkower) Are you aware of whether
21  that's true with the Georgia photo ID?
22      A.  No, I'm not.
23      MS. BERKOWER:  Can we take a five-minute
24  break off the record?
25      MR. FREDERICK:  Sure.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

## 257

1           (Recess from 2:29 to 2:38 p.m.)
2       Q.  (By Ms. Berkower)  Since we got that time
3  check, it seems we have an hour and 43 minutes left of
4  time, but I know Ms. Rathgeber needs to leave at 3:30.
5  Is there any flexibility with your plans?
6       A.  There is, but I'd appreciate it if you can get
7  it pretty close to 3:30.  It would very kind of you.
8       Q.  So if we just kept going straight with no more
9  breaks, would that be acceptable?
10      A.  That would be better for me if we could do
11  that.
12      Q.  Okay.  That's what we'll do.  Otherwise, if
13  it's a hard deadline, we could schedule another time to
14  finish.
15      A.  Well, I'd rather not come back.
16      Q.  Okay.
17      A.  While this has been delightful, I'd rather not.
18      Q.  Okay.  Well, then we'll just keep going all the
19  way through.
20      A.  And I haven't let out a "bless your heart" yet,
21  but I'm about to.  Oh, bless your heart.  You don't want
22  to do that to me. (laughing)
23      Q.  Okay.  I don't get that very often. (laughing)
24         MR. FREDERICK:  So just so I'm clear, are
25  we planning on going straight until 3:30?

---

## 258

1         MS. BERKOWER:  I think we're going to go
2  straight until we finish with the time or until we
3  finish with the questions, whichever comes first.  But
4  we will not take any further breaks unless something
5  unexpected happens.
6         MR. FREDERICK:  Okay.
7         MS. BERKOWER:  That seems to be okay with
8  Ms. Rathgeber.  Is that okay with you, Matt?
9         MR. FREDERICK:  Yeah, that's -- I mean
10  whatever is okay with the witness is fine with me.
11      Q.  (By Ms. Berkower)  Okay.  So getting back to SB
12  14.
13      A.  Uh-huh.
14      Q.  What was the purpose of removing from SB 14 the
15  option for a voter to show a valid employee ID as SB 362
16  allowed?
17         MR. FREDERICK:  Objection, legislative
18  privilege.  I instruct you not to answer.
19      A.  I can't answer that.
20      Q.  (By Ms. Berkower)  Do you know who made that
21  decision?
22      A.  Yes.
23      Q.  Who made that decision?
24      A.  Senator Fraser.
25      Q.  Did you have any discussions or anyone from

---

## 259

1  your office have any discussions about that decision
2  with him?
3      A.  Not that I'm aware of prior to his original
4  filing.  I'm sure -- I think there were discussions
5  about that issue about what was included and what was
6  not before he filed Senate Bill 14.
7      Q.  What about after he filed Senate Bill 14?
8         MR. FREDERICK:  Objection, form.
9  Objection, vague.
10      A.  Not that I remember.
11      Q.  (By Ms. Berkower)  What was the substance of
12  any discussions that you had?
13         MR. FREDERICK:  Objection, vague.
14  Objection, legislative privilege.
15         I instruct you not to answer.
16      A.  I can't answer that.
17      Q.  (By Ms. Berkower)  What were the circumstances
18  by which the license to carry concealed handgun were
19  included in SB 14?
20         MR. FREDERICK:  Object on the grounds of
21  privilege.  To the extent it requires you to disclose
22  thought process or communications, if you can describe
23  the general circumstances without doing that, you may
24  answer.
25      A.  I think it was a -- the concealed handgun

---

## 260

1  license had been included in previous drafts, and there
2  was a thought that because of the DPS background check
3  associated with it, that it was a higher form of ID, and
4  therefore, would be perfect to include.
5      Q.  Did you say a higher form of ID?
6      A.  A more strenuous form of ID.
7      Q.  What does that mean exactly?
8      A.  That you had to meet certain requirements in
9  order to get a concealed handgun license that were even
10  more onerous than a driver's license.
11      Q.  Do you know what those additional requirements
12  are?
13      A.  I don't remember all of them.
14      Q.  Do you know the racial composition of license
15  to carry holders?
16      A.  No.
17         MR. FREDERICK:  Objection, relevance.
18         You can answer.
19      A.  No, I don't.
20      Q.  (By Ms. Berkower)  Is it disproportionately
21  White relative to Texas registered voters?
22         MR. FREDERICK:  Objection, relevance.
23      A.  I don't know.
24      Q.  (By Ms. Berkower)  Are you aware of any
25  legislator or staff who suspected that TLC holders are



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

261

1  disproportionately White?
2         MR. FREDERICK:  Objection, relevance.
3  Objection, calls for speculation.
4     A.  I'm not aware of that issue.
5     Q.  (By Ms. Berkower)  As an attorney, did you have
6  any concern that it might create an appearance that the
7  law was enacted with discriminatory purpose?
8         MR. FREDERICK:  Objection, relevance.
9     A.  I've been inactive with my legal license for a
10  couple of years, so it would be inappropriate for me to
11  be acting as an attorney during the period of time that
12  this bill was being heard.
13     Q.  (By Ms. Berkower)  Well, I'm not asking you to
14  act as an attorney.  I'm just saying that you've had --
15  with the legal training that you do have, did this --
16  did the fact that TLC holders are disproportionately
17  White raise any concerns in your mind that the law may
18  be viewed as an act of discriminatory purpose?
19         MR. FREDERICK:  Object, assumes facts not
20  in evidence.  Object to relevance.  I also object to the
21  extent it seeks her mental process or impressions about
22  the act.
23         I instruct you not to answer on the basis
24  of privilege.
25     A.  I can't answer that.

262

1     Q.  (By Ms. Berkower)  Did anyone conduct a
2  research into the racial composition of TLC -- of
3  license to carry holders?
4         MR. FREDERICK:  Objection, vague.  You may
5  answer if you know.
6     A.  I'm not aware of that data.  I was not aware of
7  that.
8     Q.  (By Ms. Berkower)  How did the exception for
9  individuals with disabilities come to be included in SB
10  14?
11         MR. FREDERICK:  Objection to the extent it
12  calls for you to reveal any legislator's thought process
13  or staff members for a privileged communication that you
14  may answer to the extent you can do so without revealing
15  privileged matters.
16     A.  I remember general discussions of people who
17  would not be able to go outside their homes or living
18  spaces in order to get the appropriate ID in which to
19  vote.  And one of the discussions -- one had -- some of
20  the discussions center around people who were disabled
21  or so significantly disabled that it would be hard to
22  transport them to a place to get the appropriate
23  identification, whether it was a driver's license or a
24  voter ID or any other ID.  And so I think that was the
25  justification.

263

1     Q.  (By Ms. Berkower)  Were there any similar
2  concerns about people who didn't have the financial
3  resources to get themselves to a location where they
4  could get appropriate ID?
5         MR. FREDERICK:  Object on the basis of
6  privilege to the extent it seeks thought process.
7         I will instruct you not to answer on the
8  basis of privilege.
9     A.  I'm sorry.  I can't answer that.
10     Q.  (By Ms. Berkower)  Why didn't the SB 14 include
11  the use of student IDs?
12         MR. FREDERICK:  Objection, legislative
13  privilege.
14         I instruct you not to answer.
15     A.  I can't answer that.
16     Q.  (By Ms. Berkower)  Wasn't it allowed in the
17  previous voter ID bills?
18         MR. FREDERICK:  Objection, relevance.
19  Objection, argumentative.
20     A.  It was allowed in some of the previous bills.
21  I don't remember if it was in 363 or not, or 362 or not.
22     Q.  (By Ms. Berkower)  Was there some change in
23  circumstance between 2009 and 2011 that made student IDs
24  less reliable in some way?
25         MR. FREDERICK:  Objection.  Object on the

264

1  basis of relevance.  Object on the basis of legislative
2  privilege.
3         I instruct you not to answer.
4     A.  I'm sorry.  I can't answer that.
5     Q.  (By Ms. Berkower)  Was there any publicly known
6  reason that student IDs were less reliable in 2009 --
7  I'm sorry, in 2011 than in 2009?
8     A.  Not that I'm aware of.  But I'm not certain
9  they were included in 362, student IDs were a specific
10  inclusion to the 362.  I think only to the extent that
11  you could argue that a valid identification card issued
12  by an institution or political subdivision of the state,
13  which would apply only to those state -- those people
14  attending state institutions as opposed to private
15  colleges.
16     Q.  How many state institutions does Texas have?
17     A.  I don't remember.  Counting community colleges
18  is about 60.
19     Q.  Do you know how many students are enrolled at
20  those schools?
21     A.  No, I don't.
22     Q.  Is it more than a thousand?
23     A.  Yes.
24     Q.  Is it more than 10,000?
25     A.  Yes.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

---

### 265

1     Q.  Is it more than a hundred thousand?

2         MR. FREDERICK:  Object.  Calls for

3 speculation.

4         You may answer if you know but don't

5 speculate.

6     A.  I know there are more than a hundred thousand

7 students enrolled in higher education in Texas.  I don't

8 know how many of them are Texas residents.

9     Q.  (By Ms. Berkower) Can you get Texas residency

10 if you're enrolled as a student in a school of higher

11 learning in Texas?

12     A.  Under situations where you've served in the

13 military or lived in the state for a set period of time,

14 there are some exceptions that allow for state

15 residency.  But they're -- they're more limited than --

16 I don't know.  There are some situations where you can

17 get residency, yes.

18     Q.  Was there any concern that you knew of that

19 failure to include student IDs might disproportionately

20 impact minority voters?

21         MR. FREDERICK:  Objection, legislative

22 privilege.

23         Instruct you not to answer.

24     A.  I can't answer that.

25     Q.  (By Ms. Berkower) Do you know if any analysis

---

### 266

1 was conducted to determine the effect of excluding

2 student IDs?

3         MR. FREDERICK:  Objection, legislative

4 privilege.

5         Instruct you not to answer.

6     A.  I can't answer that.

7     Q.  (By Ms. Berkower) Did you have any concern,

8 given your legal training, that it might create an

9 appearance that the law was enacted with a

10 discriminatory purpose?

11         MR. FREDERICK:  Objection, vague.

12 Objection, relevance.  Objection, legislative privilege.

13         Instruct you not to answer.

14     A.  I can't answer that.

15     Q.  (By Ms. Berkower) How did the exception for

16 individuals with religious objections to being

17 photographed come to be included in SB 14?

18         MR. FREDERICK:  Object to legislative

19 privilege, but if you can answer without revealing

20 privileged matters or communications, you may do so.

21     A.  My memory is that there was discussion about

22 people who refused to have their photo taken under any

23 situation, and the general consensus from the senators

24 was that those people should not be excluded from voting

25 if their objection was a habit that they had and -- I

---

### 267

1 mean that it -- it was relevant more than once in their

2 lives, that they had a habit of refusing to have their

3 photo taken for religious objections, that those people

4 should not be excluded from voting.  And so they set

5 forth a process that those people could vote.

6     Q.  (By Ms. Berkower) Why is it that some changes

7 in response to concerns raised about SB 14 and the types

8 of identification permitted were taken into account and

9 others were not?

10         MR. FREDERICK:  Objection, assumes facts

11 not in evidence, calls for speculation, and object on

12 legislative privilege and instruct you not to answer.

13     A.  I can't answer that.

14     Q.  (By Ms. Berkower) Well, you just said the

15 legislature made modifications to SB 14 for persons with

16 disabilities, correct?

17     A.  Correct.

18     Q.  The legislature made modifications to SB 14 for

19 persons with particular religious beliefs regarding

20 photography, did they not?

21     A.  Yes.

22     Q.  Did the legislature make modifications to SB 14

23 based on concerns pertaining to racial and ethnic

24 minorities?

25         MR. FREDERICK:  Objection, legislative

---

### 268

1 privilege.

2         Instruct you not to answer.

3     A.  I can't answer that.

4         MS. BERKOWER:  She can't answer yes or no?

5         MR. FREDERICK:  No, she can't, because it

6 implies that -- it implies a thought process.  The

7 concern is identified in the question.

8         MS. BERKOWER:  It doesn't say -- okay.

9     Q.  (By Ms. Berkower) Can you describe the

10 provisions in the bill pertaining to administration of

11 the ID requirement at the polls?

12         MR. FREDERICK:  Objection, vague.

13         You can answer.

14     A.  Yeah.  I don't know that I understand that.

15     Q.  (By Ms. Berkower) Well, we can turn to that

16 section.

17     A.  That would be helpful.  Thank you.

18     Q.  I think it's on Page 5.

19     A.  Okay.

20     Q.  Item C.

21     A.  Uh-huh.  Yes.

22     Q.  So why were so few specifics included in the

23 bill about how the new requirement would be implemented

24 at the polls?

25         MR. FREDERICK:  Objection, vague.

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

269

1   Objection, speculation.  Objection, legislative
2   privilege.
3        Instruct you not to answer.
4        A.  I'm sorry.  I can't answer that.
5        Q.  (By Ms. Berkower)  Doesn't the success of the
6   bill hinge on proper administration of the polls?
7        MR. FREDERICK:  Objection, argumentative.
8   Objection, calls for speculation.  Objection, relevance.
9        Q.  (By Ms. Berkower)  You can answer.
10       A.  It's typical in legislation to set forth the
11  objective and then allow the agency that administers it
12  to determine what specifically needs to happen through
13  the rule-making process, which is also a public process,
14  and how to implement it.  The legislature understands
15  that they don't know everything, and the people closest
16  to administering it would be the best ones to determine
17  how that should happen.
18       Q.  Well, if that's the case, then why were you in
19  the best position to determine which type of
20  identification should be used?
21       MR. FREDERICK:  Objection, argumentative.
22  Objection, assumes facts not in evidence.
23  Mischaracterizes the prior testimony.  And also calls
24  for legislative privilege.
25       I would instruct you not to answer on the

270

1   basis of privilege.
2        A.  I can't answer.
3        Q.  (By Ms. Berkower)  Why didn't the legislature
4   take more steps to specify how poll workers would
5   determine whether the voter had presented an ID that
6   proved their identity?
7        MR. FREDERICK:  Objection, legislative
8   privilege.
9        Instruct you not to answer.
10       A.  I can't answer that.
11       Q.  (By Ms. Berkower)  How was the election
12  identification certificate provision in SB 14 developed?
13       MR. FREDERICK:  Object to the extent it
14  calls for thought process, mental impressions or
15  communications involving specific legislators about
16  pending legislation.
17       If you can answer without revealing
18  privileged matters, you can do so.
19       A.  Which one are you asking about, the --
20       Q.  (By Ms. Berkower)  The election identification
21  certificate.  Do you mean which section?
22       A.  Yeah.  Oh, here it is on 13.  There was a
23  concern or my memory is there was discussion on the
24  Senate floor after testimony that there are people who
25  could not for some reason or another get an ID of one of

271

1   the other types, and that there ought to be at least one
2   option that allowed people to get a certificate if they
3   couldn't get the appropriate other identification.  And
4   so they developed a process for creating a specific
5   identification certificate for the purposes of voting.
6        Q.  Did you or anyone in the Lieutenant Governor's
7   office play a role in drafting that provision?
8        A.  I did not.
9        Q.  Do you know what it was modeled on?
10       A.  I do not.
11       Q.  Are you aware of any concerns about this
12  certificate and the difficulty it might -- the
13  difficulty in obtaining it?
14       MR. FREDERICK:  Objection, vague.
15       A.  I'm not aware of what the difficulty would be.
16       Q.  (By Ms. Berkower)  Well, I guess, are you aware
17  of any concerns that the certificate may be difficult
18  for people to obtain?
19       MR. FREDERICK:  Object on legislative
20  privilege to the extent this calls for confidential or
21  nonpublic communications among legislators or
22  legislative thought process.  If you're aware of
23  nonprivileged discussions, you may answer the question.
24       A.  There was public discussion on the Senate floor
25  about insuring that there was not a fee for the election

272

1   identification certificate.  There was some discussion
2   about whether or not having an election identification
3   certificate was equivalent to a poll tax, and therefore,
4   it was made free so that it would never be considered a
5   poll tax for people, for voters.
6        Q.  (By Ms. Berkower)  Do you know of any nonpublic
7   conversations about any concerns with the certificate?
8        MR. FREDERICK:  Object on the basis of
9   legislative privilege.
10       Instruct you not to answer.
11       A.  I'm sorry.  I can't answer that.
12       Q.  (By Ms. Berkower)  Do you know the average
13  distance to drivers -- to DPS offices in Texas?
14       A.  No.
15       MR. FREDERICK:  Objection, relevance.
16       A.  No, I don't.
17       Q.  (By Ms. Berkower)  Do you know if it's the same
18  in rural and urban areas?
19       MR. FREDERICK:  Objection, relevance.  You
20  may answer.
21       A.  I would assume it was less in urban areas than
22  rural areas, but I don't that for a fact.
23       Q.  (By Ms. Berkower)  Is there a DPS office in
24  every county?
25       A.  I don't think so.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 273

1     Q.  Is there public transportation to all DPS
2 offices?
3     A.  I don't know.
4     Q.  Do you know what the wait time is at DPS
5 offices on average?
6     A.  I know it varies by DPS office.
7     Q.  Do you know about how long it is?
8     A.  I know that they're trying to achieve an
9 objective level, and I don't know what that level is.  I
10 think it's 20 minutes, but I think they're exceeding
11 that at this moment.
12     Q.  Have you ever spent only 20 minutes at a DPS
13 office?
14     A.  Yes, I have.
15     Q.  When was that?
16     A.  Last time I renewed my driver's license.
17     Q.  Where did you go?
18     A.  The DPS had an office that was downtown, and I
19 went and renewed my driver's license, and it took about
20 five minutes.
21     Q.  Downtown here in Austin?
22     A.  Yes.  It's been since closed.
23     Q.  It since closed that office?
24     A.  Uh-huh.
25     Q.  Too few customers?

### 274

1     A.  Could be.
2     Q.  Do you know what the cost of obtaining the
3 underlying documents needed to get an election
4 identification certificate is?
5     A.  No, I don't.
6     Q.  Did you ever hear any of these kinds of issues
7 raised when the bill was being debated in the Senate?
8     A.  I remember a discussion about whether or not
9 the certificate itself cost money, but I don't remember
10 any other discussion about it.
11     Q.  Did you conduct any analysis on these issues?
12     MR. FREDERICK:  Objection, legislative
13 privilege.
14     Instruct you not to answer.
15     A.  I'm sorry.  I can't answer that.
16     Q.  (By Ms. Berkower)  Do you know of any analysis
17 that was conducted on these issues?
18     MR. FREDERICK:  Objection, vague.
19     Also instruct you not to answer on the
20 basis privilege.
21     A.  Not that I remember.  I'm sorry.  I can't
22 answer that.
23     Q.  (By Ms. Berkower)  During the legislative
24 drafting process or the legislature's consideration of
25 SB 14, do you know of any analysis of costs or steps a

### 275

1 voter would need to take to obtain one of these
2 certificates?
3     MR. FREDERICK:  Objection, legislative
4 privilege.
5     Instruct you not to answer.
6     A.  I'm sorry.  I can't answer that.
7     Q.(By Ms. Berkower)  Do you know what documents are
8 needed to obtain an election identification certificate?
9     A.  No.  I'm reading that right now.
10     Q.  But you're not generally familiar with which
11 document?
12     A.  No.  I don't remember.
13     Q.  If the documents that you need to show to get
14 an ID are not themselves free, doesn't that mean the ID
15 itself isn't really free?
16     MR. FREDERICK:  Objection, argumentative.
17 Objection, assumes facts not in evidence.  You may
18 answer.
19     A.  I don't think so.  I think there's a difference
20 between the components of an issue and the actual issue
21 itself.  I mean, I drive myself to work each day, and I
22 don't have -- I don't get paid for my car or my gas in
23 order to get to work, but I get paid for the work I
24 do.  To me, I'm still not getting paid for that
25 transportation to get to work.  I don't see the

### 276

1 components as being necessary to valuing the whole.
2     Q.  (By Ms. Berkower)  Would you take a job where
3 it cost more to get to work than you were paid?
4     MR. FREDERICK:  Objection, relevance.
5     A.  I don't think so.
6     Q.  (By Ms. Berkower)  So if you have to pay -- if
7 you have to pay for documents that you need to get one
8 of these certificates --
9     A.  Uh-huh.
10     Q.  -- doesn't that mean the certificate itself
11 isn't actually free given the underlying costs?
12     MR. FREDERICK:  Objection, argumentative.
13     A.  I don't think I agree with that logic.  I
14 really just don't.  I think that some of these documents
15 could be things that you have from your family or that
16 you didn't pay for in order to get it.
17     Q.  (By Ms. Berkower)  But what if you didn't have
18 any of those to begin with and you had to buy
19 replacements from the state?
20     A.  But if you did, it would be free.
21     Q.  But if you don't, would it still be free?
22     MR. FREDERICK:  Objection, argumentative.
23     A.  I just don't see that as a cost for getting the
24 certificate.
25     Q.  (By Ms. Berkower)  Well, what if you weren't



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER

MAY 29, 2012

---

### 277

1  born in at a hospital, then --
2          MR. FREDERICK:  Objection.  Sorry.
3      Q.  (By Ms. Berkower)  -- and you had to buy a copy
4  of your birth certificate in order to get a replacement
5  copy in order to get the election certificate --
6  information certificate.  Doesn't that mean you're
7  effectively paying for the election certificate?
8          MR. FREDERICK:  Objection,
9  argumentative.  Objection, calls for speculation.
10          You may answer if you can.
11      A.  I think there's a process at DHS for -- for
12  getting free copies of your birth certificate.  You
13  can't get an unlimited number of them, but you can get
14  some free ones.
15      Q.  (By Ms. Berkower)  What if it's not free
16  though?
17          MR. FREDERICK:  Objection, vague.
18  Objection, form.
19      A.  Then it's not free.
20          MR. FREDERICK:  You can answer if you can.
21      Q.  (By Ms. Berkower)  If the documents you need to
22  get an ID are not themselves free, wouldn't that mean
23  there's a cost to voting for those who lack the
24  necessary underlying documents?
25          MR. FREDERICK:  Objection, argumentative.

---

### 278

1  Objection, assumes facts not in evidence.
2          You may answer if you can.
3      A.  I just can't answer that question.  I don't
4  think that's an equivalency.
5      Q.  (By Ms. Berkower)  And it's not an equivalency
6  why?
7          MR. FREDERICK:  Objection, form.
8      A.  The fact that you have to pay for something in
9  order to get something else doesn't mean that that
10  something else is actually costing you something,
11  particularly if there are alternatives for achieving
12  that -- that third item.  I just don't see that as a --
13  as a given.  There may be situations where somebody has
14  to spend money in order to get a free certificate, but
15  there may be plenty of situations where they're not.
16  That doesn't make the certificate cost money.
17      Q.  (By Ms. Berkower)  Not even for the people who
18  had to pay for the underlying document?
19          MR. FREDERICK:  Objection, form.
20      A.  The certificate itself doesn't cost money.  The
21  things required in order to obtain the certificate may
22  cost money.  I do think there's a difference.
23      Q.  (By Ms. Berkower)  Do you know whether Whites,
24  Hispanics or Blacks or any other group are more likely
25  not to have the necessary ID to get one of these

---

### 279

1  certificates?
2          MR. FREDERICK:  Objection.
3          To the extent this calls for your mental
4  impressions or thought process about SB 14 as pending, I
5  would instruct you not to answer on the basis
6  privilege.  Otherwise, I would object based on
7  relevance.  And to the extent you can answer without
8  disclosing privileged information, you can, if you're
9  able to.
10      A.  I don't -- I don't know the statistics on who
11  has IDs and who doesn't.
12      Q.  (By Ms. Berkower)  Did you ever ask?
13          MR. FREDERICK:  Objection,
14  form.  Objection, vague.
15          Also instruct you not to answer on the
16  basis of privilege.
17      A.  I'm sorry.  I can't answer that.
18      Q.  (By Ms. Berkower)  Where does one obtain an
19  election identification certificate?
20      A.  I think you can get them from the DPS.
21      Q.  Does SB 14 require employers to provide paid
22  leave to obtain one of these IDs?
23      A.  Not that I'm aware of.
24      Q.  Do some individuals in Texas live at least 50
25  miles from a driver's license office?

---

### 280

1      A.  I don't know.
2      Q.  How much does gas currently cost per gallon in
3  Texas in your experience?
4      A.  About 3.60.
5      Q.  So how much would it cost at a minimum to drive
6  the hundred miles round trip?
7          MR. FREDERICK:  Objection, vague.
8  Objection, calls for speculation.  Objection, relevance.
9      A.  I think it depends on how far your car goes.
10  If you have a Prius, I mean, it doesn't cost too
11  much.  But I do think your point is taken, it costs
12  money to drive somewhere.
13      Q.  (By Ms. Berkower)  Do you have a copy of your
14  birth certificate?
15      A.  Yes, I do.
16      Q.  Where would you get a copy if you lost it?
17      A.  The DHS, Department of Human Services.
18      Q.  Do you know how much that would cost?
19      A.  No, I don't.
20      Q.  Do you know how long it would take?
21      A.  I've done it before, and it seems like to me I
22  called them and picked it up in an afternoon.
23      Q.  How would you go about finding out where to go
24  and how much it cost if you didn't know?
25      A.  All that information is online.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 281

1    Q.  Was any part of the purpose of SB 14 to
2  decrease the number of Hispanic voters?
3        MR. FREDERICK:  Objection, to the extent
4  this calls for you to reveal anyone's thought process or
5  communications, but to the extent it only seeks
6  information about the purpose of the bill itself, you
7  may answer.
8    A.  Not that I'm aware of.
9    Q.  (By Ms. Berkower)  Was any part of the purpose
10 of SB 14 to decrease the number of any other groups of
11 minority voters?
12       MR. FREDERICK:  Same instruction.
13   A.  Not that I'm aware of.
14   Q.  (By Ms. Berkower)  Was any part of the purpose
15 of SB 14 to prevent illegal aliens from voting?
16       MR. FREDERICK:  Same instruction.
17   A.  Not that I'm aware of.  Although I'm aware of
18 representative Brown's quote on the floor in the House,
19 so she may have had that intent, but that was not the
20 intent in the Senate as I'm aware of.
21   Q.  (By Ms. Berkower)  Was it an intent of
22 Lieutenant Governor Dewhurst?
23       MR. FREDERICK:  Objection, relevance.
24 Objection, legislative privilege.
25       Instruct you not to answer.

---

### 282

1    A.  I'm sorry.  I can't answer that.
2    Q.  (By Ms. Berkower)  Was any part of the purpose
3  of SB 14 to discriminate in any way against a group or
4  groups of minority voters?
5        MR. FREDERICK:  Just give you the same
6  cautionary instruction.  You may testify about the
7  purpose.
8    A.  Not that I'm aware of.
9    Q.  (By Ms. Berkower)  Was any part of the purpose
10 of SB 14 for partisan purposes?
11       MR. FREDERICK:  Same instruction.
12   A.  What do you mean by that?
13   Q.  (By Ms. Berkower)  Well, was any part of the
14 purpose to depress democratic participation --
15 Democrats' participation in elections to further the
16 partisan interests of Republican candidates?
17       MR. FREDERICK:  Same instruction.
18   A.  Oh, not that I'm aware of.
19   Q.  (By Ms. Berkower)  So, in your view, what was
20 the purpose of SB 14?
21   A.  As I've said before, to ensure the integrity of
22 the voting process, to make sure that the person voting
23 is actually the person that they say they are on the
24 voter registration.
25   Q.  Is that -- is that every purpose of SB 14?

---

### 283

1    A.  Yes, plus the ability to increase voter
2  confidence in the security of the voting process.
3    Q.  Did the purpose of photo ID in Texas evolve
4  over time between legislative sessions?
5        MR. FREDERICK:  Objection.  To the extent
6  that calls for legislative subjective understanding and
7  thought process, I instruct you not to answer.
8    A.  I would say, obviously, the bill drafts changed
9  over a period of time, so, yes, it changed over a period
10 of time.
11   Q.  (By Ms. Berkower)  But did the purpose of the
12 laws change over time?
13   A.  Not from my perspective, no.
14   Q.  Was it always to prevent in-person voter fraud?
15   A.  Yes, I think so.
16   Q.  Was it ever to prevent illegal aliens from
17 voting?
18   A.  Not from my perspective, but I know that there
19 may be people who have said that.
20   Q.  Lieutenant Governor, though, has consistently
21 indicated in his public statements that one of the
22 purposes was to prevent noncitizens from voting.  Can
23 you explain that?
24       MR. FREDERICK:  Objection, calls for
25 speculation.  Also object to the extent that it calls

---

### 284

1  for the Lieutenant Governor's thought process about
2  pending legislation.  I would instruct you not to
3  answer.
4    A.  I'm sorry.  I can't answer that.
5        MS. BERKOWER:  Some of those statements
6  were public statements.  Matt, she can't answer about
7  the public statements, why he said in public that the
8  purpose was to prevent noncitizens from voting?
9        MR. FREDERICK:  Well, first of all, I
10 don't think she can because she doesn't know what he's
11 thinking.  But to the extent that that question would
12 call for her to reveal his internal thought process
13 about pending legislation, yes, I think that would be
14 privileged.
15   Q.  (By Ms. Berkower)  So you're not answering?
16   A.  No.  I'm not answering.
17   Q.  If we wanted to know why the Lieutenant
18 Governor consistently indicates that one of the purposes
19 of SB 14 was to prevent noncitizens from voting, would
20 we need to ask him?
21       MR. FREDERICK:  Objection, relevance.
22   Q.  (By Ms. Berkower)  You may answer.
23   A.  Yes.
24   Q.  Do you know of any evidence that in-person
25 voter impersonation is a problem?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

---

285

1    A.  I know that there was some testimony to that
2  effect during the Committee of the Whole process of the
3  Senate floor discussion, but I don't remember the
4  specifics.
5    Q.  Do you know of any studies that documented a
6  widespread problem?
7    MR. FREDERICK:  Objection, vague.
8    Also instruct you not to reveal any
9  confidential communication or investigation by the
10  Lieutenant Governor, but to the extent you can answer
11  without doing that, you may answer.
12    A.  The discussion I remember having was held in
13  public session on the floor.
14    Q.  (By Ms. Berkower)  Are you aware of any
15  incidents, specific incidents of in-person voter fraud
16  in the state of Texas in the last 20 years?
17    A.  I've read newspaper articles that describe
18  voter fraud, but I don't know the specifics.
19    Q.  Do you know of any incidents of mail-in ballot
20  fraud that have occurred in the state of Texas in the
21  last 20 years?
22    A.  Again, I've read newspaper articles that
23  discussed mail-in voter fraud and in-voter registration
24  fraud over the past 20 years or so, but I don't remember
25  the specifics.

---

286

1    Q.  Why was it not a sufficient deterrent to voter
2  fraud to increase criminal penalties?
3    MR. FREDERICK:  Objection, legislative
4  privilege.
5    Instruct you not to answer.
6    A.  I'm sorry.  I can't answer that.
7    Q.  (By Ms. Berkower)  Do you know if the increase
8  in criminal penalties that SB 14 be included are
9  currently in effect?
10    A.  Yes.  The bill's not in effect because it's
11  undergoing DOJ review.
12    Q.  Why would -- why did SB 14 not include any
13  provisions about mail-in ballots?
14    MR. FREDERICK:  Objection, legislative
15  privilege.
16    Instruct you not to answer.
17    A.  I'm sorry.  I can't answer that.
18    Q.  (By Ms. Berkower)  Have you ever heard about
19  voters who did not vote because they were concerned that
20  voter fraud would cancel out their vote?
21    A.  I don't remember a discussion to that effect.
22    Q.  Would a registered voter who has voted in
23  previous elections but who was refused a regular ballot
24  because of SB 14 still have confidence in the system?
25    MR. FREDERICK:  Objection, calls for

---

287

1  speculation.
2    Q.  (By Ms. Berkower)  You may answer.
3    A.  There's a procedure set forth for anybody to
4  vote provisionally and then show up with the appropriate
5  identification within I think six days.  If that's what
6  you're asking.
7    Q.  Would a person who had to take off work or
8  travel to a DPS office to get an election identification
9  certificate have confidence in the system?
10    MR. FREDERICK:  Objection, calls for
11  speculation.
12    A.  I don't know.
13    Q.  (By Ms. Berkower)  Do you think SB 14 will
14  increase turnout?
15    MR. FREDERICK:  Objection, relevance.
16    If you have an opinion, you may answer.
17    A.  I don't know.
18    Q.  (By Ms. Berkower)  Did the Lieutenant Governor
19  play a role in developing a strategy to ensure that SB
20  14 was passed?
21    MR. FREDERICK:  Objection, vague.  I would
22  also object on the basis of legislative privilege.  And
23  instruct you not to reveal any communications, mental
24  impressions or thought process.  To the extent you can
25  answer the specific question whether or not he had any

---

288

1  role, you may do so, if you can do it without revealing
2  privileged information.  I would also object on the
3  grounds that it assumes facts not in evidence.
4    A.  As president of the Senate, he has a role in
5  whether or not a piece of legislation is heard, yes.
6    Q.  (By Ms. Berkower)  That wasn't exactly the
7  question.  The question was whether he played a role in
8  developing a strategy to ensure that SB 14 was passed.
9    MR. FREDERICK:  Same objection.  Same
10  instruction.
11    A.  Same answer.  As president of the Senate, where
12  he controls what's heard on the floor, yes, he would
13  develop a strategy for when a bill is heard.  He gets to
14  choose when they're heard.
15    Q.  (By Ms. Berkower)  What was that strategy in
16  the case of SB 14?
17    MR. FREDERICK:  Objection, on the basis of
18  legislative privilege.
19    Instruct you not to answer unless you can
20  do so without revealing confidential communications or
21  thought processes.
22    A.  In his role as president of the Senate, the
23  Lieutenant Governor operates as a traffic cop, when
24  bills are heard, what order they're heard in.
25  Frequently, a Senator will be out of the -- off the

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

289

1   Senate floor because they need to go give a speech or
2   have lunch with a constituent, and so we don't hear
3   their bills during the period of time that they're not
4   available.
5         So, yes, to the extent that he is the
6   manager of the Senate legislative work process, he does
7   have a role in determining when a bill is heard, how
8   it's heard, how soon it's heard, when it's heard, who is
9   recognized, all the above.
10    Q.   (By Ms. Berkower)  Was it part of the
11  Lieutenant Governor's strategy to pass SB 14 -- was part
12  of the strategy to send the bill directly to the
13  Committee of the Whole?
14        MR. FREDERICK:  Objection, argumentative.
15  Objection, also, on legislative privilege to the extent
16  it asks for the Lieutenant Governor's thought process.
17        To the extent you can answer without
18  revealing that or privileged communications, you may do
19  so, but if you cannot, I instruct you not to answer.
20    A.   I think, as I've answered earlier, the intent
21  was to follow the Senate rules, to the extent possible,
22  to recognize that Governor Perry enlisted as an
23  emergency item, and to allow the Senate, the full
24  Senate, the opportunity to hear all of the testimony,
25  all of the public testimony, and all the witnesses.  And

---

290

1   so, yes, I think hearing it in the Committee of the
2   Whole was his decision.
3     Q.   (By Ms. Berkower)  Did the Lieutenant Governor
4   have any plan to prevent what occurred in 2009 to SB 362
5   from happening to SB 14?
6         MR. FREDERICK:  Objection, assumes facts
7   not in evidence.  Objection, calls for speculation.  I
8   also object on the basis of legislative privilege and
9   instruct you not to answer unless you can do so without
10  revealing privileged matters.
11    A.   I don't understand the question because prevent
12  what from happening to 14 that happened to 316, what are
13  we preventing?
14    Q.   (By Ms. Berkower)  Well, prevent -- prevent
15  anything from happening -- well, I guess, did he have
16  any communications with members of the House or the
17  Governor's office to ensure that the bill would pass
18  both houses?
19        MR. FREDERICK:  Objection, based on
20  privilege.  You may answer whether a communication
21  occurred, but I instruct you not to reveal the substance
22  of any communication.
23    A.   Well, when the Governor issues an emergency
24  proclamation, it's a very public process, and the
25  legislature tries to respond accordingly.  So to the

---

291

1   extent that he tried to do what the Governor listed as
2   an emergency item, yes, he did try and hear the bill
3   during the emergency item period.
4         (Exhibit 109 marked for identification.)
5     Q.   (By Ms. Berkower)  This is Exhibit 109.
6     A.   Okay.
7     Q.   Do you recognize this?
8     A.   I assume these are Senate rules for the 82nd
9   legislature.
10    Q.   Can you turn to Rule 5.11?
11    A.   Okay.  Hold on.  I got two copies here.
12    Q.   Oh.
13    A.   Yes.
14    Q.   Does this suspend the two-thirds requirement
15  for voter ID legislation again in the 2011 legislative
16  session?
17    A.   Yes.  I think it continues the rule as it
18  existed in the 2009 session.
19    Q.   Did the Lieutenant Governor choose to refer SB
20  14 directly to the Committee of the Whole?
21    A.   Yes, he makes that decision.
22    Q.   Did the full Senate adopt a resolution
23  concerning the procedures to apply when in the Committee
24  of the Whole Senate for the duration of the
25  consideration of SB 14?

---

292

1     A.   I assume so.  They had to adopt rules in order
2   to hearing it -- have a hearing.
3         MS. BERKOWER:  Okay.  And we have another
4   exhibit.  This will be 110, I guess.
5         (Exhibit 110 marked for identification.)
6     Q.   (By Ms. Berkower)  Do you recognize this?
7     A.   It's the Senate journal for Monday, January 11,
8   2011.
9     Q.   Can you turn your attention to Page 60,
10  please?  What's the heading of this page?
11    A.   Senate Resolution 79.
12    Q.   And can you read the third paragraph that
13  starts "Resolved"?
14    A.   Okay.  (Reading to herself.)
15    Q.   And then Item 1.
16    A.   Okay.
17    Q.   "The committee shall afford reasonable
18  opportunity to interested parties to appear and testify
19  before the committee."  Do you see that?
20    A.   Yes.
21    Q.   How long was SB 14 considered in the Senate
22  from first reading to passage?
23    A.   I don't remember.  Do you have that here?
24    Q.   Do you want to just refresh your recollection
25  with it?

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

293

1     A.  Yes, please.
2     Q.  (Handed to witness.)
3         MS. BERKOWER:  Matt, do you have a copy?
4         MR. FREDERICK:  I can look on with this
5  one.  Thank you.
6     A.  It was filed on the 12th and engrossed on the
7  26th of January.
8     Q.  Compared to other bills you've worked on, was
9  that a relatively short time?
10        MR. FREDERICK:  Objection, vague.
11        You can answer.
12    A.  It happens from time to time.
13    Q.  (By Ms. Berkower)  When else has it happened?
14    A.  Well, we have a special session on the
15 transportation bill and did everything in about three
16 days one summer.  That was summer of 2009.
17    Q.  Do you think that this period of time afforded
18 interested parties a reasonable opportunity to appear
19 and testify?
20    A.  Well, yes.  I mean, they did testify.
21    Q.  Do you think that this was enough time, a
22 reasonable amount of time?
23        MR. FREDERICK:  Objection, relevance.
24    A.  I mean, every bill is required to have a
25 hearing, and this bill had a hearing with public

---

294

1  testimony and expert witnesses.  It was held in a very
2  public place that is televised for people within the
3  Capitol complex as well.
4     Q.  (By Ms. Berkower)  Did you have a role during
5  -- I'm sorry?
6     A.  Oh, I just -- you can look at it.
7     Q.  Did you have a role during consideration by the
8  Committee of the Whole at SB 14?
9     A.  Did I have a role?
10    Q.  Yes.
11    A.  No.  I didn't have an official role.
12    Q.  Did the Lieutenant Governor?
13    A.  Yes.
14    Q.  What was it?
15    A.  Well, he referred the bill to the Committee of
16 the Whole.  He determined who would be in charge during
17 the Committee of the Whole.  And then he participated
18 as -- acting as a senator during the Committee of the
19 Whole process, listened to testimony.
20    Q.  Did you have a role during consideration of SB
21 14 on the Senate floor?
22    A.  I don't have an official role with it, but we
23 prepared the background information, insured that all
24 the paperwork was prepared and compiled in such a manner
25 so that the bill was ready to be heard according to the

---

295

1  Senate rules.
2     Q.  Did the Lieutenant Governor have a role during
3  consideration of SB 14 on the Senate floor?
4     A.  Yes.  He was the president of the Senate, and
5  he managed recognizing the senators to hear the bill and
6  discuss it, debate it.
7     Q.  He carried out his procedural duties during
8  that time?
9     A.  Yes, he did.
10    Q.  During the floor debate on SB 14, did anyone
11 raise concerns about its impact on minority voters?
12    A.  I don't remember the specific information, but
13 I rather think Senator West did.
14    Q.  What concerns did he have?
15    A.  I don't remember the details.
16    Q.  Were there any changes to SB 14 during floor
17 consideration that you view as responsive to minority
18 concerns?
19        MR. FREDERICK:  Object, basis of
20 relevance.  Also object to the extent it calls for your
21 own mental impressions as a staff member of the
22 Lieutenant Governor.  I would instruct you not to answer
23 on the basis of privilege.
24    A.  Okay.  I know that there were amendments
25 offered and adopted.  I just don't remember what they

---

296

1  did.
2     Q.  (By Ms. Berkower)  What does it mean to you
3  when a legislator says on the Senate floor "I'm not
4  advised"?
5     A.  That means that they're not aware of whatever
6  the issue is.
7     Q.  Is part of a bill's sponsor -- is part of the
8  role of the bill's sponsor to answer questions about it?
9     A.  Sometimes that responsibility is shared with
10 other senators.  For instance, we divvy up the budget
11 into articles and each senator -- there are senators who
12 develop expertise on each of those articles of the
13 budget, and they answer the questions about that
14 article, not the Chair of Finance who typically carries
15 the budget.
16    Q.  Do you remember if Senator Fraser repeatedly
17 said "I'm not advised" during a Senate's consideration
18 of SB 14?
19        MR. FREDERICK:  Objection, relevance.
20        You can answer.
21    A.  I don't remember what he said.
22    Q.  (By Ms. Berkower)  Were you ever -- were you
23 aware of whether the forms of ID listed in SB 14 are the
24 least restrictive options to achieve the goal of
25 avoiding voter fraud?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

297

1        MR. FREDERICK:  Objection, relevance.
2    Objection, calls for a legal conclusion.  Calls for
3    speculation.  I also object on the basis of privilege
4    and instruct you not to answer.
5        A.  I'm sorry.  I can't answer that.
6        Q.  (By Ms. Berkower)  Do you know if Lieutenant
7    Governor Dewhurst had any communications about what
8    forms of ID to include in SB 362?
9        MR. FREDERICK:  Objection, asked and
10   answered.  Also object to the extent it calls for
11   legislatively privileged communications, but you may
12   answer if you can remember the question whether or not
13   such communications occurred.
14       A.  I know that he was thoroughly briefed on
15   362.  I don't -- I don't think he was involved in the
16   original drafting of it, but he may have been involved
17   in the amendments to that.
18       Q.  (By Ms. Berkower)  Do you know if Lieutenant
19   Governor Dewhurst had any communications about what
20   forms of ID to include in SB 14?
21       A.  He did not in the original filing of SB 14 in
22   November of 2010, but he did get briefed and was aware
23   of what was included before it was given the number SB
24   14 in the January time frame.
25       Q.  Did Lieutenant Governor vote on the amendments

298

1    offered to SB 14?
2        A.  No.  He was not allowed to do so unless there
3    was a tie.
4        Q.  Were any amendments introduced during the
5    Committee of the Whole?
6        A.  No.  I don't believe so.  It was passed out
7    without amendments, and the amendments occurred on the
8    Senate floor.
9        Q.  Did the Lieutenant Governor play any role in
10   the conference committee's consideration of SB 14?
11       A.  He designates the conference committee
12   membership and then determines whether or not the
13   conference committee can be brought -- the conference
14   committee report can be brought up on the floor, so yes,
15   he does.
16       Q.  Is that something you're involved with as well?
17       A.  Yes.
18       Q.  What is your involvement with that process?
19       A.  I double-check to make sure the conference
20   committee report is complete, that the side-by-side
21   analysis and all the materials that are necessary in
22   that package are there.  When determining who's on the
23   conference committee, we look at the members.  There's
24   always five members of the conference.  Two of them have
25   to be from the committee of origin.

299

1        In this case, the committee of origin was
2    the Committee of the Whole, so we could have appointed
3    any of the senators to that conference committee.
4    Typically, deference is given to the committee -- the
5    bill author or sponsor, and they will request their five
6    members.
7        Q.  Is it unusual for the conference committee to
8    insert a new provision into legislation?
9        A.  No.
10       Q.  Why did the conference committee change the
11   structure of the free ID offered in SB 14?
12       MR. FREDERICK:  Objection, legislative
13   privilege.
14       Instruct you not to answer.
15       A.  I'm sorry.  I can't answer that.
16       Q.  (By Ms. Berkower)  What was the reason the
17   conference committee removed the provision that would
18   have allowed a tribal ID to be used under SB 14?
19       MR. FREDERICK:  Objection, legislative
20   privilege.
21       Instruct you not to answer.
22       A.  I'm sorry.  I can't answer that.
23       Q.  (By Ms. Berkower)  What was the purpose of the
24   conference committee's decision to remove the provision
25   that would require that voter education would be

300

1    targeted at low income and minority voters?
2        MR. FREDERICK:  Objection, legislative
3    privilege.
4        Instruct you not to answer.
5        A.  I'm sorry.  I can't answer that.
6        Q.  (By Ms. Berkower)  What was the purpose of the
7    conference committee's decision to remove the provision
8    to require -- to allow temporary driving licenses that
9    contain a photo to be used under SB 14?
10       MR. FREDERICK:  Objection, legislative
11   privilege.
12       Instruct you not to answer.
13       A.  Sorry.  I can't answer that.
14       Q.  (By Ms. Berkower)  Why is the conference --
15   what was the purpose of the conference committee's
16   decision to remove the provision that would have
17   required affidavits for provisional voters to be
18   available in each polling place?
19       MR. FREDERICK:  Objection, legislative
20   privilege.
21       Instruct you not to answer.
22       A.  Sorry.  I can't answer that.
23       Q.  (By Ms. Berkower)  Did the Lieutenant Governor
24   ever discuss whether SB 14 might disproportionately
25   impact minority voters?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 301

1       MR. FREDERICK:  Objection, legislative
2   privilege.
3       Instruct you not to answer.
4       A.  I'm sorry.  I can't answer that.
5       Q.  (By Ms. Berkower)  Was the Lieutenant Governor
6   concerned that SB 14 might disproportionately impact
7   minority voters?
8       MR. FREDERICK:  Objection, relevance.
9   Objection, legislative privilege.
10      Instruct you not to answer.
11      A.  I'm sorry.  I can't answer that.
12      Q.  (By Ms. Berkower)  Did the Lieutenant Governor
13  believe he had an obligation pursuant to Section 5 of
14  the Voting Rights Act to determine whether SB 14 might
15  impact minority voters?
16      MR. FREDERICK:  Objection, relevance.
17  Objection, legislative privilege.
18      Instruct you not to answer.
19      A.  I'm sorry.  I can't answer that.
20      Q.  (By Ms. Berkower)  Are you aware of any
21  legislators making any statements about illegal aliens
22  voting?
23      MR. FREDERICK:  Let me just object and
24  instruct you.  I mean, to the extent these are
25  confidential nonpublic communications, I would instruct

## 302

1   you not to reveal it.
2       THE WITNESS:  Yeah.
3       MR. FREDERICK:  But if you can answer
4   without revealing privileged communications, you may do
5   so.
6       A.  Well, I know Representative Brown made her
7   statement on the House floor, but I'm not aware of that
8   statement being made on the Senate floor.
9       Q.  (By Ms. Berkower)  What about private
10  statements about illegal aliens voting, do you know of
11  any?
12      A.  I'm not aware of any.
13      Q.  Have you ever heard any Texas State legislator
14  who voted in favor of Senate Bill 14 say that it would
15  prevent racial or ethnic minorities from voting in
16  Texas?
17      MR. FREDERICK:  Objection, relevance.  And
18  objection on the basis of privilege.
19      But you may answer the yes-or-no question
20  whether you've ever heard it.
21      A.  No, I've not.  I've not heard of that.
22      (Exhibit 111 marked for identification.)
23      Q.  (By Ms. Berkower)  Do you recognize this?
24      A.  Yes, I do.
25      Q.  Have you seen this before?

## 303

1       A.  I'm sure I have.  I don't remember it.
2       Q.  Is it a press release that Lieutenant Governor
3   issued after SB 14 was passed?
4       A.  Yes.
5       Q.  Do you see that on the second to the -- well,
6   do you see the last sentence says "Voter ID will
7   stamp out voter fraud and increase public confidence in
8   our elections process by ensuring that only U.S.
9   citizens who are legally eligible vote in Texas
10  elections." Did I read that correctly?
11      A.  Yes, you did.
12      Q.  Why does this press release reference the need
13  to ensure only U.S. citizens vote?
14      MR. FREDERICK:  Objection, relevance.
15  Objection, calls for speculation.
16      As to the extent that this calls for you
17  to reveal the Lieutenant Governor's thought process
18  about the bill, I'll instruct you not to answer on the
19  basis of privilege.
20      A.  I'm not aware of the answer to your
21  question.  I didn't remember this statement.
22      Q.  (By Ms. Berkower)  Did you review this press
23  release before it went out?
24      A.  I don't think so.
25      Q.  Did you participate in the drafting at all?

## 304

1       A.  I don't -- I don't think so.
2       Q.  What's the basis for saying that the public
3   needs an increase of confidence that only U.S. citizens
4   are participating in elections?
5       MR. FREDERICK:  Objection, calls for
6   speculation.  Objection, relevance.  Also object to the
7   extent it calls for privileged communications or thought
8   process.
9       So to the extent you can answer without
10  revealing privilege, you may do so.  If you can't, I
11  instruct you not to answer.
12      A.  As I've said before today, I do think that
13  there -- that one of the objectives of the voter ID
14  legislation was to increase public confidence in the
15  election process and ensure there wasn't voter fraud,
16  and it's fraudulent for people who are not U.S. citizens
17  to vote.
18      Q.  (By Ms. Berkower)  How does photo ID at the
19  polls ensure that only U.S. citizens are voting?
20      MR. FREDERICK:  Objection.  To the extent
21  it calls for any privileged matters, I instruct you not
22  to answer.  If you can answer without revealing that,
23  you may do so.
24      A.  I think the intent was to make it -- make the
25  election process a stronger process to put additional



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

305

1  safeguards in place to ensure that U.S. citizens were
2  voting and not people voting illegally.  And so to that
3  extent, while it may not be perfect, it's better than
4  our current system.
5      Q.  (By Ms. Berkower)  But how does the ID
6  requirement speak to citizenship at all if it's possible
7  as a noncitizen to get some of the IDs that are
8  permitted under SB 14?
9      MR. FREDERICK:  Objection, argumentative.
10  Objection, calls for speculation.  Objection, relevance.
11  You may answer if you can.
12      A.  I'm under the impression or understanding that
13  many of the IDs state whether or not a person is a
14  citizen or a legal alien.  For purposes -- for that
15  purpose, then it would be evident to the poll workers.
16      Q.  (By Ms. Berkower)  Well, what if the Texas
17  driver's license did not actually include that
18  information?
19      MR. FREDERICK:  Objection, calls for
20  speculation.
21      A.  I think it does.
22      Q.  (By Ms. Berkower)  What's your basis for
23  thinking that?
24      A.  I thought that it says on the back of it if
25  you're -- like it expires when your Visa expires or

306

1  something along those lines.  It's that kind of
2  language.  I don't remember exactly.
3      Q.  Is your citizenship listed on your Texas
4  driver's license?
5      A.  No.  I don't think it is, but it may be
6  included in the magnetic strip, come to think of it.
7  That being said, I think that it's for people who have a
8  Visa that it says that it expires when the Visa expires.
9      Q.  Isn't citizenship assessed during the voter
10  registration process?
11      A.  I'm not aware.  I think you have to swear that
12  you are a citizen.
13      Q.  Do you swear under penalty of perjury?
14      A.  That's my memory, yes.
15      Q.  Does that not provide any deterrent to people
16  who aren't citizens trying to register?
17      MR. FREDERICK:  Objection, calls for
18  speculation.
19      A.  It does provide a deterrent, but it doesn't
20  provide the most that we can do to help make sure that
21  it's One Person, One Vote.
22      Q.  (By Ms. Berkower)  What's the most that we
23  could do to help in your view?
24      A.  Well, we could just tattoo everybody with a
25  U.S. state citizenship, but that's not as far as we're

307

1  willing to go with the Texas legislature.  I mean, there
2  are extremes that are ridiculous.
3      However, I think the goal of the voter ID
4  legislation was to ensure that we increase the integrity
5  of the elections process and made it a little bit
6  tighter so that it was One Person, One Vote, and you
7  knew the person who registered was the person that
8  actually showed up to vote.
9      Q.  But it doesn't actually do anything to keep
10  citizens -- noncitizens from voting, does it?
11      MR. FREDERICK:  Objection, argumentative.
12      A.  Well, I think when somebody shows up with a
13  passport, you have at least an increased level of
14  security that they are a U.S. citizen, and therefore,
15  they've met a threshold that wasn't there before.
16      Q.  (By Ms. Berkower)  Did you ever have any
17  communications with Bryan Hebert about whether showing
18  two forms of nonphoto ID would make the electoral system
19  more secure?
20      MR. FREDERICK:  I'm going to object on the
21  basis of privilege.  To the extent that you can answer
22  by identifying a conversation on the general subject
23  matter, you may do so, but don't reveal the substance of
24  any conversation with Mr. Hebert.
25      A.  I know that I received a lot of summary

308

1  information from Bryan Hebert on what was included in
2  each piece of this legislation, what types of IDs were
3  included.
4      Q.  (By Ms. Berkower)  When did you get those
5  communications?
6      A.  On a regular basis as each piece of legislation
7  was being considered.
8      Q.  So is this in 2005, 2007, 2009 and 2011?
9      A.  Yes.  I don't really remember 2005 at all, but
10  '07 and '09, '11, yes.
11      Q.  What was the means by which you received this
12  information?
13      A.  Sometimes e-mails, sometimes daily briefings,
14  verbal briefings.
15      Q.  When you were doing the verbal briefings, who
16  else was present?
17      A.  I don't remember.  It's standard operating
18  procedure for me to talk to our policy staff every day
19  about major issues that are going through the
20  legislative process.  And I would get briefings every
21  day from every staff person.
22      Q.  At any time since the passage of SB 14, have
23  you come to believe that the bill will have a
24  retrogressive effect on minority voters?
25      MR. FREDERICK:  Objection, calls for legal



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                             MAY 29, 2012

---

## 309

1    conclusion.  Objection, relevance.
2            You may answer to the extent you can.
3        A.  No.  I'm not aware of any data that shows
4    that.  In fact, I think I've seen data that it increased
5    minority participation either in Georgia or Indiana, but
6    I wouldn't swear to that.
7        Q.  (By Ms. Berkower)  Where did you see that data?
8        A.  I want to say it was in a newspaper article.
9        Q.  Which newspaper article?
10       A.  I don't remember.  I'm sorry.
11       Q.  Do you even remember which newspaper maybe?
12       A.  No, I don't.
13       Q.  Do you remember about when you read that
14   article?
15       A.  No, but it would have been during the
16   discussion of the last -- after the Indiana case and
17   before present time.
18       Q.  Are you involved at all with Lieutenant
19   Governor Dewhurst campaign for Senate?
20       A.  No, I'm not.  I mean, other than I hope he does
21   well, I mean, you know.  No, I'm not paid by the
22   campaign in any way.
23       Q.  Do you have any communication with his campaign
24   staff?
25       A.  Yes, I do.

---

## 311

1        A.  First says "Dewhurst push for voter ID for two
2    sessions."  Second is "Dewhurst supports conservative
3    legislation such as voter ID."
4        Q.  How do those fall into the category of opposing
5    illegal immigration?
6            MR. FREDERICK:  Objection, calls for
7    speculation.
8        A.  I'm -- I don't do politics.  This is quoting a
9    Jay Rude article and a Houston Chronicle article.  So it
10   looks like a Richard Durham -- Dunham's article.  So it
11   appears to me that what they're doing is quoting public
12   articles.
13       Q.  (By Ms. Berkower)  Okay.  But this is -- if
14   this is from his, Dewhurst's campaign website, doesn't
15   it indicate that he affiliates voter ID with illegal
16   immigration reform?
17           MR. FREDERICK:  Objection, assumes facts
18   not in evidence, calls for speculation, argumentative.
19   You can answer if you can.
20       A.  Well, I wasn't privy to what the thought
21   process was for preparing this information.
22       Q.  (By Ms. Berkower)  So it's not privileged, you
23   just don't know?
24       A.  I don't.  I don't do campaign work.
25           (Exhibit 113 marked for identification.)

---

## 310

1        Q.  How often?
2        A.  Oh, things like can you come over on the
3    weekend and stuff envelopes, that sort of thing.  Not a
4    regular basis.  We do communicate with his schedulers at
5    the campaign office, and we communicate with the
6    scheduler pretty frequently, but that's about
7    maintaining a schedule.  It's not about substantive
8    issues.
9            MS. BERKOWER:  I'm going to have this
10   exhibit, this is 112, I think.
11           (Exhibit 112 marked for identification.)
12       Q.  (By Ms. Berkower)  Are you familiar with this?
13       A.  Oh, yes, I've seen this.
14       Q.  What is this?
15       A.  I've seen it in commercials.
16       Q.  Can you turn to Page 3, please?
17       A.  Okay.
18       Q.  Is this a printout of Lieutenant Governor
19   Dewhurst's campaign website?
20       A.  I really don't know.  It looks like it.
21       Q.  Do you see the section in the middle of the
22   third page?
23       A.  "Strongly opposes illegal immigration," yes.
24       Q.  What are the first two measures that it says
25   "Support"?

---

## 312

1        Q.  (By Ms. Berkower)  Are you familiar with this?
2        A.  Oh, yes, I've read this.
3        Q.  Did you write this?
4        A.  No, I did not.
5        Q.  Is this a press release from the Lieutenant
6    Governor's office?
7        A.  Yes, it is.
8        Q.  When did this come out?
9        A.  March 12, 2012.
10       Q.  And what is the substance of the press release?
11       A.  He is opposing the Justice Department's
12   blocking of Texas voter ID law.
13       Q.  What's the -- does it say that "the Texas voter
14   ID law allows for numerous forms of government-issued
15   photo identification, including passports and concealed
16   handgun licenses.  Offers free identification for those
17   in need, and also provides voter education poll worker
18   training, ensuring every legal citizen can exercise
19   their right to vote"?
20       A.  Yes, it does.
21       Q.  Why does this press release affiliate
22   citizenship with the voter ID law?
23           MR. FREDERICK:  Objection, calls for
24   speculation.  Objection, relevance.
25           You can answer if you know.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

313

1    A.  I don't -- I don't know the answer to that.
2    Q.  (By Ms. Berkower)  If you were called to trial,
3  would you testify that SB 14 has no discriminatory
4  purpose?
5    A.  I don't know the answer to that.
6    Q.  You don't know whether SB 14 has a
7  discriminatory purpose?
8    A.  From my perspective, it does not, but I don't
9  know everybody else's perspective.
10   Q.  If you were called to trial, would you testify
11 that SB 14 has no discriminatory effect on minorities?
12   A.  I don't know the answer to that.  It hasn't
13 gone into effect here in Texas.
14      MS. BERKOWER:  Can we check the time?
15      (Brief discussion off the record.)
16      MS. BERKOWER:  This is going to be Exhibit
17 113; is that right?  114.
18      (Exhibit 114 marked for identification.)
19   Q.  (By Ms. Berkower)  Do you recognize this?
20      MR. FREDERICK:  Let me ask before we go
21 on.
22      MS. BERKOWER:  Yeah.
23      MR. FREDERICK:  How much longer do you
24 think we've got?
25      MS. BERKOWER:  I think we're going to go

---

314

1  to the full seven hours.  I have some, but then we're
2  going to give it over to Mr. Harris.
3      MR. FREDERICK:  Okay.  Well, can we go off
4  the record for just a minute?
5      (Discussion off the record.)
6    Q.  (By Ms. Berkower)  Okay.  Do you recognize
7  this?
8    A.  I see what it is.
9    Q.  What is it?
10   A.  It's talking points for -- or draft talking
11 points for the voter ID bill signing.
12   Q.  For Lieutenant Governor Dewhurst?
13   A.  I don't know, but that would be consistent
14 with --
15   Q.  Have you reviewed -- have you seen this
16 document before?
17   A.  I don't remember it, but this is the format his
18 talking points take.
19   Q.  Do you know if you were involved in the
20 drafting of this document?
21   A.  Not that I remember, but I could be involved in
22 the fact-checking of it.
23   Q.  It says in the top line, "We know" -- sorry,
24 the top -- the first line of the second paragraph says,
25 "We know the threat of voter fraud is real."  What did

---

315

1  he mean by that?
2      MR. FREDERICK:  Objection, calls for
3  speculation.  Also object on the basis of privilege.
4      To the extent it seeks the Lieutenant
5  Governor's thought process, if you can answer without
6  revealing privileged matters, you can do so.
7    A.  During the Committee of the Whole process, I
8  know he sat through all of the testimony, and some of
9  the testimony dealt with deceased voters and people who
10 are not qualified to vote voting, and therefore, this
11 could be based on his experience in that committee
12 process.
13   Q.  (By Ms. Berkower)  In your mind, what's the
14 definition of "voter impersonation"?
15      MR. FREDERICK:  Objection, relevance, but
16 you may answer if you can.
17   A.  Well, my impression would be that someone who's
18 not the person on the voter registration certificate
19 showed up and voted in their name.
20   Q.  (By Ms. Berkower)  Did you fact check that
21 statement?
22   A.  Not that I remember.  I don't remember these
23 talking points.
24      MS. BERKOWER:  This will be 115.
25      (Exhibit 115 marked for identification.)

---

316

1    Q.  (By Ms. Berkower)  Do you recognize this?
2    A.  Yes, I think so.
3    Q.  Did you draft this?
4    A.  No, I didn't.
5    Q.  What is this?
6    A.  I think these were talking points prepared by
7  Bryan Hebert.
8    Q.  What was the occasion for which these talking
9  points were prepared?
10   A.  I don't remember a specific occasion but more
11 along the lines of it being a list of things -- of
12 comments that could be made about voter ID legislation.
13   Q.  What were these talking points adapted -- I'm
14 sorry.  Were these talking points adapted or approved by
15 Lieutenant Governor?
16   A.  He doesn't typically adopt or approve talking
17 points, and frequently, they're from talking points that
18 we give him.
19   Q.  Do you know if these talking points were
20 distributed to other legislators?
21   A.  I'm not aware of it, but it wouldn't surprise
22 me at all if they were shared with at least Senator
23 Fraser's office and perhaps people in the House.
24   Q.  Why wouldn't it surprise you?
25   A.  Because we typically coordinate something like


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                          MAY 29, 2012

---

**317**

1  this with other people working on the issues.  We do it
2  on all kinds of issues.  The budget summaries are
3  typical.  Everybody gets copies of them.
4      Q.   This says that the bill is similar to Indiana
5  and Georgia laws, both of which were upheld by federal
6  authorities.  Didn't you testify earlier that there are
7  a number of IDs acceptable under those laws that are not
8  acceptable under SB 14?
9          MR. FREDERICK:  Objection, argumentative.
10  Misstates prior testimony.
11      A.   I think Matt's right.  I think that misstates.
12  I think there are some additional or differences in
13  Indiana and Georgia laws, but I don't know what they
14  are.  And this does say they're similar, not identical.
15          MS. BERKOWER:  I guess I might do maybe
16  two at a time if that's all right?
17      A.   That would be a good thing.  Anything that's
18  faster.
19          MR. FREDERICK:  Yeah, yeah.
20          MS. BERKOWER:  This is going to be 116 and
21  117, I guess.
22          (Exhibits 116 and 117 marked for
23  identification.)
24          MS. BERKOWER:  Matt, will you look on with
25  her in the interest of time?

---

**318**

1          MR. FREDERICK:  Of course.
2      Q.   (By Ms. Berkower)  Do you recognize what these
3  are?
4      A.   LexisNexis.  This is the Georgia law.  And this
5  is the Indiana law, I'm assuming.
6      Q.   On the Georgia law, do you see under Section
7  A2, A4 and A6, can you review those quickly, please?
8      A.   Okay.  2 is a voter identification
9  certificate.  And 4 is employer identification card.
10  And 6 is a travel identification card.
11      Q.   So Section 2 permits any state or U.S.
12  government issued ID; is that correct?
13      A.   Yes.
14      Q.   Section 4 permits an employee -- an employee ID
15  issued by a state or U.S. government agency; is that
16  correct?
17      A.   Yes.
18      Q.   And Section 6 permits a travel ID; is that
19  correct?
20      A.   Yes.
21      Q.   Are any of those permitted under SB 14?
22      A.   Well, there are some United States IDs allowed
23  under 14, yes.  And there is a voter identification card
24  that -- under 14, but not all the additional cards.
25      Q.   Is it fair to say that there's a number of IDs

---

**319**

1  that are permitted under the Georgia law that are not
2  permitted under SB 14?
3      A.   Yes.
4      Q.   Turning your attention to the Indiana law.  On
5  the first page of that exhibit, Item 4.
6      A.   Uh-huh.
7      Q.   The document was issued by the United States or
8  the state of Indiana.  Does that -- does that show that
9  there are some IDs permitted under Indiana law that are
10  not permitted under SB 14?
11      A.   Well, as long as those IDs have all the
12  additional information listed above, an expiration of
13  photograph, and it probably does provide -- apply to the
14  expanded list of identification cards.
15      Q.   So turning back to the talking points.
16      A.   These?
17      Q.   Yes.
18      A.   Okay.
19      Q.   I don't remember which number that is.
20      A.   115.
21      Q.   Turning back to 115, it says that "SB 14 is
22  similar to Indiana and Georgia laws, both of which were
23  upheld by federal authorities."  Do you think that's an
24  accurate characterization of SB 14?
25      A.   Yes, I do.  I do think they're similar.  The

---

**320**

1  structure of the Indiana law is very different.  And the
2  Georgia law is very similar.  It does allow for some
3  additional identification, but otherwise, the structure
4  is very similar through the rest of the bill.
5      Q.   Why don't the talking points identify any of
6  the differences between those laws?
7          MR. FREDERICK:  Objection, calls for
8  speculation.  Argumentative.
9          You may answer.
10      A.   I don't know.  I don't know the answer to that.
11      Q.   (By Ms. Berkower)  Would you agree that if SB
12  14 were implemented, it would be stricter than the
13  Georgia or Indiana laws?
14          MR. FREDERICK:  Objection, vague.  Calls
15  for speculation.
16          You may answer.
17      A.   On a superficial reading, and I haven't studied
18  these, I would say that Texas is slightly more strict.
19      Q.   (By Ms. Berkower)  Did you conduct any research
20  into either the Georgia or Indiana laws when you were
21  working on SB 14?
22          MR. FREDERICK:  Objection, legislative
23  privilege.  Instruct you not to answer.
24      A.   I'm sorry.  I can't answer that.
25          MS. BERKOWER:  The question of whether she

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 321

1  conducted research, not what she found or how it
2  influenced her?
3       MR. FREDERICK:  Yeah.  I think that goes
4  to thought process and mental impressions of the
5  Lieutenant Governor's.  So, yes, I'll stand by the
6  objection.
7       MS. BERKOWER:  Well, she already testified
8  that she spoke with people from Indiana about their
9  voter ID law.  So --
10      MR. FREDERICK:  And objection, asked and
11 answered.  I mean, I think research is different than
12 did you have conversations, because research would be a
13 legislative investigation, whereas conversations with
14 people outside the state, I think I permitted that
15 question, because I think it's arguable that that would
16 not be a privileged communication to the extent it's
17 just another person outside the legislature.  I think
18 this is different, and I stand by that objection.
19      MS. BERKOWER:  Okay.  So just so I'm clear
20 on it, it's because it was material considered by her in
21 her legislative capacity, is that your objection?
22      MR. FREDERICK:  I think the question seeks
23 to determine the character and content of a legislative
24 investigation made concerning a pending bill, so yes.
25      MS. BERKOWER:  Okay.

### 322

1       (Exhibit 118 marked for identification.)
2  Q.  (By Ms. Berkower)  Do you recognize this?
3  A.  Oh, yes.  Uh-huh.  This is a draft.
4  Q.  What is this?
5  A.  This is a draft of the statement that came out
6  and is referenced as number -- whatever this one was,
7  113.
8  Q.  Which statement?
9  A.  It's a draft of that --
10 Q.  Oh, Exhibit 113?
11 A.  Yeah.
12 Q.  Sorry.  Okay.  Sorry.  I didn't -- I see that.
13 Okay.  This is ultimately what became Exhibit 113, that
14 press release?
15 A.  Right.
16 Q.  Did you participate in the drafting of this?
17 A.  No, I didn't.  He sent me a copy of it though.
18 Q.  Who is "he"?
19 A.  Oh, Michael Walz.
20 Q.  Who's Michael Walz?
21 A.  He's the communications director for the
22 Lieutenant Governor's office.
23 Q.  And who's Buddy Barfield?
24 A.  He's the -- I don't know what his official
25 title is, but he works for the campaign.

### 323

1  Q.  Oh, I see.  "Dewhurst for Texas."
2  A.  Yes.
3  Q.  Why did Michael Walz copy Buddy Barfield on the
4  e-mail?
5       MR. FREDERICK:  Objection, calls for
6  speculation.
7  A.  I don't know.  I mean, he may have just been
8  telling him about it.
9  Q.  (By Ms. Berkower)  Does your office usually
10 copy the campaign on communications such as this?
11 A.  Typically, it -- I mean, when they do the
12 distribution of the actual statement, that's when that
13 distribution takes place.  That's my understanding of
14 it.  They're on the distribution list that goes out.
15 Q.  Was Lieutenant Governor aware of the
16 possibility that a lawsuit might be brought to obtain
17 preclearance?
18      MR. FREDERICK:  Objection, to the extent
19 it calls for speculation.
20      Also to the extent that it calls for his
21 thought process and mental impressions about pending
22 legislation, I instruct you not to answer on the basis
23 of privilege.
24 A.  Okay.  I'm sorry.  I can't answer that.  I'm
25 sorry.  I can't answer that.

### 324

1  Q.  (By Ms. Berkower)  You can't get into whether
2  he knew that judicial preclearance is one way to obtain
3  preclearance?
4  A.  Apparently not.  No.
5  Q.  Okay.  Did the Lieutenant Governor advocate for
6  filing a lawsuit to obtain judicial preclearance?
7  A.  I don't remember him advocating for a lawsuit.
8  Q.  Does the Lieutenant Governor support the
9  lawsuit --
10      MR. FREDERICK:  Objection.
11 Q.  (By Ms. Berkower)  -- to obtain judicial
12 preclearance?
13      MR. FREDERICK:  Objection, relevance.
14 A.  I think he supports the legislation.  He would
15 support implementation in the legislation.
16      MS. BERKOWER:  Okay.
17      (Exhibit 119 marked for identification.)
18 Q.  (By Ms. Berkower)  This is Exhibit 119.  Do you
19 recognize this?
20 A.  Yes.  I've seen this before.
21 Q.  What is this?
22 A.  Wait.  There's two pages.
23 Q.  Oh, is it different?
24 A.  Yes.
25 Q.  Doesn't go together?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 325

1    A.  I don't remember this being together.
2    Q.  Okay.  Well, let's just take the first page
3  then.
4    Yeah.  I don't remember the second page.
5    Q.  Okay.
6    A.  First page I remember.
7    Q.  What is this?
8    A.  I think this is a summary document, and I don't
9  know if it was prepared by Bryan Hebert or by Fraser's
10 office.
11   Q.  Did you work on this?
12   A.  No.  I received it though.
13   Q.  Do you see the bottom section that says "What
14 about people who" -- well, it says, Part 3 says "Likely
15 questions from opponents."
16   A.  Uh-huh.
17   Q.  Are these talking points?
18   A.  I don't -- I don't know that they were ever
19 characterized that way.
20   Q.  What was the document used for, do you know?
21   A.  I think it was just meant to be informative of,
22 you know, here's what's in the legislation, here's what
23 it does, here's some comments that may be said about it,
24 that sort thing.
25   Q.  Under the last section, in the "Likely

### 326

1  questions from opponents" section, the last bolded
2  heading says "What about people who do not have access
3  to photo ID?"  And the response seems to be, "I'm
4  confidence that every voter in Texas has or can obtain
5  an acceptable photo ID."  What's the basis for that
6  statement?
7    MR. FREDERICK:  Objection, calls for
8  speculation.  Objection, to the extent it calls for
9  legislatively privileged material, I would instruct you
10 not to answer.  If you can answer without revealing
11 that, you can do so.
12   A.  I don't know what the person who wrote this was
13 thinking, but I do think the legislation set forth
14 opportunities for people to get a free voter ID for
15 voting.
16   Q.  (By Ms. Berkower)  Did you fact-check that
17 statement?
18   A.  No, not that I'm aware.  No.
19   Q.  Do you know if anybody fact-checked that
20 statement?
21   A.  No.
22   Q.  Would you generally send documents like this
23 around your office without fact-checking them?
24   MR. FREDERICK:  Objection, argumentative.
25   A.  Within our office, the point is that you can

### 327

1  provide summary information to anybody who might be
2  dealing with a given issue, yes, we would send it out
3  within our office.
4    Q.  (By Ms. Berkower)  Underneath that bullet point
5  that I read, it says "No voter has come forward in the
6  last three sessions of this debate to claim otherwise,
7  and no such voter has come forward in Indiana or Georgia
8  during the last four years."  What's the basis for that
9  statement?
10   A.  I can't answer you.  I don't know.
11   Q.  Do you think that just because no voters have
12 come through in the last three sessions of this debate
13 to claim they couldn't get acceptable ID means that such
14 people don't exist?
15   MR. FREDERICK:  Objection, relevance.
16 Objection, argumentative.  You may answer.
17   A.  I don't know that this sentence can be true
18 without it applying to everyone, so I don't -- I think
19 you can say no voter has come forward in the last three
20 sessions and not mean that no one can get -- I mean,
21 there's no one out there who can't get an ID.
22   Q.  (By Ms. Berkower)  How do you know if no one
23 can get an ID?
24   MR. FREDERICK:  Objection, relevance.
25 Calls for speculation.

### 328

1    A.  I think you wouldn't know unless somebody
2  brought it up and asked for an ID and couldn't get one.
3    MS. BERKOWER:  I think this is going to be
4  our last exhibit.
5    A.  Thank you.
6    MS. BERKOWER:  He might have more, but
7  this is my last one.
8    (Exhibit 120 marked for identification.)
9    Q.  (By Ms. Berkower)  Do you recognize this?
10   A.  No.  I don't remember this one.
11   Q.  Do you know what it is?
12   A.  I'm reading the interview by the Department of
13 Justice.
14   Q.  You've never seen it before?
15   A.  Not that I remember.
16   Q.  Whose handwriting is in the top right corner,
17 do you know?
18   A.  No.  It says "Bryan 552, 111, A-L-L."  No, I
19 don't know.
20   Q.  Do you think that indicates it's Bryan
21 Hebert's?
22   A.  I don't recognize the handwriting as being
23 Bryan's, but it could be.
24   Q.  So maybe this begs the question, but did you
25 fact check this document?

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                            MAY 29, 2012

---

329

1     A.  No.
2     Q.  Are there any answers that you provided today
3  that you now wish to change?
4     A.  Not that I can think of.  No.
5     Q.  Is there any information you didn't recall
6  earlier when I asked you about it but that you now
7  recall?
8     A.  Not that I can think of.
9     MS. BERKOWER:  Okay.  I think that
10  concludes my questions now, but we'll leave open the
11  deposition pending the ruling on the motion we filed on
12  May 21st and any other motions relating to privilege,
13  the assertion of legislative privilege.
14     (Brief discussion off the record.)
15     MR. HARRIS:  I'll obviously be brief
16  because of limited time, and I appreciate your time.
17     THE WITNESS:  Thank you.  And what's your
18  name again?
19     MR. HARRIS:  I'm Adam Harris from Fried
20  Frank.  We represent the Texas League of Young Voters.
21     EXAMINATION
22  BY MR. HARRIS:
23     Q.  Ms. Rathgeber, you previously testified that
24  it's your general practice to maintain hard copy files
25  specific to particular pieces of legislation; is that

---

330

1  right?
2     A.  During the legislative session, it is.
3     Q.  And you maintain such files for SB 14; is that
4  right?
5     A.  Yes.  I did have a small file on SB 14.
6     Q.  And you stated that you discarded these files
7  after the legislative session; is that right?
8     A.  Yes.
9     Q.  Approximately when would that have been, what
10  month?
11     A.  Well, it would be the first of -- of doing it
12  in the first week of the special session following the
13  regular session, because I was cleaning out to make sure
14  we had room to do the special.  So it would have been
15  the first week of June.
16     Q.  Of 2011?
17     A.  Oh, yeah, I'm sorry.  Uh-huh.
18     Q.  And what were the contents of this file that
19  you discarded?
20     A.  Typically, I keep each of the bill drafts in
21  case I need to look back and see how any bill is
22  changed.  It's faster sometimes than trying to print
23  them off the computer system.  Fiscal notes, again, I
24  keep those, even though that they are -- everything I
25  have is online mostly.  I think I had contact

---

331

1  information for the people that we called in Indiana to
2  come and testify.  That's all I remember.
3     Q.  And on documents like copies of the bill
4  drafts, would you typically take handwritten notes?
5     A.  No.  Typically, I don't, because what I'm doing
6  is using them for reference and not to edit them.
7     Q.  Apart from this particular file we've been
8  discussing, have you discarded any other documents
9  regarding SB 14 at any time?
10     A.  Not that I can think of.  I mean, that -- they
11  would be all be in that file.  I would have a stack of
12  amendments made or proposed, as well, in that file.
13     Q.  You and Ms. Berkower discussed the question of
14  whether SB 362 would have permitted a student ID to vote
15  in Texas.  Do you remember that?
16     A.  Right.
17     Q.  And I believe you stated that it would depend
18  on the interpretation of a section of that bill which
19  refers to -- and I think this is number -- Exhibit
20  Number 29.
21     A.  Uh-huh.
22     Q.  And I'm looking on Page 6.  I believe you
23  stated that the answer to that question would depend on
24  the interpretation of language that states that a voter
25  can vote with a valid identification card that contains

---

332

1  the person's photograph and is issued by -- under
2  Subpart B, an agency, institution or political
3  subdivision of the state.
4     A.  Right.
5     Q.  If Senator Fraser had stated publicly on the
6  record during the vote on SB 362 that he interpreted
7  this language to mean that a student at at least a
8  public state Texas college or university could vote with
9  a student ID, would you have any reason to doubt that
10  interpretation?
11     A.  No, I wouldn't.  He's the bill author.
12     Q.  Do you have any reason to question the validity
13  of an ID issued by a state institution such as your alma
14  mater, the University of Texas?
15     MR. FREDERICK:  Objection, relevance.
16     A.  I don't -- I don't know why validity is the
17  correct word.  Either you're a student or you're not.
18  Either they issue an ID or they don't.  I don't
19  understand the question, I don't think.
20     Q.  Do you have any reason to question the value of
21  a student ID when it comes to proving that one is who he
22  or she says he or she is?
23     MR. FREDERICK:  Objection, relevance.
24     A.  I mean, I don't think so.  I think you have to
25  show some forms in order to attend higher education.

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 333

1  Q.  (By Mr. Harris) And you and Ms. Berkower also
2  discussed the question of whether one could vote with an
3  expired ID under SB 14 and under previous iterations of
4  the bill.  You remember that?
5  A.  Uh-huh.
6  Q.  And I believe it was your testimony, but please
7  correct me if I'm wrong, but that the reason that you
8  think a bill might exclude an expired ID is that because
9  people change and their looks change, it makes it harder
10  to prove using the expired ID that the person is who she
11  says she is; is that right?
12  A.  That's what I said, yes.
13  Q.  You testified that a driver's license in Texas
14  is valid for six years; is that right?
15  A.  I think that's correct.
16  Q.  Do you know how long a passport is valid?
17  A.  I think it's ten years, except for children,
18  it's five years.
19  Q.  Now, I know you said that you don't do
20  politics; is that right?
21  A.  I try not to.
22  Q.  But I assume that, you know, in your role as
23  someone who works for an elected official, you at least
24  generally follow elections in Texas; is that right?
25  A.  Well, yes, but publicly.  I don't work on the

---

### 334

1  election.
2  Q.  Uh-huh.  Are you generally aware of disparities
3  on how particular -- are you generally aware of
4  disparities on how particular racial or ethnic groups
5  vote in Texas?
6  MR. FREDERICK:  Objection, relevance.
7  A.  I don't think I understand the word
8  "disparities."
9  Q.  (By Mr. Harris)  Are you aware of any
10  propensities for a particular group to support one party
11  more regularly than it supports the other party?
12  MR. FREDERICK:  Objection, relevance.
13  A.  I've certainly read articles about it, but I
14  don't know how valid that is.  I haven't read any valid
15  all Hispanics vote this way, all White people vote that
16  way.
17  Q.  (By Mr. Harris)  What have you read?
18  A.  That generally there's a tendency for Hispanic
19  voters to vote Democratic.
20  Q.  Have you ever discussed that fact with the
21  Lieutenant Governor?
22  A.  No.
23  Q.  Have you ever discussed the importance of the
24  Hispanic vote in general with the Lieutenant Governor?
25  MR. FREDERICK:  Objection, relevance.

---

### 335

1  A.  I have heard Governor Dewhurst say things about
2  the growth in the Hispanic population being the future
3  of Texas.  That where goes the Hispanic population,
4  there goes the State of Texas.  That's not specific to
5  voting.  It's more about the demographics of the state.
6  Q.  (By Mr. Harris)  And when did you hear
7  Lieutenant Governor make those statements?
8  A.  He's made those statements with regard to
9  education and economic development, in jobs programs and
10  the military.  That's all that comes to mind right now.
11  Q.  I think as you've previously stated, today is
12  an election today in Texas; is that right?
13  A.  Yes.
14  Q.  And the Lieutenant Governor is on the ballot in
15  the Republican primary for the U.S. Senate; is that
16  right?
17  A.  Yes.
18  Q.  Have you had discussions with Lieutenant
19  Governor about this current primary election?
20  MR. FREDERICK:  Objection, relevance.
21  A.  Only insofar as it affects my future
22  employment.
23  Q.  (By Mr. Harris)  Gotcha.  It's an important
24  topic to you, I'm sure.
25  A.  Or lack thereof is really what it is.

---

### 336

1  Q.  Have you followed the public polling in the
2  race at all?
3  A.  I've read the newspapers about it, yes.
4  Q.  And do you have a sense of who the chief
5  opposition is to Lieutenant Governor in the race?
6  A.  In the Republican Party, the Democratic Party?
7  Q.  Yeah, in the Republican primaries.  Excuse me.
8  A.  Yes.
9  Q.  And who is that?
10  A.  Well, the top two candidates beneath the
11  Lieutenant Governor are Leppert and Cruz.
12  Q.  And is it correct that recent polling has
13  Mr. Cruz, I guess, in second behind the Lieutenant
14  Governor in the -- in the primary for the U.S. Senate?
15  MR. FREDERICK:  Objection, relevance.
16  A.  I've seen it with Leppert in second, as well.
17  I mean, it's just been in the newspaper.  I don't know
18  how reliable that polling is.
19  Q.  (By Mr. Harris)  Do you have any understanding
20  of Mr. Cruz's ethnic background?
21  MR. FREDERICK:  Objection, relevance.
22  A.  Yes.
23  Q.  (By Mr. Harris)  And what is that
24  understanding?
25  A.  I'm aware his father came from Cuba.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

### 337

1    Q.  Have you had any discussions with Lieutenant
2    Governor regarding the Hispanic vote in this year's
3    Republican Senate primary?
4        MR. FREDERICK:  Objection, relevance.
5    A.  No, I haven't.
6    Q.  (By Mr. Harris)  Are you familiar with an
7    organization known as King Street Patriots?
8    A.  I have seen it on Governor Dewhurst's schedule,
9    but I have not -- I don't know what they do.  I think
10   they're a tea party organization, but I don't know that
11   for a fact.
12   Q.  Do you know whether the Lieutenant Governor's
13   office had any communications with the King Street
14   Patriots about SB 14?
15   A.  Not to my knowledge.
16   Q.  Do you know whether the Lieutenant Governor's
17   office had any communications with the King Street
18   Patriots about prior iterations of voter ID law in
19   Texas?
20   A.  Not to my knowledge.
21   Q.  Do you know whether the Lieutenant Governor has
22   ever attended events hosted or sponsored by the King
23   Street Patriots?
24   A.  Yes.  I know he has.
25   Q.  And what events are those?

### 338

1    A.  I don't know.  I've just seen that on his
2    schedule.  That would not have been handled through the
3    state office.  It would have been a campaign event, and
4    I wouldn't be privy to that information.
5    Q.  Do you know whether the Lieutenant Governor has
6    recently attended any events hosted or sponsored by the
7    King Street Patriots?
8    A.  Yeah.  I don't know how recent, but yes, I
9    think he has been through this campaign season.
10   Q.  You testified that it's your belief that the
11   voter ID law would increase voter confidence in
12   elections in Texas; is that right?
13   A.  Yes.
14       MR. FREDERICK:  Object to the extent it
15   misstates prior testimony, but you can answer.
16   A.  Right.  I do think it increases voter
17   confidence to have a more secure election process.
18   Q.  (By Mr. Harris)  When did you come -- when did
19   you come to that conclusion?
20       MR. FREDERICK:  Objection, relevance.
21   A.  I don't remember the time frame, but it's my
22   personal belief.
23   Q.  (By Mr. Harris)  Have you ever heard any voters
24   in Texas express that belief?
25   A.  I want to say in testimony I have, but it would

### 339

1    have been public testimony that people feel like giving
2    an ID is -- for a vote is not onerous, because it's the
3    same as writing a check or getting on an airplane.  And
4    I know there's been testimony to that effect.
5    Q.  Do you recall particular testimony to that
6    effect?
7    A.  Yeah.  I can't tell you who it was or who did
8    it, but I know I've heard that.  It would have been in
9    public.
10   Q.  Well, I appreciate your time, and as promised,
11   we'll try to get you out of here.
12   A.  I appreciate it.
13       MR. HARRIS:  Thank you.  And that will
14   conclude the deposition for the defense interveners
15   subject to reopening the court rules on the motion to
16   compel.
17       (Deposition concluded at 4:12 p.m.)
18
19
20
21
22
23
24
25

### 340

1    CHANGES AND SIGNATURE
2        RE: TEXAS VS. HOLDER, ET AL
3    PAGE  LINE  CHANGE         REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20       I, JULIA RATHGEBER, have read the foregoing
21   deposition and hereby affix my signature that same is
22   true and correct, except as noted above.
23
24       _____
25            JULIA RATHGEBER



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                          MAY 29, 2012

---

### 341

1  THE STATE OF _____)

2  COUNTY OF_____)

3

4       Before me,_____, on this day

5  personally appeared JULIA RATHGEBER, known to me (or

6  proved to me under oath or through_____

7  (description of identity card or other document) to be

8  the person whose name is subscribed to the foregoing

9  instrument and acknowledged to me that they executed the

10  same for the purposes and consideration therein

11  expressed.

12       Given under my hand and seal of office

13  this_____day of _____, 2012.

14

15

16       _____

        NOTARY PUBLIC IN AND FOR

17       THE STATE OF _____

18

19

20

21

22

23

24

25

---

### 343

1  the officer and that the transcript of the oral

2  deposition is a true record of the testimony given by

3  the witness;

4      That the deposition transcript was submitted on the

5  _____day of _____, 2012, to the witness or to the

6  attorney for the witness for examination, signature and

7  return to_____, by

8  _____, 2012; and if returned, the original

9  transcript will forwarded to Risa Berkower, the

10  custodial attorney;

11      That the amount of time used by each party at the

12  deposition is as follows:

13      Ms. Berkower: 6 hours, 31 minutes

14      Mr. Harris:  10 minutes

15      I further certify that I am neither counsel for,

16  related to, nor employed by any of the parties or

17  attorneys in the action in which this proceeding was

18  taken, and further that I am not financially or

19  otherwise interested in the outcome of the action.

20      Certified to by me this 31st day of May, 2012.

21

22       _____

23      Chris Carpenter, Texas CSR 1151

       Expiration Date: 12/31/2012

       100 Congress Avenue, Suite 2000

24      Austin, TX 78701

       (512)328-5557

25       Firm Registration No. 283

---

### 342

1       IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF COLUMBIA

3  STATE OF TEXAS,           )

             Plaintiff,      )

4  VS.                       )

5                            )

   ERIC H. HOLDER, JR. in his  )

6  official capacity as Attorney )

   General of the United States, )

7          Defendant,        )

8                            )

   ERIC KENNIE, et al,       )

9      Defendant-Intervenors,     )

10                           )

   TEXAS STATE CONFERENCE OF    ) CASE NO. 1:12-CV-00128

11 NAACP BRANCHES,           ) (RMC-DST-RLW)

            ) Three-Judge Court

12      Defendant-Intervenors,     )

13 TEXAS LEAGUE OF YOUNG VOTERS )

   EDUCATION FUND, et al,     )

14                           )

       Defendant-Intervenors,     )

15                           )

   TEXAS LEGISLATIVE BLACK     )

16 CAUCUS, et al,            )

17      Defendant-Intervenors,     )

18                           )

   VICTORIA RODRIGUEZ, et al.,  )

19 Defendant-Intervenors.     )

20      REPORTER'S CERTIFICATION

        DEPOSITION OF JULIA RATHGEBER

21         MAY 29, 2012

22      I, Chris Carpenter, Certified Shorthand Reporter in

23 and for the State of Texas, hereby certify to the

24 following:

25      That the witness, JULIA RATHGEBER, was duly sworn by

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com