## Page 1

```
                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,              )
          Plaintiff,         )
                             )
V.                           )
                             )
ERIC H. HOLDER, JR.,         )
in his official capacity     )
as Attorney General of       )
the United States,           )
          Defendant.         )
                             )
ERIC KENNIE, et al.,         )
     Defendant-Intervenors,  )
                             )
TEXAS STATE CONFERENCE       )   CASE NO. 1:12-CV-00128
OF NAACP BRANCHES, et al.,   )   (RMC-DST-RLW)
     Defendant-intervenors,  )   Three-Judge Court
                             )
TEXAS LEAGUE OF YOUNG        )
VOTERS EDUCATION FUND, et al.,)
     Defendant-Intervenors,  )
                             )
TEXAS LEGISLATIVE BLACK      )
CAUCUS, et al.,              )
     Defendant-Intervenors,  )
                             )
VICTORIA RODRIGUEZ, et al.,  )
     Defendant-Intervenors.  )
```

                    ORAL DEPOSITION OF
                    LETICIA ANN SALAZAR
                    JUNE 14, 2012

     ORAL DEPOSITION OF LETICIA ANN SALAZAR, produced as a witness at the instance of the Defendant-Intervenors, and duly sworn, was taken in the above-styled and numbered cause on the 14th day June, 2012, from 9:36 a.m. to 12:31 p.m., before Amy C. Kofron, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Dechert, 300 West 6th Street, Austin, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

## Page 2

              A P P E A R A N C E S

FOR THE PLAINTIFF:
Mr. Reynolds Brissenden
OFFICE OF THE ATTORNEY GENERAL OF TEXAS
P.O. Box 12548
Austin, Texas 78711-2548

FOR THE DEFENDANT:
Ms. Elizabeth Westfall
Ms. Michelle McLeod
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue NW
NWB Room 7203
Washington, DC 20530

FOR THE DEFENDANT-INTERVENORS, TEXAS STATE CONFERENCE OF NAACP BRANCHES AND MEXICAN AMERICAN LEGAL CAUCUS:
Mr. Vandewalker, via phone
Ms. Myrna Perez, via phone
THE BRENNAN CENTER FOR JUSTICE
AT NYU LAW SCHOOL
161 Avenue of the Americas, Floor 12
New York, New York 10013-1205

Also Present:
Ms. Lindsey Stencel
Mr. Nick Riley, via phone

## Page 3

                         INDEX

Appearances. . . . . . . .                       2
LETICIA ANN SALAZAR
    Examination by Mr. Vandewalker. . .          4
    Examination by Ms. Westfall. ..             49
Signature and Changes. . . .                    64
Reporter's Certificate. . .                     66


                       EXHIBITS
NO.  DESCRIPTION                               PAGE
1    Request for Proposal                       11
2    Account Tracking                           15
3    Affidavit of Keith Ingram                  29
4    Fiscal Note                                33
5    Burson-Marsteller document                 42

## Page 4

        LETICIA ANN SALAZAR,
having been first duly sworn, testified as follows:
        EXAMINATION
BY MR. VANDEWALKER:
    Q.  Good morning, Ms. Salazar.  My name is Ian Vandewalker.  As you just heard, I represent defendant-intervenors in this matter.  And we -- I thank you for coming in today, especially on short notice, and I also thank you in advance for your patience with us as we're on the phone.  The travel arrangements didn't work out, and so, you know, there may be some slight logistical hiccups with us being on the phone.  I apologize for that.
    A.  Okay.
    Q.  Could you just, for the record, please -- you may have already done this, but just to be sure, state and spell your full name.
    A.  Leticia Ann Salazar, L-e-t-i-c-i-a, A-n-n, S-a-l-a-z-a-r.
    Q.  Thank you.  And are you represented by counsel today?
    A.  Yes.
    Q.  And who's your attorney?
    A.  Reynolds.
    Q.  Could you -- just could we get the full name, please.
        THE WITNESS:  I'm sorry.  I don't --
        MR. BRISSENDEN:  Reynolds Brissenden from the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

## 5

1  Texas Attorney General's office.
2         MR. VANDEWALKER:  Thank you.
3     Q.  And, Ms. Salazar, who's your current employer?
4     A.  The Office of the Secretary of State.
5     Q.  Have you ever been deposed before?
6     A.  No.
7     Q.  Okay.  So I'm going to give you some ground rules and
8  instructions that will hopefully make this go as smoothly as
9  possible.
10    A.  Okay.
11    Q.  You're under oath and required to answer all questions
12 truthfully and to the best of your knowledge.  Do you understand
13 that?
14    A.  Yes.
15    Q.  If you don't fully hear a question, especially with
16 this phone situation, please ask me to repeat it.  Will you do
17 that?
18    A.  Yes.
19    Q.  If you don't understand a question, please tell me so.
20 Will you do that?
21    A.  Yes.
22    Q.  Also, please wait for me to complete my question
23 before you start to answer so we don't talk over each other and
24 give the court reporter a headache.  Will you do that?
25    A.  Yes.

## 6

1     Q.  And you'll probably automatically do this because I am
2  on the phone, but please answer all questions verbally rather
3  than with gestures.  Will you do that?
4     A.  Yes.
5     Q.  Are you taking any medication that would prevent you
6  from giving true and accurate answers today?
7     A.  No.
8     Q.  Is there any other circumstance that you're aware of
9  that would prevent you from giving true and accurate answers
10 today?
11    A.  No.
12    Q.  Thank you.
13        Did you do anything to prepare for today's deposition?
14    A.  I spoke with Reynolds and just went over --
15        MR. BRISSENDEN:  Don't disclose what we
16 discussed.
17    Q.  I'm sorry.  I don't know if the phone cut off.  I
18 heard that you went over, and then I didn't hear any more.
19    A.  I just spoke with Reynolds.
20    Q.  Okay.  And when did you talk to Reynolds?
21    A.  Yesterday.
22    Q.  Okay.  Did you review any documents to prepare for
23 today's deposition?
24    A.  Only the documents that I handed over.
25    Q.  Okay.  Do you know how -- like about how many

## 7

1  documents that we're talking about?
2     A.  About four or five.
3     Q.  Okay.  Thank you.
4         How long have you worked for the Texas Secretary of
5  State's office?
6     A.  I started there in '98, so going on 14 years.
7     Q.  And have you always had the same title during that
8  time?
9     A.  No.
10    Q.  Okay.  How long have you had -- well, what is your
11 current title?
12    A.  I am a program coordinator/meeting planner.
13    Q.  And how long have you had that title?
14    A.  Since 2002, ten years.
15    Q.  Okay.  Thank you.
16        And what's your official duties in that position?
17    A.  I plan all conferences for the Elections division.  I
18 plan the election night returns for -- during the elections,
19 communicate with media subscribers for ENR.  I do the
20 legislative tracking during session, and I assist with creating
21 the training materials for election officials.
22    Q.  Okay.  You used the term ENR.  What does that mean?
23    A.  I'm sorry.  Election night returns.
24    Q.  Oh, okay.  Sure.  Thank you.
25        Do you -- are you also involved in the Secretary of

## 8

1  State's voter education initiative?
2     A.  Yes.
3     Q.  And what generally are your responsibilities with
4  respect to voter education?
5     A.  Um, I review items that our legal department creates
6  and get things posted to the web site, assist with reviewing,
7  um, all of the materials and implementing them in whatever way
8  is necessary.
9     Q.  Okay.  What about, um, the training of election
10 workers that the Secretary of State does; are you involved in
11 that?
12    A.  Yes.
13    Q.  And what generally do you do with respect to training
14 election workers?
15    A.  We have an online training program that I oversee.  So
16 our legal department provides the content, and I just ensure
17 that the information gets posted online properly and communicate
18 with the election officials when the training is available and
19 how they go about logging in, the logistics of it.
20    Q.  Right.  Okay.  Thank you.
21        Does the Secretary of State's office have plans to
22 carry out statewide voter education initiatives in 2012?
23    A.  We will if the -- if it's precleared, yes.
24    Q.  Well, I'm talking generally about voter -- all -- any
25 voter education, not specific to the issues in this lawsuit, but



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

9

1    just voter education generally.  Is there a plan to carry out
2    voter education in 2012?
3        A.  Yes.
4        Q.  Okay.  Does the Secretary of State carry out voter
5    education initiatives in every election year?
6        A.  Every even-numbered year.
7        Q.  Okay.  Every even-numbered year.
8            And generally, what is the purpose of these regularly,
9    every-even-numbered-year voter education initiatives?
10       A.  And if I may, I need to go back.  We educate them
11   every election year, but the even-numbered years is when we go
12   out with the strong media output.
13       Q.  I see.  Thank you.
14           And so what would you say the goals of these
15   voter education initiatives are?
16       A.  Um, ensuring that the voters know how to cast a ballot
17   properly, what their rights are, information on voting systems
18   and how to register.
19       Q.  Is the Make Your Mark on Texas voter education plan
20   the voter education initiative for this year?
21       A.  Yes.
22       Q.  Is this plan -- would you say it's different in any
23   significant way than voter education initiatives that the
24   Secretary of State has done in past even-numbered years?
25           MR. BRISSENDEN:  Objection, vague.

10

1            You may answer.
2        A.  No.
3        Q.  Are there any other -- other than "Make Your Mark on
4    Texas," are there any other statewide voter education
5    initiatives planned for 2012?
6        A.  Yes.  We have our -- well, voter education -- yes,
7    that's -- that's all that we have.  I'm sorry.
8        Q.  Okay.  So Make Your Mark on Texas is the only voter
9    education initiative for 2012; is that right?
10       A.  Yes.
11       Q.  Okay.  And did an outside vendor design Make Your Mark
12   on Texas?
13       A.  Yes.
14       Q.  How did the Secretary of State's office select the
15   vendor to design Make Your Mark on Texas?
16       A.  Well, our office sent out an RFP, and there were, I
17   believe, five or six companies that sent a response.  And then a
18   group of us selected three -- the top three.  And then the top
19   three came and provided an oral presentation.
20       Q.  Okay.  If I can ask -- and this is where the logistics
21   of being on the phone get a little complicated -- Ms. Stelcen to
22   enter as an exhibit for us Request -- a document that's titled
23   Request for Proposal No. 12111.
24           MS. STELCEN:  Okay.  I'm handing it to the court
25   reporter to mark.  What do you want this --

11

1            MR. VANDEWALKER:  Thank --
2            MS. STELCEN:  -- marked as, Ian?
3            MR. VANDEWALKER:  Yeah.  Salazar 1 is fine with
4    us, if that works for everyone there.
5            (Exhibit No. 1 marked)
6            MR. BRISSENDEN:  Thank you.
7            MS. STELCEN:  All right.  I'm placing it in front
8    of the witness right now.
9            MR. VANDEWALKER:  Thank you.
10       Q.  Ms. Salazar, is this the RFP that you referred to?
11       A.  Yes.
12       Q.  Who drafted this RFP?
13       A.  I believe it was a joint effort with our then-Director
14   of Communications and general counsel and the purchasing agent.
15       Q.  And who was the Director of Communications at the
16   time?
17       A.  At the time, it was Randall Dillard.
18       Q.  And who was the general counsel at the time?
19       A.  John Sepehri.
20       Q.  And who was the managing agent at the time?
21       A.  Mary Jon Urban.
22       Q.  Thank you.
23           Do you know when this RFP was drafted?
24       A.  No.
25       Q.  Do you know when it was issued?

12

1        A.  No.
2        Q.  And you said that you received about five or six
3    proposals.  Do -- did you -- you were part of the team that
4    reviewed those proposals; is that correct?
5        A.  Yes.
6        Q.  What were the criteria that were used to select the
7    finalists on those proposals?
8        A.  At the time, Senate Bill 14, being able to educate
9    voters on Senate Bill 14, the MOVE Act, along with the general
10   what we always do with casting a ballot, informing the voters on
11   the voting systems.  And that was -- and basically how they
12   utilize the money in the best way.
13       Q.  Do you recall if any of the proposals specifically
14   included plans designed to target African American communities?
15       A.  I don't remember.
16       Q.  What about plans to -- designed to target Spanish
17   speaking communities?
18       A.  Yes, that was -- that was part of it.
19       Q.  And by part of it, do you mean that those --
20   the proposals that you received covered those things, covered
21   Spanish speaking communities?
22       A.  I'm embarrassed to say that I really don't remember.
23       Q.  Well, that's okay.  If you don't remember, you don't
24   remember.  It's -- you know, memory is what it is.
25           In the decision-making process to select the finalists



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

### 13

1  and select the ultimate vendor, how important was it to the team
2  that the proposals involve efforts to reach out to minority
3  communities?
4         MR. BRISSENDEN:  Objection, vague.
5         You may answer.
6         THE WITNESS:  Do I answer?
7    A.  It was important, yes.
8    Q.  Did it -- did you assign a certain number of points to
9  it in the selection process?
10   A.  There was a points system.  I do not remember how or
11 what the content of that document was.
12   Q.  Let's see.  Who made the ultimate -- the -- I'm sorry.
13     Which vendor was ultimately selected?
14   A.  Burson-Marsteller.
15   Q.  And who made the ultimate decision to select
16 Burson-Marsteller?
17   A.  It was a group of us that scored them, and we chose
18 the highest scored company.
19   Q.  And who was in that group?
20   A.  Myself, Rich Parsons, John Sepehri, Jordy Keith and
21 Louri O'Leary.
22   Q.  Did any legislators encourage anyone in your office to
23 select Burson-Marsteller or another vendor?
24   A.  No.
25   Q.  Did anyone from the governor's office encourage your

### 14

1  team to select Burson-Marsteller?
2    A.  No.
3    Q.  Did anyone from the Lt. Governor's office encourage
4  your team to select Burson-Marsteller?
5    A.  No.
6    Q.  To your knowledge, does Burson-Marsteller have
7  experience specifically targeting non-white or non-Anglo
8  communities of voters?
9    A.  To my knowledge, no.
10   Q.  Did you participate in the preparation of the fiscal
11 note for S.B. 14?
12   A.  No.
13   Q.  How much money does the Secretary of State's office
14 plan to spend on its Make Your Mark on Texas voter education
15 plan?
16   A.  I'm not part of the budgeting process.  I don't know.
17   Q.  So do you know how much money has been spent so far by
18 the Secretary of State's office on the voter education plan?
19   A.  No, I don't know.
20   Q.  So earlier you talked about how one of the selection
21 criteria for the vendors was how efficiently they would use the
22 money that they would get.  And I'm wondering how you sort of
23 implemented that decision-making if you're not part of the
24 budgeting as the plan is being -- itself is being implemented?
25   A.  Well, comparing what was given to us, you know, if we

### 15

1  were going -- we knew that media buys were important.  We knew
2  that the -- you know, TV, radio spots, opposed to, for instance,
3  just utilizing what we already have in place and doing something
4  completely different, it -- you know, I -- it doesn't make any
5  sense.
6    Q.  Okay.
7         MR. VANDEWALKER:  And if I could ask Ms. Stelcen
8  to find an exhibit.  It's Bates No. Texas 298674.  The document
9  is entitled Secretary of State/State of Texas Account Tracking
10 Through March 31, 2012.
11        MS. STELCEN:  Okay.  I'm just asking the court
12 reporter to mark this as Salazar 2.
13        (Exhibit No. 2 marked)
14        MS. STELCEN:  Okay.  It's in front of the
15 witness.
16        MR. VANDEWALKER:  Thank you.
17   Q.  Ms. Salazar, have you seen this document before?
18   A.  No.
19   Q.  Is this something that you would encounter in your
20 duties at the Secretary of State's office?
21   A.  No.
22   Q.  Thank you.
23        Ms. Salazar, do you know -- setting aside that exhibit
24 now, do you know whether any of the money that will pay for the
25 Make Your Mark on Texas will come from federal funds?

### 16

1    A.  It's all from federal funds.
2    Q.  And are those funds under the Help America Vote Act or
3  HAVA?
4    A.  Yes.
5    Q.  Has your office confirmed that HAVA funds can be spent
6  on voter education related to photo ID requirements under
7  S.B. 14?
8    A.  Not that I'm aware of.
9    Q.  Again, thinking about the money budgeted for the Make
10 Your Mark on Texas plan, do you know if any money is
11 specifically reserved out of that amount for educating voters
12 about photo ID requirements under S.B. 14?
13   A.  Not that I'm aware of.
14   Q.  Do you know if the Secretary of State has a plan to
15 continue educating voters about photo ID requirements regarding
16 S.B. 14, if it's precleared, past the 2012 election, after the
17 2012 election I mean?
18   A.  I'm sorry.  Can you repeat that?
19   Q.  Sure.  I'm sorry.  That was a complicated question.  I
20 apologize.
21        Do you know if the Secretary of State's office has
22 plans continuing after the 2012 election to educate voters about
23 the photo ID requirements under S.B. 14, if it's precleared?
24   A.  After the November election?
25   Q.  That's correct.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

```
                                    17
 1        A.  Yes.  We'll continue to educate them, yes.
 2        Q.  And do you know if there's a plan in place as to how
 3   the Secretary of State will do that?
 4        A.  Not a specific plan, no, but we -- we're ready to go
 5   with it at any time.  We're waiting to find out what we need
 6   once it's precleared.  We need that information first.
 7        Q.  Right.  And do you know if there are any amount of
 8   money budgeted for voter education continuing after the November
 9   2012 election?
10        A.  Not that I'm aware of.
11        Q.  So we've talked a little bit about the Make Your Mark
12   on Texas plan and also about voter education specific to
13   S.B. 14.  I just want to make sure I understand.
14            The voter -- the efforts to educate voters about
15   the photo ID requirement under S.B. 14, will those be
16   implemented under the Make Your Mark on Texas plan?
17        A.  If it's precleared.
18        Q.  Right.  Yes.  Thank you.  If it's precleared, yes.
19        A.  Yes.
20        Q.  So there won't be any other activities -- and
21   I -- that are outside Make Your Mark on Texas that will have to
22   do with photo ID requirements if S.B. 14 is precleared?
23        A.  I don't understand what you mean by outside
24   activities.
25        Q.  I just mean that the Make Your Mark on Texas, is that

                                    18
 1   the whole plan?  Is there anything besides Make Your Mark on
 2   Texas that would be used to educate voters about photo ID
 3   requirements if S.B. 14 is precleared?
 4        A.  No, not that I'm aware of.
 5        Q.  What is the Secretary of State going to tell voters
 6   about the photo ID requirement under S.B. 14, if it's
 7   precleared?
 8        A.  What --
 9            MR. BRISSENDEN:  Objection, vague, speculation.
10            You may answer.
11        A.  What the new forms of ID are.
12        Q.  So do you mean the forms of ID that will be accepted
13   to allow -- at the polls to allow a voter to vote; is that what
14   you mean?
15        A.  Yes.
16        Q.  So the plan will inform voters what ID will be
17   accepted at the polls on -- if S.B. 14 is precleared.
18            Will it inform them of anything else about the photo
19   ID requirements under S.B. 14?
20        A.  Again, we'd have to -- I don't know.  We'd have to
21   wait to see what we get back.
22        Q.  And what -- and what do you mean by what you get back?
23        A.  Back from DOJ once it's precleared.  And our legal
24   department handles all of that.  So I don't know what else would
25   be under that.

                                    19
 1        Q.  Is there anything else that as of this moment you're
 2   preparing to do if S.B. 14 is precleared?
 3        A.  Yes.  We're in the middle of preparing to train the
 4   election officials.
 5        Q.  Okay.  But focussing on voter education, is there
 6   anything else you're preparing to do right now if S.B. 14 is
 7   precleared?
 8            MR. BRISSENDEN:  Objection, vague.
 9        A.  No, nothing that I'm aware of.
10        Q.  Will the voter education plan about the photo ID
11   requirements under S.B. 14 inform voters of how to get
12   acceptable photo ID if they don't currently have one?
13        A.  Yes.
14        Q.  And how will it do that?
15        A.  How will our plan do that?
16        Q.  Yes.
17        A.  The plan hasn't been set, but we will go out with
18   whatever information that we -- we'll post it on our web site.
19   We'll post it on social media.  We'll go out with community
20   outreach and whatever else we need to do.
21        Q.  I see.
22            But in terms of the content of the messages, what will
23   the plan tell voters about how to get acceptable photo ID under
24   S.B. 14?
25        A.  I'm not involved in the creation of it, so I don't

                                    20
 1   know at this time.
 2        Q.  Who is going to control the creation of the content?
 3        A.  Our legal department.
 4        Q.  And do you -- when you say the legal department, do
 5   you mean -- is that within the division of elections, or is that
 6   for the Secretary of State as a whole?
 7        A.  In our Elections division.
 8        Q.  And who is the head of the legal department within the
 9   Elections division?
10        A.  Elizabeth Hanshaw Winn.
11        Q.  Do you know if the efforts to inform voters about
12   photo ID, if S.B. 14 is precleared, will talk about where they
13   can get acceptable forms of ID?
14        A.  I would -- yes, I would assume so.
15        Q.  But have you -- have you seen a plan or proposed
16   content that has -- that covers that issue?
17        A.  Yes.  On the back of the voter registration
18   certificate, we have the election identification card that's
19   available through DPS.  We have that information already in
20   place.
21        Q.  And so that would -- am I correct in understanding
22   that you mean that that information would tell voters to get an
23   identification certificate at a DPS office?
24        A.  From what I can remember, it just has its -- the
25   Department of Public Safety, you can get this specific card
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

### 21

1  through the Department of Public Safety.
2      Q.  Okay.  And who receives a voter registration
3  certificate?  Who gets those?
4          MR. BRISSENDEN:  Objection, vague.
5      A.  All -- the registered voters.
6      Q.  So, if someone is already registered, registered years
7  ago in Texas, they will receive a voter registration certificate
8  this year --
9      A.  They already have.
10     Q.  -- is that correct?
11         I'm sorry.  I spoke over you.  What was your answer?
12     A.  They already have.
13     Q.  They already have received a voter registration
14 certificate in 2012?
15     A.  Yes.
16     Q.  Okay.  So if I understand you correctly, you send out
17 a voter registration certificate to every registered voter every
18 year?
19     A.  It's every two years.
20     Q.  Every two years.  And on the back of this voter
21 registration certificate, it says something about how to get an
22 election identification certificate; is that correct?
23     A.  Well, it has -- at the top, it starts with prior to
24 federal approval, the following identification will be approved
25 at the polling place when you go to vote.  And it lists the

### 22

1  identification pieces under Senate Bill 14.
2      Q.  What does this notice say about when someone would
3  need an election identification certificate?
4      A.  Well, it lists all of the approved items under Senate
5  Bill 14 that you can use to go vote, and the election
6  identification certificate is one of them.  So they would need
7  it when they're at the polling place to vote if they don't have
8  any of the other items.
9      Q.  I see.
10         Okay.  Thinking now about the plan to educate voters
11 about the photo ID requirement under S.B. 14, if it's
12 precleared, does that plan depend on the internet?
13     A.  It's one of the sources that we're going to utilize.
14     Q.  Have any specific web sites concerning photo ID
15 requirements been designed yet?
16     A.  Concerning Senate Bill 14, no.
17     Q.  When will the content specific to photo ID
18 requirements be designed?
19     A.  When and if we find out that it's precleared.
20     Q.  Do you know how long it will take to create that
21 content?
22     A.  I don't know exactly how long, but we are aware that
23 the possibility is there, and we will get it done very quickly.
24     Q.  Okay.  When you say very quickly, do you mean -- I
25 mean, could you give a time range?

### 23

1      A.  No, I can't.
2      Q.  Would it be longer than a week?
3      A.  I'm not sure.
4      Q.  Would it be longer than a month?
5          MR. BRISSENDEN:  If you know.
6      A.  I don't know.
7      Q.  Okay.  And will the web content that we're talking
8  about, will that be posted on the VoteTexas.gov web site?
9      A.  Yes.
10     Q.  Will it be posted anywhere else?
11     A.  Yes.  We have a Facebook page that we will place it
12 there.  We'll place it on the Secretary of State's page -- web
13 site.  And we also have a Twitter account, and we'll send out
14 tweets.  We also have an app, a smart phone app as well.
15     Q.  Do you know what percentage of Latinos have internet
16 access?
17     A.  No, I don't.
18     Q.  Do you know what percentage of African Americans have
19 internet access?
20     A.  No.
21     Q.  Do you know what percentage of low-income Texans have
22 internet access?
23     A.  No.
24     Q.  Do you know if Burson-Marsteller has done research on
25 those access issues for minorities and low-income Texans?

### 24

1      A.  I know they did a demographic survey.  I'm not -- I
2  can't remember the details of it.
3      Q.  Do you know what the basis is for thinking that the
4  internet will be an effective way to reach minority communities?
5          MR. BRISSENDEN:  Objection, vague.
6      A.  One of the items that -- I do remember that one of the
7  items that came back from the survey is that internet access --
8  or internet is highly used among -- across the board.
9      Q.  And which survey are you referring to?
10     A.  The Burson -- that Burson did, the demographic survey
11 that Burson prepared.
12     Q.  And what -- what do you -- you said that it will be --
13 it's highly used across the board.  Could you say more about
14 what "highly used" means?
15     A.  I just remember that that was the title of it.  They
16 had a piece in there.  They had a Hispanic column, an elderly
17 column and a young voters column, 18 to 24, and across the
18 board, all of those categories, that the internet was highly
19 used.  That's all I remember.
20     Q.  Do you remember if there were differences between
21 those categories, some highly used -- some were -- some of those
22 groups had used the internet more than others?
23     A.  I remember there were slight differences, but they
24 were very comparable.
25     Q.  Do you recall if you gave that survey to your lawyers



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

### 25

1   to give to us?
2       A.  Yes.
3       Q.  Yes, you did?
4       A.  Yes, I did.  I'm sorry.
5       Q.  Thank you.
6           Does the plan to educate voters about photo ID
7   requirements under S.B. 14, if it's precleared, depend on
8   mailers or direct mailings?
9       A.  Not to my -- I don't know yet.
10      Q.  Does the plan to educate voters about photo ID
11  requirements, if S.B. 14 is precleared, make use of newspaper
12  ads?
13      A.  I believe we've got banner ads, but I don't know if
14  they will be used in newspapers.  I'm not sure.
15      Q.  And what is a banner ad?
16      A.  What are they?  They --
17      Q.  Yes.
18      A.  -- they -- I know that we've already implemented them
19  on the internet.  And when you click on it, it takes you to the
20  VoteTexas web site.  We had them implemented.
21      Q.  So a banner --
22      A.  -- for the primary.
23      Q.  I see.
24          So a banner ad is an ad on a web site; is that right?
25      A.  That's what we had implemented for the primary.  I'm

### 26

1   not sure if there is a plan to provide banner ads in the
2   newspaper advertisements.
3       Q.  Do you know -- well, will -- will the Secretary of
4   State's office be using banner ads going forward with voter
5   education from today?
6       A.  I know that for the internet, yes.
7       Q.  Okay.  And will banner ads be part of the effort to
8   educate voters about photo ID if S.B. 14 is precleared?
9       A.  I don't know, but -- I don't know.
10      Q.  Do you know who would know?
11      A.  Rich Parsons.
12      Q.  Does the plan to educate voters about photo ID
13  requirements, if S.B. 14 is precleared, make use of television
14  ads?
15      A.  Yes.
16      Q.  Have any ads discussing photo ID requirements under
17  S.B. 14 been designed or produced yet?
18      A.  Regarding Senate Bill 14, no, not yet.
19      Q.  Do you know how long it will take to design those ads?
20      A.  No, I don't.
21      Q.  Do you know if it will take longer than a week?
22      A.  I don't know.
23      Q.  Do you know if it will take longer than a month?
24      A.  I don't know.
25      Q.  Do you know if ads that may be used to educate voters

### 27

1   about photo ID requirements, if S.B. 14 precleared, what media
2   markets they would target?
3       A.  Um, I -- I'm not -- I don't know.
4       Q.  Do you know who would know?
5       A.  Rich Parsons.
6       Q.  Thank you.
7           Does the plan to educate voters about photo ID
8   requirements, if S.B. 14 is precleared, make use of radio ads?
9       A.  Well, we already have radio -- we used radio ads
10  during the primary.  Nothing has been implemented yet regarding
11  Senate Bill 14.  As far as Senate Bill 14 goes, we've made it
12  known to the vendor, Burson-Marsteller, that if and when Senate
13  Bill 14 gets precleared, that we are going to require a very
14  quick turnaround to get everything in place within a very
15  reasonable amount of time.  So they have already been made aware
16  of possible changes that are -- that could come about.
17      Q.  I see.  So the plan is to wait for preclearance and
18  then create a voter education plan specific to photo ID
19  requirements; is that right?
20          MR. BRISSENDEN:  Objection, vague,
21  mischaracterization of testimony.
22      A.  Again, we have the main components already in place.
23  When and if Senate Bill 14 gets precleared, they are already on
24  mark that these items need to get updated, and they are prepared
25  to do so as well is -- our office is as well.

### 28

1       Q.  And when you say the main components, what does that
2   mean?
3       A.  Well, we've already -- we already have TV ads, radio
4   spots.  We've got the VoteTexas web site.  We've got the Face --
5   all social media.  It's all in place.  And we just need to
6   update it, if you will, according to the Senate Bill 14
7   requirements, and we will be able to do that.
8       Q.  Okay.  So it's that updating that will take place
9   after Senate Bill 14 is precleared, if it is; is that right?
10      A.  Essentially, yes.  It's not recreating the wheel.
11  It's just giving it a refresh of the new information.
12      Q.  Has the Secretary of State's office conducted any
13  market research or demographic analysis to determine the most
14  effective way to reach non-white voters?
15      A.  Burson-Marsteller did.
16      Q.  And have you seen that research?
17      A.  It's what I was speaking of earlier.
18      Q.  I see.
19          So the survey that you mentioned earlier that has been
20  produced, that's what you're referring to?
21      A.  Yes.
22      Q.  If S.B. 14 is precleared and the voter education plan
23  regarding photo ID requirements is implemented, what will be
24  your measures for success of that plan?
25          MR. BRISSENDEN:  Objection, vague.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

```
                          29
 1       A.  Um, I don't know if I -- I don't know.
 2       Q.  I just -- I'm just going to try and just be clear.
 3           When you say -- do you mean -- do you have trouble
 4   understanding the question, or do you just mean you don't know
 5   the answer?
 6       A.  I guess I don't really understand your question.
 7       Q.  Okay.  If S.B. 14 is precleared and a plan to educate
 8   voters about photo ID is implemented, how will you know if it
 9   worked or not?
10           MR. BRISSENDEN:  Same objection.
11       A.  I don't think our -- I don't think we can measure.  I
12   don't know.
13       Q.  Is there a plan to measure success with, say, polls or
14   new surveys or anything like that?
15       A.  Not that I'm aware of.
16           MR. VANDEWALKER:  Okay.  At this point, I'd like
17   to introduce another document.  If I could have the assistance
18   of Ms. Stelcen.  The affidavit of Keith Ingram?
19           MS. STELCEN:  I'm going to have the court
20   reporter mark it as Salazar 3.
21               (Exhibit No. 3 marked)
22           MS. STELCEN:  I'm now placing this in front of
23   the witness.
24           MR. VANDEWALKER:  Thank you.
25       Q.  Ms. Salazar, have you ever seen this document before?

                          30
 1       A.  No.
 2       Q.  Okay.  As I'm sure you can tell, it is an affidavit of
 3   Keith Ingram.  Do you know who Keith Ingram is?
 4       A.  Yes.
 5       Q.  And who is he?
 6       A.  He's the director of the Elections division.
 7       Q.  Could I ask you to turn -- it's the third page.  I
 8   want to look at Paragraph 7.
 9       A.  Okay.
10       Q.  If you could just take a second to read paragraph 7,
11   please.
12       A.  Okay.
13       Q.  Thank you.
14           And so Paragraph 7 talks about -- it makes a
15   distinction between a basic education program and a complete
16   program.  Do you know what the difference between those two is?
17       A.  I -- no, not by reading this, no.
18       Q.  Okay.  And have those terms ever been used to talk
19   about voter education plans around the Secretary of State's
20   office that you're aware of?
21       A.  The only thing that I can think of is our basic
22   education program is what we have in place now, and a complete
23   program is if and when Senate Bill 14 gets precleared.  That's
24   the only way I can imagine this is what this means.
25       Q.  Okay.  Now, Paragraph 7 also says, "In order to have a

                          31
 1   basic education program in place to have a successful November
 2   2012 election season, the Secretary of State's office would need
 3   to have a final decision by August 15, 2012."
 4           If the Court doesn't issue a decision about
 5   preclearance until August 31st, to your knowledge, will it be
 6   then impossible to effectively educate voters about the photo ID
 7   requirements under S.B. 14?
 8       A.  No --
 9           MR. BRISSENDEN:  Objection, form.
10       A.  -- absolutely not.
11       Q.  So do you understand, then, what the first half of
12   that sentence means?
13       A.  Yes.
14       Q.  What does it mean?
15       A.  It means that we will be able to roll out with the
16   necessary training and voter outreach if Senate Bill 14 is
17   precleared by August 15th.
18       Q.  Right.  What I'm asking is what if Senate Bill 14 is
19   precleared after August 15th?
20       A.  We would still be able to have everything implemented.
21       Q.  Do you think the plan would have less of an impact if
22   a preclearance decision isn't made until August 31st?
23           MR. BRISSENDEN:  Objection, vague.
24       A.  No, I do not.
25       Q.  And why not?

                          32
 1       A.  Because we -- we're going to be prepared.  We are
 2   prepared to do whatever we need to do to get this out to the
 3   public and to our election officials on time.
 4       Q.  To your knowledge, did anyone in the Elections
 5   division examine voter education plans in other states that have
 6   been considered -- I'm sorry.  I'll start over.
 7           To your knowledge, did anyone in the Elections
 8   division examine voter education plans in other states that were
 9   considering or had enacted photo ID laws?
10       A.  I believe so, yes.
11       Q.  And do you know what -- what states' plans were
12   considered?
13       A.  No, I do not.
14       Q.  Do you know who would -- who in the Secretary of
15   State's office was examining other states' plans?
16       A.  Our then-Director of Elections, Ann McGeehan.
17       Q.  And do you know if Ann McGeehan took into account what
18   other states were doing with -- when she was doing what she did
19   to plan Texas' voter education plan?
20           MR. BRISSENDEN:  Objection, vague, calls for
21   speculation.
22       A.  No, I do not.
23           MR. VANDEWALKER: Okay.  Ms. Salazar, we've been
24   going for about an hour, and it may be a good time to take a
25   break, if you want one.
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 33

1    THE WITNESS:  Okay.
2    MR. VANDEWALKER:  Okay.  So why don't we say five
3  minutes.
4    MR. BRISSENDEN:  That would be great.
5    MR. VANDEWALKER:  Okay.  Thank you.
6    (Recess from  10:34 a.m. to 10:40 a.m.)
7    MR. VANDEWALKER:  Okay.  If I could ask Ms.
8  Stelcen to help with an exhibit again.  This one is titled
9  Committee on Legislative Research Oversite Division.
10    MS. STELCEN:  Okay.  I'm going to have the court
11  reporter mark this as Salazar 4.
12    (Exhibit No. 4 marked)
13    MS. STELCEN:  Okay.  Ms. Salazar has it.
14    MR. VANDEWALKER:  Okay.  Thank you.
15    Q.  Are you familiar with this document, Ms. Salazar?
16  Have you ever seen it before?
17    A.  No, I have not.
18    Q.  Okay.  I'll represent to you that this is a fiscal
19  note that was produced by the Missouri legislature's committee
20  on legislative research in 2010 when Missouri was considering
21  enacting a photo ID law.  That committee is a nonpartisan agency
22  that does research for the Missouri legislature.
23    Could you turn to the fourth page?
24    A.  Okay.
25    Q.  And on that page, it lists costs projected for print,

## 34

1  TV and radio public service announcements during a single
2  election cycle.  And in the first table there, it totals those
3  costs.  Do you see that number?
4    A.  Yes.
5    Q.  And could you just read the number for me?
6    A.  $2,000.
7    Q.  Oh, I'm sorry.  I'm looking at the total of that -- at
8  the bottom of that total.
9    A.  Oh, I'm sorry.  On the first section.
10    Q.  Yes, ma'am.
11    A.  $966,000.
12    Q.  Thank you.
13    And then, the plan also involves mailers, which is the
14  next table down.  Do you see the total of that next table
15  involving mailings?
16    A.  Yes.
17    Q.  And what is that number?
18    A.  $2,037,750.
19    Q.  And do you know the total that Texas is planning to
20  spend on voter education this year?
21    A.  No, I do not.
22    Q.  Okay.  I'm just going to just represent to you that
23  previous witnesses have testified that it's about $3 million.
24    A.  Uh-huh.
25    Q.  And do you happen to know the voter turnout in Texas

## 35

1  in the last presidential election?
2    A.  No, I don't.
3    Q.  Do you know if it's more or less than Missouri?
4    A.  I don't know.
5    Q.  Do you know if the population of Texas is more or less
6  than Missouri?
7    A.  I don't know.
8    Q.  Thank you for indulging me.
9    I'd like to turn now to talk about poll worker
10  training, which you said is also part of your duties at the
11  Secretary of State's office.
12    A.  Okay.
13    Q.  Is the Elections division typically responsible for
14  informing county election officials about changes in the
15  election law?
16    A.  Yes.
17    Q.  Who in your office is responsible for informing county
18  election officials about changes in election law?
19    A.  Well, we all have a part in it.
20    Q.  Okay.  So it's a -- it's a group effort.
21    Is there a specific team or department that's involved
22  in it?
23    A.  Well, our legal department prepares the information,
24  and my section, the special project section, implements it and
25  gets it out there to the election officials.

## 36

1    Q.  And how do you actually inform election officials
2  about changes in election law?
3    A.  Every year we have an annual conference, typically
4  late July, sometime in August as well.  And then, that's for the
5  county election officials.  And then, in the -- during the
6  wintertime, late November, early December, we have one for
7  cities, secretaries, school superintendents and other political
8  subdivisions.  In addition to that, we have our election judges
9  and clerks handbooks, we have an online training program for
10  poll workers, and we provide a video for election judges and
11  clerks.
12    Q.  And how is the content of those last things you
13  mentioned, the handbook, the online training program and the
14  video, how is that created?
15    A.  Our legal department creates that, creates the
16  content.
17    Q.  Okay.  If S.B. 14 is precleared, will the Elections
18  division be responsible for informing county election officials
19  how to administer the new photo ID requirement?
20    A.  Yes.
21    Q.  Has the Elections division sent any communications to
22  county election officials to begin preparing them to administer
23  the new photo ID requirement, if S.B. 14 is precleared?
24    A.  I don't know of the specific information, but they are
25  aware of it.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

### 37

1   Q.  So if I understand you, there has been some
2   communication between the Secretary of State and election
3   officials about the photo ID requirement --
4   A.  Yes.
5   Q.  -- possibly being enforced?
6   A.  Yes.
7   Q.  Okay.  Do you know when those communications might
8   have happened?
9   A.  I do remember we had an initial memo go out September
10  of 2011.  And it outlined the requirements that the county
11  officials -- what they were going to be responsible for and how
12  they needed to post certain notices in their office and provide
13  the -- I can't remember what the form is called, but it was
14  included in the information that I provided that all voters who
15  voted in the November 2000 election were given that notice,
16  letting them know that upon federal approval, the Senate Bill 14
17  new photo ID requirements were going to be in place.
18  Q.  I'm sorry.  I think you said all voters who voted in
19  the November 2000 election.  Is that what you meant?
20  A.  No, 2011.
21  Q.  Ah, 2011.  Thank you.
22      Has the Election division produced any materials at
23  this point that it plans to use to show county election
24  officials how to properly administer the new photo ID
25  requirements in S.B. 14?

### 38

1   A.  They're in draft mode, from what I know.
2   Q.  Have you seen those drafts?
3   A.  No, I have not.  They don't come to me until they're
4   final.
5   Q.  Okay.
6   A.  Our office has -- what we're doing is we have two
7   versions.  We're going to have two versions ready by August
8   15th.  One version is no Senate Bill 14.  The other version's
9   with Senate Bill 14 incorporated.  And both versions, we've got
10  the deadline of August 15th, so those both will be ready to go,
11  and we'll implement whichever one is appropriate at the time.
12  Q.  How does the Secretary of State's office ensure that
13  county election officials understand the materials that you send
14  them to train them?
15      MR. BRISSENDEN:  Objection, vague.
16  A.  I don't -- we can't really ensure.  We give them the
17  information that is required.
18  Q.  Do you have any way of getting feedback from them on
19  whether they understand the materials?
20  A.  I mean, our office is there for questions if they're
21  unfamiliar -- you know, if they don't understand.  We provide
22  everything on our Secretary of State's web site under Conducting
23  Your Elections.  All information that we send out to them is
24  also posted on that page.
25  Q.  And does the Secretary of State oversee the efforts

### 39

1   that the county election officials make to train their poll
2   workers?
3   A.  Do we oversee their efforts?
4   Q.  Right.
5   A.  We provide them the information that's necessary,
6   and they are required -- I mean, you know, they handle it after
7   the fact.  We don't monitor them.
8   Q.  Okay.  And does the Elections division of the
9   Secretary of State's office play any role at all in training the
10  poll workers before an election?
11  A.  We have our online training program that both poll
12  workers and the election judges and clerks, as well as the
13  county election officials, can all take part in training
14  directly through the web site.
15  Q.  And does that involve -- so that involves producing
16  materials; is that correct?
17  A.  Yes.
18  Q.  Training materials?  Sorry.  I'm sorry.  I meant to
19  clarify training materials, and then I spoke over your answer.
20      Does that include training materials?
21  A.  Yes.
22  Q.  Thank you.
23      And how far in advance of an election are those
24  materials that would be used to train poll workers typically
25  distributed?

### 40

1   A.  We typically go live two months before the election.
2   Q.  Does the Elections division typically organize any
3   seminars to facilitate poll worker training?
4   A.  Poll worker training?  No.  We -- our seminars are
5   geared toward the actual election officials.  So there's --
6   Q.  Okay.
7   A.  -- basically a training -- training the trainer.
8   Q.  Right.  And when do those seminars happen, the
9   election officials' training?
10  A.  This year it's taking place August 20th through 22nd.
11  Q.  Is that typical, that they're usually around that time
12  every year or every time you have them?
13  A.  It was originally scheduled for July 31st, but since
14  the primary got moved, we had to move the seminar to a later
15  date.  But, yes, they are usually either late July or early
16  August.
17  Q.  If the decision on preclearance doesn't -- isn't made
18  until the end of August, as the Court has suggested, how will
19  that affect the use of the seminar to train county election
20  officials?
21      MR. BRISSENDEN:  Objection, vague to the extent
22  that it also mischaracterizes representations from the Court.
23      You may answer.
24  A.  It won't affect it.  We will go ahead with our seminar
25  and provide the necessary materials to the election officials in



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

|  | 41 |  | 43 |
|---|---|---|---|
| 1 | other means of communication. | 1 | MS. STELCEN: And Ms. Salazar has the exhibit. |
| 2 | Q.  And what other means of communication will you use? | 2 | MR. VANDEWALKER: Thank you. |
| 3 | A.  We would post everything on our web site.  We would | 3 | Q.  Ms. Salazar, you mentioned earlier a survey by |
| 4 | e-mail it to them, and if necessary, hard copy mail. | 4 | Burson-Marsteller that talked about, among other things, levels |
| 5 | Q.  If you do use hard copy mail for that purpose that you | 5 | of internet usage.  Is this the survey that you were talking |
| 6 | just mentioned, would that money come from voter education | 6 | about? |
| 7 | funds? | 7 | A.  Yes. |
| 8 | MR. BRISSENDEN: If you know. | 8 | Q.  So if we could just turn to what is the second page. |
| 9 | A.  No, I don't -- no, I don't know. | 9 | It says Methodology at the top? |
| 10 | Q.  Okay.  Turning back to the materials that you produced | 10 | A.  Okay. |
| 11 | that are intended for poll workers, are any of those materials | 11 | Q.  Okay.  So this page sets out three groups that were |
| 12 | specific to Spanish speaking poll workers? | 12 | surveyed.  One of those groups is Hispanic Texas Voter.  The |
| 13 | A.  No. | 13 | other groups are Texas Voter 18 to 24 and Texas Voter 65-plus. |
| 14 | Q.  So are all of the training materials in English? | 14 | A.  Yes. |
| 15 | A.  For the election officials, yes. | 15 | Q.  Do you know the -- anything about the composition of |
| 16 | Q.  And I -- I'm maybe not remembering what you said, but | 16 | these groups other than what it says here? |
| 17 | does the Secretary of State's office produce any materials that | 17 | A.  No, I do not. |
| 18 | are intended for the poll workers? | 18 | Q.  Do you know, for example, what the racial composition |
| 19 | A.  Not in Spanish, no. | 19 | of the Texas Voter 18 to 24 group is? |
| 20 | Q.  Okay.  But do you produce any materials at all that | 20 | A.  No, I don't. |
| 21 | are intended for the poll workers? | 21 | Q.  And do you know the racial composition of the Texas |
| 22 | A.  Yes.  It's our online training program. | 22 | Voter 65-plus group? |
| 23 | Q.  Right.  Okay.  Okay.  Thank you. | 23 | A.  No. |
| 24 | And all of those materials are in English; is that | 24 | Q.  So do you have any reason to think that those two |
| 25 | correct? | 25 | groups that are divided by -- that are set out by age include |

|  | 42 |  | 44 |
|---|---|---|---|
| 1 | A.  Yes. | 1 | Hispanic voters? |
| 2 | Q.  Okay. | 2 | A.  I don't know. |
| 3 | MR. VANDEWALKER: And can I just ask Ms. Stelcen | 3 | Q.  Okay.  Do you see anything here indicating whether |
| 4 | if you've got the last exhibit that we talked about at the | 4 | African American voters were surveyed? |
| 5 | break? | 5 | A.  No. |
| 6 | MS. STELCEN: You know what, Ian, we're actually | 6 | Q.  Thank you. |
| 7 | having some printing issues with that.  So if you want to let | 7 | So if we could just turn -- it may be close to halfway |
| 8 | Elizabeth do her examination, and then we can go back to that | 8 | through the document.  I apologize there aren't easily |
| 9 | once I have the copy.  Does that make sense? | 9 | accessible page numbers, but it's Bates No. Texas 298545. |
| 10 | MR. VANDEWALKER: That's fine with me if that's | 10 | A.  Okay. |
| 11 | okay with -- | 11 | Q.  It's a page entitled Web Sites and Media are Most Used |
| 12 | MS. STELCEN: Or we can take a break also.  We're | 12 | Sources of Voting Information. |
| 13 | just -- I mean, it shouldn't take more than five minutes.  We | 13 | A.  Yes. |
| 14 | were just having a little issue.  Okay.  So why don't -- we can | 14 | Q.  Thank you. |
| 15 | take a quick break. | 15 | So this seems to be the results of a survey asking the |
| 16 | MS. WESTFALL: Unless he has other questions. | 16 | question, "When seeking out information or news about voting in |
| 17 | MR. VANDEWALKER: Okay.  Sure.  Perfect.  Let's | 17 | your community, where do you find the information you need?" |
| 18 | take a five-minute break, and we'll come back. | 18 | And it shows the second column is Media.  Do you know |
| 19 | MS. STELCEN: Okay.  Thank you. | 19 | what Media means there? |
| 20 | (Recess from 11:05 a.m. to 11:10 a.m.) | 20 | A.  No, I don't. |
| 21 | MR. VANDEWALKER: So if you could present the | 21 | Q.  Okay.  Well, the first column is Web Sites.  And if we |
| 22 | exhibit that we've had such excitement about. | 22 | look at little farther down, we see Advertising and also Social |
| 23 | MS. STELCEN: Okay.  I'm going to ask the court | 23 | networking sites.  Do you know any more about those categories |
| 24 | reporter to mark this as Salazar No. 5. | 24 | other than what it says right here? |
| 25 | (Exhibit No. 5 marked) | 25 | A.  Do I know more information?  What do you mean? |



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

```
                                      45
 1      Q.  Do you know -- I mean, it says here that there's Web
 2  sites and Advertising and Social networking sites.  Do you know
 3  any more information than what those labels convey?
 4      A.  No, I don't.
 5      Q.  Now, looking at -- if you take the first column, Web
 6  sites, it shows that Hispanics say that they find the
 7  information they need on web sites 53 percent of the time, which
 8  is less than the group of voters 18 to 24.  Do you see that?
 9          MR. BRISSENDEN:  That -- Ian, just -- not to be
10  difficult, but the copy that we have is not in color; it's in
11  black and white.  And so it's difficult to see which of the bars
12  pertain to 18 to 24 versus which ones are -- pertain to
13  Hispanic.  They're all black-and-white.
14          MR. VANDEWALKER:  Yeah.  We have the same problem
15  because the copy that was provided to us is in black and white.
16  So I can't help with that problem.  I can say that the key shows
17  that voters 18 to 24 is the dark mark on the far left, that
18  65-plus is the white mark, and Hispanic is the dark mark on the
19  far right.
20      Q.  Ms. Salazar, do you think it's a reasonable
21  interpretation of this chart that the Hispanic column is the
22  column on the far right in each column?
23      A.  I can't --
24          MR. BRISSENDEN:  If you --
25      A.  I can't decipher that.

                                      46
 1          MR. VANDEWALKER:  Okay.  Can we go off the record for
 2  a minute, please.
 3          (Recess from 11:14 a.m. to 11:16 a.m.)
 4      Q.  Okay.  So looking at this chart, the columns -- the
 5  first column, it talks about web sites.  And although we don't
 6  know which of these columns within that group refers to which,
 7  what's the highest number there showing that how many people use
 8  web sites to find the information they need?
 9      A.  67 percent.
10      Q.  67 percent?
11          So is it your understanding that that indicates that
12  over 30 percent of people don't use web sites to get the
13  information that they need?
14      A.  Yes.
15      Q.  And looking at the next group of columns, again,
16  what's the highest percentage there?
17      A.  84 percent.
18      Q.  And so do you think that that means that over
19  15 percent -- I'm sorry.
20          Do you think that means that over 15 percent of people
21  don't get their information from media?
22          MR. BRISSENDEN:  Objection, vague.
23      A.  Yes.
24      Q.  And just looking over to the Social networking sites
25  column, about halfway through, what's the highest number there?

                                      47
 1      A.  24 percent.
 2      Q.  And so do you understand that to mean that over 70
 3  percent of people don't get the information they need from
 4  social networking sites?
 5          MR. BRISSENDEN:  Same objection.
 6      A.  From the people that they produce this survey with,
 7  yes.
 8      Q.  Right.  And just -- just to continue asking silly
 9  questions about this thing that we can't really read:  For each
10  group of columns, is it the case that -- sorry.
11          I'll limit my questions to the first four groups of
12  columns, web site, media, friends and family and advertising.
13  For each of those, is it true that the three columns in each
14  group are at different levels, indicating that whichever one is
15  Hispanic is a different level from the other two?
16      A.  Yes.
17      Q.  Thank you.
18          I'd like to turn a couple pages later to what is Bates
19  stamped as 298547, the page that says at the top, "Voters find
20  the process fair and accessible."
21      A.  Okay.
22      Q.  So the question they asked is, "Do you believe that
23  the voting process is fair and accessible to all Texans?"
24          And looking at the people who said no, under all Texas
25  voters, the first column, what was the most common answer given

                                      48
 1  for the reason that people said that the voting process is not
 2  fair and accessible?
 3          MR. BRISSENDEN:  Objection, vague.
 4      A.  According to the people they surveyed, it says
 5  33 percent.
 6      Q.  And what was the --
 7      A.  For --
 8      Q.  -- reason those 33 --
 9      A.  I'm sorry.
10      Q.  I'm sorry.
11      A.  Documentation.
12      Q.  Thank you.
13          I'll just ask the question just for the record.
14          What was the reason that those 33 percent gave
15  thinking that the voting process is not fair and accessible?
16      A.  From the people they surveyed, it was documentation.
17      Q.  Thank you.
18          Do you have any reason to think that the people they
19  surveyed are not a representative cross-section of Texas voters?
20          MR. BRISSENDEN:  Objection, vague.
21      A.  I don't know.
22          MR. VANDEWALKER:  Okay.  I think we have
23  exhausted our questions.  If Ms. Westfall would like to take
24  over.
25          MS. WESTFALL:  Thank you very much.
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 49

EXAMINATION
BY MS. WESTFALL:
Q. Ms. Salazar, my name is Elizabeth Westfall. I represent the Department of Justice in this case. And I just have a few questions for you. I won't keep you much longer.
A. Okay.
Q. Thank you for your time.
Ms. Salazar, who do you report to?
A. I report to Louri O'Leary.
Q. And what is her title?
A. She's the manager of the administrative section.
Q. Is there a group of staff in the Secretary of State's office that handles responsibilities related to the Elections division?
A. I'm sorry. That went in and went right out. Can you repeat that?
Q. I'll try it again.
Is there a group of staff in the Secretary of State's office that handles responsibilities for the Elections division?
A. Yes.
Q. How big is that group?
A. We are at 26.
Q. If there was a request from a state legislator for information related to an elections bill, who in your office would handle that request?

## 50

A. Our legal department.
Q. Who in particular in the legal department would handle that request?
A. Elizabeth Hanshaw Winn.
Q. Anybody else?
A. Any of the attorneys. Name them all or --
Q. No. That's okay.
Is Ms. Winn the head of that department?
A. Of the legal section, yes.
Q. How big is the legal section?
A. Six. Six attorneys and two administrative staff.
Q. Do you, yourself, have contact with that section?
A. Yes.
Q. How frequently?
A. If I ever have a legal question that I need answered, that -- but it -- it just depends on the given day.
Q. Is it pretty routine that you have contact with that office?
MR. BRISSENDEN: Objection, vague.
A. Again, depending on circumstances.
Q. I believe you testified earlier that one of your responsibilities is tracking legislation; is that correct?
A. Yes.
Q. When you are tracking legislation, do you provide that information to the legal section?

## 51

A. Yes.
Q. Who do you work with in the legal section regarding tracking legislation?
A. All of the attorneys.
Q. Could you describe how you track legislation?
MR. BRISSENDEN: I'm going to, at this time, instruct the witness not to answer. We presented Ms. Salazar today on short notice based upon the agreement that was reached that Ms. Salazar would be here today to talk about voter education efforts, poll worker training, the documents, the topics that are listed in her notice of deposition, which all pertain to voter education and poll worker training. So to the extent that the line of questioning is now talking about tracking legislation and those procedures, I believe those are outside the bounds of what the agreement was, and so I'd instruct her not to answer.
MS. WESTFALL: Mr. Brissenden, I take strong issue with your instruction. The witness has not been noticed pursuant to Rule 30(b)(6), if I'm not mistaken. And I am following up on questions that -- with questions about testimony that she has already provided in this deposition. So I would ask that you withdraw your instruction to your witness.
MR. BRISSENDEN: She has simply earlier testified as to what her responsibilities, duties are as part of her position. She has not gone into and provided any detailed

## 52

testimony with regards to tracking legislation. That's a new topic area. I understand it's not a 30(b)(6) deposition, but it is an agreement that was reached with counsel. It was understood that because she is being presented on such short notice that we would, in the spirit of cooperation, have a deposition focused on the narrow topics of voter education and poll worker training.
MS. WESTFALL: Did you --
MR. BRISSENDEN: So I will instruct her not to answer.
MS. WESTFALL: Did you have any communications with anyone in the U.S. Department of Justice related to such an agreement that you've just described?
MR. BRISSENDEN: I wasn't involved particularly with the communications, but Mr. Sweeten and others in our office were.
MS. WESTFALL: I will represent to you that on behalf of the attorney general, that I am not aware of any agreement that we would have entered into to limit the topics of this deposition. I have just a few questions for Ms. Salazar that will not keep her long or you. I do not intend to spend a tremendous amount of time examining her today. But I do want to make clear for the record that the attorney general is not a -- a party to any such agreement. There's no 30(b)(6) notice as to this witness. It's improper for you to be instructing her not



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

### 53

1  to answer questions on that basis, and I would ask your
2  indulgence in allowing me to proceed with my examination.
3       MR. BRISSENDEN:  And I disagree.  The Department
4  of Justice did not notice the deposition either, so --
5       MS. WESTFALL:  We're the defendant in this
6  action.
7       MR. BRISSENDEN:  I understand.
8       MS. WESTFALL:  We're entitled to take questions
9  of this -- of this fact witness.
10      MR. BRISSENDEN:  I understand.  But the --
11      MS. WESTFALL:  She's not a 30(b)(6) witness.
12 She's a fact witness.
13      MR. BRISSENDEN:  I understand.  But the
14 deposition was not noticed by the Department of Justice.  It was
15 noticed by intervenor's counsel with the understanding that
16 these topics of voter education and poll worker training would
17 be the topics that would be discussed based upon the limited
18 time frame that we were provided in which to present her here
19 today.  I'm not being difficult, but that was the understanding
20 and agreement that we were all under whenever we agreed to
21 present Ms. Salazar here today.
22      MS. WESTFALL:  That may be your understanding,
23 but it's contrary to the federal rules.  Do you want to
24 reconsider your instruction to your witness?
25      MR. BRISSENDEN:  Not at this time.

### 54

1       MS. WESTFALL:  Could you read back the question.
2       (Requested portion was read by the reporter)
3       MS. WESTFALL:  Are you instructing her not to
4  answer?
5       MR. BRISSENDEN:  Yes.
6    Q.  Did you do any tracking of legislation in the 2011
7  legislative session?
8       MR. BRISSENDEN:  Same instruction.
9    Q.  Is there anyone else in your office who handles issues
10 related to state legislation?
11   A.  It would be our group of attorneys and our Director of
12 Elections.
13   Q.  Is that the Elections division?
14   A.  Yes.
15   Q.  So outside of the attorneys and you, are -- is there
16 anyone else in the Secretary of State's office who handles
17 issues related to state legislation?
18   A.  Within the division, Dan Glotzer, our primary finance
19 manager.
20   Q.  And is he within the Secretary of State's office?
21   A.  Yes.
22   Q.  Can you think of anyone else who handles state
23 legislation issues within the Secretary of State's office?
24   A.  Oh, within the entire office.  I'm sorry.  I don't
25 know of the amount of people, but, yes, there are other people.

### 55

1    Q.  Is there someone in the Secretary of State's office
2  who serves as a liaison to the legislature on elections issues?
3    A.  I don't know specifics.  As far as I know, Keith will.
4  He hasn't in the past, but I know he will.
5    Q.  Are you talking about Keith Ingram --
6    A.  Yes.
7    Q.  -- in the Elections division?
8       Is there anyone in the Secretary of State's office
9  itself and not the Elections division who would serve as the
10 liaison to the -- to the state legislature?
11   A.  I don't know.
12   Q.  In 2011, did you track Senate Bill 14?
13      MR. BRISSENDEN:  I'm going to instruct the
14 witness not to answer the question.
15      MS. WESTFALL:  What's your basis?
16      MR. BRISSENDEN:  Same basis as before.
17      MS. WESTFALL:  All right.  We'll take a break.
18 We'll take a break and discuss this further once I'm done with
19 this other questions.
20   Q.  In 2009, did you track previous voter ID bills?
21      MR. BRISSENDEN:  Same instruction.
22   Q.  Are you going to follow the advice of counsel?
23   A.  Yes.
24   Q.  Did you ever have any communications with legislators
25 and their staff?

### 56

1       MR. BRISSENDEN:  Same instruction.
2    Q.  Were you ever in meetings with legislators or their
3  staff about any voter ID bill?
4       MR. BRISSENDEN:  Same instruction.
5    Q.  Are you aware of any research that the Secretary of
6  State or the Elections division conducted on voter ID?
7       MR. BRISSENDEN:  Same instruction.
8    Q.  Since 2005, to your knowledge, has the Secretary of
9  State ever conducted any research on voter ID?
10      MR. BRISSENDEN:  Same instruction.
11      Again, we're here to talk about voter ID or voter
12 training and poll worker training, voter education.  Those are
13 the topics that were agreed to on such short notice.
14      MS. WESTFALL:  Agreed to in the passive voice.
15 That was the defendant intervenors; that was not the attorney
16 general.  We're not a party to any such agreement.  She's
17 appearing here as a fact witness.  Your instruction is contrary
18 to the federal rules.
19   Q.  Are you aware of any research that the Secretary of
20 State or the Elections division conducted related to Senate Bill
21 14?
22      MR. BRISSENDEN:  I'm going to instruct the
23 witness again not to answer.
24   Q.  You testified about drafts of poll worker training
25 related to Senate Bill 14; is that correct?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

### 57

1  A.  Yes.
2  Q.  How will poll workers be trained to implement Senate
3  Bill 14 if it is precleared?
4  A.  We have our online poll worker training.  We have
5  election judges' and clerks' handbooks, our conferences and any
6  other means of communication.
7  Q.  How will poll workers determine -- and have you seen
8  the drafts at all?
9  A.  No.
10  Q.  Do you have a sense of what the training will look
11  like?
12  A.  No.
13  Q.  Based -- have you had any meetings about the training?
14  A.  None that I have been in -- a part of.
15  Q.  Are you aware of whether -- of how poll workers will
16  determine whether a photo ID presented by a voter identifies the
17  voter?
18  A.  Can you repeat the question?
19  Q.  Certainly.  How are poll workers going to be trained
20  to figure out when a voter presents a photo ID whether that
21  voter and the ID match?
22  A.  Right.  Through the -- those items, the online poll
23  worker training, the conferences, the handbooks.
24  Q.  Do you understand the substance of the training that
25  will be given to poll workers in that regard?

### 58

1  A.  Will I understand it?
2  Q.  No.  Do you understand how poll workers will be
3  trained to make that very important decision as to whether a
4  voter and the ID match?
5  A.  Yes.  I mean, we're going to provide all the necessary
6  information to make sure that they understand what is necessary.
7  Q.  And do you understand, sitting here today, what those
8  standards will be?
9  A.  Yes.
10  Q.  And how will poll workers make that decision?
11  A.  Well, through the training that we provide, they're
12  going to know what's required of the voters when they enter the
13  polling place.
14  Q.  And maybe I'm not being clear.  But how -- what is
15  your understanding of how a poll worker, when a voter walks into
16  a polling location --
17  A.  Uh-huh.  Uh-huh.
18  Q.  -- will figure out whether the voter and the ID match?
19      MR. BRISSENDEN:  Objection, asked and answered.
20      You may answer.
21  A.  They will -- I mean, they will know what's appropriate
22  as far as the identification goes.  And if they have the proper
23  identification, they will be allowed to vote if they are a
24  registered voter.
25  Q.  Suppose a voter comes in and has a different name on

### 59

1  the photo ID from the name that the voter has registered to vote
2  with and has in the poll book.  What will a poll worker do at
3  that point?
4      MR. BRISSENDEN:  Objection, hypothetical, calls
5  for speculation.
6      If you know.
7  A.  I don't know.
8  Q.  And if a voter walks in and the picture on the ID does
9  not appear to be the same because the person has cut the hair,
10  colored the hair, changed the hair, done something in
11  appearance-wise, and it's not clear to the poll worker whether
12  the ID and the person match, what does a poll worker do?
13      MR. BRISSENDEN:  Objection, hypothetical, vague,
14  compound, calls for speculation.
15      If you know.
16  A.  I don't know.
17  Q.  I believe you testified earlier about voter education
18  on obtaining an alternative form of ID called an election
19  identification certificate; is that correct?
20  A.  Yes.
21  Q.  And is it your testimony that this voter education
22  will be targeted to populations without necessary and allowable
23  forms of photo ID under Senate Bill 14?
24      MR. BRISSENDEN:  Objection, vague.
25  A.  I don't know how it will be targeted.

### 60

1  Q.  Do you know whether it's going to be targeted to the
2  whole population or just people who may not have the forms of
3  allowable ID?
4  A.  Our office targets all -- everyone.
5  Q.  So it would be just statewide, regardless
6  of -- actually, strike that.
7      Do you think your office will make any determination
8  about voters who do or do not have forms of allowable photo ID
9  under the law --
10      MR. BRISSENDEN:  Objection, vague, compound.
11  Q.  -- before they do the voter ID program?
12  A.  I don't know.
13  Q.  Is there any plan to target voter ID to minority
14  voters?
15  A.  I don't know.
16  Q.  Is there any plan to target voter ID to low-income
17  voters?
18  A.  I don't know.
19      MS. WESTFALL:  Okay.  I think we'll just take a
20  recess right now.  We'll come back in a minute.  We can go off
21  the record.
22      (Recess from  11:41 a.m. to 12:31 p.m.)
23      MS. WESTFALL:  Mr. Brissenden, we've had an
24  extended break.  Have you reconsidered the position you took
25  before the break on your instruction to the witness not to



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 61

1  answer questions related to tracking legislation?
2          MR. BRISSENDEN:  We have.  We've discussed it and
3  talked with Mr. Sweeten.  You and I and others have had a
4  conference about it.  And at this time we're standing on the
5  agreement that was reached among counsel about the scope of this
6  deposition.
7          MS. WESTFALL:  And by counsel, you mean the State
8  and counsel for the defendant intervenors; is that right?
9          MR. BRISSENDEN:  I mean all that were involved
10 with the agreement.  I myself wasn't, but others were.
11         MS. WESTFALL:  So during the break I spoke with
12 your co-counsel, Patrick Sweeten, who indicated the State did
13 have an agreement with some of the defendant intervenors about
14 the scope of this deposition.  And Mr. Sweeten did agree the
15 Attorney General was not a party to that agreement.
16         There is no dispute, and I take it you're not
17 going to dispute now that this deposition has not been noticed
18 pursuant to Federal Rule 30(b)(6).  Ms. Salazar is appearing for
19 her deposition today as a fact witness.  And the State's not
20 disputing the relevance of any of the questions that I've asked
21 to the claims that the State has brought in this litigation.
22         The final comment I want to make on the record is
23 that I believe the instructions to the witness before the break
24 not to answer some of these questions are in direct violation of
25 Federal Rule 30(c)(2), which indicates that a person may

## 62

1  instruct the deponent not to answer only when necessary to
2  preserve a privilege, to enforce a limitation ordered by the
3  Court or to present a motion under Rule 30(d)(3), none of which
4  are applicable in this case.
5          So from the standpoint of the Attorney General,
6  we will leave the deposition of Ms. Salazar open and I will turn
7  it over to counsel for the defendant intervenors.
8          MR. VANDEWALKER:  Thank you.  I just want to note
9  for the record that the last exhibit entered which, along with
10 all the other exhibits responsive to the notice of deposition,
11 was provided to defendant intervenors late last night after
12 hours, took a couple of hours for us to access with the help of
13 IT personnel.  The copy of that exhibit that we have is in black
14 and white, although we understand that the original was in color
15 and that our copy creates some legibility issues.
16    The witness was instructed not to answer some of our
17 questions because of the quality of the copy that is the only
18 copy that we have.  And because of that we -- defendant
19 intervenors reserve the right to reopen -- rather, defendant
20 intervenors don't want the deposition to close.  We reserve the
21 right to recall Ms. Salazar once we get a color copy of that
22 exhibit and are able to ask her the questions that we want to
23 ask her about it.
24         And I would note that we request from the State
25 of Texas that we be provided with a color copy of that exhibit

## 63

1  as soon as possible, and specifically by the end of -- by close
2  of business today.  Thank you.
3          (Deposition concluded at 12:34 p.m.)

## 64

CHANGES AND SIGNATURE

WITNESS NAME_____ DATE OF DEPOSITION_____
PAGE LINE    CHANGE       REASON



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 65

1    I, LETICIA ANN SALAZAR, have read the foregoing
2  deposition and hereby affix my signature that same is true and
3  correct, except as noted above.
4
5
6         _____
          LETICIA ANN SALAZAR
7
8
9    THE STATE OF TEXAS   )
10   COUNTY OF TRAVIS     )
11         Before me,_____, on this day personally
12  appeared LETICIA ANN SALAZAR known to me (or proved to me under
13  oath of through_____) (description of identity card or
14  other document) to be the person whose name is subscribed to the
15  foregoing instrument and acknowledged to me that they executed
16  the same for the purposes and consideration therein expressed.
17         Given under my hand and seal of office this_____
18  day of _____.
19
20
21         _____
           NOTARY PUBLIC IN AND FOR
22         THE STATE OF
23
24
25

## 67

1  on_____ to the witness or to the attorney for the
2  witness for examination, signature and return to me
3  by_____;
4       That the amount of time used by each party at the
5  deposition is as follows:
6       Mr. Vandewalker - 01:29
7       Mr. Westfall - 00:31
8       That pursuant to information given to the
9  deposition officer at the time said testimony was taken the
10 following includes counsel for all parties of record:
11      Mr. Brissenden, Attorney for Plaintiff
        Ms. Westfall, Attorney for Defendant
12      Mr. Vandewalker, Attorney for Defendant-Intervenor
13      I further certify that I am neither counsel for,
14 related to, nor employed by any of the parties or attorneys in
15 the action in which this proceeding was taken, and further that
16 I am not financially or otherwise interested in the outcome of
17 the action.
18      Certified to by me this_____day of_____, 2012.
19
20
21      _____
        Amy C. Kofron, Texas CSR #6352
22      Expiration Date: 12/31/2013
        Esquire Deposition Solutions
23      100 Congress Avenue, Suite 2020
        Austin, Texas 78701
24
25

## 66

1        IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLUMBIA
2
     STATE OF TEXAS,          )
3         Plaintiff,          )
                              )
4    V.                       )
                              )
5    ERIC H. HOLDER, JR.,     )
     in his official capacity )
6    as Attorney General of   )
     the United States,       )
7         Defendant.          )
                              )
8    ERIC KENNIE, et al.,     )
          Defendant-Intervenors, )
9                             )
     TEXAS STATE CONFERENCE   ) CASE NO. 1:12-CV-00128
10   OF NAACP BRANCHES, et al., ) (RMC-DST-RLW)
          Defendant-intervenors, ) Three-Judge Court
11                            )
     TEXAS LEAGUE OF YOUNG    )
12   VOTERS EDUCATION FUND, et al., )
          Defendant-Intervenors,  )
13                            )
     TEXAS LEGISLATIVE BLACK  )
14   CAUCUS, et al.,          )
          Defendant-Intervenors,  )
15                            )
     VICTORIA RODRIGUEZ, et al.,  )
16        Defendant-Intervenors.  )
17            REPORTER'S CERTIFICATION
           DEPOSITION OF LETICIA ANN SALAZAR
18              June 14, 2012
19      I, Amy C. Kofron, Certified Shorthand Reporter in
20 and for the State of Texas, hereby certify to the following:
21      That the witness, LETICIA ANN SALAZAR, was duly
22 sworn by the officer and that the transcript of the oral
23 deposition is a true record of the testimony given by the
24 witness;
25      That the deposition transcript was submitted



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com