## 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                    )
                                   )
        Plaintiff,                 )
                                   )
VS.                                )
                                   )
ERIC H. HOLDER, JR., IN            )
HIS OFFICIAL CAPACITY AS           )
ATTORNEY GENERAL OF THE            )
UNITED STATES,                     )
                                   )
        Defendant,                 )
                                   )
ERIC KENNIE, ET AL.,               )
                                   )
        Defendant-Intervenors,     )
                                   )
THE TEXAS SATE CONFERENCE          ) CASE NO. 1:12-CV-00128
OF NAACP BRANCHES, ET              ) (RMC-DST-RLW)
AL.,                               ) Three-Judge Court
                                   )
        Defendant-Intervenors,     )
                                   )
TEXAS LEAGUE OF YOUNG              )
VOTERS EDUCATION FUND, ET          )
AL.,                               )
                                   )
        Defendant-Intervenors,     )
                                   )
TEXAS LEGISLATIVE BLACK            )
CAUCUS, ET AL.,                    )
                                   )
        Defendant-Intervenors,     )
                                   )
VICTORIA RODRIGUEZ, ET             )
AL.,                               )
                                   )
        Defendant-Intervenors.     )

## 2

```
 1   *********************************************************
 2            ORAL DEPOSITION OF
 3            MICHAEL SCHOFIELD
 4               JUNE 1, 2012
 5   *********************************************************
 6      ORAL DEPOSITION OF MICHAEL SCHOFIELD, produced as a
 7   witness at the instance of the Defendants Eric H. Holder,
 8   et al., and duly sworn, was taken in the above-styled and
 9   numbered cause on Friday, June 1, 2012, from 9:39 a.m. to
10   4:48 p.m., before Tamara K. Chapman, CSR in and for the
11   State of Texas, reported by machine shorthand, at the
12   Office of the Attorney General, 816 Congress, Suite 1000,
13   Austin, Texas, pursuant to the Federal Rules of Civil
14   Procedure and the provisions stated on the record or
15   attached hereto.
16
17
18
19
20
21
22
23
24
25
```

## 3

```
 1
 2                    A P P E A R A N C E S
 3   FOR THE PLAINTIFF STATE OF TEXAS:
 4      Mr. John W. McKenzie, III
        Special Counsel to the Attorney General
        General Counsel Division
 5      P.O. Box 12548
        Austin, Texas  78711-2548
 6      john.mckenzie@texasattorneygeneral.gov
 7
 8      Mr. Reynolds Brissenden
        ATTORNEY GENERAL OF TEXAS
        Civil Medicaid Fraud Division
 9      300 W. 15th Street
        Austin, Texas  78701
10      reynolds.brissenden@oag.state.tx.us
11
12      Mr. Justin Gordon
        OFFICE OF THE GOVERNOR
        P.O. Box 12428
13      Austin, Texas  78711
        justin.gordon@gov.texas.gov
14
15
16   FOR THE DEFENDANTS ERIC H. HOLDER, ET AL.:
        Mr. Bruce Gear
17      U.S. DEPARTMENT OF JUSTICE
        950 Pennsylvania Avenue, NW
        NWB - Room 7202
18      Washington, DC  20530
        bruce.gear@usdoj.gov
19
20      Mr. Spencer R. Fisher
        U.S. DEPARTMENT OF JUSTICE
21      950 Pennsylvania Avenue, NW
        Northwestern Building, Suite 7146
22      Washington, DC  20530
        spencer.fisher@usdoj.gov
23
24
25
```

## 4

```
 1   FOR THE KENNIE INTERVENORS:
        Mr. Chad W. Dunn
 2      BRAZIL & DUNN, LLP
        4201 Cypress Creek Parkway, Suite 530
 3      Houston, Texas  77068
        chad@brazilanddunn.com
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 5

* * *

EXAMINATION INDEX

                                                Page
EXAMINATION BY MR. GEAR...................    7

EXAMINATION BY MR. DUNN...................  225


* * *

INDEX OF EXHIBITS

                                                Page
Exhibit 5..................................  164
   SB 14, HB 218, relating to requiring
a voter to present proof of
identification
(No Bates - 18 pages)

Exhibit 28.................................   61
   HB 218, relating to requiring a voter
to present proof of identification
(No Bates - 13 pages)

Exhibit 44.................................   38
   HB No. 1706, relating to requiring a
voter to present proof of identification
(No Bates - 10 pages)
Exhibit 101................................   39
   History of HB 1706
(No Bates - 3 pages)
Exhibit 102................................   58
   History of HB 218
(No Bates - 4 pages)
Exhibit 106................................   87
   History of SB 362
(No Bates - 3 pages)

## 6

Exhibit 223................................  123
   History of SB 14
(No Bates - 9 pages)
Exhibit 310................................   21
   Amended Notice of Deposition
(No Bates - 7 pages)
Exhibit 311................................  211
   2/25/2009 e-mail from John Sepheri to
Michael Schofield
(Bates TX_00040055 - TX_00024520)

Exhibit 314................................   88
   SB 362, HB 218, relating to requiring
a voter to present proof of
identification
(No Bates - 9 pages)

## 7

1  MICHAEL SCHOFIELD,
2  having been first duly sworn, testified as follows:
3  EXAMINATION
4  BY MR. GEAR:
5      Q.  Good morning, Mr. Schofield.
6      A.  Good morning.
7      Q.  This is the -- this is your deposition today and
8  this is the matter of Texas v. Holder, USDC, for DC Docket
9  Number 1:11 CV 128.
10     Could you spell your -- state your name and spell
11 it for the record, please?
12     A.  My name is Michael Schofield, S-C-H-O-F-I-E-L-D.
13     Q.  And my name is Bruce Gear.  I'm with the
14 Department of Justice.  I represent Eric Holder in this
15 case, the United States Attorney General.  And if I could
16 just ask everyone else to introduce yourself for the
17 record.
18     MR. MCKENZIE:  Sure.  John McKenzie, for the
19 State of Texas and for the witness.
20     MR. BRISSENDEN:  Reynolds Brissenden, for
21 the State of Texas and the witness.
22     MR. GORDON:  Justin Gordon for the State of
23 Texas and the witness.
24     MR. DUNN:  Chad Dunn, for the Defendant
25 Kennie intervenors.

## 8

1      MR. FISHER:  Spencer Fisher, for the
2  Attorney General.
3      Q.  (BY MR. GEAR)  Now, you understand that you have
4  been sworn in and that you're under oath -- and you're
5  under oath under penalty of perjury and that this is
6  basically like trial testimony.  Do you understand that?
7      A.  Yes.
8      Q.  Okay.  That during your deposition, you're
9  expected to testify completely, fully and truthfully.  Do
10 you also understand that?
11     A.  Yes.
12     Q.  Okay.  Now, just a couple of ground rules for the
13 deposition.  I'm going to be asking you some questions,
14 and you'll be providing the answers.  Just for the court
15 reporter's purposes, I need to be able to complete my
16 question to you, and then I will give you a complete
17 opportunity to finish your answer to me.  The reason we're
18 doing that is because the court reporter can't record both
19 communications at the same time.  So when you answer, I
20 need a verbal answer.  Shaking your head "yes" or "no"
21 cannot be recorded by the court reporter.  Do you
22 understand that?
23     A.  Yes.
24     Q.  Okay.  So, also, if I ask you a question that you
25 do not understand, you know, you can always stop me or ask



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 9

1  me to repeat the question.  I have no problem doing that.
2  I want you to understand my questions and I want to
3  understand your complete answers; is that okay?
4      A.  Yes.
5      Q.  All right.  Is there any reason today that you
6  would not be able to answer my questions completely and
7  truthfully?
8      A.  What do you mean?
9      Q.  Is there any reason today that you would not be
10  able to respond to my questions completely and truthfully?
11      A.  You mean -- are you talking about privileges?
12  Are you talking about --
13      Q.  No, just generally.
14      A.  No, no.
15      Q.  And we'll get to the privileges.
16      A.  Right.
17      Q.  I understand that you may be asserting some
18  privileges today.
19          Are you taking any medication or drugs today that
20  would interfere with your ability to testify today?
21      A.  No.
22      Q.  Something else that I think is important:  If at
23  any point you need to take a break and we're in the middle
24  of a question and answer, I just ask that you complete
25  your question and then let me know, and I'll allow you to

## 10

1  take a break.  And that's also true if you need to speak
2  to your attorney at any time.  If we're in the middle of
3  questions and answers, just -- I'd ask you to just
4  complete your answer; and then at that point, let me know
5  that you need to speak to your attorney, and I'll allow
6  you to do that.  Do you understand?
7      A.  Yes.
8      Q.  Now, there's a couple of terms I'll be using
9  today that I may be using interchangeably.  One is "voter
10  ID" and "photo ID."  I'll be using those interchangeably
11  throughout the deposition.  I want you to interpret those
12  terms as broadly as you can to mean a requirement that a
13  voter present a form of identification, whether it -- as a
14  photo or otherwise when voting in person before being
15  permitted to vote with a regular ballot.  Do you
16  understand that?  Let me try that again.
17          So essentially the term "photo ID" and "voter ID"
18  will be used interchangeably today.  And I want you to
19  interpret that as broadly as possible for an individual
20  who is voting at the polls would be allowed to do so
21  whether the ID has a photo or not.  Do you understand
22  that?
23      A.  I'm to interpret "photo ID" to mean not having to
24  show a photo ID?
25      Q.  You're to interpret it as though the form of

## 11

1  identification, whether the individual has a photo on that
2  identification or not.  Do you understand that?
3      A.  I'm not trying to be obtuse.  I'm -- I'm.  We're
4  going to use "photo ID" and "voter ID" interchangeably?
5      Q.  Yes.
6      A.  That part I understood.  I didn't get the -- I'm
7  not -- it sounded like you're saying you're -- photo ID
8  and voter ID are being used interchangeably, whether
9  there's a photo or not.
10      Q.  That's correct.
11      A.  So we're using photo ID whether there's a photo
12  or not?
13      Q.  That's correct.  And I'll attempt to clarify --
14      A.  Okay.
15      Q.  -- whenever we get into any terms of the
16  legislation where there's a time where an individual could
17  use a photo or a nonphoto to show identification.  Do you
18  understand that?
19      A.  That, I understand.
20      Q.  Okay.  When I refer to "you," I'm asking you about
21  your capacity in the governor's office and your position.
22  Do you understand that?
23      A.  Yes.
24      Q.  If I refer to "you," I'm also asking you about
25  you or any other staff that you may supervise within the

## 12

1  governor's office.  Do you understand that?  And I will
2  attempt to clarify every time when I distinguish between
3  the two that I'm asking you about you and you or your
4  staff.  Do you understand that?
5          MR. MCKENZIE:  And I just want to interpose
6  an objection to the record to the extent there's any
7  ambiguity as to what you mean, we're going to ask the
8  witness to interpret "you" to mean the regular meaning of
9  "you."  But if it's not ambiguous from the question or
10  it's clarified by counsel, then answer as counsel
11  requests.
12      Q.  (BY MR. GEAR)  Do you understand everything I've
13  said so far?
14      A.  Yes.
15      Q.  One other term that I'll be using today,
16  "minority voters."  And when I use the term "minority
17  voters," I mean voters that are not white or not Anglo.
18  Do you understand that?
19      A.  Yes.
20      Q.  All right.  So let's talk a little bit about
21  previous deposition and trial experience.  Have you ever
22  had a deposition before?
23      A.  Have I ever given one?
24      Q.  Given one.
25      A.  Yes, once.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                                June 1, 2012

## 13

1    Q. Okay. And can you tell me when you gave that
2    deposition?
3    A. Last September.
4    Q. And what subject matter did that deposition deal
5    with?
6    A. It was in connection with my work for the
7    governor's office.
8    Q. Okay. And can you tell me, were you a defendant
9    or a witness?
10   A. Witness.
11   Q. All right. And can you tell me generally what
12   the subject matter of that deposition was?
13   A. It was regarding whether a document was to be
14   produced under the Public Information Act.
15   Q. Okay. And was there a title to that case that
16   you can recall?
17   A. I don't remember the caption.
18   Q. All right. Was it a civil or a criminal matter?
19   A. Civil.
20   Q. Did that deposition result in testimony at trial?
21   A. No.
22   Q. Have you ever testified at trial?
23   A. No.
24   Q. You ever been personally a party to a lawsuit?
25   A. No.

## 14

1    Q. What did you do to prepare for deposition today?
2    A. I met with Mr. McKenzie and another attorney from
3    the Attorney General's Office and another attorney from
4    the general counsel of the Office of the Governor.
5    Q. And when did you meet with these individuals?
6    A. The day before yesterday. And for a couple of
7    minutes before the deposition this morning, I was
8    introduced to Reynolds.
9    Q. And did you review any documents during your
10   deposition preparation?
11   A. I didn't review any documents. I turned
12   documents over to the Attorney General's Office.
13   Q. And how many documents did you turn over to the
14   Attorney General's Office?
15   A. I don't know the number.
16   Q. Was it more than five?
17   A. It would -- yes.
18   Q. And when did you conduct a search for those
19   documents? When did you conduct the search?
20   A. I guess last week --
21   Q. All right.
22   A. -- when I got the deposition notice.
23   Q. And this would be one of those times where I
24   would clarify. Did you personally conduct a search, or
25   did someone else within the governor's office conduct that

## 15

1    search?
2    A. I'm no longer within the governor's office --
3    Q. Ok.
4    A. -- so I did a search of my own, private.
5    Q. And when you say you searched your own, private,
6    what do you mean by that?
7    A. I had two flash drives that I made so that I
8    could answer any questions from my successor if he had
9    any. As it happens, he hasn't.
10   Q. And those flash drives are still within your
11   possession, custody and control?
12   A. They are.
13   Q. And when you searched those flash drives, did you
14   find communications or documents that were relevant to
15   voter ID?
16   A. I found -- I had the subpoena duces tecum with
17   me, and I found documents that were responsive to the
18   subpoena duces tecum.
19   Q. Okay. And other than searching the flash drives
20   and your personal files, did you search anything else?
21   A. I did. I looked through any paper files I had
22   just to make sure that I didn't have anything on the
23   subject matter.
24   Q. And you maintain paper files at home?
25   A. I have files of general -- general topics, like

## 16

1    legislative procedure, water issues. Things like that,
2    that didn't relate directly necessarily to my assignments.
3    Q. And when you searched your paper files, did you
4    find anything that was in relation to voter ID?
5    A. No.
6    Q. Do you also use or did you also use e-mail or
7    text in your capacity -- employment with the governor?
8    A. I used e-mail. I don't use text.
9    Q. Okay. Did you use personal e-mail?
10   A. No.
11   Q. So other than your attorneys, did you speak to
12   anyone else about this deposition today?
13   A. Other than about the fact that I was giving one,
14   no. Not about the subject matter.
15   Q. Okay. Are you aware that other individuals are
16   being deposed in relation to this case?
17   A. Yes.
18   Q. And did you have an occasion to speak to any of
19   those individuals prior to coming in for your deposition
20   today?
21   A. I saw one person on the street and said "Hi." I
22   said, "Are you being deposed?"
23   He said, "Yes."
24   And I said, "I'm being deposed."
25   That was basically the extent of it.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                    June 1, 2012

---

### 17

1    Q. And what person was that?

2    A. The Secretary of State's elections division

3    chief.

4    Q. Is that Ann McGeehan?

5    A. No, she's the former.

6    Q. Okay. Keith Ingram?

7    A. Thank you. He's a friend of mine. I apologize

8    to him in case he ever reads this for blanking on his

9    name.

10   Q. So did you talk about the substance of these

11   depositions?

12   A. No. It was literally five seconds on the street

13   corner. I was walking one way, and he was going the

14   other.

15   Q. Okay. Anyone else that you've spoken to

16   regarding depositions?

17   A. Regarding the subject matter of the depositions?

18   Q. Yes.

19   A. No, sir.

20   Q. And that's a "no"?

21   A. Yes.

22   Q. Okay. Did you bring any notes today with you?

23   A. I did not.

24   Q. All right. Did you happen to bring the documents

25   that you produced to your attorney today?

---

### 18

1    A. No. I produced them to them the day before

2    yesterday.

3         MR. GEAR: And did you happen to bring

4    copies of the documents that are going to be downloaded to

5    the...

6         MR. MCKENZIE: FTP site? I just brought --

7    I just e-mailed those copies. I didn't bring any hard

8    copies. I'm sorry.

9         MR. GEAR: All right.

10   Q. (BY MR. GEAR) Now, during this deposition you

11   may be claiming a privilege. Is that your intent today?

12   A. Yes.

13   Q. What type of privilege are you planning to claim?

14   A. I'm not -- I'm not fully familiar with the --

15   I've never litigated a case involving the governor's

16   office, but I understand there is a deliberative and

17   legislative privilege. I don't know exactly what it's

18   called or how that works, but I'm sure that counsel will

19   interject at the appropriate time.

20   Q. Well, you were not a legislator, correct?

21   A. I was not.

22   Q. And you were not in the legislator's office; you

23   were in the executive office, correct?

24   A. I was in the governor's office.

25   Q. Okay. So then, you would not be claiming a

---

### 19

1    legislative privilege today; Is that accurate?

2    A. I don't know if the -- I don't know how the

3    privilege works. I don't know if the governor has a

4    separate privilege or whatever. Whatever privilege it is

5    for the deliberations in the governor's office regarding

6    that is what I will be.

7    Q. Do you understand that you are the one that

8    controls the privilege; you own the privilege essentially?

9    A. I don't know if I do or the governor's office

10   does for matters that were done by governor's office

11   employees. I'm not familiar with that.

12   Q. Do you understand that you have a right to waive

13   any privilege at any time?

14   A. I understand that I would have a right to waive

15   privileges that pertain to me, yes.

16   Q. Do you understand that the Texas Attorney

17   General's Office has withheld documents based on the

18   privileges that you're claiming today?

19   A. Yes.

20   Q. And did you direct them to withhold those

21   documents?

22        MR. MCKENZIE: I'm going to object to the

23   extent that it calls for attorney-client communication.

24   Do not answer it.

25   Q. (BY MR. GEAR) Do you know how many documents

---

### 20

1    have been produced to the Texas Attorney General's Office?

2    A. I --

3    Q. By you or anyone else within your office at the

4    time?

5    A. I only know what I turned over.

6    Q. And you described that as less than ten

7    documents?

8    A. No. I could do a quick estimate.

9    Q. Please.

10   A. Probably 15 documents.

11   Q. Okay. Are you going to continue to assert

12   privileges today during your deposition?

13   A. Yes.

14   Q. And why are you asserting a privilege today?

15        MR. MCKENZIE: Again, I'm going to instruct

16   the witness not to answer to the extent it reflects

17   attorney-client communications. So please don't answer.

18   Q. (BY MR. GEAR) Are you refusing to answer based

19   on advice of your counsel?

20   A. Yes.

21   Q. Would you consider waiving a privilege today?

22   A. No.

23   Q. Well, if you would like to waive a privilege in

24   response to any particular question that I ask during the

25   deposition, just let me know.

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 21

1   A. Okay.

2   Q. Thank you.

3        (Exhibit 310 was marked.)

4   Q. (BY MR. GEAR)  I'm showing you what's been marked

5   as Exhibit No. 310.  I'll give you a chance to look at

6   that.

7        (Witness reviews document.)

8   Q. (BY MR. GEAR)  Have you had a chance to look at

9   the exhibit marked as Exhibit 310?

10  A. I haven't got to the subpoena duces tecum yet.

11  Has this changed from the first -- this is the amended

12  notice of deposition.  Has it changed from the original

13  notice of deposition?

14  A. No.  Other than the date and time.

15  Okay.

16  Q. So we were discussing Exhibit 310.  Have you

17  reviewed this document before?

18  A. I've not reviewed this document before, because

19  this is the amended notice of deposition.  I saw the

20  original notice of deposition.

21  Q. And I turn your attention specifically to Page --

22  I believe it's Page 5 for you, which is listed as

23  Documents.  Do you see that?

24  A. Yes.

25  Q. Do you recall reviewing the request for documents

## 22

1   page?

2   A. I did.

3   Q. Okay.  And I turn your attention specifically to

4   Paragraph 1 and ask you to take a look at that.  Did you

5   review Section 1, and did you search for these documents?

6   A. I did.

7   Q. And when I say "you," I mean did you or anyone

8   else within the governor's office search for these

9   documents?

10  A. And, again, I searched my -- my own documents.  I

11  don't -- I can't speak to any documents in the governor's

12  office.

13  Q. So are you aware of whether or not anyone within

14  the governor's office searched for these particular

15  documents?

16  A. I am not aware.

17  Q. And would that be true for each paragraph, 1

18  through 12?

19  A. Yes.  I -- I reviewed the entire subpoena duces

20  tecum before looking through my documents and then kept it

21  open while I was looking so that I could refer back to it.

22  Q. And you said you're no longer with the governor's

23  office.  When did you leave the governor's office?

24  A. In September of 2011.

25  Q. When you left the governor's office, I believe

## 23

1   you indicated that someone took your place?

2   A. Yes.

3   Q. Okay.  When you left the governor's office, did

4   you leave the files that you had previously worked on at

5   the governor's office?

6   A. Yes.

7   Q. All right.  And that would include e-mails?

8   A. Yes.

9   Q. Communications and other kinds of document?

10  A. Yes.  I did some housecleaning before I left in

11  terms of old paper files from prior sessions and things

12  like that.

13  Q. Did you request -- did you make a request to

14  anyone that is still within the governor's office to

15  search for the documents requested in the notice of

16  deposition?

17  A. I did not.

18  Q. So as you sit here today, you have no knowledge

19  as to whether or not anyone within the governor's office

20  searched for the documents requested in the amended notice

21  of deposition?

22  A. That's correct.

23        MR. GEAR:  Can we go off the record for a

24  second.

25        (Off the record.)

## 24

1        MR. GEAR:  We can go back on the record.

2   Q. (BY MR. GEAR)  Can you tell me who replaced you

3   when you left the governor's office?

4   A. Yes.  And I know I'm going to blank on his name.

5   Q. I do that all the time.

6   A. I apologize.  I know the man well.  I just can't

7   think his name right now.  I'll have it soon I'm sure.

8   Oh, Ryan Brannon.

9        THE WITNESS:  Sorry, Ryan.  That's two today

10  already.

11  A. B-R-A-N-N-O-N.

12  Q. (BY MR. GEAR)  All right.  While you were in the

13  governor's office, I want to talk about the records that

14  were maintained there.  How are records maintained in the

15  governor's office?

16  A. I'm not sure I understand --

17  Q. How are records maintained in the governor's

18  office?

19  A. I'm sorry, I don't know what you mean by that.

20  Q. How are records maintained?  When I ask you the

21  question about records, are you unclear as to what I mean

22  by that?

23  A. No.  It's the "maintained" part.  I mean, I can

24  tell you what I did.  I don't know -- you know, if I

25  created a document on the computer, it stayed on the



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                    June 1, 2012

---

### 25

1  computer.  I don't know --
2      Q.  Okay.
3      A.  -- in terms of what you mean of how to maintain
4  it.
5      Q.  Well, let me broaden that question, then.
6      Is there a filing system at the governor's office
7  for retention of documents?
8      A.  I don't know that there's a specific filing
9  system.
10     Q.  Okay.
11     A.  I just kept my files.
12     Q.  Can you tell me how you kept your files?
13     A.  I kept -- any computer files, I kept on the
14  computer.  And I'm not much of a computer -- but whatever
15  the main Schofield drive would be.  And anything that
16  wasn't in computer form, I would keep in a manila folder
17  in a filing cabinet.  Although those tended to be general
18  notes on, as I said, issues like legislative procedure and
19  water and filling vacancies in the legislature and things
20  like that.
21     Q.  And did you say you maintain the manila folder in
22  a file cabinet?
23     A.  Yes.  There were -- a file cabinet inside my
24  office, one directly outside, and then there were usually
25  piles all over my desk.

---

### 26

1      Q.  Did you have a work-issued phone?
2      A.  Yes.
3      Q.  And what type of phone was that?
4      A.  I don't know.
5      Q.  iPhone?
6      A.  Oh, oh.  I thought you meant desk phone, you
7  know, a phone on the desk.  No, we were not issued
8  telephones.  We were issued Blackberries with e-mail
9  capacity only.
10     Q.  Okay.  And during the course of your employment
11  in the governor's office, did you communicate by
12  Blackberry?
13     A.  Yes.
14     Q.  Do you know -- are you aware of whether anyone
15  searched your Blackberry for any documents, e-mails that
16  may be responsive to the notice for deposition?
17     A.  I don't know.
18     Q.  Are you aware of whether anyone within the
19  governor's office searched the file cabinet that you
20  maintained in the governor's office --
21     A.  I do not.
22     Q.  -- or documents that are responsive?
23     A.  I'm sorry.
24     I don't know.
25     Q.  Are you aware if anyone searched the computer

---

### 27

1  that you testified to for documents that are responsive to
2  the notice of deposition?
3      A.  I don't know.
4      Q.  Did you communicate with anyone in the governor's
5  office regarding the notice of deposition, specifically
6  the request for documents?
7      A.  No.
8      Q.  And, again, you may have said this and I'm sorry.
9  When did you complete the search?
10     A.  It was several days ago.  Probably -- I don't
11  know what day, but probably -- maybe last Friday or
12  Saturday.
13     Q.  And when did you turn those documents over to
14  your counsel?
15     A.  The day before yesterday.
16     Q.  In the amended notice of deposition on Page 2 at
17  the bottom, did you note that:  The above deponent was
18  required to produce all documents in his custody,
19  possession or control that are responsive to the enclosed
20  attachment by May 17th?
21     A.  I did not note that.
22     Q.  And you did not produce those documents by
23  May 17th?
24     A.  I did not.
25     Q.  So as we sit here today, you're unaware of

---

### 28

1  whether e-mails on your work-issued Blackberry were
2  searched for documents in response to the deposition --
3  the notice of deposition; is that correct?
4      A.  That's correct.
5      Q.  And you're unaware of whether any correspondence
6  was produced in response to the notice of deposition; is
7  that correct?
8      A.  That's correct.
9      Q.  And do you -- in your capacity in the governor's
10  office, were you responsible for writing or drafting any
11  speeches?
12     A.  I did not write any speeches.  If there was a
13  speech that mentioned an area that I was working on, they
14  might send it over to me to review that and to see if I
15  had any comments.
16     Q.  And do you generally maintain a draft of speeches
17  on your computer?  Or a paper file, perhaps?
18     A.  It would not have been a paper file.  I don't
19  recall -- I doubt that I would have -- it would probably
20  be within the text of the e-mail.  So I doubt that I made
21  a separate -- but I may have.  I don't remember.
22     Q.  As you sit here today, are you -- do you have any
23  knowledge as to whether anyone searched your computer or
24  Blackberry for any speeches that may be responsive to the
25  notice of deposition?

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

|  | 29 |
|---|---|
| 1 | A. I do not, no. |
| 2 | Q. And you mentioned your file cabinet contained |
| 3 | notes. Do you have any knowledge as to whether or not |
| 4 | anyone searched the file cabinet for any notes that may be |
| 5 | responsive to the notice of deposition? |
| 6 | A. I do not, no. |
| 7 | Q. Do you have any knowledge as to whether anyone |
| 8 | within the governor's office may have searched for any |
| 9 | reports or analysis that may be responsive to the notice |
| 10 | of deposition? |
| 11 | A. I do not, no. |
| 12 | Q. And, again, do you have any knowledge as to |
| 13 | whether anyone within the governor's office searched for |
| 14 | any other documents that may be responsive to the notice |
| 15 | of deposition? |
| 16 | A. I do not, no. |
| 17 | Q. Is there a retention policy in the governor's |
| 18 | office for retaining documents? |
| 19 | A. There is. |
| 20 | Q. And can you tell me what that retention policy |
| 21 | is? |
| 22 | A. I'm not really familiar with the terms of it. |
| 23 | Q. What was your practice as an employee in the |
| 24 | governor's office for maintaining -- retaining documents? |
| 25 | A. If we created something originally, particularly |

|  | 30 |
|---|---|
| 1 | dealing with an agency or anything that was official, we |
| 2 | kept a copy of it. Much of what we did in the legislative |
| 3 | sphere was transient. Notes about -- you know, reminding |
| 4 | yourself about a hearing tomorrow or things you want to |
| 5 | try to get in a bill or whatever. And I don't know |
| 6 | whether I kept copies of that or not. |
| 7 | Q. So when you said things -- you testified to |
| 8 | things that are official. What does that mean? |
| 9 | A. The governor has a number of, you know, official |
| 10 | responsibilities, and they're kind of numerous. If you |
| 11 | were doing something with respect to that, I'm sure that, |
| 12 | you know, he'd keep a copy of that. |
| 13 | And that would be -- that wouldn't be something |
| 14 | that I would keep a copy of. That would be something that |
| 15 | the staff -- the staff of the division director would keep |
| 16 | a copy of. Things that went out and -- |
| 17 | Q. So when there's -- |
| 18 | A. -- correspondence. |
| 19 | Q. I'm sorry. When there's a document or a |
| 20 | communication that is considered official, is there a |
| 21 | central filing system for that particular document, |
| 22 | generally? |
| 23 | A. I assume there is. I don't -- I never had to |
| 24 | deal with it. |
| 25 | Q. Is there any other method within the governor's |

|  | 31 |
|---|---|
| 1 | office of maintaining electronic files, other than your |
| 2 | personal computer or your computer that you had at the |
| 3 | governor's office? |
| 4 | A. I don't know, because I didn't deal with that. |
| 5 | Q. Who did deal with it? |
| 6 | A. I don't know. |
| 7 | Q. Did you supervise anyone while you were employed |
| 8 | with -- at the governor's office? |
| 9 | A. No. |
| 10 | Q. Let's talk briefly about your educational |
| 11 | background. Can you describe your educational background |
| 12 | for me. |
| 13 | A. Yes. I have a BA in political science |
| 14 | from Rutgers College -- Rutgers University, and a JD from |
| 15 | the Paul M. Hebert Law Center at Louisiana State |
| 16 | University. |
| 17 | Q. And do you currently have an active law license? |
| 18 | A. I do. |
| 19 | Q. Do you currently practice law? |
| 20 | A. I do not at the moment. |
| 21 | Q. And regarding your work history, have you ever |
| 22 | actually practiced law? |
| 23 | A. Yes. |
| 24 | Q. And can you tell me a little bit about that? |
| 25 | A. Sure. I graduated from law school in 1992, and I |

|  | 32 |
|---|---|
| 1 | practiced in the trial department at Baker Botts from 1992 |
| 2 | to 1998. I was an associate at Howrey & Simon, LLP, from |
| 3 | 1998 to 2000. I practiced in-house at a company called |
| 4 | Equiva Services, LLC, from 2000 until 2002. |
| 5 | Q. And what was the last -- |
| 6 | A. Equiva Services, E-Q-U-I-V-A. |
| 7 | Q. All right. And in any of those capacities |
| 8 | working in the various law firms, did you deal with any |
| 9 | issues that pertained to election law in the State of |
| 10 | Texas? |
| 11 | A. No. |
| 12 | Q. Did you review any issues that pertained to voter |
| 13 | ID in the State of Texas? |
| 14 | A. No. |
| 15 | Q. Did you review any issues that pertained to voter |
| 16 | fraud in the State of Texas? |
| 17 | A. No. |
| 18 | Q. In your capacity as an attorney in any of these |
| 19 | offices, did you either defend or litigate a case that |
| 20 | dealt with voter fraud in the State of Texas? |
| 21 | A. No. |
| 22 | Q. So I understand that you are a -- you were a |
| 23 | policy analyst in the governor's office, correct? |
| 24 | A. That's correct. |
| 25 | Q. Okay. And so when did you first become employed |



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                                    June 1, 2012

---

## 33

1  at the governor's office?

2      A.  I became first employed at the governor's office

3  in January of 2003.

4      Q.  And did you -- and when did you leave the

5  governor's office?

6      A.  I left that job in January -- in September of

7  2005.

8      Q.  And where did you go after that?

9      A.  I ran for the legislature.

10      Q.  And did you win?

11      A.  I did not.

12      Q.  So ran for the legislative in 2005.  What did you

13  do after that?

14      A.  After that, I was reemployed by the governor's

15  office, beginning in January of 2007.  And that's when I

16  became a policy analyst.

17      Q.  So from January 2003 until September of 2005,

18  what title or position did you hold?

19      A.  Assistant general counsel.

20      Q.  And can you describe the responsibilities that

21  you held as an assistant general counsel?

22      A.  They were basically two-fold.  I had legal

23  responsibilities involving everything from signing off on

24  settlements of the State, things of that nature, to policy

25  responsibilities involving whatever areas the governor

## 34

1  would assign me.

2      Q.  So between 2003 and 2005 in your capacity as

3  general counsel, were you ever asked to handle any issues

4  related to voter ID in the State of Texas?

5      A.  I did the elections bills.  I don't recall if

6  there were voter ID bills filed in the 2005 session or

7  not.  I don't believe there were in the 2003 session.

8      Q.  So when you said you did the elections bills,

9  what would that have included?  What responsibilities

10  would that have included?

11      A.  I would analyze the bill, follow the pass of the

12  bill in the legislature and keep track of what was going

13  on.

14      Q.  So I'm trying to stick with the 2003-2005 time

15  period and understand what exactly your responsibilities

16  were.  So you said you would analyze the bills and follow

17  the bills.  Can you explain a little bit more what you

18  mean by "analyze the bills"?  So if, for instance, there

19  was a voter ID bill in 2005, what exactly would you do

20  when it comes to analyzing a bill?

21      A.  I would read the bill, write a summary of what it

22  did, how it changed the law, what it would -- you know,

23  how the law would be different from it is today.  And

24  there was a format that -- for -- regardless of what the

25  subject matter of the bill was, there was a format to

## 35

1  follow for different questions to ask.  What the bill --

2  and I can't remember the form anymore.  But, you know,

3  every bill had the same format.  And then make a

4  recommendation to the governor as to how the bill, as it

5  currently is written comports with the governor's views,

6  whether he'd recommend supporting it or not.

7      Q.  So do I understand that you would make

8  recommendations to the governor whether to support the

9  bill or not?

10      A.  Yes.  Although it was not directly necessarily to

11  the governor.  It would sort of go to the next level of

12  people, and they would look at it and meet with you and

13  figure out why you were for or against and whether it was

14  a good idea and where we should be.

15      Q.  Okay.  Let me just back up for a second so I can

16  continue to try to understand exactly what you do.

17          You said that you would read the bill.  How would

18  a bill generally come to you and where would it come from?

19      A.  The governor's office subscribes to a service

20  that lets us know when each new bill is filed.  Someone in

21  the governor's office would look at all the captions and

22  assign them to the person who had that subject matter, and

23  then you would get an e-mail saying, "These are all the

24  new bills that were filed in your area today."

25      Q.  And do you know what the name of the service is?

## 36

1      A.  I don't remember, but I think we use the same one

2  every session.

3      Q.  So again I'm generalizing, if a bill related to

4  voter ID were to -- and is it an e-mail service?  Is it an

5  electronic service?  A paper service?  What exactly is the

6  service?

7      A.  I'm not sure I know the difference between e-mail

8  and electronic, but --

9      Q.  Consider them the same, E-mail, electronic.  Did

10  it come electronically --

11      A.  Yes.

12      Q.  -- or did it come by paper?

13      A.  Electronically.

14      Q.  So when you receive a bill, what's the next step

15  in the process?  What is it that you personally would have

16  had to do?

17      A.  The first thing I had to do is read it.

18      Q.  Okay.  Now, is there a specific process?  You

19  described reading the bill, writing a summary, formatting

20  questions and recommendations and then the recommendation

21  for the governor.  Is there -- is there a specific process

22  that you would follow when you receive a bill beyond this?

23      A.  I don't understand the question.

24      Q.  Okay.  Let me -- let me -- and I'm just -- this

25  is my chance to understand exactly what you know and how

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 37

1  things occur, and so I'm just formulating these as we go
2  along, but --
3      So when you read a bill, is there a specific
4  process that you follow in reading a bill?  It's a very
5  general question.  Is there a -- I mean -- do you
6  understand the question?
7      A.  No.
8      Q.  Okay.  So you receive a bill, correct?
9      A.  Right.
10     Q.  Electronically?
11     A.  (Witness nods head.)
12     Q.  You read that bill, correct?
13     A.  Right.
14     Q.  What is it that you are looking for when you are
15  reading a particular bill?  And this is a general
16  question.
17     A.  First of all, you're just looking for what is in
18  it, what is it about, what does it do.  You know, what do
19  the provisions in the bill do to change the law.
20     Q.  Would you compare that bill, for instance, to the
21  existing law, if there is one?
22     A.  Yes.  At least in the sense of saying what this
23  bill does and -- you wouldn't necessarily do a
24  point-by-point comparison.  It depends on the situation.
25     Q.  Okay.  How -- you said it wouldn't be a

## 38

1  point-by-point comparison --
2      A.  It might be, But not necessarily.
3      Q.  So let's talk a little more specifically now in
4  2005.  If you received a voter ID bill, would you have
5  done a point-by-point comparison?
6      A.  I don't remember.
7      Q.  But you would have reviewed both the bill that
8  you just received and the existing law?
9      A.  Typically.  Again, it depends on the bill.
10     Q.  Once you read the bill, you described that you
11  write a summary.  What exactly does that mean?
12     A.  You write a summary summarizing what the
13  provisions of the bill were.  You know, what they did,
14  what were the main -- not necessarily every single
15  provision, depending on what the bill was.  But, you know,
16  the primary provisions that change the law, what they did.
17     Q.  Between reading the bill and writing the summary,
18  does that involve any additional research?
19     A.  It could.  Depending on the bill.
20     Q.  And more specifically, when dealing with -- if a
21  voter ID bill was received in 2005 by you and after you
22  read the bill, do you believe that you would have done any
23  additional research beyond just simply reading the bill?
24     A.  Again, I don't recall a bill in 2005.
25         (Exhibit 44 was marked.)

## 39

1      MR. GEAR:  This was previously marked as
2  Exhibit No. 44.
3      Q.  (BY MR. GEAR)  I've handed you what's been marked
4  as Exhibit No. 44.  Take some time and look at that,
5  please
6         (Witness reviews document.)
7      Q.  (BY MR. GEAR)  And let me know when you've had
8  enough time to review it.
9      A.  Okay.
10     Q.  You have had an opportunity to review Exhibit
11  No. 44?
12     A.  Yes.
13     Q.  And can you tell me what that is?
14     A.  This looks like a draft of a bill, House Bill
15  No. 1706.  And it says -- it doesn't have the footer at
16  the bottom that tells you what session it was or, you
17  know, give any indication of whether this is the as-filed
18  version or a committee substitute or something along those
19  lines.
20     Q.  I'm going to also hand you what's been marked as
21  Exhibit 101.
22         (Exhibit 101 was marked.)
23     Q.  (BY MR. GEAR)  Give you a chance to look at that.
24         (Witness reviews document.)
25     Q.  (BY MR. GEAR)  And my general question is, does

## 40

1  that help put Exhibit No. 44 into context?
2      A.  It does.
3      Q.  Okay.  And can you tell me what Exhibit No. 44
4  is?
5      A.  Well, I don't know what version Exhibit No. 44 --
6  you know, how far along it was in the process.  But it was
7  a bill that ultimately passed the House and then just went
8  nowhere in the Senate.  It was referred to the committee
9  and then just died there, in 2005.
10     Q.  Okay.  And so can you tell me who authored the HB
11  No. 1706?
12     A.  Mary Denny who was chairman of elections at the
13  time.
14     Q.  Okay.  So my understanding is -- is that you were
15  in the governor's office as his legal counsel until 2005,
16  September of 2005?
17     A.  That's correct.
18     Q.  Would you have been involved in reviewing HB
19  No. 1706?
20     A.  I believe I would have.
21     Q.  Okay.  So we were talking generally about if a
22  bill was received by the service and what you would do, so
23  let's turn our attention now to more specifics about HB
24  No. 1706.  Do you recall reviewing this bill in 2005?
25     A.  I don't recall reviewing it specifically.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                                June 1, 2012

---

## 41

1    Q.  Now, when you received this bill -- and do you
2    have any idea of when you would have actually received a
3    draft of this bill?
4        A.  When it was filed, probably within two or
5    three days of its filing.  I would get an e-mail that
6    would -- listed all the bills that were filed, and you
7    click on that particular bill when you're ready to work on
8    it.  And then it would sent you to wherever you get the
9    draft of it.
10       Q.  So would you have received HB 1706 in its final
11   form prior to filing, or would you have received a draft
12   that -- would you have received a draft?
13       A.  I don't recall receiving a draft.  The system
14   would just give you the filed version.
15       Q.  I think what I'm trying to ask is -- for
16   clarification purposes, where along the process would you
17   actually receive the bill?  And just for clarification
18   purposes if you look at Exhibit 101, there are a number of
19   steps in the process that a bill goes through, obviously.
20   Can you tell me generally where you would have received
21   either a draft of the final version of Exhibit No. 44 by
22   referencing Exhibit No. 101?
23       A.  Yes.  And, again, I'm sorry I don't remember.
24   I'd be happy to tell you if I did.  But typically what
25   would happen is, when there's an official version the

## 42

1    computer tells you about it and you go get it.  So when
2    there's a version that's filed or a version that's been
3    reported out of committee or a version that's passed the
4    House or -- been reported to a committee -- out of
5    committee in the other House, when there's some -- if I
6    recall correctly, when there's some official version of
7    it, you would get that -- not necessarily drafts -- in
8    fact, not drafts in between.
9        Q.  Okay.  And so when you say "official version,"
10   can you define what you mean by that?
11       A.  It's -- and again, this is what would come
12   through that system.  When the bill is filed, the filed
13   version goes into the system and then you're notified that
14   it's there.
15       Q.  And you would receive the filed version?
16       A.  You would receive the filed version.
17       Q.  Okay.  Do you recall if you were involved in the
18   drafting -- any of the drafting stages of HB 1706?
19       A.  I don't remember.
20       Q.  Would you ever be involved in the drafting of a
21   bill?
22       A.  Sometimes.
23       Q.  Do you recall if anyone within the governor's
24   office was involved in the drafting of HB 1706?
25       A.  I don't.

## 43

1    Q.  In receiving the official version of the bill, do
2    you recall if you had any communication with
3    Representative Denny?
4        A.  I don't -- I didn't work very closely with
5    Representative Denny.  She's a very nice lady.  I just
6    didn't happen to work very closely with her because I was
7    pretty new.
8        I probably talked with her at committee hearings
9    about it, but I can't recall actually doing that.  And
10   probably not about the bill, either, come to think of it.
11       Q.  So when you're involved in the drafting of a
12   bill, generally how you would you be involved?
13       A.  There weren't very many bills I was involved in
14   the drafting of.  And I don't think I ever got involved in
15   the drafting of the photo ID bill that I can recall, other
16   than, you know, talking with members as the bill's
17   proceeding.
18       Q.  So we've talked about HB 1706, and that was a
19   2005 bill.  You don't recall that you were involved in the
20   drafting of that bill, correct?
21       A.  Yeah.  I don't.
22       Q.  Do you recall that there was a photo ID bill in
23   2007?
24       A.  Yes.
25       Q.  And were you involved in the drafting of that

## 44

1    bill at all?
2        MR. MCKENZIE:  Well, I'm going to object on
3    the basis of deliberative process privilege to the extent
4    that it's not public that the governor participated in the
5    drafting of any bills.  If it was public information, then
6    you may answer the question.
7        A.  I don't think there's any public information
8    about drafting a bill.
9        Q.  (BY MR. GEAR)  Okay.  Are you refusing to answer
10   my question on the advice of your counsel?
11       A.  I'm going to follow the advice of my counsel.
12       Q.  But as you sit here today, you don't recall being
13   involved in the drafting of any photo ID bills; is that
14   correct?
15       MR. MCKENZIE:  Same objection.
16       Q.  (BY MR. GEAR)  I believe you've already testified
17   to that, but...
18       And you're refusing to answer my question
19   based on advice of counsel?
20       A.  Yes.  I'm -- I'm also not entirely sure what you
21   mean by "drafting."  But apparently I'm being advised not
22   to answer.
23       Q.  Well, when I make the reference "drafting a
24   bill," what do you believe that means?
25       A.  I mean, there's different stages of a bill.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 45

1    There's, you know, putting together the first proposal and
2    coming up with all the terms and all the -- there's also
3    making suggestions along the way of, you know, "We don't
4    like this provision.  We prefer that provision."  Or, you
5    know, "We really hope that comes out before that gets to
6    conference" or things like that.  And those kind of things
7    go on all the time.
8         Q.  Okay.  So let's talk a little bit about the
9    communications that would have gone on in 2005 during the
10   legislative process for HB 1706.  Do you recall having any
11   communications regarding HB 1706?
12        A.  I don't recall any communications from 2005.
13        Q.  Well, you indicated that you may have met with
14   Representative Denny regarding HB 1706?
15        A.  It was common for me to go up to the chairman at
16   a hearing and chat, but I don't recall any talks about
17   specific bills.
18        Q.  Do you have any responsibility when dealing with
19   a bill, to communicate with the authors of that bill?
20        A.  Again, each bill is different.  Sometimes you
21   communicate with the authors regularly; other times --
22   last session, I had over 400 bills.  Some of them -- you
23   know, probably 300 of them, I never talked to anybody
24   about.
25        Q.  Okay.  And so as you sit here today, do you have

## 46

1    any memory of communicating with any of the authors or
2    coauthors of HB 1706?
3         A.  I don't.
4         Q.  When you searched for responsive documents to the
5    document requests in the notice of deposition, did you
6    search for documents from the 2005 time period?
7         A.  I didn't.  Although, again, the -- what do you
8    call them -- the travel drives were just from this
9    session.
10        Q.  And, again, you're unaware of --
11        A.  "This session" meaning this past session.
12        Q.  2011?
13        A.  2011.
14        Q.  And you're unaware of whether anyone within the
15   governor's office searched for documents within that time
16   period --
17        A.  I'm not aware --
18        Q.  -- 2005?
19        A.  -- as we sit here today.
20        Q.  Can you list every allowable form of
21   identification under SB 1706?
22        A.  Not off the top of my head, no.
23        Q.  Do you --
24        A.  HB 1706.
25        Q.  HB 1706.  Thank you.

## 47

1         Can you review the document so we can have a
2    discussion about that?
3         A.  Yes.
4              (Witness reviews document.)
5         A.  I found it, but --
6         Q.  (BY MR. GEAR)  Okay.  And just so I'm clear,
7    while you were in the governor's office as general
8    counsel, would that have included a responsibility of
9    reviewing and drafting bills as we discussed here today?
10        A.  Reviewing bills.  I don't know that I drafted any
11   bills.
12        Q.  Okay.  I thought you said previously during your
13   deposition testimony that there were some bills that you
14   were involved in drafting.
15        A.  That came much later.
16        Q.  Okay.  Much later as in -- what do you mean by
17   that?
18        A.  Not during the years that I was working in the
19   general counsel's office.  I don't think I drafted any
20   bills.
21        Q.  Okay.  Would you be involved in coordinating the
22   drafting of those bills as general counsel?
23        A.  No.
24        Q.  Regarding --
25        A.  Again, by "drafting," I'm talking about drafting

## 48

1    the initial bill as opposed to making suggestions about
2    provisions that --
3         Q.  Well, when I -- when I refer to drafting, I also
4    mean making revisions, not just the initial bill but all
5    the way through to the final version.  Do you understand
6    that?
7         A.  Yes.
8         Q.  Okay.  Would you have been involved in
9    determining what the allowable forms of identification
10   were under HB 1706?
11              MR. MCKENZIE:  And I'm going to object on
12   the basis of deliberative process privilege.  To the
13   extent you developed any of that during your time as the
14   general counsel or any other position at the govern's
15   office, I would instruct you not to answer.
16        Q.  (BY MR. GEAR)  Are you refusing to answer based
17   on the advice of your counsel?
18        A.  I'm going to follow the advice of my counsel.
19        Q.  And if during the course of this deposition,
20   you're following the advice of your counsel and not
21   answering, if you would just verbally state that, that
22   would make the record clearer.
23        A.  (Witness nods head.)
24        Q.  Thank you.
25        Do you recall any responsibility with HB 1706?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

| 49 |
|---|

1    A. I don't recall it. I would not be surprised if I
2    was the one who analyzed the bill, but I don't recall it.
3    Q. Okay. And in analyzing the bill, you indicated
4    that you would have created a summary of the bill?
5    A. Yes.
6    Q. And are you aware of whether or not that summary
7    of HB 1706 has been produced to your attorney?
8    A. I don't know.
9    Q. And generally what would a summary of a bill
10   include?
11       MR. MCKENZIE: I caution the witness to
12   answer generally and not specifically as to HB 1706.
13   Q. (BY MR. GEAR) Well, I'm asking generally,
14   because I just would like to know how you go about
15   summarizing the bill?
16   A. As I said, there's -- and maybe this answers the
17   question earlier about -- I think you said what process is
18   used.
19   Q. I did.
20   A. The analysis form kind of was the process.
21   Q. Okay.
22   A. It sort of said, you know, "Give us a summary of
23   what the bill does," and then there would be other
24   questions that change from session to session depending on
25   new things that we -- some things were very simple. Like

| 50 |
|---|

1    when's the effective of date of this? So you would put
2    that in there. Other things might be, Does it repeal any
3    existing laws. Make sure we know all about those. And
4    then there might be questions, like, does it cost money?
5    Or whatever was being asked that year. And you would go
6    through the bill and make sure you had noted any instances
7    or any situations or are there any constitutional issues,
8    or whatever it might have been that was being asked. And
9    I can't -- to be honest with you, I can't recall all the
10   questions from just last year, much less than 2005, but --
11   and they tended to get longer each session as we thought
12   of more things.
13       Then that gave you the process by which you were
14   to analyze what was in the bill and what it did, and did
15   it affect the ability of Texas to bring in new jobs or
16   whatever it might be the questions were.
17   Q. Okay. And I understand, as you sit here today,
18   you don't recall if you actually were involved in the
19   process for HB 1706; is that accurate?
20   A. That is.
21   Q. But I would like to still focus on the analysis
22   of the bill. When analyzing a bill -- and in particular ,
23   we can expand this to any voter ID bill. Did you ever
24   analyze a voter ID bill to determine the effect of that
25   particular bill on minority voters?

| 51 |
|---|

1        MR. MCKENZIE: Again, I think that's really
2    a close question as to whether or not that's privileged.
3    I caution the witness to answer generally and not -- when
4    you're talking about specifically voter ID bills, I think
5    that you're getting into internal deliberations at the
6    governor's office. So I'm going to instruct you not to
7    answer.
8    A. On the advice of counsel --
9    Q. (BY MR. GEAR) You're not answering?
10   A. Yes, sir.
11   Q. Have you ever analyzed the effect of a bill on
12   minority voters? And I'm talking about any bill.
13   A. I don't recall ever analyzing a bill by
14   distinguishing between Texans on race or ethnicity or
15   anything like that.
16   Q. Have you ever been asked while in the governor's
17   office, either as general counsel or as a policy
18   analyst --
19       (Multiple voices.)
20   A. Assistant general counsel.
21       MR. MCKENZIE: Again, I object.
22   A. General counsel was my boss.
23   Q. (BY MR. GEAR) I got you. I got you. That's my
24   mistake.
25       -- assistant general counsel or as a policy

| 52 |
|---|

1    analyst to analyze the effects of a bill on minority
2    voters?
3        MR. MCKENZIE: Again, I'm going to object on
4    the basis of privilege. What he was asked by other folks,
5    I think reveals deliberations of the governor's office,
6    and I'm going to instruct the witness not to answer.
7    Q. (BY MR. GEAR) Have you ever analyzed a bill
8    while in the governor's office to determine the effects of
9    the bill on minority voters?
10       MR. MCKENZIE: Again I'm going to object on
11   the same basis. "Ever" would, of course, reveal about
12   voter ID, as well. So I think it would reflect the
13   internal deliberations of the governor on voter ID, as
14   well.
15   Q. (BY MR. GEAR) Have you analyzed a bill while
16   employed by the governor's office to determine the effect
17   on minority voters?
18       MR. MCKENZIE: Same objection.
19   Q. (BY MR. GEAR) Are you refusing to answer on the
20   advice of counsel?
21   A. I'm going to decline to answer on the advice of
22   counsel.
23   Q. Have you ever analyzed a bill in general to
24   determine the effect on minorities in the State of Texas?
25       MR. MCKENZIE: Same objection. Just to make



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                                June 1, 2012

---

### 53

1  the record clear, you're following the advice of counsel.

2     A. I'm following the advice of counsel.

3     Q. (BY MR. GEAR) Have you ever been asked while

4  employed in the governor's office, to analyze a bill to

5  determine the effect of that bill on minorities in the

6  State of Texas?

7        MR. MCKENZIE: Same objection.

8     Q. (BY MR. GEAR) Have you ever analyzed a bill

9  while employed in the governor's office to determine if it

10  had a disproportionate impact on minorities?

11        MR. MCKENZIE: Same objection.

12     Q. (BY MR. GEAR) Have you analyzed a bill while in

13  the governor's office to determine if the bill had a

14  disproportionate impact on minorities?

15        MR. MCKENZIE: Same objection.

16     Q. (BY MR. GEAR) And you're refusing to answer on

17  advice of your counsel?

18     A. I'm going to decline to answer on the advice of

19  counsel.

20     Q. Have you ever been asked to analyze a bill -- and

21  I'm talking about any bill generally -- while employed in

22  the governor's office to determine the impact on minority

23  voters?

24        MR. MCKENZIE: Same objection.

25     A. I'm going to decline to answer on the advice of

### 54

1  counsel.

2     Q. (BY MR. GEAR) What was the purpose of HB 1706?

3        MR. MCKENZIE: I'm going to caution the

4  witness. You may answer as to the general legislative

5  purpose, but not as to any sort of internal purposes that

6  the governor may have had or the governor's office may

7  have had in deciding whether or not to sign or veto any

8  bill or analyze any bill.

9     A. I'm sorry. Could you repeat the question?

10     Q. (BY MR. GEAR) What was the purpose of HB 1706?

11     A. I wasn't involved with the drafting of the bill

12  or promoting it. To be honest with you, I don't really

13  know what the author's purpose was.

14     Q. Do you recall any communications with the

15  governor regarding HB 1706?

16     A. I do not.

17     Q. Do you recall any communications with any of the

18  legislators regarding HB 1706?

19     A. I don't.

20     Q. Do you believe any communications with

21  constituents of the governor regarding HB 1706?

22     A. I don't.

23     Q. Do you recall any communication with any

24  groups -- community groups within the State of Texas

25  regarding HB 1706?

### 55

1     A. I don't.

2     Q. I may have asked you this, but I'll ask again.

3  Forgive me.

4        Do you recall any communication with anyone

5  regarding HB 1706?

6     A. I do not. If you have any documents to refresh

7  my memory, I'd be happy to look at them.

8     Q. Do you know if the governor took a position on

9  HB 1706?

10     A. I don't recall.

11     Q. Do you have any knowledge as to whether HB 1706,

12  in part, was designed to prevent undocumented or illegal

13  aliens from voting?

14        MR. MCKENZIE: Again, you may answer as to

15  general purpose, but not subjective purpose in the

16  governor's office.

17     A. I don't remember.

18     Q. (BY MR. GEAR) Do you recall any concerns that

19  were expressed by constituents regarding HB 1706?

20     A. No. I really don't remember much about the bill.

21     Q. Okay. And I understand your testimony.

22        Do you recall any position taken by supporters

23  regarding HB 1706?

24     A. I do not.

25     Q. So it's fair to say as we sit here today, you

### 56

1  don't recall anything about HB 1706?

2     A. I recall that the -- now that you showed it to

3  me, I recall that the chairman filed the bill. That's

4  about all I remember. I didn't even remember it passed

5  the house.

6     Q. And when you say "the chairman filed the bill,"

7  were you present when that occurred?

8     A. No, no. It was Mary Denny's bill.

9     Q. Mary Denny's bill.

10     A. She's the chairman.

11     Q. And were you present when the bill was filed?

12     A. No.

13     Q. Okay.

14     A. That's a term we use to indicate the person has

15  sponsored the bill and filed it. I have never physically

16  seen anybody put a bill in the hopper.

17     Q. Okay. Do you -- in your capacity in the

18  governor's office, do you sit in during the legislative

19  floor debates? Are you present during those debates?

20     A. Only one time, and it wasn't involving this bill.

21  Back in 2003, I sat in on one floor debate.

22     Q. And do you recall what that bill involved?

23     A. House Bill 4.

24     Q. House Bill 4.

25        And did that have anything to do at all with

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

57

1  voter ID or photo ID?
2      A. It did not.
3      Q. And I believe you testified to your knowledge of
4  what happened to the bill.  Can you tell me, did the bill
5  pass in the House?
6      A. I didn't have any recollection of it.  But
7  Exhibit 101 indicates that it passed the House.
8      Q. Okay.  And what happened after it passed the
9  House?
10     A. It went to the Senate, where it was referred to
11  committee, and never received a hearing.
12     Q. Okay.  And is that common or uncommon?  Would you
13  know that?
14     A. It's fairly common.  There are -- I mean, I don't
15  want to -- there are thousands of bills each session.
16  Towards the end of session, it's not at all uncommon for
17  one House to pass a bill, either to make a statement or to
18  give the author a bill or for any number of reasons.  And
19  it goes over to the other House, and isn't going anywhere.
20  Sometimes it's just a matter of time.  By the time you get
21  it passed, there isn't time left to do anything on the
22  other side.  There could be opposition on the other side.
23  There's all kinds of reasons.
24     Q. Okay.  Do you recall if you or anyone else within
25  the governor's office played with a role in attempting to

---

58

1  ensure the passage of HB 1706?
2      A. I don't recall.
3      Q. Do you recall any other photo or voter ID-related
4  bills that you may have reviewed in 2005?
5      A. I don't recall -- I don't.
6      Q. Now, if I recall your testimony correctly, you
7  were gone between September 2005 to January of 2007?
8      A. That's correct.
9      Q. Do you recall reviewing a photo ID bill in
10  January -- or in 2007?
11     A. I'm trying to get my sessions straight.
12         MR. MCKENZIE:  Can we get a break?
13         MR. GEAR:  Sure.  We can take a ten-minute
14  break.
15             (Break.)
16             (Exhibit 102 was marked.)
17         MR. GEAR:  Back on the record.
18     Q. (BY MR. GEAR)  Let me show you what's -- we were
19  moving to 2007, and I believe I had asked you your
20  involvement in voter ID legislation in 2007.  And to put
21  it into context, I gave you a copy of the Texas
22  Legislature Online History that has been marked as
23  Exhibit 102.  And I'll just ask you to take a look at that
24  for a second.
25             (Witness reviews document.)

---

59

1      Q. (BY MR. GEAR)  And the question I would ask you,
2  does that refresh your recollection as to whether you
3  reviewed any voter ID legislation in 2007?
4      A. Yes.
5      Q. And does that mean, yes, you do recall reviewing
6  voter ID legislation in 2007?
7      A. I do recall.
8      Q. And can you tell me, based on your deposition
9  testimony for HB 1706, would it have been the same process
10  that you followed?
11     A. Yes.  The form would be a little different each
12  session by asking different general questions about all
13  bills.  But it's basically the same format.
14     Q. And so for HB 1706, you would have
15  received the bill electronically by the service that you
16  described, correct?
17     A. Yes.
18     Q. And then the next step in the process would have
19  been to read the bill; is that right?
20     A. Yes.
21     Q. And so in -- and did you review and read HB 218?
22     A. Yes.
23     Q. And do you recall reviewing and reading HB 218?
24     A. Well, no, not specifically.
25     Q. So I can say that if your testimony is going to

---

60

1  be the same as HB 1706, then I can accept that and we can
2  move on.  But if you have more knowledge about 18 --
3  HB 218, then we can go through this.
4      A. I remember HB 218.
5      Q. Okay.
6      A. I don't specifically remember the day I read the
7  first draft of the -- I mean, the broad version of the
8  bill, but I remember more about the process.
9      Q. And you would have received this through the
10  electronic service, correct?
11     A. I believe so.  I don't recall receiving anything
12  in advance.
13     Q. And at what stage in the process as described in
14  Exhibit 102 would you have received the HB 218?
15     A. And again, I don't recall the day I received it,
16  but I would have received an e-mail telling me all the
17  bills that were filed in my areas that day or the day
18  before or the day before that.
19     Q. Okay.
20     A. And that would have been in -- I mean, I don't
21  remember this, but that would have been in November of '06.
22  Legislators are allowed to file bills the week after the
23  election, even before they're sworn in.
24     Q. So it would have come through the electronic
25  service on the date that it was filed or --

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                          June 1, 2012

## 61

1    A.  Normally.  Now, I have to put one caveat.  I
2  don't know if we had the system up that early.  We may not
3  have.  But that's normally how we receive them.
4    Q.  Now, I just want to understand that.  You don't
5  know if you had the system up that early.  What does that
6  mean?
7    A.  The system by which we receive all those bills
8  and review them gets put in place for the session.  It's
9  not Evergreen.
10   Q.  Okay.
11   A.  And so I don't know for -- I don't recall if we
12 set it up in November.  It might have been -- we might
13 have been receiving bills a different way.  They may
14 have -- you know, I don't know --
15   Q.  Other than --
16   A.  They may have just alerted us to the fact that it
17 had been filed.  They may have just had us go on the House
18 website and review them.  I'm not sure exactly how I
19 received this one because of when it was done.
20   Q.  When you stay "they" may have alerted you,
21 do you know -- can you tell me who "they" is?
22   A.  People in the governor's executive office who
23 assign out the bills.  And it's somebody different every
24 section.
25        (Exhibit 28 was marked.)

## 62

1    Q.  (BY MR. GEAR)  All right.  I'm showing you what's
2  been marked as Exhibit 28, and I'm going to give you an
3  opportunity to look at that.
4        (Witness reviews document.)
5    Q.  (BY MR. GEAR)  Have you had an opportunity to
6  review Exhibit No. 28?
7    A.  Yes.
8    Q.  And can you tell me what that is?
9    A.  This is a copy of House Bill 218 from the 2007
10 legislative session.  What I don't know is at what stage
11 of the process it is.  I don't know if this is the filed
12 version or the version that passed.  It doesn't have any
13 markings either in the top left or on the footer that
14 would tell you sort of where in the process it was.
15   Q.  And would Exhibit 102 assist you in determining
16 where in the process it was?
17   A.  No, it wouldn't tell me what this portion of the
18 text is.
19   Q.  But you recognize that as HB 218, which is a
20 version of the bill -- voter ID bill in 2007?
21   A.  Yes.  And I don't remember every line, but
22 this -- this looks like the bill.
23   Q.  Okay.  And can you tell me who the authors of the
24 bill were?
25   A.  Yes.  The author was Betty Brown.

## 63

1    Q.  Betty Brown.
2        Do you recall if you had any communication with
3  Representative Brown -- with Representative Betty Brown
4  regarding the HB 218?
5    A.  I'm pretty sure I did not.  I don't recall if I
6  had any conversations with her staff, but I don't -- I
7  definitely don't recall talking to Representative Brown.
8    Q.  So as you sit here today, you don't recall
9  whether you had any conversation with Representative Brown
10 or her staff?
11   A.  That's correct.
12   Q.  Okay.  Also an author of the bill is -- it says
13 "Berman."  Do you recall having any communications with
14 Mr. Berman or his staff?
15   A.  This might have been the session when
16 Representative Berman was chairman of elections.  I
17 don't -- as we sit here, I don't remember having
18 conversations with him; but I wouldn't be surprised if he
19 talked about bills in his committee pretty informally.  I
20 don't remember having any sit-down meetings with
21 Representative Berman.
22   Q.  As part of your responsibilities in the
23 governor's office in 2007 and -- would you have still been
24 assistant general counsel at the time?
25   A.  No.

## 64

1    Q.  You would have been a policy analyst at that
2  time?
3    A.  Yeah.  I think the actually title is Governor's
4  Advisor II.  I don't know what that means, but...
5    Q.  So let's back up for a second so I can understand
6  what responsibilities you would have as a governor's
7  advisor.  And so we're talking about 2007, when you
8  returned to the governor's office.  Can you tell me what
9  your responsibilities included at that time?
10   A.  Yes.  Basically all the same responsibilities as
11 when I was in the general counsel's office, minus the
12 legal responsibilities.  I was no longer analyzing, you
13 know, settlements from the State or doing any of those
14 kind of strictly legal work.  I was now doing entirely
15 policy, and there was an addition of being a liaison to
16 agencies, which is something I did not do when I was
17 general counsel.  So I was a liaison of the lottery
18 commission, the racing commission, and at some point, the
19 Attorney General's Office and all the courts.
20   Q.  And when you talk about a liaison to agencies,
21 the AG's office and all the courts, dealing specifically
22 with the 2007 voter ID bill, what responsibilities as a
23 liaison would that include?
24   A.  None.
25   Q.  So does that mean you were not responsible for



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 65

1  communicating with any of the legislators regarding
2  HB 218?
3      A.  Well, those are -- those are separate functions.
4  As I say, when I was in general counsel, I had sort of two
5  functions:  advising on legislation and legal functions.
6      When I came back, I was in the budget, planning
7  and policy division, where I had, as does everybody there,
8  responsibilities for legislation and also for agencies.
9  You do everything from -- if it's an agency that has
10  meetings, you would attend their meetings and see what was
11  going on with their -- review their agendas, see what
12  they're doing, work on their budget, you know, review that
13  when it comes in, those sorts of thing.  None of that
14  would be, I don't think, pertinent to anything that you're
15  interested in today.
16      Q.  Okay.  And so just so I'm clear and the record is
17  clear, when you returned in 2007, would your
18  responsibilities have remained the same regarding voter ID
19  bills?
20      A.  Yes.
21      Q.  Okay.  And so as a -- as an advisor to the
22  governor at this point, would you have any additional
23  responsibilities regarding photo ID bills?
24      A.  None that was different from when I was there
25  before, if that's what you're getting at.

## 66

1      Q.  Okay.  Was HB 218 ever considered an emergency
2  item by Governor Perry?
3      A.  I don't believe so, no.
4      Q.  As a policy analyst for Governor Perry, do you
5  know why HB 218 was never considered as an emergency item?
6      MR. MCKENZIE:  I'm going to object on the
7  grounds of deliberative process privilege.  To the extent
8  that there's nonpublic deliberations that would be
9  revealed by that answer, I'll instruct you not to answer.
10      THE REPORTER:  If you could slow down a
11  little bit when you're --
12      MR. MCKENZIE:  Oh, I'm sorry.  I'll repeat
13  the objection.
14      I'm going to object on the basis of
15  deliberative process privilege to the extent it reveals
16  any nonpublic deliberations from the governor's office,
17  and I'm going to instruct you not to answer.
18      Q.  (BY MR. GEAR)  What are "emergency items"?
19      A.  Emergency items are a prerogative of the governor
20  under the Texas Constitution to essentially reset the
21  legislative calendar that is laid out in Article 3,
22  Section 5.
23      Under our Constitution, the first 30 days of a
24  legislative session, the legislature basically can't do
25  anything but introduce bills and consider emergency

## 67

1  expenditures.  The next 30 days, they basically can't do
2  anything except hear bills in committee.  Which means the
3  first 60 days of a 140-day session, they're not entitled
4  to hear any bills.
5      And so the same provision gives the governor the
6  ability to declare something an emergency item, in which
7  case it can be heard earlier.  So if you have a bill that
8  either needs more time to be worked on or that the
9  governor wants to highlight or for whatever reason, the
10  governor has that ability.
11      Q.  And did you ever play a role in designating bills
12  as an emergency item?
13      A.  No.
14      Q.  Can you tell me what the process for designating
15  bills as an emergency item would be?
16      A.  No.
17      Q.  Did you ever advise the governor when or when not
18  to designate bills as an emergency item?
19      A.  No.
20      Q.  So as you sit here today, are you aware of a
21  formal process for designating bills as an emergency item?
22      A.  I am not.
23      Q.  Are you aware of what, if any, steps must be
24  taken prior to declaring a subject matter as an emergency
25  item?

## 68

1      A.  Prior to declaring or to declare it?
2      Q.  Prior to declaring.
3      A.  No, not that I know of.
4      Q.  Are you aware of any steps that must be taken in
5  declaring a bill as an emergency item or a subject matter
6  as an emergency item?
7      MR. MCKENZIE:  Again you may answer as to
8  matters of public record.
9      A.  My understanding is the governor issues a
10  proclamation.
11      Q.  (BY MR. GEAR)  So, for example, does -- prior to
12  the issuance of the proclamation, does that require any
13  analysis of the emergency item?  And I'm talking
14  generally.
15      MR. MCKENZIE:  I'm still going to object on
16  the basis of privilege, because we know for -- as a
17  foundation that SB 14 was a emergency.  So if he replies
18  generally as to what happens with emergencies, you will
19  necessarily be implicating SB 14.
20      So on that basis, I'm going to instruct you
21  not to answer.
22      MR. GEAR:  Well, and I would say that I'm
23  asking him generally about the process for declaring
24  emergency items.  I didn't ask him specifically about
25  SB 14.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 69

1    Q.  (BY MR. GEAR)  So are you refusing to answer my
2  question --
3    A.  Would you rephrase it in a way that doesn't do
4  that?
5    Q.  What I asked you generally, and I believe I said
6  that in my initial question, is --
7    MR. GEAR:  Can we just read the question
8  back?  Is that possible?
9    (The requested material was read.)
10    MR. MCKENZIE:  All right.  Same objection,
11  because we know that SB 14, in fact, was declared as an
12  emergency.  So I'm still going to instruct him not to
13  answer.
14    Q.  (BY MR. GEAR)  And you're following the advice of
15  your counsel?
16    A.  I will follow the advice of counsel.
17    Q.  Based on your experience as a policy analyst for
18  Governor Perry, can declaring a emergency item be viewed
19  as a political decision?
20    MR. MCKENZIE:  Same objection.
21    A.  I don't even understand the question.
22    Q.  (BY MR. GEAR)  Can declaring an emergency item be
23  viewed as a political decision?
24    MR. MCKENZIE:  Same objection.
25    A.  I guess I'm going to decline to answer on advice

## 70

1  of counsel, but I'm not sure I understand the question.
2    Q.  (BY MR. GEAR)  Are you aware of any -- any
3  emergency items that have been declared for a political
4  reason?
5    MR. MCKENZIE:  Same objection.
6    Q.  (BY MR. GEAR)  Are you refusing to answer?
7    A.  Yes, sir.
8    Q.  Who helps the governor determine whether a bill
9  becomes an emergency item?
10    A.  I don't know.
11    **Q.  Is the declaration of a subject matter as a**
12    **emergency item a common or uncommon occurrence?**
13    **MR. MCKENZIE:  Objection; vague.**
14    You can answer.
15    A.  There are usually a couple or a few emergency
16  items in a legislative session.  Last session, there were
17  five.
18    Q.  (BY MR. GEAR)  Do you know why the subject matter
19  was declared an emergency item?
20    MR. MCKENZIE:  I'll object on the grounds of
21  deliberative process privilege.
22    MR. GEAR:  I think we're going to take a
23  break for a second.
24    MR. MCKENZIE:  Okay.
25    (Break.)

## 71

1    MR. GEAR:  We can go back on the record.
2    Q.  (BY MR. GEAR)  So I asked you who, if anyone, in
3  the governor's office helps the -- or assists the governor
4  in determining whether or not a subject matter becomes an
5  emergency item.  Do you recall that question?
6    A.  Yes, I recall the question.
7    Q.  And do you recall how you answered?
8    A.  I said, "I don't know."
9    Q.  And how long -- in 2007, how long had you been
10  working in the governor's office?
11    A.  In 2007, I had just started back.  I had worked
12  there for two sessions before that.
13    Q.  Two sessions before that.  And you're unaware of
14  who, if anyone, in the governor's office would advise the
15  governor on how subject matters become an emergency item?
16    A.  Yes.  That wasn't in my job.
17    Q.  Were you ever involved in any communications with
18  the governor regarding HB 218 when the topic of discussion
19  was determining if the bill became an emergency item?
20    A.  I don't know if there ever was a discussion about
21  it.
22    Q.  Well, were there any communications between staff
23  and the governor regarding HB 218 becoming an emergency
24  item?
25    A.  I don't know.

## 72

1    Q.  Were there any discussions with anyone outside of
2  the governor's office where you were present where the
3  topic of discussion was declaring HB 218 as an emergency
4  item?
5    A.  I don't recall any.
6    Q.  Do you recall any communications of any kind
7  that -- where the topic was declaring HB 218 as an
8  emergency item?
9    A.  I don't -- I don't recall.
10    Q.  Do you recall any public record which would
11  support the reason why HB 218 was declared an emergency
12  item?
13    A.  It wasn't.  Was it?  I don't remember HB 218
14  being an emergency item.
15    Q.  And you're right.  It was not.
16    Do you recall any public communication where the
17  discussion of HB 218 possibly becoming an emergency item
18  was the topic of discussion?
19    A.  I don't remember any.
20    Q.  Are you aware of anyone in the governor's office
21  involved in the development or drafting of HB 218?
22    A.  No.
23    Q.  Are you aware of any communications at all
24  between the governor's office and the lieutenant
25  governor's office regarding HB 218?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                           June 1, 2012

---

### 73

1     A. No.

2     Q. Are you aware of any communication at all between

3  the governor's office and Ms. Betty Brown regarding

4  HB 218?

5     A. I don't remember any.

6     Q. Are you aware of any communications regarding

7  HB 218 with any of the authors out of the governor's

8  office?

9     A. I don't recall any.

10    Q. Are you aware of any communications with any of

11 the coauthors regarding HB 218?  And I'm referring to

12 communications from the governor's office.

13    A. I don't remember any, but I also don't remember

14 who the coauthors were.

15    Q. Okay.  If you turn your attention to Exhibit 102,

16 does that refresh your recollection as to who the

17 coauthors were?

18    A. Yes, it does.

19    Q. Can you tell me what the purpose of HB 218 was?

20      MR. MCKENZIE:  Again, you may answer as to

21 general purpose.  I would ask you not to answer to the

22 extent it would reflect deliberations of the governor's

23 office.

24    A. I don't know what the authors' purpose of the

25 bill was.

---

### 74

1     Q. (BY MR. GEAR)  Were you present with the governor

2  during any communications regarding the allowable forms of

3  ID under HB 218?

4     A. I don't recall any -- I don't recall meeting with

5  the governor on this bill at all.

6     Q. Do you recall any meetings with anyone within the

7  Texas state government regarding HB 218?

8     A. No.  I must have talked with somebody about it at

9  some point, I'm guessing; but I don't recall any specific

10 discussions with anybody.

11    Q. Okay.  When you say you must have talked to

12 somebody at some point, what are you basing that on?

13    A. It's a very fluid process that you -- you know,

14 you go to hearings, they're hearing your bill.  And I'm

15 sure I chatted with somebody about it.  I don't recall --

16 and certainly if any legislator had asked about it, I

17 would tell them what I knew.

18    Q. Are you aware of any public debate or testimony

19 regarding HB 218?  Do you recall any public debate or

20 testimony?

21    A. There was a hearing in the House.  I don't recall

22 specifically.

23    Q. Were you present during that hearing in the

24 House?

25    A. I don't remember being present, but I likely was.

---

### 75

1     Q. Do you know if HB 218 was designed in part to

2  prevent noncitizens from voting?

3     A. I don't recall.  And I'm not sure I ever knew.

4     Q. Would the governor know that?

5     A. I don't know.

6     Q. Would the governor know the purpose or the intent

7  of HB 218?

8     A. We didn't draft the bill, so I wouldn't think he

9  would know the authors' intent in drafting the bill.

10    Q. Was the governor's office involved in any aspect

11 of drafting HB 218?

12      MR. MCKENZIE:  I'm going to object on

13 privilege grounds, that that's not public information.

14    A. I guess I'm going to decline to answer on the

15 advice of counsel.

16    Q. (BY MR. GEAR)  Do you recall during the public

17 debate, that Betty Brown stated on the House floor that

18 HB 218 was designed to keep illegal aliens or noncitizens

19 and otherwise not qualified from voting?

20    A. I don't recall what she said.

21    Q. Do you recall any communications with the

22 governor regarding preventing noncitizens or illegal

23 aliens from voting as related to HB 218?

24      MR. MCKENZIE:  I'm going to object on the

25 deliberative process grounds.

---

### 76

1       MR. GEAR:  On what grounds, Counselor?

2       MR. MCKENZIE:  Deliberative process grounds.

3     Q. (BY MR. GEAR)  Are you refusing to answer the

4  question based on the advice of your counsel?

5     A. Yes, sir.

6     Q. You had a chance to review HB 218, and did you

7  review the allowable forms of ID?

8     A. I did.  I'd have to go back and look at them

9  again.

10    Q. Would you agree that the allowable forms of ID

11 under HB 218 also include nonphoto IDs?

12    A. I lost my page.

13      I'm sorry.  Can you repeat the question?

14      MR. GEAR:  Could you read it back.

15      (The requested material was read.)

16    A. And, again, I don't know what step in the process

17 this version of the bill is.  I don't know if this is the

18 bill that passed the House or this was just the filed

19 version.  But the version of the bill that is marked as

20 Exhibit 28 allows for -- Page 10, Line 20, has forms of ID

21 that do not include a photograph.

22    Q. (BY MR. GEAR)  Okay.  Do you know if the version

23 that passed the House -- and I'm referring to 218 --

24 allowed for identification that did not include a

25 photograph?

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                                    June 1, 2012

---

**77**

1    A. I believe it did.

2    Q. Are you aware of any analysis conducted by the

3  governor's office regarding HB 218?

4    A. Am I aware of one?

5    Q. Are you aware of any analysis from the governor's

6  office regarding HB 218?

7    A. Yes.

8    Q. And what would that analysis include?

9        MR. MCKENZIE: I'm going to object on the

10  deliberative process privilege grounds.

11    A. You're asking what it included?

12    Q. (BY MR. GEAR) Yes.

13    A. I'm going decline to answer on advice of counsel.

14    Q. Did you prepare that analysis?

15    A. Yes.

16    Q. And is that the summary of the bill as you

17  described in earlier testimony?

18    A. Yes. And whatever else was on our form at the

19  time.

20    Q. Okay. And regarding the analysis of the summary,

21  as you testified, would that have included a comparison of

22  previous voter ID bills?

23        MR. MCKENZIE: I'm going to object on

24  deliberative process privilege grounds as to what the

25  content of that analysis included.

---

**78**

1    Q. (BY MR. GEAR) And you're refusing to answer?

2    A. Yes, sir.

3    Q. Would the summary of HB 218 have involved any

4  legal research?

5        MR. MCKENZIE: Again, I'm going to object as

6  to the content of the analysis.

7    A. I decline to answer on the advice of counsel.

8    Q. (BY MR. GEAR) Did the governor take a position

9  on HB 218?

10        MR. MCKENZIE: You may answer as to public

11  position.

12    A. I don't recall.

13    Q. (BY MR. GEAR) Did you take a position on HB 218?

14        MR. MCKENZIE: Again, you may answer as to

15  public position.

16    A. Do I publically take a position?

17    Q. (BY MR. GEAR) Yes.

18    A. I can't imagine that I did.

19    Q. Do you ever take a public position on photo ID

20  bills? Have you ever taken?

21    A. While I'm working for the governor?

22    Q. Yes.

23    A. When I'm working for the governor, my views are

24  my own. And what I do for the governor reflects my advice

25  to the governor, not my public, you know, views or

---

**79**

1  whatever.

2    Q. And you stated that you eventually left and ran

3  for office, correct?

4    A. Yes.

5    Q. And was that for the Senate or the House?

6    A. House.

7    Q. And did you take a public position on photo ID

8  when you were running as a candidate for the House?

9    A. Well, the bill had already passed, so it wasn't

10  much of an issue.

11    Q. Did you take a position?

12    A. No. I think I just stated that I worked on

13  certain bills for the governor.

14    Q. And which bills -- which bills did you state you

15  worked on?

16    A. The photo ID bill, loser pay tort reform, eminent

17  domain bill, and probably others.

18    Q. Are you aware of any attempt in -- by the

19  governor's office to determine if HB 218 had a

20  disproportionate impact on minority voters?

21        MR. MCKENZIE: Yeah. I'm going to object on

22  deliberative process grounds as to what type of analysis

23  you guys might do to aid the governor's decision-making.

24    A. I'll decline to answer on advice of counsel.

25    Q. (BY MR. GEAR) And you referred to HB 218 as

---

**80**

1  passing. Did I understand that testimony?

2    A. No. I believe it passed the House.

3    Q. And did it pass the Senate?

4    A. I don't think so.

5    Q. Do you recall when it passed the House?

6    A. I do not recall, but it's in Exhibit 102.

7    Q. And what does Exhibit 102 indicate?

8    A. I believe it's late April. April 24th of 2007.

9    Q. Are you aware of any analysis conducted regarding

10  either HB 1706 or HB 218 regarding the voters in the State

11  of Texas that may not have an allowable form of ID under

12  those proposed bills?

13        MR. MCKENZIE: Again, I'm going to object to

14  the content of the analysis you may have conducted for the

15  governor that aided in decision-making. I'm going to

16  instruct you not to answer.

17    A. I'll decline to answer on the advice of counsel.

18    Q. (BY MR. GEAR) Are you aware of any attempts to

19  determine the impact of HB 218 on minority voters?

20        MR. MCKENZIE: Same objection.

21    A. I decline to answer on the advice of counsel.

22    Q. (BY MR. GEAR) Are you aware of any

23  communications regarding -- out of the governor's office

24  regarding any concerns expressed regarding the burden that

25  HB 218 may place on minority voters?

---



**ESQUIRE**
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                              June 1, 2012

---

### 81

1      MR. MCKENZIE:  Let me ask a question.  Is it
2  public communication you're talking about or all
3  communications?
4      MR. GEAR:  Public communications.
5      MR. MCKENZIE:  Okay.
6  A.  I don't recall.
7  Q.  (BY MR. GEAR)  And that would also be true for
8  the last question regarding the impact to minority voters.
9  Are you aware of any public communication?
10  A.  It wasn't part of my job to draft public
11  communications typically, so I don't recall any.
12  Q.  Whose job was it?
13  A.  It depends on what the communication was.
14  Q.  Regarding photo ID.
15  A.  I mean, it depends on what the communication was.
16  If there was press inquiries, the press shop might do it.
17  You know, it depends on what it was.
18  Q.  Does the governor have a specific press officer
19  or a person assigned to handle his press releases?
20  A.  He has a communications division.
21  Q.  Okay.
22  A.  I'm not sure if that's what it's called.
23  Q.  And do you know who heads up the communications
24  division?
25  A.  In 2007, I don't remember who it was.

---

### 82

1  Q.  Do you know if there has been a turnover in the
2  head of the communications division --
3  A.  There usually is.
4  Q.  -- in 2009?
5      THE REPORTER:  Wait.  You guys are talking
6  at the same time.
7      THE WITNESS:  I'm sorry.
8  Q.  (BY MR. GEAR)  So the response was there usually
9  is a turnover --
10  A.  Yes.
11  Q.  -- in the communications division of the
12  governor's office?
13  A.  Yes.
14  Q.  Are you aware of anyone in the governor's office
15  that played a role in attempting to ensure the passage of
16  HB 218?
17      MR. MCKENZIE:  Again, to the extent it's not
18  public and it might reflect policy decisions of the
19  governor, I'm going to instruct you not to answer the
20  question.
21  A.  I decline to answer on advice of counsel.
22  Q.  (BY MR. GEAR)  I may have asked you this, and I
23  apologize, if I did.  Are you aware of whether the
24  governor took a public position on HB 218?
25  A.  I don't recall.

---

### 83

1  Q.  Were you involved in any communications with the
2  governor regarding what the forms of allowable
3  identification would be under HB 218?
4      MR. MCKENZIE:  Objection on deliberative
5  process grounds.  I'm going to instruct you not to answer.
6  A.  I decline to answer on the advice of counsel.
7  Q.  (BY MR. GEAR)  Were you ever involved in any
8  communication with constituents regarding HB 218?
9  A.  I don't recall.
10  Q.  Were you ever involved in any communications with
11  any member of the legislature regarding HB 218?
12  A.  I don't recall specific communications, but I
13  would not be surprised if I talked to members during the
14  course of the session.
15  Q.  Do you have any memory of who you may have talked
16  to during the session?
17  A.  No.
18  Q.  Do you have any memory of communicating with any
19  staff regarding HB 218, the staff of legislators?
20  A.  I don't.
21  Q.  Do you have any memory or are you aware of any
22  communications of -- communications with the lieutenant
23  governor's office regarding HB 218?
24  A.  No.
25  Q.  If you engaged in such communication -- and I

---

### 84

1  understand that you don't recall the communication -- how
2  would you normally engage in that communication?  By
3  phone, by Blackberry?
4  A.  Either by phone or seeing them in person.
5  Q.  Do you ever send text messages regarding
6  communications?
7  A.  No.
8  Q.  How does one go about meeting with you in your
9  capacity in the governor's office?  Do they need to
10  schedule an appointment, or is it a more informal process?
11  A.  It's more informal.  People can schedule an
12  appointment; but -- particularly, you know, if it suits
13  their schedule.  But people see you in the hallway, people
14  come by.
15  Q.  And do you maintain a calendar, or did you
16  maintain a calendar while in the governor's office?
17  A.  No.  My -- Outlook would have an appointment
18  calendar, if there was one calendared.  If you said, you
19  know, "I want to come in and see you at 3 o'clock
20  tomorrow," I'd put it on there so I wouldn't forget it.
21  But if I just went and saw somebody or we talked on the
22  phone, there's no calendar.
23  Q.  Sure.
24  A.  And that was the vast majority of my
25  communications with people.

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                                                June 1, 2012

---

## 85

1    Q. Generally, what involvement does the Department
2 of State have in the proposal and enactment of election
3 laws?
4    A. The Department of State?
5    Q. Yes.
6    MR. MCKENZIE: Secretary of State.
7    A. Secretary of State?
8    Q. (BY MR. GEAR) Secretary of State. Excuse me.
9    A. I'm sorry, I got sidetracked by that. Could you
10 re-ask the question?
11    Q. I'll ask it again.
12    Generally, what involvement does the Secretary of
13 State have in the proposal and enactment of election laws?
14    A. For one thing, they serve as a resource. The
15 Secretary of State's office is the election official for
16 the State of Texas. So they serve as a resource to
17 legislators and to us if we ask them. They may have bills
18 that they want to pursue to clean up whatever their
19 processes are, and they may shop them to legislators. But
20 I've never worked there.
21    Q. Do you recall in your capacity in the governor's
22 office while working on photo ID legislation -- do you
23 recall communicating with the Secretary of State's office?
24    A. On photo ID?
25    Q. Yes.

## 86

1    A. I don't recall doing -- I communicated with their
2 general counsel on almost a daily basis on different
3 things.
4    Q. During HB 218, would have reviewed the public
5 record regarding the photo ID legislation?
6    MR. MCKENZIE: Again, I'm going to object to
7 the extent it reflects your internal deliberations and
8 what you consider important in your analysis in your
9 recommendations to the governor.
10    Q. (BY MR. GEAR) And I'm asking you, did you review
11 the public record?
12    A. I don't know what you mean by "public record."
13    Q. The public committee hearings, the public floor
14 debates, would you have been responsible for reviewing the
15 public records in that format?
16    MR. MCKENZIE: And the basis of my objection
17 is that the public record -- the fact that it's out there
18 is public; but the fact that the governor and analysts may
19 have taken it and incorporated it as part of their, I
20 guess, work product or deliberations into the final
21 analysis that they gave to the governor is the basis of my
22 objection. And I'm still going to object and instruct you
23 not to answer.
24    A. I'll decline to answer on the advice of counsel.
25    MR. GEAR: So you're objecting based on the

## 87

1 fact that I asked him a question if he reviewed a public
2 record?
3    MR. MCKENZIE: Yes. Just like if an
4 attorney were to do research of public material to try to
5 develop their case and didn't want to turn that over as
6 work product. Because even though it's public, their
7 collection or colation of that information is not public
8 and would reflect their work product.
9    Q. (BY MR. GEAR) And from 2007, were you also in
10 the governor's office in 2009?
11    A. Yes.
12    Q. And do you recall if there -- do you recall if
13 there was photo ID legislation in 2009?
14    A. Yes, there were.
15    Q. And would you have been involved in reviewing
16 that photo ID legislation?
17    A. Yes.
18    (Exhibit 106 was marked.)
19    Q. (BY MR. GEAR) I'm showing you what's been marked
20 as Exhibit 106 and just ask you to take a look at that.
21    (Witness reviews document.)
22    Q. (BY MR. GEAR) The legislation that was
23 considered in 2009, was that SB 362?
24    A. Yes.
25    Q. And was that photo ID legislation?

## 88

1    A. Yes. There were other bills, as well.
2    Q. In 2009?
3    A. Yes.
4    Q. Okay. Would you have been involved in
5 considering all of those bills?
6    A. Yes.
7    Q. Can you tell me the designation of the other
8 bills? Was it -- I know this one is SB 362.
9    A. I don't remember bill numbers.
10    (Exhibit 314 was marked.)
11    Q. (BY MR. GEAR) Okay. I'm showing you what's been
12 marked as Exhibit 314, if you could take a look at that.
13    (Witness reviews document.)
14    Q. (BY MR. GEAR) Can you tell me who the authors of
15 SB 362 were?
16    A. Senator Frasier was the author of the bill.
17    Q. And the process you described of receiving and
18 reviewing a bill, would that be the same for SB 362?
19    A. Let me refer to Exhibit 106 to see when it was
20 filed.
21    Q. Sure. And you can state that for the record, if
22 you'd like.
23    A. This bill was filed in December of 2008, so I'm
24 not certain yet if we had our system up. So it may not
25 have been received in exactly the same way as the other

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

89

1  bills. But we would have had a system in place to make
2  sure that the correct analysis would get -- correct
3  analyst would get the bill that was assigned to him or
4  her.
5       Q. And regarding SB 362, would you have written a
6  summary regarding that bill?
7       A. Yes.
8       Q. Would you have compared SB 362 to previous photo
9  ID legislation?
10          MR. MCKENZIE: And again, I'm going to
11  object as to the content of his analysis and instruct you
12  to not answer.
13      A. I will decline to answer on advice of counsel.
14      Q. (BY MR. GEAR) Do you recall if SB 362 was
15  designated as an emergency item?
16      A. I don't believe it was.
17      Q. Why not?
18          MR. MCKENZIE: Again, I'm going to object on
19  deliberative process privilege grounds.
20      A. I decline to answer on advice of counsel.
21      Q. (BY MR. GEAR) Do you see that SB 362 allows
22  forms of ID that do not include a photo ID?
23      A. I hadn't actually got as far as the forms of ID.
24      Q. Take your time and look at it.
25      A. I'm sorry. Could you remind me of the question?

90

1       Q. The question that I had asked you previously was,
2  do you see that SB 362 allows forms of ID that are
3  nonphoto ID?
4       A. Yes. And again, as with the other bill, there is
5  no heading or footer on this, so I don't know what stage
6  of the process this bill was from, whether it was the
7  filed version or the version that passed the Senate or --
8  or what it was. But it does allow for forms of ID other
9  than photo ID.
10      Q. And did the filed version allow for other forms
11  of ID other than photo ID?
12      A. I believe that it did.
13      Q. Were you involved in any communications with the
14  governor regarding SB 362?
15      A. I don't recall communicating with the governor
16  about SB 362.
17      Q. Were you involved in any communications with the
18  lieutenant governor regarding SB 362?
19      A. No.
20      Q. Were you involved in any communications with the
21  legislators regarding 362?
22      A. I don't recall specific communications, but I
23  very likely communicated with members of the legislature
24  regarding Senate Bill 362.
25      Q. Now, you said you were very likely to have

91

1  communicated. Is there a process in your review and
2  summary of 362 which would have required you to
3  communicate with legislators?
4       A. No.
5       Q. And when you say you're very likely, what are you
6  basing that on?
7       A. The fact that I attended the hearings, I would
8  have been involved with some of that. There was -- it's
9  not a requirement of my job that I discuss things with
10  legislators. It just either sometimes helped in the
11  performance of the job or sometimes they wanted to know
12  things about the bill, or that sort of thing.
13      Q. So you recall attending the hearings for SB 362?
14      A. I don't specifically recall it; but I'm -- very,
15  very likely to have either been there in person or
16  watching from my office.
17      Q. Okay. And was that function different from your
18  review and summary of HB 1706 and -- I should just say
19  HB 218?
20      A. No. The function didn't really change much over
21  time. Basically I was responsible for analyzing the bill
22  and tracking its progress through the legislature. Or
23  lack of progress, depending on the bill. It was basically
24  my responsibility to know what was going on with the bill
25  and where it was in the process.

92

1       Q. Do you recall the public debates regarding
2  SB 362?
3       A. I don't recall specifically the debate. I'm sure
4  I watched the floor debates.
5       Q. Do you recall what the concerns raised by
6  opponents of SB 362 were?
7       A. I don't recall the specific concerns, but I'd
8  certainly -- you'd have to refresh my recollection. I
9  mean...
10      Q. Are you familiar with the House Research
11  Organization Bill Analyses?
12      A. I don't remember it. I'm sure I saw it.
13      Q. Have you reviewed House Research Organization
14  Bill Analyses before, previously? Are you familiar
15  with --
16      A. Have I ever seen one?
17      Q. Yes.
18      A. Yes.
19      Q. Okay. And do you recall reviewing one in 2009
20  regarding photo ID?
21      A. No.
22      Q. How would the governor's office receive a copy of
23  the House Research Organization Bill Analyses?
24      A. I don't think we did. I think if you wanted to
25  see it, you just went online and looked it up.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                                    June 1, 2012

---

## 93

1  Q.  Do you recall going online and looking it up
2  regarding SB 362?
3      A.  I don't.  I never used anybody else's analysis in
4  creating my analysis.  So if I looked at any limits for a
5  bill, it would be later.
6      Q.  Did you refer back to your previous analysis on
7  voter ID when considering SB 362?
8      A.  I don't recall.
9      Q.  Based on your review of SB 362, do you see that
10 it allows for a driver's license or a personal ID card
11 issued by DPS?
12     A.  Where are you?
13     Q.  SB 362.  Let me see if I can direct you to it.
14 Page 5?
15     Q.  Page 5.
16     A.  I'm sorry, could you repeat the question?
17     Q.  Do you see that it allows a -- for a photo ID,
18 driver's license or a personal ID card issued by DPS?
19     A.  Yes.
20     Q.  That it also allows for a U.S. military card that
21 contained a photograph?
22     A.  Yes.
23     Q.  That it allowed for a U.S. citizenship
24 certificate that contained a photograph?
25     A.  Yes.

## 94

1      Q.  So when you complete your summary, who reads your
2  analysis or your summary?  Who does that go to?
3      A.  It doesn't go to a specific person.  Once it's in
4  the system, it can be -- it can be used by a few people
5  who are entitled to see it for their -- you know, they
6  have all different purposes.
7      Q.  Who's entitled to see it?
8      A.  I'm not entirely sure who all the people who are
9  entitled to see it.  I know, for example, I was not
10 entitled to see other analysts' analyses, because there
11 would be no reason why I would need to see their bill.  So
12 I couldn't get into them if I wanted to.
13     Q.  So let me ask that question again.
14     Who, that you're aware of, is entitled to review
15 your analysis of SB 362?
16     A.  I know that my direct report would, which is the
17 director of the budget planning and policy.
18     Q.  And who was that?
19     A.  At which time?
20     Q.  During the review and summary of SB 362?
21     A.  This was 2009.  So I guess that was -- forgive
22 me.  My memory is terrible.  I believe Mary Katherine was
23 the VPP director.  Mary Katherine Stout, S-T-O-U-T.
24     Q.  And do you know what Mary Katherine would do when
25 she received -- what her responsibilities were once she

## 95

1  received your summary of SB 362?
2      A.  Well, she received them from everybody, so she's
3  getting 7,000 of them.
4      Q.  Okay.
5      A.  So I don't think that she's necessarily reading
6  all of them.  But she, I believe, had access to it, the
7  legislative division would, so they could communicate with
8  legislators.  And I don't know who else for sure.
9      Q.  So it's the legislative division that's
10 responsible for -- for the actual communication with
11 legislators?
12     A.  Yes.
13     Q.  Okay.  And so you indicated that you are aware
14 that the director of -- well, Mary Katherine and the
15 legislative division would have gotten copies of your
16 summary.  Anyone else?
17     A.  Well, it's not so much they would get copies.  I
18 think they would have access to the computer and would
19 pull them up if they wanted to see them.  I don't think
20 anybody --
21     Q.  Do you know if --
22     A.  -- as far as I know, actually got a copy.
23     Q.  Do you know if it's the normal course after your
24 summaries have been completed for the legislative division
25 to review those summaries?

## 96

1      A.  Again, there are -- in some sessions, there are
2  as many as 7,000 bills, so I doubt they read all of them.
3  I'm sure that they have their own process for knowing when
4  they need to see them.
5      Q.  Was SB 362 a legislative priority for the
6  governor --
7          MR. MCKENZIE:  I'm going to object --
8      Q.  (BY MR. GEAR)  -- in 2009?
9          MR. MCKENZIE:  I'm sorry, I didn't mean to
10 talk over you.
11         I'm going to object on deliberative process
12 grounds because -- to the extent it's a nonpublic priority
13 of the governor.  If it's a public priority of the
14 governor, you may answer.
15     A.  I'm not quite sure I know what a public priority
16 is.  I'll decline with respect to the internal --
17         (Multiple voices.)
18     Q.  (BY MR. GEAR)  Okay.  I believe I said
19 "legislative priority."  Was it a legislative priority for
20 the governor in 2009?
21         MR. MCKENZIE:  Same objection.
22     A.  Are you asking me if it was an emergency item?
23     Q.  (BY MR. GEAR)  No.  I'm just asking was it a
24 priority in general for the governor in 2009.
25         MR. MCKENZIE:  Same objection if it's not

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

97

1  public.
2      A. I don't know if it was on any list of priorities
3  or not. I don't remember anymore. That's all I --
4      Q. (BY MR. GEAR)  Does the governor generally create
5  a list of priority legislation for any given session?
6      A. It all -- it depends how you're operating. You
7  might have -- you know, you may have a list of priorities;
8  you might just lay out your bills in the state -- of the
9  state that you're interested in; the governor may give
10 speeches and declare it to be something he has a priority
11 and cares about.
12         Priorities definitely were -- we used in the
13 office on at a regular basis. How formal it is, I
14 couldn't tell you.
15     Q. Were you involved in any decision-making process
16 regarding the allowable forms of ID under SB 362?
17         MR. MCKENZIE:  Again, I'm going to object if
18 that information reflects nonpublic internal government
19 process communications.
20     A. And I'll decline to answer on the advice of
21 counsel.
22     Q. (BY MR. GEAR)  Were there any communications
23 regarding the allowable forms of ID pursuant to SB 362?
24         MR. MCKENZIE:  Same objections to the extent
25 they're intra-governor staff communications.

98

1          MR. GEAR:  I think he can answer the
2  question "yes" or "no" to were there communications
3  regarding SB 362.
4          MR. MCKENZIE:  Right. Under -- I guess,
5  like, incrementally, the questions are getting more
6  specific about what the subject matter of the
7  communication was. It starts off as voter ID and it
8  starts to go into -- about what form of ID. And as it
9  gets more and more specific, I feel more inclined to
10 object. So I try to let the broad voter ID questions go.
11 But the stuff about acceptable forms of ID and stuff,
12 that's when I start asserting the objection.
13     Q. (BY MR. GEAR)  Were there any communications that
14 you're aware of regarding SB 362?
15     A. I don't recall specifically.
16     Q. Do you know what the intent of SB 362 was?
17         MR. MCKENZIE:  You may answer as to general
18 legislative intent, not intra-governor office intent.
19     A. I don't know what Senator Frasier's intent was.
20     Q. (BY MR. GEAR)  Do you know what any of the
21 authors' intent was?
22     A. When you say "any of the authors" --
23     Q. Authors of the bill, 362.
24     A. I mean, the way I would do it, the author is the
25 author, and the coauthors are folks who are allowed to

99

1  sign onto the bill. So I don't know who the coauthors
2  are.
3      Q. Well, if you refer to the Texas Legislature
4  Online History for 362, does that indicate who the authors
5  are and the coauthors, as well as the sponsors?
6      A. Yes. And it's different from the copy -- the
7  Exhibit 314. Oh, no, it's not. They list both -- I'm
8  sorry. They list Frasier and then -- both as author and
9  then Nelson and Nichols as coauthor on Exhibit 106.
10     Q. Do you know what the intent of SB 362 was for
11 either the author, coauthor, sponsor or cosponsors?
12     A. I do not.
13     Q. Was the intent of a bill something that you
14 considered or determined in the analysis of any particular
15 bills?
16         MR. MCKENZIE:  Objection to the extent it
17 reflects the content of the analysis that you made for the
18 governor or his staff.
19     A. I'll decline to answer based on the advice of
20 counsel.
21         MR. GEAR:  I think now would probably be a
22 good time to take a lunch break. Let's do maybe half an
23 hour?
24         MR. MCKENZIE:  Yes.
25         (Break.)

100

1          MR. GEAR:  Back on the record.
2      Q. (BY MR. GEAR)  We're back after lunch. I'd like
3  to take a little more time to really understand what it is
4  you do in the governor's office or what you did in the
5  governor's office. And as I understand your testimony,
6  you indicated that you would receive a bill generally in
7  its final version, electronically in the form, the name
8  you did not remember; is that correct?
9      A. Yeah. I should have inquired about it over
10 lunch, but I forgot it.
11     Q. And you discussed several times the possibility
12 during some of the previous voter ID registration -- I'm
13 sorry -- voter ID legislation that the service may not
14 have been available. Do you recall that testimony?
15     A. Yes.
16     Q. And when the service -- in situations where the
17 service is not set up or not available, how would the
18 governor's office normally receive a bill?
19     A. First of all, I don't know how the governor's
20 office receives it. I just know how I would receive it.
21     Q. Okay.
22     A. I think -- they still probably officially receive
23 stacks of paper bills in the -- and I think I've seen
24 them -- in the central office. So I think the official
25 bill is still a stack of -- you know, you get a stack of



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

---

101

1    paper.  So that's how they would get that.  What I was
2    referring to is the way we would get our assignments to
3    analyze a bill, which would come from -- I would get an
4    e-mail that would say, "These are the bills that were
5    filed in your area today," and it might be 30 of them on,
6    you know, a horrible day.  It might be six.  It might be
7    eight.  Whatever it will be.  And you'd have a certain
8    amount of time to get an analysis written in the system so
9    that anybody who's entitled to use it and needed to see
10   it, they could see it.  And then over the course of the
11   session, you'd follow that bill.
12         Now, you mentioned being in the final form, and
13   that's kind of the opposite of the way I think about it.
14   To me, the final form is the bill at the end of session,
15   after it's gone through committee and it's either passed
16   or not and it's sort of where it is.
17         What you're referring to as final is I believe
18   what I'm referring to as the filed version, which is the
19   version that has been filed with the House or the Senate.
20   And I guess you mean final in the sense they're done
21   writing it.  But that's not what I would consider final.
22   So we refer to those as filed.
23         Q.  Okay.  So when you -- the type of bill that you
24   generally receive is the filed version, correct?
25         A.  Generally.

---

102

1         Q.  And when you receive the version that is the
2    filed version, do you -- have you at any time added
3    additional language or drafted additional language to the
4    filed version of a bill?
5              MR. MCKENZIE:  And again, you can answer it
6    generally, but not as to specific bills.
7         A.  And it's very different with various different
8    bills.  But in Texas, the governor typically doesn't have
9    as much role in that as in other states.  There are
10   bills where -- there are some bills -- you know, one or
11   two, I was deeply involved in drafting.  None involving
12   photo ID.
13         There are other bills where you'll go and suggest
14   a provision or you suggest a provision come out or a
15   member will come to you and say, "We're thinking about
16   putting this provision in.  What do you think?"  So you're
17   involved in that kind of capacity.  It's not very often
18   that you're involved in actually sitting down drafting a
19   bill.
20         Q.  (BY MR. GEAR)  So as I understand your testimony,
21   you were not involved in drafting any of the photo ID
22   bills?
23         A.  Right.
24         Q.  And is it also your testimony that no one in the
25   governor's office was involved in the drafting of any of

---

103

1    the photo ID bills?
2              MR. MCKENZIE:  Again, I'm going to object to
3    the extent their participation was not public and it
4    concerns stuff that they might be done in their
5    deliberative process about photo ID.
6         A.  I don't know for certain if anybody.  I would be
7    highly doubtful that anybody did.
8         Q.  (BY MR. GEAR)  And --
9         A.  And again, when I say "draft," I'm not referring
10   to, during the process, saying, "Hey, what do you think
11   about Subsection B?  Can we" -- you know, "What do you
12   think about Subsection A.  Can we move this?  Can we
13   lose" -- I think we're referring at this stage of our
14   questions to what I'm referring to as the filed version,
15   creating a bill.  We don't -- you know, very seldom have
16   much role in that that I'm aware of.
17         Q.  Now, would you -- do you recall seeing any of the
18   photo ID bills prior to the filed version?
19         A.  I don't remember specifically.  But between
20   sessions, we would certainly see the bill from last time.
21   Whether somebody would send us a version of a bill and
22   say, "This is what I'm thinking of filing this time," on
23   photo ID specifically, I don't recall.  That does happen,
24   but I don't recall if it happened on photo ID.
25         Q.  And so is the record is clear, do you recall any

---

104

1    communications regarding any of the photo ID bills prior
2    to the -- prior to reviewing or seeing the final
3    version --
4         A.  You mean --
5         Q.  -- filed version?
6         A.  -- the filed version?
7         Q.  Yes.
8         A.  I don't specifically recall them.  But as --
9    again, if there were -- if somebody had submitted
10   something and said, you know, "What do you think about
11   this bill," or "We're thinking of filing this," you know,
12   that is a fairly common occurrence.
13         Q.  Okay.
14         A.  Now, for the vast -- I had 400 bills last time.
15   I would say for at least 3- -- I had 400 and probably 20.
16   For at least 390 of them, the first time I saw anything
17   about them is when they got filed.
18         Q.  And would that be true for the various versions
19   of the photo ID legislation?
20         A.  It certainly was true for the first bill we
21   discussed, the 1706.  I don't think I ever saw anything
22   ahead of time on House Bill 218.  And I don't recall if I
23   saw anything on -- as we got later and later.  Because by
24   that time, the legislature had been working on these bills
25   for, you know, three sessions; and it's common to keep

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                                June 1, 2012

---

### 105

1   working on something in between sessions. So I don't know
2   if I saw anything in particular or somebody saying, "We're
3   thinking about rolling it out this way."
4       Q.  Would that be the same testimony for SB 362?
5       A.  Yes.
6       Q.  Now, you also indicated that you don't like to
7   rely on other people's work when you review a -- or
8   summarize a piece of legislation. Do you recall that
9   testimony?
10      A.  Yes.
11      Q.  What do you rely on when summarizing a piece of
12  legislation?
13          MR. MCKENZIE:  I'm going to object to the
14  extent you have like specific resources that you relied
15  upon in voter ID bills. But you can speak generally as to
16  the types of resources that you look at as a general
17  matter.
18      Q.  (BY MR. GEAR)  And I want to be clear.  I'm
19  asking you generally when you are summarizing a bill. And
20  we can step out of the realm of voter ID for a second.
21  I'm trying to understand exactly how you go about that
22  process.
23      A.  The first thing you do is read the bill. And
24  that's a different process. Some bills are one page and
25  some are 200, so it's different. If you're reading a

### 106

1   one-page bill that, you know, amends one line of a
2   statute, it could take a couple of minutes. You look at
3   what it says, you look up the statute, unless you already
4   know it, and you say, "This bill does this and would
5   change the current law to do X." If something is longer,
6   it may be a more involved process. But it involves
7   reading the bill myself and writing what I think is in it,
8   not what somebody in leg counsel thought it said or would
9   do or...
10      Q.  Is that it?
11      A.  Yes.
12      Q.  Okay. And as far as the resources that you would
13  review, if it's a more lengthy bill -- if it's a lengthy
14  bill, is there a certain set of resources that you would
15  go to in reviewing that bill?
16      A.  It depends on the topic. You know, some of --
17  most of my lengthiest bills involve gaming, and there's
18  nothing to -- there's no current law to compare it to.
19  It's just the bill itself being very, very lengthy, you
20  know, for whatever the author's purpose was in laying
21  everything out. So you're really trying to figure out
22  what's in this bill and what does it do and how would it
23  work.
24      Q.  So specifically dealing with voter ID
25  legislation, is a particular resource that you would

### 107

1   review in summarizing the voter ID legislation?
2           MR. MCKENZIE:  Again, I'm going to object on
3   the deliberative process grounds to the extent it would
4   reveal your deliberations as a staff member of the
5   governor's office.
6       A.  I'll decline to answer on the advice of counsel.
7       Q.  (BY MR. GEAR)  Are there any public sources that
8   you would review regarding the summary of voter ID
9   legislation or that you reviewed?
10          MR. MCKENZIE:  The same objection. Based on
11  what he elected to look at, be it public or private. If
12  not publically known, I object on deliberative process
13  grounds that he not answer if it would reveal the
14  deliberations as a staff member of the governor's office.
15      Q.  (BY MR. GEAR)  And you're not answering that
16  question?
17      A.  On advice of counsel.
18      Q.  Now, after you complete the review of
19  legislation, you indicated that there was a limited number
20  of people that had access to that summary, correct?
21      A.  Yes.
22      Q.  And where, physically, do you -- what physically
23  do you do with the summary after you have completed your
24  summary?
25      A.  Physically, you hit a button on the computer that

### 108

1   sends it into the system.
2       Q.  So it's stored electronically?
3       A.  Yes.
4       Q.  And can you tell me where in the system the
5   summary would be stored?
6       A.  I honestly don't know anything about that kind of
7   thing.
8       Q.  Is there a particular file -- electronic file
9   that your summaries are stored on?
10      A.  I don't know.
11      Q.  So when you complete your summary, you just hit a
12  button and you don't know where that goes?
13      A.  Yes. I mean, I'm -- I don't know very much about
14  computers. It's -- you open a formatted program, I guess,
15  on the computer that has the different questions and the
16  different things you're to look for in the different
17  analysis and you fill it out. And once you are -- once
18  you're done writing -- sometimes it's maybe a multi-day
19  process on some bills; others it take five minutes.
20          But when you are done and ready to submit it, you
21  hit a button to submit it. At that point, it's in the
22  system and, I believe, becomes accessible to whoever is
23  entitled to view it.
24      Q.  So there's a format you follow when, I guess,
25  preparing your summaries to store electronically. Did I



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

### 109

1  understand your testimony?

2      A.  There's a format in the software to make sure

3  that we have all the different bases covered and also to

4  make it -- so that the 7,000 bills -- whoever is looking

5  at it isn't looking at all different styles and all

6  different forms.  You know, they know where to look in

7  each bill for whatever they're looking for.

8      Q.  Okay.  So dealing specifically with the voter ID

9  legislation, can you tell me who specifically had access

10  to your summary?

11      A.  Again, I'm not really sure exactly who has access

12  to them.

13      Q.  What entity, what division had access to your

14  summary?

15      A.  I know that my direct boss, the director of

16  budget planning and policy, would have access to them,

17  whether they actually look at them, because there's 7,000

18  of them.  And I know that the legislative staff does, and

19  I'm not sure who else.

20      Q.  And that's the legislative staff for both the

21  House and the Senate?

22      A.  The governor has one staff that works both.  He

23  has a director and then a person for the House and a

24  person for the Senate.

25      Q.  Is there any type of report or analysis that's

### 110

1  prepared for legislators?

2      A.  No, not that I'm aware of.  I certainly didn't.

3      Q.  Have you ever seen the -- or reviewed the

4  Crawford decision?

5      MR. MCKENZIE:  I'm going to object to the

6  extent you reviewed it as part of your deliberations for

7  the governor.  To the extent you reviewed it independent

8  of your service with the governor, you may answer the

9  question.

10      A.  I read it when it first came out.

11      Q.  (BY MR. GEAR)  Do you have an opinion regarding

12  the Crawford decision?

13      MR. MCKENZIE:  And it's the same objection

14  to the extent the opinion was developed in the course of

15  your service as a staff member of the governor's office.

16  To the extent you had an opinion you developed independent

17  of that, you may answer.

18      A.  I was working for the governor at the time that

19  I -- that I -- anytime that I would have made any use of

20  it.  So I -- I guess I have to decline to answer on the

21  advice of counsel.

22      Q.  (BY MR. GEAR)  Do you believe the Crawford

23  decision has an impact on the State of Texas' crafting of

24  photo identification laws?

25      MR. MCKENZIE:  Again to the extent that

### 111

1  belief was developed during the course of your service as

2  the governor's staff, I would encourage you not to answer.

3  To the extent you have an opinion outside of that service,

4  you're free to answer.

5      A.  I have to decline to answer on the advice of

6  counsel.

7      Q.  (BY MR. GEAR)  Do you believe that the Crawford

8  decision had an impact on the State of Texas' requirements

9  to obtain preclearance of the photo identification

10  legislation?

11      A.  I'm not sure I understand.

12      Q.  Let me ask the question again.

13      Do you believe that the Crawford decision had an

14  impact on the State of Texas' requirements to obtain

15  preclearance, Section 5 preclearance, of its photo

16  identification legislation?

17      A.  I must not remember the decision well enough,

18  because I don't remember anything about that.  I thought

19  our preclearance came from Section 5.

20      Q.  Do you remember anything about the Crawford

21  decision?

22      A.  I remember some things; I don't remember that.

23      Q.  Did you apply any portion of the Crawford

24  decision in your summary of the photo ID legislation?

25      MR. MCKENZIE:  Same deliberative process;

### 112

1  objection.  To the extent you -- it reflects deliberations

2  that you had while a staff member at the governor's

3  office, I will ask you not to answer.

4      A.  I'll decline to answer on the advice of counsel.

5      Q.  (BY MR. GEAR)  Did you review the Indiana law

6  regarding its photo identification provisions?

7      MR. MCKENZIE:  Same objections.

8      A.  I'll decline to answer on the advice of counsel.

9      Q.  (BY MR. GEAR)  Have you ever reviewed the Indiana

10  law regarding its photo identification provisions?

11      MR. MCKENZIE:  Same objection to the extent

12  that it reveals your analysis prior to the governor's

13  final decision on the bill.  To the extent you have an

14  opinion separate from that service, you may answer.

15      A.  I'll decline to answer on the advice of counsel.

16      Q.  (BY MR. GEAR)  Are you aware of the provisions of

17  the Indiana photo identification legislation?

18      MR. MCKENZIE:  Same objection to the extent

19  you gathered that awareness as part of your research as a

20  governor's staffer.  To the extent you have independent

21  knowledge, you may answer the question.

22      MR. GEAR:  Well, the fact that he's aware of

23  legislation, what privilege are you asserting?

24      MR. MCKENZIE:  Deliberative process.

25  Because it reveals his mental impressions and what he knew



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                                            June 1, 2012

## 113

1  about other laws that may have influenced his final
2  analysis on SB 14.
3          Q. (BY MR. GEAR)  Are you refusing to answer that
4  question based on the advice of your counsel?
5          A. Yes, sir.
6          Q. Are you aware of the Georgia voter ID legislation
7  or law?
8              MR. MCKENZIE:  Same objection.
9          Q. (BY MR. GEAR)  Have you ever reviewed the Georgia
10 voter ID law?
11             MR. MCKENZIE:  Same objection.  If you did
12 it while the governor's staff, I will instruct you not to
13 answer.
14         A. I'll decline to answer on the advice of counsel.
15         Q. (BY MR. GEAR)  So in the process that you
16 described, you also said that you made recommendations
17 regarding -- regarding the summary of your bills; is that
18 correct?
19         A. Yes.
20         Q. And who the governor's office -- or who do you
21 make those recommendations to?
22         A. Well, again you make it in your memo; and then,
23 you know, whoever can access it is entitled to access it.
24         Q. (BY MR. GEAR)  And generally regarding your
25 recommendations, is there a process that you follow or is

## 114

1  there a requirement as to how you lay out that
2  recommendation?
3          A. I'm not sure I understand that.
4          Q. Generally, I'm just trying to figure out how you
5  lay out recommendations in a bill.  And I'm not referring
6  specifically to the photo ID legislation.  I'm just trying
7  to understand how you go from summarizing to making
8  recommendations.  What do you do in that process?
9          A. In addition to summarizing the bill, you're
10 analyzing what the provisions mean and what they do.
11 You're answering the questions that regard policy that
12 apply to all bills which can apply to yours, as well.  And
13 then you are taking all of that and trying to fit into
14 what the governor's philosophy is and whether he would be
15 in favor of that bill or not.
16             Now, you can be wrong.  I don't -- I can't say
17 that a hundred percent of the time I thought we'd be in
18 favor of something and it worked out that way or vice
19 versa.  But that's where you start.
20         Q. So prior to completing your summary of SB 362,
21 were you aware of the governor's position on photo ID
22 legislation?
23         A. 362 was 2009?
24         Q. Yes.
25         A. I believe so, yes.  I believe that I already knew

## 115

1  where he stood on photo ID legislation before I read the
2  text of that bill.
3          Q. And does that influence the summary that you
4  would complete --
5              (Multiple voices.)
6          A. It would influence the recommendation.  You
7  already know how he feels about it.
8          Q. (BY MR. GEAR)  Okay.
9          A. Now, that could also change if how he feels about
10 something in particular -- if the bill doesn't comport
11 with that or, you know, if he likes something in general
12 but the way that this is written, he wouldn't like, or
13 whatever that might be.
14         Q. And did you provide a recommendation to the
15 governor regarding SB 362?
16         A. I'm sure I did.
17         Q. And do you recall what that recommendation was?
18             MR. MCKENZIE:  I'm going to object on the
19 basis of deliberative process privilege.
20         A. I'll decline to answer on the advice of counsel.
21         Q. (BY MR. GEAR)  Do you know what the governor's
22 position was on SB 362?
23             MR. MCKENZIE:  Objection -- same objection.
24 You may answer to the extent it was public.  If it's
25 private and only known to governor staff, I'm going to

## 116

1  instruct you not to answer.
2          A. I don't know if it was public, so I have to
3  decline to answer on the advice of counsel.
4          Q. (BY MR. GEAR)  Did you have any communications
5  with the governor regarding your summary of SB 362?
6          A. I don't think so.
7          Q. Did you provide any advice regarding your
8  recommendation of 362 to the governor or anyone in the
9  governor's office?
10         A. You mean other than the recommendation itself
11 being advice.
12         Q. Oral advice.
13         A. I don't recall.
14         Q. So is it your position today, during this
15 deposition, that you did not consider the Indiana voter ID
16 law when drafting photo ID legislation for the State of
17 Texas?
18             MR. MCKENZIE:  It's the same deliberative
19 process objection.
20         A. I decline to answer on the advice of counsel.
21         Q. (BY MR. GEAR)  Did you consider Indiana law when
22 drafting your recommendation for the governor on Texas
23 photo ID legislation?
24             MR. MCKENZIE:  Same objection.
25         A. I decline to answer on advice of counsel.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

### 117

1    Q. (BY MR. GEAR)  And same question for Georgia law,
2   did you consider Georgia law when drafting your summary of
3   SB 362?
4          MR. MCKENZIE:  Same objection.
5    A. I decline to answer on the advice of counsel.
6    Q. (BY MR. GEAR)  Did you consider any other
7   existing laws out of state that pertain to photo ID when
8   completing your summary on SB 362?
9          MR. MCKENZIE:  I'm still going to make the
10  same objection.
11   A. I decline to answer on the advice of counsel.
12   Q. (BY MR. GEAR)  Did you compare SB 362 to the
13  previous photo ID legislation?
14         MR. MCKENZIE:  I'll make the same objection.
15   Q. (BY MR. GEAR)  And you're refusing to answer that
16  question?
17   A. Yes, sir.
18   Q. Who or what body typically drafts legislation
19  that the governor determines is a priority?
20   A. I'm sorry?
21   Q. Who or what body typically drafts legislation for
22  the governor's consideration where he would ultimately
23  determine that that would be a priority?
24   A. I'm not sure I understand the process the way you
25  do.  The legislators send their ideas to leg counsel, who

### 118

1   draft them for them, and then they file them.
2          And the governor, I guess, will -- I'm not quite
3   sure I understand the priority part.  But there is no
4   entity that drafts bills for the governor that I'm aware
5   of.
6    Q. And let me see if I can clarify that.
7          So it's the legislators that send their drafts or
8   bills to the legislative counsel, correct?
9    A. Yes.
10   Q. And that would also be true for voter ID bills or
11  voter ID legislation?
12   A. I would think so, yes.
13   Q. Do you know if any outside entity other than the
14  legislators were involved in the drafting of SB 362?
15   A. I don't know.
16   Q. Do you know if any outside entities other than
17  legislators were involved in the drafting of HB 1706?
18   A. I don't know.
19   Q. And the same question for HB 218?
20   A. I don't know.
21   Q. Have you ever heard of ALEC?
22   A. Yes.
23   Q. Do you know if ALEC was involved in recommending
24  language for SB 362?
25   A. I don't know.

### 119

1    Q. Did you have any communications with ALEC while
2   an employee of the governor's office?
3    A. No.
4    Q. Are you aware of any communications with ALEC
5   while you were an employee at the governor's office?
6    A. Am I aware of any communications between ALEC and
7   the governor's office?
8    Q. Yes.
9    A. No, I'm not.
10   Q. Did you have any substantive input regarding
11  SB 14?
12         MR. MCKENZIE:  And I'm going to object to
13  the extent that it reflects private intra-government
14  analysis.  To the extent it's public, you may answer.
15   A. I'll decline to answer on the advice of counsel.
16   Q. (BY MR. GEAR)  Were you involved in any
17  communications where the consideration of voter ID was
18  discussed as an emergency item?  Were you involved in any
19  communications where the consideration of voter ID
20  legislation was involved -- strike that.
21         Were you involved in any communications where the
22  consideration of voter ID legislation was considered as an
23  emergency item?
24   A. I don't believe so.
25   Q. Are you aware of whether or not SB 14 was

### 120

1   determined to be an emergency item?
2    A. Yes, it was.
3    Q. Do you know why SB 14 was determined to be an
4   emergency item?
5          MR. MCKENZIE:  Again, you may answer as to
6   matter of public record that you know or in a proclamation
7   or anything to that effect.  I would instruct you not to
8   answer to the extent it is not public and it is
9   intra-governor staff communications.
10   A. I'm not aware of -- of that.  And I don't recall
11  what the proclamation said, but I'm sure I saw it.
12   Q. (BY MR. GEAR)  Do you know who would be aware of
13  why SB 14 was determined to be an emergency item?
14   A. No, I don't recall being involved in the
15  emergency item discussions.  Three of the emergency items
16  were assigned to me during the session, and I don't
17  remember being involved in the discussion of making them
18  an emergency for any of them.
19   Q. And what three items did you consider as
20  emergency items?
21   A. Not that I considered, that I was assigned the
22  bills that might become emergency items.
23   Q. And what three items were you assigned that
24  became emergency items?
25   A. The voter ID bill, because I had the election law



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                                    June 1, 2012

---

### 121

1    bills; the loser pays tort reform bill, because I had
2    bills involving the judiciary; and the eminent domain
3    bill, because I had bills involving eminent domain.
4        Q. So let me understand your testimony. As you sit
5    here today, it's your testimony that you were not involved
6    in any communications with the governor or anyone in the
7    governor's office regarding the determination of making
8    SB 14 or the voter ID legislation an emergency item?
9        A. It's my testimony that I don't remember being
10   involved in any discussions or communications.
11       Q. Do you know who would assist the governor in
12   determining if voter ID is an emergency item?
13       A. I do not.
14       Q. Are you aware of any written communications in
15   the governor's office that would identify why SB 14 was
16   determined to be an emergency item?
17       A. There would be a proclamation issued by the
18   governor.
19       Q. Okay. And who, if anyone, within the governor's
20   office would assist the governor in writing that
21   proclamation?
22       A. Well, I'm not specifically certain who would
23   assist them in writing it. And it may be different from
24   bill to bill. I don't know.
25       Q. Did you assist them in drafting the proclamation?

### 122

1        A. I don't recall that. There was -- sometimes they
2    would send me something that involved my area and said,
3    "We're thinking about writing this. Is this correct?" I
4    don't remember if I got to do that with respect to the
5    emergencies, because I don't -- I don't know that they're
6    that involved in writing.
7        Q. So I want to take you back to the communications
8    regarding SB 14. Do you recall any communications between
9    the governor and his staff regarding SB 14?
10       A. Do I recall any discussions between the governor
11   and his staff?
12       Q. That's correct. Regarding SB 14.
13       A. I don't recall meeting with the governor on the
14   bill, but I wouldn't be surprised if I did. But I don't
15   recall meeting with him.
16       Q. Do you recall meeting with anyone in the
17   lieutenant governor's office regarding SB 14?
18       A. I'm virtually certain I didn't.
19       Q. Do you recall meeting with any legislators
20   regarding SB 14?
21       A. Yes.
22       Q. What legislators or which legislators did you
23   meet with?
24       A. The night before the bill was laid out in the
25   House, I went and saw Patricia Harless. I don't remember

### 123

1    if she remembers the meeting. It wasn't very long. Just
2    sort of said, "Good luck tomorrow," and chatted with her
3    for a few minutes.
4        Q. And what did you discuss?
5        MR. MCKENZIE: We're probably going to have
6    a debate about this, but we have a pending motion as to
7    whether or not communications between legislators and the
8    governor's office about pending legislation are
9    privileged. So until that gets resolved, I'm going to
10   assert the legislative privilege to protect Patricia
11   Harless's confidences.
12       MR. GEAR: Are you saying that he has a
13   legislative privilege on it?
14       MR. MCKENZIE: No. Patricia Harless has a
15   legislative privilege, but he can't disclose it without
16   busting her confidentiality.
17       Q. (BY MR. GEAR) Can you tell me when that
18   conversation took place?
19       A. I believe it was the night before the bill was to
20   be laid out. It may not have -- do you have a copy of
21   this for Senate Bill 14?
22       Q. I do.
23       (Exhibit 223 was marked.)
24       Q. (BY MR. GEAR) I'm showing you what's --
25       MR. GEAR: And I'm sorry, Counsel, I only

### 124

1    have one copy of this.
2        Q. (BY MR. GEAR) But I'm showing you what's been
3    marked as Exhibit 223 in another deposition.
4        (Witness reviews document.)
5        A. Looks like it was only considered one time. It
6    didn't go back on a point of order. If that's the case,
7    then it was in late March. And I just wandered down to
8    her office to see Colby and say hi to Patricia Harless
9    and, you know, talk with her about her big day tomorrow.
10       Q. (BY MR. GEAR) And did you discuss SB 14?
11       A. Yes.
12       Q. And who, if anyone else, was present during that
13   discussion?
14       A. I don't remember.
15       Q. Well, you just mentioned her -- one of her staff,
16   correct?
17       A. I went to see Colby. I don't -- I don't remember
18   if he went in or not. I just chatted with her for a few
19   minutes.
20       Q. Did you provide Ms. Harless with any written
21   documents or communication during your discussion?
22       A. No.
23       Q. Do you recall any communications with the
24   Secretary of State's office in your capacity as a policy
25   analyst for the governor's office and tying it into SB 14?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

### 125

1    A. I don't recall.  I spoke to them so often on all
2  manner of election bills, that I can't recall if I ever
3  spoke to them about SB 14.
4    Q. Do you recall if the Secretary of State's office
5  expressed any concerns regarding SB 14?
6    A. I don't remember.
7    Q. Do you recall if the Secretary of State's office
8  supported the provisions in SB 14?
9       MR. MCKENZIE:  I'm going to object on
10  deliberative process grounds.  We've also asserted as to
11  executive agencies that are communicating with the
12  governor's office, so I'm going to instruct the witness
13  not to answer.
14    A. In that case, I'll decline to answer on the
15  advice of counsel.
16    Q. (BY MR. GEAR)  Do you recall if there were any
17  communications with constituents regarding SB 14?
18  Constituents of the governor.
19    A. In other words, Texans?
20    Q. Yes.
21    A. There was one group that came to see me regarding
22  their entire legislative agenda and everything they were
23  hoping to pass, and I presume that they talked about
24  Senate Bill 14.  I do not recall specifically.
25    Q. And what was the name of the group that came?

### 126

1    A. They were the King Street Patriots.
2    Q. And that meeting was at the governor's office?
3    A. We had a few meetings.  There was a meeting in my
4  office -- probably a couple of meetings in my office.  And
5  I think I saw them one day down in the Capitol.  My office
6  is not in the Capitol.
7    Q. So let's just start with the first meeting that
8  you recall.  Can you tell me when that meeting took place?
9    A. It was likely before session started.  Because if
10  I recall correctly, they were coming around with a long
11  list of bills they were hoping that legislators would sign
12  off on.  And they would get somebody to introduce --
13    Q. When you say "they" -- you've identified the King
14  String Patriots, but can you tell me who "they" are?
15    A. The leader is a lady named Catherine Engelbrecht.
16  And I think she had other people with her -- one or two
17  other people, but I don't remember that.
18    Q. So from your memory, there were three, maybe
19  more, individuals from the King Street Patriots involved
20  in this first meeting?
21    A. Probably not -- my office isn't that big.  So it
22  was possibly two people or maybe three at the most.
23    Q. And as you sit here today, do you remember the
24  names of the other two individuals that were --
25    A. I don't even know for a fact that there were.

### 127

1    Q. Okay.
2    A. But, no, I don't remember any names.
3    Q. Who, if anyone, was present other than you from
4  your office?
5    A. Probably nobody.
6    Q. What was the subject matter of the communications
7  with the King Street Patriots?
8    A. As I said, they had a list of topics.  They
9  weren't bills, because they hadn't drafted any bills.  But
10  they had a list of topics that they were hoping someone
11  would support, and they were going to go down and meet
12  with legislators.  And they stopped by to show us their --
13  you know, that they were going to do this and hope that we
14  would enjoy their bills.
15    Q. Did one of the list of topics include the photo
16  ID legislation?
17    A. I don't remember.  It was a long list.  I think
18  it was probably their first time at the Capitol, and they
19  came with a very long list of things.
20    Q. You indicated this as a group that met with you
21  regarding SB 14.  Did I misunderstand your testimony?
22    A. Well, I don't remember if they -- they probably
23  did, because all of their bills were election law bills.
24  So they -- I don't remember specifically talking with them
25  about SB 14.

### 128

1    Q. What other election law bills did they discuss
2  with you?
3    A. They had -- there were numerous bills about
4  registration and about conduct of elections and -- I don't
5  remember the specifics.  It was several pages, single
6  spaced, of individual ideas they had.
7    Q. And when -- in response to the deposition notice
8  and the request for documents, did you produce any
9  communications between yourself and the King Street
10  Patriots?
11    A. No, I do not have anything.
12    Q. Did they provide you any written communication
13  during their meeting, the first meeting that you
14  discussed?
15    A. I don't recall.  They had a list.  I remember,
16  because it was pages long.  I don't remember if they gave
17  me a copy.
18    Q. And you discussed the second meeting.  Was that
19  also in your office?
20    A. I think -- I think I remember Ms. Engelbrecht
21  coming back after bills had been filed and there were
22  actual bill numbers on bills.  So I think she had a very
23  similar list -- may not have been -- they may just have
24  been similar format.  But she had another list of bills
25  with actual numbers on them and sponsors and authors.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

---

### 129

1   Q.  Was SB 14 specifically discussed during that
2   meeting?
3       A.  I don't remember.
4       Q.  Do you recall who was with Ms. Engelbrecht?
5       A.  No.
6       Q.  Do you recall if there was anyone else present
7   from the governor's office during this meeting?
8       A.  I doubt that there was.
9       Q.  Do you know how long this meeting took place?
10      A.  Oh, probably 20 minutes, half an hour.  That's
11  usually the length of most of my meetings.
12      Q.  What, if any, promises were made to
13  Ms. Engelbrecht and the King Street Patriots regarding
14  photo ID legislation?
15      A.  I don't remember much of what was said, but I can
16  tell you I didn't promise anybody anything.  From where I
17  am, I'm in no position to promise anybody that they're
18  going to pass or not pass or anything a bill.
19      Q.  Did you relay the information from these two
20  meetings to the governor?
21      A.  No.
22      MR. MCKENZIE:  I was going to object on the
23  basis of deliberative process privilege.
24      Q.  (BY MR. GEAR)  Did you consider the information
25  provided by the King Street Patriots when completing a

---

### 130

1   summary of SB 14?
2       MR. MCKENZIE:  Same objection.  To the
3   extent that it reflects your private deliberations that
4   are not public, I would instruct you not to answer.
5       A.  I'll decline to answer on the advice of counsel.
6       Q.  (BY MR. GEAR)  Do you recall any other groups
7   that you met with -- actually, strike that.
8       I believe you indicated that there may have been
9   more than just two meetings with the King Street Patriots?
10      A.  Yes.  I think I walked in on a meeting they were
11  having in the Capitol with a legislator.
12      Q.  And what legislator were they having a meeting
13  with?
14      A.  Representative Aliseda.
15      Q.  Was that Ms. Engelbrecht?
16      A.  Yes.
17      Q.  Can you tell me who else was present during that
18  meeting?
19      A.  No.  But there were several people there.
20      Q.  Several people.  Can you given me a number?
21      A.  Probably half a dozen.  I remember, because it
22  crowded his small office.
23      Q.  Were there any other legislators?
24      A.  I don't think so.
25      Q.  Was anyone from your office present during that

---

### 131

1   meeting?
2       A.  No.  I just happened by.  I just wanted to say hi
3   to Representative Aliseda.
4       Q.  Did you attend the meeting?
5       A.  For a few minutes.
6       Q.  Do you recall the subject matter of the meeting
7   with the King Street Patriots and Mr. Aliseda?
8       A.  While I was there, they were talking about an
9   English-only language.
10      Q.  As it relates to?
11      A.  I'm not sure, because I didn't participate in the
12  whole thing.  But I think that there was some talk of
13  carrying a bill regarding English only.  I don't know what
14  that really -- whether it was in schools or whether it was
15  in -- I don't -- public documents.  I don't remember.
16      Q.  Do you recall if the topic of discussion in the
17  first two meetings that you had addressed the issue of
18  English only?
19      A.  I don't know if that was one of the bills.  It
20  probably was, but I don't know.
21      Q.  Do you have an opinion as to whether or not SB 14
22  should be in English only language?
23      A.  I don't understand the question.
24      Q.  And it wasn't a very good question.
25      Do you have an opinion as to whether or not the

---

### 132

1   provisions of SB 14, when implemented, should be in
2   English only?  And let me continue to try to clarify that
3   for you.
4       The election material that pertains to the
5   requirements of SB 14, do you believe that that should be
6   in English only?
7       A.  That never even occurred to me.  Federal law
8   requires -- Texas statewide has to provide English and
9   Spanish.  And we provide Vietnamese ballots in certain
10  areas.  And I think starting this election, Korean, in, I
11  guess, Harris County.
12      Q.  Do you know if the governor has taken a position
13  on English only as it applies to SB 14?
14      A.  I don't think it's ever come up.
15      Q.  Do you know what Mr. Aliseda did in reference to
16  the discussions with the King Street Patriots?
17      A.  No.  No.
18      Q.  You testified earlier that you were involved --
19  that you actually attended some of the legislative debates
20  regarding photo ID; is that correct?
21      A.  No.  What I testified was that the only time I
22  ever attended a floor debate was for House Bill 4, the
23  tort reform bill in 2003.  Other than that, I've never
24  been on the floor -- well, this session, I was on the
25  floor of the Senate for an eminent domain bill.  But I've

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                                    June 1, 2012

## 133

1  never been on the floor for any debate regarding voter ID.
2      Q.  Were you aware that SB 14 was a controversial
3  legislation?
4          MR. MCKENZIE:  I'm going to object to the
5  extent that your awareness was gathered as part of your
6  deliberations as a governor's office official.  To the
7  extent you have an independent basis for your belief, you
8  may answer that question.
9      Q.  (BY MR. GEAR)  Well, based on what's available in
10 the public record, were you aware that SB 14 was
11 controversial?
12     A.  I know there were opponents.
13     Q.  Opponents who expressed concerns about SB 14?
14     A.  Yes.  But I'm also aware that there was a poll
15 that said 70 percent of Texans favored it, so I don't
16 consider that controversial.
17     Q.  So you did not consider SB 14 controversial
18 legislation?
19     A.  Again, that's -- you can decide what you mean by
20 "controversial."  I think there were opponents of the
21 bill, and they made their opposition known.
22     Q.  Well -- and I'm not here to testify.  So what do
23 you believe I mean when I say the term "controversial"?
24     A.  That's really open to interpretation.
25     Q.  Well, what is your interpretation of it?

## 134

1      A.  I would think that if there was a big split in
2  the public on something, it's controversial.
3      Q.  And you don't believe that there was a split in
4  the public when considering SB 14?
5      A.  I think the political class was very split on it.
6  I think the public seemed to overwhelmingly support it.
7      Q.  And when you say "the political class," what do
8  you mean by that?
9      A.  People who are involved in legislation and
10 politics.
11     Q.  And when you say "political class," are you
12 referring to Democrats and Republicans?
13     A.  Just in general.
14     Q.  Okay.  And how was the political class split when
15 considering SB 14?
16     A.  In the legislature, it was split on partisan
17 lines mostly.
18     Q.  Do you know how Democrats voted on SB 14,
19 generally?
20     A.  Only in the House.
21     Q.  Do you remember what that was?
22     A.  I remember that Representative Pickett voted
23 "yes," and he was the only Democrat who did.
24     Q.  Do you recall any of the concerns expressed by
25 opponents to SB 14?

## 135

1      A.  Do I recall concerns expressed by opponents?
2      Q.  That's correct.  Any concerns expressed by
3  opponents?
4      A.  Yes.
5      Q.  And what concerns do you recall?
6      A.  I recall opponents saying that they thought
7  elderly or poor voters wouldn't have photo IDs.
8      Q.  In your consideration or summary of SB 14, did
9  you attempt to determine whether or not SB 14 would have a
10 disproportionate impact on elderly or poor voters?
11         MR. MCKENZIE:  I'm going to object on
12 deliberative process grounds.
13     A.  I'll decline to answer on the advice of counsel.
14     Q.  (BY MR. GEAR)  Are you aware of any studies or
15 analysis that would support the position that SB 14 would
16 have a disproportionate impact on elderly or poor voters?
17         MR. MCKENZIE:  And again, to the extent you
18 gathered those analyses or reports in furtherance of your
19 duties as a governor employee, I would instruct you not to
20 answer that question.
21     A.  I don't recall any.
22     Q.  (BY MR. GEAR)  Are you aware of any independent
23 studies regarding the effect of SB 14 on poor or elderly
24 voters?
25         MR. MCKENZIE:  Same objection.

## 136

1      A.  I don't recall any.
2      Q.  (BY MR. GEAR)  Are you aware that in the state of
3  Texas, minorities are disproportionately poor to the rest
4  of the population?
5          MR. MCKENZIE:  And it's the same objection.
6      Q.  (BY MR. GEAR)  And I'm asking you, generally are
7  you aware that in the state of Texas, that minorities are
8  the population that are disproportionately poor to other
9  Texans?
10     A.  I think that's a very broad statement, and I
11 don't have statistics on the economics.
12     Q.  (BY MR. GEAR)  Did you look at any statistics on
13 the economics of -- that would break down the poverty
14 lines of elderly or the poor?
15         MR. MCKENZIE:  I'm going to object to the
16 extent that you did that as part of your deliberations as
17 a governor employee.  To the extent you just have that
18 knowledge outside of that experience, you may answer the
19 question.
20     A.  I'll decline to answer on the advice of counsel.
21     Q.  (BY MR. GEAR)  Did you deplete a summary of
22 SB 14?
23     A.  Yes.
24     Q.  And did you follow the same process in hitting
25 the button and sending that summary to an electronic file?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                          June 1, 2012

---

### 137

1     A.  Yes.
2     Q.  And is it also accurate that only certain people
3  had access to your summary?
4     A.  Yes.
5     Q.  And can you tell me who had access to that
6  summary?
7     A.  Again, my answer is the same as for the other
8  ones.  I don't know exactly who did.
9     Q.  Can you tell me the departments or divisions that
10  had access to it?
11     A.  The ones that I know are the division director of
12  BPP, where I worked, and the legislative staff.
13     Q.  So regarding SB 14, did you conduct any analysis
14  regarding the impact of SB 14 on minority voters?
15          MR. MCKENZIE:  And again, I'm beginning to
16  object on deliberative process grounds.
17     A.  I'll decline to answer on the advice of counsel.
18     Q.  (BY MR. GEAR)  Are you aware of any independent
19  study regarding voter ID legislation and the impact on
20  minority voters?  And I'm saying any independent study.
21          MR. MCKENZIE:  I understand.  But to the
22  extent that it's part of the public domain and you pulled
23  it from that domain and used it as part of your analysis
24  in recommending or not recommending a bill to the
25  governor, I would suggest or I would instruct you not to

### 138

1  answer the question.
2     Q.  (BY MR. GEAR)  And I want to be clear before you
3  assert any privilege on this.  I'm asking you, generally
4  are you, as you sit here today, aware of any analysis
5  regarding the impact of voter ID legislation on
6  minorities?
7          MR. MCKENZIE:  Right.  So there might be
8  some analyses after the fact -- after your work in the
9  governor's office.  But if it's during, I would say don't
10  answer the question.
11     A.  I don't tend to read analyses like that for, you
12  know, personal reading.  Anything that I would do in that
13  regard would have been in my duties at the governor's
14  office.  So in that respect, I would have to decline to
15  answer.  But I don't know what studies you're referring
16  to.  I don't recall any.
17     Q.  (BY MR. GEAR)  Well, and that's what I'm trying
18  to find out, did you review any studies.  I'm not trying
19  to testify for you.
20     A.  I don't recall any.
21     Q.  Okay.
22     A.  I don't know.
23     Q.  Are you aware of any studies on the public record
24  that show that there is an impact to minority voters
25  regarding SB 14?

### 139

1          MR. MCKENZIE:  And same objection.  To the
2  extent you pulled them from the public record and relied
3  upon them for analysis that you ultimately presented to
4  the governor or his staff, I would instruct you not to
5  answer.
6          MR. GEAR:  Again, I think that's a "yes" or
7  "no" answer, if he's aware of any studies on the public
8  record that address the impact of voter ID legislation on
9  minority voters.
10          MR. MCKENZIE:  No, I understand.  And I
11  understand you have to make your record.  But I still am
12  going to assert the objection, because his awareness
13  reflects his knowledge; and if he acquired that knowledge
14  as part of his deliberations for the governor's office,
15  then I think it would reflect the internal thought
16  processes of the governor's staff.  And so I object on
17  that basis.
18          But to the extent you have knowledge outside
19  of your service as a governor employee, then you may
20  answer his question.
21     A.  I don't have any knowledge of studies.
22     Q.  (BY MR. GEAR)  As you sit here today, are you
23  aware of any studies that considered the burden on
24  minority voters regarding voter ID legislation?
25          MR. MCKENZIE:  And it's the same objection.

### 140

1     A.  I don't have any personal awareness of studies.
2     Q.  (BY MR. GEAR)  Is there a public record, an
3  analysis, a report that would show that the -- there was a
4  consideration of the burden regarding voter ID legislation
5  on minority voters?
6     A.  I don't know.
7     Q.  And you didn't review anything in the public
8  record; is that correct?
9          MR. MCKENZIE:  Objection on deliberative
10  process grounds.
11     A.  I'm still not sure what you mean by "public
12  record."  We've been using this phrase since this morning,
13  and I don't know what you mean by that.
14     Q.  (BY MR. GEAR)  Well, my understanding is that
15  the -- as the case currently exists, the State of Texas --
16          MR. GEAR:  And you can correct me if I'm
17  wrong.
18     Q.  (BY MR. GEAR)  -- has been allowing deponents to
19  testify to the public report.  You prepared for the
20  deposition with your counsel.  I don't know what your
21  counsel told you about what the public record consists of.
22  I'm trying to understand what your testimony is and what
23  you know.  You're asserting a deliberative process
24  privilege over the public record, so maybe we need to
25  clarify right now what -- how are you interpreting the

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

### 141

1  term "public record"?
2      A. I literally -- I don't know what you mean when
3  you ask that. I don't know if you mean studies by the
4  government or -- I don't -- what's a -- I don't know what
5  "public record" is. I mean, a record of a case I know is
6  the file. I don't know what you mean by "the public
7  record" in general. I mean, I'm not trying to be
8  obstreperous --
9      Q. There was --
10     A. -- I really don't know.
11     Q. There was public debate on this, correct?
12     A. Yes.
13     Q. There was recorded and public hearings during the
14  debate in the House and the Senate on SB 14, correct?
15     A. Yes.
16     Q. There were exhibits that were offered during the
17  public debate on SB 14 in both the House and the Senate.
18  Are you aware of that?
19     A. I presume there were exhibits in both Houses.
20     Q. There was testimony by the Secretary of State's
21  office during the consideration of SB 14. Are you aware
22  of that?
23     A. Yes.
24     Q. And there was testimony by various citizens of
25  State of Texas regarding SB 14. Are you aware of that?

### 142

1      A. Yes.
2      Q. And are you aware of testimony by the Texas
3  Attorney General's Office recording SB 14?
4      A. Actually, I don't remember that.
5      Q. So when I reference the "public record," I'm
6  referencing testimony, documents or communications that
7  were distributed during the public debates on SB 14. Do
8  you understand that?
9      A. Yes. Now, when you asked about the studies in
10  the public record, are you saying studies that were
11  attached as exhibits to debate in the legislature?
12     Q. Studies that were used -- attached to debates,
13  used as consideration for the passage of SB 14. Does that
14  make sense?
15     MR. MCKENZIE: For the State of Texas's
16  position on public record, we're allowing witnesses to
17  testify about things that they said or things that might
18  have appeared in the public record that they talked about,
19  and to explain precisely what they meant when they said
20  that stuff on the public record. When it's stuff in the
21  public record that people may have looked at and privately
22  held in their files as a basis to offer advice, we're sill
23  asserting the objection.
24     But to the extent that you know that
25  information, you never relied on it and it's just out

### 143

1  there and you didn't rely on it as part of your
2  deliberations, then I would say answer the question. Or
3  if you don't know the answer to the question, then answer
4  that. But to the extent you know and it was something
5  that you may have pulled from the public sphere and it's
6  not publically available, what exactly you used, then I
7  would instruct you not to answer.
8      Q. (BY MR. GEAR) Your counsel used the term
9  "appeared in the public record," so I will stay with that
10  terminology when I'm asking you about the public record.
11     A. Okay.
12     Q. Do you understand?
13     So I'm asking you, are you aware of any
14  communications that appeared in the public record that
15  would show that SB 14 has a disproportionate impact on
16  minority voters?
17     MR. MCKENZIE: Same objection to the extent
18  you've got it as part of your analyses. But if not, then
19  go ahead and answer.
20     A. I'm aware that there were arguments that there
21  was a disproportionate impact. I'm not aware of studies
22  or documentation or any of that. I don't recall any of
23  that.
24     Q. (BY MR. GEAR) And you did not summarize or
25  analyze that issue; is that correct?

### 144

1      MR. MCKENZIE: Same objection, deliberative
2  process objection.
3      A. I would have to decline to answer on the advice
4  of counsel.
5      Q. (BY MR. GEAR) Are you aware of any
6  communications that appear in the public record that would
7  support that SB 14 imposed a burden on minority voters?
8      MR. MCKENZIE: And same objection. To the
9  extent that there are communications that you relied on in
10  your analysis and is not known that you relied on those, please
11  don't answer. To the extent that you know about them and
12  they were of no factor in your analysis, you're free to
13  answer.
14     Q. (BY MR. GEAR) And again, that appear in the
15  public record, as your counsel has now stated.
16     A. I recall that there was argument. I don't recall
17  the specifics of what -- what folks used to bolster their
18  argument.
19     Q. And what was the argument regarding the burden of
20  SB 14 by opponents? Do you recall that?
21     A. I recall the argument that minorities or poor
22  voters wouldn't have as much -- wouldn't be as likely to
23  have a photo ID. I don't remember if there was any
24  evidence to bolster that. And I remember talk about one
25  district where the representative thought they'd have to



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 145

1   drive a long way to get -- but I don't remember any -- you
2   know, any specifics about that.
3       Q.  During the analysis or the summary of SB 14, did
4   you consider the burden to minority voters?
5           MR. MCKENZIE:  Again, I'm going to object on
6   deliberative process grounds as to what your
7   considerations were in your analysis.
8       A.  I'm going to decline to answer on the advice of
9   counsel.
10      Q.  (BY MR. GEAR)  Are you aware of any communication
11  in the public record that would show that SB 14 does not
12  have a disproportionate impact on minority voters?
13          MR. MCKENZIE:  Same objection to the extent
14  you relied on it in your analysis and is not publically
15  known as to what you factored in your analysis --
16      Q.  (BY MR. GEAR)  And again --
17          MR. MCKENZIE:  -- and on the public record.
18      Q.  (BY MR. GEAR)  And again, I'm not asking you to
19  speak about the public record.
20          MR. MCKENZIE:  Same objection.
21      A.  I'm sorry.  Could you repeat the question?
22          MR. GEAR:  Could you read it back, please.
23          (The requested material was read.)
24      A.  I don't recall the evidence that either side used
25  to bolster their case in terms of what study they may have

## 146

1   used or whatever other exhibits they would have put into
2   the record.
3       Q.  (BY MR. GEAR)  Do you recall any evidence
4   whatsoever in -- that appeared in the public record that
5   would support that SB 14 does not impose a burden upon
6   minority voters?
7       A.  I don't recall.
8           MR. MCKENZIE:  Same objection.
9       Q.  (BY MR. GEAR)  Are you aware of any communication
10  in the public record that would support that voter fraud
11  is a widespread problem in the state of Texas?
12          MR. MCKENZIE:  Again to the extent you
13  pulled stuff from the public record and privately
14  collected it as a basis for your opinion, I would
15  encourage you not to answer it.  To the extent you have
16  public information that you did not rely on in any
17  analysis for the governor's office, you may answer the
18  question.
19      A.  And again, it's basically the same.  I remember
20  argument being made by both sides about that issue.  I
21  don't remember what studies they proffered or other
22  exhibits that they attached or anything like that.
23      Q.  (BY MR. GEAR)  Did the governor's office, you or
24  anyone in the governor's office, including the governor,
25  consider issues of voter fraud when summarizing or

## 147

1   considering SB 14?
2           MR. MCKENZIE:  Objection.  To the extent
3   it's not public, you may answer.  To the extent there's a
4   public statement by the governor that you're aware of
5   about voter fraud, but to the extent that it's a private
6   intra-governor staff communication, I would instruct you
7   not to answer.
8       A.  I decline to answer on advice of counsel.
9       Q.  (BY MR. GEAR)  Are you familiar with what the
10  term "voter fraud" means in the state of Texas?
11      A.  It would be good if we put a definition on it.
12  You know, there are, I guess, multiple things that can all
13  go under that heading.
14      Q.  Sure.  And can you tell me what voter fraud is as
15  defined in the State of Texas election code?
16      A.  In the code?  I do not recall the exact wording
17  in the election code.
18      Q.  Do you recall it being defined anywhere in Texas
19  law?
20      A.  I do not recall the definition of "voter fraud"
21  in Texas law.
22      Q.  Just generally, what do you understand "voter
23  fraud" to mean when referring it to elections in the State
24  of Texas?
25      A.  I refer to it as intentionally either voting when

## 148

1   someone isn't entitled to or voting for someone who's
2   dead, or voting multiple times, or voting in any way that
3   you know is illegal or erasing votes or changing totals,
4   or anything that skews the results from what the actual
5   voters that are entitled to vote, voted on election day
6   and, in our case, in Texas, the days leading up to
7   election day when we allow voting.
8       Q.  Does your definition include voter impersonation?
9       A.  "Voter impersonation" is also a phrase that's
10  been -- just sort of popped up.  And I think different
11  people mean different things when they say it.  Some
12  people mean something very narrow, where they mean just
13  pretending to be Mike Schofield and going to vote.  Other
14  folks would include that to mean voting for somebody other
15  yourself, whether it's a made-up person that you submitted
16  a phony application for or somebody you know who is dead
17  or somebody you know isn't voting.  It depends on what you
18  mean when you're saying "voter impersonation."
19      Q.  Well, what do you mean when you --
20      A.  I mean all those things.  To me, voter
21  impersonation -- although during the debate, we kept
22  hearing people refer to "voter impersonation" and they
23  seemed to only mean me pretending to be you, as opposed
24  to, you know, me filing a bunch of applications for people
25  that don't exist and then voting them all.  They didn't

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

---

### 149

1   seem to mean that when they say "voter impersonation."
2   But I'm not sure everything meant the same thing when they
3   used the phrase.
4      Q. (BY MR. GEAR) Did you consider voter fraud
5   during your summary of SB 14?
6      MR. MCKENZIE: Same deliberative process
7   objection.
8      A. I'll decline to answer on advice of counsel.
9      Q. (BY MR. GEAR) Did you consider voter
10  impersonation during your summary of SB 14?
11     MR. MCKENZIE: Same deliberative process
12  objection.
13     A. I'll decline to answer on the advice of counsel.
14     Q. (BY MR. GEAR) Do you know what the purpose of
15  SB 14 is?
16     MR. MCKENZIE: You may answer as to general
17  purpose. Please do not reveal any governor-specific
18  purpose.
19     A. And I don't know what Senator Frasier's purpose
20  was in filing the bill.
21     Q. (BY MR. GEAR) Does SB 14 address the issue of
22  voter fraud?
23     A. I would say it does, in that it requires a voter
24  to demonstrate the -- their identity. So we know that the
25  person who is claiming to vote as John Smith is John

---

### 150

1   Smith.
2      Q. So does it address the issue of voter
3   impersonation?
4      A. It does probably in all the broad senses that
5   I've talked about.
6      Q. Other than voter impersonation -- again I want to
7   be clear on how you're defining "voter impersonation," so
8   if you wouldn't mind explaining that to me again.
9      A. As I understand the bill, the voter impersonation
10  that is dealt with there is showing up at the polls either
11  in early voting or on election day and voting as someone
12  that you're not, whether it's a real person that you're
13  voting as or whether it's a person who doesn't exist that
14  you've registered to vote or whether it's somebody who's
15  dead or in any way. It would be more difficult to do that
16  if you had to show a photo ID because you're less likely
17  to have a photo ID for that person than you are for
18  yourself.
19     Q. And other than voter impersonation as you just
20  defined it here, does SB 14 address any of the other
21  issues of voter fraud that you testified to?
22     A. I think that is mostly what I testified to.
23     Q. Well, by mail ballot voter fraud. For instance,
24  does voter ID -- does SB 14 address the issue by mail
25  ballot voter fraud?

---

### 151

1      A. To my knowledge, the bill wasn't addressed to
2   mail ballots. It was addressed to voting in person and
3   polling places.
4      Q. Did you consider the prevalence of voter
5   impersonation when summarizing SB 14?
6      MR. MCKENZIE: Again, same deliberative
7   process objection.
8      A. I'll decline to answer on the advice of counsel.
9      Q. (BY MR. GEAR) Can you identify, as you sit here
10  today, any cases of voter impersonation in the State of
11  Texas?
12     MR. MCKENZIE: Again to the extent you
13  acquired that knowledge of what you may or may not be able
14  to identify in furtherance of your duties as a governor
15  employee, I instruct you not to answer. To the extent
16  that you have knowledge independent of your service as a
17  governor employee, please answer the question.
18     A. I don't have firsthand independent knowledge.
19     Q. (BY MR. GEAR) Of any cases of voter
20  impersonation in the State of Texas?
21     A. Yes. I don't spend much time inside the polling
22  places on election day.
23     Q. When you say you don't have firsthand knowledge,
24  I'm asking you in your capacity as an employee of the
25  governor's office during the consideration of SB 14, did

---

### 152

1   you consider voter impersonation in your summary of SB 14?
2      MR. MCKENZIE: And I'm going to object on
3   deliberative process grounds.
4      A. I'll decline to answer on the advice of counsel.
5      Q. (BY MR. GEAR) Are you aware of any studies or
6   analysis on the public record that support that voter
7   impersonation is a problem in the State of Texas?
8      MR. MCKENZIE: Same deliberative process
9   objection.
10     A. I'll decline to answer on the advice of counsel.
11     Q. (BY MR. GEAR) And. Again, I'm asking you are
12  there -- is there any public record as it's been
13  identified here that would identify that voter
14  impersonation is a problem, exists, in the State of Texas?
15     MR. MCKENZIE: And again, it's the same
16  objection to the extent that you collected documents that
17  you would have to reveal in answering that question as
18  part of your service to the governor. To the extent you
19  have knowledge outside of that about any analyses that are
20  in the public record or they didn't factor into your
21  analysis, then you can answer the question.
22     Q. (BY MR. GEAR) Before you answer that, again, I
23  want to make it clear that I'm asking is there a public
24  record that you're aware of, a record that appears in the
25  public. I'm not asking you about private communications.

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

| 153 | 155 |
|---|---|

**153**

1  I'm not asking you about private records. I'm asking you
2  about what appears in the public.
3      Are you aware, whether you were employed by the
4  governor or not, is there any communication on the public
5  record that exists that supports that voter impersonation
6  is a problem in the State of Texas?
7      MR. MCKENZIE:  And the reason why I'm making
8  the objection is because the public record is very large.
9  Potentially, it could include news articles, it could
10  include statements on the floor, it could include
11  exhibits. It's not at all clear to me from the testimony
12  or the witness today that he relied on all of it. And so
13  to the extent there is a subset of that that he would have
14  to reveal, I think that it would reflect his internal
15  mental impressions and some the advice that he may have
16  given to the governor. So on that basis, I object on
17  deliberative process grounds.
18      To the extent that my assumptions are
19  incorrect and that it wasn't part of your services to the
20  governor or that you are aware of the entire universe of
21  public record, you may answer the question. But based on
22  my understanding of what you probably understood, I'm
23  asserting the deliberative process on your behalf as I've
24  been instructed by you and your office.
25      THE WITNESS:  I don't usually ask for a

**154**

1  break while a question is pending, but I think -- I think
2  it make be helpful to clear this up so I can figure out
3  what it is that's -- so I can answer without waiving a
4  privilege, if I can -- if I can discuss this with counsel
5  for about half a minute.  If you don't want me to while a
6  question's pending, I understand.
7      MR. GEAR:  I think in this situation, I'd
8  like you to answer that question.
9      THE WITNESS:  Okay.
10     Q.  (BY MR. GEAR)  Are you aware of the existence of
11  any public record that supports that voter impersonation
12  is a problem in the State of Texas?
13     A.  And, again --
14     MR. MCKENZIE:  Same objection, but go ahead
15  and say what you were going to say.
16     A.  I don't know what you mean by "a problem." I've
17  seen articles and I've seen other things that indicate
18  that there have been problems. There have been problems
19  with voter registration which, of course, leads to voting
20  the ill-gotten registrations, and I've seen other things.
21  As I sit here today, I don't remember what -- what
22  documents or what articles I've seen. But, yes, I have
23  seen some and, yes, we were concerned about voter fraud in
24  the State of Texas.
25     Q.  (BY MR. GEAR)  And when you say "we," you mean

**155**

1  the governor's office?
2      A.  Yes.
3      Q.  And when you say you saw studies for analysis
4  about voter registration, do you recall what you saw?
5      MR. MCKENZIE:  Again, I'm going to object on
6  the deliberative process grounds to the extent you saw
7  that stuff in furtherance of your duties as a governor
8  employee.
9      A.  In that case, I'll decline to answer on the
10  advice of counsel.
11     Q.  (BY MR. GEAR)  Okay.  And, again, I want to make
12  sure that I'm limiting this to the public record. Can you
13  tell me what communications, studies, analysis that you're
14  aware of that you actually reviewed that support that
15  voter ID is a problem.  And you were concerned about the
16  term "problem."  Problem that is documented, that it
17  exists, that there is actual documented knowledge of voter
18  impersonation.
19     MR. MCKENZIE:  And it's the same objection,
20  because the question asks what you reviewed. And unless
21  you reviewed everything in the public record that had
22  anything to do with voter fraud, it may reveal a subset of
23  information that you relied upon as being more probative
24  or less probative of voter fraud and may have influenced
25  your decision as to what recommendation you were going to

**156**

1  make to the governor.
2      Q.  (BY MR. GEAR)  And let me clarify my question.
3      I'm not asking you if you reviewed everything in
4  the public record.  I'm asking you if you reviewed
5  anything that appeared in the public record.
6      MR. MCKENZIE:  You may answer a "yes" or
7  "no" question if you reviewed anything in the public
8  record.
9      A.  Yes.
10     Q.  (BY MR. GEAR)  And can you tell me what that was?
11     MR. MCKENZIE:  I'm going to object on
12  deliberative process grounds as to what you reviewed.
13     A.  As we sit here today, I can't remember the
14  specifics of different articles or anything like that. I
15  just can't recall.
16     Q.  (BY MR. GEAR)  Now, you stated that the
17  governor's office was concerned about voter fraud. What
18  is the basis of that concern?
19     MR. MCKENZIE:  Again, to the extent it
20  reveals internal intra-governor communications and
21  deliberations, I'm going to instruct you not to answer
22  that question. To the extent it's a matter of public
23  record and the governor's talked about and you know that
24  he's talked about it, you may answer the question.
25     A.  I'm not sure what he talked publically, so I'll



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                          June 1, 2012

---

### 157

1    decline to answer on the advice of counsel.

2    Q. (BY MR. GEAR)  I'm not sure I understood the

3    preface to your assertion.

4    A. There was sort of two parts to what he was

5    saying, you know, other than what the governor has said

6    publically.  And to be honest with you, I don't know what

7    the governor said publically or don't recall.  And so with

8    respect to our intra-governor's office communications and

9    discussions, I would assert the privilege and decline to

10   answer on advice of counsel.

11    Q. Did the governor's office, you or anyone in the

12   governor's office, generate any communication regarding

13   voter fraud in the State of Texas?

14    MR. MCKENZIE:  Again, I'm going to object on

15   deliberative process grounds unless that communication was

16   sent to the public in the form of a press release or

17   something to that effect.  To the extent it's

18   intra-governor office communications about voter fraud,

19   I'm going to instruct you not to answer that question.

20    A. And I don't know what was -- I don't remember

21   what was publically issued from the governor's office

22   regarding voter fraud.

23    Q. (BY MR. GEAR)  Did the governor's office meet

24   with the Texas Attorney General regarding voter fraud?

25    MR. MCKENZIE:  I'm going to object on

---

### 158

1    attorney-client privilege grounds and on deliberative

2   process privilege grounds to the extent that you had

3   communications with the Attorney General's Office that

4   were legal in character about voter ID -- or voter fraud,

5   I should say.  Voter ID is a broad question that I'm

6   allowing you to answer.  But voter fraud specifically --

7   sorry.

8    Voter ID is a broad question that I'm

9   allowing you to answer.  Voter fraud is more specific.

10   And on that basis, because it could reveal more about the

11   subject matter of confidential communications between you

12   and an attorney or you and the other staff in the

13   governor's office, I'm going to instruct you not to answer

14   that question.

15    A. I don't recall any names.

16    Q. (BY MR. GEAR)  Are you aware of any documented

17   cases of voter impersonation in the State of Texas?

18    MR. MCKENZIE:  Same objection to the extent

19   that you acquired that knowledge in service of the

20   governor.

21    A. I don't recall specific instances.  I know

22   Representative Aliseda prosecuted some, but I don't know

23   specific cases.

24    Q. (BY MR. GEAR)  Do you know what the subject

25   matter of those prosecutions are?

---

### 159

1    A. I do not recall.

2    Q. Do you know if they involved voter impersonation?

3    A. I don't recall.

4    Q. Do you know if they involved voter fraud, in

5   general?

6    A. In general, yes.

7    Q. Have you ever reviewed any communications

8   regarding those prosecutions?

9    MR. MCKENZIE:  To the extent you reviewed

10   them in service of the governor, I will instruct you not

11   to answer.  To the extent you know that information

12   independent of that service, you may answer the question.

13    A. I'm sorry.  Could you say that again?

14    (The requested material was read.)

15    A. I believe Representative Aliseda spoke about

16   them.  Other than that, I don't have any knowledge.

17    Q. (BY MR. GEAR)  And when you say "spoke about

18   them," it appears in the public record?

19    A. I believe so.  I can't swear to that.  I think he

20   talked about them on the House floor.

21    Q. Do you recall what the subject matter of the

22   public record -- what it would reflect?

23    A. I believe it would have been in the debate on

24   this bill.

25    Q. But you don't recall the subject matter of what

---

### 160

1    he spoke about on the House floor?

2    A. He mentioned having prosecuted those cases and --

3   whether or not he discussed them in depth and talked about

4   the specific cases, I do not recall.

5    Q. Okay.  So in 2005, were you aware of any

6   documented cases of voter impersonation?

7    MR. MCKENZIE:  To the extent you acquired

8   that knowledge in furtherance of your service to the

9   governor, I would instruct you not to answer.  To the

10   extent you have no knowledge or you have independent

11   knowledge, you may answer the question.

12    A. Honestly, I don't recall from 2005.

13    Q. (BY MR. GEAR)  2007, were you aware of any

14   documented cases of voter impersonation?

15    MR. MCKENZIE:  Same objection.

16    A. I don't recall specific cases.

17    Q. (BY MR. GEAR)  Regarding 2005, 2007, 2009 or

18   2011 --

19    MR. MCKENZIE:  Same objection.

20    Q. (BY MR. GEAR)  -- would that be fair to say?

21    MR. MCKENZIE:  Pardon me.  I didn't mean to

22   speak over you.

23    Same objection.

24    A. I do not have documented -- knowledge of

25   documented specific cases.

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                                June 1, 2012

---

161

1   Q. (BY MR. GEAR) And I'm just trying to understand
2   your testimony --
3   A. That I recall.
4   Q. I'm just trying to understand your testimony
5   as far as I can regarding the concern of voter fraud in
6   the governor's office. Is there anything on the public
7   record that would identify what the basis of the concern
8   was that the governor had regarding voter fraud?
9        MR. MCKENZIE: Same deliberative process
10  objection.
11  A. I'll decline to answer on advice of counsel.
12  Q. (BY MR. GEAR) On the public record, something
13  that appeared in the public record?
14       MR. MCKENZIE: No, I understand. Same
15  objection. I'm not going to -- well, I will explain it
16  again -- just because the public record is big and what he
17  considers a part of it is small and I think that that
18  subset of information and him defining it would reveal
19  confidential deliberations at the governor's office. So
20  on that basis, I instruct the witness not to answer.
21  Q. (BY MR. GEAR) When you summarized SB 14, did you
22  consider the purpose of the bill?
23       MR. MCKENZIE: Same objection.
24  A. I'll decline to answer on the advice of counsel.
25  Q. (BY MR. GEAR) What is the purpose of SB 14?

---

162

1        MR. MCKENZIE: You may answer as to general
2   purpose. Please don't reveal internal subjective purposes
3   that the governor's office has.
4   A. I don't know Senator Frasier's purpose
5   specifically behind why he filed SB 14.
6   Q. (BY MR. GEAR) Do you know if the purpose of
7   SB 14, in part, was to deny undocumented or illegal aliens
8   from voting?
9        MR. MCKENZIE: Same objection as to the
10  internal governor purpose. You may answer as to general
11  purpose.
12  A. I don't recall that as a purpose, But I don't
13  remember the entire debate.
14  Q. (BY MR. GEAR) Do you recall during the -- well,
15  let me say that differently.
16       Do you recall any debate that appears in the
17  public record expressing a concern that undocumented or
18  illegal aliens are voting?
19  A. I don't recall it. That doesn't mean it wasn't
20  mentioned in the debate.
21  Q. Did you communicate with Senator Frasier's office
22  about the emergency designation of SB 14?
23  A. No.
24  Q. Were you present during any communications that
25  the governor may have had regarding SB 14 as an emergency

---

163

1   designation?
2   A. I don't believe so, no.
3   Q. Can you describe the basic provisions of SB 14?
4   A. The bill requires a voter who's showing up in
5   person at a polling place to provide one of seven forms of
6   photo ID. Failing that, the voter can vote provisionally
7   and provide the necessary documentation within six days.
8   The bill requires that training in this new provision
9   would be made to poll workers and people who were involved
10  in the election. It requires signage and other
11  notification to people. I guess those are the basic
12  provisions.
13  Q. Now, based on your prior testimony during the
14  deposition, you indicated that you were involved in the
15  summary of SB 362. Is that accurate?
16  A. You mean did I draft an analysis in the
17  governor's office on SB 362?
18  Q. You completed a summary of SB 362. Is that --
19  A. As part of the analysis, yes.
20  Q. Okay. Do you know why SB 14 removed some of the
21  allowable forms of ID from SB 362, what's the difference
22  between the two?
23  A. Do I know why, or do I know what's the
24  difference?
25  Q. Let me ask that question again.

---

164

1        You had an opportunity to review SB 14; is that
2   correct?
3   A. I didn't review it today, no.
4   Q. I think we marked that as --
5   A. What I have is the -- maybe it's my fault I took
6   you out of order. But we have the legislative history of
7   it.
8   Q. Not a problem.
9        (Discussion off the written record.)
10       MR. MCKENZIE: Would now be a good time to
11  take a break?
12       MR. GEAR: Sure. We can take a break.
13       (Break.)
14       (Exhibit 5 was marked.)
15  Q. (BY MR. GEAR) So I'm handing you what's been
16  previously marked as Exhibit No. 5. Before we went off
17  the record, we were talking about SB 14, and you
18  graciously reminded me that we had not reviewed the actual
19  bill.
20       Can you take a second and look at that? And then
21  we can have a conversation.
22  A. Certainly.
23       (Witness reviews document.)
24  Q. (BY MR. GEAR) Have you had a chance to review
25  Exhibit No. 5?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                                     June 1, 2012

---

165

1     A. Voter impersonation.
2     Q. Okay. And can you identify what that is?
3     A. Yes. This is Senate Bill 14 from the 2011
4  legislative session.
5     Q. And do you see that this is the signed version of
6  it?
7     A. It is.
8     Q. So that means that this would be the filed
9  version of Senate Bill 14?
10    A. No, this is the version that finally passed.
11    Q. Okay. And you see that the signature of
12 Governor Perry is on this version?
13    A. Yes.
14    Q. Can you tell me what -- the purpose of removing
15 from Senate Bill 14 the option for a voter to show
16 nonphoto identification? What's the purpose of removing
17 that? And you can compare SB 362, if you need to.
18       MR. MCKENZIE: And I'm going to instruct you
19 to answer as to general legislative purpose, but please do
20 not answer as to internal governor office purposes that
21 may or may not have existed.
22    A. I don't recall being involved in discussions
23 regarding removal of the -- of the one provision and the
24 insertion of the other.
25    Q. (BY MR. GEAR) Do you know who made that

---

166

1  decision?
2     A. No.
3     Q. Do you know who would have been responsible for
4  making that decision?
5     A. I don't. I assume the author, but I don't know.
6     Q. And the author that you're referencing is Senator
7  Frasier?
8     A. Yes. But again, I don't know that he -- you
9  know, I don't know how that decision came about.
10    Q. Are you aware of what the basis of the change for
11 removing nonphoto ID was -- strike that.
12       Are you aware of what occurred between 2009 and
13 2011 that would necessitate the change of removing
14 nonphoto ID from voter ID legislation?
15    A. I don't know what the author considered in
16 deciding how to file his bill.
17    Q. Do you know what the intent of removing nonphoto
18 ID was --
19       MR. MCKENZIE: And --
20    Q. (BY MR. GEAR)  -- from SB 14?
21       MR. MCKENZIE: Sorry. I apologize. I
22 didn't mean to speak over the question.
23       Please just answer as to public purpose that
24 you may know. Do not reveal any intra-legislature -- I
25 mean -- sorry, any intra-governor communications or

---

167

1  private purposes the governor may or may not have had.
2     A. I don't know what the Senator's decision was
3  based on.
4     Q. (BY MR. GEAR) Are you aware of any communication
5  that appears on the public record that would evidence that
6  two forms of nonphoto ID were no longer enough to verify
7  the identification of a voter in the State of Texas?
8        MR. MCKENZIE: Same objection to the extent
9  it fields private governor deliberations. To the extent
10 it doesn't, you may answer.
11    Q. (BY MR. GEAR) Again, I'm asking you about the
12 public record. Are you aware of any communications in the
13 public record that would support that nonphoto ID was --
14    A. I don't recall any public record on that.
15    Q. Are you aware of what the purpose for not
16 allowing nonphoto identification in SB 14 is?
17       MR. MCKENZIE: Same. Deliberative process
18 privilege objection. To the extent of the public purpose
19 that you know of, you may speak to that.
20       MR. GEAR: And for the purpose of creating a
21 privilege log, I think that's a "yes" or "no" answer, are
22 you aware of the purpose. I haven't asked him about what
23 the substance of that awareness may be. I'm just asking
24 him if he's aware of the purpose.
25    A. I don't recall the author -- I certainly never

---

168

1  discussed with the author the purpose of drafting the bill
2  the way it was drafted. It's different from the bill he
3  filed the session before.
4     Q. (BY MR. GEAR) Did you consider the removal of
5  nonphoto ID when summarizing or conducting an analysis of
6  SB 14?
7        MR. MCKENZIE: Objection on deliberative
8  process grounds. I instruct you not to answer.
9     A. I'm going to decline to answer on the advice of
10 counsel.
11    Q. (BY MR. GEAR) Let me see if I can ask this
12 question. What changed between 2009 and 2011 that made
13 the allowable forms of ID under SB 362 no longer
14 sufficient under SB 14?
15       MR. MCKENZIE: Again, I'm going to instruct
16 on the same grounds to the extent it reveals deliberations
17 from the governor's office. To the extent that it
18 doesn't, you may answer the question.
19    A. A lot of legislative work on bills between
20 sessions. And, you know, whether there was anything in
21 the work they did between sessions that made them decide
22 they'd rather do it this way, I don't recall.
23    Q. (BY MR. GEAR) Are you aware of any communication
24 between the governor and his staff regarding
25 considerations of what would be allowable forms of ID

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

### 169

1    pursuant to SB 14?
2         MR. MCKENZIE:  And again, I'm going to
3    object on deliberative process grounds as to the contents
4    of communications among the governor's staff.
5         A.  I'll decline to answer on the advice of counsel.
6         Q.  (BY MR. GEAR)  Are you aware of any
7    communications with the Secretary of State's office
8    between the governor's office -- you or anyone in the
9    governor's office and the Secretary of State's office
10   regarding allowable forms of ID?
11        MR. MCKENZIE:  Same objection to the extent
12   it reveals deliberations of the executive branch of Texas.
13   To the extent it doesn't, you may answer the question.
14        A.  I'll decline to answer on the advice of counsel.
15        Q.  (BY MR. GEAR)  Are you aware of any
16   communications from the governor's office that you were
17   present with the Department of -- or DPS regarding
18   allowable forms of ID?
19        MR. MCKENZIE:  Same objection.
20        A.  I'll decline to answer on the advice of counsel.
21        Q.  (BY MR. GEAR)  How would allowing a nonphoto ID
22   enhance the integrity of the ballot box in the State of
23   Texas?
24        A.  How would allowing a nonphoto ID enhance the
25   integrity compared to a photo ID?

---

### 170

1         Q.  Strike that question.
2              How would allowing a nonphoto ID -- strike that
3    question.
4              Are you aware that the Indiana photo ID law
5    allows for additional forms of nonphoto -- are you
6    aware -- I'm sorry.  Strike that.  I'll take a drink of
7    water.
8              Are you aware that the Indiana law allows for
9    nonphoto ID?
10        MR. MCKENZIE:  I'm going to object to the
11   extent you acquired that awareness in furtherance of your
12   duties as an analyst for the governor.  To the extent you
13   have any independent knowledge that doesn't derive from
14   your experience with the governor's office, you may answer
15   the question.
16        A.  I'll decline to answer on the advice of counsel.
17        Q.  (BY MR. GEAR)  Are you aware that the Indiana law
18   allows -- and I'm referencing their photo ID law -- allows
19   for more allowable forms of ID than the SB 14?
20        MR. MCKENZIE:  Same objection.
21        A.  I decline to answer on the advice of counsel.
22        Q.  (BY MR. GEAR)  Are you aware that the Georgia law
23   allows for more allowable forms of ID than the -- than SB
24   14 in the State of Texas?
25        MR. MCKENZIE:  Same objection.

---

### 171

1         A.  I decline to answer on advice of counsel.
2         Q.  (BY MR. GEAR)  During your analysis or summary of
3    SB 14, did you consider either Indiana or Georgia law and
4    the allowable forms of ID that they would allow under
5    their laws?
6         MR. MCKENZIE:  Same objection.
7         A.  I decline to answer on the advice of counsel.
8         Q.  (BY MR. GEAR)  What's the purpose of removing
9    from SB 14 the option for a voter to show a valid employee
10   ID, as did SB 362?
11        MR. MCKENZIE:  Again you may answer as to
12   publically stated purposes.  Please don't reveal the
13   private purposes of the governor's office.
14        A.  I don't know any publically stated purpose.
15        Q.  (BY MR. GEAR)  Are you aware of any privately
16   stated purpose?
17        MR. MCKENZIE:  You can answer "yes" or "no"
18   if you're aware.
19        A.  I don't recall specific policy.  I remember my
20   reaction to it.  But it was, you know, for the purpose of
21   doing my analysis.
22        Q.  (BY MR. GEAR)  Okay.  What was your reaction to
23   it?
24        MR. MCKENZIE:  I'm going to object on the
25   grounds of deliberative process privilege.

---

### 172

1         A.  I'll decline to answer on the advice of counsel.
2         Q.  (BY MR. GEAR)  Do you know who would have made
3    that decision?
4         A.  No.
5         Q.  Are you aware of any communications regarding
6    that decision?
7         A.  I don't remember any.
8         Q.  Do you know what the circumstances by which the
9    license to carry a concealed handgun were included in
10   SB 14?
11        A.  No.
12        Q.  Do you know the racial composition of license to
13   carry concealed handgun holders is in the State of Texas?
14        A.  No.
15        MR. MCKENZIE:  I was going to object to
16   extent that you acquired that knowledge on the basis of
17   serving the governor's office.  But you've already
18   answered, so that's fine.
19        Q.  (BY MR. GEAR)  Are you aware that the individuals
20   in the State of Texas who carry a concealed handgun
21   license are disproportionately white?
22        MR. MCKENZIE:  I'm going to object to the
23   extent you acquired any awareness of that fact during your
24   service at the governor's office.  To the extent you have
25   awareness of that outside your service of the governor's

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

173

1    office, you may answer the question.
2        A. I'm not aware of any such thing.
3        Q. (BY MR. GEAR) Did you, in your function of
4    creating -- of completing an analysis or a summary of
5    SB 14 consider the demographics of individuals who may
6    hold a concealed handgun license?
7            MR. MCKENZIE: And I'm going to object on
8    the grounds of deliberative process privilege as to what
9    you considered in your analysis.
10       A. I'll decline to answer on the advice of counsel.
11       Q. (BY MR. GEAR) Were you present during any
12   communications while working in the governor's office
13   where legislators were present and discussed their opinion
14   as to whether or not individuals in the State of Texas who
15   carry a concealed handgun license were disproportionately
16   white?
17       A. No.
18       Q. Do you recall any public debate? So is there
19   anything that appears in the public record that would
20   support that individuals who carry a handgun license in
21   the State of Texas are disproportionately white?
22       A. I don't recall that, no.
23       Q. Are you aware or do you know why student IDs were
24   removed from consideration of 362 during the passage of
25   SB 14?

---

174

1            MR. MCKENZIE: Object. To the extent you
2    acquired that knowledge during your service to the
3    governor's office in furtherance of those duties, I'd ask
4    you not to answer. To the extent you know outside of your
5    service to the governor's office, you may answer.
6        A. I don't know. And, you know, 362 and 14 were
7    different bills. I don't really consider it removing from
8    one to the other. You know, Senate Bill 14 was filed as a
9    new bill. I understand what you're saying, in that there
10   was a bill that was similar in a previous session; but
11   generally folks work on deals between sessions, and
12   they'll come back a little different.
13       Q. (BY MR. GEAR) Fair enough.
14           Student IDs were considered in HB 218, correct?
15       A. I think that is correct.
16       Q. Student IDs were considered in SB 362?
17       A. I'm not certain.
18       Q. And that would have been the 2009 -- you can
19   review the exhibit.
20       A. Student ID was included in 218, House Bill 218.
21   And I'm sorry, what was your next question?
22       Q. 362, same question. And you might as well look
23   at HB 1706, as well.
24           (Witness reviews document.)
25       Q. (BY MR. GEAR) Did you have an opportunity to

---

175

1    review it?
2        A. I don't see it in Senate Bill 362, which just may
3    mean that I'm missing it.
4        Q. Well, let me turn your attention to HB 1706,
5    Exhibit 44. Do you see that it is included in the 2005
6    version of photo ID legislation? And I turn your
7    attention to Page 3.
8        A. Again, this is a bill by a different author in a
9    different session. I don't necessarily think it's a
10   continuation of the same bill.
11       Q. Do you see that it was considered in 2005?
12       A. The student identification card issued by a
13   public or private institution was included amongst the ID
14   in House Bill 1706.
15       Q. Do you know why it was not considered in SB 14?
16           MR. MCKENZIE: And again, please don't
17   reveal any intra-governor communications. To the extent
18   you have knowledge outside of your service to the
19   governor's office, you may answer the question.
20       A. I don't remember who removed it or why or...
21       Q. (BY MR. GEAR) Were you involved in any
22   communications where the consideration to remove student
23   IDs was discussed?
24           MR. MCKENZIE: Same objection. To the
25   extent it reveals information you obtained at the

---

176

1    governor's office, I'm going to ask you not to answer the
2    question.
3        A. I'll decline to answer on the advice of counsel.
4        Q. (BY MR. GEAR) Did you conduct any research on
5    the removal of nonphoto ID from consideration on SB 14?
6            MR. MCKENZIE: Same objection on
7    deliberative process grounds as to what research you did.
8        A. I don't recall doing any research, but I also
9    don't recall if the bill as filed had that in it or not.
10       Q. (BY MR. GEAR) Are you aware of anything that
11   changed between 2009 and 2011 that would have made the
12   identification -- student identification less reliable
13   at -- while voting?
14           MR. MCKENZIE: Again, I would ask you not to
15   answer that question to the extent you acquired knowledge
16   as to the reliability of student IDs in the course of your
17   service as an employee of the governor. To the extent you
18   have independent knowledge, you may answer the question.
19       A. I don't have any independent knowledge. I don't
20   recall.
21       Q. (BY MR. GEAR) Were you involved in any
22   communications where the concern was expressed that
23   removing student IDs from consideration in SB 14 would
24   have a disproportionate impact on minority voters?
25           MR. MCKENZIE: To the extent those

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

177

1    communications were in the governor's office or among
2    governor staff, I'm going to instruct you not to answer
3    that question.
4            MR. GEAR:  And the question is, were you
5    involved in any communications.
6            MR. MCKENZIE:  Yes.  And I'm still going to
7    lodge the objection.
8       A.  I don't recall any communications.
9       Q.  (BY MR. GEAR)  Do you recall any communications
10   that appear in the public record where the concern was
11   expressed that the removal of student IDs from SB 14 would
12   have a disproportionate impact on minority voters?
13           MR. MCKENZIE:  Same objection to the extent
14   that you pulled information from the public record and
15   relied on it in your analysis.
16      A.  And, again, I don't agree with the
17   characterization of removing it from Senate Bill 14.  It
18   was never in Senate Bill 14.  I'm not sure that it was
19   ever removed from the bill.
20      Q.  (BY MR. GEAR)  Are you familiar with the current
21   law in the State of Texas regarding allowable forms of ID?
22      A.  I am familiar, but I don't know all of them.  I
23   have to look it up myself whenever I have to look at it.
24      Q.  Can you describe for me what's allowed under the
25   current law regarding photo ID?

---

178

1       A.  I can't, because I always look it up myself.
2       Q.  Does it allow for nonphoto ID?
3       A.  Yes.  Most voters vote with their voter
4    registration certificate.
5       Q.  Okay.  So the current law allows for a voter to
6    use a voter registration certificate, correct?
7       A.  Yes.
8       Q.  And that's a nonphoto ID?
9       A.  Yes.
10      Q.  And the current law allows for voters to use
11   forms of utility bills that display their
12   identification --
13      A.  Yes.
14      Q.  -- and their address, correct?
15      A.  That the local legislature was seeking to change
16   by passing this bill.
17      Q.  Okay.  And the current law as we're discussing it
18   would thereby allow a voter to use a student ID.  Would
19   you agree with that?
20      A.  I don't remember.  As I said, I look it up every
21   time I have to deal with it.  There's a lot of different
22   forms of ID currently.
23      Q.  How did the exception for individuals with
24   disabilities come to be included in SB 14?
25           MR. MCKENZIE:  Please don't reveal any

---

179

1    communications between the governor and staff or
2    legislative communications, to extent they're not public.
3       A.  I don't remember.  I think it was an amendment on
4    the Senate floor, but I don't remember for sure.
5       Q.  (BY MR. GEAR)  Do you recall who raised the
6    amendment or made the amendment --
7       A.  No.
8       Q.  -- proposed the amendment?
9       A.  But if I'm correct on that, it will be on the...
10      Q.  Okay.  Do you know what the purpose of this
11   amendment was to include disabilities as an exception in
12   SB 14?
13      A.  No.
14      Q.  Do you recall if there were any communications in
15   the governor's office regarding the exception for
16   disabilities pursuant to SB 14?
17           MR. MCKENZIE:  Again, I'm going to object to
18   the extent answering that question would reveal the
19   subject matter of internal governor office communications.
20      A.  I'll decline to answer on the advice of counsel.
21      Q.  (BY MR. GEAR)  How did the exception for
22   individuals with religious objects to being photographed
23   come into -- to be included in SB 14?
24      A.  I don't know.  I don't recall.
25      Q.  Do you know what the purpose of that inclusion

---

180

1    was?
2       A.  I don't.
3            MR. MCKENZIE:  Same objection.  Go ahead.
4       Q.  (BY MR. GEAR)  Do you know how it -- how the
5    discussion or the purpose -- I'm sorry, strike that.
6            Do you know how that issue arose?
7       A.  I do not recall.
8       Q.  Do you know what concerns, if any, that the
9    exception to religious objections was included into SB 14?
10      A.  I'm sorry.  Could you repeat that?
11           MR. MCKENZIE:  Objection; vague.
12      Q.  (BY MR. GEAR)  Are you aware of any -- are you
13   aware of whether or not the exception for individuals with
14   religious objections to being photographed was included
15   into SB 14 in response to any specific concerns?
16      A.  I don't recall that.
17      Q.  Can you describe the election identification
18   certificate provision of SB 14?
19      A.  Yes.  Currently the Department of Public Safety
20   issues driver's licenses.  They also issue identification
21   cards to people who for whatever reason don't have a
22   driver's license but want to have a identification card.
23   And this was a card to be issued for people who just
24   wanted to vote.  And if I recall in the final version of
25   the bill, they're not allowed to use it for any other

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

### 181

1   purpose.
2       Q.  Do you know how that portion of the SB 14 was
3   developed?
4       A.  Yes.
5       Q.  What was the purpose of including the election
6   identification certificate into SB 14?
7           MR. MCKENZIE:  I'm going to object to the
8   extent it reveals private governor purposes.  To the
9   extent it's a matter of public record, you may answer
10  the question.
11      A.  I have to decline on the advice of counsel.
12      Q.  (BY MR. GEAR)  What, if anything, was it modeled
13  on?  Or did it follow any other previous legislation or
14  legislation from other states?
15          MR. MCKENZIE:  Same objection.  To the
16  extent you acquired that knowledge during your service at
17  the governor's office.
18      A.  I'll decline to answer on the advice of counsel.
19      Q.  (BY MR. GEAR)  Would the governor know --
20      A.  I'm fairly --
21          MR. MCKENZIE:  Wait.  Is that the end of the
22  question?  I meant to object.
23          MR. GEAR:  I was in the middle of thinking,
24  but...
25          MR. MCKENZIE:  Okay.

---

### 182

1           THE WITNESS:  When we come to a natural
2   stopping point, I'd like to ask my lawyer like a 30-second
3   question to make sure I know something, whenever --
4           MR. GEAR:  I think this is a good time to do
5   it.
6           THE WITNESS:  Okay.
7           (Break.)
8       Q.  (BY MR. GEAR)  Regarding the identification
9   certificate provision, are you aware of any concerns that
10  the -- that were expressed that the election
11  identification certificate would be difficult for
12  constituents in the State of Texas or residents in the
13  State of Texas to obtain?
14          MR. MCKENZIE:  I'm going to object to the
15  extent you acquired that awareness in service of the
16  governor and as part of your analysis.  If you have
17  independent awareness, you may answer the question.
18          MR. GEAR:  And so I don't have to restate
19  the question, I want to make sure that you understand I'm
20  limiting it to the public record.  Are you aware of any
21  concerns that were expressed.
22          MR. MCKENZIE:  And the same objection to the
23  extent that you surveyed the public record and decided to
24  focus on a certain piece of it in order to give analysis
25  to the governor.

---

### 183

1       A.  I don't recall a particular objection to the
2   election identification certificate as opposed to in
3   general.  We discussed earlier about -- I remember a
4   debate on the floor about how it was difficult to go
5   downtown or something.  I don't remember anybody
6   specifically talking about the election identification
7   certificate.
8       Q.  (BY MR. GEAR)  Well, you talked about the debate
9   on the public floor.  Can you tell me what that debate --
10  the substance of that debate?
11      A.  If I remember correctly -- and my memory is
12  suspect -- I think Senator Ureste talked about how his
13  district is very large.  He compared it to some other
14  large geographic area and said it was difficult to get
15  downtown.
16      Q.  He talked about the distance his constituents
17  would have to travel?
18      A.  I believe that's correct.
19      Q.  And do you recall testimony regarding some
20  constituents would have to travel as far as a hundred
21  miles?
22      A.  I don't remember the specific testimony.  I'm
23  sure it's all on the record.
24      Q.  Do you know if every county in the State of Texas
25  has a driver's license office?

---

### 184

1           MR. MCKENZIE:  And again, I object to the
2   extent you acquired knowledge or not about that during
3   your service as a member of the governor's office staff.
4   To the extent you have independent knowledge about that,
5   please answer the question.
6       Q.  (BY MR. GEAR)  And this doesn't have to be tied
7   to any voter ID legislation.  I'm just asking you, do you
8   know, does every county in the state have a driver's
9   license office?
10          MR. MCKENZIE:  Same objection to the extent
11  you acquired it trying to analyze legislation.  If you
12  have other knowledge, then --
13      A.  I don't have other knowledge.  I guess I have to
14  decline to answer on the advice of counsel.
15      Q.  (BY MR. GEAR)  Would you agree that there are
16  some residents in the State of Texas who would have to
17  travel a hundred miles or more to get to a functional
18  driver's license office?
19          MR. MCKENZIE:  Objection; speculation.  But
20  you may answer.
21      A.  I don't have knowledge of that.
22      Q.  (BY MR. GEAR)  Is there a public
23  transportation -- strike that.
24          Is there public transportation to all driver's
25  license offices in the State of Texas?

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                                  June 1, 2012

---

### 185

1     A. I --
2         MR. MCKENZIE: Objection on speculation
3     grounds. To the extent -- you may answer.
4     A. I don't know.
5     Q. (BY MR. GEAR) Do you know generally what the
6     waiting time would be in the driver's license office to
7     obtain a driver's license or a State-issued ID?
8     A. I don't recall. I know I've done it. I just
9     don't remember long I waited.
10    Q. Do you have a driver's license?
11    A. I do.
12    Q. How did you obtain your driver's license?
13    A. I don't remember if I renewed via mail or if I
14    had to go to an office and -- I just don't remember how
15    I...
16        I assume you mean the most recent time I did it?
17    Q. The most recent time.
18    A. Yeah, I really don't remember doing it.
19    Q. And what county do you live in?
20    A. Harris County.
21    Q. Harris County.
22        And is there a driver's license office in Harris
23    County?
24    A. Yes.
25    Q. How far away is that from your home?

### 186

1     A. I probably didn't go to the closest one. So
2     the -- I'm not sure how far the closest one is from my
3     house. I probably went to one off of 290, which isn't
4     near my house.
5     Q. Do you recall what documentation, if any, you had
6     to take to obtain or renew your driver's license?
7     A. I don't. But it's in the law. I don't remember
8     what I had to do.
9     Q. Would you agree that there is an underlying
10    requirement for a registered -- before a registered voter
11    could obtain an election identification certificate, that
12    they would have to present some form of identification to
13    obtain that?
14    A. I don't remember exactly what ended up in the
15    provision, and I don't remember what DPS, to the extent
16    that they did any rule-making on that. So I don't recall
17    what you had to demonstrate in order to get the
18    certificate. And I don't know what you have to
19    demonstrate to get the DPS ID, which current law allows,
20    which may be the same thing.
21    Q. As you sit here today, are you aware of any
22    requirements to present underlying documents to obtain an
23    election identification certificate?
24    A. I know you have to present. I forget, if I knew,
25    what ended up being the requirement.

### 187

1     Q. But as you sit here today, you don't know what
2     those underlying documents are?
3     A. That's correct. I don't recall.
4     Q. Did you consider the underlying documents that
5     have to be presented to obtain an election identification
6     certificate during your analysis of SB 14?
7         MR. MCKENZIE: Object on deliberative
8     process grounds as to what you considered in your
9     analysis.
10    A. I have to decline to answer on the advice of
11    counsel.
12    Q. (BY MR. GEAR) Are you aware of any communication
13    that appears in the public record that would identify what
14    those underlying documents may be?
15        MR. MCKENZIE: And to the extent you
16    acquired that knowledge as part of your analysis by
17    selecting pieces of the public record, I'm going to
18    instruct you not to answer.
19    Q. (BY MR. GEAR) And again, the public record
20    includes debate on the floor.
21        MR. MCKENZIE: Same objection.
22    A. I do not recall whether the -- and I don't recall
23    whether it was in the bill or whether it was a DPS rule
24    thereafter. I just don't remember.
25    Q. (BY MR. GEAR) During the drafting process or the

### 188

1     legislature's consideration of SB 14, was there an
2     analysis of costs or steps a voter would need to take to
3     obtain an election identification certificate?
4         MR. MCKENZIE: I'm going to object to the
5     extent that analysis was performed inside the governor's
6     office.
7     A. I don't recall. I'm not sure that I knew.
8     Q. (BY MR. GEAR) Are you aware of any analysis that
9     exists in the public record regarding that?
10    A. I don't recall.
11    Q. If the underlying documents required to obtain an
12    election identification certificate are not free, would
13    you agree that the election certificate itself would not
14    be free?
15    A. I don't think so, no.
16    Q. Let me clarify, because I see confusion.
17        If you had to pay for the underlying documents,
18    if you didn't have them in your possession, custody or
19    control or you just simply lost them and you had to pay
20    for those, would you agree that there's a cost to the
21    underlying documents?
22    A. No. I mean, if I lost my birth certificate,
23    which I did, and had to go get a new one, that doesn't
24    mean that whatever I got it for cost money; it was -- I
25    had lost the certificate, and I had to go get a new birth

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

| 189 |
|-----|

1    certificate. So, no, I don't boot strap those together
2    and say that that means the certificate costs money.
3        Q. Okay. And so do you know how much it costs to
4    obtain a certified copy of a birth certificate in the
5    State of Texas?
6        A. I don't. I was born in New Jersey.
7        Q. Okay. So you would have to go to New Jersey?
8        A. I had to go to New Jersey. And I only did it a
9    couple of months ago, and I don't remember what it cost.
10       Q. Do you know how you would obtain a certified copy
11   of a birth certificate from New Jersey? I understand you
12   just said you did it.
13       A. I do. You call them up and you order it and send
14   them a certified check.
15       Q. Do you know how long that takes?
16       A. It took about -- and I don't know the exact. It
17   took maybe a week, maybe 10 days. I don't think it was
18   that long. I was actually quite surprised.
19       Q. As to how long it took?
20       A. No. How short a time it took. I grew up in New
21   Jersey.
22       Q. A week to 10 days?
23       A. (Witness nods head.)
24       Q. Do you remember the cost?
25       A. I don't. I may still have the information

| 190 |
|-----|

1    somewhere, but I don't recall as we sit here.
2        Q. But it was not free?
3        A. It was not free. It was inexpensive enough that
4    I ordered three of them.
5        Q. Well, would you agree that there are residents in
6    the State of Texas who live below the poverty line that
7    may not be able to order three certified copies of their
8    birth certificate?
9            MR. MCKENZIE: Object on speculation
10   grounds. You may answer.
11       A. I would think you wouldn't need three. I just
12   did it as -- if I lost it once, I figured you could lose
13   it again.
14       Q. (BY MR. GEAR) Where can one obtain an election
15   identification certificate?
16       A. I don't know. I don't know if it specifies in
17   the bill, and I don't know if DPS came out with the rules
18   on where they would be available.
19       Q. Did you consider that during your analysis of
20   SB 14?
21           MR. MCKENZIE: Objection on deliberative
22   process grounds.
23       A. I decline to answer on the grounds -- or on the
24   advice of counsel.
25       Q. (BY MR. GEAR) So it would stand to reason that

| 191 |
|-----|

1    if you don't know where one can obtain a election
2    identification certificate, you also would not know the
3    hours in which they could actually obtain the election
4    identification certificate?
5        A. I know it was contemplated that you would get
6    them the same places that you obtained driver's licenses
7    and DPS cards and during the same hours. I live in a
8    populous county, so I'm sort of more familiar with that
9    than I am with the way other counties operate.
10       Q. Does SB 14 require employers to provide paid
11   leave to obtain a driver's license or an ID?
12       A. Not that I'm aware of.
13       Q. I asked you before would you agree if some
14   residents in the State of Texas would have to travel a
15   hundred miles or more to obtain a State-issued driver's
16   license or ID, would you agree that there are some
17   residents in the State of Texas that would have to travel
18   at least 50 miles?
19           MR. MCKENZIE: I'm going to object on
20   speculation grounds and also to the extent you reached an
21   opinion on that during your services as the governor's
22   employee. If you have an opinion separate from that
23   service, you may answer the question.
24       A. Yeah. I'm not the right person to ask. I don't
25   know how far people have to travel.

| 192 |
|-----|

1        Q. (BY MR. GEAR) Are you aware of public debate
2    that express concerns that minority voters are less likely
3    to have the allowable form of idea under SB 14?
4            MR. MCKENZIE: I'm going to object to the
5    extent that that awareness played a factor in your
6    analysis. To the extent you have independent awareness,
7    you may answer the question.
8        Q. (BY MR. GEAR) And again, I want to make sure you
9    understand what my question is here.
10       Are you aware of any record that appears in the
11   public record or any communication that appears in the
12   public record. So I'm limiting that question specifically
13   to the public record.
14       A. Could you give me the whole question again or
15   have it read back, either way.
16           (The requested material was read.)
17           (Discussion off the record.)
18       Q. (BY MR. GEAR) Let me just re-ask the question.
19       Are you aware of -- and again, I'm limiting my
20   question to public record, communications, documents that
21   appear in the public record. Are you aware of any
22   communications or documents or analysis that show that
23   there was a consideration as to whether or not minority
24   voters were less likely to possess the forms of allowable
25   identification under SB 14?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                              June 1, 2012

---

### 193

1    MR. MCKENZIE:  Same objection.
2    A.  I believe that was an argument made on the floor
3  by opponents of the bill.  I don't know of any statistical
4  data or anything like that.
5    Q.  (BY MR. GEAR)  Did you consider those concerns
6  during your analysis of SB 14?
7    MR. MCKENZIE:  I'm going to object on
8  deliberative process grounds.
9    A.  I decline to answer on the advice of counsel.
10    Q.  (BY MR. GEAR)  Are you aware of anyone who
11  supported SB 14 that considered the concerns expressed by
12  the opponents regarding that issue?
13    MR. MCKENZIE:  Same objection to the extent
14  you acquired that knowledge in service at the governor's
15  office.
16    A.  I decline to answer on the advice of counsel.
17    Q.  (BY MR. GEAR)  Was any part of the purpose of
18  SB 14 to decrease the number of Hispanic voters?
19    MR. MCKENZIE:  You may answer as a general
20  purpose.  Please do not answer as to any private purposes
21  the governor may or may not have had.
22    A.  Not that I know of.
23    Q.  (BY MR. GEAR)  Was any part of the purpose of
24  SB 14 to decrease the number of any other group of
25  minority voters?

### 194

1    A.  Not that I know of.
2    Q.  Was any part of the purpose of SB 14 for partisan
3  purposes?
4    A.  I don't --
5    MR. MCKENZIE:  Same objection.  To the
6  extent it reveals publically expressed purposes, you may
7  answer.  To the extent it's private purposes of the
8  governor's office, I'd instruct you not to answer.
9    A.  I don't understand the question.
10    Q.  (BY MR. GEAR)  Political purposes?  If I -- let
11  me just ask the question again.
12    Was any part of SB 14 -- any part of the purpose
13  of SB 14 for political purposes?
14    MR. MCKENZIE:  Same objection.
15    A.  I really can't get into the minds of legislators
16  to know what their purpose is.  I'm sure most bills, they
17  have some hope that it will help make them popular back
18  home.  But I don't really know.
19    Q.  (BY MR. GEAR)  Was any part of the purpose of
20  SB 14 to depress the Democratic participation in elections
21  to further the political interests of Republican
22  candidates?
23    MR. MCKENZIE:  Same objection.
24    A.  I'm sorry.  Could you repeat the question.
25    (The requested material was read.)

### 195

1    A.  My understanding of the purpose of the bill was
2  to make sure that people who were voting were entitled to
3  vote, and I don't think that that necessarily has to favor
4  one party or the other.
5    Q.  (BY MR. GEAR)  Do you have a concern that SB 14
6  will disproportionately impact minority voters?
7    MR. MCKENZIE:  Object to the extent you
8  developed a concern in the course of your services as a
9  governor employee.  To the extent you don't have a concern
10  in that capacity, you may answer the question.
11    A.  No.
12    Q.  (BY MR. GEAR)  Do you have a concern that SB 14
13  will have a discriminatory effect on minority voters?
14    MR. MCKENZIE:  Same objection.
15    A.  No.
16    Q.  (BY MR. GEAR)  Do you recall any debate on the
17  public record that expressed that in part SB 14 was
18  designed to prevent illegal aliens or undocumented
19  citizens, noncitizens from voting?
20    A.  I don't recall that.  But the debate's on the
21  public record.
22    Q.  Do you recall the lieutenant governor or anyone
23  from the lieutenant governor expressing -- governor's
24  office expressing that concern?
25    A.  I don't.

### 196

1    Q.  Based on your review and analysis of SB 14, was
2  SB 14 designed to address any specific problem in the
3  State of Texas?
4    MR. MCKENZIE:  I'm going to tell you not to
5  answer to the extent that will reveal your review or
6  analysis of SB 14.
7    A.  How could it not?  I decline to answer on the
8  advice of counsel.
9    Q.  (BY MR. GEAR)  Does SB 14 address any specific
10  problem in the State of Texas?
11    MR. MCKENZIE:  Same objection to the extent
12  your opinion on that derives from the analysis and review
13  you did as an employee of the governor's office.
14    A.  SB 14 was designed to help ensure that the voters
15  who are eligible to vote are able to vote and their vote
16  doesn't get offset by all types of voter fraud that we
17  talked about earlier.  So to the extent that SB 14
18  addresses the problem, that's the problem it's intended to
19  address.  I think it's designed primarily to ensure fair
20  elections and to make sure that we know that the people
21  voting are entitled to do so.
22    Q.  (BY MR. GEAR)  But as you sit here today, you're
23  unable to identify any cases of voter impersonation in the
24  State of Texas; is that correct?
25    A.  That's right.

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

### 197

1    Q.  And as you sit here today, you're unable to
2  identify any specific allegations by mail voter fraud in
3  the State of Texas; is that correct?
4    A.  Mail voter fraud?
5    Q.  By mail voter fraud, correct.
6    A.  I don't know about specific cases.  There's been
7  a lot written on mail voter fraud.  And we had a bill that
8  passed the legislature in 2003 addressing it.  And there's
9  still been newspaper articles and all kinds of stuff about
10  mail voter fraud.
11    Q.  Would you agree that voter impersonation in the
12  State of Texas is rare?
13    A.  No.
14    Q.  And What are you basing that on?
15    A.  We had testimony in the elections committee on a
16  number of applications for -- to register to vote that
17  were fraudulent or for nonexistent people.  And I can't
18  see a motive for registering nonexistent people unless you
19  intend to vote them.
20    Q.  Well, let's talk about this testimony.  You said
21  there was testimony in the elections committee, correct?
22    A.  (Witness nods head.)
23    Q.  Do you know when that testimony took place?
24    A.  I think in 2005 and 2007 and maybe 2009.
25    Q.  All right.  And let's talk specifically about

---

### 198

1  2005.  Do you recall who the chair of the elections
2  committee was at that point?
3    A.  I usually get my years mixed up.  I don't know
4  if -- 2003 was Mary Denny, right?  I think 2005 may have
5  been Leo Berman.
6    Q.  Okay.  And so in --
7    A.  That --
8    Q.  I'm sorry.
9    A.  Let me make sure I got that right.  The last
10  session, 2011, was Larry Taylor.  I believe Todd Smith was
11  '9.  So Leo Berman must have been '7.  I think Mary Denny
12  may have been chair in 2005.  I don't -- I'm getting my
13  sessions confused.
14    Q.  Okay.  That's understandable.
15    What was the testimony in 2005, as you recall it?
16    A.  I don't recall specifically, but it's all on the
17  record.  There were -- and I don't remember which was in
18  what session.  But there were -- as I recall, there was
19  testimony regarding that in the House and maybe in the
20  Senate.  I tend to follow the House closer.
21    Q.  And the subject matter of that testimony?
22    A.  Regarded mail -- excuse me -- regarded
23  applications for voter registrations.
24    Q.  And you said "nonexistent individuals"?
25    A.  (Witness nods head.)

---

### 199

1    Q.  What does that mean?
2    A.  Filling out an application in the name of
3  somebody who doesn't exist or doesn't live at that
4  address, you know, just with a name.  There apparently
5  were quite a few of them.
6    Q.  Okay.  And so you indicated that SB 14 addresses
7  the issue of voter impersonation, correct?
8    A.  It does in that respect.  I think it more
9  addresses just ensuring that we have -- that we know who's
10  voting because they show a photo ID.  And that way, I know
11  that my vote hasn't been offset by somebody who isn't
12  entitled to vote or is voting in a false name.
13    Q.  Are you aware of any cases where a legitimate
14  voter's vote has not been counted as a result of voter
15  impersonation?
16    A.  Every time there's a voter impersonation.
17    Q.  Are you aware of any cases of voter
18  impersonation?
19    A.  It's impossible to catch, virtually.  That's why
20  there's so few prosecutions.  As I say, we -- there are
21  records of tens of thousands of applications that are
22  incorrect or that are false.  How many of those are
23  maliciously so, I couldn't tell you.
24    But to the extent that anybody files a false
25  voter registration application and then votes it, they

---

### 200

1  offset the vote of somebody who voted the other way.
2    Q.  So we're focusing on 2005 right now.  Are you
3  aware of anyone who filed a false voter registration
4  application and voted?
5    MR. MCKENZIE:  And to the extent you
6  developed awareness in the course of your service in the
7  governor's office, I would object on deliberative process
8  grounds.
9    A.  As I say, most of what I learned, I learned
10  through the House hearings.
11    Q.  (BY MR. GEAR)  Okay.  And during the House
12  hearings, was there any documented case of a person who
13  filed a false voter registration application and voted?
14    MR. MCKENZIE:  Same objection.
15    A.  Yeah.  I'd have to go back and look at the
16  testimony.
17    Q.  (BY MR. GEAR)  So as you sit here today, are you
18  aware of any voter in 2005 who filed a false voter
19  registration application and voted?
20    A.  I --
21    Q.  As you sit here today.
22    MR. MCKENZIE:  And to the extent you
23  acquired that knowledge in the course of your service as
24  the governor's employee, I would instruct you not to
25  answer.  To the extent that you have that knowledge based

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Michael Schofield                                                    June 1, 2012

---

201

1   upon the service not in the governor's office, then you
2   may answer the question.
3       A.  As we sit here today, I cannot name the -- I
4   assume you mean the name of the applicant or the person,
5   either one.  I could not tell you the names of anybody.
6       Q.  (BY MR. GEAR)  And just to expand on that, are
7   you aware of any documented cases, whether you know the
8   name of the applicants or not, where an applicant filed a
9   false voter registration application and voted?
10      A.  I don't know -- we separate our applications from
11  our conduct of elections in two different offices in most
12  counties.  So the folks who came to testify were the
13  registration people, typically in the Texas tax assessor-
14  collector's office.  They don't handle the conduct of
15  election day activities.  So who voted and who registered
16  at their office, That's not something they would have in
17  their -- so when they came to testify, I don't recall
18  whether they -- whether they traced one all the way
19  through and said, "This was an application for Joe Smith;
20  and then on election day or in early voting, Joe Smith was
21  voted."  I don't know about that.
22      Q.  And would that be the same answer for 2007, 2009
23  and 2011?
24      A.  Yes.  With the exception of the cases that
25  Representative Aliseda referred to having prosecuted, I

---

202

1   don't know specifically myself of individual cases.
2       Q.  Are you aware of any individual cases of voter
3   impersonation that appear on the public record in the
4   State of Texas that were discussed during SB 14?
5           MR. MCKENZIE:  Same objection as to your
6   awareness -- to the extent your awareness played a role in
7   your analysis.
8       Q.  (BY MR. GEAR)  Again, I'm asking are you aware of
9   any that appear on the public record.
10      A.  Other than the ones that Representative Aliseda
11  referred to, I'm not aware of specific cases.
12      Q.  Have you ever heard about a voter who did not
13  vote because they were concerned that voter fraud would
14  cancel out their vote?
15          MR. MCKENZIE:  Same objection to the extent
16  you acquired stories of that nature during your service as
17  a governor employee.
18      A.  I don't recall any specific stories.
19      Q.  (BY MR. GEAR)  At some point, you campaigned for
20  the House; is that correct?
21      A.  That's correct.
22      Q.  And what year was that?  Could you remind me?
23      A.  It happened twice.  In the 2006 election cycle
24  and then for half of the 2012 election cycle.
25      Q.  Okay.  So during any time during 2006 and for

---

203

1   half of the 2012 cycle, did any voter ever approach you
2   and indicate that they did not vote because they were
3   concerned about voter fraud cancelling out their vote?
4       A.  No.  I don't think the concern was people not
5   voting because they thought their vote would be canceled.
6   I think the concern was that their vote gets canceled out.
7       Q.  And are you -- strike that.
8       A.  That wouldn't necessarily lead to any action on
9   any part of that particular voter or, in the case of your
10  question, inaction.
11      Q.  Are you done with that answer?
12      A.  Yes, sir.
13      Q.  Under SB 14 are you aware of the provisional
14  ballot provisions?
15      A.  Yes.
16      Q.  And can you describe what the provisions are?
17      A.  Basically a voter who fails to present the
18  appropriate ID has six days to go to the voter registrar
19  and provide ID so that their provisional vote will be
20  counted.  There are other reasons for provisional votes,
21  but that's the voter ID provision.
22      Q.  Do you have any knowledge of how often
23  provisional ballots are counted in the State of Texas?
24          MR. MCKENZIE:  To the extent you acquired
25  that knowledge in the service of the governor, I instruct

---

204

1   you not to answer.
2       Q.  (BY MR. GEAR)  Let me limit that to your
3   knowledge as a candidate for the House, do you have any
4   knowledge, did you acquire any knowledge about how often
5   provisional ballots are counted?
6       A.  Not in connection with my being a candidate.  I
7   will say that we have not -- this provision obviously has
8   not gone into effect yet so there has been no instance yet
9   of these kind of provisional ballots for this reason where
10  all you have to is go down and show appropriate ID.  There
11  are some things that aren't fixable --
12      For example, when I voted on -- one year and the
13  lady in front of me said, "My mom couldn't get her flight
14  home to vote.  Can she vote here?"  And I said, "She can
15  vote here, but it's going to be provisional and the
16  chances of it counting are very low because she's not
17  registered in this precinct."
18      That isn't fixable.  If you don't present the
19  appropriate ID -- and I'm sure I've shown up without my
20  driver's license, although how I would have driven there
21  without one is questionable, but that's fixable.  So I
22  would anticipate a much higher percentage of provisional
23  ballots would be accepted because you wouldn't cast one, I
24  wouldn't think, unless you go and demonstrate your photo
25  ID, unless you're trying to make a point or something.

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 205

1    So if you showed up and you realized you didn't
2    have a photo ID, you cast your provisional ballot, you
3    would be able to go and demonstrate that you have a photo
4    ID, because you have one.  But again, that's conjecture.
5    I don't mean to --
6    Q.  Sure.
7    A.  So I think it's different from current
8    provisional IDs, which is what I'm getting at.  I would
9    think it would be a higher percentage than current
10   provisional ones because most or many current provisional
11   ballots are uncurable.
12   Q.  Which means they're not counted?
13   A.  In the end if it doesn't comply with whatever the
14   provisions, it can't be counted.
15   Q.  Just stepping outside of SB 14 and even stepping
16   outside of voter ID legislation altogether, do you have
17   any knowledge of how often provisional ballots are counted
18   in the State of Texas?
19   A.  I don't.  I couldn't give you that percentage.
20   Q.  Would it be fair to say that provisional ballots
21   are more often not counted than counted during elections
22   in the State of Texas?
23        MR. MCKENZIE:  Objection; speculation and
24   asked and answered.  But you may answer.
25   A.  I don't know the percentage.

## 206

1    Q.  (BY MR. GEAR)  During your analysis of SB 14, did
2    you attempt to determine the percentage of how often
3    provisional ballots are counted in the State of Texas?
4         MR. MCKENZIE:  Objection on deliberative
5    process grounds.  I instruct you not to answer.
6    A.  I will decline to answer due to the advice of
7    counsel.
8    Q.  (BY MR. GEAR)  You made a comment about you don't
9    know how someone could get to the polling place without
10   actually having their ID --
11   A.  No, how I would, because I drive.
12   Q.  And my question is, you are aware, of course,
13   that there are individuals in the State of Texas who do
14   not have a driver's license?
15   A.  I am aware of that.
16   Q.  And are you aware that minorities in the State of
17   Texas are less likely to have a driver's license than
18   Anglos?
19        MR. MCKENZIE:  I'm going to object to the
20   extent you developed any awareness on that subject during
21   your service as a governor employee.  Whether or not you
22   were aware speaks to what was on your mind at the time you
23   gave analysis.
24   A.  And I decline to answer on the advice of counsel.
25   Q.  (BY MR. GEAR)  Do you think SB 14 will increase

## 207

1    voter turnout?
2         MR. MCKENZIE:  To the extent you developed
3    an opinion on that during the course of your service as a
4    governor employee I instruct you not to answer.
5    A.  I decline to answer on the advice of counsel.
6    Q.  (BY MR. GEAR)  Did the governor or any of his
7    staff play any role in developing a strategy to ensure
8    sure that SB 14 would pass?
9         MR. MCKENZIE:  I'm going to object.  The
10   deliberative process grounds, as the internal strategy of
11   the governor's office.
12   A.  I decline to answer on the advice of counsel.
13        MR. MCKENZIE:  Objection to the extent that
14   that question would cause you to reveal the internal
15   strategy of the governor's office.
16   Q.  (BY MR. GEAR)  Were you present during any
17   meetings with, communications with legislators where a
18   strategy was discussed to pass SB 14?
19        MR. MCKENZIE:  Again, I'm going to object on
20   the grounds of legislative privilege.  To the extent that
21   legislators were communicating with the governor's office
22   about a strategy on passing SB 14.
23   Q.  (BY MR. GEAR)  It's a yes or no answer.
24        MR. MCKENZIE:  Same objection.
25        MR. GEAR:  Are you directing him not to

## 208

1    answer?
2    A.  I decline to answer on advice of counsel.
3    Q.  (BY MR. GEAR)  Are you aware of any
4    communications where the strategy to pass SB 14 was
5    discussed?
6         MR. MCKENZIE:  Same objection to the extent
7    it reveals legislator communications or governor
8    communications.
9         MR. GEAR:  I think if we take a quick break,
10   maybe a 10-minute break, I may be able to wrap up quickly.
11        MR. MCKENZIE:  Okay.
12        (Break.)
13        MR. GEAR:  Back on the record.
14        MR. MCKENZIE:  Before you ask your first
15   question I think you wanted to clarify the record about
16   something.
17        THE WITNESS:  Yes.  Reading the bill
18   refreshed my recollection.  I believe, and I could be
19   wrong there were so many questions, but I believe you
20   asked me if I remembered any meetings with the Attorney
21   General's office regarding this bill.
22   Q.  (BY MR. GEAR)  I did ask you that.
23   A.  And I do.  I won't be able to answer any
24   questions on it, but I do recall meetings with the
25   Attorney General's office over a provision of the bill.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                    June 1, 2012

## 209

1  Q. There are some questions you can answer. When
2  did that meeting occur?
3  A. Late in the session. I don't know exactly when.
4  Q. And we're talking about the 2011 session?
5  A. 2011 session during the consideration of Senate
6  Bill 14.
7  Q. And do you recall who was present during that
8  meeting?
9  A. I'm sure our general counsel was there and
10 several people from the AG's office, and I can't remember
11 exactly who attended. They came over to our place, which
12 was rare.
13 Q. When we're talking about "were there," can you
14 tell me where that meeting occurred?
15 A. In general counsel's office in the conference
16 room they have.
17 Q. For the record, can you tell the subject matter
18 of that meeting?
19      MR. MCKENZIE: I'm going to object to -- for
20 the very broad statement as to something that might appear
21 on a privilege log. Don't go into any detail as to any
22 communications you had with the office of the Attorney
23 General.
24 A. Okay. I definitely need some advice -- and I
25 have my own privilege log --

## 210

1      MR. MCKENZIE: You can say it was about
2  voter ID, but I wouldn't get into any further
3  communications than that, if it was about voter ID. I
4  don't know. Or the bill number, things of that effect.
5  A. It was about a provision of the bill.
6  Q. (BY MR. GEAR) And you're talking about SB 14?
7  A. SB 14.
8  Q. Did the King Street Patriots propose any language
9  for SB 14?
10 A. Not that I recall.
11 Q. Did the King Street Patriots propose any language
12 for voter ID in general?
13 A. No, not that I recall.
14 Q. Are you aware of whether there were any promises
15 made to the King Street Patriots from the governor
16 regarding voter ID?
17 A. Not that I know of but -- I'm not aware of any.
18 Q. (BY MR. GEAR) Are you aware of any
19 communications with any other outside groups regarding
20 voter ID, communications between the governor and outside
21 groups?
22 A. As we sit here today, I don't. But if you can
23 refresh my recollection, that would be very helpful.
24 Q. I'm just trying to determine what you know. So
25 is your --

## 211

1  A. I don't remember it. I may have known at the
2  time, but I don't remember any as we sit here today.
3      (Exhibit 311 was marked.)
4  Q. (BY MR. GEAR) Showing you what's marked as
5  Exhibit No. 311.
6      MR. GEAR: For the record, this exhibit does
7  not follow the exhibit numbers of the previously marked
8  exhibits.
9      (Witness reviews document.)
10 Q. (BY MR. GEAR) Did you have a chance to review
11 that exhibit?
12 A. Yes. Except for the last couple of pages. Give
13 me just a second. I want to finish the last couple of
14 pages.
15 Q. Sure.
16      (Witness reviews document.)
17      MR. MCKENZIE: Just for the record, these
18 are several documents, right, not all part of one e-mail;
19 is that correct?
20      MR. GEAR: I was going to let him identify
21 it.
22      MR. MCKENZIE: Oh, sorry.
23      MR. GEAR: But that's right. Yes, there
24 would be several.
25      MR. MCKENZIE: Okay.

## 212

1  Q. (BY MR. GEAR) Did you have a chance to review
2  the exhibit before you?
3  A. (Witness nods head.)
4  Q. Can you identify what this is?
5  A. These are different e-mails. Some of them are
6  related to each other and some aren't. Most of them are
7  from the Secretary of State's office although some of them
8  are from within the governor's office.
9  Q. So let's just start from Page 1, or the first
10 page of exhibit --
11 A. 40050.
12 Q. Yes. 40050. You see that this was produced by
13 the State of Texas, correct?
14 A. That's the TX designation?
15 Q. Yes.
16 A. Yes.
17 Q. Do you see the designation of legislative
18 privilege on this document?
19 A. Oh, I'm sorry. We're on Page 40055?
20 Q. I'm sorry.
21 A. I skipped it. I'm sorry.
22 Q. Do you see the designation of legislative
23 privilege?
24 A. Yes.
25 Q. Are you claiming legislative privilege based on



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                           June 1, 2012

---

### 213

1  your e-mails?
2      A. I'm sorry?
3      Q. Are you claiming legislative privilege based on
4  any e-mail in which you're involved?
5      A. I believe that we're claiming legislative
6  privileges with respect to this e-mail. I don't know
7  about other e-mails.
8      Q. Do you know why you're claiming legislative
9  privilege on this?
10     A. I don't know what this e-mail is.
11     Q. Okay. Do you see that you're on -- this e-mail
12  was sent to you?
13     A. Yes.
14     Q. And do you see that it was sent to you on
15  February 25th, 2009, at 11:22 a.m.?
16     A. That's correct.
17     Q. And did you -- you do not know the substance of
18  this e-mail?
19     A. I don't know anything about this e-mail.
20     Q. Do you recall receiving this e-mail on
21  February 25th, 2009?
22     A. No. But John Sperry e-mailed me a lot.
23     Q. And who is John Sperry?
24     A. General counsel at the Secretary of State's
25  office.

### 215

1      A. Yes.
2      Q. And is this e-mail related to 40055?
3      A. I don't know. I don't know if he sent me two
4  e-mails in rapid succession or if this is a different
5  e-mail.
6      Q. Do you see where it references: First time voter
7  ID PDF?
8      A. Yes.
9      Q. And is that in reference to the voter ID
10  legislation that was proposed in 2009?
11     A. I don't know for sure because I don't know what
12  "first time voter ID PDF" means. But it is a -- the first
13  e-mail is from Jennifer Fagan who works at the State
14  Affairs Committee of the Senate and it says: Attached is
15  another draft bill.
16         I don't know if it was a draft bill of SB 14,
17  which I assume went to State Affairs. But her boss didn't
18  file it, so I don't know.
19     Q. So looking at the bottom e-mail first, you
20  identify Jennifer Fagan as someone from the State Affairs
21  Committee at the Senate?
22     A. Correct.
23     Q. And would you have communicated with the State
24  Affairs Committee at the Senate regarding at this time SB
25  362?

### 214

1      Q. I believe I previously asked you if you engaged
2  in communications with the Secretary of State's office
3  regarding photo ID legislation?
4      A. Uh-huh.
5      Q. You testified yes to that?
6      A. I don't remember what I testified here. There is
7  a second e-mail here, 40050, where -- this is actually not
8  in answer to that question so never mind. This is from
9  the Senate's State of Affairs Committee. I thought it was
10  from Secretary of State.
11     Q. Okay. So turning your attention back to 40055,
12  did you engage in communications with the Secretary of
13  State's office regarding photo ID legislation?
14     A. I don't recall doing that.
15     Q. This e-mail would indicate that you did, at least
16  by an e-mail?
17     A. I don't know -- I'm sorry, I don't know the
18  substance of the e-mail.
19     Q. That's fair. That's fair. But John Sperry is
20  from the Secretary of State's office?
21     A. He was.
22     Q. He was?
23     A. At that time.
24     Q. Turning your attention to 40050, do you see that
25  this is an e-mail from February 25th, 2009, at 11:22 a.m.?

### 216

1      A. Probably. I communicate with them when -- most
2  of the time -- or they would communicate with me when a
3  bill that I was assigned was going to come up for a
4  hearing.
5      Q. And so would the point of contact with the State
6  Affairs Committee be Jennifer Fagan?
7      A. Often. Not necessarily have a -- for a committee
8  they have a fairly large staff.
9      Q. Who, if anyone else, would you communicate with
10  from the State Affairs Committee? And specifically
11  regarding SB 362?
12     A. It would be anybody that worked on election stuff
13  and I can't remember the names of the folks at this time.
14  Not everybody, I don't think, worked on election stuff.
15     Q. And what would be the substance of those
16  communications be?
17         MR. MCKENZIE: I'm going to object on
18  legislative privilege grounds to the extent it reveals
19  confidential communications between legislators and the
20  governor's office about a bill.
21     A. I decline to answer on the advice of counsel.
22     Q. (BY MR. GEAR) Did this -- are you aware of
23  whether the State Affairs Committee introduced draft
24  language for SB 362?
25     A. Well, I don't know that -- I'm not sure what you

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

217

1    mean by committee "instituted draft language."
2         Q.  Well, specifically Jennifer Fagan.  That's fair.
3         A.  I mean --
4         Q.  I'm just trying to figure out what you know.
5         A.  Procedurally, legislators introduce language so I
6    don't -- you know, I don't know how to -- you know, who
7    helped draft language for it, if there was a committee
8    substitute or something, I don't know.  And I don't know
9    if that's what this is.
10        "First-time voter ID" is ringing some other kind
11   of bell.  I don't know if there was a different -- was
12   there a Federal provision?  Was there something in the
13   Help America Vote Act about having to show an ID the first
14   time you vote or the first time you register?  I'm not
15   sure if this is Senate Bill 14 or not.  I'm not the person
16   to ask, because my memory is so bad.
17        Q.  Who is the person to ask, based on this e-mail?
18        A.  I hate to throw her under the bus, but I guess
19   Jennifer would know what it was she was referring to.
20        Q.  When you researched the electronic drive that you
21   described earlier in your testimony, did you search for
22   any drafts that may have come from Jennifer Fagan?
23        A.  I didn't have anything like that.
24        Q.  Turning your attention to 39892, which is the
25   next page, can you tell me who Brandy Marty is?

218

1         A.  She was the director of the Division of Budget,
2    Planning and Policy during that session.
3         Q.  And do you see where this refers to:  Attachment,
4    2009 legislative ideas DOC?
5         A.  Yes.
6         Q.  Can you tell me what that means?
7         A.  I believe, and I'm pretty sure that I'm correct,
8    that this the -- we referred to these earlier in the
9    deposition -- the Secretary of State's office would have
10   ideas for legislation regarding their procedures and they
11   would bring those up during the session and ask members to
12   file them for them.  And most of the rest of these e-mails
13   pertain to those.
14        Q.  Did the Secretary of State's office provide ideas
15   for voter ID legislation?
16        MR. MCKENZIE:  I'm going to object to the
17   extent that it would reveal confidential communications
18   among members of the executive branch of Texas.  To the
19   extent that it wouldn't, you can answer, but...
20        A.  The one thing I can tell you just sort of -- this
21   isn't that.  This would have nothing to do with voter ID.
22        Q.  (BY MR. GEAR)  Do you know what this has to do
23   with?
24        A.  Every session they I have a bunch of procedural
25   things that they're trying to clean up to -- to -- to

219

1    their procedures, and it can be anything from when they
2    need to notify the counties of somebody who's died -- or
3    vice versa, counties have to identify them -- or when they
4    have -- they're always trying to clean things up because
5    every session the technology advances, everything else
6    advances.  Those are all pretty -- I think probably every
7    legislator has a copy of what it is that's in their
8    legislative ideas.
9         And if you look at the -- if I remember this -- I
10   thought I was in trouble for a while.  Here somewhere --
11   here we go.  I think it's 40062.  It's John sends over to
12   our office:  I never heard from anyone about our bills.
13   And I'm thinking:  Oh, God, was I too busy to contact the
14   Secretary of State?
15        And then it turns out that the bills that he's
16   referring to are all his nonelection bills.  As you know,
17   the Secretary of State has other -- they do all of the
18   business and corporate stuff, they do a bunch of other
19   things in addition to election stuff.
20        Q.  Correct.
21        A.  And most of these e-mails, from the glance that I
22   was ale to give, are relating to that, relating to the
23   fact that they hadn't heard back on their nonelections
24   portion of their legislative ideas memo, and they wanted
25   to know what was going on.

220

1         Q.  So let me see if I can just move this along.  The
2    page that you referred me to, 40062 to 40055 moving
3    forward, are any of those related to voter ID?
4         A.  I -- no, I'm sure that they weren't.  I can't
5    remember exactly what they were in the bills but...
6         Q.  So turning the Page from 40062, the next page
7    would be 40123.  Do you see that?
8         A.  Yes.
9         Q.  Would this e-mail be in relation to voter ID?
10        A.  I would think not.  If you look at the first
11   e-mail she talks about what the subjects are.  A notary
12   public bill, a bill about electronic delivery of rules,
13   and it's going to go through business and commerce.  And
14   photo ID went through State Affairs, not business and
15   commerce.
16        Q.  Turning your attention to 40147.  Again, I see
17   that this refers to SOS nonelection bills suggestions.
18        A.  Right.
19        Q.  Would it be accurate to say that this did not
20   relate to photo ID?
21        A.  Yes.
22        Q.  Turning the page to 40148.  Again, this refers to
23   SOS nonelections bill suggestions.  Is it fair to say that
24   this does not apply to photo ID?
25        A.  Yes.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 221

1      Q.  Turning your attention to 40197.  Do you see the
2   reference to:  SOS omnibus PDF?
3      A.  Yes.
4      Q.  Does that -- does this e-mail apply to photo ID?
5      A.  I would doubt that there is any photo ID.  It
6   would, I believe, include their elections bills as opposed
7   to just not their nonelections bills.  And it was sent to
8   the clerk of the Elections Committee.
9      Q.  And who is that?
10     A.  It was at the time Steven Schar.
11     Q.  And would Steven Schar have had any involvement
12  in the drafting of photo ID legislation?
13     A.  I don't know.
14     Q.  Did you have any communications with Steven Schar
15  regarding your analysis of photo ID legislation?
16     A.  I wouldn't share our in-house analysis with
17  anybody.
18     Q.  Other than the individuals who are --
19     A.  The people in our office.  In other words,
20  outside the office.  Not even legislators.
21     Q.  Turning your attention to 40215.  Do you see
22  where it indicates:  Quick question, up at the top?
23     A.  I skimmed over this one earlier.  Maybe I can
24  read this quickly.
25         (Witness reviews document.)

## 222

1      Q.  (BY MR. GEAR)  Does 40215 relate to photo ID
2   legislation?
3      A.  I can't swear to it.  This appears to be
4   Secretary of State omnibus election clean-up bill that I
5   referred to earlier, and that would not be any photo ID.
6   And I can't imagine John Sperry sending around something
7   saying:  We need to file a photo ID bill.
8         Plus you can tell from the numbered comments they
9   talk about things like age computation and notices of
10  elections, Section 24 of the bill which doesn't have 24
11  sections.  So this is not photo ID.
12     Q.  Okay.  And you're referring to 40215, correct?
13     A.  Yes.
14     Q.  Turning your attention -- and the actual number
15  is cut off, but it starts with 2431, and I believe that's
16  a 3?
17     A.  It is.
18     Q.  Do you see where it references:  A heaping
19  helping of hot buzz?
20     A.  Yes, that's the normal slug that Harvey Kromberg
21  puts on his outgoing messages.
22     Q.  And the "from" is -- can you read that?
23     A.  It's qr@quorumreport.com.  It is a newsletter --
24     Q.  And is that a newsletter that you received?
25     A.  Yes.

## 223

1      Q.  And this is a newsletter that you would normally
2   receive in the course of business?
3      A.  Yeah.  I don't read these.  I don't know why he
4   sent a test e-mail.  As you can see it says "test" across
5   the top.  I never read his -- I would just go online and
6   read the full "Quorum Report" from time to time during the
7   day.  I didn't really bother with the e-mails.
8      Q.  And do you know who sent this you?
9      A.  It's a company.  "Quorum Report" is a newsletter
10  in town.  I don't know that Harvey Kromberg specifically
11  sends it, but whoever works for him sends these out
12  periodically.  They send them out so that people can see
13  when there's an update on their stories so that they can
14  jump on -- everybody in the Capitol wants to be the first
15  to know everything.
16     Q.  Do you see the specific reference to DOJ
17  interviewing lawmakers on SB 14?
18     A.  Yes.
19     Q.  Was there any discussion as to whether or not
20  this was a potential problem in the governor's office?
21         MR. MCKENZIE:  I'm going to object to the
22  extent that reflects internal communications among
23  governor office employees.  So I'm going to instruct you
24  not to answer.
25     A.  I decline to answer on advice of counsel.

## 224

1      Q.  (BY MR. GEAR)  And then do you see 2432 and the
2   number is cut off?
3      A.  It's a 0.
4      Q.  0.  Can you tell me who Jonathan Hurst is?
5      A.  Yes, he replaced Brandy Marty as the director of
6   Budget Planning and Policy.
7      Q.  And would it be Jonathan Hurst who has access to
8   your analysis of voter ID legislation?
9      A.  During the investigation, my boss would have it.
10  I don't know if -- what happens in between sessions,
11  whether you can go on and get them or not.  I know that we
12  pay for it by the month, so I don't know if he could go
13  get them in between or not.  I assume that there is a way
14  they can get them, but I don't know for a fact.  If we
15  were to go back and have a session now and I would do it,
16  he would be the person who had the access.
17     Q.  Do you recall having any communications with
18  Jonathan Hurst regarding voter ID legislation?
19     A.  I doubt it.  He took over after the session and I
20  was transitioning out and he was -- pretty much as he was
21  taking that role.
22     Q.  Just so we're clear, you're saying after the
23  session.  Are you referring to the 2011 session?
24     A.  Yes, the 2011 legislative session.  He was
25  Brandy's assistant before that, and then he came the



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                                    June 1, 2012

---

225

1  director.
2      Q. And turning your attention to 24520, I believe.
3      A. Yes.
4      Q. I have no further questions on that.
5          Do you want to change any of the answers that you
6  have provided today?
7      A. Not as we sit here today.  I'm sure if I see the
8  transcript and have an errata sheet, but at this time I
9  don't have any.
10     Q. Throughout the course of the deposition you've
11 corrected the record when you've remembered something.  Is
12 there any other corrections or anything that you want to
13 change on the record as you've testified today?
14     A. Not at this time.
15     Q. Is there anything additional you want to share
16 regarding the voter ID legislation?
17     A. No, sir.
18         MR. GEAR:  So at this point I have no
19 additional questions and I'm going to allow Chad to ask
20 you a few questions, but I would say that I'm going to
21 hold this deposition open pending the Court's ruling on
22 the privilege issue.  So, in other words, we may all be
23 back here again.
24              EXAMINATION
25 BY MR. DUNN:

---

226

1      Q. Is it Scholfield or Scholfield?
2      A. Scholfield.
3      Q. Scholfield.  I beg your pardon.  My name is Chad
4  Dunn.  I represent the intervenors in the case, several
5  groups of intervenors, and I'm the representative for all
6  of them here today.  I just have a few questions, and some
7  of them are going to sound like I'm asking the same thing,
8  but that's really just trying to get you to the point
9  where you're at the subject matter I want to talk to you
10 about.  Okay.
11         You were asked some questions about voter
12 registration and fraudulent voter registration generally
13 and the public testimony regarding that.  Do you remember
14 that?
15     A. I remember the basic area of testimony.
16     Q. I'm going to be very precise in my questioning
17 and at no point do I intend to ask you a question about
18 anything that's not in the public record.  Okay?
19     A. (Witness nods head.)
20     Q. I'll try to make that clear, but I just want you
21 to know that up front.
22         Other than what is in the public testimony in
23 support of SB 14, do you have any other information
24 regarding voter fraud as it applies to SB 14?
25         MR. MCKENZIE:  I'm going to object on

---

227

1  deliberative process grounds.
2          MR. DUNN:  I'm not asking what it is, I'm
3  just asking if he has it, yes or no.
4          MR. MCKENZIE:  But you're asking him if he
5  has information on voter fraud.  I was going to inform the
6  knowledge he has before or while an analysis from the
7  governor's office, so I'm going to stand on the objection.
8          MR. DUNN:  So your position to the Court is
9  he can't even identify whether he has information
10 independent from the public record.
11         MR. MCKENZIE:  Yeah.  My position to the
12 Court is that to the extent it would reveal -- the fact
13 that he has information on voter fraud in his office that
14 he could have relied on in his analysis, then that would
15 be privileged, yes.
16         MR. DUNN:  And you understand the Court has
17 said we're allowed to obtain information at least to the
18 effect of a privilege log.  So if I don't even know if
19 there is that information, then it's like not providing a
20 privilege log.  I'm not asking what it is, I'm just asking
21 him to identify whether he's got it.
22         MR. MCKENZIE:  Right, I understand.  But to
23 me the layer is more specific than just talking about
24 voter ID.  You're talking about voter fraud, which is one
25 of the issues that's in contention.  How much it was

---

228

1  weighed or analyzed by the governor's office I think is
2  something that would be subject to the deliberative
3  process privilege.
4          MR. DUNN:  I just want the record to note
5  that I have a number of questions on this subject, and
6  we'll have to get a Court ruling on it and come back,
7  assuming my interpretation of the Court's earlier rulings
8  are correct.
9      Q. (BY MR. DUNN)  Off of that issue now for the time
10 being, with respect to testimony you gave about there
11 being, I think you said ten thousand or tens of thousands,
12 I'm not sure I heard you right, potentially fraudulent
13 voter registration.  Are you with me at least in the area
14 of the testimony?
15     A. Yes.
16     Q. Do you remember what county or counties that
17 public testimony concerned?
18     A. I remember Harris County in particular.  I don't
19 remember what other counties.
20     Q. Was the testimony from a Harris County official?
21     A. I believe so.  Or staff members.
22     Q. Okay.  Other than that testimony concerning the
23 situation in Harris County, did you hear from any other
24 counties that had a similar problem?
25     A. To be honest, I don't remember the rest of the

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

**229**

1 hearing. I'm from Harris County so I noted, but I don't
2 remember the rest of the...
3     Q. There may have been others, but the only one you
4 can recall is Harris County?
5     A. That's correct.
6     Q. Was -- do you recall if anybody testified at that
7 hearing to sort of rebut the allegations that Harris
8 County had made?
9     A. I don't recall.
10     Q. So essentially your opinions, as you stated them
11 earlier about potential fraud and voter registration was a
12 repetition of the testimony you heard from the Harris
13 County folks; is that true?
14     A. No.
15     Q. In other words, you have independent belief that
16 such fraud in voter registration occurs?
17     A. Yeah, I would say that whatever testimony I heard
18 that day was part of whatever went into making up my
19 analysis at the time.
20     Q. So you had other information regarding
21 fraudulent --
22     A. I can't remember all --
23     Q. -- voter registration?
24     A. I'm sorry, my fault.
25     Q. You had other information regarding fraudulent

---

**230**

1 voter registration?
2     A. I believe we did. I do not recall what it was at
3 this time.
4     Q. So by way of example in the public record only,
5 the only thing you can point us to is this Harris County
6 testimony?
7     A. As we sit here today, the only thing I can
8 recall.
9     Q. Are you aware of litigation regarding Harris
10 County's malfeasance in the operation of the voter
11 registration operation?
12     MR. MCKENZIE: To the extent that you
13 acquired knowledge of that during your tenure and during
14 your analysis at the governor's office, I instruct you not
15 to answer it.
16     A. That's the only format in which I learned any of
17 this, so I decline to answer on the advice of counsel.
18     Q. (BY MR. DUNN) Have you observed any of the
19 numerous newspaper and press reporting regarding
20 litigation concerning Harris County's voter registration
21 operation?
22     MR. MCKENZIE: Same objection to the extent
23 you acquired that while you were working at the governor's
24 office and it's part of your analysis.
25     A. I think I've seen articles. I don't remember

---

**231**

1 much about them. I don't read "The Chronicle' as much as
2 I should.
3     Q. (BY MR. DUNN) Have you accessed the Court file
4 with regard to that litigation?
5     A. No.
6     Q. And did you play any legal role in advising
7 Harris County as it pertains to that issue?
8     A. No, I've never worked for Harris County.
9     Q. Have you ever dealt with the election officials
10 in Harris County for any reason?
11     A. Yes.
12     Q. On what occasions?
13     A. When I worked in the governor's office.
14     Q. And did it always relate to election matters?
15     A. Do you mean any time I dealt with anybody from
16 Harris County or when I dealt with the people that did
17 election law?
18     Q. When you dealt with Harris County officials, was
19 it for issues other than election law?
20     A. I would deal with them on other issues too, I'm
21 sure.
22     Q. Did you have anything to do with organizing the
23 testimony for the legislative hearings?
24     A. No.
25     Q. If the evidence ultimately demonstrates that

---

**232**

1 Harris County doesn't have fraudulent registrations,
2 instead it has an organized outfit to suppress voter
3 registration, then the information you relied upon in
4 support of this bill would also be inaccurate. Would you
5 agree?
6     MR. MCKENZIE: I'm going to object on
7 speculation grounds.
8     A. That certainly calls for a lot of speculation,
9 but also, as I say, there was more than just Harris County
10 involved. Plus, as I testified earlier, there was a
11 general desire to demonstrate to the people who were
12 voting were who they said they were, irrespective of -- as
13 Mr. Gear said problems. It's not just a matter of
14 problems, it's also a matter of if you have the
15 opportunity going forward to demonstrate that voters are
16 who they say they are, that makes your elections more
17 fair.
18     Q. (BY MR. DUNN) There was a general desire to
19 support this legislation in some way factually, isn't that
20 true?
21     A. Repeat that.
22     Q. There was a general desire to support this
23 legislation by some factual basis, isn't that true?
24     MR. MCKENZIE: I'm going to object to the
25 extent that the desire is from the governor's office. To

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

233

1 the extent it's a matter of public record, you can answer.
2     A. I'm not sure I understand the question.
3     Q. (BY MR. DUNN)  That's fair enough.  Have you ever
4 done any work actually administering elections?
5     A. No.
6     Q. Your experience as its deals with election laws
7 is advising the governor, as far as I can tell.  Is that
8 true?
9     A. Yes.
10     Q. In other words, you haven't run campaigns, been
11 an election lawyer, otherwise administered election
12 projects?
13     A. No, I've been involved in campaigns.  The rest of
14 it I haven't.  I've not been an election lawyer or -- I'm
15 sorry.  Whatever -- what was the --
16     Q. You haven't administered elections on behalf of
17 some government authority?
18     A. No.  I think I worked the polls one time.
19     Q. As an election judge or volunteer?
20     A. Volunteer.
21     Q. As an observer appointed by a candidate or party
22 or actually volunteered for the election apparatus?
23     A. I believe I was a volunteer for the election
24 apparatus once.  I've observed for candidates I guess a
25 couple of times.  I observed the count for the Harris

234

1 County Republican party once.  But normally I -- to the
2 extent that I'd be involved in election, it would be
3 helping a candidate, not necessarily the polls.
4     Q. I understand you work in Travis County?  That's
5 where we are today, isn't it?
6     A. Yes.  I do not now.  I did at the time?
7     Q. Where did work now, in Harris County?
8     A. I don't.
9     Q. Are you registered to vote in Harris County or
10 Travis County?
11     A. Harris County.
12     Q. Has that remained the same?
13     A. Yes.
14     Q. Even while you were working for the governor?
15     A. Yes.  I always went home on the weekends and
16 maintained my residence in Houston.
17     Q. Why did you not move your residence to Travis
18 County?
19     A. I prefer Houston.
20     Q. Have you ever been to a King Street Patriots
21 meeting?
22     A. Yes.
23     Q. How many?
24     A. Probably four or five.
25     Q. Did you volunteer to be one of their poll

235

1 watcher/observers?
2     A. No.
3     Q. During the 2010 election did you attend any King
4 Street Patriots meetings in the run-up to the 2010
5 election?
6     A. I don't think so.
7     Q. When was the last time you'd been to a meeting?
8     A. I went to one a couple of weeks ago.  They were
9 having -- no, that was a meeting at their building, but it
10 was not a meeting at the King Street Patriots.  I take
11 that back.  But I've been to one during -- during the most
12 recent election cycle.  I've been to probably two or
13 three.
14     Q. You're talking about this primary that we're
15 stepping into now?
16     A. Yes.
17     Q. I see.  Not in 2010?
18     A. Not in 2010.
19     Q. Is it true that you relationship, whatever it is,
20 with King Street Patriots didn't start until this election
21 cycle?
22     A. Yes, except the fact that they came to the office
23 before that.  They came to the governor's office during
24 the last session, if not also maybe the session before.
25     Q. And I heard your testimony about that.  I'm now

236

1 more focused on your personal interaction in attending the
2 group's functions.  That all occurred in the run-up to
3 this election, as I understand?
4     A. Most, if not all.  I probably was at a meeting or
5 two prior, but I was not a regular attendee.  In fact I --
6 I spoke at one of their meetings.  They asked me to come
7 speak on -- I was speaking to various groups on the
8 budget, how the Texas state budget works, and I guess they
9 saw me atone and asked me to come speak to their meetings,
10 so I spoke to a King Street Patriots meeting.
11     Q. Did you offer any information about election laws
12 when you spoke?
13     A. No, it was a presentation about how the Texas
14 state budget works.
15     Q. Did you attend any of the meetings that
16 Governor Perry attended?
17     A. No.
18     Q. Are you aware that Governor Perry has attended a
19 number of King Street Patriots meetings?
20     A. I know that he's attended one.
21     Q. But you weren't present?
22     A. I was not present.
23     Q. Would you agree that Governor Perry is a strong
24 supporter of the King Street Patriots?
25         MR. MCKENZIE:  Objection; vague.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                                June 1, 2012

---

### 237

1    A. I'm not sure.

2    Q. (BY MR. DUNN) Do you have any information or

3    knowledge that you learned about the King Street Patriots

4    poll watching activities from 2010?

5    A. Do I have information about their poll watching

6    activities?

7        MR. MCKENZIE: I'm going to object to the

8    extent that you learned about that during your time in the

9    last session, 2011 session, in service to the governor.

10   To the extent you have knowledge --

11       I'm going to object to the extent you have

12   knowledge acquired during the 2011 legislative session in

13   service of the governor. To the extent that you have

14   knowledge outside of that service, you may answer the

15   question.

16   A. I know generally that they had a program of

17   training and providing poll watchers. I wasn't involved

18   in it. I don't know specifically about it.

19   Q. (BY MR. DUNN) Have you volunteered to be a poll

20   watcher for King Street Patriots?

21   A. No.

22   Q. Have you attended any of their training?

23   A. No.

24   Q. Have you watched any of the videos they prepared?

25   A. I didn't know they had any.

### 238

1    Q. Have you attended any events where speakers came

2    and spoke about voter fraud?

3    A. I don't think so. They have different speakers

4    from around the nation talk, they have authors come in,

5    they have different people. I usually come to talk to the

6    people I know in the audience rather than to see the

7    speaker, but I don't recall specifically one on voter

8    fraud.

9    Q. Where are these meetings you attend?

10   A. They have a office in Houston by the Loop.

11   Q. Are you aware of allegations that the King Street

12   Patriots poll watchers in 2010 were assigned almost

13   exclusively to minority poling locations?

14       MR. MCKENZIE: I'm going to object to the

15   extent that you acquired that knowledge in the 2011 legislative

16   session in service of the governor. To extent you have

17   knowledge of that outside of that service, you may answer

18   the question.

19   A. I think Senator Van De Putte made that allegation

20   on the floor. That's the only time I've heard it.

21   Q. (BY MR. DUNN) You haven't heard that in any of

22   the press reporting regarding the King Street Patriots?

23       MR. MCKENZIE: Same objection.

24   A. I don't think so.

25   Q. (BY MR. DUNN) Were you aware that the Department

### 239

1    of Justice ultimately sent in inspectors in 2010 because

2    of King Street Patriots activities?

3        MR. MCKENZIE: Same objection.

4    A. No.

5    Q. (BY MR. DUNN) Have you attended any of the

6    statewide or nationwide summits for King Street Patriots?

7    A. I think one of the events I went to was their

8    first summit. They had something at a hotel that was

9    being simulcast, and I was there for a couple of hours on

10   a Saturday morning.

11   Q. That was a Sheraton Brookhollow hotel there at

12   610 and 290?

13   A. I don't recall. I was probably an hour and a

14   half.

15   Q. Did you watch any of the simulcast speeches?

16   A. I probably watched some of the speeches, but

17   again usually I go to the events, I talk to people I know

18   in the audience. And I don't know for a fact that it was

19   the summit, but it seems like it might have been.

20   Q. Did you see Catherine Engelbrecht there and speak

21   with her?

22   A. I probably did.

23   Q. Have you made any financial donations to King

24   Street Patriots?

25   A. No.

### 240

1    Q. What sort of contact -- have you had any contact

2    with Paul Bettencourt?

3    A. Yes. He's a friend of mine.

4    Q. How long have you been friends with him?

5    A. Probably since the mid 1990s.

6    Q. Did Mr. Bettencourt ever discuss with you the

7    occasion when he was sued for violating federal laws that

8    related to voter registration?

9    A. Not that I recall.

10   Q. Have you ever worked in the Harris County tax

11   office?

12   A. No.

13   Q. Have you ever applied to work there?

14   A. I don't think so.

15   Q. Have you given any legal advice to the Voter

16   Registration Department in Harris County?

17   A. No.

18   Q. Do you deal with Ed Johnson ever?

19   A. Yes.

20   Q. How do you know him?

21   A. He's a friend of mine. He lives probably a mile

22   and a half from me.

23   Q. How long have you and Ed Johnson been friends?

24   A. Since at least 2005.

25   Q. Were you associated with Ed Johnson's consulting



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                          June 1, 2012

---

### 241

1  business, his political consulting business he had with
2  Representative Bohac?
3      A.  No.  I worked for the governor.
4      Q.  You aware of the business that I'm referencing?
5      A.  Yes.
6      Q.  What do you know about that business in terms of
7  what kind of work it did?
8      A.  My understanding that they provided -- and in
9  fact I -- I don't know if he was still working there, but
10 in 2006 I used Bohac's software as my -- as my voter ID
11 and block-walking information software.
12     Q.  Was that because you were running a campaign?
13     A.  Yes.  I was running for the House.
14     Q.  You were a candidate for the House?
15     A.  Yes.
16     Q.  What district was that?
17     A.  House District 133.
18     Q.  Who is the incumbent in that district?
19     A.  Jim Murphy.
20     Q.  Was that who you ran against?
21     A.  Yes.
22     Q.  In the primary?
23     A.  He and a woman named Barbara Larson.
24     Q.  Was that an open seat at the time?
25     A.  It was.

### 242

1      Q.  Who had resigned?
2      A.  Joe Nixon tried to run for the Senate.
3      Q.  I see.
4      A.  If he didn't resign, he couldn't run for
5  re-election.
6      Q.  So as a candidate, you purchased from Mr. Bohac
7  some software to help you do your voter outreach; is that
8  true?
9      A.  Yes.
10     Q.  One of the advertisements that Mr. Bohac and
11 Mr. Johnson made in their business is that they had
12 special lists and information as a result of Ed Johnson's
13 relationship with the tax office.  Isn't that true?
14         MR. MCKENZIE:  I'm going to go ahead and
15 object that it assumes facts not in evidence.
16     A.  Not that I know of.
17     Q.  (BY MR. DUNN)  You've never seen an advertisement
18 where Ed Johnson an Representative Bohac claim they had
19 special lists because of Ed Johnson's position working for
20 the voter registrar in Harris County?
21         MR. MCKENZIE:  I object on relevance
22 grounds.
23     A.  I've never seen any advertisement of their
24 business.
25     Q.  (BY MR. DUNN)  That was in 2006, sir?

### 243

1      A.  It was 2005, was when I bought it, for the 2006
2  election cycle.
3      Q.  Is that the only time you've gotten a list from
4  that group?
5      A.  No, I use it again this election cycle, although
6  I don't know if they're still involved in -- I got it
7  through my consultant this time.  I used the same
8  software.
9      Q.  Who was your consultant?
10     A.  Allen Blakemore.
11     Q.  Did you run for something this cycle as well?
12     A.  I was running for the State House of
13 Representatives until the federal court changed the
14 districts and eliminated the one I was running in.
15     Q.  What district was that?
16     A.  It was District 136, the one Beverly Woolley is
17 retiring from.
18     Q.  I imagine then you followed closely the
19 redistricting decisions by the federal court in San
20 Antonio?
21         MR. MCKENZIE:  Objection; relevance.  You
22 may answer.
23     A.  To be honest, I was too busy knocking on doors to
24 follow it as closely as I should.  You know, when a big
25 bomb would hit like a new map coming out, I would know

### 244

1  about it.  But otherwise on a day-to-day basis I would
2  hear rumors, but mostly I was out knocking on doors.
3      Q.  (BY MR. DUNN)  Are you aware that the three
4  federal judges the San Antonio found discriminatory
5  aspects to the State House map as adopted?
6         MR. MCKENZIE:  I'm objecting because it has
7  facts not in the record and also that it mischaracterizes
8  facts in the real world.  But you may answer.
9      A.  I never read the opinion.  All I know is when the
10 maps changed.
11     Q.  (BY MR. DUNN)  Ultimately the map changed as a
12 result of an order, though, from the San Antonio court?
13     A.  There was an order and then there was a stay by
14 the Supreme Court and then there was another order.
15     Q.  Have we covered the two campaigns that you've run
16 or are there others?
17     A.  That's it.
18     Q.  And just to make sure it's clear in our record,
19 there was one in 2005 and then one in 2011 that was
20 short-lived?
21     A.  Right.  The 2005 one was the 2006 primary.
22     Q.  Okay.
23     A.  But I started running in the fall of 2005.
24     Q.  Do you have any relationship with George
25 Hammerlein?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

### 245

1    A.  Yes.

2    Q.  How do you know him?

3    A.  I've known him for a lot of years.  I don't know

4    how I first met him.

5    Q.  Mr. Hammerlein used to work for the Voter

6    Registration Department in Harris County.  Is that true?

7    A.  Yes, it is.

8    Q.  And now he's with the county clerk, helping with

9    the administration of the actual election.  Is that true?

10   A.  I know he works for the county clerk.  I'm not

11   sure what his capacity is.

12   Q.  Have you had any arrangement at all where you

13   gave any kind of advice, legal, political or otherwise, as

14   it relates to the Harris County Voter Registration

15   Department?

16   A.  No.

17   MR. DUNN:  I think that's all I have.

18   Thanks for your time, sir.

19   THE REPORTER:  Mr. Gear, you get the

20   original.  Who else would like a copy?

21   MR. MCKENZIE:  We would.

22   THE REPORTER:  Would you like it expedited

23   and the rough draft as well?

24   MR. MCKENZIE:  Yes.

25   MR. DUNN:  I'll take a mini.

### 246

1    (THE DEPOSITION CONCLUDED AT 4:48 P.M.)

### 247

1                    CHANGES AND SIGNATURE

2    PAGE     LINE     CHANGE          REASON

3    _____

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25            MICHAEL SCHOFIELD

### 248

1                    SIGNATURE PAGE

2

3    I, MICHAEL SCHOFIELD, have read the foregoing

     deposition and hereby affix my signature that same is true

     and correct, except as noted above.

4

5

6    _____

     MICHAEL SCHOFIELD

7

8

9    THE STATE OF _____)

10   COUNTY OF _____)

11   Before me, _____, on this

     day personally appeared MICHAEL SCHOFIELD, known to me (or

12   proved to me under oath or through

     _____ (description of identity card

13   or other document)) to be the person whose name is

     subscribed to the foregoing instrument and acknowledged to

14   me that they executed the same for the purposes and

     consideration therein expressed.

15   Given under my hand and seal of office this

     _____ day of _____, 2012.

16

17

18   _____

     NOTARY PUBLIC IN AND FOR

19   THE STATE OF _____

     COMMISSION EXPIRES: _____

20

21

22

23

24

25



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 249

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,            )
                          )
    Plaintiff,            )
                          )
VS.                       )
                          )
ERIC H. HOLDER, JR., IN   )
HIS OFFICIAL CAPACITY AS  )
ATTORNEY GENERAL OF THE   )
UNITED STATES,            )
                          )
    Defendant,            )
                          )
ERIC KENNIE, ET AL.,      )
                          )
    Defendant-Intervenors, )
                          )
THE TEXAS SATE CONFERENCE )
OF NAACP BRANCHES, ET      )   CASE NO. 1:12-CV-00128
AL.,                       )   (RMC-DST-RLW)
                           )   Three-Judge Court
    Defendant-Intervenors, )
                           )
TEXAS LEAGUE OF YOUNG      )
VOTERS EDUCATION FUND, ET  )
AL.,                       )
                           )
    Defendant-Intervenors, )
                           )
TEXAS LEGISLATIVE BLACK    )
CAUCUS, ET AL.,            )
                           )
    Defendant-Intervenors, )
                           )
VICTORIA RODRIGUEZ, ET     )
AL.,                       )
                           )
    Defendant-Intervenors. )

REPORTER'S CERTIFICATION
DEPOSITION OF MICHAEL SCHOFIELD
JUNE 1, 2012

## 250

I, Tamara K. Chapman, Certified Shorthand Reporter in
and for the State of Texas, hereby certify to the
following:

That the witness, MICHAEL SCHOFIELD, was duly sworn
by the officer and that the transcript of the oral
deposition is a true record of the testimony given by the
witness;

That the deposition transcript was submitted on
_____ to the witness or to the attorney for
the witness for examination, signature and return to me by
_____;

That the amount of time used by each party at the
deposition is as follows:

Mr. John W. McKenzie, III - 00:00

Mr. Bruce Gear - 5:06

Mr. Chad W. Dunn - 00:00

That pursuant to information given to the deposition
officer at the time said testimony was taken, the
following includes counsel for all parties of record:

Mr. John W. McKenzie, III - FOR THE PLAINTIFF STATE
OF TEXAS

Mr. Bruce Gear - FOR THE DEFENDANTS ERIC H. HOLDER,
ET AL.

Mr. Chad W. Dunn - FOR THE KENNIE INTERVENORS

## 251

That $_____ is the deposition officer's charges
to the Defendants Eric H. Holder, et al., for preparing
the original deposition transcript and any copies of
exhibits;

I further certify that I am neither counsel for,
related to, nor employed by any of the parties or
attorneys in the action in which this proceeding was
taken, and further that I am not financially or otherwise
interested in the outcome of the action.

Certified to by me this 5th day of June, 2012.

_Tamara K Chapman_
_____
Tamara K. Chapman, Texas CSR 7248
Expiration Date:  12/31/12
Esquire Deposition Solutions
Firm Registration No. 283
100 Congress Avenue, Suite 2020
Austin, Texas 78701
T: 512.634.1980
F: 512.328.8139
www.esquiresolutions.com



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com