**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                        )
                                       )
        Plaintiff,                     )
                                       )
VS.                                    )   CASE NO. 1:12-CV-00128
                                       )   (RMC-DST-RLW)
ERIC H. HOLDER, JR., in his            )   Three-Judge Court
official capacity as Attorney          )
General of the United States,          )
                                       )
        Defendant.                     )
                                       )
ERIC KENNIE, et al.,                   )
                                       )
        Defendant-Intervenors,         )
                                       )
TEXAS STATE CONFERENCE OF              )
NAACP BRANCHES, et al.,                )
                                       )
        Defendant-Intervenors,         )
                                       )
TEXAS LEAGUE OF YOUNG VOTERS           )
EDUCATION FUND, et al.,                )
                                       )
        Defendant-Intervenors,         )
                                       )
TEXAS LEGISLATIVE BLACK                )
CAUCUS, et al.,                        )
                                       )
        Defendant-Intervenors,         )
                                       )
VICTORIA RODRIGUEZ, et al.,            )
                                       )
        Defendant-Intervenors.         )
--------------------------------------------------
                ORAL DEPOSITION OF
                   TODD SMITH
                  JUNE 1, 2012
--------------------------------------------------

ORAL DEPOSITION of TODD SMITH, produced as a witness

**2**

1   at the instance of the Defendant, and duly sworn, was
2   taken in the above-styled and numbered cause on the 1st
3   day of June, 2012, from 10:45 a.m. to 4:54 p.m., before
4   Jean Thomas Fraunhofer, CSR in and for the State of
5   Texas, reported by machine shorthand, at the Law Offices
6   of DECHERT LLP, 300 West 6th Street, Suite 210, Austin,
7   Texas 78701, pursuant to the Federal Rules of Civil
8   Procedure and the provisions stated on the record or
9   attached hereto.

**3**

1                    A P P E A R A N C E S
2
3   FOR THE PLAINTIFF:
        MATTHEW FREDERICK
4       Assistant Attorney General
        ATTORNEY GENERAL OF TEXAS
5       P.O. Box 12548
        Austin, Texas 78711
6       Tel: (512) 936-1307
        Email: Matthew.frederick@oag.state.tx.us
7
8
9   FOR THE DEFENDANT:
10      ELIZABETH S. WESTFALL
        MICHELLE A. McLEOD
11      Trial Attorneys
        U.S. DEPARTMENT OF JUSTICE
12      950 Pennsylvania Avenue, NW
        Room 7254 NWB
13      Washington, DC 20005
        Tel: (202) 305-0115
14      Email: Elizabeth.westfall@usdoj.gov
15  FOR THE DEFENDANT-INTERVENOR: MALDEF
16      NINA PERALES
        LUIS FIGUEROA
17      MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL
         FUND (MALDEF)
18      110 Broadway, Suite 300
        San Antonio, Texas 78205
19      Tel: (210) 224-5476
        Email: Nperales@maldef.org
20
21  ALSO PRESENT:  JUAN CARLOS IBARRA (Advancement Project)
22               JANINE LOPEZ (MALDEF)
23
24
25

**4**

1                      I N D E X
    WITNESS                                   PAGE
2
    TODD SMITH
3     Examination by Ms. Westfall       5
      Examination by Ms. Perales        181
4
    Signature and Changes               252
5   Reporter's Certificate              253
6            E X H I B I T S
    NO.       DESCRIPTION               PAGE
7
8   EXHIBIT US-28  HB218 (previously marked)     87
    EXHIBIT US-29  HB362 (previously marked)     96
9   EXHIBIT US-81  SB14 (previously marked)      138
    EXHIBIT US-88  2/8/11 Letter to John Beck from  239
10                 David Dewhurst (previously marked)
    EXHIBIT US-100  Amended Notice of Deposition   11
11  EXHIBIT US-101  Documents Privilege Log        58
    EXHIBIT US-102  HB1706                         72
12  EXHIBIT US-103  Texas Legislative Online History  100
                    (SB362)
13  EXHIBIT US-104  Clear Lake GOP website screen  111
    EXHIBIT US-105  3/28/09 Lubbock Online website  117
14                  screen
    EXHIBIT US-106  HB401                          128
15  EXHIBIT US-107  HB1338                         132
    EXHIBIT US-108  Texas Legislative Online History  149
16                  (SB14)
    EXHIBIT US-109  3/21/11 House Journal          153
17  EXHIBIT US-110  3/23/11 House Journal          169
    RODRIGUEZ-15  HB1706                           181
18  RODRIGUEZ-16  3/6/09 Memo to Todd Smith from   189
                  Hope Andrade
19  RODRIGUEZ-17  4/6/09 Committee on Elections    198
                  Transcript
20  RODRIGUEZ-18  4/7/09 Committee on Elections    199
                  Transcript (Vol. 1)
21  RODRIGUEZ-19  4/7/09 Committee on Elections    203
                  Transcript (Vol. 3)
22  RODRIGUEZ-20  4/6/09 Committee on Elections    208
                  Transcript (Vol. 2)
23  RODRIGUEZ-22  A Bill to be Entitled An Act     209
    RODRIGUEZ-22  4/29/09 Quorum Report            215
24  RODRIGUEZ-23  5/6/09 Quorum Report             219
    RODRIGUEZ-24  2/9/10 Quorum Report             236
25



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                          June 1, 2012

---

### 5

1          TODD SMITH,
2    having been first duly sworn, testified as follows:
3          EXAMINATION
4    BY MS. WESTFALL
5    Q.  Good morning, Mr. Smith.  How are you?
6    A.  Good.
7    Q.  Could you state and spell your name for the
8    record, please?
9    A.  Todd Smith, T-O-D-D, S-M-I-T-H.
10   Q.  Hi.  My name is Elizabeth Westfall.  I
11   represent the US Attorney General in this matter, and
12   I'd like others in the room to introduce themselves.
13         MS. McLEOD:  Michelle McLeod, also
14   representing the Attorney General.
15         MS. PERALES:  Nina Perales with MALDEF.
16   It's a pleasure.  Thank you for being here today.
17         MR. FREDERICK:  Matthew Frederick for the
18   State of Texas.
19         MS. LOPEZ:  Janine Lopez with MALDEF.
20         MR. FIGUEROA:  Luis Figueroa with MALDEF.
21         MR. IBARRA:  Juan Carlos Ibarra with the
22   Advancement Project.
23   Q.  (BY MS. WESTFALL) Thank you.  Have you had your
24   deposition taken before Mr. Smith?
25   A.  I have never had my deposition taken before.

---

### 6

1    Q.  How exciting.
2    A.  M-hm.
3    Q.  I will go over some ground rules so you know
4    what to expect today.  You've been placed under oath, so
5    you are expected to testify truthfully, accurately and
6    completely; do you understand?
7    A.  Yes.
8    Q.  The court reporter will prepare a transcript of
9    everything that is said today, so please wait for me to
10   finish my questions before you answer, okay?
11   A.  Okay.
12   Q.  And please, likewise, do not give any nonverbal
13   responses like uh-huh, m-hm or shaking or nodding your
14   head so it can be transcribed, okay?
15   A.  Okay.
16   Q.  I'll try to ask you clear questions, but there
17   may be times today when I don't, so if you don't
18   understand a question, please let me know, okay?
19   A.  M-hm.
20   Q.  If you wish to stop and take a break, you
21   should feel free to do so, but I ask that if I have a
22   question pending, please finish the question and then we
23   can take a break.
24   A.  Okay.
25   Q.  Your attorney may make an objection.  If he's

---

### 7

1    making an objection for the record, unless he instructs
2    you not to answer, you can go ahead and answer the
3    question.  Do you understand these instructions?
4    A.  Yes.
5    Q.  Are you on any medication today that might
6    affect your ability to testify truthfully?
7    A.  No.
8    Q.  Is there any other reason that you cannot
9    testify truthfully today?
10   A.  No.
11   Q.  And if I refer to you, unless I specify
12   otherwise, I'm asking you a question about you in your
13   capacity as a former member of the Texas House of
14   Representatives; do you understand?
15   A.  Yes.  But I'm a current member of the House of
16   Representatives.
17   Q.  My apologies.
18   A.  Six more months.
19   Q.  Six more months.  I didn't realize the timing.
20   A.  That's okay.
21   Q.  And if I refer to you, I also mean to include
22   your office in the House of Representatives.  Is that
23   okay?
24   A.  I guess when you say "you," it also includes
25   anybody in my office.

---

### 8

1    Q.  Yes.  I'm asking about you in your professional
2    capacity and you and your office, and I'm going to do my
3    best to try to refer to your office and staff, but there
4    may be occasions when we're having some back and forth
5    and I forget to do so, so I'd ask for your indulgence in
6    that regard.
7          I may also use the term voter ID and photo
8    ID interchangeably during the deposition, and I want you
9    to interpret these terms very broadly to include a
10   requirement that a voter present a form of
11   identification, whether it has a photo or not, when
12   voting in person before being permitted to vote by
13   regular ballot.  Is that okay?
14   A.  I suppose.
15   Q.  I'm going to try to refer to photo ID instead
16   of voter ID, but it's -- you know, again, I may ask for
17   your indulgence in that regard.
18         Also, when I refer to the term minority
19   voters, I mean voters who are non-white and non-anglo;
20   do you understand that?
21   A.  Yes.
22   Q.  Do you have any other questions or any
23   questions about these instructions I just supplied to
24   you?
25   A.  No.

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                                June 1, 2012

---

9

1   Q.  Thank you.  Have you ever been a party in
2   litigation?
3       A.  Don't believe so.
4       Q.  Have you ever testified in court before?
5       A.  N-hn.  No.
6       Q.  Have you ever been involved in a case as a
7   witness where the State of Texas was a plaintiff or a
8   defendant?
9       A.  No.
10      Q.  What did you do to prepare for today's
11  deposition?
12      A.  Just visited with my attorney briefly
13  yesterday.
14      Q.  And who's your attorney?
15      A.  Mr. Frederick.
16      Q.  Did you meet with anyone else?
17      A.  No.
18      Q.  How long did you meet with Mr. Frederick?
19      A.  Maybe an hour, hour and a half.
20      Q.  Did you review any documents in preparation for
21  today's deposition?
22      A.  A few documents, just stuff that he had.
23      Q.  Could you describe generally what those
24  documents were?
25      A.  It appeared to be like a Google search that he

---

10

1   had done on Todd Smith anticipating what you might have
2   in the public record.
3       Q.  I see.  So this is Mr. Frederick's extensive
4   news search that you studied?
5           MR. FREDERICK:  For the record, it was not
6   my search.
7       Q.  Other than your attorney, did you speak with
8   anyone else about your deposition today?
9       A.  No.
10      Q.  Have you spoken to anyone else who's testified
11  in deposition in this matter before this deposition?
12      A.  Yes.  I talked to Patricia at some point long
13  ago, and, basically, she was just kind of kiddingly
14  telling -- Pat -- I don't know if it's okay to say that,
15  but she was just kiddingly telling me that she had
16  indicated in a prior deposition that he was someone who
17  had knowledge about the issue, so --
18      Q.  I see.  Was anything -- Did you discuss
19  anything else with Ms. Harless?
20      A.  No, I don't believe so.
21      Q.  Did you discuss the substance of her testimony
22  in any way?
23      A.  No.
24      Q.  Did you speak to anyone else in the Texas
25  legislature about your deposition?

---

11

1       A.  I don't believe so, no.
2       Q.  Did you bring any notes with you today?
3       A.  No.
4           (Exhibit US-100 marked.)
5       Q.  Could you mark this be US Exhibit 100?  You've
6   been handed what's been marked US-100.  Do you recognize
7   this document?
8       A.  You know, I don't -- I believe I received it at
9   some point in time, but didn't look at it very
10  carefully, so I do -- I guess I recognize it to that
11  degree.
12      Q.  And what is it?
13      A.  It's a notice of deposition.
14      Q.  Is this noticing your deposition for today,
15  sir?
16      A.  Looks like it does, yes.
17      Q.  And do you see under the Attachment A, a couple
18  pages in, that it lists a numbered list of documents?
19      A.  Yes.
20      Q.  Did you search for the documents listed in this
21  document, US Exhibit 100?
22      A.  As earlier defined, yes, I believe my staff
23  did.
24      Q.  Did you direct your staff to search for these
25  documents?

---

12

1       A.  Yes.
2       Q.  What did you tell them?
3       A.  To seek to visit with counsel, and I'm not even
4   sure who they were talking with, whether it was the
5   Attorney General's office or someone in the House of
6   Representatives, but they would have been guided by some
7   counsel in complying with this request for information.
8       Q.  Who on your staff undertook that search?
9       A.  Trish Conrad.
10      Q.  Trish Conrad?
11      A.  Yes.
12      Q.  What is her title?
13      A.  Chief of staff.
14      Q.  Did she look in your House of Representatives'
15  office for documents?
16      A.  I do not know what she did other than to comply
17  with this request per counsel, so I really don't know
18  where she looked or what she did.
19      Q.  I see.  And do you maintain any files related
20  to your responsibilities in the house in your personal
21  residence?
22      A.  No.
23      Q.  Do you maintain any correspondence on email on
24  a personal computer at home?
25      A.  No.

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                              June 1, 2012

---

### 13

1    Q.  Do you keep -- Is it your testimony that
2    everything related to your work on photo ID issues is
3    maintained in your office at the House of
4    Representatives?
5        A.  Yes.
6        Q.  Did Ms. Conrad produce documents to your
7    attorney?
8        A.  Yes.
9        Q.  When did she conduct the search for documents?
10       A.  Just -- I assume soon after we received this
11   notice.
12       Q.  Did you discuss with anyone asserting any
13   privilege over these documents?
14       A.  Say that one more time.
15       Q.  Did you discuss with anyone, namely, your
16   attorney, asserting a privilege over any of these
17   documents?
18       A.  I think that yesterday is -- as a part of the
19   discussion, he indicated that some of those documents
20   were privileged.
21       Q.  Okay.  And we'll talk about privilege in one
22   moment.  How do you usually communicate with your staff?
23   What method of communication?  Let me be more specific.
24       A.  Well, it just depends on where I am, but, you
25   know, we communicate in a variety of ways.  Telephone,

### 14

1    cell phone, email, text.  Those are the only way that I
2    can think of verbally.
3        Q.  Do you maintain a email account with the House
4    of Representatives that you use?
5        A.  Yes.  I rarely -- I don't personally use it
6    much, but it's way more for my staff.
7        Q.  What account do you use to email your staff?
8        A.  They -- if they -- They will send it to my
9    personal email sometimes, which I get on my phone.
10       Q.  Can you tell me whether that's gmail or what
11   the host is?
12       A.  I needed to bring my wife.  I can't, no.  It's
13   not gmail.  It's --
14       Q.  Is it Yahoo?
15       A.  No.
16       Q.  Is it AOL?
17       A.  No, I don't know.  I'm computer technologically
18   ignorant, and I don't know that I can answer that.
19       Q.  In response to this request for documents, did
20   you check that email account or direct Ms. Conrad to
21   check that email account for any communications related
22   to photo ID?
23       A.  There's nothing that I keep stored there.  I
24   erase them all automatically as a part of my routine,
25   personal and otherwise, so --

### 15

1    Q.  Do you know the date that -- that this
2    litigation was filed on approximately?
3        A.  Do I know what now?
4        Q.  When the litigation was filed, when the
5    complaint was filed in this action.
6        A.  No.
7        Q.  Was it around January of this year?
8        A.  I don't know.
9        Q.  Did anyone at any point tell you to preserve
10   records and documents related to this litigation?
11       A.  Not that I recall, but I don't -- I'll just say
12   it certainly would not have been any communications of
13   any kind related to voter ID or photo ID since
14   litigation began, if it began in January.
15       Q.  Correct.  But my question was at any point
16   anyone told you not to maintain and preserve documents
17   related to your work on photo ID bills in the House of
18   Representatives?
19       A.  Not that I recall.
20       Q.  Can you describe your office's record retention
21   policy as a general matter?
22       A.  No.  I don't know that -- you know, that we
23   have a -- any kind of document retention policy.
24       Q.  And do you know what -- could you describe the
25   search that Ms. Conrad undertook?

### 16

1    A.  No, I don't know.
2        Q.  Will you be invoking regulative privilege today
3    over your deposition testimony?
4        A.  I imagine I will.
5        Q.  Mr. Smith, do you realize that it's up to you
6    as a legislator to invoke that?
7        A.  Yes.  I will, yes.
8        Q.  Okay.  Have you asserted any privileges over
9    any documents withheld in this litigation?
10       A.  I believe I have.
11       Q.  Why are you asserting a legislative privilege?
12       MR. FREDERICK:  Objection.  Objection.
13   Relevance.  I will also object to the extent it seeks
14   for thoughts, mental impressions about the legislation
15   that is involved in this case.
16       MS. WESTFALL:  Mr. Frederick, there is no
17   legislative act you can point to.  This is a discussion
18   about why Mr. Smith as a legislative has decided to
19   invoke privilege.  I'm not going to withdraw my
20   question.
21       MR. FREDERICK:  That's fine.  But to the
22   extent you are asking him why he is asserting privilege
23   in a case that directly involves multiple pieces of
24   legislation, I think that question would tend to ask him
25   to reveal his thoughts or mental impressions about the

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

## 17

1  legislation. I'm not quite sure --

2       MS. WESTFALL: Are you instructing him not

3  to answer?

4       MR. FREDERICK: I'm instructing him not to

5  answer to the extent that it would reveal his thoughts,

6  mental impressions or communications that would relate

7  to SB14 or any other photo voter ID or voter ID

8  legislation, but if you can answer the question as posed

9  without doing so, you may answer.

10      A. I don't know how I would do that.

11      Q. Sitting here today, do you know why you are

12  asserting the legislative privilege?

13      A. I don't know that I understand the full

14  parameters of the legislative privilege, but I presume

15  I'm doing it because there are policy reasons why

16  elected officials should not be put under oath and asked

17  certain questions about certain subjects.

18      Q. And you know that -- Are you an attorney,

19  Mr. Smith?

20      A. Yes.

21      Q. And are you aware that legislators may waive,

22  if they so choose -- or not waive, but they may choose

23  not to invoke the legislative privilege and may choose

24  to testify openly and truthfully about matters involving

25  legislative acts?

---

## 18

1       A. I presume that's the case, yes.

2       Q. And is it your decision today that you are not

3  going to do that?

4       A. Yes.

5       Q. If you would like to waive the privilege in

6  response to any particular question that I may ask

7  today, will you let me know?

8       MR. FREDERICK: I'm going to object. You

9  are inviting the witness to waive privilege over a

10  specific question. I believe that is an improper

11  question. I obviously --

12      MS. WESTFALL: Mr. Frederick?

13      MR. FREDERICK: I ask you to not instruct

14  my witness about how to insert his privilege.

15      MS. WESTFALL: I was asking a question,

16  whether he would be willing if he decided not to invoke

17  the privilege. It has to be affirmatively invoked. I

18  think both parties agree that that's the standard here.

19  If he decides not to invoke, he could let me know, and

20  I'm asking whether he would be amenable to doing that.

21      MR. FREDERICK: My objection is to the

22  implication that he would be able to invoke or not

23  invoke to specific questions and still maintain the

24  privilege. I don't know what your office's position is

25  on that, but I'm not prepared to assume that you would

---

## 19

1  allow him to selectively invoke the privilege.

2       MS. WESTFALL: It's his to invoke. Now,

3  whether there's subject matter waiver, I think is --

4  this is a different privilege. This is not

5  attorney-client privilege, so I believe he would be able

6  to invoke with regard to particular areas of questions

7  and exams without subject matter waiver. That's my

8  preliminary thought on that topic.

9       MR. FREDERICK: Fair enough.

10      Q. (BY MS. WESTFALL) So my question stands,

11  Mr. Smith, if you would like to waive the privilege with

12  regard to -- or choose not to invoke the privilege with

13  regard to any set of questions I ask today, will you let

14  me know?

15      A. Well, I'm not sure I understand from that

16  exchange whether or not it is clear on the record that I

17  have the ability to waive it on a question-by-question

18  basis without subjecting myself to a total waiver of

19  whatever this privilege may protect me from. But I

20  suppose if -- You know, you seem to stop short of

21  stipulating that I can do that.

22      Q. I need to consult with my co-counsel during the

23  break to make sure because I'm here representing the

24  Attorney General, so I need to consult with many people

25  before I -- I'm able to assert that, and if there are

---

## 20

1  particular areas where you feel you might want to

2  testify and not invoke, we can take a break, and I

3  can -- we can see if we can work something out. Is that

4  acceptable to you?

5       A. It's certainly acceptable to me. I mean, there

6  may be some questions I'd be willing to answer if I knew

7  that it wasn't -- I wasn't opening myself up to some

8  broad exposure that I don't fully understand.

9       MS. WESTFALL: Yes.

10      MR. FREDERICK: And I would also say that

11  I would also like the same chance to consult with my

12  co-counsel and my client to talk about it.

13      MS. WESTFALL: Certainly.

14      MR. FREDERICK: But I'm happy to do so if

15  it comes up.

16      Q. (BY MS. WESTFALL) Okay. So let's take it as it

17  comes up and not in the abstract. Thank you.

18           Could you describe your educational

19  background starting with college, Mr. Smith?

20      A. SMU undergrad, Bachelor of Arts in political

21  science, minor in history and economics, and UT law

22  degree.

23      Q. And SMU stands for?

24      A. Southern Methodist University.

25      Q. And what year did you graduate?

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 21

1  A.  From SMU, I graduated in 1985.
2  Q.  What year did you graduate from the University
3  of Texas?
4  A.  I guess it would have been December of 1988.
5  Q.  Did you maintain an active bar license?
6  A.  Yes.
7  Q.  What state is that with?
8  A.  Texas.
9  Q.  And do you have a license in any other states?
10  A.  No.
11  Q.  Can you list all of the jobs that you have had
12  since you graduated from law school in chronological
13  order starting with right after law school?
14  A.  Locke, Purnell, Rain, Harrell was the name of
15  it.  Now it's Locke Lord, I think, or whatever, and then
16  the Note Boom Law Offices, and then my own law practice.
17  Q.  What is your current job?
18  A.  I am a plaintiff's attorney, sole proprietor,
19  in Bedford, Texas.
20  Q.  What is your area of practice?
21  A.  Personal injury.
22  Q.  How long have you had your own practice?
23  A.  Since 1996.
24  Q.  Do you have any partners?
25  A.  No.

## 22

1  Q.  When were you first elected to the Texas House
2  of Representatives?
3  A.  1996.
4  Q.  What area does that encompass?
5  A.  Geographically?
6  Q.  Geographically.
7  A.  Roughly the Hurst, Euless, Bedford area.
8  Q.  What is the number of the district?
9  A.  92.
10  Q.  What are the demographics racially of the
11  district approximately?
12  A.  Oh, gosh.
13  Q.  I don't want to hold you to it precisely.
14  A.  I mean, it's --
15  MR. FREDERICK:  Object on relevance, but
16  you can answer the question.
17  A.  I mean, it's overwhelmingly anglo, but there is
18  a substantial, I guess, Hispanic minority population and
19  a fairly substantial Tongan minority population in south
20  Euless, and I just would be wrong, I think, if I
21  asked -- I mean, I would venture to guess that maybe
22  30 percent is minority of some type.  I could be wrong.
23  Q.  In terms of the growth and changes in
24  population in your house district, has it been trending
25  sort of increasingly Hispanic --

## 23

1  A.  Sure.
2  Q.  -- since '96?
3  A.  Yes.  I think it's becoming more diverse in a
4  variety of regards.  It's just not Hispanic.  It's very
5  diverse.  We've got elementary schools on the south side
6  of my district where there's 50 languages spoken in that
7  one school, so just very, very diverse from all over the
8  world.
9  Q.  Thank you.  How many staff do you have in your
10  House office?
11  A.  Depends on when you are talking about, but
12  currently during the interim, I have one in Austin and
13  one in the district.
14  Q.  And when the House is in session?
15  A.  Then we add a few temporary employees in the
16  Austin office that work session only usually, students.
17  Q.  Can you identify the name and title of every
18  person who has worked in your office who has handled
19  voter ID or photo ID issues since 2005?
20  A.  Oh, boy.  Golly.
21  Q.  And I put aside interns.
22  A.  I'm trying to remember who my chief of staffs
23  have been since 2005.  I'm not going to be able to
24  remember their names.  That's awful, but --
25  Q.  Could you perhaps identify the central staff

## 24

1  people who helped you with photo ID and voter ID from
2  2005 to the present?
3  A.  It's like -- These are people that you work
4  with for four months and then they disappear on you and
5  you don't see them again.  Oh, boy.
6  Q.  You know what, Mr. Smith, maybe if you are
7  having difficulty remembering them, we can discuss them
8  in conjunction with particular legislation and that will
9  refresh your recollection.  Would that be helpful?
10  A.  Steven Schar is certainly one of them.  He was
11  the clerk of the elections committee, and then, gosh,
12  the young man that's now works, I think, in the Perry
13  political operation.  I just can't remember his name.
14  Those two -- There were two guys that were kind of
15  actively involved in that issue in the session where I
16  was involved in.
17  Q.  Were -- These two individuals, they worked for
18  you as committee staff or handled your responsibilities
19  on the election committee?
20  A.  Yeah.  My clerk and my assistant clerk, so,
21  yes, elections committee staff.
22  Q.  Was this in 2005 and 2009?
23  A.  Not '05.  It was 2009.
24  Q.  What were their responsibilities generally?
25  A.  Just the -- the -- to conduct the affairs of



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                          June 1, 2012

---

25

1    the elections committee in every respect.
2        Q.  Does that mean coordinating witnesses, working
3    with other members on the committee?  What are those
4    responsibilities?
5        A.  Yeah.  I mean, it means visiting with me about
6    which bills would be set for hearing, making sure
7    that -- that the procedures are followed properly for
8    setting bills for hearing and that -- that members of
9    the committee have the information they need to know
10   what bills are going to be heard and that the -- you
11   know, if it's invited testimony, make sure the people
12   are invited to testify that need to be, and to the
13   extent that it's public testimony, that the proper
14   notice is given so that whatever members of the public
15   wish to testify can do so and, you know, then following
16   the hearings, arrange other hearings to vote bills out
17   of committee, you know, just what all committee clerks
18   do.
19       Q.  Would those clerks be responsible in any way
20   for communicating with their counterparts in the Senate
21   whether it was -- I guess it would be the committee as a
22   whole in 2009?
23       A.  I don't know.  I mean, I can't say.  I don't --
24   You know, I don't know the extent to which there were
25   incidental communications between staff and the House on

---

26

1    elections and staff on the Senate.  I presume there was
2    at least some degree of contact along the way.
3        Q.  Did they communicate with members of the
4    Senate?
5        A.  I doubt extensively.  Maybe not at all.
6        Q.  Were you the one who handled those
7    communications yourself?
8        A.  Yet to the extent that they occurred, then that
9    would have been me.  I did -- You know, I would have
10   talked to Fraser a time or two and actually observed
11   some of the proceedings in the Senate, just small
12   portion of the time they spent over there, just
13   watching, talking to people.
14       Q.  Were you on or near the Senate floor when the
15   Senate considered Senate Bill 362 in 2009?
16       A.  For part of it, yes.
17       Q.  How long were you physically there?
18       A.  Boy, I think I probably got bored within a
19   couple of hours, I don't remember how long, but it
20   wouldn't have been nearly as long as they had to be
21   there.
22       Q.  Do you remember which witnesses you got to hear
23   speak?
24       A.  You know, I don't really remember.  I could
25   guess, but I could be -- I could be confusing what I saw

---

27

1    with what I read, so I don't really remember, no.
2        Q.  Did you recently --
3        A.  It may not even have been witnesses.  It may
4    have been during the time when there was argument being
5    made between senators, and, again, you know, I want
6    to -- it wasn't that -- I want to believe that that was,
7    you know, the time when Senator Fraser said he couldn't
8    hear Wendy Davis.  I do remember that.  If I recall
9    correctly, I think I was on the floor when that
10   happened.
11       Q.  Okay.  Thank you.
12       A.  That didn't have anything to do with voter ID,
13   but it was entertaining.
14       Q.  Did you recently campaign for office in the
15   Senate?
16       A.  Yes.
17       Q.  What district was that?
18       A.  Senate District 9.
19       Q.  Did you resign from the House -- your House
20   seat to run?
21       A.  I did.
22       Q.  Why did you decide to run in the Senate?
23       A.  Oh, boy.
24           MR. FREDERICK:  Objection.  Relevance.
25           MS. WESTFALL:  It's just some background

---

28

1    foundational questions, Mr. Frederick.
2        A.  You know, that was -- there's lots of reasons
3    why I decided to do that, but just the opportunity.  An
4    open seat was certainly one of them, the belief that
5    those Senate seats on the margin in the Senate were
6    really important and could actually have the ability to
7    influence public policy, unlike my House seat in the
8    current, you know, overwhelming majority situation.  And
9    just a little bit of frustration with my leader, you
10   know, in the House in terms of the most recent
11   legislative session and wanting to have an opportunity
12   to -- to serve in a different place.
13       Q.  You were unhappy with Mr. Straus because of the
14   way he was managing your committee assignments or --
15       A.  Yeah.
16       Q.  -- the way he managed the House or what was the
17   nub of the problem?
18       A.  Oh, it was just disappointment over how I
19   was -- what positions I was given, and it did in my
20   opinion relate to the voter ID issue certainly, and so,
21   yeah, I felt like I was thrown in the bus by him and
22   wasn't happy about it.  So it was just, you know --
23       Q.  Time to try something new?
24       A.  I was a very loyal person who handled it in the
25   way was asked and fully protecting him and then had

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

29

1  every reason to believe that I was going to be given a
2  chairmanship and that did not happen, and so he was not
3  happy, and I don't think that anything could fully
4  repair the way I felt about that. So it was -- it would
5  have been certainly preferable from my standpoint to
6  have the opportunity to serve in the Senate for a
7  variety of reasons, including that one.
8      Q.  I see. I see. And did you have an opponent in
9  your primary election?
10     A.  Yes.
11     Q.  Who was that individual?
12     A.  Kelly Hancock.
13     Q.  What was -- And you described the outcome of
14 the election. Why do you think Ms. Hancock prevailed?
15     A.  Mr. Hancock.
16         MR. FREDERICK:  Object to relevance, but
17 you can answer the question.
18     A.  I think because he had the -- primarily because
19 he had the endorsement of the Attorney General.
20     Q.  I see.
21     A.  I'm kidding.
22     Q.  I'm not from around here.
23     A.  No. I -- You know, he had the right groups,
24 and he was the, you know, most -- at least the one who
25 was perceived to be the most conservative candidate and

30

1  that was the one who won in all the races in our area in
2  this particular election cycle.
3      Q.  Was photo ID an issue in the campaign?
4      A.  Yeah. He hit me on it a time or two. It
5  wasn't the biggest issue, but he did put in his
6  literature that I wanted people to be able to vote with
7  a library card or something like that, even though I
8  believe he voted for the same legislation in a prior
9  session.
10     Q.  Was there anything else that -- that your
11 opponent raised in terms of photo ID during the
12 campaign?
13     A.  Not during this one. During the one two years
14 ago was the biggest issue.
15     Q.  In 2010?
16     A.  2010. I had an opponent in my primary -- in my
17 House in that race. It was the biggest issue.
18     Q.  And what was the substance of --
19     A.  That I killed voter ID on purpose by keeping
20 the bill in committee until late in the process.
21     Q.  And what was your opinion of that charge?
22     A.  That it was ridiculous.
23         MR. FREDERICK:  I'm going to object here.
24 I think we're getting into legislative privilege. This
25 is seeking your opinion about the process of

31

1  consideration of a specific bill in 2009. I think that
2  intrudes on legislative privilege. I will instruct you
3  not to answer the question.
4          MS. WESTFALL:  Mr. Frederick, this is not
5  about a legislative act. This is about a political
6  campaign that occurred after the consideration of the
7  bill. The bill was no longer at issue. I would ask you
8  to allow Mr. Smith to answer that question. This is not
9  privilege.
10         MR. FREDERICK:  This question directly
11 asks him for his opinion about a charge about his
12 handling of a specific piece of legislation that is at
13 issue in this case that would reveal his thoughts about
14 pending legislation because it required him to reveal
15 how he felt about how the registration was handled. I
16 would instruct him not to answer on the basis of
17 privilege.
18     Q.  (BY MS. WESTFALL) I will ask it a different
19 way. How did you respond during the campaign to that
20 charge?
21     A.  You know, by saying that it was false, and,
22 certainly, the date the bill came out of committee was a
23 fact, but it was not -- I spent the entire legislative
24 session almost night and day trying to find a way to
25 pass a voter -- a voter ID bill -- not a photo ID bill,

32

1  but a voter ID bill in a 76/74 legislative body, and so
2  the allegation that I did anything other than stay awake
3  at night trying to find a way to pass this bill was
4  simply false.
5      Q.  Thank you for your testimony.
6      A.  M-hm.
7      Q.  Sir, when was the last time you voted?
8      A.  Tuesday.
9      Q.  Do you usually vote in person or do you vote by
10 mail?
11     A.  Person.
12     Q.  Where is your polling place relative to your
13 residence?
14     A.  Early voting is a library in Euless. This time
15 I voted on election day at an elementary school, North
16 Euless Elementary School.
17     Q.  Was it far from your home?
18     A.  No. It's -- The library is 5 miles and the
19 elementary school is 3 miles probably.
20     Q.  So do you usually vote in person at the polls?
21     A.  Yes.
22     Q.  Have you ever seen anyone try to impersonate a
23 voter when you've been voting?
24     A.  No.
25     Q.  Have you ever witnessed what you believe to be



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                                  June 1, 2012

## 33

1 a noncitizen voting?
2    A.  No.
3    Q.  Have you ever challenged the voter's
4 eligibility to vote yourself?
5    A.  Have I ever challenged the voter --
6    Q.  A voter's eligibility at the polls.
7    A.  No.
8    Q.  Have you served on any committee in the House
9 that handled election issues?
10    A.  Yes.
11    Q.  When was the first session that you served on a
12 committee in the House handling election issues?
13    A.  Craddick stuck me there at some point.  I
14 don't -- Under Mary Denny, whenever Mary Denny was
15 chairman.
16    Q.  Was that not something that you welcomed?
17    A.  No.
18    Q.  Is this a committee that members get assigned
19 to that's not always something of their choice?
20    A.  This depends upon who you are.  Betty Brown
21 loved that committee.  I didn't.
22    Q.  Did you have a background in election law --
23    A.  No.
24    Q.  -- as a lawyer?
25    A.  No.

## 34

1    Q.  Have you ever had any experience researching or
2 understanding issues under the Texas Election Code or
3 Federal election laws before that time?
4    A.  No.
5    Q.  So was 2005 the first time; do you believe?
6    A.  If that's when Mary Denny was chairman, yes,
7 and then he would have gone off and then I was chair in
8 2009.  Those are the only two sessions I ever served on
9 the committee.
10    Q.  Who was the speaker at the time who appointed
11 you to that committee --
12    A.  To chair or to --
13    Q.  -- in 2005 to serve on the committee?
14    A.  Craddick.
15    Q.  And I believe you testified you were the
16 chairman of the committee in 2009; is that correct?
17    A.  That's correct.
18    Q.  What responsibilities does a member have at
19 chairing a committee as opposed to serving on a
20 committee?
21    A.  The power to set bills for hearing.  The power
22 to not set bills for hearing.  The power to put bills up
23 for a vote in committee.  The power not to.  I think
24 that's the biggest part of it.
25    Q.  And are chairs of committees generally directed

## 35

1 by the House speaker as to those activities or do they
2 act independently?  Do they have their own authority to
3 do --
4    A.  They have their own authority, but I think, you
5 know, there's usually consultation with the speaker's
6 office about things.
7    Q.  Are you familiar with the select committee on
8 voter ID and voter fraud?
9    A.  I knew that there was one last session.
10    Q.  That was in 2011?
11    A.  Yes.
12    Q.  Why was that committee -- or why was that
13 select committee convened?
14       MR. FREDERICK:  Objection.  Object on
15 privilege.  To the extent this question calls for you to
16 reveal any communication with a legislator or a staff
17 member about the reason for why this committee was
18 convened, I'll instruct you not to answer.  If you can
19 answer without revealing that, you may answer.
20    A.  Yeah.  I mean, as far as why it was convened,
21 that would be a question that only the speaker or his
22 staff could answer.  I don't know.
23    Q.  Was it convened in 2010 for the 2011 session?
24    A.  I don't remember that.  My recollection is that
25 it was convened for the first time in the session itself

## 36

1 in 2011.
2    Q.  Were you a party to any of the communications
3 related to the convening of that committee?
4    A.  No.
5    Q.  How did you learn about it?
6    A.  I think I learned about it when the committee
7 assignments came out that I was not happy about it.
8    Q.  I see.  I see.  And was who was assigned to
9 serve as the chair of that committee?
10    A.  Dennis Bonnen.
11    Q.  And Ms. Harless was also serving on that
12 committee; is that right?
13    A.  I don't remember that.  I don't remember, but I
14 wouldn't be surprised.
15    Q.  Why do you think Mr. Bonnen was assigned to
16 chair that committee?
17    A.  I don't know.
18    Q.  Was it convened to one bill?
19    A.  That's my understanding, but I don't know for
20 sure.
21    Q.  And that bill was Senate Bill 14; is that
22 right?
23    A.  Yes.
24    Q.  And so you did not even serve on that
25 committee; is that correct?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                              June 1, 2012

---

**37**

1    A. That's correct.

2    Q. Can you identify based on your experience in

3  the House any other selected committees that were

4  convened to hear one bill in the session?

5    A. Well, you know, I served on in 2001, I think, a

6  select committee on teacher health insurance, for

7  example, or I think that committee was all about

8  one bill.

9    Q. Can you think of any others?

10   A. I can't, but I wouldn't be surprised if there

11  aren't some because that one -- the only reason I

12  remember that is because I actually served on it myself.

13   Q. And is it usual for select committees to only

14  consider one bill?

15   A. Is it usual?

16   Q. Yes. If a select committee is convened is it

17  only to consider one bill is my question.

18   A. I think they generally are at least for

19  considering one subject matter, if not one bill.

20   Q. Other than that one select committee you

21  remember from 2001 and the select committee on voter

22  fraud, voter ID in 2011, do you remember any other

23  select committees convened while you were serving in the

24  House?

25   A. Right now I'm serving on a select committee on

---

**38**

1  school finance. Again, you know, that is something that

2  may or may not lead to a single piece of legislation,

3  but it is certainly limited to that purpose.

4    Q. Are you aware of any other select committees

5  related to voting or elections law that were convened

6  prior to the select committee in 2011?

7    A. I don't think so. Not that I recall.

8    Q. Do you know whether the select committee on

9  voter ID or voter fraud was a fast track, so to speak,

10  committee?

11   A. I don't know what that means really.

12   Q. Who do you think would know?

13   A. What a fast track committee means? I mean, I

14  presume, you know -- I mean, I think the committee could

15  have voted the bill out early or late just like any

16  other committee. They chose to vote it out early, but I

17  don't know if there's anything about the structure of

18  the committee that required that result.

19   Q. Did the elections committee still operate

20  during the 2011 session even though there was this

21  select committee on voter ID?

22   A. Yes.

23   Q. Did the House elections committee consider any

24  legislation related to mail-in ballot fraud?

25   A. In 2011?

---

**39**

1    Q. Yes.

2    A. I believe they did. I believe they considered

3  legislation, and I think I recall Larry Taylor making

4  public comments about that, but I could be wrong.

5    Q. Were there any hearings related to mail-in

6  ballot fraud in 2011 --

7    A. I don't know.

8    Q. -- for the committee?

9    A. I do not know.

10   Q. Did you attend any of the committee meetings?

11   A. No. I was not on the committee.

12   Q. You were not on the House elections committee

13  in 2011?

14   A. No.

15   Q. I see. Are you familiar with the Federal

16  Voting Rights Act?

17   A. Generally.

18   Q. Are you familiar with Section 5 of the Voting

19  Rights Act?

20   A. Just generally.

21   Q. What's your understanding of Section 5's

22  requirements based on your experience as a lawyer?

23   A. That there are certain states that have to have

24  the changes in election law pre-cleared by the

25  Department of Justice in order for them to go into

---

**40**

1  effect.

2    Q. And it was your understanding that Senate Bill

3  14 would have to go through that process?

4    A. Yes.

5    Q. As a general matter, not -- not talking about

6  Senate Bill 14 in particular, but based on your service

7  on the elections committee, what steps have you taken,

8  if any, when legislation that's subject to Section 5 is

9  being drafted and developed and considered by the House?

10   MR. FREDERICK: I think -- I don't believe

11  that this question is intended to call for privileged

12  communications. I would just object to the extent that

13  it could be construed that way and caution you, you may

14  answer a question, but don't reveal any privileged

15  communication about a specific piece of legislation.

16   A. Can you repeat the question again?

17   MS. WESTFALL: Sure. It was a long

18  question. Well, actually, court reporter, could you

19  read that back?

20   (Requested portion was read.)

21   A. I don't -- You know, I don't recall there being

22  any specific additional steps that were taken.

23  Obviously, we can always seek the advice of legal

24  counsel in drafting legislation to the extent that there

25  are questions about whether or not it is likely to meet

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                    June 1, 2012

## 41

1  that standard or not, and, you know, I don't -- in 2009
2  when I was involved in this, we really didn't get close
3  enough to passing a bill to get too active in that kind
4  of discussion.
5      Q.  Ordinarily at what stage in the process would
6  you consult counsel to make sure that your bill is going
7  to be Section 5 compliant?
8      A.  I don't -- I don't think there is -- I don't
9  know that there has been any other situation where it
10  was really as sensitive as the voter ID bill.
11     Q.  I see.  But, ordinarily, I mean, you would like
12  to have your legislation be pre-cleared --
13     A.  Sure.
14     Q.  -- for Section 5 because you want to implement
15  whatever you enact; is that right?
16     A.  Yes.
17     Q.  So you would want to take steps to make sure if
18  there's any questions or concerns or potential pitfalls
19  that a legislation might have?
20     A.  Right.
21     Q.  To make sure that it was compliant, correct?
22     A.  Right.  And the bottom line was that any
23  legislation that I would have drafted in 2009 that would
24  have had a chance to pass was in my judgment clearly
25  compliant.

## 42

1      Q.  I see.
2      A.  It wasn't in my view close to any legal line,
3  and I didn't know anybody who thought any of the
4  legislation that we were considering in 2009 that, you
5  know, seriously believes that it would have a problem
6  surviving that -- that Section 5 challenge.
7      Q.  What do you base that understanding on?  And I
8  don't mean to intrude upon any attorney-client
9  communications you might have, but is it based on your
10  own view as a lawyer and understanding of Section 5 or
11  what?
12     A.  Just -- Yeah.  No.  It is a sense that I had
13  from the totality of information that I had available to
14  me, including every conversation I ever had, everything
15  I ever read on the subject and, you know, familiarity
16  with the kind of arguments that are made regarding other
17  forms of the legislation and other states.  And so,
18  yeah, I'm certainly not a -- a legally -- a legal expert
19  opinion.  It was a policymaker's sense and judgment
20  based on everything I knew.
21     Q.  Are you referring to substitute legislation
22  that you sought to advance in 2009 related to SB362?
23     A.  Substitute legislation?
24     Q.  I'm using the wrong term, but --
25     A.  My legislation, yes.

## 43

1      Q.  Correct.
2      A.  Yes.
3      Q.  Was there a bill number for that?  Did you file
4  that?
5      A.  Yeah.  It was a Senate bill as well.  It went
6  through the Senate first as well, but I don't remember
7  the number.
8      Q.  But it wasn't Senate Bill 362.  It was
9  something else?
10     A.  I don't remember.  I don't remember what the
11  Senate bill was that session.
12     Q.  We'll talk about it a little bit later today,
13  but thank you for your testimony.
14         What is your understanding of Section 5's
15  specific requirements?
16     A.  Gosh.  That -- You know, that -- you must
17  establish that it doesn't -- the legislation doesn't
18  have the intent or the effect of reducing minority
19  voting participation.
20     Q.  And I believe you testified earlier that it
21  applies to all voting changes; is that right?
22     A.  That's my understanding.  Anything that affects
23  elections in most states.
24     Q.  Have you ever received any legal advice from
25  any source on election related matters related to

## 44

1  Section 5 without revealing the content of that advice?
2      A.  I don't know about -- I mean, just informal
3  conversations with -- you know, with someone who is an
4  attorney and was recommended to me as having some
5  background and expertise in that, yes.
6      Q.  Who is that individual?
7      A.  Ted Cruz.  I think it was a brief telephone
8  conversation with our next senator.
9      Q.  Are you familiar with a Federal law called The
10  Help America Vote Act?
11     A.  You know, again, I couldn't tell you what it
12  does, but I have heard of it, and I'm trying to remember
13  what -- what it does.
14     Q.  Do you know what forms of identification are
15  sufficient under The Help America Vote Act for purposes
16  of first time registrants?
17     A.  No, I don't remember.
18     Q.  Did you review the Supreme Court's decision,
19  Crawford versus Marion County, when it was issued by the
20  Supreme Court in 2008?
21     A.  The Indiana case?
22     Q.  Yes.
23     A.  Yeah, I did.
24     Q.  Did you believe it impacted the state's ability
25  to craft photo ID laws?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 45

1    A.   Did I believe the case --
2    Q.   Do you believe the opinion had an ability on
3    states covered by Section 5 of the Voting Rights Act to
4    develop and enact photo ID laws?
5    A.   I'm not sure I understand the question.
6    Q.   Did Crawford have any impact on the state's
7    ability to get Section 5 preclearance of photo ID laws?
8    A.   I don't -- You know, that's a legal question I
9    don't know that I can answer, but my understanding is
10   Indiana is not a Section 5 state and that the Voting
11   Rights Act was not an issue. It was just an
12   interpretation of the US constitution.
13   Q.   Are you currently -- Strike that. Are you
14   familiar with the American Legislative Exchange Counsel?
15   A.   Yes.
16   Q.   What is it?
17   A.   It's a bunch of bills, groups that invite
18   legislators to come and hear their pitch.
19   Q.   Are you a member of what I'll refer to as ALEC?
20   A.   Yes.
21   Q.   In what capacity?
22   A.   State Representative.
23   Q.   How long have you been a member of ALEC?
24   A.   Probably the whole time I've been in the
25   legislature.

## 46

1    Q.   Do you go to its meetings and conversations?
2    A.   Sometimes I have.
3    Q.   Have you been to meetings and conversations in
4    which photo ID was discussed?
5    A.   I don't remember. Not that I recall.
6    Actually -- Actually, I do recall. I think there was a
7    meeting because I, you know, remember the guy that wrote
8    the book that testified in these hearings. I can't
9    remember his name. Anyway, I assume you know who I'm
10   talking about, but I can't remember his name. It starts
11   with an F. Anyway, I think there was a meeting
12   involving voter ID and -- you know, and it may have been
13   an ALEC meeting and that author that I can't remember
14   his name would have testified and that, you know,
15   Baznowski (phonetic) or --
16   Q.   Von Spakovsky?
17   A.   Yes, him.
18   Q.   When was this meeting? Maybe you can --
19   A.   You know, I think it was after two -- during
20   the interim after 2009 and before 2011, probably the
21   summer following the 2009 legislative session.
22   Q.   Was the meeting in Washington DC or elsewhere?
23   A.   No, I don't think so. I'm wanting to say it
24   was like Atlanta.
25   Q.   Did you receive at that conference any

## 47

1    materials related to model legislation, draft
2    legislation, talking points, any written materials
3    related to voter ID you can think about?
4    A.   I think there was some, but I don't -- and I
5    probably picked it up and probably never read it.
6    Q.   Do you think you retained it in your files?
7    A.   I don't -- Probably not.
8    Q.   So it was in Atlanta sometime in 2010 to the
9    best of your recollection?
10   A.   Yes.
11   Q.   Was it a panel of folks on photo ID?
12   A.   I think so.
13   Q.   And Mr. von Spakovsky was one of the speakers?
14   A.   I think so.
15   Q.   Do you remember any other panel members?
16   A.   The author was there. I can't remember his
17   name.
18   Q.   Was that the -- Was that ALEC conference the
19   only one you can remember in which photo ID was
20   discussed?
21   A.   That's the only one I remember, yes.
22   Q.   Do you know if other members of the House or
23   Senate are members of ALEC?
24   A.   Sure.
25   Q.   Were any of them in attendance at that meeting

## 48

1    together?
2    A.   Sure. Yes.
3    Q.   Who was that?
4    A.   I don't remember.
5    Q.   Do you remember whether Senator Fraser was
6    there?
7    A.   No.
8    Q.   Do you remember whether Lieutenant Governor
9    Dewhurst was there?
10   A.   No, I don't remember specifically anybody being
11   there. I can't even be sure, you know, which meeting it
12   was, but I'm pretty sure I attended some.
13   Q.   Did --
14   A.   It could have been NCSL, but I think it was
15   ALEC.
16   Q.   Did ALEC offer you any technical advice on
17   voter ID?
18   A.   No.
19   Q.   I believe you just mentioned that the National
20   Conference of State Legislators may have had a meeting
21   about voter ID; is that right?
22   A.   This meeting is the only one that I remember
23   ever having attended, but I think it was ALEC, and it
24   certainly was a conference, and the only other one I had
25   been to was NCSL, so it's possible it's NCSL, but I



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                              June 1, 2012

## 49

1  don't think so.
2      Q.  Did you receive any voter ID or photo ID
3  materials from NCSL?
4      A.  Not that I remember.
5      Q.  Have you attended any other conferences or
6  meetings of groups at which you received any technical
7  assistance or policy guidance on voter ID or photo ID?
8      A.  Not that I can recall.
9      Q.  What is the current system under current law
10  aside from Senate Bill 14 for determining how to
11  identify a voter at the polls on election day?
12      A.  Say that one more time.
13      Q.  Certainly.  Certainly.  What's -- What's the
14  current law -- since Senate Bill 14 has not been
15  pre-cleared --
16      A.  Yeah.
17      Q.  -- for identifying a voter at the polls on
18  election day?
19      A.  Oh, boy.  My understanding is that they simply
20  have to have a document of some kind, and I believe --
21  and there's a list of documents that are acceptable, and
22  I believe there's also a process by which they can do
23  some kind of provisional ballot under circumstances
24  where they don't have a document.  I'm not sure about
25  that, but I think that's right.

## 50

1      Q.  Do you know that when you register to vote, the
2  county registrar -- if the county registrar finds you to
3  be eligible, mails you a voter registration card in the
4  mail?
5      A.  M-hm.
6      Q.  Is that one of the forms of identification that
7  can be used at the polls on election day?
8      A.  Yes.
9      Q.  Are you aware of whether a wide variety of
10  photo IDs can be used in polls on election day?
11      A.  I know there's a wide variety of documents, and
12  I presume it includes a number of photo IDs.
13      Q.  Are there also a number of non-photo IDs under
14  current law that can be used?
15      A.  Yes.
16      Q.  So you are aware that if, for example, a voter
17  lost her voter registration card, she would be able to
18  use a lot of different forms of ID at the polls to prove
19  identity.
20      A.  Right.
21      Q.  Are you aware of any reports of voter
22  registration cards being stolen from the mail?
23      A.  You know, reports -- You know, I want to
24  believe, and I can't cite you to any specific comment,
25  that I have anecdotally heard, you know, stories of

## 51

1  people, you know, coming upon a voter registration card
2  that was sent to the wrong address, and, you know, I
3  don't know if that was -- you know, if that was
4  something where there was evidence that it was actually
5  used and voted or just making the point that it could
6  have been.  I don't recall.
7      Q.  So sitting here today, you can't think of any
8  specific instances of hearing of voter registration
9  cards being stolen and then used by someone else in an
10  election?  Is that your testimony?
11      A.  I can't recall that, no.
12      Q.  Is the current system for identifying voter at
13  the polls effective in your view in identifying voters?
14          MR. FREDERICK:  Objection.  Relevance.
15      A.  Is it effective?
16      Q.  In identifying voters.
17      A.  I don't understand the question.
18      Q.  Do you think it does the job in identifying
19  voters or is it deficient?
20      A.  In most cases, I mean, there are obviously --
21  you know, there are opportunities for fraud that -- that
22  the legislation was intended to at least reduce, you
23  know, the extent to which that occurred is I guess what
24  is up for debate, and -- and I don't know the answer to
25  that question, if I answered your question.

## 52

1      Q.  Thank you for your testimony.  So is it your
2  understanding that the current system provides for an
3  opportunity for in-person voter impersonation, but that,
4  generally speaking, or in the main or on the whole there
5  is not a history of that it happened in Texas?
6          MR. FREDERICK:  Object to the question.
7  It mischaracterizes the testimony, but you can answer.
8      A.  Yeah.  I think there is the opportunity for
9  fraud, and I'm not saying that it has not occurred.  I'm
10  saying that we don't know the extent to which it has
11  occurred.  It's sort of like -- My sense that if we
12  have -- the way I've described is we have evidence of a
13  few instances.  I really couldn't characterize how many,
14  but at least some.  I think that was conceded even by
15  the opponents of the legislation, which was to
16  whether that was the tip of the iceberg or whether it
17  was the iceberg.
18      Q.  What do you believe?
19      A.  You know, I --
20          MR. FREDERICK:  Objection.  Relevance.
21      A.  My guess is probably somewhere in between.  In
22  other words, it's not -- it would be unreasonable to me
23  to presume that we know -- what we know is all that has
24  ever occurred.  That doesn't make sense.  On the other
25  hand, I don't believe that it's likely that it is --



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

53

1   what we know is the tip of a huge iceberg where, you
2   know, people are being bussed in to -- to vote illegally
3   in huge quantities. I don't believe that's likely the
4   case either. That's my opinion.
5       Q. So I want to break that down into sort of what
6   you know has happened in terms of -- and we're talking
7   about in-person voter impersonation at the polls.
8       A. Right.
9       Q. Because these laws are designed solely to
10  address that issue; is that correct?
11      A. Yes.
12      Q. So what -- can you provide me with any other
13  testimony about the basis for the known in-person voter
14  impersonation in Texas, and we'll talk about the public
15  record in a bit, but I want to draw your memory.
16      A. You know, I'm just not going to remember it
17  all, and, you know, it certainly is true, you know,
18  that -- that many of the -- or some of the allegations
19  of voter fraud could easily be shown to be something
20  other than voter fraud, and Rafael Anchia can fill you
21  in in that regard in great detail.
22          And so the question was how many instances
23  there were that that is not the case, and, you know -- I
24  mean, you know, and what is evidence because we had a
25  lot of -- you know, we had some testimony from certain

54

1   individuals, you know, as a part of our hearing that
2   would say things like, you know, I was working at the
3   polls, and I personally witnessed the same person vote
4   twice. You know, is that evidence of voter fraud? I
5   suppose it is. It was his testimony, and so we had
6   instances like that.
7          There was, I know, a big debate at that
8   time about something that was going on in south Texas
9   that was in the newspapers a lot where there may have
10  been -- at least the allegation was that there was some
11  sort of -- not just, you know, one person doing
12  something on their own, but some kind of actual
13  coordinated effort at voter fraud, but, again, I don't
14  know that that was clearly -- by the time we voted the
15  bill out of committee that it was clear what the -- what
16  had actually happened there.
17      Q. Was that related to in-person voter
18  impersonation?
19      A. I believe so.
20      Q. Were there convictions that came out of that?
21      A. I don't recall. I can't even tell you. I
22  think it was like a school board election in south
23  Texas, but it was happening -- or it was in the
24  newspaper at the time we were considering the bill in
25  2009. Of course, this last week, there was an instance

55

1   in Tarrant County which has made the newspaper of --
2   of -- I think it was a Democratic precinct chairperson
3   who somebody else using their voter
4   registration card. It was in the newspaper last week.
5   Obviously, that was not a part of our -- our discussions
6   in 2009.
7          So, you know, I think the bottom line is
8   that Rafael -- people like Rafael -- Rafael certainly is
9   the one who is most knowledgeable in opposition to the
10  legislation, and, you know, I think their position is
11  that it's infrequent.
12      Q. And is that -- is that your position as well?
13  I mean, are you aware of credible evidence, convictions,
14  something where you know for sure that this was
15  in-person voter impersonation that you can testify about
16  today?
17      A. My presumption is that you are a fool or you
18  are uninformed if you -- if you are willing to commit a
19  felony in order to add a single vote to the candidate of
20  your choice, and so the question is how many fools are
21  there out there. And, you know -- and you know -- And,
22  I, you know -- again, I think I've answered that
23  question. You know, more than the actual cases that we
24  are aware of and not an epidemic.
25      Q. But in your view your testimony is it would not

56

1   be very rational for an individual to engage in this
2   behavior, so to that extent --
3       A. It seams to me that the penalty in relation to
4   the benefit is pretty severe, and I can't -- you know,
5   the fear -- you know, the question is do they really
6   understand the consequences. It is hard for me to
7   imagine people doing it, if they did. But, you know,
8   some people are really into politics.
9       Q. So we talked about what -- what you know in
10  terms of things that have happened in the past in terms
11  of in-person voter impersonation, but the unknown future
12  potential for in-person voter impersonation, what is
13  you're -- the basis of saying that this bill is
14  necessary for that threat?
15      A. I think the argument in favor of the bill is --
16  is that we are -- we have, you know, a number of very,
17  very close elections and that because of that, we've had
18  elections decided by a handful of votes and that without
19  regard to the extent to which it occurs, it's important
20  to do what you can do to ensure that it does not occur.
21  And, obviously, you know, the challenge is the tension
22  between the goal on the one hand of voter security and
23  integrity of the ballot box and voter access on the
24  other hand.
25      Q. And getting back to my earlier question that



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                              June 1, 2012

---

### 57

1    I'm not sure you fully answered, what is the problem
2    with the current system for identifying the voter at the
3    polls that you could identify sitting here today?
4        A.   Just, you know, the -- the fact that that
5    precinct chairperson could simply hand their voter
6    registration card to somebody else, and they could go
7    vote for them.  Through a perfectly -- It's just very
8    difficult to imagine how you would prevent that from
9    happening if somebody gets ahold of somebody else's card
10   and they're confident that that person's not going to go
11   back, and I think that's what happened in this instance
12   is the actual person later went and voted using their
13   card, and so that same voter registration card had been
14   voted twice, which is how they discovered it.
15       Q.   How would that work in Texas?  I am not a
16   registered voter in Texas, but when you go in to vote,
17   don't you sign the poll book --
18       A.   Yes.
19       Q.   -- when you present your card?  So it would --
20   this bill would not prevent someone from voting twice
21   because they've already selected the signature once of a
22   voter who comes in with a particular card and indicates
23   that he or she is that voter?
24       A.   Right.  I don't think the concern is with --
25   not limited to someone voting twice.  It is someone

---

### 58

1    that's not a legal voter using the legal voter's card to
2    vote.  And, obviously, you know, nothing is foolproof,
3    and the voter ID bill is not foolproof.  You can, you
4    know, go get a fake photo ID just if you, again, are
5    that into politics, but it -- it presumptively makes it
6    more difficult to do.
7            (Exhibit US-101 marked.)
8        Q.   Thank you.  We're going to move on to a
9    different topic.  Could you mark this as US-101?  You've
10   been handed what's been marked US-101.  Do you recognize
11   this document?
12       A.   No.
13       Q.   I will represent to you that this is a
14   privileged log that was produced by your attorney for
15   the state last night concerning documents that have been
16   withheld based on privilege that were in your files that
17   were responsive to the documents we talked about
18   earlier, US-100, the amended notice of your deposition.
19   If you could take a look, I'm going to ask you some
20   questions about this document.  Unfortunately, it's not
21   paginated, but I will try to direct you through the
22   document based on the Bates numbers on the left-hand
23   column.  If you could turn to the second page.
24           Do you see at the bottom or the second
25   entry Texas 0026616?  It indicates that there was a

---

### 59

1    communication from the election division in
2    September 2010 to you?  Do you recall that document?
3        A.   No, but it's -- it sounds like it was -- we had
4    a hearing -- an interim hearing.  I presume that some
5    questions were asked during the interim hearing and
6    probably Ann McGeehan followed up with some kind of a
7    communication to the entire committee, I presume.
8            MS. WESTFALL:  Mr. Frederick, I would ask
9    that pursuant to the May 28th order indicating that
10   communications from agencies to legislators are in that
11   order with regard to lieutenant governor can be
12   produced.  I'd ask that this document be produced to us
13   because I do not believe it's covered by legislative
14   privilege.  Will you take that under advisement?
15           MR. FREDERICK:  I'm happy to look at the
16   order and take it under advisement, but I cannot
17   represent now that we will.
18       Q.   Thank you.  And turning to the next page at the
19   bottom, Texas 00266627 --
20       A.   Yes, ma'am.
21       Q.   -- who was Erica Grigg?
22       A.   She is -- This was my -- one of my employees
23   during two thousand -- I'm trying to remember when she
24   started, but certainly 2011.
25       Q.   Is she still in your employment?

---

### 60

1        A.   No.
2        Q.   Do you believe that the date, May 24, 2012, the
3    date of the document is incorrect?
4        A.   No, she would have -- Yeah.  Oh, yeah, yeah,
5    that's definitely incorrect.  Yeah.
6        Q.   What year do you think this was created?
7        A.   Well, let me see what it is.  What is Erica
8    Grigg?  She's the sender?
9        Q.   Yes.
10       A.   The author?  That must be the wrong date.  I
11   can't imagine that something happened last week.
12   Erica's not in my office.
13       Q.   I see.  Do you think this was pertaining to
14   voter ID -- a bill that you were drafting relating to
15   voter ID?
16       A.   I presume.  It must have been -- It must have
17   been May of 2009 is all I can imagine, if that was the
18   case.  Oh, no, it could have been -- You know, I did go
19   ahead and prepare a bill and file it in the 2011
20   session.  I don't know.  That date doesn't make any
21   sense either way.
22       Q.   Turning your attention again -- These are not
23   paginated.  Perhaps your counsel can help you find Texas
24   266717, about five pages in.  Actually, I don't need to
25   direct you there.  Are you familiar with the Georgia

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                           June 1, 2012

---

**61**

1  photo ID law?
2      A.  I have, you know, certainly in the midst of
3  handling this issue looked at in general other states'
4  approaches to photo ID and Georgia would have been one
5  of them.  You know, I have a sense that they have a --
6  if I'm recalling correctly, a pretty strict photo ID
7  requirement.  They are one of the states that does.
8      Q.  Do you know whether it's as strict as Texas
9  Senate Bill 14?
10     A.  I don't know the difference, no.
11     Q.  Could you tell me who Charles Foster is?
12     A.  No.
13     Q.  Directing your attention now a few more
14  documents in to Texas 00266838.  Perhaps your counsel
15  can help you find it.
16     A.  Yeah.  What is the question?
17     Q.  I want to ask you if you know what these
18  communications were about between -- from Charles Foster
19  to what appears to be your office and your staff.
20     A.  No, I don't.
21     Q.  Is he a staff person in your office?
22     A.  I don't think so.
23     Q.  Is he a constituent?
24     A.  I don't know.  Yeah -- No.  No, I don't know.
25  Don't know who that is.

---

**62**

1          MS. WESTFALL:  Mr. Frederick, I would ask
2  that to the extent Mr. Foster is a constituent and not
3  staff and there's no basis for any legislative privilege
4  pursuant to the court's May 28th order, that you produce
5  this correspondence.
6          MR. FREDERICK:  The May 28th order is the
7  order that involves the lieutenant governor's privileged
8  log?
9          MS. WESTFALL:  Yes, but it's equally
10 applicable.  There is a footnote about constituent
11 correspondence, and the document number for the order is
12 154.  It's the one we received Sunday or Monday night.
13         MR. FREDERICK:  I recall the footnote.
14 I'm happy to take it under advisement, but as I recall
15 the footnote, I'm not sure totally sure that it applies,
16 but I'm happy to look at it.
17         MS. WESTFALL:  Well, I happy to represent
18 now, "Neither a constituent letter nor a response is
19 privileged" is the first sentence in Footnote 6.
20 "Questions to the lieutenant governor and his staff
21 about constituent communications impact on thinking and
22 motivations are privileged."  So, clearly, the court is
23 saying constituent letters and responses are not
24 privileged, so we ask that they be produced.
25         MR. FREDERICK:  Okay.

---

**63**

1          MS. WESTFALL:  Take that under advisement?
2          MR. FREDERICK:  I will take it under
3  advisement.  I don't necessarily agree with your
4  interpretation, but I understand the position.  I'll
5  take it under advertisement.
6          MS. PERALES:  My copy of the order is
7  missing the pages, so I would have given it to you to
8  read, but I just can't find it.
9          MS. WESTFALL:  And I won't give you mine
10 because of my work product.
11         MR. FREDERICK:  Not a problem.
12     Q.  (BY MS. WESTFALL) Turning your attention now to
13 Texas 00266984 of this document, do you see that this
14 document and those that follow refer to draft copy of
15 Power Point presentation on voter ID?
16     A.  Yes.
17     Q.  Did you finalize these Power Points and present
18 these remarks publicly?
19     A.  Yes.
20     Q.  Mr. Frederick, I would ask that -- likewise,
21 that these be produced since they are public remarks
22 that Mr. Smith has made.
23         Where did you make these remarks,
24 Mr. Smith?
25     A.  Just among Republican party groups in Tarrant

---

**64**

1  County.  That was after the campaign where I was
2  attacked for intentionally killing the bill, and I took
3  my limited dog and pony show out to the groups to help
4  them understand what happened because, obviously,
5  it's -- the argument was procedural, and so it just
6  required an hour of their time really to help them
7  understand what happened.
8      Q.  And it does appear that you made a number of --
9  based on this privilege log, you made a number of these
10 presentations in May 2010, June 2010, various times in
11 June 2010, April 2010.  Does that sound correct?
12     A.  It sounds correct.  It would have been after
13 the primary in March of 2010, yes.
14         MS. WESTFALL:  Thank you.  Mr. Frederick,
15 I would ask that all of these Power Points be produced
16 since they pertain to publicly disseminated speech and
17 remarks to constituents that were made by Mr. Smith to
18 which he just testified.
19         MR. FREDERICK:  So you are asking us to
20 produce the drafts that were not publicly discussed?  Is
21 that what you are asking?
22         MS. WESTFALL:  If he made the remarks and
23 he relied upon a Power Point, I would ask for that Power
24 Point because that is clearly in the public domain
25 that -- remarks that he made to Republican groups.  It's

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

65

1    clearly not privileged, and I believe it was erroneously
2    listed as -- being covered by legislative privilege in
3    this log.
4        MR. FREDERICK: I understand what you are
5    saying about something that he used in a meeting,
6    although it doesn't look to me based on this log that
7    that's what these are.
8        MS. WESTFALL: Have you produced a final
9    version of his remarks or are these just drafts?
10       MR. FREDERICK: These say drafts. Have
11   you all received a final version?
12       MS. WESTFALL: I don't know. I'm asking
13   you. I just received this last night, the log. Could
14   you look into that as to whether we have remarks that he
15   presented publicly. I don't know that this is final
16   draft -- a draft that he didn't present that you would
17   argue and certainly I wouldn't is covered by legislative
18   privilege, but could you investigate that?
19       MR. FREDERICK: I would actually ask that
20   you review the documents that have been produced, and if
21   there is not a final version, then I'll be happy to
22   look, but based on these notations, it looks like these
23   were drafts. I'm not going to go back and look at all
24   of his documents. I don't have time to do that.
25       MS. WESTFALL: In the first instance we

---

66

1    will do a search of the database to see if we have
2    anything. If there's nothing, we'll have subsequent
3    communication about this.
4        MR. FREDERICK: Fair enough. That sounds
5    good.
6        Q.  (BY MS. WESTFALL) Mr. Smith, it also appears
7    that at TX-00267542, it lists copies of electronic
8    calendar reminders regarding speaking engagements
9    regarding voter ID and handwritten notes. That entire
10   document appears to have been withheld. Are these --
11   are these -- Do you keep an electronic calendar or does
12   your secretary, Mr. Smith?
13       A.  Yes.
14       MS. WESTFALL: This -- Records of
15   communications that he has had about voter ID and not
16   the substance of those communications or his handwritten
17   notes would be not covered by any privilege, I can
18   imagine. So, again, we will endeavor to see whether
19   those have already been produced to us, but I want to
20   say on the record that if they haven't, I would request
21   that they be produced.
22       MR. FREDERICK: Subject to review of the
23   document, I, you know -- to make sure that it's not
24   privileged. I can't represent now that we will produce
25   it, but we can certainly take that under advertisement.

---

67

1        MS. WESTFALL: Likewise, TX-00267550
2    indicates email communications between Representative
3    Smith, staff and constituent groups regarding voter ID.
4    I believe that would also be covered by the
5    May 28th order, and those should be produced to the
6    extent they already haven't been.
7        MR. FREDERICK: Again, I mean, we'll take
8    it under advertisement. I can't represent now that we
9    will produce. I'm happy to take it under advisement and
10   produce it if it is not a privileged communication.
11       MS. WESTFALL: I think since we just
12   received this order on May 28th, have you done any
13   document productions to us, to the Attorney General?
14       MR. FREDERICK: Sitting here now, I can't
15   tell you whether we have or not.
16       MS. WESTFALL: I would request that all
17   constituent communications sent from legislators to
18   constituents and not the other way be produced to us and
19   take that under advisement pursuant to the court's
20   order, okay?
21       MR. FREDERICK: Happy to do that.
22       Q.  (BY MS. WESTFALL) I would also direct you to
23   TX-00267559. I believe you testified, Representative
24   Smith, that Representative Anchia was a bill opponent of
25   photo ID; is that correct?

---

68

1        A.  I think he would proudly list himself in that
2    category, yes.
3        MS. WESTFALL: And you see at that entry
4    it lists copy of memorandum sent by Representative
5    Anchia to members of the House elections committee
6    regarding the Indiana voter ID, et cetera, and that has
7    been withheld.
8        Mr. Frederick, I would ask that that be
9    produced -- if you are going to assert Representative
10   Smith's handwritten notations redacted to the extent you
11   believe those are privileged, will you take that under
12   advisement?
13       MR. FREDERICK: Sure.
14       MS. WESTFALL: And the final document on
15   the last page of US-101 is the TX-00267561, which is a
16   communication between -- from the Texas Secretary of
17   State elections division to Representative Smith, and we
18   would ask that be produced pursuant to the
19   May 28th order as well.
20       MR. FREDERICK: Would the basis for
21   that be -- I believe there's a statement regarding
22   factual content returned from agencies.
23       MS. WESTFALL: Yes.
24       MR. FREDERICK: Okay. We'll take it under
25   advisement. Yeah, we'll look at the document and

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                              June 1, 2012

---

### 69

1  consider it under the order.
2          MS. WESTFALL:  Thank you.
3      Q.  (BY MS. WESTFALL) What was the original impetus
4  for photo ID in Texas?
5      A.  Original impetus?  Help me.
6      Q.  In the two thousands.  Why did Texas become
7  interested in photo ID?
8      A.  I don't really understand the question.  Why
9  did Texas become interested?  Texas who?
10     Q.  When did you first hear about photo ID in
11 Texas?
12     A.  Oh, gosh.  I think there was legislation, you
13 know, going back to the late '90's.  I think, if I
14 recall correctly, you know, Debra Danberg was involved
15 in the first bill that I'm aware of which requires for
16 the first time that you produce a document, which is
17 current law.  Prior to that, you didn't have to produce
18 a document.
19     Q.  Was there a time in the mid-2000's that
20 interest in photo ID developed in the Texas House?
21     A.  In photo ID?
22     Q.  Yes.
23     A.  Yeah.  I think that whenever it kind of became
24 a national issue that it became a political issue in the
25 State of Texas.

---

### 70

1      Q.  And you believe it was based on a national
2  movement and nothing that related to any circumstances
3  going on in the state; is that correct?
4      A.  Yeah.  I think it was an issue in other states
5  and, you know, just through these legislative -- or
6  through any means, numbers, et cetera, we looked at what
7  other states are doing and decided whether or not we
8  think we should do likewise, and, obviously, this one
9  was, you know, something that had a lot of political
10 support at the grassroots level.
11     Q.  Do you understand what the motivation was at
12 the grassroots level for wanting photo ID?
13     A.  The motivation at the grassroots level?
14     Q.  Yes.
15     A.  Gosh.  That's going to vary by human being.
16     Q.  I believe you testified earlier about kind of a
17 vision and talking about bus loads --
18     A.  Yes.
19     Q.  -- of people coming over the border.
20     A.  Right.
21          MR. FREDERICK:  I'll object to the
22 mischaracterization of testimony.
23     Q.  Am I mischaracterizing your testimony,
24 Mr. Smith?
25     A.  I don't know what you are saying.  I did use

---

### 71

1  the term bus loads saying I don't believe that that
2  occurs, I think.
3      Q.  But was there a belief that bus loads of
4  individuals were crossing the border and participating
5  in elections?
6      A.  I think there clearly are a lot of people that
7  have the impression or belief that -- that -- that
8  nonlegal citizens are voting in our elections in some
9  significant quantity.
10     Q.  Do you believe that that was motivating some of
11 the movement to enact photo ID in Texas?
12     A.  Was the grassroots belief in that?  Sure.  Yes.
13     Q.  Thank you.  I'm going to hand you what's been
14 previously marked as US-44.  You've been handed what's
15 been previously marked as United States 44.  Do you
16 recognize this document?
17     A.  No.
18     Q.  You don't?
19     A.  No, I don't remember it.
20     Q.  Okay.  Were you involved in any legislation in
21 2005 pertaining to photo ID?
22     A.  2005?
23     Q.  Yes.
24     A.  I probably voted for it if it -- I believe it
25 probably was voted on -- on the floor.

---

### 72

1      Q.  Can you look at the final page of this document
2  to see the effective date?
3      A.  Yeah.  I thought it was later than that.  2011.
4      Q.  Have you been -- I'm sorry.  You've been passed
5  the wrong exhibit.  They were mixed up.
6      A.  That's why we were confused.
7          MS. WESTFALL:  Let's go off the record for
8  one second.
9          (Recess from 12:04 p.m. to 12:05 p.m.)
10         (Exhibit US-102 marked.)
11     Q.  (BY MS. WESTFALL) We are back on record.
12 You've been handed what's been marked US-102.  Do you
13 recognize this document?
14     A.  You know, I don't recognize it in terms of
15 recalling having looked at it before.
16     Q.  Do you know who sponsored it?
17     A.  It looks like it was Denny -- Mary Denny, I
18 presume, was the author.
19     Q.  Were you involved in the development of this
20 bill before it was filed?
21     A.  I don't believe so, no.
22     Q.  Do you have any familiarity with this
23 legislation?
24     A.  Yes.  I was on the committee that session.  I
25 mean, I think it's just one of many different versions

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                    June 1, 2012

---

### 73

1  of the voter ID bill that was considered by the
2  legislature during the decade.
3      Q.  Could you take a look at Page 4 and just review
4  the document, the proof of identification?
5      A.  What do you want me to review on Page 4?
6      Q.  Just Page 4.  Are you familiar with a list of
7  ID that is listed there?  I just want to see if I can
8  jog your memory a little bit.
9      A.  Yeah.  My recollection is that this bill
10  probably is a not a -- I don't know.  I could be wrong.
11  I believe I'm correct that the House never passed a hard
12  photo ID bill until 2011.  So all of these prior
13  versions at least that came off the floor before that
14  had included two non-photo IDs.
15      Q.  And is that what is indicated in US-103,
16  HB1706?
17      A.  I, mean this has -- this bill has a list of
18  photo IDs and it has a list of non-photo IDs.  The
19  following documentation is acceptable as proof of
20  identification of this chapter, and it includes a number
21  of non-photo IDs.
22      Q.  Are you familiar off the top of your head with
23  the IDs allowable under Senate Bill 14?
24      A.  No.
25      Q.  Do you know what the purpose of House Bill 1706

### 74

1  was?
2      A.  The purpose?  I'm not sure I understand what
3  you mean by purpose.  Whose purpose?
4      Q.  The legislature's.
5      A.  The legislature?
6      Q.  Well, the bill's sponsors, authors and
7  supporters, what did they intend to do with this bill?
8          MR. FREDERICK:  Let me just object on the
9  basis of privilege.  To the extent that this is asking
10  for you to reveal your own or any other legislator's
11  thoughts or mental impressions about this bill or any
12  communications you had with another legislator about the
13  bill, I would instruct you not to answer, but if you can
14  identify the purpose of the bill without doing that, you
15  may do so.
16      A.  I don't know.  I'm a little confused in terms
17  of trying to identify the intent of a bunch of people.
18  I don't know how to do that.
19      Q.  Well, you're a legislator and you sit in a body
20  that acts collectively.  So on the basis of your role on
21  the legislature and your expertise and service in the
22  House, I would ask if you have any testimony about the
23  purpose of the bill's sponsors, authors and supporters
24  in advancing this bill.
25      A.  I presume that their purpose was to make it

### 75

1  more difficult to commit voter fraud.
2      Q.  Is that based on any communications you had
3  with anyone?
4      A.  It's based on my -- based on probably more
5  likely than that what I read in the newspaper and stuff
6  about what they were saying about why they were doing
7  it.
8      Q.  Are you aware of any communications concerning
9  the forms of allowable ID in House Bill 1706?
10      A.  Am I aware of any communication about the forms
11  of ID?
12      Q.  Yes, sir.
13      A.  No, I would not have been actively involved in
14  the legislation at that time.  I would have been just a
15  member on the floor voting.
16      Q.  Do you know who drafted this language for the
17  bill?
18      A.  No.
19      Q.  Do you know what --
20      A.  Probably ledge council.
21      Q.  Was there a model that it was based on?
22      A.  I don't know.
23      Q.  Was House Bill 1706 in part designed to prevent
24  noncitizens from voting in the view of its authors and
25  supporters?

### 76

1          MR. FREDERICK:  Object only to the extent
2  that it calls for subjective intent of any author or
3  supporter.  If you -- If this calls for you to reveal
4  any communications with those individuals or other
5  legislators, I'd instruct you not to answer on the basis
6  of privilege.  If you can answer without doing that, you
7  may do so.
8      A.  I think, you know, the purpose was to prevent
9  any person who is not legally authorized to vote from
10  voting and that would include citizens and noncitizens.
11      Q.  And how did HB1706 serve that purpose?
12      A.  If I -- Without really looking at it and
13  reading every word of it, I believe that it probably
14  required you to have a back up non-photo ID because I
15  believe in general, that's what the legislation did
16  until 2011.
17      Q.  Yes.  And I will represent to you that HB1706
18  allowed for both photo and two forms of non-photo ID.
19  I'm sure your counsel won't disagree with that
20  characterization.
21      A.  Right.  So it's just -- you know, instead of
22  being able to just take somebody else's voter
23  registration card and with impunity hand it to somebody
24  and vote and leave, you have to go to the trouble or if
25  you find a voter registration card or stumble on a voter

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                    June 1, 2012

---

**77**

1  registration card, you probably are not going to stumble
2  on some other identifying document, and so it just -- it
3  makes it, again, somewhat more difficult to commit voter
4  fraud by having to require two forms of non-photo ID.
5      Q.  And how does that prevent people who are not
6  lawfully in the United States from participating in
7  elections?
8          MR. FREDERICK:  I'd object on the basis of
9  privilege.  To the extent that this calls for your own
10  mental impressions, thought processes about this bill or
11  any communications related to the bill with other
12  legislators, if you can answer the question without
13  doing that, you may do so.
14          THE WITNESS:  My own thought processes?
15          MR. FREDERICK:  Your thought processes
16  specific to this bill at the time it was pending.  If
17  you would have to kind of go back --
18          THE WITNESS:  I don't recall what my
19  thought process was at the time of the bill, so there's
20  no danger.
21          MR. FREDERICK:  Then I think we're safe.
22  But to the extent it would require you to reveal a
23  communication from another legislator about this bill, I
24  would caution you just not to reveal that, but you can
25  answer if you can do so without doing that.

**78**

1      A.  You know, again, I think it would make it more
2  difficult for that person, whether they're a resident or
3  not a be a resident or a legal citizen or not a citizen,
4  to cast a fraudulent vote because they would have to
5  just go through more trouble and more difficulty in
6  obtaining the information they would need to -- to go
7  and claim to be somebody that they are not.
8      Q.  So doesn't one attest to being a US citizen
9  when one registers to vote in Texas?
10      A.  I believe so.
11      Q.  It's on the registration application; is it
12  not?
13      A.  I believe so.
14      Q.  So that's when citizenship is determined,
15  correct?
16      A.  I believe so.
17      Q.  In House Bill 1706, isn't it true that today
18  you can obtain -- or at the time the bill was considered
19  in Texas, you could obtain a driver's license without
20  being a US citizen; is that correct?
21      A.  I believe -- I believe that's correct.
22      Q.  And you could obtain a military ID card without
23  being a US citizen; is that correct?
24      A.  I don't know about that.
25      Q.  And you could certainly have a employee ID card

**79**

1  without being a US citizen if you were a permanent
2  resident, for example, or here on another type of visa;
3  is that correct?
4      A.  I don't know.
5      Q.  You could have a student ID card without being
6  a US citizen; is that right?
7      A.  I presume.
8      Q.  And may one obtain a license to carry a
9  concealed handgun in the State of Texas without being a
10  US citizen?
11      A.  I don't know.
12      Q.  So why is it that you testified earlier that
13  this bill, 1706, prevents noncitizens from participating
14  in elections if citizenship is determined at the voter
15  registration stage and one may obtain these documentary
16  proof of ID without being a US citizen?
17          MR. FREDERICK:  Object to the extent it
18  mischaracterizes prior testimony.  Object as compound.
19  You may answer.
20      A.  I'm not clear on the extent to which there is
21  any ability to verify on the voter registration card
22  when someone says they are a citizen, that they are in
23  fact a citizen.  My recollection, which could be
24  inaccurate, is that there is nothing that you really
25  are.  It's obviously a crime to claim to be a citizen

**80**

1  and not be a citizen, but there is no formal process by
2  which they go and check and make sure that people who
3  claim to be citizens are in fact citizens.  I don't know
4  if that answers your question at all.
5      Q.  So assuming a noncitizen manages to get on the
6  voters rolls, as you described, and the individual
7  obtains a driver's license --
8      A.  Right.
9      Q.  -- lawfully.
10      A.  Right.
11      Q.  Would this bill, 1706, prevent that individual
12  from voting on election day?
13          MR. FREDERICK:  Object.  Calls for
14  speculation.  You can answer.
15      A.  No, because they -- they -- they could vote
16  with a photo ID under this legislation precisely the
17  same way they could under prior law.
18      Q.  Thank you.  Are you aware of any conversations
19  with legislators about the purpose of House Bill 1706 or
20  other photo ID in 2005 as part of the purpose being to
21  prevent noncitizens from voting?
22          MR. FREDERICK:  Object on the basis of
23  privilege.  The question as phrased asked if you were
24  aware of any conversations.  I believe you can testify
25  to the extent there were or were not.  I would caution



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                                June 1, 2012

---

### 81

1  you not to reveal the substance of any communication
2  with another legislator.
3      A.  I don't recall any conversations that I would
4  have had with anybody in 2005.
5      Q.  Regarding noncitizen voting?
6      A.  Regarding anything involving voter ID.
7      Q.  Are you familiar with the legislators who
8  opposed House Bill 1706?
9      A.  Am I familiar?  I mean, most Democrats.  I
10  don't have specific recollections of individual
11  conversations with anybody.
12      Q.  Do you know what their concerns were about the
13  bill?
14          MR. FREDERICK:  I'll object on the basis
15  of privilege.  To the extent this would require you to
16  reveal any concerns expressed to you by another
17  legislator in a conversation, that would be privileged.
18  If you can answer without revealing that, you may do so.
19          MS. WESTFALL:  Mr. Frederick, can you
20  identify any bill opponents who have invoked the
21  legislative privilege affirmatively in this case?
22          MR. FREDERICK:  I don't understand the
23  point of that question.
24          MS. WESTFALL:  There's no legislative
25  privilege on communications from bill opponents to

---

### 82

1  Representative Smith.
2          MR. FREDERICK:  He's asserting privilege.
3          MS. WESTFALL:  I'm asking about
4  communications he received from bill opponents.
5          MR. FREDERICK:  Well, I believe you've
6  asked him for the substance of a communication from a
7  bill opponent.  First of all, we don't know who they
8  are, so I don't know that they have waived privilege,
9  but, also --
10          MS. WESTFALL:  Who has affirmatively
11  invoked legislative privilege?  Who has opposed any
12  photo ID bill in Texas?  Who have you identified in your
13  correspondence with the Attorney General?
14          MR. FREDERICK:  I don't know.  That
15  question is irrelevant because Representative Smith has
16  invoked legislative privilege.  To the extent anyone
17  communicates with him about pending legislation, that is
18  privileged.
19          MS. WESTFALL:  Not the content of what
20  they said to him.
21          MR. FREDERICK:  Absolutely it is.  My
22  position -- Our position is there are two people who --
23  at least two people who hold the privilege, and if one
24  of those people has not waived the privilege, that
25  conversation remains privileged and should not be

---

### 83

1  disclosed because if it were, it would violate the
2  legislative privilege.
3          MS. WESTFALL:  Are you instructing him not
4  to answer?
5          MR. FREDERICK:  I'm instructing him not to
6  answer to the extent he would have to reveal the
7  substance of any communications.
8          THE WITNESS:  I can save you both a lot of
9  time.
10          MS. WESTFALL:  I'm grateful.
11      A.  I don't remember any such conversation.
12      Q.  I'm grateful.  Are you aware of any action
13  taken by any legislature in 2005 to address any concerns
14  from bill opponents?
15          MR. FREDERICK:  I'm going to object on the
16  basis of privilege.  You may testify whether you or are
17  not aware, but you may not disclose the thought process
18  of any legislator as to why they did something.  That
19  would be privileged.
20      A.  No.  What I will -- What I will recall is in
21  general the arguments that were made that were a matter
22  of public record and newspapers, et cetera, in 2005.  I
23  will not recall any specific conversations with anybody
24  on this particular bill.  And I know the reason that it
25  was a -- it was a less strict version of voter ID at

---

### 84

1  this time was because the Senate was still a relatively
2  moderate body, and there simply was no ability to get a
3  stricter bill out of the Senate, and, therefore, there
4  was no attempt to obtain a stricter bill out of the
5  House.  That's my belief.
6      Q.  Are you aware of any analysis that was
7  conducted in 2005 related to who had these forms of ID
8  and who didn't have those forms of ID in 1706 or any
9  other photo ID bill?
10      A.  No.
11      Q.  Are you aware of any attempt to determine the
12  impact of House bill 1706 or other photo ID legislation
13  on minority voters?
14      A.  No.
15      Q.  Did House Bill 1706 pass in the House?
16      A.  I believe so.
17      Q.  Was it referred to the Senate committee on
18  state affairs?
19      A.  I don't know.
20      Q.  Did it get passed in the Senate?
21      A.  I don't think so.  I don't think the bill ever
22  passed in the Senate.  Well, I could be wrong, but I
23  don't think it passed in the Senate until 2009.
24      Q.  Would election bills ordinarily that pass in
25  the House be referred to the State Affairs Committee in

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 85

1   Senate?
2       A.  I don't know.
3       Q.  Is that the committee that would handle
4   election bills ordinarily?
5       A.  In the Senate, I don't know.
6       Q.  It wouldn't be the committee as a whole, would
7   it?
8       A.  It could be.  I mean, it's just their choice.
9   My understanding is the rules allow them to do either.
10      MS. WESTFALL:  Okay.  Great.  Well, do
11  folks want to take a break for lunch?  It's 12:30.  Or
12  we could do another half an hour.  It's your choice.
13      (Recess from 12:30 p.m. to 1:12 p.m.)
14      MS. WESTFALL:  During the break, I had a
15  chance to consult with my colleagues about the subject
16  matter waiver invocation of legislative privilege issue,
17  and I want to advise Representative Smith and you,
18  Mr. Frederick, that the United States will not advance
19  any subject matter waiver argument if Representative
20  Smith chooses to answer and decides not to invoke
21  legislative privilege with regard to individual specific
22  questions that I may ask in today's deposition.  So I
23  wanted to advise you of that position and advise
24  Representative Smith that if there are particular
25  questions that you -- for which you would want -- you

## 86

1   would like to answer and not invoke the privilege, that
2   would be our legal position.
3       MR. FREDERICK:  I appreciate that.  I have
4   also talked about this, and I have -- it is my
5   understanding that despite your kind offer to not
6   advance subject matter waiver arguments, it is our
7   position that that still would not -- that would not
8   protect us from the court ruling that something was in
9   fact a waiver, either subject matter or complete, and so
10  I cannot advise Representative Smith to -- to
11  selectively waive or selectively answer privileged
12  questions, and I will continue to instruct him to assert
13  privilege consistent with my understanding that he is
14  still asserting privilege.
15      MS. WESTFALL:  And your client understands
16  that it's his to invoke, correct?
17      MR. FREDERICK:  Oh, yes, yes.  I think so.
18      THE WITNESS:  Yes.
19      MS. WESTFALL:  That hasn't been made clear
20  by these interesting colloquies.
21      Q.  (BY MS. WESTFALL) Representative Smith, are you
22  familiar with the voter ID bill that was introduced in
23  2007?
24      A.  No, not other than generally an understanding
25  that the legislation that preceded the bill that passed

## 87

1   in 2011 was always generally similar in that it
2   effectively moved from one form of non-photo ID to two
3   forms of non-photo ID.
4       Q.  Okay.  Would you mark this as Exhibit 28,
5   previously marked?  Representative Smith, you've been
6   handed what's been previously marked as US Exhibit 28.
7   Do you recognize this document?
8       A.  No.
9       Q.  Did you serve on the House elections committee
10  in 2007?
11      A.  No.
12      Q.  Did you have any involvement with any
13  legislation related to photo ID in 2007?
14      A.  Other than voting for it on the floor, no.
15      Q.  Thank you.  Are you aware of any concerns
16  raised during the development of House Bill 218
17  regarding the impact of the bill on Hispanic voters?
18      MR. FREDERICK:  On the basis of
19  legislative privilege to the extent the question
20  requires you to reveal the contents of any communication
21  from a legislator or a legislative staff member about
22  the bill, I'll instruct you not to answer on the basis
23  of privilege.  However, if you can answer without
24  revealing that, you may do so.
25      A.  I think my -- I mean, with the exception of the

## 88

1   bill passed almost unanimously, if not unanimously, in I
2   think 1999, which required documentation of some kind
3   for the first time, I think that every time the
4   legislation has been considered there have been concerns
5   expressed by opponents of that nature, if that answers
6   your question.
7       Q.  And who are the opponents?
8       A.  MALDEF, NAACP, Democratic party.  Those are the
9   ones that I remember.
10      Q.  What is the basis of their concern that bills
11  like 218 will have an adverse impact on minority voters?
12      MR. FREDERICK:  Let me interpose a
13  cautionary objection.  I don't believe that this is
14  actually calling for privileged material, but to the
15  extent of identifying a basis of concern would reveal
16  the communication from another legislator, I would
17  instruct you not to reveal that, but you can answer --
18      A.  Yeah.  That would only be communications that
19  I've read in the papers and public information, and that
20  is that somehow any additional burden that you place on
21  a voter is going to disproportionately fall on minority
22  voters.
23      Q.  What -- What's the reason for that?
24      A.  The reason for what?
25      Q.  For believing -- For bill opponents believing



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

| 89 |
|---|

1  that it will disproportionately fall on minority voters.
2      A.  I don't know that I really understand the
3  reason for believing that in instances where you're
4  simply going from one non-photo ID to two non-photo IDs
5  because in those instances, I think you are talking
6  about documentation that is always currently in the
7  possession of every legal voter.  So I don't really
8  understand the argument in that instance.
9      Q.  So just so I understand your testimony, your
10  testimony is that with regard to legislation where both
11  a photo ID and two forms of non-photo ID are allowable,
12  it is your view that that would not disproportionately
13  fall upon minority voters based upon your knowledge?
14      A.  Yeah.  I don't understand the argument that it
15  would really because you're talking about requiring only
16  documentation that is currently in the possession of
17  every legal voter as far as I know because the list is
18  so extensive that I just have never ever seen any
19  evidence of any kind that any legal voter doesn't
20  currently have in their possession what they would need
21  to vote which is different than requiring a photo ID, so
22  I don't understand that argument.  There may be one that
23  I am not aware.  I know there is because they've made
24  it, but I don't understand it.
25      Q.  Were you present at any of the legislative

| 90 |
|---|

1  public debates on HB218 on the floor?
2      A.  I'm sure I was.  I don't recall it, but I'm
3  sure I was.
4      Q.  Are you aware of any analysis or reports that
5  were generated to determine whether House Bill 218 or
6  other photo ID laws -- I mean, bills introduced in 2007
7  would have a disparate impact on minority voters?
8      A.  No.
9      Q.  And like HB1706, was HB218 in your view in part
10  designed to prevent noncitizens from voting in
11  elections?
12      A.  I think it was designed to prevent any voter
13  who's not legally entitled to vote from voting including
14  noncitizens.
15      Q.  With regard to how that would work with regard
16  to House Bill 218, is your testimony the same as regard
17  to House Bill 1706?
18      A.  Yes, as far as I know.
19      Q.  Did the -- any of the supporters of House Bill
20  218, including legislators, publicly indicate that the
21  bill is designed to prevent noncitizens from voting?
22      A.  I'm sure they probably did.
23      Q.  Do you recall -- I'm sorry.  I didn't mean to
24  interrupt you?
25      A.  No.  I think they -- You know, I don't know

| 91 |
|---|

1  if -- I would be surprised if there were not public
2  statements by these individuals at the top of this bill
3  listing that -- as being one of the benefits of the
4  bill.
5      Q.  Were you present on the House floor debate of
6  House Bill 218?
7      A.  I don't recall, but I probably was.
8      Q.  Do you recall Representative Betty Brown stated
9  on the House floor that it was "designed to keep illegal
10  aliens, noncitizens and other people otherwise not
11  qualified from voting"?  Does that sounds familiar?
12      A.  It doesn't surprise me, but I don't recall it.
13      Q.  Are you aware of any nonpublic private
14  conversations where legislators indicated that House
15  Bill 218 was designed to prevent noncitizens from
16  voting?
17          MR. FREDERICK:  On the basis of privilege,
18  I think you may answer.  I'm sorry.
19      A.  Conversations with legislators I think is what
20  she was asking.
21          MS. WESTFALL:  Were you present during
22  conversations -- This is a foundational question,
23  Mr. Frederick.
24          MR. FREDERICK:  Can you repeat the
25  question, please?

| 92 |
|---|

1      Q.  (BY MS. WESTFALL) I certainly could.  Were you
2  present during any private conversations where
3  legislators indicated that House Bill 218 was designed
4  to keep noncitizens from voting?
5          MR. FREDERICK:  Object on the basis of
6  privilege.  The question implies the substance of the
7  conversation, so I'd instruct you not to answer.
8      Q.  Are you following your counsel's advice?
9      A.  Yes.
10      Q.  If House Bill 218 was implemented, do you think
11  it would have prevented noncitizens from voting?
12      A.  I'd have to read it more carefully than I have
13  read it today, but if it is, as I understand it, to be a
14  piece of legislation that simply goes from requiring a
15  minimum threshold of one non-photo document to two
16  non-photo documents, then I think it makes it more
17  difficult for a -- for any voter who's not legally
18  entitled to vote to vote.
19      Q.  I believe --
20      A.  Somewhat more difficult.
21      Q.  How?
22      A.  Just because, again, I'm sure there are a
23  number of examples, but the easiest one is just someone
24  coming upon a voter registration card in some manner,
25  and they would have to go to the trouble of either



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                                      June 1, 2012

## 93

1  manufacturing or obtaining an additional document that
2  showed their identity as being the same person.  So I
3  think that's just -- in that instance alone, it makes it
4  more difficult to do.
5      Q.  I guess I'm not completely understanding your
6  testimony as to how that relates to noncitizen voting.
7  Could you explain?
8      A.  Well, I mean that person -- the person who is
9  voting with somebody else's voter registration card may
10  or may not be a noncitizen.  It could be anybody.
11     Q.  Right.  But my question was whether you can
12  explain how House Bill 218 would prevent noncitizens
13  from voting.
14     A.  I don't think --
15         MR. FREDERICK:  Objection.  Asked and
16  answered.
17     A.  Yeah.  I don't think any bill completely
18  precludes the possibility of voter fraud.
19     Q.  And I believe you testified earlier that
20  citizenship is determined and ascertained through the
21  county election registration process when an individual
22  submits a registration application and checks a box
23  indicating citizenship and signs under penalty of
24  perjury; is that right?
25     A.  Again, you know, I think the people who support

## 95

1  question, but -- but I think there are documents that
2  are on the list, I presume, that are available to
3  noncitizens.
4      Q.  Thank you for your testimony.  Are you aware in
5  2007 of any analysis or research that was conducted to
6  determine who among registered voters had these forms of
7  photo ID identified in House Bill 218?
8      A.  No.
9      Q.  Are you aware of any attempt or research to
10  determine whether House Bill 218 did in fact have an
11  adverse impact on minority voters?
12     A.  Well, it didn't pass.
13     Q.  Was there any effort to determine -- do
14  research as to whether this bill would adversely affect
15  minority voters?
16     A.  Not that I'm aware of.
17     Q.  Did the House pass House Bill 218 to your
18  recollection?
19     A.  I believe they did.
20     Q.  And what happened?  Was it referred to the
21  Senate?
22     A.  I believe that that -- I mean, my general
23  understanding is that prior to 2009, these bills passed
24  the House in some version and died in the Senate, and I
25  don't recall the details of how that happened.

## 94

1  this legislation, if I recall correctly, are somewhat
2  skeptical about the extent to which that is -- is
3  actually something that itself prohibits noncitizens
4  from voting because if you are willing to commit voter
5  fraud, then why would you be willing to fraudulently
6  check that box?
7      Q.  I believe you testified earlier that if
8  assuming noncitizens manage to get onto the voter rolls
9  and they go to the polls on election day, that if they
10  present one of the forms of ID listed in House Bill 218
11  such as a driver's license, military ID, license to
12  carry concealed weapon, et cetera, that that would not
13  prevent that voter from participating in voting in the
14  election because one need not necessarily be a citizen
15  to hold and possess and obtain lawfully those documents;
16  is that correct?
17         MR. FREDERICK:  Object to the extent it
18  mischaracterizes the prior testimony, but you can
19  answer.
20     A.  I -- I think I did agree that this legislation
21  didn't change the ability of someone who would vote with
22  a driver's license before from voting with a driver's
23  license after, and to the extent that they have a
24  driver's license and they are a noncitizen, then -- then
25  there's no change.  I don't know if that answers your

## 96

1      Q.  Are you aware of the photo ID bill that was
2  introduced in 2009?
3      A.  Yes.
4      Q.  Do you recall the bill number?
5      A.  No, I don't.  Again, I think I filed a shell
6  bill that really didn't have anything in it when I was
7  appointed to the elections chair and then the bill that
8  moved was -- ended up coming from the Senate.
9      Q.  Can you mark this as Exhibit 29?  You've been
10  handed what's been previously marked US-29.  Do you
11  recognize this document?
12     A.  I believe this is the Senate bill that -- or I
13  don't know if this is the version that was passed out of
14  the Senate, but I presume it is and the number refreshes
15  my memory, sounds right.
16     Q.  I believe you just testified that you filed a
17  shell bill when you became committee chair for the House
18  elections committee.
19     A.  Yes.
20     Q.  When were you appointed chair of the House
21  elections committee?
22     A.  Oh, February 2009, I believe, I guess.  I'm
23  pretty sure it had to be February.  It was late, I
24  remember that, because we had a new speaker.
25     Q.  Was that Speaker Straus?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Todd Smith                                                          June 1, 2012

## 97

1    A.  Yes.
2    Q.  Tell me about how it happened that you became
3  chair of the elections committee?
4        MR. FREDERICK:  Object on the basis of
5  privilege.  I'll just caution you you may testify about
6  how it happened, but I would instruct you not to reveal
7  the contents of any communication with a legislator.
8        MS. WESTFALL:  Mr. Frederick, I would ask
9  what legislative act being appointing to a committee it
10  refers to?  It's procedural in nature.  This is not
11  protected by the privilege.
12        MR. FREDERICK:  I'm going to stand by the
13  objection, and I think he can probably -- I expect that
14  he can answer without revealing any matters I would
15  consider privileged, so --
16    A.  The speaker appointed me, I think, to answer
17  the question.
18    Q.  Why did he appoint you?
19    A.  Perhaps just another indication that he didn't
20  like me very much.
21    Q.  Did you -- What was your reaction when you were
22  appointed to the chair of the elections committee?
23    A.  It was not my choice, but I did recognize that
24  it had political significance in that particular
25  legislative session.  And if we were going to get a

## 98

1  voter ID bill out of the House, if that was possible, I
2  was probably a good person to try to do that under those
3  circumstances.
4    Q.  What was the political significance of chairing
5  the elections committee that year?
6    A.  Just that it was just a very visible -- I mean,
7  my God, I was, you know -- you know, just in charge of
8  public relations.  It was a public relations position is
9  what it really was.  It was just a lot of press, the
10  focus of the session.
11    Q.  Was it Texas press alone, national press?
12    A.  I'm sure there was some national press, but it
13  was primarily Texas press that I was dealing with.
14    Q.  Why was there so much interest from the media
15  in Texas?
16    A.  Well, I don't know, but, you know, there's a
17  lot of -- I don't know the answer to that question.  It
18  was a combination of factors, but it was obviously a
19  significant political issue.
20    Q.  Was it your understanding when you were
21  appointed chair that the primary role that you were
22  going to have on the committee was to move forward a
23  photo ID law -- bill, pardon me?
24    A.  Yes.
25    Q.  That was the chief focus of the session; is

## 99

1  that right?
2    A.  That was clearly the -- Yes.  I spent almost
3  all of my time that session trying to pass this bill.
4    Q.  And who else of the Republican caucus of your
5  colleagues served on that committee along with you?
6    A.  Betty Brown, Dennis Bonnen, Linda Harper Brown,
7  Dwayne Bohac.  I think that's -- I think I've listed off
8  all the Republicans.  Did you ask me for the entire
9  committee?
10    Q.  Just the members of the Republican caucus.
11    A.  No, those were it.
12    Q.  So there was a time when you introduced shell
13  bill?
14    A.  I believe so.
15    Q.  Was it right after you had been appointed the
16  chair?
17    A.  It was soon after that, just before the
18  deadline to file House bills.
19    Q.  Do you recall the date of that filing?
20    A.  Probably early March.
21    Q.  Was there ongoing activity in the Senate with
22  regard to photo ID?
23    A.  Yes.  I believe the Senate activity had already
24  begun at that point.  I think they took it up very
25  early, may have already been in the process even before

## 100

1  I was made the chairman.  I don't remember.
2    Q.  Could you mark this --
3    A.  I just remember the Senate went first.
4        (Exhibit US-103 marked.)
5    Q.  Could you mark this as United States 103?
6  You've been handed what's been marked US-103.  Do you
7  recognize this document?
8    A.  No.
9    Q.  I will represent to you this is a legislative
10  history of Senate Bill 362 that may be able to refresh
11  your memory as to dates when things were filed and when
12  they were considered by the Senate and the House.
13    A.  M-hm.
14    Q.  So is it your testimony that as the Senate was
15  considering Senate Bill 362, you had filed a shell bill
16  as soon as you were appointed chairmanship in February
17  of '09; is that correct?
18    A.  I probably filed the shell bill in early March,
19  right before the deadline to file House bills.
20    Q.  Do you recall the number of that bill?
21    A.  No.
22    Q.  Did you work on pushing that bill through
23  legislatively or did you basically wait for the Senate?
24    A.  We waited for the Senate.
25    Q.  Did someone direct you to do that?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith

June 1, 2012

### 101

1      MR. FREDERICK:  I'm going to object on the
2  basis of privilege.  I'm going to instruct you not to
3  answer that question.
4      A.  Okay.
5      Q.  Are you going to follow the advice of counsel?
6      A.  Yes.
7      Q.  Was there a time that the Senate passed 362?
8      A.  Yes.
9      Q.  That came to the House and it was referred to
10  your committee; is that correct?
11      A.  Yes.
12      Q.  Tell me what happened after that.
13      A.  Oh, we set it for a hearing right away.  If I
14  recall correctly, two days of hearings, and I don't know
15  what else -- what the question is beyond that, but --
16      Q.  Did you play any role in the development of
17  Senate Bill 362 when it was introduced in the Senate?
18      A.  No.
19      Q.  You just received it in the House and took it
20  as it was; is that correct?
21      A.  Yes.
22      Q.  Is there a reason that you are aware of why
23  voter ID originated in the Senate and not the House?
24      A.  I think it was just because the Senate had
25  failed to pass it in previous legislative sessions and

### 102

1  the House was not interested in getting involved in it
2  under the circumstances unless the Senate were to pass
3  it because it obviously was very controversial and would
4  be a great waste of time if the Senate once again did
5  not pass the bill for whatever reason.
6      Q.  Are you aware of whether the lieutenant
7  governor saw it as a priority getting passed in Senate
8  right away?
9      A.  Public statements would indicate that he did
10  and his actions.
11      Q.  Turning your attention to Senate Bill 362
12  itself, could you take a look at the forms of ID that
13  are permitted, which if I could refer you to Page 5 of
14  that exhibit -- Have you had a chance to take a look?
15      A.  I've skimmed it, yes.
16      Q.  Could you describe the forms of allowable ID
17  under Senate Bill 362 in a general sense?
18      A.  Well, there's a number of photo IDs that are
19  available as an option and then, again, a long list of
20  non-photo IDs that may be used in lieu of a photo ID.
21      Q.  Was Senate Bill 362 essentially quite similar
22  to previous iterations of photo ID that had been
23  introduced in the House?
24      A.  I believe so, yes.
25      Q.  And is it your understanding that Senate Bill

### 103

1  362 was introduced in the Senate for the same reasons
2  that previous photo ID bills had been introduced in the
3  House?
4      A.  I presume so.  The policy arguments were the
5  same.
6      Q.  Was there any new purpose that it was serving
7  in 2009?
8      MR. FREDERICK:  Object on the basis of
9  privilege, that you can answer if you can do so without
10  revealing privileged communications.
11      A.  Yeah -- No, not other than just continued
12  demand from the grassroots that this bill be passed
13  building political pressure.
14      Q.  Tell me who -- Are there particular grassroots
15  groups that you in your mind identify with this issue?
16      A.  Just, you know, I think all Republican party
17  groups, Texas Federation of Republican Women and then
18  just any other party affiliated group.  The party
19  activist in general had determined that this was an
20  important issue.
21      Q.  Why was it such a priority for those groups?
22      MR. FREDERICK:  Objection.  Calls for
23  speculation.  You may answer.
24      MS. WESTFALL:  You may answer.
25      A.  Again, the fear that large numbers of votes

### 104

1  were being cast by people who were not legally entitled
2  to do so and predominantly to the benefit of the other
3  party.
4      Q.  So do you think it was -- it was motivated by
5  the same concerns about noncitizen voting that animated
6  the bills in 2005 and 2007?
7      MR. FREDERICK:  Objection.  Assumes facts
8  not in evidence.  You may answer.
9      A.  Again, I think, you know, their -- certainly,
10  noncitizens voting was a significant concern of theirs,
11  but I think they would be concerned about anybody voting
12  that's not legally entitled to do so.
13      Q.  And are you aware of any facts -- any instances
14  of in-person voter impersonation that had arisen between
15  2007 and 2009?
16      A.  I'm sure there were some, but -- some
17  individual alleged instances, but I can't cite you as to
18  any.
19      Q.  Are you aware of any such instances that are
20  not already discussed on the public record and public
21  debate of 362?
22      A.  No.
23      Q.  Was 362 considered in the Senate committee as a
24  whole?
25      A.  Yes.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                              June 1, 2012

| 105 |
|---|

1     Q.   Why was it considered in that committee?
2     A.   I don't know.
3     Q.   Was it considered in that committee to expedite
4  its consideration by the Senate?
5     A.   I don't know that that -- If you wanted to
6  expedite it, you would have to go through the committee
7  as a whole rather than substantive committee.
8     Q.   Would it be easier simply to go to the
9  committee as a whole, have the whole Senate and
10  immediately have a vote by the whole Senate?
11         MR. FREDERICK:  Objection.  Calls for
12  speculation.
13     A.   I am not an expert in Senate process, so I
14  don't really know that.
15     Q.   Are you aware of whether the lieutenant
16  governor wanted to play an increased role in
17  consideration of Senate Bill 362 and that's why the bill
18  was considered by the committee as a whole?
19         MR. FREDERICK:  Objection.  Vague.
20     A.   I don't know.  I certainly know that it was
21  important to him politically in light of the fact that
22  he had presided over prior Senates where the bill had
23  not passed to have it pass, but specifically why he
24  chose to do it as a committee as a whole or to the
25  extent to which he was even the one who made that

| 106 |
|---|

1  decision versus the Senate as a whole, I don't know.
2     Q.   To your knowledge is the lieutenant governor
3  empowered under the Senate rules in assigning bills to
4  committees?
5     A.   I don't know.  I presume.
6     Q.   Did you attend or listen to any of the debate
7  in the Senate for Senate Bill 362?
8     A.   Yes.
9     Q.   Did the committee as a whole hold a hearing on
10  Senate Bill 362?
11     A.   Yes.
12     Q.   Is that the hearing that you are referring to
13  that you listened to parts of?
14     A.   You know, I don't really remember at what
15  points I was over there.  I certainly was over there
16  when the entire Senate was meeting and discussing the
17  issue of voter ID.  Whether it was during the committee
18  as a whole or whether it was when the Senate was meeting
19  or both, I don't recall.
20     Q.   Looking at Exhibit US-103 on the second page --
21     A.   What's that?
22     Q.   The Texas Legislature Online History.  Do you
23  see that?
24     A.   M-hm.
25     Q.   On the second page you are looking at right

| 107 |
|---|

1  there --
2     A.   M-hm.
3     Q.   -- do you see that on March 10th there was a
4  public hearing in the Senate?
5     A.   M-hm.  Yes.
6     Q.   Does that refresh your recollection as to
7  whether you were in attendance for that portion of
8  consideration of the bill?
9     A.   I just don't remember.  There was obviously
10  some times when they were meeting on voter ID where I
11  was available to go and participate, and there were
12  other times where they were meeting on it and I had a
13  conflict in the House and was not able to attend or just
14  chose not to.
15     Q.   Do you recall hearing that Senator Fraser at
16  that hearing was asked whether an analysis of the racial
17  analysis of voters without a driver's license had been
18  undertaken?
19     A.   No, I don't recall that.
20     Q.   Did you learn at any time after that hearing
21  that the elections division or another entity had
22  submitted any analysis of the racial composition of
23  voters who don't have a Texas driver's license to any
24  member of the legislature?
25     A.   I don't recall ever seeing any information of

| 108 |
|---|

1  that type the entire time I was dealing with the issue.
2     Q.   While you were -- Actually, strike that.
3         So the bill was passed in the Senate.  Can
4  you look -- Was it not?
5     A.   Yes, it was passed in the Senate.
6     Q.   And looking at US-103, can you see when it
7  passed the Senate?
8     A.   It looks like to me on March the 18th.
9     Q.   And then it came up to the House and in your
10  committee; is that right?
11     A.   Yes.
12     Q.   At that time you scheduled hearings, I believe?
13  That was your earlier testimony, I believe; is that
14  correct?
15     A.   Yes.
16     Q.   When were those hearings?
17     A.   On opening day of the Texas Rangers baseball
18  season, whenever that was, because I couldn't go to the
19  game.  I was upset about it.  Early April.
20     Q.   Were any changes made to Senate Bill 362 in the
21  committee?
22     A.   Yes.
23     Q.   What were those changes?
24     A.   Whatever Linda Harper Brown and Betty Brown
25  wanted ultimately.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                      June 1, 2012

---

### 109

1  Q.  Which was?

2  A.  Gosh, I'm trying to remember what they finally

3  agreed to, but we had -- There were basically six

4  members.  I had to get five votes from six members.

5  Republicans and Heflin were the only ones who were even

6  in play, and so any two of them could cooperate and

7  control the language in the bill, and they did.  And so,

8  you know, I don't remember, but it was a -- basically a

9  very strict photo ID requirement, if I recall correctly.

10  Not what I had proposed, but was actually voted out of

11  the committee, and then I filed my bill as an amendment

12  should it have gotten to the floor.

13        It was my intent to get the members of the

14  legislature to vote on both versions, and my expectation

15  is, if we had gotten there, that the strict version

16  would have been defeated and then mine would have been

17  offered as an alternative and would have passed if the

18  base of the party had been willing to support it, and

19  they would not have, I don't think.

20  Q.  So the stricter version that you are referring

21  to was that strictly photo ID without the two non-photo

22  IDs alternatives to the best of your recollection?

23  A.  In general, yes, that's the best of my

24  recollection.

25  Q.  And your amendment --

---

### 110

1  A.  Actually, I think I may be wrong about that

2  because I think that the Senate -- because they had

3  voted for two non-photos, that -- that -- I think -- I

4  don't remember.  I just don't remember what they

5  required.  I shouldn't speculate.  I don't remember.

6  But it -- it clearly did not include some of the things

7  that I had proposed for purposes of obtaining the

8  marginal votes like delaying implementation beyond the

9  redistricting year, money for a voter registration

10  drive.  I remember all the -- there's, I think, three

11  different sweeteners that we put in there to try to get

12  the marginal votes.

13        (Exhibit US-104 marked.)

14  Q.  Could you mark this US-104?

15  A.  Actually, I remember now.  At the end of the

16  day, their position was we will vote for the precise

17  Senate bill period.  If I recall correctly, I think what

18  we voted on committee was precisely the Senate bill.

19  Q.  And you were endeavoring a committee to widen

20  the appeal of the bill --

21  A.  Yes.

22  Q.  -- by adding, as you said, some sweeteners to

23  the bill?

24  A.  Yes.

25        (Exhibit US-104 marked.)

---

### 111

1  Q.  We'll talk about that in a moment.  In the

2  interim, you've been handed what's been marked as United

3  States 104.

4  A.  M-hm.

5  Q.  Do you recognize this document?

6  A.  No -- Oh, yes.  I recognize not this document,

7  but I recognize what the document is referring to.

8  Q.  What is it?

9  A.  Basically a document that was signed by 71, I

10  believe.  Does it say 71?  Ultimately a document like

11  this was signed by 71 members, I believe.

12  Q.  Could you describe the document?

13  A.  This was just a -- Let me read this one real

14  quick.

15  Q.  Take your time.

16  A.  Yeah.  I was -- This was something that I

17  actually participated in drafting the language that was

18  ultimately signed by 71 of the Republican members of the

19  House.  It was brought to me before it was published,

20  and I was given the opportunity to actually amend it and

21  change some of the language in this document.  For

22  example, I believe I was personally responsible for

23  putting in there the next possible uniform election date

24  rather than the next election date.  There were some

25  changes that I made of that type and you, know, I

---

### 112

1  thought it was a good because if we were going to pass

2  the bill, it would -- it would require -- this would

3  allow the 71 members who were willing to support a hard

4  photo ID bill to go on record as that being their

5  preference, which I thought would then free them up to

6  support my version, which is the one that actually got a

7  chance to pass.  Does that make sense?

8  Q.  Actually, it doesn't make sense.

9  A.  They needed to be clear to the extent that the

10  party preferred a strict version, if that's what we're

11  going to call it, and we ultimately passed something

12  that was less strict.  This would allow these members to

13  go on record again as expressing their preference for

14  the version that was preferred by the party, which I

15  hoped would then free them up to then support the

16  version that actually had a chance to pass.

17  Q.  Do you see that this document appears to be

18  dated April 28, 2009 on the upper right?

19  A.  I didn't see that.

20  Q.  On the upper right of the first page.  It could

21  be dated at the bottom of the letter as well, but --

22  A.  Yeah.  I don't think -- There is clearly not 71

23  people that are listed here, and so I don't really know

24  what -- you know, what -- ultimately, there were 71

25  people.  I'm almost sure of that.  I don't recall the

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                      June 1, 2012

---

113

1  number because it really kind of made my point, which is
2  that it takes 76 votes to pass a bill and 71 is not
3  enough.
4      Q.  At what stage in the legislative process was
5  this pledge published to the best of your recollection?
6      A.  Well, it looks like to me it was published on
7  or before April 28, but I don't recall that.  I don't
8  recall specifically.  It was late in the session.  I
9  remember that.
10     Q.  How long was Senate Bill 362 in the House
11 committee?
12     A.  Got there in late March, committee hearing in
13 early April and voted out, if I recall, something --
14 well, it may be on this sheet -- May the 10th or
15 something like that in that range is when I think the
16 bill was voted out of the committee.  It doesn't --
17 Yeah, what does it say?  May 11th.
18     Q.  Thank you.
19     A.  M-hm.
20     Q.  So to reiterate what you told us about the
21 procedural history, the bill came to the elections
22 committee and the bill as it was filed in the Senate
23 essentially, SB362, was advanced by some members of the
24 committee.  You wanted a substitute that had some other
25 provisions in it that would make it more powerful to

---

114

1  other members of the House --
2      A.  Yes.
3      Q.  -- and then, ultimately, it stayed in your
4  committee until May 11th.
5      A.  Yes.
6      Q.  And what version came out of the committee?
7      A.  The Senate bill.
8      Q.  And then it went to the House, and what
9  happened after that?
10     A.  It never made it to the House floor.  That was
11 the infamous --
12     MS. PERALES:  Chub.
13     A.  Yeah.  Where the -- the opponents of the bill
14 basically talked the session -- talked the remainder of
15 the session so that bill and every bill after it on the
16 calendar died.
17     Q.  So there was, I take it, opposition to Senate
18 Bill 362 in the House?
19     A.  Some, yes.
20     Q.  And can you describe all the quarters of
21 opposition to Senate Bill 362?
22     A.  All the what?
23     Q.  All the different factions or categories of
24 legislators who disliked the bill?
25     A.  I think it was basically every Democrat, and I

---

115

1  guess we even had a couple of Republicans who had
2  previously voted against it.
3      Q.  What was the basis of the opposition to Senate
4  Bill 362?
5      A.  Well, I think the basis for the Republicans
6  might be different than the basis from the Democrats.
7      Q.  So why don't we start with the Democrats first.
8  What was the basis of their opposition?
9      A.  Okay.  Because my -- I think I've already
10 described it.  Would just be concern that the additional
11 requirements to vote would somehow disproportionately
12 prevent Democrats from voting rather than Republicans.
13 Again, in this version, which was not a strict photo ID
14 requirement, I really don't understand why that would be
15 the case because the document's already in their
16 possession, but they obviously felt like that there was
17 some reason to oppose it.
18     Q.  And --
19     A.  In my opinion it was just foolish politically.
20 In that bill, I think they were foolish politically.
21     Q.  You think the basis was --
22     A.  The Democrats were foolish politically in the
23 way they handled it that session.  If I put on my
24 Democratic party hat and was an advocate for their
25 interests, I think their interest would have been far

---

116

1  better served by passing the kind of bill that would
2  have passed that session than by being tarred and
3  feathered for killing an entire calendar of bills in
4  order to prevent a very popular piece of legislation
5  from passing.  I do not understand how that could have
6  been in the best interests of the Democratic party's
7  political prospects.
8      Q.  And you are suggesting that opposition from the
9  Democrats was because of self-interest in terms of
10 Democratic voters being depressed by this bill.  Is that
11 your testimony?
12     A.  Again, you know, they obviously believed that.
13 I don't understand why they believed that.
14     Q.  Did they have other concerns?
15     A.  You know, I think they were being pressured.
16 Just like Republicans were being pressured by their
17 grassroots, Democrats were being pressured by some of
18 their activist organizations that are -- you know,
19 probably have different views than some of the rank and
20 file members that were Democrats on the floor.
21     Q.  Was there any concern about disproportionate
22 impact of Senate Bill 362 on minority voters?
23     A.  I think, yeah, the -- the advocacy groups,
24 MALDEF and NAACP, certainly expressed those concerns.
25     Q.  Were there any legislators who expressed those

---


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                    June 1, 2012

---

### 117

1    concerns?
2        A.  Yes.
3        Q.  Who were they?
4        A.  Rafael and Mark Veasey and a number of others.
5        Q.  Anybody else you can name sitting here today?
6        A.  I think Mark and Rafael were the leading two
7    opponents, kind of representative of the two largest
8    minority groups.
9            (Exhibit US-105 marked.)
10       Q.  So I believe you testified -- Actually, strike
11   that.
12           Could you mark this US-105?  You've been
13   handed what's been marked US-105.  Do you recognize this
14   document?  I'll give you a chance to take a look.
15       A.  It's apparently one of many, many news stories
16   in that legislative session about this issue.  Do you
17   want me to read it?
18       Q.  If you could just take a quick glance,
19   particularly, where it talks in the middle of the page
20   about changes that you were proposing to make to
21   accomplish passage in the House of photo ID.
22       A.  It looks like it's talking here primarily about
23   the delay in implementation.
24       Q.  Could you explain that provision of your
25   alternative?

---

### 118

1        A.  There was concern -- The allegation from the
2    opposition was that we were trying to somehow adversely
3    affect the redistricting year elections, and my proposal
4    was to prove that that was not the case by simply
5    ensuring that the implementation and legislation would
6    not occur until after that election had occurred, and
7    there was some question about whether or not you could
8    even successfully go through all the legal hurdles in
9    time for this legislation to be implemented by the next
10   election cycle anyway.  So that was what I referred to
11   as a quasi-concession because I wasn't even entirely
12   sure that it was a concession, but, believe me, I -- you
13   know, I was ripped to shreds by the -- some of the
14   Republican activists for having the audacity to suggest
15   such a thing, but it was, you know, one of several
16   things that resulted from my conversations with the
17   people whose votes we needed to pass the bill to try to
18   find ways that we could obtain their votes, and,
19   obviously, I realized I had to do it in a way that would
20   not offend the base, and so I was trying to find things
21   that would get the marginal votes on board, but that
22   would not cause me to lose the base, and I don't know
23   that in that legislative session it was possible to find
24   any language that 76 people would agree to.  In fact, I
25   strongly believe that it was not.  There was no language

---

### 119

1    any 76 people would ever agree to.
2        Q.  So you mentioned I think sweeteners, and would
3    you describe that this delay in implementation was one
4    of those provisions?
5        A.  Yes.
6        Q.  Were there other provisions?
7        A.  There were other provisions, yes, and I want to
8    think there were three, and I'm having trouble
9    remembering the third one, but one of them was to spend
10   several million dollars on a major statewide voter
11   registration drive to increase the number of legal
12   registered voters.
13       Q.  Who was going to conduct that drive?
14       A.  I think it was just -- we were just going to --
15   You know, the plan was to flow money for those drives
16   through the voter registrar's office of the counties
17   throughout the state.
18       Q.  Were the county officials going to be doing
19   those drives?
20       A.  Yes.
21       Q.  And were they going to be targeted in areas
22   that were underserved or lower registration levels?
23       A.  I think the intent was to have the county
24   officials in each county to do a county-wide voter
25   registration drive, and, you know, there may have been

---

### 120

1    some language in some of the versions in my bill that
2    specified that it had to -- the drive had to be
3    county-wide and had to be an effort to register voters
4    in all parties of the county.
5        Q.  So it was not targeted necessarily to
6    communities where there was historic low levels of
7    registration or where there had been historic levels of
8    disenfranchisement in Texas?
9        A.  I think the intent was to require that the
10   registration drive be implemented everywhere to try to
11   increase the number of registered voters everywhere.
12       Q.  How much monies had you appropriated in the
13   bill or authorized for appropriation?
14       A.  I don't remember, but several million.  It was
15   five or $10,000,000, 4 million.  I don't remember
16   precisely the number.  It was subject to negotiation to
17   the extent that we got there, but I do think there was
18   some money set aside in the appropriations bill for that
19   purpose.
20       Q.  What was the third provision if you can
21   remember it sitting here today?  And if not, I won't
22   press you.
23       A.  Gosh, what was it?  Money to register voters,
24   delay in implementation.
25       Q.  Sir, was it a --

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith
June 1, 2012

---

### 121

1    A.  I can't remember.
2    Q.  -- list of sort of a way -- bright-line rule
3  for determining whether someone had proven their
4  identification at the polls?  Was that it?
5    A.  Was what now?
6    Q.  Like list your hair color, list your eye color?
7  Was it something very specific about ID at the polls or
8  does that not ring a bell?
9    A.  No.
10    Q.  Okay.
11    A.  It was something -- I just remember -- I
12  remember there was -- that I had assurances of certain
13  marginal votes that if we added three things to the
14  Senate bill, that they would vote for the bill.
15    Q.  Where did you get this language or ideas for
16  sweeteners?
17    A.  Just from conversations with those people who I
18  knew were the handful of people who had previously voted
19  against it that might be persuaded to vote for it with
20  some changes.
21    Q.  Were those legislators -- were any of them
22  racial minorities?
23    A.  No.
24    Q.  And were attempts to generate a compromise in
25  committee, did they eventually break down?

---

### 122

1    A.  Yeah.  Most of my efforts during the session
2  were focused on what -- what I would have to do to get a
3  bill off the floor.  It became quite apparent once it
4  was time to get the bill out of the committee that I
5  wasn't in control of the language of what was coming out
6  of the committee.
7    Q.  Did you vote for the bill in committee?
8    A.  Yes.
9    Q.  And that was essentially 362 that came out of
10  the committee?
11    A.  I believe it was exactly 362.
12    Q.  Was it a straight party line vote?
13    A.  No.  Heflin voted for it.
14    Q.  So I believe you testified that Senate Bill 362
15  was -- didn't reach the House floor because it was
16  chubbed; is that correct?
17    A.  Yes.
18    Q.  Did you remain chair of the committee on
19  elections for the interim session --
20    A.  Yes.
21    Q.  -- in 2010?
22    A.  Yes.
23    Q.  Did you hold hearings on voter ID in 2010?
24    A.  I believe we did.
25    Q.  Did you hold more than one?

---

### 123

1    A.  Well, I don't know about 2010.  I don't
2  remember when we had them -- when we had the interim
3  committee, but I imagine that's when it was.
4    Q.  Was it in June of 2010 --
5    A.  Probably just had one hearing on it.
6    Q.  Did you convene the meeting as the chair?
7    A.  I believe so.
8    Q.  What was the focus of the hearing?
9    A.  Just, I think, to hear invited testimony about
10  any additional information that had developed since the
11  last legislative session in terms of other states'
12  involvement with this type of legislation.
13    Q.  Do you recall that Ann McGeehan testified in
14  that hearing?
15    A.  I presume she did.  She's testified in front of
16  the hearing committee so many times, I don't really
17  recall that specific one, but I'm sure she did.
18    Q.  Do you recall that at the hearing she had
19  testified that she was aware at that time of 24 election
20  fraud cases for possible prosecution of election fraud
21  in the past two years and that two of those involved
22  in-person voter impersonation?
23    A.  Sounds right.
24    Q.  Did you have any reaction to Ms. McGeehan's
25  testimony?

---

### 124

1    A.  No.  I think, you know, by that time I was sort
2  of -- I was pretty aware of that sort of statistic.
3    Q.  Was it your intent at that time to move forward
4  in the next session with a photo ID law?
5    A.  I think that would just entirely depend upon
6  what would happen in the elections following the
7  hearing, but -- and, clearly, once those elections
8  occurred, there was no question that it was going to
9  happen and happen quickly.
10    Q.  So what happened after the 2010 election that
11  caused you to think that?
12    A.  Republicans got 101 votes in the House and
13  maintained their majority in the Senate.
14    Q.  When did you first become aware of the fact
15  that the Texas legislator was going to move forward
16  rapidly on photo ID in 2011?
17    A.  Well, I think just as a -- presumptively, I
18  think I became aware of it when the election results
19  came in.  I would have known that would have followed.
20  In terms of formerly being notified of that, I think it
21  probably wouldn't have happened until the committee
22  assignments were made, and there was a select committee
23  on voter ID.
24    Q.  When did you learn -- So you were no longer on
25  the House election committee in 2011?

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                   June 1, 2012

---

### 125

1    A.  Right.

2    Q.  When did you learn that?

3    A.  Oh, I, you know, did not want to chair the

4  elections committee again, and so, you know, without

5  revealing conversations, my understanding was -- my

6  belief was that I would be given a different

7  chairmanship, and, you know, that makes a lot of sense

8  because, again, the version that I was tauting was the

9  version -- the only version that had a chance to pass,

10  if any did, and I think it turns out none did, but if

11  any did in 2009, and, clearly, the version that had a

12  chance to pass in 2011 was going to be dramatically

13  different, and so it would have been awkward for me to

14  be pushing dramatically different legislation when I was

15  very public in defending the version that had a chance

16  to pass in the prior legislative session.

17      So I think it made perfect sense to have

18  someone else do that, and I just, you know -- you know,

19  would rather -- you know, I never had asked for an

20  assignment that required me to spend all of my time as

21  party chairman.  Not my favorite assignment.

22    Q.  So when are committee assignments -- when were

23  committee assignments determined in 2010 for the 2011

24  session?

25    A.  I don't know when they were determined.  They

---

### 126

1  were announced in February, I imagine, of 2011.  Could

2  have been January, but it probably was February.

3    Q.  Did you introduce any election related

4  legislation at the end of 2010 to be filed in 2011?

5    A.  Yes.  I filed -- After having been accused in

6  my election of what I was accused of, I did file a

7  strict photo ID bill at the beginning of the legislative

8  session, but I didn't expect that that would be the

9  vehicle.  It was just something I chose personally to

10  file.

11    Q.  What made you do that having taken the stance

12  you previously had six months earlier?

13    A.  Just because to make it clear, as I had

14  explained to my constituents, that the version I was

15  supporting in 2009 was the most strictest version that

16  had a chance to pass and with 101 Republicans, it was a

17  very different scenario, and, clearly, you know, what my

18  constituents wanted was to make people show a photo ID

19  in order to vote, period.

20    Q.  Was that your motivation?

21    A.  To represent my constituents, yes.

22    Q.  And why were they motivated to tell you we must

23  have this strict photo ID bill?

24      MR. FREDERICK:  Objection.  Calls for

25  speculation.

---

### 127

1    A.  I think in general they were -- as we've

2  already discussed were concerned that illegal voters

3  were voting in large numbers and potentially changing

4  the results of elections.

5    Q.  Do you have any understanding of why your

6  constituents believed this or the basis for their

7  belief?

8      MR. FREDERICK:  Objection.  Calls for

9  speculation.  You may answer.

10    A.  Just because it was the number one priority of

11  various different party organizations and was discussed

12  at length at almost every meeting.  It had just became a

13  priority of the party.

14    Q.  I guess in terms of -- I'm going to re-ask my

15  question a different way.  Your constituents had -- I

16  believe you testified your constituents had a view that

17  there was a lot of illegal noncitizen voting occurring

18  and that's why strict photo ID was required, and this

19  was in 2010; is that correct?

20      MR. FREDERICK:  Object.  Mischaracterizes

21  prior testimony.  You may answer.

22    A.  Yeah, again, illegal voting, not necessarily

23  limited to noncitizens, but certainly one of their --

24  you know, yes.  I mean, there was, you know, certainly a

25  major concern that some of the fraudulent voting that

---

### 128

1  was occurring could be by people who were not even

2  citizens of the United States.

3    Q.  And are you aware of any facts or information

4  that any of your constituents had about that phenomenon

5  you just described?

6    A.  No.

7      (Exhibit US-106 marked.)

8    Q.  You've been handed what's been marked US-106.

9  Do you recognize this document?

10    A.  I'm sorry.  I'm still looking at this newspaper

11  article.  106?

12    Q.  Yes.

13    A.  Is this the one I filed in 2011?  Yeah, it

14  looks like it.

15    Q.  And was this the bill that you were just

16  referring to in terms of --

17    A.  Yes.  And basically what this is it's

18  patterned after one of the other states.  I don't

19  remember which state.  I asked ledge counsel to draft a

20  bill that was patterned after -- it could have been

21  Georgia.  I don't remember any state, but I think my

22  decision was to have them draft a bill from a state that

23  was a Section 5 state where it had been implemented, and

24  I don't -- it could have been Georgia.  I just don't

25  recall as I sit here today if that's for sure the case,



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Todd Smith                                                    June 1, 2012

---

129

1    but a southern state that had successfully implemented a
2    photo ID requirement.
3        Q.  Thank you.
4        A.  M-hm.
5        Q.  Are you familiar with ways in which this bill,
6    House Bill 401, differs from Senate Bill 14 that was
7    filed by Senator Fraser?
8        A.  In general, it simply does not allow you to
9    vote with two non-photo IDs.  Big difference.
10       Q.  And do you see at the first page on Section
11   12 -- well, Section 1 of the bill, the section regarding
12   voter ID cards?
13       A.  M-hm.
14       Q.  Do you know why you included this provision?
15       A.  Probably because whatever state I asked that
16   this legislation being patterned after had some similar
17   provision, but --
18       Q.  And do you see that this requires that the
19   "registrar provide at least one place in the county to
20   accept applications for and issue Texas voter
21   identification cards"?  And do you see that?  Yes?
22       A.  I'm not seeing where exactly it says that.
23       Q.  On Page 1 --
24       A.  Page 1.
25       Q.  -- under Section 12.007.

---

130

1        A.  M-hm.  Each voter registrar shall issue -- "The
2    voter registrar must provide one place in the county to
3    accept applications for and issue Texas voter
4    identification cards."  Yeah.
5        Q.  Do you remember that provision?
6        A.  I didn't remember it until you pointed it out
7    to me.  You know, I think that's just about ensuring
8    that there is access -- reasonably easy access to these
9    cards.
10       Q.  Do you believe that's important to include in
11   any photo ID bill?
12           MR. FREDERICK:  Objection.  Relevance.
13       A.  I do, yes, believe that it is important that
14   legal voters have access to the polls.
15       Q.  Do you believe that it was an important
16   attempt to try to minimize the burden on voters who
17   didn't possess one of the forms of photo ID?
18           MR. FREDERICK:  Objection.  Relevance.
19   You may answer.
20       A.  I think it is important to take all reasonable
21   efforts to ensure that legal voters have a reasonable --
22   reasonable burden in casting a legal vote.
23       Q.  And do you think it's important in that regard
24   to ensure that voters don't need to travel a significant
25   distance to obtain one of these cards?  Is that why you

---

131

1    included that provision?
2        A.  You know, yes.  I mean, I think the presumption
3    was that by requiring some such availability by county
4    that the maximum distance that anyone would have to
5    travel to get one could only be so much.
6        Q.  Do you see also that this same paragraph
7    requires a voter registrar can't charge an application
8    fee for the issuance of a Texas voter ID card?
9        A.  Right.
10       Q.  Why did you include that provision in the bill?
11       A.  I think all versions of the bill previously
12   considered had provided this identification card
13   available at no charge, and, you know, because we don't
14   make people pay to vote.
15       Q.  I direct your attention to the forms of voter
16   ID on Page 5 of this document, starts on Page 5 --
17   actually, starts on Page 6.  Pardon me.  Do you see that
18   where it lists forms of ID?
19       A.  M-hm.
20       Q.  How did you create this list of allowable forms
21   of ID?
22       A.  I don't remember.  It was probably something
23   that was just pulled from prior versions of the
24   legislation.
25       Q.  Do you see that it includes student IDs?

---

132

1        A.  Yes.
2        Q.  Why did you include that provision?
3        A.  Again, it's probably just from a prior version
4    of the legislation, perhaps the language that came out
5    of the Senate that we had used in the prior session.  I
6    don't know for sure, but that would be my guess.
7        Q.  Did you conduct any analysis of voters who do
8    or do not have these forms of ID?
9        A.  No.
10       Q.  Did you consider the racial impact of requiring
11   these particular forms of ID on registered voters?
12       A.  No.
13           (Exhibit 107 marked.)
14       Q.  Was the photo ID bill -- Actually, strike that.
15   Let's mark this.
16           You've been handed what's been marked 107.
17   Do you recognize this document?
18       A.  Only that it was a bill that we filed at some
19   point in the most recent legislative session.
20       Q.  Why did you file this bill?
21       A.  I think because during the prior campaign I had
22   made promises to do so.
23       Q.  Was this a promise to your constituents?
24       A.  Yes.  I believe that's correct.
25       Q.  Could you describe what this bill is intended

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                                    June 1, 2012

---

### 133

1  to do?
2      A.  Require that a voter provide proof of
3  citizenship when registering to vote rather than simply
4  relying on their honesty in checking the box.
5      Q.  Which of your constituents were --
6      A.  Which of my constituents were what?
7      Q.  I'm sorry.  I'm gathering may thoughts.  Which
8  of your constituents urged you to file this type of
9  legislation?
10     A.  I don't -- I don't know that I can cite
11 specific constituents that urged me to do it.  I think
12 in some of the political literature that we had sent out
13 responding to the attacks that I killed voter ID, we had
14 decided to say we would file certain legislation like
15 this.  So it was a -- you know, just keeping a campaign
16 pledge.
17     Q.  Why do you think this bill was necessary?
18     A.  I don't know that it is necessary.  I think
19 that it's just another way that you can ensure that
20 every legal voter is a citizen.
21     Q.  This was designed to require documentary proof
22 of citizenship when registering to vote; is that right?
23     A.  Right.  I think Arizona did it, if I recall
24 correctly; is that right?
25     Q.  As you sit here today, can you think of any

### 134

1  facts or information that would support the need for
2  requiring documentary proof of citizenship when
3  registering to vote?
4      A.  Just because there is concern among the people
5  I represent that it's too easy to lie and thereby vote
6  and that, therefore, they presume it's probably
7  happening.
8      Q.  Do you have any evidence or facts or
9  information about noncitizens who had done just that and
10 were on the voter rolls?
11     A.  No.
12     Q.  Did your constituents present you with any such
13 facts or analysis?
14     A.  No.
15     Q.  Do you have any data from the elections
16 division on that point?
17     A.  No.
18     Q.  Were you at all concerned that this legislation
19 would be burdensome to voters if enacted?
20     MR. FREDERICK:  I think I need to object
21 here on privilege.  This has now gotten into your
22 specific mental impressions about this legislation as
23 opposed to its purpose, so I'll instruct you not to
24 answer on the basis of privilege.
25     Q.  Are you following your counsel's advice?

### 135

1      A.  Yes.
2      Q.  Were hearings held on this bill?
3      A.  I don't think so.  I don't know.  I don't
4  remember.  I can't be sure.
5      Q.  When did you file this bill?
6      A.  Must not have been right at the very beginning
7  of the session because of the number, but it must have
8  been sometime in January, I would imagine, of 2011.
9      Q.  Are you aware of whether Senator Fraser filed a
10 similar bill in the Senate?
11     A.  No.
12     Q.  Did you talk to Senator Fraser about filing
13 this bill?
14     A.  No.
15     Q.  Did you give anyone advance notice about filing
16 this bill?
17     A.  Not other than my constituents in the campaign.
18     Q.  Did this bill pass the House?
19     A.  No.
20     Q.  Why was there not more support for this bill?
21     MR. FREDERICK:  Objection.  Calls for
22 speculation.
23     A.  I don't know.  I don't know.  You know, I think
24 there was support for the bill.  For whatever reason,
25 the chairman of the committee chose not to pass it out

### 136

1  of committee, if I recall correctly.
2      Q.  Did you have any concerns that this bill would
3  disproportionately fall on Hispanic voters?
4      MR. FREDERICK:  Objection.  Privilege.
5  Instruct you not to answer.
6      Q.  Are you following the advice of counsel?
7      A.  Yes.
8      Q.  Are you aware of any conversations with any
9  legislator or constituent about concerns of this bill
10 falling more heavily on Hispanic eligible voters?
11     A.  Say that one more time.
12     Q.  That was a long question.  Let me try again.
13 Are you aware of any communications about concerns that
14 this bill would fall more heavily on eligible Hispanic
15 voters?
16     MR. FREDERICK:  Objection to the extent
17 that this would call for communications from other
18 legislators or legislative staff and instruct you not to
19 answer on the basis of privilege.  Otherwise, you may
20 answer, if you can.
21     A.  Let me just say I don't believe there were any
22 discussions of any significance, and, you know, to some
23 extent in answering the prior questions, it's not going
24 to create -- in other words, this is not -- I don't
25 think likely to pass, and so bills that do not pass,



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                    June 1, 2012

## 137

1    cannot create burdens.
2          Q.   Did it not generate a lot of attention?
3          A.   No.  N-hn.
4          Q.   Did you receive they criticism from any quarter
5    after you filed this bill?
6          A.   I don't recall that ever happening, no.
7          Q.   Were there a number --
8          A.   This is the kind of bill where your presumption
9    is that it's not going to pass unless the leadership of
10   the state wants it to pass, and there's no indication on
11   my part that that was the case, and, therefore, my
12   presumption I was keeping a political pledge and filing
13   a bill that was not likely to go anywhere.
14         Q.   So, in other words, this was a symbolic
15   legislation?
16         A.   It was.  You know, again, I filed it and if the
17   powers that be wanted to move it, it could have moved,
18   but --
19         Q.   Did you --
20         A.   -- I had no indication that that was going to
21   happen.
22         Q.   Did you nevertheless have concerns that some of
23   your Hispanic constituents might be concerned about this
24   bill?
25         A.   No, nobody ever expressed that to me.

## 138

1          Q.   I'm going to hand you what's been previously
2    marked as US-81.  Do you recognize this document?
3          A.   I presume this is the bill that we passed this
4    prior session on voter ID.
5          Q.   And I will represent to you, I'm sure your
6    counsel won't disagree, this is the version that was
7    filed in the Senate.  This was not the engrossed
8    version.
9          A.   Okay.
10         Q.   Are you familiar with the forms of photo ID
11   allowable under Senate Bill 14?
12         A.   I don't recall off the top of my head, no.
13         Q.   Turning your attention to Page 8 of this
14   document, Section 12, could you take a quick look at the
15   forms of ID allowable listed on Page 8?
16         A.   Okay.
17         Q.   Do you see that it only allows for a relatively
18   limited number of IDs; is that right?
19         A.   Yes.
20         Q.   Does this represent a significant departure
21   from Senate Bill 362 in terms of forms of allowable ID?
22         A.   Yes.
23         Q.   Could you describe those differences?
24         A.   Instead of having a long list of photo IDs
25   and/or to a long list of non-photo IDs that you could

## 139

1    use in conjunction with one another, you had to provide
2    one of the much smaller number of photo IDs and you
3    could not vote without a photo ID, except I think in the
4    final version there were some exceptions.
5          Q.   And this bill was filed in the Senate, correct?
6          A.   Yes.
7          Q.   This bill was filed by Senator Fraser; is that
8    right?
9          A.   Yes.
10         Q.   Do you know who decided to include these
11   particular forms of ID in Senate Bill 14?
12         A.   No.
13         Q.   Were you at all involved in that decision?
14         A.   No.
15         Q.   Do you know why it was so restrictive in the
16   bill as filed?
17         A.   No.
18         Q.   Do you know why there were only four forms of
19   photo ID?
20         A.   No.
21         Q.   And do you know why any one of these was
22   included in the bill?
23              MR. FREDERICK:  Objection.
24         A.   No.
25         Q.   Do you recall when Senate Bill 362 allowed for

## 140

1    expired IDs in any cases?
2          A.   No, I don't remember.
3          Q.   And if you don't remember, you can refer back
4    to Bill 362 if you want to look at the list of IDs
5    because I want to ask you some questions to compare.
6          A.   You want me to look at the photo IDs or the
7    non-photo?
8          Q.   The photo.  For example, turning your attention
9    to the driver's license --
10         A.   M-hm.
11         Q.   -- if you see under Senate Bill 14 as filed --
12         A.   Yes.
13         Q.   -- it could not be expired and under Senate
14   Bill 362 it could have been expired within two years of
15   presenting that form of ID; is that correct?
16         A.   Yes.
17         Q.   Do you know why Senate Bill 14 limited the
18   ability to present expired ID that had been in place in
19   362?
20         A.   No.
21         Q.   Is there any difference in terms of proving
22   your identity when you go to the polls and using a form
23   of ID that was expired within two years and one that is
24   current in your view?
25         A.   Not that I can think of.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith

June 1, 2012

---

**141**

1    Q.  Do you know why non-photo ID was eliminated as
2    an acceptable form of ID in Senate Bill 14?
3    A.  Just a concern that, again, just like a voter
4    registration card, someone can have one of those
5    documents in their possession and represent that they
6    are somebody they are not and that wouldn't be readily
7    apparent at the polls.
8    Q.  But it was an acceptable form of ID that the
9    Senate had just passed in 2009, correct?
10   A.  Yes.
11   Q.  And in the form of Senate Bill 362, right, that
12   provision was included.
13   A.  Yes.
14   Q.  And the Senate supported it; is that right?
15   A.  Yes.
16   Q.  So why the complete change in approach in 2011?
17       MR. FREDERICK:  Objection.  Asked and
18   answered.
19   A.  I think it was just because in each instance
20   the legislature was trying to pass the strictest photo
21   ID bill it could under the political make-up of the
22   body.
23   Q.  Who would know why non-photo ID was taken out
24   of Senate Bill 14?
25   A.  I think everybody understands why non-photo ID

---

**143**

1    happened, it clearly had happened, and there was just --
2    everybody that was a Republican was driving that train
3    in the Senate and in the House.
4    Q.  Who was really moving it forward in the Senate
5    legislatively?
6    A.  I just would not know in terms of the Senate.
7    Legislatively, it's Fraser, and, you know, obviously, I
8    think the lieutenant governor had a interest in ensuring
9    that bill passed, but every Republican would have.
10   Q.  Do you think it was the two of them, Senator
11   Fraser and the lieutenant governor who were really
12   advancing Senate Bill 14 and organizing the caucus --
13       MR. FREDERICK:  Objection.  Relevance.
14   Objection.  Calls for speculation.
15   A.  They were prominent among all of the
16   Republicans in the Senate, and, again, if that bill had
17   not passed and you were a Republican senator and it had
18   not come out of the Senate, everybody would have been
19   under quite a bit of political pressure, not just those
20   two.
21   Q.  Did you have any conversations with either
22   Senator Fraser or Lieutenant Governor Dewhurst about
23   Senate Bill 14?
24   A.  In Senate Bill 14, no.
25   Q.  Did you have any conversations with them about

---

**142**

1    was taken out of Senate Bill 362 because it was just a
2    demand by our constituents that we require a photo ID in
3    order for people to vote, and they were very cynical
4    about the notion of allowing non-photo IDs, and you
5    were -- like I said, my opponent used that against me in
6    the most recent election politically, without mentioning
7    that he too had voted for that same version of the bill.
8    So this notion of letting people vote with their library
9    card feeds the perception that you are in favor of
10   liberal laws allowing people to vote even under
11   circumstances where they were not legally entitled to.
12   Q.  Do you know whether there was one person or a
13   group of people who decided that Senate Bill 14 would
14   not include non-photo ID?
15   A.  Like I said, I think every Republican member of
16   the legislature would have been lynched if the bill had
17   not passed.  That was a fairly strict photo ID bill
18   given the political make-up of the body in 2011.
19   Q.  Do you have a feeling of who was driving Senate
20   Bill 14 in the Senate?
21       MR. FREDERICK:  Objection.  Relevance.
22   Objection.  Asked and answered.
23   A.  I think it was being driven by -- you know, you
24   could argue that the grassroots themselves were being,
25   you know, incited by outsiders, but however that

---

**144**

1    Senate Bill 362?
2    A.  Sure.  I would not have talked -- I don't
3    recall talking to the lieutenant governor.  I would have
4    talked with his staff.
5    Q.  Did you talk --
6    A.  Abair, would have talked with Fraser and his
7    staff.
8    Q.  Can you describe the nature of those
9    conversations?
10       MR. FREDERICK:  Object on the basis of
11   legislative privilege.  You can answer to the extent you
12   can identify the general subject matter of the
13   conversations, but you may not reveal the substance of
14   any conversation.
15   A.  Just really kind of talking about the game plan
16   in the House and, you know, the extent to which, you
17   know, they were comfortable conversations with the
18   governor's representative about what I was trying to do.
19   Q.  Who from the governor's office did you speak
20   with?
21   A.  I can't remember her name, but blond, 2009,
22   nice bubbly person.  I don't remember her name.
23   Q.  And from Mr. Dewhurst's office it was chief
24   Brian Abair who you spoke to?
25   A.  Yes.

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

145

1    Q.  Did you speak to Julie Rathgeber at all in his
2    office?
3    A.  Not that I recall.
4    Q.  Or Mr. Brunson?
5    A.  Not that I recall.
6    Q.  Did you speak with any of those individuals
7    after Senate Bill 362 did not pass in the House?
8    A.  I don't remember.  May have, may not have.  If
9    so -- If so, it might have been in passing sometime
10   during the interim.
11   Q.  During your attention back to Senate Bill 14,
12   do you see it refers to US military identification
13   cards?
14   A.  Yes.
15   Q.  And do you know what type of documents are
16   encompassed in that form of photo ID?
17   A.  No.  I'm not familiar with what the military
18   has by way of identification cards.
19   Q.  Could you describe what a citizenship
20   certificate is?
21   A.  No.
22   Q.  Do you know how much it cost to obtain one?
23   A.  No.
24   Q.  Do you know how much it cost to obtain a US
25   passport?

---

146

1    A.  I don't know.  It's hundreds of dollars.  I
2    don't know.
3    Q.  And do you know --
4    A.  I can't remember exactly how much, but --
5    Q.  Thank you.
6    A.  Yeah.
7    Q.  Do you know what documents you need to present
8    to get a US passport?
9    A.  No, I don't remember.
10   Q.  I believe you testified earlier --
11   A.  My wife would be better at this than I.
12   Q.  I believe you testified earlier that you're
13   familiar with a Georgia photo ID law; is that right?
14   A.  I testified that I think that is one of the
15   Section 5 states that has a strict photo ID requirement.
16   Q.  Have you reviewed that?  Do you remember ever
17   having reviewed that law?
18   A.  I'm sure I did.  I'm sure -- I don't remember
19   exactly what's in it, but I'm sure I did.
20   Q.  Did you ever review the Indiana photo ID law?
21   A.  I'm sure I did.  I don't remember if I review
22   the bill language or stuff like the opinion itself that
23   described the law.
24   Q.  As you sit here today, do you recall whether
25   Senate Bill 14 is stricter than the Georgia photo ID law

---

147

1    in terms of restrictive number of photo IDs that may be
2    used?
3    A.  You know, I have a general impression that the
4    Texas law is as strict as any, but I can't tell you that
5    I'm able to compare the list of photo IDs between the
6    two forms of -- the two legislation and say one is
7    stricter than the other.
8    Q.  Could you tell me what the term legislative
9    emergency means within the Texas legislature?
10   A.  Whatever the governor says it means.
11   Q.  Are there any constraints on what the governor
12   can declare a legislative emergency?
13   A.  Apparently not.
14   Q.  What do you mean by that?
15   A.  Well, just because of what happened last
16   legislative session.  It seems to be simply a matter of
17   his legislative priorities.
18   Q.  Was photographic voter ID declared to be a
19   legislative emergency for the 82nd legislature?
20   A.  I believe so.
21   Q.  When did you first learn about that?
22   A.  Whenever he announced it, whenever that would
23   have been.
24   Q.  Are you aware of any conversations related to
25   that decision to include it in the emergency call?

---

148

1    A.  No.
2    Q.  Do you know why Governor Perry designated voter
3    ID as a legislative emergency?
4    MR. FREDERICK:  Objection.  Relevance.
5    Objection.  Calls for speculation.
6    Q.  You can answer.
7    A.  No, other than the obvious.
8    Q.  The obvious being?
9    A.  That his constituents wanted him to.
10   Q.  Has any election law to your knowledge ever
11   been declared an emergency before voter ID?
12   A.  Not that I recall.
13   Q.  And when an issue area or bill is declared an
14   emergency, what are the consequences in terms of
15   scheduling consideration of the bill?
16   A.  Oh, I think you can just begin -- if I recall
17   correctly, begin hearings on it earlier and the House
18   can take it up earlier.  It's just a matter of being
19   able to get right on it.
20   Q.  Does it mean that the legislature can consider
21   the issue within the first 60 days of session?
22   A.  I believe so.
23   Q.  Do you have any knowledge other than
24   constituent desire for this bill to be passed to which
25   you've testified why there was a need to consider this



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                                    June 1, 2012

| 149 |
| --- |

1   legislation within the first 60 days of 2011?
2       A.  Well, I think, you know, there's so much
3   concern expressed about the way that the bill had died
4   in the prior legislative session that everybody
5   understood that there was going to be a need to consider
6   this bill early rather than late under totally different
7   political circumstances and get it out of the way, move
8   onto other things.
9       Q.  Would Senate Bill 14 refer to the committee of
10  the whole Senate?
11      A.  I don't remember, but I think so.  I was not
12  involved in it as much last session.
13          (Exhibit US-108 marked.)
14      Q.  Could you mark this.  US-108?  You've been
15  handed what's been marked US-108.  Do you recognize what
16  this is?
17      I suppose it's information about the bill.
18  Goodness gracious.  Lots of activities, huh?
19      Q.  Do you know why Senate Bill 14 was referred to
20  the committee of the whole Senate rather than state
21  affairs?
22      A.  No.
23      Q.  Did you attend the Senate hearing on
24  January 25th?
25      A.  I don't believe so.

| 150 |
| --- |

1       Q.  Are you aware of any conversations Senator
2   Williams had with Ann McGeehan related to conducting
3   analysis of which voters did not have a driver's
4   license?
5       A.  No.
6       Q.  Did you ever come to learn of -- there was a
7   certain name of registered voters who could not be
8   matched on the driver's license list in October of 2011?
9           MR. FREDERICK:  Objection.  Vague.  You
10  may answer.
11      A.  I'm not sure I understand the question.  Are
12  you saying am I aware of the fact that there are a lot
13  of legal voters that do not have driver's licenses?
14      Q.  My question is whether you are aware of the
15  elections division having matched the voter registration
16  rolls against the driver's license databases to
17  determine which registered voters could not be matched
18  with the record in the driver's license database.
19      A.  No.
20      Q.  Did that ever come to your attention at all?
21      A.  No.  I was not very actively involved in
22  legislation in 2011.
23      Q.  You were a sponsor of Senate Bill 14 in the
24  House though; were you not?
25      A.  Yes.

| 151 |
| --- |

1       Q.  How did that come about?
2       A.  Just a political favor from Patricia who
3   realized the situation I had been put in the prior
4   session.
5       Q.  So she allowed you to be a sponsor even though
6   she was the primary sponsor?
7       A.  Yeah.  That's typical.  A sponsor is someone
8   who's, you know, thought to be a leader in the
9   legislation, but in reality, it's the actual author or
10  sponsor that does the work.
11      Q.  So why did you decide to sponsor a bill that
12  was so dramatically different from what you had been
13  advancing in 2009?
14          MR. FREDERICK:  Objection.  Legislative
15  privilege.  Instruct you not to answer.
16          THE WITNESS:  Okay.
17      Q.  Are you following the advice of counsel?
18      A.  Yes.
19      Q.  How it did come to be that Patricia Harless was
20  the main sponsor of the bill?
21          MR. FREDERICK:  Object to the extent that
22  your answer would reveal any privileged communication.
23  If you can answer without revealing privileged
24  communication, you may do so.
25      A.  My sense is that she was chosen because she's a

| 152 |
| --- |

1   active leader in the Texas Federation of Republican
2   Women, and this was one of their legislative priorities
3   and that she would because of her delightful personality
4   and pleasant demeanor be a good person to put at the
5   front mike on legislation of this type.
6       Q.  Is there any other reason you can think of
7   sitting here today?
8       A.  No.
9       Q.  Was Senate Bill 14 referred to the House select
10  committee on voter identification and voter fraud?
11      A.  I believe so.
12      Q.  Why was it referred to that committee?
13          MR. FREDERICK:  Objection.  Legislative
14  privilege.  Do not reveal the contents of any
15  communication with another legislator about SB14.  If
16  you can answer without doing that, you may.
17      A.  I think really that's kind of like -- that's
18  the same question as why was a committee formed.  Once a
19  committee was formed, it was clear that the bill would
20  be referred to that committee.
21      Q.  Bear with me one moment.  Are you doing okay?
22      A.  Yeah, I'm good.
23          (Exhibit US-109 marked.)
24      Q.  Representative Smith, you've been handed what's
25  been marked as US-109.  Do you recognize this document?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                                                June 1, 2012

---

### 153

1  A.  No.  I recognize what it is, but I don't know
2  if I've ever seen it before.
3  Q.  Could you describe what it is?
4  A.  Just a portion of a House Journal dated -- from
5  Monday, March 21st.
6  Q.  Turning your attention to Page 918 of this
7  document, are you there?
8  A.  M-hm.
9  Q.  Were you on the -- Strike that.  Was this the
10  House Journal of the proceedings on the House floor?
11  A.  Yes.
12  Q.  Were you on the House floor during this debate?
13  A.  I believe so.  Well, I know I was generally --
14  I don't know that I was on the House floor every minute
15  of it, but I do recall being there.
16  Q.  And do you see an exchange between
17  Representative Harless and Representative Anchia about
18  two-thirds of the way down the page concerning whether
19  there are any studies conducted by any state agency
20  about the number of voters that lack required
21  identification and the racial breakdown of those voters?
22  A.  I see it, yes.
23  Q.  Do you recall reading from this exhibit hearing
24  that exchange between the two representatives?
25  A.  No.

---

### 154

1  Q.  Do you see that Representative Anchia asked
2  Representative Harless if she was aware of any studies
3  conducted by any state agency about the number of voters
4  that lacked the required ID?
5  A.  Yes.
6  Q.  And what percentage of those voters are
7  African-American or Hispanic?
8  A.  Yes.
9  Q.  Do you see Representative Harless indicated
10  that she was unaware in testimony of any studies?
11  A.  Yes.
12  Q.  And that, further, she was -- she was unaware
13  of the existence of any other studies?
14  A.  Yes.
15  Q.  To your knowledge was Representative Harless
16  aware of any studies of this nature?
17  MR. FREDERICK:  Objection.  Calls for
18  speculation.
19  A.  I don't know.
20  Q.  Were you aware of any studies of this nature at
21  the time of this hearing?
22  A.  At this time of this hearing?
23  Q.  Yes.
24  A.  You know, I would have during the prior session
25  when I was involved in the issue read a number of

---

### 155

1  national secondary sources related to this issue, and
2  I'm sure that to the extent that I want to recall that,
3  there are at least some attempts to quantify the extent
4  to which that is the case.  I don't recall specifically
5  what they were, so I -- at the time of this debate on
6  the House floor two years later, I would have previously
7  been exposed to probably what existed in that regard.
8  Q.  That was with regard to voters outside of the
9  State of Texas?
10  A.  I think so.
11  Q.  So was that outside of Senate Bill 14?
12  A.  I think so.
13  Q.  Was that outside of Senate Bill 362?
14  A.  Yes.  I think this was kind of anything that
15  there was available to read.  I think even the Supreme
16  Court decision in the Indiana case may have gotten into
17  whatever data is available on those kinds of questions,
18  although maybe not since it wasn't a Section 5, but, you
19  know, I do believe that I have been exposed to the
20  arguments that it would have a disproportionate effect
21  on minority voters.  You know, I think that's really
22  kind of a matter of -- in terms of the -- you know, if
23  you are asking does the -- We never were even able to
24  quantify what percentage of registered voters do not
25  have a driver's license, and there were various

---

### 156

1  different estimates.  I know I've seen that in other
2  states as well, you know, estimates anywhere from
3  10 percent to, you know, less than 1 percent.  I think
4  I've strayed from your question, but -- so go ahead.
5  Q.  It's caused me to think of another question
6  which is do you know specifically the studies that you
7  read about impact of photo ID on minority voters?
8  A.  No.
9  Q.  Do you know when you read those studies?
10  A.  Yeah.  Everything I did would have been in
11  2009.
12  Q.  What was the conclusion of those studies?
13  A.  I don't know that there was only one conclusion
14  to the studies.  You know, there be a study for every
15  conclusion you want to reach.  I don't remember.  You
16  know, to me, again, if the question is are the people
17  that do not have photo IDs more likely to be minorities
18  than those that are not, I think it is a matter of
19  common sense that they would be.  I don't really need a
20  study to tell me that.
21  Q.  Do you think that that view, which you
22  described sort of as a common sense view, was held by
23  other legislators in the House.
24  MR. FREDERICK:  Objection.  Relevance.
25  Objection.  Legislative privilege.  To the extent it

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                          June 1, 2012

---

### 157

1  will require you to reveal communications or another
2  legislator's thought process, I instruct you not to
3  answer.
4      Q.  Are you following your counsel's advice?
5      A.  Yes.
6      Q.  Are you aware of any communications about the
7  fact that minorities are less likely to have photo ID.
8          MR. FREDERICK:  Objection.  Vague.
9      A.  I mean --
10     Q.  Amongst legislators.
11     A.  Yeah.  Just, again, primarily from opponents of
12  the legislation.
13     Q.  Are you aware of any supporters of photo ID
14  being a party to any of those communications.
15     A.  I would have been, just listening.
16     Q.  Are you aware of any other supporters of photo
17  ID besides you being present in those communications.
18     A.  I imagine every member of the elections
19  committee would have been there when those arguments
20  were being made as a matter of testimony.
21     Q.  Turning back to US-109, which was dated March
22  21st; was it not?
23     A.  Yes.
24     Q.  Turning back to US-108, when did Senate Bill 14
25  pass the House?

### 158

1      A.  It looks like almost everything happened on
2  March 23rd.  I guess that's when it happened.  A lot
3  of -- Let's see.  House read third time.  Third reading
4  on the 24th.  So I guess it was the 24th of March, it
5  looks like.
6      Q.  Are you aware of any studies or research having
7  been conducted during 2011 of the impact of Senate Bill
8  14 on minority voters?
9          MR. FREDERICK:  Objection.  Vague.
10     Q.  Can you re-ask it?  Just make sure I understand
11  what you are asking.
12         MS. WESTFALL:  Can you read back the
13  question?
14         (Requested portion was read.)
15         MR. FREDERICK:  Same objection.
16     A.  No.  I do believe that as I speak as a result
17  of this litigation that we're here about today that
18  their efforts to try to obtain information from the
19  Secretary of State's office, that would help identify
20  that, but that's all I'm aware of.
21     Q.  Are you aware of the election division having
22  undertaken an effort in February or March of 2011 to
23  match the voter registration list against the driver's
24  license database?
25     A.  I don't recall that.

### 159

1          MR. FREDERICK:  Objection.  Assumes facts
2  not in evidence.
3      Q.  Did you ever hear about that at all?
4      A.  No, not until today.  Not that I recall.
5      Q.  I will represent to you that Ann McGeehan in
6  her deposition yesterday testified that such a match had
7  been conducted and that it indicated that around 700,000
8  voters did not have access -- that were on the voter
9  registration rolls did not have a driver's license.
10     A.  Currently, yeah.
11     Q.  Yes.
12     A.  In that month.
13         MR. FREDERICK:  Objection.  Assumes facts
14  not in evidence.
15     Q.  Does that testimony surprise you?
16     A.  Not really.  I mean, I knew -- my own
17  calculation was that was 700,000 people, and I didn't
18  really know precisely how many.  It depended on which
19  estimate you used of what percentage of, you know,
20  registered voters do not have driver's licenses, but
21  just my extrapolation from estimates that seemed more
22  reliable from other states.  I think it may have been in
23  the Indiana and Supreme Court opinion and then kind of
24  presuming something about the nature of Texas's
25  population.

### 160

1          So it might -- I think it may have been a
2  2 percent figure or something like that in that Supreme
3  Court opinion, and so my presumption was it was
4  something higher than that because of the nature of our
5  population.
6          And so I -- you know, I think you'll see
7  if you get that slide show projection, I may have
8  actually, you know, estimated in that slide show
9  projection that it was 700,000 people that did not have
10  a photo ID.
11     Q.  When did you conduct that analysis?
12     A.  2009.  Everything I did on this was in 2009.
13     Q.  And how did you conduct that analysis?
14     A.  Again, I think just from something I read there
15  was a reliable estimate of another state of the
16  percentage of people that were legal voters that did not
17  have a photo ID, and I took that percentage, and I
18  doubled it or something.  And, you know, I mean, some of
19  the states that -- you know, there was -- Again, I think
20  I've already testified there were estimates as low as
21  less than 1 percent, as high as 10 percent, and so in
22  reading it all if you come up with something in between
23  you come up with something close to what you are talking
24  about.  That may be a little higher than I anticipated,
25  but I may have been thinking four or 500,000.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith
June 1, 2012

---

**161**

1    Q.   Who in your office conducted that analysis?
2    A.   Me.
3    Q.   And did you -- other than the --
4    A.   Back of the envelope kind of analysis, I can
5    assure you, but --
6    Q.   In the -- in the -- Other than the Power Point
7    you just testified to that was listed in the privilege
8    log that you testified about earlier, did you
9    memorialize that analysis in writing anywhere?
10   A.   No.  But I probably would have mentioned it in
11   committee hearings.
12   Q.   And which committee hearings did you mention
13   that in; do you remember?
14   A.   I don't know, but just anyone where we were
15   discussing voter ID.
16   Q.   Did you share any of your Power Points that you
17   prepared for these communications with constituent
18   groups, with any of your colleagues in the legislature?
19   A.   It seems like I just ran it by the speaker's
20   office before I went out and did it --
21   Q.   Did you share --
22   A.   -- because I felt that was appropriate for me
23   to at least let them know what I was going out in the
24   public while he was a committee chairman and present.
25   Q.   Would that have been, I believe, after your

---

**162**

1    primary election?
2    A.   Yes.
3    Q.   And was that in 2009?
4    A.   '10.
5    Q.   In '10.  Okay.
6    A.   Yes.
7    Q.   And so you went out with the Power Point and
8    you showed it to the senator -- to Speaker Straus in
9    advance of this presentation?
10   A.   Not him personally.  I think I probably sent it
11   to Denise in his office.
12   Q.   What is Denise's last name?
13   A.   Davis.
14   Q.   Did you send it to anyone other than Speaker
15   Straus in the legislature?
16   A.   I don't believe so.
17   Q.   Did you send it to anyone on the Senate side?
18   A.   I may have after I gave the presentation sent
19   it to constituents.  People may have asked me for it.
20   Q.   Some constituents.
21   A.   But, no, I don't recall giving it to any other
22   member.  I don't think anyone would care to look at it.
23   Q.   And you made an oral presentation or reference
24   to the data in committee hearings in 2009, is that
25   correct, or 2010?

---

**163**

1    A.   I'm just -- I'm not recalling specifically
2    doing that.  I wouldn't be surprised that I did.
3    Q.   Do you recall having any conversations with any
4    members about your analysis?
5    A.   Sure.  I mean, I would have -- I don't recall
6    specific conversations, but I'm sure I would have had
7    discussions like that.
8    Q.   Would they have been with members of the House
9    elections committee?
10   A.   Probably.
11   Q.   Would they have been with any other members of
12   the House?
13   A.   Probably.
14   Q.   Did you have any conversations with members of
15   the senate or their staff?
16   A.   I don't really recall having any conversations
17   with members of the Senate other than Wendy Davis and
18   Fraser.  There may have been others that I don't
19   remember, but those are the ones that I remember.
20   Q.   Do you think you shared any of this analysis
21   with Senator Fraser or his staff?
22   A.   I don't recall whether I did or not.
23   Q.   Did you share any of this analysis with
24   Patricia Harless or her staff?
25   A.   I don't remember.  Gave her my notebook, I

---

**164**

1    remember that, and we had some conversations.  But I
2    don't remember whether we talked about how many people
3    don't have driver's licenses that are legal voters.
4    Q.   Did you share any of this information with
5    Mr. Dewhurst's office and, in particular, Brian Abair or
6    any other staff people?
7    A.   Not that I recall.
8    Q.   Did you in doing this analysis try to determine
9    whether there was going to be a disproportionate impact
10   on minority voters?
11   A.   I don't -- I mean, again, I don't think any
12   effort was made to quantify the precise extent to which
13   that was going to occur, but I think, you know, that it
14   was a matter of common sense that however many hundreds
15   of thousands of people we were talking about was -- was
16   disproportionately poor and, therefore, minority.
17   Q.   So did you have a concern based on, you know,
18   your experience as an attorney, your knowledge of
19   Section 5 and this analysis that you conducted in 2009,
20   that -- and based on your common sense view that poor
21   people are less likely to have photo ID and, therefore,
22   be minorities, that this legislation would have
23   difficulty being pre-cleared by the Justice Department?
24       MR. FREDERICK:  Objection.  This is
25   getting into specific legislation.  I instruct you not

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                                June 1, 2012

|  | 165 |
|---|---|

1    to answer on the basis of legislative privilege.
2        Q.   Are you following your counsel's advice?
3        A.   Yes.
4        Q.   Are you familiar with Spanish Surname
5    Registered Voter Analysis?
6        A.   I probably am, if you'll remind me.
7        Q.   Unfortunately, I have to ask you the questions
8    and you have to answer the questions, so I can't remind
9    you.
10       A.   Okay.  I mean, I feel like I have had
11   discussions about it, and Rafael has probably educated
12   me about it, but I can't remember.
13       Q.   Okay.  Thank you for your testimony.  Was there
14   a strategy to ensure that Senate Bill 14 would be passed
15   on the House floor?
16       MR. FREDERICK:  Objection.  Legislative
17   privilege.  Instruct you not to answer.
18       Q.   Are you following your counsel's advice?
19       A.   Yes.
20       Q.   Was there any effort to get around the chubbing
21   problem of 2009?
22       MR. FREDERICK:  I'm going to object to the
23   extent it would require you to disclose confidential
24   communications or any legislator's thought process, and
25   to the extent that you can answer without revealing that

|  | 166 |
|---|---|

1    matter, you can do so.
2        A.   There were offers made by Democrats to the
3    Republicans of a variety of types to -- which would have
4    if accepted ended the chubbing, if that answers your
5    question.
6        Q.   Not really.  Was it horsetrading on other
7    bills?
8        A.   No.  It was really this bill.  I mean, Dunnam
9    offered in writing to the caucus --
10       MR. FREDERICK:  Okay.
11       Q.   It was in writing, and it's on the record?
12       A.   It's probably -- I think it's part of my slide
13   show presentation.
14       MS. PERALES:  Can't wait.
15       A.   Exactly, because I was basically trying to help
16   my constituents understand that the Republican caucus
17   had the opportunity to have the Betty Brown bill, the
18   hard photo ID bill, voted up or down the House floor,
19   and chose not to do that as just another indication of
20   the point that I was making was that that bill did not
21   have the votes.
22       Q.   So can you explain what happened in terms of
23   ensuring that the bill would be passed on the House
24   floor because I'm not really clear in that
25   understanding?

|  | 167 |
|---|---|

1        A.   What would happen?  I'm not sure I understand
2    the question.
3        Q.   To avoid the chubbing.  You were talking that
4    Representative Dunnam --
5        A.   Offered.  In other words, the Democrats clearly
6    had the ability to kill the bill.  At some point it was
7    clear that they could talk the clock out.  So they were
8    offering -- They were offering several things.  I don't
9    recall them all.  The one that was most meaningful to me
10   of which I was later accused of was the offer by Dunnam
11   to have the Betty Brown bill -- to end the chubbing and
12   have that bill brought to the floor and argued by both
13   sides without amendment and then have a vote up or down.
14   And the Republican caucus would not agree do that, and I
15   think that was the right decision on their part -- on
16   our part, and -- and that was to -- because you
17   shouldn't have to, you know, negotiate with terrorists,
18   and, you know -- you know, smiling when I say that, but,
19   you know, that would be bad precedent to sit -- and you
20   are supposed to be able to amend bills.
21       But what it did allow me to demonstrate to
22   my constituents is that it really was my version of the
23   bill that they were most concerned about actually having
24   a chance to pass rather than the Betty Brown bill.  They
25   knew they didn't have the votes, that the Betty Brown

|  | 168 |
|---|---|

1    bill would not pass, but my amendment might very well
2    have gotten the marginal votes and in my opinion would
3    have been better for everybody at that time, but, you
4    know, it's -- that's water under the bridge.
5        Q.   Your testimony was about 2009 and not 2011; is
6    that right?
7        A.   2009.
8        Q.   Okay.
9        A.   Not 2011.  That offer was not relevant or made
10   in 2011 because the terrorists had lost power.  They
11   didn't have they power.
12       Q.   Was there -- So is it your testimony that there
13   didn't have to be a strategy for getting Senate Bill 14
14   passed on the House floor because the Republican had the
15   votes?
16       A.   Yes.  I think you'd really have to -- It was a
17   foolproof majority.  I don't know how you could screw
18   that up.
19       Q.   Did you participate in the House floor debate
20   on the bill?
21       A.   No.
22       Q.   Did you vote to table amendments that were
23   offered?
24       A.   I followed Patricia's lead.
25       Q.   Did you review or give any significant



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                    June 1, 2012

---

169

1  substantive thought to any of the amendments or did you
2  follow her --
3      A.  I was available and talked to Patricia on the
4  floor as things were coming up, if she had a question.
5      Q.  Do you recall an amendment that would have
6  prohibited fees -- charging fees for the underlying
7  documents needed to obtain an election identification
8  certificate?
9      A.  I don't specifically recall that, but I'm not
10 surprised by it.  I don't doubt that there was one.
11     Q.  Can we go off the record?
12     A.  Can I say for myself on the record that I was
13 not really referring to my democratic friends as
14 terrorists.
15         MS. WESTFALL:  Let's go off the record.
16         (Recess from 2:14 p.m. to 2:28 p.m.)
17         (Exhibit 110 marked.)
18     Q.  (BY MS. WESTFALL) Could you please mark this as
19 US Exhibit 110?  You've been handed what's been marked
20 US Exhibit 110.  Do you recognize this document?
21     A.  I recognize what it is.
22     Q.  Could you describe it for the record?
23     A.  It's a portion of -- or perhaps all -- I don't
24 know -- but a portion at least of the House Journal
25 dated March 23rd, 2011, my birthday.

---

170

1      Q.  Oh.  Do you recall that this was the day when
2  the House considered an amendment to Senate Bill 24?
3      A.  I wouldn't have recalled that.
4      Q.  Directing your attention to Page 969 of this
5  document about Amendment 15.
6      A.  M-hm.
7      Q.  Could you take a look at Amendment 15 and let
8  me know if you recall this amendment?
9      A.  You referred to it earlier in the deposition,
10 it looks like.
11     Q.  Do you remember how you voted on this
12 amendment?
13     A.  I'm sure I followed Patricia.  It looks like I
14 did.
15     Q.  And could you explain why?
16         MR. FREDERICK:  Objection.  Legislative
17 privilege.  Instruct you not to answer.
18     Q.  Are you following the advice of counsel?
19     A.  Yes.
20     Q.  Turning your attention now to Page 979 of this
21 document at Amendment 23, are you familiar with this --
22 with this amendment?
23     A.  23?
24     Q.  Yes.
25     A.  I'm familiar with what it does.  I don't recall

---

171

1  specifically it happening, but it did.
2      Q.  Could you describe what the amendment would
3  have accomplished?
4      A.  It would have added to the photo IDs that could
5  be used.
6      Q.  Do you recall how you voted on this amendment?
7      A.  It looks like I voted yes to table.
8      Q.  Do you know why you voted that way?
9         MR. FREDERICK:  Objection.  Legislative
10 privilege.  Instruct you not to answer.
11     Q.  Are you following the advice of counsel?
12     A.  Yes.
13     Q.  Do you know generally why student ID wasn't
14 included in Senate Bill 14?
15         MR. FREDERICK:  Objection.  Legislative
16 privilege.  Instruct you not to answer.
17     Q.  Are you following the advice of counsel?
18     A.  Yes.
19     Q.  Turning your attention to Amendment 50 at Page
20 1009.  Do you see that amendment offered by
21 Representative Raymond?
22     A.  M-hm.  Yes, ma'am.
23     Q.  Are you familiar with this memo?
24     A.  No.
25     Q.  Turning your attention to House Journal 1015

---

172

1  and 16, do you see Amendment 54?
2      A.  Yes.
3      Q.  Are you familiar with this amendment offered by
4  Representative Alvarado?
5      A.  I don't know what you mean by familiar with.  I
6  don't recall it.
7      Q.  Okay.  Thank you.  Do you recall any amendments
8  offered on the House floor to Senate Bill 14 that would
9  have mitigated the effect of the bill on racial or
10 ethnic minorities?
11     A.  Say that one more time.
12     Q.  Do you remember any amendment to Senate Bill 14
13 being offered on the House floor that were adopted that
14 would have mitigated the impact of the bill on minority
15 voters?
16         MR. FREDERICK:  I'm going to object
17 based -- it assumes facts not in evidence.  Also, going
18 to object to the extent that any answer would imply
19 Representative Smith's thoughts and mental impressions
20 about specific amendments.  I would, therefore, instruct
21 you not to answer on the basis of privilege.
22     Q.  Are you going to follow his instruction?
23     A.  Yes.
24     Q.  Turn your attention to Amendment 58 on Page
25 House Journal 1021.  Do you see that Representative

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

## 173

1  Anchia offered an amendment?

2    A.  Yes.

3    Q.  Do you recall this amendment?

4    A.  No.

5    Q.  Based on your -- Could you take a quick look at

6  that amendment?

7    A.  Okay.

8    Q.  Have you had a chance to review it?

9    A.  Yes.

10    Q.  Could you describe what this amendment would do

11  generally speaking?

12    A.  Says that the bill does not take effect until

13  the later of January 1st, 2012 or the dates on which the

14  Secretary of State completes a study providing a lot of

15  information about the effect of the legislation on

16  voters.

17    Q.  How did you vote on this amendment?

18    A.  I voted yes to table.

19    Q.  Do you know why you voted that way?

20    MR. FREDERICK:  Objection.  Legislative

21  privilege.  Instruct you not to answer.

22    Q.  Are you following the advice of counsel?

23    A.  Yes.

24    Q.  Do you think this information was necessary to

25  gather in conjunction with submitting the bill once it

## 174

1  was passed for Section5 preclearance?

2    MR. FREDERICK:  Objection.  Legislative

3  privilege.  Instruct you not to answer.

4    Q.  Are you following counsel's advice?

5    A.  Yes.

6    Q.  Are you aware of any communications about the

7  demographics -- the racial demographics of who possesses

8  a license to carry license in the State of Texas?

9    MR. FREDERICK:  Objection.  Vague.  You

10  may answer.

11    A.  No.

12    Q.  Are you aware of any conversations about

13  speculation about the racial demographics of that group?

14    MR. FREDERICK:  Objection.  Vague.  You

15  may answer.

16    A.  The right to carry?

17    Q.  Correct.

18    A.  You mean a concealed handgun license?

19    Q.  Yes.

20    A.  Am I aware of any conversations where people

21  speculated about the demographic make-up of that group?

22    Q.  Correct.

23    A.  No.

24    Q.  Are you aware of any existing document or

25  report that identifies how many Texas voters are in

## 175

1  possession of a US military card?

2    A.  No.

3    Q.  Are you aware of any document or report that

4  identifies how many Texas voters are in possession of a

5  passport?

6    A.  No.

7    Q.  Are you aware of any document or report that

8  identifies how many Texas voters are in possession of a

9  citizenship certificate that has a photo?

10    A.  No.

11    Q.  Other than what you've testified about today --

12  Actually, strike that.

13        Could you tell me every single purpose

14  that you're aware of for Senate Bill 14, legislative

15  purpose?

16    A.  Ensuring that every vote that is cast is a

17  legal vote and deterring -- making it more difficult for

18  someone to cast an illegal vote and providing the

19  required identification without any financial burdens

20  associated with it other than the costs associated with

21  travel, I suppose, and whatever documents are required

22  to get the document.  You know, I think that's it.

23    Q.  So other than -- and we -- You've testified at

24  great length about any facts such as they exist related

25  to ensuring all those are legal.  Is there any other

## 176

1  factual information that you have that would support the

2  connection between Senate Bill 14 and ensuring all votes

3  are legal that you haven't already testified about

4  today?

5    A.  No.

6    Q.  In terms of deterring illegal voting, you've

7  testified about that today.  Are there any other facts

8  or information that you could supply that would support

9  Senate Bill 14 achieving that purpose of deterring an

10  illegal vote?

11    MR. FREDERICK:  Objection.  Vague.  You

12  may answer.

13    A.  I gave Patricia a whole folder or multiple

14  folders of documents that I had collected in the prior

15  session, and I was kind of reviewing in anticipation of

16  the possibility of ending up on the floor with this

17  bill, and I'm sure there's, you know -- John Fund is his

18  name.  You probably already knew that, but, you know,

19  you can read his book and whatever you want.  I imagine

20  that to the extent that there is evidence to support

21  that sort of thing, it is likely to be mentioned in that

22  book, but there's a number of sources, and there is

23  probably information in that packet of some additional

24  evidence that I have not talked about today of voter

25  fraud, you know, again, some of it more credible than



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                    June 1, 2012

---

### 177

1  others.

2      Q.  Was that voter fraud in Texas or outside of

3  Texas or both?

4      A.  Probably both, at least questions about the

5  possibility of voter fraud.

6      Q.  When did you supply that to Representative

7  Harless?

8      A.  Right when she started -- when she was first

9  appointed to handle that legislation.

10     Q.  Would that have been in January 2011?

11     A.  Early -- The early session 2011.  I don't

12  remember if it was January or February, but early.

13     Q.  Can you describe the election identification

14  certificate under Senate Bill 14?

15     A.  No.  I mean, it's my understanding that this

16  just would be a unique new card that would be created to

17  use for the sole purpose of voting.

18     Q.  And I believe you -- Go ahead.

19     A.  A photo -- It would include a photo and

20  presumably additional identifying information, but I

21  don't know precisely what.

22     Q.  Where would you obtain that document?

23     A.  Wasn't it like DPS locations?

24     Q.  Was it a driver's license office?

25     A.  I don't remember.

---

### 178

1          Q.  And I believe you just testified that obtaining

2  that form of identification would be burdensome insofar

3  a voter would have to travel to the office; is that

4  right?

5          MR. FREDERICK:  Object to the extent it

6  mischaracterizes prior testimony.

7      A.  No.  I mean, again, I think that's a fact

8  question that has to be established in this litigation,

9  and I don't really know the answer to that.  I don't

10  know the distances and number of people in the worst

11  case scenario.  I just don't know.

12     Q.  But is it your understanding that there would

13  be -- to the extent there's travel required to get the

14  document --

15     A.  Sure.

16     Q.  -- that's a burden.  Do you agree with that?

17     A.  The question is is it an unreasonable burden,

18  but I don't think there's any question it's a burden.

19  Yes, it's a burden.

20     Q.  Do you also agree that to obtain the underlying

21  documents to get the election identification

22  certificate, to the extent that costs some sort of

23  out-of-pocket cost, that that's a likewise burden?

24     A.  Sure.

25     Q.  Are there any other burdens that you can think

---

### 179

1  of now associated with getting an election

2  identification certificate?

3      A.  You know, I mean, the cost of obtaining the

4  documents to get the ID, to -- you know, I don't know if

5  travel is involved in getting -- in getting the

6  documents, to get the photo ID, but you may have travel

7  involved there, I don't know.  If that is stuff that's

8  handled by the mail or must involve travel, but so other

9  than travel to get the required photo ID and/or the

10  documents that are necessary to get the photo ID and the

11  cost of the documents to get the photo ID, I'm not aware

12  of anything else.

13     Q.  Are you aware of the fact that you may have to

14  go to a driver's license office during business hours

15  only?

16     A.  Yes.  I presume that would be the case.

17     Q.  And for person who work during the day, it

18  might being a burden to obtain time off to travel during

19  business hours to a driver's license office; isn't that

20  right?

21     A.  Yes.

22     Q.  And, also, have you been to a driver's license

23  office recently to renew your driver's license?

24     A.  Depends on your definition of recently, but I

25  have been to one whenever the deadline was here in

---

### 180

1  Austin.

2      Q.  Are you aware that sometimes or perhaps often

3  one faces very long lines at driver's license offices?

4      A.  I hear that.  I've been fortunate to avoid it,

5  but, yeah, I know there were concerns about that.

6      Q.  What have you heard about lengthy lines at the

7  driver's license office?

8      A.  Oh, it seems to me didn't we do something

9  legislatively that resulted in even longer lines than

10  normal?  And there were complaints about it last

11  session.

12     Q.  How long are the lines?  How long have you

13  heard that they can extend for people?

14     A.  I don't know, but I presume there were budget

15  cuts that reduced the number of employees or lengthened

16  those lines, but in terms -- I don't know what the

17  anecdotal horror stories are about the longest period of

18  time someone has stood in a line to get a driver's

19  license renewed, but I know there has been some concern.

20  I believe there's been some concern about it, whatever

21  time it was before getting even longer because of budget

22  cuts.

23     Q.  Was that a bill that was passed in 2011 at the

24  same time Senate Bill 14 was passed?

25     A.  I don't know.  I believe I'm correct that there

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                    June 1, 2012

---

181

1  was actually some discussion on the House floor from
2  people that were concerned about additional cuts where
3  they were having complaints from constituents about long
4  lines.
5        MS. WESTFALL:  Thank you.  I think at this
6  time other than we're going to keep the deposition open
7  because, obviously, we have some disagreements about
8  privilege issues, I will turn over the podium to my
9  co-counsel.  Would you like to switch seats?
10       MS. PERALES:  Yes, please.
11       (Exhibit RODRIGUEZ-15 marked.)
12                 EXAMINATION
13  BY MS. PERALES:
14    Q.  Good afternoon, Representative Smith.  My name
15  is Nina Perales, and I work with the Mexican American
16  Legal Defense Fund, and in this case I represent a group
17  of parties called the Rodriguez Intervenors.  I am going
18  to try very hard to skip any of the material that you've
19  already testified about with Ms. Westfall, so some of my
20  questions might seem like they are moving around a
21  little randomly, but that is so we can get to the end
22  more quickly.
23       I'd like to look at the 2005 bill and just
24  ask you a question about that.  That's HB1706.  And you
25  were on the committee in 2005, but my understanding is

---

182

1  that HB1706 initially was sent to a subcommittee, so I
2  know that you might not be as completely familiar with
3  it.
4        Does anybody know what the last Rodriguez
5  exhibit was yesterday?  We'll start with 15.  I'd like
6  to mark this Rodriguez 15.  The court reporter has
7  handed you what has been marked Rodriguez Deposition 15,
8  which I will represent to you is the introduced version
9  of HB1706 in 2005 sponsored by Ms. Denny, and my
10  question for you -- And I will also represent to you
11  that you voted for this bill in committee.  In fact, I
12  believe Representative Anchia may have been the only
13  person in the committee who didn't vote for it.  I don't
14  know if that helps refresh your recollection.
15    A.  No.  It doesn't.  That surprises me.
16    Q.  And you will see -- starting on the third page
17  of the bill, you'll start to see the list of documents
18  that will prove identity of a voter.
19    A.  M-hm.
20    Q.  So there's a list under A and a list under B.
21    A.  M-hm.
22    Q.  And so I believe you testified earlier that
23  this seems like a fairly typical list in 2005 of the
24  types of non-photo ID that would be acceptable; is that
25  correct?

---

183

1    A.  I'm not sure I understand the question of
2  typical list in 2005.  I mean, you know, this is a --
3  this is -- looks like the kind of language that you see
4  repeatedly in these various voter ID laws that were
5  considered in the first decade of this century.
6    Q.  Okay.  When -- And is it your belief that the
7  items that are listed under the photo and non-photo
8  items would assist in proving a voter's identity?
9    A.  Yes, I suppose so.  To some extent there's some
10  evidence of a voter's identity.
11    Q.  Are you familiar with how any of these specific
12  items ended up in the bill?
13    A.  No.
14    Q.  Okay.  Do you know where the bill language came
15  from?
16    A.  No.
17    Q.  Do you recall whether in the engrossed version
18  as it was passed in the House there was an additional
19  provision that counties could make voter ID cards with
20  photos on them?
21    A.  No, I don't recall.
22    Q.  I think I'd like to move now to 2009.  Go ahead
23  and take this.  Why did you file a shell bill?
24       MR. FREDERICK:  I'm going to object on the
25  basis of privilege.  Instruct you not to answer.

---

184

1        MS. PERALES:  I want to get this clear on
2  the record as well that it's my understanding -- please
3  correct me if I'm wrong, Mr. Frederick -- that when you
4  are advising the representative you are alerting him to
5  the possibility of being able to invoke privilege as
6  opposed to instructing him not to answer the question
7  because it's his privilege to waive or not.
8        MR. FREDERICK:  I believe that is a --
9  that's a fair characterization.  My understanding as I
10  have been advised by the representative that he intends
11  to assert privilege.  Consistent with that instruction
12  as his lawyer, I am alerting him to the existence of the
13  privilege issue and by telling him that I instruct him
14  not to answer, I intend to alert him that he is able to
15  not answer the question based on privilege as opposed to
16  another objection where I would object and say you may
17  answer.
18        MS. PERALES:  And just so the witness
19  knows, he can choose to answer if he likes.
20        THE WITNESS:  I'm aware of that.
21    Q.  (BY MS. PERALES)  Did you support Speaker Straus
22  in his first run for speaker?  By that, I mean did you
23  vote for him?
24    A.  Yes, I did vote for him.
25    Q.  Okay.  That's a better question then.

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                                    June 1, 2012

---

185

1     A.  Yes.
2     Q.  Is it your understanding that you had the trust
3  of Speaker Straus in 2009 when he named you chair of the
4  elections committee?
5     A.  I believe I do.
6     Q.  And without revealing the content of the
7  conversation, did you come to understand in 2009 that
8  Speaker Straus was entrusting with the responsibility to
9  pass a voter ID bill?
10    A.  He was asking me to do my best.  I don't know
11 about trusting me about the responsibility.  I think
12 everybody understood it was an uphill battle.
13    Q.  It was a very controversial issue, wasn't it?
14    A.  It was very controversial.
15    Q.  In fact, it might have been the most
16 controversial issue of the '09 session; don't you think?
17    A.  Yes.  Clearly.
18    Q.  Do you recall any other controversial issues
19 that were being debated in '09?
20    A.  Always abortion.
21    Q.  True.
22    A.  But I don't -- that was just a dominating issue
23 in that session from a public relations standpoint in
24 terms of what you read about it in the newspaper.
25    Q.  And by that, you mean voter ID?

---

186

1     A.  Yes.
2     Q.  How about immigration?
3        MR. FREDERICK:  Objection.  Vague.  But
4  you may answer.
5     A.  I don't understand your question.
6     Q.  Was immigration and doing something about
7  immigration a controversial issue in the '09 session?
8     A.  Sure.  It didn't have the same level of
9  visibility in that particular session, more so in the
10 last one, but certainly by that time it had become a
11 major issue.
12    Q.  Did you happen to notice over the past several
13 sessions whether there was an increasing number of bills
14 being introduced that aimed to affect immigrants or
15 regulate immigration in the state?
16    A.  I presume that's true.
17    Q.  Okay.  So I'm going to ask you now about SB362,
18 which is Exhibit US-29.  Was this introduced?  This is
19 as it came out of the Senate.  Okay.  Well, I'm going to
20 ask you to refer to US-29 so I can ask you a few
21 questions about it.
22    A.  M-hm.
23    Q.  You testified previously that you were the
24 chairman of elections when this bill, SB362, comes over
25 from the Senate and lands in your committee.  Yes?

---

187

1     A.  Yes.
2     Q.  Okay.  And you've also testified today that you
3  did quite a bit of research into topics related to voter
4  ID, and so I want to follow up on that a little bit.
5  You testified earlier that -- Well, I'll ask you, do you
6  know what a certificate of citizenship is?
7     A.  No.
8     Q.  But it is listed as one of the forms of photo
9  ID that is acceptable for voting, yes, in this bill?
10 Let's go to Page 6.
11    A.  Yeah.  "A United States citizenship certificate
12 issued to the person that contains the person's
13 photograph."
14    Q.  Okay.  And so SB362 specifically adds the word
15 certificate to the pre-existing law and the words that
16 contains the person's photograph, correct?
17    A.  Yes.
18    Q.  And if the voter under this law could produce
19 this document, it would be the only piece of ID
20 necessary because it's on the first list, correct?
21    A.  Yes.
22    Q.  Do you know if this certificate of citizenship
23 is different from the naturalization certificate?
24    A.  No.
25    Q.  Do you know that the United States citizenship

---

188

1  certificate does not have a photograph on it?
2     A.  No.
3     Q.  So would it be fair to say then that you didn't
4  look into this particular item of ID in the bill?
5        MR. FREDERICK:  Objection.  Vague.
6     A.  I don't recall the extent to which we had
7  testimony on that issue in front of the committee where
8  we went through the photo IDs item by item, but it's
9  possible.
10    Q.  And in terms of your own personal inquiry into
11 the aspects of the bill, would you say you did not make
12 any research or inquiry?
13       MR. FREDERICK:  I'm going to object on the
14 basis of legislative privilege to the extent it's asking
15 for his own investigation.  Instruct you not to answer.
16    Q.  Do you know whether a legal permanent resident
17 immigrant of the United States can get a concealed
18 handgun license?
19    A.  No, I don't know.
20    Q.  You mentioned earlier that you were aware that
21 a legal permanent resident immigrant could obtain a
22 driver's license and drive in the State of Texas.  Yes?
23    A.  I think that used to be the case, and I think
24 it's not any longer.
25    Q.  A legal permanent resident, a green card

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                                      June 1, 2012

---

189

1    holder?
2        A.  Oh, I don't know.
3        Q.  And you are aware that a legal permanent
4    resident, immigrant young men and women do serve in the
5    US military, correct?
6        A.  I don't know.  I do not know, but I presuming
7    you are right.
8        MS. PERALES:  Okay.  We previously marked
9    Rodriguez 11 in a prior deposition.  Do you know
10   whether -- well, do you know whether -- This is what I'm
11   going to do.  I'm going to give you a copy of what has
12   previously been marked Rodriguez 11, and I'm going to
13   hand the same to the witness.  I am not going to remark
14   this document.  Oh, no, this is incorrect.  I'm sorry.
15   Hand it back, please.  This is not what I asked for.
16   I'm looking for a memo dated -- Do you have that?  I
17   think it was marked yesterday, and we're just trying to
18   find it.
19       MS. WESTFALL:  We can go off the record
20   for a minute.
21       (Recess from 3:02 p.m. to 3:07 p.m.)
22       (Exhibit RODRIGUEZ-16 marked.)
23       Q.  (BY MS. PERALES) Representative Smith, the
24   court reporter has handed you what's been mark as
25   Rodriguez Deposition Exhibit 16.  Do you recognize this

---

190

1    as a memo to you and the other members of the committee
2    in March of 2009?
3        A.  I don't recall it, but that appears to be what
4    it is.
5        Q.  Okay.  And it makes reference to a
6    March 2nd hearing, but it also says --
7        A.  Organizational meeting.
8        Q.  -- Organizational Meeting.  Do you remember
9    having an organizational meeting?
10       A.  No, I don't specifically recall it, but I
11   presume we did.
12       Q.  Now, is it your understanding that this memo
13   from the Secretary of State is following up on some
14   questions that were raised during the hearing on the
15   meeting?
16       A.  It looks like that, yeah.
17       Q.  Okay.  And, finally, on the last page on No. 5,
18   where it says number voters who have registered since
19   2006 without a driver's license number, do you see that
20   information?
21       A.  M-hm.  Yes.
22       Q.  Did you -- Did you use that information?
23       A.  Use it?
24       Q.  In the sense you were speaking earlier about
25   estimating how many voters in Texas might lack a

---

191

1    driver's license.  Now, this is only as to people who
2    had registered since 2006, but I was wondering if you
3    had relied on that as part of what you testified earlier
4    about.
5        A.  I doubt it.  I don't think so.  I think I
6    remember my back of the envelope calculation was based
7    on some kind of information I had received from national
8    publications or Supreme Court opinions or something I
9    had read about other State's that were different than
10   Texas with fewer minorities, smaller proportion of poor
11   population, and I just extrapolated from that apparently
12   reliable data.  I don't remember specifically what it
13   was, but it seemed to me the most credible information I
14   could find about other states that seemed credible, and
15   I simply needed to make some judgment about how Texas
16   would differ from that state, whichever one it was.
17       Q.  So if you look at the second group of numbers,
18   it talks about the Secretary of State querying this
19   statewide voter file and estimating that 809,000 voters
20   might lack Texas driver's licenses and Social Security
21   numbers.  Do you see that there?
22       A.  Yeah, I do see it.
23       Q.  Do you remember coming cross that information?
24       A.  I don't remember as I sit here today.  No, this
25   was early in the process.  It may have been very --

---

192

1    Let's see.  These are the people who did not write down
2    their Social Security number or their driver's license
3    number when they registered to vote.  It's not
4    necessarily people who for sure don't have one; is that
5    correct?
6        Q.  Well, it does say --
7        A.  These are the people that did not indicate --
8    did not provide that information on the voter
9    registration card which is slightly different than
10   knowing for sure they don't have them.  I think -- Is
11   that how I read it?  That's how I'm reading it.
12       Q.  Yes.  I think that's a fair reading of it.
13   It's a little more vague as to the second group.
14       A.  The question is how many of those people that
15   for whatever reason at any time write down the driver's
16   license or their social security number do in fact have
17   one.  I don't know.
18       Q.  So to sort of zoom out from the memo itself,
19   would it be fair to say that at this point in the
20   process -- this is about a month before your hearing in
21   April -- that concerns had begun to be expressed -- and
22   I don't need you to reveal privileged concerns, but,
23   obviously, this is already a conversation that seems to
24   be happening between members of the committee and
25   Secretary of State, are concerns being expressed at this

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                      June 1, 2012

## 193

1    time point that there might be voters who don't have ID
2    for voting?
3        A.  Oh, I think not.  Everybody knew there were
4    voters that didn't have a photo ID or at least a
5    driver's license.  Let me put it that way.  But I think
6    there was a little uncertainty.  That was part of the
7    difficulty in really trying to ascertain precisely how
8    many people did not have a photo ID because it wasn't
9    just limited to driver's license.  When you got to some
10   reasonable estimate of how many people didn't have a
11   driver's license, then you had to try to guess how many
12   of those people that don't have a driver's license have
13   some kind of other photo ID.
14       I will say this, that we had -- you know,
15   we never -- we couldn't find a single person who
16   testified, and we had, you know, multiple rooms full of
17   people testify, and I specifically -- let the biggest
18   committee hear rooms.  We had overflow crowds in two
19   rooms, and the first thing I did was say I want to
20   prioritize any testimony from anybody who's here today
21   that does not believe they have in their possession the
22   required identification that would allow you to vote.
23       Q.  And that would be under --
24       A.  And one man came forward and said he didn't
25   think he did, and he said because I don't have a

## 194

1    driver's license, so I don't think I can vote in this
2    bill, and then I -- you know, I said do you have any
3    other photo ID?  He pulled out his billfold.  He not
4    only had the non-photo.  He had another kind of photo ID
5    in his billfold.  He just had the impression that you
6    had to have a driver's license to vote, and people that
7    didn't have a driver's license couldn't vote.
8        And so, you know, again, my opinion -- And
9    this is part of my frustration.  There may be some --
10   you know, some more -- I think more credible issues
11   associated with a hard photo ID bill gets to the issue
12   of how much of a burden is it on certain voters to go
13   certain distances and pay for this information, and
14   that's the kind of fact question that needs to be
15   resolved in this litigation.
16       But insofar as the legislation we were
17   considering in 2009, it was -- there just was not any --
18   I mean, finally, I said, okay, we can't find a human
19   being that doesn't -- nobody can produce a body that
20   would not have on their possession currently the IDs
21   required to vote.  Can you even give me a hypothetical
22   for who might not be able to vote in this bill, and the
23   hypothetical I was given was you could have a homeless
24   person with all their possessions in a backpack, and
25   they could lose the backpack within two weeks of the

## 195

1    election, and so that was the only hypothetical that was
2    presented for the kind of person -- of course, that
3    person would have had trouble voting under the prior law
4    as well.  So I was a little frustrated from the -- I was
5    frustrated with criticism and complaints from my right
6    and my left in this legislation and part of my
7    frustration.
8        In so far as the criticism from the left
9    was concerned was that the rhetoric that you got from
10   the partisans on the left was exactly the same, even
11   though the language in the bill was dramatically
12   different than it is with a strict photo ID bill.  You
13   got the same arguments about, you know, poor -- even
14   though nobody -- that was the best -- In the committee
15   hearings we had, that was the only suggestion of who
16   would have trouble under that language was the
17   hypothetical of the homeless man with all of his
18   possession in a backpack that lost his backpack, and so
19   it was -- you know, I was a little frustrated that the
20   rhetoric didn't change when the language in my bill
21   changed.  And that's just because the issue was so
22   politicized that it had very little to do with what we
23   were actually doing as a matter of policy.
24       Q.  When you mentioned my bill in your last
25   sentence, you were referring to SB362 or your committee

## 196

1    substitute?
2        A.  I was referring to the version of the bill --
3    Well, that was true of the Senate bill as well, you
4    know.  All my bill did was add two or three -- I
5    think -- I can't remember what the third one is, but
6    three additional provisions to the Senate bill, but
7    neither version would have required any voter to get a
8    document that's not already in their possession to be
9    able to vote.
10       Q.  Understood and agreed.
11       A.  And to me, that's pretty substantially
12   different from a bill that does.
13       Q.  Such as a hard photo ID bill?
14       A.  Yes.  In terms of there being arguments
15   available that there is a burden created on the voter
16   that -- and we can argue about whether that burden is
17   reasonable or unreasonable, and I guess the courts are
18   the ones that answer that question.
19       Q.  Yes.  So just with respect to 2009 and the memo
20   from the Secretary of State, you -- putting aside the
21   question about all the non-photo ID that was available
22   in HB in SB362, would it be fair to say that questions,
23   concerns had begun to arise with respect to how many
24   voters had a driver's license that could be used for
25   voting as of March 6, 2009 when this memo comes back



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                                    June 1, 2012

197

1     from Secretary of State?
2          A.   I just think that the issue of photo ID was
3     a -- by this time until 2009 a national issue that had
4     been where all of the arguments available to both sides
5     were hashed out as a matter of public record, and if you
6     spent, you know, a few minutes or hours or weeks reading
7     what was available on the subjects, you were going to
8     quickly be aware of the fact that that's really what the
9     debate was about.   So I don't know that it was as -- It
10    just was a matter of common knowledge to anyone who was
11    familiar with the issue that those were the issues.
12         Q.   Thank you.
13         A.   M-hm.
14         Q.   And with respect to the committee and a meeting
15    that was held between the Secretary of State and the
16    committee, which then resulted in this memo a little
17    less than a week later where the memo was coming back
18    with information, would it be fair to say then that
19    concerns were being raised within the conversations
20    between the committee and the Secretary of State about
21    the availability of drivers licenses to vote?
22         A.   Right.   And just trying to quantify the number
23    of participate who would actually have to go out and get
24    an additional document if we were to require a photo ID.
25    Again, that being less relevant in light of the fact

198

1     that none of the legislation in this particular session
2     would have required that.
3              (Exhibit RODRIGUEZ-17 marked.)
4          Q.   Thank you.   I'm going to talk to you a little
5     bit now about the hearing that was held on April 6th and
6     April 7th.   I'd like to mark this, please.   This will be
7     Rodriguez-17.   And the court reporter has handed you
8     what was marked Rodriguez-17.   I wanted to say in
9     reviewing these transcripts, I appreciated your civility
10    and uniformed kindness to the witnesses who came to
11    testify.
12         A.   Thank you.
13         Q.   You're welcome.   I could tell that it was -- it
14    was quite the hearing.
15         A.   Yeah, it was interesting.
16         Q.   Look with me if you would -- Is it correct to
17    say that on Page 37 you make reference to what you
18    believe would be a small minority of people who do not
19    have photographic identification?   It's at the beginning
20    of your remarks on Page 37.
21         A.   Yes.   What's the question?
22         Q.   Just whether you make reference to what you
23    believe is a small minority of people who lack
24    photographic identification.
25         A.   Right.

199

1          Q.   Now, if you read backwards onto Page 36, it
2     looks like there's a conversation happening between you
3     and Representative Brown.   She makes reference -- And
4     she makes reference to your having previously used a
5     5 percent figure.   Do you recall that?
6          A.   That may have been, you know, again, in that
7     range of anywhere from less than 1 to 10 where I'm going
8     in between and just pulling the number out of the sky
9     for purposes of discussion.
10             (Exhibit RODRIGUEZ-18 marked.)
11         Q.   Let's go ahead and mark this one.   The court
12    reporter has handed you what has been marked
13    Rodriguez-18.   I'm not going to ask you if you recognize
14    this as a transcript of the hearing -- of the hearing on
15    April 7th because you may not have seen a transcript of
16    the hearing on April 7th.
17         A.   No, I have not.
18         Q.   So I'll represent to you that it's a transcript
19    of the hearing on April 7th.
20         A.   I recall Buck Wood testifying.
21         Q.   Go ahead and look at Page 107, 108.   You begin
22    speaking at the bottom of Page 107.   You say, "It is
23    significant that this legislation, unlike some of the
24    other pieces of legislation, does not require you to get
25    that photo ID."   Do you see that statement?

200

1          A.   M-hm.
2          Q.   And did you believe at the time that it was
3     significant that SB362 did not require photo
4     identification.
5          A.   Yeah.   I don't -- I don't know what is being
6     said before I make that comment, but it may very well
7     that I was expressing my frustration over the fact that
8     the arguments being made against it seemed to be the
9     very same arguments that were being made against a
10    strict photo ID requirement when they would not seem
11    apply in this instance.
12         Q.   Did you believe that it was significant that
13    the bill that you were having your hearing on, SB362,
14    did not require photo ID for voting?
15         A.   It certainly is a substantially different piece
16    of legislation in terms of the kind of questions that
17    were involved in the litigation, yes.
18         Q.   And I think previous to that the witness may
19    have been talking about the cost of obtaining
20    identification, and that might be why --
21         A.   Right.
22         Q.   -- why you are drawing the distinction.
23         A.   Right.
24         Q.   Follow your comments, if you would, over to the
25    next page.   You mention again about there being a very



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

### 201

1   small percentage of persons without photo ID.
2       A.  M-hm.
3       Q.  And you mentioned 1.2 percent in Indiana.
4       A.  There you go.  Yeah.
5       Q.  And then you say the presumption is it's a
6   little higher in Texas because of the fact that we have
7   a larger minority community.  Do you see that there?
8       A.  Right.  M-hm.
9       Q.  Did you think it was valid to make the
10  percentage a little bit higher in a state like ours with
11  a larger minority community?
12      A.  Sure, I do.
13      Q.  I'd like you to go back to April 6, if you
14  would.  That's Rodriguez Exhibit 17.
15      A.  M-hm.
16      Q.  On Page 180, 181, you are having a conversation
17  here with a witness named Justin Leavitt who came, I
18  believe, from Los Angeles to testify about voter ID, and
19  you see that you start speaking at the bottom of Page
20  180 and you say, "And you agree that by providing a
21  non-photo alternative, in addition to what other means
22  we can take, would significantly lessen any marginal
23  additional burden on some voters?  You agree with that?"
24  Do you see your question there?
25      A.  M-hm.

### 202

1       Q.  Would it be correct to say that you believe
2   that providing a non-photo alternative would
3   significantly lessen any marginal additional burden on
4   some voters?
5       A.  Yes.
6       Q.  If you would go again to Rodriguez-18 on
7   April 7th, the other transcript.  I get lost in
8   transcripts too.
9       A.  What page?
10      Q.  On this one it is Page 107.  It's the wrong
11  citation.  Hang on one second.  I'll find it.  There it
12  is.  It's on Page 108.  This is the conversation that
13  you are having with a witness named Mary Naranjo and
14  beginning at Line 11, do you see where you say, "With
15  regard to that percent, I think you are correct to the
16  extent we mandated a photo ID there would be potential
17  arguments regarding a mandated cost that might be a
18  barrier for some people at the polls"?  Do you see that?
19      A.  M-hm.  Yes.
20      Q.  And did you believe that if there was a
21  mandated photo ID requirement that it would create
22  barriers for some persons to get to the polls and vote?
23      A.  I think that what I'm stating there is that
24  there are potential arguments -- Again, as I've already
25  testified, clearly all of these things are additional

### 203

1   burdens and then the question is is there an acceptable
2   burden, an unacceptable burden because any kind of a
3   identification requirement is going to be a burden to
4   some degree.  And so the question is what is acceptable.
5           (Exhibit RODRIGUEZ-19 marked.)
6       Q.  Okay.  That's the next volume.  The court
7   reporter is handing you what's been marked Rodriguez
8   Exhibit 19.  It is the continuation of the April 7th
9   hearing in the elections committee.  There was a lot of
10  talking and the multiple volumes --
11      A.  I feel like those poor politicians on Meet the
12  Press when they play their prior statements on that
13  particular show.
14      Q.  I'm being gentle.  Look at Page 625, if you
15  would.  Now, I have in my notes that we should read from
16  625 to 627, so I think there's a back and forth going
17  on, and I wanted you to get some context.  Let me see.
18  Okay.  There's something going back and forth with a
19  Mr. Rodebush.  Do you recall your conversation with him
20  in this hearing?
21      A.  If I read it, I might.  Let's see.  This is
22  invited testimony or public testimony.  This is the
23  second day, right.  Let's see.
24      Q.  This is the second day.
25      A.  Yeah.  That was public testimony, so this is

### 204

1   just someone from the public.
2       Q.  I think Mr. Rodebush is in favor.  I'm not
3   completely sure.
4       A.  Okay.
5       Q.  On Page 627 -- And, in fact, on these pages, I
6   think that -- would it be fair to say that you are
7   talking to Mr. Rodebush about the possible economic
8   impact of a hard photo ID requirement?
9       A.  Yes.
10      Q.  All right.  And where you say on Page 627,
11  "Indigents will not vote in disproportionate numbers to
12  the extent that you create economic barriers to the
13  polls," is that something that you believed when you
14  said it?  You say I think they're right about that.
15      A.  Sure.  I think economic barriers are more
16  likely to deter poor people from voting than rich people
17  from voting.
18      Q.  Okay.  And did you -- Let's see.  On Page 626
19  starting around Line 17, you say, "I don't know that the
20  problem here" -- I'm sorry.  626 starting at Line 17.
21  "I don't know that the problem here is a legal barrier
22  because I think the kind of thing that we're talking
23  about, and if I'm correct, has been held not to be a
24  legal poll tax, but I still believe it's a legitimate
25  issue as a matter of public policy for us to consider."



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                          June 1, 2012

## 205

1  Do you see that there?
2      A.  M-hm.
3      Q.  What exactly are you saying is a legitimate
4  issue as a matter of public policy?
5      A.  The effort to do everything that we could
6  feasibly do to minimize any economic barrier to voting.
7      Q.  And in your mind would that include providing
8  more forms of ID in a bill that could be used for voter
9  ID so as to minimize the economic impact?
10         MR. FREDERICK:  I want to clarify.  Are
11  you asking him just for his opinion now or for what he
12  was thinking with regard to a specific bill?
13         Q.  We'll let him answer.  I think I should ask
14  your opinion now.
15         A.  What's the question?
16         Q.  You were talking about it's a legitimate issue
17  as a matter of public policy to think about reducing the
18  economic burdens of voter ID requirement, and my
19  question to you is whether you think that providing a
20  more expansive list of possible IDs for voting is one
21  way to minimize the economic impact.
22         A.  I guess I presume that is the case.  Obviously,
23  I take it that there are some forms of photo ID that are
24  more easily fraudulent than others and that there you
25  kind of, I guess with all of the things we're talking

## 206

1  about, have to weigh the concerns of security versus the
2  concerns of access, I guess, one another.
3      Q.  But with respect to expanding a photo ID
4  requirement to include non-photo items, in your opinion
5  would that be a way for using the economic impact of a
6  voter ID requirement?
7      A.  Yes.
8      Q.  Because somebody might receive a utility bill
9  in any event because they -- they have a utility bill.
10     A.  Yes.  They already have it in their possession.
11  They don't have to go out and get something new.
12     Q.  Okay.  I got the sense from these transcripts
13  that you spoke positively about what you understood
14  about the Florida voter ID model.  Do you remember
15  being -- feeling positively about the Florida model?
16     A.  That's the third thing.
17     Q.  The affidavit bypass?
18     A.  Yes.
19     Q.  But I don't want to get there yet.  I want to
20  get to your substitute, but I was going to ask you
21  simply why you liked or why you had some positive
22  feeling about the Florida model.
23         MR. FREDERICK:  I'll object on the basis
24  of privilege, asking about your mental impressions on
25  pending legislation.  I'll instruct you not to answer.

## 207

1      Q.  On the abstract, putting aside the legislation,
2  is there anything about what you know about the Florida
3  model that you liked?
4      A.  What I remember about it was the process by
5  which the -- if I recall correctly, the people who did
6  not have the proper identification when they voted.  The
7  process by which those votes could still count because
8  of some sort of curative action that took place after
9  the fact, was more inclusive, much less likely to have a
10  legal vote not count.
11     Q.  Okay.
12     A.  I don't think it was an affidavit bypass.
13     Q.  I was guessing wrong.
14     A.  I'm trying to remember the process, but I think
15  there was basically a committee that met and --
16     Q.  Verified the voter's signature perhaps?
17     A.  That's what it was.  It was a signature match,
18  yeah.
19     Q.  Okay.  We'll get there.
20     A.  The committee deemed the signatures to be the
21  same than the vote counted, unless the court deemed them
22  to be different.
23         (Exhibit RODRIGUEZ-20 marked.)
24     Q.  The court reporter has handed you what's been
25  Rodriguez Deposition Exhibit 20.  This is the later part

## 208

1  of the first day of the hearing on April 6th, and I
2  wanted to ask you to take a look at Page 315.  I'm
3  sorry, 351.  Okay.  Okay.
4      A.  Is that me?
5      Q.  That's you.
6      A.  God.  I was pontificating.
7      Q.  Because it carries on.
8      A.  Where does it start?
9      Q.  It starts on 349.  What I'm interested in is
10  sort of near the end of what you were saying there.
11     A.  Okay.
12     Q.  On Line 11, you'll see that you begin a
13  sentence on Page 351.  "There's some things I hope we
14  are going to be able to do on the House side to make it
15  even more sensitive to these concerns."  What did you
16  mean when you made that statement?
17     A.  Those three things we're talking about.
18     Q.  Okay.  So you're referring to the bill that you
19  later introduced as your substitute?
20     A.  Right.
21     Q.  Okay.  I'd like to mark that next.  And this
22  will help you because you'll be able to refer to it.
23     A.  What am I looking at?
24         (Exhibit RODRIGUEZ-21 marked.)
25     Q.  This is -- Do you recognize this exhibit which


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                    June 1, 2012

---

### 209

1    has been marked Rodriguez 21 as your substitute?
2        A.  That I filed to be considered on floor after it
3    came out of committee?  Is that what it is?
4        Q.  No, because what ended up coming out of
5    committee was 362, so I believe you circulated this in
6    committee.
7        A.  Well, I actually filed -- In other words, we
8    had -- I think if I recall correctly we had to prefile
9    amendments, so I prefiled a complete substitute of the
10   bill and this could be that.
11       Q.  I think this is something you may have passed
12   out in committee for consideration.
13       A.  Probably.  It's probably the same thing.  I
14   mean, I think --
15       Q.  It could be the same thing.
16       A.  It's basically the Senate bill with those three
17   things, I imagine, is what it is.
18       Q.  Okay.
19       A.  That is money to have a voter registration
20   drive, the adoption of a Florida like process by which
21   you consider the provisional ballots, and it's a process
22   which resulted in those ballots being more likely to
23   count than not count, and the delay in implementation.
24       Q.  All right.
25       A.  That's what it was.  I think that's -- Without

---

### 210

1    reading this entire thing, I imagine that's what this
2    is.
3        Q.  Take a look at Page 7 for me.  Paragraphs D
4    does make reference to the procedure for signature
5    verification.  So I'm hoping that you can identify this
6    document as your substitute bill or your floor
7    amendment.
8        A.  Yeah.  It looks like it talks about the
9    signature verification committee on Page 14.
10       Q.  I see an effective date on the last page of
11   January 21, '13.
12       A.  Yeah, delay in implementation.
13       Q.  Are you fairly sure that this is your
14   substitute?
15       A.  It looks like it, yeah.
16       Q.  I have another question for you.
17       A.  It could be one of various different versions
18   of my substitute, but it does appear to be that, yes.
19       Q.  On Page 14 right above the signature
20   verification committee, there is a new section entitled
21   Presentation of Identification for Certain Provisional
22   Ballots.  Would it be fair to say that your substitute
23   also provided an opportunity for the voter to return
24   with ID following the election?
25       A.  Yes.

---

### 211

1        Q.  So that's another part that makes it different?
2        A.  I didn't -- That would have been in my bill.  I
3    didn't recall whether it was in Senate Bill 14 or not.
4        Q.  Okay.  362?
5        A.  14, the one that actually passed.  That's what
6    I thought you were comparing it to.
7        Q.  No, I was actually sticking with the 2009
8    process.
9        A.  362?
10       Q.  362.
11       A.  Yeah.  I think that may have been some
12   provision by which you could show up with the correct ID
13   after the fact.  I don't know if this is the same or
14   different.  I think the Senate bill had some provision
15   for that.
16       Q.  Okay.  I have another question for you.  Is
17   there a difference between your substitute and Senate
18   Bill 362 in 2009 with respect to how much discretion the
19   poll worker was allowed to exercise once given the ID?
20   Is it fair to say that your substitute said that if the
21   poll worker simply got the ID, the poll worker had to
22   accept it as opposed to some kind of verification
23   whether the person looked like their picture?
24       A.  Yeah.  I know we talked about that, and I think
25   the decision was made to simply not change the language

---

### 212

1    from the current language because it simply hadn't been
2    a problem, and we were afraid if we changed the
3    language, we might create a problem that didn't exist.
4        In other words, there just was -- whatever
5    language was current law seemed to be working so far as
6    photo ID was required, and so -- or allowed, I should
7    say, as a means of identification.  So we I think the
8    final decision was not to monkey with success, if I
9    recall correctly.
10       Q.  Now, around the time that you rolled out your
11   substitute, which I understand is around April 29th, is
12   this is also the time -- and I'm going to ask if you
13   recall this incident -- in which Representative Betty
14   Brown made certain questions to a witness who was Asian
15   American regarding names?
16       A.  Yeah.
17       Q.  Do you recall that incident?
18       A.  Yes, I recall that.
19       Q.  Can you describe it for me?  It happened in a
20   hearing.
21       A.  Yeah.  Gosh, I mean, I think what she did in
22   essence was ask him why he wouldn't just change his name
23   to something easy so that he wouldn't have to worry
24   about there being some communication problem because he
25   had a complicated foreign name or, you know, might

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                    June 1, 2012

---

## 213

1   not -- his actual name might not match what's on the
2   voter rolls and so, yeah, I remember.
3       Q.  So this is the context within which you then
4   roll out your proposal for substitute.
5       A.  I don't remember.  I don't -- I don't know -- I
6   don't remember if that was on the same day.  I thought
7   that happened with Representative Brown when we were
8   hearing public testimony in early April.
9       Q.  Did things become more heated after
10  Representative Brown made that comment and it was
11  covered in the media?
12          MR. FREDERICK:  Objection.  Vague.
13      A.  More heated in what regard?
14      Q.  Was there media coverage of Representative
15  Brown's remarks?
16      A.  Yes.  There was like websites where you could
17  like put in a complicated name and it would spit out a
18  real simple one like Jim Bob.
19      Q.  I did not know about that.
20      A.  It was like a Betty Brownometer.
21      Q.  Did it seem to you at that time that there was
22  some racial tension in the reactions to those remarks?
23      A.  There was an audible gasp in the room.  I
24  remember that.
25      Q.  Do you think that following that comment the

---

## 214

1   general context surrounding passage of voter ID became
2   more tense?
3          MR. FREDERICK:  Objection.  Vague.
4       A.  I don't know how it could have become more
5   tense, but certainly she, by making comments like that,
6   fed the -- the -- the opposition again.  I don't believe
7   insofar as the version of the legislation we were
8   considering at that time that there was really any
9   justification for that opposition, but to the extent
10  that the opposition was trying to create racial
11  undertones, she certainly aided their cause.
12      Q.  Okay.
13      A.  I don't think that was her intent, but it had
14  that effect.
15      Q.  I need April 29th.  I'm going to ask you about
16  another comment since you were really good about
17  remembering that one.  In 2005 when you were on the
18  elections committee, do you recall a hearing in which
19  Representative Betty Brown was rolling out a bill to
20  require proof of citizenship for voter registration and
21  she had an exchange with Representative Anchia regarding
22  the reasons why one would need to prove citizenship at
23  the time of voter registration?
24      A.  No, I don't recall that.
25      Q.  Okay.  It was good.

---

## 215

1       A.  I'm sure.  It's an unfair fight.
2          (Exhibit RODRIGUEZ-22 marked.)
3       Q.  The court reporter has handed you what has been
4   marked Rodriguez Exhibit 22.  Do you recognize this as
5   an April 29, 2009 article in the Quorum Report?
6       A.  Again, it's one of many things that were
7   written about this issue that session.  I don't
8   specifically recall it.
9       Q.  Do you recall speaking to the media about some
10  of the issues --
11      A.  Yes.
12      Q.  -- around this time?
13      A.  Yes.
14      Q.  Okay.
15      A.  I remember a particular incident where I went
16  to the press table and started expressing my
17  frustration.
18      Q.  You do?
19      A.  Yes.
20      Q.  Okay.  Can you tell me what you said at that
21  time?
22      A.  I was -- I don't know.  I have not had a chance
23  to read this document that you marked as Exhibit 22, so
24  I don't know if it pertains to this particular version,
25  but I was frustrated because it appeared that two of the

---

## 216

1   members on our committee were actually continually
2   changing the -- what they would need in the bill in
3   order for it to come out, and, you know, for a certain
4   period of time, I was operating under the presumption
5   that they were operating in good faith, and at some
6   point in time I stopped believing that because every
7   time I would have a bill draft that had -- would
8   incorporate what they told me they needed last time,
9   then there would be a new something else they needed.
10         So I got the impression that they were
11  actually themselves trying to frustrate my ability to
12  get a bill out of committee and begin to, you know,
13  speculate that that may have been a part of a political
14  effort to blame Straus or anybody associated with them
15  for failing to pass this bill, and so the only thing I
16  could do was to go public and let the press know that
17  that's what was happening in my committee.
18      Q.  And was that before you rolled out your
19  substitute on April 29 or did that start happening
20  after?
21      A.  I don't remember.  I think -- I want to think
22  that all happened after.  It was kind of happening as we
23  went along.  I mean, it's not that there weren't
24  discussions, but, you know, again, early in the session
25  my focus was on trying to come up with language that  76

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 217

1   people in the House floor would agree with and then
2   later did I begin to focus on whatever would be
3   necessary to get the bill out of committee, which were
4   two very different things in light of the make-up of the
5   committee on the one hand and the House floor on the
6   other, and so, you know, I was just willing to do
7   whatever was necessary to get the bill out of committee
8   and then my intent was to allow a vote on that version
9   and then come in with a substitute that could get the
10  marginal votes.
11      Q.   So would it be fair to say that on
12  April 29th you were already watching your right flank in
13  the committee?
14      A.   Clearly I had to get five of six votes in order
15  to get out of committee and five of those six were
16  Republicans.  And so any two members working together
17  and in cooperation had the power to prevent a bill from
18  coming out of committee, if you understand the math.
19      Q.   And you mentioned those two numbers were Betty
20  Brown and was it Linda Harper Brown?
21      A.   Linda Harper Brown.
22      Q.   And this article mentions some of the things
23  that you've talked about earlier, "$7.5 million for
24  enhanced voter registration efforts and includes a
25  mechanism for allowing voters who don't present

## 218

1   acceptable ID to have their votes subsequently counted."
2   And it talks about the signature verification committee.
3       A.   M-hm.
4       Q.   And then -- Let's see.  At the bottom of the
5   page you are quoted --
6       A.   It was an eminently fair bill and Matt Engel
7   called me a Tom Delay style partisan thug.
8       Q.   He would.
9       A.   Yeah.  So that's who I'm talking about.  It was
10  just ridiculous how politicized it was.
11      Q.   I think he dreams about Tom Delay.
12      A.   Is that right?
13      Q.   Yeah.  I don't know.  He doesn't talk to me.
14  But at the bottom of the page talks about you defending
15  your bill and quotes you saying, "The bill strikes the
16  proper balance between concerns about security and
17  concerns about voter accessibility."
18          Is that a statement that can be fairly
19  attributed to you with respect to your substitute?
20      A.   Yes, I think so.
21          (Exhibit RODRIGUEZ-23 marked.)
22      Q.   Okay.  Okay.  Let's go on to the next one.  The
23  court reporter has handed you what's been marked
24  Rodriguez 23.  Do you recognize this as a Quorum Report
25  article?

## 219

1       A.   Yes.  I don't recall it specifically, but it
2   appears to be a Quorum Report article.
3       Q.   Okay.  And it's reporting that you toughened up
4   the ID requirements in your -- the latest iteration of
5   your voter ID bill.
6       A.   Right.
7       Q.   Can you explain that to me?
8       A.   Just what we talked about earlier which is
9   doing what was necessary to get the bill out of
10  committee by having conversations with the people
11  that -- whose votes would be needed to get out of
12  committee, and it looks like I'm expressing frustration
13  that I had drafted a bill that did what I believed they
14  had asked me to include in the bill and yet it still
15  wasn't enough.
16      Q.   It reports that you put in provisions from
17  Ms. Brown's own legislation on the issue.
18      A.   Yes, I believe that's right.
19      Q.   And she continued to oppose it.
20      A.   And for some period of time until I went
21  public.
22      Q.   Okay.  And it also says that this is a hard
23  photo ID requirement.
24      A.   At some point -- Let me just say this.  At some
25  point after I went public, then she said -- they said we

## 220

1   will vote for the exact same version as came out of the
2   Senate, and then it happened within a few days, but that
3   was the -- you know, that was the first time that that
4   had been communicated to me was a few days before the
5   bill was voted out of committee, so --
6       Q.   Is it correct to say then that at this point on
7   May 6 the version of the bill that you are circulating
8   has a hard photo ID requirement?
9       A.   No, I don't think so.  You know what?  I don't
10  remember.  It's possible.  It is -- I think that is
11  right.  I think -- I think, again, some of the earlier
12  discussions was I want my bill, not the Senate bill, my
13  bill, so I was trying to get her to agree to her bill
14  with the three sweeteners.  That's sort of it -- We had
15  all kinds of discussions, but, anyway, it was -- what
16  they were demanding kept changing and the pressure was
17  starting to build as we got later in the session, and I
18  could see a situation where they were trying to set me
19  up as the guy who kept the bill in committee under
20  circumstances where they were actually preventing me
21  from getting it out by never giving me clarification on
22  what would be required to get the vote.
23      Q.   I see here you talk about the bill having
24  exemptions for the indigent voters over 70 who were
25  never issued a birth certificate, nursing home residents



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                    June 1, 2012

---

221

1    or those with a religious objection to ID.  That's in
2    that second paragraph there.
3        A.  Again, I imagine that is language that's taken
4    from her prior versions of the bill.
5        Q.  Yes.  All right.  And was that meant to
6    minimize the impact of the bill on elderly voters who
7    might lack ID?
8        A.  I presume.
9        Q.  And then it mentions in the third paragraph
10   that you kept the roll out period and the appropriation
11   of 7.5 million for what would now be a combination of
12   voter registration and mobile photo ID units.  Do you
13   see that there?
14       A.  M-hm.
15       Q.  Did you include the appropriations for delayed
16   implementation and funding for voter registration in
17   order to minimize any potential negative impact or try
18   to mitigate any potential impact of voter ID?
19           MR. FREDERICK:  Object on the basis of
20   legislative privilege.  She's asking why you include
21   something.  I would object and instruct you not to
22   answer.
23           MS. PERALES:  In response to your
24   objection, I think at this point I'm going to raise or
25   suggest to you that the representative may have waived

---

222

1    his privilege on this particular issue because he spoke
2    publicly quite a bit in committee and in the press about
3    the positive aspects of those elements of his
4    substitute, the voter registration, the delayed
5    implementation, the signature verification.  These are
6    things that I believe that the representative has talked
7    about enough outside of a privileged setting that he
8    would be able to answer whether the purpose of that or
9    whether his intention with that was to mitigate any
10   negative impact.
11           MR. FREDERICK:  If that is the case, then
12   I would absolutely agree that a public statement would
13   not be privileged even if it's about the purpose behind
14   a specific amendment.  I'm not aware of that though, and
15   so at this point because it is a specific -- I mean, if
16   the representative can specifically recall that it was a
17   public statement, then -- then, you know, I would agree
18   and I think he could answer without revealing privileged
19   information, but I am not aware that that is the case.
20           MS. PERALES:  Okay.
21           MR. FREDERICK:  So --
22           MS. PERALES:  I will ask him a few more
23   questions.
24           MR. FREDERICK:  I think consistent with
25   his assertion of privilege, I have to instruct him not

---

223

1    to answer that question.
2        Q.  (BY MS. PERALES)  Okay.  Let's talk about before
3    the Betty Brown stuff.  Well, there really is no before
4    the Betty Brown stuff, but going back before
5    April 29th and the day that you roll out your substitute
6    bill, I guess for lack of a better word, and you spoke
7    to the Quorum Report -- provided reports to the Quorum
8    Report and possibly others and where you talk about how
9    the bill strikes the proper balance between concerns
10   about security and concerns over voter accessibility,
11   did you make public statements at that time regarding
12   the three elements of your substitute that were new and
13   that relationship to voter accessibility?
14       A.  I think earlier than this -- earlier in the
15   session there's lots of conversations with the press
16   where I'm talking about balancing the important concerns
17   regarding security on the one hand and access on the
18   other.
19       Q.  Now, with respect to your substitute --
20       A.  Yes.
21       Q.  So let's pick one aspect of the substitute, the
22   7.5 million for voter ed and voter registration.  Did
23   you ever publicly discuss that provision as intending to
24   increase access?
25       A.  Sure.

---

224

1        Q.  And did you talk about it as also intending to
2    mitigate any potential negative effect of being required
3    to produce ID?
4        A.  What we were trying to do is go out of our way
5    to completely eliminate any possible arguments to
6    that -- to that effect, and I think I succeeded to the
7    point where my right wing was unwilling to go along.
8        Q.  Okay.  And then also with respect to the
9    signature verification committee, which is a really good
10   idea and one that you pulled from another source from
11   Florida --
12       A.  Right.
13       Q.  -- did you also discuss that publicly as in a
14   way in which somebody who might not have ID could still
15   have their legal vote counted?
16       A.  Yes.  Absolutely.
17       Q.  And did you discuss it publicly as a way to
18   mitigate the potential and negative impact of the voter
19   ID requirement --
20       A.  Yes.
21       Q.  -- and delayed implementation?  Tell me about
22   your public comments with respect to delayed
23   implementation and how that might assist in mitigating
24   the potential harmful impact.
25       A.  That was really more about getting the marginal

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                    June 1, 2012

---

### 225

1  votes on the House floor and it created the major
2  backlash on the right because, you know, the Senate had
3  immediate effect.  Again, a two-year delay in
4  implementation is what I would call a quasi-concession
5  because it's not even clear it was a concession at all,
6  and my intent was to publicly talk about a four-year
7  delay in implementation under the presumption that it
8  would go to a conference committee and end up at two
9  because the marginal votes were concerned that if we
10 started with two, we would just go to conference
11 committee and end up current -- it would end up -- we'd
12 end up assuming the Senate's version of immediate
13 effect.
14         And so in order to ensure their support, I
15 agreed to go public with a -- and tried to get off the
16 floor a four-year delay in implementation and with the
17 understanding I would not ask them to support the bill
18 unless it came back from conference committee with a
19 two-year delay in implementation.
20         But what ended up happening was we got so
21 much flack from the right for proposing a four-year
22 delay in implementation, that I went back to them and
23 said, listen, guys, this is killing me on the right,
24 please let me come off the House floor with a two-year
25 delay in implementation, and if I can't keep two in

### 226

1  conference, then I won't ask you to vote for the bill
2  and you are not committing to do so.
3      Q.  Did it work?
4      A.  It obviously didn't.  I mean, we didn't get it
5  to the floor.
6      Q.  You didn't get it out of committee either, so
7  I'm trying to figure out where the not working ended up
8  happening.  I mean, you are trying to get to 76.
9      A.  Yeah.
10     Q.  Did you feel like you got to 76 --
11     A.  No.
12     Q.  -- on your substitute?
13     A.  No.  Because, you know, I was operating under
14 the presumption that the partisans would operate in good
15 faith, which was foolish on my part.  I'm talking about
16 out on the right.  And, you know, the -- they weren't
17 interested in -- they didn't want a bill.  They wanted a
18 particular bill, but didn't have the votes to pass, and
19 in my opinion some people -- it was a part of a
20 political strategy to demand that you pass a bill.  They
21 knew you didn't have the votes to pass, so that they
22 could blame you and the speaker for failing to do it.
23     Q.  So as you were potentially gaining votes on the
24 left, you were losing them on the right.
25     A.  Exactly.  Yeah.

### 227

1      Q.  Okay.  Do you remember at some point during
2  this time -- it was actually right before you rolled out
3  your substitute around April 20th, 21st, meeting with
4  advocacy groups that had concerns --
5      A.  Yes.
6      Q.  -- about voter ID?
7      A.  Yes.
8      Q.  And that Advocacy, Inc., what's his name?
9  Dustin Rynders from Advocacy, Inc., a disability rights
10 organization.
11     A.  NAACP, you guys.  I remember a meeting like
12 that, yeah.
13     Q.  Do you remember talking with the folks in the
14 room about sort of efforts to try to allay some of the
15 concerns?
16     A.  Yes.
17     Q.  And do you recall Representative Anchia there
18 as well?
19     A.  I believe he was.  I don't know for sure, but I
20 believe he was.
21     Q.  Do you recall saying to this group that you
22 were getting beaten up by your caucus?
23     A.  I don't recall that, but --
24     Q.  Does it -- would it -- is it possible -- Let me
25 see.

### 228

1      A.  I don't think it was my caucus as much as it
2  was party activists, you know, around the state that
3  were misrepresenting the realities that we faced.
4      Q.  Okay.  Do you also recall mentioning to those
5  people that you were getting pressure from Speaker
6  Straus to make sure there was no blood or huge fight on
7  the floor?
8      A.  No, I don't.  I don't recall saying that, and I
9  don't know that I would have.
10     Q.  Okay.
11     A.  Yeah, because I don't think -- I mean, pressure
12 from Speaker Straus would not being an accurate -- We
13 were all concerned with trying to -- you know, trying to
14 have this legislative session end up as successfully as
15 it possibly could under very difficult circumstances.
16     Q.  Do you think you discussed concerns in that
17 meeting with the possibility that when voter ID hit the
18 House floor, that there could be a big fight?
19     A.  Sure.  I think we presumed there could be a big
20 fight with voter ID on the floor.
21     Q.  Do you think that you communicated to that
22 group that Speaker Straus really didn't want a big fight
23 on the floor on voter ID?
24     A.  I don't -- I don't know why I would have.
25 My -- I may have -- My sense is that there's some

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                              June 1, 2012

---

229

1    something in the communication that's not completely
2    accurate that somehow what I said is not -- I don't
3    believe I said precisely that, but I may have said
4    something along those lines involving the speaker, but I
5    don't remember anything like that, and what you're
6    telling me doesn't ring true in terms of what I would
7    have likely said.
8        Q.  That's why I'm asking you about it.
9        A.  Yeah.
10       Q.  Do you recall talking with them about bringing
11   in a possible proposal by you about some deceptive
12   practices language from Anchia's bill?
13       A.  Yeah.  Yeah, I do.  We were very open to the
14   idea of creating additional penalties for any effort to
15   send out false information to, you know -- you know,
16   tell people the wrong election date or the wrong place
17   to vote or anything like that, that kind of voter fraud.
18       Q.  Okay.  Do you think that your substitute bill
19   would have been sufficient to guarantee integrity in
20   elections with respect to voter identification?
21       A.  No.
22       Q.  Why not?
23       A.  Because guarantee is too strong a word.
24       Q.  Give me the right way to put it then.
25           MR. FREDERICK:  Objection.  Vague.  You

---

230

1    may answer.
2        A.  It would have improved the security of the
3    polls, and it would have -- you know, in striking the
4    balance between access and security, it was certainly
5    more on the access end of the spectrum than a hard photo
6    ID requirement which is more on the security end of the
7    spectrum.
8        Q.  But did you feel comfortable that your bill
9    would in fact improve the security end of things?
10       A.  Yes, to some extent.
11       Q.  Only.  Did you -- Did you have hesitation or
12   concerns that your bill wasn't doing enough to guarantee
13   security?
14           MR. FREDERICK:  Objection.  Vague.
15       A.  I had concerns that it wasn't doing as much as
16   my constituents wanted it to do, but I didn't really
17   have to concern myself with the policy choice because it
18   was clear that something along the lines of what I
19   proposed was the only plausible option given the make-up
20   of the House floor.  It was that or nothing.  And I
21   couldn't get the grassroots to understand that or their
22   preference may have been nothing.  I mean, it was just,
23   you know, portrayed very simplistically to them as the
24   weak bad bill versus the strong good bill, and that's
25   all they knew, and, you know, when I went and did my

---

231

1    little slide show presentation, I told them that every
2    Betty Brown bill prior to that legislation had allowed
3    voting with two non-photo IDs, they were just shocked
4    and appalled, and so it was a matter of great
5    misinformation.  So, anyway --
6        Q.  So there's a number of concepts that are out on
7    the table.  One is the level of strictness in the voter
8    ID bill that your constituents might have been calling
9    on you to propose.
10       A.  M-hm.
11       Q.  Then there's the issue of what could be passed
12   in the House given in 2009 a very close margin between
13   Democrats and Republicans.
14       A.  M-hm.
15       Q.  But I'm asking you about a third thing, which
16   is whether you had any hesitation or discomfort with
17   your substitute because you thought it might not be
18   sufficient to ensure ballot security.
19       A.  Again, nothing ensures ballot security, and
20   what I knew was that this bill would provide more
21   security than we ever had before.
22       Q.  And were you comfortable with that?
23       A.  I was -- Again, if you are asking me in
24   representing my constituents if I had to choose between
25   that version and the version we passed this session,

---

232

1    obviously, I have to choose the version we passed this
2    session.
3        Q.  But --
4        A.  In terms of, you know -- You know, I mean,
5    clearly, I believe there is certain irrational hysteria
6    on both sides of this issue that is for political
7    reasons perfectly capable of exaggerating its
8    significance.  And to me, one of the primary reasons for
9    passing this legislation was just the importance of
10   getting it behind us so that we could then focus on
11   other things that were at least if not more important to
12   the state.
13           And so I just -- You know, again, I wasn't
14   impressed with the leftist arguments about
15   disenfranchising legal voters with the bills that we
16   were talking about in my legislative session in 2009,
17   and I think there are a lot of people on the Republican
18   side that have a false impression about the frequency
19   with which this occurs.
20       Q.  I know that you mentioned earlier that you were
21   familiar with perhaps a handful of incidents in which
22   people had claimed impersonation voter fraud had
23   occurred.
24       A.  Right.
25       Q.  And you testified earlier that the problem

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                      June 1, 2012

---

233

1    could be larger and that you didn't know.
2        A.   Right.
3        Q.   Right.  And I also don't -- I mean, there's
4    many things that we don't know.
5        A.   No.
6        Q.   Given what you knew -- Because here you are, a
7    policymaker.  You are on top of this issue now.  You've
8    researched it.  You've looked at other states.  You know
9    what the Attorney General's Office and Secretary of
10   State have offered in terms of information about voter
11   fraud and how prevalent or not prevalent it is.
12       A.   M-hm.
13       Q.   Putting aside the question of what you've
14   very -- what you've explained very well as public
15   perception with, respect to the policy of balancing
16   security and access to the ballot, were you comfortable
17   with your bill that it struck the right balance between
18   access and security?
19       A.   I want as much security as you can possibly get
20   that doesn't create an unreasonable burden on legal
21   voters.  And so my preference would be the hard voter ID
22   bill unless there's credible evidence that it creates
23   unreasonable burden on legal voters because it provides
24   additional security.
25       Q.   Did you have specific concerns with respect to

---

234

1    your substitute that it would not provide enough
2    security?
3        A.   Again, when you say "enough security," I
4    want -- it's like, you know, enough fun, enough --
5        Q.   Enough money?
6        A.   Enough money.  You want as much as you can get
7    that doesn't have any adverse effect, and so more is
8    better unless it creates an unreasonable burden on legal
9    voters.
10       Q.   If your substitute had made it out of committee
11   and passed the House, what would have happened in
12   conference in 2009?
13           MR. FREDERICK:  Objection.  Calls for
14   speculation.  You can answer.
15       A.   Say that one more time.  I was just imagining
16   myself governor, so I lost my train of thought.
17       Q.   If your substitute -- You got that happy look
18   on your face.  If your substitute had passed the House,
19   passed committee, passed the House, what would have
20   happened to it in conference committee?
21           MR. FREDERICK:  Same objection.  You can
22   answer.
23       A.   I think that it would have stayed exactly the
24   way I proposed it because I would have made it very
25   clear to the senators that if they changed anything, I

---

235

1    wouldn't get the votes in the House.
2        Q.   And you think --
3        A.   I think they would be sensitive to that.
4    That's my guess on how that would have proceeded in that
5    unlikely scenario.
6        Q.   Okay.  Well, it might have happened if you had
7    gotten it out of committee, maybe.
8        A.   Well, you know, no -- In other words, when
9    the -- when the party leaders and activists started
10   characterizing my bill as bad and weak, then I don't
11   think you could have gotten the members to vote for it
12   because they just -- because of the perception that was
13   being created back home.
14       Q.   So were Betty Brown and Linda Harper-Brown
15   responding to the party activists or was it the other
16   way around?
17       A.   I really don't know.  I honestly don't know who
18   they were talking to, but they were talking to somebody.
19   It was kind of a game plan that I wasn't privy to.
20       Q.   Okay.  Do you recall in either 2009 or 2011
21   Lieutenant Governor Dewhurst talking about noncitizen
22   voting a form of voter fraud?
23       A.   No.
24       Q.   Do you recall in either 2009 or 2011 anybody
25   within Power Texas talking about noncitizen voting as

---

236

1    voter fraud?
2        A.   No.
3            (Exhibit RODRIGUEZ-24 marked.)
4            MS. PERALES:  Okay.  This is Rodriguez 24.
5    It keeps getting worse, doesn't it?
6            MR. FREDERICK:  I'm sorry.  Was that
7    Rodriguez 23 or 24?
8        Q.   24.  It's 24.  Do you recognize Rodriguez
9    Exhibit 24 as an article from the Quorum Report?
10       A.   Yes.
11       Q.   And help me understand who is SREC?
12       A.   State Republican Executive Committee.
13       Q.   Okay.  And is this article correctly saying
14   that there was an email blast from the State Republican
15   Executive Committee accusing you of deliberately
16   sabotaging the voter ID bill?
17       A.   I don't remember that.  I don't believe that's
18   true.  Where do you see that?
19       Q.   It's just the first line of the article.
20       A.   Email blast?  No just certain members.  Not the
21   committee itself.
22       Q.   Certain members?
23       A.   Yeah.  Couple of members it looks like did
24   that.  I don't remember it, but --
25       Q.   So a couple of members of the State Republican

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

237

1   Executive Committee?
2       A.  M-hm.  Yes.
3       Q.  Do you see down below where it says the SREC
4   email?
5       A.  M-hm.  Yes.
6       Q.  Do you recall ever seeing this email?
7       A.  I don't recall this specific email, but
8   certainly the arguments in it are familiar.
9       Q.  Do you ever recall reading that somebody wrote
10  The chief ally of the Democrats and the Delay game was
11  and is Todd Smith?
12      A.  Where is that?  I don't see that.
13      Q.  It's there on the second page.  It's in the
14  paragraph above the paragraph with the underlining in
15  it.
16      MR. FREDERICK:  The first --
17      A.  I don't know who's writing that.  Who is that?
18  What's the question?
19      Q.  If you ever recall reading an email where it
20  says you were an ally with the Democrats to delay the
21  bill and kill it.
22      A.  Effectively what my political opponent was
23  arguing, and then when I -- you know, anybody that was
24  within a hundred miles of the voter ID issue that
25  session was accused by their political opponent of being

---

238

1   the one who killed it.  It was Straus.  It was me.  It
2   was Betty Brown.  It was anybody within a hundred miles
3   of it.  If you were running against somebody within a
4   hundred miles, you said they killed it.
5       Q.  Down below that is some text that's titled
6   "Todd Smith's Reply."  Can you read that and tell me if
7   you wrote it?
8       A.  I don't recall having written, but it certainly
9   looks like something that I could have and probably did
10  write.
11      Q.  Okay.  If I had been mad, I probably would have
12  written something a lot worse.
13      A.  If you what now?
14      Q.  If I had been mad, I probably would have
15  written something a lot worse.
16      A.  That would be my voice mail.
17      Q.  Okay.
18      A.  Yeah.  I think this is all very accurate in
19  terms of what it says I wrote here.
20      Q.  And that's with respect to Rodriguez 24?
21      A.  Yes.
22      Q.  The court reporter has handed you what has been
23  marked US-88, and I had asked you a question earlier
24  about whether you recall the lieutenant governor talking
25  about noncitizen voting as voting fraud during the '09

---

239

1   to '11 period, and you said you couldn't remember, and I
2   was wondering if by looking at this it would have
3   refreshed your recollection at all.
4       A.  I wouldn't have seen this, so it wouldn't be
5   refreshing my recollection.  I have not seen Exhibit 88.
6   It seems to be evidence that he at least wrote one
7   constituent and made some concern like that.
8       Q.  It doesn't jog your memory as to any speeches
9   or mail or anything you got from the lieutenant
10  governor?
11      A.  No.
12      Q.  Do you know whether the SB14 bill language came
13  from the lieutenant governor?
14      A.  No.
15      Q.  Okay.  Now in 2011, you were not on the
16  elections committee, correct?
17      A.  Yes.
18      Q.  Which in hindsight might have been a blessing.
19      A.  It's always a blessing.
20      Q.  In 2011, can you name some of the controversial
21  legislative issues during the session besides voter ID?
22      A.  The budget was 90 percent of the controversy
23  that session, I think.  I was on public ed, so the
24  reforms and reduction in regulation and additional
25  flexibility of two school districts was very

---

240

1   controversial, reducing or eliminating or changing what
2   I think we eventually did class size, et cetera, making
3   it easy to fire bad teachers and so several things.  I
4   can't remember.  I mean --
5       Q.  How about redistricting?
6       A.  Oh, yeah, that one.  Yeah.
7       Q.  And what about immigration and what was called
8   the Sanctuary Cities bill?
9       A.  Yeah.  Airport screening, you know, was our big
10  issue.  We spent more time on that, I think, than
11  anything else.  Redistricting, again, to me it's not as
12  controversial inside the House among the members as it
13  is in the press.  I mean, if your ox is getting gored
14  then it's a pretty big deal, but people vote their party
15  and it's done.
16      Q.  You are from up there by Euless, right?
17      A.  Yeah.
18      Q.  That may also be why.
19      A.  Why?
20      Q.  Because it's big suburban area, big suburban
21  geography up there.
22      A.  Our districts don't have to change dramatically
23  because we grow about the same rate as the population.
24      Q.  Or faster.
25      A.  Faster.  That's right.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                    June 1, 2012

## 241

1    Q.  So with respect to what was called the
2  Sanctuary Cities bill, would you say that was pretty
3  controversial in the 2011 session?
4    A.  I mean, I think -- You know, my sense is that's
5  one of the bills that all the Republicans and some of
6  the Democrats would support.
7    Q.  But do you remember whether it was
8  controversial?
9    A.  Yeah, it's controversial.  It's got people who
10  disagree with it.
11    Q.  Do you remember it going to a special session?
12    A.  Sure.
13    Q.  All right.  Was that because it died during the
14  regular session and was put back on the call for the
15  special by the governor?
16    A.  Yes.
17    Q.  You had talked with Ms. Westfall about a voter
18  ID bill that you had introduced in the 2011 session that
19  you characterized as a stricter bill.
20    A.  M-hm.  Yes.
21    Q.  And is it fair to say that you included student
22  ID as one of the forms of photographic identification in
23  your stricter bill?
24    A.  I don't know.
25    Q.  Okay.

## 242

1    A.  I presume if you say I did, I did.
2    Q.  All right.  And if it was in your stricter
3  bill, is that because you believe that a student ID
4  proves somebody's ID?
5    MR. FREDERICK:  Object on the basis of
6  legislative privilege and instruct you not to answer.
7    Nina, when you get to a stopping point,
8  can we take a short break?
9    MS. PERALES:  Yes, let's take a short
10  break right now because I'm sort of coming to the end.
11    (Recess from 4:33 p.m. to 4:40 p.m.)
12    Q.  (BY MS. PERALES) Based on your previous
13  testimony with Ms. Westfall on incidents of voter fraud,
14  would it be correct to say that you cannot specifically
15  remember an incident of impersonation voter fraud other
16  than the one that you mentioned earlier that you talked
17  about happening recently in Tarrant County?
18    A.  In terms of knowing the specifics and the
19  details of any other event, as I sit here today, I would
20  say, yes.  Obviously, I think the opposition to the
21  legislation's characterization of those incidents as
22  being infrequent or uncommon or language like that is a
23  concession on their part that it does occur to some
24  extent, and when you consider the political desire on
25  the part of people I represent to have the legislation

## 243

1  and a concession that it occurs to some extent, then it
2  really at that point becomes academic in trying to
3  quantify the extent to which it occurs.  It really
4  doesn't matter at that point because we have close
5  elections, and so if it occurs even infrequently and
6  your constituents want you to do it, then there's a
7  reason to do it.
8    Q.  Do you have any information showing that any
9  particular incident of impersonation fraud ever happened
10  with respect to more than one voter in a particular
11  election?
12    A.  I don't -- I just don't -- I can't cite you to
13  any that I can -- I mean, I think the one I talked about
14  in south Texas involved more than one voter, but I do
15  not know whether that ultimately was determined to have
16  been multiple instances of in-person voter fraud or not.
17  I think there were allegations of that.  I don't know
18  whether those allegations were proven to be correct.
19    Q.  Was that also a mix of allegations related to
20  mail ballots?
21    A.  No.  I think that involved in-person fraud
22  because we were certainly honing in on that type of
23  voter fraud.
24    Q.  Was that City of McAllen or Progresso; do you
25  recall?

## 244

1    A.  Progresso sounds right.
2    Q.  And it's your recollection that with respect to
3  Progresso, there was more than one allegation of
4  impersonation voter fraud?
5    A.  I thought there was.  Yeah, my sense was that
6  it was sort of a -- again, I'm working off of
7  recollection here, but there was allegations of, you
8  know, people doing it in an organized manner and not
9  just one person going out and doing something wild and
10  crazy and completely independently.
11    Q.  Do you know if Progresso is a big city or a
12  little city?
13    A.  I presume it's a little city.
14    Q.  Aside from Progresso can you think of any other
15  information that you ever learned of a voter
16  impersonation incident in a particular election that
17  involved more than one person?
18    A.  I bet if you read the John Fund book, you'll
19  get some evidence of that.
20    Q.  Did you read the John Fund book in 2009?
21    A.  I don't remember.  I may have read portions of
22  it.  I may have read the whole thing.  I don't remember.
23    Q.  Wasn't the John Fund book about a different
24  state than Texas?
25    A.  I this it's about the nation.  It's about voter



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

### 245

1  fraud nationwide and about voter ID.  I think there's
2  some mention of Texas in that book.
3      Q.  Do you recall whether he presented any specific
4  examples of impersonation voter fraud happening more
5  than one time in a particular election?
6      A.  I think he did.  I could be wrong, but I think
7  he did.  Certainly in other -- you know, if not in
8  Texas, in other states.
9      Q.  Okay.  I wanted to ask you a couple of
10 questions about the bill that you were looking at
11 earlier that you introduced in 2011 requiring
12 documentary proof of citizenship for voter registration.
13 Do you remember that?
14     A.  Yes.
15     Q.  Did you ever introduce a bill requiring
16 documentary proof of mental capacity for people who are
17 registering to vote?
18     A.  I don't recall doing that.
19     Q.  Did you ever introduce a bill requiring
20 documentary proof of age for persons registering to
21 vote?
22     A.  No.
23     Q.  Did you ever introduce a bill requiring
24 documentary proof of residence for persons applying to
25 register to vote?

---

### 246

1      A.  I don't believe so.
2      Q.  Would it be fair to say then that with respect
3  to bills that you've introduced regarding eligibility
4  requirements for voter registration, that the only bills
5  you've ever introduced had to do with documentary proof
6  of citizenship?
7      A.  Probably.
8      Q.  Why only citizenship?  You said earlier people
9  can lie.  They can lie about their age, their sanity,
10 their residence, their citizenship.  Why did your bill
11 only focus on citizenship?
12         MR. FREDERICK:  Objection.  Calls for
13 legislative privilege.  Instruct you not to answer.
14     Q.  I'll go at it another way.  Would it be fair to
15 say that with respect to communications from your
16 constituents that the overriding concern with respect to
17 voter eligibility was on US citizenship?
18     A.  Probably.
19     Q.  And you were responding to your constituent
20 concerns when you introduced the bill on documentary
21 proof of citizenship?
22         MR. FREDERICK:  Object based on
23 legislative privilege.  Why you acted is privileged.
24 I'll instruct you not to answer.
25     Q.  You mentioned earlier today about an incident

---

### 247

1  of impersonation voter fraud in Tarrant County with
2  respect to a precinct chairman.  Do you recall that?
3      A.  Yes.
4      Q.  That's pretty close to home for you, right?
5      A.  Yes.
6      Q.  Did you read it in the local papers?
7      A.  Yes.
8      Q.  Do you recall that the chairman had arranged
9  for her son to vote impersonating her husband?
10     A.  I think that's right.
11     Q.  Do you know whether the son used a voter
12 registration certificate or whether he used ID where he
13 may have had the same name as his dad?
14     A.  I don't know.
15     Q.  I'll have a junior.  I'll share with you, so my
16 husband and my son have the same name, and I suppose one
17 could go in with the other one's ID.
18     A.  Don't do it.
19     Q.  Don't, no.  So it's possible, isn't it, that if
20 the son had used the ID -- his own ID and he had the
21 same name as his dad, that that kind of voter
22 impersonation would not be fixed by SB14?
23         MR. FREDERICK:  Objection.  Calls for
24 speculation.  You may answer.
25     A.  Say that one more time.

---

### 248

1      Q.  It's possible, isn't it, that if in that
2  instance of impersonation voter fraud if the son had
3  been using his driver's license to vote under his dad's
4  name, they were the same name, that that fraud would not
5  have been prevented by SB14?
6      A.  It seems to me that's the kind of fraud that
7  would be prevented by SB14 because presumably he looks
8  different than his dad.
9      Q.  Oh, but if his name matched his dad's name on
10 the rolls and he had an ID showing him with his dad's
11 name, then SB14 would not have been able to prevent that
12 fraud.
13     A.  I guess not, yeah.
14     Q.  But, in fact, in Tarrant County, the fraud was
15 identified, wasn't it, because dad showed up later in
16 the day to vote in the very same precinct.
17     A.  Right.
18     Q.  So because you sign in to vote, they were able
19 to tell under the current system that someone had
20 already voted under his name.
21     A.  Right.
22     Q.  So SB14 in a sense is superfluous because the
23 voter fraud was detected.
24         MR. FREDERICK:  Objection.  Assumes facts
25 not in evidence.  Calls for speculation.

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                                   June 1, 2012

---

**249**

1  A.  In that instance perhaps.
2  Q.  Okay.  Would you also agree that if Ms. James,
3  that was her name, had used -- had actually used that
4  voter certificate, that she would have had access to her
5  husband's voter certificate by virtue of being in the
6  same household as him?
7  MR. FREDERICK:  Objection.  Calls for
8  speculation.  You may answer.
9  A.  Say it one more time.
10  Q.  Ms. James, the lady precinct chairwoman, by
11  virtue of living with her husband would have had access
12  to his voter certificate because they shared the same
13  home, that, otherwise, in order to secure somebody's
14  voter certificate, you are either going to have to steal
15  it from them or buy it from them or in some way get
16  ahold of it from somebody.
17  A.  Sometimes they're mailed to you because it went
18  to a prior tenant who used to live there that you now
19  know is in New York.
20  Q.  So if you accidentally ended up with somebody
21  else's voter certificate though, that would certainly
22  not be because you were sort of some conspiracy to cast
23  an illegal vote.
24  A.  No.
25  Q.  You had talked earlier in your deposition about

---

**250**

1  the fact that there's probably some very small number of
2  people who lack photo ID and that you basically
3  presented that proposition, and I was curious --
4  A.  Who lacked a driver's license.  I don't know
5  that we ever really were able to determine who didn't
6  have -- how many people of the 5 or 6 percent, whatever,
7  2 percent, whatever it is, that don't have a driver's
8  license, what proportion of those have some other form
9  of photo ID that would be acceptable on these list.
10  Q.  So with respect to these people, did you ever
11  in your mind come to an idea of who they might be, what
12  their personal circumstances might be?
13  A.  People who don't drive.
14  Q.  And who are the people who don't drive?
15  MR. FREDERICK:  Objection.  Vague.
16  Objection.  Calls for speculation.  You may answer.
17  A.  Yeah.  I don't know, but I presume very poor
18  would be prominent among the list of people who use
19  public transportation.  Perhaps the very elderly,
20  although -- Don't they have a Social Security or
21  Medicaid Medicare photo ID?  You don't get a photo ID?
22  I thought senior citizens had something, but -- So those
23  are the ones I can think of, the elderly that don't
24  drive and poor.
25  Q.  How about out-of-state college students who

---

**251**

1  might not have a Texas driver's license?
2  A.  Certainly --
3  MR. FREDERICK:  Objection.  Vague.
4  A.  -- would be among that group of people.
5  MS. PERALES:  Can I have a one-minute
6  break?  I think I'm done.
7  (Recess from 4:51 p.m. to 4:54 p.m.)
8  MS. PERALES:  I reserve the remainder of
9  my questions and save the remainder for trial and pass
10  the witness to Mr. Frederick.
11  MR. FREDERICK:  I reserve my questions for
12  the time of trial.
13  (Deposition concluded at 4:54 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

---

**252**

1  CHANGES AND SIGNATURE
2  RE:  STATE OF TEXAS VS. TEXAS STATE CONFERENCE OF NAACP
   BRANCHES, et al
3
   PAGE  LINE    CHANGE           REASON
4  _____
   _____
5  _____
   _____
6  _____
   _____
7  _____
   _____
8  _____
   _____
9  _____
   _____
10 _____
   _____
11 _____
12  I, TODD SMITH, have read the foregoing deposition
   and hereby affix my signature that same is true and
13  correct, except as noted above.
14
15           _____
16  THE STATE OF _____ )  TODD SMITH, Witness
   COUNTY OF _____ )
17
18  Before me, _____, on this day
   personally appeared TODD SMITH, known to me (or proved
19  to me under oath or through _____ )
   (description of identity card or other document) to be
20  the person whose name is subscribed to the foregoing
   instrument and acknowledged to me that they executed the
   same for the purposes and consideration therein
   expressed.
21  Given under my hand and seal of office this _____
22  day of _____, _____.
23
24           _____
25           Notary Public in and for the State
             of _____

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                        June 1, 2012

## 253

```
 1        IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLUMBIA
 2
     STATE OF TEXAS,          )
 3                            )
          Plaintiff,          )
 4                            )   CASE NO. 1:12-CV-00128
     VS.                      )   (RMC-DST-RLW)
 5                            )
     ERIC H. HOLDER, JR., in his )  Three-Judge Court
 6   official capacity as Attorney)
     General of the United States,)
 7                            )
          Defendant.          )
 8                            )
     ERIC KENNIE, et al.,     )
 9                            )
          Defendant-Intervenors, )
10                            )
     TEXAS STATE CONFERENCE OF   )
11   NAACP BRANCHES, et al.,     )
                              )
12        Defendant-Intervenors, )
                              )
13   TEXAS LEAGUE OF YOUNG VOTERS )
     EDUCATION FUND, et al.,     )
14                            )
          Defendant-Intervenors, )
15                            )
     TEXAS LEGISLATIVE BLACK    )
16   CAUCUS, et al.,     )
                              )
17        Defendant-Intervenors, )
                              )
18   VICTORIA RODRIGUEZ, et al.,  )
                              )
19        Defendant-Intervenors.  )
20            REPORTER'S CERTIFICATE
              ORAL DEPOSITION OF TODD SMITH
21              JUNE 1, 2012
22       I, JEAN THOMAS FRAUNHOFER, the undersigned Certified
23   Shorthand Reporter in and for the State of Texas,
24   certify that the facts stated in the foregoing pages are
25
```

## 254

```
 1   true and correct.
 2       I further certify that I am neither attorney or
 3   counsel for, related to, nor employed by any parties to
 4   the action in which this testimony is taken and,
 5   further, that I am not a relative or employee of any
 6   counsel employed by the parties hereto or financially
 7   interested in the action.
 8       SUBSCRIBED AND SWORN TO under my hand and seal of
 9   office on this the 5th day of June, 2012.
10
11
12
```



```
             JEAN THOMAS FRAUNHOFER
13           Texas CSR 7990
             Expiration Date:  12/31/12
14           ESQUIRE DEPOSITION SERVICES
             Firm Registration No. 77
15           9901 IH-10 West, Suite 800
             San Antonio, Texas  78230
16           Tel:  (210) 331-2280
17
18
19
20
21
22
23
24
25
```

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS