## 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,            )
        Plaintiff,         )
                           )
V.                         )
                           )
ERIC H. HOLDER, JR.,       )
in his official capacity   )
as Attorney General of     )
the United States,         )
        Defendant.         )
                           )
ERIC KENNIE, et al.,       )
    Defendant-Intervenors, )
                           )
TEXAS STATE CONFERENCE     )  CASE NO. 1:12-CV-00128
OF NAACP BRANCHES, et al., )  (RMC-DST-RLW)
    Defendant-intervenors, )  Three-Judge Court
                           )
TEXAS LEAGUE OF YOUNG      )
VOTERS EDUCATION FUND, et al., )
    Defendant-Intervenors, )
                           )
TEXAS LEGISLATIVE BLACK    )
CAUCUS, et al.,            )
    Defendant-Intervenors, )
                           )
VICTORIA RODRIGUEZ, et al.,)
    Defendant-Intervenors. )

ORAL DEPOSITION OF
SPEAKER JOE STRAUS, III
JUNE 11, 2012

ORAL DEPOSITION OF SPEAKER JOE STRAUS, III, produced
as a witness at the instance of the Defendant, and duly sworn,
was taken in the above-styled and numbered cause on the 11th day
June, 2012, from 9:35 a.m. to 4:10 p.m., before Amy C. Kofron,
CSR in and for the State of Texas, reported by machine
shorthand, at the offices of the United States Attorney, 816
Congress Avenue, Austin, Texas, pursuant to the Federal Rules of
Civil Procedure and the provisions stated on the record or
attached hereto.

## 3

INDEX

Appearances. . . . . . . . .                      2
SPEAKER JOE STRAUS, III
    Examination by Mr. Freeman. . .               5
    Examination by Ms. Rudd. . .                184
    Examination by Mr. Sweeten. . .             201
    Further Examination by Mr. Freeman. . .     202
    Further Examination by Mr. Sweeten. . .     203
Signature and Changes. . . .                    205
Reporter's Certificate. . .                     207


UNITED STATES' EXHIBITS

NO.  DESCRIPTION                              PAGE
460  Notice of Deposition                      13
461  Drivers License Offices                   20
462  Transcript Of Joe Straus, III             50
463  Rules and Precedents of the Texas House   56
464  Privilege Log                             60
465  Talking points                            69
466  Talking points                            79
467  Talking points                            91
468  E-mail from Janice McCoy                  101
469  Blockbuster Application                   114

## 2

A P P E A R A N C E S

FOR THE PLAINTIFF AND THE WITNESS:
Mr. Patrick Sweeten
OFFICE OF THE ATTORNEY GENERAL OF TEXAS
P.O. Box 12548
Austin, Texas 78711-2548
ALSO FOR THE WITNESS:
Judge Thomas Phillips
Mr. Jesse Ancira
Ms. Jill Carvalho

FOR THE DEFENDANT:
Mr. Daniel J. Freeman
Ms. Jennifer Maranzano
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue NW
NWB Room 7203
Washington, DC 20530

FOR THE DEFENDANT-INTERVENORS, TEXAS
STATE CONFERENCE OF NAACP BRANCHES AND
MEXICAN AMERICAN LEGAL CAUCUS:
Ms. Amy L. Rudd
DECHERT, L.L.P.
300 West 6th Street
Suite 2010
Austin, Texas 78701

## 4

470  Express News Article                      143
471  Transcript of Todd Smith Deposition       147
472  Texas Tribune Article                     153
473  E-mail from DSumner                       154
474  Web Mail Correspondence                   164
475  Voter ID Represenatives                   168
476  Conference Committee Report Form          175
477  Dallas News Article                       181


INTERVENOR'S EXHIBITS

NO.  DESCRIPTION                              PAGE
1    Elections Committee Interim Report        188
2    Legislative Budget Board Impact Statement 192
3    Conference Committee Report Form          195
4    Bill Analysis                             196
5    Bill Analysis                             196
6    Bill Analysis                             198

## 5

1    MR. FREEMAN: This is the deposition of Speaker
2  Joe Straus, III in the matter of Texas V. Holder, U.S. District
3  Court for District of Columbia, Docket No. 1:11-CV-128. My name
4  is Dan Freeman, and I'm here on behalf of the defendant,
5  Attorney General Eric H. Holder, Jr.
6    And I'll allow the other attorneys in the room to introduce
7  themselves for the record.
8    MS. MARANZANO: Jennifer Maranzano. I'm here
9  also on behalf of the defendant, Attorney General Eric Holder.
10    MS. RUDD: Amy Rudd on behalf of defendant
11  intervenors, the Texas NAACP and MALC.
12    MR. SWEETEN: I'm Patrick Sweeten. I'm
13  representing the State of Texas and Speaker Joe Straus.
14    JUDGE PHILLIPS: Tom Phillips with summer
15  associate Jill Carvalho representing Speaker Straus.
16    MS. CARVALHO: I'm Jill Carvalho here with Baker
17  Botts and Judge Phillips representing Speaker Straus.
18    MR. ANCIRA: Jesse Ancira, general counsel and
19  chief of staff for Speaker Straus.
20    MR. FREEMAN: Thank you so much.
21    SPEAKER JOE STRAUS, III
22  having been first duly sworn, testified as follows:
23    EXAMINATION
24  BY MR. FREEMAN:
25    Q. Mr. Speaker, you've been deposed before just once,

## 6

1  correct?
2    A. Correct.
3    Q. And that was in Texas V. Holder, the redistricting
4  litigation?
5    A. That's right.
6    Q. So just to refresh your memory, a deposition functions
7  as a question and answer. So in order for the court reporter to
8  record your answer, you need to speak your answer rather than
9  nodding, gesturing, et cetera. Do you understand?
10    A. Yes.
11    Q. Okay. The purpose of the deposition is to obtain your
12  full and complete answers so that we can record your testimony
13  for the purposes of this litigation. Do you understand?
14    A. Yes.
15    Q. I may not always be clear. If you don't understand my
16  question, please ask me to restate, and I will do my best to
17  clear it up. Do you understand?
18    A. Yes.
19    Q. If you need a break, let me know, and we'll try and
20  finish the question and see about a break. Is that acceptable?
21    A. Yes.
22    Q. If you need to pour yourself a new glass of water or
23  need to get up for coffee, please do so between questions, not
24  during. Is that all right?
25    A. Yes.

## 7

1    Q. If you want to talk to your attorney, that's fine.
2  But if there's a question pending or you're in the middle of an
3  answer, please finish that up first. Is that all right?
4    A. Yes.
5    Q. At various points, your attorney may object to a
6  question that I ask. Many of these objections can be resolved
7  by the Court at a later time. Therefore, unless your attorney
8  specifically directs you not to answer, please respond to my
9  question. Is that all right?
10    A. Yes.
11    Q. Okay. Sometimes your attorney may instruct you not to
12  rely on certain information when you're answering a question.
13  If you follow that instruction, please answer accordingly by
14  preceding your answer by saying "based on that instruction" or
15  something similar to that. Does that make sense?
16    A. Say it again.
17    Q. So if your attorney instructs you not to rely on
18  certain information when you're formulating your answer based on
19  an assertion of privilege, if you could clarify in your answer
20  that you're relying on that instruction and not relying on
21  certain information when providing your answer, please state
22  that as a part of your answer. Does that make sense?
23    A. Yes.
24    Q. Okay. Good.
25    If you follow your attorney's instruction not to

## 8

1  rely on certain information and as a result cannot answer,
2  please tell me, "I cannot answer based on my attorney's
3  instruction" or something to that effect. Is that all right?
4    A. Yes.
5    Q. Okay. I believe that your attorney agrees that you
6  hold any legislative privilege personally. Therefore, with
7  regard to your own statements or actions or those of your staff,
8  you may choose to assert or waive the privilege. For example,
9  during the redistricting litigation, I believe that you, among
10  numerous other legislators, chose to provide full testimony.
11    Will you be asserting legislative privilege here
12  today?
13    A. Yes.
14    Q. I will attempt to conform my answer to the scope of
15  the privilege as defined by the Court's orders in this case.
16  But for the record, I will preserve the attorney general's
17  disagreement with some of those decisions.
18    If you're -- and you're represented by several
19  attorneys here today, correct?
20    A. Yes.
21    Q. Who are your attorneys?
22    A. The men and women who just introduced themselves to
23  you.
24    Q. Okay. So that is Mr. Sweeten --
25    A. Yes.

Senator Joe Straus, III                                           June 11, 2012

## 9

1  Q.  -- from the Office of the Attorney General?
2      In what capacity does the Office of the Attorney
3  General represent you?  For example, does the Office of the
4  Attorney General represent you in your personal capacity?  Your
5  official capacity?  Both?
6      MR. SWEETEN:  We're representing him for -- for
7  purposes of this litigation.
8      MR. FREEMAN:  Okay.
9  Q.  When did that representation begin?
10 A.  I don't know.
11 Q.  Okay.  And is the scope of that representation for the
12 purpose of this litigation only at present?
13 A.  I believe so.
14 Q.  Okay.  In what capacity does Justice Phillips
15 represent you?
16 A.  He's represented me and the House in redistricting
17 matters and in -- and in this case.
18 Q.  Is there a separate retainer addressing this case with
19 Baker Botts and the House?
20     THE WITNESS:  Are you going to answer that?
21     MR. SWEETEN:  Are you asking just --
22 Q.  Are you aware of a separate document that you signed
23 or entered into?
24 A.  Yeah.
25     THE WITNESS:  Recently, right?

## 10

1  Q.  If your general counsel has additional information
2  that would allow you to clarify your answer, I'm --
3  A.  He would.
4  Q.  -- I'm happy for you to --
5  A.  Yes, he would.
6  Q.  -- to check in with him very quickly.
7  A.  General counsel would be able to answer that.
8      MR. ANCIRA:  Yes.  There's a separate retainer
9  that specifically denotes representation on voter ID.
10 Q.  Okay.  And is that representation funded by the state?
11 A.  Yes.
12 Q.  And is -- do you have a copy of that retainer?
13 A.  No.
14 Q.  Here in your office?
15 A.  Yes, in the office.
16 Q.  Okay.
17     MR. FREEMAN:  Mr. Sweeten, would you be willing
18 to produce that without a separate document request, or will you
19 need to have us request that in writing?
20     MR. SWEETEN:  I'll talk to -- why don't you let
21 me talk to Chief Justice Phillips at a break, and we can get you
22 an answer on that.
23     MR. FREEMAN:  Sure.  Great.
24 Q.  And is the House funding representation for any other
25 groups of legislators in this matter, to your -- to the extent

## 11

1  of your knowledge?
2  A.  Not to my knowledge.
3  Q.  Okay.  So, for example, the Mexican American
4  Legislative Caucus is not provided with state funded
5  representation in this matter?
6  A.  Not to my knowledge.
7  Q.  Okay.  Sometimes you remember things later in the day.
8  If that happens, let me know while it's on your mind, and we'll
9  add it to the record.  Will you do that?
10 A.  Yes.
11 Q.  Okay.  I'll give you regular chances to do that as
12 well.  And sometimes after we've been talking for a while, you
13 may realize that a prior answer was not entirely accurate.  If
14 you realize that, will you let me know so that we can correct
15 the record?
16 A.  Yes.
17 Q.  Sometimes while you're answering you may think of a
18 document that will help you remember or help you answer more
19 accurately.  If you do, please let me know.  We may have the
20 document here.  Counsel to my left has a small library.  And if
21 not, we may be able to get it for you.  Does that make sense?
22 A.  Yes.
23 Q.  Okay.  Just a few routine questions to make sure that
24 you're in fine shape to participate in a deposition today.
25 Please don't take offense.  They're quick and standard.

## 12

1      Are you on any medications or drugs of any kind that
2  might make it difficult for you to understand and answer
3  questions?
4  A.  No.
5  Q.  Have you had anything alcoholic to drink in the last
6  eight hours?
7  A.  No.
8  Q.  Are you at all sick today?
9  A.  Not yet.
10 Q.  No.Are you currently under a doctor's care for any
11 illness?
12 A.  No.
13 Q.  Is there any reason you can think of why you will not
14 be able to answer my questions fully and accurately?
15 A.  No.
16 Q.  Last thing:  I need to remind you that you're under
17 oath and subject to federal penalties for giving false or
18 misleading testimony.  So it's important to answer my questions
19 truthfully, accurately and completely.  Do you understand?
20 A.  Yes.
21 Q.  Any questions so far?
22 A.  No.
23 Q.  Okay.  So as we discussed a moment ago, you've been
24 deposed only once before, correct?
25 A.  That's correct.

## 13

1    Q.   And that was in Texas V. United States, the
2    redistricting preclearance litigation, correct?
3    A.   Yes.
4    Q.   Have you ever testified in court?
5    A.   No.
6    Q.   Have you ever personally been the plaintiff or
7    defendant in a lawsuit?
8    A.   No.
9    Q.   Okay.  And other than the redistricting litigation,
10   have you ever been involved in a case where the State of Texas
11   was a party?
12   A.   Not that I recall.
13   Q.   Okay.
14        MR. FREEMAN:  I'm going to have marked as U.S.
15   460.
16        (Exhibit No. 460 marked)
17   Q.   Do you recognize this document?
18   A.   No, I don't.
19   Q.   So you haven't seen this document before?
20   A.   No.  I don't recall reading it, no.
21   Q.   Now that you're looking at the document, can you tell
22   me what the document is?
23   A.   It's the notice of deposition.
24   Q.   Okay.  What did you do to prepare for this deposition?
25   A.   I met with my legal counsel.

## 14

1    Q.   Who was there?
2    A.   Pardon me?
3    Q.   Who was present?
4    A.   The people around the table here.
5    Q.   Okay.  Anyone else?
6    A.   No.
7    Q.   And when was that?
8    A.   Over the weekend.
9    Q.   Just that once?
10   A.   Yes.
11   Q.   And where did you meet?
12   A.   In San Antonio.
13   Q.   Okay.  Was that at your office in San Antonio?
14   A.   It was in a public place, in a -- in a -- in an
15   office.  It wasn't my office.
16   Q.   Okay.  Did you review any documents while preparing
17   for this deposition?
18   A.   No.
19   Q.   Okay.  Did you bring any documents with you today?
20   A.   I did not.
21   Q.   Now, I know that you've previously stated that you
22   have not seen that document, Exhibit 460 before.  But did you
23   undertake a search for any documents listed in Attachment A of
24   that document prior to this deposition?
25        MR. SWEETEN:  I want to go ahead and -- because

## 15

1    if you've discussed the searches with your attorney, don't
2    reveal the specifics or the substance of the communication.  You
3    can reveal if any communications did occur.
4    A.   Ask the question again.
5    Q.   Sure.  Did you undertake a search for any of the
6    documents listed in Attachment A of the notice of deposition,
7    Exhibit -- U.S. Exhibit 460, prior to today's deposition?
8    A.   I did not personally, no.
9    Q.   Did you direct your staff to undertake any search for
10   those documents or similar documents?
11   A.   I asked my staff to handle the routine legal requests.
12   Q.   Okay.  Do your staff have access to your e-mail, your
13   work e-mail and your personal e-mail?
14   A.   Yes.
15   Q.   And to the extent of your knowledge, did they search
16   your work e-mail and your personal e-mail?
17   A.   I don't know.
18   Q.   Okay.  Did you speak with anyone else about the
19   deposition today?
20   A.   No.
21   Q.   Okay.  Now, I know you went through some of your
22   personal background during the last deposition last fall, but
23   that was in a different matter, and I just need to ask a few
24   quick background questions.  First, where were you born?
25   A.   San Antonio.

## 16

1    Q.   And where did you grow up?
2    A.   In San Antonio.
3    Q.   Okay.  What's your educational background?
4    A.   I went to public school in San Antonio and -- and have
5    a bachelors degree from -- undergraduate degree from Vanderbilt.
6    Q.   Okay.  Did you pursue any postgraduate education?
7    A.   I did not.
8    Q.   And what's your employment history since college?
9    A.   Oh, gosh.
10   Q.   Highlights, if that's easier.
11   A.   Worked -- worked in a previous administration in
12   Washington when I was very young and then various business
13   endeavors in Texas.
14   Q.   Okay.  What was your position in government?
15   A.   Oh, a Schedule C appointee.
16   Q.   Okay.  Do you recall the years approximately?
17   A.   Mid '80s.
18   Q.   Okay.
19   A.   Early to mid '80s.
20   Q.   Okay.
21   A.   And then again in the late '80s and early '90s.
22   Q.   Okay.  Both times Schedule C appointees?
23   A.   Uh-huh.
24   Q.   Okay.  And what types of business endeavors have you
25   been involved in?

## 17

1     A. Mostly family related.
2     Q. Okay.
3     A. Or as a sole proprietor in the financial services
4 business.
5     Q. Okay. And what types of business is your family in?
6     A. We've been in ranching, real estate and wholesale
7 distributing mainly.
8     Q. Okay. Sounds like a good Texas mix.
9       And so you've discussed your two Schedule C
10 appointments in the federal government. Do you have any other
11 participation in government outside of elected office?
12     A. No.
13     Q. Okay. Any political participation?
14     A. Over the years, yes.
15     Q. Yes. What is the extent of your political
16 participation?
17     A. I've worked in various campaigns as a volunteer and in
18 various volunteer activities in -- mainly in San Antonio.
19     Q. Okay. Have you worked specifically on any campaigns
20 as an employee or staffer?
21     A. Yes. When I was very young, Senator Tower's last
22 reelection campaign and then -- and Congressman Lamar Smith's
23 first campaign for Congress.
24     Q. Okay.
25     A. Other than that, it was strictly as a volunteer.

## 18

1     Q. Were you ever involved in any policy matters as a
2 businessman, lobbying government, working for proposals or
3 working on regulations?
4     A. Not that I recall.
5     Q. Okay. Have you ever made any requests for materials
6 under the Texas Open Records Act?
7     A. I don't believe so.
8     Q. Okay. When did you last renew your driver's license?
9     A. Recently.
10     Q. When was it approximately?
11     A. I believe it was August or September of this year.
12     Q. Okay. Oh --
13     A. Or last year.
14     Q. -- last year, yes.
15     A. Last year, yeah. Within a year.
16     Q. Did you renew it in person?
17     A. Yes.
18     Q. And where did you go?
19     A. San Antonio.
20     Q. Okay. How far was that office from your home?
21     A. 20 minutes, 30 minutes.
22     Q. Okay. Do you remember what the hours of that office
23 were?
24     A. No.
25     Q. Okay. Do you remember what time of day you went?

## 19

1     A. Sometime in the afternoon.
2     Q. Okay. Where are you normally during those hours?
3     A. Oh, gosh, it varies.
4     Q. Working in some --
5     A. I don't have a --
6     Q. -- capacity?
7     A. I don't have a normal schedule.
8     Q. That's understandable.
9     A. Yeah.
10     Q. But working in some capacity?
11     A. Yes.
12     Q. Okay. And how did you get to the office?
13     A. I drove.
14     Q. Okay. How long did you wait in line when you were
15 there?
16     A. Quite a while. Two -- as I recall, it was between two
17 and three hours.
18     Q. Do you remember what documents you brought with you?
19     A. I don't.
20     Q. Okay. Do you know if some driver's licenses are being
21 closed because of lack of funding or have been closed?
22     A. I don't recall.
23     Q. Do you know if some driver's license offices have
24 instituted reduced hours?
25     A. I don't know.

## 20

1     Q. Okay. Do you know if there are driver's license
2 offices in every county in Texas?
3     A. I'm not aware.
4     Q. Do you have a rough idea of how many driver's license
5 offices there are in Texas as a whole?
6     A. I don't know.
7     Q. Okay. Do you know how many there are in Bexar County?
8     A. Several. I believe there's at least three.
9     Q. Okay. Why don't we just -- to refresh your
10 recollection on this.
11       MR. FREEMAN: This will be marked U.S. 461.
12       (Exhibit No. 461 marked)
13     Q. And if you could take a quick look at that document
14 and --
15     A. Okay.
16     Q. -- tell me what it is.
17     A. Uh-huh.
18     Q. What is that document?
19     A. It says Driver License Offices.
20     Q. And do you see how many offices there are in Bexar
21 County?
22     A. Looks like four.
23     Q. And do you see if there are some offices that are
24 closed temporarily?
25     A. In Bexar County, no.

Senator Joe Straus, III                                    June 11, 2012

---

## 21

1    Q.   In the State of Texas as a whole?
2    A.   Yes.
3    Q.   And how many House districts are there in Bexar
4    County?
5    A.   Ten.
6    Q.   Okay.  So there are -- am I correct that there are
7    more House districts than there are driver's licenses in the
8    county?
9    A.   Yes.
10   Q.   Okay.  Are you aware of whether there's a particular
11   driver's license station in the Capitol Annex?
12   A.   I've -- I believe someone has told me about it, but
13   I --
14   Q.   Do you know --
15   A.   -- haven't been there.
16   Q.   Do you know how long the delays are there?
17   A.   I have no idea.
18   Q.   Okay.  Do you know if that office is listed on the DPS
19   web site or other public materials?
20   A.   I'm not aware.
21   Q.   Do you know why there would be a DPS station inside
22   the Capitol?
23   A.   No.
24   Q.   Okay.  Do you have a copy of your birth certificate?
25   A.   Do I have one?

## 22

1    Q.   Uh-huh.
2    A.   Yes.
3    Q.   Do you know where you would get a copy if you lost
4    yours?
5    A.   I've done it before.  I'm trying to remember.  County?
6    County courthouse, I believe.  I'm not sure.
7    Q.   It's not a quiz.  It's just --
8    A.   I don't --
9    Q.   -- to the extent of your knowledge.
10   A.   No, I don't.
11   Q.   Okay.
12   A.   I know.  But I can't remember.
13   Q.   Do you know how much it would cost?
14   A.   I don't.
15   Q.   Okay.  Do you know how long it would take?
16   A.   No.
17   Q.   And how would you go about finding out, if you had to
18   find out?
19   A.   I don't know.
20   Q.   Okay.  What ID are you carrying on your person today?
21   A.   ID?
22   Q.   Uh-huh.
23   A.   Several.  Texas driver's license.
24   Q.   Okay.  Do you -- well, let me try and narrow it down.
25       What photo ID do you have on your person today?

## 23

1    A.   Texas driver's license.
2    Q.   Anything else?
3    A.   Probably one from -- from the state.
4    Q.   Okay.  The -- a legislator ID?
5    A.   Capitol, yes.
6    Q.   Okay.  Do either of those establish your citizenship?
7    A.   I don't believe so.
8    Q.   To the best of your knowledge?
9    A.   I don't -- I wouldn't -- I don't think so.
10   Q.   Okay.  And in terms of ID that you have but aren't
11   carrying on your person, do you have a passport?
12   A.   A passport?
13   Q.   Yes.
14   A.   Yes.
15   Q.   Do you have a license to carry concealed?
16   A.   Do I have to tell you that?  I'm kidding.  No, I
17   don't.
18   Q.   If you --
19   A.   I don't.
20   Q.   Honestly, if -- it's not an important enough question
21   that I would press you if you didn't --
22   A.   Yeah.
23   Q.   -- want to answer.
24   A.   I do not have one.
25   Q.   Okay.  And do you have a military ID of any kind?

## 24

1    A.   No.
2    Q.   Okay.  And your legislator ID, does that establish
3    your identity for purposes of entering the Capitol?
4    A.   Yes.
5    Q.   Okay.  What is the drinking age in Texas?
6    A.   21.
7    Q.   Okay.  Are you aware of individuals having ever
8    created counterfeit photographic identification cards in Texas?
9        MR. SWEETEN:  Objection, vague and compound.
10       You can answer.
11       THE WITNESS:  I'm sorry?
12       MR. SWEETEN:  I objected to the question as vague
13   and compound --
14       THE WITNESS:  Oh.
15       MR. SWEETEN:  -- but you can answer the
16   question --
17       THE WITNESS:  Oh.
18       MR. SWEETEN:  -- if you've heard about it.
19   A.   I've heard -- I've heard about it.
20   Q.   Okay.  And have you heard of individuals creating
21   counterfeit photographic identification cards for the purpose of
22   obtaining alcohol?
23       MR. SWEETEN:  Same objection.
24       Go ahead.  You can answer, if you can.
25   A.   I've heard of it.

Senator Joe Straus, III                                              June 11, 2012

---

## 25

1   Q.  Are you aware of any convictions for fake IDs in the
2   State of Texas in the last 20 years related to alcohol purposes?
3   A.  I'm not aware specifically, no.
4   Q.  Okay.  Are you aware of any investigated incidents
5   concerning the use of fake IDs in Texas?
6   A.  I'm not specifically aware, no.
7   Q.  Okay.  Are you aware of what the security features are
8   on a Texas driver's license?
9   A.  No.
10  Q.  Okay.  Are you aware of whether S.B. 14, the
11  photographic voter identification bill that we will be
12  discussing at length later, provides financing for polling
13  places to have black lights to test the validity of a Texas
14  driver's license?
15          MR. SWEETEN:  You can testify about what's in the
16  text of the bill.  In answering the question, don't reveal any
17  sort of thought processes and mental impressions about the bill
18  that you have.  But you can answer --
19          THE WITNESS:  Okay.
20          MR. SWEETEN:  -- based on the text of the bill.
21  A.  My answer to that is I don't -- I don't recall.
22  Q.  Okay.  And are you aware of whether there's funding
23  relating to barcode scanners for testing the validity of a Texas
24  driver's license?
25  A.  I don't --

## 26

1          MR. SWEETEN:  Same instruction.
2   A.  I don't recall.
3   Q.  Okay.  Have you ever seen a U.S. citizenship
4   certificate?
5   A.  I don't recall seeing one.
6   Q.  Okay.  Have you ever seen a tribal ID?
7   A.  No.
8   Q.  With regard to the citizenship certificate, are you
9   aware of what photo they usually contain?
10  A.  No.
11  Q.  Okay.  How much does gas go for in San Antonio these
12  days?
13  A.  Regular?
14  Q.  Sure, regular.
15  A.  $3.66.
16  Q.  Okay.  And when was the last time you voted?
17  A.  In the primary.
18  Q.  Okay.  How long ago was that, just for the record?
19  A.  I voted early.  The primary was -- so it must -- it
20  must have been mid May.
21  Q.  Okay.  And how far is the early voting center from
22  your house?
23  A.  Oh, the closest one is a couple of miles, three miles
24  maybe.
25  Q.  So less than --

## 27

1   A.  Two or three miles.
2   Q.  Less than 20 minutes away?
3   A.  Yes.
4   Q.  Less than 10 minutes away?
5   A.  Probably 10 minutes, yeah.
6   Q.  Okay.  And when is the last time you voted on election
7   day?
8   A.  I don't remember.
9   Q.  Okay.
10  A.  I usually vote early.
11  Q.  And if you want to vote on election day, do you know
12  where your precinct is?
13  A.  Yes.
14  Q.  And how far is the precinct from your house?
15  A.  Not far.
16  Q.  Less than five minutes?
17  A.  Yes.
18  Q.  Okay.
19  A.  Although this year my precinct location was closed.
20  Q.  Okay.
21  A.  So we were rerouted to another location, but still
22  within ten minutes of my house.
23  Q.  Okay.  How do you usually communicate with your
24  legislative colleagues in terms of the medium you use?  Phone?
25  E-mail?

## 28

1   A.  Typically by phone.
2   Q.  Okay.  How often during a week of legislative session
3   do you communicate via e-mail?
4   A.  Less often than when we're not in session.
5   Q.  Okay.  More than ten times a week?
6   A.  Communicate with members?
7   Q.  With your legislative colleagues, yes.
8   A.  Oh, probably fewer than ten times a week, yeah.  When
9   we're in session, I see them personally.
10  Q.  Okay.  More than five?
11  A.  I don't -- I don't count.  I don't know.
12  Q.  Okay.  Just an approximation.
13  A.  Yeah.  Not very often.
14  Q.  Okay.  Do you communicate with other members via text
15  message?
16  A.  Yes.
17  Q.  And do you communicate with your staff via e-mail
18  during the session?
19  A.  Occasionally.
20  Q.  Okay.  Text message?
21  A.  Yes.
22  Q.  Okay.  When you e-mail with your staff during the
23  session, do you use your official account or your personal
24  account?
25  A.  Both.

29

1   Q.  Okay.  How about other members?
2   A.  Usually text message.
3   Q.  Okay.  Do you ever archive your e-mail?
4   A.  I think so.
5       Q.  Do you -- I guess -- strike that.
6           Do you archive e-mail related to certain matters or
7   certain bills?
8   A.  No.  I wouldn't think so, no.
9       Q.  Okay.  So I know that you have a large office, at
10  least relative to other Texas legislators, and so I'm not going
11  to ask you who each of your staff members are.  As I said
12  before, it's not a pop quiz.  But I hope we can have -- just go
13  through a few quick categories of staff.
14      First, who are the staff who dealt with voter ID in
15  any capacity, first before you were speaker, so when you were
16  just an ordinary legislator?
17  A.  Oh, gosh.  It would have been --
18      MR. SWEETEN:  Let me just --
19  A.  I -- I know --
20      MR. SWEETEN:  Let me caution you.
21      THE WITNESS:  Yes.
22      MR. SWEETEN:  When you're answering the question,
23  he's just asking you for the staff members that worked on the
24  issue of voter ID.  You can answer the question as phrased.  But
25  as you're answering the question --

30

1       THE WITNESS:  Okay.
2       MR. SWEETEN:  -- don't give any specific
3   substance of communications or specifics --
4       THE WITNESS:  Yeah.
5       MR. SWEETEN:  -- as to what they -- they
6   provided.
7   A.  Well, before I was speaker --
8   Q.  Uh-huh.
9   A.  -- there was just a staff member or two, and it could
10  have been either -- either/or.
11      Q.  Okay.  Who were those individuals?
12  A.  Well, there were various people in the years before I
13  was speaker.
14      Q.  So specifically in the 2007 session, I guess, when it
15  got to the floor of the House?
16  A.  Probably was Patrick Reinhart.
17      Q.  Okay.  And is he still with your office?
18  A.  No.
19      Q.  Okay.  And since you became speaker, who are the
20  staffers who've worked on voter ID, to the best of your
21  recollection?
22  A.  It would be my chief of staff or Meredyth Fowler.
23      Q.  Okay.  And who was your chief of staff during the last
24  session?
25  A.  Denise Davis.

31

1   Q.  Okay.  And now it's --
2   A.  Jesse.
3   Q.  Okay.  Yeah.
4   A.  Didn't want to mispronounce your last name.
5       MR. ANCIRA:  Ancira.
6       MR. FREEMAN:  Ancira?  Okay.  Thank you.
7   Q.  When did Meredyth Fowler come to work for you?
8   A.  I believe she came to work when I was elected Speaker
9   in '09.
10      Q.  And was she hired to work specifically on elections
11  issues?
12  A.  She has a broader portfolio than that.
13      Q.  Okay.  Did she have any background in elections
14  issues, to the best of your recollection?
15  A.  I don't -- I don't know.
16      Q.  Did you hire her personally, or did your chief of
17  staff?
18  A.  My chief of staff.
19      Q.  Okay.  Was she referred from another employer to your
20  office?
21  A.  I don't recall.
22      Q.  Okay.  So as a general matter, what additional staff
23  are you entitled to because you are the speaker rather than an
24  ordinary member, what categories of staff?
25  A.  The policy analysts and administrative personnel,

32

1   legal counsel.
2   Q.  Okay.
3   A.  That sort of thing.
4       Q.  Okay.  So the policy analysts, is Meredyth Fowler a
5   policy analyst?
6   A.  Yes.
7       Q.  Are those generally attorneys?
8   A.  Some are and some are not.
9       Q.  Okay.  And you had said Ms. Fowler is assigned to
10  several committees.  Is that sort of the general makeup of the
11  office?  You have policy analysts who are assigned to several
12  different committees?
13  A.  That's correct.
14      Q.  Okay.  Is there one person who supervises all of the
15  policy analysts?
16  A.  Yes.
17      Q.  Who would that be?
18  A.  Well, it was Lisa Kaufman.
19      Q.  Okay.  And what was her position?
20  A.  She was counsel to the speaker and budget director
21  or --
22      MR. ANCIRA:  Director of policy.
23  A.  Director of policy and budget.
24      MR. ANCIRA:  Budget.
25  A.  Yeah.

## 33

1    Q.  Okay.  Do any of your staff serve as your attorney for
2  the purpose of providing you with legal advice?
3    A.  Say that again.
4    Q.  Do any of your staff serve as your attorney for the
5  purpose of providing you with legal advice?
6    A.  I assume so, yes.
7    Q.  And who would that be?
8    A.  Right now Jesse Ancira.
9    Q.  Okay.
10   A.  Uh-huh.
11   Q.  Anyone besides your general counsel?
12   A.  Currently?
13   Q.  Uh-huh.
14   A.  I suppose any of the attorneys who are on staff do.
15   Q.  And how do you distinguish between when they're
16  providing you with legal advice and when they're providing you
17  with policy advice?
18   A.  I don't know how to make that distinction.
19   Q.  Okay.
20   A.  I suppose we -- I don't -- I don't know how to make
21  that distinction.
22   Q.  Okay.  So you said that you also have staff who are in
23  charge of various administrative matters, correct?
24   A.  Yes.
25   Q.  Is there one particular person on your staff who's in

## 34

1  charge of recordkeeping?
2    A.  Hmm.  One person in charge of recordkeeping?  I'm -- I
3  delegate that to the chief of staff, and it would be at his
4  direction.
5    Q.  Okay.  So it's delegated down, but you're not sure
6  exactly where?
7    A.  That's right.
8    Q.  Okay.  How are documents maintained in your office?
9    A.  Again, I delegate -- I delegate that.
10   Q.  Okay.  So if you were looking for documents on a
11  particular bill, you'd ask someone for them?
12   A.  I would ask someone, yes.
13   Q.  Okay.  Do you know if you have a record retention
14  policy?
15   A.  I'm sure we do, but --
16   Q.  Okay.
17   A.  -- but again, I delegate that.
18   Q.  Okay.  Do you know if you maintain files specific to
19  particular pieces of legislation?
20   A.  I don't know.
21   Q.  Okay.  And you said earlier that some search was
22  conducted for documents related to this litigation.  Do you know
23  when it was conducted?
24   A.  I don't.
25   Q.  Do you know if at any time someone searched your

## 35

1  e-mail using a set of key terms provided by the Office of the
2  Attorney General?
3    A.  I don't know.
4    Q.  Do you save your text messages?
5    A.  Typically not.
6    Q.  Okay.  Do you routinely specifically delete them?
7    A.  To save space, sometimes I do.
8    Q.  Okay.  So it's not a routine one way or the other,
9  just --
10   A.  No.
11   Q.  -- haphazard?
12   A.  Uh-huh.
13   Q.  Okay.  Me too.
14       What district do you represent?
15   A.  District 121.
16   Q.  Okay.  When were you first elected?
17   A.  In 2005.
18   Q.  And that was a special election to fill an open seat,
19  correct?
20   A.  That's correct.
21   Q.  How many republican candidates were there in that
22  election?
23   A.  There were two.
24   Q.  And how did the republican candidates distinguish
25  themselves?

## 36

1    A.  How did they distinguish themselves?
2    Q.  In terms of the campaign, positions, background,
3  et cetera.
4    A.  I don't recall how we distinguished ourselves.  There
5  were four candidates:  One independent, as I remember, one
6  democrat and two republicans.
7    Q.  Okay.  Do you recall what issues you campaigned on
8  that year?
9    A.  Not specifically.
10   Q.  Okay.  Is District 121 a safe seat for republicans
11  under the -- well --
12   A.  I would certainly hope so this year.
13   Q.  Okay.  Well, let's, I guess, start under the map from
14  which you were elected in 2010.  Is it a relatively safe seat
15  for republicans?
16       MR. SWEETEN:  Calls for speculation.
17   Q.  To the extent of your knowledge.
18   A.  It has -- the seat has elected republicans for many
19  years.
20   Q.  Okay.  And have you ever released Spanish language
21  campaign materials?
22   A.  I don't believe so.
23   Q.  Have you ever done Spanish language ads?
24   A.  I've done very little advertising --
25   Q.  Okay.

## 37

1    A. -- until recently, and it was a -- I don't -- I don't
2  think it -- I don't think it was in Spanish, no.
3    Q. Okay.
4    A. I may have -- actually, I may have -- I can't
5  remember. I might have.
6    Q. Might have? Not certain?
7    A. Yeah.
8    Q. That's fine.
9       Have you ever campaigned -- actually, excuse me.
10      In your first election --
11   A. Uh-huh.
12   Q. -- did you campaign at all on issues related to voter
13 fraud?
14        MR. SWEETEN: You can talk about public speeches
15 you made in the campaign.
16   A. Yeah. I don't -- I don't recall. I believe my -- the
17 issues I campaigned on were generally fiscal issues.
18   Q. Okay. Did you have any republican challengers in
19 2006?
20   A. No.
21   Q. 2008?
22   A. No.
23   Q. 2010?
24   A. No.
25   Q. This year?

## 38

1    A. Yes.
2    Q. And that election just happened, and I believe you
3  won. Am I correct?
4    A. Correct.
5    Q. Congratulations.
6    A. Thank you.
7    Q. What was the -- what was the spread, the result in
8  terms of --
9    A. Over and --
10   Q. -- percentages?
11   A. Over and under?
12   Q. Over and under 50 --
13   A. Yeah.
14   Q. -- is what matters.
15   A. Yeah. It was -- I believe it was 63.
16   Q. Okay. And you said that previously you hadn't done
17 much in the way of advertising, but you had this cycle; is that
18 correct?
19   A. That's correct.
20   Q. Did you do TV?
21   A. Yes.
22   Q. Radio?
23   A. Yes.
24   Q. Mailers?
25   A. Yes.

## 39

1    Q. And again, you're not certain if any of those were in
2  Spanish?
3    A. I don't recall any in Spanish.
4    Q. Okay. What issues did you campaign on?
5    A. General record of the legislature.
6    Q. Okay. Anything related to voter ID?
7    A. Perhaps, as part of a list of accomplishments.
8    Q. Okay. Anything specific to voter ID other than as an
9  accomplishment?
10   A. I don't recall.
11   Q. Anything about voter fraud?
12   A. I don't recall.
13   Q. Have you ever had any general election opponent,
14 democratic or libertarian, who got more than 40 percent in the
15 general election?
16   A. No.
17   Q. Okay. Then we can skip that.
18      Was immigration an issue at all in the 2010 -- or
19 excuse me -- in the primary that just happened in 2012?
20   A. Immigration?
21   Q. Immigration.
22        MR. SWEETEN: Objection, vague.
23        Are you asking about his campaign or just
24 generally was immigration an issue?
25   Q. Did either you or your opponent raise the issue of

## 40

1  immigration?
2    A. My opponent might have.
3    Q. Did you?
4    A. I don't -- I don't recall. No, I don't think so.
5    Q. Do you remember what your opponent said related to
6  immigration?
7    A. I believe he cited disappointment in the lack of an
8  immigration related bill passing the legislature.
9    Q. Do you remember, was that a specific bill?
10        MR. SWEETEN: That he cited?
11        MR. FREEMAN: Yes.
12        MR. SWEETEN: You can answer as phrased.
13   A. I believe he was disappointed that the Sanctuary
14 Cities bill did not pass.
15   Q. Okay. And for the record, what was your opponent's
16 name?
17   A. I try to not remember. Matt -- Matt Beebe.
18   Q. Okay.
19   A. Yeah.
20   Q. In each of your elections, have different numbers of
21 voters turned out in terms of the total number of ballots cast?
22   A. I'm sure.
23   Q. What factors were -- did you perceive to be related to
24 the different levels of turnout, to the extent of your
25 knowledge?

## 41

1    A.   I suppose whether or not the election was a
2    presidential election year, typically.
3    Q.   Anything else?
4    A.   No.
5    Q.   Okay.  Why did you initially decide to run?
6    A.   There was an open seat in the legislature.
7    Q.   Were you encouraged to run by anyone?
8    A.   Certain friends who had thought over the years that I
9    might have an interest in further public service.
10   Q.   Did you have any hired campaign staff in the first
11   election?
12   A.   Yes.
13   Q.   And who were they?
14   A.   A fellow named James Barry is the only one that I
15   think was hired.
16   Q.   Okay.  Did you have any consultants?
17   A.   Yes.
18   Q.   And who were they?
19   A.   Frank Guerra.
20   Q.   Anyone else?
21   A.   No, not that I remember.
22   Q.   Did you have any consultants in this last primary?
23   A.   Yes.
24   Q.   And who were they?
25   A.   There's a list.  I don't --

## 42

1    Q.   Is it a list that you recall?
2    A.   You know, I could get it for you.  I don't --
3    Q.   It's okay.  Any highlights?
4    A.   Frank Guerra again.
5    Q.   Okay.
6    A.   But -- and others.
7    Q.   Okay.  Did you have any particular major donors or
8    bundlers in the first election?
9    A.   No.
10   Q.   Any in the primary you just went through?
11   A.   Not specific to the primary.
12   Q.   Okay.  Any major bundlers or donors who have supported
13   you in the last couple of years?
14   A.   I have a large number of contributors that I've
15   attracted over the years.
16   Q.   Okay.  Any major endorsements in the last primary?
17   A.   No.
18   Q.   Okay.  How would you describe the district that you
19   just ran in?  So, I guess, the interim district --
20   A.   When you say major endorsements, I mean, I had a lot
21   of endorsements, but I'm not sure that there was any
22   blockbuster.
23   Q.   Okay.  Anything that you consider particularly
24   notable?  And if --
25   A.   No.

## 43

1    Q.   -- if naming one would offend the others --
2    A.   No.
3    Q.   -- it's okay.
4    A.   No.
5    Q.   All right.  How would you describe the district that
6    you just ran in, which is, I guess, the interim district by the
7    San Antonio court?
8    A.   I'm not sure I can --
9    Q.   In terms of -- well, in terms of the economics of the
10   district?
11   A.   I guess you -- I mean, you could look at the
12   demographics of the district.
13   Q.   I mean, is it relatively affluent for Texas or for
14   Bexar County?
15   A.   Relatively.
16   Q.   Okay.
17   A.   It's not -- I wouldn't say it's the most affluent in
18   Bexar County.
19   Q.   Okay.  And is it -- am I correct that it's northern
20   Bexar County?
21   A.   Yes.
22   Q.   Okay.  And what are the demographics like in terms of
23   is it relatively Anglo, relatively Latino?
24   A.   I can't remember.
25   Q.   Okay.

## 44

1    A.   I know it's -- I don't recall exactly what the
2    breakdown is.  I've seen it, but I don't remember.
3    Q.   For Bexar County, is it relatively Anglo?
4    A.   I would assume it's relatively -- a relatively high
5    percentage of Anglos for Bexar County, but I don't remember the
6    specifics.
7    Q.   Is it relatively similar to the district that you had
8    run from previously, or has it been substantially changed?
9    A.   I don't remember.
10   Q.   Okay.  So how about the district that you had run from
11   previously; is that relatively affluent?
12   A.   I would say it's probably similar to the district as
13   it is now, maybe slightly less affluent than the recent
14   alterations.
15   Q.   Is the Hispanic community in your old district more or
16   less affluent than the Anglo community?
17   A.   I don't know.  I would -- I don't know.
18   Q.   Okay.
19   A.   I would assume it would be -- mirror the demographics
20   of the county.
21   Q.   Okay.
22   A.   Don't know.
23   Q.   Well, do you know if in the county as a whole the
24   Hispanic community is more or less affluent than the Anglo
25   community?

## 45

1    A. I would assume less.

2    Q. Is the driver's license office that you went to a

3 little bit less than a year ago, is that in your district?

4    A. No.

5    Q. Is it on a mass transit route?

6    A. I don't know.

7    Q. Okay. Are there sidewalks nearby, to the best of your

8 recollection?

9    A. I think so.

10    Q. Okay. All right. So let's move into legislative

11 procedure then unless -- are you okay to keep going for a bit

12 longer?

13    A. Sure.

14    Q. Okay. So as a general matter, do you believe that

15 compliance with the Texas Constitution is an important

16 consideration in the law-making process?

17    MR. SWEETEN: Okay. When you're answering these

18 questions, I don't want you to reveal your thought process, your

19 mental impressions about specific legislation. Okay? If in

20 answering the question, you're not doing so, I will let you

21 answer it as a general matter. But do not reveal specific

22 mental processes or impressions or motivations with respect to

23 legislation when answering the question.

24    THE WITNESS: Okay.

25    MR. FREEMAN: Do you need to have the question

## 46

1 read back to you?

2    THE WITNESS: Sure.

3    (Requested portion was read)

4    A. Yes.

5    Q. How do you ensure compliance with the Texas

6 Constitution when you're working on developing a bill?

7    MR. SWEETEN: Same instruction. Don't reveal

8 matters of legislative privilege, your thought processes, your

9 analysis when you're -- about specific legislation. If in

10 answering the question you're not doing that and can answer as a

11 general matter, I'll let you answer the question.

12    A. Okay. I rely on legal counsel.

13    Q. Okay. Any other steps that you take?

14    A. No.

15    Q. Do you believe that compliance with federal law is an

16 important consideration in the law-making process?

17    MR. SWEETEN: Same instruction.

18    A. Yes.

19    Q. And what steps do you take to ensure compliance with

20 federal law when you're working on developing a bill?

21    MR. SWEETEN: Same instruction. As to a specific

22 bill, don't reveal your thoughts, mental processes, motivations,

23 impressions about legislation. If you can answer the question

24 without doing that, you can answer it. Otherwise, do not answer

25 it.

## 47

1    A. I rely on legal counsel.

2    Q. Okay. When you say legal counsel, do you mean the

3 general counsel in your office?

4    A. Or the parliamentarian or other House or legislative

5 counsel.

6    Q. By legislative counsel, do you mean the Texas

7 Legislative Council?

8    A. And others, yes.

9    Q. Do they -- does the Texas Legislative Council offer

10 formal opinions concerning compliance with the Texas

11 Constitution, to the extent of your knowledge? If you don't

12 know, it's okay.

13    A. I'm not a lawyer, so I -- I don't -- sometimes I'm

14 listening for things I shouldn't be answering because I don't

15 know.

16    Q. And that's fine. And I'll just say as a general

17 matter, if you feel that you have to look over to your general

18 counsel --

19    A. Yeah.

20    Q. -- because you don't know --

21    A. Okay. I don't know.

22    Q. -- just saying you don't know --

23    A. I don't know. I don't.

24    Q. -- is absolutely fine.

25    A. I don't know.

## 48

1    Q. That's fine. Again, it's not a pop quiz. If you

2 don't know an answer, that's an answer.

3    A. Okay.

4    Q. Not that I want you to say you don't know, but you

5 understand.

6    Last one of these questions. Do you believe that

7 compliance with the federal Voting Rights Act is an important

8 consideration in the law-making process?

9    MR. SWEETEN: If you can answer the question

10 without revealing your thoughts and mental impressions about

11 specific legislation, I'll allow you to do so as a general

12 matter. Do not reveal your mental impressions or thought

13 processes regarding specific legislation in answering the

14 question.

15    A. I would -- I would say I'd consider complying with

16 federal law is important.

17    Q. Okay. And what steps do you take, as a general

18 matter, not related to any specific legislation or thoughts or

19 mental impressions, how do you ensure that compliance with the

20 Voting Rights Act occurs when you're developing a bill?

21    MR. SWEETEN: Same instruction.

22    A. Yeah. I -- I rely on legal advice.

23    Q. Okay. And just a quick question: You said the

24 parliamentarian provides advice as well. Is that with regard to

25 the procedures of the Texas House or in some way with the

## 49

1  legality of -- the substantive legality of bills?
2      A.  Mainly with the procedures of the Texas House.
3      Q.  But any -- any advice outside, legal advice outside of
4  those procedures?
5      A.  Well, he is a lawyer, but typically, just for
6  advice -- procedural advice and rules of the House.
7      Q.  Okay.  And is the parliamentarian a member of the
8  Speaker's staff, or does the parliamentarian work for the House
9  as a whole?
10     A.  Works for the House.
11     Q.  Okay.  Who is the current parliamentarian?
12     A.  Chris Griesel.
13     Q.  Okay.  But am I correct that Ms. Davis used to be the
14  parliamentarian of the House?
15     A.  That's correct.
16     Q.  Okay.  Okay.  So we had previously discussed that you
17  were deposed during the redistricting preclearance litigation,
18  Texas V. United States, correct?
19     A.  Correct.
20     Q.  And you testified under oath during that deposition,
21  correct?
22     A.  Yes.
23     Q.  Okay.  And you didn't assert a legislative privilege
24  in that deposition, correct?
25         THE WITNESS:  Did I?

## 50

1         JUDGE PHILLIPS:  If you remember.
2      A.  I don't --
3      Q.  To the extent of your recollection.
4      A.  I -- I don't --
5      Q.  If you don't --
6      A.  -- I don't remember.
7      Q.  If you don't remember, you don't remember.
8      A.  No.
9      Q.  Okay.  I'd like to put in front of you what I'd like
10  to have marked U.S. 462.
11         (Exhibit No. 462 marked)
12     Q.  And I'll represent to you that this is only a partial
13  excerpt of a far longer document.
14         Have you seen this document before?
15     A.  I don't believe so.
16     Q.  Are you able to tell from the face of the document
17  what the document is?
18     A.  Oral deposition of Texas House Speaker.
19     Q.  Okay.  Could you take a look at the end of Page 20 and
20  the beginning of Page 21?
21     A.  Okay.
22     Q.  Would it be fair to say that you explained in your
23  prior deposition that the informal powers of the speaker rest in
24  two categories, the power of appointment and control the flow of
25  legislation?

## 51

1      A.  Yes, I see that.
2      Q.  Is that still your testimony today?
3      A.  Yes.
4      Q.  Okay.  And if you look at Page 22, would it be fair to
5  say that you explain that your power of appointment includes the
6  power to appoint committee chairs, correct?
7      A.  That's correct.
8      Q.  Is that still your testimony today?
9      A.  Yes.
10     Q.  And would it be fair to say that you also appoint --
11  excuse me.
12         And you appoint the chairs of the standing substantive
13  committees; is that correct?
14     A.  Yes.
15     Q.  And do you also appoint the chairs of standing
16  procedural committees?
17     A.  Yes.
18     Q.  And the conference committees?
19     A.  Yes.
20     Q.  And select committees?
21     A.  Yes.
22     Q.  And if we continue to Page 23, would it be accurate to
23  say that you explained that you appoint half the membership of
24  standing substantive committees, correct?
25     A.  It's -- I believe that's right, yes.

## 52

1      Q.  But the other half is appointed according to so-called
2  seniority picks, correct?
3      A.  Correct.
4      Q.  Is that still your testimony?
5      A.  Yes.
6      Q.  Okay.  Can you explain the seniority picks system to
7  me?
8         MR. SWEETEN:  Don't reveal -- in answering the
9  question, don't reveal your thought processes with respect to
10  any specific --
11         THE WITNESS:  Okay.
12         MR. SWEETEN:  -- piece of legislation.  Okay?
13         THE WITNESS:  Yeah.
14         MR. SWEETEN:  If you can answer the question
15  without doing that, then you can.  Otherwise --
16         THE WITNESS:  Yeah.
17         MR. SWEETEN:  -- I'm going to instruct you not to
18  answer the question.
19     A.  We -- members at the beginning of a session fill out
20  committee request cards --
21     Q.  Uh-huh.
22     A.  -- based on their personal preferences and on their
23  seniority.
24     Q.  Okay.  And am I correct that the -- each member gets
25  one pick based on seniority where their top choice, they -- they

Senator Joe Straus, III                                    June 11, 2012

---

## 53

1  get that automatically?

2      A.  Well --

3          MR. SWEETEN:  Same instruction.

4      Q.  If they are the most senior person who wanted that

5  slot?

6      A.  Yes.

7      Q.  Okay.  And the Elections committee is a substantive

8  standing committee, correct?

9      A.  Yes.

10     Q.  Okay.  So if a senior member wanted to be on a

11  particular substantive standing committee and they were the most

12  senior members requesting that slot, you would not be able to

13  keep him or her off that committee, correct?

14     A.  Correct.

15     Q.  You would only be able to decide that that member

16  would not be the chair or vice chair, correct?

17     A.  That's correct.

18     Q.  Okay.  However, you appoint the full membership of a

19  select committee, correct?

20     A.  Yes.

21     Q.  And there are no seniority picks for select

22  committees?

23     A.  No.

24     Q.  Okay.  And you have the power to convene a select

25  committee; is that correct?

## 54

1      A.  To convene one?

2      Q.  Yes.

3      A.  It's -- that power is given in the rules, yes, I think

4  so.

5      Q.  Okay.

6      A.  Uh-huh.

7      Q.  Do you -- are you aware of any limitations on when you

8  may appoint a select committee?

9          MR. SWEETEN:  You can answer as general matter

10  of -- of procedure.

11     A.  No.

12     Q.  Okay.  Are there any rule-based limitations of which

13  you are aware concerning the subject matter that a select

14  committee may address?

15     A.  No.

16     Q.  Okay.  So effectively, the appointment of a select

17  committee allows the Speaker to exclude particular members from

18  the committee process addressing a particular bill, if the

19  Speaker so chose, correct?

20         MR. SWEETEN:  Same instruction.  Go ahead.

21     A.  Yes.

22     Q.  Okay.  Now, you also said in your redistricting

23  deposition that you have control over legislative matters, is

24  that correct, just the legislative process to some extent?

25     A.  I guess to some extent.

## 55

1      Q.  Okay.  And is that still your testimony?

2      A.  Yes.

3      Q.  Okay.  With regard to the flow of legislation, if you

4  can look at Page 26, you explain that you have the power to

5  recognize or not to recognize certain bills, correct?

6          MR. SWEETEN:  Caution the witness to take the

7  time you need to review the document --

8          MR. FREEMAN:  Yeah.

9          MR. SWEETEN:  -- he's asking about.

10     A.  Absolutely.

11     A.  Yes, the answer I gave here is accurate.

12     Q.  Okay.

13     A.  It says, you know, that the Speaker has some power of

14  recognizing certain bills or not, which is rarely ever used.

15  It's more of a consensus building among committee chairs is how

16  the flow is establish.

17     Q.  Can you explain to me what it would mean for the

18  Speaker not to recognize a bill?

19     A.  It would be extraordinary.

20     Q.  Okay.  You could, but you don't, as a general matter;

21  is that correct?

22     A.  Yes.

23     Q.  Okay.  Do you decide to which committees particular

24  bills will be referred, you or your office?

25     A.  The parliamentarian really does the -- does the

## 56

1  distribution to committees.

2      Q.  Okay.

3          MR. FREEMAN:  If we could try and -- well, if we

4  could have this marked as U.S. 463.

5          (Exhibit No. 463 marked)

6      Q.  And first off, are you aware of whether a separate set

7  of rules for the Texas House were published for the 82nd

8  legislature?

9      A.  Yes.

10     Q.  Okay.  And what is the document in front of you?

11     A.  Rules and Precedence of the Texas House 81st

12  Legislature.

13     Q.  Are you aware of whether the rules for the 82nd

14  legislature have been posted on the Texas House's web site?

15     A.  I would assume they are.  Don't know.

16     Q.  Okay.  If you could take a quick look at Rule 1,

17  Section 4 on Page 3.

18     A.  Okay.

19     Q.  And is it the case that Rule 1, Section 4 states that,

20  "All proposed legislation shall be referred by the speaker to an

21  appropriate standing or select committee with jurisdiction"?

22     A.  That's what it says.

23     Q.  Did that rule change in the 82nd legislature?

24     A.  I don't think so.

25     Q.  So is it possible that that's a -- a duty of the

---

## 57

1  Speaker but one that is largely delegated?
2      A.  That's correct.
3      Q.  Okay.  I just wanted to clear that up.
4          Are there standing committees with overlapping
5  jurisdiction?
6      A.  Yes.
7      Q.  And so if a bill could arguably go before one
8  committee or another, is that your call?
9      A.  I delegate to the -- to the parliamentarian --
10     Q.  Okay.
11     A.  -- on the referral of bills.
12     Q.  Are there any bills where you ever -- let me try and
13 structure the question.
14     A.  Uh-huh.
15     Q.  Your counsel is rightfully making a little bit of
16 noise.  Let me try and rephrase that.
17         As a general matter, would you ever make the call
18 yourself if it were a more important bill and there was some
19 question as to what committee it would be referred to, without
20 addressing any specific bills or your thoughts about any
21 specific individual bills?
22         MR. SWEETEN:  You can answer the question as a
23 general matter.  Just don't reveal matters related to specific
24 legislation.
25     A.  I don't recall an instance where I had any

## 58

1  disagreement with the parliamentarian in the delegation of
2  that --
3      Q.  Okay.
4      A.  -- of that duty.
5      Q.  Okay.  Can you be overruled by members of the House in
6  terms of the referral of a bill to a particular committee?
7          MR. SWEETEN:  You can testify about general
8  legislative procedures.
9      A.  I don't -- I don't know.
10     Q.  Has that ever happened in -- in your --
11     A.  Hasn't happened since I've -- no.
12     Q.  Okay.  Am I correct that you also rule on points of
13 order during legislative debate?
14     A.  Yes.
15     Q.  Now, if you could turn to Page 27 of your deposition,
16 which is, again, U.S. 462.
17     A.  27?  Okay.  Uh-huh.
18     Q.  Am I correct that you explained on Page 27 that you
19 coordinate with the Lt. Governor to decide which body will act
20 first on certain bills?
21     A.  We have from time to time.
22     Q.  Is -- so that's still your testimony today?
23     A.  In certain matters, yes.
24     Q.  Are you at all involved in deciding who will carry a
25 senate bill when it comes to the House?

## 59

1      A.  Rarely, if ever.
2      Q.  Okay.  Do you have the power to introduce bills as
3  Speaker?
4      A.  Boy, I don't know.  I haven't.
5      Q.  Okay.
6      A.  I'm not sure.
7      Q.  You answered my next question before I even asked it.
8      A.  Yeah.
9      Q.  Do you have the power to vote on bills?
10     A.  Yes.
11     Q.  Do you have the power to vote on amendments?
12     A.  I assume so, yes.
13     Q.  Have you done so since you became Speaker?
14     A.  Very rarely.
15     Q.  Approximately how many times, to your recollection?
16     A.  I voted for the budget.  I don't recall any other
17 votes.
18     Q.  Okay.  Does the Speaker's office, as a typical
19 procedure, gather signatures of votes before a bill is released?
20         MR. SWEETEN:  You can answer as a general matter.
21     A.  Gather signatures?
22     Q.  Gather commitments to vote for a bill from individual
23 legislators.  I guess what in -- what in Washington is referred
24 to as whipping a bill.
25     A.  Oh.  That's -- typically not, no.  The various

## 60

1  caucuses might do that.
2      Q.  Okay.  But not the Speaker's office?
3      A.  Typically not.
4      Q.  Okay.  Do you direct your staff to develop summaries
5  of floor amendments for major bills?
6      A.  Not that I recall.
7      Q.  Okay.
8          MR. FREEMAN:  If we could mark this U.S. 464.
9          (Exhibit No. 464 marked)
10     Q.  And I'll represent to you that this is part of a
11 larger document produced by the State of Texas to the attorney
12 general on May 11th.  And it sets out documents that have been
13 withheld from the attorney general on the basis of assertions of
14 privilege.  If you could look on Page 126, which is actually
15 just the second page of the document.
16     A.  Uh-huh.
17     Q.  Do you see the first entry says, "S.B. 14 Floor
18 amendment summaries from the files of Speaker Straus"?
19     A.  I see that.
20     Q.  Are you aware of whether you ever individually
21 reviewed -- was that -- sorry.  Strike that.
22         Was that document ever transmitted to you?
23     A.  Not that I recall.
24     Q.  Okay.  And during your redistricting deposition -- I'm
25 not sure if this is in the excerpt that I provided you -- you

## 61

1    previously testified that Gerardo Interiano was deeply involved
2    in providing -- providing substantive input concerning
3    redistricting, correct?
4        A.   He was involved in redistricting, yes.
5        Q.   Are you or your staff typically involved in providing
6    substantive input on other members' bills besides in
7    redistricting?
8            MR. SWEETEN:  Objection, vague.
9            You can answer as a general matter.
10       A.   Ask it again.
11       Q.   Are you or your staff typically involved in providing
12   substantive input on other members' bills prior to a bill being
13   released?
14           MR. SWEETEN:  Same objection and instruction.
15       A.   I -- I don't.
16       Q.   Okay.  Are you aware if your staff does?
17       A.   What was the term you used?
18       Q.   Substantive input.
19       A.   No.
20       Q.   Okay.  Before you became Speaker of the House, what
21   committees did you serve on?
22       A.   I served on Pensions and Investments.  I served on
23   Regulated Industries.  And I served on a committee that has been
24   reformulated, Civil Practices.  I'm not sure what it was called
25   back when I first started.

## 62

1        Q.   Okay.  What does the Civil Practices committee
2    address?
3        A.   What was it called?  What was that committee called
4    before?  Judiciary.  It was called judiciary.
5        Q.   Okay.  Yeah.
6            So is it often that non-attorneys are appointed to the
7    Judiciary committee?
8        A.   Yes.
9        Q.   Okay.  Were you chairman or vice chairman of any
10   committees?
11       A.   Oh, I was also on economic development for a while.
12       Q.   Okay.
13       A.   And the vice chair of that committee.
14       Q.   Okay.  Did you ever serve on a select committee?
15       A.   Yes.
16       Q.   Which select committee?
17       A.   There was a select committee on
18   electric -- electricity and -- and electric power.
19       Q.   Was this after the fallout from Enron?
20       A.   No.  It had more to do with capacity --
21       Q.   Okay.
22       A.   -- and projecting decades out.
23       Q.   Okay.  Am I correct that the Speaker does not serve on
24   individual committees?
25       A.   That's correct.

## 63

1        Q.   Okay.  I'm about to get into a new topic.  So if you'd
2    like to take a five-minute break now.
3        A.   I might go to the --
4        Q.   Okay.
5        A.   -- boys room, if that's okay.
6            MR. FREEMAN:  All right.  We can go off the
7    record.
8            (Recess 10:45 a.m. to 10:53 a.m.)
9        Q.   We're back on the record after a short break.
10           Speaker Straus, are you a member of the American
11   Legislative Exchange Council?
12       A.   A member?
13       Q.   Do you participate in the American Legislative
14   Exchange Council?
15       A.   I go to a number of conferences in the summer, and
16   that's -- that's one of them, yes.
17       Q.   Do you ever direct your staff to speak with the
18   American Legislative Exchange Council concerning particular
19   legislation?
20       A.   No.
21           MR. SWEETEN:  Don't answer the question to the
22   extent it would reveal matters of legislative privilege, okay,
23   as to what you would -- your analysis in a bill, et cetera.
24   Don't reveal --
25           THE WITNESS:  Okay.

## 64

1            MR. FREEMAN:  Mr. Sweeten, to the extent that
2    this is a communication with an outside advocacy group --
3            MR. SWEETEN:  It's certainly fine for him to
4    discuss any communications that he or his staff are aware of
5    with this outside group.  He's not going to give his mental
6    impressions or thought process about any specific legislation as
7    that's prohibited.  So I think that's -- I think that's where
8    the line would be properly drawn.
9        Q.   Well, did you ever ask anyone from the American
10   Legislative Exchange Council for a modelled bill concerning
11   voter ID?
12           MR. SWEETEN:  Same objection.  I think that would
13   ask him to reveal his thought processes regarding specific
14   legislation if you were to ask him to reveal that information.
15   He can testify as to whether he had a contact with them.  And
16   he -- in fact, because I think that they would be not a
17   constituent, they would -- you would be allowed to ask him any
18   specific questions that he's -- or discussions he's had with
19   them.  But as far as this legislative process, you can't ask him
20   that question that way.
21           MR. FREEMAN:  Mr. Sweeten, do I have to take
22   out --
23           MR. SWEETEN:  Mr. Freeman --
24           MR. FREEMAN:  -- the Court's order in which the
25   Court said that communications with constituents, lobbyists and

## 65

1    advocacy groups --
2                MR. SWEETEN:  Perfectly fine.
3                MR. FREEMAN:  -- are entirely not subject
4    to this --
5                MR. SWEETEN:  You must have misunderstood my
6    objection because my objection --
7                MR. FREEMAN:  You must have --
8                MR. SWEETEN:  No.
9                MR. FREEMAN:  -- objected --
10               MR. SWEETEN:  No.
11               MR. FREEMAN:  -- to a question that was simply
12   asking the substance of any conversation --
13               MR. SWEETEN:  You want -- read it back.  It
14   wasn't.  Read -- read the question back.
15               MR. FREEMAN:  I think we're pretty far down the
16   road, and I think it would be hard for the court reporter to
17   read it back.  And so I will reask it --
18               MR. SWEETEN:  Just go ahead and ask your
19   question, and I'll object when I see fit.  Okay?
20        Q.  Mr. Speaker, have you ever had any conversations or
21   communications with the American Legislative Exchange Council
22   requesting any information or modelled bills concerning voter
23   ID?
24               MR. SWEETEN:  You can answer to the extent you
25   can -- you can discuss communications you had with ALEC.  Don't

## 66

1    reveal your -- the process or -- by which you have considered a
2    specific bill in doing so.  You can go ahead.
3         A.  I don't recall speaking with anyone at ALEC.
4         Q.  Are you aware of any modelled bill produced by ALEC
5    concerning voter ID?
6         A.  I have not seen one.
7         Q.  Okay.  What is Empower Texans?
8         A.  It's a -- I don't know what you would call it.  It's
9    an organization.  It's a political entity.
10        Q.  Okay.  Who is Michael Quinn Sullivan?
11        A.  Someone associated with Empower Texans.
12        Q.  Does he -- does he run Empower Texans?
13        A.  He says he does.
14        Q.  Okay.  Have you ever spoken directly with Mr. Sullivan
15   since you became Speaker?
16        A.  Yes, I have.
17        Q.  Did you discuss voter ID?
18        A.  I don't recall.
19        Q.  Okay.  When did you speak with Mr. Sullivan?
20        A.  Oh, must have been well -- well before the 82nd
21   session, before that.
22        Q.  So sometime before 2011?
23        A.  '11, yeah.
24        Q.  Okay.  Do you recall what issues you did discuss?
25        A.  I don't.

## 67

1         Q.  Is your conversation at all recorded anywhere?
2         A.  Not that I'm aware of.
3         Q.  Okay.  What is the Immigration Reform Coalition of
4    Texas or --
5         A.  I don't --
6         Q.  -- IRCOT?
7         A.  I don't know.
8         Q.  Who is Rebecca Forest?
9         A.  I don't know.
10        Q.  Okay.  Do you recall ever speaking -- just for the
11   record, since you don't know who she is, do you recall ever
12   speaking with Ms. Forest since you became speaker?
13        A.  No.
14        Q.  Okay.  What is the San Antonio Tea Party?
15        A.  A political organization, I suppose.
16        Q.  Do you know who George Rodriguez is?
17        A.  Yes.
18        Q.  Is he president of the San Antonio Tea Party?
19        A.  He was.
20        Q.  Do you know who's the current president of the San
21   Antonio Tea Party?
22        A.  I do not.
23        Q.  Prior to the passage of S.B. 14, did you speak with
24   Mr. Rodriguez or any other member or leader of the San Antonio
25   Tea Party concerning voter ID?

## 68

1                MR. SWEETEN:  You can answer the question as
2    phrased.
3                THE WITNESS:  What's that?
4                MR. SWEETEN:  You can answer the question as
5    phrased.
6                THE WITNESS:  Okay.
7         A.  I don't remember.  I met with him, but I don't
8    remember that specifically coming up.
9         Q.  Okay.  So you don't recall anything that you
10   specifically said to him or he specifically said to you about
11   the issue?
12        A.  I don't.
13        Q.  What is the Tenth Amendment Center?
14        A.  I don't know.
15        Q.  Okay.  Do you know who Steve Baysinger is?
16        A.  Oh, yes.  Yes.
17        Q.  Who is Steve Baysinger?
18        A.  Steve Baysinger lives in -- I think he lives in
19   San Antonio or close by and is part of that San Antonio Tea
20   Party group.
21        Q.  The Tenth Amendment Center is a -- is a Tea Party
22   group, or he's part of the --
23        A.  Well, I don't -- I don't know.  He attended a meeting
24   where it was mostly San Antonio Tea Party people.
25        Q.  Okay.  Was that in August 2011?

## 69

1   A.  I don't recall.

2   Q.  Okay.  Let's see if we can refresh your recollection.

3   August of '11.  Okay.

4        MR. FREEMAN:  If we could have this marked as

5   U.S. 465.

6        (Exhibit No. 465 marked)

7   Q.  Do you recognize this document?

8   A.  I don't.

9   Q.  Have you seen this document before?

10  A.  I don't remember.

11  Q.  Okay.  What is this document?

12       MR. SWEETEN:  Caution the witness to take the

13  time you need to review the document.

14  A.  I'm not sure what it is.

15  Q.  Is it possible that is a briefing paper --

16  A.  Oh, yes.

17  Q.  -- prepared by your staff?

18  A.  Yeah, uh-huh.

19  Q.  Okay.

20  Briefing paper for 8/15.

21  Q.  And does this briefing paper refresh your recollection

22  as to whether you met with San Antonio Tea Party leaders on

23  August 15th, 2011?

24  A.  Yes.

25  Q.  And are you aware of whether that meeting was recorded

## 70

1   in any fashion?

2   A.  I'm not aware.

3   Q.  Was the meeting closed to the media?

4   A.  I believe so.

5   Q.  Is that your typical practice, in terms of when you

6   meet with constituents, that -- is it -- are -- are such

7   meetings typically closed to the media?

8   A.  Yes.

9   Q.  Okay.  If you could take -- take a moment to just kind

10  of read through for a bit.

11  A.  Uh-huh.

12  Q.  Are you aware of whether the San Antonio Tea Party was

13  particularly interested in the Sanctuary Cities issue?

14  A.  I don't recall what their main issues are.

15  Q.  Okay.  Do you recall whether you -- and if you could

16  look on the page marked TX_00012594 --

17  A.  Where would I find that?

18  Q.  -- the fourth page of the -- or fifth page of the

19  document.

20       MR. SWEETEN:  It's up there.

21  A.  Fifth page?

22  Q.  Fifth page of the document.

23       MR. SWEETEN:  And you're saying 594 are the last

24  three digits?

25       MR. FREEMAN:  Yep.

## 71

1   A.  Okay.

2   Q.  Do you see where this says, "Not only voter ID - which

3   I was pleased to see passed this session, but also important

4   Election Integrity Reform to stop vote harvesting"?

5   A.  I see that.

6   Q.  Do you recall if you spoke with that group concerning

7   voter ID and election integrity reform?

8   A.  I don't recall.  It's certainly possible.

9   Q.  Okay.  If you could turn back to the second page,

10  which is marked TX_00012591, just to clear up something from

11  earlier.  Do you see under Background, if you could read through

12  that real quickly, part 2?

13  A.  I see that, yes.

14  Q.  Was your staff under the impression that the meeting

15  was likely to be focused primarily on immigration and state

16  sovereignty issues?

17       MR. SWEETEN:  Objection, calls for speculation.

18  Q.  You may answer.

19  A.  It says, "the meeting is likely to be to focused

20  primarily on immigration and state sovereignty issues."

21  Q.  In your experience, were audiences that were concerned

22  with sanctuary cities or immigration issues typically also

23  interested in voter ID?

24       MR. SWEETEN:  Objection, compound.  Objection.

25  Calls for speculation.

## 72

1        Also, in answering the question, I don't want you to

2   reveal your thoughts or mental impressions about legislation.

3   Okay?  So if you can answer the question without doing so, you

4   can go ahead and provide him an answer.

5   A.  The question is?

6   Q.  The question was, in your experience and in your

7   communications with constituents, were constituents who were

8   interested in immigration and state sovereignty typically also

9   interested in voter ID?

10       MR. SWEETEN:  Same objection -- objections

11  expressed and same instruction.

12  Q.  If you need to me to repeat it, I can.

13  A.  I don't -- I don't have expectations about what people

14  are interested in when I meet with them.

15  Q.  Have they often expressed interest in those issues

16  together, the same constituents?

17  A.  I don't -- I don't --

18       MR. SWEETEN:  Objection, foundation, calls for

19  speculation.  Objection, compound.

20       You can testify as to matters of the public

21  record.

22  A.  I don't know.

23       MR. FREEMAN:  Mr. Sweeten, the representative --

24  the Speaker can testify as to his communications with

25  constituents that are not matters of the public record.  And so

## 73

1   I will ask you to withdraw and not reassert that same objection.

2        MR. SWEETEN:  Okay.  Understand where I'm coming

3   from then, because you don't -- you don't seem to understand

4   what I'm saying.  Okay?  What he's not going to do -- and he

5   will, if -- if asked, he will disclose, as the Court order has

6   provided, constituent communications.  Okay?  When you're asking

7   him now to compare one audience's hearsay as to another

8   audience's hearsay, then potentially you -- you are asking him

9   for his qualitative judgment, which could impact the legislative

10  privilege.  I think this is all of no moment because he's

11  indicated that he doesn't know.  But I'm telling you -- I mean,

12  I'm not -- the objection is not just based on the fact that

13  there's a constituent communication.  It's the fact you're

14  asking him to provide an analysis and thought process regarding

15  that, which could impact the legislative privilege.

16       MR. FREEMAN:  I think that's a mighty thin could

17  for a mighty long objection.

18       MR. SWEETEN:  Okay.  Well, let --

19       MR. FREEMAN:  So --

20       MR. SWEETEN:  -- let me just tell you I object to

21  the sidebar.  I'm not really particularly concerned with what

22  you think of my objections.  Okay?  I'm going to make them as I

23  think are appropriate, and I'll continue to do so.

24       Q.  What are the King Street Patriots?

25       A.  I don't know who they are.

## 74

1        Q.  Okay.  What is True the Vote?

2        A.  I don't know what that is either.  I've heard the

3   terms.  I don't know who they are.

4        Q.  Okay.  Who is Catherine Engelbrecht?

5        A.  I don't know.

6        Q.  So you've never met with Ms. Engelbrecht, to the

7   extent of your recollection?

8        A.  I don't remember.

9        Q.  Okay.  Do you know who Paul Bettencourt is?

10       A.  I know who he is.

11       Q.  Did you ever speak with Mr. Bettencourt since you

12  became Speaker?

13       A.  I don't recall.

14       Q.  Okay.  Do you know who George Hammerlein is?

15       A.  No.

16       Q.  Okay.  Do you know who Skipper Wallace is?

17       A.  Yes.

18       Q.  Did you ever speak with Mr. Wallace since you became

19  speaker?

20       A.  Yes.

21       Q.  Did you speak with him about voter ID?

22       A.  Perhaps.

23       Q.  Okay.  Do you recall when?

24       A.  No.

25       Q.  Do you recall what he might have said to you or did

## 75

1   say to you?

2        A.  Not specifically.

3        Q.  Okay.  Did you ever speak with any experts concerning

4   voter ID, any Ph.D. holding professors or anything of the type?

5        MR. SWEETEN:  Okay.  I'm going to -- I'm going to

6   instruct you at this point that when he's asking you this

7   question, it could implicate matters of the legislative

8   privilege, including any analysis, thought processes that you

9   had in reviewing legislation.  So to the extent the question

10  asks for that information, don't provide that.  To the extent it

11  does not, you can -- you can answer the question as phrased.

12       A.  No.

13       Q.  Okay.

14       A.  That I recall.

15       Q.  That's fine.

16       Did you ever speak with any minority groups concerning

17  voter ID?

18       MR. SWEETEN:  You can answer the question.

19       A.  I don't -- I don't recall speaking -- I don't recall.

20       Q.  Okay.  Let me just be specific and see if I can jog

21  your recollection at all.

22       Did you ever meet with LULAC concerning voter ID?

23       A.  I don't believe so.

24       Q.  Okay.  Did you ever meet with the American G.I. Forum?

25       A.  I don't believe so.

## 76

1        Q.  Did you ever meet with MALDEF?

2        A.  I don't think so.

3        Q.  Did you ever meet with the NAACP?

4        A.  On this issue?

5        Q.  Yes.

6        A.  I don't believe so.

7        Q.  Okay.  I'm not trying to trip you up here.

8        A.  Yeah.  No.  I --

9        Q.  I don't have a document that I'm waiting to throw at

10  you.

11       A.  I may have met with -- I may have met with any or all

12  of them, but I don't recall on this issue.

13       Q.  Okay.  That's fine.

14       Did you ever meet with any other constituents

15  concerning voter ID, to the best of your recollection?

16       A.  Not that I can recall.

17       Q.  Okay.  Did you ever exchange correspondence with any

18  constituents concerning voter ID?

19       A.  Perhaps.  I don't remember, but --

20       Q.  Okay.

21       A.  -- I get -- I get letters from constituents routinely,

22  and I'm certain they would have had -- would have received some

23  sort of response, but I don't recall.

24       Q.  Okay.  Do you approve letters, responses to

25  constituents before they go out as a general practice?

---

## 77

1    A.  Not each one.

2    Q.  Do you sort of approve a form response to some extent?

3    A.  Yes.

4    Q.  Okay.  And do you know if your office maintains a

5  general correspondence file?

6    A.  Yes.

7    Q.  Okay.  If you could turn back to the privilege log

8  that I gave you before.

9    A.  This?

10   Q.  Yeah.  And if you could --

11   A.  This one?

12   Q.  Yes.  And that is, for the record, Exhibit 464.  Thank

13  you, sir.

14       If you could turn to Page 126.

15   A.  Okay.

16   Q.  Do you see where it says, "Draft letter from Speaker

17  Straus to constituents regarding Voter ID legislation"?

18       The last entry.

19   A.  Yes, I see it.

20   Q.  Are you aware of whether a final letter ever went out

21  around that date?

22   A.  I'm not aware.  I assume it did.

23   Q.  Do you know if that letter was produced to the Office

24  of the Attorney General as part of your document production?

25   A.  Don't know.

---

## 78

1    Q.  Okay.  Prior to the passage of S.B. 14, did you

2  address voter ID in any public speeches of which you're aware?

3    A.  Say the dates again.

4    Q.  So prior to the passage of S.B. 14.  So in, I guess,

5  April 2011, did you address voter ID in any speeches, to the

6  best of your recollection?

7    A.  Perhaps in a long list of items I might have been

8  speaking about.

9    Q.  So do you recall any particular instances?

10   A.  Where I would have spoken on that issue?

11   Q.  Uh-huh.

12   A.  No.  But I could have included it in some public

13  comments.

14   Q.  Okay.  Do you recall what you said?

15   A.  Not specifically.

16   Q.  Okay.  After passage of the bill --

17   A.  Uh-huh.

18   Q.  -- did you address S.B. 14 in any public speeches?

19   A.  Probably.

20   Q.  Do you recall when or where?

21   A.  No.

22   Q.  Okay.  Do you recall what you said?

23   A.  Not in -- not in specific language, no.

24   Q.  Okay.  Do you recall giving a speech in Dallas in

25  September of last year?

---

## 79

1    A.  No.

2    Q.  Okay.  Here.  If I can put a document in front of

3  you --

4    A.  Okay.

5    Q.  -- and we can refresh your recollection.

6       MR. FREEMAN:  If we could mark this as U.S. 466.

7       (Exhibit No. 466 marked)

8    Q.  If you could just take a minute to review the

9  document.

10   A.  Okay.

11   Q.  Okay.  Did this refresh your recollection?  Do you

12  recall having given a speech in Dallas in September of 2011?

13   A.  I don't.  But I see here that somebody requested some

14  background information for such an occasion.

15   Q.  Have you seen this document before?

16   A.  I don't remember seeing it.

17   Q.  Okay.  Do you have any recollection as to what -- or

18  what audience you were speaking to in Dallas in September?

19   A.  No, I don't.

20   Q.  Okay.  Do you generally rely on talking points when

21  you're providing speeches?

22   A.  Oh, I always have -- I always like to have them

23  available.

24   Q.  Okay.  Do you know if you used these talking points in

25  Dallas?

---

## 80

1    A.  I don't recall.

2    Q.  Do you recall having given speeches after the passage

3  of S.B. 14 in Tyler?

4    A.  A speech in Tyler?

5    Q.  Uh-huh.

6    A.  No.  I may have -- may have made some remarks to a

7  support -- group of supporters or business leaders or something,

8  but I don't recall a speech --

9    Q.  Okay.  I mean --

10   A.  -- in public.

11   Q.  I guess I'll -- let's use the term "speech" to broadly

12  include just speaking to a group.

13   A.  Comments.  Yeah.

14   Q.  It doesn't need to be on a --

15   A.  Yes.

16   Q.  -- on a dais, but --

17   A.  I have been -- I have been to Tyler and probably made

18  some public comments.

19   Q.  Okay.  Corpus Christi?

20   A.  Yes.

21   Q.  El Paso?

22   A.  Yes.

23   Q.  Fort Worth?

24   A.  Yes.

25   Q.  Anywhere else that you recall speaking about voter ID

## 81

1  since --
2       A.  No.  I don't remember --
3       Q.  -- the passage of the bill?
4       A.  I don't remember speaking about voter ID at any of
5  those places, but it's certainly possible.
6       Q.  Do you recall receiving any different talking
7  points from the ones that are marked as Exhibit U.S. 466?
8       A.  I don't remember -- I don't remember receiving these.
9       Q.  Okay.
10      A.  But staff typically produces something that I could
11 use.
12      Q.  Okay.  Okay.  I'll return to this later.
13 What were the purposes of S.B. 14?
14      MR. SWEETEN:  You can provide the general purpose
15 of the bill.
16      A.  To ensure integrity of our elections.
17      Q.  Anything else?
18      A.  I'd have to read the bill, but that's generally the
19 purpose.
20      Q.  Okay.  And what was your basis for believing that
21 was the purpose of S.B. 14?
22      MR. SWEETEN:  I'm going to object.  I think
23 you're calling for matters of legislative privilege.  You're
24 asking for his analysis on why he thinks something was the
25 purpose.  He can provide testimony, as the Court has said, to

## 82

1  the general purpose.  He has.  I think that question, you're --
2  you're now seeking to find out his mental processes and
3  impressions about why he believes it accomplished that purpose.
4  So I'm going to object as to legislative privilege and instruct
5  you not to answer the question on that basis.
6       Q.  Okay.  Was the purpose of S.B. 14, in part, to
7  decrease the number of Hispanic voters who could effectively
8  cast a ballot?
9       MR. SWEETEN:  You can answer as to the general
10 purpose of the bill.  To the extent that that's a question about
11 the general purpose, you can answer as phrased.
12      A.  No.
13      Q.  Where in the record could I find evidence related to
14 that purpose?
15      MR. SWEETEN:  I'm going to object.  You're asking
16 for him to find in the public record something that supports his
17 thoughts about why this was the general purpose of the bill.
18 And in so doing, you're asking him to reveal his thoughts and
19 mental impressions, and as such, it is legislatively privileged.
20 Instruct not to answer.
21      Q.  Was the purpose of S.B. 14, in part, to decrease the
22 number of African-American voters who could effectively cast a
23 ballot?
24      MR. SWEETEN:  You can answer the question to the
25 extent it's asking about general purpose.

## 83

1       A.  No.
2       Q.  Okay.  Was the purpose, in part, to discriminate in
3  any way against any group or groups of minority voters?
4       MR. SWEETEN:  Same instruction.
5       A.  No.
6       Q.  Okay.  What is Texas' current system for determining
7  how to verify the identity of a voter?
8       MR. SWEETEN:  You're asking, as we're sitting
9  here, what current law is in place?
10      MR. FREEMAN:  Yes.
11      MR. SWEETEN:  He can answer that question.
12 If you know.
13      A.  I can't recite -- well, tell me -- ask me again.
14      Q.  What is Texas' current system for determining how to
15 verify the identity of a voter?
16      A.  Voter registration card.
17      Q.  Okay.  So you have to show a voter registration
18 card --
19      A.  Or --
20      Q.  -- when you show up at the polls?
21      A.  -- or an ID, I believe.
22      Q.  Okay.  Do you know if that ID has to be a photo ID?
23      A.  Well, I believe I was asked for one.
24      Q.  Do you know if that --
25      A.  When I voted.

## 84

1       Q.  Do you know if that's the legal requirement?
2       A.  I don't -- I don't think so.
3       Q.  Okay.  This has previously been marked as U.S.
4  Exhibit 16 in a prior deposition.
5       A.  Okay.
6       Q.  On the day that Governor Perry signed S.B. 14, did you
7  state, "This session we have taken major steps to ensure
8  elections are fair, legal and without fraud, and Texans can know
9  that we are working to make sure their vote is secure and
10 counts"?
11      A.  I see that.  I'm quoted here, yes.
12      Q.  Do you recall having stated that?
13      A.  Yes.  Sounds like --
14      Q.  Okay.
15      A.  -- sounds like something I would have said.
16      Q.  Okay.  And did you thank Representative Patricia
17 Harless for her diligent work in passing voter ID?
18      A.  Yes, I did.
19      Q.  Were you referring only to S.B. 14?
20      MR. SWEETEN:  Objection.  You're asking him to
21 interpret what the -- what this statement means, which is
22 prohibited by the order.  In fact, let me go ahead and read that
23 so we're all on the same page here:  "Although the document must
24 be produced, that does not give defendants license to inquire
25 about otherwise privileged material.  Questions about a

## 85

1  post-enactment statement or document that call for a response
2  about legislative acts legislator took prior to the enactment of
3  Senate Bill 14 and prior voter ID bills and questions regarding
4  the motivations of the legislature with respect to those bills
5  are privileged."
6        So to the extent it would reveal your thoughts and
7  mental impressions, don't answer the question as to even a
8  public statement.
9    Q.  So let me try and rephrase my question and hope
10  against hope that we can avoid the objection.
11        When you were saying that the legislature had
12  "taken major steps to ensure that elections are fair, legal and
13  without fraud," in making that public statement, the major steps
14  that you were referring to in that public statement, were you
15  referring only to S.B. 14?
16        MR. SWEETEN:  Objection.  You're asking him for
17  the meaning of this statement, which is beyond -- could intrude
18  upon the legislative privilege and his thoughts about the
19  statement.  So I think that is what I just read to you from the
20  Court, and that specifically addresses that instance.
21        And I'm going to instruct you not to -- not to answer
22  the question if it would require you to reveal your thoughts,
23  mental impressions about legislation.
24        MR. FREEMAN:  Okay.  Well, I think that we have a
25  difference of opinion as to whether explaining the meaning of a

## 86

1  public statement asks him to -- about his thoughts or mental
2  impressions about ID or about any other bill.  It simply asks
3  him what he meant about that statement.  But I have a feeling
4  that you don't intend to change your mind on that, so we'll keep
5  moving.
6        MR. SWEETEN:  Do you --
7        MR. FREEMAN:  Am I correct?
8        MR. SWEETEN:  Do you understand my instruction
9  about legislative privilege, to not reveal legislative -- to not
10  reveal your thoughts and impressions about a specific piece of
11  legislation in answering these questions.
12        THE WITNESS:  Okay.
13        MR. SWEETEN:  Okay.
14        MR. FREEMAN:  And you're instructing him not to
15  answer the question as phrased?
16        MR. SWEETEN:  No.  What I -- what I said is he
17  can answer to the extent it does not do so.
18    Q.  Okay.  So in saying, "We have taken major steps to
19  ensure elections are fair, legal and without fraud,"
20  Mr. Speaker, were you referring only to S.B. 14 in that public
21  statement?
22    A.  Well, I made the statement at the bill signing
23  ceremony.
24    Q.  Okay.  So in that statement, you were saying yes?  You
25  mean, yes, just S.B. 14?

## 87

1        MR. SWEETEN:  Same instruction.
2    A.  I think it's related to -- to that occasion.
3    Q.  Okay.  What would a voter need to do under current
4  law, that we just discussed a moment ago, to commit in-person
5  voter fraud?
6    A.  I'm not -- I'm not sure how to answer the question.
7    Q.  Would they need to obtain someone else's voter
8  registration card?
9    A.  I don't know all the ways someone would commit voter
10  fraud today.
11    Q.  Okay.  Do you know what the punishment is for stealing
12  someone else's voter ID card?
13        MR. SWEETEN:  Under the current law?
14        MR. FREEMAN:  Under current law.
15    A.  I don't.
16    Q.  Okay.  Are you aware of any specific incidents of
17  in-person voter fraud in your district, Texas House District
18  121, in the last 20 years?
19    A.  No.
20    Q.  Are you aware of any specific incidents of in-person
21  voter fraud in Bexar County in the last 20 years?
22    A.  I wouldn't know.
23    Q.  Okay.  Are you aware of any specific incidents of
24  in-person voter fraud in the State of Texas in the last 20
25  years?

## 88

1    A.  I believe there have been cases.
2    Q.  Can you tell me --
3    A.  That I'm personally aware of?
4    Q.  I want details of --
5        MR. SWEETEN:  Yeah.  Let me caution you here.  Because
6  there is -- the legislative privilege covers constituent -- I
7  mean, covers communications you've had with other legislators,
8  legislative staff, with state agencies, with the Texas
9  Legislative Council.  So if you've heard any of the information
10  through those communications, don't reveal that information.
11  You can answer the question with the instruction.
12    A.  I've seen public -- I've seen public statements made
13  by others indicating there has been voter fraud.
14    Q.  Have you seen any information setting out the number
15  of investigated incidents?
16        MR. SWEETEN:  Same instruction.  You can refer to
17  matters of the public record --
18    A.  I've seen -- yeah.  I've seen --
19        MR. SWEETEN:  -- or matters that are not
20  privileged.
21    A.  I've seen and heard public statements from various
22  individuals who say they've prosecuted these cases.
23    Q.  Are you aware of how many convictions there have been?
24    A.  I'm not.
25    Q.  Okay.  Are you aware of whether Attorney General

## 89

1   Abbott has dedicated substantial resources over the last decade
2   to investigating allegations of voter fraud?
3          MR. SWEETEN:  Don't reveal privileged matters in
4   answering the question.  You can refer to matters of the public
5   record or nonprivileged matters.
6          A.  I've heard him make public statements about it, but to
7   the extent he's used resources, I don't know.
8          Q.  Okay.  Do you know how many incidents of mail-in
9   ballot fraud have occurred in House District 121 in the last 20
10  years?
11         MR. SWEETEN:  Same instruction.  You can answer
12  to the extent it's not revealing legislative privileged matters.
13  Go ahead.
14         A.  No, I don't.
15         Q.  Do you know how many incidents in Bexar County?
16         A.  No.
17         Q.  How about in the State of Texas?
18         MR. SWEETEN:  Same instruction.
19         A.  Not aware.
20         Q.  Okay.  Do you know whether there have been more
21  incidents of mail-in ballot fraud than in-person voter fraud?
22         A.  I don't know.
23         Q.  Okay.  Do you know if mail-in ballot fraud has been
24  prosecuted more than in-person voter fraud?
25         MR. SWEETEN:  Pause one second.  Let me -- let me

## 90

1   make my objection.  If it's -- if it's required in answering
2   this question, don't reveal matters of legislative privilege,
3   including the communications that we've discussed or your
4   thoughts and mental processes about legislation.  You can answer
5   to the extent you're not doing that, or you can refer to matters
6   of the public record.
7          A.  I don't -- I don't know.
8          Q.  Okay.  Are you familiar with the term "vote
9   harvesting"?
10         A.  Heard it, yes.
11         Q.  What is vote harvesting, to the extent of your
12  knowledge?
13         A.  It's when someone attempts to collect votes to be
14  delivered.
15         Q.  And is it a form of mail-in ballot fraud?
16         A.  Sounds like it.
17         Q.  Are you aware of any incidents of vote harvesting in
18  District 121?
19         A.  I'm not aware.
20         Q.  Bexar County?
21         A.  I don't know.
22         Q.  Okay.  Texas as a whole?
23         A.  I'm not a prosecutor, so I -- you know, I don't keep
24  up specifically with cases.
25         Q.  Okay.

## 91

1          MR. FREEMAN:  I'd like to have this document
2   marked as U.S. 467.  Sorry about the pile of paper.
3          (Exhibit No. 467 marked)
4          A.  Okay.
5          Q.  If you could take a minute to review the document.
6          A.  (Reviewing document.)
7          Q.  And really, we're just going to be talking about the
8   first few pages, so...
9          A.  Okay.
10         Q.  What is this document?
11         A.  It is a draft of the accomplishments of the 82nd
12  session.
13         Q.  Is this -- have you seen this document before?
14         A.  Oh, I recall seeing it at one time.
15         Q.  Okay.  Is this, again, talking points for use -- for
16  your use?
17         A.  I think it was -- I think this is the kind of thing
18  that's made available to members.
19         Q.  Okay.  And is it made by --
20         A.  Post-session.
21         Q.  Okay.  And for what purpose is it made available to
22  members?
23         A.  For their own use as they see fit.
24         Q.  But it's produced by your office, correct?
25         A.  Appears to be, yeah.

## 92

1          Q.  Did you ever use these statements as talking points?
2          A.  Not all of them.
3          Q.  On the third page, which is marked, TX_00012638 --
4          A.  Uh-huh.
5          Q.  -- do you see where it say that, "S.B. 14 will help
6   deter in-person voter fraud by requiring a voter to present a
7   photo ID in order to vote"?
8          A.  Yes, I see that.
9          Q.  So am I correct that the purpose of S.B. 14 was not to
10  address mail-in ballot fraud?
11         MR. SWEETEN:  Okay.  Don't answer the question.  He's
12  already asked you about the general purpose.  You've provided
13  that.  In the context of this statement, what he's asking you
14  for is legislatively privileged material.  I'm going to instruct
15  you not to answer the question on that basis.
16         Q.  Let me see if I can rephrase.
17         Based on the document in front of you, is it your
18  understanding that S.B. 14 does not address mail-in ballot
19  fraud?
20         MR. SWEETEN:  Same objection.  Instruct not to
21  answer based on legislative privilege.
22         Q.  Then I'll just ask specifically about the document
23  itself.
24         Do these talking points developed by your staff state
25  that S.B. 14 deters in-person voter fraud?

## 93

1       MR. SWEETEN:  You can answer.
2       A.  Yes.
3       Q.  Okay.  When you vote in Texas, are you required to
4  sign a poll book?
5       MR. SWEETEN:  You can answer as to -- as a
6  general matter under current law, if you know.
7       Q.  When you -- when you show up to vote --
8       A.  Yes.
9       Q.  -- do you recall ever signing a book?
10      A.  Oh, yes.
11      Q.  Okay.
12      A.  Yes.
13      Q.  And --
14      A.  What did -- what did you call it?
15      Q.  A poll book.
16      A.  Okay.
17      Q.  Like a polling place.
18      A.  Yeah, yeah, yeah.  Right.
19      Q.  And if you're voting for the first time after
20  registering by mail, do you know if you're required to show any
21  additional forms of identification in addition to a Texas voter
22  registration card?
23      A.  I don't know.
24      Q.  Okay.  Are you familiar with the Help America Vote
25  Act?

## 94

1       A.  Generally.
2       Q.  Okay.  Do you know if it requires at a national level
3  a form of ID to be provided the first time someone votes after
4  filing a mail-in registration.
5       A.  I don't know.
6       Q.  Okay.  Do you see where this document says, "Although
7  it exists, in-person impersonation is difficult to prove under
8  our current laws since voters are not required to present a
9  photo ID"?
10      A.  I don't see it.
11      Q.  It is the second bullet point on Page 12638.
12      A.  Oh.  Yes, I see that.
13      Q.  Does this statement explain any basis for the
14  assertion at the beginning of the sentence, "Although it
15  exists"?  I'm just asking about the statement.
16      MR. SWEETEN:  You can answer based on the face of
17  the statement itself.  Don't reveal any mental impressions in
18  answering the question.
19      A.  What was your question?
20      Q.  Sorry.  Let me rephrase.  It was inartful at best.
21      The beginning of that sentence where it states,
22  "Although it exists," is that asserting in-person voter
23  impersonation exists?
24      A.  That's what it -- that's what it appears to say, yes.
25      Q.  Does it provide any further support for the statement

## 95

1  that in-person voter impersonation exists?
2       MR. SWEETEN:  Again, you can answer on the face
3  of the statement itself.
4       A.  I can just -- yeah.  I can just -- I just see what it
5  says, "Although it exists, in-person voter impersonation is
6  difficult to prove under our current laws."
7       Q.  And so my question is does the statement provide any
8  documentation, any evidence, any naming of particular incidents
9  to support its assertion that in-person voter impersonation
10  exists?
11      MR. SWEETEN:  Again, you can answer what's on the
12  statement itself.
13      A.  I don't see that it -- I don't see it.
14      Q.  Okay.  If you wanted to check for in-person voter
15  impersonation, would it be possible to check signatures in the
16  poll book against signatures on record with the state?
17      MR. SWEETEN:  You're -- you're taking -- you're
18  moving away from the document.  You're asking him as to current
19  law --
20      MR. FREEMAN:  Uh-huh.
21      MR. SWEETEN:  -- is that possible to do
22  something?
23      MR. FREEMAN:  Yes.
24      MR. SWEETEN:  You can answer.
25      A.  Is it possible?  I suppose it's -- I suppose it's

## 96

1  possible.
2       Q.  Are you aware of whether Attorney General Abbott
3  included such searches in his investigation for in-person voter
4  fraud?
5       A.  I'm not aware.
6       Q.  Are you aware of whether Attorney General Abbott
7  uncovered any in-person voter fraud based on such searches?
8       MR. SWEETEN:  Don't reveal communications you had
9  with our office.  Don't reveal matters of legislative privilege.
10  You can answer based upon the public record.
11      A.  I don't know.
12      Q.  Okay.  Do you see where it says in this statement,
13  "Anyone can take another person's voter certificate and
14  fraudulently vote"?
15      Same bullet.
16      A.  I see that, yes.
17      Q.  Are you aware of any recorded incidents of theft of a
18  voter certificate?
19      MR. SWEETEN:  Again, don't reveal legislatively
20  privileged matters.
21      A.  Personally, I'm not aware.
22      Q.  Okay.  Okay.  Does your driver's license indicate that
23  you are Joe Straus, III?
24      A.  Yes.
25      Q.  It separately says III?

## 97

1    A.  I don't know.

2    Q.  Want to check?

3    A.  Sure.  Well, I signed it that way.  Yes, it does say

4  that.

5    Q.  Okay.  Do you know if your voter registration card

6  says Joe Straus, III?

7    A.  I don't know.

8    Q.  Okay.  If it -- sorry.  Strike that.

9    Is there a Joe Straus, IV?

10   A.  No, not to my knowledge.

11   Q.  Was your father Joe Straus, Jr.?

12   A.  Yes.

13   Q.  Are you aware of whether his driver's license

14  indicated that he was Joe Straus, Jr. as opposed to Joe Straus?

15   A.  I'm pretty certain it does say that, yes.

16   Q.  Okay.  Are you aware of whether his voter registration

17  certificate said Joe Straus, Jr.?

18   A.  I don't know.

19   Q.  If -- would it be possible of the voter -- or excuse

20  me -- if the voter registration certificate merely says Joe

21  Straus that you could use your driver's license to vote as your

22  father, if you'd wanted to?

23       MR. SWEETEN:  Under current law, you can answer

24  the question.

25   A.  I -- I don't know.

## 98

1    Q.  Okay.  Okay.  When you spoke in public concerning

2  voter ID, did you ever state that voter ID was a component of

3  immigration reform?

4    A.  Did I?

5    Q.  Yes.

6    A.  I don't recall saying that.

7    Q.  Okay.  Why not?

8       MR. SWEETEN:  Objection.  Don't -- don't answer

9  the question.  He's asking about your thoughts, mental

10  impressions about legislation.  Instruct not to answer.

11   Q.  In any talking points developed after the bill was

12  passed, did you or your staff ever connect voter ID to

13  immigration reform?

14   A.  You're saying in a public statement?

15   Q.  To the extent of your knowledge.  I'm talking about

16  talking points developed after the bill's passage.

17   A.  Developed by staff?

18   Q.  You or your staff, yes.

19   A.  I don't recall.

20   Q.  Okay.  This has been previously marked as Exhibit 7,

21  U.S. Exhibit 7, in a prior deposition.  What is this document?

22   A.  It looks like something taken off of a web site for

23  Representative Harless.

24   Q.  Okay.  And under immigration reform, does she list

25  "Require Texas photo ID to vote"?

## 99

1    A.  I see that, yes.

2    Q.  Are you aware of any other legislators or staff,

3  including the lieutenant governor, making any public statements

4  about illegal aliens voting?

5    A.  Am I aware of --

6    Q.  Any legislators or staff or the lieutenant governor

7  making any public statement about illegal aliens voting?

8    A.  I don't recall.

9    Q.  Okay.  Are you aware of any other public statements

10  made by advocates of photographic identification laws for voting

11  that such laws would deter illegal aliens from voting?

12   A.  I don't --

13       MR. SWEETEN:  Objection, foundation.  Objection,

14  compound.

15       You can answer the question.

16   A.  Yeah.  I don't -- I don't recall seeing that, but --

17   Q.  Okay.

18   A.  -- possible.

19   Q.  All right.  Have you heard of -- are you aware of any

20  public statements made by advocates of photographic voter

21  identification laws that such laws will deter all noncitizens

22  from voting, documented and nondocumented?

23   A.  Say it again.

24   Q.  Are you aware of any other public statements made by

25  advocates of voter ID saying that such laws will deter

## 100

1  noncitizens from voting?

2    A.  No.

3    Q.  Okay.  Do you know if it's necessary to swear under

4  oath that you're a U.S. citizen in order -- in order to register

5  to vote?

6       MR. SWEETEN:  You can answer under current law.

7    A.  I don't know what the current law is on that.

8    Q.  If you don't know, you don't know.

9    A.  I don't know.

10   Q.  It's okay.

11   A.  I registered a long time ago.

12   Q.  Understandable.

13       Are you aware of any documented cases of undocumented

14  immigrants or illegal aliens voting?

15       MR. SWEETEN:  In answering the question, don't

16  reveal matters of legislative privilege, including the

17  communications that we've gone through earlier, which would be

18  leg staff, legislators, state agencies, Texas Leg Council.

19  Also, don't reveal your thought processes with respect to

20  specific legislation.  You can answer to the extent you're not

21  so revealing that information.

22   A.  I'm not aware.

23   Q.  Are you aware of any documented cases of any

24  noncitizens voting?

25       MR. SWEETEN:  Same instruction.

### 101

1    A.   I'm not aware.
2    Q.   Okay.  What ethnic, racial or language minority group
3  makes up the majority of immigrants in Texas?
4    A.   Hispanic.
5    Q.   Has the rise in concern about undocumented immigrants
6  voting grown along with the Hispanic population in Texas
7  growing?
8         MR. SWEETEN:  Objection, calls for speculation.
9  Objection to the extent it would ask to reveal your thoughts,
10  mental impressions about any specific legislation or
11  communications.  But to the extent it does not do so, you can
12  answer the question.
13    Q.   And just to clarify, my question addresses only public
14  sentiment of which you're aware concerning the possibility of
15  undocumented immigrants voting and whether that has increased as
16  the Hispanic population has increased.
17    A.   I don't -- I don't know.
18    Q.   Okay.
19         MR. FREEMAN:  If we could have this marked as
20  U.S. 468.
21         (Exhibit No. 468 marked)
22    Q.   I will represent to you that it was produced by the
23  State of Texas without that black block.  Underneath that black
24  block is what we refer to as personally identifiable
25  information.  And so in order to protect the privacy of this

### 102

1  individual, before it was entered into the record, in the
2  deposition, we've blocked out that information.
3    A.   Okay.
4    Q.   Just an IP address and such.
5         MR. FREEMAN:  And we'll produce that to the State
6  when we do our final batch, if you -- if you'd like it.
7         MR. SWEETEN:  I don't think that's necessary.
8  I -- I accept counsel's representations.
9         MR. FREEMAN:  Okay.  I mean, your -- your Bates
10  stamp is still on there if you feel like checking.
11         JUDGE PHILLIPS:  Do you have copies of that?
12    Q.   What is this document?
13    A.   It's an e-mail to Senator Fraser.
14    Q.   And what does this document express in the e-mail?
15    A.   It says, "YES to voter I.D.  NO to including a school,
16  university or college I.D. as proper identification to vote.
17  Too many illegals have acquired these and it would defeat the
18  purpose.  Thank you."
19    Q.   Did you receive any similar messages during the leadup
20  to voter ID or S.B. 14?
21    A.   Not that I recall.
22    Q.   Okay.  Are you aware of any claims by opponents of
23  S.B. 14 that the bill attempted to exploit fears of illegal
24  immigrants voting?
25         MR. SWEETEN:  In answering the question, don't reveal

### 103

1  conversations you've had that would be privileged.  You can
2  refer to matters of the public record.  You can answer.
3    A.   Only through public statements, yes.
4    Q.   Okay.  But you are aware of those claims?
5    A.   I've heard them.
6    Q.   Who made those claims, to the extent of your
7  recollection?
8    A.   Various legislators and other public -- other groups
9  making public statements.
10    Q.   Okay.  Did you ever respond publicly to any of those
11  claims?
12    A.   Not that I'm aware of.
13         MR. FREEMAN:  Okay.  We've been going for about an
14  hour, if you want to take another five minutes.
15         MR. SWEETEN:  Okay.
16         MR. FREEMAN:  I know that you have somewhere you
17  need to --
18         THE WITNESS:  I'm trying to remember.  When am I
19  leaving?
20         MR. SWEETEN:  In an hour.
21         THE WITNESS:  In an hour?  Okay.
22         MR. FREEMAN:  All right.  So why don't we take
23  five minutes, and then -- just real quick --
24         MR. SWEETEN:  Okay.
25         MR. FREEMAN:  -- everyone can stretch their legs.

### 104

1         MR. SWEETEN:  Okay.
2         (Recess from 11:47 a.m. to 12:00 p.m.)
3    Q.   Okay.  So if we could flip back to what had been
4  marked Exhibit U.S. 467, the draft accomplishments of the 82nd
5  Legislature.
6         Do you see where the document states that, "Voter
7  fraud drives honest citizens out of the democratic process and
8  breeds distrust of the election process and the government"?
9    A.   I see that at the top, yes.
10    Q.   Have any of your constituents ever told you that they
11  do not vote because they believe their vote doesn't count
12  because of voter fraud?
13         MR. SWEETEN:  Separate from this statement?
14         MR. FREEMAN:  Separate from the document, yes.
15         MR. SWEETEN:  Okay.  You can answer as to -- this
16  to the fact of whether a constituent has ever asked you that.
17    A.   Specifically that statement?
18    Q.   The sentiment of that statement.  Have any of your
19  constituents ever said, Well, I don't vote because there's so
20  much voter fraud out there?
21    A.   I don't recall -- I don't recall that.
22    Q.   Are you aware of any other basis for this statement in
23  the -- in the talking points here?
24         MR. SWEETEN:  Don't answer the question.  It
25  would require you to reveal matters of legislative privilege.

## 105

1    Instruct not to answer.
2          MR. FREEMAN:  You're instructing him not to
3    answer as a whole as to his personal knowledge of whether
4    there's a basis for this statement in the document?
5          MR. SWEETEN:  Absolutely.  That's absolutely
6    covered by the legislative privilege.  It would -- it would
7    require, just as the Court has said, that questions about a
8    post-enactment statement or documents that call for a response
9    about legislative acts or the -- or acts the legislator took
10   prior to the enactment of Senate Bill 14 and prior voter ID
11   bills and questions regarding the motivations of the legislator
12   with respect to these bills are privileged.
13         MR. FREEMAN:  Mr. Sweeten, what legislative act
14   does my question reflect?
15         MR. SWEETEN:  It -- I am instructing him not to
16   answer on the basis of privilege because you're asking about a
17   statement about voter fraud which would implicate his thought
18   process with respect to the voter ID bill passed, which was
19   Senate Bill 14.
20         MR. FREEMAN:  Mr. Sweeten --
21         MR. SWEETEN:  He's not going to reveal his mental
22   impressions about that.
23         MR. FREEMAN:  Mr. Sweeten, if -- if we have to
24   have a sidebar, I don't know if you want it to be on the record
25   or off the record.

## 106

1          MR. SWEETEN:  Either way.
2          MR. FREEMAN:  Okay.  That's fine.
3          MR. SWEETEN:  I mean, whatever you want to do.
4          MR. FREEMAN:  No.  I just -- you had previously
5    objected to having a sidebar on the record, so --
6          MR. SWEETEN:  No.  I -- to be clear, it was your
7    mocking sidebar that I objected to.  We can have a discussion
8    about privilege and it -- and the extent of it.  It was about
9    the specific sidebar, but go ahead.
10         MR. FREEMAN:  And I will object to your
11   characterization of my sidebar as mocking.
12         But --
13         MR. SWEETEN:  Okay.
14         MR. FREEMAN:  -- nevertheless, Mr. Sweeten, I
15   think that you're reading that order far too broadly and that
16   limitations on discussions of post-enactment statements.  There
17   is not a bar on asking questions about basis unless the question
18   would reflect his thoughts or mental impressions about the bill
19   itself or would reflect -- otherwise reflect legislative acts.
20         To the extent that I'm asking about his knowledge
21   that would serve as the foundation for this statement or his
22   awareness of facts, not related to the legislative process but
23   related to voter fraud as a problem in Texas or communications
24   with constituents or public sentiment, that would serve as a
25   foundation for a talking point, I do not believe that it is

## 107

1    covered by privilege.
2          MR. SWEETEN:  Well, in response to that, my
3    instruction to him is to not reveal matters of privilege, which
4    would -- which is what this specifically is asking when you're
5    asking him to support it.  You know, in other words, you're
6    asking him, It says this, and what is the basis for this
7    statement?  When you're asking him that, that necessarily
8    impacts his legislative process, his mental thoughts, his
9    analysis, his motivation about the specific legislation.  And so
10   I disagree with you on that.
11         MR. FREEMAN:  I am asking -- this statement in
12   the talking points is a statement about public sentiment in
13   Texas.  It's not a statement about S.B. 14 that would -- I mean,
14   there are other statements in here about S.B. 14, but it's a
15   statement about voter fraud in Texas and the effect of the
16   perception of voter fraud on public confidence.  And so my
17   question asks his knowledge concerning those pre-enactment
18   circumstances and the basis for this talking point.
19         MR. SWEETEN:  I fail to see how that does not
20   request information and his considerations about legislation.
21   When we're talking about Senate Bill 14, when we're talking
22   about voter fraud, you're asking him information that would
23   relate to what his thought processes were with respect to this
24   bill, which is a matter of privilege.  I will allow him to
25   testify as to public statements that he's heard that -- you

## 108

1    know, with respect to a specific issue.  I will allow him to
2    refer to the record.  But when you're asking about -- about his
3    thought processes, which that question necessarily does, you're
4    asking for something that the Court has protected, and it's
5    legislatively privileged.
6          So that's my instruction.  If you can answer to
7    the extent you're not revealing matters of privilege, you can
8    answer the question.  But if you cannot without revealing
9    matters of privilege, do not answer the question.
10   Q.   Do you want the question to be rephrased?
11   A.   Please.
12   Q.   Yes.  The question was, are you aware of any facts
13   supporting the statement that voter fraud drives honest citizens
14   out of the democratic process and breeds distrust of the
15   election process?
16         And in answering that question, I'm not asking -- what
17   I'm not asking is information you learned during debates about
18   voter ID.  I'm not asking about your understanding of what
19   effect S.B. 14 is intended to have or will have.  I'm just
20   asking about your understanding of public perception and the
21   basis for the statement of the talking point.
22         MR. SWEETEN:  So do you understand my
23   instruction?  If you can't --
24         THE WITNESS:  I'm not sure.
25         MR. SWEETEN:  If you can't -- okay.  Then let's

Senator Joe Straus, III                                    June 11, 2012

---

### 109

1  make sure it's clear.  If you cannot answer this question
2  without providing your mental impressions or thought processes
3  about the bill --
4         THE WITNESS:  Uh-huh.
5         MR. SWEETEN:  -- do not answer the question.
6  If -- you can refer to matters of the public record, but if
7  you -- if -- do you understand now?
8         THE WITNESS:  Yeah.
9         Ask it again.
10        Q.  Okay.  Are you aware of any facts supporting the
11 statement in the talking points that voter fraud drives honest
12 citizens out of the democratic process and breeds distrust of
13 the election process and the government?
14        A.  Any facts that --
15        Q.  That are not public sentiment.
16        MR. SWEETEN:  That are not legislatively privileged.
17        A.  No.
18        MR. SWEETEN:  I want you to be careful.
19        THE WITNESS:  Okay.
20        Q.  Do the talking points also state that the very
21 perception of fraud creates low confidence in the election
22 system?
23        A.  Ask it again.
24        Q.  Do they state that the very perception of fraud
25 creates low confidence in the election system?

---

### 110

1         A.  Okay.
2         Q.  It is in the --
3         A.  Where was that?
4         Q.  -- fourth bullet.
5         A.  Okay.  The fourth bullet?
6         Q.  I'm pretty sure.  Second sentence.
7         A.  No.  It's the third one.  Third one, I think.  Right?
8         Q.  It's the third.  I am very sorry, sir.
9         A.  Yeah.  That's all right.  "The very perception of
10 fraud creates low confidence in the election system."
11        Yeah, I see that.
12        Q.  Okay.  Whose perception of fraud is this referring to?
13        MR. SWEETEN:  Don't interpret the statement if it
14 would require you to reveal matters of legislative privilege.
15        A.  I don't know.
16        Q.  Is the perception of fraud different from the
17 existence of fraud?
18        MR. SWEETEN:  Same instruction.
19        A.  I don't know.  I suppose it could be.
20        Q.  Are you aware of whether voter confidence increased
21 when Texas first implemented its current ID requirement?
22        MR. SWEETEN:  Same objection.  Don't reveal your
23 thoughts, mental impressions, motivations about legislation in
24 answering the question.  If you cannot do so, do not answer the
25 question.

---

### 111

1         A.  I'm not aware.
2         Q.  Okay.  Are you aware of whether voter confidence is
3  currently higher in states where photographic voter ID has been
4  implemented?
5         MR. SWEETEN:  Same instruction.
6         A.  I seem to have read some articles.
7         Q.  What articles?
8         A.  I can't tell you specifically, but I seem to have read
9  something about confidence increasing.
10        Q.  Was it a survey of some kind?
11        A.  I don't remember.
12        Q.  Were they written by The Heritage Foundation?
13        A.  No.
14        Q.  Hans von Spakovsky?
15        A.  No.  It would -- it probably was -- probably in some
16 column or something.  I don't remember.
17        Q.  Okay.  So it wasn't an academic study, was it?
18        A.  No.
19        Q.  Okay.
20        A.  No.
21        Q.  Are you aware of any studies that have reached
22 contrary conclusions?
23        MR. SWEETEN:  In discussing studies, don't reveal
24 your thoughts, mental impressions or analysis that you conducted
25 with respect to the specific legislation.  If you -- if in

---

### 112

1  answering the question that would require you to do that, then
2  do not do it.  Otherwise, you can answer the question.
3         A.  No.
4         Q.  Okay.  Do you see in the first bullet of the talking
5  points where it says that, "Many everyday circumstances require
6  citizens to provide a photo ID such as boarding a plane, cashing
7  a check and renting a movie"?
8         A.  Yes, I see that.
9         Q.  Do you believe that to be the case?
10        MR. SWEETEN:  Same objection.  Don't reveal
11 matters of privilege about your beliefs or thought processes
12 about legislation in answering this question.
13        A.  I I see what it says, and it seems -- seems accurate.
14        Q.  Do you know if it's possible to board a plane without
15 a photo ID?
16        A.  I always have one.  I don't know if you can do it
17 without.
18        Q.  Okay.  So you've never seen or heard of an individual
19 not being allowed on a plane because they didn't have a photo
20 ID?
21        A.  I'm not aware of it.
22        Q.  And you've never read a regulation or notice requiring
23 a photo ID?
24        A.  I don't recall reading one, no.
25        Q.  Do you know if it requires the specific types of ID

## 113

1   named in S.B. 14 to get on a plane?

2        A.   I don't know.

3        Q.   If I were to represent to you that I boarded my flight

4   from DC yesterday using an employee ID, would that surprise you?

5        A.   I wouldn't -- I don't know.

6        Q.   Okay.  Is it possible to cash a check without a photo

7   ID?

8        A.   I haven't cashed a check in so long I don't remember.

9   I don't know.

10       Q.   Clearly, you don't live with irresponsible roommates

11  like I do.

12            Have you ever deposited a check at an ATM?

13       A.   No.

14       Q.   Okay.  Have you ever seen an advertisement for Chase

15  Bank and an app that allows you to cash checks using your phone?

16       A.   Don't recall.

17       Q.   Okay.  Do you have any basis to believe that you can't

18  deposit a check at an ATM?

19       A.   I don't -- I don't -- I don't use ATMs.

20       Q.   Okay.  Is it possible to rent a movie without a photo

21  ID?

22       A.   I don't know.

23       Q.   Are you a member of Blockbuster?

24       A.   Are they still around?

25       Q.   They are limping along.

## 114

1        A.   Okay.  No, I --

2        Q.   I will represent to you as a member of the bar that

3   they are limping along.

4            When did you last see a Blockbuster application?

5        A.   Probably ten years ago.

6        Q.   Okay.  And I'm going to put this in front of you only

7   because a lot of things have been said in this case about

8   Blockbuster.

9        A.   Okay.

10            MR. FREEMAN:  So this will be marked as U.S. 469.

11            (Exhibit No. 469 marked)

12       Q.   What is this document?  And review it first, please.

13       A.   This is an account application for Blockbuster.

14       Q.   And does this account application require you to show

15  a photo ID?

16       A.   I don't -- I can't find that.

17       Q.   Okay.  Do you know how many registered voters in Texas

18  lack a driver's license, state ID card or license to carry?

19            MR. SWEETEN:  In answering the question, don't

20  reveal matters of privilege, including communications that

21  you've had with the individuals or entities that we talked about

22  or your thoughts or mental -- mental impressions or motivations

23  regarding the bill.  You can answer to the extent you're not

24  doing so.

25       A.   I don't know the number.

## 115

1        Q.   Okay.  But do you know that there are -- whether there

2   are registered voters in Texas who lack a driver's license,

3   state ID card or license to carry?

4            MR. SWEETEN:  Objection, compound.

5            Go ahead.  You can answer.

6        A.   I assume there are.

7        Q.   Okay.  Do you know how many registered voters in Bexar

8   County lack a driver's license, state ID or license to carry?

9            MR. SWEETEN:  Same instruction on privilege.

10  Don't reveal matters on privilege.  You can answer the question

11  to the extent you are not doing so.

12       A.   I don't know the number.

13       Q.   As a general matter and to the legislature as a whole,

14  did DPS ever provide, during the debates or prior to passage of

15  S.B. 14, that type of data?

16            MR. SWEETEN:  You can refer to matters of the

17  public record.  Don't reveal communications you've had with

18  state agencies regarding that.

19       A.   I don't recall.

20       Q.   Okay.  Do you have any knowledge of what voters are

21  more likely than others to lack ID?

22            MR. SWEETEN:  Same instruction on privilege.

23  Don't reveal matters of legislative privilege in answering the

24  question.

25       A.   I do not.

## 116

1        Q.   Is it your belief or understanding that rich or poor

2   voters are more likely to lack ID, one group or the other?

3            MR. SWEETEN:  He's asking for your belief.  To

4   the extent that you're revealing information about your belief

5   reveals your beliefs or mental impressions about legislation, do

6   not answer the question.

7        A.   I've read -- you know, again, I've read articles in

8   the newspaper --

9        Q.   Okay.

10       A.   -- that would indicate that poor people would be less

11  likely.

12       Q.   Okay.  And do you typically rely on articles in the

13  newspaper to formulate your understanding of these types of

14  issues?

15            MR. SWEETEN:  And don't answer the question as

16  phrased.  He's asking you your thought process, which could

17  reveal your thought process with respect to legislation.  So

18  don't reveal matters of privilege.

19            MR. FREEMAN:  That's all right.  I withdraw the

20  question.  That's fine.

21       Q.   Are poverty rates in Texas similar across racial

22  groups?

23            MR. SWEETEN:  You can answer as to the current

24  facts, if you know.

25       A.   Say that again.

## 117

1      Q.   Are poverty rates in Texas similar across racial
2    groups, to the extent you know?
3      A.   Are poverty rates similar across racial groups?  I
4    don't --
5      Q.   Is one racial group more or less likely, as a
6    whole -- sorry.  Strike that.
7          Is a higher percentage of one racial group or another
8    in the State of Texas below the poverty line, to the extent of
9    your knowledge?
10     A.   On average?
11     Q.   Uh-huh.
12     A.   I think so.
13     Q.   Are Hispanics in Texas more likely to be below the
14   poverty line than Anglos?
15     A.   I believe that's correct.
16     Q.   And are African-Americans more likely to be below the
17   poverty line than Anglos?
18     A.   I believe that's correct.
19     Q.   Is it more likely that Hispanics will lack ID than
20   Anglos, based on the conversation we've just had?
21         MR. SWEETEN:  Do not reveal matters of privilege.
22   That means your mental impressions, thoughts or motivations
23   about legislation.  Okay?  If answering this question would
24   require you to do so, do not answer that question.
25         THE WITNESS:  Okay.

## 118

1      A.   I don't know.
2      Q.   Well, we've just -- we've just discussed about how
3    it's your belief that poor individuals are more likely to lack
4    ID and Hispanics are more likely to be poor.  So as a result, is
5    it more likely that Hispanics are more likely to lack ID than
6    Anglos?
7          MR. SWEETEN:  Don't reveal matters of privilege.
8      A.   I suppose that's possible.
9      Q.   Okay.  Are you aware that Texas recently took the
10   position that there are 795,955 registered voters whose records
11   could not be matched to a driver's license record via a first
12   name, last name and date of birth match?
13         MR. SWEETEN:  Objection, assumes facts not in
14   evidence.
15         You can answer the question.
16     Q.   Let's put some facts in evidence.
17         This has --
18     A.   You're --
19     Q.   -- previously been marked --
20     A.   -- you're about to show me.
21     Q.   I am.
22         This has previously been marked as U.S. 21, and it is
23   a letter from Mr. Sweeten to Ms. Westfall of the Justice
24   Department.
25         MR. SWEETEN:  Caution the witness to read the

## 119

1    document before answering questions.
2      Q.   Please read the document.
3      A.   Okay.
4      Q.   Okay.  Does this document state that -- that Texas was
5    unable to match 795,955 registered voters to driver's license
6    records?
7      A.   That's what I see, yes.
8      Q.   Okay.  Are you aware of whether the State of Texas
9    ever produced county-by-county totals of registered voters who
10   could not be matched?
11     A.   I don't know.
12     Q.   Okay.  Do you know what documents are necessary to get
13   an election identification certificate under S.B. 14?
14     A.   I'd have to look.
15     Q.   Okay.  What is an election identification certificate?
16     A.   Oh, I don't know.  What is that?
17     Q.   Well, is an election identification certificate the
18   form of ID that is available for voters who lack a driver's
19   license to be used --
20     A.   Oh, I see.
21     Q.   -- strictly for voting purposes?
22     A.   Yeah.
23     Q.   Okay.
24     A.   Exactly.
25     Q.   But you don't know what documents are necessary to get

## 120

1    that?
2      A.   I don't.
3      Q.   Okay.  If you could flip back to the talking points.
4      A.   Okay.
5      Q.   Try and find the bullet for you.
6          If you could look at the, one, two, three, fourth
7    bullet.  Do you see where this --
8      A.   Uh-huh.
9      Q.   -- states that, "S.B. 14 provides a free ID to those
10   who need it for voting purposes"?
11     A.   Yes, I see that.
12     Q.   Now, we previously discussed that you didn't know how
13   much it costs to get a new copy of a birth certificate, right?
14     A.   Yes.
15     Q.   But it does cost money, doesn't it?
16     A.   I assume so.
17     Q.   So if an individual lacks a birth certificate and a
18   birth certificate is necessary to get an election identification
19   certificate, is it possible for that individual to obtain an
20   election identification certificate without paying a cost?
21         MR. SWEETEN:  Don't reveal matters of privilege
22   in answering the question.
23     A.   I don't know the answer to your question if it's
24   possible.
25     Q.   Let me try and rephrase it.

## 121

1    If an individual needs to show a birth certificate in
2  order to obtain an election identification certificate and that
3  individual has to pay some amount of money to get a copy of the
4  birth certificate because they don't have it, will that
5  individual end up needing to pay money to get the election
6  identification certificate?
7         MR. SWEETEN:  Don't reveal matters of privilege
8  in answering the question.
9         A.  I don't know if there's another -- another way.  I
10  don't know.
11        Q.  Okay.  Do you know where voters can obtain an election
12  identification certificate?
13        MR. SWEETEN:  You can answer as to current
14  existing, if you know.
15        A.  I do not know.
16        Q.  Okay.  And just for Mr. Sweeten, the current law does
17  not allow for election identification certificates.  Election
18  identification certificates are created as a -- I'll represent
19  to you that they're created as part of S.B. 14.  So I just don't
20  want there to be some conflict between my question and your
21  attorney's instruction.
22        MR. SWEETEN:  I think he's answered he doesn't
23  know.
24        MR. FREEMAN:  Yeah.  Yeah, yeah.  No.  I'm just
25  trying to clear up the record.

## 122

1         A.  Well, what if I'd said I did know?
2         Q.  Do you know if you can obtain them at driver's license
3  offices?
4         A.  I don't know.
5         Q.  Okay.  Do you know if most individuals have access to
6  a driver's license office that's as convenient as the one in the
7  Capitol Annex?
8         A.  I wouldn't think so.
9         Q.  Do you know if S.B. 14 requires employers to
10  provide paid leave to obtain an ID?
11        MR. SWEETEN:  You can refer to the text of the
12  bill.  Don't provide your thoughts and mental impressions about
13  legislation.
14        A.  Ask the question again.
15        Q.  Do you know if S.B. 14 requires employers to provide
16  paid leave so that their employees can obtain a photo ID if they
17  needed to?
18        A.  I'd have to look at the bill.  No, I don't.
19        Q.  Okay.  Do some individuals in Texas live at least 50
20  miles from a driver's license office?
21        MR. SWEETEN:  You can answer, if you know.
22        THE WITNESS:  Okay.
23        A.  I don't know.  Probably.
24        Q.  About how much do you think gas would cost you to
25  drive 100 miles round trip?

## 123

1         MR. SWEETEN:  Objection, calls for speculation.
2  Go ahead.  You can answer.
3         A.  50 miles?
4         Q.  100 miles round trip.
5         A.  100 miles round trip would cost me about $7.
6         Q.  Nice car.
7         Would being forced to take a few hours off from work
8  to wait in line at a driver's license office constitute a burden
9  to some of your constituents?
10        MR. SWEETEN:  Do not answer the question if the
11  question asks you to reveal your motivations or thoughts about
12  the legislation, okay?
13        A.  Ask it again, please.
14        MR. SWEETEN:  I would instruct you to invoke
15  privilege in the event that that is the case, that you're
16  revealing matters of privilege.
17        THE WITNESS:  Okay.
18        Q.  Based on your knowledge of your constituents and the
19  district that you serve, do you believe that being forced to
20  take a few hours off from work unpaid would constitute a burden
21  if they needed to take time off in the middle of the day to go
22  to a driver's license office?
23        MR. SWEETEN:  Same instruction.  Are you clear on
24  my instruction?
25        THE WITNESS:  No.  Say it again.

## 124

1         MR. SWEETEN:  Okay.  What I'm telling you is if
2  in answering this question about a burden --
3         THE WITNESS:  Uh-huh.
4         MR. SWEETEN:  -- if this would require you to
5  reveal your thoughts, mental impressions --
6         THE WITNESS:  Okay.
7         MR. SWEETEN:  -- or motivations about
8  legislation, do not answer it.
9         THE WITNESS:  Okay.
10        A.  It's not about this legislation.  But with early
11  voting over two weeks, I don't think so.
12        Q.  Well, I -- my question was about going to the driver's
13  license office.  If they were required for some reason, where
14  they hadn't been required before, that they would have to go to
15  a driver's license office and sit in line for another three
16  weeks -- or excuse me -- three hours, two hours, whatever you
17  said, would that be a burden?
18        MR. SWEETEN:  Assumes facts not in evidence.
19  Same instruction on legislative privilege.
20        A.  I don't know.
21        Q.  Okay.  For some of your constituents, would an
22  unexpected $22 expense be a burden?
23        MR. SWEETEN:  Same instruction.  If in answering
24  this question you would have to reveal your thought processes
25  about legislation, including Senate Bill 14, do not answer the

---

125

1    question.
2         A.  Yeah.  I guess I cannot answer that question.
3         Q.  If you were to -- if the legislature were to increase
4    the cost of driver's licenses by $22, would you expect to hear
5    from your constituents about it?
6              MR. SWEETEN:  Objection, calls for speculation.
7         Go ahead.
8         A.  I hear more from constituents about the length of time
9    standing in line than I do about the fee.
10        Q.  Okay.  But you do hear about the length of time for
11   folks standing in line?
12        A.  I have.
13        Q.  Okay.  And they're not happy about it?
14        A.  Not happy.
15        Q.  Do you think that a three-hour wait in order to be
16   able to vote would deter some voters from turning out?
17             MR. SWEETEN:  If in answering this question it
18   would require you to reveal your thought processes about any
19   legislation, including Senate Bill 14, my instruction to you
20   would be not to answer the question.  Okay?
21        A.  Would a three-hour --
22        Q.  So if there were an additional three-hour wait before
23   you were able to vote, if you had to stand in line for three
24   hours, do you think it would deter some of your constituents
25   from turning out to vote?

---

126

1              MR. SWEETEN:  Same instruction, privilege.
2         A.  I don't know.
3         Q.  Okay.  If it cost $22 to be able to vote, do you think
4    that it would deter some of the voters from your district from
5    turning out to go vote?
6              MR. SWEETEN:  Same objection.  Also assumes facts
7    not in evidence, calls for speculation and legislative
8    privilege.
9              Don't reveal your motivations regarding
10   legislation in answering the question.
11        A.  Okay.  I probably wouldn't answer that.
12        Q.  Okay.  If it takes three hours to get an ID, is the ID
13   really free?
14             MR. SWEETEN:  Same objection.
15             Same instruction on legislative privilege.  Don't
16   reveal your mental thoughts, impressions and motivations about
17   any -- Senate Bill 14 or any legislation in answering this
18   question.  If you cannot do so, do not answer the question.
19        A.  Yeah.  I don't know.
20        Q.  If it costs $22 to get a document necessary to get an
21   ID, is the ID really free?
22             MR. SWEETEN:  Same objection.
23             Instruct not to answer if it would reveal your
24   thoughts and mental processes about a bill, including Senate
25   Bill 14.

---

127

1         A.  Okay.  I wouldn't answer that question.
2         Q.  Okay.  I think this is the last point -- time we're
3    going to go to the talking points, but I do need you to go back
4    to it one more time.
5         A.  Okay.
6         Q.  And this is, again, bullet four.  Does it state that
7    voters can also cast a provisional ballot if they forget their
8    ID on election day.  They simply need to return within six days
9    to present a valid ID to the voter registrar in order for their
10   provisional ballot to be counted?
11        A.  Yes, I see that.
12        Q.  Do you know where the voter registrar is in Bexar
13   County?
14             MR. SWEETEN:  You can answer as to -- if you know
15   about a fact in existence.
16        A.  I think at the courthouse.
17        Q.  Where is the Bexar County courthouse?
18        A.  Downtown.
19        Q.  How far is that from your house?
20        A.  15 minutes.
21        Q.  So farther than your precinct?
22        A.  Pardon me?
23        Q.  Farther than your precinct?
24        A.  Oh, yeah.
25        Q.  And farther than your early voting location?

---

128

1         A.  Yes.
2         Q.  Okay.
3         A.  It's also an early voting location.
4         Q.  But it's not your early voting location?
5         A.  Not the one I went to.
6         Q.  Okay.  And is it your understanding of S.B. 14, based
7    on the text alone, that if a voter doesn't have ID, provisional
8    ballot won't count unless they get one within six days?
9              MR. SWEETEN:  You can refer to the specific text
10   of the bill in answering the question.  Don't reveal your
11   analysis, but go ahead.
12        A.  Say again.
13        Q.  Based on your understanding of S.B. 14 from the text
14   of the bill and based on your reliance on these talking
15   points --
16        A.  Uh-huh.
17        Q.  -- if a voter doesn't have ID, is it correct that a
18   provisional ballot won't count unless they get one within six
19   days and show up at the -- at the voter registrar?
20             MR. SWEETEN:  Same instruction.
21        A.  I believe so.
22        Q.  Do you know how long -- sorry.  You already told me.
23             Am I correct that you already said you didn't know how
24   long it takes to get a birth certificate if you don't have one,
25   right?

## 129

1     A.  I don't know.
2     Q.  Okay.  Are all driver's license offices open at least
3 once a week?  Do you know?
4     A.  I don't know.
5     Q.  Okay.  We can go back to the exhibit concerning
6 driver's license offices.
7     A.  It's 461.
8     Q.  Thank you.
9     A.  Uh-huh.
10     Q.  And just on the first page, in the City of Baird, is
11 that driver's license office only two or three days a
12 month -- open only two or three days a month?
13     A.  The City of -- I'm sorry?
14     Q.  City of Baird, B-a-i-r-d.
15     A.  B-a-i-r-d.  I don't see it on here.
16     Q.  Give me a moment.  I was trying to go without finding
17 my copy.
18         MR. FREEMAN:  Thank you.
19     A.  Oh, okay.  In Callahan County?
20     Q.  In Callahan County.
21     A.  Yeah.
22     Q.  Is that office only open the first, third and fifth
23 Wednesdays of the month?
24     A.  That's what this list indicates.
25     Q.  So it's possible that a week could pass without that

## 130

1 office even being open, right?
2     A.  I would think so.
3     Q.  So then, it's possible that an election could happen,
4 and the nearest driver's license office wouldn't even be open
5 within six days for a voter to go get an ID, correct, if they
6 didn't have one?
7         MR. SWEETEN:  Objection; calls for speculation.
8         Go ahead.
9     A.  First, third and fifth.  Our elections are always
10 early, right?  I don't know.
11     Q.  Okay.  Well, we're -- we're at a good stopping point
12 if you want to stop now, or we can try and go a little further
13 for ten more minutes before you need to go.
14         JUDGE PHILLIPS:  I think we'd prefer to go on.
15         THE WITNESS:  Go on ten more minutes.
16         MR. FREEMAN:  All right.  Let's go on.  Okay.
17     Q.  This has previously been marked as U.S. Exhibit 60.
18 I'm just putting this in front of you to refresh your
19 recollection, if need be.
20         Are you aware of the forms of ID that are permissible
21 under the Indiana photo ID law?
22     A.  I am not.
23     Q.  Have you ever previously reviewed this law?
24         MR. SWEETEN:  Don't reveal --
25     A.  This specific language here, no, I have not.

## 131

1     Q.  Isn't it the case that Indiana allows the use of any
2 state or federal ID with a name, photo and expiration date that
3 is unexpired or expired after the last general election?
4         MR. SWEETEN:  You can refer to the text of the
5 legislation he's handed you.
6     A.  Where would it -- where would that be in here?
7     Q.  It's Section 1.  You can just review Section 1.
8     A.  Okay.  So your question is again?
9     Q.  Isn't it the case that Indiana allows the use of any
10 state or federal ID that contains a name, photo and expiration
11 date that is unexpired or expired after the last general
12 election?
13     A.  That's what it appears to say, yes.
14     Q.  Is it your understanding that the Indiana law
15 establishes -- these documents under the Indiana law establish
16 an individual's identity for the purpose of voting?
17         MR. SWEETEN:  Don't reveal your opinions about
18 legislation in answering this question.  He's not asking
19 you -- he's not asking you what's on it now.  He's asking you do
20 you agree that this means something.  If that relates to -- to
21 your thoughts or mental impressions about legislation, don't
22 answer the question.
23     A.  I just see what I read here.
24     Q.  But is it your understanding, to the extent you have
25 an understanding -- and if you don't have an understanding, you

## 132

1 don't.  But is it your understanding that for purposes of voting
2 under the Indiana law, that these types of IDs establish an
3 individual's identity?
4         MR. SWEETEN:  Objection; legislative privilege.
5     A.  I just -- I just see what it says here.  I don't -- I
6 don't know.
7     Q.  Okay.  This has previously been marked as -- I promise
8 we won't be using that one again if you want to throw it
9 somewhere else since I see you are --
10     A.  Okay.
11     Q.  -- developing a bit of a pile.  But this one has
12 previously been marked as U.S. Exhibit 6.
13         MR. FREEMAN:  And I apologize.  I only have a few
14 copies.
15     Q.  Are you aware of the forms of ID that are permissible
16 under the Georgia photo ID law?
17     A.  I'm not.
18     Q.  And if you could review Section 21-2-417 of the
19 Georgia code, do you see if it allows the use of an employee ID?
20     A.  It said a valid employee identification card
21 containing a photograph of the elector and issued by any branch,
22 department, agency or entity of the United States government,
23 this state or any county, municipality, board, authority or
24 other entity of this state.
25     Q.  So, yes?  As long as it's a --

Senator Joe Straus, III                                    June 11, 2012

---

### 133

1     A.   That's what --

2     Q.   -- state or federal employee ID?

3     That's what it looks like, yes.

4     Q.   Okay.  Does it allow for the use of a tribal ID?

5     A.   "A valid tribal identification card containing a

6 photograph of the elector."

7     Yes.

8     Q.   Okay.  Does the Georgia -- do the forms -- pardon me.

9 Strike that.

10     Do the forms of identification named in the Georgia

11 law establish an individual's identity for the purpose of

12 voting?

13     MR. SWEETEN:  Same objection.  Don't provide your

14 analysis about what establishes identity to the extent that

15 would reveal matters of legislative privilege.  If you can't

16 answer the question without doing that, do not do so.

17     A.   Ask it again.

18     Q.   Sure.  I'm just asking about the function of this list

19 under the Georgia law.

20     A.   Uh-huh.

21     Q.   Do these types of ID establish an individual's

22 identity for the purpose of voting under Georgia law?

23     MR. SWEETEN:  Same objection, legislative

24 privilege.

25     A.   Yeah.  I don't know.  I'm just looking at this law for

---

### 134

1 the first time.  I don't know.

2     Q.   Okay.  We've only got four minutes until you guys have

3 to go, and I really am at a natural stopping point.  So I think

4 we should just break now.  Thanks.

5     (Lunch recess 12:40 p.m. to 1:56 p.m.)

6     Q.   We're back on the record after lunch and after

7 Mr. Speaker had a meeting to attend, but ready to go again.

8     Mr. Speaker, are you aware of a photographic voter

9 identification bill that was introduced in the 80th Texas

10 Legislature in 2007?

11     A.   I'm aware there was one.

12     Q.   Was any individual bill subject to serious

13 consideration or debate?

14     A.   I --

15     MR. SWEETEN:  You can answer.

16     A.   As I recall, there was debate on the bill.

17     Q.   Was the bill passed out of the House?

18     A.   I believe it was.

19     Q.   Who introduced that bill; do you recall?

20     A.   I don't.

21     Q.   This has previously been marked as U.S. Exhibit 28.

22 Have you seen this bill before?

23     A.   I probably did back then, yes.

24     Q.   Is this the bill that was passed out of the House in

25 2007?

---

### 135

1     A.   I remember Representative Brown carried the bill, yes.

2     Q.   Okay.  What was your public involvement with this

3 bill, if any?

4     MR. SWEETEN:  You can testify about public

5 statements.

6     A.   I don't recall.

7     Q.   Did you make any public statements that you recall?

8     A.   I don't remember.

9     Q.   Okay.  What were the -- do you recall what the basic

10 provisions of the bill were?

11     A.   No, I don't remember specifically.

12     Q.   Okay.  And I'll ask if you need to refresh your

13 recollection with the bill in front of you.  Do you know whether

14 the bill allowed an individual to use one form of photo ID or

15 two forms of non-photo ID to identify themselves prior to

16 voting?

17     A.   I'd have to look in here.

18     Q.   Would you take a look at Sections ^ 7(b) and 11 on

19 Pages -- 7(b) is on Page 6, and 11 begins on Page 9.

20     A.   Okay.  7(b)?  Uh-huh.

21     Q.   And did the bill allow the use of one photo ID or two

22 non-photos ID?

23     MR. SWEETEN:  Confirm the text of the bill in

24 answering the question.

25     A.   One form of the identification listed in Section

---

### 136

1 63.0101 or two different forms of identification listed in

2 Section 63.0101.

3     Q.   And can you take a look at Section 11 and see if that

4 first grouping or photo ID is in the second grouping or

5 non-photo IDs?

6     A.   Section 11?

7     Q.   Uh-huh, beginning on Page 9.

8     A.   9?  Yeah.  "A driver's license or personal

9 identification card issued to the person by the Department of

10 Public Safety --

11     Q.   Not to interrupt, but I'll ask if you could just

12 review it, because there's a lot there.  So reading it into the

13 record would take awhile and isn't really necessary to answer my

14 question.  I guess if you could look and see if the group that

15 you need, one is photo ID and the group two is non-photo ID.

16     A.   Okay.

17     Q.   And is that correct?  Is that the case?

18     A.   That's the way it looks.

19     Q.   And did H.B. 218 allow exceptions from the ID

20 requirement for individuals who are over the age of 80, disabled

21 veterans, military widows and in the event of some natural

22 disasters?

23     A.   Where would that be?

24     Q.   That would be in Section 7, Section 7(h) through (k),

25 which is on Page 7 of the bill.

## 137

1      A.  Age 80 or older or what else?

2      Q.  Disabled veterans, military widows and emergencies,

3  natural disasters.

4      A.  Yes.

5      Q.  Does H.B. 218 use non-photo IDs to establish an

6  individual's identity, from what you've reviewed?

7      A.  I think so.

8      Q.  Does H.B. 218 address non-citizen voting in any way,

9  from what you reviewed?

10         MR. SWEETEN:  You can answer based on the text of

11  the bill.

12      A.  I see a reference to United States citizen papers.

13      Q.  But that's just one form among many to establish your

14  identity, correct?

15      A.  That's the way it appears, yes.

16      Q.  Any other way in which you see that it addresses

17  non-citizen voting?  And take your time, please.

18      A.  I don't see it.

19      Q.  Okay.  Did you vote for this bill?  Do you recall?

20         MR. SWEETEN:  That's a matter of public record.

21  You can testify --

22      A.  Yes.

23      Q.  Do you recall if any republicans voted against it?

24      A.  I believe there were some.

25      Q.  Do you know if they're still members of the Texas

## 138

1  House?

2      A.  I don't think so.

3      Q.  Okay.  Do you know what happened to the bill, why it

4  didn't become law?

5      A.  I don't recall.

6      Q.  Do you know if it died in the Senate?

7      A.  I really don't remember.

8      Q.  Okay.  When did you first file the necessary papers to

9  seek the speakership?

10      A.  In January of 2011 -- I mean 2009.

11      Q.  Okay.  Who were the ABCs?  Was there a group of people

12  that were referred to as the ABCs?

13      A.  That's how some of the members were referred to in the

14  press.

15      Q.  What did that mean?

16      A.  Well, I wasn't -- I wasn't defined as part of that --

17      Q.  Okay.

18      A.  -- group.

19      Q.  But what did the press mean when it used the term

20  ABCs?

21         MR. SWEETEN:  Objection, speculation.

22      A.  They were opposed to the then-Speaker of the House.

23      Q.  Did ABC mean Anyone But Craddick?

24      A.  Yes.

25      Q.  Did they make any public statements concerning their

## 139

1  basis for supporting you as opposed to then-Speaker Craddick?

2      A.  They could have.

3      Q.  Any of which you're aware?

4      A.  I don't recall anything specific.

5         MR. SWEETEN:  Other than the name itself.

6      Q.  Did you make any public statements concerning your

7  basis for seeking the speakership?

8      A.  I'm sure I did.

9      Q.  Do you remember what your principal -- your primary

10  bases were at the time, based on the public record?

11      A.  Yes, that most members of the House thought there

12  needed to be a change in leadership.

13      Q.  Okay.  Anything else in terms of the main reasons?

14      A.  Just a philosophy of empowering the members.

15      Q.  Okay.  Would it be fair to describe Representative

16  Craddick as having been an aggressive speaker?

17      A.  I don't know if it would be fair or not.

18      Q.  Okay.  Did Representative Craddick eliminate some of

19  the powers of committee chairs when he was Speaker?

20      A.  I'm not aware.  I wasn't a committee chairman.  I

21  don't know.

22      Q.  Okay.  Did you make any promises when seeking the

23  speakership in 2009?

24         MR. SWEETEN:  You can testify about any public

25  statements you made.  If he's asking you about specific

## 140

1  conversations you've had with legislators, I would remind you of

2  the legislative privilege and communication elements of that

3  privilege, to the extent it asks you to reveal your mental

4  processes about why you performed a certain legislative act.  So

5  you can answer the question with that instruction.

6         MR. FREEMAN:  Patrick -- Mr. Sweeten.  Sorry.

7         MR. SWEETEN:  That's okay.

8         MR. FREEMAN:  I believe that under clear U.S.

9  case law, U.S. V. ^ Hilstolsky, promises are not subject to the

10  legislative privilege.

11         MR. SWEETEN:  I think with respect to this

12  Court's order, I don't think that it has upheld what you're

13  saying.  If he's made a statement or a statement was made to him

14  by another legislator and it related to a legislative act, then

15  I think that that would still be very clearly under the four

16  corners of the Court's order on privilege.

17         THE WITNESS:  Can I ask you a question.

18         (Sotto voce discussion)

19         MR. SWEETEN:  I believe that any conversation

20  he's had with a legislator is covered by the privilege.

21         MR. FREEMAN:  Okay.

22         MR. SWEETEN:  And so my instruction to him would

23  be to not provide that information.  At the same time, in the

24  event -- if we'll just have an agreement that you won't construe

25  it as a waiver, I'll let him answer that question.

## 141

1  　　　　MR. FREEMAN: I'm happy to give you my word that
2  we will not construe it as a waiver.
3  　　　　A. I've been asked this question publicly and answered
4  this question publicly. No, I made no promises to anyone.
5  　　　　Q. Okay. Easy enough. Was there a recorded vote for
6  Speaker in 2009?
7  　　　　A. Yes.
8  　　　　Q. And what was the final vote?
9  　　　　A. 150 to 0.
10 　　　　Q. Congratulations.
11 　　　　Are you aware of any photographic voter identification
12 bill that was introduced in the 81st Texas legislature in 2009?
13 　　　　A. Yes.
14 　　　　Q. Was any individual bill passed by one house or the
15 other?
16 　　　　A. Yes.
17 　　　　Q. And was that S.B. 362?
18 　　　　A. I don't remember the bill number.
19 　　　　Q. Was it Senator Fraser's bill?
20 　　　　A. Yes.
21 　　　　Q. Do you recall when in the session it was introduced?
22 　　　　A. Early.
23 　　　　Q. Okay. Do you recall whether Senator Fraser made any
24 public statements as to why he had introduced the bill, just to
25 the best of your recollection?

## 142

1  　　　　A. I don't recall.
2  　　　　Q. Okay. Did the Texas Senate alter its procedures in
3  2009 to facilitate passage of voter ID?
4  　　　　MR. SWEETEN: The question calls for speculation.
5  And don't reveal matters of legislative privilege regarding a
6  specific piece of legislation, which that question asks you to
7  do. If you want to ask him a general purpose question as to a
8  specific rule by the Senate, he can answer that. But you're
9  asking him to reveal his thoughts, mental impressions about the
10 bill. That's privileged. I'll instruct him not to answer.
11 　　　　MR. FREEMAN: I'll withdraw and rephrase.
12 　　　　Q. What is the two-thirds rule in the Texas Senate?
13 　　　　A. It's their rule requiring two-thirds of consent to
14 bring a bill to the floor.
15 　　　　Q. Okay. In 2009, did the Texas Senate modify the
16 two-thirds rule?
17 　　　　A. I believe that -- I believe the Fraser bill may have
18 come to the floor in a way other than receiving two-thirds
19 consent.
20 　　　　Q. Was the change in 2009 to the two-thirds rule
21 subject-matter specific to voter ID, to the best of your
22 recollection?
23 　　　　A. I don't know.
24 　　　　MR. FREEMAN: If we could have this marked as
25 U.S. 470.

## 143

1  　　　　(Exhibit No. 470 marked)
2  　　　　Q. Have you seen this article before?
3  　　　　A. Yes, I remember seeing this.
4  　　　　Q. What is this article?
5  　　　　A. It's an article that was in the Express News.
6  　　　　Q. Okay. And -- I didn't mean to cut you off.
7  　　　　A. That's okay.
8  　　　　Q. And are you quoted in this article as saying, "The
9  issue of ballot security is important, but the way the Senate
10 behaved at the first opportunity did nothing to help the House
11 pass a responsible anti-voter fraud bill. So, at this point,
12 it's become all politics"?
13 　　　　A. I see that comment here, yes.
14 　　　　Q. Do you believe that to be an accurate quote?
15 　　　　A. I suppose. I suppose it could be, yeah.
16 　　　　Q. Do you recall what you meant when you stated -- and I
17 just mean with regard to the comment that you were making and
18 not a reflection on a bill, but what you meant by the comment
19 itself, what you meant by a responsible anti-voter fraud bill?
20 　　　　MR. SWEETEN: He's not going to give the
21 motivation for why he made this comment. He's not going to give
22 the why of the comment. He indicated that was his comment. You
23 can't ask him what was the support for that. It reveals matters
24 of privilege. I'm going to instruct him not to answer the
25 question as phrased.

## 144

1  　　　　Q. I have a disagreement with your counsel so I am going
2  to ask my question. He may disagree as to whether or not you
3  can answer it.
4  　　　　But what did you mean, not with regard to the
5  substance of the bills, but with regard to the proceedings by
6  saying, "at this point, it's become all politics"?
7  　　　　MR. SWEETEN: Again, I'm going to instruct you
8  not to answer. The basis of that instruction is the Court's
9  very well defined instruction on legislative privilege,
10 including questions about -- I'm reading from Paragraph E of the
11 Court's order, "questions about a post enactment statement of
12 documents that call for a response about legislative acts the
13 legislator took prior to the enactment of Senate Bill 14 and
14 prior voter ID bills and questions regarding the motivations of
15 the legislator with respect to those bills or privilege."
16 　　　　So I'm going to instruct you, as to the specific
17 comment that he's asked you about not to provide your
18 motivations or thoughts about legislation. That would be
19 legislatively privileged.
20 　　　　Q. Are you not going to answer based on your counsel's
21 instruction?
22 　　　　A. Yeah, I think I won't answer. The words here seem --
23 are -- the words here are in the story.
24 　　　　Q. Did you have any conversations concerning House
25 sponsorship of the bill, just as a general yes or no matter?

## 145

1    MR. SWEETEN:  You can answer if you had
2 conversations about sponsorship.
3    A.  I probably did.
4    Q.  Who was a party to those conversations?
5    MR. SWEETEN:  You can answer as to who the party
6 was.  Just don't reveal the substance, is what I'm getting at.
7    A.  I don't recall specific conversations, but it would
8 not be unusual to talk to the person who authored the bill.
9    Q.  Okay.  So to talk to the senator about --
10    A.  Oh, I don't remember talking to him.
11    Q.  Okay.  But you would have a conversation as a general
12 matter with the person who was going to carry the bill in the
13 House?
14    A.  I very well could, yes.
15    Q.  Okay.  Did you make any public statements concerning
16 the bill once it was in the House?
17    MR. SWEETEN:  You can answer.
18    THE WITNESS:  I can?
19    MR. SWEETEN:  You can answer public statements.
20    A.  I can't answer because I don't recall.
21    Q.  Okay.  And this has previously been marked as U.S. 29.
22 Is this a copy of S.B. 362?
23    A.  Yes.
24    Q.  And I'll direct you to Section 6(b) and Section 11 for
25 purposes of refreshing your recollection.  Did this bill allow

## 146

1 the use of one photo ID or two non-photo IDs in order to
2 identify a voter at the polls?
3    A.  Where would this be?
4    Q.  Section 6(b) begins on Page 3.  And Section 11 --
5 pardon me.  Section 10 begins on Page 5.
6    A.  And your question was?
7    Q.  Did S.B. 362 allow voters to use one form of photo ID
8 or two forms of non-photo ID in order to establish their
9 identities at the polls?
10    A.  I believe so.
11    Q.  And if you can look at Section 11, did S.B. 362 allow
12 the use of a military, excuse me -- of an employee ID to
13 establish identity at the polls?
14    MR. SWEETEN:  Can you read the question back, please.
15    (Requested portion was read)
16    MR. SWEETEN:  Okay.  You can answer based on the text
17 of the bill in front of you.
18    A.  It's in Section 11?
19    Q.  Section 10.  I'm sorry.  10(a)6, to be specific.
20    A.  "An employee of an agency or institution"?
21    Q.  Yes.
22    A.  It appears that way, yes.
23    Q.  And if a high school or college is an agency
24 institution or political -- or excuse me -- agency institution
25 of the state such as a public university, would this bill permit

## 147

1 the use of a student ID as means to establish identity at the
2 polls?
3    MR. SWEETEN:  You can answer based on the text.
4    A.  I don't know.  Is that -- where would I see that?
5    Q.  It would be the same provision on the basis of a high
6 school or university being an agency or institution of the
7 state.
8    A.  I don't know how to interpret that.
9    Q.  Okay.  Does the bill address -- pardon me.  Strike
10 that.
11    Would the bill have required a voter to establish
12 citizenship prior to voting?
13    MR. SWEETEN:  You can answer based on the text of
14 the bill.
15    A.  I don't see that.
16    Q.  Okay.  Are you aware of whether other legislators have
17 been deposed in this case?
18    A.  I assume they have.  I'm not aware.
19    Q.  Are you aware whether Representative Todd Smith has
20 been deposed in this case?
21    A.  I don't know.
22    MR. FREEMAN:  We can mark this at U.S. 471.
23    (Exhibit No. 471 marked)
24    Q.  I'll represent to you that this is an excerpt of a
25 much longer document.  What does this document appear to be?

## 148

1    A.  Oral Deposition of Todd Smith, June 1st, 2012.
2    Q.  And could you review Pages 28 and 29.  And then I'll
3 just ask a quick question about that.
4    MR. SWEETEN:  You said 28 and 29, Dan?
5    MR. FREEMAN:  Yes.
6    MR. SWEETEN:  Okay.
7    A.  Tell me again where you want me to look.
8    Q.  Just Page 28 and 29, I guess, beginning with --
9 beginning with, "You were unhappy."
10    A.  I see that.
11    Q.  Is it your understanding from this document that
12 Representative Smith testified that he was a very loyal person
13 who handled voter ID in the way that he was asked and fully
14 protected you and that had every reason to believe that he was
15 going to be given a chairmanship and that did not happen?
16    A.  I can just see what his answers were.
17    Q.  Yeah.  Was Representative Smith given a chairmanship
18 in the 82nd Legislature?
19    A.  I can't answer that without --
20    Q.  As a matter of public record?
21    A.  He was not a chairman in the last session.
22    MR. SWEETEN:  I think that's fine.  You've
23 testified whether he was or wasn't.  That's a matter of public
24 record.
25    THE WITNESS:  But was he given one?

## 149

1      MR. SWEETEN:  That's fine.  He's got the answer.
2      THE WITNESS:  He was not -- okay.
3      Q.   Were any other 2009 chairs -- did any other 2009
4  chairs return to the House but no longer hold chairmanships?
5      A.   I don't recall.
6      Q.   Okay.  If you'll turn to Page 185, which is near the
7  end.  Just read in the middle of the page.
8      A.   Where are we?
9      Q.   Page 185, and I guess beginning at Line 6.  If you
10  could just --
11      MR. SWEETEN:  This is excerpted so it doesn't
12  have all the pages.
13      Q.   Yeah.  The page numbers are at the top of the pages.
14      A.   Okay.
15      Q.   If you could just review that, beginning at Line 6.
16  Do you see where Representative Smith testified that voter ID
17  was the most controversial issue in the 81st Legislature?
18      A.   It was very controversial, he said.
19      Q.   And did he not say -- did he not agree with the
20  question, "In fact, it might have been the most controversial
21  issue of the '09 session"?
22      A.   Yes.
23      Q.   And based on the public statements made concerning
24  voter ID in the 81st Legislature, would you agree with that
25  statement?

## 150

1      MR. SWEETEN:  You can answer as he has asked you
2  to, based upon the public statements made.  You can answer that
3  question.
4      A.   It was very controversial.
5      Q.   During the 81st Legislature, were you aware of a
6  pledge circulated by the Republican Party of Texas concerning
7  voter ID?
8      A.   I don't recall.
9      Q.   And this has previously been marked as U.S.
10  Exhibit 22.
11      A.   Uh-huh.
12      Q.   Were you asked to sign this pledge -- well, first
13  review it.  Sorry.
14      A.   Was I asked?
15      Q.   Uh-huh.
16      A.   I don't recall.
17      Q.   Do you recall whether you spoke with Eric Opiela about
18  this pledge?
19      A.   I don't recall.
20      Q.   Is it generally courtesy of some kind not to ask the
21  Speaker to sign such pledges?
22      MR. SWEETEN:  Objection, compound.  Objection,
23  calls for speculation.
24      You can answer the question as phrased, as to a
25  general matter.

## 151

1      A.   I don't know what would be routine for that.
2      Q.   Are such pledges frequently circulated in the Texas
3  House concerning prospective legislation?
4      A.   By political parties or caucuses or groups?
5      Q.   Yes.
6      A.   Probably, yeah.
7      Q.   Are you ordinarily asked to sign them, along with the
8  other members?
9      A.   I have been asked on various issues.
10      Q.   But you don't recall whether you were asked to sign
11  this one?
12      A.   I don't recall.
13      Q.   Okay.  What happened to S.B. 362 in the House?
14      A.   What happened?
15      Q.   Why did it not pass the House?
16      MR. SWEETEN:  You can testify as to matters of
17  public record, but don't reveal matters of privilege, which
18  would be your thought process.
19      A.   There were lengthy delays.
20      Q.   Is that process sometimes referred to as chubbing?
21      A.   Yes.
22      Q.   Does chubbing comply with the letter of the House
23  rules?
24      A.   It did.
25      Q.   Were any points of order raised in an effort to stop

## 152

1  the chubbing?
2      A.   I don't recall.  Probably.
3      Q.   Okay.  But the chubbing continued.  So if they were
4  raised, you denied those points of order, correct?
5      A.   I don't recall.
6      Q.   Were you challenged for the speakership at the
7  beginning of the 82nd Legislature?
8      A.   Yes.
9      Q.   Who was or --
10      A.   Actually, at the beginning, you mean opening on the
11  first day of the session?
12      Q.   Prior to becoming Speaker for the 82nd Legislature --
13      A.   Yes.
14      Q.   -- did other individuals --
15      A.   Yes.
16      Q.   -- challenge your position as Speaker?
17      A.   Yes.
18      Q.   Who challenged your position as Speaker?
19      A.   Representatives and Paxton.
20      Q.   Did represent Berman challenge your position as
21  Speaker or did he merely support your opponents?
22      A.   Maybe he did at one time.  I don't recall.
23      Q.   What were the issues raised by Representatives Paxton
24  and Chisum publicly?
25      A.   What were the --

## 153

1  Q.  The issues that they raised?

2  A.  I don't remember.

3  Q.  Did you speak publicly concerning any of these issues?

4  A.  Perhaps.  I don't remember.

5      MR. FREEMAN:  Okay.  And if this could be marked

6  as U.S. 472.

7      (Exhibit No. 472 marked)

8  Q.  Have you seen this article before?

9  A.  Might have.  I don't -- probably saw it.

10  Q.  Okay.  And what is the basic sentiment of this

11  article?

12  A.  It appears there were charges made by Representative

13  Berman.

14  Q.  Did Representative Berman allege that you had reached

15  an agreement with the democrats to block voter ID?

16  A.  It alludes to a letter where he said that.

17  Q.  Is the letter -- oh, you mean Representative Berman?

18  A.  Yes.

19  Q.  Okay.

20  A.  It says, "The three things, according to Berman, were

21  that there would be no votes on the House Floor on Voter ID,

22  immigration or pro-life legislation."

23  Q.  And you previously testified that you had not reached

24  any such agreement, correct?

25  A.  That's correct.

## 154

1      MR. FREEMAN:  Mark this as U.S. 473.

2      (Exhibit No. 473 marked)

3  Q.  What is this document?

4  A.  It's an e-mail to District 24 Taylor.

5  Q.  Who is -- is that Representative Taylor?

6  A.  I assume so.  Is that Representative Larry Taylor?  I

7  don't know what District 24.  I assume so, yeah.

8  Q.  Okay.  Have you seen this e-mail or others like it?

9  A.  No.

10  Q.  Okay.  Were there any large e-mail blasts sent early

11  in the session opposing you in the speakership role?

12  A.  I'm sure there were, yes.

13  Q.  Okay.  What does the term RINO mean?

14  A.  It means nothing to me.

15  Q.  Okay.  Does it mean Republican in Name Only?

16  A.  That's what those who use that phrase mean, yes.

17  Q.  I presume you don't consider yourself to be a RINO?

18  A.  No.

19  Q.  Were any e-mails like this one sent to your account or

20  your office?

21  A.  Probably.

22  Q.  Did your staff deal with them without passing them on

23  to you?

24  A.  I don't -- I don't know.

25  Q.  That may be privileged.

## 155

1  A.  I don't recall.

2      MR. SWEETEN:  He doesn't recall in the first

3  place, so I'm sure it's difficult for him to say where --

4  Q.  Were any other public statements made concerning voter

5  ID and your fitness to serve as Speaker?

6      MR. SWEETEN:  You can testify as to public

7  statements made.

8  A.  Made by whom?

9  Q.  Anyone who we haven't discussed previously.

10  A.  Probably.  I don't remember specifically.

11  Q.  Any specific statements you recall?

12  A.  No.

13  Q.  And does this letter -- just to be clear for the

14  record, does this letter say that you worked to kill a very good

15  voter ID bill in the prior session?

16  A.  It says it.  I don't know who wrote it.

17  Q.  Yeah.  That's all I'm asking, is whether it says it.

18  Did you respond to the e-mails received by your office that were

19  similar to this one, to your knowledge or recollection?

20  A.  We typically respond to most e-mails or most

21  communications.

22  Q.  Did any member of the public contend at any point that

23  you should not be the Speaker because you could not advocate for

24  conservative Christian values?

25      MR. SWEETEN:  You can testify about any public

## 156

1  statements in answering this question.

2  A.  Yes, in the media.  That's been reported in the media,

3  yes.

4  Q.  Did you respond publicly to those statements?

5  A.  Maybe not specifically to that statement, but yes, I

6  had a public statement about religious faith and public service.

7  Q.  Okay.  Did Representative Patricia Harless submit a

8  House photographic voter identification bill in the 82nd

9  Legislature?

10  A.  Did she propose legislation?

11  Q.  Her own bill, yes.

12  A.  I believe she did.  There were a number of

13  representatives who filed bills.

14  Q.  And this has previously been marked as U.S. Exhibit 4.

15  A.  Uh-huh.

16  Q.  Is this Representative Harless' bill?

17  A.  Yes.

18  Q.  Was this bill referred to the Select Committee on

19  Voter Identification and Voter Fraud?

20  A.  I think it was, but it could have been referred to

21  Elections Permanent Committee.  I'm not sure.

22  Q.  Do you recall if more than one bill was referred to

23  the Select Committee on Voter Identification and Voter Fraud?

24  A.  I don't -- I don't recall.

25  Q.  This has previously been marked as Exhibit 13.

157

1    A.  Okay.
2    Q.  Have you seen this kind of report before?
3    A.  Have I seen this?
4    Q.  Uh-huh.
5    A.  I don't recall seeing this.
6    Q.  Is it a printout from the Texas Legislature's web
7    site?
8    A.  Yes.
9    Q.  And does the Texas Legislature's web site generate
10   reports for a given committee for what bills were referred to
11   that committee in a particular session?
12   A.  Yes.
13   Q.  And does this report indicate that only one bill was
14   referred to the Select Committee on Voter Identification and
15   Voter Fraud, and that was S.B. 14?
16   A.  That's what it says, yes.
17   Q.  Okay.  So it's likely that Representative Harless'
18   bill was referred to Elections, correct?
19       MR. SWEETEN:  Objection, calls for speculation.
20   A.  I don't know.
21   Q.  Okay.  Do you recall speaking with your staff as a
22   general matter concerning H.B. 112, Representative Harless'
23   bill?
24   A.  I don't recall specifically that, discussing her bill.
25   Q.  And if you could review her bill real quickly,

158

1    specifically Section 6(b) and Section 10.  Did this bill allow
2    voters to identify themselves using one form of photo ID or two
3    forms of non-photo ID?
4        MR. SWEETEN:  You can answer based on the text of
5    the bill.
6    A.  6(b)?
7    Q.  Yes.
8    A.  That's what it says, yes.
9    Q.  Okay.  Do you know if you made any public statements
10   concerning this bill?
11   A.  I don't recall.
12   Q.  Do you know if you spoke with any constituents,
13   lobbyists, or advocacy groups about this bill?
14   A.  I don't recall doing that.
15   Q.  This has previously been marked as Exhibit 5.  What is
16   this document?
17   A.  S.B. 14.
18   Q.  Okay.  Does anything in this bill address non-citizen
19   voting?
20       MR. SWEETEN:  You can answer based on the text of
21   the bill.
22   A.  Where would I find that?
23       MR. SWEETEN:  Let's look for it.  Let's see.
24   A.  I don't see it.
25   Q.  Okay.  What forms of identification are allowable to

159

1    identify a voter under this bill?  And you can look to Section
2    14 to refresh your recollection if you'd like, which is on Page
3    9.
4    A.  A driver's license, election identification
5    certificate, personal identification card issued to the person
6    by the Department of Public Safety, military identification card
7    contains the person's photograph, United States citizenship
8    certificate that contains person's photograph, U.S. passport,
9    license to carry concealed handgun.
10   Q.  And that's all, correct?
11   A.  That's all I see, yes.
12   Q.  And so under S.B. 14 it's not possible to establish
13   identity using non-photo ID, correct?
14   A.  That's the way it appears to me.
15   Q.  Okay.  And sorry to make you jump back, but that
16   pledge that I showed you earlier --
17   A.  The what?
18   Q.  The pledge that I showed you earlier?
19   A.  Uh-huh.
20   Q.  Did that ask members to agree that they would use a --
21   they would pass a photo ID bill that allowed -- that required
22   voters to vote only with photo ID?
23   A.  Ensure a valid photo ID is needed to vote.
24   Q.  Okay.  Did you have any discussions, as a general
25   matter, concerning the contents of S.B. 14 prior to its passage?

160

1        MR. SWEETEN:  You can discuss if any
2    conversations did occur.  He's entitled to find out if those
3    occurred, but don't reveal the substance of those conversations.
4    A.  I don't -- specific language or aspects of the bill?
5    Q.  Substance in any way.
6    A.  No.
7    Q.  So no discussions concerning the omission of student
8    ID?
9    A.  No.
10   Q.  No discussions concerning the omission of employee ID?
11   A.  I don't recall having specific discussions about -- or
12   I don't recall having discussions about specific items that
13   would be included or not included in a bill.
14   Q.  Okay.  If you could turn back to Exhibit 466.  Sorry
15   to make you dig in the pile of paper.
16   A.  Which one is that?
17   Q.  It was the talking points from Dallas.  It says on the
18   top 12329, if that's helpful.
19       MR. SWEETEN:  Want to just use mine.
20   A.  Okay.
21   Q.  Do you see on the third page, does it say that Texas
22   passed arguably the strictest voter ID law in the nation during
23   the 82nd legislature?
24   A.  That's what it says, yes.
25   Q.  And again, do you know if you used these talking

## 161

1  points during the speech at issue?

2      A.  I don't recall.

3      Q.  And do you understand that talking point to mean --

4  not the substance of the bill, but the talking point -- to mean

5  that you passed a bill that is stricter than other photo ID

6  bills?

7      MR. SWEETEN:  Daniel, objection.  He's not going

8  to characterize -- off the record.

9      (Brief off-record discussion)

10      MR. SWEETEN:  Look, on this he's not going to

11  answer what he meant by saying it.  It says what it says.

12      MR. FREEMAN:  That's fine.  I'll withdraw the

13  question.  Okay.

14      Q.  I'd like to talk about the process by which S.B. 14

15  was introduced.  First off, what does the term "legislative

16  emergency" mean in the Texas Legislature?

17      A.  Well, I assume that's provided by the governor.  And

18  it's simply an item that the governor would decree to be an

19  emergency which would allow the legislature to take up a bill

20  before the requisite number of days normally the legislature

21  would have to wait.

22      Q.  Okay.  Are there any constraints on what the governor

23  may choose to declare as a legislative emergency?

24      MR. SWEETEN:  You can answer as a matter of

25  general legislation.

## 162

1      A.  I'm not aware of any constraints.

2      Q.  Did you or your staff have any conversations with the

3  governor or the governor's staff, to the extent of your

4  knowledge, as a general matter concerning legislative

5  emergencies in the 82nd legislature?

6      MR. SWEETEN:  You can answer as phrased.  Don't

7  reveal the substance of the conversation.

8      A.  No.

9      Q.  Okay.  Was photographic voter ID declared to be a

10  legislative emergency in 2011?

11      MR. SWEETEN:  If that's a matter of public

12  record, you can answer the question.

13      A.  Yes.

14      Q.  Was it declared to be a matter of legislative

15  emergency in January?

16      A.  I believe so.

17      Q.  And as you said before, it's the governor's office

18  that declared legislative emergencies, right?

19      A.  That's correct.

20      Q.  Is there a specific individual in the governor's

21  office, to the extent that it is public information, who is

22  responsible for declaring legislative emergencies?

23      A.  Not that I'm aware of.

24      Q.  Okay.  Do you know if any election was set to occur

25  during the first 60 days of the session?

## 163

1      A.  An election?

2      Q.  Uh-huh.

3      A.  I don't recall.

4      Q.  Okay.  Do you recall having any conversations with

5  Lieutenant Governor Dewhurst or his staff concerning which house

6  would move first on voter ID?

7      MR. SWEETEN:  You can answer.

8      A.  I don't recall.

9      Q.  Do you know when S.B. 14 passed out of the Senate?

10      A.  I don't.

11      Q.  And this has previously been marked as U.S. 8.

12      A.  Okay.

13      Q.  What is this document?

14      A.  It's the history of legislative -- history of Senate

15  Bill 14.

16      Q.  And does this give you a date on when S.B. 14 passed

17  out of the Senate?

18      A.  I think it does.

19      Q.  Was it January 26th, as noted on Page 6?

20      A.  January 26th?

21      Q.  Yep.

22      A.  Record vote in the gross senate, yes.

23      Q.  Did you or your staff have any conversations

24  concerning who would carry the voter ID bill in the house?

25      MR. SWEETEN:  You can answer as phrased, but

## 164

1  don't provide any additional substance of the conversation if

2  there was one.

3      A.  Yes, I'm sure we did.

4      Q.  Who did you have those conversations with?

5      A.  I don't recall.  Probably --

6      Q.  Do you know when they occurred?

7      A.  No.

8      Q.  Did you receive any communications from constituents

9  accusing you of delaying S.B. 14?

10      A.  Not that I recall.

11      MR. FREEMAN:  Okay.  And if this could be marked

12  as U.S. 474.

13      (Exhibit No. 474 marked)

14      Q.  What is this document?

15      A.  This is a web mail correspondence, Office of the

16  Governor.

17      Q.  And when is it dated?

18      A.  It's dated the 25th of January, 2011.

19      Q.  And does this state that Speaker Straus is blocking

20  voter ID in the house?

21      A.  It's making that assertion, yes, by two people from

22  Richmond, Texas.

23      Q.  And does it state that the bill is needed in Texas and

24  that the people want it?

25      A.  It says that.

## 165

1  Q.  On January 25th, had any bills passed out of the Texas

2  House?

3  A.  I don't believe so, no.

4  Q.  Had you even made committee assignments?

5  A.  No.

6  Q.  In the period that you've served, have any

7  controversial bills ever passed out of the Texas House by

8  January 25th?

9  A.  No.

10  Q.  Okay.  Now, we mentioned this once before, but what is

11  a select committee?

12  MR. SWEETEN:  Objection, asked and answered.

13  You can answer.

14  MR. FREEMAN:  I'm trying to move this deposition

15  along quickly.

16  MR. SWEETEN:  I'm letting him answer.

17  A.  It's a committee appointed at the discretion of the

18  Speaker.

19  MR. FREEMAN:  Let the record reflect that counsel

20  were all laughing.

21  Q.  Who picked the name of the Select Committee on Voter

22  Identification and Voter Fraud?

23  Q.  Who picked it?

24  Q.  Uh-huh.

25  A.  The Speaker assigned it, yes.

## 166

1  Q.  Okay.  Are you aware of any other select committees

2  related to voting or elections in current or past legislatures?

3  A.  Yes.  There have been committees on election contests.

4  Q.  Okay.  Do those have a specific procedural role when

5  there is an election contest?

6  A.  Yes.

7  Q.  Are there any other select committees that have

8  addressed substantive issues related to elections outside that

9  unique field of election contests, to your recollection?

10  A.  I'm not aware.

11  Q.  Are you aware of any other select committees that

12  relate directly to a standing committee in the way that the

13  Select Committee on Voter Identification and Voter Fraud relates

14  to elections?

15  MR. SWEETEN:  Objection, vague.  Objection, calls

16  for speculation.

17  Go ahead.  You can answer.

18  A.  I'd have to think about the other select committees

19  we've had.

20  THE WITNESS:  What other select committees have

21  we had?

22  MR. ANCIA:  None in the last --

23  MR. FREEMAN:  To the extent of your knowledge?

24  MR. SWEETEN:  He can't tell you.  Just answer if

25  you can.

## 167

1  THE WITNESS:  I can't remember it.

2  MR. FREEMAN:  There's no "phone a friend" in

3  depositions, unfortunately.  And it's fine if you can't answer.

4  THE WITNESS:  I was asking my brain, and it

5  couldn't remember.

6  MR. FREEMAN:  Sometimes it's your friend.

7  Sometimes it's not.

8  THE WITNESS:  Select committees often relate to

9  issues that overlap with other committees.

10  Q.  Okay.  Was the Select Committee on Voter

11  Identification and Voter Fraud a fast-track committee?

12  MR. SWEETEN:  If that's a matter of public

13  record, you can testify to it.

14  A.  A fast-track committee?  I don't know what a

15  fast-track committee would be.

16  Q.  And this has previously been marked as U.S. Exhibit

17  12.  What is this document?

18  A.  It's a public release from Speaker's office.

19  Q.  And at the bottom of the page, does its designate the

20  Select Committee on Voter Identification and Voter Fraud as a

21  fast-track committee?

22  A.  Yes, it does.

23  Q.  Do you know what that meant?

24  A.  No.

25  Q.  Okay.

## 168

1  A.  This was Wednesday, February 9th.  No, I don't know.

2  Q.  Were any other committees that session designated as

3  fast-track committees?

4  A.  Not that I see here, no.

5  Q.  Are you aware of any public statements made by

6  legislators, party officials, or any advocates that

7  Representative Todd Smith had delayed release of a voter ID bill

8  from the Elections committee in 2009?

9  A.  Am I aware of statements made by others?

10  Q.  Yes.

11  MR. SWEETEN:  Public statements he's asking.

12  A.  From anyone?

13  Q.  Anyone.

14  A.  I seem to recall seeing that.

15  Q.  Do you know who made those statements?

16  A.  I don't.

17  Q.  Did Representative Smith win his primary last month?

18  A.  No.

19  Q.  Do you recall who the members of the Select Committee

20  on Voter Identification and Voter Fraud were?

21  A.  I'd have to look at the list.

22  Q.  Okay.  Ask and you shall receive.

23  MR. FREEMAN:  If this could be designated as U.S.

24  475.

25  (Exhibit No. 475 marked)

## 169

1    Q.   Who are the members of the Select Committee on Voter
2    Identification and Voter Fraud?
3    A.   Representative Bonnen, Veasey, Aliseda, Gutierrez,
4    Harless, Hilderbran, Hochberg, Pena and Taylor.
5    Q.   So Representative Todd Smith was not on the select
6    committee; is that correct?
7    A.   No.
8    Q.   Are you aware of any testimony in the redistricting
9    litigation concerning whether Representative Aliseda was the
10   preferred candidate of Latino voters in his district?
11   A.   Am I aware of --
12   Q.   Any testimony in the redistricting litigation
13   concerning whether Representative Aliseda was the preferred
14   candidate of Latino voters in his district?
15   A.   I am not.
16   Q.   Are you aware of any public statements made by
17   Representative Pena that he could not win in the interim
18   district drawn by the San Antonio court in which he resided?
19   A.   Public statements, no.
20   Q.   Okay.  Representative Anchia is not on the committee;
21   is that correct?
22   A.   That's correct.
23   Q.   Would it be fair to say that Representative Anchia was
24   the most actively involved in public debates and statements
25   concerning voter ID in prior sessions?

## 170

1         MR. SWEETEN:  You can answer.
2    A.   You could say that.
3    Q.   Would it be fair to say that he was the most actively
4    involved Hispanic legislator on this issue in past sessions, in
5    terms of his public statements?  I'm happy to cabinet.
6    A.   I think there were others too, but he certainly was
7    high profile, yes.
8    Q.   And Representative Berman is not on the committee; is
9    that correct?
10   A.   That's correct.
11   Q.   Representative Berman was chairman of Elections under
12   Speaker Craddick, was he not?
13   A.   I don't recall.
14   Q.   Okay.  And Representative Berman was on the Elections
15   committee in 2011, correct?
16   A.   I don't remember.
17   Q.   Does Representative Berman use his seniority pick to
18   be on the Elections committee each term?
19   A.   I don't remember.
20        MR. SWEETEN:  Whoa, whoa, whoa.  Okay.  Yeah.
21   That's fine.
22   Q.   Was Representative Berman -- did Representative Berman
23   make public statements concerning voter ID in prior sessions?
24   A.   Did he make public statements?
25   Q.   Uh-huh.

## 171

1    A.   Could have, I'm sure.
2    Q.   Anything you recall?
3    A.   No.
4    Q.   Would it be fair to say that Representative Berman has
5    made very -- has publicly expressed very strong opinions
6    concerning voter ID?
7    A.   I would assume he has.
8    Q.   Has Representative Berman expressed very strong
9    opinions publicly concerning immigration?
10   A.   Yes.
11   Q.   Did you at any point publicly request that
12   Representative Berman stop offering amendments to other
13   representatives' legislation limiting benefits based on
14   citizenship?
15   A.   Ask the question again.
16   Q.   Did you at any time publicly request that
17   Representative Berman stop offering amendments to other
18   representatives' legislation that would limit benefits based on
19   citizenship?
20        MR. SWEETEN:  You can answer as a public matter.
21   A.   No.
22   Q.   Did any other representative make that request to
23   Representative Berman?
24   A.   Publicly?
25   Q.   Yes,

## 172

1    A.   Not that I'm aware of.  I don't know.
2    Q.   Did Representative Berman, during the last legislative
3    session, offer a series of amendments to other representatives'
4    legislation that would limit benefits based on citizenship?
5    A.   I seem to recall he did that, but -- was that I guess
6    this last -- I don't remember when that was.  But, yes, he has
7    in the past.
8    Q.   Okay.  Do you recall Representative Berman making any
9    public statements linking voter ID and immigration?
10   A.   I don't.
11   Q.   Okay.  Did you campaign in favor of Representative
12   Berman's challenger in the republican primary?
13   A.   Did I campaign in favor of his challenger?
14   Q.   Or endorse his challenger?
15   A.   No.
16   Q.   Did you donate any money to his challenger?
17   A.   I did not.
18   Q.   Okay.  Did you have any conversations concerning the
19   creation of a select committee to address voter ID?
20   A.   Ask it again.
21   Q.   Did you have any conversations concerning the creation
22   of a select committee to handle voter ID?
23   A.   Did I have conversations for this select committee?
24   Q.   Uh-huh.
25   A.   I probably did.

Senator Joe Straus, III                                    June 11, 2012

---

## 173

1     Q.  Do you recall who you had those conversation with?
2     A.  I would assume mainly internally.
3     Q.  So your staff?
4     A.  Yes.
5     Q.  Anyone outside your staff that you recall?
6     A.  I do not recall.
7     Q.  Did you have any conversations concerning the
8  membership of the select committee?
9     A.  Externally?  Meaning where?
10    Q.  In general.  Unfortunately, I can't ask anything more
11 specific than that without angering your counsel so --
12    A.  Right.  I don't recall conversations.
13    Q.  Are you aware of any other examples of committees that
14 have heard only one bill?
15    A.  I'd have to look.  Not aware.
16    Q.  Okay.  Were any bills submitted during the 82nd
17 Legislature whose purpose was to address mail-in voter fraud?
18    A.  I believe so.
19    Q.  But none of them were referred to the Select Committee
20 on Voter Identification and Voter Fraud, right?
21        MR. SWEETEN:  I assume that's a matter of public
22 record so you can testify as to --
23    A.  Yeah.  I suppose the statistics exist.  No.
24    Q.  Okay.  Other than Speaker's discretion, are there any
25 other public criteria for appointing members of a select

---

## 174

1  committee?
2     A.  Other than the Speaker's?
3     Q.  Uh-huh.
4     A.  No.
5     Q.  Okay.  Do you know when the select committee took up
6  S.B. 14?
7     A.  I don't recall.
8     Q.  I think you have a document in front of you that
9  should be able to help you refresh your recollection.
10        MR. SWEETEN:  Is it before or after the
11 Blockbuster application?
12        Here we go.  I think that's what he may be
13 talking about.  The bill report.
14        MR. FREEMAN:  Yes.
15    A.  When it was referred to committee?
16    Q.  Yes.
17    A.  February 11th.
18    Q.  And when did it pass out from the committee?
19    A.  The 7th of March.
20    Q.  What is the emergency calendar?
21    A.  The emergency calendar?
22    Q.  Uh-huh.
23    A.  That would be the calendar of emergency items.
24    Q.  And what are the criteria to place something on the
25 emergency calendar?  What makes something an emergency?

---

## 175

1        MR. SWEETEN:  If that's a matter of public
2  record, you can testify to it.  If it involves your own thought
3  processes --
4     A.  No, it's not my thought processes.  My recollection is
5  it's one of the items that the governor would identify as an
6  emergency.
7     Q.  Oh.  So any item that is a legislative emergency would
8  be placed on the emergency calendar?
9     A.  I don't recall.
10    Q.  Okay.  I believe this is a matter of public record,
11 but just to clarify.  Did you cast any votes in favor or against
12 S.B. 14 during the floor debate?
13    A.  I did not.
14    Q.  And you appoint house members of a conference
15 committee, correct?
16    A.  Yes.
17    Q.  Do you recall who was on the conference committee?
18    A.  No.
19    Q.  If we could have this marked as U.S. 476
20        (Exhibit No. 476 marked)
21    Q.  Does this document memorialize who the members of the
22 conference committee were?
23    A.  Yes.
24    Q.  And who were the House conferees?
25    A.  Representatives Harless, Aliseda, Bonnen, Truitt and

---

## 176

1  Veasey.
2     Q.  And were these all members of the select committee?
3     A.  Most of them.
4     Q.  Was Representative Truitt on the select committee?
5     A.  No.
6     Q.  And, again, this committee did not include
7  Representative Anchia, correct?
8     A.  That's correct.
9     Q.  And it also did not include Representative Guttierez,
10 who was on the select committee, correct?
11    A.  That's correct.
12    Q.  Is there any meaning that can be -- should be imputed
13 to a member's failure to sign a conference committee report form
14 as a matter of public understanding of what it means in the
15 legislature?  I'm not trying to get at anyone's thoughts or
16 mental impressions.  I just want to understand if that has a
17 meaning or designation in terms of a vote?
18        MR. SWEETEN:  Yeah.  I think that would require
19 him to give his thoughts on -- you're handing him a document.
20 Mark Veasey hasn't signed it.  I think you're asking his mental
21 impressions.
22        JUDGE PHILLIPS:  You could ask what's in the
23 rule.
24        MR. FREEMAN:  That's basically what I'm trying to
25 get at, and my question was perhaps not artfully phrased.

---

### 177

1     Q.  I'm just trying to understand, if you have a
2  conference committee report that has eight signatures out of
3  ten, does that mean it was an eight-two vote in favor of the
4  conference committee?
5         MR. SWEETEN:  As a general matter, you can
6  testify to that.
7     A.  As a general matter, I think there's a certain number
8  of signatures required.
9     Q.  How many signatures are required to pass a bill out of
10 a conference committee?
11    A.  A majority.
12    Q.  Okay.  Do you know how long it took S.B. 14 to go
13 through the conference process?
14    A.  I don't.
15    Q.  Were there any public complaints that you are aware of
16 that it was taking too long for S.B. 14 to get out of
17 conference?
18    A.  Any public complaints?
19    Q.  Uh-huh.
20    A.  I'm not aware.
21    Q.  Any public concerns that delay in the conference
22 committee could keep the bill from passing of which you're
23 aware?
24    A.  I don't remember.
25    Q.  Okay.  Were there -- are you aware of whether there

---

### 178

1  were any changes introduced to S.B. 14 in the conference
2  committee that had not been in either version of the bill passed
3  by either house?
4     A.  I don't recall.
5     Q.  Can you name any other instance in which a conference
6  committee added a provision that was in neither the House or
7  Senate version of the bill?
8     A.  On any matter?
9     Q.  Yeah.
10    A.  Yes.
11    Q.  Is that a relatively common occurrence?
12    A.  It happens.
13    Q.  Okay.  To your knowledge, has the Secretary of State
14 enforced S.B. 14 in any way?
15    A.  I'm not aware.
16    Q.  Do you know if any local election official has
17 enforced S.B. 14?
18    A.  I'm not aware.
19    Q.  Have you heard any public reports of confusion
20 regarding requirements to vote in terms of identification?
21    A.  No.
22    Q.  Okay.  Who are the main opponents of S.B. 14 in terms
23 of publicly stated opposition?
24        MR. SWEETEN:  You can answer.  It's public.  He's
25 asking public statements.

---

### 179

1     A.  Mostly leaders of -- democrat leaders.
2     Q.  Okay.  Any outside groups?
3     A.  I assume so, but I don't --
4     Q.  Any specific ones you can recall?
5     A.  I don't want to leave anybody out.  I don't know.
6     Q.  As a general matter, minority groups, groups
7  representing minority voters' interests?
8     A.  I think so.
9     Q.  Any election officials?
10    A.  Not that I know of.
11    Q.  What were the reasons that the outside groups gave for
12 their opposition to S.B. 14?
13        MR. SWEETEN:  You can answer as to public
14 expressed reasons given.
15    A.  I think generally they claim that it's an impediment
16 to voting.
17    Q.  Did they suggest any particular changes publicly that
18 could be made to reduce the impediment to voting which you're
19 aware?
20    A.  I don't remember specifically.  I'm sure they did.
21    Q.  Okay.  Did you make any public statements concerning
22 the opposition to S.B. 14?
23    A.  I don't recall.
24    Q.  Did you ever discuss publicly whether S.B. 14 would
25 impact minority voters' ability to cast a ballot?

---

### 180

1     A.  I don't recall making a statement.
2     Q.  Okay.  Did you ever have any general discussions
3  concerning compliance with Section 5 of the Voting Rights Act
4  regarding S.B. 14?
5     A.  Did I have --
6     Q.  Any conversations?
7     A.  Not that I recall.
8     Q.  Did you have any conversations concerning the
9  submission of S.B. 14 for administrative preclearance?
10    A.  No.
11    Q.  Do you know if your staff had any conversations
12 concerning submission of S.B. 14 for administrative
13 preclearance?
14    A.  Not aware.
15    Q.  Am I correct that during a regular legislative session
16 members may not solicit written pledges of support or promise to
17 vote for any person for the office of Speaker as a matter of
18 public stated House policy?
19    A.  Yes.
20    Q.  Okay.  Have any legislators publicly declared their
21 intention to challenge you for the speakership in the next
22 legislature?
23    A.  Yes.
24    Q.  Have any legislators made a filing of some kind to
25 challenge you?

## 181

1     A.  I believe -- I believe one has.
2     Q.  Is that Bryan Hughes?
3     A.  Yes.
4     Q.  Has Mr. Hughes publicly noted any commitments being
5   made in his favor?
6     A.  Not that I'm aware of.
7         (Brief interruption)
8         MR. FREEMAN:  Let's mark this as 477.
9         (Exhibit No. 477 marked)
10    Q.  Have you seen this article before?
11    A.  I think I did see it, yes.
12    Q.  And does Mr. Hughes say in this article that he would
13  support a change in the rules so that bills with widespread
14  support could be snatched out of the committee and be moved
15  directly to the floor?
16    A.  It says that he said --
17    Q.  Okay.
18    A.  -- that he would appoint really conservative members
19  to be chairmen so that bills dealing with anti illegal
20  immigration, anti abortion and limiting government could get
21  through and that he would support a change in the rules so that
22  bills with widespread support could be snatched out of the
23  committees and moved directly to the floor.
24    Q.  Has anyone ever publicly advocated for such a rule and
25  referenced the 2009 procedures for voter ID and the delays that

## 182

1   occurred there?
2     A.  Ask your question again.
3     Q.  Sure.  Has anyone ever -- it was not well phrased and
4   hopefully I'll do better this time.
5         Has anyone ever publicly advocated for such a rule
6   that would allow the majority of the membership to pull bills
7   out of committee regardless of the committee's vote and
8   referenced voter ID?
9     A.  Not that I'm aware of.
10    Q.  Okay.  And does this article describe you as being
11  genial and well-liked?
12    A.  I hope so.  I don't know.
13    Q.  It does.
14    A.  Yeah, it does.
15    Q.  Have any legislators publicly declared their intention
16  to support another legislator for the office of Speaker in the
17  next legislature?
18    A.  I'm not aware.
19    Q.  Any declared their intentions simply not to vote for
20  you?
21    A.  I'm not aware of that either.
22    Q.  Has voter ID been an issue discussed publicly
23  concerning the speakership for the next session?
24    A.  Not that I'm aware of.
25    Q.  Neither negatively or favorably?

## 183

1     A.  I don't know.
2     Q.  Okay.  Have any legislators, party committees or other
3   groups or constituents ever publicly stated that if voter ID did
4   not pass in the 82nd Legislature in 2011 that you should be
5   removed from Speaker?
6     A.  I'm not sure.
7     Q.  Okay.  So you had to make sure that voter ID passed
8   regardless of the purpose of the bill to maintain the
9   speakership; am I correct?
10        MR. SWEETEN:  No.  Don't answer the question.
11  He's asking for your personal motivations.  It's legislative
12  privilege.  Instruct not to answer.
13        MR. FREEMAN:  We're going to take a break for a
14  couple minutes, and then I will be wrapping up.
15        (Recess from 3:20 p.m. to 3:34 p.m.)
16    Q.  We are back on the record.  I have exactly one
17  follow-up question and then concluding questions.
18        I had asked previously about the purpose of S.B. 14.
19  Are you aware of whether S.B. 362 or any of the prior
20  photographic voter ID bills had a different purpose than S.B.
21  14?
22    A.  No.
23    Q.  Okay.  Are there any answers that you've previously
24  given that you wish to change at this time?
25    A.  No.

## 184

1     Q.  Any information that you didn't recall that you now
2   recall?
3     A.  No.
4     Q.  Anything you would like to add so we can understand
5   your answers more clearly?
6     A.  No.
7         MR. FREEMAN: This deposition is technically left
8   open pending decisions on privilege over documents and
9   testimony, but I -- given that there have been objections on the
10  basis of privilege, but I don't believe that there will be any
11  actual follow-up beyond this time, and I pass the witness to the
12  defendant intervenors.
13        MS. RUDD: Thank you.  And I am going to apologize
14  in advance.  I may be slightly repetitive.  I will try to get
15  through my questions quickly.  I'm hoping it will take less than
16  half an hour.  So I don't want to belabor your time any more
17  than I have to.
18        EXAMINATION
19  BY MS. RUDD:
20    Q.  Are you aware of any statistical analysis in the
21  public record concerning the effect of S.B. 14 on the
22  African-American population in Texas?
23    A.  I'm not specifically aware, no.
24    Q.  Same question about the Hispanic population.  Are you
25  aware of any statistical analysis that's been placed in the

## 185

1  public record regarding the effect of the legislation on that
2  population?
3  　　A.  There may have been, but I'm not specifically aware,
4  no.
5  　　Q.  Okay.  How about statistical analysis concerning the
6  effect of S.B. 14 on Texas citizens making less than $35,000 a
7  year?
8  　　A.  I don't know.
9  　　Q.  Okay.  Are you aware of any assertions in the public
10 record that low income individuals in Texas may have more
11 difficulty obtaining photo ID under S.B. 14?
12 　　A.  35,000?
13 　　Q.  Sure.
14 　　A.  No.
15 　　Q.  Okay.  Are you aware of any assertions in the public
16 record that low income individuals are less likely to be able to
17 pay for the types of photo ID that may be required under S.B.
18 14?
19 　　A.  Public record?
20 　　Q.  Any testimony in public hearings regarding the
21 legislation?
22 　　A.  Maybe some floor debate.
23 　　Q.  Okay.  Can you list for me some of the reasons that a
24 person may need to have a driver's license.  I know we've talked
25 about several before when we were discussing some of the talking

## 186

1  points.  Driving a car, for example, or boarding a plane.  Can
2  you think of any other reasons why you might need a Texas
3  driver's license?
4  　　MR. SWEETEN:  You're asking as a general matter?
5  　　MS. RUDD:  As a general matter.
6  　　A.  None other than the obvious, operating a vehicle.
7  　　Q.  Right.  Not all people drive a vehicle, correct?
8  　　A.  Pardon me?
9  　　Q.  Not all people drive a vehicle or own a car; is that
10 correct?
11 　　A.  That's correct.
12 　　Q.  And not all people can afford to fly wherever they
13 want or at all; is that right?
14 　　A.  Yes.
15 　　Q.  You think there are citizens of Texas who have never
16 been on a flight before?
17 　　A.  Yes.
18 　　Q.  Okay.  So there are probably many reasons that Texas
19 citizens who are eligible to vote don't have a Texas driver's
20 license; is that right?
21 　　MR. SWEETEN:  Objection, calls for speculation.
22 　　You can answer.
23 　　A.  I would assume that's correct.
24 　　Q.  Okay.  Are you aware of assertions on the public
25 record that minorities are less likely to own gun licenses?

## 187

1  　　A.  No, I'm not.
2  　　Q.  Do you agree that there are at least some people in
3  Texas, like yourself, who don't own gun licenses?
4  　　A.  Here we go again. Yes, I'm aware not everyone has a
5  license.
6  　　MR. SWEETEN:  I don't have one either.
7  　　MS. RUDD:  Nor do I.
8  　　Q.  Are you aware of assertions in the public record --
9  　　A.  I do own -- go ahead.
10 　　Q.  Are you aware of assertions in the public record that
11 in-person voter fraud is a problem in Texas?
12 　　A.  Say that again.
13 　　Q.  Are you aware of assertions on the public record that
14 in-person voter fraud is distinguished from other forms of voter
15 fraud as a problem in Texas?
16 　　A.  Assertions made by others?
17 　　Q.  Correct.
18 　　A.  I believe I have seen statements made by some
19 prosecutors, the attorney general or someone.
20 　　Q.  Okay.  As you sit here today, can you point me to
21 anything specific that you recall from the public record
22 regarding in-person voter fraud?
23 　　A.  No.
24 　　Q.  Okay.  In general, are you aware of any analysis
25 relating to in-person voter fraud in Texas on the public record?

## 188

1  　　A.  I don't know.
2  　　Q.  Okay.  In your mind -- you testified earlier that the
3  purpose of S.B. 14 was protecting the integrity of the ballot
4  box.  Do I have that right?
5  　　A.  Yes.
6  　　Q.  In your mind is there a distinction between protecting
7  the integrity of the ballot box and voter fraud, preventing
8  voter fraud?  Are those part and parcel of the same thing?
9  　　MR. SWEETEN:  Are you asking him as to the
10 legislation or are you asking him as a general matter?
11 　　MS. RUDD:  As a general matter.
12 　　A.  As a general matter, I think confidence and fair and
13 clean elections is important, yes.
14 　　Q.  And that confidence in fair and clean elections would
15 include preventing people who aren't eligible to vote from
16 voting; is that right?
17 　　A.  Yes.
18 　　MR. SWEETEN:  Don't talk about the specific
19 legislation.
20 　　A.  In general, yes.
21 　　Q.  Okay.  Let me see.  I am going to quickly go through
22 some exhibits.  And I think we've been doing this in the past.
23 I'm going to mark these as Straus Intervenor Exhibit 1, and I'll
24 go from there.
25 　　(Straus Intervenor Exhibit 1 marked)

## 189

1    Q.  Feel free to take a look at this when you're ready,
2  but if you could tell me what this is, that would be great.
3    A.  This looks like the interim report from the committee
4  on elections prior to the 82nd Legislature.
5    Q.  Okay.  So this would be the committee on elections in
6  the 81st legislative session; is that right?
7    A.  Yes.
8    Q.  And if you look at the top, it looks like this
9  document went to you; is that right?
10    A.  That's correct.
11    Q.  Do you typically --
12    A.  To me and to fellow members, yes.
13    Q.  Thank you.  Do you typically read documents addressed
14  to you?
15    A.  Well, I typically do.
16    Q.  Fair enough.  If you will flip with me to Page 26 of
17  that document.  It's Bates labeled Texas_0006525.
18    A.  Okay.
19    Q.  There it says in Charge No. 3, "Examine the prevalence
20  of fraud in Texas elections.  Study new law in other states
21  regarding voter identification and recommend statutory changes
22  necessary to ensure that only eligible voters can vote in Texas
23  elections."  Did I read that correctly?
24    A.  I think so.
25    Q.  Good, I can read.  Okay.  If you'll flip with me now to

## 190

1  next page of Page 27, which is Texas_6526.  If you look there
2  underneath the heading labeled Testimony.
3    A.  Okay.
4    Q.  The second paragraph down, beginning "Since 2002".
5    A.  Yes.
6    Q.  Let me back up for a second.  Who's Jay Dyer?
7    A.  Deputy Attorney General For Government and External
8  Affairs.
9    Q.  Do you know Mr. Dyer?
10    A.  I've met him, yes.
11    Q.  Okay.  If you look at the second paragraph there, it
12  says, "Since 2002, Mr. Dyer testified that the AG's office
13  received 267 referrals of incidences of alleged illegal voting
14  as defined in Section 64.012 of the Texas Election Code."  Did I
15  read that right?
16    A.  Yes.
17    Q.  And then he goes on to say, "Thirty-five of those
18  alleged violations have been resolved with guilty pleas,
19  dismissals or plea agreements, while 12 cases remain active and
20  the remainder of the cases are either still being investigated
21  or the statute of limitations has expired;" is that right?
22    A.  That's what it says, yes.
23    Q.  So what this is saying is since 2002 -- and this
24  report as you'll recall is in 2011.  So in that nine-year
25  period, approximate nine-year period, there have only been 267

## 191

1  referrals of instances of alleged voter fraud to the AG's
2  office; is that right?
3    A.  That's what this indicates, yes.
4    Q.  Do you happen to know what the population of the State
5  of Texas was as of the 2011 -- as of 2011?
6    A.  Somewhere in the neighborhood of 24, 25 million.
7    Q.  I'm actually impressed.  I had to look it up. 25.6
8  million is what Google tells me.
9    A.  Okay.
10    Q.  So relative to the 25.6 million person population in
11  the State of Texas, do you consider 267 referrals of voter fraud
12  to the AG's office a significant problem?
13    MR. SWEETEN:  Don't answer the question.  It
14  would call for matters of legislative privilege and his opinions
15  about legislation.  Instruct not to answer.
16    Q.  Okay.  If you look down the page with me.  It says in
17  the middle of the second -- middle of the third paragraph there,
18  "He went on to explain, however, that the extent to which voter
19  fraud cases are prosecuted locally compared to the amount of
20  cases that are referred and handled by the AG's office could not
21  be determined."
22    And then if you continue to the fourth paragraph, it
23  says, "The prosecution of election fraud cases at the local
24  level are generally handled by the district attorney for felony
25  offenses and the county attorney for misdemeanors violations.

## 192

1  Additional research would need to be conducted to gather
2  information from these officials about voter fraud cases that
3  are referred to and prosecuted by their offices."
4    Did I read that correctly?
5    A.  Yes.
6    Q.  Are you aware of any analysis in the public
7  record concerning the number of cases handled locally by the
8  district attorney for felony offenses at the local level, voter
9  fraud?
10    A.  I'm not.
11    Q.  Are you aware of any analysis in the public record of
12  prosecutions of election fraud conducted by county attorneys for
13  misdemeanors violations?
14    A.  No, I'm not.
15    Q.  Are you aware of any additional research reported on
16  in the public record concerning actual incidents of voter fraud
17  in the State of Texas?
18    A.  Ask it again.
19    MS. RUDD: Can you read that back for me.
20    (Requested portion read by the reporter)
21    A.  No.
22    MS. RUDD: Okay.  I'll have this marked as Straus
23  Intervenor Exhibit 2.
24    (Straus Intervenor Exhibit No. 2 marked)
25    Q.  Can you tell me what this document is?

## 193

1      A.  It's from the Legislative Budget Board, Criminal

2 Justice Impact Statement, 82nd Legislative Session.

3      Q.  And this is dated May 5th, 2011; is that right?

4      A.  That's right.

5      Q.  And this again, in the To line it says it went to the

6 Honorable David Dewhurst and the Honorable Joe Straus.  That's

7 you, correct?

8      A.  Yes.

9      Q.  Do you recall reading this document when it was sent

10 to you?

11      A.  No, I don't.

12      Q.  And who is John O'Brien?

13      A.  He was the director of the Legislative Budget Board.

14      Q.  Do you know Mr. O'Brien?

15      A.  Yes.

16      Q.  And in the in re: line it says S.B. 14.  Do you see

17 that?

18      A.  Yes.

19      Q.  Okay.  If you'll scan with me down to the last full

20 paragraph on that page.  Sort of the middle of that paragraph

21 begins, "In fiscal year 2010."  Do you see that?

22      A.  Yes.

23      Q.  It says, "In fiscal year 2010, less than five

24 offenders were admitted to prison and less than five were

25 released from prison in illegal voting or attempting to vote

## 194

1 illegally."

2      Did I read that correctly?

3      A.  Yes.

4      Q.  Do you have any reason to disagree with that

5 statement?

6      A.  No.

7      Q.  And then it continues, "In fiscal year 2010, less than

8 five people were under patrol supervision for illegal voting or

9 attempting to vote illegally."

10      Do you have any reason to disagree with that

11 statement?

12      A.  I do not.

13      Q.  And then continuing, "In fiscal year 2010, five

14 offenders were placed on community supervision and less than

15 five were released from community supervision for illegal voting

16 or attempting to vote illegally."

17      Do you have any reason to disagree with that

18 statement?

19      A.  No.

20      Q.  And finally, "In 2010, less than five people were

21 arrested for illegal voting or attempting to vote illegally."

22      Do you see that?

23      A.  Yes, I do.

24      Q.  Do you have any reason to disagree with that

25 statement?

## 195

1      A.  No.

2      Q.  And do any of those statements regarding illegal

3 voting make the distinction between in-person illegal voting and

4 any other form of illegal voting?

5      MR. SWEETEN:  You're asking about what's on here?

6      MS. RUDD:  Correct.

7      MR. SWEETEN:  You can answer based on the text.

8      A.  Not that I see.

9      MS. RUDD:  Okay.  I'm going to have this marked as

10 Straus Intervenor Exhibit 3.

11      (Straus Intervenor Exhibit No. 3 marked)

12      Q.  I believe we looked at the first page of this document

13 just a few moments ago.  This is the full document.  And I'd

14 like you to just take a look through the document and tell me

15 whether you see any analysis in this -- well, first let me ask

16 you to testify as to what this document is.

17      A.  This is the Conference Committee Report For Senate

18 Bill 14.

19      Q.  Okay.  And if you look at the top left-hand corner of

20 this document, it looks like this document went again to

21 Representative Dewhurst and you?

22      A.  Yes, Lt. Governor Dewhurst.

23      Q.  Thank you.  Now, my question is, in looking through

24 this document -- and feel free to take as much time as you need

25 -- is there any analysis in this document regarding the number

## 196

1 of incidents of voter fraud in the State of Texas?

2      MR. SWEETEN:  You can answer as to what's in the

3 text.

4      A.  In the bill itself or in the analysis or?

5      Q.  In the analysis.

6      A.  Don't see that.

7      Q.  Okay.  I'm going to hand you what I'll have marked as

8 Straus Intervenor Exhibit 4.

9      (Straus Intervenor Exhibit No. 4 marked)

10      Q.  Can you tell me what this document is.

11      A.  It's the senate's bill analysis.

12      Q.  Is this a document that you typically see or is sent

13 to you?

14      A.  Senate analysis, no.

15      Q.  Okay.  If you could just look through that document

16 for me and tell me whether it contains any analysis of the

17 number of incidents of voter fraud or the prevalence of voter

18 fraud in Texas?

19      MR. SWEETEN:  And you can answer based on the

20 text of the bill or the bill analysis.

21      A.  I don't see it.

22      MS. RUDD:  Okay.  I'll have this marked as Straus

23 Intervenor Exhibit 5.

24      (Straus Intervenor Exhibit No. 5 marked)

25      Q.  Can you identify this document for me.

### 197

1     A.  This is the bill analysis of the committee substitute
2  Senate Bill 14.
3     Q.  And let me ask you, do you ever read these types of
4  analyses coming out of the Senate?
5     A.  I'm much more likely to read the House bill analysis.
6     Q.  Have you --
7     A.  House research.
8     Q.  Have you read this type of analysis coming out of the
9  Senate before?
10    A.  Have I?  Maybe in rare cases.
11    Q.  But you're familiar with the fact that this type of
12 analysis is done in connection with Senate bills?
13    A.  Yes.
14    Q.  Same question. Can you tell me whether there's any
15 analysis of the number of incidents of voter fraud or the
16 prevalence of voter fraud in Texas in this document?
17       MR. SWEETEN:  You can answer based on the text of
18 the document she's handed you.
19       THE WITNESS: I'm looking for an analysis of?
20       MR. SWEETEN: Incidents of voter fraud, I think is
21 the question.
22    A.  No.
23       MS. RUDD:  Okay.  Last one.  Straus Intervenor
24 Exhibit 7?
25       THE REPORTER: 6.

### 198

1       (Straus Intervenor Exhibit No. 6 marked)
2     Q.  Can you tell me what this document is?
3     A.  It's another bill analysis for Senate Bill 14, Senate
4  Research Center.
5     Q.  And same question.  Is there any analysis in this
6  document that you can see describing the number of incidents of
7  voter fraud or the prevalence of voter fraud in Texas?
8        MR. SWEETEN:  You can answer based on the text of
9  the document.
10    A.  No.
11    Q.  Okay.  Just a couple of final questions for you.
12       Are House committees required to publicly report on
13 any analysis of legislation done in committee?
14    A.  Are House committees required to?
15    Q.  Publicly report on their analysis of proposed
16 legislation?
17    A.  Yes.
18    Q.  Okay.  And is it true that House bills all come
19 attached -- if they're discussed in the committee all come
20 attached with a fiscal note and a bill analysis?
21    A.  Yes.
22    Q.  Okay.  So is it fair to say that if there is no public
23 report that contains an analysis of the number of incidents of
24 voter fraud or the prevalence of voter fraud in Texas that that
25 analysis didn't occur in any committee of the House?

### 199

1       MR. SWEETEN: Don't reveal any conversations
2  you've had or matters of privilege in answering the question.
3       Also, objection, calls for speculation.
4       You can answer.
5     A.  I don't know how to judge what isn't in a report.
6     Q.  When you charge as the Speaker of the House a
7  committee with certain tasks, do you expect them to report
8  publicly on what their answer is to the various charges that
9  you've given them?
10       MR. SWEETEN:  Don't reveal your personal
11 motivations.  You can talk about general procedure in answering
12 that question.
13    A.  Yeah, personal charges.
14    Q.  So if we refer back to I think my first exhibit, which
15 is the report of the committee on elections from January 10,
16 2011.
17    A.  Uh-huh.
18    Q.  At the beginning of that document.
19    A.  Yeah.
20    Q.  Page 5, Bates No. Texas_6504, there are five charges
21 there.
22    A.  Uh-huh.
23    Q.  Do you or someone on your staff typically draft the
24 charges to the committees?
25    A.  Yes.

### 200

1     Q.  Okay.  And is it the committees' duty, in your
2  opinion, to report information consistent with those charges
3  when they publish a committee report?
4     A.  Yes.
5        MR. SWEETEN:  You can answer as a general matter.
6     A.  Yes.
7     Q.  Okay.  So if you've charged a committee with certain
8  assignments, do you expect that any analysis done in connection
9  with those assignments will be publicly reported as part of the
10 committee report at the end of the day?
11       MR. SWEETEN:  Objection, compound.  Objection,
12 calls for speculation.
13       You can answer as a general matter.  Don't reveal
14 matters of privilege.
15    A.  As a general matter, I issue charges during the
16 interim and rely on the committees to work at their own
17 discretion.
18    Q.  Do you know whether, apart from this report on January
19 10th, 2011, there's ever been any public report that contains
20 any analysis of the number of incidents of voter fraud or the
21 prevalence of voter fraud in Texas?
22       MR. SWEETEN:  As to the public record, you can
23 answer.
24    A.  Only -- no, I'm not, other than maybe one you've shown
25 me earlier.

Senator Joe Straus, III                                    June 11, 2012

---

## 201

1    MS. RUDD:  No further questions.
2         EXAMINATION
3    BY MR. SWEETEN:
4    Q.  Speaker Straus, you -- Senate Bill 14 was heard first
5    in the Senate, correct?
6    A.  Yes.
7    Q.  And were there public proceedings regarding Senate
8    Bill 14 before it was voted upon?  Do you know?
9    A.  Before it was voted upon by the Senate?
10   Q.  Yes.
11   A.  Committee.  I assume the committee considered it
12   first, yes.
13   Q.  When it came to the House -- and I'm asking as matters
14   of public record -- was there a committee that heard testimony
15   and considered this bill?
16   A.  Yes.
17   Q.  Was this bill debated on the floor of the House with
18   evidence and argument being presented both ways on the floor of
19   the House, based on the public record?
20   A.  Yes.
21   Q.  Okay.  With respect to your vote -- you were voted in
22   as the Speaker of the House on what date?  What year?
23   A.  January -- early January of '09, and the same in early
24   January of 2011.
25   Q.  Okay.  What was the vote in '09 for you to be the

---

## 202

1    Speaker of the House?
2    A.  It was unanimous, 150 to 0.
3    Q.  What was the vote in 2011?
4    A.  I don't recall exactly, but it was in the neighborhood
5    of 135.
6    Q.  To?
7    A.  To 15ish.
8         MR. SWEETEN: I don't have any further questions.
9         MR. FREEMAN:  I have a few quick follow-ups just
10   based on Mr. Sweeten's questions.
11        FURTHER EXAMINATION
12   BY MR. FREEMAN:
13   Q.  First, just to clarify, you testified a moment ago
14   that there were proceedings in a committee in the Senate prior
15   to the vote. Was that the committee of the whole?
16   A.  I don't recall.
17   Q.  Okay.  Second, you just testified a moment ago that
18   there was evidence and argument presented on the floor of the
19   Texas House prior to the vote; is that correct?
20   A.  The bill came to the floor.  It was fully debated,
21   yes.
22   Q.  What evidence was presented on the floor of the Texas
23   House in terms of evidence of in-person voter fraud?
24   A.  I don't recall specific evidence.
25   Q.  Is it customary for evidence to be presented during

---

## 203

1    legislative debate or is that typically provided in committee?
2    A.  There could be -- it could occur in both committee and
3    on the floor.
4    Q.  But you're not aware of any specific evidence of
5    in-person voter fraud that was presented during the debate on
6    S.B. 14 in the House in 2011, correct?
7    A.  I don't recall specifically, no.
8    Q.  And finally, you just testified a moment ago that the
9    vote for you in 2009 for the speakership was 150 to 0; is that
10   correct?
11   A.  That's correct.
12   Q.  Are speaker votes typically addressed or negotiated
13   internally prior to the public vote?
14   A.  Yes.
15   Q.  Did Speaker Craddick wish to continue to hold the
16   speakership in 2009?  Did he express that publicly?
17   A.  Up to a point, yes.
18        MR. FREEMAN: I have no further questions.
19   A.  But not when the vote was taken.
20        MR. FREEMAN: I have no further questions.
21        FURTHER EXAMINATION
22   By MR. SWEETEN:
23   Q.  With respect to your recollection of the public
24   testimony on the floor of the House or the committee of the
25   House, would the best evidence of that be the actual record

---

## 204

1    itself?
2    A.  Yes.
3    Q.  Okay.  Rather than your personal recollection as
4    you're sitting here?
5    A.  Most definitely.
6         MR. SWEETEN: I don't have any further questions.
7         MR. FREEMAN:  Thank you for your time.
8    (Deposition concluded at 4:10 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Senator Joe Straus, III                                    June 11, 2012

## 205

CHANGES AND SIGNATURE

WITNESS NAME_____ DATE OF DEPOSITION_____

PAGE LINE    CHANGE    REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

## 206

I, JOE STRAUS, III, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____

JOE STRAUS, III

THE STATE OF TEXAS )
COUNTY OF TRAVIS )

Before me,_____, on this day personally appeared JOE STRAUS, III known to me (or proved to me under oath of through_____) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this_____ day of _____.

_____

NOTARY PUBLIC IN AND FOR
THE STATE OF

## 207

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,          )
     Plaintiff,          )
                         )
V.                       )
                         )
ERIC H. HOLDER, JR.,     )
in his official capacity )
as Attorney General of   )
the United States,       )
     Defendant.          )
                         )
ERIC KENNIE, et al.,     )
     Defendant-Intervenors,  )
                         )
TEXAS STATE CONFERENCE   )  CASE NO. 1:12-CV-00128
OF NAACP BRANCHES, et al., )  (RMC-DST-RLW)
     Defendant-intervenors,  )  Three-Judge Court
                         )
TEXAS LEAGUE OF YOUNG    )
VOTERS EDUCATION FUND, et al., )
     Defendant-Intervenors,  )
                         )
TEXAS LEGISLATIVE BLACK  )
CAUCUS, et al.,          )
     Defendant-Intervenors,  )
                         )
VICTORIA RODRIGUEZ, et al.,  )
     Defendant-Intervenors,  )

REPORTER'S CERTIFICATION
DEPOSITION OF SPEAKER JOE STRAUS, III
June 11, 2012

I, Amy C. Kofron, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, JOE STRAUS, III, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on_____ to the witness or to the attorney for the

## 208

witness for examination, signature and return to me by_____;

That the amount of time used by each party at the deposition is as follows:

Mr. Freeman - 04:38
Mr. Sweeten - 00:06
Ms. Rudd - 00:17

That pursuant to information given to the deposition officer at the time said testimony was taken the following includes counsel for all parties of record:

Mr. Sweeten, Attorney for Plaintiff
Mr. Freeman, Attorney for Defendant
Ms. Rudd, Attorney for Defendant-Intervenor

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this_____day of_____, 2012.

_____

Amy C. Kofron, Texas CSR #6352
Expiration Date: 12/31/2013
Esquire Deposition Solutions
100 Congress Avenue, Suite 2020
Austin, Texas 78701