CARLOS URESTI                                          June 11, 2012

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
STATE OF TEXAS,               )
                              )
          Plaintiff,          )
                              )
VS.                           )
                              )
ERIC H. HOLDER, JR. in his    )
official capacity as Attorney )
General of the United States, )
                              )
          Defendant,          )
                              )
ERIC KENNIE, et al,           )
                              )
     Defendant-Intervenors,   )
                              )
TEXAS STATE CONFERENCE OF     )  CASE NO. 1:12-CV-00128
NAACP BRANCHES,               )  (RMC-DST-RLW)
                              )  Three-Judge Court
     Defendant-Intervenors,   )
                              )
TEXAS LEAGUE OF YOUNG VOTERS  )
EDUCATION FUND, et al,        )
                              )
     Defendant-Intervenors,   )
                              )
TEXAS LEGISLATIVE BLACK       )
CAUCUS, et al,                )
                              )
     Defendant-Intervenors,   )
                              )
VICTORIA RODRIGUEZ, et al.,   )
                              )
     Defendant-Intervenors.   )
```

*************************************************
ORAL DEPOSITION OF
SENATOR CARLOS URESTI
JUNE 11, 2012
*************************************************

**Page 2**

1    ORAL DEPOSITION OF SENATOR CARLOS URESTI, produced

2  as a witness at the instance of the Defendant, was duly

3  sworn, was taken in the above-styled and numbered cause

4  on the JUNE 11, 2012, from 9:36 a.m. to 1:15 p.m.,

5  before Chris Carpenter, CSR, in and for the State of

6  Texas, reported by machine shorthand, at the offices of

7  The Attorney General of Texas, 209 West 14th Street, 1st

8  Floor Conference Room, Austin, Texas 78701, pursuant to

9  the Federal Rules of Civil Procedure and the provisions

10 stated on the record or attached hereto.

**Page 3**

A P P E A R A N C E S

FOR THE PLAINTIFF, STATE OF TEXAS:
    Matthew Frederick
    OFFICE OF THE ATTORNEY GENERAL OF TEXAS
    P.O. Box 12548
    Austin, TX 78711-2548

    209 West 14th Street
    8th Floor
    Austin, TX 78701
    (512) 936-1307
    matthew.frederick@texasattorneygeneral.gov

FOR THE DEFENDANT, HOLDER, ET AL:
    Bruce Gear
    U.S. DEPARTMENT OF JUSTICE
    950 Pennsylvania Avenue, NW
    NWB - Room 7202
    Washington, DC 20530
    (202) 305-7766
    bruce.gear@usdoj.gov

FOR THE DEFENDANT-INTERVENOR MEXICAN AMERICAN
LEGISLATIVE CAUCUS:

    Jose Garza
    LAW OFFICE OF JOSE GARZA
    7414 Robin Rest Dr.
    San Antonio, TX 98209
    (210) 392-2856
    garzpalm@aol.com

**Page 4**

FOR THE DEPOENENT:
    Roberto "Bobby" Maldonado
    BOBBY MALDONADO, P.C.
    924 McCullough Avenue
    San Antonio, TX 78215
    bobby@bobbymaldonado.com



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

5

INDEX

1
2   Appearances........................................3
3   SENATOR CARLOS URESTI
4       Examination by Mr. Frederick..............6
        Examination by Mr. Garza................115
5       Examination by Mr. Gear.................119
        Further Examination by Mr. Frederick.....122
6
    Signature and Changes...........................127
7
    Reporter's Certificate..........................129
8
                    EXHIBITS
9
    NO. DESCRIPTION                    PAGE MARKED
10
    1   Senate Journal, May 9, 2011          39
11
    2   Senate Journal, Jan. 26, 2011        40
12
    3   Declaration of Carolos Uresti        44
13
14
15
16
17
18
19
20
21
22
23
24
25

7

1   Bexar County, the southeast side of San Antonio, and it
2   stretches all the way to El Paso.  It also includes
3   two-thirds of the Texas-Mexico border.  It includes all
4   or part of 23 counties.  It includes 62 school
5   districts.  It's larger than approximately 20 states or
6   so and about 118 countries and two planets.  It's a big
7   district.
8       Q.  Senator Uresti, are you asserting legislative
9   privilege in this case over matters related to Senate
10  Bill 14?
11          (Conferring with Mr. Maldanado.)
12      A.  No, sir, I'm not.
13      Q.  I know you said you're a lawyer.  Have you
14  actually been deposed before?
15      A.  Actually, I think this is the first time I've
16  ever been deposed in 20 years.
17      Q.  Okay.  I won't belabor the ground rules, but
18  I'll go through them very quickly just to remind you.
19          The most important is just to answer
20  audibly so the court reporter can hear.  So instead of
21  nodding your head or shaking your head, if you could say
22  yes or no, that will help our court reporter.
23          And if you don't understand a question I
24  ask, please don't hesitate to ask me to rephrase.  I'll
25  be happy to do so.  Do you understand?

6

1           SENATOR CARLOS URESTI,
2   having been first duly sworn to testify the truth, the
3   whole truth, and nothing but the truth, testified as
4   follows:
5                   EXAMINATION
6   BY MR. FREDERICK:
7       Q.  Good morning.  Would you please state your full
8   name for the record?
9       A.  Sure.  Carlos I. Uresti.
10      Q.  Thank you.  And Senator Uresti, are you
11  suffering from an illness or any other condition today
12  that might prevent you from accurately answering my
13  questions?
14      A.  No, sir.
15      Q.  What is your occupation?
16      A.  I'm an attorney.
17      Q.  And you are a member of the Texas Senate; is
18  that right?
19      A.  Yes, sir.
20      Q.  Which district do you represent in the Senate?
21      A.  19th.
22      Q.  Can you describe that district, geographically,
23  just generally for me, please?
24      A.  Sure.  District 19 is approximately 50,000
25  square miles.  It starts from the southeast part of

8

1       A.  Yes, sir.
2       Q.  And again, to make the court reporter's job
3   easier, if you could just wait until I finish asking a
4   question to start your answer, that will avoid us
5   talking over each other.  And likewise, I will do my
6   best not to start a new question while you're still
7   answering.  Do you understand that?
8       A.  Yes, sir.
9       Q.  Now, your lawyer may object to some of my
10  questions.  If he does, unless he instructs you not to
11  answer, you can still answer my question.  Do you
12  understand that?
13      A.  Yes, sir.
14      Q.  Thank you, sir.  And you are represented by
15  counsel today; is that right?
16      A.  Yes, sir.  I'm represented by Bobby Maldonado.
17      Q.  Great.  Thank you.
18          Senator Uresti, what did you do to prepare
19  for your deposition today?
20      A.  About the only thing I did was read my
21  affidavit that I had submitted a couple of months ago,
22  and generally reviewed the timeline of the amendments,
23  et cetera, that were filed on the bill.
24      Q.  Did you meet with anyone to discuss your
25  deposition today?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                    June 11, 2012

9

1    A.  Just my attorney.
2    Q.  How many times did you meet with your attorney
3    to discuss your deposition?
4    A.  Once.
5    Q.  About how long did that meeting last?
6    A.  About an hour and a half.
7    Q.  Was anybody else at the -- at your meeting with
8    your attorney?
9    A.  No, sir.
10   Q.  Other than the affidavit you submitted and the
11   timeline of the bill and amendments, did you review any
12   other documents to prepare for your deposition today?
13   A.  Not that I can recall.
14   Q.  Did you bring any documents with you today?
15   A.  No, sir.
16   Q.  Are you currently registered to vote?
17   A.  Yes, sir.
18   Q.  Do you have a current Texas driver's license?
19   A.  Yes, sir.
20   Q.  Do you have a concealed handgun license?
21   A.  No, sir.
22   Q.  Do you have a passport?
23   A.  Yes, sir.
24   Q.  Are there any other members of your household
25   who are of voting age?

10

1    A.  Yes, sir.
2    Q.  And who are they?
3    A.  Well, I guess let me make sure I understand the
4    question.  Are you talking about my immediate family?
5    Q.  Correct, yes.
6    A.  Well, I'm single, and my children are both
7    adults.
8    Q.  Okay.  Are your children registered to vote?
9    A.  Yes, sir.
10   Q.  Do your children have current Texas drivers'
11   licenses?
12   A.  I don't know.
13   Q.  Do you know if your children have a passport?
14   A.  They did when they were minors, but I don't
15   think those passports are valid anymore.
16   Q.  Okay.
17   A.  But I don't know.
18   Q.  How many children do you have?
19   A.  I have two young boys, two young adult boys.
20   Q.  How old are they?
21   A.  29 and 26.
22   Q.  And what are their names?
23   A.  The oldest is Michael C. Uresti, and my
24   youngest is Carlos A. Uresti, Jr.
25   Q.  Do your sons live in Texas?

11

1    A.  Yes.
2    Q.  What town do they live in?
3    A.  Both of them live in San Antonio.
4    Q.  All right.  Do you know if either of your sons
5    has a concealed handgun license?
6    A.  My youngest son does.  I believe he does.
7    Q.  And that's Michael?
8    A.  No, Carlos.
9    Q.  Oh, Carlos.
10   A.  Junior.  He just got out of the Marine Corps.
11   Q.  Oh, okay.  Did your other son serve in the
12   military?
13   A.  No, sir.
14   Q.  Are you aware of whether or not your younger
15   son has a military ID?
16   A.  I believe he does, but I don't know if it has a
17   photo on it or not.
18   Q.  I want to talk about Senate Bill 14, and I'm
19   sure you remember, but just to make clear, when I talk
20   about Senate Bill 14, I refer to the photo voter ID that
21   was passed by the legislature in the 2011 session.
22   A.  Yes, sir.
23   Q.  Did you speak with any lobbyists about Senate
24   Bill 14?
25   A.  I really don't remember speaking to any

12

1    lobbyists about it.  I'm not saying I didn't, but I
2    don't recall speaking to a lobbyist.
3    Q.  Do you recall whether you spoke to any
4    representative of an organization outside the Texas
5    legislature about Senate Bill 14?
6    A.  I don't recall speaking to anybody outside the
7    legislature.
8    Q.  Do you recall speaking to anybody outside the
9    legislature about any of the prior voter ID bills
10   considered in either 2005, 2007 or 2009?
11   A.  I don't recall, other than the Department of
12   Justice, but...
13   Q.  And you spoke to the Department of Justice at
14   some point about Senate Bill 14; is that right?
15   A.  That's correct.
16   Q.  Did you speak to the Department of Justice
17   about any of the previous voter ID bills considered by
18   the legislature?
19   A.  In preparing my affidavit, I did.
20   Q.  And when was that?
21   A.  A couple of months ago.
22   Q.  Okay.  So this was either during or after the
23   2011 session?
24   A.  It was after.
25   Q.  Okay.  Do you recall ever speaking to the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

CARLOS URESTI                                          June 11, 2012

13

1  Department of Justice about voter ID before the 2011
2  session?
3      A.  I did not speak to them before.
4      Q.  Do you recall whether you received any
5  materials on voter ID legislation from anyone outside
6  the Texas Legislature during the 2011 session?
7      A.  I don't recall.  I'm not going to say we
8  didn't.  Our office gets, as you know, a lot of
9  different information.  But specifically, I don't
10 recall.
11     Q.  About how many bills get considered during a
12 single legislative session?
13     A.  Well, generally, I know approximately 5,000
14 bills are filed every session, and then you have the
15 substitutes to those bills.  And then, of course, you
16 have amendments and then amendments of amendments.  So
17 you're talking about literally thousands of pieces of
18 legislation, and a result, thousands of different
19 information coming in on those different bills.
20     Q.  Okay.  So I imagine there are at least some
21 groups interested in most, if not all, of those -- of
22 those bills that get filed?
23     A.  Sure.
24     Q.  Do you recall -- do you recall whether you got
25 any material from a group outside the legislature on

14

1  Senate Bill 362 in 2009 or any of the previous voter ID
2  bills considered by the legislature?
3      A.  I don't remember.
4      Q.  Is there a Senate Democratic Caucus group?
5      A.  Yes, there is.
6      Q.  And you are a Democrat, right?
7      A.  Of course.
8      Q.  Okay.  So you're a member of the Democratic
9  Caucus?
10     A.  Yes.
11     Q.  Do you recall whether the Democratic Caucus
12 provided any materials to its members about SB 14 during
13 the 2011 session?
14     A.  I don't recall.
15     Q.  Are you also a member of the Mexican American
16 Legislative Caucus?
17     A.  No, sir.  I'm the chairman of the Senate
18 Hispanic Caucus, so we have our own -- the Senate has
19 their own caucus besides -- separate from the House
20 caucus.
21     Q.  Because the Mexican American Legislative Caucus
22 is the House; is that right?
23     A.  Yes, sir.
24     Q.  Okay.  And its the Senate Hispanic Caucus; is
25 that right?

15

1      A.  Yes, sir.
2      Q.  Did the Senate Hispanic Caucus provide its
3  members with any materials on SB 14 during the 2011
4  session?
5      A.  I don't recall.  I don't think we did, but I'm
6  not positive.
7      Q.  Does the Senate Hispanic Caucus have a chair or
8  a president?
9      A.  I'm the chairman of the caucus.
10     Q.  Okay.  Have you talked to any of your
11 constituents about a photo ID requirement for voting?
12     A.  Yes, sir.
13     Q.  Do you have an idea about how many constituents
14 you have talked to about photo voter ID?
15     A.  Well, I speak to them, I guess, generally in
16 groups.
17     Q.  Uh-huh.
18     A.  And then individually as well.  So I mean, I
19 would be guessing.  It could be hundreds.  It could be
20 in the thousands.  Again, I'm just guessing, because
21 over the several years, I've spoken to literally
22 thousands of people, but not necessarily specifically
23 about the voter ID bill, but... So it's a guess.  I've
24 spoken to a lot of people.
25     Q.  Okay.  So you give a lot of addresses or

16

1  speeches or talks to groups of constituents?
2      A.  Yes, sir.
3      Q.  And it's possible that a talk might include
4  several topics?  Is that right?
5      A.  Yes, sir.
6      Q.  Do you recall whether you've gotten e-mails or
7  letters from your constituents about either SB 14 or
8  generally photo voter ID?
9      A.  Yes, sir, we have.
10     Q.  Do you have a ballpark estimate of how many
11 letters or e-mails you have gotten about SB 14 or photo
12 voter ID?
13     A.  Again, I would be guessing.  Over the years, we
14 literally get, on an average, 3-, 4-, 500 e-mails a day,
15 not on voter ID, but you talk about -- you know, you can
16 pick an issue, so you multiply that out.  So I couldn't
17 even guess at that answer.
18     Q.  Is there a dedicated e-mail address for
19 constituent correspondence in your office?
20     A.  Yes, sir.
21     Q.  Is that an official state legislative account?
22     A.  Yes, sir.  It's my Senate e-mail address.
23     Q.  Is that -- in your experience, is that where
24 constituent e-mails go?
25     A.  Yes, sir.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                            June 11, 2012

17

1   Q.  Do you ever get constituent e-mails to another
2   e-mail account?
3   A.  That's the only one we have set up.  Now, it
4   may go to my staff as well.  But I believe 99 percent of
5   constituent e-mails, at least the initial e-mail, will
6   come to Carlos.Uresti@senate.state.tx.us.
7   Q.  To the extent that you can recall, and
8   understanding that you have a lot of communication with
9   constituents, do any of your constituents support a
10  requirement of photo voter ID for voting?
11  A.  I believe there is probably some that do.
12  Q.  And do any of your constituents, to your
13  knowledge, oppose a photo ID requirement for voting?
14  A.  Yes, sir.  I believe there's many that do as
15  well.
16  Q.  Would you say that most of your constituents
17  support a photo voter ID requirement for voting?
18  A.  No, sir.
19  Q.  Would you say that most of your constituents
20  oppose a photo ID requirement for voting?
21  A.  Yes, sir.
22  Q.  Again, understanding that you have a lot of
23  constituent communications, do you have an estimate of
24  what percentage of your constituents support or oppose
25  photo voter ID requirements for voting?

18

1   A.  Well, if you want me to guess, 75 percent of
2   them.
3   Q.  Okay.  And is that an estimate just based on
4   communications, either oral or written, by e-mail or
5   letter?
6   A.  Most of them would be my interactions with
7   folks once they understand the bill.  I think, again,
8   generally speaking, 75 percent would say -- would oppose
9   it.
10  Q.  Did you prepare any talking points on SB 14 for
11  either a committee proceeding or a Floor debate?
12  A.  Yes, sir.
13  Q.  To the extent you can recall, did you prepare
14  talking points for the previous photo ID bill, SB 362?
15  A.  I'm pretty sure we did.  Knowing how diligent
16  my staff is, I'm pretty sure we had those prepared.
17  Q.  Is it typically your staff that prepares
18  talking points about specific legislation?
19  A.  Generally, they'll draft them, and I'll refine
20  my points.
21  Q.  To the best of your recollection, was it your
22  staff and yourself that prepared talking points for you
23  about SB 14?
24  A.  Yes, sir.
25  Q.  Did anyone else prepare talking points on SB 14

19

1   for you?
2   A.  Not that I believe.
3   Q.  Did anyone else prepare talking points for you
4   about the previous bill, SB 362?
5   A.  Not that I -- not that I know of, no.
6   Q.  Did you conduct any studies about the potential
7   impact of Senate Bill 14?
8   A.  No, sir.  Not individually, no.
9   Q.  Did your staff conduct any studies about the
10  potential impact of SB 14?
11  A.  No, sir.
12  Q.  And Senate Bill 362, to the best of your
13  recollection, did you or your staff conduct any studies
14  about the potential impact of SB 362?
15  A.  No, sir.
16  Q.  Did you review any studies about the potential
17  impact of SB 14?
18  A.  I think we -- I recall vaguely reviewing
19  studies of other voter ID bills, but not once this bill
20  was passed.  If that's your question.  In other words,
21  did I review a study after Senate Bill 14 was passed?
22  No.  Have I reviewed studies of similar pieces of
23  legislation and the effects it would have on minority
24  districts and constituents, yes, I have.
25  Q.  Did you review any studies or projections about

20

1   the specific impact of Senate Bill 14 on Texas voters,
2   either after or before it passed?
3   A.  Well, again, it wasn't specific to Senate Bill
4   14, because we didn't know what the final form of the
5   bill would be.  But generally, similar legislation, yes,
6   I do recall reviewing some studies about how similar
7   legislation would affect my district in Texas.
8   Q.  Do you recall any of the specific studies that
9   you reviewed?
10  A.  No, sir.
11  Q.  And when you say similar legislation, was that
12  legislation that had been considered or passed by other
13  states?
14  A.  Either that, or it was other states -- when the
15  bill was being presented, it would be represented that
16  other states had passed similar legislation.
17  Q.  Do you recall seeing or reviewing any studies
18  about Indiana's photo voter ID law?
19  A.  I don't recall.
20  Q.  Do you recall seeing or reviewing any studies
21  about Georgia's photo voter ID law?
22  A.  Vaguely.  You remember, it's been a couple of
23  years, and -- about a year and a half, I guess.  But
24  vaguely.
25  Q.  Do you recall generally what the substance of



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

CARLOS URESTI                                                June 11, 2012

21

1    that study was about the Georgia law?
2        A.   No, sir.
3        Q.   Before the 2011 session, do you recall seeing
4    any studies about the potential impact of Senate Bill
5    362 on Texas voters?
6        A.   Vaguely.
7        Q.   Do you recall any of the specific studies that
8    you reviewed?
9        A.   No, sir.
10       Q.   Do you recall if any were actually specific to
11   Texas?
12       A.   No, sir.
13       Q.   Have you seen any studies on the impact of
14   voter ID laws generally on voter turnout?
15       A.   Not that I can recall.
16       Q.   So you mentioned a few minutes ago that you had
17   spoken with someone at the Department of Justice about
18   Senate Bill 14; is that right?
19       A.   Yes, sir.
20       Q.   Do you recall who you spoke with at the
21   Department of Justice about SB 14?
22       A.   Bruce Geary.
23       Q.   Bruce Gear?
24       A.   Gear.
25       Q.   Was there anyone else at the Department of

22

1    Justice that you spoke to?
2        A.   No, sir.
3        Q.   Did you send any letters or e-mails to the
4    Department of Justice about SB 14?
5        A.   No, sir.
6        Q.   Did you provide any information to the
7    Department of Justice about SB 14?
8        A.   Just the affidavit.
9        Q.   Did the Department of Justice ask you to
10   provide testimony in this lawsuit?
11       A.   Not that I can recall.
12       Q.   Did the Department of Justice ask you to
13   provide a declaration or affidavit in this lawsuit?
14       A.   Just an affidavit.
15       Q.   Do you recall, roughly, when the Department of
16   Justice asked you to provide an affidavit in this
17   lawsuit?
18       A.   February or March, I think, 2012, of this
19   year.  I believe that's the time frame.
20       Q.   Are you aware that the Department of Justice
21   sent a letter to the State of Texas, on March 12, 2012,
22   interposing an objection or refusing to preclear SB 14?
23       A.   I'm not aware of the letter.
24       Q.   Are you aware that the preclearance was denied
25   of SB 14?

23

1        A.   Yes, sir.
2        Q.   Are you aware that that happened on March 12,
3    2012?
4        A.   No, sir.
5        Q.   So you wouldn't be able to say whether or not
6    you spoke to the Department of Justice before or after
7    preclearance was denied?
8        A.   No, sir.
9        Q.   Has the Department of Justice asked you to do
10   anything else in this lawsuit besides provide a
11   declaration or affidavit?
12       A.   No, sir.
13       Q.   Senator, are you -- are you familiar with
14   Section 5 of the Voting Rights Act?
15       A.   Generally.
16       Q.   What's your understanding, just very generally,
17   of Section 5?
18       A.   Generally, due to the state of Texas's history
19   over the last several decades with regard to a
20   discriminatory effect on voters, based on its laws and
21   its policies, that before certain laws can go into
22   effect, it has -- those laws have to be precleared by
23   the Department of Justice to ensure that voters aren't
24   disenfranchised and they continue to have the ability to
25   vote.

24

1        Q.   And is it your understanding that under
2    Section 5, the inquiry goes to whether a particular law
3    has a discriminatory effect or a discriminatory purpose?
4        A.   Yes, sir.
5        Q.   Okay.  I want to talk briefly about the effect
6    part of that specific to SB 14.
7        Q.   Do you contend that Senate Bill 14 will
8    have the effect of denying or abridging African American
9    Texans' right to vote?
10       A.   Yes, sir.
11       Q.   What is the basis for that contention?
12       A.   Well, the strict requirements that are in the
13   bill that require all voters to have a photo ID, in
14   addition to their voter's registration card, which I
15   believe is a -- can be -- especially speaking about my
16   district, there will be many obstacles in the way of my
17   constituents obtaining that photo ID in a timely fashion
18   in order to vote, and as a result, it will have that
19   effect.
20       Q.   Do you know, roughly speaking, what percentage
21   of your constituents are African American, Hispanic,
22   Anglo, and Asian American?
23       A.   Yes, sir.  Approximately -- of the 800,000 or
24   so folks that I represent, approximately 69 to 69 and a
25   half percent are Hispanic.  Approximately 5 to 5 and a



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                                    June 11, 2012

25

1    half percent are African American.  Maybe less than 1
2    percent is Asian American.  And then the balance would
3    be Anglo.
4        Q.   And so your contention that Senate Bill 14 will
5    have the effect of denying or abridging African American
6    voters' right to vote, is the contention basically that
7    requiring a photo ID will harm African American voters'
8    right to vote because they may not have the ID that's
9    required?
10       A.   Exactly.
11       Q.   Okay.  Is there any other specific way or any
12   other way that you contend that SB 14 will have a
13   negative impact on African American voters?
14       A.   Well, I think an additional way will be the
15   fact that it may disenfranchise African Americans from
16   voting, based on their long history of having to
17   overcome civil rights violations.  And during all of the
18   things that they've had to go through, I believe that
19   this will disenfranchise them -- disenfranchise them
20   once again based on, perhaps, some of the fear that
21   still exists in African Americans and many of those that
22   live in my district.  Their distrust perhaps, and the
23   intimidation as well.  So I believe because of that,
24   that they may feel that intimidation and fear and
25   distrust, and as a result be disenfranchised and not go

26

1    to the voting booth.
2        Q.   When you say intimidation, is there -- what is
3    it in SB 14 that you understand would intimidate or
4    deter African American voters from voting?
5        A.   The fact that they have to go, for one, to the
6    Department of Public Safety to get a photo ID.  Many of
7    them may not drive.  Many of them may be elderly and
8    have gone through Civil Rights Movement.  They may be in
9    their 70 or 80s.  So that fear that may still exist,
10   perhaps.  I think that could be intimidating.  And
11   knowing that they're going to have to overcome those
12   obstacles, coupled with the fact the fee or the travel,
13   you know, et cetera, all of those factors, either
14   individually or together, I think will lend itself to
15   some intimidation amongst African American voters.
16       Q.   So is it accurate to say that in your
17   understanding, the negative effects that may -- that may
18   occur with respect to African American voters are all
19   based on this requirement that they have to either show
20   or get a specific form of ID that they may not have
21   already?
22       A.   Exactly, especially given the fact that they
23   already have a voter's registration card, that they're
24   going to be required to go and obtain an additional form
25   of identity, specifically a photograph ID, yes, I

27

1    believe so.
2        Q.   Do you contend that Senate Bill 14 will have
3    the effect of denying or abridging Latino Texans' right
4    to vote?
5        A.   Absolutely.
6        Q.   And can you explain to me what the basis for
7    that contention is?
8        A.   Well, again, speaking specifically of my
9    district, first of all, wherein it's almost 70 percent
10   Hispanic, many of my residents live along the border.
11   Again, I represent two-thirds of the Texas-Mexico
12   border.  Many already do not have a valid ID for
13   different reasons, even though they are American
14   citizens.  Once again, I believe the effect of this bill
15   will be to disenfranchise them or to prevent barriers or
16   obstacles keeping them from being able to exercise their
17   constitutional right to vote.
18       Q.   And in your understanding, the barrier or
19   obstacle caused by SB 14 would be the requirement that
20   they have to have -- that if they don't have one of the
21   specific forms of ID, they will not be allowed to cast a
22   ballot; is that right?
23       A.   Absolutely.  That would have been the case with
24   my mother, for example.  She had a voter's registration
25   card.  She was a American citizen born in Texas, hadn't

28

1    driven in many years because of her health, and she
2    would not be able to vote with this -- if this bill goes
3    into effect because she can't get to the DPS office to
4    get a photo ID.
5        Q.   How old is your mother?
6        A.   She passed away last November.  She was 77.
7        Q.   Oh, I'm sorry.
8            Do you believe that SB 14, if it -- if it
9    is implemented, will have the effect of preventing or
10   deterring indigent Texans from voting?
11       A.   There's no question it will.
12       Q.   And is -- can you briefly explain the basis for
13   that?
14       A.   Well, for one, the cost of obtaining the ID.
15   Two, again, keeping in mind that in my district, it's --
16   you know, there are some folks that may live in Kinney
17   County, for example, which is in between Eagle Pass
18   and -- or Uvalde and Del Rio.  To travel to a DPS office
19   could take an hour, an hour and a half one way.  That's
20   assuming there's a DPS office that's open.  And if
21   you're indigent, most likely, you don't have a vehicle.
22   There's no infrastructure wherein you can just hop on a
23   bus and travel there.  And if you do, hopefully you'll
24   get there before the lines are too long and/or before
25   the DPS office has closed.  So there is no question for

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

CARLOS URESTI                                              June 11, 2012

29

1  anyone to think that this bill will not affect the
2  indigent.  They need to come out to my district and talk
3  to those folks.
4      Q.  Do you have a general idea of what percentage
5  of your constituents are indigent?
6      A.  Well, I can tell you that -- I don't know the
7  exact number, but a large number of my constituents
8  either live in poverty or are on the border of living in
9  poverty, where the average -- the average per capita
10 income for my district is $12,500 per year.  So it's a
11 huge number.  When you go along the border, the poverty
12 rates are much bigger than they are than in other parts
13 of Texas.
14     Q.  Do you believe that SB 14 will negatively
15 effect Asian Americans voters' right to vote in Texas?
16     A.  Yes, sir.
17     Q.  Can you tell me the basis for that contention?
18     A.  Well, for the same reasons that I've already
19 mentioned how I think it will effect African Americans
20 and Hispanics as well.  You know, the whole idea of
21 requiring them to obtain an additional form of ID, photo
22 ID, in addition to their voter's registration card, I
23 think imposes conditions upon them that aren't
24 necessary, and given the fact that many of the folks
25 that live in my district live in poverty or are very

30

1  poor, it's just a burden that they're -- it's going to
2  be difficult for them to overcome.  And that goes to
3  basically most folks that live in my district, and I
4  would submit throughout Texas as well.
5      Q.  Do you believe that SB 14 will have a negative
6  effect on Anglo voters in your district?
7      A.  Absolutely.
8      Q.  And is that for the same reason we've talked
9  about, why it will affect other voters in your district?
10     A.  Well, I think more so because of the indigency
11 issue or the poverty issue as well.  You known, if
12 you've ever driven to Presidio, you know that that's a
13 long way from Austin or to any DPS office.  And because
14 of that fact, the geographical issue, coupled with the
15 indigency issue, the fact that they're poor, will make
16 it very difficult.
17     Q.  Are you familiar with any polls about support
18 for voter photo ID legislation among Texans?
19     A.  I don't follow polls generally, so no, I
20 don't.  I'm not.
21     Q.  Do you recall any polls being introduced or
22 discussed during the legislative debate about SB 14?
23     A.  Generally, there were -- I know somebody who
24 made reference to a poll, but I couldn't tell you the
25 specifics of that poll.

31

1      Q.  I want to move on to a similar but slightly
2  different area and talk about possession of photo IDs.
3          Do you believe that African American
4  voters in Texas are less likely than average to have one
5  of the IDs required by SB 14?
6      A.  Yes, sir.
7      Q.  Do you believe that Latino voters in Texas are
8  less likely than average to have a form of
9  identification required by SB 14?
10     A.  Yes, sir.
11     Q.  Do you believe that Asian American voters in
12 Texas are less likely to have a form of identification
13 required by SB 14?
14     A.  Yes, sir.
15     Q.  Do you believe that elderly voters in Texas are
16 less likely than average to have one of the IDs required
17 by SB 14?
18     A.  Yes, sir.
19     Q.  And do you believe that indigent voters are
20 less likely than average, indigent voters of Texas are
21 less likely than average to have one of the IDs required
22 by SB 14?
23     A.  Absolutely.
24     Q.  Do you believe that disabled voters in Texas
25 are less likely than average to have one of the IDs

32

1  required by SB 14?
2      A.  Yes, sir.
3      Q.  Do you believe that voters in rural areas are
4  less likely than average -- rural areas of Texas are
5  less likely than average to have one of the IDs required
6  by SB 14?
7      A.  Yes, sir.
8      Q.  Do you believe that voters who lack a high
9  school diploma are less likely than average to have a
10 form of identification required by SB 14?
11     A.  Most likely, yes.
12     Q.  And we've talked a little bit about the
13 requirement of actually getting an ID.  If somebody
14 doesn't have one, do you believe that an indigent voter
15 in Texas is less likely than a nonindigent voter to be
16 able to get one of the forms of ID required by SB 14?
17     A.  Yes, sir.
18     Q.  Do you believe that elderly voters are in Texas
19 are less likely than nonelderly voters to be able to
20 obtain one of the IDs required by SB 14?
21     A.  Yes, sir.
22     Q.  Do you believe that disabled voters in Texas
23 are less likely than voters who are not disabled to be
24 able to obtain one of the IDs required by SB 14?
25     A.  Yes, sir.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                    June 11, 2012

33

1    Q.  Do you believe that voters in rural areas of
2    Texas are less likely than urban or suburban voters to
3    be able to obtain a form of identification required by
4    SB 14?
5    A.  Yes, sir.
6    Q.  Do you believe that young voters in Texas are
7    less likely than average to have one of the IDs required
8    by SB 14?
9    A.  I believe so, yes.
10   Q.  And similarly, do you believe that young voters
11   in Texas are less likely than average to be able to
12   obtain one of the forms of ID required by SB 14?
13   A.  Yes, sir.
14   Q.  I want to move on to talk about -- talk about
15   discriminatory purpose for a little bit.
16       Do you contend that the Texas Legislature
17   intended to harm African American voters by passing
18   SB 14?
19   A.  Not the whole legislature, no.
20   Q.  Do you contend that certain legislators voted
21   in favor of Senate Bill 14 for the specific purpose of
22   harming African American voters?
23   A.  I contend that the bill was passed for that
24   purpose.
25   Q.  Do you contend that that was the purpose of the

34

1    legislature -- back up a bit.
2        Do you contend that the legislature as a
3    whole passed Senate Bill 14 for the purpose of harming
4    African American voters in Texas?
5    A.  Not as a whole, no.
6    Q.  Okay.  But you believe that maybe part of the
7    legislature, or certain legislators supported SB 14 for
8    the purpose of harming African American voters?
9    A.  Well, I can't say that the legislators did that
10   purposefully.  I just know that my position, my
11   contention is, is that the bill had that effect.
12   Q.  Your contention is that SB 14 had the effect of
13   harming African American voters' ability to vote?
14   A.  Yes, sir.
15   Q.  Okay.  but you don't contend that the bill was
16   passed for the purpose of harming African American
17   voters' ability to vote?
18   A.  No, I do contend that.  Yes, I do contend that.
19   Q.  But you don't contend that that was the purpose
20   of the legislature of the whole to harm African American
21   voters?
22   A.  Well, I can't say as a whole, because I didn't
23   vote for the bill, and I know many of my colleagues, at
24   least my Democratic colleagues didn't vote for the
25   bill.  And that's why I can't say as a whole the

35

1    legislature passed that bill.
2    Q.  With respect to the legislators who supported
3    and voted for Senate Bill 14, do you contend that -- do
4    you contend that the legislators who voted for Senate
5    Bill 14 did so for the purpose of harming African
6    American Texans' ability to vote?
7    A.  Well, I certainly think that they knew after --
8    by that time that the bill came up for a vote, based on
9    my objections and some of my colleagues' objections, our
10   concern about how this bill would affect our
11   constituents, I think at that point, if they weren't on
12   notice beforehand, they certainly were on notice at that
13   time.
14   Q.  Do you believe that -- do you believe that the
15   Texas Legislature intended to harm Latino voters by
16   enacting SB 14?
17   A.  Well, again, I can't tell you that the
18   legislature did that, because many voted against it.
19   So I can't say as a whole the legislature passed --
20   intended to do that, because I voted against it, and
21   again, many of my colleagues voted against the bill.
22   Q.  I understand.  Do you contend that the members
23   of the Texas Legislature who voted for SB 14 voted for
24   the bill in order to harm Latino voters in Texas?
25   A.  And again, I believe that they may not have

36

1    been some of their intent initially, but the -- I
2    believe when the bill passed, that was the intent of the
3    bill.
4    Q.  Okay.  So just to be clear, it's your
5    contention that the legislators who voted in favor of
6    SB 14 did so for the purpose of harming the ability of
7    African American and Hispanic Texans to vote?
8    A.  Well, I think clearly the bill that was passed
9    had that effect.  That's my contention is, the bill that
10   was passed had that effect and they were -- they were
11   the members that voted for that bill.
12   Q.  Do you believe that any individual member of
13   the legislature who voted for SB 14 voted for the bill
14   specifically because they thought that it would
15   negatively affect Latino and African American voters and
16   they wanted it to have that effect?
17   A.  I can't say that for certain, no.
18   Q.  Can you identify any particular legislator who
19   supported SB 14 who you would contend supported the bill
20   in order to harm the voting rights of African American
21   or Hispanic Texans?
22   A.  I can't individually, because I don't know what
23   they were thinking.  But again, I would just submit that
24   they had to know of the effects of the bill, because we
25   made that clear to them, either on the Senate floor and



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

CARLOS URESTI                                          June 11, 2012

37

1  I'm assuming on the House floor, the effects the bill
2  would have on our specific districts.
3      Q.  To your knowledge, is there -- do you know of
4  any evidence that any member of the Texas Legislature
5  who voted for SB 14 did so because they understood that
6  the bill would negatively affect African American and
7  Latino voters and they wanted it to have that effect?
8      A.  I guess the only evidence would be the
9  testimony from the legislators, like myself, advising
10 them that this bill would have a negative effect on our
11 districts and our constituency.
12     Q.  So other than -- other than knowledge or
13 presumed knowledge of the effect of the bill, is there
14 any other basis for your contention that members of the
15 legislature voted for SB 14 for the purpose of harming
16 African American or Latino voters?
17     A.  Well, other than the knowledge given to them by
18 their colleagues and myself, I don't know of any other
19 evidence that exists.  I mean, it's on the record.  I
20 believe it's probably in the journal.  I don't know what
21 other knowledge they would need.
22     Q.  And I understand that there was a lot of
23 testimony from several members of the legislature about
24 the potential effect of the bill.  Do you think it's
25 possible that some of the members who supported SB 14

38

1  just disagreed with that testimony or didn't think it
2  would have the same effect?
3      A.  Sure, of course.
4      Q.  Okay.  If a member just didn't agree or thought
5  -- didn't agree with the testimony that it would have a
6  negative effect on Latino or African American voters or
7  just sincerely believed that it would not have any
8  negative effect, would a vote in favor of the bill,
9  would that demonstrate a discriminatory purpose?
10     A.  Well, I would be speculating when I answer that
11 question, but no one knows my district better than I, I
12 would submit.  And when you have 75 percent that are
13 both African American and Hispanic, and I testified to
14 my colleagues this bill will have a discriminatory
15 effect on my constituents, I would think they'd give
16 great weight to that testimony.  Of course, it's their
17 decision to disagree with me, but given what I know
18 about my district, having represented it for six years,
19 I believe a vote contrary would mean that they
20 understood the effects of the bill and notwithstanding
21 the negative consequences and effects of the bill, they
22 decided to vote in favor of that bill.
23     Q.  And when you said they understood the effects
24 of the bill, you can't say for sure, as you sit here,
25 whether any individual member actually understood or

39

1  believed that those effects would happen, can you?
2      A.  Oh, of course not.  I can't --
3          MR. GARZA:  Objection, argumentative and
4  asked and answered.  You can go ahead and answer.
5      A.  Yeah, of course not.  I can't get into their
6  head.
7          MR. FREDERICK:  Chris, mark this as Uresti
8  Deposition Exhibit 1, please.
9          (Uresti Exhibit 1 marked for
10 identification.)
11         MR. GEAR:  Matthew, I don't know if you
12 wanted to put our appearances on the record.
13         MR. FREDERICK:  Oh.
14         MR. GEAR:  Because there's objections
15 and --
16         MR. FREDERICK:  Okay.  Well, yeah, let's
17 go ahead and do before we get into the exhibit.
18         At this time, counsel has requested that
19 everyone put in an appearance for the record.  I'll
20 start.  I'm Matt Frederick.  I'm appearing for the State
21 of Texas.
22         MR. GEAR:  I'm Bruce Gear.  I'm appearing
23 on behalf of Eric Holder, the Defendant.
24         MR. GARZA:  Jose Garza appearing on behalf
25 the defendant intervenors, the Mexican American

40

1  Legislative Caucus.
2          MR. MALDONADO:  Roberto Maldonado
3  appearing on behalf of the deponent.
4      Q.  (BY MR. FREDERICK) Senator Uresti, just to be
5  clear, are you represented today by Mr. Garza?
6      A.  No, sir.  I'm represented by Roberto Maldonado.
7      Q.  Thank you.  If you would look at what's been
8  marked as Deposition Exhibit 1, please.  Can you
9  identify what this document appears to be?
10     A.  Exhibit 1 appears to be Senate Journal, Monday,
11 dated Monday, May 9, 2011, from the 82nd Legislature.
12     Q.  I'm going to give you another exhibit before we
13 get into that one.
14         If you'll mark this one, Chris, as Uresti
15 Exhibit 2, please.
16         (Uresti Exhibit 2 marked for
17 identification.)
18     Q.  (BY MR. FREDERICK) Can you identify that
19 exhibit for the record, please?
20     A.  Exhibit 2 appears to be, again, from the Senate
21 Journal of the 82nd Legislature dated January 26, 2011.
22     Q.  Thank you.  If you'll turn, please, to the
23 second page of Exhibit 2, there -- a couple of lines
24 down from the top -- well, first, does this appear to
25 top left, does this appear to be Page 146 of the

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

ESQUIRE
DEPOSITION SOLUTIONS

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                      June 11, 2012

41

1  journal?
2      A.   Yes, sir.
3      Q.   A couple of lines from the top, do you see
4  where it says "Senate Bill 14 on the third reading"?
5      A.   Yes, sir.
6      Q.   And do you see a few lines down, it recites
7  that the bill was read -- read the third time and then
8  passed by a vote of 19 in favor and 11 opposed?
9      A.   Correct.
10     Q.   I would like for you -- I'm going to hand you
11  this pen, and I would like for you to circle the name of
12  any of the legislators who voted in favor of this bill
13  who you contend supported the bill in order to harm
14  African American or Latino voters.
15     A.   Repeat your question.
16     Q.   Of course.  I would like you to circle the name
17  of any senator who voted in favor of the bill who you
18  contend voted in favor of the bill to harm the ability
19  of African American and Latino Texans to vote.
20     A.   Well, again, Counselor, my position is, it was
21  the intent -- it was the effect of the bill, once it was
22  passed, that had the intent to discourage or
23  disenfranchise voters, specifically those of African
24  American or Hispanic that live in my district.  So I
25  can't identify a particular senator.  My position is

42

1  that it was the intent -- it was the effect of the bill,
2  Senate Bill 14, that had that negative consequence.
3      Q.   Okay.  So as you sit here today, you can't
4  identify any specific senator who voted for SB 14 for
5  the purpose of harming African American and Latino
6  Texans' right to vote?
7      A.   It would be very difficult, because I can't get
8  into their head and know what they were thinking when
9  they voted.
10     Q.   So as you sit here today, you cannot identify
11  any specific senator who voted for the bill to harm
12  African American and Latino voters?
13     A.   That's correct.
14     Q.   Thank you.
15          If I were to show you a list of members of
16  the Texas House who voted in favor of SB 14, would you
17  be able to identify any specific House member who you
18  believe voted for SB 14 in order to harm African
19  American and Latino Texans' right to vote?
20     A.   No, sir.
21     Q.   Thank you.
22          Do you contend that the Texas Legislature
23  intended to harm indigent voters by passing SB 14?
24     A.   And again, my response is not the whole
25  legislature, because not all of us voted for the bill.

43

1      Q.   Do you contend that any of the legislators who
2  voted for SB 14 did so for the purpose of harming
3  indigent voters?
4      A.   And again, my response would be similar to your
5  previous questions in that it's the bill that had that
6  effect on the indigent, and that would be my position.
7      Q.   So you couldn't identify any particular
8  legislator who voted for SB 14 for the specific purpose
9  of preventing indigent people from voting?
10     A.   No, sir.
11     Q.   Do you believe that the members of legislature
12  who voted for SB 14 did so in order to harm elderly
13  people by preventing them from voting?
14     A.   And again, my response would be the same, which
15  is that the bill had that effect of harming the elderly
16  or preventing the elderly from voting.
17     Q.   So you couldn't identify a specific legislator
18  who voted for SB 14 for the purpose of preventing
19  elderly people from voting?
20     A.   No, sir.
21     Q.   Do you believe that the members of the
22  legislature who voted for SB 14 did so in order to harm
23  rural voters by preventing them from voting?
24     A.   And again, Counselor, my response would be the
25  same, in that it was the bill, Senate Bill 14, that had

44

1  the effect on preventing rural voters from being able to
2  vote.
3      Q.   So you can't identify any specific legislator
4  who voted for SB 14 for the purpose of harming rural
5  voters by preventing them from voting?
6      A.   No, sir.
7      Q.   So other than the potential effect of SB 14, is
8  there any other evidence that you were aware of to
9  support the contention that SB 14 was passed with a
10  discriminatory purpose?
11          MR. GARZA:  Objection, calls for a legal
12  conclusion.
13     A.   Can you repeat your question again, please?
14     Q.   (BY MR. FREDERICK) Of course.  Other than the
15  potential effect of SB 14 on voters in Texas, is there
16  any other evidence on which you base your contention
17  that the bill was passed with a discriminatory purpose?
18     A.   Not that I can think of, no.
19          MR. FREDERICK:  Do you mind if we take a
20  five-minute break?
21          MR. MALDONADO:  Not at all.
22          THE WITNESS:  Perfect.
23          (Recess from 10:38 a.m. to 10:47 a.m.)
24          MR. FREDERICK:  Mark that as Exhibit 3.
25          (Exhibit 3 marked for identification.)



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                                    June 11, 2012

45

1   Q.  (By Mr. Frederick)  Senator, the court reporter
2   has handed you what's been marked as Deposition
3   Exhibit 3.  If you'll turn to the second page, if you
4   can identify this document, please.  And please take
5   your time to look it over.
6   A.  This appears -- Counselor, this appears to be a
7   declaration of Carlos Uresti, myself, and it's dated
8   April 9, 2012.
9   Q.  Does this appear to be a true and correct copy
10  of the declaration that you provided to the Department
11  of Justice in this lawsuit?
12  A.  Yes, sir.
13  Q.  Who wrote this declaration?
14  A.  I did.
15  Q.  Did anyone at the Department of Justice provide
16  comments on the substance of this declaration?
17  A.  Not that I can recall.
18  Q.  Did anyone at the Department of Justice make
19  edits or changes to the declaration after you had
20  written it?
21  A.  No, sir.
22  Q.  Did anyone else assist you in writing this
23  declaration?
24  A.  No, sir.  And let me clarify that.  I may have
25  asked my staff for specific data like the bill number,

46

1   et cetera, but as far as writing it, no.
2   Q.  Okay.  So your staff may have helped you find
3   some of the information, right?
4   A.  Yes, sir.
5   Q.  But you actually did the writing?
6   A.  Yes, sir.
7   Q.  Is it correct that the Department of Justice
8   asked you to provide a declaration for this lawsuit?
9   A.  Yes, sir.
10  Q.  When was that request made, to the extent that
11  you can recall?
12  A.  Again, well, obviously, it was before April the
13  9th, somewhere between March and April.
14  Q.  How was that request communicated to you from
15  the Department of Justice?
16  A.  I think they called my office, my office called
17  me, and then I contacted the Department of Justice.  I
18  believe that's how it worked.
19  Q.  Did you discuss an affidavit with the
20  Department of Justice before you drafted this affidavit?
21  A.  I don't understand your question.
22  Q.  Sure.  Is it accurate that you had a
23  conversation with someone at the Department of Justice
24  before you actually drafted this declaration?
25  A.  Yes, sir.

47

1   Q.  And did the substance of that conversation
2   include the declaration that you had been asked to
3   draft?
4   A.  If you're asking me if they asked me to prepare
5   an affidavit or declaration, yes, that's correct.
6   Q.  What else did they -- what else did you discuss
7   related to the affidavit with the Department of Justice
8   before you wrote the affidavit?
9   A.  That's pretty much it.
10  Q.  Did the Department of Justice tell you that
11  they wanted you to include anything specific in that
12  affidavit?
13  A.  I think it was the conversation was more about
14  be as specific as you can be.  But again, I don't
15  remember exactly that conversation.
16  Q.  Before that conversation about your -- about
17  this affidavit, which was in -- sometime in March or
18  April of 2012; is that right?
19  A.  Yes, sir.
20  Q.  Before that conversation, had you had a
21  conversation with the Department of Justice?
22  A.  Not that I can recall.  I don't think I've ever
23  spoken to them before.
24  Q.  The Department of Justice didn't call you to
25  ask about Senate Bill 14 during the administrative

48

1   preclearance process?
2   A.  They never spoke to me.  I don't think they
3   ever spoke to my office.
4   Q.  So moving back to the conversation that you had
5   with the Department of Justice about your affidavit, in
6   that conversation, did the Department of Justice ask you
7   if you believed that Senate Bill 14 would have a
8   discriminatory effect?
9   A.  I don't -- I really don't recall if they asked
10  me that specific question or not.
11  Q.  Do you recall if you told them that you
12  believed that Senate Bill 14 would have a discriminatory
13  effect?
14  A.  I honestly don't recall.
15  Q.  Do you recall --
16  A.  What I was going to say is -- this is a side
17  matter.  There was another bill that I was working on.
18  It was a local San Antonio bill called "BexarMet Water
19  District Bill."  Bexar Metropolitan Water District
20  Bill.  That bill required clearance -- preclearance by
21  the Department of Justice, coincidentally.  Had nothing
22  to do with this bill specifically, but because it had to
23  do with voting rights, the Voting Rights Act, it had to
24  be precleared.
25      So I had other conversations not related



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                    June 11, 2012

49

1  to Senate Bill 14 with the Department of Justice,
2  coincidentally, so that's why I'm a little -- trying to
3  make sure I remembered those conversations.
4      Q.  I understand.  Thank you.  And BexarMet Water
5  District, that's Bexar County, right?
6      A.  Yes, sir.
7      Q.  Which includes San Antonio?
8      A.  Yes, sir.
9      Q.  And that's B-e-x-a-r?
10     A.  Thank you.  B-e-x-a-r.  And most of the Bexar
11 Metropolitan Water District is within my senate district
12 as well.
13     Q.  In the conversation or conversations you had
14 with the Department of Justice about the BexarMet Water
15 District Bill, was Senate Bill 14 ever mentioned in
16 those conversations?
17     A.  No, sir.
18     Q.  I appreciate you clarifying that.
19     A.  Yes, sir.
20     Q.  How many conversations did you have with the
21 Department of Justice about the declaration that you
22 provided in this lawsuit?
23     A.  I think two.
24     Q.  How long did each of those conversations last?
25     A.  I'm guessing the first one might have lasted

50

1  five minutes or so.  I really don't recall.  And then
2  the second one was probably maybe 10 minutes.  There
3  might have been a third one.  And if there was a third
4  one, you know, probably along the same lines, 5 to 10
5  minutes.
6      Q.  Just so I'm clear, so the Department of Justice
7  asked you to provide a declaration in this lawsuit,
8  right?
9      A.  Yes, sir.
10     Q.  And you had a conversation sometime in March or
11 April of 2012, you think, about providing that
12 declaration?
13     A.  Yes, sir.
14     Q.  And that -- was that conversation by telephone?
15     A.  Yes, sir.
16     Q.  And I think that you testified earlier, but was
17 it Mr. Gear that you spoke to at the Department of
18 Justice?
19     A.  Initially, I really don't recall if that was
20 the first person I communicated with.  I don't remember.
21     Q.  Is -- do you recall, other than Mr. Gear, any
22 other specific individual at the Department of Justice
23 with whom you spoke about SB 14?
24     A.  Other than the first conversation, because I
25 don't recall who that was, no, I don't believe I spoke

51

1  to anyone else.
2      Q.  So after you spoke to the Department of Justice
3  for the first time, you drafted the declaration; is that
4  right?
5      A.  Yes, sir.
6      Q.  And did you provide that draft to the
7  Department of Justice?
8      A.  I believe so.
9      Q.  Did you -- after you submitted or provided a
10 draft of your declaration, did you discuss your
11 declaration again with the Department of Justice?
12     A.  We reviewed it together, yes.
13     Q.  Were any changes made after you reviewed or
14 discussed the department of -- your declaration, excuse
15 me, with the Department of Justice?
16     A.  I believe the only changes I made were typos
17 that I had made in my affidavit.
18     Q.  Do you know why the Department of Justice asked
19 you to provide an affidavit in this case?
20     A.  I can only assume because they were objecting
21 to the bill.
22     Q.  Did anybody from the Department of Justice ever
23 tell you why they wanted you to provide an affidavit?
24     A.  I assumed they were asking everybody, quite
25 frankly.  I say "everyone," all the Democratic senators

52

1  that opposed it.  I never asked that question.
2      Q.  And nobody ever told you why, specifically,
3  they wanted you to provide an affidavit?
4      A.  No, sir.
5      Q.  Did anyone outside the Department of Justice
6  ever tell you why the Department of Justice wanted you
7  to provide an affidavit in this case?
8      A.  No, sir.
9      Q.  And you said that there were -- you had two
10 phone conversations about your affidavit.  Do you recall
11 any other conversations by phone or in person with the
12 Department of Justice in this case?
13     A.  We never met in person, and there may have
14 been, again, a third one that followed.
15     Q.  Okay.  So after your second conversation when
16 you discussed the affidavit itself, did the Department
17 of Justice then provide you with an affidavit to sign?
18     A.  I prepared the affidavit.
19     Q.  Oh, okay.  So after you had the second
20 conversation, then you finalized the affidavit, signed
21 it, and sent it to the Department of Justice; is that
22 right?
23     A.  Yes, sir.  I signed it and I had it notarized
24 in my office and then sent it off.
25     Q.  And this shows that you signed it and swore to



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                                    June 11, 2012

53

1   it on April 9th, 2012?
2       A.  Yes, sir.
3       Q.  Other than the Department of Justice and
4   possibly members of your staff, did you discuss this
5   affidavit with anyone else?
6       A.  Never.
7       Q.  Sitting here today, is there anything in this
8   affidavit that you would like to change or clarify?  And
9   please take your time.
10      A.  On page -- I guess it's -- it says Page 3 of 5
11  at the top.
12      Q.  Okay.
13      A.  Paragraph 6.
14      Q.  Yes.
15      A.  The last sentence of the paragraph reads:  "I
16  also called the offices of Senator Jane Nelson and
17  Senator Tommy Williams to inform them that I would be
18  arriving late because of my illness."  It should be
19  Senator Kim Brimer instead of Tommy Williams.
20      Q.  Okay.
21      A.  And the reason I made that mistake is because
22  both of them were chairs of the administrative --
23  Administration Committee, and I was the vice chair.  And
24  I just thought it was Tommy.  It was Kim Brimer.
25      Q.  And this was in 2007?

54

1       A.  Correct.
2       Q.  Okay.  So in Paragraph 6, then, rather than "I
3   also called the office of Senator Jane Nelson and
4   Senator Tommy Williams," it should say "Senator Jane
5   Nelson and Senator Kim Brimer," right?
6       A.  Correct.
7       Q.  And I'll give you time.  Is there anything else
8   that you would like to change or clarify?
9       A.  As far as the substance is concerned, no.  I
10  see a few typos but nothing else.
11      Q.  All right.  Thank you.  I'd like to -- on Page
12  3, if you could direct your attention to Paragraph 7?
13      A.  Okay.
14      Q.  And it looks like this is a discussion about a
15  vote on House Bill 218; is that right?
16      A.  Yes, sir.
17      Q.  And the House Bill 218 was -- that was a photo
18  ID bill that was considered in 2007 by the legislature;
19  is that right?
20      A.  Yes, sir.
21      Q.  And that bill, that bill didn't get passed by
22  the legislature, did it?
23      A.  No, sir.
24      Q.  And I guess the fact that that bill was a House
25  bill that came to the Senate, does that mean that it

55

1   passed the House?
2       A.  Yes, sir.
3       Q.  But then, obviously, it did not pass the
4   Senate, right?
5       A.  It didn't pass the Senate.  I'm assuming it did
6   pass the House to come over.
7       Q.  Okay.  In the Senate, who sets the -- who sets
8   the Senate calendar?
9       A.  The Lieutenant Governor.
10      Q.  Lieutenant Governor.  So there's no calendar
11  committee in the Senate?
12      A.  No, sir.  It's not like in the House where they
13  have their own House Calendars Committee that determines
14  what bills come to the Floor.  In the Senate, it's --
15  there's no such committee, and the Lieutenant Governor,
16  as presiding officer, dictates the calendar.
17      Q.  So what would be required to change the Senate
18  calendar?
19      A.  Well, to bring a bill up, we have, like in this
20  case, the two-third -- I say "this case," Senate Bill
21  14, you have the two-thirds rule, which requires
22  two-thirds of the senators to agree to bring up any
23  particular bill before it can be heard.  But that's only
24  after the Lieutenant Governor determines that a
25  particular bill is going to be called.  So as the

56

1   presiding officer, he still has that power.
2       Q.  I see.
3       A.  So in order to change it, a majority of members
4   can make that decision as they did with Senate Bill 14.
5       Q.  So is it accurate to say that once a -- once a
6   bill has been put on calendar or allowed to go to the
7   calendar by the Lieutenant Governor, it's the members
8   that decide the order the bills get considered in?
9       A.  No.
10      Q.  No?
11      A.  No.
12      Q.  How does -- how is the order in which bills get
13  considered determined?
14      A.  The Lieutenant Governor ultimately makes that
15  decision.  There can be a bill on the calendar that
16  could sit there for two weeks, and then the Lieutenant
17  Governor makes the final decision which bill is going to
18  be called up and when.
19      Q.  I see.  So the Lieutenant Governor, for lack of
20  a better word, decides to bring up a bill; is that
21  right?
22      A.  Yes.
23      Q.  And then at that point, is when under customary
24  procedures, the senators would vote to determine whether
25  that bill gets considered?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                        June 11, 2012

57

1    A.   Exactly.
2    Q.   Now, the requirement of two-thirds, or the
3  two-thirds vote by senators, does that appear in the
4  Senate rules?
5    A.   It's a -- it's a -- well, the first day the
6  session, the senators caucus, and we vote on our
7  rules.  And as far as I can recall, other than Senate
8  Bill 14, the rules have always required two-thirds, a
9  two-thirds vote before a bill comes up to be voted on,
10  on the Senate floor.
11    Q.   Is it customary in the Senate to have what I
12  think is sometimes referred to as a "blocker bill"?
13    A.   Yes, sir.
14    Q.   Can you tell me your understanding of what the
15  blocker bill is?
16    A.   The blocker bill is -- is a bill that's usually
17  not of great importance, I suppose, and it's placed on
18  the calendar to essentially support the whole two-thirds
19  concept.  So in other words, before a bill can be taken
20  out of the regular order of business, which means taken
21  around the blocker bill, you must have two-thirds of the
22  senators agree to take up that bill.  And that's
23  primarily the purpose of the blocker bill.
24    Q.   So is it accurate so say then that, again, for
25  lack of a better word, it's kind of a -- there's a line;

58

1  there's a bill that's first in line and then bills
2  behind it in line?
3    A.   Yes.
4    Q.   Is that fair?
5    A.   Yes.
6    Q.   And the custom in the Senate is to have a
7  blocker bill that sits at the head of the line; is that
8  right?
9    A.   Yes, sir.
10    Q.   And the understanding is that that blocker bill
11  is not actually going to get passed, right?
12    A.   Eventually, it might, but it would -- usually
13  it's not until the end of the session, if at all.
14    Q.   Okay.  So at least the expectation, generally,
15  is that that bill will -- it will either not move at all
16  or it will move very late; is that right?
17    A.   Yes, sir.
18    Q.   Okay.  And so the fact that there's a bill at
19  the head of the line means that to consider any other
20  bill behind it, the Senate has to suspend the regular
21  order of business; is that right?
22    A.   Yes, sir.
23    Q.   Because in the regular order of business, bills
24  would just be considered in whatever order they are in
25  the line; is that right?

59

1    A.   Well, generally, but it doesn't always work
2  that way.  Again, it depends on when the Lieutenant
3  Governor decides to bring up your bill.  So there's not
4  a specific line where you can say, "Okay.  I'm Number
5  3."
6    Q.   Okay.
7    A.   It's not that way.  You might think you're
8  Number 3, but it may be, for whatever reason, if the
9  presiding officer determines he's not ready to call up
10  your bill, then the bill doesn't get called up.
11    Q.   Okay.  If for whatever reason there were not a
12  blocker bill in place and so -- if there weren't a
13  blocker bill in place at all, then would bills generally
14  be considered in the regular order of business?
15    A.   I wouldn't know.  I don't think that's been
16  done in decades.
17    Q.   As far as the order of bills, other than the
18  blocker bill, would the Lieutenant Governor have the
19  ability to change the order of bills that were up for
20  consideration?
21    A.   Can you rephrase?
22    Q.   Does that make sense?
23    A.   No.
24    Q.   Let me see if I can ask it more clearly.
25        If there were certain bills that -- that

60

1  were up for consideration, let's say they were behind
2  the blocker bill, would the Lieutenant Governor have the
3  ability to take a new bill and say this bill is now
4  going to be first in line for consideration behind the
5  blocker bill even though these 10 or 20 other bills were
6  already sitting there?
7    A.   Yes, because he did that on House Bill 218.
8        Now it would require the -- in that
9  situation, the two-thirds rule, so two-thirds of the
10  senators present and voting would have to agree to bring
11  up the bill.  But he could call up any bill that's on
12  the calendar.  We're taking up bill, House Bill 214, for
13  example, or Senate Bill 14.
14    Q.   Okay.
15    A.   Generally, you need the two-thirds rule except
16  this last session when that was waived for that bill
17  specifically.
18    Q.   Right.
19    A.   Does that make sense?
20    Q.   I does, yes.  I think so.  So I've been talking
21  about kind of a line and an order of bills, but it
22  sounds like, in a sense, that's not really how it works,
23  because the Lieutenant Governor just calls a bill
24  regardless of where it might be in the line; is that
25  right?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                    June 11, 2012

61

1    A.  Exactly.  Exactly.
2    Q.  Do the Senate rules require that all members be
3    present in order to vote on a bill?
4    A.  Not all members.  Can you rephrase your
5    question?  Because the way -- all members don't have to
6    be present for us to vote on a bill.  A member has to be
7    present to vote on a bill.
8    Q.  Okay.  So the fact that three, four members
9    aren't there for the vote does not prevent the Senate
10   from voting on a bill; is that right?
11   A.  Assuming there's a quorum.
12   Q.  I see.  So there has to be a quorum for the
13   Senate to vote on a bill; is that right?
14   A.  Yes, sir.
15   Q.  But assuming there is a quorum, the fact that
16   one or more senators are not present does not prevent
17   the Senate from voting?
18   A.  Yes, sir, that's correct.
19   Q.  Unless, of course, that enough are gone to
20   break the quorum, right?
21   A.  Correct.
22   Q.  Do the Senate rules require all members to be
23   present in order to suspend the regular order of
24   business?
25   A.  No, sir.

62

1    Q.  Looking back at Paragraph 7 on Page 3 of what
2    we've marked as Deposition Exhibit 3.  So this -- you
3    state in Paragraph 7 that Senator Hinojosa informed you
4    that supporters of HB 218 had changed the Senate
5    calendar when you were absent, and -- is that right?
6    A.  Yes, sir.
7    Q.  And is it accurate that what happened was you
8    were gone, but SB -- HB 218 was called to a vote while
9    you were gone; is that accurate?
10   A.  I was in my apartment sick.  And generally, all
11   the time, every morning they call us to order.  We do
12   the prayer.  You do resolutions honoring, you know, our
13   military.  Somebody's 50th anniversary.  Et cetera, et
14   cetera.  That generally takes a couple of hours.  So
15   that morning, when I was ill, I called in and said "I
16   will be in right after we complete our Senate
17   resolutions," et cetera.  That's when this bill was
18   called up was when -- normally, we would be doing
19   resolutions, but instead, they suspended that to take up
20   this bill, which is highly unusual.  In fact, I don't --
21   I'd say it's extraordinary.
22   Q.  Is it your understanding that HB 218 was moved
23   up or taken up because its proponents thought they could
24   pass it while you were gone?
25   A.  Absolutely.

63

1    Q.  Can you recall -- can you recall any other time
2    during your membership in the Senate when a bill
3    passed without the presence of all members?
4    A.  Sure.  It's done all the time.
5    Q.  Can you recall any other instance, besides the
6    one you described here in Paragraph 6, when a bill was
7    moved up or taken out of order for a vote while a member
8    was gone?
9    A.  Yes.
10   Q.  Do you recall any specific bills?
11   A.  I can't recall a specific bill, no.  But again,
12   I can never recall -- I can't recall any situation where
13   a bill was taken up before we do the resolutions, you
14   know, the bringing the folks on to the Senate floor,
15   acknowledging them, et cetera.
16   Q.  I see.  Do you recall on the day in the 2007
17   session when -- that you described in Paragraph 6, when
18   HB 218 was voted on, were there any other members who
19   were not present for that vote?
20   A.  The first vote that was taken on House Bill
21   218, from what I recall, Dean Whitmire, John Whitmire,
22   was -- had been on the Floor, but I believe he was on
23   the House floor at the time.  Senator Heger, I think
24   also was on the House floor.  And that's all I can
25   recall as far as those that were absent.

64

1    Q.  So after you got a call from Senator Hinojosa,
2    you went to the Senate floor?
3    A.  I had no choice.  Yes, sir.
4    Q.  And moving down, moving down to Paragraph 9 on
5    the same page, says that HB 218 passed on its first vote
6    before you arrived; is that right?
7    A.  Yes, sir.
8    Q.  And then you say that -- where am I?  Oh, here
9    we are.  Okay.  Still in Paragraph 9, it says "Opponents
10   of the bill forced a second vote."  Is that accurate?
11   A.  Yes, sir.
12   Q.  How did -- how did opponents of HB 218 force a
13   second vote on the bill?
14   A.  The Lieutenant Governor called for a second
15   vote.  Because from what I understand, and I wasn't
16   present, for most of the vote, Senator Whitmire raised
17   objection.  Because generally, the custom of the Senate
18   is if you check in with the secretary of the Senate and
19   you excuse yourself either to go to use the facilities
20   or to go the members' lounge to eat lunch, have coffee,
21   or you may be meeting with the presiding officer,
22   oftentimes in his office, constituents in the back hall,
23   the secretary of the Senate knows that you're present.
24   And for the most part, knows how you're going to vote,
25   which is interesting, but -- based on our past votes, et

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com



ESQUIRE
DEPOSITION SOLUTIONS

CARLOS URESTI                                                    June 11, 2012

65

1   cetera.  Senator Whitmire objected to the first vote
2   based on those reasons, and the Lieutenant Governor
3   called for a second vote.  So I wasn't present during
4   most of the second vote.  I appeared moments -- seconds
5   before my name was called.
6       Q.  So Senator Whitmire, if I understand you
7   correctly, he objected because he had checked in and
8   then left, but a vote was called in his absence, even
9   though he had checked in?
10      A.  Yes, sir.
11      Q.  Do you know -- and I understand you weren't
12  there at the time, but do you know whether or not
13  Senator Whitmire specifically objected to the vote on HB
14  218 based on the fact that you were not present?
15      A.  I don't know.
16      Q.  You mentioned that the secretary often knows
17  how members will vote.  Do members of the Senate ever
18  ask the secretary in advance to put them down for a
19  vote, one way or the other, on a bill that they know
20  will be coming up?
21      A.  Some senators do that.
22      Q.  Do senators ever -- ever ask other senators to
23  vote for them on a specific bill, like vote for them one
24  way or the other on a bill?
25      A.  Well, in the Senate, it's different, done

66

1   differently than in the House, whereas the House, you
2   register your vote from your desktop.
3       Q.  Okay.
4       A.  In the Senate, it's usually a roll call vote,
5   although, again, you could leave your vote with the
6   secretary of the Senate, assuming you know that the bill
7   is coming up.
8       Q.  Right.
9       A.  And I will submit to you, in this case, no one
10  knew that this bill was coming up.
11      Q.  So in the House, they basically vote on bills
12  by pushing a button on their desk, correct?
13      A.  Right.  And no one votes for any other member
14  on the House floor either.
15      Q.  No?  Never?  But if they were to do that, they
16  could conceivably just push a button, right?
17      A.  Conceivably.
18      Q.  Okay.  But that's not how it works in the
19  Senate?
20      A.  No, sir.
21      Q.  In the Senate, it's actually, Senator Uresti,
22  you're called and then you state your vote; is that
23  right?
24      A.  Generally, that's how it happens.  But it's,
25  again, if you've ever heard the secretary of the Senate

67

1   call the roll, you'll understand that before she
2   finishes the roll call, halfway before she finishes the
3   roll call, the presiding officer is gaveling.
4       Q.  Okay.  But in any event, you don't vote in the
5   Senate by pressing a button on your desk.
6       A.  No, sir, you don't.
7       Q.  Okay.  At the time that you described -- the
8   time during the 2007 session that you're describing in
9   here in Paragraphs 6 through 9, were you aware that HB
10  218 might come up for consideration?
11      A.  That morning?  No, I was not.
12      Q.  Did you anticipate that it would come up that
13  day?
14      A.  No, sir, because they did not have the votes to
15  pass that bill.  The purpose of my call was out of
16  courtesy, because I sit on two different committees that
17  meet early in the morning, and I thought it was the
18  senatorial thing to do, which was to call the chairman,
19  chairpersons of the different committees to let them
20  know that I would be absent for those committees early
21  in the morning.  And the secretary of the Senate, as
22  well, that I would be absent during the resolutions, but
23  I would be present for regular order of business when it
24  came -- when it did come to be.  But there was no reason
25  for us to believe that House Bill 218 was going to come

68

1   up for a vote because they did not have the votes --
2       Q.  I see.
3       A.  -- to suspend.
4       Q.  Right.  So the Lieutenant Governor called the
5   second vote on HB 218; is that right?
6       A.  Yes, sir.  I was not present at the time,
7   though.
8       Q.  Was there any rule, to your knowledge, that
9   required the Lieutenant Governor to allow a second vote
10  on HB 218?
11      A.  Not a specific rule other than the custom of
12  the Senate, which is not to count a senator absent once
13  they've checked in, unless they've checked out.
14      Q.  Is it accurate to say that it was within the
15  Lieutenant Governor's discretion to have a second vote
16  on HB 218?
17      A.  Sure.  I think especially given the fact of the
18  way the first vote was handled.
19      Q.  But there was nothing that -- there was nothing
20  that required him to allow a second vote, was there?
21      A.  Of course not, other than to follow Senate
22  custom.
23          MR. MALDONADO:  Would you mind if we took
24  a break?
25          MR. FREDERICK:  Not at all.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                    June 11, 2012

69

1      (Recess from 11:25 a.m. to 11:34 a.m.)
2      Q.  (BY MR. FREDERICK) Senator, I'd like to move to
3   the next page of your declaration, Paragraph 13.  It
4   says "During the Senate's consideration of SB 14, I
5   testified that SB 14 would have a disproportionate
6   effect on minority voters in Senate District 19 and the
7   State of Texas as a whole."  Is that accurate?
8      A.  Yes, sir.
9      Q.  And that's your -- that's your position today,
10  is that Senate Bill 14, in your understanding, will have
11  a disproportionate effect on minority voters, both in
12  your district and in the state as a whole, right?
13     A.  Yes, sir.
14     Q.  Do you recall -- do you recall what the
15  specific testimony was that you refer to here in
16  Paragraph 13?
17     A.  Well, generally, I recall.  Again, it's been
18  over a year.  But I -- I touched on the fact that my
19  district is the largest geographical district in the
20  continental U.S., have almost or part of 23 counties,
21  50,000 square miles.  There's 23 counties.  Of the 23
22  counties, that about 8 of them or so either had no DPS
23  office, Department of Public Safety office or had
24  limited hours.  I think that was the thrust of my
25  argument.

70

1      Q.  And by "disproportionate effect," did you mean
2   that minority voters in your district and in the state
3   would be less likely to possess the ID required by SB
4   14?
5      A.  Yes, sir.
6      Q.  How -- how do you know that minority voters in
7   your district are less likely to have the ID required by
8   SB 14?
9      A.  Well, I know that a majority of my folks are
10  poor.  They're working class.  Very few of them have
11  probably traveled outside the country, and therefore,
12  obtained a passport.  As far as a military ID, I have a
13  military ID from when I left the Marine Corps that does
14  not have a photo ID on it.  Although, it's good forever,
15  doesn't have a photo.  So many of my, as you know, my
16  constituents were former military.  And again, given the
17  district, the vast -- geographically, the distance
18  between the towns, I believe that it will have that
19  disproportionate effect on my constituents.  Also given
20  the fact that 75 percent of them or so are either
21  African American or Hispanic.
22     Q.  So you say you have a military ID from your
23  service?
24     A.  That does not have a photo ID on it.
25     Q.  Okay.  When did you leave the active service?

71

1      A.  1989.
2      Q.  And you've had -- is the ID you have now, is
3   the same one you had when you left active duty in '89?
4      A.  That's the one they issued me, yes.
5      Q.  Do you know whether it would be possible, if
6   you wanted to, or needed to, for you to get a new ID
7   from the military with your photo on it?
8      A.  I don't know.  I never tried.  I never tried
9   since I was told that ID was good forever.
10     Q.  Is it your understanding that all military IDs
11  are good forever?
12     A.  I don't know.
13     Q.  If you lost your military ID and needed to get
14  a new one, for any reason, how would you do that?
15     A.  I was told "Don't ever lose your military ID,
16  Marine," so I wouldn't know the process.
17     Q.  Okay.  So you've never -- you, personally, have
18  never had to replace your military ID?
19     A.  No, sir.
20     Q.  And you're not aware of what would be required
21  to replace a military ID?
22     A.  No, sir.
23     Q.  You're not aware of what would be required if
24  you wanted to get a new one, say, with your picture on
25  it?

72

1      A.  No, sir.
2      Q.  Have you conducted any studies of ID possession
3   by voters in your district?
4      A.  No, sir.
5      Q.  Have you seen any studies of ID possession by
6   voters in your district?
7      A.  No, sir.
8      Q.  Have you conducted any survey of your
9   constituents to see how many of them possess the ID
10  required by SB 14?
11     A.  No, sir.
12     Q.  Are you aware of any survey of your
13  constituents to see who possesses or how many possess
14  the ID required by SB 14?
15     A.  No, sir.
16     Q.  Have you or your staff conducted any informal
17  polls of constituents to see how many possess the ID
18  required by SB 14?
19     A.  Not that I'm aware of.
20     Q.  Do you know how many of your constituents lack
21  the -- one of the forms of ID required by SB 14?
22     A.  I don't know the exact amount, but I would
23  imagine many lack several of those specific forms of
24  ID.  My mother is a perfect example.
25     Q.  And so you say you imagine many lack several of



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                                    June 11, 2012

---

73

1  the forms.  Is that -- is that a conclusion that you
2  draw from the rates of poverty and the number of elderly
3  people and the number the minority voters in your
4  district?
5      A.   It's from knowing my district and for the
6  reasons, the examples you just gave.  And again, using
7  my mom as a perfect example.  She never had a passport.
8  Her driver's license had expired because she didn't
9  drive.  She was home on hospice.  And was never in the
10  military.  So would not have been able to vote.  She
11  would not have met any of those five exceptions.  She
12  didn't carry a gun.  She didn't have a concealed
13  handgun.  I should say a concealed handgun license.
14      Q.   And she was registered to vote?
15      A.   Yes, sir.
16      Q.   And did she vote?
17      A.   She voted for me.  The most recent time would
18  have been November I believe of 2010.
19      Q.   To the best of your recollection, did your
20  mother typically vote in person?
21      A.   Yes, sir.  She did until she was sent home on
22  hospice.
23      Q.   Do you know how many of your constituents do
24  not have a driver's license?
25      A.   I don't know.

---

74

1      Q.   Do you know how many of your constituents do
2  not have either a driver's license or a state-issued
3  personal ID card?
4      A.   Well, I assume you're talking about those that
5  are of any particular age.  I don't know.  We're talking
6  about 800,000 people.  So I don't know the answer to
7  your question.
8      Q.   Do you know how many of your constituents have
9  a concealed handgun license?
10      A.   No, sir.
11      Q.   Do you know how many of your constituents have
12  a passport?
13      A.   No, sir.
14      Q.   Do you know how many of your constituents have
15  a military ID card?
16      A.   No, sir.
17      Q.   Can you identify any individual constituent who
18  does not have the identification required by Senate Bill
19  14?
20      A.   My mother was -- is the best example.
21      Q.   Can you identify any other individual, besides
22  your mother, who does not have one of the IDs required
23  by SB 14?
24      A.   That does not have at least one of them?
25      Q.   Yes, that does not have at least one.

---

75

1      A.   I don't know offhand, but I can think of many
2  that don't have several of them.  I don't know how many
3  of my constituents are driving around without a -- an
4  expired driver's license, for example.  But I know many
5  of them that don't have military IDs, that don't have
6  passports, that don't have a certification of U.S.
7  citizenship, and they don't have a concealed handgun
8  license.  I know many of those folks.
9      Q.   Can you think of the name of any particular
10  constituent who does not have at least one of the IDs
11  required which SB 14?
12      A.   Well, no, again, because I don't know how many
13  of them may have an expired driver's license.  Or may
14  not have, simply, have a valid Texas ID license.  They
15  may not have ever gone to get a Texas ID license -- or
16  Texas ID, rather.
17      Q.   So as you sit here, you can't identify any
18  specific registered voter in your district who does not
19  have at least one of the forms of ID required by SB 14?
20      A.   Well, other than my mother when she was alive.
21      Q.   But other than that, no individuals that you
22  can identify?
23      A.   Not by name.
24      Q.   Can you identify any individual constituent
25  who -- of yours, who does not have the documentation

---

76

1  that would be necessary to get one of the IDs required
2  by SB 14?
3      A.   That's impossible to do.
4      Q.   So the answer is no, you can't identify any
5  specific person?
6      A.   Correct.  I can't identify any specific person
7  because it's impossible.
8      Q.   Do you know how many registered voters in Texas
9  do not have at least one of the forms of ID required by
10  SB 14?
11      A.   I don't, but I would hope the Secretary of
12  State would know that, because I don't.
13      Q.   So you -- so you can't -- well, scratch that.
14          Can you identify any particular registered
15  voter in Texas who does not have at least one of the
16  forms of ID required by SB 14?
17      A.   I can't.  I would defer to the Secretary of
18  State's Office.
19      Q.   Do you know how many Texas registered voters
20  lack documents necessary to get a state-issued photo ID?
21      A.   I have no idea.  I doubt anybody in Texas knows
22  the answer to that question.
23      Q.   Can you identify any particular registered
24  voter who does not have the documentation necessary to
25  get a state-issued photo ID SB 14?

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                          June 11, 2012

77

1      A.  I have no idea.
2      Q.  Are you familiar with the levels of photo ID
3   possession by registered voters in Texas, and by
4   "levels," I mean the percentage of voters from different
5   groups who have the kinds of photo IDs required by SB
6   14?
7      A.  No, not specifically.
8      Q.  You don't -- you don't know how -- what
9   percentage of African American voters have one of the
10  IDs required by SB 14?
11     A.  No.  Generally, I do know that African
12  Americans and Hispanics tend to not have the proper
13  photo identification required by SB 14, and the elderly
14  and disabled, as well, but specific numbers, I don't
15  have that.
16     Q.  So you don't have a percentage for African
17  American or Anglo or Asian American or Hispanic voters?
18     A.  No, sir.
19     Q.  Okay.  You say that you're aware that African
20  American and Hispanic voters, I'm paraphrasing, I don't
21  want to misquote you.  It's your understanding that
22  African American and Hispanic voters tend not to have
23  the photo IDs required by SB 14; is that right?
24     A.  I know that for a fact.
25     Q.  How do you know that?

78

1      A.  Well, I've been a legislator for 15 years.
2   I've block-walked my neighborhood many, many times.  And
3   I have individually spoken to constituents that proudly
4   hold up their voter registration card.  Some of them
5   still call it a "poll tax."  And that they say,
6   "Mr. Uresti, I have my poll tax."  These are
7   individuals, typically, they're elderly, they're
8   Hispanic, they're African American.  They may be
9   homebound.  They may be in a wheel chair.  They don't
10  drive.  They don't travel.  So I know for a fact that
11  they don't have a driver's license.  I know for a fact,
12  as in my mom's case, that they don't drive.  They don't
13  have a passport.  They don't carry a concealed handgun.
14         So I know for a fact, based on
15  representing this district, the Senate District 19 for
16  six years, and as a state representative, District 118
17  for nine years, because I have individually spoken to
18  many of these folks.  That's how I know.
19     Q.  And those individuals that you have spoken to
20  in your experience as a legislator, you mentioned that
21  many of them were elderly or disabled; is that right?
22     A.  Yes, sir.
23     Q.  Would you say that most of those individuals
24  that you are referring to who you think don't have
25  photo ID are elderly or disabled?

79

1      A.  I'm sorry.  Say that again?
2      Q.  Of course.  The individuals that you mentioned
3   who you believe wouldn't have a photo ID, do you believe
4   that most of those individuals were elderly or disabled?
5      A.  Yes.  And of either Hispanic or African
6   American, given my district.
7      Q.  You said you were a House member representing
8   District 118; is that right?
9      A.  Yes, sir.
10     Q.  And is -- 118 is in Bexar County, right?
11     A.  Yes, sir.
12     Q.  Was it -- when you represented the district,
13  was it completely within Bexar County?
14     A.  Yes, sir.
15     Q.  Other than your experience as a legislator,
16  block walking, talking to constituents, is there any
17  other specific basis for your belief that African
18  American and Hispanic voters are less likely to possess
19  the ID required by SB 14?
20     A.  I can't think of a better way of knowing that
21  than actually talking to the folks.  That's all I have.
22     Q.  Is it your understanding that the elderly and
23  disabled voters may be qualified to cast mail-in or
24  absentee ballots in Texas?
25     A.  They might be qualified, yes.

80

1      Q.  So it's possible that an elderly or disabled
2   person, even if he or she did not have the ID required
3   by SB 14, might still be able to cost a regular ballot
4   by mail?
5      A.  They might be able to if they're aware of that,
6   one.  And then two, as you know, Counselor, many -- at
7   least my voters prefer to vote in person.  They want to
8   feel that their vote is counted for and may not trust
9   the mail-in process.
10     Q.  If a voter for whatever reason lacks the ID
11  required to vote in person by SB 14 but could still cast
12  a ballot by mail, in your mind, would that voter's --
13  would that voter be disenfranchised or denied the right
14  to vote by SB 14?
15     A.  If they were allowed and able to vote by mail?
16  Well, assuming they voted by mail, then I don't see how
17  they were disenfranchised, if they actually voted.
18     Q.  Are you familiar with the levels or percentages
19  of photo ID possession by voters in Georgia?
20     A.  No, sir.
21     Q.  Are you familiar with the levels of photo ID
22  possession by voters in Indiana?
23     A.  Probably as much as they are as familiar with
24  Texas.  No, sir, I don't.
25     Q.  Okay.  Going back to the voters who you've



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                        June 11, 2012

81

1    spoken to over the years, can you remember any of those
2    voters by name?
3               I'm sorry.  Let me clarify.  The voters
4    you've spoken to over the years, can you recall by name
5    any of the voters who you believe did not have a photo
6    ID that would be required under SB 14?
7       A.  Well, I can assume Ms. Lois Luke, perhaps,
8    Mrs. Rodriguez, Mr. Albert.  I mean, there are so many.
9    Those are -- I think of an elderly, disabled, Anglo
10   woman, Ms. Luke.  Mr. Albert was an African American,
11   wheelchair bound.  Mrs. Rodriguez, I recall, was a lady
12   that held up her voter registration card who said "I've
13   got my tax, Mr. Uresti."  So those are the first three
14   that just pop in my head.
15      Q.  And Ms. Luke was Lois Luke?
16      A.  Correct.
17      Q.  Do you recall Ms. Rodriguez's first name?
18      A.  No, I don't.  There's a lot of Rodriguezes in
19   my district.
20      Q.  Right.  What about Mr. Albert, do you recall
21   his first name?
22      A.  No, sir.
23      Q.  And to your recollection, were Ms. Luke,
24   Ms. Rodriguez and Mr. Albert all elderly individuals?
25      A.  Yes, sir.  And Mr. Albert, that actually might

82

1    have been his first name.  Because he kept calling
2    himself "Mr. Albert," so that actually could have been
3    his first name.
4       Q.  Okay.
5       A.  Just to clarify.
6       Q.  Okay.  Looking back at your declaration, which
7    we've marked as Deposition Exhibit 3, in Paragraphs 14
8    through 17, you generally describe the geography and
9    makeup of your district and how that might impose some
10   difficulty on your constituents; is that right?
11      A.  Well, not how it might, but how it would
12   actually impose difficulty on my constituents.
13      Q.  Okay.  And you've testified that your district
14   is extremely large, right?
15      A.  Yes, sir.
16      Q.  And many of the counties in your district are
17   rural; is that accurate?
18      A.  Almost all of them except for perhaps Bexar
19   County and El Paso County, yes.
20      Q.  Do you have part of El Paso County in your
21   current district?
22      A.  Yes, sir.
23      Q.  So other than Bexar County and possibly
24   El Paso, you've said all of the other counties in your
25   district are rural?

83

1       A.  Yes, sir.
2       Q.  How many of the counties in your district are
3    -- would you consider to be poor counties?
4       A.  All of them.
5       A.  All of them.
6       A.  I have, I believe, it's the third poorest
7    district in the state of Texas.
8       Q.  Is that the third poorest Senate district?
9       A.  Yes, sir.
10      Q.  Is it your understanding, based on your
11   experience representing the district, that constituents
12   in the rural and poor areas of your district face
13   hardships doing kind of everyday activities such as
14   getting groceries?
15      A.  Getting groceries, getting to school.  A lot of
16   my constituents out in West Texas have to be bussed to
17   school.  Takes an hour, hour and a half at times to get
18   to school in the mornings.  So there's no question about
19   it.
20      Q.  Are there communities in your district that
21   you're -- that you know of where people have to drive 30
22   minutes or more to get to a grocery store?
23      A.  Absolutely.
24      Q.  Can you think of any specific towns or
25   communities where people have to drive more than an hour

84

1    to get to a grocery store?
2       A.  Well, I guess you would have to define a
3    grocery store.  If we're talking about an HEB, I could
4    think of towns that would have to drive a couple of
5    hours to get to an HEB.  Absolutely.  So, again, you
6    with have to define grocery store.  But if we're using
7    HEB, which is the one I'm most familiar with, there are
8    towns that aren't -- don't have HEBs in them.  In their
9    town.
10      Q.  So their -- safe to say then that there are
11   towns in your district where to get to a supermarket
12   like an HEB, it would take at least an hour or possibly
13   more?
14      A.  Sure.  I'll give you an example.  I mean, there
15   are towns south of San Antonio that my constituents
16   drive into San Antonio to go to the HEB.  To go to the
17   malls.  There's malls unheard of in West Texas.
18      Q.  Right.
19      A.  Simply unheard of.
20      Q.  Can you think of any specific towns?
21      A.  I can think of all them.  Del Rio, Uvalde,
22   Eagle Pass, Hondo, Castroville, LaCoste, Lytle, Italia,
23   Devine, Presidio, Socorro, Pecos, Fort Stockton.
24      Q.  So -- so do people in Eagle Pass have to drive,
25   they have to drive out of town to get to a supermarket?



**ESQUIRE**
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                                    June 11, 2012

85

1    A.  No.  To get to a mall.
2    A.  Oh, to a mall.
3    A.  A large mall.
4    Q.  Okay.
5    A.  Absolutely.     And keep in mind, those drives
6    are -- from Ulvade to San Antonio, you know, are a
7    little over two hours.  Eagle Pass to San Antonio is 2
8    hours and 20 minutes.  So we're not talking about a
9    20-minute drive.
10   Q.  Right.  Probably not a lot in-between Eagle
11   Pass and San Antonio, necessarily.
12   A.  There's nothing between there except for a rest
13   stop.  So many of them have to plan that once a month,
14   perhaps, to come in to go buy clothes for their kids.
15   Many of my constituents do that either right before
16   Christmas or right before the school year.  So they plan
17   two trips a year, because that's all they can afford.
18   Q.  Is there -- when they -- when people in your
19   district who have to drive a long way to get clothes for
20   their kids, when they do make those trips, is there
21   public transportation that is available to them?
22   A.  No, sir.  There's not -- I'm assuming they
23   could get a Greyhound bus, perhaps, but you're talking a
24   24-hour trip with kids, perhaps.  No, there's no such
25   transportation.

86

1    Q.  So to make those trips to get things like
2    clothing for their kids, if they make it, they have to
3    have a car to make it; is that right?
4    A.  Well, if they have a vehicle.  Many of my
5    constituents, particularly the ones along the border
6    share a vehicle, and they have to coordinate with other
7    family members or friends.  I know, specifically,
8    families that will do that, and they will come up.
9    Usually, they'll come to San Antonio or they'll go to
10   the outlet malls in San Marcos, try to buy as many
11   clothes as they can afford, and then they go back home.
12   Q.  Is it common for people in the rural areas of
13   your district to have to drive a long way to get to a
14   hospital?
15   A.  Yes, sir.  I mean, depending on what type of
16   hospital you're speaking of, of course.  Particularly
17   our veterans.
18   Q.  Uh-huh.  For -- for basic, say, kind of basic
19   emergency room care, can you think of towns where people
20   would have to drive more than 30 minutes if they wanted
21   to get to an emergency room?
22   A.  If you're out in West Texas, you have a wreck
23   along the highway, it's going to take you more than 30
24   minutes to get to a hospital.  God forbid you're in an
25   accident out there.  And that goes for any Texan, but

87

1    specifically my constituents.
2         And keep in mind that if you had an
3    accident, the time it would take for an ambulance to
4    reach you, to begin with, assuming you had
5    communication, because many times you don't even have
6    cell phone coverage out there in West Texas.  So
7    assuming you had communication for an ambulance to get
8    there, and usually, they're volunteer ambulances, EMS
9    services, et cetera, then to be able to get you back to
10   the closest hospital will be -- would be very difficult.
11   Q.  And so in your district, some of the obstacles
12   you've described, I think two -- some of the obstacles
13   that would be imposed by Senate Bill 14 would include
14   things like limited availability of driver's license
15   offices in certain counties, right?
16   A.  Yes, sir.
17   Q.  And possibly limited hours or limited days for
18   the driver's license offices that exist, right?
19   A.  Yes, sir.
20   Q.  And on top of that, there would be, in many
21   cases, the significant distance to travel even to get to
22   the driver's license offices that exist, right?
23   A.  Exactly.  And all that is exacerbated by the
24   fact that those that are working would have to take off
25   time from work, and to make a trip like that isn't --

88

1    you know, an hour early off of work, it's -- sometimes
2    it's a whole day.
3    Q.  In those circumstances that we were just
4    talking about that might make it difficult for somebody
5    to get a photo ID if they didn't have one, is it your
6    contention that those would disproportionately affect
7    Hispanic or African American voters in your district?
8    A.  Absolutely.
9    Q.  And why is that?
10   A.  75 percent of my district are either African
11   American or Hispanic.
12   Q.  I see.  Is it your contention that in your
13   district, if a Hispanic voter and Anglo voter lived in
14   the same place or same town, that the requirement and
15   burdens of getting a photo ID would affect them
16   differently?
17   A.  Perhaps.
18   Q.  Well -- I'm sorry.  Why would that be?
19   A.  Well, I think when you look at the demographics
20   of the district coupled with the economic status of
21   Hispanics, African Americans versus Anglos, you will see
22   there's a difference, obviously.  And so I think it's
23   more cumbersome upon the Hispanics and the African
24   Americans, particularly in my district, because they
25   tend to be poorer.  They tend to be more indigent, out



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                                    June 11, 2012

89

1   of work.  The unemployment rates are much higher for
2   Hispanics and African Americans than Anglos, not only in
3   my district but in Texas.
4       Q.   So then it's your understanding that a photo ID
5   requirement like that in SB 14 would disproportionately
6   impact Hispanic and African American voters in your
7   district because they would be more likely to be
8   indigent?
9       A.   Correct.  So many of them don't own vehicles
10  and many of them don't drive, and therefore, they don't
11  have a driver's license.
12      Q.   Other than a higher incidence of poverty among
13  Hispanics and African Americans as compared to Anglos,
14  is there any other reason that you're aware of that a
15  photo ID requirement would have a greater impact on
16  Hispanic and African American voters?
17      A.   Other than what?  What was the question?
18      Q.   Other than the higher incidence of poverty.
19      A.   Well, I know that -- I'm sure there are other
20  reasons, as well, besides poverty.  There's also the
21  geographical distance that we've spoken about, one.  I
22  there's an issue of them being educated to understand
23  this bill, the effects of this bill, the requirements of
24  this bill.  Many of my constituents don't realize that
25  if this bill takes effect or when this bill takes effect

90

1   that they can't just show up with their voter -- voter's
2   registration card.
3            So there's that huge concern, that they're
4   not going to be informed, and so when they do show up
5   with their voter registration card, like many of my
6   constituents do, they're going to be turned away from
7   the ballot box, and therefore, not be allowed to vote
8   and exercise their constitutional right.
9       Q.   Do you contend that Senate Bill 14, if
10  implemented, would affect low-income Hispanic voters
11  more than it would affect low-income Anglo voters?
12      A.   Most likely, yes.
13      Q.   Why is that?
14      A.   Again, for the reasons that I stated.
15  Historically, we have to look at the history of Texas,
16  and in that regard, it's not something we can be proud
17  of when it comes to civil rights movement.  Again, not
18  only for African Americans but with the effect they had
19  on Hispanics.  So I think when you look historically at
20  Texas's performance with regard to the voting rights of
21  Hispanics, this bill I believe takes a step backwards.
22  And instead of encouraging all voters to vote and
23  assisting all voters to vote, it disenfranchises them.
24      Q.   So I believe it's been your testimony that SB
25  14, if implemented, would disenfranchise certain

91

1   individuals who did not have the required ID because
2   they would not be allowed to vote, right?
3       A.   Correct.
4       Q.   Other than preventing people without IDs from
5   voting, how -- how specifically would SB 14
6   disenfranchise or prevent people from voting?
7       A.   Ask that again, please.
8       Q.   Sure.  Other than preventing people without an
9   ID from voting, how would SB 14 specifically prevent
10  people from voting?
11      A.   Well, if they don't have their ID to vote, they
12  can't vote.  I don't know of any other way to prevent
13  them.  The bill is already preventing them if they don't
14  have an ID from voting.  And it's not giving them any
15  exceptions to the rule, any hardship exceptions, any
16  grandfathering clauses, if you will.  Students that have
17  college ID aren't able to vote, perhaps, because they
18  choose not to carry a handgun, yet those that decide to
19  carry a handgun are given a greater privilege or more of
20  a privilege to vote.  I don't see how that's
21  constitutional.  I don't see how that's -- treats every
22  citizen equally and fairly.
23      Q.   And I guess my question is -- and I understand
24  that, and I appreciate that.  But is there anything that
25  SB 14 would do, other than obviously preventing people

92

1   without an ID from voting, is there anything that SB 14
2   would do specifically that would prevent people from
3   voting?
4       A.   Well, and I think I touched on this earlier to
5   one of your questions, I think the information, or lack
6   thereof, of this bill, will have unintend -- or intended
7   consequences of discouraging folks from voting if they
8   get misinformation about this bill.  And they're advised
9   that they need a particular ID, they may not know and
10  they may think they can bring their birth certificate,
11  for example, which is not going to suffice, according to
12  this bill.
13           So I think it's -- but there are other
14  ways that this bill is going to prevent bill folks from
15  voting, particularly, my constituents, keep it in mind,
16  many of them speak Spanish, as well.  So I think the --
17  there are side effects, if you will, of this bill that
18  are going to prevent constituents -- my constituents
19  from voting.
20      Q.   Okay.  So people, one, they might not have the
21  ID in the first place, right?
22      A.   Correct.
23      Q.   And they also just might not be aware that they
24  need to have the ID, right?
25      A.   Correct.

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139



Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                               June 11, 2012

93

1    Q.  Are there --
2    A.  And they may be given wrong information,
3  inadequate information, as well.  They may be Spanish
4  speakers, so they may not understand whatever
5  information is given to them in English.  I don't know
6  what information has been provided to them, but if any,
7  it's been very little.
8    Q.  Is there any other specific impact that you can
9  think of that SB 14 would have on voters?
10   A.  Well, I would think that's the most serious
11  impact preventing them or disenfranchising them from
12  voting.
13   Q.  Do you believe that SB 14, if it were
14  implemented, would have a different impact on a Latino
15  voter and an Anglo voter who were in the same location
16  and at the same socioeconomic level?
17   A.  I believe that it could.
18   Q.  How do you think it could?
19   A.  Well, if they're a Spanish speaker, for
20  example, depending on the information provided to them,
21  and there are many Spanish speakers in my district.
22   Q.  Sure.  Other than the potential language
23  barrier, can you think of any other reasons that a
24  Latino and an Anglo or an African American voter of the
25  same location and socioeconomic level might be affected

94

1  differently by SB 14?
2    A.  Perhaps.  But again, I think we have to look
3  historically at the turnout for Anglos versus Hispanics
4  versus African Americans already, and then to -- add
5  this bill to the mix, this bill doesn't do anything to
6  encourage any of them to vote in greater numbers.
7        So I think if, again, in my opinion, I
8  will submit to you, that it will discourage them,
9  disenfranchise them or prevent them.  Because it's not
10  doing -- there's not one thing in this bill, there's not
11  one thing in this bill that encourages those voters to
12  vote or assists them in voting.  Because in fact, it
13  puts one more burden in their way.  And that -- and so I
14  would say that would be my response.
15   Q.  You said your district includes a very long
16  stretch of the Texas-Mexico border; is that right?
17   A.  Yes, sir.  Two-thirds of the Texas-Mexico
18  border, from Eagle Pass to El Paso.
19   Q.  Is it your understanding that many people who
20  live in towns on the Texas-Mexico border cross back and
21  forth frequently between Texas and Mexico?
22   A.  I believe that used to be the case.  I don't
23  think it's as often given the situation in Mexico along
24  the border towns as it used to be.  In fact, I know that
25  many of constituents don't do as much as they used to.

95

1  It used to be a daily routine for many of them, and now
2  it's -- it's a, generally speaking, it's -- it's rare.
3    Q.  And why specifically is that?
4    A.  Because of the violence along the border in
5  Mexico.
6    Q.  Do you have a sense of kind of when that
7  changed, when people maybe stopped going across the
8  border into Mexico as much as they used to?
9    A.  Over the last three or four years, as the
10  violence grew, and -- because I ask my constituents when
11  I visit, because I don't go over there, and I ask them.
12  And a few years ago, "yeah, we'll go once in a while."
13  Couple of years ago, "Well, I'll go visit family or
14  friends."  And now it's most of the responses are they
15  don't go over.
16   Q.  Do many of your constituents who live on the
17  border, they cross over into Mexico to work every day?
18   A.  No.  A small number.
19   Q.  A small number?
20   A.  (Witness nods head yes.)
21   Q.  If someone were to cross the border frequently,
22  they would need a passport, right?
23   A.  I'm assuming.  I don't know if they could use a
24  visa.  I really don't know.  Again, I don't really go
25  into Mexico.

96

1    Q.  To your knowledge, is it -- is it more likely
2  that someone living on the border would have a passport
3  as opposed to somebody who lives in, say, North Texas or
4  somewhere far from the border?
5    A.  No.  Again, from what I recall, if you're just
6  crossing over into Mexico, they don't even check for
7  your ID.  But again, I haven't been in Mexico in a
8  decade, I suppose, so I don't know.
9    Q.  Okay.  If you found out, if it were proven to
10  you that there were no disparity in ID possession
11  between minority voters and nonminority voters in Texas,
12  would you support Senate Bill 14?
13   A.  Ask your question again, please.
14   Q.  Of course.  I'll preface it by saying I
15  understand that it is not your contention that there's
16  no disparity in photo ID possession, but if there was
17  evidence that there was no disparity in photo ID
18  possession between voter and nonminority voters in
19  Texas, would you support SB 14?
20   A.  No.
21   Q.  Why not?
22   A.  Because this bill does nothing to encourage or
23  assist my constituents to vote.  It doesn't have same-
24  day voter registration, for example.  It doesn't allow
25  college kids with IDs to vote.  You know, there are so



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                      June 11, 2012

97

1  many reasons.  But the bill doesn't do anything to
2  encourage people from -- encourage people to vote or
3  assist them to vote.
4        It has, instead, it still would present
5  some of my constituents from voting.  So notwithstanding
6  what you said is true, it would still prevent some of my
7  constituents from voting or disenfranchise them.
8    Q.  So if I understand you correctly, you're saying
9  that SB 14 would still disenfranchise, prevent from
10  voting some of your constituents even if they had the
11  required ID?
12    A.  That's not what you asked me though.
13    Q.  Oh, okay, then I'm misunderstanding you.  Are
14  you saying that SB 14 would prevent some of your
15  constituents from voting even if they had the required
16  ID?
17    A.  Well, of course not.  I mean, if they had the
18  required ID, I mean, it may disenfranchise some of them,
19  but that's not what I understood you to ask.  I don't
20  think -- I didn't understand that to be your question.
21  I thought what you asked me was assuming that -- that
22  all of my constituents had a photo ID at the same
23  level.  I thought that was your question.
24    Q.  That makes sense.  I understand.
25    A.  And my answer was no, because for those that

98

1  don't, it still has those conditions on there and does
2  nothing to assist them or encourage them to vote.
3    Q.  So even if the level of ID possession were the
4  same, there would still be some people who would not be
5  able to vote under SB 14.
6    A.  Yes, sir, because nothing changes.  That's
7  still the largest district in the universe.  I mean, it
8  -- we still have two-thirds of -- two-thirds of
9  Texas-Mexico border, still have the indigency rates,
10  poverty rate, none of that changes.
11    Q.  Uh-huh.  Is it your contention that SB 14, if
12  it were implemented, would disenfranchise voters who did
13  have the required ID?
14    A.  I believe that it could have some effect, yes.
15    Q.  How would SB 14 disenfranchise a voter who had
16  the required ID?
17    A.  Well, I think it could because you have many
18  folks, like myself, that have served our country, and we
19  did that so we could, for one reason, exercise our
20  constitutional right, probably one of our greatest
21  constitutional rights, which is to vote.  And I
22  shouldn't have to prove my citizenship after serving my
23  country, notwithstanding that I was born in San Antonio,
24  Texas, served my country proudly.  My son is a Marine.
25  My father served in Korea.  That I must show, once

99

1  again, that I'm an American citizen, and God forbid that
2  my driver's license is expired because I'm in session
3  and I'm not able to go and get a new driver's license,
4  that I show up with my voter registration card valid.
5  My driver's license is expired because I've been serving
6  in session or a special session.  I can't use my
7  military ID card because it doesn't have a photograph on
8  it.  I don't have a certification of U.S. citizenship,
9  whatever that means, nor do I have a concealed handgun
10  permit, that I would not be allowed to vote.
11    Q.  If there were evidence that minority voters in
12  Texas were not less likely than other voters to have the
13  ID required by SB 14, would you still contend that SB 14
14  had a discriminatory effect?
15    A.  Can you ask that question again?
16    Q.  Of course.  If there were evidence that
17  minority voters in Texas were no less likely than other
18  voters to have the required identification, would you
19  still contend that SB 14 had a discriminatory effect?
20        MR. GARZA:  Objection, asked and answered.
21        MR. GEAR:  Also, the same objection, calls
22  for speculation.
23    A.  Well, yeah, I don't see how my answer is any
24  different than -- you're just rephrasing it, the
25  question differently, but given all of the -- you know,

100

1  the scenarios I already presented to you, Counsel, about
2  my district, the demographics of the district, we're
3  talking about the third poorest district in Texas.
4        You can't forget the history of Texas,
5  which is the reason why we have the Voting Rights Act.
6  The civil rights movement for not only the African
7  Americans but also Hispanics that were discriminated
8  against for years and years and years.  I mean, I can
9  get into all of that, if you want to, Counselor.  Where
10  I was discriminated.  Where I was called a "Wetback" in
11  the United States Marine Corps, as an officer, as a
12  captain in the United States Marine Corps.  Being called
13  a "Wetback" by other officers in the Marine Corps, that
14  was in 1988.  So we can't forget that.
15        And I think it's real simple in this
16  deposition to do that, and with this bill, to look past
17  that.  And I remember a comment by one of the senators
18  when all the senators got up and talked about different
19  situations that affected us, that that member commented,
20  "Well, all those things have happened in the past."
21  Well, of course, they did.  That's what history is
22  about.  And that's why we brought it to the forefront to
23  remind our colleagues that may not have experienced that
24  before, and obviously hadn't.
25        But this will have that effect.  So even



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                                    June 11, 2012

101

1   if the evidence did present that, which it doesn't, you
2   know, would disagree with it, as you talked about
3   earlier, one of your questions, if my colleagues
4   disagreed with me, I would disagree with that, because
5   it would still have that effect, and all you have to do
6   is look at history.
7        Q.   (By Mr. Frederick)  I understand that, and I
8   appreciate that.  And I guess my question, I'm trying to
9   ask it, a narrower question.  I understand, and I
10  appreciate that there is a historical background that
11  affects how a lot of Texans feel about voting and
12  whether they're likely to vote and may be discouraged
13  from voting.
14       My question is:  How is it -- let me
15  rephrase.
16       Senate Bill 14, on its face, says that any
17  voter in Texas must be present a certain ID to cast a
18  ballot, correct?
19       A.   Correct.
20       Q.   It doesn't say that African American voters
21  must require specific ID but everybody else can just
22  show up with their voter registration card, right?
23       A.   Correct.
24       Q.   So it doesn't extinguish between races or
25  ethnicities of Texas voters on its face; is that right?

102

1        A.   On its face it doesn't, but the effect does.
2        Q.   And obviously, as we've been talking about, if
3   somebody doesn't have the ID that's required by SB 14,
4   SB 14 will prevent that person from casting an in-person
5   ballot, right?
6        A.   Yes, sir.
7        Q.   What I'm trying to understand is how SB 14 and
8   the photo ID requirement would prevent any individual
9   who had the required ID from voting?
10       A.   Well, generally speaking, if they had the ID
11  and it was a valid driver's license --
12       Q.   Right.
13       A.   -- that's part of the problem.  But if they had
14  a valid driver's license with a photo ID, and assuming
15  they weren't discouraged or disenfranchised by the bill,
16  you see, that's the second piece to it.  On its face,
17  you can dot the Is.  They show up.  They vote.  They
18  have the ID -- proper document, ID, they can vote.
19       But you have to understand, that's what I
20  was trying to get at, the history, though, of Texas,
21  when it comes to Hispanics and African Americans being
22  discriminated against, knowing that there's this new
23  bill out there, there's this new requirement out there,
24  once word gets out, assuming it gets out, which is
25  another problem, it's my belief and my opinion, knowing

103

1   my district as well as I think I do, as I know I do,
2   that many of my constituents, primarily Hispanic and
3   African American, are going to be either discouraged or
4   disenfranchised from going to the polls because there's
5   nothing in this bill that assists them or encourages
6   them to go vote.
7        So they may, again, going back to one of
8   my previous questions -- or answers rather, have
9   disinformation, wrong information, bad information,
10  about what this bill requires.  And if they believe they
11  have to have a concealed handgun license, for example,
12  and say, "Well, heck, I don't have a concealed handgun
13  license, so I guess I can't vote."  See, that's part of
14  the problem.
15       It's not -- it's those consequences, those
16  side effects of this bill that we're -- I'm trying to
17  get across, and maybe I'm not doing as good a job as I
18  need to be or should be, but that's what you have to
19  factor in, coupled with the history of Texas when it
20  comes to voting.
21       Q.   Thank you.  I think that helps me understand.
22  So as I understand what you just said, it's even if
23  somebody had the ID, it's possible, as you understand
24  your district, that if somebody had bad information
25  about what the bill did, they might think that the bill

104

1   required something more than it actually does; is that
2   right?
3        A.   That could be -- that's definitely one of the
4   situations that could apply.
5        Q.   So if somebody might, for example, if they hear
6   that SB 14 requires five forms of identification, and
7   nobody explained that it only actually requires one of
8   five, they might -- if they just heard five forms of
9   identification, they might think, well, to vote, I have
10  to have every single one of those.
11       A.   Exactly.  And to be frank, I had to read the
12  bill to remind myself what those criteria were, because
13  I couldn't remember them.
14       Q.   Okay.  Well, that's helpful.  So there, on the
15  one hand, you've got the obvious fact that if you do not
16  have one of the required IDs, you will not be allowed to
17  cast an in-person ballot?
18       A.   Yes, sir.
19       Q.   And then as I understand it, the second kind of
20  different effect would be that if -- if there is
21  inaccurate or bad information about the bill, that might
22  discourage somebody from voting, even if they did have
23  an ID that would in fact qualify them to vote under SB
24  14, right?
25       A.   Yes.  But also, not only if they had bad



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                    June 11, 2012

105

1   information, but if they never get the information. You
2   see, that's an important component to it, as well.
3       Q.  Right.  So there's an ID problem, if you don't
4   have the ID, and then there's an information problem,
5   that even if you have an ID, you may have no information
6   or bad information, right?
7       A.  Yes, sir.
8       Q.  And when you talk about the history and the --
9   you know, the discrimination that nobody would dispute
10  has gone on in the past in Texas and may or may not be
11  continuing, I don't -- I'm not trying to argue that
12  point, but the history of discrimination.  As you
13  understand the potential effect of SB 14, is the history
14  and its effect, is that contained in kind of the
15  information and how people will receive information
16  about the bill, or does it have an independent effect on
17  people's voting?
18      A.  I don't think I understand your question.
19      Q.  You've testified that the history of
20  discrimination in Texas against Latino and African
21  American voters could possibly have an effect on
22  people's voting behavior today.
23      A.  Correct.
24      Q.  And we've talked about the information problems
25  where you have a new bill that imposes new requirements

106

1   for voting, and in your district, in particular, there's
2   a concern that accurate information or information,
3   period, may just not get to people to let them know that
4   they can still vote, right?
5       A.  Yes, that they can still vote, but even
6   information to inform them that they have to meet one of
7   those five criteria.
8       Q.  Right.  Right.  And what I'm trying to -- what
9   I'm trying to get a sense of is how -- how the history
10  of discrimination kind of fits with SB 14.  In thinking
11  about what effect the bill might have, and so I
12  understand that there's a history of discrimination that
13  could have an effect on people voting, and I understand
14  that, you know, there's this new bill that many people
15  argue will have a negative effect on people voting.
16          I guess a general question that I'm trying
17  to kind of get at is:  Are those independent things or
18  do they -- does SB 14 work with -- does SB 14 work with
19  the history to kind of create an additional effect?
20          MR. GEAR:  Objection, vague.
21      A.  Perhaps -- I will try to answer it this way:
22  Forget the Voting Rights Act.  Forget the history of
23  Texas.  Let's just assume everything was great
24  beforehand.  Would SB 14 prevent African Americans and
25  Hispanics in my district or disenfranchise them from

107

1   voting?  My answer would be yes.  Now you throw in the
2   history of Texas when it comes to voting, I think this
3   just exacerbates the situation.  I don't know if that
4   answers your question.
5       Q.  (By Mr. Frederick)  It does.  That's
6   helpful.  So is it your contention that because of the
7   history of discrimination with regard to voting, that
8   Hispanic and African American voters are -- are less
9   likely to vote generally, and so, therefore, more likely
10  to be discouraged by any new limitation on voting?
11      A.  Generally, yes.
12      Q.  Okay.
13      A.  If you put a limitation on the voting,
14  absolutely.
15      Q.  Now, if it were shown that minority voters in
16  Texas were no less likely to have the required
17  identification, would you -- would it still be your
18  belief that SB 14 would have a racially discriminatory
19  effect on minority voters?
20      A.  I thought you asked me that question.
21          MR. GARZA:  You did.  Objection, asked and
22  answered.
23      Q.  (By Mr. Frederick)  I tried to -- I wasn't sure
24  if I asked it clearly.
25      A.  Sure.  Yes.  That's what I thought we were

108

1   struggling with answering, but maybe I didn't --
2       Q.  I think we were -- I think what I had left out
3   of the previous question was racially discriminatory.  I
4   think I just said "discriminatory effect."  And I wanted
5   to be clear, because I -- we've been talking about
6   poverty, location, a lot of different things.
7       A.  Yes, sir.  My answer would be yes.
8           MR. FREDERICK:  Can we go off the record
9   for just one second.
10          (Recess from 12:41 p.m. to 12:48 p.m.)
11      Q.  (BY MR. FREDERICK) Senator Uresti, have you
12  discussed this lawsuit with anyone other than your
13  lawyer for the Department of Justice?
14      A.  No, sir.
15      Q.  You haven't discussed this lawsuit with any of
16  the parties to the suit?
17      A.  I'm not even familiar with who the parties are
18  exactly. No, sir.
19      Q.  Has anyone asked you to provide testimony,
20  other than the declaration you provided, in this
21  lawsuit?
22      A.  No, sir.
23      Q.  I want to touch briefly on legislative
24  procedure.  Can you tell me in the Senate, what is a
25  House Bill Day?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                                          June 11, 2012

109

1      A.  I'm not as familiar with that procedure --
2   probably should be -- but I believe it's a bill -- a
3   day, rather, when the Senate holds off on taking up
4   Senate bills, and we take up House bills for the day, to
5   try to move their bills along, and the House is supposed
6   to do the same with Senate bills, the noncontroversial
7   bills, et cetera.
8      Q.  Okay.  To your knowledge, is there a specific
9   -- scratch that.
10         How is the order of business determined on
11  House Bill Day?
12     A.  I'm not too sure.
13     Q.  When a House bill is considered by the Senate
14  on a House Bill Day, is there a two-thirds vote required
15  to bring that House bill to the Floor?
16     A.  I believe the blocker bill still applies, but
17  I'm not too sure.
18     Q.  You were a member of the House, correct?
19     A.  Yes.
20     Q.  Do you know what chubbing is?
21     A.  Yes, I do.  I never chubbed a day that I was in
22  the House.
23     Q.  Okay.  In your understanding, what is the
24  purpose of chubbing in the House?
25     A.  I suppose you could chub a bill in the House

110

1   for a couple of reasons, perhaps to convince the author
2   of the bill to take an amendment to the bill that she or
3   he otherwise might not necessarily care to do.
4          You chub a bill if you want to delay
5   other bills for further consideration.  You either can
6   put it off to the next day, to kill a bill, to give you
7   time to prepare another amendment.  There's -- there's
8   many different reasons why you could chub a bill.
9      Q.  But among the reasons for chubbing would
10  include either slowing down or killing a particular
11  bill, right?
12     A.  Generally, yes.
13     Q.  Do you believe that chubbing is a legitimate
14  means to kill a bill?
15     A.  It's a procedure that is allowed to House
16  members, so I believe so.
17     Q.  Would you agree that members of the Texas
18  Senate have a duty to represent their constituents?
19     A.  Absolutely.
20     Q.  Would you agree that an elected official's most
21  important duty is to represent his or her constituents?
22     A.  Of course.
23     Q.  And would you agree that part of that duty is
24  to enact policies that are favored by one's
25  constituents?

111

1      A.  Or object to policies that are not favored by a
2   constituent.
3      Q.  Fair enough.  So generally to pursue policies
4   consistent with the policies favored by one's
5   constituents, right?
6      A.  Or -- or to prevent policies that are not
7   favored by your constituents.  I mean, it works both
8   ways regardless of who the legislator is.
9      Q.  Right.  So to favor policies that your
10  constituents favor and oppose policies that your
11  constituents oppose is a duty of a legislator?
12     A.  Yes, sir.
13     Q.  Okay.  And would you agree that it's
14  politically rational for an elected official to vote for
15  policies that are favored by his or her constituents?
16     A.  Yes.
17     Q.  Would you agree that there is nothing wrong
18  with a legislator voting for policies favored by his or
19  her constituents?
20     A.  Nothing wrong it?  I might disagree with them,
21  if that's what -- I don't know if that's what you're
22  asking or not.  But a legislator can vote any way they
23  choose to vote.
24     Q.  Do you have any basis to dispute that a photo
25  voter ID requirement for voting is supported by a

112

1   majority of voters in Texas?
2      A.  I'm sorry.  Ask your question again.
3      Q.  Sure.  Do you have any basis to dispute that
4   voter ID requirements are supported by a majority of
5   voters in Texas?
6      A.  Well, I guess you'd have to define voter ID
7   requirements, because when I talk to my constituents
8   about voter ID requirements, at least what's in this
9   bill, a majority of them oppose it.  So I guess you'd
10  have to start off by defining what voter ID requirements
11  means.
12     Q.  When I say voter ID requirements, I refer to a
13  requirement that a voter show photo identification in
14  order to cast a ballot, similar to what SB 14 requires.
15     A.  Correct.
16     Q.  Do you have any basis to dispute that voter ID,
17  as I have just defined it, is supported by a majority of
18  voters in the state as a whole?
19     A.  Yes.
20     Q.  You do have a basis to dispute that?
21     A.  Yes.
22     Q.  What is that basis?
23     A.  Talking to my constituents about the
24  requirements, not only of presenting a photo ID, but in
25  obtaining a photo ID.  And I think that's the second



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                                    June 11, 2012

113

1    important piece to that, to your question.
2        Q.  Okay.  So as far as your constituents are
3    concerned, people in your senate district, you would not
4    agree that most of your constituents support voter ID as
5    I have defined it, right?
6        A.  No, sir, I would not agree with that.
7        Q.  Okay.  Statewide, do you have any basis to
8    dispute that looking at every voter in Texas, the
9    majority of voters in Texas support voter ID?
10       A.  I wouldn't know.
11       Q.  Do you have any basis to dispute that each
12   legislator that voted for SB 14, the majority of their
13   constituents supported voter ID?
14       A.  I don't know that.
15       Q.  Would you agree that it's a legitimate reason
16   to vote in favor of a bill that an overwhelming majority
17   of your constituents wanted to see that bill pass?
18       A.  No, not necessarily.  I don't -- I don't always
19   vote a certain way simply because a majority may feel a
20   certain way.  And I don't think the legislature works
21   that way, because we would have funded education where
22   we wouldn't have cut $5 million out of education last
23   session, even though a majority the Texans believe we
24   should fund education.  So I don't agree with that.
25       Q.  Can you think of any instance -- and you may

114

1    have just referred to one.  Can you think of any
2    specific instance where you have voted against a bill,
3    even though an overwhelming number of your constituents
4    wanted to see that bill pass?
5        A.  I can't think of an instance.  I'm not saying
6    there aren't any, but I can't think of any instance.  I
7    was giving the example of the legislature as a whole, if
8    you were looking at polls -- which I don't do, but it
9    sounds like that's what you are basing some of your
10   questions off of -- a majority of Texans believe we
11   should fund education, and the legislature didn't vote
12   that way.
13       Q.  Right.
14       A.  In fact, we voted the opposite.
15       Q.  Well, that's a good example.  In that instance,
16   in school funding, do you believe that it would have
17   been legitimate for a representative or a senator to
18   vote in favor of school funding or educational funding
19   because the majority of his constituents wanted that to
20   happen?
21       A.  Well, I think that would be one reason.  I
22   would think that the other reason would be because
23   that's what they believed in.  It's what they
24   supported.  And that's how I vote.  That's what I
25   believe in, and I try to represent my district to the

115

1    best -- to my best ability.
2        Q.  Do you believe that a legislator -- do you
3    believe that it's legitimate for a legislator to vote in
4    favor of a bill solely because the overwhelming number
5    of his constituents supports that bill, regardless of
6    whether the legislator themselves believes in the bill?
7        A.  Can't you ask it again, please?
8        Q.  Of course.  Do you believe it would be
9    legitimate for a legislator to vote in favor of a bill
10   solely because the majority of his constituents strongly
11   supported that bill?
12       A.  Sure, I suppose so.
13           MR. FREDERICK:  I have no further
14   questions.  I pass the witness.
15           MR. GARZA:  I have just a few questions to
16   clarify the record.
17           EXAMINATION.
18   BY MR. GARZA:
19       Q.  Senator, counsel for the state asked you a
20   number of questions about whether it's legitimate for a
21   legislator to vote for a measure because there is
22   popular support for that measure.  Would you agree with
23   me that in circumstances where that particular piece
24   of legislation discriminates against a distinct
25   minority, even if that legislation is overwhelmingly

116

1    supported by his or her constituents, the legislator
2    would have an obligation to examine that legislation to
3    ensure himself that it's constitutional and that it
4    doesn't violate Civil Rights statutes?
5        A.  Absolutely.  And I would assume that that would
6    be the case on any bills like that.
7        Q.  And in the history of the Texas legislature, in
8    fact, there are instances where you can look to
9    legislators using instruments, such as a filibuster, to
10   prevent discriminatory -- or to attempt to prevent
11   discriminatory legislation from proceeding?
12       A.  Absolutely.  If I recall, Henry B. Gonzalez did
13   that quite effectively.
14       Q.  In fact, he did that in 1957, so-called
15   segregation session?
16       A.  Yes, sir.
17       Q.  He made part of his reputation as a result of
18   that filibuster; isn't that correct?
19       A.  Yes, sir.  It was before I was born, but I
20   recall.
21       Q.  Yes, you're too young to remember this.  I was
22   seven, but --
23       A.  Yes, sir.
24       Q.  -- you're much too young to remember that.
25           So there are instances, then, where a



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                                        June 11, 2012

117

1  legislator should oppose legislation that even if it's
2  overwhelmingly popular?
3      A.  It takes a legislator with courage to do that,
4  yes.
5      Q.  Now, you went over a number of characteristics
6  of your district that are -- present unique obstacles
7  because of the voter ID bill or the photo ID bill to
8  your constituents.  Isn't it true that in your district,
9  because of the demography and because of the
10 socioeconomic status of the district and of your
11 constituents, that there is a higher incidence of people
12 driving without insurance than in other parts of the
13 state?
14     A.  Absolutely.
15     Q.  And isn't there a fairly substantial incidence
16 of drivers' license suspensions because people are
17 driving without insurance?
18     A.  Yes, sir.
19     Q.  Okay.  That would be -- that would cause an
20 otherwise eligible person who is eligible to vote to
21 have additional difficulties in securing the IDs that
22 are required by SB 14?
23     A.  Yes, sir.
24     Q.  And the last area that I wanted to just touch
25 on briefly:  You were asked a number of questions

118

1  regarding individual legislators and their intent in the
2  manner in which they voted on SB 14.  And as I
3  understood your question or your answer, one of the
4  things that you looked at was that you felt that the
5  foreseeable consequences of SB 14 were fairly obvious?
6      A.  Yes, sir.
7      Q.  And that your colleagues were aware of the
8  foreseeable consequences of SB 14 on minority voters?
9      A.  Yes, sir.
10     Q.  And that one of the things that informed your
11 opinion about the intent of the legislation was that in
12 spite of that foreseeable consequence, those legislators
13 voted for the bill?
14     A.  Yes, sir.
15     Q.  Okay.  You weren't attempting to make a broad
16 assessment of the intent, as the courts have made, about
17 the sorts of circumstantial evidence that could prove
18 intent in your answer; is that correct?
19     A.  No, sir.
20     Q.  You didn't look at all of the different factors
21 that a court would look at to gauge intent in your
22 answer today?
23     A.  Of course not.
24     Q.  Okay.
25         MR. GARZA:  I don't have any further

119

1  questions.
2              EXAMINATION
3  BY MR. GEAR:
4      Q.  Turning back to the potential obstacles in your
5  district that you have testified about, regarding
6  poverty in your district, do you know the -- generally,
7  what the percentages of poverty rates are for minorities
8  within your district?
9      A.  I don't know them offhand, but I do know that
10 they are higher than the Anglos in my district.  Again,
11 keeping in mind, 75 percent of my district is either
12 African American or Hispanic, mostly Hispanic, that
13 average per capita income of my district is around
14 $12,500 per year, and again, it's the third poorest
15 senatorial district in the state of Texas.
16     Q.  Do you know the unemployment rates in your
17 district?
18     A.  I don't know them offhand.
19     Q.  And do you know if minorities are more or less
20 likely to be unemployed within your district?
21     A.  They are more likely to be unemployed.
22     Q.  Do you know if minorities are more or less
23 likely to own a car within your district?
24     A.  Less likely.
25     Q.  Are there communities in your district that

120

1  have no public transportation available?
2      A.  There is several.
3      Q.  Do you know the names of those communities, the
4  cities?
5      A.  Presidio, for example, which is out in West
6  Texas.  And again, when you ask that question, I guess
7  we'd have to define what that means, because in
8  San Antonio we have quite an impressive infrastructure
9  with regard to bussing, but in Eagle Pass, that doesn't
10 exist, and in Del Rio, in Uvalde, in Brackettville, in
11 Lytel, Italia, and I could go on and on.
12     Q.  You talked about your testimony on the Floor
13 regarding the burden that would be imposed on minority
14 voters.  Do you recall that testimony during your
15 deposition?
16     A.  Yes, sir.
17     Q.  Do you have any memory as to how the supporters
18 of SB 14 responded to your testimony?
19     A.  They voted to pass the bill.
20     Q.  And there was some testimony about you being
21 out sick.  I believe that's reflected in your
22 declaration.  Was it generally known how you would vote
23 on HB 218?
24     A.  There was no question that folks knew how I
25 would vote, and there was no question that my colleagues



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                           June 11, 2012

121

1   knew I was sick.  And the day before, when some of them
2   encouraged me to go home, I would not go home because of
3   that purpose, and they kidded about it and say, "Don't
4   worry, it's not like we're going to bring up the voter
5   ID bill while you're gone."  Of course they did.  But
6   I'll never make that same mistake again.
7        Q.   And you voted against the bill?
8        A.   Yes, sir.
9        Q.   And I'm talking about 218.
10       A.   Yes, sir.
11       Q.   And just so I'm clear, was 218 calendared for
12  discussion the day it was brought up?
13       A.   Well, again, our calendaring system is
14  different than in the House, so from what I recall --
15  and it's been, gosh, five years -- I believe it was on
16  one of the calendars, but I don't remember which one.
17       Q.   Okay.  Are you aware of any amendments to SB 14
18  that, if passed, would have produced a discriminatory
19  effect on voters?
20       A.   I believe there were several amendments.
21       Q.   Can you tell me about those generally?
22       A.   I'd be guessing.  I believe there was -- I
23  really would be guessing.  Same day registration, for
24  example.  Over 65, et cetera.  I don't recall them
25  exactly.

122

1        Q.   Thank you.
2        A.   But I do know that my colleagues submitted
3   several different amendments that failed.
4        MR. GEAR:  I have nothing further.
5        MR. FREDERICK:  I do have a couple follow-
6   up questions.
7            FURTHER EXAMINATION
8   BY MR. FREDERICK:
9        Q.   You were discussing with Mr. Garza the issue of
10  intent behind Senate Bill 14, and you testified today --
11  you have testified today that you believe senators who
12  voted in favor of SB 14 were aware of the effect that
13  the bill would have on minority voters; is that right?
14       A.   That's correct.
15       Q.   And the reason that they were aware of the
16  effect the bill would have is because their democratic
17  colleagues told them about that effect in the Senate,
18  right?
19       A.   I believe that's one of the reasons.
20       Q.   Are there any other reasons?
21       A.   Well, remember, there were committees that met
22  on this bill in previous sessions where there were a
23  number of folks that testified, individuals, different
24  groups, et cetera, that brought it to their attention.
25       Q.   Were there also groups and individuals that

123

1   testified that the bill would not have a disparate or a
2   discriminatory effect on minority voters?
3        A.   I believe so.
4        Q.   So is it possible that members would voted in
5   favor of Senate Bill 14 simply disagreed with the
6   testimony by individuals and groups and legislators who
7   said that there would be a discriminatory impact?
8        A.   Oh, it's possible, but from what I recall, the
9   groups that testified in favor of the bill didn't
10  represent Hispanic communities or African American
11  communities.  I mean, you didn't have the NAACP coming
12  in supporting the bill.  You didn't have LULAC coming in
13  supporting the bill or MALDEF coming in and supporting
14  the bill.  So those that supported bill weren't groups
15  that represented, you know, the Hispanic or African
16  American communities.
17       Q.   Was it your testimony that the only persons who
18  are qualified to testify about the impact of a bill on
19  minorities are specific minority groups?
20       A.   Absolutely not.
21       Q.   Okay.  So it would be possible, then, for a
22  legislator, based on all of the testimony on either side
23  of an issue, to believe one side over the other, right?
24       A.   Of course.
25       Q.   So if they -- if a member of the Texas

124

1   legislature sincerely believed that SB 14 would not have
2   a discriminatory impact on minority voters, then that
3   legislator's vote would not be evidence of
4   discriminatory intent, would it?
5        A.   I can't say -- I can't answer that question.
6        Q.   Let me try asking it a different way.  If a
7   legislator sincerely, but possibly unreasonably believed
8   that there would be no disparate impact from a bill,
9   then how would a vote for that bill show discriminatory
10  intent?
11       MR. GEAR:  Objection, calls for a legal
12  conclusion, and objection, calls for speculation.
13       A.   I'm not saying that their -- their vote
14  necessarily would show that intent.  What I think I've
15  been saying all along is the product, the bill has that
16  effect.
17       Q.   (BY MR. FREDERICK)  Uh-huh.  But you've
18  testified, haven't you, that you believe that SB 14 was
19  the product of discriminatory intent, have you not?
20       A.   I don't think I necessarily put it that way.
21       Q.   Well, is it -- is it your testimony that you
22  don't believe that SB 14 was enacted with a
23  discriminatory intent?
24       A.   The effect of the bill, I think I've said all
25  along, had that effect.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                              June 11, 2012

125

1    Q.  All right.  So you -- I think you made it very
2    clear that your position is that SB 14 will have a
3    discriminatory effect, in your understanding, on
4    minority voters in Texas, right?
5    A.  Yes, sir.
6    Q.  But do you contend that the purpose of SB 14
7    was to discriminate against minority voters in Texas?
8    A.  I believe the effect, if that's what you're
9    asking of that bill, if it had that effect, my answer is
10   yes.
11   Q.  Okay.  And so my question is:  If a legislator
12   -- well, are you -- is it your contention that
13   legislators who supported SB 14 acted with a
14   discriminatory intent toward minority voters in Texas?
15   A.  I can't answer that question.  I don't -- I
16   can't tell you that what they were thinking at the time when
17   they developed any particular intent.  I mean, it's
18   possible to get into their minds and say why they voted
19   a certain way, based on the questions you asked.
20   Q.  Okay.  So you're not -- it's not your testimony
21   today that any specific member of the Texas legislature
22   supported SB 14 with the intent to discriminate against
23   minority voters?
24   MR. GARZA:  Objection, asked and
25   answered.

126

1    A.  No.  I'm saying I don't know.  There may have
2    been some that did that.  There's no way of showing
3    that, and I can't get into their head, and somebody may
4    say, "You're darned right I'm going to vote this way."
5    I don't know that, and so I can't answer you and say
6    yes.
7    Q.  (BY MR. FREDERICK) Okay.  But -- I understand.
8    So as you sit here today, you cannot swear
9    under oath that any specific Texas legislator voted for
10   SB 14 with the intent to discriminate against minority
11   voters?
12   MR. GEAR:  Objection, asked and answered.
13   A.  No.  I don't have that knowledge, that any of
14   them did that intentionally.  I can't get in to their
15   head and know why they voted a particular way.
16   MR. FREDERICK:  Thank you.
17   THE REPORTER:  Anybody else?
18   (Signature reserved.)
19   (Deposition concluded at 1:15 p.m.)
20
21
22
23
24
25

127

1    CHANGES AND SIGNATURE
2    RE: TEXAS VS. HOLDER, ET AL
3    PAGE LINE CHANGE        REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   I, SENATOR CARLOS URESTI, have read the foregoing
21   deposition and hereby affix my signature that same is
22   true and correct, except as noted above.
23
24   _____
25   SENATOR CARLOS URESTI

128

1    THE STATE OF _____)
2    COUNTY OF_____)
3
4    Before me,_____, on this day
5    personally appeared SENATOR CARLOS URESTI, known to me
6    (or proved to me under oath or
7    through_____ (description of identity
8    card or other document) to be the person whose name is
9    subscribed to the foregoing instrument and acknowledged
10   to me that they executed the same for the purposes and
11   consideration therein expressed.
12   Given under my hand and seal of office
13   this_____day of _____, 2012.
14
15
16   _____
     NOTARY PUBLIC IN AND FOR
17   THE STATE OF _____
18
19
20
21
22
23
24
25



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

129

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                    )
                                   )
        Plaintiff,                 )
                                   )
VS.                                )
                                   )
ERIC H. HOLDER, JR. in his   )
official capacity as Attorney )
General of the United States, )
                                   )
        Defendant,              )
                                   )
ERIC KENNIE, et al,           )
                                   )
    Defendant-Intervenors,    )
                                   )
TEXAS STATE CONFERENCE OF    )  CASE NO. 1:12-CV-00128
NAACP BRANCHES,              )  (RMC-DST-RLW)
                                   )  Three-Judge Court
    Defendant-Intervenors,    )
                                   )
TEXAS LEAGUE OF YOUNG VOTERS )
EDUCATION FUND, et al,       )
                                   )
    Defendant-Intervenors,    )
                                   )
TEXAS LEGISLATIVE BLACK      )
CAUCUS, et al,               )
                                   )
    Defendant-Intervenors,    )
                                   )
VICTORIA RODRIGUEZ, et al.,  )
                                   )
    Defendant-Intervenors.   )

            REPORTER'S CERTIFICATION
        DEPOSITION OF SENATOR CARLOS URESTI
                JUNE 11, 2012

        I, Chris Carpenter, Certified Shorthand Reporter in
and for the State of Texas, hereby certify to the
following:
        That the witness, SENATOR CARLOS URESTI, was duly

---

130

sworn by the officer and that the transcript of the oral

deposition is a true record of the testimony given by

the witness;

    That the deposition transcript was submitted on the

_____day of _____, 2012, to the witness or to the

attorney for the witness for examination, signature and

return to_____, by

_____, 2012; and if returned, the original

transcript will forwarded to Matthew Frederick, the

custodial attorney;

    That the amount of time used by each party at the

deposition is as follows:

    Mr. Frederick:  4 hours, 3 minutes

    Mr. Garza:  5 minutes

    Mr. Gear:  5 minutes

    I further certify that I am neither counsel for,

related to, nor employed by any of the parties or

attorneys in the action in which this proceeding was

taken, and further that I am not financially or

otherwise interested in the outcome of the action.

    Certified to by me this 12th day of June, 2012.


        _____

        Chris Carpenter, Texas CSR 1151

        Expiration Date:  12/31/2012

        100 Congress Avenue, Suite 2000

        Austin, TX  78701

        (512)328-5557

        Firm Registration No. 283



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

**A**

a.m
44:23 69:1

ability
23:24 34:13,
17 35:6 36:6
41:18 59:19
60:3 115:1

able
23:5 27:16
28:2 32:16,
19,24 33:3,11
42:17 44:1
73:10 80:3,5,
15 87:9 91:17
98:5 99:3

above-styled
2:3

abridging
24:8 25:5
27:3

absence
65:8

absent
62:5 63:25
67:20,22
68:12

absentee
79:24

Absolutely
27:5,23 30:7
31:23 62:25
83:23 84:5
85:5 88:8
107:14 110:19
116:5,12
117:14 123:20

accident
86:25 87:3

account
16:21 17:2

accurate

26:16 46:22
56:5 57:24
62:7,9 64:10
68:14 69:7
82:17 106:2

accurately
6:12

acknowledged
128:9

acknowledging
63:15

Act
23:14 48:23
100:5 106:22

acted
125:13

action
130:17,19

active
70:25 71:3

activities
83:13

add
94:4

addition
24:14 29:22

additional
25:14 26:24
29:21 106:19
117:21

address
16:18,22

addresses
15:25

Administratio
n
53:23

administrativ
e
47:25 53:22

adult

10:19

adults
10:7

advance
65:18

advised
92:8

advising
37:9

affect
20:7 29:1
30:9 35:10
36:15 37:6
88:6,15
90:10,11

affects
101:11

affidavit
8:21 9:10
12:19 22:8,
13,14,16
23:11 46:19,
20 47:5,7,8,
12,17 48:5
51:17,19,23
52:3,7,10,16,
17,18,20
53:5,8

affix
127:21

afford
85:17 86:11

African
24:8,21 25:1,
5,7,13,15,21
26:4,15,18
29:19 31:3
33:17,22
34:4,8,13,16,
20 35:5 36:7,
15,20 37:6,16
38:6,13
41:14,19,23

42:5,12,18
70:21 77:9,
11,16,19,22
78:8 79:5,17
81:10 88:7,
10,21,23
89:2,6,13,16
90:18 93:24
94:4 100:6
101:20 102:21
103:3 105:20
106:24 107:8
119:12
123:10,15

age
9:25 74:5

ago
8:21 12:21
21:16 95:12,
13

agree
38:4,5 55:22
57:22 60:10
110:17,20,23
111:13,17
113:4,6,15,
24 115:22

ahead
39:4,17

al
1:8,13,16,18
3:11 127:2
129:8,13,16,
18

Albert
81:8,10,20,
24,25 82:2

alive
75:20

allow
68:9,20 96:24

allowed
27:21 56:6

80:15 90:7
91:2 99:10
104:16 110:15

along
27:10 29:11
50:4 86:5,23
94:23 95:4
109:5 124:15,
25

already
26:21,23
27:12 29:18
60:6 91:13
94:4 100:1

also
7:2 14:15
53:16 54:3
63:24 70:19
89:20 92:23
99:21 100:7
104:25 122:25

although
66:5 70:14

always
57:8 59:1
113:18

ambulance
87:3,7

ambulances
87:8

amendment
110:2,7

amendments
8:22 9:11
13:16 121:17,
20 122:3

AMERICAN
3:16 14:15,21
24:8,21,22
25:1,2,5,7,
13 26:4,15,18
27:13,25
31:3,11



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

33:17,22
34:4,8,13,16,
20 35:6 36:7,
15,20 37:6,16
38:6,13 39:25
41:14,19,24
42:5,12,19
70:21 77:9,
17,20,22 78:8
79:6,18 81:10
88:7,11 89:6,
16 93:24 99:1
101:20 103:3
105:21 107:8
119:12
123:10,16

**Americans**
25:15,21
29:15,19
77:12 88:21,
24 89:2,13
90:18 94:4
100:7 102:21
106:24

**among**
30:18 89:12
110:9

**amongst**
26:15

**amount**
72:22 130:11

**and/or**
28:24

**Anglo**
24:22 25:3
30:6 77:17
81:9 88:13
90:11 93:15,
24

**Anglos**
88:21 89:2,13
94:3 119:10

**anniversary**

62:13

**another**
17:1 40:12
48:17 102:25
110:7

**answer**
7:19 8:4,11
16:17 38:10
39:4 74:6
76:4,22 97:25
99:23 106:21
107:1 108:7
118:3,18,22
124:5 125:9,
15 126:5

**answered**
39:4 99:20
107:22 125:25
126:12

**answering**
6:12 8:7
108:1

**answers**
103:8 107:4

**anticipate**
67:12

**Antonio**
3:19 4:3 7:1
11:3 48:18
49:7 84:15,16
85:6,7,11
86:9 98:23
120:8

**anybody**
9:7 12:6,8
51:22 76:21
126:17

**anymore**
10:15

**apartment**
62:10

**appear**
40:24,25 45:9

57:3

**appearance**
39:19

**appearances**
39:12

**Appearances..
..............
..............
............3**
5:2

**appeared**
65:4 128:5

**appearing**
39:20,22,24
40:3

**appears**
40:9,10,20
45:6

**applies**
109:16

**apply**
104:4

**appreciate**
49:18 91:24
101:8,10

**approximately**
6:24 7:5
13:13 24:23,
24,25

**April**
45:8 46:12,13
47:18 50:11
53:1

**area**
31:2 117:24

**areas**
32:3,4 33:1
83:12 86:12

**argue**
105:11 106:15

**argument**

69:25

**argumentativ
e**
39:3

**around**
57:21 75:3
119:13

**arrived**
64:6

**arriving**
53:18

**Asian**
24:22 25:2
29:15 31:11
77:17

**asked**
22:16 23:9
39:4 45:25
46:8 47:2,4
48:9 50:7
51:18 52:1
97:12,21
99:20 107:20,
21,24 108:19
115:19 117:25
125:19,24
126:12

**asking**
8:3 47:4
51:24 111:22
124:6 125:9

**asserting**
7:8

**assessment**
118:16

**assist**
45:22 96:23
97:3 98:2

**assisting**
90:23

**assists**
94:12 103:5

**assume**
51:20 74:4
81:7 106:23
116:5

**assumed**
51:24

**assuming**
28:20 37:1
55:5 61:11,15
66:6 80:16
85:22 87:4,7
95:23 97:23
102:14,24

**attached**
2:10

**attempt**
116:10

**attempting**
118:15

**attention**
54:12 122:24

**Attorney**
1:6 2:7 3:5
6:16 9:1,2,8
129:6 130:6,
10

**attorneys**
130:17

**audibly**
7:20

**Austin**
2:8 3:6,8
30:13 130:24

**author**
110:1

**availability**
87:14

**available**
85:21 120:1

**Avenue**
3:13 4:3
130:23



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

average
16:14 29:9
31:4,8,16,20,
21,25 32:4,5,
9 33:7,11
119:13

avoid
8:4

aware
11:14 22:20,
23,24 23:2
44:8 67:9
71:20,23
72:12,19
77:19 80:5
89:14 92:23
118:7 121:17
122:12,15

**B**

B
116:12

back
34:1 48:4
62:1 64:22
80:25 82:6
86:11 87:9
94:20 103:7
119:4

background
101:10

backwards
90:21

bad
103:9,24
104:21,25
105:6

balance
25:2

ballot
27:22 80:3,12
90:7 101:18
102:5 104:17

112:14

ballots
79:24

ballpark
16:10

barrier
27:18 93:23

barriers
27:15

base
44:16

based
18:3 23:20
25:16,20
26:19 35:8
64:25 65:2,14
78:14 83:10
123:22 125:19

basic
86:18

basically
25:6 30:3
66:11

basing
114:9

basis
24:11 27:6
28:12 29:17
37:14 79:17
111:24 112:3,
16,20,22
113:7,11

beforehand
35:12 106:24

behalf
39:23,24 40:3

behavior
105:22

being
20:15 27:16
30:21 44:1
89:22 100:12

102:21 120:20

belabor
7:17

belief
79:17 102:25
107:18

believe
11:6,16 17:4,
11,14 19:2
22:19 24:15
25:18,23
27:1,14 28:8
29:14 30:5
31:3,7,11,15,
19,24 32:3,8,
14,18,22
33:1,6,9,10
34:6 35:14,25
36:2,12 37:20
38:19 42:18
43:11,21
46:18 50:25
51:8,16 63:22
67:25 70:18
73:18 79:3
81:5 83:6
90:21,24
93:13,17
94:22 98:14
103:10 109:2,
16 110:13,16
113:23
114:10,16,25
115:2,3,8
120:21
121:15,20,22
122:11,19
123:3,23
124:18,22
125:8

believed
38:7 39:1
48:7,12
114:23 124:1,

7

believes
115:6

besides
14:19 23:10
63:5 74:21
89:20

best
8:6 18:21
19:12 73:19
74:20 115:1

better
38:11 56:20
57:25 79:20
91:19

between
28:17 46:13
70:18 85:12
94:21 96:11,
18 101:24

Bexar
7:1 48:19
49:5,10
79:10,13
82:18,23

B-e-x-a-r
49:9,10

BexarMet
48:18 49:4,14

big
7:6

bigger
29:12

Bill
7:10 8:23
9:11 11:18,
20,24 12:5,14
14:1 15:23
18:7,14 19:4,
7,12,19,21
20:1,3,5,15
21:4,18 24:7,
13 25:4 27:2,

14 28:2 29:1
33:21,23
34:3,11,15,
23,25 35:1,3,
5,8,10,24
36:2,3,8,9,
11,13,19,24
37:1,6,10,
13,24 38:8,
14,20,21,22,
24 41:4,7,12,
13,17,18,21
42:1,2,11,25
43:5,15,25
44:17 45:25
47:25 48:7,
12,17,18,19,
20,22 49:1,15
51:21 54:15,
17,18,21,24,
25 55:19,20,
23,25 56:4,6,
15,17,20,25
57:8,9,12,
15,16,19,21,
22,23 58:1,7,
10,15,18,20
59:3,10,12,
13,18 60:2,3,
5,7,11,12,
13,16,23
61:3,6,7,10,
13 62:17,20
63:2,6,11,
13,20 64:10,
13 65:19,23,
24 66:6,10
67:15,25
69:10 74:18
87:13 89:23,
24,25 90:9,21
91:13 92:6,8,
12,14,17
94:5,10,11
96:12,22 97:1
100:16 101:16


Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

102:15,23
103:5,10,16,
25 104:12,21
105:16,25
106:11,14
108:25 109:2,
11,13,14,15,
16,25 110:2,
4,6,8,11,14
112:9 113:16,
17 114:2,4
115:4,5,6,9,
11 117:7
118:13 120:19
121:5,7
122:10,13,16,
22 123:1,5,9,
12,13,14,18
124:8,9,15,24
125:9

**bills**
12:9,17
13:11,14,15,
19,22 14:2
19:19 55:14
56:8,12 58:1,
23 59:13,17,
19,25 60:5,21
63:10 66:11
109:4,5,6,7
110:5 116:6

**birth**
92:10

**bit**
32:12 33:15
34:1

**BLACK**
1:15 129:15

**block**
79:16

**blocker**
57:12,15,16,
21,23 58:7,10
59:12,13,18

60:2,5 109:16

**block-walked**
78:2

**Bobby**
4:2 8:16

**bobby@bobbyma
ldonado.com**
4:4

**booth**
26:1

**border**
7:3 27:10,12
29:8,11 86:5
94:16,18,20,
24 95:4,8,17,
21 96:2,4
98:9

**born**
27:25 98:23
116:19

**both**
10:6 11:3
38:13 53:22
69:11 111:7

**bound**
81:11

**Box**
3:6 90:7

**boys**
10:19

**Brackettville**
120:10

**BRANCHES**
1:11 129:11

**break**
44:20 61:20
68:24

**briefly**
24:5 28:12
108:23 117:25

**Brimer**

53:19,24 54:5

**bring**
9:14 55:19,22
56:20 59:3
60:10 92:10
109:15 121:4

**bringing**
63:14

**broad**
118:15

**brought**
100:22 121:12
122:24

**Bruce**
3:12 21:22,23
39:22

**bruce.gear@us
doj.gov**
3:15

**burden**
30:1 94:13
120:13

**burdens**
88:15

**bus**
28:23 85:23

**business**
57:20 58:21,
23 59:14
61:24 67:23
109:10

**bussed**
83:16

**bussing**
120:9

**but..**
12:12 15:23

**button**
66:12,16 67:5

**buy**
85:14 86:10

---
C
---

C
3:3 10:23

**calendar**
55:8,10,16,
18 56:6,7,15
57:18 60:12
62:5

**calendared**
121:11

**calendaring**
121:13

**Calendars**
55:13 121:16

**call**
47:24 59:9
60:11 62:11
64:1 66:4
67:1,2,3,15,
18 78:5

**called**
46:16 48:18
53:16 54:3
55:25 56:18
59:10 62:8,
15,18 64:14
65:3,5,8
66:22 68:4
100:10,12

**calling**
82:1

**calls**
44:11 60:23
99:21 124:11,
12

**came**
35:8 54:25
67:24

**cannot**
42:10 126:8

**capacity**
1:6 129:6

**capita**
29:9 119:13

**captain**
100:12

**car**
86:3 119:23

**card**
24:14 26:23
27:25 29:22
74:3,15 78:4
81:12 90:2,5
99:4,7 101:22
128:8

**care**
86:19 110:3

**CARLOS**
1:23 2:1 5:3
6:1,9 10:24
11:8,9 45:7
127:20,25
128:5 129:20,
25

**Carlos.Urest
i@senate.sta
te.tx.us**
17:6

**Carolos**
5:12

**Carpenter**
2:5 129:22
130:22

**carry**
73:12 78:13
91:18,19

**CASE**
1:10 7:9
27:23 51:19
52:7,12 55:20
66:9 78:12
94:22 116:6
129:10

**cases**



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

87:21
cast
27:21 79:23
80:11 101:17
104:17 112:14
casting
102:4
Castroville
84:22
CAUCUS
1:16 3:16
14:4,9,11,16,
18,19,20,21,
24 15:2,7,9
40:1 57:6
129:16
cause
2:3 117:19
caused
27:19
cell
87:6
certain
23:21 33:20
34:7 36:17
59:25 87:15
90:25 101:17
113:19,20
125:19
certainly
35:7,12
certificate
92:10
Certificate..
..............
...........1
29
5:7
certification
75:6 99:8
129:20

Certified
129:22 130:20
certify
129:23 130:15
cetera
8:23 26:13
46:1 62:13,
14,17 63:15
65:1 87:9
109:7 121:24
122:24
chair
15:7 53:23
78:9
chairman
14:17 15:9
67:18
chairpersons
67:19
chairs
53:22
change
53:8 54:8
55:17 56:3
59:19 127:3
changed
62:4 95:7
changes
45:19 51:13,
16 98:6,10
127:1
Changes......
..............
.........127
5:6
characteristi
cs
117:5
check
64:18 96:6
checked

65:7,9 68:13
children
10:6,8,10,13,
18
choice
64:3
choose
91:18 111:23
Chris
2:5 39:7
40:14 129:22
130:22
Christmas
85:16
chubb
109:25 110:4,
8
chubbed
109:21
chubbing
109:20,24
110:9,13
circle
41:11,16
circumstances
88:3 115:23
circumstantia
l
118:17
cities
120:4
citizen
27:25 91:22
99:1
citizens
27:14
citizenship
75:7 98:22
99:8
Civil
2:9 25:17

26:8 90:17
100:6 116:4
clarify
45:24 53:8
54:8 81:3
82:5 115:16
clarifying
49:18
class
70:10
clauses
91:16
clear
11:19 36:4,25
40:5 50:6
108:5 121:11
125:2
clearance
48:20
clearly
36:8 59:24
107:24
closed
28:25
closest
87:10
clothes
85:14,19
86:11
clothing
86:2
coffee
64:20
coincidental
ly
48:21 49:2
colleagues
34:23,24
35:21 37:18
38:14 100:23
101:3 118:7
120:25 122:2,

17
colleagues'
35:9
college
91:17 96:25
COLUMBIA
1:1 129:1
come
17:6 29:2
55:6,14
67:10,12,24,
25 85:14
86:8,9
comes
57:9 90:17
102:21 103:20
107:2
coming
13:19 65:20
66:7,10
123:11,12,13
comment
100:17
commented
100:19
comments
45:16
committee
18:11 53:23
55:11,13,15
committees
67:16,20
122:21
common
86:12
communicated
46:14 50:20
communicatio
n
17:8 87:5,7
communicatio



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ns
17:23 18:4

communities
83:20,25
119:25 120:3
123:10,11,16

compared
89:13

complete
62:16

completely
79:13

component
105:2

concealed
9:20 11:5
73:12,13 74:9
75:7 78:13
99:9 103:11,
12

conceivably
66:16,17

concept
57:19

concern
35:10 90:3
106:2

concerned
54:9 113:3

concluded
126:19

conclusion
44:12 73:1
124:12

condition
6:11

conditions
29:23 98:1

conduct
19:6,9,13

conducted

72:2,8,16

CONFERENCE
1:10 2:8
129:10

Conferring
7:11

Congress
130:23

consequence
42:2 118:12

consequences
38:21 92:7
103:15 118:5,
8

consider
58:19 83:3

consideration
59:20 60:1,4
67:10 69:4
110:5 128:11

considered
12:10,17
13:11 14:2
20:12 54:18
56:8,13,25
58:24 59:14
109:13

consistent
111:4

constituency
37:11

constituent
16:19,24
17:1,5,23
74:17 75:10,
24 111:2

constituents
15:11,13
16:1,7 17:9,
12,16,19,24
19:24 24:17,
21 29:5,7

35:11 38:15
64:22 70:16,
19 72:9,13,
17,20 73:23
74:1,8,11,14
75:3 78:3
79:16 82:10,
12 83:11,16
84:15 85:15
86:5 87:1
89:24 90:6
92:15,18
94:25 95:10,
16 96:23
97:5,7,10,15,
22 103:2
110:18,21,25
111:5,7,10,
11,15,19
112:7,23
113:2,4,13,17
114:3,19
115:5,10
116:1 117:8,
11

constitutiona
l
27:17 90:8
91:21 98:20,
21 116:3

contacted
46:17

contained
105:14

contend
24:7 25:12
27:2 33:16,
20,23,25
34:2,15,18,19
35:3,4,22
36:19 41:13,
18 42:22 43:1
90:9 99:13,19
125:6

contention
24:11 25:4,6
27:7 29:17
34:11,12
36:5,9 37:14
44:9,16 88:6,
12 96:15
98:11 107:6
125:12

continental
69:20

continue
23:24

continuing
105:11

contrary
38:19

conversation
46:23 47:1,
13,15,16,20,
21 48:4,6
49:13 50:10,
14,24 52:15,
20

conversation
s
48:25 49:3,
13,16,20,24
52:10,11

convince
110:1

coordinate
86:6

copy
45:9

Corps
11:10 70:13
100:11,12,13

Correct
10:5 12:15
41:9 42:13
45:9 46:7

47:5 54:1,6
61:18,21
66:12 76:6
81:16 89:9
91:3 92:22,25
101:18,19,23
105:23 109:18
112:15 116:18
118:18 122:14
127:22

correctly
65:7 97:8

corresponden
ce
16:19

cost
28:14 80:3

couldn't
16:16 30:24
43:7,17
104:13

counsel
8:15 39:18
100:1 115:19
130:15

Counselor
41:20 43:24
45:6 80:6
100:9

count
68:12

counted
80:8

counties
7:4 69:20,21,
22 82:16,24
83:2,3 87:15

countries
7:6

country
70:11 98:18,
23,24



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

County
7:1 28:17
49:5 79:10,13
82:19,20,23
128:2

couple
8:21 12:21
20:22 40:23
41:3 62:14
84:4 95:13
110:1 122:5

coupled
26:12 30:14
88:20 103:19

courage
117:3

course
13:15 14:7
38:3,16 39:2,
5 41:16 44:14
61:19 68:21
79:2 86:16
96:14 97:17
99:16 100:21
110:22 115:8
118:23 121:5
123:24

COURT
1:1,11 7:20,
22 8:2 45:1
118:21 129:1,
11

courtesy
67:16

courts
118:16

coverage
87:6

create
106:19

criteria
104:12 106:7

cross
94:20 95:17,
21

crossing
96:6

CSR
2:5 130:22

cumbersome
88:23

current
9:18 10:10
82:21

currently
9:16

custodial
130:10

custom
58:6 64:17
68:11,22

customary
56:23 57:11

cut
113:22

——— D ———

daily
95:1

darned
126:4

data
45:25

Date
130:23

dated
40:11,21 45:7

day
16:14 57:5
63:16 67:13
88:2 95:17
96:24 108:25
109:3,4,11,
14,21 110:6

121:1,12,23
128:4 130:5,
20

days
87:17

DC
3:14

Dean
63:21

debate
18:11 30:22

decade
96:8

decades
23:19 59:16

decide
56:8 91:18

decided
38:22

decides
56:20 59:3

decision
38:17 56:4,
15,17

Declaration
5:12 22:13
23:11 45:7,
10,13,16,19,
23 46:8,24
47:2,5 49:21
50:7,12 51:3,
10,11,14 69:3
82:6 108:20
120:22

dedicated
16:18

Defendant
1:7 2:2 3:11
39:23,25
129:7

DEFENDANT-
INTERVENOR

3:16

Defendant-
Intervenors
1:9,12,14,
17,19 129:9,
12,14,17,19

defer
76:17

define
84:2,6 112:6
120:7

defined
112:17 113:5

defining
112:10

definitely
104:3

Del
28:18 84:21
120:10

delay
110:4

Democrat
14:6

Democratic
14:4,8,11
34:24 51:25
122:16

demographics
88:19 100:2

demography
117:9

demonstrate
38:9

denied
22:24 23:7
80:13

denying
24:8 25:5
27:3

DEPARTMENT

3:12 12:11,
13,16 13:1
21:17,21,25
22:4,7,9,12,
15,20 23:6,9,
23 26:6
45:10,15,18
46:7,15,17,
20,23 47:7,
10,21,24
48:5,6,21
49:1,14,21
50:6,17,22
51:2,7,11,
14,15,18,22
52:5,6,12,
16,21 53:3
69:23 108:13

depending
86:15 93:20

depends
59:2

DEPOENENT
4:1

deponent
40:3

deposed
7:14,16

DEPOSITION
1:22 2:1
8:19,25 9:3,
12 39:8 40:8
45:2 62:2
82:7 100:16
120:15 126:19
127:21 129:20
130:2,4,12

describe
6:22 82:8

described
63:6,17 67:7
87:12

describing



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

67:8
**DESCRIPTION**
5:9 128:7
**desk**
66:12 67:5
**desktop**
66:2
**deter**
26:4
**determine**
56:24
**determined**
56:13 109:10
**determines**
55:13,24 59:9
**deterring**
28:10
**developed**
125:17
**Devine**
84:23
**dictates**
55:16
**didn't**
12:1 13:8
20:4 34:22,24
38:1,4,5
47:24 54:21
55:5 73:8,12
88:5 97:20
108:1 114:11
118:20 123:9,
11,12
**difference**
88:22
**different**
13:9,18,19
27:13 31:2
65:25 67:16,
19 77:4 93:14
99:24 100:18
104:20 108:6

110:8 118:20
121:14 122:3,
23 124:6
**differently**
66:1 88:16
94:1 99:25
**difficult**
30:2,16 42:7
87:10 88:4
**difficulties**
117:21
**difficulty**
82:10,12
**diligent**
18:15
**diploma**
32:9
**direct**
54:12
**disabled**
31:24 32:22,
23 77:14
78:21,25
79:4,23 80:1
81:9
**disagree**
38:17 101:2,4
111:20
**disagreed**
38:1 101:4
123:5
**discourage**
41:22 94:8
104:22
**discouraged**
101:12 102:15
103:3 107:10
**discouraging**
92:7
**discretion**
68:15
**discriminate**

125:7,22
126:10
**discriminated**
100:7,10
102:22
**discriminates**
115:24
**discriminatio
n**
105:9,12,20
106:10,12
107:7
**discriminator
y**
23:20 24:3
33:15 38:9,14
44:10,17
48:8,12
99:14,19
107:18 108:3,
4 116:10,11
121:18 123:2,
7 124:2,4,9,
19,23 125:3,
14
**discuss**
8:24 9:3
46:19 47:6
51:10 53:4
**discussed**
30:22 51:14
52:16 108:12,
15
**discussing**
122:9
**discussion**
54:14 121:12
**disenfranchis
e**
25:15,19
27:15 41:23
90:25 91:6

94:9 97:7,9,
18 98:12,15
106:25
**disenfranchi
sed**
23:24 25:25
80:13,17
102:15 103:4
**disenfranchi
ses**
90:23
**disenfranchi
sing**
93:11
**disinformati
on**
103:9
**disparate**
123:1 124:8
**disparity**
96:10,16,17
**disproportio
nate**
69:5,11 70:1,
19
**disproportio
nately**
88:6 89:5
**dispute**
105:9 111:24
112:3,16,20
113:8,11
**distance**
70:17 87:21
89:21
**distinct**
115:24
**DISTRICT**
1:1 6:20,22,
24 7:7 20:7
24:16 25:22

27:9 28:15
29:2,10,25
30:3,6,9
38:11,18
41:24 48:19
49:5,11,15
69:6,12,19
70:2,7,17
72:3,6 73:4,5
75:18 78:15,
16 79:6,8,12
81:19 82:9,
13,16,21,25
83:2,7,8,11,
12,20 84:11
85:19 86:13
87:11 88:7,
10,13,20,24
89:3,7 93:21
94:15 98:7
100:2,3
103:1,24
106:1,25
113:3 114:25
117:6,8,10
119:5,6,8,
10,11,13,15,
17,20,23,25
129:1
**districts**
7:5 19:24
37:2,11
**distrust**
25:22,25
**document**
40:9 45:4
102:18 128:8
**documentatio
n**
75:25 76:24
**documents**
9:12,14 76:20
**doesn't**
32:14 59:1,10



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

70:15 94:5
96:23,24 97:1
99:7 101:1,
20,24 102:1,3
116:4 120:9
**doing**
62:18 83:13
94:10 103:17
**dot**
102:17
**doubt**
76:21
**down**
40:24 41:6
64:4 65:18
110:10
**DPS**
28:3,18,20,25
30:13 69:22
**Dr**
3:18
**draft**
18:19 47:3
51:6,10
**drafted**
46:20,24 51:3
**draw**
73:2
**drive**
26:7 73:9
78:10,12
83:21,25
84:4,16,24,25
85:9,19
86:13,20
89:10
**driven**
28:1 30:12
**driver's**
9:18 73:8,24
74:2 75:4,13
78:11 87:14,

18,22 89:11
99:2,3,5
102:11,14
**drivers'**
10:10 117:16
**drives**
85:5
**driving**
75:3 117:12,
17
**due**
23:18
**duly**
2:2 6:2
129:25
**during**
12:22 13:6,11
14:12 15:3
25:17 30:22
47:25 63:2
65:3 67:8,22
69:4 120:14
**duty**
71:3 110:18,
21,23 111:11

—————— E ——————

**E**
3:3
**each**
8:5 49:24
113:11 130:11
**Eagle**
28:17 84:22,
24 85:7,10
94:18 120:9
**earlier**
50:16 92:4
101:3
**early**
67:17,20 88:1
**easier**
8:3

**eat**
64:20
**economic**
88:20
**edits**
45:19
**educated**
89:22
**EDUCATION**
1:13 113:21,
22,24 114:11
129:13
**educational**
114:18
**effect**
23:20,22
24:3,5,8,19
25:5 27:3,14
28:3,9 29:15,
19 30:6
34:11,12
36:9,10,16
37:7,10,13,24
38:2,6,8,15
41:21 42:1
43:6,15 44:1,
7,15 48:8,13
69:6,11 70:1,
19 89:25
90:18 98:14
99:14,19
100:25 101:5
102:1 104:20
105:13,14,16,
21 106:11,13,
15,19 107:19
108:4 121:19
122:12,16,17
123:2 124:16,
24,25 125:3,
8,9
**effectively**
116:13

**effects**
19:23 26:17
36:24 37:1
38:20,21,23
39:1 89:23
92:17 103:16
**either**
11:4 12:10,22
16:7 18:4,11
20:2,14
26:13,19 29:8
36:25 58:15
64:19 66:14
69:22 70:20
74:2 79:5
85:15 88:10
103:3 110:5,
10 119:11
123:22
**El**
7:2 82:19,20,
24 94:18
**elderly**
26:7 31:15
32:18 43:12,
15,16,19 73:2
77:13 78:7,
21,25 79:4,22
80:1 81:9,24
**elected**
110:20 111:14
**eligible**
117:20
**e-mail**
16:18,22
17:2,5 18:4
**e-mails**
16:6,11,14,
24 17:1,5
22:3
**emergency**
86:19,21
**employed**

130:16
**EMS**
87:8
**enact**
110:24
**enacted**
124:22
**enacting**
35:16
**encourage**
94:6 96:22
97:2 98:2
**encouraged**
121:2
**encourages**
94:11 103:5
**encouraging**
90:22
**end**
58:13
**English**
93:5
**enough**
61:19 111:3
**ensure**
23:23 116:3
**equally**
91:22
**ERIC**
1:5,8 39:23
129:5,8
**especially**
24:15 26:22
68:17
**essentially**
57:18
**estimate**
16:10 17:23
18:3
**et**
1:8,13,16,18



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI

June 11, 2012

140

3:11 8:23
26:13 46:1
62:13,17
63:15 64:25
87:9 109:7
121:24 122:24
127:2 129:8,
13,16,18

**ethnicities**
101:25

**event**
67:4

**Eventually**
58:12

**everybody**
51:24 101:21

**everyday**
83:13

**evidence**
37:4,8,19
44:8,16 96:17
99:11,16
101:1 118:17
124:3

**exacerbated**
87:23

**exacerbates**
107:3

**exact**
29:7 72:22

**Exactly**
25:10 26:22
47:15 57:1
61:1 87:23
104:11 108:18
121:25

**Examination**
5:4,5 6:5
115:17 119:2
122:7 130:6

**examine**
116:2

**example**
27:24 28:17
60:13 72:24
73:7 74:20
75:4 84:14
92:11 93:20
96:24 103:11
104:5 114:7,
15 120:5
121:24

**examples**
73:6

**exceptions**
73:11 91:15

**excuse**
51:14 64:19

**executed**
128:10

**exercise**
27:16 90:8
98:19

**Exhibit**
39:8,9,17
40:8,10,12,
15,16,19,20,
23 44:24,25
45:3 62:2
82:7

**EXHIBITS**
5:8

**exist**
26:9 87:18,22
120:10

**exists**
25:21 37:19

**expectation**
58:14

**experience**
16:23 78:20
79:15 83:11

**experienced**
100:23

**Expiration**
130:23

**expired**
73:8 75:4,13
99:2,5

**explain**
27:6 28:12

**explained**
104:7

**expressed**
128:11

**extent**
17:7 18:13
46:10

**extinguish**
101:24

**extraordinary**
62:21

**extremely**
82:14

─────── **F** ───────

**face**
83:12 101:16,
25 102:1,16

**facilities**
64:19

**fact**
25:15 26:5,
12,22 29:24
30:14,15
54:24 58:18
61:8,15 62:20
65:14 68:17
69:18 70:20
77:24 78:10,
11,14 87:24
94:12,24
104:15,23
114:14 116:8,
14

**factor**
103:19

**factors**
26:13 118:20

**failed**
122:3

**fair**
58:4 111:3

**fairly**
91:22 117:15
118:5

**familiar**
23:13 30:17
77:2 80:18,
21,23 84:7
108:17 109:1

**families**
86:8

**family**
10:4 86:7
95:13

**far**
46:1 54:9
57:7 59:17
63:25 70:12
96:4 113:2

**fashion**
24:17

**father**
98:25

**favor**
33:21 36:5
38:8,22 41:8,
12,17,18
42:16 111:9,
10 113:16
114:18 115:4,
9 122:12
123:5,9

**favored**
110:24 111:1,
4,7,15,18

**fear**
25:20,24 26:9

**February**
22:18

**Federal**
2:9

**fee**
26:12

**feel**
25:24 80:8
101:11 113:19

**felt**
118:4

**filed**
8:23 13:14,22

**filibuster**
116:9,18

**final**
20:4 56:17

**finalized**
52:20

**financially**
130:18

**find**
46:2

**finish**
8:3

**finishes**
67:2

**Firm**
130:25

**first**
6:2 7:15 27:9
40:24 49:25
50:20,24 51:3
57:5 58:1
60:4 63:20
64:5 65:1
68:18 81:13,
17,21 82:1,3
92:21

**fits**
106:10



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

**five**
50:1 73:11
104:6,8 106:7
121:15

**five-minute**
44:20

**Floor**
2:8 3:8 18:11
36:25 37:1
55:14 57:10
63:14,22,23,
24 64:2 66:14
109:15 120:12

**folks**
18:7 24:24
28:16 29:3,24
30:3 63:14
70:9 75:8
78:18 79:21
92:7,14 98:18
120:24 122:23

**follow**
30:19 68:21

**follow-**
122:5

**followed**
52:14

**following**
129:24

**follows**
6:4 130:12

**forbid**
86:24 99:1

**force**
64:12

**forced**
64:10

**forefront**
100:22

**foregoing**
127:20 128:9

**foreseeable**

118:5,8,12

**forever**
70:14 71:9,11

**forget**
100:4,14
106:22

**form**
20:4 26:20,24
29:21 31:8,12
32:10 33:3

**former**
70:16

**forms**
27:21 32:16
33:12 72:21,
23 73:1 75:19
76:9,16
104:6,8

**Fort**
84:23

**forth**
94:21

**forwarded**
130:9

**found**
96:9

**four**
61:8 95:9

**frame**
22:19

**frank**
104:11

**frankly**
51:25

**Frederick**
3:5 6:6 39:7,
13,16,20
40:4,18
44:14,19,24
45:1 68:25
69:2 101:7
107:5,23

108:8,11
115:13 122:5,
8 124:17
126:7,16
130:9,13

**Frederick....
..........6**
5:4

**Frederick....
.122**
5:5

**frequently**
94:21 95:21

**friends**
86:7 95:14

**full**
6:7

**FUND**
1:13 113:24
114:11 129:13

**funded**
113:21

**funding**
114:16,18

**Further**
5:5 110:5
115:13 118:25
122:4,7
130:15,18

─────────────
         **G**
─────────────

**Garza**
3:17,18 39:3,
24 40:5 44:11
99:20 107:21
115:15,18
118:25 122:9
125:24 130:13

**Garza........
........115**
5:4

**garzpalm@aol.**

**com**
3:20

**gauge**
118:21

**gave**
73:6

**gaveling**
67:3

**Gear**
3:12 21:23,24
39:11,14,22
50:17,21
99:21 106:20
119:3 122:4
124:11 126:12
130:14

**Gear........
.........11
9**
5:5

**Geary**
21:22

**General**
1:6 2:7 3:5
29:4 106:16
129:6

**generally**
6:23 8:22
13:13 15:15
16:8 18:8,19
20:5,25 21:14
23:15,16,18
30:19,23
58:14 59:1,13
60:15 62:10,
14 64:17
66:24 69:17
77:11 82:8
95:2 102:10
107:9,11
110:12 111:3
119:6 120:22
121:21

**geographical**
30:14 69:19
89:21

**geographical
ly**
6:22 70:17

**geography**
82:8

**Georgia**
21:1 80:19

**Georgia's**
20:21

**getting**
32:13 83:14,
15 88:15

**give**
15:25 38:15
40:12 54:7
84:14 110:6

**given**
26:22 29:24
37:17 38:17
68:17 70:16,
19 79:6 91:19
93:2,5 94:23
99:25 128:12
130:2

**giving**
91:14 114:7

**go**
7:18 16:24
17:4 23:21
25:18,25
26:5,24 29:11
39:4,17 56:6
64:19,20
84:16 85:14
86:9,11
95:11,12,13,
15,24 99:3
103:6 108:8
120:11 121:2



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI
June 11, 2012
142

**God**
86:24 99:1

**goes**
24:2 28:2
30:2 86:25

**going**
13:7 26:11,24
30:1 40:12
41:10 48:16
55:25 56:17
58:11 60:4
64:24 67:25
80:25 86:23
90:4,6 92:11,
14,18 95:7
103:3,4,7
121:4 126:4

**gone**
26:8 61:19
62:8,9,24
63:8 75:15
105:10 121:5

**Gonzalez**
116:12

**Good**
6:7 70:14
71:9,11
103:17 114:15

**gosh**
121:15

**gotten**
16:6,11

**Governor**
55:9,10,15,24
56:7,14,17,19
59:3,18 60:2,
23 64:14 65:2
68:4,9

**Governor's**
68:15

**grandfathering**

91:16

**Great**
8:17 38:16
57:17 106:23

**greater**
89:15 94:6

**greatest**
98:20

**grew**
95:10

**Greyhound**
85:23

**groceries**
83:14,15

**grocery**
83:22 84:1,3,
6

**ground**
7:17

**group**
13:25 14:4

**groups**
13:21 15:16
16:1 77:5
122:24,25
123:6,9,14,19

**guess**
10:3 15:15,23
16:17 18:1
20:23 37:8
53:10 54:24
84:2 91:23
101:8 103:13
106:16 112:6,
9 120:6

**guessing**
15:19,20
16:13 49:25
121:22,23

**gun**
73:12

_____
H

**H**
1:5 129:5

**hadn't**
27:25 100:24

**half**
9:6 20:23
24:25 25:1
28:19 83:17

**halfway**
67:2

**hall**
64:22

**hand**
41:10 104:15
128:12

**handed**
45:2

**handgun**
9:20 11:5
73:13 74:9
75:7 78:13
91:18,19 99:9
103:11,12

**handled**
68:18

**happen**
39:1 114:20

**happened**
23:2 62:7
100:20

**happens**
66:24

**happy**
7:25

**hardship**
91:15

**hardships**
83:13

**harm**
25:7 33:17
34:20 35:15,

24 36:20
41:13,18
42:11,18,23
43:12,22

**harming**
33:22 34:3,8,
13,16 35:5
36:6 37:15
42:5 43:2,15
44:4

**haven't**
96:7 108:15
124:18

**HB**
62:4,8,22
63:18 64:5,12
65:13 67:9
68:5,10,16
120:23

**head**
7:21 39:6
42:8 58:7,19
81:14 95:20
126:3,15

**health**
28:1

**hear**
7:20 104:5

**heard**
55:23 66:25
104:8

**HEB**
84:3,5,7,12,
16

**HEBs**
84:8

**heck**
103:12

**Heger**
63:23

**held**
81:12

**help**
7:22

**helped**
46:2

**helpful**
104:14 107:6

**helps**
103:21

**Henry**
116:12

**her**
28:1 73:8
81:12 110:21
111:15,19
116:1

**hereby**
127:21 129:23

**hereto**
2:10

**hesitate**
7:24

**high**
32:8

**higher**
89:1,12,18
117:11 119:10

**highly**
62:20

**highway**
86:23

**Hinojosa**
62:3 64:1

**Hispanic**
14:18,24
15:2,7 24:21,
25 27:10
36:7,21 38:13
41:24 70:21
77:17,20,22
78:8 79:5,18
88:7,11,13
89:6,16 90:10



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

103:2 107:8
119:12
123:10,15
**Hispanics**
29:20 77:12
88:21,23
89:2,13
90:19,21 94:3
100:7 102:21
106:25
**historical**
101:10
**Historically**
90:15,19 94:3
**history**
23:18 25:16
90:15 100:4,
21 101:6
102:20 103:19
105:8,12,13,
19 106:9,12,
19,22 107:2,7
116:7
**hold**
78:4
**HOLDER**
1:5 3:11
39:23 127:2
129:5
**holds**
109:3
**home**
73:9,21 86:11
121:2
**homebound**
78:9
**Hondo**
84:22
**honestly**
48:14
**honoring**
62:12

**hop**
28:22
**hope**
76:11
**hopefully**
28:23
**hospice**
73:9,22
**hospital**
86:14,16,24
87:10
**hour**
9:6 28:19
83:17,25
84:12 88:1
**hours**
62:14 69:24
84:5 85:7,8
87:17 130:13
**House**
14:19,22 37:1
42:16,17
54:15,17,24
55:1,6,12,13
60:7,12
63:20,23,24
66:1,11,14
67:25 79:7
108:25 109:4,
5,11,13,14,
15,18,22,24,
25 110:15
121:14
**household**
9:24
**huge**
29:11 90:3
**hundreds**
15:19

———— I ————

**ID**
11:15,20

12:9,17 13:1,
5 14:1 15:11,
14,23 16:8,
12,15 17:10,
13,17,20,25
18:14 19:19
20:18,21
21:14 24:13,
17 25:7,8
26:6,20,25
27:12,21
28:4,14
29:21,22
30:18 32:13,
16 33:12
54:18 70:3,7,
12,13,14,22,
24 71:2,6,9,
13,15,18,21
72:2,5,9,14,
17,21,24
74:3,15
75:14,15,16,
19 76:9,16,
20,25 77:2
78:25 79:3,19
80:2,10,19,21
81:6 88:5,15
89:4,15 91:1,
9,11,14,17
92:1,9,21,24
96:7,10,16,17
97:11,16,18,
22 98:3,13,16
99:7,13
101:17,21
102:3,8,9,10,
14,18 103:23
104:23 105:3,
4,5 111:25
112:4,6,8,10,
12,16,24,25
113:4,9,13
117:7 121:5
**idea**

15:13 29:4,20
76:21 77:1
**identificati
on**
31:9,12 32:10
33:3 39:10
40:17 44:25
74:18 77:13
99:18 104:6,9
107:17 112:13
**identify**
36:18 40:9,18
41:25 42:4,
10,17 43:7,17
44:3 45:4
74:17,21
75:17,22,24
76:4,6,14,23
**identity**
26:25 128:7
**IDs**
31:2,5,16,
21,25 32:5,
20,24 33:7
71:10 74:22
75:5,10 76:1
77:5,10,23
91:4 96:25
104:16 117:21
**ill**
62:15
**illness**
6:11 53:18
**imagine**
13:20 72:23,
25
**immediate**
10:4
**impact**
19:7,10,14,
17 20:1 21:4,
13 25:13
89:6,15 93:8,

11,14 123:7,
18 124:2,8
**implemented**
28:9 90:10,25
93:14 98:12
**importance**
57:17
**important**
7:19 105:2
110:21 113:1
**impose**
82:9,12
**imposed**
87:13 120:13
**imposes**
29:23 105:25
**impossible**
76:3,7
**impressive**
120:8
**inaccurate**
104:21
**inadequate**
93:3
**in-between**
85:10
**incidence**
89:12,18
117:11,15
**include**
16:3 47:2,11
87:13 110:10
**includes**
7:2,3,4 49:7
94:15
**income**
29:10 119:13
**independent**
105:16 106:17
**INDEX**
5:1



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

**Indiana**
80:22

**Indiana's**
20:18

**indigency**
30:10,15 98:9

**indigent**
28:10,21
29:2,5 31:19,
20 32:14
42:23 43:3,6,
9 88:25 89:8

**individual**
36:12 38:25
50:22 74:17,
21 75:24
102:8 118:1

**individually**
15:18 19:8
26:14 36:22
78:3,17

**individuals**
75:21 78:7,
19,23 79:2,4
81:24 91:1
122:23,25
123:6

**inform**
53:17 106:6

**informal**
72:16

**information**
13:9,19 22:6
46:3 92:5
93:2,3,5,6,20
103:9,24
104:21 105:1,
4,5,6,15,24
106:2,6

**informed**
62:3 90:4
118:10

**infrastructure**
28:22 120:8

**initial**
17:5

**initially**
36:1 50:19

**in-person**
102:4 104:17

**inquiry**
24:2

**instance**
2:2 63:5
113:25 114:2,
5,6,15

**instances**
116:8,25

**instead**
7:20 53:19
62:19 90:22
97:4

**instructs**
8:10

**instrument**
128:9

**instruments**
116:9

**insurance**
117:12,17

**intended**
33:17 35:15,
20 42:23 92:6

**intent**
36:1,2 41:21,
22 42:1
118:1,11,16,
18,21 122:10
124:4,10,14,
19,23 125:14,
17,22 126:10

**intentionally**

126:14

**interactions**
18:6

**interested**
13:21 130:19

**interesting**
64:25

**interposing**
22:22

**intervenors**
39:25

**intimidate**
26:3

**intimidating**
26:10

**intimidation**
25:23,24
26:2,15

**introduced**
30:21

**issue**
16:16 30:11,
14,15 89:22
122:9 123:23

**issued**
71:4

**Italia**
84:22 120:11

**J**

**Jan**
5:11

**Jane**
53:16 54:3,4

**January**
40:21

**job**
8:2 103:17

**John**
63:21

**Jose**

3:17,18 39:24

**Journal**
5:10,11 37:20
40:10,21 41:1

**JR**
1:5 10:24
129:5

**JUNE**
1:24 2:4
129:21 130:20

**Junior**
11:10

**just**
6:23 7:18,19
8:3 9:1
11:10,19
15:20 18:3
22:8,14 23:16
28:22 30:1
34:10 36:4,23
38:1,4,7 40:4
50:6 53:24
58:24 60:23
66:16 73:6
81:14 82:5
88:3 90:1
92:23 96:5
99:24 101:21
103:22 104:8
106:3,23
107:3 108:4,9
112:17 114:1
115:15 117:24
121:11

**JUSTICE**
3:12 12:12,
13,16 13:1
21:17,21
22:1,4,7,9,
12,16,20
23:6,9,23
45:11,15,18
46:7,15,17,
20,23 47:7,

10,21,24
48:5,6,21
49:1,14,21
50:6,18,22
51:2,7,11,
15,18,22
52:5,6,12,
17,21 53:3
108:13

**K**

**keep**
85:5 87:2
92:15

**keeping**
27:16 28:15
119:11

**KENNIE**
1:8 129:8

**kept**
82:1

**kidded**
121:3

**kids**
85:14,20,24
86:2 96:25

**kill**
110:6,14

**killing**
110:10

**Kim**
53:19,24 54:5

**kind**
57:25 60:21
83:13 86:18
95:6 104:19
105:14
106:10,17,19

**kinds**
77:5

**Kinney**
28:16

**knew**



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

35:7 66:10
120:24 121:1

**know**
7:13 10:12,
13,17 11:4,16
13:8,13 16:15
19:5 20:4
24:20 26:13
28:16 29:6,20
30:12,23
34:10,23
36:22,24
37:3,18,20
38:17 39:11
42:8 50:4
51:18 59:15
62:12 63:14
65:11,12,15,
19 66:6 67:20
70:6,9,15
71:5,8,12,16
72:20,22
73:23,25
74:1,5,6,8,
11,14 75:1,2,
4,8,12 76:8,
12,19 77:8,
11,24,25
78:10,11,14,
18 80:6 83:21
85:6 86:7
88:1 89:19
91:12 92:9
93:5 94:24
95:23,24
96:8,25 99:25
101:2 103:1
105:9 106:3,
14 107:3
109:20 111:21
113:10,14
119:6,9,16,
18,19,22
120:3 122:2
123:15 126:1,

5,15
**Knowing**
18:15 26:11
73:5 79:20
102:22,25
**knowledge**
17:13 37:3,
12,13,17,21
68:8 96:1
109:8 126:13
**known**
30:11 120:22
128:5
**knows**
38:11 64:23,
24 65:16
76:21
**Korea**
98:25

---
**L**
---

**lack**
32:8 56:19
57:25 72:20,
23,25 76:20
92:5
**lacks**
80:10
**LaCoste**
84:22
**lady**
81:11
**language**
93:22
**large**
29:7 82:14
85:3
**larger**
7:5
**largest**
69:19 98:7
**last**

9:5 23:19
28:6 49:24
53:15 60:16
95:9 113:22
117:24
**lasted**
49:25
**late**
53:18 58:16
**Latino**
27:3 31:7
35:15,24
36:15 37:7,16
38:6 41:14,19
42:5,12,19
93:14,24
105:20
**LAW**
3:18 20:18,21
21:1 24:2
**laws**
21:14 23:20,
21,22
**lawsuit**
22:10,13,17
23:10 45:11
46:8 49:22
50:7 108:12,
15,21
**lawyer**
7:13 8:9
108:13
**LEAGUE**
1:13 129:13
**least**
13:20 17:5
34:24 58:14
74:24,25
75:10,19
76:9,15 80:7
84:12 112:8
**leave**
66:5 70:25

**left**
40:25 65:8
70:13 71:3
108:2
**legal**
44:11 124:11
**legislation**
13:5,18 18:18
19:23 20:5,7,
11,12,16
30:18 115:24,
25 116:2,11
117:1 118:11
**LEGISLATIVE**
1:15 3:16 7:8
13:12 14:16,
21 16:21
30:22 40:1
108:23 129:15
**legislator**
36:18 43:8,17
44:3 78:1,20
79:15 111:8,
11,18,22
113:12 115:2,
3,6,9,21
116:1 117:1,3
123:22 124:7
125:11 126:9
**legislators**
33:20 34:7,9
35:2,4 36:5
37:9 41:12
43:1 116:9
118:1,12
123:6 125:13
**legislator's**
124:3
**legislature**
11:21 12:5,7,
9,18 13:6,25
14:2 33:16,19
34:1,2,7,20

35:1,15,18,
19,23 36:13
37:4,15,23
40:11,21
42:22,25
43:11,22
54:18,22
113:20 114:7,
11 116:7
124:1 125:21
**legitimate**
110:13 113:15
114:17 115:3,
9,20
**lend**
26:14
**less**
25:1 31:4,8,
12,16,20,21,
25 32:4,5,9,
15,19,23
33:2,7,11
70:3,7 79:18
99:12,17
107:8,16
119:19,22,24
**let's**
39:16 60:1
106:23
**letter**
18:5 22:21,23
**letters**
16:7,11 22:3
**level**
93:16,25
97:23 98:3
**levels**
77:2,4 80:18,
21
**license**
9:18,20 11:5
73:8,13,24
74:2,9 75:4,



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

8,13,14,15
78:11 87:14,
18,22 89:11
99:2,3,5
102:11,14
103:11,13
117:16
**licenses**
10:11
**Lieutenant**
55:9,10,15,24
56:7,14,16,19
59:2,18 60:2,
23 64:14 65:2
68:4,9,15
**likely**
28:21 31:4,8,
12,16,20,21,
25 32:4,5,9,
11,15,19,23
33:2,7,11
70:3,7 79:18
89:7 90:12
96:1 99:12,17
101:12 107:9,
16 119:20,21,
23,24
**likewise**
8:5
**limitation**
107:10,13
**limited**
69:24 87:14,
17
**line**
57:25 58:1,2,
7,19,25 59:4
60:4,21,24
127:3
**lines**
28:24 40:23
41:3,6 50:4
**list**

42:15
**literally**
13:17 15:21
16:14
**little**
32:12 33:15
49:2 85:7
93:7
**live**
10:25 11:2,3
25:22 27:10
28:16 29:8,25
30:3 41:24
94:20 95:16
**lived**
88:13
**lives**
96:3
**living**
29:8 96:2
**lobbyist**
12:2
**lobbyists**
11:23 12:1
**local**
48:18
**location**
93:15,25
108:6
**Lois**
81:7,15
**long**
9:5 25:16
28:24 30:13
49:24 85:19
86:13 94:15
**look**
40:7 45:5
88:19 90:15,
19 94:2
100:16 101:6
116:8 118:20,

21
**looked**
118:4
**Looking**
62:1 82:6
113:8 114:8
**looks**
54:14
**lose**
71:15
**lost**
71:13
**lot**
13:8 15:24,25
17:8,22 37:22
81:18 83:15
85:10 101:11
108:6
**lounge**
64:20
**low-income**
90:10,11
**Luke**
81:7,10,15,23
**LULAC**
123:12
**lunch**
64:20
**Lytel**
120:11
**Lytle**
84:22

---
**M**
---

**machine**
2:6
**mail**
80:4,12,15,16
**mail-in**
79:23 80:9
**majority**
56:3 70:9

112:1,4,9,17
113:9,12,16,
19,23 114:10,
19 115:10
**makeup**
82:9
**Maldanado**
7:11
**MALDEF**
123:13
**Maldonado**
4:2 8:16
40:2,6 44:21
68:23
**mall**
85:1,2,3
**malls**
84:17 86:10
**manner**
118:2
**March**
22:18,21 23:2
46:13 47:17
50:10
**Marcos**
86:10
**Marine**
11:10 70:13
71:16 98:24
100:11,12,13
**mark**
39:7 40:14
44:24
**MARKED**
5:9 39:9
40:8,16 44:25
45:2 62:2
82:7
**material**
13:25
**materials**
13:5 14:12

15:3
**Matt**
39:20
**matter**
48:17
**matters**
7:9
**Matthew**
3:5 39:11
130:9
**matthew.fred
erick@texasa
ttorneygener
al.gov**
3:9
**McCullough**
4:3
**mean**
15:18 37:19
38:19 54:25
70:1 77:4
81:8 84:14
86:15 97:17,
18 98:19 100:8
111:7 123:11
125:17
**means**
57:20 58:19
99:9 110:14
112:11 120:7
**measure**
115:21,22
**meet**
8:24 9:2
67:17 106:6
**meeting**
9:5,7 64:21
**member**
6:17 14:8,15
36:12 37:4
38:4,25 42:17
61:6 63:7



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

                        Suite 220
              3101 Bee Caves Road
                 Austin, TX 78746
             www.esquiresolutions.com

66:13 79:7
100:19 109:18
123:25 125:21

**members**
9:24 14:12
15:3 35:22
36:11 37:14,
23,25 42:15
43:11,21 53:4
56:3,7 61:2,
4,5,8,22
63:3,18 65:17
86:7 110:16,
17 123:4

**members'**
64:20

**membership**
63:2

**memory**
120:17

**mentioned**
21:16 29:19
49:15 65:16
78:20 79:2

**met**
52:13 73:11
122:21

**Metropolitan**
48:19 49:11

**MEXICAN**
3:16 14:15,21
39:25

**Mexico**
94:21,23
95:5,8,17,25
96:6,7

**Michael**
10:23 11:7

**miles**
6:25 69:21

**military**
11:12,15

62:13 70:12,
13,16,22
71:7,10,13,
15,18,21
73:10 74:15
75:5 99:7

**million**
113:22

**mind**
28:15 44:19
68:23 80:12
85:5 87:2
92:15 119:11

**minds**
125:18

**minorities**
119:7,19,22
123:19

**minority**
19:23 69:6,11
70:2,6 73:3
96:11 99:11,
17 107:15,19
115:25 118:8
120:13 122:13
123:2,19
124:2 125:4,
7,14,23
126:10

**minors**
10:14

**minutes**
21:16 50:1,2,
5 83:22 85:8
86:20,24
130:13,14

**misinformatio**
**n**
92:8

**misquote**
77:21

**mistake**
53:21 121:6

**misunderstand**
**ing**
97:13

**mix**
94:5

**mom**
73:7

**moments**
65:4

**mom's**
78:12

**Monday**
40:10,11

**month**
85:13

**months**
8:21 12:21

**morning**
6:7 62:11,15
67:11,17,21

**mornings**
83:18

**most**
7:19 13:21
17:16,19 18:6
28:21 30:3
32:11 49:10
64:16,24 65:4
73:17 78:23
79:4 84:7
90:12 93:10
95:14 110:20
113:4

**mostly**
119:12

**mother**
27:24 28:5
72:24 73:20
74:20,22
75:20

**move**
31:1 33:14

58:15,16 69:2
109:5

**moved**
62:22 63:7

**Movement**
26:8 90:17
100:6

**moving**
48:4 64:4

**multiply**
16:16

**must**
57:21 98:25
101:17,21

**myself**
37:9,18 45:7
98:18 104:12

―――――――

**N**

**N**
3:3

**NAACP**
1:11 123:11
129:11

**name**
6:8 41:11,16
65:5 75:9,23
81:2,4,17,21
82:1,3 128:8

**names**
10:22 120:3

**narrower**
101:9

**necessarily**
15:22 85:11
110:3 113:18
124:14,20

**necessary**
29:24 76:1,
20,24

**need**
29:2 37:21

60:15 92:9,24
95:22 103:18

**needed**
71:6,13

**negative**
25:13 26:17
30:5 37:10
38:6,8,21
42:2 106:15

**negatively**
29:14 36:15
37:6

**neighborhood**
78:2

**neither**
130:15

**Nelson**
53:16 54:3,5

**never**
48:2 52:1,13
53:6 63:12
66:15 71:8,
17,18 73:7,9
105:1 109:21
121:6

**new**
8:6 60:3
71:6,14,24
99:3 102:22,
23 105:25
106:14 107:10

**nine**
78:17

**nobody**
52:2 104:7
105:9

**nodding**
7:21

**nods**
95:20

**noncontrover**
**sial**

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com



ESQUIRE
DEPOSITION SOLUTIONS

109:6
**nonelderly**
32:19
**nonindigent**
32:15
**nonminority**
96:11,18
**normally**
62:18
**North**
96:3
**notarized**
52:23
**NOTARY**
128:16
**noted**
127:22
**nothing**
6:3 48:21
54:10 68:19
85:12 96:22
98:2,6 103:5
111:17,20
122:4
**notice**
35:12
**notwithstandi
ng**
38:20 97:5
98:23
**November**
28:6 73:18
**number**
29:7,11 45:25
59:4,8 73:2,3
95:18,19
114:3 115:4,
20 117:5,25
122:23
**numbered**
2:3

**numbers**
77:14 94:6
**NW**
3:13
**NWB**
3:13

───── O ─────

**oath**
126:9 128:6
**object**
8:9 111:1
**objected**
65:1,7,13
**objecting**
51:20
**objection**
22:22 39:3
44:11 64:17
99:20,21
106:20 107:21
124:11,12
125:24 126:12
**objections**
35:9 39:14
**obligation**
116:2
**obstacle**
27:19
**obstacles**
24:16 26:12
27:16 87:11,
12 117:6
119:4
**obtain**
26:24 29:21
32:20,24
33:3,12
**obtained**
70:12
**obtaining**
24:17 28:14

112:25
**obvious**
104:15 118:5
**obviously**
46:12 55:3
88:22 91:25
100:24 102:2
**occupation**
6:15
**occur**
26:18
**offhand**
75:1 119:9,18
**OFFICE**
3:5,18 13:8
16:19 28:3,
18,20,25
30:13 46:16
48:3 52:24
54:3 64:22
69:23 76:18
128:12
**officer**
55:16 56:1
59:9 64:21
67:3 100:11
130:1
**officers**
100:13
**offices**
2:6 53:16
87:15,18,22
**official**
1:6 16:21
111:14 129:6
**official's**
110:20
**oftentimes**
64:22
**Oh**
11:9,11 28:7
39:2,13 52:19

64:8 85:2
97:13 123:8
**Okay**
7:17 10:8,16
11:11 12:22,
25 13:20
14:8,24
15:10,25 18:3
24:5 25:11
34:6,15 36:4
38:4 39:16
42:3 46:2
52:15,19
53:12,20
54:2,13 55:7
58:14,18
59:4,6,11
60:14 61:8
64:9 66:3,18
67:4,7 70:25
71:17 77:19
80:25 82:4,6,
13 85:4 92:20
96:9 97:13
104:14 107:12
109:8,23
111:13 113:2,
7 117:19
118:15,24
121:17 123:21
125:11,20
126:7
**old**
10:20 28:5
**oldest**
10:23
**Once**
9:4 18:7
19:19 25:20
27:14 41:21
56:5 68:12
85:13 95:12
98:25 102:24
**ones**

86:5
**one's**
110:24 111:4
**open**
28:20
**opinion**
94:7 102:25
118:11
**Opponents**
64:9,12
**oppose**
17:13,20,24
18:8 111:10,
11 112:9
117:1
**opposed**
41:8 52:1
96:3
**opposite**
114:14
**ORAL**
1:22 2:1 18:4
130:1
**order**
24:18 35:24
36:20 41:13
42:18 43:12,
22 56:3,8,12
57:20 58:21,
23,24 59:14,
17,19 60:21
61:3,23 62:11
63:7 67:23
109:10 112:14
**organization**
12:4
**original**
130:8
**outcome**
130:19
**outlet**
86:10

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com



outside
12:4,6,8
13:5,25 52:5
70:11

over
7:9 8:5 15:21
16:13 23:19
45:5 55:6
69:18 81:1,4
85:7 95:9,11,
15,17 96:6
117:5 121:24
123:23

overcome
25:17 26:11
30:2

overwhelming
113:16 114:3
115:4

overwhelmingl
y
115:25 117:2

**P**

P
3:3

P.C
4:2

p.m
2:4 108:10
126:19

P.O
3:6

PAGE
5:9 40:23,25
45:3 53:10
54:11 62:1
64:5 69:3
127:3

Paragraph
53:13,15
54:2,12 62:1,
3 63:6,17

64:4,9 69:3,
16

Paragraphs
67:9 82:7

paraphrasing
77:20

part
6:25 7:4 24:6
34:6 64:24
69:20 82:20
102:13 103:13
110:23 116:17

particular
24:2 36:18
41:25 43:7
55:23,25 74:5
75:9 76:14,23
92:9 106:1
110:10 115:23
125:17 126:15

particularly
86:5,16 88:24
92:15

parties
108:16,17
130:16

parts
29:12 117:12

party
130:11

Paso
7:2 82:19,20,
24 94:18

Pass
28:17 55:3,5,
6 62:24 67:15
84:22,24
85:7,11 94:18
113:17 114:4
115:14 120:9,
19

passed
11:21 19:20,

21 20:2,12,16
28:6 33:23
34:3,16 35:1,
19 36:2,8,10
41:8,22 44:9,
17 54:21 55:1
58:11 63:3
64:5 121:18

passing
33:17 42:23

passport
9:22 10:13
70:12 73:7
74:12 78:13
95:22 96:2

passports
10:15 75:6

Pecos
84:23

pen
41:11

Pennsylvania
3:13

people
15:22,24
43:9,13,19
73:3 74:6
83:21,25
84:24 85:18
86:12,19
91:4,6,8,10,
25 92:2,20
94:19 95:7
97:2 98:4
105:15 106:3,
13,14,15
113:3 117:11,
16

people's
105:17,22

percent
17:4 18:1,8
24:25 25:1,2

27:9 38:12
70:20 88:10
119:11

percentage
17:24 24:20
29:4 77:4,9,
16

percentages
80:18 119:7

Perfect
44:22 72:24
73:7

performance
90:20

period
106:3

permit
99:10

person
50:20 52:11,
13 73:20
76:5,6 80:2,
7,11 102:4
117:20 128:8

personal
74:3

personally
71:17 128:5

persons
123:17

phone
52:10,11 87:6

photo
11:17,20
15:11,14
16:8,11
17:10,13,17,
20,25 18:14
20:18,21
24:13,17 25:7
26:6 28:4
29:21 30:18

31:2 54:17
70:14,15,24
71:7 76:20,25
77:2,5,13,23
78:25 79:3
80:19,21 81:2
88:5,15 89:4,
15 96:16,17
97:22 102:2,
14 111:24
112:13,24,25
117:7

photograph
26:25 99:7

pick
16:16

picture
71:24

piece
102:16 113:1
115:23

pieces
13:17 19:22

place
59:12,13
88:14 92:21

placed
57:17

Plaintiff
1:3 3:4 129:3

plan
85:13,16

planets
7:6

please
6:7,23 7:24
39:8 40:8,15,
19,22 44:13
45:4 53:9
91:7 96:13
115:7

point



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

12:14 35:11
56:23 105:12
**points**
18:10,14,18,
20,22,25 19:3
**policies**
23:21 110:24
111:1,3,4,6,
9,10,15,18
**politically**
111:14
**poll**
30:24,25
78:5,6
**polls**
30:17,19,21
72:17 103:4
114:8
**poor**
30:1,15 70:10
83:3,12
**poorer**
88:25
**poorest**
83:6,8 100:3
119:14
**pop**
81:14
**popular**
115:22 117:2
**position**
34:10 41:20,
25 43:6 69:9
125:2
**positive**
15:6
**possess**
70:3 72:9,13,
17 79:18
**possesses**
72:13
**possession**

31:2 72:2,5
77:3 80:19,22
96:10,16,18
98:3
**possible**
16:3 37:25
71:5 80:1
103:23 123:4,
8,21 125:18
**possibly**
53:4 82:23
84:12 87:17
105:21 124:7
**potential**
19:6,10,14,16
21:4 37:24
44:7,15 93:22
105:13 119:4
**poverty**
29:8,9,11,25
30:11 73:2
89:12,18,20
98:10 108:6
119:6,7
**power**
56:1
**prayer**
62:12
**preclear**
22:22
**preclearance**
22:24 23:7
48:1,20
**precleared**
23:22 48:24
**preface**
96:14
**prefer**
80:7
**prepare**
8:18 9:12
18:10,13,25

19:3 47:4
110:7
**prepared**
18:16,22
52:18
**prepares**
18:17
**preparing**
12:19
**presence**
63:3
**present**
60:10 61:3,6,
7,16,23 63:19
64:16,23
65:3,14 67:23
68:6 97:4
101:1,17
117:6
**presented**
20:15 100:1
**presenting**
112:24
**president**
15:8
**presiding**
55:16 56:1
59:9 64:21
67:3
**Presidio**
30:12 84:23
120:5
**pressing**
67:5
**presumed**
37:13
**pretty**
18:15,16 47:9
**prevent**
6:12 27:15
61:9,16 91:6,
9,12 92:2,14,

18 94:9 97:6,
9,14 102:4,8
106:24 111:6
116:10
**preventing**
28:9 43:9,13,
16,18,23
44:1,5 91:4,
8,13,25 93:11
**previous**
12:17 14:1
18:14 19:4
43:5 103:8
108:3 122:22
**primarily**
57:23 103:2
**prior**
12:9
**privilege**
7:9 91:19,20
**probably**
17:11 37:20
50:2,4 70:11
80:23 85:10
98:20 109:2
**problem**
102:13,25
103:14 105:3,
4
**problems**
105:24
**Procedure**
2:9 108:24
109:1 110:15
**procedures**
56:24
**proceeding**
18:11 116:11
130:17
**process**
48:1 71:16
80:9

**produced**
2:1 121:18
**product**
124:15,19
**projections**
19:25
**proper**
77:12 102:18
**proponents**
62:23
**proud**
90:16
**proudly**
78:3 98:24
**prove**
98:22 118:17
**proved**
128:6
**proven**
96:9
**provide**
15:2 22:6,10,
13,16 23:10
45:15 46:8
50:7 51:6,19,
23 52:3,7,17
108:19
**provided**
14:12 45:10
49:22 51:9
93:6,20
108:20
**providing**
50:11
**provisions**
2:9
**Public**
26:6 69:23
85:21 120:1
128:16
**purpose**



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

24:3 33:15,
21,24,25
34:3,8,16,19
35:5 36:6
37:15 38:9
42:5 43:2,8,
18 44:4,10,17
57:23 67:15
109:24 121:3
125:6

**purposefully**
34:10

**purposes**
128:10

**pursuant**
2:8

**pursue**
111:3

**push**
66:16

**pushing**
66:12

**put**
39:12,19 56:6
65:18 107:13
110:6 124:20

**puts**
94:13

――――― Q ―――――

**qualified**
79:23,25
123:18

**qualify**
104:23

**question**
7:23 8:4,6,11
10:4 19:20
28:11,25
38:11 41:15
44:13 46:21
48:10 52:1
61:5 74:7

76:22 83:18
89:17 91:23
96:13 97:20,
23 99:15,25
101:8,9,14
105:18 106:16
107:4,20
108:3 112:2
113:1 118:3
120:6,24,25
124:5 125:11,
15

**questions**
6:13 8:10
43:5 92:5
101:3 103:8
114:10
115:14,15,20
117:25 119:1
122:6 125:19

**quickly**
7:18

**quite**
51:24 116:13
120:8

**quorum**
61:11,12,15,
20

――――― R ―――――

**R**
3:3

**races**
101:24

**racially**
107:18 108:3

**raised**
64:16

**rare**
95:2

**rate**
98:10

**rates**

29:12 73:2
89:1 98:9
119:7,16

**rational**
111:14

**reach**
87:4

**read**
8:20 41:7
104:11 127:20

**reading**
41:4

**reads**
53:15

**ready**
59:9

**real**
100:15

**realize**
89:24

**really**
11:25 48:9
50:1,19 60:22
95:24 121:23

**reason**
30:8 53:21
59:8,11 67:24
71:14 80:10
89:14 98:19
100:5 113:15
114:21,22
122:15 127:3

**reasons**
27:13 29:18
65:2 73:6
89:20 90:14
93:23 97:1
110:1,8,9
122:19,20

**recall**
9:13 12:2,3,
6,8,11,25

13:4,7,10,24
14:11,14 15:5
16:6 17:7
18:13 19:18
20:6,8,17,
19,20,25
21:3,7,10,
15,20 22:11,
15 30:21
45:17 46:11
47:22 48:9,
11,14,15
50:1,19,21,
25 52:10 57:7
63:1,5,10,
11,12,16,21,
25 69:14,17
81:4,11,17,
20 96:5
116:12,20
120:14
121:14,24
123:8

**receive**
105:15

**received**
13:4

**Recess**
44:23 69:1
108:10

**recites**
41:6

**recollection**
18:21 19:13
73:19 81:23

**record**
2:10 6:8
37:19 39:12,
19 40:19
108:8 115:16
130:2

**refer**
11:20 69:15
112:12

**reference**
30:24

**referred**
57:12 114:1

**referring**
78:24

**refine**
18:19

**reflected**
120:21

**refusing**
22:22

**regard**
23:19 90:16,
20 107:7
120:9

**regarding**
118:1 119:5
120:13

**regardless**
60:24 111:8
115:5

**register**
66:2

**registered**
9:16 10:8
73:14 75:18
76:8,14,19,
23 77:3

**registration**
24:14 26:23
27:24 29:22
78:4 81:12
90:2,5 96:24
99:4 101:22
121:23 130:25

**regular**
57:20 58:20,
23 59:14
61:23 67:23
80:3

**related**



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

7:9 47:7
48:25 130:16

**remember**
11:19,25 14:3
20:22 47:15
50:20 81:1
100:17 104:13
116:21,24
121:16 122:21

**remembered**
49:3

**remind**
7:18 100:23
104:12

**Repeat**
41:15 44:13

**rephrase**
7:24 59:21
61:4 101:15

**rephrasing**
99:24

**replace**
71:18,21

**reported**
2:6

**reporter**
7:20,22 45:1
126:17 129:22

**Reporter's**
5:7 8:2
129:20

**represent**
6:20 24:24
27:11 110:18,
21 114:25
123:10

**representative**
12:4 78:16
114:17

**represented**
8:14,16 20:15

38:18 40:5,6
79:12 123:15

**representing**
78:15 79:7
83:11

**reputation**
116:17

**request**
46:10,14

**requested**
39:18

**require**
24:13 60:8
61:2,22
101:21

**required**
25:9 26:24
31:5,9,13,16,
21 32:1,5,10,
16,20,24
33:3,7,12
48:20 55:17
57:8 68:9,20
70:3,7 71:20,
23 72:10,14,
18,21 74:18,
22 75:11,19
76:1,9,16
77:5,10,13,23
79:19 80:2,11
81:6 91:1
97:11,15,18
98:13,16
99:13,18
102:3,9
104:1,16
107:16 109:14
117:22

**requirement**
15:11 17:10,
13,17,20
26:19 27:19
32:13 57:2
88:14 89:5,15

102:8,23
111:25 112:13

**requirements**
17:25 24:12
89:23 105:25
112:4,7,8,10,
12,24

**requires**
55:21 103:10
104:6,7
112:14

**requiring**
25:7 29:21

**reserved**
126:18

**residents**
27:10

**resolutions**
62:12,17,19
63:13 67:22

**respect**
26:18 35:2

**responded**
120:18

**response**
42:24 43:4,
14,24 94:14

**responses**
95:14

**Rest**
3:18 85:12

**result**
13:18 24:18
25:25 116:17

**return**
130:7

**returned**
130:8

**review**
9:11 19:16,
21,25

**reviewed**
8:22 19:22
20:9 21:8
51:12,13

**reviewing**
19:18 20:6,
17,20

**right**
6:18 8:15
11:4 12:14
14:6,22,25
16:4 21:18
24:9 25:6,8
27:3,17,22
29:15 42:6,19
46:3 47:18
49:5 50:8
51:4 52:22
54:5,11,15,
19 55:4 56:21
58:8,11,16,
21,25 60:18,
25 61:10,13,
20 62:5,16
64:6 66:8,13,
16,23 68:4,5
69:12 77:23
78:21 79:8,10
80:13 81:20
82:10,14
84:18 85:10,
15,16 86:3
87:15,18,22
90:8 91:2
92:21,24
94:16 95:22
98:20 101:22,
25 102:5,12
104:2,24
105:3,6
106:4,8
110:11 111:5,
9 113:5
114:13
122:13,18

123:23 125:1,
4 126:4

**Rights**
23:14 25:17
26:8 36:20
48:23 90:17,
20 98:21
100:5,6
106:22 116:4

**Rio**
28:18 84:21
120:10

**RMC-DST-RLW**
1:11 129:11

**Roberto**
4:2 40:2,6

**Robin**
3:18

**RODRIGUEZ**
1:18 81:8,11,
24 129:18

**Rodriguezes**
81:18

**Rodriguez's**
81:17

**roll**
66:4 67:1,2,3

**Room**
2:8 3:13
86:19,21

**roughly**
22:15 24:20

**routine**
95:1

**rule**
55:21 60:9,15
68:8,11 91:15

**Rules**
2:9 7:17
57:4,7,8
61:2,22

**rural**



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

32:3,4 33:1
43:23 44:1,4
82:17,25
83:12 86:12

**S**

**S**
3:3

**safe**
84:10

**Safety**
26:6 69:23

**same-**
96:23

**San**
3:19 4:3 7:1
11:3 48:18
49:7 84:15,16
85:6,7,11
86:9,10 98:23
120:8

**saying**
12:1 96:14
97:8,14 114:5
124:13,15
126:1

**says**
41:4 53:10
64:5,9 69:4
101:16

**SB**
14:12 15:3
16:7,11
18:10,14,23,
25 19:4,10,
14,17 21:21
22:4,7,22,25
24:6 25:12
26:3 27:19
28:8 29:14
30:5,22 31:5,
9,13,17,22
32:1,6,10,16,
20,24 33:4,8,

12,18 34:7,12
35:16,23
36:6,13,19
37:5,15,25
42:4,16,18,23
43:2,8,12,18,
22 44:4,7,9,
15 50:23 62:8
69:4,5 70:3,8
72:10,14,18,
21 74:23
75:11,19
76:2,10,16,25
77:5,10,13,23
79:19 80:3,
11,14 81:6
89:5 90:24
91:5,9,25
92:1 93:9,13
94:1 96:19
97:9,14 98:5,
11,15 99:13,
19 102:3,4,7
104:6,23
105:13
106:10,18,24
107:18 112:14
113:12 117:22
118:2,5,8
120:18 121:17
122:12 124:1,
18,22 125:2,
6,13,22
126:10

**scenarios**
100:1

**school**
7:4 32:9
83:15,17,18
85:16 114:16,
18

**scratch**
76:13 109:9

**seal**

128:12

**second**
40:23 45:3
50:2 52:15,19
64:10,13,14
65:3,4 68:5,
9,15,20
102:16 104:19
108:9 112:25

**seconds**
65:4

**secretary**
64:18,23
65:16,18
66:6,25 67:21
76:11,17

**Section**
23:14,17 24:2

**securing**
117:21

**see**
41:3,6 54:10
56:2,19 59:24
61:12 63:16
68:2 72:9,13,
17 80:16
88:12,21
91:20,21
99:23 102:16
103:13 105:2
113:17 114:4

**seeing**
20:17,20 21:3

**seen**
21:13 72:5

**segregation**
116:15

**Senate**
5:10,11 6:17,
20 7:9 11:18,
20,23 12:5,14
14:1,4,17,18,
24 15:2,7

16:22 19:7,
12,21 20:1,3
21:4,18 24:7
25:4 27:2
33:21 34:3
35:3,4 36:25
40:10,20 41:4
42:2 43:25
47:25 48:7,12
49:1,11,15
54:25 55:4,5,
7,8,11,14,
17,20 56:4
57:4,7,10,11
58:6,20 60:13
61:2,9,13,
17,22 62:4,16
63:2,14 64:2,
17,18,23
65:17,25
66:4,6,19,
21,25 67:5,21
68:12,21
69:6,10 74:18
78:15 83:8
87:13 90:9
96:12 101:16
108:24 109:3,
4,6,13 110:18
113:3 122:10,
17 123:5

**Senate's**
69:4

**SENATOR**
1:23 2:1 5:3
6:1,10 7:8
8:18 23:13
40:4 41:17,25
42:4,11 45:1
53:16,17,19
54:3,4,5 62:3
63:23 64:1,16
65:1,6,13
66:21 68:12
69:2 108:11

114:17 115:19
127:20,25
128:5 129:20,
25

**senatorial**
67:18 119:15

**senators**
51:25 55:22
56:24 57:3,6,
22 60:10
61:16 65:21,
22 100:17,18
122:11

**send**
22:3

**sense**
59:22 60:19,
22 95:6 97:24
106:9

**sent**
22:21 52:21,
24 73:21

**sentence**
53:15

**separate**
14:19

**serious**
93:10

**serve**
11:11

**served**
98:18,24,25

**service**
70:23,25

**services**
87:9

**serving**
98:22 99:5

**session**
11:21 12:23
13:2,6,12,14
14:13 15:4



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

21:3 57:6
58:13 60:16
63:17 67:8
99:2,6 113:23
116:15
**sessions**
122:22
**set**
17:3
**sets**
55:7
**seven**
116:22
**shaking**
7:21
**share**
86:6
**shorthand**
2:6 129:22
**show**
26:19 42:15
90:1,4 98:25
99:4 101:22
102:17 112:13
124:9,14
**showing**
126:2
**shown**
107:15
**shows**
52:25
**sick**
62:10 120:21
121:1
**side**
7:1 48:16
92:17 103:16
123:22,23
**sign**
52:17
**Signature**
5:6 126:18

127:1,21
130:6
**signed**
52:20,23,25
**significant**
87:21
**similar**
19:22 20:5,6,
11,16 31:1
43:4 112:14
**similarly**
33:10
**simple**
100:15
**simply**
75:14 84:19
113:19 123:5
**sincerely**
38:7 124:1,7
**single**
10:6 13:12
104:10
**sir**
6:14,19 7:12
8:1,8,13,14,
16 9:9,15,17,
19,21,23
10:1,9 11:13,
22 14:17,23
15:1,12 16:2,
5,9,20,22,25
17:14,18,21
18:12,24
19:8,11,15
20:10 21:2,9,
12,19 22:2,5
23:1,4,8,12
24:4,10,23
29:16 31:6,
10,14,18
32:2,7,17,21,
25 33:5,13
34:14 40:6

41:2,5 42:20
43:10,20 44:6
45:12,21,24
46:4,6,9,25
47:19 49:6,8,
17,19 50:9,
13,15 51:5
52:4,8,23
53:2 54:16,
20,23 55:2,12
57:13 58:9,
17,22 61:14,
18,25 62:6
64:3,7,11
65:10 66:20
67:6,14 68:6
69:8,13 70:5
71:19,22
72:1,4,7,11,
15 73:15,21
74:10,13,16
77:18 78:22
79:9,11,14
80:20,24
81:22,25
82:15,22
83:1,9 85:22
86:15 87:16,
19 94:17 98:6
102:6 104:18
105:7 108:7,
14,18,22
111:12 113:6
116:16,19,23
117:18,23
118:6,9,14,19
120:16 121:8,
10 125:5
**sit**
38:24 42:3,10
56:16 67:16
75:17 126:8
**sits**
58:7
**Sitting**

53:7 60:6
**situation**
60:9 63:12
94:23 107:3
**situations**
100:19 104:4
**six**
38:18 78:16
**slightly**
31:1
**slowing**
110:10
**small**
95:18,19
**so-called**
116:14
**socioeconomi
c**
93:16,25
117:10
**Socorro**
84:23
**solely**
115:4,10
**somebody**
30:23 32:13
88:4 96:3
102:3 103:23,
24 104:5,22
126:3
**Somebody's**
62:13
**somewhere**
46:13 96:4
**son**
11:6,11,15
98:24
**sons**
10:25 11:4
**sorry**
28:7 79:1

81:3 88:18
112:2
**sorts**
118:17
**sounds**
60:22 114:9
**south**
84:15
**southeast**
6:25 7:1
**Spanish**
92:16 93:3,
19,21
**speak**
11:23 12:16
13:3 15:15
92:16
**speaker**
93:19
**speakers**
93:4,21
**speaking**
11:25 12:2,6,
8,25 18:8
24:15,20 27:8
86:16 95:2
102:10
**special**
99:6
**specific**
18:18 20:1,3,
8 21:7,10
24:6 25:11
26:20 27:21
33:21 37:2
42:4,11,17
43:8,17 44:3
45:25 47:11,
14 48:10
50:22 59:4
63:10,11
65:23 68:11
69:15 72:23



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

75:18 76:5,6
77:14 79:17
83:24 84:20
93:8 101:21
109:8 114:2
123:19 125:21
126:9

**specifically**
13:9 15:22
26:25 27:8
36:14 41:23
48:22 52:2
60:17 65:13
77:7 86:7
87:1 91:5,9
92:2 95:3

**specifics**
30:25

**speculating**
38:10

**speculation**
99:22 124:12

**speeches**
16:1

**spite**
118:12

**spoke**
12:3,13 21:20
22:1 23:6
48:2,3 50:17,
23,25 51:2

**spoken**
15:21,24
21:17 47:23
78:3,17,19
81:1,4 89:21

**square**
6:25 69:21

**staff**
17:4 18:16,
17,22 19:9,13
45:25 46:2
53:4 72:16

**start**
8:4,6 39:20
112:10

**starts**
6:25

**STATE**
1:2,10 2:5
3:4 6:7 16:21
22:21 23:18
39:20 62:3
66:22 69:7,12
70:2 76:12
78:16 83:7
112:18 115:19
117:13 119:15
128:1,17
129:2,10,23

**stated**
2:10 90:14

**state-issued**
74:2 76:20,25

**STATES**
1:1,6 7:5
20:13,14,16
100:11,12
129:1,6

**State's**
76:18

**Statewide**
113:7

**status**
88:20 117:10

**statutes**
116:4

**step**
90:21

**Stockton**
84:23

**stop**
85:13

**stopped**
95:7

**store**
83:22 84:1,3,
6

**Street**
2:7 3:7

**stretch**
94:16

**stretches**
7:2

**strict**
24:12

**strongly**
115:10

**struggling**
108:1

**Students**
91:16

**studies**
19:6,9,13,16,
19,22,25
20:6,8,17,20
21:4,7,13
72:2,5

**study**
19:21 21:1

**submit**
30:4 36:23
38:12 66:9
94:8

**submitted**
8:21 9:10
51:9 122:2
130:4

**subscribed**
128:9

**substance**
20:25 45:16
47:1 54:9

**substantial**
117:15

**substitutes**

13:15

**suburban**
33:2

**suffering**
6:11

**suffice**
92:11

**suit**
108:16

**Suite**
130:23

**supermarket**
84:11,25

**support**
17:9,17,24
30:17 44:9
57:18 96:12,
19 113:4,9
115:22

**supported**
34:7 35:2
36:19 37:25
41:13 111:25
112:4,17
113:13 114:24
115:11 116:1
123:14
125:13,22

**supporters**
62:4 120:17

**supporting**
123:12,13

**supports**
115:5

**suppose**
57:17 96:8
109:25 115:12

**supposed**
109:5

**Sure**
6:9,24 10:3
11:19 13:23

18:15,16
38:3,24 46:22
49:3 63:4
68:17 84:14
89:19 91:8
93:22 107:23,
25 109:12,17
112:3 115:12

**survey**
72:8,12

**suspend**
58:20 61:23
68:3

**suspended**
62:19

**suspensions**
117:16

**swear**
126:8

**swore**
52:25

**sworn**
2:3 6:2 130:1

**system**
121:13

---
**T**
---

**take**
28:19 44:19
45:4 53:9
57:22 60:3
62:19 84:12
86:23 87:3,24
109:4 110:2

**taken**
2:3 57:19,20
62:23 63:7,
13,20 130:18

**takes**
62:14 83:17
89:25 90:21
117:3

**taking**



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI

June 11, 2012

156

60:12 109:3

**talk**
11:18,19
16:3,15 24:5
29:2 31:2
33:14 105:8
112:7

**talked**
15:10,14 30:8
32:12 100:18
101:2 105:24
120:12

**talking**
8:5 10:4
13:17 18:10,
14,18,22,25
19:3 60:20
74:4,5 79:16,
21 84:3 85:8,
23 88:4 100:3
102:2 108:5
112:23 121:9

**talks**
16:1

**tax**
78:5,6 81:13

**telephone**
50:14

**tell**
29:6,17 30:24
35:17 47:10
51:23 52:6
57:14 108:24
121:21 125:16

**tend**
77:12,22
88:25

**testified**
6:3 38:13
50:16 69:5
82:13 105:19
119:5 122:10,
11,23 123:1,9

124:18

**testify**
6:2 123:18

**testimony**
22:10 37:9,23
38:1,5,16
69:15 90:24
108:19
120:12,14,18,
20 123:6,17,
22 124:21
125:20 130:2

**Texan**
86:25

**Texans**
28:10 30:18
36:7,21 41:19
101:11 113:23
114:10

**Texans'**
24:9 27:3
35:6 42:6,19

**TEXAS**
1:2,10,13,15
2:6,7,8 3:4,5
6:17 9:18
10:10,25 12:4
13:6 20:1,7
21:5,11 22:21
27:25 29:13,
15 30:4 31:4,
7,12,15,20,24
32:4,15,18,22
33:2,6,11,16
34:4 35:15,
23,24 37:4
39:21 42:16,
22 44:15 69:7
75:14,15,16
76:8,15,19,21
77:3 79:24
80:24 83:7,16
84:17 86:22
87:6 89:3

90:15 94:21
96:3,11,19
98:24 99:12,
17 100:3,4
101:17,25
102:20 103:19
105:10,20
106:23 107:2,
16 110:17
112:1,5
113:8,9 116:7
119:15 120:6
123:25 125:4,
7,14,21 126:9
127:2 129:2,
10,13,15,23
130:22

**Texas-Mexico**
7:3 27:11
94:16,17,20
98:9

**Texas's**
23:18 90:20

**Thank**
6:10 8:14,17
40:7,22
42:14,21
49:4,10 54:11
103:21 122:1
126:16

**themselves**
115:6

**therefore**
70:11 89:10
90:7 107:9

**thereof**
92:6

**they'd**
38:15

**thing**
8:20 67:18
94:10,11

**things**

25:18 86:1
87:14 100:20
106:17 108:6
118:4,10

**think**
7:15 10:15
15:5 18:7
19:18 22:18
25:14 26:10,
14 29:1,19,23
30:10 35:7,11
36:8 37:24
38:1,15 44:18
46:16 47:13,
22 48:2 49:23
50:11,16
57:12 59:7,15
60:20 63:23
68:17 69:24
75:1,9 78:24
79:20 81:9
83:24 84:4,
20,21 86:19
87:12 88:19,
22 90:19
92:4,5,10,
13,16 93:9,
10,18,23
94:2,7,23
97:20 98:17
100:15 103:1,
21,25 104:9
105:18 107:2
108:2,4
112:25
113:20,25
114:1,5,6,
21,22 124:14,
20,24 125:1

**thinking**
36:23 42:8
106:10 125:16

**third**
41:4,7 50:3
52:14 83:6,8

100:3 119:14

**thisday**
128:13

**thought**
36:14 38:4
53:24 62:23
67:17 97:21,
23 107:20,25

**thousands**
13:17,18
15:20,22

**three**
61:8 81:13
95:9

**Three-Judge**
1:11 129:11

**throughout**
30:4

**throw**
107:1

**thrust**
69:24

**time**
7:15 22:19
35:8,13 39:18
41:7 45:5
51:3 53:9
54:7 62:11
63:1,4,23
65:12 67:7,8
68:6 73:17
87:3,25 110:7
125:16 130:11

**timeline**
8:22 9:11

**timely**
24:17

**times**
9:2 78:2
83:17 87:5

**today**
6:11 8:15,19,



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI

June 11, 2012
157

25 9:12,14
40:5 42:3,10
53:7 69:9
105:22 118:22
122:10,11
125:21 126:8
**together**
26:14 51:12
**told**
48:11 52:2
71:9,15
122:17
**Tommy**
53:17,19,24
54:4
**top**
40:24,25 41:3
53:11 87:20
**topics**
16:4
**touch**
108:23 117:24
**touched**
69:11 92:4
**toward**
125:14
**town**
11:2 84:9,25
88:14
**towns**
70:18 83:24
84:4,8,11,15,
20 86:19
94:20,24
**transcript**
130:1,4,9
**transportatio
n**
85:21,25
120:1
**travel**
26:12 28:18,

23 78:10
87:21
**traveled**
70:11
**treats**
91:21
**tried**
71:8 107:23
**trip**
85:24 87:25
**trips**
85:17,20 86:1
**true**
45:9 97:6
117:8 127:22
130:2
**trust**
80:8
**truth**
6:2,3
**try**
86:10 106:21
109:5 114:25
124:6
**trying**
49:2 101:8
102:7,20
103:16 105:11
106:8,9,16
**turn**
40:22 45:3
**turned**
90:6
**Turning**
119:4
**turnout**
21:14 94:3
**two**
7:6 10:19
28:15 49:23
52:9 56:16
67:16 80:6

85:7,17 87:12
**two-third**
55:20
**two-thirds**
7:3 27:11
55:21,22
57:2,3,8,9,
18,21 60:9,15
94:17 98:8
109:14
**TX**
3:6,8,19 4:3
130:24
**type**
86:15
**typically**
18:17 73:20
78:7
**typos**
51:16 54:10
_____
**U**
_____
**U.S**
3:12 69:20
75:6 99:8
**Uh-huh**
15:17 86:18
98:11 124:17
**ultimately**
56:14
**Ulvade**
85:6
**under**
24:1 56:23
81:6 98:5
104:23 126:9
128:6,12
**understand**
7:23,25 8:7,
12 10:3 18:7
26:3 35:22
37:22 46:21
49:4 64:15

65:6,11 67:1
89:22 91:23
93:4 96:15
97:8,20,24
101:7,9
102:7,19
103:21,22,23
104:19
105:13,18
106:12,13
126:7
**understandin
g**
17:8,22 23:16
24:1 26:17
27:18 57:14
58:10 62:22
69:10 71:10
77:21 79:22
83:10 89:4
94:19 109:23
125:3
**understood**
37:5 38:20,
23,25 97:19
118:3
**unemployed**
119:20,21
**unemployment**
89:1 119:16
**unheard**
84:17,19
**unintend**
92:6
**unique**
117:6
**UNITED**
1:1,6 100:11,
12 129:1,6
**universe**
98:7
**unless**
8:10 61:19

68:13
**unreasonably**
124:7
**unusual**
62:20
**urban**
33:2
**URESTI**
1:23 2:1 5:3,
12 6:1,9,10
7:8 8:18
10:23,24
39:7,9 40:4,
14,16 45:7
66:21 78:6
81:13 108:11
127:20,25
128:5 129:20,
25
**use**
64:19 95:23
99:6
**usually**
57:16 58:12
66:4 86:9
87:8
**Uvalde**
28:18 84:21
120:10
_____
**V**
_____
**vague**
106:20
**vaguely**
19:18 20:22,
24 21:6
**valid**
10:15 27:12
75:14 99:4
102:11,14
**vast**
70:17
**vehicle**

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com



28:21 86:4,6
**vehicles**
89:9
**versus**
88:21 94:3,4
**veterans**
86:17
**vice**
53:23
**VICTORIA**
1:18 129:18
**violate**
116:4
**violations**
25:17
**violence**
95:4,10
**visa**
95:24
**visit**
95:11,13
**volunteer**
87:8
**vote**
9:16 10:8
23:25 24:9,18
25:6,8 27:4,
17 28:2 29:15
34:13,17,23,
24 35:6,8
36:7 38:8,19,
22 41:8,19
42:6,19 44:2
54:15 56:24
57:3,6,9
61:3,6,7,9,13
62:8 63:7,19,
20 64:5,10,
13,15,16,24
65:1,3,4,8,
13,17,19,23
66:2,4,5,11,

22 67:4 68:1,
5,9,15,18,20
73:10,14,16,
20 80:7,8,11,
14,15 90:7,
22,23 91:2,
11,12,17,20
94:6,12
96:23,25
97:2,3 98:2,
5,21 99:10
101:12
102:17,18
103:6,13
104:9,23
106:4,5 107:9
109:14
111:14,22,23
113:16,19
114:11,18,24
115:3,9,21
117:20
120:22,25
124:3,9,13
126:4
**voted**
33:20 35:3,4,
18,20,21,23
36:5,11,13
37:5,15
41:12,17,18
42:4,9,11,16,
18,25 43:2,8,
12,18,22 44:4
57:9 63:18
73:17 80:16,
17 113:12
114:2,14
118:2,13
120:19 121:7
122:12 123:4
125:18 126:9,
15
**voter**
11:20 12:9,17

13:1,5 14:1
15:14,23
16:8,12,15
17:10,17,25
19:19 20:18,
21 21:14
30:18 32:14,
15 75:18
76:15,24 78:4
80:10,13
81:12 88:13
90:1,5 93:15,
24 96:18,24
98:15 99:4
101:17,22
111:25 112:4,
6,8,10,12,13,
16 113:4,8,9,
13 117:7
121:4
**VOTERS**
1:13 20:1
21:5 23:20,23
24:13 25:13
26:4,15,18
30:6,9 31:4,
7,11,15,19,
20,24 32:3,8,
18,19,22,23
33:1,2,6,10,
17,22 34:4,8,
21 35:15,24
36:15 37:7,16
38:6 41:14,23
42:12,23
43:3,23 44:1,
5,15 69:6,11
70:2,6 72:3,6
73:3 76:8,19
77:3,4,9,17,
20,22 79:18,
23 80:7,19,
22,25 81:2,3,
5 88:7 89:6,
16 90:10,11,

22,23 93:9
94:11 96:11,
18 98:12
99:11,12,17,
18 101:20,25
105:21 107:8,
15,19 112:1,
5,18 113:9
118:8 120:14
121:19 122:13
123:2 124:2
125:4,7,14,
23 126:11
129:13
**voter's**
24:14 26:23
27:24 29:22
80:12 90:1
**voters'**
25:6,7 29:15
34:13,17
**votes**
64:25 66:13
67:14 68:1
**voting**
9:25 15:11
17:10,13,17,
20,25 23:14
25:16 26:1,4
28:10 36:20
43:9,13,16,
19,23 44:5
48:23 60:10
61:10,17
90:20 91:5,6,
9,10,14 92:1,
3,7,15,19
93:12 94:12
97:5,7,10,15
100:5 101:11,
13 102:9
103:20 104:22
105:17,22
106:1,13,15,

22 107:1,2,7,
10,13 111:18,
25
**vs**
1:4 127:2
129:4

---
**W**
---
**wait**
8:3
**waived**
60:16
**walking**
79:16
**want**
11:18 18:1
24:5 31:1
33:14 77:21
80:7 100:9
108:23 110:4
**wanted**
36:16 37:7
39:12 47:11
51:23 52:3,6
71:6,24 86:20
108:4 113:17
114:4,19
117:24
**Washington**
3:14
**wasn't**
20:3 64:15
65:3 107:23
**Water**
48:18,19
49:4,11,14
**way**
7:2 24:16
25:11,12,14
28:19 30:13
59:2,7 61:5
65:19,24
68:18 79:20



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

85:19 86:13
91:12 94:13
106:21 111:22
113:19,20,21
114:12 124:6,
20 125:19
126:2,4,15

**ways**
92:4 111:8

**weeks**
56:16

**weight**
38:16

**we'll**
95:12

**went**
64:2 117:5

**We're**
60:12 74:5
84:3,6 85:8
100:2 103:16
121:4

**weren't**
35:11 59:12
65:11 102:15
118:15 123:14

**West**
2:7 3:7 83:16
84:17 86:22
87:6 120:5

**Wetback**
100:10,13

**we've**
30:8 32:12
62:2 82:7
89:21 102:2
105:24 108:5

**whatever**
58:24 59:8,11
80:10 93:4
99:9

**wheel**

78:9

**wheelchair**
81:11

**whereas**
66:1

**wherein**
27:9 28:22

**whether**
11:14 12:3
13:4,24 14:11
16:6 23:5
24:2 38:25
56:24 65:12
71:5 101:12
115:6,20

**Whitmire**
63:21 64:16
65:1,6,13

**whole**
6:3 29:20
33:19 34:3,5,
20,22,25
35:19 42:24
57:18 69:7,12
88:2 112:18
114:7

**Williams**
53:17,19 54:4

**within**
49:11 68:14
79:13 119:8,
20,23

**witness**
2:2 44:22
95:20 115:14
129:25 130:3,
5,6

**woman**
81:10

**word**
56:20 57:25
102:24

**words**
19:10 57:19

**work**
59:1 87:25
88:1 89:1
95:17 106:18

**worked**
46:18

**working**
48:17 70:10
87:24

**works**
60:22 66:18
111:7 113:20

**worry**
121:4

**wouldn't**
23:5 59:15
71:16 79:3
113:10,22

**wreck**
86:22

**writing**
45:22 46:1,5

**written**
18:4 45:20

**wrong**
93:2 103:9
111:17,20

**wrote**
45:13 47:8

**Y**

**Yeah**
39:5,16 95:12
99:23

**year**
20:23 22:19
29:10 69:18
85:16,17
119:14

**years**

7:16 15:21
16:13 20:23
28:1 38:18
78:1,16,17
81:1,4 95:9,
12,13 100:8
121:15

**YOUNG**
1:13 10:19
33:6,10
116:21,24
129:13

**younger**
11:14

**youngest**
10:24 11:6

**yourself**
18:22 64:19

**1**

**1**
5:10 25:1
39:8,9 40:8,
10

**10**
50:2,4 60:5

**100**
130:23

**1038**
44:23

**1047**
44:23

**11**
1:24 2:4 41:8
129:21

**1125**
69:1

**112-CV-00128**
1:10 129:10

**1134**
69:1

**115**

2:4 126:19

**1151**
130:22

**118**
7:6 78:16
79:8,10

**12**
22:21 23:2

**12/31/2012**
130:23

**1241**
108:10

**1248**
108:10

**12500**
29:10 119:14

**12548**
3:6

**12th**
130:20

**13**
69:3,16

**14**
7:10 11:18,
20,24 12:5,14
14:12 15:3
16:7,11
18:10,23,25
19:7,10,17,
21 20:1,4
21:18,21
22:4,7,22,25
24:6,7 25:4,
12 26:3 27:2,
19 28:8 29:14
30:5,22 31:5,
9,13,17,22
32:1,6,10,
16,20,24
33:4,8,12,
18,21 34:3,7,
12 35:3,5,16,
23 36:6,13,19



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

37:5,15,25
41:4 42:2,4,
16,18,23
43:2,8,12,18,
22,25 44:4,7,
9,15 47:25
48:7,12 49:1,
15 50:23
55:21 56:4
57:8 60:13
69:4,5,10
70:4,8 72:10,
14,18,21
74:19,23
75:11,19
76:2,10,16,25
77:6,10,13,23
79:19 80:3,
11,14 81:6
82:7 87:13
89:5 90:9,25
91:5,9,25
92:1 93:9,13
94:1 96:12,19
97:9,14 98:5,
11,15 99:13,
19 101:16
102:3,4,7
104:6,24
105:13
106:10,18,24
107:18 112:14
113:12 117:22
118:2,5,8
120:18 121:17
122:10,12
123:5 124:1,
18,22 125:2,
6,13,22
126:10

**146**
40:25

**14th**
2:7 3:7

**15**

---

78:1

**17**
82:8

**19**
6:24 41:8
69:6 78:15

**1957**
116:14

**1988**
100:14

**1989**
71:1

**19th**
6:21

**1st**
2:7

_____ 2 _____

**2**
5:11 40:15,
16,20,23 85:7

**20**
7:5,16 60:5
85:8

**2000**
130:23

**2005**
12:10

**2007**
12:10 53:25
54:18 63:16
67:8

**2009**
12:10 14:1

**2010**
73:18

**2011**
5:10,11 11:21
12:23 13:1,6
14:13 15:3
21:3 40:11,21

**2012**

---

1:24 2:4
22:18,21 23:3
45:8 47:18
50:11 53:1
128:13 129:21
130:5,8,20

**202**
3:14

**20530**
3:14

**209**
2:7 3:7

**20-minute**
85:9

**210**
3:19

**214**
60:12

**218**
54:15,17 60:7
62:4,8,22
63:18,21
64:5,12 65:14
67:10,25
68:5,10,16
120:23 121:9,
11

**23**
7:4 69:20,21

**24-hour**
85:24

**26**
5:11 10:21
40:21

**283**
130:25

**29**
10:21

_____ 3 _____

**3**
5:12 44:24,25
45:3 53:10

---

54:12 59:5,8
62:1,2 82:7
130:13

**3-**
16:14

**30**
83:21 86:20,
23

**305-7766**
3:14

**362**
14:1 18:14
19:4,12,14
21:5

**39**
5:10

**392-2856**
3:19

_____ 4 _____

**4**
130:13

**4-**
16:14

**40**
5:11

**44**
5:12

_____ 5 _____

**5**
23:14,17
24:2,25 50:4
53:10 113:22
130:13,14

**500**
16:14

**5000**
13:13

**50000**
6:24 69:21

**50th**
62:13

---

**512**
3:9

**512328-5557**
130:24

_____ 6 _____

**6**
53:13 54:2
63:6,17 67:9

**62**
7:4

**65**
121:24

**69**
24:24

_____ 7 _____

**7**
54:12 62:1,3

**70**
26:9 27:9

**7202**
3:13

**7414**
3:18

**75**
18:1,8 38:12
70:20 88:10
119:11

**77**
28:6

**78215**
4:3

**78701**
2:8 3:8
130:24

**78711-2548**
3:6

_____ 8 _____

**8**
69:22

**800000**



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

24:23 74:6

**80s**
26:9

**82nd**
40:11,21

---
                     '

**'89**
71:3

---
             8

**8th**
3:8

---
             9

**9**
5:10 40:11
45:8 64:4,9
67:9

**924**
4:3

**936**
2:4

**936-1307**
3:9

**950**
3:13

**98209**
3:19

**99**
17:4

**9th**
46:13 53:1



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com