**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS                    *

                Plaintiff,        *

vs.                               *      Case No. 1:12-cv-00128
                                  *      RMC-DST-RLW
                                  *
ERIC H. HOLDER, JR., in his       *
official Capacity as Attorney     *
General of the United States      *
                                  *
                Defendant.        *

*******************************************

ORAL DEPOSITION OF MARC VEASEY

*******************************************

ANSWERS AND DEPOSITION OF MARC VEASEY, produced as a
witness at the instance of the Plaintiff, taken in the
above-styled and -numbered cause on the 7th day of June, 2012,
A.D., beginning at 9:15 a.m. before Andrea Reed, a Certified
Shorthand Reporter in and for the State of Texas, in the
offices of TECH Fort Worth Building, located at 1120 South
Freeway, Fort Worth, Texas, in accordance with the Federal
Rules of Civil Procedure and the agreement hereinafter set
forth.

**Page 2**

A P P E A R A N C E S

FOR THE PLAINTIFF, STATE OF TEXAS:
    Mr. Matthew H. Frederick
    Mr. Adam W. Aston
    OFFICE OF THE ATTORNEY GENERAL OF TEXAS
    P.O. Box 12548
    Austin, Texas 78711-2548
    209 West 14th Street
    8th Floor
    Austin, Texas 78701
    512.475.4330
    512.370.9077 (fax)
    matthew.frederick@texasattorneygeneral.gov
    adam.aston@oag.state.tex.us

FOR THE DEFENDANT, HOLDER, ET AL.:

    Ms. Maria Hortensia Rios
    U.S. DEPARTMENT OF JUSTICE
    950 Pennsylvania Avenue, NW
    Washington, DC 20003
    202.616.9750
    202.514.1005 (fax)
    maria.rios@usdoj.gov

FOR THE KENNIE INTERVENORS:
    Mr. Chad W. Dunn
    BRAZIL & DUNN LLP
    4201 Cypress Creek Parkway
    Suite 530
    Houston, Texas 77068
    281.580.6310
    281.580.6362 (fax)
    chad@BrazilAndDunn.com

WITNESS ADDRESS:
    1120 South Freeway
    Fort Worth, Texas 76104

**Page 3**

I N D E X

Appearances............................................Page  2
Exhibit Index..........................................Page  4
Stipulations...........................................Page  5
Examination by Mr. Frederick...........................Page  5
Signature and Corrections..............................Page 155
Reporter's Certificate.................................Page 156

**Page 4**

EXHIBIT LIST

| No. | Description | Page Marked | Page Ident. |
|---|---|---|---|
| 1 | Declaration from Marc Veasey, Case 1:12-cv-00128-RMC-DST-RLW Document 69-13, Filed 4/10/12.. | 32 | 32 |
| 2 | Lighthouse Opinion Polling, Fall 2010 Statewide Landscape Benchmark Survey, Special Presentation for Senate Republican Caucus, January 2010 | 100 | 100 |
| 3 | Twitter Dialogue............... | 111 | 111 |
| 4 | House Journal.................. | 134 | 134 |
| 5 | Texas House of Representatives 2011 (82R) (Emergency Calendar) Volume 1, Transcribed on April 23, 2012................ | 137 | 137 |



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

ESQUIRE
DEPOSITION SOLUTIONS

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

5

P R O C E E D I N G S

1      THE REPORTER: It's Thursday, June 7, 2012, 9:15
2   a.m. Do you have any stipulations or agreements for the record
3   before I swear the witness?
4      MR. FREDERICK: No.
5      MR. DUNN: I don't think so.
6      MARC VEASEY,
7   having been first duly cautioned and sworn to testify the
8   truth, the whole truth and nothing but the truth, testified on
9   his oath as follows:
10      EXAMINATION
11   BY MR. FREDERICK:
12      Q. Good morning, Representative Veasey.
13      A. Good morning.
14      Q. My name is Matt Frederick. I represent the State of
15   Texas in Texas versus Holder, the voter ID litigation.
16      A. Yes.
17      Q. Would you please state your full name for the record.
18      A. Marc Allison Veasey, V-e-a-s-e-y.
19      Q. And have you been deposed before?
20      A. Yes, I have.
21      Q. How many times about?
22      A. Once.
23      Q. Okay. And do you remember the case that that was in?
24      A. It was the recent -- the current redistricting

6

1   case.
2      Q. Is there any reason, like an illness or anything,
3   that you might not be able to answer my questions accurately
4   today?
5      A. No.
6      Q. Okay. Great. Let me run very quickly through some
7   ground rules. You probably remember most of them from
8   redistricting. One important thing is just to make sure you
9   answer audibly. So instead of nodding your head or shaking it,
10   just say "yes" or "no" so the court reporter can record your
11   answer.
12      A. Yes, I understand.
13      Q. And if you don't understand a question I ask, please
14   ask me to rephrase. I'll be happy to do so.
15      A. Yes, I understand that.
16      Q. Okay. If you'll just wait until I finish my
17   questions to answer just so the court reporter doesn't have to
18   take down two of us speaking at the same time.
19      Can you do that?
20      A. Make sense. Absolutely.
21      Q. Okay. And I will likewise try my best not to ask a
22   new question while you're still answering.
23      A. Make sense.
24      Q. Your lawyer may object to my questions. Unless he
25   instructs you not to answer, you may answer the question

7

1   regardless of his objection. I have no doubt that Mr. Dunn
2   will appropriately instruct you not to answer if he thinks
3   that's right. But otherwise, you know, I would ask that you
4   please answer my questions.
5      A. I understand.
6      Q. Okay. And you're represented by counsel today,
7   right?
8      A. That is correct.
9      Q. And who's that?
10      A. That would be Mr. Dunn.
11      Q. Can you tell me what you did to get ready for your
12   deposition today?
13      A. I can't think of anything that I did to get ready for
14   the deposition.
15      Q. Okay. Did you review any documents?
16      A. No, I have not reviewed any documents.
17      Q. Did you speak with your attorney before the
18   deposition?
19      A. Yes.
20      Q. About how long did that meeting last?
21      A. Let's see. You know, I couldn't tell you, between
22   talking with Chad and Mr. Hebert, how long I've talked with
23   them correctly. But today, I've talked with Chad, Mr. Dunn,
24   about maybe 45 minutes before we met.
25      Q. Okay. And you've previously spoken to Mr. Hebert.

8

1   That's Gerry Hebert?
2      A. Yes.
3      Q. Have you spoken to anybody else about your deposition
4   today besides Mr. Dunn and Mr. Hebert?
5      A. Maybe. I may have mentioned it to family or friends,
6   but not extensively, no.
7      Q. But you didn't talk about the substance of --
8      A. No.
9      Q. -- of it with them?
10      A. No.
11      Q. Just kind of that you would be here today?
12      A. Right, that kind of thing. Exactly.
13      MR. DUNN: Pause just a little bit after his
14   questions. It'll help our court reporter, and it'll also give
15   me more time to object if I need to.
16      THE WITNESS: Okay.
17      Q. (BY MR. FREDERICK) Senator Veasey, are you
18   registered to vote?
19      A. I am a registered voter.
20      Q. Do you have a current Texas driver's license?
21      A. I do have a current Texas driver's license.
22      Q. Do you have a passport?
23      A. I do have a current passport.
24      Q. Do you have a concealed handgun license?
25      A. I do not own a concealed handgun license.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

**9**

1    Q.  Are there other members of your household who are

2  voting age?

3    A.  Yes.

4    Q.  And who is that?

5    A.  That would be my wife.

6    Q.  Okay.  And what's your wife's name?

7    A.  Tonya, T-o-n-y-a.

8    Q.  All right.  Is your wife registered to vote?

9    A.  My wife is registered to vote.

10    Q.  Do you know if she has a current Texas driver's

11  license?

12    A.  My wife does have a current Texas driver's license.

13    Q.  Does she have a passport?

14    A.  My wife does have a passport.

15    Q.  Any other members of your household that are voting

16  age?

17    A.  No.

18    Q.  All right.  I'm sure you could guess we're here today

19  to talk mostly about SB14.  And when I say "SB14," you

20  understand that that means the Voter ID Bill that passed in the

21  2011 Legislature, right?

22    A.  Correct.

23    Q.  Great.  I will try and be clear, you know, when I'm

24  talking about Photo Voter ID.  I may say "Photo ID" or "Voter

25  ID."  What I mean to say when I say that is a Photo Voter ID

**10**

1  requirement for voting such as the one in SB14.

2    A.  I understand.  Okay.

3    Q.  Did you give any speeches about Senate Bill 14?

4    A.  That would be -- I'm certain that I've given several

5  speeches about SB14.  On the House floor and at different

6  Democratic groups or any other group for that matter that may

7  have asked me to come speak about it.  Not necessarily just

8  Democratic groups.

9    Q.  Do you remember -- other than -- other than

10  statements in the Legislature, do you remember about how many

11  speeches you've given on SB14?

12    A.  I do not recall.

13    Q.  Is it more than ten, do you think?

14    A.  I would say -- depending on what you would consider a

15  speech, I would say probably more than ten.  Just based on you,

16  know -- and, you know, just thinking about all the different,

17  you know, places that I've been since the Session ended.  And

18  oftentimes I was asked to speak about Voter ID.

19    Q.  Okay.  I imagine being a representative, you get

20  asked to give a lot of speeches; is that right?

21    A.  That would be correct.

22    Q.  Do you -- do you recall the previous Voter ID Bill

23  from 2009, SB362?

24    A.  I don't necessarily recall it in details, but I do

25  remember, yeah, absolutely.

**11**

1    Q.  Do you recall if you gave any speeches about SB362?

2    A.  Yes.  I don't remember specifically, but I can tell

3  you since I've been in the Legislature -- I was elected in

4  2004, and so my first Session would have been 2005.  And I have

5  probably talked about Voter ID since the time I was elected

6  into the Legislature.

7    Q.  So you were elected in 2004 --

8    A.  Correct.

9    Q.  -- and at that point, was Voter ID generally already

10  kind of a -- let's say a visible political issue in Texas?

11    A.  If I recall correctly, it -- you know, it's just

12  been -- it's been something that people have been concerned

13  about for quite sometime.

14    Q.  Did you talk to any lobbyists about Senate Bill 14?

15    A.  Probably.

16    Q.  Do you recall any specific lobbyist that you spoke

17  to?

18    A.  No, I do not.

19    Q.  Did you talk to any -- any advocacy groups about

20  SB14?

21    A.  I do not recall.

22    Q.  Did you get any materials from -- from any lobbyists

23  about Voter ID Legislation generally?

24    A.  No.

25    Q.  No.

**12**

1        Do you recall whether you got any materials from

2  anyone outside the Legislature about Voter ID Legislation?

3    A.  About Voter ID Legislation.  What do you mean by

4  that?

5    Q.  I'll limit it to the period since, let's say, January

6  1st, 2011.

7    A.  Okay.

8    Q.  Has anyone outside the Legislature given you

9  documents or studies or just any kind of material to review

10  about Photo Voter ID generally?

11    A.  I do not recall, but I will say that obviously, you

12  know, different -- especially during the Session, during that

13  time period between January and you, know, Memorial Day, so

14  many people come and advocate for so many different things

15  inside of the office that someone may have come by and given me

16  something, but I just do not recall.  But, yeah, we get -- you

17  know, a lot of -- a lot of people come through with a lot of

18  different things.

19    Q.  How many bills usually get considered in a single

20  Legislative Session?

21    A.  Oh, my goodness.  I would say billwise, I'm not sure

22  how many bills made it to the floor, but I bet you that, you

23  know, between tabling and, you know, motions to table, motions

24  to carry, amendments, things like that, thousands and thousands

25  of items are voted on.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

13

1      Q.   Okay.  How often do people come, you know, to your
2   office or contact you during a Session just about issues
3   they're interested in?
4      A.   All the time.
5      Q.   Pretty much every day?
6      A.   Pretty much every day.  That would be correct.
7      Q.   Do you recall whether the Texas -- well, let me back
8   up a bit.  Is there a Democratic Caucus group in the Texas
9   House?
10      A.   There is a Democratic Caucus group.
11      Q.   And you're a member of that group?
12      A.   Yeah.  I'm the chairperson of the group.
13      Q.   Okay.
14      A.   Yeah.
15      Q.   Did the Democratic Caucus provide any materials about
16   SB14 to its members in the 2011 Session?
17      A.   I do not recall.  I would imagine that we did.  It
18   was something that we, you know, always talk about every
19   Session.  So I would imagine that we did provide members with
20   something, but I don't remember exactly, you know, what it was
21   or exactly what the presentations were.
22      Q.   You're a member of the Texas Legislative Black
23   Caucus; is that right?
24      A.   That would be correct.
25      Q.   Do you recall until the Legislative Black Caucus

14

1   provided any materials to its members about SB14?
2      A.   I do not recall but I would imagine that there would
3   have been materials, but I don't recall specifically though.
4      Q.   Okay.
5      A.   It was something that the Black Caucus was very
6   concerned about.
7      Q.   Can you recall any specific individual or group that
8   provided you with materials in the 2011 Session about Voter ID
9   Legislation?
10      A.   No, I do not recall any groups.
11      Q.   Have you -- have you talked to any of your
12   constituents about Photo Voter ID Legislation?
13      A.   Yes, oftentimes.
14      Q.   Have you gotten e-mails or letters from constituents
15   about Voter ID Legislation?
16      A.   I am certain that I have.  Yes, I'm -- but I don't
17   specifically remember from who or what, but, yeah -- but I'm
18   certain that I have.
19      Q.   You probably get a lot of e-mails and letters from
20   constituents about a lot of things?
21      A.   About a lot of different things.  That would be
22   correct.
23      Q.   Do you have -- in your office, is there a specific
24   e-mail account where -- that -- where constituent e-mails go?
25      A.   There would be -- there is a e-mail account where

15

1   constituent e-mails would go.  If you go to House.state.tx.us.,
2   there is a deal where you can contact your legislator, and you
3   put your ZIP code in there, put your address in there, and
4   it'll direct you to your legislator.  And then, yeah, we get
5   e-mails through that quite often.  And then -- yeah, we get
6   e-mails through that quite often.
7      Q.   Are there any other e-mail accounts where
8   constituents would send an e-mail if they wanted you to get
9   it?
10      A.   Sometimes they may send me e-mails to
11   marc@marcveasey.com, or they may send an e-mail to, you know,
12   the staff people on my staff.
13      Q.   Is marc@marcveasey.com, is that a personal e-mail or
14   is it an official --
15      A.   It's a campaign.  Campaign, yeah.
16      Q.   And the e-mail that you referred to related to the
17   official Texas House Web site, that would be an official state
18   e-mail account?
19      A.   Right.  Exactly.
20      Q.   And is that the primary account where constituent
21   e-mail would go?
22      A.   Yes.
23      Q.   Do any of your constituents oppose a photo ID
24   requirement for voting?
25      A.   I would say every constituent, if not every

16

1   constituent, like 99 percent of the constituents that have
2   spoken with me about Photo ID or Voter ID have been opposed to
3   it.
4      Q.   When you say 99 percent who have spoken to you, does
5   that include people who have e-mailed you about Voter ID?
6      A.   That would be constituents that have e-mailed me
7   about Voter ID, yes.
8      Q.   And you've also -- have you spoken in person to some
9   constituents about Voter ID?
10      A.   Yes, I have.
11      Q.   Do any of your constituents support a Photo ID
12   requirement for voting?
13      A.   I cannot recall one constituent that has told me that
14   they are for Photo ID laws.
15      Q.   To your knowledge, have you produced any constituent
16   e-mails to the state in this litigation?
17      A.   No, I have not.
18      Q.   Were you ever asked to produce constituent e-mails?
19      A.   I do not recall being asked to produce constituent
20   e-mails.
21      Q.   Did you prepare talking points for committee hearings
22   for floor debates on SB14?
23      A.   If I did not prepare them, then a staff person in my
24   office would have prepared them.
25      Q.   Did anybody besides you or your staff prepare talking



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

17

1    points for you for SB14?
2        A.  I know that my staff worked with other members'
3    offices on -- on Photo ID.
4        Q.  Is it pretty common in the legislature for members or
5    staff from different member offices to work together on talking
6    points?
7        A.  Yes, there is, absolutely.
8        Q.  Do you recall any -- or are you aware of any
9    particular office or legislator with whom your staff worked to
10   prepare talking points for SB14?
11       A.  Rafael Anchia.
12       Q.  Did you have any personal meetings with any
13   legislator to discuss SB14?
14       A.  Yes.
15       Q.  Do you recall who you met with?
16       A.  I don't recall everyone who I met with outside of
17   Rafael Anchia and -- yeah, and I'm certain Jessica Farrar who's
18   a member out of Houston.  But I do not -- but I can't recall
19   everyone that I talked to, but I'm certain that I've talked to
20   more people than them.  I just don't remember, you know, who --
21   everyone that I talked to.
22       Q.  Do you think you talked to every Democratic member of
23   the Texas House about SB14?
24       A.  I -- if I -- probably.  But I don't remember if I
25   did -- if I spoke to every single one, but more than likely I

---

18

1    did.
2        Q.  You think -- is it safe to say you talked to most of
3    the Democratic members of the house?
4        A.  I would say that that's correct, whether it was
5    one-on-one or whether or not we were talking in a group setting
6    at a Democratic Caucus meeting.  And, yes, I would say that
7    I've spoken to just about every Democratic Caucus member.
8        Q.  Did the Democratic Caucus have any meetings where
9    SB14 was discussed?
10       A.  I'm certain that we did.  Absolutely.
11       Q.  Were there any meetings specifically devoted to SB14
12   or Voter ID?
13       A.  There were -- if I recall correctly, that there were
14   a couple of meetings that we had but don't remember the exact,
15   you know, venue or place.  But, yeah, I would say that
16   absolutely.
17       Q.  Did the Democratic Caucus have any speakers or guests
18   come in at those meetings about SB14 to talk about the bill or
19   Voter ID?
20       A.  I do not recall whether it was just House member
21   driven or whether we had someone from the outside come in and
22   do a presentation.  I do not recall.
23       Q.  Did you invite any witnesses to come testify in the
24   committee about SB14?
25       A.  I do not recall if I did or not.

---

19

1        Q.  Do you recall if you had any constituents come give
2    testimony on SB14?
3        A.  I do not remember any constituents from District 95
4    coming up to give testimony.
5        Q.  Do you recall if you invited any constituents to come
6    give testimony on SB14?
7        A.  I do not recall.
8        Q.  In the 2009 Session, do you -- did you invite any
9    witnesses to provide testimony on the Voter ID bill in that
10   Session?
11       A.  I don't remember.
12       Q.  Do you remember if any of your constituents testified
13   on the Voter ID bill in the 2009 Session?
14       A.  I do not recall if any constituents testified.
15       Q.  Did you conduct any studies about potential impact of
16   SB14?
17       A.  I did not personally conduct any studies.
18       Q.  Did your staff conduct any studies about SB14's
19   potential impact?
20       A.  My staff did not conduct any -- any studies.
21       Q.  Do you recall whether you or your staff conducted any
22   studies about the impact of the 2009 Voter ID bill?
23       A.  No.  I can tell you that we did not conduct a study
24   on our own, no.
25       Q.  Did you review any studies or see any studies about

---

20

1    the potential impact of SB14?
2        A.  Yes, I did.
3        Q.  Do you recall which studies you saw?
4        A.  The one study that I remember specifically was the
5    People for the American Way and the study that they did.
6        Q.  Are there any other specific studies you can remember
7    reviewing about Voter ID in the 2011 Session?
8        A.  Read some information from Carter-Baker.  I remember
9    that.  And there was some documentation that I read from --
10   well, the NYU School of Law.  I think the Brennan --
11       Q.  The Brennan Center?
12       A.  Yes.
13       Q.  Sorry to interrupt.
14       A.  Yeah, the Brennan Center.  Exactly.
15       Q.  The People for the American Way study that you
16   mentioned, was -- can you describe that study generally, if you
17   recall?
18       A.  It talked about the impact that it would have upon
19   African American and Latino communities specifically.  But I
20   guess what I remember specifically about it was that there was
21   a picture of an African American -- I believe it was an African
22   American man on the other side of the fence sort of being, you
23   know, like showing -- being like basically, you know, shut out
24   from the polling place and a quote from a guy at the Republican
25   State Convention in the 1980s, you know, advocating for less

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

21

1  people voting.  And I guess, you know, saying that that was the
2  whole -- that that was sort of the point for Voter ID.
3        Q.  Was -- for the People of the American Way study, was
4  there an individual author or authors identified?
5        A.  I do not recall.
6        Q.  Do you recall what -- what the date of that study
7  was?
8        A.  I do not recall the date of the study.
9        Q.  Do you recall the year when it was written?
10        A.  No, I do not.
11        Q.  Was the People for the American Way study -- do you
12  recall the methodology?  Was it a survey or do you recall?
13        A.  No, I don't know how they, you know, came about their
14  numbers.
15        Q.  Did the People for the American Way study that you
16  reviewed, was that a study of Texas or was it a nationwide
17  study?
18        A.  I believe it was a nationwide study.
19        Q.  Do you -- and I know it's been a while, but do you
20  recall whether that study included any data or research about
21  Texas specifically?
22        A.  I do not recall whether it did.  I just remember the
23  quote from the guy at the Republican State Convention, but I
24  don't remember --
25        Q.  And the quote that you mentioned, was that from the

22

1  Texas Republican State Convention?
2        A.  Yes.
3        Q.  And you said that quote was from a convention
4  sometime in the '80s?
5        A.  That would be correct.
6        Q.  You don't recall who the person was that made the
7  quote, do you?
8        A.  No, I do not.  It was someone that is -- that I think
9  was a fairly well-known Republican, active, but I just can't
10  remember his name.
11        Q.  Do you recall the title of that People for the
12  American Way study was?
13        A.  I do not remember the exact title.  If I were to see
14  it today, I would be able to recall it because it had a pretty
15  compelling title to it, but I don't remember it right now off
16  the top of my head.
17        Q.  So you mentioned the People for the American Way
18  study, the Carter-Baker report, and then a study by the Brennan
19  Center.
20            Can you recall any other studies on Voter ID
21  that you considered in the 2011 Session?
22        A.  No, I cannot recall anything specifically.
23        Q.  In the 2009 Session, can you recall any studies that
24  you saw about Voter ID for the 2009 Session?
25        A.  I'm certain in the 2009 Session that I also

23

1  referred -- that I also looked at that People for the American
2  Way.  And then I'm certain that we had -- that there were
3  witnesses from the Brennan Center that also had material that
4  came and testified in '09.
5        Q.  Can you recall any other particular study or report
6  that you read in the 2009 Session?
7        A.  No, I do not.
8        Q.  Have you -- and this is a general question, not for
9  any specific Legislative Session, but have you seen any studies
10  that look at the impact of a Photo ID requirement on voter
11  turnout?
12        A.  Yes, I have.
13        Q.  Do you recall any specific studies that address that?
14        A.  I'm certain the People for the American Way
15  study that I read, that it had specific numbers on there on
16  voter impact.  I'm certain that -- that many of the people that
17  came to testify against the bill, that they also, you know,
18  had, you know, similar studies.
19        Q.  Of the studies that you've seen about the potential
20  impact on turnout of Photo ID laws, do you recall seeing any
21  that showed a -- that concluded that there would be a decrease
22  in turnout?
23        A.  Yes.
24        Q.  Do you recall seeing any studies on the impact of
25  Photo ID laws on turnout that concluded or predicted that there

24

1  would be an increase in turnout?
2        A.  I do not recall any saying that there would be an
3  increase in turnout.
4        Q.  Do you recall seeing any studies of the impact of
5  Photo ID on turnout that concluded that it would be a wash or
6  kind of no effect on turnout?
7        A.  No, I don't recall seeing any that said that.
8        Q.  Did you talk to anyone at the Department of Justice
9  about SB14?
10        A.  Yes.
11        Q.  Do you recall who you spoke to?
12        A.  I do not recall by name -- by specific name, I do
13  not.
14        Q.  How many times -- when you spoke to the Department of
15  Justice, was it in person or over-the-phone?
16        A.  Over the telephone.
17        Q.  Do you recall how many times you spoke with the
18  Department of Justice?
19        A.  At least twice maybe.  Maybe more, but at least
20  twice.
21        Q.  Do you recall when those conversations took place?
22        A.  No, I do not recall.  It's been -- it was earlier
23  this year, but I don't remember exactly when.
24        Q.  So it was after the 2011 Legislative Session?
25        A.  Yes.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

25

1    Q.  Did -- do you recall any conversations with the
2  Department of Justice, either during the 2011 Session or before
3  the 2011 Session, about Voter ID?
4    A.  Before the 2011 Session, no, I can't -- I do not
5  recall, no.
6    Q.  What did you talk about with Department of Justice?
7    A.  I -- they asked me, you know, questions about Photo
8  ID, but I -- but as far as exactly what they specifically asked
9  me, I couldn't, you know, tell you that.
10   Q.  Do you recall whether the Department of Justice asked
11  you if SB14 would have a discriminatory effect?
12   A.  I believe that they did.
13   Q.  Do you recall what you told them about that?
14   A.  I would have told them, yes.
15   Q.  Do you recall whether the Department of Justice asked
16  you if SB14 was -- had a racially discriminatory purpose?
17   A.  I believe that they asked me that or something to
18  that effect.
19   Q.  Did you send any letters or e-mails to the Department
20  of Justice about SB14?
21   A.  During the Session, possibly.  We -- I may have
22  during Session it seems like, something specifically that we
23  may have written to the Justice Department.  But it's kind of
24  fuzzy because, you know, after we had Photo ID, we had
25  redistricting.  So it was -- we had quite a busy Session.

26

1    Q.  So you think that you may have sent a letter or an
2  e-mail to the Department of Justice, but you're not --
3    A.  Yeah, it just seems like that we -- that we may have.
4    Q.  When you say "we may have," who -- who would have
5  sent that?
6    A.  Myself and other members of the Democratic Caucus.
7  We may have sent a joint letter, or we may have sent individual
8  letters.
9    Q.  And can you recall specifically whether there was a
10  letter specifically about Voter ID or SB14?
11   A.  I -- I believe so.  Like I stated earlier, it's been
12  so -- you know, there was so much that happened after Voter ID
13  that -- that I don't remember exactly what happened.
14   Q.  Do you recall why the Democratic Caucus or Democratic
15  members sent a letter during the Session to the Department of
16  Justice?
17   A.  Any letters that would have been sent during the
18  Session would have been to address concerns dealing with
19  discrimination, you know, based on, you know, my knowledge of,
20  you know, conversations with different Democratic Caucus
21  members.
22   Q.  Have you -- that you can recall today, have you sent
23  letters to the Department of Justice during other Legislative
24  Sessions?
25   A.  Probably.  I'm certain.  Probably.

27

1    Q.  Do you recall any particular letter that you sent to
2  DOJ during a Legislative Session?
3    A.  No, not off the top of my head, I cannot.
4    Q.  Do you recall why you sent letters in previous
5  Sessions to DOJ?
6    A.  Any letters that I would have sent to the Department
7  of Justice probably would have been because I felt something
8  was discriminatory.
9          MR. DUNN:  And just to be clear on the record, I
10  assume you're talking about the voting division and not all of
11  DOJ.
12   Q.  (BY MR. FREDERICK)  Well, I guess now I'm just asking
13  about the Department of Justice.  Do you --
14        MR. FREDERICK:  But fair point.
15   Q.  (BY MR. FREDERICK)  Do you recall sending a letter to
16  any division of the Department of Justice other than the voting
17  section?
18   A.  No, I don't -- no, I do not.
19   Q.  And would the purpose of sending a letter during
20  Session -- to the voting section, would that be to prevent a
21  law from being pre-cleared by the Department of Justice?
22   A.  Yes, it would have been -- not necessarily in all
23  cases, but I would -- generally speaking, I would say that,
24  yeah, we would want the Justice Department to, you know, take a
25  look at a certain law and for the law to not be pre-cleared or

28

1  for them to, you know, look into concerns that I would have
2  felt were discriminatory in nature.
3    Q.  Are you generally familiar with Section 5, the Voting
4  Rights Act?
5    A.  As a nonattorney, yes, I'm familiar with that.
6    Q.  And is it your understanding that Section 5 requires
7  Texas and other states to submit any law that change -- any
8  voting change to the Department of Justice or the DC, district
9  court, to get approval before it can go into effect?
10   A.  Yes.
11   Q.  And so would it have been your understanding that any
12  law about voting that was passed by the Texas Legislature would
13  have eventually gone either to DOJ or to a court in DC?
14   A.  That is correct.
15   Q.  If you knew that -- that a law was going to come
16  before the Department of Justice eventually, why would you send
17  a letter during the Legislative Session before the law had been
18  passed?
19   A.  I don't -- I can't say whether or not I sent the
20  letter before the law was passed or after the law was passed.  I
21  couldn't recall when -- exactly when it was sent.
22   Q.  Do you recall any letters that you sent to the
23  Department of Justice about a specific bill before it actually
24  passed the Legislature?
25   A.  No, I cannot recall.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

29

1    Q.   If you knew that a voting law would go through the
2    Department of Justice eventually, why would you -- why would
3    you send a letter to the Department of Justice during the
4    Legislative Session about that law?
5        A.   If I felt strongly that I thought a law was going to
6    have discriminatory intent, then, I would, you know, obviously
7    go to the -- ask the Department of Justice to intervene
8    because, historically, that's been the -- the department of --
9    the DOJ has been the government agency where, you know,
10   minorities go if they feel that there's discrimination, you
11   know, locally that's not being addressed.
12       Q.   But you would have known that the DOJ would consider
13   the law at some point anyway, right?
14       A.   Yes.
15       Q.   Did the Department of Justice contact you during the
16   2011 Legislative Session?
17       A.   I do not recall.
18       Q.   To your knowledge, did the Department of Justice
19   contact any -- any Democratic legislator during the 2011
20   Legislative Session?
21       A.   Not to my knowledge.
22       Q.   Are you aware during any Session of the Department of
23   Justice contacting you or another legislator during a
24   Legislative Session?
25       A.   Not to my knowledge.

30

1        Q.   Did you provide any information to the Department of
2    Justice about SB14?
3        A.   Yes.
4        Q.   Do you recall what that information was?
5        A.   I was asked questions specifically about, you know,
6    like amendments that I may have filed or amendments that were
7    filed and -- and any knowledge I had of this information.
8        Q.   To your recollection, did the Department of Justice
9    explain why they wanted to know about amendments that were
10   filed to SB14?
11       A.   I'm certain that it would have been -- had something
12   to do with -- you know, establishing some sort of -- whether or
13   not there was discrimination that took place.
14       Q.   Can you recall any particular statement about why
15   they were asking about amendments?
16       A.   No.  No.
17       Q.   Okay.  In your conversations with the Department of
18   Justice, did -- did the Department of Justice tell you whether
19   or not it believed there was a discriminatory purpose behind
20   SB14?
21       A.   Did they tell me whether or not there was
22   discriminatory purpose?  I do not recall them saying that.  I
23   believe that I would have been the person saying that I felt
24   this was discriminatory.
25       Q.   Did the Department of Justice in their conversations

31

1    with you, did they indicate to you that they believed there
2    would be a discriminatory effect from SB14?
3        A.   I do not remember them, you know, saying anything
4    of that nature.  I just remember me, you know, telling them
5    what I thought.  But I don't remember them, you know, telling
6    me that they thought that something was discriminatory.
7        Q.   So mostly -- in your conversations, it was mostly the
8    Department of Justice asking you questions; is that right?
9        A.   Yes, that would be correct.
10       Q.   Do you recall any instance in your conversations
11   where the Department of Justice provided you with any -- you
12   know, any information?
13       A.   I do not recall the Department of Justice providing
14   me with any information.
15       Q.   Did the Department of Justice ask you to provide any
16   testimony in this lawsuit?
17       A.   No, they did not.
18       Q.   Did the Department of Justice ask you to provide a
19   declaration in this lawsuit?
20       A.   I believe that I did sign a declaration.
21       Q.   Did the Department of Justice ask you to provide a
22   declaration?
23       A.   I do not recall the exact language that went on
24   between the two of us, between myself and the party that was
25   representing the Department of Justice.  So I wouldn't be able

32

1    to tell you that.
2        Q.   Okay.  Here I'll give you --
3        A.   So -- oh, yes, so this -- I have my declaration here.
4        Q.   Okay.  Yeah, here I'll -- I've got it too.
5        A.   Okay.
6        Q.   We'll go ahead and mark it.
7            MR. FREDERICK:  Would you please mark this as
8    Veasey Deposition Exhibit 1, please.
9            MR. DUNN:  Is it going to be 13 or 1.
10           MR. FREDERICK:  We'll mark this as Exhibit 1.
11           (Deposition Exhibit No. 1 was marked.)
12       Q.   (BY MR. FREDERICK)  And Representative Veasey, I'll
13   represent to you that the cover page that you see on Exhibit 1,
14   there at the top, it has a case number and a document number,
15   69-13.
16           Do you see that?
17       A.   Yes, I do.
18       Q.   Okay.  I'll represent to you that this was taken from
19   a filing by the Department of Justice so that that's what that
20   document number indicates.
21       A.   Okay.  Thank you.
22       Q.   If you'll turn to the second page, can you identify
23   what this document is?
24       A.   Yes.  This is a declaration of -- from me.
25       Q.   Do you recall when you signed this declaration?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

33

1     A.   The exact date when I signed this declaration, I
2   cannot recall off the top of my head, but it is dated April the
3   9th of this year.
4     Q.   To your knowledge, is this a -- is this a true and
5   correct copy of the declaration that you signed --
6     A.   Yes.
7     Q.   -- for the Department of Justice?
8     A.   Yes.
9     Q.   Who wrote this declaration?
10    A.   I am assuming that -- that the Department of Justice
11  did this declaration -- or wrote this declaration.  Excuse me.
12    Q.   So to your recollection, the Department of Justice
13  wrote this and provided it to you for signature?
14    A.   That would be correct.
15    Q.   Did you discuss the contents of this declaration with
16  the Department of Justice before you got a copy to review?
17    A.   What I recall is that I talked with the Department of
18  Justice to make sure that everything in this document was
19  factual.
20    Q.   Do you recall who you spoke to at the Department of
21  Justice about this declaration?
22    A.   It was a gentleman named Bruce, if I recall that
23  first name correctly.  I believe it was a gentleman named
24  Bruce.  But I do not remember the gentleman's last name.
25    Q.   Is it possible that it was Bruce Gear?  Is that name

34

1   familiar?
2     A.   It's just not ringing a bell.  I've just talked to so
3   many people that it's just not ringing a bell, but that may
4   have been correct.
5     Q.   Okay.  Do you know if the gentleman with whom you
6   spoke was a lawyer at the Department of Justice?
7     A.   I do not know if he was a licensed attorney or
8   whether he was a office worker.  I'm not certain of that.
9     Q.   How many conversations did you have with the
10  Department of Justice about your declaration?
11    A.   At least two.
12    Q.   Did it -- did you have any conversation with anyone
13  at the Department of Justice about your declaration before you
14  got a copy of the declaration to review?
15    A.   Yes.
16    Q.   Do you recall when that conversation took place?
17    A.   I -- the conversation took place on -- you know, on
18  both occasions that we spoke.  On at least two -- on at least
19  two of the occasions where we had conversation by phone, we
20  talked about trying to go over to make sure it was correct.
21    Q.   When you say "go over it," do you -- were you -- were
22  you going over an actual draft?
23    A.   When I say "go over it," I mean that the gentleman
24  that I spoke to at DOJ, you know, he wanted to be sure that
25  this declaration -- or, you know, these facts were correct, and

35

1   so he said, okay, let me ask you a question.  You know, your
2   name a Marc Veasey, correct?  Yes.  You were born in 1971 and
3   raised in Tarrant County?  Correct.  You are African American?
4   Correct.  You know, just to go through like what you see before
5   us in this document, 69-13, to make sure that all of the words
6   in here were correct.
7     Q.   And during that conversation, were you looking at a
8   copy of the declaration?
9     A.   No, I was not.
10    Q.   So is it your -- is it your understanding that this
11  declaration was -- or at least a draft of the declaration was
12  written before you spoke to the Department of Justice about it,
13  and then you -- and then you talked about the contents of it?
14    A.   Yes.
15    Q.   Are you aware of anybody else who drafted or made
16  comments or edits to this declaration?
17    A.   No, I'm not aware of anyone that would have edited
18  the document at all.
19    Q.   When you were talking to the Department of Justice
20  about this, did you make any changes?
21    A.   I do not recall making any changes.
22    Q.   Do you know where the Department of Justice got the
23  information that's contained in this declaration?
24    A.   Probably from asking me the questions.  I don't know
25  where else they would have put together the information, but,

36

1   you know, when we were talking -- and, you know, from our first
2   conversation, I'm sure that some of this would have been
3   derived from the conversation that we had.
4     Q.   Okay.  And when you say "the conversation," would
5   that be -- do you mean the conversation where they were asking
6   you questions about SB14?
7     A.   Correct.
8     Q.   Is there anything -- and I'm happy to give you a
9   minute to look through it.  Is there anything in this
10  declaration that you would like to change or clarify today?
11    A.   No, I don't see anything in here that I would like to
12  change or clarify.  I did look at -- at this document
13  before signing it, and so I feel, you know, pretty confident
14  that everything that is in here is correct.
15    Q.   Did you discuss the contents of this declaration with
16  anybody other than people at the Department of Justice?
17    A.   Yes.
18    Q.   And who was that?
19    A.   My general counsel here in the office.  And I'm
20  sorry, when I say "here in the office," my general counsel in
21  my state legislative office, Anne Hagan.  And that -- for the
22  record, that is Anne with an "e."
23    Q.   Yes.  Did you discuss the contents of this
24  declaration with anybody other than the people at the
25  Department of Justice or your general counsel Ms. Hagan?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

37

1      A.  No.
2      Q.  I'm not -- I don't want you to reveal the substance
3  of any conversation, assuming one occurred, but did you talk
4  about this declaration before signing it with Mr. Dunn or Mr.
5  Hebert?
6      A.  I do not -- this particular declaration, I do not
7  recall talking with them about this.  This, you know, was sent
8  to the office.
9          MR. DUNN:  I'm just going to time-out.  We're
10  getting into attorney-client privilege matters now.  So I
11  object and instruct you not to answer any further.
12      Q.  (BY MR. FREDERICK)  Right.  And I want to be very
13  clear, I'm not trying -- all I want to know is if a
14  conversation happened.  I don't want to know what was said
15  because, I agree, that would be privilege.
16          MR. FREDERICK:  So it is --
17          MR. DUNN:  Let me ask him.  He wants to know if
18  you had a conversation with your lawyers about this
19  declaration.  Without getting into details, "yes" or "no."
20          THE WITNESS:  I do not remember talking to
21  lawyers about this.  This came to the -- this was sent to the
22  office, Anne looked at it.  It looked good to her.  I looked at
23  it.  It looked good to me.  We sent it back.  I don't remember
24  specifically talking to you or Gerry about this documentation.
25      Q.  (BY MR. FREDERICK)  Great.  Thank you.

38

1          If you turn with me to -- let's see -- to
2  Paragraph 12, which is on -- it's marked on the top as Page 4
3  of 5.
4      A.  Okay.
5      Q.  And let's see, down here on about -- starting on the
6  third line of Paragraph 12, is it accurate that this is telling
7  you about the 2007 legislative debate?
8      A.  Yes.
9      Q.  And right here on the -- beginning on the third line
10  towards the end, it says, Minority voters are more likely than
11  white voters not to have the necessary identification.
12          Is that an accurate representation of what this
13  says?
14      A.  Yes.
15      Q.  Now, this -- so this was the 2007 debate.
16          Was the bill in -- do you remember what forms of
17  ID were acceptable under the bill -- the Photo ID bill
18  considered in 2007?
19      A.  Now, I do not remember.
20      Q.  Do you recall whether any of the forms of ID under
21  the 2007 bill were non-Photo ID?
22      A.  I do not recall specifically.  I'd have to go back
23  and look at the bill.  There's been so many different forms
24  that have come before, so I'd have to go back and look.
25      Q.  Is it your understanding under the law as it is now,

39

1  that it's acceptable for voters to show non-Photo ID at the
2  polls?
3      A.  Yes.
4      Q.  And you don't know -- you can't -- you don't know
5  whether the proposed 2007 Legislation would have removed all
6  forms of non-Photo ID?
7      A.  I believe that it would have, but I don't recall
8  exactly what forms of ID would have been acceptable in the 2007
9  because the freshest one on my mind is obviously the one that
10  passed in '11.
11      Q.  And it's your contention, is it not, that -- that
12  SB14, the bill that passed, would have negative impact on
13  minority voters; is that right?
14      A.  Yes, I am.
15      Q.  And is it your contention that the reason that it
16  would have that impact is that minority voters in Texas are
17  less likely than nonminority voters to have the required ID?
18      A.  That is correct.
19      Q.  So, I mean, based on this, this statement about 2007,
20  is it fair to say that your concerns about the 2007 bill and
21  the 2011 bill were basically the same?
22      A.  Yes.
23      Q.  What evidence do you have that minority voters in
24  your district are more likely than white voters not to have the
25  necessary identification?

40

1      A.  That would be just based on my experience and working
2  in the community.  That would be based on my experience -- my
3  previous election experience, you know, like talking to people
4  that you know -- you know, that live in apartment to
5  apartment; you know, talking to people that take the bus
6  everywhere; you know, talking to people that, you know, go
7  to -- that don't have a bank account and they have to go to
8  check stores and get checks cashed and different things like
9  that, that I would say that that impact -- and just, I mean,
10  based on different studies that I've read, that that impact
11  would have a greater effect in a -- in a district that is
12  heavily Latino or heavily African American than in areas that
13  were non-Black or non-Latino.
14      Q.  So the people -- you referred to talking to people in
15  the community.  To the best of your recollection, are the
16  people that you spoke to on this issue -- were the people you
17  spoke to African American or Latino?
18      A.  Most of the people that I've spoken to were African
19  American or Latino, yes.
20      Q.  Do you recall talking to any -- I'll use the term
21  that gets used commonly, any Anglo members of the community
22  about this issue of ID possession?
23      A.  Yes.
24      Q.  Do you recall -- do you recall any specific people
25  that you've -- I know it's been a while, but do you recall any



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 41

1   specific people that you've spoken to in the community about
2   whether they -- they have a Photo ID?
3       A.   No.  I do not remember anything specifically or any
4   single person that I spoke to specifically, but I do remember
5   just, you know, like talking to people that would come in.  We
6   used to have an operation in the mall back in 1998 at La Gran
7   Plaza, which is just a little further up I-35, and at that
8   time, it was called Town Center Mall.  And I can remember
9   talking to, you know, people that would come into our store --
10  Democratic party storefront that we had inside of the mall, and
11  people would say, well, you know, I can't vote because I don't
12  have an ID.  Like, I can remember people saying that.
13           And then we would say, well, no, do you have a
14  bill or do you have a bus pass or something with your -- they
15  said, well, no.  Then you need to take it up there so you can
16  vote.  But I can specifically remember talking to people that
17  would stop into the office or that people that I would like
18  talk to in the mall that told me that they didn't have an ID.
19      Q.   And so what -- you mentioned a Democratic Party
20  storefront in what used to be the Town Center Mall.
21      A.   Yes.
22      Q.   What's the period when you worked there?
23      A.   The 1998 cycle, the 2000 cycle and the 2002 cycle.
24      Q.   Were you working for the Democratic Party at that
25  point?

## 42

1       A.   I was working for the Tarrant County Democratic Party
2   at that point.
3       Q.   And during that period, roughly '98 through 2002, the
4   Texas law didn't require an actual Photo ID to vote, did it?
5       A.   No.
6       Q.   So the people that came in and said they didn't have
7   ID, they weren't -- were they concerned about the lack of a
8   Photo ID or just any ID?
9       A.   They were concerned about the lack of a -- of a
10  driver's license or a Texas ID.
11      Q.   So people you spoke to during that '98 to 2002 rough
12  period, they -- is it your recollection that they thought they
13  had to have a driver's license or some state-issued Photo ID to
14  vote?
15      A.   Yes.
16      Q.   Do you recall any -- any of the people you talked to
17  telling you why they thought that?
18      A.   I think that they just probably just assumed that
19  like a lot of people assume a lot of things.
20      Q.   Did they assume, to your recollection, that a Photo
21  ID would be necessary to verify their identification?
22      A.   That was my understanding at the time of talking with
23  them.  They would also say, you know, well, I don't have a
24  voter registration card.  So they would
25  either say that they didn't -- either they didn't have their ID

## 43

1   or they didn't have their voter registration card.  That was
2   the other document that was -- I guess that was a non-Photo ID
3   that they would often refer to.
4       Q.   As part of that work, did you ever help anybody get a
5   Photo ID?
6       A.   No.
7       Q.   You mentioned -- when I was asking about evidence of
8   ID possession, you mentioned experience in the community and
9   you mentioned some studies.
10           Do you recall specific studies about ID
11  possession by minority voters?
12      A.   Yes.  I know that the People for the American Way,
13  that they had some pretty interesting numbers, pretty
14  compelling numbers on why was that, you know, minorities were
15  less likely to have identification than other members of
16  society.
17      Q.   Were there any other studies that you can recall?
18      A.   Not that I can recall specifically.  But the
19  information that I read from the Brennan Law Center and other
20  documentation over time that was brought into the office, I
21  thought was pretty compelling.
22      Q.   Looking back at this Paragraph 12 --
23      A.   Yes.
24      Q.   -- to your declaration, do you recall specific
25  studies that you would have based this opinion on in 2007?

## 44

1       A.   Yeah.  Yeah absolutely.  There were, you know,
2   studies that I remember, you know, having.  I don't
3   specifically remember which studies, but studies that we saw
4   from, you know, different people that were concerned and
5   organizations that were concerned about the bill that showed
6   that there was -- that there would be a -- and different things
7   that I've read from, you know, different news organizations and
8   different studies online that specifically, you know, talked
9   about, you know, anywhere from -- most of the studies I saw
10  said -- showed anywhere from like one to 3 percent, you know,
11  dropoff in African American and Latino voter participation.  So
12  in a close election, obviously, that would be enough to swing
13  the election.
14      Q.   Were those studies specifically, to the extent you
15  can recall, were they specifically about Photo ID or was it
16  just ID generally?
17      A.   It -- they were -- it was specifically to Voter ID
18  laws or Photo ID laws.
19      Q.   As you can recall, have you ever seen any studies
20  that conclude that -- that minority voters would have non-Photo
21  ID or would lack non-Photo ID, you know, at a greater rate than
22  non-minority voters?
23      A.   Yes.
24      Q.   Do you know what studies those are?
25      A.   I believe that the studies that I saw from People for



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

45

1    the American Way and the Brennan Center and others that were
2    working on Voter ID at the time showed pretty compelling
3    evidence of that.
4        Q.   Under current Texas law, is it your understanding
5    that there's some ID required, but you can show, say, a voter
6    registration card?
7        A.   Right.  Correct.
8        Q.   And you can also show -- I don't remember the exact
9    list, but you can show things like a utility bill with your
10   address?
11       A.   That is correct.
12       Q.   Do you believe that that kind of law requiring a
13   non-Photo ID has a discriminatory impact on minority voters?
14       A.   No.  I think that the way that the law is currently
15   written, that -- that obviously there still are some -- you
16   know, some barriers for people to go and vote, but they're
17   barriers that can be overcome fairly easily.
18       Q.   Are there any specific barriers you're thinking of
19   under the current system --
20       A.   Uh-huh.
21       Q.   -- that would affect minority voters particularly?
22       A.   Well, I mean, like let's say, for instance, if you're
23   transient, if you live in different apartment complexes, you
24   may not have the -- and you take the bus, you may not
25   necessarily be -- you know, have the ID or you may not

46

1    necessarily have the driver's license and so, you know, your
2    life may be from, you know, place to place, from one apartment
3    complex to your grandmother's house or one apartment complex to
4    your mom's -- I mean, so being able to -- just be able to
5    easily get those things, it may not be as easy for you -- for,
6    you know, people that live that particular lifestyle versus
7    others.
8        Q.   Uh-huh.  Other than a driver's license or some other
9    Photo ID, do you -- do you believe that it's more difficult for
10   minority voters to get non-Photo ID, like a voter registration
11   card or utility bill?
12       A.   I would say that anyone that -- who moves around a
13   lot, like I stated earlier, it's always going to be harder for
14   them to have documentation like that.  But at least you have a
15   wider, you know, range of things that you can have access to,
16   which makes it's a lot more fair.
17       Q.   Do you think on the whole the requirement -- the
18   current requirements of some form of photo or non-Photo ID, do
19   you believe that that has an impact -- any negative impact on
20   minority voters who might not have the ID?
21       A.   I think that -- that right now that any impact would
22   be minimal because I think that is -- because there are so many
23   ways that you can vote right now that it's easy for -- that
24   it's easy for people to meet anything that may be preventing
25   them from voting.  So, you know, like right -- like -- I mean,

47

1    if you have an ID and it's expired right now, you know, no one
2    is necessarily going to prevent you from going to vote.  You
3    know, under the 2011 law, obviously if your ID is more than a
4    certain period expired, then you would not be able to -- you
5    know, to go and vote.
6            And so while there are still definitely some
7    obstacles -- I mean, there was -- I mean, I can remember
8    talking to people at Town Center Mall that were just like, I
9    just don't -- I just don't know where I would get anything like
10   that right now where I can go -- like I remember people
11   specifically saying that to me, like I just don't know like
12   what, you know, I could get that could -- you know, we would
13   tell them, well, go get -- you know, go get you a bill, go
14   get -- and I can remember people saying, I just don't know.  I
15   just don't know what I can get right now to go and vote.
16           And so -- but -- but -- but within that group,
17   most people -- when I say "within that group," I'm talking
18   about the bus rider, the -- you know, the frequent mover, you
19   know, the people that, you know, just kind of live the paycheck
20   to paycheck, that if you -- most of those people if you would
21   say -- tell them, hey, go get a bill, go get your BlockBuster
22   card, you know, go get something with your photo on it or --
23   most of them would say, okay, let me go see what I can do.  I
24   think I can meet that threshold.  But there would always be
25   some that would be like, God, I just -- I just don't know.

48

1    Like I can specifically remember people saying I just don't
2    know if I can even get that.
3        Q.   Do you remember -- do you remember if any of the
4    people who thought maybe they couldn't even get a non-Photo ID,
5    were they registered to vote?
6        A.   They believed that they were registered.  They told
7    use that they were registered.  They believed that they were
8    registered.
9        Q.   Other than -- other than conversations with
10   individuals -- actually, let me back it up and make sure I'm
11   asking you a general question first.
12           Do you have specific evidence that minority
13   voters in your district are more likely than Anglo or
14   non-minority voters not to have necessary ID to vote?
15       A.   Specifically in my district?
16       Q.   Uh-huh.
17       A.   I would say that I believe that minority voters in my
18   district would be less likely to have those IDs because the
19   studies that I've seen, obviously, you know, are -- they're
20   speaking, you know, nationally about the impact of the Photo ID
21   law and what that impact would be in minority communities.  And
22   so, you know, obviously with my area that I represent being
23   heavily, you know, African American and Latino, of course, it's
24   likely that -- that that would be a big issue.
25       Q.   Have you conducted any studies of ID possession by



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

**49**

1    individuals in your district?
2         A.   I have not.
3         Q.   What about -- have you conducted any studies of ID
4    possession of people in Tarrant County?
5         A.   I have not.
6         Q.   Have you seen any studies of ID possession specific
7    to your district?
8         A.   I have not.
9         Q.   Have you seen any studies of ID possession by people
10   in Tarrant County?
11        A.   I have not.
12        Q.   Have you seen any studies by any -- any studies of ID
13   possession by individuals in -- in Texas?
14        A.   I do not -- I can't -- I cannot recall specifically
15   seeing anything that relates to Texas itself, but that doesn't
16   mean that I haven't seen anything.  I may just -- I just cannot
17   recall right now seeing anything that's specific to Texas, but
18   I've read, you know, so much over the years on Voter ID, I
19   just -- I can't remember exactly everything that I've read.
20        Q.   But you've seen -- you've seen national studies
21   that -- that conclude that there's a disparity in possession of
22   ID --
23        A.   Yes.
24        Q.   -- between minority individuals and non-minority
25   individuals?

**50**

1         A.   Yes.
2         Q.   And so you -- you assume that people -- that the
3    conclusions in national studies will apply more or less to
4    people in your district?
5         A.   Yes.
6         Q.   Have you conducted a survey of your constituents to
7    see how many of them possess the ID required by SB14?
8         A.   No.
9         Q.   Are you aware of any surveys of your constituents to
10   see how many of them possess the ID required by SB14?
11        A.   No, I have not.
12        Q.   Have you conducted any polls of your constituents to
13   see how many of them might possess the ID required by SB14?
14        A.   No, I have not.
15        Q.   Do you know how many of your constituents do not have
16   one of the forms of ID required by SB14?
17        A.   I do not know that number.
18        Q.   Do you know how many of your constituents don't have
19   a driver's license?
20        A.   I do not know that number.
21        Q.   Do you know how many of your constituents don't have
22   either a driver's license or a DPS issued ID card?
23        A.   I do not know that number.
24        Q.   Do you know how many of your constituents have a
25   concealed handgun license?

**51**

1         A.   I'm not -- I do not know that number.
2         Q.   Do you know how many of your constituents have a
3    passport?
4         A.   I do not know that number.
5         Q.   And do you know how many of your constituents have a
6    military ID card?
7         A.   I do not know that number.
8         Q.   Can you identify any individual constituent of yours
9    who does not have one of the forms of ID required by SB14?
10        A.   I cannot think of a specific constituent right now,
11   but outside of my district my grandmother, who turns 100 this
12   year, God willing, under this particular bill if she were to
13   lose her mail ballot, which we've had to look for it in the
14   house -- she votes by mail.  And when it comes to her house,
15   sometimes, you know, she may sit it somewhere or she may -- I
16   mean, we have to look for her bills, her ballot, everything.
17   She would not be able to vote if she lost her ballot because
18   her ID is very, very old, and she's not going to look for her
19   birth certificate so she can -- so she can go to DPS to get
20   another.  You know, she wouldn't be able to get that easily,
21   and she wouldn't be able to do it in a hurry.  I mean, it's
22   hard for anybody 99 to do anything in a hurry.  So --
23        Q.   Okay.  So you can't identify any specific constituent
24   of yours who lacks one of the required IDs; is that right?
25        A.   No.

**52**

1         Q.   Just so I'm clear, you cannot identify any
2    constituent who doesn't have one of the forms of ID?
3         A.   No.  Just off the top of my head right now, no, I
4    cannot.
5         Q.   Other than your grandmother, can you think of any
6    register -- can you identify any registered voter in Texas who
7    does not have one of the documents necessary to get a state
8    issued Photo ID?
9         A.   I cannot specifically think of an individual right
10   now, but I'm sure that if I asked I could find them -- well,
11   like I stated earlier, when we were at Town Center Mall, I met
12   people like that, you know, from time to time that were walking
13   through the mall that came in, and they were curious about what
14   we were doing and, you know, was curious about voting and when
15   election day was or, you know, when they could vote early.  And
16   we would ask them about ID, and they would tell us that they
17   didn't have any of the forms of ID that we told them that they
18   needed.
19        Q.   Do you know for a fact that those people that you
20   spoke to were actually registered to vote?
21        A.   I do not recall, but at the -- Tarrant County does
22   have a number, it's a 817884 number, if I recall correctly, and
23   sometimes we would call to see if they were registered, and
24   they would be registered.  But they just -- you know, I mean,
25   it's just -- you know, that's just -- that's the life that they



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 53

1    lived.
2        Q.   When did -- when did you stop working in the -- in
3    that storefront operation in the Town Center Mall?
4        A.   I was -- at the time, I was an employee of the
5    federal government for the United States House of
6    Representatives, and I would take leave of absence from my job
7    as an employee of the U.S. House of Representatives, and I
8    would go and work for the Tarrant County Democratic Party when
9    we would do those storefronts.  And I did that in the '98
10   cycle, the 2000 cycle and the 2002.  So 2002 was the last cycle
11   that I did that.
12       Q.   You were employed by U.S. House.  Did -- what was
13   your job at that time?
14       A.   I was a field representative on the staff of
15   Congressman Martin Frost.
16       Q.   And your grandmother, you said she votes by mail
17   typically?
18       A.   She votes by mail, yes.
19       Q.   And she's certainly eligible to vote by mail?
20       A.   Yes, definitely.
21       Q.   Do you know how many of your constituents don't have
22   the documents that would be necessary to get an ID under SB14?
23       A.   I do not know off the top of my head.
24       Q.   Can you identify any -- any specific constituent who
25   doesn't have the documents necessary to get a Photo ID under

## 54

1    SB14?
2        A.   No, I cannot think of anyone right now off the top of
3    my head.
4        Q.   Can you identify any registered voter in Texas who
5    does not have the documents necessary to get a Photo ID
6    required by SB14?
7        A.   Off the top of my head right now, I cannot tell you a
8    specific name.
9        Q.   And you mentioned with your grandmother that --
10   mentioned something about a birth certificate.
11           Do you know whether or not your grandmother has
12   a birth certificate?
13       A.   I don't even know if she does, no.
14       Q.   And other than your grandmother, you can't think of
15   any specific registered voter in Texas who doesn't have one of
16   the required forms of ID?
17       A.   I cannot think of anybody off the top of my head.
18       Q.   Are you doing all right?  Do you want to take a quick
19   break?
20       A.   No, I'm good.
21       Q.   If you want to take a break, let me know and I'm
22   happy to --
23       A.   No, no, no.
24           MR. DUNN:  Let's keep moving.
25       A.   Yeah, let's keep moving.

## 55

1        Q.   (BY MR. FREDERICK)  All right.
2        A.   If you see me moving around or anything, I'm just
3    trying to get comfortable and sit up.
4            MR. DUNN:  If you don't mind, can we pause one
5    minute while I run to the men's room?
6            MR. FREDERICK:  Yeah.  Yeah, of course.  Can we
7    go off the record for just a moment.
8            (Break was taken at 10:36 a.m. to 10:39 a.m.)
9        Q.   (BY MR. FREDERICK)  Are you familiar with the levels
10   of Photo ID possession by voters in Texas?  And by "levels," I
11   mean like the proportion or percentage of voters of different
12   groups that have Photo ID?
13       A.   I do not know that off the top of my head.
14       Q.   So you're not familiar with the percentage of African
15   American voters who have a Photo ID required by SB14?
16       A.   No, I do not know that.
17       Q.   And would the same -- and you're not familiar with
18   the percentage of Anglo, Asian American or Hispanic voters who
19   would have the required ID under SB14?
20       A.   No.
21       Q.   Are you familiar at all with the -- with the Voter ID
22   law that was passed by Georgia?
23       A.   Yes, I'm familiar with it to a certain extent.
24       Q.   Are you familiar with the levels of Photo ID
25   possession by Georgia voters that is a percentage of African

## 56

1    American voters, Asian American, Hispanic voters in Georgia?
2        A.   No.  No.
3        Q.   Are you familiar with the levels of Photo ID
4    possession by voters in Indiana?
5        A.   No.
6        Q.   If you found out that there was actually no disparity
7    in ID possession among Texas voters, that is, if minority and
8    non-minority voters were not anymore less likely than each
9    other to have Photo ID, would you support SB14?
10       A.   I would have to look at the numbers very carefully to
11   see because based on my experience, I would not see -- based on
12   my previous employment experience, I wouldn't see how that
13   would be possible.
14       Q.   Right.  And I understand that --
15       A.   Right.
16       Q.   -- that you probably would disagree with that factual
17   premise.
18       A.   Uh-huh.
19       Q.   If you looked at data information that -- that showed
20   that minority voters were not any less likely to have the ID
21   required by SB14 -- well, I guess, if you looked at the data
22   and it actually did show that, would you then support SB14?
23       A.   No.  Because I believe that SB14, I believe the
24   intent is to -- is to win elections by discriminating against
25   minorities.  I think that that is like the intent of the bill.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Marc Veasey                                                    June 7, 2012

---

**57**

1   I don't think the intent of the bill is to make sure that
2   people have a Photo ID when they go and vote.
3       Q.   You don't think the intent of the bill was to make
4   sure that people have a Photo ID --
5       A.   No --
6       Q.   -- when they vote?
7       A.   -- I do not.  I do not believe that.
8       Q.   And that is -- that's what the bill does, right?
9       A.   That is what the bill would do, but I think that the
10  intent of the bill is to win close elections.  I don't think
11  the intent of the bill is to make sure that everybody has an ID
12  when they go and vote.  I think the intent of the bill is to
13  make sure that people win elections by making sure that people
14  who are less likely to have a photo identification don't go and
15  vote, and so if there's an election -- like let's say there's a
16  swing district or something that would politically be
17  identified as a swing district, you know, sort of like the
18  Linda Harper Brown race in 2008 where it was decided by, I
19  think, 20 votes.  In that sort of scenario, if you could -- if
20  you figure a way how to scam one to 3 percent of the voters
21  from voting that were typically -- that are typically
22  minorities, then you could make sure that that sort of -- you
23  could get the desired outcome of that election, you know, by
24  making sure that -- by using a bill like this to prevent people
25  from voting.

---

**58**

1            Like I don't believe that the poll tax was to --
2   so people would have to pay to go and vote.  I think that the
3   poll tax was so people, you know, that didn't have the money
4   couldn't vote.
5       Q.   So if you -- even if you found out that minority
6   voters were just as likely to have the ID required by SB14, you
7   would still contend that the bill had a discriminatory purpose?
8       A.   Yes.
9       Q.   So if a legislator -- if any legislator believed that
10  SB14 wouldn't actually have a disproportionate impact on
11  minority voters, do you think that his or her vote for that
12  bill would be motivated by racial discrimination?
13      A.   Now say that again.
14      Q.   Sure.  If a legislator believed for whatever reason
15  that SB14 would not have any disparity -- disproportionate
16  impact on minority voters, would his or her vote in favor of
17  SB14 be racially discriminatory?
18      A.   Not necessarily.
19      Q.   Now, based on -- I mean, as I understand, based on
20  your testimony, you do believe that SB14 will have at least a
21  disproportionate impact on minority voters?
22      A.   Yes, I do believe that.
23      Q.   Is it you are understanding that other members of the
24  Texas Legislature believe that it will not have a
25  discriminatory impact on minority voters?

---

**59**

1       A.   There are other members of the Legislature that
2   believe opposite of me.  I think that is correct.
3       Q.   And so if someone were to believe otherwise, to
4   believe that this bill would not have a disparate or
5   Disproportionate impact on minority voters, they could support
6   the bill without being racially discriminatory, right?
7       A.   Repeat that one to me again.
8       Q.   Of course.  So if a legislator did believe that SB14
9   would not have a disproportionate impact on minority voters,
10  they could vote for the bill and support it without acting in a
11  racially discriminatory manner, right?
12      A.   I mean, if you're asking me about if I think that
13  people who vote for it, if they're committing discrimination --
14  I mean, obviously there are people that vote for it because
15  they think it's good public policy, and we just happen to
16  disagree on it.  I don't think that everyone that votes for it
17  is voting for it because they mean to be discriminatory.
18      Q.   And so the fact that -- I mean, the fact that
19  somebody thinks that this is -- "this" being SB14 -- is good
20  public policy and won't have a discriminatory impact on
21  minority voters, the fact that they would vote for it with that
22  belief that doesn't mean that it would be racially
23  discriminatory to support the bill?
24      A.   Right.  Yeah, if you're -- you know, if you represent
25  the Park Cities and you don't come into contact with very many

---

**60**

1   minorities, you may not -- you may have not seen the things
2   that I saw at Town Center Mall, and so you may just see it as
3   public policy.  You may not necessarily see it as
4   discrimination.  Your experiences in life may be at Park
5   Cities --
6       Q.   Okay.
7       A.   -- where everybody has IDs and passports and life is
8   good.
9       Q.   So it's possible that, you know, depending on
10  somebody's district -- well, I mean, based on somebody else's
11  life experience, they might -- that might lead them to just
12  think that there wouldn't be any racially discriminatory
13  impact?
14      A.   That's correct.
15      Q.   Okay.  Turn back to your -- to Exhibit 1, your
16  declaration.  I want to look at Paragraph 18.  It's on Page 4.
17      A.   (Witness complies.)
18      Q.   Are you there?
19      A.   Yes.
20      Q.   And is it accurate that this talks about amendments
21  that you offered to SB14 on the House floor?
22      A.   Correct.
23      Q.   Can you -- can you tell me what amendments -- okay.
24  So one of the first amendments, Amendment 11, would have
25  allowed a voter to complete an affidavit saying that they are

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

## 61

1    the same person on -- on the voting roll, right?

2        A.  Correct.

3        Q.  And the second amendment, which is No. 21, would have

4    added employee ID cards with photos -- employer issued employee

5    ID cards with a photo as a valid form of ID; is that right?

6        A.  Correct.

7        Q.  If Amendment No. 11 had been accepted, do you think

8    you would have voted for SB14?

9        A.  I probably still would have had some concern about

10   SB14, but had Amendment No. 11 been accepted, then it certainly

11   would have been a sort of, you know, more proof to me that at

12   least, you know, people didn't want -- that people wanted

13   everyone to have the opportunity to vote.  And that was -- that

14   was -- which was the point that I made on the House floor when

15   I offered that particular amendment.  Because if you have a

16   paper trail of someone signing an affidavit, and you could go

17   back and examine that, you know, then that way you could prove

18   whether or not voter impersonation was taking place.

19             And so, you know -- and so by -- you know, when

20   that one was struck down, it just showed me that they really

21   weren't interested in, you know, trying to pass a bill to

22   protect the sanctity of the voting booth, that it was just

23   about, you know, politics.  It was about winning elections.

24       Q.  How would a provision that allowed a voter to

25   complete an affidavit stating that he or she was the person on

## 62

1    the voting roll, how would that prevent in-person voting fraud

2    in your view?

3        A.  Because if you have to sign an affidavit and there

4    are legal penalties that would be incurred, then most people

5    wouldn't do that.  I mean, that -- you know, that wouldn't be

6    something that people would be willing to risk so they could,

7    you know, cast, you know, a fraudulent vote.  That would be

8    enough to scare most people.

9        Q.  And obviously if you are the right -- I mean, if that

10   is actually you on the roll --

11       A.  Right.

12       Q.  -- you're not going to have any problem swearing?

13       A.  Right.  Exactly.

14       Q.  But if you -- I mean, say I -- if you are somebody

15   who is going to cast a vote under somebody else's name, how

16   would a signature requirement in your view prevent -- prevent

17   that act of voter fraud?

18       A.  Because it's another step that the person would have

19   to take.  You vote, and then so the person would suspect that

20   you're doing something wrong, and they're asking you to come

21   over here and sign something because they're suspecting that

22   you're doing something wrong.  And so, you know, more than

23   likely, you would be like, you know, what -- you know, well,

24   let me come back when I find my ID.  I mean, somebody would

25   figure out some sort of way to get out of there in my opinion.

## 63

1    Most people are not going to take that -- that extra step to

2    commit some sort of a fraud when it's explained clearly to them

3    by signing this affidavit, you are committing perjury if this

4    is not you.  Do you understand that?

5        Q.  Uh-huh.  If the bill -- or if the law -- if the law

6    allowed people to complete an affidavit if they didn't have an

7    ID or if they forgot their ID, why would -- why would a poll

8    worker suspect that somebody is doing something wrong just

9    because they didn't have an ID?

10       A.  I would say that -- that some of the -- by some of

11   the e-mails and things like that that were forwarded to me

12   that there is a -- sort of a stereotype that -- you know, that

13   some Republicans have of people that live in certain areas,

14   like the district that I represent, that there's a lot of, you

15   know, widespread abuse and cheating going on.  And so the poll

16   worker, you know, that may be working there, they may not be

17   from the community.  They may be a Republican poll worker that

18   is working, you know, at this particular, you know, polling

19   area, and they may come in with the impression or with, you

20   know, the stereotype that there is cheating going on in that

21   area.

22             And there was an e-mail that I specifically

23   referred to on the dias (phonetic) while we were -- before SB14

24   passed that, and it was someone calling for a poll worker.  It

25   was a former chairman of the Tarrant County Republican Party.

## 64

1    And basically the e-mail said, We know that there is cheating

2    going on, and basically, she was talking about the boxes in

3    southeast Fort Worth where we're currently located, that

4    there's cheating -- we know that there's lots of cheating and

5    voter fraud that goes on in that area, so we need election

6    workers to go and work here on election day.  And that was what

7    the e-mail stated.  And so someone that would come in with that

8    sort of a, you know, stereotype about a place, you know,

9    would -- would probably be suspicious of someone.

10       Q.  So the idea would be that if somebody is coming in to

11   maybe a more heavily minority community from outside, they

12   might have some idea that, oh, man, there's going to be a lot

13   of cheating here?

14       A.  I would say based on my experience, this past Session

15   particularly on the elections committee and on this committee

16   and based on the -- the testimony that I heard for not just

17   Photo ID, but lots of bills related to election, that I would

18   say that that particular stereotype of people that live outside

19   of the minority community is unfortunately pretty prevalent.

20       Q.  If a poll worker -- if a poll worker suspected that

21   there might be cheating, and voters, even if they lacked Photo

22   ID, could sign an affidavit that they were who they said they

23   were, and that was just part of the ball, how would that allow

24   the poll worker to -- even if they were suspicious, how would

25   that let them identify people who were cheating or voting for



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

65

1  somebody else?
2      A.  Uh-huh.  Well, I mean, if someone were voting like --
3  and they're just not going to vote -- and they're just not
4  going, you know, to just cast -- sign the book and move on, but
5  there's a separate book they have to sign for people that are
6  suspected of cheating, well, then you're singled out.  You're
7  like, come over here.  I need for you to sign this book.  You
8  do not have the proper ID.  I need for you to sign this.  This
9  is going to be checked.  This is going to be authorized.  So
10  we're going to call you, you know, Jerry Smith or John Doe to
11  see did he really vote this day and to see is it really, you
12  know, this person.
13          And so, you know, you can actually investigate
14  it a lot easier that way if someone is signing an affidavit
15  that is separate from the book that everyone signs when they go
16  to vote.  And so for people to actually take the time to do
17  that, you know, they better make sure that when the voter --
18  when the Tarrant County election administration or whomever or
19  the investigator from the AG's office, that they better -- that
20  Jerry Smith better be at that house because this affidavit has
21  been signed stating that Jerry Smith that lives at 123 Main
22  Street is, in fact, this person.  And if not, then there could
23  be some -- obviously some very serious criminal penalties to
24  pay.
25      Q.  So in that case if we've got somebody -- somebody's

66

1  coming in and they -- maybe they've got Jerry Smith's -- maybe
2  they just want to vote for Jerry Smith, so they'll go -- they
3  got to sign a book or sign an affidavit so they would -- I
4  would think they would sign Jerry Smith, right?
5      A.  Right.
6      Q.  And so if someone followed up and said, okay, we're
7  going to check -- we're going to check this affidavit and see
8  if this was actually Jerry Smith.  So they call Jerry Smith and
9  Jerry Smith says, I don't know who that was.  I didn't vote
10  there.
11      A.  Right.
12      Q.  They still wouldn't know who voted, though, would
13  they?
14      A.  Not necessarily.  They wouldn't necessarily know who
15  voted, but they would know that that was a vote that didn't
16  count and that vote could be thrown out.
17      Q.  You mentioned a separate book, and I confess, I'm not
18  familiar with this amendment, No. 11 specifically --
19      A.  Uh-huh.
20      Q.  -- but would it have provided for a separate book or
21  a separate list of people who had to sign because --
22      A.  Yeah, absolutely.  Yeah, the idea of this amendment
23  was for someone who is suspected of committing voter
24  impersonation or voter fraud, for them to have to sign an
25  affidavit stating that they are who they are, and the vote

67

1  would count unless they were to go back and -- and it was
2  proven that they were not that person.  And so, yeah, it would
3  be a totally -- the idea was for them to have to sign a form,
4  you know, stating that they -- who they are, like something
5  totally separate than the book that you normally sign so that
6  could be examined separately from the rest of the role.  That
7  was the exact intent of that amendment.
8      Q.  And did that amendment include a requirement that all
9  of the signatures and all the affidavit signatures be verified
10  individually?
11      A.  I would need to go back and look at the amendment.  I
12  don't remember exactly, but -- but in drafting the amendment,
13  that was certainly what I had in mind, was for those sorts of
14  things to be able to be examined.
15      Q.  But under the, you know, the hypothetical we were
16  talking about where voter impersonator or fraudulent voter
17  comes in, signs somebody else's name on the affidavit,
18  unless -- unless somebody recognizes that person who signs the
19  affidavit to be somebody else, there's really no way for that
20  person -- the fraudulent voter to be caught, is there?
21      A.  There may not be a way for the fraudulent voter to be
22  actually caught, but at least the vote wouldn't count.  And I
23  think that from everyone that I heard that came to testify,
24  they were more concerned -- they weren't necessarily concerned
25  with people being caught, they were more concerned with making

68

1  sure that votes that are fraudulently cast aren't counted.  And
2  you could do that by having a fail-safe affidavit.
3      Q.  So Amendment 21, that would have added an employee
4  identification card with a photo, right?
5      A.  Yes.
6      Q.  Do you believe that an employee ID would be easier to
7  forge or fake then a state-issued ID?
8      A.  It -- I mean, it would certainly depend.  You know,
9  if you worked at Lockheed, probably not.  You know, it probably
10  wouldn't be very easy to forge that sort of ID.  But, yeah --
11  but I thought that having, you know, an ID, you know, once
12  again, you know, with your picture on it, whether it's your --
13  it could be at Tarrant County College or any place just
14  stating -- showing that you are who you say you are, you ought
15  to be able to vote with that.  And if -- you know, once again,
16  if someone suspected there was some sort of a, you know,
17  mischief going on or some sort of cheating going on, the person
18  could, you know, again, sign an affidavit, you know, stating
19  that they are the person that's on the work ID.
20      Q.  Is it possible that -- that depending on the
21  employer, some employee IDs could be easier to forge than a
22  state ID?
23      A.  Yes.  I could see where someone would say that.
24      Q.  If employee IDs were allowed and a poll worker could
25  make the decision to make somebody who presented an employee



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

69

1  Photo ID, you know, go sign an affidavit, was there any concern
2  that that would create a potential -- create a potential burden
3  on any group of voters who would be less likely -- or who would
4  be more likely to only have employee ID?
5      A.  Right.  Right.  No, I don't remember that being, you
6  know, discussed at all.  I think what we were trying to do was
7  to make sure that people have -- you know, take less of the
8  burden off of the voter.  Because the way that SB14 is written,
9  it puts much more of a burden on the voter that has an expired
10  driver's license, on the voter that only has college ID, or the
11  voter that only has a work ID.  So we wanted to take less of a
12  burden off of them and provide more opportunities for everybody
13  to be able to vote.
14     Q.  Were there any studies -- excuse me -- any studies
15  that you're aware of to determine how many Texas voters might
16  have an employee Photo ID?
17     A.  No.
18     Q.  And there weren't any studies to determine how many
19  Texas voters might have an employee Photo ID but not another
20  Photo ID?
21     A.  No.
22     Q.  Do low-wage workers typically have photo employee
23  IDs?
24     A.  I would not be able to make that sort of a blanket,
25  you know, statement about any, you know, group or demographic.

70

1      Q.  Have you ever worked at a minimum wage job?
2      A.  Yes, I have.
3      Q.  Okay.  Did you have an employee Photo ID?
4      A.  Right now, the Texas Legislature.
5      Q.  Fair enough.  That's probably below minimum wage.
6      A.  Yeah, exactly.
7      Q.  Other than the Texas Legislature --
8      A.  Yes.
9      Q.  -- have you ever worked a minimum wage job?
10     A.  Yes.
11     Q.  Did you get a photo employee ID there?
12     A.  I'm trying to remember what's the last -- my minimum
13  wage jobs.  I'm trying to -- the jobs that I had in college and
14  in high school, we had -- yeah, we did have a Photo ID at
15  Kroger, didn't we?  That was 20 years ago, but it seems like we
16  did have an ID that we had to check in that had our photo in it
17  when we signed in every day.  We had to swipe a card.  But,
18  yeah -- but, yeah, it's been so long.  I can't remember which
19  places -- which minimum or, you know, lower wage jobs I had,
20  hourly jobs that required a photo ID and which ones did not.
21  Yeah, I want to say when I worked at Kroger when I was in high
22  school that we did have to swipe in with a card that had -- I
23  remember we swiped in with a card, and it seems like it did
24  have our ID on it.  Yeah.  I mean, our picture on it.
25     Q.  Right.

71

1      A.  Yeah.
2      Q.  Do you think it's possible that people at lower wage
3  or hourly jobs might be less likely to have a photo employee ID
4  than people at salaried or higher paying jobs?
5      A.  I think it would depend on the place.  It would --
6  you know, it would depend on a lot of -- whether or not the
7  place wanted it, whether or not -- how high secure it was.
8  Obviously, if you work at -- you know, if you sweep the floors
9  at Lockheed or American Airlines, you're probably going to have
10  to have an ID even if you're making $7 an hour.  So I think it
11  would just depend on the place, and I think it'd be hard to
12  just make a blanket --
13     Q.  Do you believe that minority voters would be less
14  likely than nonminority voters to have a photo employee ID?
15     A.  It would -- I wouldn't be able to make that
16  assessment.
17     Q.  And you say -- and there weren't any studies that
18  you're aware of to determine rates of employee Photo ID
19  possession?
20     A.  No.  I think the intent of the amendment, again, was
21  just to give people an opportunity to vote just in case -- you
22  may have someone that works a -- you may have somebody that
23  their IDs expired.  Maybe they're driving with an expired
24  license because they can't go and get their license --
25  expired -- because they just don't have the money.  They just

72

1  had to get their car repaired, or they just had a big hospital
2  expense come through, or they had to buy cap and gown for their
3  kids to graduate or whatsoever.  And so they -- you know, you
4  put off, you know, paying Peter to pay Paul or what have you.
5  And so you may -- you know, you may -- and you may want to go
6  vote, but your ID is expired, you know, so you can make your
7  life better so you don't have to -- so you're not having to go
8  by paycheck to paycheck.
9          And so if your driver's license is expired but
10  you still want to go vote to try to make your life better
11  because you want to vote for somebody that you think will help
12  improve the community, the idea was just to let that person
13  have an opportunity -- the person that couldn't go and get that
14  license or didn't have the money to go and get a birth
15  certificate to get the free ID or whatever it is.  It's taking
16  the burden off of them so they could have another form of ID to
17  vote.
18     Q.  But there wasn't any evidence that you saw that would
19  indicate how much of a burden that might take off the voters?
20     A.  No.  No, there was not.
21     Q.  I'm going to move on to Paragraph 19 on the next page
22  of your declaration.  And this is talking about Amendment No.
23  55 that you authored.  It says that the bill -- that this
24  amendment would have prevented implementation of the bill if
25  Secretary of State determined that the majority of voters



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

73

1   without an acceptable form of photo identification were racial
2   or ethnic minorities.
3       A.   Uh-huh.
4       Q.   Is that an accurate statement?
5       A.   Yes.
6       Q.   Do you know whether it would be possible for the
7   Secretary of State to determine the race or ethnicity of
8   registered voters in Texas?
9       A.   Well, the idea of this particular bill -- and I
10  called this my -- what I specifically called this was my --
11  this was my conservative talk radio amendment, and this was an
12  amendment -- because oftentimes on conservative talk radio, you
13  will hear -- is people will say, if you show me that there is
14  discrimination, if you can prove to me without a shadow of a
15  doubt that there is discrimination, I'll go out there, and I'll
16  march with you, know, this civil rights leader.  Or I'll go out
17  there and I'll say there was discrimination too, but if not
18  then it's just people saying that there is discrimination going
19  on with no proof.
20           And so what this particular amendment was
21  designed to say, this was the talk radio amendment.  This was
22  the amendment that if people -- if this bill were to pass,
23  SB14, and become law and there were African Americans and
24  Hispanics that lived in Fort Worth and Dallas and no matter
25  where, and it was proven that it was -- it had a discriminatory

---

74

1   effect, then we could, you know, temporarily, you know, stop
2   the bill because we wouldn't want to have a bill in place that
3   was discriminating against people.
4            So basically what this amendment said was, Hey,
5   if there is proof after election day that people were being
6   discriminated against then, you know, then we need to -- we
7   need to stop the bill from taking place because no one --
8   everyone says that they're against discrimination.  You know,
9   it doesn't matter if you're a conservative, Democrat,
10  Republican, liberal.  Everyone says that they're against
11  discrimination.  So here's discrimination.  We saw that it took
12  place after this bill passed, so let's stop it in its tracks
13  right now.
14      Q.   Okay.  So the idea was to -- was the idea to have an
15  election where ID was required and then determine, based on
16  votes cast in that election or votes not cast --
17      A.   Right.
18      Q.   -- how many people were not able to -- not able to
19  have their vote count because of lack of ID?
20      A.   Right.
21      Q.   Okay.
22      A.   Right.
23      Q.   Okay.  So it was kind of to have a test of the Photo
24  ID requirement and then --
25      A.   Right.  Right.  Exactly.

---

75

1       Q.   -- and then see what happened?
2       A.   Exactly.
3       Q.   In your understanding, would it be possible under
4   Section 5 to implement SB14 kind of on a test basis to
5   determine whether it would have any discriminatory effect?
6       A.   Can you say that again.  I'm sorry.
7       Q.   Sure.  In your understanding -- and I understand
8   you're not a lawyer -- would it be possible for Texas to
9   implement SB14 on, you know, kind of a test basis for one
10  election in order to determine whether it would have a
11  disparate impact on minority voters?
12      A.   No, I would not be for -- you mean being given a test
13  run basically?
14      Q.   Right.  Right.
15      A.   No.
16      Q.   Isn't that what this amendment would do?
17      A.   No.  What this amendment would do -- and this is --
18  basically if the bill -- if it were -- if we were -- you know,
19  obviously, you know, my belief is that there would be
20  discrimination.  And so if there is discrimination, then, no,
21  we would have to, you know, immediately stop the law from --
22  the Secretary of State would have to stop the law.  And it's
23  not really written that way on here.  But that -- but that is
24  what -- that is the intent of that particular amendment.  But,
25  yeah -- but you're right, though, it is -- the way it's written

---

76

1   on there, it's not -- it's kind of vague.
2       Q.   Okay.  So your understanding when you proposed the
3   amendment was that whatever you want to call the -- you know,
4   the test election or the first election where the data would be
5   gathered, that would take place after the appearance?
6       A.   Yeah, it would have further prevented the
7   implementation of the bill if the Secretary of State determined
8   that the majority of voters without an acceptable form of ID,
9   identification or racial or ethnic minorities.
10      Q.   I understand.
11      A.   But that -- further should be in there.
12      Q.   So how would the Secretary of State have determined
13  the race or ethnicity of voters?
14      A.   Well, I mean, I think that the media -- you know
15  different, organizations, if someone -- if after election date
16  occurs and the people that were turned away were
17  disproportionately African American and Hispanic, then that
18  evidence could be offered up to Secretary Andrade's office.
19  And that was -- and I think that would be, you know, pretty
20  easy to determine.  Like if -- like if in all of Tarrant
21  County, you know, my district and representative -- the
22  district Representative Lon Burnam represents, if those two
23  districts were disproportionately affected by SB14, then we
24  know that there's an issue.
25      Q.   So under this Amendment 55, was it your intention, or

---

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

77

1    did the amendment provide for actual data collection by the
2    Secretary of State?
3        A.   I don't recall it -- you know, of course, it's been a
4    while, and so I don't recall it saying that.  But I would need
5    to go back and look at the -- exactly how the amendment was
6    written.  I may have had something there for data collection,
7    maybe I didn't.  I'm not sure.
8        Q.   Do you recall if there was any -- if there were any
9    funds provided for in this amendment to allow the Secretary of
10   State to, you know, conduct the study or collect the data?
11       A.   No, I do not.
12       Q.   Do you think it's possible that the -- that this
13   amendment was not accepted because it would have placed a heavy
14   burden on the Secretary of State's office?
15       A.   No.  I just -- no.  I -- my personal belief is that
16   it was not accepted because, you know, people wanted a strict
17   bill and that was going to be the end of it.  That any serious
18   consideration to prevent discrimination or what have you was
19   never really the concern of the people that were for the bill.
20       Q.   You mentioned a moment ago that under this -- under
21   Amendment No. 55, you thought maybe the media and organizations
22   would be able to determine who was prevented from voting by the
23   Photo ID bill; is that right?
24       A.   Uh-huh.
25       Q.   Do you think that -- do you think it would be

78

1    acceptable for the Secretary of State to rely on media reports
2    and reports of nongovernmental organizations in making a
3    determination about whether a law can take effect?
4        A.   I think that -- that we oftentimes rely on the media
5    to, you know, uncover fraud or bring certain things to
6    revelation for the public, and government will act on that.
7    So -- and so just like I said, I would need to go back and look
8    at the amendment to see how it was worded.  I don't know if I
9    had anything in there for data collection or not.  But, you
10   know, I know that, you know, even outside of the media that,
11   you know, that if someone couldn't vote, I would probably get
12   calls at my office the next day saying, hey, you know,
13   Representative Veasey, I tried to go vote and I took, you know,
14   my card up there that I got from this social service agency
15   that, you know, helps me and I was not able to vote, but I had
16   been doing it before but I couldn't this time.  And so I would
17   think that I would probably get calls from those, you know,
18   voters as well.
19             And so I just think that if there was any
20   evidence and the Secretary of State's office, you know,
21   determined that those voters were ethnic minorities and
22   something should be acted upon.  We just shouldn't say, well,
23   they were discriminated against, and -- well, but they'll get
24   it next time.  I mean, we need to -- you know, something should
25   be acted upon to make sure that doesn't happen again.

79

1        Q.   But this Amendment 55 would have allowed however the
2    data was collected, whether it was actual data or media
3    reports, it would have allowed the Secretary of State to make
4    the determination; is that right?
5        A.   If it were proven to be accurate.  I mean, we
6    wouldn't want anything -- any sort of law passed or any -- or
7    any sort of action taken by any, you know, state agency just
8    based on any sort of, you know, rumor or innuendo.  It would
9    need to be something that was proven.
10       Q.   And so how would the Secretary of State go about --
11   under this Amendment No. 55, how would the Secretary of State
12   determine whether -- you know, whether the facts or the reports
13   or whatever were accurate?
14       A.   Well, I mean, they would have to -- I mean, it's
15   their job to make sure that voting is done, you know, legally
16   and correctly here in the state and that certain laws are
17   followed.  And so I don't know -- I don't know why they
18   wouldn't be able to, you know, ascertain whether or not someone
19   were discriminated against when they went to go vote.  I don't
20   see why they wouldn't be able to easily, you know, verify that.
21       Q.   Do you know whether or not the Secretary of State's
22   office collects racial data on people who register to vote?
23       A.   I'm not certain of that.
24       Q.   If the Secretary of State's office did not collect,
25   you know, or did not have a record of every registered voter's

80

1    race or ethnicity, would they be able to -- would they be able
2    to make the determination provided for in this Amendment No.
3    55?
4        A.   I don't see why they wouldn't be able to.  I mean,
5    they do many other things that are related to voting.  I don't
6    know why they wouldn't be able to put this into their purview
7    if and -- because their job is to make sure that people can
8    vote, that people understand about voting, that people
9    understand the various laws related to voting.  So if someone
10   were discriminated against, I don't know why they wouldn't be
11   able to determine that there was discrimination that took place
12   and make some sort of an action or some sort of a, you know,
13   recommendation on how to prevent that discrimination from
14   taking place in the future.  It just -- it seems -- it just
15   seems very -- it just seems very reasonable to me.  As a state
16   legislator and having served on relations committee, it just
17   seems reasonable to me that they would be able to do this
18   without there being any sort of a -- even any sort of a fiscal
19   impact to the office at all.
20       Q.   For this Amendment 55, did you conduct any study or
21   analysis of the fiscal impact?
22       A.   I believe that there was no fiscal impact on that.  I
23   would need to go back and check, but I believe that there
24   was -- that it was determined that they could probably just do
25   that just as their every day regular duty.  I mean, if people



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

81

1  are calling in or if evidence is presented to them of
2  discrimination, that they, you know, take some sort of action.
3      Q.  Did you or your staff make that determination, that
4  there wouldn't be a fiscal impact?
5      A.  I do not recall.  I do not recall.
6      Q.  Do you recall whether there was a specific
7  determination that Amendment No. 55, if accepted, would not
8  have any fiscal impact?
9      A.  It's been so long, I don't recall anything specific
10 to the fiscal matters or how we determined any numbers or
11 anything of that nature.  It's been so long now.
12     Q.  So you don't recall whether or not there was a
13 specific determination of the fiscal impact of Amendment No.
14 55?
15     A.  I do not recall.
16     Q.  To make this determination under Amendment 55, the
17 Secretary of the State's office would have to be able -- they
18 would have to know the race or ethnicity of individuals voters,
19 though, right?
20     A.  No, not necessarily.  I mean, they would have to
21 after it was presented to them.  Like if I called that office
22 up and I asked to speak to Hope, and I would say, hey,
23 Secretary Andrade, there were, you know, eight African American
24 and Latino voters in my district that were not able to vote
25 because they were told they didn't have the proper ID, I need

---

82

1  for you to look into it.  I don't think that she would need to
2  be able to verify that they were African American.  I think
3  those people would be able to verify for her that they were
4  African American and Hispanic.  If I were to offer up that
5  evidence or if NBC5 were to offer it up, they ought to be able
6  to look into it and find out whether or not that that's true or
7  false.
8      Q.  So for people that report either to you or to their
9  representative or to whomever, for people who report that I was
10 prevented from voting --
11     A.  Right.
12     Q.  -- you would at least have somebody to check with to
13 verify whether they were, you know, a member of the group that
14 they said they were a member of?
15     A.  Right.  Right.  Exactly.
16     Q.  But that would not -- that would still leave out
17 people who, for whatever reason, chose not to report it, right?
18     A.  Yeah, the people that chose not to report it, I mean,
19 I guess there would be no real way of ever knowing that.  And
20 there would be people that wouldn't report.  In my opinion,
21 there would be people that wouldn't report just based on my
22 opinion as a campaign worker.
23     Q.  Right.  So there is some risk, isn't there, that if
24 the Secretary of State, if they can't independently determine
25 who was not able to vote and then also determine the race or

---

83

1  ethnicity of every person who was not able to vote, they
2  wouldn't be able to make an accurate determination of how many
3  of those people were actually minority voters, would they?
4      A.  Yeah.  I mean, if they -- I don't see why not if they
5  were -- if they were -- if they called the office up and they
6  were asked or if I called the office up and I said I have, you
7  know, eight Latino and African American voters in my district
8  that couldn't vote because of SB14, I don't know why she
9  wouldn't be able to determine whether or not they were African
10 American or Hispanic.
11     Q.  And I agree with that.
12     A.  Right.
13     Q.  I guess my point is, the secretary would not have a
14 way to know for sure that there weren't, you know, an equal
15 number of non-minority voters who were prevented from voting?
16     A.  Not -- I mean, now, the other thing that she would be
17 able to do is -- you know, there are voter file systems that --
18 that, you know, people can subscribe to and, you know, things
19 like that and pay for a fee, and they could possibly determine
20 on their own whether or not discrimination has taken place.
21 And those particular voter systems, you know, do keep, you
22 know, race -- records on race and age and whether or not the
23 people are senior citizens.  You know, there are voter file --
24 you know, things that you can subscribe to that certainly has
25 all that information.  So even without people calling in, it

---

84

1  is -- it is reasonable that -- to think that the Secretary of
2  State's office could conduct a study even on their own, even
3  if, you know, me or any other -- or any other state
4  representative never even offered up any opinions or no one
5  ever called in.  So it is -- it is definitely reasonable that
6  they could conduct a study on their own at a minimal cost.
7      Q.  These voter file systems, who maintains or creates
8  these systems?
9      A.  Different people do.  I know that the one that I use
10 is -- that the Texas Democratic Party maintains it.  But I know
11 that that's not the only place where you can get the
12 information.
13     Q.  To your knowledge, does the Republican Party maintain
14 a voter file similar --
15     A.  I wouldn't know.  I'm not sure.  Yeah.  I would not
16 be aware of that.
17         MR. DUNN:  They do but it's not as good.
18     Q.  (BY MR. FREDERICK)  Is there -- do you know of any
19 person or organization, other than the major political parties,
20 that keep -- that maintains a voter file?
21     A.  Well, the various election -- I mean, the county
22 elections administrators they should have that information when
23 they take, you know, Voter ID -- I mean -- the Voter ID -- when
24 they take voter registration cards in and things like that.
25 You could probably be able to get that information from the



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

85

1    various county election administrators.
2        Q.   But voter registration cards don't indicate race, do
3    they?
4        A.   I think that there is an option on there if you want
5    to put what race you are, but it's optional.  I don't think
6    that you have to.
7        Q.   Okay.  So based on registration -- voter registration
8    records alone, that might not allow the secretary to determine
9    the race of every voter who was not able to vote?
10       A.   No.  No.  And you may have a voter that they may have
11   a Hispanic surname, but they may be married to someone that's
12   Hispanic.  So --
13       Q.   Have you talked about this lawsuit with anybody other
14   than, obviously, your lawyers or the Department of Justice?
15       A.   If I have, it's just been in kind of, you know,
16   like -- like I stated earlier with like family or friends
17   saying, hey, I'm a plaintiff in this lawsuit.  I think it's
18   been in the newspaper that I'm a plaintiff in the lawsuit,
19   so -- but, yeah -- but as far as like, you know, declarations
20   or anything specific, no.
21       Q.   You haven't discussed this lawsuit with any of the
22   other parties?
23       A.   I don't believe so.  I know if I have, it's just been
24   in passing, but I don't believe so, though.
25       Q.   I'm going to move to a different area.

---

86

1            Have you ever called point of order on a bill.
2        A.   Yes, I have.
3        Q.   Do you recall -- do you recall when you have done
4    that?
5        A.   I don't remember every time that I've done it, but,
6    yeah -- I mean, but there's one time in specifically that I
7    remember, but I can't remember every time that I've done
8    that.
9        Q.   What's the specific time you remember?
10       A.   There was a Republican from -- that represented New
11   Braunfels, and they had prevented a fairly, you know, innocuous
12   bill that I had from coming out of their committee, and they
13   did it just because I was a Democrat, and based on the
14   conversations that I had with other people that was Republicans
15   and Democrats on the committee.  And they did it for the
16   chairman of the committee who was a Republican, and it was
17   just -- it wasn't like I was asking them to, you know, let some
18   major, you know, liberal piece of legislation out.  I mean, it
19   was a fairly -- and so -- and he had a point of order that the
20   parliamentarian could absolutely not overrule.  I mean, it was
21   just -- it was very black and white, and they could not
22   overrule my point of order, and so that killed his bill.  And I
23   remember it specifically because some people from New Braunfels
24   called the office and asking did I have anything against New
25   Braunfels.  And so that's why I specifically remember that one.

---

87

1    But I know I've called points of order more often than that.
2        Q.   So you called a point of order on a bill -- on this
3    Republican from New Braunfels on his bill?
4        A.   Right.
5        Q.   And you called a point of order because he had
6    prevented one of your bills from coming out of his committee?
7        A.   Right.
8        Q.   Do you remember what the bill was?
9        A.   I say it was from coming out of my committee.  It
10   was -- he had prevented a bill that I had from going under the
11   local and consent calendar.  The bill passed -- it passed like
12   eight to one, but it got put on the general calendar, which
13   means that it probably died.
14       Q.   Do you remember what representative's bill was
15   that you called a point of order on?
16       A.   I don't remember specifically.  It was a local
17   government bill.
18       Q.   When are points of order used in a Legislative
19   Session?
20       A.   Points of order are used in a Legislative Session
21   when another member doesn't agree with the bill.  And so, you
22   know, they scrub the bill or their staff scrubs the bill to see
23   if there are any issues within it, and they call a point of
24   order.
25       Q.   So it's done to -- is it accurate to say that points

---

88

1    of order are called to prevent a specific bill from going
2    forward?
3        A.   Yes.
4        Q.   Did you call a point of order on the Voter ID bill,
5    on SB14?
6        A.   I do not recall.
7        Q.   You don't recall whether you did or not or --
8        A.   Correct, I do not.
9        Q.   If there had been a sustainable point of order on
10   SB14, is it safe to assume that it would have been called by
11   somebody who opposed the bill?
12       A.   Yes.
13       Q.   And SB14 was sent back to the committee in the House
14   based on procedural defects; isn't that right?
15       A.   That is -- I don't remember exactly why, but I do
16   remember that there was a point of order on it that was sent
17   back.
18       Q.   And it got sent back --
19       A.   Right.
20       Q.   -- on a point of order?
21       A.   Right.
22       Q.   And whatever the defect was, did that get remedied
23   out for -- the point of order was called?
24       A.   It must have because the bill end up passing.
25       Q.   Is a point -- is point of order, is that part of the

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

89

1   House rules?
2       A.   Yes.
3       Q.   So calling a point of order is a way to use the House
4   rules to stop a bill or at least slow it down, right?
5       A.   Right.
6       Q.   And there are other House rules that can be used to
7   expedite a bill, right?
8       A.   Yes.
9       Q.   Like, for instance, five-day posting rule?
10      A.   Suspend the rule, absolutely.
11      Q.   What is chubbing?
12      A.   Chubbing is a -- sort of a -- I would describe it as
13  sort of a -- an informal term that is used to -- when members
14  go to the back mic and they ask the author of the bill lots of
15  questions, or if a bill, particular lots of questions, to
16  prevent a bill that is far back in the general calendar from --
17  from taking place.
18      Q.   So in chubbing, a -- so when a bill is chubbed, does
19  that mean that questions are asked about different bills?
20      A.   Correct.
21      Q.   And is the idea -- is the idea to talk about bills
22  that are in front of a bill and kind of order of business in
23  order to just prevent that bill from coming up?
24      A.   Right.  Right.  Exactly.
25      Q.   Is that usual -- I mean, to the extent that there is

90

1   any usual use of chubbing, is it usually done on bills that
2   might not otherwise get a lot of debate?
3       A.   That -- yes and no.
4       Q.   And let me -- as soon as I asked the question, I
5   realized it wasn't very clear.
6            In chubbing when members go to the back mic and
7   ask questions about bills that are in front of --
8       A.   Right.
9       Q.   -- of the line, does it matter what -- does it matter
10  what those bills are?
11      A.   No, it doesn't matter what the bills are.  It does
12  not --
13      Q.   So you just -- is the idea chubbing --
14      A.   It could be a very serious bill, or it could be a
15  bill that would normally just pass out, but, yeah.
16      Q.   But the idea is just to talk about whatever is coming
17  up --
18      A.   Right.
19      Q.   -- just to --
20      A.   Right.
21      Q.   -- to eat up the clock?
22      A.   Right.  It's the House version of the filibuster.
23      Q.   Where is the rule regarding chubbing in the House
24  rules?
25      A.   I do not know if there is a rule on House chubbing.

91

1       Q.   So you're not aware that there is a provision for
2   chubbing in the House rules?
3       A.   No.
4       Q.   Did you engage in any chubbing in the 2009 Session of
5   the Legislature?
6       A.   I do not recall, but -- yeah.  I do not recall if I
7   did or not.
8       Q.   Do you recall that there was any chubbing done in the
9   House in 2009?
10      A.   I would say that there is chubbing that takes place
11  on both sides every Session, particularly towards the end of
12  the Session.  So if you told me that someone did, it would
13  not -- it wouldn't surprise me.  I wouldn't be startled.
14      Q.   Do you recall that there was chubbing in relation to
15  the Voter ID bill, SB362 in 2009?
16      A.   I do not recall.
17      Q.   Do you believe that chubbing is a legitimate maneuver
18  to kill or slow down a bill?
19      A.   Yes.
20      Q.   There was an amendment to the House rules in 2011 --
21  there was an amendment in 2011 to the House rules to limit the
22  practice of chubbing; is that right?
23      A.   I do not recall.
24      Q.   Would you have any reason to dispute that there was a
25  rule change in 2011 to limit chubbing?

92

1       A.   No, I would not.
2       Q.   But you do not recall a specific amendment to the
3   rules?
4       A.   No, I do not.
5       Q.   Have you ever amended a piece of legislation that was
6   under consideration in the House?
7       A.   Yes, I have.
8       Q.   What's the vote count that's required to amend a bill
9   before the full House on second reading?
10      A.   A majority.
11      Q.   A simple majority on second reading?
12      A.   Right.
13      Q.   Is that true for both House bills and Senate bills
14  there on second reading?
15      A.   For Senate bills -- I believe so on Senate bills.  I
16  would need to check to be certain on that, but I believe so.
17      Q.   So it's your understanding that to amend a Senate
18  bill on the House floor, it just requires a simple majority to
19  amend it?
20      A.   I would need to go back -- I would need to go and
21  check on that -- on the Senate to be for sure.  There's --
22  there was one controversy.  We had a home owner's association
23  that -- and it was a Senate bill, and I can't remember.  I'm
24  just -- I'm just temporarily at a loss on the Senate bills.
25      Q.   Have you ever amended a Senate bill that was under



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

93

1   consideration in the House?
2       A.  I don't -- I do not recall.
3       Q.  Are you familiar at all with the Senate rules?
4       A.  No.
5       Q.  Do you know whether a vote in the Senate to concur or
6   got to conference on a bill is decided by a simple majority?
7       A.  I'm not sure.
8       Q.  Do you recall -- in the 2011 Legislature, do you
9   recall how many days past between the day SB14 was referred to
10  committee and the date of the committee hearing?
11          MR. DUNN:  Do you know which committee
12  conference or --
13      Q.  (BY MR. FREDERICK)  Oh, this would be -- this would
14  have been the select -- not the conference committee.  Do you
15  recall how many days passed between the day the bill was
16  referred to committee and the date of the committee hearing?
17      A.  I do not.
18      Q.  If I represented to you that SB14 was referred to the
19  select committee on February 9th, 2011, does that refresh your
20  memory?
21      A.  Not really, it does not refresh my memory.  I do
22  remember that it -- that it happened early on in the months.
23  The House members was both Republican and Democrat where that
24  he wanted to make sure that he had it done quickly so that
25  the -- you know, so the conservatives weren't mad at the

94

1   speaker.
2       Q.  As you sit here, would you have any reason to dispute
3   that the bill -- that SB14 was referred to committee on
4   February 9th, 2011?
5       A.  No, I would not have any reason to dispute that.
6       Q.  Do you recall that the hearing on SB14 in the
7   committee was posted on February 22nd, 2011?
8       A.  No, I don't have any reason to dispute that.
9       Q.  And if I represented to you that the hearing was --
10  the hearing on SB14 in the committee was held on March 1st,
11  2011, would you have any reason to dispute that?
12      A.  No.
13      Q.  So based on that, would you have any reason to
14  dispute that there was seven days that passed between the date
15  the hearing was posted and the date that the hearing was held?
16      A.  No, I would have no reason to dispute that.
17      Q.  What's the -- what's the normal rule for how long a
18  hearing has to be announced before it's held in the House?
19      A.  There is a -- what is it?  A 48-hour layout rule
20  or -- I can't remember the time period exactly.  But it's -- I
21  want to say it's 48 hours.
22      Q.  Okay.  Is there a -- is there a five-day posting
23  rule?
24      A.  I believe so.  I think that's right, yeah.
25      Q.  And so whether it's a 48-hour layout rule or a

95

1   five-day posting rule, seven days would be more than the
2   required notice, right?
3       A.  Right.
4       Q.  Is it unusual to provide more than the required
5   notice for a committee hearing in the House?
6       A.  Is it unusual to provide more?
7       Q.  More than the required notice?
8       A.  I couldn't say whether it's unusual or not.  The only
9   time that people really notice is when -- if a rule was
10  suspended.
11      Q.  And you were a member of the select committee on
12  voter identification and voter fraud in 2011, weren't you?
13      A.  That is correct.
14      Q.  Were you the vice chair of that committee?
15      A.  That is correct.
16      Q.  And so you attended the committee hearing -- the
17  select committee's hearing of SB14?
18      A.  Yes, absolutely I did.
19      Q.  How long did that committee hearing last?
20      A.  I want to say it lasted two days.
21      Q.  Okay.  Is that more than -- is that more than the
22  average committee meeting?
23      A.  Yes.
24      Q.  Is there kind of a ballpark in your mind range of how
25  long a typical committee hearing lasts?

96

1       A.  No, it just depends on the bill.
2       Q.  But two days is longer than average?
3       A.  Two days is longer than average for a controversial
4   bill, not necessarily.
5       Q.  But compared to --
6       A.  But compared to, yeah if you're just passing a bill
7   to, you know, allow cities to build spray parks, then, yeah,
8   you know, that's going to pass out in the committee really
9   quickly.  But, yeah, if it's really controversial, a bill in
10  public health or state affairs, you know, sometimes that
11  will -- it'll go into the next day if it's a really
12  controversial bill.
13      Q.  Do you recall how much time passed between the time
14  of the select committee's hearing of SB14 and the floor debate
15  in the House on SB14?
16      A.  I do not recall.
17      Q.  If I represented to you that it was two weeks, would
18  that refresh your memory?
19      A.  It would not refresh my memory, but considering that
20  I remember that he called the bill pretty early on during
21  Session, I would say that -- that that would -- yeah, that
22  wouldn't surprise me.
23      Q.  Do you believe that members of the public were given
24  adequate time to participate in the Voter ID hearing in the
25  House?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

97

1      A.   Now, I do not know that.
2      Q.   Do you believe that the public was given adequate
3  notice of the committee hearing on SB14 in the House?
4      A.   I do not know.
5      Q.   Do you believe the public was given adequate notice
6  of the floor debate on SB14 in the House?
7      A.   I would need -- I would need to go back and check.
8      Q.   If there were -- if there were two weeks between the
9  committee vote and the floor debate, would that be adequate
10  notice to the public about the floor debate?
11      A.   I would say, yes.
12      Q.   And if there were seven -- if the committee hearing
13  were posted seven days before it was held, would that provide
14  adequate notice to the public about the committee hearing?
15      A.   I would say, yes.  It would still be tough to get
16  people to come in on a weekday or something like that to
17  testify on a bill, but I would say -- but generally speaking,
18  yes.
19      Q.   Would you agree that representatives to the Texas
20  House have a duty to represent their constituents?
21      A.   Yes.
22      Q.   Would you agree that an elected official's most
23  important duty is to represent his or her constituents?
24      A.   Yes.
25      Q.   And would you agree that part of the duty of an

98

1  elected official in representing his or her constituents is to
2  enact policies that his or her constituents favor?
3      A.   Yes.
4      Q.   Would you agree that there's nothing wrong when a
5  representative votes for a policy that's favored by his
6  constituents?
7      A.   I mean, it depends.  I mean, if they -- whether or
8  not they believe that that's the right policy.  But generally
9  speaking, I would say I would agree with that.
10      Q.   So as long as -- fair enough.
11           As long as a representative believes that it's
12  good policy --
13      A.   Right.
14      Q.   -- there's nothing wrong with voting for a policy
15  that's favored by one's constituents?
16      A.   Right.
17      Q.   And generally speaking, it's politically rationale
18  for an elected official to vote for policies that his
19  constituents with favor?
20      A.   Right.
21      Q.   Do you have any basis to dispute that Photo Voter ID
22  for voting is supported by a majority of voters in Texas?
23      A.   The majority of voters in Texas?
24      Q.   Voters in Texas.
25      A.   That would not surprise me.

99

1      Q.   Have you seen any -- are you familiar with polling
2  about -- polling of Texans to determine support for Photo Voter
3  ID requirements?
4      A.   Yes, I have.
5      Q.   Do you recall specific polls you've seen?
6      A.   I don't recall specific polls that I've seen, but I
7  know that during the Voter ID debate, that those particular
8  polls were often cited.
9      Q.   Do you recall what the polls showed?
10      A.   The polls showed that -- that there was support for
11  Voter ID.  But, of course, with the way that the polls were
12  worded, I think that would be the reason why you would see the
13  results the way they were.  I think that if I were to conduct
14  the poll and I worded it the way that I wanted, I think that I
15  probably could have gotten a little bit different results.
16      Q.   Do you recall any of the specific wording in the
17  polls that were discussed in the legislative debate on SB14?
18      A.   I don't remember anything specifically, but I do know
19  they were cited.
20      Q.   How would you -- if you were to conduct a poll on --
21  you know, of Texans on support for Photo Voter ID, how would
22  you phrase the question?
23      A.   I would say do you favor a Voter ID bill that puts
24  a -- has to proof -- has to put a burden on the voter to prove
25  who they were and may have a discriminatory effect on certain

100

1  voters, would you still be in favor of it.  I would ask
2  something along on those lines instead of are you for a Photo
3  ID bill.  I wouldn't just ask that way.  I would like, you
4  know, ask based on what I believe, you know, the bill does.
5           MR. FREDERICK:  Would you please mark this as
6  Exhibit 2.
7           (Deposition Exhibit No. 2 was marked.)
8      Q.   (BY MR. FREDERICK)  So the court reporter has just
9  handed you a document that's been marked Deposition Exhibit 2.
10      A.   Yes.
11      Q.   Are you familiar with this document?
12      A.   No, I'm not familiar with this document.
13      Q.   What does this document appear to be?
14      A.   It is a -- it looks like it's a poll.  It looks like
15  it's a survey.
16      Q.   And it's a survey or a poll conducted by Lighthouse
17  Opinion Polling; is that right?
18      A.   That would be correct.
19      Q.   Have you seen this poll before?
20      A.   I have not seen this particular poll before.
21      Q.   Have you heard this poll mentioned before?
22      A.   I do not believe so.
23      Q.   Okay.  If you will turn -- the pages are not marked,
24  but if you'll turn to the third page of the exhibit.
25      A.   (Witness complies.)



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Marc Veasey                                                    June 7, 2012

---

**101**

1  Q.  Down at the bottom, it says Photo Voter ID
2  Requirement, do you see that?
3  A.  Yes.
4  Q.  And the question is, Do you favor or oppose requiring
5  a valid Photo ID before a person is allowed to vote; is
6  that right?
7  A.  Yes.
8  Q.  And this poll shows that 75 percent of Democrats
9  favor -- or responded that they favored such a requirement; is
10  that right?
11  A.  Yes.
12  Q.  And 94 percent of Republicans favored the
13  requirement?
14  A.  Yes.
15  Q.  And then over on -- to the right where it says,
16  Favor, it shows 80 -- it says, White, and 86 percent favor; is
17  that right?
18  A.  Yes.
19  Q.  And then it says, Black, and 82 percent favor; is
20  that right?
21  A.  Yes.
22  Q.  And then it says, Hispanic, and then 83 percent
23  favor; is that right?
24  A.  Yes.  Yes.
25  Q.  So at least based on this poll, this would indicate

---

**102**

1  that a pretty overwhelming majority of Texans -- the Texas
2  voters favor a Photo Voter ID requirement; is that right?
3  A.  I would say based on this particular poll, yes.
4  Q.  Sure.  And this poll shows that Texas voters
5  overwhelmingly favor a valid Photo ID requirement to vote
6  regardless of political affiliation; is that right?
7  A.  Yes.
8  Q.  And this poll also shows that Texas voters
9  overwhelmingly favor a valid Photo ID requirement for voting
10  regardless of race or ethnicity; is that right?
11  A.  Yes.
12  Q.  Are you familiar with any other specific polls of
13  Texas voters about Photo ID requirements?
14  A.  I cannot think of any specifically, but I do know
15  that there are other polls out there and that I think have been
16  on various, you know, Web sites and things like that that
17  legislators would normally read.
18  Q.  Based on this poll that we're looking at in Exhibit
19  2, would it be reasonable for a legislator to conclude based on
20  that poll that most Texans favored Photo ID requirement for
21  voting?
22  A.  Yeah, I think based on the way that it's written, I
23  would say that, yes.  Based on the way the polling question was
24  asked.
25  Q.  And so a representative whose constituents were in

---

**103**

1  favor of a Photo Voter ID requirement would be acting in
2  politically rationale manner if he or she supported a bill that
3  supported a bill that required Photo ID to vote, right?
4  A.  No, not necessarily.  Because of the way the question
5  is worded, it doesn't tell the entire story.
6  Q.  Oh, sure, yeah, I should have been clear.
7  A.  Right.
8  Q.  I'm not --
9  A.  Right.
10  Q.  I'm talking about the poll anymore.
11  A.  Oh, okay.
12  Q.  Just generally speaking, if a representative knew
13  from whatever source that his or her constituents favored the
14  Voter ID, then it would be politically rationale for that
15  representative to vote for a Photo ID bill?
16  A.  Unless they thought there was some sort of
17  discrimination that was taking place, then it wouldn't be
18  rationale.
19  Q.  Fair enough.
20  So if a representative knew that his
21  constituents were strongly in favor of a Photo ID bill and the
22  representative also did not believe that it would have any
23  discriminatory affect on minority voters, then it would be
24  rationale for that representative to vote on the Photo ID
25  bill.

---

**104**

1  A.  Yes.
2  Q.  Okay.  And under those circumstances, it would be not
3  racially discriminatory for that representative to vote for a
4  Photo ID bill; is that right?
5  A.  If it were based on those circumstances alone, that
6  would be correct.
7  Q.  Have you ever decided to introduce or carry a bill
8  because a constituent asked you to do so?
9  A.  Oh, yeah, I would say that I listen to what my
10  constituents wanted and base my bill -- the bills that I file
11  heavily weigh on what they say.
12  Q.  When constituents either asked you to introduce a
13  bill or indicate that they really favor a particular bill, do
14  you undertake any kind of factual or empirical analysis to
15  determine if there's a need for that bill?
16  A.  Yes.  I would definitely, you know, seek out the
17  opinions of others, do research and study, you know, get as
18  many, you know, documents that I could find, seeing this is
19  really a problem or is this something that just one particular
20  constituent has an issue with.  Absolutely.
21  Q.  Can you recall any specific bill where you undertook
22  a factual or empirical analysis to determine that there was a
23  need for that bill?
24  A.  Yeah, I would say that most of the bills that I file,
25  that I would look to see whether or not it's really necessary

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

105

1    before I filed them and do some sort of an analysis.
2        Q.  Can you think of any specific bill where you've
3    conducted a factual analysis to determine if the bill was
4    necessary?
5        A.  I would say that just about every bill that I file,
6    if there's some sort -- there's some sort of an analysis done.
7    To -- you know, to what extent the analysis -- what you
8    consider an analysis is, you know, obviously -- you know, I
9    don't -- I don't go and pay an expensive polling company to --
10   you know, to come in and do research in my district every time
11   I file a bill, but I do definitely -- I take lots of different
12   things into consideration.
13       Q.  Can you describe generally what the typical analysis
14   is that you undertake to determine whether a bill is necessary
15   or not?
16       A.  I would say from town hall meetings in your district,
17   from different resources that you read.  Like if you hear
18   that -- if your constituent is telling you that health care is
19   an issue, then you may, you know, like find out like what's
20   going on in other state legislatures around the country on how
21   to address certain issues pertaining to health care.  And so
22   you may do -- you may get the idea from your constituents, but
23   you may get further details on how to craft the bill, you know,
24   based on, you know, other things that you read in journals or
25   other periodicals.

106

1        Q.  And how would looking at what other state
2    legislatures are doing, how would that tell you whether the
3    legislation is necessary or not?
4        A.  I would -- I would -- I wouldn't base that on what
5    the state legislature is doing.  I would base that more on the
6    side where I would be listening to what my constituents were
7    saying.
8        Q.  If -- let me ask you this.  If your constituents are
9    telling you that there is a need for a specific piece of
10   legislation, would that be enough for you to conclude that
11   there is a need for that legislation?
12       A.  Not necessarily.  Because sometimes there will be
13   something that you think is not right or something that you
14   think is wrong, and so you wouldn't necessarily want to advance
15   something that you thought was wrong, you know, just because a
16   lot of people are asking you to do it.  I mean, sometimes you
17   need to, you know, sit down and show people that, no, here's
18   what would happen if we were to ask for A, B and C, and so we
19   may want to think twice before we ask for A, B and C.
20       Q.  So other than what you learn in town hall meetings or
21   what other state legislatures are doing, what would you do when
22   you thought there was more work to be done?  What would you do
23   to figure out if there was really a need for legislation that
24   your constituents wanted?
25       A.  There would be, you know, lots of other, you know,

107

1    studying that can be done through the House research
2    organization.  Like there are other -- you know, like the
3    different Legislative Think Tanks, talk with them to determine
4    whether or not, you know, this is reasonable or this particular
5    idea is even feasible and whether or not it's going to work,
6    whether or not there is a fiscal impact.  You know, all sorts
7    of different things.  You know, your constituents may want
8    something that there's going to be a huge fiscal impact, and so
9    you wouldn't necessarily, you know, advance something that
10   would cost the state lots of money that the state doesn't have
11   the money to pay for.
12       Q.  Right.  So if your constituents wanted another
13   international airport right in the middle of Fort Worth --
14       A.  Right.  Exactly.
15       Q.  -- you might have to look at --
16       A.  Right.  Right.  Exactly.
17       Q.  Are there specific think tanks or research
18   organizations other than the House research organization that
19   you have consulted about bills or about potential bills?
20       A.  Yeah, absolutely.
21       Q.  What -- can you tell me what some of those are?
22       A.  Center for Public Policy Priorities, the Texas State
23   Teacher's Association, the NAACP.  Oh, God, man, I mean, lots
24   of different organizations.  Yeah, absolutely.
25       Q.  Kind of depends on the bill, I guess?

108

1        A.  Right.  Right, exactly.
2        Q.  Can you -- can you identify or remember a specific
3    bill that your constituents favored or asked you to introduce
4    that you conducted extra research to make sure it was
5    necessary?
6        A.  I can't think of anything specific right off the top
7    of my head, but I'm certain that, yes, absolutely I have.
8        Q.  Can you think of any specific bills where your
9    constituents really favored something and you didn't conduct
10   more -- you know, other research to determine if it was
11   necessary?
12       A.  I can't think of anything off the top of my head
13   right now.
14       Q.  Have you ever -- to the extent you can recall, have
15   you commissioned any kind of survey or poll to determine
16   whether a bill was necessary?
17       A.  I've done very informal surveys like on my
18   newsletters, like the state newsletters, asking people, you
19   know, certain questions.  Do you favor this?  Do you favor
20   that?  Please send it back if you do.  Obviously that's not the
21   most accurate way to get a reading of something.  Obviously
22   you'd want to do, you know, something that's a little bit more
23   scientific.  But I have done, you know, more informal things
24   like that where I have asked people to reply back to a
25   newsletter that I sent out, you know, asking them, you know, do



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

109

1  they favor A, B or C.
2      Q.  Who gets your newsletters?
3      A.  The constituents that I represent.
4      Q.  And so something like the poll that we've got marked
5  as Exhibit 2, that would be --
6      A.  Yes.
7      Q.  It's fair to say that that's kind of the formal end,
8  you know, of investigation about a bill?
9      A.  Not necessarily.  You still want to talk to other
10  members.  Like you may want to talk to a member that has
11  expertise in a certain area.  Like if I was going to file a
12  bill on education, then you could talk to Scott Hoppler after
13  you've, you know, gotten everything else from, you know, Texas
14  State Teacher's Association.  You know, or LULAC or NAACP on
15  anything that deals with, you know, on education.  Maybe you
16  would go to Scott then to say, Scott, here's the idea that they
17  brought to me.  What do you think about it?  So, you know,
18  maybe you'll talk to other legislators that have specific
19  expertise in a certain area.
20      Q.  Have you ever commissioned any kind of academic study
21  to determine whether a particular bill was necessary?
22      A.  No.
23      Q.  Have you ever commissioned a formal poll to determine
24  whether a specific bill was necessary?
25      A.  No.  A formal poll, you mean like a --

110

1      Q.  (Indicates.)
2      A.  No.
3      Q.  So you've never commissioned a formal poll such as
4  the one we've got as Exhibit 2 --
5      A.  Right.
6      Q.  -- to determine whether a bill is necessary?
7      A.  That would be correct.
8      Q.  Are you aware whether or not there's a mechanism in
9  the House rules to waive certain procedural requirements to
10  expedite a bill's --
11      A.  Yes.
12          THE REPORTER:  I'm sorry.  He cut your last word
13  off.  To expedite a bill's --
14          THE WITNESS:  I think I said "process."
15          MR. DUNN:  Procedural requirements is what I
16  remember.
17          MR. FREDERICK:  Okay.  At the end?
18          MR. DUNN:  Yes, sir.
19      Q.  (BY MR. FREDERICK)  Let me -- I'll ask it again.
20          Are you aware whether the House rules provide a
21  mechanism to waive certain procedural requirements in order to
22  expedite a bill's progress through the Legislature?
23      A.  There are rules to expedite bills through the regular
24  House rules, absolutely.
25      Q.  And is one example of that waiving the five-day

111

1  posting rule in the House?
2      A.  Yes.
3      Q.  Have you ever had a bill set for hearing after the
4  five-day posting rule was suspended that you can recall?
5      A.  Not that I can recall off the top of my head, no.
6      Q.  Is it your belief that you've never set a bill for
7  hearing after suspending the five-day posting rule?
8      A.  I would need to go back and check the House journal.
9  I'm just not -- I just can't answer that to be certain.
10      Q.  So right now based on just your recollection, you
11  can't --
12      A.  Yeah.
13      Q.  -- say for sure whether you have or have not set a --
14      A.  No.
15      Q.  -- bill for hearing after the --
16      A.  No, I have no recollection.
17      Q.  -- after the dive-day posting rule was suspended?
18      A.  I have no recollection.
19          Can we go off the record real quick so I can run
20  to the restroom?
21      Q.  Oh, of course, yeah.
22          (Break was taken at 12:14 p.m. to 12:21 p.m.)
23          (Deposition Exhibit No. 3 was marked.)
24      Q.  (BY MR. FREDERICK)  Okay.  The court reporter has
25  handed you what's been marked as Deposition Exhibit 3.  Can you

112

1  take a moment to look at this, and can you identify this
2  document for the record.
3      A.  Oh, Twitter.
4      Q.  You may have to open it up to see.
5      A.  Yes.
6      Q.  Does this appear to be your Twitter account --
7      A.  Yes.
8      Q.  -- or a printout of your Twitter account?
9      A.  Yes.
10      Q.  If you would, turn to -- with me to Page 27.
11      A.  Okay.
12      Q.  And if you look down, it's the -- it's by the second
13  to last entry down there.  It says, I will also serve as vice
14  chair of a select committee that will look into the fictitious
15  charges of voter fraud; is that accurate?
16      A.  Yes.  Yes.
17      Q.  And you typed that?  You wrote that?
18      A.  Yes.
19      Q.  And it looks like --
20      A.  Well, if I didn't write it, somebody from my staff
21  did.
22      Q.  Okay.
23      A.  Or I would have authorized it, yeah.
24      Q.  And it shows that this was -- this statement was made
25  on February 15th, 2011; is that right?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

113

1    A.  Yes.
2    Q.  At the time this statement was made, February 15th,
3  2011, had the select committee heard any testimony on SB14?
4    A.  I do not recall.  This sounds like, by the way the
5  sentence is written, that, no.
6    Q.  Okay.  And to the best of your knowledge, at the time
7  this statement was made, had the select committee received
8  any -- any kind of evidence on SB14?
9    A.  No.
10   Q.  But in this statement, you characterize charges of
11  voter fraud as fictitious --
12   A.  Yes.
13   Q.  -- is that right?
14   Q.  Had you already made up your mind at this point
15  that there was no voter fraud in Texas?
16   A.  I was basing this up on my time in the Legislature
17  since 2005 when, you know, year after year, committee hearing
18  after committee hearing, we were -- we've asked the Attorney
19  General's office, we asked the chairman of the committee,
20  whether it was Leo Berman or whomever, the different groups
21  that came to testify on behalf of the Voter ID bill to show
22  evidence of voter fraud, and they never did.
23   Q.  So is it your contention that there is no voter fraud
24  in the State of Texas?
25   A.  My contention is that I do not know of any voter

114

1  fraud in the State of Texas, and I have never been shown
2  anything over all these years to prove there was any voter
3  fraud in the State of Texas.
4    Q.  Any voter fraud at all?
5    MR. DUNN:  Are you talking about any voter fraud
6  or in-person voter fraud?
7    MR. FREDERICK:  Right now I'm talking about any
8  voter fraud.
9    MR. DUNN:  Okay.
10   Q.  (BY MR. FREDERICK)  And just to be clear, referring
11  back to the statement in Exhibit 3, I believe it says,
12  Fictitious charges of voter fraud.  So right now I'm just
13  talking about any voter fraud.
14   A.  Right.
15   Q.  Is it your contention that there's not any voter
16  fraud in the State of Texas?
17   A.  No, I'm not going to say that there's not any voter
18  fraud in Texas.  I've not seen any evidence of -- well, because
19  this particular committee, this vice -- as this select
20  committee was specifically designed to only pass out the
21  voter -- the Photo ID bill.  And so based on my previous
22  experience in the Legislature and after going to committee
23  hearing after committee hearing, I would say that for this
24  specific committee was asked to look into, I have never seen
25  any -- any charges of voter fraud.  And the only charges of

115

1  voter fraud that I had ever heard of had been fictitious.  They
2  had all been sort of either been rumored, innuendo or totally
3  completely misunderstandings.
4    Q.  Okay.  Now, you the mentioned the scope of the
5  committee.  So SB14 was -- the purpose of SB14 was to address a
6  specific type of voter fraud, right?
7    A.  Yes.
8    Q.  And the purpose was to address in-person voter fraud,
9  right?
10   A.  Right.
11   Q.  As opposed to say mail-in ballot fraud?
12   A.  Right.
13   Q.  Is it your contention that there is no in-person
14  voter fraud in Texas?
15   A.  I don't believe that there is in-person voter fraud
16  going on in Texas because I've not seen any evidence of
17  in-person voter fraud in Texas.
18   Q.  Are you able to swear under oath today that there is
19  no such thing as in-person voter fraud in Texas?
20   A.  I cannot swear under oath that I know anything 100
21  percent certain, but based on the evidence that I've seen and
22  been presented to me, it's not a problem in the State of Texas.
23   Q.  What kind of evidence would it take to change your
24  mind to make you think that there is a problem with in-person
25  voter fraud in Texas?

116

1    A.  If there was a fail-safe -- like, for instance, one
2  thing if there was like a fail-safe affidavit like the
3  amendment that I had and everyone that signed those fail-safe
4  affidavits around the state, if they were examined thoroughly
5  and you could show that there was, you know, people that were
6  committing voter impersonation, then I would believe that there
7  was a problem with voter fraud in the state.
8    Q.  So if there were one conviction of somebody for voter
9  impersonation fraud, would that be enough to make you believe
10  that there was potentially a problem with voter fraud in
11  Texas?
12   A.  If there was one?  No, not if there was one person.
13   Q.  How many --
14   A.  I mean, I can't think of any -- I can't think of
15  any -- for my entire time in the Texas Legislature and just
16  studying, you know, public policy, I mean, I cannot think of a
17  time to where we passed any sort of a bill based on one
18  particular occurrence or incident or something that an
19  individual did ever.  It's just hard for me to -- I can't think
20  of that.
21   Q.  All right.  How many convictions of in-person voter
22  fraud would it take to make you believe that there was some
23  problem with in-person voter fraud in Texas?
24   A.  I would think that there would need to be like a --
25  clearly a problem.  Like there would need to be clear



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

117

1   documentation that there is a wide -- that there is widespread,
2   you know, voter fraud going on.  Those are certainly the
3   accusations that have been made, is that there's widespread
4   voter fraud in the State of Texas.  When people come and
5   testify, when these various conservative groups come before,
6   whether it's elections committee or whether it's this special
7   select committee that I was on, it was always -- they always
8   said that there's widespread voter fraud going on, and I just
9   never saw any evidence of it.  And I think that if there was
10  evidence of it, then, yeah, of course, we all want something to
11  be done -- we don't want to be unfairly.  We want something to
12  be done.
13       Q.  It's your understanding that in-person voter fraud
14  would be more difficult to detect than mail-in voter fraud
15  under the current system?
16       A.  Which one would be more to difficult detect under the
17  current system?
18       Q.  (Shakes head up and down.)
19       A.  It's hard for me to say certainly which one would be
20  harder to detect.  I mean, there are -- people could make
21  points on both -- for both on why, you know, one may be worse
22  than the other.  So I just -- it would be hard for me to say
23  which one is worse than one or the other.
24       Q.  Do you believe that there's some problem with mail-in
25  ballot fraud in Texas?

118

1       A.  I -- I've -- and I've heard in certain areas that
2   there have been some issues with it.  But I would say that
3   generally speaking, that most people really see it as a
4   convenient way of voting.  I know that when I went door-to-door
5   just, you know, these last couple of weeks of early voting, you
6   know, just a few weeks ago here, that the elderly people that
7   for whatever reason had misplaced their ballots and couldn't
8   find them, that they really wanted to vote by mail, and they
9   saw it as a convenience.  But certainly that there is -- you
10  know, like anything else, if there's any sort of abuses going
11  on, it needs to, you know, be rooted out.
12       Q.  Do you believe that there is abuse of mail-in
13  balloting that happens in Texas?
14       A.  I would -- I do not have any personal recollection of
15  it, so I wouldn't be able to say certain if that is the case.
16  But I don't -- I don't think that has been an issue here, I can
17  say that.
18       Q.  When you say "here" --
19       A.  In Fort Worth.
20       Q.  Have you seen any evidence as a legislator that there
21  is mail-in ballot fraud going on in Texas?
22       A.  There have been a couple of articles, you know, in
23  the paper about some problems with mail-in ballots.  But still,
24  though, I would say, you know, 95 percent of the time, most
25  people that mail in their ballots, they see it as a -- as an

119

1   easy and convenient way of voting.  At least that's my -- that's
2   that's my personal experience and just from talking with
3   different people and talking with senior citizens.
4        Q.  Do you believe there is a legitimate concern in Texas
5   about mail-in ballot fraud?
6        A.  No, I don't think there's a legitimate concern.  I
7   think there is a legitimate concern for any -- there's a
8   potential for anything to go bad.  But I don't think that --
9   that -- currently speaking, I don't think that there is that
10  big of an issue.
11       Q.  Would you have any specific reason to disagree with
12  another legislator maybe in a different part of the state who,
13  based on his or her own experience, thought that there was a
14  problem with mail-in ballot fraud?
15       A.  No.
16       Q.  Would you have any reason to disagree with a
17  legislator from another part of the state who, based on his or
18  her experience, thought that there was a legitimate concern
19  about in-person voter fraud?
20       A.  I would want to see, you know, what sort of evidence
21  that they would prevent.
22       Q.  What sort of evidence have you seen of mail-in ballot
23  fraud?
24       A.  I've not seen any evidence of mail-in ballot fraud.
25  Just I've only heard, you know -- you know, various stories

120

1   about it being an issue in other -- in parts of the states
2   outside of North Texas.  But I've not -- you know, me
3   specifically, I don't know of any issues.
4        Q.  But based on the stories you've heard, you think that
5   if someone from maybe another part of the state thought there
6   was mail-in ballot fraud going on, you wouldn't have any reason
7   to disagree with them, right?
8        A.  Not necessarily.
9        Q.  But you're not aware of any specific evidence of
10  mail-in ballot fraud?
11       A.  No.
12       Q.  And you're not aware of any actual convictions for
13  mail-in ballot fraud, right?
14       A.  It seem -- there does seems like there's someone
15  who's been convicted for it before.  It seems like I do vaguely
16  remember that.
17       Q.  Is that enough to -- is that enough to make you think
18  that there's a legitimate concern in Texas about mail-in ballot
19  fraud?
20       A.  Not one person, no.  I would say.
21       Q.  Do you believe there's a legitimate concern in Texas
22  about mail-in ballot fraud based on what you -- what you know?
23       A.  No.  I would say, no.  I would say that there may
24  have been areas in the state where there have been some
25  problems, but overall most people like it, especially now where



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

**121**

1   most of the people that are 65 or older.  They can read, write.
2   You know, they're from the, you know, baby boom generation, the
3   people that are getting older now.  And, you know, obviously
4   with previous generations where people, you know, necessarily
5   didn't have as much formal education and people would stop
6   going to school 7th, 8th grade, what have to go work in the
7   farmer -- in the farms and fields and things like that.  When
8   those people became older, then there could be some issues.
9   But I think that overall, most of the people that I talk to,
10  they love it.  They absolutely love it.  It's just not -- just
11  hadn't really been an issue.
12      Q.  You're not aware of any specific instance where
13  somebody has been convicted of mail-in ballot fraud; is that
14  right?
15      A.  I do -- I do vaguely remember some people that have
16  been in trouble for it or reading some articles in the paper
17  about it.
18      Q.  So you've read some articles about people being in
19  trouble for mail-in ballot fraud.
20          Do you know if those people were convicted?
21      A.  I don't remember if anybody was specifically
22  convicted.
23      Q.  Do you know if any of those people were indicted?
24      A.  I do -- it does seem like I remember some minorities
25  being indicted for vote-by-mail problems.  Because I think that

---

**122**

1   was one of the issues that we raised specifically, was that it
2   seems like the people that were -- that seemed to be targeted
3   were minority.
4       Q.  Are you aware of any newspaper stories or articles
5   about in-person voter fraud?
6       A.  Yes.  There was an article in the Star-Telegram maybe
7   a month ago.
8       Q.  And was that the case -- I believe it was a precinct
9   chairman or someone who --
10      A.  Yes.
11      Q.  It was an instance of alleged in-person voter fraud
12  in Fort Worth?
13      A.  Yes.
14      Q.  Okay.  And there was actually an indictment in that
15  case; is that right?
16      A.  I believe so, yes.
17      Q.  So based on that indictment -- well, are you familiar
18  with any other stories, reports of in-person voter fraud
19  anywhere in Texas?
20      A.  I can't think of any other ones.  That's the only
21  one -- I mean, since we've been studying this, that's the only
22  one.  There was another one.  There was a gentleman from
23  Houston.  It was a white male, and he cast a fraudulent ballot,
24  but he thought that because he was a -- he was not a U.S.
25  citizen, he thought that because -- since he was from Canada

---

**123**

1   and he was a resident alien that he could vote.  And so they
2   ended up -- he didn't cast a fraudulent ballot, but he had an
3   ID.  It wasn't a case of voter impersonation.  It was just a
4   case where he had mistaken -- and he wanted to vote straight
5   Republican, my understanding.  So --
6       Q.  But you're aware of one in-person ballot fraud case
7   in Houston, and then there's one case of in-person voter fraud
8   in Fort Worth.
9           Are you aware of any other stories about
10  in-person voter fraud in Texas?
11      A.  No, those are the only two that I can think of.
12      Q.  And then remind me, the mail-in ballot fraud.  You
13  said you heard stories of mail-in ballot fraud.  Can you remind
14  me what those are?
15      A.  There was the case of a lady in Texarkana, and I know
16  that there was a lady here in my district who -- who ended
17  up -- it's sadly, still in a nursing home because she was --
18  some people came to visit her house, and she was in the shower
19  and it scared her.  And she ended having medical issues and
20  things like that, and I know that someone had accused her of
21  voter fraud and she hadn't committed it.  And so I know that
22  there were like several minorities that were, you know,
23  targeted by the AG's office for vote-by-mail fraud, but I don't
24  know -- I don't think that anyone was ever convicted.
25      Q.  Was there a conviction in the Texarkana case?

---

**124**

1       A.  I do not remember if there was a conviction in the
2   Texarkana case.  I don't know if she -- I don't remember what
3   was the ultimate outcome of that case.  I don't remember.
4       Q.  Based on what you know about mail-in ballot fraud, do
5   you think it's possible that someone could reasonably believe
6   that there is a potential problem with mail-in ballot fraud in
7   Texas?
8       A.  Yes.
9       Q.  And based on what you know about in-person voting
10  fraud, do you believe someone could reasonably think there
11  might be a problem with in-person voter fraud in Texas?
12      A.  Based on everything that I have seen, I just don't
13  see how anybody can think that that's a legitimate problem.
14  Based on every in-person -- all the evidence that's been
15  presented, like all of the people with such zeal and such, you
16  know, determination to prove that there is in-person voter
17  fraud, impersonation going on, and it just hasn't been proven.
18  I just don't see how it is a real problem in this state.  I
19  mean, and you're talking about some people that are just real
20  zealots who just want to show -- they want to be the person
21  that discovers that this is going on, and they just -- and
22  nothing has come of it.
23      Q.  So you don't think there's a reasonable basis to
24  believe in in-person voter fraud, right?
25      A.  Right.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

---

125

1    Q.  You do believe there's a basis to believe in mail-in
2  voter fraud, right?
3    A.  I think that just the idea of someone voting outside
4  of a voting booth could be -- could lead people to think that
5  there could be some concerns just because you're voting outside
6  of a booth.  So that -- you know, but when you go and vote
7  someplace and people are going to see your face, people are
8  going to -- you have to sign something.  You know, there are
9  penalties.  I mean, it's a lot different than when your home
10 becomes your polling place.
11   Q.  Do poll workers have the authority to arrest people
12 for suspecting in-person voter fraud?
13   A.  That, I'm not certain.  I'm not certain of that.  I
14 had a poll worker tell me on election day this past weekend, it
15 was a Republican poll worker that was working over here in
16 southeast Fort Worth, and he told me that he does have the
17 power -- that he does have the power to detain if there were
18 certain activities going on, you know, within 500 feet of the
19 polling.
20   Q.  Oh, that would be election hearing, too close to the
21 polling place?
22   A.  Right.  Right.  Exactly.
23   Q.  You don't know of any specific authority to detain
24 somebody who's suspected of not being the person who they say
25 they are?

---

126

1    A.  I do not know if they have that ability or not.
2    Q.  Isn't it true under the current system that in order
3  for somebody to be caught for voter fraud, somebody would have
4  to recognize them and know that they were not the person they
5  purported to be based on their registration card?
6    A.  Yes, I would say that's correct.
7    Q.  So it's reasonable to think that in-person voter
8  fraud would be difficult to detect?
9    A.  Well, then that's why I did the fail-safe affidavit,
10 but no one wanted to go for it.  I thought that that would be
11 an easier way to make it -- you can match up signatures and
12 what have you.
13   Q.  But you agree that under the current system, it's
14 difficult to detect in-person voter fraud?
15   A.  I mean, it depends on -- on difficult.  But I would
16 say that even now if you suspected that someone was cheating or
17 someone was who they weren't, I mean, you can always go and
18 check signatures.  There are other, you know, things that you
19 could do.  You could keep, you know, records and say, you know,
20 I don't think this person is really this person.  Let's go and
21 check this name to see if, you know, Mary Smith really did come
22 and vote.  So, I mean, I think that there are certain steps
23 that poll workers could take, you know, right now with extra
24 training or what have you to prevent or detect someone who may
25 commit voter fraud.

---

127

1    But I just don't think that it's a -- I mean,
2  with a -- I mean, what did we have last time?  I don't know
3  what our turnout was for this last past primary.  But it turned
4  out so low, I just don't see -- I just don't see it being a
5  problem.  I just don't -- I just really haven't seen anything.
6  With all the evidence I've seen, it just doesn't seem like it's
7  there.
8    Q.  You mentioned, in connection with mail-in ballot
9  fraud, that you thought that some of the cases that were
10 prosecuted or pursued were targeting minority voters; is that
11 right?
12   A.  Yes.
13   Q.  Is it your understanding that prosecuting voter fraud
14 is not the sole responsibility of the State Attorney General?
15 Do you understand that?
16   A.  Yeah, I understand what you're asking.  I don't
17 know -- I would imagine that local authorities would be able to
18 prosecute also.
19   Q.  So it's your understanding -- or you wouldn't have
20 any reason to dispute that say the local D.A. --
21   A.  Right.
22   Q.  -- would also --
23   A.  Absolutely.
24   Q.  -- be able to prosecute voter fraud?
25   A.  Absolutely.

---

128

1    Q.  Don't you think -- I mean, based on your own
2  testimony that there was some targeting of minority voters.
3    Do you think there's a political risk for local
4  prosecutors to prosecute voter fraud?
5    A.  No.
6    Q.  Why not?
7    A.  Because in the county like here where we're at right
8  here, this is a very Republican county, so I mean, they
9  wouldn't be afraid of prosecuting an elderly African American
10 woman that lives in southeast Fort Worth.  Or the same thing in
11 Texarkana.  You know, I just don't know why -- why would the
12 local D.A. feel there would be any political repercussions for
13 that.
14   Q.  What about in Houston or Dallas, would it be
15 different?
16   A.  In Houston, again, I think the D.A. -- isn't the D.A.
17 a Republican there?  I'm not sure.  But up until 2006, I mean,
18 Dallas had a Republican district attorney.
19   Q.  Do you think any D.A., even in Fort Worth or
20 anywhere, would want to be accused of targeting minority
21 voters?
22   A.  I don't think that anybody would want to be accused
23 of targeting minority voters.
24   Q.  Is it possible that that would be -- well, isn't it
25 also possible, apart from any allegations of racial



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Marc Veasey                                                    June 7, 2012

---

**129**

1  discrimination, that prosecuting somebody for fraudulent voting
2  could be seen as politically biased if, for example, Republican
3  D.A. prosecutes somebody who allegedly voted fraudulently for a
4  Democrat?
5      A.  Uh-huh.  People could definitely say that that would
6  be politically biased, but you could say the same thing about,
7  you know, the AG's office, too.  If it's a Republican
8  prosecuting, you know, all Democrats or all minorities, you
9  could definitely make that case.
10     Q.  And a local D.A. or any D.A. wouldn't want to be
11 accused of political bias or political motivation or
12 prosecution, would they?
13     A.  No, I don't think a local D.A. would, or I don't
14 think anyone would or even someone from Austin.
15     Q.  Do you believe that -- is it your understanding that
16 there are non-citizens who are registered to vote in Texas.
17     A.  I do not believe that there are non-citizens that are
18 registered to vote in Texas.  Can non-citizens accidentally
19 register to vote like that gentleman did in Houston?
20 Absolutely.  But it is up to each entire -- or election
21 administration -- county election administration in the state
22 to make sure that the people that are registered to vote are
23 citizens.  But, no, I don't -- so, I don't believe that
24 non-citizens are voting.
25     Q.  Do you believe that non-citizens are registered to

---

**130**

1  vote?
2      A.  No.  I think that if non-citizens get registered to
3  vote, I think it's probably thrown out.  I think local election
4  administrators seem to do a good job at that, at rooting out
5  who's eligible to vote and who's not.
6      Q.  So it's your understanding that -- is it fair to say
7  that your understanding is that if there are any non-citizens
8  on the voting rolls in Texas, it's a very small amount?
9      A.  Yes.
10     Q.  And it's your understanding that if a non-citizen
11 makes it onto a voter registration roll, they'll get removed
12 pretty quickly?
13     A.  Right.  Right.  I  would say, yes.
14     Q.  And so would it be -- you know, would you think that,
15 you, know if the state were to devote resources to removing
16 non-citizens from voting rolls, that would be not a good use of
17 money?
18     A.  For the state to do that?
19     Q.  Yeah.
20     A.  No, I would think that local election administrators
21 would best equipped to do that.  I absolutely feel that way.
22     Q.  So it wouldn't be a great use of the state's money to
23 go after non-citizens on voting rolls?
24     A.  Right.  Right.  I would say that -- that -- where --
25 that we should have a hearing, and if that's -- if somebody

---

**131**

1  thinks that's a problem, that there should be a hearing in the
2  election committee, and that election committee should listen
3  to what the local county administrators have to say and what
4  they would need, whether it was extra resources or whether they
5  already have the, you know, equipment available to be able to,
6  you know, ferret out people that are not, you know, legally
7  registered to vote.
8      Q.  I'm going to move to a slightly different area and
9  talk about the purpose of SB14.
10     A.  Okay.
11     Q.  Is it your contention that the legislature intended
12 to harm African American voters by passing SB14?
13     A.  I would say that, yes, the intent of SB14 was to harm
14 African American and Latino voters.
15     Q.  And what is the basis for that contention?
16     A.  The basis for that contention is several things.
17 Everyone saw all of the documentation and presentations that
18 showed that it would have a negative effect on African
19 Americans and Latinos that go to the polls and vote.  Even
20 amendments like the ones that I had that had the fail-safe
21 affidavit, the one that showed -- the one that we talked about
22 earlier that showed if there was, you know, no pun intended,
23 but just, you know, very blatant examples of discrimination
24 that took place, then the law would no longer exist.  Even
25 people, you know, voted "no" against that, and everybody was

---

**132**

1  just ready to get the bill passed.
2      Q.  Is there anything else that supports your contention
3  that SB14 was passed for a discriminatory purpose?
4      A.  The comments that -- the conversation that I had with
5  Representative Berman at the back mic when he asked me why was
6  I, you know, fighting this, which is in the -- which is in
7  69-13 here.  When we were at the back mic and I asked him, and
8  I said -- and he asked me -- he came to me and he said, Why are
9  you, you know, against this bill?  Why are you fighting against
10 this bill?  And I said because I think it -- you know, it
11 discriminates.  I think it would hurt, you know, my
12 constituents.  And he said, It's not going to determine whether
13 or not, you know, or Yvonne -- you know Yvonne Davis, who's an
14 African American member out of Dallas -- whether you or Yvonne
15 or any Black Caucus members get re-elected.
16         And so he what I saw that as is that, yeah,
17 if you're in a district where -- you know, Al Gore got, you
18 know, 80 percent of vote, then it's not going to hurt you.
19 But, you know, maybe it's going to hurt, you know, someone in a
20 district where Al Gore got 50 percent of the vote.  And so what
21 I saw his statement to me was saying, it's not going to hurt
22 you, so you shouldn't be up here, you know, really worried
23 about this bill.  It may hurt somebody in a Linda Harper Brown
24 type race where it's a 20-vote scenario.  And so that was kind
25 of disturbing to me when he made those comments.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

133

1    Q.  And he made that comment in 2007?
2    A.  Yes.
3    Q.  And that was for -- I forget the bill number, but
4  that was not SB14?
5    A.  No, that was not SB14.
6    Q.  So other than the effect amendments that
7  weren't accepted and Representative Berman's statement in 2007,
8  is there anything else that leads you to believe SB14 had a
9  discriminatory purpose?
10    A.  And the e-mail that I received from Stephanie
11  Click.
12    Q.  From who?
13    A.  Stephanie Click.  She's the former Tarrant County
14  election -- I mean, former Tarrant County Republican party
15  executive -- not executive director, but chairman.  You know,
16  where she sent out the e-mail saying that -- that we know that
17  there's all sorts of voter, you know, fraud, voter
18  impersonation that takes place in southeast Fort Worth.  Just a
19  blanket, you know, sort of a statement, not in Colleyville or
20  not in Southlake or, you know, not in Westover Hills, but in
21  southeast Fort Worth.  And that was -- you know, when people
22  say things like that, it makes me think that bills like this
23  are supported by people like her and who encourages legislators
24  to pass bills like this, that there's discriminatory intent
25  when people just make blanket, you know, sort of broad

134

1  statements like that that cover an entire community.
2    Q.  Stephanie Click is not a member of the Legislature,
3  right?
4    A.  No.  She's seeking to be a member of the Legislature,
5  but she's not currently one.
6    Q.  She didn't vote on SB14?
7    A.  No.
8    Q.  Okay.  So other than those four things, is there
9  anything else that leads you to believe that SB14 had a
10  discriminatory purpose?
11    A.  Those are the main four things.
12    Q.  Can you think of anything else?
13    A.  Not right now, no.
14    Q.  Do you -- do you contend that individual legislators
15  voted in favor of SB14 for the specific purpose of harming
16  African American and Latino voters?
17    A.  I do not think that all members that voted for it
18  voted for it for that reason.
19    Q.  Do you think that some members voted for SB14 for the
20  specific person of harming African American and Latino voters?
21    A.  Yes.
22        MR. FREDERICK:  Mark this as 4, please.
23        (Deposition Exhibit No. 4 was marked.)
24    Q.  (BY MR. FREDERICK)  Can you identify what's been
25  marked as Deposition Exhibit 4, please.

135

1    A.  This is a House Journal.
2    Q.  Okay.  Is it from March 24th, 2011?
3    A.  Yes.
4    Q.  If you'll turn -- if you'll turn to the last page of
5  this exhibit?
6    A.  Okay.
7    Q.  Does that appear to be Page 1082 --
8    A.  Yes.
9    Q.  -- from the House Journal?
10    A.  Yes.
11    Q.  And there at the top, do you see where it says, SB14
12  was passed by Record 156?
13    A.  Yes.
14    Q.  Okay.  I'm going to ask you to do -- I'd like you to
15  take this pen --
16    A.  Okay.
17    Q.  -- and I would like you to circle the name of every
18  person on this page who voted -- who you believe voted for SB14
19  for the purpose of harming African American or Latino voters.
20    A.  (Witness complies.)
21    Q.  So you've shown me the exhibit that you've marked,
22  and it indicates you have underlined Berman --
23    A.  Uh-huh.
24    Q.  -- is that correct?
25    A.  Yes.

136

1    Q.  And you have not underlined anyone else's name who
2  voted for SB14?
3    A.  Right.
4    Q.  So it's your contention that Representative Berman
5  voted for SB14 for the purpose of harming African American and
6  Latino voters, right?
7    A.  Yeah.
8    Q.  But you don't contend that any other legislator voted
9  for SB14 for the purpose of harming African American or Latino
10  voters, correct?
11    A.  I'm not necessarily contending that.  That's the one
12  where we had a conversation that made me believe that.
13    Q.  Okay.
14    A.  Yeah.
15    Q.  But you're not testifying today that anybody else
16  besides Representative Berman voted for SB14 for the purpose of
17  harming African American or Latino voters, are you?
18    A.  I'm not saying that some of the other people on the
19  list didn't.  I'm just saying that I wouldn't want to make that
20  sort of accusation at someone without having any sort of
21  evidence like I have with Berman where we had a conversation to
22  where he made it pretty clear to me why -- you know, and
23  questioned me on why I was for the bill -- or against the bill.
24  Excuse me.
25    Q.  Right.  So then it's your testimony that you don't


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

137

1  have any evidence that anybody other than Representative Berman
2  voted for SB14 for the purpose of harming African American or
3  Latino voters; is that right?
4     A.  Right.  Right.  Exactly.
5     Q.  So we've talked about the House.  I want to move over
6  to the Senate quickly.
7         Do you contend that any member of the Texas
8  Senate voted in favor of SB14 for the specific purpose of
9  harming African American or Latino voters?
10     A.  I'm not familiar enough with the Senators to be able
11  to make that assessment.
12     Q.  So you don't have any evidence that would lead you to
13  believe that any senator voted for SB14 for the purpose of
14  harming African American or Latino --
15     A.  That's correct.
16     Q.  -- voters?
17     A.  Correct.  Correct.
18         MR. FREDERICK:  Would you mark that one, please.
19         (Deposition Exhibit No. 5 was marked.)
20     Q.  (BY MR. FREDERICK)  So the court reporter has handed
21  you what's been marked as Deposition Exhibit 5.  Can you take a
22  look at that and tell me what it appears to be.
23     A.  This is a -- a member will ask for all comments to be
24  reduced to writing and be made part of the permanent record,
25  and that's what it looks like this is about.

138

1     Q.  Okay.  So this looks like it's a transcript of --
2     A.  Correct.
3     Q.  -- House proceedings?
4     A.  Correct.
5     Q.  And there on the first page it says it's the March
6  23rd, 2011, House Floor Debate on SB14; is that right?
7     A.  Correct.
8     Q.  Okay.  If I could get you to turn to -- we've got
9  many pages on this, but I'm looking at Page 96.
10     A.  Uh-huh.  Let me see --
11     Q.  And it'll be -- yeah, we've got --
12     A.  In the squares there?
13     Q.  Exactly.  Yeah, it'll be four pages to each page.
14     A.  Okay.
15     Q.  It's actually not too far in.  Oh, you know what --
16  let me help you.  There are actually three volumes --
17     A.  Oh, okay.
18     Q.  -- there that are stapled together.  So it's -- let's
19  say the first 96.
20     A.  Okay.  Okay.
21     Q.  Now, if you'll look -- if you'll look up at the top
22  left of Page 93, you're quoted there on Line 2, and it says,
23  This is the bypass affidavit.
24     A.  Right.
25     Q.  Do you -- which -- does that refer to an amendment

139

1  that you introduced?
2     A.  Yes.
3     Q.  Okay.  Which amendment was that?
4     A.  That was the amendment about, you know, making sure
5  that you sign the affidavit to confirm that you are who you say
6  that you are if you don't have a Photo ID --
7     Q.  Okay.  That's the one we talked about earlier --
8     A.  Correct.
9     Q.  -- where if you don't have a Photo ID, you can just
10  sign an affidavit swearing that you are the person that you say
11  you are, and then you can cast a ballot, right?
12     A.  Yes.
13     Q.  So if you'll look -- that amendment was not accepted;
14  is that right?
15     A.  Correct.
16     Q.  And I -- right here -- let's go back to 93.
17         (Witness complies.)
18     Q.  -- and on line -- beginning on Line 12, this is your
19  statement, it says -- I'm starting kind of in the middle of
20  Line 12.  It says, Indiana and Georgia may not have
21  discriminated against enough people as the Republican National
22  Committee would have liked.  And so they want to create even
23  a -- it says (inaudible) -- bill here, and that is why I think
24  they probably will not accept this amendment.
25     A.  Yes.

140

1     Q.  Is that accurate?
2     A.  Yes.
3     Q.  Okay.  So based on that, it seems like you thought
4  that -- you thought that amendment, your amendment for the
5  bypass affidavit would not be accepted?
6     A.  Right.
7     Q.  And you stated here that your opinion is that --
8  well, at least it's stated on Line 12, Page 93 that there was
9  some discriminatory intent --
10     A.  Right.
11     Q.  -- in rejecting this amendment; is that right?
12     A.  Correct.
13     Q.  If you'll go down to Page 96, down toward the bottom,
14  there' a -- the last statement, it begins on Line 20, and this
15  is Representative Harless.  And there's a quote from her, this
16  is Line 22, it says, The whole purpose of having a Photo ID is
17  so that when you go to the polls, you are showing proof of who
18  have you are.  We've laid out the criteria, and this guts the
19  bill basically.
20         Now, it sounds from that like Representative
21  Harless is making the point in response to your amendment that
22  the purpose is to require Photo ID, right?
23     A.  Right.
24     Q.  And it was her understanding that if somebody could
25  just sign an affidavit without having an ID, that would



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

141

1    basically mean that it was not a requirement that everybody
2    would have a Photo ID.
3         A.   Right.
4         Q.   So do you believe that Representative Harless was
5    acting in a racially discriminatory manner in opposing the
6    amendment you offered to have the bypass affidavit?
7         A.   No.  I think that Representative Harless was just
8    acting on what she was told to do.  And I think that the way
9    that the bill was written, and my understanding was that the
10   bill was written -- at least the word in the Legislature was
11   that -- that it was -- that this particular bill was very
12   stringent, and that it was something that was produced out of
13   ALEC, A-L-E-C, and that the bill was -- and that there would be
14   no changes to the bill at all.  So I think that she was just
15   being a foot soldier and just following orders.
16        Q.   But if -- okay.  I appreciate that.  And -- but
17   it's -- it's accurate, isn't it, that if somebody doesn't have
18   an ID but can sign an affidavit and vote even if they don't
19   have an ID, then the bill doesn't actually require a Photo ID
20   to vote, right?
21        A.   Right.
22        Q.   Okay.  I'm going to ask you now to turn, if you
23   would, to Page 100 -- the one at the top left will be Page 173.
24        A.   Okay.
25        Q.   And I will represent to you that there's only one

142

1    Page 173.
2         A.   What volume?
3         Q.   It'll say Volume II at the top.
4         A.   Volume II.
5         Q.   Yeah.  It looks like it's consecutively page --
6    paginated.  Well, it's Volume II in any case.
7         A.   (Witness complies.)
8         Q.   Are you there?
9         A.   Yes.
10        Q.   Okay.  Now, let's see -- so we're at -- we're kind of
11   coming into the middle of the debate here, but if you'll take a
12   look -- does it look to you like what's being debated here is
13   an amendment to provide for same-day voter registration?
14        A.   Right.  Exactly.
15        Q.   Okay.  Do you recall who authored that amendment?
16        A.   It looks like I did.
17        Q.   Oh, okay.
18        A.   I'm guessing.  I don't know.  I mean, I'm just
19   looking -- based on the transcript, but I don't know if I did
20   or not.  I can't --
21        Q.   Okay.
22        A.   I can't say that for certain.  But I -- it looks like
23   he is going back and forth with me on this.
24        Q.   Okay.  But that is what's being debated here?
25        A.   Right.

143

1         Q.   And so the amendment that's being debated, I take
2    from the debate, is it would provide for people to register to
3    vote on the same day that they vote, right?
4         A.   Uh-huh.  Right.
5         Q.   And that's not the system we have now in Texas,
6    right?
7         A.   No, it is not.
8         Q.   Okay.  Now, you --
9         A.   Okay.  It's Rodriguez's bill.
10        Q.   Oh, okay.
11        A.   Yes.
12        Q.   But you -- you spoke in --
13        A.   It's amendment.  Excuse me.
14        Q.   You spoke in favor of the amendment?
15        A.   Yes, definitely.
16        Q.   And you thought it was a good amendment?
17        A.   Definitely.
18        Q.   You thought it would be a good change to SB14,
19   right?
20        A.   Yes.
21        Q.   And this would have been -- I mean, it would have
22   been a substantial change to SB14, right?
23        A.   Right.
24        Q.   Was there testimony in the select committee in the
25   House on same-day registration?

144

1         A.   I do not recall.
2         Q.   Was there any evidence presented to the select
3    committee about same day registration?
4         A.   I don't recall.
5         Q.   So you don't recall whether or not there was any?
6         A.   No.
7         Q.   If you look down at -- is it -- is it common for a
8    substantial amendment to be adopted or accepted to a bill
9    without some evidence being presented in the committee?
10        A.   Occasionally, yeah.
11        Q.   Can you think of a specific case where that happened?
12        A.   Yeah, in 2000 and -- in 2005, Mary Denny had a
13   bill -- she wanted to pass the Voter ID bill, and she tried to
14   amend it on the transportation bill.
15        Q.   Was --
16        A.   And she tried to -- and people were like, hey, we
17   can't put this on -- this is like a major bill.
18        Q.   Okay.  So she tried to put -- in 2005, Representative
19   Denny tried to put a Voter ID provision as an amendment to a
20   transportation bill --
21        A.   Right.
22        Q.   -- is that right?  Okay.
23        A.   And then we had a deal in elections.  There was an
24   ominous -- ominous bill that came out that the Secretary of
25   State's office told us that they had to have.  And the chairman



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 145

1  of elections, it was his bill, and he let every Republican that
2  wanted to put, you know, these sort of anti-voting measures on
3  the bill, and he allowed all the amendments on there.  And a
4  lot of them were like major -- would have been major changes in
5  election law.
6      Q.   And what -- remind me what year that was.
7      A.   This year.
8      Q.   Oh, this year?
9      A.   Yeah, this Session.
10     Q.   Which bill was that?
11     A.   I don't recall the bill number, but it was a -- a
12  huge bill that the Secretary of State's office wanted.  And it
13  just became a Christmas tree, which was --
14     Q.   And the --
15     A.   Yes.  Okay.  Which is just sort of slang for you
16  know --
17     Q.   Hang whatever you want to it?
18     A.   Yeah, put whatever amendments you want to on it.
19     Q.   The original bill in 2011 that the Secretary of State
20  wanted, what did that bill do?
21     A.   In 2005?
22     Q.   Oh, sorry.  The second --
23     A.   2011?
24     Q.   Yeah.
25     A.   In 2011, the bill that she -- it was like a -- I

## 146

1  don't remember exactly.  I would have to go back and -- I don't
2  remember exactly.
3      Q.   But was it a voting bill?
4      A.   I don't recall exactly what it was.  It was more of
5  an administrative, sort of a -- you know, just some things that
6  they wanted to be able to change administratively, and some
7  laws that they wanted to be able to kind of clean up.  And I
8  think it was just sort of a -- more of an inner-agency
9  administrative, you know, wish bill.
10     Q.   And so you said there were a lot of significant or
11  substantial amendments --
12     A.   Yeah.
13     Q.   -- that were allowed to be added.
14     A.   Absolutely.
15     Q.   Were those amendments added in committee or on the
16  floor?
17     A.   On the House floor.
18     Q.   On the floor?
19     A.   Yeah.
20     Q.   And I take it they were voted on?
21     A.   Uh-huh.  Yeah.
22     Q.   In 2005, Representative Denny, you said she had tried
23  to add some Voter ID provisions or provision to a
24  transportation bill.
25     A.   Correct.

## 147

1      Q.   Were those amendments accepted?
2      A.   Yes.  Someone called a point of order on the bill,
3  and the parliamentarian said that, no, it was okay for her to
4  do it.
5      Q.   Did the bill ultimately pass?
6      A.   That's a good question.  I don't remember.
7      Q.   Do you remember what the basic substance of her
8  amendment was?
9      A.   I do not remember.  I just remember it was the Voter
10  ID bill, but I don't remember exactly what her Voter ID bill
11  had in it.
12     Q.   Looking back to -- here on Page 173, the 2011 Debate
13  about same-day registration --
14     A.   Right.
15     Q.   -- now down on this Page 174, Page 19 (sic), this is
16  Representative Phillips, and he says -- well, up above at 16,
17  it's got you saying, Why will you not accept the amendment?
18     A.   Uh-huh.
19     Q.   And beginning at 19, Representative Phillips says,
20  It's not a voter registration bill -- actually before, he --
21  I'll start at 18.  I told you this is a Voter ID bill.  It's
22  not a voter registration bill.  Put it through the committee
23  process and get it debated and go through the floor, and if it
24  gets here, we can debate that.  But this is a Voter ID bill.
25          Do you see that?

## 148

1      A.   Yes, I do.
2      Q.   Now, I think you testified earlier, and I'm
3  paraphrasing -- that the -- that SB14 was intended to be a
4  narrow in-person voter fraud bill, right?
5      A.   Uh-huh.
6      Q.   But there is -- isn't it correct that there's a
7  single subject rule for bills in Texas?
8      A.   Yes, there is.
9      Q.   And basically that requires that amendments have to
10  be germane to the purpose of the bill that they're offering to
11  amend, right?
12     A.   Yes.
13     Q.   Is it -- is it fair in your opinion to say here that
14  Representative Phillips is saying that this amendment is not
15  germane to SB14 because it's about registration and not -- not
16  Voter ID?
17     A.   I think that's the point that he was making, but I
18  think the point that I also made was that, you know, as
19  Representative Harless kept saying that, no, this is a bill to
20  help create -- to decrease -- to increase voter participation
21  because people will feel good about going to the polls because
22  they feel like that their vote will count and not fraudulent
23  votes that were cast.  And so my point is that, well, if that's
24  the case, then let's do same-day voter registration because
25  even more people would be able to participate.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

### 149

1   Q.  Did you expect this amendment to be accepted?

2   A.  I didn't expect that any amendments would be

3   accepted.

4   Q.  If this amendment had been accepted, the same-day

5   registration amendment --

6   A.  Uh-huh.

7   Q.  -- would that have caused a problem with the single

8   subject rule and germaneness?

9   A.  You know, yeah, it depends.  I would need to go look

10  at my rule book.  I'm not sure.  Yeah.  I don't think so.

11  Q.  Well, do you think that Representative Phillips

12  had -- was expressing a legitimate concern that this was --

13  that this amendment was not germane to SB14?

14  A.  I'm not sure.  I think that it -- I think you could

15  argue either way, you know, and we usually duke it out with

16  parliamentarian.  But I think that you could argue either way

17  that the bill -- that it could either relevant or not.

18  Q.  Okay.

19  A.  You could certainly -- you know, you would just need

20  to have your rule book handy and be able to make your point.

21  Q.  If the same-day registration amendment had been

22  accepted to SB14, do you think a point of order could have been

23  raised against it -- against the bill on that basis?

24  A.  I don't believe so.  It's my opinion that that point

25  of order could not be -- could not have been raised based on my

### 150

1   knowledge of the rules.

2       Can we go off record real quick?

3   Q.  Of course.

4       (Off the record at 1:20 p.m. for less than a

5       minute.)

6   Q.  (BY MR. FREDERICK)  All right.  If you will turn with

7   me, still in the same exhibit, toward the back.  This will be

8   in Volume III.  And the page at the top right will be 123.

9   It's the third to the last big page.

10  A.  Okay.

11  Q.  Are you there?

12  A.  Yes.

13  Q.  Okay.  Down toward the bottom right, Page 124 --

14  excuse me -- there's a statement by you beginning on Line 10.

15  It says, I think that what is being done here today is no

16  different than the things that were done here in the '50s.  No

17  different than the things that were done here previous to that.

18  The things that were done here during reconstruction and

19  before.

20      Is that accurate?  Is that what it says?

21  A.  Yes.

22  Q.  And that's -- and you did make that statement?

23  A.  Yes.

24  Q.  Okay.  You say "the things that were done."

25      What things are you talking about?

### 151

1   A.  The things that were done, you know, previous to --

2   the things that were done around reconstruction when people

3   were first -- when African Americans in particular were first

4   allowed to vote, and there were, you know, lots of rumors and

5   innuendos about voter fraud and things that were taking place

6   that weren't true, but people -- but laws were passed and

7   reconstruction ended to address those things, even though they

8   were just rumor and innuendo and not true.

9       And the same thing in the 19, you know, '50s,

10  when there was, you know, concern of, you know -- of rights for

11  African Americans in this country.  And so the State

12  Legislatures put up barriers all across the South, and what

13  have you, to prevent a lot of those things from advancing.

14  Q.  And so the -- when you talk about reconstruction or

15  post-reconstruction, would that be things like the Black Codes

16  that were passed in the South?

17  A.  Right.  Exactly.  Absolutely.

18  Q.  And then more generally, I guess -- I mean, Jim Crow

19  is another?

20  A.  Right.

21  Q.  So that's the kind of thing you were talking about?

22  A.  Right.

23  Q.  Okay.  And I guess -- I mean, technically, I guess,

24  Jim Crow would continue in the 50s, right?

25  A.  Correct.

### 152

1   Q.  Okay.  And so the laws that were passed -- I mean,

2   either Jim Crow, or the -- I think the examples most people

3   would know about are separate bathrooms, separate drinking

4   fountains.

5   A.  Right.

6   Q.  Things like that.  Things -- and those were laws

7   where, you know, it said Black people are not allowed to do

8   this --

9   A.  Right.

10  Q.  -- right?

11      I mean, it's a blatantly discriminatory

12  legislation that singles out Black people, right?

13  A.  Correct.

14  Q.  All right.  And I guess -- and at some point in that

15  period, there were absolute restrictions in Texas on whether

16  Black people could vote, right?

17  A.  Correct.

18  Q.  I mean, Black people were not allowed to vote in the

19  primaries for some period in this state, right?

20  A.  Right.  That's correct.  Right.

21  Q.  SB14 does not make any specific rule that says --

22  that singles out Black people, right?

23  A.  Right.

24  Q.  And it doesn't have any -- it doesn't establish a

25  separate set of rules for Black people, White people, Hispanic



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

---

### 153

1  people, right?
2      A.  Correct.
3      Q.  So I mean, obviously you're aware that SB14 is being
4  considered by a court in DC right now?
5      A.  Right.
6      Q.  If the court does not agree with you, that SB14 is
7  the same -- is no different than the things done during Jim
8  Crow and after reconstruction, should it approve SB14?
9      A.  Uh-huh.
10         MR. FREDERICK:  All right.  I have --
11         THE REPORTER:  I'm sorry.  Did you answer?
12     A.  Well, wait.  Say that again.
13         MR. FREDERICK:  I think the answer was "uh-huh."
14     A.  No, you're saying if there's no discrimination that
15  was found by the court, should they approve it?  I mean, they
16  would have to if there was no -- isn't that correct?  I mean,
17  I'm just -- procedurally I would think that that would be the
18  next step.  If they found that there's no discrimination and it
19  preclears, then it would become law, right?  Is that what
20  you're asking?
21     Q.  (BY MR. FREDERICK)  Right.
22     A.  Yes, it would become law.
23     Q.  Let me ask it to be more specific.  I mean -- you
24  know, that's okay.  I think we're good.
25         MR. FREDERICK:  I have no further questions now.

---

### 154

1  I understand Representative Veasey needs to leave to catch a
2  plane.  I have -- I'll state for the record, I have represented
3  to the Representative and his lawyer I don't right now have a
4  specific reason to believe that I will need to take further
5  testimony, but I will hold the deposition open subject to
6  agreement on scheduling for further deposition.
7         MR. DUNN:  And we have responded that in the
8  event it's necessary to reschedule, we'll do our best to work
9  out something that will allow that to continue.
10         MR. FREDERICK:  And for the record, I think we
11  both considered the possibility of a telephonic deposition if
12  necessary for everybody's schedule.
13         MR. DUNN:  Sure.
14         MR. FREDERICK:  Thank you very much for your
15  time, Representative Veasey.  Have a safe trip.
16         THE WITNESS:  Thank you very much.
17         (End of proceedings at 1:28 p.m.)
18
19
20
21
22
23
24
25

---

### 155

1                 CORRECTIONS AND SIGNATURE
2  PAGE/LINE     CORRECTION        REASON FOR CHANGE
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15    I, MARC VEASEY, have read the foregoing deposition and
   hereby affix my signature that same is true and correct except
16 as noted herein.
17
18   _____
                 MARC VEASEY
19               NO. 1:12-cv-00128
20 STATE OF TEXAS )
      Subscribed and sworn to before me by the said witness,
21 MARC VEASEY, on this the _____ day of _____,
22 2012.
23
   _____
24               NOTARY PUBLIC IN AND FOR
                 THE STATE OF TEXAS
25 My Commission Expires:

---

### 156

1  STATE OF TEXAS )
2     I, Andrea L. Reed, a Certified Shorthand Reporter in and
3  for the State of Texas, do hereby certify that, pursuant to the
4  agreement hereinbefore set forth, there came before me on the
5  7th day of June, A.D., 2012, at 9:15 a.m., at the offices of
6  TECH Fort Worth Building, 1120 South Freeway, in the City of
7  Fort Worth, State of Texas, the following named person, to-wit:
8  MARC VEASEY, who was by me duly cautioned and sworn to testify
9  the truth, the whole truth and nothing but the truth of his
10 knowledge touching and concerning the matters in controversy in
11 this cause; and that he was thereupon carefully examined upon
12 his oath and his examination reduced to writing under my
13 supervision; that the deposition is a true record of the
14 testimony given by the witness, same to be sworn to and
15 subscribed by said witness before any Notary Public, pursuant
16 to the agreement of the parties; and that the amount of time
17 used by each party at the deposition is as follows:
18     MR. MATTHEW H. FREDERICK - 04 hours, 03 minutes,
19     MR. CHAD W. DUNN - 00 hours, 00 minutes,
20     MS. MARIA HORTENSIA RIOS - 00 hours, 00 minutes.
21   I further certify that I am neither counsel for, nor
22 related to or employed by, any of the parties to the action in
23 which this deposition is taken, and further that I am not a
24 relative or employee of any attorney or counsel employed by the
25 parties hereto, or financially interested in the action.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

157

1      I further certify that before the completion of the
2   deposition, the Deponent did request to review the transcript.
3      In witness whereof, I have hereunto set my hand and
4   affixed my seal this 8th day of June, A.D., 2012.
5
6
7
8
9   _____
    Andrea L. Reed, CSR
10  Esquire Deposition Solutions
    1700 Pacific Avenue, Suite 4750
11  Dallas, Texas  75201
    Registration No. 286
12  Cert. No. 7773
    Cert. Expires 12/31/12
13  (214)257-1436
14
15
16
17
18
19
20
21
22
23
24
25



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com