## 1

340896 eb

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                    *
          Plaintiff,               *
VS.                                *
ERIC H. HOLDER, JR., in his        *
official capacity as Attorney      *
General of the United States,      *
          Defendant,               *
ERIC KENNIE, et al,                *
          Defendant-Intervenors,   *
TEXAS STATE CONFERENCE OF NAACP    * CASE NO.
BRANCHES, et al,                   * 1:12-CV-00128
          Defendant-Intervenors,   * (RMC-DST-RLW)
TEXAS LEAGUE OF YOUNG VOTERS        * THREE-JUDGE COURT
EDUCATION FUND, et al,             *
          Defendant-Intervenors,   *
TEXAS LEGISLATIVE BLACK CAUCUS,    *
et al,                             *
          Defendant-Intervenors,   *
VICTORIA RODRIGUEZ, et al          *
          Defendant-Intervenors.   *

DEPOSITION OF SENATOR THOMAS D. WILLIAMS
UPON RECEIPT OF SIGNATURE, THE ORIGINAL OF THIS
DEPOSITION WILL BE IN THE CUSTODY OF:

Maria H. Rios, Esquire
U.S. Department of Justice
950 Pennsylvania Avenue, NW
NWB - Room 7202
Washington, DC 20530

Date              Edith A. Boggs, CSR

6-1-12            HOUSTON, TEXAS

## 2

DEPOSITION OF SENATOR THOMAS D. WILLIAMS

DEPOSITION AND ANSWERS of SENATOR THOMAS D. WILLIAMS,
taken before Edith A. Boggs, a certified shorthand
reporter in Harris County for the State of Texas, taken
at the offices of United States Attorney's Office, 816
Congress, Austin, Texas, on the 1st day of June, 2012,
between the hours of 9:31 a.m. and 5:29 p.m.

## 3

A P P E A R A N C E S

ATTORNEYS FOR PLAINTIFF, STATE OF TEXAS:

Office of the Attorney General of Texas
P.O. Box 12548 (78711-2548)
209 West 8th Street, 8th Floor
Austin, Texas 78701
By:  Patrick K. Sweeten, Esquire
and Jay Dyer, Esquire

(512) 936-1307
patrick.sweeten@aog.state.tx.us

ATTORNEYS FOR DEFENDANT, HOLDER, ET AL:

U.S. Department of Justice
950 Pennsylvania Avenue, NW
NWB - Room 7202
Washington, DC 20530
By:  Maria H. Rios, Esquire
and Jennifer Maranzano, Esquire
and Spencer Fisher, Esquire
(202) 305-7766
maria.rios@usdoj.gov

## 4

A P P E A R A N C E S (Continued)

ATTORNEYS FOR INTERVENORS:

American Civil Liberties Union Foundation
Southern Regional Office
230 Peachtree Street
Atlanta, Georgia  30303-1227
By:  Nancy G. Abudu, Esquire
(404) 523-2721
nabudu@aclu.org

AND

Advancement Project
1220 L Street, NW
Suite 850
Washington, DC  20005
By:  Donita Judge, Esquire
(202) 728-9557
djudge@advancementproject.org

REPORTED BY:

Ms. Edith A. Boggs



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

5

EXAMINATION INDEX

QUESTIONS BY                    PAGE

Ms. Rios              7

Ms. Abudu             207

Ms. Rios              253


INDEX OF EXHIBITS

NO.   MARKED       DESCRIPTION
      OR FIRST
      REFERENCED
6     196     LexisNexis Official Code of Georgia
              Annotated

29    124     SB 362

44    83      HB 1706

45    95      Declaration of Carlos Uresti

60    193     PL 109-2005

400   17      Amended Notice of Deposition

401   53      NEW YORK TIMES article The Talk,
              and the Talk, and the Talk, of Austin
402   84      Texas Legislative Council Second
              Revised Privilege Log, May 23, 2012

403   92      HB 218

404   154     Senate Resolution No. 14

405   160     Public Statement from Tommy
              Williams, State Senator, District 4

6

406   163     Wednesday, January 14, 2009, Texas
              Senate, 81st Legislature, 2009 Regular Session
407   168     Texas Senate Staff Services, 82nd
              Legislative Session, Excerpt: Senate Bill 14, January
              26, 2011
408   169     Texas Senate Staff Services, 82nd
              Legislative Session, Excerpt: Senate Bill 14, January
              26, 2011
409   169     Committee of the Whole Senate,
              Tuesday, March 10, 2009

410   177     SB 14

411   177     Senate Resolution No. 36

412   253     Excerpt of transcript,
              Consideration of Senate Bill 14, 1/25/2011

7

1                    PROCEEDINGS
2          THE COURT REPORTER:  Would all counsel
3    present their names and affiliations.
4          MS. RIOS:  Yes.  Maria H. Rios with the
5    Justice Department.
6          MS. MARANZANO:  Jennifer Maranzano with the
7    Justice Department.
8          MS. ABUDU:  Nancy Abudu,
9    defendant-intervenors.
10         MS. JUDGE:  Donita Judge,
11   defendant-intervenors.
12         MR. DYER:  Jay Dyer for the State of Texas.
13         MR. SWEETEN:  Patrick Sweeten from the Texas
14   Attorney General's office on behalf of the State of
15   Texas and on behalf of the witness, Senator Tommy
16   Williams.
17         MS. RIOS:  Okay.  Good morning.  We are here
18   for the deposition of Senator Tommy Williams in Texas
19   versus Holder.
20         SENATOR THOMAS D. WILLIAMS
21   was called as a witness and, being first duly sworn by
22   the notary, testified as follows:
23                    EXAMINATION
24   Q.  (BY MS. RIOS)  Sir, could you please state your
25   name for the record.

8

1    A.  Sure.  It's Thomas D. Williams.  I go by Tommy.
2    That's my nickname.
3    Q.  Mr. Williams, I'm going to discuss briefly some
4    ground rules.
5          You should answer my questions truthfully,
6    accurately and completely.
7          The court reporter will prepare a transcript of
8    everything that is said today, so, you must respond to
9    my questions verbally.  So, no shaking heads, going
10   uh-huh, because she's going to record, you know,
11   whatever is a verbal response.
12         Please wait for me to finish my questions before
13   you answer, and I'll try to do the same.
14         And I will try to ask you clear questions but if
15   you don't understand a question, please let me know.
16         If you wish to stop and take a break, please tell
17   me, and I will try to accommodate you.
18         Understand that you are under oath and you may be
19   subject to penalty of perjury for giving false or
20   misleading testimony, just like at trial.
21         Do you understand these instructions?
22   A.  I do.
23   Q.  And do you have any questions about these
24   instructions?
25   A.  No.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Senator Thomas D. Williams                                      June 1, 2012

---

9

1      Q.  Okay.  Are you on any medication today that would
2   affect your ability to testify?
3      A.  No.
4      Q.  Okay.  Is there any reason why you cannot testify
5   truthfully and accurately today?
6      A.  No.
7      Q.  Okay.  I may use the terms "voter ID" and "photo
8   ID" interchangeably during the deposition.  I want you
9   to interpret the term broadly to mean the requirement
10  that a voter present a form of identification, whether
11  it is a photo -- it has a photo on them or otherwise,
12  when voting in person before being permitted to cast a
13  regular ballot.  Do you understand?
14     A.  I do.
15         Tell me your name again.
16     Q.  My first name is Maria and my last name is Rios.
17     A.  Okay.
18     Q.  If I refer to "you," I am asking you questions
19  about you in your capacity as a member of the Texas
20  State Senate and not in any other capacity.  Do you
21  agree?
22     A.  Yes.
23     Q.  And when referring to the term "minority voters,"
24  I mean voters who are not white, nonAnglo.  Do you
25  understand?

---

10

1      A.  Yes.
2      Q.  Okay.
3          MR. SWEETEN:  I quibble with the instruction
4   on the "you."  You're asking him -- are you saying that
5   every time you refer to "you," you're talking to him
6   you, as a member of the Senate?  Because if you were
7   going to ask him, "Where were you born," how would he
8   possibly answer that?
9          So, I don't think we can agree to the
10  instruction on "you."  I think "you" should be given its
11  ordinary meaning in the course of this deposition.  I've
12  said that several times.  I've heard that instruction
13  several times.  So, I just would object to that
14  instruction.
15         MS. RIOS:  You know, Counsel, if I'm going
16  to ask him a question in which "you" means you, you
17  know, as a person in his personal capacity or in any
18  other capacity that is not as a State Senator, I will
19  specify that that's the case.
20         MR. SWEETEN:  Okay.  If you could just
21  specify, that would be helpful.  And I'm not trying to
22  be argumentative.  I just think that potentially could
23  be confusing but if you'll specify, that's perfectly
24  fine.
25     Q.  (BY MS. RIOS)  Senator Williams, are you

---

11

1   represented by counsel today?
2      A.  I am.
3      Q.  And who is your counsel?
4      A.  Mr. Sweeten.
5      Q.  And have you been deposed before?
6      A.  I have.
7      Q.  How many times?
8      A.  Once, I think.  Once or twice.
9      Q.  And what was the nature of the proceedings?
10     A.  It was business litigation.
11     Q.  And this was business litigation in your personal
12  capacity?
13     A.  Correct.
14     Q.  Okay.  And have you ever been deposed in your
15  capacity as a State Senator?
16     A.  No.
17     Q.  Or a State Representative?
18     A.  No.
19     Q.  Have you testified in court before?
20     A.  I don't think so.
21     Q.  Okay.
22     A.  Other than a deposition.
23     Q.  And have you ever been personally a party in a
24  lawsuit?
25     A.  Yes.

---

12

1      Q.  As a plaintiff or a defendant?
2      A.  Yes.
3      Q.  Both as a plaintiff and as a defendant?
4      A.  (Witness indicated by nodding his head
5   affirmatively.)
6      Q.  And who were you suing or defending against?
7      A.  It was business litigation.
8      Q.  Again, in your personal capacity?
9      A.  In my capacity as an officer of a business.
10     Q.  And what type of business was this?
11     A.  It was -- it is a financial services company,
12  Woodforest Financial Services.  I'm president of
13  Woodforest Financial Services.
14     Q.  And have you ever been involved in a case where
15  the State of Texas was the plaintiff or a defendant?
16     A.  No.
17     Q.  Okay.  What did you do to prepare for today's
18  deposition?
19     A.  I met with Mr. Sweeten yesterday.
20     Q.  Was that the only meeting that you had with
21  Mr. Sweeten?
22     A.  No.  I've talked to him before but yesterday was
23  the only day we used to prepare for this deposition.
24     Q.  Did you meet with anyone else?
25     A.  Well, there were other people present in the

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 13

1     room.
2        Q.  And who else was present at the meeting that you
3     had with Mr. Sweeten?
4        A.  Mr. Dyer was present at the meeting and
5     Ms. Napier from the Attorney General's office and Ryan
6     La Rue, who is an attorney that works for me.
7        Q.  And Mr. La Rue works for you in relation to your
8     personal business?
9        A.  No.
10       Q.  Mr. La Rue is your personal attorney?
11       A.  No.
12       Q.  In which capacity did Mr. La Rue -- what's your
13    link with Mr. La Rue?
14       A.  Mr. La Rue works for me.  He's the Committee
15    Director for the Transportation and Homeland Security
16    Committee.  He's also an attorney.
17       Q.  Okay.  So, he's a member of your staff?
18       A.  Correct.
19       Q.  Okay.  Did you review any documents?
20       A.  Yes.
21       Q.  Which ones?
22       A.  The documents that we produced from our office as
23    a result of your open records request.
24       Q.  And how long was this meeting?
25       A.  It was a couple of hours, approximately.  I don't

## 14

1     know exactly.
2        Q.  And besides Mr. Dyer, Ms. Napier, Mr. La Rue and
3     Mr. Sweeten, was anyone else present at this meeting?
4        A.  No.
5        Q.  Other than your attorneys and the people who
6     attended yesterday's meeting, did you speak to anyone
7     about your deposition today?
8        A.  Only if someone asked me what I was going to
9     Austin for, I would say I'm going to give a deposition
10    for the voter ID case but I haven't discussed the case
11    with anyone else.  So, other people know I'm here, my
12    other staff members, the people who do my scheduling, my
13    wife.
14       Q.  And have you had a conversation with anyone who
15    has been deposed in this case?
16       A.  Have I had a conversation or have I had a
17    conversation about this case?
18       Q.  Have you had a conversation with anyone who has
19    been deposed in this case?
20       A.  Yes.
21       Q.  Yes?
22       A.  Yes.
23       Q.  And was your conversation related to this case?
24       A.  No.
25       Q.  And was it, you know, related to the deposition

## 15

1     taken in this case?
2        A.  No.
3        Q.  Did you bring any notes or documents with you
4     today?
5        A.  No.
6        Q.  Okay.  Is it your understanding that you, as a
7     State Senator, may invoke legislative privilege?
8        A.  It is.
9        Q.  Are there any other privileges you are asserting
10    today besides legislative privilege?
11         MR. SWEETEN:  Well, I mean, it depends on
12    what the questions are.  If you ask him questions that
13    implicate my discussions with him, we would invoke the
14    attorney/client privilege.
15         If you were to ask something else that would
16    invade another privilege, we would certainly assert that
17    on his behalf.  I think it's a question by question
18    basis.  I don't think he could possibly know the answer
19    to that.
20       Q.  (BY MS. RIOS)  Could you answer my question?
21       A.  Well, I'm asserting legislative privilege, and I
22    would assert any other privilege that might be available
23    to me on the advice of my attorney.
24       Q.  Okay.  Have you asserted legislative privilege
25    over documents and materials in your possession or in

## 16

1     the possession of your staff members that relate to
2     Senate Bill 14?
3        A.  Yes.
4        Q.  And do you understand that due to your assertion
5     of privilege, the Office of the Attorney General for the
6     State of Texas has withheld certain documents in your
7     possession that relate to Senate Bill 14?
8        A.  Yes.
9        Q.  And do you further understand that the Office of
10    the Attorney General has not produced these documents to
11    counsel for the U.S. Attorney General in this
12    litigation?
13       A.  I do.
14       Q.  Okay.  Do you continue today to assert a
15    legislative privilege over documents related to Senate
16    Bill 14?
17       A.  I do.
18       Q.  Okay.  Will you be invoking legislative privilege
19    during your deposition testimony today that relates to
20    other voter photo identification bills considered by the
21    Texas Legislature?
22       A.  Yes.
23       Q.  Okay.  And why are you asserting legislative
24    privilege?
25         MR. SWEETEN:  Don't answer the question.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Thomas D. Williams                                    June 1, 2012

---

## 17

1        It would require him to reveal information
2   that we've discussed, and that's not relevant.  He's
3   entitled to it.  His decision to invoke it is his own.
4        A.  On the advice of counsel, I'm not going to answer
5   that question.
6        Q.  (BY MS. RIOS)  Okay.  Okay.  I'm going to show
7   you what we will mark as Exhibit 400.  That's the
8   amended notice of deposition.
9            (Exhibit 400 marked.)
10       Q.  (BY MS. RIOS)  Do you recognize this document?
11       A.  Well, I'm taking a look at it.  It appears to me
12   that it's a notice to my office that you intend to
13   depose me today.
14       Q.  Okay.  And if you could please look at the last
15   two and a half pages.
16       A.  Uh-huh.
17       Q.  There's a list of documents.  Did you undertake a
18   search for these documents?
19       A.  Let me read the list.
20           Yes.
21       Q.  And where did you look for the documents
22   responsive to this request?
23       A.  I instructed my staff to do the search.
24       Q.  Okay.  And who conducted the search?
25       A.  It was several of my staff members.

## 18

1        Q.  And could you please tell me the names of the
2   staff members that assisted you in conducting this
3   search?
4        A.  You know, what I did was I instructed my Chief of
5   Staff and my administrative person and my Legislative
6   Director that they were to undertake a search to produce
7   all of these documents.  And I don't know who else they
8   might have used to help do that on the staff.  I left it
9   up to them to do that.
10       Q.  And since I'm going to ask you about them later,
11   let me just ask what is the name of your Chief of Staff?
12       A.  Janet Stieben, S T I E B E N.
13       Q.  And your Legislative Director?
14       A.  Is Jason Baxter.
15       Q.  And what did they find?
16       A.  Well, everything they found, we produced and gave
17   to the Attorney General's office.
18       Q.  And did that include both paper and electronic
19   form records?
20       A.  I believe that it did.
21       Q.  And the electronic form records were printed?
22       A.  I'm not sure what you're asking.
23       Q.  Did you print out the records that were in
24   electronic format to give to the attorneys?
25       A.  If there was an E-mail, they would have printed

## 19

1   the E-mail.
2        Q.  Okay.  And look specifically at, you know,
3   documents responsive to number 5.
4        A.  Uh-huh.
5        Q.  Okay.  Do you understand that this search was to
6   include both public and nonpublic analysis related to
7   the effects of SB14 on minority voters?
8            MR. SWEETEN:  I'm sorry, which number are we
9   talking about?
10           MS. RIOS:  Number 5.
11           MR. SWEETEN:  Okay.  And your question
12   again?
13           Can you read her question back, please?
14   (Whereupon, the requested testimony was read back
15   as follows:
16   QUESTION:  Okay.  Do you understand that this
17   search was to include both public and nonpublic
18   analysis related to the effects of SB14 on
19   minority voters?)
20       A.  I think I understand that's true.
21       Q.  (BY MS. RIOS)  Okay.  And how many reports did
22   you submit to your attorneys?
23       A.  You know, my staff submitted all that.  I don't
24   know how to answer that.  I don't know the answer.
25       Q.  So, after your staff gathered all of the

## 20

1   documents responsive to our requests, did you at any
2   time review what they had gathered?
3        A.  No, I instructed them to share that information
4   with the Attorney General's office.
5        Q.  Do you know if there were any documents
6   responsive to number 5 that were submitted to your
7   attorneys?
8        A.  I don't know the answer to that.
9        Q.  Okay.  And I direct your attention to number 8.
10   Did you or anyone in your office search for documents in
11   response to number 8?
12       A.  Yes, my staff did.
13       Q.  Okay.  And how many public documents were
14   submitted to your attorneys responsive to request number
15   8?
16       A.  I don't know the answer to that.  It's included
17   in the information that you have.
18       Q.  Okay.
19       A.  If I made a public statement, you've got it.
20       Q.  But do you not know the number of --
21       A.  No.
22       Q.  Okay.  And look at number 11.
23       A.  Yes.
24       Q.  Okay.  Did you or anyone in your office search
25   for documents responsive to number 11?

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Thomas D. Williams

June 1, 2012

---

**21**

1  A. Yes.
2  Q. And how many documents were produced to your
3  attorneys?
4  A. I don't know how many were produced.
5  Q. Do you know if any were produced?
6  A. I know that there's one that's included in the
7  information that we disclosed to you.
8  Q. Okay. And could you describe that document to
9  me, please?
10  A. I think that there is a document that was
11  disclosed to you that talked about how many prosecutions
12  there had been in Harris County related to this in a
13  statement from the Harris County District Attorney that
14  was responsive to this question.
15  Q. And do you recall how many prosecutions are
16  mentioned in this document?
17  A. I do not.
18  Q. Okay. Is there a person in your legislative
19  office who maintains records?
20  A. I'm not sure what you're asking.
21  Q. I'm talking about records and retention. Is
22  there someone in your legislative office, in your --
23  A. That's just in charge of that?
24  Q. Yes.
25  A. No.

---

**22**

1  Q. And how are records maintained in your office?
2  A. In accordance with state policy.
3  Q. And what is the retention policy?
4  A. I've instructed my staff to follow the state
5  retention policy, and they do that so far as I know.
6  Q. Okay. And do you know where papers filed since
7  2005 are maintained at your office?
8  A. Do I know?
9  Q. Yes.
10  A. No.
11  Q. And how about electronic files, do you know where
12  they are maintained?
13  A. No.
14  Q. So, you do not know if paper files or electronic
15  files are maintained at your office or at another
16  location?
17  A. I don't know.
18  Q. And as to the location where these records are
19  maintained, that would be based on the state retention
20  policy?
21  A. Yes.
22  Q. Okay. Could you briefly describe your
23  educational background?
24  A. I graduated from public high school and attended
25  Texas A&M University. I graduated from there with a BBA

---

**23**

1  in accounting.
2  Q. Okay. Are you a CPA?
3  A. I am.
4  Q. Okay. Any post college education?
5  A. School of hard knocks, yeah.
6  Q. And since when have you served in the Senate?
7  A. I was elected in 2002.
8  Q. And prior to that, were you a member of the Texas
9  House?
10  A. I was.
11  Q. And the years of your service?
12  A. I was elected in 1996, and I served in the House
13  until I was elected to the Senate.
14  Q. Had you pursued public office before your service
15  as a member of the Texas House?
16  A. No.
17  Q. So, in 1996 when you were elected to the House,
18  that was your first public office?
19  A. Yes.
20  Q. Okay. Could you describe the area encompassed by
21  your district as District 4, The Woodlands?
22  A. Do you want me to describe it as it is configured
23  now or as it was configured before the current
24  redistricting?
25  Q. As it was configured before the current

---

**24**

1  redistricting.
2  A. It's Southeast Texas. It included all of Orange
3  County, most of Jefferson County except for the City of
4  Port Arthur, all of Chambers County except for the
5  Intercoastal Waterway, all of Liberty County, portions
6  of Harris County, from Kingwood, Atascocita and down to
7  Baytown, and in Montgomery County, the south and eastern
8  portions of the county, The Woodlands, east of Magnolia,
9  New Caney and Porter.
10  Q. And is this close to the Louisiana border?
11  A. A portion of my district is close to the
12  Louisiana border.
13  Q. Okay. And what is the --
14  A. It is the border with Louisiana, a portion of it
15  was, yes, not in my current district but in the district
16  I had before redistricting.
17  Q. And the total population of your district before
18  redistricting?
19  A. I don't recall exactly what it was. I know I was
20  about 20,000 under whatever the new target population
21  was.
22  Q. And could you describe the demographics of your
23  district? And, again, I'm referring to your district
24  before redistricting.
25  A. Well, it's the people of Southeast Texas, and as

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 25

1  far as the specific breakdown of -- if you're asking me
2  about the ethnic makeup, I couldn't tell you off the top
3  of my head what those numbers are.
4      Q.  Could you give me an estimate of the proportion
5  of Hispanics, African Americans, Native Americans, Asian
6  Americans in your district?
7      A.  I cannot.
8      Q.  And to which committees do you belong in the
9  Senate?
10     A.  Presently or at the time that we considered this
11 bill?
12     Q.  At the time SB14 was considered.
13     A.  That would have been the last legislative
14 session?
15     Q.  Yes.
16     A.  I was a member of the Senate Finance Committee.
17 I was a member of the Senate State Affairs Committee.  I
18 was a member of the International Relations and Trade
19 Committee.  And I was the Chairman of the Transportation
20 and Homeland Security Committee.  I was also a member of
21 the Legislative Audit Committee, and then I served on
22 several subcommittees on the Senate Finance Committee
23 and on several conference committees during the session.
24     Q.  Okay.  And since when have you -- what were the
25 dates of your service in the State Affairs Committee?

## 26

1      A.  You know, I'd have to go back and look exactly.
2  When I came in in 2002, I don't believe I was on the
3  State Affairs Committee in the '03 session but I think
4  in '05 -- maybe I was in '03 and '05 and then I was not
5  in '07 and I was put -- maybe I wasn't in '09.  I don't
6  know exactly.  I know there was one or two sessions that
7  I was not on that committee and then I was put back on
8  the committee.  So, I don't remember the exact dates out
9  of the five or six sessions that I've served in the
10 Senate.
11     Q.  But --
12     A.  But it's a matter of public record.
13     Q.  Okay.  Were you --
14     A.  It's easy enough to check.
15     Q.  Were you a member of the State Affairs Committee
16 in 2009?
17     A.  I think I was.  Can we look and see?  It's of
18 public record.  I know I was in '11.  I don't think I
19 was in '09 but I don't remember.
20     Q.  Going back to your district demographics, are you
21 aware of the demographics of your district post
22 redistricting?
23     A.  Not specifically.
24     Q.  So, you wouldn't be able to tell me about the
25 proportion of Hispanics, African Americans, Native

## 27

1      Americans, Asian Americans in your district?
2      A.  No.  They are all my constituents no matter what
3  color they are.
4      Q.  And do you know if State Affairs has been the
5  sole committee that has considered voter ID bills since
6  you have been in the Senate?
7      A.  I know that it has not been.
8      Q.  What other committees have considered voter ID
9  bills?
10     A.  The Committee of the Whole.
11     Q.  Okay.  And other than the Committee of the Whole
12 and State Affairs, do you know of other committees which
13 have considered voter ID bills?
14     A.  To my knowledge, no other committee in the Senate
15 has considered that legislation.
16     Q.  Okay.  Have you ever -- okay.  Do you belong to
17 any subcommittees of the State Affairs Committee?
18     A.  Not to my recollection.
19     Q.  And any special task forces or other groups that
20 stem from the State Affairs Committee?
21     A.  I'm not sure what you're asking me.
22     Q.  If the State Affairs Committee appoints some of
23 its members to look into a special issue and they
24 constitute like a special subcommittee for consideration
25 of a special issue, that's what I'm referring to.

## 28

1      A.  And your question again is what?
2      Q.  During the time you have been a member of the
3  State Affairs Committee, have you -- you told me that
4  you have not been a member of any subcommittee of the
5  State Affairs Committee.  Have you been a member of any
6  other group that's part of the State Affairs Committee?
7      A.  You know, I don't recall.  I'd have to go back
8  and check the record.
9      Q.  Okay.
10     A.  It's a matter of public record.  If you really
11 want to know, you can find out.
12         We're going to have to get the temperature turned
13 down in here.
14     Q.  Putting aside the voter photo ID bills, how many
15 election-related bills have you sponsored or co-signed?
16     A.  I don't know.
17     Q.  And any voter photo ID bills that you have not
18 co-sponsored or signed but that you have provided input
19 for?
20     A.  What's your question?
21     Q.  Okay.  Any election-related bills that you have
22 not co-authored or co-signed that you have provided
23 input to?
24         MR. SWEETEN:  Objection.  Vague.
25     A.  I mean, I really don't know what it is you're



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 29

1  asking me.
2      Q. (BY MS. RIOS)  You stated that you don't remember
3  any other election-related bills you have sponsored or
4  co-signed related to -- strike that.
5      Okay.
6      THE WITNESS:  Could you read back her
7  question and my response?
8      (Whereupon, the requested testimony was read back
9  as follows:
10     QUESTION:  Putting aside the voter photo ID
11     bills, how many election-related bills have you
12     sponsored or co-signed?
13     ANSWER:  I don't know.
14     QUESTION:  And any voter photo ID bills that you
15     have not co-sponsored or signed but that you have
16     provided input for?
17     ANSWER:  What's your question?
18     QUESTION:  Okay.  Any election-related bills that
19     you have not co-authored or co-signed that you
20     have provided input to?
21         MR. SWEETEN:  Objection.  Vague.
22     ANSWER:  I mean, I really don't know what it is
23     you're asking me.)
24     A.  I think that covers what you're asking.  I can't
25  tell you.

## 30

1      Q. (BY MS. RIOS)  Okay.  You know, what I meant --
2  my question about the input is have you talked to other
3  legislators about voter ID bills that they have
4  sponsored?
5      A.  I probably have but I don't -- I mean, I couldn't
6  recall any specific conversation.
7      Q.  Did you talk to other legislators about mail-in
8  fraud bills?
9         MR. SWEETEN:  You can answer as to whether
10  you've had communications, if you recall them.  Do not
11  give the substance of any communications you've had
12  regarding any of these bills because that would be a
13  matter of legislative privilege.
14     A.  I may have but I don't recall any specific
15  instance.
16     Q. (BY MS. RIOS)  Do you recall talking to other
17  legislators about bills related to updating the voter
18  registration rolls?
19         MR. SWEETEN:  Same instruction.
20     A.  I may have.  I don't recall any specific
21  conversation.
22     Q. (BY MS. RIOS)  What are your primary areas of
23  focus as a State Senator?
24     A.  Well, I think my committees reflect the things
25  that I work on, and there are other issues I've worked

## 31

1  on as well, criminal justice issues and civil litigation
2  issues.  You know, you have to be a Jack of all trades
3  in the Senate.
4      Q.  Yeah, you have to be a Jack of all trades but
5  what are your primary areas of focus?
6         MR. SWEETEN:  Objection.  Asked and
7  answered.
8         You can answer.
9      A.  I think I've already answered your question.  I
10  mean, you can check my legislative record, and I think
11  it's pretty clear the issues that I've worked on span
12  many different topics.
13     Q. (BY MS. RIOS)  Any signature initiatives that you
14  can tell me about today?
15         MR. SWEETEN:  You can reveal any matters of
16  public record in answering the question.
17     A.  Sure.  I think, you know, we've done a lot of
18  work trying to curb pill mills and the abuse of
19  prescription drugs.  That would be an issue I'm well
20  known across the state for.
21     Q. (BY MS. RIOS)  Any others that you wish to share
22  with us today?
23     A.  Transportation and homeland security related
24  issues.  I chair the committee, so, I've carried a lot
25  of legislation related to that.

## 32

1      Q.  Any others?
2      A.  Not in particular.
3      Q.  Are you familiar with the American Legislative
4  Exchange Council?
5      A.  I am.
6      Q.  And what is it?
7      A.  It is a bipartisan group of legislators and
8  people from the business community who get together
9  periodically to work on state governance-related issues.
10     Q.  Okay.  Do you have any affiliation with ALEC?
11     A.  I have attended some of their meetings.  I'm not
12  a regular attender.
13     Q.  Could you tell me how long have you been
14  attending ALEC meetings?
15     A.  The first one I attended was probably after the
16  1997 session but I couldn't tell you specifically
17  without going back and looking at my calendar for the
18  last 16 years.
19     Q.  Okay.  And since 1997, approximately how many
20  times have you attended ALEC meetings?
21     A.  I don't know.
22     Q.  Your scheduler would be able to provide that
23  information to us?
24     A.  Probably.
25     Q.  Okay.  And these meetings, do you attend the



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

| 33 | 35 |
|---|---|
| 1  meetings approximately once a year or more often? | 1      A.  That's correct. |
| 2      A.  Less often. | 2      Q.  Okay.  Did you ever receive any documents from |
| 3      Q.  Less often?  So, less often than once a year? | 3  ALEC related to voter ID? |
| 4      A.  Yes. | 4      A.  I don't recall. |
| 5      Q.  Okay.  And do you know if other members of the | 5      Q.  Did ALEC offer you any assistance on voter ID? |
| 6  Texas Legislature also attend ALEC meetings? | 6      A.  No. |
| 7      A.  Yes. | 7      Q.  Okay.  Did you solicit any assistance from ALEC |
| 8      Q.  And who are these members? | 8  related to voter ID? |
| 9      A.  Well, you'd have to check with ALEC about it.  I | 9      A.  No. |
| 10  couldn't tell you who all attends. | 10      Q.  Did you solicit any assistance from fellow ALEC |
| 11      Q.  Yes, but I'm asking about the members that you | 11  members on voter ID? |
| 12  recall seeing at the meetings you have attended. | 12      A.  I don't -- I can't answer that because I know -- |
| 13      A.  I know Senator Fraser has attended, and I know | 13  I don't know who's a member of ALEC or who's active in |
| 14  that -- let's see.  Who else have I seen there? | 14  ALEC that I might have worked with. |
| 15  Representative Chisum.  That's all I can say for | 15      Q.  Okay.  Let me rephrase that. |
| 16  certain. | 16          Did you solicit any advice on voter ID from |
| 17      Q.  Okay. | 17  people who have attended ALEC events? |
| 18      A.  I know there are others but I can't recall | 18      A.  Not to the best of my knowledge. |
| 19  whether it was that meeting or something else that I saw | 19      Q.  Okay.  Did any people who attended ALEC events |
| 20  them at. | 20  provide you with any documents related to voter ID? |
| 21      Q.  You describe ALEC as a bipartisan organization. | 21      A.  Not to my recollection. |
| 22  Do you recall seeing any members of the Democratic side? | 22      Q.  Did any people who attended ALEC meetings provide |
| 23      A.  I know there are Democrats who are members and | 23  you with any technical assistance on voter ID? |
| 24  who have attended. | 24      A.  Not to my knowledge. |
| 25      Q.  Okay.  Any names? | 25      Q.  Okay.  Are you familiar with the National Council |

| 34 | 36 |
|---|---|
| 1      A.  I can't recall, no. | 1  of State Legislators? |
| 2      Q.  And is ALEC an organization that is diverse in | 2      A.  I am. |
| 3  other ways? | 3      Q.  And do you attend its meetings? |
| 4      A.  I don't know. | 4      A.  I have attended some. |
| 5      Q.  Do you know if there are members of racial or | 5      Q.  Okay.  Could you tell me when did you attend |
| 6  ethnic minorities who attend ALEC meetings? | 6  these meetings? |
| 7      A.  I believe there are. | 7      A.  The only one I recall that I attended was in the |
| 8      Q.  Could you give me any names? | 8  summer of 1997 in Philadelphia, Pennsylvania. |
| 9      A.  No. | 9      Q.  Okay. |
| 10      Q.  Do you have copies of the agendas or other | 10      A.  That's the only one I recall attending. |
| 11  documents that were distributed at the ALEC meetings you | 11      Q.  Okay. |
| 12  have attended? | 12      A.  I know I've -- I believe I've probably attended |
| 13      A.  No. | 13  others but that's the only specific recollection I have. |
| 14      Q.  Okay.  Did you serve in any ALEC task forces? | 14      Q.  And were these annual meetings that you attended |
| 15      A.  I may have. | 15  or -- |
| 16      Q.  You may have.  Do you recall any specifics? | 16      A.  I did not attend them annually. |
| 17      A.  No. | 17      Q.  You did not attend them annually? |
| 18      Q.  Do you recall when did you serve on these task | 18      A.  No. |
| 19  forces? | 19      Q.  But the meetings that you attended, were these |
| 20      A.  No. | 20  like the annual meetings of the National Council? |
| 21      Q.  And do you recall the -- what the task force is | 21      A.  Yes. |
| 22  focused on? | 22      Q.  Okay.  And since 1997, do you recall how many |
| 23      A.  No. | 23  other ones you attended? |
| 24      Q.  So, you do not recall any issues discussed by | 24      A.  No. |
| 25  these task forces? | 25      Q.  Okay.  And at these meetings with the National |



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

## 37

1  Council of State Legislators, did you attend these
2  meetings with legislators from other states?
3      A.  There were legislators from other states in
4  attendance, yes.
5      Q.  Okay.  And did you solicit any advice on voter ID
6  from the National Council of State Legislators?
7      A.  Not to my knowledge.
8      Q.  And did you solicit any advice from legislators
9  that you met through the National Council of State
10  Legislators?
11      A.  I don't recall that I did.
12      Q.  Okay.  Were you provided any assistance on voter
13  ID, you know, from the National Council of State
14  Legislators?
15      A.  Not to my recollection.
16      Q.  Okay.  And were you provided any assistance on
17  voter ID from legislators you met through the National
18  Council of State Legislators?
19      A.  Not to my knowledge.
20      Q.  When I asked you about your staff and who
21  helped you conduct the search responsive to the notice
22  of deposition, you mentioned your Chief of Staff, Janet
23  Stiebens?
24      A.  Stieben, no S on the end, S T I E B E N.
25      Q.  Stieben.  Okay.  What are her responsibilities?

## 38

1      A.  She's the Chief of Staff.  She's in charge of all
2  of the people in the office, making sure that the office
3  runs on time, and she does my scheduling.  She also
4  edits all of our press releases and other duties as I
5  might assign to her.
6      Q.  And since when has she worked in your office?
7      A.  Since 1996.
8      Q.  So, since you were elected to the House?
9      A.  Yes.
10      Q.  And Mr. Baxter, what are his responsibilities?
11      A.  He -- the biggest job that he has is making sure
12  I'm prepared when I go to the floor, that we've got an
13  analysis of the legislation that we're going to consider
14  that day, and he also has overall responsibilities for
15  reviewing the legislation that we're carrying in my
16  office and the progress of that legislation and to
17  monitor the legislative aids and make sure that their
18  recommendations to me are consistent with my overall
19  guidelines and that we're following the procedures of
20  the Senate and, you know, just he has overall
21  responsibility making sure the office flows along
22  smoothly from a legislative standpoint.
23      Q.  What did you mean that the legislation is
24  consistent with your overall guidance?
25          MR. SWEETEN:  Are you saying as a general

## 39

1  matter?  We're not talking about specific legislation
2  here?
3          MS. RIOS:  As a general matter.
4          MR. SWEETEN:  Okay.
5      A.  Well, I'm well known as a fiscal and social
6  conservative, and he is familiar with my voting record
7  and how I represent my district, and he has overall
8  responsibility in making sure that the research and
9  recommendations are consistent with my beliefs.
10      Q.  (BY MS. RIOS)  And since when has Mr. Baxter been
11  your Legislative Director?
12      A.  I don't recall exactly.  It would have been the
13  '05 or the '07 session, 2005 or 2007.
14      Q.  Okay.  Who of your staff has worked on photo ID
15  issues or bills?
16          MR. SWEETEN:  You can answer as phrased.
17          MS. RIOS:  I'm asking who.
18          MR. SWEETEN:  And I'm letting him answer.
19      A.  Jason Baxter, Ryan La Rue, Amanda Montain.  Those
20  would be the people that principally have worked on it.
21      Q.  (BY MS. RIOS)  Okay.
22      A.  There may have been others that, you know, helped
23  in some peripheral way but they are the ones that had
24  the primary responsibility.
25      Q.  And Mr. La Rue, what is his title?

## 40

1      A.  Presently, he is the Committee Director for the
2  Transportation and Homeland Security Committee.  His
3  name is spelled L A capital R U E.
4      Q.  And since when has he worked on your staff or is
5  he assigned to the committee?
6      A.  Those are two different questions.
7      Q.  Yes.  I'm asking does he work, you know, for you?
8  Is he a member of your staff?
9      A.  Yes.
10      Q.  And since when has he been a member of your
11  staff?
12      A.  Since he graduated from law school is when I
13  hired him, and I don't remember exactly when that was.
14  It was after the -- sometime after the '03 and '05
15  session.
16      Q.  Okay.  And is Mr. La Rue employed by you or by
17  the committee?
18      A.  I think both.
19      Q.  Okay.  And since when has he served as the
20  Committee Director?
21      A.  Since I was named as the Chairman of that
22  committee in July preceding the last session.
23      Q.  Amanda Montain, what's her title?
24      A.  She's my General Counsel.
25      Q.  And since when has she served as your General



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Thomas D. Williams                                    June 1, 2012

## 41

1  Counsel?
2     A.  Since she graduated from law school.
3     Q.  And approximately when was this?
4     A.  I think that I named her General Counsel after
5  the '09 session and before the 2011 session.
6     Q.  How often do you communicate with your staff?
7     A.  Well, it depends.  I mean, frequently.
8     Q.  Okay.  And how do you communicate with them?
9  E-mail, phone?
10    A.  Mostly by phone or in person.
11    Q.  Do you communicate with them by E-mail?
12    A.  Yes, sometimes.
13    Q.  Okay.  And do you have -- do you use your
14 personal account or your government account?
15    A.  I have a personal E-mail account that most of the
16 correspondence with my staff goes through when I'm not
17 in Austin.  When I'm in Austin, it's mostly face-to-face
18 or on the phone.
19    Q.  And do you communicate with them by texting?
20    A.  I do.
21    Q.  Okay.  And is this through your personal phone or
22 a government phone?
23    A.  My personal phone.
24    Q.  And the communications with your staff, how often
25 do you communicate with them when the legislation is not

## 42

1  in session?
2     A.  As needed.
3     Q.  As needed is how often?
4     A.  There's rarely a week that would go by that I
5  wouldn't talk to them but there could be a week that I
6  might not communicate with them at all.
7     Q.  And how often do you communicate with your staff
8  on nonlegislative matters?
9     A.  Infrequently.
10    Q.  And what means do you use to communicate with
11 your staff on nonlegislative matters?
12    A.  Mostly in person or on the telephone.  I might
13 send them a text.
14    Q.  And how often do you communicate with your staff
15 on legislative matters?
16    A.  During the session, frequently.  During the
17 interim period, less frequently but rarely would a week
18 go by that I might not speak to them about some matter,
19 some member of the staff, not every member.
20    Q.  And how often do you communicate with other
21 members of the legislature on legislative matters?
22    A.  During the session, frequently.
23    Q.  And through what means?
24    A.  Mostly in-person communication.
25    Q.  And when the legislature is not in session, how

## 43

1  often do you communicate with other members of the
2  legislature?
3     A.  Very infrequently.
4     Q.  And what means do you use to communicate with
5  them?
6     A.  Telephonically most frequently.  I might send
7  them an E-mail.  I might send them a text.
8     Q.  And when you communicate with members of your
9  staff or other people using your personal E-mail
10 account, do you save these messages?
11    A.  I don't save them -- are you asking if I save
12 them in my personal E-mail?
13    Q.  Or somewhere else.
14    A.  No.  Just until I clean my E-mail box out.
15    Q.  Do you save any messages under personal E-mail
16 that are related to your role as a State Senator?
17    A.  No.
18    Q.  And do you save any messages on your personal
19 phone or text messages, you know, related to your
20 functions as State Senator?
21    A.  No.
22    Q.  So, when a search was conducted for documents
23 responsive to our subpoena, were there any messages from
24 your personal E-mail account or from your personal
25 phone?

## 44

1     A.  Not to my recollection, there weren't any.
2     Q.  There were --
3     A.  Are you asking if I searched or if there was
4  anything that was found?
5     Q.  If you searched.
6     A.  I did.
7     Q.  And were those submitted?
8     A.  I don't believe there were any found that were
9  responsive to your request.
10    Q.  Okay.  But you indicated earlier that you don't
11 save these messages, the messages to your staff from
12 your personal phone or E-mail account?
13    A.  That's correct, but we searched anyway to be
14 sure.
15    Q.  Do you have any retention -- do you follow any
16 retention policy when it comes to messages in your
17 personal E-mail account?
18    A.  No.
19    Q.  Do you follow any retention policy when it comes
20 to messages in your personal phone?
21    A.  No.
22    Q.  Okay.  Do you use your personal account so that
23 these communications are not subject to the Texas public
24 records retention policies or laws?
25    A.  No.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 45

1 Q. Do you follow the Texas public records retention
2 laws and regulations when it comes to communications
3 with your staff?
4        MR. SWEETEN: Objection. Vague.
5 A. I'm not going to answer the question.
6        MR. SWEETEN: Well, no, you can answer
7 subject to my instruction.
8 A. You know, any time I communicate with a staff
9 member, it would be -- on a legislative matter, it would
10 be on their state E-mail, and that E-mail would be
11 retained according to the state E-mail policies, and
12 there's no need for me to retain it because there's a
13 record of it then, and they follow whatever the state
14 policy is.
15 Q. (BY MS. RIOS) So, if there is a record, it would
16 be on their end and not yours?
17 A. Correct.
18 Q. Okay. And when you communicate with members of
19 your staff, you communicate with their government
20 accounts?
21 A. If it's a legislative matter, I do.
22 Q. And do you ever communicate with your staff to
23 their personal accounts?
24 A. I do.
25 Q. Okay. Do any of those communications have to do

## 46

1 with legislative matters?
2 A. No.
3 Q. And who makes -- how do you make the call of
4 whether it's a legislative or nonlegislative matter?
5 A. It's never been a problem. We've always used --
6 made sure that if we're discussing a legislative matter
7 that at least on their side, the staff's side, there is
8 a copy of all the communication.
9 Q. Okay.
10 A. It's never been an issue.
11 Q. Okay. And did your staff members search their
12 personal accounts to see if there was anything
13 responsive to our notice of deposition?
14 A. I'm sure they did.
15 Q. Did you ask them to do that?
16 A. Yes. It was a part of these instructions that
17 would have been, yes.
18 Q. And do you know if there was anything responsive
19 in their personal accounts to our requests?
20 A. I don't know.
21 Q. When did you last renew your driver's license?
22 A. I don't know. I can find out. I could look at
23 it and tell you. Would you like me to do that?
24 Q. Please do.
25 A. It expires on my birthday in 2013, so, it would

## 47

1 have been six years prior to that in '07.
2 Q. Okay. And what did you have to do in '07 to
3 renew your driver's license?
4 A. I don't recall.
5 Q. Do you know if -- do you recall if you had to go
6 to a driver's license office?
7 A. I don't recall. I know that every 12 years, you
8 have to go in and have your picture made and renew your
9 license in person. I can't tell you the last time I did
10 that. I know I follow the law.
11 Q. Okay. So, you don't recall whether you did that
12 in '07 or in 2001?
13 A. That's correct.
14 Q. Okay. And do you recall in 2001 and 2007 what
15 were the hours of operation of the office you visited?
16 A. I don't know. 8:00 to 5:00 I think is what they
17 typically operate but I don't recall specifically.
18 Q. And do you recall if you had to wait in line?
19 A. I'm sure I did when I went in person.
20 Q. Okay. And do you recall how long it was to wait
21 in line?
22 A. I do not.
23 Q. Okay. And did you drive to get to this facility?
24 A. I'm sure I did.
25 Q. Okay. And if you had not gotten there by

## 48

1 driving, how long would it -- do you recall how long it
2 would have taken you to go to this facility?
3 A. Well, I guess it would depend on what means
4 besides driving I used, whether I was walking or riding
5 a bicycle or taking a bus or asking a friend to drive
6 me. So, I guess the answer is it would depend on how I
7 got there.
8 Q. And for -- do you have a copy of your birth
9 certificate?
10 A. I do.
11 Q. And where would you go to get a copy of your
12 birth certificate if you lost yours?
13 A. I believe that I would have to go to the Harrison
14 County courthouse and get it.
15 Q. And do you know what would be the cost of a birth
16 certificate?
17 A. I have no idea.
18 Q. And how would you get to the Harris County
19 courthouse to get a replacement copy of your birth
20 certificate?
21 A. I wouldn't go to the Harris County courthouse.
22 That's not what I said.
23 Q. Okay. Where is it that you went?
24 A. Harrison County courthouse.
25 Q. Harrison County. Harrison County. And how would



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

| 49 | 51 |
|---|---|

**49**

1  you get to Harrison County?
2      A. Well, I would have to drive.
3      Q. Drive?
4      A. Or take a bus.  You may be able to get it
5  locally.  I don't know the answer to that.  I've had a
6  copy since I've been enrolled in school.
7      Q. Do you know if you could get a birth certificate
8  by mail?
9      A. You know, I don't know.  Maybe.
10     Q. Have you at any time done some research on how to
11  get a replacement birth certificate?
12         MR. SWEETEN:  With respect to any research
13  you've done, you can -- don't reveal matters that are
14  subject to the legislative privilege.  That would
15  include thoughts, mental impressions, opinions,
16  motivations about legislation, legislators that you may
17  have spoke with, legislative staff members, state
18  agencies, Texas Legislative Council or constituents.
19         You can reveal as to matters of public
20  record or to the extent it doesn't implicate that
21  privilege.
22     A. I know it was discussed in committee and it was
23  also discussed on the floor when the legislation -- the
24  voter ID legislation was debated.  So, I know there was
25  an extensive discussion about that.

**51**

1         MR. SWEETEN:  I think you're asking means.
2  He's not going to reveal who he voted for, right?
3         MS. RIOS:  Oh, no.  No.
4         MR. SWEETEN:  I think we're on the same
5  page.
6      A. You're asking by what means?  I presented a photo
7  ID.
8      Q. (BY MS. RIOS)  No.  I'm asking you whether you
9  voted in person at the polls, whether you voted early?
10     A. I voted in person early during the early voting
11  period.
12     Q. Okay.  And how far is your polling place from
13  your house?
14     A. Are you asking about my precinct or about where I
15  voted early?
16     Q. Where you voted early.
17     A. Three miles probably, approximately three miles.
18     Q. Okay.  And do you ever vote at your polling place
19  on election day?
20     A. Sometimes.
21     Q. And how far is your polling place -- your regular
22  polling place from your house?
23     A. Less than a mile.
24     Q. Less than a mile.  And how do you get from your
25  home to your regular polling place?

| 50 | 52 |
|---|---|

**50**

1         It's also my belief that every kid who is
2  enrolled in school has to have a certified copy of their
3  birth certificate.  It's a fairly common requirement
4  that you have that.
5      Q. (BY MS. RIOS)  But I'm asking you did you conduct
6  any research on how to get a replacement?
7         MR. SWEETEN:  Okay.  Once again, if this
8  is -- if this relates to your thoughts, mental
9  processes, opinions, motivations about legislation,
10  don't reveal that subject matter.
11         If it relates to matters of a public record
12  and doesn't implicate the legislative privilege, you can
13  answer.
14     A. Only to the extent it was discussed in committee.
15     Q. (BY MS. RIOS)  So, you don't have any knowledge
16  independent to what was discussed in committee?
17     A. No.
18     Q. And what committee was this?
19     A. It would have been the Committee of the Whole or
20  the Senate State Affairs Committee.
21     Q. And what year?
22     A. Either in '09 or '11.
23     Q. Okay.  And when was the last time you voted?
24     A. It was May 29th.
25     Q. And how did you vote on May 29th?

**52**

1      A. I would walk or drive.
2      Q. And when you voted on Tuesday at the -- when you
3  voted for the primaries, how did you get to your early
4  voting place from your home?
5      A. Which primary?
6      Q. The one on Tuesday, May the 29th.
7      A. And would you repeat the question again?
8      Q. How did you get from your home to your early
9  voting site?
10     A. I'm trying to recall because it's very near my
11  office.  I drove to the office, and I think that I
12  stopped by there on the way back from lunch.  So, I
13  would have -- I think I drove.  I have walked but I
14  think this time I drove on May 29th as I was returning
15  from an appointment or from lunch.
16     Q. And, Mr. Williams, do you have any experience,
17  you know, related to election administration?
18     A. No.
19     Q. So, you have never volunteered as a poll worker,
20  an elections judge?
21     A. No.
22     Q. And what is your experience related to election
23  law?
24         MR. SWEETEN:  Objection.  Vague.
25     A. The only experience I have is the experience I


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Thomas D. Williams                                    June 1, 2012

## 53

1    gained as a legislator.
2       Q. (BY MS. RIOS)  Have you ever witnessed anyone try
3    to impersonate another voter?
4       A. Have I personally witnessed that?
5       Q. Yes.
6       A. No, not to my knowledge.
7       Q. Okay.  And have you ever witnessed a noncitizen
8    vote?
9       A. Not to my knowledge.
10      Q. Have you ever challenged a voter's eligibility?
11      A. I have not.
12      Q. I'm going to show you what will be marked as
13   Exhibit 401.
14          (Exhibit 401 marked.)
15      Q. (BY MS. RIOS)  This is an article from the NEW
16   YORK TIMES dated May 30th, 2009, and it's entitled The
17   Talk, and the Talk, and the Talk, of Austin.  I bring to
18   your attention Page 2.  And if you could look at the
19   paragraph towards the bottom of the page that begins
20   with, "Senator Tommy Williams."
21      A. Uh-huh.
22      Q. Okay.  According to this article, you stated, "My
23   grandfather voted in the Democratic primary for 50 years
24   after he was dead."
25      A. That's correct.

## 54

1       Q. And how do you know about this?
2       A. My brother and my grandmother related that
3    information to me.
4       Q. Okay.
5       A. I believe that my brother testified about this in
6    the Committee of the Whole.
7       Q. And did you or anyone from your family take any
8    action in relation to the assertion that your
9    grandfather voted for 50 years after his death?
10      A. My brother and my grandmother tried several times
11   to get my grandfather removed from the rolls.  She was
12   not successful, and she enlisted my brother to help her.
13   And he tried to also get him removed, and I don't
14   believe that he was successful in doing that.
15      Q. And it's removed from which rolls?
16      A. The voter rolls.  He was dead.  He died when my
17   mother was two.
18      Q. And what did he -- what year was this?
19      A. It would have been in the '30s.
20      Q. Okay.  And these were the voter rolls from -- was
21   it from a county?
22      A. Harrison County.
23      Q. Harrison County.  And how many times did your
24   grandmother and your brother try to get your grandfather
25   removed from the rolls?

## 55

1       A. You'd have to ask my brother.  I don't know the
2    answer to that.
3       Q. Do you know if anyone was arrested, prosecuted or
4    convicted for -- did anyone vote for your grandfather
5    during these 50 years?
6       A. Apparently someone did.
7       Q. Okay.  And do you know if anyone was arrested,
8    prosecuted or convicted for voting for your grandfather?
9       A. Not to my knowledge.
10      Q. Okay.  And do you know how often someone voted
11   for your grandfather during these 50 years?
12      A. I do not have -- I do not know exactly.
13      Q. And what evidence do you have that a vote was
14   cast for your grandfather at any time during these
15   50 years?
16      A. My brother testified about it in committee.
17      Q. Does he have -- and what evidence did he have?
18      A. You would have to ask him about that.
19      Q. Did he have any copies of the voter rolls
20   indicating that a vote was cast?
21      A. You would have to ask him about that.
22      Q. Okay.  And these were 50 years beginning in the
23   '30s?
24      A. Yes.  I think it may have been more than
25   50 years.

## 56

1       Q. And do you know of any evidence that the -- that
2    your grandfather's name was on the rolls?
3       A. Yes.  My grandmother received his voter
4    registration card, and when she called and tried to have
5    him removed and she told the person that he had been
6    dead for decades, they said, "No, ma'am, he voted in the
7    last election."
8       Q. Okay.  Did she file a complaint?
9       A. I don't know.  I don't know.
10      Q. Did your brother file a complaint?
11      A. I think that whatever he did is reflected in the
12   testimony that he gave before the Committee of the
13   Whole.
14      Q. Do you have any other evidence or information
15   that your brother did not include in his testimony?
16      A. No.
17      Q. Are you familiar with the National Voter
18   Registration Act?
19      A. I know -- I've heard of it.  I don't know what
20   you mean by "familiar."
21      Q. Okay.  Are you aware that the National Voter
22   Registration Act includes provisions about keeping the
23   voter rolls up to date and accurate?
24      A. I am.
25      Q. Okay.  Do you know whether your grandmother or



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

**57**

1    your brother made any complaint under the National Voter
2    Registration Act?
3        A. And when was that act passed?
4        Q. That act passed -- that was in 1996.
5        A. I believe my grandmother was deceased at that
6    time.
7        Q. And by that time was your grandfather off the
8    voter rolls, do you know?
9        A. I don't know.
10       Q. You don't know? And so, when you stated, "My
11   grandfather voted in the Democratic primary for 50 years
12   after he was dead," was that, you know, based on what
13   your brother and your grandmother told you?
14       A. Yes.
15       Q. But do you have any personal knowledge that this
16   assertion is true?
17       A. I know that they were truthful when they told me
18   that.
19       Q. But do you --
20       A. They would have no reason not to be.
21       Q. But do you have any evidence of this assertion?
22           MR. SWEETEN: Asked and answered.
23           You can go ahead and answer it.
24       A. All I have is what they told me. I believe it to
25   be true.

---

**58**

1        Q. (BY MS. RIOS) Okay. Are you familiar with
2    Section 5 of the Voting Rights Act?
3        A. I know -- when you say "familiar," I'm not sure
4    what you mean by that. Can you clarify that?
5        Q. Do you know about Section 5 of the Voting Rights
6    Act?
7        A. Yes.
8        Q. And what is your understanding of Section 5
9    requirements?
10       A. My understanding of Section 5 requirements are
11   that it applies only to the states that were members of
12   the confederacy, and it requires those states to -- when
13   there is a change in election law, to preclear that
14   law -- the change in law with either the Justice
15   Department or the DC Court of Appeals.
16       Q. And do you believe that compliance with this
17   statute is important?
18           MR. SWEETEN: When you're answering the
19   question, don't reveal your thoughts, mental
20   impressions, opinions, motivations about legislation,
21   including Senate Bill 14, and don't reveal
22   communications that you've had that I've outlined.
23       A. It's something that we have to deal with as state
24   legislators.
25       Q. (BY MS. RIOS) And how does a legislator ensure

---

**59**

1    that election laws comply with Section 5?
2           MR. SWEETEN: I'm going to object. I think
3    you're asking him matters that are subject to the
4    legislative privilege that would require him to reveal
5    his thoughts, mental impressions, opinions, motivations
6    about legislation and the furtherance of the legislative
7    process.
8        A. I'm not going to answer the question on advice of
9    counsel.
10       Q. (BY MS. RIOS) And when you said that, "Section 5
11   is something that we have to deal with," what did you
12   mean by that?
13       A. It's a -- what I meant was that it is a federal
14   law that is something that has to be considered in the
15   legislative process.
16       Q. And considered how?
17           MR. SWEETEN: I think when you're asking him
18   how he's considering it, you're asking him to reveal his
19   thoughts, mental impressions, opinions, motivations
20   about legislation and the furtherance of the legislative
21   process. Objection. Legislative privilege. Instruct
22   not to answer.
23       A. On the advice of counsel, I won't answer that
24   question.
25       Q. (BY MS. RIOS) Okay. Did you receive any legal

---

**60**

1    advice on the elections-related legislation to ensure
2    compliance with Section 5?
3           MR. SWEETEN: You can -- go ahead.
4           MS. RIOS: I'm asking if he does receive
5    legal advice. I'm not asking about, you know, the
6    subject of this legal advice.
7           MR. SWEETEN: Okay. And so, I'm going to
8    let you answer a yes or no as to whether you've received
9    legal advice. Don't reveal the substance of the
10   conversation.
11       A. Yes.
12       Q. (BY MS. RIOS) And from whom did you receive this
13   legal advice?
14       A. It could be a number of sources. It could be a
15   member of my staff. It could be someone from the
16   Attorney General's office. It could be someone from the
17   Secretary of State's office. And it could be someone
18   from the staff of the committee -- from the State
19   Affairs Committee, for example, where that kind of
20   legislation is most frequently considered.
21       Q. Okay. And did you receive any legal advice on
22   Senate Bill 14 to ensure compliance with Section 5?
23           MR. SWEETEN: I think the question gets into
24   the substance of communication. I think he can -- and I
25   think he has indicated where he's received sources of

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Thomas D. Williams                               June 1, 2012

---

### 61

1  legal advice but I think when we get into what the
2  specifics are, I think that that's problematic from the
3  legislative privilege standpoint.  So, I'm going to
4  object.
5            MS. RIOS:  I'm asking did he receive legal
6  advice on Senate Bill 14 to ensure compliance with
7  Section 5.  That's --
8            MR. SWEETEN:  I think that's a little more
9  than a general subject matter description.  I'll
10  allow -- I'll work with you to allow the question.  If
11  you're asking about whether he's received legal advice,
12  he's given that.  If he's received legal advice as to
13  Senate Bill 14, he can answer that but then you say
14  ensure compliance with Section 5, I think we're
15  talking -- we're getting into more substance of the
16  communication.  So, I think if you can avoid that, then
17  I'll let him answer the question.
18       A.  Would you like to rephrase the question?
19       Q.  (BY MS. RIOS)  Okay.  Did you receive any legal
20  advice on Senate Bill 14?
21       A.  Yes.
22       Q.  From whom?
23       A.  From members of my staff, from the Secretary of
24  State's office and from -- you know, I don't recall.
25  There were probably other people who gave me legal

### 62

1  advice but I don't recall specifically.
2       Q.  And did you receive any legal advice on Senate
3  Bill 14 about complying with Section 5?
4            MR. SWEETEN:  I mean, the Court has allowed
5  a general subject matter description.  Let me take a
6  minute with him.
7            (Short recess.)
8            MR. SWEETEN:  If you could repeat the
9  question.
10            (Whereupon, the requested testimony was read back
11  as follows:
12            QUESTION:  And did you receive any legal advice
13  on Senate Bill 14 about complying with Section
14  5?)
15            MR. SWEETEN:  Okay.  I'm going to allow him
16  to answer it.  I think that's a general subject matter.
17  I'll allow him to give an answer.
18            But don't reveal the substance of the
19  communications.
20       A.  Yes.
21       Q.  (BY MS. RIOS)  Okay.  Did you specifically -- did
22  you request advice on complying with Section 5 as it
23  pertains to Senate Bill 14 or was this offered to you as
24  a matter of course?
25            MR. SWEETEN:  I think this has been asked

### 63

1  and answered, and I think we're getting into -- he's
2  already answered whether he's -- about that last issue.
3  I think he's already done this.  So, I don't want to
4  keep -- I don't want to reveal the substance of the
5  communications, and so, I'm going to instruct him at
6  this point not to answer that question as phrased.
7       A.  On the advice of counsel, I'm not going to answer
8  that question.
9            MS. RIOS:  What I'm asking was whether he
10  requested this advice or whether this was given to him
11  as a matter of course.  I'm not --
12            MR. SWEETEN:  In other words, the advice
13  that he answered the question on previously, in other
14  words, whether he initiated the request or whether it
15  was given, is that what you're asking?
16            MS. RIOS:  Yes.
17            MR. SWEETEN:  I'll let him answer in that
18  context.
19       A.  I don't recall.
20       Q.  (BY MS. RIOS)  Okay.  What is Texas' current
21  system for determining how to verify the identity of a
22  voter who shows up at the polling place to vote?
23            MR. SWEETEN:  You can answer about current
24  law.
25       A.  Current law provides that if you show up with a

### 64

1  voter registration card, that is sufficient for you to
2  vote in the election.
3       Q.  (BY MS. RIOS)  Okay.  And has this system failed
4  to prevent voter fraud?
5            MR. SWEETEN:  In answering the question, do
6  not reveal your thoughts, mental impressions, opinions
7  or motivation about legislation or in furtherance of the
8  legislative process, including Senate Bill 14.  Don't
9  reveal communications you've have with legislators, with
10  legislative staff, with state agencies, Texas
11  Legislative Council or constituents in answering the
12  question.
13            I'm not prohibiting you from answering based
14  on matters of the public record.  With that instruction,
15  you can answer the question to the extent you're not
16  revealing matters of legislative privilege.
17       A.  I think that I would refer you to the record that
18  was taken in the Committee of the Whole when we took
19  testimony on this bill, on this legislation, and I think
20  there were a number of instances that were cited where
21  it was believed that there was in-person voter fraud
22  occurring in the state, and I think it's a matter of
23  public record and you can see that.
24       Q.  (BY MS. RIOS)  I'm aware of the public record,
25  you know, Senator Williams, but we are taking your

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Thomas D. Williams                                    June 1, 2012

---

### 65

1    deposition, so, I am asking you about whether the
2    current system has failed to prevent voter fraud?
3         MR. SWEETEN:  And I'm going to object based
4    upon the legislative privilege for the reasons I've
5    outlined previously but, again, he can answer based upon
6    matters of public record.  He's not going to reveal his
7    thoughts, mental impressions, opinions or motivations
8    about legislation in answering this question.
9         A.  There is information in the public record that
10   there has been in-person voter fraud, in my opinion.
11   That's what the record shows.
12        In fact, I think in the last session of the
13   legislature, I introduced an affidavit from someone who
14   was paid to be someone else in the Progreso Independent
15   School District.  There was a sworn affidavit to that
16   effect that they were paid and given a voter
17   registration card to go vote.
18        Q.  (BY MS. RIOS)  And this affidavit from the
19   Progreso School District election, did it lead to any
20   criminal charges or convictions?
21        A.  I don't know the answer to that.
22        Q.  Okay.  Do you know if it's a matter of public
23   record whether this affidavit led to any convictions
24   or --
25        A.  I'm sure that it is.

### 66

1         Q.  Do you know if there were any convictions or even
2    criminal charges?
3         A.  I've already answered that I didn't know.  I
4    don't know.
5         Q.  And other than this affidavit, any other evidence
6    that the current system failed to prevent voter fraud?
7         MR. SWEETEN:  Again, don't reveal your
8    thoughts, mental impressions, opinions or motivations
9    about legislation or in furtherance of the legislative
10   process, including Senate Bill 14.  Do not reveal
11   communications you've had with the individuals or
12   entities that I've outlined previously.  You can answer
13   the question.
14        A.  I think that there were a number of instances
15   where there was voter fraud that was in-person voter
16   fraud that was cited during the course of the testimony
17   that we took in committee.
18        Q.  (BY MS. RIOS)  And were these allegations,
19   complaints or convictions?
20        A.  They were complaints.
21        Q.  Complaints that led to convictions?
22        A.  I don't -- I can't tell you whether they led to
23   convictions or not.
24        Q.  Didn't you think that it was important to know
25   whether a complaint or the affidavit from Progreso led

### 67

1    to a conviction before introducing it in the record?
2         MR. SWEETEN:  That calls for matters of
3    legislative privilege, including his thoughts, mental
4    impressions, opinions, motivations about legislation or
5    in furtherance of the legislative process.
6         I'm going to instruct him not to answer as
7    to whether he felt it was important as to that issue.
8         You can refer to matters in the public
9    record, if possible, in answering the question.
10   Otherwise, I'm going to instruct you not to answer based
11   on the legislative privilege.
12        A.  I don't think I have anything further to say.
13        Q.  (BY MS. RIOS)  Okay.  If you forget your
14   registration card on election day, can you show any
15   other documents that will enable you to cast a ballot?
16        MR. SWEETEN:  You're asking under current
17   law?
18        MS. RIOS:  Under current law.
19        MR. SWEETEN:  Okay.  You can answer as to
20   current law.
21        A.  Yes.
22        Q.  (BY MS. RIOS)  What other documents can you show?
23        A.  A Texas driver's license, a passport.  Any kind
24   of photo identification that you might have would
25   probably be sufficient.

### 68

1         I also believe there's some other -- I'll refer
2    you back to the legislation but there are other things,
3    such as a utility bill and other things, a library card,
4    things that you can show that might be sufficient.
5         Q.  The library card, the utility bill, these are
6    documents that do not have a photograph?
7         A.  Yes.
8         Q.  And by presenting these documents, you would be
9    allowed to vote?
10        A.  Yes.
11        Q.  Okay.  You told me about the affidavit, you know,
12   from the Progreso school system and other allegations of
13   impersonation at the polls.  Any other problems with the
14   current law?
15        MR. SWEETEN:  Objection.  Calls for matters
16   of legislative privilege, including requiring him to
17   reveal his thoughts, mental impressions, opinions, the
18   motivation about legislation or in furtherance of the
19   legislative process and/or communications that we've
20   outlined previously.
21        So, you can answer, if you can, to the
22   extent you're not revealing matters of privilege.
23   Otherwise, do not answer the question.
24        THE WITNESS:  Could I ask you to read her
25   question back, please?

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Thomas D. Williams                                    June 1, 2012

---

### 69

1    (Whereupon, the requested testimony was read back
2    as follows:
3    QUESTION:  Okay.  You told me about the
4    affidavit, you know, from the Progreso school
5    system and other allegations of impersonation at
6    the polls.  Any other problems with the current
7    law?)
8        MR. SWEETEN:  Same objection and
9    instruction.
10       A.  The problem with the current law is --
11       MR. SWEETEN:  Hold on a minute.  Don't
12   answer if it's going to invade legislative privilege.
13   You can answer based on matters of public record but
14   you're not going to give your thoughts, mental
15   impressions or opinions or motivation about legislation
16   as you've asserted legislative privilege and that would
17   reveal legislative privilege.  So, with that
18   instruction, you can proceed.
19       A.  In the absence of a valid photo ID, there's no
20   way to determine if the person who is voting is who they
21   say they are.  That's the problem.
22       Q.  (BY MS. RIOS)  Any other problems that you wish
23   to identify related to the current system?
24       A.  No.
25       Q.  When was Senate Bill 14 signed into law?

### 70

1        A.  You know, I don't know the exact date.
2        Q.  Okay.
3        A.  We could look at the bill if you have a copy of
4    it.  I mean, it's a matter of public record.
5        Q.  And do you know if elections have been held since
6    Senate Bill 14 was signed into law in July of 2011?
7        A.  Yes.
8        Q.  And has the Secretary of State enforced Senate
9    Bill 14?
10       A.  I don't believe so.
11       Q.  And are you aware of any problems or fraud that
12   have occurred since Senate Bill 14 was signed into law?
13       A.  I don't have any specific knowledge.
14       MR. SWEETEN:  Ms. Rios, I need to take a
15   bathroom break but I don't have to right now, just if
16   you get to a logical stopping place.
17       MS. RIOS:  We can stop right now.
18       Off the record.
19       (Short recess.)
20       Q.  (BY MS. RIOS)  Okay.  Mr. Williams, when did you
21   first hear any support for enacting a photo voter
22   identification statute in Texas?
23       A.  1997.
24       Q.  '97.  And what were the circumstances?
25       MR. SWEETEN:  Don't reveal matters of

### 71

1    privilege in answering it but you can answer.
2        A.  It's a matter of public record that Democratic
3    Representative Debra Danburg introduced the bill.  It
4    passed out of the House with over 140 votes, I believe,
5    that said if you didn't have your voter registration
6    card that you had to present a photo ID to be able to
7    vote, and I voted for that bill.
8        Q.  (BY MS. RIOS)  Do you know if this was the
9    bill --
10       A.  It may not have been '97.  It may have been '99.
11       Q.  So, in the absence of the voter registration
12   card, the bill provided that you should bring a photo
13   ID?
14       A.  Right.
15       Q.  And the voter registration card does not have a
16   photo?
17       MR. SWEETEN:  You mean right now?  You're
18   saying --
19       MS. RIOS:  Right now, yes.
20       MR. SWEETEN:  -- the voter registration card
21   does not have a photo?
22       A.  That's correct.
23       Q.  (BY MS. RIOS)  And when did you first hear
24   support for having just a photo voter identification
25   statute?

### 72

1        MR. SWEETEN:  You can reveal matters that
2    aren't subject to legislative privilege.
3        A.  I don't recall.
4        Q.  (BY MS. RIOS)  Did any of your constituents raise
5    photo voter ID as an important issue to them?
6        MR. SWEETEN:  Objection.  You can reveal
7    whether or not you've had discussions with constituents,
8    the general matter of those but do not reveal the
9    substance of any communications you've had with
10   constituents.
11       A.  I believe my constituents were very concerned.
12       Q.  (BY MS. RIOS)  And when did they express this
13   concern to you?
14       MR. SWEETEN:  You can answer when.
15       A.  I know it has been an issue that they've been
16   very concerned about during my entire tenure in the
17   Senate.
18       Q.  (BY MS. RIOS)  Since 2002?
19       A.  (Witness indicated by nodding his head
20   affirmatively.)
21       Q.  And how often have your constituents raised photo
22   ID as an important issue to them?
23       MR. SWEETEN:  You can talk about the
24   frequency of communications you've had with your
25   constituents regarding the issue of voter ID.  You can

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 73

1  answer that question.
2     A. I don't know.  I can't tell you how often.  I
3  don't recall.
4     Q. (BY MS. RIOS)  Okay.  What are the names of the
5  constituents who have raised photo ID as an important
6  issue for them?
7     A. I don't recall their names.
8     Q. Is there any record of constituents raising photo
9  ID as an important issue for them?
10    A. I don't know.
11    Q. Do you have any -- I mean, did they raise their
12 concern about photo ID in writing or orally?
13       MR. SWEETEN:  You can answer that.
14    A. I know that I have heard it orally.  I may have
15 had written correspondence about it but I don't recall
16 specifically.
17    Q. (BY MS. RIOS)  Do you know if this written
18 correspondence was kept in your office?
19    A. It would have been maintained subject to the
20 requirements that we maintain in Texas but only to that
21 extent.
22    Q. Did any of your constituents bring you evidence
23 of voter impersonation at the polls?
24       MR. SWEETEN:  I think you're asking him to
25 reveal the substance of communications with

### 74

1  constituents.  I think that would invade matters subject
2  to the legislative privilege.
3        So, as to evidence of the substance of the
4  communication, I'm going to object on legislative
5  privilege grounds.
6     A. I don't think I can answer the question without
7  violating a confidence of privilege.
8     Q. (BY MS. RIOS)  So, you cannot answer the question
9  about whether they brought you evidence of voter
10 impersonation?
11       MR. SWEETEN:  Same instruction.
12    A. That's correct.
13    Q. (BY MS. RIOS)  Did other individuals or
14 organizations bring you evidence of voter impersonation
15 at the polls?
16       MR. SWEETEN:  Can you read the question
17 back?
18       (Whereupon, the requested testimony was read back
19 as follows:
20       QUESTION:  Did other individuals or organizations
21 bring you evidence of voter impersonation at the
22 polls?)
23       MR. SWEETEN:  You can answer to the extent
24 it's not a constituent which would be a resident in the
25 State of Texas.  You can answer if that was brought to

### 75

1  you by someone other than a constituent.
2     A. I think that my response -- my response is that
3  to the extent that it's available in the public record,
4  I've been made aware of instances of in-person voter
5  fraud.  And there's nothing that I can recall beyond
6  that that's already a part of the public record.
7     Q. (BY MS. RIOS)  So, in the public record, you put
8  the affidavit from the Progreso Independent School
9  District.  Did you put anything else in the public
10 record?
11    A. Specifically, I don't recall that I put it in but
12 I know there was testimony from Harris County, and I
13 don't recall how it got into the record but I recall
14 that it is a matter of public record that there were a
15 large number of people, maybe as many as 3400, that had
16 voted who were not residents of the United States, and
17 they were purged -- later purged from the rolls, and
18 there was other testimony about that but it's all a part
19 of the public record.  All I know about is part of the
20 public record.
21    Q. Is the Progreso Independent -- is the Progreso
22 School District in your district?
23    A. It is not.
24    Q. Okay.  Where is the Progreso School District
25 located?

### 76

1     A. In the Rio Grand Valley.
2     Q. Have any groups or individuals brought you
3  evidence of other types of voter fraud, meaning voter
4  fraud that is unrelated to impersonation at the polls?
5        MR. SWEETEN:  Same instruction as to
6  constituents, if it's not a constituent.
7     A. I need to take a break and visit with counsel
8  before I answer that question.
9        MS. RIOS:  Off the record.
10       (Short recess.)
11       THE WITNESS:  Could I ask you to repeat the
12 question to me, please?
13       (Whereupon, the requested testimony was read back
14 as follows:
15       QUESTION:  Have any groups or individuals brought
16 you evidence of other types of voter fraud,
17 meaning voter fraud that is unrelated to
18 impersonation at the polls.)
19    A. There are well-publicized accounts in my home
20 county of Montgomery County of voter fraud that
21 occurred, and I'm aware of that through the media, in a
22 road utility district election.
23    Q. (BY MS. RIOS)  And what type of voter fraud did
24 that pertain to?
25    A. The accounts in the media were that the people --



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 77

1   there were people who were voting in the election that
2   claimed to be residents of the district that were not,
3   in fact, residents of that district.
4       Q.  So, people who -- anyone was charged or convicted
5   for this?
6       A.  I believe my recollection is that there was a
7   conviction.  I don't believe they've been sentenced yet
8   but I don't know.  It is a matter of public record.
9       Q.  And this is unrelated to in-person voter
10  impersonation at the polls, the situation that happened
11  in Montgomery County?
12      A.  I believe that it is.  By the media accounts, I
13  believe it is.
14          MS. RIOS:  Patrick, I am going to ask some
15  of the questions that I already asked with the caveat
16  that it's our position that when constituents provide
17  unsolicited evidence or allegations or complaints to the
18  Senator, that is not protected by the legislative
19  privilege.  These are just communications and evidence
20  that he could receive unrelated to the bills that he's
21  working on.
22          MR. SWEETEN:  Okay.  And if -- and my
23  instruction has been and will continue to be that to the
24  extent you're asking him to reveal communications with
25  constituents that that is a matter subject to the

## 78

1   legislative privilege.
2           So, the substance of those communications,
3   what he talked about, I mean, there's -- that those
4   would be covered by the privilege.
5           You can -- I'm certainly going to let you
6   answer, as the Court order has addressed, the identity
7   of constituents, the general subject matter description
8   of the constituents and what they discussed, the date of
9   the communication, the means and method, whether others
10  were present.  All those foundational questions are fine
11  but I think the core of the legislative privilege
12  includes as one element the constituent communication.
13  So, I'm going to continue my instruction with respect to
14  that issue.
15      Q.  (BY MS. RIOS)  Okay.  Did your constituents bring
16  you unsolicited evidence or complaints of voter
17  impersonation at the polls?
18          MR. SWEETEN:  You can answer if constituents
19  brought you complaints.  Again, the substance of the
20  communication don't reveal but the facts around the
21  communication, I'll let you answer.
22      A.  Yes.
23      Q.  (BY MS. RIOS)  And who were these constituents
24  who brought you evidence of voter impersonation at the
25  polls?

## 79

1       MR. SWEETEN:  You can answer the name of the
2   constituent that's discussed this general subject matter
3   issue with you.
4       A.  There is one constituent that I recall
5   specifically, and her name is Melinda Fredricks.
6       Q.  (BY MS. RIOS)  And when did Melinda Fredricks
7   bring you evidence of voter impersonation at the polls?
8       A.  During the consideration of Senate Bill 14,
9   sometime during that legislative session.  I don't
10  recall the specific date or time.
11      Q.  Did Melinda Fredricks bring you evidence of
12  convictions or charges related to voter impersonation at
13  the polls?
14          MR. SWEETEN:  You don't have to answer the
15  specifics of the communication.  You've given a general
16  subject matter description.  So, I would instruct you
17  not to answer on the basis of legislative privilege as
18  to specific questions about the substance of those
19  communications.
20      A.  On the advice of counsel, I'm not going to answer
21  that question.
22      Q.  (BY MS. RIOS)  Other than Melinda Fredricks, have
23  other constituents brought you evidence of voter
24  impersonation at the polls?
25          MR. SWEETEN:  You can answer as phrased.

## 80

1       A.  I don't have a specific recollection.  They may
2   have.
3       Q.  (BY MS. RIOS)  Have any organizations or
4   community groups brought you evidence of voter
5   impersonation at the polls?
6           MR. SWEETEN:  Can you tell me the question
7   again?  I'm sorry.
8           (Whereupon, the requested testimony was read back
9   as follows:
10          QUESTION:  Have any organizations or community
11          groups brought you evidence of voter
12          impersonation at the polls?)
13          MR. SWEETEN:  You can answer as phrased.
14      A.  Only to the extent that it's a matter of the
15  public record.
16      Q.  (BY MS. RIOS)  Okay.
17      A.  I don't recall anything that's not in the public
18  record.
19      Q.  So, there was no evidence of voter fraud -- of
20  voter impersonation brought by organizations or
21  community groups to you other than what is in the public
22  record?
23          MR. SWEETEN:  Asked and answered.
24          Go ahead.  You can answer.
25      A.  That is correct.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

81

1    Q. (BY MS. RIOS) Okay. Did voter impersonation at
2  the polls become an important issue for you?
3        MR. SWEETEN: You can reveal matters of the
4  public record, not your mental impressions or thoughts
5  but you can reveal matters of the public record in
6  answering that question.
7    A. Yes, it is an issue that I think is very
8  important.
9    Q. (BY MS. RIOS) And when did this issue become
10 very important for you?
11   A. I think that it is a matter of the public record
12 that since I've been in the Senate, this has been an
13 issue that I've taken a strong position on.
14   Q. And why voter impersonation at the polls and not
15 other types of voter fraud?
16       MR. SWEETEN: Yeah, I'm going to object.
17 You're asking him now to reveal his thoughts, mental
18 impressions, opinions and motivations about legislation,
19 and this includes Senate Bill 14. You're trying to get
20 into his thought process. So, I'm going to object based
21 on legislative privilege and instruct you not to answer
22 the question.
23   A. On the advice of counsel, I'm not going to answer
24 that question.
25   Q. (BY MS. RIOS) Are you aware of how many

82

1  convictions for in-person voter fraud have been obtained
2  in the last 20 years in Texas?
3        MR. SWEETEN: You can answer as to matters
4  of public record.
5    A. Only to the extent it's been revealed in the
6  public record. I don't have any knowledge other than
7  what was discussed during the debate of the legislation.
8    Q. (BY MS. RIOS) Are you aware of how many
9  investigations for in-person voter fraud have been
10 obtained in the last 20 years?
11       MR. SWEETEN: Don't reveal matters of
12 privilege. You can refer to matters of the public
13 record.
14   A. To the extent that it was discussed in committee
15 or in the debate, yes, but I have no knowledge beyond
16 that.
17   Q. (BY MS. RIOS) Since you were elected to the
18 Senate, when was the first time that a voter -- a photo
19 voter ID has been introduced into the legislature?
20       MR. SWEETEN: Can you read the question
21 again?
22       (Whereupon, the requested testimony was read back
23 as follows:
24       QUESTION: Since you were elected to the Senate,
25 when was the first time that a voter -- a photo

83

1  voter ID has been introduced into the
2  legislature?)
3        MR. SWEETEN: Okay. You can answer.
4    A. I don't -- I don't specifically recall. I
5  would -- I think it's the '03 session but I'm not -- I
6  couldn't tell you for certain without going back and
7  looking at the record.
8    Q. (BY MS. RIOS) Do you have any independent
9  recollection of any legislation introduced in '03?
10   A. I do not.
11   Q. And going back to the public record, do you know
12 how many convictions for in-person voter fraud are in
13 the public record?
14   A. I do not have an independent recollection of
15 that.
16   Q. And do you have an independent recollection of
17 how many investigations for in-person voter fraud are in
18 the public record?
19   A. I do not.
20   Q. I'm going to show you what has been marked as
21 Exhibit 44. That's the number we have used and that's
22 the bill from '05. Do you recognize this bill?
23   A. It appears to be a copy of House Bill 1706 from
24 the 2005 session.
25   Q. Were you involved in the development or drafting

84

1  of House Bill 1706?
2    A. I was a member of the Senate. This bill was
3  drafted in the House.
4    Q. But were you involved in any way in the drafting
5  of House Bill --
6    A. No.
7    Q. Let me show you what has -- what will be marked
8  as 402, which is the second revised privilege log dated
9  May 23, 2012.
10       MR. SWEETEN: Can I have a copy?
11       MS. RIOS: Sure.
12       MR. SWEETEN: Thank you.
13       (Exhibit 402 marked.)
14   Q. (BY MS. RIOS) The page that I'm bringing to your
15 attention is Page 89, which is the last one, which is an
16 excerpt, and I'm going to your attention the second item
17 on that page.
18   A. Uh-huh.
19   Q. Okay. Who is Jennifer Jackson?
20   A. I don't know.
21   Q. Do you know if she is a member of the TLC, the
22 Texas Legislative Council?
23   A. She may be.
24   Q. Okay. And could you look at Pages 59 and 42?
25 Those are the two preceding ones.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

85

1    A. I'm looking at Page 42.
2    Q. And Page 59.
3    A. Uh-huh.
4    Q. They also list correspondence between Ms. Jackson
5  and you. Do you know who Ms. Jackson is?
6    A. You know, it would appear that she's a member of
7  the Legislative Council after looking at this document.
8  That's what it says and, you know, she may be. I
9  don't -- I've never met her in person.
10   Q. Okay. And did you receive materials related to
11 voter ID from Attorney Jackson on or about May 5th,
12 2005?
13   A. I don't recall.
14   Q. So, you do not recall receiving the materials
15 listed on this privilege log?
16   A. Not specific. I don't specifically recall.
17   Q. Okay. And do you recall when was the first time
18 that you contacted TLC about voter ID?
19   A. I do not.
20   Q. Do you remember -- do you recall if you contacted
21 TLC about voter ID in 2005?
22   A. I do not.
23   Q. Do you recall if you contacted someone at the
24 Secretary of State about voter ID in 2005?
25   A. I do not recall specifically.

---

86

1    Q. Did you contact anyone in the Attorney General's
2  office about voter ID in 2005?
3    A. I do not recall specifically.
4    Q. Any legislators?
5    A. I don't have any specific recollection.
6    Q. Any individuals or organizations?
7    A. I don't have any specific recollection.
8    Q. When did you begin to work on voter ID
9  legislation?
10   A. As I've previously stated, I believe that I voted
11 on a voter ID bill in the '97 or '99 session when I was
12 a member of the House. We would have reviewed the bill
13 before we voted on it. And once I was elected to the
14 Senate, I spent some time on it. That would be the
15 first time that I worked on the legislation myself that
16 I -- you know, a bill that I was working on.
17   Q. Okay. Do you know what are the basic provisions
18 of House Bill 1706?
19   A. Only to the extent that it's a matter of the
20 public record and the bill is before me. I don't know
21 if this is the introduced version. I can't tell if this
22 is an engrossed version or what. So, only to the extent
23 that it -- what you've given me. I have no specific
24 recollection of the provisions of this bill.
25   Q. Do you know what forms of identification are

---

87

1  allowed under this bill?
2    A. I can read them to you out of this. They are
3  listed in Section -- it says here 63.0101 B.
4    Q. Okay.
5    A. Do you want me to answer the question?
6    Q. Okay. Well, you know, comparing Senate Bill 14
7  with the forms of acceptable ID under this bill, does
8  this bill include student ID cards?
9    A. I'll have to look and see.
10     It would appear that it does in Subsection 63 of
11 63.010.
12   Q. And how about in Senate Bill 14?
13   A. I don't have that before me. I don't believe
14 that it was a part of that bill. That's not my
15 recollection that it was.
16   Q. Okay. And does this bill include ID cards issued
17 by Texas state agencies?
18   A. Which bill are we talking about now?
19   Q. 1706.
20   A. It says in Section 1 that a driver's license or
21 personal identification card issued to the person by the
22 Department of Public Safety or the equivalent agency of
23 another state that is not expired. Is that what you're
24 asking me?
25   Q. I'm looking at number 8.

---

88

1    A. Number 8. Okay. The identification card issued
2  by a state agency of the state that contains the
3  person's photograph.
4    Q. Does Senate Bill 14 accept an identification card
5  issued by the state agency of the state that contains
6  the person's photograph?
7    A. Unless I looked at the bill, I couldn't be
8  certain. I don't believe that it does but I would have
9  to look at the bill.
10   Q. Okay. Does this bill allow for two forms of
11 nonphoto ID to be used to verify a person's identity?
12   A. It would appear that this bill allows several
13 different things to be used as a form of identification
14 if more than one can be produced.
15   Q. Okay. Would two forms of nonphoto ID verify
16 someone's identity?
17     MR. SWEETEN: Don't answer the question. It
18 would require you to reveal your thoughts, mental
19 impressions, opinions and motivations about legislation
20 or furtherance of the legislative proces and, as such,
21 would be subject to the legislative privilege.
22   A. On the advice of counsel, I'm not going to answer
23 that question.
24   Q. (BY MS. RIOS) Do you believe that only a photo
25 ID would verify a person's identity?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

89

1    MR. SWEETEN:  Same objection.  Same
2    instruction.
3        A.  Based on the advice of counsel, I'm not going to
4    answer that question.
5        Q.  (BY MS. RIOS)  Are you aware of the purpose of
6    House Bill 1706?
7            MR. SWEETEN:  You can testify about the
8    general purpose, if you're aware.
9        A.  House Bill 1706 says that it is a bill to be
10   entitled an act relating to requiring a voter to present
11   proof of identification.
12       Q.  Okay.  And does House Bill 1706 address that
13   issue?
14           MR. SWEETEN:  You're asking does the text of
15   the bill address this issue that he just said, is that
16   the question?
17           MS. RIOS:  Yes.
18           MR. SWEETEN:  You can answer based on the
19   text of the bill.
20       A.  This was -- House Bill 1706 was an attempt to
21   address this requirement.
22       Q.  (BY MS. RIOS)  Okay.
23       A.  I don't recall specifically but I don't think
24   this was passed into law.  I don't know specifically
25   without going back and looking at the record.  I can't

---

90

1    tell by looking at this bill.
2        Q.  Okay.  And are you aware of whether House Bill
3    1706 -- did it have the purpose to prevent noncitizen
4    voting?
5            MR. SWEETEN:  You can testify as to the
6    general purpose of the bill.  In fact, the Court order
7    says that to the extent such privilege exists, the
8    privilege does not protect testimony with respect to the
9    general purpose or the purpose of the legislature as a
10   whole in enacting Senate Bill 14 as opposed to the
11   subjective intent of the legislature.  So, you can
12   testify as to the general purpose of the bill.
13           THE WITNESS:  Would you repeat the question
14   that she asked?
15           (Whereupon, the requested testimony was read back
16           as follows:
17           QUESTION:  Okay.  And are you aware of whether
18           House Bill 1706 -- did it have the purpose to
19           prevent noncitizen voting?)
20       A.  You know, I don't know the answer to that
21   question without looking at it more, without further
22   studying.  Do you want me to read it and try to
23   determine?
24       Q.  (BY MS. RIOS)  Well, I'm asking based on your
25   recollection.

---

91

1        A.  I don't specifically recall this bill.
2        Q.  Okay.  This bill was referred to State Affairs,
3    the Senate Committee in May of 2005.  Were you serving
4    on the committee at the time?
5        A.  It's a matter of public record whether I was or
6    not.  I think I probably was.
7        Q.  Okay.  And do you know what happened to House
8    Bill 1706 after it was referred to the Senate Committee
9    on State Affairs?
10       A.  I do not have a specific recollection.
11       Q.  Did you take a public position on House Bill
12   1706?
13       A.  I don't recall.
14       Q.  Okay.  And do you recall talking to anyone,
15   either within or outside government, regarding House
16   Bill 1706?
17       A.  I have no specific recollection.
18       Q.  Did you talk to your constituents about House
19   Bill 1706?
20       A.  I have no specific recollection.
21       A.  And did you or your office conduct any analysis
22   related to House Bill 1706?
23           MR. SWEETEN:  I'm sorry, could you read that
24   back, please?
25           (Whereupon, the requested testimony was read back

---

92

1    as follows:
2    QUESTION:  And did you or your office conduct any
3           analysis related to House Bill 1706?)
4           MR. SWEETEN:  Object to the question as
5    vague as to the term "analysis."
6           Don't reveal any communications you've had
7    with your staff on this issue.  You can answer the
8    question.
9        A.  I don't have any specific recollection of this
10   bill from the 2005 session.
11       Q.  (BY MS. RIOS)  Okay.  Do you know if a photo ID
12   bill was introduced in the legislative session in 2007?
13       A.  I don't have a specific recollection.
14       Q.  Okay.  So, let me give you a copy of House Bill
15   218, which will be marked as 403.
16           (Exhibit 403 marked.)
17       Q.  (BY MS. RIOS)  And this is House Bill 218
18   relating to requiring a voter to send proof of
19   identification.  Do you recognize this bill?
20       A.  I see that you have provided me with a copy of
21   the legislation.  I have no idea if this is the
22   introduced version, if it's the --
23       Q.  It's the engrossed version.
24       A.  And how would I know that by looking at this?
25       Q.  It's the engrossed version.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 93

1    A.  How would I know that?  It doesn't say that on
2    here.
3    Q.  It has been represented to us as that.
4        MR. SWEETEN:  You can answer based on your
5    knowledge.
6    A.  And so, you're representing to me that it's the
7    engrossed version of House Bill 218, and it's clearly a
8    copy of that bill.
9    Q.  (BY MS. RIOS)  Did you or your staff play a role
10   in the development of House Bill 218?
11       MR. SWEETEN:  Objection.  Vague.
12       You can answer.
13   A.  I don't have any specific recollection of working
14   on this bill.
15   Q.  (BY MS. RIOS)  Okay.  Were you present at any
16   meetings during the development of House Bill 218?
17   A.  I have no specific recollection.
18   Q.  And do you know what is the purpose of House Bill
19   218?
20   A.  It says in the opening paragraph that it is a
21   bill to be entitled an act relating to requiring a voter
22   to present proof of identification.
23   Q.  And what is the purpose of that bill?
24   A.  I just read it to you.
25   Q.  So, this is just a bill requiring a voter to

## 94

1    present proof of identification?
2    A.  That's what it says.
3    Q.  And why?
4        MR. SWEETEN:  Objection to the question as
5    vague.
6        And don't reveal any thoughts, mental
7    impressions or opinions, motivations about legislation.
8        And I think that -- I mean, he can answer as
9    to the general purpose he knows but he doesn't have to
10   provide additional information other than the general
11   purpose of the bill, which he has tried to answer.
12   A.  My suggestion to you is that you talk to Brown,
13   Berman, Bohac, Riddle, et al, who drafted the bill.
14   Q.  (BY MS. RIOS)  Okay.  After the House passed Bill
15   218, it was considered by the Senate and it was referred
16   to the State Affairs Committee.  Were you a member of
17   the committee in 2007?
18   A.  I don't know.
19   Q.  Okay.  Do you know whether the Senate Committee
20   held a hearing on House Bill 218?
21   A.  I don't have any specific recollection.
22   Q.  Do you know if the Senate voted on House Bill
23   218?
24   A.  I don't have a specific recollection of this
25   bill.

## 95

1    Q.  Okay.  Let me show you Exhibit 45.  This is a
2    declaration of Senator Uresti.  Bring to your attention
3    paragraph 52 states, "During 2007, House Bill 218 was
4    considered by the Senate."
5    A.  Uh-huh.
6    Q.  Okay.  And then I bring to your attention number
7    6.
8    A.  Uh-huh.
9    Q.  And that's the paragraph when Senator Uresti
10   explained that he was sick with flu --
11   A.  Uh-huh.
12   Q.  -- and that he reviewed the Senate calendar and
13   it indicated that the Senate would debate
14   noncontroversial local legislation in the morning.  "I
15   then called the office of Patsy Spaw, the Secretary of
16   the Senate, to tell her that I would be arriving at the
17   Senate by late afternoon.  I also called the offices of
18   Senator Jane Nelson and Senator Tommy Williams to inform
19   them that I would be arriving late because of my
20   illness."  Do you know why Senator Uresti called your
21   office?
22       MR. SWEETEN:  Objection.  Assumes facts not
23   in evidence.  Objection.  It's compound.  And objection.
24   Calls for speculation.
25       To the extent you can answer the question as

## 96

1    posed, you can do so.
2    A.  I have no idea.
3    Q.  (BY MS. RIOS)  Were you in a leadership position
4    in 2007?
5    A.  I believe I was Chair of the Republican Caucus.
6    Q.  Besides the Republican Caucus, did you have any
7    other committee chair or subcommittee chair positions?
8    A.  I don't have a specific recollection without
9    going back.  I don't believe I was a chair of anything
10   in '07 except the Republican Caucus.
11   Q.  Okay.  Are you aware why Senator Uresti would
12   call you to inform you that he would be arriving late
13   because of illness?
14       MR. SWEETEN:  Objection.  It calls for
15   speculation.
16       You can answer to the extent -- also --
17   yeah, you can answer.
18   A.  I have no idea why he would call me.
19   Q.  (BY MS. RIOS)  Okay.  In 2007, during the
20   legislative session, did you take any public position as
21   to House Bill 218?
22   A.  Well, I think that it's a matter of public record
23   that I supported this bill.  And now that I have it in
24   context and assuming Senator Uresti's affidavit is
25   correct, then yes, I would have been supporting 218.  I



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

97

1   don't have a copy of it here, do I?
2         Yeah, I'm sure I was in support of it.
3      Q.  And what was the purpose of House Bill 218?
4      A.  To prevent in-person voter fraud.
5      Q.  Okay.  Any other purpose?
6      A.  You can read the bill.  It says it's relating to
7   requiring a voter to present proof of identification.  I
8   think that's self-explanatory.
9      Q.  And how would House Bill 218 prevent in-person
10  voter fraud?
11        MR. SWEETEN:  In answering that, that would
12  ask you to reveal your mental impressions, thoughts
13  about legislation and in furtherance of the legislative
14  process, so, I instruct you not to answer that question
15  except to the extent you can refer to matters of the
16  public record.
17     A.  I think other than what I stated publicly and
18  what was said in committee that's a part of the public
19  record, there's nothing else that I -- I don't have any
20  other impressions or recollections beyond that.
21     Q.  (BY MS. RIOS)  Okay.  Did you or your office
22  conduct any analysis prior to taking a position on
23  Senate Bill 218?
24        MR. SWEETEN:  I'm going to object and
25  instruct you not to answer based upon legislative

---

98

1   privilege.  To the extent you can refer to matters of
2   the public record, you can do so.
3      A.  On the advice of counsel, I don't think I can
4   answer that question.
5      Q.  (BY MS. RIOS)  Did you or your office conduct any
6   analysis on the impact of House Bill 218 on minority
7   voters?
8         MR. SWEETEN:  Same objection and instruction
9   based upon the legislative privilege.
10     A.  I don't believe I can answer that question, on
11  the advice of counsel.
12     Q.  (BY MS. RIOS)  Okay.  Did you talk to any
13  election officials about House Bill 218?
14        MR. SWEETEN:  You can answer as phrased.
15     A.  To the extent it was discussed in committee, that
16  would be the only recollection I have of talking to any
17  election officials.  I think that's what you asked.  Is
18  that correct?
19     Q.  (BY MS. RIOS)  Yes.
20     A.  Okay.
21     Q.  Who do you recall talking to about House Bill
22  218?
23     A.  Well --
24        MR. SWEETEN:  You can answer but don't
25  reveal the substance of the communications to the extent

---

99

1   that they're protected by legislative privilege.
2      A.  It would be a matter of public record in the
3   committee.  I feel certain that the Secretary of State
4   came and trans -- or someone from that office may have
5   given testimony, possibly from the Attorney General's
6   office but it's a matter of public record.  That would
7   have been the only conversations I would have had would
8   have been in the committee hearing.
9      Q.  (BY MS. RIOS)  Did you have any conversations
10  outside the committee hearing?
11     A.  I don't have any specific recollection of that.
12     Q.  Did you consult the -- did you have any
13  conversations with the Texas Legislative Council about
14  House Bill 218?
15     A.  I don't have a specific recollection of that.
16     Q.  Did you have any conversations with the
17  Lieutenant Governor about House Bill 218?
18     A.  I don't have a specific recollection of that.
19     Q.  Did you have any conversations about House Bill
20  218 with the State Attorney's office?
21     A.  I don't have any specific recollection of that.
22     Q.  And with the Secretary of State?
23     A.  You know, I don't have a specific recollection.
24  If there was any discussion, I reiterate again, it would
25  have been in the committee process where this bill was

---

100

1   heard, assuming I was a member of the committee, and
2   then only to the extent that the bill was debated on the
3   floor.  All I have -- the only discussions I would have
4   had would have been a matter of public record.
5      Q.  And when you say that you don't have a specific
6   recollection, that means that you don't have a
7   recollection?
8      A.  That's what it means.
9      Q.  Okay.  Were there any concerns about the impact
10  House Bill 218 would have on minority voters?
11        MR. SWEETEN:  Don't reveal -- in answering
12  the question, don't reveal your thoughts, your mental
13  impressions, your opinions, your motivations about
14  legislation, including this bill, and don't reveal
15  communications you've had with staff, with other
16  legislators, state agencies, the Legislative Council or
17  constituents.  You can refer to matters of the public
18  record in answering this question.
19        THE WITNESS:  Would you repeat the question,
20  please?
21        (Whereupon, the requested testimony was read back
22  as follows:
23  QUESTION:  Okay.  Were there any concerns about
24  the impact House Bill 218 would have on minority
25  voters?)



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 101

1    MR. SWEETEN:  Same instruction.
2    A.  Yes, my only knowledge would be that that's a
3    matter of the public record, and I know that there were
4    some members who may have publicly expressed that but I
5    don't have a specific recollection.
6    Q.  (BY MS. RIOS)  So, you do not recall?
7    A.  I think I've answered your question.
8    Q.  Would you agree that part of the purpose of House
9    Bill 218 was to prevent noncitizens from voting?
10    A.  I should look at it again.
11    MR. SWEETEN:  I'm going to object to the
12    question as asked and answered.  He's already expressed
13    his answer as to the general purpose of the bill.
14    I'm not instructing you not to answer.
15    A.  My answer is the same, that it would appear to me
16    the purpose of this bill is to prevent in-person voter
17    fraud.  It clearly says that it is a bill to be entitled
18    an act relating to requiring a voter to present proof of
19    identification.
20    Q.  (BY MS. RIOS)  Okay.  Would House Bill 218
21    prevent noncitizen voting?
22    MR. SWEETEN:  Now you're going beyond the
23    general.  He can answer questions as to the general
24    purpose of the bill.  He's not going to reveal his
25    thoughts, mental impressions, opinions or motivations

---

### 102

1    about legislation or in furtherance of the legislative
2    process.  So, I'm going to instruct him not to answer
3    other than as to the general purpose of the bill,
4    pursuant to the Court order in this case.
5    A.  The purpose of this bill was to prevent in-person
6    voter fraud, and that would mean that someone would have
7    to be a registered voter who was legally able to vote.
8    And beyond that, there's nothing that I can add to that.
9    Q.  (BY MS. RIOS)  But why would a voter need to
10    present proof of ID to vote?
11    MR. SWEETEN:  I'm going to object.  You're
12    asking for him to reveal his thoughts, mental
13    impressions, his opinions, his motivation about the
14    legislation and in furtherance of the legislative
15    process and, as such, I'm going to instruct him not to
16    answer based upon legislative privilege.
17    You can refer to matters of the public
18    record if you can.
19    But he's not going to provide more than what
20    the general purpose of the bill is.
21    A.  I think I've already answered the question.  I
22    think you're belaboring the point.
23    Q.  (BY MS. RIOS)  Could you answer the question,
24    please?
25    MR. SWEETEN:  Would you read the question

---

### 103

1    back?
2    (Whereupon, the requested testimony was read back
3    as follows:
4    QUESTION:  But why would a voter need to present
5    proof of ID to vote?)
6    MR. SWEETEN:  Objection.  It calls for him
7    to reveal matters subject to the legislative privilege.
8    A.  On the advice of counsel, I don't believe I'm
9    going to answer that question.
10    Q.  (BY MS. RIOS)  Okay.  Based on the public record,
11    how does House Bill 218 prevent in-person voter fraud?
12    A.  The goal -- first of all, this bill, we know now,
13    did not pass into law.  It was just a bill that was
14    introduced and passed out of the House.
15    I think the purpose of the bill was to require
16    some form of identification so that you knew the person
17    who was voting was the person they claimed to be.
18    Q.  Do you know if a noncitizen can obtain a driver's
19    license in Texas?
20    MR. SWEETEN:  Do you mean right now under
21    current law as we're sitting here?
22    MS. RIOS:  Yes.
23    MR. SWEETEN:  You can answer that question.
24    A.  Yes, they can.
25    Q.  (BY MS. RIOS)  And does your driver's license

---

### 104

1    look the same as a driver's license issued to a
2    permanent legal resident?
3    A.  I'm not sure of the answer.  I'm not sure.  I
4    know there have been some differences and I know there
5    have been some changes that have been made to that law
6    but I can't recall whether it would look the same or
7    not.  I think not under current law.  It just changed
8    recently.
9    Q.  Does your driver's license state that you're a
10    citizen?
11    A.  No.
12    Q.  And do you know if the driver's license held by
13    someone who is a legal permanent resident would state
14    that they are an LPR?
15    A.  I don't know the answer to that.
16    Q.  Okay.  Can a noncitizen be issued a military ID?
17    A.  I believe they can if they're a member of the
18    military.
19    Q.  And would this military ID indicate their
20    immigration status?
21    A.  I don't know the answer to that.
22    Q.  During the development of House Bill 218 and
23    subsequent voter ID legislation, did you or your staff
24    look into whether noncitizen driver's licenses say that
25    this license was issued to a noncitizen?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Thomas D. Williams                                    June 1, 2012

---

### 105

1    MR. SWEETEN: I'm going to object on
2  legislative privilege. That question requires him to
3  reveal his thoughts, mental impressions, opinions,
4  motivations about legislation and the furtherance of the
5  legislative process. It would also require him to
6  reveal communications between the staff, other
7  legislators, state agencies, the Texas Legislative
8  Council or constituents.
9    You can testify about matters of the public
10  record. Otherwise, don't reveal matters subject to the
11  legislative privilege.
12    A. It's a matter of public record that we passed
13  legislation this past session that requires you prove
14  your legal presence in the country to obtain a Texas
15  driver's license.
16    That language was put in a bill. It was amended
17  on the House side into a Senate bill, and it was
18  language that was taken out of a bill that I was the
19  sponsor of.
20    So, we require people now to prove their legal
21  presence in the country before they can obtain a Texas
22  driver's license. And their driver's license will
23  expire when their legal presence in this country
24  expires.
25    Q. (BY MS. RIOS) And legal presence is not the same

### 106

1  as citizenship, right?
2    A. Correct.
3    Q. Based on the public record, were there concerns
4  about the impact of this bill on minority voters?
5    MR. SWEETEN: You can refer to matters of
6  the public record as the question's preface suggests.
7  Do not reveal legislatively privileged matter.
8    A. Are we talking about House Bill 218 now?
9    Q. (BY MS. RIOS) Yes.
10    A. I think there were concerns that were expressed
11  as a matter of the public record.
12    Q. What were these concerns?
13    A. I'm not able to articulate those specifically at
14  this time. I think they are a part of the proceedings
15  of the House and the Senate.
16    Q. And you do not have an independent recollection
17  about these concerns?
18    A. No.
19    Q. Okay. Did you take -- did you or your staff take
20  any action to address these concerns?
21    MR. SWEETEN: Don't answer the question. It
22  would call for matters subject to the legislative
23  privilege, requiring you to reveal your thoughts, mental
24  impressions, opinions, your motivations about
25  legislation or furtherance of the legislative process.

### 107

1  Instruct not to answer.
2    A. On the advice of counsel, I'm not going to answer
3  that question.
4    Q. (BY MS. RIOS) Okay. During the pendency of
5  House Bill 218 in 2007, Royal Masset -- is that how his
6  name is pronounced?
7    MR. SWEETEN: I don't know.
8    A. Masset.
9    Q. (BY MS. RIOS) -- Masset, the former Political
10  Director for the Republican Party of Texas, stated, and
11  I quote, "They are just basically using shear racism to
12  pump their own political points. They are trying to
13  exploit the public fear of illegal aliens." What is
14  your reaction to this quote?
15    MR. SWEETEN: Don't reveal your thoughts,
16  mental impressions, opinions or motivation about
17  legislation or in furtherance of the legislative process
18  in answering that question.
19    A. I'm not familiar with it until you read it to me,
20  and I suggest that you talk to Mr. Masset about it.
21    Q. (BY MS. RIOS) Any opinion about the assertion
22  made by Mr. Masset?
23    MR. SWEETEN: Don't reveal your thoughts,
24  mental impressions, opinions, motivation about
25  legislation or in furtherance of the legislative

### 108

1  process. Those are subject to the legislative
2  privilege.
3    A. No.
4    Q. (BY MS. RIOS) But as we sit here today, do you
5  have a reaction at this statement?
6    MR. SWEETEN: It's the same privilege. Do
7  not -- I understand as we're sitting here today, you've
8  put that in the question but he's still not going to
9  reveal his thoughts, mental impressions or his opinions
10  or motivation about legislation, and so, to the extent
11  that answering that question would require him to do so,
12  I'm going to instruct him not to answer that question.
13    A. I don't -- I don't have an opinion about what
14  Mr. Masset said. Why would I care?
15    Q. (BY MS. RIOS) Okay. Once House Hill 218 was
16  referred to the Senate, do you recall who testified on
17  behalf of this bill?
18    MR. SWEETEN: You can answer.
19    A. I do not.
20    Q. (BY MS. RIOS) Do you recall if the Republican
21  party testified at the committee hearing?
22    A. I do not.
23    Q. Okay. Do you recall any amendments made in the
24  Senate to House Bill 218?
25    A. I do not.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 109

1     Q.  Okay.  Do you know what happened when this bill
2     was brought to the Senate floor to vote?
3             MR. SWEETEN:  I think you're asking matters
4     of the public record, which he's free to refer to.
5     A.  Based on what you're showing me here and Senator
6     Uresti's affidavit, we tried to -- this bill apparently
7     was voted out of committee and was pending on the
8     calendar, and we tried to bring the bill up on the
9     floor, and I was involved in that process of trying to
10    get the bill -- make sure that we had our two-thirds of
11    the members present and voting to get the bill before
12    the body.
13    Q.  (BY MS. RIOS)  Okay.  And so, this bill required
14    the support of two-thirds of the senators to bring it to
15    the floor for a vote?
16    A.  To take the bill out of the regular order of
17    business, we would have had to suspend the regular order
18    of business, and that requires two-thirds of the members
19    present and voting.
20    Q.  And why two-thirds?
21    A.  That's what the rule says.  That's the Senate
22    rule.
23    Q.  The Senate rule.
24    A.  It was at that time.  The House has the same
25    rule, by the way.

---

### 110

1     Q.  And when House Bill 218 was brought to the Senate
2     floor for a vote, how many Senators were present?
3     A.  It's a matter of public record.  I don't recall
4     specifically how many were there.  You have to have a
5     quorum, so, there was a quorum present.
6         I know that we believed that we had two-thirds.
7     The Republicans believed that we had the necessary
8     two-thirds to bring the bill up, and that's what I was
9     engaged in doing was trying to make sure that all of our
10    members were on the floor.
11    Q.  And when you're referring that all of the members
12    were on the floor, you're referring to the Republican
13    members?
14    A.  Correct.
15    Q.  And how were you involved in bringing this bill
16    to the floor?
17    A.  I think I just explained that to you.
18    Q.  Okay.
19    A.  I was trying to make sure that all of the
20    Republican Senators were on the floor so that we had the
21    two-thirds to get the bill up and have it considered by
22    the body.
23    Q.  Okay.  And when -- based on your reading, do you
24    remember if -- strike that.
25         Do you remember if Senator Uresti was present

---

### 111

1     when you were bringing the bill to the floor?
2     A.  He was not there when we first attempted to bring
3     it to the floor.  He was there later.
4     Q.  And why was the vote held when not all of the
5     members of the Senate were present?
6             MR. SWEETEN:  I think when you're asking the
7     why, I think we're getting into him revealing thoughts
8     and mental impressions, opinions and motivations about
9     legislation.  You can testify about facts that are
10    matters of public record but I think that's
11    legislatively privileged.
12    A.  There are frequently bills that are passed
13    through the Texas Senate when all members aren't
14    present.
15    Q.  (BY MS. RIOS)  And did you make the decision to
16    bring it to the floor at that instant?
17    A.  I was involved in that decision, yes.
18    Q.  And who else was involved in the decision to
19    bring 218 at that instant?
20    A.  You know, I don't recall everyone who was
21    involved in it.  I would guess it would -- my
22    recollection would be it would be the Senate sponsor,
23    and I presume that was Senator Fraser but I don't know
24    that for a fact.
25         And also, I discussed it with the Lieutenant

---

### 112

1     Governor because he would have to recognize me for me --
2     or he would have to recognize the bill's author to be
3     able to bring the bill up.
4     Q.  And what is Senator Uresti's race or national
5     origin?
6     A.  He's a citizen of the United States and a Marine
7     Corps Veteran.
8     Q.  I asked about his race or national origin.  I'm
9     very well aware of his military service.
10    A.  He's Hispanic.  Is that what you're asking?
11    Q.  Yes.
12    A.  Yeah.
13    Q.  And do you dispute any fact in paragraphs 5 or
14    6 -- 6 or 7?
15            MR. SWEETEN:  Objection.  The question is
16    compound.
17         She's on this one now.
18    A.  I don't know where we are.
19            MR. SWEETEN:  Uresti's affidavit.
20         Can you tell us the number of the exhibit
21    and we'll pull that up and take a look at it?
22         MS. RIOS:  It might be over there.
23         MR. SWEETEN:  I think he's got it now.
24         MS. ABUDU:  Patrick, do you now have an
25    extra copy of Uresti's affidavit?  I see it on top.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

113

1        MR. SWEETEN:  Let's see.  I don't.
2     A.  I don't have any recollection that Senator Uresti
3  called my office, and I have no way of knowing whether
4  he called Senator Nelson's office or not.  I don't have
5  any way of knowing whether he called Patsy Spaw or not.
6  And so, you know, I -- I just can't verify that but I
7  don't have -- specifically with respect to my office, I
8  don't know why he would call me, and I don't recall that
9  he did.
10     Q.  (BY MS. RIOS)  Okay.
11     A.  It would be very unusual for him to call my
12  office.
13     Q.  When you say that bills frequently are passed
14  without all of the senators present, with a quorum but
15  not all of the senators present, are you including bills
16  that are strongly opposed by the other party?
17        MR. SWEETEN:  Objection.
18     A.  Yes.
19        MR. SWEETEN:  Objection.  Vague.
20        But you answered.  That's fine.
21     Q.  (BY MS. RIOS)  And how about bills strongly
22  opposed by racial and ethnic minority members of the
23  Senate?  Let me ask the question -- the whole question.
24        MR. SWEETEN:  Okay.
25     Q.  (BY MS. RIOS)  When you say that bills are

---

114

1  frequently passed without all of the Senators being
2  present, how about bills strongly opposed by the racial
3  and ethnic minority members of the Senate?
4        MR. SWEETEN:  Objection.  I think it calls
5  for speculation.  Objection to the question as vague.
6  Also to the extent it would reveal a communication
7  you've had with a legislator, don't reveal that portion
8  of it but to the extent you can answer the question --
9     A.  I don't have any specific recollection.
10     Q.  (BY MS. RIOS)  I was talking in general terms
11  when you know that minority -- racial minority and
12  ethnic minority Senators are strongly opposed to a bill,
13  is it -- does the -- are bills frequently passed when
14  they are not present?
15        MR. SWEETEN:  I'm going to impose the same
16  objection.
17     A.  I think I've already answered the question.
18     Q.  (BY MS. RIOS)  And your answer was?
19     A.  I don't have a specific recollection.
20     Q.  It's a yes or no answer.
21     A.  I've answered the question to the best of my
22  ability.
23     Q.  Okay.  Did Senator Uresti call your office
24  because you were involved with bringing House Bill 218
25  to the floor?

---

115

1        MR. SWEETEN:  Objection.  Calls for
2  speculation.  Objection.  Assumes facts not in evidence.
3        You can answer.
4     A.  I think you need to call Senator Uresti and ask
5  him that.
6     Q.  (BY MS. RIOS)  What part of Texas does Senator
7  Uresti represent?
8     A.  He represents an area from San Antonio to El
9  Paso.  The Big Bend area --
10     Q.  And what did --
11     A.  -- would be included in that.
12     Q.  And what do you know about the racial or ethnic
13  makeup of Senator Uresti's constituents?
14     A.  I don't have any specific knowledge about it.
15  Generally, I would presume he has a large Hispanic
16  population in that part of the state.
17     Q.  And did you have any concerns about holding a
18  vote on House Bill 218 given that the constituency that
19  Senator Uresti represents is Hispanic?
20        MR. SWEETEN:  Don't reveal your thoughts,
21  your mental impressions, opinions or motivations about
22  legislation, including this bill, but to the extent you
23  can refer to matters of the public record, you are free
24  to do so.
25     A.  I think as a matter of public record, I've said

---

116

1  frequently that I support this voter identification
2  legislation, and beyond that, I don't have anything to
3  say beyond what my public record is, what I've said in
4  the public record.  It is strongly supported among all
5  racial and ethnic groups in Texas and strongly supported
6  by Democrats and Republicans across the state.
7     Q.  (BY MS. RIOS)  And you're basing this assertion
8  on what?
9        MR. SWEETEN:  Again, you can refer to
10  matters of the public record.  Don't reveal your
11  internal thought process.
12     A.  It's a matter of public record that there's been
13  extensive surveys done on this and they were discussed
14  as a part of the debate of all of these -- all of this
15  legislation.
16     Q.  (BY MS. RIOS)  So, besides the surveys on the
17  support on voter ID legislation, did you conduct any
18  studies about the people who might be affected by this
19  legislation?
20        MR. SWEETEN:  Don't reveal matters that are
21  not on the public record.  Don't reveal your thoughts,
22  mental impressions, opinions, motivations about
23  legislation or your communications with state agencies,
24  with legislative staff, with legislators, constituents
25  in answering the question.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 117

1    A. You know, I don't have any comment beyond what's
2  already in the public record.
3    Q. (BY MS. RIOS)  Okay.  And which are these
4  surveys?
5    A. You know, they're a matter of public record.  I
6  can't tell you as I sit here today.  I don't recall what
7  they were.  They are well documented as part of the
8  public record.
9    Q. And did you study these surveys?
10    MR. SWEETEN:  You can reveal matters of the
11  public record but don't reveal your internal thought
12  processes, mental impressions, motivations about the
13  legislation in answering the question.  It's subject to
14  legislative privilege.
15    A. My recollection is that it was discussed in
16  committee.  It was discussed during the debate on all of
17  this legislation.  So -- and it was widely reported in
18  the press.
19    Q. (BY MS. RIOS)  Okay.  And do you know what
20  specific questions were asked to the public in these
21  surveys?
22    A. I can't tell you beyond what's already a part of
23  the public record.  I don't have a specific
24  recollection.
25    Q. Did you make any inquiries about the specific

## 118

1  questions that they made to the people that were
2  contacted as part of the survey?
3    MR. SWEETEN:  Don't reveal your thoughts,
4  mental impressions, opinions, motivations about
5  legislation or the communications we've outlined
6  previously in answering the question.  You're free to
7  refer to matters of the public record.
8    A. As I've said already, I don't have a specific
9  recollection.
10    Q. (BY MS. RIOS)  Okay.  There was a second vote on
11  House Bill 218, as it is stated in Senator Uresti's
12  declaration and in the public record.  What were the
13  circumstances of this second vote?
14    MR. SWEETEN:  You can refer to matters of
15  the public record.  Don't reveal communications that are
16  privileged.
17    A. I remember that there was a second vote.  I
18  don't -- I know that it involves some controversy about
19  whether one of the members was on the floor and voting
20  or not, and it was the discretion of the Lieutenant
21  Governor to decide whether there was going to be another
22  vote on it or not.  So, he exercised that discretion.  I
23  think it's a matter of the public record.  It's in the
24  Senate Journal.
25    Q. (BY MS. RIOS)  Okay.  And do you know the result

## 119

1  of this second vote?
2    A. The legislation -- we couldn't suspend the rules
3  to bring the legislation before the body as a result of
4  the second vote.
5    Q. So, it failed because of the two-thirds rule?
6    A. We weren't able to suspend the regular order of
7  business.
8    Q. And in order to suspend the regular order of
9  business, you needed two-thirds vote?
10    A. Correct.
11    Q. And what is the purpose of getting two-thirds
12  vote in order to suspend the regular course of business?
13  I'm asking what is the purpose of that rule, the
14  two-thirds rule?
15    MR. SWEETEN:  Okay.  You can testify as to
16  the general purpose of the two-thirds rule.
17    Are you talking about -- you want to show
18  him the statute?
19    MS. RIOS:  No, in general.
20    MR. SWEETEN:  You can testify about the
21  general purpose of the two-thirds rule to the extent
22  you --
23    A. Yeah.  The rule is contained in both the House
24  and the Senate rules, and it is a common parliamentary
25  procedure.  In the U.S. Senate, I believe they require

## 120

1  60 percent instead of two-thirds.
2    The way it is implemented in the Senate, it is a
3  calendar mechanism.  It is the way we control the flow
4  of legislation to the floor.
5    In the House, that's done by the Calendars
6  Committee.  In the Senate, the members decide which
7  legislation will be considered by the body, along with
8  the Lieutenant Governor, who has the power of
9  recognition.
10    So, that power is vested in a committee in the
11  House that's appointed by the Speaker.  And in the
12  Senate, that member -- that power is vested in the
13  members, along with the Lieutenant Governor, through the
14  power of recognition.  So, it is a mechanism to control
15  the flow of legislation to the floor.
16    Q. (BY MS. RIOS)  And what is the purpose of this
17  rule?
18    MR. SWEETEN:  Objection.  Asked and
19  answered.
20    Q. (BY MS. RIOS)  Okay.  Is a purpose of this rule
21  to have general consensus on bills?
22    A. The purpose of the rule is to -- it is a calendar
23  mechanism.  It is a way to control the flow of
24  legislation to the floor of the Senate.  That is the
25  primary purpose of the rule.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 121

1    Q.  And are most bills brought under this rule?
2    A.  Many bills are brought under that rule.  Not all.
3    Q.  Okay.  And how many times during your tenure in
4  the Senate has this rule been suspended?
5    A.  I'm not -- it's been -- we suspend the two-thirds
6  rule every time we take up a piece of legislation to
7  consider it.  To consider a piece of legislation, the
8  vote is to suspend the two-thirds rule -- or it takes a
9  two-thirds vote to suspend the regular order of
10  business.
11        So, every time -- so, the rule is -- that's how
12  we get bills to the floor.  I'm not sure what you're
13  asking.
14    Q.  Okay.  You need a two-thirds vote to get a bill
15  to the floor, that's how it works, right?
16    A.  Not always.
17    Q.  Not always but the --
18    A.  If you want to take a bill out of the regular
19  order of business, you have to suspend the two-thirds
20  rule.  You have to suspend the regular order of
21  business.  It takes two-thirds to do that.
22    Q.  Okay.  How many times during your tenure has the
23  Senate suspended the two-thirds rule so that a bill can
24  be brought without the two-thirds vote?
25    A.  We frequently consider legislation in the regular

## 122

1  order of business, and I can't tell you how often that
2  is done.  I will give you an example.  This last session
3  the budget passed in the regular order of business.  We
4  frequently pass House bills in the regular order of
5  business, and it's often done in special session.
6    Q.  I'll have to come back to this.
7        Okay.  Did you have any conversations about House
8  Bill 218 after it did not pass the Senate?
9        MR. SWEETEN:  You can reveal whether or not
10  you had such conversations but don't reveal the
11  substance of them.  They're privileged.
12    A.  You know, I don't have a specific -- this was
13  several years ago.  I don't have a specific
14  recollection.
15    Q.  (BY MS. RIOS)  Okay.
16    A.  I'm sure that I talked to people about it but I
17  don't have a specific recollection.
18    Q.  Did you have any conversations about voter ID
19  bills after HB 218 didn't pass the Senate?
20    A.  I'm sure I did.
21    Q.  With whom did you have these conversations?
22    A.  You know, I don't know.  I mean, I can't tell
23  you.  It's been so long and there's so many people that
24  I talk to.  Beyond what's a matter of the public record,
25  I don't have any recollection at all.

## 123

1    Q.  Did you have any conversations about voter ID
2  bills with other legislators?
3    A.  I'm sure I did.
4    Q.  And did you have conversations with executive
5  branch employees?
6    A.  I don't know.
7    Q.  Did you talk about voter ID legislation with the
8  Lieutenant Governor?
9    A.  I'm sure I did.
10    Q.  And when did you have this conversation?
11    A.  I don't have a specific recollection.
12    Q.  And what was the nature of these communications?
13        MR. SWEETEN:  Don't reveal the nature of the
14  communications if she's asking about the substance.
15        MS. RIOS:  I can ask about the general
16  subject matter of the communications.
17        MR. SWEETEN:  And with what group are you
18  referring to?
19        MS. RIOS:  I'm referring to legislators.
20        MR. SWEETEN:  Okay.  I think he's already
21  said he doesn't recall specifically who he talked to.
22  So, it would be --
23        But you can answer the question as to the
24  general subject matter.
25    A.  You know, I don't recall a specific -- any

## 124

1  specific conversation from that long ago.
2    Q.  (BY MS. RIOS)  And did you have any conversations
3  with the Lieutenant Governor?
4    A.  None that I recall specifically.
5    Q.  You earlier noted that you talked to the
6  Lieutenant Governor.
7    A.  I'm sure I talked to him.  I'm sure I talked to
8  several of my colleagues in the Senate but I don't have
9  a specific recollection of the time or what was
10  discussed.  I'm sure we were frustrated that the bill
11  had not passed.
12    Q.  Okay.  This has been marked as Exhibit 29, and
13  this is Senate Bill 362.  Were you involved in the
14  development of Senate Bill 362?
15    A.  Is this the bill from the '09 session?
16    Q.  Yes.
17    A.  Yes, I was involved in this.
18    Q.  And can you describe the process by which Senate
19  Bill 362 was developed?
20        MR. SWEETEN:  Yeah, I think here you're
21  asking him to reveal his thoughts, mental impressions,
22  opinions, motivations about legislation, including
23  communications that he's had with other legislators'
24  staff.  So, I think we're going to need to assert our
25  legislative privilege as to that question.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 125

1    A. I'm not going to be able to answer your question
2  the way you've phrased it.
3    Q. (BY MS. RIOS) Do you recall when did you start
4  working on the development of Senate Bill 362?
5        MR. SWEETEN: Objection. Vague.
6    MS. RIOS: When?
7        MR. SWEETEN: Well, I know but what is the
8  development of, and I'm not sure how that's defined
9  but --
10   Q. (BY MS. RIOS) You can answer.
11       MR. SWEETEN: You can answer when you
12  started working on the bill.
13   A. I don't have a -- I don't recall the specific
14  time that I began to work on this bill but it would have
15  been sometime prior to or concurrent with the 2009
16  session.
17   Q. (BY MS. RIOS) Okay. Did you look at past photo
18  ID bills in the Texas Legislature?
19       MR. SWEETEN: Don't answer the question. It
20  would require you to reveal your thoughts, mental
21  impressions, opinions and motivations about legislation
22  or furtherance of the legislative process and, as such,
23  would be legislatively privileged.
24   A. On the advice of counsel, I'm not going to answer
25  your question.

## 126

1    Q. (BY MS. RIOS) Did you have any communications
2  about Senate Bill 362 with other current or former
3  legislators who had offered past photo ID bills?
4        MR. SWEETEN: You can answer. Just don't
5  reveal the subject of the communications other than a
6  general subject matter description.
7    A. I may have. I wasn't the primary author of the
8  bill. So, I don't have a specific recollection of
9  talking to anybody who was a former legislator. Is that
10  what you're asking?
11   Q. (BY MS. RIOS) Or current.
12   A. No, I don't. Senator Fraser, I believe, is the
13  primary author of this.
14   Q. Did you talk to Senator Fraser about Senate Bill
15  362?
16   A. Yes.
17   Q. And when did you talk to him?
18   A. I don't recall specifically.
19   Q. Did you talk to him one time, many times?
20   A. Many times, I'm sure.
21   Q. And when did you have these conversations with
22  Senator Fraser?
23   A. As I told you, I don't recall specifically.
24   Q. Okay. Do you recall if anyone else was present
25  during these conversations you had with Senator Fraser?

## 127

1    A. I do not.
2    Q. Okay. Did you communicate with Senator Fraser on
3  the telephone about Senate Bill 362?
4    A. I may have.
5    Q. Do you know when these conversations took place?
6    A. I do not.
7    Q. Okay. Did you communicate with Senator Fraser by
8  E-mail regarding 362?
9    A. I doubt it.
10   Q. And why do you doubt it?
11   A. I doubt that I had any E-mail communications with
12  him about this. I would have talked to him in person.
13   Q. Okay. Did you have any communications with
14  officials or legislators from other states about Senate
15  Bill 362?
16   A. Not to the best of my recollection.
17   Q. Did you have any communications with anyone in
18  Georgia?
19       MR. SWEETEN: Objection. Asked and
20  answered.
21       You can answer.
22   A. Not to the best of my recollection.
23   Q. (BY MS. RIOS) Any communications with anyone
24  from Indiana?
25       MR. SWEETEN: Same objection.

## 128

1        You can answer.
2    A. To the extent that it's a matter of the public
3  record, when the bills were considered in committee,
4  there may have been people from Indiana there. There
5  may have been people from Georgia. I don't recall
6  specifically without looking at the record.
7    Q. (BY MS. RIOS) But outside of the hearings, did
8  you have any communications with anyone from Georgia or
9  Indiana?
10   A. I don't recall.
11   Q. Did you have any communications about Senate Bill
12  362 with interest groups?
13   A. I'm not sure what you're asking me there. Help
14  me. I don't know what you're getting at.
15   Q. With any organizations.
16   A. It's a matter of public record that there were a
17  lot of people who came and testified for and against
18  this bill, and that's -- really the only thing that I
19  would have any recollection of would be what's a matter
20  of the public record.
21   Q. But I'm referring to any communications that you
22  had outside the Senate chambers.
23   A. I just answered your question.
24   Q. So, you do not recall?
25   A. That is correct.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Thomas D. Williams                          June 1, 2012

---

### 129

1    Q. Okay. Did you have any communications with any
2  groups representing minority voters?
3    A. It's a matter of the public record that we did
4  take testimony from groups that represented minority
5  interests.
6    Q. But did you have any communications with these
7  groups outside the Senate chambers?
8    A. I don't know. I don't recall.
9    Q. Did you have any communications about Senate Bill
10 362 with your constituents?
11   A. I don't recall specifically.
12   Q. Okay. And did you have any communications about
13 Senate Bill 362 with election officials?
14   A. It's a matter of public record that there were
15 election officials that testified about the bill.
16 Beyond that, I have no specific recollection.
17   Q. Did you have any communications with Melinda
18 Fredricks about Senate Bill 362?
19   A. I may have. I don't have any specific
20 recollection.
21   Q. And if you had any communication with
22 Ms. Fredricks, do you recall if this was oral or
23 written?
24   A. You know, I don't have any specific recollection
25 beyond what's a matter of the public record. I'm trying

### 130

1  to remember if she testified before the committee or
2  not. I don't recall.
3    Q. Did you have any communications about Senate Bill
4  362 with the Attorney General's office?
5    A. I'm -- I feel like they probably testified in
6  committee about that but beyond that, I don't have any
7  specific recollection.
8    Q. And any communications about the bill with staff
9  from the Secretary of State?
10   A. Only to the extent that it was part of the public
11 record all I'm able to recall.
12   Q. Did you have any communication with the TLC?
13   A. I don't have any specific recollection of that.
14   Q. So, what you're telling me today is that the
15 communications that you had with the -- about Senate
16 Bill 362 are limited to what is in the public record?
17   A. As we sit here today, the only thing that I would
18 have any recollection of would be what is in the public
19 record.
20   Q. Are you aware of the purpose of excluding from
21 Senate Bill 362 the student ID as a form of allowable
22 identification that voters may show when they come to
23 the polls?
24   MR. SWEETEN: I'm going to object. I think
25 that calls for matters subject to the legislative

### 131

1  privilege. It would require him to reveal his thoughts,
2  mental impressions, opinions, motivations about the
3  legislation or in furtherance of the legislative
4  process. He had communications that we've outlined
5  previously.
6    So, I'm going to instruct not to answer
7  based on the legislative privilege unless you can refer
8  to matters of the public record.
9    A. There may be statements that I made that are a
10 part of the public record but beyond that, there's
11 nothing that I can reveal.
12   Q. (BY MS. RIOS) Okay. Did you have any
13 communications with anyone about the forms of
14 identification to be included in Senate Bill 362?
15   MR. SWEETEN: You can answer the question as
16 phrased. Don't reveal the substance of any such
17 communications that would be legislatively privileged as
18 outlined before.
19   A. Yes.
20   Q. (BY MS. RIOS) With whom?
21   MR. SWEETEN: You can answer.
22   A. With Senator Fraser.
23   Q. (BY MS. RIOS) Anyone else?
24   A. Not that I recall.
25   Q. And when did you have this conversation with

### 132

1  Senator Fraser about what forms of ID to include in
2  Senate Bill 362?
3    A. I don't recall the specific time or the general
4  time.
5    Q. Okay. Do you recall if there were others present
6  when you had these conversations?
7    A. I do not.
8    Q. And these were in-person discussions?
9    A. Yes.
10   Q. Okay. How about by phone or E-mail?
11   A. I don't recall. It would be very unusual that I
12 would have discussed it in an E-mail with him. We don't
13 generally communicate that way. And I may have talked
14 to him about it on the phone but I don't have a specific
15 recollection.
16   Q. Okay. And what was the general subject matter of
17 your communications with Senator Fraser about what forms
18 of ID to include in the bill?
19   MR. SWEETEN: I think that is the general
20 subject matter. You're starting to ask for the
21 specifics of the conversation. Your preface of your
22 question asked about forms of ID, and he's revealed the
23 communications that would have been about forms of ID.
24 To ask any more detail about that communication would
25 implicate the legislative privilege that both senators

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

133

1  have asserted.
2      A. I don't think I can answer the question based on
3  what counsel has told me.
4      Q. (BY MS. RIOS) Did you analyze or direct anyone
5  to analyze which registered voters did not possess one
6  of the required forms of ID identified in Senate Bill
7  362?
8      MR. SWEETEN: Senator, in answering the
9  question, don't reveal thoughts, mental impressions,
10  opinions, motivation about legislation or furtherance of
11  the legislative process or communications you've had
12  with the entities or individuals I've previously listed.
13  You can refer to matters of the public record but don't
14  reveal privilege in answering the question.
15      THE WITNESS: Could you repeat the question
16  that she asked, please?
17      (Whereupon, the requested testimony was read back
18  as follows:
19      QUESTION: Did you analyze or direct anyone to
20  analyze which registered voters did not possess
21  one of the required forms of ID identified in
22  Senate Bill 362?)
23      A. Only to the extent that it is a part of the
24  public record and I know that this was discussed
25  extensively in the Committee of the Whole.

135

1      Q. (BY MS. RIOS) Did you conduct or instruct anyone
2  to conduct an analysis of 362 as it impacts minority
3  voters?
4      MR. SWEETEN: Same objection. You're asking
5  for his mental impressions, thought process, opinions
6  and motivations about legislation. It's subject to the
7  legislative privilege.
8      Instruct not to answer except to the extent
9  you can reveal matters of the public record.
10      A. Well, I would respectfully refer you to the
11  deliberations of the Committee of the Whole when we took
12  this up, and I know this matter was discussed
13  extensively. Beyond that, there's nothing that I can
14  reveal to you.
15      Q. (BY MS. RIOS) Okay. Did you make any attempt to
16  analyze whether Senate Bill 362 had a disproportionate
17  impact on minority voters?
18      MR. SWEETEN: Objection. Legislative
19  privilege.
20      Instruct not to answer except to the extent
21  you can refer to matters of public record.
22      A. That was -- that topic was specifically discussed
23  at length as a part of the process of the Committee of
24  the Whole, and there really wasn't any deliberation
25  outside of that.

134

1      Q. (BY MS. RIOS) Okay. Did you read any research
2  or analysis of voter ID to assist you in working on
3  Senate Bill 362?
4      MR. SWEETEN: That question would require
5  him to reveal his thoughts, his mental processes,
6  impressions, opinions, motivation about legislation or
7  furtherance of the legislative process. As such, it
8  would be privileged.
9      You can refer to matters of the public
10  record to the extent you can in answering the question.
11  Otherwise, don't reveal privileged matter.
12      A. I don't think I can answer that question.
13      MS. RIOS: I'm asking which ones.
14      MR. SWEETEN: And in doing so, you're asking
15  him his thought process, his mental impressions,
16  opinions, motivations about legislation. This is
17  squarely within what is under the umbrella of the
18  legislative privilege.
19      I'm instructing the Senator not to answer
20  the question on that basis.
21      Q. (BY MS. RIOS) So, you cannot answer me as to why
22  you selected these studies?
23      MR. SWEETEN: Same instruction.
24      A. I don't believe I can answer that with -- I'm
25  going to invoke my legislative privilege.

136

1      Q. (BY MS. RIOS) Okay. If Senate Bill 362 had been
2  passed, would it have been subject to the requirements
3  of Section 5 of the Voting Rights Act?
4      A. I believe it would have been.
5      MR. SWEETEN: It's almost 1:00 o'clock --
6  it's 1:10. I'm hungry. Can we take a very short lunch
7  break, maybe 20 minutes, when you get to a logical
8  stopping point?
9      MS. RIOS: We can stop here.
10      (Lunch recess.)
11      MS. RIOS: Okay. Back on the record.
12      Q. (BY MS. RIOS) I'm going to ask the last
13  questions that I asked so we can get back on -- in the
14  groove.
15      If SB 362 had been passed, would it have been
16  subject to the requirements of Section 5?
17      A. And I believe my answer was I think it would be.
18      Q. Okay.
19      A. To the best of my knowledge, it would be.
20      Q. Are you familiar with the concept of Spanish
21  surname voter registration?
22      A. Yes.
23      Q. And what do you know about Spanish surname voter
24  registration?
25      A. Not much but just I've heard it talked about.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 137

1  Q.  Did you consider, you know, looking into the
2  Spanish surname voter registration database to figure
3  out whether the Hispanic population would be more or
4  less likely to have the necessary photo ID under Senate
5  Bill 362?
6        MR. SWEETEN:  Objection.  Legislative
7  privilege.
8        It asks for your thoughts, mental
9  impressions, opinions, motivations about legislation.
10  Instruct you not to answer except to the extent you
11  refer to matters of the public record.
12  A.  I don't believe I can answer the question based
13  on the advice of counsel.  And what I would say is I
14  don't know anything other than what was discussed in
15  committee or on the floor of the Senate.
16  Q.  (BY MS. RIOS)  Okay.  What is the purpose or
17  purposes of Senate Bill 362?
18        MR. SWEETEN:  You can answer.
19  A.  The purpose of Senate Bill 362 was to ensure that
20  the person who presents themselves to vote is, in fact,
21  the person that they say they are.
22  Q.  (BY MS. RIOS)  Any other purpose?
23  A.  No.
24  Q.  And who introduced Senate Bill 362?
25  A.  Senator Fraser.

---

### 138

1  Q.  And who decided that it would be Senator Fraser
2  the one who would introduce Senate Bill 362?
3        MR. SWEETEN:  Don't reveal any
4  communications you've had with other legislators or
5  state agencies, including with Senator Fraser.  Also, it
6  calls for speculation.
7        To the extent you can answer that without
8  revealing privileged matters, you can.
9  A.  Well, I think Senator Fraser decided when he
10  filed it, I mean.
11  Q.  (BY MS. RIOS)  Okay.  You laid out Senate
12  Resolution 14, adopting the rules of the Senate for the
13  80th legislature as the permanent rules of the 81st
14  legislature with the modification of the two-thirds rule
15  as to voter ID.
16  A.  This is in the '09 session?
17  Q.  Yes, '09.
18  A.  Okay.
19  Q.  Do you know who decided that you would be the one
20  who would lay out Senate Resolution 14?
21        MR. SWEETEN:  I'm sorry, Senate Resolution
22  14?
23        MS. RIOS:  Yes.
24        MR. SWEETEN:  Not Senate Resolution 14?
25        MS. RIOS:  No.

---

### 139

1        MR. SWEETEN:  Obviously, don't reveal
2  matters of legislative privilege in answering the
3  question but you can answer.
4  A.  It's the prerogative of the Lieutenant Governor.
5  Q.  (BY MS. RIOS)  So, the Lieutenant Governor was
6  the one who chose you to present this Senate Resolution
7  14?
8        MR. SWEETEN:  Don't reveal privileged
9  communications.
10  A.  I don't think I can answer this without revealing
11  privileged communication.
12  Q.  (BY MS. RIOS)  I'm asking who.
13        MR. SWEETEN:  Read the question again.
14        (Whereupon, the requested testimony was read back
15  as follows:
16  QUESTION:  So, the Lieutenant Governor was the
17  one who chose you to present this Senate
18  Resolution 14?)
19        MR. SWEETEN:  Same objection.
20  A.  He has the power of recognition.  He recognized
21  me to lay out the Senate rules.  It's a matter of public
22  record.
23  Q.  (BY MS. RIOS)  Did you volunteer to lay out
24  Senate Resolution 14?
25        MR. SWEETEN:  Don't reveal communications

---

### 140

1  you had with any legislators or state agencies.
2  A.  I think that it is a matter of public record that
3  Senator Whitmire, who was the dean of the Senate, did
4  not want to carry the resolution.  I was willing to
5  carry it and was a logical person to do it, as Chairman
6  of the Administration Committee.
7  Q.  (BY MS. RIOS)  When you stated earlier that the
8  purpose of Senate Bill 362 is to ensure that the person
9  who presents him or herself to vote is the person they
10  say they are, how does Senate Bill 362 ensure that
11  that's the case?
12        MR. SWEETEN:  Don't reveal your thoughts,
13  mental impressions, opinions, motivations about
14  legislation or the legislative process in answering the
15  question.
16        Objection.  Legislative privilege.  Go
17  ahead.
18  A.  It's been a matter of public record, and I've
19  said publicly that if you -- the only way to prevent
20  in-person voter fraud is to require someone to present a
21  photo ID when they vote.  Otherwise, you can't even
22  begin to know whether they are committing fraud or not.
23  Q.  (BY MS. RIOS)  Okay.  Are nonphoto ID documents
24  allowed under Senate Bill 362 to verify a voter's
25  identity?

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

141

1        MR. SWEETEN:  You can answer based upon the
2   Texas bill, which is a matter of public record.
3        THE WITNESS:  Could you repeat the question
4   that she asked, please?
5        (Whereupon, the requested testimony was read back
6        as follows:
7        QUESTION:  Okay.  Are nonphoto ID documents
8        allowed under Senate Bill 362 to verify a voter's
9        identity?)
10   A.  Let me get the bill in front of me.
11        MR. SWEETEN:  It's right there.
12   A.  Yes.
13   Q.  (BY MS. RIOS)  And you said earlier that the
14   problems that occur in the system is that it leaves open
15   the possibility that a voter is not who they say they
16   are; is that correct?
17        MR. SWEETEN:  I think you asked him that in
18   the context of a public statement but could you -- if
19   you could give him the context of that.
20        MS. RIOS:  That was something that he said
21   verbatim earlier in the deposition.
22        MR. SWEETEN:  Again, if you want to give him
23   the context of that statement.  I think it was
24   misleading.
25   A.  I would like to know what the question was that I

---

142

1   was responding to.
2   Q.  (BY MS. RIOS)  Okay.  You said earlier that the
3   problem with the current system is that it leaves open
4   the possibility that a voter is not who she or he says
5   they are.  How does Senate Bill 362 correct this?
6        MR. SWEETEN:  You're asking him about his
7   thoughts, mental impressions, opinions and motivation
8   about legislation or the furtherance of the legislative
9   process.
10        I'm going to instruct you not to answer
11   except to the extent you can reveal matters of public
12   record.
13   A.  You know, I don't know that I can answer that
14   without violating my legislative privilege.  I've spoken
15   publicly on it.  I don't have anything beyond my public
16   comments to say.
17   Q.  (BY MS. RIOS)  Was Senate Resolution 14 your
18   resolution or did you merely carry it?
19   A.  I was the author of Senate Resolution 14.  I
20   asked that it be drafted.
21   Q.  And who drafted Senate Resolution 14?
22   A.  You know, I don't recall.  It would be possible
23   to find out but I don't remember.
24   Q.  And when did you begin to work on Senate
25   Resolution 14?

---

143

1        MR. SWEETEN:  You can answer.
2   A.  I -- prior to -- once I was clear that I was
3   going to be the person who carried it, I think I asked
4   that it be drafted.  So, that would have been when I
5   started working on it.  It would have been near the
6   beginning of that legislative session, probably the
7   first or second day.  It could have been earlier.
8   Q.  (BY MS. RIOS)  And did you introduce Senate
9   Resolution 14 in part because you were frustrated that
10   House Bill 218 had not passed?
11        MR. SWEETEN:  I'm going to object.  I think
12   you're asking him to reveal his thoughts, mental
13   impressions, opinions, motivation about legislation.
14        Objection.  Legislative privilege.
15        THE WITNESS:  Now, could you repeat the
16   question that she asked me?
17        (Whereupon, the requested testimony was read back
18        as follows:
19        QUESTION:  And did you introduce Senate
20        Resolution 14 in part because you were frustrated
21        that House Bill 218 had not passed?)
22        MR. SWEETEN:  Same objection.  Calls for his
23   mental impressions.  Legislative privilege.
24   A.  Other than what was said in the public record on
25   the debate about the Senate Resolution, I don't think

---

144

1   there's anything that I can share with you.  I stated my
2   thoughts pretty clearly in that resolution, I think, or
3   during the debate of the resolution.
4   Q.  (BY MS. RIOS)  Okay.  Did anything occur between
5   2007 and 2009, which is when Senate Bill 362 was
6   introduced, that caused you to conclude that there was a
7   continued need for voter ID legislation?
8        MR. SWEETEN:  I'm going to object.  That
9   calls for matters of legislative privilege, asking him
10   to reveal his thoughts, mental impressions.
11        Instruct you not to answer except to the
12   extent you can refer to matters of the public record.
13   A.  I don't think that I can answer that question on
14   the advice of counsel.
15        There is a public record in the debate about
16   Senate Resolution 14.  It's a part of the Senate Journal
17   that -- where I outline my reasons for introducing the
18   resolution.  I think they are quite clear.  Is there any
19   part of that you didn't understand?
20   Q.  (BY MS. RIOS)  I read the record but we're taking
21   your deposition, so, you can tell us what was it that
22   occurred that caused you to conclude that there was a
23   continued need for such legislation?
24        MR. SWEETEN:  Again, objection.  You're
25   invading the legislative privilege with that question.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 145

1   He's not going to reveal his mental impressions,
2   thoughts or opinions about legislation.  He can answer
3   based upon matters of the public record.
4       A.  And my answer is beyond what is a part of the
5   public record in the Senate Journal, there are no other
6   reasons.
7       Q.  (BY MS. RIOS)  Did the Lieutenant Governor tell
8   you that you would be the person carrying Senate
9   Resolution 14?
10      MR. SWEETEN:  You're asking about a specific
11  conversation he had with the Lieutenant Governor.
12      I'm going to object to you revealing the
13  substance of the communication.  You can reveal whether
14  you had communications with the Lieutenant Governor but
15  don't reveal the substance.
16      He can give a general purpose description
17  but I think that the question asks for something beyond
18  that, as phrased.
19      A.  It's a matter of record in the Senate Journal
20  that I had a discussion with the Lieutenant Governor
21  about who would carry the rules resolution.  That's what
22  SJR 14 was.  And beyond that, there's nothing that I can
23  add to that.  I think the record -- the public record
24  accurately reflects what happened.
25      Q.  (BY MS. RIOS)  Okay.  And are you aware of any

## 146

1   in-person voter impersonation that happened between 2007
2   and 2008 that caused you to believe that the voter ID
3   bill was still needed in Texas?
4       MR. SWEETEN:  Calls for matters of
5   legislative privilege, including communications he's had
6   with constituents, legislators, legislative staff, state
7   agencies, Texas Legislative Council and also asks for
8   his mental impressions and opinions about a bill.
9       To the extent you can refer to matters of
10  the public record, you are free to do so.  Otherwise, my
11  instruction is not to answer the question as phrased.
12      THE WITNESS:  Could you read the question to
13  me again?
14      Q.  (BY MS. RIOS)  Strike that.
15      A.  Okay.
16      Q.  Besides the public record, did you receive any
17  unsolicited evidence that in-person voter impersonation
18  was still a problem that needed to be addressed by photo
19  ID legislation in Texas between 2007 and 2009?
20      MR. SWEETEN:  You can reveal matters of the
21  public record.
22      A.  I don't believe beyond what I said in the public
23  record, there's anything that I can add.
24      Q.  (BY MS. RIOS)  Okay.  And what were the bases for
25  your concerns about voter fraud in 2009?

## 147

1       MR. SWEETEN:  Objection.  Legislative
2   privilege.  Don't reveal privileged matters.
3       You can answer based upon matters in the
4   public record.
5       A.  You know, there's an extensive record on this.
6   There was a six and a half hour debate on the Senate
7   floor about the rule change.  There's really nothing
8   that I can add to that.
9       There was over 20 hours of debate on the bill, on
10  Senate Bill 14.  I mean, I've stated my position very
11  clearly.  There's nothing beyond that that I can add.
12      Q.  (BY MS. RIOS)  Did you or your staff collect
13  evidence of voter impersonation at the polls that was
14  not included in the public record?
15      MR. SWEETEN:  Objection.  Asks for matters
16  subject to the legislative privilege.
17      Don't answer except to the extent you can
18  refer to the matter of the public record.  That is
19  legislatively privileged.
20      A.  I don't think there's anything I can add to what
21  I've already said.  It's a matter of public record.
22      Q.  (BY MS. RIOS)  Okay.  Did you or your staff
23  request evidence of voter impersonation at the polls
24  from the Secretary of State?
25      MR. SWEETEN:  Same objection.  Legislative

## 148

1   privilege.
2       THE WITNESS:  Could you read back the
3   question to me, please?
4       (Whereupon, the requested testimony was read back
5       as follows:
6       QUESTION:  Okay.  Did you or your staff request
7       evidence of voter impersonation at the polls from
8       the Secretary of State?)
9       MR. SWEETEN:  Don't reveal communications
10  you had with the Secretary of State.  You can reveal
11  whether you had communications with the Secretary of
12  State and also reveal matters of the public record.
13      A.  The Secretary of State's office testified about
14  this in the Committee of the Whole, and beyond that, I
15  don't know that there's anything I can add to that.
16      Q.  (BY MS. RIOS)  Okay.  How is Senate Bill 362
17  more effective in preventing in-person voter
18  impersonation than the current practice?
19      MR. SWEETEN:  Don't answer the question.  It
20  asks for you to reveal your mental impressions,
21  opinions, motivations about legislation and, as such, is
22  subject to the legislative privilege.
23      A.  On the advice of counsel, I'm going to refuse to
24  answer that question.
25      Q.  (BY MS. RIOS)  Does Senate Bill 362 solve any



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 149

1    problem related to noncitizens voting?
2        A. I believe that --
3            MR. SWEETEN: Hold on a minute. Does it
4    involve any problems of noncitizens voting, once again,
5    you're asking for his thoughts, mental impressions,
6    opinions. That is subject to legislative privilege.
7            My instruction is do not answer the question
8    as phrased. You can refer to matters of the public
9    record, however.
10       A. It's a public matter that this bill -- it says
11   right here that it's a bill to be entitled an act
12   relating to requiring a voter to present proof of
13   identification, and to the extent that someone who was
14   not a citizen can present that ID, then I think it would
15   but it's -- you know, it speaks for itself on the face
16   of it.
17       Q. (BY MS. RIOS) Can you identify any noncitizen
18   who has voted, by name?
19           MR. SWEETEN: Objection. Legislative
20   privilege.
21           You can refer to matters of the public
22   record.
23       A. There was extensive testimony about this in the
24   Committee of the Whole when this bill was considered.
25       Q. (BY MS. RIOS) Did this testimony in the record

---

### 150

1    include any information about individuals convicted for
2    voting, meaning noncitizens?
3            MR. SWEETEN: You can answer as phrased.
4        A. No, not to my recollection.
5        Q. (BY MS. RIOS) Did you have any communications
6    with legislators who opposed 362?
7            MR. SWEETEN: You can answer whether you had
8    communications.
9        A. Yes.
10       Q. (BY MS. RIOS) Okay. And who did you communicate
11   with?
12           MR. SWEETEN: You can answer.
13       A. I can't recall everyone. I know that I had a
14   conversation with Senator Whitmire, and I had a
15   conversation with Senator West and Senator Van de Putte.
16   And there were probably others but those are the only
17   ones that I can recall at this time.
18       Q. (BY MS. RIOS) Okay. Did you take any steps with
19   regard to Senate Bill 362 in an attempt to address any
20   concerns that they brought to your attention?
21           MR. SWEETEN: Don't answer the question. It
22   calls for matters subject to the legislative privilege.
23   Instruct not to answer.
24       A. On the advice of counsel, I can't answer that
25   question.

---

### 151

1        Q. (BY MS. RIOS) And who besides you were the main
2    proponents of Senate Bill 362?
3            MR. SWEETEN: You can answer to the extent
4    it's a matter of public record. Don't reveal specific
5    communications between legislators.
6        A. The legislation reflects the members who were
7    joint and co-authors of the bill, and those people were
8    supporters of the bill. Beyond that, there's nothing
9    that I can add.
10       Q. (BY MS. RIOS) Okay. Was this legislation a
11   priority for the Governor of Texas? Do you know?
12           MR. SWEETEN: Objection. Calls for
13   speculation but you can refer to matters of the public
14   record.
15       A. The Governor has publicly supported voter
16   identification legislation. I do not recall
17   specifically on Senate Bill 362 whether he spoke to that
18   publicly or not but I know that he's long supported
19   voter identification laws.
20       Q. (BY MS. RIOS) And was this legislation a
21   priority for the Lieutenant Governor? Are you aware if
22   it is?
23       A. Only to the extent that he publicly said that it
24   was important to get a voter identification bill passed.
25       Q. Okay. Do you know if Senate Bill 362 was a

---

### 152

1    priority for anyone outside Texas government? I'm
2    referring to organizations, groups.
3            MR. SWEETEN: I think -- objection. Vague.
4    Also, don't reveal matters of privilege but you can
5    answer to the extent you can.
6        A. It's a matter of public record who came and
7    testified for and against the bill, and I think it's
8    clear in the record that the Republican party strongly
9    favored the bill and there were other groups that did
10   also and there were other groups that did not support
11   the bill.
12       Q. (BY MS. RIOS) Okay.
13       A. But beyond what's in the public record, there's
14   nothing that I can add to that.
15       Q. Did you meet with any groups or organizations who
16   were opponents of 362?
17           MR. SWEETEN: You can answer the question as
18   phrased.
19       A. We heard from the opponents in committee. I may
20   have met with them outside of committee but I don't have
21   a specific recollection. I wouldn't have been adverse
22   to meeting with them but I don't have a specific
23   recollection.
24       Q. (BY MS. RIOS) And when you say "with them," to
25   whom are you --



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 153

1    A. The opponents, the people you were asking about.
2    Q. Okay. Did you meet with any groups representing
3  minority voters?
4    A. I don't have a specific recollection. I would
5  not have been opposed to meeting. If they had asked for
6  a meeting with me, I would have been happy to meet with
7  them.
8    Q. But you do not recall meeting with them?
9    A. Not -- not sitting here today, I don't recall
10  whether I did or not.
11    Q. What was your role in trying to get SB 362
12  passed?
13      MR. SWEETEN: You can reveal the matters of
14  the public record. Don't reveal matters subject to the
15  privilege.
16    A. Well, it's, I think, a matter of public record
17  that I was a joint author of the bill, that I was a
18  strong proponent of it and, as you have pointed out and
19  as I've already pointed out, I was the sponsor of the
20  rules resolution that allowed us to get this bill to the
21  floor.
22    Q. (BY MS. RIOS) And you were a co-sponsor of 362?
23    A. I think so, the joint author.
24    Q. Okay.
25    A. Or co-sponsor.

## 154

1    Q. What was your strategy for getting 362 passed?
2      MR. SWEETEN: I think that calls for you to
3  reveal your mental impressions, thoughts about
4  legislation, opinions, motivations and communications
5  and would be subject to the privilege, and I instruct
6  you not to answer on that basis but you can refer to
7  matters of the public record.
8    A. And I think there is a very clear record in the
9  Senate Journal that I laid out when I introduced the
10  resolution that gave what my thought process was in how
11  we would get this bill to the floor and why we needed to
12  get it to the floor.
13      Beyond what's in that resolution and what was a
14  part of the debate, which is of public record, there's
15  nothing that I can add.
16    Q. (BY MS. RIOS) Okay. Let me give you
17  Exhibit 404.
18      (Exhibit 404 marked.)
19    Q. (BY MS. RIOS) And these are the Senate rules
20  adopted January 14, 2009.
21    A. No, they are not. This is a copy of one rule
22  that was adopted.
23    Q. Okay. It's a copy of one rule. It's an excerpt?
24    A. Yes.
25    Q. And specifically it shows Rule 5.11. What were

## 155

1  the circumstances for adopting this rule?
2      MR. SWEETEN: Objection to the question as
3  vague.
4    A. Would you like to restate the question?
5    Q. (BY MS. RIOS) How was this provision adopted in
6  the 2009 Senate rules?
7    A. Which provision?
8    Q. 5.11 D.
9    A. That was what I amended into the Senate rules at
10  the beginning of the 2009 session. As I recall, it was
11  one of two amendments that I made to the rules that
12  session.
13    Q. Okay. Are you aware of the purpose of the
14  two-thirds rule?
15      MR. SWEETEN: You can testify as to the
16  general purpose of the two-thirds rule.
17    A. Yes, and I testified about it earlier and, as
18  I've said, it's a calendar mechanism, it is the way we
19  control the flow of legislation that comes to the floor.
20    Q. (BY MS. RIOS) Okay. And are you aware of the
21  purpose of carving out voter ID requirements from the
22  general two-thirds rule?
23    A. Yes, I am.
24    Q. What was the purpose?
25    A. They were -- that purpose was clearly stated in

## 156

1  the floor debate over the Senate rules. And beyond
2  what's a matter of that public record, there's nothing
3  else for me to add.
4    Q. So, a bill related to voter identification
5  requirements would not need an affirmative vote of
6  two-thirds of the members present to put it on the
7  calendar?
8      MR. SWEETEN: You're asking him if that's
9  what the bill says?
10    Q. (BY MS. RIOS) Is that what it says?
11      MR. SWEETEN: You can answer.
12    A. Would you restate the question?
13      THE WITNESS: Do you want to read that back
14  to me?
15    A. Or I think you might want to restate it.
16    Q. (BY MS. RIOS) When it comes to voter
17  identification requirement bills, you would only need a
18  majority of the members to vote on it to put it on the
19  calendar, while the usual special order rule is that
20  they would need two-thirds vote?
21    A. That's not correct.
22    Q. Okay. Why did you carve out the voter ID
23  requirements from the two-thirds rule?
24      MR. SWEETEN: He can testify about the
25  general purpose of the bill. I think when you start



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 157

1  asking him about the specific legislation, which is the
2  voter ID, I think you're starting to get into matters
3  that are subject to the legislative privilege. I will
4  let him testify as to the purpose of Rule 5.11, which
5  he's done twice now today.
6      THE WITNESS: Would you read her question
7  back to me?
8      (Whereupon, the requested testimony was read back
9  as follows:
10     QUESTION: Okay. Why did you carve out the voter
11     ID requirements from the two-thirds rule?)
12  A. I have -- I spoke publicly about this in the
13  debate on this rule change about us creating a special
14  order for the voter identification bills that are
15  reported favorably from the Committee of the Whole, and
16  so, beyond that, there's really nothing that I can add.
17     Have you not read that?
18  Q. (BY MS. RIOS) Yes, sir.
19     And other than voter identification requirements,
20  were there any other bills that were carved out from the
21  two-thirds rule in 2009?
22     MR. SWEETEN: You can answer the question as
23  phrased.
24  A. In 2009, there were bills that were passed in the
25  regular order of business that did not require

## 158

1  two-thirds suspension of the rules, and there were bills
2  in many other sessions that did not require a two-thirds
3  suspension of the rules. It was frequently done.
4  Q. (BY MS. RIOS) I'm not referring to the regular
5  call of business. I'm referring to special orders. Is
6  the voter ID requirement bill the only one that's
7  identified in the -- in Rule 5.11 about special orders?
8  A. It is specifically identified in 5.11 D.
9  Q. Okay. And did you try to determine how many
10 senators would support Senate Bill 362 prior to bringing
11 it to the floor?
12 A. I didn't bring Senate Bill 362 to the floor.
13 Senator Fraser did. It was his bill.
14 Q. But as a co-sponsor of the bill, did you try to
15 find out how many senators would support Senate Bill 362
16 prior to bringing it to the floor?
17 A. The author of the bill would be the one who would
18 determine where the votes were.
19 Q. Did you talk to your colleagues in the Senate as
20 to whether they would support 362?
21     MR. SWEETEN: You can answer as to whether
22 you had a conversation.
23 A. Yes. As a matter of fact, I have a specific
24 recollection that in the debate on the rule change, it
25 was my hope that we would be able to come up with a

## 159

1  solution that everyone could support.
2  Q. (BY MS. RIOS) What is the significance of
3  carving out voter identification requirements from, you
4  know, the rest of Rule 5.11?
5      MR. SWEETEN: I think because you're asking
6  about the legislation, I think you're asking him to
7  reveal thoughts and mental impressions that would be
8  subject to the legislative privilege. He can testify
9  about the text of the bill. He's testified already
10 twice about the general purpose.
11     THE WITNESS: Could you repeat the question,
12 please?
13     (Whereupon, the requested testimony was read back
14 as follows:
15     QUESTION: What is the significance of carving
16     out voter identification requirements from, you
17     know, the rest of Rule 5.11?)
18  A. I spoke specifically about this in the debate
19 over the adoption of the rules resolution at the
20 beginning of that session, and as a matter of public
21 record, I noted that there were several issues, many
22 instances, I think somewhere around 70 instances, where
23 bills had been passed without the suspension of the
24 regular order of business and that specifically three
25 major issues had been passed.

## 160

1  They were, as I recall, workers' compensation,
2  redistricting under both Republicans and Democrats, and
3  a sweeping tax reform legislation known as the Peveto
4  Bill. So, I've spoken about it publicly, and beyond
5  that, there's nothing that I can add to that.
6  Q. (BY MS. RIOS) Okay. And during the past -- and
7  since you have been a Senator, how many times has that
8  happened? You mentioned 80, you know, pieces of
9  legislation but since you have been a Senator, how many?
10 A. I don't recall specifically but we have passed
11 quite a bit of legislation in, I believe, every session
12 that I've been in that we did not suspend the regular
13 order of business.
14 Q. Okay.
15     (Exhibit 405 marked.)
16 Q. (BY MS. RIOS) This is 405. This is a public
17 statement from you January 15, 2009, and this is comment
18 allowing a majority vote for Senate floor debate on
19 legislation requiring valid photo ID to vote.
20     The last paragraph says that, "In recent times,
21 majority vote rules have been involved in regular
22 special sessions," and it mentions the number of years
23 but during your tenure at -- in the Senate, how many
24 times has the majority vote requirement been invoked?
25 A. The minority vote requirement, I don't know



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

## 161

1  what --
2      Q. Majority vote requirement has been invoked.
3      A. I don't know what you're referring to.
4      Q. I'm referring to the very last sentence in the
5  last paragraph.
6      A. Since I've been -- that last sentence refers to
7  bills that were passed in the regular order of business.
8  They only require a majority vote.
9        I can't tell you, there's been so -- there's been
10 numerous bills every session that I've been in the
11 Senate that have passed in the regular order of
12 business.
13       Without going back and looking specifically, I
14 can't tell you.  And there may have been a session that
15 there wasn't but most sessions, there are and, frankly,
16 many of my colleagues don't understand that.
17     Q. Okay.  By addressing photo ID with a majority
18 vote special order, did that deviate from the just
19 regular operation in the Senate?
20     A. No.  Special orders have been used by a number --
21 on a number of pieces of legislation over the years, and
22 I spoke to that in the floor debate about the adoption
23 of the rules.  And as we sit here today, I can't recall
24 every specific instance but it was well researched, and
25 I provided my colleagues with that information, and we

## 162

1  talked about it on the floor.
2      Q. Okay.  The debate on the floor of Senate
3  Resolution 14 lasted like six hours?
4      A. Six or six and a half hours, yeah.
5      Q. Okay.  And was -- were some of your colleagues
6  opposed to Senate Resolution 14?
7      A. Yes.
8      Q. And did they bring to your attention that they
9  thought that this was, you know, a deviation from their
10 regular rules?
11       MR. SWEETEN:  You can testify based on
12 matters of the public record.
13     A. As reflected in the Senate Journal, I believe
14 they did.
15     Q. (BY MS. RIOS)  Okay.  Would it have been
16 difficult to pass the voter ID bill in 2009 without the
17 rules change?
18       MR. SWEETEN:  I think it calls for
19 speculation and calls for him to reveal his mental
20 thoughts, impressions about legislation.
21       So, don't answer except for to the extent
22 you can refer to matters of the public record.
23     A. There was a discussion about this that is -- was
24 a part of the rules resolution debate, as I recall.
25 Beyond that, there's nothing that I can add to that.

## 163

1      Q. (BY MS. RIOS)  Okay.  But did you publicly
2  acknowledge during this debate that it would be
3  difficult to pass a voter ID bill this year without the
4  change of rules?
5      A. I believe that I did.
6      Q. Okay.  And did you acknowledge that the voter ID
7  bill in 2009 had been a partisan issue incapable of
8  resolution?
9        MR. SWEETEN:  You can testify about -- are
10 you quoting from somewhere?
11       MS. RIOS:  Yes.
12     Q. (BY MS. RIOS)  I'm going to provide that to you.
13     A. I think what I said was it was an intractable
14 issue.
15       (Exhibit 406 marked.)
16     Q. (BY MS. RIOS)  This is an excerpt, and I'm
17 bringing to your attention Page 20, which is the second
18 page.  And you're having an exchange with Senator West.
19 And when he asked you, "It's been a partisan issue
20 incapable of resolution," you answered, "Correct"?
21     A. Where did I say that?
22       Oh, yes.  Okay.  I see it.  I did say that, yes,
23 and he said that, that is correct.
24     Q. Okay.  Did you make another amendment to the
25 rules in 2009?

## 164

1      A. Yes, there was one -- my recollection is there
2  was one other amendment that was included in that rules
3  resolution, and if memory serves me correct, it was a
4  technical correction that was related to a
5  constitutional amendment that was passed by Senator
6  Carona in the previous session regarding the recording
7  of record votes, and the legislation -- or the
8  constitutional amendment that we passed was in conflict
9  with the Senate rules, and we corrected that conflict to
10 reflect the constitutional amendment that had been
11 passed and adopted by the voters.
12     Q. Okay.  And how was Senate Resolution 14 voted?
13 What was the final tally?
14     A. I don't remember the final tally.  What I recall
15 is that none of the Democrats voted for it and all of
16 the Republicans voted for it except for Senator Carona.
17     Q. Okay.
18     A. That's my recollection.
19     Q. And part of Rule 5.11 D provides that the bill
20 would go to the Committee of the Whole instead of going
21 to one of the other Senate committees.  Is this the
22 usual -- is it unusual for a bill to go straight to the
23 Committee of the Whole?
24       MR. SWEETEN:  Answer as a general matter.
25     A. I spoke to it in the floor debate, and my



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 165

1  recollection of what I said was that I thought it was an
2  important issue, that it needed to be before the entire
3  body so that everyone could hear the same testimony and
4  that I was hopeful that as a result of us all working on
5  it at the same time that we would be able to come up
6  with a bipartisan solution to the problem.
7       Q. (BY MS. RIOS)  Okay.  Any other bill during your
8  tenure at the Senate being filed in the Committee of the
9  Whole without going to any other committee first?
10      A. We have considered redistricting bills in the
11  Committee of the Whole, as I recall.
12      Q. In addition to restricting bills?
13      A. I don't recall whether any other bills were
14  considered in the Committee of the Whole or not.  I know
15  this bill was and I believe one of our redistricting
16  bills was.
17      Q. Okay.  The last page of this excerpt of the Texas
18  Journal, Page 61 has some closing remarks by Senator
19  Carona, and towards the middle of the paragraph he
20  states, "I refuse to believe that, in the spirit of
21  goodwill and statesmanship, we couldn't sit down
22  together, given the appropriate amount of time, and work
23  through this issue.  I know you say, 'Well, yes, we'll
24  have that now and in the Committee of the Whole,' but we
25  know that's not the same because the leverage changes

---

### 166

1  entirely.  Well, all you need is 16 votes and you
2  already got them."
3       Do you agree that by bringing Senate Bill 362 to
4  the Committee of the Whole instead of to a regular
5  committee the leverage changed?
6       MR. SWEETEN:  Don't reveal your thoughts and
7  mental impressions about legislation.  You can refer to
8  matters of the public record in answering the question.
9       A. That was certainly Senator Carona's impression.
10  And it was my goal to get this bill, as I stated, before
11  the Committee of the Whole so we could all consider it
12  together.
13      MR. SWEETEN:  Maria, I've got to take a
14  quick break.  Can we take about a 3-minute time out?
15      MS. RIOS:  Yes.
16      (Short recess.)
17      MS. RIOS:  Okay.  Let's go back on the
18  record.
19      Q. (BY MS. RIOS)  Okay.  You said -- and this is in
20  the record -- that bringing the issue of in-person voter
21  impersonation to the Committee of the Whole would help,
22  you know, craft a bipartisan solution.  What did you --
23  what concerns brought by the opposition were -- were
24  included in the amendments?
25      MR. SWEETEN:  One second.

---

### 167

1       Q. (BY MS. RIOS)  Let me strike that.  Let me
2  just --
3       During the debate on Senate Resolution 14, some
4  members of the opposition raised issues that were
5  important, you know, to them to see if they could be
6  added to our rules change.  Why weren't these
7  amendments incorporated?
8       MR. SWEETEN:  Don't answer the question.
9  I'm instructing you not to answer on the basis of
10  legislative privilege.
11      A. On the advice of counsel, I don't believe I can
12  answer that question.
13      Q. (BY MS. RIOS)  Okay.  And during the debate on
14  362, what concerns of the opposition were incorporated
15  into the bill?
16      MR. SWEETEN:  Don't answer the question
17  unless you can do so based upon matters of public
18  record.  Don't reveal your thoughts, mental impressions
19  about the bill in answering the question.
20      A. Yeah, you know, there's nothing beyond what's in
21  the public record about amendments that were adopted or
22  not adopted that I could add.  So --
23      Q. (BY MS. RIOS)  So, do you recall any amendments,
24  you know, proposed by Senators of racial or ethnic
25  origins that were incorporated into Senate Bill 362?

---

### 168

1       MR. SWEETEN:  You can answer.  That's based
2  on the public record.
3       A. I don't recall any amendments that were offered
4  during that debate at all.  So, not without looking at
5  the record, I have no independent recollection.
6       Q. (BY MS. RIOS)  Okay.  Do you agree that a key to
7  the effective implementation of -- strike that.
8       Okay.  I'm going to give you some excerpts of the
9  floor debate -- well, the Committee of the Whole
10  consideration of SB 362.
11      (Exhibit 407 marked.)
12      Q. (BY MS. RIOS)  Let me give you this copy.
13      A. How do I know they are the same as this one?
14  This is bigger than the one you gave me.
15      Q. I eliminated some pages but I am not going to --
16  I will tell you which page number.
17      MR. SWEETEN:  This looks like it's
18  double-sided.  So, let's just make sure it's the same.
19  I just want to make sure the record is clear.  I don't
20  have any doubt it's the same if you say it is.  If
21  there's any difference, why don't we just mark --
22      A. This starts with Page 33, this one starts with
23  Page 33.  Then it goes to 34 and then to Page 9.  It's
24  different.
25      MR. SWEETEN:  If this is what you want to

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 169

1    mark, let's just mark it as a new one.
2           MS. RIOS:  Okay.
3           (Exhibit 408 marked.)
4    A.  So, we're looking at 408?
5    Q.  (BY MS. RIOS)  Yes.
6    A.  Okay.
7           MR. SWEETEN:  I'll look on with you, if you
8    don't mind.
9    Q.  (BY MS. RIOS)  Sorry about that.  I'm talking
10   about this one.
11          MR. SWEETEN:  Okay.  So, put 408 aside.
12          (Exhibit 409 marked.)
13          MS. ABUDU:  Maria, do you have extra copies
14   of that?
15          MS. RIOS:  Yes.
16          MS. ABUDU:  This is 409, Committee of the
17   Whole?
18          MS. RIOS:  Yes.
19   Q.  (BY MS. RIOS)  Okay.  SB 362 allowed voters the
20   alternative of presenting nonphoto IDs; is that correct?
21   A.  362 was from the '07 session?
22   Q.  No.  362 is from '09.
23          MR. SWEETEN:  Let's give him the bill.
24          THE WITNESS:  Could you read the question
25   back, please?

## 170

1           (Whereupon, the requested testimony was read back
2    as follows:
3           QUESTION:  Okay.  SB 362 allowed voters the
4           alternative of presenting nonphoto IDs; is that
5           correct?)
6    A.  Yes.
7    Q.  (BY MS. RIOS)  Okay.  And this was not something
8    that was included in Senate Bill 14; is that correct?
9    A.  I believe that's correct.
10   Q.  Okay.  There were allegations in the debate that
11   in order to comply with Senate Bill 362, there would be
12   costs incurred and that it was a poll tax and that was
13   something that Dr. Chandler Davidson spoke about during
14   this debate.  Do you remember discussing the debate with
15   Dr. Davidson?
16   A.  Not specifically but I bet if you've got a copy
17   of the transcript, I might be able to remember it.
18   Q.  If you go to US 4393 --
19          MR. SWEETEN:  Did you say 4393?
20          MS. RIOS:  Yes.
21          MR. SWEETEN:  Is that a page number?
22          MS. RIOS:  On the bottom.
23   A.  Got it.
24   Q.  (BY MS. RIOS)  And if you look at the transcript
25   at Page 536 --

## 171

1    A.  Uh-huh.
2    Q.  -- Mr. Davidson says, "Well, as I have explained
3    to the other senator just a minute ago, it is sometimes
4    expensive to get various forms of photo ID that are
5    required to vote."
6           And later on in that page you state that you can
7    also bring alternate forms, and then you go on to list
8    the forms that don't have a photograph.
9           If you go on to Page 540, you state, "I think
10   it's very inflammatory for you to come before this body
11   and talk about the legislature imposing a poll tax when
12   the bill doesn't provide for that at all."
13          So, my question to you, Senator Williams, is you
14   supported Senate Bill 362; is that correct?
15   A.  I did.
16   Q.  Okay.  And Senate Bill 362 provided for the
17   alternative of bringing two nonphoto IDs to the polls;
18   is that correct?
19   A.  I think what it did is that it provided that if
20   you had your voter registration card and one other form
21   of ID that that would be sufficient.
22   Q.  And was Senate Bill 362 an improvement on the
23   current system?
24          MR. SWEETEN:  Don't answer the question.  It
25   would ask you to reveal thoughts, mental impressions

## 172

1    about the bill.  You can refer to matters of the public
2    record in answering but don't reveal matters that are
3    privileged.
4    A.  What I would say is that this bill was opposed by
5    every Democrat on the floor of the Senate.
6    Q.  (BY MS. RIOS)  Do you believe that identification
7    without a photograph does not verify the identity of a
8    voter?
9           MR. SWEETEN:  Don't answer the question.  It
10   asks for your mental impressions about legislation.
11   A.  On the advice of counsel, I cannot answer that
12   question.
13   Q.  (BY MS. RIOS)  Do you agree that the key to
14   effective implementation of the voter ID bill is
15   adequate poll worker training?
16          MR. SWEETEN:  Don't answer the question to
17   the extent it asks you to reveal your thoughts and
18   mental impressions about the legislation.  That would be
19   legislatively privileged.
20   A.  I don't know whether we're talking about Senate
21   Bill 362 or Senate Bill 14.  Can you tell me?
22   Q.  (BY MS. RIOS)  362.
23   A.  And I --
24          MR. SWEETEN:  My instruction is don't reveal
25   your thoughts and mental impressions about the bill.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 173

1      A. I think beyond what I said in the public record,
2  there's nothing else that I can add.
3      Q. (BY MS. RIOS) Okay. During the floor debate on
4  Senate Bill 362, did anyone raise concerns about its
5  impact on minority voters?
6          MR. SWEETEN: Talking about the debate, you
7  can answer.
8      A. I think it's a matter of public record.
9      Q. (BY MS. RIOS) And what was your response to
10  these concerns?
11          MR. SWEETEN: On the public record, you can
12  answer to the extent you refer to that.
13      A. I would refer you back to the public record.
14  There's nothing I can add to it.
15      Q. (BY MS. RIOS) Did any racial or ethnic minority
16  Senator vote in favor of SB 362?
17      A. I don't believe so.
18      Q. Okay. Did you place any significance on the
19  united opposition of all minority members of the Senate?
20          MR. SWEETEN: Don't answer the question. It
21  calls for matters of legislative privilege. Instruct
22  not to answer.
23      A. On the advice of counsel, I don't believe I can
24  answer the question.
25      Q. (BY MS. RIOS) Okay. Do you believe that their

## 174

1  concern about the impact of the bill on minority voters
2  was genuine?
3          MR. SWEETEN: Objection. Calls for him to
4  reveal matters of legislative privilege, his mental
5  impressions and it calls for speculation.
6          Do not answer the question as posed.
7      A. I can't answer the question, on the advice of
8  counsel.
9      Q. (BY MS. RIOS) Was it true that some legislators
10  and members of the public stayed up all night during the
11  consideration of SB 362 before the Committee of the
12  Whole?
13      A. Could you repeat the question, please? I'm
14  sorry.
15      Q. Was it true that some legislators and members of
16  the public stayed up all night during the debate on 362?
17      A. Yes.
18      Q. Why do you think there was such strong opposition
19  to Senate Bill 362?
20          MR. SWEETEN: Don't answer the question. It
21  calls for matters of legislative privilege. Instruct
22  not to answer.
23      A. On the advice of counsel, I can't answer your
24  question.
25      Q. (BY MS. RIOS) Okay. When SB 362 was passed --

## 175

1  passed the Senate, what was the vote?
2          MR. SWEETEN: You can answer.
3      A. It's a matter of public record. All the
4  Republicans voted for it and none of the Democrats voted
5  for it.
6      Q. (BY MS. RIOS) Did you place any significance on
7  the united opposition of the minority party to Senate
8  Bill 362?
9          MR. SWEETEN: Objection to legislative
10  privilege.
11          Instruct not to answer.
12      A. On the advice of counsel, I can't answer your
13  question.
14      Q. (BY MS. RIOS) Did you have any role once Senate
15  Bill 362 was referred to the House? Did you have any
16  conversations with any House members on Senate Bill 362
17  after it left the House -- I mean, after it left the
18  Senate?
19          MR. SWEETEN: You can answer.
20      A. I have no specific recollection of a conversation
21  with House members. I'm sure during the course of the
22  session that I visited with my friends and colleagues in
23  the House about this important legislation but I don't
24  have any specific recollection of when, who or what we
25  talked about.

## 176

1      Q. (BY MS. RIOS) Okay. Are you aware of a federal
2  statute called the Help America Vote Act or HAVA?
3      A. I am.
4      Q. And does HAVA implement identification
5  requirements for certain voter registration applicants?
6      A. I don't know the answer to that.
7      Q. Do you know what forms of ID are sufficient under
8  HAVA?
9      A. I do not.
10      Q. Do you know if HAVA allows for registration
11  applicants to show nonphoto ID?
12      A. I don't know the answer to that.
13      Q. Do you have any reason to believe that the
14  requirements under HAVA are insufficient?
15          MR. SWEETEN: Don't reveal matters subject
16  to the legislative privilege.
17      A. I don't know what the requirements of HAVA are,
18  so, I can't tell you.
19          You know, we've got to have some AC in here or
20  I'm leaving. It is too hot.
21          MR. SWEETEN: That's fine. I'll go down and
22  talk to the lady.
23          (Off the record.)
24      Q. (BY MS. RIOS) Let's go to Senate Bill 14. It's
25  the one that the Governor signed.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

177

1    (Exhibit 410 marked.)
2    Q. (BY MS. RIOS)  Okay.  So, Senator Williams, did
3    you have a role in the introduction of Senate Bill 14 in
4    2011?
5    A. I was a joint or co-sponsor of the bill.
6    Q. Okay.  And did you have a role in laying the
7    rules for consideration of Senate Bill 14?
8    A. I did not lay out the rules resolution in that
9    session, as I recall.  Senator Eltife did.
10   Q. Okay.
11       (Exhibit 411 marked.)
12   Q. (BY MS. RIOS)  And if you could compare this one
13   to the rule from 2009.
14       MS. ABUDU:  Maria, do you have an extra copy
15   of that one?
16       MS. RIOS:  Yes.
17   Q. (BY MS. RIOS)  Okay.  Who decided who was going
18   to lay the rules for consideration of the voter
19   identification requirements?
20       MR. SWEETEN:  You can reveal matters of
21   public record.  Don't reveal communications you've had.
22   That would be privileged.
23   A. My recollection of this is that Senator -- excuse
24   me -- Lieutenant Governor Dewhurst recognized Senator
25   Eltife, who was the Chair of the Senate Administration

178

1    Committee in the 2011 session, and he carried the rules
2    that session.
3    Q. (BY MS. RIOS)  Okay.  Did you have any meetings
4    with the Lieutenant Governor about laying this rule?
5        MR. SWEETEN:  You can answer if you had any
6    meetings.
7    A. Yes, I did.  I don't recall the specific time or
8    who was present in the meeting or what was discussed or
9    how many times we met.  I'm sure I met with him about
10   that.
11   Q. (BY MS. RIOS)  And did you meet before the
12   session started?
13   A. I don't recall.
14   Q. Was SB14 given a designation by the Governor to
15   be emergency legislation?
16   A. My recollection is that he did make voter ID an
17   emergency item.
18   Q. And what are the consequences of a bill to have
19   such designation?
20   A. It can be considered earlier in the session.
21   Q. Okay.  And by giving it emergency designation,
22   does it automatically get considered within the first
23   60 days of the session?
24   A. Not automatically.
25   Q. Would it usually be considered within the first

179

1    60 days?
2    A. It could be considered once it was an emergency
3    item.  It could not unless it was an emergency item but
4    it doesn't automatically make it considered.
5    Q. And this emergency designation comes from the
6    Governor, the voter ID as an emergency matter?
7    A. Are you asking me a question?
8    Q. Yes, I'm asking you.
9    A. And what is your question?
10   Q. Okay.  My question is did you request that the
11   Governor designate SB14 as an emergency legislation?
12   A. Not that I recall.
13   Q. Do you know if anyone requested the Governor to
14   designate SB14 as an emergency legislation?
15   A. I don't know who might have done that.  I may
16   have known but I don't know now.  I don't recall.
17   Q. Okay.  Did you have any meetings with the
18   Governor or his staff about SB14?
19   A. Not to the best of my recollection.
20   Q. Okay.  And did you have any meetings with the
21   Lieutenant Governor about SB14?
22   A. I don't have a specific recollection.  I feel
23   certain that I did have a meeting with him but I don't
24   recall the time or place or who was present at the
25   meeting.

180

1    Q. Was it one meeting or several meetings?
2    A. I don't recall.
3    Q. Okay.  And the meeting that you had with the
4    Lieutenant Governor and his staff, did you request the
5    meeting or did they request you to attend such meeting?
6    A. I don't recall.
7    Q. And the meeting with the Governor, who invited
8    whom?
9        MR. SWEETEN:  I think he said there wasn't a
10   meeting.
11   A. I didn't meet with the Governor.  I think that
12   was my testimony.  I don't recall that I ever met with
13   him about it.
14   Q. (BY MS. RIOS)  All right.  Do you know what was
15   the need to consider SB14 in the first 60 days of the
16   legislative session?
17       MR. SWEETEN:  You're asking for him to
18   reveal his mental impressions, thoughts, motivations
19   about the legislation, potentially communications with
20   protected individuals and entities.  So, I'm going to
21   instruct him not to answer on that basis.
22       To the extent that you can refer to matters
23   of the public record, you are free to do so.  Don't
24   reveal privilege in the answer.
25       THE WITNESS:  Can you restate her question



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 181

1    for me, please?
2        (Whereupon, the requested testimony was read back
3        as follows:
4        QUESTION:  All right.  Do you know what was the
5        need to consider SB14 in the first 60 days of the
6        legislative session?)
7    A.  The Governor makes that designation, and you
8    would have to ask him what his reasons were.  He spoke
9    publicly about it, and you can look at the public record
10   about it but I know nothing beyond what he said
11   publicly.
12   Q.  (BY MS. RIOS)  Okay.  And looking at the -- at
13   the -- at Rule 5.11 from 2011, is it similar to the
14   rule -- referring to rule 5.11 -- to the version from
15   two years before?
16   A.  I believe that it's the same.  Yeah, I believe
17   it's the same.
18   Q.  And why was this provision adopted in the rules?
19       MR. SWEETEN:  He can testify about the
20   general purpose of 5.11, which I think he has just said
21   it's the same but you can ask him the general purpose.
22   A.  Beyond what I've already said, there's nothing I
23   can add.  It's exactly the same as the '09 rule.
24   Q.  (BY MS. RIOS)  And once again, pursuant to this
25   rule, SB14 would be considered by the Committee of the

## 182

1    Whole?
2    A.  Correct.
3    Q.  Okay.  And how many other bills in this 82nd
4    session were considered by the Committee of the Whole
5    without being considered by another committee
6    previously?
7    A.  I don't recall that there were any other bills
8    that were considered by the Committee of the Whole that
9    session but my memory is imperfect.  That's some time
10   ago.
11   Q.  Okay.  When did you start working on the
12   development of Senate Bill 14?
13   A.  You know, Senator Fraser was the sponsor of this
14   bill, as I recall, and I think he developed the bill,
15   and then probably the first time I would have really
16   considered it would have been in committee because I was
17   on the State Affairs Committee the last session.
18   Q.  Okay.
19   A.  Or it was sent to the Committee of the Whole.
20   So, that would have been just prior to -- it's his bill.
21   He had it drafted.
22   Q.  No, I'm asking you because you identified
23   yourself as a co-sponsor.
24   A.  Right.
25   Q.  And did you have any communications about Senate

## 183

1    Bill 14 with other current or former legislators who had
2    offered past photo ID bills?
3    A.  Yes.
4    Q.  With whom?
5    A.  With Senator Fraser, that I recall.  Beyond that,
6    I'm sure there were other members of the legislature
7    that I talked to but I don't recall specifically, and I
8    don't recall with him when, how often or how many times.
9    Q.  And in drafting Senate Bill 14, did you or your
10   staff review any reports or studies?
11       MR. SWEETEN:  Don't answer that.  That calls
12   for matters of legislative privilege.  You can answer by
13   referring to matters of the public record but don't
14   reveal your thoughts, mental impressions or opinions.
15   A.  I think it's a public record that Senator Fraser
16   drafted the bill.
17   Q.  (BY MS. RIOS)  I'm referring to if you reviewed
18   any reports or any studies that would have helped in
19   drafting Senate Bill 14?
20       MR. SWEETEN:  Same instruction.  Don't
21   answer if it reveals privilege.  You can refer to
22   matters of the public record, however.
23   A.  I didn't draft the bill.
24   Q.  (BY MS. RIOS)  Okay.  And did you ask -- did you
25   or your staff conduct any analysis related to the voter

## 184

1    ID issue?
2        MR. SWEETEN:  Don't answer the question
3    unless -- except for referring to matters of the public
4    record.  That is a matter that is legislatively
5    privileged.  Your analysis, mental impressions,
6    opinions, thoughts about the legislation are privileged.
7        THE WITNESS:  Would you repeat the question,
8    please?
9        (Whereupon, the requested testimony was read back
10       as follows:
11       QUESTION:  Okay.  And did you ask -- did you or
12       your staff conduct any analysis related to the
13       voter ID issue?)
14   A.  My staff would have reviewed Senate Bill 14.
15   Q.  (BY MS. RIOS)  Did you consider including any
16   additional forms of ID in Senate Bill 14 that had not
17   been included in prior pieces of legislation?
18       MR. SWEETEN:  Don't answer the question.  It
19   calls for matters of legislative privilege.  Do not
20   reveal that information.
21   A.  On the advice of counsel, I can't answer your
22   question.
23   Q.  (BY MS. RIOS)  And did you consider allowing
24   expired forms of ID?
25       MR. SWEETEN:  Don't answer the question.  It



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 185

1  calls for matters of legislative privilege.  Those are
2  mental impressions, opinions and thoughts.
3      A.  On the advice of counsel, I can't answer your
4  question.
5      Q.  (BY MS. RIOS)  Okay.  If a photo ID is expired
6  but was validly issued, why doesn't that prove that the
7  person is the same person on the ID?
8      MR. SWEETEN:  Don't answer the question to
9  the extent it relates to legislation, including Senate
10 Bill 14.  Your analysis, thoughts and mental impressions
11 about the bill, if it doesn't reveal those, then you can
12 provide an answer.
13     A.  There -- I don't have anything that I can share
14 with you beyond what was part of the public testimony
15 that we took in the Committee of the Whole.
16     MR. SWEETEN:  Can we go ahead and put on
17 record Spencer's --
18     MR. FISHER:  Spencer Fisher for the Attorney
19 General.
20     THE WITNESS:  For which Attorney General?
21     MR. SWEETEN:  The Department of Justice.
22     THE WITNESS:  Eric Holder, Attorney General?
23     MR. SWEETEN:  Yes.
24     MS. ABUDU:  The Attorney General.
25     Q.  (BY MS. RIOS)  You indicated earlier in testimony

## 186

1  that in Texas you can go -- that 12 years can go by
2  without getting a new photograph for your driver's
3  license; is that correct?
4      A.  Yes, I testified to that.
5      Q.  Okay.  So, a recently expired driver's license,
6  wouldn't that prove that the person is the same person
7  on the ID?
8      MR. SWEETEN:  Same objection and instruction
9  as previously.
10     A.  And I think my answer is the same.  Beyond what
11 we talked about in the Committee of the Whole, there's
12 really nothing I can add to that, or the floor debate.
13 That's all part of the public record.
14     Q.  (BY MS. RIOS)  Okay.  Did you or your staff
15 conduct any analysis on how many registered voters
16 possess the forms of ID required by Senate Bill 14?
17     MR. SWEETEN:  Don't answer the question.  It
18 calls for matters that are subject to the legislative
19 privilege.  You can answer as to matters of the public
20 record.
21     A.  And that information was discussed at length
22 during the committee process and in the floor debate on
23 Senate Bill 14.
24     MR. SWEETEN:  I'm also going to object that
25 it's asked and answered.

## 187

1      Q.  (BY MS. RIOS)  Okay.  Did you request the
2  Secretary of State's office to conduct any analysis on
3  how many registered voters lacked a driver's license?
4      MR. SWEETEN:  Same objection.  You're asking
5  him to reveal communications he may or may not have had
6  with the Secretary of State's office.
7      You can refer to matters of the public
8  record.  You can also identify whether or not you had
9  communications with the Secretary of State but, as
10 phrased, she's asking the substance of those questions.
11     Do you understand my instructions?
12     THE WITNESS:  I think so.
13     MR. SWEETEN:  Okay.
14     A.  And what I want to say is that, you know, I don't
15 have any specific recollection beyond what was said
16 that's a matter of the public record.  I believe I
17 talked to the Secretary of State.  Whatever, you know, I
18 said in the public record is all that I recall about it.
19     Q.  (BY MS. RIOS)  Did you have any conversations
20 with anyone in the Secretary of State's office about the
21 driver's license records?
22     MR. SWEETEN:  You can answer.  It's a
23 general subject matter.  You can answer whether a
24 conversation occurred.
25     A.  You know, I may have, and I don't -- I really

## 188

1  don't recall without going back and looking at the
2  record.
3      Q.  (BY MS. RIOS)  Okay.  Did you or your staff
4  conduct any analysis to determine if minority voters
5  would be disproportionately less likely to possess the
6  forms of ID required by SB14?
7      MR. SWEETEN:  Objection.  Legislative
8  privilege.
9      Don't answer the question if it would reveal
10 matters of legislative privilege.  You can refer to
11 matters of the public record.
12     A.  I think on the advice of counsel, I can't --
13 there's nothing for me to add.
14     Q.  (BY MS. RIOS)  Okay.  What is a military ID?
15     MR. SWEETEN:  You can answer.
16     A.  It's an identification card issued by the United
17 States government to members of the military.
18     Q.  (BY MS. RIOS)  Okay.  How many forms of military
19 ID are acceptable under SB14?
20     A.  It says in Section 63.010, Subsection 2 that a
21 United States military identification card that contains
22 the person's photograph that has not expired or that has
23 expired no earlier than 60 days before the date of
24 presentation.
25     Q.  Okay.  Did you or your staff research which



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

189

1  agency issued valid military IDs?
2       MR. SWEETEN: Don't answer the question.
3  Calls for matters of legislative privilege. You can
4  refer to matters of the public record but don't reveal
5  your thought process or mental impression analysis.
6       A. On the advice of counsel, I don't think there's
7  anything I can add to your -- or that I can answer your
8  question.
9       Q. (BY MS. RIOS) So, you cannot tell me how many
10 different types of military ID there are?
11      A. No.
12      Q. Okay. What is a citizenship certificate?
13      A. I don't know.
14      Q. It is one of the --
15      A. Yeah.
16      Q. -- acceptable types of ID in Senate Bill 14.
17 Have you seen one?
18      A. No.
19      Q. Okay. And would you know how much it costs to
20 obtain one?
21      A. No.
22      Q. Do you know how you would obtain a replacement?
23      A. No.
24      Q. Do you know whether all citizenship certificates
25 include a photograph?

---

190

1       A. No.
2       Q. So, are you saying that a citizenship certificate
3  without a photograph would be an acceptable form of ID
4  under Senate Bill 14?
5       A. I didn't say that.
6       Q. Do you know if citizenship certificates have
7  photographs?
8       A. No.
9       Q. So, was a citizenship certificate included in
10 SB14 without any investigation as to whether that is a
11 photo ID?
12      A. I don't see where it's included but -- election
13 identification certificate -- you're going to have to
14 show me where it's in here.
15      Q. Okay. It would be on Page 10, and it says that
16 it includes a person's photograph.
17      A. No.
18      Q. Okay.
19      A. What it says is that a United States citizenship
20 certificate issued to the person that contains the
21 person's photograph would be acceptable. It doesn't say
22 that it does or does not.
23      Q. Okay. And are you aware that some children are
24 issued citizenship certificates by the United States?
25      A. I've already testified that I've never seen one.

---

191

1       Q. Oh, you've never seen one. So, a person who
2  brings to the polling booth a citizenship certificate
3  that has a picture of him when he was 5 years old, would
4  that verify that person's identity?
5       A. I have no idea.
6       Q. How much does it cost to obtain a U.S. passport?
7       A. I don't know.
8       Q. Do you have a passport?
9       A. I do.
10      Q. Okay. And do you know what documents you have to
11 provide to obtain one?
12      A. You know, all I remember -- what I recall is a
13 certified birth certificate and a driver's license but I
14 could be wrong about that. It's been a long time since
15 I renewed it.
16      Q. And do you know how many Texan voters hold valid
17 U.S. passports?
18      A. No.
19      Q. Did you or your staff do any research into how
20 many Texan voters currently hold U.S. passports?
21      MR. SWEETEN: Don't answer the question. It
22 asks to reveal matters subject to the legislative
23 privilege. Instruct not to answer. You can reveal
24 matters that are of public record.
25      A. I can't answer on the advice of counsel.

---

192

1       Q. (BY MS. RIOS) Did you or your staff perform any
2  analysis on the number of minority voters in Texas who
3  hold valid passports?
4       MR. SWEETEN: Same objection. Same
5  instruction.
6       A. Same answer. I can't answer, on the advice of
7  counsel.
8       Q. (BY MS. RIOS) Are you aware of the purpose for
9  removing from SB14 the option of a voter showing two
10 forms of nonphoto ID?
11      MR. SWEETEN: Don't answer the question.
12      He will answer questions as to the general
13 purpose of the bill, as set forth in the Court's order.
14 He's not going to answer questions as you phrased it.
15      A. Only to the extent that matter was discussed on
16 the floor of the Senate or the committee.
17      Q. (BY MS. RIOS) Okay. And can you tell me what
18 changed between 2009 and 2011 that made two forms of
19 nonphoto ID no longer an acceptable option?
20      MR. SWEETEN: Don't reveal matters of
21 privilege. You can refer to matters of the public
22 record but don't answer the question as stated
23 otherwise.
24      A. My recollection is that the Indiana law had
25 passed constitutional muster with the Supreme Court

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Thomas D. Williams                                    June 1, 2012

## 193

1  during the interim period and there was not a
2  requirement for alternate forms of ID. So, it had been
3  determined that that wasn't necessary to have a
4  constitutional bill.
5      Q. (BY MS. RIOS) Okay. This is the Indiana bill,
6  which has been marked as Exhibit 60.
7      A. Okay. What's your question about it?
8      Q. Indiana accepts any photo ID issued by Indiana or
9  by a federal agency. Are these forms of ID included in
10  SB14?
11     MR. SWEETEN: Assumes facts not in evidence.
12  If he wants to review the statute and --
13     A. I can read it and see. I don't recall.
14     Q. (BY MS. RIOS) Okay. Could you take a look at
15  it?
16     A. Sure.
17     It says in number 4 the document was issued by
18  the United States or by the State of Indiana. Is that
19  what you're referring to, number 4?
20     Q. Yes.
21     A. That provision is not included in Senate Bill 14,
22  to the best of my recollection.
23     Q. Okay. In Indiana, if a voter does not have an
24  ID, the voter can cast a provisional ballot that will be
25  counted if the person signs an affidavit to the effect

## 195

1      take that extra step, is that your reading from the
2  Indiana statute?
3      A. The way I read it is the voter would have to go
4  before a circuit court clerk or the county election
5  board and execute the affidavit.
6      Q. That's subsequent to the election?
7      A. Correct.
8      Q. So, the SB14 option that you are referring to,
9  which is the free ID for purposes of voting, is not the
10  same as the Indiana procedure for casting a provisional
11  ballot and then going to the Court to sign an affidavit?
12     MR. SWEETEN: Based on the text?
13     MS. RIOS: Based on the text.
14     A. Based on the text that you've presented and, of
15  course, I have no way of knowing if this is really the
16  Indiana law or not. I'm taking your word for it.
17     Q. (BY MS. RIOS) Okay. Does Indiana allow
18  individuals to use ID that has expired at some time
19  since the last general election? That would be on the
20  first page at 3B.
21     A. It says that the document included an expiration
22  date and that the document expired after the date of the
23  most recent general election.
24     Q. Is this allowed under Senate Bill 14?
25     A. No.

## 194

1  that he is indigent and cannot procure a photo ID. You
2  can take a look.
3      A. And where is that?
4      Q. That's on Page 2015.
5      A. Okay.
6      Q. Okay. Is that allowed under SB14?
7      A. There are provisional voting -- there is
8  provisional voting allowed under Senate Bill 14. It's
9  not worded exactly like this.
10     Q. But does that -- but does it allow an exception
11  for when a person is indigent?
12     A. What Senate Bill 14 contemplates is that if
13  someone is unable to afford -- to obtain a state
14  identification card that costs, I think, $10, that the
15  fee would be waived if they signed an affidavit and said
16  that they needed the identification card for the purpose
17  of voting.
18     So, anyone could obtain a state ID card at no
19  cost if they were willing to sign an affidavit that they
20  were indigent, or they could pay the $10 fee.
21     Q. But that would require a person to go and get
22  this ID that -- this free ID that you're describing; is
23  that correct?
24     A. Yes.
25     Q. Okay. But in Indiana, a voter does not have to

## 196

1      Q. Okay. Is it fair to say that there are
2  differences between the Indiana photo ID bill -- law and
3  Senate Bill 14?
4      MR. SWEETEN: Based on the text you've shown
5  him?
6      MS. RIOS: Based on the text.
7      A. Yes, based on the text.
8      Q. (BY MS. RIOS) Okay. Is it fair to say that
9  Indiana accepts photo ID options not accepted under
10  SB14?
11     A. Yes.
12     Q. Okay.
13     A. Based on the text that you've shown me.
14     Q. Okay. And this has been marked as Exhibit 6, and
15  this is the Georgia photo ID law.
16     (Off the record.)
17     Q. (BY MS. RIOS) Okay. I'm going to ask you a
18  couple of questions about this. And this we got from
19  LexisNexis.
20     A. Okay.
21     Q. Does Georgia accept photo IDs issued by any
22  government entity, meaning federal, Georgia or any other
23  state?
24     A. Yes, it would appear in Section 2, the text that
25  you've given me, that any valid identification card



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Senator Thomas D. Williams                                    June 1, 2012

---

### 197

1  issued by a branch, department, agency or entity of the
2  State of Georgia, any other state or the United States
3  authorized by law to issue personal identification,
4  provided that the identification contains a photograph
5  of the elector.
6      Q.  And are these forms of photo ID included in SB14?
7      A.  Some are and some are not.
8      Q.  Does SB14 accept identifications from other
9  states, for example?
10     A.  I don't know without looking.  I'll be glad to
11 look as long as we keep the meter running.
12     Q.  No.
13         MS. RIOS:  Off the record.
14         (Off the record.)
15     A.  It would appear that Senate Bill 14 does not
16 allow for identification issued by other states.
17     Q.  (BY MS. RIOS)  Okay.  Georgia accepts valid photo
18 tribal identification cards.  Are these forms of photo
19 ID included in SB14?
20     A.  I don't know what that is.
21     Q.  Tribal identification cards.
22     A.  It's not specifically identified in Senate Bill
23 14.
24     Q.  Okay.  Does Georgia accept valid photo employee
25 cards issued by state or federal agencies?

### 198

1      A.  Yes.
2      Q.  Okay.  And are these forms of photo ID included
3  in SB14?
4      A.  No.
5      Q.  Okay.  Is it fair to say that there are
6  differences between SB14 and the Georgia photo ID
7  statute in terms of the acceptable forms of ID?
8      A.  As it's presented here, it would appear there are
9  differences.
10     Q.  And is it fair to say that Georgia accepts more
11 types of photo ID than those listed in SB14?
12     A.  It would appear so based on the text that's in
13 front of me.
14     Q.  Okay.  Are you aware of the purpose of removing
15 from SB14 the option for a voter to show a state or
16 federal issued photo ID?
17         MR. SWEETEN:  Don't answer the question as
18 phrased.  It calls for matters of legislative privilege.
19 I instruct not to answer on that basis except to the
20 extent that you can refer to matters of the public
21 record.
22     A.  On the advice of counsel, I don't believe I can
23 answer your question.
24     Q.  (BY MS. RIOS)  Okay.  You mentioned the election
25 identification certificate when you were talking about

### 199

1  photo ID forms acceptable under SB14.  Did any
2  legislator express concern that an election
3  identification certificate would be difficult for some
4  of their constituents to obtain?
5          MR. SWEETEN:  You can refer to matters in
6  the public record.  Don't reveal those that are
7  privileged communications.
8      A.  I think it's a matter of public record that there
9  were objections.
10     Q.  (BY MS. RIOS)  Okay.  Did you have any private
11 conversations about the election identification
12 certificate?
13         MR. SWEETEN:  You can answer the question as
14 phrased.
15     A.  I may have.  I don't recall specifically but I
16 may have.
17     Q.  (BY MS. RIOS)  Did you have any private
18 conversations about the election identification
19 certificate with Senators of the Democratic party?
20     A.  I may have.
21     Q.  Do you --
22     A.  I don't recall specifically.
23     Q.  Okay.  Do you know the number of voters who
24 reside in counties that do not have a driver's license
25 office?

### 200

1      A.  I don't know.  I know there are voters who reside
2  in counties who don't have a driver's license office but
3  I can't tell you how many there are, if that's what
4  you're asking.
5      Q.  Do you know how many counties don't have a
6  driver's license office?
7          MR. SWEETEN:  And you're asking as he's
8  sitting here?
9          MS. RIOS:  Right.
10     A.  No.
11     Q.  (BY MS. RIOS)  And do you know the number of
12 voters residing in counties with limited driver's
13 license office hours, some are open one day a week, a
14 couple of days a week?
15     A.  As we're sitting here, I can't give you that
16 number.
17     Q.  Okay.  Did you or your staff conduct an analysis
18 on the cost or steps a voter would need to take to
19 obtain an election identification certificate?
20         MR. SWEETEN:  Objection to the question.  It
21 calls for matters that are subject to the legislative
22 privilege.  You can refer to matters of the public
23 record.  Otherwise, I would instruct you not to answer
24 the question.
25     A.  There's nothing that I can add beyond the public

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Thomas D. Williams                                    June 1, 2012

---

## 201

1    record.
2        Q. (BY MS. RIOS)  Okay.  And what documents are
3    needed to obtain an election identification certificate
4    under SB14?
5        A. I believe that it would be the same documents
6    that are required to get a Texas driver's license.  The
7    requirements to receive an election identification
8    certificate, it would appear to me that they are the
9    same as the requirements to get a state ID card.  There
10   are a number of things that would be acceptable but they
11   would include a certified birth certificate and some
12   other form of identification.
13       Q. Okay.  And how much does it cost to acquire a
14   certified birth certificate?
15       A. It would depend on what county you're in.
16       Q. And would it be possible to obtain an election
17   identification certificate without having to pay for the
18   certified birth certificate?
19       A. I think you have to have the birth certificate.
20       Q. Okay.  If the documents needed to get the
21   election identification certificate are not free, isn't
22   there a cost to voting for those who lack the necessary
23   documents?
24           MR. SWEETEN:  Can you read the question
25   back, please?

---

## 203

1    Texas live at least 50 miles from the nearest driver's
2    license office?
3        A. I'm sure some do.  Maybe more than that.
4        Q. And how much would gas cost at a minimum to drive
5    a 100-mile round trip to get the election identification
6    certificate?
7        A. I have no idea.  It would depend on what kind of
8    car you were driving or whether you were on a motorcycle
9    or riding a bicycle or what it might be.
10       Q. So, those would be additional costs that voters
11   would have to make in order to get the free election
12   identification certificate?
13           MR. SWEETEN:  Objection.  Argumentative.
14           You can answer.
15       A. It may or may not be an additional cost that they
16   would have to bear.
17       Q. (BY MS. RIOS)  Senator Davis proposed Amendment
18   12, which provided that the underlying document needed
19   to obtain an election identification certificate, that
20   is, the birth certificate, be free for indigent
21   voters.  Did you oppose this amendment?
22           MR. SWEETEN:  You can refer to matters of
23   the public record.  Don't reveal matters that are
24   subject to legislative privilege.
25       A. You'd have to look at the record.  My

---

## 202

1           (Whereupon, the requested testimony was read back
2    as follows:
3    QUESTION:  Okay.  If the documents needed to get
4    the election identification certificate are not
5    free, isn't there a cost to voting for those who
6    lack the necessary documents?)
7        A. And my response would be that yes, there is a
8    cost but I don't believe that that cost is an
9    unreasonable burden based on --
10           MR. SWEETEN:  Just answer the question.
11       A. -- the testimony that was taken during the debate
12   on this.
13       Q. (BY MS. RIOS)  Does SB14 require employers to
14   provide paid leave so that employees may obtain an
15   election identification certificate?
16       A. Not to my recollection.  I can look at it and see
17   but I don't recall that it did that.
18           MS. RIOS:  Off the record.
19           (Off the record.)
20       A. I don't see where it does.
21       Q. (BY MS. RIOS)  Okay.  And do you know whether
22   some people in Texas live at least 50 miles from the
23   nearest driver's license office?
24       A. What is your question?
25       Q. My question is do you know whether some people in

---

## 204

1    recollection is that I opposed that amendment.
2        Q. (BY MS. RIOS)  Okay.  Senator Ellis proposed
3    Amendment 19 to add student IDs to the list of
4    acceptable photo IDs, and this would be limited to
5    student IDs issued by Texas public universities.  Did
6    you oppose this amendment?
7            MR. SWEETEN:  You can refer to matters of
8    the public record.  Don't reveal matters of legislative
9    privilege.
10       A. My recollection is that I voted against that
11   amendment.
12       Q. (BY MS. RIOS)  Do you recall why you opposed this
13   amendment?
14           MR. SWEETEN:  Don't reveal matters -- your
15   thoughts, opinions, mental impressions about the
16   legislation.  You can refer to matters of the public
17   record.
18       A. Only to the extent that I discussed it on the
19   floor of the Senate.
20       Q. (BY MS. RIOS)  Did you gather any evidence that
21   would indicate that there's a problem with forgery with
22   state university IDs?
23           MR. SWEETEN:  Don't answer the question.  It
24   asks for you to reveal matters that are subject to
25   legislative privilege.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Thomas D. Williams                                June 1, 2012

## 205

1    To the extent you can refer to matters of
2  the public record, you can do so.
3    A. I don't believe I can answer the question, on the
4  advice of counsel.
5    Q. (BY MS. RIOS)  Okay.  And did you have any
6  evidence of charges or convictions for forgery for
7  misusing public university IDs?
8    MR. SWEETEN:  Don't reveal matters that are
9  subject to the legislative privilege, including
10  communications that you've had with other legislators,
11  individuals or groups that are covered by the privilege.
12  Don't reveal your thoughts and mental impressions.  You
13  can refer to matters of the public record.
14    A. I don't believe I can answer the question, based
15  on advice from my counsel.
16    Q. (BY MS. RIOS)  Okay.  And are you aware that
17  Senator Ellis based his student ID amendment on the
18  Indiana voter ID statute?
19    MR. SWEETEN:  Objection.  Don't reveal
20  communications with Senator Ellis or his legislative
21  staff.  You can refer to matters of the public record.
22    And objection.  Calls for speculation.
23    A. Beyond what's reflected in the Senate Journal,
24  there's nothing -- and the record of the proceedings,
25  there's nothing that I can add.

## 206

1    Q. (BY MS. RIOS)  Are you aware why a student ID
2  issued by a state university would be acceptable in
3  Indiana but not in Texas?
4    MR. SWEETEN:  Don't answer the question.  It
5  calls for matters of legislative privilege.  Instruct
6  not to answer.
7    A. I cannot answer your question, based on the
8  advice of counsel.
9    Q. (BY MS. RIOS)  During the floor debate on Senate
10  Bill 14, did anyone raise concerns about its impact on
11  minority voters?
12    MR. SWEETEN:  You can answer the question as
13  phrased.
14    A. Yes.
15    Q. (BY MS. RIOS)  Who did?
16    A. Several Senators did.  I don't recall
17  specifically which ones.  I think every Democratic
18  Senator stood up and voiced some objection to the bill.
19    Q. What was your -- your response to the
20  legislators' concerns about the bill's impact on
21  minority voters other than what is on the record?
22    MR. SWEETEN:  Objection.  Calls for matters
23  of legislative privilege.  Don't reveal communications
24  you've had.  Don't reveal your thoughts and mental
25  impressions about the legislation.

## 207

1    A. There's nothing beyond the public record that I
2  can share with you.
3    (Off the record.)
4    (Short recess.)
5    EXAMINATION
6    Q. (BY MS. ABUDU)  Well, good afternoon, Senator
7  Williams.  My name is Nancy Abudu.  I'm an attorney with
8  the American Civil Liberties Union, and I'm representing
9  several defendant-intervenors in this case, including
10  the Texas Legislative Black Caucus, as well as African
11  American registered voters in Texas.
12    Obviously, you are still under oath.
13    And because you have asserted legislative
14  privilege with a number -- or with respect to a number
15  of questions posed to you today, we're, of course,
16  reserving our right to redepose you if and when the
17  Court fully addresses that issue.  Okay?
18    MS. ABUDU:  And I'll just ask if we can have
19  a 30-minute time check before our time expires.
20    Q. (BY MS. ABUDU)  All right.  Now, a number of the
21  questions we would have posed to you today have already
22  been asked of you by the Department of Justice.  So, I'm
23  going to try to fill in some areas within that general
24  scope of questioning.  So, I may be jumping around a bit
25  but it's only to avoid redundancy.  All right?

## 208

1    A. Okay.  I appreciate that.
2    Q. Could you go ahead and state your race for the
3  record?
4    A. I'm Anglo.
5    Q. So, that means that you are white?
6    A. Yes.
7    Q. And that means that you do not have any Hispanic
8  heritage, correct?
9    A. Not to my knowledge.
10    Q. And as a Senator for the State of Texas, do you
11  consider yourself to be an employee of the State of
12  Texas?
13    A. I do not.
14    Q. Okay.  Are you employed anywhere?
15    A. I am.
16    Q. And what do you do for a living?
17    A. I'm the president of Woodforest Financial
18  Services.
19    Q. Okay.  And what does Woodforest Financial
20  Services do?
21    A. We provide investment advice and products and
22  services to individuals and businesses and employee
23  benefits to businesses.
24    Q. And as president of that company, are you the
25  owner of the company?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 209

1    A.  No.
2    Q.  And who is the owner of that company?
3    A.  It's owned -- it's a wholly-owned subsidiary of
4  the Woodforest Financial Group.
5    Q.  And how many employees does that company employ?
6    A.  Which company?
7    Q.  The Woodforest -- your employer.
8    A.  I'm an employee of Woodforest Financial Services,
9  and I don't know exactly how many people I have working
10 now.  I want to say 12 or 15.
11   Q.  And of those 12 or 15 employees, are any of them
12 members of racial minorities?
13   A.  Not at the present time.
14   Q.  So, all of those 12 to 15 employees are all
15 Anglo?
16   A.  Yes, of Woodforest Financial Services, yes.
17   Q.  And how long have you been with Woodforest
18 Financial Services?
19   A.  The company was created in 2000 when I sold my
20 business to the Woodforest Financial Group.
21   Q.  Okay.
22   A.  So, since 2000.
23   Q.  All right.  And since 2000, have you -- has
24 Woodforest Financial Services ever had any minority
25 employees?

## 210

1    A.  Yes.
2    Q.  And over that span of time, how many would you
3  say the company has employed?
4    A.  Racial minorities, we have had one or two.
5    Q.  Okay.  And those -- so, one or two, you don't
6  know if it's one or two?
7    A.  I know of one, and there could have been another,
8  yeah.
9    Q.  Okay.  The one that you know of for sure, what
10 was that employee's job title?
11   A.  She was a sales assistant.
12   Q.  Okay.  And does that mean that she was -- had any
13 managerial responsibilities?
14   A.  She did not.
15   Q.  Okay.  So, to your recollection, Woodforest
16 Financial Services has never had a minority employee in
17 a managerial position?
18   A.  No.
19   Q.  Okay.  Now, you are a member of the Republican
20 party, correct?
21   A.  I am.
22   Q.  Have you ever been a member of any other
23 political party?
24   A.  No.
25   Q.  And earlier, I believe you testified that -- you

## 211

1  self-identified as a conservative Republican, correct?
2    A.  I did.  I am.
3    Q.  So, are there other categories of Republicans
4  that you consider to exist?
5    A.  I would say that I am a fiscal and social
6  conservative.  I believe that's what I said, and I think
7  that's how I would identify myself.  I would leave it up
8  to others to identify themselves however they like
9  but --
10   Q.  Okay.  Have you ever heard the term "moderate
11 Republican"?
12   A.  I have.
13   Q.  What is your understanding of what a moderate
14 Republican is?
15   A.  I think the general definition would be that it
16 would be someone who is more -- more towards the left of
17 the rest of the Republican party, someone more center or
18 left of the Republican party.
19      Many people call me a moderate.  That's -- as a
20 matter of fact, I just went through an election, and I
21 was called a socialist.  So, I think it really just
22 depends on where you're sitting.  I think you wouldn't
23 think that was true but somebody did.
24   Q.  And do you know -- was it a Republican who called
25 you a socialist?

## 212

1    A.  It was someone who was voting in the
2  Republican -- it was an African American Republican who
3  probably votes in the Republican primary.
4    Q.  Okay.  Now, would you say that you're generally
5  familiar with the racial composition of the Republican
6  party here in Texas?
7    A.  Yes.
8    Q.  Could you provide me with a racial breakdown of
9  the Republican party here in Texas?
10   A.  No, I don't know specific numbers.  And I think
11 it's pretty loosely defined whether you're a Republican
12 or Democratic.  Anyone can say it.  It's not like you
13 have to have a card or anything.
14   Q.  When you all have primaries here, are they closed
15 primaries, meaning only people who identify as
16 Republicans can vote in a Republican primary?
17   A.  No.  That's not true in Texas.
18   Q.  Okay.  So, anyone can vote in a Republican
19 primary?
20   A.  Correct.
21   Q.  Okay.  So, that means even a Democratic or
22 someone who identifies as a Democratic can vote in a
23 Republican primary?
24   A.  That's correct.
25   Q.  Okay.  Now, in terms of the racial composition of



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Thomas D. Williams                              June 1, 2012

---

213

1 the Republican party, would you -- would it surprise you
2 if I told you that 90 percent of the Republican party is
3 made up of African Americans in Texas?
4     A. I would be surprised.
5     Q. Okay.  Now, if I told you that 90 percent of
6 those in the Republican party in Texas are Anglos, would
7 that surprise you?
8     A. I would be surprised by that.
9     Q. Okay.  So, then do you have a general sense of
10 what the --
11     A. Something less than 90 percent.
12     Q. Okay.  Something less -- 80 percent would you say
13 are white?
14     A. You know, I don't know.
15     Q. Would you be able to say at least more than
16 50 percent of the Republican party is Anglo in Texas?
17     A. Probably so.
18     Q. Okay.  Now, are you aware of any efforts made by
19 the Republican party in Texas to increase the number of
20 racial minorities who are members of the party?
21     A. Yes.
22     Q. And what have those actions been, to your
23 knowledge?
24     A. Well, there are people who are involved in
25 outreach, and we have a very active group of Hispanic

---

214

1 citizens that are active in my county party, and we have
2 a number of people who are African Americans that also
3 are involved in outreach who are involved in the state
4 party.  In my county specifically, there are a lot of
5 Hispanic members.
6     Q. Can you tell me a little bit more about what you
7 mean when you say "outreach"?
8     A. I think the outreach is to reach out to people
9 who are members of ethnic minority groups and share with
10 them what the values of the Republican party are and see
11 if they share those values and try to persuade them that
12 they should be a part of the Republican party.
13     Q. Can you be a little bit more specific in terms of
14 the form of that outreach?
15     A. I cannot.
16     Q. Are you aware of any town hall meetings held by
17 the members of the Republican party to engage in this
18 kind of outreach?
19     A. I know that there are people involved in the
20 outreach.  I am not.  And so, I don't -- I can't tell
21 you what they are doing.
22     Q. And why are you not involved in any outreach on
23 behalf of the Republican party to minority communities?
24     A. I'm very busy being the State Senator and trying
25 to run my business, and I don't have time to be involved

---

215

1 in any other activities.
2     Q. Do you think that it's important to engage in
3 such outreach?
4     A. I think it is, yes, and I've been supportive of
5 it.
6     Q. And how have you been supportive of it?
7     A. I support the party financially, and I
8 specifically speak favorably about those outreach
9 programs and encourage people to participate in them.
10 I go and speak to the Hispanic Chamber of Commerce and
11 the Hispanic Republicans and talk to them and
12 participate in their events.
13     Q. And what kinds of things do you talk to them
14 about?
15     A. What I'm doing as their State Senator.
16     Q. Could you be more specific?
17     A. I might give them a legislative update and talk
18 to them about what we're working on and what we see as
19 the problems that are facing the state.
20     Q. And what do you see as the problems facing the
21 state that you've expressed to these individuals during
22 your own actions in terms of this general outreach?
23     A. Well, I would talk about the kinds of things that
24 I've worked on, including the budget and voter ID and
25 the social issues that I've worked on, those sorts of

---

216

1 things.
2     Q. And what kind of social issues have you been
3 working on?
4     A. I've worked on the Health and Human Services
5 budget, and I've done quite a bit of work on -- in fact,
6 I was a conferee on that part of the budget in the '09
7 session.
8        And I've also worked on conservative social
9 issues regarding pro-life versus pro-choice.  I'm a
10 pro-life person.  And so, I share that talk with people.
11     Q. Are you or have you done any work with respect to
12 social issues that you consider impact minorities more
13 than Anglos?
14     A. No.
15     Q. So, the social issues that you have been involved
16 with, none of those issues have a particular concern
17 when it comes to minority communities; is that correct?
18     A. I talk to those groups like I talk to a general
19 audience.  I'm not trying to shade anything one way or
20 the other.  So, I just tell them what I'm involved in
21 and, you know, see if they identify with that.
22     Q. Do you believe that there are certain social
23 issues that do affect minorities more than they affect
24 Anglos?
25     A. I don't know.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

217

1      Q.  You've never done any research to find out
2   whether there are social issues that have a greater
3   impact on minority communities?
4      A.  No.
5      Q.  Are you aware of whether unemployment rates in
6   Texas disparately impact minority communities?
7      A.  I'm not aware.
8      Q.  Are you aware of whether education policies
9   disparately impact minority communities?
10      A.  I'm not aware.
11      Q.  Are you aware of whether healthcare issues
12   disparately impact minority communities?
13      A.  I'm not aware.  I think that all of the things
14   that you've talked about affect people no matter what
15   color their skin is.
16      Q.  But do you also acknowledge that some of those
17   social issues, such as healthcare, education,
18   employment, have a greater impact on racial minorities?
19      A.  I think it would be presumptuous of me to say
20   that.  I listen very carefully to what my colleagues in
21   the legislature have to say who represent those people,
22   and I try very hard to be sensitive to what those issues
23   are.
24      Q.  And what efforts do you take in order to be
25   sensitive to those issues?

---

218

1      A.  Well, just try to understand what they're
2   concerned about and why they're concerned about it, and
3   if there's a way that I can help them advance their
4   issue, I will try to do that.
5      Q.  So, does that mean that if you find out that a
6   certain social issue does have a negative disparate
7   impact on the minority community that you will make an
8   effort to work on that issue?
9      A.  I will listen to people who represent those
10   communities, and if I can help them, I will.  I try very
11   hard to make sure that I'm sensitive to what their
12   concerns are.
13      Q.  Do you view yourself as someone who represents
14   minority communities?
15      A.  I have minority communities in my district.
16      Q.  In fact, I'd like to talk a little bit more about
17   your district.  Earlier you discussed the composition in
18   terms of counties and cities of your district before
19   redistricting, and so, I just want to find out what
20   counties are in your district now after redistricting.
21   Can you break that down?
22      A.  Sure.  I have all of Chambers County, all of
23   Jefferson County, I have a portion of Harris County, and
24   that's changed slightly but it's roughly the same areas
25   that I had before in Harris County, and I still

---

219

1   represent a portion of Montgomery County but it's a much
2   larger portion of Montgomery County.
3      And so, the counties that I used to -- it's
4   easier to say what I don't have.  I had Orange and
5   Liberty County in my old district.  I don't have them
6   now.  And I have all of Jefferson County and all of
7   Chambers County and I have a very small portion of
8   Galveston County.
9      Q.  Okay.  Now, as a Senator from -- now, all of this
10   is Senate District 4, correct?
11      A.  Correct.
12      Q.  Now, as a Senator from District 4, do you think
13   that it's important for you to know the demographics of
14   your district?
15      A.  Sure, it is but it's not the most important thing
16   for me to know.
17      Q.  Okay.  What is the racial demographic of your
18   district then?
19      A.  I can't tell you without looking at the reports.
20      Q.  Well, would you be surprised if -- let's see.
21   If -- okay.  So, for example, you said you have part of
22   Chambers County; is that correct?
23      A.  Uh-huh.
24      Q.  And does that include the City of Galveston?
25      A.  No.

---

220

1      Q.  So, that is not -- that was never part of your
2   district or that's not part of -- was that ever part of
3   your district?
4      A.  I don't have any of the City of Galveston now.  I
5   have a portion of Galveston County.
6      Q.  Okay.  And you said that you -- Jefferson County
7   is part of your district after redistricting, correct?
8      A.  All of it is.  I had a portion of it before.
9      Q.  And the City of Beaumont is part of that county,
10   correct?
11      A.  Correct.
12      Q.  And you represent Beaumont as well?
13      A.  I do.
14      Q.  Okay.  Do you know what the racial demographics
15   are of Beaumont?
16      A.  I know that Beaumont has a large African American
17   community, and I know that Port Arthur has, in
18   percentage terms, an even larger African American
19   community.
20      And just yesterday, I was with the mayor of Port
21   Arthur, and she's an African American woman and a friend
22   of mine.
23      Q.  And can you share with us was -- well, was that
24   an official meeting that you had with the mayor?
25      A.  We were at the same event yesterday, and so, we

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

221

1    were both there in our official capacity.
2        Q. And did you all have discussions about official
3    business involving the City of Beaumont?
4        A. It was the City of -- the mayor of the City of
5    Port Arthur.
6        Q. I'm sorry. Of Port Arthur.
7        A. I told her that I was anxious to get down and
8    visit with her now that Port Arthur was a part of my
9    district and I had the primary behind me, that I would
10   be calling her to come down and visit.
11       Q. Okay.
12       A. I knew her before. I had worked with her before.
13       Q. Okay. And you said that Port Arthur also has a
14   significant minority population; is that correct?
15       A. It has a large African American population.
16       Q. So, would you agree that there may be issues --
17   social issues that affect the African American community
18   in Port Arthur based on their race?
19       A. There may be.
20       Q. Do you plan to do any investigation into that?
21       A. Yes.
22       Q. Okay. And how will you conduct that
23   investigation?
24       A. Well, I'm going to start by visiting with the
25   mayor.

222

1        Q. Okay. Now, do you know what the racial
2    demographics are now, post the 2010 census, of Texas as
3    a whole?
4        A. I know that it is -- I believe I know that Texas
5    is a minority majority state, that Anglos are in the
6    minority in our state.
7        Q. And would you generally agree that historically
8    African Americans in Texas have elected African American
9    officials to office?
10       A. I know that's often true but I know it's also not
11   always true.
12       Q. And would you agree that generally Hispanic
13   voters in Texas have elected Hispanic officials to
14   office?
15       A. That's not always true.
16       Q. But it has been true, that Hispanic voters elect
17   Hispanic officials, correct?
18       A. They do sometimes.
19       Q. Okay. And so, now in Texas, based on the racial
20   demographics, Anglos are the minority, correct?
21       A. Yes, I believe that's correct.
22       Q. And if we were just, for argument sake, to say
23   that minorities tend to elect minorities to office, if
24   Anglos are the minority racial group now, then would you
25   agree that means it's very likely that Anglos will be a

223

1    minority of the Texas Legislature?
2        MR. SWEETEN: Objection. Calls for
3    speculation. Objection. Vague.
4        You can answer to the extent you can.
5        A. I don't have any idea what the future may hold.
6        Q. (BY MS. ABUDU) Okay. All right. Now, you said
7    that -- are you up for reelection this November?
8        A. I am.
9        Q. Okay. And you were -- so, the last election that
10   you ran in was in 2008?
11       A. Correct.
12       Q. Did you have any opposition in that election?
13       A. I did. I had a primary opponent.
14       Q. Okay. So, a Republican opponent?
15       A. Correct.
16       Q. And in the general election, did you have any
17   opposition?
18       A. Not in 2008.
19       Q. And do you know why that is?
20       MR. SWEETEN: Objection. Calls for
21   speculation.
22       A. No. People are happy with the job I'm doing.
23       Q. (BY MS. ABUDU) All people in your district? Did
24   all of the registered voters in your district come out
25   to vote in the 2008 election?

224

1        A. Of course not.
2        Q. Okay. So, that means that it's possible there
3    are constituents in your district who may not be happy
4    with the job you're doing?
5        A. It's possible.
6        Q. Okay.
7        A. I hear from a lot of them that aren't.
8        Q. And so, you say that you are up for reelection
9    this November. Do you have opposition?
10       A. I do.
11       Q. And who is that?
12       A. Well, he's not officially nominated yet. I
13   understand there's a Libertarian candidate that will be
14   running against me but they don't have a primary system.
15   So, they haven't officially nominated him yet. They
16   nominate in the convention, in their convention.
17       Q. And do you have a Democratic opponent?
18       A. Not this time.
19       Q. And the Libertarian opponent, do you know the
20   person's race?
21       A. I do not.
22       Q. Now, how -- as a legislator, as a Senator, how
23   many people are on your staff?
24       A. I don't know. Let me think about this. I have
25   to write it down. Can I have a piece of scrap paper to



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 225

1  write?  I can't -- I have to think about this.
2      MS. ABUDU:  Let's go off the record then.
3      (Off the record.)
4  A.  13, counting some people who are not full-time.
5  Q.  (BY MS. ABUDU)  Okay.  And are any of those 13
6  individuals members of racial minorities?
7  A.  Yes.
8  Q.  How many of them are?
9  A.  One.
10  Q.  And who is that person?
11  A.  Tulsi Overbeck.
12  Q.  And what is that person's job title?
13  A.  She is the Committee Clerk for the Transportation
14  and Homeland Security Committee.
15  Q.  And does she have any managerial
16  responsibilities?
17  A.  She does.
18  Q.  And what are those responsibilities?
19  A.  She runs the committee.  So, she has oversight --
20  when we're in session, she has oversight of the clerks
21  that work for the committee.  There are no clerks during
22  the interim but she oversees them.
23  Q.  And how long has she worked for you?
24  A.  She started last session.
25  Q.  Okay.  And do you interview all applicants for

---

### 226

1  positions in your office?
2  A.  I do not.  My Chief of Staff does, and then I
3  interview the ones that she selects as qualified
4  candidates.
5  Q.  And please repeat this person's name for me
6  again.
7  A.  Janet Stieben.
8  Q.  Not the Chief of Staff, the minority --
9  A.  Oh, Tulsi Overbeck.
10  Q.  So, did you interview her before she got the
11  position?
12  A.  I did.
13  Q.  Okay.  And have you interviewed any other
14  minority candidates for positions in your office?
15  A.  I have.
16  Q.  And other than the person you just mentioned,
17  have you ever -- have you offered -- have you made job
18  offers to any other minorities?
19  A.  Yes.
20  Q.  And have those other individuals accepted
21  positions?
22  A.  One did.
23  Q.  Okay.  And did this person -- and this person
24  ended up working for you?
25  A.  For a short period of time.

---

### 227

1  Q.  And when was that?
2  A.  Last session.
3  Q.  And what was that person's job responsibility --
4  or job title?  Let's start there.
5  A.  I don't recall.  She was there for such -- I
6  think she was the Homeland Security Analyst, I believe,
7  but I'm not sure exactly what her title was.
8  Q.  And what was her name?
9  A.  I can't remember.  She worked for me for a very
10  short period of time.  She got an offer from the
11  Governor's office and left me.  So, she only worked for
12  me for -- I don't even think it was one complete pay
13  period.
14  Q.  Now, do you make any effort to recruit racial
15  minorities to work in your office?
16  A.  I have told my Chief of Staff that I would like
17  for my staff to reflect the makeup of my district but
18  that we have to hire qualified people, and to make every
19  effort to make sure that we -- where we have minority
20  candidates who are qualified, to be sure and get them in
21  for an interview.
22  Q.  And would you agree that that policy is an
23  affirmative action policy?
24  A.  No.
25  Q.  And why is that?

---

### 228

1  A.  I just -- I don't think that it is.  I mean --
2  Q.  Well, what is your understanding of affirmative
3  action?
4  A.  I don't know.  What I would say is I want to
5  encourage minorities to be a part of my staff and a part
6  of the whole political process, and I don't view them as
7  minorities.  I view them as other people but I want to
8  make sure that we're inclusive.
9      I think probably the best example that I can give
10  you of that is I brought the Pilots Commission from the
11  Sabine Neches Waterway in and scolded them that they
12  needed to recruit more African American pilots because
13  they weren't reflecting the makeup of the district.
14      So, I think they took that to heart.  They did
15  some interviews but I don't think they were successful
16  in hiring anybody but they know how I feel about it.
17  That's an appointed position that's confirmed by the
18  Senate, so --
19  Q.  Do you know why they were unsuccessful?
20  A.  There's not very -- there aren't very many
21  African American ship pilots.  These are, you know, big
22  boats, ships.
23  Q.  And would you say that your Republican colleagues
24  in the legislature share your position in terms of the
25  racial composition of legislative staff?

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 229

1    MR. SWEETEN: Objection. Calls for
2 speculation. Objection. Vague.
3    A. I have no way of knowing that.
4    Q. (BY MS. ABUDU) Okay. Do you talk to your
5 legislative colleagues about the racial makeup of
6 legislative staff?
7    A. No.
8    Q. Okay. And why is that?
9    A. I mean, I -- why would I?
10    Well, you testified that you have spoken with
11 your own staff about the importance of your -- of it
12 reflecting the demographics in the state. So, would you
13 agree that that's something that's important to you?
14 And do you talk to your legislative colleagues about
15 issues in general that are important to you?
16    A. I'm not going to -- I don't want to speak to
17 my -- I don't ever really discuss my hiring practices or
18 staffing policies with other members of the Senate.
19 Typically, that would be a very unusual conversation for
20 me to have.
21    Q. Do you employ students on your staff?
22    A. Occasionally, we have interns.
23    Q. Okay. And do you interview those interns before
24 they are hired?
25    A. No.

## 230

1    Q. And do you have any student interns working for
2 you right now?
3    A. No.
4    Q. When usually do you have student interns working
5 for you?
6    A. During the session.
7    Q. So, this legislative session, you did have
8 student interns working for you?
9    A. I don't recall that I did.
10    Q. Well, let's say -- so, we're going to call this,
11 what, the 2012 session, right?
12    A. No. It was the 2011 session.
13    Q. The 2011 session, you do not recall having any
14 student interns?
15    A. I don't think I did.
16    Q. During the 2010 session, did you have any student
17 interns?
18    A. There wasn't a session in 2010. We have sessions
19 in the odd numbered years.
20    Q. In 2009, did you have student interns?
21    A. You know, I don't remember.
22    Q. In 2007, did you have student interns?
23    A. I know I've had them since I've been in the
24 Senate, and I know I had a few when I was in the House
25 but I can't tell you when it was, and mostly I can't

## 231

1 even tell you their names any more. I mean, they worked
2 there for a short period of time.
3    Q. All right. Now, you testified earlier that you
4 have worked on criminal justice policy issues, correct?
5    A. Yes. I was Vice Chair of the Criminal Justice
6 Committee my first session in the Senate.
7    Q. And what were your responsibilities as Vice
8 Chair?
9    A. Well, I ran the committee if the Committee Chair
10 couldn't be there, at his direction and, you know, that
11 was really it. If he needed me to do something, that's
12 what I was there for, to fill in for him.
13    Q. And what was the mission of this committee?
14    A. Well, the committee's job was to consider the
15 legislation that was referred to the committee by the
16 Lieutenant Governor and to make recommendations to the
17 full Senate about which of those bills should receive
18 consideration by the full body.
19    Q. Okay. And what kind of issues fell under this
20 Criminal Justice Committee?
21    A. Well, all types of matters dealing with
22 everything from how the prisons were run to sex offender
23 legislation and, you know, just everything you could
24 think of that had to do with the criminal justice
25 system. Pretty broad jurisdiction.

## 232

1    Q. And did it include review of the racial
2 demographics within the criminal justice system?
3    MR. SWEETEN: When you're answering the
4 question, don't reveal thoughts and opinions about
5 specific legislation, your mental impressions, opinions,
6 that sort of thing because that is covered by the
7 legislative privilege. However, to the extent you can
8 do so --
9    A. I don't recall any specific discussions about
10 that in the committee.
11    Q. (BY MS. ABUDU) Are you aware that minorities are
12 overrepresented in the criminal justice system here in
13 Texas?
14    MR. SWEETEN: Objection. Assumes facts not
15 in evidence.
16    Go ahead and answer.
17    A. It's my impression that that's true.
18    Q. (BY MS. ABUDU) Do you know why that is true?
19    MR. SWEETEN: Objection. Calls for
20 speculation.
21    A. I do not.
22    Q. (BY MS. ABUDU) Has it ever been brought to your
23 attention that police officers or law enforcement in
24 Texas have been accused of racial profiling?
25    A. Yes.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

233

1      Q. Have you done any work with respect to racial
2  profiling in Texas?
3          MR. SWEETEN:  When you are answering the
4  question, don't reveal mental impressions, opinions,
5  motivations about specific legislation.
6          You can, obviously, refer to matters of the
7  public record but, otherwise, it would be legislative
8  privilege.
9          Go ahead.  You can answer.
10     A. I know that Senator West had a bill that was in
11 our committee that dealt with building a database of
12 information so that this issue could be studied
13 empirically, and I supported him in that effort.  I was
14 one of the few Republicans who supported him.
15     Q. (BY MS. ABUDU)  Okay.  And why did you support
16 him in that?
17         MR. SWEETEN:  Don't reveal the whys.  That
18 asks you to reveal your thoughts, mental impressions,
19 opinions and motivation about legislation.  That would
20 be legislatively privileged.
21         You can refer to matters of the public
22 record, including committee hearings, statements made on
23 the public record.
24     A. You know, Senator West put this legislation
25 forward.  He felt like it was important, and I felt like

234

1  it was important for me to support him in his efforts.
2      Q. (BY MS. ABUDU)  And did you make any public
3  statements regarding -- well, scratch that.  We may come
4  back to that.
5          Let's talk a little bit more about your
6  colleagues in the legislature.  Would you agree that
7  there's some members of the legislature that you are
8  closer to than others?
9      A. What do you mean by that?
10     Q. Meaning are there some legislators that you
11 consider to be your friends even outside of the
12 legislative session, you all spend time together?
13     A. Yeah, there are.
14     Q. Okay.  Who would those people be?
15     A. Senator West would be one.  He's an African
16 American Senator from the Dallas area, and Marsha and I
17 see them socially.  We've done things together.  I've
18 had him over to my apartment for dinner and the --
19 there's several House members that I'm close friends
20 with, and so --
21     Q. Okay.  And is Marsha your wife?
22     A. Uh-huh.
23     Q. Okay.  All right.  And are there any legislators
24 who you dislike?
25     A. Not really.

235

1      Q. Not really?
2      A. No.
3      Q. So, you like everybody in the legislature?
4      A. I get along with all of my colleagues.
5      Q. Okay.  And they would say -- you think they would
6  say the same about you?
7          MR. SWEETEN:  Objection.  Calls for
8  speculation.
9      A. I think you have to ask them.
10     Q. (BY MS. ABUDU)  Okay.  Now, do you think it's
11 important for a Texas legislator to generally know his
12 or her reputation around the state?
13     A. You know --
14         MR. SWEETEN:  Objection to the question as
15 vague.
16     A. It's very vague because even in my own district
17 people hold different opinions of me.  Some like me.
18 Some don't like me.  Some like me a lot.  Some are very
19 viscerally opposed to me but that's probably -- I'm less
20 well known across the state and I would think that --
21 but the same would hold true but probably to a lesser
22 degree because I would not be as well known outside my
23 Senate district.
24     Q. (BY MS. ABUDU)  So, let's focus on your Senate
25 district.  What is your understanding as to why you have

236

1  constituents who are viscerally opposed to you, using
2  your term?
3          MR. SWEETEN:  Objection.  Calls for
4  speculation.
5          You can answer to the extent you can.
6      A. I would say that people who are viscerally
7  opposed to me would be the people who might call me a
8  socialist or a left wing rhino, things like that.  So, I
9  don't think they know me very well but there are people
10 who feel that way.
11     Q. (BY MS. ABUDU)  Okay.  Would you agree that
12 anyone who considers you to be a socialist -- well, we
13 will scratch that.
14         Do you think that it's important to know what
15 your reputation is amongst the minority populations in
16 your district?
17         MR. SWEETEN:  Objection.  Vague.  Objection.
18 Asked and answered.
19         You can go ahead and answer to the extent
20 you can.
21     A. Sure, I mean.
22     Q. (BY MS. ABUDU)  And what is your understanding in
23 terms of what minority populations in your district
24 think about you?
25     A. I think I'm well regarded.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Thomas D. Williams                                    June 1, 2012

---

237

1      Q.  Have you ever heard that African Americans in
2   your district consider you to be racially biased against
3   minorities?
4          MR. SWEETEN:  Objection.  Assumes facts not
5   in evidence.
6      A.  I've never heard that.
7      Q.  (BY MS. ABUDU)  I'm sorry, I couldn't hear over
8   your attorney's objection.
9          MR. SWEETEN:  Can you repeat his answer?
10         (Whereupon, the requested testimony was read back
11   as follows:
12         ANSWER:  I've never heard that.)
13     Q.  (BY MS. ABUDU)  Have you ever heard that Hispanic
14   voters in your district consider you to be racially
15   biased?
16         MR. SWEETEN:  Objection.  Assumes facts not
17   in evidence.  Objection.  Vague.
18         You can answer to the extent you can.
19     A.  No, I've never heard that.
20     Q.  (BY MS. ABUDU)  Do you believe that if voters in
21   your district felt that way in terms of your racial bias
22   that you would have heard that?
23         MR. SWEETEN:  Objection.  Calls for
24   speculation.  Objection.  Vague.
25     A.  I think I would have, yeah.

---

238

1      Q.  (BY MS. ABUDU)  Now, after the 2008 election, did
2   you examine the election results?
3      A.  Yeah.
4      Q.  And what specifically within the election results
5   did you review?
6      A.  We typically take a look at -- are you saying the
7   2008 general election or primary election?  Because in
8   '08, I was only opposed in the primary, and that's the
9   only time I would have looked at was when I had an
10   opponent.
11     Q.  Okay.  Let's say in the primary then.
12     A.  We would typically go back first and look at the
13   election results on a county by county basis, and then
14   we might break it down and look at it on a precinct
15   level but, as I recall, I carried every single county in
16   my district, and there may have been a couple of
17   precincts that I didn't but we didn't really get off in
18   the weeds looking at it much lower than that.
19     Q.  Okay.
20     A.  I think I won with 60 percent of the vote.
21     Q.  And did you look at the results by race?
22     A.  I did not.
23     Q.  And why is that?
24     A.  I don't care what color they are.  I mean, I --
25   everybody -- I want to represent everybody in my

---

239

1   district.
2      Q.  Right.  But if you were aware that there was a
3   particular reason why minorities were not voting for
4   you, would you be interested in finding out why?
5          MR. SWEETEN:  Objection.  Incomplete
6   hypothetical.  Objection.  Calls for speculation.
7   Objection.  Vague.
8          You can answer to the extent you can.
9      A.  You know, I want everybody to vote for me.
10     Q.  (BY MS. ABUDU)  So, that means that if you knew
11   that -- so, that means that you would want to
12   investigate why minority voters might not vote for you?
13     A.  I believe --
14         MR. SWEETEN:  Same objection.  Go ahead.
15     A.  I believe that they do.
16     Q.  (BY MS. ABUDU)  Okay.  But you just testified
17   that you didn't look at the 2008 election results by
18   race.
19     A.  You know, I didn't, you're right but it's my
20   belief that I have broad support in my community.  When
21   you get 60 percent of the vote, you've got a lot of
22   people voting for you.
23     Q.  Is there any other basis for that belief?
24     A.  No.
25     Q.  Okay.  Do you understand what the term "racially

---

240

1   polarized voting" means?
2      A.  Why don't you define it for me.
3      Q.  Well, let's say racially polarized voting means
4   that -- goes back to what I said earlier, that African
5   Americans tend to vote for African Americans, Latinos
6   tend to vote for Latinos and Anglos tend to vote for
7   Anglos.
8          MR. SWEETEN:  Objection.  Assumes facts not
9   in evidence.
10     A.  I've heard of it.
11     Q.  (BY MS. ABUDU)  Okay.  Would you say that is the
12   case here in Texas?
13     A.  I think in some districts, it is, and in some
14   districts, it's not.
15     Q.  And in Senate District 4, is it an issue?
16     A.  I don't believe it is.
17     Q.  And what is the basis for that belief?
18     A.  I generally win with a lot of the vote, a high
19   percentage of the vote.  When I ran and had a Democratic
20   opponent, I got 64 percent of the vote.  I had a lot of
21   people that voted for me.
22     Q.  Let's say for the 2008 primary election then,
23   what was the voter turnout by race?
24     A.  I don't know.
25     Q.  So, then you don't know if minority voters

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Thomas D. Williams                                    June 1, 2012

---

241

1    support you?
2           MR. SWEETEN: Objection. Argumentative.
3    Objection. Asked and answered.
4       Q. (BY MS. ABUDU) You can answer.
5       A. I think I've already answered the question.
6       Q. Well, your response is confusing. You said that
7    you think minority voters support you but then you can't
8    provide information about the racial turnout in the most
9    recent election you've had.
10          MR. SWEETEN: Objection. Argumentative.
11   Objection. Asked and answered. Is there a question on
12   there?
13          MS. ABUDU: Yeah, there is.
14      Q. (BY MS. ABUDU) Can you answer it?
15      A. What is the question?
16      Q. The question is what is the basis for your
17   statement that minority voters in Senate District 4 vote
18   for you?
19          MR. SWEETEN: Objection. Argumentative.
20   Objection. Asked and answered.
21          You can answer to the extent you can.
22      A. You know, as I said a moment ago, the last
23   general election that I had with an opponent, I had a
24   very large percentage of the vote. I cannot tell you
25   what the vote was break out by race but when you get

---

242

1    64 percent of the vote, you've got a lot of people that
2    are Democrats and Republicans, people that are Hispanic,
3    Anglo and African American who are voting for you when
4    you get that large percentage of the vote in a general
5    election.
6       Q. (BY MS. ABUDU) So, your basis or the basis for
7    your belief that minority voters in Senate District 4
8    support you is based on the percentage -- the election
9    results in your favor; is that correct?
10          MR. SWEETEN: Objection. Asked and
11   answered.
12          You can answer.
13      A. Yes.
14      Q. (BY MS. ABUDU) Okay. And that's the only
15   basis --
16      A. Yes.
17      Q. -- for your belief that minority voters in Senate
18   District 4 support you?
19      A. Yes.
20      Q. Do you know what -- for the 2008 primary
21   election, what was the percentage in terms of voter
22   turnout?
23          MR. SWEETEN: Objection. Vague. Do you
24   mean in his district? Do you mean somewhere else or --
25      Q. (BY MS. ABUDU) In Senate District 4.

---

243

1       A. I don't know.
2       Q. So, if only 20 percent of registered voters in
3    Senate District 4 actually came out for the 2008 primary
4    election, that's not a majority of the registered
5    voters, correct?
6           MR. SWEETEN: Objection. Assumes facts not
7    in evidence. Objection. Argumentative.
8           You can answer to the extent you can.
9       A. You know, if you want to have a discussion about
10   this, we should probably get the election results in
11   front of us. It's very difficult for me to speak to
12   this without having the actual numbers in front of me.
13      Q. (BY MS. ABUDU) Right. And I'm asking you really
14   because you are the Senator from that district and --
15          MR. SWEETEN: Objection to the side bar.
16      Q. (BY MS. ABUDU) All right. Let's turn to this
17   issue of voter fraud that you talked about earlier.
18   Now, is it your belief that voter -- or in-person voter
19   fraud is a problem here in Texas?
20          MR. SWEETEN: Don't answer the question. It
21   would call for you to reveal thoughts, mental
22   impressions, opinions, motivation about legislation or
23   in furtherance of the legislative process. As such, it
24   is legislatively privileged. Don't reveal the
25   privileged communications that we've outlined before.

---

244

1           To the extent you can answer by referring to
2    matters of the public record, you are free to do so.
3       A. I think I've made it clear that I believe that
4    in-person voter fraud, it's a matter of the public
5    record, it's a significant problem in our state.
6           And I've also made as a matter of public record
7    that even a small amount of voter fraud can have a big
8    effect on an election, and I think that is an issue that
9    needs to be addressed in our state, and that's -- and we
10   have addressed it partially with the legislation that we
11   passed.
12      Q. (BY MS. ABUDU) Assuming the --
13      A. That's a matter of the public record.
14      Q. Assuming that the bill that you passed is
15   precleared, correct? It's not in effect?
16      A. Right. I understand that.
17      Q. Now, you testified that your brother appeared
18   before the legislature and testified regarding your --
19   someone voting on behalf of your deceased grandfather;
20   is that correct?
21      A. That's correct.
22          MR. SWEETEN: You can testify about matters
23   on the public record.
24          MS. ABUDU: I'm sorry, did you just give an
25   objection or --

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 245

1    MR. SWEETEN:  No.  I just instructed him
2  that I don't have an objection to the extent that the
3  question calls for matters on the public record, which I
4  think it was established hours ago that it was but --
5  so, I'm just indicating objection, legislative privilege
6  to the extent it reveals matters outside of the public
7  record but he can freely discuss matters of the public
8  record.
9    Q.  (BY MS. ABUDU)  Now, were you influenced by your
10  brother's testimony when you voted in favor of Senate
11  Bill 14?
12    MR. SWEETEN:  Don't answer the question.  It
13  would call for you to reveal your thoughts, mental
14  impressions, opinions or motivations about legislation
15  and, as such, would be legislatively privileged.
16    A.  On the advice of counsel, I'm not going to answer
17  your question but I would further add that my brother's
18  testimony was in the '09 session, not in the '11
19  session, as I recall.
20    Q.  (BY MS. ABUDU)  Okay.  So, he did not testify in
21  support of Senate Bill 14?
22    A.  I don't believe that he did.
23    Q.  Okay.  But if he did, you would know about it?
24    A.  Yes.
25    Q.  Did any other of your family members testify in

---

### 246

1  support of the '09 photo ID bill?
2    A.  My brother did, as I said.
3    Q.  No, I said any other family members testify?
4    A.  No.
5    Q.  Okay.  Did any other family members testify in
6  favor of Senate Bill 14?
7    A.  No.
8    Q.  Did you solicit your brother's testimony with
9  respect to the '09 photo ID bill?
10    MR. SWEETEN:  I have trouble with the word
11  "solicit."  What do you mean by the word "solicit"?
12    Q.  (BY MS. ABUDU)  Did you ask your brother to come
13  and testify before the legislature in 2009 regarding the
14  photo ID bill?
15    MR. SWEETEN:  You can answer that.
16    A.  I did.
17    Q.  (BY MS. ABUDU)  Why?
18    MR. SWEETEN:  No.  No.  Objection.  That
19  would call for your motivations, mental impressions,
20  opinions about legislation and the legislative process.
21  So, don't answer the why question.
22    A.  On the advice of counsel, I can't answer your
23  question.
24    Q.  (BY MS. ABUDU)  And this question I'm about to
25  ask is only for clarification.  When -- there was never

---

### 247

1  any statement that someone had voted illegally on behalf
2  of your father, right?
3    MR. SWEETEN:  You can refer to matters of
4  the public record and answer the question.
5    A.  The testimony was about my maternal grandfather.
6    Q.  (BY MS. ABUDU)  Okay.  I just wanted to clarify
7  because I think that there was a misstatement in the
8  public record and instead of saying "grandfather," it
9  just said "father."  So, I wanted to clarify that.
10    A.  Okay.
11    Q.  Now, you testified earlier about a number of
12  individuals who submitted affidavits about an election
13  in Progreso, Texas; is that correct?
14    A.  I believe I submitted -- I testified that I
15  submitted their affidavits into the record.
16    Q.  Okay.  How did you obtain these affidavits?
17    A.  They were given to me.
18    Q.  By whom?
19    A.  You know, I'm not certain who gave them to me.  I
20  believe that it was Melinda Fredricks who gave them to
21  me or she at least made me aware of them.  I'm not sure
22  I obtained them from her.
23    Q.  And I'm sure you explained who Ms. Fredricks is
24  but would you remind me?
25    A.  She's a constituent.

---

### 248

1    Q.  A constituent in Senate District 4?
2    A.  Yes.
3    Q.  And is Progreso, Texas in Senate District 4?
4    A.  No.
5    Q.  What Senate district is that in?
6    A.  It's in the Rio Grand Valley.  I believe it's in
7  Senator Lucio's district.  It may be in Senator
8  Hinojosa's.  I'm not sure.  It may be in both of their
9  districts.
10    Q.  Have you ever been to Progreso, Texas?
11    A.  I have.
12    Q.  In your legislative capacity?
13    A.  Yes.
14    Q.  And what exactly were you doing while you were
15  there in your legislative capacity?
16    A.  I was there as the Chair of the Transportation
17  and Homeland Security Committee, reviewing homeland
18  security operations in the border region.
19    Q.  And when was that?
20    A.  I've made more than one trip.  I made a trip
21  prior to the 2011 session, after July of 2010 but before
22  January of 2011, and I made a couple of other trips down
23  there, one during the session, one subject -- subsequent
24  to the session, and I don't remember if I went through
25  Progreso then or not but I very well could have.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

249

1      Q.  Okay.  And for the sake of time, I'm just going
2   to ask do you -- have you ever met Simon Torres?
3      A.  No.
4      Q.  Have you ever met Maricela Infante?
5      A.  No.
6      Q.  Have you ever met Abigail Infante?
7      A.  No.
8      Q.  Have you ever met Jessica Rangel?
9      A.  No.
10     Q.  Jesus Vasquez, have you ever met him?
11     A.  No.
12     Q.  Have you ever met Andrea Pena?
13     A.  No.
14     Q.  So, you received these affidavits from
15   individuals who you have never met, correct?
16     A.  That's correct.
17     Q.  Did you make any attempt to meet with these
18   individuals in person?
19     A.  I don't know if they testified before our
20   committee or not.  I don't believe that they did.
21     Q.  Have you ever spoken with any of these
22   individuals?
23     A.  No.
24     Q.  Okay.  Now, are you originally from East Texas?
25     A.  I am.

250

1      Q.  Now, can you talk to me a little bit about the
2   history of racial discrimination in East Texas?
3      A.  In what respect?
4      Q.  Well, I'm thinking, for example, Jasper, Texas,
5   where an African American man was tied to a truck and
6   then murdered.  Are you familiar with that incident?
7      A.  I am.
8      Q.  Do you agree that incident was racially
9   motivated?
10     A.  It would appear that it was.
11     Q.  And are you aware of other racially motivated
12   incidents in East Texas?
13     A.  Not any specific incident but I -- they may have
14   occurred.  It's plausible to me that they may have
15   occurred.
16     Q.  Do you believe that as a Senator from East Texas
17   that it's your responsibility to know about racially
18   motivated incidents happening in that area of the state?
19        MR. SWEETEN:  Objection.  Argumentative.
20     A.  I would know about them if they had occurred in
21   my district.  Jasper is not part of my district.  So,
22   when you say "East Texas," that's a very broad area.
23   So, if there have been racially motivated incidents in
24   my district, I think they would have been brought to my
25   attention.

251

1      Q.  (BY MS. ABUDU)  Okay.  And so, that means that
2   there have been no racially motivated incidents in your
3   district that have been brought to your attention?
4        MR. SWEETEN:  Objection.  Argumentative.
5   Objection.  Vague.
6      Q.  (BY MS. ABUDU)  You can answer.
7        THE WITNESS:  I'm okay to answer?
8        MR. SWEETEN:  Yeah, as long as this doesn't
9   affect your thoughts on legislation.
10     A.  I know that there were some issues with the
11   sheriff -- the former sheriff of Chambers County.  Those
12   are the racially motivated incidents that I'm aware of
13   that have occurred in my district during the time that
14   I've been in office.  And he's no longer the sheriff,
15   and I supported his opponent as a result of those
16   accusations.
17     Q.  (BY MS. ABUDU)  Okay.  And what is the race of
18   his opponent?
19     A.  He was Anglo.
20     Q.  Okay.  Now, for the sake of time, I'm going to
21   try to quickly wrap up.
22        You were asked earlier about the application of
23   Section 5 of the Voting Rights Act to the State of Texas
24   earlier today.  Are you aware that under Section 5 of
25   the Voting Rights Act the presumption is that any

252

1   election change in Texas is -- will have a racially
2   discriminatory impact?
3        MR. SWEETEN:  Objection.  You can answer if
4   you know.  I think you've already answered voting rights
5   questions but --
6      A.  I think that all I -- my recollection of the
7   language is that we have to get any changes in election
8   law precleared.
9      Q.  (BY MS. ABUDU)  Okay.  But are you aware that the
10   presumption under Section 5 --
11        MS. ABUDU:  He can answer my question.
12        MR. SWEETEN:  I think he's attempting to do
13   that.  So, I would object to the side bar but you can go
14   ahead and ask your question.
15     Q.  (BY MS. ABUDU)  -- the presumption is that Senate
16   Bill 14 is racially discriminatory, are you aware of
17   that?
18        MR. SWEETEN:  Objection.  Asked and
19   answered.
20     A.  I am not aware of that.
21     Q.  (BY MS. ABUDU)  Okay.  Well, by asserting
22   legislative privilege throughout this deposition, you
23   are refusing to share any -- is it true that you are
24   refusing to share any information that would rebut that
25   presumption?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

253

1      MR. SWEETEN: Objection.
2      Don't answer the question.
3      The question is improper. He has a right to
4   assert whatever privilege is available to him under the
5   law, and he is asserting the privilege. I am
6   instructing him as to the boundaries of the privilege.
7   He is asserting the privilege, and he does not have to
8   provide an answer as to the potential effect of that
9   legally.
10      I'm going to instruct you not to answer the
11   question.
12      A. I cannot answer the question, based on the advice
13   of my counsel.
14      Q. (BY MS. ABUDU) Okay. Thank you very much,
15   Senator Williams.
16      A. You're welcome.
17      (Short recess.)
18      (Exhibit 412 marked.)
19      FURTHER EXAMINATION
20      Q. (BY MS. RIOS) What has been marked as
21   Exhibit 412, that's part of the consideration of the
22   Senate Bill 14 in January. Senator Williams, did you
23   request the Secretary of State to do a comparison
24   between the voter rolls and the driver's license files?
25      MR. SWEETEN: Don't reveal matters of

254

1   legislative privilege but you can reveal matters that
2   are subject to the public record.
3      Q. (BY MS. RIOS) If you go to the bottom of the
4   page --
5      A. Clearly, Ms. McGeehan from the Secretary of
6   State's office has indicated that I asked them if they
7   could do some comparisons.
8      Q. And these comparisons were between the registered
9   voters and the driver's license data?
10      A. Correct. That's what she says.
11      Q. Okay. Did you have any written communications
12   about this analysis that Ms. McGeehan stated she was
13   going to get for you?
14      MR. SWEETEN: You can answer if you had
15   written communications.
16      A. Could you repeat the question? I'm sorry.
17      Q. (BY MS. RIOS) Sure. Were there any written
18   communications about this analysis that Ms. McGeehan was
19   going to conduct?
20      A. There may have been. I did not write anything --
21      Q. Okay. Did you --
22      A. -- to the best of my recollection.
23      Q. Are you aware whether your office received any
24   written response from her?
25      A. I think that we might have, and I think it was a

255

1   part of the record but only to that extent.
2      MS. RIOS: Okay. Counsel, I have been
3   requested to ask you for any written communications
4   about the analysis conducted by Ms. McGeehan and her
5   office comparing the registered voter list with the
6   driver's license list, and this was an analysis that
7   Ms. McGeehan stated in the deposition yesterday was
8   conducted between February and March of 2011.
9      MR. SWEETEN: I wasn't in the deposition of
10   Ms. McGeehan. I'm not sure what you're referring to.
11   My -- you know, we -- so, I can talk to Senator Williams
12   about it at a later time and we can discuss it but as
13   far as your request, there's -- I'm going to have to
14   investigate what was said that you're talking about,
15   which I know nothing about, and I'll meet with Senator
16   Williams on it and we can try to get you your answer if
17   any such thing exists.
18      MS. RIOS: I was asked to ask you for these
19   documents --
20      MR. SWEETEN: I understand.
21      MS. RIOS: -- by lead counsel.
22      MR. SWEETEN: I understand.
23      Q. (BY MS. RIOS) Senator Williams, do you know
24   whether Anglos, Hispanics or blacks or any other groups
25   are more likely not to have IDs listed under SB14?

256

1      MR. SWEETEN: Don't reveal your thoughts and
2   your mental impressions, opinions, motivations about
3   legislation, including Senate Bill 14, in answering this
4   question but you can refer to matters of the public
5   record.
6      A. I know that it was discussed extensively in the
7   Committee of the Whole and during the floor debate but
8   beyond that, I don't have any knowledge.
9      Q. (BY MS. RIOS) Okay. The Senate passed Senate
10   Bill 14 very quickly. I'm referring to the House floor
11   consideration. In your experience, how often does the
12   Senate pass legislation in the first two weeks of a
13   session?
14      MR. SWEETEN: You can answer that.
15      A. Well, it happens. And I think I've passed bills
16   in the beginning of the session like that in the first
17   couple of weeks. I know one session, it was the first
18   bill that got to the Governor's desk.
19      So, it happens but it really depends on whether
20   the Governor has called -- if he doesn't treat it as an
21   emergency item, it can't be passed that fast.
22      Q. (BY MS. RIOS) So, in your experience, can you
23   give me an estimate of how many bills have --
24      A. I have no idea.
25      Q. No idea?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 257

1   A. Huh-uh.
2   Q. Okay. Were you on the Conference Committee for
3   SB14?
4   A. I probably was but I don't recall specifically
5   that I was. I probably was.
6   Q. And who selected the members of the Conference
7   Committee?
8   A. The Lieutenant Governor does.
9   Q. Do you recall if you requested the Lieutenant
10  Governor to be a member of the Conference Committee?
11  A. I don't recall.
12  Q. And do you recall if it was the Lieutenant
13  Governor who told you, "Senator Williams, I want you in
14  the Conference Committee"?
15  A. It's completely his prerogative.
16  Q. Based on the public record, were there concerns
17  that SB14 might disproportionately impact minority
18  voters?
19      MR. SWEETEN: You can refer to matters of
20  the public record, as the question prefaced.
21  A. It was certainly discussed as a matter of -- in
22  the committee and also in the floor debate.
23  Q. (BY MS. RIOS) Okay. And did you believe that
24  you had an obligation pursuant to Section 5 of the
25  Voting Rights Act to determine whether SB14 might

## 258

1   disproportionately impact minority voters?
2       MR. SWEETEN: Don't reveal your thoughts,
3   mental impressions, opinions, motivation about
4   legislation, including Senate Bill 14, in answering the
5   question.
6       I instruct you not to answer based on
7   legislative privilege.
8   A. And I think based on what counsel has told me,
9   I'm not able to answer your question.
10  Q. (BY MS. RIOS) Are you aware of any legislators
11  making any public statements about illegal aliens
12  voting?
13      MR. SWEETEN: You can answer to the extent
14  she's referring to the public record.
15  A. I'm sure some of my colleagues have made those
16  statements but I can't give you any specific instances.
17  Q. (BY MS. RIOS) Any names?
18  A. No. I just -- I just simply don't recall. I
19  know that that's been part of the dialogue in this.
20  Q. And are you aware of the Lieutenant Governor or
21  the Governor making any public statements about illegal
22  aliens voting?
23  A. I don't recall that specifically, no.
24  Q. And have any of the legislators, the Lieutenant
25  Governor or the Governor made any statements about

## 259

1   illegal aliens voting at fundraisers?
2   A. I don't have any specific recollection.
3   Q. Okay. Have you ever heard at any time from any
4   Texas state legislator who voted in favor of SB14 that
5   it would prevent a legitimately registered voter from
6   voting in Texas?
7       MR. SWEETEN: Hold on a minute. Don't
8   reveal any communications you've had with legislators.
9   That's subject to the legislative privilege.
10  A. And so, repeat the question for me.
11      THE WITNESS: Would you read it back?
12  (Whereupon, the requested testimony was read back
13  as follows:
14  QUESTION: Okay. Have you ever heard at any time
15      from any Texas state legislator who voted in
16      favor of SB14 that it would prevent a
17      legitimately registered voter from voting in
18      Texas?)
19      MR. SWEETEN: Same objection and
20  instruction. You can refer to matters of the public
21  record but don't reveal private conversations with
22  legislators about legislation.
23  A. I don't recall that I ever heard anyone who voted
24  for the bill say that at either -- as a matter of public
25  record.

## 260

1   Q. (BY MS. RIOS) Have you ever heard any Texas
2   state legislator who voted in favor of SB14 say that it
3   would prevent racial or ethnic minorities from voting in
4   Texas?
5       MR. SWEETEN: Objection. Legislative
6   privilege.
7       Don't reveal communications you've had with
8   legislators. That's clearly covered by the legislative
9   privilege. You can refer to matters of the public
10  record, as I've instructed you today.
11  A. I don't believe there's any instance that I can
12  point to in the public record about that.
13  Q. (BY MS. RIOS) Are you aware of any allegations
14  that SB14 attempted to play on people's fears of illegal
15  immigrants voting?
16      MR. SWEETEN: You can refer to matters of
17  the public record. Don't reveal your mental
18  impressions, thoughts or opinions about the bill or
19  communications you've had with the various individuals
20  or entities I've listed today. Those are subject to
21  legislative privilege.
22  A. I know that -- I think it's clear that that's a
23  matter of the public dialogue. It's in the public arena
24  that there were people who were concerned about that.
25  Q. (BY MS. RIOS) Any particulars?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

261

1      A. No.
2      MR. SWEETEN: Same instruction.
3      Q. (BY MS. RIOS) What did you want to accomplish
4   with SB14?
5      MR. SWEETEN: Objection. Legislative
6   privilege.
7      Don't answer the question except to the
8   extent you can refer to matters of public record.
9      A. As I've stated publicly, I think that protecting
10  the integrity of the ballot box is fundamental to our
11  way of life and that this is an important step in
12  protecting that integrity.
13     Q. (BY MS. RIOS) And how does SB14 protect the
14  integrity of the ballot box?
15     MR. SWEETEN: Objection. Legislative
16  privilege.
17     Don't answer the question.
18     A. Based on advice of counsel, I can't answer your
19  question.
20     Q. (BY MS. RIOS) Why is SB14 a better way to
21  protect the integrity of the ballot box than the current
22  practice?
23     MR. SWEETEN: Objection. Calls for matters
24  subject to legislative privilege.
25     I'm going to instruct you not to answer the

262

1   question as phrased.
2      A. Based on the advice of counsel, I can't answer
3   your question.
4      Q. (BY MS. RIOS) Has anyone ever told you that they
5   did not vote because they are concerned that voter fraud
6   would cancel out their vote?
7      MR. SWEETEN: Objection. Don't reveal
8   communications you've had with constituents, Texas
9   Legislative Council, state agencies, legislative staff,
10  legislators. Don't reveal your thoughts, mental
11  impressions, opinions and motivations about legislation.
12     You can refer to matters of the public
13  record in answering the question.
14     A. Based on the advice of counsel, I don't think
15  there's anything that I have to add to that. So, only
16  what's in the public record.
17     Q. (BY MS. RIOS) Was there a time when you learned
18  that Texas has represented in this litigation that
19  795,000 voters do not have driver's licenses?
20     MR. SWEETEN: Objection. Misstates the
21  testimony -- or misstates the record.
22     Go ahead and answer, assuming you can.
23     A. I know that there are registered voters who don't
24  have a driver's license. I have no idea if that number
25  is correct.

263

1      Q. (BY MS. RIOS) At any time since the passage of
2   SB14, have you come to believe that it was passed with
3   any discriminatory purpose?
4      MR. SWEETEN: You're saying since passage?
5      MS. RIOS: Yes.
6      MR. SWEETEN: So, you can answer the
7   question except to the extent that your answer would
8   reveal your thoughts, mental impressions, opinions and
9   motivation about the legislation itself.
10     A. No.
11     Q. (BY MS. RIOS) Okay. At any time since the
12  passage of SB14, have you come to believe that SB14 will
13  have a greater aggressive effect on minority voters?
14     MR. SWEETEN: Same instruction. Same
15  objection.
16     A. No.
17     Q. (BY MS. RIOS) Okay. If called to trial, will
18  you testify that SB14 has no discriminatory purpose?
19     MR. SWEETEN: He's already answered the
20  question probably five times today about the general
21  purpose of SB14. You're now asking once again what the
22  purpose is. You're also asking about our trial strategy
23  as to whether we will call him.
24     I will let him answer one more time what the
25  general purpose of Senate Bill 14 is. He can answer

264

1   that question.
2      A. The purpose of the bill is to protect the
3   integrity of the ballot box by ensuring that the person
4   who is presenting themselves as a voter is -- that they
5   are indeed who they say they are.
6      MS. RIOS: Patrick, I prefaced my question
7   by saying "if called to trial."
8      MR. SWEETEN: Okay. Well --
9      MS. RIOS: I do not know what your trial
10  strategy is, if there is a trial.
11     MR. SWEETEN: Okay. Well, if you take --
12  and I want to work with you on this because I understand
13  you have questions you have to ask but I'm just simply
14  saying that the Senator has sat here all day and
15  answered questions about the general purpose of the
16  bill. He's now done so again.
17     "If called to trial," you know, when you put
18  that in there, you're asking if we're going to call him
19  to trial or what he would say when asked. You've
20  already asked him, "What do you think the purpose of the
21  bill is?" I just don't understand the purpose of your
22  question but I'll tell you what, I'm just going to let
23  you ask the question again and let the Senator answer
24  it.
25     Q. (BY MS. RIOS) Okay. If called to trial, will



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 265

1  you testify that SB14 has no discriminatory purpose?
2      A.  I don't believe that it has any discriminatory
3  purpose.
4      Q.  And if called to trial, would you testify that
5  SB14 has no discriminatory effect?
6      A.  I don't believe that it is a discriminatory bill.
7          MS. RIOS:  Okay.  We'll leave this
8  deposition open pending the resolution of some
9  privileged motions.
10         MR. SWEETEN:  Okay.
11         MS. RIOS:  Thank you.
12         MR. SWEETEN:  And we will reserve questions
13  for Senator Williams to the time of trial.
14         (Whereupon at 5:29 p.m. the
15         deposition was adjourned.)
16
17
18
19
20
21
22
23
24
25

## 266

1      E R R A T A   S H E E T
2
3  Correction                Page   Line
4
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24
25

## 267

1      I, SENATOR THOMAS D. WILLIAMS, have read the
foregoing deposition and hereby affix my signature that
2  same is true and correct, except as noted above.
3
   _____
4      SENATOR THOMAS D. WILLIAMS

   THE STATE OF _____
5  COUNTY OF _____
6  Before me, _____, on this day personally
   appeared SENATOR THOMAS D. WILLIAMS, known to me (or
7  proved to me under oath or through _____)
   (description of identity card or other document) to be
8  the person whose name is subscribed to the foregoing
   instrument and acknowledged to me that they executed the
9  same for the purposes and consideration therein
   expressed.
10
   Given under my hand and seal of office this _____ day
11 of _____, _____.
12 _____
   NOTARY PUBLIC IN AND FOR
13 THE STATE OF _____
14
15
16
17
18
19
20
21
22
23
24
25

## 268

1  STATE OF TEXAS      *
   COUNTY OF HARRIS    *
2
3      I, the undersigned certified shorthand reporter
   and notary public in and for the State of Texas, certify
   that the facts stated in the foregoing pages are true
4  and correct.
5      I further certify that I am neither attorney or
   counsel for, nor related to or employed by, any of the
6  parties to the action in which this deposition is taken
   and, further, that I am not a relative or employee of
7  any counsel employed by the parties hereto, or
   financially interested in the action.
8
       SUBSCRIBED AND SWORN TO under my hand and seal of
9  office on this the 4th day of June, 2012.
10
11
12     EDITH A. BOGGS, CSR
       Certified Shorthand Reporter and
13     Notary Public in and for
       the State of Texas
14 Notary Expires: 5-10-2016
   Certificate No. 3022
15 Expiration date:  12-31-2013
   Esquire Deposition Solutions, LLC
16 Registration No. 3
17
18
19
20
21
22
23
24
25



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com