2011S0078-1 01/12/11

By: Fraser, et al.                                                    S.B. No. 14

A BILL TO BE ENTITLED
AN ACT

relating to requirements to vote, including presenting proof of identification; providing criminal penalties.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  Subchapter A, Chapter 15, Election Code, is amended by adding Section 15.005 to read as follows:

Sec. 15.005.  NOTICE OF IDENTIFICATION REQUIREMENTS. (a)  The voter registrar of each county shall provide notice of the identification requirements for voting prescribed by Chapter 63 and a detailed description of those requirements with each voter registration certificate issued under Section 13.142 or renewal registration certificate issued under Section 14.001.

(b)  The secretary of state shall prescribe the wording of the notice to be included on the certificate under this section.

SECTION 2.  Subsection (a), Section 15.022, Election Code, is amended to read as follows:

(a)  The registrar shall make the appropriate corrections in the registration records, including, if necessary, deleting a voter's name from the suspense list:

(1)  after receipt of a notice of a change in registration information under Section 15.021;

(2)  after receipt of a voter's reply to a notice of investigation given under Section 16.033;

(3)  after receipt of a registration omissions list and any affidavits executed under Section 63.006 [63.007], following an election;

(4)  after receipt of a voter's statement of residence executed under Section 63.0011;

(5)  before the effective date of the abolishment of a county election precinct or a change in its boundary;

(6)  after receipt of United States Postal Service information indicating an address reclassification;

(7)  after receipt of a voter's response under Section 15.053; or

(8)  after receipt of a registration application or change of address under Chapter 20.

SECTION 3.  Subchapter A, Chapter 31, Election Code, is amended by adding Section 31.012 to read as follows:

Sec. 31.012.  VOTER IDENTIFICATION EDUCATION. (a)  The secretary of state and the voter registrar of each county that maintains a website shall provide notice of the identification requirements for voting prescribed by Chapter 63 on each entity's respective website. The secretary of state shall prescribe the wording of the notice to be included on the websites.

(b)  The secretary of state shall conduct a statewide effort to educate voters regarding the identification requirements for voting prescribed by Chapter 63.

SECTION 4.  Section 32.111, Election Code, is amended by adding Subsection (c) to read as follows:

(c)  The training standards adopted under Subsection (a) must include provisions on the acceptance and handling of the identification presented by a voter to an election officer under

2:13-cv-193
09/02/2014

DEF0001

exhibitsticker.com

Section 63.001.
        SECTION 5.   Subsection (a), Section 32.114, Election Code,
is amended to read as follows:
        (a)   The county clerk shall provide one or more sessions of
training using the standardized training program and materials
developed and provided by the secretary of state under Section
32.111 for the election judges and clerks appointed to serve in
elections ordered by the governor or a county authority.   Each
election judge shall complete the training program.   Each election
clerk shall complete the part of the training program relating to
the acceptance and handling of the identification presented by a
voter to an election officer under Section 63.001.
        SECTION 6.   Chapter 62, Election Code, is amended by adding
Section 62.016 to read as follows:
        Sec. 62.016.   NOTICE OF ACCEPTABLE IDENTIFICATION OUTSIDE
POLLING PLACES. The presiding judge shall post in a prominent place
on the outside of each polling location a list of the acceptable
forms of identification.   The notice and list must be printed using
a font that is at least 24-point.
        SECTION 7.   Section 63.001, Election Code, is amended by
amending Subsections (b), (c), (d), and (f) and adding Subsections
(g) and (h) to read as follows:
        (b)   Except as provided by Subsection (h), on [On] offering
to vote, a voter must present to an election officer at the polling
place one form of identification listed in Section 63.0101 [the
voter's voter registration certificate to an election officer at
the polling place].
        (c)   On presentation of the documentation required by
Subsection (b) [a registration certificate], an election officer
shall determine whether the voter's name on the documentation
[registration certificate] is on the list of registered voters for
the precinct.
        (d)   If the voter's name is on the precinct list of
registered voters and the voter's identity can be verified from the
documentation presented under Subsection (b), the voter shall be
accepted for voting.
        (f)   After determining whether to accept a voter, an election
officer shall return the voter's documentation [registration
certificate] to the voter.
        (g)   If the requirements for identification prescribed by
Subsection (b) are not met, the voter may be accepted for
provisional voting only under Section 63.011. For a voter who is
not accepted for voting under this section, an election officer
shall:
            (1)   inform the voter of the voter's right to cast a
provisional ballot under Section 63.011; and
            (2)   provide the voter with written information, in a
form prescribed by the secretary of state, that:
                (A)   lists the requirements for identification;
                (B)   states the procedure for presenting
identification under Section 65.0541;
                (C)   includes a map showing the location where
identification must be presented; and
                (D)   includes notice that even if all procedures
are followed, there is no guarantee a provisional ballot will be
accepted.
        (h)   The requirements for identification prescribed by

Subsection (b) do not apply to a voter who:
          (1)   presents the voter's voter registration certificate on offering to vote; and
          (2)   was 70 years of age or older on January 1, 2012, as indicated by the date of birth on the voter's voter registration certificate.
     SECTION 8.   Subsection (a), Section 63.0011, Election Code, is amended to read as follows:
     (a)   Before a voter may be accepted for voting, an election officer shall ask the voter if the voter's residence address on the precinct list of registered voters is current and whether the voter has changed residence within the county.  If the voter's address is omitted from the precinct list under Section 18.005(c), the officer shall ask the voter if the voter's residence, if [as] listed, on identification presented by the voter under Section 63.001(b) [the voter's voter registration certificate] is current and whether the voter has changed residence within the county.
     SECTION 9.   Chapter 63, Election Code, is amended by adding Section 63.0012 to read as follows:
     Sec. 63.0012.  NOTICE OF IDENTIFICATION REQUIREMENTS TO CERTAIN VOTERS. (a)  An election officer shall distribute written notice of the identification that will be required to vote in elections held after January 1, 2012, and information on obtaining identification without a fee under Section 521.422, Transportation Code, to each voter who, when offering to vote, presents a form of identification that will not be sufficient for acceptance as a voter under this chapter beginning with those elections.
     (b)   The secretary of state shall prescribe the wording of the notice and establish guidelines for distributing the notice.
     (c)   This section expires September 1, 2013.
     SECTION 10.   Section 63.006, Election Code, is amended to read as follows:
     Sec. 63.006.   VOTER WITH REQUIRED DOCUMENTATION [CORRECT CERTIFICATE] WHO IS NOT ON LIST.  (a)  A voter who, when offering to vote, presents the documentation required under Section 63.001(b) [a voter registration certificate indicating that the voter is currently registered in the precinct in which the voter is offering to vote], but whose name is not on the precinct list of registered voters, shall be accepted for voting if the voter also presents a voter registration certificate indicating that the voter is currently registered:
          (1)   in the precinct in which the voter is offering to vote; or
          (2)   in a different precinct from the one in which the voter is offering to vote and the voter executes an affidavit stating that the voter:
               (A)(i)   is a resident of the precinct in which the voter is offering to vote or is otherwise entitled by law to vote in that precinct; or
                    (ii)   was a resident of the precinct in which the voter is offering to vote at the time the information on the voter's residence address was last provided to the voter registrar;
               (B)   did not deliberately provide false information to secure registration in a precinct in which the voter does not reside; and
               (C)   is voting only once in the election.
     (b)   After the voter is accepted, an election officer shall:

TX_00003604

_(1)_ indicate beside the voter's name on the poll list that the voter was accepted under this section; and
_(2) if applicable, enter on the registration omissions list the precinct of the voter's registration as indicated by the voter's registration certificate._

SECTION 11.   Section 63.009, Election Code, is amended to read as follows:

Sec. 63.009.   VOTER WITHOUT CERTIFICATE WHO IS NOT ON LIST. A [(a)   Except as provided by Subsection (b), a] voter who does not present a voter registration certificate when offering to vote, and whose name is not on the list of registered voters for the precinct in which the voter is offering to vote, shall be accepted for provisional voting if the voter executes an affidavit in accordance with Section 63.011.

[(b)   If an election officer can determine from the voter registrar that the person is a registered voter of the county and the person presents proof of identification, the affidavits required by Sections 63.007 and 63.008 are substituted for the affidavit required by Section 63.011 in complying with that section.   After the voter is accepted under this subsection, an election officer shall also indicate beside the voter's name on the poll list that the voter was accepted under this section.]

SECTION 12.   Section 63.0101, Election Code, is amended to read as follows:

Sec. 63.0101.   DOCUMENTATION OF PROOF OF IDENTIFICATION. The following documentation is _an_ acceptable _form_ [as proof] of _photo_ identification under this chapter:

(1)   a driver's license or personal identification card issued to the person by the Department of Public Safety _that has not_ [or a similar document issued to the person by an agency of another state, regardless of whether the license or card has] expired;

(2)   a _United States military identification card that contains the person's photograph that has not expired_ [form of identification containing the person's photograph that establishes the person's identity];

(3)   a [birth certificate or other document confirming birth that is admissible in a court of law and establishes the person's identity;

[(4)] United States citizenship _certificate_ [papers] issued to the person _that contains the person's photograph; or_

_(4)_ [(5)]   a United States passport issued to the person _that has not expired_[;

[(6)   official mail addressed to the person by name from a governmental entity;

[(7)   a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter; or

[(8)   any other form of identification prescribed by the secretary of state].

SECTION 13.   Subsections (a) and (b), Section 63.011, Election Code, are amended to read as follows:

(a)   A person to whom Section _63.001(g)_ [63.008(b)] or _63.009_ [63.009(a)] applies may cast a provisional ballot if the person executes an affidavit stating that the person:

(1)   is a registered voter in the precinct in which the person seeks to vote; and

(2)   is eligible to vote in the election.

(b)  A form for an affidavit required by this section shall be printed on an envelope in which the provisional ballot voted by the person may be placed and must include a space for entering the identification number of the provisional ballot voted by the person and a space for an election officer to indicate whether the person presented a form of identification described by Section 63.0101. The affidavit form may include space for disclosure of any necessary information to enable the person to register to vote under Chapter 13. The secretary of state shall prescribe the form of the affidavit under this section.

SECTION 14.  Subsection (b), Section 64.012, Election Code, is amended to read as follows:

(b)  An offense under this section is a felony of the second [third] degree unless the person is convicted of an attempt. In that case, the offense is a state jail felony [Class A misdemeanor].

SECTION 15.  Subsection (b), Section 65.054, Election Code, is amended to read as follows:

(b)  A provisional ballot shall [may] be accepted [only] if the board determines that, from the information in the affidavit or contained in public records, the person is eligible to vote in the election and has not previously voted in that election and the person meets the identification requirements of Section 63.001(b) in the period prescribed under Section 65.0541.

SECTION 16.  Subchapter B, Chapter 65, Election Code, is amended by adding Section 65.0541 to read as follows:

Sec. 65.0541.  PRESENTATION OF IDENTIFICATION FOR CERTAIN PROVISIONAL BALLOTS. (a)  A voter who is accepted for provisional voting under Section 63.011 because the voter does not meet the identification requirements of Section 63.001(b) may, not later than the sixth day after the date of the election, present proof of identification to the voter registrar for examination by the early voting ballot board.

(b)  The secretary of state shall prescribe procedures as necessary to implement this section.

SECTION 17.  Section 66.0241, Election Code, is amended to read as follows:

Sec. 66.0241.  CONTENTS OF ENVELOPE NO. 4. Envelope no. 4 must contain:

(1)  the precinct list of registered voters;
(2)  the registration correction list;
(3)  the registration omissions list;
(4)  any statements of residence executed under Section 63.0011; and
(5)  any affidavits executed under Section 63.006 [63.007] or 63.011.

SECTION 18.  Section 521.422, Transportation Code, is amended by amending Subsection (a) and adding Subsection (d) to read as follows:

(a)  Except as provided by Subsection (d), the [The] fee for a personal identification certificate is:

(1)  $15 for a person under 60 years of age;
(2)  $5 for a person 60 years of age or older; and
(3)  $20 for a person subject to the registration requirements under Chapter 62, Code of Criminal Procedure.

(d)  The department may not collect a fee for a personal identification certificate issued to a person who states that the person is obtaining the personal identification certificate for the

purpose of satisfying Section 63.001(b), Election Code, and:

       (1)  who is a registered voter in this state and presents a valid voter registration certificate; or

       (2)  who is eligible for registration under Section 13.001, Election Code, and submits a registration application to the department.

SECTION 19.  Effective January 1, 2012, Sections 63.007 and 63.008, Election Code, are repealed.

SECTION 20.  As soon as practicable after the effective date of this section:

       (1)  the secretary of state shall adopt the training standards and develop the training materials required to implement the change in law made by this Act to Section 32.111, Election Code; and

       (2)  the county clerk of each county shall provide a session of training under Section 32.114, Election Code, using the standards adopted and materials developed to implement the change in law made by this Act to Section 32.111, Election Code.

SECTION 21.  The change in law made by this Act applies only to an offense committed on or after January 1, 2012.  An offense committed before January 1, 2012, is covered by the law in effect when the offense was committed, and the former law is continued in effect for that purpose.  For purposes of this section, an offense is committed before January 1, 2012, if any element of the offense occurs before that date.

SECTION 22.  State funds disbursed under Chapter 19, Election Code, for the purpose of defraying expenses of the voter registrar's office in connection with voter registration may also be used for additional expenses related to coordinating voter registration drives or other activities designed to expand voter registration. This section expires January 1, 2013.

SECTION 23.  (a)  Except as provided by Subsection (b) of this section, this Act takes effect January 1, 2012.

(b)  The changes in law made by Sections 1, 3, 4, 5, 9, 20, and 22 of this Act take effect September 1, 2011.



FILE

82nd-'11

By: _____ Fraser

S.B. No. 14

A BILL TO BE ENTITLED

1                          AN ACT

2   relating to requirements to vote, including presenting proof of

3   identification; providing criminal penalties.

4       BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

5       SECTION 1.  Subchapter A, Chapter 15, Election Code, is

6   amended by adding Section 15.005 to read as follows:

7       Sec. 15.005.  NOTICE  OF  IDENTIFICATION  REQUIREMENTS.

8   (a)  The voter registrar of each county shall provide notice of the

9   identification requirements for voting prescribed by Chapter 63 and

10  a  detailed  description  of  those  requirements  with  each  voter

11  registration  certificate  issued  under  Section  13.142  or  renewal

12  registration certificate issued under Section 14.001.

13      (b)  The secretary of state shall prescribe the wording of

14  the notice to be included on the certificate under this section.

15      SECTION 2.  Subsection (a), Section 15.022, Election Code,

16  is amended to read as follows:

17      (a)  The registrar shall make the appropriate corrections in

18  the registration records, including, if necessary, deleting a

19  voter's name from the suspense list:

20          (1)  after  receipt  of  a  notice  of  a  change  in

21  registration information under Section 15.021;

22          (2)  after receipt of a voter's reply to a notice of

23  investigation given under Section 16.033;

24          (3)  after receipt of a registration omissions list and

2011S0078-1  01/12/11            1

__.B. No. _____

1  any affidavits executed under Section 63.006 [63.007], following an

2  election;

3       (4)  after receipt of a voter's statement of residence

4  executed under Section 63.0011;

5       (5)  before the effective date of the abolishment of a

6  county election precinct or a change in its boundary;

7       (6)  after receipt of United States Postal Service

8  information indicating an address reclassification;

9       (7)  after receipt of a voter's response under Section

10  15.053; or

11       (8)  after receipt of a registration application or

12  change of address under Chapter 20.

13       SECTION 3.  Subchapter A, Chapter 31, Election Code, is

14  amended by adding Section 31.012 to read as follows:

15       Sec. 31.012.  VOTER IDENTIFICATION EDUCATION.  (a)  The

16  secretary of state and the voter registrar of each county that

17  maintains a website shall provide notice of the identification

18  requirements for voting prescribed by Chapter 63 on each entity's

19  respective website.  The secretary of state shall prescribe the

20  wording of the notice to be included on the websites.

21       (b)  The secretary of state shall conduct a statewide effort

22  to educate voters regarding the identification requirements for

23  voting prescribed by Chapter 63.

24       SECTION 4.  Section 32.111, Election Code, is amended by

25  adding Subsection (c) to read as follows:

26       (c)  The training standards adopted under Subsection (a)

27  must include provisions on the acceptance and handling of the

___.B. No. _____

1  any affidavits executed under Section 63.006 [63.007], following an

2  election;

3         (4)  after receipt of a voter's statement of residence

4  executed under Section 63.0011;

5         (5)  before the effective date of the abolishment of a

6  county election precinct or a change in its boundary;

7         (6)  after receipt of United States Postal Service

8  information indicating an address reclassification;

9         (7)  after receipt of a voter's response under Section

10  15.053; or

11         (8)  after receipt of a registration application or

12  change of address under Chapter 20.

13    SECTION 3.  Subchapter A, Chapter 31, Election Code, is

14  amended by adding Section 31.012 to read as follows:

15    Sec. 31.012.  VOTER IDENTIFICATION EDUCATION.  (a) The

16  secretary of state and the voter registrar of each county that

17  maintains a website shall provide notice of the identification

18  requirements for voting prescribed by Chapter 63 on each entity's

19  respective website.  The secretary of state shall prescribe the

20  wording of the notice to be included on the websites.

21    (b)  The secretary of state shall conduct a statewide effort

22  to educate voters regarding the identification requirements for

23  voting prescribed by Chapter 63.

24    SECTION 4.  Section 32.111, Election Code, is amended by

25  adding Subsection (c) to read as follows:

26    (c)  The training standards adopted under Subsection (a)

27  must include provisions on the acceptance and handling of the

2011S0078-1  01/12/11          2

__.B. No. _____

1   identification presented by a voter to an election officer under

2   Section 63.001.

3        SECTION 5.  Subsection (a), Section 32.114, Election Code,

4   is amended to read as follows:

5        (a)  The county clerk shall provide one or more sessions of

6   training using the standardized training program and materials

7   developed and provided by the secretary of state under Section

8   32.111 for the election judges and clerks appointed to serve in

9   elections ordered by the governor or a county authority.  Each

10  election judge shall complete the training program.  Each election

11  clerk shall complete the part of the training program relating to

12  the acceptance and handling of the identification presented by a

13  voter to an election officer under Section 63.001.

14       SECTION 6.  Chapter 62, Election Code, is amended by adding

15  Section 62.016 to read as follows:

16       Sec. 62.016.  NOTICE OF ACCEPTABLE IDENTIFICATION OUTSIDE

17  POLLING PLACES.  The presiding judge shall post in a prominent place

18  on the outside of each polling location a list of the acceptable

19  forms of identification.  The notice and list must be printed using

20  a font that is at least 24-point.

21       SECTION 7.  Section 63.001, Election Code, is amended by

22  amending Subsections (b), (c), (d), and (f) and adding Subsections

23  (g) and (h) to read as follows:

24       (b)  Except as provided by Subsection (h), on [On] offering

25  to vote, a voter must present to an election officer at the polling

26  place one form of identification listed in Section 63.0101 [the

27  voter's voter registration certificate to an election officer at

2011S0078-1  01/12/11          3

__.B. No. _____

1   ~~the polling place~~].

2   (c)   On   presentation   of   the   documentation   required   by

3   Subsection (b) [~~a registration certificate~~], an election officer

4   shall   determine   whether   the   voter's   name   on   the   documentation

5   [~~registration certificate~~] is on the list of registered voters for

6   the precinct.

7   (d)   If   the   voter's   name   is   on   the   precinct   list   of

8   registered voters and the voter's identity can be verified from the

9   documentation presented under Subsection (b), the voter shall be

10  accepted for voting.

11  (f)   After determining whether to accept a voter, an election

12  officer   shall   return   the   voter's   documentation   [~~registration~~

13  ~~certificate~~] to the voter.

14  (g)   If   the   requirements   for   identification   prescribed   by

15  Subsection   (b)   are   not   met,   the   voter   may   be   accepted   for

16  provisional voting only under Section 63.011.  For a voter who is

17  not   accepted   for   voting   under   this   section,   an   election   officer

18  shall:

19  (1)   inform the voter of  the voter's right  to cast  a

20  provisional ballot under Section 63.011; and

21  (2)   provide the voter with written information, in a

22  form prescribed by the secretary of state, that:

23  (A)   lists the requirements for identification;

24  (B)   states   the   procedure   for   presenting

25  identification under Section 65.0541;

26  (C)   includes a map showing the location where

27  identification must be presented; and

2011S0078-1  01/12/11            4

__.B. No. _____

1                (D)  includes notice that even if all procedures

2  are followed, there is no guarantee a provisional ballot will be

3  accepted.

4        (h)  The  requirements  for  identification  prescribed  by

5  Subsection (b) do not apply to a voter who:

6              (1)  presents   the   voter's   voter   registration

7  certificate on offering to vote; and

8             (2)  was 70 years of age or older on January 1, 2012, as

9  indicated by the date of birth on the voter's voter registration

10  certificate.

11        SECTION 8.  Subsection (a), Section 63.0011, Election Code,

12  is amended to read as follows:

13        (a)  Before a voter may be accepted for voting, an election

14  officer shall ask the voter if the voter's residence address on the

15  precinct list of registered voters is current and whether the voter

16  has changed residence within the county.  If the voter's address is

17  omitted from the precinct list under Section 18.005(c), the officer

18  shall ask the voter if the voter's residence, if [as] listed, on

19  identification presented by the voter under Section 63.001(b) [the

20  voter's voter registration certificate] is current and whether the

21  voter has changed residence within the county.

22        SECTION 9.  Chapter 63, Election Code, is amended by adding

23  Section 63.0012 to read as follows:

24        Sec. 63.0012.  NOTICE  OF  IDENTIFICATION  REQUIREMENTS  TO

25  CERTAIN VOTERS.  (a)  An election officer shall distribute written

26  notice of the identification that will be required to vote in

27  elections held after January 1, 2012, and information on obtaining

TX_00003672

___.B. No. _____

1    identification without a fee under Section 521.422, Transportation

2    Code, to each voter who, when offering to vote, presents a form of

3    identification that will not be sufficient for acceptance as a

4    voter under this chapter beginning with those elections.

5         (b)  The secretary of state shall prescribe the wording of

6    the notice and establish guidelines for distributing the notice.

7         (c)  This section expires September 1, 2013.

8         SECTION 10.  Section 63.006, Election Code, is amended to

9    read as follows:

10        Sec. 63.006.  VOTER WITH REQUIRED DOCUMENTATION [CORRECT

11   CERTIFICATE] WHO IS NOT ON LIST.  (a)  A voter who, when offering to

12   vote, presents the documentation required under Section 63.001(b)

13   [a voter registration certificate indicating that the voter is

14   currently registered in the precinct in which the voter is offering

15   to vote], but whose name is not on the precinct list of registered

16   voters, shall be accepted for voting if the voter also presents a

17   voter registration certificate indicating that the voter is

18   currently registered:

19             (1)  in the precinct in which the voter is offering to

20   vote; or

21             (2)  in a different precinct from the one in which the

22   voter is offering to vote and the voter executes an affidavit

23   stating that the voter:

24                  (A)(i)  is a resident of the precinct in which the

25   voter is offering to vote or is otherwise entitled by law to vote in

26   that precinct; or

27                  (ii)  was a resident of the precinct in which

2011S0078-1  01/12/11          6

TX_00003673

1 the voter is offering to vote at the time the information on the

2 voter's residence address was last provided to the voter registrar;

3                     (B)    did    not    deliberately    provide    false

4 information to secure registration in a precinct in which the voter

5 does not reside; and

6                     (C)   is voting only once in the election.

7          (b)   After the voter is accepted, an election officer shall:

8                 (1)   indicate beside the voter's name on the poll list

9 that the voter was accepted under this section; and

10                 (2)   if applicable, enter on the registration omissions

11 list the precinct of the voter's registration as indicated by the

12 voter's registration certificate.

13          SECTION 11.   Section 63.009, Election Code, is amended to

14 read as follows:

15          Sec. 63.009.   VOTER WITHOUT CERTIFICATE WHO IS NOT ON LIST.

16 A [(a)  Except as provided by Subsection (b), a] voter who does not

17 present a voter registration certificate when offering to vote, and

18 whose name is not on the list of registered voters for the precinct

19 in which the voter is offering to vote, shall be accepted for

20 provisional voting if the voter executes an affidavit in accordance

21 with Section 63.011.

22          [(b)   If an election officer can determine from the voter

23 registrar that the person is a registered voter of the county and

24 the person presents proof of identification, the affidavits

25 required by Sections 63.007 and 63.008 are substituted for the

26 affidavit required by Section 63.011 in complying with that

27 section.   After the voter is accepted under this subsection, an

___.B. No. _____

1  election officer shall also indicate beside the voter's name on the
2  poll list that the voter was accepted under this section.]

3      SECTION 12.  Section 63.0101, Election Code, is amended to
4  read as follows:

5      Sec. 63.0101.  DOCUMENTATION OF PROOF OF IDENTIFICATION.
6  The following documentation is an acceptable form [as proof] of
7  photo identification under this chapter:

8          (1)  a driver's license or personal identification card
9  issued to the person by the Department of Public Safety that has not
10 [or a similar document issued to the person by an agency of another
11 state, regardless of whether the license or card has] expired;

12         (2)  a United States military identification card that
13 contains the person's photograph that has not expired [form of
14 identification containing the person's photograph that establishes
15 the person's identity];

16         (3)  a [birth certificate or other document confirming
17 birth that is admissible in a court of law and establishes the
18 person's identity;

19         [(4)] United States citizenship certificate [papers]
20 issued to the person that contains the person's photograph; or

21         (4) [(5)]  a United States passport issued to the
22 person that has not expired[;

23         [(6)  official mail addressed to the person by name
24 from a governmental entity;

25         [(7)  a copy of a current utility bill, bank statement,
26 government check, paycheck, or other government document that shows
27 the name and address of the voter; or

2011S0078-1  01/12/11          8

__.B. No. _____

1              [(8)   any other form of identification prescribed by
2  the secretary of state].

3              SECTION 13.  Subsections  (a)  and  (b),  Section  63.011,
4  Election Code, are amended to read as follows:

5              (a)  A person to whom Section 63.001(g) [63.008(b)] or 63.009
6  [63.009(a)] applies may cast a provisional ballot if the person
7  executes an affidavit stating that the person:

8                     (1)  is a registered voter in the precinct in which the
9  person seeks to vote; and

10                     (2)  is eligible to vote in the election.

11             (b)  A form for an affidavit required by this section shall
12  be printed on an envelope in which the provisional ballot voted by
13  the person may be placed and must include a space for entering the
14  identification number of the provisional ballot voted by the person
15  and a space for an election officer to indicate whether the person
16  presented a form of identification described by Section 63.0101.
17  The  affidavit  form  may  include  space  for  disclosure  of  any
18  necessary information to enable the person to register to vote
19  under Chapter 13.  The secretary of state shall prescribe the form
20  of the affidavit under this section.

21             SECTION 14.  Subsection (b), Section 64.012, Election Code,
22  is amended to read as follows:

23             (b)  An offense under this section is a felony of the second
24  [third] degree unless the person is convicted of an attempt.   In
25  that case, the offense is a state jail felony [Class A misdemeanor].

26             SECTION 15.  Subsection (b), Section 65.054, Election Code,
27  is amended to read as follows:

2011S0078-1  01/12/11              9

TX_00003676

___.B. No. _____

1    (b)  A provisional ballot shall [may] be accepted [only] if

2    the board determines that, from the information in the affidavit or

3    contained in public records, the person is eligible to vote in the

4    election and has not previously voted in that election and the

5    person meets the identification requirements of Section 63.001(b)

6    in the period prescribed under Section 65.0541.

7        SECTION 16.  Subchapter B, Chapter 65, Election Code, is

8    amended by adding Section 65.0541 to read as follows:

9        Sec. 65.0541.  PRESENTATION OF IDENTIFICATION FOR CERTAIN

10   PROVISIONAL BALLOTS.  (a)  A voter who is accepted for provisional

11   voting under Section 63.011 because the voter does not meet the

12   identification requirements of Section 63.001(b) may, not later

13   than the sixth day after the date of the election, present proof of

14   identification to the voter registrar for examination by the early

15   voting ballot board.

16       (b)  The secretary of state shall prescribe procedures as

17   necessary to implement this section.

18       SECTION 17.  Section 66.0241, Election Code, is amended to

19   read as follows:

20       Sec. 66.0241.  CONTENTS OF ENVELOPE NO. 4.  Envelope no. 4

21   must contain:

22           (1)  the precinct list of registered voters;

23           (2)  the registration correction list;

24           (3)  the registration omissions list;

25           (4)  any statements of residence executed under Section

26   63.0011; and

27           (5)  any affidavits executed under Section 63.006

2011S0078-1 01/12/11              10

__.B. No. _____

1   [63.007] or 63.011.

2        SECTION 18.   Section   521.422,   Transportation   Code,   is

3   amended by amending Subsection (a) and adding Subsection (d) to

4   read as follows:

5        (a)   Except as provided by Subsection (d), the [The] fee for

6   a personal identification certificate is:

7              (1)   $15 for a person under 60 years of age;

8              (2)   $5 for a person 60 years of age or older; and

9              (3)   $20   for   a   person   subject   to   the   registration

10  requirements under Chapter 62, Code of Criminal Procedure.

11       (d)   The   department   may   not   collect   a   fee   for   a   personal

12  identification certificate issued to a person who states that the

13  person is obtaining the personal identification certificate for the

14  purpose of satisfying Section 63.001(b), Election Code, and:

15             (1)   who   is   a   registered   voter   in   this   state   and

16  presents a valid voter registration certificate; or

17             (2)   who   is   eligible   for   registration   under   Section

18  13.001, Election Code, and submits a registration application to

19  the department.

20       SECTION 19.   Effective January 1, 2012, Sections 63.007 and

21  63.008, Election Code, are repealed.

22       SECTION 20.   As soon as practicable after the effective date

23  of this section:

24             (1)   the   secretary   of   state   shall   adopt   the   training

25  standards and develop the training materials required to implement

26  the change in law made by this Act to Section 32.111, Election Code;

27  and

TX_00003678
JA_000018

TX_00003678

___.B. No. _____

1        (2)  the county clerk of each county shall provide a

2  session of training under Section 32.114, Election Code, using the

3  standards adopted and materials developed to implement the change

4  in law made by this Act to Section 32.111, Election Code.

5       SECTION 21.  The change in law made by this Act applies only

6  to an offense committed on or after January 1, 2012.  An offense

7  committed before January 1, 2012, is covered by the law in effect

8  when the offense was committed, and the former law is continued in

9  effect for that purpose.  For purposes of this section, an offense

10  is committed before January 1, 2012, if any element of the offense

11  occurs before that date.

12       SECTION 22.  State  funds  disbursed  under  Chapter  19,

13  Election Code, for the purpose of defraying expenses of the voter

14  registrar's office in connection with voter registration may also

15  be used for additional expenses related to coordinating voter

16  registration drives or other activities designed to expand voter

17  registration. This section expires January 1, 2013.

18       SECTION 23.  (a)  Except as provided by Subsection (b) of

19  this section, this Act takes effect January 1, 2012.

20      (b)  The changes in law made by Sections 1, 3, 4, 5, 9, 20,

21  and 22 of this Act take effect September 1, 2011.

TX_00003679
JA_000019

TX_00003679

TX_00003680
JA_000020

TX_00003680

## BILL ANALYSIS

Senate Research Center                                                            S.B. 14
                                                                         By: Fraser et al.
                                                              Committee of the Whole
                                                                              1/21/2011
                                                                               As Filed

### AUTHOR'S / SPONSOR'S STATEMENT OF INTENT

Under current law, to vote a regular ballot, voters are only required to present a voter registration certificate to a poll worker. While this practice attempts to ensure that only registered voters receive a regular ballot on Election Day, it leaves a potential loophole for fraud. With the current process, no statutory standards exist to verify the identity of individuals at the polling place when they present a voter registration certificate. On Election Day, an election judge must accept a voter if a voter registration certificate is valid, even if the judge suspects that the voter is not the person listed on the certificate.

As proposed, S.B. 14 amends current law relating to requirements to vote, including presenting proof of identification, and provides criminal penalties.

### RULEMAKING AUTHORITY

This bill does not expressly grant any additional rulemaking authority to a state officer, institution, or agency.

### SECTION BY SECTION ANALYSIS

SECTION 1.  Amends Subchapter A, Chapter 15, Election Code, by adding Section 15.005, as follows:

Sec. 15.005. NOTICE OF IDENTIFICATION REQUIREMENTS.  (a) Requires the voter registrar of each county (registrar) to provide notice of the identification requirements for voting prescribed by Chapter 63 (Accepting Voter) and a detailed description of those requirements with each voter registration certificate issued under Section 13.142 (Initial Registration Certificate) or renewal registration certificate issued under Section 14.001 (Renewal Registration Certificate).

(b) Requires the secretary of state to prescribe the wording of the notice to be included on the certificate under this section.

SECTION 2.  Amends Section 15.022(a), Election Code, as follows:

(a) Requires the registrar to make the appropriate corrections in the registration records, including, if necessary, deleting a voter's name from the suspense list:

(1) after receipt of a notice of a change in registration information under Section 15.021 (Notice Of Change In Registration Information By Voter);

(2) after receipt of a voter's reply to a notice of investigation given under Section 16.033 (Cancellation Following Investigation By Registrar);

(3) after receipt of a registration omissions list and any affidavits executed under Section 63.006 (Voter With Correct Certificate Who Is Not On List), rather than Section 63.007 (Voter With Incorrect Certificate Who Is Not On List), following an election;

TX_00003682
JA_000022

TX_00003682

(4) after receipt of a voter's statement of residence executed under Section 63.0011 (Statement Of Residence Required);

(5) before the effective date of the abolishment of a county election precinct or a change in its boundary;

(6) after receipt of United States Postal Service information indicating an address reclassification;

(7) after receipt of a voter's response under Section 15.053 (Response To Confirmation Notice); or

(8) after receipt of a registration application or change of address under Chapter 20 (Voter Registration Agencies).

SECTION 3. Amends Subchapter A, Chapter 31, Election Code, by adding Section 31.012, as follows:

Sec. 31.012. VOTER IDENTIFICATION EDUCATION. (a) Requires the secretary of state and the registrar of each county that maintains a website to provide notice of the identification requirements for voting prescribed by Chapter 63 on each entity's respective website. Requires the secretary of state to prescribe the wording of the notice to be included on the websites.

(b) Requires the secretary of state to conduct a statewide effort to educate voters regarding the identification requirements for voting prescribed by Chapter 63.

SECTION 4. Amends Section 32.111, Election Code, by adding Subsection (c), as follows:

(c) Requires that the training standards adopted under Subsection (a) (relating to a requirement that the secretary of state adopt standards of training in election law and procedure for presiding or alternate election judges, develop materials for a standardized curriculum for that training, and distribute the materials to certain entities that hold certain elections) include provisions on the acceptance and handling of the identification presented by a voter to an election officer under Section 63.001 (Regular Procedure For Accepting Voter).

SECTION 5. Amends Section 32.114(a), Election Code, to require each election clerk to complete the part of the training program relating to the acceptance and handling of the identification presented by a voter to an election officer under Section 63.001.

SECTION 6. Amends Chapter 62, Election Code, by adding Section 62.016, as follows:

Sec. 62.016. NOTICE OF ACCEPTABLE IDENTIFICATION OUTSIDE POLLING PLACES. Requires the presiding judge to post in a prominent place on the outside of each polling location a list of the acceptable forms of identification. Requires that the notice and list be printed using a font that is at least 24-point.

SECTION 7. Amends Section 63.001, Election Code, by amending Subsections (b), (c), (d), and (f) and adding Subsections (g) and (h), as follows:

(b) Requires a voter, except as provided by Subsection (h), on offering to vote, to present to an election officer at the polling place one form of identification listed in Section 63.0101 (Documentation Of Proof Of Identification), rather than the voter's voter registration certificate.

(c) Requires an election officer, on presentation of the documentation required by Subsection (b), rather than on presentation of a registration certificate, to determine whether the voter's name on the documentation, rather than on the registration certificate, is on the list of registered voters for the precinct.

SRC-GSM S.B. 14 82(R)

TX_00003683
JA_000023

TX_00003683

TX_00003684
JA_000024

TX_00003684

(d) Requires that the voter be accepted for voting, if the voter's name is on the precinct list of registered voters and the voter's identity can be verified from the documentation presented under Subsection (b).

(f) Requires an election officer, after determining whether to accept a voter, to return the voter's documentation, rather than the voter's registration certificate, to the voter.

(g) Provides that if the requirements for identification prescribed by Subsection (b) are not met, the voter may be accepted for provisional voting only under Section 63.011 (Provisional Voting). Requires an election officer, for a voter who is not accepted for voting under this section, to:

> (1) inform the voter of the voter's right to cast a provisional ballot under Section 63.011; and

> (2) provide the voter with written information, in a form prescribed by the secretary of state, that:

>> (A) lists the requirements for identification;

>> (B) states the procedure for presenting identification under Section 65.0541;

>> (C) includes a map showing the location where identification must be presented; and

>> (D) includes notice that even if all procedures are followed, there is no guarantee a provisional ballot will be accepted.

(h) Provides that the requirements for identification prescribed by Subsection (b) do not apply to a voter who presents the voter's voter registration certificate on offering to vote and was 70 years of age or older on January 1, 2012, as indicated by the date of birth on the voter's voter registration certificate.

SECTION 8. Amends Section 63.0011(a), Election Code, to require the election officer, if the voter's address is omitted from the precinct list under Section 18.005(c) (relating to the exclusion, under certain conditions, from the original or supplemental list of registered voters the residence address of a voter who is a federal judge, a state judge, or the spouse of a federal judge or state judge), to ask the voter if the voter's residence, if listed on identification presented by the voter under Section 63.001(b), rather than as listed on the voter's voter registration certificate, is current and whether the voter has changed residence within the county.

SECTION 9. Amends Chapter 63, Election Code, by adding Section 63.0012, as follows:

> Sec. 63.0012. NOTICE OF IDENTIFICATION REQUIREMENTS TO CERTAIN VOTERS. (a) Requires an election officer to distribute written notice of the identification that will be required to vote in elections held after January 1, 2012, and information on obtaining identification without a fee under Section 521.422 (Personal Identification Certificate Fee), Transportation Code, to each voter who, when offering to vote, presents a form of identification that will not be sufficient for acceptance as a voter under this chapter beginning with those elections.

> (b) Requires the secretary of state to prescribe the wording of the notice and establish guidelines for distributing the notice.

> (c) Provides that this section expires on September 1, 2013.

SECTION 10. Amends Section 63.006, Election Code, as follows:

TX_00003686
JA_000026

TX_00003686

Sec. 63.006. New heading: VOTER WITH REQUIRED DOCUMENTATION WHO IS NOT ON LIST. (a) Requires that a voter who, when offering to vote, presents the documentation required under Section 63.001(b), rather than presents a voter registration certificate indicating that the voter is currently registered in the precinct in which the voter is offering to vote, but whose name is not on the precinct list of registered voters, be accepted for voting if the voter also presents a voter registration certificate indicating that the voter is currently registered in the precinct in which the voter is offering to vote, or in a different precinct from the one in which the voter is offering to vote and the voter executes an affidavit stating that the voter is a resident of the precinct in which the voter is offering to vote or is otherwise entitled by law to vote in that precinct or was a resident of the precinct in which the voter is offering to vote at the time the information on the voter's residence address was last provided to the voter registrar, did not deliberately provide false information to secure registration in a precinct in which the voter does not reside, and is voting only once in the election.

(b) Requires an election officer, after the voter is accepted, to indicate beside the voter's name on the poll list that the voter was accepted under this section and, if applicable, enter on the registration omissions list the precinct of the voter's registration as indicated by the voter's registration certificate.

SECTION 11. Amends Section 63.009, Election Code, as follows:

Sec. 63.009. VOTER WITHOUT CERTIFICATE WHO IS NOT ON LIST. Deletes the existing designation of Subsection (a). Requires that a voter who does not present a voter registration certificate when offering to vote, and whose name is not on the list of registered voters for the precinct in which the voter is offering to vote, be accepted for provisional voting if the voter executes an affidavit in accordance with Section 63.011, and deletes an exception under existing Subsection (b). Deletes existing Subsection (b) providing that, if an election officer can determine from the voter registrar that the person is a registered voter of the county and the person presents proof of identification, the affidavits required by Sections 63.007 and 63.008 are substituted for the affidavit required by Section 63.011 in complying with that section, and requiring an election officer, after the voter is accepted under this subsection, to also indicate beside the voter's name on the poll list that the voter was accepted under this section.

SECTION 12. Amends Section 63.0101, Election Code, as follows:

Sec. 63.0101. DOCUMENTATION OF PROOF OF IDENTIFICATION. Provides that the following documentation is an acceptable form of photo identification under this chapter: a driver's license or personal identification card issued to the person by the Department of Public Safety (DPS) that has not expired; a United States military identification card that contains the person's photograph that has not expired; a United States citizenship certificate issued to the person that contains the person's photograph; or a United States passport issued to the person that has not expired. Deletes existing text providing that the following documentation is acceptable as proof of identification under this chapter: a driver's license or personal identification card issued to the person by the DPS or a similar document issued to the person by an agency of another state, regardless of whether the license or card has expired; a form of identification containing the person's photograph that establishes the person's identity; a birth certificate or other document confirming birth that is admissible in a court of law and establishes the person's identity; United States citizenship papers issued to the person; a United States passport issued to the person; official mail addressed to the person by name from a governmental entity; a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter; or any other form of identification prescribed by the secretary of state.

SECTION 13. Amends Sections 63.011(a) and (b), Election Code, as follows:

(a) Authorizes a person to whom Section 63.001(g) or 63.009, rather than Section 63.008(b) or 63.009(a), applies to cast a provisional ballot if the person executes an

TX_00003688

affidavit stating that the person is a registered voter in the precinct in which the person seeks to vote and is eligible to vote in the election.

(b) Requires that a form for an affidavit required by this section be printed on an envelope in which the provisional ballot voted by the person may be placed and include a space for entering the identification number of the provisional ballot voted by the person and a space for an election officer to indicate whether the person presented a form of identification described by Section 63.0101.

SECTION 14. Amends Section 64.012(b), Election Code, to provide that an offense under this section is a felony of the second, rather than third, degree unless the person is convicted of an attempt. Provides that in that case, the offense is a state jail felony, rather than a Class A misdemeanor.

SECTION 15. Amends Section 65.054(b), Election Code, to require, rather than authorize, that a provisional ballot be accepted if the early voting ballot board (board) determines, rather than only if the board determines, that from the information in the affidavit or contained in public records, the person is eligible to vote in the election and has not previously voted in that election and the person meets the identification requirements of Section 63.001(b) in the period prescribed under Section 65.0541.

SECTION 16. Amends Subchapter B, Chapter 65, Election Code, by adding Section 65.0541, as follows:

Sec. 65.0541. PRESENTATION OF IDENTIFICATION FOR CERTAIN PROVISIONAL BALLOTS. (a) Authorizes a voter who is accepted for provisional voting under Section 63.011 because the voter does not meet the identification requirements of Section 63.001(b) to, not later than the sixth day after the date of the election, present proof of identification to the voter registrar for examination by the board.

(b) Requires the secretary of state to prescribe procedures as necessary to implement this section.

SECTION 17. Amends Section 66.0241, Election Code, to require that Envelope no. 4 contain the precinct list of registered voters, the registration correction list, the registration omissions list, any statements of residence executed under Section 63.0011, and any affidavits executed under Section 63.006 or 63.011, rather than Section 63.007 or 63.011.

SECTION 18. Amends Section 521.422, Transportation Code, by amending Subsection (a) and adding Subsection (d), as follows:

(a) Provides that the fee for a personal identification certificate, except as provided under Subsection (d), is $15 for a person under 60 years of age, $5 for a person 60 years of age or older, and $20 for a person subject to the registration requirements under Chapter 62 (Sex Offender Registration Program), Code of Criminal Procedure.

(d) Prohibits DPS from collecting a fee for a personal identification certificate issued to a person who states that the person is obtaining the personal identification certificate for the purpose of satisfying Section 63.001(b), Election Code, and who is a registered voter in this state and presents a valid voter registration certificate, or who is eligible for registration under Section 13.001 (Eligibility For Registration), Election Code, and submits a registration application to DPS.

SECTION 19. Repealer, effective January 1, 2012: Sections 63.007 (Voter With Incorrect Certificate Who Is Not On List) and 63.008 (Voter Without Certificate Who Is On List), Election Code.

SECTION 20. Requires the secretary of state, as soon as practicable after the effective date of this section, to adopt the training standards and develop the training materials required to

TX_00003690
JA_000030

TX_00003690

implement the change in law made by this Act to Section 32.111 (Training Standards For Election Judges), Election Code.   Requires the county clerk of each county, as soon as practicable after the effective date of this section, to provide a session of training under Section 32.114 (Public County Training Program), Election Code, using the standards adopted and materials developed to implement the change in law made by this Act to Section 32.111, Election Code.

SECTION 21. Provides that the change in law made by this Act applies only to an offense committed on or after January 1, 2012.  Provides that an offense committed before January 1, 2012, is covered by the law in effect when the offense was committed and the former law is continued in effect for that purpose.  Provides that for purposes of this section, an offense is committed before January 1, 2012, if any element of the offense occurs before that date.

SECTION 22.  Authorizes state funds disbursed under Chapter 19 (Financing Voter Registration), Election Code, for the purpose of defraying expenses of the voter registrar's office in connection with voter registration to also be used for additional expenses related to coordinating voter registration drives or other activities designed to expand voter registration. Provides that this section expires January 1, 2013.

SECTION 23. (a) Effective date, except as provided by Subsection (b) of this section: January 1, 2012.

（b) Effective date, for the changes in law made by Sections 1, 3, 4, 5, 9, 20, and 22 of this Act: September 1, 2011.

Case 2:13-cv-00193   Document 725-1   Filed on 11/17/14 in TXSD   Page 32 of 130

## LEGISLATIVE BUDGET BOARD
### Austin, Texas

## FISCAL NOTE, 82ND LEGISLATIVE REGULAR SESSION

### January 24, 2011

**TO:** Honorable Robert Duncan, Chair, Senate Committee of the Whole Senate

**FROM:** John S O'Brien, Director, Legislative Budget Board

**IN RE:** **SB14** by Fraser (Relating to requirements to vote, including presenting proof of identification; providing criminal penalties.), **As Introduced**

---

**Estimated Two-year Net Impact to General Revenue Related Funds** for SB14, As Introduced: a negative impact of ($2,000,000) through the biennium ending August 31, 2013.

The bill would make no appropriation but could provide the legal basis for an appropriation of funds to implement the provisions of the bill.

---

**General Revenue-Related Funds, Five-Year Impact:**

| Fiscal Year | Probable Net Positive/(Negative) Impact to General Revenue Related Funds |
|---|---|
| 2012 | ($2,000,000) |
| 2013 | $0 |
| 2014 | $0 |
| 2015 | $0 |
| 2016 | $0 |

**All Funds, Five-Year Impact:**

| Fiscal Year | Probable Savings/(Cost) from *General Revenue Fund* 1 |
|---|---|
| 2012 | ($2,000,000) |
| 2013 | $0 |
| 2014 | $0 |
| 2015 | $0 |
| 2016 | $0 |

## Fiscal Analysis

The bill would require the voter registrar of each county to provide a notice of identification requirements for voting with each initial voter registration certificate or renewal registration certificate issued.  The Secretary of State (SOS) and the voter registrar of each county that maintains a website would be required to post on their websites a notice of the identification requirements. SOS would be required to prescribe the wording of these notices. SOS would also be required to establish a statewide effort to educate voters regarding the identification requirements for voting.

The bill would require training standards to include instructions on the acceptance and handling of the identification presented by a voter to an election officer and each election clerk would be required to complete this training.

The presiding judge at each polling place would be required to post in a prominent location outside of the

TX_00003693

TX_00003694
JA_000034

TX_00003694

location a list of the acceptable forms of identification. The Secretary of State would be required to prescribe the wording for written notifications of the identification requirements to vote in elections after January 1, 2012 and election officers would be required to provide this written notification of voting identification requirements to voters who do not meet identification requirements.

The Department of Public Safety (DPS) would be prohibited from collecting a fee for a personal identification certificate issued to a person who states that they are obtaining the personal identification certificate to meet voting identification requirements and that person meets certain other voter registration criteria.

The bill would change an offense under this section after January 1, 2012 to a second degree felony from a third degree felony unless the person is convicted of an attempt, in which case, the offense would be a state jail felony instead of a Class A misdemeanor.

The Secretary of State would be required to prescribe procedures for voters who provisionally vote without proper identification to present proof of identification to the voter registrar not later than the sixth day after the date of the election.

The bill would repeal Sections 63.007 and 63.008 of the Election Code related to voters with incorrect certificates who are not on the voter list and voters without certificates who are not on the voter list.

The Secretary of State (SOS) would be required to adopt the training standards and to develop training materials as soon as practicable after September 1, 2011. Each county clerk would be required to provide a session of training using the standards adopted by and the materials developed by SOS as soon as practicable as well.

The bill would expand the uses of state funds disbursed under Chapter 19 of the Election Code to include additional expenses related to coordinating voter registration drives or other activities designed to expand voter registration.  This section would expire January 1, 2013.

Sections 1, 3, 4, 5, 9, 20, and 22 pertaining to providing notice of voter identification requirements, providing voter identification training, providing voter education to the public, and expanding the uses of voter registration funds would be effective September 1, 2011.  The rest of the bill would be effective January 1, 2012.

**Methodology**

The total fiscal impact of the bill is estimated to be $2 million for fiscal year 2012 out of the General Revenue Fund.  This estimate includes $0.5 million to research and develop ways to inform the public of the new identification requirements.  Additional costs are estimated to be $1.5 million for media advertisements: television ($750,000), radio ($300,000), print ($300,000), and internet ($150,000).

The Secretary of State would also be required to prescribe the wording for voter identification requirement notifications and to develop training materials on voter identification requirements.  It is assumed that any fiscal implication associated with these responsibilities could be absorbed within existing resources.

The fiscal impact of expanding the uses of funds disbursed under Chapter 19 of the Election Code to include coordinating voter registration drives or other activities designed to expand voter registration is unknown because it is not known how many voter registration drives or other activities designed to expand voter registration would occur.

The fiscal impact of the revenue loss from the prohibition of DPS to collect a fee for a personal identification certificate issued to a person seeking the certificate for the purpose of voting is unknown because it is not known how many people would make a request for a personal identification certificate for voting.

**Local Government Impact**

The bill would require counties to notify registered voters of changes online if the county maintains a website, at polling locations, and included with voter registration certificates. Election clerks would be required to undergo training regarding accepted forms of voter identification.

According to Texas Association of Counties (TAC), Tarrant County anticipated a one-time cost to reprint provisional balloting materials and provide new notices ($8,000); Bexar County stated that due to limited space on current registration certificates, larger cards would be necessary resulting in additional costs for cards,

TX_00003695

TX_00003696
JA_000036

TX_00003696

printing and postage ($381,256); however, Comal County reported the costs associated with the provisions of the bill could be absorbed within existing resources.

**Source Agencies:**    304 Comptroller of Public Accounts, 307 Secretary of State, 405 Department of Public Safety

**LBB Staff:** JOB, SD, MS, BTA

TX_00003697

TX_00003698
JA_000038

# LEGISLATIVE BUDGET BOARD
## Austin, Texas

## CRIMINAL JUSTICE IMPACT STATEMENT

## 82ND LEGISLATIVE REGULAR SESSION
### Revision 1

### January 24, 2011

**TO:** Honorable Robert Duncan, Chair, Senate Committee of the Whole Senate

**FROM:** John S O'Brien, Director, Legislative Budget Board

**IN RE:** SB14 by Fraser (Relating to requirements to vote, including presenting proof of identification; providing criminal penalties.), **As Introduced**

The bill would amend the Elections Code as it relates to requirements to vote. The provisions of the bill that create new punishment or enhance existing punishment for criminal offenses are the subject of this analysis. Under the provisions of the bill, the punishment for attempting to vote illegally would be enhanced from a Class A Misdemeanor to a State Jail Felony and the punishment for illegal voting would be enhanced from a third degree felony to a second degree felony.

A Class A Misdemeanor is punishable by confinement in a county jail for any term of not more than one year, or, in addition to confinement, a fine not to exceed $4,000.

A state jail felony is punishable by confinement in a state jail for any term of not more than two years or less than 180 days, or, in addition to confinement, a fine not to exceed $10,000.

A felony of the third degree is punishable by imprisonment in the institutional division for any term of not more than 10 years or less than 2 years, or, in addition to confinement, a fine not to exceed $10,000.

A felony of the second degree is punishable by imprisonment in the institutional division for any term of not more than 20 years or less than 2 years, or, in addition to confinement, a fine not to exceed $10,000.

Increasing the penalty for any criminal offense is expected to result in increased demands upon the correctional resources of counties or of the State due to longer terms of probation, or longer terms of confinement in county jails or prison. When an offense is changed from a misdemeanor to a felony, there is a transfer of the burden of confinement of convicted offenders from the counties to the State. In fiscal year 2010, less than five offenders were admitted to prison and less than five offenders were released from prison for illegal voting. In fiscal year 2010, less than five people were under parole supervision for illegal voting. In fiscal year 2010, five offenders were placed on community supervision and less than five offenders were released from community supervision for illegal voting or attempting to vote illegally. In fiscal year 2010, less than five people were arrested for illegal voting or attempting to vote illegally. It is assumed the number of offenders convicted under this statute would not result in a significant impact on the programs and workload of State corrections agencies or on the demand for resources and services of those agencies.

**Source Agencies:**
**LBB Staff:** JOB, GG, LM, ADM, ESi

TX_00003700
JA_000040

TX_00003700

# LEGISLATIVE BUDGET BOARD
## Austin, Texas

## CRIMINAL JUSTICE IMPACT STATEMENT

## 82ND LEGISLATIVE REGULAR SESSION

## January 24, 2011

**TO:** Honorable Robert Duncan, Chair, Senate Committee on Committee of the Whole Senate

**FROM:** John S O'Brien, Director, Legislative Budget Board

**IN RE: SB14** by Fraser (Relating to requirements to vote, including presenting proof of identification; providing criminal penalties.), **As Introduced**

The bill would amend the Elections Code as it relates to requirements to vote. The provisions of the bill that create new punishment or enhance existing punishment for criminal offenses are the subject of this analysis. Under the provisions of the bill, the punishment for attempting to vote illegally would be enhanced from a Class A Misdemeanor to a State Jail Felony and the punishment for illegal voting would be enhanced from a third degree felony to a second degree felony.

A Class A Misdemeanor is punishable by confinement in a county jail for any term of not more than one year, or, in addition to confinement, a fine not to exceed $4,000.

A state jail felony is punishable by confinement in a state jail for any term of not more than two years or less than 180 days, or, in addition to confinement, a fine not to exceed $10,000.

A felony of the third degree is punishable by imprisonment in the institutional division for any term of not more than 10 years or less than 2 years, or, in addition to confinement, a fine not to exceed $10,000.

A felony of the second degree is punishable by imprisonment in the institutional division for any term of not more than 20 years or less than 2 years, or, in addition to confinement, a fine not to exceed $10,000.

Increasing the penalty for any criminal offense is expected to result in increased demands upon the correctional resources of counties or of the State due to longer terms of probation, or longer terms of confinement in county jails or prison. When an offense is changed from a misdemeanor to a felony, there is a transfer of the burden of confinement of convicted offenders from the counties to the State. In fiscal year 2010, less than five offenders were admitted to prison and less than five offenders were released from prison for illegal voting. In fiscal year 2010, less than five people were under parole supervision for illegal voting. In fiscal year 2010, five offenders were placed on community supervision and less than five offenders were released from community supervision for illegal voting or attempting to vote illegally. In fiscal year 2010, less than five people were arrested for illegal voting or attempting to vote illegally. It is assumed the number of offenders convicted under this statute would not result in a significant impact on the programs and workload of State corrections agencies or on the demand for resources and services of those agencies.

**Source Agencies:**
**LBB Staff:** JOB, GG, LM, ADM, ESi

TX_00003702
JA_000042

TX_00003702

**SENATE**

**NOTICE OF PUBLIC HEARING**


COMMITTEE:      Committee of the Whole Senate

TIME & DATE:    1:30 PM, Monday, January 24, 2011

PLACE:          Senate Chamber

---

**PLEASE NOTE THAT THE SENATE WILL CONVENE AT 1:30 P.M.

Upon adoption of the appropriate motion, the Senate will resolve into the Committee of the Whole Senate to consider the following:

<u>SB 14</u>      Fraser/et al.

Relating to requirements to vote, including presenting proof of identification; providing criminal penalties.

The Committee will hear invited testimony only on SB 14.

The public is invited to observe the proceedings of the Committee from the Senate Gallery on the 3rd Floor.

For any questions regarding the hearing, please contact Patsy Spaw (512) 463-0100.

---

# SENATE JOURNAL

## EIGHTY-SECOND LEGISLATURE — REGULAR SESSION

## AUSTIN, TEXAS

## PROCEEDINGS

### FOURTH DAY
(Monday, January 24, 2011)

The Senate met at 1:38 p.m. pursuant to adjournment and was called to order by the President.

The roll was called and the following Senators were present: Birdwell, Carona, Davis, Deuell, Duncan, Ellis, Eltife, Estes, Fraser, Gallegos, Harris, Hinojosa, Huffman, Jackson, Lucio, Nelson, Nichols, Ogden, Patrick, Rodriguez, Seliger, Shapiro, Uresti, Van de Putte, Watson, Wentworth, West, Whitmire, Williams, Zaffirini.

Absent-excused: Hegar.

The President announced that a quorum of the Senate was present.

Chaplain Steven Vaughn, Texas Army National Guard, offered the invocation as follows:

I will say of the Lord, He is my refuge and my fortress, my God, in whom I trust. (Psalm 91:2) Father, today we pause to honor a group of men and women who by their very sacrifice have set themselves apart from all others. We cannot bestow more honor and dignity upon them than they themselves have already earned, but we can say "thank you." We can and do ask Your hand of mercy and love be around them. For those still recovering we ask that You give the doctors the wisdom needed to assist these patriots in their recovery process. We ask also for their families that will walk this road alongside them. Grant them the wisdom and strength to be a pillar of support and love as their loved one makes his or her journey. Now, Father, we humbly ask Your blessings upon our country and our service members currently serving in harm's way. We ask that they might soon be returned to their loved ones. We ask in Your blessed and holy name. Amen.

Senator Whitmire moved that the reading of the Journal of the proceedings of the previous day be dispensed with and the Journal be approved as printed.

The motion prevailed without objection.

## LEAVE OF ABSENCE

On motion of Senator Whitmire, Senator Hegar was granted leave of absence for today on account of illness.

## RESOLUTION SIGNED

The President announced the signing of the following enrolled resolution in the presence of the Senate:  **SCR 6**.

## SENATE BILLS ON FIRST READING

The following bills were introduced, read first time, and referred to the committees indicated:

**SB 1** by Ogden
General Appropriations Bill.
To Committee on Finance.

**SB 14** by Fraser, Birdwell, Carona, Deuell, Duncan, Eltife, Estes, Harris, Hegar, Huffman, Jackson, Nelson, Nichols, Ogden, Patrick, Seliger, Shapiro, Wentworth, Williams
Relating to requirements to vote, including presenting proof of identification; providing criminal penalties.
To Committee of the Whole Senate.

## MESSAGES FROM THE GOVERNOR

The following Messages from the Governor were read and were filed with the Secretary of the Senate:

Austin, Texas
January 20, 2011

STATE OF TEXAS
OFFICE OF THE GOVERNOR

TO THE SENATE AND HOUSE OF REPRESENTATIVES OF THE EIGHTY-SECOND TEXAS LEGISLATURE, REGULAR SESSION:

I, RICK PERRY, Governor of the State of Texas, pursuant to Article III, Section 5, of the Texas Constitution and by this special message, do hereby submit the following emergency matter for immediate consideration to the Senate and House of Representatives of the 82nd Legislature, now convened:

Legislation that requires a voter to present proof of identification when voting.

Respectfully submitted,

/s/Rick Perry
Governor

Austin, Texas
January 20, 2011

STATE OF TEXAS
OFFICE OF THE GOVERNOR

TO THE SENATE AND HOUSE OF REPRESENTATIVES OF THE EIGHTY-SECOND TEXAS LEGISLATURE, REGULAR SESSION:

I, RICK PERRY, Governor of the State of Texas, pursuant to Article III, Section 5, of the Texas Constitution and by this special message, do hereby submit the following emergency matter for immediate consideration to the Senate and House of Representatives of the 82nd Legislature, now convened:

Legislation that will provide for a federal balanced budget amendment to the United States Constitution.

Respectfully submitted,

/s/Rick Perry
Governor

Austin, Texas
January 21, 2011

STATE OF TEXAS
OFFICE OF THE GOVERNOR

TO THE SENATE AND HOUSE OF REPRESENTATIVES OF THE EIGHTY-SECOND TEXAS LEGISLATURE, REGULAR SESSION:

I, RICK PERRY, Governor of the State of Texas, pursuant to Article III, Section 5, of the Texas Constitution and by this special message, do hereby submit the following emergency matter for immediate consideration to the Senate and House of Representatives of the 82nd Legislature, now convened:

Legislation that requires a sonogram before a woman elects to have an abortion so that she may be fully medically informed.

Respectfully submitted,

/s/Rick Perry
Governor

**SENATE RESOLUTION 31**

Senator Uresti offered the following resolution:

WHEREAS, The Senate of the State of Texas is pleased to join the citizens of Real County and Texans across the state in celebrating Real County Day at the State Capitol on January 24, 2011; and

WHEREAS, Real County was established in 1913 from parts of Edwards, Bandera, and Kerr Counties, and it was named for Julius Real, the only Republican in the Texas Senate at that time; and

WHEREAS, Situated on the Balcones Escarpment, on the southern edge of the Edwards Plateau, Real County is marked by the rugged terrain and scenic canyons of the Frio and Nueces Rivers; and

WHEREAS, Anglo-American settlers first came to the area in the 1850s, and the military post Camp Wood was established in 1857; ranching soon came to dominate the local economy, with the raising of angora goats and sheep playing a major role; and

WHEREAS, Today, ranching continues to play a vital role in the economy of Real County, with tourism and hunting also contributing greatly to its prosperity; the county is also known for its pecans; Leakey, the county seat, annually hosts the July Jubilee; and

WHEREAS, Real County Day at the Capitol is an excellent opportunity to celebrate the history and the fine qualities of this area; now, therefore, be it

RESOLVED, That the Senate of the State of Texas, 82nd Legislature, hereby commend the people of Real County on their many contributions to the rich historical legacy of our state and extend to them best wishes for a memorable Real County Day at the State Capitol; and, be it further

RESOLVED, That a copy of this Resolution be prepared for them as an expression of esteem from the Texas Senate.

**SR 31** was read and was adopted without objection.

### GUESTS PRESENTED

Senator Uresti was recognized and introduced to the Senate Garry Merritt, Real County Judge; Charles Reagor, Trustee of Leakey ISD; Carl Jensen, Leakey City Councilmember; Charles Hunger, Trustee of Nueces Canyon Consolidated ISD; and Karen Dean, City of Camp Wood.

The Senate welcomed its guests.

### PHYSICIANS OF THE DAY

Senator Watson was recognized and presented Drs. John and Judith Egerton of Austin as the Physicians of the Day.

The Senate welcomed the Egertons and thanked them for their participation in the Physician of the Day program sponsored by the Texas Academy of Family Physicians.

### GUESTS PRESENTED

Senator Zaffirini was recognized and introduced to the Senate members of the Mariachi Los Tigres del Sur of Martin High School in Laredo.

The Senate welcomed its guests.

### SENATE RESOLUTION 53

Senator Van de Putte offered the following resolution:

WHEREAS, The Senate of the State of Texas is pleased to recognize and pay tribute to the members of the United States military who have so honorably served our great nation and state in the armed services and join all Texans in observing January 24, 2011, as Wounded Warrior Day at the Texas State Capitol; and

WHEREAS, The soldiers, sailors, airmen, and Marines of the United States military and their families have made extraordinary sacrifices to serve our nation both abroad and within our own borders; and

WHEREAS, Of the 253,049 members of the United States military who are currently deployed around the world, 19,413 are from Texas, and of the 42,167 service members who have been wounded since 2001 in the Iraqi Freedom, Enduring Freedom, and New Dawn Conflicts, 3,622 have been from Texas; and

WHEREAS, We are blessed to honor today the wounded warriors who have returned from these conflicts, including Major John J. Ploch, Staff Sergeant Richard Groff, Staff Sergeant Frank Lamar, Sergeant Juan Carrion, Sergeant Chris Goebel, and Private First Class Kevin Macari; without their willingness to serve and the contributions made by them and their families, we could not enjoy many of the freedoms that make this nation great; and

WHEREAS, These veterans have bravely and selflessly served in defense of our nation and its democratic ideals; with silent dedication and unmatched grit, they ensure our safety and security, and it is indeed fitting that all Texans recognize, honor, and reaffirm their gratitude to these true American heroes; and

WHEREAS, Although these veterans represent many different hometowns and backgrounds, what unites them is greater than what divides them–a deep and abiding love of their country; it is for America and all Americans that they leave their homes and their family and friends in order to guarantee the continuation of those freedoms etched into the Declaration of Independence and ensured by our Constitution; and

WHEREAS, It is for our service members' willingness to serve to protect these freedoms that we honor them; now, therefore, be it

RESOLVED, That the Senate of the State of Texas, 82nd Legislature, hereby commend the wounded warriors of our nation for their sacrifice, dedication, and patriotism, recognizing them, honoring them, and reaffirming the gratitude of all Texans to these true American heroes; and, be it further

RESOLVED, That a copy of this Resolution be prepared in honor of the dedication and sacrifice of the men and women of the United States armed services and their families.

**SR 53** was read and was adopted by a rising vote of the Senate.

### GUESTS PRESENTED

Senator Van de Putte, joined by Senators Estes, Ogden, Davis, and Birdwell, was recognized and introduced to the Senate Sergeant Juan Carrion, Sergeant Chris Goebel, Staff Sergeant Frank Lamar, Private First Class Kevin Macari, and the Purple Heart Warriors present.

The Senate welcomed its guests.

### GUEST PRESENTED

Senator Wentworth was recognized and introduced to the Senate Staff Sergeant Richard Groff.

The Senate welcomed its guest.

### GUEST PRESENTED

Senator Zaffirini was recognized and introduced to the Senate Major John J. Ploch.

The Senate welcomed its guest.

### GUEST PRESENTED

Senator Fraser was recognized and introduced to the Senate Staff Sergeant Floyd L. Hall.

The Senate welcomed its guest.

## GUEST PRESENTED

Senator Birdwell was recognized and introduced to the Senate Lieutenant Colonel Tim Karcher of Copperas Cove.

The Senate welcomed its guest.

## GUEST PRESENTED

Senator West was recognized and introduced to the Senate Chaplain Roger Benimoff of Dallas County.

The Senate welcomed its guest.

## GUESTS PRESENTED

Senator Estes was recognized and introduced to the Senate Army veterans Joel Jimenez, Paul Miller, and Paul VanLinder.

The Senate welcomed its guests.

## GUESTS PRESENTED

Senator Van de Putte was again recognized and introduced to the Senate T. P. O'Mahoney, Chair, Texas Veterans Commission; Tom Palladino, Executive Director, Texas Veterans Commission; and Adjutant General Jose Mayorga.

The Senate welcomed its guests.

## ACKNOWLEDGMENT

Senator Whitmire acknowledged the following Senators who are veterans: Senator Birdwell, United States Army; Senator Hinojosa, United States Marines; Senator Ogden, United States Marines; and Senator Uresti, United States Marines.

## ACKNOWLEDGMENT

Senator Van de Putte acknowledged Lieutenant Governor David Dewhurst, a veteran of the United States Air Force.

## SENATE RESOLUTION 41

Senator Williams offered the following resolution:

**SR 41,** Commending Sergeant James Eddie Wright on his service to our nation.

The resolution was read and was adopted without objection.

## GUEST PRESENTED

Senator Williams was recognized and introduced to the Senate Sergeant James Eddie Wright of Conroe.

The Senate welcomed its guest.

## SENATE RESOLUTIONS

Senator Hinojosa offered the following resolutions:

**SR 75,** Commending Ram Chavez on his service to our nation.

The resolution was read.

**SR 76,** Commending Frank Alaniz on his service to our nation.

The resolution was read.

**SR 78,** Commending Roberto Callejo on his service to our nation.

The resolution was read.

**SR 75, SR 76,** and **SR 78** were adopted without objection.

### GUESTS PRESENTED

Senator Hinojosa was recognized and introduced to the Senate Ram Chavez, United States Army, and Frank Alaniz and Roberto Callejo, United States Marine Corps.

The Senate welcomed its guests.

### SENATE RESOLUTION 49

Senator Davis offered the following resolution:

**SR 49,** Commending Master Sergeant Richard Ruffert on his service to our nation.

The resolution was read and was adopted without objection.

### GUEST PRESENTED

Senator Davis was recognized and introduced to the Senate Richard Ruffert of Fort Worth, United States Army.

The Senate welcomed its guest.

### SENATE RESOLUTION 69

Senator Uresti offered the following resolution:

**SR 69,** Commending First Sergeant Ruperto Cruz, Jr., on his service to our nation.

The resolution was read and was adopted without objection.

### GUEST PRESENTED

Senator Uresti was recognized and introduced to the Senate Ruperto Cruz, Jr., United States Army, Retired, of San Antonio.

The Senate welcomed its guest.

### STANDING COMMITTEE APPOINTED

The President announced the appointment of the following committee for the 82nd Legislature:

FINANCE
Ogden, Chair; Hinojosa, Vice-chair; Deuell, Duncan, Eltife, Estes, Lucio, Nelson, Patrick, Seliger, Shapiro, West, Whitmire, Williams, Zaffirini.

## SENATE RESOLUTION 79

Senator Duncan offered the following resolution:

WHEREAS, Article III, Section 9, and Article IV, Section 16, of the Texas Constitution and Article XIII of the Senate Rules recognize the existence of the Committee of the Whole Senate; and

WHEREAS, Pursuant to Senate Rule 7.06, the President referred Senate Bill 14, relating to voter identification requirements, directly to the Committee of the Whole Senate; and

WHEREAS, Senate Rule 13.01 provides that it is in order for the Senate at any time after bills and resolutions have been called to resolve itself into a Committee of the Whole Senate; and

WHEREAS, The Senate may adopt by resolution specific procedures to govern the operation of the Committee of the Whole Senate during its consideration of Senate Bill 14; now, therefore, be it

RESOLVED, That the Senate resolve itself into a Committee of the Whole Senate on Monday, January 24, 2011, at the conclusion of the morning call for the consideration of Senate Bill 14; and

RESOLVED, That the Senate may meet as in Committee of the Whole Senate from day to day as necessary; and

RESOLVED, That the following procedures shall apply when in Committee of the Whole Senate for the duration of its consideration of Senate Bill 14:

1. The Committee shall afford reasonable opportunity to interested parties to appear and testify before the Committee.

2. The Chair shall require all parties appearing at the meeting to swear or affirm that the testimony they give to the Committee is true and correct.

3. The Chair may fix the order of appearance and time allotted for each witness unless a majority of the members present directs otherwise.

4. Senate Rules addressing access to the Senate Floor shall be enforced by the Chair while the Committee is meeting, except as follows:

(a) Witnesses appearing before the committee may be admitted to the floor of the Senate as their names are called by the Chair, and may remain only until their testimony is completed.

(b) Each Senator may be assisted by one employee of the Senate within the brass rail at any given time. The Sergeant-at-Arms shall provide seating next to a requesting senator for such authorized employees.

5. Senate Rule 3.04, relating to posters, placards, banners and signs, and Senate Rule 3.05, relating to applause, outbursts, and demonstrations, shall be strictly enforced by the Chair. Subject to approval by the Chair, witnesses may use visual aids as necessary in the presentation of their testimony.

6. Senate Rule 3.01, relating to attire, shall not apply to witnesses.

**SR 79** was read and was adopted by the following vote: Yeas 18, Nays 12.

Yeas: Birdwell, Carona, Deuell, Duncan, Eltife, Estes, Fraser, Harris, Huffman, Jackson, Nelson, Nichols, Ogden, Patrick, Seliger, Shapiro, Wentworth, Williams.

Nays: Davis, Ellis, Gallegos, Hinojosa, Lucio, Rodriguez, Uresti, Van de Putte, Watson, West, Whitmire, Zaffirini.

Absent-excused: Hegar.

## NOTICE FILED BY LEGISLATOR CONCERNING RELATIVE WHO IS A LOBBYIST

Name of Legislator: John Whitmire

A legislator must file a notice before introducing, sponsoring, or voting on a measure or bill if the legislator's spouse, parent, or child is registered as a lobbyist with respect to the subject matter of the measure or bill. Gov't Code § 572.0531.

The notice must be filed with the Texas Ethics Commission and the chief clerk of the house or the secretary of the senate, as applicable. In addition, the spouse or relative must file a notice with the Texas Ethics Commission. A legislator uses this form to provide the notice. A spouse or relative uses FORM LOB-REL.

LOBBYIST NAME AND BILL/MEASURE INFORMATION

Name of registered lobbyist: Whitney Whitmire

Bill, measure, or class of bills or measures with respect to which this notice is required. See attached.

> I give notice that I intend to introduce, sponsor, or vote on a bill or measure and my spouse, parent, or child is registered as a lobbyist under Chapter 305 of the Government Code with respect to the subject matter of the bill or measure.

/s/John Whitmire                                                            January 10, 2011

Attachment:

amusements, games, sports; business and commerce; coastal affairs and beaches; communications and press; consumer protection; corporations and associations; disaster preparedness and relief; economic and industrial development; energy; environment; fees and other non-tax revenue; gambling; health and healthcare; highways and roads; insurance; oil and gas; product liability; property interests; taxation; transportation; utilities; vehicles and traffic.

Received by Texas Ethics Commission on January 20, 2011

## COMMITTEE OF THE WHOLE SENATE

On motion of Senator Duncan and by unanimous consent, the Senate at 4:18 p.m. resolved into a Committee of the Whole Senate to consider **SB 14** with Senator Duncan presiding.

**(Tuesday, January 25, 2011)**

### IN LEGISLATIVE SESSION

The President called the Senate to order at 10:44 a.m. as In Legislative Session.

### COMMITTEE OF THE WHOLE SENATE REPORT

Senator Duncan was recognized and reported that the Committee of the Whole Senate had met and would continue consideration of **SB 14**.

### CO-AUTHOR OF SENATE BILL 121

On motion of Senator Ellis, Senator Carona will be shown as Co-author of **SB 121**.

### CO-AUTHORS OF SENATE BILL 124

On motion of Senator Patrick, Senators Carona and Nelson will be shown as Co-authors of **SB 124**.

### CO-AUTHORS OF SENATE BILL 178

On motion of Senator Fraser, Senators Deuell, Hegar, and Nichols will be shown as Co-authors of **SB 178**.

### CO-AUTHORS OF SENATE BILL 321

On motion of Senator Hegar, Senators Deuell and Eltife will be shown as Co-authors of **SB 321**.

### CO-AUTHOR OF SENATE CONCURRENT RESOLUTION 5

On motion of Senator Hinojosa, Senator Lucio will be shown as Co-author of **SCR 5**.

### CO-AUTHOR OF SENATE JOINT RESOLUTION 15

On motion of Senator Wentworth, Senator Eltife will be shown as Co-author of **SJR 15**.

### RESOLUTIONS OF RECOGNITION

The following resolutions were adopted by the Senate:

#### Memorial Resolutions

**SR 51** by Van de Putte, In memory of Mary Espiritu of San Antonio.

**SR 54** by West, In memory of Charles Key.

**SR 57** by Watson, In memory of Hunter Mason Morris.

**SR 61** by Uresti, In memory of Maria Rosa Pena of San Antonio.

#### Congratulatory Resolutions

**SR 29** by Harris, Recognizing Danny F. Vance of Arlington on the occasion of his retirement from the Trinity River Authority of Texas.

**SR 39** by Ellis, Recognizing East Bethel Missionary Baptist Church in Houston on the occasion of its 85th anniversary.

**SR 42** by Van de Putte, Recognizing John J. Ploch for his service to his country.

**SR 43** by Van de Putte, Recognizing Juan Carrion for his service to his country.

**SR 44** by Van de Putte, Recognizing Frank Lamar for his service to his country.

**SR 45** by Van de Putte, Recognizing Kevin Macari for his service to his country.

**SR 46** by Van de Putte, Recognizing Chris Goebel for his service to his country.

**SR 47** by Van de Putte, Recognizing Richard Groff for his service to his country.

**SR 58** by Watson, Recognizing Carlota Vasquez of Austin on the occasion of her 90th birthday.

**SR 59** by Ellis, Recognizing Minnie J. and Delbert Ray Jefferson for their 25 years of service to Christian Home Missionary Baptist Church.

**SR 62** by Uresti, Recognizing Glenn Ratliff of Monahans on the occasion of his 100th birthday.

**SR 63** by West, Recognizing Holy Cross Catholic Church in Dallas on the occasion of the dedication ceremony for the new church sanctuary.

**SR 64** by West, Congratulating Travis T. Howard Lewis on being honored by the Alpha Xi Omega Chapter of Alpha Kappa Alpha Sorority, Incorporated.

**SR 65** by Ogden, Recognizing Mark Evans on the occasion of his retirement as Trinity County Judge.

**SR 67** by Nelson, Fraser, Huffman, and Lucio, Recognizing the Turquoise Council of Americans and Eurasians on the occasion of its Turkic-Texan Friendship Reception and Awards Dinner.

**SR 68** by Ellis, Congratulating Kalamu Ryo Johnson and Jatoi Jones Johnson on the birth of their daughter, Kailah Ryonne Johnson.

**SR 70** by Lucio, Recognizing Jose M. Mendoza on the occasion of his retirement from the Brownsville Police Department.

**SR 77** by Hinojosa, Recognizing Richard Valent for his service to his country.

**SR 80** by Davis, Recognizing James Cash, Jr., for his career as a leader in academia and business.

### Official Designation Resolutions

**SR 40** by Birdwell, Celebrating January 25, 2011, as Hewitt Day at the State Capitol.

**SR 50** by West, Recognizing January of 2011 as National Slavery and Human Trafficking Prevention Month.

**SR 66** by Whitmire, Recognizing the Texas Chapter of Paralyzed Veterans Annual BBQ Cook-Off as a Texas State Barbecue Championship competition.

**SR 71** by Lucio, Celebrating January 30 through February 5, 2011, as Catholic Schools Week.

**SR 73** by Nelson, Recognizing January 23 through January 29, 2011, as Texas Nurse Anesthetists Week.

**SR 74** by Nelson, Proclaiming January, 2011, Communities In Schools Month and January 26, 2011, Communities In Schools Day at the State Capitol.

## ADJOURNMENT

On motion of Senator Whitmire, the Senate at 10:45 a.m. Tuesday, January 25, 2011, adjourned until 11:00 a.m. today.

---

# APPENDIX

---

### RESOLUTIONS ENROLLED

January 19, 2011

**SCR 6**, **SR 24**, **SR 26**, **SR 27**, **SR 28**, **SR 30**, **SR 32**, **SR 33**, **SR 35**, **SR 36**, **SR 37**, **SR 38**

### SENT TO GOVERNOR

January 20, 2011

**SCR 3**

### SENT TO SECRETARY OF STATE

January 24, 2011

**SCR 6**

# MINUTES

## SENATE COMMITTEE ON COMMITTEE OF THE WHOLE SENATE
Monday, January 24, 2011
1:30 PM
Senate Chamber

\*\*\*\*\*

Pursuant to Article XIII, Senate Rule 13.01, the Senate resolved into the Committee of the Whole at 4:16 p.m., Monday, January 24, 2011, in the Senate Chamber for a public hearing on SB 14.

Pursuant to Senate Rule 13.02, Senator Robert Duncan was named Chair of the Committee of the Whole Senate.

\*\*\*\*\*

**MEMBERS PRESENT:**                                    **MEMBERS ABSENT:**
Lt. Governor David Dewhurst                             Senator Glenn Hegar
Senator Brian Birdwell
Senator John Carona
Senator Wendy Davis
Senator Bob Deuell
Senator David Dewhurst
Senator Robert Duncan
Senator Rodney Ellis
Senator Kevin Eltife
Senator Craig Estes
Senator Troy Fraser
Senator Mario Gallegos, Jr.
Senator Chris Harris
Senator Juan Hinojosa
Senator Joan Huffman
Senator Mike Jackson
Senator Eddie Lucio, Jr.
Senator Jane Nelson
Senator Robert Nichols
Senator Steve Ogden
Senator Dan Patrick

TX_00002658

Senator Jose Rodriguez
Senator Kel Seliger
Senator Florence Shapiro
Senator Carlos Uresti
Senator Leticia Van de Putte
Senator Kirk Watson
Senator Jeff Wentworth
Senator Royce West
Senator John Whitmire
Senator Tommy Williams
Senator Judith Zaffirini

\*\*\*\*\*

Pursuant to the passage of Senate Resolution 79, Senator Robert Duncan called the Committee of the Whole Senate to order at 4:16 p.m.  There being a quorum present, the following business was transacted:

Senator Duncan outlined the procedures and process for the Committee of the Whole Senate.

The Chair laid out SB 14 by Senator Troy Fraser, relating to requirements to vote, including presenting proof of identification; providing criminal penalties.

The Chair asked Senator Fraser if a committee substitute would be laid out or considered for SB 14.  Senator Fraser responded that there would be no committee substitute considered.

Senators Van de Putte raised a parliamentary inquiry about submitting amendments to SB 14. Senator Duncan announced that amendments would be accepted at any time, there would be no deadline for submitting committee amendments to SB 14.  Senator Van de Putte asked if members of the public could begin registering at 7:30 a.m. on Tuesday, January 25, 2011. Senator Duncan responded that the public would be able to begin registering at 7:30 a.m. and announced that invited testimony would be limited to ten minutes per person while the time limits for public testimony would be three minutes per person, pending the adoption of the appropriate motion on Tuesday, January 25, 2011.

Senator Ellis was recognized for a question regarding invited testimony and  requested that an equal amount of proponents and opponents offering invited testimony on SB 14 be allowed. Senator Duncan responded that he would consider the issue at the appropriate time.

**Senate Committee on Committee of the Whole Senate**
Minutes
Monday, January 24, 2011
Page 3

Senator Uresti was recognized for a question regarding whether a list of invited persons would be provided to the members. Senator Duncan responded by announcing the names of the resources witnesses that would be available (David Maxwell, Office of the Attorney General's Office; Ann McGeehan, Secretary of State's Office; and Rebecca Davio, Department of Public Safety) and stated that invited persons would be recognized, as follows, one proponent and then one opponent.

Senator Gallegos was recognized for a question about whether or not Spanish speaking staff would be available to assist Spanish speaking members of the public. Senator Duncan responded that arrangements were being made to address his question. Senator Gallegos also asked about the procedures for submitting written testimony, especially, if members of the public cannot attend the hearing. Senator Duncan responded that written testimony can only be submitted and made part of the record up until the bill has been voted out of committee.

With no further questions, at 4:36 p.m., Senator Duncan moved that the Committee of the Whole stand at ease until 8 a.m. on Tuesday, January 25, 2011.

On Tuesday, January 25, 2011, Senator Duncan called the Committee on the Whole to order at 8:05 a.m. There being a quorum present, the following business was transacted:

Senator Duncan once again outlined the procedures and process of SB 14; namely, a ten minute time limit for persons providing invited testimony, the availability of resource witnesses to provide answers for members, and a time limit of three minutes for persons providing public testimony. Senator Duncan recognized the court reporters: Aloma Kennedy and Lorrie Schnoor.

Senator Van de Putte asked Senator Duncan about access to the Senate Chamber for individuals with disabilities. Senator Duncan responded that a wireless microphone and table would be made available to individuals with disabilities.

Senator Duncan recognized Senator Fraser to lay out and explain SB 14, relating to requirements to vote, including presenting proof of identification; providing criminal penalties.

Senator Huffman was recognized for a motion to enter exhibit #1 into the public record (invited and public testimony, exhibits and transcripts on SB 362 as considered by the Texas Senate in March, 2009). Without objection, the motion was adopted by unanimous consent. Senator Davis inquired whether exhibit #1 included the responses received after the March 2009 hearing.

**Senate Committee on Committee of the Whole Senate**
Minutes
Monday, January 24, 2011
Page 4

Senator Eltife assumed presiding duties at 8:58 a.m.

Senator Duncan resumed presiding duties at 9:05 a.m.

Senator Van de Putte moved to enter exhibit #2 into the record, (all actions contained in the Senate Journals of SB 362, 81st Legislature, 2009, including motions, remarks, written responses, exhibits, and any other materials directly related to SB 362). Without objection, the motion was adopted by unanimous consent.

Senator Fraser moved to enter exhibit #3 into the record, (letter from Hope Andrade, Texas Secretary of State, re: HAVA funds). Without objection, the motion was adopted by unanimous consent.

Senator Seliger moved that the Committee of the Whole rise and report progress at 10:43 a.m. Without objection, it was so ordered.

_____
Senator Robert Duncan, Chair


_____
Patsy Spaw, Secretary of the Senate

TRANSCRIPT OF PROCEEDINGS BEFORE

THE SENATE OF THE STATE OF TEXAS

EIGHTY-SECOND LEGISLATURE

(COMMITTEE OF THE WHOLE SENATE)

AUSTIN, TEXAS


IN RE:                          §
                                §
CONSIDERATION OF                §
SENATE BILL 14                  §


COMMITTEE OF THE WHOLE SENATE

TUESDAY, JANUARY 25, 2011


        BE IT REMEMBERED THAT AT 8:05 a.m., on

Tuesday, the 25th day of January 2011, the above-

entitled matter continued at the Texas State Capitol,

Senate Chamber, Austin, Texas, before the Committee of

the Whole Senate.  The following proceedings were

reported by Aloma J. Kennedy, Lorrie A. Schnoor and Kim

Pence, Certified Shorthand Reporters.


VOLUME 2                              PAGES 20 - 542

2

## CONSIDERATION OF SENATE BILL 14 1/25/2011

21

1          P R O C E E D I N G S
2          TUESDAY, JANUARY 25, 2011
3               (8:05 a.m.)
4          CHAIRMAN DUNCAN:  The Committee of the
5 Whole will come to order.
6      OPENING INSTRUCTIONS BY CHAIRMAN DUNCAN
7          CHAIRMAN DUNCAN:  Members, we talked
8 yesterday a little bit about the process, and I thought
9 I would go through that once again so that we'll all
10 kind of know what the plan is.
11          First of all, I intend to recognize
12 Senator Fraser in just a moment to lay out the specifics
13 of Senate Bill 14.  And then after he lays the bill out,
14 then members will be recognized for questions of the
15 author or co-authors.  Then after that is finished, then
16 our invited testimony will begin.  It's the Chair's
17 intent to place a 10-minute limit on invited testimony.
18 And then there will be no questions to interrupt the
19 invited testimony as they're laying out their positions
20 or their testimony.  Then once they're finished, members
21 will be recognized for questions.
22          When that's done, we'll have a resource
23 witness panel that will be available for you.  I'm
24 advised that we have David Maxwell, Deputy Director of
25 Law Enforcement with the Office of the Attorney General;

22

1 and Ann McGeehan, Director of Elections, the Secretary
2 of State's office; and Rebecca Davio, Assistant Director
3 for Driver's License with the Department of Public
4 Safety.
5          When we have completed the invited
6 testimony and you've had an opportunity to question
7 those who have been invited, then I will -- I don't
8 think the list is as long as it was last year, but I
9 certainly I'm sure there will be discussion among the
10 members concerning their testimony.
11          Then we'll open up for public testimony.
12 You will recall last session, we would announce the
13 names of those who were in line, and you are in line in
14 order of your registration at the front desk.  We will
15 have those persons escorted down to the well, and then
16 they will be allowed to begin their testimony.
17          It's the intent of the Chair to impose a
18 three-minute time limit on the public testimony as well,
19 and I will not recognize anyone to interrupt someone
20 giving public testimony until their time has run.  There
21 is a timer at the front at the secretary's desk.  There
22 will be a warning; I think it's a 30-second warning.
23          Members, we do have a court reporter,
24 Ms. Kennedy.
25          Ms. Kennedy, would you stand so everyone

23

1 can see you.
2          Remember Ms. Kennedy from last time.  I
3 think she went 12 or 13 hours.
4          Because we're making a record here,
5 obviously we need to be mindful that the court reporter
6 only has two hands and can only type one person at a
7 time.  So the Chair will be careful to help you remember
8 that we cannot have people talking over each other.
9          Also we need to try to identify each other
10 so that -- or identify yourself when you're speaking or
11 I'll try to do that so that the record will be clear as
12 to the source of the comments being recorded.
13          We will take periodic breaks in order to
14 allow the court reporter a little time, but we will move
15 expeditiously as we move through the process.
16          There is a document -- like last session,
17 we will have an orderly process for admitting documents
18 into the record.  They will be labeled as exhibits and
19 be referred to in the record and will be received in the
20 record by exhibit number.  So when you have an exhibit
21 that you want to introduce into the record, well, then,
22 you'll need to have it marked.  And the secretary's desk
23 up here will have a procedure for marking your exhibits
24 and receiving them in the record.
25          Once we have completed the public

24

1 testimony -- and, obviously, we're going to be
2 interrupted by our Senate session which begins at 11:00.
3 Once we finish the public testimony, then it will be
4 appropriate for you to lay out any amendments that you
5 may wish to have considered by the body.
6          And once that's completed, then,
7 obviously, we will vote on our resolutions to rise and
8 report back to the full Senate.
9          That is basically the layout of the
10 procedure.  Any questions?
11          Senator Van de Putte.
12          SEN. VAN de PUTTE:  Thank you,
13 Mr. Chairman.  Thank you for outlining the process and
14 the procedures that we will be using today.  My question
15 is specifically with those members of the public who
16 wish to offer testimony sometimes today who have
17 disabilities.  To my knowledge, we have people coming to
18 the floor who are in wheelchairs and will not be able to
19 use the podium.  I wanted to ask what sort of amenities
20 or accommodations we will have so that they will be able
21 to have that, but some sort of a table so they can refer
22 to their documents when they're testifying.
23          CHAIRMAN DUNCAN:  Thank you, Senator Van
24 de Putte, an excellent question.
25          We do have a wireless mic that will be

CONSIDERATION OF SENATE BILL 14 1/25/2011

---

**25**

1 available for those who cannot access the mic -- at the
2 secretary's desk.
3          SEN. VAN de PUTTE:  Would it be possible
4 for those members of the public who are offering
5 testimony who have disabilities who are in a wheelchair
6 to have some sort of -- either a table or something so
7 that they can refer to their notes?  The problem with
8 last time is that they weren't able to actually, because
9 they don't have use of the podium.
10          CHAIRMAN DUNCAN:  Senator, we can
11 accommodate that.
12          SEN. VAN de PUTTE:  Thank you very much,
13 Mr. Chairman.
14          CHAIRMAN DUNCAN:  Members, also I forgot
15 to mention, the resolution that we passed yesterday
16 allows us to have a staff person on the floor to assist
17 us.  And so if you wish to have that person sit, well,
18 then, you'll need to ask the sergeant for a chair, and
19 we have chairs available back there.
20          Any other questions?
21          All right.  The Chair hears none.
22          Senator Fraser, you're recognized to
23 explain Senate Bill 14.
24
25

**26**

1          LAYING OUT OF SENATE BILL 14
2          SEN. FRASER:  Thank you, members.
3 Obviously, this is an issue that we know a lot about, we
4 had a lot of experience with two years ago.  The issue I
5 think has been defined and talked about a lot.
6          I think we all recognize the dangers of
7 voter fraud has threatened the integrity of the
8 electoral process for the entire history of the United
9 States.  The threat continues today.  In 2005, there was
10 a Commission, a bipartisan commission, the Carter-Baker
11 Commission, that was appointed by the Election
12 Commission.  Of course, President Carter, a past
13 president; James Baker, Secretary of State, they
14 reaffirmed the dangers by saying, "Elections are at the
15 heart of democracy.  Americans are losing confidence in
16 the fairness of elections.  And while we do not face a
17 crisis today, we need to address the problem of our
18 electoral system."
19          The Commission concluded at the end of the
20 day, "There is considerable national evidence of
21 in-person voter fraud.  And regardless of whether one
22 believes that voter impersonation is widespread or
23 relatively rare, there can be no serious dispute that
24 the real effect can be substantial because in a close
25 election, even a small amount of fraud could make the

**27**

1 margin of difference."
2          Texas today has a legitimate interest in
3 protecting elections.  It is imperative that we protect
4 the public's confidence in elections by deterring and
5 detecting voter fraud.
6          In upholding the Indiana photo ID law, the
7 U.S. Supreme Court stated, "Confidence in the integrity
8 of our electoral process is essential to the functioning
9 of our participatory democracy.  Voter fraud drives
10 honest citizens out of the democratic process and breeds
11 distrust of our government.  Voters who fear the
12 legitimate votes will be outweighed by fraudulent ones,
13 will feel disenfranchised."
14          On October 10, Lighthouse poll, which I
15 have here and be entering into the record -- it's the
16 newest poll that is out -- shows that 86 percent of
17 Texas voters -- that's both Republican and Democrats --
18 favor voter photo ID laws.
19          The bill that we're laying out today is in
20 compliance with the U.S. Supreme Court Decision which
21 upheld the Indiana voter ID legislation because it,
22 No. 1, deters and detects fraud; 2, it protects the
23 confidence in elections; and, 3, it counts only eligible
24 voters' votes.
25          It also complies with the Supreme Court

**28**

1 decision, because it offset burdens on voters by
2 providing access to free ID cards, allowing for
3 provisional ballots and absentee ballots, ensuring that
4 obtaining photo ID is no more inconvenient or burdensome
5 than the usual act of voting and providing an exception
6 for elderly voters.
7          The current law, as you know, provides
8 that when a voter shows up to vote, he or she must just
9 show a valid voter registration card.  If unable to do
10 so, the voter may show a photo ID card or other official
11 mail from a government entity -- utility bill, bank
12 statement, government check, paycheck or other
13 government document with name and address -- and sign an
14 affidavit.
15          Senate Bill 14, what we're doing with this
16 bill, Senate Bill 14 would require a voter to show a
17 photo ID except that people 70 or older on January 1,
18 2012, may continue to vote with just a registration
19 card, under current law.
20          Acceptable ID will include an unexpired
21 card issued by the Department of Public Safety, a
22 military ID, a passport or a citizenship certificate
23 with photo.  Voters who cannot produce an acceptable
24 form of photo identification will be allowed to cast a
25 provisional ballot.  That ballot will be counted if the

---

## CONSIDERATION OF SENATE BILL 14 1/25/2011

29

1 voter returns within six days to show a photo ID.
2           It would also provide for statewide
3 training and notification of the changes required for
4 the individual to vote with the photo ID.  It would
5 provide for a free DPS-issued identification card to any
6 registered voter who requests an identification card.
7           Every fraudulent vote effectively still is
8 a legitimate vote.  Elections are too important to leave
9 unprotected when the Legislature could take proactive
10 steps to prevent fraud and protect our democracy.
11           Mr. President, that is what Senate Bill 14
12 does.  And if there's no questions, I would move
13 passage.
14           SEN. WHITMIRE:  Mr. President --
15           SEN. VAN de PUTTE:  Yes.
16           SEN. WHITMIRE:  -- could we slow down?
17 Will the gentleman yield?
18           CHAIRMAN DUNCAN:  I think Senator Van de
19 Putte was first on the list, Senator.
20           Senator Van de Putte.
21           SEN. VAN de PUTTE:  Thank you,
22 Mr. Chairman, I think.  Mr, Chairman, inquiry.  At what
23 point in the proceedings today would a motion be in
24 order to move that all of the testimony and record from
25 this issue from the 2009 legislative session be made

30

1 into the record?  Would that be done -- would that
2 motion be proper at the point of original testimony or
3 at the beginning of these questions at this point?
4           CHAIRMAN DUNCAN:  Senator, at any time
5 that one would want to make that motion, it would be
6 recognized.
7           SEN. VAN de PUTTE:  Mr. Chairman, would
8 you recognize me for that motion at this time?
9           SEN. FRASER:  Mr. Chairman --
10           CHAIRMAN DUNCAN:  Before we do that, we do
11 have a motion in writing that Sen. Huffman intends to
12 introduce with the record, so why don't we do that first
13 and then we'll do everything else.  And it would be my
14 suggestion to -- what I had hoped to do was finish
15 the testimony or at least the question and answers on
16 the bill and then start at that point in time putting
17 evidence into the record.  So if that's suitable with
18 everyone, it just makes a little more sense to me to
19 keep it in order that way.
20           SEN. VAN de PUTTE:  Thank you,
21 Mr. Chairman.
22           And then I would like to ask my colleague,
23 the author of the bill, to yield.
24           CHAIRMAN DUNCAN:  Okay.
25           SEN. FRASER:  Mr. Chairman, before we --

31

1           CHAIRMAN DUNCAN:  Senator Fraser, why
2 don't we approach the chair; approach.
3           (Off-the-record discussion at bench)
4           CHAIRMAN DUNCAN:  The Chairman recognizes
5 Senator Huffman for motion in writing.
6           SEN. HUFFMAN:  Thank you, Mr. Chairman.
7           At this time I move that the entire record
8 and transcripts of the hearing related to Senate Bill
9 362 heard by the Committee of the Whole during the 81st
10 Legislative session be included in the record and would
11 move that it marked as Exhibit No. 1.
12           Exhibit No. 1 includes all the invited,
13 public and written testimony, in addition to all of the
14 exhibits submitted by the members during the hearing on
15 Senate Bill 362.  The previous testimony and debate on
16 Senate Bill 362 is relevant, because then and now the
17 objective is to create legislation that protects the
18 integrity and reliability of the electoral process.
19           It includes 870 pages of transcribed
20 testimony.  There were 13 invited witnesses plus two
21 resource witnesses, 36 public witnesses and 29 written
22 articles presented.  So it includes all the exhibits as
23 well, submitted by members during the 81st legislative
24 session on the Committee of the Whole, which totals 55
25 total exhibits.

32

1           At this time I move for introduction of
2 Exhibit No. 1 into the Committee of the Whole's records.
3           (Exhibit No. 1 marked)
4           CHAIRMAN DUNCAN:  Members, you've heard
5 the motion.  Is there any objection to the motion?
6           SEN. DAVIS:  Question.
7           CHAIRMAN DUNCAN:  Senator Davis, do you
8 have a question?
9           SEN. DAVIS:  Yes.
10           Senator Huffman, during the debate on the
11 Senate floor last session, a number of questions could
12 not be answered by some of the resource witnesses at the
13 moment that they were asked; and, instead, there was a
14 follow-up.  For example, the Secretary of State's office
15 and the Attorney General's office wrote follow-up
16 answers to some of the questions that they were not
17 prepared to ask during the hearing.  Does your motion in
18 writing include the inclusion of those written responses
19 that were provided to the Senate after the hearing took
20 place?
21           SEN. HUFFMAN:  I am not advised on that,
22 but I would certainly have no objection and would move
23 for all of that to be included in the record, because I
24 think it would certainly make it, you know, more
25 complete and certainly would be relevant.

CONSIDERATION OF SENATE BILL 14 1/25/2011

**33**

1 The record has been certified by Patsy
2 Spaw, the Secretary of the Senate, and so we might check
3 with her to see if that was done. If not, we could
4 certainly make sure that it was placed in Exhibit No. 1
5 as part of the record.
6 SEN. DAVIS: Thank you. I would
7 appreciate that.
8 CHAIRMAN DUNCAN: I suggest that it be
9 Exhibit 1A, if there are additional information, so that
10 it can be kept separate from what you are going to
11 introduce in your motion in writing as Exhibit 1.
12 SEN. HUFFMAN: Yes, sir.
13 CHAIRMAN DUNCAN: Okay. Is there any
14 objection to Exhibit 1 being included in the record?
15 All right. The Chair hears none. Exhibit
16 1 will be included in the record.
17 (Exhibit No. 1 admitted)
18 CHAIRMAN DUNCAN: All right. Sen. Van de
19 Putte.
20 SEN. VAN DE PUTTE: Thank you,
21 Mr. Chairman.
22 QUESTIONS FROM SENATE FLOOR
23 SEN. VAN DE PUTTE: Would the gentleman
24 yield, the author of the bill yield?
25 SEN. FRASER: I would yield.

**34**

1 SEN. VAN DE PUTTE: Thank you. Thank you,
2 Mr. Chairman.
3 And thank you, Senator Fraser.
4 Senator Fraser, this is kind of like a
5 dance where we have another song, another round, and so
6 we find ourselves with another year and this version of
7 the voter identification bill. And I wanted to ask you
8 a few questions.
9 Given the fact that the bill that was
10 debated during the 81st Legislature was a different
11 bill, can you tell me the model for the bill that was in
12 the 81st Legislature and the differences in what you
13 have proposed in this legislative session?
14 SEN. FRASER: Well, if you don't mind, the
15 bill before us today is Senate Bill 14, and I will
16 probably spend my time talking about that bill. The
17 bill you're addressing, obviously, didn't get through
18 the process. So I'm going to be addressing the comments
19 on Senate Bill 14 which is before us. So I would be
20 glad to describe it, if you would like.
21 SEN. VAN DE PUTTE: Well, my question has
22 to deal with -- I understand that since last we met,
23 there are two years and different court cases. And the
24 bill that was before this body last legislative session
25 was modeled on a Georgia law and the template. And

**35**

1 I understand it, this year's model is fashioned after
2 the Indiana law?
3 SEN. FRASER: And I think you actually
4 have made the point that I was going to make. Two years
5 have passed. Since that time, we've had, you know,
6 obviously, the confirmation by the Supreme Court on the
7 photo ID and then also the preclearance of the Georgia
8 bill by Dale Jays (phonetic).
9 So looking at, you know, the experience of
10 the bill in place, the simplicity of the photo ID, we
11 chose to go with that. And as you will remember, the
12 recommendation by President Carter and Secretary of
13 State Baker was, you know, the national photo ID, and
14 that's what we're attempting to implement.
15 SEN. VAN DE PUTTE: Thank you.
16 Mr. Chairman.
17 And a few other questions. With the
18 Carter-Baker Commission, they felt very strongly about
19 encouraging the maximum participation in voter and
20 suggested the type of strategies that we're using. But
21 the addendum for both gentlemen and the members of the
22 commission were that they, as I recall, and entered into
23 the record during last legislative session, was that the
24 conclusion of the commission was that we should not
25 implement the type of photo identification until you had

**36**

1 universal registration, and I believe that was one. But
2 given that or not, what I really wanted to ask you is --
3 SEN. FRASER: Hold on a second. I'm
4 sorry. I disagree with that. That is not what the
5 commission said. And if you would like to correct that,
6 but I disagree.
7 SEN. VAN DE PUTTE: The State of Georgia
8 is under two sections of the Voting Rights Act, as is
9 Texas. Is that correct?
10 SEN. FRASER: They are a Section 5 voting
11 rights state like Texas.
12 SEN. VAN DE PUTTE: And to your knowledge,
13 is the State of Indiana subject to Section 5 of the
14 Voting Rights Act?
15 SEN. FRASER: To my knowledge, they are
16 not.
17 SEN. VAN DE PUTTE: So Indiana would have
18 a different burden of proof under a legal document and a
19 legal challenge than the State of Georgia?
20 (Brief pause)
21 SEN. FRASER: I'm sorry. I was asking for
22 some data. Would you reask the question, please.
23 SEN. VAN DE PUTTE: The State of Indiana,
24 which your bill is modeled after, without two alternate
25 forms of identification; whereas, the Georgia bill that

KENNEDY REPORTING SERVICE, INC.
512.474.2233

CONSIDERATION OF SENATE BILL 14 1/25/2011

---

37

1 we talked about last legislative session had two --
2 certainly had a photo identification, but if the voter
3 was unable to produce a photo identification, they could
4 produce for the election judges two forms of
5 identification without, and it was utility bill and --
6 in fact, the things that you struck here.
7          But in Indiana that requirement is not
8 there, so we went with the Indiana bill.  But my
9 question is, Indiana is not subject to Section 5 of the
10 Voting Rights Act.  So their legal hurdle to the
11 Department of Justice challenge is very different than
12 what happened in the State of Georgia.  Is that correct?
13          SEN. FRASER:  The Indiana law has been
14 approved by the U.S. Supreme Court, the Georgia law was
15 precleared by the Department of Justice, and both of
16 those have gone through that challenge.
17          SEN. VAN de PUTTE:  Senator Fraser, when
18 this legislature passes the voter identification bill --
19 and there is no doubt that this bill will pass -- it
20 will have to proceed to the Department of Justice for
21 clearance?
22          SEN. FRASER:  As a Section 5 state, we are
23 subject to Section 5 rules.
24          SEN. VAN de PUTTE:  So, yes, it will
25 proceed to the Department of Justice?

---

38

1          SEN. FRASER:  We are a Section 5 voter
2 rights state, and we will be subject to those laws.
3          SEN. VAN de PUTTE:  And do you have any
4 concerns that a Section 5 state as Texas would offer to
5 the Department of Justice a voter identification bill
6 that mirrors a non-Section 5 state rather than something
7 that has already been upheld in the Georgia law, a
8 Section 5 state?
9          SEN. FRASER:  We are offering a bill that
10 has been approved by the U.S. Supreme Court.  And the
11 parameters that the Supreme Court set, we meet all of
12 those tests.
13          SEN. VAN de PUTTE:  However, in the
14 Indiana court and in the Supreme Court case on Indiana,
15 what they said was, the undue burden was -- did not be
16 demonstrative because they did not have the level of
17 minority voters, that was never a check point, because
18 they did not have to go through the Department of
19 Justice.  Is that correct?
20          SEN. FRASER:  I'm sorry.  I'm having
21 equipment failure here.  Just a second.
22          (Brief pause)
23          SEN. FRASER:  Senator, I'm sorry.  I'm
24 asking for data, backup data, because the information
25 that you're addressing, my information doesn't agree

---

39

1 with that, is that the Georgia law that I have in front
2 of me said it is a photo ID.  Do you have something that
3 shows differently?
4          SEN. VAN de PUTTE:  Yes.  In the Georgia
5 bill, you have to have a photo ID.  However --
6          SEN. FRASER:  I realize you're saying
7 that, but do you have -- you know, do you --
8          SEN. VAN de PUTTE:  The bill that you
9 introduced last year had the two alternate forms of ID,
10 which was exactly the Georgia bill.  We used the model
11 of the Georgia bill.
12          SEN. FRASER:  And that bill is not before
13 us today; Senate Bill 14 is before us.
14          SEN. VAN de PUTTE:  That's correct.  And
15 so my question is --
16          SEN. FRASER:  And I would ask you, did you
17 vote for that bill last year?
18          SEN. VAN de PUTTE:  No, sir, I didn't.
19          SEN. FRASER:  Okay.
20          SEN. VAN de PUTTE:  But my question is, do
21 you have any concerns that we will offer to the
22 Department of Justice a bill, a voter identification
23 bill that is modeled after a state law that does not
24 have to go through Section 5, rather than a Georgia
25 model which already has been proven and has been

---

40

1 affirmed, both in the court case and the Department of
2 Justice?  That was my question.  Do you have any concern
3 that we will have done all of this debate and work, and
4 certainly to ensure the ballot security, only to be shut
5 down at the Department of Justice, because we are a
6 Section 5 state and what we're offering in your bill is
7 not something that has been approved by the Department
8 of Justice?
9          SEN. FRASER:  I have no concern about
10 Senate Bill 14, both going before the U.S. Supreme Court
11 or going before the Department of Justice.
12          SEN. VAN de PUTTE:  Thank you, Senator
13 Fraser.  I wanted to ask a little bit of your thinking.
14 And in the bill that you have before us, the student
15 identifications were omitted from your list of
16 acceptable documentation.  And could you give me the
17 rationale why a student photo identification is not
18 acceptable form of identification?
19          SEN. FRASER:  The types of identification
20 we've included are one from a government entity that
21 would identify that person as who they are, that they
22 say they are, they're a valid voter and a citizen of the
23 United States, and these are the ones that we have
24 suggested that would be acceptable.
25          SEN. VAN de PUTTE:  So the rationale for

---

TX_00000066

CONSIDERATION OF SENATE BILL 14 1/25/2011

**41**

1 not having student identification cards on the list,
2 since you omitted them, is because they aren't issued by
3 a governmental entity?
4        SEN. FRASER:  I didn't say that.
5        SEN. VAN de PUTTE:  I'm sorry.  Can you
6 repeat your answer.
7        SEN. FRASER:  I said I did not say that.
8        SEN. VAN de PUTTE:  So why were the
9 student identifications -- you explained that the
10 student identifications were omitted from the list of
11 acceptable documentation, because it was not a
12 government entity.
13        SEN. FRASER:  The four types of
14 identification that we are offering up we believe are
15 less confusing, they're simpler for both voters and
16 election voters.  Everyone knows what they look like.
17 There is a standardization of those, and they all look
18 alike and it would be less confusing for the systems who
19 are accepting the voter IT.
20        SEN. VAN de PUTTE:  And, Senator Fraser,
21 one of the provisions in your bill also omits birth
22 certificates from the list of acceptable forms of
23 identification, even though that does come from
24 government entities.  And so why is it that birth
25 certificates were omitted?

**42**

1        SEN. FRASER:  This is requiring a photo
2 ID, current photo ID.
3        SEN. VAN de PUTTE:  Senator Fraser, are
4 there any provisions in the bill to accommodate a voter
5 that has a different address on their photo
6 identification and their voter registration card?
7        SEN. FRASER:  The Secretary of State is
8 here as a resource witness, and I'm sure they will be
9 glad to answer that.
10        SEN. VAN de PUTTE:  No, I'm not asking the
11 difference.  I'm asking, is there any provision in
12 Senate Bill 14?
13        SEN. FRASER:  It is not addressed, because
14 that is taken care of by the Secretary of State, that we
15 don't address that in the bill.  That would be by an
16 interpretation of rule of the Secretary of State.  They
17 will be here, and you can ask them that question.
18        SEN. VAN de PUTTE:  So also you would
19 prefer that we ask the Secretary of State what sort of
20 provision, since your bill is silent on different last
21 names?
22        SEN. FRASER:  Again, that's a question
23 that --
24        SEN. VAN de PUTTE:  So, for example, women
25 that got married?

**43**

1        SEN. FRASER:  We've actually got two
2 different -- you know, kind of an overlap here.  We've
3 got the Department of Public Safety that I believe
4 Senator Williams is going to be answering questions,
5 because that's his area.  And then we also have the
6 Secretary of State available as a resource that I think
7 you can ask that question.
8        SEN. VAN de PUTTE:  Senator Fraser, under
9 Senate Bill 14, your voters can cast a provisional
10 ballot.  Under the Indiana bill, that is set at a 10-day
11 cure.  Why is it that you chose a six-day cure?
12        SEN. FRASER:  And you'll remember, the
13 Georgia law is only 48 hours, two days.  They went 10
14 days; the Georgia law went two days.  We decided that
15 six days should be sufficient to come back.
16        SEN. VAN de PUTTE:  And as I understand
17 it, the Georgia law does have a 48, but they can use two
18 alternate forms of ID which are not in your bill.  So
19 what sort of --
20        SEN. FRASER:  I'm sorry.  You know, you
21 keep saying that.  You need to pull up the data to show
22 me that, please.
23        SEN. VAN de PUTTE:  So to prove their
24 provisional ballot is correct and the six-day cure, what
25 documentation does your bill have that is acceptable?

**44**

1        SEN. FRASER:  Photo ID.
2        SEN. VAN de PUTTE:  So only a photo
3 identification.  So they would have to --
4        SEN. FRASER:  The acceptable photo IDs
5 that are outlined in the bill would be an acceptable
6 form, yes.
7        SEN. VAN de PUTTE:  Senator Fraser, do you
8 know right now in the State of Texas, we're able to cast
9 provisional ballots?  That's correct, isn't it?
10        SEN. FRASER:  I'm sorry.  Ask that again.
11        SEN. VAN de PUTTE:  Current election law
12 allows Texas voters to cast a provisional ballot.  Is
13 that correct?
14        SEN. FRASER:  I'm sorry.  That is another
15 question I think you should ask the Secretary of State.
16 It is my belief that, but I'm sorry, I don't want to
17 answer that.  You can, if you don't mind, ask the
18 Secretary of State.
19        SEN. VAN de PUTTE:  Thank you, Senator.
20 Since it's based on Indiana law, do you believe that the
21 State of Texas has a greater minority population than
22 the State of Indiana?
23        SEN. FRASER:  I'm not advised.
24        SEN. VAN de PUTTE:  To your knowledge,
25 have any studies been done to determine if there has

KENNEDY REPORTING SERVICE, INC.
512.474.2233

CONSIDERATION OF SENATE BILL 14 1/25/2011

45

1 been, under current Texas voter laws, any impact that it
2 would have on affected class of Latino and
3 African-American voters?
4          SEN. FRASER:  The bill that I'm laying out
5 today is a model that has been approved by the U.S.
6 Supreme Court, it has been precleared by the Department
7 of Justice in Georgia.  It will deter fraud.  We're
8 providing free access of cards.  And, yes, we believe
9 this will protect confidence in election in making sure
10 only eligible voters are counted.
11          SEN. VAN de PUTTE:  Senator Fraser, on the
12 availability of free identification cards, is there a
13 means test, or what sort of proof do citizens have to
14 give to the Department of Public Safety to be able to
15 get a free identification card under your bill?
16          SEN. FRASER:  The Department of Public
17 Safety is here as a resources witness.  Senator Williams
18 is also here.  That's his area of expertise.  If you
19 have a question about that, if you would like, I will
20 yield to Senator Williams now or you can wait and ask
21 the DPS when it comes up.
22          SEN. VAN de PUTTE:  Well, right now the
23 DPS I don't think gives free IDs.  But in your bill,
24 what sort of process or documentation can voters use to
25 get a free identification card, in your bill?  What are

46

1 the --
2          SEN. FRASER:  If you would like I can
3 yield to Senator Williams or we can wait and have the
4 DPS.  Our instruction is the bill, is that they will
5 issue an ID card and they will not charge.  That is very
6 clear to the DPS.  And if you want to ask how that will
7 be done, they will be coming up, and you will be able to
8 ask that question.  Or if you would like for me to yield
9 to Senator Williams, we'll let him answer that.
10          SEN. VAN de PUTTE:  No, Senator.  Thank
11 you.  I appreciate this is just a different bill from
12 last legislative session, and I was trying to get at
13 least some of your thinking of why you went with a
14 different bill than last year, a more restrictive, a far
15 more restrictive bill than what we debated last
16 legislative session.  And I look forward to the
17 questions, I look forward to the testimony today, but I
18 don't have any other further questions.
19          And I'm sure some of my colleagues have
20 questions, both of the author of the bill and any of the
21 other senators that have certain sections that they have
22 got expertise on.
23          But thank you very much, Mr. Chairman.  I
24 don't have any other further questions.
25          CHAIRMAN DUNCAN:  Senator Watson?

47

1          SEN. WATSON:  Thank you, Mr. Chair.
2          Will the senator yield for a couple of
3 questions?  Oh, I'm sorry.
4          SEN. FRASER:  One second, please.  Are you
5 wanting me to yield?
6          SEN. WATSON:  Yes --
7          SEN. FRASER:  Hold on a second, please.
8          SEN. WATSON:  -- if you don't mind.
9          (Brief pause)
10          (Senator Whitmire speaking without mic)
11          SEN. FRASER:  Do you have the floor now?
12          (Senator Whitmire speaking without mic)
13          SEN. FRASER:  No, you're asking questions
14 over here.
15          (Senator Whitmire speaking without mic)
16          SEN. FRASER:  Making sure I get the
17 answers correct.
18          I will yield now.
19          SEN. WATSON:  Thank you, Chairman Fraser.
20          I want, if you don't mind, to ask about
21 the fiscal note for just a second.  The fiscal note that
22 was attached to your bill, Senate Bill 14, indicates
23 that the fiscal implication to the state is anticipated
24 to be $2 million.  Is that correct?
25          SEN. FRASER:  Could you hold one second.

48

1          SEN. WATSON:  Sure.
2          SEN. FRASER:  I need to pull the data
3 here.
4          (Brief pause)
5          SEN. FRASER:  Senator, I was just
6 verifying.  We spent a lot of time last night talking
7 about this.  I think you're aware that the HAVA funds
8 that come from the federal government, which I believe
9 are Help America Vote Institute, I guess it is, Help
10 America Vote, the HAVA, there are funds that come to
11 every state to the secretary of state.  We have a fund
12 that is setting in the Secretary of State's office that
13 would be more than sufficient to handle this.
14          In other states like Indiana and Georgia,
15 the HAVA funds have been used before.  We have requested
16 that those funds be available for this.  They advised us
17 back, until the passage of the bill, they can't approve
18 the funds.  But the assumption is that those funds are
19 before the Secretary of State, and they will be here at
20 some point.  You can ask them about those funds, the
21 parameters, but it is our belief that the HAVA funds
22 will be available for this and would offset the fiscal
23 note.
24          SEN. WATSON:  I appreciate that answer.
25 My question was, it's a $2 million fiscal note.  Right?

KENNEDY REPORTING SERVICE, INC.
512.474.2233

CONSIDERATION OF SENATE BILL 14 1/25/2011

49

1          SEN. FRASER:  Right now the fiscal note
2 that was delivered is $2 million, yes.
3          SEN. WATSON:  Okay.  And that's what I
4 really wanted to ask about.  And I'll talk about the
5 fact that y'all want to take some federal funds, here in
6 a second.  But first of all, last session when we were
7 talking about the fiscal note, my memory was and is,
8 that at the beginning of the session when you filed the
9 bill last session, there was a zero fiscal note, and
10 then that got changed to the same as it is right now, a
11 $2 million fiscal note for voter awareness, and it was
12 exclusively for voter awareness in the second fiscal
13 note.
14          Can you tell me what analysis has gone
15 into coming up with how much money should be spent on
16 voter awareness and voter education regarding this bill,
17 in order to get to that $2 million?
18          SEN. FRASER:  I think the analysis on this
19 comes from the Secretary of State's office, and I'm sure
20 they will be glad to answer your question.  Two years
21 ago before we started, we advised them that we needed
22 voter education.  If you remember in the bill, we
23 discussed in that when we were discussing that, that we
24 needed to have an appropriation for that.
25          I think Senator Ogden stood up and talked

50

1 about the fact that they would be willing to make sure
2 that there was money there.  Since then, we have been
3 made aware that the Secretary of State not only I think
4 has a plan for doing that but also a plan for requesting
5 the funds from HAVA.
6          SEN. WATSON:  Well, I'll ask about that.
7 So, then, let me ask you another question.  You
8 indicated in your opening comments that -- and I've read
9 your legislation -- under this bill, everyone gets a
10 free identification card if they come in and ask for a
11 free identification card, they show a voter registration
12 card and/or they apply for a registration card.  That
13 $2 million that you've just talked about doesn't include
14 the cost, any of the cost for providing these free
15 identification cards, does it?
16          SEN. FRASER:  I'm sorry.  I was doing
17 something else.  Would you ask that last question again,
18 please.
19          SEN. WATSON:  Does the $2 million in the
20 fiscal note include any of the cost of providing free
21 identification cards?
22          SEN. FRASER:  To my knowledge, it does
23 not.
24          SEN. WATSON:  And, in fact, there is no
25 means test and your bill forbids DPS from collecting a

51

1 fee.  If any eligible voter comes in or submits a
2 registration application, they can then avoid what is
3 the typical $15 fee?
4          SEN. FRASER:  Senator, have you seen the
5 numbers that have been collected by DPS on the number of
6 eligible voters that have registered since 2006, the
7 ones that registered with a driver's license or a
8 driver's license and a social security card that
9 identified the number of people registering --
10          SEN. WATSON:  Yes.
11          SEN. FRASER:  -- that already had
12 identification?  So the question you're asking is, the
13 universe we're talking about we believe is very, very,
14 very small.  In fact, the Carter Commission, after the
15 implementation in both Indiana and Georgia, and actually
16 Mississippi they looked at, they found that only 1.2
17 percent of people did not have, already have a photo ID
18 available, so the universe of this, so the
19 question you're asking --
20          SEN. WATSON:  Then why don't we talk about
21 specific numbers.  With you talking about those numbers,
22 you're probably aware that in 2007, House Bill 218 was
23 offered.  It was referred to the committee, the Senate
24 Committee on State Affairs.  And in that one, which was
25 HB 218, DPS talked specifically about identification

52

1 cards and it put a fiscal note, it believed that it
2 would be $1.3 million per biennium or $4 million every
3 six years out of the highway fund.  Were you familiar
4 with that?
5          SEN. FRASER:  Senator, you're getting into
6 an area that's outside of my area of expertise.  We have
7 the person that's in charge of that.  You've got two
8 choices.  Either you can ask that question of DPS as a
9 resource when it comes up, or I will yield to Senator
10 Williams right now and he can answer your question.
11          SEN. WATSON:  Senator, if you would answer
12 that question.
13          SEN. FRASER:  I now yield to Senator
14 Williams.
15          SEN. WILLIAMS:  I just want to be sure
16 I've got your question right.
17          SEN. WATSON:  Sure.  Since we're talking
18 about numbers here -- and I'm trying to get a feel for
19 what the cost of this is -- in House Bill 218 in the
20 2007 -- the 80th legislative session, there was a bill
21 filed that dealt with the provision of identification
22 cards.  And in that one, the LBB indicated the fiscal
23 note would be $1.3 million or $4 million every year
24 coming out of the highway fund.  Are you familiar with
25 that?

CONSIDERATION OF SENATE BILL 14 1/25/2011

53

1        SEN. WILLIAMS:  I'm not familiar with
2 House Bill 218.  But, you know, I take what you're
3 saying --
4        SEN. WATSON:  Sure.  Okay.
5        SEN. WILLIAMS:  -- at value.
6        SEN. WATSON:  And since I anticipate that
7 there would be deferral to you on the next question,
8 too, let me just go ahead and ask that.  Last session,
9 in the 81st session, there was a bill by -- it was HB
10 2335 that indicated, similar to what Senate Bill 14 does
11 not, that there couldn't be a fee charged for issuing a
12 document that someone might use as proof of their
13 identification for purposes of voting.  In the fiscal
14 note there, the LBB singled out DPS identification
15 cards, which is what we're talking about here, and
16 assumed that if everyone used those, the number they
17 came up in that fiscal note was $47 million over five
18 years.  Are you familiar with that one?
19        SEN. WILLIAMS:  I'm not familiar with
20 that --
21        SEN. WATSON:  Okay.
22        SEN. WILLIAMS:  -- particular bill.  But
23 what I can tell you is that the cost to the Department
24 of Public Safety for issuing an ID card is about $1.67.
25 It's a very small amount of money.  So $47 million

54

1 sounds -- that's a lot of IDs at a buck 67 apiece.  And
2 so what I would say is that when I discussed this with
3 the Department of Public Safety recently -- and they'll
4 be here to testify about this in detail more -- I think
5 that it would be difficult for them to determine now how
6 many people might take advantage of the free ID card.  I
7 think it's probably not possible for them to estimate
8 that.
9        But the cost, I think we're all pretty
10 comfortable that it would be fairly negligible.  When
11 you look at the universe of registered voters, which is
12 somewhere around 13 million people, I think, and you've
13 got about 15 million people that have either a driver's
14 license -- and I can get you the exact numbers.  I have
15 them here -- there are a lot of people that already --
16        SEN. WATSON:  Right.
17        SEN. WILLIAMS:  -- have state ID cards.
18 And a lot of the folks that don't have those would be
19 using a mail-in ballot, and there is no requirement to
20 present any kind of photo identification for a mail-in
21 ballot, and this legislative doesn't touch that.  So we
22 think that the chances that there's going to be somebody
23 who is going to want to avail themself, there will be
24 some, but it's going to be a very small number.
25        SEN. WATSON:  Of course, what I'm

55

1 attempting to do is not engage in that as I vote no
2 this.  What I've tried to go is go back and find out
3 what the LBB, which we rely upon for fiscal notes, has
4 actually said about these sorts of things, with previous
5 legislation that has addressed this, as opposed to
6 speculation.
7        SEN. WILLIAMS:  And, Senator Watson, I
8 understand, and there are a lot of things -- I'm not
9 familiar with those bills.  And what I would tell you is
10 that each -- the LBB comes up with their methodology
11 based on what each bill's requirements are.  And not
12 being familiar with that --
13        SEN. WATSON:  Sure.
14        SEN. WILLIAMS:  -- I can't tell you what
15 the difference between that and this is.  But we did
16 specifically sit down and talk to DPS, and they really
17 don't expect that this is going to be any big burden on
18 the agency that they're not going to be able to handle.
19        SEN. WATSON:  Thank you for your answer.
20        SEN. WILLIAMS:  Yes.
21        SEN. WATSON:  I have a couple more
22 questions for Senator Fraser, if that would be all
23 right.
24        SEN. FRASER:  I'm back with you.
25        SEN. WATSON:  Okay.  Great!  Thank you,

56

1 Senator.
2        Would the HAVA money that -- first of all,
3 you're familiar that in the base budget that the Senate
4 has but out, the $2 million for this biennium for voter
5 education has been explicitly cut.  You're familiar with
6 that.  Right?
7        SEN. FRASER:  I don't think the word
8 "explicitly cut," I don't think it's been addressed.
9        SEN. WATSON:  Well, it's been struck
10 through in the base budget.  Did you know that?
11        SEN. FRASER:  I'm not advised.
12        SEN. WATSON:  Okay.  Are you also familiar
13 that in this budget it calls for a $358 million cut to
14 the DPS budget?
15        SEN. FRASER:  Again, I'm not on Finance;
16 I'm not sure you're on Finance.  And so, no, I
17 haven't -- the base bill is the starting point of
18 discussion, so I'm not advised.
19        SEN. WATSON:  All right.  So you're not
20 advised whether, out of that 9.5 percent of the cut
21 comes in regulatory and the licensing area for DPS?
22        SEN. FRASER:  Well, and as you know, as we
23 start the session, that's a draft budget as a starting
24 point.  We're a long ways from that being concluded.  So
25 the answer is no, I'm not aware.

CONSIDERATION OF SENATE BILL 14 1/25/2011

57

1    SEN. WATSON:  Thank you very much.

2    Thank you, Mr. Chairman.

3    SEN. ELTIFE:  Senator Whitmire, what

4 purpose do you rise?

5    SEN. WHITMIRE:  Will the gentleman yield?

6    SEN. ELTIFE:  Senator Fraser yield?

7    SEN. FRASER:  Be glad to.

8    SEN. WHITMIRE:  Senator Fraser, a couple

9 of questions about the implementation of your

10 legislation if it passes.  First off, I have to make

11 this observation:  Have you ever seen the gallery so

12 empty when the Legislature is considering something

13 that's been given such a high billing as Senator Duncan

14 was making yesterday when he asked us to go to Committee

15 of the Whole?  I mean, how timely this was and how

16 critical it was?  The Governor has made it an emergency,

17 and I don't think I've -- I don't know if there's 20

18 people in the gallery.  If it's so important, can you

19 explain to me why the gallery is empty --

20    SEN. FRASER:  I am not advised.

21    SEN. WHITMIRE:  -- based on --

22    SEN. FRASER:  I'm concentrating on the

23 action on the floor rather than looking up and seeing

24 who is in the gallery.

25    SEN. WHITMIRE:  Well, but it's an

58

1 indication, if the public is really concerned,

2 particularly based on your polling data, which I'm sure

3 you would join with, we don't govern in the state by

4 polls normally, do we?

5    SEN. FRASER:  Well, other than I find it

6 interesting, whenever they asked the people of your

7 district that you represent --

8    SEN. WHITMIRE:  Sure.

9    SEN. FRASER:  -- of whether they're in

10 favor, the polls continue to show that the public, both

11 Republican and Democrat --

12    SEN. WHITMIRE:  Well --

13    SEN. FRASER:  -- you say, "Will you

14 support a person voting with a photo ID?"

15    SEN. WHITMIRE:  And did you include in

16 that question and would you be for it if it would

17 disenfranchise senior citizens, students or others?  You

18 and I know it's all in how you ask the question.  In

19 fact, the way you're stating it, I'm surprised you

20 didn't get 100 percent.  If you ask people, "Are you

21 against vote fraud?" I would assume you would get

22 100 percent.

23    SEN. FRASER:  Here's the question --

24 here's the question --

25    SEN. WHITMIRE:  It's the unintended

59

1 consequences that we're concerned about.

2    SEN. FRASER:  "Do you favor or oppose

3 requiring a photo ID before a person is allowed to

4 vote?"  Pretty straightforward.

5    SEN. WHITMIRE:  I'm surprised you didn't

6 get 100 percent if you include "and stop fraud."  It's

7 when you add into it, "if it meant disenfranchising

8 senior citizens," and then I think you would have a

9 significant drop.

10    The bottom line is, Senator Fraser, and

11 we'll have -- and let's have this ballot:  Would you

12 concede that we're all, all 31 of us are against

13 election fraud?

14    SEN. FRASER:  I will not concede that

15 until after the vote, and we're assuming the ones that

16 vote for it are --

17    SEN. WHITMIRE:  Well, let me go ahead and

18 speak for the 12 of us that are probably going to vote

19 "No."  We're all against election fraud.  And I would

20 suggest we've actually seen an election process since we

21 took this up two years ago.  Let's look at the most

22 recent election.  What fraudulent activity this past

23 November are you so concerned about?  I think it's the

24 election -- and maybe I should be more concerned.

25    If you look at the election results, it

60

1 was an overwhelming victorious day for Republicans in

2 November.  You replaced 34 Democrats in the house.  Now,

3 are you suggesting there was significant fraud on that

4 election day?

5    SEN. FRASER:  Senator, all we're trying to

6 do with this bill is that when you walk into the polling

7 place and represent that you are John Whitmire --

8    SEN. WHITMIRE:  Sure.

9    SEN. FRASER:  -- that you can prove you

10 are who you say you are before you vote, it's a very

11 simple concept.

12    SEN. WHITMIRE:  Except, Senator Fraser,

13 the unintended consequences that you're going to

14 disenfranchise people that have not been able to acquire

15 these cards, and that's what I want to spend a few

16 moments on.  Walk me through a real life example of how

17 a senior citizen in my district is going to acquire that

18 card.  Do they do it by mail?  Do they have to do it in

19 person?  What's the process?

20    SEN. FRASER:  Senior citizens over --

21    SEN. WHITMIRE:  Give me a real life.

22 Don't say, "We're going to provide it."  Let's break

23 down what an 86-year-old lady in my district, never been

24 required to have one, how is she going to get her card?

25    SEN. FRASER:  She would vote under current

KENNEDY REPORTING SERVICE, INC.
512.474.2233

CONSIDERATION OF SENATE BILL 14  1/25/2011

61

1 law because she's exempt.

2          SEN. WHITMIRE:  You've given her an

3 exemption.  Does she have to prove, that day, her age?

4 I mean, Troy --

5          SEN. FRASER:  You can ask that question of

6 the Secretary of State.  But I'm assuming --

7          SEN. WHITMIRE:  Well, you're the author.

8 And let me just tell you, like I said, we're all against

9 fraud.  As elected officials, it's in our own personal

10 self-interest to have honest elections with the highest

11 integrity.  We're doing it for the people that we

12 represent as well.  So that's not the issue, are we for

13 or against fraud?  It's the implementation, it's the

14 disenfranchisement, Troy, that we're fighting for and

15 what we've been fighting for, for the last couple of

16 years.  Tell me how we're going to address the

17 unintended consequences of someone not being able to

18 vote on election day, because I know you don't want

19 that.  And I --

20          SEN. FRASER:  I was sent down here by the

21 people of my district to represent their views.  The

22 polling of my district shows that it's almost 90 percent

23 of the people in favor of it.

24          SEN. WHITMIRE:  Okay.

25          SEN. FRASER:  The district that you

62

1 represent, I think if you poll in that district -- and I

2 have used some polling that shows close to the same

3 number -- that say that when they're asked, "Do you

4 think you should have to show a photo ID?" and they say

5 yes.

6          SEN. WHITMIRE:  And my --

7          SEN. FRASER:  So my answer is, we need to

8 pass this, because the people in our district --

9          SEN. WHITMIRE:  Well --

10          SEN. FRASER:  -- believe that they should

11 show a photo ID.

12          SEN. WHITMIRE:  First of all, I don't

13 govern by poll.  And if I was at a town hall meeting and

14 I walked through, after they've said they're for voter

15 ID, then I start talking about the implementation of it,

16 they start being just as concerned as I am.  So I want

17 to know how people are going to acquire these cards.

18 Forget the 86-year-old.  Let's go to a 56-year- old

19 person.  How do they acquire the card?  Are you familiar

20 in Houston it takes two to three hours to get a driver's

21 license at the DPS office?

22          SEN. FRASER:  John, I was about to ask

23 you, you know, ask you your age, but I know your age.

24 We're both 61.  A 61-year-old person in our age group,

25 is it going to be a real problem for you and I to drive

63

1 down to the DPS to get --

2          SEN. WHITMIRE:  Well, see, that's what's

3 so sad about this discussion.  You're not putting

4 yourself in the shoes of someone who doesn't have the

5 means that you and I have, they have to depend on

6 someone else for transportation.  They may not have any

7 resources.  How is a 56-year-old person in Houston,

8 Texas, going to acquire this card --

9          SEN. FRASER:  We are not changing --

10          SEN. WHITMIRE:  -- no driver's license.

11          SEN. FRASER:  We are not changing the

12 mail-in ballot.  And if someone has a reason that they

13 need to vote by mail --

14          SEN. WHITMIRE:  On a mail-in ballot, how

15 do you prove -- that's early voting.  How do you verify

16 who you are in that instance?

17          SEN. FRASER:  I'm sure the Secretary of

18 State would be glad to answer that.

19          SEN. WHITMIRE:  Okay.  But that's not what

20 we're talking about.  We're talking about on election

21 day, a person in Houston wants to vote, how do they

22 acquire the voter ID, photo ID?

23          SEN. FRASER:  The DPS and the Secretary of

24 State will both be here, and I'm sure they will be glad

25 to answer that question.

64

1          SEN. WHITMIRE:  Troy, you're proposing

2 this.  And before we go forward, I would like to know,

3 do you have to go to the DPS office?  Do you order it by

4 mail?  That's a critical concern of all of us that are

5 voting "No" against this bill.  And I don't --

6          SEN. FRASER:  Senator, did --

7          SEN. WHITMIRE:  -- think you want to

8 disenfranchise anybody, but I'm afraid that there's

9 unintended consequences that you have not envisioned.

10          SEN. FRASER:  Did another senator advise

11 you of what you had to do go down to the DPS office

12 to get your driver's license?

13          SEN. WHITMIRE:  Well, we're not talking

14 about me.  We're fortunate; you and I are fortunate.  We

15 probably don't have to wait in lines.  In Houston.

16 Texas --

17          SEN. FRASER:  There are 15 million drivers

18 in Texas.  Of the 31 Senate districts, I think that

19 would mean there's about 500,000, I believe, in my

20 district.  And I don't think I've got a one of them that

21 I instructed on how to go down and get a photo ID.

22          SEN. WHITMIRE:  Okay.  Well, let me just

23 tell you about the DPS operations in Harris County.  A

24 working person cannot go by and get their license

25 renewed on their lunch hour, before work or after work,

CONSIDERATION OF SENATE BILL 14 1/25/2011

---

65

1 because literally it's a two to three-hour wait.  So how
2 do you add this new group of participants that have to
3 show up at a DPS office to get a voter ID.
4              SEN. FRASER:  We have someone coming from
5 the DPS.  I think you can ask that question or
6 I'll yield to Senator Williams.
7              SEN. WHITMIRE:  I'm not sure if they're --
8 I think you as the sponsor ought to explain that.
9              SEN. FRASER:  The bill that I'm laying out
10 is very clear, that it complies with the Supreme Court
11 ramification and it also has been cleared by the
12 Department of Justice.
13              SEN. WHITMIRE:  Okay.  So you don't know.
14 Is that your answer?
15              SEN. FRASER:  I said we've got resource
16 witnesses that are coming.  I'm not an expert in that
17 area.  We do have an expert coming, and they'll be glad
18 to answer your question.
19              SEN. WHITMIRE:  The DPS folks will have to
20 publicly say at Gessner and I-10 or at Tacoma and 290,
21 two sites in my district -- and I complained and asked
22 for more resources -- it's a two- to three-hour wait,
23 Governor Dewhurst, to get your driver's license renewed.
24 So you can't even go over there on your lunch hour and
25 get a driver's license, and now you want the folks to go

---

66

1 over there and, I assume, wait in line to get a voter
2 ID.
3              Let me ask you another question about the
4 education that you're going to provide.  Is it going to
5 be done in bilingual materials with a --
6              SEN. FRASER:  I'm sure the Secretary of
7 State will be glad to answer that question.
8              SEN. WHITMIRE:  Well, you're the sponsor.
9              SEN. FRASER:  And as the sponsor, I
10 invited the Secretary of State as a resource witness, to
11 make sure we have someone that knows the answer to that
12 particular question.
13              SEN. WHITMIRE:  One also is, your bill
14 provides same-day registration.  Now, according to you,
15 you're going to have a fail-safe system that you'll know
16 who is showing up to vote.  Are you open to the idea
17 that someone who has gotten motivated in the last 30
18 days, maybe the days just leading up to the election,
19 with this secure form of ID can show up on election day,
20 prove who they are and ask to vote?
21              SEN. FRASER:  The bill does not provide
22 for same-day registration.
23              SEN. WHITMIRE:  I'm sorry.  What?
24              SEN. FRASER:  The bill does not provide
25 for same-day registration.

---

67

1              SEN. WHITMIRE:  Would you be amenable to
2 us proposing it and --
3              SEN. FRASER:  The bill does not provide,
4 as I -- I filed the bill, and the bill does not provide
5 for same-day registration.
6              SEN. WHITMIRE:  Okay.  Thank you for your
7 answers.
8              CHAIRMAN DUNCAN:  Senator Uresti.
9              SEN. URESTI:  Thank you, Mr. Chairman.
10              Would the gentleman yield for some
11 questions?
12              SEN. FRASER:  I would love to yield.
13              SEN. URESTI:  Thank you, Senator Fraser.
14 I want to ask you a few questions, kind of to follow on
15 what Dean Whitmire asked you specifically regarding the
16 DPS offices.  And I don't know if they're here yet or
17 not.  But particularly about my district, you know how
18 large it is.  It goes from San Antonio all the way to
19 El Paso, and it has 23 counties, as I'm sure you're
20 aware, Senator Fraser.
21              And one of the concerns that I have is
22 that between here and El Paso -- and you may know this.
23 If not, I would like to let you know and the other
24 members know -- well, let me ask you this:  Do you know
25 how many of my 23 counties do not have a DPS office?

---

68

1              SEN. FRASER:  Senator, you know, the start
2 of your description of this, I'm very familiar with the
3 district, because I used to represent a lot of it.  And
4 that area between -- going out toward El Paso, I've had
5 that when I was a state rep.  It was in my state
6 representative district.  And then part of your other
7 district was when I was a senator.  So, yes, I'm very
8 familiar with it.
9              The answer to your question that you're
10 asking about driver's license location, we'll have
11 somebody from DPS here, and I'm sure they'll be glad to
12 answer that question for you.
13              SEN. URESTI:  Well, in the meantime,
14 Senator Fraser, let me let you and the members know.
15 There are eight counties in my district out of the 23
16 that do not have a DPS office.  Loving County has no
17 office, Crockett County, Hudspeth County, Jeff Davis
18 County, Kinney County, Real County -- we had some good
19 folks here yesterday representing Real County -- and
20 Terrell County have their offices temporarily closed.
21 And, Senator Fraser, do you know how many people live in
22 those counties?  There are 47,000 people that live in
23 those counties in my district that don't have a DPS
24 office.
25              SEN. FRASER:  Do you know how many in

---

TX_00000073

CONSIDERATION OF SENATE BILL 14 1/25/2011

---

69

1 those counties drive that have a license?

2          SEN. URESTI:  No, I don't.  Do you know,

3 Senator?

4          SEN. FRASER:  I don't, no.  I have been

5 out in those counties and I see people driving.  I'm

6 assuming they have a driver's license.

7          SEN. URESTI:  Well, it makes it even more

8 difficult if they don't have a driver's license and they

9 need to get a driver's license or a photo ID to vote.

10 How are they going to drive long distances in order to

11 retrieve that -- or obtain that ID?

12          SEN. FRASER:  Again, the data we've been

13 shown is that people registered to vote -- and I guess I

14 would like to look in your area -- but about 90 percent

15 of the people that are coming in show their driver's

16 license when they register to vote.

17          You know, yes, there's -- it looks like

18 there's a lot of people or, you know, 47,000, but I'm

19 assuming that the bulk of those, probably a lot of them

20 have IDs.

21          SEN. URESTI:  Well, that's an assumption,

22 Senator Fraser, that you're making that I don't have the

23 luxury of making on behalf of those 47,000 people.  But

24 in addition to that, Senator Fraser and members, there's

25 another 70,000, another 70,000 constituents in my

---

70

1 district that have access to only partial or sporadic

2 service; for example, Senator Fraser, the first Tuesday

3 of each month from 9:00 to 4:00.  So they have one day a

4 month, members, to go and get an ID, and that's between

5 the hours of 9:00 to 4:00.

6          Well, if you can't get off of work that

7 one month -- that one Tuesday and that's the only day

8 it's open, what are my constituents supposed to do,

9 Senator Fraser?

10          SEN. FRASER:  I think that's probably a

11 question you would want to ask the DPS.  Or, if you

12 would like, I will yield to Senator Williams.

13          SEN. URESTI:  But this isn't their bill;

14 this is your bill, Senator Fraser.

15          SEN. FRASER:  And that's the reason I

16 bring in, you know, knowledgeable witnesses, expert

17 witnesses that can answer these questions.  We have

18 someone from DPS that will be here.  Or Senator

19 Williams, that's in the area of his committee.

20          SEN. URESTI:  So they're going to answer

21 my question as to what should my constituents do if they

22 can't get off of work that one Tuesday of the month in

23 order to get their ID to vote?  That's what you're

24 saying, they're going to answer that question?

25          SEN. FRASER:  You'll just have to ask

---

71

1 them.

2          SEN. URESTI:  This is your bill, Senator

3 Fraser.  I'm asking you, because I need to go back to my

4 district and tell them that they have to get a photo ID

5 in order to vote.  And their first question to me is

6 going to be, "Well, Senator Uresti, you know that our

7 DPS offices are closed," or "We have no DPS office in

8 our county," or "It's only open on one Tuesday a month."

9 What am I supposed to do, Sen. Uresti?

10          SEN. FRASER:  Again, the DPS will be here.

11 You can outline the problem, and you can outline the

12 problem with Senator Williams, and you're free to ask

13 them those questions.

14          SEN. URESTI:  Sen. Fraser, in addition to

15 those counties that have no DPS offices, many of my

16 constituents in several other counties are going to have

17 to travel long distances in order to get an ID.  For

18 example, my constituents in Crockett County, Ozona, will

19 have to travel 163 miles round trip to San Angelo to get

20 to the nearest DPS office.  And if you live in Sanderson

21 in Terrell County, you will have to travel 170 miles

22 round trip to get to Fort Stockton.  If you live in

23 Sierra Blanca in Hudspeth County, you have to travel

24 176 miles to get to El Paso in order to get to the DPS

25 office.  Did you know that, Sen. Fraser?

---

72

1          SEN. FRASER:  I'm very aware of that,

2 that, you know, the district I represented, there were

3 bus routes that were 80 to 90 miles each way for kids to

4 attend public school, because the people lived out in

5 the country.

6          SEN. URESTI:  And would you agree with me,

7 then, that that's going to be a challenge for those

8 folks?

9          SEN. FRASER:  We're not changing the early

10 voting mail-in ballot rules, and that will still be an

11 option for people.

12          SEN. URESTI:  So they don't need an ID to

13 vote by mail?

14          SEN. FRASER:  By mail?  Again, you can ask

15 the Secretary of State.  We're not addressing the

16 mail-in ballots.  The Secretary of State will be here.

17 Someone from their office, you can ask that question.

18          SEN. URESTI:  Well, let me just mention a

19 few more of my counties.  If you live in Van Horn in

20 Culberson County, you have to travel 200 miles round

21 trip to Marfa, which is the nearest DPS office.  If you

22 live in Pecos, which is in Reeves County, you have to

23 travel 143 miles to Fort Stockton.  If you live in

24 Rocksprings in Edwards County, it's 152 miles round trip

25 to Del Rio, Sen. Fraser.  And finally, if you live in

---

CONSIDERATION OF SENATE BILL 14 1/25/2011

**73**

1 Medina, which is in Hondo, if you live in Hondo, which
2 is in Medina County, you have to travel 84 miles.
3          And so again my question; Sen. Fraser --
4 if you can't answer it, just let me know -- what am I
5 supposed to tell my constituents -- because this is your
6 bill; it's not my bill -- how are they supposed to get
7 their Texas ID if their DPS office is --
8          SEN. FRASER:  Senator, if I were you, when
9 the DPS comes up, I would ask them questions and say,
10 "Is there a way that we could do something like a
11 temporary van coming through to accommodate these
12 people?"  And if I were the senator from that area, that
13 probably would be a question I would ask the DPS.  But
14 again, they're coming forward, and that's a question I
15 think that is appropriate of the DPS of, you know, "How
16 do we make sure that we accommodate those people?"
17          SEN. URESTI:  Well, it's a great
18 suggestion, Senator Fraser.  But what if DPS says, "We
19 can't do that.  It's not in the budget, the $2 million
20 that we're being allocated"?  So then what do I tell my
21 constituents?
22          SEN. FRASER:  Well, you're assuming the
23 answer before you ask the question of the DPS.
24          SEN. URESTI:  Well, you're assuming that
25 they're going to say that they will be able to do it.

**74**

1          SEN. FRASER:  No.  I'm assuming that the
2 DPS is going to come up and you'll have the opportunity
3 to ask them.
4          SEN. URESTI:  Okay.  So then let's assume
5 the DPS spokesperson says, "Great idea that Senator
6 Fraser has.  We can do that," there's going to be a cost
7 associated with that.  Isn't that correct?  That's not
8 included in the fiscal note of $2 million?
9          SEN. FRASER:  Again, I'm not advised, I
10 think the DPS could advise you on that, or
11 Sen. Williams.
12          SEN. URESTI:  Do we know when they're
13 going to be available to answer or --
14          SEN. FRASER:  I think they're on hand.
15 And as soon as we complete these questioning, I think
16 we'll going to bring -- you know, as soon as we start
17 the -- well, I think that the plan -- I'm not speaking
18 for the Chair, but I believe we're going to allow
19 questions from members, then we're going to have invited
20 guests.  And then once we start the public testimony,
21 they would be ready to come up, and I think they'll
22 answer any questions you've got.
23          SEN. URESTI:  Senator Fraser, let me ask
24 you a few more questions, if I may, please.  And I want
25 to be clear.  So as I understand it, in order to vote

**75**

1 with your bill, if your bill passes, you can have a
2 voter registration card and a Texas ID or a driver's
3 license, and you're able to vote with both of those
4 documents.  Correct?
5          SEN. FRASER:  Actually, you don't -- if
6 you go in and you're on the voter roll and you have a
7 driver's license, they'll allow you to vote, because I
8 know that's -- you know, I do that now.
9          SEN. URESTI:  So you don't need your voter
10 registration card, is my real question?  If you have a
11 valid Texas ID or a valid Texas driver's license, then
12 you do not need --
13          SEN. FRASER:  I think probably if you'll
14 ask the Secretary of State.  But my understanding is
15 that you just have to identify yourself with a photo.
16 And if you're on the voter roll and you're at the
17 correct voting location, you live in that precinct and
18 you're on that roll and you show them your ID, I believe
19 you'll be allowed to vote.
20          SEN. URESTI:  And that's my question, but
21 I want to be specific about it.  So if I have a valid
22 photo ID or a valid Texas driver's license and I'm on
23 the rolls, then I do not need a voter registration card.
24 Correct?
25          SEN. FRASER:  To my understanding, the

**76**

1 answer is yes.  But I still think I would ask that
2 question of the secretary of State.
3          SEN. URESTI:  Well, I'm pretty sure that's
4 correct.  That's what I read.  Then why do we need a
5 voter registration card, then?  Why are we going to need
6 voter registration cards after your bill passes?
7          SEN. FRASER:  Good question.  Why don't
8 you ask that of the Secretary of State.  It might be
9 a -- you could offer that as a cost-saving measure.
10          SEN. URESTI:  But it's your bill, Senator
11 Fraser.  I mean --
12          SEN. FRASER:  All my bill is addressing is
13 the photo identification when you vote.  You know,
14 Carlos, when you walk in and they say, "Senator Uresti,
15 you know, we'll need some identification," and even
16 though you're on the roll, you're going to have to show
17 a photo ID.
18          SEN. URESTI:  And that's correct, and I
19 agree with you, Senator Fraser.  But the result will be,
20 you do not need your voter registration card, then?
21          SEN. FRASER:  That is my understanding.
22 But, again, I would ask the Secretary of State.
23          SEN. URESTI:  Okay.  That's all the
24 question I have for now, Mr. Chairman.
25          Thank you, Senator Fraser.

CONSIDERATION OF SENATE BILL 14 1/25/2011

77

1          CHAIRMAN DUNCAN:  Thank you, Senator.
2    Senator Gallegos.
3          SEN. GALLEGOS:  Senator Fraser, the
4    questions that you're being asked and are asking us to
5    wait for resource witnesses, I'm concerned that we're
6    not getting answers from the author of the bill.  Now,
7    Senator Huffman just showed us a box with testimony and
8    questions and supposedly answers that were asked two
9    years ago.  And a lot of the questions that you're
10   referring to that we get answers from resource witnesses
11   weren't answered at that time.
12          I mean, we just want an assurance here
13   that whatever was in that box that Senator Huffman had
14   did not have all the questions answered.  I heard what
15   she told Senator Davis, but a lot of the questions that
16   you're being asked today were the same questions that
17   were asked two years ago and have never been answered.
18          SEN. FRASER:  Senator, I stayed up very
19   late last night reading the deposition of the questions
20   that were asked, that you asked me last year, the
21   answers.  And I guess if you're concerned about that,
22   maybe you should get that deposition and you read it and
23   that way you can feel more comfortable about what was
24   asked and what was answered.  Have you read the
25   deposition?

78

1          SEN. GALLEGOS:  There will be plenty of
2    time for that.  But I'm just asking you, as the author
3    of the bill.  You know, I mean, you are laying it out,
4    and you're trying to explain it.  And you're asking us
5    to ask resource witnesses on questions, especially the
6    questions that Senator Uresti had.  And it concerns me
7    that before we even, you know, lay it out and go forward
8    with a bill, that the people that are here listening, at
9    least they have the right to -- they leave, they have
10   the right to know these questions, especially those
11   questions that Senator Uresti just got through asking
12   you.  And it concerns me that we cannot get answers at
13   the time that the bill is laid out, before we even go
14   forward with the witnesses.  And that just concerns me,
15   that we're not getting answers.
16          SEN. FRASER:  I think you can take a lot
17   of comfort in the fact that we will not ask you to vote
18   for the bill until we bring up an expert witness and you
19   will be allowed to ask those question and get the answer
20   you're looking for.
21          SEN. GALLEGOS:  Well, I mean, we did that
22   two years ago.  And some of the questions that the box
23   that Senator Huffman had still doesn't have answers in
24   that box that she had that's going to be introduced as
25   Exhibit No. 1.

79

1          SEN. FRASER:  Have you read all the data
2    that was in the box?
3          SEN. GALLEGOS:  I have not read it; I have
4    not read it.  But, you know, I would think that,
5    especially some of the questions that I asked and I'm
6    fixing to ask you, you know, that if those answers
7    aren't in that box that Senator Huffman introduced as
8    Exhibit No. 1.  I just want to make a point that it
9    concerns me that these questions these senators have
10   about their districts are not being answered.  I just
11   wanted to make that point.
12          And on another question, Senator, on the
13   fiscal note -- and I know that Senator Watson brought it
14   up -- it says that it's $2 million to implement.  Now,
15   here is my concern on that, is that Texas is ranked
16   No. 2 nationally in this country as far as population.
17   Missouri is ranked 19th.  Yet, the numbers that I'm
18   looking at on the costs that the Secretary of the State
19   of Missouri on implementing -- and Missouri only has
20   5.9; we have 25 million -- Missouri has 5.9 in
21   population, and the Secretary of the State of Missouri
22   is going it's going to cost $6 million just to implement
23   their voter ID program, and that's just the first year.
24   The second year, another $4 million.
25          Now, with only 5.9 in population, and I'm

80

1    looking at Texas that has 25 million, now, what kind of
2    methodology is the Secretary of State using in Missouri
3    as opposed to the Secretary of State in Texas?  To me,
4    that math -- you know, I'm not an expert in math, but I
5    can tell the difference between 5.9 and 25 million to
6    implement a voter ID bill, you know, that obviously
7    there's something wrong here in the numbers.  Can you
8    tell me the difference in 6 million for Missouri and
9    2 million in implementing the cost of voter ID in Texas?
10          SEN. FRASER:  I'm not a citizen of
11   Missouri, so we don't have access to that information.
12   And you and I have been in the Legislature a long time,
13   and you're very aware that your fiscal note -- whenever
14   you file a bill, you get a fiscal note with a bill, they
15   look at the cost, and this is the cost that's been
16   estimated.
17          SEN. GALLEGOS:  You know, Senator, I'm
18   concerned here that this number that has been laid out
19   in this bill -- you know, and we do have -- and I don't
20   know if the rules if we have the Ogden amendment on this
21   bill where you're looking at one number and then all of
22   a sudden, before we start implementing the bill, it's
23   going to cost us $30 million to implement the bill by
24   the numbers -- if we use the formula being used by
25   Missouri that has only 5.9 in population.  Now, that

CONSIDERATION OF SENATE BILL 14 1/25/2011

81

1 really concerns me. $30 million, Senator Watson could
2 use that here and stop the closure of those Austin
3 Independent School District schools that are being
4 closed. They could use that $30 million that I see as
5 opposed to what I'm seeing as the formula in math that
6 Missouri used.
7           Now, it concerns me that the fiscal note
8 that's laid out in this bill is misleading, according to
9 the other states that are using more money and less
10 population to implement their voter ID bill. That
11 concerns me, Senator. And, I mean, is there somebody
12 that can answer that question for me, why it costs so
13 little on a state that has 25 million in population as
14 opposed to another state that has 5 million and it's
15 triple the cost?
16           You know, I mean, that concerns me, and
17 that should concern you, when you're given a number, and
18 we're telling the people in the audience here, the
19 taxpayers, it's only going to cost us $2 million. And
20 we have 25 million in population; Missouri only has
21 5.9 million, and it's costing them $6 million to
22 implement voter ID. Now, you know, that really concerns
23 me. And I don't want to mislead the public in any form
24 or fashion that it's only going to cost us $2 million to
25 upstart voter ID when that is a misleading number. And

82

1 that concerns me, Senator, and it should you. If this
2 number is misleading, now who can answer that question
3 for me?
4           SEN. FRASER: I think you're very aware of
5 the fact that this number comes from LBB. I know
6 they probably called the Secretary of State and asked
7 for that number. So if you have a concern about it,
8 probably you should ask the LBB and/or the Secretary of
9 State. I believe the Secretary of State is going to
10 tell you there are HAVA funds that they're requesting
11 that would possibly even eliminate that $2 million.
12           SEN. GALLEGOS: Well, I mean, I heard you
13 tell Senator Watson about the HAVA funds. I'm just
14 saying on straight-up, straight-up implementation, that
15 $2 million as opposed to $6 million in Missouri, you
16 know, that's without HAVA funds, too. I'm saying that
17 when you come down to it, if that number -- if, when the
18 implementation starts, instead of $2 million it's
19 $30 million, then, you know, I'm concerned.
20           I believe that the Ogden amendment should
21 go on there and say, you know, if it's going to be over,
22 over what you're showing on the fiscal note, that it
23 shouldn't be implemented if it's going to cost that type
24 of money. That's a lot of money; that's a lot of money
25 to implement voter ID when you're just saying -- well,

83

1 not you -- but the fiscal note on this bill is saying
2 only two million bucks. Now, you know, that just
3 concerns me, Senator. And I guess I'll ask that
4 question when the proper resource witness comes up.
5           Senator Fraser, the other question I had
6 was similar to Senator Uresti's question. Now, two
7 years ago, I put maps up on one of my amendments where
8 the City of Houston has no DPS offices within the 610
9 loop. The City of Port Worth, I believe -- let me see
10 here. Let me look at my notes here.
11           The City of Port Worth I think doesn't
12 have any either inside -- what is that loop? 82,
13 1827 -- 81. And Dallas, Senator West, only has one --
14 only has one inside the city, only has one DPS center
15 inside the city. And it concerns me, if we're going to
16 mandate Texans to get a photo ID and you have no place
17 to send them to, especially inside the loop and
18 especially those without transportation, and if they
19 can't get to it on a bus route, to one of the DPS
20 centers --
21           SEN. FRASER: Senator, if you have
22 evidence that someone in your district has the inability
23 to get a driver's license, I wish you would bring that
24 forward.
25           SEN. GALLEGOS: I'm talking about your

84

1 bill that mandates a photo ID. And if we're going to
2 mandate Texans, then we should at least allow them the
3 opportunity to have places where they can get it, where
4 they don't have to travel 150 miles, like Senator Uresti
5 just said. That's my concern, especially the elderly
6 that don't have any and they're going to have to get a
7 photo ID, that that person is going to have to travel
8 150 miles, even from their house inside the loop, those
9 people that don't have cars and they have to do public
10 transportation.
11           Now, I'm looking at the map in the City of
12 Houston, the bus route where it takes them three buses
13 just to get close to a DPS center from anywhere inside
14 the 610 loop. That really concerns me, Senator, on
15 this, and hopefully that -- Senator Fraser?
16           SEN. FRASER: I'm with you.
17           SEN. GALLEGOS: Hopefully that you will
18 look at it and maybe in some of our amendments will take
19 that into consideration. I'm just telling you, you
20 know, what's in Houston, not in Horseshoe Bay where you
21 live. And, you know, that is really a problem that we
22 have, especially those of us that represent minority
23 communities like Senator Uresti and me and others on
24 this floor.
25           There is another issue, Senator Fraser,

KENNEDY REPORTING SERVICE, INC.
512.474.2233

85

1 that I wanted to ask you.  On driver's license, you
2 know, it says on a driver's license that's -- on a
3 driver's license that's pulled from somebody for
4 whatever reason, DPS gives you a temporary, and that
5 temporary is good for about 40 days or in some cases
6 when they've been stopped for a DWI or anything but
7 still have not gone through the legal process, they are
8 given a paper temporary license, and it says on that
9 paper that this is used for identification purposes.
10           Now, I guess my question to you would be
11 that if that is pulled -- and there's several thousands
12 of drivers, of Texans, that are using this paper ID
13 right now -- that if a driver's license is pulled for
14 whatever reason, that that DPS certification, paper
15 temporary license can be used as an ID to go vote.
16           SEN. FRASER:  Senator, if you don't mind,
17 I'm going to yield to Senator Williams on that question.
18 If you don't mind, he'll answer that question for you.
19           SEN. WILLIAMS:  Senator Gallegos, I had a
20 similar question of what you have as I visited with the
21 Department of Public Safety about this.  And, in fact,
22 it had been a while since I had renewed my license.  And
23 they now issue -- these temporary licenses actually have
24 a photo on the license, and it would be valid under
25 Sen. Fraser's bill as identification if you went to

86

1 vote.
2           And, you know, in more detail, we could
3 get the Department of Public Safety to give you some
4 more detail on that.  But now the temporary licenses
5 actually have a photo on the paper license that you're
6 referring to.
7           SEN. GALLEGOS:  Well, Senator Williams,
8 I'm showing that 98,000 drivers right now have temporary
9 licenses without photo IDs.
10           SEN. WILLIAMS:  Well, you know, I'm not
11 advised about that.  I think we ought to get the
12 Department of Public Safety --
13           SEN. GALLEGOS:  Well, I agree.
14           SEN. WILLIAMS:  I'm told that these, you
15 know, temporary licenses you used to get when you were
16 in the process of renewing your licenses now have your
17 ID on them, your photo.
18           SEN. GALLEGOS:  Senator Williams, I
19 understand what you just told me.  But, you know, I've
20 known some folks that have had their license pulled and
21 have not gone through the process, and there is no photo
22 ID.  All they're given is the sheet of paper that I have
23 right here that they're driving with, 98,184 that are
24 driving with this paper right here, no photo ID.
25           And it says -- it says here -- well, I'm

87

1 not going to read it to you.  Just trust me; you can
2 read it yourself.  It says that this would be used for
3 identification purposes.
4           SEN. WILLIAMS:  Well, thank you, Senator
5 Gallegos.  And I'm glad that you raised this issue, and
6 we ought to ask the Department of Public Safety to clear
7 it up for us.  Thank you.
8           SEN. GALLEGOS:  That's why I brought it
9 up, Senator Williams and Senator Fraser.  That's being
10 done on temporary suspended license, no photo ID.  But
11 on the face of this sheet that DPS has given out, I just
12 says that this is for identification purposes.  I just
13 wanted to point that out.  I do have an amendment that I
14 hope you will take, Senator, that alleviates almost
15 100,000 that we know of right now.
16           SEN. FRASER:  Have you turned that
17 amendment in?  If you get the amendments in so we get a
18 chance to look at them --
19           SEN. GALLEGOS:  Sure.
20           SEN. FRASER:  -- I think there's a better
21 chance for, you know, us to understand what you're
22 trying to do.  So if you have an amendment, I would ask
23 you to turn it in.
24           SEN. GALLEGOS:  Sure.
25           Thank you, Mr. Chairman.

88

1           CHAIRMAN DUNCAN:  Senator Davis.
2           SEN. DAVIS:  Senator Fraser, will you
3 yield for some questions, please?
4           SEN. FRASER:  If you will allow me one
5 second to get some better headsets on.
6           SEN. DAVIS:  I was going to ask you if you
7 could hear me.
8           (Laughter)
9           (Brief pause)
10           SEN. FRASER:  I will now yield.
11           SEN. DAVIS:  Can you hear me okay, Senator
12 Fraser?
13           SEN. FRASER:  Right now I am.
14           SEN. DAVIS:  All right.  A couple of
15 questions for you.  You've talked earlier this morning
16 about both the Supreme Court opinion in the Indiana case
17 and also the Justice Department review of Georgia.  Are
18 you aware that in each of those, there were particular
19 instances that made the acceptance of those particular
20 laws different than yours might be interpreted by those
21 same bodies?
22           SEN. FRASER:  If you don't mind, we've
23 got, you know -- Senator Huffman, I think, is prepared
24 to, you know, answer legal questions.  If you've got a
25 question about a -- do you have specific examples --

CONSIDERATION OF SENATE BILL 14 1/25/2011

89

1        SEN. DAVIS:  Well, I would --

2        SEN. FRASER:  -- that you would like to --

3 and we also, I believe, are going to have someone from

4 Indiana here this afternoon, and we're also going to

5 have an invited -- an attorney that will address that.

6 So if you have specific questions about that, that might

7 be the appropriate place.

8        SEN. DAVIS:  Well, I'll read to you from

9 those in a moment.  But let's start just by talking

10 about what's required on the Texas voter registration

11 application right now.  Right now a person may put their

12 driver's license number or their social security number

13 on their registration application to become a voter in

14 the State of Texas.  Correct?

15        SEN. FRASER:  You've got the data.  And I

16 think probably the best person to ask, and that's the

17 Secretary of State.

18        SEN. DAVIS:  Well, I have it right here.

19 And there are some people who can't provide that

20 information, and there's another opportunity for that

21 person to attest to whom they are, to attest to the fact

22 that they're a legal citizen and not a felon who would

23 be prevented from voting.  And I'm sure the Secretary of

24 State probably has a number that shows to us -- and we

25 will ask for this on the record today -- how many people

90

1 fill out Section No. 9, the attestation clause, versus

2 the people who are able to fill out Section 8, and

3 what's the gulf between that.  Are you aware what the

4 gulf is between those two numbers?

5        SEN. FRASER:  I believe I know the section

6 you're talking about, but I actually would prefer you

7 ask that of the Secretary of State's office.

8        SEN. DAVIS:  Okay.  But I'm asking you.

9 Are you aware -- under your bill that you're proposing,

10 are you aware of what the gulf is, the gap is between

11 those two numbers, the people who are able to provide

12 their driver's license or social security number versus

13 those that fill out the attestation clause, because they

14 don't have either?

15        SEN. FRASER:  When you ask the Secretary

16 of State that question, I will be listening very

17 carefully to make sure that I hear what they say.

18        SEN. DAVIS:  And would you agree that it's

19 probably the case that if I fill out Section 9, the

20 attestation clause, because I can't fill out Section 8

21 with either a social security number or my driver's

22 license number, that I will probably be impacted by a

23 bill that's going to require what your bill requires in

24 order for me to vote?

25        SEN. FRASER:  Again, that would be a good

91

1 second of the Secretary of State.

2        SEN. DAVIS:  Well, I'm asking you as the

3 bill's author.  Are you concerned that there will be an

4 impact to those people who currently cannot fill out

5 Section 8 but can only fill out the attestation clause

6 in Section 9?

7        SEN. FRASER:  And again, you're making a

8 reference to Section 8 that -- you know, I'm sorry.  I

9 don't -- I'm not -- I don't know what you're referring

10 to.  The Secretary of State is the expert in that area.

11 And when you ask that question, I'll be listening and

12 will, you know, listen to the response.

13        SEN. DAVIS:  Earlier you talked about the

14 Executive Director from the Carter-Baker Commission, and

15 you cited a statistic, that only 1.2 percent of

16 Americans would be affected by a requirement that a

17 photo ID be required.  Correct?

18        SEN. FRASER:  I did make that reference,

19 yes.

20        SEN. DAVIS:  Are you aware that that was

21 limited to a study of only three states, and Texas was

22 not one of them?

23        SEN. FRASER:  Yes, because at that time

24 the Carter-Baker was looking at the states that had

25 issued a photo ID.

92

1        SEN. DAVIS:  And would you agree that it

2 may be the case that if I live in one of those three

3 states and it's easier for me to get a driver's license

4 in that state, then I may have a lower percentage of

5 citizens who don't have a photo ID than another state

6 might have where it's more difficult to get a driver's

7 license?

8        SEN. FRASER:  I'm not advised.

9        SEN. DAVIS:  Are you aware that even in

10 those states, in the 1.2 percentage number, there was a

11 disparate impact that was found on elderly and women and

12 African-Americans in terms of people who actually had

13 the eligible photo ID that's counted in that percentage?

14        SEN. FRASER:  I'm not advised.

15        SEN. DAVIS:  Does it concern you at all

16 that the bill that we are looking at today, the bill

17 that you filed, might have a disparate impact on women,

18 minorities and senior citizens, possibly disabled people

19 in the State of Texas?

20        SEN. FRASER:  The bill that we're filing

21 today I believe will be approved by the U.S. Supreme

22 Court, and also the bill in Georgia was precleared by

23 the Justice Department.  So I believe our bill will

24 comply with both of those.

25        SEN. DAVIS:  Okay.  Well, I'm going to

KENNEDY REPORTING SERVICE, INC.
512.474.2233

CONSIDERATION OF SENATE BILL 14 1/25/2011

93

1 read to you from the Supreme Court opinion, the U.S.
2 Supreme Court opinion when it was reviewing the Indiana
3 law.
4         They acknowledged that there is evidence
5 in the record, in fact, of which we may take judicial
6 notice that indicates that a somewhat heavier burden may
7 be placed on a limited number of persons by virtue of
8 the photo ID requirement.  They include elderly persons
9 born out of state, persons who, because of economic or
10 other personal limitations, may find it difficult either
11 to secure a copy of their birth certificate or to
12 assemble the other required documentation to obtain a
13 state-issued ID, homeless persons and persons with a
14 religious objection to being photographed.
15         "If we assume, as the evidence suggests,
16 that some members of these classes were registered
17 voters when the Indiana law was enacted, the new
18 identification requirement may have imposed a special
19 burden on their right to vote.  The severity of that
20 burden is, of course, mitigated by the fact that if
21 eligible voters without photo ID may cast provisional
22 ballots, that will ultimately be counted."
23         Are you aware that in the State of
24 Indiana, I can cast a provisional ballot, and the
25 Supreme Court made its decision in terms of whether the

94

1 burden was constitutionally acceptable, based on the
2 fact in Indiana, I can cast a provisional ballot, and if
3 I attest to the fact that I'm unable to pay for the cost
4 of getting the underlying documents to receive a photo
5 ID, that I do not, in voting my provisional ballot, have
6 to show a photo ID?
7         SEN. FRASER:  Senator, my observation is
8 that what you've read from the Supreme Court opinion is
9 a portion of it, but it's a snippet.  And it also
10 continues to say that these do not present an undue
11 burden for the person to vote.
12         SEN. DAVIS:  That's correct.  They said
13 they did not believe that it created a constitutionally
14 prohibited burden, based on the fact that voters in the
15 State of Indiana have the opportunity to vote a
16 provisional ballot even if they don't have a photo ID,
17 if they can show that they were unable to get one,
18 either because of their circumstances as an elderly
19 person or because they're indigent.  Does your bill
20 provide a special exception for people under those
21 circumstances to vote a provisional ballot?
22         SEN. FRASER:  The bill that I'm moving
23 forward I believe will be approved by the U.S. Supreme
24 Court and will be precleared by the Department of
25 Justice.

95

1         SEN. DAVIS:  Okay.  Let's look at the
2 things that are required in your bill in terms of a
3 photo ID.  And I appreciate what you said earlier.  I
4 think it's true.  I think if you ask anybody on the
5 street that you might walk up to at this moment in time
6 whether they think it's a good idea for someone to show
7 a photo ID in order to vote, they would probably agree.
8 What they might not understand in agreeing with that,
9 though, are what the requirements are going to be in the
10 State of Texas in order for them to comply with that
11 particular requirement, and they also might not
12 appreciate the challenge and the difficulty that some
13 people may have in supplying that.
14         SEN. FRASER:  Senator, this is not rocket
15 science.  The people of your district understand very
16 clearly that when they walk into that voting booth, they
17 have to show a photo ID proving they are who they say
18 they are.  The people in Fort Worth, that area, I have
19 the polling data -- I believe the number is about --
20 around 90 percent.  And of that, that's Republicans and
21 Democrats.  So I believe the people that elected you,
22 sent you down here, have said, "We believe that when you
23 go in to vote, you should show identification to prove
24 you are who you say you are."  It's a very, very simple
25 concept.

96

1         SEN. DAVIS:  Are you aware that in the
2 Indiana law and also in the Georgia law, people are
3 allowed to come and vote with a state-issued student ID
4 if they're attending a state university?
5         SEN. FRASER:  I'm not advised.
6         SEN. DAVIS:  And your bill does not allow
7 that kind of a photo ID to be used.  Is that correct?
8         SEN. FRASER:  We have four forms of ID
9 that we have laid out as acceptable.  Those are all
10 recognized acceptable forms of identification that we
11 have recommended.
12         SEN. DAVIS:  And it does not include that,
13 for the record.  Are you also aware that in the Indiana
14 law and in the Georgia law, the ID can be expired and
15 still be utilized, but under the requirements in your
16 bill, that cannot occur?
17         SEN. FRASER:  You know, I think our belief
18 is that someone should have a valid ID that has not
19 expired.  "Expired" implies it is not valid, and we in
20 Texas believe you should have a valid ID.
21         SEN. DAVIS:  What will I do if my driver's
22 license expires the day before I go to vote and I'm not
23 aware of it until I show up at the polling place?
24         SEN. FRASER:  And I would ask you, what
25 would happen if you were driving to the polling place

KENNEDY REPORTING SERVICE, INC.
512.474.2233

CONSIDERATION OF SENATE BILL 14 1/25/2011

97

1 with an invalid driver's license?  What would happen?

2          SEN. DAVIS:  I would get a ticket, but I
3 wouldn't be denied my constitutional right to vote as a
4 legal citizen of the United States.

5          SEN. FRASER:  You would not be denied your
6 right to vote.  Under this law and under this bill, as
7 you know, if you walk in with an invalid driver's
8 license, you would be allowed to vote.  It would be a
9 provision vote, and you would be allowed six days to go
10 back to the place that issues driver's license, get a
11 valid license and come back, and your vote would be
12 counted.

13          SEN. DAVIS:  Well, we had a conversation
14 about that earlier in terms of how difficult and
15 challenging -- for some people it actually is -- to be
16 able to comply with that requirement.  But let me ask
17 you for a moment, if I bring in a state-issued Texas
18 driver's license and it expired 30 days ago or 60 days
19 ago or a year ago, how does that fail to prove that I'm
20 the person on the card, simply because it has expired?

21          SEN. FRASER:  Well, I would ask you the
22 same question.  If your driver's license expired 30 days
23 ago, is it acceptable to the patrolman that just stopped
24 you?  It's expired.

25          SEN. DAVIS:  I'm asking you the question.

98

1 The reason that we are advocating or you are advocating
2 for photo ID is so that the person who is receiving my
3 ballot can verify that I am the person casting it.
4 Correct?

5          SEN. FRASER:  Yes.

6          SEN. DAVIS:  And if my driver's license is
7 expired but it's a state-issued driver's license and it
8 has my name and it has my picture on it and my name
9 matches what's on the registrar's -- the precinct rolls,
10 how does that fail to prove that I'm who I am?

11          SEN. FRASER:  I think we go back to the
12 word "valid," do you have a valid Texas driver's
13 license?

14          SEN. DAVIS:  How does it fail to prove
15 that I am who I am?

16          SEN. FRASER:  You don't have a valid Texas
17 driver's license.

18          SEN. DAVIS:  And as I said earlier, in
19 Georgia and in Indiana, under the laws that were deemed
20 acceptable by the Supreme Court and the courts in
21 Georgia retained preclearance by the Department of
22 Justice, each of those allows some acceptance of expired
23 IDs.

24          I want to talk a little bit about how
25 difficult if is, because I really think every one of us

99

1 in this room needs to appreciate the burden that people
2 have when they're being asked to supply some of the
3 documentation that's required in your bill.  And I've
4 put together a little chart that I just want to go over
5 very quickly.  I won't belabor the point.

6          Can you bring it closer over here, Dan, so
7 I can actually point at it?

8          Thank you.

9          Now, each of us, whether we're in the
10 Senate or the House of Representatives in the State of
11 Texas, we each bring unique backgrounds and perspectives
12 to the table.  And because of our unique backgrounds and
13 perspectives, we're able to represent people in ways
14 that hopefully contribute to a better understanding for
15 each of us in terms of how we can best serve them.

16          Senator Fraser, I came from a fairly
17 challenged background before I arrived on the floor of
18 the Texas Senate.  I had the opportunity to receive an
19 incredible education that ultimately allowed me the
20 privilege of standing here and having a conversation
21 with you today.  But there was a time when I was
22 indigent, there was a time when I was a single mother
23 and I was working a full-time job during the day in
24 Dallas, from which I had to leave my house at 6 o'clock
25 in the morning every morning to arrive at, and I worked

100

1 a part-time job four nights a week waiting tables.

2          If I had been required during that point
3 in time to show some of the ID requirements that are
4 being proposed under your bill, I have to admit to you
5 that I would have been quite challenged in being able to
6 accomplish it.  I had gotten divorced, so my name was
7 different on my state ID than was on the registration
8 rolls.  And so because of that, I would have had to go
9 through the process of trying to get a new state ID.
10 And, honestly, with my schedule, it would have been
11 fairly impossible for me to achieve it.

12          I think it's pretty easy for us to stand
13 on the Senate floor where we are today and the shoes
14 we're in today and say, "Why should that be a problem?"
15 But for people who have to take time off of work and for
16 whom that's an unaffordable idea, it can be a very, very
17 real problem.

18          The other issue, in trying to receive a
19 state ID in the State of Texas is, it's almost a
20 circular process.  In order to get the state ID, you
21 have to have underlying ID that provide you with the
22 opportunity to get that ID.  And I know we're talking
23 right now in the State of Texas about giving free ID to
24 people who come in to the Department of Motor Vehicles
25 and ask for that ID, based on the fact that they want to

## CONSIDERATION OF SENATE BILL 14 1/25/2011

101

1 vote.

2          But if I can't provide underlying

3 documentation, I'm going to have to go get that

4 underlying documentation, and it's going to cost me

5 money, and I'm concerned about that person.  I'm

6 concerned that if I need a birth certificate in the

7 State of Texas, it's going to cost me $23.  I'm also

8 concerned that I might have a really hard time getting

9 that birth certificate.  And if you look to see what you

10 can show in order to get it, you see the circularity of

11 the problem.  You can show a driver's license or you can

12 show a state ID.  Well, the reason I need the birth

13 certificate is so I can get my driver's license or my

14 state ID.

15          In order for me to get a birth

16 certificate, I can show a social security card as one of

17 my underlying two documents that are required.  But in

18 order to have a social security card, I've got to have a

19 driver's license or a state ID, so it puts me right back

20 at my original problem.  To get my driver's license or

21 my state ID, I might be able to use a passport.  But in

22 order to use my passport, I'm going to have to have a

23 birth certificate, but I couldn't get my birth

24 certificate because I didn't have a driver's license or

25 a state ID to get my birth certificate.

102

1          You see the problem?  It's not just the

2 problem of the time one has to take off of work in order

3 to comply with this requirement, it's not just a problem

4 of how much money it costs.  Sometimes it can be a

5 problem of almost a near impossibility for a person to

6 be able to provide the underlying documentation in order

7 for them to go and vote.

8          And my concern about that is, we will

9 disparately impact persons who find greater challenges

10 in fulfilling the underlying documentation requirements;

11 and, yet, we haven't provided anywhere in the bill, as

12 was done in Indiana, a provisional opportunity for

13 someone to come and cast a ballot and say that they were

14 unable to comply with the requirements for a photo ID.

15 Why is that?

16          SEN. FRASER:  Senator, I appreciate the

17 story you just gave.  And I would advise you of the

18 other 31 members here.  There's a lot of people that can

19 tell like stories.  When I was 16 and working on a

20 potato picker in California or when I was 17 working

21 picking cucumbers in Rising Star or when I was 18,

22 picking cotton in West Texas, I figured out a way to

23 have time after work to go get a driver's license,

24 because I really wanted one.  I worked that into the

25 schedule, as I think a lot of people do.

103

1          I think what I would ask you is to give

2 evidence, either in Indiana or Georgia, of a single

3 person that has come forward and said that they were

4 denied their ability to vote because of these

5 provisions, because in my knowledge, there has not been

6 a single person that came forward.

7          SEN. DAVIS:  And again, you know, when you

8 turn to those two laws, they actually provide some

9 exceptions that are not provided in your bill, and so

10 the instances in which people were excluded or

11 prohibited from exercising their constitutional right to

12 vote won't have been challenged in the same was is being

13 proposed for the State of Texas under this particular

14 bill.

15          I want to ask you a question about what

16 happens, as a woman, if I come in to vote and I have my

17 state ID, and the name on my state ID is different than

18 my name on the registrar's certificate, because I've

19 either married or divorced.  What will happen in that

20 situation?

21          SEN. FRASER:  The question has already

22 been asked twice.  We will have someone here from the

23 Secretary of State and the DPS that can answer that

24 question for you.

25          SEN. DAVIS:  Okay.  Back to the fiscal

104

1 note, Senator Fraser.  The fiscal note --

2          SEN. FRASER:  We've also talked about that

3 a couple of times.

4          SEN. DAVIS:  Yes, we did, but I want to

5 ask this question.  The fiscal note, of course,

6 described the methodology under which the $2 million

7 figure was compiled, and it specifically states that it

8 left out the cost for training poll workers and election

9 officers.  It specifically states that it left out any

10 cost for coordinating voter registration drives.  It

11 specifically states that it left out the costs of

12 providing the ID cards, all of that because it is an

13 unknown number.

14          SEN. FRASER:  Well, you're making an

15 assumption, and this amount was brought forward by LBB

16 after they talked to the secretary of the State.  The

17 Secretary of State, I think, they can answer that

18 question.  But I disagree that it's unknown.  I believe

19 the Secretary of State and LBB knew exactly what they

20 were doing when they brought it forward, because that's

21 their job.

22          SEN. DAVIS:  Well, it literally says that.

23 It says, "The fiscal impact of the revenue loss from the

24 prohibition of DPS to collect a fee is unknown because

25 it is not know how many people would make such a

CONSIDERATION OF SENATE BILL 14 1/25/2011

105

1 request."

2              SEN. FRASER:  And that is a correct

3 statement.

4              SEN. DAVIS:  And it also says that the

5 cost of coordinating voter registration drives or other

6 activities designed to expand registration is also

7 unknown, and it also says that the cost for

8 responsibilities, the training for people who would be

9 responsible for implementing this is unknown.

10              Now, if I file a bill this session and I'm

11 challenged, based on the fiscal impact of the bill,

12 clearly this session more than any other will be very,

13 very concerned about that.  And the LBB has put a

14 statement on it that they really don't know what the

15 cost is, but intuitively we understand there's going to

16 be a cost.  We'll probably have a conversation about

17 that.  Right?

18              SEN. FRASER:  And I think the conversation

19 you should have should be the Secretary of State in

20 discussing the HAVA funds that the federal government

21 has provided to both Indiana and Georgia for the

22 implementation of their law that we believe will be

23 approved for that, but it has not been approved, because

24 HAVA has clearly said the bill has to be passed before

25 they could pass judgment on whether those funds could be

106

1 used.  That amount of money is setting in the Secretary

2 of State's office now, and I think that would be a good

3 question to ask them.

4              SEN. DAVIS:  Let me ask a question about

5 the bill itself.  I'm a little confused about a section.

6 This is on Page 5.  I'm reading from Section 8,

7 Subsection (a).  "If the voter's address is omitted from

8 the precinct list under Section 18.005(c), the officer

9 shall ask the voter if the voter's residence, if listed,

10 on ID presented by the voter under Section 63.001(b) is

11 current and whether the voter has changed residence

12 within the county."  What if the answer is "No," what is

13 the election worker to do at that point?

14              SEN. FRASER:  That's a perfect question to

15 ask the Secretary of State.

16              SEN. DAVIS:  It's your bill, though,

17 Senator Fraser, and the language is here.  And there is

18 no guidance for someone -- if we were to vote on a bill

19 like this, how are we to know how a situation like that

20 would be handled if it's not addressed in the bill?

21              SEN. FRASER:  Senator, I'm sure you're

22 aware through -- the past session, you were here.

23 You're reading current law.  There is one change there

24 where we insert "presented by the voter under Section

25 63.001," which is the description I think of the photo

107

1 ID.  But basically that is current law, and I think it

2 would be a good thing to ask the Secretary of State.

3 Everything you've read is current law.

4              SEN. DAVIS:  Well, it's not current law,

5 because it changes it from the difference being on the

6 voter registration certificate versus being on the

7 person's ID.  What I'm concerned about is that if I come

8 in with an ID and my address has changed and I have the

9 correct address on the precinct list that's different

10 than what's on my ID, that a poll worker might actually

11 reject my opportunity to vote, because the address on my

12 ID is showing differently than is showing on the

13 precinct list.

14              SEN. FRASER:  And the good thing about

15 that is, these HAVA funds that we're going to request

16 will also train poll workers to make sure they

17 understand it.  The ruling would be made by the

18 Secretary of State, and they will train them how to do

19 that, and I feel very comfortable that you would get to

20 vote.

21              SEN. DAVIS:  Well, I'm glad you feel very

22 comfortable, Senator Fraser.  I remain very, very

23 concerned about the number of people under the very

24 severe restrictions that are imposed by the bill you

25 have proposed.  I'm very concerned about the number of

108

1 people who may be impacted by it.  And I understand and

2 agree with you, that assuring that voter fraud is not

3 occurring is very, very important, and it's a

4 conversation we should be having and a cure we should

5 all attempt to find.

6              But in the process, I'm very afraid that

7 we're going to wind up disenfranchising people who

8 currently are legal citizens in the State of Texas who

9 have the legal opportunity to vote and are going to be

10 denied the right for that right under your bill as it's

11 proposed today.

12              SEN. FRASER:  And I believe our bill will

13 be approved by the U.S. Supreme Court and approved in

14 Section 5 by the Department of Justice.

15              Thank you.

16              SEN. DAVIS:  Thank you.

17              CHAIRMAN DUNCAN:  Senator West.

18              SEN. WEST:  Thank you very much,

19 Mr. Chairman.  I would like to ask the author a couple

20 of questions.

21              Senator Fraser, good morning, sir.

22              SEN. FRASER:  I think we commented about

23 the Barry White voice last year.  I was reading the

24 deposition.

25              SEN. WEST:  That was actually Billy Ocean,

KENNEDY REPORTING SERVICE, INC.
512.474.2233

CONSIDERATION OF SENATE BILL 14 1/25/2011

109

1 which both of us like.

2            SEN. FRASER:  Both of us do like.  I
3 agree.

4            SEN. WEST:  Now, we're not going to have
5 any unfunded mandates on counties, are we?  This bill
6 would not occasion any unfunded mandates on counties.

7            SEN. FRASER:  This bill?

8            SEN. WEST:  Yes, this bill that you're
9 proposing.  The counties will not have to pick up any of
10 this cost -- is that correct -- because that would be an
11 unfunded mandate?  And I know you are not for unfunded
12 mandates.  Right?

13            SEN. FRASER:  I am not for -- I'm opposed
14 to unfunded mandate, but I'm not advised of whether it
15 would be --

16            SEN. WEST:  So you can tell counties, you
17 can tell all county officials in the sound of my voice
18 and your voice that there will be no unfunded mandates
19 in this bill and counties will not have to spend any
20 money that they don't have right now to implement this
21 particular bill.  Correct?

22            SEN. FRASER:  I had my largest county,
23 Bell County, in my office last week, and I told Judge
24 Burrows at that time that I'm opposed to unfunded
25 mandate and, you know, we'll do everything we can to

110

1 keep them off the counties.

2            SEN. WEST:  So you're telling county
3 officials there are no unfunded mandates coming from
4 this bill?

5            SEN. FRASER:  I didn't say that.

6            SEN. WEST:  So there may be unfunded
7 mandates coming from this bill?

8            SEN. FRASER:  Not advised.

9            SEN. WEST:  So let me back up.  And I want
10 to pursue this just a minute now.  You philosophically
11 are not for unfunded mandates.  Right?

12            SEN. FRASER:  That's a correct statement.

13            SEN. WEST:  That is a correct statement.
14 And you, by your action in previous legislatures, have
15 made certain that you have not passed any bills that
16 would provide for unfunded mandates on the counties.
17 Right?

18            SEN. FRASER:  I have made an effort not to
19 vote, if possible.

20            SEN. WEST:  Okay.  Now, in this particular
21 bill, it is your objective to make certain that there
22 are no unfunded mandates on any county in this entire
23 state.  Is that correct?

24            SEN. FRASER:  I'm not advised.

25            SEN. WEST:  You're not advised as to what

111

1 your objective is?

2            SEN. FRASER:  No.  My philosophy is that I
3 do everything I can trying to keep any unfunded
4 mandates.  I'm not advised of how they would be
5 impacted.

6            SEN. WEST:  All right.  So you can't tell
7 county officials that there are not unfunded mandates in
8 this bill?

9            SEN. FRASER:  Well, as you know, a lot of
10 times there's unintended consequences, and we don't know
11 until it's passed, the impact.

12            SEN. WEST:  It was your bill, though.
13 This is your bill.  You don't know --

14            SEN. FRASER:  My bill says that --

15            SEN. WEST:  I'm just --

16            SEN. FRASER:  -- when you walk into the --

17            SEN. WEST:  I'm just trying to find out
18 whether or not county officials are going to have to
19 pick up any of the cost in terms of putting this bill
20 into effect.  You tell me.  Tell the county officials
21 that there are no unfunded mandates in this bill.  Tell
22 them.

23            SEN. FRASER:  I'm not advised.

24            SEN. WEST:  So what you're telling county
25 officials, that you're not advised as to whether or not

112

1 there is any unfunded mandates in this bill.  Correct?

2            SEN. FRASER:  I'm sure that there's
3 probably an expert witness coming.  You probably can ask
4 a question.  Someone, or someone may be coming to
5 testify about that, but --

6            SEN. WEST:  All right.  Let's talk about
7 expert witnesses.  Did you ask for the fiscal note in
8 this bill?

9            SEN. FRASER:  I'm sorry?

10            SEN. WEST:  Did you ask for the fiscal
11 analysis in this bill -- the fiscal note?

12            SEN. FRASER:  No.  I think the committee
13 chairman did.  I believe the -- there is a fiscal note
14 requested.  I did not request it.

15            SEN. WEST:  Did you review the fiscal
16 note?

17            SEN. FRASER:  The fiscal note was handed
18 to me.  I read the fiscal note.  I guess reviewing it,
19 yes, I read it.

20            SEN. WEST:  Okay.  Go to the local
21 government impact section of it, Page 2 of 3, down at
22 the bottom.

23            SEN. FRASER:  Yes.

24            SEN. WEST:  Okay.  Second paragraph,
25 "According to Texas Association of Counties, Tarrant

CONSIDERATION OF SENATE BILL 14 1/25/2011

**113**

1 County anticipated a one-time cost to reprint
2 provisional balloting materials and provides new
3 notices, of $8,000.  Bexar County stated that due to
4 limited space on current registration certificate, large
5 cards would be necessary, resulting in additional costs
6 for cards, printing and postage of $381,000," et cetera.
7          Is that a cost that is going to be picked
8 up by the state or is that going to be a cost that's
9 going to be occasioned by the counties?
10         SEN. FRASER:  Senator, you're on the
11 Finance Committee.  You helped with proposing the draft
12 bill, and then you will be voting on the bill coming out
13 of the committee that you send to us, so I think you
14 would be better to answer that.  My job is to pass the
15 bill.  The implementation of the bill, then, and the
16 cost will have to be considered by the Finance
17 Committee.
18         SEN. WEST:  So let me make sure that I
19 understand this, then.  The answer to that question is,
20 you don't know.  So if we don't appropriate that
21 money -- that being the Legislature doesn't appropriate
22 that money -- then that's an unfunded mandate.  Correct?
23         SEN. FRASER:  My job is to bring the bill
24 forward, put it before the membership, advise what the
25 bill will do.  And then if there's a fiscal impact --

**114**

1          SEN. WEST:  Advise what the bill will do?
2          SEN. FRASER:  The bill is going --
3          SEN. WEST:  Is that your job?  Didn't you
4 just say part of your job is to advise what it will do?
5          SEN. FRASER:  Yes.  What it's going to do
6 is that when you walk into --
7          (Simultaneous discussion)
8          SEN. WEST:  So I'm asking you --
9          SEN. FRASER:  -- in Oak Cliff and want to
10 vote, you're going to have to show your smiling face --
11         SEN. WEST:  And I'm asking what it will
12 do.  I'm asking what it will do in terms of unfunded
13 mandates right now.
14         SEN. FRASER:  Not advised about unfunded
15 mandates.
16         SEN. WEST:  Not advised.  So where will
17 the counties get this money under the local impact --
18         (Simultaneous discussion)
19         SEN. FRASER:  And I think that's going to
20 be your responsibility as a member of Finance.
21         SEN. WEST:  Do you know -- then let me ask
22 this question.  Do you know where the county will get
23 the money from, counties will get that money from?
24 Under the local government impact, do you know where the
25 counties will get that money from?

**115**

1          SEN. FRASER:  You're asking me a question.
2 No, I do not know --
3          SEN. WEST:  Okay.  Thank you.  Now, as it
4 relates to -- this bill, plus the costs that we don't
5 know, you've said repeatedly that it's going to cost at
6 least $2 million.  And we know, based on the fiscal
7 note, that there's still some undetermined cost.
8          SEN. FRASER:  I have not said one time
9 that it's going to cost $2 million.  I've said there is
10 a fiscal note that has been projected, but there are
11 dollars in the HAVA fund, federal funds, that are
12 setting in the Secretary of State's office that far
13 exceed that number.  And I think the Secretary of State
14 probably will let us know what that is.  So there is a
15 pot of money there that we believe will help offset some
16 of the associated expenses.  I do not believe the cost
17 will be $2 million.
18         SEN. WEST:  Now, the HAVA funds, is that
19 general revenue or is that federal funds?
20         SEN. FRASER:  Federal funds.
21         SEN. WEST:  Okay.
22         SEN. FRASER:  And I believe I'm right, but
23 again, I would ask that question of the Secretary of
24 State if I were you.
25         SEN. WEST:  Okay.  Well, as it relates to

**116**

1 general revenue, now, as I understand and as I've used
2 the term "general revenue" over the last 17 years I've
3 been here -- and maybe Senator Ogden or someone else on
4 the Finance Committee can correct me if I'm wrong --
5 general revenue basically means state funds -- right --
6 monies that we get from state --
7          SEN. FRASER:  You are the member of
8 Finance.
9          SEN. WEST:  Well, let me -- general
10 revenue -- okay.  Well, then, take my word for it;
11 that's what it means.  It means monies that we receive
12 from tax revenues in the State of Texas, not HAVA funds
13 but revenues from taxes and revenues that are -- and
14 sources of revenues that we get from citizens in the
15 State of Texas.  And that's what this deals with, it is
16 specifically general revenue-related funds, not HAVA
17 funds.  HAVA funds are federal funds.  So let's make
18 sure -- in terms of my questions, that's the distinction
19 that I'm making.
20         SEN. FRASER:  Well, the distinction you're
21 not making is that if the HAVA funds are not available,
22 yes, there would be a cost to the state.  But if HAVA
23 funds are available, it would offset that cost to the
24 state.
25         SEN. WEST:  Where do you see that in this

CONSIDERATION OF SENATE BILL 14 1/25/2011

117

1 fiscal note?

2            SEN. FRASER:  It's not in that.  That's

3 conversation --

4            SEN. WEST:  Then how are you making that

5 statement, if it's not in this fiscal note?  There's

6 nothing in the fiscal note that says that.

7            SEN. FRASER:  Mr. Chairman?

8            CHAIRMAN DUNCAN:  Senator Fraser.

9            SEN. FRASER:  Could I please enter into

10 the record -- this is information coming that is

11 addressing the questions he's talked about addressing

12 HAVA.  I would like to have this added as an exhibit,

13 please.

14            CHAIRMAN DUNCAN:  Bring it forward to the

15 Secretary, if you would, and we'll need to --

16            SEN. WEST:  May we approach on it, Your

17 Honor -- Your Honor -- may we approach on it,

18 Mr. Chairman?

19            CHAIRMAN DUNCAN:  You may.

20            (Brief pause)

21            SEN. FRASER:  Mr. President?

22            CHAIRMAN DUNCAN:  Senator Fraser, if

23 you'll hold on just a minute.  I'm going to allow --

24 we're already premarked a couple of exhibits.  And so

25 just in order to keep the record flowing correctly, I'm

118

1 going to recognize Sen. Van de Putte at this point to

2 introduce a motion in writing.

3            Senator Van de Putte.

4            SEN. VAN de PUTTE:  Thank you,

5 Mr. Chairman.  And thank you, Chairman, and the bill

6 author, to yield so that I can move that all actions

7 taken by the Senate on the 81st Legislature on Senate

8 Bill 362, as contained in the official Senate Journal,

9 be included in the record as Exhibit 2.  The Senate

10 Journal excerpts shall include motions, remarks, written

11 responses, exhibits and any other material directly

12 related to Senate Bill 362.

13            Mr. Chairman, I move this motion in

14 writing.

15            CHAIRMAN DUNCAN:  Members, you've heard

16 the motion.  Is there any objection?

17            The Chair hears none.  Exhibit 2 will be

18 received into the record.

19            (Exhibit No. 2 marked and admitted)

20            CHAIRMAN DUNCAN:  Now, Senator Fraser,

21 you're recognized on Exhibit 3, I believe.

22            SEN. FRASER:  And, members, just to

23 clarify, what we're entering here is the answer to the

24 question that we've been discussing.  It is a letter

25 from the Secretary of State, Hope Andrade, saying that

119

1 the $2 million we're discussing, there is sufficient

2 HAVA funds allocated to voter education and poll worker

3 training that would cover this expense that is

4 available.

5            Also, in addition to your question, we

6 have been advised by other counties saying they do not

7 expect more than a nominal cost for counties, existing

8 staff and resources should be sufficient to implement

9 the new law.

10            And I would request this be entered into

11 the record.

12            CHAIRMAN DUNCAN:  Members, Senator Fraser

13 sends up Exhibit No. 3.  It will be received into the

14 record.

15            (Exhibit No. 3 marked and admitted)

16            CHAIRMAN DUNCAN:  Senator Fraser, you

17 still have the floor.  Senator West, Senator has yielded

18 to you for questions.

19            And before we do that, before we do that,

20 let me make an announcement.  We typically adjourn 30

21 minutes ahead of session in order to allow the sergeants

22 and secretary to prepare for the Senate session.  So at

23 10:30, I'll recognize a member on a motion to rise and

24 report progress.  So if you can watch the clock.  It

25 doesn't mean we're going to cut you off, it just means

120

1 at that point in time, we'll have to cease until we

2 finish the senate session.

3            SEN. WEST:  Thank you, Mr. Chairman.

4            Senator Fraser?

5            SEN. FRASER:  Yes.

6            SEN. WEST:  Okay.  So you've admitted this

7 as part of the record.  So these are federal funds and

8 not general revenue.  Is that correct?

9            SEN. FRASER:  No.  Those are federal

10 funds, as I understand it, yes.

11            SEN. WEST:  It's not general revenue?

12            SEN. FRASER:  Yes.

13            SEN. WEST:  Okay.  And the certainty of it

14 is still up in the air.  Based on this document from the

15 Secretary of State, they still have to confirm that the

16 funds can, in fact, be used for this particular purpose?

17            SEN. FRASER:  That is correct, and that's

18 what I advised earlier, is that HAVA has said until the

19 passage of the bill, they would not rule, but the funds

20 have been used before in Indiana and Georgia, and it is

21 expected that we will be able to use them here.

22            SEN. WEST:  Okay.  Now, you had made

23 mention also that you've talked to some other counties

24 and that there won't be any unfunded mandates on those

25 counties?

CONSIDERATION OF SENATE BILL 14 1/25/2011

121

1           SEN. FRASER:  You didn't read the rest of
2  the fiscal note, is that Comal County reported the costs
3  associated with the provision would be absorbed within
4  existing revenues.  You gave one example, but I think
5  most of the counties expect this to be a nominal cost
6  and that they have existing staff and resources --
7           SEN. WEST:  And then --
8           SEN. FRASER:  To handle this.
9           SEN. WEST:  I'm sorry.  You said most of
10 the counties.  You've given examples of three.  You said
11 most of the counties.  Is --
12          SEN. FRASER:  Do you have evidence from
13 others?  I --
14          SEN. WEST:  There's 254 counties, and
15 you've just made a statement that most of the counties
16 have said they can absorb it within their normal --
17          SEN. FRASER:  I said I do not expect it to
18 be more than a nominal cost.
19          SEN. WEST:  But otherwise -- now Bexar
20 County is saying it's going to be over $380,000.  That's
21 not a nominal cost, is it?
22          SEN. FRASER:  Well, I guess that's
23 something you should consider in the Finance Committee.
24 They have a huge budget, and in --
25          SEN. WEST:  Who has a huge budget?

122

1           SEN. FRASER:  The large counties.
2           SEN. WEST:  I'm sorry?
3           SEN. FRASER:  The large counties.
4           SEN. WEST:  They have huge budgets?
5           SEN. FRASER:  Yes.  And you will have to
6  make that decision.
7           SEN. WEST:  They don't have budget
8  shortfalls in large counties?
9           SEN. FRASER:  If I were you, then I would
10 discuss that with the chairman --
11          SEN. WEST:  But the reality is, the
12 reality is, is that if -- and I won't belabor the
13 point -- the reality is, if those counties will have to
14 fund this out of existing revenue from their budgets,
15 it's going to be an unfunded mandate on them if the
16 state does not appropriate the money.  Is that correct?
17          SEN. FRASER:  Yes.  It is expected that it
18 will be a nominal cost for counties.  Existing staff and
19 resources should be sufficient to implement the new law.
20          SEN. WEST:  And where are you getting that
21 from?
22          SEN. FRASER:  From the sheet here.  If
23 you'll follow, Comal County reported the cost associated
24 with the provision of the bill should be absorbed within
25 existing revenues.

123

1           SEN. WEST:  But that's Comal County.
2  That's not Travis County, that's not Harris County,
3  that's not Bell County or any of the other counties.
4  That's Comal County.  Comal County is not indicative of
5  all of the counties in the State of Texas, is it?
6           SEN. FRASER:  I think what you should do,
7  then, is get 254 counties, if you'll call them all and
8  get that number and --
9           SEN. WEST:  Okay.  Well, I mean, it's your
10 bill.
11          (Simultaneous discussion)
12          SEN. FRASER:  -- Finance.
13          SEN. WEST:  And the reality is, if it's an
14 unfunded mandate, you're responsible for it if this bill
15 passes.  Now, let me ask you this:  The $2 million, the
16 $2 million that you're talking about, if it does not
17 come from HAVA funds, then it's going to have to come
18 from general revenue.  Is that correct?
19          SEN. FRASER:  I'm not advised.  I'm not a
20 member of Finance; you are.  And I think that would be a
21 decision of Finance.
22          SEN. WEST:  Let's talk about just sections
23 of the bill.  Specifically, the issue concerning -- and
24 I think you and Senator Davis have gone over this.  And
25 I'm on page, in Section 7 of the bill, specifically (c)

124

1  and (d).  Let me know when you're with me on it.
2           SEN. FRASER:  What page are you on?
3           SEN. WEST:  I'm in Section 7 of the bill.
4           SEN. FRASER:  That's Section 11.
5           Six, 7.  Okay.  Got it.  Okay.
6           SEN. WEST:  Okay.  As relates to -- let's
7  talk about the election officer.  Now, what's the
8  definition of the election officer?
9           SEN. FRASER:  That would be a good
10 question to the Secretary of State.
11          SEN. WEST:  So you don't know what an
12 election officer is?
13          SEN. FRASER:  I've got a witness, you
14 know, an expert witness coming in that -- you know, I
15 think I do, but it would be improper for me to answer.
16 I've got an expert person you can ask.
17          SEN. WEST:  Let me ask this:  Did you rely
18 on the Secretary of State's office in helping to draft
19 this bill?
20          SEN. FRASER:  We have had a lot of
21 discussion with the Secretary of State's office over the
22 last three years in the process of drafting bills.
23          SEN. WEST:  So you don't know what an
24 election officer is?
25          SEN. FRASER:  I didn't say I don't know

CONSIDERATION OF SENATE BILL 14 1/25/2011

125

1 what the election officer is. But the Secretary of
2 State is coming, and it would be improper for me to
3 answer that if we have an expert witness that can answer
4 it, you know, for sure.
5          SEN. WEST: So it would be improper for
6 you to answer what an election officer is?
7          SEN. FRASER: No. We've got an expert
8 witness that would be the better person to ask.
9          SEN. WEST: Okay. In terms of what an
10 election officer is in your bill. Okay.
11          As it relates to Section (d), you say
12 that, "If the voter's name is on the precinct list of
13 registered voters and the voter's identity can be
14 verified from the documentation presented under
15 Subsection (b), the voter shall be accepted for voting."
16 But if, indeed -- and the election officer is to make
17 that determination. Is that correct?
18          SEN. FRASER: Again, that's a great
19 question to ask the Secretary of State's office.
20          SEN. WEST: How does your bill work? Tell
21 us how your bill works.
22          SEN. FRASER: You know, it's a --
23          (Simultaneous discussion)
24          SEN. WEST: I mean, would that be a great
25 question to ask the Secretary of State?

126

1          SEN. FRASER: It's a great concept. You
2 walk in in Oak Cliff to vote. And if you're in the
3 right precinct and your name is on the list and you pull
4 out your driver's license and you show it to them and
5 your smiling face on your driver's license matches
6 you --
7          SEN. WEST: Well, let me --
8          SEN. FRASER: -- I think they're going to
9 hand you a ballot and allow you to vote.
10          SEN. WEST: Then let me ask you this: My
11 last name is spelled W-e-s-t. Suppose there's some
12 typographical error where they spelled it W-e-s, but
13 it's me. I have an ID, but my name is misspelled. What
14 happens then? I have to vote a provisional ballot?
15          SEN. FRASER: I think that would be a good
16 question for the Secretary of State, because I think
17 they will cover that in the training with the election
18 officials you're discussing.
19          SEN. WEST: What is your, intent, Senator?
20          SEN. FRASER: My intent is that the
21 Secretary of State would make a ruling on that.
22          SEN. WEST: Under those circumstances,
23 what would be your intent, as the author of this bill?
24 If my name is W-e-s-t but there is a typographical error
25 someplace and it's W-e-s, what is the intent. Give the

127

1 record your intent as the author of this bill.
2          SEN. FRASER: My intent, as the author of
3 the bill, is that I'm going to give the authorization to
4 the Secretary Of State to make a ruling and train the
5 poll workers so that it would be clear that they're
6 allowing the proper person to vote.
7          SEN. WEST: They're allowing the proper
8 person to vote. So in that circumstance, would it be up
9 to the election officer there to determine whether I'm
10 the same person --
11          SEN. FRASER: I think it would be up to
12 the Secretary of State --
13          SEN. WEST: Let me finish; let me finish.
14          -- whose last name is W-e-s, but my
15 identification says W-e-s-t, and I'm presenting that, it
16 would be up to that election worker. Right?
17          SEN. FRASER: I think that would be a
18 great question to ask the Secretary of State.
19          SEN. WEST: But what's your intent,
20 though? I'm just asking your intent. I can't ask the
21 Secretary of the Senate what's your -- I mean, Secretary
22 of State what your intent is.
23          SEN. FRASER: I intend to --
24          (Simultaneous discussion)
25          SEN. WEST: You've got to manifest your

128

1 intent so the Secretary of State will know, have some
2 guidance in terms of how this bill should be
3 implemented. Don't you agree, as the author of the
4 bill?
5          SEN. FRASER: My intent is to give the
6 Secretary of State the authorization to determine the
7 rules, train the poll workers. They would make a
8 determination on that.
9          SEN. WEST: So the poll worker in this
10 instance would be the election officer? I have to ask
11 the Secretary of State?
12          SEN. FRASER: You need to ask the
13 secretary of State.
14          SEN. WEST: Okay. Poll workers, let's
15 talk about poll workers. How much do we pay poll
16 workers?
17          SEN. FRASER: That would be a good
18 question to ask the Secretary of State.
19          SEN. WEST: Okay. What's the minimum
20 wage? I would ask the Secretary of State?
21          SEN. FRASER: What does that have to do
22 with this bill?
23          SEN. WEST: I mean, I'm just trying to
24 understand exactly how much we pay our poll workers.
25          SEN. FRASER: Again, Senator, you're

CONSIDERATION OF SENATE BILL 14 1/25/2011

---

129

1 asking the question.  I would suspect probably poll
2 workers may be paid different from one county to
3 another.  And it's an area -- I think that that's a good
4 question of the Secretary of State.
5            SEN. WEST:  Okay.  Now, you keep referring
6 to the Secretary of State.  But in the bill analysis,
7 doesn't it also say that this bill does not expressly
8 grant any additional rulemaking authority to the state
9 office -- to a state officer, institution or agency?
10 Does it say that?  Do I have to ask the Secretary of
11 State about that also?
12            SEN. FRASER:  Senator, I'm sorry.  I'm not
13 advised.  I do not have a bill analysis.  Do you have
14 one in front of you you would like show me?
15            SEN. WEST:  I do.  Look under "Rulemaking
16 Authority."
17            SEN. FRASER:  We don't have it.
18            SEN. WEST:  You don't have -- okay.  In
19 the bill analysis, what it says is that this bill does
20 not expressly grant any additional rulemaking authority
21 to a state officer, institution or agency?
22            SEN. FRASER:  Isn't that standard language
23 that's put on every bill?
24            SEN. WEST:  I don't know.  But what I'm
25 asking you is --

---

130

1            SEN. FRASER:  You don't know?
2            SEN. WEST:  -- given the fact that you are
3 deferring everything to the Secretary of State, are you
4 going to put some additional language in the bill that
5 provides the Secretary of State some additional
6 rulemaking?
7            SEN. FRASER:  I think the key word there,
8 this does not provide any additional.  I think it's
9 assumed that the Secretary of State has that ability
10 under current ability we've given the Secretary of
11 State.
12            SEN. WEST:  Let me ask this, Senator
13 Fraser.  Okay.  All right.  You can't give me what your
14 intent is in that situation.  I'll just take that for
15 granted.
16            You have made reference to the Carter-
17 Baker Commission and recommendations.  Is that correct?
18            SEN. FRASER:  I want to make an
19 observation here for Senator Whitmire.  If you'll look
20 up, it is filling up, so there must be someone concerned
21 about the legislation we're talking about.
22            What was the question?
23            SEN. WHITMIRE:  Lubbock.
24            SEN. FRASER:  While Senator West gathers
25 himself, I'll tell you that those are the great people

---

131

1 from West Texas, the City of Lubbock.  And they are
2 great voters and very concerned.  And I've seen the
3 polling data that shows that West Texas was the highest
4 percentage of people that believe that they should show
5 their ID whenever they show up to vote.  I'm really glad
6 to have them at my back.
7            Go ahead.
8            SEN. WEST:  Do I need to ask the Secretary
9 of State about that, too, or what?
10            SEN. FRASER:  You could.  These people
11 respect the opinion of the Secretary of State, and they
12 probably have already asked.
13            SEN. WEST:  Okay.  Senator Fraser, a
14 couple of things.  As it relates to the Carter-Baker
15 Commission, you've talked about the recommendations, and
16 you are following the recommendations that came out of
17 that commission.  Is that correct?
18            SEN. FRASER:  No.  I filed a piece of
19 legislation that I believe will be approved by the U.S.
20 Supreme Court and will be cleared by the Department of
21 Justice.
22            SEN. WEST:  Okay.  Let me ask you this:
23 Have you made mention of the Carter-Baker Commission?
24            SEN. FRASER:  I have made references a
25 couple of times of things that they mentioned in their

---

132

1 report.
2            SEN. WEST:  Of the recommendations that
3 they mentioned, did you incorporate any of those in your
4 bill?
5            SEN. FRASER:  My bill is a bill I believe
6 that will be approved by the U.S. Supreme Court and be
7 approved by the Department of Justice and will --
8            SEN. WEST:  So the answer to the question
9 is what?  Did you incorporate any of the recommendations
10 from the Carter-Baker Commission in your bill?
11            SEN. FRASER:  The bill that we're filing
12 is a bill that I believe will be approved by the U.S.
13 Supreme Court and be approved by the Department of
14 Justice.
15            SEN. WEST:  So the answer to the question
16 is?
17            SEN. FRASER:  That we're filing a bill
18 that's going to be approved by the U.S. Supreme Court.
19            SEN. WEST:  Well, that wasn't the question
20 asked.  The question asked, did you incorporate any of
21 the recommendations in the Carter-Baker Commission in
22 your bill?  That was the question I asked.
23            SEN. FRASER:  I read the Carter-Baker
24 report.  And you know, obviously, I'm aware of the
25 things they're recommending.  But the bill that I've

---

## CONSIDERATION OF SENATE BILL 14 1/25/2011

133

1 drafted is based on the fact that whenever you walk in
2 to vote, I want you to show an ID proving you are who
3 you say you are, and I believe that bill will be
4 approved by the U.S. Supreme Court.
5            SEN. WEST:  So you don't know whether you
6 did or not.  Is that the answer to my question?
7            SEN. FRASER:  My answer is, the bill that
8 we filed, that we brought forward, is a bill that
9 clearly says that whenever you vote, you need to show
10 your ID, and I believe that bill will be approved by the
11 U.S. Supreme Court.
12           SEN. WEST:  Was that one of the
13 recommendations of the commission?
14           SEN. FRASER:  I'm not advised.
15           SEN. WEST:  But you made reference to it
16 as a predicate for why this particular bill --
17           SEN. FRASER:  No.  I made a reference to
18 comments that were made by the Carter-Baker Commission.
19           SEN. WEST:  What were those comments that
20 you made?
21           SEN. FRASER:  If you want to go over it
22 again, I can do my opening statement again if you would
23 like.
24           SEN. WEST:  No, just the comments from the
25 Carter-Baker Commission.

134

1            SEN. FRASER:  Carter-Baker Commission,
2 bipartisan -- Carter-Baker Commission affirms the
3 danger.  Elections are at the heart of the democracy.
4 "Americans are losing confidence in the fairness of
5 elections, and while we do not face a crisis today, we
6 need to address the problems of our electoral system."
7            The Carter-Baker Commission concluded at
8 the end of the day, there's considerable national
9 evidence of in-person voter fraud.  And regardless of
10 whether one believes that voter impersonation is
11 widespread or relatively rare, there can be no serious
12 dispute that it is a real effect, can be substantial
13 because, in a close election, even a small amount of
14 fraud could make a margin of difference.
15           SEN. WEST:  Okay.
16           SEN. FRASER:  That was my reference to the
17 commission.
18           SEN. WEST:  Okay.  Did they also
19 recommend, though, that we should use some sort of
20 mobile strategy, mobile strategy in order to get
21 vehicles out to different locations to --
22           SEN. FRASER:  I didn't reference that.
23           SEN. WEST:  No.  I said did they also
24 recommend that, though?
25           SEN. FRASER:  I'm sorry.  I'm not advised.

135

1 I didn't reference that.
2            SEN. WEST:  Okay.  But if they did make a
3 recommendation that we should do everything we can to
4 make certain people are registered to vote, you would
5 support that, wouldn't you?
6            SEN. FRASER:  The bill I'm filing, that
7 I'm filing today --
8            SEN. WEST:  No.  That's not --
9            SEN. FRASER:  -- very clearly says that I
10 think it will be approved by the U.S. Supreme Court and
11 approved by the Department of Justice.
12           SEN. WEST:  And we need to ask the
13 Secretary of State.  Okay.  I understand that.  But what
14 I'm asking is, you would agree that if we are trying to,
15 quote unquote, purify our election process, that we
16 should do everything we can in order to make certain
17 people are registered to vote.  Wouldn't you agree with
18 that?
19           SEN. FRASER:  I think probably when the --
20           SEN. WEST:  Well, you would not agree with
21 that?
22           SEN. FRASER:  If you'll allow me to make a
23 statement.
24           SEN. WEST:  Sure.
25           SEN. FRASER:  I think when DPS comes up, I

136

1 think there's going to be a lot of discussion about what
2 can they do in the form of either making it easy for
3 people to sign up and/or even, maybe even a temporary
4 van for an area that Senator Uresti had talked about in
5 far West Texas.  Those people that are, you know,
6 100 miles from the nearest location, maybe there's a way
7 to accommodate that.  So I think the answer to your
8 question is, I'm anxious to hear the response of the
9 Department of Safety of what they're either able and/or
10 willing to do.
11           SEN. WEST:  And let's assume that they are
12 able and willing to do more than your bill permits.
13 Would you support an amendment that would enable them to
14 do what they're able to do in order to --
15           SEN. FRASER:  Have you prefiled that
16 amendment and have I had a chance to look at it?
17           SEN. WEST:  No.  I'm asking you a question
18 right now.
19           SEN. FRASER:  And I'm asking you, have you
20 filed your amendment?
21           SEN. WEST:  Well, you basically said, sir,
22 that you have to wait -- we have to wait until you hear
23 their testimony before we can make a determination as to
24 whether or not they're --
25           SEN. FRASER:  No, I can't tell you --

CONSIDERATION OF SENATE BILL 14 1/25/2011

137

1          SEN. WEST:  Well, let me finish; let me
2 finish, please.  Let me finish.
3          What you just said a second ago is, is
4 that you want to defer to the Department of Public
5 Safety to make a determination as to whether or not
6 there are things that they can do in order to make
7 certain they're doing the outreach that's necessary to
8 accommodate just some of the concerns that senator
9 Uresti had.
10          SEN. FRASER:  I didn't say that at all.  I
11 said --
12          SEN. WEST:  What did you say?
13          SEN. FRASER:  -- I'm anxious to hear their
14 testimony when they're asked and their response of what
15 they are able, capable of doing for that.  And then once
16 you do that, if you want to offer an amendment, I will
17 look at every amendment offered.  If you'll got one, you
18 need to go ahead and file it.
19          SEN. WEST:  Let me give you a
20 hypothetical, then.  If the Department says that they
21 can do much more than your bill currently allows them to
22 do, would you support an amendment that would give them
23 the resources or give them the rulemaking authority to
24 be able to do the outreach?
25          SEN. FRASER:  I'm probably not going to

138

1 work in hypotheticals right now.  Let's wait until we
2 hear from them.  Then we'll determine that.
3          SEN. WEST:  Okay.  Well, I'm going to make
4 sure and I'll put that down.
5          I want to talk about seniors just for one
6 second.  How did you come up with 70 years old?  Well,
7 hold on.  Let me ask you this:  Is there a definition, a
8 federal definition under any of our laws, U.S. laws or
9 either state laws, that defines a senior citizen?
10          SEN. FRASER:  It was really actually a
11 very complicated system that we came up with this.  It
12 actually was recommended by a democratic member that
13 said, "If you'll put that in the bill, that would help
14 five or six of us vote for the bill."  So that was
15 recommended originally to be put in the bill.  But the
16 answer to your question is, I'm 61 years old, and I
17 think you're just about as old as I am.
18          SEN. WEST:  No, I'm younger; I'm younger
19 than you are.  I'm younger.
20          SEN. FRASER:  Oh, you're 60 -- 59?
21          SEN. WEST:  I'm younger than you are.
22          SEN. FRASER:  How old are you, sir?
23          SEN. WEST:  I'm 58 years old.
24          SEN. FRASER:  Okay.  Of the people
25 (laughter) --

139

1          SEN. WEST:  Ask the Secretary.  We're not
2 going to --
3          SEN. FRASER:  I want to see your photo ID.
4          SEN. WEST:  Ask the Secretary.
5          SEN. FRASER:  I need a photo ID.
6          SEN. WEST:  Got to ask the Secretary.
7          SEN. FRASER:  And here, this is a good
8 observation.  I live in an area, a retirement community,
9 and I know a lot of the people in that area.  And the
10 people that are my age, that are 61 up to 65 up to 70, I
11 think are still very, very capable.  It is not an
12 inconvenience on them.  There's a lot of people that are
13 70 --
14          SEN. WEST:  And what community?
15          SEN. FRASER:  You want me to answer the
16 question?
17          SEN. WEST:  I just didn't hear.  You said
18 you lived in a retirement --
19          SEN. FRASER:  I live in an area where
20 there's a lot of retired people.
21          SEN. WEST:  People.  Okay.
22          SEN. FRASER:  Yes, like myself.
23          SEN. WEST:  Yes.
24          SEN. FRASER:  Those people that I know,
25 people that are up to that age, it would not be an

140

1 inconvenience for them, and they're still very, very
2 active.  Actually, I've got numerous people that I play
3 golf with often that are above 70 and up to 80.  So,
4 actually, the number probably could have been higher,
5 but that number we thought was a fair number and
6 represented a number that we could offer up as a very
7 fair number for an exception to this bill.
8          SEN. WEST:  Let me make sure I understand
9 your answer to that question.  You're saying that the
10 age 70 is predicated on people that you know that live
11 in your community?
12          SEN. FRASER:  It is predicated by a
13 democrat member offering me that up as a number, that if
14 we would put that in the bill, there would be five or
15 six Democrats that would vote for the bill.  That's the
16 answer to my question.
17          SEN. WEST:  Okay.  But you added a lot of
18 other stuff after that.  What was all that other stuff?
19          SEN. FRASER:  The other stuff was the
20 people that I know that are capable of that.  Now, if
21 someone is not capable, we are not changing the mail-out
22 ballot procedures.  And that anyone for some reason that
23 could not vote in person would be allowed to vote like
24 they do today.
25          SEN. WEST:  Don't you think that a better

KENNEDY REPORTING SERVICE, INC.
512.474.2233

CONSIDERATION OF SENATE BILL 14 1/25/2011

**141**

1 definition would be 65? Why wouldn't you use 65? And
2 let me give an example.
3            In the Human Resource Code, elderly person
4 means a person 65 years of age or older. Why wouldn't
5 we use that as an age? Our Penal Code uses elderly
6 individual means a person 65 years of age or older. Our
7 Utility Code means an individual who is 60 years or
8 older. Our Human Resource Code means an elderly person,
9 means a person who 60 years or older. And now we're
10 going to have our election code basically saying a
11 person of 70 years or older. Don't you think -- I'm not
12 going to vote for your bill anyway, but just in case.
13            SEN. FRASER: You actually were one of the
14 ones that was asking if I would put it in the bill.
15            SEN. WEST: No, no, no, no, no, no, no,
16 no. Let's get it straight. I didn't ask you that --
17 okay? -- for the record. Okay? I didn't ask you that.
18            SEN. FRASER: Okay.
19            SEN. WEST: But if you're going to put it
20 in there, it seems as though you should have one of a
21 consistent definition with some of the other statutes.
22 You're making an elderly individual for voting purpose
23 more onerous than it is under these other statutes, like
24 in our Penal Code where it says an individual -- elderly
25 person is 65 years old.

**142**

1            SEN. FRASER: I actually believe that the
2 number probably could easily be higher, because --
3            SEN. WEST: So you would make it 80 years
4 old?
5            SEN. FRASER: I'm sorry?
6            SEN. WEST: You would make it 80 years old
7 for election purposes?
8            SEN. FRASER: I'm saying when I'm 80, I
9 still believe I'll be able to get in the car, go down
10 and get my ID and be able to vote.
11            SEN. WEST: But, see, you're assuming that
12 all elderly people have cars.
13            SEN. FRASER: If they don't, they can vote
14 by mail.
15            SEN. WEST: But you're assuming that they
16 all have cars and that they'll be able to do everything
17 that you'll be able to do at the age of 80. And I'm
18 pretty certain you will be able to do it given, you
19 know, the things that you do to keep yourself in shape
20 and everything.
21            But I don't think we should be building
22 that definition based on how you perceive yourself and
23 people in your neighborhood. The fact of the matter is,
24 you're more affluent than most other people in the State
25 of Texas. And if you're going to build a definition, I

**143**

1 think what you need to look at is what the average
2 elderly person in the State of Texas, you know, is and
3 the means that they have.
4            SEN. FRASER: And, Senator, I think, you
5 know, if you're going to consider that, you've got to
6 think about how things have changed. When my parents
7 were 65, they were old. Things have changed a lot with
8 diet and exercise, and people are changing what they can
9 do.
10            People that are 70 or 75 or 80 are still
11 very, very active today, and I think it's a very fair
12 number. Now, I feel very comfortable that you're
13 probably going to offer an amendment, raising -- or
14 changing that number. And I think probably, if the
15 members of the body, you know, could help us decide
16 that, I think -- myself, I believe that 70 is a very
17 fair number --
18            SEN. WEST: Let me --
19            SEN. FRASER: -- exception.
20            CHAIRMAN DUNCAN: Senator West --
21            SEN. WEST: Yes.
22            CHAIRMAN DUNCAN: -- if I might
23 interrupt -- and I don't want to -- we can continue with
24 your line of questions when we reconvene as a Committee
25 of the Whole. It's 20 till. We've gone 10 minutes over

**144**

1 what we previously announced. Would you have any
2 objection if we could continue the dialogue after
3 session?
4            SEN. WEST: No objection.
5            CHAIRMAN DUNCAN: Okay. Very good. Why
6 don't we go ahead and do that. Before we do that, let
7 me ask the body if you would, please, if you have
8 amendments that you would wish to -- we're not putting a
9 deadline on amendments, but it will help us if you can
10 deliver your amendments as soon as possible to Jennifer
11 Fagan who is the State Affairs Committee Director, and
12 we will try to collate them and make sure that there are
13 not conflicting amendments. And if you'll do that as
14 soon as possible, that will be helpful.
15            There are a number of people that are on
16 queue to be recognized, and I will recognize them in
17 order that they're on queue. Now we'll record that and
18 then start. Senator Lucio will be first, Senator Van de
19 Putte, Senator Ellis, Senator Seliger, unless you're
20 just -- you're just on for the motion, so we'll take you
21 off center -- Wentworth. He's just for the motion, so
22 we'll take him off. And then, Senator Zaffirini, you
23 would be in queue at that point in time. And then we'll
24 just start the queue. Whenever we come back in, you can
25 go ahead and hit your button and we'll have the queue.

TX_00000092

CONSIDERATION OF SENATE BILL 14 1/25/2011

---

**145**

1          Exhibits, too.  If you have exhibits that
2 you want to enter into the record so that we can make
3 sure we have an orderly transition of those exhibits,
4 would you go ahead and bring those forward, at least
5 during the interim time, so we can go ahead and number
6 them and have them available.  It's not absolutely
7 necessary that we introduce them in their chronological
8 order, but it does help have a cleaner record.
9          Finally, I want to remind you, we did have
10 a little talking over, so we've got to make sure we have
11 a clear record.  So please, in the future, remember to
12 speak one at a time.
13          Senator Zaffirini is recognized for an
14 announcement.
15          (Announcement by Senator Zaffirini)
16          CHAIRMAN DUNCAN:  Thank you, Senator.
17          The Chair recognizes Senator Seliger for a
18 motion.
19          SEN. SELIGER:  Mr. President, I move that
20 the Committee of the Whole Senate rise and report
21 progress.
22          CHAIRMAN DUNCAN:  Members, you've heard
23 the motion.  Is there objection?
24          Chair hears none.  It's so ordered.
25          (Recess:  10:43 a.m. to 12:38 p.m.)

---

**146**

1                AFTERNOON SESSION
2          TUESDAY, JANUARY 25, 2011
3               (12:38 p.m.)
4          CHAIRMAN DUNCAN:  The Committee of the
5 Whole Senate will come to order.  The Secretary will
6 call the roll.
7               ROLL CALL
8          SECRETARY SPAW:  Birdwell?
9          SEN. BIRDWELL:  (Indicated presence)
10          SECRETARY SPAW:  Carona?
11          SEN. CARONA:  (Indicated presence)
12          SECRETARY SPAW:  Davis?
13          SEN. DAVIS:  (Indicated presence)
14          SECRETARY SPAW:  Deuell?
15          SEN. DEUELL:  (Indicated presence)
16          SECRETARY SPAW:  Duncan?
17          CHAIRMAN DUNCAN:  (Indicated presence)
18          SECRETARY SPAW:  Ellis?
19          SEN. ELLIS:  (Indicated presence)
20          SECRETARY SPAW:  Eltife?
21          SEN. ELTIFE:  (Indicated presence)
22          SECRETARY SPAW:  Estes?
23          SEN. ESTES:  (Indicated presence)
24          SECRETARY SPAW:  Fraser?
25          SEN. FRASER:  (Indicated presence)

---

**147**

1          SECRETARY SPAW:  Gallegos?
2          SEN. GALLEGOS:  (Indicated presence)
3          SECRETARY SPAW:  Harris?
4          SEN. HARRIS:  (Indicated presence)
5          SECRETARY SPAW:  Hegar?
6          SEN. HEGAR:  (Indicated presence)
7          SECRETARY SPAW:  Hinojosa?
8          SEN. HINOJOSA:  (Indicated presence)
9          SECRETARY SPAW:  Huffman?
10          SEN. HUFFMAN:  (Indicated presence)
11          SECRETARY SPAW:  Jackson?
12          SEN. JACKSON:  (Indicated presence)
13          SECRETARY SPAW:  Lucio?
14          SEN. LUCIO:  (Indicated presence)
15          SECRETARY SPAW:  Nelson?
16          SEN. NELSON:  (Indicated presence)
17          SECRETARY SPAW:  Nichols?
18          SEN. NICHOLS:  (Indicated presence)
19          SECRETARY SPAW:  Ogden?
20          SEN. OGDEN:  (Indicated presence)
21          SECRETARY SPAW:  Patrick?
22          SEN. PATRICK:  (Indicated presence)
23          SECRETARY SPAW:  Rodriguez?
24          SEN. RODRIGUEZ:  (Indicated presence)
25          SECRETARY SPAW:  Seliger?

---

**148**

1          SEN. SELIGER:  (Indicated presence)
2          SECRETARY SPAW:  Shapiro?
3          SEN. SHAPIRO:  (Indicated presence)
4          SECRETARY SPAW:  Uresti?
5          SEN. URESTI:  (Indicated presence)
6          SECRETARY SPAW:  Van de Putte?
7          SEN. VAN de PUTTE:  (Indicated presence)
8          SECRETARY SPAW:  Watson?
9          SEN. WATSON:  (Indicated presence)
10          SECRETARY SPAW:  Wentworth?
11          SEN. WENTWORTH:  (Indicated presence)
12          SECRETARY SPAW:  West?
13          SEN. WEST:  (Indicated presence)
14          SECRETARY SPAW:  Whitmire?
15          SEN. WHITMIRE:  (Indicated presence)
16          SECRETARY SPAW:  Williams?
17          SEN. WILLIAMS:  (Indicated presence)
18          SECRETARY SPAW:  Zaffirini?
19          SEN. ZAFFIRINI:  (Indicated presence)
20          SECRETARY SPAW:  Lieutenant Governor
21 Dewhurst?
22          PRESIDENT DEWHURST:  (Indicated presence)
23          CHAIRMAN DUNCAN:  Quorum is present.
24          (Pause)
25

---

## CONSIDERATION OF SENATE BILL 14  1/25/2011

149

1        QUESTIONS FROM THE SENATE FLOOR (CONTINUED)

2              CHAIRMAN DUNCAN:  Senator Fraser, are you

3 ready?

4              SEN. FRASER:  I am ready.

5              CHAIRMAN DUNCAN:  Senator West, you're

6 recognized to continue your questioning with Senator

7 Fraser.

8              SEN. WEST:  Yes, sir.  Thank you very

9 much.

10              SEN. FRASER:  And we're going to try it

11 without earphones.  See how that works.  I think I'm

12 good with you.

13              CHAIRMAN DUNCAN:  And if I could advise

14 both of you, I had some -- we had some concerns about

15 you were both talking at the same time on your last

16 dialogue.  So if each of you could remember that, and

17 I'll try to help you --

18              SEN. WEST:  Okay.

19              CHAIRMAN DUNCAN:  -- if you forget.

20              SEN. WEST:  All right.  Thank you.

21              Senator Fraser, I think, then, when we

22 were looking -- can I ask that the last question be read

23 back?

24              CHAIRMAN DUNCAN:  The -- probably not

25 because we have switched court reporter shifts and so --

150

1              SEN. WEST:  I was just trying not to be

2 redundant on it.

3              And, Senator Fraser, if -- if I am being

4 redundant, we talked about --

5              SEN. FRASER:  You are being redundant.

6              SEN. WEST:  Okay.  I need to ask the

7 Secretary of State about that.

8              (Laughter)

9              SEN. WEST:  Wait a minute.  Hold on.  I'm

10 being redundant?

11              Senator Fraser, I think I was asking you

12 about the $2 million; and you had indicated that those

13 funds may very well come from the federal funds, but

14 we're not certain at this point.  And if they don't come

15 from federal funds, they will have to come from general

16 revenue, and we're at least -- the minimum amount is

17 about $2 million.  And I think that I mentioned to you

18 that the average teacher in the state of Texas makes

19 about $48,000.

20              If we have to appropriate state funds in

21 order to fund this voter ID bill, it will cost a minimum

22 of $2 million, and that's the equivalent of about 40,000

23 teachers.  You do understand and appreciate that.  Is

24 that correct?

25              SEN. FRASER:  And I very much appreciate

151

1 how valuable our schoolteachers are to the state of

2 Texas.  Without a doubt, I'm very, very aware of that.

3              And, again, the discussion we had prior to

4 us breaking, we believe very, very strongly that there

5 is sufficient funds in the Secretary of State's budget

6 from HAVA funds that would -- that the letter says they

7 have enough funds to cover this.  They are going to

8 request of the federal government.  It is not

9 unprecedented.  They have allowed that to be used

10 before, so we have every reason to believe it will be

11 done.  And so the discussion of whether that money would

12 deprive some -- the rest of the budget is speculative us

13 not knowing because we believe very strongly that --

14 that that money is going to be available.

15              SEN. WEST:  And this may very well be a

16 technical question for the Secretary of State.

17              If for some reason --

18              SEN. FRASER:  I would never refer anything

19 to --

20              SEN. WEST:  If for some reason the bill is

21 not precleared by Justice, will those HAVA funds be made

22 available?

23              SEN. FRASER:  I'm sorry.  That one I, for

24 sure, do not know the answer to that.  That would be a

25 great question for the Secretary of State.

152

1              SEN. WEST:  For sure?

2              SEN. FRASER:  For sure.

3              SEN. WEST:  Okay.

4              SEN. FRASER:  I do not know the answer to

5 that question.

6              SEN. WEST:  Okay.  And we need to make

7 certain we do.  If -- would you support an amendment,

8 though, that basically says that if general revenue,

9 state revenue, had to be used in order to fund this

10 particular bill, that you would then delay the -- the

11 implementation of it?

12              And the reason I'm asking that is, surely

13 you don't want to take general revenue from our coffers

14 to fund voter ID when we may end up having to lay off

15 thousands of teachers.  I would assume that you would

16 want teachers -- us to appropriate money to make certain

17 that we can fund our education system over funding a

18 voter ID system.

19              SEN. FRASER:  Senator, could I remind you

20 that there was a motion in writing that was entered by

21 Senator Huffman of the -- the testimony of two years

22 ago.  And I think if you'll go back and read that

23 testimony, yourself and several others, one of the big

24 arguments you had was making sure that there was

25 sufficient money that went forward for the education of

## CONSIDERATION OF SENATE BILL 14 1/25/2011

### 153

1 voters, making sure voters understood and that no one
2 would misunderstand this process.  So it's difficult for
3 me when you're arguing both sides of the issue.
4                I think the answer to your question is,
5 I'm not going to take a position today about whether we
6 should or should not.  We are requesting that the
7 Secretary of State do sufficient education so that no
8 one misunderstands the -- the implementation of this
9 bill.
10               SEN. WEST:  Regard --
11               SEN. FRASER:  We're going to give -- we're
12 going to give them that power.  And that without a
13 doubt, I would hate for us to be using money that could
14 be used for a schoolteacher, and I'm not going to get
15 into that debate because I'm a great supporter of
16 schoolteachers.
17               But I still stand by the letter from the
18 Secretary of State.  The Secretary of State believes
19 very clearly that they have sufficient funds, the money
20 is available, and it will be made available.
21               SEN. WEST:  So the answer to my question
22 is, is that if there are no federal funds available, you
23 would support an amendment that basically says that we
24 should not use general revenue in order to fund this
25 bill?

### 154

1                SEN. FRASER:  And my position is, is that
2 you've taken both sides of that issue.  You argued in
3 favor of funds last time.  You're -- now you're asking
4 for amendment saying we're not going to use funds.  If
5 we don't use funds to educate voters, obviously that's a
6 problem.
7                And the answer is, no, I believe the
8 instruction to the Secretary of State is that we do need
9 to educate the voters.
10               SEN. WEST:  So you'd be -- you'd be in
11 favor of cutting schoolteachers using -- and, I mean,
12 you agree with me that based on the budget that was
13 introduced by the House and the budget that was
14 introduced by the Senate, that school districts will be
15 under pressure to terminate some of the teachers that
16 would otherwise be in the classroom?
17               SEN. FRASER:  I -- I don't agree with
18 anything other than the fact --
19               SEN. WEST:  Okay.  All right.
20               SEN. FRASER:  -- that your own finance,
21 you're going to have to make those decisions; and we've
22 got to make sure that we educate voters, making sure
23 that they understand the implementation of this law.
24               SEN. WEST:  All right.  Let me ask the
25 question this way, then:  Would you agree with me that

### 155

1 both the House and the Senate have introduced bills that
2 put pressure on school districts to reduce their budgets
3 that would impact the number of teachers that would be
4 in classrooms?
5                SEN. FRASER:  You're a member of the
6 Finance Committee that implemented a draft budget.  I am
7 not.  I have not advised.
8                And the answer is, I'm sorry, I don't --
9 I -- I'm not advised on that issue.
10               SEN. WEST:  If you were so advised -- if
11 you were so advised that both the House and the Senate
12 by -- if you were so advised by me, the Chairman of
13 Finance, the Chairman of Appropriation, that both the
14 House and the Senate have introduced bills that would
15 require us cutting our commitment to our public schools
16 and our teachers, if you were so advised that both
17 houses introduced the budget that did that, would your
18 position still be the same as it relates to the question
19 I asked you concerning whether or not we should be using
20 general revenue in order to fund voter ID implementation
21 over funding our public schools?
22               SEN. FRASER:  I am so advised that you're
23 a member of finance, a very respected member, and you're
24 very capable of making those hard decisions; and I'm
25 sure you'll move forward and make the right decision for

### 156

1 our wonderful schoolteachers across the state.
2                SEN. WEST:  What decision would you make?
3                SEN. FRASER:  I'm sorry?
4                SEN. WEST:  What decision would you make?
5                SEN. FRASER:  I made a decision to support
6 you, as a member of finance, to keep you on the
7 committee.
8                SEN. WEST:  So if you had -- if you had to
9 make a decision, though, if you were on finance and had
10 to make a decision, what decision would you make?
11               SEN. FRASER:  I'm sorry.  I'm not sitting
12 on finance.  I'm not subject to being able to listen to
13 the debates, so it would be -- wouldn't be right for me
14 to take a position on that.
15               SEN. WEST:  But if you had to make -- take
16 a position on funding voter ID over schoolteachers,
17 which one would you fund?
18               SEN. FRASER:  I'm -- I think the
19 position -- because this bill is before us, it is
20 extremely important that -- that we deter and detect
21 fraud and restore the public confidence in the election
22 system.
23               SEN. WEST:  So that's your answer in terms
24 of -- is that what you're telling the teachers, that
25 you'd rather do that than -- to the extent it's there,

## CONSIDERATION OF SENATE BILL 14 1/25/2011

157

1 you'd --

2          (Simultaneous speaking)

3          SEN. FRASER:  Well, unfortunately, since

4 I'm not a member of finance, I don't get to make a

5 choice of what I would rather do.  I'm laying --

6 bringing forward a bill today that would restore the

7 confidence of the public in the election system and --

8 today, because I'm sponsoring that bill, that I'm going

9 to ask that we -- you know, we restore that confidence.

10          SEN. WEST:  So, I'm trying to -- so let me

11 make certain I understand your answer to my question.

12          SEN. FRASER:  I know you're trying to --

13          SEN. WEST:  Let me -- let me -- hold up.

14 Now, I'm listening, because if you remember, both of us

15 can't talk at the same time because the stenographer's

16 taking it down, and I'm trying to make certain that I am

17 reminded of that fact.

18          So your answer to that question is that

19 you would prefer to fund the voter ID bill, if need be,

20 with state funds than to put extra money -- take that

21 $2 million, if we need to, and put it back in the budget

22 for our school districts?

23          SEN. FRASER:  You know, the -- you know,

24 the important thing -- or the good thing with the

25 Legislature is you don't get to make -- answer questions

158

1 for me, and the -- I did not say that at all.

2          Today I'm laying -- bringing forward a

3 bill that would deter and detect fraud and restore the

4 public confidence in the election system.

5          SEN. WEST:  How does your bill detect

6 fraud?

7          SEN. FRASER:  Come back?  I'm sorry.  I

8 didn't hear you.  What did you say?

9          SEN. WEST:  How does your bill detect

10 fraud?

11          SEN. FRASER:  The -- the bill is designed

12 to deter and detect fraud and restore --

13          SEN. WEST:  No.  I asked you:  How does

14 your bill detect fraud?

15          SEN. FRASER:  The -- I think the easy

16 answer to that would be, is that when you walk into

17 the -- into your election booth and you show your

18 driver's license, they know for sure that you're Royce

19 West and that if you're on the precinct list,

20 registered, you're entitled to vote.

21          SEN. WEST:  And so that's -- that's the

22 fraud detection provision in it?  And so you'd rather

23 fund --

24          SEN. FRASER:  That's the way the bill

25 works.

159

1          SEN. WEST:  Now, let me ask you this:  If

2 there's empirical evidence that -- in Texas, at least,

3 because, you know, we are -- we are Texas.  We are the

4 Lone Star State.  The rest of America can go this way,

5 and we'll go that -- the other way.  Right?  Right.

6 Okay.  You're good with that.  Right?

7          SEN. FRASER:  I'm sitting here listening.

8          SEN. WEST:  You don't agree with that?

9          SEN. FRASER:  No, I'm listening to you.

10 You're --

11          SEN. WEST:  We are Texans.

12          SEN. FRASER:  You're still answering my

13 questions for me.

14          SEN. WEST:  We're Texans.

15          SEN. FRASER:  Keep going.

16          SEN. WEST:  I'm just asking you whether

17 you agree with it.  And so the question I'm asking you

18 is:  Is there any indication that we have prosecuted any

19 fraud associated with identification in the state of

20 Texas?  Is there any empirical evidence whatsoever?

21          SEN. FRASER:  The bill that I'm bringing

22 forward today will clearly say that when you walk in the

23 voting booth, you identify yourself as who you say you

24 are, and the bill that we're bringing forward we believe

25 will pass the Supreme Court of the United States and be

160

1 approved by Department of Justice.

2          SEN. WEST:  I notice you keep on saying

3 that in terms of you believe that the bill is going to

4 pass muster at the Department of Justice and also the

5 United -- the Supreme Court of the United States.  Are

6 you anticipating any -- let me -- let me ask this:  If

7 the Department of Justice decides not to preclear this

8 legislation, are you anticipating any type of court

9 challenge by the state of Texas?

10          SEN. FRASER:  Senator, I'm starting to

11 have trouble hearing you.  Hold on a second.  Let me put

12 my earphones on.

13          (Pause)

14          SEN. FRASER:  Are you there?

15          SEN. WEST:  Yes.

16          SEN. FRASER:  Would you say something?

17          SEN. WEST:  Testing, testing, testing.

18          SEN. FRASER:  Okay.  I got you.

19          SEN. WEST:  One, two, three.

20          SEN. FRASER:  Okay.  Will you ask your

21 question again?

22          SEN. WEST:  You have consistently

23 indicated that this particular bill will pass the

24 Department of Justice and also the Supreme Court.  I'm

25 asking you:  Do you anticipate that if the Department of

CONSIDERATION OF SENATE BILL 14 1/25/2011

161

1 Justice decides not to preclear this particular
2 legislation, any litigation concerning it?
3           SEN. FRASER:  You're -- you're being
4 subjective about me assuming what's going to happen.  I
5 believe the bill that we had -- that we're offering will
6 be precleared.
7           SEN. WEST:  But I'm asking if it's not
8 precleared.  Do you want to see us go into litigation
9 with the federal government concerning your bill if it's
10 not precleared?
11          SEN. FRASER:  I don't -- I don't think
12 that's, you know, my choice.  I think we -- we will
13 present the bill forward and try to present our best
14 case that it should.
15          SEN. WEST:  Okay.  So does your bill
16 anticipate any litigation at all?
17          SEN. FRASER:  The bill in no way addresses
18 or thinks about any litigation.  It is clearly just a
19 bill saying this is -- this is what we're asking you to
20 do, to present a photo ID when you vote, and that's the
21 extent of the bill.
22          SEN. WEST:  I know because -- and the
23 reason I ask that question, you continue to make
24 reference to the Department of Justice and the U.S.
25 Supreme Court or --

162

1           SEN. FRASER:  Only because the -- the
2 bills that have been brought forward by other states,
3 which Indiana was cleared by the -- you know, made it
4 all the way to the U.S. Supreme Court; and then in
5 Georgia, they were precleared from the Department of
6 Justice because a bill -- you know, since we're a
7 Section 5 state, they were precleared.
8           SEN. WEST:  Okay.  In Georgia, not
9 Indiana.  Indiana's not a Section 5 state?
10          SEN. FRASER:  No, they are not.
11          SEN. WEST:  Okay.  Has the Legislature or
12 have you conducted any research on how burdens of the
13 photo ID requirements may fall disproportionately upon
14 racial minorities?
15          SEN. FRASER:  Come back again.  I'm sorry.
16 My sound went off.
17          SEN. WEST:  Okay.  In drafting your -- in
18 drafting your bill, was there any research conducted on
19 how burdens of -- burdens of photo identification
20 requirements may fall disproportionately on racial
21 minorities?
22          SEN. FRASER:  Probably the best evidence
23 that I could bring forward, that the latest poll that
24 was conducted of Texans, including the people in your
25 area.  Of the -- there were 86 percent of the public

163

1 that in favor of that.  Of that, 82 percent were black,
2 83 percent were Hispanic.
3           So I would say the answer to your question
4 is:  If you ask someone that is either African American
5 or Hispanic, do they believe that -- "Do you
6 favor/oppose requiring a valid photo ID before a person
7 is allowed to vote?" and you have 82 percent of the
8 public that says that --
9           SEN. WEST:  Right.
10          SEN. FRASER:  -- pretty -- pretty
11 straightforward.
12          SEN. WEST:  You keep referring to that
13 poll.  What poll is that, sir, and who was it conducted
14 by?
15          SEN. FRASER:  It was conducted -- this is
16 one of many we had.  I've got a whole series of polls.
17 This just happened to be the latest one that was
18 conducted January the 10th, 2011.  This one was by the
19 Lighthouse Opinion Polling & Research, LLC.
20          SEN. WEST:  Lighthouse Opinion.
21          SEN. FRASER:  Lighthouse Opinion Polling,
22 LLC.
23          SEN. WEST:  Okay.  And --
24          SEN. FRASER:  One that was --
25          (Simultaneous discussion)

164

1           SEN. WEST:  Were you finished?
2           SEN. FRASER:  Yeah.
3           SEN. WEST:  Okay.  Now, the question,
4 though, that I asked, not -- and I agree with you that
5 most people will say that some form of photo ID is okay.
6 Now --
7           SEN. FRASER:  But what --
8           SEN. WEST:  Let me -- let me finish.  Let
9 me finish, though.  Hold on for a second.
10          I would agree with you that, but my
11 question wasn't about their opinion.  My question was:
12 Have you conducted any research on how burdens of photo
13 ID requirements may fall disproportionately on racial
14 minorities?
15          SEN. FRASER:  And I think the answer to
16 that, if you look at what happened in Indiana and
17 Georgia is a good example because it is a Section 5
18 state.  In those states, to our -- to my knowledge,
19 there has not been a single person that has came forward
20 to identify themself that they were in any way, you
21 know, in -- you know, kept from voting or inconvenienced
22 by voting.
23          So the answer to your question is, that I
24 look at the data that has been collected from the states
25 that have implemented, and they're coming forward.  That

KENNEDY REPORTING SERVICE, INC.
512.474.2233

CONSIDERATION OF SENATE BILL 14 1/25/2011

165

1 is the case.  Plus the fact that if you ask African
2 Americans or Hispanics in Texas, it's a very
3 straightforward question.  When you have 82 percent of
4 the public, the people that you represent, saying, you
5 know, "I think that's a good ideal," I'm having a lot of
6 trouble understanding how -- why you don't understand
7 that.
8             SEN. WEST:  Okay.  So the answer to my
9 question is, is that you did not conduct any type of
10 research on it other than looked at opinion polls and
11 referenced what went on in other states?
12             SEN. FRASER:  No, we've done all --
13 there's been a lot of research done.
14             SEN. WEST:  And that's what I was asking.
15 What research have you done --
16             SEN. FRASER:  I just explained --
17             SEN. WEST:  -- to make that determination?
18             SEN. FRASER:  -- to you what we did.  We
19 have looked at the experience of other states.  And
20 you're going to have witnesses come from some of the
21 other affected states, and you're going to be able to
22 ask that question:  Who has came forward in your state
23 and said it's a problem?
24             SEN. WEST:  Okay.  So you're saying, then,
25 that as a result of experiences in other states and an

166

1 opinion poll, that that is the sum total of the research
2 that's been done by you in preparation of this bill?
3             SEN. FRASER:  Senator, I think the people
4 in your district understand very clearly.  If you ask
5 them a direct question, someone you represent, and said,
6 "Do you favor or oppose requiring a valid photo ID
7 before you're allowed to vote," this is -- that's not
8 rocket science.
9             SEN. WEST:  Well, the --
10             SEN. FRASER:  "Should you be required to
11 show your picture ID when you go into vote?"  That's --
12 that's -- to me, that's -- that's, you know, pretty
13 telling.
14             SEN. WEST:  Well, the great thing about it
15 is, we're going to have an opportunity to do just that.
16 Because guess what?  I've got a few people from my
17 district down here to testify, so you'll have an
18 opportunity to ask them that.  Okay?
19             SEN. FRASER:  Good.
20             SEN. WEST:  But, again, that's the sum
21 total of your research, though.  Right?
22             SEN. FRASER:  I didn't say that was the
23 sum total of my research.
24             SEN. WEST:  Now, would you agree that
25 Texas has a larger proportion of minorities than

167

1 Indiana?
2             SEN. FRASER:  Not advised.
3             SEN. WEST:  So if -- if the demographic
4 information that we have from the U.S. Department of
5 Census indicated that, you would not disagree with that.
6 Correct?
7             SEN. FRASER:  Well, I mean, every state
8 has a different demographic of the makeup of people
9 within the state.
10             SEN. WEST:  Sure.  I know that, yeah.
11             SEN. FRASER:  Georgia is a -- you know,
12 they're -- they're a Section 5 voter rights state, but
13 their makeup is not exactly like Texas.
14             SEN. WEST:  That's the point.  That's what
15 I'm asking you.  You said you weren't advised, so I was
16 just trying to point to you some set of facts that all
17 of us commonly know that we get from the Department of
18 Census, U.S. Department of Census.  And if they give
19 different demographic information for the states, then
20 that would probably be controlling, and you would agree
21 that that's the best evidence that we have of what the
22 population is in those various states.  That's all I'm
23 asking.  Now, let me ask this.
24             SEN. FRASER:  But you're trying to answer
25 my question, and I did not say that.

168

1             SEN. WEST:  No, I'm not.  But are the
2 forms of identification listed in your bill the least
3 restrictive options in order to achieve the goal of
4 avoiding what you call voter identification fraud?
5             SEN. FRASER:  Okay.  You're going to have
6 to ask that again.
7             SEN. WEST:  Are the forms of
8 identification that you've listed in the bill the least
9 restrictive options in order to achieve the goal of
10 avoiding what you have said is voter identification
11 fraud?
12             SEN. FRASER:  And I think what you're
13 asking, which is going to be the easiest to use?  And
14 the -- the data, if you look back at 2006, the number of
15 people that have registered to vote, about -- I think
16 the number now is 91 percent actually use their driver's
17 license when they registered to vote.  So the assumption
18 is at least 91 percent of the people that voted -- or
19 that registered since 2006 had a driver's license.  So
20 I'd say that's the -- if it's the -- the easiest thing,
21 I'd say a driver's license.
22             SEN. WEST:  So this -- the list of
23 identifications that you use as the -- is the least
24 restrictive options that you could come up with?
25             SEN. FRASER:  Well, I don't -- I'm not

CONSIDERATION OF SENATE BILL 14 1/25/2011

**169**

1 sure.  Your verbiage you're using, I don't know that
2 that's the intent.
3              SEN. WEST:  Well --
4              SEN. FRASER:  I'm saying that the thing
5 that the -- the type of identification that is most
6 readily available appears to be a driver's license.
7 It -- we think, that is.
8              SEN. WEST:  Okay.  Now, since there are
9 studies that show that African Americans and Hispanics
10 are more affected by poverty and --
11             SEN. FRASER:  Ask him, then.
12             We're trying to figure out if this is a
13 filibuster.
14             SEN. WEST:  Is it a what?
15             SEN. FRASER:  A filibuster?
16             SEN. WEST:  Oh, no, this is serious
17 business.  This is serious business.
18             SEN. FRASER:  I guess I would remind you
19 that the information that was put into the record this
20 morning by Senator Huffman, the questions you've gone
21 over, I believe we put them --
22             SEN. WEST:  Well, at any -- at any point,
23 you can defer to whomever you want to answer the
24 question.
25             SEN. FRASER:  No, no, I'm saying --

**170**

1              SEN. WEST:  You've been referring to the
2 Secretary of State.
3              SEN. FRASER:  -- these -- the questions --
4 the questions you're asking, the question and the answer
5 are already in the record from two years ago; that
6 you're asking the exact same question, and I'm answering
7 the exact same answer.  It's already in the --
8              SEN. WEST:  And it may very well be.  I
9 just don't remember.  I haven't gone back and read that
10 entire record.  It was like 26 hours.  So if I'm being a
11 little bit redundant, please give me -- give me a little
12 space on that.
13             Let me go back to the questions I'm
14 asking.  Studies have shown that African Americans and
15 Hispanics are more affected by poverty and, therefore,
16 are more likely to participate in government benefit
17 programs.  Will the elimination of the government
18 documents as a form of ID disproportionately affect
19 African Americans and Hispanics?
20             SEN. FRASER:  I'm not advised.
21             SEN. WEST:  Okay.  If in fact -- well, let
22 me back up and ask you this question.
23             Do you agree that African Americans and
24 Hispanics are disproportionately affected by poverty in
25 the state of Texas?

**171**

1              SEN. FRASER:  Not advised.
2              SEN. WEST:  Okay.  Do you --
3              SEN. FRASER:  I grew up in a pretty poor
4 family, so --
5              SEN. WEST:  Well, that's what I know, and
6 correct me if I'm wrong because we've had our
7 conversations.  Your father was a minister, too.  Right?
8              SEN. FRASER:  Minster and --
9              SEN. WEST:  Okay.  He went to a lot of
10 African American churches?
11             SEN. FRASER:  Yes, he did.
12             SEN. WEST:  Did a little singing and stuff
13 like that?
14             SEN. FRASER:  Yes.
15             SEN. WEST:  Okay.  And do you represent a
16 district that has a high poverty level -- or excuse
17 me -- a high ethnic minority population?
18             SEN. FRASER:  Interestingly -- well, and
19 what you call high, it is not one of the highest
20 percentage wise of ethnic minority.  But the last figure
21 I was shown, my district is the third poorest district
22 in the state, right behind Senator Uresti's.  That
23 that -- that number is a couple of year's old, but
24 I'm -- you know, the --
25             SEN. WEST:  Okay.

**172**

1              SEN. FRASER:  -- people in my district
2 are -- are the working poor.
3              SEN. WEST:  Okay.  The -- the protected
4 classes, that would be an African American and
5 Hispanics, do you have a high concentration of African
6 Americans and Hispanics in your district?
7              SEN. FRASER:  Well, I don't know what
8 you'll call a high percentage.  I've got --
9              SEN. WEST:  Okay.  Comparatively speaking.
10             SEN. FRASER:  There -- there are a lot of
11 my voters in my district that, you know, I'm -- I love
12 to say "my constituents" -- that are African American or
13 Hispanic.
14             SEN. WEST:  Are they in poverty or what?
15 I mean, you know what poverty is.
16             SEN. FRASER:  Well, Senator, if --
17             SEN. WEST:  Oh.
18             SEN. FRASER:  If I have the third poorest
19 district in the state, that implies that we have some
20 people that are working poor.
21             SEN. WEST:  Let me just ask you this
22 question.
23             Do you know whether or not the elimination
24 of the government documents that have hereto before been
25 utilized by voters for identification purposes at the

CONSIDERATION OF SENATE BILL 14 1/25/2011

173

1 polls --

2           SEN. FRASER: Issued before?

3           SEN. WEST: Yeah, I mean, under current

4 law. Let me back up, then.

5           Based on current law and the various

6 government identifications that can be used for purposes

7 of voting, by eliminating those, whether they have an

8 adverse impact on ethic minorities in the state?

9           SEN. FRASER: Let me -- let me tell you

10 that the people in my district voted -- or they're

11 polling that they -- 92 percent of them say that they're

12 in favor of this -- this requirement.

13           SEN. WEST: Okay. So you don't -- and

14 that's your response to my question?

15           SEN. FRASER: My response is, is that I

16 think the people of the state of Texas, which makes

17 up -- I think it was 83 percent of -- of African

18 Americans and 85 percent of Hispanics, said that they're

19 in favor of it. I'm sorry. It's 82 percent Hispanic --

20 I'm sorry -- Hispanic, 80 -- 83 percent Hispanic, the

21 African American, which is -- it's listed as a black

22 vote, is 82 percent say they are in favor of asking for

23 a photo ID.

24           So it's -- it's -- this is a pretty easy

25 question for them, "Should you have to show your -- your

174

1 photo ID, your driver's license, when you come in to

2 vote?" And they said, "Sure. That's" -- you know,

3 "That's fair."

4           SEN. WEST: And that's your response to my

5 question?

6           SEN. FRASER: Yes.

7           SEN. WEST: Okay. No more questions at

8 this time.

9           SEN. FRASER: Thank you, Senator.

10           CHAIRMAN DUNCAN: Chair recognizes Senator

11 Lucio for questions.

12           SEN. LUCIO: Thank you, Mr. Chairman.

13           Senator Fraser, under this legislation,

14 there are no exceptions at all if you do not have a

15 driver's license -- and correct me if I'm wrong --

16 military ID, citizenship certificates, or passports.

17 Now, not even Senate IDs are appropriate for the

18 purposes of voting. That means the state employee

19 working in the building wishing to cast a ballot during

20 early voting at the Sam Houston Building couldn't use a

21 combination of their voter registration card and their

22 Senate ID. Further, this bill's requirements for

23 identification are stronger than what's used for new

24 employees in obtaining driver's license, the way we

25 understand it.

175

1           Now, I know many people don't think it's

2 all that difficult to get a driver's license and that

3 everyone has one, but that's just not the case.

4 Eleven percent of Americans surveyed by the Brennan

5 Center for Justice do not have government-issued photo

6 ID. Forty percent of those without voter ID are

7 disproportionately the -- the elderly, the -- the

8 students, women, people with disabilities, low-income

9 people, and people of color.

10           According to disability advocates, nearly

11 10 percent of the 40 million Americans with disabilities

12 do not have any state-issued photo ID. So I do not see

13 how this legislation is going to ensure that they are

14 not kept from exercising their right to vote. Again,

15 it's a right. It's not a privilege. Plus, according to

16 that same survey, one of every five senior women does

17 not have a license.

18           What troubles me even more about the

19 legislation is that it could mean, for so many, under

20 this legislation, election workers will be responsible

21 for determining identity; and that has never been part

22 of their job as election clerks.

23           Now, I got a question.

24           SEN. FRASER: Is there a question coming?

25 I'm looking for the question.

176

1           SEN. LUCIO: Yeah, it's coming up. I had

2 to --

3           SEN. FRASER: You've got about five or six

4 thoughts. I -- well, I'm going to --

5           (Simultaneous speaking)

6           SEN. FRASER: -- one of them. But you're

7 getting so many thoughts, I'll have trouble responding

8 to them.

9           SEN. LUCIO: What are -- what are they

10 going to do, Senator Fraser, when someone has

11 conflicting last names, conflicting last names on IDs,

12 on their voter rolls, and how many professional ballots

13 will be cast? Are counties ready to resolve all those

14 issues?

15           That might have been asked, I missed it,

16 and I apologize for that because we've been busy, as we

17 always are. But let me -- let me just ask this

18 question, as a follow-up.

19           (Simultaneous speaking)

20           SEN. FRASER: You've asked me 12 --

21           SEN. LUCIO: Go ahead and address --

22           SEN. FRASER: -- so far.

23           SEN. LUCIO: Go ahead and address that

24 one.

25           SEN. FRASER: Huh?

KENNEDY REPORTING SERVICE, INC.
512.474.2233

CONSIDERATION OF SENATE BILL 14 1/25/2011

177

1        SEN. LUCIO:  Okay.  Well --

2        CHAIRMAN DUNCAN:  Wait, wait, wait, wait,

3  wait.  Y'all are really crossing over to where you're

4  not making a good record, so one at a time.  I think

5  Senator Fraser was answering a question; and if he could

6  answer it and, Senator Lucio, you could follow with

7  another question.

8        SEN. FRASER:  And, Senator, if -- if you

9  really do want an answer to questions, I would love to

10  do one at a time because I actually --

11        SEN. LUCIO:  Okay.

12        SEN. FRASER:  -- you've asked so many

13  questions, I can't remember --

14        SEN. LUCIO:  Okay.

15        SEN. FRASER:  -- the first one.

16        CHAIRMAN DUNCAN:  All right.

17        SEN. FRASER:  But --

18        CHAIRMAN DUNCAN:  Wait.  You're doing it

19  again, Senator.  If we could -- I'm going to stay on

20  this because we do want a good record.

21        SEN. FRASER:  If you'll just allow me to

22  just answer a couple of them, and then we'll get them

23  out of the way.

24        SEN. LUCIO:  I'll take one at a time.

25        What are you going to do when someone has

178

1  conflicting last names on their ID on the voter rolls?

2        SEN. FRASER:  Okay.  I'm going to start

3  even further back than that.

4        I -- the -- the first observation you made

5  is that we're making it harder than getting a driver's

6  license.  That is totally incorrect.  Driver's license

7  is one of the things we're offering, so whatever

8  difficulty it is to get a driver's license, once they

9  get it, that is their identification.  So this is not in

10  any way harder than getting a driver's license.

11        No. 2, you made an observation about the

12  elderly.  We have two different observations that --

13  that come into play here.  First one is that at -- if

14  they're 70 years old on January 1st, 2012, they are not

15  subject to this bill, so they are -- they are operating

16  under current law.  And then, also, we are not in any

17  way impacting the mail-in ballot system that is in place

18  today.  Any elderly person that wants to vote by mail

19  would -- would have the ability to do it.

20        So, you know, those things, I think,

21  are -- the question you're asking, the third question,

22  about if the name does not match on the -- the ballot,

23  that's the same question that's been asked probably five

24  times already today.  My answer continues to be the

25  same, as I've told everyone.  We have the Secretary of

179

1  State coming.  I don't -- I don't know the -- the exact

2  ruling of what they -- the Secretary of State, slash,

3  the election administrator is how they determine that;

4  and I would like that question to be asked to the

5  Secretary of State, if possible.

6        SEN. LUCIO:  Okay.  That's fine, Senator.

7        To obtain a driver's license, you could

8  use nonphoto options.  Correct?

9        SEN. FRASER:  Senator, you can ask that of

10  the DPS.

11        SEN. LUCIO:  I'm sorry?

12        SEN. FRASER:  If you would -- DPS is going

13  to be here.  I would ask you that you could ask the DPS

14  their procedures for -- for getting...

15        SEN. LUCIO:  Okay.  Well, I have

16  information to that effect, but it's all right.  I'll

17  wait for DPS.

18        Let me ask a question on -- on where we

19  have been in this country and this state, and we don't

20  want to go.

21        But do you know what the 24th Amendment

22  did?

23        SEN. FRASER:  I'm sorry.  I do not.

24        SEN. LUCIO:  It ended -- it amended the

25  constitution to allow -- outlaw poll taxes; and it did

180

1  so, and it ended in 1964.  I was a freshman in college

2  at the time, and you must have been junior high.

3        SEN. FRASER:  I was four or five, then,

4  Eddie, I guess.  '64, I was 17 years old.

5        SEN. LUCIO:  All right.  I did a little

6  research, Senator, on the poll tax in --

7        SEN. FRASER:  15 years old.

8        SEN. LUCIO:  -- Texas history.  It's

9  something that personally hurts me.  After all, my dad

10  had to pay a poll tax which wasn't that long ago.  I

11  went to some of those elections with him because he

12  wanted to show me and make sure that I got involved in

13  the political process.  I remember those elections, and

14  my -- my mother voted, too.  But it was -- it was a

15  sacrifice, quite frankly.

16        Now, Texas adopted a poll tax in 1902.  It

17  required that otherwise eligible voters pay between

18  $1.50 and $1.75 to register to vote.  Now, $1.75 may not

19  sound like a lot, but for a lot of families living on

20  the breadline, it made voting a privilege instead of a

21  right.  Well, 1.75 -- $1.75 adjusted for inflation today

22  is about 40 to $45.  That means, Senator, that's a mean

23  instrument -- excuse me -- using several ways of

24  calculating, including the consumer price index.

25        Now, 40 bucks is a symbolic figure.  A

KENNEDY REPORTING SERVICE, INC.
512.474.2233

CONSIDERATION OF SENATE BILL 14 1/25/2011

181

1 driver's license or ID today costs $25, even for a
2 renewal.  And going to the DMV, which is Department of
3 Motor Vehicles, can take time.  You're going to get
4 there, wait in line, return home, take off from work,
5 pay for the gas.  Now, let's say it takes two hours.
6 Minimum wage in Texas is 7.25 an hour.  So if you took
7 off two hours and paid for gas, you're looking at $40,
8 the same amount of the old poll tax would cost today.
9 Don't -- don't you find that kind of ironic?  I do.
10           Under this bill, voters will effectively
11 have to pay the same amount to vote that minorities and
12 the poor had to pay in poll tax in 1902.  I'm serious,
13 though.  Forty dollars is a lot of money for a lot of
14 people in my district living paycheck to paycheck.  You
15 can buy a week's shopping for 40 bucks.  You're either
16 going to eat or you're going to -- you're going to vote.
17 That is the choice many will think about making.
18           The poll tax was outlawed in -- in the
19 1960s by the 24th Amendment.  It was outlawed because
20 the nation understood that poll tax -- taxes served as
21 one purpose, to --
22           (Simultaneous speaking)
23           SEN. LUCIO:  -- disenfranchise minorities
24 and the vulnerable.
25           I'm leading to another question, if I may.

182

1           Texas has a history, unfortunately, in my
2 opinion of voter suppression.  Texas used the poll tax
3 to suppress voters.  In fact, Texas only ratified the
4 24th Amendment in 2009, 2009.
5           So what is to stop future legislators
6 making a driver's license or an ID cost more than $25?
7 We've talked openly over the last few months about
8 raising fees to cover the back -- the budget hole.  So,
9 you know, it's -- it's happened with passports.
10 Passports keep going up and up in price.  What if in the
11 future, driver's license cost $125 or $300?  Would it be
12 a poll tax then?  And would it be a poll tax then,
13 Senator?
14           SEN. FRASER:  Senator, this bill in no way
15 envisions a poll tax.  It has nothing to do with the fee
16 that is charged.  You're on finance.  You're the one
17 that has control over that.  The bill we have before us
18 today -- there's nothing you've talked about the last
19 five minutes that has anything to do with this bill --
20 is that this bill is nothing more than showing your
21 driver's license or a ID that we will give them free of
22 charge that they can pick up after work that -- you
23 know, when I was picking cucumbers and -- you know, in
24 the afternoon, when I got off work, I could -- I still
25 had time before seven o'clock to go down and -- to the

183

1 driver's license place to get the driver's license.  So
2 this has -- this bill in no way has anything to do with
3 a poll tax.
4           SEN. LUCIO:  Well, and I -- I appreciate,
5 you know, what you're saying.  However, I just want to
6 make sure that it doesn't get out of hand.  And I would
7 ask you, possibly, if you would vote, you would be
8 prepared to work with me and others to -- in order to
9 draft a constitutional amendment that would make any
10 raise in fees associated with driver's license or state
11 ID only possible by a two-thirds vote of each chamber.
12 You think that we could work to that end?
13           SEN. FRASER:  Senator, I'm -- I'm not
14 going to commit on anything.  You're on finance.  Y'all
15 are going to have to work through the issues of
16 balancing the budget.
17           The bill that I'm laying out today, I
18 think, is a very fair way for people to identify
19 themselves, that they can prove they are who they say
20 they are when they go to vote.  The -- the thing that I
21 would let you know that, you know, I want to make sure
22 that every -- we've -- we've talked to senator -- you
23 know, the -- Davis has asked about women.  I want to
24 make sure that women, men, Hispanics, African Americans,
25 Anglos, everyone in the state has the same opportunity

184

1 to go in and make sure that their vote is counted.  And
2 I don't -- the things you're talking about really are
3 not part or subject to this bill.
4           SEN. LUCIO:  Well, a driver's license is
5 part of it, I believe, and I'll be --
6           SEN. FRASER:  But -- but the cost of a
7 driver's license is determined by the Finance Committee.
8           SEN. LUCIO:  When -- when -- when does a
9 driver's license expire?  I was going to ask you that
10 question.
11           SEN. FRASER:  When does it expire?
12           SEN. LUCIO:  Yes, sir.
13           SEN. FRASER:  You know, interestingly, I
14 was in -- looking at mine just then, in my office.  I
15 got a new one this year, and it's good for six years.
16 So every six years, evidently.  I'm -- I'm going to ask
17 DPS that, but my assumption is that a driver's license
18 is renewed to last for six years.
19           SEN. LUCIO:  Well, we talked about senior
20 citizens.  There are senior citizens, 60, 70 years old,
21 who used an expired driver's license as a form of ID.
22 That's where I'm going with my questions and my remarks.
23 Are they no longer -- they no longer drive, but they
24 still vote.
25           Now, under this bill, they will have to

CONSIDERATION OF SENATE BILL 14 1/25/2011

185

1 renew their license in order to vote.  Is that correct?

2                 SEN. FRASER:  You -- you've given a
3 hypothetical, and I guess it's one of the things --
4 actually, we were in the back discussing a question that
5 was brought up by Senator Davis about an expired
6 driver's license and at what point should it be -- how
7 long should it be used.  I think someone used it for an
8 extended period, like the example you're giving, for
9 several years.  Unfortunately, that's not a valid --
10 that would be considered a valid license.

11                 SEN. LUCIO:  I was under that impression
12 or to renew their passport or -- which are seldom used
13 by seniors.

14                 SEN. FRASER:  I disagree with that.  I
15 travel with a lot of seniors.  I think there's a lot,
16 you know.

17                 SEN. LUCIO:  Well, the ID.  They use this
18 ID for passports.

19                 Well, I obviously have a bunch of other
20 questions, but in the -- in the interest of time, I will
21 address these to you in writing because I'm very, very
22 concerned about, you know, some of the things that are
23 going to be transpiring.  I think Senator Davis touched
24 on marriage -- the marriage -- marriage issues.

25                 Or I'll give you one scenario, if I may.

186

1 Two citizens that are getting married.  The woman
2 getting married has decided to change her name.  They
3 get the marriage certificate.  They get married and so
4 on.  But when the newlywed wife tries to vote, there is
5 a problem.  The name on her voter ID does not match the
6 name on her voter registration.  So maybe she did the
7 right thing and changed her name on the voter ID, but
8 before that, when she registered to vote, she had used
9 her maiden name.  Maybe she registered to vote with her
10 new married surname but had not had yet changed her
11 voter ID to reflect a change of name.  Maybe there is no
12 time to address it because she gets married in October.

13                 SEN. FRASER:  Senator, these --

14                 SEN. LUCIO:  Those are just scenarios that
15 are coming up.

16                 Others that I'm concerned with are the 18
17 year olds that are turning 18 thirty days inside of --
18 you know, between a primary and a general election.
19 Many of them will not be able to register to vote.

20                 There are so many different scenarios,
21 Senator, and I'm very concerned about whether or not
22 they will be disenfranchised.  That's all.  Thank you
23 very much for your time.

24                 CHAIRMAN DUNCAN:  Senator Van de Putte?

25                 SEN. VAN de PUTTE:  Thank you,

187

1 Mr. Chairman.

2                 Would author of the bill yield for some
3 clarification?

4                 SEN. FRASER:  I would yield.

5                 SEN. VAN de PUTTE:  Thank you very much,
6 Senator Fraser.  I wanted to have a moment to clarify
7 some of the conversation and the points that we had on
8 our discussion earlier.

9                 I thought that I had heard you say that
10 the bill that we had in the 81st Legislature was
11 actually modeled after Georgia.  When after comparison,
12 I think that it was actually modeled more closely after
13 the Arizona bill, which is a Section 5 voting rights
14 state as well.  And so I wanted to clarify that, but I
15 thought we had talked so much about the Georgia
16 legislation.  So the -- the bill, Senate Bill 362, was
17 actually modeled more after Arizona's law.

18                 SEN. FRASER:  Senator --

19                 SEN. VAN de PUTTE:  And I --

20                 SEN. FRASER:  I am -- I don't want to
21 disagree with you, but I don't think Arizona's ever came
22 out of my mouth on this floor of the legislature about
23 last year's bill or this bill.

24                 SEN. VAN de PUTTE:  No.

25                 SEN. FRASER:  I'm -- the -- the bill that

188

1 we modeled last year was a Texas model that we were
2 moving forward, and whenever earlier you were addressing
3 the Georgia bill -- you're a past president of NCSL, and
4 I have the NCSL analysis here.  And that's the reason I
5 was confused because you were referencing Georgia, and
6 I've got --

7                 SEN. VAN de PUTTE:  That's correct.

8                 SEN. FRASER:  The document that came from
9 the organization that you chaired and that was the
10 reason I was confused about what you were representing.

11                 SEN. VAN de PUTTE:  Well, Senator, you
12 were confused, and I was confused.  However, both -- I
13 think we can both agree that your bill, Senate Bill 14,
14 is more restrictive than current Georgia and Arizona
15 law; that this is based after an Indiana model, but it
16 is even more restrictive.  I mean, you have a pretty
17 tight vote --

18                 SEN. FRASER:  I -- I --

19                 SEN. VAN de PUTTE:  -- of the bill.

20                 SEN. FRASER:  I disagree with you on that,
21 that there are -- are small things that we're different
22 on, which basically is the number of things that you can
23 use for identification.  But there are a list.  I think
24 they have six in Indiana.  We have four in Texas.  We're
25 under discussion about that four, should it be expanded.

CONSIDERATION OF SENATE BILL 14  1/25/2011

---

189

1          So saying that they're very different is
2  not a correct observation.  There is very small
3  differences between the -- the Indiana, Georgia, or
4  Texas.  They're actually very, very much alike, and that
5  also gives us the reason we believe it will be approved
6  by the Supreme Court and DOJ.
7          SEN. VAN de PUTTE:  Well, I wanted the
8  opportunity to correct myself because Georgia only
9  allows for an alternate two forms in a provisional
10  ballot for first-time voters only, and so they do not
11  allow -- and I stand corrected.  You are correct that
12  they don't have two forms of alternate that are not a
13  photo ID.  The only time in the Georgia law that they
14  make reference to two forms -- and that's what I was
15  looking at and they have other things that they can use,
16  a bank statement, a current utility bill, a paycheck --
17  is when they are casting a ballot for the first time and
18  they have -- they are new registrants and they don't
19  have a photo ID.
20          So I stand corrected.  You are correct in
21  that for a provisional ballot, they do not allow two.
22  The only time they do -- and I'm looking at their
23  Senate -- their -- their bill -- is on a -- and I stand
24  corrected.  So I wanted to let you know that I misspoke.
25  That is not correct.  It's only the two alternate forms

---

190

1  when they're doing for first-time registrants.
2          SEN. FRASER:  Thank you for that
3  correction, and that -- that is -- the documentation I
4  show does show that they require a photo ID.
5          SEN. VAN de PUTTE:  And so I just want to
6  thank you for the ability to clarify this and know that
7  this is your -- this is a Texas bill, and it'll probably
8  be known as the Texas bill.  And -- and -- and to your
9  credit, for every -- all the work that you've done, I
10  believe it is very stringent in small ways in the
11  wording.  But for the groups of people that I think will
12  have a burden, they -- they have no alternate means.
13          So thank you very much for the opportunity
14  to clarify.  And, Mr. Chairman, I don't have any other
15  questions of the author.
16          CHAIRMAN DUNCAN:  Senator Ellis?
17          SEN. ELLIS:  Just a couple questions,
18  Senator.  I know you're tired.  You've been up a long
19  time.
20          From your opening statement, the primary
21  reason for this bill is because of your concern about
22  voter fraud.  Right?  Voter fraud, that's the primary
23  reason --
24          SEN. FRASER:  The integrity --
25          SEN. ELLIS:  -- for the --

---

191

1          SEN. FRASER:  -- of the ballot, making
2  sure that the person that is trying to vote is who they
3  represent to be.
4          SEN. ELLIS:  And if that's the case, why
5  wouldn't you apply a voter -- photo voter identification
6  requirement to mail-in ballots?  Don't you think there's
7  probably room for more fraud for the mail-in ballots?
8          SEN. FRASER:  I will support you a hundred
9  percent.  You file that bill, you come forward with it,
10  and we'll talk about it.  But this bill does not in any
11  way address mail-in ballots.  This is only in-person
12  voter --
13          SEN. ELLIS:  But you -- but you will
14  concede that there's probably room, just from a
15  layperson's perspective?  Neither you nor I are experts
16  on it, and I'm just asking you to make the point.  Will
17  you concede that there's room -- there's potential for
18  more fraud with a mail-in ballot than with somebody
19  showing up?
20          SEN. FRASER:  I'm going to concede that
21  the bill that I'm laying out today will help a lot with
22  the in-person, you know, potential of fraud, and it will
23  make sure the person there is -- is who they say they
24  are.
25          SEN. ELLIS:  If you just had to guess,

---

192

1  would you think people who are more apt to do a mail-in
2  ballot would be people in the red jersey or the blue
3  jersey?
4          SEN. FRASER:  I wouldn't be apt to guess.
5          SEN. ELLIS:  Do you care?
6          SEN. FRASER:  Oh, I care a lot, but I'm
7  not going to guess.
8          SEN. ELLIS:  Okay.  You heard the
9  discussion earlier about the concern -- I think even in
10  your district, some of those DPS offices, I think, on
11  that map may be closing a few days a week.  So you --
12  you did say that you have some concern about access for
13  people to go and get --
14          SEN. FRASER:  It -- it is a discussion
15  going on, and it's -- you know, there -- I actually was
16  grinning as they were talking about the -- the -- you
17  know, the offices, is that I have the same challenge
18  sometime; and, you know, you've got to work to make sure
19  that they're open.
20          But that's a discussion we're having
21  with -- with Senator Williams.  He's having a discussion
22  with DPS, and we're -- we're trying to look at, through
23  his committee, the Finance Committee and communique with
24  DPS, the -- the easiest way to make sure that everyone
25  can -- can comply.

---

## CONSIDERATION OF SENATE BILL 14 1/25/2011

193

1              SEN. ELLIS:  But you'll agree, it's a
2 problem?  There's some concerns about it?
3              SEN. FRASER:  I don't know that I'll agree
4 that it's a problem.  Problem implies that, you know,
5 there are -- everyone works through it.  I've got a
6 driver's license.  You've got a driver's license.
7 Probably, I would love for them to come in my office and
8 take my picture, but it doesn't work that way.  I have
9 to go and put out the effort to go and get it.  And
10 that's the system we have, and we just need to make it
11 as easy as possible.
12              SEN. ELLIS:  Well, what prompted you,
13 Senator, to carry this bill?  I mean, was it
14 something -- just laying up at night?  Did somebody come
15 to you?  What -- you're such a handsome fellow, but why
16 you?
17              SEN. FRASER:  The -- and actually, I'll go
18 back to -- you asked me the same question two years ago,
19 and it's in the record.  We just, you know, entered it.
20              Actually, this is over a number of years,
21 just watching and looking at articles of things that
22 happened.  Obviously, there's a lot of press about
23 the -- the Carter-Baker Commission of concern, and I
24 watched the issue.  And it was being asked a lot, as I
25 was speaking out in the district, is that when are we

194

1 going to, you know, address it.  And I thought -- I
2 thought the issue had matured, and I decided to file it.
3 If you -- if you remember, this is the third session I
4 filed this bill.
5              SEN. ELLIS:  Well, I've always known you
6 to be a member, Senator, who digs into an issue.  You --
7 you read a lot.
8              Why would you say a new photo ID?  Why
9 wouldn't you just make a -- have a bill that has a
10 requirement that we put a photo on the voter
11 registration card?  I mean, wouldn't you agree?
12 Probably more people have a voter registration card in
13 Texas than have a driver's license.
14              SEN. FRASER:  That -- well, I don't --
15              SEN. ELLIS:  Okay.  All right.
16              SEN. FRASER:  I don't --
17              SEN. ELLIS:  You think more people in
18 Texas --
19              SEN. FRASER:  -- think that's true.
20              SEN. ELLIS:  -- have a driver's license?
21              SEN. FRASER:  I don't -- I'm having the
22 chairman of the committee that is over it --
23 interestingly, I want you to think about what you just
24 suggested, is that driver's license is going to be the
25 easy form of identification.  We -- we know that 90-plus

195

1 percent of the people -- and I think the number is
2 probably higher than that -- have a driver's license in
3 Texas.
4              But if you're going to put a picture on a
5 voter registration, that means that every single person
6 that's registered to vote has to go back in, have a
7 picture made, have the cost of putting it on there.  So
8 it's not only the cost --
9              SEN. ELLIS:  Let me try it a different
10 way.  Do you think that more people who are registered
11 to vote -- you think that more people who are registered
12 to vote would have the voter registration card than a
13 driver's license?
14              SEN. FRASER:  Say it again.  Do it one
15 more time.
16              SEN. ELLIS:  Do you -- would you agree
17 that more people --
18              CHAIRMAN DUNCAN:  Senator?  Senator Ellis,
19 y'all are talking over each other.  If you --
20              SEN. ELLIS:  Oh, are we?  Should I back
21 up?
22              CHAIRMAN DUNCAN:  Yeah -- no.  No.
23 Just --
24              SEN. ELLIS:  I'll talk slower.
25              CHAIRMAN DUNCAN:  -- when he starts to

196

1 answer the question, let him answer it and then ask
2 another question so only one person is speaking at a
3 time.
4              SEN. ELLIS:  Okay.
5              CHAIRMAN DUNCAN:  Thank you.
6              SEN. ELLIS:  Are you through?
7              SEN. FRASER:  I'm not even sure what the
8 question was.
9              SEN. ELLIS:  The question is, would you
10 agree that more people who vote have a voter
11 registration card than a driver's license?  They'd have
12 to because you've got to -- you're supposed to go get a
13 voter registration to be able to vote.
14              SEN. FRASER:  Can I answer your question?
15              SEN. ELLIS:  Yeah.
16              SEN. FRASER:  I'm -- I'm sure everyone at
17 some point were mailed one, but it has been years since
18 I walked in with a voter registration card.  I show my
19 driver's license when I vote, and I would say probably
20 that is -- do you show yours, or do you show your
21 driver's license?
22              SEN. ELLIS:  I show my driver's license.
23              SEN. FRASER:  Well, there's -- but you
24 have -- you probably were mailed a voter registration.
25              SEN. ELLIS:  I have both.

## KENNEDY REPORTING SERVICE, INC.
### 512.474.2233

CONSIDERATION OF SENATE BILL 14  1/25/2011

197

1        SEN. FRASER:  Okay.

2        SEN. ELLIS:  Let me ask you this:  There's

3 an article in today's paper.  It says nearly 650,000

4 Texans who refuse to pay surcharge penalties for drunken

5 driving, no insurance, and other violations are being

6 offered a one-time amnesty by the state.  Those offered

7 amnesty represent just over half of the estimated

8 1.2 million Texans in default.  It talks about what they

9 owe the state.  But all of these folks who are in

10 default, because we balanced the budget in '03 with

11 surcharges for people who have a license, all have had

12 their licenses suspended for not paying.  So would that

13 concern you any that, at least, according to folks who

14 go get amnesty, that's 1.2 million.  That would be more

15 than that.  There's 1.2 million owes the state X amount.

16 That's what this article is about.

17        But would you concede it ought to be a

18 problem because we've got a lot of people who had a

19 driver's license, I assume the one's who owe the

20 surcharges are -- you know, maybe a disproportionate

21 number of them are folks who didn't have the money to

22 pay the surcharges.  Maybe some of them were just civil

23 libertarians, didn't like the bill and wouldn't pay it

24 period.  But a lot of them are probably working-class

25 people who can't pay it.  So at least over 1.2 million

198

1 Texans since 2003 have gotten their licenses suspended,

2 so they will no longer have a valid driver's license

3 that they could use to go and vote like you and I do.

4 Does that concern you?

5        SEN. FRASER:  Well, first of all, if -- if

6 some reason it's a felony, that -- of the crime that

7 they're not paying for, I'm not sure that they -- I

8 guess I'd question whether they're eligible.  I don't

9 know the answer.  We'd ask the Secretary of State that.

10        SEN. ELLIS:  I don't think --

11        SEN. FRASER:  But the easy answer to your

12 question is, we're going to give them an ID free.  So if

13 they've lost their driver's license, all they got to do

14 is go back down and get a free ID.  We'll hand them a

15 new one.

16        SEN. ELLIS:  So you think the over

17 1.2 million people who had their licenses suspended

18 because of the surcharges this legislature put on them

19 in 2003 is not -- they haven't been convicted of a -- of

20 a felony.  That's not on their record, but their license

21 has been suspended.  They're being offered amnesty,

22 according to the article in today's paper.  You think

23 that those folks would go and get this new ID?  You

24 don't think they'd be worried about showing up and

25 somebody saying, "Hey, by the way, now that I know where

199

1 you are, I want my money.  I want some of this 1. --

2 $1.1 billion that you owe to the state"?

3        SEN. FRASER:  I'm not advised.

4        SEN. ELLIS:  Okay.  One distinction,

5 obviously, is these people still have a constitutional

6 right to be able to vote.

7        One last point.  On the exemption for the

8 elderly, I don't know if I'm reading this right or not,

9 but in your mind, is that a one-time exemption or would

10 people over -- I think you and Senator West were going

11 through the age deal earlier, and we have to find out

12 from the Secretary of State which one of you hits 70

13 first.  But if you have -- the way I read your bill, if

14 you don't hit 70 before that date in January, I believe,

15 of 2012, then it wouldn't apply.  So anybody on this

16 floor who will be over 70 at some point or any of your

17 constituents who will hit 70 after that date in January

18 of 2012, would not have that exemption.  Is that

19 correct?

20        SEN. FRASER:  Yes.

21        SEN. ELLIS:  So your intent is that one

22 time.

23        SEN. FRASER:  No, it's not a one-time at

24 all.

25        SEN. ELLIS:  Continuous for people who are

200

1 already 70 after January of 2012?

2        SEN. FRASER:  If you're 70 on January 1,

3 2012, you will be subject to current law the rest of

4 your life.

5        SEN. ELLIS:  Okay.  I want to make sure

6 that's clear, because some folks have --

7        SEN. FRASER:  If you're 70 on that --

8        SEN. ELLIS:  -- called my office from

9 AARP --

10        SEN. FRASER:  Yes.

11        SEN. ELLIS:  Okay.

12        SEN. FRASER:  Yes.

13        SEN. ELLIS:  So it's not for all people

14 over 70.  Just those who will hit 70 by January of 2012.

15        SEN. FRASER:  If you're 70 on January 1,

16 2012, you will be subject to the -- the -- not be

17 subject to these provisions.  You basically will be

18 operating under current law for the rest of your life.

19        SEN. ELLIS:  Are you confident, Senator,

20 that your bill would not have a disparate impact on the

21 elderly, on women, on those that are physically

22 challenged, on racial ethnic minorities?

23        SEN. FRASER:  I am --

24        SEN. ELLIS:  Are you confident?

25        SEN. FRASER:  -- absolutely sure.  I would

CONSIDERATION OF SENATE BILL 14 1/25/2011

---

**201**

1 not have filed the bill if I had thought it -- I want to
2 make sure that every person in the state has a right to
3 vote.  The -- not -- you know, the right that we extend
4 them, they should have that, and I do not believe that
5 in any way we're impacting that and that -- that -- you
6 know, I want to make sure that the groups you're talking
7 about, you know, women, minority, elderly, that they all
8 have the right to vote; and I believe my bill does that.
9               SEN. ELLIS:  Okay.  And I know that's your
10 intent.
11              SEN. FRASER:  Yes.
12              SEN. ELLIS:  But you're confident that it
13 will have no impact?
14              SEN. FRASER:  I'm very confident.
15              SEN. ELLIS:  Okay.  To that end, would you
16 have a problem with putting a provision in this bill so
17 that the Secretary of State would do an annual report on
18 whether or not this bill has had a disparate impact?
19              SEN. FRASER:  I think we're going to get
20 our report back from the -- assuming it gets to the
21 Supreme Court and Department of Justice, I believe we'll
22 get our report card from that.  And then through time,
23 if there are -- and I'm going to go back to the examples
24 of Indiana and Georgia.  To my knowledge, there has
25 never been a person that has reported that had a

**202**

1 problem -- came forward because they had a problem with
2 the laws they've, you know, implemented.  We're doing
3 exactly the same thing.
4               So I think you and I, as legislators, if
5 there's a problem, will hear about it.  And I would not
6 want to put the burden on an agency.  You know, if we
7 hear about it, then we can do that in the future.
8               SEN. ELLIS:  Maybe I'm just at a loss.  If
9 you -- I know your intent, and you are confident your
10 bill will not have a disproportionate impact on certain
11 groups.  I mean, were the concern be the methodology,
12 you could design that.  But what would be wrong with the
13 Secretary of State doing an annual report on whether or
14 not this bill has a disproportionate impact on any
15 groups of people so that we know?  What -- I mean, you
16 know, we -- oftentimes we pass -- I think we even have
17 a -- I think it might have been Shapleigh who put it in
18 some time ago, when we do a tax bill as a requirement,
19 that we have LBB do a disparate impact statement just so
20 we know because as you know, I mean, we're tinkering
21 with a constitutional right.
22              And, Senator, I might add, we're in a
23 state -- well, you know the history.  I mean, initially,
24 you had to be a property owner to vote or you had to be
25 a male to vote, had to be a certain color to vote.  Now,

**203**

1 over time, that has gotten better; but in our southern
2 states, in particular, it has not been an easy journey
3 to get to where we are.  So what -- what would be wrong
4 with just simply coming up with some simple methodology
5 and let the Secretary of State do that?
6               SEN. FRASER:  We have a simple
7 methodology.  It's called going into a session on the
8 second Tuesday of every -- you know, every odd year.
9 And you, as my desk mate, sitting beside me, I feel very
10 comfortable that we'll -- we'll get that -- you know,
11 we'll look at it every couple of years.  So I -- I think
12 the fact that we come back in, we're going to be given
13 the opportunity every two years to -- to re-examine.
14 And there will be discussion about this, of whether it's
15 working or not.
16              SEN. ELLIS:  To implement your bill,
17 you're going to use federal money to be able to do it.
18 Where would that money be used if it was not going to be
19 used to implement this new system?
20              SEN. FRASER:  Well, obviously -- and,
21 again, I don't want to speak for the Secretary of
22 State's office.  When they're here, they can give you an
23 ideal.  But if there's a pretty good-sized pot of money
24 that's sitting there that we haven't spent yet and
25 we're -- you know, we're pretty good about being

**204**

1 creative about, you know, where you spend money.  So I'm
2 assuming that money is restrictive about where they can
3 spend it, and I think probably this is a -- an
4 application where it fits.
5               And I guess to answer to your question, I
6 don't know.  You can ask them, but I think this is a
7 good place to spend it.
8               SEN. ELLIS:  Would a new change go into
9 effect in the next cycle?
10              SEN. FRASER:  I'm sorry.  Do that again.
11              SEN. ELLIS:  With a new election change, a
12 major requirement going into place for the next cycle
13 with new districts, you and I have new districts, do you
14 think it would make sense to give people the ability to
15 register on that day with the photo ID you're requiring?
16              SEN. FRASER:  No.
17              SEN. ELLIS:  So could you go in and
18 register on that day because some people are just maybe
19 confused about this new requirement we're putting in
20 place?
21              SEN. FRASER:  We're going to spend a lot
22 of time and hopefully dollars educating both the public
23 and the -- the workers, and I think the system will work
24 very well like it is.
25              SEN. ELLIS:  Your bill looks -- I mean,

---

KENNEDY REPORTING SERVICE, INC.
512.474.2233

TX_00000107
JA_000106

CONSIDERATION OF SENATE BILL 14 1/25/2011

205

1 it's obviously a bit more stringent, bit more onerous
2 than the bill you had last session.  And based on the
3 questions with you and, I think, Senator Van de Putte
4 earlier, it looks like this bill is also more stringent
5 than the Indiana bill that you modeled it after.
6             SEN. FRASER:  That -- you missed the
7 conversation we just had with -- with Senator Van de
8 Putte.  That is not the case.  It actually is -- is a
9 very, very small change between --
10            SEN. ELLIS:  They take student --
11            SEN. FRASER:  Huh?
12            SEN. ELLIS:  They take student IDs --
13            SEN. FRASER:  Well, I --
14            SEN. ELLIS:  -- in Indiana?
15            SEN. FRASER:  We -- we have four forms of
16 IDs in this bill that we're accepting, but we're also
17 listening to the debate.  Indiana has six forms.
18 Georgia I think expands it to about eight.  So it's the
19 number -- the type of, but they're all photo --
20 government-issued photo IDs.
21            SEN. ELLIS:  Okay.  So I guess when I say
22 it's more onerous, there are more people in Texas who
23 would have a student ID than a passport.
24            SEN. FRASER:  Not advised.
25            SEN. ELLIS:  Okay.  Do you know how many

206

1 Americans have a passport?
2             SEN. FRASER:  Not advised.
3             SEN. ELLIS:  Well, I know from the press
4 counts, you and I have one.  But -- but I'll just tell
5 you --
6             SEN. FRASER:  We don't -- we don't talk
7 about that.
8             (Laughter)
9             SEN. ELLIS:  We've gone to a few places
10 together.
11            Six percent of the people, I think, in
12 America have passports.  I think about the lowest
13 percentage for most nations in the top 20, 6 percent of
14 the people in America have passports.  So I guess I'm
15 saying, why would you choose that as one of your forms
16 of ID as opposed to a student ID when you know we have
17 problems getting young people sometimes to focus for
18 more than a week?  But folks who have a passport, you've
19 got to be fairly worldly, shall we say, to go get a
20 passport.  And if the number is 6 percent in America,
21 I'm just guessing less than 6 percent of the people in
22 Texas have a passport.
23            SEN. FRASER:  We know the people that are
24 issuing the passports.  We don't know where all the
25 student IDs are coming from because not all student IDs

207

1 are issued with, you know, our -- our input.  So the
2 easy answer to that is that we want to make sure that we
3 have something that is easily recognizable to the poll
4 worker, and we can verify that it is -- it is valid.
5             SEN. ELLIS:  What if we tried to put in a
6 student ID from a state institution so at least we did
7 that.
8             SEN. FRASER:  Senator, if you want to
9 offer amendments, as I told Senator Gallegos, I draw
10 them up, get it to you where I can look at it and get
11 plenty of time to look at it.  There's -- you know,
12 we're going to look at every amendment.  If you -- you
13 know, you can throw anything out.  We'll discuss it.
14            But, I mean, the thing we're trying to do
15 is we're trying to make it easy as possible on the
16 Secretary of State and the poll worker as we implement,
17 making sure that it's easily identifiable but also, you
18 know, is good public policy.
19            SEN. ELLIS:  Well, I'm just asking -- now,
20 I hate to take your time, but, I mean, you -- you put it
21 on the fast track.  I mean, I -- I'd like to be working
22 on the budget or something else, but --
23            SEN. FRASER:  I didn't put it --
24            SEN. ELLIS:  -- since you put it on the
25 fast track.

208

1             SEN. FRASER:  I didn't put it on the fast
2 track.  I'm -- you know, I did not put it on the fast
3 track.  I think the -- the person in the center office
4 put it on a -- as an emergency bill and --
5             SEN. ELLIS:  So you really don't want to
6 do this, do you?
7             SEN. FRASER:  I am standing here
8 explaining it to you because I think it's good public
9 policy.
10            SEN. ELLIS:  I'll leave you alone after
11 this one.
12            But based on the election results of the
13 last cycle, what fraud will your side of the aisle be
14 worried about?  Senator Whitmire raised that with me the
15 other day.  I'm saying this:  As well as your side did,
16 seems like my side ought to be a little bit more worried
17 about if there was some fraud.
18            SEN. FRASER:  I think if you look at the
19 polling in your district, your district is worried
20 because they're telling you you need to vote for it; and
21 I'm telling you, you're on the wrong side of this issue.
22            SEN. ELLIS:  I respectfully would say you
23 ought to be a little careful with that notion of what
24 polling data says.  I'm willing to bet you, Troy, when
25 our predecessors stood on this floor and sat in these

CONSIDERATION OF SENATE BILL 14 1/25/2011

209

1 seats and passed most of the restrictions, that at some
2 point were in state law, the polling data indicated they
3 were on the right side of history; but you and I know
4 they were on the wrong side of it.
5            SEN. FRASER:  All I can tell you is the
6 question's pretty straightforward.  It said -- they
7 asked the people in your area, "Should you have to show
8 a photo ID when you vote?"  And the number across,
9 Republican, Democrat, Hispanic, African American,
10 others, were overwhelming.
11            SEN. ELLIS:  Well, let me ask you this:
12 If I come up with new polling data that says they would
13 support same-day registration, recognizing student ID,
14 exempting people over 70 forever, not just for those who
15 hit 70 before the next election cycle, would that
16 would you be voting based on what the polling says?
17            SEN. FRASER:  Well, come -- come forward
18 with your data.  But I can tell you the things you've
19 mentioned, the only one that is applicable to this bill
20 is the -- the elderly because the same-day voting, those
21 other things, that's another issue for another day.
22 Doesn't fit on this bill.
23            SEN. ELLIS:  Thank you.
24            CHAIRMAN DUNCAN:  Chair recognizes Senator
25 Zaffirini.

210

1            SEN. ZAFFIRINI:  Thank you,
2 Mr. President -- or Mr. Chairman.
3            Senator Fraser, my first questions will
4 focus on the criminal justice impact, if you have a copy
5 of that.
6            SEN. FRASER:  Well, excuse me, before
7 you -- what your first question should be, do I still
8 have my thick book that you were impressed with last
9 time.  My --
10            SEN. ZAFFIRINI:  Yes.  I was --
11            SEN. FRASER:  I reread the data last night
12 that you were going to instruct your staff asking them
13 why you didn't have one.
14            SEN. ZAFFIRINI:  Well, good.  I wish you
15 had it again.
16            SEN. FRASER:  I do have it.
17            SEN. ZAFFIRINI:  Good.
18            SEN. FRASER:  Right here.
19            SEN. ZAFFIRINI:  Good.
20            SEN. FRASER:  I was -- oh, go ahead,
21 please.
22            SEN. ZAFFIRINI:  But do you have a copy of
23 your criminal justice impact statement?
24            SEN. FRASER:  I do now.
25            SEN. ZAFFIRINI:  My first questions will

211

1 focus on that.
2            In the first paragraph, you'll see that it
3 states very clearly that the punishment for attempting
4 to vote illegally would be enhanced from a Class A
5 misdemeanor to a state jail felony, and the punishment
6 for illegal voting would be enhanced from a third degree
7 felony to a second degree felony.  What would be the
8 impact on our state budget of increasing those
9 penalties?
10            SEN. FRASER:  I'm sorry.  I'm not advised
11 as the impact on the budget, as you know.  You're on
12 finance, I'm not.  You would know that.
13            The second question I'm assuming you're
14 asking is, why we would consider doing this?  Actually,
15 these suggestions were brought forward by Democratic
16 members of your delegation that said, "Why don't we go
17 ahead and increase it?"  So we increased the penalties
18 for fraud.  So the recommendations on doing this, it
19 actually was across the board.  We had people on both
20 sides, but there was recommendations that we increase
21 these penalties.
22            The impact of the cost to the budget, I'm
23 sorry, I'm not advised.  My job is to make sure the
24 public is well served, and if someone commits fraud
25 by -- by voter impersonation, that the penalties are

212

1 strict.
2            SEN. ZAFFIRINI:  But I am concerned about
3 this, Senator, and I don't know what Democrat or what
4 Republican asked you to make those changes.  I was not
5 privy to that conversation.
6            But if you look at the last paragraph, it
7 says:  Increasing the penalty for any criminal offense
8 is expected to result in increased demands upon the
9 correctional resources of counties or of the state due
10 to longer terms of probation, of longer terms of
11 confinement and county jails or prison.  And then it
12 also states:  When an offense is changed from a
13 misdemeanor to a felony, there is a transfer of the
14 burden of confinement of convicted offenders from the
15 counties to the state.
16            So earlier there was senators who talked
17 about unfunded mandates for the counties, but in this
18 case, we are -- we seem to be relieving the county of
19 some of its burden but then increasing the burden to the
20 state.  And my question remains:  At what cost?
21            Now, this bill, were it before the Finance
22 Committee, we would have a fiscal note; but because it's
23 not, it's because it's before the Committee of the
24 Whole.  We are restricted to the fiscal note that we
25 have here, and it's strange that we don't have a

CONSIDERATION OF SENATE BILL 14 1/25/2011

---

213

1 connection between the cost of the criminal justice

2 impact and the fiscal note.  It seems that there's two

3 independent documents, as they should be, but it seems

4 to me, that the fiscal note should reflect the cost that

5 is defined or, at least, specified in the criminal

6 justice impact statement.

7            SEN. FRASER:  Well, and I think the easy

8 answer to that -- I'll -- if someone else, if -- we may

9 defer to Senator Williams, if he wanted to comment, or

10 another member.

11            But I think the easy answer to this is

12 that if we implement the photo ID, it's pretty

13 straightforward, that someone -- if they're going in, if

14 they have a driver's license and they're -- you're

15 attempting to vote, that there's a good assumption that

16 the driver's license is valid, that they are who they

17 say they are.  So I'm -- we're hoping that the deterrent

18 will be that people will not try to vote fraudulently,

19 that the ones that are voting will be valid voters, and

20 we don't have a lot of people going to prison because

21 hopefully, they won't try to vote illegally.  I --

22 that's the hope.

23            SEN. ZAFFIRINI:  Well, actually, Senator,

24 that is why some of us are opposed to this bill because

25 we don't understand the problem that has been defined.

---

214

1 For example, in that same paragraph, it says:  In fiscal

2 year 2010, less than five people were under parole or

3 supervision for illegal voting.  In fiscal year 2010,

4 five offenders were placed on community supervision, and

5 less than five offenders were released from community

6 supervision for illegal voting or attempting to vote

7 illegally; and then more important, in fiscal year 2010,

8 less than five people were arrested for illegal voting

9 or attempting to vote illegally.

10            So it seems to me that this criminal

11 justice impact statement makes the point that there

12 isn't a problem, especially if you look at the last

13 sentence:  It is assumed the number of offenders

14 convicted under this statute would not result in a

15 significant impact on the programs and workload of state

16 corrections agencies or on the demand for resources and

17 services of those agencies.  So if they don't see an

18 increased demand in this area because they don't see

19 people being arrested, then where's the problem?

20            SEN. FRASER:  Well, and I guess I just

21 disagree with your analysis of this, is that voter

22 fraud, under current law, that our laws are so weak,

23 it's virtually impossible to -- to catch one and

24 convict; and that's the problem we're trying to address.

25            SEN. ZAFFIRINI:  Well, okay, Senator.

---

215

1 Thank you.

2            My next questions will focus on the fiscal

3 note.  Do you have a copy of the fiscal note?

4            SEN. FRASER:  I do.  Somewhere.

5            SEN. ZAFFIRINI:  I'll wait till you get

6 it.

7            SEN. FRASER:  Yes.

8            SEN. ZAFFIRINI:  You have it?

9            SEN. FRASER:  I have.

10            SEN. ZAFFIRINI:  So the fiscal note shows

11 $2 million but all in fiscal year 2012.  Why aren't

12 there recurring costs?  Is that because the photo ID

13 card is issued in perpetuity, or it doesn't have to be

14 renewed?

15            SEN. FRASER:  Senator, again, you're --

16 you're a member of finance who would know.  You know,

17 this comes from LBB which did consultation with the

18 affected parties, which are Secretary of State, DPS.

19 We're going to have expert witnesses who will come up in

20 a minute --

21            SEN. ZAFFIRINI:  Okay.

22            SEN. FRASER:  -- and they will explain how

23 they delivered that data.  I think probably what you're

24 going to hear from them is that a lot of the initial

25 cost would be in the education of the -- the -- the

---

216

1 Secretary of State educating both voters and poll

2 workers and any initial -- the free cards that we're

3 giving out, there will be more, probably, the first year

4 than other years.  I'm -- I'm assuming that's it, but I

5 think I'd ask that question of the Secretary of State

6 and DPS.

7            SEN. ZAFFIRINI:  Well, but, again, the

8 fiscal note is submitted to the chair of the committee

9 that hears the bill.  You'll notice at the top of

10 Page 1, it is directed to Robert Duncan, chair of the

11 Senate Committee of the Whole, not to Senator Ogden,

12 chair of Finance.  And so it is not for the Finance

13 Committee to consider the costs and the implications of

14 these policy changes, but it's up to the Committee of

15 the Whole; and we are the ones who have this fiscal

16 note.

17            And I challenged the fiscal note last

18 time.  Remember it was zero, and I couldn't believe it?

19 And I asked you questions about that, and I just

20 couldn't believe it.  And so now, all of a sudden, it's

21 a fairly similar bill.  Many would say more restrictive,

22 but now it has a fiscal note of $2 million.

23            And did you say earlier, Senator, that

24 this cost would be covered by HAVA funds?

25            SEN. FRASER:  And -- and the difference

---

TX_00000110

CONSIDERATION OF SENATE BILL 14  1/25/2011

---

**217**

1 between this year and two years ago, I think the
2 assumption last year -- two years ago is that they would
3 just be able to use the HAVA funds.  And, again, I think
4 you probably should ask the Secretary of State.
5           I believe since then, they have made a
6 request of HAVA requesting that, and HAVA's response, I
7 believe, is that they will wait until the bill is
8 passed.  And when the bill is passed, then they will
9 make a determination on whether you could use the -- the
10 money.  But we're also looking at history of other
11 states.  They have been allowed to use HAVA money.
12           But, again, I think I'd ask the Secretary
13 of State that question.
14           SEN. ZAFFIRINI:  Well, as the author of
15 this bill, would you prefer that the state pay this
16 $2 million in costs, or would you prefer that we use
17 federal funds?
18           SEN. FRASER:  I would prefer the money
19 that's sitting over here in a pot at the Secretary of
20 State -- that has not been spent; obviously, I'd much
21 rather use that.
22           SEN. ZAFFIRINI:  Do you know, Senator,
23 what the HAVA funds are used for?
24           SEN. FRASER:  For educating -- it's the --
25 help America vote.  It's to encourage voting.

---

**218**

1           SEN. ZAFFIRINI:  So basically, if we use
2 the HAVA funds for this purpose, we are repurposing the
3 HAVA funds that are already there and intended for
4 things like new equipment and ongoing training programs?
5           SEN. FRASER:  Senator, I don't think -- I
6 think the decision will be made by the federal agency
7 that sent us the money, the HAVA people; and if they've
8 already authorized other states to use this for voter --
9 it's for voter education, and this would fall in the
10 area of voter education, I would assume.
11           SEN. ZAFFIRINI:  Well, it's my
12 understanding, Senator, that it is for the state to
13 submit a plan.  The federal government doesn't tell us
14 what to do in that area, not that it doesn't tell us in
15 other areas.
16           SEN. FRASER:  And, Senator, I hate -- it's
17 the same answer I've given multiple people before, is
18 that the Secretary of State will be coming up.  I think
19 that's the person to address this.
20           SEN. ZAFFIRINI:  Do you have any
21 suggestions regarding the training that is referred to
22 on Page 2 of the fiscal note, local government impact?
23           SEN. FRASER:  I do not.  That, again,
24 will -- it is the job of the Secretary of State to
25 administer that, recommend the training, and I believe

---

**219**

1 they have the authority under current law.
2           SEN. ZAFFIRINI:  And you have no
3 information, then, about any recurring costs that we
4 should worry about?
5           SEN. FRASER:  I have none.
6           SEN. ZAFFIRINI:  And to whom would you
7 refer us on that issue?
8           SEN. FRASER:  On recurring costs?
9           SEN. ZAFFIRINI:  Uh-huh.
10           SEN. FRASER:  Could you give me an
11 example?  I don't -- I don't think I --
12           SEN. ZAFFIRINI:  Well, the fiscal note
13 shows all the expense in fiscal year 2012, and then it
14 doesn't show any other expenses --
15           SEN. FRASER:  I --
16           SEN. ZAFFIRINI:  -- beyond that.
17           SEN. FRASER:  I would ask the Secretary of
18 State or DPS.
19           SEN. ZAFFIRINI:  It just seems to me,
20 Senator, that there will be recurring costs because one
21 example would be the State's responsibility to provide
22 free photo ID cards on a recurring basis to the
23 significant portion of our population that moves
24 regularly.  They move from one part of the state to
25 another, and they might need a different card in that

---

**220**

1 area.  And that would be a recurring cost, would it not?
2           SEN. FRASER:  Senator, since 2006, there
3 have only been 37,000 people that registered to vote
4 that did not have a current driver's license.  That --
5 that's in the last five years.  So the assumption is,
6 the number that is coming into the system that would not
7 have a card, the number is very low.  The cost of that
8 card is not a huge number.  So actually, the amount that
9 it would cost to take care of them is a -- not a large
10 number.
11           SEN. ZAFFIRINI:  What I'm worried about,
12 Senator, as a member of the Finance Committee, is
13 unintended consequences and unexpected costs.  Not
14 unexpected because we don't foresee them and can't
15 identify them, but because of the criminal justice
16 impact statement and because of the fiscal note that we
17 have that simply don't address these issues.
18           For example, Line 12, Page 12 of the bill,
19 you refer to the cost of the get-out-the-vote efforts;
20 and basically, the fiscal note states:  The analysis is
21 incomplete because, quote, it is not known how many
22 voter registration drives or other activities designed
23 to expand voter registration would occur.  So we don't
24 even have an estimated cost of one voter registration
25 drive.  And if it is our intent to ensure that we have

---

KENNEDY REPORTING SERVICE, INC.
512.474.2233

TX_00000111
JA_000110

## CONSIDERATION OF SENATE BILL 14 1/25/2011

221

1 more, we're not considering the cost, it seems to me
2 that we are being irresponsible in terms of identifying
3 the exact cost or the best estimated cost of this bill.
4          SEN. FRASER:  And we are -- have the
5 benefit of not being the first one to implement this.
6 We don't have to reinvent the wheel.  We can look at the
7 history of states that have implemented, like Indiana,
8 Georgia, and others, look at common things that have
9 happened there.  We're going to have a person from
10 Indiana here.  I think it -- that would probably be a
11 question you might ask, is the reoccurring cost, because
12 they've had this in effect.  I believe they passed it in
13 2006.
14          SEN. ZAFFIRINI:  But, of course, when we
15 talk about other states, including Indiana, we -- Texas
16 is much bigger and much more diverse; and so our
17 problems will be very different, our challenges will be
18 very different, and I believe our costs will be
19 significantly higher.  But, again, I'm concerned as a
20 member of the Finance Committee.
21          But speaking of costs related to other
22 states, are you aware, Senator, that in many, if not
23 all, of the states that have implemented photo ID bills,
24 including those with less restrictive laws than the one
25 that you propose, they have been challenged in court.

222

1 What costs are we anticipating regarding being
2 challenged in court because of this bill?
3          SEN. FRASER:  I'm -- I'm not advised, that
4 you're making an assumption we'll be challenged, and
5 I'm -- I do not -- I'm not advised.
6          SEN. ZAFFIRINI:  I think it's a pretty
7 safe assumption.  Indiana was challenged, and as I said,
8 many, if not all, of the states that have implemented
9 these bills have been challenged.
10          So I think, again, as members of the
11 Finance Committee, as members of the Senate, even those
12 who are not members of the Finance Committee, should
13 look at that as a possibility and certainly should
14 consider the costs.  Is this where we want to spend our
15 money?  Even the $2 million.  What if HAVA funds are not
16 used for this purpose?  Is this where we want to spend
17 the $2 million and significantly more in defending the
18 bill instead of addressing the other issues that we are
19 facing right now because of economic crisis in Texas?
20          SEN. FRASER:  Was that a question?
21          SEN. ZAFFIRINI:  Yes.  Is it?
22          SEN. FRASER:  Is what?  Should --
23          SEN. ZAFFIRINI:  Is this where we want to
24 spend our money?
25          SEN. FRASER:  It's -- the decision on

223

1 that, you know, I'm not on Finance, you are.  You're --
2 you're -- you're asked to make those hard decisions.  So
3 that, I would -- you know, that'll go back to the
4 Finance Committee.
5          SEN. ZAFFIRINI:  Okay.
6          SEN. FRASER:  But you're also making an
7 assumption that there's going to be an expense, which I
8 don't think there will be one because I think we'll be
9 able to spend the HAVA funds.
10          SEN. ZAFFIRINI:  All right.  Well, we
11 disagree on those.  I think those assumptions are fairly
12 safe.
13          Senator Fraser, Senator Van de Putte
14 distributed this map earlier.  Have you seen this map?
15          SEN. FRASER:  I have not.
16          SEN. ZAFFIRINI:  Basically, it shows
17 her -- if my -- Mr. Chairman?
18          CHAIRMAN DUNCAN:  Senator Zaffirini?
19          SEN. ZAFFIRINI:  If I may direct a
20 question to Senator Van de Putte?
21          CHAIRMAN DUNCAN:  Pardon?
22          SEN. ZAFFIRINI:  If I may direct a
23 question to Senator Van de Putte?
24          CHAIRMAN DUNCAN:  Senator Van de Putte
25 doesn't have the floor.

224

1          SEN. ZAFFIRINI:  That's why I'm asking.
2          SEN. FRASER:  And -- and I won't yield.
3          SEN. ZAFFIRINI:  You won't yield?
4          SEN. FRASER:  No, I will not yield.
5          SEN. ZAFFIRINI:  All right.
6          SEN. FRASER:  You -- I'll be glad to
7 answer the question.
8          SEN. ZAFFIRINI:  All right.  I simply
9 wanted to ask if she planned to distribute this, and if
10 so, I wasn't going to address it.
11          CHAIRMAN DUNCAN:  If you want to introduce
12 the exhibit, you're welcome to do so.  We've marked it,
13 I think.
14          SEN. ZAFFIRINI:  All right.  Then I would
15 like --
16          SEN. FRASER:  Senator, I'm sorry.  I have
17 a map in front of me.  I had not seen it, so --
18          SEN. ZAFFIRINI:  All right.  Well, Senator
19 Van de Putte has indicated that I can request permission
20 to introduce this as an exhibit.
21          CHAIRMAN DUNCAN:  Okay.  I think it's been
22 marked, and would you -- would you bring it down,
23 please?
24          SEN. ZAFFIRINI:  I believe Senator Van de
25 Putte has a clean copy.  And this is a map that Senator

TX_00000112

## CONSIDERATION OF SENATE BILL 14 1/25/2011

225

1 Van de Putte had developed, and it's titled, "Counties
2 With Department of Public Safety Driver's License Office
3 Closures."
4            My question, Senator Fraser, would focus
5 on my district.  For example, in my district, which
6 comprises 16 counties and part of Bexar, Northeast
7 Bexar, there is one county that has wheelchair
8 accessibility barriers; there are two counties that have
9 absolutely no driver's license offices; there are four
10 that have offices that are temporarily closed; and there
11 is one that has an office that is open three days or
12 fewer each week.  And so you can see the accessibility
13 issues that we're dealing with, and you can -- when you
14 get the map -- oh, you do have a copy of the map.  You
15 can see the difference throughout the state.  There are
16 some states that you can see have a lot of pink, a lot
17 of blue, a lot of green, and then -- counties, rather --
18 and there are others that are just white, that have
19 absolutely no barriers.
20            So, Senator Fraser, looking at this map,
21 are you concerned that this bill would impact certain
22 counties that have a problem related to the
23 accessibility to driver's license offices?
24            CHAIRMAN DUNCAN:  Senator Zaffirini, if I
25 could -- before you get an answer to that question,

226

1 let's get it in the record so everybody knows what we're
2 talking about.
3            SEN. ZAFFIRINI:  All right.
4            CHAIRMAN DUNCAN:  It's Exhibit --
5            SEN. ZAFFIRINI:  Mr. Chairman?
6            CHAIRMAN DUNCAN:  It's Exhibit 6, I
7 believe.  Is that correct?  It's not the two that you've
8 previously submitted.
9            SEN. ZAFFIRINI:  No.
10            CHAIRMAN DUNCAN:  Is that correct?
11            SEN. ZAFFIRINI:  It's Exhibit 6, then,
12 according to --
13            CHAIRMAN DUNCAN:  Okay.
14            SEN. NELSON:  Mr. Chairman?
15            CHAIRMAN DUNCAN:  And for what purpose?
16            SEN. NELSON:  It's me, and to ask Senator
17 Zaffirini a question or to point out that some of us do
18 not have a copy of this map.
19            CHAIRMAN DUNCAN:  Okay.  Well, that would
20 be a parliamentary inquiry and --
21            SEN. NELSON:  Then I would like to make
22 that.
23            CHAIRMAN DUNCAN:  That's what I'm trying
24 to clear up, is I'm trying to get the exhibit in so that
25 we can distribute it so that everyone can understand

227

1 what the questions are.
2            Would you identify it, please?  What's the
3 title of it?
4            SEN. ZAFFIRINI:  Yes.  It is titled,
5 "Counties with Department of Public Safety Driver's
6 License Office Closures."  It is a map of Texas showing
7 this -- these issues, and it was developed by Senator
8 Van de Putte.  I had assumed that she had introduced it
9 into the record or had planned to, but I'm happy to do
10 it.
11            CHAIRMAN DUNCAN:  Okay.  Do we have
12 copies?
13            SEN. NELSON:  We don't.  Only the
14 Democrats do.
15            CHAIRMAN DUNCAN:  Okay.  Well, here's what
16 I would suggest so that other members have an
17 opportunity to follow your questions and the answers,
18 that we at least get copies of that exhibit and
19 distribute it, if we could do that.  And then, so if we
20 could defer on that until we get that done, Senator --
21            SEN. ZAFFIRINI:  Certainly.
22            CHAIRMAN DUNCAN:  -- that would be
23 helpful.
24            SEN. ZAFFIRINI:  Absolutely.  No problem,
25 Mr. Chairman.

228

1            Moving right along.  I do have exhibit --
2 I guess it's 4 --
3            CHAIRMAN DUNCAN:  We do have --
4            SEN. ZAFFIRINI:  -- and Exhibit No. 5 that
5 I'd like to enter into the record --
6            CHAIRMAN DUNCAN:  Okay.
7            SEN. ZAFFIRINI:  -- at this time.  And
8 I'll wait until they're distributed, if you -- if I may
9 be permitted.
10            CHAIRMAN DUNCAN:  Would you identify
11 Exhibit 4, please?
12            SEN. ZAFFIRINI:  Certainly.  Exhibit 4 is
13 a copy of a driver's license with personal information
14 obliterated.
15            CHAIRMAN DUNCAN:  Thank you.  And
16 Exhibit 5?
17            SEN. ZAFFIRINI:  Exhibit 5 is a letter
18 directed to me, which I received today, from Spencer
19 Overton, professor of law at the George Washington
20 University Law School and a member of the Carter-Baker
21 Commission on federal election reform.
22            CHAIRMAN DUNCAN:  All right.  Those
23 exhibits will be received in the record and distributed
24 to the members.
25            (Exhibit Nos. 4 and 5 marked and admitted)

CONSIDERATION OF SENATE BILL 14 1/25/2011

---

229

1          CHAIRMAN DUNCAN:  Senator, you're -- you
2 can --
3          SEN. ZAFFIRINI:  Thank you.
4          CHAIRMAN DUNCAN:  -- continue on those
5 exhibits.
6          SEN. ZAFFIRINI:  Senator Fraser, thank you
7 for your courtesy and for your patience and your
8 stamina.  I'm impressed, as always.
9          On Page 4 of your bill, Senator Fraser,
10 Line 8, it states that "and the voter's identity can be
11 verified from the documentation presented under
12 Subsection (b), the voter shall be accepted for voting."
13 Can you describe what training the poll workers would
14 receive to ensure that they are trained in
15 identification verification?
16          SEN. FRASER:  Senator, you're moving
17 faster than I can.  I'm on Page 4.  Where are you
18 referring?
19          SEN. ZAFFIRINI:  Line 8 of the bill.
20 Well, basically, that's all it says, that if the
21 voter's -- that "If the voter's identity can be verified
22 from the documentation presented, the voter shall be
23 accepted for voting."  That's the only part that I'm
24 quoting, and then I'm asking what kind of training the
25 poll workers would undergo in identification

---

230

1 verification.
2          SEN. FRASER:  Great question to the
3 Secretary of State.
4          SEN. ZAFFIRINI:  To the Secretary of
5 State.
6          Do you worry at all, Senator, and I
7 know -- I believe it was Senator Davis who asked this
8 question earlier:  Do you worry at all about people who
9 don't look like their driver's licenses at all?
10          SEN. FRASER:  I'm sorry.  I -- there's so
11 many things to worry about in life, that's -- you know,
12 the -- the question you're asking, I think, is covered
13 by the Secretary of State; and I believe they would make
14 a determination.
15          SEN. ZAFFIRINI:  Well, Senator Fraser, I
16 have distributed Exhibit 4.  Would you take a good look
17 at that, please?
18          And, Members, I ask you to please look at
19 my Exhibit 4 and look at the photograph of this driver's
20 license.  Has anyone of you ever seen this person
21 before?  He looks familiar?
22          SEN. FRASER:  Yes.
23          SEN. ZAFFIRINI:  Can you identify this
24 person?  I'd like to ask this person to stand.
25          (Unidentified person stands)

---

231

1          SEN. ZAFFIRINI:  Take a good look.  Look
2 at that picture.  Look at him.  That's right.  That --
3 and this picture was taken in 2006.  Now, if I didn't
4 know Ray, who is my chief of staff, and I were to look
5 at this picture, I would say, "You're not verified.  You
6 can't vote.  You're an imposter."  Look at the
7 difference.  Total difference, and yet this photograph
8 was taken in 2006, and so it's current, it's valid.  And
9 you can see if we who know him and have seen him, see
10 him every day, don't recognize his picture, imagine what
11 a poll worker would do with a driver's license like
12 this.
13          UNIDENTIFIED SPEAKER:  (Mic off)
14          SEN. ZAFFIRINI:  He's not a Laredoan, so
15 don't worry about it.
16          (Laughter)
17          SEN. ZAFFIRINI:  Senator Fraser, do you
18 understand why we worry?
19          (Senator Shapiro speaking without mic)
20          SEN. ZAFFIRINI:  Well, it's a very good
21 point to make, Senator Shapiro, that we should look at
22 our composite photos; and most of us don't look like
23 them, and yet they have the dates like 2008.
24          SEN. WEST:  We keep using those pictures.
25          SEN. ZAFFIRINI:  2009.  We sure keep using

---

232

1 those pictures, so what would happen?
2          My next question, Senator Fraser, focuses
3 on Exhibit 5.
4          And, Members, you have a copy of
5 Exhibit 5.
6          And it is a letter directed to me from
7 Spencer Overton, professor of law from George Washington
8 University.  And basically, I received this letter from
9 Professor Overton today, and it directly addresses
10 Senate Bill 14's inconsistency with the Carter-Baker
11 Commission.
12          Specifically, the letter states that
13 Professor Overton wrote this letter to, quote, Refute
14 claims that Senate Bill 14 is consistent with the
15 recommendations of the Carter-Baker Commission.  And
16 according to Professor Overton, quote, The Commissioners
17 recommended requiring photo ID of voters only if state's
18 assumed the responsibility to seek out citizens and
19 provide them with an ID free of charge, if states assume
20 the responsibility to seek out unregistered citizens and
21 register them and automatically update the registration
22 of citizens when they move, and if states allow citizens
23 without a photo ID to vote by signing an affidavit under
24 penalty of perjury for the first two federal elections
25 following adoption of the photo ID.

---

TX_00000114

CONSIDERATION OF SENATE BILL 14 1/25/2011

233

1    Now, Senator Fraser, this bill does not
2 meet any of these criteria.  Is that correct?  Under
3 your bill, the state would not assume any of these
4 responsibilities?
5    SEN. FRASER:  Not advised.
6    SEN. ZAFFIRINI:  Well, I assure you,
7 Senator, that it does not.  But Professor --
8    SEN. FRASER:  I disagree.
9    SEN. ZAFFIRINI:  Could you show me it
10 does, where in your bill it would allow this?
11    SEN. FRASER:  I'm not advised.  This --
12 there's been no representation made that we are modeling
13 this bill after the -- the Carter-Baker recommendations.
14 This bill is moving forward as a bill that when someone
15 votes, they will present an ID to show they are who they
16 say they are.  The bill that I'm passing we think will
17 be approved by the Supreme Court and will be approved by
18 Department of Justice.
19    SEN. ZAFFIRINI:  Well, then, let me ask
20 you a question.  Where in your bill does it specify that
21 the state would assume the responsibility to seek out
22 citizens and provide them with an ID free of charge?
23    SEN. FRASER:  I would think it would be
24 your responsibility to show in the bill, you know,
25 your -- the bill speaks for itself.

234

1    SEN. ZAFFIRINI:  So you can't tell me if
2 your bill does that?
3    SEN. FRASER:  The bill speaks for itself.
4 The language of the bill is very clear as to what the --
5 the issues we're addressing.
6    SEN. ZAFFIRINI:  Okay.  Do you know,
7 Senator Fraser, if this -- under your bill, the state
8 would assume the responsibility to seek out unregistered
9 citizens and to register them and automatically update
10 the registration of citizens when they move?
11    SEN. FRASER:  I don't believe that is
12 covered in my bill.
13    SEN. ZAFFIRINI:  It is not.
14    And do you know, Senator Fraser, if your
15 bill -- under your bill, the state would allow citizens
16 without a photo ID to vote by signing an affidavit under
17 penalty of perjury for the first two federal elections
18 following adoption of the photo ID bill?
19    SEN. FRASER:  Every person that votes will
20 be required to have a photo ID.
21    SEN. ZAFFIRINI:  Well, basically, it seems
22 to me, my analysis is that Senate Bill 14, as
23 introduced, does not meet these specifications of the
24 Carter-Baker Commission.
25    And what's more, in this letter that you

235

1 have, Members, Professor Overton states that, quote,
2 Even President Carter and Secretary Baker rejected the
3 strict photo ID requirement initially adopted in Georgia
4 after concluding it was discriminatory because it was
5 costly or difficult for poor Georgians to obtain the
6 identification for voting, unquote.  But according to
7 Professor Overton, quote, It devotes insufficient
8 resources to address the burdens it would impose on
9 Texas voters who lack photo ID.
10    SEN. FRASER:  That is absolutely
11 incorrect.  The original observation -- the bill that
12 was filed in Georgia was changed, and the bill that
13 originally -- that is in law now, that was not their
14 observation.  And that was written in 2005.  The bill
15 was replaced 2008.  That was not their observation.
16    SEN. ZAFFIRINI:  Well --
17    SEN. FRASER:  That it was -- I saw that
18 comment made in a 2005 comment, but you're also making
19 sure you don't take it out of context.  And the -- the
20 law that had been passed by Georgia was revisited.  They
21 passed a different law, and then that law was -- that
22 bill was precleared by Department of Justice.
23    SEN. ZAFFIRINI:  But it still required --
24    SEN. FRASER:  So the bill he's --
25    SEN. ZAFFIRINI:  -- photo ID.

236

1    SEN. FRASER:  -- addressing is not law --
2 current law in Georgia.
3    SEN. ZAFFIRINI:  But the Georgia law still
4 requires a photo ID.
5    SEN. FRASER:  Yes, it does.
6    SEN. ZAFFIRINI:  It does.
7    And finally, Professor Overton closes with
8 his statement that the current proposal for a photo ID
9 law in Texas is inconsistent with the recommendations of
10 the Carter-Baker Commission.
11    SEN. FRASER:  I disagree with that.
12    SEN. ZAFFIRINI:  Why, Senator?
13    SEN. FRASER:  I just disagree with that.
14    SEN. ZAFFIRINI:  Are there any specific
15 points that you disagree with that he made or that I
16 quoted in his letter?
17    SEN. FRASER:  I'm -- you know, the letter
18 that you're laying out is -- the first time I've seen it
19 is just then.  We're -- our bill is not -- we're not
20 trying to model it after that, but the Carter-Baker
21 Commission very clearly recommended a photo ID.
22    SEN. ZAFFIRINI:  Well, Senator, the reason
23 that we asked for this letter, we followed up on your
24 early statement when you laid out the bill.  And you
25 referred to the Carter-Baker Commission, and it was

CONSIDERATION OF SENATE BILL 14  1/25/2011

237

1 based on your statement that we followed up and did this
2 immediate research and got this letter written to us.
3            SEN. FRASER:  Will you show me where I
4 referred to it in my opening statement?
5            SEN. ZAFFIRINI:  Well, I don't have the
6 transcript yet; but as I recall, you referred to it in
7 your opening statement.
8            SEN. FRASER:  Do you want me to read what
9 I said again from the opening statement?
10            SEN. ZAFFIRINI:  Yes, would you?
11            SEN. FRASER:  I read two --
12            SEN. ZAFFIRINI:  Your copy to the -- your
13 reference to the Carter-Baker Commission report.
14            SEN. FRASER:  I said, "The Carter-Baker
15 Commission reaffirms the dangers.  Elections are at the
16 hard democracy.  Americans are losing confidence in the
17 fairness of elections, and while we do not face a crisis
18 today, we need to address the problems of our electoral
19 system.  At the end of the day, there's considerable
20 national evidence of in-person fraud; and regardless of
21 whether one believes that voter impersonation is
22 widespread or relatively rare, there can be no serious
23 dispute that -- that real effect can be substantial
24 because in a close election, even a small amount of
25 fraud could take -- be the margin of difference."

238

1            SEN. ZAFFIRINI:  Well, sir.
2            SEN. FRASER:  That was a quote that was
3 made.  It was -- it was used not only there, but it is
4 also used later in the Supreme Court decision.
5            SEN. ZAFFIRINI:  Right.  And, Senator
6 Fraser, it is because I was surprised at that statement
7 that we followed up, and it seems that that is in the
8 report.  But there is other information in addition to
9 that, so I could turn around and say, "Well, are you
10 taking it out of context?"  I won't raise that question
11 as a courtesy, but I could raise it.
12            But on the other hand, what I want to make
13 very clear is that the reason we followed up was that
14 you made this opening statement.
15            SEN. FRASER:  Your letter is dated January
16 the 24th.  I made the statement this morning.  Was --
17 did I make the statement, and then he -- he wrote the
18 letter and sent it to you today?
19            SEN. ZAFFIRINI:  Well, I requested it
20 today, so that's perhaps a typo because we received it
21 today.  Let me check.  We received it -- we received it
22 this morning.
23            SEN. FRASER:  Before I made the statement?
24            SEN. ZAFFIRINI:  It should be
25 January 25th.

239

1            SEN. FRASER:  But you -- you said that you
2 responded -- that you requested it after I made the
3 statement in my --
4            SEN. ZAFFIRINI:  I requested --
5            SEN. FRASER:  -- opening comments.
6            SEN. ZAFFIRINI:  I requested this
7 information based on your opening statement, and I
8 received this letter today.  That's correct.  Okay?
9            Thank you very much, Senator.  I
10 appreciate, as I said, your courtesy and your patience.
11            SEN. FRASER:  Thank you.
12            CHAIRMAN DUNCAN:  Members, we've been
13 going for a while, and I think it would be -- we're kind
14 of at a -- maybe getting close to a breaking point.  Why
15 don't we go ahead and take a ten-minute break and then
16 reconvene, give the court reporter and staff a minute or
17 two to rest.  So a time certain, we'll stand at ease
18 until 2:30.
19            (Recess:  2:21 p.m. to 2:34 p.m.)
20            CHAIRMAN DUNCAN:  Senate Committee of the
21 Whole will come back to order.  Senator Hinojosa?
22            SEN. HINOJOSA:  Thank you, Mr. Chairman.
23 Senator Fraser?
24            SEN. FRASER:  These are actually pretty
25 good.

240

1            SEN. HINOJOSA:  Can you hear me?
2            SEN. FRASER:  Yes, this is -- these are
3 much better.  Yes, I do.  I can hear you.
4            SEN. HINOJOSA:  I just have a few
5 questions that I'd like to follow up on.
6            Do you know how many people are registered
7 to vote here in the state of Texas?
8            SEN. FRASER:  Oh, I do -- I'm sorry, I do
9 not know.
10            SEN. HINOJOSA:  Approximately, 13 million.
11            SEN. FRASER:  Okay.  13, yeah.  Okay.
12            SEN. HINOJOSA:  Yeah.  And do you know how
13 many voted in the last election?
14            SEN. FRASER:  No, I'm not advised on that
15 either.  I'm sorry.
16            SEN. HINOJOSA:  Close to 5 million voters
17 voted this last election.  And do you know how many
18 people were arrested or prosecuted or indicted for
19 trying to use somebody else's voter registration card?
20            SEN. FRASER:  I'm sorry, not -- no, I do
21 not have that number.
22            SEN. HINOJOSA:  None?
23            SEN. FRASER:  I don't -- I don't have the
24 number, I'm sorry.  I'm not advised.
25            SEN. HINOJOSA:  Well, do you have any

KENNEDY REPORTING SERVICE, INC.
512.474.2233

## CONSIDERATION OF SENATE BILL 14  1/25/2011

241

1 evidence?

2                SEN. FRASER:  I'm sorry?

3                SEN. HINOJOSA:  Do you have any evidence?

4                SEN. FRASER:  Evidence?

5                SEN. HINOJOSA:  Yeah, evidence to support

6 your bill about voter fraud when they go to vote?

7                SEN. FRASER:  Senator, you know the thing

8 that we're trying to address here is that, as you know,

9 it's virtually impossible to defect voter fraud because

10 our current law makes it impossible not only to -- to

11 verify that they're voting illegally, but even if you

12 catch them, we don't have the ability to stop them from

13 voting.  So the -- the ability to stop someone today

14 voting illegally is almost impossible in Texas.  That's

15 the thing that I'm trying to address with my bill, is

16 that we believe if we make them show a voter ID, then we

17 will know that they are who they represent themselves to

18 be.

19                SEN. HINOJOSA:  Actually, Senator Fraser,

20 back home, most of the election judges know who the

21 voters are in their precincts.

22                SEN. FRASER:  Well, that's interesting.

23 Back home, in the area you're from, most of the -- or a

24 lot of the stories that I've seen reported to the

25 media -- and actually, you've got two voter registrars

242

1 through your area that have endorsed this concept

2 because they are -- they are having a problem with voter

3 fraud, and I -- that actually -- I'm -- I'm responding

4 to things I've read they've said in the media.  But I

5 believe there are numerous registrars that believe this

6 is a -- large problem.

7                SEN. HINOJOSA:  Well, I hear what you're

8 saying, but I don't see any evidence.  There's a lot of

9 anecdote, a lot of rumors and guessing and speculation,

10 which I don't think it's a way to make good public

11 policy.

12                Are you familiar with the Carter-Baker

13 Commission on federal election reform?

14                SEN. FRASER:  Senator, what are you -- I'm

15 sorry.  What --

16                SEN. HINOJOSA:  Are you familiar with the

17 Carter-Baker Commission on federal election reform?

18                SEN. FRASER:  Yes, I am.

19                SEN. HINOJOSA:  Okay.  Are you aware that

20 by putting a requirement of having a photo ID to be able

21 to vote, that there are approximately 3 million

22 registered voters in the state of Texas that do not have

23 voter ID?

24                SEN. FRASER:  I don't know where you get

25 that number.

243

1                SEN. HINOJOSA:  Well, if you look at

2 3 million people who are going -- who will be kept from

3 voting as compared to you cannot show anybody getting

4 prosecuted -- getting prosecuted and convicted voter

5 fraud, that's one big difference, one big price to pay

6 for a bill that you don't have any evidence to support

7 there's voter fraud.

8                SEN. FRASER:  One second, Senator.  My --

9 my iPhone is interfering with my microphone.

10                The 3 million number, where do you get

11 that?

12                SEN. HINOJOSA:  That's the estimate by the

13 Carter-Baker Commission on federal election reform that

14 here in Texas --

15                SEN. FRASER:  Can you -- can you show me

16 where it says in that Commission report?  I don't

17 remember.

18                SEN. HINOJOSA:  Yes, sir, it's a letter

19 dated January 24th, 2011, from Professor Spencer Overton

20 addressed to Senator Judy Zaffirini where he states that

21 approximately 3 million Texas voters do not have photo

22 ID.

23                SEN. FRASER:  Senator, that is --

24                (Simultaneous speaking)

25                SEN. FRASER:  -- pure speculation by that

244

1 gentleman.  He has nothing to base that on, and that is

2 not in reference to the Carter-Baker report.  That is a

3 estimation by some, you know, political hack that --

4 that y'all have asked to write a letter.

5                SEN. HINOJOSA:  Well, actually, I thought

6 it was the opposite.  I thought your side was pure

7 speculation.  Thank you.

8                CHAIRMAN DUNCAN:  The chair recognizes

9 Senator Williams.

10                SEN. WILLIAMS:  Thank you, Mr. Chairman.

11                Would Senator Fraser yield for some

12 questions?

13                SEN. FRASER:  I will yield.

14                SEN. WILLIAMS:  Senator Fraser, there's

15 several things that I wanted to clear up for the record.

16                The first, I'd like to make a reference

17 back to the Secretary of State has recently sent this

18 letter -- she sent it over today -- that indicated that

19 there would be probably $2 million of the HAVA funds

20 that would be available for voter education, to help

21 fund the voter education efforts that we would have in

22 connection with this bill.  And it would be -- normally,

23 it would be the Secretary of State's office who would

24 develop what those problem programs are with taking into

25 account our legislative intent about what we're trying

CONSIDERATION OF SENATE BILL 14 1/25/2011

245

1 to accomplish.  Is that right?

2            SEN. FRASER:  Yes.

3            SEN. WILLIAMS:  The other thing that I

4 wanted to correct, for the record, Senator Watson opined

5 earlier that a lot of this funding for these items had

6 been struck in the budget, and actually, I went back and

7 pulled a copy of the budget.  I had not looked at this

8 part, and so there were some budget riders that had

9 expired and that were no longer relevant in the current

10 budget.  Those were struck.  And under Strategy B.1.4,

11 under elections improvement, administer Federal Help

12 America Vote Act, we actually have, it looks like, a

13 total of about $43 million over the next biennium that's

14 been appropriated in the budget that Senator Ogden laid

15 out for us earlier.  So I just wanted to clear that up

16 for the record because that's kind of been a moving

17 target.

18            Another question that I had for you was

19 the -- I wanted to go back, if I could, and -- and just

20 touch on what my understanding after hearing all this

21 questioning that's gone on, what your -- the purpose of

22 your bill is -- really is to deter and detect fraud

23 in-person voter fraud at the polls.  Is that correct?

24            SEN. FRASER:  That is correct.

25            SEN. WILLIAMS:  Okay.  And has the United

246

1 States Supreme Court -- I believe they've stated that

2 it's been documented throughout our nation's history by

3 respected historians and journalists, and they

4 demonstrate not only that the risk of voter fraud is

5 very real, but they could affect the outcome in a close

6 election.  Does Senate Bill 14 provide the kind of

7 safeguard against that fraud that might be crucial in an

8 election?

9            SEN. FRASER:  Yes, it does, Senator.

10            SEN. WILLIAMS:  Now, we've had some close

11 elections, even in the Texas Legislature.  I know over

12 in the House right now, there is an election contest

13 that's been -- for Senate, State House District 48.

14 It's being contested.  The last numbers that I saw from

15 the Secretary of State showed that Donna Howard had won

16 her seat by 12 votes, which amounts to .02 percent of

17 all the votes cast in that race.  And, of course, back

18 in 2008, Linda Harper Brown up in Dallas County defeated

19 her opponent by 19 votes, or .05 percent of the total

20 votes cast in that race.

21            Are those the kind of close elections you

22 think that the Supreme Court might have been referencing

23 when they said in Crawford 533 U.S. at 11-12 that

24 it's -- the threat's not only real, but it's actually --

25 you know, it demonstrates it's not real, but it could

247

1 affect the outcome of a close election?

2            SEN. FRASER:  The answer is absolutely,

3 yes, and it actually the -- it's even closer to home.

4 Senator Jackson, when he was elected to the Texas House,

5 ended up winning by seven votes.

6            SEN. WILLIAMS:  Landslide Jackson --

7            SEN. FRASER:  Landslide Jackson.

8            SEN. WILLIAMS:  -- I think they called

9 him.

10            SEN. FRASER:  So if -- fraud, in an

11 election like that, could have changed history.

12            SEN. WILLIAMS:  Senator Fraser, Senate

13 Bill 14 provides safeguards to protect the reliability

14 and integrity of our voting system, especially those in

15 close elections like we've just talked about?

16            SEN. FRASER:  Yes.

17            SEN. WILLIAMS:  Okay.  I believe in this

18 Crawford v. Marion, on Page 10, the Supreme Court brief,

19 they quoted -- the United States Supreme Court quoted

20 the Carter-Baker report that has been referenced here.

21 And in that report, their quote was, "There's no

22 evidence of extensive fraud in the U.S. elections or of

23 multiple voting, but both occur, and it could affect the

24 outcome of a close election.  The electoral system

25 cannot inspire public confidence if no safeguards exist

248

1 to deter or detect fraud or to confirm the identity of

2 voters.  Photo identification cards currently are needed

3 to board a plane, enter federal buildings, and cash a

4 check.  Voting is equally important."

5            Is that your understanding?  Is Senate

6 Bill 14 designed to inspire that public confidence in

7 close elections like --

8            SEN. FRASER:  Yes, it is.

9            SEN. WILLIAMS:  -- we talked about?

10            Senator Fraser, do you recall the

11 testimony and exhibits that we provided in 2009 -- now

12 it's been admitted earlier today as Exhibit 1 -- that

13 detail the extensive voter fraud in Harris County and

14 other areas of the state?

15            SEN. FRASER:  Yes, I'm very familiar with

16 it.

17            SEN. WILLIAMS:  Okay.  Senator, having

18 listened to what I heard and just read a minute ago from

19 the Carter-Baker Commission and the language that was

20 adopted from them in the Supreme Court brief, are you

21 aware of how difficult it is to not only discover but

22 to prosecute voter fraud?

23            SEN. FRASER:  Yes, it is very difficult.

24            SEN. WILLIAMS:  And having said that,

25 do -- do you think that that's one of the reasons we

KENNEDY REPORTING SERVICE, INC.
512.474.2233

CONSIDERATION OF SENATE BILL 14 1/25/2011

249

1 don't see many of these cases that are prosecuted
2 because if someone is voting deceptively as someone
3 else, it's going to be very difficult to discover that
4 if they're successful?
5           SEN. FRASER:  And that was recognized by
6 the U.S. Supreme Court in their decision.
7           SEN. WILLIAMS:  So are you offering Senate
8 Bill 14 as a tool for the state of Texas to detect and
9 deter this type of voter fraud and further inspire
10 confidence in our voters and the voting system, to make
11 sure that all Texans and all of our elections are
12 conducted with the upmost integrity and equity to all
13 Texans?
14           SEN. FRASER:  Absolutely.  That would be
15 my reasoning.
16           SEN. WILLIAMS:  Okay.  Couple of things
17 that I just think that it was important to get back into
18 the record again about what the Supreme Court actually
19 said in Crawford v. Marion; and all of this, of course,
20 was included in the record last time.
21           I thought it was interesting that Justice
22 Stevens comments about this.  He said first, the state
23 has an interest in deterring and detecting voter fraud.
24 They have a valid interest in participating in a
25 nationwide effort to improve and modernize the election

250

1 procedures that have been criticized as antiquated and
2 inefficient, and the state, in that case, also argues
3 that it has a particular interest in preventing voter
4 fraud in response to a problem that is, in part, the
5 product of its own maladministration; namely, that in
6 the case -- in this case, Indiana's voter registration
7 roles included a large number of people who were either
8 deceased or no longer live in Indiana.
9           Now, Senator Fraser, when I look back at
10 the record that we had introduced as Exhibit 1 today,
11 didn't that record include many, many instances where we
12 had people who were registered at fictitious addresses
13 who had been voting or people who were deceased?  I
14 think my own brother came and testified that our
15 grandfather had voted for 62 years after his death, and
16 my grandmother had a very difficult time trying to get
17 him taken off the voter roles and, in fact, had not been
18 able to do so.
19           SEN. FRASER:  Yes, I'm -- I'm -- remember
20 that very well.
21           SEN. WILLIAMS:  Okay.  And so, you know,
22 there's been a lot of talk about the burden on people,
23 and Senator Davis made some very compelling and
24 interesting remarks in her comments.  But I would say
25 that, you know, wouldn't you think that especially for

251

1 the elderly, which we've had a big focus on here today,
2 of the inconvenience on elderly voters, people who are
3 age 65, don't they have an opportunity to use a mail-in
4 ballot and they completely bypass any restrictions that
5 your bill or inconveniences that it might cause them?
6           SEN. FRASER:  I'm actually surprised at
7 the percentage now of people that do mail in ballots.
8 That percentage continues to increase, and so someone
9 that did have a problem getting to the polls -- and, you
10 know, I gave the example last year of my -- my mother in
11 the retirement center, that she couldn't get to the --
12 it was too much -- it's too hard for her to get to the
13 polls, but she voted by mail.  And there's -- there are
14 people in that category, and we have that safeguard in
15 Texas.
16           SEN. WILLIAMS:  Well, and -- and I think
17 we all care about everyone being able to exercise their
18 constitutional right to vote, and along with the
19 provisions that you have for people that are 70 and over
20 plus the mail-in ballots and the fact that provisional
21 ballots can be cast and allow people with expired
22 licenses and that sort of thing the opportunity to prove
23 up who they are, don't you think that addresses many of
24 the concerns that have been raised here today?
25           SEN. FRASER:  Absolutely.  They -- and

252

1 that was our intent, is that obviously, we want to make
2 sure everyone is afforded the -- the ability to vote,
3 and we think we have those provisions in place so that
4 all Texans, every Texan, will be allowed to vote.
5           SEN. WILLIAMS:  Well, I -- I think it's
6 also interesting, and you've noted several times today,
7 that so far as we could determine from our research,
8 there isn't a single voter in Indiana or Georgia who's
9 raised the issue that they've been disenfranchised since
10 those laws have been enacted.  Is that true, to the best
11 of your knowledge?
12           SEN. FRASER:  To the best of my knowledge.
13 And we have asked that question repeatedly, and to the
14 best of our knowledge, we have -- not a single person
15 has come forward in either state.
16           SEN. WILLIAMS:  And I think it's -- you
17 know, when I look at the syllabus of the Crawford v.
18 Marion County election board case that went to the Texas
19 Supreme Court, they note in the syllabus that there's no
20 question about the legitimacy or importance of the
21 State's interest in counting only eligible votes.  And I
22 think they go on to say that -- that requiring that and
23 the fact that the cards in the Indiana case, as we're
24 doing, they make those cards free.  The inconvenience
25 of going -- of gathering the required documents, posing for

CONSIDERATION OF SENATE BILL 14 1/25/2011

253

1 a photograph, does not qualify as a substantial burden
2 on most voters' right to vote or represent a significant
3 increase over the usual burdens of voting.  And I think
4 that's interesting that that was noted.
5           And those provisions that we have are
6 essentially -- in your bill, there are very similar
7 provisions with respect to those matters.  Correct?
8           SEN. FRASER:  They -- yes, and I want to
9 clarify.  The Crawford case went to the U.S. Supreme
10 Court, and those observations were made in the -- the
11 majority opinion.
12           SEN. WILLIAMS:  Now, they go on to say
13 that it's generally applicable, nondiscriminatory voting
14 regulation, it's universally applicable, it's imminently
15 reasonable because the burden of acquiring, possessing,
16 and showing a free photo identification is not a
17 significant increase over the usual voting burdens, and
18 the State's interest are sufficient to sustain whatever
19 those minimal burdens are.
20           So we know there's some inconvenience, but
21 we've done everything we can to make that inconvenience
22 as insignificant as possible.  Is that --
23           SEN. FRASER:  I will actually go with that
24 in the -- the Crawford/Indiana case.
25           SEN. WILLIAMS:  Just in closing, in my

254

1 final comments as -- before we go to take testimony, I
2 just think that it's noteworthy to look back at what the
3 opponents of this legislation have said on the floor
4 thus far today, and what I've heard is very little
5 debate about the actual content of your legislation.
6 And I think that speaks to the fact that it's
7 unequivocally a good idea that people ought to be able
8 to be positively identified as who they say they are
9 when they come to vote.
10           What I've heard today is a lot of talk
11 about procedures, even though what we're doing is very
12 normal for a Committee of the Whole, and it's the same
13 procedure that we used the last session when we
14 considered this.  Is that correct, Senator Fraser?
15           SEN. FRASER:  It is, and I think it's very
16 difficult for a member to argue the merits of the bill
17 when it's so straightforward when you ask someone in
18 their district do they think that someone should --
19 should have -- be required to show a photo ID when they
20 vote, that you've got near 90 percent of the population
21 across the state of Texas.  Again, every one of these
22 members, it's hard to argue the merits -- argue the
23 merits of the bill.
24           SEN. WILLIAMS:  Yeah, the other thing that
25 I've heard that I think is interesting is fiscal notes.

255

1 A lot of talk about fiscal notes, even though we have a
2 letter from the Secretary of State that states that
3 there are going to be HAVA funds that will be available
4 to help with the voter education, and I think we're
5 going to have testimony in a few moments.
6           And I tried to clarify that early on that
7 the cost of issuing for the state these free ID cards is
8 less than $2.  It's a very minimal cost, and with almost
9 16 million people that we have who have a driver's
10 license or -- or an ID card now, it seems unlikely that
11 there's going to be a whole lot of people out of that
12 13 million that actually don't already have a driver's
13 license or a state ID card.
14           In fact, Senator Fraser, I spoke last
15 night with the Department of Public Safety and today
16 with the Secretary of State and just asked them if it
17 would be possible for us to target those voters who are
18 below age 65 and have -- don't have an ID card, a
19 driver's license or an ID card issued by the state; and
20 they said, yes, it would be possible for us to direct
21 our voter education to those people specifically so that
22 we could step it up and let them know before your bill
23 takes effect -- not till, when, in January?  Is that --
24 am I remembering that correctly?
25           SEN. FRASER:  January, 2012.

256

1           SEN. WILLIAMS:  So a year from now.  So
2 we've got a lot of time to let these people know what's
3 coming.
4           And then the other thing I've heard a lot
5 about is current law, and, you know, there's been a lot
6 of discussion.  In fact, a lot of what we've talked
7 about is what's actually on the books right now, and
8 your bill is not touching any of that top side or
9 bottom.  Really, most of what you do is very limited by
10 changing what the requirements are when you come to the
11 polls.  Is that correct?  There's not any other real
12 substantive change to election law here.
13           SEN. FRASER:  We're only addressing the --
14 the actual in-person voting and the identification
15 required when somebody votes in person.  We're not
16 addressing mail-in ballots or any of the other
17 provisions.  It's just that one section.
18           SEN. WILLIAMS:  Well, thank you for
19 allowing me to question you about this and I appreciate
20 you bringing this issue before us and I especially
21 appreciate the fortitude that you've shown during this
22 long debate.  Thank you.
23           SEN. FRASER:  Thank you, Senator.
24           CHAIRMAN DUNCAN:  Chair recognizes Senator
25 Shapiro.

CONSIDERATION OF SENATE BILL 14  1/25/2011

257

1          SEN. SHAPIRO:  Thank you, Mr. Chairman.

2          I would just like to ask one question

3 because we're getting mixed signals, and I just want to

4 make sure.  It's just going to take a yes-or-no answer,

5 and I think that will be the easiest.

6          In Section 7 of your bill, which is

7 actually on Page 5, the requirements for identification

8 prescribed for people who do not have to have a vote --

9 a photo ID, where it references their age, does the bill

10 require that people 70 or older present a voter

11 registration card and that they be at least 70 years of

12 age on January 1st, 2012?

13          SEN. FRASER:  My understanding and this

14 is, again, something probably the Secretary of State

15 will address, but I believe your age is -- is on the

16 card.  So if someone is 70 on January 1, 2012, they will

17 not be asked to show a photo ID.

18          SEN. SHAPIRO:  Okay.  And this is

19 something that the Secretary of State has put into this

20 bill?

21          SEN. FRASER:  No.  No, I --

22          SEN. SHAPIRO:  This is something that you

23 have --

24          SEN. FRASER:  -- inserted it into the

25 bill.  It'd be your interpretation --

258

1          SEN. SHAPIRO:  I got you.

2          SEN. FRASER:  -- to -- to make sure --

3          SEN. SHAPIRO:  Identify whether it's at

4 hand?

5          SEN. FRASER:  -- that they can identify

6 themselves --

7          SEN. SHAPIRO:  Okay.

8          SEN. FRASER:  -- but it's not intended

9 that they would -- I believe they're --

10          SEN. SHAPIRO:  Separate.

11          SEN. FRASER:  Yes.

12          SEN. SHAPIRO:  It's not intended to be

13 separate.  It's intended --

14          SEN. FRASER:  No.

15          SEN. SHAPIRO:  -- to be the same document.

16          SEN. FRASER:  Yes, as long as they're --

17          SEN. SHAPIRO:  Okay.

18          SEN. FRASER:  -- you know, 70 on

19 January 1, 2012.

20          SEN. SHAPIRO:  And the date of birth is on

21 our current voter registration card?

22          SEN. FRASER:  You need to ask that of the

23 Secretary of State.

24          SEN. SHAPIRO:  Okay.  And my recollection

25 is it is.  Thank you.

259

1          SEN. FRASER:  Okay.

2          CHAIRMAN DUNCAN:  Chair recognizes Senator

3 Huffman.

4          SEN. HUFFMAN:  Thank you, Mr. Chairman.

5          Senator Fraser, will you yield for a

6 couple of questions?

7          SEN. FRASER:  I would love to yield.

8          SEN. HUFFMAN:  Thank you, sir.  I'd like

9 to commend you, too, for a long day of answering a lot

10 of tough questions.

11          SEN. FRASER:  Thank you.

12          SEN. HUFFMAN:  But I think it's important,

13 as we kind of wrap this part of the procedures up today,

14 that -- that we circle back to -- to the idea and the

15 concept that -- that we got here today.  But there is a

16 line of Supreme Court cases that have brought us here.

17 Would you agree with that?

18          SEN. FRASER:  Yes.

19          SEN. HUFFMAN:  And certainly, the Crawford

20 v. Marion case gives us guidance on how to do what we're

21 doing here today properly.  Would you agree --

22          SEN. FRASER:  I think that's the one --

23          SEN. HUFFMAN:  -- with that?

24          SEN. FRASER:  -- was referenced, I think,

25 in the Indiana case, I believe.

260

1          SEN. HUFFMAN:  Okay.

2          SEN. FRASER:  And that's yes.

3          SEN. HUFFMAN:  And did you, as you sat

4 down with your staff and so forth in, you know,

5 pre-session, in the interim, and you started thinking

6 about this bill and so forth, did you and your staff

7 take into consideration Crawford v. Marion and try to

8 follow the law and the rules the Supreme Court has laid

9 out for us?

10          SEN. FRASER:  Yes, without a doubt.

11 That's already been approved by the Supreme Court, and

12 obviously, we wanted to make sure we stayed within those

13 parameters.

14          SEN. HUFFMAN:  All right.  Now, you know,

15 the Supreme Court, I think -- we know that the Supreme

16 Court has told us that there is a balancing test, and we

17 understand that the right to vote is sacred.  And so we

18 know that the law tells us that if there is a burden

19 placed upon a voter, that they're going to look very

20 carefully at that; and it's going to have weight, but

21 it's going to be balanced against legitimate state

22 interest.  And so I think what we need to explore, just

23 briefly, is that, in fact, we -- we have legitimate

24 state interest.  The state of Texas has an interest to

25 make sure that our elections are done with -- well, as

CONSIDERATION OF SENATE BILL 14 1/25/2011

261

1 perfect as we can get them but with integrity, right,
2 and with voter confidence.
3          So as you prepared the bill and as you
4 look at the bill -- and the Supreme Court has told us
5 that there are legitimate interests, and they define
6 those for us.  So as you prepared the bill and you look
7 at Senate Bill 14 today, do you think that it addresses
8 the relevant and legitimate concerns of deterring and
9 detecting voter fraud?  And I know you've been asked
10 this question a lot.
11          SEN. FRASER:  Absolutely.
12          SEN. HUFFMAN:  Right.  Do you think that
13 it -- that it's important in that the bill will help to
14 improve and modernize the election procedures of Texas?
15          SEN. FRASER:  Yes.
16          SEN. HUFFMAN:  Do you think that there's a
17 larger scheme nationwide through the Help America Vote
18 Act and the National Voter Registration -- Registration
19 Act to do just that, to make elections come up to modern
20 times?
21          SEN. FRASER:  Absolutely.
22          SEN. HUFFMAN:  Do you think that Senate
23 Bill 14 will help to prevent voter fraud and actually
24 help to ensure that only the votes of eligible Texas
25 voters are counted in these crucial elections that

262

1 happen in the state of Texas?
2          SEN. FRASER:  That is our intent, and we
3 believe the bill does that.
4          SEN. HUFFMAN:  And do you believe that
5 once we have established these safeguards, that the
6 voters will feel more confident about their vote being
7 counted and only the votes of registered Texans who can
8 vote to be counted?
9          SEN. FRASER:  Yes, that is our belief.
10          SEN. HUFFMAN:  Do you think that once
11 that's established, that it will actually encourage the
12 democratic process and that it will encourage more
13 voters to go to the polls?
14          SEN. FRASER:  The thing we've seen in
15 other states that have implemented photo ID, the -- the
16 voter turnout actually increased.  And so, yes, we
17 believe the confidence in the voters will increase, and
18 we believe it will actually increase the voting
19 percentages.
20          SEN. HUFFMAN:  Now, we've heard comments
21 today from many senators, Senator Whitmire, Senator
22 Davis, Senator Uresti, about hypothetical burdens that
23 may be placed on some hypothetical voter.  But taking
24 that into account and looking at and trying to balance
25 it, do you feel like we have a bill here that -- that

263

1 presents and moves forward our legitimate interest in
2 Texas as it regards voting?
3          SEN. FRASER:  Without a doubt.
4          SEN. HUFFMAN:  All right.
5          SEN. FRASER:  We believe it does.
6          SEN. HUFFMAN:  Thank you very much,
7 Senator Fraser.
8          SEN. FRASER:  Thank you, Senator.
9          SEN. HUFFMAN:  Thank you.
10          CHAIRMAN DUNCAN:  Chair recognizes Senator
11 Wentworth.
12          SEN. WENTWORTH:  Thank you, Mr. Chairman.
13          Will the gentleman yield?
14          SEN. FRASER:  I will yield.
15          SEN. WENTWORTH:  Senator, I want to
16 compliment you on your long hours of being on your feet
17 in responding to these questions.  I just wanted to
18 touch on a couple of things.
19          One is we had -- we had some testimony
20 here two years ago on a very similar bill, and I just
21 wanted -- since it's been raised earlier today, the
22 issue about whether or not maybe passage of this bill
23 would reduce voter participation.  There are only a
24 couple of other states, Indiana and Georgia, where these
25 sorts of bills have been passed.  One of the witnesses

264

1 in March of '09 said to us:  Not only does voter ID help
2 prevent fraudulent voting, but where it has been
3 implemented, it has not reduced turnout.  There is no
4 evidence that voter ID decreases the turnout of voters
5 or has a disparate impact on minority voters, the poor,
6 or the elderly.  The overwhelming majority of Americans
7 have photo ID or can easily obtain one.
8          Now, this is in the record from the 2009
9 hearing, which we've already adopted, but I just wanted
10 to recall some of the testimony that we had.
11          Another quote was:  Recent election
12 results in Georgia and Indiana also confirmed that the
13 suppositions that voter ID will hurt minority turnout
14 are incorrect.
15          In addition -- and I'm not sure whether
16 this was part of the record in '09, but there is a study
17 of Indiana's photo ID law that was conducted by a
18 University of Missouri professor.  He found that
19 requiring identification doesn't have much impact on
20 voter turnout rates.  His name is Jeffery Milyo.  He's
21 professor of economics and public affairs at the
22 University of Missouri, a part of the Institute of
23 Public Policy of the Harry S. Truman School of Public
24 Affairs.
25          And his conclusion is -- if I can find it

KENNEDY REPORTING SERVICE, INC.
512.474.2233

## CONSIDERATION OF SENATE BILL 14 1/25/2011

**265**

1 quickly -- it's a many-page study, and his conclusion is
2 that the findings that emerge from his analysis are that
3 photo ID is associated with an overall county level
4 turnout increase of almost 2 percentage points -- and
5 this is just in Indiana.  This isn't Georgia as well --
6 an insignificant increase in relative turnout for
7 counties with a greater percentage of minority and poor
8 population; no consistent or significant impact on
9 relative turnout in counties with a greater percentage
10 of less educated or elderly voters; and finally, a
11 significant relative increase in turnout for counties
12 with a higher percentage of Democrat voters.
13           I was just wondering if you remembered
14 those things that were testified to two years ago or
15 whether you were familiar with this university
16 professor's study.
17           SEN. FRASER:  Thank you for bringing that
18 forward.  It -- yes, I -- now, as you mention it, I do
19 remember it.  The other thing that comes to mind that
20 was through the testimony two years ago is in the '09 --
21 I'm sorry -- the '08 president election for '09, that
22 even though the president was from Illinois, the
23 adjoining state, Indiana, had doubled the increase of
24 voting next door in the state -- in Indiana where they
25 had put in photo ID.  Illinois did not have it, but the

**266**

1 increase was double the amount of increase next door.
2 So it certainly didn't show that they were hurt by the
3 implementation of the --
4           SEN. WENTWORTH:  Where Indiana has a photo
5 ID law --
6           SEN. FRASER:  Illinois does not.
7           SEN. WENTWORTH:  Thank you very much,
8 Senator.
9           SEN. FRASER:  Thank you, Senator.
10           CHAIRMAN DUNCAN:  Okay.  Members, we
11 have -- that completes all of the Members who want to
12 ask questions of the author.  You can sit down for a
13 second, Senator, if you want to.  Take a rest.
14           We have a little bit of housecleaning.
15 There's a few witnesses that -- or a few exhibits that
16 may want to go in that we have now made copies of.  I
17 think, Senator Van de Putte, you had -- Senator
18 Zaffirini had Exhibit 6 which was a map of the DPS, and
19 we've now had that copied and available to distribute.
20 Do you want to go ahead and offer it into the record?
21           SEN. VAN de PUTTE:  Yes, I will.
22           CHAIRMAN DUNCAN:  Okay.  It'll be
23 received.
24           (Exhibit No. 6 marked and admitted)
25           CHAIRMAN DUNCAN:  And then I believe we

**267**

1 had -- Senator Davis had a chart that -- excuse me.
2           SEN. VAN de PUTTE:  Mr. Chairman, do -- I
3 move to add to Exhibit 6 the counties with Department of
4 Public Safety Driver's License Office Closures prepared
5 by legislative counsel.
6           CHAIRMAN DUNCAN:  Okay.  Thank you.  That
7 will be received in the record.
8           Senator Davis, you had an exhibit that you
9 wanted to offer.
10           SEN. DAVIS:  Yes, Mr. Chair.  I'd like to
11 add that as -- I guess it would be Exhibit No. 7 to the
12 record.
13           CHAIRMAN DUNCAN:  And I think we have
14 copies to distribute to the Members?  Would you describe
15 it, please?
16           SEN. DAVIS:  Yes, I'm sorry.  It's the
17 chart that I displayed and talked about earlier in my
18 questions of Senator Fraser.  It's exact -- an exact
19 replica of the chart that was displayed on the Senate
20 floor.
21           CHAIRMAN DUNCAN:  It has a -- it's a
22 graphic that has a -- at the top, a title that says,
23 "DL/State ID."  Okay.  Exhibit 7 will be received in the
24 record.
25           SEN. DAVIS:  Thank you.

**268**

1           (Exhibit No. 7 marked and admitted)
2           CHAIRMAN DUNCAN:  Are there any other
3 exhibits that --
4           SEN. FRASER:  Mr. President?
5           CHAIRMAN DUNCAN:  -- were discussed that
6 we'd like to include?  Senator Fraser?
7           SEN. FRASER:  And I had one that I
8 mentioned that I was going to enter in that I have not
9 yet.  It is the Lighthouse Opinion Poll.  This is the
10 most current poll that is taken and has a very good
11 breakout of not only across the state, the regions, but
12 also has a breakout, Republican, Democrat, and it breaks
13 out for the African American, Hispanic, and --
14           CHAIRMAN DUNCAN:  Do you have copies of
15 that to distribute?
16           SEN. FRASER:  I have one copy.
17           CHAIRMAN DUNCAN:  Okay.  Well, Exhibit 8
18 will be received, but if you'll go ahead and get copies
19 so that we can distribute those at this time.
20           (Exhibit No. 8 marked and admitted)
21           SEN. GALLEGOS:  Mr. President?
22           CHAIRMAN DUNCAN:  Senator Gallegos, for
23 what purpose?
24           SEN. GALLEGOS:  I have also some diagrams,
25 but I wasn't going to present them until the time of my

CONSIDERATION OF SENATE BILL 14 1/25/2011

269

1 amendments.  I mean, do they need to be entered now or
2 at the time of the amendment?
3           CHAIRMAN DUNCAN:  I don't see any problem
4 with entering them at the time when it's relevant to
5 what you're trying to do.
6           SEN. GALLEGOS:  Yeah.
7           CHAIRMAN DUNCAN:  You can put them in the
8 record at that time --
9           SEN. GALLEGOS:  Okay.
10          CHAIRMAN DUNCAN:  -- when we're --
11          SEN. GALLEGOS:  Then I'll wait till --
12 till the time of the amendment.  Thank you,
13 Mr. President.
14          CHAIRMAN DUNCAN:  All right.  Members, the
15 next phase is the invited testimony.
16          And Senator Van de Putte and Senator
17 Fraser, if you could come up to the -- make sure we've
18 got everybody in the right order.
19          And while they're coming up, I want to
20 announce that it's my intention to -- we have about
21 17 -- last check, 17 registered witnesses for public
22 testimony, and I would like to accommodate those
23 witnesses, if we could.  So remember that when you're
24 questioning and -- that we have some folks that would
25 like to testify here later on.

270

1           All right.  Members, let's go ahead and
2 move into the invited testimony.
3           The first witness will be Jerry Bonnett,
4 general counsel, Indiana Secretary of State.
5 Mr. Bonnett?  Mr. Bonnett, you'll have ten minutes the
6 timer is right before you.  You'll get a yellow light at
7 30 seconds, I think.  And then we'll strictly hold you
8 to the time, and then open it to questions at that time.
9 You'll not be interrupted during your testimony.
10             INVITED TESTIMONY
11          TESTIMONY BY JERRY BONNETT
12          MR. BONNETT:  All right.  Thank you,
13 Chairman Duncan.  I want to thank Senator Fraser and
14 supporters of Senate Bill 14 for inviting me to be here
15 today.
16          CHAIRMAN DUNCAN:  Would you state your
17 name and --
18          MR. BONNETT:  Yes.  My name is Jerry
19 Bonnett.  I've served as general counsel for the Indiana
20 Secretary of State Todd Rokita from 2005 to the end of
21 2010 when he completed his second term in office.  I am
22 currently serving as general counsel to Indiana's next
23 Secretary of State and chief election officer, the
24 Honorable Charles White.
25          Since 2005, my duties as general counsel

271

1 have involved assisting with the implementation of
2 Indiana's photo ID law, including working with multiple
3 players in Indiana's election process, which is included
4 the Bureau of Motor Vehicles, county election boards,
5 poll workers, our Help America Vote Act, and support
6 agencies in coming up with the procedures and rules to
7 administer our photo ID law.
8           I've also been responsible for statewide
9 monitoring of election day activity in elections in our
10 statewide and primary -- primary general elections in
11 2006, 2007, 2008, and 2010.  I've reviewed every
12 complaint from the -- regarding voting submitted to the
13 Secretary of State, the Indiana Election Division, the
14 Indiana Election Commission, the Department of Justice,
15 our Help America Vote Act, and other county election
16 boards.
17          I've also assisted the Indiana Attorney
18 General and the Indiana Solicitor General with the
19 discovery trials appeals and ultimately Supreme Court
20 review in the state courts and in the U.S. Supreme Court
21 of Indiana's photo ID law.
22          Prior to the first statewide election in
23 Indiana under the photo ID law, there was no shortage of
24 organizations claiming that we smell a rat of some sort
25 and that the law has some illegal discriminatory effect

272

1 or political subtext.  My job has been to look for
2 exactly any application of the law that was illegal or
3 overburdensome.
4           Despite the intense scrutiny of the law
5 that has been locally -- local, state, national, and
6 even international, in my impression, Indiana has
7 been -- and our courts who have been very open to giving
8 a fair and complete hearing to anyone feeling agreed or
9 disenfranchised by our voter ID laws.  In the five years
10 and eight statewide primary general elections I've been
11 involved with, there's been scant evidence of
12 disenfranchisement or discrimination in Indiana.  If the
13 naysayers and conspiracy theorists and armchair social
14 scientists were correct in their prognostications,
15 Indiana would have experienced hundreds of thousands of
16 disenfranchised voters after the laws passed in 2005,
17 but hardly any group or individual or circumstance has
18 been found that has genuinely disenfranchised or
19 inconvenienced a voter beyond what the Supreme Court has
20 held to be the reasonable, orderly regulation of
21 elections.
22          Did Indiana fix something that wasn't
23 broke?  Was it a law in search of a crime?  Admittedly,
24 there's been little evidence of in-person voter fraud in
25 Indiana, but that's been of little consolation to

CONSIDERATION OF SENATE BILL 14 1/25/2011

273

1 citizens who have come to Secretary of State's office
2 with concerns about the confidence in our elections.
3          What Indiana has experienced were
4 manipulation of voter registrations with thousands of
5 voter registrations submitted just prior to the closing
6 of registration which have confounded the orderly
7 registration of voters.  Indiana has experienced issues
8 with voter list maintenance where -- where partisan
9 activists have refused to update voter registration
10 lists, insisting the U.S. Department of Justice to
11 intervene and require voter list maintenance in Indiana.
12 Indiana has seen inconsistent agency-to-agency
13 cooperation in the sharing of information.  There have
14 been times when the Social Security office was unable to
15 provide verifications of voter registrations, times when
16 other state agencies were not able to exchange
17 information that would assist in verifying voter
18 registrations.
19          There have been reports of people in urban
20 areas being bussed around from poll location to poll
21 location.  There is evidence, after the fact, of dead
22 voters having registered or of dead voters having voted.
23 There was also a report of a well-intentioned high
24 school civics teacher who was intent on having every 17
25 year old that came into her class register to vote and

274

1 every 18 year old vote even though there were some
2 students of hers who are not students -- who are not
3 U.S. citizens, but they were shamed into going through
4 the registration process and that resulted in illegal --
5 an illegal vote being cast and also confounded those
6 students eventual efforts to become naturalized U.S.
7 citizens.
8          In my position, I am in a position to say
9 that the law has not been applied -- has been applied in
10 the strict and unbending manner that the dissenters have
11 suggested.
12          After the 2005 photo ID law was enacted
13 but before the first election was held, the Secretary of
14 State and the election division and interested groups
15 developed procedures to deal with the issue of the
16 conformity of names on an ID to voter registration
17 lists.  Rules were developed that would allow for a
18 voter named Mary Ellen Smith to -- who might appear on
19 the voter registration in as many as ten different ways
20 to -- to proceed to vote.
21          Also, Indiana -- rules were adopted by the
22 Election Division in Indiana so that if a voter had
23 married between the time of the voter registration, at
24 the polls on election day, they could update their voter
25 registration by signing the poll book and proceed to

275

1 vote.  In Indiana, voters can conform their voter
2 registration up through election day to the IDs that
3 they have.
4          Other state agencies have reached out to
5 anyone identified who has been experiencing problems of
6 obtaining photo IDs.  In Indiana, it's not a money
7 issue.  And an ID is reviewed by social service agencies
8 in Indiana as key to other social services and other
9 benefits of citizenship, and there's been an interest in
10 working with individuals who had difficulty obtaining
11 photo ID.  Also, in the Indiana Election Day Handbook,
12 in bold print, it says, on -- in several locations, that
13 lack of ID or problems with an ID is not a cause for
14 someone -- for a voter to be turned away.
15          After five busy years of monitoring
16 primary general elections in Indiana, working with
17 deputies, reviewing complaints, I can say that Indiana's
18 photo ID law is not only constitutional as it is written
19 but as it has been applied in routine use -- is applied
20 and become routinely used in good faith and in -- and in
21 an accommodating matter in the state.
22          Now, keeping to its principal and intent,
23 Indiana's law, subject to all matter of partisan,
24 nonpartisan, state, national scrutiny, has not been
25 applied with the rigid inflexibility and consequences

276

1 predicted by detractors.  After exhaustive review in the
2 state and federal courts involving the application of
3 the law as applied -- instance of the law and in -- and
4 in Indiana's informed public opinion, Indiana photo ID
5 has earned broad acceptance, even from skeptics, as
6 become -- as having become integral component of voter
7 confidence and law that honors the privilege and the
8 dignity of American's right to free and equal
9 participation in elections.
10          So I honor you for the difficult work
11 you're doing here today.  I assure you that the work
12 won't be done if and when you pass Senate Bill 14.  I
13 can certainly tell you that the sun came up in Indiana
14 after Indiana's photo ID was passed.  It continued to
15 come up and continues to come up after each election
16 that we have.  So I'm ready to address your questions,
17 please.
18          CHAIRMAN DUNCAN:  Thank you, Mr. Bonnett.
19          So we'll have our first questions.
20 Senator Van de Putte, you're recognized.
21          QUESTIONS FROM SENATE FLOOR
22          SEN. VAN de PUTTE:  Thank you very much,
23 Mr. Chairman.
24          And thank you very much, Mr. Bonnett, for
25 traveling from Indiana.  I know on such short notice.

## CONSIDERATION OF SENATE BILL 14 1/25/2011

277

1 We appreciate you being here to help us with your expert
2 testimony as we deliberate this very, very important
3 issue.
4         I had a few questions that -- that I
5 wanted to ask because here in Texas, we looked at the
6 Indiana law, and we're looking toward -- this is -- as
7 our bill author has said, it's kind of a Texas bill,
8 which we think is more restrictive than yours.  And we
9 have heard from testimony that there is increased
10 turnout, and you haven't found any instances in where
11 the burden of the new Indiana law was placed upon
12 anybody.  And -- and I think in your testimony and in --
13 said that it is working and even in your Supreme Court
14 case, no party or amicus cited -- well, of course, there
15 were no cases of impersonation at the polls in Indiana.
16         So I have some confusion because in the
17 bill that you passed, we had reports in Marion County in
18 2007 that 32 vote -- voters cast ballots that would not
19 be counted because of the voter ID law, and I want to
20 ask you about them because just a couple of them really
21 bring to mind some difficulties, and yet you cited that
22 there were no problems.
23         In South Bend, Indiana, ten retired nuns
24 were barred from voting in the 2008 Indiana democratic
25 primary.  Some of them were in their 80s and 90s.  They

278

1 no longer had driver's license.  They lived at the
2 convent, and the convent actually had the polling place
3 in their convent.  The irony was that I believe in that
4 case, the election judges were actually other nuns who
5 lived with these nuns, but they were barred from casting
6 a ballot even though they had previously voted in at
7 least ten elections in Indiana but that these nuns were
8 not able to because they did not have an ID, even though
9 the election judges live with them.  And so can you
10 comment?  This was in the newspapers, but it was also in
11 Catholic Digest magazine and so wanted to know because
12 we heard --
13         MR. BONNETT:  I can't --
14         SEN. VAN de PUTTE:  -- that there were no
15 instances, yet we had these reports.  And so could you
16 tell us?  I mean, what happened to these nuns?
17         MR. BONNETT:  I can't speak to the -- the
18 Marion County voters that you referenced to, although I
19 think that was covered in the Indiana League of Women
20 Voters v. Rokita case that was heard by the Indiana
21 Supreme Court.
22         In the case of the -- the -- the nuns, in
23 Northern Indiana, the -- it's my understanding and
24 that -- that situation was also discussed in -- in the
25 Crawford case -- the -- the nuns did have passports.

279

1 They did have a form of ID that was acceptable, but they
2 refused to present that.  They were eligible for other
3 exceptions under the law, absentee voting exception, and
4 it was really a media event because the media had been
5 brought to the scene before.  And they also refused to
6 go provisionally.  I did not -- I believe they were
7 brought in a van to a polling location that was not --
8 not, I understand, any time that they were voting at the
9 place that they lived.
10         SEN. VAN de PUTTE:  So --
11         MR. BONNETT:  That incident was -- seemed
12 to be discredited as a -- as a legitimate case of
13 disenfranchisement.
14         SEN. VAN de PUTTE:  So you're saying these
15 nuns organized in a -- in a fraudulent matter, that
16 these nuns all got together?  But even though they're --
17 from the report what was reported, they lived at the
18 convent, and they were all in their 80s and 90s.  So I
19 don't know.  You know, maybe they had passports, maybe
20 they didn't.  But you're saying that this was
21 orchestrated by these devious nuns to actually prove up
22 Indiana law, and really, they intended to mess you up
23 purposefully or --
24         MR. BONNETT:  Yes, Your Honor.
25         SEN. VAN de PUTTE:  Oh, thank you.

280

1         (Laughter)
2         SEN. VAN de PUTTE:  Well, let me ask you
3 about another case.  One of them was Lauren McCallick
4 who was an 18-year-old freshman at Saint Mary's College
5 in South Bend and who was not able to cast her ballot
6 that was due because of the law, and so that was one of
7 the cases that was there.  And can you tell me about
8 her?  Was she devious, as well, or was it orchestrated?
9         I mean, from the reports and from what was
10 happened, she was crying and she -- it was the first
11 time that she was going to be able to vote, and she
12 tried to -- she did do a provisional ballot.  But since
13 she couldn't get the documentation that she needed
14 within the time requirement, she didn't have a chance to
15 vote because she was in class and she couldn't go back
16 to her -- so can you tell me what happened to Ms. Lauren
17 McCallick in this case?
18         MR. BONNETT:  Unfortunately, I'm not
19 familiar with -- with that case.
20         SEN. VAN de PUTTE:  Oh.
21         MR. BONNETT:  So --
22         SEN. VAN de PUTTE:  Well, then what
23 happened in -- again, in Marion County, when we had some
24 senior citizens that weren't able to?  Now, they weren't
25 devious nuns.  These were seniors who were living in

CONSIDERATION OF SENATE BILL 14 1/25/2011

281

1 a -- some sort of a -- it wasn't a senior assisted, but
2 it was some sort of a temporary, like rehab, where
3 people go after strokes or after a motor vehicle
4 accident, and that they weren't allowed.  I mean, I can
5 understand your story about the nuns because, you know,
6 I'm a Catholic and sometimes they get really organized,
7 and they make their point.  But what --
8          MR. BONNETT:  I am too.
9          SEN. VAN de PUTTE:  What -- what about the
10 people who were living in the -- again, in Marion
11 County, in a -- not their full residence --
12          MR. BONNETT:  Uh-huh.
13          SEN. VAN de PUTTE:  -- but for a certain
14 period of time because they had a disability, they had
15 had a stroke, and they were living in this.  What
16 happened to those folks?
17          MR. BONNETT:  Well, and I don't know the
18 specifics without more information, but every -- every
19 reported case has been investigated and reviewed.  The
20 state election division, the state social service
21 agencies, and Bureau of Motor Vehicles Division have
22 been quite willing to assist voters who have -- have had
23 difficulties obtaining an ID.
24          The largest group of voters in Indiana had
25 some form of ID, a -- a -- of what was left over, the

282

1 exceptions covered many of those voters, and the --
2 ultimately, you know, anyone registered to vote who
3 didn't have the ID, that group was small and has not
4 been identifiable in such a way that the state has been
5 able to even identify them, and certainly efforts have
6 been made in litigation to try and identify a group.
7 But I -- I believe the state would develop
8 administrative procedures to assist anyone having
9 trouble with an ID faster than the litigation would
10 proceed through the courts to try and validate the law.
11          SEN. VAN de PUTTE:  Well, I appreciate
12 your answer, but you can understand my concern.
13 Particularly in the district that I represent, we have,
14 that I know of, six convents, the Sisters of Divine
15 Providence with their mother house with over 120 retired
16 nuns living there from orders all over; the Society of
17 Mary, which they're Marianist priests, and after they
18 finish at the University of Dayton and other Marianist
19 schools, they come to San Antonio and live right there
20 at Saint Mary's University.  We have over 56 nuns from
21 Incarnate Word and that community, and they're, you
22 know, in their 80s, 90s.  In fact, we even have a couple
23 that are over a hundred, and while on and on, you see my
24 problem.
25          And when I read things about Indiana and

283

1 having the religious who don't live outside in homes but
2 who all have the same residences and who come back to
3 that convent or retirement home run by the nuns or run
4 by the priests, it's -- it's very difficult, and so I
5 have some concerns because I have so many voters that
6 are retired religious, and that's why I wanted to clear
7 that up.
8          But let me ask you about something else.
9          MR. BONNETT:  If I may, before you change
10 the subject, I will note that Indiana, for example, has
11 a Mennonite population that objects to being
12 photographed, and our law provided an exception for
13 individuals for religious reasons who objected to being
14 photographed; and there is an exception for disabled
15 individuals who live within a state licensed
16 convalescent or care center.  So Indiana has developed
17 exceptions for identifiable groups.
18          SEN. VAN de PUTTE:  Oh, well, I think
19 that's wonderful that Indiana did that, but you may not
20 know that that's in our Texas bill.
21          MR. BONNETT:  Uh-huh.
22          SEN. VAN de PUTTE:  And so why this is
23 more restrictive than Indiana is we don't have the
24 protections that you do in Indiana under this bill, for
25 those who live in religious communities, for those who

284

1 are disabled.
2          And that's the other thing I wanted to
3 talk to you about because I understand that, you know,
4 this is about the other thing that you said about
5 increased turnout.  But I really wanted to talk to you
6 about -- because, I mean, let's face it, isn't the
7 turnout from 2008 November election because we had a
8 highly contested primary season, but it was because we
9 had this wonderful, wonderful, very, very active
10 electorate in electing between now President Obama and
11 John McCain.  I mean, it was fabulous.  I mean, so you
12 really can't compare turnouts to turnouts because the
13 turnout was wonderful in November, and we're all very
14 excited about that.  So I wonder a little bit because, I
15 mean, everybody's turnout went up.
16          MR. BONNETT:  May I respond to that?
17          SEN. VAN de PUTTE:  Absolutely, please.
18          MR. BONNETT:  If you compare the turnout
19 in the 2006 election, which was a nonpresidential
20 off-election year but -- for statewide primary and
21 general elections to the 2010 election last year, there
22 was also an increase between 2006 and 2010 in -- in
23 voter turnout in Indiana, which would be more comparing
24 the apples -- apples to oranges.
25          And you're right, in 2008, Indiana voted

KENNEDY REPORTING SERVICE, INC.
512.474.2233

CONSIDERATION OF SENATE BILL 14 1/25/2011

285

1  it's electoral votes for a Democratic presidential
2  candidate for the first time in over 30 years.  Also, in
3  the 2006 state Congressional races after the photo ID
4  was enacted, three of Indiana's nine Congressional seats
5  switched from Democrat -- or from Republican to
6  Democrat, which tended to dispute the theory of the
7  political subtext of the law.
8          SEN. VAN de PUTTE:  Thank you.  There --
9  there are a couple of other questions that I wanted
10 to -- to --
11         MR. BONNETT:  Uh-huh.
12         SEN. VAN de PUTTE:  -- check on Indiana
13 law.  Can you tell me -- your law has a free voter ID
14 card issued by the state or the county.  Are there
15 restrictions or affidavits or a means test for access to
16 a free voter identification card from Indiana?
17         MR. BONNETT:  I don't want to misstate --
18 misspeak that.  It's on the Bureau of Motor Vehicle
19 Regulations.  I -- I believe that the person applied for
20 that ID needs to sign an affidavit that they don't
21 have -- have another ID with the state.  But beyond
22 that, I'm not -- I can't say about the issue of the
23 means --
24         SEN. VAN de PUTTE:  Well --
25         MR. BONNETT:  -- test.

286

1          SEN. VAN de PUTTE:  Well, I looked at it,
2  and I didn't think so.  It just says that they have to
3  state that they don't have a driver's license and they
4  don't have another.
5          MR. BONNETT:  Uh-huh.
6          SEN. VAN de PUTTE:  But there is no
7  affidavit of indigency or -- or anything required, at
8  least from what I looked at your law.  But I'm not sure.
9  That's why I wanted to ask.
10         MR. BONNETT:  That's my understanding.
11 Now, a related issue is when a provisional ballot is
12 verified, if a voter who has voted provisionally within
13 the ten days after the election signs an affidavit that
14 they don't have an ID and cannot get one without expense
15 and possibly can't afford one -- I'm not sure of the
16 exact language on the affidavit -- then they're entitled
17 to have their vote counted.
18         SEN. VAN de PUTTE:  Well, one of the
19 things that I wanted to look at, and I have the Indiana
20 law and I -- because ours is a little bit more
21 restrictive.  But under your section of the -- of the
22 Indiana bill, it has something in here because -- that
23 has me a little troubled because we don't, and I'm going
24 to read it.
25         But the voter prescribed by -- and it has

287

1  Indiana code that has not complied with -- and I think
2  that Indiana code 3-7-33-4.5 -- on election day must
3  present one of the following documents to the -- and it
4  says, "A current and valid photo ID," or it says,
5  "current utility bill, bank statement, government check,
6  paycheck, government document that shows the name and
7  address of the voter."  And yet we've been told that
8  Indiana only has a photo.
9          So what -- what is this section referring
10 to?  Is it a provisional ballot or is it a first-time
11 voter or -- or does Indiana allow for the photo ID, but
12 if they don't have the photo ID, can they use other
13 forms?
14         MR. BONNETT:  I'm not aware that Indiana
15 accepts any alternative than a photo ID.  That might --
16 I'd have to look at the law carefully on that.  Might
17 refer to the verification of address or the residency
18 with respect to voters who have moved, but I do not
19 believe that Indiana has any requirement other than --
20 than that of a -- of a government-issued photo ID with
21 an expiration date for in-person voting.
22         SEN. VAN de PUTTE:  Well, I think that
23 is -- it was very hard to follow, but I think it's under
24 a provisional ballot that has a state's licensed care
25 facility or something.  But there is at least that

288

1  protection for those who are at a temporary facility;
2  that even if they don't have a photo ID, the exception
3  is not that they're just exempted but I think that they
4  can utilize other forms of ID, which our Texas bill
5  doesn't have.
6          To your knowledge, was -- since this was
7  from the Indiana Legislature, do you remember any
8  discussions on why they -- they put that in?  Was this
9  put in at the same time as the original voter ID
10 legislation, or was this only done after the mess up
11 with, you know, the nuns and the -- the other folks who
12 were at this temporary facility?
13         MR. BONNETT:  I didn't live in Indiana
14 during the time that this legislation was -- was
15 discussed and deliberated, but it's my understanding
16 that the -- the exceptions to the provisions for
17 individuals who live in state-licensed assisted living
18 facilities has always been part of the -- of the
19 scheme -- or the bill, and I think the -- the utility
20 bills and the other documents you refer to might go to
21 the issue of establishing their residency in the
22 state-licensed facility, which is then an exception if
23 the polling place is located in that facility.
24         SEN. VAN de PUTTE:  Thank you.  I really
25 appreciate your candid answer; and, again, we thank you

CONSIDERATION OF SENATE BILL 14 1/25/2011

289

1 very much for your travel here to help us on this
2 important deliberation.  Thank you.
3           MR. BONNETT:  Thank you.
4           SEN. VAN de PUTTE:  I don't have any other
5 questions, Mr. Chairman.
6           CHAIRMAN DUNCAN:  Chair recognizes Senator
7 Davis.
8           SEN. DAVIS:  Thank you, Mr. Chair.
9           Mr. Secretary, thank you so much for
10 traveling to be with us today and to help inform us
11 about the work that you've done in Indiana on this
12 issue.  I just want to make sure that I clearly
13 understand because today there's been a great deal of
14 discussion about your bill, as you can imagine, as the
15 reason why the bill that's being proposed in the Texas
16 Senate today would be able to withstand constitutional
17 scrutiny.  So I want to make sure that we have a clear
18 record in terms of how the bill that Indiana has
19 introduced, or the law that you've introduced, mirrors
20 or does not mirror what we are -- are discussing on the
21 Senate floor today.
22           So I think I heard you say that you do
23 allow women who have been married or divorced to come in
24 to vote and to provide some affidavit that they -- their
25 name has changed and is different than is on the ID that

290

1 they have because of marriage or divorce.  Is that
2 correct?
3           MR. BONNETT:  That's correct.  That's by
4 administrative directive.  It's not part of the statute.
5 And I'll say that when the -- when the Indiana courts
6 and the -- federal courts reviewed the law, it was
7 reviewed in the context not just of the statutory
8 language but other administrative procedures that were
9 developed after the law was passed, after the framework
10 of the law was passed, for the -- the view of -- as
11 applied, how the law was applied.
12           SEN. DAVIS:  Absolutely.  And I think
13 that's terribly important, and I'd like to invite you
14 to -- to please inform us as much as possible both
15 statutorily what was reviewed in terms of what you've
16 done to try to preserve the integrity of someone's right
17 to vote and administratively what's been done.
18           So you said on that particular one, that
19 was a rule that was instituted administratively, but it
20 was part of what was reviewed by the court system in
21 terms of the implementation of that law?
22           MR. BONNETT:  Yes.  That -- that directive
23 clarified procedures for poll workers in -- in viewing
24 IDs for conforming names.
25           SEN. DAVIS:  And then I believe you said

291

1 that in the -- the language that's presented to a voter
2 in terms of their right to vote in Indiana, in bold
3 language, you have clarified for voters there that not
4 having a photo ID will not in and of itself be
5 sufficient cause for them not to be able to vote.  Is
6 that correct?
7           MR. BONNETT:  Yes.  I'll -- I'll just look
8 up the exact -- the exact bold language, one example's
9 are referred to on Page 10 of the Indiana Election Day
10 Handbook.  This is the 2008 copy.  In bold, "No voter
11 should be turned away from the polls for failing to
12 provide photo ID."  That's -- that's instruction to all
13 poll workers.
14           SEN. DAVIS:  And does that wording go to
15 instances where, for example, as you -- as you talked
16 about earlier, if a person comes to the poll and they do
17 not have a photo ID, they can vote a provisional
18 balance -- or ballot -- excuse me -- on the condition
19 that they attest that they do not have a photo ID
20 because there would be a cost to receiving that ID
21 either through having to get the underlying
22 documentation that would qualify them to receive the ID
23 or some other cost that would be associated with
24 receiving the ID?
25           MR. BONNETT:  Yes, there are several

292

1 alternatives to means to -- to verifying a provisional
2 ID to allow --
3           SEN. DAVIS:  And can you discuss what
4 those several alternatives are, please?
5           MR. BONNETT:  Well, generally, providing
6 the -- the ID or providing the -- the -- voter
7 registration correction or an affidavit that there is a
8 religious exception to being photographed, that an ID
9 cannot be obtained without -- without cost.  There may
10 be another.  That's provided for in the Voter Bill of
11 Rights which is posted at each poll site, and then
12 voters who vote provisionally are given a paper receipt,
13 so to speak, with the instructions on how to verify
14 their provisional ballot and have it cast, how and
15 where.
16           SEN. DAVIS:  Thank you.  That's very
17 helpful.
18           And I believe you also have a provision in
19 Indiana, do you not, that allows for the use of an
20 expired driver's license for a certain period of time.
21 Is that correct?
22           MR. BONNETT:  Yes.  And I believe if it --
23 if it goes back to the beginning of the -- the opening
24 of registration for the election which is generally 30
25 days from the prior election.  So it's generally about a

KENNEDY REPORTING SERVICE, INC.
512.474.2233

CONSIDERATION OF SENATE BILL 14  1/25/2011

293

1 year, year past.

2          SEN. DAVIS:  Okay.  Have you done any work

3 in Indiana to track or to attempt to track the

4 percentage of persons based on categories, whether it be

5 senior status, whether it be minority status, whether it

6 be indigent status, where people have claimed that

7 somehow their right to vote has been interfered with as

8 a result of this particular law?

9          MR. BONNETT:  I'm not familiar with the

10 state doing that research.  Certainly the -- there are

11 interest groups that have -- have made a concerted

12 effort to identify individuals, groups, or

13 characteristics, identify them and locate beyond the

14 theoretical basis; and generally, it's not been

15 something that's been accomplished.  There's been a

16 tremendous separation between the theoretical concerns

17 and what's actually been experienced in our elections

18 over the last five years.

19          SEN. DAVIS:  When you started your

20 comments this afternoon, you began by saying that there

21 had been scant evidence of disenfranchisement, and scant

22 to me means that there must have been some.  So can you

23 talk a little bit with us about what that's looked like

24 for Indiana?

25          MR. BONNETT:  There -- there was a single

294

1 media report prior to the 2010 election, a few days

2 prior to the election.  It was not officially reported

3 to the state, but the media account was a gentleman

4 of -- in a particular county of 40-something years, due

5 to some unusual circumstances did not have a birth

6 certificate.  I think it involved him having been

7 discharged to foster care through state programs,

8 et cetera.  But it also was evident that the Bureau of

9 Motor Vehicles Division has a special group -- team that

10 works with individuals who have particular problems to

11 address those needs.  And the -- the report did not

12 result in -- in a complaint, and there was no indication

13 the state got that the person wasn't able to vote

14 under -- under one of the exceptions.

15          There have been some reports, also, that

16 generally upon investigation, the individuals were able

17 to vote under -- under some provision.

18          SEN. DAVIS:  And you mentioned that -- a

19 moment ago, that through both administrative rule and

20 through the statute itself, in the state of Indiana,

21 you've tried to be cognizant of this disenfranchisement

22 issue through some of the -- the rules that you've

23 enacted along with it.  We talked about the fact that

24 you have a religious exception for -- for people who

25 cannot be photographed or refused to be photographed for

295

1 religious purposes.  We talked about the fact that if a

2 person comes to the polling location without an ID, they

3 can vote a provisional ballot so long as they attest as

4 one of the -- the reasons for voting that provisional

5 ballot, that they had to pay a fee in order to -- to get

6 a photo ID and they were unable to pay that fee.  You

7 talked about the special rule that's been created to

8 handle the situation where women have married or

9 divorced and their -- their name would be different than

10 what is on their ID.

11          Are there other -- and excuse me -- you

12 also talked about the expiration of a driver's license

13 not being a reason to immediately turn that -- that

14 voter away so long as it's within that --

15          MR. BONNETT:  Uh-huh.

16          SEN. DAVIS:  -- period of time that you

17 described earlier.

18          Are there any other conditions that were

19 implemented, either through the statute or through

20 administrative rule, that you feel we should know about

21 in terms of reflecting a sensitivity to trying to

22 preserve the enfranchisement of your voters as much as

23 possible?

24          MR. BONNETT:  Yes.  College -- college

25 students at some state universities have -- it came

296

1 about, they have IDs that don't have an expiration date,

2 and through arrangements with -- with state colleges,

3 the universities provided through some type -- I believe

4 it was a secure online facility -- a way for the polling

5 locations to -- to verify the expiration date

6 independent of the actual ID.  And so arrangements were

7 made, then, for students with -- with a university ID

8 that did not have the expiration date but where the

9 college was able to provide that information

10 independently to go ahead and vote on election day.

11          SEN. DAVIS:  Very good.  Are there any

12 other?

13          MR. BONNETT:  Not that come to mind.

14          SEN. DAVIS:  Okay.  Thank you,

15 Mr. Secretary.  I appreciate it.

16          MR. BONNETT:  Uh-huh.

17          CHAIRMAN DUNCAN:  There being no further

18 questions, Mr. Bonnett.  Thank you for your testimony

19 today and for traveling here.

20          SEN. WEST:  Mr. Chairman?

21          CHAIRMAN DUNCAN:  Senator West, you're a

22 little late on the light there.

23          SEN. WEST:  I thought it was on.  I

24 apologize.  And I just have a couple of questions,

25 anyway.

## CONSIDERATION OF SENATE BILL 14 1/25/2011

297

1        And it may have already -- you may have
2 already addressed this, and I just may not have heard
3 it.  As it relates to the provisional ballots in your
4 state --
5        MR. BONNETT:  Uh-huh.
6        SEN. WEST:  -- an individual can, in fact,
7 cast a provisional ballot.  Is that correct?
8        MR. BONNETT:  Yes.
9        SEN. WEST:  Okay.  And they have to --
10 what's the process?  Once they cast the ballot, in order
11 for the ballot to count, they have to come back within a
12 certain number of days?
13        MR. BONNETT:  Within ten days.
14        SEN. WEST:  And what do they have to do?
15        MR. BONNETT:  They can correct any -- any
16 issue with -- with voter registration.  For example, if
17 a person appears at a poll and they're simply not
18 registered at a poll, they can still cast a provisional
19 ballot.  You know, there may be some administrative
20 issue in the -- with kind of registration board about
21 why they didn't show up in the precinct where they
22 believe they needed to vote.  That -- that can be
23 corrected, and the Election Board is free to correct
24 that through and beyond the election.  They can bring in
25 the identification, and they can certainly seek

298

1 assistance with obtaining the identification that's
2 required.  They can also come and execute an affidavit
3 that -- obviously, we talked about the exception to
4 being photographed for religious reasons.  They can
5 execute an affidavit that says they -- they don't have
6 the ID.  They cannot get one without cost, and then
7 they're eligible to have that vote counted.
8        SEN. WEST:  Okay.  So there's a process in
9 place.
10        Does the state keep any tally or report on
11 the number of provisional ballots that are cast in the
12 state of Indiana?
13        MR. BONNETT:  Yes.  The county election
14 boards submit that information with their -- with their
15 poll results data to the Election Division, and it's --
16 it's published online for every election.  The -- the
17 number of provisional ballots and the disposition and
18 the counties actually are also required to send copies
19 of the affidavits to the Secretary of State's office,
20 which then can be examined for the reason.  For example,
21 how many didn't show up on a poll book or there was a
22 challenge raised of some sort so that we can -- we've
23 been able to investigate the status and disposition of
24 provisional ballots.
25        SEN. WEST:  Is that information

299

1 disaggregated by ethnicity?
2        MR. BONNETT:  No.  I'm not -- I do not
3 believe that there's an indication on the provisional
4 ballot affidavit.
5        SEN. WEST:  So you really don't -- I mean,
6 in terms of the provisional ballots, the tallies, in
7 terms of provisional ballots, is it disaggregated by
8 ethnicity; that is, the number of Hispanics, African
9 Americans that are voting?
10        MR. BONNETT:  It's not, although the
11 copies of the affidavits are -- are -- are public
12 information, and there have been some social scientists
13 who have been studying and attempting to write about
14 provisional ballots and determine if there's any -- any
15 meeting or conclusions that can be gathered --
16        SEN. WEST:  Has there been any -- any such
17 studies done in Indiana?
18        MR. BONNETT:  I have looked at one study
19 from a adjunct law professor.  It did not appear to
20 provide any -- any academic or statistically sound
21 conclusions.  It was more a discourse on the issue of
22 photo ID, in general, but it made some reference to some
23 statistics that were, you know, tallies of the number of
24 provisional ballots.
25        The provisional balloting started at the

300

1 same time as the photo ID, so we don't have a calculus
2 of the provisional balloting before Indiana's photo ID.
3        SEN. WEST:  Do you happen to have the cite
4 for that particular professor's study or article?
5        MR. BONNETT:  I'll be most happy to --
6        SEN. WEST:  Okay.
7        MR. BONNETT:  -- to get it to you or get
8 it to the committee.
9        SEN. WEST:  To the chairman and the staff?
10 I'd appreciate that.
11        As it relates to provisional ballots, is
12 there any type of report on the number of individuals or
13 the percentage of individuals that come back and go
14 through the process to make certain their vote count?
15 Is it less than 10 percent of those individuals that
16 cast?
17        MR. BONNETT:  I'm not aware of an
18 aggregated report.  The data exists, and it's -- it's
19 online.  I'm not aware of an aggregated analysis of how
20 many.
21        Some provisional ballots, you know, there
22 are some instances where a person would go to a precinct
23 and not be registered to vote a provisional ballot and
24 then be directed to, and the poll workers are advised to
25 have someone go ahead and vote that provisional ballot.