1  tax or a fee to get the ID, that would be the equivalent

2  of a poll tax, and that would be unconstitutional.  So

3  one important provision which the Indiana legislation

4  had and which the Texas bill has is the fact that free

5  voter ID cards are available.

6           The Court noted that some people will have

7  heavier burdens and -- but the fact that some people may

8  have heavier burdens does not make the statute itself

9  facially invalid and unconstitutional.  It means that

10 perhaps in an individual case an individual might be

11 able to show that the burden -- the specific burden on

12 that individual is so high that it would be

13 unconstitutional to apply the statute to that

14 individual, but that's not the same thing as saying that

15 the statute is facially invalid and unconstitutional as

16 a whole.  And that's what we usually think of when we

17 think of the Court striking down a law as

18 unconstitutional.  That strikes down the whole law as

19 invalid.

20           So that was the ultimate conclusion.

21 Justice Scalia, in his opinion concurring, would go a

22 little bit further than Justice Stevens, but he

23 essentially reaches the same result.  Justice Scalia

24 says that the voter ID law is a generally applicable,

25 nondiscriminatory voting regulation, and thus individual

1   impacts on specific voters are irrelevant for

2   determining the severity of the burden.  In Justice

3   Scalia's analysis, he said you look at the burden is not

4   severe on anyone.  The burden is show a photo ID.  That

5   burden could have some different impacts on particular

6   individuals, again, who might have a particular hardship

7   getting that ID.  But, again, that's not enough to say

8   that the law, as a whole, is unconstitutional.

9               SEN. ELTIFE:  Members, any questions of

10  the witness?

11              (No response)

12              SEN. ELTIFE:  No questions.

13              Mr. Ward, thank you for being here.

14              MR. WARD:  Thank you very much.

15               TESTIMONY BY GARY BLEDSOE

16              SEN. ELTIFE:  At this time, we'll call

17  Gary Bledsoe forward.

18              MR. BLEDSOE:  Good evening.  My name is

19  Gary Bledsoe.  I represent the Texas State Conference of

20  NAACP branches, and I am proud to stand before you as a

21  fellow Texan, and indeed I want to emphasize the term

22  "fellow Texans."

23              You know, the Texas that we have today is

24  very different from the Texas that I grew up in, and

25  indeed I've seen many things occur that have been

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
 1   extremely positive for me.  I grew up in a segregated
 2   Texas when voting was really a luxury, something that
 3   was not to be expected in my community.  It was
 4   something very much that people cherished and desired,
 5   desired to occur.
 6              And many of you might even remember back
 7   in 1974 when Frank Robinson, an African-American who was
 8   registering individuals to vote out in Palestine, was
 9   actually killed at his home because of his attempts to
10   register people to vote.  Now, I happened to be a
11   freshman in law school at that time.  So it's not all
12   that long ago that that actually occurred.
13              And, you know, when I -- when I look at
14   the ways that we have had to struggle to get the
15   opportunity to vote, I want you to know that we cherish
16   that and know that's extremely important.  And in many
17   ways, our state had become exemplary.  When I go around
18   the country and you -- we understand how we've enabled
19   people that have been on paper with felony convictions
20   to vote and things of that nature, that's a good thing.
21              And, you know, the fact that -- we don't
22   really have a problem with voter fraud in elections.  I
23   think that all the testimony seems to indicate that,
24   that indeed people who go to vote are indeed people who
25   actually are registered to vote.  So there's really not
```

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
 1   a problem in that regard from what we've seen.
 2                However, I'm aware that what we're
 3   discussing now is whether or not we will have a bill.
 4   So I would reach out to each and every one of you and
 5   say that if we are going to discuss voter
 6   identification, then let's do so in a way to be
 7   constructive and to be enabling so that we can try and
 8   empower all the people within our state to presume that
 9   all people who would be eligible to vote ought to be
10   allowed to vote.  And so we should reduce impediments
11   and not present additional impediments that would
12   prevent people from voting.
13                Now, frequently we have come before you
14   and talked about this issue.  I know that the last time
15   I came before you we talked about a number of instances
16   of serious irregularities that have occurred in our
17   state, and I don't want to go back and go over all
18   those, but I want to point some of those out to you
19   because I think if we're talking about voter problems
20   that really and truly we ought to be talking about some
21   of the issues that prevent access because we think
22   that's a much more significant problem than the problem
23   with people voting who are not the people who were --
24   who were actually registered to vote.
25                In just this past year, we had a situation
```

1  with elderly citizens up in Bowie County who were

2  harassed by individuals after they had voted absentee,

3  and people were demanding to know how they voted,

4  terrorizing the elderly people who made contact with us

5  because they were very concerned, but it was very

6  obvious it was because of politics, from our

7  observation.

8              We know that we had so many problems or

9  complaints directed to us out of Harris County this last

10 session where people were intimidated by other

11 individuals who hovered over them, who stared at them

12 and gave very hateful looks towards them, intimidating

13 some people from going forward with actually voting.

14             So we know these things continue and

15 occur, and it's not just the kinds of things that we've

16 seen in the recent past, such as when an

17 African-American candidate for sheriff in a county

18 outside Houston had -- one of his white supporters had

19 their home catch fire.  And so instead of investigating

20 what might have occurred, they ended up investigating

21 the African-American candidate for sheriff.

22             We know that where they've used off-duty

23 police along with improper uses of mailboxes in Tarrant

24 County to intimidate African-Americans from being able

25 to vote.  So it goes on and on, and all these things

CONSIDERATION OF SENATE BILL 14 1/25/2011

1   have occurred within the last decade and some within the

2   past six months.  So we know that indeed we have not

3   arrived to where we have eliminated problems with

4   preventing our having access to be able to vote.

5               And, you know, I was able to be an

6   election observer for an election down in Venezuela, and

7   that was really quite illuminating to me in that the

8   individuals had to give a fingerprint whenever they

9   voted, and an untrained person had to look at the

10  fingerprint and determine whether or not it was the

11  right person.  And we know that the photograph came up

12  on the screen and you had to look and see if this was

13  the right person.

14              And, you know, they had armed guards

15  around, and I actually had the misfortune of having a

16  gun directed at me by a guard.  When I was asked by an

17  official in the Secretary of State's Office to actually

18  go and observe them vote, I actually had to back off

19  when a gun was directed right at my face for -- five or

20  six feet away.

21              So I think we look at those things, we

22  don't need to move in that direction.  We need to be

23  going out and telling people that what we have is really

24  good.  What we have is actually working, where we have a

25  democracy, we have people that are engaged that are from

CONSIDERATION OF SENATE BILL 14 1/25/2011

1   different backgrounds, different races, different

2   ethnicities, and we get there and we debate and we

3   discuss issues.

4           You know, when they had the birth of a

5   nation years ago and they talked about what would occur

6   in our country with enfranchising African-Americans, we

7   found out just the opposite was true, and that indeed

8   we're moving toward something that's very special, but

9   there are people that are competing against what we've

10  been trying to accomplish.

11          But, Senators, I really want to say to you

12  that we have a system that I feel is actually a good

13  system.

14          Now, besides all the other matters that I

15  can talk about, I wanted to visit with you about some of

16  the problems that we see with where we're proceeding

17  with SB 14.  You know, I don't understand why, but in

18  many ways I look at SB 14 and SB 14 is much more

19  problematic than the Indiana law and much more

20  problematic than the Georgia law that have been

21  utilized.  When we look at the Indiana law, the Indiana

22  law -- we can see where individuals can actually come in

23  and if they are indigent, they can give an affidavit and

24  be allowed to vote by saying that they can't afford to

25  have a voter ID.

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
 1              We know that under the Texas law in
 2   comparison with the Indiana law you've got to come back
 3   in a stated period of days, and these six days.  And the
 4   way that six days is worded and the time that's
 5   involved, it's going to require people to come during
 6   their workdays from 8 to 5, which is a real problematic
 7   thing for individuals to do.  And we know that when you
 8   have to come in from 8 to 5 and you're a working person,
 9   that's going to be something that's difficult for you to
10   do.
11              We have a law that says if you're voting
12   in an election, that on election day you can go and have
13   time off from your work.  There's not a law that says
14   you can come and have that taken care of.
15              Now, the -- we know, too, that the other
16   thing about an Indiana law -- and I would note that
17   Indiana is not a covered jurisdiction.  So Indiana and
18   the Indiana case involved constitutional issues and not
19   the Voting Rights Act.
20              But, now, Indiana allows you the one free
21   bite.  So when you go in and you have an expired
22   identification, you can still use that identification
23   for one election.  The idea is that then the person will
24   be put on notice that their identification is expired,
25   and they will go and have that identification come up to
```

1  date.  So I think that's another distinction.

2              Now, in Georgia and in Indiana, they did

3  some things that we have not done here.  They did

4  diligent inquiries, and they determined that prior to

5  adoption of their laws, they determined that indeed

6  almost every one in those states had DMV

7  identifications.  So everyone in Georgia had a DMV

8  identification, and only 43,000 people in Indiana did

9  not have a DMV identification.  So that's much different

10  from what we have here.

11              Also, those states are much smaller.  And

12  in Texas with the location of driver's license offices,

13  et cetera, some people have to travel over 100 miles.

14  So even with an indigent's provision, that's not going

15  to allow people who are poor, indigent, impaired, have

16  difficult access to these places to be able to actually

17  register.  And I don't know what the implications are

18  for obligations under the NVRA, but we have not complied

19  with our obligations under the law.  And that has been a

20  problem in Indiana as well.

21              And I'd just say, finally, it's very clear

22  that the Texas law will impair and have a clearly

23  disparate disadvantage on people of color.  The forms of

24  ID selected are problematic.  There would have been

25  something better.  The forms of ID selected in Indiana

CONSIDERATION OF SENATE BILL 14 1/25/2011

1   and Georgia were both superior.  The criminal

2   prosecution will discourage.  We know that this might

3   impair compliance with the NVRA.  We know that there

4   have been so many problems with election officials that

5   this will empower them more so to disadvantage

6   individuals.  And we know that because of the time to

7   vote, the problem with identification and especially

8   cross-racial identifications, the issue of the

9   expirations and the types of the IDs selected, those

10   things are going to further reduce the minority vote.

11   So we think this is a covered jurisdiction, and you can

12   look at this in a different way.  Thank you.

13                  SEN. ELTIFE:  Mr. Bledsoe, thank you.  And

14   some members do have questions for you.

15                  Senator West?

16                  QUESTIONS FROM SENATE FLOOR

17                  SEN. WEST:  Thank you very much,

18   Mr. Chairman.

19                  Mr. Bledsoe, thank you also.  Now, you've

20   been the President of the NAACP Conference -- state

21   conference for how many years now?

22                  MR. BLEDSOE:  Twenty years.

23                  SEN. WEST:  Twenty years.  Is there a

24   well-documented history of voter suppression that is

25   specifically related to race and ethnicity in this

1    state?  And how would this voter ID law fit into that

2    particular history?

3                    MR. BLEDSOE:  Well, I think it's

4    consistent with the history, and that's sad.  You know,

5    I think that we've seen Texas really evolve in a lot of

6    ways.  And, you know, Texas has had a history where in

7    recent years I had a lot of bipartisan cooperation.  And

8    I know that when we've done report cards in the past, we

9    had people in both parties that were doing exceptionally

10   well on our report card.

11                   But we haven't extricated ourselves from

12   the past.  And indeed when we look at the past and we

13   look at all the disenfranchisement that's taking place,

14   this is a direct extension of that because indeed if one

15   wanted a voter ID law, there would be a way of having a

16   voter ID law that would be more enabling, that would not

17   suppress the vote.  Because what we want people to do is

18   to go out and to compete and to actually say that we

19   will compete for the minority vote and not have a law

20   that we think will have a clear disadvantage in terms of

21   suppressing the minority vote.

22                   SEN. WEST:  Would you -- so do you believe

23   that this voter ID law will, in fact, discriminate

24   against people of color?

25                   MR. BLEDSOE:  There's no question, again,

CONSIDERATION OF SENATE BILL 14 1/25/2011

1   the types of IDs that are selected, the time period with

2   the nature of the jobs that African-Americans have and

3   the requirement for African-Americans to come in and

4   actually produce their proof within a certain period of

5   time.  We've had enormous problems in this state with

6   the cross-racial identifications, and I can just see

7   enormous problems with that.  Especially with the kinds

8   of things that we've seen in Bell County and some other

9   places here recently, we know that's going to be a

10  problem.

11              And we know, too, that in terms of the

12  issue of expirations, that's going to be a problem.  And

13  if you look at state data on like voter -- excuse me --

14  motor vehicle ownership, our access to vehicles, you'll

15  find there's a big disparity among racial groups.  And

16  so we're talking about the poorest of minority groups

17  not truly having access to be able to go and access the

18  identification.  So I think it's clearly going to have a

19  disparate impact.

20              SEN. WEST:  So is it your testimony that

21  this particular voter ID bill will discourage as opposed

22  to encourage people to participate in the electoral

23  system?

24              MR. BLEDSOE:  It will; it clearly will.

25  And, you know, one of the big things obviously is the

```
 1   criminal prosecution, but then there are the other

 2   provisions as well where you make it so difficult for

 3   people.  You know, we've had, in numerous instances,

 4   Fort Bend, Harris, Bowie Counties, where individuals

 5   have been turned away, who weren't even allowed to cast

 6   a provisional ballot.  And so that's a problem.  You

 7   know, it's kind of like the thing in Indiana when the 12

 8   nuns were attempting to vote, and they did not allow 12

 9   nuns to vote because they didn't bring their voter

10   identification with them.

11                 SEN. WEST:  It was 12 of them?

12                 MR. BLEDSOE:  Twelve; 12 nuns, yes.

13                 SEN. WEST:  Twelve.  Okay.  Huh,

14   interesting.

15                 Now, let me ask this question, sir:

16   You've had an occasion to speak with many

17   African-American elected officials concerning voter

18   identification laws over the last few years.  Is that

19   correct?

20                 MR. BLEDSOE:  That's correct.

21                 SEN. WEST:  Have you found any

22   African-American legislators -- any African-American

23   elected officials in the state of Texas that are in

24   favor of the voter identification laws that are being

25   considered by the Texas Legislature?
```

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
1              MR. BLEDSOE:  We've seen none.  And, you
2   know, our group is unanimously opposed to it.  And, you
3   know, we've got Republicans and Democrats in our
4   leadership.  And let me say that one of our folks that I
5   think you even know, Senator -- I don't know that you
6   know this -- but Obie Greenleaf, who is a city
7   councilman now up in Sherman, he just went and tried to
8   renew his registration, and he was pulled out of line,
9   told he had to go home and get -- and get his birth
10  certificate.
11              SEN. WEST:  And he's a city councilman?
12              MR. BLEDSOE:  He's a city councilman.  And
13  another African/American male, who is 80 years old, was
14  told to do the same thing.  Now, all the whites in line
15  were not pulled out.
16              And, you know, we've done some surveys
17  around the state, and we're not complying with NVRA.  So
18  there is a real problem with our people being registered
19  to vote by our agencies.
20              SEN. WEST:  Well, there have, in fact,
21  been some campaigns that have been launched lately -- or
22  back in 2005, 2006, campaigns against voter fraud.  Do
23  you remember those campaigns by the Attorney General?
24              MR. BLEDSOE:  I'm aware.
25              SEN. WEST:  And some of the images that
```

CONSIDERATION OF SENATE BILL 14 1/25/2011

1    were used there within the content of those campaigns?

2                    MR. BLEDSOE:  I think those things became

3    part of litigation, if I'm not --

4                    SEN. WEST:  All right.  So, frankly, the

5    passage of this particular bill will encourage

6    additional litigation in the civil rights area.  Is that

7    correct?

8                    MR. BLEDSOE:  There's no question.  Let's

9    look at the PV 19, for example --

10                   SEN. WEST:  Right.

11                   MR. BLEDSOE:  -- and the 19 children who

12   bore the names of their fathers, and they were

13   wrongfully prosecuted because they voted in Waller

14   County.  And that county still has enormous problems.

15   You know, we had a couple years ago where the county

16   registration officials declined to follow through and

17   tender legitimately completed voter registration cards

18   to be registered, and that was right before an election,

19   and that continues to be a problem.  And if it wasn't

20   for the AG's Office telling them ultimately to register

21   those voters, I don't know if they ever would have been

22   registered, but they were not registered before the

23   election.  So there was an impact in them not following

24   through and registering those voters.

25                   SEN. WEST:  Well, sir, I appreciate your

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
 1   advocacy, and needless to say you're steadfast as it
 2   relates to protecting the rights and civil rights of
 3   people in this state.  Thank you.
 4             MR. BLEDSOE:  Thank you.
 5             CHAIRMAN DUNCAN:  The Chair recognizes
 6   Senator Hinojosa.
 7             SEN. HINOJOSA:  Thank you, Mr. Chairman.
 8   Mr. Bledsoe, thank you for your testimony.  And I was
 9   very interested as you described the history in where
10   minorities for a long time were being kept from voting
11   and exercising their right to vote.  You talk about many
12   problems from intimidation, I guess, to the poll tax.
13   Can you name some of those situations, for example,
14   where laws have been passed for the sole purpose of
15   trying to suppress the vote of minorities?
16             MR. BLEDSOE:  Obviously there were --
17   there were a number of those that occurred.  One of the
18   things that we had in our state was the grandfather
19   clause.  You know, we had had poll taxes in this state,
20   and ultimately in this state they ended up passing the
21   rule that was used in the Democratic Primary, which at
22   that time there were -- the two parties were the
23   conservative Democrats and the liberal Democrats.  And
24   so if you didn't vote in that Democratic primary, you
25   really didn't have a vote.
```

1    And that had to go -- the NAACP litigated
2  that case, and we first defeated that system back in, I
3  think, '28 or '29 before the Supreme Court, but they
4  finessed the rule.  And so the NAACP had to litigate it
5  again, go to the Supreme Court again in 1944 where it
6  was finally invalidated.  So there have been quite a few
7  instances.  But if you happened to be African-American
8  or Latino and your grandfather had not been able to vote
9  in 1910, the teens or the '20s, '30s, you couldn't vote
10 either.
11    SEN. HINOJOSA:  And as you well know,
12 Texas right now is under a Voting Rights Act.
13    MR. BLEDSOE:  That is correct.
14    SEN. HINOJOSA:  And they have an actual
15 burden to prove that whatever laws they pass in terms of
16 voting doesn't discriminate or suppress the vote against
17 minorities.
18    MR. BLEDSOE:  And that's one thing they
19 didn't have in Indiana.  That's an additional obstacle
20 that they'll have to encounter with the law in this
21 state.
22    SEN. HINOJOSA:  And as you recite history,
23 it seems to me that many times different laws, different
24 methods are used to try to suppress the vote of
25 minorities, and they use different euphemisms and

1  different names.  And it seems to me that the purpose of

2  the voter ID legislation is, again, to suppress the

3  vote.  Are you familiar with the Carter-Baker Commission

4  and Federal Election Reform?

5              MR. BLEDSOE:  Yes, I am.

6              SEN. HINOJOSA:  Yeah.  Well, one of the

7  studies they made would show that here in Texas where we

8  have approximately 13 million registered voters, that if

9  we pass voter ID, it would disenfranchise approximately

10  3 million voters, mostly minorities.  Are you surprised

11  at that?

12              MR. BLEDSOE:  I'm not, because I think

13  this will have enormous implications.  And again, if we

14  wanted to look at Indiana or Georgia, I would have

15  problems, but those laws -- they are so much less

16  restrictive than what's being proposed here.  This law

17  would have enormous implications because of the way that

18  it is written.  So it seems like instead of seeking the

19  least restrictive means, we're seeking the most

20  restrictive means.

21              SEN. HINOJOSA:  And as you describe the

22  different problems that exist in terms of sometimes

23  intimidation, sometimes in placing obstacles to

24  minorities to vote, have you come across a lot of

25  instances where there's voter fraud where a person tried

CONSIDERATION OF SENATE BILL 14 1/25/2011

 1  to impersonate a registered voter?

 2              MR. BLEDSOE:  I have not seen of such a

 3  situation, Senator.  I think there are very few

 4  situations because you are putting yourself in harm's

 5  way when you do that, even under the current laws.  So I

 6  think there are fail-safes under the current law that

 7  would prevent you from doing that.  But be that as it

 8  is, I think that it's pretty much widely acknowledged

 9  today that that's really -- really not a problem.

10              SEN. HINOJOSA:  And, for example, the last

11  ten years, do you know how many prosecutions have taken

12  place in terms of indicting a person for trying to

13  impersonate a registered voter?

14              MR. BLEDSOE:  I think I saw something on

15  the Internet maybe about one in South Texas recently and

16  one person, and there might have been something in

17  Harris County.  But in all those years, maybe one or

18  two, and I don't know if they were successful or not.

19              SEN. HINOJOSA:  Well, if you compare the

20  number of people who have been indicted, maybe three or

21  four or five in the last five or six years that try to

22  impersonate a voter, to the negative impact that this

23  piece of legislation would have on minorities by

24  disenfranchising approximately 3 million who do not

25  carry photo ID, don't you think it's a little bit out of

CONSIDERATION OF SENATE BILL 14 1/25/2011

1   balance and a steep price to pay?

2                MR. BLEDSOE:  It is.  Again, if we wanted

3   to have the integrity, there are things we could do to

4   ensure integrity more so than what we're actually doing

5   here.  You know, there have been good and great

6   suggestions that have been put forth.  And again, the

7   distinctions between Indiana and Georgia is the DMV had

8   IDs on almost all those folks.  So when we went to the

9   Department of Justice in Georgia to get preclearance,

10  Georgia could tell DOJ that 100 percent of our people we

11  have IDs on already, and that's something we don't have.

12               SEN. HINOJOSA:  Thank you for your

13  testimony.

14               MR. BLEDSOE:  Thank you, sir.  Thank you,

15  Mr. Chair.

16               CHAIRMAN DUNCAN:  Hold on just a minute.

17               Senator Ellis?

18               SEN. ELLIS:  Yeah, briefly, Mr. President.

19  I just wanted to thank Mr. Bledsoe.  I called him last

20  night and asked him to come.  I know he had client

21  business and court matters toady, and you've been

22  waiting all day to testify.  I think my colleagues asked

23  the questions I would have asked, but I just wanted to

24  publically thank you for staying here all day today.

25               MR. BLEDSOE:  Thank you, Senator.  I

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
 1    appreciate it.  Thank you.
 2                   CHAIRMAN DUNCAN:  Are there any other
 3    questions of the witness?
 4                   (No response)
 5                   CHAIRMAN DUNCAN:  Thank you, Mr. Bledsoe.
 6    We appreciate your appearance here today.
 7                   TESTIMONY BY ANDRES TIJERINA
 8                   CHAIRMAN DUNCAN:  Dr. Andres Tijerina.
 9    Dr. Tijerina, state your name and who you represent.
10                   MR. TIJERINA:  My name is Andres Tijerina
11    representing myself.
12                   CHAIRMAN DUNCAN:  You may begin.
13                   MR. TIJERINA:  I'm a citizen of Austin, a
14    citizen of Texas, born in Texas, and I'd like to provide
15    some useful information to give a historical perspective
16    to voting laws and specifically those that have been
17    discriminatory against Mexican-Americans and minorities
18    in Texas.
19                   As I said, I am from Texas.  I'm from West
20    Texas.  I have a BA from A&M, a masters from Tech, a
21    Ph.D. from The University of Texas at Austin, and I also
22    worked as the liaison officer for the United States Air
23    Force Academy in Colorado Springs.  I'm a retired Air
24    Force officer.  I'm a member of the Texas State
25    Historical Association among other associations.  I'm
```

1   also a Fellow of the TSHA, and I've conducted research

2   here at the State Archives, the National Archives,

3   University of Texas and other places in order to write

4   numerous books and publications that I've published

5   through Texas A&M University press and other refereed

6   publications, primarily on Texas history and

7   Mexican-American history that's given me this -- a

8   perspective that I'd like to share with you all this

9   afternoon.

10                    Texas, I think, has a legacy and a history

11   of voter discrimination that is very clearly directed

12   and explicitly directed at Mexican-Americans to

13   specifically and effectively keep them from voting that

14   goes way back to the establishment of Texas right after

15   it was annexed to the United States and goes right on up

16   to the present.

17                    It has a record of establishing and

18   writing laws to create legal devices and to take actions

19   specifically intended to intimidate Mexican-Americans

20   and minorities from voting, to drive them away from the

21   polls; actions to divide and to redistrict their

22   population base, their counties, specifically directed

23   to keep them from voting or to weaken their voting

24   effect in Texas; devices and actions to literally

25   terrorize them through the years, through the decades.

CONSIDERATION OF SENATE BILL 14 1/25/2011

1            The effect has been to effectively reduce

2  the number of Mexican-Americans who have voted through

3  the years, through the history of Texas, and at the same

4  time to leave an impact or a legacy among their

5  community of distrust of the state government and even a

6  fear of state government and state law enforcement

7  officials.  This has been done in many ways that

8  appeared beneficial or that were presented as beneficial

9  even innocuous laws.  Many of the people who effected

10  this were people who approached Mexican-Americans

11  innocuously or supposedly to help them.

12            Political bosses, Texas has some of the

13  most powerful political bosses, or had through history,

14  Jim Wells, Robert Kleberg, George Parr, who used very

15  explicit and physical methods, literally corralling

16  hundreds of Mexican-American voters, thousands of

17  Mexican-American voters, primarily in the years from

18  around 1870 until around 1940, 1950, where they would

19  literally corral hundreds or thousands and direct those

20  votes, either through assistance to them by hiring them

21  to work on the county at election time or literally

22  through intimidation or specific assassinations.  In any

23  case, taking hundreds or thousands of Mexican-Americans

24  and then directing them to vote for people who became

25  great Texans, Lyndon B. Johnson, John Nance Garner,

CONSIDERATION OF SENATE BILL 14 1/25/2011

1  Edward M. House, who benefited from corralling of

2  Mexican-American voters, either through assistance to

3  those voters or intimidation and threats of those

4  voters.

5              The Terrell Election Law, which was

6  presented as a beneficial law, actually created a poll

7  tax specifically directed at Mexican-American voters to

8  keep them from voting, a 1918 law to explicitly

9  eliminate interpreters; other devices like the white

10 man's primary that required that people take an oath

11 that said that they were a white man and a Democrat; but

12 also violence, violence that is almost unbelievable

13 today, even considering the violence that we see in

14 today's newspapers, even considering the violence you

15 see in Mexico; Texas Rangers, law enforcement officials

16 or vigilante groups in Harlingen, Edinburg, across Texas

17 all the way out to El Paso, riots in which the

18 Anglo-American, 4,000 Anglo-American riders in 1916 in

19 Harlingen chanting, "Keep the Mexicans from voting,"

20 literally rioted and lynched several Mexican-American

21 U.S. citizens to keep them from voting; Texas Rangers

22 literally ethnic-cleansing hundreds and thousands of

23 U.S. citizens, shooting them in the back of the head

24 under sworn testimony that we have here in the Texas

25 State library, all of them explicitly to keep them from

1    voting at election time; going through the barrios in

2    Corpus Christi and Harlingen at election time, riding

3    through and telling them, "Any Mexican-American citizen

4    caught voting would be either killed or sent to prison."

5             That's the heritage of Texas, and it goes

6    all the way on up to the lynchings in the 1930s, 1940s

7    of Mexican-Americans.  And then later all the way up

8    through the 1960s and 1970s, Mexican-American

9    organizations, LULAC, GI forum and voter right --

10   Southwest Voter Education Project of Woody Velasquez,

11   having to literally engage in lawsuits to try to enforce

12   the 1965 Voter Rights Act that has continued up until

13   last -- well, 2008, in this very county, a group tried

14   to, in effect, limit the extension of the Voter Rights

15   Act and actually had to go up to an appeals court of the

16   U.S. Supreme Court.

17            So the record of Texas has been

18   specifically directed against Mexican-Americans and

19   minority voters, and it's been very effective, not only

20   in limiting and reducing their votes, but also in

21   creating a legacy among their community of distrust of

22   our state government, distrust of our voting process,

23   distrust of the democratic process and even fear.  Thank

24   you.

25            CHAIRMAN DUNCAN:  Thank you, Dr. Tijerina.

TX_00000708

CONSIDERATION OF SENATE BILL 14 1/25/2011

1          Are there any questions?

2          (No response)

3          CHAIRMAN DUNCAN:  All right.  The Chair

4  hears none.  We appreciate your testimony.

5          MR. TIJERINA:  Thank you.

6          QUESTIONS FROM SENATE FLOOR

7          CHAIRMAN DUNCAN:  Oh, I'm sorry.  Excuse

8  me.  We do have Senator Gallegos.

9          Excuse me, Senator.

10          SEN. GALLEGOS:  Professor, let me ask

11  you -- I mean, I just heard your testimony and the

12  history, and you've said all that discrimination has

13  been targeted mainly to Mexican-Americans here in the

14  state of Texas.  Is that correct?

15          MR. TIJERINA:  Yes, sir, very explicitly

16  to Mexican-Americans.

17          SEN. GALLEGOS:  So let me ask you, in your

18  expertise on history discrimination except as compared

19  to voting rights, how would you compare the present bill

20  that is before us as to some of the intimidation and

21  discrimination factors that you had just described to us

22  in the past and some of the bills that were for like the

23  no interpreters?  That was in 1918?

24          MR. TIJERINA:  Yes, sir.

25          SEN. GALLEGOS:  And some of the other

1   issues that you brought up.  How would you compare this

2   Senate Bill to the past history that you described to

3   this chamber?

4                   MR. TIJERINA:  That those in history also

5   were presented in a very positive good light.  The

6   people who presented these laws and the people who took

7   the action, the rioters who lynched Mexican-Americans

8   called themselves the Good Government League.  They had

9   good names.  The people who killed and assassinated

10  hundreds, even thousands of Mexican-American/U.S.

11  citizens, called themselves Progressives.  The laws that

12  were passed by Terrell himself in the Terrell Election

13  Law of 1903, he explicitly stated that he wanted to

14  "kill the Mexican vote."  The candidates during that

15  time period who campaigned for the U.S. Senate -- it's

16  in the Senate record -- campaigned that their intent --

17  that their intent was to kill the Mexican vote.  And yet

18  the way the poll tax was written, the way the Terrell

19  Election Law was written, it was innocuous.  It was

20  beneficial.  It was written specifically to assure that

21  only those legal voters could vote and to clean up the

22  elections.

23                   So to read the Terrell Election Law itself

24  was very innocuous or beneficial, and yet to hear

25  Terrell himself speak, he was very explicit.  He wanted

 1    to "kill the Mexican vote," and that's how I would

 2    compare them.

 3              Many of these devices through the years

 4    are written to sound beneficial or innocuous, and yet

 5    they have just the opposite effect.

 6              SEN. GALLEGOS:  Professor Tijerina, what

 7    you're describing to me and what I just heard is what

 8    I've seen on television recounts of what happened in

 9    Mississippi and in Alabama and those southern states

10    that prevented African-Americans from either registering

11    or voting.  Is that what you're comparing this to?

12              MR. TIJERINA:  I think it would -- it

13    would have a parallel, yes, sir.

14              SEN. GALLEGOS:  Let me ask you, is there

15    any evidence that old historical discriminatory actions

16    are relevant or applicable today?

17              MR. TIJERINA:  Yes, sir, in the sense that

18    there has been and there is a legacy today in Texas of

19    voter discrimination, voter intimidation and a legacy of

20    fear and distrust; yes, sir.

21              SEN. GALLEGOS:  Professor, let me ask you

22    also, is there any evidence -- well, I think you just

23    answered this -- of innocuous or beneficial election

24    laws that may have actually had the intent to

25    disenfranchise Mexican-Americans -- Mexican-American

CONSIDERATION OF SENATE BILL 14 1/25/2011

1   voters?

2              MR. TIJERINA:  Yes, sir, those that I just

3   cited.

4              SEN. GALLEGOS:  Okay.  I just -- I just

5   wanted to be clear on that fact.  Thank you very much,

6   Professor.

7              MR. TIJERINA:  Thank you.

8              CHAIRMAN DUNCAN:  Are there any other

9   questions of the witness?

10             (No response)

11             CHAIRMAN DUNCAN:  All right.  The Chair

12  hears none.  The witness will be excused.  Thank you.

13             TESTIMONY BY CHASE BEARDEN

14             CHAIRMAN DUNCAN:  The Chair calls

15  Chase Bearden.  Please state your name and who you

16  represent.

17             MR. BEARDEN:  My name is Chase Bearden.

18  I'm with the Coalition of Texans with Disabilities.

19  Good afternoon.  Thank you for a chance to speak to all

20  of you.

21             We have spent some time looking at voter

22  ID, and we feel that there is a portion that will

23  disenfranchise a large number of Texans with

24  disabilities.  We've looked at just the logistics of

25  trying to reach a place to get this free ID that

CONSIDERATION OF SENATE BILL 14 1/25/2011

1   everyone has talked about.

2           There's a large cost associated for a

3   person with a disability who lives in a rural area or

4   place that's farther out to try and reach a DPS office

5   to try and get these IDs.  The majority of people with

6   disabilities, especially that have had one for their

7   entire life, may not have ever gotten a driver's

8   license.  They may not have a Texas license.  They more

9   than likely don't have a passport.  So when you look at

10  trying to get the IDs that you need to go and vote,

11  you're starting off at a large cost.

12          The majority of people with disabilities

13  that are wanting to get these IDs will have to probably

14  go and get their birth certificate.  To find someone who

15  can actually pick them up, drive them there, find an

16  accessible vehicle, if they don't have one, or find a

17  bus line that actually goes to where they can get a

18  birth certificate is going to be very difficult.  A lot

19  of people said, "Well, maybe they can go online.  They

20  could access and get their birth certificate sent to

21  them online."  There's a large number of Texans with

22  disabilities who are living on a very small amount of

23  money each month.  They more than likely don't have a

24  computer to even access the Internet much less a

25  provider or a credit card that they could use to access

1   the birth certificate they need.  It also takes quite a

2   while to get that birth certificate if you were to

3   access that online unless you were to expedite it.

4                    Then after getting that, you would have to

5   find a way to get to the DPS office.  If you do live in

6   a very rural area and you have a significant disability,

7   maybe you're using a power chair and your family doesn't

8   have an accessible van to be able to get you somewhere,

9   you have to look at how are you going to be able to make

10  it to where that person can access these IDs easily.

11                   One of the other areas that we looked at

12  was people living in nursing homes, state-supported

13  living centers who might not be able to access the IDs

14  they need to go and get identification.  Do we have

15  something in place that's going to allow them to be able

16  to go and more than likely not be able to catch a ride

17  or hop in their car and drive down to the DPS office.

18  They are living in a state-supported living center, but

19  they still have the right to vote.

20                   So looking at how they would get their

21  identifications, we feel like they would still more than

22  likely be put in a place where they are not going to be

23  able to get the identification they need.

24                   One of the other areas that we looked at

25  was that there's an exemption for a person that's over

1  70.  And when we thought about that, isn't that similar

2  to the same issues that a person with a disability might

3  be facing, a harder time getting transportation to get

4  in to go get that ID, maybe the cost, living on a fixed

5  income?  So we have an inconsistency that kind of keeps

6  the same person from getting the ID they need, that free

7  ID, but we're giving an exemption to someone else.

8              When we started looking at a person who is

9  traveling to go and actually vote and they get there and

10  they don't have the correct ID or they are missing

11  something, so they have to cast a provisional ballot,

12  trying to get back there within six days can sometimes

13  be logistically impossible for a person.  They might

14  have had to get public transportation to go and get

15  there.  So they had to set up a ride through one of the

16  kind of disability bus systems, but they might not be

17  able to get a ride again or to get to the place to get

18  the documentation they need to get back and cure their

19  ballots.

20             Currently right now there are being bills

21  filed that would reduce the accessibility at some of the

22  polling places on nonfederal elections.  They wouldn't

23  have to use all the accessible voting machines.  We feel

24  like if you end up passing a law like that and then you

25  add voter ID to that and you're kind of putting a burden

1  on someone trying to force them to get an ID that they

2  might not be able to get to, and then they get to the

3  polling place and they don't even have the accessibility

4  they need to cast a private ballot.  It's just recently

5  in 2001 that we've been able to get the technology we

6  need to cast that private ballot without someone else

7  doing it for us.  And now we're looking at having that

8  removed and then being forced to try and find an ID

9  that's acceptable that might not be obtainable by

10  everyone.

11            So we ask that y'all take the time to

12  really investigate how these IDs will really affect

13  someone who might not be able to obtain what it is y'all

14  are asking for.  Thank you.

15            CHAIRMAN DUNCAN:  Thank you, Mr. Bearden.

16            QUESTIONS FROM SENATE FLOOR

17            CHAIRMAN DUNCAN:  Senator Zaffirini?

18            SEN. ZAFFIRINI:  Thank you for being with

19  us this afternoon, Mr. Bearden.  Excellent testimony.  I

20  have several questions for you that will focus on the

21  needs of persons with disabilities and how they will be

22  impacted if Senate Bill 14 were to pass.

23            First, are persons with disabilities less

24  likely to have a current driver's license, military ID

25  or passport than the general population of voters?

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
 1            MR. BEARDEN:  I think there's probably a
 2  large number of people with disabilities who don't have
 3  a current driver's license or who don't have a driver's
 4  license.  Many depend on the bus system, and they live
 5  in areas where they can access buses.  Not all the bus
 6  systems will access DPS.  Not all people with
 7  disabilities are going to have a passport.  Many of them
 8  are living on a fixed income and more than likely are
 9  not traveling abroad.  They more than likely have not
10  been in the military or are carrying any other type of
11  ID.
12            SEN. ZAFFIRINI:  And what is the reason
13  for this?  Why is it that persons with disabilities --
14  and I'm trying to enter it into the record.  Why is it
15  that persons with disabilities are less likely than
16  other voters to have these documents?
17            MR. BEARDEN:  People with disabilities
18  tend to be of the lowest demographics when it comes to
19  having jobs, having income.  They are having a harder
20  time trying to get the services they need.  So being
21  able to have a driver's license or a passport is a lot
22  of times unobtainable.
23            SEN. ZAFFIRINI:  Thank you.  What
24  additional barriers do persons with disabilities have in
25  obtaining the forms of ID requested or required by
```

```
 1  Senate Bill 14.
 2                  MR. BEARDEN:  Could you repeat that again?
 3                  SEN. ZAFFIRINI:  What additional barriers
 4  do persons with disabilities have or would have in
 5  obtaining the forms of identification required by Senate
 6  Bill 14?
 7                  MR. BEARDEN:  I think many of the barriers
 8  would be -- I think it was brought up that one of the
 9  DPS offices was inaccessible.  There's still
10  accessibility issues in Texas.  We've had accessibility
11  issues in polling places.
12                  When you look at trying to get $22 put
13  together to buy a birth certificate, have to take the
14  time to get that birth certificate, then go to get
15  another ID, I think when you look at the amount of money
16  that that is -- and I know everyone doesn't feel it's a
17  large amount of money -- but someone living on a fixed
18  income, on SSI, that is a large portion of their funds,
19  and a lot of them won't be able to obtain it.
20                  SEN. ZAFFIRINI:  Would the voter
21  identification required in this bill be sufficient to
22  ensure access to accurate information about the new ID
23  requirement information for the full range of persons
24  with disabilities in our state?
25                  MR. BEARDEN:  We don't feel it will.  The
```

CONSIDERATION OF SENATE BILL 14 1/25/2011

1  majority of people who have disabilities are living on a

2  fixed income.  They don't have access to a computer.

3  They don't have access to the Internet and more than

4  likely not to have a newspaper to receive the

5  information.  So we don't feel that they will be able to

6  get all the information.

7            SEN. ZAFFIRINI:  Thank you.  What effect

8  do you believe that Senate Bill 14 would have on the

9  turnout of voters with disabilities?

10            MR. BEARDEN:  The turnout of voters with

11  disabilities has increased up to -- we feel like it will

12  decrease.  The majority of people will show up.  They'll

13  try and cast their vote.  They will have to do a

14  provisional ballot, and I think when they start to look

15  at having to come back, they will have a harder time

16  making it.  The journey getting there sometimes is

17  incredibly difficult, trying to find a way to get there,

18  trying to get everything in order to be able to get

19  there.  So we do think it will decrease the turnout.

20            SEN. ZAFFIRINI:  Thank you.  Now, thinking

21  specifically of persons with disabilities who are

22  registered voters and who do have a photo ID, is there

23  any way that they would be impacted negatively by Senate

24  Bill 14?

25            MR. BEARDEN:  I think they could be if

1  they do not bring their ID.  The majority of people with

2  disabilities, if they had a photo ID and were to show up

3  without it or to have one that has expired, may not have

4  the time to actually go afterwards, get an ID redone or

5  to get a current ID to be able to make it back and have

6  their ballot cured in time.

7            SEN. ZAFFIRINI:  Would part of the problem

8  be that they might have a photo ID that is very old?

9            MR. BEARDEN:  I think that's very

10  possible.  There's a lot of people who might have

11  received an injury who were driving before who are not

12  driving anymore, who have held onto an ID that has

13  expired.  That's all they've needed.  So more than

14  likely if they are not driving and their ID is expired,

15  they probably won't have a current ID.

16            SEN. ZAFFIRINI:  And they might have a

17  driver's license that has expired, too --

18            MR. BEARDEN:  Uh-huh, yes.

19            SEN. ZAFFIRINI:  -- that would have a

20  photo?

21            What affect do you believe Senate Bill 14

22  would have on the number of provisional ballots cast by

23  voters with disabilities?

24            MR. BEARDEN:  I think we'll have a lot --

25  a larger amount of provisional ballots casted, and I

1  don't think we will be able to -- in the next few

2  elections be able to educate people fast enough to be

3  able to lower that level.  We've spent since 2001

4  educating people, that they have the technologies now to

5  make an independent, private vote themselves.  And it

6  took time to get people to understand that if they were

7  visually impaired, they didn't have to rely on someone

8  else anymore.  They went before, they had a bad

9  experience, weren't able to cast their own ballot, and

10  then once we passed HAVA and they had the technology to

11  cast their own ballot, it took us time to get people

12  educated to know that they can still do that and how to

13  do that.  So I think we would be kind of taking steps

14  backwards by doing this.

15          SEN. ZAFFIRINI:  To your knowledge, have

16  HAVA funds been used specifically to increase the access

17  of persons with disabilities to polling places.

18          MR. BEARDEN:  Yes, they have.  We've

19  specifically worked with HAVA and the Secretary of

20  State's Office to increase Texans with disabilities

21  voter outreach.  We've also worked with them on finding

22  access issues.  So I think these funds would be greatly

23  hampered, and the ability for Texans to be able to vote

24  would have problems.

25          SEN. ZAFFIRINI:  Do you have any concerns

CONSIDERATION OF SENATE BILL 14 1/25/2011

1   about the plan or the possibility of diverting

2   $2 million in HAVA funds to pay for this Senate Bill 14

3   instead?

4               MR. BEARDEN:  Yes.  Because right now I

5   believe that's about what they are spending to do all

6   the outreach and to work on accessibility and to

7   maintain some of the voting machines.  Right now what

8   they've said, the reason -- I believe one of the House

9   bills that's been filed to not have to have the

10  accessible voting machines is that it's a higher cost

11  during nonfederal elections.  If that's the case and the

12  counties are not able to afford to make -- have an

13  accessible machine, the funds that could have helped

14  them are probably now going to be taken away to let

15  people know that they're going to need an ID.

16              SEN. ZAFFIRINI:  So it is your testimony

17  that if $2 million in HAVA funds are diverted for the

18  purpose of Senate Bill 14, that there could be a

19  negative impact on the accessibility of persons with

20  disabilities to the polling places?

21              MR. BEARDEN:  Yes.

22              SEN. ZAFFIRINI:  Thank you.  Now,

23  Mr. Bearden, you represent the Coalition of Texans with

24  Disabilities?

25              MR. BEARDEN:  Yes, I do.

CONSIDERATION OF SENATE BILL 14 1/25/2011

1              SEN. ZAFFIRINI:  And that comprises

2    different member organizations?

3              MR. BEARDEN:  Yes, it does.

4              SEN. ZAFFIRINI:  Who are some of those

5    member organizations?

6              MR. BEARDEN:  We have organizations that

7    are not disability related.  We have a majority of

8    disability groups that are out there.  I think we

9    have --

10             SEN. ZAFFIRINI:  Do you have veterans, for

11   example --

12             MR. BEARDEN:  We do; we do.

13             SEN. ZAFFIRINI:  -- with disabilities?

14             MR. BEARDEN:  We have veterans'

15   associations.  We have organizations that are more

16   specific to single disabilities.  We've worked with

17   groups of older Texans.

18             SEN. ZAFFIRINI:  And is your testimony

19   today personal, or are you representing this Coalition

20   of Texans with Disabilities?

21             MR. BEARDEN:  I'm representing the

22   Coalition of Texans with Disabilities.

23             SEN. ZAFFIRINI:  Have they discussed this

24   bill thoroughly?

25             MR. BEARDEN:  Yes.

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
 1                SEN. ZAFFIRINI:  And what is their
 2   consensus about this bill?
 3                MR. BEARDEN:  We feel it will
 4   disenfranchise a portion of Texans with disabilities.
 5                SEN. ZAFFIRINI:  And you are speaking for
 6   this coalition --
 7                MR. BEARDEN:  -- yes.
 8                SEN. ZAFFIRINI:  -- when you stand in
 9   opposition to this bill?
10                MR. BEARDEN:  Yes.
11                SEN. ZAFFIRINI:  Thank you.  Now, you're
12   familiar with the bill, of course, and you've seen
13   different versions of it through the years?
14                MR. BEARDEN:  Yes.
15                SEN. ZAFFIRINI:  Can you think of any
16   amendments that we could propose that would help address
17   the issues that are of concern to persons with
18   disabilities?
19                MR. BEARDEN:  I think an amendment that
20   might be similar to a person who is 70 years old who
21   would be able to say that they have a disability and
22   that maybe they have the registrar -- they have written
23   earlier to the voter registrar and stated they have a
24   disability that would affect them from being able to get
25   the ID to be able to just present their voter
```

CONSIDERATION OF SENATE BILL 14 1/25/2011

1   registration card.

2             SEN. ZAFFIRINI:  Are there any other

3   amendments that could cure this bill for you?

4             MR. BEARDEN:  I can't think of any right

5   now, but I could ask more of our groups.

6             SEN. ZAFFIRINI:  Well, I offer you the

7   opportunity to work with my staff today, and we will

8   address those concerns, and we will try to craft some

9   amendments that would suit your issues --

10            MR. BEARDEN:  Sounds good.

11            SEN. ZAFFIRINI:  -- and try to cure them.

12            MR. BEARDEN:  Thank you.

13            SEN. ZAFFIRINI:  Thank you very much,

14   Mr. Bearden.

15            Thank you, Mr. Chairman.

16            CHAIRMAN DUNCAN:  Thank you, Senator.  Are

17   there any other questions of Mr. Bearden?

18            (No response)

19            CHAIRMAN DUNCAN:  All right.  Thank you,

20   Mr. Bearden.  I appreciate your testimony.

21            Members, that concludes the invited

22   testimony for the day.  We have been going now for a

23   little over three hours, and so it's time for a short

24   break.  We'll take a 15-minute break, and then we'll

25   begin testimony with regard to our resource witnesses.

1   My plan is just to call them up in the order that I've

2   previously announced, and you can ask any questions, and

3   then we'll go into public testimony after that.

4                    So the Senate Committee of the Whole will

5   stand at ease until 5:45.

6                    (Recess:  5:30 p.m. to 5:45 p.m.)

7                    CHAIRMAN DUNCAN:  Senate Committee of the

8   Whole will come back to order.

9                         RESOURCES TESTIMONY

10                   TESTIMONY BY REBECCA DAVIO

11                   CHAIRMAN DUNCAN:  We have -- Members, the

12  next portion of this hearing will be our resource

13  witnesses.  The first resource witness we announced

14  earlier will be Rebecca David (sic) with the Texas

15  Department of Public Safety.

16                   Ms. David, why don't you come on up, state

17  your name and who you represent, and then we'll open the

18  floor to questions.

19                   MS. DAVIO:  My name is Rebecca Davio.  I

20  am the Assistant Director for Driver Licenses at DPS.

21                    QUESTIONS FROM SENATE FLOOR

22                   CHAIRMAN DUNCAN:  Okay.  Senator

23  Zaffirini, you have a light on.  Are you -- would you

24  like to ask any questions?

25                   SEN. ZAFFIRINI:  (Nodded)

1          CHAIRMAN DUNCAN:  All right.  Any other

2  member have a question?  Senator Watson, you're

3  recognized.

4          SEN. WATSON:  Yes.  Thank you,

5  Mr. Chairman.  Ma'am, you may not be the right person to

6  ask this, but I was deferred earlier, and so I thought I

7  would ask a couple of questions and see if you are the

8  right person.

9          Right now when someone goes in to get an

10 identification, is it your office that provides that

11 identification card?

12         MS. DAVIO:  Yes, sir.

13         SEN. WATSON:  And how much is charged for

14 that identification card?

15         MS. DAVIO:  That card is $15.

16         SEN. WATSON:  All right.  So how much does

17 it cost you to produce the card?

18         MS. DAVIO:  $1.67 to produce and mail it.

19         SEN. WATSON:  All right.  So if we're

20 looking at it from a budgetary standpoint for the state

21 of Texas, it costs you $1.60, but currently the state

22 collects $15?

23         MS. DAVIO:  Yes, sir.  $1.67 is what our

24 costs are.

25         SEN. WATSON:  I'm sorry.  $1.67.  I

TX_00000727

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
 1   rounded that down, didn't I?  So now you've made the
 2   math completely hard for me and probably impossible.
 3               MS. DAVIO:  I'm sorry.
 4               SEN. WATSON:  But the bottom line to it is
 5   there's a net -- 15 minus $1.67 gives the state of Texas
 6   a net return?
 7               MS. DAVIO:  Yes, sir.
 8               SEN. WATSON:  Now, under this legislation,
 9   have you seen that there is no means test for someone
10   that comes in to get an ID card?
11               MS. DAVIO:  No, sir.
12               SEN. WATSON:  You've not seen that, or am
13   I saying that right?
14               MS. DAVIO:  By "means test," do you mean
15   do they qualify?  Do they have to show economic
16   disadvantage?
17               SEN. WATSON:  That's right.
18               MS. DAVIO:  No, sir.
19               SEN. WATSON:  There's not a means test, is
20   there?
21               MS. DAVIO:  No, sir.  I didn't see one.
22               SEN. WATSON:  And, in fact, it forbids
23   your department from collecting a fee if an eligible
24   voter -- if a person is an eligible voter or submits a
25   registration application.  Is that right?
```

 1               MS. DAVIO:  Yes, sir.  That's the way that
 2   I understand it.
 3               SEN. WATSON:  And have you had a chance to
 4   look at the fiscal note for this legislation?
 5               MS. DAVIO:  Yes, sir.
 6               SEN. WATSON:  Have you seen anywhere in
 7   that fiscal note where it looks to try to determine what
 8   the cost to the state of Texas would be for the state
 9   losing the fees if people were able to get these
10   identification cards for free?
11               MS. DAVIO:  No, sir.  I don't believe
12   that's covered in the fiscal note.  We were unable to
13   estimate that because we didn't know how many people
14   would take advantage of the card -- of the free ID card.
15               SEN. WATSON:  But you would anticipate
16   some would, otherwise it wouldn't be in the bill.  Is
17   that right?
18               MS. DAVIO:  I'm sorry.  I don't understand
19   that question.
20               SEN. WATSON:  You would anticipate that
21   some people would attempt to get the card for free?
22               MS. DAVIO:  Yes, sir.  That would make
23   sense.
24               SEN. WATSON:  Are you familiar with the
25   legislation or the fiscal note that was attached to

```
 1   House Bill 218 in the 2007 session?
 2               MS. DAVIO:  I'm sorry, sir.  I am not.  I
 3   just started this job in June of this year.
 4               SEN. WATSON:  Well, I don't -- that's one
 5   of the better answers I've heard today.  So thank you.
 6               Are you familiar with the fiscal note that
 7   was attached to House Bill 2335 in the last session of
 8   the legislature?
 9               MS. DAVIO:  Again, no, sir.
10               SEN. WATSON:  Okay.  Thank you very much.
11               MS. DAVIO:  Thank you.
12               CHAIRMAN DUNCAN:  Senator Williams, you
13   are recognized.
14               SEN. WILLIAMS:  Thank you.  I appreciate
15   you being here tonight and staying with us all day.  I
16   have several questions that I wanted to ask just to
17   clarify some things that I think have been brought up as
18   we went along here.  For the record, can you tell us
19   what the requirements are for someone to receive
20   either -- well, to receive an official identification
21   card from the state of Texas?
22               MS. DAVIO:  Yes, sir.  Basically, those
23   requirements are quite simple.  You can say that you
24   have to verify that you qualify, and currently that is
25   proving that you are a U.S. citizen or you have lawful
```

CONSIDERATION OF SENATE BILL 14 1/25/2011

1    residence here.  And the second thing is to demonstrate

2    who you are, to prove who you are by providing various

3    different types of identification.

4                   SEN. WILLIAMS:  Okay.  Anything else?  Do

5    you have to be photographed or fingerprinted or anything

6    like that?

7                   MS. DAVIO:  Yes, sir, you do have to be

8    photographed and fingerprinted and provide your

9    signature.

10                   SEN. WILLIAMS:  Okay.  Can someone have

11   both a Texas driver's license and an ID?

12                   MS. DAVIO:  Yes, sir.

13                   SEN. WILLIAMS:  And if someone had a

14   driver's license and they wanted to come back and get a

15   free ID, if they wanted to stand in line to do that,

16   they could do that.  Is that correct?

17                   MS. DAVIO:  Yes, sir, as I understand it.

18                   SEN. WILLIAMS:  Okay.  How long does it

19   take once an applicant has submitted all of their

20   materials to DPS to actually mail out the physical ID?

21                   MS. DAVIO:  We issue a temporary receipt

22   that's good for 45 days.  The time that it takes varies.

23   We are currently, I believe, running about 35 days

24   production and mailing time.  There are times -- we're

25   having some equipment problems right now.  There are

1    times when it's shorter than that.

2              SEN. WILLIAMS:  Okay.  And the temporary

3    ID is valid for how long?

4              MS. DAVIO:  Forty-five days.

5              SEN. WILLIAMS:  Okay.  About the same

6    amount of time that it takes to get the physical

7    license.  Okay.

8              MS. DAVIO:  Yes, sir.

9              SEN. WILLIAMS:  What security features

10   does a temporary ID have?

11             MS. DAVIO:  The temporary ID has a picture

12   of the ID or driver license applicant and also has their

13   basic demographic information that's shown on the

14   license.

15             SEN. WILLIAMS:  Okay.  There's been a lot

16   said about how many licenses -- how many license

17   offices -- driver's license offices we have around the

18   state.

19             MS. DAVIO:  Yes, sir.

20             SEN. WILLIAMS:  Can you tell me what the

21   total number of driver's license offices are?

22             MS. DAVIO:  Yes, sir.  There are 307

23   locations.  Currently 226 of those are operating.  That

24   includes 174 full-time offices, 34 part-time offices and

25   18 mobile offices that are open.

CONSIDERATION OF SENATE BILL 14 1/25/2011

 1            SEN. WILLIAMS:  Okay.  And how many

 2   counties do not have a driver's license office?

 3            MS. DAVIO:  There are 77.

 4            SEN. WILLIAMS:  Seventy-seven.  Okay.

 5            MS. DAVIO:  Yes, sir.  And I do have a map

 6   that shows the driver license offices if you'd like to

 7   have that passed out.

 8            SEN. WILLIAMS:  Okay.  I think we've had

 9   one submitted earlier and -- no, we haven't?  Okay.

10   Well, let's -- why don't we go ahead and submit that

11   into evidence.

12            MS. DAVIO:  This map, when you get it,

13   will show the full-time, the part-time and mobile

14   offices that are open and the offices that are

15   temporarily closed.

16            SEN. WILLIAMS:  Okay.

17            CHAIRMAN DUNCAN:  Okay.  Ms. Davio, let us

18   first -- this will be Exhibit 9.

19            (Exhibit No. 9 marked)

20            CHAIRMAN DUNCAN:  And you've just

21   described Exhibit 9 as a map.  Driver's License Offices

22   in Texas is what the label is, and that will be

23   distributed.  Exhibit 9, is there any objection to

24   receiving that?

25            (No response)

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
 1            CHAIRMAN DUNCAN:  Exhibit 9 is received.
 2            (Exhibit No. 9 admitted)
 3            SEN. WILLIAMS:  Okay.  So we have 77
 4  counties that don't have a license office.  Is that
 5  correct?
 6            MS. DAVIO:  Yes, sir.
 7            SEN. WILLIAMS:  Okay.  And could you
 8  describe for me briefly -- you mentioned that some
 9  offices are temporarily closed.  Why are those offices
10  temporarily closed, and what is the department doing to
11  remedy that situation?
12            MS. DAVIO:  Yes, sir.  The DPS just
13  implemented our new driver license system, fully
14  implemented in May.  Our mobile offices are functioning
15  on equipment from our Legacy system, and that equipment
16  is very, very old.  And as it breaks, we are unable to
17  replace it.  We simply can't get parts.  We can't get
18  replacement pieces even trying to go out and buy things
19  on eBay, and so we have no other choice other than to
20  temporarily close that office.
21            We have tried to get new equipment --
22  equipment for our new system to work in these mobile
23  locations.  And the way that we've changed -- the way
24  that we have changed the way we do driver license, we're
25  pushing much more data through, and so we find it very
```

Case 2:13-cv-00193   Document 725-5   Filed on 11/17/14 in TXSD   Page 52 of 220

1  difficult, impossible really, to get the new equipment

2  to work.

3            SEN. WILLIAMS:  So when you say Legacy

4  equipment and the new equipment, you're talking about

5  computers that you use to process the information --

6            MS. DAVIO:  Yes, sir.  I'm sorry.

7            SEN. WILLIAMS:  -- that people get in?

8            MS. DAVIO:  Yes, sir.

9            SEN. WILLIAMS:  Okay.  And so what kind of

10  information is being submitted?  I guess what we're

11  trying to do is meet the qualifications of the REAL ID

12  Act, which is a federally mandated program -- right --

13  and that's why we're switching to this new equipment?

14            MS. DAVIO:  Well, we're switching to the

15  new equipment because our old system was so old.

16            SEN. WILLIAMS:  Right.

17            MS. DAVIO:  There are many safeguards that

18  are built into the new technology.  For example, we now

19  scan real-time all the documents that are brought in.

20  So it used to be that we had to make copies and send

21  those back to headquarters for scanning.  They are now

22  scanned real-time, and we give the originals back to the

23  customer.  We also capture a photo, the fingerprints and

24  the image of the person's signature.

25            SEN. WILLIAMS:  So --

TX_00000735

```
 1              MS. DAVIO:  And that's a lot of data.
 2              SEN. WILLIAMS:  Yeah.  And the issue is --
 3   and have you tried using these mobile phone air cards or
 4   anything like that to be able to have --
 5              MS. DAVIO:  We have tried using air cards.
 6   We have tried using DSL lines.  All of our offices,
 7   full-time offices, use T1 lines, and that's been the
 8   only thing that we can find.
 9              SEN. WILLIAMS:  Okay.  So you mentioned to
10   me yesterday when we visited that you have an initiative
11   going on.  Tell us a little bit about what you're trying
12   to do.
13              MS. DAVIO:  Yes, sir.  We realized that
14   closing these offices even temporarily might cause a
15   burden.  What we're trying to do is look and be able to
16   provide a more consistent level of service.  We found
17   that in some locations we only serve one or two or a
18   very small number of customers, when in our other
19   offices customers experience a very long wait time.  And
20   so we're trying to equalize that level of service as
21   much as we can, provide a consistent high quality level
22   of service across the state.
23              So to do this we are doing a business
24   intelligence analysis project.  That actually means that
25   we are looking at our data very carefully to see how
```

```
 1   many transactions are conducted at what location, how
 2   long those transactions take, that kind of thing, so
 3   that we can optimize the use of our resources.  We
 4   realize this is not a good time to come and ask for
 5   additional resources, and so we're trying to make the
 6   best use of the resources that we can through this
 7   analysis project.
 8                   SEN. WILLIAMS:  Okay.  Can a noncitizen
 9   get an ID card from the state?
10                   MS. DAVIO:  A noncitizen, yes.  If you are
11   an asylee or a refuge or have some other status of
12   lawful presence, yes, sir, you can.
13                   SEN. WILLIAMS:  Illegal foreign visitor,
14   for instance.  You wouldn't have to be an asylee.
15   Right?  You could be a legal foreign visitor?
16                   MS. DAVIO:  Yes, sir, a legal foreign
17   visitor.
18                   SEN. WILLIAMS:  Okay.  And is there
19   anything unique about that card?
20                   MS. DAVIO:  The cards do say "temporary
21   visitor" on them.
22                   SEN. WILLIAMS:  Okay.  How many driver's
23   license holders do we have in this state?
24                   MS. DAVIO:  There are a little better than
25   15 million.
```

CONSIDERATION OF SENATE BILL 14 1/25/2011

1            SEN. WILLIAMS:  Okay.  And how many people

2    hold ID cards?

3            MS. DAVIO:  Approximately 750,000.

4            SEN. WILLIAMS:  And just to clarify, I

5    think I may have -- I'm not sure about the cost of an

6    ID.  Is there anything you want to add to what my

7    remarks are?  I'm not sure I was actually on the money

8    with everything.  Is what I said early, $1.67, is the

9    cost to produce those cards?  Is that --

10            MS. DAVIO:  Yes, sir.  The cost of

11   producing and mailing, yes, sir.

12            SEN. WILLIAMS:  Okay.  And then what is

13   the cost to the state to give those IDs away?

14            MS. DAVIO:  What is the cost to the state

15   to give those away?  The loss of the revenue, the

16   $15.00 --

17            SEN. WILLIAMS:  Okay.

18            MS. DAVIO:  -- or the $5 for over 65.

19            SEN. WILLIAMS:  Okay.  And have you been

20   able to determine how many people this would apply?  You

21   can't tell?

22            MS. DAVIO:  No, sir.

23            SEN. WILLIAMS:  Okay.

24            MS. DAVIO:  We don't have any way of

25   estimating.

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
1              SEN. WILLIAMS:  So when we talk about
2  cost, there could be a loss of revenue, but really the
3  cost to produce that document is pretty negligible --
4  right -- $1.67?
5              MS. DAVIO:  Yes, sir.
6              SEN. WILLIAMS:  All right.  All right.
7  That's all the questions I have.  Thank you very much.
8              MS. DAVIO:  Thank you.
9              SEN. ELTIFE:  Thank you, Senator Williams.
10             Senator Gallegos?
11             SEN. GALLEGOS:  Thank you, Mr. Chairman.
12 Now, you're representing the DPS.  Is that what you
13 said?
14             MS. DAVIO:  Yes, sir.  I'm the assistant
15 director --
16             SEN. GALLEGOS:  I'm sorry.  I didn't -- I
17 didn't hear your name or --
18             MS. DAVIO:  My name is Rebecca Davio --
19             SEN. GALLEGOS:  Rebecca.
20             MS. DAVIO:  -- and I'm the Assistant
21 Director for Driver Licenses at DPS.
22             SEN. GALLEGOS:  Okay, Rebecca.  And you
23 passed out this map right here.  Right?
24             MS. DAVIO:  Yes, sir.
25             SEN. GALLEGOS:  Okay.  Now, I'm trying to
```

CONSIDERATION OF SENATE BILL 14 1/25/2011

1    see real close here.  It's got a big green spot right in

2    the middle of Harris County.

3                    MS. DAVIO:  Yes, sir.

4                    SEN. GALLEGOS:  Is that correct?

5                    MS. DAVIO:  Yes, sir.

6                    SEN. GALLEGOS:  But the maps I have shows

7    nothing within the 610 Loop.

8                    MS. DAVIO:  That actually -- I believe

9    that green -- that big green circle that you commented

10   on is -- indicates that there are seven driver license

11   offices within Harris County.

12                   SEN. GALLEGOS:  Yeah, but I'm looking at

13   this one.  It says there's nothing within the 610 Loop.

14   Is that correct?

15                   MS. DAVIO:  I'm sorry, sir.  I'm not

16   familiar with that map.  That point has been made

17   earlier and --

18                   SEN. GALLEGOS:  No.  I introduced this map

19   two years ago, and I'm introducing it again today.  I'm

20   just asking if you're the assistant of DPS, you don't

21   know that there's not a DPS office within the 610 Loop

22   in the largest city in the state?

23                   MS. DAVIO:  I can't claim to be intimately

24   familiar with the layout of Houston.  I have been to the

25   offices.

1           SEN. GALLEGOS:  Well, wait a minute.  What
2    was your title again?
3           MS. DAVIO:  I'm the Assistant Director for
4    Driver Licenses at DPS.
5           SEN. GALLEGOS:  Okay.  Well, then if you
6    don't know the answer, who can give me the answer?  I
7    haven't been getting any answers today.  And we are told
8    to ask DPS.  Now you're before us, and you can't answer
9    that question for me.  So who can I -- I mean, who do I
10   ask?
11          MS. DAVIO:  I'll verify that for you, sir.
12          SEN. GALLEGOS:  Before we finish today?
13          MS. DAVIO:  Yes, sir.
14          SEN. GALLEGOS:  All right.  And not only
15   that, in Fort Worth, I only see one within the loop.  In
16   Dallas, only one inside the city.  But you're still --
17   on your map that you're introducing here, it shows a
18   bunch of green spots.  Now, I think it needs to be
19   clarified by cities of how many are there, how many are
20   open, how many are closed, after your 10 percent cut in
21   the agency how many are proposed to be closed and the
22   hours that they open up.  You know, that is what I'd
23   like to know.
24          Now, the other question that I had is --
25   and Senator Williams brought up a good point.  The

CONSIDERATION OF SENATE BILL 14 1/25/2011

1   problem that I have on temporary license, the

2   temporaries -- my son lost his, and he went and got a

3   temporary license, and its got his photo ID.  That's a

4   temporary license.  So what Senator Williams said is

5   correct.

6              My concern is on a confiscated license

7   when the DPS picks up -- or the law enforcement agency

8   picks up that license and replaces it with this

9   temporary license.  Well, this confiscated license.

10  Let's not call it temporary because temporaries have a

11  photo ID.  This confiscated license does not have a

12  photo ID, yet the verbiage on it says this will act as a

13  valid DPS license and valid ID.  That's what it says,

14  for 40 days.  Okay?  And the date of it y'all gave us

15  that we asked for, is in 2010 there's almost 100,000

16  drivers out there with this license without a photo ID,

17  yet the verbiage on it has that this will be a valid DPS

18  license for 40 days.  Now, is that correct?  Yes or no.

19              MS. DAVIO:  Yes, those are issued --

20              SEN. GALLEGOS:  Okay.

21              MS. DAVIO:  -- by law enforcement.  They

22  are not issued through the DPS offices.

23              SEN. GALLEGOS:  So there's two different

24  classes.  I just wanted to make it clear for Senator

25  Williams.  He's pretty -- he's pretty almost correct.  I

CONSIDERATION OF SENATE BILL 14 1/25/2011

1   just want to make the difference between a temporary and

2   a confiscated that I just showed you that y'all give

3   out.

4            MS. DAVIO:  That sheet of paper is

5   actually given by law enforcement officers at the time

6   of stop on the street.

7            SEN. GALLEGOS:  I understand, but it has

8   DPS verbiage on it.

9            MS. DAVIO:  Yes, sir.  It's our form, but

10  we do not issue it.

11           SEN. GALLEGOS:  Okay.  Now -- and this is

12  just one -- one avenue that we looked.  That's just

13  100,000 in one category.  There's four other categories

14  that we have not got a tally on, that confiscated --

15  that licenses are confiscated for whatever other issue,

16  nonpayment of child support or some other categories

17  that you confiscate licenses.  And we haven't taken the

18  tally on those.  I'm just going on this one avenue where

19  licenses are confiscated and that person has not been

20  convicted yet.  He or she is innocent until proven

21  guilty.  But this is the only form of ID that they have,

22  and it doesn't have a picture on it.

23           MS. DAVIO:  It would be possible for the

24  people whose license are confiscated to apply for an ID.

25           SEN. GALLEGOS:  It doesn't say that on

1   here.  Nowhere does it say that.  I understand what you

2   just told me.

3                 MS. DAVIO:  Yes, sir.

4                 SEN. GALLEGOS:  But when they stop me and

5   take my license and give me this in return, it has

6   nowhere that instructs me that I have an option to go

7   get a license with a picture.  It doesn't say that on

8   here.  That's why you have almost 100,000 out there with

9   this type of license.  And not only that, in just one

10  month, last month -- well, let's see in December of

11  2010, we have 10,000 out there driving right now with

12  this license without a picture.

13                So I just wanted to make that clear that

14  this is -- that this is out there, that it's got DPS

15  language on it.  It doesn't tell us that we can -- we

16  have an option to go get one with a picture.  It doesn't

17  say that on here.  So that's why you have the high

18  number out there driving with this license.

19                So I just wanted to make that clear for

20  the record that that's how many drivers that we know of.

21  We haven't gone into the other categories.  There could

22  be more that are driving with this license, that's their

23  only form of ID, and I just want to make it sure --

24  Senator Fraser is not on the floor -- but that he

25  understood that.  But Senator Williams is, and I just

CONSIDERATION OF SENATE BILL 14 1/25/2011

1  wanted to make sure that that is understood, the

2  difference between the two licenses, that one, the

3  temporary has a photo ID --

4           MS. DAVIO:  Yes, sir.

5           SEN. GALLEGOS:  -- the confiscated does

6  not, but yet it shows here that this -- by the DPS that

7  it is a valid ID that you can use.

8           MS. DAVIO:  As I understand that, sir,

9  it's valid for driving purposes.  And because it's

10 provided by the law enforcement officer on the side of

11 the street, they don't have any of the equipment to take

12 a person's picture or do any of that.

13          SEN. GALLEGOS:  I understand that; I

14 understand that.  I just wanted to make the difference

15 in the two.  And I can use this paper ID, you know, go

16 to Wal-Mart, "Where is your ID?"  "Here it is right

17 here; here it is right here.  The DPS gave it to me," or

18 it's got DPS language that I can use it as a valid ID.

19 I just wanted to make sure that that's clear.  Is that

20 correct?

21          MS. DAVIO:  Sir, I'm unable to comment on

22 whether Wal-Mart would accept that as an ID.

23          SEN. GALLEGOS:  Well, it says here -- it

24 says here that this is valid per DPS language and I can

25 use as an ID.

```
 1            MS. DAVIO:  I believe it's valid for
 2  driving purposes.  It's a temporary driving permit, and
 3  so I can't speak to whether a bank or retail
 4  establishment would accept it for identification
 5  purposes.
 6            SEN. GALLEGOS:  Okay.  Well, let's just
 7  say they'll take it because it's got your language on
 8  it, but I just wanted to make that point out there to
 9  the members that, you know, when you're talking about an
10  ID from the DPS, there are differences, and this one
11  just doesn't happen to have a photo ID on it.  I just
12  want to make that clear.
13            And you will give me those answers before
14  we get through tonight?
15            MS. DAVIO:  Yes, sir.  I will work to do
16  that.  I know I can give you the answer about the
17  offices within the 610 Loop in Houston.  We have the
18  information about the hours that the offices are open,
19  and we'll look into the cuts -- the proposed cuts.
20            SEN. GALLEGOS:  Let me ask you this
21  question:  Do you anticipate any other closures per the
22  shortfall that we have now of any DPS office, whether in
23  Houston or anywhere in the state?
24            MS. DAVIO:  Well, there may be some more
25  of the temporary closures because of the equipment
```

1   failure because we don't have any other way to replace

2   that failing equipment with new equipment.  Because of

3   this need for a higher, larger data pipeline, there may

4   be some additional closures, but we're looking at where

5   our offices are located and how they are staffed through

6   our business intelligence project.  And so we plan on

7   coming to all the legislators and the local judges and

8   bringing you that information about office closures and

9   what our recommendations would be to provide the optimal

10  level.

11            SEN. GALLEGOS:  I'm only asking that

12  because if we're going to mandate Texans to obtain a

13  photo ID and we have to go to DPS to get that and you're

14  telling us you anticipate some more closures, I'd like

15  to know where they are at.  And then that way we can

16  tell our folks that these particular locations -- that

17  you're going to get a free ID under this bill, that

18  those offices are going to be closed.

19            MS. DAVIO:  Sir, we don't plan to close

20  any more offices unless the equipment breaks.  Right now

21  we have no plans to close any of our driver license

22  offices, those mobile locations, unless the equipment

23  fails.

24            SEN. GALLEGOS:  Unless the equipment

25  fails?

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
1              MS. DAVIO:  Yes, sir, in the short term.
2              SEN. GALLEGOS:  So you have no plans to
3  close any other offices?
4              MS. DAVIO:  In the short --
5              SEN. GALLEGOS:  Is that what you're
6  telling me?
7              MS. DAVIO:  In the short-term, yes, sir.
8  We want to do the business --
9              SEN. GALLEGOS:  What do you mean
10 "short-term"?
11             MS. DAVIO:  We want to -- we need to do
12 this business intelligence analysis so that we can
13 really look to determine how we can best use our
14 resources to provide the optimal level of service for
15 all Texans when they are trying to get their driver
16 license or an ID.
17             SEN. GALLEGOS:  All right.  And you'll get
18 me those answers before we finish today?
19             MS. DAVIO:  Yes, sir.
20             SEN. GALLEGOS:  Okay.  Thank you.
21             MS. DAVIO:  Yes, sir.
22             CHAIRMAN DUNCAN:  The Chair recognizes
23 Senator Ellis.
24             SEN. ELLIS:  Ms. Davio, I know you've been
25 here all day, and we're all very appreciative of that,
```

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
1   and we know you don't have a position on the bill.
2   You're just here as a resource.
3                   MS. DAVIO:  Yes, sir.
4                   SEN. ELLIS:  Including Senator Gallegos,
5   we appreciate you being here and the work you do.
6                   MS. DAVIO:  Thank you.
7                   SEN. ELLIS:  Let me ask you this:  Now, I
8   saw this article in the paper today about the driver
9   surcharges.
10                  MS. DAVIO:  Yes, sir.
11                  SEN. ELLIS:  Are you familiar with that
12  program?
13                  MS. DAVIO:  Yes, sir.
14                  SEN. ELLIS:  Does that come under your
15  jurisdiction?
16                  MS. DAVIO:  Yes, sir, it does.
17                  SEN. ELLIS:  If I'm reading this right, it
18  says it's estimated that a total of about 1.2 million
19  Texans are in default?
20                  MS. DAVIO:  Yes, sir.  I believe that's
21  the number.
22                  SEN. ELLIS:  Okay.  Now, how do we get to
23  that?  I mean, can you give us some sense -- since we
24  passed that in '03, is it about 100,000 per year, a
25  half?  Is it getting better?  Worse?  I'm just trying to
```

1   get a sense of how much -- how many more people may end

2   up in that category between now and when Senator

3   Fraser's bill goes into effect.

4           MS. DAVIO:  You're asking about the number

5   of people that are in default on their surcharges?

6           SEN. ELLIS:  Yeah.  About 1.2 million now,

7   and I'm asking how much do you think that will grow

8   between now and January of 2012, next year, a year from

9   now?

10          MS. DAVIO:  We actually hope that the

11  number of people in default will be reduced.  There is a

12  program going on now -- that was probably what the

13  article in the paper was -- about the amnesty program.

14  So what this program does is it allows people who are in

15  default, if they've received a surcharge between 2004

16  and 2008 and are in default on that surcharge, then they

17  can pay 10 percent up to a maximum of $250.  And if they

18  pay that reduced amount and their reinstatement fees and

19  do the other things, then they will no longer be in

20  default.  That program will run -- the amnesty program

21  will run through -- I believe it's April 17th.

22          And then we will begin a program for

23  indigent folks that cannot pay their surcharges.  And so

24  we will enable those people to pay their surcharges, and

25  so we really do hope the number of people in default

```
 1   will be reduced.
 2              SEN. ELLIS:  Is this your first amnesty
 3   program?
 4              MS. DAVIO:  Yes, sir, it is.
 5              SEN. ELLIS:  Now, you know -- I'm sure you
 6   know -- two other states that had a similar program for
 7   trying to balance their budgets abandoned the programs.
 8   And in those states, I'm told that they tried the
 9   amnesty programs, they tried virtually everything you
10   could think of, and it didn't work.  So they just
11   abandoned the programs.
12              So is there any empirical evidence that
13   would make you think that 1.2 million people who have
14   lost their licenses in Texas because they didn't pay on
15   average, I guess, what -- I guess this is a thousand
16   dollars a year if you were drunk, 2,000 if the blood
17   alcohol level was twice the legal limit?  Is there any
18   reason why you would think the amnesty program in Texas
19   will work when it didn't work in the other two states
20   that abandoned the program?
21              MS. DAVIO:  We actually have had a pretty
22   good response so far.  I'm sorry.  Off the top of my
23   head, I can't give you the statistics of the people that
24   have opted in, but I'd be happy to get that information
25   for you.
```

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
1              SEN. ELLIS:  Now, I think I heard you say
2    in response to a question from Senator Williams
3    15 million Texans have a driver's license.
4              MS. DAVIO:  Yeah.
5              SEN. ELLIS:  Or did you mean authorized to
6    have one?  Are you counting the 1.2 million who have
7    lost them?
8              MS. DAVIO:  I believe that's active driver
9    licenses.
10             SEN. ELLIS:  Okay.  So 15 million have
11   active driver's licenses.  And just as a point of
12   reference to Senator Williams, there are 12.6 million
13   registered voters in Texas.  So he was correct earlier
14   when he made the point that --
15             SEN. WILLIAMS:  (No mic)
16             SEN. ELLIS:  Yeah, that's right.  Probably
17   about 30 percent of them vote.  Of course, maybe half of
18   them vote wrong; maybe half of those vote wrong, but
19   about 30 percent of them vote, Senator.
20             But I just wanted to make the point 15
21   million people have driver's license in Texas, 12.6
22   million registered voters.  Most people who go to vote
23   do what most of us on this floor do, they show their
24   driver's license.  And if the trend of 1.2 million who
25   have drivers -- who had driver's licenses haven't lost
```

CONSIDERATION OF SENATE BILL 14 1/25/2011

1  them since 2003 continues, if your amnesty program does

2  not work, if it's not something unique about the Lone

3  Star State that would make it work here when it didn't

4  work in those other states, that means that 15 million

5  figure is going to be going down in terms of the people

6  who have a driver's license.  Correct?

7            MS. DAVIO:  Yes, sir.

8            SEN. ELLIS:  Okay.  Now --

9            MS. DAVIO:  Those people --

10            SEN. ELLIS:  Those people who owe those

11  surcharges, is that a felony, or what is it?

12            MS. DAVIO:  I don't believe it's a felony.

13            SEN. ELLIS:  It's a civil offense?

14            MS. DAVIO:  I mean, it depends upon

15  what -- there's five different things that you can

16  receive a surcharge for.

17            SEN. ELLIS:  How about drunk?

18            MS. DAVIO:  Yes, sir.  Driving while

19  intoxicated is one of them.

20            SEN. ELLIS:  Wouldn't that be a felony

21  when they get a surcharge?  It's a civil fine.  I'm

22  really making a point to my colleagues.

23            And can -- what can you-all do to those

24  folks short of taking a driver's license?  You know, can

25  we -- maybe the finance chair can start building some

1   more debtor prisons.  Can you put them in prison, or do

2   you know?  If you don't know, it's okay.

3                   MS. DAVIO:  I don't know, sir.

4                   SEN. ELLIS:  Okay.  I just want to raise

5   that point so my colleagues do realize what we're doing,

6   Senator Fraser, under your bill.  15 million people have

7   a driver's license.  1.2 million have lost them.  I

8   don't think we're going to start building debtor

9   prisons.  I don't think we're going to get to the point

10  where three times you're drunk and get a surcharge we

11  lock you up.  We can't afford to do it, but it's making

12  it more and more challenging, and it is a burden that

13  we're putting on these folks.  Thank you.

14                  SEN. WHITMIRE:  Mr. President?

15                  CHAIRMAN DUNCAN:  The Chair recognizes

16  Senator Whitmire.

17                  SEN. WHITMIRE:  Briefly.  First of all,

18  how long -- how long have you been in your present job?

19  Pretty recent?

20                  MS. DAVIO:  Yes, sir.  I just started

21  June 1st of 2010.

22                  SEN. WHITMIRE:  So about six months?

23                  MS. DAVIO:  Yes, sir.

24                  SEN. WHITMIRE:  Did you ever envision when

25  they gave you the job you were going to be here today

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
 1   and have the opportunity to meet Senator Gallegos?
 2                   (Laughter)
 3                   MS. DAVIO:  The pleasure is all mine.
 4                   (Laughter)
 5                   SEN. WHITMIRE:  No; we appreciate you as
 6   we do our other state employees.
 7                   MS. DAVIO:  Thank you.
 8                   SEN. WHITMIRE:  A couple of things I want
 9   to clarify, Senator Ellis was talking about the folks
10   who have had their license suspended because of the
11   severance.  I don't believe he asked if you have no
12   license but we're going to require you to go get an ID
13   at a DPS office, what is the relationship if I come into
14   the office, I don't have a license because it's been
15   suspended because I can't pay the severance, it's a
16   civil penalty.  Is there any chance that you're arrested
17   because you haven't paid your back severance?  I mean,
18   first I think whether you confiscate the person or
19   handcuff them, it would probably be a huge deterrent for
20   someone to go there knowing they owe you thousands of
21   dollars.  Would you not agree?
22                   MS. DAVIO:  Yes, sir.
23                   SEN. WHITMIRE:  Okay.  But going one step
24   further, if someone chose to do that what -- and they
25   apply for a voter ID and the computer is going to kick
```

1    out "you owe us" -- and some of these figures are

2    fantastic amounts, thousands of dollars -- what will be

3    the conduct of the DPS?  I walk up to your station for

4    voter ID and you say Mr. Whitmire you owe us $20,000 in

5    back severance, is that going to be brought up and

6    you're going to be asked to not leave until you have a

7    payment plan?

8                    MS. DAVIO:  No, sir.  Those are really

9    handled as separate transactions.  If you come in and

10   you say you want to get an ID and you don't already have

11   an ID, then they will determine if you are eligible, and

12   you should be eligible.  And they do have the

13   information in the driver license system about the

14   surcharges.  But if you aren't asking to get a driver

15   license then that won't be brought up.

16                    SEN. WHITMIRE:  Okay.  It's your

17   testimony -- y'all have actually discussed this

18   internally.  It's going to be the policy, as you state

19   before us today, I come in there, I owe you a surcharge,

20   but I don't want to deal with the surcharge today, they

21   are not going to bring it up or ask me for my intention

22   of paying it, don't leave until you make a payment plan?

23                    MS. DAVIO:  No, sir.  I haven't witnessed

24   that.  I have visited the --

25                    SEN. WHITMIRE:  Well, you haven't

CONSIDERATION OF SENATE BILL 14 1/25/2011

1    witnessed it -- excuse me for interrupting because this

2    is all in the planning stage.  So I know you haven't

3    seen it because no one has been in there asking for a

4    voter ID.

5                    MS. DAVIO:  No, sir, they haven't asked.

6                    SEN. WHITMIRE:  Would it be -- and can

7    you -- has it really been decided or is that just your

8    opinion or you've got to go upstairs to the colonel or

9    the DPS board?  I mean, this is a pretty serious matter

10   in my mind because you have no license because you can't

11   afford to pay the surcharge, but we're fixing -- if this

12   law will pass -- require you to go to that location, law

13   enforcement, a pretty intimidating setup anyway to some.

14   You know, they've already run afoul, but they've got to

15   go to that site for a voter ID.  Are you telling me

16   there won't be any discussion of the surcharge, or is it

17   really you don't know?

18                   MS. DAVIO:  You're right.  We haven't

19   discussed voter ID, but I have witnessed numerous

20   transactions where somebody comes in and they request to

21   get an ID.  And, you know, they may -- they may make an

22   inquiry about can I -- you know, what about a driver

23   license or something like that, and actually the records

24   come up and show that they are ineligible to get a

25   driver license.  But if there --

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
 1              SEN. WHITMIRE:  Because of the surcharge?
 2   Because of the surcharge?
 3              MS. DAVIO:  Yes, sir.  And so then they
 4   can still continue to get an ID, and I haven't witnessed
 5   any occasion where there was discussion of the
 6   surcharges unless the customer brought that up.
 7              SEN. WHITMIRE:  Well, if this passes, and
 8   of course none of us are going anywhere, but -- and I
 9   understand you're just representing the DPS, but I would
10   think that would be a major policy decision, that you
11   deal with something as important and precious as the
12   right to vote, but we're fixing to require you to come
13   in contact with law enforcement that you owe thousands
14   of dollars with the same personnel.  I think someone is
15   going to have to really put some safeguards, Senator
16   Williams, that you can enter one of these sites and not
17   have to deal with the surcharge.
18              And would you not agree, even though you
19   have an amnesty program and you said it's working pretty
20   good -- in fact, pretty expensive, it's 250 and I think
21   there's a fee schedule.  You've still got to pay a fee
22   to the folks that are doing y'all's collection work.  So
23   what is the actual cost, 250?  I think 150 to the
24   collection agency, and then it's going to run about five
25   or $600 if you want to -- if you want to use the amnesty
```

CONSIDERATION OF SENATE BILL 14 1/25/2011

1  program.  But that -- do you know the amount that's

2  working pretty good?  What does "pretty good" to you

3  mean out of a million folks?

4           MS. DAVIO:  I'm sorry.  I will work to get

5  you those information.

6           SEN. WHITMIRE:  Yeah, and I'm not trying

7  to pin you down.  It's just, you know, you're the best

8  source we've got at the time.

9           Let me ask you something.  You said a

10  while ago if someone confiscated your license, you could

11  apply for an ID.  What if they confiscate it the week

12  before the election?  What's the processing time to

13  apply for this ID?  Say you're unfortunate, you come to

14  Austin before a Saturday election.  On Thursday, if

15  you're real unfortunate, they get your license because

16  you have been pulled over.  How are you going to get

17  that before Saturday's election?  Do you know the

18  turnaround?

19           MS. DAVIO:  You can come into our office,

20  and we -- as long as you qualify, we issue a temporary

21  receipt immediately.

22           SEN. WHITMIRE:  Come in your office, what

23  do you mean by that?

24           MS. DAVIO:  You can go to any driver

25  license office.

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
 1                 SEN. WHITMIRE:  Any office?
 2                 MS. DAVIO:  Yes, sir.  And as long as you
 3   qualify, then you can walk out with a temporary receipt.
 4                 SEN. WHITMIRE:  Of course under my
 5   scenario, you've first got to get out of jail, but
 6   that's not mine or your problems tonight.
 7                 Let's talk about that office, and then
 8   I'll pass.  The truth of the matter is, is it not, as
 9   you stand before us today, you have no idea what the
10   future budget considerations are going to do to your
11   office locations, do you not?  When you were having a
12   question and answer with Senator Williams, that's under
13   today's setup, is it not?
14                 MS. DAVIO:  Yes, sir.
15                 SEN. WHITMIRE:  Have you been in meetings
16   recently at the command headquarters where you're
17   contemplating a significant, maybe as much as a
18   10 percent cut in your budget?  Have y'all made your
19   plans for how to deal with the shortfall and expected
20   reduction of DPS funding?
21                 MS. DAVIO:  Yes, sir.  The 5 percent cut.
22                 SEN. WHITMIRE:  That you've already been
23   requested to make.
24                 MS. DAVIO:  Yes, sir.  I believe that that
25   did envision the closing of some -- I believe --
```

```
 1              SEN. WHITMIRE:  Have you looked at the
 2  House proposed budget and the Senate proposed --
 3              MS. DAVIO:  I have not.
 4              SEN. WHITMIRE:  -- and calculated the
 5  impact and reduction of services and maybe troopers and
 6  personnel as it relates to the licensing division?
 7              MS. DAVIO:  I'm sorry, sir.  I have not.
 8              SEN. WHITMIRE:  So the truth of the matter
 9  is when you were answering Senator Williams' question,
10  that's under current funding levels, is it not, as you
11  understand them?  Since you took the job in June and
12  here we are the second week of January, that's really
13  the funding and the resources that you were using to
14  answer his questions.  It certainly wasn't going
15  forward.  Is that not correct?
16              MS. DAVIO:  That's correct, sir.
17              SEN. WHITMIRE:  You do expect significant
18  reductions in your operating resources, do you not?
19              MS. DAVIO:  I would remain optimistic.
20              SEN. WHITMIRE:  Do you see that guy
21  sitting right in front of you right there?  We don't
22  call him Mr. -- we don't call him Mr. Optimistic around
23  here.
24              (Laughter)
25              SEN. WHITMIRE:  The truth of the matter
```

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
1    is -- and I really understand this position you're in.
2    And, quite frankly, I'm not even sure it's fair that
3    they brought you here to answer our questions, but
4    you're here, and they had the right to do so.  But we
5    haven't even written the budget.  Our first meeting is
6    next Monday, and the operation of these offices and
7    their hours, their personnel, is yet to be determined as
8    we go and consider this legislation.  Is that not
9    correct?
10                   MS. DAVIO:  Yes, sir, I think that --
11                   SEN. WHITMIRE:  You have no idea what
12   you're going to have after September 1.
13                   MS. DAVIO:  I think that's a fair
14   statement, sir.
15                   SEN. WHITMIRE:  But we do know that in
16   Houston -- and Senator Gallegos was asking you about the
17   locations -- that's an important factor, but I'm really
18   more important -- or concerned about when you get to one
19   of our locations.  Are you familiar with 290 and Tacoma?
20                   MS. DAVIO:  Yes, sir.
21                   SEN. WHITMIRE:  Gessner and I-10?
22                   MS. DAVIO:  Yes, sir.
23                   SEN. WHITMIRE:  South Houston?  Nearly
24   each of our Harris County sites, you know it takes from
25   two to three hours to enter that office and renew your
```

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
 1   driver's license on many days of the week.
 2                MS. DAVIO:  Yes, sir, I think that's true.
 3   That is the way it's happened in the past.  We are
 4   implementing a queuing system which we hope will bring
 5   about reductions in wait times at our 50 largest
 6   offices.
 7                SEN. WHITMIRE:  But today, this week, it's
 8   not unusual -- and I've checked -- it can still take you
 9   up to three hours.  In fact, if we accomplish anything
10   in this discussion with you, I would like to appeal to
11   you to work with your supervisors and Senator Ogden and
12   each of the 31 Senators and fix that problem.  That's a
13   very fixable problem that we've been talking about too
14   long.
15                But you know it takes up to three hours.
16   People cannot take off their lunch hour or expect to go
17   over there before work or after work.  It is a major
18   challenge to enter one of those offices today and get
19   your license renewed.  But have you had an opportunity
20   to factor in what it's going to be like to get
21   additional people now for voter ID?  You really don't
22   know what the demands or the numbers will be --
23                MS. DAVIO:  That's correct.
24                SEN. WHITMIRE:  -- as we talk?
25                MS. DAVIO:  We were unable to estimate the
```

CONSIDERATION OF SENATE BILL 14 1/25/2011

1    impact.

2              SEN. WHITMIRE:  And then I'll repeat one

3    more time.  That's today's circumstances, and we're

4    faced with budget cuts to the DPS going forward that

5    could even compound the current wait at those Houston

6    offices.  And I was even told by a colleague of mine

7    that it can happen in other even rural settings in this

8    state, that you would literally wait two and three hours

9    to renew your driver's license.  Is that not correct?

10             MS. DAVIO:  It is possible that you can

11   have a two- or three-hour wait in many of our offices at

12   this moment.

13             SEN. WHITMIRE:  Have y'all had much

14   internal discussion about the impact that this proposed

15   legislation will have in detail in terms of personnel

16   required, equipment required?  I mean, have y'all had

17   any initial planning?

18             MS. DAVIO:  We have had discussions, yes,

19   sir.  It's very, very difficult, we found it impossible,

20   to estimate the impact of this legislation.

21             SEN. WHITMIRE:  I really appreciate you

22   being here tonight and your hard work.  And if I was

23   you, I would say -- I'd speak to Senator Ogden before

24   you leave here tonight and make a pitch for your budget.

25             MS. DAVIO:  Okay.  Thank you.

CONSIDERATION OF SENATE BILL 14 1/25/2011

1        CHAIRMAN DUNCAN:  The Chair recognizes

2  Senator Van de Putte.

3        SEN. VAN de PUTTE:  Thank you,

4  Mr. Chairman.  Good evening.  Thank you for being here.

5  My questions are fairly quick.  But I want to follow up

6  with the fiscal impact, and you stated there were how

7  many counties that don't have offices right now?

8        MS. DAVIO:  There are currently 77

9  counties without a functioning --

10        SEN. VAN de PUTTE:  Seventy-seven.

11        MS. DAVIO:  Yes, sir -- yes, ma'am.

12        SEN. VAN de PUTTE:  Mr. Chairman, could we

13  have the resource witness look at exhibit -- or Item No.

14  6, which was the map that was displayed, compiled by the

15  legislative counsel?  The map that this expert witness

16  brought shows us dots.  And if you could just glance at

17  that, that was prepared by legislative counsel.  As you

18  can see, the counties are outlined with closed,

19  temporarily closed, permanently closed, those counties

20  that may have one, but they are there -- would you

21  suggest that since that was compiled by legislative

22  counsel that that document is correct?

23        MS. DAVIO:  Senator, this is the first

24  time I've seen this map.  Just doing a very quick visual

25  check on the counties that they have in red that say

CONSIDERATION OF SENATE BILL 14 1/25/2011

1    that there are no offices, I can verify that.  I haven't

2    gone through and done all the others to give you a

3    completely accurate response.  If you could give me a

4    little bit more time, I'd be happy -- I'd be happy to do

5    that.

6                SEN. VAN de PUTTE:  We will certainly

7    allow you to do that because we have another resource

8    witness.

9                MS. DAVIO:  Okay.

10               SEN. VAN de PUTTE:  Let me ask you, we

11   have 77 where they are closed, they have no one.  We

12   have temporary ones because of equipment malfunction.

13   But are you aware of the document that is the

14   legislative appropriations request that was sent on

15   August 23, 2010 and printed to us in 2010?

16               MS. DAVIO:  I did not see that document

17   personally.

18               SEN. VAN de PUTTE:  Well, let me tell you

19   why I'm a little bit concerned because when Senator

20   Williams talked to you, you said you had -- the division

21   had no plans or no intention of closing any more unless

22   there was equipment failure, and you talked a little bit

23   about equipment failure.  That's correct.  Right?

24               MS. DAVIO:  Yes, ma'am.  No more offices

25   unless there were equipment failure until we had

1    completed our business intelligence analysis.

2                    SEN. VAN de PUTTE:  Well, let me tell you

3    why I'm a little concerned.

4                    MS. DAVIO:  Okay.

5                    SEN. VAN de PUTTE:  On Page 704 of the

6    legislation appropriations request, DPS says, "No. 10,

7    building program and deferred maintenance."  The

8    category is under "Program Service Reduction (Other).

9    Item Comment:  11 additional DPS offices would be closed

10   due to lack of funding for utilities."  So it's

11   utilities funding, not -- "resulting in 215 FTEs that

12   would be displaced and DPS customers would travel

13   further for any assistance."

14                   Now, this is in a document that was given

15   to the legislature dated August 23, 2010.  You said you

16   don't have to plan any more, but somewhere in the agency

17   under this request, they are closing another -- I'm

18   sorry -- they are closing another 11.  Do you know where

19   those other 11 are that they plan to close?

20                   MS. DAVIO:  I do not have personal

21   knowledge of that.  I believe this was for 2012 and

22   the 2013 --

23                   SEN. VAN de PUTTE:  Well, yeah, but --

24                   MS. DAVIO:  -- legislative appropriation

25   request.

CONSIDERATION OF SENATE BILL 14 1/25/2011

1        SEN. VAN de PUTTE:  This is the

2  legislative appropriations.  So right now what you're

3  saying is nothing is going to be closed.  But in the

4  document that DPS supplied to us as their legislative

5  appropriations request, on Page 704, they tell us, "Oh,

6  we're closing 11 more."  And it's not due to equipment

7  failure.  It's due to the reduction in utilities funding

8  as a result of our crisis in our revenue and with the

9  displacement of 215 FTEs where DPS says, "Customers will

10 travel further for assistance."

11        So I'm trying to figure out -- you say,

12 "Okay.  We're not going to," but then we have a

13 document.  I just don't know what part of DPS to

14 believe.

15        MS. DAVIO:  I'm terribly sorry.  I was

16 imprecise.  I should have said this fiscal year we had

17 no more plans to close any offices.

18        SEN. VAN de PUTTE:  This fiscal year.  Oh.

19 We just didn't ask the right question then.

20        MS. DAVIO:  I'm sorry.

21        SEN. VAN de PUTTE:  We should have

22 asked --

23        MS. DAVIO:  I don't claim to be --

24        SEN. VAN de PUTTE:  -- do you plan to

25 close any maybe after September 1st of next year?

CONSIDERATION OF SENATE BILL 14 1/25/2011

1          MS. DAVIO:  I'm sorry.  I don't claim to

2    be an expert on our legislative appropriation request.

3    I'm not our chief financial officer.

4          SEN. VAN de PUTTE:  Thank you for that

5    clarification.

6          MS. DAVIO:  I'm sorry.

7          SEN. VAN de PUTTE:  And I'm sorry you were

8    caught like this.  But, you know, you can understand our

9    confusion when you testify as the expert witness for DPS

10   one thing, and then the budget documents that are turned

11   into us say another.  And I am so sorry that you were

12   put in this predicament, but the documents are the

13   documents.  So let me, again, ask some other questions

14   since I think that one is pretty well taken care of.

15         Can you tell me in obtaining an

16   identification card what types of birth certificates are

17   allowed under current DPS guidelines?

18         MS. DAVIO:  What types of birth

19   certificates?

20         SEN. VAN de PUTTE:  Yes.

21         MS. DAVIO:  An original or a certified

22   copy of a birth certificate issued by the appropriate

23   state Bureau of Vital Statistics or the equivalent

24   agency from a U.S. state, U.S. territory, the District

25   of Columbia or a Canadian province, or an original or

1  certified copy of a United States Department of State

2  certification of birth abroad.

3           SEN. VAN de PUTTE:  Are any of those

4  documents a Department of Defense hospital or facility?

5           MS. DAVIO:  I don't know for certain if

6  the Department of Defense would be included in a

7  Department of State certification of birth abroad.

8           SEN. VAN de PUTTE:  No, there are two

9  different ones.  And this is why I'm asking.  Members,

10  this is very, very clear.  We have many, many citizens

11  and your constituents who were born on military basis

12  within the United States.  And if I right now had to go

13  get an identification card, I don't have -- I wouldn't

14  have a birth certificate.  And the reason, I was born in

15  Madigan Hospital, Fort Lewis, Tacoma, Washington.  But

16  if you were born before 1960, the records are slowly

17  being updated into the state of Washington as are many

18  of our military hospitals.  But my birth certificate is

19  not from the Department of State.  It is not from the

20  city.  The only birth certificate that I have is from a

21  military hospital on a military installation.

22           Now, it was valid for me to get my

23  passport, and it was valid for me to get my driver's

24  license when I got my driver's license.  But should I

25  have to apply today and what I think might happen under

1    our current regulations is that the type of birth

2    certificate that is required for those of us who happen

3    to be born prior to 1960, which would be anybody, '40s,

4    '50s, '30s and on, we would not have a birth certificate

5    that would be recognized by DPS if you were born on a

6    military -- in a military hospital.  Is that correct?

7                    MS. DAVIO:  I can't be absolutely positive

8    of that.  I'll confirm, and we will look.

9                    SEN. VAN de PUTTE:  If you could, because

10   I think --

11                   MS. DAVIO:  Yes, ma'am.

12                   SEN. VAN de PUTTE:  And I don't know how

13   many would be, but if -- for those that were born when

14   there was a mandatory draft and there was a mandatory

15   thing, if you were born in a military hospital, those

16   are Department of Defense hospitals, not Department of

17   State.  Some states have included them as they start to

18   update and others haven't because a lot of those

19   military hospitals are now closed as those bases have

20   been closed.  So I just wanted to make sure.  And if you

21   would check that for us?

22                   MS. DAVIO:  Yes, ma'am.

23                   SEN. VAN de PUTTE:  And then if it's a

24   birth certificate, what happens if for many of our

25   elderly who were born not in a hospital and not -- but

1   they used baptismal or church records to establish their

2   social security, to establish anything?  Right now if

3   there is not a recorded birth certificate in one of the

4   state registries, is a church document that was allowed

5   back then for a driver's license, is that allowed --

6                    MS. DAVIO:  There are --

7                    SEN. VAN de PUTTE:  -- currently to get --

8                    MS. DAVIO:  There are a variety of

9   documents, and we're expanding the list, but we try and

10  work with our customers to -- if you can bring in a

11  variety and demonstrate to us to our satisfaction.

12                   SEN. VAN de PUTTE:  Yes, I understand.

13  What types of birth certificates?  Is it only those

14  that --

15                   MS. DAVIO:  Typically we would not allow a

16  church or a baptismal birth certificate.

17                   SEN. VAN de PUTTE:  So that would affect

18  people like my mother.

19                   MS. DAVIO:  She may be able to find other

20  documentation that she can bring.

21                   SEN. VAN de PUTTE:  She might be.

22                   Let me also ask you for one other thing.

23  I have a wonderful constituent and she asked that I

24  relate her story and has given me permission.  She

25  contacted us last June in that -- Ms. Hardy who needed

CONSIDERATION OF SENATE BILL 14 1/25/2011

1  to have a DPS identification card.  However, she's very,

2  very ill and could not travel to the DPS office.  I put

3  in a request to DPS to ask what sort of options she had

4  since she needed an ID but could not travel.

5            MS. DAVIO:  Yes, ma'am.

6            SEN. VAN de PUTTE:  That was on June the

7  18th, and we were very pleased at least that a week

8  later someone was able to call her and give her some

9  options.

10            Well, the options included that she had to

11  physically go.  And so luckily she was able to go, but

12  not until months later, but it entailed bus trips, a

13  nurse going with her, on public transit, going to the

14  offices.

15            And so my question is, what sort of -- and

16  it took her months, months to get this.  Are there any

17  accommodations currently for those with disabilities if

18  they are unable to physically go to a DMV station to

19  acquire identification documents?

20            MS. DAVIO:  We do have a home bound

21  program where we send an employee out to take their

22  picture and gather their information.

23            SEN. VAN de PUTTE:  Do you know how robust

24  that program is?  Is there one in -- and why weren't we

25  told about it when we called last summer?

CONSIDERATION OF SENATE BILL 14 1/25/2011

1        MS. DAVIO:  I can't tell you why you

2   weren't told about it.  I apologize for that.  I

3   don't -- I don't know how many of those IDs we issue.  I

4   could check into that if you'd like me to.

5        SEN. VAN de PUTTE:  Well, I'm a little bit

6   worried because we had several employees of DPS call,

7   including the Chief of the Complaint Resolution

8   Specialty Department, assisting with inquiries of

9   identification cards, who said the only option for my

10   constituent was physical presence.

11        MS. DAVIO:  There may --

12        SEN. VAN de PUTTE:  So within DPS if

13   there's a program, certainly didn't tell a Senator's

14   office and certainly didn't tell the client.  And if

15   this is -- I mean, what happened here?  We didn't know

16   about a program.  Are there plans to make that known in

17   light of -- or publicize it in any way in light of the

18   new additional restrictions?

19        MS. DAVIO:  I apologize that you weren't

20   told about it.  There may have been particular

21   circumstances that your constituent didn't qualify for

22   that, but we can certainly make sure that all of our

23   employees know about that and are informed so that there

24   won't be such an oversight in the future.

25        SEN. VAN de PUTTE:  So you mean you have

1   to qualify?  So if you're like undergoing chemotherapy,

2   can't leave the house or an organ transplant, you have

3   certain categories to qualify?  So even if you're a

4   person with disabilities, you have to have a person of

5   disabilities with certain qualifications to get the home

6   bound program?

7           MS. DAVIO:  I'm sorry.  I can't discuss

8   the detailed reasons why someone would qualify and

9   someone wouldn't, but I will certainly check into that

10  for you.

11          SEN. VAN de PUTTE:  Well, thank you.  And

12  I am -- I apologize for my mean tone, but understand how

13  frustrating it is --

14          MS. DAVIO:  I understand.

15          SEN. VAN de PUTTE:  -- when people call

16  our offices, they are trying to do the right thing.

17  They are trying to get an ID card, they have situations,

18  and then the people who are employed and hired from

19  state government to provide the information who are head

20  of the departments of this don't know of their own

21  programs.  It's really disheartening.

22          And then if you would, please find out

23  from someone on the fiscal side so that we don't have

24  two opposing statements from DPS of the additional 11

25  offices that are scheduled to be closed, not this fiscal

CONSIDERATION OF SENATE BILL 14 1/25/2011

1   year, but probably starting in 2012 and 2013.  And then

2   if you would, please get back with us with the

3   information of what types of birth certificates would be

4   eligible to be used for someone seeking to obtain a

5   personal identification card.

6              Thank you very much, Mr. Chairman.  I

7   don't have any other questions.

8              CHAIRMAN DUNCAN:  The Chair recognizes

9   Senator Zaffirini.

10              SEN. ZAFFIRINI:  Thank you, Mr. Chairman.

11              Ms. Davio, your title is Assistant

12   Director for Driver Licenses, Department of Public

13   Safety.  Is that correct?

14              MS. DAVIO:  Yes, ma'am.

15              SEN. ZAFFIRINI:  And were you expected to

16   testify on all aspects of the bill or only what refers

17   to driver's licenses specifically?

18              MS. DAVIO:  Only what refers to a driver

19   license specifically, as I understand it, in DPS.

20              SEN. ZAFFIRINI:  When Senator Fraser laid

21   out the bill, I asked a number of questions about the

22   criminal justice impact statement.  Is there someone

23   available from DPS who can answer my questions related

24   to the criminal justice impact statement?

25              MS. DAVIO:  I don't believe that there's a

1    resource witness here that can answer that currently.

2              SEN. ZAFFIRINI:  And you cannot?

3              MS. DAVIO:  I'm sorry.  I can't.

4              SEN. ZAFFIRINI:  That's all right.  I

5    assumed that you could not based on your title.  But I

6    would like to have someone answer my questions, if not

7    today, maybe tomorrow.

8              And just to put a face on the issues that

9    we have been discussing today, I happened to receive a

10   letter from the County Judge of Frio County recently,

11   and he explained to me that the office -- the DPS

12   driver's license office in Frio County has been closed.

13   And he wrote in his letter, "Signage on the door directs

14   drivers needing their services to go to San Antonio,

15   Hondo or Jourdanton."

16             Now, San Antonio is 55 miles from

17   Pearsall, Hondo is 42, and Jourdanton is 41.  That's an

18   average of 46 miles.  You said earlier that 77 counties

19   do not have driver's license offices.

20             MS. DAVIO:  Currently, yes, ma'am.

21             SEN. ZAFFIRINI:  Do you know how far those

22   residents of those counties have to drive to get a

23   driver's license?

24             MS. DAVIO:  I do not have the average for

25   every single location.  That would probably be pretty

1    difficult to calculate, but, you know, that is something

2    that we're looking at.

3                    SEN. ZAFFIRINI:  Well, certainly because

4    if that's the average distance, double that for a round

5    trip.

6                    MS. DAVIO:  Yes, ma'am.

7                    SEN. ZAFFIRINI:  That's a lot of mileage,

8    especially for low-income persons, for persons with

9    disabilities who have to get a ride, because that's a

10   one-way distance that I just mentioned to you.

11                   MS. DAVIO:  Yes, ma'am.  Driver licenses

12   do have to be renewed every six years, once every six

13   years.  And if the option to renew online would be used,

14   then they'd actually only have to go to the office once

15   every 12 years.

16                   SEN. ZAFFIRINI:  Do you have mobile units

17   that can go to these counties?

18                   MS. DAVIO:  We do not presently have

19   mobile units.  As I mentioned before, the amount of data

20   that we're collecting with your photo, your

21   fingerprints, your -- all the scans of your documents,

22   we have not been able to get that to work with an air

23   card or a DSL line, and we tried for several months.

24                   SEN. ZAFFIRINI:  Now, I can't speak for

25   the 77 counties, but I know that for the ones in my

 1  district that have been closed or temporarily closed --

 2  in fact, I mentioned earlier that in my district there

 3  are -- there is one office that has wheelchair

 4  accessible barriers, there are two counties that have no

 5  offices, four counties in which the offices have been

 6  temporarily closed and one that is open three days or

 7  fewer per week.

 8             Now, in the counties in my district, there

 9  is a digital divide.  So it's easy to say "renew

10  online," but when you're dealing with counties where

11  there is a predominantly low income, minority population

12  and there is a digital divide, imagine the impact.  Do

13  you have any data relating to addressing those issues

14  and how to increase the accessibility of the residents

15  of those counties to your particular services?

16             MS. DAVIO:  One of the elements of the

17  business intelligence analysis project that we're doing

18  is actually to try and get information to understand

19  where people have connectivity and aren't using that.

20  Maybe they don't know that they can renew online and

21  being able to encourage people to do that there, but

22  that would also give us information about where people

23  don't have accessibility.

24             SEN. ZAFFIRINI:  Thank you.  Judge Garcia

25  writes, "This has caused quite a bit of inconvenience

CONSIDERATION OF SENATE BILL 14 1/25/2011

1  and consternation for our drivers and potential drivers

2  in this county when they need driver's license renewals,

3  driver's licenses," et cetera, and you can imagine the

4  consternation and the inconvenience that they are

5  suffering.

6              There's been some reference to how long

7  persons have had to wait to get their driver's license,

8  and I know that before we got our driver's license in

9  Laredo, the big joke -- and it wasn't really a joke.  It

10 was a cruelty joke because it was so true -- is that

11 persons who were waiting for their driver's licenses

12 could stand in line, order pizza, receive it and eat it

13 and still be waiting for their driver's license.

14             Now, there has been some improvement in

15 that, but I wonder what kind of inconvenience we're

16 talking about when we're talking about these long, long

17 lines in the different counties.  And if that isn't bad

18 enough, dealing with the issues related to the counties

19 that don't have any offices.

20             And you, I understand from your exchange

21 with Senator Van de Putte, do expect more offices to

22 close, at least temporarily -- is that correct -- in the

23 next fiscal year?

24             MS. DAVIO:  If the equipment fails in our

25 mobile offices, we will have to close those offices.

CONSIDERATION OF SENATE BILL 14 1/25/2011

1              SEN. ZAFFIRINI:  And have you looked at

2    Senate Bill 1 thoroughly yet?

3              MS. DAVIO:  I'm sorry?

4              SEN. ZAFFIRINI:  Have you looked at Senate

5    Bill 1, the appropriations bill, thoroughly yet?

6              MS. DAVIO:  I have not done any detailed

7    analysis of that, no, ma'am.

8              SEN. ZAFFIRINI:  So you have no idea

9    what -- how that budget will impact you at this point in

10   time?

11             MS. DAVIO:  No, ma'am.  I know people

12   at -- the experts at our agency are looking at it now.

13             SEN. ZAFFIRINI:  Well, when you have that

14   information -- I assume that you will -- would you share

15   that us, please?

16             MS. DAVIO:  Yes, ma'am.

17             SEN. ZAFFIRINI:  From your perspective.

18   Thank you very much.

19             Thank you, Mr. Chairman.

20             CHAIRMAN DUNCAN:  Senator Williams?

21             SEN. WILLIAMS:  Thank you, Mr. Chairman.

22   Just a couple of things that I wanted to clarify.  And I

23   guess, first of all, I wanted to thank Senator Gallegos

24   and Senator Whitmire because I really wasn't that

25   familiar with people who had their licenses confiscated

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
 1    or taken away because of the driver responsibility plan.
 2              Now, by the way, if you have your license
 3    confiscated, what kind of traffic offense would you have
 4    had to have been involved in for law enforcement to take
 5    your -- confiscate your license?  Do you know?  It
 6    doesn't have to be an exhaustive list, but just --
 7              MS. DAVIO:  The major reason that people
 8    give those particular forms apart -- away, that law
 9    enforcement issues those, as I understand it, is for
10    intoxication offenses where they've failed or refused to
11    provide a specimen.
12              SEN. WILLIAMS:  Okay.
13              MS. DAVIO:  That's my understanding.
14              SEN. WILLIAMS:  So if you refused to take
15    a breathalyzer test or give blood, then they'll take
16    your license away?
17              MS. DAVIO:  That's my understanding, sir.
18              SEN. WILLIAMS:  Okay.  Now, that person
19    can apply for a temporary license, a work permit, you
20    know, to be able to get back and forth to work.
21              MS. DAVIO:  They may be able to, yes, sir.
22              SEN. WILLIAMS:  And they could come and
23    get a state ID -- correct -- at no cost if they wanted
24    to have it to vote?
25              MS. DAVIO:  Yes, sir, they could.
```

1  Absolutely.

2           SEN. WILLIAMS:  Okay.  And then what about

3  if you had your license taken away because of -- what

4  kinds of things under the driver responsibility?  Are

5  those also going to be a lot of speeding tickets?  I

6  guess it could be.  Or more than likely it's going to

7  involve a DWI since we have one of the worse records of

8  any state in the country on that, I believe?

9           MS. DAVIO:  It could be DWI.  It could be

10 driving while your license is invalid.  It could be

11 traffic offenses as you mentioned, driving without

12 insurance.

13          SEN. WILLIAMS:  So the bottom line is

14 these law breakers would be inconvenienced by having to

15 go get a free ID so they could go and vote if that's --

16 if they wish to exercise their constitutional

17 responsibility.  Is that correct?

18          MS. DAVIO:  Yes, sir.  They would be able

19 to get an ID.

20          SEN. WILLIAMS:  Okay.  And then how often

21 would -- once you had this state ID card and assuming

22 that you were a citizen and you had met all the

23 requirements that it took to get the license or the

24 state ID card, how often would that be renewed?  How

25 often are they going to have to appear in person to get

1  that renewed?

2             MS. DAVIO:  The ID cards just like the

3  driver licenses are good for six years, and it is

4  possible to renew them online.

5             SEN. WILLIAMS:  Okay.  So it could be 12

6  years?

7             MS. DAVIO:  Yes, sir.

8             SEN. WILLIAMS:  So they would be able to

9  vote with that ID card at least six and maybe 12 years?

10            MS. DAVIO:  Yes, sir.

11            SEN. WILLIAMS:  Okay.  That -- okay.  I

12  just wanted to make sure that we had cleared that up.

13  Thank you very much.  I really appreciate you hanging in

14  here with us tonight.

15            MS. DAVIO:  Thank you.

16            SEN. WILLIAMS:  I did have one last

17  question.  Excuse me, Mr. Chairman, if I could.  The

18  other thing I wanted to ask is, in a moment when we have

19  the Secretary of State's Office up here, I'm going to

20  talk to them, and I visited with you about it, I'm

21  hoping that we can take your driver's license file and

22  cross-match that with the voter registration files and

23  try to find that group of people who are voting and

24  registered to vote, but they don't have a driver's

25  license or a state ID card so that we can focus our

```
 1   efforts on education on -- especially on that group.
 2              Now, would you be able to do that, provide
 3   that information to the Secretary of State's Office
 4   with -- under the current resources that you have?  And
 5   I'm not going to ask you about the next biennium's
 6   budget.  We're just trying to get through this biennium
 7   now.  But under the current biennium, would you be able
 8   to provide that information to the Secretary of State
 9   with the resources?
10              MS. DAVIO:  They already -- they already
11   have the information, and I believe they are working on
12   the analysis now.
13              SEN. WILLIAMS:  Oh, okay.  Great.  Boy,
14   y'all are quick.  Thank you.
15              CHAIRMAN DUNCAN:  Okay.  Thank you.
16              We have a few more -- a few more questions
17   from -- this witness has been going about an hour and
18   ten minutes.
19              Senator West?
20              SEN. WEST:  Thank you, Mr. Chairman.  I'm
21   not going to be redundant.  I just have a couple of
22   requests.  Can your office provide an analysis of how
23   long the average wait in each one of the offices that
24   you have -- what is the average wait in order to get a
25   driver's license?  I assume that you have that sort of
```

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
 1   an analysis.
 2              MS. DAVIO:  Actually, sir, currently we do
 3   not have that information.  We have anecdotal
 4   information, but we do not have wait times.  We're in
 5   the process of installing a queuing system in our 50
 6   largest offices.  And so in a matter of months I'd be
 7   able to provide that information for you in our largest
 8   offices, but I do not have any complete information for
 9   wait times in our offices.
10              SEN. WEST:  Give us the best guesstimate
11   that you have.  I assume that there are conversations
12   about wait time that you have internally.  And, you know
13   just make sure you just qualify it based on what you
14   have.  It's not -- it's not a perfect example, a perfect
15   study or anything like that, but get us -- give us the
16   best estimates that you have concerning that.  Okay?
17              MS. DAVIO:  The average wait time?
18              SEN. WEST:  Yes.
19              MS. DAVIO:  In all of our offices?
20              SEN. WEST:  Yeah, broken down by office,
21   so I don't just want a global -- to the extent that you
22   can.  And what you may want to do is just contact the
23   offices and get an idea from the individuals that are in
24   the offices.
25              As you go about implementing this
```

CONSIDERATION OF SENATE BILL 14 1/25/2011

1   particular identification procedure, have you given an

2   idea as to whether or not you are going to be using

3   troopers or civilian employees to do this?

4           MS. DAVIO:  There really aren't troopers

5   in the driver license division anymore.  That was a

6   recommendation from the Sunset Commission.  So there are

7   no commissioned troopers in the driver license office.

8           SEN. WEST:  So it would be civilian

9   employees?

10          MS. DAVIO:  Yes, sir.

11          SEN. WEST:  All right.  Thank you.

12          CHAIRMAN DUNCAN:  Senator Gallegos?

13          SEN. GALLEGOS:  Let me ask you, Rebecca --

14   and I'm sorry you drew the short straw.  And Senator

15   West asked the question I was going to ask you, but

16   Senator Williams brought up an issue that, you know, I

17   disagree with him.  When you're stopped, it's an

18   alleged -- you're not a law breaker, it's an alleged.

19   You know, I'm not the jury, and I'm not the judge.  So

20   that person that's stopped is not guilty until he or she

21   has their day in court.

22          So when you confiscate the license, you

23   have confiscated on an alleged offense.  And until he or

24   she has their day in court and they are convicted, then

25   you can call him or her a law breaker.  So I disagree

1  with Senator Williams.  Is that correct?  I mean, am I

2  wrong?  Am I wrong?  When you arrest that person, is he

3  or she convicted right then and there?

4              MS. DAVIO:  No, sir.

5              SEN. GALLEGOS:  So you're telling me they

6  are not guilty until they have their day in court.  Is

7  that correct?

8              MS. DAVIO:  I believe that's the way the

9  legal system works.

10             SEN. GALLEGOS:  I didn't hear you.  I'm

11 sorry.

12             MS. DAVIO:  I believe that's the way the

13 legal system works.

14             SEN. GALLEGOS:  Okay.  So that person --

15 that person that has that temporary license is innocent

16 until proven guilty.  Is that correct?

17             MS. DAVIO:  You're asking me to testify on

18 something that's outside my area of expertise, sir.  I

19 don't -- I don't know the intricacies of traffic --

20             SEN. GALLEGOS:  The document that your

21 office gives these law enforcement agencies when

22 somebody is stopped either on DWI or whatever issue,

23 whatever issue when you confiscate a license, that

24 person is innocent until proven guilty under the --

25 under the temporary license that I'm seeing here, that

1    has your language on it, that you give to these law

2    enforcement agencies when you stop these people.  Is

3    that correct?

4                    MS. DAVIO:  As I understand it, a DWI, if

5    they get a mandatory suspension, that does not start

6    until after their conviction.

7                    SEN. GALLEGOS:  After a conviction?

8                    MS. DAVIO:  Yes, sir, for a --

9                    SEN. GALLEGOS:  So when you stop that

10   person, that is not a conviction?

11                   MS. DAVIO:  Or DWI mandatory suspension.

12                   SEN. GALLEGOS:  That is not a conviction,

13   though?

14                   MS. DAVIO:  Just shopping them I don't

15   believe is a conviction.

16                   SEN. GALLEGOS:  And you give they one of

17   these licenses.  You have confiscated their license and

18   have given them a temporary.  Is that correct?

19                   MS. DAVIO:  Law enforcement does that,

20   yes, sir.

21                   SEN. GALLEGOS:  Well, you gave them the --

22                   (Simultaneous discussion)

23                   MS. DAVIO:  We simply give them the form.

24                   SEN. GALLEGOS:  You give the law

25   enforcement this paper.  It has your language on it.  Is

```
1    that correct?

2               MS. DAVIO:  Yes, sir.  That is our form.

3    Yes, sir.

4               SEN. GALLEGOS:  Okay.  Thank you.

5               CHAIRMAN DUNCAN:  Senator Wentworth?

6               SEN. WENTWORTH:  I'm going to be very

7    brief and thank you for your testimony this evening and

8    tell you that this probably happened before you arrived

9    here in June of last year.  But there were some

10   considerable complaints from people in my district in

11   north Bexar County --

12               MS. DAVIO:  Uh-huh.

13               SEN. WENTWORTH:  -- about a driver license

14   office on Perrin Beitel Road --

15               MS. DAVIO:  Uh-huh.

16               SEN. WENTWORTH:  -- where I can testify

17   anecdotally, as you have, that it was an hour or

18   longer --

19               MS. DAVIO:  Yes, sir.

20               SEN. WENTWORTH:  -- about the wait.

21               MS. DAVIO:  Yes, sir.

22               SEN. WENTWORTH:  And there were enough

23   complaints over the years that you all let the lease

24   expire.

25               MS. DAVIO:  Yes, sir.
```

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
 1                SEN. WENTWORTH:  And then you found a new
 2   location on Pat Booker Road out near Randolph Air Force
 3   Base, and my constituents are very pleased with that
 4   improvement and were grateful that that improvement has
 5   been made.
 6                MS. DAVIO:  Thank you so much.
 7                SEN. WENTWORTH:  Thank you.
 8                MS. DAVIO:  I appreciate that.  It's nice
 9   to hear a good story.
10                SEN. WENTWORTH:  You bet.
11                CHAIRMAN DUNCAN:  Thank you, Senator
12   Wentworth.
13                Are there any other questions of the
14   resource witness?
15                (No response)
16                CHAIRMAN DUNCAN:  All right.  Thank you
17   very much, Ms. Davio.
18                MS. DAVIO:  Uh-huh.
19                CHAIRMAN DUNCAN:  All right.  The Chair
20   calls Ann McGeehan, Secretary of State's Office.  If
21   you'll state your name and who you represent, please.
22                TESTIMONY BY ANN McGEEHAN
23                MS. McGEEHAN:  Ann McGeehan, and I'm
24   Director of Elections in the Texas Secretary of State's
25   Office.
```

CONSIDERATION OF SENATE BILL 14 1/25/2011

1          CHAIRMAN DUNCAN:  All right.  Thank you,

2  Ms. McGeehan.

3          The Chair recognizes Senator Davis.

4            QUESTIONS FROM SENATE FLOOR

5          SEN. DAVIS:  Hello.  Good evening.  Thank

6  you so much for being here with us to provide answers

7  for our questions.  I know you've had a long day.

8          I just want to ask you a few questions

9  about the current state of voter education as its taking

10 place today in the Secretary of State's Office.  Can you

11 describe for us the use of the HAVA funds and how those

12 are currently being used today?

13         MS. McGEEHAN:  We received -- when

14 Congress passed the Help America Vote Act, the state of

15 Texas received a set amount of funds.  And pursuant to

16 the Help America Vote Act, there are certain purpose

17 areas that we can use those funds for, and one of the

18 purpose areas is voter education.  So since two -- we

19 have conducted three statewide education -- voter

20 education programs, one in 2006, one in 2008 and one in

21 2010 using those federal dollars.  And they have been --

22 we've worked with a public education firm to do

23 research, and then they develop creative material.  We

24 run PSAs on TV, radio.  In this last cycle, 2010, we

25 used the Internet quite a bit as well.

CONSIDERATION OF SENATE BILL 14 1/25/2011

1            SEN. DAVIS:  And how many people do you

2 think you reach through your voter education efforts

3 right now?  And how much have each of those cycles of

4 voter education effort cost?

5            MS. McGEEHAN:  The average cost is about

6 $3 million for each one, around that amount.  As far as

7 the number of people we've touched through the campaign,

8 we do have some reports on that.  I don't have that

9 number at my fingertip, but we have a report for each

10 one of the voter education campaigns that talks a little

11 bit about the effectiveness and how many people saw the

12 media spots and things of that nature.

13            SEN. DAVIS:  And are the Help America Vote

14 Act funds funds that are continually given to the state

15 from the federal government, or was it a one-time

16 disbursement that's been used over the course of those

17 three cycles?

18            MS. McGEEHAN:  It was authorized in that

19 one bill.  We've received it in about three or four

20 separate payments.  We don't contemplate that we're

21 going to be receiving any more.

22            SEN. DAVIS:  And what was the total amount

23 that was given to Texas?

24            MS. McGEEHAN:  Let me grab that.  The

25 total amount for all the purpose areas is $224,092,477.

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
1              SEN. DAVIS:  That's the amount that was
2   given to the state of Texas?
3              MS. McGEEHAN:  Yes.
4              SEN. DAVIS:  Okay.  And so of that amount,
5   how much have we spent so far?
6              MS. McGEEHAN:  Let's see here.  We -- I
7   think we have spent $177,798,488.
8              SEN. DAVIS:  Okay.  And you described
9   spending about $3 million over the last three two-year
10  cycles.  How have we spent the balance of that?
11             MS. McGEEHAN:  Well, I mean, the bulk of
12  the money or about half of the money went to counties to
13  obtain HAVA compliant voting systems, electronic voting
14  systems that made -- that complied with HAVA and allowed
15  disabled voters to vote independently.  So let's see.
16  $140 million went to the counties for that purpose.
17             The other program areas are for developing
18  a statewide voter registration system.  We've spent
19  25 million on that.  And then as far as the
20  administrative expenses, we've spent about 2.8 million
21  on that.  For voter education, we've spent 9.5 million
22  so far.
23             SEN. DAVIS:  And what are the -- setting
24  aside the requirements of the bill that's being
25  introduced today, what are the intended plans for the
```

1  balance of that money?  Were this bill not to come

2  forward to your department, what would the intended use

3  for those funds be?

4              MS. McGEEHAN:  I can't speak necessarily

5  for, you know, exactly what would be done in the next

6  general election cycle, but I would contemplate we would

7  do another statewide voter education program in 2012,

8  and if funds remained in 2014.

9              SEN. DAVIS:  Is there a plan for ongoing

10 capital expenditures as you talked about, which was the

11 use of the bulk of the funds that we've received so far?

12             MS. McGEEHAN:  Yeah.  There are --

13 there's 24 -- roughly $24 million left in the -- in the

14 purpose area for grants to counties to obtain voting

15 equipment.

16             SEN. DAVIS:  Okay.  And so after you take

17 out that 24 million, what will the balance be that

18 remains for voter education efforts?

19             MS. McGEEHAN:  Well, that's -- that's

20 already frozen as far as the -- in order to draw down

21 those funds, the state had to submit a state plan.  We

22 had to meet with stakeholders, publish in the Register

23 and submit it to the Election Assistance Commission.

24 And so pursuant to that state plan, we had to define how

25 we were going to spend the money, and so these -- the

1   budget that I discussed is following that state plan.

2              SEN. DAVIS:  Okay.  And under that state

3   plan right now, what portion of funding remains for

4   voter education?

5              MS. McGEEHAN:  For voter -- okay.  And

6   actually to be more precise, what the -- the purpose

7   area for voter education is for voter education and also

8   for election official and poll worker training; that's

9   grouped.  And the amount remaining is between 5 and

10  $7 million.

11             SEN. DAVIS:  Okay.  And that is expected

12  to extend us or to take us through the next how many

13  years under that plan?

14             MS. McGEEHAN:  It will -- again, it's

15  going to depend how extensive our next few voter

16  education programs are because that's what the bulk of

17  the money has been spent on, voter education programs.

18  The average is about 3 million.  So I guess the hope

19  might be for at least two other statewide voter

20  education programs.

21             SEN. DAVIS:  Okay.  And I'm sure you've

22  seen the fiscal note that was a part of this bill.  And

23  by the way, I think it would be very helpful if you

24  would enter that state plan into the record as an

25  exhibit for our further use.

CONSIDERATION OF SENATE BILL 14 1/25/2011

1           I'm sure you've seen the fiscal note that

2   came as a part of this bill in terms of the expected

3   expenditures.  Part of that note talks about a fiscal

4   impact that's related to researching and developing ways

5   to inform the public of the new ID requirements.  That's

6   $.5 million expenditure, an additional cost of

7   1.5 million for media advertisements, television, radio,

8   print and Internet.  That's specifically to educate

9   voters about the new requirements under this bill.

10           What will go undone that's currently in

11  the state plan -- if we take 2 million of the 5 million

12  remaining, what will go undone that's currently in the

13  state plan in terms of voter education effort?

14           MS. McGEEHAN:  I don't know that I have an

15  exact answer to that.  If we're able to incorporate the

16  new voter ID requirements that would be required by this

17  bill into a voter education program, then maybe we

18  wouldn't need 2 million just for the voter ID.  We could

19  parlay that into the -- basically the voter education

20  campaigns that we've done or the voter education

21  programs have been to educate voters on the basic rights

22  on how to vote, what you need to vote.  So it may not be

23  such an extension to incorporate these new requirements

24  for voter ID, or they may.  I mean, depending on the

25  research that we get back from stakeholders and whatnot,

```
 1   but it's hard for me to say today exactly how much that
 2   may take away from future voter education efforts.
 3              SEN. DAVIS:  When was the last time in the
 4   state of Texas we made any changes of significance to
 5   the voter rules?
 6              MS. McGEEHAN:  Probably the -- when we had
 7   to implement the federal Help America Vote Act.  That's
 8   when provisional voting became a requirement.  There
 9   were significant changes to voter registration as to
10   what's required to become a registered voter, and that's
11   why we have these HAVA dollars for voter education.
12              SEN. DAVIS:  And that began in '06.
13   Correct?
14              MS. McGEEHAN:  Correct.
15              SEN. DAVIS:  Okay.  In '06, the Texas
16   voter registration application form changed in
17   accordance with those requirements, it's my
18   understanding, and that's when we began to collect this
19   data that requested a driver's license number or a
20   social security number.  Is that's correct?
21              MS. McGEEHAN:  That's correct.
22              SEN. DAVIS:  Okay.  So we have data, I
23   guess, only from '06, and that would -- would that only
24   be then for new registrants from '06?  If I had already
25   registered to vote prior to that, you wouldn't have that
```

```
 1  information from me.
 2                MS. McGEEHAN:  That's right.
 3                SEN. DAVIS:  Correct?
 4                MS. McGEEHAN:  That's right.  It was
 5  voluntary before.  So we have some TDLs and SSN numbers
 6  from -- but it wasn't required until 2006.
 7                SEN. DAVIS:  So we've been able to gather
 8  that information from that point in time for people who
 9  are newly registering to vote in the state of Texas.  Of
10  that group, how many people or what percentage of people
11  are answering one or both of those questions in response
12  to No. 8 versus signing the attestation clause in
13  Section No. 9?
14                MS. McGEEHAN:  Are you asking the number
15  of --
16                SEN. DAVIS:  Let me -- let me break it
17  down better.
18                MS. McGEEHAN:  Okay.  Okay.
19                SEN. DAVIS:  So under Question No. 8, what
20  percentage of people currently, who are requesting a
21  voter registration card, who are filling out the
22  application starting in '06 with this new form, what
23  percentage of people are providing their Texas driver's
24  license in response to the questions on the application?
25                MS. McGEEHAN:  Okay.  I don't have the
```

 1  percent number, but the actual number is 2.3 million

 2  since 2006.  Since January 1, 2006 through December 31,

 3  2010, 2.3 million, when they registered, provided their

 4  driver's license number.

 5                 SEN. DAVIS:  What's the total number of

 6  applications in that time period?

 7                 MS. McGEEHAN:  And the total number -- I

 8  think it's going to be just under 3 million, and I'm

 9  doing math on the fly.  I might have to -- I'd prefer to

10  give that --

11                 SEN. DAVIS:  Can you provide that

12  information --

13                 MS. McGEEHAN:  Yes.

14                 SEN. DAVIS:  -- to us?

15                 MS. McGEEHAN:  Yes.

16                 SEN. DAVIS:  That would be appreciated.

17                 So what's the number of people who are not

18  filling out either the driver's license number or the

19  social security number in Section 8 but instead are

20  going to Section 9 and signing the attestation clause of

21  Section 9?

22                 MS. McGEEHAN:  And that's the attestation

23  clause saying they have not been issued either form of

24  ID?

25                 SEN. DAVIS:  (Nodded)

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
 1            MS. McGEEHAN:  Yeah, that number is
 2  34,506.
 3            SEN. DAVIS:  Okay.  Do we have any -- any
 4  estimate of the number of people who are currently
 5  registered today?  If we've only been gathering that
 6  information since 2006, do we have any kind of an
 7  estimate of the number of people who are currently
 8  registered to vote today who do not have a driver's
 9  license number to provide?
10            MS. McGEEHAN:  Well, if we -- if we look
11  at our entire statewide file, we have 5.2 million voters
12  that did provide a driver's license number or an ID
13  number.  We have 2.1 million voters that present -- that
14  provided a social security number.  4 million of them
15  provided both.  And then the numbers that have
16  neither -- or the voters that hadn't provided either one
17  is 690,887.  So it doesn't necessarily mean that those
18  people haven't been issued, but they didn't -- either
19  they don't have those numbers or they registered before
20  it was required, and so they didn't provide them when
21  they registered if it was pre-2006.
22            SEN. DAVIS:  But the question wasn't
23  asked.  It was -- I guess as you said, you could
24  voluntarily provide that information prior to '06.
25            MS. McGEEHAN:  Well, it was asked, but it
```

1   was optional.  It was on the form.

2              SEN. DAVIS:  Uh-huh.  Okay.  So we really

3   don't know how many of that group were answering the

4   question voluntarily because they have the number versus

5   those who were not answering it, not because they chose

6   to, but because they did have their driver's license

7   number?

8              MS. McGEEHAN:  Yes, you are correct.

9   That's right.

10              SEN. DAVIS:  So when we're putting

11   together an estimate of what the cost to educate our

12   voters is going to be and when we think about how

13   significant the changes are that are addressed in this

14   bill, what's your -- what's your process been to try to

15   determine how many people will be impacted and what that

16   voter education is going to need to look like?

17              MS. McGEEHAN:  Well, we -- I mean, to be

18   very honest, we haven't done much planning yet.  We

19   prepared this fiscal note on Friday.  That would be

20   obviously a very important component is trying to

21   identify who the appropriate audiences are, who you need

22   to get the information out to.

23              Senator Williams had approached us earlier

24   today to see if we could do some comparisons to try and

25   further focus in on who those registered voters are that

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
 1  don't have -- or have not been issued a driver's license
 2  or a personal ID number.  So we're trying to run some of
 3  those numbers right now.
 4            SEN. DAVIS:  I guess a confusion for me is
 5  how we came up with the $2 million fiscal note for that
 6  and yet we don't really know, as you said a moment ago
 7  we don't really know how many people will be impacted by
 8  it and what that statewide voter education effort is
 9  going to need to look like.  So where did the $2 million
10  number come from?
11            MS. McGEEHAN:  Well, the $2 million number
12  came from the way the bill is written because the bill
13  simply says "a statewide voter education effort."  So
14  there's not too much detail in the bill as to what's
15  required.  Our assumption is that our previous voter
16  education programs might be the model, and they've been
17  around 3 million.  And plus, we also noticed that last
18  session the Senate put a $2 million fiscal note on it.
19  So we thought, well, maybe that's some representation of
20  legislative intent as to what an appropriate voter
21  education program might cost, but --
22            SEN. DAVIS:  So we've had voter education
23  efforts in the past that have cost about $3 million each
24  time we've engaged in the voter education effort.  We're
25  talking today about making some sweeping changes to
```

CONSIDERATION OF SENATE BILL 14 1/25/2011

1   what's required in order to vote in the state of Texas.

2   Why is the number to educate -- on such a sweeping

3   change for what will likely be a much larger group of

4   impacted people in the state of Texas, why is that

5   number so much lower than the $3 million number that's

6   currently being spent for voter education?

7              MS. McGEEHAN:  Well, if the -- if a

8   $2 million program is added into an existing $3 million

9   program, then you've got a $5 million program.  I mean,

10  our voter education under HAVA is directed to all

11  registered voters.  And so, you know, a new voter -- a

12  new photo ID requirement would also need to be directed

13  to all registered voters because it's a change for all

14  voters.

15             SEN. DAVIS:  So we're talking about -- I'm

16  sorry to interrupt you.  We're talking a $2 million

17  addition to the $3 million that was already intended for

18  voter education in this next two-year cycle.

19             MS. McGEEHAN:  Possibly, possibly.  I

20  mean, we -- you know, we've got a communications

21  director that would have some input on that.  This

22  fiscal note represented what we thought might be a

23  reasonable fiscal note.  If we have, you know,

24  legislative direction to take it a different way or do

25  additional outreach, that's fine.  But based on the way

```
 1   the bill was written and based on the fiscal note filed
 2   last time, we thought that was a reasonable number.
 3                 SEN. DAVIS:  So let's say we spend about a
 4   total of $5 million in the next two years with our
 5   intended voter education effort that's already been
 6   planned and with an additional cost for educating on the
 7   requirements of this proposed new law.  That's about the
 8   balance of the voter education fund right now.  Is that
 9   correct?
10                 MS. McGEEHAN:  Well, it's about -- we've
11   spent 9 million.  I think the balance -- yeah, the
12   balance is between 5 and 7 million.  That's correct.
13                 SEN. DAVIS:  Okay.  So that will take us
14   through about what -- how long of a period of time will
15   that take us through?
16                 MS. McGEEHAN:  If we used 5 million to do
17   a voter -- a general voter education plan and then
18   another 2 million to do a detailed photo -- photo
19   identification plan, that might -- that might use it up.
20                 SEN. DAVIS:  And if it uses it up, what
21   will we do in future years to educate our voters about
22   these requirements?
23                 MS. McGEEHAN:  Well, frankly -- I mean,
24   state law has never appropriated state funds to educate
25   voters.  So, you know, these federal funds have been
```

CONSIDERATION OF SENATE BILL 14 1/25/2011

1  really nice to have them to do that.  We never had that

2  kind of funding before.  So if there's a desire to do

3  voter education programs of this -- of this type, then

4  we would need state appropriation.

5              SEN. DAVIS:  So these federal funds will

6  take us basically through a one-time voter education

7  drive on the requirements of this new law, but it's not

8  going to take us further than that?

9              MS. McGEEHAN:  Not if we use it all,

10  not -- it could possibly use up the remainder of the

11  voter education funds.

12              SEN. DAVIS:  Okay.  So we've talked about

13  the voter education.  Talk to us a little bit about the

14  costs of training the poll workers and the registrars.

15              MS. McGEEHAN:  We currently have several

16  training programs for -- well, we have training programs

17  for the county election officials and then other

18  training programs for the poll workers.  We have an

19  online training program.  We have a video.  We have

20  handbooks.  So we would have to update all of those --

21  all those different formats of training.

22              SEN. DAVIS:  And what's the anticipated

23  costs for updating all those forms of training?

24              MS. McGEEHAN:  We don't usually put a

25  fiscal note when there's a change in state law and we

1   have to change and update training like that because at

2   least it's always been considered that is part of our

3   mandate in election administration.  So when we get

4   appropriation under the election administration

5   umbrella, our statutory mandate is to train and assist

6   election authorities.

7                   SEN. DAVIS:  And what's happened to

8   your -- your budget, not only in this current biennium

9   that we're in, but the proposed budget going forward?

10                   MS. McGEEHAN:  We're still digesting that

11   as far as on the House side.  I don't know about the

12   Senate side yet.  But on the House side, I believe we

13   took about a 14.5 percent budget reduction on the

14   House -- HB 1 bill.

15                   SEN. DAVIS:  So we're talking about a

16   fairly dramatic budget cut for your agency while at the

17   same time we are talking about adding some very

18   significant requirements in terms of the changes that

19   you would need to make to your training programs and

20   materials for purposes of educating election workers and

21   county administrators on the new rules that would be

22   implemented in this bill?

23                   MS. McGEEHAN:  That's correct.

24                   SEN. DAVIS:  And there's no fiscal note

25   currently estimated for what that cost might be?

1    MS. McGEEHAN:  It's my understanding that

2  when we've been asked to prepare fiscal notes for these

3  kinds of issues, we have not added a fiscal impact for

4  something that's already a statutory duty.  As we

5  analyze HB 1, maybe we're going to have to revise that,

6  but at least our standing policy was if it was a

7  statutory duty that we're already charged to do, that we

8  don't put an additional fiscal note on it.

9    SEN. DAVIS:  Are you concerned that you're

10  going to find yourselves fairly flatfooted in terms of

11  not being prepared with the resources that you need, to

12  train election workers and to train county

13  administrators on the requirements of this new law

14  facing the budget cuts that you're facing without a

15  fiscal note that's going to add resources to your

16  department for purposes of carrying out these

17  requirements?

18    MS. McGEEHAN:  I think all state agencies

19  in the state have concerns about providing the services

20  they are charged to provide in light of significant

21  budget cuts.  But on the issue of training, the analysis

22  was that that was not going to cost anything additional

23  as to what we've already been appropriated.

24    SEN. DAVIS:  And do you agree with that,

25  that it's not going to cost anything additional for your

1  agency to provide the training for the significant

2  changes in the law that will be imposed if this bill is

3  passed into law?

4            MS. McGEEHAN:  Well, after every session,

5  we have to change all our materials.  And, you know,

6  maybe I can talk to our fiscal officer and maybe we'll

7  start putting in fiscal notes for these kinds of things,

8  but it has been our policy not to add a fiscal note for

9  something we're currently doing under state law and

10 funded for.

11           SEN. DAVIS:  And so the change in

12 materials is all that would occur?  If I'm an election

13 worker in the state of Texas and I'm facing some pretty

14 significant changes -- and I have to tell you I've read

15 this bill numerous times, and I'm still confused in

16 terms of what it would require of me as an election

17 worker.  Is that the only costs that we assume will be

18 incurred, is the cost of the change of the material?

19 Isn't there some training -- active training that has to

20 occur to be able to make sure that the election workers

21 and the county administrators who are tasked with

22 carrying out this new law will understand exactly what's

23 expected of them in terms of its implementation?

24           MS. McGEEHAN:  We do -- we do, I think,

25 pretty extensive training right now.  I mean, in an odd

CONSIDERATION OF SENATE BILL 14 1/25/2011

1    numbered year, we hold four seminars, and we have very

2    good attendance from our county election officials.  So

3    I would be certain that our August county election

4    official seminar will be heavily -- if this passes will

5    heavily emphasize these new rules.

6              To go back to the federal funds, which we

7    know are limited, the grant for voter education also

8    includes election official training and poll worker

9    training.  So if there are any remaining HAVA dollars in

10   that category that we don't use on voter education, we

11   could perhaps use to additional -- to develop additional

12   training materials.

13             SEN. DAVIS:  Yes, and we talked about that

14   a moment ago, and you did state on the record that that

15   category of 5 to $7 million that's remaining is the

16   entirety of the federal resource that you have available

17   to you right now, both for voter education and for

18   training purposes.  And we've also talked about the fact

19   that the expectation and the demand on that particular

20   fund for public education is going to take the

21   significant balance that remains there.  Correct?

22             MS. McGEEHAN:  Right.  Well, just to be

23   clear, the remaining balance in the HAVA is all we have

24   for voter education, but there are some state funds -- I

25   don't think it's a lot -- but that would go towards

1    updating handbooks and video and things likes that that

2    we normally produce as training materials.

3                SEN. DAVIS:  When the Help America Vote

4    Act was implemented and in '06, as you said, that was

5    the first significant change that's been made or it's

6    the most recent significant change that's been made in

7    election laws in the state of Texas in terms of the

8    requirements of your agency and the training of your

9    agency, did the costs that your agency realize as a

10   result of the training component for HAVA increase as a

11   result of those new requirements?

12               MS. McGEEHAN:  We -- what we did do was

13   develop an online training component.  So we used a

14   portion of the HAVA dollars to develop an online

15   training component, which was in addition to our other

16   training.  I could get -- I don't know the cost of that,

17   but I could get you the cost.

18               SEN. DAVIS:  It would be a helpful number

19   to have.

20               There's also a discussion in terms of the

21   fiscal note on this bill, including a coordinated voter

22   registration drive or other activities that would be

23   designed to expand voter registration.  What would the

24   costs of such a registration drive be?  It's on Page 2

25   of the fiscal note.

CONSIDERATION OF SENATE BILL 14 1/25/2011

1    MS. McGEEHAN:  Okay.  I think that what

2 that is referring to is that at the end of Senate

3 Bill 14, there's a reference that says county voter

4 registrars can use Chapter 19 funds to defray costs in

5 conducting a voter registration drive.  But I don't see

6 anything -- and I may have missed it -- but I don't see

7 anything in Senate Bill 14 that requires a voter

8 registration drive.  I think it's -- what that section

9 in the bill is doing is trying to make clear that these

10 funds, which are -- go to county voter registrars to

11 enhance voter registration could be used to do voter

12 registration drives, but I don't see anything that

13 requires a voter registration drive in Senate Bill 14.

14    SEN. DAVIS:  What resources currently are

15 expected of our local governments in carrying out the

16 training and the public awareness programs under our

17 election code.

18    MS. McGEEHAN:  The -- there's no state law

19 requirement to do voter education by the county

20 officials.  Most of them do it as a public service

21 because they want to, but there's not a mandate under

22 state law to do that.

23    Under Senate Bill 14, there's required

24 training of poll workers on the new photo ID

25 requirements.  And I may have missed part of your

1  question.

2           SEN. DAVIS:  And that required training is

3  to be done at the county level.  It's expected that the

4  county will fulfill that requirement through their own

5  resources?

6           MS. McGEEHAN:  Well, they are required to

7  use the Secretary of State materials.  I think that the

8  election code gives them discretion as to how they

9  implement it and how they conduct their training.

10          SEN. DAVIS:  So it's foreseeable that at

11  the county level increased costs will be realized as a

12  consequence of the expectations of this bill?

13          MS. McGEEHAN:  Most counties conduct

14  training today.  So they would just be incorporating

15  another component into their training program.

16  Depending on how they handled it would impact how

17  significant the fiscal impact would be in that county.

18          SEN. DAVIS:  If I'm a voter today and I

19  want to go to the bill itself in terms of making sure I

20  understand what would be expected of me under today's

21  rules versus under the rules of the new bill, if I'm a

22  voter today and I come in to vote and I don't have my

23  voter registration card, instead I have an ID, I have a

24  state issued ID, I have a valid driver's license, and my

25  driver's license shows a different name than is

1   currently on the roll because I've married or I've

2   divorced, how is that situation handled today?

3                MS. McGEEHAN:   State law doesn't directly

4   address it.   So I think that as a practical matter

5   what's happening is the poll workers are making judgment

6   calls as they qualify those voters for voting.

7                SEN. DAVIS:   But they are not being given

8   guidance or rules or requirements in terms of how they

9   are to deal with that situation today?

10               MS. McGEEHAN:   No.

11               SEN. DAVIS:   It's within their discretion?

12               MS. McGEEHAN:   At this point.   I mean,

13   state law is silent on it, and our office has not issued

14   any guidance on it.   So we're hearing a lot about that

15   today.   That's definitely something we'll probably need

16   to look into, but right now there is no rule or statute

17   on that issue.

18               SEN. DAVIS:   Okay.   And today if I go to

19   vote and my identification that I use for purposes of

20   voting has a different address on it than is listed on

21   the precinct roll, I think it's the interpretation today

22   under 2004 Secretary of State opinion that I am asked

23   for my correct address, and I am to be believed if I say

24   that my address is the address that's on the precinct

25   list as opposed to what might be on my ID?

```
 1              MS. McGEEHAN:  I think that's basically
 2   correct.  The purposes -- you know, showing ID today is
 3   only for purposes of proving who you are.  It's not to
 4   prove where you live.  So independent from the
 5   requirement to show ID, either certificate or one of the
 6   other authorized ID, there's a separate requirement in
 7   the code where the election -- where the poll worker has
 8   to ask every voter "Have you moved," so regardless of
 9   what ID they show.  And if they say yes, they've moved,
10   then they have to sign a statement of residence and
11   update their information.  If they say no, they haven't,
12   they still live at the address on the list of registered
13   voters, then they are permitted to vote.
14              SEN. DAVIS:  And what is your
15   understanding of whether -- how or whether that would
16   change under the requirements of the new bill if
17   everyone now is going to come in with a state-issued ID
18   or a driver's license?  If the address on that ID does
19   not match the address that's on the voter file, how is
20   that to be handled going forward if this bill were to
21   pass into law?
22              MS. McGEEHAN:  My current understanding is
23   that that process wouldn't change, that the purpose of
24   SB 14 is, again, just to prove up ID, not prove where
25   you reside.
```

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
1              SEN. DAVIS:  And what steps would the
2   Secretary of State's Office engage in to assure that the
3   ID wasn't being used to establish an understanding of
4   the voter's residency?
5              MS. McGEEHAN:  Would definitely, I think,
6   be included in our training materials to emphasize that.
7              SEN. DAVIS:  Currently, is there any
8   information that the Secretary of State's Office gathers
9   that breaks down by category voters in the state?  And
10  when I say "by category," I mean by race, by gender, by
11  disability, by age.
12             MS. McGEEHAN:  We have some information.
13  We have -- we have age for sure.  On gender -- we have
14  some information on gender, but it's not conclusive
15  because gender is now -- it used to be a required
16  element on the voter registration application.  In 1995,
17  it was taken -- or it became optional after the National
18  Voter Registration Act.  So we have some data on gender,
19  but, again, it's not complete.
20             Regarding ethnicity, we really -- we don't
21  have any information like that because it's not
22  collected when a person applies to register to vote.
23  The only data that we do have is we do have the number
24  of voters that have an Hispanic surname.  And so we can
25  run the list of registered voters against this list of
```

1 Hispanic surnames that is provided by the census

2 department.

3          SEN. DAVIS:  I'm sure you understand that

4 one of the sensitive issues that will arise as a

5 consequence of this legislation will be a question as to

6 whether the implementation of this law creates a

7 disproportionate impact on minorities, on seniors, on

8 the disabled, on women.  How will the Secretary of

9 State's Office work to be able to answer those questions

10 when they are asked if we currently don't track that

11 data?  And is there an intention to track it going

12 forward?

13          MS. McGEEHAN:  When we changed the voter

14 registration application in '94, '95, due to the

15 National Voter Registration Act, there was a long

16 discussion regarding this issue of whether the state

17 application should request a voter's race.  The

18 determination at that time, based on feedback from all

19 the stakeholders, was not to do it because the thought

20 was that might be intimidating to a minority voter, "Why

21 are you asking, you know, what my ethnicity is?  It

22 doesn't impact whether I can register or not."

23          We can revisit that issue because in order

24 to provide data, you know, if the legislature wants data

25 like that from the Secretary of State's Office, we have

1  to have some way to collect it.  So we could revisit

2  putting that question or adding that as a question to

3  the voter registration application.  I'd be happy to

4  visit on ways where we could try and collect that, but

5  right now we would not have the tools that we would need

6  to be able to collect that data.

7             SEN. DAVIS:  It seems rather important as

8  implementation of this law advances that that

9  information be made available for the Justice Department

10  review as well as any judicial review that might occur

11  in terms of the impact of the implementation of the law.

12             I believe that's all the questions I have

13  for you.  Thank you so much.

14             MS. McGEEHAN:  Thank you.

15             CHAIRMAN DUNCAN:  The Chair recognizes

16  Senator West.

17             SEN. WEST:  Thank you very much,

18  Mr. Chairman.  Many of the questions Senator Davis has

19  already asked, but have you had a chance to look at the

20  bill as introduced?

21             MS. McGEEHAN:  Yes.

22             SEN. WEST:  Okay.  Do you happen to have

23  it there in front of you?

24             MS. McGEEHAN:  Yes, I do.

25             SEN. WEST:  Okay.  Great.  Before I get

1  into it, does this bill provide you any rulemaking

2  authority?

3          MS. McGEEHAN:  No.

4          SEN. WEST:  Okay.  So in interpreting

5  the -- let me back up.  Are you often called upon by

6  county registrars to answer questions concerning issues

7  that arise in local counties?

8          MS. McGEEHAN:  Yes.

9          SEN. WEST:  How do you normally decide

10  those questions?  Do you just look at the black and

11  white law?  Do you issue opinions?  How is that --

12  what's that process?

13          MS. McGEEHAN:  We issue opinions in a

14  couple of different ways.  We have a toll-free number.

15  One is dedicated just for county officials.  So if it's

16  a fairly straightforward, simple question, we give a

17  quick answer over the phone.  If it's a -- if it's a

18  less involved question, we might get an email.  We'll

19  give a response via email.  If it's something that's

20  hard or we're really interpreting several different laws

21  or it's a new law and we feel like it has statewide

22  impact, we want to make sure that everyone is operating

23  under the same understanding, we'll issue an advisory.

24          SEN. WEST:  Okay.  And so an advisory or

25  just depending upon the circumstances maybe an email

1   opinion or something like that?

2            MS. McGEEHAN:  Well, advisories are

3   usually a little more -- it's like the most formal that

4   we do.

5            SEN. WEST:  Right.

6            MS. McGEEHAN:  Yeah.  Okay.

7            SEN. WEST:  All right.  Let me ask you to

8   go to Page 4 of the bill.

9            MS. McGEEHAN:  Okay.  Can you tell me the

10  section?  Because I think I have a different format.

11           SEN. WEST:  Okay.  It's Section 7, and

12  Section 7(c) and (d).

13           MS. McGEEHAN:  Okay.

14           SEN. DAVIS:  Let me know when you get

15  there.

16           MS. McGEEHAN:  Yes.

17           SEN. WEST:  Okay.  It's my understanding

18  that the election officer that's being referred to in

19  Section (d) is -- is the individual working at the poll.

20  Is that right?

21           MS. McGEEHAN:  Yes.

22           SEN. WEST:  Okay.  That person will be

23  called upon in Section (d) to determine if the voter's

24  name is on the precinct list of registered voters, and

25  the voter's identity can be verified from the

1    documentation presented.  Is that correct?

2                    MS. McGEEHAN:  Yes.

3                    SEN. WEST:  Okay.  In advising on that,

4    will that be a strict interpretation?  Let me -- this is

5    what I mean.  I think that some of the hypotheticals

6    that were provided by Senator Davis may be illustrative

7    of what I'm asking.  My last name is West, W-e-s-t.  And

8    say that there's a typographical error where my name is

9    spelled W-e-s on the voters' roll, precinct list, and

10   then my -- but my identity I'm using my driver's license

11   and it has "t" on it.  How does a poll -- an election

12   officer in that situation resolve that problem?

13                    MS. McGEEHAN:  That's a good question, and

14   I don't think the bill necessarily defines what

15   verification --

16                    SEN. WEST:  I know.  Senator Fraser said

17   I'd have to ask the Secretary of State that question.

18   That's why I'm asking you that question.

19                    MS. McGEEHAN:  I think -- you know, based

20   on the way the bill is written now and if we had to

21   develop training materials for the poll workers on how

22   to implement this, we would look to the best practices

23   of the states that have implemented.  I heard Indiana

24   testify earlier today that they have written some

25   guidelines.  We'd look to that and try and incorporate

1   the best practices on reasonable methods to verify the

2   ID document against the list of registered voters.

3                   SEN. WEST:  Okay.  But you would agree

4   with me that in interpreting Section (c) and (d) without

5   some sort of guidance would lend itself to a great deal

6   of subjectivity; thus inconsistent application

7   throughout the state?

8                   MS. McGEEHAN:  It could, yes.

9                   SEN. WEST:  Okay.  As it relates to --

10  let's see.  What page is it on?  The next page, which

11  will be (h), it's in the same section.

12                  MS. McGEEHAN:  Okay.

13                  SEN. WEST:  Would you read Section (h) and

14  tell me how you interpret that as the chief

15  administrator of the election laws in the state of Texas

16  next to, needless to say, Secretary of State?

17                  MS. McGEEHAN:  (h) reads, "The

18  requirements for identification prescribed by Subsection

19  (b) do not apply to a voter who: (1) presents the

20  voter's voter registration certificate on offering to

21  vote; and (2) was 70 years of age or older on January 1,

22  2012, as indicated by the date of birth on the voter's

23  voter registration certificate."

24                  The way I had -- until earlier this

25  afternoon when Senator Ellis asked the question, I had

CONSIDERATION OF SENATE BILL 14 1/25/2011

1   assumed that anybody that is 70 years of age or older

2   would not have to provide the photo ID.  I think the

3   wording is less than perfect.  I think that's the

4   intent, and I heard Senator Fraser, I think, answer that

5   his intent is it would apply.  You know, even if a

6   person became 70 after January 1, 2012, they could still

7   take advantage of this exception.

8              SEN. WEST:  Okay.  But would it be your

9   suggestion that we need to reword that language to make

10  certain that whether you're there or someone else -- I

11  understand that you're here and you heard the

12  discussion, but if for some reason you're not in the

13  same position you're in right now, there's going to be

14  someone else, and they won't have -- they will not have

15  had the benefit of this discussion.  So, therefore, do

16  you think it would be advisory to -- advisory to reword

17  that to make certain it's perfectly clear?

18              MS. McGEEHAN:  I think so.  If people are

19  reading it inconsistent, it would probably help it if it

20  were.

21              SEN. WEST:  Okay.  Now, a couple of other

22  questions.  As it relates to the counties, it's my

23  understanding that you -- that your agency and maybe

24  either yourself or someone working for you put together

25  the fiscal note.  Is that correct?

1            MS. McGEEHAN:  Yes.  Our agency put it --

2    I helped.

3            SEN. WEST:  Okay.  Did someone under your

4    supervision contact local governments to determine the

5    impact, the fiscal impact, that implementation of this

6    will have?

7            MS. McGEEHAN:  No, we did not.

8            SEN. WEST:  That was done by someone else?

9            MS. McGEEHAN:  I think LBB does that.  We

10   just -- we just --

11           SEN. WEST:  Provided the information?

12           MS. McGEEHAN:  Yeah.  Right.

13           SEN. WEST:  And based on your experience

14   when these types of changes -- let me back up.

15           How much experience have you had in this

16   particular area, that is, the election laws, in

17   administration of election laws?

18           MS. McGEEHAN:  I have been working in the

19   elections division for 21 years.

20           SEN. WEST:  So you've had a little

21   experience, huh?

22           MS. McGEEHAN:  Yes.

23           SEN. WEST:  Okay.  All right.  As it

24   relates to when changes are made in state law of this

25   nature, is there an impact, a fiscal impact, on local

1    units of governments when they have to make changes to

2    comply with these types of changes or laws that are

3    being suggested?

4                    MS. McGEEHAN:  I think it really depends

5    on what the change is.  You know, if there's a new

6    mandate for a county or if the county has to do

7    something different, then obviously there would be a

8    fiscal impact.

9                    SEN. WEST:  Well, will -- and, again,

10   drawing on your expertise, will counties have to do

11   something different to implement this particular law?

12                   MS. McGEEHAN:  They will have to -- they

13   are going to have to post information on their website

14   notifying the public what the new photo ID requirements

15   are.

16                   SEN. WEST:  Right.

17                   MS. McGEEHAN:  When they issue voter

18   registration certificates, they are going to have to

19   mail out -- which they have to mail out every two years

20   under current law.  The new certificates will have new

21   language, but -- informing voters of the voter ID

22   requirements, but that should be cost neutral because

23   they are already mailing out the voter registration

24   certificates.

25                   The piece that I think might have a fiscal

1    impact is the training.  If the counties have to change

2    up their training procedures much or do more training

3    because they want to make sure the word is out to all

4    their -- that might increase their training costs.

5                    SEN. WEST:  Okay.  So there are some

6    factors that need to be taken into consideration as to

7    whether or not counties will be burdened with additional

8    cost to implement this law.  Is that correct?

9                    MS. McGEEHAN:  Yes.

10                   SEN. WEST:  Okay.  And would it be a fair

11   statement to say the larger the county, the more of the

12   burden -- of the financial burden -- well, that's not a

13   fair question.

14                   Would it be a fair statement to say that

15   the larger the county, the larger the potential

16   financial obligation that they would have to encounter

17   in order to implement the law?

18                   MS. McGEEHAN:  I think that's true, but I

19   can hear small counties say that it might be

20   proportional, you know, since their budgets are -- I

21   mean --

22                   SEN. WEST:  Right.  It's all relative to

23   what your budgets are.

24                   MS. McGEEHAN:  Yeah.

25                   SEN. WEST:  But the fact is that that --

1  do you -- is there any -- you've read the fiscal note

2  associated with this bill?

3                MS. McGEEHAN:  Yes.

4                SEN. WEST:  The $2 million that's in the

5  fiscal note, does any of that go to the county to --

6  counties in order to implement this legislation?

7                MS. McGEEHAN:  No.

8                SEN. WEST:  So any cost that is not

9  covered by the state for counties would be -- have to be

10  borne by the counties.  Right?

11                MS. McGEEHAN:  Yes, yes.

12                SEN. WEST:  Okay.  Now, as it relates

13  to -- is there any way that the Secretary of State's

14  Office can give us -- do an analysis or get with the

15  various counties to determine exactly what the fiscal

16  impact of implementing this legislation would be?

17                MS. McGEEHAN:  We could -- we could

18  certainly solicit that information from counties and ask

19  them what -- how they see this impacting them fiscally.

20                SEN. WEST:  You could do that for each and

21  every one of the counties?

22                MS. McGEEHAN:  We can do it.

23                SEN. WEST:  Mr. Chairman, I'd like to

24  request that the Secretary of State's Office provides

25  the Senate an analysis of -- I shouldn't say an

 1   analysis -- at least solicit from the various counties

 2   what the fiscal implication is going to be in order to

 3   implement this bill.

 4            CHAIRMAN DUNCAN:  Okay.  I think, Senator,

 5   that will be an individual request from you, and then it

 6   can be distributed to all members of the Senate --

 7            SEN. WEST:  Okay.

 8            CHAIRMAN DUNCAN:  -- whenever it's done.

 9   You know, I doubt that that will be done by the time we

10   rise and report to the Senate.

11            SEN. WEST:  Okay.  We can't get it

12   tonight?

13            (Laughter)

14            SEN. WEST:  I'm just joking with you.

15            CHAIRMAN DUNCAN:  You won't be a very

16   popular guy if the --

17            SEN. WEST:  I'd like --

18            (Laughter)

19            SEN. WEST:  I'd like to get it as soon as

20   possible, though.

21            Let's see.  No further questions.  Thank

22   you very much.

23            MS. McGEEHAN:  Thank you.

24            CHAIRMAN DUNCAN:  Thank you, Senator West.

25            Senator Gallegos?

1      SEN. GALLEGOS:  Let me ask you, I don't

2  know if you heard my question earlier to Senator Fraser

3  and he referred to you or the Secretary of State's

4  Office to answer it.  My concern was in the fiscal note

5  that we ranked number two in the country in population.

6  And Missouri ranks number nineteenth, and to implement

7  their voter ID program, they came up with -- they only

8  have 5.9 million people.  We have 25 million.  They came

9  up with a fiscal note of 6 million in the first year and

10  then 4 million in the second year for a total of 10

11  million second and third.  That's $10 million.  And you

12  just -- I think earlier testimony with Senator Davis,

13  you said once the 2 million runs out, that's it.  Is

14  that what you said?

15      MS. McGEEHAN:  For -- yeah, the amount of

16  money we have for voter education is limited.  So when

17  that runs out, that's all we have.

18      SEN. GALLEGOS:  I guess my concern is if

19  Missouri only has 5.9 million people, just to implement

20  their voter ID program they start with 6 million in the

21  first year and 4 million in the second and third year

22  for a total of $10 million, for just 5.9 million folks,

23  what are they -- you know, I don't -- what are they

24  doing as far as when they are reading the bill?  I heard

25  that you said you're going by the bill, and that's how

```
 1   you came up with your fiscal note.  Is that correct?
 2               MS. McGEEHAN:  Yes.
 3               SEN. GALLEGOS:  Okay.  Well, then what are
 4   they doing that we're not or, you know, how can you --
 5   you know, for $10 million for 5.9 million people and
 6   we're only going to spend 2 million, I mean, what's the
 7   difference?
 8               MS. McGEEHAN:  I am not familiar with the
 9   Missouri voter identification bill, and I did hear you
10   ask that earlier today, but I've been trying to listen
11   to all the questions.  So we can -- we can research it
12   and see.  Some states actually provide more to their
13   local county governments and print ballots and things
14   like that.  I don't know if that's the situation in
15   Missouri, but I honestly don't know the answer to that
16   question because I don't know what the Missouri voter ID
17   law requires.
18               SEN. GALLEGOS:  Well, it's a substantial
19   more amount of money than we're looking --
20               MS. McGEEHAN:  Yeah.
21               SEN. GALLEGOS:  -- at the fiscal note that
22   you have -- that you've given this committee on Senate
23   Bill 14.  And I just -- it concerns me that that amount
24   of money, if somebody is doing -- in the formula or
25   methodology that you came up with that number -- I mean,
```

1    is that a true number?  I mean, you know, as far as are

2    we really doing voter education that should be done, you

3    know, on 25 million people as opposed to what Missouri

4    is doing with only 5.9?  I mean, it just -- I mean, that

5    would send up a red flag to me.  Wouldn't it you?

6                    MS. McGEEHAN:  Sure.  I would like to

7    understand those numbers because they are very

8    different.

9                    SEN. GALLEGOS:  You know, I -- if we're

10   going to mandate to Texans, you know, and then do it --

11   do a good educational program and Missouri is spending

12   $10 million on their folks and we're only spending

13   2 million on ours, I'd like to know what the -- what the

14   difference is.  Are their people better than ours?  You

15   know, do they deserve, you know, more education?  You

16   know, I just -- you know, with the population as opposed

17   to our population, you know, I don't -- you know, I'm a

18   little concerned there.  You know, are we cutting our

19   folks short?  Are we really going to do what you're

20   telling us that you're going to do as far as educating

21   the public out there on this bill?

22                    And it just concerns me that, you know, we

23   see -- and I haven't even taken a comparison of the

24   other states.  And we're number two, and Missouri is 19,

25   and they are spending 10 million bucks.  You know, that

1   would concern me, and I would hope it would concern any

2   of the other Senators on this floor.  Are we, you know,

3   really going to do -- in implementing this bill, are we

4   going to educate those folks out there?

5              Now, you know -- and I'd like that answer.

6   I mean, you can't answer it now, I understand, but I

7   would like an answer to that.

8              MS. McGEEHAN:  We'll get you an answer.

9              SEN. GALLEGOS:  And a comparison on what

10  really your states that have implemented voter ID, how

11  much are they paying, you know, to implement the program

12  and what they do.

13             Now, on the fiscal note, it says you're

14  going to do TV and radio and some other things.  I mean,

15  can you explain to this body the process on TV, or is it

16  going to be in different languages, or how are you going

17  to -- how are you going to split up the money?  Who gets

18  the most?  You know, I mean, it's not -- it's not

19  explained to us in the fiscal note how you're going to

20  spread the money around.  And is that going to be

21  accessible to us or how the process is going to be, or

22  how much money are you going to spend in Harris County

23  as opposed to Lubbock, Texas or wherever?

24             MS. McGEEHAN:  Yes, that would be

25  available.  And, you know, the programs that we've done

CONSIDERATION OF SENATE BILL 14 1/25/2011

1  previously, we have detailed records that show, you

2  know, where the media ran, and so we would -- that would

3  be a part of any program going future.

4           The way -- the way it has worked thus far,

5  the three statewide voter education programs that we

6  have done, is we've gone out for bid for a public

7  education firm.  And then the first thing that firm does

8  is research, and they meet with stakeholders, and then

9  they craft the creative proposal.  And then they turn

10  that into the actual media and do the media buys for TV,

11  radio and cycle, Internet and also print.

12           For the PSAs -- and I'm not the expert on

13  this -- but I understand that we pay for a certain

14  amount, and then we get some earned credit where TV

15  stations will run them for free.  If you pay them, you

16  know, to run it once, they'll run it three times and

17  only charge you for once, something along those lines.

18           SEN. GALLEGOS:  And is that going to be --

19  is there going to be access as far as different

20  languages in than budget?

21           MS. McGEEHAN:  Oh, yes.  We -- our current

22  programs are in English and in Spanish, and in Harris

23  County, we've had a component for Vietnamese.

24           SEN. GALLEGOS:  Okay.  Now, on Page 2 of

25  the bill under what y'all are going to do under voter --

```
 1   under 31.012, Voter Identification, Senator West brought
 2   it up about -- it says here you and -- your office and
 3   the voter registrar of each county that maintains it
 4   shall provide notice of the ID requirements as
 5   prescribed by this change.
 6                 Now, my concern there is, is at the county
 7   level -- you know, I think Senator West brought it up --
 8   is how much is going to be incumbent on each county, you
 9   know?  I and others here on this floor represent the
10   largest county, Harris County, and Harris County is
11   already starting to lay off, and they have a shortfall,
12   and they are laying off as we speak right now.  So, you
13   know -- and I see what it says in the bill, you know,
14   that you're going to get together with them.  I mean,
15   are they going to have the money?  Or where is the -- if
16   they don't have the money, where is the other money
17   going to come from?  Other than the 2 million you
18   already have prescribed here and any federal matches
19   that come in, where is that money going to come if those
20   counties cannot provide?
21                 MS. McGEEHAN:  I think that the bill
22   presumes that counties have a website, and so this
23   requirement is that they post, you know, the information
24   about the new photo ID requirements that the Secretary
25   of State's Office will actually prescribe.  So we will
```

1  send that out to the counties, and then they'll have to

2  post it on their website.

3           Now, in light of the fiscal

4  circumstances -- and Senator West has asked us to do a

5  survey -- we'll probably get some very detailed

6  information, you know, as far as the counties' fiscal

7  circumstances, if they are going to have to take down

8  their websites or, you know, where they are going to

9  have to cut.

10          SEN. GALLEGOS:  Well, you know, with all

11  due respect, I mean, we can presume a lot of things, and

12  I could presume a lot of things, you know, just on

13  anything, but I can tell you right now -- I'm not

14  presuming -- I know that they're laying off in Harris

15  County right now.  That's not a presumption.  That's a

16  fact; that's a fact.  And they're also furloughing in

17  the City of Houston.

18          So, I mean, it just concerns me that this

19  section here that says you're going to work hand-in-hand

20  with each registrar in each county, and if those

21  counties are already going through a budget shortfall

22  like we are, then how can you presume that they're going

23  to have -- I'm just saying that this bill presumes that

24  they're going to have a website and they're going to

25  have people to handle the education.

CONSIDERATION OF SENATE BILL 14 1/25/2011

1    You can't presume anything if they're

2  laying off right now as we speak, and that's a fact.

3  Like I said, that's not a presumption.  That concerns

4  me.  And what I'm asking is that if that can't happen in

5  Harris County or any other county in this state, where

6  is the extra money?  If they don't have, obviously, the

7  funds to provide what is prescribed under Senate Bill

8  14, where is that money going to come from?

9    MS. McGEEHAN:  Well, you know, Senate Bill

10 14 doesn't make an appropriation to the county, so I

11 don't know the answer to your question on that because,

12 like I said, the bill -- I think the assumption is that

13 counties have a website.  So if they're not going to

14 have a website --

15    SEN. GALLEGOS:  But the bill prescribes

16 that you will work in conjunction with the county

17 registrar.  Is that what I'm reading --

18    MS. McGEEHAN:  Yes.

19    SEN. GALLEGOS:  -- or am I reading the

20 wrong bill?

21    MS. McGEEHAN:  Maybe I'm not -- the way I

22 read that was that we would provide them the wording,

23 the language that they would put up on their website.

24    SEN. GALLEGOS:  Well, you're going to

25 provide them with that.  But what about the bodies and

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
 1   any other education that's prescribed by this bill?  If
 2   they don't have the bodies -- they're laying off bodies
 3   right now.
 4             MS. McGEEHAN:  Yes.
 5             SEN. GALLEGOS:  Okay.  And you see where
 6   I'm going here?
 7             MS. McGEEHAN:  No, I understand.
 8             SEN. GALLEGOS:  And if you provided a
 9   fiscal note, you know, that we're going by and that's on
10   every website in the State of Texas, everybody that has
11   a computer, then really what I'm asking you, is this a
12   true fiscal note or is it misleading to the voters out
13   there, that it's going to cost more than what you're
14   showing here if other counties are having budget
15   shortfalls like we are?
16             MS. McGEEHAN:  Well, when we're asked to
17   submit a fiscal note to LBB, they want to know what the
18   state impact is.  So generally we don't solicit what the
19   impact is to local government.  And I'm not exactly sure
20   who within LBB does that, if that's LBB or the
21   Comptroller.  But I can tell you -- and maybe we've been
22   doing them wrong, but the way we've understood our
23   requirement in responding to a fiscal note request was
24   to state what the state impact was.  It's specifically
25   for the agent -- you know, like for our agency for the
```

1   Secretary of State's office.

2                    SEN. GALLEGOS:  Okay.  So what you're

3   telling me is that outside of the $2 million that's in

4   the fiscal note and that under this section that you're

5   going to work with the registrar in each county, then we

6   just have to roll the dice and hope that the money is

7   there.  Is that what you're telling me?

8                    MS. McGEEHAN:  Well, I think this fiscal

9   note that LBB did put -- does indicate that there may be

10  some county costs.  You know, they did put some numbers

11  in for Tarrant County and for Bexar County.  So, you

12  know, it's not -- I don't think it's the number you're

13  looking for.  It's not a comprehensive number, but I

14  think that the fiscal note does indicate that there may

15  be a fiscal impact on counties.

16                   SEN. GALLEGOS:  There may be a fiscal

17  impact.  You don't know how much?

18                   MS. McGEEHAN:  No, I don't.

19                   SEN. GALLEGOS:  So what we're looking at

20  in your fiscal note is just an open-ended fiscal note.

21  Is that what you're telling me?

22                   MS. McGEEHAN:  The fiscal note is really

23  showing the impact on the Secretary of State's office.

24  I can't really speak to how the portion of the fiscal

25  note that concerns impact on local government, how

1   LBB -- you know, what their process is.  I don't really

2   know.

3            SEN. GALLEGOS:  All right.  Then let me

4   rephrase my question.

5            MS. McGEEHAN:  Okay.

6            SEN. GALLEGOS:  So the $2 million that

7   you're showing is what the state is going to be

8   impacted.  And the language that is showing you're going

9   to work in conjunction with the counties, you know, you

10  cannot speak to that, so we really don't know.  Is that

11  what you're saying?  It could or could not be impacted

12  for a million, two million, three million, whatever the

13  number.  I don't know the numbers that you gave Bexar

14  County and Tarrant County.  I have not been privy to

15  those numbers.  But what I'm saying is, I really would

16  like to know that if my county is going to be impacted,

17  if at all, it's going to be in here, you know.  Do you

18  see what I'm saying?

19           MS. McGEEHAN:  Well, yes, I understand

20  what you're saying.  And we are going to be sending out

21  a survey to try and gather that data from all the

22  counties.

23           SEN. GALLEGOS:  You know, I don't like the

24  mandate to my county, something that this bill said that

25  they will do and then find out that they don't have the

1  funds to do it.  You know, to me, that's an unfunded

2  mandate in really telling Texans that are looking at

3  this debate on computer and that are looking at this

4  bill online, that this $2 million fiscal note that

5  you've provided is only an impact to the state, not the

6  counties, not each county.  Is that correct?

7              MS. McGEEHAN:  That's correct.

8              SEN. GALLEGOS:  Okay.  Thank you very

9  much.

10              CHAIRMAN DUNCAN:  Thank you, Senator

11  Gallegos.

12              Senator Van de Putte.

13              SEN. VAN de PUTTE:  Thank you,

14  Mr. Chairman.

15              Ms. McGeehan, you've been an excellent

16  resource witness for us, and there are just two

17  questions that I need to ask to get into the record with

18  regard to a survey.

19              Does Texas participate in the Election

20  Administration and Voting Survey?

21              MS. McGEEHAN:  Yes.

22              SEN. VAN de PUTTE:  When was this survey

23  completed, the last survey was completed?  Was it after

24  the 2008 election?

25              MS. McGEEHAN:  Yes.

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
 1                  SEN. VAN de PUTTE:  So we have that survey
 2   available?
 3                  MS. McGEEHAN:  Yes.
 4                  SEN. VAN de PUTTE:  Okay.  The question
 5   that I have goes to the data on the survey that goes, I
 6   think, to all -- and this is the federal commission --
 7   dealing with the number of provisional ballots in the
 8   State of Texas.  As far as you know, how do we rank in
 9   the number of provisional ballots that are used with
10   regard to our voting population?
11                  MS. McGEEHAN:  My general recollection is
12   that as far as the total number cast, we're on the lower
13   end.  But as far as the number of provisional votes,
14   meaning that not as many people cast a provisional vote
15   in Texas as in some other states, but as far as the
16   number of provisional ballots that are counted --
17                  SEN. VAN de PUTTE:  Yes.
18                  MS. McGEEHAN:  -- we have one of the lower
19   rates among the states as to the number of provisional
20   ballots that are counted.  It is my understanding that
21   in the state chart, that we have very high rejection
22   provisional ballot rates.  So, in other words, even
23   right now under this system that we have, that the
24   number of provisional ballots that are cast, we have
25   some of the highest rejection rates for those
```

1    provisional ballots in all of the country.

2                        MS. McGEEHAN:  Yes.

3                        SEN. VAN de PUTTE:  At least that's what I

4    understand from the report.

5                        MS. McGEEHAN:  That's correct.

6                        SEN. VAN de PUTTE:  Thank you.  I know

7    that we have the datasets that were put in for 2008, and

8    so hopefully that we will be able to get this and make

9    sure that as we monitor the bill as it progresses and

10   the bill as it's implemented, we certainly don't need to

11   get to the bottom of the bottom of the bottom on

12   rejection of provisional ballots.

13                        Thank you.

14                        CHAIRMAN DUNCAN:  Thank you, Senator Van

15   de Putte.

16                        Senator Fraser.

17                        SEN. FRASER:  Thanks for being here today

18   and waiting all day.

19                        I would like to clarify a point before you

20   sit down.  I think you're aware this morning that we had

21   entered into a record -- the Secretary of State had a

22   letter addressing the $2 million in the HAVA funds that

23   was put into the record.  Our understanding, from

24   talking to the Secretary, the way the HAVA funds work,

25   and also her relationship with the county, that she has

```
 1   very broad discretion, assuming that the HAVA people
 2   approve the using of this.
 3              The $3 million that you're talking about
 4   in voter education, it doesn't necessarily mean that
 5   it's three plus two.  It's possible that there's an
 6   overlap, that this two million could be folded in --
 7   possibly into the three.  But that discretion goes back
 8   to the Secretary and they make a determination.  Is that
 9   not true?
10              MS. McGEEHAN:  That's exactly right.
11              SEN. FRASER:  The other thing that I want
12   to clarify that there is a lot of discussion about, what
13   expense might go to Houston or what expense might go to
14   Bexar.  Right now there is not clear, because I think
15   there's a lot of discussion going on of whether is that
16   Bexar expense or is that Secretary of State expense?
17              And we've got to determine what those
18   dollars are being spent on.  Can we use Secretary of
19   State dollars and HAVA funds for that?  So I think we're
20   premature of a county saying they've got "X" amount of
21   expenses, because it's possible that some of those
22   expenses flow from the Secretary of State's office, they
23   do not flow to the county, and they could handle that
24   with available people within the county and budget.  Is
25   that not correct?
```

CONSIDERATION OF SENATE BILL 14 1/25/2011

1          MS. McGEEHAN:  That's correct.  And just

2  an example of that, the cost that Bexar County put in

3  the fiscal note was -- I think their assumption was that

4  the certificate, the voter registration certificate

5  would have to increase in size.  And I don't see

6  anything in the bill that requires that.  And the

7  Secretary of State prescribes the form.  So once that's

8  explained to the county, they might withdraw that

9  fiscal --

10          SEN. FRASER:  I want to make sure that

11  that's clear, is that some of these assumptions are

12  possibly the-sky-is-falling assumptions that this is --

13  you know, this expense is going to be put on us, and I

14  don't think that's been discussed.  And some of this, I

15  think, can be done by ruling of the Secretary of State,

16  directing them.  And there is a real good chance that a

17  lot of these expenses go away that can be absorbed

18  through the Secretary of State.  And that is correct,

19  isn't it?

20          MS. McGEEHAN:  Yes.

21          SEN. FRASER:  Okay.  I wanted to clear

22  that up.  Thank you so much.

23          CHAIRMAN DUNCAN:  The Chair recognizes

24  Senator Williams.

25          SEN. WILLIAMS:  Thank you, Mr. Chairman.

1          Ms. McGeehan, I want to add my thanks for

2   you hanging in here with us all day.  There's about

3   three things that I would like to clear up with you.  I

4   just want to understand unequivocally, HAVA funds can be

5   spent for things like training poll workers.  Is that

6   correct?

7          MS. McGEEHAN:  Yes.

8          SEN. WILLIAMS:  Okay.  Thank you.  Then

9   are you familiar with the voter ID bill that went

10  into -- in Utah recently?  Have you taken a look at

11  that?

12         MS. McGEEHAN:  No, I have not looked at

13  that.

14         SEN. WILLIAMS:  Okay.  I just think it's

15  noteworthy, in light of Senator Van de Putte's comments,

16  because the Salt Lake County Clerk's office -- I've got

17  a news report here -- it's confirmed that there were

18  only 13 cases of voters having to pick up their

19  provisional ballots because they didn't have the proper

20  identification to vote when they put this new law into

21  effect.  So it seems like it's had a great -- again, one

22  more state where the impact has been really minimal.

23  I'm not sure why we're having these other issues, but I

24  don't think its because of this.

25         And then finally I wanted to ask you, we

```
 1   had talked earlier about the project that I asked you to

 2   do, to cross-reference the driver's licenses and the

 3   voter registration.  How is that coming along?  I know I

 4   only asked today, but I just --

 5              MS. McGEEHAN:  Yes.

 6              SEN. WILLIAMS:  -- but what is a

 7   reasonable expectation for us to get that information?

 8              MS. McGEEHAN:  I would hope by the end of

 9   the week.  One thing that our IT folks and our election

10   experts are trying to struggle with is like matching

11   criteria --

12              SEN. WILLIAMS:  Right.

13              MS. McGEEHAN:  -- you know, which we won't

14   have a TLD number, so we're working through some of

15   that.  But I would expect by the end of the week we

16   would have it, if not earlier.

17              SEN. WILLIAMS:  Okay.  So do you need any

18   further direction from us?  For instance, if we wanted

19   to target that universe of people that we know are out

20   there and maybe make a little extra effort to make sure

21   that they understood they were going to have a new

22   requirement when they went to vote as far as getting a

23   photo ID, if they didn't already have one -- and we've

24   identified who they are -- if we gave legislative intent

25   as a part of the bill tomorrow, would that be sufficient
```

CONSIDERATION OF SENATE BILL 14 1/25/2011

1  for you-all and the Secretary of State's office to take

2  that direction and know that that's something that we

3  wanted to have done in your training plans and voter

4  education plans?

5           MS. McGEEHAN:  Yes.  I think if there were

6  a statement of legislative intent, we would certainly

7  follow that.

8           SEN. WILLIAMS:  That would be sufficient.

9  Okay.  Thank you very much.  Appreciate your help.

10          CHAIRMAN DUNCAN:  All right.  Members, are

11  there any other questions of Ms. McGeehan?

12          Okay.  The Chair hears none.  Thank you,

13  Ms. McGeehan.

14          The Chair calls David Maxwell, Deputy

15  Director of Law Enforcement, Texas Attorney General's

16  Office.

17          Mr. Maxwell, would you approach and state

18  your name and who you represent, and then we'll open it

19  up for questions.

20              TESTIMONY BY DAVID MAXWELL

21          MR. MAXWELL:  I have a written statement

22  that I would like to put into the record, sir.

23          CHAIRMAN DUNCAN:  Well, we haven't been

24  doing that.

25          MR. MAXWELL:  Okay.

CONSIDERATION OF SENATE BILL 14 1/25/2011

1        CHAIRMAN DUNCAN:  If you would just go

2  ahead and --

3        SEN. WEST:  Mr. Chairman?

4        CHAIRMAN DUNCAN:  We'll see.  There is a

5  proper way to get that in.  And if --

6        MR. MAXWELL:  My name is David Maxwell.

7  I'm a resource witness.

8        CHAIRMAN DUNCAN:  Would you state your

9  name and who you represent.

10        SEN. WEST:  Mr. Chairman?

11        CHAIRMAN DUNCAN:  Just let him state his

12  name, and then I'll take your inquiry.

13        Mr. Maxwell.

14        MR. MAXWELL:  My name is David Maxwell.

15  I'm the Deputy Director of Law Enforcement for the Texas

16  Attorney General's office.

17        CHAIRMAN DUNCAN:  All right.  Senator

18  West, for what purpose?

19        SEN. WEST:  Mr. Chairman, I would like to

20  introduce an exhibit.  I think it's Exhibit 10.

21        CHAIRMAN DUNCAN:  Oh, okay.  Exhibit 10.

22  Do we have Exhibit 10 up here?  Do you have copies ready

23  for distribution?

24        SEN. WEST:  Yes, I think you have the

25  exhibit up there.  And, members, what Exhibit 10 is, is

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
 1   a letter from the members of the Congressional

 2   delegation:  Sheila Jackson Lee, Eddie Bernice Johnson,

 3   Charlie Gonzalez, Lloyd Doggett, Gene Green, Rubén

 4   Hinojosa, Sylvestre Reyes and Al Green, asking that

 5   we -- opposing Senate Bill 14 and stating the reasons

 6   why they oppose Senate Bill 14.

 7                   So I would introduce that into the record.

 8                   CHAIRMAN DUNCAN:  Members, any objections?

 9                   The Chair hears none.  It will be received

10   in the record.

11                   (Exhibit No. 10 marked and admitted)

12                   CHAIRMAN DUNCAN:  Okay.  Are there any

13   questions for Mr. Maxwell?

14                   All right.

15                   The Chair hears none.

16                   (Off-the-record discussion)

17                   CHAIRMAN DUNCAN:  All right.  Are there

18   any questions of Mr. Maxwell?

19                   (Brief pause)

20                   CHAIRMAN DUNCAN:  All right.  The Chair

21   hears none.

22                   Thank you, Mr. Maxwell.  Appreciate you.

23

24

25
```

1                      PUBLIC TESTIMONY

2                  CHAIRMAN DUNCAN:  Okay.  We are now ready

3   to go into the public witness phase of the hearing

4   today.  According to our pre-set procedure, I'll call

5   the names of the first five witnesses and they will be

6   brought down to the Senate floor, and then we'll call

7   them in their order.

8                  First is John Patrick, Anita Pruitt,

9   Jessica Gomez, Terri Burke, and Clifford Gay.

10                 (Brief pause)

11                 SEN. VAN de PUTTE:  Mr. Chairman?

12                 CHAIRMAN DUNCAN:  Yes.

13                 SEN. VAN de PUTTE:  Inquiry, Mr. Chairman.

14  I have a statement here from one of our constituents

15  representing the Southwest Voter Registration Education

16  Project to put into the record.  What appropriate time

17  would you accept this or would it be appropriate to put

18  this into the record?  This is someone who wants to put

19  something into the record but is not here to testify.

20                 CHAIRMAN DUNCAN:  It can go in at your

21  request as a part of the record.  But it's not a sworn

22  statement.  Is that correct?

23                 SEN. VAN de PUTTE:  That's correct.

24                 CHAIRMAN DUNCAN:  I think the process that

25  we discussed earlier on was that any senator could put

1  anything in the record that was -- you know --

2            SEN. VAN de PUTTE:  Mr. Chairman, may I be

3  allowed to enter into the record the statement prepared

4  and presented by Lydia Camarillo, Southwest Voter

5  Registration Education Project Vice President?

6            CHAIRMAN DUNCAN:  As exhibit what?  Number

7  what?  Be number 11?

8            SEN. VAN de PUTTE:  No. 11.

9            CHAIRMAN DUNCAN:  Is there any objection?

10            The Chair hears none.  It will be

11  received.

12            (Exhibit No. 11 marked and admitted)

13            CHAIRMAN DUNCAN:  Okay.  And while our

14  first five public witnesses will be approaching, let me

15  go ahead and announce the names of the next five

16  witnesses.

17            Catherine Engelbrecht, Carol Kitson,

18  Placido Salazar, Roman Pena and Rosa Rosales.

19            Okay.  If you'll approach.  The first

20  witness that we have is -- I don't have those cards --

21  here we go -- witnesses and panel of -- you will have

22  three minutes.  You'll get a -- I guess a 30-second

23  warning, is a yellow light, that it comes on.  We will

24  not interrupt you.  And then after you're finished, then

25  the members may ask you questions.

1          All right.  Go ahead and approach the

2     bench, Mr. Patrick.  State your name and who you

3     represent.

4              TESTIMONY BY JOHN PATRICK

5          MR. PATRICK:  My name is John Patrick.

6     I'm the Secretary-Treasurer of the Texas AFL-CIO.

7          Members of the Senate, Mr. Chairman, as an

8     officer of the Texas AFL-CIO, I talk to workers we

9     represent around the state.  Those employees include

10    refinery workers, teachers, plumbers, nurses,

11    steelworkers, theatrical workers, correctional officers,

12    firefighters, flight attendants, state workers, rubber

13    workers and countless other trades and professions.

14    From my experience at this point in time, three issues

15    concern our Texas union members above all others.

16    First, jobs; second, jobs; third, jobs.  Quite frankly,

17    from my perspective and from the perspective of the

18    AFL-CIO, jobs should be the emergency issue before this

19    legislative session, not the voter ID bill.

20          Senate Bill 14 will be the first bill

21    considered by a committee in the Texas Senate during

22    this legislative session.  The Governor has designated

23    this bill as an emergency item.  Unfortunately, I'm not

24    aware of any mention of the word "jobs" or "employment"

25    in Senate Bill 14.  Senate Bill 14 would no longer allow

1    someone to vote with a voter registration certificate

2    alone but would require an official photo ID.  The

3    stated reason for the issue is alleged voter fraud.

4                    Thousands of education employees around

5    this state, as well as state employees and other local

6    government employees, are concerned about budget cuts

7    being considered by this state legislature.  Those

8    individuals would prefer that this body consider

9    legislation that addresses our budgetary concerns rather

10   than debating voters' photos.

11                   Thousands of private sector employees are

12   also concerned about jobs, as well they should be.

13   Rather than obsessing about voters' photos, they would

14   probably prefer that you consider legislation that

15   establishes a preference for state and local governments

16   to buy American products and services.

17                   CHAIRMAN DUNCAN:  Thank you, Mr. Patrick.

18   Your time has expired.

19                   Members, are there any questions of the

20   witness?

21                   All right.  The Chair hears none.

22                   We appreciate your appearance.

23                   The Chair calls Anita Pruitt -- or

24   "Privitt."

25                   Ms. Pruitt.

1    TESTIMONY BY ANITA PRUITT

2         MS. PRUITT:  I'm Anita Pruitt.  I

3    represent the League of Women Voters of Texas.

4         For the 90-plus years since women gained

5    the right to vote nationally, LWV has educated and

6    agitated for active, informed participation of all

7    citizens in government.  No form of participation is

8    more important than voting.  We oppose any requirement

9    that imposes needless difficulties on voters or tends to

10   discourage legitimate voters from going to the polls and

11   casting a ballot.

12        Texas voters know that identification is

13   already required.  To close what is characterized as a

14   potential loophole for fraud, SB 14 would restrict

15   acceptable identification a voter must present to a

16   limited list of photo IDs and provide for criminal

17   penalties.  The real voting problem in Texas is not

18   potential voter impersonation but low voter turnout.

19   Texas was 46th among the states in turnout of the voter-

20   eligible population for 2008 and 50th for the 2010

21   general election.  No state had a lower turnout.

22        In each election cycle, League of Women

23   Voters fields hundreds of questions from voters around

24   the state.  These questions show that Texas voters are

25   often confused about requirements and discouraged from

1   voting when they don't understand the process.  SB 14

2   would add uncertainties for voters and for election

3   workers.  The bill would make it more difficult for many

4   legitimate voters to cast a ballot and tend to

5   discourage many more legitimate voters from even going

6   to the polls.

7               Student voters would be among those

8   adversely affected.  Many students registered to vote in

9   Texas or eligible to register to vote under Texas law

10  might not have any of the voter IDs specified for SB 14.

11  Those who register to vote where they attend school may

12  fear that they will be turned away at the polls because

13  their documents don't match.

14              In a few years we will celebrate the 50th

15  anniversary of landmark civil rights legislation.  Now

16  we wonder how it could be so hard to have gotten that

17  legislation passed.  I'm wondering now, if we pass this

18  legislation in Texas, how future generations will look

19  back at us.  Will they wonder why we did this or was it

20  a legitimate thing that we did?

21              The League of Women Voters of Texas

22  believes that this legislation is a backwards step, and

23  we ask you to oppose it.

24              CHAIRMAN DUNCAN:  Thank you, Ms. Pruitt.

25              Are there any questions of Ms. Pruitt?

CONSIDERATION OF SENATE BILL 14 1/25/2011

1          All right.  The Chair hears none.

2          We appreciate your appearance here today.

3          The Chair calls Jessica Gomez.

4          Please state your name and who you

5  represent.

6          TESTIMONY BY JESSICA GOMEZ

7          MS. GOMEZ:  Thank you, Mr. Chairman.  My

8  name is Jessica Gomez, and I'm here as a voting rights

9  specialist with Advocacy Incorporated, the protection

10 and advocacy system for people with disabilities in the

11 State of Texas.

12          I'm here today testifying in opposition on

13 behalf of Advocacy Incorporated, as well as the

14 Disability Policy Consortium, because of the large and

15 onerous burdens Senate Bill 14 would place on the number

16 of Texans with disabilities that do not have the photo

17 identification required by this bill.

18          An estimated 10 percent of people with

19 disabilities do not have photo identification.  In

20 Texas, that equals 257,800 voting age persons with

21 disabilities who do not have the photo identification

22 required by this bill.  People with disabilities are

23 less likely to have photo ID because many do not drive

24 and rely on others to assist them with activities such

25 as banking, that requires photo ID.

CONSIDERATION OF SENATE BILL 14 1/25/2011

1           I will not go through all of the burdens
2  upon people with disabilities to obtain an ID, since my
3  colleague, Chase Bearden, already outlined those for
4  you.  But I did want to urge all of you to consider an
5  exemption for people with disabilities in the State of
6  Texas who do not have an ID.
7           And this bill will likely pass, in light
8  of the burdens that it places on people with
9  disabilities.  I would urge you all to consider
10 throughout this session other ways that you might ease
11 the voting process for people with disabilities.  For
12 instance, a permanent mail-in ballot application,
13 enforcement of the National Voter Registration Act which
14 requires all state agencies, not just the Department of
15 Public Safety, to offer voter registration
16 opportunities, and expansion of the number of people a
17 person can assist in filing a late ballot on the basis
18 of a disability.
19          I stand ready to assist all of your
20 offices in thinking about the ways that this bill might
21 impact people with disabilities and ways that it can be
22 revised to benefit them.
23          Thank you.
24          CHAIRMAN DUNCAN:  Thank you, Ms. Gomez.
25          Are there any questions for the witness?

```
 1   All right.  The Chair hears none.
 2                   We appreciate your appearance here today.
 3                   Oh, I'm sorry, Senator Zaffirini.  I
 4   didn't see it.
 5                   QUESTIONS FROM SENATE FLOOR
 6                   SEN. ZAFFIRINI:  That's all right.  Thank
 7   you, Mr. Chairman.
 8                   Thank you so much for your testimony.  Did
 9   you hear Mr. Bearden's testimony earlier?
10                   MS. GOMEZ:  Yes, ma'am, I did.
11                   SEN. ZAFFIRINI:  And you heard my question
12   when I asked him if he had specific amendments for this
13   particular bill that would help us cure it and make it
14   more positive, have a positive impact on persons with
15   disabilities who want to vote?
16                   MS. GOMEZ:  Yes, I did.
17                   SEN. ZAFFIRINI:  Do you have additional
18   suggestions or only the suggestions that you just
19   articulated?
20                   MS. GOMEZ:  Well, those are suggestions
21   that would be in addition to this bill.  These would be
22   separate bills filed by senators.  In terms of an
23   exemption or an amendment for this bill, I would suggest
24   an affidavit that people with disabilities could sign
25   that would provide criminal penalties if they were to
```

1  lie on that affidavit.

2          To further secure that process, you could

3  also require a fingerprint so that if that person did

4  vote fraudulently and then another person, the real

5  voter came in, you could run the fingerprints and

6  prosecute the original voter.

7          I would not support any amendments that

8  would require verification of the disability status,

9  because that would just again place another burden on

10  people with disabilities to prove their status in order

11  to vote.

12          SEN. ZAFFIRINI:  It would also add an

13  expense, wouldn't it?

14          MS. GOMEZ:  Sorry?

15          SEN. ZAFFIRINI:  It would also add an

16  expense?

17          MS. GOMEZ:  Absolutely.  And for many of

18  the reasons that Mr. Bearden outlined in his testimony,

19  because of the expenses of traveling and obtaining the

20  necessary documentation.

21          SEN. ZAFFIRINI:  Well, how do you respond

22  to the person who will say, well, persons with

23  disabilities don't have to drive or get a ride to a

24  driver's license office or to DPS in particular, the

25  agency itself, to get a voter -- I mean, a photo ID,

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
1   they can simply register on-line?  How do you respond to
2   that suggestion?
3              MS. GOMEZ:  I don't believe that there is
4   a process to make that readily available.  And, in
5   addition, there is such a high number of people with low
6   income who have disabilities that many of them might not
7   have access to computer or the Internet that would be
8   required to do that on-line.
9              SEN. ZAFFIRINI:  So you would worry about
10  a digital divide for persons with disabilities?
11             MS. GOMEZ:  Absolutely.
12             SEN. ZAFFIRINI:  Okay.  Thank you very
13  much.
14             MS. GOMEZ:  Thank you.
15             CHAIRMAN DUNCAN:  Thank you, Senator
16  Zaffirini.
17             Are there any other questions of
18  Ms. Gomez?
19             The Chair hears none.
20             Thank you very much.
21             The Chair calls Terri Burke.
22              TESTIMONY BY TERRI BURKE
23             MS. BURKE:  Good evening, senators.  I'm
24  Terri Burke.  I'm the Executive Director of the ACLU of
25  Texas.
```

CONSIDERATION OF SENATE BILL 14 1/25/2011

1          I'm here to talk about SB 14 in the
2    context of provisional ballots.  But I want to be
3    certain you know that we believe that Texas is overdue
4    for an overhaul of its election law, and we would
5    certainly support a comprehensive look at that.
6               More than two years ago, Attorney General
7    Abbott pledged to root out what he called an epidemic of
8    voter fraud in Texas.  He established a special unit in
9    his office.  He tapped $1.4 million in federal crime-
10   fighting grant money and dispatched legislators --
11   "legislators" -- yes, maybe that, too -- investigators.
12   In '08, the last time we heard about this, General
13   Abbott had prosecuted 26 cases, all involving blacks or
14   Hispanics.  All were committed by absentee ballot, not
15   in-person voting.  So how would photo voter ID have
16   addressed those lives?  SB 14 is still as it was in '09.
17   It is still a solution in search of a problem.
18               Provisional ballots are one of the
19   legislative priorities of the ACLU of Texas this
20   session.  We believe that these ballots were developed
21   to give the opportunities to voters to cast a
22   provisional ballot.  They were envisioned as fail-safe
23   voting protection for the voter to remedy faulty voter
24   lists.  What we're discovered in researching those in
25   Texas is that we have an extremely high rate of ballot

1  rejections.  The average rate of rejection nationally is

2  20 percent; yet, in Texas, it's nearly 80 percent of the

3  provisional ballots cast, as least in the '08 election.

4  In other words, 42,000 Texas voters who cast provisional

5  ballots in 2008 saw most of those were not accepted.

6  9,400 were counted.

7            If passed, SB 14 will no doubt increase

8  the number of provisional ballots that are cast at the

9  polls and also will increase the number of votes that

10  are rejected, due to new identification requirements.

11  This bill would cost more Texas voters their legitimate

12  right to vote.  32,000 Texas voters were rejected in

13  2008.  That so many were rejected is a threat to our

14  representative democracy.  Texas ranked, as you've

15  heard, 50th in registered voter turnout for 2010.  We

16  cannot continue placing undue burdens on eligible voters

17  and keep a healthy democracy.

18            Thank you for your attention and thank you

19  for what you're doing for the State of Texas.

20            CHAIRMAN DUNCAN:  Thank you, Ms. Burke.

21            Are there any questions for Ms. Burke?

22            Okay.  The Chair hears none.  We

23  appreciate your appearance here today.

24            All right.  The next group of persons who

25  will need to be called into the chamber are Alfredo

1   Esparza, Marcelo Tafoya, Barbara Baxter, Hector M.

2   Flores and Sergio Castillo.

3               All right.  Our next witness is Catherine

4   Engelbrecht.

5               Ms. Engelbrecht, state your name and who

6   you represent.

7           TESTIMONY BY CATHERINE ENGELBRECHT

8               MS. ENGELBRECHT:  Hi.  My name is

9   Catherine Engelbrecht.  I'm with King Street Patriots

10  and True the Vote.  Thank you-all, senators, for the

11  privilege of being able to speak with you this evening.

12              I stand before you today to testify in

13  support of Senate Bill 14.  I'm President of King Street

14  Patriots, and I said earlier True the Vote, two

15  non-profit groups, both based out of Houston.  King

16  Street Patriots is a volunteer organization of concerned

17  citizens, and True the Vote is a citizen-led initiative

18  to protect the right to vote and the integrity of the

19  election process.

20              True the Vote volunteers work to educate

21  citizens and train other citizen volunteers to be poll

22  workers and poll watchers for their party, candidate or

23  issue.  Now, the reason that that is important is

24  because in the last election cycle, we put out trained

25  volunteers over 1,000 volunteers.  And through the

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
 1   course of the election cycle, they turned back in over
 2   700 what we call incident reports.  Those incident
 3   reports categorically were indications of election laws
 4   being broken.  But many of the abuses stemmed from the
 5   lax and ambiguous forms of identification currently
 6   accepted at our polls.
 7                 These types of abuses would have been
 8   mitigated had we had benefit of legislation like SB 14.
 9   We witnessed numerous instances in which voters were in
10   possession of more than one registration card.  For
11   example, a voter came in with a registration card and
12   turned it over to the election judge, who looked at the
13   poll book and said, "Oh, I'm sorry.  You're already
14   voted."  And he reached into his other pocket and said,
15   "Oh, well, how about this card?"
16                 "That's a good card.  You can vote that
17   one."
18                 Another instance where a woman came in to
19   vote and was told she had already voted.  And she said,
20   "Well, that's not the case.  I haven't."  And she looked
21   at the poll book and there was staring back at her a
22   signature that she did not recognize.
23                 Without photo identification, there is no
24   way to verify that a person is who they say they are, if
25   they are that person on the registration card, a utility
```

1   bill or the check.  These examples are clearly

2   violations of election code law, but there is no

3   realtime recourse for a poll worker.  Poll workers are

4   obliged to allow these individuals to vote, to cast a

5   regular ballot, because the system does not prevent it.

6              Without photo identification, the evidence

7   of impropriety is limited only to a signature

8   comparison, which is typically considered insufficient

9   to warrant any further review.  And so when we often

10  ask, "Well, where are the prosecutions?" it's because

11  more often than not, they end with the signature

12  comparisons, and that's all we have.

13             So as these scenes play out in polling

14  places across our communities over and over again,

15  election cycle after election cycle, the message

16  communicated to both poll workers and to voters is:  The

17  rules don't really matter.  And if the rules don't

18  really matter, then how do we know that our election

19  results are right?  We are on a very slippery slope.

20  And the surest way to regain our footing is to restore

21  common sense to our election code.

22             CHAIRMAN DUNCAN:  Thank you,

23  Ms. Engelbrecht.

24             MS. ENGELBRECHT:  Thank you so much.

25             CHAIRMAN DUNCAN:  Senator Williams, do you

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
 1   have a question?
 2                  QUESTIONS FROM SENATE FLOOR
 3                  SEN. WILLIAMS:  No.  I just wanted to
 4   thank her for being here and for all the effort that her
 5   group put into the last election cycle.  I really
 6   appreciate what you guys are doing.
 7                  MS. ENGELBRECHT:  Thank you.
 8                  CHAIRMAN DUNCAN:  Thank you.
 9                  Any other questions?
10                  Senator Patrick.
11                  SEN. PATRICK:  Yes.  Thank you,
12   Mr. Chairman.
13                  Catherine, thank you.  Senator Williams
14   said you did what so many people really wanted to have
15   done, and that was to put eyes on the election.  You
16   trained poll workers.  They stood there -- poll
17   watchers -- they identified; they reported.  You-all
18   stood up as citizens, fair and unbiased, and we
19   appreciate your work and your effort.
20                  I met you just about a year ago, and you
21   were just a citizen, just a mom who, with your husband,
22   own your own business, that said, "I want to make a
23   difference," and I appreciate you and all the work that
24   those unheralded volunteers did.  Thank you very much.
25                  MS. ENGELBRECHT:  Thank you.  Thanks to
```

CONSIDERATION OF SENATE BILL 14 1/25/2011

1  all of you.

2  CHAIRMAN DUNCAN:  Hold on a minute.  We've

3  got another questions.

4  Senator Van de Putte, did you have a

5  question?

6  SEN. VAN de PUTTE:  I sure did.  Thank

7  you, Mr. Chairman.

8  Thank you very much for coming and

9  especially for waiting so long.  But I wanted to

10  understand, because I'm from Bexar County and not from

11  Harris County where --

12  MS. ENGELBRECHT:  Sure.

13  SEN. VAN de PUTTE:  -- we love the people

14  to be involved.  But on the reports that we had from --

15  at least from the press, the group that you represent,

16  the King Street Patriots, it was an article about voter

17  intimidation.  And so I wanted to ask you, were the

18  districts, were the voting polling places that your

19  group believed were having the numerous amount of fraud,

20  where you were accusing several places of having voter

21  intimidation, mainly occur in minority district that

22  have been directed at Latinos and African- Americans, as

23  reported in the press?

24  MS. ENGELBRECHT:  That is all

25  unequivocally incorrect.

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
1              SEN. VAN de PUTTE:  And so there --
2              MS. ENGELBRECHT:  May I?  I'll explain
3    very quickly.  When we started the early election,
4    within just a few hours of the polls opening, we were
5    informed that a conference call, a press conference call
6    had been called by the Texas Democrat party, already
7    charging that there were 14 counts of voter
8    intimidation, with no backing whatsoever.  Well, the
9    press ran with that, and it was all over the place.
10             The county attorney later said -- and,
11   unfortunately, that didn't make it out to the press --
12   that there was, in fact, no voter intimidation.  And our
13   efforts were equally served over all 37 of the early
14   election polling places, so we did not single out any
15   community.
16             SEN. VAN de PUTTE:  So this was at all --
17   you had groups at all of the early voting places, it
18   wasn't just in the places that had minority, mainly
19   Latino or African-American?
20             MS. ENGELBRECHT:  That's correct.  We
21   had --
22             SEN. VAN de PUTTE:  Thank you for the
23   clarification.
24             MS. ENGELBRECHT:  Thank you.
25             CHAIRMAN DUNCAN:  Thank you, Senator Van
```

1    de Putte.

2              Are there any other questions of the

3    witness?

4              All right.  Ms. Engelbrecht, thank you for

5    your testimony today.

6              The Chair calls Carol Kitson.

7              Ms. Kitson, please state your name and who

8    you represent.

9              TESTIMONY BY CAROL KITSON

10             MS. KITSON:  My name is Carol Kitson, and

11   I basically represent myself and, quite frankly, my

12   daughter.

13             This past November election, I was

14   appointed as an alternate judge in Harris County

15   precinct.  And we had the presiding judge, two clerks.

16   We did have two poll watchers at that location, and a

17   translator.

18             In the late afternoon, the presiding

19   judge's husband, who was acting as election clerk and

20   responsible for giving each voter a numerical code, to

21   allow activation of a voting machine, commented to the

22   poll watcher that the voter he had just given this code

23   to had voted earlier in the day at our location.  The

24   poll watcher agreed with this.

25             And I, too, had noted this same particular

CONSIDERATION OF SENATE BILL 14 1/25/2011

1  gentleman, because he had some very distinguishing

2  characteristics.  He had a very distinctive scar and

3  limited use of one arm.  I remembered seeing him earlier

4  in the day as a voter.  Of course, I don't remember what

5  name or what voter card he used.  And because we could

6  not possibly identify him -- we're not allowed to ask

7  for a photo ID -- he was able to vote for a second time.

8              This man was recognizable, but most people

9  would not be.  We would have no way of knowing during a

10 busy election how many people were coming back through.

11 It's absolutely impossible.

12             Requiring all voters to present a photo ID

13 would prevent individuals from voting more than once.

14 This is important because even a few votes per precinct

15 passed fraudulent can affect the outcome in an election.

16 In Falls County where there's 9,392 registered voters,

17 they had a 42 percent turnout.  In the Governor's race,

18 the difference was only 86 votes.

19             In Val Verde County, where they have

20 27,801 registered voters, they had a 26 percent turnout,

21 and the difference was only 377 votes.

22             And in Bexar County, a very large county,

23 registered voters of 905,859, they have 622 precincts,

24 and they had a 34 percent turnout.  The difference was

25 1,671 votes between the two candidates for Governor.

CONSIDERATION OF SENATE BILL 14 1/25/2011

1  That's less than three votes per precinct.

2         Each fraudulent votes cast diminishes all

3  of the valid votes cast.  Every legal voter in Texas

4  deserves to know that his or her vote was counted

5  correctly, and we need to know that the winner of our

6  elections is truly the winner and not elected because

7  some voters used illegal means to get their candidate

8  elected.  We owe this to ourselves and to the future

9  generations of Texans.

10         Thank you very much for letting me be here

11  today.

12         CHAIRMAN DUNCAN:  Thank you, Ms. Kitson.

13         Are there any questions for Ms. Kitson?

14         All right.  The Chair hears none.

15         You're excused.  Thank you very much.

16         The Chair calls Placido Salazar.

17         Thank you, Mr. Salazar.  You have three

18  minutes.  State your name and who you represent, please.

19         TESTIMONY BY PLACIDO SALAZAR

20         MR. SALAZAR:  Yes, sir.  Good evening,

21  first of all, to all of you and thank you for serving

22  our state.  My name is Placido Salazar.  I'm a Vietnam

23  veteran, 20-year man, and I'm the Civil Rights chair for

24  the Dr. Hector P. Garcia American GI Forum Organization

25  of Texas.

CONSIDERATION OF SENATE BILL 14 1/25/2011

1          And I would like to say that this whole

2    thing about voter ID as well as other measures currently

3    trying to be pushed through the state and federal

4    legislation is xenaphobia at its worst, fearing that

5    immigrants will vote.  And I'm also a present chair in

6    Universal City, and we have enough trouble getting even

7    the registered U.S. citizen voters to the polls.  Last

8    election, out of a city of almost 20,000, and mostly

9    veterans who you would think would appreciate the

10   privilege to vote, like myself, we had 60 Democrats and

11   75 Republicans, and we are worried about illegal

12   immigrants coming to vote.  That's ludicrous.

13          The Dr. Hector P. Garcia American GI Forum

14   Organization of Texas, let it be known for the record

15   that we are totally opposed to the artificial emergency

16   grandstanding by Governor Rick Perry regarding the

17   non-issue of the Texas voter ID and other conveniently

18   selected self-promoting legislation.  This senseless and

19   costly voter ID legislation will not just affect

20   Hispanics but also students, seniors and others who are

21   unable to get around; people living in nursing homes,

22   for example.

23          This is nowhere nearly as important nor

24   affecting every citizen of our Great State of Texas as

25   the ballooning budget deficit of up to $27 billion and

CONSIDERATION OF SENATE BILL 14 1/25/2011

1   the ridiculous cuts in education funding, especially

2   when Texas is almost at the bottom of other states in

3   the education ratings and cannot afford to fire any

4   teachers.  Our teachers invested too much time and money

5   to fulfill their dreams of teaching our children.  Stop

6   playing politics with our students' and our teachers'

7   lives and funding.  Governor Perry, you were elected to

8   be governor of Texas.  Be a sensible, responsible

9   governor of Texas.

10            Some schools in Texas have a drop-out rate

11  of 70 percent; yet, our governor is running around the

12  country promoting his book, Fed Up.  Rick Perry, we are

13  fed up with the shameful number of student drop-out.  He

14  can't even take care of business in Texas; yet, he wants

15  to promote himself to Washington D.C.?  Give me a break!

16  We already had enough of that nonsense with your

17  predecessor.  He left Texas' financial situation in

18  shambles, then he really fixed our wagon in D.C.

19            Too many of our Hispanic-American troops

20  gave their lives and too many MIAs may never come home,

21  fighting for the democracy and the freedom, or so-called

22  freedom, of other peoples in other countries around the

23  world for this great veterans organization, the AGIF, to

24  allow Rick Perry or any other political leader to

25  trample over our civil rights.

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
 1                  CHAIRMAN DUNCAN:  Mr. Salazar, your time
 2  has expired.  I'll give you a little bit --
 3                  MR. SALAZAR:  Get rid of this legislation.
 4  Thank you.
 5                  CHAIRMAN DUNCAN:  Thank you for your
 6  testimony and for your wait here today.  Wait A minute.
 7  There may be some questions.  I don't know.
 8                  Are there any questions of the witness?
 9                  All right.  The Chair hears none.
10                  Thanks again for your appearance and your
11  testimony.
12                  MR. SALAZAR:  Thank you, sir.
13                  CHAIRMAN DUNCAN:  The Chair recognizes
14  "Riman" Pena.
15                  Roman.  Okay.  It looks like an "i" to me.
16                  State your name correctly, please, and who
17  you represent.
18                  TESTIMONY BY ROMAN PENA
19                  MR. PENA:  Mr. Speaker, thank you for your
20  kindness.
21                  Senator Uresti -- my senator -- Senator
22  Van de Putte and senators and ladies and gentlemen, good
23  afternoon -- well, it's good night now.
24                  My name is Roman Pena, also known as Vic
25  Pena.  And I am here today -- rather tonight --
```

CONSIDERATION OF SENATE BILL 14 1/25/2011

1  representing LULAC and the American GI Forum, who was

2  born of LULAC to represent soldiers returning from World

3  War II and wars thereafter.

4           As Vice Commander of the American GI

5  Forum, C.P. Garcia Chapter, and Texas LULAC Veterans

6  Affairs Chairperson, I'm very saddened as I sit here

7  listening to the author of this bill, Senator Fraser,

8  responding to your questions that he knows nothing of

9  how this new law will impact voters in Texas.  Many

10  years ago, then Senator Navarro wrote Sam Houston about

11  the Know Nothing party, and it wasn't nice.

12           Mr. Speaker, what is the real reason

13  behind this legislation?  To disenfranchise voters?

14  Which voters?  Fifty years ago, my generation -- and

15  some of you included -- had a vision to make Texas and

16  the United States of America a better place to live and

17  be happy and share the American dream.  And, my fellow

18  Texans, we succeeded, because we walked in the valley of

19  darkness and feared no evil, for great men and women

20  like yourselves said, "Enough is enough," ya basta!

21           Today some members of your generation are

22  trying to return Texas back to those dark ages.  I beg

23  of you to defeat this mean-spirited legislation, let not

24  the flesh overcome the spirit for it is said that the

25  fulfillment of the prophecy is at hand.

TX_00000875

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
 1                    Thank you, and have a good day.  And tear
 2   down this bill, Mr. Speaker.
 3                    CHAIRMAN DUNCAN:  Well, thank you,
 4   Mr. Pena.
 5                    Sen. Van de Putte, do you have a question?
 6                    CONDOLENCES FROM SENATE FLOOR
 7                    SEN. VAN de PUTTE:  Just for the witness.
 8                    Mr. Pena, we understand that you have just
 9   experienced a personal loss.
10                    MS. PINZUR:  Yes, I sure have.
11                    SEN. VAN de PUTTE:  So on behalf of the
12   Texas Senate, let me offer condolences on the death of
13   your wife, and so recently, and your patriotism and
14   belief in your government to come and testify when you
15   yourself had such a personal loss so quickly.  Please
16   note our condolences on the passing of your beautiful
17   wife.
18                    MR. PENA:  I accept your condolences,
19   Senator.
20                    Thank you very much.  Is there any
21   questions?
22                    CHAIRMAN DUNCAN:  Any more questions?
23                    The Chair hears none.
24                    Thank you, Mr. Pena.  Appreciate it.  And
25   sorry for your loss.
```

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
 1              MR. PENA:  Thank you.
 2              CHAIRMAN DUNCAN:  The Chair calls Rosa
 3  Rosales, National Alliance for Education and Equity, and
 4  LULAC.
 5              State your name, please, and who you
 6  represent.
 7              TESTIMONY BY ROSA ROSALES
 8              MS. ROSALES:  Honorable senators, ladies
 9  and gentlemen, my name is Rosa Rosales.  I'm here today
10  representing the National Alliance for Education and
11  Equity -- and Equality -- and, of course, as an
12  immediate past national president of the League of
13  United Latin American Citizens, the oldest and the,
14  largest Latino organization in the nation that was
15  founded to eradicate discrimination of any shape and
16  form.
17              I am here today to voice strong opposition
18  to SB 14, voter ID.  At a time when the State of Texas
19  is having to deal with a $27 billion deficit and,
20  therefore, having big cuts in social services, health
21  care, education -- and higher education, this voter
22  education bill should not be a priority.  This is not a
23  quality-of-life legislation for the State of Texas for
24  all of us.
25              As a matter of fact, the bill will
```

1   actually create unnecessary barriers for the elderly,

2   minorities and the working poor.  Texas has a history of

3   voter discrimination, as you have heard it here by many

4   that have testified.  If the law is enacted, it would

5   primarily affect minorities and the elderly.  The bill

6   would actually regress the State of Texas to the days of

7   the poll tax.  Voters, especially the working poor and

8   the elderly and women, will return -- or not return to

9   the county department, the voter registration county, to

10  provide the required identification within six days to

11  cure the provisional vote and the problem that we've had

12  with provisional votes here in the State of Texas.  Most

13  of them, a very high percentage, are rejected to begin

14  with.

15          The implementation of this bill will cause

16  the State of Texas a substantial amount of money.  It's

17  been estimated $2 -- $2 million.  That money could

18  actually be put to a better use, to address the

19  immediate needs of the State of Texas where every single

20  dollar is put into education.  You know, higher

21  education, health care, nursing homes, social services,

22  instead of a voter ID bill, especially the State of

23  Texas, I have been told, is in the last place of all the

24  states in the United States when it comes to education.

25  What a shame.

1              Finally, this SB 14, voter ID, is most

2    likely to violate Section 5 and Section 2 of the Federal

3    Voting Rights Act.  LULAC is ready and prepared to take

4    any action, whether it be legal action tomorrow, if it

5    does violate the Voting Rights Act.

6              Thank you so much.

7              CHAIRMAN DUNCAN:  Thank you very much.

8              Are there any questions for Ms. Rosales?

9              The Chair hears none.

10             Thank you for your testimony.

11             All right.  We're ready for our next

12   panel.  But before that, let me announce the last group.

13   Amalia Martinez, Fidel Acevedo, Ray Rodgers, Gordon

14   Quan, Rachel Delgado and Sandra Crenshaw.

15             Okay.  The Chair calls Alfredo Esparza

16   with LULAC.

17             State your name and who you represent,

18   please.

19             TESTIMONY BY ALFREDO ESPARZA

20             MR. ESPARZA:  My is Alfredo Esparza.  I'm

21   for LULAC, District 15, San Antonio, Texas.  I'm on

22   behalf of senior citizens in Bexar County, which I

23   represent.

24             And the reason that I'm here today, I

25   think this SB 14 is a bill that's very bad for senior

```
 1   citizens.  And the reason, can you imagine if your
 2   mother is 70 or 80 years old, trying to go and get an
 3   ID?  Are you going to take her or your son or your
 4   daughter or his grandson?  I don't believe so, because I
 5   work with seniors citizens every day.  And you know
 6   what?  It's a hardship just to go to get their needs and
 7   their groceries or their medications.
 8                  And we come in as LULAC to help our senior
 9   citizens.  Now, just think, there is a hardship for
10   senior citizens to go and get a new ID just to vote.  A
11   lot of senior citizens vote, but this bill will make it
12   a real hardship problem to senior citizens, especially
13   those that are on disability or SSI.  It's hard for them
14   to get around.
15                  After you pass 60 or 65 like me, you think
16   about where you're going and where you need to be.  And
17   I don't know about you, but I know as a fact that here
18   in Texas, it's not proper for bills like this to pass,
19   and that's why I'm here to testify about it.
20                  Thank you very much.
21                  CHAIRMAN DUNCAN:  Thank you, Mr. Esparza.
22                  Are there any questions for Mr. Esparza?
23                  The Chair hears none.
24                  Thank you for your testimony today.
25                  The Chair calls Marcelo Tafoya.
```

1          Mr. Tafoya, please state your name and who

2  you represent.

3          TESTIMONY BY MARCELO TAFOYA

4          MR. TAFOYA:  My name is Marcelo Tafoya.

5  Good afternoon.  I am the District 12 director for

6  LULAC, the League of United Latin American Citizens.  I

7  also represent the CCC, the Coalition of Community

8  Concerns.  And the biggest concern we have is

9  discrimination, especially in voting.

10          A couple of years ago, I was pleased to

11  join some gentlemen that came down from the Justice

12  Department looking into voter fraud and voter

13  discrimination.  They found no voter fraud, but they

14  found six cases of voter discrimination against the

15  Hispanic community.  In cases where an Hispanic

16  individual came up, and they gave them 45 minutes,

17  because they had nobody there, to interpret for them on

18  the voting process.  A lady sat there for 45 minutes in

19  a wheelchair waiting for somebody to come down from the

20  county.

21          This is only one.  There were several

22  others that were turned away because they said that they

23  had broken in front of the line.  You know, I don't

24  understand a lot of the issues that was brought up at

25  the time, but it just happened to be a Spanish when all

CONSIDERATION OF SENATE BILL 14 1/25/2011

1  these things were occurring.

2          Now, as far as being handicapped, I find

3  an issue with cost.  Okay?  I'm on a fixed income.  I'm

4  pretty fortunate that I have my driver's license for a

5  long time ago so I get it through the mail.  Okay?  I

6  don't have to go take a test anymore.  Maybe later on,

7  they find out that I testified, they will probably call

8  me in to go take a test, check my eyes, do the whole

9  process.  Right?  But I don't care.  I'm willing to do

10 that or whatever it takes to defeat a bill that is

11 unnecessary.  Why do you have to try to fix something

12 that is working?

13         No. 2, why do you take this bill on today

14 when our children are failing in school?  Look, I'm

15 worried about my grandchildren, my great-grandchildren

16 that are not getting educated, that we're lacking the

17 money that it takes to educate our children properly.

18 Why don't you take something up like that instead of

19 worrying about somebody getting you elected again in

20 this process?  So please defeat this bill, let's get

21 busy with the rule, let's get some money into the

22 caucus.  Let's don't be spending it uselessly, spending

23 it for no reason whatsoever and start putting it where

24 it belongs, the education of our children and the

25 welfare of our community.

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
 1                    I want to thank y'all very much.  God
 2   love!
 3                    CHAIRMAN DUNCAN:  Thank you, Mr. Tafoya.
 4   Hold on just a second.
 5                    Are there any questions for Mr. Tafoya?
 6                    All right.  The Chair hears none.
 7                    Thank you for your testimony.
 8                    The Chair calls Hector M. Flores.
 9   Mr. Flores, please state your name and who you
10   represent.
11                    TESTIMONY BY HECTOR M. FLORES
12                    MR. FLORES:  Governor, Mr. Chairman,
13   members of the Senate, my name is Hector Flores.  I'm
14   from Duncanville, Texas, and I'm here to represent the
15   Texas League of United Latin American Citizens known as
16   LULAC, and I'm here to give opposition to this bill.
17                    With a budget shortfall and many other
18   issues confronting Texas during these hard economic
19   times, we cannot understand why voter ID is such an
20   urgent matter for the Texas Legislature.  LULAC has
21   voted unanimously to oppose this bill, and we ask you
22   also to protect the voting rights of all citizens of
23   Texas but also ask you to protect the voting rights of
24   the Latino voters, as mandated by Section 5 and Section
25   2 of the Voting Rights Act.
```

CONSIDERATION OF SENATE BILL 14 1/25/2011

1          Specifically, LULAC argues against the

2   passage of any voter identification bill until such time

3   as Texas can guarantee zero tolerance of voter

4   discrimination and implement all protection of the Civil

5   Rights Act as ordered by the Supreme Court.  Given the

6   history of Texas, this will be a long time in coming.

7          In 2005, 2006 and 2007, the Voting Rights

8   sections of the Department of Justice filed 10 separate

9   lawsuits against Texas.  All 10 suits were for

10  discrimination against Mexican-Americans, and one of the

11  suits involved discrimination against Mexican-Americans

12  and African-Americans combined.

13          There was also a separate lawsuit in

14  Harris County for discrimination against Vietnamese-

15  Americans.  All suits were successful against Texas, and

16  Texas entered into consent -- agreements to correct

17  discriminations.

18          During the same period, several suits were

19  brought by LULAC and MALDEF against Texas and also

20  against several government entities, in particular in my

21  hometown of Dallas, in Farmers Branch and in Irving,

22  Texas.  And, obviously, in LULAC vs. Perry, the Supreme

23  Court found that Texas purposely discriminated against

24  Mexican-Americans in Congressional District 23 in

25  San Antonio where I come from.

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
 1              I have five pages, but I will only try to
 2  synopsize.  In light of the fact that the proposed bill
 3  brought forward by the Texas Legisl- -- the Senate, it's
 4  likely to violate both Sections 5 and Section 2 of the
 5  Federal Voting Rights Act.  LULAC urges you not to adopt
 6  the proposed bill as is.
 7              And, as you know, LULAC has participated
 8  in over 400 court-ordered elections in Texas since
 9  adoption of the Voting Rights Act, and we will
10  vigorously challenge any voter ID bill.  We're also, as
11  has been mentioned earlier, ready to pursue an objection
12  before the Voting Rights section of the Department of
13  Justice, if necessary.  But we hope that there are many
14  options that you can take, but the first one you can
15  take is not to support this bill.
16              I thank you very much for listening to me
17  tonight, and I hope you will do the right thing.
18              CHAIRMAN DUNCAN:  Senator Gallegos, do you
19  have a question?
20              QUESTIONS FROM SENATE FLOOR
21              SEN. GALLEGOS:  Yes.
22              Mr. Flores, let me ask -- and then I heard
23  you when you testified in Dallas and you were on the
24  redistricting hearing, and you were knowledgeable about
25  voting rights and all that.  I heard your testimony
```

```
 1    today.  I was wondering, were you in the chamber when
 2    Prof. Tijerina testified?
 3                    MR. FLORES:  Absolutely.
 4                    SEN. GALLEGOS:  You heard his testimony?
 5                    MR. FLORES:  Yes, I did.
 6                    SEN. GALLEGOS:  Okay.  Let me ask you,
 7    hearing his testimony and the history of discrimination
 8    against Mexican-Americans as far as voting here in the
 9    State of Texas, do you agree with his testimony?
10                    MR. FLORES:  Yes, I do.  In fact, the
11    first time that I voted, I had to go get a poll tax to
12    vote, when I turned of age.  And so I had to decide
13    whether I was going to go to the movies that weekend or
14    go vote.  And so, you know, it's a way to keep people
15    from voting, in my opinion.  And, of course, that's one
16    of the reasons we did away with the poll tax in Texas.
17                    SEN. GALLEGOS:  So in your opinion, the
18    incidents that Prof. Tijerina pointed out in his
19    testimony -- and you've heard all of them; you heard all
20    of them -- that it leads up to discrimination that is
21    part of the history of the State of Texas to present.
22    How would you compare that to Senate Bill 14 that's on
23    the floor today?
24                    MR. FLORES:  Well, I'm not only expert on
25    the bill, but I understand that there's still much
```

CONSIDERATION OF SENATE BILL 14 1/25/2011

1  desired to be done to fix this bill so perhaps it might

2  comply into the future.  Obviously, this is going to be

3  just an obstacle for the elderly, for handicapped

4  people, but also for minorities who may not have an ID

5  to begin with.  And I would venture to say that both my

6  grandmothers -- and I'm a fifth generation Tejano --

7  both of my grandmothers didn't go around with their ID.

8  And, you know, this is going to be a problem and it's

9  going to keep people from voting.  I don't think it's

10  the right way to go for Texas.

11               SEN. GALLEGOS:  Mr. Flores, thank you for

12  coming to testify.  Thank you.

13               MR. FLORES:  Thank you, Senator.

14               CHAIRMAN DUNCAN:  Senator West, for what

15  purpose?

16               SEN. WEST:  Just one question.

17               Hector, how you doing?

18               MR. FLORES:  I got up at 4:30 this

19  morning.  They sequestered me over there.  They told me

20  I might be here till 8 o'clock in the morning like the

21  last time.  I said, "Absolutely not.  I got to go work

22  in the morning."

23               SEN. WEST:  Well, thank you very much for

24  coming down.  I really do appreciate it.

25               MR. FLORES:  My pleasure.

1        SEN. WEST:  You know, during the earlier

2   conversation that I was having with Senator Fraser, he

3   was saying that people in our district are supportive of

4   this voter ID bill.  Now, you've lived in that district

5   for as long as I have.

6        MR. FLORES:  Thirty-eight years.

7        SEN. WEST:  In fact, we kind of live

8   pretty much around the corner from one another?

9        MR. FLORES:  Yes, sir.

10        SEN. WEST:  And you have worked in that

11   district as an activist for years.  Is that correct?

12        MR. FLORES:  Yes, sir.

13        SEN. WEST:  So you have opportunities to

14   talk to people in the district.  Is it a fair

15   statement -- is that a fair statement that was made by

16   my friend, Senator Fraser, that the bulk of people in

17   the 23rd senatorial district favor this voter ID bill?

18        MR. FLORES:  I don't think so.

19        SEN. WEST:  Okay.  Thank you very much.

20        MR. FLORES:  Thank you, sir.

21        Mr. Chairman.

22        CHAIRMAN DUNCAN:  Thank you for your

23   testimony.

24        Are there any other questions of the

25   witness?

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
 1              All right.  The Chair hears none.
 2              Appreciate your testimony today.
 3              MR. FLORES:  Thank you very much.
 4              CHAIRMAN DUNCAN:  Fidel Acevedo.
 5               TESTIMONY BY FIDEL ACEVEDO
 6              MR. ACEVEDO:  Thank you, Mr. Speaker,
 7    senators.  My name is Fidel Acevedo, and I'm here to
 8    testify on Senate Bill 14.  It seems like a long way
 9    from the last time we had to do this, but we have to do
10    it all over again.  It seems like history repeats
11    itself.  We can't just get away from it right away.  We
12    just have to keep right on doing it until we do the
13    right thing.
14              I think the GOP has the right idea about
15    doing some things repeatedly.  Certainly this senate
16    bill is not one of them.  I have to tell the senate
17    chamber here today that I have to excuse myself from --
18    refrain from using some harsh language that's coming
19    from San Antonio District 14, the Fighting 14, and my
20    senator, they're listening to me, I have to be
21    respectful to each and every one of you.
22              However, it does merit saying that this
23    bill, as the gentleman testified earlier as an expert,
24    it is discriminatory to say the least.  It will continue
25    the tradition here in the State of Texas of doing just
```

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
 1  that.  "Some way, somehow, we're going to keep
 2  Mexican-Americans from voting."  It is not like if, over
 3  there in Horseshoe Bay, that the Mexicans are just
 4  getting ready to go over there and remove Senator
 5  Fraser.  Huh?  I don't think so.  That's not going to
 6  happen.
 7              But as I slow down just a little bit, just
 8  to think of what tremendous work you guys do, let's put
 9  the priorities right.  I have to tell you -- and I must
10  say this -- that our priorities are wrong here in the
11  chamber right now.  Education, education, jobs, jobs,
12  the economy.  The photo ID can wait if we must have to
13  go that route.  But it's jobs, education for our
14  children.  That is the priority.
15              I think maybe somebody had heartburn and
16  the Governor had to say, "We have to have an emergency
17  session for this particular one," or maybe perhaps the
18  Lt. Governor had to follow up and say, "Hey, look!  This
19  is a valid emergency.  We ought to put it in the
20  priority first time out, first thing out, have to come
21  out of the chute is this bill."
22              Please help defeat this bill.  I know
23  that's an impossibility, but at least it's -- I'm an
24  optimist, and I hope that you guys can do the right
25  thing.  Thank you.
```

CONSIDERATION OF SENATE BILL 14 1/25/2011

1          CHAIRMAN DUNCAN:  Thank you.

2              Are there any questions for the witness?

3              All right.  The Chair hears none.

4              We appreciate your appearance here today.

5              MR. ACEVEDO:  Thank you.

6              CHAIRMAN DUNCAN:  Members, we have some

7  cards of some persons who registered that they would

8  like to testify but did not respond to the call, but

9  I'll read their names once again.  Ray Rodgers, Gordon

10 Quan, Rachel Delgado, Sandra Crenshaw, Clifford Gay,

11 Barbara Baxter, Sergio Castillo, Amalia Martinez of

12 Austin, Texas, LULAC 12.

13             The doorkeeper will check once again.

14 These cards will be placed in the record, that they have

15 appeared and they have registered their position.

16             Is there anyone else who would wish to

17 testify on, for or against Senate Bill 14?

18             All right.  The Chair hears none.

19             Senator West?

20             SEN. WEST:  Mr. Chairman, I would like to

21 put in Exhibit No. 13, which is the League of United

22 Latin American Citizens' objections and arguments

23 against the voter identification bill.

24             CHAIRMAN DUNCAN:  What's the exhibit

25 number?

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
1              SEN. WEST:  Twelve.

2              CHAIRMAN DUNCAN:  Twelve.  Exhibit 12.  Is

3   there any objection?

4              Exhibit 12 will be received.

5              (Exhibit No. 12 marked and admitted)

6              CHAIRMAN DUNCAN:  There being no public

7   testimony coming forward -- or no additional public

8   testimony coming forward, the public testimony is

9   closed.

10             Senator Fraser, you're recognized for a

11  motion.

12             MOTION BY SENATOR FRASER

13             SEN. FRASER:  Mr. President, I would now

14  move that Senate Bill 14 be reported to the Senate, with

15  a recommendation that it do pass and be printed.

16             CHAIRMAN DUNCAN:  The Secretary will call

17  the roll.

18             ROLL CALL FOR VOTE ON SENATE BILL 14

19             SECRETARY SPAW:  Birdwell?

20             SEN. BIRDWELL:  (Indicated "yea" vote)

21             SECRETARY SPAW:  Carona?

22             SEN. CARONA:  (Indicated "yea" vote)

23             SECRETARY SPAW:  Davis?

24             SEN. DAVIS:  (Indicated "nay" vote)

25             SECRETARY SPAW:  Deuell?
```

CONSIDERATION OF SENATE BILL 14 1/25/2011

1    SEN. DEUELL:  (Indicated "yea" vote)

2    SECRETARY SPAW:  Duncan?

3    CHAIRMAN DUNCAN:  (Indicated "yea" vote)

4    SECRETARY SPAW:  Ellis?

5    SEN. ELLIS:  (Indicated "nay" vote)

6    SECRETARY SPAW:  Eltife?

7    SEN. ELTIFE:  (Indicated "yea" vote)

8    SECRETARY SPAW:  Estes?

9    SEN. ESTES:  (Indicated "yea" vote)

10   SECRETARY SPAW:  Fraser?

11   SEN. FRASER:  (Indicated "yea" vote)

12   SECRETARY SPAW:  Gallegos?

13   SEN. GALLEGOS:  (Indicated "nay" vote)

14   SECRETARY SPAW:  Harris?

15   SEN. HARRIS:  (Indicated "yea" vote)

16   SECRETARY SPAW:  Hegar?

17   SEN. HEGAR:  (Indicated "yea" vote)

18   SECRETARY SPAW:  Hinojosa?

19   SEN. HINOJOSA:  (Indicated "nay" vote)

20   SECRETARY SPAW:  Huffman?

21   SEN. HUFFMAN:  (Indicated "yea" vote)

22   SECRETARY SPAW:  Jackson?

23   SEN. JACKSON:  (Indicated "yea" vote)

24   SECRETARY SPAW:  Lucio?

25   SEN. LUCIO:  (Indicated "nay" vote)

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
 1              SECRETARY SPAW:  Nelson?

 2              SEN. NELSON:  (Indicated "yea" vote)

 3              SECRETARY SPAW:  Nichols?

 4              SEN. NICHOLS:  (Indicated "yea" vote)

 5              SECRETARY SPAW:  Ogden?

 6              SEN. OGDEN:  (Indicated "yea" vote)

 7              SECRETARY SPAW:  Patrick?

 8              SEN. PATRICK:  (Indicated "yea" vote)

 9              SECRETARY SPAW:  Rodriguez?

10              SEN. RODRIGUEZ:  (Indicated "nay" vote)

11              SECRETARY SPAW:  Seliger?

12              SEN. SELIGER:  (Indicated "yea" vote)

13              SECRETARY SPAW:  Shapiro?

14              SEN. SHAPIRO:  (Indicated "yea" vote)

15              SECRETARY SPAW:  Uresti?

16              SEN. URESTI:  (Indicated "nay" vote)

17              SECRETARY SPAW:  Van de Putte?

18              SEN. VAN de PUTTE:  (Indicated "nay" vote)

19              SECRETARY SPAW:  Watson?

20              SEN. WATSON:  (Indicated "nay" vote)

21              SECRETARY SPAW:  West?

22              SEN. WEST:  (Indicated "nay" vote)

23              SECRETARY SPAW:  Whitmire?

24              SEN. WHITMIRE:  (Indicated "nay" vote)

25              SECRETARY SPAW:  Williams?
```

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
1              SEN. WILLIAMS:  (Indicated "yea" vote)

2              SECRETARY SPAW:  Zaffirini?

3              SEN. ZAFFIRINI:  (Indicated "nay" vote)

4              SECRETARY SPAW:  Wentworth?

5              SEN. WENTWORTH:  (Indicated "yea" vote)

6              SECRETARY SPAW:  West?

7              SEN. WEST:  (Indicated "nay" vote)

8              SECRETARY SPAW:  Whitmire?

9              SEN. WHITMIRE:  (Indicated "nay" vote)

10             SECRETARY SPAW:  Williams?

11             SEN. WILLIAMS:  (Indicated "yea" vote)

12             SECRETARY SPAW:  Zaffirini?

13             SEN. ZAFFIRINI:  (Indicated "nay" vote)

14             SECRETARY SPAW:  Governor Dewhurst?

15             PRESIDENT DEWHURST:  (Indicated "yea"

16  vote)

17             CHAIRMAN DUNCAN:  There being 20 ayes, 12

18  nays, Senate Bill 14 will be favorably reported to the

19  Senate, with the recommendation that it do pass and be

20  printed.

21             The Chair recognizes Senator Wentworth for

22  a motion.

23             SEN. WENTWORTH:  Mr. President, I move

24  that the Committee of the Whole Senate rise and

25  report -- Mr. Chairman, I should say.
```

1          CHAIRMAN DUNCAN:  Is there any objection

2  to the motion?

3          The Chair hears none.  It's so ordered.

4          PRESIDENT DEWHURST:  Good job.  Thank you.

5          (Conclusion of hearing before Committee Of

6  the Whole at 9:19 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                C E R T I F I C A T E

 2   STATE OF TEXAS      )

 3   COUNTY OF TRAVIS    )

 4                WE, Kim Pence, Aloma J. Kennedy and Lorrie

 5   A. Schnoor, Certified Shorthand Reporters in and for the

 6   State of Texas, do hereby certify that the above-

 7   mentioned matter occurred as hereinbefore set out.

 8                WE FURTHER CERTIFY THAT the proceedings of

 9   such were reported by us or under our supervision, later

10   reduced to typewritten form under our supervision and

11   control and that the foregoing pages are a full, true

12   and correct transcription of the original notes.

13                IN WITNESS WHEREOF, WE have hereunto set

14   our hand and seal this 7th day of February 2011.

15

16

17

18                          _____
                            Kim Pence
19                          Certified Shorthand Reporter
                            CSR No. 4595 - Expires 12/31/11
20                          Firm Registration No. 276
                            Kennedy Reporting Service, Inc.
21                          8140 North Mo-Pac Expressway
                            Suite II-120
22                          Austin, Texas 78759

23

24

25
```

TX_00000897

```
 1

 2

 3

 4                        _____
                          Aloma J. Kennedy
 5                        Certified Shorthand Reporter
                          CSR No. 494 - Expires 12/31/12
 6
                          Firm Registration No. 276
 7                        Kennedy Reporting Service, Inc.
                          8140 North Mo-Pac Expressway
 8                        Suite II-120
                          Austin, Texas 78759
 9

10

11

12

13
                          _____
14                        Lorrie A. Schnoor
                          Certified Shorthand Reporter
15                        CSR No. 4642 - Expires 12/31/11

16                        Firm Registration No. 276
                          Kennedy Reporting Service, Inc.
17                        8140 North Mo-Pac Expressway
                          Suite II-120
18                        Austin, Texas 78759

19

20

21

22

23

24

25
```

0020
```
 1              TRANSCRIPT OF PROCEEDINGS BEFORE
 2              THE SENATE OF THE STATE OF TEXAS
 3              EIGHTY-SECOND LEGISLATURE
 4              (COMMITTEE OF THE WHOLE SENATE)
 5                      AUSTIN, TEXAS
 6
 7
   IN RE:              Â§
 8                      Â§
   CONSIDERATION OF         Â§
 9 SENATE BILL 14          Â§
10
11
12
13              COMMITTEE OF THE WHOLE SENATE
14              TUESDAY, JANUARY 25, 2011
15
16
17              BE IT REMEMBERED THAT AT 8:05 a.m., on
18 Tuesday, the 25th day of January 2011, the above-
19 entitled matter continued at the Texas State Capitol,
20 Senate Chamber, Austin, Texas, before the Committee of
21 the Whole Senate.  The following proceedings were
22 reported by Aloma J. Kennedy, Lorrie A. Schnoor and Kim
23 Pence, Certified Shorthand Reporters.
24
25 VOLUME 2                    PAGES 20 - 542
```
0021
```
 1            P R O C E E D I N G S
 2         TUESDAY, JANUARY 25, 2011
 3               (8:05 a.m.)
 4         CHAIRMAN DUNCAN:  The Committee of the
 5 Whole will come to order.
 6      OPENING INSTRUCTIONS BY CHAIRMAN DUNCAN
 7         CHAIRMAN DUNCAN:  Members, we talked
 8 yesterday a little bit about the process, and I thought
 9 I would go through that once again so that we'll all
10 kind of know what the plan is.
11         First of all, I intend to recognize
12 Senator Fraser in just a moment to lay out the specifics
13 of Senate Bill 14.  And then after he lays the bill out,
14 then members will be recognized for questions of the
15 author or co-authors.  Then after that is finished, then
16 our invited testimony will begin.  It's the Chair's
17 intent to place a 10-minute limit on invited testimony.
18 And then there will be no questions to interrupt the
19 invited testimony as they're laying out their positions
20 or their testimony.  Then once they're finished, members
21 will be recognized for questions.
22         When that's done, we'll have a resource
23 witness panel that will be available for you.  I'm
24 advised that we have David Maxwell, Deputy Director of
```

25   Law Enforcement with the Office of the Attorney General;
0022
1   and Ann McGeehan, Director of Elections, the Secretary
2   of State's office; and Rebecca Davio, Assistant Director
3   for Driver's License with the Department of Public
4   Safety.
5            When we have completed the invited
6   testimony and you've had an opportunity to question
7   those who have been invited, then I will -- I don't
8   think the list is as long as it was last year, but
9   certainly I'm sure there will be discussion among the
10  members concerning their testimony.
11           Then we'll open up for public testimony.
12  You will recall last session, we would announce the
13  names of those who are in line, and you are in line in
14  order of your registration at the front desk.  We will
15  have those persons escorted down to the well, and then
16  they will be allowed to begin their testimony.
17           It's the intent of the Chair to impose a
18  three-minute time limit on the public testimony as well,
19  and I will not recognize anyone to interrupt someone
20  giving public testimony until their time has run.  There
21  is a timer at the front at the secretary's desk.  There
22  will be a warning; I think it's a 30-second warning.
23           Members, we do have a court reporter,
24  Ms. Kennedy.
25           Ms. Kennedy, would you stand so everyone
0023
1   can see you.
2            Remember Ms. Kennedy from last time.  I
3   think she went 12 or 13 hours.
4            Because we're making a record here,
5   obviously we need to be mindful that the court reporter
6   only has two hands and can only type one person at a
7   time.  So the Chair will be careful to help you remember
8   that we cannot have people talking over each other.
9            Also we need to try to identify each other
10  so that -- or identify yourself when you're speaking or
11  I'll try to do that so that the record will be clear as
12  to the source of the comments being recorded.
13           We will take periodic breaks in order to
14  allow the court reporter a little time, but we will move
15  expeditiously as we move through the process.
16           There is a document -- like last session,
17  we will have an orderly process for admitting documents
18  into the record.  They will be labeled as exhibits and
19  be referred to in the record and will be received in the
20  record by exhibit number.  So when you have an exhibit
21  that you want to introduce into the record, well, then,
22  you'll need to have it marked.  And the secretary's desk
23  up here will have a procedure for marking your exhibits
24  and receiving them in the record.
25           Once we have completed the public
0024

1  testimony -- and, obviously, we're going to be
2  interrupted by our Senate session which begins at 11:00.
3  Once we finish the public testimony, then it will be
4  appropriate for you to lay out any amendments that you
5  may wish to have considered by the body.
6          And once that's completed, then,
7  obviously, we will vote on our resolutions to rise and
8  report back to the full Senate.
9          That is basically the layout of the
10  procedure.  Any questions?
11          Senator Van de Putte.
12          SEN. VAN de PUTTE:  Thank you,
13  Mr. Chairman.  Thank you for outlining the process and
14  the procedures that we will be using today.  My question
15  is specifically with those members of the public who
16  wish to offer testimony sometimes today who have
17  disabilities.  To my knowledge, we have people coming to
18  the floor who are in wheelchairs and will not be able to
19  use the podium.  I wanted to ask what sort of amenities
20  or accommodations we will have so that they will be able
21  to have that, but some sort of a table so they can refer
22  to their documents when they're testifying.
23          CHAIRMAN DUNCAN:  Thank you, Senator Van
24  de Putte, an excellent question.
25          We do have a wireless mic that will be
0025
1  available for those who cannot access the mic -- at the
2  secretary's desk.
3          SEN. VAN de PUTTE:  Would it be possible
4  for those members of the public who are offering
5  testimony who have disabilities who are in a wheelchair
6  to have some sort of -- either a table or something so
7  that they can refer to their notes?  The problem with
8  last time is that they weren't able to actually, because
9  they don't have use of the podium.
10          CHAIRMAN DUNCAN:  Senator, we can
11  accommodate that.
12          SEN. VAN de PUTTE:  Thank you very much,
13  Mr. Chairman.
14          CHAIRMAN DUNCAN:  Members, also I forgot
15  to mention, the resolution that we passed yesterday
16  allows us to have a staff person on the floor to assist
17  us.  And so if you wish to have that person sit, well,
18  then, you'll need to ask the sergeant for a chair, and
19  we have chairs available back there.
20          Any other questions?
21          All right.  The Chair hears none.
22          Senator Fraser, you're recognized to
23  explain Senate Bill 14.
24
25
0026
1          LAYING OUT OF SENATE BILL 14
2          SEN. FRASER:  Thank you, members.

TX_00000901

JA_000900
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00000901

3   Obviously, this is an issue that we know a lot about, we
4   had a lot of experience with two years ago.  The issue I
5   think has been defined and talked about a lot.
6            I think we all recognize the dangers of
7   voter fraud has threatened the integrity of the
8   electoral process for the entire history of the United
9   States.  The threat continues today.  In 2005, there was
10  a Commission, a bipartisan commission, the Carter-Baker
11  Commission, that was appointed by the Election
12  Commission.  Of course, President Carter, a past
13  president; James Baker, Secretary of State, they
14  reaffirmed the dangers by saying, "Elections are at the
15  heart of democracy.  Americans are losing confidence in
16  the fairness of elections.  And while we do not face a
17  crisis today, we need to address the problem of our
18  electoral system."
19           The Commission concluded at the end of the
20  day, "There is considerable national evidence of
21  in-person voter fraud.  And regardless of whether one
22  believes that voter impersonation is widespread or
23  relatively rare, there can be no serious dispute that
24  the real effect can be substantial because in a close
25  election, even a small amount of fraud could make the
0027
1   margin of difference."
2            Texas today has a legitimate interest in
3   protecting elections.  It is imperative that we protect
4   the public's confidence in elections by deterring and
5   detecting voter fraud.
6            In upholding the Indiana photo ID law, the
7   U.S. Supreme Court stated, "Confidence in the integrity
8   of our electoral process is essential to the functioning
9   of our participatory democracy.  Voter fraud drives
10  honest citizens out of the democratic process and breeds
11  distrust of our government.  Voters who fear the
12  legitimate votes will be outweighed by fraudulent ones,
13  will feel disenfranchised."
14           On October 10, Lighthouse poll, which I
15  have here and be entering into the record -- it's the
16  newest poll that is out -- shows that 86 percent of
17  Texas voters -- that's both Republican and Democrats --
18  favor voter photo ID laws.
19           The bill that we're laying out today is in
20  compliance with the U.S. Supreme Court Decision which
21  upheld the Indiana voter ID legislation because it,
22  No. 1, deters and detects fraud; 2, it protects the
23  confidence in elections; and, 3, it counts only eligible
24  voters' votes.
25           It also complies with the Supreme Court
0028
1   decision, because it offset burdens on voters by
2   providing access to free ID cards, allowing for
3   provisional ballots and absentee ballots, ensuring that
4   obtaining photo ID is no more inconvenient or burdensome

TX_00000902
JA_000901
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00000902

5   than the usual act of voting and providing an exception
6   for elderly voters.
7            The current law, as you know, provides
8   that when a voter shows up to vote, he or she must just
9   show a valid voter registration card.  If unable to do
10  so, the voter may show a photo ID card or other official
11  mail from a government entity -- utility bill, bank
12  statement, government check, paycheck or other
13  government document with name and address -- and sign an
14  affidavit.
15           Senate Bill 14, what we're doing with this
16  bill, Senate Bill 14 would require a voter to show a
17  photo ID except that people 70 or older on January 1,
18  2012, may continue to vote with just a registration
19  card, under current law.
20           Acceptable ID will include an unexpired
21  card issued by the Department of Public Safety, a
22  military ID, a passport or a citizenship certificate
23  with photo.  Voters who cannot produce an acceptable
24  form of photo identification will be allowed to cast a
25  provisional ballot.  That ballot will be counted if the
0029
1   voter returns within six days to show a photo ID.
2            It would also provide for statewide
3   training and notification of the changes required for
4   the individual to vote with the photo ID.  It would
5   provide for a free DPS-issued identification card to any
6   registered voter who requests an identification card.
7            Every fraudulent vote effectively still is
8   a legitimate vote.  Elections are too important to leave
9   unprotected when the Legislature could take proactive
10  steps to prevent fraud and protect our democracy.
11           Mr. President, that is what Senate Bill 14
12  does.  And if there's no questions, I would move
13  passage.
14           SEN. WHITMIRE:  Mr. President --
15           SEN. VAN de PUTTE:  Yes.
16           SEN. WHITMIRE:  -- could we slow down?
17  Will the gentleman yield?
18           CHAIRMAN DUNCAN:  I think Senator Van de
19  Putte was first on the list, Senator.
20           Senator Van de Putte.
21           SEN. VAN de PUTTE:  Thank you,
22  Mr. Chairman, I think.  Mr, Chairman, inquiry.  At what
23  point in the proceedings today would a motion be in
24  order to move that all of the testimony and record from
25  this issue from the 2009 legislative session be made
0030
1   into the record?  Would that be done -- would that
2   motion be proper at the point of original testimony or
3   at the beginning of these questions at this point?
4            CHAIRMAN DUNCAN:  Senator, at any time
5   that one would want to make that motion, it would be
6   recognized.

TX_00000903

JA_000902
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00000903