25  legislation and the potential disenfranchising impact.
0319
1           SEN. HUFFMAN:  And didn't the Supreme
2   Court of the United States reject your assertions that
3   voter photo ID laws unduly burden the right to vote?
4           MR. FIGUEROA:  What the Crawford decision
5   said was it was, one, not a voting rights case.  It
6   wasn't a Section 5 case or a Section 2 Voting Rights
7   case.  It was a 14th Amendment undue burdens case.  And
8   what they essentially held was the burdens that it
9   imposes on voters was not significant enough to cause a
10  violation of the 14th Amendment.
11          SEN. HUFFMAN:  Thank you.
12          MR. FIGUEROA:  I would state that this
13  bill is more restrictive than the Indiana bill, though.
14          CHAIRMAN DUNCAN:  Thank you, Mr. Figueroa.
15  There's no other questions -- oh, I'm sorry.
16  Senator Gallegos has a question.
17          SEN. GALLEGOS:  Thank you, Mr. Chairman.
18  Mr. Figueroa, I don't know if you remember my testimony
19  two years ago, and I showed the maps.  If we're going to
20  mandate voter ID in Texas, that we should allow the
21  folks that we're mandating access to DPS centers where
22  they get this photo ID.  And if you saw inside the 610
23  Loop in Houston, there are no DPS centers.
24          MR. FIGUEROA:  That's right.
25          SEN. GALLEGOS:  And also -- or inside the
0320
1   820 Loop in Fort Worth there's no DPS centers, and
2   there's only one inside the city of Dallas that would,
3   in fact, make getting, number one, a photo ID costly,
4   and time-consuming.  I'm concerned that especially in
5   inner-city Houston and Fort Worth and some there in
6   Dallas that don't have vehicles or use mass transit as a
7   means of transportation that there's no bus lines to the
8   DPS centers --
9           MR. FIGUEROA:  That's right.
10          SEN. GALLEGOS:  -- that provide the photo
11  ID that we are fixing to mandate them.  I wanted to ask
12  your -- you know, whether MALDEF -- you know, would that
13  be subject to any type of retrogression as far as
14  allowing somebody poor or doesn't have a vehicle or
15  can't afford the transportation to the outskirts to try
16  to get a photo ID, that there would be subject to any
17  Section 5 violations in the civil rights code?
18          MR. FIGUEROA:  Yeah.  Ironic -- the
19  Indiana case did make the one reference that we've been
20  talking about, and the Supreme Court did make
21  significant references to the fact of the free ID
22  provided by Indiana, how to eliminate some of these
23  burdens.  However, Indiana, like I mentioned, wasn't a
24  Section 5 state.
25          And that was a larger issue in Georgia
0321

TX_00001043
JA_001042
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001043

1  where similarly the DPS departments were not in the
2  inner city.  So I do think it is a factor that they will
3  consider in preclearance about how accessible is it to
4  obtain that free identification.  And in the rural
5  counties of Texas, the inner cities, if it shows that it
6  does have extreme difficulties for minorities to access
7  those free IDs because of the inability to get to a DPS
8  office, the amount of time it takes, the money it takes,
9  the documents it requires to get that free
10  identification, I think that does play an important part
11  of it.
12          SEN. GALLEGOS:  So what you're saying
13  is -- your testimony is that it definitely is a factor.
14  And then like -- other than the areas that I mentioned
15  in my district and Fort Worth and Dallas, let's say an
16  area like Senator Uresti's area where in some cases
17  they've got to go 200 miles, you'll have to catch --
18  you'll have to either rent a helicopter or get a
19  Southwest Airlines flight to go, and even though we're
20  offering free ID, you know, the issue is how to get
21  there.
22          MR. FIGUEROA:  Yeah.
23          SEN. GALLEGOS:  And what I described to
24  you on these instances where, you know, these people
25  cannot provide themselves with -- especially the elderly
0322
1  in these areas, you know, with transportation or don't
2  have the money to provide it, I mean, we can tell them
3  that we have free voter ID available to them if they can
4  get there.
5          MR. FIGUEROA:  Right.
6          SEN. GALLEGOS:  Is that -- is that what
7  your testimony is here?
8          MR. FIGUEROA:  Yes.  If they can get
9  there, if they have the means to get there, if they have
10  the documents to get the documentation, absolutely.
11  Free isn't necessarily free.
12          SEN. GALLEGOS:  All right.  Thank you.
13          CHAIRMAN DUNCAN:  Are there any other
14  questions of the witness?
15          (No response)
16          CHAIRMAN DUNCAN:  All right.  The Chair
17  hears none.  Thank you for your testimony, Mr. Figueroa.
18          TESTIMONY BY CHRISTIAN WARD
19          CHAIRMAN DUNCAN:  The Chair calls
20  Christian Ward.  Mr. Ward, state your name and who you
21  represent, please.  You have ten minutes with a --
22          MR. WARD:  Thank you, Mr. Chairman.
23          CHAIRMAN DUNCAN:  I think it's either a
24  one-minute warning or 30 seconds.  I can't remember.
25          SECRETARY SPAW:  One.
0323
1          CHAIRMAN DUNCAN:  One-minute warning.
2          MR. WARD:  Thank you, Mr. Chairman.  My

3  name is Chris Ward. I'm essential here representing
4  myself. I'm an attorney. I'm a partner with the firm
5  of Yetter Coleman. I practice primarily in complex
6  appeals, including regarding constitutional issues and
7  have some expertise and experience in particular in
8  voting rights law, including the 2009 Supreme Court case
9  Northwest Austin MUD v. Holder.
10          I'm here primarily to testify regarding
11  the general constitutional standard as explained by the
12  Supreme Court for analyzing a facial challenge to the
13  validity of a voter ID bill. Before I go into that, I
14  do want to say, because it's come up, that in my reading
15  of the Texas bill, it has an exemption for elderly nuns
16  and any other Texan over 70 whether or not they reside
17  in a nursing home. So that's something that's come up,
18  and I wanted to bring that out.
19          With regard to the legal constitutional
20  standard, the Supreme Court in the case Crawford v.
21  Marion County Election Board examined the Indiana voter
22  ID law, and it went through a very careful analysis of
23  that law, and the essential holding of that law is that
24  a voter ID act is not, in general, constitutionally
25  invalid on its face. And the Indiana law that the court
0324
1  was considering at the time it issued the Crawford
2  opinion was at that time considered the most restrictive
3  voter ID law on the books of any state. And so the fact
4  that the Supreme Court found that law constitutional
5  says that there is a lot of room for imposing voter ID
6  laws under the Court's interpretation of the
7  Constitution.
8          There were two primary opinions in the
9  Crawford case. The first one that I'll talk about is
10  considered the main or controlling opinion of the case.
11  It was a case decided by a plurality, which means there
12  were three Justices signed onto one opinion that's
13  regarded as the controlling opinion by Justice Stevens,
14  of course who was one of the most liberal members of the
15  Court. And the other opinion by Justice Scalia also
16  garnered three votes. Justice Stevens' opinion is
17  regarded as the controlling opinion because it -- it
18  puts a little more stricter review, but essentially
19  those two opinions get to the same result by slightly
20  different analysis, which actually on further
21  examination turned out to be somewhat the same.
22          In Justice Stevens' controlling opinion,
23  he first looked -- he first described what the
24  appropriate test would be for a constitutional challenge
25  to an election regulation like a voter ID law, and the
0325
1  test that the Court will apply, he says, is you weigh
2  the asserted injury to the right to vote against the
3  precise interests put forward by the state. So you look
4  at the alleged injury or impairment of the right to

TX_00001045
JA_001044
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001045

5  vote, the alleged burden imposed by the voter ID
6  requirement, and you compare that with the severity of
7  the harm that the state is trying to avoid.
8          That opinion identifies at least three
9  valid state interests that the state of Indiana was
10 attacking with its voter ID legislation.  Number one,
11 deterring and detecting voter fraud, Justice Stevens
12 says that you can't -- nobody can question the
13 importance of detecting and deterring voter fraud.
14         Now, he noted that in that case there was
15 nothing in the record of that case that in-person voting
16 fraud, showing up and impersonating another person, had
17 actually occurred or was a big problem in Indiana, but
18 it was enough that this is a possibility.
19         He tells a story of an associate,
20 Boss Tweed, in New York back during the 1860s, and this
21 associate would send his repeaters.  He would recruit
22 men who had whiskers and send them to vote once with a
23 full beard and then send them to a barber and get the
24 chin shaved off and send them back with mutton chops and
25 a mustache and then send them back with just a mustache.
0326
1  And then if you needed another vote, send them back skin
2  face, it said, plain face, and that makes each one good
3  for four votes.
4          Now, I mention that both because I thought
5  it was a little amusing story, but the more serious
6  point is that the Court looked at this.  This is an
7  anecdote from history.  This is not saying that a state
8  has to have any showing that this a current modern
9  problem.  The Court cites this anecdote as an example of
10 this is a potential problem that a legislature is within
11 its rights to attempt to address by this type of law.
12         Other valid state interests that the Court
13 identified with regard to a voter ID legislation is the
14 improvement and modernization of election procedures.
15 The Court noted that Congress has shown that it believes
16 that photo ID is an effective method of establishing
17 voters' qualifications to vote.  The National Voter
18 Registration Act of 1993, also known as the Motor Voter
19 Act, is the act that says when you go to apply for your
20 driver's license, you have to be offered the chance to
21 register to vote.  It's also the act -- it also has
22 requirements that limit the states' abilities to purge
23 their voter rolls.  So that's one reason why voter rolls
24 tend to have more voters than actually continue to
25 reside in a particular state or a particular
0327
1  jurisdiction.
2          The Court also noted the Carter-Baker
3  report, which has also been mentioned in earlier
4  testimony today by Former President Carter and Former
5  Secretary of State James Baker.  In that report, they
6  identified photo identification as an appropriate step

TX_00001046
JA_001045
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001046

7   to take to deter voter fraud.
8          The Court also mentioned safeguarding
9   voter confidence in the system as another valid state
10  interest that is served by a voter ID requirement.
11          Justice Stevens' opinion then looked to
12  the alleged burdens on the right to vote, and he noted
13  that the photo ID requirement imposes some burdens that
14  other identification methods do not.  For example, you
15  might lose your driver's license or lose your wallet on
16  the way to the polls and then you'd have a problem.  But
17  he noted that these are not serious or frequent enough
18  to cause a constitutional infirmity.
19          And he noted that the relevant burden to
20  be considered here is the burden that is on persons who
21  are eligible to vote but who do not happen to possess a
22  valid photo ID.  So you look at the fact that that
23  affects, for one thing, a -- probably a small minority
24  of voters -- of eligible voters in the state already.
25          The Court noted that if you had to pay a
0328
1   tax or a fee to get the ID, that would be the equivalent
2   of a poll tax, and that would be unconstitutional.  So
3   one important provision which the Indiana legislation
4   had and which the Texas bill has is the fact that free
5   voter ID cards are available.
6          The Court noted that some people will have
7   heavier burdens and -- but the fact that some people may
8   have heavier burdens does not make the statute itself
9   facially invalid and unconstitutional.  It means that
10  perhaps in an individual case an individual might be
11  able to show that the burden -- the specific burden on
12  that individual is so high that it would be
13  unconstitutional to apply the statute to that
14  individual, but that's not the same thing as saying that
15  the statute is facially invalid and unconstitutional as
16  a whole.  And that's what we usually think of when we
17  think of the Court striking down a law as
18  unconstitutional.  That strikes down the whole law as
19  invalid.
20          So that was the ultimate conclusion.
21  Justice Scalia, in his opinion concurring, would go a
22  little bit further than Justice Stevens, but he
23  essentially reaches the same result.  Justice Scalia
24  says that the voter ID law is a generally applicable,
25  nondiscriminatory voting regulation, and thus individual
0329
1   impacts on specific voters are irrelevant for
2   determining the severity of the burden.  In Justice
3   Scalia's analysis, he said you look at the burden is not
4   severe on anyone.  The burden is show a photo ID.  That
5   burden could have some different impacts on particular
6   individuals, again, who might have a particular hardship
7   getting that ID.  But, again, that's not enough to say
8   that the law, as a whole, is unconstitutional.

TX_00001047
JA_001046

TX_00001047

9          SEN. ELTIFE:  Members, any questions of
10 the witness?
11          (No response)
12          SEN. ELTIFE:  No questions.
13          Mr. Ward, thank you for being here.
14          MR. WARD:  Thank you very much.
15           TESTIMONY BY GARY BLEDSOE
16          SEN. ELTIFE:  At this time, we'll call
17 Gary Bledsoe forward.
18           MR. BLEDSOE:  Good evening.  My name is
19 Gary Bledsoe.  I represent the Texas State Conference of
20 NAACP branches, and I am proud to stand before you as a
21 fellow Texan, and indeed I want to emphasize the term
22 "fellow Texans."
23           You know, the Texas that we have today is
24 very different from the Texas that I grew up in, and
25 indeed I've seen many things occur that have been
0330
1  extremely positive for me.  I grew up in a segregated
2  Texas when voting was really a luxury, something that
3  was not to be expected in my community.  It was
4  something very much that people cherished and desired,
5  desired to occur.
6           And many of you might even remember back
7  in 1974 when Frank Robinson, an African-American who was
8  registering individuals to vote out in Palestine, was
9  actually killed at his home because of his attempts to
10 register people to vote.  Now, I happened to be a
11 freshman in law school at that time.  So it's not all
12 that long ago that that actually occurred.
13           And, you know, when I -- when I look at
14 the ways that we have had to struggle to get the
15 opportunity to vote, I want you to know that we cherish
16 that and know that's extremely important.  And in many
17 ways, our state had become exemplary.  When I go around
18 the country and you -- we understand how we've enabled
19 people that have been on paper with felony convictions
20 to vote and things of that nature, that's a good thing.
21           And, you know, the fact that -- we don't
22 really have a problem with voter fraud in elections.  I
23 think that all the testimony seems to indicate that,
24 that indeed people who go to vote are indeed people who
25 actually are registered to vote.  So there's really not
0331
1  a problem in that regard from what we've seen.
2           However, I'm aware that what we're
3  discussing now is whether or not we will have a bill.
4  So I would reach out to each and every one of you and
5  say that if we are going to discuss voter
6  identification, then let's do so in a way to be
7  constructive and to be enabling so that we can try and
8  empower all the people within our state to presume that
9  all people who would be eligible to vote ought to be
10 allowed to vote.  And so we should reduce impediments

TX_00001048
JA_001047
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001048

11  and not present additional impediments that would
12  prevent people from voting.
13         Now, frequently we have come before you
14  and talked about this issue.  I know that the last time
15  I came before you we talked about a number of instances
16  of serious irregularities that have occurred in our
17  state, and I don't want to go back and go over all
18  those, but I want to point some of those out to you
19  because I think if we're talking about voter problems
20  that really and truly we ought to be talking about some
21  of the issues that prevent access because we think
22  that's a much more significant problem than the problem
23  with people voting who are not the people who were --
24  who were actually registered to vote.
25         In just this past year, we had a situation
0332
1  with elderly citizens up in Bowie County who were
2  harassed by individuals after they had voted absentee,
3  and people were demanding to know how they voted,
4  terrorizing the elderly people who made contact with us
5  because they were very concerned, but it was very
6  obvious it was because of politics, from our
7  observation.
8         We know that we had so many problems or
9  complaints directed to us out of Harris County this last
10  session where people were intimidated by other
11  individuals who hovered over them, who stared at them
12  and gave very hateful looks towards them, intimidating
13  some people from going forward with actually voting.
14         So we know these things continue and
15  occur, and it's not just the kinds of things that we've
16  seen in the recent past, such as when an
17  African-American candidate for sheriff in a county
18  outside Houston had -- one of his white supporters had
19  their home catch fire.  And so instead of investigating
20  what might have occurred, they ended up investigating
21  the African-American candidate for sheriff.
22         We know that where they've used off-duty
23  police along with improper uses of mailboxes in Tarrant
24  County to intimidate African-Americans from being able
25  to vote.  So it goes on and on, and all these things
0333
1  have occurred within the last decade and some within the
2  past six months.  So we know that indeed we have not
3  arrived to where we have eliminated problems with
4  preventing our having access to be able to vote.
5         And, you know, I was able to be an
6  election observer for an election down in Venezuela, and
7  that was really quite illuminating to me in that the
8  individuals had to give a fingerprint whenever they
9  voted, and an untrained person had to look at the
10  fingerprint and determine whether or not it was the
11  right person.  And we know that the photograph came up
12  on the screen and you had to look and see if this was

TX_00001049
JA_001048
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001049

13  the right person.
14          And, you know, they had armed guards
15  around, and I actually had the misfortune of having a
16  gun directed at me by a guard.  When I was asked by an
17  official in the Secretary of State's Office to actually
18  go and observe them vote, I actually had to back off
19  when a gun was directed right at my face for -- five or
20  six feet away.
21          So I think we look at those things, we
22  don't need to move in that direction.  We need to be
23  going out and telling people that what we have is really
24  good.  What we have is actually working, where we have a
25  democracy, we have people that are engaged that are from
0334
1  different backgrounds, different races, different
2  ethnicities, and we get there and we debate and we
3  discuss issues.
4          You know, when they had the birth of a
5  nation years ago and they talked about what would occur
6  in our country with enfranchising African-Americans, we
7  found out just the opposite was true, and that indeed
8  we're moving toward something that's very special, but
9  there are people that are competing against what we've
10  been trying to accomplish.
11          But, Senators, I really want to say to you
12  that we have a system that I feel is actually a good
13  system.
14          Now, besides all the other matters that I
15  can talk about, I wanted to visit with you about some of
16  the problems that we see with where we're proceeding
17  with SB 14.  You know, I don't understand why, but in
18  many ways I look at SB 14 and SB 14 is much more
19  problematic than the Indiana law and much more
20  problematic than the Georgia law that have been
21  utilized.  When we look at the Indiana law, the Indiana
22  law -- we can see where individuals can actually come in
23  and if they are indigent, they can give an affidavit and
24  be allowed to vote by saying that they can't afford to
25  have a voter ID.
0335
1          We know that under the Texas law in
2  comparison with the Indiana law you've got to come back
3  in a stated period of days, and these six days.  And the
4  way that six days is worded and the time that's
5  involved, it's going to require people to come during
6  their workdays from 8 to 5, which is a real problematic
7  thing for individuals to do.  And we know that when you
8  have to come in from 8 to 5 and you're a working person,
9  that's going to be something that's difficult for you to
10  do.
11          We have a law that says if you're voting
12  in an election, that on election day you can go and have
13  time off from your work.  There's not a law that says
14  you can come and have that taken care of.

TX_00001050
JA_001049
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001050

15          Now, the -- we know, too, that the other
16  thing about an Indiana law -- and I would note that
17  Indiana is not a covered jurisdiction.  So Indiana and
18  the Indiana case involved constitutional issues and not
19  the Voting Rights Act.
20          But, now, Indiana allows you the one free
21  bite.  So when you go in and you have an expired
22  identification, you can still use that identification
23  for one election.  The idea is that then the person will
24  be put on notice that their identification is expired,
25  and they will go and have that identification come up to
0336
1  date.  So I think that's another distinction.
2          Now, in Georgia and in Indiana, they did
3  some things that we have not done here.  They did
4  diligent inquiries, and they determined that prior to
5  adoption of their laws, they determined that indeed
6  almost every one in those states had DMV
7  identifications.  So everyone in Georgia had a DMV
8  identification, and only 43,000 people in Indiana did
9  not have a DMV identification.  So that's much different
10  from what we have here.
11          Also, those states are much smaller.  And
12  in Texas with the location of driver's license offices,
13  et cetera, some people have to travel over 100 miles.
14  So even with an indigent's provision, that's not going
15  to allow people who are poor, indigent, impaired, have
16  difficult access to these places to be able to actually
17  register.  And I don't know what the implications are
18  for obligations under the NVRA, but we have not complied
19  with our obligations under the law.  And that has been a
20  problem in Indiana as well.
21          And I'd just say, finally, it's very clear
22  that the Texas law will impair and have a clearly
23  disparate disadvantage on people of color.  The forms of
24  ID selected are problematic.  There would have been
25  something better.  The forms of ID selected in Indiana
0337
1  and Georgia were both superior.  The criminal
2  prosecution will discourage.  We know that this might
3  impair compliance with the NVRA.  We know that there
4  have been so many problems with election officials that
5  this will empower them more so to disadvantage
6  individuals.  And we know that because of the time to
7  vote, the problem with identification and especially
8  cross-racial identifications, the issue of the
9  expirations and the types of the IDs selected, those
10  things are going to further reduce the minority vote.
11  So we think this is a covered jurisdiction, and you can
12  look at this in a different way.  Thank you.
13          SEN. ELTIFE:  Mr. Bledsoe, thank you.  And
14  some members do have questions for you.
15          Senator West?
16          QUESTIONS FROM SENATE FLOOR

TX_00001051
JA_001050
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001051

17          SEN. WEST:  Thank you very much,
18  Mr. Chairman.
19          Mr. Bledsoe, thank you also.  Now, you've
20  been the President of the NAACP Conference -- state
21  conference for how many years now?
22          MR. BLEDSOE:  Twenty years.
23          SEN. WEST:  Twenty years.  Is there a
24  well-documented history of voter suppression that is
25   specifically related to race and ethnicity in this
0338
1  state?  And how would this voter ID law fit into that
2  particular history?
3          MR. BLEDSOE:  Well, I think it's
4  consistent with the history, and that's sad.  You know,
5  I think that we've seen Texas really evolve in a lot of
6  ways.  And, you know, Texas has had a history where in
7  recent years I had a lot of bipartisan cooperation.  And
8  I know that when we've done report cards in the past, we
9  had people in both parties that were doing exceptionally
10  well on our report card.
11          But we haven't extricated ourselves from
12  the past.  And indeed when we look at the past and we
13  look at all the disenfranchisement that's taking place,
14  this is a direct extension of that because indeed if one
15  wanted a voter ID law, there would be a way of having a
16  voter ID law that would be more enabling, that would not
17  suppress the vote.  Because what we want people to do is
18  to go out and to compete and to actually say that we
19  will compete for the minority vote and not have a law
20  that we think will have a clear disadvantage in terms of
21  suppressing the minority vote.
22          SEN. WEST:  Would you -- so do you believe
23  that this voter ID law will, in fact, discriminate
24  against people of color?
25          MR. BLEDSOE:  There's no question, again,
0339
1  the types of IDs that are selected, the time period with
2  the nature of the jobs that African-Americans have and
3  the requirement for African-Americans to come in and
4  actually produce their proof within a certain period of
5  time.  We've had enormous problems in this state with
6  the cross-racial identifications, and I can just see
7  enormous problems with that.  Especially with the kinds
8  of things that we've seen in Bell County and some other
9  places here recently, we know that's going to be a
10  problem.
11          And we know, too, that in terms of the
12  issue of expirations, that's going to be a problem.  And
13  if you look at state data on like voter -- excuse me --
14  motor vehicle ownership, our access to vehicles, you'll
15  find there's a big disparity among racial groups.  And
16  so we're talking about the poorest of minority groups
17  not truly having access to be able to go and access the
18  identification.  So I think it's clearly going to have a

TX_00001052
JA_001051
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001052

19  disparate impact.
20          SEN. WEST:  So is it your testimony that
21  this particular voter ID bill will discourage as opposed
22  to encourage people to participate in the electoral
23  system?
24          MR. BLEDSOE:  It will; it clearly will.
25  And, you know, one of the big things obviously is the
0340
1  criminal prosecution, but then there are the other
2  provisions as well where you make it so difficult for
3  people.  You know, we've had, in numerous instances,
4  Fort Bend, Harris, Bowie Counties, where individuals
5  have been turned away, who weren't even allowed to cast
6  a provisional ballot.  And so that's a problem.  You
7  know, it's kind of like the thing in Indiana when the 12
8  nuns were attempting to vote, and they did not allow 12
9  nuns to vote because they didn't bring their voter
10  identification with them.
11          SEN. WEST:  It was 12 of them?
12          MR. BLEDSOE:  Twelve; 12 nuns, yes.
13          SEN. WEST:  Twelve.  Okay.  Huh,
14  interesting.
15          Now, let me ask this question, sir:
16  You've had an occasion to speak with many
17  African-American elected officials concerning voter
18  identification laws over the last few years.  Is that
19  correct?
20          MR. BLEDSOE:  That's correct.
21          SEN. WEST:  Have you found any
22  African-American legislators -- any African-American
23  elected officials in the state of Texas that are in
24  favor of the voter identification laws that are being
25  considered by the Texas Legislature?
0341
1          MR. BLEDSOE:  We've seen none.  And, you
2  know, our group is unanimously opposed to it.  And, you
3  know, we've got Republicans and Democrats in our
4  leadership.  And let me say that one of our folks that I
5  think you even know, Senator -- I don't know that you
6  know this -- but Obie Greenleaf, who is a city
7  councilman now up in Sherman, he just went and tried to
8  renew his registration, and he was pulled out of line,
9  told he had to go home and get -- and get his birth
10  certificate.
11          SEN. WEST:  And he's a city councilman?
12          MR. BLEDSOE:  He's a city councilman.  And
13  another African/American male, who is 80 years old, was
14  told to do the same thing.  Now, all the whites in line
15  were not pulled out.
16          And, you know, we've done some surveys
17  around the state, and we're not complying with NVRA.  So
18  there is a real problem with our people being registered
19  to vote by our agencies.
20          SEN. WEST:  Well, there have, in fact,

TX_00001053
JA_001052
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001053

21  been some campaigns that have been launched lately -- or
22  back in 2005, 2006, campaigns against voter fraud.  Do
23  you remember those campaigns by the Attorney General?
24          MR. BLEDSOE:  I'm aware.
25          SEN. WEST:  And some of the images that
0342
1  were used there within the content of those campaigns?
2          MR. BLEDSOE:  I think those things became
3  part of litigation, if I'm not --
4          SEN. WEST:  All right.  So, frankly, the
5  passage of this particular bill will encourage
6  additional litigation in the civil rights area.  Is that
7  correct?
8          MR. BLEDSOE:  There's no question.  Let's
9  look at the PV 19, for example --
10          SEN. WEST:  Right.
11          MR. BLEDSOE:  -- and the 19 children who
12  bore the names of their fathers, and they were
13  wrongfully prosecuted because they voted in Waller
14  County.  And that county still has enormous problems.
15  You know, we had a couple years ago where the county
16  registration officials declined to follow through and
17  tender legitimately completed voter registration cards
18  to be registered, and that was right before an election,
19  and that continues to be a problem.  And if it wasn't
20  for the AG's Office telling them ultimately to register
21  those voters, I don't know if they ever would have been
22  registered, but they were not registered before the
23  election.  So there was an impact in them not following
24  through and registering those voters.
25          SEN. WEST:  Well, sir, I appreciate your
0343
1  advocacy, and needless to say you're steadfast as it
2  relates to protecting the rights and civil rights of
3  people in this state.  Thank you.
4          MR. BLEDSOE:  Thank you.
5          CHAIRMAN DUNCAN:  The Chair recognizes
6  Senator Hinojosa.
7          SEN. HINOJOSA:  Thank you, Mr. Chairman.
8  Mr. Bledsoe, thank you for your testimony.  And I was
9  very interested as you described the history in where
10  minorities for a long time were being kept from voting
11  and exercising their right to vote.  You talk about many
12  problems from intimidation, I guess, to the poll tax.
13  Can you name some of those situations, for example,
14  where laws have been passed for the sole purpose of
15  trying to suppress the vote of minorities?
16          MR. BLEDSOE:  Obviously there were --
17  there were a number of those that occurred.  One of the
18  things that we had in our state was the grandfather
19  clause.  You know, we had had poll taxes in this state,
20  and ultimately in this state they ended up passing the
21  rule that was used in the Democratic Primary, which at
22  that time there were -- the two parties were the

TX_00001054
JA_001053
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001054

23  conservative Democrats and the liberal Democrats.  And
24  so if you didn't vote in that Democratic primary, you
25  really didn't have a vote.

0344
1          And that had to go -- the NAACP litigated
2  that case, and we first defeated that system back in, I
3  think, '28 or '29 before the Supreme Court, but they
4  finessed the rule.  And so the NAACP had to litigate it
5  again, go to the Supreme Court again in 1944 where it
6  was finally invalidated.  So there have been quite a few
7  instances.  But if you happened to be African-American
8  or Latino and your grandfather had not been able to vote
9  in 1910, the teens or the '20s, '30s, you couldn't vote
10  either.
11          SEN. HINOJOSA:  And as you well know,
12  Texas right now is under a Voting Rights Act.
13          MR. BLEDSOE:  That is correct.
14          SEN. HINOJOSA:  And they have an actual
15  burden to prove that whatever laws they pass in terms of
16  voting doesn't discriminate or suppress the vote against
17  minorities.
18          MR. BLEDSOE:  And that's one thing they
19  didn't have in Indiana.  That's an additional obstacle
20  that they'll have to encounter with the law in this
21  state.
22          SEN. HINOJOSA:  And as you recite history,
23  it seems to me that many times different laws, different
24  methods are used to try to suppress the vote of
25  minorities, and they use different euphemisms and

0345
1  different names.  And it seems to me that the purpose of
2  the voter ID legislation is, again, to suppress the
3  vote.  Are you familiar with the Carter-Baker Commission
4  and Federal Election Reform?
5          MR. BLEDSOE:  Yes, I am.
6          SEN. HINOJOSA:  Yeah.  Well, one of the
7  studies they made would show that here in Texas where we
8  have approximately 13 million registered voters, that if
9  we pass voter ID, it would disenfranchise approximately
10  3 million voters, mostly minorities.  Are you surprised
11  at that?
12          MR. BLEDSOE:  I'm not, because I think
13  this will have enormous implications.  And again, if we
14  wanted to look at Indiana or Georgia, I would have
15  problems, but those laws -- they are so much less
16  restrictive than what's being proposed here.  This law
17  would have enormous implications because of the way that
18  it is written.  So it seems like instead of seeking the
19  least restrictive means, we're seeking the most
20  restrictive means.
21          SEN. HINOJOSA:  And as you describe the
22  different problems that exist in terms of sometimes
23  intimidation, sometimes in placing obstacles to
24  minorities to vote, have you come across a lot of

TX_00001055
JA_001054
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001055

25   instances where there's voter fraud where a person tried
0346
1   to impersonate a registered voter?
2              MR. BLEDSOE:  I have not seen of such a
3   situation, Senator.  I think there are very few
4   situations because you are putting yourself in harm's
5   way when you do that, even under the current laws.  So I
6   think there are fail-safes under the current law that
7   would prevent you from doing that.  But be that as it
8   is, I think that it's pretty much widely acknowledged
9   today that that's really -- really not a problem.
10              SEN. HINOJOSA:  And, for example, the last
11   ten years, do you know how many prosecutions have taken
12   place in terms of indicting a person for trying to
13   impersonate a registered voter?
14              MR. BLEDSOE:  I think I saw something on
15   the Internet maybe about one in South Texas recently and
16   one person, and there might have been something in
17   Harris County.  But in all those years, maybe one or
18   two, and I don't know if they were successful or not.
19              SEN. HINOJOSA:  Well, if you compare the
20   number of people who have been indicted, maybe three or
21   four or five in the last five or six years that try to
22   impersonate a voter, to the negative impact that this
23   piece of legislation would have on minorities by
24   disenfranchising approximately 3 million who do not
25   carry photo ID, don't you think it's a little bit out of
0347
1   balance and a steep price to pay?
2              MR. BLEDSOE:  It is.  Again, if we wanted
3   to have the integrity, there are things we could do to
4   ensure integrity more so than what we're actually doing
5   here.  You know, there have been good and great
6   suggestions that have been put forth.  And again, the
7   distinctions between Indiana and Georgia is the DMV had
8   IDs on almost all those folks.  So when we went to the
9   Department of Justice in Georgia to get preclearance,
10   Georgia could tell DOJ that 100 percent of our people we
11   have IDs on already, and that's something we don't have.
12              SEN. HINOJOSA:  Thank you for your
13   testimony.
14              MR. BLEDSOE:  Thank you, sir.  Thank you,
15   Mr. Chair.
16              CHAIRMAN DUNCAN:  Hold on just a minute.
17   Senator Ellis?
18              SEN. ELLIS:  Yeah, briefly, Mr. President.
19   I just wanted to thank Mr. Bledsoe.  I called him last
20   night and asked him to come.  I know he had client
21   business and court matters toady, and you've been
22   waiting all day to testify.  I think my colleagues asked
23   the questions I would have asked, but I just wanted to
24   publically thank you for staying here all day today.
25              MR. BLEDSOE:  Thank you, Senator.  I
0348

TX_00001056

JA_001055
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001056

1  appreciate it.  Thank you.
2          CHAIRMAN DUNCAN:  Are there any other
3  questions of the witness?
4          (No response)
5          CHAIRMAN DUNCAN:  Thank you, Mr. Bledsoe.
6  We appreciate your appearance here today.
7          TESTIMONY BY ANDRES TIJERINA
8          CHAIRMAN DUNCAN:  Dr. Andres Tijerina.
9  Dr. Tijerina, state your name and who you represent.
10          MR. TIJERINA:  My name is Andres Tijerina
11  representing myself.
12          CHAIRMAN DUNCAN:  You may begin.
13          MR. TIJERINA:  I'm a citizen of Austin, a
14  citizen of Texas, born in Texas, and I'd like to provide
15  some useful information to give a historical perspective
16  to voting laws and specifically those that have been
17  discriminatory against Mexican-Americans and minorities
18  in Texas.
19          As I said, I am from Texas.  I'm from West
20  Texas.  I have a BA from A&M, a masters from Tech, a
21  Ph.D. from The University of Texas at Austin, and I also
22  worked as the liaison officer for the United States Air
23  Force Academy in Colorado Springs.  I'm a retired Air
24  Force officer.  I'm a member of the Texas State
25  Historical Association among other associations.  I'm
0349
1  also a Fellow of the TSHA, and I've conducted research
2  here at the State Archives, the National Archives,
3  University of Texas and other places in order to write
4  numerous books and publications that I've published
5  through Texas A&M University press and other refereed
6  publications, primarily on Texas history and
7  Mexican-American history that's given me this -- a
8  perspective that I'd like to share with you all this
9  afternoon.
10          Texas, I think, has a legacy and a history
11  of voter discrimination that is very clearly directed
12  and explicitly directed at Mexican-Americans to
13  specifically and effectively keep them from voting that
14  goes way back to the establishment of Texas right after
15  it was annexed to the United States and goes right on up
16  to the present.
17          It has a record of establishing and
18  writing laws to create legal devices and to take actions
19  specifically intended to intimidate Mexican-Americans
20  and minorities from voting, to drive them away from the
21  polls; actions to divide and to redistrict their
22  population base, their counties, specifically directed
23  to keep them from voting or to weaken their voting
24  effect in Texas; devices and actions to literally
25  terrorize them through the years, through the decades.
0350
1          The effect has been to effectively reduce
2  the number of Mexican-Americans who have voted through

JA_001056
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

3    the years, through the history of Texas, and at the same
4    time to leave an impact or a legacy among their
5    community of distrust of the state government and even a
6    fear of state government and state law enforcement
7    officials.  This has been done in many ways that
8    appeared beneficial or that were presented as beneficial
9    even innocuous laws.  Many of the people who effected
10   this were people who approached Mexican-Americans
11   innocuously or supposedly to help them.
12              Political bosses, Texas has some of the
13   most powerful political bosses, or had through history,
14   Jim Wells, Robert Kleberg, George Parr, who used very
15   explicit and physical methods, literally corralling
16   hundreds of Mexican-American voters, thousands of
17   Mexican-American voters, primarily in the years from
18   around 1870 until around 1940, 1950, where they would
19   literally corral hundreds or thousands and direct those
20   votes, either through assistance to them by hiring them
21   to work on the county at election time or literally
22   through intimidation or specific assassinations.  In any
23   case, taking hundreds or thousands of Mexican-Americans
24   and then directing them to vote for people who became
25   great Texans, Lyndon B. Johnson, John Nance Garner,
0351
1    Edward M. House, who benefited from corralling of
2    Mexican-American voters, either through assistance to
3    those voters or intimidation and threats of those
4    voters.
5              The Terrell Election Law, which was
6    presented as a beneficial law, actually created a poll
7    tax specifically directed at Mexican-American voters to
8    keep them from voting, a 1918 law to explicitly
9    eliminate interpreters; other devices like the white
10   man's primary that required that people take an oath
11   that said that they were a white man and a Democrat; but
12   also violence, violence that is almost unbelievable
13   today, even considering the violence that we see in
14   today's newspapers, even considering the violence you
15   see in Mexico; Texas Rangers, law enforcement officials
16   or vigilante groups in Harlingen, Edinburg, across Texas
17   all the way out to El Paso, riots in which the
18   Anglo-American, 4,000 Anglo-American riders in 1916 in
19   Harlingen chanting, "Keep the Mexicans from voting,"
20   literally rioted and lynched several Mexican-American
21   U.S. citizens to keep them from voting; Texas Rangers
22   literally ethnic-cleansing hundreds and thousands of
23   U.S. citizens, shooting them in the back of the head
24   under sworn testimony that we have here in the Texas
25   State library, all of them explicitly to keep them from
0352
1    voting at election time; going through the barrios in
2    Corpus Christi and Harlingen at election time, riding
3    through and telling them, "Any Mexican-American citizen
4    caught voting would be either killed or sent to prison."

TX_00001058
JA_001057
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001058

5        That's the heritage of Texas, and it goes
6  all the way on up to the lynchings in the 1930s, 1940s
7  of Mexican-Americans.  And then later all the way up
8  through the 1960s and 1970s, Mexican-American
9  organizations, LULAC, GI forum and voter right --
10  Southwest Voter Education Project of Woody Velasquez,
11  having to literally engage in lawsuits to try to enforce
12  the 1965 Voter Rights Act that has continued up until
13  last -- well, 2008, in this very county, a group tried
14  to, in effect, limit the extension of the Voter Rights
15  Act and actually had to go up to an appeals court of the
16  U.S. Supreme Court.
17        So the record of Texas has been
18  specifically directed against Mexican-Americans and
19  minority voters, and it's been very effective, not only
20  in limiting and reducing their votes, but also in
21  creating a legacy among their community of distrust of
22  our state government, distrust of our voting process,
23  distrust of the democratic process and even fear.  Thank
24  you.
25        CHAIRMAN DUNCAN:  Thank you, Dr. Tijerina.
0353
1        Are there any questions?
2        (No response)
3        CHAIRMAN DUNCAN:  All right.  The Chair
4  hears none.  We appreciate your testimony.
5        MR. TIJERINA:  Thank you.
6        QUESTIONS FROM SENATE FLOOR
7        CHAIRMAN DUNCAN:  Oh, I'm sorry.  Excuse
8  me.  We do have Senator Gallegos.
9        Excuse me, Senator.
10        SEN. GALLEGOS:  Professor, let me ask
11  you -- I mean, I just heard your testimony and the
12  history, and you've said all that discrimination has
13  been targeted mainly to Mexican-Americans here in the
14  state of Texas.  Is that correct?
15        MR. TIJERINA:  Yes, sir, very explicitly
16  to Mexican-Americans.
17        SEN. GALLEGOS:  So let me ask you, in your
18  expertise on history discrimination except as compared
19  to voting rights, how would you compare the present bill
20  that is before us as to some of the intimidation and
21  discrimination factors that you had just described to us
22  in the past and some of the bills that were for like the
23  no interpreters?  That was in 1918?
24        MR. TIJERINA:  Yes, sir.
25        SEN. GALLEGOS:  And some of the other
0354
1  issues that you brought up.  How would you compare this
2  Senate Bill to the past history that you described to
3  this chamber?
4        MR. TIJERINA:  That those in history also
5  were presented in a very positive good light.  The
6  people who presented these laws and the people who took

file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

7  the action, the rioters who lynched Mexican-Americans
8  called themselves the Good Government League.  They had
9  good names.  The people who killed and assassinated
10  hundreds, even thousands of Mexican-American/U.S.
11  citizens, called themselves Progressives.  The laws that
12  were passed by Terrell himself in the Terrell Election
13  Law of 1903, he explicitly stated that he wanted to
14  "kill the Mexican vote."  The candidates during that
15  time period who campaigned for the U.S. Senate -- it's
16  in the Senate record -- campaigned that their intent --
17  that their intent was to kill the Mexican vote.  And yet
18  the way the poll tax was written, the way the Terrell
19  Election Law was written, it was innocuous.  It was
20  beneficial.  It was written specifically to assure that
21  only those legal voters could vote and to clean up the
22  elections.
23          So to read the Terrell Election Law itself
24  was very innocuous or beneficial, and yet to hear
25  Terrell himself speak, he was very explicit.  He wanted
0355
1  to "kill the Mexican vote," and that's how I would
2  compare them.
3          Many of these devices through the years
4  are written to sound beneficial or innocuous, and yet
5  they have just the opposite effect.
6          SEN. GALLEGOS:  Professor Tijerina, what
7  you're describing to me and what I just heard is what
8  I've seen on television recounts of what happened in
9  Mississippi and in Alabama and those southern states
10  that prevented African-Americans from either registering
11  or voting.  Is that what you're comparing this to?
12          MR. TIJERINA:  I think it would -- it
13  would have a parallel, yes, sir.
14          SEN. GALLEGOS:  Let me ask you, is there
15  any evidence that old historical discriminatory actions
16  are relevant or applicable today?
17          MR. TIJERINA:  Yes, sir, in the sense that
18  there has been and there is a legacy today in Texas of
19  voter discrimination, voter intimidation and a legacy of
20  fear and distrust; yes, sir.
21          SEN. GALLEGOS:  Professor, let me ask you
22  also, is there any evidence -- well, I think you just
23  answered this -- of innocuous or beneficial election
24  laws that may have actually had the intent to
25  disenfranchise Mexican-Americans -- Mexican-American
0356
1  voters?
2          MR. TIJERINA:  Yes, sir, those that I just
3  cited.
4          SEN. GALLEGOS:  Okay.  I just -- I just
5  wanted to be clear on that fact.  Thank you very much,
6  Professor.
7          MR. TIJERINA:  Thank you.
8          CHAIRMAN DUNCAN:  Are there any other

9   questions of the witness?
10          (No response)
11          CHAIRMAN DUNCAN:  All right.  The Chair
12  hears none.  The witness will be excused.  Thank you.
13          TESTIMONY BY CHASE BEARDEN
14          CHAIRMAN DUNCAN:  The Chair calls
15  Chase Bearden.  Please state your name and who you
16  represent.
17          MR. BEARDEN:  My name is Chase Bearden.
18  I'm with the Coalition of Texans with Disabilities.
19  Good afternoon.  Thank you for a chance to speak to all
20  of you.
21          We have spent some time looking at voter
22  ID, and we feel that there is a portion that will
23  disenfranchise a large number of Texans with
24  disabilities.  We've looked at just the logistics of
25  trying to reach a place to get this free ID that
0357
1   everyone has talked about.
2           There's a large cost associated for a
3   person with a disability who lives in a rural area or
4   place that's farther out to try and reach a DPS office
5   to try and get these IDs.  The majority of people with
6   disabilities, especially that have had one for their
7   entire life, may not have ever gotten a driver's
8   license.  They may not have a Texas license.  They more
9   than likely don't have a passport.  So when you look at
10  trying to get the IDs that you need to go and vote,
11  you're starting off at a large cost.
12          The majority of people with disabilities
13  that are wanting to get these IDs will have to probably
14  go and get their birth certificate.  To find someone who
15  can actually pick them up, drive them there, find an
16  accessible vehicle, if they don't have one, or find a
17  bus line that actually goes to where they can get a
18  birth certificate is going to be very difficult.  A lot
19  of people said, "Well, maybe they can go online.  They
20  could access and get their birth certificate sent to
21  them online."  There's a large number of Texans with
22  disabilities who are living on a very small amount of
23  money each month.  They more than likely don't have a
24  computer to even access the Internet much less a
25  provider or a credit card that they could use to access
0358
1   the birth certificate they need.  It also takes quite a
2   while to get that birth certificate if you were to
3   access that online unless you were to expedite it.
4           Then after getting that, you would have to
5   find a way to get to the DPS office.  If you do live in
6   a very rural area and you have a significant disability,
7   maybe you're using a power chair and your family doesn't
8   have an accessible van to be able to get you somewhere,
9   you have to look at how are you going to be able to make
10  it to where that person can access these IDs easily.

TX_00001061
JA_001060
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001061

11          One of the other areas that we looked at
12  was people living in nursing homes, state-supported
13  living centers who might not be able to access the IDs
14  they need to go and get identification.  Do we have
15  something in place that's going to allow them to be able
16  to go and more than likely not be able to catch a ride
17  or hop in their car and drive down to the DPS office.
18  They are living in a state-supported living center, but
19  they still have the right to vote.
20          So looking at how they would get their
21  identifications, we feel like they would still more than
22  likely be put in a place where they are not going to be
23  able to get the identification they need.
24          One of the other areas that we looked at
25  was that there's an exemption for a person that's over
0359
1   70.  And when we thought about that, isn't that similar
2   to the same issues that a person with a disability might
3   be facing, a harder time getting transportation to get
4   in to go get that ID, maybe the cost, living on a fixed
5   income?  So we have an inconsistency that kind of keeps
6   the same person from getting the ID they need, that free
7   ID, but we're giving an exemption to someone else.
8           When we started looking at a person who is
9   traveling to go and actually vote and they get there and
10  they don't have the correct ID or they are missing
11  something, so they have to cast a provisional ballot,
12  trying to get back there within six days can sometimes
13  be logistically impossible for a person.  They might
14  have had to get public transportation to go and get
15  there.  So they had to set up a ride through one of the
16  kind of disability bus systems, but they might not be
17  able to get a ride again or to get to the place to get
18  the documentation they need to get back and cure their
19  ballots.
20          Currently right now there are being bills
21  filed that would reduce the accessibility at some of the
22  polling places on nonfederal elections.  They wouldn't
23  have to use all the accessible voting machines.  We feel
24  like if you end up passing a law like that and then you
25  add voter ID to that and you're kind of putting a burden
0360
1   on someone trying to force them to get an ID that they
2   might not be able to get to, and then they get to the
3   polling place and they don't even have the accessibility
4   they need to cast a private ballot.  It's just recently
5   in 2001 that we've been able to get the technology we
6   need to cast that private ballot without someone else
7   doing it for us.  And now we're looking at having that
8   removed and then being forced to try and find an ID
9   that's acceptable that might not be obtainable by
10  everyone.
11          So we ask that y'all take the time to
12  really investigate how these IDs will really affect

13  someone who might not be able to obtain what it is y'all
14  are asking for.  Thank you.
15          CHAIRMAN DUNCAN:  Thank you, Mr. Bearden.
16          QUESTIONS FROM SENATE FLOOR
17          CHAIRMAN DUNCAN:  Senator Zaffirini?
18          SEN. ZAFFIRINI:  Thank you for being with
19  us this afternoon, Mr. Bearden.  Excellent testimony.  I
20  have several questions for you that will focus on the
21  needs of persons with disabilities and how they will be
22  impacted if Senate Bill 14 were to pass.
23          First, are persons with disabilities less
24  likely to have a current driver's license, military ID
25  or passport than the general population of voters?
0361
1          MR. BEARDEN:  I think there's probably a
2  large number of people with disabilities who don't have
3  a current driver's license or who don't have a driver's
4  license.  Many depend on the bus system, and they live
5  in areas where they can access buses.  Not all the bus
6  systems will access DPS.  Not all people with
7  disabilities are going to have a passport.  Many of them
8  are living on a fixed income and more than likely are
9  not traveling abroad.  They more than likely have not
10  been in the military or are carrying any other type of
11  ID.
12          SEN. ZAFFIRINI:  And what is the reason
13  for this?  Why is it that persons with disabilities --
14  and I'm trying to enter it into the record.  Why is it
15  that persons with disabilities are less likely than
16  other voters to have these documents?
17          MR. BEARDEN:  People with disabilities
18  tend to be of the lowest demographics when it comes to
19  having jobs, having income.  They are having a harder
20  time trying to get the services they need.  So being
21  able to have a driver's license or a passport is a lot
22  of times unobtainable.
23          SEN. ZAFFIRINI:  Thank you.  What
24  additional barriers do persons with disabilities have in
25  obtaining the forms of ID requested or required by
0362
1  Senate Bill 14.
2          MR. BEARDEN:  Could you repeat that again?
3          SEN. ZAFFIRINI:  What additional barriers
4  do persons with disabilities have or would have in
5  obtaining the forms of identification required by Senate
6  Bill 14?
7          MR. BEARDEN:  I think many of the barriers
8  would be -- I think it was brought up that one of the
9  DPS offices was inaccessible.  There's still
10  accessibility issues in Texas.  We've had accessibility
11  issues in polling places.
12          When you look at trying to get $22 put
13  together to buy a birth certificate, have to take the
14  time to get that birth certificate, then go to get

JA_001062
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

15  another ID, I think when you look at the amount of money
16  that that is -- and I know everyone doesn't feel it's a
17  large amount of money -- but someone living on a fixed
18  income, on SSI, that is a large portion of their funds,
19  and a lot of them won't be able to obtain it.
20          SEN. ZAFFIRINI:  Would the voter
21  identification required in this bill be sufficient to
22  ensure access to accurate information about the new ID
23  requirement information for the full range of persons
24  with disabilities in our state?
25          MR. BEARDEN:  We don't feel it will.  The
0363
 1  majority of people who have disabilities are living on a
 2  fixed income.  They don't have access to a computer.
 3  They don't have access to the Internet and more than
 4  likely not to have a newspaper to receive the
 5  information.  So we don't feel that they will be able to
 6  get all the information.
 7          SEN. ZAFFIRINI:  Thank you.  What effect
 8  do you believe that Senate Bill 14 would have on the
 9  turnout of voters with disabilities?
10          MR. BEARDEN:  The turnout of voters with
11  disabilities has increased up to -- we feel like it will
12  decrease.  The majority of people will show up.  They'll
13  try and cast their vote.  They will have to do a
14  provisional ballot, and I think when they start to look
15  at having to come back, they will have a harder time
16  making it.  The journey getting there sometimes is
17  incredibly difficult, trying to find a way to get there,
18  trying to get everything in order to be able to get
19  there.  So we do think it will decrease the turnout.
20          SEN. ZAFFIRINI:  Thank you.  Now, thinking
21  specifically of persons with disabilities who are
22  registered voters and who do have a photo ID, is there
23  any way that they would be impacted negatively by Senate
24  Bill 14?
25          MR. BEARDEN:  I think they could be if
0364
 1  they do not bring their ID.  The majority of people with
 2  disabilities, if they had a photo ID and were to show up
 3  without it or to have one that has expired, may not have
 4  the time to actually go afterwards, get an ID redone or
 5  to get a current ID to be able to make it back and have
 6  their ballot cured in time.
 7          SEN. ZAFFIRINI:  Would part of the problem
 8  be that they might have a photo ID that is very old?
 9          MR. BEARDEN:  I think that's very
10  possible.  There's a lot of people who might have
11  received an injury who were driving before who are not
12  driving anymore, who have held onto an ID that has
13  expired.  That's all they've needed.  So more than
14  likely if they are not driving and their ID is expired,
15  they probably won't have a current ID.
16          SEN. ZAFFIRINI:  And they might have a

TX_00001064

JA_001063
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001064

17  driver's license that has expired, too --
18          MR. BEARDEN:  Uh-huh, yes.
19          SEN. ZAFFIRINI:  -- that would have a
20  photo?
21          What affect do you believe Senate Bill 14
22  would have on the number of provisional ballots cast by
23  voters with disabilities?
24          MR. BEARDEN:  I think we'll have a lot --
25  a larger amount of provisional ballots casted, and I
0365
1   don't think we will be able to -- in the next few
2   elections be able to educate people fast enough to be
3   able to lower that level.  We've spent since 2001
4   educating people, that they have the technologies now to
5   make an independent, private vote themselves.  And it
6   took time to get people to understand that if they were
7   visually impaired, they didn't have to rely on someone
8   else anymore.  They went before, they had a bad
9   experience, weren't able to cast their own ballot, and
10  then once we passed HAVA and they had the technology to
11  cast their own ballot, it took us time to get people
12  educated to know that they can still do that and how to
13  do that.  So I think we would be kind of taking steps
14  backwards by doing this.
15          SEN. ZAFFIRINI:  To your knowledge, have
16  HAVA funds been used specifically to increase the access
17  of persons with disabilities to polling places.
18          MR. BEARDEN:  Yes, they have.  We've
19  specifically worked with HAVA and the Secretary of
20  State's Office to increase Texans with disabilities
21  voter outreach.  We've also worked with them on finding
22  access issues.  So I think these funds would be greatly
23  hampered, and the ability for Texans to be able to vote
24  would have problems.
25          SEN. ZAFFIRINI:  Do you have any concerns
0366
1   about the plan or the possibility of diverting
2   $2 million in HAVA funds to pay for this Senate Bill 14
3   instead?
4           MR. BEARDEN:  Yes.  Because right now I
5   believe that's about what they are spending to do all
6   the outreach and to work on accessibility and to
7   maintain some of the voting machines.  Right now what
8   they've said, the reason -- I believe one of the House
9   bills that's been filed to not have to have the
10  accessible voting machines is that it's a higher cost
11  during nonfederal elections.  If that's the case and the
12  counties are not able to afford to make -- have an
13  accessible machine, the funds that could have helped
14  them are probably now going to be taken away to let
15  people know that they're going to need an ID.
16          SEN. ZAFFIRINI:  So it is your testimony
17  that if $2 million in HAVA funds are diverted for the
18  purpose of Senate Bill 14, that there could be a

19  negative impact on the accessibility of persons with
20  disabilities to the polling places?
21          MR. BEARDEN:  Yes.
22          SEN. ZAFFIRINI:  Thank you.  Now,
23  Mr. Bearden, you represent the Coalition of Texans with
24  Disabilities?
25          MR. BEARDEN:  Yes, I do.
0367
1          SEN. ZAFFIRINI:  And that comprises
2  different member organizations?
3          MR. BEARDEN:  Yes, it does.
4          SEN. ZAFFIRINI:  Who are some of those
5  member organizations?
6          MR. BEARDEN:  We have organizations that
7  are not disability related.  We have a majority of
8  disability groups that are out there.  I think we
9  have --
10          SEN. ZAFFIRINI:  Do you have veterans, for
11  example --
12          MR. BEARDEN:  We do; we do.
13          SEN. ZAFFIRINI:  -- with disabilities?
14          MR. BEARDEN:  We have veterans'
15  associations.  We have organizations that are more
16  specific to single disabilities.  We've worked with
17  groups of older Texans.
18          SEN. ZAFFIRINI:  And is your testimony
19  today personal, or are you representing this Coalition
20  of Texans with Disabilities?
21          MR. BEARDEN:  I'm representing the
22  Coalition of Texans with Disabilities.
23          SEN. ZAFFIRINI:  Have they discussed this
24  bill thoroughly?
25          MR. BEARDEN:  Yes.
0368
1          SEN. ZAFFIRINI:  And what is their
2  consensus about this bill?
3          MR. BEARDEN:  We feel it will
4  disenfranchise a portion of Texans with disabilities.
5          SEN. ZAFFIRINI:  And you are speaking for
6  this coalition --
7          MR. BEARDEN:  -- yes.
8          SEN. ZAFFIRINI:  -- when you stand in
9  opposition to this bill?
10          MR. BEARDEN:  Yes.
11          SEN. ZAFFIRINI:  Thank you.  Now, you're
12  familiar with the bill, of course, and you've seen
13  different versions of it through the years?
14          MR. BEARDEN:  Yes.
15          SEN. ZAFFIRINI:  Can you think of any
16  amendments that we could propose that would help address
17  the issues that are of concern to persons with
18  disabilities?
19          MR. BEARDEN:  I think an amendment that
20  might be similar to a person who is 70 years old who

TX_00001066
JA_001065
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001066

21 would be able to say that they have a disability and
22 that maybe they have the registrar -- they have written
23 earlier to the voter registrar and stated they have a
24 disability that would affect them from being able to get
25 the ID to be able to just present their voter
0369
1 registration card.
2          SEN. ZAFFIRINI:  Are there any other
3 amendments that could cure this bill for you?
4          MR. BEARDEN:  I can't think of any right
5 now, but I could ask more of our groups.
6          SEN. ZAFFIRINI:  Well, I offer you the
7 opportunity to work with my staff today, and we will
8 address those concerns, and we will try to craft some
9 amendments that would suit your issues --
10          MR. BEARDEN:  Sounds good.
11          SEN. ZAFFIRINI:  -- and try to cure them.
12          MR. BEARDEN:  Thank you.
13          SEN. ZAFFIRINI:  Thank you very much,
14 Mr. Bearden.
15          Thank you, Mr. Chairman.
16          CHAIRMAN DUNCAN:  Thank you, Senator.  Are
17 there any other questions of Mr. Bearden?
18          (No response)
19          CHAIRMAN DUNCAN:  All right.  Thank you,
20 Mr. Bearden.  I appreciate your testimony.
21          Members, that concludes the invited
22 testimony for the day.  We have been going now for a
23 little over three hours, and so it's time for a short
24 break.  We'll take a 15-minute break, and then we'll
25 begin testimony with regard to our resource witnesses.
0370
1 My plan is just to call them up in the order that I've
2 previously announced, and you can ask any questions, and
3 then we'll go into public testimony after that.
4          So the Senate Committee of the Whole will
5 stand at ease until 5:45.
6          (Recess:  5:30 p.m. to 5:45 p.m.)
7          CHAIRMAN DUNCAN:  Senate Committee of the
8 Whole will come back to order.
9                RESOURCES TESTIMONY
10               TESTIMONY BY REBECCA DAVIO
11          CHAIRMAN DUNCAN:  We have -- Members, the
12 next portion of this hearing will be our resource
13 witnesses.  The first resource witness we announced
14 earlier will be Rebecca David (sic) with the Texas
15 Department of Public Safety.
16          Ms. David, why don't you come on up, state
17 your name and who you represent, and then we'll open the
18 floor to questions.
19          MS. DAVIO:  My name is Rebecca Davio.  I
20 am the Assistant Director for Driver Licenses at DPS.
21               QUESTIONS FROM SENATE FLOOR
22          CHAIRMAN DUNCAN:  Okay.  Senator

TX_00001067
JA_001066
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001067

23  Zaffirini, you have a light on.  Are you -- would you
24  like to ask any questions?
25          SEN. ZAFFIRINI:  (Nodded)
0371
1           CHAIRMAN DUNCAN:  All right.  Any other
2  member have a question?  Senator Watson, you're
3  recognized.
4           SEN. WATSON:  Yes.  Thank you,
5  Mr. Chairman.  Ma'am, you may not be the right person to
6  ask this, but I was deferred earlier, and so I thought I
7  would ask a couple of questions and see if you are the
8  right person.
9           Right now when someone goes in to get an
10  identification, is it your office that provides that
11  identification card?
12          MS. DAVIO:  Yes, sir.
13          SEN. WATSON:  And how much is charged for
14  that identification card?
15          MS. DAVIO:  That card is $15.
16          SEN. WATSON:  All right.  So how much does
17  it cost you to produce the card?
18          MS. DAVIO:  $1.67 to produce and mail it.
19          SEN. WATSON:  All right.  So if we're
20  looking at it from a budgetary standpoint for the state
21  of Texas, it costs you $1.60, but currently the state
22  collects $15?
23          MS. DAVIO:  Yes, sir.  $1.67 is what our
24  costs are.
25          SEN. WATSON:  I'm sorry.  $1.67.  I
0372
1  rounded that down, didn't I?  So now you've made the
2  math completely hard for me and probably impossible.
3          MS. DAVIO:  I'm sorry.
4          SEN. WATSON:  But the bottom line to it is
5  there's a net -- 15 minus $1.67 gives the state of Texas
6  a net return?
7          MS. DAVIO:  Yes, sir.
8          SEN. WATSON:  Now, under this legislation,
9  have you seen that there is no means test for someone
10  that comes in to get an ID card?
11          MS. DAVIO:  No, sir.
12          SEN. WATSON:  You've not seen that, or am
13  I saying that right?
14          MS. DAVIO:  By "means test," do you mean
15  do they qualify?  Do they have to show economic
16  disadvantage?
17          SEN. WATSON:  That's right.
18          MS. DAVIO:  No, sir.
19          SEN. WATSON:  There's not a means test, is
20  there?
21          MS. DAVIO:  No, sir.  I didn't see one.
22          SEN. WATSON:  And, in fact, it forbids
23  your department from collecting a fee if an eligible
24  voter -- if a person is an eligible voter or submits a

25   registration application.  Is that right?
0373
1         MS. DAVIO:  Yes, sir.  That's the way that
2   I understand it.
3         SEN. WATSON:  And have you had a chance to
4   look at the fiscal note for this legislation?
5         MS. DAVIO:  Yes, sir.
6         SEN. WATSON:  Have you seen anywhere in
7   that fiscal note where it looks to try to determine what
8   the cost to the state of Texas would be for the state
9   losing the fees if people were able to get these
10   identification cards for free?
11         MS. DAVIO:  No, sir.  I don't believe
12   that's covered in the fiscal note.  We were unable to
13   estimate that because we didn't know how many people
14   would take advantage of the card -- of the free ID card.
15         SEN. WATSON:  But you would anticipate
16   some would, otherwise it wouldn't be in the bill.  Is
17   that right?
18         MS. DAVIO:  I'm sorry.  I don't understand
19   that question.
20         SEN. WATSON:  You would anticipate that
21   some people would attempt to get the card for free?
22         MS. DAVIO:  Yes, sir.  That would make
23   sense.
24         SEN. WATSON:  Are you familiar with the
25   legislation or the fiscal note that was attached to
0374
1   House Bill 218 in the 2007 session?
2         MS. DAVIO:  I'm sorry, sir.  I am not.  I
3   just started this job in June of this year.
4         SEN. WATSON:  Well, I don't -- that's one
5   of the better answers I've heard today.  So thank you.
6         Are you familiar with the fiscal note that
7   was attached to House Bill 2335 in the last session of
8   the legislature?
9         MS. DAVIO:  Again, no, sir.
10         SEN. WATSON:  Okay.  Thank you very much.
11         MS. DAVIO:  Thank you.
12         CHAIRMAN DUNCAN:  Senator Williams, you
13   are recognized.
14         SEN. WILLIAMS:  Thank you.  I appreciate
15   you being here tonight and staying with us all day.  I
16   have several questions that I wanted to ask just to
17   clarify some things that I think have been brought up as
18   we went along here.  For the record, can you tell us
19   what the requirements are for someone to receive
20   either -- well, to receive an official identification
21   card from the state of Texas?
22         MS. DAVIO:  Yes, sir.  Basically, those
23   requirements are quite simple.  You can say that you
24   have to verify that you qualify, and currently that is
25   proving that you are a U.S. citizen or you have lawful
0375

TX_00001069
JA_001068
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001069

1 residence here.  And the second thing is to demonstrate
2 who you are, to prove who you are by providing various
3 different types of identification.
4          SEN. WILLIAMS:  Okay.  Anything else?  Do
5 you have to be photographed or fingerprinted or anything
6 like that?
7          MS. DAVIO:  Yes, sir, you do have to be
8 photographed and fingerprinted and provide your
9 signature.
10         SEN. WILLIAMS:  Okay.  Can someone have
11 both a Texas driver's license and an ID?
12         MS. DAVIO:  Yes, sir.
13         SEN. WILLIAMS:  And if someone had a
14 driver's license and they wanted to come back and get a
15 free ID, if they wanted to stand in line to do that,
16 they could do that.  Is that correct?
17         MS. DAVIO:  Yes, sir, as I understand it.
18         SEN. WILLIAMS:  Okay.  How long does it
19 take once an applicant has submitted all of their
20 materials to DPS to actually mail out the physical ID?
21         MS. DAVIO:  We issue a temporary receipt
22 that's good for 45 days.  The time that it takes varies.
23 We are currently, I believe, running about 35 days
24 production and mailing time.  There are times -- we're
25 having some equipment problems right now.  There are
0376
1 times when it's shorter than that.
2          SEN. WILLIAMS:  Okay.  And the temporary
3 ID is valid for how long?
4          MS. DAVIO:  Forty-five days.
5          SEN. WILLIAMS:  Okay.  About the same
6 amount of time that it takes to get the physical
7 license.  Okay.
8          MS. DAVIO:  Yes, sir.
9          SEN. WILLIAMS:  What security features
10 does a temporary ID have?
11         MS. DAVIO:  The temporary ID has a picture
12 of the ID or driver license applicant and also has their
13 basic demographic information that's shown on the
14 license.
15         SEN. WILLIAMS:  Okay.  There's been a lot
16 said about how many licenses -- how many license
17 offices -- driver's license offices we have around the
18 state.
19         MS. DAVIO:  Yes, sir.
20         SEN. WILLIAMS:  Can you tell me what the
21 total number of driver's license offices are?
22         MS. DAVIO:  Yes, sir.  There are 307
23 locations.  Currently 226 of those are operating.  That
24 includes 174 full-time offices, 34 part-time offices and
25 18 mobile offices that are open.
0377
1          SEN. WILLIAMS:  Okay.  And how many
2 counties do not have a driver's license office?

TX_00001070

JA_001069
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001070

3          MS. DAVIO:  There are 77.

4          SEN. WILLIAMS:  Seventy-seven.  Okay.

5          MS. DAVIO:  Yes, sir.  And I do have a map

6  that shows the driver license offices if you'd like to

7  have that passed out.

8          SEN. WILLIAMS:  Okay.  I think we've had

9  one submitted earlier and -- no, we haven't?  Okay.

10  Well, let's -- why don't we go ahead and submit that

11  into evidence.

12          MS. DAVIO:  This map, when you get it,

13  will show the full-time, the part-time and mobile

14  offices that are open and the offices that are

15  temporarily closed.

16          SEN. WILLIAMS:  Okay.

17          CHAIRMAN DUNCAN:  Okay.  Ms. Davio, let us

18  first -- this will be Exhibit 9.

19          (Exhibit No. 9 marked)

20          CHAIRMAN DUNCAN:  And you've just

21  described Exhibit 9 as a map.  Driver's License Offices

22  in Texas is what the label is, and that will be

23  distributed.  Exhibit 9, is there any objection to

24  receiving that?

25          (No response)

0378

1          CHAIRMAN DUNCAN:  Exhibit 9 is received.

2          (Exhibit No. 9 admitted)

3          SEN. WILLIAMS:  Okay.  So we have 77

4  counties that don't have a license office.  Is that

5  correct?

6          MS. DAVIO:  Yes, sir.

7          SEN. WILLIAMS:  Okay.  And could you

8  describe for me briefly -- you mentioned that some

9  offices are temporarily closed.  Why are those offices

10  temporarily closed, and what is the department doing to

11  remedy that situation?

12          MS. DAVIO:  Yes, sir.  The DPS just

13  implemented our new driver license system, fully

14  implemented in May.  Our mobile offices are functioning

15  on equipment from our Legacy system, and that equipment

16  is very, very old.  And as it breaks, we are unable to

17  replace it.  We simply can't get parts.  We can't get

18  replacement pieces even trying to go out and buy things

19  on eBay, and so we have no other choice other than to

20  temporarily close that office.

21          We have tried to get new equipment --

22  equipment for our new system to work in these mobile

23  locations.  And the way that we've changed -- the way

24  that we have changed the way we do driver license, we're

25  pushing much more data through, and so we find it very

0379

1  difficult, impossible really, to get the new equipment

2  to work.

3          SEN. WILLIAMS:  So when you say Legacy

4  equipment and the new equipment, you're talking about

TX_00001071
JA_001070
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001071

5   computers that you use to process the information --
6             MS. DAVIO:  Yes, sir.  I'm sorry.
7             SEN. WILLIAMS:  -- that people get in?
8             MS. DAVIO:  Yes, sir.
9             SEN. WILLIAMS:  Okay.  And so what kind of
10  information is being submitted?  I guess what we're
11  trying to do is meet the qualifications of the REAL ID
12  Act, which is a federally mandated program -- right --
13  and that's why we're switching to this new equipment?
14            MS. DAVIO:  Well, we're switching to the
15  new equipment because our old system was so old.
16            SEN. WILLIAMS:  Right.
17            MS. DAVIO:  There are many safeguards that
18  are built into the new technology.  For example, we now
19  scan real-time all the documents that are brought in.
20  So it used to be that we had to make copies and send
21  those back to headquarters for scanning.  They are now
22  scanned real-time, and we give the originals back to the
23  customer.  We also capture a photo, the fingerprints and
24  the image of the person's signature.
25            SEN. WILLIAMS:  So --
0380
1             MS. DAVIO:  And that's a lot of data.
2             SEN. WILLIAMS:  Yeah.  And the issue is --
3   and have you tried using these mobile phone air cards or
4   anything like that to be able to have --
5             MS. DAVIO:  We have tried using air cards.
6   We have tried using DSL lines.  All of our offices,
7   full-time offices, use T1 lines, and that's been the
8   only thing that we can find.
9             SEN. WILLIAMS:  Okay.  So you mentioned to
10  me yesterday when we visited that you have an initiative
11  going on.  Tell us a little bit about what you're trying
12  to do.
13            MS. DAVIO:  Yes, sir.  We realized that
14  closing these offices even temporarily might cause a
15  burden.  What we're trying to do is look and be able to
16  provide a more consistent level of service.  We found
17  that in some locations we only serve one or two or a
18  very small number of customers, when in our other
19  offices customers experience a very long wait time.  And
20  so we're trying to equalize that level of service as
21  much as we can, provide a consistent high quality level
22  of service across the state.
23            So to do this we are doing a business
24  intelligence analysis project.  That actually means that
25  we are looking at our data very carefully to see how
0381
1   many transactions are conducted at what location, how
2   long those transactions take, that kind of thing, so
3   that we can optimize the use of our resources.  We
4   realize this is not a good time to come and ask for
5   additional resources, and so we're trying to make the
6   best use of the resources that we can through this

TX_00001072
JA_001071
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001072

7   analysis project.
8         SEN. WILLIAMS:  Okay.  Can a noncitizen
9   get an ID card from the state?
10        MS. DAVIO:  A noncitizen, yes.  If you are
11  an asylee or a refuge or have some other status of
12  lawful presence, yes, sir, you can.
13        SEN. WILLIAMS:  Illegal foreign visitor,
14  for instance.  You wouldn't have to be an asylee.
15  Right?  You could be a legal foreign visitor?
16        MS. DAVIO:  Yes, sir, a legal foreign
17  visitor.
18        SEN. WILLIAMS:  Okay.  And is there
19  anything unique about that card?
20        MS. DAVIO:  The cards do say "temporary
21  visitor" on them.
22        SEN. WILLIAMS:  Okay.  How many driver's
23  license holders do we have in this state?
24        MS. DAVIO:  There are a little better than
25  15 million.
0382
1         SEN. WILLIAMS:  Okay.  And how many people
2   hold ID cards?
3         MS. DAVIO:  Approximately 750,000.
4         SEN. WILLIAMS:  And just to clarify, I
5   think I may have -- I'm not sure about the cost of an
6   ID.  Is there anything you want to add to what my
7   remarks are?  I'm not sure I was actually on the money
8   with everything.  Is what I said early, $1.67, is the
9   cost to produce those cards?  Is that --
10        MS. DAVIO:  Yes, sir.  The cost of
11  producing and mailing, yes, sir.
12        SEN. WILLIAMS:  Okay.  And then what is
13  the cost to the state to give those IDs away?
14        MS. DAVIO:  What is the cost to the state
15  to give those away?  The loss of the revenue, the
16  $15.00 --
17        SEN. WILLIAMS:  Okay.
18        MS. DAVIO:  -- or the $5 for over 65.
19        SEN. WILLIAMS:  Okay.  And have you been
20  able to determine how many people this would apply?  You
21  can't tell?
22        MS. DAVIO:  No, sir.
23        SEN. WILLIAMS:  Okay.
24        MS. DAVIO:  We don't have any way of
25  estimating.
0383
1         SEN. WILLIAMS:  So when we talk about
2   cost, there could be a loss of revenue, but really the
3   cost to produce that document is pretty negligible --
4   right -- $1.67?
5         MS. DAVIO:  Yes, sir.
6         SEN. WILLIAMS:  All right.  All right.
7   That's all the questions I have.  Thank you very much.
8         MS. DAVIO:  Thank you.

TX_00001073
JA_001072
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001073

9      SEN. ELTIFE:  Thank you, Senator Williams.
10      Senator Gallegos?
11      SEN. GALLEGOS:  Thank you, Mr. Chairman.
12 Now, you're representing the DPS.  Is that what you
13 said?
14      MS. DAVIO:  Yes, sir.  I'm the assistant
15 director --
16      SEN. GALLEGOS:  I'm sorry.  I didn't -- I
17 didn't hear your name or --
18      MS. DAVIO:  My name is Rebecca Davio --
19      SEN. GALLEGOS:  Rebecca.
20      MS. DAVIO:  -- and I'm the Assistant
21 Director for Driver Licenses at DPS.
22      SEN. GALLEGOS:  Okay, Rebecca.  And you
23 passed out this map right here.  Right?
24      MS. DAVIO:  Yes, sir.
25      SEN. GALLEGOS:  Okay.  Now, I'm trying to
0384
1 see real close here.  It's got a big green spot right in
2 the middle of Harris County.
3      MS. DAVIO:  Yes, sir.
4      SEN. GALLEGOS:  Is that correct?
5      MS. DAVIO:  Yes, sir.
6      SEN. GALLEGOS:  But the maps I have shows
7 nothing within the 610 Loop.
8      MS. DAVIO:  That actually -- I believe
9 that green -- that big green circle that you commented
10 on is -- indicates that there are seven driver license
11 offices within Harris County.
12      SEN. GALLEGOS:  Yeah, but I'm looking at
13 this one.  It says there's nothing within the 610 Loop.
14 Is that correct?
15      MS. DAVIO:  I'm sorry, sir.  I'm not
16 familiar with that map.  That point has been made
17 earlier and --
18      SEN. GALLEGOS:  No.  I introduced this map
19 two years ago, and I'm introducing it again today.  I'm
20 just asking if you're the assistant of DPS, you don't
21 know that there's not a DPS office within the 610 Loop
22 in the largest city in the state?
23      MS. DAVIO:  I can't claim to be intimately
24 familiar with the layout of Houston.  I have been to the
25 offices.
0385
1      SEN. GALLEGOS:  Well, wait a minute.  What
2 was your title again?
3      MS. DAVIO:  I'm the Assistant Director for
4 Driver Licenses at DPS.
5      SEN. GALLEGOS:  Okay.  Well, then if you
6 don't know the answer, who can give me the answer?  I
7 haven't been getting any answers today.  And we are told
8 to ask DPS.  Now you're before us, and you can't answer
9 that question for me.  So who can I -- I mean, who do I
10 ask?

TX_00001074
JA_001073
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001074

11          MS. DAVIO:  I'll verify that for you, sir.
12          SEN. GALLEGOS:  Before we finish today?
13          MS. DAVIO:  Yes, sir.
14          SEN. GALLEGOS:  All right.  And not only
15   that, in Fort Worth, I only see one within the loop.  In
16   Dallas, only one inside the city.  But you're still --
17   on your map that you're introducing here, it shows a
18   bunch of green spots.  Now, I think it needs to be
19   clarified by cities of how many are there, how many are
20   open, how many are closed, after your 10 percent cut in
21   the agency how many are proposed to be closed and the
22   hours that they open up.  You know, that is what I'd
23   like to know.
24          Now, the other question that I had is --
25   and Senator Williams brought up a good point.  The
0386
1    problem that I have on temporary license, the
2    temporaries -- my son lost his, and he went and got a
3    temporary license, and its got his photo ID.  That's a
4    temporary license.  So what Senator Williams said is
5    correct.
6          My concern is on a confiscated license
7    when the DPS picks up -- or the law enforcement agency
8    picks up that license and replaces it with this
9    temporary license.  Well, this confiscated license.
10   Let's not call it temporary because temporaries have a
11   photo ID.  This confiscated license does not have a
12   photo ID, yet the verbiage on it says this will act as a
13   valid DPS license and valid ID.  That's what it says,
14   for 40 days.  Okay?  And the date of it y'all gave us
15   that we asked for, is in 2010 there's almost 100,000
16   drivers out there with this license without a photo ID,
17   yet the verbiage on it has that this will be a valid DPS
18   license for 40 days.  Now, is that correct?  Yes or no.
19          MS. DAVIO:  Yes, those are issued --
20          SEN. GALLEGOS:  Okay.
21          MS. DAVIO:  -- by law enforcement.  They
22   are not issued through the DPS offices.
23          SEN. GALLEGOS:  So there's two different
24   classes.  I just wanted to make it clear for Senator
25   Williams.  He's pretty -- he's pretty almost correct.  I
0387
1    just want to make the difference between a temporary and
2    a confiscated that I just showed you that y'all give
3    out.
4          MS. DAVIO:  That sheet of paper is
5    actually given by law enforcement officers at the time
6    of stop on the street.
7          SEN. GALLEGOS:  I understand, but it has
8    DPS verbiage on it.
9          MS. DAVIO:  Yes, sir.  It's our form, but
10   we do not issue it.
11          SEN. GALLEGOS:  Okay.  Now -- and this is
12   just one -- one avenue that we looked.  That's just

13  100,000 in one category.  There's four other categories
14  that we have not got a tally on, that confiscated --
15  that licenses are confiscated for whatever other issue,
16  nonpayment of child support or some other categories
17  that you confiscate licenses.  And we haven't taken the
18  tally on those.  I'm just going on this one avenue where
19  licenses are confiscated and that person has not been
20  convicted yet.  He or she is innocent until proven
21  guilty.  But this is the only form of ID that they have,
22  and it doesn't have a picture on it.
23          MS. DAVIO:  It would be possible for the
24  people whose license are confiscated to apply for an ID.
25          SEN. GALLEGOS:  It doesn't say that on
0388
1  here.  Nowhere does it say that.  I understand what you
2  just told me.
3          MS. DAVIO:  Yes, sir.
4          SEN. GALLEGOS:  But when they stop me and
5  take my license and give me this in return, it has
6  nowhere that instructs me that I have an option to go
7  get a license with a picture.  It doesn't say that on
8  here.  That's why you have almost 100,000 out there with
9  this type of license.  And not only that, in just one
10  month, last month -- well, let's see in December of
11  2010, we have 10,000 out there driving right now with
12  this license without a picture.
13          So I just wanted to make that clear that
14  this is -- that this is out there, that it's got DPS
15  language on it.  It doesn't tell us that we can -- we
16  have an option to go get one with a picture.  It doesn't
17  say that on here.  So that's why you have the high
18  number out there driving with this license.
19          So I just wanted to make that clear for
20  the record that that's how many drivers that we know of.
21  We haven't gone into the other categories.  There could
22  be more that are driving with this license, that's their
23  only form of ID, and I just want to make it sure --
24  Senator Fraser is not on the floor -- but that he
25  understood that.  But Senator Williams is, and I just
0389
1  wanted to make sure that that is understood, the
2  difference between the two licenses, that one, the
3  temporary has a photo ID --
4          MS. DAVIO:  Yes, sir.
5          SEN. GALLEGOS:  -- the confiscated does
6  not, but yet it shows here that this -- by the DPS that
7  it is a valid ID that you can use.
8          MS. DAVIO:  As I understand that, sir,
9  it's valid for driving purposes.  And because it's
10  provided by the law enforcement officer on the side of
11  the street, they don't have any of the equipment to take
12  a person's picture or do any of that.
13          SEN. GALLEGOS:  I understand that; I
14  understand that.  I just wanted to make the difference

TX_00001076
JA_001075
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001076

15  in the two.  And I can use this paper ID, you know, go
16  to Wal-Mart, "Where is your ID?"  "Here it is right
17  here; here it is right here.  The DPS gave it to me," or
18  it's got DPS language that I can use it as a valid ID.
19  I just wanted to make sure that that's clear.  Is that
20  correct?
21          MS. DAVIO:  Sir, I'm unable to comment on
22  whether Wal-Mart would accept that as an ID.
23          SEN. GALLEGOS:  Well, it says here -- it
24  says here that this is valid per DPS language and I can
25  use as an ID.
0390
1          MS. DAVIO:  I believe it's valid for
2  driving purposes.  It's a temporary driving permit, and
3  so I can't speak to whether a bank or retail
4  establishment would accept it for identification
5  purposes.
6          SEN. GALLEGOS:  Okay.  Well, let's just
7  say they'll take it because it's got your language on
8  it, but I just wanted to make that point out there to
9  the members that, you know, when you're talking about an
10  ID from the DPS, there are differences, and this one
11  just doesn't happen to have a photo ID on it.  I just
12  want to make that clear.
13          And you will give me those answers before
14  we get through tonight?
15          MS. DAVIO:  Yes, sir.  I will work to do
16  that.  I know I can give you the answer about the
17  offices within the 610 Loop in Houston.  We have the
18  information about the hours that the offices are open,
19  and we'll look into the cuts -- the proposed cuts.
20          SEN. GALLEGOS:  Let me ask you this
21  question:  Do you anticipate any other closures per the
22  shortfall that we have now of any DPS office, whether in
23  Houston or anywhere in the state?
24          MS. DAVIO:  Well, there may be some more
25  of the temporary closures because of the equipment
0391
1  failure because we don't have any other way to replace
2  that failing equipment with new equipment.  Because of
3  this need for a higher, larger data pipeline, there may
4  be some additional closures, but we're looking at where
5  our offices are located and how they are staffed through
6  our business intelligence project.  And so we plan on
7  coming to all the legislators and the local judges and
8  bringing you that information about office closures and
9  what our recommendations would be to provide the optimal
10  level.
11          SEN. GALLEGOS:  I'm only asking that
12  because if we're going to mandate Texans to obtain a
13  photo ID and we have to go to DPS to get that and you're
14  telling us you anticipate some more closures, I'd like
15  to know where they are at.  And then that way we can
16  tell our folks that these particular locations -- that

17  you're going to get a free ID under this bill, that
18  those offices are going to be closed.
19          MS. DAVIO:  Sir, we don't plan to close
20  any more offices unless the equipment breaks.  Right now
21  we have no plans to close any of our driver license
22  offices, those mobile locations, unless the equipment
23  fails.
24          SEN. GALLEGOS:  Unless the equipment
25  fails?
0392
1           MS. DAVIO:  Yes, sir, in the short term.
2           SEN. GALLEGOS:  So you have no plans to
3   close any other offices?
4           MS. DAVIO:  In the short --
5           SEN. GALLEGOS:  Is that what you're
6   telling me?
7           MS. DAVIO:  In the short-term, yes, sir.
8   We want to do the business --
9           SEN. GALLEGOS:  What do you mean
10  "short-term"?
11          MS. DAVIO:  We want to -- we need to do
12  this business intelligence analysis so that we can
13  really look to determine how we can best use our
14  resources to provide the optimal level of service for
15  all Texans when they are trying to get their driver
16  license or an ID.
17          SEN. GALLEGOS:  All right.  And you'll get
18  me those answers before we finish today?
19          MS. DAVIO:  Yes, sir.
20          SEN. GALLEGOS:  Okay.  Thank you.
21          MS. DAVIO:  Yes, sir.
22          CHAIRMAN DUNCAN:  The Chair recognizes
23  Senator Ellis.
24          SEN. ELLIS:  Ms. Davio, I know you've been
25  here all day, and we're all very appreciative of that,
0393
1   and we know you don't have a position on the bill.
2   You're just here as a resource.
3           MS. DAVIO:  Yes, sir.
4           SEN. ELLIS:  Including Senator Gallegos,
5   we appreciate you being here and the work you do.
6           MS. DAVIO:  Thank you.
7           SEN. ELLIS:  Let me ask you this:  Now, I
8   saw this article in the paper today about the driver
9   surcharges.
10          MS. DAVIO:  Yes, sir.
11          SEN. ELLIS:  Are you familiar with that
12  program?
13          MS. DAVIO:  Yes, sir.
14          SEN. ELLIS:  Does that come under your
15  jurisdiction?
16          MS. DAVIO:  Yes, sir, it does.
17          SEN. ELLIS:  If I'm reading this right, it
18  says it's estimated that a total of about 1.2 million

19    Texans are in default?
20           MS. DAVIO:  Yes, sir.  I believe that's
21    the number.
22           SEN. ELLIS:  Okay.  Now, how do we get to
23    that?  I mean, can you give us some sense -- since we
24    passed that in '03, is it about 100,000 per year, a
25    half?  Is it getting better?  Worse?  I'm just trying to
0394
1     get a sense of how much -- how many more people may end
2     up in that category between now and when Senator
3     Fraser's bill goes into effect.
4            MS. DAVIO:  You're asking about the number
5     of people that are in default on their surcharges?
6            SEN. ELLIS:  Yeah.  About 1.2 million now,
7     and I'm asking how much do you think that will grow
8     between now and January of 2012, next year, a year from
9     now?
10           MS. DAVIO:  We actually hope that the
11    number of people in default will be reduced.  There is a
12    program going on now -- that was probably what the
13    article in the paper was -- about the amnesty program.
14    So what this program does is it allows people who are in
15    default, if they've received a surcharge between 2004
16    and 2008 and are in default on that surcharge, then they
17    can pay 10 percent up to a maximum of $250.  And if they
18    pay that reduced amount and their reinstatement fees and
19    do the other things, then they will no longer be in
20    default.  That program will run -- the amnesty program
21    will run through -- I believe it's April 17th.
22           And then we will begin a program for
23    indigent folks that cannot pay their surcharges.  And so
24    we will enable those people to pay their surcharges, and
25    so we really do hope the number of people in default
0395
1     will be reduced.
2            SEN. ELLIS:  Is this your first amnesty
3     program?
4            MS. DAVIO:  Yes, sir, it is.
5            SEN. ELLIS:  Now, you know -- I'm sure you
6     know -- two other states that had a similar program for
7     trying to balance their budgets abandoned the programs.
8     And in those states, I'm told that they tried the
9     amnesty programs, they tried virtually everything you
10    could think of, and it didn't work.  So they just
11    abandoned the programs.
12           So is there any empirical evidence that
13    would make you think that 1.2 million people who have
14    lost their licenses in Texas because they didn't pay on
15    average, I guess, what -- I guess this is a thousand
16    dollars a year if you were drunk, 2,000 if the blood
17    alcohol level was twice the legal limit?  Is there any
18    reason why you would think the amnesty program in Texas
19    will work when it didn't work in the other two states
20    that abandoned the program?

TX_00001079
JA_001078
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001079

21      MS. DAVIO:  We actually have had a pretty
22  good response so far.  I'm sorry.  Off the top of my
23  head, I can't give you the statistics of the people that
24  have opted in, but I'd be happy to get that information
25  for you.
0396
1       SEN. ELLIS:  Now, I think I heard you say
2  in response to a question from Senator Williams
3  15 million Texans have a driver's license.
4       MS. DAVIO:  Yeah.
5       SEN. ELLIS:  Or did you mean authorized to
6  have one?  Are you counting the 1.2 million who have
7  lost them?
8       MS. DAVIO:  I believe that's active driver
9  licenses.
10      SEN. ELLIS:  Okay.  So 15 million have
11  active driver's licenses.  And just as a point of
12  reference to Senator Williams, there are 12.6 million
13  registered voters in Texas.  So he was correct earlier
14  when he made the point that --
15      SEN. WILLIAMS:  (No mic)
16      SEN. ELLIS:  Yeah, that's right.  Probably
17  about 30 percent of them vote.  Of course, maybe half of
18  them vote wrong; maybe half of those vote wrong, but
19  about 30 percent of them vote, Senator.
20      But I just wanted to make the point 15
21  million people have driver's license in Texas, 12.6
22  million registered voters.  Most people who go to vote
23  do what most of us on this floor do, they show their
24  driver's license.  And if the trend of 1.2 million who
25  have drivers -- who had driver's licenses haven't lost
0397
1  them since 2003 continues, if your amnesty program does
2  not work, if it's not something unique about the Lone
3  Star State that would make it work here when it didn't
4  work in those other states, that means that 15 million
5  figure is going to be going down in terms of the people
6  who have a driver's license.  Correct?
7       MS. DAVIO:  Yes, sir.
8       SEN. ELLIS:  Okay.  Now --
9       MS. DAVIO:  Those people --
10      SEN. ELLIS:  Those people who owe those
11  surcharges, is that a felony, or what is it?
12      MS. DAVIO:  I don't believe it's a felony.
13      SEN. ELLIS:  It's a civil offense?
14      MS. DAVIO:  I mean, it depends upon
15  what -- there's five different things that you can
16  receive a surcharge for.
17      SEN. ELLIS:  How about drunk?
18      MS. DAVIO:  Yes, sir.  Driving while
19  intoxicated is one of them.
20      SEN. ELLIS:  Wouldn't that be a felony
21  when they get a surcharge?  It's a civil fine.  I'm
22  really making a point to my colleagues.

TX_00001080

JA_001079
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001080

23        And can -- what can you-all do to those
24  folks short of taking a driver's license?  You know, can
25  we -- maybe the finance chair can start building some
0398
1   more debtor prisons.  Can you put them in prison, or do
2   you know?  If you don't know, it's okay.
3        MS. DAVIO:  I don't know, sir.
4        SEN. ELLIS:  Okay.  I just want to raise
5   that point so my colleagues do realize what we're doing,
6   Senator Fraser, under your bill.  15 million people have
7   a driver's license.  1.2 million have lost them.  I
8   don't think we're going to start building debtor
9   prisons.  I don't think we're going to get to the point
10  where three times you're drunk and get a surcharge we
11  lock you up.  We can't afford to do it, but it's making
12  it more and more challenging, and it is a burden that
13  we're putting on these folks.  Thank you.
14        SEN. WHITMIRE:  Mr. President?
15        CHAIRMAN DUNCAN:  The Chair recognizes
16  Senator Whitmire.
17        SEN. WHITMIRE:  Briefly.  First of all,
18  how long -- how long have you been in your present job?
19  Pretty recent?
20        MS. DAVIO:  Yes, sir.  I just started
21  June 1st of 2010.
22        SEN. WHITMIRE:  So about six months?
23        MS. DAVIO:  Yes, sir.
24        SEN. WHITMIRE:  Did you ever envision when
25  they gave you the job you were going to be here today
0399
1   and have the opportunity to meet Senator Gallegos?
2        (Laughter)
3        MS. DAVIO:  The pleasure is all mine.
4        (Laughter)
5        SEN. WHITMIRE:  No; we appreciate you as
6   we do our other state employees.
7        MS. DAVIO:  Thank you.
8        SEN. WHITMIRE:  A couple of things I want
9   to clarify, Senator Ellis was talking about the folks
10  who have had their license suspended because of the
11  severance.  I don't believe he asked if you have no
12  license but we're going to require you to go get an ID
13  at a DPS office, what is the relationship if I come into
14  the office, I don't have a license because it's been
15  suspended because I can't pay the severance, it's a
16  civil penalty.  Is there any chance that you're arrested
17  because you haven't paid your back severance?  I mean,
18  first I think whether you confiscate the person or
19  handcuff them, it would probably be a huge deterrent for
20  someone to go there knowing they owe you thousands of
21  dollars.  Would you not agree?
22        MS. DAVIO:  Yes, sir.
23        SEN. WHITMIRE:  Okay.  But going one step
24  further, if someone chose to do that what -- and they

25  apply for a voter ID and the computer is going to kick
0400
1  out "you owe us" -- and some of these figures are
2  fantastic amounts, thousands of dollars -- what will be
3  the conduct of the DPS?  I walk up to your station for
4  voter ID and you say Mr. Whitmire you owe us $20,000 in
5  back severance, is that going to be brought up and
6  you're going to be asked to not leave until you have a
7  payment plan?
8          MS. DAVIO:  No, sir.  Those are really
9  handled as separate transactions.  If you come in and
10  you say you want to get an ID and you don't already have
11  an ID, then they will determine if you are eligible, and
12  you should be eligible.  And they do have the
13  information in the driver license system about the
14  surcharges.  But if you aren't asking to get a driver
15  license then that won't be brought up.
16          SEN. WHITMIRE:  Okay.  It's your
17  testimony -- y'all have actually discussed this
18  internally.  It's going to be the policy, as you state
19  before us today, I come in there, I owe you a surcharge,
20  but I don't want to deal with the surcharge today, they
21  are not going to bring it up or ask me for my intention
22  of paying it, don't leave until you make a payment plan?
23          MS. DAVIO:  No, sir.  I haven't witnessed
24  that.  I have visited the --
25          SEN. WHITMIRE:  Well, you haven't
0401
1  witnessed it -- excuse me for interrupting because this
2  is all in the planning stage.  So I know you haven't
3  seen it because no one has been in there asking for a
4  voter ID.
5          MS. DAVIO:  No, sir, they haven't asked.
6          SEN. WHITMIRE:  Would it be -- and can
7  you -- has it really been decided or is that just your
8  opinion or you've got to go upstairs to the colonel or
9  the DPS board?  I mean, this is a pretty serious matter
10  in my mind because you have no license because you can't
11  afford to pay the surcharge, but we're fixing -- if this
12  law will pass -- require you to go to that location, law
13  enforcement, a pretty intimidating setup anyway to some.
14  You know, they've already run afoul, but they've got to
15  go to that site for a voter ID.  Are you telling me
16  there won't be any discussion of the surcharge, or is it
17  really you don't know?
18          MS. DAVIO:  You're right.  We haven't
19  discussed voter ID, but I have witnessed numerous
20  transactions where somebody comes in and they request to
21  get an ID.  And, you know, they may -- they may make an
22  inquiry about can I -- you know, what about a driver
23  license or something like that, and actually the records
24  come up and show that they are ineligible to get a
25  driver license.  But if there --
0402

JA_001081

1      SEN. WHITMIRE:  Because of the surcharge?
2  Because of the surcharge?
3      MS. DAVIO:  Yes, sir.  And so then they
4  can still continue to get an ID, and I haven't witnessed
5  any occasion where there was discussion of the
6  surcharges unless the customer brought that up.
7      SEN. WHITMIRE:  Well, if this passes, and
8  of course none of us are going anywhere, but -- and I
9  understand you're just representing the DPS, but I would
10  think that would be a major policy decision, that you
11  deal with something as important and precious as the
12  right to vote, but we're fixing to require you to come
13  in contact with law enforcement that you owe thousands
14  of dollars with the same personnel.  I think someone is
15  going to have to really put some safeguards, Senator
16  Williams, that you can enter one of these sites and not
17  have to deal with the surcharge.
18      And would you not agree, even though you
19  have an amnesty program and you said it's working pretty
20  good -- in fact, pretty expensive, it's 250 and I think
21  there's a fee schedule.  You've still got to pay a fee
22  to the folks that are doing y'all's collection work.  So
23  what is the actual cost, 250?  I think 150 to the
24  collection agency, and then it's going to run about five
25  or $600 if you want to -- if you want to use the amnesty
0403
1  program.  But that -- do you know the amount that's
2  working pretty good?  What does "pretty good" to you
3  mean out of a million folks?
4      MS. DAVIO:  I'm sorry.  I will work to get
5  you those information.
6      SEN. WHITMIRE:  Yeah, and I'm not trying
7  to pin you down.  It's just, you know, you're the best
8  source we've got at the time.
9      Let me ask you something.  You said a
10  while ago if someone confiscated your license, you could
11  apply for an ID.  What if they confiscate it the week
12  before the election?  What's the processing time to
13  apply for this ID?  Say you're unfortunate, you come to
14  Austin before a Saturday election.  On Thursday, if
15  you're real unfortunate, they get your license because
16  you have been pulled over.  How are you going to get
17  that before Saturday's election?  Do you know the
18  turnaround?
19      MS. DAVIO:  You can come into our office,
20  and we -- as long as you qualify, we issue a temporary
21  receipt immediately.
22      SEN. WHITMIRE:  Come in your office, what
23  do you mean by that?
24      MS. DAVIO:  You can go to any driver
25  license office.
0404
1      SEN. WHITMIRE:  Any office?
2      MS. DAVIO:  Yes, sir.  And as long as you

3   qualify, then you can walk out with a temporary receipt.
4           SEN. WHITMIRE:  Of course under my
5   scenario, you've first got to get out of jail, but
6   that's not mine or your problems tonight.
7           Let's talk about that office, and then
8   I'll pass.  The truth of the matter is, is it not, as
9   you stand before us today, you have no idea what the
10   future budget considerations are going to do to your
11   office locations, do you not?  When you were having a
12   question and answer with Senator Williams, that's under
13   today's setup, is it not?
14           MS. DAVIO:  Yes, sir.
15           SEN. WHITMIRE:  Have you been in meetings
16   recently at the command headquarters where you're
17   contemplating a significant, maybe as much as a
18   10 percent cut in your budget?  Have y'all made your
19   plans for how to deal with the shortfall and expected
20   reduction of DPS funding?
21           MS. DAVIO:  Yes, sir.  The 5 percent cut.
22           SEN. WHITMIRE:  That you've already been
23   requested to make.
24           MS. DAVIO:  Yes, sir.  I believe that that
25   did envision the closing of some -- I believe --
0405
1           SEN. WHITMIRE:  Have you looked at the
2   House proposed budget and the Senate proposed --
3           MS. DAVIO:  I have not.
4           SEN. WHITMIRE:  -- and calculated the
5   impact and reduction of services and maybe troopers and
6   personnel as it relates to the licensing division?
7           MS. DAVIO:  I'm sorry, sir.  I have not.
8           SEN. WHITMIRE:  So the truth of the matter
9   is when you were answering Senator Williams' question,
10   that's under current funding levels, is it not, as you
11   understand them?  Since you took the job in June and
12   here we are the second week of January, that's really
13   the funding and the resources that you were using to
14   answer his questions.  It certainly wasn't going
15   forward.  Is that not correct?
16           MS. DAVIO:  That's correct, sir.
17           SEN. WHITMIRE:  You do expect significant
18   reductions in your operating resources, do you not?
19           MS. DAVIO:  I would remain optimistic.
20           SEN. WHITMIRE:  Do you see that guy
21   sitting right in front of you right there?  We don't
22   call him Mr. -- we don't call him Mr. Optimistic around
23   here.
24           (Laughter)
25           SEN. WHITMIRE:  The truth of the matter
0406
1   is -- and I really understand this position you're in.
2   And, quite frankly, I'm not even sure it's fair that
3   they brought you here to answer our questions, but
4   you're here, and they had the right to do so.  But we

TX_00001084
JA_001083
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001084

5    haven't even written the budget.  Our first meeting is
6    next Monday, and the operation of these offices and
7    their hours, their personnel, is yet to be determined as
8    we go and consider this legislation.  Is that not
9    correct?
10             MS. DAVIO:  Yes, sir, I think that --
11             SEN. WHITMIRE:  You have no idea what
12   you're going to have after September 1.
13             MS. DAVIO:  I think that's a fair
14   statement, sir.
15             SEN. WHITMIRE:  But we do know that in
16   Houston -- and Senator Gallegos was asking you about the
17   locations -- that's an important factor, but I'm really
18   more important -- or concerned about when you get to one
19   of our locations.  Are you familiar with 290 and Tacoma?
20             MS. DAVIO:  Yes, sir.
21             SEN. WHITMIRE:  Gessner and I-10?
22             MS. DAVIO:  Yes, sir.
23             SEN. WHITMIRE:  South Houston?  Nearly
24   each of our Harris County sites, you know it takes from
25   two to three hours to enter that office and renew your
0407
1    driver's license on many days of the week.
2             MS. DAVIO:  Yes, sir, I think that's true.
3    That is the way it's happened in the past.  We are
4    implementing a queuing system which we hope will bring
5    about reductions in wait times at our 50 largest
6    offices.
7             SEN. WHITMIRE:  But today, this week, it's
8    not unusual -- and I've checked -- it can still take you
9    up to three hours.  In fact, if we accomplish anything
10   in this discussion with you, I would like to appeal to
11   you to work with your supervisors and Senator Ogden and
12   each of the 31 Senators and fix that problem.  That's a
13   very fixable problem that we've been talking about too
14   long.
15             But you know it takes up to three hours.
16   People cannot take off their lunch hour or expect to go
17   over there before work or after work.  It is a major
18   challenge to enter one of those offices today and get
19   your license renewed.  But have you had an opportunity
20   to factor in what it's going to be like to get
21   additional people now for voter ID?  You really don't
22   know what the demands or the numbers will be --
23             MS. DAVIO:  That's correct.
24             SEN. WHITMIRE:  -- as we talk?
25             MS. DAVIO:  We were unable to estimate the
0408
1    impact.
2             SEN. WHITMIRE:  And then I'll repeat one
3    more time.  That's today's circumstances, and we're
4    faced with budget cuts to the DPS going forward that
5    could even compound the current wait at those Houston
6    offices.  And I was even told by a colleague of mine

7   that it can happen in other even rural settings in this
8   state, that you would literally wait two and three hours
9   to renew your driver's license.  Is that not correct?
10         MS. DAVIO:  It is possible that you can
11  have a two- or three-hour wait in many of our offices at
12  this moment.
13         SEN. WHITMIRE:  Have y'all had much
14  internal discussion about the impact that this proposed
15  legislation will have in detail in terms of personnel
16  required, equipment required?  I mean, have y'all had
17  any initial planning?
18         MS. DAVIO:  We have had discussions, yes,
19  sir.  It's very, very difficult, we found it impossible,
20  to estimate the impact of this legislation.
21         SEN. WHITMIRE:  I really appreciate you
22  being here tonight and your hard work.  And if I was
23  you, I would say -- I'd speak to Senator Ogden before
24  you leave here tonight and make a pitch for your budget.
25         MS. DAVIO:  Okay.  Thank you.
0409
1          CHAIRMAN DUNCAN:  The Chair recognizes
2   Senator Van de Putte.
3          SEN. VAN de PUTTE:  Thank you,
4   Mr. Chairman.  Good evening.  Thank you for being here.
5   My questions are fairly quick.  But I want to follow up
6   with the fiscal impact, and you stated there were how
7   many counties that don't have offices right now?
8          MS. DAVIO:  There are currently 77
9   counties without a functioning --
10         SEN. VAN de PUTTE:  Seventy-seven.
11         MS. DAVIO:  Yes, sir -- yes, ma'am.
12         SEN. VAN de PUTTE:  Mr. Chairman, could we
13  have the resource witness look at exhibit -- or Item No.
14  6, which was the map that was displayed, compiled by the
15  legislative counsel?  The map that this expert witness
16  brought shows us dots.  And if you could just glance at
17  that, that was prepared by legislative counsel.  As you
18  can see, the counties are outlined with closed,
19  temporarily closed, permanently closed, those counties
20  that may have one, but they are there -- would you
21  suggest that since that was compiled by legislative
22  counsel that that document is correct?
23         MS. DAVIO:  Senator, this is the first
24  time I've seen this map.  Just doing a very quick visual
25  check on the counties that they have in red that say
0410
1   that there are no offices, I can verify that.  I haven't
2   gone through and done all the others to give you a
3   completely accurate response.  If you could give me a
4   little bit more time, I'd be happy -- I'd be happy to do
5   that.
6          SEN. VAN de PUTTE:  We will certainly
7   allow you to do that because we have another resource
8   witness.

TX_00001086
JA_001085
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001086

9          MS. DAVIO:  Okay.

10          SEN. VAN de PUTTE:  Let me ask you, we

11  have 77 where they are closed, they have no one.  We

12  have temporary ones because of equipment malfunction.

13  But are you aware of the document that is the

14  legislative appropriations request that was sent on

15  August 23, 2010 and printed to us in 2010?

16          MS. DAVIO:  I did not see that document

17  personally.

18          SEN. VAN de PUTTE:  Well, let me tell you

19  why I'm a little bit concerned because when Senator

20  Williams talked to you, you said you had -- the division

21  had no plans or no intention of closing any more unless

22  there was equipment failure, and you talked a little bit

23  about equipment failure.  That's correct.  Right?

24          MS. DAVIO:  Yes, ma'am.  No more offices

25  unless there were equipment failure until we had

0411

1  completed our business intelligence analysis.

2          SEN. VAN de PUTTE:  Well, let me tell you

3  why I'm a little concerned.

4          MS. DAVIO:  Okay.

5          SEN. VAN de PUTTE:  On Page 704 of the

6  legislation appropriations request, DPS says, "No. 10,

7  building program and deferred maintenance."  The

8  category is under "Program Service Reduction (Other)."

9  Item Comment:  11 additional DPS offices would be closed

10  due to lack of funding for utilities."  So it's

11  utilities funding, not -- "resulting in 215 FTEs that

12  would be displaced and DPS customers would travel

13  further for any assistance."

14          Now, this is in a document that was given

15  to the legislature dated August 23, 2010.  You said you

16  don't have to plan any more, but somewhere in the agency

17  under this request, they are closing another -- I'm

18  sorry -- they are closing another 11.  Do you know where

19  those other 11 are that they plan to close?

20          MS. DAVIO:  I do not have personal

21  knowledge of that.  I believe this was for 2012 and

22  the 2013 --

23          SEN. VAN de PUTTE:  Well, yeah, but --

24          MS. DAVIO:  -- legislative appropriation

25  request.

0412

1          SEN. VAN de PUTTE:  This is the

2  legislative appropriations.  So right now what you're

3  saying is nothing is going to be closed.  But in the

4  document that DPS supplied to us as their legislative

5  appropriations request, on Page 704, they tell us, "Oh,

6  we're closing 11 more."  And it's not due to equipment

7  failure.  It's due to the reduction in utilities funding

8  as a result of our crisis in our revenue and with the

9  displacement of 215 FTEs where DPS says, "Customers will

10  travel further for assistance."

11          So I'm trying to figure out -- you say,
12   "Okay.  We're not going to," but then we have a
13   document.  I just don't know what part of DPS to
14   believe.
15          MS. DAVIO:  I'm terribly sorry.  I was
16   imprecise.  I should have said this fiscal year we had
17   no more plans to close any offices.
18          SEN. VAN de PUTTE:  This fiscal year.  Oh.
19   We just didn't ask the right question then.
20          MS. DAVIO:  I'm sorry.
21          SEN. VAN de PUTTE:  We should have
22   asked --
23          MS. DAVIO:  I don't claim to be --
24          SEN. VAN de PUTTE:  -- do you plan to
25   close any maybe after September 1st of next year?
0413
1          MS. DAVIO:  I'm sorry.  I don't claim to
2   be an expert on our legislative appropriation request.
3   I'm not our chief financial officer.
4          SEN. VAN de PUTTE:  Thank you for that
5   clarification.
6          MS. DAVIO:  I'm sorry.
7          SEN. VAN de PUTTE:  And I'm sorry you were
8   caught like this.  But, you know, you can understand our
9   confusion when you testify as the expert witness for DPS
10   one thing, and then the budget documents that are turned
11   into us say another.  And I am so sorry that you were
12   put in this predicament, but the documents are the
13   documents.  So let me, again, ask some other questions
14   since I think that one is pretty well taken care of.
15          Can you tell me in obtaining an
16   identification card what types of birth certificates are
17   allowed under current DPS guidelines?
18          MS. DAVIO:  What types of birth
19   certificates?
20          SEN. VAN de PUTTE:  Yes.
21          MS. DAVIO:  An original or a certified
22   copy of a birth certificate issued by the appropriate
23   state Bureau of Vital Statistics or the equivalent
24   agency from a U.S. state, U.S. territory, the District
25   of Columbia or a Canadian province, or an original or
0414
1   certified copy of a United States Department of State
2   certification of birth abroad.
3          SEN. VAN de PUTTE:  Are any of those
4   documents a Department of Defense hospital or facility?
5          MS. DAVIO:  I don't know for certain if
6   the Department of Defense would be included in a
7   Department of State certification of birth abroad.
8          SEN. VAN de PUTTE:  No, there are two
9   different ones.  And this is why I'm asking.  Members,
10   this is very, very clear.  We have many, many citizens
11   and your constituents who were born on military basis
12   within the United States.  And if I right now had to go

TX_00001088
JA_001087
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001088

13  get an identification card, I don't have -- I wouldn't
14  have a birth certificate.  And the reason, I was born in
15  Madigan Hospital, Fort Lewis, Tacoma, Washington.  But
16  if you were born before 1960, the records are slowly
17  being updated into the state of Washington as are many
18  of our military hospitals.  But my birth certificate is
19  not from the Department of State.  It is not from the
20  city.  The only birth certificate that I have is from a
21  military hospital on a military installation.
22            Now, it was valid for me to get my
23  passport, and it was valid for me to get my driver's
24  license when I got my driver's license.  But should I
25  have to apply today and what I think might happen under
0415
1   our current regulations is that the type of birth
2   certificate that is required for those of us who happen
3   to be born prior to 1960, which would be anybody, '40s,
4   '50s, '30s and on, we would not have a birth certificate
5   that would be recognized by DPS if you were born on a
6   military -- in a military hospital.  Is that correct?
7            MS. DAVIO:  I can't be absolutely positive
8   of that.  I'll confirm, and we will look.
9            SEN. VAN de PUTTE:  If you could, because
10  I think --
11            MS. DAVIO:  Yes, ma'am.
12            SEN. VAN de PUTTE:  And I don't know how
13  many would be, but if -- for those that were born when
14  there was a mandatory draft and there was a mandatory
15  thing, if you were born in a military hospital, those
16  are Department of Defense hospitals, not Department of
17  State.  Some states have included them as they start to
18  update and others haven't because a lot of those
19  military hospitals are now closed as those bases have
20  been closed.  So I just wanted to make sure.  And if you
21  would check that for us?
22            MS. DAVIO:  Yes, ma'am.
23            SEN. VAN de PUTTE:  And then if it's a
24  birth certificate, what happens if for many of our
25  elderly who were born not in a hospital and not -- but
0416
1   they used baptismal or church records to establish their
2   social security, to establish anything?  Right now if
3   there is not a recorded birth certificate in one of the
4   state registries, is a church document that was allowed
5   back then for a driver's license, is that allowed --
6            MS. DAVIO:  There are --
7            SEN. VAN de PUTTE:  -- currently to get --
8            MS. DAVIO:  There are a variety of
9   documents, and we're expanding the list, but we try and
10  work with our customers to -- if you can bring in a
11  variety and demonstrate to us to our satisfaction.
12            SEN. VAN de PUTTE:  Yes, I understand.
13  What types of birth certificates?  Is it only those
14  that --

15          MS. DAVIO:  Typically we would not allow a
16  church or a baptismal birth certificate.
17          SEN. VAN de PUTTE:  So that would affect
18  people like my mother.
19          MS. DAVIO:  She may be able to find other
20  documentation that she can bring.
21          SEN. VAN de PUTTE:  She might be.
22          Let me also ask you for one other thing.
23  I have a wonderful constituent and she asked that I
24  relate her story and has given me permission.  She
25  contacted us last June in that -- Ms. Hardy who needed
0417
1  to have a DPS identification card.  However, she's very,
2  very ill and could not travel to the DPS office.  I put
3  in a request to DPS to ask what sort of options she had
4  since she needed an ID but could not travel.
5          MS. DAVIO:  Yes, ma'am.
6          SEN. VAN de PUTTE:  That was on June the
7  18th, and we were very pleased at least that a week
8  later someone was able to call her and give her some
9  options.
10          Well, the options included that she had to
11  physically go.  And so luckily she was able to go, but
12  not until months later, but it entailed bus trips, a
13  nurse going with her, on public transit, going to the
14  offices.
15          And so my question is, what sort of -- and
16  it took her months, months to get this.  Are there any
17  accommodations currently for those with disabilities if
18  they are unable to physically go to a DMV station to
19  acquire identification documents?
20          MS. DAVIO:  We do have a home bound
21  program where we send an employee out to take their
22  picture and gather their information.
23          SEN. VAN de PUTTE:  Do you know how robust
24  that program is?  Is there one in -- and why weren't we
25  told about it when we called last summer?
0418
1          MS. DAVIO:  I can't tell you why you
2  weren't told about it.  I apologize for that.  I
3  don't -- I don't know how many of those IDs we issue.  I
4  could check into that if you'd like me to.
5          SEN. VAN de PUTTE:  Well, I'm a little bit
6  worried because we had several employees of DPS call,
7  including the Chief of the Complaint Resolution
8  Specialty Department, assisting with inquiries of
9  identification cards, who said the only option for my
10  constituent was physical presence.
11          MS. DAVIO:  There may --
12          SEN. VAN de PUTTE:  So within DPS if
13  there's a program, certainly didn't tell a Senator's
14  office and certainly didn't tell the client.  And if
15  this is -- I mean, what happened here?  We didn't know
16  about a program.  Are there plans to make that known in

JA_001089

17  light of -- or publicize it in any way in light of the
18  new additional restrictions?
19          MS. DAVIO:  I apologize that you weren't
20  told about it.  There may have been particular
21  circumstances that your constituent didn't qualify for
22  that, but we can certainly make sure that all of our
23  employees know about that and are informed so that there
24  won't be such an oversight in the future.
25          SEN. VAN de PUTTE:  So you mean you have
0419
1   to qualify?  So if you're like undergoing chemotherapy,
2   can't leave the house or an organ transplant, you have
3   certain categories to qualify?  So even if you're a
4   person with disabilities, you have to have a person of
5   disabilities with certain qualifications to get the home
6   bound program?
7           MS. DAVIO:  I'm sorry.  I can't discuss
8   the detailed reasons why someone would qualify and
9   someone wouldn't, but I will certainly check into that
10  for you.
11          SEN. VAN de PUTTE:  Well, thank you.  And
12  I am -- I apologize for my mean tone, but understand how
13  frustrating it is --
14          MS. DAVIO:  I understand.
15          SEN. VAN de PUTTE:  -- when people call
16  our offices, they are trying to do the right thing.
17  They are trying to get an ID card, they have situations,
18  and then the people who are employed and hired from
19  state government to provide the information who are head
20  of the departments of this don't know of their own
21  programs.  It's really disheartening.
22          And then if you would, please find out
23  from someone on the fiscal side so that we don't have
24  two opposing statements from DPS of the additional 11
25  offices that are scheduled to be closed, not this fiscal
0420
1   year, but probably starting in 2012 and 2013.  And then
2   if you would, please get back with us with the
3   information of what types of birth certificates would be
4   eligible to be used for someone seeking to obtain a
5   personal identification card.
6           Thank you very much, Mr. Chairman.  I
7   don't have any other questions.
8           CHAIRMAN DUNCAN:  The Chair recognizes
9   Senator Zaffirini.
10          SEN. ZAFFIRINI:  Thank you, Mr. Chairman.
11          Ms. Davio, your title is Assistant
12  Director for Driver Licenses, Department of Public
13  Safety.  Is that correct?
14          MS. DAVIO:  Yes, ma'am.
15          SEN. ZAFFIRINI:  And were you expected to
16  testify on all aspects of the bill or only what refers
17  to driver's licenses specifically?
18          MS. DAVIO:  Only what refers to a driver

TX_00001091
JA_001090
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001091

19  license specifically, as I understand it, in DPS.
20          SEN. ZAFFIRINI:  When Senator Fraser laid
21  out the bill, I asked a number of questions about the
22  criminal justice impact statement.  Is there someone
23  available from DPS who can answer my questions related
24  to the criminal justice impact statement?
25          MS. DAVIO:  I don't believe that there's a
0421
1  resource witness here that can answer that currently.
2          SEN. ZAFFIRINI:  And you cannot?
3          MS. DAVIO:  I'm sorry.  I can't.
4          SEN. ZAFFIRINI:  That's all right.  I
5  assumed that you could not based on your title.  But I
6  would like to have someone answer my questions, if not
7  today, maybe tomorrow.
8          And just to put a face on the issues that
9  we have been discussing today, I happened to receive a
10  letter from the County Judge of Frio County recently,
11  and he explained to me that the office -- the DPS
12  driver's license office in Frio County has been closed.
13  And he wrote in his letter, "Signage on the door directs
14  drivers needing their services to go to San Antonio,
15  Hondo or Jourdanton."
16          Now, San Antonio is 55 miles from
17  Pearsall, Hondo is 42, and Jourdanton is 41.  That's an
18  average of 46 miles.  You said earlier that 77 counties
19  do not have driver's license offices.
20          MS. DAVIO:  Currently, yes, ma'am.
21          SEN. ZAFFIRINI:  Do you know how far those
22  residents of those counties have to drive to get a
23  driver's license?
24          MS. DAVIO:  I do not have the average for
25  every single location.  That would probably be pretty
0422
1  difficult to calculate, but, you know, that is something
2  that we're looking at.
3          SEN. ZAFFIRINI:  Well, certainly because
4  if that's the average distance, double that for a round
5  trip.
6          MS. DAVIO:  Yes, ma'am.
7          SEN. ZAFFIRINI:  That's a lot of mileage,
8  especially for low-income persons, for persons with
9  disabilities who have to get a ride, because that's a
10  one-way distance that I just mentioned to you.
11          MS. DAVIO:  Yes, ma'am.  Driver licenses
12  do have to be renewed every six years, once every six
13  years.  And if the option to renew online would be used,
14  then they'd actually only have to go to the office once
15  every 12 years.
16          SEN. ZAFFIRINI:  Do you have mobile units
17  that can go to these counties?
18          MS. DAVIO:  We do not presently have
19  mobile units.  As I mentioned before, the amount of data
20  that we're collecting with your photo, your

21   fingerprints, your -- all the scans of your documents,
22   we have not been able to get that to work with an air
23   card or a DSL line, and we tried for several months.
24          SEN. ZAFFIRINI:  Now, I can't speak for
25   the 77 counties, but I know that for the ones in my
0423
1    district that have been closed or temporarily closed --
2    in fact, I mentioned earlier that in my district there
3    are -- there is one office that has wheelchair
4    accessible barriers, there are two counties that have no
5    offices, four counties in which the offices have been
6    temporarily closed and one that is open three days or
7    fewer per week.
8          Now, in the counties in my district, there
9    is a digital divide.  So it's easy to say "renew
10   online," but when you're dealing with counties where
11   there is a predominantly low income, minority population
12   and there is a digital divide, imagine the impact.  Do
13   you have any data relating to addressing those issues
14   and how to increase the accessibility of the residents
15   of those counties to your particular services?
16          MS. DAVIO:  One of the elements of the
17   business intelligence analysis project that we're doing
18   is actually to try and get information to understand
19   where people have connectivity and aren't using that.
20   Maybe they don't know that they can renew online and
21   being able to encourage people to do that there, but
22   that would also give us information about where people
23   don't have accessibility.
24          SEN. ZAFFIRINI:  Thank you.  Judge Garcia
25   writes, "This has caused quite a bit of inconvenience
0424
1    and consternation for our drivers and potential drivers
2    in this county when they need driver's license renewals,
3    driver's licenses," et cetera, and you can imagine the
4    consternation and the inconvenience that they are
5    suffering.
6          There's been some reference to how long
7    persons have had to wait to get their driver's license,
8    and I know that before we got our driver's license in
9    Laredo, the big joke -- and it wasn't really a joke.  It
10   was a cruelty joke because it was so true -- is that
11   persons who were waiting for their driver's licenses
12   could stand in line, order pizza, receive it and eat it
13   and still be waiting for their driver's license.
14          Now, there has been some improvement in
15   that, but I wonder what kind of inconvenience we're
16   talking about when we're talking about these long, long
17   lines in the different counties.  And if that isn't bad
18   enough, dealing with the issues related to the counties
19   that don't have any offices.
20          And you, I understand from your exchange
21   with Senator Van de Putte, do expect more offices to
22   close, at least temporarily -- is that correct -- in the

file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

23  next fiscal year?
24          MS. DAVIO:  If the equipment fails in our
25  mobile offices, we will have to close those offices.
0425
1          SEN. ZAFFIRINI:  And have you looked at
2  Senate Bill 1 thoroughly yet?
3          MS. DAVIO:  I'm sorry?
4          SEN. ZAFFIRINI:  Have you looked at Senate
5  Bill 1, the appropriations bill, thoroughly yet?
6          MS. DAVIO:  I have not done any detailed
7  analysis of that, no, ma'am.
8          SEN. ZAFFIRINI:  So you have no idea
9  what -- how that budget will impact you at this point in
10  time?
11         MS. DAVIO:  No, ma'am.  I know people
12  at -- the experts at our agency are looking at it now.
13         SEN. ZAFFIRINI:  Well, when you have that
14  information -- I assume that you will -- would you share
15  that us, please?
16         MS. DAVIO:  Yes, ma'am.
17         SEN. ZAFFIRINI:  From your perspective.
18  Thank you very much.
19         Thank you, Mr. Chairman.
20         CHAIRMAN DUNCAN:  Senator Williams?
21         SEN. WILLIAMS:  Thank you, Mr. Chairman.
22  Just a couple of things that I wanted to clarify.  And I
23  guess, first of all, I wanted to thank Senator Gallegos
24  and Senator Whitmire because I really wasn't that
25  familiar with people who had their licenses confiscated
0426
1  or taken away because of the driver responsibility plan.
2          Now, by the way, if you have your license
3  confiscated, what kind of traffic offense would you have
4  had to have been involved in for law enforcement to take
5  your -- confiscate your license?  Do you know?  It
6  doesn't have to be an exhaustive list, but just --
7          MS. DAVIO:  The major reason that people
8  give those particular forms apart -- away, that law
9  enforcement issues those, as I understand it, is for
10  intoxication offenses where they've failed or refused to
11  provide a specimen.
12         SEN. WILLIAMS:  Okay.
13         MS. DAVIO:  That's my understanding.
14         SEN. WILLIAMS:  So if you refused to take
15  a breathalyzer test or give blood, then they'll take
16  your license away?
17         MS. DAVIO:  That's my understanding, sir.
18         SEN. WILLIAMS:  Okay.  Now, that person
19  can apply for a temporary license, a work permit, you
20  know, to be able to get back and forth to work.
21         MS. DAVIO:  They may be able to, yes, sir.
22         SEN. WILLIAMS:  And they could come and
23  get a state ID -- correct -- at no cost if they wanted
24  to have it to vote?

TX_00001094
JA_001093
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001094

25      MS. DAVIO:  Yes, sir, they could.
0427
1   Absolutely.
2            SEN. WILLIAMS:  Okay.  And then what about
3   if you had your license taken away because of -- what
4   kinds of things under the driver responsibility?  Are
5   those also going to be a lot of speeding tickets?  I
6   guess it could be.  Or more than likely it's going to
7   involve a DWI since we have one of the worse records of
8   any state in the country on that, I believe?
9            MS. DAVIO:  It could be DWI.  It could be
10  driving while your license is invalid.  It could be
11  traffic offenses as you mentioned, driving without
12  insurance.
13           SEN. WILLIAMS:  So the bottom line is
14  these law breakers would be inconvenienced by having to
15  go get a free ID so they could go and vote if that's --
16  if they wish to exercise their constitutional
17  responsibility.  Is that correct?
18           MS. DAVIO:  Yes, sir.  They would be able
19  to get an ID.
20           SEN. WILLIAMS:  Okay.  And then how often
21  would -- once you had this state ID card and assuming
22  that you were a citizen and you had met all the
23  requirements that it took to get the license or the
24  state ID card, how often would that be renewed?  How
25  often are they going to have to appear in person to get
0428
1   that renewed?
2            MS. DAVIO:  The ID cards just like the
3   driver licenses are good for six years, and it is
4   possible to renew them online.
5            SEN. WILLIAMS:  Okay.  So it could be 12
6   years?
7            MS. DAVIO:  Yes, sir.
8            SEN. WILLIAMS:  So they would be able to
9   vote with that ID card at least six and maybe 12 years?
10           MS. DAVIO:  Yes, sir.
11           SEN. WILLIAMS:  Okay.  That -- okay.  I
12  just wanted to make sure that we had cleared that up.
13  Thank you very much.  I really appreciate you hanging in
14  here with us tonight.
15           MS. DAVIO:  Thank you.
16           SEN. WILLIAMS:  I did have one last
17  question.  Excuse me, Mr. Chairman, if I could.  The
18  other thing I wanted to ask is, in a moment when we have
19  the Secretary of State's Office up here, I'm going to
20  talk to them, and I visited with you about it, I'm
21  hoping that we can take your driver's license file and
22  cross-match that with the voter registration files and
23  try to find that group of people who are voting and
24  registered to vote, but they don't have a driver's
25  license or a state ID card so that we can focus our
0429

TX_00001095
JA_001094
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001095

1  efforts on education on -- especially on that group.
2           Now, would you be able to do that, provide
3  that information to the Secretary of State's Office
4  with -- under the current resources that you have?  And
5  I'm not going to ask you about the next biennium's
6  budget.  We're just trying to get through this biennium
7  now.  But under the current biennium, would you be able
8  to provide that information to the Secretary of State
9  with the resources?
10          MS. DAVIO:  They already -- they already
11 have the information, and I believe they are working on
12 the analysis now.
13          SEN. WILLIAMS:  Oh, okay.  Great.  Boy,
14 y'all are quick.  Thank you.
15          CHAIRMAN DUNCAN:  Okay.  Thank you.
16          We have a few more -- a few more questions
17 from -- this witness has been going about an hour and
18 ten minutes.
19          Senator West?
20          SEN. WEST:  Thank you, Mr. Chairman.  I'm
21 not going to be redundant.  I just have a couple of
22 requests.  Can your office provide an analysis of how
23 long the average wait in each one of the offices that
24 you have -- what is the average wait in order to get a
25 driver's license?  I assume that you have that sort of
0430
1  an analysis.
2           MS. DAVIO:  Actually, sir, currently we do
3  not have that information.  We have anecdotal
4  information, but we do not have wait times.  We're in
5  the process of installing a queuing system in our 50
6  largest offices.  And so in a matter of months I'd be
7  able to provide that information for you in our largest
8  offices, but I do not have any complete information for
9  wait times in our offices.
10          SEN. WEST:  Give us the best guesstimate
11 that you have.  I assume that there are conversations
12 about wait time that you have internally.  And, you know
13 just make sure you just qualify it based on what you
14 have.  It's not -- it's not a perfect example, a perfect
15 study or anything like that, but get us -- give us the
16 best estimates that you have concerning that.  Okay?
17          MS. DAVIO:  The average wait time?
18          SEN. WEST:  Yes.
19          MS. DAVIO:  In all of our offices?
20          SEN. WEST:  Yeah, broken down by office,
21 so I don't just want a global -- to the extent that you
22 can.  And what you may want to do is just contact the
23 offices and get an idea from the individuals that are in
24 the offices.
25          As you go about implementing this
0431
1  particular identification procedure, have you given an
2  idea as to whether or not you are going to be using

TX_00001096
JA_001095
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001096

3    troopers or civilian employees to do this?
4           MS. DAVIO:  There really aren't troopers
5    in the driver license division anymore.  That was a
6    recommendation from the Sunset Commission.  So there are
7    no commissioned troopers in the driver license office.
8           SEN. WEST:  So it would be civilian
9    employees?
10          MS. DAVIO:  Yes, sir.
11          SEN. WEST:  All right.  Thank you.
12          CHAIRMAN DUNCAN:  Senator Gallegos?
13          SEN. GALLEGOS:  Let me ask you, Rebecca --
14   and I'm sorry you drew the short straw.  And Senator
15   West asked the question I was going to ask you, but
16   Senator Williams brought up an issue that, you know, I
17   disagree with him.  When you're stopped, it's an
18   alleged -- you're not a law breaker, it's an alleged.
19   You know, I'm not the jury, and I'm not the judge.  So
20   that person that's stopped is not guilty until he or she
21   has their day in court.
22          So when you confiscate the license, you
23   have confiscated on an alleged offense.  And until he or
24   she has their day in court and they are convicted, then
25   you can call him or her a law breaker.  So I disagree
0432
1    with Senator Williams.  Is that correct?  I mean, am I
2    wrong?  Am I wrong?  When you arrest that person, is he
3    or she convicted right then and there?
4           MS. DAVIO:  No, sir.
5           SEN. GALLEGOS:  So you're telling me they
6    are not guilty until they have their day in court.  Is
7    that correct?
8           MS. DAVIO:  I believe that's the way the
9    legal system works.
10          SEN. GALLEGOS:  I didn't hear you.  I'm
11   sorry.
12          MS. DAVIO:  I believe that's the way the
13   legal system works.
14          SEN. GALLEGOS:  Okay.  So that person --
15   that person that has that temporary license is innocent
16   until proven guilty.  Is that correct?
17          MS. DAVIO:  You're asking me to testify on
18   something that's outside my area of expertise, sir.  I
19   don't -- I don't know the intricacies of traffic --
20          SEN. GALLEGOS:  The document that your
21   office gives these law enforcement agencies when
22   somebody is stopped either on DWI or whatever issue,
23   whatever issue when you confiscate a license, that
24   person is innocent until proven guilty under the --
25   under the temporary license that I'm seeing here, that
0433
1    has your language on it, that you give to these law
2    enforcement agencies when you stop these people.  Is
3    that correct?
4           MS. DAVIO:  As I understand it, a DWI, if

TX_00001097
JA_001096
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001097

5   they get a mandatory suspension, that does not start
6   until after their conviction.
7           SEN. GALLEGOS:  After a conviction?
8           MS. DAVIO:  Yes, sir, for a --
9           SEN. GALLEGOS:  So when you stop that
10  person, that is not a conviction?
11          MS. DAVIO:  Or DWI mandatory suspension.
12          SEN. GALLEGOS:  That is not a conviction,
13  though?
14          MS. DAVIO:  Just shopping them I don't
15  believe is a conviction.
16          SEN. GALLEGOS:  And you give they one of
17  these licenses.  You have confiscated their license and
18  have given them a temporary.  Is that correct?
19          MS. DAVIO:  Law enforcement does that,
20  yes, sir.
21          SEN. GALLEGOS:  Well, you gave them the --
22          (Simultaneous discussion)
23          MS. DAVIO:  We simply give them the form.
24          SEN. GALLEGOS:  You give the law
25  enforcement this paper.  It has your language on it.  Is
0434
1   that correct?
2           MS. DAVIO:  Yes, sir.  That is our form.
3   Yes, sir.
4           SEN. GALLEGOS:  Okay.  Thank you.
5           CHAIRMAN DUNCAN:  Senator Wentworth?
6           SEN. WENTWORTH:  I'm going to be very
7   brief and thank you for your testimony this evening and
8   tell you that this probably happened before you arrived
9   here in June of last year.  But there were some
10  considerable complaints from people in my district in
11  north Bexar County --
12          MS. DAVIO:  Uh-huh.
13          SEN. WENTWORTH:  -- about a driver license
14  office on Perrin Beitel Road --
15          MS. DAVIO:  Uh-huh.
16          SEN. WENTWORTH:  -- where I can testify
17  anecdotally, as you have, that it was an hour or
18  longer --
19          MS. DAVIO:  Yes, sir.
20          SEN. WENTWORTH:  -- about the wait.
21          MS. DAVIO:  Yes, sir.
22          SEN. WENTWORTH:  And there were enough
23  complaints over the years that you all let the lease
24  expire.
25          MS. DAVIO:  Yes, sir.
0435
1           SEN. WENTWORTH:  And then you found a new
2   location on Pat Booker Road out near Randolph Air Force
3   Base, and my constituents are very pleased with that
4   improvement and were grateful that that improvement has
5   been made.
6           MS. DAVIO:  Thank you so much.

TX_00001098
JA_001097
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001098

7        SEN. WENTWORTH:  Thank you.
8        MS. DAVIO:  I appreciate that.  It's nice
9   to hear a good story.
10       SEN. WENTWORTH:  You bet.
11       CHAIRMAN DUNCAN:  Thank you, Senator
12   Wentworth.
13       Are there any other questions of the
14   resource witness?
15       (No response)
16       CHAIRMAN DUNCAN:  All right.  Thank you
17   very much, Ms. Davio.
18       MS. DAVIO:  Uh-huh.
19       CHAIRMAN DUNCAN:  All right.  The Chair
20   calls Ann McGeehan, Secretary of State's Office.  If
21   you'll state your name and who you represent, please.
22       TESTIMONY BY ANN McGEEHAN
23       MS. McGEEHAN:  Ann McGeehan, and I'm
24   Director of Elections in the Texas Secretary of State's
25   Office.
0436
1        CHAIRMAN DUNCAN:  All right.  Thank you,
2   Ms. McGeehan.
3        The Chair recognizes Senator Davis.
4        QUESTIONS FROM SENATE FLOOR
5        SEN. DAVIS:  Hello.  Good evening.  Thank
6   you so much for being here with us to provide answers
7   for our questions.  I know you've had a long day.
8        I just want to ask you a few questions
9   about the current state of voter education as its taking
10   place today in the Secretary of State's Office.  Can you
11   describe for us the use of the HAVA funds and how those
12   are currently being used today?
13       MS. McGEEHAN:  We received -- when
14   Congress passed the Help America Vote Act, the state of
15   Texas received a set amount of funds.  And pursuant to
16   the Help America Vote Act, there are certain purpose
17   areas that we can use those funds for, and one of the
18   purpose areas is voter education.  So since two -- we
19   have conducted three statewide education -- voter
20   education programs, one in 2006, one in 2008 and one in
21   2010 using those federal dollars.  And they have been --
22   we've worked with a public education firm to do
23   research, and then they develop creative material.  We
24   run PSAs on TV, radio.  In this last cycle, 2010, we
25   used the Internet quite a bit as well.
0437
1        SEN. DAVIS:  And how many people do you
2   think you reach through your voter education efforts
3   right now?  And how much have each of those cycles of
4   voter education effort cost?
5        MS. McGEEHAN:  The average cost is about
6   $3 million for each one, around that amount.  As far as
7   the number of people we've touched through the campaign,
8   we do have some reports on that.  I don't have that

9  number at my fingertip, but we have a report for each
10  one of the voter education campaigns that talks a little
11  bit about the effectiveness and how many people saw the
12  media spots and things of that nature.
13       SEN. DAVIS:  And are the Help America Vote
14  Act funds funds that are continually given to the state
15  from the federal government, or was it a one-time
16  disbursement that's been used over the course of those
17  three cycles?
18       MS. McGEEHAN:  It was authorized in that
19  one bill.  We've received it in about three or four
20  separate payments.  We don't contemplate that we're
21  going to be receiving any more.
22       SEN. DAVIS:  And what was the total amount
23  that was given to Texas?
24       MS. McGEEHAN:  Let me grab that.  The
25  total amount for all the purpose areas is $224,092,477.
0438
1       SEN. DAVIS:  That's the amount that was
2  given to the state of Texas?
3       MS. McGEEHAN:  Yes.
4       SEN. DAVIS:  Okay.  And so of that amount,
5  how much have we spent so far?
6       MS. McGEEHAN:  Let's see here.  We -- I
7  think we have spent $177,798,488.
8       SEN. DAVIS:  Okay.  And you described
9  spending about $3 million over the last three two-year
10  cycles.  How have we spent the balance of that?
11       MS. McGEEHAN:  Well, I mean, the bulk of
12  the money or about half of the money went to counties to
13  obtain HAVA compliant voting systems, electronic voting
14  systems that made -- that complied with HAVA and allowed
15  disabled voters to vote independently.  So let's see.
16  $140 million went to the counties for that purpose.
17       The other program areas are for developing
18  a statewide voter registration system.  We've spent
19  25 million on that.  And then as far as the
20  administrative expenses, we've spent about 2.8 million
21  on that.  For voter education, we've spent 9.5 million
22  so far.
23       SEN. DAVIS:  And what are the -- setting
24  aside the requirements of the bill that's being
25  introduced today, what are the intended plans for the
0439
1  balance of that money?  Were this bill not to come
2  forward to your department, what would the intended use
3  for those funds be?
4       MS. McGEEHAN:  I can't speak necessarily
5  for, you know, exactly what would be done in the next
6  general election cycle, but I would contemplate we would
7  do another statewide voter education program in 2012,
8  and if funds remained in 2014.
9       SEN. DAVIS:  Is there a plan for ongoing
10  capital expenditures as you talked about, which was the

11  use of the bulk of the funds that we've received so far?
12          MS. McGEEHAN:  Yeah.  There are --
13  there's 24 -- roughly $24 million left in the -- in the
14  purpose area for grants to counties to obtain voting
15  equipment.
16          SEN. DAVIS:  Okay.  And so after you take
17  out that 24 million, what will the balance be that
18  remains for voter education efforts?
19          MS. McGEEHAN:  Well, that's -- that's
20  already frozen as far as the -- in order to draw down
21  those funds, the state had to submit a state plan.  We
22  had to meet with stakeholders, publish in the Register
23  and submit it to the Election Assistance Commission.
24  And so pursuant to that state plan, we had to define how
25  we were going to spend the money, and so these -- the
0440
1   budget that I discussed is following that state plan.
2           SEN. DAVIS:  Okay.  And under that state
3   plan right now, what portion of funding remains for
4   voter education?
5           MS. McGEEHAN:  For voter -- okay.  And
6   actually to be more precise, what the -- the purpose
7   area for voter education is for voter education and also
8   for election official and poll worker training; that's
9   grouped.  And the amount remaining is between 5 and
10  $7 million.
11          SEN. DAVIS:  Okay.  And that is expected
12  to extend us or to take us through the next how many
13  years under that plan?
14          MS. McGEEHAN:  It will -- again, it's
15  going to depend how extensive our next few voter
16  education programs are because that's what the bulk of
17  the money has been spent on, voter education programs.
18  The average is about 3 million.  So I guess the hope
19  might be for at least two other statewide voter
20  education programs.
21          SEN. DAVIS:  Okay.  And I'm sure you've
22  seen the fiscal note that was a part of this bill.  And
23  by the way, I think it would be very helpful if you
24  would enter that state plan into the record as an
25  exhibit for our further use.
0441
1           I'm sure you've seen the fiscal note that
2   came as a part of this bill in terms of the expected
3   expenditures.  Part of that note talks about a fiscal
4   impact that's related to researching and developing ways
5   to inform the public of the new ID requirements.  That's
6   $.5 million expenditure, an additional cost of
7   1.5 million for media advertisements, television, radio,
8   print and Internet.  That's specifically to educate
9   voters about the new requirements under this bill.
10          What will go undone that's currently in
11  the state plan -- if we take 2 million of the 5 million
12  remaining, what will go undone that's currently in the

TX_00001101
JA_001100
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001101

13  state plan in terms of voter education effort?

14          MS. McGEEHAN:  I don't know that I have an

15  exact answer to that.  If we're able to incorporate the

16  new voter ID requirements that would be required by this

17  bill into a voter education program, then maybe we

18  wouldn't need 2 million just for the voter ID.  We could

19  parlay that into the -- basically the voter education

20  campaigns that we've done or the voter education

21  programs have been to educate voters on the basic rights

22  on how to vote, what you need to vote.  So it may not be

23  such an extension to incorporate these new requirements

24  for voter ID, or they may.  I mean, depending on the

25  research that we get back from stakeholders and whatnot,

0442

1   but it's hard for me to say today exactly how much that

2   may take away from future voter education efforts.

3           SEN. DAVIS:  When was the last time in the

4   state of Texas we made any changes of significance to

5   the voter rules?

6           MS. McGEEHAN:  Probably the -- when we had

7   to implement the federal Help America Vote Act.  That's

8   when provisional voting became a requirement.  There

9   were significant changes to voter registration as to

10  what's required to become a registered voter, and that's

11  why we have these HAVA dollars for voter education.

12          SEN. DAVIS:  And that began in '06.

13  Correct?

14          MS. McGEEHAN:  Correct.

15          SEN. DAVIS:  Okay.  In '06, the Texas

16  voter registration application form changed in

17  accordance with those requirements, it's my

18  understanding, and that's when we began to collect this

19  data that requested a driver's license number or a

20  social security number.  Is that's correct?

21          MS. McGEEHAN:  That's correct.

22          SEN. DAVIS:  Okay.  So we have data, I

23  guess, only from '06, and that would -- would that only

24  be then for new registrants from '06?  If I had already

25  registered to vote prior to that, you wouldn't have that

0443

1   information from me.

2           MS. McGEEHAN:  That's right.

3           SEN. DAVIS:  Correct?

4           MS. McGEEHAN:  That's right.  It was

5   voluntary before.  So we have some TDLs and SSN numbers

6   from -- but it wasn't required until 2006.

7           SEN. DAVIS:  So we've been able to gather

8   that information from that point in time for people who

9   are newly registering to vote in the state of Texas.  Of

10  that group, how many people or what percentage of people

11  are answering one or both of those questions in response

12  to No. 8 versus signing the attestation clause in

13  Section No. 9?

14          MS. McGEEHAN:  Are you asking the number

15   of --
16         SEN. DAVIS:  Let me -- let me break it
17   down better.
18         MS. McGEEHAN:  Okay.  Okay.
19         SEN. DAVIS:  So under Question No. 8, what
20   percentage of people currently, who are requesting a
21   voter registration card, who are filling out the
22   application starting in '06 with this new form, what
23   percentage of people are providing their Texas driver's
24   license in response to the questions on the application?
25         MS. McGEEHAN:  Okay.  I don't have the
0444
1   percent number, but the actual number is 2.3 million
2   since 2006.  Since January 1, 2006 through December 31,
3   2010, 2.3 million, when they registered, provided their
4   driver's license number.
5         SEN. DAVIS:  What's the total number of
6   applications in that time period?
7         MS. McGEEHAN:  And the total number -- I
8   think it's going to be just under 3 million, and I'm
9   doing math on the fly.  I might have to -- I'd prefer to
10   give that --
11         SEN. DAVIS:  Can you provide that
12   information --
13         MS. McGEEHAN:  Yes.
14         SEN. DAVIS:  -- to us?
15         MS. McGEEHAN:  Yes.
16         SEN. DAVIS:  That would be appreciated.
17         So what's the number of people who are not
18   filling out either the driver's license number or the
19   social security number in Section 8 but instead are
20   going to Section 9 and signing the attestation clause of
21   Section 9?
22         MS. McGEEHAN:  And that's the attestation
23   clause saying they have not been issued either form of
24   ID?
25         SEN. DAVIS:  (Nodded)
0445
1         MS. McGEEHAN:  Yeah, that number is
2   34,506.
3         SEN. DAVIS:  Okay.  Do we have any -- any
4   estimate of the number of people who are currently
5   registered today?  If we've only been gathering that
6   information since 2006, do we have any kind of an
7   estimate of the number of people who are currently
8   registered to vote today who do not have a driver's
9   license number to provide?
10         MS. McGEEHAN:  Well, if we -- if we look
11   at our entire statewide file, we have 5.2 million voters
12   that did provide a driver's license number or an ID
13   number.  We have 2.1 million voters that present -- that
14   provided a social security number.  4 million of them
15   provided both.  And then the numbers that have
16   neither -- or the voters that hadn't provided either one

TX_00001103
JA_001102
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001103

17  is 690,887.  So it doesn't necessarily mean that those
18  people haven't been issued, but they didn't -- either
19  they don't have those numbers or they registered before
20  it was required, and so they didn't provide them when
21  they registered if it was pre-2006.
22            SEN. DAVIS:  But the question wasn't
23  asked.  It was -- I guess as you said, you could
24  voluntarily provide that information prior to '06.
25            MS. McGEEHAN:  Well, it was asked, but it
0446
1  was optional.  It was on the form.
2            SEN. DAVIS:  Uh-huh.  Okay.  So we really
3  don't know how many of that group were answering the
4  question voluntarily because they have the number versus
5  those who were not answering it, not because they chose
6  to, but because they did have their driver's license
7  number?
8            MS. McGEEHAN:  Yes, you are correct.
9  That's right.
10           SEN. DAVIS:  So when we're putting
11  together an estimate of what the cost to educate our
12  voters is going to be and when we think about how
13  significant the changes are that are addressed in this
14  bill, what's your -- what's your process been to try to
15  determine how many people will be impacted and what that
16  voter education is going to need to look like?
17           MS. McGEEHAN:  Well, we -- I mean, to be
18  very honest, we haven't done much planning yet.  We
19  prepared this fiscal note on Friday.  That would be
20  obviously a very important component is trying to
21  identify who the appropriate audiences are, who you need
22  to get the information out to.
23            Senator Williams had approached us earlier
24  today to see if we could do some comparisons to try and
25  further focus in on who those registered voters are that
0447
1  don't have -- or have not been issued a driver's license
2  or a personal ID number.  So we're trying to run some of
3  those numbers right now.
4            SEN. DAVIS:  I guess a confusion for me is
5  how we came up with the $2 million fiscal note for that
6  and yet we don't really know, as you said a moment ago
7  we don't really know how many people will be impacted by
8  it and what that statewide voter education effort is
9  going to need to look like.  So where did the $2 million
10  number come from?
11           MS. McGEEHAN:  Well, the $2 million number
12  came from the way the bill is written because the bill
13  simply says "a statewide voter education effort."  So
14  there's not too much detail in the bill as to what's
15  required.  Our assumption is that our previous voter
16  education programs might be the model, and they've been
17  around 3 million.  And plus, we also noticed that last
18  session the Senate put a $2 million fiscal note on it.

TX_00001104

JA_001103
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001104

19  So we thought, well, maybe that's some representation of
20  legislative intent as to what an appropriate voter
21  education program might cost, but --
22          SEN. DAVIS:  So we've had voter education
23  efforts in the past that have cost about $3 million each
24  time we've engaged in the voter education effort.  We're
25  talking today about making some sweeping changes to
0448
1  what's required in order to vote in the state of Texas.
2  Why is the number to educate -- on such a sweeping
3  change for what will likely be a much larger group of
4  impacted people in the state of Texas, why is that
5  number so much lower than the $3 million number that's
6  currently being spent for voter education?
7          MS. McGEEHAN:  Well, if the -- if a
8  $2 million program is added into an existing $3 million
9  program, then you've got a $5 million program.  I mean,
10  our voter education under HAVA is directed to all
11  registered voters.  And so, you know, a new voter -- a
12  new photo ID requirement would also need to be directed
13  to all registered voters because it's a change for all
14  voters.
15          SEN. DAVIS:  So we're talking about -- I'm
16  sorry to interrupt you.  We're talking a $2 million
17  addition to the $3 million that was already intended for
18  voter education in this next two-year cycle.
19          MS. McGEEHAN:  Possibly, possibly.  I
20  mean, we -- you know, we've got a communications
21  director that would have some input on that.  This
22  fiscal note represented what we thought might be a
23  reasonable fiscal note.  If we have, you know,
24  legislative direction to take it a different way or do
25  additional outreach, that's fine.  But based on the way
0449
1  the bill was written and based on the fiscal note filed
2  last time, we thought that was a reasonable number.
3          SEN. DAVIS:  So let's say we spend about a
4  total of $5 million in the next two years with our
5  intended voter education effort that's already been
6  planned and with an additional cost for educating on the
7  requirements of this proposed new law.  That's about the
8  balance of the voter education fund right now.  Is that
9  correct?
10          MS. McGEEHAN:  Well, it's about -- we've
11  spent 9 million.  I think the balance -- yeah, the
12  balance is between 5 and 7 million.  That's correct.
13          SEN. DAVIS:  Okay.  So that will take us
14  through about what -- how long of a period of time will
15  that take us through?
16          MS. McGEEHAN:  If we used 5 million to do
17  a voter -- a general voter education plan and then
18  another 2 million to do a detailed photo -- photo
19  identification plan, that might -- that might use it up.
20          SEN. DAVIS:  And if it uses it up, what

TX_00001105
JA_001104
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001105

21  will we do in future years to educate our voters about
22  these requirements?
23          MS. McGEEHAN:  Well, frankly -- I mean,
24  state law has never appropriated state funds to educate
25  voters.  So, you know, these federal funds have been
0450
1   really nice to have them to do that.  We never had that
2   kind of funding before.  So if there's a desire to do
3   voter education programs of this -- of this type, then
4   we would need state appropriation.
5          SEN. DAVIS:  So these federal funds will
6   take us basically through a one-time voter education
7   drive on the requirements of this new law, but it's not
8   going to take us further than that?
9          MS. McGEEHAN:  Not if we use it all,
10  not -- it could possibly use up the remainder of the
11  voter education funds.
12          SEN. DAVIS:  Okay.  So we've talked about
13  the voter education.  Talk to us a little bit about the
14  costs of training the poll workers and the registrars.
15          MS. McGEEHAN:  We currently have several
16  training programs for -- well, we have training programs
17  for the county election officials and then other
18  training programs for the poll workers.  We have an
19  online training program.  We have a video.  We have
20  handbooks.  So we would have to update all of those --
21  all those different formats of training.
22          SEN. DAVIS:  And what's the anticipated
23  costs for updating all those forms of training?
24          MS. McGEEHAN:  We don't usually put a
25  fiscal note when there's a change in state law and we
0451
1   have to change and update training like that because at
2   least it's always been considered that is part of our
3   mandate in election administration.  So when we get
4   appropriation under the election administration
5   umbrella, our statutory mandate is to train and assist
6   election authorities.
7          SEN. DAVIS:  And what's happened to
8   your -- your budget, not only in this current biennium
9   that we're in, but the proposed budget going forward?
10          MS. McGEEHAN:  We're still digesting that
11  as far as on the House side.  I don't know about the
12  Senate side yet.  But on the House side, I believe we
13  took about a 14.5 percent budget reduction on the
14  House -- HB 1 bill.
15          SEN. DAVIS:  So we're talking about a
16  fairly dramatic budget cut for your agency while at the
17  same time we are talking about adding some very
18  significant requirements in terms of the changes that
19  you would need to make to your training programs and
20  materials for purposes of educating election workers and
21  county administrators on the new rules that would be
22  implemented in this bill?

TX_00001106
JA_001105
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001106

23        MS. McGEEHAN:  That's correct.

24        SEN. DAVIS:  And there's no fiscal note

25   currently estimated for what that cost might be?

0452

1        MS. McGEEHAN:  It's my understanding that

2   when we've been asked to prepare fiscal notes for these

3   kinds of issues, we have not added a fiscal impact for

4   something that's already a statutory duty.  As we

5   analyze HB 1, maybe we're going to have to revise that,

6   but at least our standing policy was if it was a

7   statutory duty that we're already charged to do, that we

8   don't put an additional fiscal note on it.

9        SEN. DAVIS:  Are you concerned that you're

10   going to find yourselves fairly flatfooted in terms of

11   not being prepared with the resources that you need, to

12   train election workers and to train county

13   administrators on the requirements of this new law

14   facing the budget cuts that you're facing without a

15   fiscal note that's going to add resources to your

16   department for purposes of carrying out these

17   requirements?

18        MS. McGEEHAN:  I think all state agencies

19   in the state have concerns about providing the services

20   they are charged to provide in light of significant

21   budget cuts.  But on the issue of training, the analysis

22   was that that was not going to cost anything additional

23   as to what we've already been appropriated.

24        SEN. DAVIS:  And do you agree with that,

25   that it's not going to cost anything additional for your

0453

1   agency to provide the training for the significant

2   changes in the law that will be imposed if this bill is

3   passed into law?

4        MS. McGEEHAN:  Well, after every session,

5   we have to change all our materials.  And, you know,

6   maybe I can talk to our fiscal officer and maybe we'll

7   start putting in fiscal notes for these kinds of things,

8   but it has been our policy not to add a fiscal note for

9   something we're currently doing under state law and

10   funded for.

11        SEN. DAVIS:  And so the change in

12   materials is all that would occur?  If I'm an election

13   worker in the state of Texas and I'm facing some pretty

14   significant changes -- and I have to tell you I've read

15   this bill numerous times, and I'm still confused in

16   terms of what it would require of me as an election

17   worker.  Is that the only costs that we assume will be

18   incurred, is the cost of the change of the material?

19   Isn't there some training -- active training that has to

20   occur to be able to make sure that the election workers

21   and the county administrators who are tasked with

22   carrying out this new law will understand exactly what's

23   expected of them in terms of its implementation?

24        MS. McGEEHAN:  We do -- we do, I think,

25   pretty extensive training right now.  I mean, in an odd
0454
1   numbered year, we hold four seminars, and we have very
2   good attendance from our county election officials.  So
3   I would be certain that our August county election
4   official seminar will be heavily -- if this passes will
5   heavily emphasize these new rules.
6          To go back to the federal funds, which we
7   know are limited, the grant for voter education also
8   includes election official training and poll worker
9   training.  So if there are any remaining HAVA dollars in
10   that category that we don't use on voter education, we
11   could perhaps use to additional -- to develop additional
12   training materials.
13          SEN. DAVIS:  Yes, and we talked about that
14   a moment ago, and you did state on the record that that
15   category of 5 to $7 million that's remaining is the
16   entirety of the federal resource that you have available
17   to you right now, both for voter education and for
18   training purposes.  And we've also talked about the fact
19   that the expectation and the demand on that particular
20   fund for public education is going to take the
21   significant balance that remains there.  Correct?
22          MS. McGEEHAN:  Right.  Well, just to be
23   clear, the remaining balance in the HAVA is all we have
24   for voter education, but there are some state funds -- I
25   don't think it's a lot -- but that would go towards
0455
1   updating handbooks and video and things likes that that
2   we normally produce as training materials.
3          SEN. DAVIS:  When the Help America Vote
4   Act was implemented and in '06, as you said, that was
5   the first significant change that's been made or it's
6   the most recent significant change that's been made in
7   election laws in the state of Texas in terms of the
8   requirements of your agency and the training of your
9   agency, did the costs that your agency realize as a
10   result of the training component for HAVA increase as a
11   result of those new requirements?
12          MS. McGEEHAN:  We -- what we did do was
13   develop an online training component.  So we used a
14   portion of the HAVA dollars to develop an online
15   training component, which was in addition to our other
16   training.  I could get -- I don't know the cost of that,
17   but I could get you the cost.
18          SEN. DAVIS:  It would be a helpful number
19   to have.
20          There's also a discussion in terms of the
21   fiscal note on this bill, including a coordinated voter
22   registration drive or other activities that would be
23   designed to expand voter registration.  What would the
24   costs of such a registration drive be?  It's on Page 2
25   of the fiscal note.
0456

TX_00001108
JA_001107
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001108

1        MS. McGEEHAN:  Okay.  I think that what
2    that is referring to is that at the end of Senate
3    Bill 14, there's a reference that says county voter
4    registrars can use Chapter 19 funds to defray costs in
5    conducting a voter registration drive.  But I don't see
6    anything -- and I may have missed it -- but I don't see
7    anything in Senate Bill 14 that requires a voter
8    registration drive.  I think it's -- what that section
9    in the bill is doing is trying to make clear that these
10   funds, which are -- go to county voter registrars to
11   enhance voter registration could be used to do voter
12   registration drives, but I don't see anything that
13   requires a voter registration drive in Senate Bill 14.
14       SEN. DAVIS:  What resources currently are
15   expected of our local governments in carrying out the
16   training and the public awareness programs under our
17   election code.
18       MS. McGEEHAN:  The -- there's no state law
19   requirement to do voter education by the county
20   officials.  Most of them do it as a public service
21   because they want to, but there's not a mandate under
22   state law to do that.
23       Under Senate Bill 14, there's required
24   training of poll workers on the new photo ID
25   requirements.  And I may have missed part of your
0457
1    question.
2        SEN. DAVIS:  And that required training is
3    to be done at the county level.  It's expected that the
4    county will fulfill that requirement through their own
5    resources?
6        MS. McGEEHAN:  Well, they are required to
7    use the Secretary of State materials.  I think that the
8    election code gives them discretion as to how they
9    implement it and how they conduct their training.
10       SEN. DAVIS:  So it's foreseeable that at
11   the county level increased costs will be realized as a
12   consequence of the expectations of this bill?
13       MS. McGEEHAN:  Most counties conduct
14   training today.  So they would just be incorporating
15   another component into their training program.
16   Depending on how they handled it would impact how
17   significant the fiscal impact would be in that county.
18       SEN. DAVIS:  If I'm a voter today and I
19   want to go to the bill itself in terms of making sure I
20   understand what would be expected of me under today's
21   rules versus under the rules of the new bill, if I'm a
22   voter today and I come in to vote and I don't have my
23   voter registration card, instead I have an ID, I have a
24   state issued ID, I have a valid driver's license, and my
25   driver's license shows a different name than is
0458
1    currently on the roll because I've married or I've
2    divorced, how is that situation handled today?

TX_00001109
JA_001108
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001109

3          MS. McGEEHAN:  State law doesn't directly
4   address it.  So I think that as a practical matter
5   what's happening is the poll workers are making judgment
6   calls as they qualify those voters for voting.
7          SEN. DAVIS:  But they are not being given
8   guidance or rules or requirements in terms of how they
9   are to deal with that situation today?
10          MS. McGEEHAN:  No.
11          SEN. DAVIS:  It's within their discretion?
12          MS. McGEEHAN:  At this point.  I mean,
13   state law is silent on it, and our office has not issued
14   any guidance on it.  So we're hearing a lot about that
15   today.  That's definitely something we'll probably need
16   to look into, but right now there is no rule or statute
17   on that issue.
18          SEN. DAVIS:  Okay.  And today if I go to
19   vote and my identification that I use for purposes of
20   voting has a different address on it than is listed on
21   the precinct roll, I think it's the interpretation today
22   under 2004 Secretary of State opinion that I am asked
23   for my correct address, and I am to be believed if I say
24   that my address is the address that's on the precinct
25   list as opposed to what might be on my ID?
0459
1          MS. McGEEHAN:  I think that's basically
2   correct.  The purposes -- you know, showing ID today is
3   only for purposes of proving who you are.  It's not to
4   prove where you live.  So independent from the
5   requirement to show ID, either certificate or one of the
6   other authorized ID, there's a separate requirement in
7   the code where the election -- where the poll worker has
8   to ask every voter "Have you moved," so regardless of
9   what ID they show.  And if they say yes, they've moved,
10   then they have to sign a statement of residence and
11   update their information.  If they say no, they haven't,
12   they still live at the address on the list of registered
13   voters, then they are permitted to vote.
14          SEN. DAVIS:  And what is your
15   understanding of whether -- how or whether that would
16   change under the requirements of the new bill if
17   everyone now is going to come in with a state-issued ID
18   or a driver's license?  If the address on that ID does
19   not match the address that's on the voter file, how is
20   that to be handled going forward if this bill were to
21   pass into law?
22          MS. McGEEHAN:  My current understanding is
23   that that process wouldn't change, that the purpose of
24   SB 14 is, again, just to prove up ID, not prove where
25   you reside.
0460
1          SEN. DAVIS:  And what steps would the
2   Secretary of State's Office engage in to assure that the
3   ID wasn't being used to establish an understanding of
4   the voter's residency?

TX_00001110
JA_001109
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001110

5          MS. McGEEHAN:  Would definitely, I think,
6    be included in our training materials to emphasize that.
7          SEN. DAVIS:  Currently, is there any
8    information that the Secretary of State's Office gathers
9    that breaks down by category voters in the state?  And
10   when I say "by category," I mean by race, by gender, by
11   disability, by age.
12          MS. McGEEHAN:  We have some information.
13   We have -- we have age for sure.  On gender -- we have
14   some information on gender, but it's not conclusive
15   because gender is now -- it used to be a required
16   element on the voter registration application.  In 1995,
17   it was taken -- or it became optional after the National
18   Voter Registration Act.  So we have some data on gender,
19   but, again, it's not complete.
20          Regarding ethnicity, we really -- we don't
21   have any information like that because it's not
22   collected when a person applies to register to vote.
23   The only data that we do have is we do have the number
24   of voters that have an Hispanic surname.  And so we can
25   run the list of registered voters against this list of
0461
1    Hispanic surnames that is provided by the census
2    department.
3          SEN. DAVIS:  I'm sure you understand that
4    one of the sensitive issues that will arise as a
5    consequence of this legislation will be a question as to
6    whether the implementation of this law creates a
7    disproportionate impact on minorities, on seniors, on
8    the disabled, on women.  How will the Secretary of
9    State's Office work to be able to answer those questions
10   when they are asked if we currently don't track that
11   data?  And is there an intention to track it going
12   forward?
13          MS. McGEEHAN:  When we changed the voter
14   registration application in '94, '95, due to the
15   National Voter Registration Act, there was a long
16   discussion regarding this issue of whether the state
17   application should request a voter's race.  The
18   determination at that time, based on feedback from all
19   the stakeholders, was not to do it because the thought
20   was that might be intimidating to a minority voter, "Why
21   are you asking, you know, what my ethnicity is?  It
22   doesn't impact whether I can register or not."
23          We can revisit that issue because in order
24   to provide data, you know, if the legislature wants data
25   like that from the Secretary of State's Office, we have
0462
1    to have some way to collect it.  So we could revisit
2    putting that question or adding that as a question to
3    the voter registration application.  I'd be happy to
4    visit on ways where we could try and collect that, but
5    right now we would not have the tools that we would need
6    to be able to collect that data.

TX_00001111
JA_001110
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001111

7          SEN. DAVIS:  It seems rather important as
8  implementation of this law advances that that
9  information be made available for the Justice Department
10  review as well as any judicial review that might occur
11  in terms of the impact of the implementation of the law.
12          I believe that's all the questions I have
13  for you.  Thank you so much.
14          MS. McGEEHAN:  Thank you.
15          CHAIRMAN DUNCAN:  The Chair recognizes
16  Senator West.
17          SEN. WEST:  Thank you very much,
18  Mr. Chairman.  Many of the questions Senator Davis has
19  already asked, but have you had a chance to look at the
20  bill as introduced?
21          MS. McGEEHAN:  Yes.
22          SEN. WEST:  Okay.  Do you happen to have
23  it there in front of you?
24          MS. McGEEHAN:  Yes, I do.
25          SEN. WEST:  Okay.  Great.  Before I get
0463
1  into it, does this bill provide you any rulemaking
2  authority?
3          MS. McGEEHAN:  No.
4          SEN. WEST:  Okay.  So in interpreting
5  the -- let me back up.  Are you often called upon by
6  county registrars to answer questions concerning issues
7  that arise in local counties?
8          MS. McGEEHAN:  Yes.
9          SEN. WEST:  How do you normally decide
10  those questions?  Do you just look at the black and
11  white law?  Do you issue opinions?  How is that --
12  what's that process?
13          MS. McGEEHAN:  We issue opinions in a
14  couple of different ways.  We have a toll-free number.
15  One is dedicated just for county officials.  So if it's
16  a fairly straightforward, simple question, we give a
17  quick answer over the phone.  If it's a -- if it's a
18  less involved question, we might get an email.  We'll
19  give a response via email.  If it's something that's
20  hard or we're really interpreting several different laws
21  or it's a new law and we feel like it has statewide
22  impact, we want to make sure that everyone is operating
23  under the same understanding, we'll issue an advisory.
24          SEN. WEST:  Okay.  And so an advisory or
25  just depending upon the circumstances maybe an email
0464
1  opinion or something like that?
2          MS. McGEEHAN:  Well, advisories are
3  usually a little more -- it's like the most formal that
4  we do.
5          SEN. WEST:  Right.
6          MS. McGEEHAN:  Yeah.  Okay.
7          SEN. WEST:  All right.  Let me ask you to
8  go to Page 4 of the bill.

9       MS. McGEEHAN:  Okay.  Can you tell me the
10  section?  Because I think I have a different format.
11          SEN. WEST:  Okay.  It's Section 7, and
12  Section 7(c) and (d).
13          MS. McGEEHAN:  Okay.
14          SEN. DAVIS:  Let me know when you get
15  there.
16          MS. McGEEHAN:  Yes.
17          SEN. WEST:  Okay.  It's my understanding
18  that the election officer that's being referred to in
19  Section (d) is -- is the individual working at the poll.
20  Is that right?
21          MS. McGEEHAN:  Yes.
22          SEN. WEST:  Okay.  That person will be
23  called upon in Section (d) to determine if the voter's
24  name is on the precinct list of registered voters, and
25  the voter's identity can be verified from the
0465
1   documentation presented.  Is that correct?
2           MS. McGEEHAN:  Yes.
3           SEN. WEST:  Okay.  In advising on that,
4   will that be a strict interpretation?  Let me -- this is
5   what I mean.  I think that some of the hypotheticals
6   that were provided by Senator Davis may be illustrative
7   of what I'm asking.  My last name is West, W-e-s-t.  And
8   say that there's a typographical error where my name is
9   spelled W-e-s on the voters' roll, precinct list, and
10  then my -- but my identity I'm using my driver's license
11  and it has "t" on it.  How does a poll -- an election
12  officer in that situation resolve that problem?
13          MS. McGEEHAN:  That's a good question, and
14  I don't think the bill necessarily defines what
15  verification --
16          SEN. WEST:  I know.  Senator Fraser said
17  I'd have to ask the Secretary of State that question.
18  That's why I'm asking you that question.
19          MS. McGEEHAN:  I think -- you know, based
20  on the way the bill is written now and if we had to
21  develop training materials for the poll workers on how
22  to implement this, we would look to the best practices
23  of the states that have implemented.  I heard Indiana
24  testify earlier today that they have written some
25  guidelines.  We'd look to that and try and incorporate
0466
1   the best practices on reasonable methods to verify the
2   ID document against the list of registered voters.
3           SEN. WEST:  Okay.  But you would agree
4   with me that in interpreting Section (c) and (d) without
5   some sort of guidance would lend itself to a great deal
6   of subjectivity; thus inconsistent application
7   throughout the state?
8           MS. McGEEHAN:  It could, yes.
9           SEN. WEST:  Okay.  As it relates to --
10  let's see.  What page is it on?  The next page, which

file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

11  will be (h), it's in the same section.
12          MS. McGEEHAN:  Okay.
13          SEN. WEST:  Would you read Section (h) and
14  tell me how you interpret that as the chief
15  administrator of the election laws in the state of Texas
16  next to, needless to say, Secretary of State?
17          MS. McGEEHAN:  (h) reads, "The
18  requirements for identification prescribed by Subsection
19  (b) do not apply to a voter who: (1) presents the
20  voter's voter registration certificate on offering to
21  vote; and (2) was 70 years of age or older on January 1,
22  2012, as indicated by the date of birth on the voter's
23  voter registration certificate."
24          The way I had -- until earlier this
25  afternoon when Senator Ellis asked the question, I had
0467
1  assumed that anybody that is 70 years of age or older
2  would not have to provide the photo ID.  I think the
3  wording is less than perfect.  I think that's the
4  intent, and I heard Senator Fraser, I think, answer that
5  his intent is it would apply.  You know, even if a
6  person became 70 after January 1, 2012, they could still
7  take advantage of this exception.
8          SEN. WEST:  Okay.  But would it be your
9  suggestion that we need to reword that language to make
10  certain that whether you're there or someone else -- I
11  understand that you're here and you heard the
12  discussion, but if for some reason you're not in the
13  same position you're in right now, there's going to be
14  someone else, and they won't have -- they will not have
15  had the benefit of this discussion.  So, therefore, do
16  you think it would be advisory to -- advisory to reword
17  that to make certain it's perfectly clear?
18          MS. McGEEHAN:  I think so.  If people are
19  reading it inconsistent, it would probably help it if it
20  were.
21          SEN. WEST:  Okay.  Now, a couple of other
22  questions.  As it relates to the counties, it's my
23  understanding that you -- that your agency and maybe
24  either yourself or someone working for you put together
25  the fiscal note.  Is that correct?
0468
1          MS. McGEEHAN:  Yes.  Our agency put it --
2  I helped.
3          SEN. WEST:  Okay.  Did someone under your
4  supervision contact local governments to determine the
5  impact, the fiscal impact, that implementation of this
6  will have?
7          MS. McGEEHAN:  No, we did not.
8          SEN. WEST:  That was done by someone else?
9          MS. McGEEHAN:  I think LBB does that.  We
10  just -- we just --
11          SEN. WEST:  Provided the information?
12          MS. McGEEHAN:  Yeah.  Right.

TX_00001114
JA_001113
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001114

13          SEN. WEST:  And based on your experience
14  when these types of changes -- let me back up.
15          How much experience have you had in this
16  particular area, that is, the election laws, in
17  administration of election laws?
18          MS. McGEEHAN:  I have been working in the
19  elections division for 21 years.
20          SEN. WEST:  So you've had a little
21  experience, huh?
22          MS. McGEEHAN:  Yes.
23          SEN. WEST:  Okay.  All right.  As it
24  relates to when changes are made in state law of this
25  nature, is there an impact, a fiscal impact, on local
0469
1   units of governments when they have to make changes to
2   comply with these types of changes or laws that are
3   being suggested?
4           MS. McGEEHAN:  I think it really depends
5   on what the change is.  You know, if there's a new
6   mandate for a county or if the county has to do
7   something different, then obviously there would be a
8   fiscal impact.
9           SEN. WEST:  Well, will -- and, again,
10  drawing on your expertise, will counties have to do
11  something different to implement this particular law?
12          MS. McGEEHAN:  They will have to -- they
13  are going to have to post information on their website
14  notifying the public what the new photo ID requirements
15  are.
16          SEN. WEST:  Right.
17          MS. McGEEHAN:  When they issue voter
18  registration certificates, they are going to have to
19  mail out -- which they have to mail out every two years
20  under current law.  The new certificates will have new
21  language, but -- informing voters of the voter ID
22  requirements, but that should be cost neutral because
23  they are already mailing out the voter registration
24  certificates.
25          The piece that I think might have a fiscal
0470
1   impact is the training.  If the counties have to change
2   up their training procedures much or do more training
3   because they want to make sure the word is out to all
4   their -- that might increase their training costs.
5           SEN. WEST:  Okay.  So there are some
6   factors that need to be taken into consideration as to
7   whether or not counties will be burdened with additional
8   cost to implement this law.  Is that correct?
9           MS. McGEEHAN:  Yes.
10          SEN. WEST:  Okay.  And would it be a fair
11  statement to say the larger the county, the more of the
12  burden -- of the financial burden -- well, that's not a
13  fair question.
14          Would it be a fair statement to say that

15  the larger the county, the larger the potential
16  financial obligation that they would have to encounter
17  in order to implement the law?
18          MS. McGEEHAN:  I think that's true, but I
19  can hear small counties say that it might be
20  proportional, you know, since their budgets are -- I
21  mean --
22          SEN. WEST:  Right.  It's all relative to
23  what your budgets are.
24          MS. McGEEHAN:  Yeah.
25          SEN. WEST:  But the fact is that that --
0471
 1  do you -- is there any -- you've read the fiscal note
 2  associated with this bill?
 3          MS. McGEEHAN:  Yes.
 4          SEN. WEST:  The $2 million that's in the
 5  fiscal note, does any of that go to the county to --
 6  counties in order to implement this legislation?
 7          MS. McGEEHAN:  No.
 8          SEN. WEST:  So any cost that is not
 9  covered by the state for counties would be -- have to be
10  borne by the counties.  Right?
11          MS. McGEEHAN:  Yes, yes.
12          SEN. WEST:  Okay.  Now, as it relates
13  to -- is there any way that the Secretary of State's
14  Office can give us -- do an analysis or get with the
15  various counties to determine exactly what the fiscal
16  impact of implementing this legislation would be?
17          MS. McGEEHAN:  We could -- we could
18  certainly solicit that information from counties and ask
19  them what -- how they see this impacting them fiscally.
20          SEN. WEST:  You could do that for each and
21  every one of the counties?
22          MS. McGEEHAN:  We can do it.
23          SEN. WEST:  Mr. Chairman, I'd like to
24  request that the Secretary of State's Office provides
25  the Senate an analysis of -- I shouldn't say an
0472
 1  analysis -- at least solicit from the various counties
 2  what the fiscal implication is going to be in order to
 3  implement this bill.
 4          CHAIRMAN DUNCAN:  Okay.  I think, Senator,
 5  that will be an individual request from you, and then it
 6  can be distributed to all members of the Senate --
 7          SEN. WEST:  Okay.
 8          CHAIRMAN DUNCAN:  -- whenever it's done.
 9  You know, I doubt that that will be done by the time we
10  rise and report to the Senate.
11          SEN. WEST:  Okay.  We can't get it
12  tonight?
13          (Laughter)
14          SEN. WEST:  I'm just joking with you.
15          CHAIRMAN DUNCAN:  You won't be a very
16  popular guy if the --

17      SEN. WEST:  I'd like --

18      (Laughter)

19      SEN. WEST:  I'd like to get it as soon as

20 possible, though.

21      Let's see.  No further questions.  Thank

22 you very much.

23      MS. McGEEHAN:  Thank you.

24      CHAIRMAN DUNCAN:  Thank you, Senator West.

25      Senator Gallegos?

0473

1      SEN. GALLEGOS:  Let me ask you, I don't

2 know if you heard my question earlier to Senator Fraser

3 and he referred to you or the Secretary of State's

4 Office to answer it.  My concern was in the fiscal note

5 that we ranked number two in the country in population.

6 And Missouri ranks number nineteenth, and to implement

7 their voter ID program, they came up with -- they only

8 have 5.9 million people.  We have 25 million.  They came

9 up with a fiscal note of 6 million in the first year and

10 then 4 million in the second year for a total of 10

11 million second and third.  That's $10 million.  And you

12 just -- I think earlier testimony with Senator Davis,

13 you said once the 2 million runs out, that's it.  Is

14 that what you said?

15      MS. McGEEHAN:  For -- yeah, the amount of

16 money we have for voter education is limited.  So when

17 that runs out, that's all we have.

18      SEN. GALLEGOS:  I guess my concern is if

19 Missouri only has 5.9 million people, just to implement

20 their voter ID program they start with 6 million in the

21 first year and 4 million in the second and third year

22 for a total of $10 million, for just 5.9 million folks,

23 what are they -- you know, I don't -- what are they

24 doing as far as when they are reading the bill?  I heard

25 that you said you're going by the bill, and that's how

0474

1 you came up with your fiscal note.  Is that correct?

2      MS. McGEEHAN:  Yes.

3      SEN. GALLEGOS:  Okay.  Well, then what are

4 they doing that we're not or, you know, how can you --

5 you know, for $10 million for 5.9 million people and

6 we're only going to spend 2 million, I mean, what's the

7 difference?

8      MS. McGEEHAN:  I am not familiar with the

9 Missouri voter identification bill, and I did hear you

10 ask that earlier today, but I've been trying to listen

11 to all the questions.  So we can -- we can research it

12 and see.  Some states actually provide more to their

13 local county governments and print ballots and things

14 like that.  I don't know if that's the situation in

15 Missouri, but I honestly don't know the answer to that

16 question because I don't know what the Missouri voter ID

17 law requires.

18      SEN. GALLEGOS:  Well, it's a substantial

19  more amount of money than we're looking --
20          MS. McGEEHAN:  Yeah.
21          SEN. GALLEGOS:  -- at the fiscal note that
22  you have -- that you've given this committee on Senate
23  Bill 14.  And I just -- it concerns me that that amount
24  of money, if somebody is doing -- in the formula or
25  methodology that you came up with that number -- I mean,
0475
1   is that a true number?  I mean, you know, as far as are
2   we really doing voter education that should be done, you
3   know, on 25 million people as opposed to what Missouri
4   is doing with only 5.9?  I mean, it just -- I mean, that
5   would send up a red flag to me.  Wouldn't it you?
6           MS. McGEEHAN:  Sure.  I would like to
7   understand those numbers because they are very
8   different.
9           SEN. GALLEGOS:  You know, I -- if we're
10  going to mandate it to Texans, you know, and then do it --
11  do a good educational program and Missouri is spending
12  $10 million on their folks and we're only spending
13  2 million on ours, I'd like to know what the -- what the
14  difference is.  Are their people better than ours?  You
15  know, do they deserve, you know, more education?  You
16  know, I just -- you know, with the population as opposed
17  to our population, you know, I don't -- you know, I'm a
18  little concerned there.  You know, are we cutting our
19  folks short?  Are we really going to do what you're
20  telling us that you're going to do as far as educating
21  the public out there on this bill?
22          And it just concerns me that, you know, we
23  see -- and I haven't even taken a comparison of the
24  other states.  And we're number two, and Missouri is 19,
25  and they are spending 10 million bucks.  You know, that
0476
1   would concern me, and I would hope it would concern any
2   of the other Senators on this floor.  Are we, you know,
3   really going to do -- in implementing this bill, are we
4   going to educate those folks out there?
5           Now, you know -- and I'd like that answer.
6   I mean, you can't answer it now, I understand, but I
7   would like an answer to that.
8           MS. McGEEHAN:  We'll get you an answer.
9           SEN. GALLEGOS:  And a comparison on what
10  really your states that have implemented voter ID, how
11  much are they paying, you know, to implement the program
12  and what they do.
13          Now, on the fiscal note, it says you're
14  going to do TV and radio and some other things.  I mean,
15  can you explain to this body the process on TV, or is it
16  going to be in different languages, or how are you going
17  to -- how are you going to split up the money?  Who gets
18  the most?  You know, I mean, it's not -- it's not
19  explained to us in the fiscal note how you're going to
20  spread the money around.  And is that going to be

TX_00001118
JA_001117
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001118

21  accessible to us or how the process is going to be, or
22  how much money are you going to spend in Harris County
23  as opposed to Lubbock, Texas or wherever?
24          MS. McGEEHAN:  Yes, that would be
25  available.  And, you know, the programs that we've done
0477
1  previously, we have detailed records that show, you
2  know, where the media ran, and so we would -- that would
3  be a part of any program going future.
4          The way -- the way it has worked thus far,
5  the three statewide voter education programs that we
6  have done, is we've gone out for bid for a public
7  education firm.  And then the first thing that firm does
8  is research, and they meet with stakeholders, and then
9  they craft the creative proposal.  And then they turn
10  that into the actual media and do the media buys for TV,
11  radio and cycle, Internet and also print.
12          For the PSAs -- and I'm not the expert on
13  this -- but I understand that we pay for a certain
14  amount, and then we get some earned credit where TV
15  stations will run them for free.  If you pay them, you
16  know, to run it once, they'll run it three times and
17  only charge you for once, something along those lines.
18          SEN. GALLEGOS:  And is that going to be --
19  is there going to be access as far as different
20  languages in than budget?
21          MS. McGEEHAN:  Oh, yes.  We -- our current
22  programs are in English and in Spanish, and in Harris
23  County, we've had a component for Vietnamese.
24          SEN. GALLEGOS:  Okay.  Now, on Page 2 of
25  the bill under what y'all are going to do under voter --
0478
1  under 31.012, Voter Identification, Senator West brought
2  it up about -- it says here you and -- your office and
3  the voter registrar of each county that maintains it
4  shall provide notice of the ID requirements as
5  prescribed by this change.
6          Now, my concern there is, is at the county
7  level -- you know, I think Senator West brought it up --
8  is how much is going to be incumbent on each county, you
9  know?  I and others here on this floor represent the
10  largest county, Harris County, and Harris County is
11  already starting to lay off, and they have a shortfall,
12  and they are laying off as we speak right now.  So, you
13  know -- and I see what it says in the bill, you know,
14  that you're going to get together with them.  I mean,
15  are they going to have the money?  Or where is the -- if
16  they don't have the money, where is the other money
17  going to come from?  Other than the 2 million you
18  already have prescribed here and any federal matches
19  that come in, where is that money going to come if those
20  counties cannot provide?
21          MS. McGEEHAN:  I think that the bill
22  presumes that counties have a website, and so this

TX_00001119
JA_001118
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001119

23  requirement is that they post, you know, the information
24  about the new photo ID requirements that the Secretary
25  of State's Office will actually prescribe.  So we will
0479
1  send that out to the counties, and then they'll have to
2  post it on their website.
3          Now, in light of the fiscal
4  circumstances -- and Senator West has asked us to do a
5  survey -- we'll probably get some very detailed
6  information, you know, as far as the counties' fiscal
7  circumstances, if they are going to have to take down
8  their websites or, you know, where they are going to
9  have to cut.
10          SEN. GALLEGOS:  Well, you know, with all
11  due respect, I mean, we can presume a lot of things, and
12  I could presume a lot of things, you know, just on
13  anything, but I can tell you right now -- I'm not
14  presuming -- I know that they're laying off in Harris
15  County right now.  That's not a presumption.  That's a
16  fact; that's a fact.  And they're also furloughing in
17  the City of Houston.
18          So, I mean, it just concerns me that this
19  section here that says you're going to work hand-in-hand
20  with each registrar in each county, and if those
21  counties are already going through a budget shortfall
22  like we are, then how can you presume that they're going
23  to have -- I'm just saying that this bill presumes that
24  they're going to have a website and they're going to
25  have people to handle the education.
0480
1          You can't presume anything if they're
2  laying off right now as we speak, and that's a fact.
3  Like I said, that's not a presumption.  That concerns
4  me.  And what I'm asking is that if that can't happen in
5  Harris County or any other county in this state, where
6  is the extra money?  If they don't have, obviously, the
7  funds to provide what is prescribed under Senate Bill
8  14, where is that money going to come from?
9          MS. McGEEHAN:  Well, you know, Senate Bill
10  14 doesn't make an appropriation to the county, so I
11  don't know the answer to your question on that because,
12  like I said, the bill -- I think the assumption is that
13  counties have a website.  So if they're not going to
14  have a website --
15          SEN. GALLEGOS:  But the bill prescribes
16  that you will work in conjunction with the county
17  registrar.  Is that what I'm reading --
18          MS. McGEEHAN:  Yes.
19          SEN. GALLEGOS:  -- or am I reading the
20  wrong bill?
21          MS. McGEEHAN:  Maybe I'm not -- the way I
22  read that was that we would provide them the wording,
23  the language that they would put up on their website.
24          SEN. GALLEGOS:  Well, you're going to

TX_00001120
JA_001119
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001120

25  provide them with that.  But what about the bodies and
0481
1  any other education that's prescribed by this bill?  If
2  they don't have the bodies -- they're laying off bodies
3  right now.
4        MS. McGEEHAN:  Yes.
5        SEN. GALLEGOS:  Okay.  And you see where
6  I'm going here?
7        MS. McGEEHAN:  No, I understand.
8        SEN. GALLEGOS:  And if you provided a
9  fiscal note, you know, that we're going by and that's on
10  every website in the State of Texas, everybody that has
11  a computer, then really what I'm asking you, is this a
12  true fiscal note or is it misleading to the voters out
13  there, that it's going to cost more than what you're
14  showing here if other counties are having budget
15  shortfalls like we are?
16        MS. McGEEHAN:  Well, when we're asked to
17  submit a fiscal note to LBB, they want to know what the
18  state impact is.  So generally we don't solicit what the
19  impact is to local government.  And I'm not exactly sure
20  who within LBB does that, if that's LBB or the
21  Comptroller.  But I can tell you -- and maybe we've been
22  doing them wrong, but the way we've understood our
23  requirement in responding to a fiscal note request was
24  to state what the state impact was.  It's specifically
25  for the agent -- you know, like for our agency for the
0482
1  Secretary of State's office.
2        SEN. GALLEGOS:  Okay.  So what you're
3  telling me is that outside of the $2 million that's in
4  the fiscal note and that under this section that you're
5  going to work with the registrar in each county, then we
6  just have to roll the dice and hope that the money is
7  there.  Is that what you're telling me?
8        MS. McGEEHAN:  Well, I think this fiscal
9  note that LBB did put -- does indicate that there may be
10  some county costs.  You know, they did put some numbers
11  in for Tarrant County and for Bexar County.  So, you
12  know, it's not -- I don't think it's the number you're
13  looking for.  It's not a comprehensive number, but I
14  think that the fiscal note does indicate that there may
15  be a fiscal impact on counties.
16        SEN. GALLEGOS:  There may be a fiscal
17  impact.  You don't know how much?
18        MS. McGEEHAN:  No, I don't.
19        SEN. GALLEGOS:  So what we're looking at
20  in your fiscal note is just an open-ended fiscal note.
21  Is that what you're telling me?
22        MS. McGEEHAN:  The fiscal note is really
23  showing the impact on the Secretary of State's office.
24  I can't really speak to how the portion of the fiscal
25  note that concerns impact on local government, how
0483

TX_00001121
JA_001120
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001121

1  LBB -- you know, what their process is.  I don't really
2  know.
3          SEN. GALLEGOS:  All right.  Then let me
4  rephrase my question.
5          MS. McGEEHAN:  Okay.
6          SEN. GALLEGOS:  So the $2 million that
7  you're showing is what the state is going to be
8  impacted.  And the language that is showing you're going
9  to work in conjunction with the counties, you know, you
10  cannot speak to that, so we really don't know.  Is that
11  what you're saying?  It could or could not be impacted
12  for a million, two million, three million, whatever the
13  number.  I don't know the numbers that you gave Bexar
14  County and Tarrant County.  I have not been privy to
15  those numbers.  But what I'm saying is, I really would
16  like to know that if my county is going to be impacted,
17  if at all, it's going to be in here, you know.  Do you
18  see what I'm saying?
19          MS. McGEEHAN:  Well, yes, I understand
20  what you're saying.  And we are going to be sending out
21  a survey to try and gather that data from all the
22  counties.
23          SEN. GALLEGOS:  You know, I don't like the
24  mandate to my county, something that this bill said that
25  they will do and then find out that they don't have the
0484
1  funds to do it.  You know, to me, that's an unfunded
2  mandate in really telling Texans that are looking at
3  this debate on computer and that are looking at this
4  bill online, that this $2 million fiscal note that
5  you've provided is only an impact to the state, not the
6  counties, not each county.  Is that correct?
7          MS. McGEEHAN:  That's correct.
8          SEN. GALLEGOS:  Okay.  Thank you very
9  much.
10          CHAIRMAN DUNCAN:  Thank you, Senator
11  Gallegos.
12          Senator Van de Putte.
13          SEN. VAN de PUTTE:  Thank you,
14  Mr. Chairman.
15          Ms. McGeehan, you've been an excellent
16  resource witness for us, and there are just two
17  questions that I need to ask to get into the record with
18  regard to a survey.
19          Does Texas participate in the Election
20  Administration and Voting Survey?
21          MS. McGEEHAN:  Yes.
22          SEN. VAN de PUTTE:  When was this survey
23  completed, the last survey was completed?  Was it after
24  the 2008 election?
25          MS. McGEEHAN:  Yes.
0485
1          SEN. VAN de PUTTE:  So we have that survey
2  available?

3          MS. McGEEHAN:  Yes.
4          SEN. VAN de PUTTE:  Okay.  The question
5  that I have goes to the data on the survey that goes, I
6  think, to all -- and this is the federal commission --
7  dealing with the number of provisional ballots in the
8  State of Texas.  As far as you know, how do we rank in
9  the number of provisional ballots that are used with
10  regard to our voting population?
11          MS. McGEEHAN:  My general recollection is
12  that as far as the total number cast, we're on the lower
13  end.  But as far as the number of provisional votes,
14  meaning that not as many people cast a provisional vote
15  in Texas as in some other states, but as far as the
16  number of provisional ballots that are counted --
17          SEN. VAN de PUTTE:  Yes.
18          MS. McGEEHAN:  -- we have one of the lower
19  rates among the states as to the number of provisional
20  ballots that are counted.  It is my understanding that
21  in the state chart, that we have very high rejection
22  provisional ballot rates.  So, in other words, even
23  right now under this system that we have, that the
24  number of provisional ballots that are cast, we have
25  some of the highest rejection rates for those
0486
1  provisional ballots in all of the country.
2          MS. McGEEHAN:  Yes.
3          SEN. VAN de PUTTE:  At least that's what I
4  understand from the report.
5          MS. McGEEHAN:  That's correct.
6          SEN. VAN de PUTTE:  Thank you.  I know
7  that we have the datasets that were put in for 2008, and
8  so hopefully that we will be able to get this and make
9  sure that as we monitor the bill as it progresses and
10  the bill as it's implemented, we certainly don't need to
11  get to the bottom of the bottom of the bottom on
12  rejection of provisional ballots.
13          Thank you.
14          CHAIRMAN DUNCAN:  Thank you, Senator Van
15  de Putte.
16          Senator Fraser.
17          SEN. FRASER:  Thanks for being here today
18  and waiting all day.
19          I would like to clarify a point before you
20  sit down.  I think you're aware this morning that we had
21  entered into a record -- the Secretary of State had a
22  letter addressing the $2 million in the HAVA funds that
23  was put into the record.  Our understanding, from
24  talking to the Secretary, the way the HAVA funds work,
25  and also her relationship with the county, that she has
0487
1  very broad discretion, assuming that the HAVA people
2  approve the using of this.
3          The $3 million that you're talking about
4  in voter education, it doesn't necessarily mean that

5  it's three plus two.  It's possible that there's an
6  overlap, that this two million could be folded in --
7  possibly into the three.  But that discretion goes back
8  to the Secretary and they make a determination.  Is that
9  not true?
10        MS. McGEEHAN:  That's exactly right.
11        SEN. FRASER:  The other thing that I want
12  to clarify that there is a lot of discussion about, what
13  expense might go to Houston or what expense might go to
14  Bexar.  Right now there is not clear, because I think
15  there's a lot of discussion going on of whether is that
16  Bexar expense or is that Secretary of State expense?
17        And we've got to determine what those
18  dollars are being spent on.  Can we use Secretary of
19  State dollars and HAVA funds for that?  So I think we're
20  premature of a county saying they've got "X" amount of
21  expenses, because it's possible that some of those
22  expenses flow from the Secretary of State's office, they
23  do not flow to the county, and they could handle that
24  with available people within the county and budget.  Is
25  that not correct?
0488
1        MS. McGEEHAN:  That's correct.  And just
2  an example of that, the cost that Bexar County put in
3  the fiscal note was -- I think their assumption was that
4  the certificate, the voter registration certificate
5  would have to increase in size.  And I don't see
6  anything in the bill that requires that.  And the
7  Secretary of State prescribes the form.  So once that's
8  explained to the county, they might withdraw that
9  fiscal --
10        SEN. FRASER:  I want to make sure that
11  that's clear, is that some of these assumptions are
12  possibly the-sky-is-falling assumptions that this is --
13  you know, this expense is going to be put on us, and I
14  don't think that's been discussed.  And some of this, I
15  think, can be done by ruling of the Secretary of State,
16  directing them.  And there is a real good chance that a
17  lot of these expenses go away that can be absorbed
18  through the Secretary of State.  And that is correct,
19  isn't it?
20        MS. McGEEHAN:  Yes.
21        SEN. FRASER:  Okay.  I wanted to clear
22  that up.  Thank you so much.
23        CHAIRMAN DUNCAN:  The Chair recognizes
24  Senator Williams.
25        SEN. WILLIAMS:  Thank you, Mr. Chairman.
0489
1        Ms. McGeehan, I want to add my thanks for
2  you hanging in here with us all day.  There's about
3  three things that I would like to clear up with you.  I
4  just want to understand unequivocally, HAVA funds can be
5  spent for things like training poll workers.  Is that
6  correct?

7          MS. McGEEHAN:  Yes.
8          SEN. WILLIAMS:  Okay.  Thank you.  Then
9   are you familiar with the voter ID bill that went
10  into -- in Utah recently?  Have you taken a look at
11  that?
12         MS. McGEEHAN:  No, I have not looked at
13  that.
14         SEN. WILLIAMS:  Okay.  I just think it's
15  noteworthy, in light of Senator Van de Putte's comments,
16  because the Salt Lake County Clerk's office -- I've got
17  a news report here -- it's confirmed that there were
18  only 13 cases of voters having to pick up their
19  provisional ballots because they didn't have the proper
20  identification to vote when they put this new law into
21  effect.  So it seems like it's had a great -- again, one
22  more state where the impact has been really minimal.
23  I'm not sure why we're having these other issues, but I
24  don't think its because of this.
25         And then finally I wanted to ask you, we
0490
1   had talked earlier about the project that I asked you to
2   do, to cross-reference the driver's licenses and the
3   voter registration.  How is that coming along?  I know I
4   only asked today, but I just --
5          MS. McGEEHAN:  Yes.
6          SEN. WILLIAMS:  -- but what is a
7   reasonable expectation for us to get that information?
8          MS. McGEEHAN:  I would hope by the end of
9   the week.  One thing that our IT folks and our election
10  experts are trying to struggle with is like matching
11  criteria --
12         SEN. WILLIAMS:  Right.
13         MS. McGEEHAN:  -- you know, which we won't
14  have a TLD number, so we're working through some of
15  that.  But I would expect by the end of the week we
16  would have it, if not earlier.
17         SEN. WILLIAMS:  Okay.  So do you need any
18  further direction from us?  For instance, if we wanted
19  to target that universe of people that we know are out
20  there and maybe make a little extra effort to make sure
21  that they understood they were going to have a new
22  requirement when they went to vote as far as getting a
23  photo ID, if they didn't already have one -- and we've
24  identified who they are -- if we gave legislative intent
25  as a part of the bill tomorrow, would that be sufficient
0491
1   for you-all and the Secretary of State's office to take
2   that direction and know that that's something that we
3   wanted to have done in your training plans and voter
4   education plans?
5          MS. McGEEHAN:  Yes.  I think if there were
6   a statement of legislative intent, we would certainly
7   follow that.
8          SEN. WILLIAMS:  That would be sufficient.

9    Okay.  Thank you very much.  Appreciate your help.
10          CHAIRMAN DUNCAN:  All right.  Members, are
11   there any other questions of Ms. McGeehan?
12          Okay.  The Chair hears none.  Thank you,
13   Ms. McGeehan.
14          The Chair calls David Maxwell, Deputy
15   Director of Law Enforcement, Texas Attorney General's
16   Office.
17          Mr. Maxwell, would you approach and state
18   your name and who you represent, and then we'll open it
19   up for questions.
20          TESTIMONY BY DAVID MAXWELL
21          MR. MAXWELL:  I have a written statement
22   that I would like to put into the record, sir.
23          CHAIRMAN DUNCAN:  Well, we haven't been
24   doing that.
25          MR. MAXWELL:  Okay.
0492
1          CHAIRMAN DUNCAN:  If you would just go
2    ahead and --
3          SEN. WEST:  Mr. Chairman?
4          CHAIRMAN DUNCAN:  We'll see.  There is a
5    proper way to get that in.  And if --
6          MR. MAXWELL:  My name is David Maxwell.
7    I'm a resource witness.
8          CHAIRMAN DUNCAN:  Would you state your
9    name and who you represent.
10          SEN. WEST:  Mr. Chairman?
11          CHAIRMAN DUNCAN:  Just let him state his
12   name, and then I'll take your inquiry.
13          Mr. Maxwell.
14          MR. MAXWELL:  My name is David Maxwell.
15   I'm the Deputy Director of Law Enforcement for the Texas
16   Attorney General's office.
17          CHAIRMAN DUNCAN:  All right.  Senator
18   West, for what purpose?
19          SEN. WEST:  Mr. Chairman, I would like to
20   introduce an exhibit.  I think it's Exhibit 10.
21          CHAIRMAN DUNCAN:  Oh, okay.  Exhibit 10.
22   Do we have Exhibit 10 up here?  Do you have copies ready
23   for distribution?
24          SEN. WEST:  Yes, I think you have the
25   exhibit up there.  And, members, what Exhibit 10 is, is
0493
1    a letter from the members of the Congressional
2    delegation:  Sheila Jackson Lee, Eddie Bernice Johnson,
3    Charlie Gonzalez, Lloyd Doggett, Gene Green, Rubén
4    Hinojosa, Sylvestre Reyes and Al Green, asking that
5    we -- opposing Senate Bill 14 and stating the reasons
6    why they oppose Senate Bill 14.
7          So I would introduce that into the record.
8          CHAIRMAN DUNCAN:  Members, any objections?
9          The Chair hears none.  It will be received
10   in the record.

11          (Exhibit No. 10 marked and admitted)
12          CHAIRMAN DUNCAN:  Okay.  Are there any
13  questions for Mr. Maxwell?
14          All right.
15          The Chair hears none.
16          (Off-the-record discussion)
17          CHAIRMAN DUNCAN:  All right.  Are there
18  any questions of Mr. Maxwell?
19          (Brief pause)
20          CHAIRMAN DUNCAN:  All right.  The Chair
21  hears none.
22          Thank you, Mr. Maxwell.  Appreciate you.
23
24
25
0494
1               PUBLIC TESTIMONY
2          CHAIRMAN DUNCAN:  Okay.  We are now ready
3  to go into the public witness phase of the hearing
4  today.  According to our pre-set procedure, I'll call
5  the names of the first five witnesses and they will be
6  brought down to the Senate floor, and then we'll call
7  them in their order.
8          First is John Patrick, Anita Pruitt,
9  Jessica Gomez, Terri Burke, and Clifford Gay.
10          (Brief pause)
11          SEN. VAN de PUTTE:  Mr. Chairman?
12          CHAIRMAN DUNCAN:  Yes.
13          SEN. VAN de PUTTE:  Inquiry, Mr. Chairman.
14  I have a statement here from one of our constituents
15  representing the Southwest Voter Registration Education
16  Project to put into the record.  What appropriate time
17  would you accept this or would it be appropriate to put
18  this into the record?  This is someone who wants to put
19  something into the record but is not here to testify.
20          CHAIRMAN DUNCAN:  It can go in at your
21  request as a part of the record.  But it's not a sworn
22  statement.  Is that correct?
23          SEN. VAN de PUTTE:  That's correct.
24          CHAIRMAN DUNCAN:  I think the process that
25  we discussed earlier on was that any senator could put
0495
1  anything in the record that was -- you know --
2          SEN. VAN de PUTTE:  Mr. Chairman, may I be
3  allowed to enter into the record the statement prepared
4  and presented by Lydia Camarillo, Southwest Voter
5  Registration Education Project Vice President?
6          CHAIRMAN DUNCAN:  As exhibit what?  Number
7  what?  Be number 11?
8          SEN. VAN de PUTTE:  No. 11.
9          CHAIRMAN DUNCAN:  Is there any objection?
10          The Chair hears none.  It will be
11  received.
12          (Exhibit No. 11 marked and admitted)

TX_00001127
JA_001126

TX_00001127

13        CHAIRMAN DUNCAN:  Okay.  And while our
14  first five public witnesses will be approaching, let me
15  go ahead and announce the names of the next five
16  witnesses.
17        Catherine Engelbrecht, Carol Kitson,
18  Placido Salazar, Roman Pena and Rosa Rosales.
19        Okay.  If you'll approach.  The first
20  witness that we have is -- I don't have those cards --
21  here we go -- witnesses and panel of -- you will have
22  three minutes.  You'll get a -- I guess a 30-second
23  warning, is a yellow light, that it comes on.  We will
24  not interrupt you.  And then after you're finished, then
25  the members may ask you questions.
0496
1         All right.  Go ahead and approach the
2  bench, Mr. Patrick.  State your name and who you
3  represent.
4            TESTIMONY BY JOHN PATRICK
5         MR. PATRICK:  My name is John Patrick.
6  I'm the Secretary-Treasurer of the Texas AFL-CIO.
7         Members of the Senate, Mr. Chairman, as an
8  officer of the Texas AFL-CIO, I talk to workers we
9  represent around the state.  Those employees include
10  refinery workers, teachers, plumbers, nurses,
11  steelworkers, theatrical workers, correctional officers,
12  firefighters, flight attendants, state workers, rubber
13  workers and countless other trades and professions.
14  From my experience at this point in time, three issues
15  concern our Texas union members above all others.
16  First, jobs; second, jobs; third, jobs.  Quite frankly,
17  from my perspective and from the perspective of the
18  AFL-CIO, jobs should be the emergency issue before this
19  legislative session, not the voter ID bill.
20        Senate Bill 14 will be the first bill
21  considered by a committee in the Texas Senate during
22  this legislative session.  The Governor has designated
23  this bill as an emergency item.  Unfortunately, I'm not
24  aware of any mention of the word "jobs" or "employment"
25  in Senate Bill 14.  Senate Bill 14 would no longer allow
0497
1  someone to vote with a voter registration certificate
2  alone but would require an official photo ID.  The
3  stated reason for the issue is alleged voter fraud.
4         Thousands of education employees around
5  this state, as well as state employees and other local
6  government employees, are concerned about budget cuts
7  being considered by this state legislature.  Those
8  individuals would prefer that this body consider
9  legislation that addresses our budgetary concerns rather
10  than debating voters' photos.
11        Thousands of private sector employees are
12  also concerned about jobs, as well they should be.
13  Rather than obsessing about voters' photos, they would
14  probably prefer that you consider legislation that

JA_001127

15  establishes a preference for state and local governments
16  to buy American products and services.
17          CHAIRMAN DUNCAN:  Thank you, Mr. Patrick.
18  Your time has expired.
19          Members, are there any questions of the
20  witness?
21          All right.  The Chair hears none.
22          We appreciate your appearance.
23          The Chair calls Anita Pruitt -- or
24  "Privitt."
25          Ms. Pruitt.
0498
1          TESTIMONY BY ANITA PRUITT
2          MS. PRUITT:  I'm Anita Pruitt.  I
3  represent the League of Women Voters of Texas.
4          For the 90-plus years since women gained
5  the right to vote nationally, LWV has educated and
6  agitated for active, informed participation of all
7  citizens in government.  No form of participation is
8  more important than voting.  We oppose any requirement
9  that imposes needless difficulties on voters or tends to
10  discourage legitimate voters from going to the polls and
11  casting a ballot.
12          Texas voters know that identification is
13  already required.  To close what is characterized as a
14  potential loophole for fraud, SB 14 would restrict
15  acceptable identification a voter must present to a
16  limited list of photo IDs and provide for criminal
17  penalties.  The real voting problem in Texas is not
18  potential voter impersonation but low voter turnout.
19  Texas was 46th among the states in turnout of the voter-
20  eligible population for 2008 and 50th for the 2010
21  general election.  No state had a lower turnout.
22          In each election cycle, League of Women
23  Voters fields hundreds of questions from voters around
24  the state.  These questions show that Texas voters are
25  often confused about requirements and discouraged from
0499
1  voting when they don't understand the process.  SB 14
2  would add uncertainties for voters and for election
3  workers.  The bill would make it more difficult for many
4  legitimate voters to cast a ballot and tend to
5  discourage many more legitimate voters from even going
6  to the polls.
7          Student voters would be among those
8  adversely affected.  Many students registered to vote in
9  Texas or eligible to register to vote under Texas law
10  might not have any of the voter IDs specified for SB 14.
11  Those who register to vote where they attend school may
12  fear that they will be turned away at the polls because
13  their documents don't match.
14          In a few years we will celebrate the 50th
15  anniversary of landmark civil rights legislation.  Now
16  we wonder how it could be so hard to have gotten that

TX_00001129
JA_001128
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001129

17  legislation passed.  I'm wondering now, if we pass this
18  legislation in Texas, how future generations will look
19  back at us.  Will they wonder why we did this or was it
20  a legitimate thing that we did?
21          The League of Women Voters of Texas
22  believes that this legislation is a backwards step, and
23  we ask you to oppose it.
24          CHAIRMAN DUNCAN:  Thank you, Ms. Pruitt.
25          Are there any questions of Ms. Pruitt?
0500
1           All right.  The Chair hears none.
2           We appreciate your appearance here today.
3           The Chair calls Jessica Gomez.
4           Please state your name and who you
5   represent.
6           TESTIMONY BY JESSICA GOMEZ
7           MS. GOMEZ:  Thank you, Mr. Chairman.  My
8   name is Jessica Gomez, and I'm here as a voting rights
9   specialist with Advocacy Incorporated, the protection
10  and advocacy system for people with disabilities in the
11  State of Texas.
12          I'm here today testifying in opposition on
13  behalf of Advocacy Incorporated, as well as the
14  Disability Policy Consortium, because of the large and
15  onerous burdens Senate Bill 14 would place on the number
16  of Texans with disabilities that do not have the photo
17  identification required by this bill.
18          An estimated 10 percent of people with
19  disabilities do not have photo identification.  In
20  Texas, that equals 257,800 voting age persons with
21  disabilities who do not have the photo identification
22  required by this bill.  People with disabilities are
23  less likely to have photo ID because many do not drive
24  and rely on others to assist them with activities such
25  as banking, that requires photo ID.
0501
1           I will not go through all of the burdens
2   upon people with disabilities to obtain an ID, since my
3   colleague, Chase Bearden, already outlined those for
4   you.  But I did want to urge all of you to consider an
5   exemption for people with disabilities in the State of
6   Texas who do not have an ID.
7           And this bill will likely pass, in light
8   of the burdens that it places on people with
9   disabilities.  I would urge you all to consider
10  throughout this session other ways that you might ease
11  the voting process for people with disabilities.  For
12  instance, a permanent mail-in ballot application,
13  enforcement of the National Voter Registration Act which
14  requires all state agencies, not just the Department of
15  Public Safety, to offer voter registration
16  opportunities, and expansion of the number of people a
17  person can assist in filing a late ballot on the basis
18  of a disability.

19          I stand ready to assist all of your
20  offices in thinking about the ways that this bill might
21  impact people with disabilities and ways that it can be
22  revised to benefit them.
23          Thank you.
24          CHAIRMAN DUNCAN:  Thank you, Ms. Gomez.
25          Are there any questions for the witness?
0502
1   All right.  The Chair hears none.
2           We appreciate your appearance here today.
3           Oh, I'm sorry, Senator Zaffirini.  I
4   didn't see it.
5           QUESTIONS FROM SENATE FLOOR
6           SEN. ZAFFIRINI:  That's all right.  Thank
7   you, Mr. Chairman.
8           Thank you so much for your testimony.  Did
9   you hear Mr. Bearden's testimony earlier?
10          MS. GOMEZ:  Yes, ma'am, I did.
11          SEN. ZAFFIRINI:  And you heard my question
12  when I asked him if he had specific amendments for this
13  particular bill that would help us cure it and make it
14  more positive, have a positive impact on persons with
15  disabilities who want to vote?
16          MS. GOMEZ:  Yes, I did.
17          SEN. ZAFFIRINI:  Do you have additional
18  suggestions or only the suggestions that you just
19  articulated?
20          MS. GOMEZ:  Well, those are suggestions
21  that would be in addition to this bill.  These would be
22  separate bills filed by senators.  In terms of an
23  exemption or an amendment for this bill, I would suggest
24  an affidavit that people with disabilities could sign
25  that would provide criminal penalties if they were to
0503
1   lie on that affidavit.
2           To further secure that process, you could
3   also require a fingerprint so that if that person did
4   vote fraudulently and then another person, the real
5   voter came in, you could run the fingerprints and
6   prosecute the original voter.
7           I would not support any amendments that
8   would require verification of the disability status,
9   because that would just again place another burden on
10  people with disabilities to prove their status in order
11  to vote.
12          SEN. ZAFFIRINI:  It would also add an
13  expense, wouldn't it?
14          MS. GOMEZ:  Sorry?
15          SEN. ZAFFIRINI:  It would also add an
16  expense?
17          MS. GOMEZ:  Absolutely.  And for many of
18  the reasons that Mr. Bearden outlined in his testimony,
19  because of the expenses of traveling and obtaining the
20  necessary documentation.

TX_00001131
JA_001130
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001131

21      SEN. ZAFFIRINI:  Well, how do you respond
22 to the person who will say, well, persons with
23 disabilities don't have to drive or get a ride to a
24 driver's license office or to DPS in particular, the
25 agency itself, to get a voter -- I mean, a photo ID,
0504
1 they can simply register on-line?  How do you respond to
2 that suggestion?
3      MS. GOMEZ:  I don't believe that there is
4 a process to make that readily available.  And, in
5 addition, there is such a high number of people with low
6 income who have disabilities that many of them might not
7 have access to computer or the Internet that would be
8 required to do that on-line.
9      SEN. ZAFFIRINI:  So you would worry about
10 a digital divide for persons with disabilities?
11      MS. GOMEZ:  Absolutely.
12      SEN. ZAFFIRINI:  Okay.  Thank you very
13 much.
14      MS. GOMEZ:  Thank you.
15      CHAIRMAN DUNCAN:  Thank you, Senator
16 Zaffirini.
17      Are there any other questions of
18 Ms. Gomez?
19      The Chair hears none.
20      Thank you very much.
21      The Chair calls Terri Burke.
22       TESTIMONY BY TERRI BURKE
23      MS. BURKE:  Good evening, senators.  I'm
24 Terri Burke.  I'm the Executive Director of the ACLU of
25 Texas.
0505
1      I'm here to talk about SB 14 in the
2 context of provisional ballots.  But I want to be
3 certain you know that we believe that Texas is overdue
4 for an overhaul of its election law, and we would
5 certainly support a comprehensive look at that.
6      More than two years ago, Attorney General
7 Abbott pledged to root out what he called an epidemic of
8 voter fraud in Texas.  He established a special unit in
9 his office.  He tapped $1.4 million in federal crime-
10 fighting grant money and dispatched legislators --
11 "legislators" -- yes, maybe that, too -- investigators.
12 In '08, the last time we heard about this, General
13 Abbott had prosecuted 26 cases, all involving blacks or
14 Hispanics.  All were committed by absentee ballot, not
15 in-person voting.  So how would photo voter ID have
16 addressed those lives?  SB 14 is still as it was in '09.
17 It is still a solution in search of a problem.
18      Provisional ballots are one of the
19 legislative priorities of the ACLU of Texas this
20 session.  We believe that these ballots were developed
21 to give the opportunities to voters to cast a
22 provisional ballot.  They were envisioned as fail-safe

23   voting protection for the voter to remedy faulty voter
24   lists.  What we're discovered in researching those in
25   Texas is that we have an extremely high rate of ballot
0506
1    rejections.  The average rate of rejection nationally is
2    20 percent; yet, in Texas, it's nearly 80 percent of the
3    provisional ballots cast, as least in the '08 election.
4    In other words, 42,000 Texas voters who cast provisional
5    ballots in 2008 saw most of those were not accepted.
6    9,400 were counted.
7         If passed, SB 14 will no doubt increase
8    the number of provisional ballots that are cast at the
9    polls and also will increase the number of votes that
10   are rejected, due to new identification requirements.
11   This bill would cost more Texas voters their legitimate
12   right to vote.  32,000 Texas voters were rejected in
13   2008.  That so many were rejected is a threat to our
14   representative democracy.  Texas ranked, as you've
15   heard, 50th in registered voter turnout for 2010.  We
16   cannot continue placing undue burdens on eligible voters
17   and keep a healthy democracy.
18        Thank you for your attention and thank you
19   for what you're doing for the State of Texas.
20        CHAIRMAN DUNCAN:  Thank you, Ms. Burke.
21        Are there any questions for Ms. Burke?
22        Okay.  The Chair hears none.  We
23   appreciate your appearance here today.
24        All right.  The next group of persons who
25   will need to be called into the chamber are Alfredo
0507
1    Esparza, Marcelo Tafoya, Barbara Baxter, Hector M.
2    Flores and Sergio Castillo.
3        All right.  Our next witness is Catherine
4    Englebrecht.
5        Ms. Engelbrecht, state your name and who
6    you represent.
7    TESTIMONY BY CATHERINE ENGELBRECHT
8        MS. ENGELBRECHT:  Hi.  My name is
9    Catherine Engelbrecht.  I'm with King Street Patriots
10   and True the Vote.  Thank you-all, senators, for the
11   privilege of being able to speak with you this evening.
12        I stand before you today to testify in
13   support of Senate Bill 14.  I'm President of King Street
14   Patriots, and I said earlier True the Vote, two
15   non-profit groups, both based out of Houston.  King
16   Street Patriots is a volunteer organization of concerned
17   citizens, and True the Vote is a citizen-led initiative
18   to protect the right to vote and the integrity of the
19   election process.
20        True the Vote volunteers work to educate
21   citizens and train other citizen volunteers to be poll
22   workers and poll watchers for their party, candidate or
23   issue.  Now, the reason that that is important is
24   because in the last election cycle, we put out trained

25  volunteers over 1,000 volunteers.  And through the
0508
1  course of the election cycle, they turned back in over
2  700 what we call incident reports.  Those incident
3  reports categorically were indications of election laws
4  being broken.  But many of the abuses stemmed from the
5  lax and ambiguous forms of identification currently
6  accepted at our polls.
7          These types of abuses would have been
8  mitigated had we had benefit of legislation like SB 14.
9  We witnessed numerous instances in which voters were in
10  possession of more than one registration card.  For
11  example, a voter came in with a registration card and
12  turned it over to the election judge, who looked at the
13  poll book and said, "Oh, I'm sorry.  You're already
14  voted."  And he reached into his other pocket and said,
15  "Oh, well, how about this card?"
16          "That's a good card.  You can vote that
17  one."
18          Another instance where a woman came in to
19  vote and was told she had already voted.  And she said,
20  "Well, that's not the case.  I haven't."  And she looked
21  at the poll book and there was staring back at her a
22  signature that she did not recognize.
23          Without photo identification, there is no
24  way to verify that a person is who they say they are, if
25  they are that person on the registration card, a utility
0509
1  bill or the check.  These examples are clearly
2  violations of election code law, but there is no
3  realtime recourse for a poll worker.  Poll workers are
4  obliged to allow these individuals to vote, to cast a
5  regular ballot, because the system does not prevent it.
6          Without photo identification, the evidence
7  of impropriety is limited only to a signature
8  comparison, which is typically considered insufficient
9  to warrant any further review.  And so when we often
10  ask, "Well, where are the prosecutions?" it's because
11  more often than not, they end with the signature
12  comparisons, and that's all we have.
13          So as these scenes play out in polling
14  places across our communities over and over again,
15  election cycle after election cycle, the message
16  communicated to both poll workers and to voters is:  The
17  rules don't really matter.  And if the rules don't
18  really matter, then how do we know that our election
19  results are right?  We are on a very slippery slope.
20  And the surest way to regain our footing is to restore
21  common sense to our election code.
22          CHAIRMAN DUNCAN:  Thank you,
23  Ms. Engelbrecht.
24          MS. ENGELBRECHT:  Thank you so much.
25          CHAIRMAN DUNCAN:  Senator Williams, do you
0510

TX_00001134
JA_001133
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001134

1  have a question?
2          QUESTIONS FROM SENATE FLOOR
3          SEN. WILLIAMS:  No.  I just wanted to
4  thank her for being here and for all the effort that her
5  group put into the last election cycle.  I really
6  appreciate what you guys are doing.
7          MS. ENGELBRECHT:  Thank you.
8          CHAIRMAN DUNCAN:  Thank you.
9          Any other questions?
10          Senator Patrick.
11          SEN. PATRICK:  Yes.  Thank you,
12  Mr. Chairman.
13          Catherine, thank you.  Senator Williams
14  said you did what so many people really wanted to have
15  done, and that was to put eyes on the election.  You
16  trained poll workers.  They stood there -- poll
17  watchers -- they identified; they reported.  You-all
18  stood up as citizens, fair and unbiased, and we
19  appreciate your work and your effort.
20          I met you just about a year ago, and you
21  were just a citizen, just a mom who, with your husband,
22  own your own business, that said, "I want to make a
23  difference," and I appreciate you and all the work that
24  those unheralded volunteers did.  Thank you very much.
25          MS. ENGELBRECHT:  Thank you.  Thanks to
0511
1  all of you.
2          CHAIRMAN DUNCAN:  Hold on a minute.  We've
3  got another questions.
4          Senator Van de Putte, did you have a
5  question?
6          SEN. VAN de PUTTE:  I sure did.  Thank
7  you, Mr. Chairman.
8          Thank you very much for coming and
9  especially for waiting so long.  But I wanted to
10  understand, because I'm from Bexar County and not from
11  Harris County where --
12          MS. ENGELBRECHT:  Sure.
13          SEN. VAN de PUTTE:  -- we love the people
14  to be involved.  But on the reports that we had from --
15  at least from the press, the group that you represent,
16  the King Street Patriots, it was an article about voter
17  intimidation.  And so I wanted to ask you, were the
18  districts, were the voting polling places that your
19  group believed were having the numerous amount of fraud,
20  where you were accusing several places of having voter
21  intimidation, mainly occur in minority district that
22  have been directed at Latinos and African- Americans, as
23  reported in the press?
24          MS. ENGELBRECHT:  That is all
25  unequivocally incorrect.
0512
1          SEN. VAN de PUTTE:  And so there --
2          MS. ENGELBRECHT:  May I?  I'll explain

TX_00001135
JA_001134
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001135

3   very quickly.  When we started the early election,
4   within just a few hours of the polls opening, we were
5   informed that a conference call, a press conference call
6   had been called by the Texas Democrat party, already
7   charging that there were 14 counts of voter
8   intimidation, with no backing whatsoever.  Well, the
9   press ran with that, and it was all over the place.
10          The county attorney later said -- and,
11   unfortunately, that didn't make it out to the press --
12   that there was, in fact, no voter intimidation.  And our
13   efforts were equally served over all 37 of the early
14   election polling places, so we did not single out any
15   community.
16          SEN. VAN de PUTTE:  So this was at all --
17   you had groups at all of the early voting places, it
18   wasn't just in the places that had minority, mainly
19   Latino or African-American?
20          MS. ENGELBRECHT:  That's correct.  We
21   had --
22          SEN. VAN de PUTTE:  Thank you for the
23   clarification.
24          MS. ENGELBRECHT:  Thank you.
25          CHAIRMAN DUNCAN:  Thank you, Senator Van
0513
1   de Putte.
2          Are there any other questions of the
3   witness?
4          All right.  Ms. Engelbrecht, thank you for
5   your testimony today.
6          The Chair calls Carol Kitson.
7          Ms. Kitson, please state your name and who
8   you represent.
9          TESTIMONY BY CAROL KITSON
10          MS. KITSON:  My name is Carol Kitson, and
11   I basically represent myself and, quite frankly, my
12   daughter.
13          This past November election, I was
14   appointed as an alternate judge in Harris County
15   precinct.  And we had the presiding judge, two clerks.
16   We did have two poll watchers at that location, and a
17   translator.
18          In the late afternoon, the presiding
19   judge's husband, who was acting as election clerk and
20   responsible for giving each voter a numerical code, to
21   allow activation of a voting machine, commented to the
22   poll watcher that the voter he had just given this code
23   to had voted earlier in the day at our location.  The
24   poll watcher agreed with this.
25          And I, too, had noted this same particular
0514
1   gentleman, because he had some very distinguishing
2   characteristics.  He had a very distinctive scar and
3   limited use of one arm.  I remembered seeing him earlier
4   in the day as a voter.  Of course, I don't remember what

5    name or what voter card he used.  And because we could
6    not possibly identify him -- we're not allowed to ask
7    for a photo ID -- he was able to vote for a second time.
8            This man was recognizable, but most people
9    would not be.  We would have no way of knowing during a
10   busy election how many people were coming back through.
11   It's absolutely impossible.
12           Requiring all voters to present a photo ID
13   would prevent individuals from voting more than once.
14   This is important because even a few votes per precinct
15   passed fraudulent can affect the outcome in an election.
16   In Falls County where there's 9,392 registered voters,
17   they had a 42 percent turnout.  In the Governor's race,
18   the difference was only 86 votes.
19           In Val Verde County, where they have
20   27,801 registered voters, they had a 26 percent turnout,
21   and the difference was only 377 votes.
22           And in Bexar County, a very large county,
23   registered voters of 905,859, they have 622 precincts,
24   and they had a 34 percent turnout.  The difference was
25   1,671 votes between the two candidates for Governor.
0515
1    That's less than three votes per precinct.
2            Each fraudulent votes cast diminishes all
3    of the valid votes cast.  Every legal voter in Texas
4    deserves to know that his or her vote was counted
5    correctly, and we need to know that the winner of our
6    elections is truly the winner and not elected because
7    some voters used illegal means to get their candidate
8    elected.  We owe this to ourselves and to the future
9    generations of Texans.
10           Thank you very much for letting me be here
11   today.
12           CHAIRMAN DUNCAN:  Thank you, Ms. Kitson.
13           Are there any questions for Ms. Kitson?
14           All right.  The Chair hears none.
15           You're excused.  Thank you very much.
16           The Chair calls Placido Salazar.
17           Thank you, Mr. Salazar.  You have three
18   minutes.  State your name and who you represent, please.
19           TESTIMONY BY PLACIDO SALAZAR
20           MR. SALAZAR:  Yes, sir.  Good evening,
21   first of all, to all of you and thank you for serving
22   our state.  My name is Placido Salazar.  I'm a Vietnam
23   veteran, 20-year man, and I'm the Civil Rights chair for
24   the Dr. Hector P. Garcia American GI Forum Organization
25   of Texas.
0516
1            And I would like to say that this whole
2    thing about voter ID as well as other measures currently
3    trying to be pushed through the state and federal
4    legislation is xenophobia at its worst, fearing that
5    immigrants will vote.  And I'm also a present chair in
6    Universal City, and we have enough trouble getting even

7    the registered U.S. citizen voters to the polls.  Last
8    election, out of a city of almost 20,000, and mostly
9    veterans who you would think would appreciate the
10   privilege to vote, like myself, we had 60 Democrats and
11   75 Republicans, and we are worried about illegal
12   immigrants coming to vote.  That's ludicrous.
13          The Dr. Hector P. Garcia American GI Forum
14   Organization of Texas, let it be known for the record
15   that we are totally opposed to the artificial emergency
16   grandstanding by Governor Rick Perry regarding the
17   non-issue of the Texas voter ID and other conveniently
18   selected self-promoting legislation.  This senseless and
19   costly voter ID legislation will not just affect
20   Hispanics but also students, seniors and others who are
21   unable to get around; people living in nursing homes,
22   for example.
23          This is nowhere nearly as important nor
24   affecting every citizen of our Great State of Texas as
25   the ballooning budget deficit of up to $27 billion and
0517
1    the ridiculous cuts in education funding, especially
2    when Texas is almost at the bottom of other states in
3    the education ratings and cannot afford to fire any
4    teachers.  Our teachers invested too much time and money
5    to fulfill their dreams of teaching our children.  Stop
6    playing politics with our students' and our teachers'
7    lives and funding.  Governor Perry, you were elected to
8    be governor of Texas.  Be a sensible, responsible
9    governor of Texas.
10          Some schools in Texas have a drop-out rate
11   of 70 percent; yet, our governor is running around the
12   country promoting his book, Fed Up.  Rick Perry, we are
13   fed up with the shameful number of student drop-out.  He
14   can't even take care of business in Texas; yet, he wants
15   to promote himself to Washington D.C.?  Give me a break!
16   We already had enough of that nonsense with your
17   predecessor.  He left Texas' financial situation in
18   shambles, then he really fixed our wagon in D.C.
19          Too many of our Hispanic-American troops
20   gave their lives and too many MIAs may never come home,
21   fighting for the democracy and the freedom, or so-called
22   freedom, of other peoples in other countries around the
23   world for this great veterans organization, the AGIF, to
24   allow Rick Perry or any other political leader to
25   trample over our civil rights.
0518
1          CHAIRMAN DUNCAN:  Mr. Salazar, your time
2    has expired.  I'll give you a little bit --
3          MR. SALAZAR:  Get rid of this legislation.
4    Thank you.
5          CHAIRMAN DUNCAN:  Thank you for your
6    testimony and for your wait here today.  Wait A minute.
7    There may be some questions.  I don't know.
8          Are there any questions of the witness?

9        All right.  The Chair hears none.

10       Thanks again for your appearance and your

11  testimony.

12       MR. SALAZAR:  Thank you, sir.

13       CHAIRMAN DUNCAN:  The Chair recognizes

14  "Riman" Pena.

15       Roman.  Okay.  It looks like an "i" to me.

16       State your name correctly, please, and who

17  you represent.

18       TESTIMONY BY ROMAN PENA

19       MR. PENA:  Mr. Speaker, thank you for your

20  kindness.

21       Senator Uresti -- my senator -- Senator

22  Van de Putte and senators and ladies and gentlemen, good

23  afternoon -- well, it's good night now.

24       My name is Roman Pena, also known as Vic

25  Pena.  And I am here today -- rather tonight --

0519

1  representing LULAC and the American GI Forum, who was

2  born of LULAC to represent soldiers returning from World

3  War II and wars thereafter.

4        As Vice Commander of the American GI

5  Forum, C.P. Garcia Chapter, and Texas LULAC Veterans

6  Affairs Chairperson, I'm very saddened as I sit here

7  listening to the author of this bill, Senator Fraser,

8  responding to your questions that he knows nothing of

9  how this new law will impact voters in Texas.  Many

10  years ago, then Senator Navarro wrote Sam Houston about

11  the Know Nothing party, and it wasn't nice.

12       Mr. Speaker, what is the real reason

13  behind this legislation?  To disenfranchise voters?

14  Which voters?  Fifty years ago, my generation -- and

15  some of you included -- had a vision to make Texas and

16  the United States of America a better place to live and

17  be happy and share the American dream.  And, my fellow

18  Texans, we succeeded, because we walked in the valley of

19  darkness and feared no evil, for great men and women

20  like yourselves said, "Enough is enough," ya basta!

21       Today some members of your generation are

22  trying to return Texas back to those dark ages.  I beg

23  of you to defeat this mean-spirited legislation, let not

24  the flesh overcome the spirit for it is said that the

25  fulfillment of the prophecy is at hand.

0520

1        Thank you, and have a good day.  And tear

2  down this bill, Mr. Speaker.

3        CHAIRMAN DUNCAN:  Well, thank you,

4  Mr. Pena.

5        Sen. Van de Putte, do you have a question?

6        CONDOLENCES FROM SENATE FLOOR

7        SEN. VAN de PUTTE:  Just for the witness.

8        Mr. Pena, we understand that you have just

9  experienced a personal loss.

10       MS. PINZUR:  Yes, I sure have.

11          SEN. VAN de PUTTE:  So on behalf of the
12  Texas Senate, let me offer condolences on the death of
13  your wife, and so recently, and your patriotism and
14  belief in your government to come and testify when you
15  yourself had such a personal loss so quickly.  Please
16  note our condolences on the passing of your beautiful
17  wife.
18          MR. PENA:  I accept your condolences,
19  Senator.
20          Thank you very much.  Is there any
21  questions?
22          CHAIRMAN DUNCAN:  Any more questions?
23          The Chair hears none.
24          Thank you, Mr. Pena.  Appreciate it.  And
25  sorry for your loss.
0521
1          MR. PENA:  Thank you.
2          CHAIRMAN DUNCAN:  The Chair calls Rosa
3  Rosales, National Alliance for Education and Equity, and
4  LULAC.
5          State your name, please, and who you
6  represent.
7          TESTIMONY BY ROSA ROSALES
8          MS. ROSALES:  Honorable senators, ladies
9  and gentlemen, my name is Rosa Rosales.  I'm here today
10  representing the National Alliance for Education and
11  Equity -- and Equality -- and, of course, as an
12  immediate past national president of the League of
13  United Latin American Citizens, the oldest and the,
14  largest Latino organization in the nation that was
15  founded to eradicate discrimination of any shape and
16  form.
17          I am here today to voice strong opposition
18  to SB 14, voter ID.  At a time when the State of Texas
19  is having to deal with a $27 billion deficit and,
20  therefore, having big cuts in social services, health
21  care, education -- and higher education, this voter
22  education bill should not be a priority.  This is not a
23  quality-of-life legislation for the State of Texas for
24  all of us.
25          As a matter of fact, the bill will
0522
1  actually create unnecessary barriers for the elderly,
2  minorities and the working poor.  Texas has a history of
3  voter discrimination, as you have heard it here by many
4  that have testified.  If the law is enacted, it would
5  primarily affect minorities and the elderly.  The bill
6  would actually regress the State of Texas to the days of
7  the poll tax.  Voters, especially the working poor and
8  the elderly and women, will return -- or not return to
9  the county department, the voter registration county, to
10  provide the required identification within six days to
11  cure the provisional vote and the problem that we've had
12  with provisional votes here in the State of Texas.  Most

TX_00001140

JA_001139
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

13  of them, a very high percentage, are rejected to begin
14  with.
15          The implementation of this bill will cause
16  the State of Texas a substantial amount of money.  It's
17  been estimated $2 -- $2 million.  That money could
18  actually be put to a better use, to address the
19  immediate needs of the State of Texas where every single
20  dollar is put into education.  You know, higher
21  education, health care, nursing homes, social services,
22  instead of a voter ID bill, especially the State of
23  Texas, I have been told, is in the last place of all the
24  states in the United States when it comes to education.
25  What a shame.
0523
1           Finally, this SB 14, voter ID, is most
2  likely to violate Section 5 and Section 2 of the Federal
3  Voting Rights Act.  LULAC is ready and prepared to take
4  any action, whether it be legal action tomorrow, if it
5  does violate the Voting Rights Act.
6           Thank you so much.
7           CHAIRMAN DUNCAN:  Thank you very much.
8           Are there any questions for Ms. Rosales?
9           The Chair hears none.
10          Thank you for your testimony.
11          All right.  We're ready for our next
12  panel.  But before that, let me announce the last group.
13  Amalia Martinez, Fidel Acevedo, Ray Rodgers, Gordon
14  Quan, Rachel Delgado and Sandra Crenshaw.
15          Okay.  The Chair calls Alfredo Esparza
16  with LULAC.
17          State your name and who you represent,
18  please.
19          TESTIMONY BY ALFREDO ESPARZA
20          MR. ESPARZA:  My is Alfredo Esparza.  I'm
21  for LULAC, District 15, San Antonio, Texas.  I'm on
22  behalf of senior citizens in Bexar County, which I
23  represent.
24          And the reason that I'm here today, I
25  think this SB 14 is a bill that's very bad for senior
0524
1  citizens.  And the reason, can you imagine if your
2  mother is 70 or 80 years old, trying to go and get an
3  ID?  Are you going to take her or your son or your
4  daughter or his grandson?  I don't believe so, because I
5  work with seniors citizens every day.  And you know
6  what?  It's a hardship just to go to get their needs and
7  their groceries or their medications.
8           And we come in as LULAC to help our senior
9  citizens.  Now, just think, there is a hardship for
10  senior citizens to go and get a new ID just to vote.  A
11  lot of senior citizens vote, but this bill will make it
12  a real hardship problem to senior citizens, especially
13  those that are on disability or SSI.  It's hard for them
14  to get around.

15          After you pass 60 or 65 like me, you think
16   about where you're going and where you need to be.  And
17   I don't know about you, but I know as a fact that here
18   in Texas, it's not proper for bills like this to pass,
19   and that's why I'm here to testify about it.
20          Thank you very much.
21          CHAIRMAN DUNCAN:  Thank you, Mr. Esparza.
22          Are there any questions for Mr. Esparza?
23          The Chair hears none.
24          Thank you for your testimony today.
25          The Chair calls Marcelo Tafoya.
0525
1          Mr. Tafoya, please state your name and who
2   you represent.
3          TESTIMONY BY MARCELO TAFOYA
4          MR. TAFOYA:  My name is Marcelo Tafoya.
5   Good afternoon.  I am the District 12 director for
6   LULAC, the League of United Latin American Citizens.  I
7   also represent the CCC, the Coalition of Community
8   Concerns.  And the biggest concern we have is
9   discrimination, especially in voting.
10          A couple of years ago, I was pleased to
11   join some gentlemen that came down from the Justice
12   Department looking into voter fraud and voter
13   discrimination.  They found no voter fraud, but they
14   found six cases of voter discrimination against the
15   Hispanic community.  In cases where an Hispanic
16   individual came up, and they gave them 45 minutes,
17   because they had nobody there, to interpret for them on
18   the voting process.  A lady sat there for 45 minutes in
19   a wheelchair waiting for somebody to come down from the
20   county.
21          This is only one.  There were several
22   others that were turned away because they said that they
23   had broken in front of the line.  You know, I don't
24   understand a lot of the issues that was brought up at
25   the time, but it just happened to be a Spanish when all
0526
1   these things were occurring.
2          Now, as far as being handicapped, I find
3   an issue with cost.  Okay?  I'm on a fixed income.  I'm
4   pretty fortunate that I have my driver's license for a
5   long time ago so I get it through the mail.  Okay?  I
6   don't have to go take a test anymore.  Maybe later on,
7   they find out that I testified, they will probably call
8   me in to go take a test, check my eyes, do the whole
9   process.  Right?  But I don't care.  I'm willing to do
10   that or whatever it takes to defeat a bill that is
11   unnecessary.  Why do you have to try to fix something
12   that is working?
13          No. 2, why do you take this bill on today
14   when our children are failing in school?  Look, I'm
15   worried about my grandchildren, my great-grandchildren
16   that are not getting educated, that we're lacking the

TX_00001142
JA_001141
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001142

17  money that it takes to educate our children properly.
18  Why don't you take something up like that instead of
19  worrying about somebody getting you elected again in
20  this process?  So please defeat this bill, let's get
21  busy with the rule, let's get some money into the
22  caucus.  Let's don't be spending it uselessly, spending
23  it for no reason whatsoever and start putting it where
24  it belongs, the education of our children and the
25  welfare of our community.
0527
1           I want to thank y'all very much.  God
2  love!
3           CHAIRMAN DUNCAN:  Thank you, Mr. Tafoya.
4  Hold on just a second.
5           Are there any questions for Mr. Tafoya?
6           All right.  The Chair hears none.
7           Thank you for your testimony.
8           The Chair calls Hector M. Flores.
9  Mr. Flores, please state your name and who you
10  represent.
11          TESTIMONY BY HECTOR M. FLORES
12          MR. FLORES:  Governor, Mr. Chairman,
13  members of the Senate, my name is Hector Flores.  I'm
14  from Duncanville, Texas, and I'm here to represent the
15  Texas League of United Latin American Citizens known as
16  LULAC, and I'm here to give opposition to this bill.
17          With a budget shortfall and many other
18  issues confronting Texas during these hard economic
19  times, we cannot understand why voter ID is such an
20  urgent matter for the Texas Legislature.  LULAC has
21  voted unanimously to oppose this bill, and we ask you
22  also to protect the voting rights of all citizens of
23  Texas but also ask you to protect the voting rights of
24  the Latino voters, as mandated by Section 5 and Section
25  2 of the Voting Rights Act.
0528
1           Specifically, LULAC argues against the
2  passage of any voter identification bill until such time
3  as Texas can guarantee zero tolerance of voter
4  discrimination and implement all protection of the Civil
5  Rights Act as ordered by the Supreme Court.  Given the
6  history of Texas, this will be a long time in coming.
7           In 2005, 2006 and 2007, the Voting Rights
8  sections of the Department of Justice filed 10 separate
9  lawsuits against Texas.  All 10 suits were for
10  discrimination against Mexican-Americans, and one of the
11  suits involved discrimination against Mexican-Americans
12  and African-Americans combined.
13          There was also a separate lawsuit in
14  Harris County for discrimination against Vietnamese-
15  Americans.  All suits were successful against Texas, and
16  Texas entered into consent -- agreements to correct
17  discriminations.
18          During the same period, several suits were

19  brought by LULAC and MALDEF against Texas and also
20  against several government entities, in particular in my
21  hometown of Dallas, in Farmers Branch and in Irving,
22  Texas.  And, obviously, in LULAC vs. Perry, the Supreme
23  Court found that Texas purposely discriminated against
24  Mexican-Americans in Congressional District 23 in
25  San Antonio where I come from.

0529
1           I have five pages, but I will only try to
2  synopsize.  In light of the fact that the proposed bill
3  brought forward by the Texas Legisl- -- the Senate, it's
4  likely to violate both Sections 5 and Section 2 of the
5  Federal Voting Rights Act.  LULAC urges you not to adopt
6  the proposed bill as is.
7           And, as you know, LULAC has participated
8  in over 400 court-ordered elections in Texas since
9  adoption of the Voting Rights Act, and we will
10  vigorously challenge any voter ID bill.  We're also, as
11  has been mentioned earlier, ready to pursue an objection
12  before the Voting Rights section of the Department of
13  Justice, if necessary.  But we hope that there are many
14  options that you can take, but the first one you can
15  take is not to support this bill.
16           I thank you very much for listening to me
17  tonight, and I hope you will do the right thing.
18           CHAIRMAN DUNCAN:  Senator Gallegos, do you
19  have a question?
20           QUESTIONS FROM SENATE FLOOR
21           SEN. GALLEGOS:  Yes.
22           Mr. Flores, let me ask -- and then I heard
23  you when you testified in Dallas and you were on the
24  redistricting hearing, and you were knowledgeable about
25  voting rights and all that.  I heard your testimony

0530
1  today.  I was wondering, were you in the chamber when
2  Prof. Tijerina testified?
3           MR. FLORES:  Absolutely.
4           SEN. GALLEGOS:  You heard his testimony?
5           MR. FLORES:  Yes, I did.
6           SEN. GALLEGOS:  Okay.  Let me ask you,
7  hearing his testimony and the history of discrimination
8  against Mexican-Americans as far as voting here in the
9  State of Texas, do you agree with his testimony?
10           MR. FLORES:  Yes, I do.  In fact, the
11  first time that I voted, I had to go get a poll tax to
12  vote, when I turned of age.  And so I had to decide
13  whether I was going to go to the movies that weekend or
14  go vote.  And so, you know, it's a way to keep people
15  from voting, in my opinion.  And, of course, that's one
16  of the reasons we did away with the poll tax in Texas.
17           SEN. GALLEGOS:  So in your opinion, the
18  incidents that Prof. Tijerina pointed out in his
19  testimony -- and you've heard all of them; you heard all
20  of them -- that it leads up to discrimination that is

TX_00001144

JA_001143
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001144

21  part of the history of the State of Texas to present.
22  How would you compare that to Senate Bill 14 that's on
23  the floor today?
24          MR. FLORES:  Well, I'm not only expert on
25  the bill, but I understand that there's still much
0531
1  desired to be done to fix this bill so perhaps it might
2  comply into the future.  Obviously, this is going to be
3  just an obstacle for the elderly, for handicapped
4  people, but also for minorities who may not have an ID
5  to begin with.  And I would venture to say that both my
6  grandmothers -- and I'm a fifth generation Tejano --
7  both of my grandmothers didn't go around with their ID.
8  And, you know, this is going to be a problem and it's
9  going to keep people from voting.  I don't think it's
10  the right way to go for Texas.
11          SEN. GALLEGOS:  Mr. Flores, thank you for
12  coming to testify.  Thank you.
13          MR. FLORES:  Thank you, Senator.
14          CHAIRMAN DUNCAN:  Senator West, for what
15  purpose?
16          SEN. WEST:  Just one question.
17          Hector, how you doing?
18          MR. FLORES:  I got up at 4:30 this
19  morning.  They sequestered me over there.  They told me
20  I might be here till 8 o'clock in the morning like the
21  last time.  I said, "Absolutely not.  I got to go work
22  in the morning."
23          SEN. WEST:  Well, thank you very much for
24  coming down.  I really do appreciate it.
25          MR. FLORES:  My pleasure.
0532
1          SEN. WEST:  You know, during the earlier
2  conversation that I was having with Senator Fraser, he
3  was saying that people in our district are supportive of
4  this voter ID bill.  Now, you've lived in that district
5  for as long as I have.
6          MR. FLORES:  Thirty-eight years.
7          SEN. WEST:  In fact, we kind of live
8  pretty much around the corner from one another?
9          MR. FLORES:  Yes, sir.
10          SEN. WEST:  And you have worked in that
11  district as an activist for years.  Is that correct?
12          MR. FLORES:  Yes, sir.
13          SEN. WEST:  So you have opportunities to
14  talk to people in the district.  Is it a fair
15  statement -- is that a fair statement that was made by
16  my friend, Senator Fraser, that the bulk of people in
17  the 23rd senatorial district favor this voter ID bill?
18          MR. FLORES:  I don't think so.
19          SEN. WEST:  Okay.  Thank you very much.
20          MR. FLORES:  Thank you, sir.
21          Mr. Chairman.
22          CHAIRMAN DUNCAN:  Thank you for your

23   testimony.
24          Are there any other questions of the
25   witness?
0533
1          All right.  The Chair hears none.
2          Appreciate your testimony today.
3          MR. FLORES:  Thank you very much.
4          CHAIRMAN DUNCAN:  Fidel Acevedo.
5          TESTIMONY BY FIDEL ACEVEDO
6          MR. ACEVEDO:  Thank you, Mr. Speaker,
7   senators.  My name is Fidel Acevedo, and I'm here to
8   testify on Senate Bill 14.  It seems like a long way
9   from the last time we had to do this, but we have to do
10  it all over again.  It seems like history repeats
11  itself.  We can't just get away from it right away.  We
12  just have to keep right on doing it until we do the
13  right thing.
14          I think the GOP has the right idea about
15  doing some things repeatedly.  Certainly this senate
16  bill is not one of them.  I have to tell the senate
17  chamber here today that I have to excuse myself from --
18  refrain from using some harsh language that's coming
19  from San Antonio District 14, the Fighting 14, and my
20  senator, they're listening to me, I have to be
21  respectful to each and every one of you.
22          However, it does merit saying that this
23  bill, as the gentleman testified earlier as an expert,
24  it is discriminatory to say the least.  It will continue
25  the tradition here in the State of Texas of doing just
0534
1   that.  "Some way, somehow, we're going to keep
2   Mexican-Americans from voting."  It is not like if, over
3   there in Horseshoe Bay, that the Mexicans are just
4   getting ready to go over there and remove Senator
5   Fraser.  Huh?  I don't think so.  That's not going to
6   happen.
7          But as I slow down just a little bit, just
8   to think of what tremendous work you guys do, let's put
9   the priorities right.  I have to tell you -- and I must
10  say this -- that our priorities are wrong here in the
11  chamber right now.  Education, education, jobs, jobs,
12  the economy.  The photo ID can wait if we must have to
13  go that route.  But it's jobs, education for our
14  children.  That is the priority.
15          I think maybe somebody had heartburn and
16  the Governor had to say, "We have to have an emergency
17  session for this particular one," or maybe perhaps the
18  Lt. Governor had to follow up and say, "Hey, look!  This
19  is a valid emergency.  We ought to put it in the
20  priority first time out, first thing out, have to come
21  out of the chute is this bill."
22          Please help defeat this bill.  I know
23  that's an impossibility, but at least it's -- I'm an
24  optimist, and I hope that you guys can do the right

TX_00001146
JA_001145
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001146

25  thing.  Thank you.
0535
1              CHAIRMAN DUNCAN:  Thank you.
2              Are there any questions for the witness?
3              All right.  The Chair hears none.
4              We appreciate your appearance here today.
5              MR. ACEVEDO:  Thank you.
6              CHAIRMAN DUNCAN:  Members, we have some
7  cards of some persons who registered that they would
8  like to testify but did not respond to the call, but
9  I'll read their names once again.  Ray Rodgers, Gordon
10  Quan, Rachel Delgado, Sandra Crenshaw, Clifford Gay,
11  Barbara Baxter, Sergio Castillo, Amalia Martinez of
12  Austin, Texas, LULAC 12.
13              The doorkeeper will check once again.
14  These cards will be placed in the record, that they have
15  appeared and they have registered their position.
16              Is there anyone else who would wish to
17  testify on, for or against Senate Bill 14.
18              All right.  The Chair hears none.
19              Senator West?
20              SEN. WEST:  Mr. Chairman, I would like to
21  put in Exhibit No. 13, which is the League of United
22  Latin American Citizens' objections and arguments
23  against the voter identification bill.
24              CHAIRMAN DUNCAN:  What's the exhibit
25  number?
0536
1              SEN. WEST:  Twelve.
2              CHAIRMAN DUNCAN:  Twelve.  Exhibit 12.  Is
3  there any objection?
4              Exhibit 12 will be received.
5              (Exhibit No. 12 marked and admitted)
6              CHAIRMAN DUNCAN:  There being no public
7  testimony coming forward -- or no additional public
8  testimony coming forward, the public testimony is
9  closed.
10              Senator Fraser, you're recognized for a
11  motion.
12              MOTION BY SENATOR FRASER
13              SEN. FRASER:  Mr. President, I would now
14  move that Senate Bill 14 be reported to the Senate, with
15  a recommendation that it do pass and be printed.
16              CHAIRMAN DUNCAN:  The Secretary will call
17  the roll.
18              ROLL CALL FOR VOTE ON SENATE BILL 14
19              SECRETARY SPAW:  Birdwell?
20              SEN. BIRDWELL:  (Indicated "yea" vote)
21              SECRETARY SPAW:  Carona?
22              SEN. CARONA:  (Indicated "yea" vote)
23              SECRETARY SPAW:  Davis?
24              SEN. DAVIS:  (Indicated "nay" vote)
25              SECRETARY SPAW:  Deuell?
0537

TX_00001147
JA_001146
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001147

| | |
|---|---|
| 1 | SEN. DEUELL:  (Indicated "yea" vote) |
| 2 | SECRETARY SPAW:  Duncan? |
| 3 | CHAIRMAN DUNCAN:  (Indicated "yea" vote) |
| 4 | SECRETARY SPAW:  Ellis? |
| 5 | SEN. ELLIS.  (Indicated "nay" vote) |
| 6 | SECRETARY SPAW:  Eltife? |
| 7 | SEN. ELTIFE:  (Indicated "yea" vote) |
| 8 | SECRETARY SPAW:  Estes? |
| 9 | SEN. ESTES:  (Indicated "yea" vote) |
| 10 | SECRETARY SPAW:  Fraser? |
| 11 | SEN. FRASER:  (Indicated "yea" vote) |
| 12 | SECRETARY SPAW:  Gallegos? |
| 13 | SEN. GALLEGOS:  (Indicated "nay" vote) |
| 14 | SECRETARY SPAW:  Harris? |
| 15 | SEN. HARRIS:  (Indicated "yea" vote) |
| 16 | SECRETARY SPAW:  Hegar? |
| 17 | SEN. HEGAR:  (Indicated "yea" vote) |
| 18 | SECRETARY SPAW:  Hinojosa? |
| 19 | SEN. HINOJOSA:  (Indicated "nay" vote) |
| 20 | SECRETARY SPAW:  Huffman? |
| 21 | SEN. HUFFMAN:  (Indicated "yea" vote) |
| 22 | SECRETARY SPAW:  Jackson? |
| 23 | SEN. JACKSON:  (Indicated "yea" vote) |
| 24 | SECRETARY SPAW:  Lucio? |
| 25 | SEN. LUCIO:  (Indicated "nay" vote) |

0538

| | |
|---|---|
| 1 | SECRETARY SPAW:  Nelson? |
| 2 | SEN. NELSON:  (Indicated "yea" vote) |
| 3 | SECRETARY SPAW:  Nichols? |
| 4 | SEN. NICHOLS:  (Indicated "yea" vote) |
| 5 | SECRETARY SPAW:  Ogden? |
| 6 | SEN. OGDEN:  (Indicated "yea" vote) |
| 7 | SECRETARY SPAW:  Patrick? |
| 8 | SEN. PATRICK:  (Indicated "yea" vote) |
| 9 | SECRETARY SPAW:  Rodriguez? |
| 10 | SEN. RODRIGUEZ:  (Indicated "nay" vote) |
| 11 | SECRETARY SPAW:  Seliger? |
| 12 | SEN. SELIGER:  (Indicated "yea" vote) |
| 13 | SECRETARY SPAW:  Shapiro? |
| 14 | SEN. SHAPIRO:  (Indicated "yea" vote) |
| 15 | SECRETARY SPAW:  Uresti? |
| 16 | SEN. URESTI:  (Indicated "nay" vote) |
| 17 | SECRETARY SPAW:  Van de Putte? |
| 18 | SEN. VAN de PUTTE:  (Indicated "nay" vote) |
| 19 | SECRETARY SPAW:  Watson? |
| 20 | SEN. WATSON:  (Indicated "nay" vote) |
| 21 | SECRETARY SPAW:  West? |
| 22 | SEN. WEST:  (Indicated "nay" vote) |
| 23 | SECRETARY SPAW:  Whitmire? |
| 24 | SEN. WHITMIRE:  (Indicated "nay" vote) |
| 25 | SECRETARY SPAW:  Williams? |

0539

| | |
|---|---|
| 1 | SEN. WILLIAMS:  (Indicated "yea" vote) |
| 2 | SECRETARY SPAW:  Zaffirini? |

3      SEN. ZAFFIRINI:  (Indicated "nay" vote)
4      SECRETARY SPAW:  Wentworth?
5      SEN. WENTWORTH:  (Indicated "yea" vote)
6      SECRETARY SPAW:  West?
7      SEN. WEST:  (Indicated "nay" vote)
8      SECRETARY SPAW:  Whitmire?
9      SEN. WHITMIRE:  (Indicated "nay" vote)
10      SECRETARY SPAW:  Williams?
11      SEN. WILLIAMS:  (Indicated "yea" vote)
12      SECRETARY SPAW:  Zaffirini?
13      SEN. ZAFFIRINI:  (Indicated "nay" vote)
14      SECRETARY SPAW:  Governor Dewhurst?
15      PRESIDENT DEWHURST:  (Indicated "yea"
16  vote)
17      CHAIRMAN DUNCAN:  There being 20 ayes, 12
18  nays, Senate Bill 14 will be favorably reported to the
19  Senate, with the recommendation that it do pass and be
20  printed.
21      The Chair recognizes Senator Wentworth for
22  a motion.
23      SEN. WENTWORTH:  Mr. President, I move
24  that the Committee of the Whole Senate rise and
25  report -- Mr. Chairman, I should say.
0540
1      CHAIRMAN DUNCAN:  Is there any objection
2  to the motion?
3      The Chair hears none.  It's so ordered.
4      PRESIDENT DEWHURST:  Good job.  Thank you.
5      (Conclusion of hearing before Committee Of
6  the Whole at 9:19 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
0541
1          C E R T I F I C A T E
2  STATE OF TEXAS   )
3  COUNTY OF TRAVIS  )
4      WE, Kim Pence, Aloma J. Kennedy and Lorrie

TX_00001149
JA_001148
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001149

5  A. Schnoor, Certified Shorthand Reporters in and for the
6  State of Texas, do hereby certify that the above-
7  mentioned matter occurred as hereinbefore set out.
8       WE FURTHER CERTIFY THAT the proceedings of
9  such were reported by us or under our supervision, later
10  reduced to typewritten form under our supervision and
11  control and that the foregoing pages are a full, true
12  and correct transcription of the original notes.
13       IN WITNESS WHEREOF, WE have hereunto set
14  our hand and seal this 7th day of February 2011.
15
16
17

18          _____
            Kim Pence
            Certified Shorthand Reporter
19          CSR No. 4595 - Expires 12/31/11
20          Firm Registration No. 276
            Kennedy Reporting Service, Inc.
21          8140 North Mo-Pac Expressway
            Suite II-120
22          Austin, Texas 78759
23
24
25
0542
1
2
3
4          _____
           Aloma J. Kennedy
5          Certified Shorthand Reporter
           CSR No. 494 - Expires 12/31/12
6
           Firm Registration No. 276
7          Kennedy Reporting Service, Inc.
           8140 North Mo-Pac Expressway
8          Suite II-120
           Austin, Texas 78759
9
10
11
12
13
           _____
14         Lorrie A. Schnoor
           Certified Shorthand Reporter
15         CSR No. 4642 - Expires 12/31/11
16         Firm Registration No. 276
           Kennedy Reporting Service, Inc.
17         8140 North Mo-Pac Expressway
           Suite II-120
18         Austin, Texas 78759
19

TX_00001150
JA_001149
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001150

20
21
22
23
24
25

TX_00001151
JA_001150
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001151

# MINUTES

## SENATE COMMITTEE ON COMMITTEE OF THE WHOLE SENATE
Tuesday, January 25, 2011
8:00 AM
Senate Chamber

\*\*\*\*\*

Pursuant to a notice posted in accordance with Senate Rule 11.10 and 11.18, a public hearing of the Senate Committee on Committee of the Whole Senate was held on Tuesday, January 25, 2011, in the Senate Chamber.

\*\*\*\*\*

**MEMBERS PRESENT:**                                **MEMBERS ABSENT:**
Lt. Governor David Dewhurst
Senator Brian Birdwell
Senator John Carona
Senator Wendy Davis
Senator Bob Deuell
Senator David Dewhurst
Senator Robert Duncan
Senator Rodney Ellis
Senator Kevin Eltife
Senator Craig Estes
Senator Troy Fraser
Senator Mario Gallegos, Jr.
Senator Chris Harris
Senator Glenn Hegar
Senator Juan Hinojosa
Senator Joan Huffman
Senator Mike Jackson
Senator Eddie Lucio, Jr.
Senator Jane Nelson
Senator Robert Nichols
Senator Steve Ogden
Senator Dan Patrick
Senator Jose Rodriguez
Senator Kel Seliger

**Senate Committee on Committee of the Whole Senate**
Minutes
Tuesday, January 25, 2011
Page 2

Senator Florence Shapiro
Senator Carlos Uresti
Senator Leticia Van de Putte
Senator Kirk Watson
Senator Jeff Wentworth
Senator Royce West
Senator John Whitmire
Senator Tommy Williams
Senator Judith Zaffirini

*****

Pursuant to the passage of Senate Resolution 79 on Monday, January 24, 2011, Senator Robert Duncan called the Committee of the Whole Senate to order at 12:37 p.m.  There being a quorum present, the following business was transacted:

Senator Duncan recognized Senator Fraser on SB 14, relating to the requirements to vote, including presenting proof of identification; providing criminal penalties.  Debate on SB 14 resumed.

Senator Zaffirini moved to enter exhibit #4 into the record (Texas drivers photo identification of Reymundo Martinez).  Without objection, the motion was adopted by unanimous consent.

Senator Zaffirini moved to enter exhibit #5 into the record (Spencer Overton letter).  Without objection, the motion was adopted by unanimous consent.

At 2:18 p.m., Senator Duncan announced that the Committee of the Whole would stand at ease.

At 2:32 p.m., the Committee of the Whole resumed discussion on SB 14.

Senator Van de Putte moved to enter exhibit #6 into the record (Texas Legislative Council map).  Without objection, the motion was adopted by unanimous consent.

Senator Davis moved to enter exhibit #7 into the record (flow chart of the photo identification process).

Senator Fraser moved to enter exhibit #8 into the record (Lighthouse Opinion Poll).

**Senate Committee on Committee of the Whole Senate**
Minutes
Tuesday, January 25, 2011
Page 3

Senator Duncan called the following persons to provide invited testimony on SB 14 (see attached list).

Senator Eltife assumed presiding duties at 3:57 p.m.

Senator Duncan resumed presiding duties at 4:13 p.m.

Senator Eltife assumed presiding duties at 4:23 p.m.

Senator Duncan resumed presiding duties at 4:48 p.m.

At 5:28 p.m., Senator Duncan announced that the Committee of the Whole would stand at ease.

At 5:45 p.m., the Committee of the Whole resumed testimony on SB 14.  Senator Duncan recognized resource witnesses to respond to questions from members.

Senator Duncan announced that exhibit #9 (Rebecca Davio DPS map) would be entered into the record.

Senator Eltife assumed presiding duties at 5:55 p.m.

Senator Duncan resumed presiding duties at 6:07 p.m.

Senator Deuell assumed presiding duties at 7:25 p.m.

Senator Duncan resumed presiding duties at 7:32 p.m.

Senator West entered exhibit #10 into the record (Letter from Texas Congressional Democrats opposing SB 14).  Without objection, the motion was adopted by unanimous consent.

Senator Duncan called the following persons to provide public testimony on SB 14 (see attached witness list).

With no other witnesses registered, Senator Duncan moved that public testimony be closed. Without objection, it was so ordered.

**Senate Committee on Committee of the Whole Senate**
Minutes
Tuesday, January 25, 2011
Page 4

Senator Van de Putte entered exhibit #11 into the record (Testimony from Lydia Camarrio, Vice President, of the Southwest Voter Registration Education Project). Without objection, the motion was adopted by unanimous consent.

Senator West entered exhibit #12 into the record (Letter from LULAC regarding opposition to SB 14). Without objection, the motion was adopted by unanimous consent.

Senator Fraser moved that SB 14 be reported to the Senate with the recommendation that it do pass and be printed. The motion carried with a record vote of 20 ayes, 12 nays, 0 absent and 0 present not voting.

Senator Duncan recognized Senator Wentworth at 9:18 p.m., who moved that the Committee of the Whole Senate rise and report progress. Without objection, it was so ordered.

_____
Senator Robert Duncan, Chair

_____
Patsy Spaw, Secretary of the Senate

# SENATE

## NOTICE OF PUBLIC HEARING

COMMITTEE:      Committee of the Whole Senate

TIME & DATE:    8:00 AM, Tuesday, January 25, 2011

PLACE:          Senate Chamber

---

** PLEASE NOTE THAT THE SENATE WILL CONVENE AT 8:00 A.M.

Upon adoption of the appropriate motion, the Senate will resolve into the Committee of the Whole Senate to consider the following:

SB 14      Fraser/et al.

Relating to requirements to vote, including presenting proof of identification; providing criminal penalties.

The Committee will hear invited and public testimony on SB 14.

At 11:00 a.m., the Senate will reconvene to consider miscellaneous resolutions.

Upon completion of the Senate's business, the Senate will once again resolve into the Committee of the Whole and testimony will resume.

Interested parties may appear and provide written or oral testimony by submitting a witness affirmation card.  Persons wishing to submit written testimony must provide 40 copies with their witness affirmation card.

Witness affirmation cards will be available at 7:30 a.m. on the day of the hearing at the Witness Registration Desk located in front of the Senate Chamber on the 2nd Floor of the Capitol.

Witnesses and the public are invited to observe the proceedings of the Committee from the Senate Gallery on the 3rd Floor.  Witnesses who have registered to testify will have their names called by the Chair at least 5 minutes before they are scheduled to appear.  As names are called, witnesses should check in at the Witness Registration Desk for admission into the Senate Chamber for their testimony.

For any questions regarding the hearing, please contact Patsy Spaw (512) 463-0100.

---

TX_00002679

WITNESS LIST

Committee of the Whole Senate
January 25, 2011 8:00 AM

SB 14
    FOR:

           Bonnet, Jerry    General Counsel (Office of the Indiana Secretary of State), Indianapolis, IN
           Engelbrecht, Catherine   (King Street Patriots/True the Vote), Richmond, TX
           Kitson, Carol   (True the Vote), Houston, TX

    AGAINST:

           Bearden, Chase   (Coalition of Texans with Disabilities), Austin, TX
           Bledsoe, Gary L.   (Texas State Conference of NAACP Branches), Austin, TX
           Burke, Terri   (ACLU of Texas), Austin, TX
           Espanza, Alfredo C.   (LULAC), San Antonio, TX
           Figueroa, Luis   (Mexican American Legal Defense and Educational Fund (MALDEF)), San Antonio, TX
           Flores, Hector M.   (LULAC), Duncanville, TX
           Gomez, Jessica   (Advocacy, Inc. & Disability Policy Consortium), Austin, TX
           Patrick, John   (Texas AFL CIO), Friendswood, TX
           Pena, Roman   (American G.I. Forum, C.P. Garcia Chapter), San Antonio, TX
           Priutt, Anita   (League of Women Voters, Texas), Austin, TX
           Rosales, Rosa   (National Alliance for Education & Equity & LULAC), San Antonio, TX
           Salazar, Placido   (also providing written testimony) (Dr. Hector P. Garcia American GI Forum), Universal City, TX
           TaFoya, Marcelo   (LULAC District 12), Austin, TX
           Tijerina, Andres   (Self), Austin, TX

    ON:

           Davio, Rebecca   (Texas DPS), Austin, TX
           McGeehan, Ann   (Office of the Secretary of State), Austin, TX
           Ward, Christian J.   (Self), Austin, TX

Registering, but not testifying:

For:

           Blakemore, Allen F.   (Conservative Republicans of Texas), Houston, TX
           Carlson, Pat   (Texas Eagle Forum), Ft. Worth, TX
           Chow, Joseph   (Self), Houston, TX
           Delgado, Rachel   (Self), Texas City, TX
           Griffin, Travis   (Republican Party of Texas), Austin, TX
           Iverson, Michael   (King Street Patriots), Sugar Land, TX
           Jursen, Linda S.   (King Street Patriots - True the Vote), Sugar Land, TX
           Kinley, Melinda   (True the Vote/King Street Patriots), Houston, TX
           Sims, Randy   (Self), Houston, TX
           Stanko, Marian K.   (Republican Party and Election Judges), San Antonio, TX
           Wong, Martha   (Self), Houston, TX

Against:

           Acevedo, Fidel   (Council 4860 (LULAC)), Austin, TX

1

<u>WITNESS LIST</u>

Committee of the Whole Senate
January 25, 2011 8:00 AM

    Achilles, Jenny    (Self), Austin, TX
    Arguelles, Francisco    (Houston Unido - Colectivo Flatlander), Houston, TX
    Blackwell, Tom    (Self), Dallas, TX
    Boone, Daniel    (ADAPT), Austin, TX
    Boyte, Melanie    (ADAPT), Hutto, TX
    Butler, Natalie    (UT Austin Student), Austin, TX
    Casso, Amy    (LaFe Policy Research & Education Center), San Antonio, TX
    Castillo, Sergio    (LULAC 12), Round Rock, TX
    Coleman, Philip    (also providing written testimony) (ADAPT of Texas), Austin, TX
    Cranston, Cathy    (also providing written testimony) (PACT/ADAPT), Austin, TX
    Cranston, Ron    (PACT/ADAPT of Texas), Austin, TX
    Crawford, Mellisa    (ADAPT), Manor, TX
    Crenshaw, Sandra    (NIA), Dallas, TX
    Garcia, Daniel    (Houston Unido), Houston, TX
    Gay, Clifford    (Self), Buda, TX
    Gutierrez, Anthony    (Texas Democratic Party), Austin, TX
    Herrera, John R.    (Houston Unidos), Houston, TX
    Kafka, Bob    (Institute for Disability Access), Austin, TX
    Littles, Paula R.    (Self), Austin, TX
    Martinez, Amalia    (LULAC 12), Austin, TX
    Martinez, Feliciano    (Houston Unite - Alianza Mexicana), Houston, TX
    McPhail, Jennifer    (ADAPT of Texas), Austin, TX
    Mendoza, Raymundo    (Living Hope Wheel Chair Association), Katy, TX
    Mitchell, Marshall    (ADAPT), Austin, TX
    Parks, Scott Michael    (Self), Austin, TX
    Patel, Vinisha    (Houston Unidos), Sugar Land, TX
    Quan, Gordan    (Asia Society Texas Center), Houston, TX
    Richie, Boyd L.    (Texas Democratic Party), Austin, TX
    Rodgers, Ray    (Asian Chamber), Katy, TX
    Romero, Jesse    (Self), San Antonio, TX
    Rubac, Gloria    (Houston Unido), Houston, TX
    Salovitz, Heiwa    (ADAPT), Austin, TX
    Shafto, Deborah    (Houston Unido), Houston, TX
    Smith, Bryson McCall    (Coalition with People with Disabilities), Austin, TX
    Wittie, David    (also providing written testimony) (ADAPT of Texas), Austin, TX
    Woods III, John O.    (Self), Austin, TX

On:

    Baxter, Barbara    (Self), Austin, TX
    Maxwell, David    Deputy Director of Law Enforcement (Attorney General's Office), Austin, TX

2

## Committee of the Whole Exhibits on S.B. No. 14

| | |
|---|---|
| Exhibit 1 | Transcript, exhibits, and written testimony on S.B. 362, Committee of the Whole, 81st Legislature, 2009. |
| Exhibit 2 | Daily *Senate Journals* for March 10, 16, 17, and 18 and the Addendum to the March 17 *Senate Journal* (contains all actions taken by the Senate of the 81st Legislature on SB 362, including motions, remarks, written responses, exhibits, and any other material directly related to SB 362). |
| Exhibit 3 | Secretary of State Hope Andrade's  letter (1/25/11) to Senator Fraser re inquiry about the availability of Help America Vote Act (HAVA) federal funds to implement the statewide voter education program required by S.B. 14. |
| Exhibit 4 | Texas Driver License submitted by Senator Zaffirini. |
| Exhibit 5 | Letter to Senator Zaffirini (1/24/11) from Spencer Overton, Professor of Law, The George Washington University Law School, re the Carter-Baker Commission recommendations on Federal Election Reform and S.B. 14. |
| Exhibit 6 | "Counties with Department of Public Safety Drivers License Office Closures" Map produced by the Texas Legislative Council submitted by Senator Zaffirini. |
| Exhibit 7 | Chart depicting the requirements, process, and potential costs for obtaining a State ID created and submitted by Senator Davis. |
| Exhibit 8 | LIGHTHOUSE OPINION POLLING, Fall 2010 Statewide Landscape Benchmark Survey submitted by Senator Fraser. |
| Exhibit 9 | "Driver License Offices in Texas" Map prepared by the Department of Public Safety Map submitted by Senators Williams and Davis. |
| Exhibit 10 | Letter to Senator Van de Putte from Texas members of Congress Sheila Jackson Lee, Eddie Bernice Johnson, Charles Gonzalez, Lloyd Doggett, Gene Green, Ruben Hinojosa, Silvestre Reyes, and Al Green submitted by Senator West. |

Exhibit 11   Written testimony of Lydia Camarillo, Vice President of Southwest Voter Registration Education Project submitted by Senator Van de Putte.

Exhibit 12   Written testimony of Luis Roberto Vera, Jr., National General Counsel, League of United Latin American Citizens, submitted by Senator West.

TX_00003704



EXHIBIT 3

**Esperanza "Hope" Andrade**
SECRETARY OF STATE
State of Texas

January 25, 2011

The Honorable Troy Fraser
Texas Senate
PO Box 12068-Capitol Station
Austin, Texas 78711

Dear Senator Fraser:

You have inquired about the availability of Help America Vote Act (HAVA) federal funds to implement the statewide voter education program that Senate Bill 14 requires my office to undertake. As you know, my office has estimated that an educational program would cost $2,000,000. Please be advised that the state has sufficient HAVA funds allocated for voter education and poll worker training that would cover this estimated expenditure.

Based on conversations that my staff has had with the United States Election Assistance Commission (EAC), which oversees state HAVA spending, EAC would approve the use of the state's HAVA funds for a statewide effort to inform voters of the proposed SB 14 photo identification standards. While we have received this informal guidance, we are also seeking a formal opinion from the EAC for further confirmation.

Please do not hesitate to contact me should you have any further questions.

Respectfully,

Hope Andrade



Exhibit 4

JA_001161

_00003706



THE GEORGE
WASHINGTON
UNIVERSITY
LAW SCHOOL
WASHINGTON DC

SPENCER OVERTON
PROFESSOR OF LAW
(202) 994-9794
SOVERTON@GWU.EDU
WWW.SPENCEROVERTON.COM

January 24, 2011

Senator Judith Zaffirini
P.O. Box 12068
Austin, Texas 78711

Dear Senator Zaffirini:

I write in reference to Senate Bill 14 ("S.B. 14"), which proposes to enact in Texas a Voter ID law which would be among the most strict in the nation. In particular, I write to refute claims that S.B. 14 is consistent with the recommendations of the Carter-Baker Commission on Federal Election Reform. As a commissioner on that Commission, I write to clarify that S.B. 14 is inconsistent with the Commission's recommendations, which contemplated requiring voters to present photo ID only if specific safeguards were present that are currently lacking in S.B. 14.

Although the majority of Commissioners supported the use of the REAL ID (which includes a photo) for in-person voter identification, they conditioned requiring such ID on conditions which are unmet in S.B. 14. In particular, the Commissioners recommended requiring photo ID of voters only if: (1) states assume the responsibility to seek out citizens and provide them with an ID free of charge; (2) states assume the responsibility to seek out unregistered citizens and register them and automatically update the registration of citizens when they move; and (3) states allow citizens without a photo ID to vote by signing an affidavit under penalty of perjury for the first two federal elections following adoption of the photo ID.

S.B. 14 does not actively seek out Texans who lack a photo ID to provide them with an ID free of charge. Instead, it requires that an eligible voter seeking a fee waiver complete a complex bureaucratic process in which the person must state that he is obtaining an ID pursuant to Section 63.001(b) of the election code, and present a valid voter registration certificate or submit a registration application to the department.

Tellingly, even President Carter and Secretary Baker, the Commission's co-chairs, rejected the strict photo ID requirement initially adopted in Georgia after concluding it was "discriminatory" because "it was costly or difficult for poor Georgians" to obtain the identification required for voting. Like the initial Georgia law rejected by President Carter and Secretary Baker, S.B. 14 devotes insufficient resources to address the burdens it would impose on Texas voters who lack photo IDs. The Carter-Baker Commission recognized that as many as 12% of voters lack photo ID-a percentage that translates to nearly 3 million Texas voters-and for many of these voters, difficulties in obtaining a photo ID could lead to disenfranchisement.

TX_00003707
JA_001162

Exhibit 5

Further, S.B. 14 is inconsistent with the recommendations of the Carter-Baker Commission because S.B. 14 does not promote the widespread automatic voter registration that the Commission's majority contemplated in supporting Voter ID, and it does not provide an affidavit for those who lack photo ID.

While it is important to ensure that our elections are free of irregularities and fraud, the current proposal for a photo ID law in Texas is inconsistent with the recommendations of the Carter-Baker Commission.

Very truly yours,

Spencer Overton



JA_001164



**DL/State ID**

**Cost** (new) $16 (under 18); $25 (over 18); $9 (over 85); + $11 DL exam (replacement) $6 (under 18); $25 (over 18); $9 (over 85)

**Needed** (1 Primary): Photo ID, DL, Passport, Unexpired Homeland Security ID, Unexpired Military ID

or

(2 Secondary): Birth certificate, Dept of State birth certificate, Court order

or

(1 Secondary and 2 of the following): School records, Insurance policy, Vehicle title, Military DD214, Military dependant card, Marriage license, **Voter ID card**, Social Security Card, Pilots license, Temporary DL or ID, Unexpired DL or ID (even from another state), Consular document, Texas Inmate Card

**Birth certificate**

Cost: $23

**Needed:** DL or state ID

or

Notarized ($6) affidavit of relative with copy of that person's photo ID

or

If you have no relatives and no ID: Notarized affidavit and two documents with your name including one with a signature such as SSN card (per Tx Vital Records website)

**Social Security Card**

(replacement)

Cost: Free

**Needed:** DL, State ID, Passport

or

Employee ID, School ID, Health Insurance Card (not Medicare), Military ID,

**Passport**

Cost: (6 weeks) $145 book, $65 card

**Needed:** (1) Passport, Birth certificate, consular report, naturalization certificate, certificate of citizenship

(1) DL, State ID, Govt ID, Military ID

*requires* (appears on each arrow)

Exhibit 7