(b) The commission may prescribe a reasonable annual fee to be paid by each racetrack licensee. The fee must be in an amount sufficient to provide that the total amount of fees imposed under this section, together with the license fees prescribed under Section 5.01(b) of this Act and the renewal fees prescribed under Section 6.0602(e) of this Act, is sufficient to pay the costs of administering and enforcing this Act.

SECTION 15. Section 7.01, Texas Racing Act (Article 179e, Vernon's Texas Civil Statutes), is amended to read as follows:

Sec. 7.01. LICENSE REQUIRED. (a) Except as provided by this section, a [A] person may not participate in racing with pari-mutuel wagering other than as a spectator or as a person placing a wager without first obtaining a license from the commission. A person may not engage in any occupation for which commission rules require a license under this Act without first obtaining a license from the commission.

(b) The commission by rule shall categorize the occupations of racetrack employees and determine the occupations that afford the employee an opportunity to influence racing with pari-mutuel wagering. The rules must require the following employees to be licensed under this Act:

(1) an employee who works in an occupation determined by the commission to afford the employee an opportunity to influence racing with pari-mutuel wagering; or

(2) an employee who will likely have significant access to the backside of a racetrack or to restricted areas of the frontside of a racetrack.

(c) A racetrack licensed under this Act is responsible for ensuring that its employees comply with this Act and commission rules. The commission may impose disciplinary action against a licensed racetrack for violations of this Act and commission rules by its employees as provided by Section 6.0603 of this Act.

SECTION 16. Section 7.07, Texas Racing Act (Article 179e, Vernon's Texas Civil Statutes), is amended by amending Subsection (a) and adding Subsection (a-1) to read as follows:

(a) A license issued under this article is valid for a period set by the commission not to exceed 36 months following the date of its issuance. It is renewable on application, satisfactory results of a criminal history information record check, and payment of the fee in accordance with the rules of the commission.

(a-1) The commission shall obtain criminal history record information on each applicant renewing an occupational license under this article. The commission shall ensure that criminal history record information is obtained on each license holder at least once every 36 months.

SECTION 17. Section 11.01, Texas Racing Act (Article 179e, Vernon's Texas Civil Statutes), is amended by amending Subsection (a) and adding Subsection (a-1) to read as follows:

(a) The commission shall adopt rules to regulate wagering on greyhound races and horse races under the system known as pari-mutuel wagering. Wagering may be conducted only by an association within its enclosure. A person may not

accept, in person, by telephone, or over the Internet, a wager for a horse race or greyhound race conducted inside or outside this state from a person in this state unless the wager is authorized under this Act.

(a-1) The commission may commission as many investigators as the commission determines necessary to enforce this Act and the rules of the commission. Each investigator shall take the constitutional oath of office and file it with the commission. Each commissioned investigator has the powers of a peace officer.

SECTION 18. Sections 11.04(a) and (c), Texas Racing Act (Article 179e, Vernon's Texas Civil Statutes), are amended to read as follows:

(a) Only a person inside the enclosure where both live and simulcast race meetings are authorized may wager on the result of a live or simulcast race presented by the association in accordance with commission rules. Except as provided by this section, a person may not place, in person, by telephone, or over the Internet, a wager for a horse race or greyhound race conducted inside or outside this state. The commission shall adopt rules to prohibit wagering by employees of the commission and to regulate wagering by persons licensed under this Act.

(c) The commission shall adopt rules prohibiting an association from accepting a wager made on credit and shall adopt rules providing for the use of automatic banking machines within the enclosure. The commission shall limit the use of an automatic banking machine to [:

[(1)] allow a person to have access to only the person's checking account at a bank or other financial institution[; and

[(2) deliver no more than $200].

SECTION 19. Section 11.05, Texas Racing Act (Article 179e, Vernon's Texas Civil Statutes), is amended to read as follows:

Sec. 11.05. UNLAWFUL WAGERING. A person shall not wager on the result of a greyhound race or horse race in this state except as permitted by this Act. A person who is not an association under this Act may not accept from a Texas resident while the resident is in this state a wager on the result of a greyhound race or horse race conducted inside or outside this state.

SECTION 20. Section 18.01(a), Texas Racing Act (Article 179e, Vernon's Texas Civil Statutes), is amended to read as follows:

(a) The Texas Racing Commission is subject to Chapter 325, Government Code (Texas Sunset Act). Unless continued in existence as provided by that chapter, and except as provided by Subsections (b) and (c) of this section, the commission is abolished and this Act expires September 1, 2017 [2011].

SECTION 21. Section 88.521(2), Education Code, is amended to read as follows:

(2) "Director" means the executive director of Texas AgriLife Research, formerly known as the Texas Agricultural Experiment Station.

SECTION 22. Sections 88.522(b), (c), (f), and (g), Education Code, are amended to read as follows:

(b)  The director shall administer the account through established procedures of Texas AgriLife Research, formerly known as the Texas Agricultural Experiment Station.

(c)  The comptroller shall periodically transfer the amounts specified by Sections [Section] 6.08(f) and (h), Texas Racing Act (Article 179e, Vernon's Texas Civil Statutes), to the account.

(f)  Not more than 10 percent of the account may be spent each year on the cost incurred in the operation or administration of the [advisory committee or] account.

(g)  All money received by [the advisory committee or] the account under this chapter is subject to Subchapter F, Chapter 404, Government Code.

SECTION 23.  Section 88.525, Education Code, is amended by adding Subsections (a-1) and (b-1) and amending Subsection (b) to read as follows:

(a-1)  In awarding grants under this section, the director shall comply with the conflict of interest provisions of The Texas A&M University System.

(b)  The [With the advice of the advisory committee, the] director shall develop annually a request for proposals for equine research grants. Each proposal received may [must] be evaluated by a peer review committee appointed by the director and subject matter experts as necessary to evaluate the proposal. The peer review committee shall consider the applicant's research capacity and the relevance and scientific merit of the proposal and make recommendations to the director.

(b-1)  The director may award a grant to an applicant who proposes to commingle grant money awarded under this section with other sources of funding or proposes to conduct research that includes equine research.

SECTION 24.  Section 88.526(a), Education Code, is amended to read as follows:

(a)  The director shall prepare an annual report on equine research funded under this subchapter. The director shall distribute the report to the Texas Racing Commission and [the] members of the Texas horse racing industry [advisory committee]. The director shall make copies of the report available to interested parties.

SECTION 25.  Section 88.527, Education Code, is amended to read as follows:

Sec. 88.527.  CONFERENCE.   Texas AgriLife Research [The Texas Agricultural Extension Service] shall conduct an annual conference on equine research. Money from the equine research account shall be used to defray the costs of the conference. The conference must be designed to bring to the attention of the Texas horse racing industry the latest research results and technological developments in equine research. The director shall make the report created under Section 88.526 available at the conference.

SECTION 26.  The following sections of the Texas Racing Act (Article 179e, Vernon's Texas Civil Statutes) are repealed:

(1)  Section 2.072;

(2)  Section 6.04(b);

(3)  Section 6.18(a); and

(4) Section 7.02(a).

SECTION 27. The following sections of the Education Code are repealed:

(1) Section 88.521(1);

(2) Section 88.523;

(3) Section 88.5231;

(4) Section 88.5232;

(5) Section 88.524;

(6) Section 88.5245; and

(7) Section 88.525(c).

SECTION 28. (a) Not later than September 1, 2012, the Texas Racing Commission shall designate each racetrack license as active or inactive as required by Section 6.0601, Texas Racing Act (Article 179e, Vernon's Texas Civil Statutes), as added by this Act.

(b) The Texas Racing Commission by rule shall establish a staggered schedule and the procedure for the review of licenses required under Section 6.06(k), Texas Racing Act (Article 179e, Vernon's Texas Civil Statutes), as amended by this Act.

(c) The Texas Racing Commission may adjust license renewal and review fees pursuant to the commission's authority to adjust fees under Section 5.01, Texas Racing Act (Article 179e, Vernon's Texas Civil Statutes), and Section 6.0602, Texas Racing Act (Article 179e, Vernon's Texas Civil Statutes), as added by this Act, to recover any money lost by the change in law made by this Act to Section 3.07(e), Texas Racing Act (Article 179e, Vernon's Texas Civil Statutes).

(d) As soon as practicable, the executive director of Texas AgriLife Research shall submit a report to the Texas Racing Commission as required by Section 88.526, Education Code, as amended by this Act.

SECTION 29. This Act takes effect September 1, 2011.

### HB 908 - HOUSE CONCURS IN SENATE AMENDMENTS
### TEXT OF SENATE AMENDMENTS

Representative Thompson called up with senate amendments for consideration at this time,

**HB 908**, A bill to be entitled An Act relating to the division of community property on dissolution of marriage.

Representative Thompson moved to concur in the senate amendments to **HB 908**.

The motion to concur in the senate amendments to **HB 908** prevailed by (Record 1116): 142 Yeas, 0 Nays, 2 Present, not voting.

Yeas — Aliseda; Allen; Alonzo; Alvarado; Anchia; Anderson, R.; Aycock; Beck; Berman; Bohac; Bonnen; Branch; Brown; Burkett; Burnam; Button; Cain; Callegari; Carter; Castro; Chisum; Christian; Coleman; Cook; Craddick; Creighton; Crownover; Darby; Davis, J.; Davis, S.; Davis, Y.; Deshotel; Driver; Dukes; Dutton; Eiland; Eissler; Elkins; Farias; Farrar; Fletcher; Flynn; Frullo; Gallego; Garza; Geren; Giddings; Gonzales, L.; Gonzales, V.; Gonzalez; Gooden; Guillen; Gutierrez; Hamilton; Hancock; Hardcastle; Harless; Harper-Brown;

Hartnett; Hernandez Luna; Hilderbran; Hochberg; Hopson; Howard, C.; Howard, D.; Hughes; Hunter; Isaac; Jackson; Johnson; Keffer; King, P.; King, S.; King, T.; Kleinschmidt; Kuempel; Landtroop; Larson; Laubenberg; Lavender; Legler; Lewis; Lozano; Lucio; Lyne; Madden; Mallory Caraway; Margo; Marquez; Martinez; Martinez Fischer; McClendon; Menendez; Miles; Miller, D.; Miller, S.; Morrison; Murphy; Naishtat; Nash; Oliveira; Orr; Otto; Parker; Patrick; Paxton; Peña; Perry; Phillips; Pickett; Pitts; Price; Quintanilla; Raymond; Riddle; Ritter; Rodriguez; Schwertner; Scott; Sheets; Sheffield; Shelton; Simpson; Smith, T.; Smith, W.; Solomons; Strama; Taylor, V.; Thompson; Torres; Truitt; Turner; Veasey; Villarreal; Vo; Walle; Weber; White; Woolley; Workman; Zedler; Zerwas.

Present, not voting — Mr. Speaker; Taylor, L.(C).

Absent, Excused — Anderson, C.; Huberty; Muñoz; Smithee.

Absent — Kolkhorst; Reynolds.

## STATEMENT OF VOTE

When Record No. 1116 was taken, I was in the house but away from my desk. I would have voted yes.

Kolkhorst

**Senate Committee Substitute**

**CSHB 908**, A bill to be entitled An Act relating to the division of community property on dissolution of marriage.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1. Chapter 7, Family Code, is amended by adding Section 7.009 to read as follows:

Sec. 7.009. FRAUD ON THE COMMUNITY; DIVISION AND DISPOSITION OF RECONSTITUTED ESTATE. (a) In this section, "reconstituted estate" means the total value of the community estate that would exist if an actual or constructive fraud on the community had not occurred.

(b) If the trier of fact determines that a spouse has committed actual or constructive fraud on the community, the court shall:

(1) calculate the value by which the community estate was depleted as a result of the fraud on the community and calculate the amount of the reconstituted estate; and

(2) divide the value of the reconstituted estate between the parties in a manner the court deems just and right.

(c) In making a just and right division of the reconstituted estate under Section 7.001, the court may grant any legal or equitable relief necessary to accomplish a just and right division, including:

(1) awarding to the wronged spouse an appropriate share of the community estate remaining after the actual or constructive fraud on the community;

(2) awarding a money judgment in favor of the wronged spouse against the spouse who committed the actual or constructive fraud on the community; or

TX_00003148

(3) awarding to the wronged spouse both a money judgment and an appropriate share of the community estate.

SECTION 2. The change in law made by this Act applies to a suit for dissolution of a marriage pending before a trial court on or filed on or after the effective date of this Act.

SECTION 3. This Act takes effect September 1, 2011.

## HB 1380 - HOUSE CONCURS IN SENATE AMENDMENTS
## TEXT OF SENATE AMENDMENTS

Representative Truitt called up with senate amendments for consideration at this time,

**HB 1380**, A bill to be entitled An Act relating to the graduate medical training requirements for certain foreign medical school graduates applying for a license to practice medicine in this state.

Representative Truitt moved to concur in the senate amendments to **HB 1380**.

The motion to concur in the senate amendments to **HB 1380** prevailed by (Record 1117): 142 Yeas, 1 Nays, 2 Present, not voting.

Yeas — Aliseda; Allen; Alonzo; Alvarado; Anchia; Anderson, R.; Aycock; Beck; Berman; Bohac; Bonnen; Branch; Brown; Burkett; Burnam; Button; Cain; Callegari; Carter; Castro; Chisum; Christian; Cook; Craddick; Creighton; Crownover; Darby; Davis, J.; Davis, S.; Davis, Y.; Deshotel; Driver; Dukes; Dutton; Eiland; Eissler; Elkins; Farias; Farrar; Fletcher; Flynn; Frullo; Gallego; Garza; Geren; Giddings; Gonzales, L.; Gonzales, V.; Gonzalez; Gooden; Guillen; Gutierrez; Hamilton; Hancock; Hardcastle; Harless; Harper-Brown; Hartnett; Hernandez Luna; Hilderbran; Hochberg; Hopson; Howard, C.; Howard, D.; Hughes; Hunter; Isaac; Jackson; Johnson; Keffer; King, P.; King, S.; King, T.; Kleinschmidt; Kolkhorst; Kuempel; Landtroop; Larson; Laubenberg; Lavender; Legler; Lewis; Lozano; Lucio; Lyne; Madden; Mallory Caraway; Margo; Marquez; Martinez; Martinez Fischer; McClendon; Menendez; Miles; Miller, D.; Miller, S.; Morrison; Murphy; Naishtat; Nash; Oliveira; Orr; Otto; Parker; Patrick; Paxton; Peña; Perry; Phillips; Pickett; Pitts; Price; Quintanilla; Raymond; Reynolds; Riddle; Ritter; Rodriguez; Schwertner; Scott; Sheets; Sheffield; Simpson; Smith, T.; Smith, W.; Solomons; Strama; Taylor, V.; Thompson; Torres; Truitt; Turner; Veasey; Villarreal; Vo; Walle; Weber; White; Woolley; Workman; Zedler; Zerwas.

Nays — Shelton.

Present, not voting — Mr. Speaker; Taylor, L.(C).

Absent, Excused — Anderson, C.; Huberty; Muñoz; Smithee.

Absent — Coleman.

**Senate Committee Substitute**

**CSHB 1380**, A bill to be entitled An Act relating to the graduate medical training requirements for certain foreign medical school graduates applying for a license to practice medicine in this state.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  Section 155.003(a), Occupations Code, is amended to read as follows:

(a)  To be eligible for a license under this chapter, an applicant must present proof satisfactory to the board that the applicant:

(1)  is at least 21 years of age;

(2)  is of good professional character and has not violated Section 164.051, 164.052, or 164.053;

(3)  has completed:

(A)  at least 60 semester hours of college courses, other than courses in medical school, that are acceptable to The University of Texas at Austin for credit on a bachelor of arts degree or a bachelor of science degree;

(B)  the entire primary, secondary, and premedical education required in the country of medical school graduation, if the medical school is located outside the United States or Canada; or

(C)  substantially equivalent courses as determined by board rule;

(4)  is a graduate of a medical school located in the United States or Canada and approved by the board;

(5)  has either:

(A)  successfully completed one year of graduate medical training approved by the board in the United States or Canada; or

(B)  graduated from a medical school located outside the United States or Canada and has successfully completed two [~~three~~] years of graduate medical training approved by the board in the United States or Canada;

(6)  has passed an examination accepted or administered by the board; and

(7)  has passed a Texas medical jurisprudence examination as determined by board rule.

SECTION 2.  Section 155.004, Occupations Code, is amended to read as follows:

Sec. 155.004.  ADDITIONAL ELIGIBILITY REQUIREMENTS FOR GRADUATES OF CERTAIN FOREIGN MEDICAL SCHOOLS. A license applicant who is a graduate of a medical school that is located outside the United States and Canada must present proof satisfactory to the board that the applicant:

(1)  is a graduate of a school whose curriculum meets the requirements for an unapproved medical school as determined by a committee of experts selected by the Texas Higher Education Coordinating Board;

(2)  has successfully completed[~~:~~

[~~(A)  at least three years of graduate medical training in the United States or Canada that was approved by the board; or~~]

[(B)] at least two years of graduate medical training in the United States or Canada that was approved by the board [and at least one year of graduate medical training outside the United States or Canada that was approved for advanced standing by a specialty board organization approved by the board];

(3) holds a valid certificate issued by the Educational Commission for Foreign Medical Graduates; and

(4) is able to communicate in English.

SECTION 3. Section 155.005(a), Occupations Code, is amended to read as follows:

(a) To be eligible for a license under this chapter, an applicant who has been a student of a foreign medical school must present proof satisfactory to the board that the applicant:

(1) meets the requirements of Section 155.003;

(2) has studied medicine in a medical school located outside the United States and Canada that is acceptable to the board;

(3) has completed all of the didactic work of the foreign medical school but has not graduated from the school;

(4) has attained a score satisfactory to a medical school in the United States approved by the Liaison Committee on Medical Education on a qualifying examination and has satisfactorily completed one academic year of supervised clinical training for foreign medical students, as defined by the American Medical Association Council on Medical Education (Fifth Pathway Program), under the direction of the medical school in the United States;

(5) has attained a passing score on the Educational Commission for Foreign Medical Graduates examination or another examination, if required by the board;

(6) has successfully completed at least two [three] years of graduate medical training in the United States or Canada that was approved by the board as of the date the training was completed; and

(7) has passed the license examination under Subchapter B required by the board of each applicant.

SECTION 4. The changes in law made by this Act to Sections 155.003, 155.004, and 155.005, Occupations Code, apply only to an application for a license to practice medicine submitted to the Texas Medical Board on or after the effective date of this Act. An application for a license submitted before that date is governed by the law in effect on the date the application was submitted, and the former law is continued in effect for that purpose.

SECTION 5. This Act takes effect September 1, 2011.

### HB 843 - HOUSE CONCURS IN SENATE AMENDMENTS
### TEXT OF SENATE AMENDMENTS

Representative Geren called up with senate amendments for consideration at this time,

**HB 843**, A bill to be entitled An Act relating to the use of electronic means for the delivery of ad valorem tax bills to certain property owners and agents.

Representative Geren moved to concur in the senate amendments to **HB 843**.

The motion to concur in the senate amendments to **HB 843** prevailed by (Record 1118): 137 Yeas, 0 Nays, 2 Present, not voting.

Yeas — Aliseda; Allen; Alonzo; Alvarado; Anchia; Anderson, R.; Aycock; Beck; Berman; Bohac; Bonnen; Branch; Brown; Burkett; Burnam; Button; Cain; Carter; Castro; Chisum; Christian; Cook; Craddick; Creighton; Darby; Davis, J.; Davis, S.; Davis, Y.; Deshotel; Dukes; Dutton; Eiland; Eissler; Elkins; Farias; Farrar; Fletcher; Flynn; Frullo; Gallego; Garza; Geren; Giddings; Gonzales, L.; Gonzales, V.; Gonzalez; Gooden; Guillen; Gutierrez; Hamilton; Hancock; Hardcastle; Harless; Harper-Brown; Hartnett; Hernandez Luna; Hilderbran; Hochberg; Hopson; Howard, C.; Howard, D.; Hughes; Hunter; Isaac; Jackson; Johnson; Keffer; King, P.; King, S.; King, T.; Kleinschmidt; Kolkhorst; Kuempel; Landtroop; Larson; Laubenberg; Lavender; Legler; Lozano; Lucio; Lyne; Madden; Mallory Caraway; Margo; Marquez; Martinez; Martinez Fischer; McClendon; Menendez; Miles; Miller, D.; Miller, S.; Murphy; Naishtat; Nash; Oliveira; Orr; Otto; Parker; Patrick; Paxton; Peña; Perry; Phillips; Pickett; Pitts; Price; Quintanilla; Raymond; Reynolds; Riddle; Ritter; Rodriguez; Schwertner; Scott; Sheets; Sheffield; Shelton; Simpson; Smith, T.; Smith, W.; Solomons; Strama; Taylor, V.; Torres; Truitt; Turner; Veasey; Villarreal; Vo; Walle; Weber; White; Woolley; Workman; Zedler; Zerwas.

Present, not voting — Mr. Speaker; Taylor, L.(C).

Absent, Excused — Anderson, C.; Huberty; Muñoz; Smithee.

Absent — Callegari; Coleman; Crownover; Driver; Lewis; Morrison; Thompson.

**Senate Committee Substitute**

**CSHB 843**, A bill to be entitled An Act relating to the use of electronic means for the delivery of ad valorem tax bills to certain property owners and agents.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  Section 1.07(a), Tax Code, is amended to read as follows:

(a)  An official or agency required by this title to deliver a notice to a property owner may deliver the notice by regular first-class mail, with postage prepaid, unless this section or another provision of this title requires or authorizes a different method of delivery or the parties agree that the notice must be delivered as provided by Section 1.085.

SECTION 2.  Section 31.01, Tax Code, is amended by amending Subsections (a), (g), (i-1), and (j) and adding Subsections (k) and (l) to read as follows:

(a)  Except as provided by Subsections (f), [and] (i-1), and (k), the assessor for each taxing unit shall prepare and mail a tax bill to each person in whose name the property is listed on the tax roll and to the person's authorized agent. The assessor shall mail tax bills by October 1 or as soon thereafter as practicable.  The assessor shall mail to the state agency or institution the tax bill

TX_00003152

for any taxable property owned by the agency or institution. The agency or institution shall pay the taxes from funds appropriated for payment of the taxes or, if there are none, from funds appropriated for the administration of the agency or institution. The exterior of the tax bill must show the return address of the taxing unit. If the assessor wants the United States Postal Service to return the tax bill if it is not deliverable as addressed, the exterior of the tax bill may contain, in all capital letters, the words "RETURN SERVICE REQUESTED," or another appropriate statement directing the United States Postal Service to return the tax bill if it is not deliverable as addressed.

(g)  Except as provided by Subsection (f) [of this section], failure to send or receive the tax bill required by this section, including a tax bill that has been requested to be sent by electronic means under Subsection (k), does not affect the validity of the tax, penalty, or interest, the due date, the existence of a tax lien, or any procedure instituted to collect a tax.

(i-1)  If an assessor mails a tax bill under Subsection (a) or delivers a tax bill by electronic means under Subsection (k) to a mortgagee of a property, the assessor is not required to mail or deliver by electronic means a copy of the bill to any mortgagor under the mortgage or to the mortgagor's authorized agent.

(j)  If a tax bill is mailed under Subsection (a) or delivered by electronic means under Subsection (k) [of this section] to a mortgagee of a property, the mortgagee shall mail a copy of the bill to the owner of the property not more than 30 days following the mortgagee's receipt of the bill.

(k)  The assessor for a taxing unit shall deliver a tax bill as required by this section by electronic means if on or before September 15 the individual or entity entitled to receive a tax bill under this section and the assessor enter into an agreement for delivery of a tax bill by electronic means. An assessor who delivers a tax bill electronically under this subsection is not required to mail the same bill under Subsection (a).  An agreement entered into under this subsection:

(1)  must:

(A)  be in writing or in an electronic format;

(B)  be signed by the assessor and the individual or entity entitled to receive the tax bill under this section;

(C)  be in a format acceptable to the assessor;

(D)  specify the electronic means by which the tax bill is to be delivered; and

(E)  specify the e-mail address to which the tax bill is to be delivered; and

(2)  remains in effect for all subsequent tax bills until revoked by an authorized individual in a written revocation filed with the assessor.

(l)  The comptroller may:

(1)  prescribe acceptable media, formats, content, and methods for the delivery of tax bills by electronic means under Subsection (k); and

(2)  provide a model form agreement.

SECTION 3.  This Act takes effect January 1, 2012.

### HB 2376 - HOUSE CONCURS IN SENATE AMENDMENTS
### TEXT OF SENATE AMENDMENTS

Representative Hamilton called up with senate amendments for consideration at this time,

**HB 2376**, A bill to be entitled An Act relating to the regulation of plumbing.

Representative Hamilton moved to concur in the senate amendments to **HB 2376**.

The motion to concur in the senate amendments to **HB 2376** prevailed by (Record 1119): 105 Yeas, 37 Nays, 2 Present, not voting.

Yeas — Aliseda; Allen; Alonzo; Alvarado; Anchia; Anderson, R.; Berman; Bohac; Bonnen; Branch; Burnam; Button; Castro; Christian; Coleman; Cook; Crownover; Davis, J.; Davis, Y.; Deshotel; Driver; Dukes; Dutton; Eiland; Eissler; Elkins; Farias; Farrar; Frullo; Gallego; Garza; Giddings; Gonzales, L.; Gonzales, V.; Gonzalez; Guillen; Gutierrez; Hamilton; Hancock; Hardcastle; Harless; Hartnett; Hernandez Luna; Hilderbran; Hochberg; Hopson; Howard, D.; Hunter; Isaac; Jackson; Johnson; King, P.; King, S.; King, T.; Kleinschmidt; Kuempel; Larson; Laubenberg; Lozano; Lucio; Lyne; Madden; Mallory Caraway; Margo; Marquez; Martinez; Martinez Fischer; McClendon; Menendez; Miles; Miller, D.; Morrison; Naishtat; Nash; Oliveira; Orr; Otto; Paxton; Peña; Pickett; Pitts; Price; Quintanilla; Raymond; Reynolds; Ritter; Rodriguez; Schwertner; Scott; Sheets; Shelton; Smith, T.; Smith, W.; Solomons; Strama; Thompson; Torres; Turner; Veasey; Villarreal; Vo; Walle; Woolley; Workman; Zerwas.

Nays — Aycock; Beck; Brown; Burkett; Cain; Callegari; Carter; Chisum; Craddick; Creighton; Darby; Davis, S.; Fletcher; Flynn; Geren; Gooden; Harper-Brown; Howard, C.; Keffer; Kolkhorst; Landtroop; Lavender; Legler; Miller, S.; Murphy; Parker; Patrick; Perry; Phillips; Riddle; Sheffield; Simpson; Taylor, V.; Truitt; Weber; White; Zedler.

Present, not voting — Mr. Speaker; Taylor, L.(C).

Absent, Excused — Anderson, C.; Huberty; Muñoz; Smithee.

Absent — Hughes; Lewis.

### STATEMENTS OF VOTE

I was shown voting yes on Record No. 1119. I intended to vote no.

Button

I was shown voting yes on Record No. 1119. I intended to vote no.

Frullo

I was shown voting yes on Record No. 1119. I intended to vote no.

Paxton

I was shown voting yes on Record No. 1119. I intended to vote no.

T. Smith

**Senate Committee Substitute**

**CSHB 2376**, A bill to be entitled An Act relating to the regulation of plumbing.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1. Sections 1301.002(9-a) and (11), Occupations Code, are amended to read as follows:

(9-a) "Responsible master plumber" means a person licensed as a master plumber under this chapter who:

(A) allows the person's master plumber license to be used by one plumbing company for the purpose of offering and performing plumbing work under the person's master plumber license;

(B) is authorized to obtain permits for plumbing work;

(C) assumes responsibility for plumbing work performed under the person's license; [and]

(D) has submitted a certificate of insurance as required by Section 1301.3576; and

(E) has completed a training program required by Section 1301.3576.

(11) "Water supply protection specialist" means a person who holds an endorsement issued by the board to engage in [the inspection, in connection with health and safety laws, including ordinances, of]:

(A) customer service inspections, as defined by rule of the Texas Commission on Environmental Quality [the plumbing of a public water system distribution facility]; and [or]

(B) the installation, service, and repair of plumbing associated with the use and distribution use of rainwater to supply a plumbing fixture, appliance, or irrigation system [customer-owned plumbing connected to the water distribution lines of a public water system].

SECTION 2. Section 1301.304, Occupations Code, is amended by adding Subsection (d) to read as follows:

(d) Unless a threat to health or safety exists, the board may choose to not investigate a complaint in which the person filing the complaint and the person who is the subject of the complaint are engaged in litigation related to the subject matter of the complaint until the outcome of the litigation is finally determined if the board determines the complaint process is being abused.

SECTION 3. Section 1301.3565, Occupations Code, is amended by adding Subsections (a-1) and (e-1) and amending Subsection (b) to read as follows:

(a-1) A person may not design a multipurpose residential fire protection sprinkler system for installation under this section unless the person:

(1) is licensed under this chapter as a master plumber; and

(2) holds an endorsement issued under this section.

(b) The board shall issue an endorsement as a multipurpose residential fire protection sprinkler specialist to a person who:

(1) holds the license described by Subsection (a);

(2) applies to the board on a form prescribed by the board;

(3) pays a fee set by the board;

(4)  presents evidence satisfactory to the board of successful completion of a training program approved by the board that provides the training necessary for the proper design and installation of a multipurpose residential fire protection sprinkler system as required by the applicable codes and standards recognized by the state; and

(5)  passes an examination required by the board.

(e-1)  Notwithstanding any other law, a master plumber who holds an endorsement under this section is not required to hold a license or registration issued by another state agency in order to design a multipurpose residential fire protection sprinkler system for installation under this section.

SECTION 4.  Section 1301.3576, Occupations Code, is amended to read as follows:

Sec. 1301.3576.  CERTIFICATE OF INSURANCE AND TRAINING FOR RESPONSIBLE MASTER PLUMBER. Before a master plumber works as a responsible master plumber [When a person is issued a master plumber's license], the master plumber [person] must:

(1)  provide the board with a certificate of insurance that meets the requirements of Section 1301.552; and

(2)  present evidence satisfactory to the board of successful completion of a training program approved or administered by the board regarding the laws and rules applicable to the operation of a plumbing business in this state [before the person works as a responsible master plumber].

SECTION 5.  Section 1301.552, Occupations Code, is amended to read as follows:

Sec. 1301.552.  CERTIFICATE OF INSURANCE FOR PLUMBING PERMIT IN POLITICAL SUBDIVISION. A political subdivision that requires a responsible master plumber or an agent of a responsible master plumber [plumbing contractor] to obtain a permit before performing plumbing in the political subdivision shall verify through the board's Internet website, or by contacting the board by telephone, that the responsible master plumber [plumbing contractor] has on file with the board a certificate of insurance. The certificate of insurance must:

(1)  be written by an insurer authorized to engage in the [a company licensed to do] business of insurance in this state or an eligible surplus lines insurer, as defined by Section 981.002, Insurance Code;

(2)  provide for commercial general liability insurance for the responsible master plumber for a claim for property damage or bodily injury, regardless of whether the claim arises from negligence or on a contract; and

(3)  provide coverage of not less than $300,000 for all claims arising in a one-year period.

SECTION 6. Section 1301.3565, Occupations Code, as amended by this Act, applies only to the installation of a multipurpose residential fire protection sprinkler system that is designed on or after the effective date of this Act.  The installation of a multipurpose residential fire protection sprinkler system that is

designed before the effective date of this Act is governed by the law in effect immediately preceding the effective date of this Act, and the former law is continued in effect for that purpose.

SECTION 7. Not later than December 31, 2011, the Texas State Board of Plumbing Examiners shall develop the curriculum and adopt rules for the approval or administration of the training program required by Section 1301.3576(2), Occupations Code, as added by this Act.

SECTION 8. Section 1301.3576, Occupations Code, as amended by this Act, does not apply to a master plumber who, on or before January 1, 2012, provides the Texas State Board of Plumbing Examiners with a certificate of insurance that meets the requirements of Section 1301.552, Occupations Code, as amended by this Act, and that is effective on January 1, 2012.

SECTION 9. Section 1301.552, Occupations Code, as amended by this Act, applies only to a permit issued on or after the effective date of this Act. A permit issued before the effective date of this Act is governed by the law in effect on the date the permit is issued, and the former law is continued in effect for that purpose.

SECTION 10. This Act takes effect September 1, 2011.

(Speaker in the chair)

### HB 1405 - HOUSE CONCURS IN SENATE AMENDMENTS
### TEXT OF SENATE AMENDMENTS

Representative Hardcastle called up with senate amendments for consideration at this time,

**HB 1405**, A bill to be entitled An Act relating to provision by a health benefit plan of prescription drug coverage specified by formulary.

Representative Hardcastle moved to concur in the senate amendments to **HB 1405**.

The motion to concur in the senate amendments to **HB 1405** prevailed by (Record 1120): 142 Yeas, 0 Nays, 1 Present, not voting.

Yeas — Aliseda; Allen; Alonzo; Alvarado; Anchia; Anderson, R.; Aycock; Beck; Berman; Bohac; Bonnen; Branch; Brown; Burkett; Burnam; Button; Cain; Callegari; Carter; Castro; Chisum; Christian; Cook; Craddick; Creighton; Crownover; Darby; Davis, J.; Davis, S.; Davis, Y.; Deshotel; Dukes; Dutton; Eiland; Eissler; Elkins; Farias; Farrar; Fletcher; Flynn; Frullo; Gallego; Garza; Geren; Giddings; Gonzales, L.; Gonzales, V.; Gonzalez; Gooden; Guillen; Gutierrez; Hamilton; Hancock; Hardcastle; Harless; Harper-Brown; Hartnett; Hernandez Luna; Hilderbran; Hochberg; Hopson; Howard, C.; Howard, D.; Hughes; Hunter; Isaac; Jackson; Johnson; Keffer; King, P.; King, S.; King, T.; Kleinschmidt; Kolkhorst; Kuempel; Landtroop; Larson; Laubenberg; Lavender; Legler; Lewis; Lozano; Lucio; Madden; Mallory Caraway; Margo; Marquez; Martinez; Martinez Fischer; McClendon; Menendez; Miles; Miller, D.; Miller, S.; Morrison; Murphy; Naishtat; Nash; Oliveira; Orr; Otto; Parker; Patrick; Paxton; Peña; Perry; Phillips; Pickett; Pitts; Price; Quintanilla; Raymond; Reynolds; Riddle; Ritter; Rodriguez; Schwertner; Scott; Sheets; Sheffield; Shelton;

TX_00003157

Simpson; Smith, T.; Smith, W.; Solomons; Strama; Taylor, L.; Taylor, V.; Thompson; Torres; Truitt; Turner; Veasey; Villarreal; Vo; Walle; Weber; White; Woolley; Workman; Zedler; Zerwas.

Present, not voting — Mr. Speaker(C).

Absent, Excused — Anderson, C.; Huberty; Muñoz; Smithee.

Absent — Coleman; Driver; Lyne.

**Senate Committee Substitute**

**CSHB 1405**, A bill to be entitled An Act relating to provision by a health benefit plan of prescription drug coverage specified by formulary and to modifications of that coverage.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1. Section 1369.051(2), Insurance Code, is amended to read as follows:

(2) "Enrollee" means an individual who is covered under a [group] health benefit plan, including a covered dependent.

SECTION 2. Section 1369.052, Insurance Code, is amended to read as follows:

Sec. 1369.052. APPLICABILITY OF SUBCHAPTER. This subchapter applies only to a [group] health benefit plan that provides benefits for medical or surgical expenses incurred as a result of a health condition, accident, or sickness, including <u>an individual,</u> [a] group, blanket, or franchise insurance policy or insurance agreement, a group hospital service contract, or a <u>small or large employer</u> group contract or similar coverage document that is offered by:

(1) an insurance company;

(2) a group hospital service corporation operating under Chapter 842;

(3) a fraternal benefit society operating under Chapter 885;

(4) a stipulated premium company operating under Chapter 884;

(5) a reciprocal exchange operating under Chapter 942;

(6) a health maintenance organization operating under Chapter 843;

(7) a multiple employer welfare arrangement that holds a certificate of authority under Chapter 846; or

(8) an approved nonprofit health corporation that holds a certificate of authority under Chapter 844.

SECTION 3. Section 1369.053, Insurance Code, is amended to read as follows:

Sec. 1369.053. EXCEPTION. This subchapter does not apply to:

(1) a health benefit plan that provides coverage:

(A) only for a specified disease or for another single benefit;

(B) only for accidental death or dismemberment;

(C) for wages or payments in lieu of wages for a period during which an employee is absent from work because of sickness or injury;

(D) as a supplement to a liability insurance policy;

(E) for credit insurance;

(F) only for dental or vision care;

(G) only for hospital expenses; or

(H) only for indemnity for hospital confinement;

(2) [a small employer health benefit plan written under Chapter 1501;

[(3)]  a Medicare supplemental policy as defined by Section 1882(g)(1), Social Security Act (42 U.S.C. Section 1395ss), as amended;

(3) [(4)]  a workers' compensation insurance policy;

(4) [(5)]  medical payment insurance coverage provided under a motor vehicle insurance policy; [or]

(5) [(6)]  a long-term care insurance policy, including a nursing home fixed indemnity policy, unless the commissioner determines that the policy provides benefit coverage so comprehensive that the policy is a health benefit plan as described by Section 1369.052;

(6) the child health plan program under Chapter 62, Health and Safety Code, or the health benefits plan for children under Chapter 63, Health and Safety Code; or

(7) a Medicaid managed care program operated under Chapter 533, Government Code, or a Medicaid program operated under Chapter 32, Human Resources Code.

SECTION 4. Section 1369.054, Insurance Code, is amended to read as follows:

Sec. 1369.054. NOTICE AND DISCLOSURE OF CERTAIN INFORMATION REQUIRED. An issuer of a [group] health benefit plan that covers prescription drugs and uses one or more drug formularies to specify the prescription drugs covered under the plan shall:

(1) provide in plain language in the coverage documentation provided to each enrollee:

(A) notice that the plan uses one or more drug formularies;

(B) an explanation of what a drug formulary is;

(C) a statement regarding the method the issuer uses to determine the prescription drugs to be included in or excluded from a drug formulary;

(D) a statement of how often the issuer reviews the contents of each drug formulary; and

(E) notice that an enrollee may contact the issuer to determine whether a specific drug is included in a particular drug formulary;

(2) disclose to an individual on request, not later than the third business day after the date of the request, whether a specific drug is included in a particular drug formulary; and

(3) notify an enrollee and any other individual who requests information under this section that the inclusion of a drug in a drug formulary does not guarantee that an enrollee's health care provider will prescribe that drug for a particular medical condition or mental illness.

SECTION 5. Subchapter B, Chapter 1369, Insurance Code, is amended by adding Section 1369.0541 to read as follows:

Sec. 1369.0541. MODIFICATION OF DRUG COVERAGE UNDER PLAN. (a)  A health benefit plan issuer may modify drug coverage provided under a health benefit plan if:

    (1)  the modification occurs at the time of coverage renewal;

    (2)  the modification is effective uniformly among all group health benefit plan sponsors covered by identical or substantially identical health benefit plans or all individuals covered by identical or substantially identical individual health benefit plans, as applicable; and

    (3)  not later than the 60th day before the date the modification is effective, the issuer provides written notice of the modification to the commissioner, each affected group health benefit plan sponsor, each affected enrollee in an affected group health benefit plan, and each affected individual health benefit plan holder.

    (b)  Modifications affecting drug coverage that require notice under Subsection (a) include:

    (1)  removing a drug from a formulary;

    (2)  adding a requirement that an enrollee receive prior authorization for a drug;

    (3)  imposing or altering a quantity limit for a drug;

    (4)  imposing a step-therapy restriction for a drug; and

    (5)  moving a drug to a higher cost-sharing tier unless a generic drug alternative to the drug is available.

    (c)  A health benefit plan issuer may elect to offer an enrollee in the plan the option of receiving notifications required by this section by e-mail.

    SECTION 6.  Section 1369.055, Insurance Code, is amended to read as follows:

    Sec. 1369.055.  CONTINUATION OF COVERAGE REQUIRED; OTHER DRUGS NOT PRECLUDED. (a) An issuer of a [group] health benefit plan that covers prescription drugs shall offer to each enrollee at the contracted benefit level and until the enrollee's plan renewal date any prescription drug that was approved or covered under the plan for a medical condition or mental illness, regardless of whether the drug has been removed from the health benefit plan's drug formulary before the plan renewal date.

    (b)  This section does not prohibit a physician or other health professional who is authorized to prescribe a drug from prescribing a drug that is an alternative to a drug for which continuation of coverage is required under Subsection (a) if the alternative drug is:

    (1)  covered under the [group] health benefit plan; and

    (2)  medically appropriate for the enrollee.

    SECTION 7.  Section 1369.056(a), Insurance Code, is amended to read as follows:

    (a)  The refusal of a [group] health benefit plan issuer to provide benefits to an enrollee for a prescription drug is an adverse determination for purposes of Section 4201.002 if:

    (1)  the drug is not included in a drug formulary used by the [group] health benefit plan; and

    (2)  the enrollee's physician has determined that the drug is medically necessary.

SECTION 8.  Section 1501.108(d), Insurance Code, is amended to read as follows:

(d)  Notwithstanding Subsection (a), a small or large employer health benefit plan issuer may modify a small or large employer health benefit plan in accordance with Section 1369.0541 or if:

(1)  the modification occurs at the time of coverage renewal;

(2)  the modification is effective uniformly among all small or large employers covered by that health benefit plan; and

(3)  the issuer notifies the commissioner and each affected covered small or large employer of the modification not later than the 60th day before the date the modification is effective.

SECTION 9.  The change in law made by this Act applies only to a health benefit plan delivered, issued for delivery, or renewed on or after January 1, 2012. A health benefit plan delivered, issued for delivery, or renewed before January 1, 2012, is governed by the law in effect immediately before the effective date of this Act, and that law is continued in effect for that purpose.

SECTION 10.  This Act takes effect September 1, 2011.

### HB 2360 - HOUSE CONCURS IN SENATE AMENDMENTS
### TEXT OF SENATE AMENDMENTS

Representative Schwertner called up with senate amendments for consideration at this time,

**HB 2360**, A bill to be entitled An Act relating to the creation of the Corn Hill Regional Water Authority; providing authority to issue bonds.

Representative Schwertner moved to concur in the senate amendments to **HB 2360**.

The motion to concur in the senate amendments to **HB 2360** prevailed by (Record 1121): 131 Yeas, 2 Nays, 1 Present, not voting.

Yeas — Aliseda; Alonzo; Alvarado; Anchia; Anderson, R.; Aycock; Beck; Berman; Bohac; Bonnen; Branch; Brown; Burkett; Burnam; Button; Cain; Carter; Castro; Chisum; Christian; Cook; Craddick; Creighton; Crownover; Darby; Davis, J.; Davis, S.; Davis, Y.; Driver; Dukes; Dutton; Eiland; Eissler; Elkins; Farias; Farrar; Fletcher; Flynn; Gallego; Garza; Geren; Giddings; Gonzales, L.; Gonzales, V.; Gonzalez; Gooden; Guillen; Gutierrez; Hamilton; Hancock; Hardcastle; Harless; Harper-Brown; Hartnett; Hernandez Luna; Hilderbran; Hopson; Howard, D.; Hughes; Hunter; Isaac; Jackson; Johnson; Keffer; King, P.; King, S.; King, T.; Kleinschmidt; Kolkhorst; Kuempel; Landtroop; Larson; Laubenberg; Lavender; Legler; Lewis; Lozano; Lucio; Lyne; Madden; Mallory Caraway; Margo; Marquez; Martinez; Martinez Fischer; McClendon; Menendez; Miles; Miller, D.; Miller, S.; Morrison; Murphy; Nash; Orr; Otto; Parker; Patrick; Paxton; Perry; Phillips; Pickett; Pitts; Price; Quintanilla; Raymond; Reynolds; Riddle; Ritter; Schwertner; Scott; Sheets; Sheffield; Shelton; Simpson; Smith, T.; Smith, W.; Solomons; Strama; Taylor, L.; Thompson; Truitt; Turner; Veasey; Villarreal; Vo; Walle; Weber; White; Woolley; Workman; Zerwas.

Nays — Hochberg; Zedler.

Present, not voting — Mr. Speaker(C).

Absent, Excused — Anderson, C.; Huberty; Muñoz; Smithee.

Absent — Allen; Callegari; Coleman; Deshotel; Frullo; Howard, C.; Naishtat; Oliveira; Peña; Rodriguez; Taylor, V.; Torres.

### STATEMENT OF VOTE

When Record No. 1121 was taken, I was in the house but away from my desk. I would have voted yes.

Torres

**Senate Amendment No. 1 (Senate Floor Amendment No. 1)**

Amend **HB 2360** (senate committee printing) as follows:

(1) In SECTION 1 of the bill, in added Section 8364.102, Special District Local Laws Code (page 2, line 40), strike "the powers and duties necessary to accomplish the purposes" and substitute "only the powers and duties necessary to accomplish the purposes stated under Section 8364.004".

(2) In SECTION 1 of the bill, strike added Section 8364.103, Special District Local Laws Code (page 2, lines 42-46), and substitute the following:

Sec. 8364.103. MUNICIPAL UTILITY DISTRICT POWERS AND DUTIES; LIMITATIONS. (a) Except as provided by Subsections (b) and (c), the authority has the powers and duties provided by the general law of this state, including Chapters 49 and 54, Water Code, applicable to municipal utility districts created under Section 59, Article XVI, Texas Constitution.

(b) The authority may not provide wastewater, drainage, solid waste disposal, or road facilities or services.

(c) The authority does not have any power that the member entities do not have.

### HB 1061 - HOUSE CONCURS IN SENATE AMENDMENTS
### TEXT OF SENATE AMENDMENTS

Representative Otto called up with senate amendments for consideration at this time,

**HB 1061**, A bill to be entitled An Act relating to the expiration of certain investment authority of the Teacher Retirement System of Texas.

Representative Otto moved to concur in the senate amendments to **HB 1061**.

The motion to concur in the senate amendments to **HB 1061** prevailed by (Record 1122): 141 Yeas, 0 Nays, 2 Present, not voting.

Yeas — Aliseda; Allen; Alonzo; Alvarado; Anchia; Anderson, R.; Aycock; Beck; Berman; Bohac; Bonnen; Branch; Brown; Burkett; Burnam; Button; Cain; Callegari; Carter; Castro; Chisum; Coleman; Cook; Craddick; Creighton; Crownover; Darby; Davis, J.; Davis, S.; Davis, Y.; Deshotel; Driver; Dukes; Dutton; Eiland; Eissler; Elkins; Farias; Farrar; Fletcher; Flynn; Frullo; Gallego; Garza; Geren; Giddings; Gonzales, L.; Gonzales, V.; Gonzalez; Gooden; Guillen;

TX_00003162

Gutierrez; Hamilton; Hancock; Hardcastle; Harless; Harper-Brown; Hartnett; Hernandez Luna; Hilderbran; Hochberg; Hopson; Howard, D.; Hughes; Hunter; Isaac; Jackson; Johnson; Keffer; King, P.; King, S.; King, T.; Kleinschmidt; Kolkhorst; Kuempel; Landtroop; Larson; Laubenberg; Lavender; Legler; Lewis; Lozano; Lucio; Lyne; Madden; Margo; Marquez; Martinez; Martinez Fischer; McClendon; Menendez; Miles; Miller, D.; Miller, S.; Morrison; Murphy; Naishtat; Nash; Oliveira; Orr; Otto; Parker; Patrick; Paxton; Peña; Perry; Phillips; Pickett; Pitts; Price; Quintanilla; Raymond; Reynolds; Riddle; Ritter; Rodriguez; Schwertner; Scott; Sheets; Sheffield; Shelton; Simpson; Smith, T.; Smith, W.; Solomons; Strama; Taylor, L.; Taylor, V.; Thompson; Truitt; Turner; Veasey; Villarreal; Vo; Walle; Weber; White; Woolley; Workman; Zedler; Zerwas.

Present, not voting — Mr. Speaker(C); Howard, C.

Absent, Excused — Anderson, C.; Huberty; Muñoz; Smithee.

Absent — Christian; Mallory Caraway; Torres.

### STATEMENT OF VOTE

When Record No. 1122 was taken, I was in the house but away from my desk. I would have voted yes.

Torres

**Senate Amendment No. 1  (Senate Floor Amendment No. 1)**

Amend **HB 1061** (senate committee printing) by adding the following appropriately numbered SECTION to the bill and renumbering subsequent SECTIONS accordingly:

SECTION ____. Section 825.3012, Government Code, is amended by adding Subsection (b-1) to read as follows:

(b-1)  Notwithstanding Subsection (b) of this section and any provision of Section 825.301, before September 1, 2019, not more than 10 percent of the value of the total investment portfolio of the retirement system may be invested in hedge funds. This subsection expires September 1, 2019.

### HB 563 - HOUSE CONCURS IN SENATE AMENDMENTS
### TEXT OF SENATE AMENDMENTS

Representative Pickett called up with senate amendments for consideration at this time,

**HB 563**, A bill to be entitled An Act relating to the purposes and designation of a transportation reinvestment zone.

Representative Pickett moved to concur in the senate amendments to **HB 563**.

The motion to concur in the senate amendments to **HB 563** prevailed by (Record 1123): 143 Yeas, 0 Nays, 2 Present, not voting.

Yeas — Aliseda; Allen; Alonzo; Alvarado; Anchia; Anderson, R.; Aycock; Beck; Berman; Bohac; Bonnen; Branch; Brown; Burkett; Burnam; Button; Cain; Callegari; Castro; Chisum; Christian; Coleman; Cook; Craddick; Creighton;

Crownover; Darby; Davis, J.; Davis, S.; Davis, Y.; Deshotel; Driver; Dukes; Dutton; Eiland; Eissler; Elkins; Farias; Farrar; Fletcher; Flynn; Frullo; Gallego; Garza; Geren; Giddings; Gonzales, L.; Gonzales, V.; Gonzalez; Gooden; Guillen; Gutierrez; Hamilton; Hancock; Hardcastle; Harless; Harper-Brown; Hartnett; Hernandez Luna; Hilderbran; Hochberg; Hopson; Howard, C.; Howard, D.; Hughes; Hunter; Isaac; Jackson; Johnson; Keffer; King, P.; King, S.; King, T.; Kleinschmidt; Kolkhorst; Kuempel; Landtroop; Larson; Laubenberg; Lavender; Legler; Lewis; Lozano; Lucio; Lyne; Madden; Mallory Caraway; Margo; Marquez; Martinez; Martinez Fischer; McClendon; Menendez; Miles; Miller, D.; Miller, S.; Morrison; Murphy; Naishtat; Nash; Oliveira; Orr; Otto; Parker; Patrick; Paxton; Peña; Perry; Phillips; Pickett; Pitts; Price; Quintanilla; Raymond; Reynolds; Riddle; Ritter; Rodriguez; Schwertner; Scott; Sheets; Sheffield; Shelton; Simpson; Smith, T.; Smith, W.; Solomons; Strama; Taylor, L.; Taylor, V.; Thompson; Truitt; Turner; Veasey; Villarreal; Vo; Walle; Weber; White; Woolley; Workman; Zedler; Zerwas.

Present, not voting — Mr. Speaker(C); Carter.

Absent, Excused — Anderson, C.; Huberty; Muñoz; Smithee.

Absent — Torres.

### STATEMENT OF VOTE

When Record No. 1123 was taken, I was in the house but away from my desk. I would have voted yes.

Torres

**Senate Committee Substitute**

**CSHB 563**, A bill to be entitled An Act relating to the purposes and designation of a transportation reinvestment zone.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  Section 222.105, Transportation Code, is amended to read as follows:

Sec. 222.105.  PURPOSES.  The purposes of Sections 222.106 and 222.107 are to:

(1)  promote public safety;

(2)  facilitate the improvement, development, or redevelopment of property;

(3)  facilitate the movement of traffic; and

(4)  enhance a local entity's ability to sponsor a transportation project authorized under Section 222.104.

SECTION 2.  Section 222.106, Transportation Code, is amended by amending Subsections (b), (c), (g), (h), (i), (j), (k), and (l) and adding Subsections (i-1) and (i-2) to read as follows:

(b)  This section applies only to a municipality in which a transportation project is to be developed [the governing body of which intends to enter into an agreement with the department] under Section 222.104.

TX_00003164
JA_003075

(c) If the governing body determines an area to be unproductive and underdeveloped and that action under this section will further the purposes stated in Section 222.105, the governing body of the municipality by ordinance may designate a contiguous geographic area in the jurisdiction of the municipality to be a transportation reinvestment zone to promote a transportation project [described by Section 222.104 that cultivates development or redevelopment of the area].

(g) The ordinance designating an area as a transportation reinvestment zone must:

(1) describe the boundaries of the zone with sufficient definiteness to identify with ordinary and reasonable certainty the territory included in the zone;

(2) provide that the zone takes effect immediately on passage of the ordinance and that the base year shall be the year of passage of the ordinance or some year in the future;

(3) assign a name to the zone for identification, with the first zone designated by a municipality designated as "Transportation Reinvestment Zone Number One, (City or Town, as applicable) of (name of municipality)," and subsequently designated zones assigned names in the same form, numbered consecutively in the order of their designation;

(4) designate the base year for purposes of establishing the tax increment base of the municipality;

(5) establish a [an ad valorem] tax increment account for the zone; and

(6) [(5)] contain findings that promotion of the transportation project will cultivate the improvement, development, or redevelopment of the zone.

(h) From taxes collected on property in a zone, the municipality shall pay into the tax increment account for the zone [an amount equal to] the tax increment produced by the municipality, less any amount allocated under previous agreements, including agreements under Chapter 380, Local Government Code, or Chapter 311, Tax Code.

(i) All or the portion specified by the municipality of the money deposited to a tax increment account must be used to fund the transportation project for which the zone was designated, as well as aesthetic improvements within the zone. Any remaining money deposited to the tax increment account may be used for other purposes as determined by the municipality [Money deposited to a tax increment account must be used to fund projects authorized under Section 222.104, including the repayment of amounts owed under an agreement entered into under that section].

(i-1) The governing body of a municipality may contract with a public or private entity to develop, redevelop, or improve a transportation project in a transportation reinvestment zone and may pledge and assign all or a specified amount of money in the tax increment account to that entity. After a pledge or assignment is made, if the entity that received the pledge or assignment has itself pledged or assigned that amount to secure bonds or other obligations issued to obtain funding for the transportation project, the governing body of the municipality may not rescind its pledge or assignment until the bonds or other obligations secured by the pledge or assignment have been paid or discharged.

(i-2) To accommodate changes in the limits of the project for which a reinvestment zone was designated, the boundaries of a zone may be amended at any time, except that property may not be removed or excluded from a designated zone if any part of the tax increment account has been assigned or pledged directly by the municipality or through another entity to secure bonds or other obligations issued to obtain funding of the project, and property may not be added to a designated zone unless the governing body of the municipality complies with Subsections (e) and (g).

(j) Except as provided by Subsections (i-1) and [Subsection] (k), a transportation reinvestment zone terminates on December 31 of the year in which the municipality completes [complies with] a contractual requirement, if any, that included the pledge or assignment of all or a portion of money deposited to a tax increment account or the repayment of money owed under an [the] agreement for development, redevelopment, or improvement of the project for [under Section 222.104 in connection with] which the zone was designated.

(k) A transportation reinvestment zone terminates on December 31 of the 10th year after the year the zone was designated, if before that date the municipality has not entered into a contract described in Subsection (i-1) or otherwise not used the zone for the purpose for which it was designated.

(l) Any surplus remaining in a tax increment account on termination of a zone may be used for other purposes as determined by [transportation projects of] the municipality [in or outside of the zone].

SECTION 3. The heading to Section 222.107, Transportation Code, is amended to read as follows:

Sec. 222.107. COUNTY TRANSPORTATION REINVESTMENT ZONES[; TAX ABATEMENTS; ROAD UTILITY DISTRICTS].

SECTION 4. Section 222.107, Transportation Code, is amended by amending Subsections (b), (c), (e), (f), (h), (i), (k), and (l) and adding Subsections (h-1) and (k-1) to read as follows:

(b) This section applies only to a county in which a transportation project is to be developed [the commissioners court of which intends to enter into a pass-through toll agreement with the department] under Section 222.104.

(c) The commissioners court of the county, after determining that an area is unproductive and underdeveloped and that action under this section would further the purposes described by Section 222.105, by order or resolution may designate a contiguous geographic area in the jurisdiction of the county to be a transportation reinvestment zone to promote a transportation project [described by Section 222.104 that cultivates development or redevelopment of the area] and for the purpose of abating ad valorem taxes or granting other relief from taxes imposed by the county on real property located in the zone.

(e) Not later than the 30th day before the date the commissioners court proposes to designate an area as a transportation reinvestment zone under this section, the commissioners court must hold a public hearing on the creation of the zone, its benefits to the county and to property in the proposed zone, and the abatement of ad valorem taxes or the grant of other relief from ad valorem taxes imposed by the county on real property located in the zone.  At the hearing an

TX_00003166

interested person may speak for or against the designation of the zone, its boundaries, or the abatement of or the relief from county taxes on real property in the zone.  Not later than the seventh day before the date of the hearing, notice of the hearing and the intent to create a zone must be published in a newspaper having general circulation in the county.

(f)  The order or resolution designating an area as a transportation reinvestment zone must:

(1)  describe the boundaries of the zone with sufficient definiteness to identify with ordinary and reasonable certainty the territory included in the zone;

(2)  provide that the zone takes effect immediately on adoption of the order or resolution and that the base year shall be the year of passage of the order or resolution or some year in the future; [and]

(3)  assign a name to the zone for identification, with the first zone designated by a county designated as "Transportation Reinvestment Zone Number One, County of (name of county)," and subsequently designated zones assigned names in the same form numbered consecutively in the order of their designation; and

(4)  designate the base year for purposes of establishing the tax increment base of the county.

(h)  The commissioners court by order or resolution may enter into an agreement with the owner of any real property located in the transportation reinvestment zone to abate all or a portion of the ad valorem taxes or to grant other relief from the taxes imposed by the county on the owner's property in an amount not to exceed the amount calculated under Subsection (a)(1) for that year.  All abatements or other relief granted by the commissioners court in a transportation reinvestment zone must be equal in rate.  In the alternative, the commissioners court by order or resolution may elect to abate a portion of the ad valorem taxes or otherwise grant relief from the taxes imposed by the county on all real property located in the zone.  In any ad valorem tax year, the total amount of the taxes abated or the total amount of relief granted under this section may not exceed the amount calculated under Subsection (a)(1) for that year, less any amounts allocated under previous agreements, including agreements under Chapter 381, Local Government Code, or Chapter 312, Tax Code.

(h-1)  To further the development of the transportation project for which the transportation reinvestment zone was designated, a county may assess all or part of the cost of the transportation project against property within the zone. The assessment against each property in the zone may be levied and payable in installments in the same manner as provided by Sections 372.016-372.018, Local Government Code, provided that the installments do not exceed the total amount of the tax abatement or other relief granted under Subsection (h). The county may elect to adopt and apply the provisions of Sections 372.015-372.020 and 372.023, Local Government Code, to the assessment of costs and Sections 372.024-372.030, Local Government Code, to the issuance of bonds by the county to pay the cost of a transportation project.  The commissioners court of the county may contract with a public or private entity to develop, redevelop, or improve a transportation project in the transportation reinvestment zone,

including aesthetic improvements, and may pledge and assign to that entity all or a specified amount of the revenue the county receives from installment payments of the assessments for the payment of the costs of that transportation project. After a pledge or assignment is made, if the entity that received the pledge or assignment has itself pledged or assigned that amount to secure bonds or other obligations issued to obtain funding for the transportation project, the commissioners court of the county may not rescind its pledge or assignment until the bonds or other obligations secured by the pledge or assignment have been paid or discharged.  Any amount received from installment payments of the assessments not pledged or assigned in connection with the transportation project may be used for other purposes associated with the transportation project or in the zone.

(i)  In the alternative, to [To] assist the county in developing a transportation project [authorized under Section 222.104], if authorized by the commission under Chapter 441, a road utility district may be formed under that chapter that has the same boundaries as a transportation reinvestment zone created under this section.

(k)  A road utility district formed as provided by Subsection (i) may enter into an agreement [with the county to assume the obligation, if any, of the county] to fund development of a project [under Section 222.104] or to repay funds owed to the department [under Section 222.104].  Any amount paid for this purpose is considered to be an operating expense of the district.  Any taxes collected by the district that are not paid for this purpose may be used for any district purpose.

(k-1)  To accommodate changes in the limits of the project for which a reinvestment zone was designated, the boundaries of a zone may be amended at any time, except that property may not be removed or excluded from a designated zone if any part of the assessment has been assigned or pledged directly by the county or through another entity to secure bonds or other obligations issued to obtain funding of the project, and property may not be added to a designated zone unless the commissioners court of the county complies with Subsections (e) and (f).

(l)  Except as provided by Subsection (m), a tax abatement agreement entered into under Subsection (h), or an order or resolution on the abatement of taxes or the grant of relief from taxes under that subsection, terminates on December 31 of the year in which the county completes any contractual requirement that included the pledge or assignment of assessments [of money] collected under this section.

SECTION 5.  Subchapter E, Chapter 222, Transportation Code, is amended by adding Sections 222.108, 222.109, and 222.110 to read as follows:

Sec. 222.108.  TRANSPORTATION REINVESTMENT ZONES FOR OTHER TRANSPORTATION PROJECTS. (a)  Notwithstanding the requirement in Sections 222.106(b) and 222.107(b) that a transportation reinvestment zone be established in connection with a project under Section 222.104, a municipality or county may establish a transportation reinvestment zone for any transportation project. If all or part of the transportation project is subject to oversight by the department, at the option of the governing body of the municipality or county, the

department, to the extent permitted by law, shall delegate full responsibility for the development, design, letting of bids, and construction of the project, including project inspection, to the municipality or county.   After assuming responsibility for a project under this subsection, a municipality or county shall enter into an agreement with the department that prescribes:

(1)  the development process;

(2)  the roles and responsibilities of the parties; and

(3)  the timelines for any required reviews or approvals.

(b)  Any portion of a transportation project developed under Subsection (a) that is on the state highway system or is located in the state highway right-of-way must comply with applicable state and federal requirements and criteria for project development, design, and construction, unless the department grants an exception to the municipality or county.

(c)  The development, design, and construction plans and specifications for the portions of a project described by Subsection (b) must be reviewed and approved by the department under the agreement entered into under Subsection (a).

(d)  In this section, "transportation project" has the meaning assigned by Section 370.003.

Sec. 222.109.  REDUCTION PROHIBITED. (a)  A municipality or county may not be penalized with a reduction in traditional transportation funding because of the designation and use of a transportation reinvestment zone under this chapter.  Any funding from the department committed to a project before the date that a transportation reinvestment zone is designated may not be reduced because the transportation reinvestment zone is designated in connection with that project.

(b)  The department may not reduce any allocation of traditional transportation funding to any of its districts because a district contains a municipality or county that contains a transportation reinvestment zone designated under this chapter.

Sec. 222.110.  SALES TAX INCREMENT. (a)  In this section, "sales tax base" for a transportation reinvestment zone means the amount of sales and use taxes imposed by a municipality under Section 321.101(a), Tax Code, or by a county under Chapter 323, Tax Code, as applicable, attributable to the zone for the year in which the zone was designated under this chapter.

(b)  The governing body of a municipality or county may determine, in an ordinance or order designating an area as a transportation reinvestment zone or in an ordinance or order adopted subsequent to the designation of a zone, the portion or amount of tax increment generated from the sales and use taxes imposed by a municipality under Section 321.101(a), Tax Code, or by a county under Chapter 323, Tax Code, attributable to the zone, above the sales tax base, to be used as provided by Subsection (e).   Nothing in this section requires a municipality or county to contribute sales tax increment under this subsection.

(c) A county that designates a portion or amount of sales tax increment under Subsection (b) must establish a tax increment account. A municipality or county shall deposit the designated portion or amount of tax increment under Subsection (b) to the entity's respective tax increment account.

(d) Before pledging or otherwise committing money in the tax increment account under Subsection (c), the governing body of a municipality or county may enter into an agreement, under Subchapter E, Chapter 271, Local Government Code, to authorize and direct the comptroller to:

(1) withhold from any payment to which the municipality or county may be entitled the amount of the payment into the tax increment account under Subsection (b);

(2) deposit that amount into the tax increment account; and

(3) continue withholding and making additional payments into the tax increment account until an amount sufficient to satisfy the amount due has been met.

(e) The sales and use taxes to be deposited into the tax increment account under this section may be disbursed from the account only to:

(1) pay for projects authorized under Section 222.104, including the repayment of amounts owed under an agreement entered into under that section; and

(2) notwithstanding Sections 321.506 and 323.505, Tax Code, satisfy claims of holders of tax increment bonds, notes, or other obligations issued or incurred for projects authorized under Section 222.104.

(f) The amount deposited by a county to a tax increment account under this section is not considered to be sales and use tax revenue for the purpose of property tax reduction and computation of the county tax rate under Section 26.041, Tax Code.

SECTION 6. Sections 222.106(h), (i), (j), (k), and (l) and 222.107(h), (i), (k), and (l), Transportation Code, as amended by this Act, and Sections 222.106(i-1) and (i-2), 222.107(h-1) and (k-1), 222.108, and 222.109, Transportation Code, as added by this Act, apply to a transportation reinvestment zone that is governed by those sections designated before the effective date of this Act.

SECTION 7. This Act takes effect September 1, 2011.

**Senate Amendment No. 1 (Senate Floor Amendment No. 1)**

Amend **CSHB 563** (senate committee report) in SECTION 5 of the bill, after added Section 222.110(f), Transportation Code (page 5, between lines 63 and 64), by adding the following:

(g) Not later than the 30th day before the date the governing body of a municipality or county proposes to designate a portion or amount of sales tax increment under Subsection (b), the governing body shall hold a public hearing on the designation of the sales tax increment. At the hearing an interested person may speak for or against the designation of the sales tax increment. Not later than the seventh day before the date of the hearing, notice of the hearing must be published in a newspaper having general circulation in the county or municipality, as appropriate.

(h)  The hearing required under Subsection (g) may be held in conjunction with a hearing held under Section 222.106(e) or 222.107(e) if the ordinance or order designating an area as a transportation reinvestment zone under Section 222.106 or 222.107 also designates a sales tax increment under Subsection (b).

## HB 1829 - HOUSE CONCURS IN SENATE AMENDMENTS
## TEXT OF SENATE AMENDMENTS

Representative Naishtat called up with senate amendments for consideration at this time,

**HB 1829**, A bill to be entitled An Act relating to the transfer to a mental hospital of a person admitted to a facility for emergency detention.

Representative Naishtat moved to concur in the senate amendments to **HB 1829**.

The motion to concur in the senate amendments to **HB 1829** prevailed by (Record 1124): 141 Yeas, 0 Nays, 1 Present, not voting.

Yeas — Aliseda; Allen; Alonzo; Alvarado; Anchia; Anderson, R.; Aycock; Beck; Berman; Bohac; Bonnen; Branch; Brown; Burkett; Burnam; Button; Cain; Callegari; Carter; Castro; Chisum; Coleman; Cook; Craddick; Creighton; Crownover; Darby; Davis, J.; Davis, S.; Davis, Y.; Deshotel; Driver; Dukes; Dutton; Eiland; Eissler; Farias; Farrar; Fletcher; Flynn; Frullo; Gallego; Garza; Geren; Giddings; Gonzales, L.; Gonzales, V.; Gonzalez; Gooden; Guillen; Gutierrez; Hamilton; Hancock; Hardcastle; Harless; Harper-Brown; Hartnett; Hernandez Luna; Hilderbran; Hochberg; Hopson; Howard, C.; Howard, D.; Hughes; Hunter; Isaac; Jackson; Johnson; Keffer; King, P.; King, S.; King, T.; Kleinschmidt; Kolkhorst; Kuempel; Landtroop; Larson; Laubenberg; Lavender; Legler; Lewis; Lozano; Lucio; Lyne; Madden; Mallory Caraway; Margo; Marquez; Martinez; Martinez Fischer; McClendon; Menendez; Miles; Miller, D.; Miller, S.; Murphy; Naishtat; Nash; Oliveira; Orr; Otto; Parker; Patrick; Paxton; Peña; Perry; Phillips; Pickett; Pitts; Price; Quintanilla; Raymond; Reynolds; Riddle; Ritter; Rodriguez; Schwertner; Scott; Sheets; Sheffield; Shelton; Simpson; Smith, T.; Smith, W.; Solomons; Strama; Taylor, V.; Thompson; Torres; Truitt; Turner; Veasey; Villarreal; Vo; Walle; Weber; White; Woolley; Workman; Zedler; Zerwas.

Present, not voting — Mr. Speaker(C).

Absent, Excused — Anderson, C.; Huberty; Muñoz; Smithee.

Absent — Christian; Elkins; Morrison; Taylor, L.

### STATEMENT OF VOTE

When Record No. 1124 was taken, I was in the house but away from my desk. I would have voted yes.

L. Taylor

**Senate Committee Substitute**

**CSHB 1829**, A bill entitled to be An Act relating to an application for emergency detention and to the transfer to a mental hospital of a person admitted for emergency detention.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1. Section 573.012, Health and Safety Code, is amended by adding Subsection (h-1) to read as follows:

(h-1) After the presentation of an application under Subsection (h), the judge or magistrate may transmit a warrant to the applicant electronically, if a digital signature, as defined by Article 2.26, Code of Criminal Procedure, is transmitted with the document.

SECTION 2. Section 573.022, Health and Safety Code, is amended by adding Subsection (c) to read as follows:

(c) A facility that has admitted a person for emergency detention under Subsection (a) or to which a person has been transported under Subsection (b) may transfer the person to an appropriate mental hospital with the written consent of the hospital administrator.

SECTION 3. This Act takes effect September 1, 2011.

**Senate Amendment No. 1 (Senate Floor Amendment No. 1)**

Amend **CSHB 1829** (senate committee printing) by striking SECTION 1 of the bill and substituting the following:

SECTION 1. Section 573.012, Health and Safety Code, is amended by amending Subsection (h) and adding Subsection (h-1) to read as follows:

(h) A judge or magistrate may permit an applicant who is a physician to present an application by:

(1) e-mail with the application attached as a secure document in a portable document format (PDF); or

(2) secure electronic means, including:

(A) satellite transmission;

(B) [,] closed-circuit television transmission;[,] or

(C) any other method of two-way electronic communication that:

(i) [(1)] is secure;

(ii) [(2)] is available to the judge or magistrate; and

(iii) [(3)] provides for a simultaneous, compressed full-motion video and interactive communication of image and sound between the judge or magistrate and the applicant.

(h-1) After the presentation of an application under Subsection (h), the judge or magistrate may transmit a warrant to the applicant:

(1) electronically, if a digital signature, as defined by Article 2.26, Code of Criminal Procedure, is transmitted with the document; or

(2) by e-mail with the warrant attached as a secure document in a portable document format (PDF), if the identifiable legal signature of the judge or magistrate is transmitted with the document.

## HB 3487 - HOUSE CONCURS IN SENATE AMENDMENTS
## TEXT OF SENATE AMENDMENTS

Representative V. Taylor called up with senate amendments for consideration at this time,

**HB 3487**, A bill to be entitled An Act relating to regulations concerning certain service animals; providing a criminal penalty.

Representative V. Taylor moved to concur in the senate amendments to **HB 3487**.

The motion to concur in the senate amendments to **HB 3487** prevailed by (Record 1125): 143 Yeas, 0 Nays, 1 Present, not voting.

Yeas — Aliseda; Allen; Alonzo; Alvarado; Anchia; Anderson, R.; Aycock; Beck; Berman; Bohac; Bonnen; Branch; Brown; Burkett; Burnam; Button; Cain; Callegari; Carter; Castro; Chisum; Coleman; Cook; Craddick; Creighton; Crownover; Darby; Davis, J.; Davis, S.; Davis, Y.; Deshotel; Driver; Dukes; Dutton; Eiland; Eissler; Elkins; Farias; Farrar; Fletcher; Flynn; Frullo; Gallego; Garza; Geren; Giddings; Gonzales, L.; Gonzales, V.; Gonzalez; Gooden; Guillen; Gutierrez; Hamilton; Hancock; Hardcastle; Harless; Harper-Brown; Hartnett; Hernandez Luna; Hilderbran; Hochberg; Hopson; Howard, C.; Howard, D.; Hughes; Hunter; Isaac; Jackson; Johnson; Keffer; King, P.; King, S.; King, T.; Kleinschmidt; Kolkhorst; Kuempel; Landtroop; Larson; Laubenberg; Lavender; Legler; Lewis; Lozano; Lucio; Lyne; Madden; Mallory Caraway; Margo; Marquez; Martinez; Martinez Fischer; McClendon; Menendez; Miles; Miller, D.; Miller, S.; Morrison; Murphy; Naishtat; Nash; Oliveira; Orr; Otto; Parker; Patrick; Paxton; Peña; Perry; Phillips; Pickett; Pitts; Price; Quintanilla; Raymond; Reynolds; Riddle; Ritter; Rodriguez; Schwertner; Scott; Sheets; Sheffield; Shelton; Simpson; Smith, T.; Smith, W.; Solomons; Strama; Taylor, L.; Taylor, V.; Thompson; Truitt; Turner; Veasey; Villarreal; Vo; Walle; Weber; White; Woolley; Workman; Zedler; Zerwas.

Present, not voting — Mr. Speaker(C).

Absent, Excused — Anderson, C.; Huberty; Muñoz; Smithee.

Absent — Christian; Torres.

### STATEMENT OF VOTE

When Record No. 1125 was taken, I was in the house but away from my desk. I would have voted yes.

Torres

**Senate Amendment No. 1  (Senate Floor Amendment No. 1)**

Amend **HB 3487** (senate committee printing) in SECTION 1 of the bill by striking added Section 106.004, Business & Commerce Code (page 2, lines 3-7), and substituting the following:

Sec. 106.004. CIVIL PENALTY. The owner or operator of a commercial lodging establishment or restaurant that violates Section 106.002 is liable for a civil penalty in an amount not to exceed $200 for each violation.

TX_00003173
JA_003084

TX_00003173

## HB 848 - HOUSE CONCURS IN SENATE AMENDMENTS
## TEXT OF SENATE AMENDMENTS

Representative Guillen called up with senate amendments for consideration at this time,

**HB 848**, A bill to be entitled An Act relating to an agreement authorizing certain persons to make decisions regarding a child during an investigation of child abuse or neglect.

Representative Guillen moved to concur in the senate amendments to **HB 848**.

The motion to concur in the senate amendments to **HB 848** prevailed by (Record 1126): 143 Yeas, 0 Nays, 2 Present, not voting.

Yeas — Aliseda; Allen; Alonzo; Alvarado; Anchia; Anderson, R.; Aycock; Beck; Berman; Bohac; Bonnen; Branch; Brown; Burkett; Burnam; Button; Cain; Callegari; Carter; Castro; Chisum; Coleman; Cook; Craddick; Creighton; Crownover; Darby; Davis, J.; Davis, S.; Davis, Y.; Deshotel; Driver; Dukes; Eiland; Eissler; Elkins; Farias; Farrar; Fletcher; Flynn; Frullo; Gallego; Garza; Geren; Giddings; Gonzales, L.; Gonzales, V.; Gonzalez; Gooden; Guillen; Gutierrez; Hamilton; Hancock; Hardcastle; Harless; Harper-Brown; Hartnett; Hernandez Luna; Hilderbran; Hochberg; Hopson; Howard, C.; Howard, D.; Hughes; Hunter; Isaac; Jackson; Johnson; Keffer; King, P.; King, S.; King, T.; Kleinschmidt; Kolkhorst; Kuempel; Landtroop; Larson; Laubenberg; Lavender; Legler; Lewis; Lozano; Lucio; Lyne; Madden; Mallory Caraway; Margo; Marquez; Martinez; Martinez Fischer; McClendon; Menendez; Miles; Miller, D.; Miller, S.; Morrison; Murphy; Naishtat; Nash; Oliveira; Orr; Otto; Parker; Patrick; Paxton; Peña; Perry; Phillips; Pickett; Pitts; Price; Quintanilla; Raymond; Reynolds; Riddle; Ritter; Rodriguez; Schwertner; Scott; Sheets; Sheffield; Shelton; Simpson; Smith, T.; Smith, W.; Solomons; Strama; Taylor, L.; Taylor, V.; Thompson; Torres; Truitt; Turner; Veasey; Villarreal; Vo; Walle; Weber; White; Woolley; Workman; Zedler; Zerwas.

Present, not voting — Mr. Speaker(C); Dutton.

Absent, Excused — Anderson, C.; Huberty; Muñoz; Smithee.

Absent — Christian.

## Senate Committee Substitute

**CSHB 848**, A bill to be entitled An Act relating to an agreement authorizing certain persons to make decisions regarding a child during an investigation of child abuse or neglect.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  Section 34.001, Family Code, is amended to read as follows:

Sec. 34.001.  APPLICABILITY. This chapter applies only to:

(1)  an authorization agreement between a parent of a child and a person who is the child's:

(A) [(1)] grandparent;

(B) [(2)] adult sibling; or

(C) [(3)] adult aunt or uncle; and

(2) an authorization agreement between a parent of a child and the person with whom the child is placed under a parental child safety placement agreement.

SECTION 2.  Chapter 34, Family Code, is amended by adding Section 34.0021 to read as follows:

Sec. 34.0021.  AUTHORIZATION AGREEMENT BY PARENT IN CHILD PROTECTIVE SERVICES CASE.  A parent may enter into an authorization agreement with a relative or other person with whom a child is placed under a parental child safety placement agreement approved by the Department of Family and Protective Services to allow the person to perform the acts described by Section 34.002(a) with regard to the child:

(1) during an investigation of abuse or neglect; or

(2) while the department is providing services to the parent.

SECTION 3.  This Act takes effect September 1, 2011.

**Senate Amendment No. 1  (Senate Floor Amendment No. 1)**

Amend **CSHB 848** (senate committee printing) by adding new SECTION 2 (page one, between lines 24 and 25) to read as follows and renumbering subsequent SECTIONS appropriately:

SECTION 2.  Subsection (c), Section 34.002, Family Code, is amended to read as follows:

(c) An authorization agreement under this chapter does not confer on a relative of the child listed in Section 34.001 or a relative or other person with whom the child is placed under a child safety placement agreement the right to authorize the performance of an abortion on the child or the administration of emergency contraception to the child.

**HR 2020 - ADOPTED**
**(by Harless)**

The following privileged resolution was laid before the house:

**HR 2020**

BE IT RESOLVED by the House of Representatives of the State of Texas, 82nd Legislature, Regular Session, 2011, That House Rule 13, Section 9(a), be suspended in part as provided by House Rule 13, Section 9(f), to enable the conference committee appointed to resolve the differences on **SB 14** (requirements to vote, including presenting proof of identification; providing criminal penalties), to consider and take action on the following matters:

(1) House Rule 13, Section 9(a)(1), is suspended to permit the committee to change text not in disagreement in proposed SECTION 11 of the bill, in added Section 63.0012(a), Election Code, to read as follows:

(a) An election officer shall distribute written notice of the identification that will be required for voting beginning with elections held after January 1, 2012, and information on obtaining identification without a fee under Chapter

521A, Transportation Code, to each voter who, when offering to vote, presents a form of identification that will not be sufficient for acceptance as a voter under this chapter beginning with those elections.

Explanation: This change is necessary to update the cross-reference to reflect the addition of Chapter 521A, Transportation Code.

(2)  House Rule 13, Section 9(a)(1), is suspended to permit the committee to change text not in disagreement in proposed SECTION 14 of the bill, in amended Section 63.0101(1), Election Code, to read as follows:

(1)  a driver's license, election identification certificate, or personal identification card issued to the person by the Department of Public Safety that has not [or a similar document issued to the person by an agency of another state, regardless of whether the license or card has] expired or that expired no earlier than 60 days before the date of presentation;

Explanation: This change is necessary to update the list of acceptable forms of identification to reflect the addition of election identification certificates in Chapter 521A, Transportation Code.

(3)  House Rule 13, Section 9(a)(1), is suspended to permit the committee to change text not in disagreement in proposed SECTION 17 of the bill, in added Section 65.054(b)(2)(B), Election Code, to read as follows:

(B)  notwithstanding Chapter 110, Civil Practice and Remedies Code, executes an affidavit under penalty of perjury that states the voter has a religious objection to being photographed and the voter has consistently refused to be photographed for any governmental purpose from the time the voter has held this belief; or

Explanation: This change is necessary to clarify the religious objection exception to the requirement that a voter have photo identification to vote.

(4)  House Rule 13, Section 9(a)(1), is suspended to permit the committee to change text not in disagreement in proposed SECTION 18 of the bill, in added Section 65.0541(a), Election Code, to read as follows:

(a)  A voter who is accepted for provisional voting under Section 63.011 because the voter does not meet the identification requirements of Section 63.001(b) may, not later than the sixth day after the date of the election:

(1)  present a form of identification described by Section 63.0101 to the voter registrar for examination; or

(2)  execute an affidavit described by Section 65.054(b)(2)(B) or (C) in the presence of the voter registrar.

Explanation: This change is necessary to update the cross-reference to reflect the addition of Section 65.054(b)(2)(C), Election Code.

(5)  House Rule 13, Section 9(a)(4), is suspended to permit the committee to add text on a matter not included in either version of the bill by adding the following new SECTION to the bill:

SECTION 20. Subtitle B, Title 7, Transportation Code, is amended by adding Chapter 521A to read as follows:

## CHAPTER 521A. ELECTION IDENTIFICATION CERTIFICATE

Sec. 521A.001. ELECTION IDENTIFICATION CERTIFICATE. (a) The department shall issue an election identification certificate to a person who states that the person is obtaining the certificate for the purpose of satisfying Section 63.001(b), Election Code, and does not have another form of identification described by Section 63.0101, Election Code, and:

(1) who is a registered voter in this state and presents a valid voter registration certificate; or

(2) who is eligible for registration under Section 13.001, Election Code, and submits a registration application to the department.

(b) The department may not collect a fee for an election identification certificate or a duplicate election identification certificate issued under this section.

(c) An election identification certificate may not be used or accepted as a personal identification certificate.

(d) An election officer may not deny the holder of an election identification certificate the ability to vote because the holder has an election identification certificate rather than a driver's license or personal identification certificate issued under this subtitle.

(e) An election identification certificate must be similar in form to, but distinguishable in color from, a driver's license and a personal identification certificate. The department may cooperate with the secretary of state in developing the form and appearance of an election identification certificate.

(f) The department may require each applicant for an original or renewal election identification certificate to furnish to the department the information required by Section 521.142.

(g) The department may cancel and require surrender of an election identification certificate after determining that the holder was not entitled to the certificate or gave incorrect or incomplete information in the application for the certificate.

(h) A certificate expires on a date specified by the department, except that a certificate issued to a person 70 years of age or older does not expire.

Explanation: This addition is necessary to provide election identification certificates to certain voters without charge to enable those voters to meet the photo identification requirements for voting.

## HR 2020 - STATEMENT OF LEGISLATIVE INTENT

REPRESENTATIVE HARLESS: This is a resolution to allow the voter ID conference committee to go outside the bounds to make clarifying corrections. The conference committee report creates a separate free photo ID for voting purposes called an election identification certificate. The election identification certificate mirrors existing law and is essentially the same as a DPS personal ID card, except that an election ID may only be used for voting purposes. Election IDs issued to voters 70 or older do not expire. The added language ensures that the free ID issued by the DPS for voting will not impact the Texas Mobility Fund. Although TxDOT stated that the original language in **SB 14** would have not materially or significantly reduced the revenue to the mobility fund, the

conference committee made this clarification to eliminate any concerns. The conference committee report also clarified that a voter claiming religious exemption to show photo ID must have consistently refused to be photographed for any governmental purpose. This is to ensure those claiming this exemption are doing so for a legitimate reason.

REPRESENTATIVE BURNAM: Is this the privileged resolution that was placed on our desk first thing this morning?

HARLESS: Yes, sir.

BURNAM: And did you just give a thorough reading of what it does?

HARLESS: Yes, sir.

BURNAM: May I ask you a few questions about it for clarification?

HARLESS: Yes.

BURNAM: On line 15, you make reference to identification without a fee. Can you tell me how you are going to assure that there will be no fees and how it will be funded?

HARLESS: Okay, line 15, on page 1 of the resolution?

BURNAM: Correct.

HARLESS: Okay. DPS has said that there would be no fee in the bill itself in the conference committee report. Representative Anchia offered an amendment—which we have kept the provisions of in the bill—saying that any replacement card would be free of charge. Any original or replacement.

BURNAM: And where did you say it's funded now?

HARLESS: It's not funded now because it's a new form of ID. It's a new form of ID, it's not something that has been in the Transportation Code in the past.

BURNAM: Okay, so how's it going to be funded?

HARLESS: There's no fee for it.

BURNAM: No, no, how is DPS—I have legislative oversight on that committee. How is DPS going to pay for this?

HARLESS: I'm not advised to that.

BURNAM: So, are there maybe tens of thousands of new IDs that DPS is going to be required to provide, and we have not identified the funding for us to do that?

HARLESS: All the testimony and the 12 hours of communication we had on the floor on this bill stated that the thought process is, this population is very, very small. This only applies to the people that don't have one of the proof forms of identification which is the driver's license and ID card, a passport, a citizen certificate with a photo ID.

BURNAM:  Could we move on now to line 16?  I realize because this is a privileged resolution that I can't offer an amendment, but I was perplexed by your word choice on line 16 when you refer to the would-be, want-to-be, potential voter as someone who is—when offering to vote, don't you mean to say they are "attempting" to vote?

HARLESS:  This wording was done by the LBB, and I think that's what they mean—offering, attempt to vote.

BURNAM:  Well, I would suggest a more accurate portrayal, although maybe this is acceptable to the author, would be that "when voters are attempting to vote and are on the verge of being declined the opportunity to vote."  On line 17, "presents a form of identification that will not be sufficient," would you describe what will not be sufficient that has in the past been sufficient?

HARLESS:  It's my understanding that if they don't have one of the forms, the approved forms of identification that I mentioned previously—your driver's license, ID card, concealed hand gun, passport, citizenship paper with a picture, and a military ID.

BURNAM:  Then moving right along, thank you very much, on page 2, line 2, is the first reference to election identification certification.  There is an entire chapter on that beginning on page 3, line 18. Once again, I assume that you mean, on line 20, that "the department shall," you're referring to DPS?

HARLESS:  Yes.

BURNAM:  And, while you maintain that the fiscal note is minimal, there is nothing available attached to this privileged resolution. Why is that?

HARLESS:  I guess they assume there's not going to be a significant cost to the department.

### REMARKS ORDERED PRINTED

Representative Burnam moved to print remarks between Representative Harless and Representative Burnam.

The motion prevailed.

### MESSAGE FROM THE SENATE

A message from the senate was received at this time (see the addendum to the daily journal, Messages from the Senate, Message No. 2).

### HR 2020 - (consideration continued)

### HR 2020 - POINT OF ORDER

Representative Walle raised a point of order against further consideration of **HB 2020** under Rule 13, Section 9(g)(5) of the House Rules on the grounds that a fiscal note was not included.

The speaker overruled the point of order.

**HR 2020** was adopted by (Record 1127): 99 Yeas, 45 Nays, 1 Present, not voting.

Yeas — Aliseda; Anderson, R.; Aycock; Beck; Berman; Bohac; Bonnen; Branch; Brown; Burkett; Button; Cain; Callegari; Carter; Chisum; Christian; Cook; Craddick; Creighton; Crownover; Darby; Davis, J.; Davis, S.; Driver; Eiland; Eissler; Elkins; Fletcher; Flynn; Frullo; Garza; Geren; Gonzales, L.; Gooden; Hamilton; Hancock; Hardcastle; Harless; Harper-Brown; Hartnett; Hilderbran; Hopson; Howard, C.; Hughes; Hunter; Isaac; Jackson; Keffer; King, P.; King, S.; Kleinschmidt; Kolkhorst; Kuempel; Landtroop; Larson; Laubenberg; Lavender; Legler; Lewis; Lyne; Madden; Margo; McClendon; Miller, D.; Miller, S.; Morrison; Murphy; Nash; Orr; Otto; Parker; Patrick; Paxton; Perry; Phillips; Pickett; Pitts; Price; Riddle; Ritter; Schwertner; Scott; Sheets; Sheffield; Shelton; Simpson; Smith, T.; Smith, W.; Solomons; Taylor, L.; Taylor, V.; Torres; Truitt; Weber; White; Woolley; Workman; Zedler; Zerwas.

Nays — Allen; Alonzo; Alvarado; Anchia; Burnam; Castro; Coleman; Davis, Y.; Deshotel; Dukes; Dutton; Farias; Farrar; Gallego; Giddings; Gonzales, V.; Gonzalez; Gutierrez; Hernandez Luna; Hochberg; Howard, D.; Johnson; King, T.; Lozano; Lucio; Mallory Caraway; Marquez; Martinez; Martinez Fischer; Menendez; Miles; Naishtat; Oliveira; Peña; Quintanilla; Raymond; Reynolds; Rodriguez; Strama; Thompson; Turner; Veasey; Villarreal; Vo; Walle.

Present, not voting — Mr. Speaker(C).

Absent, Excused — Anderson, C.; Huberty; Muñoz; Smithee.

Absent — Guillen.

### STATEMENT OF VOTE

When Record No. 1127 was taken, I was excused because of important business in the district. I would have voted no.

Muñoz

### SB 14 - ADOPTION OF CONFERENCE COMMITTEE REPORT

Representative Harless submitted the conference committee report on **SB 14**.

Representative Harless moved to adopt the conference committee report on **SB 14**.

The motion to adopt the conference committee report on **SB 14** prevailed by (Record 1128): 98 Yeas, 46 Nays, 1 Present, not voting.

Yeas — Aliseda; Anderson, R.; Aycock; Beck; Berman; Bohac; Bonnen; Branch; Brown; Burkett; Button; Cain; Callegari; Carter; Chisum; Christian; Cook; Craddick; Creighton; Crownover; Darby; Davis, J.; Davis, S.; Driver; Eiland; Eissler; Elkins; Fletcher; Flynn; Frullo; Garza; Geren; Gonzales, L.; Gooden; Hamilton; Hancock; Hardcastle; Harless; Harper-Brown; Hartnett; Hilderbran; Hopson; Howard, C.; Hughes; Hunter; Isaac; Jackson; Keffer; King, P.; King, S.; Kleinschmidt; Kolkhorst; Kuempel; Landtroop; Larson; Laubenberg; Lavender; Legler; Lewis; Madden; Margo; Miller, D.; Miller, S.; Morrison; Murphy; Nash; Orr; Otto; Parker; Patrick; Paxton; Peña; Perry; Phillips; Pickett;

TX_00003180

Pitts; Price; Riddle; Ritter; Schwertner; Scott; Sheets; Sheffield; Shelton; Simpson; Smith, T.; Smith, W.; Solomons; Taylor, L.; Taylor, V.; Torres; Truitt; Weber; White; Woolley; Workman; Zedler; Zerwas.

Nays — Allen; Alonzo; Alvarado; Anchia; Burnam; Castro; Coleman; Davis, Y.; Deshotel; Dukes; Dutton; Farias; Farrar; Gallego; Giddings; Gonzales, V.; Gonzalez; Guillen; Gutierrez; Hernandez Luna; Hochberg; Howard, D.; Johnson; King, T.; Lozano; Lucio; Mallory Caraway; Marquez; Martinez; Martinez Fischer; McClendon; Menendez; Miles; Naishtat; Oliveira; Quintanilla; Raymond; Reynolds; Rodriguez; Strama; Thompson; Turner; Veasey; Villarreal; Vo; Walle.

Present, not voting — Mr. Speaker(C).

Absent, Excused — Anderson, C.; Huberty; Muñoz; Smithee.

Absent — Lyne.

## STATEMENTS OF VOTE

When Record No. 1128 was taken, I was excused because of important business. I would have voted yes.

Huberty

When Record No. 1128 was taken, I was absent because of important business in the district. I would have voted no.

Muñoz

## COMMITTEES GRANTED PERMISSION TO MEET

Representative Hunter requested permission for the Committee on Calendars to meet while the house is in session, during bill referral today, in 3W.9, to set a calendar.

Permission to meet was granted.

Representative Branch requested permission for the Committee on Higher Education to meet while the house is in session, during bill referral today, in 3W.15, to consider pending business.

Permission to meet was granted.

## COMMITTEE MEETING ANNOUNCEMENTS

The following committee meetings were announced:

Calendars, during bill referral today, 3W.9, for a formal meeting, to set a calendar.

Higher Education, during bill referral today, 3W.15, for a formal meeting, to consider pending business.

## COMMITTEES GRANTED PERMISSION TO MEET

Representative Deshotel requested permission for the Committees on Business and Industry and Pensions, Investments, and Financial Services to meet while the house is in session, during bill referral today, in E2.026, to consider pending business.

Permission to meet was granted.

## PROVIDING FOR ADJOURNMENT

Representative Otto moved that, at the conclusion of the reading of bills and resolutions on first reading and referral to committees, the house adjourn until 10 a.m. tomorrow.

The motion prevailed.

## BILLS AND JOINT RESOLUTIONS ON FIRST READING
## AND REFERRAL TO COMMITTEES
## RESOLUTIONS REFERRED TO COMMITTEES

Bills and joint resolutions were at this time laid before the house, read first time, and referred to committees. Resolutions were at this time laid before the house and referred to committees. (See the addendum to the daily journal, Referred to Committees, List No. 1.)

(Flynn in the chair)

## ADJOURNMENT

In accordance with a previous motion, the house, at 5:22 p.m., adjourned until 10 a.m. tomorrow.

––––––––––––––––

## ADDENDUM

––––––––––––––––

## REFERRED TO COMMITTEES

The following bills and joint resolutions were today laid before the house, read first time, and referred to committees, and the following resolutions were today laid before the house and referred to committees. If indicated, the chair today corrected the referral of the following measures:

List No. 1

**HCR 160** (By Hughes), In memory of former state representative Dr. Bob Glaze.

To Rules and Resolutions.

**HCR 162** (By J. Davis), Congratulating the Space Center Intermediate Band in Houston on its receipt of a 2010 Sudler Cup.

To Rules and Resolutions.

**HCR 164** (By Smithee), Honoring Jean Hilfiger of Saint-Nabord, France, for his courageous actions in assisting U.S. military forces in France during World War II.

To Rules and Resolutions.

**HR 1958** (By Muñoz), Encouraging school districts to employ certified librarians in elementary schools.

To Public Education.

**HR 1959** (By Muñoz), In memory of Border Patrol agent Eduardo Lee "Eddie" Vela of Mission.

To Rules and Resolutions.

**HR 1960** (By V. Gonzales), Congratulating Omar Ochoa of Austin on his graduation from The University of Texas School of Law.

To Rules and Resolutions.

**HR 1961** (By V. Gonzales), Congratulating Rolando Castaneda on his appointment as chief of the Edinburg Police Department.

To Rules and Resolutions.

**HR 1962** (By Castro), Commending Vice Admiral William H. McRaven for his distinguished service to the United States of America and congratulating him on his nomination to lead U.S. Special Operations Command.

To Rules and Resolutions.

**HR 1964** (By D. Miller), Congratulating Amanda Miller on her graduation from Texas A&M University.

To Rules and Resolutions.

**HR 1965** (By Menendez), Congratulating Eric Cooper, president and CEO of the San Antonio Food Bank, on his selection as the 2011 Executive Director of the Year by Feeding America.

To Rules and Resolutions.

**HR 1966** (By Flynn), In memory of the Reverend David Wilkerson of Lindale, the founding pastor of Times Square Church in New York City and best-selling author.

To Rules and Resolutions.

**HR 1967** (By Perry), Congratulating Dr. Patrick J. Hanford on the occasion of his installation as president of the Texas Osteopathic Medical Association.

To Rules and Resolutions.

**HR 1968** (By Gooden), Commemorating the dedication of the Terrell Veterans Memorial on Memorial Day 2011.

To Rules and Resolutions.

**HR 1969** (By Gooden), Congratulating Billie Sue Squires of Terrell on her retirement from American National Bank.

To Rules and Resolutions.

**HR 1970** (By Huberty), Congratulating Richard and Maureen Huberty on their 50th wedding anniversary.

To Rules and Resolutions.

**HR 1971** (By Kolkhorst), Urging the nation's commander in chief, the executive branch of the federal government, and the United States Congress to assign top priority to alleviating the backlog of disability claims by U.S. veterans.

To Defense and Veterans' Affairs.

**HR 1972** (By Craddick), Honoring Baylor University women's golf coach Sylvia Ferdon on her retirement.

To Rules and Resolutions.

**HR 1973** (By D. Miller), Commemorating the Gillespie County Fair and Festivals Association Barbecue Cook-off.

To Rules and Resolutions.

**HR 1974** (By Pitts), In memory of U.S. Army Private First Class Joel Ramirez of Waxahachie.

To Rules and Resolutions.

**HR 1975** (By Branch), Recognizing May 20, 2011, as GenTX Day.

To Rules and Resolutions.

**HR 1976** (By Branch), Congratulating James B. Bonham Elementary School in Dallas on its selection as a Blue Ribbon School.

To Rules and Resolutions.

**HR 1977** (By Button), Commemorating the 51st Biennial Chinese American Citizens Alliance National Convention to be held in Houston on July 27-30, 2011.

To Rules and Resolutions.

**HR 1978** (By Zerwas), Requesting the lieutenant governor and the speaker to create a joint interim committee to study the overall economic and systemic impact of Alzheimer's disease through 2017, including an inventory of public and private infrastructure and capacity and funds and systems to support and expand statewide planning and the activities of the Texas Alzheimer's Research Consortium.

To Public Health.

**HR 1980** (By Legler), Honoring country music star Mickey Gilley.

To Rules and Resolutions.

**HR 1982** (By Sheets), Congratulating Sarah Mason Thomas, Ashley Stallard, Nicole Johnson, and Savannah Still of Faith Academy in Marble Falls on winning titles at the 2010 and 2011 TAPPS Tennis State Championships.

To Rules and Resolutions.

**HR 1983** (By V. Gonzales), Congratulating Rosendo Hinojosa on his appointment as senior executive chief patrol agent of the U.S. Border Patrol Rio Grande Valley Sector.

To Rules and Resolutions.

**HR 1984** (By Reynolds), Congratulating Constable Ruben Davis, who is celebrating 15 years of service with Fort Bend County.

To Rules and Resolutions.

**HR 1985** (By Bonnen), Congratulating Mike and Dorothy Kight on their 50th wedding anniversary.

To Rules and Resolutions.

**HR 1987** (By Truitt), Honoring the boys' soccer team of Carroll High School in Southlake on winning the 2010-2011 UIL 5A state championship.

To Rules and Resolutions.

**HR 1988** (By Eissler), In memory of U.S. Army Private First Class Kyle Matthew Holder of The Woodlands.

To Rules and Resolutions.

**HR 1989** (By Eissler), In memory of U.S. Marine Corps Corporal Jeffrey Warren Johnson of Tomball.

To Rules and Resolutions.

**HR 1990** (By L. Gonzales), Honoring the buddies and volunteers of the Miracle League of Austin.

To Rules and Resolutions.

**HR 1991** (By Hilderbran), Congratulating Kerrville Municipal/Louis Schreiner Field Airport on being named the 2011 General Aviation Airport of the Year by the Texas Department of Transportation aviation division.

To Rules and Resolutions.

**HR 1992** (By Margo), Congratulating Michelle Holguin, Diana Pahman, and Jarisma Rodriguez of El Paso Community College for having their scientific experiment selected for the final mission of the space shuttle Endeavour.

To Rules and Resolutions.

**HR 1993** (By Flynn), Congratulating country star and native Texan Miranda Lambert on her latest awards.

To Rules and Resolutions.

**HR 1994** (By Kleinschmidt), Congratulating the Round Top-Carmine Cubettes volleyball team on winning the 2010-2011 UIL 1A state championship.

To Rules and Resolutions.

**HR 1995** (By Hilderbran), Congratulating Clifton Fifer, Jr., on his receipt of an Outstanding Educator Award from the George Bush Presidential Library and Museum.

To Rules and Resolutions.

**HR 1996** (By Hochberg), Honoring Beckie Driver of Houston for her longtime service in the field of adult education.

To Rules and Resolutions.

**HR 1997** (By McClendon), Honoring Delores Ray Littlejohn George of San Antonio on her 75th birthday.

To Rules and Resolutions.

**HR 1998** (By S. King), Commemorating the dedication of the William G. and Shirley Swenson Home in Abilene as a Recorded Texas Historic Landmark.

To Rules and Resolutions.

**HR 1999** (By Callegari), Congratulating Michael Callegari on his graduation from Strake Jesuit College Preparatory.

To Rules and Resolutions.

**SB 270** to Public Health.

**SB 516** to Ways and Means.

**SB 578** to Criminal Jurisprudence.

**SB 1164** to Pensions, Investments, and Financial Services.

**SB 1175** to Economic and Small Business Development.

**SB 1402** to Transportation.

**SB 1424** to Public Health.

**SB 1441** to Ways and Means.

**SB 1572** to Homeland Security and Public Safety.

**SB 1643** to Judiciary and Civil Jurisprudence.

**SB 1652** to State Affairs.

**SB 1658** to Homeland Security and Public Safety.

**SB 1826** to State Affairs.

**SB 1843** to Criminal Jurisprudence.

**SB 1926** to Public Health.

**SJR 14** to Ways and Means.

### SIGNED BY THE SPEAKER

The following bills and resolutions were today signed in the presence of the house by the speaker:

**House List No. 30**

**HB 205**, **HB 328**, **HB 1254**, **HB 1450**, **HB 1789**, **HB 1936**, **HB 2002**, **HB 2067**, **HB 2403**, **HB 2468**, **HB 2936**, **HCR 127**, **HCR 135**, **HCR 154**, **HCR 155**

**Senate List No. 27**

**SB 198**, **SB 250**, **SB 279**, **SB 529**, **SB 551**, **SB 748**, **SB 758**, **SB 1024**, **SB 1107**, **SB 1478**, **SB 1505**, **SCR 45**, **SCR 46**, **SCR 52**, **SJR 28**

### MESSAGES FROM THE SENATE

The following messages from the senate were today received by the house:

**Message No. 1**

MESSAGE FROM THE SENATE
SENATE CHAMBER
Austin, Texas
Monday, May 16, 2011

The Honorable Speaker of the House
House Chamber
Austin, Texas

Mr. Speaker:

I am directed by the senate to inform the house that the senate has taken the following action:

THE SENATE HAS PASSED THE FOLLOWING MEASURES:

**HB 27**               Guillen              SPONSOR: Ellis
Relating to the payment of fines and costs by defendants who are unable to pay the fines and costs in misdemeanor cases.

**HB 34**               Branch               SPONSOR: Shapiro
Relating to including in the public high school curriculum instruction in methods of paying for postsecondary education and training.
(Amended)

**HB 275**              Pitts                SPONSOR: Ogden
Relating to making an appropriation of money from the economic stabilization fund for expenditure during the current state fiscal biennium.
(Committee Substitute)

**HB 413**              Aycock               SPONSOR: Hegar
Relating to the confidentiality of certain information held by a veterinarian.
(Amended)

**HB 1028**             Phillips             SPONSOR: Estes
Relating to certain contact between a criminal defendant and the victim of the offense of which the defendant is convicted or a member of the victim's family.

**HB 1106**             Johnson              SPONSOR: West
Relating to providing certain information to a criminal defendant at the time the defendant is placed on deferred adjudication community supervision and at the time of the dismissal of certain proceedings against the defendant.

**HB 1123**             Dutton               SPONSOR: West
Relating to the regulation of athlete agents; providing administrative and criminal penalties.
(Amended)

**HB 1146**             Kuempel              SPONSOR: Carona
Relating to the registration and regulation of appraisal management companies; providing penalties.
(Committee Substitute)

**HB 1390**             Deshotel             SPONSOR: Estes

Relating to retainage under certain construction contracts.

**HB 2229**                    Coleman                    SPONSOR: Ellis
Relating to the creation of the Texas HIV Medication Advisory Committee.

**HB 2277**                    Eiland                     SPONSOR: Williams
Relating to the sale, exchange, or replacement of life insurance and annuity contracts.
(Amended)

**HB 2457**                    Davis, John                SPONSOR: Jackson
Relating to the Texas Enterprise Fund and the Texas emerging technology fund.
(Committee Substitute/Amended)

**HCR 100**                    Branch                     SPONSOR: Zaffirini
Commemorating the 100th anniversary of the founding of the Texas State University System.

**SB 1574**                    Watson
Relating to the use of money in a tax increment fund to pay costs related to public improvements used for social services programs that promote the development or redevelopment of a reinvestment zone.

Respectfully,
Patsy Spaw
Secretary of the Senate

**Message No. 2**

MESSAGE FROM THE SENATE
SENATE CHAMBER
Austin, Texas
Monday, May 16, 2011 - 2

The Honorable Speaker of the House
House Chamber
Austin, Texas

Mr. Speaker:

I am directed by the senate to inform the house that the senate has taken the following action:

THE SENATE HAS PASSED THE FOLLOWING MEASURES:

**SB 555**                     Watson
Relating to the regulation of propane gas distribution retailers.

Respectfully,
Patsy Spaw
Secretary of the Senate

---

**APPENDIX**

---

## STANDING COMMITTEE REPORTS

Favorable reports have been filed by committees as follows:

**May 13**

Border and Intergovernmental Affairs - **HCR 146**

Corrections - **SB 1489**

County Affairs - **SB 373**, **SB 954**, **SB 955**, **SB 1014**, **SB 1243**, **SB 1687**, **SB 1692**

Criminal Jurisprudence - **SB 377**, **SB 480**, **SB 519**, **SB 1010**, **SB 1103**, **SB 1331**

Culture, Recreation, and Tourism - **HCR 144**, **SCR 11**, **SCR 16**, **SCR 18**, **SCR 39**

Economic and Small Business Development - **SB 1736**

Environmental Regulation - **SB 615**, **SB 694**

Government Efficiency and Reform - **SB 1618**

Higher Education - **SB 36**, **SB 794**, **SB 1662**, **SB 1734**

Human Services - **SB 63**

Insurance - **SB 1054**, **SB 1213**

Land and Resource Management - **SB 1922**

Natural Resources - **HB 3866**, **SB 1895**

Ways and Means - **SB 267**, **SB 520**, **SB 540**

## ENGROSSED

**May 13** - **HB 9**, **HB 142**, **HB 278**, **HB 359**, **HB 550**, **HB 882**, **HB 1119**, **HB 1241**, **HB 1745**, **HB 1897**, **HB 2093**, **HB 2104**, **HB 2169**, **HB 2338**, **HB 2369**, **HB 2594**, **HB 3199**, **HB 3352**, **HB 3371**, **HB 3423**, **HB 3486**, **HB 3488**, **HB 3578**, **HB 3579**, **HB 3580**, **HB 3813**, **HB 3829**, **HB 3837**, **HB 3840**, **HB 3843**, **HB 3844**, **HB 3849**, **HB 3852**, **HB 3856**, **HB 3858**, **HB 3859**, **HB 3862**, **HCR 84**

**May 15** - **HB 19**, **HB 25**, **HB 31**, **HB 51**, **HB 96**, **HB 159**, **HB 161**, **HB 167**, **HB 189**, **HB 197**, **HB 230**, **HB 254**, **HB 326**, **HB 427**, **HB 452**, **HB 599**, **HB 629**, **HB 677**, **HB 680**, **HB 695**, **HB 720**, **HB 737**, **HB 804**, **HB 875**, **HB 892**, **HB 940**, **HB 963**, **HB 995**, **HB 1036**, **HB 1046**, **HB 1122**, **HB 1129**, **HB 1234**, **HB 1244**, **HB 1250**, **HB 1363**, **HB 1386**, **HB 1408**, **HB 1429**, **HB 1476**, **HB 1544**, **HB 1547**, **HB 1563**, **HB 1608**, **HB 1646**, **HB 1681**, **HB 1793**, **HB 1856**, **HB 1921**, **HB 1937**, **HB 1969**, **HB 2032**, **HB 2060**, **HB 2089**, **HB 2119**, **HB 2120**, **HB 2292**, **HB 2357**, **HB 2365**, **HB 2380**, **HB 2383**, **HB 2408**, **HB 2417**, **HB 2443**, **HB 2446**, **HB 2449**, **HB 2493**, **HB 2496**, **HB 2507**, **HB 2525**, **HB 2560**, **HB 2603**, **HB 2688**, **HB 2722**, **HB 2729**, **HB 2788**, **HB 2819**, **HB 2884**, **HB 2917**, **HB 2931**, **HB 2990**, **HB 3018**, **HB 3030**, **HB 3064**, **HB 3123**, **HB 3167**, **HB 3172**,

TX_00003189

**HB 3237, HB 3268, HB 3275, HB 3320, HB 3324, HB 3390, HB 3410, HB 3422, HB 3439, HB 3453, HB 3461, HB 3462, HB 3474, HB 3542, HB 3589, HB 3597, HB 3611, HB 3624, HB 3691, HB 3696, HB 3746, HB 3747, HB 3754, HB 3812, HB 3833, HB 3841, HB 3842, HB 3845, HB 3861**

## ENROLLED

**May 13 - HCR 161**

**May 15 - HB 1450, HB 2403, HB 2468, HCR 135, HCR 154**



Chapter 123                                                    <u>S.B. No. 14</u>

1                              <u>AN ACT</u>

2  relating to requirements to vote, including presenting proof of

3  identification; providing criminal penalties.

4        BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

5        SECTION 1.  Section 13.002, Election Code, is amended by

6  adding Subsection (i) to read as follows:

7        <u>(i)  An applicant who wishes to receive an exemption from the</u>

8  <u>requirements of Section 63.001(b) on the basis of disability must</u>

9  <u>include with the person's application:</u>

10            <u>(1)  written documentation:</u>

11              <u>(A)  from  the  United  States  Social  Security</u>

12  <u>Administration evidencing the applicant has been determined to have</u>

13  <u>a disability; or</u>

14              <u>(B)  from the United States Department of Veterans</u>

15  <u>Affairs evidencing the applicant has a disability rating of at</u>

16  <u>least 50 percent; and</u>

17            <u>(2)  a statement in a form prescribed by the secretary</u>

18  <u>of state that the applicant does not have a form of identification</u>

19  <u>acceptable under Section 63.0101.</u>

20        SECTION 2.  Section 15.001, Election Code, is amended by

21  adding Subsection (c) to read as follows:

22        <u>(c)  A  certificate  issued  to  a  voter  who  meets  the</u>

23  <u>certification requirements of Section 13.002(i) must contain an</u>

24  <u>indication that the voter is exempt from the requirement to present</u>

JA_003102



1  identification other than the registration certificate before

2  being accepted for voting.

3       SECTION 3.  Effective September 1, 2011, Subchapter A,

4  Chapter 15, Election Code, is amended by adding Section 15.005 to

5  read as follows:

6       Sec. 15.005.  NOTICE OF IDENTIFICATION REQUIREMENTS.

7  (a)  The voter registrar of each county shall provide notice of the

8  identification requirements for voting prescribed by Chapter 63 and

9  a detailed description of those requirements with each voter

10 registration certificate issued under Section 13.142 or renewal

11 registration certificate issued under Section 14.001.

12      (b)  The secretary of state shall prescribe the wording of

13 the notice to be included on the certificate under this section.

14      SECTION 4.  Subsection (a), Section 15.022, Election Code,

15 is amended to read as follows:

16      (a)  The registrar shall make the appropriate corrections in

17 the registration records, including, if necessary, deleting a

18 voter's name from the suspense list:

19           (1)  after receipt of a notice of a change in

20 registration information under Section 15.021;

21           (2)  after receipt of a voter's reply to a notice of

22 investigation given under Section 16.033;

23           (3)  after receipt of a registration omissions list and

24 any affidavits executed under Section 63.006 [63.007], following an

25 election;

26           (4)  after receipt of a voter's statement of residence

27 executed under Section 63.0011;

2

1          (5)  before the effective date of the abolishment of a

2  county election precinct or a change in its boundary;

3          (6)  after  receipt  of  United  States  Postal  Service

4  information indicating an address reclassification;

5          (7)  after receipt of a voter's response under Section

6  15.053; or

7          (8)  after  receipt  of  a  registration  application  or

8  change of address under Chapter 20.

9      SECTION 5.  Effective  September  1,  2011,  Subchapter  A,

10  Chapter 31, Election Code, is amended by adding Section 31.012 to

11  read as follows:

12      Sec. 31.012.  VOTER  IDENTIFICATION  EDUCATION.   (a)  The

13  secretary  of  state  and  the  voter  registrar  of  each  county  that

14  maintains  a  website  shall  provide  notice  of  the  identification

15  requirements  for  voting  prescribed  by  Chapter  63  on  each  entity's

16  respective  website  in  each  language  in  which  voter  registration

17  materials  are  available.   The  secretary  of  state  shall  prescribe

18  the wording of the notice to be included on the websites.

19      (b)  The secretary of state shall conduct a statewide effort

20  to  educate  voters  regarding  the  identification  requirements  for

21  voting prescribed by Chapter 63.

22      (c)  The  county  clerk  of  each  county  shall  post  in  a

23  prominent  location  at  the  clerk's  office  a  physical  copy  of  the

24  notice  prescribed  under  Subsection  (a)  in  each  language  in  which

25  voter registration materials are available.

26      SECTION 6.  Effective  September  1,  2011,  Section  32.111,

27  Election  Code,  is  amended  by  adding  Subsection  (c)  to  read  as

JA_003104

S.B. No. 14

1   follows:

2       (c)   The training standards adopted under Subsection (a)

3   must include provisions on the acceptance and handling of the

4   identification presented by a voter to an election officer under

5   Section 63.001.

6       SECTION 7.   Effective September 1, 2011, Subsection (a),

7   Section 32.114, Election Code, is amended to read as follows:

8       (a)   The county clerk shall provide one or more sessions of

9   training using the standardized training program and materials

10  developed and provided by the secretary of state under Section

11  32.111 for the election judges and clerks appointed to serve in

12  elections ordered by the governor or a county authority.   Each

13  election judge shall complete the training program.   Each election

14  clerk shall complete the part of the training program relating to

15  the acceptance and handling of the identification presented by a

16  voter to an election officer under Section 63.001.

17      SECTION 8.   Chapter 62, Election Code, is amended by adding

18  Section 62.016 to read as follows:

19      Sec. 62.016.   NOTICE OF ACCEPTABLE IDENTIFICATION OUTSIDE

20  POLLING PLACES.  The presiding judge shall post in a prominent place

21  on the outside of each polling location a list of the acceptable

22  forms of identification.  The list must be printed using a font that

23  is at least 24-point.  The notice required under this section must

24  be posted separately from any other notice required by state or

25  federal law.

26      SECTION 9.   Section 63.001, Election Code, is amended by

27  amending Subsections (b), (c), (d), and (f) and adding Subsections

4

S.B. No. 14

1  (g) and (h) to read as follows:

2      (b)  Except as provided by Subsection (h), on [On] offering

3  to vote, a voter must present to an election officer at the polling

4  place one form of identification described by Section 63.0101 [the

5  voter's voter registration certificate to an election officer at

6  the polling place].

7      (c)  On  presentation  of  the documentation required under

8  Subsection (b) [a registration certificate], an election officer

9  shall  determine  whether  the voter's name on the documentation

10  [registration certificate] is on the list of registered voters for

11  the precinct.  If in making a determination under this subsection

12  the  election  officer  determines  under standards adopted by the

13  secretary of state that the voter's name on the documentation is

14  substantially similar to but does not match exactly with the name on

15  the list, the voter shall be accepted for voting under Subsection

16  (d) if the voter submits an affidavit stating that the voter is the

17  person on the list of registered voters.

18      (d)  If, as determined under Subsection (c), the voter's name

19  is  on  the  precinct  list  of  registered voters and the voter's

20  identity can be verified from the documentation presented under

21  Subsection (b), the voter shall be accepted for voting.

22      (f)  After determining whether to accept a voter, an election

23  officer  shall  return  the  voter's  documentation [registration

24  certificate] to the voter.

25      (g)  If  the  requirements  for  identification prescribed by

26  Subsection  (b)  are  not  met,  the  voter  may  be  accepted for

27  provisional voting only under Section 63.011.  For a voter who is

S.B. No. 14

1  not accepted for voting under this section, an election officer

2  shall:

3            (1)  inform the voter of the voter's right to cast a

4  provisional ballot under Section 63.011; and

5            (2)  provide the voter with written information, in a

6  form prescribed by the secretary of state, that:

7                  (A)  lists the requirements for identification;

8                  (B)  states   the   procedure   for   presenting

9  identification under Section 65.0541;

10                 (C)  includes a map showing the location where

11  identification must be presented; and

12                 (D)  includes notice that if all procedures are

13  followed and the voter is found to be eligible to vote and is voting

14  in the correct precinct, the voter's provisional ballot will be

15  accepted.

16      (h)  The  requirements  for  identification  prescribed  by

17  Subsection (b) do not apply to a voter who is disabled and presents

18  the  voter's  voter  registration  certificate  containing  the

19  indication described by Section 15.001(c) on offering to vote.

20      SECTION 10.  Subsection (a), Section 63.0011, Election Code,

21  is amended to read as follows:

22      (a)  Before a voter may be accepted for voting, an election

23  officer shall ask the voter if the voter's residence address on the

24  precinct list of registered voters is current and whether the voter

25  has changed residence within the county.  If the voter's address is

26  omitted from the precinct list under Section 18.005(c), the officer

27  shall ask the voter if the voter's residence, if [as] listed, on

6

S.B. No. 14

1  identification presented by the voter under Section 63.001(b) [~~the~~

2  ~~voter's voter registration certificate~~] is current and whether the

3  voter has changed residence within the county.

4       SECTION 11.  Effective  September  1,  2011,  Chapter  63,

5  Election Code, is amended by adding Section 63.0012 to read as

6  follows:

7       Sec. 63.0012.  NOTICE  OF  IDENTIFICATION  REQUIREMENTS  TO

8  CERTAIN VOTERS.  (a)  An election officer shall distribute written

9  notice  of  the  identification  that  will  be  required  for  voting

10  beginning  with  elections  held  after  January  1,  2012,  and

11  information on obtaining identification without a fee under Chapter

12  521A,  Transportation  Code,  to  each  voter  who,  when  offering  to

13  vote, presents a form of identification that will not be sufficient

14  for acceptance as a voter under this chapter beginning with those

15  elections.

16       (b)  The secretary of state shall prescribe the wording of

17  the notice and establish guidelines for distributing the notice.

18       (c)  This section expires September 1, 2017.

19       SECTION 12.  Section 63.006, Election Code, is amended to

20  read as follows:

21       Sec. 63.006.  VOTER  WITH  REQUIRED DOCUMENTATION  [~~CORRECT~~

22  ~~CERTIFICATE~~] WHO IS NOT ON LIST.  (a)  A voter who, when offering to

23  vote, presents the documentation required under Section 63.001(b)

24  [~~a voter registration certificate indicating that the voter is~~

25  ~~currently registered in the precinct in which the voter is offering~~

26  ~~to vote,~~] but whose name is not on the precinct list of registered

27  voters[~~,~~] shall be accepted for voting if the voter also presents a

7

S.B. No. 14

1 voter registration certificate indicating that the voter is

2 currently registered:

3         (1)   in the precinct in which the voter is offering to

4 vote; or

5         (2)   in a different precinct in the same county as the

6 precinct in which the voter is offering to vote and the voter

7 executes an affidavit stating that the voter:

8             (A)   is a resident of the precinct in which the

9 voter is offering to vote or is otherwise entitled by law to vote in

10 that precinct;

11            (B)   was a resident of the precinct in which the

12 voter is offering to vote at the time the information on the voter's

13 residence address was last provided to the voter registrar;

14            (C)   did   not   deliberately   provide   false

15 information to secure registration in a precinct in which the voter

16 does not reside; and

17            (D)   is voting only once in the election.

18    (b)   After the voter is accepted, an election officer shall:

19         (1)   indicate beside the voter's name on the poll list

20 that the voter was accepted under this section; and

21         (2)   enter   the   voter's   name   on   the   registration

22 omissions list.

23    SECTION 13.   Section 63.009, Election Code, is amended to

24 read as follows:

25    Sec. 63.009.   VOTER WITHOUT CERTIFICATE WHO IS NOT ON LIST.

26 A [(a)   Except as provided by Subsection (b), a] voter who does not

27 present a voter registration certificate when offering to vote, and

S.B. No. 14

1  whose name is not on the list of registered voters for the precinct

2  in which the voter is offering to vote, shall be accepted for

3  provisional voting if the voter executes an affidavit in accordance

4  with Section 63.011.

5  [(b)  If an election officer can determine from the voter

6  registrar that the person is a registered voter of the county and

7  the person presents proof of identification, the affidavits

8  required by Sections 63.007 and 63.008 are substituted for the

9  affidavit required by Section 63.011 in complying with that

10  section.  After the voter is accepted under this subsection, an

11  election officer shall also indicate beside the voter's name on the

12  poll list that the voter was accepted under this section.]

13  SECTION 14.  Section 63.0101, Election Code, is amended to

14  read as follows:

15  Sec. 63.0101.  DOCUMENTATION OF PROOF OF IDENTIFICATION.

16  The following documentation is an acceptable form [as proof] of

17  photo identification under this chapter:

18  (1)  a driver's license, election identification

19  certificate, or personal identification card issued to the person

20  by the Department of Public Safety that has not [or a similar

21  document issued to the person by an agency of another state,

22  regardless of whether the license or card has] expired or that

23  expired no earlier than 60 days before the date of presentation;

24  (2)  a United States military identification card that

25  contains the person's photograph that has not expired or that

26  expired no earlier than 60 days before the date of presentation

27  [form of identification containing the person's photograph that

9

S.B. No. 14

1  ~~establishes the person's identity~~];

2          (3)  a [~~birth certificate or other document confirming~~

3  ~~birth that is admissible in a court of law and establishes the~~

4  ~~person's identity;~~

5          [~~(4)~~] United States citizenship certificate [~~papers~~]

6  issued to the person that contains the person's photograph;

7          (4) [~~(5)~~] a United States passport issued to the

8  person that has not expired or that expired no earlier than 60 days

9  before the date of presentation; or

10         (5)  a license to carry a concealed handgun issued to

11  the person by the Department of Public Safety that has not expired

12  or that expired no earlier than 60 days before the date of

13  presentation

14         [~~(6)  official mail addressed to the person by name~~

15  ~~from a governmental entity;~~

16         [~~(7)  a copy of a current utility bill, bank statement,~~

17  ~~government check, paycheck, or other government document that shows~~

18  ~~the name and address of the voter; or~~

19         [~~(8)  any other form of identification prescribed by~~

20  ~~the secretary of state~~].

21     SECTION 15.  Section 63.011, Election Code, is amended by

22  amending Subsections (a) and (b) and adding Subsection (b-1) to

23  read as follows:

24     (a)  A person to whom Section 63.001(g) [~~63.008(b)~~] or 63.009

25  [~~63.009(a)~~] applies may cast a provisional ballot if the person

26  executes an affidavit stating that the person:

27         (1)  is a registered voter in the precinct in which the

10

S.B. No. 14

1  person seeks to vote; and

2          (2)  is eligible to vote in the election.

3      (b)  A form for an affidavit required by this section must

4  [shall] be printed on an envelope in which the provisional ballot

5  voted by the person may be placed and must include:

6          (1)  a space for entering the identification number of

7  the provisional ballot voted by the person; and

8          (2)  a space for an election officer to indicate

9  whether the person presented a form of identification described by

10 Section 63.0101.

11     (b-1)  The affidavit form may include space for disclosure of

12 any necessary information to enable the person to register to vote

13 under Chapter 13.  The secretary of state shall prescribe the form

14 of the affidavit under this section.

15     SECTION 16.  Subsection (b), Section 64.012, Election Code,

16 is amended to read as follows:

17     (b)  An offense under this section is a felony of the second

18 [third] degree unless the person is convicted of an attempt.   In

19 that case, the offense is a state jail felony [Class A misdemeanor].

20     SECTION 17.  Subsection (b), Section 65.054, Election Code,

21 is amended to read as follows:

22     (b)  A provisional ballot shall [may] be accepted [only] if

23 the board determines that:

24         (1)  [,] from the information in the affidavit or

25 contained in public records, the person is eligible to vote in the

26 election and has not previously voted in that election;

27         (2)  the person:

11



1                 (A) meets the identification requirements of

2 Section 63.001(b) at the time the ballot was cast or in the period

3 prescribed under Section 65.0541;

4                 (B) notwithstanding Chapter 110, Civil Practice

5 and Remedies Code, executes an affidavit under penalty of perjury

6 that states the voter has a religious objection to being

7 photographed and the voter has consistently refused to be

8 photographed for any governmental purpose from the time the voter

9 has held this belief; or

10                 (C) executes an affidavit under penalty of

11 perjury that states the voter does not have any identification

12 meeting the requirements of Section 63.001(b) as a result of a

13 natural disaster that was declared by the president of the United

14 States or the governor, occurred not earlier than 45 days before the

15 date the ballot was cast, and caused the destruction of or inability

16 to access the voter's identification; and

17                 (3) the voter has not been challenged and voted a

18 provisional ballot solely because the voter did not meet the

19 requirements for identification prescribed by Section 63.001(b).

20       SECTION 18.  Subchapter B, Chapter 65, Election Code, is

21 amended by adding Section 65.0541 to read as follows:

22       Sec. 65.0541.  PRESENTATION OF IDENTIFICATION FOR CERTAIN

23 PROVISIONAL BALLOTS.  (a)  A voter who is accepted for provisional

24 voting under Section 63.011 because the voter does not meet the

25 identification requirements of Section 63.001(b) may, not later

26 than the sixth day after the date of the election:

27                 (1) present a form of identification described by



1  Section 63.0101 to the voter registrar for examination; or

2  (2) execute an affidavit described by Section

3  65.054(b)(2)(B) or (C) in the presence of the voter registrar.

4  (b) The secretary of state shall prescribe procedures as

5  necessary to implement this section.

6  SECTION 19.  Section 66.0241, Election Code, is amended to

7  read as follows:

8  Sec. 66.0241.  CONTENTS OF ENVELOPE NO. 4.  Envelope no. 4

9  must contain:

10  (1) the precinct list of registered voters;

11  (2) the registration correction list;

12  (3) the registration omissions list;

13  (4) any statements of residence executed under Section

14  63.0011; and

15  (5) any affidavits executed under Section 63.006

16  [63.007] or 63.011.

17  SECTION 20.  Subtitle B, Title 7, Transportation Code, is

18  amended by adding Chapter 521A to read as follows:

19  CHAPTER 521A. ELECTION IDENTIFICATION CERTIFICATE

20  Sec. 521A.001.  ELECTION IDENTIFICATION CERTIFICATE.

21  (a) The department shall issue an election identification

22  certificate to a person who states that the person is obtaining the

23  certificate for the purpose of satisfying Section 63.001(b),

24  Election Code, and does not have another form of identification

25  described by Section 63.0101, Election Code, and:

26  (1) who is a registered voter in this state and

27  presents a valid voter registration certificate; or

1       (2) who is eligible for registration under Section

2  13.001, Election Code, and submits a registration application to

3  the department.

4       (b) The department may not collect a fee for an election

5  identification certificate or a duplicate election identification

6  certificate issued under this section.

7       (c) An election identification certificate may not be used

8  or accepted as a personal identification certificate.

9       (d) An election officer may not deny the holder of an

10  election identification certificate the ability to vote because the

11  holder has an election identification certificate rather than a

12  driver's license or personal identification certificate issued

13  under this subtitle.

14       (e) An election identification certificate must be similar

15  in form to, but distinguishable in color from, a driver's license

16  and a personal identification certificate.  The department may

17  cooperate with the secretary of state in developing the form and

18  appearance of an election identification certificate.

19       (f) The department may require each applicant for an

20  original or renewal election identification certificate to furnish

21  to the department the information required by Section 521.142.

22       (g) The department may cancel and require surrender of an

23  election identification certificate after determining that the

24  holder was not entitled to the certificate or gave incorrect or

25  incomplete information in the application for the certificate.

26       (h) A certificate expires on a date specified by the

27  department, except that a certificate issued to a person 70 years of



1   age or older does not expire.

2        SECTION 21.   Sections 63.007 and 63.008, Election Code, are

3   repealed.

4        SECTION 22.   Effective September 1, 2011:

5             (1)  as soon as practicable, the secretary of state

6   shall  adopt  the  training  standards  and  develop  the  training

7   materials required to implement the change in law made by this Act

8   to Section 32.111, Election Code; and

9             (2)  as soon as practicable, the county clerk of each

10  county shall provide a session of training under Section 32.114,

11  Election Code, using the standards adopted and materials developed

12  to implement the change in law made by this Act to Section 32.111,

13  Election Code.

14       SECTION 23.   The change in law made by this Act in amending

15  Subsection (b), Section 64.012, Election Code, applies only to an

16  offense committed on or after January 1, 2012. An offense committed

17  before January 1, 2012, is covered by the law in effect when the

18  offense was committed, and the former law is continued in effect for

19  that purpose. For purposes of this section, an offense is committed

20  before January 1, 2012, if any element of the offense occurs before

21  that date.

22       SECTION 24.   Effective  September  1,  2011,  state  funds

23  disbursed  under  Chapter  19,  Election  Code,  for  the  purpose  of

24  defraying expenses of the voter registrar's office in connection

25  with voter registration may also be used for additional expenses

26  related  to  coordinating  voter  registration  drives  or  other

27  activities designed to expand voter registration.   This section

JA_003116



S.B. No. 14

1  expires January 1, 2013.

2       SECTION 25.  Every provision in this Act and every

3  application of the provisions in this Act are severable from each

4  other.  If any application of any provision in this Act to any

5  person or group of persons or circumstances is found by a court to

6  be invalid, the remainder of this Act and the application of the

7  Act's provisions to all other persons and circumstances may not be

8  affected.  All constitutionally valid applications of this Act

9  shall be severed from any applications that a court finds to be

10 invalid, leaving the valid applications in force, because it is the

11 legislature's intent and priority that the valid applications be

12 allowed to stand alone.  Even if a reviewing court finds a provision

13 of this Act invalid in a large or substantial fraction of relevant

14 cases, the remaining valid applications shall be severed and

15 allowed to remain in force.

16      SECTION 26.  Except as otherwise provided by this Act, this

17 Act takes effect January 1, 2012.

JA_003117



S.B. No. 14

_____          _____
President of the Senate                   Speaker of the House

I hereby certify that S.B. No. 14 passed the Senate on January 26, 2011, by the following vote: Yeas 19, Nays 11; April 5, 2011, Senate refused to concur in House amendments and requested appointment of Conference Committee; April 11, 2011, House granted request of the Senate; May 9, 2011, Senate adopted Conference Committee Report by the following vote: Yeas 19, Nays 12. _____

                                          _____
                                          Secretary of the Senate

I hereby certify that S.B. No. 14 passed the House, with amendments, on March 24, 2011, by the following vote: Yeas 101, Nays 48, one present not voting; April 11, 2011, House granted request of the Senate for appointment of Conference Committee; May 16, 2011, House adopted Conference Committee Report by the following vote: Yeas 98, Nays 46, one present not voting. _____

                                          _____
                                          Chief Clerk of the House

Approved:

_____
27 MAY '11
Date

_____
Rick Perry
Governor

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
7:00pm   O'CLOCK

MAY 27 2011

_____
Secretary of State

17

JA_003118

**BILL ANALYSIS**

Senate Research Center                                                                S.B. 14
                                                                                 By: Fraser et al.
                                                                          Committee of the Whole
                                                                                        8/3/2011
                                                                                        Enrolled

## AUTHOR'S / SPONSOR'S STATEMENT OF INTENT

Under current law, to vote a regular ballot, voters are only required to present a voter registration certificate to a poll worker. While this practice attempts to ensure that only registered voters receive a regular ballot on Election Day, it leaves a potential loophole for fraud. With the current process, no statutory standards exist to verify the identity of individuals at the polling place when they present a voter registration certificate. On Election Day, an election judge must accept a voter if a voter registration certificate is valid, even if the judge suspects that the voter is not the person listed on the certificate.

S.B. 14 amends current law relating to requirements to vote, including presenting proof of identification, and provides criminal penalties.

## RULEMAKING AUTHORITY

This bill does not expressly grant any additional rulemaking authority to a state officer, institution, or agency.

## SECTION BY SECTION ANALYSIS

SECTION 1.  Amends Section 13.002, Election Code, by adding Subsection (i), to require an applicant who wishes to receive an exemption from the requirements of Section 63.001(b) on the basis of disability to include with the person's application written documentation from the United States Social Security Administration evidencing the applicant has been determined to have a disability, or from the United States Department of Veterans Affairs evidencing the applicant has a disability rating of at least 50 percent; and a statement in a form prescribed by the secretary of state (SOS) that the applicant does not have a form of identification acceptable under Section 63.0101.

SECTION 2.  Amends Section 15.001, Election Code, by adding Subsection (c), to require that a certificate issued to a voter who meets the certification requirements of Section 13.002(i) contain an indication that the voter is exempt from the requirement to present identification other than the registration certificate before being accepted for voting.

SECTION 3.  Amends Subchapter A, Chapter 15, Election Code, effective September 1, 2011, by adding Section 15.005, as follows:

> Sec. 15.005. NOTICE OF IDENTIFICATION REQUIREMENTS.  (a) Requires the voter registrar of each county (registrar) to provide notice of the identification requirements for voting prescribed by Chapter 63 (Accepting Voter) and a detailed description of those requirements with each voter registration certificate issued under Section 13.142 (Initial Registration Certificate) or renewal registration certificate issued under Section 14.001 (Renewal Registration Certificate).

> (b) Requires SOS to prescribe the wording of the notice to be included on the certificate under this section.

SECTION 4.  Amends Section 15.022(a), Election Code, as follows:

(a) Requires the registrar to make the appropriate corrections in the registration records, including, if necessary, deleting a voter's name from the suspense list:

(1)-(2) Makes no changes to these subdivisions;

(3) after receipt of a registration omissions list and any affidavits executed under Section 63.006 (Voter With Correct Certificate Who Is Not On List), rather than Section 63.007 (Voter With Incorrect Certificate Who Is Not On List), following an election; or

(4)-(8) Makes no changes to these subdivisions.

SECTION 5. Amends Subchapter A, Chapter 31, Election Code, effective September 1, 2011, by adding Section 31.012, as follows:

Sec. 31.012. VOTER IDENTIFICATION EDUCATION. (a) Requires SOS and the registrar of each county that maintains a website to provide notice of the identification requirements for voting prescribed by Chapter 63 on each entity's respective website in each language in which voter registration materials are available. Requires SOS to prescribe the wording of the notice to be included on the websites.

(b) Requires SOS to conduct a statewide effort to educate voters regarding the identification requirements for voting prescribed by Chapter 63.

(c) Requires the county clerk of each county to post in a prominent location at the clerk's office a physical copy of the notice prescribed under Subsection (a) in each language in which voter registration materials are available.

SECTION 6. Amends Section 32.111, Election Code, effective September 1, 2011, by adding Subsection (c), to require that the training standards adopted under Subsection (a) (relating to a requirement that SOS adopt standards of training in election law and procedure for presiding or alternate election judges, develop materials for a standardized curriculum for that training, and distribute the materials to certain entities that hold certain elections) include provisions on the acceptance and handling of the identification presented by a voter to an election officer under Section 63.001 (Regular Procedure For Accepting Voter).

SECTION 7. Amends Section 32.114(a), Election Code, effective September 1, 2011, to require each election clerk to complete the part of the training program relating to the acceptance and handling of the identification presented by a voter to an election officer under Section 63.001.

SECTION 8. Amends Chapter 62, Election Code, by adding Section 62.016, as follows:

Sec. 62.016. NOTICE OF ACCEPTABLE IDENTIFICATION OUTSIDE POLLING PLACES. Requires the presiding judge to post in a prominent place on the outside of each polling location a list of the acceptable forms of identification. Requires that the list be printed using a font that is at least 24-point. Requires that the notice required under this section be posted separately from any other notice required by state or federal law.

SECTION 9. Amends Section 63.001, Election Code, by amending Subsections (b), (c), (d), and (f) and adding Subsections (g) and (h), as follows:

(b) Requires a voter, except as provided by Subsection (h), on offering to vote, to present to an election officer at the polling place one form of identification described by Section 63.0101 (Documentation Of Proof Of Identification), rather than the voter's voter registration certificate.

(c) Requires an election officer, on presentation of the documentation required under Subsection (b), rather than on presentation of a registration certificate, to determine whether the voter's name on the documentation, rather than on the registration certificate, is on the list of registered voters for the precinct. Requires the voter, if in making a

determination under this subsection the election officer determines under standards adopted by SOS that the voter's name on the documentation is substantially similar to but does not match exactly with the name on the list, to be accepted for voting under Subsection (d) if the voter submits an affidavit stating that the voter is the person on the list of registered voters.

(d) Requires that the voter be accepted for voting, if, as determined under Subsection (c), the voter's name is on the precinct list of registered voters and the voter's identity can be verified from the documentation presented under Subsection (b).

(f) Requires an election officer, after determining whether to accept a voter, to return the voter's documentation, rather than the voter's registration certificate, to the voter.

(g) Provides that if the requirements for identification prescribed by Subsection (b) are not met, the voter may be accepted for provisional voting only under Section 63.011 (Provisional Voting). Requires an election officer, for a voter who is not accepted for voting under this section, to:

> (1) inform the voter of the voter's right to cast a provisional ballot under Section 63.011; and

> (2) provide the voter with written information, in a form prescribed by SOS, that:

>> (A) lists the requirements for identification;

>> (B) states the procedure for presenting identification under Section 65.0541;

>> (C) includes a map showing the location where identification must be presented; and

>> (D) includes notice that if all procedures are followed and the voter is found to be eligible to vote and is voting in the correct precinct, the voter's provisional ballot will be accepted.

(h) Provides that the requirements for identification prescribed by Subsection (b) do not apply to a voter who is disabled and presents the voter's voter registration certificate containing the indication described by Section 15.001(c) on offering to vote.

SECTION 10. Amends Section 63.0011(a), Election Code, to require the election officer, if the voter's address is omitted from the precinct list under Section 18.005(c) (relating to the exclusion, under certain conditions, from the original or supplemental list of registered voters the residence address of a voter who is a federal judge, a state judge, or the spouse of a federal judge or state judge), to ask the voter if the voter's residence, if listed on identification presented by the voter under Section 63.001(b), rather than as listed on the voter's voter registration certificate, is current and whether the voter has changed residence within the county.

SECTION 11. Amends Chapter 63, Election Code, effective September 1, 2011, by adding Section 63.0012, as follows:

> Sec. 63.0012. NOTICE OF IDENTIFICATION REQUIREMENTS TO CERTAIN VOTERS. (a) Requires an election officer to distribute written notice of the identification that will be required for voting beginning with elections held after January 1, 2012, and information on obtaining identification without a fee under Chapter 521A, Transportation Code, to each voter who, when offering to vote, presents a form of identification that will not be sufficient for acceptance as a voter under this chapter beginning with those elections.

> (b) Requires SOS to prescribe the wording of the notice and establish guidelines for distributing the notice.

TX_00003567

(c) Provides that this section expires on September 1, 2017.

SECTION 12. Amends Section 63.006, Election Code, as follows:

Sec. 63.006. New heading: VOTER WITH REQUIRED DOCUMENTATION WHO IS NOT ON LIST. (a) Requires a voter who, when offering to vote, presents the documentation required under Section 63.001(b), rather than presents a voter registration certificate indicating that the voter is currently registered in the precinct in which the voter is offering to vote, but whose name is not on the precinct list of registered voters, to be accepted for voting if the voter also presents a voter registration certificate indicating that the voter is currently registered in the precinct in which the voter is offering to vote, or in a different precinct in the same county as the precinct in which the voter is offering to vote and the voter executes an affidavit stating that the voter is a resident of the precinct in which the voter is offering to vote or is otherwise entitled by law to vote in that precinct, was a resident of the precinct in which the voter is offering to vote at the time the information on the voter's residence address was last provided to the voter registrar, did not deliberately provide false information to secure registration in a precinct in which the voter does not reside, and is voting only once in the election.

(b) Requires an election officer, after the voter is accepted, to indicate beside the voter's name on the poll list that the voter was accepted under this section, and enter the voter's name on the registration omissions list.

SECTION 13. Amends Section 63.009, Election Code, as follows:

Sec. 63.009. VOTER WITHOUT CERTIFICATE WHO IS NOT ON LIST. Deletes existing Subsection (a) designation. Requires a voter who does not present a voter registration certificate when offering to vote, and whose name is not on the list of registered voters for the precinct in which the voter is offering to vote, to be accepted for provisional voting if the voter executes an affidavit in accordance with Section 63.011, and deletes an exception under existing Subsection (b). Deletes existing Subsection (b) providing that, if an election officer can determine from the voter registrar that the person is a registered voter of the county and the person presents proof of identification, the affidavits required by Sections 63.007 and 63.008 are substituted for the affidavit required by Section 63.011 in complying with that section, and requiring an election officer, after the voter is accepted under this subsection, to also indicate beside the voter's name on the poll list that the voter was accepted under this section.

SECTION 14. Amends Section 63.0101, Election Code, as follows:

Sec. 63.0101. DOCUMENTATION OF PROOF OF IDENTIFICATION. Provides that the following documentation is an acceptable form of photo identification under this chapter: a driver's license, election identification certificate, or personal identification card issued to the person by the Department of Public Safety (DPS) that has not expired or that expired no earlier than 60 days before the date of presentation; a United States military identification card that contains the person's photograph that has not expired or that expired no earlier than 60 days before the date of presentation; a United States citizenship certificate issued to the person that contains the person's photograph; a United States passport issued to the person that has not expired or that expired no earlier than 60 days before the date of presentation; or a license to carry a concealed handgun issued to the person by DPS that has not expired or that expired no earlier than 60 days before the date of presentation. Deletes existing text providing that the following documentation is acceptable as proof of identification under this chapter: a driver's license or personal identification card issued to the person by DPS or a similar document issued to the person by an agency of another state, regardless of whether the license or card has expired; a form of identification containing the person's photograph that establishes the person's identity; a birth certificate or other document confirming birth that is admissible in a court of law and establishes the person's identity; United States citizenship papers issued to the person; a United States passport issued to the person; official mail addressed to the

TX_00003568
JA_003122

TX_00003568

person by name from a governmental entity; a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter; or any other form of identification prescribed by SOS.

SECTION 15. Amends Section 63.011, Election Code, by amending Subsections (a) and (b) and adding Subsection (b-1), as follows:

(a) Authorizes a person to whom Section 63.001(g) or 63.009, rather than Section 63.008(b) or 63.009(a), applies to cast a provisional ballot if the person executes an affidavit stating that the person is a registered voter in the precinct in which the person seeks to vote and is eligible to vote in the election.

(b) Requires that a form for an affidavit required by this section be printed on an envelope in which the provisional ballot voted by the person may be placed and include a space for entering the identification number of the provisional ballot voted by the person and a space for an election officer to indicate whether the person presented a form of identification described by Section 63.0101.

(b-1) Creates this subsection from existing text.  Makes no further changes to this subsection.

SECTION 16. Amends Section 64.012(b), Election Code, to provide that an offense under this section is a felony of the second, rather than third, degree unless the person is convicted of an attempt, and in that case, the offense is a state jail felony, rather than a Class A misdemeanor.

SECTION 17. Amends Section 65.054(b), Election Code, to require, rather than authorize, that a provisional ballot be accepted if the early voting ballot board (board) determines, rather than only if the board determines, that from the information in the affidavit or contained in public records, the person is eligible to vote in the election and has not previously voted in that election; the person meets the identification requirements of Section 63.001(b) at the time the ballot was cast or in the period prescribed under Section 65.0541; notwithstanding Chapter 110, Civil Practice and Remedies Code, executes an affidavit under penalty of perjury that states the voter has a religious objection to being photographed and the voter has consistently refused to be photographed for any governmental purpose from the time the voter has held this belief; or executes an affidavit under penalty of perjury that states the voter does not have any identification meeting the requirements of Section 63.001(b) as a result of a natural disaster that was declared by the president of the United States or the governor, occurred not earlier than 45 days before the date the ballot was cast, and caused the destruction of or inability to access the voter's identification; and the voter has not been challenged and voted a provisional ballot solely because the voter did not meet the requirements for identification prescribed by Section 63.001(b).

SECTION 18. Amends Subchapter B, Chapter 65, Election Code, by adding Section 65.0541, as follows:

Sec. 65.0541. PRESENTATION OF IDENTIFICATION FOR CERTAIN PROVISIONAL BALLOTS. (a) Authorizes a voter who is accepted for provisional voting under Section 63.011 because the voter does not meet the identification requirements of Section 63.001(b) to, not later than the sixth day after the date of the election, present a form of identification described by Section 63.0101 to the voter registrar for examination, or execute an affidavit described by Section 65.054(b)(2)(B) or (C) in the presence of the voter registrar.

(b) Requires SOS to prescribe procedures as necessary to implement this section.

SECTION 19. Amends Section 66.0241, Election Code, to require that Envelope no. 4 contain the precinct list of registered voters, the registration correction list, the registration omissions list, any statements of residence executed under Section 63.0011, and any affidavits executed under Section 63.006 or 63.011, rather than Section 63.007 or 63.011.

TX_00003569
JA_003123

TX_00003569

SECTION 20. Amends Subtitle B, Title 7, Transportation Code, by adding Chapter 521A, as follows:

CHAPTER 521A. ELECTION IDENTIFICATION CERTIFICATE

Sec. 521A.001. ELECTION IDENTIFICATION CERTIFICATE. (a) Requires DPS to issue an election identification certificate to a person who states that the person is obtaining the certificate for the purpose of satisfying Section 63.001(b), Election Code, and does not have another form of identification described by Section 63.0101, Election Code, and who is a registered voter in this state and presents a valid voter registration certificate, or who is eligible for registration under Section 13.001, Election Code, and submits a registration application to DPS.

(b) Prohibits DPS from collecting a fee for an election identification certificate or a duplicate election identification certificate issued under this section.

(c) Prohibits an election identification certificate from being used or accepted as a personal identification certificate.

(d) Prohibits an election officer from denying the holder of an election identification certificate the ability to vote because the holder has an election identification certificate rather than a driver's license or personal identification certificate issued under this subtitle.

(e) Requires that an election identification certificate be similar in form to, but distinguishable in color from, a driver's license and a personal identification certificate. Authorizes DPS to cooperate with the secretary of state in developing the form and appearance of an election identification certificate.

(f) Authorizes DPS to require each applicant for an original or renewal election identification certificate to furnish to DPS the information required by Section 521.142.

(g) Authorizes DPS to cancel and require surrender of an election identification certificate after determining that the holder was not entitled to the certificate or gave incorrect or incomplete information in the application for the certificate.

(h) Provides that a certificate expires on a date specified by DPS, except that a certificate issued to a person 70 years of age or older does not expire.

SECTION 21. Repealers: Sections 63.007 (Voter With Incorrect Certificate Who Is Not On List) and 63.008 (Voter Without Certificate Who Is On List), Election Code.

SECTION 22. Provides that, effective September 1, 2011:

(1) as soon as practicable, SOS is required to adopt the training standards and develop the training materials required to implement the change in law made by this Act to Section 32.111 (Training Standards For Election Judges), Election Code; and

(2) as soon as practicable, the county clerk of each county is required to provide a session of training under Section 32.114 (Public County Training Program), Election Code, using the standards adopted and materials developed to implement the change in law made by this Act to Section 32.111, Election Code.

SECTION 23. Provides that the change in law made by this Act in amending Section 64.012(b), Election Code, applies only to an offense committed on or after January 1, 2012. Provides that an offense committed before January 1, 2012, is covered by the law in effect when the offense was committed and the former law is continued in effect for that purpose. Provides that for purposes of this section, an offense is committed before January 1, 2012, if any element of the offense occurs before that date.

SECTION 24. Authorizes state funds disbursed under Chapter 19 (Financing Voter Registration), Election Code, for the purpose of defraying expenses of the voter registrar's office in connection with voter registration, effective September 1, 2011, to also be used for additional expenses related to coordinating voter registration drives or other activities designed to expand voter registration. Provides that this section expires January 1, 2013.

SECTION 25. Severability clause.

SECTION 26. Effective date, except as otherwise provided by this Act: January 1, 2012.

TX_00003571
JA_003125

TX_00003571

**LEGISLATIVE BUDGET BOARD**
**Austin, Texas**

**FISCAL NOTE, 82ND LEGISLATIVE REGULAR SESSION**

**May 11, 2011**

**TO:** Honorable David Dewhurst, Lieutenant Governor, Senate

**FROM:** John S O'Brien, Director, Legislative Budget Board

**IN RE:** **SB14** by Fraser (Relating to requirements to vote, including presenting proof of identification; providing criminal penalties. ), **As Passed 2nd House**

---

**Estimated Two-year Net Impact to General Revenue Related Funds** for SB14, As Passed 2nd House: a negative impact of ($2,024,000) through the biennium ending August 31, 2013.

The bill would make no appropriation but could provide the legal basis for an appropriation of funds to implement the provisions of the bill.

---

**General Revenue-Related Funds, Five-Year Impact:**

| Fiscal Year | Probable Net Positive/(Negative) Impact to General Revenue Related Funds |
|---|---|
| 2012 | ($2,024,000) |
| 2013 | $0 |
| 2014 | $0 |
| 2015 | $0 |
| 2016 | $0 |

**All Funds, Five-Year Impact:**

| Fiscal Year | Probable Savings/(Cost) from *General Revenue Fund* 1 |
|---|---|
| 2012 | ($2,024,000) |
| 2013 | $0 |
| 2014 | $0 |
| 2015 | $0 |
| 2016 | $0 |

**Fiscal Analysis**

The bill would exempt certain disabled voters from presenting additional identification for voting, other than the voter registration certificate, if the voter submits written document from the United States Social Security Administration evidencing the applicant has a disability or the Department of Veterans Affairs evidencing the applicant has a disability rating of at least 50 percent along with a statement that the applicant does not have an acceptable form of identification. The bill would also require voter registration certificates to contain an indication that the disabled voter is exempted from presenting additional identification, other than the voter registration certificate, before being accepted for voting.

The bill would require the voter registrar of each county to provide a notice of identification requirements for voting with each initial voter registration certificate or renewal registration certificate

issued.  The Secretary of State (SOS) and the voter registrar of each county that maintains a website would be required to post on their websites, in each language in which voter registration materials are available, a notice of the identification requirements, and county clerks would be required to post a physical copy in each language voter registration materials are available. SOS would be required to prescribe the wording of these notices. SOS would also be required to establish a statewide effort to educate voters regarding the identification requirements for voting and would be required to include education targets at low-income and minority voters.

The bill would require training standards to include instructions on the acceptance and handling of the identification presented by a voter to an election officer and each election clerk would be required to complete this training.

The presiding judge at each polling place would be required to post in a prominent location outside of the location a list of the acceptable forms of identification and the list would have to be separate from any other notices.

The Secretary of State would be required to develop standards for accepting voters when determining whether the voter's name on the voter's form of identification is substantially similar when the name does not match exactly with the name on the list of registered voters and the voter submits an affidavit stating that the voter is the person on the list of registered voters.

The Secretary of State would be required to prescribe the wording for written notifications of the identification requirements for voting beginning with elections held after January 1, 2012 and election officers would be required to provide this written notification of voting identification requirements to voters who do not meet identification requirements.  This section would expire September 1, 2017.

The Secretary of State would be required to prescribe procedures for voters who provisionally vote without proper identification to present proof of identification to the voter registrar not later than the sixth day after the date of the election.

The bill would require a temporary license issued by the Department of Public Safety (DPS) to include the photograph of the person to whom the license is issued and would require the temporary license to be issued on the day of application if all application requirements are met.  If the applicant is out of state or a member of the armed forces of the United States, DPS would be allowed to issue a temporary license without a photograph of the license holder until the applicant has time to appear and be photographed and a license with a photograph is issued.

The Department of Public Safety (DPS) would be prohibited from collecting a fee for a personal identification certificate or a duplicate personal identification certificate issued to a person who states that they are obtaining the personal identification certificate to meet voting identification requirements and does not have another form of acceptable identification and that person meets certain other voter registration criteria.

The bill would repeal Sections 63.007 and 63.008 of the Election Code related to voters with incorrect certificates who are not on the voter list and voters without certificates who are not on the voter list.

The Secretary of State (SOS) would be required to adopt the training standards and to develop training materials as soon as practicable after September 1, 2011. Each county clerk would be required to provide a session of training using the standards adopted by and the materials developed by SOS as soon as practicable as well.

The bill would change an offense under this section after January 1, 2012 to a second degree felony from a third degree felony unless the person is convicted of an attempt, in which case, the offense would be a state jail felony instead of a Class A misdemeanor.

The bill would expand the uses of state funds disbursed under Chapter 19 of the Election Code to include additional expenses related to coordinating voter registration drives or other activities designed to expand voter registration.  This section would expire January 1, 2013.

The bill would state that if any provision in the bill is found by a court to be invalid, the remainder of the bill would be allowed to stand alone.

Sections pertaining to providing notice of voter identification requirements, providing voter identification training, providing voter education to the public, and expanding the uses of voter registration funds would be effective September 1, 2011. The remainder of the bill would be effective January 1, 2012.

## Methodology

The fiscal impact of the bill excluding technology costs is estimated to be $2,000,000 million for fiscal year 2012 out of the General Revenue Fund. The estimate includes $0.5 million to research and develop ways to inform the public of the new identification requirements. Additional costs are estimated to be $1.5 million for media advertisements: television ($750,000), radio ($300,000), print ($300,000), and internet ($150,000). The Secretary of State indicates that federal funds associated with the Help America Vote Act (HAVA) may be available for use but the agency would first need to verify this with the federal government.

The Secretary of State would also be required to prescribe the wording for voter identification requirement notifications in each language voter registration materials are available, develop training materials on voter identification requirements, and develop standards for accepting voters when determining whether the voter's name on the voter's form of identification is substantially similar to the name on the list of registered voters. It is assumed that any fiscal implication associated with these responsibilities could be absorbed within existing resources.

The fiscal impact of expanding the uses of funds disbursed under Chapter 19 of the Election Code to include coordinating voter registration drives or other activities designed to expand voter registration is unknown because it is not known how many voter registration drives or other activities designed to expand voter registration would occur.

The fiscal impact of the costs and revenue loss from the prohibition of DPS to collect a fee for a personal identification certificate and duplicate personal identification certificate issued to a person seeking the certificate for the purpose of voting is unknown because it is not known how many people would make a request for a personal identification certificate for voting.

## Technology

The technology fiscal impact of the bill is estimated to be $24,000 for programming costs associated with creating an indicator on voter registration certificates for voters with certain disabilities. The notification would inform election officers at polling places that voters with certain disabilities are exempted from presenting additional identification other than the voter registration certificate. The Secretary of State indicates that federal funds associated with the Help America Vote Act (HAVA) may be available for use but the agency would first need to verify this with the federal government.

It is assumed that the state's online portal would need to be modified to allow the Department of Public Safety (DPS) to transmit photographs to be printed on duplicate personal identification certificates. If the DPS and the state's online portal systems are compatible for transmission, it is assumed that the fiscal impact of this could be absorbed within existing resources. If the systems are not compatible, it is assumed there would be additional costs.

## Local Government Impact

The bill would require counties to notify registered voters of changes online if the county maintains a website, at polling locations, and included with voter registration certificates. Election clerks would be required to undergo training regarding accepted forms of voter identification. The bill would also require an applicant who wishes to receive an exemption from certain voter identification requirements on the basis of disability to include with the person's application documentation that the applicant has been determined to have a disability.

Texas Association of Counties (TAC) gathered the following information from counties:

Bexar County stated that due to limited space on current registration certificates, larger cards would be necessary resulting in additional costs of $381,256 for cards, printing and postage. Bexar County also reported costs of $1,500 for providing voter ID informational posters in Spanish and English in 24-point font, and $2,500 in new costs per election regarding printing new forms and provisional envelopes for information for voters not accepted for voting because of failure to present the required identification. Bexar County also anticipates $50,000 in new costs associated with scanning disability affidavits and another $50,000 associated with being required to validate provisional envelopes.

Brazoria County estimated that the county clerk would be responsible $1,500 in new costs to reprint provisional envelopes. The Brazoria County Tax Assessor-Collector anticipates $40,159 in new costs associated with printing provisional envelopes, in addition to the costs of printing new voter information (Brazoria County reported that these costs would vary depending on the specific requirements of the information to be provided).

Tarrant County anticipated a one-time cost of $8,000 to reprint provisional balloting materials and provide new notices.

Comal County anticipated approximately $30,000 in new costs per election for staff at voting precincts and the early voting ballot board. The Comal County Tax Office reported costs of $2,860 to print identification requirements, $22,700 for envelopes, and $19,880 for postage to comply with the provisions of the bill.

**Source Agencies:**   307 Secretary of State, 313 Department of Information Resources, 405 Department of Public Safety

**LBB Staff:** JOB, SD, MS, BTA, KKR

1

COMMITTEE ON ELECTIONS MEETING 6/14/10

SB 14 - VOTER ID NUMBER 1233.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00261117

2

1              CHAIRMAN:  Committee on Elections will
2     now come to order.  Will the Clerk please call the
3     role?
4              THE CLERK:  Smith.
5              REP. SMITH:  Here.
6              THE CLERK:  Peña.  Allen.
7              REP. ALLEN:  Here.
8              THE CLERK:  Anchia.
9              REP. ANCHIA:  Here.
10             THE CLERK:  Bohac.
11             REP. BOHAC:  Here.
12             THE CLERK:  Bonnen.  Brown.  Harper-
13     Brown.
14             REP. HARPER-BROWN:  Here.
15             THE CLERK:  Heflin.
16             REP. HEFLIN:  Here.
17             CHAIRMAN:  All right.  Good morning.
18     Fresh from the season of political party traditions,
19     where we are in the habit of saying really nice things
20     about each other, we've decided to have a hearing on
21     voter ID and give us the opportunity to continue that
22     trend.
23             We have a charge this interim, which is
24     different in language but almost identical in substance
25     to the charge that was before this committee under its



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00261118

3

1    prior chairman during the last interim, and I noted that

2    the three items that are -- that we are asked to look at

3    this time were all in the charge the last time this

4    committee met during the interim under the leadership of

5    Leo Berman, and those would be the prevalence of fraud,

6    studying new laws in other states regarding voter

7    identification and recommended statutory changes.

8              So I see this proceeding as primarily

9    being an opportunity on our part to find out what is new

10   in the world and add that to the work that has already

11   been done, and so along --

12             Anybody have any comments to make or

13   questions of any kind before we get started, members?

14   No, okay.

15             At this time, the Chair will call Jay

16   Dyer, with the Office of the Attorney General, to

17   testify.  Welcome.  Good morning.

18             MR. DYER:  Thank you, Mr. Chairman.  Good

19   morning.  My name is Jay Dyer, for the record, and I'm

20   here on behalf of the Office of the Attorney General,

21   and I'm here this morning briefly to give a quick recap

22   and a reminder of some background information on our

23   office's election code enforcement efforts and how we're

24   involved in that process and give you all an update as

25   to where things are now as to where things were 13, 14



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003132

4

1     months ago, the last time we appeared before this

2     committee.

3                As a quick housekeeping matter and just

4     to let you all know, Eric Nichols, who many of you all

5     have met and know and who was our Deputy Attorney

6     General for Criminal Justice is sorry that he could not

7     be here.  He is in West Texas.  He is in the middle of

8     trial.  Obviously that's the kind of thing that's been

9     set a long time in advance, so he is sorry that he could

10    not be here this morning.

11               As our office has testified to this

12    committee before, as well as others, our office has two

13    divisions within the Office of the Attorney General that

14    is primarily responsible for election code enforcement.

15               Number one is our Criminal Investigations

16    Division.  This is the division that handles and

17    investigates the referrals that come into our office.

18    The second is the Criminal Prosecutions Division.  This

19    is the division that, after an investigation is worked,

20    if the facts and law warrant presentation to the grand

21    jury, this is the division that will take it to a grand

22    jury, and if a grand jury decides to return an

23    indictment, this is the division that will prosecute it.

24               Now, as always, there are three important

25    things to keep in mind when discussing or considering



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003133

5

1   the Attorney General's Office role in election code

2   violations.  First, it is of paramount importance to

3   recognize and remember that our efforts are 100 percent

4   referral based, and the referrals come to our office

5   from three primary sources.

6            The first is the Secretary of State's

7   office.  The second is, under some circumstances, if

8   some provisions of the election code are complied with,

9   registered voters can submit complaints to our office.

10  And third and finally, local officials, local law

11  enforcement officials, local election officials, can

12  refer cases to our office as well.

13           It's important to note that we do not now

14  nor have we ever stationed police officers, peace

15  officers, investigators or prosecutors at polling

16  places, either during early voting or on election day.

17           Our efforts are entirely dependent upon

18  third parties to let us know what is going on in the

19  field as far as election code violations are concerned.

20           CHAIRMAN:  Can I interrupt you at this

21  point to make sure we're clear?

22           MR. DYER:  Yes, sir.

23           CHAIRMAN:  Before you continue.

24           MR. DYER:  Absolutely.

25           CHAIRMAN:  I don't want to do that any



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003134

TX_00261121

6

1    more than I have to.  But when you say you can be

2    referred information from local officials, does that

3    mean that there could be a universe of prosecution out

4    there that you are not prepared to talk about that is

5    prosecuted locally that has not been referred to you?

6              MR. DYER:  Absolutely.  And that's my

7    second point.  Actually we have direct and original

8    jurisdiction to prosecute election code violations but

9    our jurisdiction is by no means exclusive, and what we

10   can testify to is our experience with the election code

11   enforcement process, but our experience is one piece of

12   a much larger puzzle, and in order to get a real handle

13   on whether it, to what extent there may be violations

14   that are occurring, you would have to do some sort of a,

15   have some sort of a dialogue with, for example, local

16   officials, local DA's, local county attorneys that have

17   criminal jurisdiction to prosecute cases.  These are

18   cases that can be prosecuted at the local level.

19             CHAIRMAN:  So the purpose is to examine

20   the prevalence of fraud, which I think is the extent of

21   fraud in Texas elections, you're not really in a

22   position to be able to allow us to get our hands fully

23   around that?

24             MR. DYER:  Our office can not do that,

25   no, sir.  We can only talk about the things that have



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

7

```
1     been referred to our office from outside.
2               CHAIRMAN:  Okay.  All right.  Thank you.
3               MR. DYER:  Absolutely.  Third and
4     finally, we obviously have criminal investigations that
5     are pending and that are ongoing, and that, for the sake
6     of the integrity of those elections, as well as the
7     rights and the privacy interests of the accused, it's
8     important to recognize that we really can't discuss
9     ongoing investigations.  That's something that's always
10    important to keep in mind.
11              Having said that, according to
12    information that has been compiled by our criminal
13    investigation and our criminal prosecution divisions, by
14    my count, we have received about 267 referrals since
15    August of 2002.  Not all of those referrals, because of
16    either the facts or the law or both, will warrant a full
17    fledged prosecution.  I'm here to tell you that over the
18    course of time, we have --
19              CHAIRMAN:  What does a referral mean?
20    What does that mean, just someone is making a
21    complaint?
22              MR. DYER:  It can mean any number of
23    things.  That's a good question.  For example, what can
24    happen is the Secretary of state, if an individual, and
25    they can talk about their process, I believe they're up
```





Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

JA_003136

8

1    next, if some sort of an allegation of voter fraud or an

2    election code violation comes into the Secretary of

3    State's office from a voter, they will look at it and

4    then make whatever determination they make as to whether

5    it rises to the level of an election code violation, a

6    criminal one at that.  If so, they will refer it to our

7    office, and they can talk about their process, but once

8    we get it --

9              CHAIRMAN:  So there's been some level of

10   scrutiny employed to the complaint before it gets to

11   you?  If it's just a boldface sort of frivolous,

12   baseless, completely outside of any legitimate area

13   complaint, then it -- there is some kind of screening

14   process before it gets to you, so the fact that it is a

15   referral says something about it, in terms of the

16   potential legitimacy of the complaint, is that correct?

17             MR. DYER:  Potentially.  Let me be real

18   clear about that.  I guess what I'm talking about is

19   that's it that comes from the Secretary of State's

20   Office, and I think that there is some level of a review

21   that goes on at that office, which I'll let them talk

22   about.

23             CHAIRMAN:  Okay.

24             MR. DYER:  But, for example, if the DA in

25   some county, or a sheriff in some county or a Texas



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

TX_00261124

9

1     Ranger or a law enforcement officer will refer it to us,

2     I would imagine that the same level of analysis

3     applies.  I even, these are professional law enforcement

4     officers who are in the field, and I would imagine they

5     would refer something to our office only if they felt

6     that the facts or the law as they see them or understand

7     them, we think that it can rise to that kind of a level.

8                    CHAIRMAN:  Okay.

9                    MR. DYER:  And so of the referrals that

10    we have received, 35 of them have been resolved.  They

11    have resulted in prosecutions that have been resolved.

12                   CHAIRMAN:  What does resolved mean?

13                   MR. DYER:  It can mean one of three

14    things.  Of the 35, my understanding is they've either

15    been pled out, they've led to jury trials, or they've

16    been dismissed.  I don't know, I don't think, although I

17    can run this down, that there's been an actual acquittal

18    after a jury trial, but I think --

19                   CHAIRMAN:  What is the equivalent of a

20    finding of no fraud?

21                   MR. DYER:  That would be a dismissal.  I

22    mean, there's been some instances, I think there's been

23    a handful of them have been dismissed after they've gone

24    through the indictment process, I believe that that's

25    right.  35 of the total number of prosecutions that have



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003138

10

1    been resolved.  Maybe not I'm saying that right.

2                CHAIRMAN:  I'm confused.  When you say

3    resolved, I'm still not sure what you mean.  You mean

4    they have been found to have been guilty of some degree

5    of fraud?

6                MR. DYER:  Or the prosecution, after the

7    indictment phase, has been dismissed.  Either someone

8    has been found guilty or someone has pled to some sort

9    of violation.

10               CHAIRMAN:  Okay.

11               MR. DYER:  Or has been dismissed after

12   the indictment.

13               CHAIRMAN:  So in terms of the instances

14   of fraud, we're down to 35?

15               MR. DYER:  That have been successfully,

16   because it's not always successfully, so successfully

17   resolved is a little bit of a misnomer.  Taken to their

18   conclusion to the prosecutorial phase.

19               CHAIRMAN:  Are you saying that the

20   difference between 267 and 35 may also involve

21   additional instances of fraud?

22               MR. DYER:  Out of the 267 referrals, some

23   of them have resulted in prosecutions which are

24   currently pending.  Some of them, for whatever reason,

25   either the facts or the law, has indicated that this is



**ESQUIRE**
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003139

FINAL - COMMITTEE ON ELECTIONS MEETING 6/14/10                    JUNE 14, 2010

11

1    not worthy of an investigation, either because we can't

2    substantiate the facts, even if we could substantiate

3    the facts, we couldn't prove them beyond a reasonable

4    doubt so we don't take them to grand jury, or upon

5    further review, we just decided that based on our

6    analysis, a crime hasn't been committed.

7              CHAIRMAN:  So we got three different

8    categories of that 267.  We got sort of an indication of

9    fraud by either some sort of a deal or a conviction or

10   we have a segment of them that have been found not to

11   have any validity and then we've got some that are still

12   pending, is that sort of fair, in general, to say there

13   are three categories in which you could put the 267?

14             My question is apparently we've found

15   that 35 of them may have been fraud, is that correct?

16   And that there's others that are still pending?

17             MR. DYER:  Okay, let me set this

18   straight.  We've got 267 referrals.

19             CHAIRMAN:  Right.

20             MR. DYER:  Which I guess you could

21   describe allegations.

22             CHAIRMAN:  Right.

23             MR. DYER:  These allegations have been

24   investigated.

25             CHAIRMAN:  Right.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003140

TX_00261127

12

1            MR. DYER:  Of those investigations, we

2    have a handful that have resulted in prosecutions that

3    are pending.  These are people who have been indicted,

4    but we're not --

5            CHAIRMAN:  So that 35 is pending?

6            MR. DYER:  No, sir.

7            CHAIRMAN:  Go ahead, I'm sorry.

8            MR. DYER:  Two separate phases.

9            CHAIRMAN:  Okay.

10            REP. HELFIN:  Mr. Chairman, can you

11    define what you mean by a handful?  What is a handful?

12            MR. DYER:  I think a handful, I'll call

13    it 9.

14            CHAIRMAN:  On a what?

15            MR. DYER:  12.  All of our prosecutions

16    that are pending, meaning that these are things that

17    have gone through at least the indictment phase.

18            CHAIRMAN:  Okay.  Is that in addition to

19    the 35?

20            MR. DYER:  That is in addition to the 35,

21    yes.  Those that have gone to indictment but they

22    haven't been resolved.

23            CHAIRMAN:  Okay.

24            MR. DYER:  Either with a finding of

25    guilt --



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

13

1          CHAIRMAN:  So some are in the category

2     that are or may still be fraud, is it 35 and 12?  35 in

3     the original category and then 12 pending?

4          MR. DYER:  There are 12 that are

5     pending.

6          CHAIRMAN:  Okay.

7          MR. DYER:  By my count, there are 12 that

8     are pending, meaning that they've at least been indicted

9     but they're waiting some level of resolution.

10          CHAIRMAN:  So is that the universe of

11     these cases that are or may be fraud?

12          MR. DYER:  Subject to either a jury trial

13     or some level of agreement between the defendant and the

14     prosecutor.  There are 12 that have been indicted.

15     There's been enough evidence that a grand jury has

16     decided to return the indictment and that's where those

17     12 are sitting right now.  We are waiting some level of

18     resolution.  Apart from that, there are the 35 that have

19     been resolved, either through a plea agreement, a jury

20     trial or a dismissal.

21          CHAIRMAN:  Resolved, if it's a jury

22     trial, means they were found guilty?

23          MR. DYER:  Yes.

24          CHAIRMAN:  Okay.

25          UNIDENTIFIED FEMALE:  (Inaudible).



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003142

14

1          MR. DYER:  I can get that answer for

2     you.  I don't have an answer to that.

3          CHAIRMAN:  And some of them were just

4     settlements out of court?

5          MR. DYER:  Some of them pled, yes, sir,

6     or some sort of I agree to plead to this violation.

7          CHAIRMAN:  Representative Anchia?

8          REP. ANCHIA:  What time frame are we

9     looking at, Jay?

10          MR. DYER:  We're looking at from August

11     2002 until now.

12          REP. ANCHIA:  Okay.  So almost eight

13     years?

14          MR. DYER:  Give or take, yes, sir.

15          REP. ANCHIA:  Almost eight years.  And

16     just to be clear, these are the ones that your office

17     has been dealing with?

18          MR. DYER:  Absolutely.

19          REP. ANCHIA:  This is potentially

20     exclusive of cases that other DA's, that local DAs, just

21     your office.

22          MR. DYER:  That's correct.  Yes, sir.

23          REP. ANCHIA:  Part of the initiatives

24     that the AG's office undertook to deal with voter fraud

25     in the state.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00261130

15

1           MR. DYER:  They are referrals that our
2    office received and that led to the efforts that we've
3    took on.
4           REP. ANCHIA:  You may not know this, you
5    may want to ask the Secretary of State's Office this,
6    but do you know how many votes have been cast in the
7    intervening eight years in the state of Texas?
8           MR. DYER:  I don't know.
9           REP. ANCHIA:  Sorry about that.  I'll ask
10   the Secretary of State's office.
11          CHAIRMAN:  So what I'm trying to do is
12   isolate from the 267 or eliminate from the 267 the ones
13   that that we have some finding that there is no fraud,
14   so in terms of the ones that are or may be fraud, we
15   have the 35 that you mentioned and the 12 that are
16   pending.  That's 47.  Is that of the 267?
17          MR. DYER:  Yes, those are the ones that
18   have been through at least some part of the formal
19   process.  We do have some investigations.  The reason I
20   guess I'm getting hung up on the "Are" or "May be" is
21   that we do have ongoing investigations into some of
22   these referrals.  Some of these referrals we've looked
23   at and we've decided, either for the facts or the law or
24   the passage of time, or what have you, these cases we're
25   not going to take to a grand jury.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003144

16

1           There are currently investigations that
2    are pending and ongoing.  Those may result in findings
3    of fraud, and that's why I don't want to limit that to
4    47, because if we're investigating a case in U-name-it
5    county, will that result in evidence that can be
6    admitted at trial that will show that election code
7    violations happened?  Possibly.  So I guess that's why
8    I'm getting hung up on the "Are" or "May be."
9           CHAIRMAN:  Okay.
10          MR. DYER:  Because just to say there's 47
11   that are done --
12          CHAIRMAN:  So there's 47 plus.  Would you
13   characterize it as a few cases above and beyond that
14   that are still being investigated and may be referred to
15   a grand jury?
16          MR. DYER:  There are cases that are being
17   investigated and that may result in a presentation to a
18   grand jury, I think that's fair.
19          CHAIRMAN:  All right.
20          MR. DYER:  They may not but they
21   certainly may be, depending on what the evidence will
22   show.
23          CHAIRMAN:  Okay.
24          REP. HELFIN:  Mr. Chairman?
25          CHAIRMAN:  Yes.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

JA_003145

17

1          REP. HELFIN:  Okay, now I'm confused.  So

2     you had 35 cases resolved in the prosecution process.

3          MR. DYER:  Yes, sir.

4          REP. HELFIN:  But you said there were

5     some of those that were dismissed for lack of evidence.

6     How many of the 35 were dismissed?

7          MR. DYER:  They were dismissed for any

8     number reasons.  I don't know

9          REP. HELFIN:  However many, for whatever

10    reasons.

11         MR. DYER:  I can get that.  I can get

12    that in terms of the dismissals.

13         REP. HELFIN:  Do you think it was like a

14    third of half of them?  Do you have any recall at all?

15         MR. DYER:  No, sir.  I think it was

16    probably -- I mean, I'm guessing, and I can confirm

17    this, I think of the 35, I recall 5.

18         REP. HELFIN:  Okay.  So instead of 47,

19    we're at 42.  12 in the indictment and then you had 35

20    of these, 30 that either pled or have gone to trial.

21    Would that be fair?

22         MR. DYER:  Yes, sir, and they could have

23    been dismissed for any number of reasons.

24         REP. HELFIN:  Okay.  Thank you.

25         MR. DYER:  Yes, sir.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003146

TX_00261133

18

1          CHAIRMAN:  Continue.

2          MR. DYER:  As the snapshot, of the 35, 18

3     have been, for the sake of completeness, 18 of them

4     involved some level of allegation under 86006 of the

5     election code, which deals with mail-in ballot,

6     returning a mail-in ballot.

7                Two involved 84.0041, which involves an

8     application for a mail-in ballot.  So of those 35,

9     there's been 9 of them involving illegal voting, which

10    is an offense that's delineated by 64.012 of the

11    election code, and the other 6 are what I will -- it's

12    any kind of a sampling of other offenses,

13    electioneering, releasing poll results before the poll

14    is closed, things of that nature.

15          CHAIRMAN:  Do you have the ability to

16    talk, to tell us how many are impersonation fraud?

17          MR. DYER:  That's a difficult question,

18    and just so we're clear, this is kind of one of the

19    things that we've been talking about, the concept of

20    voter impersonation, that is a sub-category of the

21    offense which is in 16012, which is illegal voting.

22                Voting impersonation has a stand-alone

23    offense.  It's really not something that exists under

24    the penal code.  The offense is called illegal voting,

25    which has, I think, four different sub-sections and it



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00261134

FINAL - COMMITTEE ON ELECTIONS MEETING 6/14/10                    JUNE 14, 2010

                                                                    19

1       can encapsulate several different kinds of what could be

2       called fraud at a polling place on election day.

3                   CHAIRMAN:  Okay.  And there are nine of

4       those.

5                   MR. DYER:  There are nine of those that

6       have been resolved.

7                   CHAIRMAN:  So you can't tell us of the

8       nine how many involved impersonation?  You said there's

9       several sub-categories within illegal voting.

10                  MR. DYER:  Right.

11                  CHAIRMAN:  Do you have the ability to

12      tell us how many of the nine involved impersonation?

13                  MR. DYER:  I have not had a chance to

14      review the facts of those nine cases.  What I can tell

15      you is that in at least one of those cases, and I think

16      this is out of Port Lavaca, and there was testimony

17      about this in front of this committee last April, and in

18      the Senate in March, there was an officer-holder that

19      was registering, I believe, resident aliens to vote, and

20      that those resident aliens subsequently voted.  I don't

21      know what kinds -- I don't know what happened in the

22      polling places but apparently these people did vote, and

23      that there was some testimony that was adduced at trial

24      that these votes may have had some sort of an effect on

25      the leaks.  There's one instance.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003148

TX_00261135

FINAL - COMMITTEE ON ELECTIONS MEETING 6/14/10                    JUNE 14, 2010

20

1          CHAIRMAN:  Okay.

2          REP. ANCHIA:  Mr. Chairman?

3          CHAIRMAN:  Yes, Representative Anchia.

4          REP. ANCHIA:  Thanks, Jay.  And I think

5   Mr. Nichols testified before this committee on those

6   cases.

7          MR. DYER:  Yes, sir, I think so.

8          REP ANCHIA:  And if I recall correctly,

9   there was a question as to mens rea with respect to the

10  actual voters.  The voters were told by -- these are

11  legal permanent residents.

12         MR. DYER:  I think that's right.

13         REP. ANCHIA:  Correct?

14         MR. DYER:  I think that's right.

15         REP. ANCHIA:  These were not undocumented

16  persons.  They were told by the candidate that they were

17  eligible as legal permanent residents to vote, is that

18  correct?

19         MR. DYER:  That's my understanding.

20         REP. ANCHIA:  I'm remembering probably

21  the same testimony from Mr. Nichols that you were, that

22  these legal permanent residents, in fact, had ID, they

23  had ID.  They had state driver's licenses or state ID's,

24  and that they, in fact, voted not being citizens but

25  under the mistaken belief, based on the information



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003149

TX_00261136

FINAL - COMMITTEE ON ELECTIONS MEETING 6/14/10                    JUNE 14, 2010

21

1    given to them by the candidate, that they were eligible

2    to vote as legal permanent residents.  Is that roughly

3    the facts?

4              MR. DYER:  That's roughly my

5    understanding of that case.

6              REP. ANCHIA:  We're talking about the

7    same one.

8              MR. DYER:  I think that you probably know

9    more about this than I do.  I don't think that those

10   voters were charged.

11             REP. ANCHIA:  That's right.  That's what

12   Mr. Nichols testified to the fact that they were not

13   charged.

14             MR. DYER:  If they have been, I do not

15   know about it.

16             REP. HARPER-BROWN:  Mr. Chairman.

17             CHAIRMAN:  Yes, Representative Harper-

18   Brown.

19             REP. HARPER-BROWN:  When we talk about

20   these cases, it's not just an individual that went in

21   and voted, they're not all necessarily just one

22   individual that went in and voted illegally, it could

23   involve hundreds or thousands of people that they took

24   in, or tens of people that they took in, or took their

25   ballots and fraudulently voted those ballots or had some



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00261137

22

1    irregularity with the voting process.  So it could be a

2    number.

3              In other words, I was going back to

4    Representative Anchia asked how many votes had been cast

5    over those years, as if, you know, to say well, there's

6    only 35 cases, that would be only 35 people that had

7    done something wrong, but there may have been 35 people

8    but it could have involved more votes than just one, is

9    that correct?

10              MR. DYER:  It could have involved more

11   votes than just one, yes, and kind of just to follow up

12   on that point, the 35 cases that have been resolved, and

13   again, just so that everyone is really clear, that's

14   just our office's experience on that, on that process,

15   and I think maybe to your point a little bit further, I

16   mean, I know for a fact that there were -- I say I know

17   for a fact, some of these cases, certainly on the mail-

18   in context, involved more than one ballot.

19              REP. HARPER-BROWN:  Right.

20              MR. DYER:  I mean, it's not necessarily

21   just 35 votes.  What exactly the universe of votes that

22   these 35 or the 12 or 267 involved is just not something

23   we can -- obviously we can't talk about local law

24   enforcement.

25              REP. HARPER-BROWN:  Right.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003151

23

1              CHAIRMAN:  Can you tell us anything about

2       the extent to which voter fraud tends to find its way to

3       your office?  I mean, is there something about this

4       particular crime that is more likely to find its way to

5       your office than other sorts of crime?

6              I mean, do you have any sense of whether

7       or not a preponderance of the evidence relating to

8       fraud, voter fraud in our state, is going to be relating

9       to matters before your agency or whether it is more

10      likely to be prosecuted locally?

11             I mean, is your presumption based on your

12      knowledge of this field, that you are dealing with the,

13      you know, tiny part of the voter fraud and the bulk of

14      it is dealt with locally or the other way around?

15             MR. DYER:  I don't know that anyone in

16      our office would really have a good answer to that.  I

17      think to get a full picture of the landscape again of

18      voter fraud in the state, I think you would probably

19      have to have some conversations with several DA's and

20      local officials.  As to why complaints come to our

21      office, it may very well be because of the original

22      jurisdiction that our office does have.

23             Our office does have original

24      jurisdiction to prosecute an election fraud case,

25      whereas something like a robbery or burglary requires a



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003152

24

1      little bit more interaction with the local DA, but if an

2      election code violation comes to our office and we

3      investigate it and we find that it warrants prosecution,

4      our office can just handle it directly.  In terms of

5      what the exact numbers are that never make it to our

6      office because someone in Travis County refers it to the

7      county DA, I don't know.

8               CHAIRMAN:  Just to make clear, if the

9      purpose of this committee is to establish the extent of

10     voter fraud, what we know in terms of the evidence in

11     our state, you're going to be able to tell us what you

12     know in your agency but you don't have any idea whether

13     that is a tiny part of the whole or whether it is the

14     whole?

15               MR. DYER:  That's correct.

16               CHAIRMAN:  Okay, all right.

17     Representative Anchia?

18               REP. ANCHIA:  Thank you, Mr. Chairman.

19     Jay, I appreciate your testimony today.

20               MR. DYER:  Absolutely.

21               REP. ANCHIA:  You've always been really

22     helpful to help contextualize some of the issues that

23     we're dealing with.  Write that down.  It's another

24     favorite word of mine.  Representative Bohac is writing

25     down my favorite words.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003153

25

1              Your office was nice enough to send us a

2       list of the matters that you have investigated and/or

3       prosecuted since 2002, and if you could just indulge me

4       for a second with some questions here about those

5       matters, and I don't think there's any disagreement with

6       anybody on this committee that voter fraud exists in the

7       state of Texas, and I'm sure you share that conclusion,

8       correct?

9              MR. DYER:  Our office has seen evidence

10      of voter fraud, yes, sir.

11             REP. ANCHIA:  And I would affirmatively

12      say that there is voter fraud in the state of Texas.

13      And one of the things that we're trying to get our hands

14      around, as Mr. Chairman discussed, was the extent of it,

15      and I think the charge also discusses a photo

16      identification.  We do have a voter ID standard in the

17      state of Texas currently and it discusses how a voter

18      photo identification standard might address some of the

19      fraud that we see in the state, and it's been my

20      contention over time that most of the fraud that we do

21      see in the state, and I think it's borne out by the

22      matters that you articulated for us, that you described

23      for us today, is in mail-in ballot fraud.  That is, a

24      bulk of what you see in the referrals and your

25      prosecution, successful prosecutions, correct?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003154

FINAL - COMMITTEE ON ELECTIONS MEETING 6/14/10                    JUNE 14, 2010

26

1          MR. DYER:  We do see a significant number

2     of mail-in allegations, yes, sir.

3          REP. ANCHIA:  And that's consistent with

4     what we see as well, and on the list that you gave me,

5     we saw, in terms of illegal voting -- Can you describe

6     --

7          We saw incidents of illegal voting.  Can

8     you describe some of the fact patterns that you see

9     under illegal voting based on the complaints and the

10    prosecutions?  Are there some typical fact patterns that

11    stand out?

12         MR. DYER:  To be honest with you, I'd

13    have to refer you to someone who just kind of handles

14    the prosecutions and the investigations more on a

15    day-to-day basis than I do, and we can certainly see if

16    we can set that kind of a discussion up.

17         I mean, 64012 talks about 3 or 4

18    different categories of illegal voting.  I do this from

19    memory.  One of them is voting in an election you're not

20    supposed to, or you're not registered in; voting in an

21    election you're not eligible to vote in; impersonating a

22    voter.  I think voting twice, and there's three or four

23    sub-sections, I think, under 64012.

24         REP. ANCHIA:  And in the list that you

25    all sent over, under the allegation of illegal voting,


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00261142

27

1     there were also charges related to providing false

2     information on an application for an early ballot.

3               I'm just looking at the cases here.  It

4     says, "Allegation of illegal voting, forgery," and then

5     the charges that were brought were seven counts, for

6     example, of knowingly providing false information on an

7     application for early voting ballot.

8           Do you categorize that as a, as an illegal

9     voting offense or a mail-in ballot, or voter

10    registration fraud event?

11              MR. DYER:  It's hard to say.

12              REP. ANCHIA:  It may be both.

13              MR. DYER:  It certainly could be.  I

14    believe that's up to the prosecutor to decide what he or

15    she feels he could prove beyond a reasonable doubt.

16              REP. ANCHIA:  Okay.

17              MR. DYER:  When presenting that

18    information to a grand jury or to a jury.

19              REP. ANCHIA:  So on the list that you all

20    were nice enough to send over, we had allegations of

21    convicted felons registering and casting ballots.  We

22    had official oppression.

23          What does that mean, official

24    oppression?  Because under the charges, it says, "Two

25    counts of official oppression."



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003156

TX_00261143

FINAL - COMMITTEE ON ELECTIONS MEETING 6/14/10                    JUNE 14, 2010

28

1               I'm not sure exactly what that is.

2               MR. DYER:  I don't know that I'm real

3       versed enough to talk about that specific offense.

4               REP. ANCHIA:  Okay.

5               MR. DYER:  I can look it up and get back

6       to you.

7               REP. ANCHIA:  No worries.  Forgery, we

8       had folks who made false reports to police, possessing a

9       ballot without the voter's consent, mail-in ballot

10      violations, we see that throughout.

11              Anyway, so there are any number of

12      instances of illegal voting.  There was one case, and

13      you might want to talk about this, of voting, one kind

14      of illegal voting, voter impersonation at a polling

15      place that was in Harris County and it's the case of

16      Jack Carol Crowder, right?

17              MR. DYER:  Yes.

18              REP. ANCHIA:  I was interested to see

19      this, because up until this case, in looking through the

20      list that your office had provided, I hadn't really

21      found a case that would have been prevented if any of

22      the bills had passed related to photo identification

23      during the 2005, 2007 and 2009 sessions.  I was trying

24      to figure out which of these cases might have been

25      prevented by the passage of any of those pieces of



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003157

TX_00261144

29

1    legislation.

2            All three of those pieces of legislation

3    are slightly different, but let's just --

4            MR. DYER:  Right.

5            REP. ANCHIA:  But let's just stipulate

6    that they are materially similar, if that's okay, to

7    where there would be a preference stated for a photo

8    identification standard.

9            So I look a look at this Harris County

10   case because I was very interested in it.  It occurred

11   in the Democratic primary, 2008 Democratic primary, and

12   correct me if I'm wrong, but the fact pattern was that

13   Jack Carol Crowder went to vote in a Democrat primary.

14   He, in fact, showed up, did not have his voter

15   registration certificate because he was not registered

16   to vote at that particular location.

17           His father, however, was, so that would be

18   Jack Carol Crowder, Jr.  -- was, in fact, registered to

19   vote but had deceased about a year earlier, deceased in

20   2007.

21           Jack Carol Crowder, III went ahead and

22   voted in that election, signed his name in the poll book

23   and apparently gave some form of ID.  It's unclear what

24   he provided, but in order to sign in the poll book, you

25   have to furnish some sort of ID.  And their names were



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00261145

30

1     the same.  Their addresses were the same, and the only

2     thing that was different was the date of birth.  That

3     was like the one piece of data in the poll book that

4     might have led the person to conclude that -- that Jack

5     Carol Crowder, III was not eligible to vote in that

6     election, but nonetheless, he voted.  He was charged

7     with a felony, as the record stated, and then I guess

8     pled down to a misdemeanor.  Are those facts generally

9     correct in your mind?

10             MR. DYER:  Generally speaking, yes.  I

11    mean, I don't know what kind of information he showed,

12    and, I mean, you may have referenced he showed some

13    level of a voter registration card, and I don't know

14    that.

15             REP. ANCHIA:  No, I said he did not show

16    a voter registration card, right.

17             MR. DYER:  From what I know from the

18    information I sent to your office, it looks like he was

19    not registered to vote and he voted, and so he was

20    charged under 64012, and from what I can tell, it looks

21    like he did plead it down to some sort of misdemeanor.

22             REP. ANCHIA:  Right.  And I did see in

23    the affidavit that was provided by the officer who

24    investigated the case that Jack Carol Crowder, III said

25    he wasn't sure if he was registered to vote, he thought



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00261146

31

```
1    he might be.  It turns out he wasn't.  He had checked,
2    when he got his driver's license, he had checked that he
3    did not want to register to vote.  I guess was motivated
4    to go in and vote, showed some form of voter ID, that's
5    why they would have asked him to sign the poll book,
6    right, which is what he did.  We're trying to figure out
7    what that is, whether it was a state ID or a driver's
8    license or some other form of ID.
9              MR. DYER:  Right, and from my side, I
10   don't know that if that information is available.  If it
11   is, I can --
12             REP. ANCHIA:  We're looking for it too,
13   we're looking for it too, but that's the one case that
14   we've been able to see of voter impersonation, and if,
15   in fact, Jack Carol Crowder, III had furnished a state
16   ID or a driver's license, that fact pattern would have
17   been prevented by the photo ID bills that we've seen
18   introduced in the legislature.  Is that your
19   understanding based on, again, if we can stipulate that
20   the three bills were substantially similar.
21             MR. DYER:  Is my time up?
22             REP. ANCHIA:  That may be my time up.  I
23   felt a buzz in my seat.
24             MR. DYER:  I'm sorry, if you could ask
25   that again.
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00261147

32

 1            REP. ANCHIA:  No, that's okay.  So based
 2    on your general understanding of the terms included in
 3    the statute, in the -- excuse me -- in the proposed
 4    bills during the 2005, 2007, 2009 sessions, if Jack
 5    Carol Crowder, III had, in fact, presented his state ID
 6    or his driver's license, would that type of voter
 7    impersonation fraud been prevented by any of the bills
 8    that were proposed?
 9            MR. DYER:  It's hard to say with any kind
10    of definitiveness.  I mean, I guess the question is if
11    the law requires him to show his driver's license.
12            REP. ANCHIA:  Uh-huh.
13            MR. DYER:  And he walks in with his
14    driver's license.
15            REP. ANCHIA:  Uh-huh.
16            MR. DYER:  Based on that fact alone, it
17    seems he may have complied with that provision of the
18    law.  With that being said --
19            REP. ANCHIA:  Clearly there was illegal
20    voting, right?
21            MR. DYER:  Clearly.
22            REP. ANCHIA:  You know, and I looked at
23    the mens rea, right, and he pled at the fact that he was
24    not eligible to vote and he voted, but I mean, it was
25    the same name, same address, same gender in the poll



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003161

TX_00261148

33

1    book.  The one thing that the poll workers did not catch

2    in that situation was date of birth.

3                    MR. DYER:  Right.

4                    REP. ANCHIA:  You know, the father was

5    significantly older than the son, and that might have,

6    that might have stopped him from voting, but otherwise,

7    he signed the poll book using his name.

8                    I just -- I'm always trying to figure out

9    instances or fact patterns that would give rise or that

10   would support the need for photo ID in terms of the

11   voter fraud that we see here, so I was just really

12   curious about this case.  I mean, I said, "Okay, here's

13   a case of in-person voter impersonation, we're going to

14   really take a look at it."  And then when I looked at

15   it, I said, "This might not be the smoking gun that I

16   thought it might be."  This, in fact, might be someone

17   who presented a state ID or driver's license and signed

18   the poll book, and it was a poll worker.  Two things I

19   think happened here.  One, the deceased father was still

20   on the rolls.

21                    MR. DYER:  Right.

22                    REP. ANCHIA:  Well, yes, he was still on

23   the rolls.  I pulled the poll book.  And then, two, the

24   poll worker didn't notice that the date of birth was

25   materially, that this person could not have been, even



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003162

34

1    though they had the same name, same address, same

2    gender, were not the exact same person.

3            It's a clearly mistake that someone could

4    make in haste or something like that, but not the

5    situation that I thought would really be the smoking gun

6    that we would be looking for, you know, to justify them,

7    the photo identification.

8            MR. DYER:  And whether it is or it is

9    not, I'll obviously leave to others, but whether that

10   justifies any kind of given piece of legislation or not

11   is obviously --

12           REP. ANCHIA:  That's not your purview,

13   yes, right.

14           MR. DYER:  I think that a prosecutor

15   would tell you that any kind of a tool that might help

16   him to identify someone who is committing some sort of

17   an illegal act and it can, in turn, lead to admissible

18   evidence at a criminal trial is a tool that they could

19   use.  Always and in every instance, probably help in

20   some cases more than others, certainly possible.

21           REP. ANCHIA:  Okay.

22           CHAIRMAN:  I wasn't clear on this.  Is

23   the case that he's talking about one of the nine illegal

24   voting cases that you earlier referred to?

25           MR. DYER:  One of the nine that's been,



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

JA_003163

35

```
1     I'll say resolved, taken to resolution, yes, sir, one of
2     the nine.
3                 CHAIRMAN:  All right.  Representative
4     Harper-Brown.
5                 REP. HARPER-BROWN:  Yes.  Thank you,
6     Mr. Chairman, but in that instance, if we had a system
7     that was similar to the system they have in Mexico,
8     where not only do they have a voter ID but they have the
9     photograph at the polling location of the person to
10    vote, then he probably wouldn't have been able to vote
11    if the worker could have pulled up his photo at the same
12    time he was verifying his registration, since he didn't
13    have his voter ID or his voter registration card.
14                MR. DYER:  If that's how they do it, that
15    certainly might make it easier, but I don't know how --
16    I'm not familiar with their system.  I'm just not
17    prepared to elaborate.
18                CHAIRMAN:  Continue.  Are you done?
19                MR. DYER:  No, sir, I'm just here
20    answering questions.
21                CHAIRMAN:  Okay.  All right.  Any other
22    questions, members, of this witness?
23                All right.  Thank you.
24                MR. DYER:  Thank you all.
25                CHAIRMAN:  At this time, the Chair calls
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00261151

36

1    Ann McGeehan with the Secretary of State's office.  Good

2    morning.

3              MS. MCGEEHAN:  Good morning.  I'm Ann

4    McGeehan, with the Secretary of State's office.  I

5    thought that first I would address the part of the

6    charge that talks about the study of the new laws in

7    other states.

8              Ken Beall, one of our staff attorneys,

9    has prepared a 50 state chart survey.  It's in your

10   packet, and so I won't go through that entire survey, of

11   course, but out of the 50 states, 27 states, including

12   Texas, require some form of identification in order to

13   vote.  Twenty-three states do not require a voter to

14   present ID before voting.

15             Out of the 27 states that require some

16   form of identification, 11 states require photo ID, and

17   within those 11, some of those states will give an

18   option for a voter to sign an affidavit if they do not

19   have the photo ID present with them when they're

20   presenting themselves to vote.

21             REP. ANCHIA:  Repeat that again, that

22   last figure.

23             MS. MCGEEHAN:  The last figure is 11

24   states require photo ID.

25             REP. ANCHIA:  And how many allow for the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00261152

37

1    affidavit as a form of ID?

2                MS. MCGEEHAN:  I did not count that up.

3    They're all a little bit different.  It's in the charts

4    though.  One of the columns in the charts talks about

5    affidavits.  I could go back --

6                Let me go back and get you the specifics

7    in that.

8                REP. ANCHIA:  If it's in the chart,

9    thanks.

10                CHAIRMAN:  And Ann, just to the clear,

11   the affidavits, how does that work?  Sign something that

12   says, "I don't have a photo ID but I am Todd Smith?"

13                MS. MCGEEHAN:  Right.  And they're all --

14   I mean, each state is a little bit different.  Some of

15   them you sign an affidavit, then you have to present

16   evidence within five days, you know, proof of

17   identification.  You go back to an election official

18   within five days.

19                CHAIRMAN:  So the general rule is you

20   have to show up with the photo ID within a certain

21   period of time; you still have to have a photo ID

22   after you sign the affidavit?

23                MS. MCGEEHAN:  Well, this is only within

24   those states that require photo ID.

25                CHAIRMAN:  Exactly, I understand.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003166

38

1          MS. MCGEEHAN:  Okay.

2          CHAIRMAN:  Yes, I understand.  Of those

3     11 states, there's a certain number that have an

4     affidavit option.

5          MS. MCGEEHAN:  Right.

6          CHAIRMAN:  In those states that have that

7     affidavit option, is it just --

8          What do you have to present within a cure

9     period?

10         MS. MCGEEHAN:  It's very different from

11    state to state.  New Mexico, I think it's very simple.

12    You just sign a statement stating your name, date of

13    birth and residence.  Florida --

14         CHAIRMAN:  And then you don't have to

15    cure at all --

16         MS. MCGEEHAN:  Right.

17         CHAIRMAN:  In New Mexico?

18         MS. MCGEEHAN:  And I think it's the same

19    in Michigan.  You know, they're very, very different.

20    You know, each state has kind of addressed this in a

21    very different way.

22         CHAIRMAN:  Okay.

23         MS. MCGEEHAN:  In some states, Georgia,

24    you have to have photo ID; Florida, you have to have the

25    photo ID.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003167

39

1              CHAIRMAN:  And they do have a cure

2       period, if you happen to show up without one.

3              MS. MCGEEHAN:  Right.

4              CHAIRMAN:  You have a certain number of

5       days to be able to come back with one.

6              MS. MCGEEHAN:  And then you have to show

7       that --

8              CHAIRMAN:  Photo ID.

9              MS. MCGEEHAN:  -- appropriate government

10      issued ID.

11             CHAIRMAN:  Okay.

12             MS. MCGEEHAN:  I know you're all very

13      familiar with the law in Texas.  Of course, we require

14      identification but it doesn't have to be photo ID.  The

15      law assumes that the voter is going to present their

16      voter registration certificate, but if they don't have

17      the certificate, then they can present one of about, oh,

18      let's see, seven or so items that are allowed for in

19      state law.  That includes driver's license, any form of

20      identification, including the person's photo, a birth

21      certificate, citizenship papers, passport, official mail

22      addressed to the person by a governmental entity, a copy

23      of a current utility bill, bank statement, government

24      check, pay check or other government document that shows

25      the name and address of the voter, and then the law also



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003168

TX_00261155

FINAL - COMMITTEE ON ELECTIONS MEETING 6/14/10                    JUNE 14, 2010

40

1    allows the Secretary of State to prescribe other

2    permissible forms of identification, but we have not at

3    this time.

4                Since the 81st legislative session, two

5    states have passed new laws which require ID for voting,

6    and again, it kind of reflects just the variety that's

7    out there.

8                Idaho, effective July 1st, will require

9    photo ID but they allow for same day registration at the

10   polls if the voter presents a valid photo ID and proof

11   of residence at the polls.

12               Utah passed a law that became effective

13   last May, which requires a photo ID or two other kinds

14   of ID, but Utah gives the voter a five day period to

15   present proof of ID to an election official if they

16   don't have it on election day.

17               On the litigation front --

18               CHAIRMAN:  So that would be one photo,

19   two non-photos, with a five day cure, where you can

20   present either the photo or the two non-photos?

21               MS. MCGEEHAN:  That's right.

22               CHAIRMAN:  Okay.

23               MS. MCGEEHAN:  On the litigation front,

24   of course, in April of 2008, before you last met in

25   regular session, the U.S. Supreme Court ruled, in the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00261156

41

1    Crawford vs. Marion County case, that the Indiana voter

2    ID law was constitutional and that the state's interest

3    were sufficiently weighty to justify any limitation

4    imposed on voters.

5              However, in 2009, there was a state court

6    challenge in Indiana on the same law, and an Indiana

7    court of appeals struck the law down on the grounds that

8    the ID law regulates voters in a manner that is not

9    uniform and impartial because voters that vote by mail

10   aren't require to present proof of identity but a voter

11   that votes in person must present proof of identity.

12   That case is on appeal and it's pending before the

13   Indiana Supreme Court, but it's our understanding that

14   the state is still enforcing and requires photo ID

15   before a voter is permitted to vote.

16             That's the overview on the, kind of the

17   big overview on the 50 states, and I would be happy to

18   give any more detail, or if you want specific copies of

19   the state law, I would be happy to get that for you.  Of

20   course --

21             Yes?

22             CHAIRMAN:  In terms of states that have

23   what we would characterize as hard photo ID's, in other

24   words, you have to present a photo ID, you may be able

25   to present it five days after the election if you don't



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00261157

FINAL - COMMITTEE ON ELECTIONS MEETING 6/14/10                    JUNE 14, 2010

42

```
 1    have it on election day, but you have to present one.
 2                MS. MCGEEHAN:  Uh-huh.
 3                CHAIRMAN:  Do you know, off the top of
 4    your head, what states we're talking about -- Indiana,
 5    Georgia, Florida?
 6                MS. MCGEEHAN:  Yes.
 7                CHAIRMAN:  Anybody else that's joined
 8    that party?
 9                MS. MCGEEHAN:  Yes.  There are 11 states
10    now that are in that group.
11                CHAIRMAN:  Well, I don't consider a state
12    that says you just sign an affidavit that says I'm Todd
13    Smith and you don't have to do anything else.
14                MS. MCGEEHAN:  Okay.
15                CHAIRMAN:  If you don't have a photo ID,
16    to be a hard photo ID.  I'm talking about a state where
17    you have to present a photo ID in order for your vote to
18    count either at the polls or within a few days after the
19    polls.  Do you know?
20                MS. MCGEEHAN:  Well, I think even
21    Georgia, and they're, you know, pretty strict law, they
22    do allow the voter to come in up to two days after the
23    election and present ID.
24                CHAIRMAN:  A photo ID?
25                MS. MCGEEHAN:  Yes.
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003171

TX_00261158

43

1          CHAIRMAN:  That's what I'm talking about.
2     I'm trying, if possible, to determine what the universe
3     of states where there is not any voter whose vote does
4     not count, whose vote counts unless they present a photo
5     ID.  In other words, you have to have one or your vote
6     does not count, and you can present it at the polls or
7     you can present it within five days if you forget it on
8     election day, but you have to have one or your vote
9     doesn't count.
10          MS. MCGEEHAN:  Yes, I think clearly
11     Florida, Georgia, Idaho now.
12          CHAIRMAN:  And I guess even that's not
13     even true really of Indiana, because they had exceptions
14     in Indiana, religious objectors.  I don't remember all
15     the exemptions, but that's correct, isn't it?  That
16     really even Indiana wouldn't fit into that category?
17          MS. MCGEEHAN:  Yes.  To be honest, I'm
18     not familiar with the exceptions in the Indiana law.
19          CHAIRMAN:  Okay.  Well, let's just -- I
20     know from past experience that Indiana and Georgia and
21     Florida are the states that sort of tend to come up.  We
22     will leave aside what's happened since then or which
23     other states may be similar to that now.
24          I mean, what I was trying to determine,
25     and I don't know if you're the one or maybe Jay is still



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00261159

44

1    here from the Attorney General.  Did he sneak out?

2                   MS. MCGEEHAN:  Yes.

3                   CHAIRMAN:  Okay.  Is whether there are

4    any states that have what would generally be

5    characterized as a hard photo ID that are voting rights

6    states that obtained approval of their hard photo ID

7    bill through either the Obama justice department or the

8    district court in Washington, D.C.

9                   In other words, if we passed a photo ID

10   bill in Texas this session, it has to go through one of

11   those two places.

12                  MS. MCGEEHAN:  Right.

13                  CHAIRMAN:  Indiana is not a voting rights

14   state, didn't have to have pre-clearance.  I believe,

15   and I'm still from the process of trying to get this

16   confirmation, Georgia and Florida are.

17                  MS. MCGEEHAN:  Yes.  Well, Georgia

18   definitely is.  Florida, I think, not the state isn't

19   but some of the jurisdictions are covered, but the state

20   as a whole is not covered.

21                  CHAIRMAN:  Georgia was pre-cleared

22   through the Bush justice administration, I know that,

23   and I'm not sure about Florida.  Do you know?

24                  MS. MCGEEHAN:  Well, Florida's law was in

25   place for the '09, for your session because you had the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

45

1    state election director come.  I don't know how old it

2    is though.  It may be the fourth, George Bush justice

3    department, may be earlier.

4              CHAIRMAN:  Well, the last information I

5    saw said that Florida -- I don't know if you know the

6    answer to this, Steven, but was a partial voting rights,

7    and I don't know what that means in term of how they got

8    or whether they had to get pre-cleared.

9              MS. MCGEEHAN:  It means their state laws

10   don't need to be pre-cleared, but if the jurisdiction

11   makes any change, like a county makes a change, certain

12   counties are covered.

13             CHAIRMAN:  So Florida is a partial voting

14   rights state and they passed a state voting act law,

15   then you -- they don't have to be pre-cleared at all.

16             MS. MCGEEHAN:  That's my understanding.

17             CHAIRMAN:  So the three that we typically

18   refer to, the only one who has had to be pre-cleared,

19   that was pre-cleared, went through the Bush justice

20   department, is that correct?

21             MS. MCGEEHAN:  In Georgia, yes.

22             CHAIRMAN:  Okay.  Thank you.

23             MS. MCGEEHAN:  All right.  Okay.  Okay,

24   the other part of the charge, of course, directs the

25   committee to examine prevalence of fraud in Texas.  And



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

TX_00261161

46

1      I'll share the data that we have, but just as Jay Dyer

2      noted, I need to similarly note that it's not

3      necessarily indicative of the entire set of data on

4      election fraud.  We only get what's reported to our

5      office, and, of course, a lot is reported locally and

6      probably some of it goes unreported as well.

7              Citizens can either file a criminal

8      complaint with their local district attorneys to

9      registered voters, file a complaint, they have that

10     option under the election code, or they can file a

11     complaint with the Secretary of State's office.  We

12     review it and if, on its face, and it has to be in

13     writing, but if it represents facts which establish

14     criminal violations of the election code, then we will

15     make a referral to the Attorney General's Office.

16              Since the last legislative session, we

17     have made -- we made 14 referrals to the office of the

18     Attorney General in 2009 and 10 referrals so far in

19     2010.  And of the 24 referrals, two of them involve --

20     at least two of them involve allegations of voter

21     impersonation.

22              We also receive many complaints through

23     our toll free line, but not all of those --

24              We try to track all complaints and try to

25     make, have an effort in place to write down all



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00261162

Case 2:13-cv-00193   Document 725-20   Filed on 11/17/14 in TXSD   Page 122 of 173
FINAL - COMMITTEE ON ELECTIONS MEETING 6/14/10                                    JUNE 14, 2010

47

1    complaints, but sometimes some complaints may come

2    through, and in these informal complaints that come

3    through, we've had some potential voter impersonation

4    complaints as well.

5              Since the last session, I thought I'd

6    highlight two changes that our office has made in the

7    areas of trying to combat fraud.

8              CHAIRMAN:  Before you move on real quick

9    and do that --

10             MS. MCGEEHAN:  Sure.

11             CHAIRMAN:  I want to ask you just about

12   what you just said.  Of the two allegations that

13   involved voter impersonation, was there some level of

14   scrutiny that your office engaged in before you referred

15   them on?  And if so, to what extent?

16             MS. MCGEEHAN:  Well, we require that a --

17   In order to make a referral to the Attorney General, we

18   must receive a written complaint, it must be signed, and

19   they must present some factual evidence of a crime.

20   They can't just say, "We think the primary was wrong."

21   They need to have specific facts.

22             We encourage folks to send us as much

23   detail as possible, and I think the two instances that

24   involve voter impersonation, we had a fair amount of

25   accompanied material, you know, sign-in sheets, things



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003176

48

1    of that nature that was sent along with the complaint,

2    forwarded to the AG's office.

3              CHAIRMAN:  So if there's a poll worker

4    that says I saw some guy walk in, you know, same guy,

5    same clothes, same person on the same day, and they're

6    just saying this and they're swearing to it, is that the

7    kind of complaint you're talking about?  Is that

8    typical?

9              MS. MCGEEHAN:  Although typically they

10   probably don't come from the poll workers, typically

11   they probably come from, you know, maybe a --

12             REP ANCHIA:  Campaign?

13             MS. MCGEEHAN:  Campaign.  Or we've had a

14   couple recently from the press, where the press has been

15   doing some investigations.

16             REP ANCHIA:  Are they sworn complaints?

17             MS. MCGEEHAN:  No.  Some of them are but

18   we don't require that they be sworn.

19             REP. ANCHIA:  Do you know if either of

20   the impersonation cases you referred to were sworn?

21             MS. MCGEEHAN:  I don't know.

22             REP. ANCHIA:  And you referred both of

23   them?

24             MS. MCGEEHAN:  Yes.

25             REP. ANCHIA:  And what was the vintage of



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00261164

49

1   those cases?

2                 MS. MCGEEHAN:  Well, one of them was the

3   Harris County case that you and Jay Dyer just discussed,

4   and the other one involved the city of Progresso.

5                 REP. ANCHIA:  The Progresso cases?

6                 MS. MCGEEHAN:  Uh-huh.

7                 REP. ANCHIA:  And it's my understanding

8   that those have been successfully prosecuted but not on

9   voter impersonation.  I wish we had Jay back here, but

10  they were illegal voting but -- I think they were

11  selling votings, is what I recall.

12                MS. MCGEEHAN:  Yes, once we made that

13  referral, we don't get any formal communication back, so

14  I don't know how those were resolved.

15                CHAIRMAN:  While I've got you, is it fair

16  to say most of the referrals you make involve absentee

17  ballots?

18                MS. MCGEEHAN:  I would say maybe about

19  half.  It's a fair number but it's not the only thing

20  that's referred.

21                CHAIRMAN:  And so obviously the other

22  half that's made up of impersonation fraud, what would

23  be the second largest category?

24                MS. MCGEEHAN:  It's really assorted.  I

25  mean, bribery of the voter, electioneering, voting more



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003178

TX_00261165

50

1    than once.

2                    REP. ANCHIA:  Can you rank those in terms

3    of incidences, mail-in ballot, fraud being obviously 50

4    percent?

5                    MS. MCGEEHAN:  Yes; several of them, the

6    subject matter is just illegal voting, so there could be

7    a lot included in that.  Voter intimidation.  I have two

8    briberies.

9                    CHAIRMAN:  Is there something about mail-

10   in ballot fraud that is easier to detect, more likely to

11   be caught, than impersonation fraud?

12                   MS. MCGEEHAN:  That's a tough question, I

13   mean, because early voting by mail, you have less

14   safeguards because it's in the privacy of a voter's home

15   so you don't have election officials present.  There

16   have been recent changes to the law though which require

17   more documentation so that everybody that -- you know,

18   any person that helps the voter complete their

19   application for ballot by mail or helps them vote a

20   ballot has to, you know, document it, so that is

21   helping, I think, in prosecution in finding kind of that

22   chain of custody.

23                   CHAIRMAN:  So sort of some information

24   that weighs both ways?  More documentation required, and

25   therefore, perhaps greater potential for some sort of



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00261166

FINAL - COMMITTEE ON ELECTIONS MEETING 6/14/10                    JUNE 14, 2010

51

1    discovery of fraud?  On the other hand, it occurs in the

2    privacy of your home rather than in the presence of

3    officials and so that might actually weigh the other

4    way?

5              MS. MCGEEHAN:  Right, but voter

6    impersonation, that would probably be something tough

7    for election officials to detect.

8              CHAIRMAN:  Yes, but in terms of

9    determining the relative toughness, the only have strong

10   feelings about whether you're more likely to get caught

11   if you attempt absentee ballot fraud versus

12   impersonation fraud.

13             MS. MCGEEHAN:  I'm not sure how to answer

14   that one right.

15             CHAIRMAN:  Clearly the preponderance of

16   the prosecution relates to absentee ballot as against

17   impersonation fraud.  I'm trying to determine what that

18   means.

19             Is that an indication of that the greater

20   preponderance of the actual fraud is absentee ballot

21   fraud or is there an indication of being some sort of

22   difference in the likelihood of being caught versus

23   engaging in one sort of fraud versus the other sort of

24   fraud.

25             MS. MCGEEHAN:  That's a hard one to



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

JA_003180

TX_00261167

52

1    answer.  I would be calling for an opinion and I don't

2    feel comfortable giving that.

3                    CHAIRMAN:  Okay.

4                    REP. HARPER-BROWN:  Mr. Chairman.

5                    CHAIRMAN:  Rep. Harper-Brown.

6                    REP. HARPER-BROWN:  Thank you,

7    Mr. Chairman.  Could you define impersonation for me?

8                    Does impersonation include someone voting

9    that is not a voter or is it when they are using some

10   other person's ID to vote?

11                   MS. MCGEEHAN:  The way it's defined in

12   the election code is when a person is impersonating

13   another registered voter.  They themselves are not

14   registered but they are impersonating an eligible

15   registered voter.  That's under the offense of illegal

16   voting.

17                   REP. HARPER-BROWN:  And so when the rolls

18   are set, the election rolls, voting rolls, do you verify

19   that these people legally have the right to vote when a

20   person registers?

21                   MS. MCGEEHAN:  There are several

22   validations that are done when a person registered, but

23   they don't -- it does not determine all eligibility

24   requirements, so what happens is the county reviews the

25   application first, makes sure the resident is in the



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00261168

53

```
 1      county.  Then that is sent to the Secretary's of State's

 2      office.

 3              We validate whether that driver's license

 4      really is the driver's license of that person.  If the

 5      voter applicant hasn't submitted a driver's license but

 6      they've submitted a Social Security number instead, we

 7      validate that that's the right Social Security number

 8      for that voter.

 9              That's what we do up front to get, as far

10      as getting a person registered.  Now once a person is

11      registered in the data base, there are other things we

12      do periodically, so weekly we get information on finally

13      convicted felons from DPS.  We run that against a

14      statewide list.  We get information on deaths from the

15      Bureau of Vital Statistics.  We run that against the

16      data base.  We don't have any systematic way to verify

17      citizenship status, but the district clerks do on a

18      monthly basis provide lists to the voter registrars of

19      persons who were excused for jury service because they

20      weren't U.S. citizens.

21              REP. HARPER-BROWN:  But if they haven't

22      been excused, then we're not verifying -- there's really

23      not away to verify citizenship?

24              MS. MCGEEHAN:  No.

25              REP. HARPER-BROWN:  Okay.  So how would
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003182

FINAL - COMMITTEE ON ELECTIONS MEETING 6/14/10                    JUNE 14, 2010

54

1    you know that someone was impersonating another voter?

2    How easy would it be for that poll worker or for someone

3    to know that they were impersonated?

4                 MS. MCGEEHAN:  I think it would be very

5    hard unless the poll worker knew everybody in his

6    precinct, some tiny community, but in most cases, it

7    would be difficult.

8                 REP. HARPER-BROWN:  So then it would be

9    difficult to quantify whether there is excessive voter

10   fraud or impersonation or whether there is minor.  I

11   mean, you really can't prove it either way because

12   there's not a way to know, unless like you said, they

13   know every person coming in.

14                MS. MCGEEHAN:  Right.  Right.

15                REP. HARPER-BROWN:  And then -- and you

16   only investigate on complaints?

17                MS. MCGEEHAN:  Correct.  And we don't

18   investigate, to make that clear.  We just sort of get

19   the facts and then refer it.

20                REP. HARPER-BROWN:  Now one of the other

21   questions, because one of the things that was mentioned

22   in some of the problems that's been happening in Dallas

23   County was about the mail-in ballot itself.

24                The mail-in ballot, does it contain all

25   the information for that election and for which election



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003183

55

1    they're voting in?  Do you know that?

2              MS. MCGEEHAN:  Yes, it's specific to the

3    election.

4              REP. HARPER-BROWN:  Okay, that's what I

5    thought, but one of the complaint was that they could

6    use think that there was any way that they could do

7    that.

8              MS. MCGEEHAN:  Well, there's one

9    exception, and that's for the primary, so the complaints

10   were out of the primary, if the person requests the

11   ballot in the primary, they can also request to

12   automatically receive a ballot by mail for the run-off.

13   So that might by what was discussed.

14             REP. HARPER-BROWN:  Okay.

15             MS. MCGEEHAN:  One application was

16   requested for both elections.

17             REP. HARPER-BROWN:  Okay.

18             MS. MCGEEHAN:  But the ballot itself --

19             REP. HARPER-BROWN:  The ballot itself is

20   very specific to that election?

21             MS. MCGEEHAN:  Yes.

22             REP. HARPER-BROWN:  Okay, that's what I

23   thought.  All right.  Thank you.

24             CHAIRMAN:  So I want to just, to kind of

25   make sure I'm as far as we can get on this kind of



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003184

56

1    question to the extent to which there is a difference,

2    if at all, between the likelihood of getting caught,

3    committing absentee ballot fraud versus impersonation

4    fraud, and what Representative Harper-Brown just

5    indicated was that basically somebody has to turn you in

6    if you walk up to the polls and say I am John when you

7    are really Ted, or you, John, you say you're John when

8    you're really Ted, and then after you vote, John shows

9    up, or before you have voted, John has already voted, I

10   guess those are two ways I can imagine off the top of my

11   head to be caught, and impersonation fraud is you have

12   somebody else know about it, turn you in, or the person

13   you're impersonating actually votes before or after you

14   do.

15           REP. ANCHIA:  Mr. Chairman, there's one

16   other thing, just to clarify that, in the case of Jack

17   Crowder, he voted for someone who was deceased at the

18   time, and when there was an audit of the rolls, they saw

19   hey, well, this person that voted is deceased, they did

20   a little more investigation and that's how they found

21   it.

22           CHAIRMAN:  Okay.  And that's what you

23   just referred to, where you compare the rolls

24   periodically to determine who was deceased?

25           MS. MCGEEHAN:  Right.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003185

TX_00261172

57

1          CHAIRMAN:  What would prompt -- I guess

2     in that case where he was deceased, what would prompt

3     somebody to question?

4               Would it be because you do this automatic

5     comparison of the rolls and somehow somebody noticed

6     that somebody had voted before the person was taken off

7     the rolls as being deceased but yet after the date which

8     they were deceased?

9               MS. MCGEEHAN:  Excuse me.  I mean, I

10    guess the public records would certainly allow somebody

11    to do that kind of investigation.  In that specific

12    case, the process that we received -- you know,

13    obviously the father's name stayed on the rolls past

14    time, you know, he died in '07 apparently and he's still

15    on the rolls in the spring of '08.  And so there are

16    some limitations on getting that information from the

17    Bureau of Vital Statistics.  It can be up to six months

18    old, for one thing, and we have to be matched based on

19    Social Security numbers, so unless we have a good match,

20    we are very hesitant to label someone has possibly

21    deceased.  You know, you don't want to cancel someone

22    who's very much alive and eligible to register to vote,

23    so unfortunately, the two data bases that the Bureau of

24    Vital Statistics database is not so easy to compare

25    against the statewide list of registered voters because



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00261173

58

1    some of the matching criteria is not the same.  We don't

2    have driver's license numbers in the Bureau of Vital

3    Statistics data base.

4              REP. ANCHIA:  And Mr. Chairman, I think

5    that the audit didn't occur at the Secretary of State's

6    level but at the local level.  I think the county did

7    the match, if I'm not mistaken.

8              MS. MCGEEHAN:  It could be.  The county

9    can also receive information locally, which may be

10   quicker than getting it from Bureau of Vital Statistics.

11             REP. CHAIRMAN:  So if granddad dies, I

12   have his voter registration card.  I'm really, you know,

13   interested in election so I'd rather vote twice rather

14   than once.  The only way that's going to be caught, on

15   that issue anyway, is if there's some kind of

16   independent effort on the part of the local government

17   to do some sort of audit?

18             MS. MCGEEHAN:  That and the fact, I

19   guess, that they are public records, so generally what

20   happens, the campaign scrutinizes all the records after

21   a close election, but as far as a systematic audit, that

22   would be up to locals to initiate that.

23             REP. CHAIRMAN:  But even if I do vote for

24   grand-dad because he's dead and I've got his voter

25   registration card and there's some kind of subsequent


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003187

TX_00261174

59

1    audit that determines that someone voted with grandad's

2    voter registration card, how are they going to tie it to

3    me?

4              MS. MCGEEHAN:  It probably would be very

5    difficult to tie it to you.

6              CHAIRMAN:  Yes, they can't find me.

7              MS. MCGEEHAN:  Yes, you signed as him and

8    there would be no way to track it back to you.

9              CHAIRMAN:  So how do we catch people with

10   absentee ballot fraud?  Is it the same thing?  Do we

11   have person that turn them in that know about it?  Do

12   you have a sense on that?

13             MS. MCGEEHAN:  Sometimes folks are turned

14   in, sometimes voters themselves feel -- sometimes there

15   can be aggressive campaigns, come to a person's home,

16   and a lot of times the voters are elderly, they'll let

17   somebody in.  Sometimes they get pressured into voting a

18   certain way.  That campaign worker leaves and then the

19   voter thinks twice and like, "Well, I really didn't want

20   to vote for candidate X," and then they'll try to cancel

21   their ballot.  Or like your similar example, they'll

22   show up to vote on election day but the poll list is

23   marked having that that person voted earlier, and the

24   voter says, "But I didn't vote early," and that's an

25   indication that something is going on.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

60

1          CHAIRMAN:  Okay.  So a lot of times the
2     voter themselves report absentee ballot fraud.
3          MS. MCGEEHAN:  Yes.
4          CHAIRMAN:  On them?
5          MS. MCGEEHAN:  Yes, and in addition to
6     campaigns.  Campaigns will also have obviously a vested
7     interest in wanting to research that.
8          CHAIRMAN:  Representative Anchia?
9          REP. ANCHIA:  I'll defer.
10          CHAIRMAN:  Okay, Dr. Allen.
11          REP. ALLEN:  An incident of inside voter
12     fraud, what I consider inside the polling place, i.e.,
13     it's a slow day at the polling place so the precinct
14     judge takes the liberty to vote for a few of my
15     neighbors who did not show up at the polls, or I know
16     will not show up.  Have you ever had that kind of fraud
17     before?
18          MS. MCGEEHAN:  We have had that
19     allegation before.  I don't know that it was ever proved
20     out, but no, not too often, but I can remember that
21     allegation coming up in the past, at least several
22     times.
23          REP. ALLEN:  Several times.  Was it
24     Houston?
25          MS. MCGEEHAN:  I think it was Houston.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003189

61

1              CHAIRMAN:  Representative Anchia?

2              REP. ANCHIA:  I wanted to follow up on

3       the Chairman's sort of line of questioning about trying

4       to get at the incidence of one type of fraud versus the

5       other, mail-in versus in-person, the type of

6       impersonation that the photo ID bills of the last three

7       sessions have tried to drive at, because none of those

8       three bills, to your knowledge, has included a photo ID

9       requirement for mail-in ballots, correct?  2005, 2007?

10             MS. MCGEEHAN:  I don't recall that being

11      --

12             REP. ANCHIA:  As far as you can remember?

13             MS. MCGEEHAN:  Right.

14             REP. ANCHIA:  So we do have about 50

15      percent of your complaints have been mail-in ballot

16      fraud, correct, that you testified to that before?

17             MS. MCGEEHAN:  Right.

18             REP. ANCHIA:  Yet the photo

19      identification bills of the last three sessions did not

20      include any sort of photo identification for mail-in

21      ballots, correct?

22             MS. MCGEEHAN:  That's my memory.

23             REP. ANCHIA:  Okay.  That's my memory

24      too.

25             When we talk about the difference in



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00261177

62

1      deterring, potential deterrents for fraud, what is the

2      penalty for a person showing up at the polls with

3      someone else's voter registration certificate and trying

4      to vote their ballot?  It's two to ten in jail and

5      $10,000 fine, is that right?

6                  MS. MCGEEHAN:  I know it's a felony.  I

7      don't know specifically what the punishment is on that.

8      I could look it up.

9                  REP. ANCHIA:  And the person would be

10     showing up in front of, in front of whom typically?

11                 MS. MCGEEHAN:  In front of the poll

12     worker, the election judge or election clerk at the

13     polls.

14                 REP. ANCHIA:  Potentially witnesses

15     there?

16                 MS. MCGEEHAN:  Yes.

17                 REP. ANCHIA:  Would those deterrents,

18     those witness be available in a mail-in ballot

19     scenario?-

20                 Is there a judge that oversees mail-in

21     ballots; that is, goes to a person's home and witnesses

22     that, witnesses a person signing?

23                 MS. MCGEEHAN:  No.  I mean, you know, the

24     early voting clerk, all that is either at the county or

25     the city, so once the ballot is mailed, the only folks



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003191

63

```
1       that might be at the voter's home would be relatives or
2       friends or something like that.
3                    REP. ANCHIA:  Or nobody?
4                    MS. MCGEEHAN:  Right.
5                    REP. ANCHIA:  So it could be completely
6       anonymous?
7                    MS. MCGEEHAN:  Right.
8                    REP. ANCHIA:  In terms of the
9       scaleability of a type of fraud, which is something that
10      always interests me why anyone would subject themselves
11      to two to ten in jail and $10,000 fine to change one
12      vote, it is easier, you've probably gotten complaints
13      about mail-in ballot fraud being on a large scale,
14      correct, vis-a-vis voter impersonation?
15                   Let me back up.  I'll ask it in nuggets.
16                   MS. MCGEEHAN:  Okay.
17                   REP. ANCHIA:  Have you received
18      complaints about large scale mail-in ballot fraud?
19                   MS. MCGEEHAN:  Large scale meaning more
20      than just one or two?
21                   REP. ANCHIA:  More than five.
22                   MS. MCGEEHAN:  Yes.
23                   REP. ANCHIA:  Okay, have you received
24      complaints of large scale voter impersonation fraud, the
25      type of voter impersonation that would be remedied by
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003192

TX_00261179

64

1    the photo ID bills that we've seen in the legislature,

2    more than five?

3              MS. MCGEEHAN:  Well, I mean, based on the

4    referrals that were made to the Attorney General, which

5    again, is not the full picture of everything going on in

6    the state, you know.

7              REP. ANCHIA:  On a per-instance basis.

8              MS. MCGEEHAN:  Out of the I guess 24

9    referrals that we've made in the last two years, two

10   clearly involved allegations of voter impersonation.

11             REP. ANCHIA:  And how many of those

12   involve more than -- again, I'm trying to get at the

13   scaleability.

14             MS. MCGEEHAN:  Right.  I think that one

15   of them did involve several voters.  It wasn't just a

16   single act.

17             REP. ANCHIA:  Was it more than five

18   voters?

19             MS. MCGEEHAN:  I don't remember.  We

20   would have to pull that case.  I'm pretty sure it was

21   the City of Progresso.

22             REP. ANCHIA:  Right, it was a Progresso

23   case, right?

24             MS. MCGEEHAN:  Yes.

25             REP. ANCHIA:  Okay.  So I mean, we're


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003193

65

1    trying to get at the incidence of a particular type of

2    voter fraud.  I mean, a corollary question is what is

3    the potential yield and what is the potential risk for a

4    campaign for an individual, right, so you --

5              Would you agree with me that the

6    potential yield versus risk, an anonymous process

7    potentially done alone in one's home versus someone,

8    versus an instance where you're showing up to change

9    potentially one vote in front of witnesses, do you see a

10   difference between the risk in yield in either of those

11   situations?  The question is, do you see a difference?

12             MS. MCGEEHAN:  Yes, there's differences

13   in risk but I hesitate to say that that somehow means

14   that there's more by mail fraud than voter impersonation

15   fraud, because we're dealing with limited data, so I

16   hate to make any kind of conclusion.

17             REP. ANCHIA:  Right, we're dealing with

18   limited data but that's the data, that's the only data

19   we have, right?  What else can we base our decisions off

20   of?  I mean, I could flip a coin.

21             MS. MCGEEHAN:  Yes.  I mean, I guess the

22   local prosecuting authorities might have data.  Election

23   contests filed in the state may have data on some of the

24   key issues as well.  There might be other sources.

25             REP. ANCHIA:  But there's probably no



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00261181

66

1    better data?  I mean, do you think?  Who would have more

2    data?

3              MS. MCGEEHAN:  I think that's the

4    problem.  It's very decentralized.  To the extent that

5    we're the central authority for elections, we receive a

6    lot of it, but I hate to say that that represents the

7    universe.

8              REP. ANCHIA:  How many votes have been

9    cast since 2002?

10             MS. MCGEEHAN:  You gave me a heads-up on

11   that one.

12             REP. ANCHIA:  Yes, I figured you texted

13   someone and got the answer.

14             MS. MCGEEHAN:  Well, I didn't text, but

15   all I can tell you right now is over 20 million, and

16   it's probably higher than that, but just going back --

17             REP. ANCHIA:  That's state and local or

18   just state?

19             MS. MCGEEHAN:  That represents the

20   November general.

21             REP. ANCHIA:  That's just for November

22   general.

23             MS. MCGEEHAN:  November general.

24             CHAIRMAN:  What was that, 20 million

25   what?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00261182

67

1          MS. MCGEEHAN:  Over 20 million votes cast

2     in the November general elections held in '08, '06, '04

3     and '02, and I'm saying it's over 20 million.  We can

4     get you the specifics.  It's all on our website.

5          CHAIRMAN:  You're talking about the state

6     of Texas?

7          MS. MCGEEHAN:  Well, there were 8 million

8     votes cast in 2008 for the presidential, and that was

9     one of our high water years for turn-out.  There was

10    about 4 million, I think, in 2006.

11         CHAIRMAN:  I thought you just told me

12    there were 20 million votes cast.

13         MS. MCGEEHAN:  During those four general

14    elections, over 20 million votes cast.

15         CHAIRMAN:  Okay, got you.  Is that the

16    total over four years?

17         MS. MCGEEHAN:  Yes.

18         CHAIRMAN:  Okay.  How many registered

19    voters are we again?  Remind me.

20         MS. MCGEEHAN:  Right at 13 million.

21         CHAIRMAN:  13, okay.

22         REP. ANCHIA:  Just really quickly.  In

23    those 20 million, just again, we're going back to 2002,

24    at least 20 million, and that's not local elections.

25         MS. MCGEEHAN:  That's not local, that's



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003196

68

1    not primary.

2              REP. ANCHIA:  It's just general, it's not

3    primary.  How many complaints total, just complaints,

4    unfounded, founded, referred, unreferred, how many

5    complaints since 2002?

6              MS. MCGEEHAN:  Including complaints that

7    we have received, you know, on the phone, I can't

8    remember.

9              REP. ANCHIA:  Look, you know, "My crazy

10   uncle, you know, doesn't have the mind to go vote and he

11   went to go vote."  I mean, just anything, everything.

12             MS. MCGEEHAN:  Well, I'm really

13   guesstimating here, but maybe between 500 to a thousand.

14             REP. ANCHIA:  Okay.  Lets take the big

15   number, a thousand.

16             MS. MCGEEHAN:  Okay.

17             REP. ANCHIA:  Could it be a bigger

18   number?  Could it be 2000?

19             MS. MCGEEHAN:  I don't think it would be

20   that big, at least as far as what we've tracked.

21             REP. ANCHIA:  And again, these are un --

22   you know, these are the ones that you may refer on, the

23   ones you may screen.

24             MS. MCGEEHAN:  Right.

25             REP. ANCHIA:  We don't have enough



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

JA_003197

Case 2:13-cv-00193   Document 725-20   Filed on 11/17/14 in TXSD   Page 144 of 173
FINAL - COMMITTEE ON ELECTIONS MEETING 6/14/10                              JUNE 14, 2010

69

1       information in 2000.  Okay, let me ask you really

2       quickly about the states that have different systems

3       than Texas, because we have a voter ID standard

4       currently, correct?

5                   MS. MCGEEHAN:  Right.

6                   REP. ANCHIA:  Okay.  And when you do not

7       have -- let's talk about Texas first and I'll get to the

8       other states.

9                   When you do not have your ID, your voter

10      ID, under the current standard, you can vote using an

11      affidavit, correct?  You sign a poll book that contains

12      an affidavit in it, correct?

13                  MS. MCGEEHAN:  Right, a person can vote a

14      provisional ballot.  It is an affidavit.  We used to

15      call it the challenge affidavit, now it's called the

16      provisional ballot, but it is, in fact, an affidavit.

17                  REP. ANCHIA:  I'm asking you about

18      something slightly different, right, and I never have my

19      voter registration certificate on me.

20                  MS. MCGEEHAN:  Oh, I'm sorry, I know what

21      you're asking now.

22                  REP. ANCHIA:  So I do not satisfy the

23      voter ID standard in the state of Texas when I go vote

24      because I do not have my voter registration

25      certificate.  And instead, I sign an affidavit, correct?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003198

TX_00261185

                                                                                 70
1                    MS. MCGEEHAN:  Right.

2                    REP. ANCHIA:  And I can present my state

3        ID or my driver's license, correct?

4                    MS. MCGEEHAN:  Right.

5                    REP. ANCHIA:  Anything else?  Can I

6        present anything else?

7                    MS. MCGEEHAN:  Yes, there is a list of

8        items that state law allows for, and it includes photo

9        and non-photo ID, official mail, government mail.

10                        REP. ANCHIA:  What does the

11       affidavit say that I sign?

12                   MS. MCGEEHAN:  The affidavit.

13                   REP. ANCHIA:  Well, you don't have to

14       quote the language, but --

15                   MS. MCGEEHAN:  Yes, my general

16       understanding is the affidavit is an affidavit just

17       simply stating that the voter does not have their voter

18       registration certificate with them.

19                   REP. ANCHIA:  And that they're eligible

20       to vote in that election, correct?

21                   MS. MCGEEHAN:  Right.

22                   REP. ANCHIA:  And they hand over their

23       identification, whatever it may be, photo identification

24       from that long list.  I usually just use my driver's

25       license and I sign the affidavit.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

FINAL - COMMITTEE ON ELECTIONS MEETING 6/14/10                    JUNE 14, 2010

71

1              What if I bust any of the provisions of

2      the affidavit, what if they're not true, what happens?

3      What's the penalty for that?

4              MS. MCGEEHAN:  Well, it could be illegal

5      voting.

6              REP. ANCHIA:  It could be a felony,

7      correct?

8              MS. MCGEEHAN:  It could be a felony.

9              REP. ANCHIA:  2 to 10, $10,000 fine,

10     right?

11             MS. MCGEEHAN:  Right.

12             REP. ANCHIA:  Okay.  So we have a penalty

13     in place and we have an affidavit system currently in

14     place, all right.

15             Do other states have a photo

16     identification standard that allows for an affidavit to

17     be signed if they they're unable to meet the photo

18     identification standard?  You sign the affidavit, again,

19     under significant penalties, correct?

20             MS. MCGEEHAN:  Right.

21             REP. ANCHIA:  Do other states have that?

22             MS. MCGEEHAN:  I believe so.

23             REP. ANCHIA:  Does Michigan have that?

24             MS. MCGEEHAN:  Yes, I know Michigan does

25     because I think they have a pretty strict requirement



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00261187

FINAL - COMMITTEE ON ELECTIONS MEETING 6/14/10                    JUNE 14, 2010

72

1    that it has to be driver's license or other government

2    issued photo ID.

3                    REP. ANCHIA:  Right.

4                    MS. MCGEEHAN:  And so they have an

5    affidavit to kind of fail over if the person doesn't

6    have that photo ID.

7                    REP. ANCHIA:  So in Michigan, you're a

8    Korean war veteran, senior, don't drive any more, don't

9    have any form of photo ID, you can say, you know, under

10   penalty of perjury, two to ten in jail, $10,000 fine, I

11   am who I say I am, all right, I am eligible to vote in

12   this election, and you sign something and you vote,

13   right?

14                   MS. MCGEEHAN:  That's my understanding.

15                   REP. ANCHIA:  Just kind of like in Texas

16   but without -- but substituting our voter registration

17   certificate ID standard for the photo ID standard they

18   have in Michigan, right?

19                   MS. MCGEEHAN:  Right.

20                   REP. ANCHIA:  And that person, and that

21   person, I guess, would be subject to prosecution.  They

22   have left a piece of paper behind that is auditable,

23   correct?  I mean, that --

24                   MS. MCGEEHAN:  Right.

25                   REP. ANCHIA:  And could a vote be



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

JA_003201

73

```
 1    invalidating at some point?  Could a person be
 2    prosecuted based on that paper?  That's two questions.
 3                 MS. MCGEEHAN:  Yes, I don't know the
 4    Michigan law but I'm sure if they falsely swore an
 5    affidavit, that's going to violate the state penal code.
 6                 REP. ANCHIA:  What's always gotten me is
 7    that I'm more worried about people not being able to
 8    exercise the franchising in this state than what I think
 9    is, are very few cases of voter impersonation.  And I
10    think it would be a horrible injustice, by way of
11    example, if that senior was not allowed to vote just
12    because they didn't have the piece of paper.
13                 In my view, having an affidavit bypass
14    standard would make a lot of sense if you were to adopt
15    a strict photo ID standard, so people don't fall through
16    the cracks, people who have fought for our country,
17    people who are disabled or people who just can't do it,
18    and we have had testimony.  That's why I asked that line
19    of questioning, because I'm very concerned about folks
20    not being able to vote when they're legally entitled to
21    do it, if we adopt a strict standard.
22                 What does Idaho do?  I was curious to see
23    your write-up on Idaho.  I mean, I see that they've gone
24    -- what I didn't see in the write-up is any sort of
25    affidavit, right?
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00261189

FINAL - COMMITTEE ON ELECTIONS MEETING 6/14/10                    JUNE 14, 2010

74

1              MS. MCGEEHAN:  Right.

2              REP. ANCHIA:  I like the fact that you

3       can -- you know, if ID becomes the new standard, you

4       know, and it is ostensibly or theoretically designed to

5       provide more security, then you can use it to vote same

6       day.

7              I think that's a very interesting

8       feature, one that I've been a proponent for in the

9       legislature.

10             What happens if you don't have it?  I

11      guess it's here at the bottom.  I'm sorry, I missed it.

12      Without the proper ID, have the option of signing an

13      affidavit with their name and address.  Do you know what

14      the affidavit says?

15             MS. MCGEEHAN:  I do not.  We could, you

16      know, we could definitely go back and do a little more

17      research on the states that have the affidavit option

18      and kind of spell that out, because they're each so

19      different.

20             REP. ANCHIA:  Okay.

21             MS. MCGEEHAN:  We could do that.  We

22      would be happy to do that.

23             REP. ANCHIA:  Some of these other states

24      allow cure periods, two days, five days.

25             MS. MCGEEHAN:  Right.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003203

75

1          REP. ANCHIA:  Do you have data on how

2     many people come back to cure?  I'd be interested to

3     know that.

4          MS. MCGEEHAN:  I don't know that

5     question.

6          REP. ANCHIA:  Some of these states, I'm

7     sure, probably keep logs of folks.

8          MS. MCGEEHAN:  Right.

9          REP. ANCHIA:  We turn them away and, you

10    know, we get a two percent cure rate or a 20 percent

11    cure rate.  I'd be interested to know those numbers.

12         MS. MCGEEHAN:  Okay.

13         REP. ANCHIA:  Let's see what other

14    questions I have here.

15         A majority of states -- I should say 27

16    states, you used the 27 number earlier in your survey of

17    the states.  Is it 27 states that have some form of

18    voter identification standard?

19         MS. MCGEEHAN:  Yes.

20         REP. ANCHIA:  That includes Texas,

21    correct?

22         MS. MCGEEHAN:  Right.

23         REP. ANCHIA:  So 23 states have nothing?

24         MS. MCGEEHAN:  I'm not sure if that's the

25    best way to say it.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003204

76

1           REP. ANCHIA:  Okay.

2           MS. MCGEEHAN:  I think that they, kind of

3     like probably the way our law used to be, I think,

4     before 1997 in our state, it still required a voter

5     registration certificate, but if you didn't have it, you

6     could just simply sign the affidavit stating you didn't

7     have it.

8           I think we characterize those states as

9     not requiring ID because a person can vote without

10    requiring it but it's not to say that they never --

11          We can re-phrase that on the chart a

12    little better.

13          CHAIRMAN:  What that means is in those

14    states, you can vote without any documentation?

15          MS. MCGEEHAN:  Right.

16          CHAIRMAN:  Whereas in the others, you

17    have to have some form of documentation, right?

18          MS. MCGEEHAN:  Right.  I guess in these

19    states where no ID is required, they have exceptions for

20    folks that don't have ID.

21          REP. ANCHIA:  So of the 27 states that do

22    have a voter identification standard, a voter ID

23    standard like we do in here Texas, how many are photo

24    again, 11?

25          MS. MCGEEHAN:  11.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00261192

77

1          REP. ANCHIA:  And then how many of those

2      11 have an affidavit bypass?  I see Idaho has one.

3          MS. MCGEEHAN:  Yes.  That I would need to

4      count up.  I didn't look so I need to look through the

5      chart and get you that number, so we'll get you that

6      number too, out of the photo ID, how many allow an

7      affidavit.

8          REP. ANCHIA:  Uh-huh.  And of those 11,

9      how many do registration, same day registration either

10     during early vote or on election day?  Is North Carolina

11     one of the 11?

12         MS. MCGEEHAN:  No, they don't require

13     photo ID.

14         REP. ANCHIA:  Got it.  Okay.  Thanks,

15     Ann.  I appreciate it.

16         MS. MCGEEHAN:  Okay.  You're welcome.

17         CHAIRMAN:  I'd like to know also, while

18     you're doing that, is, in other words, is it true that

19     even among the 27, you cannot vote without providing

20     some form of documentation?

21         In other words, if I understand the photo

22     ID, I assume in New Mexico, where you mentioned they

23     just signed an affidavit, I assume they have to present

24     some kind of non-photo before they sign the affidavit in

25     New Mexico, it's not just an affidavit, because if it's



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

TX_00261193

78

1    just an affidavit, then I put them in the 23 category

2    rather than 27, because you can vote without any

3    documentation whatsoever.  I don't care what they

4    technically require, if they allow you, if you don't

5    have it --

6               MS. MCGEEHAN:  Yes.

7               CHAIRMAN:  -- to just sign something and

8    go vote.

9               MS. MCGEEHAN:  We can do a little more

10   research.

11              Apparently it looks like they sort of

12   modified their existing photo ID law to kind of give

13   this out for the statement that that doesn't require any

14   ID, but we'll --

15              CHAIRMAN:  In my mind, if anybody can go

16   up and vote without documentation, you know, because

17   they say, "I don't have whatever ID you require," then

18   would that not, more than likely, more fairly be put in

19   the 23 category?

20              I'm interested in states where you cannot

21   vote without a piece of paper, and then somehow

22   distinguishing one state from the other in terms of what

23   piece of paper they require.  And I'd also, while you're

24   at it, I want to know if there's any voting rights

25   states that has had a voter ID bill approved through


**ESQUIRE**
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003207

TX_00261194

79

1    either the Obama justice department or the D.C. district

2    court, any.  And if so, kind of what that, what that

3    legislation is.

4                    MS. MCGEEHAN:  Okay.

5                    REP. HARPER-BROWN:  Mr. Chair?

6                    CHAIRMAN:  Yes, Representative Harper-

7    Brown.

8                    REP. HARPER-BROWN:  Thank you,

9    Mr. Chairman.  A couple of things.  I agree with

10   Representative Anchia, we certainly don't want to make

11   it more difficult for people to vote, but do you

12   remember last year -- that's why I was so impressed when

13   the gentleman from Georgia came to speak to us, and I

14   think he testified to the fact that they had had 19

15   elections since they finally got their voter ID law in

16   place, and they hadn't had any complaints.  Do you

17   remember, isn't that what he testified to?

18                    MS. MCGEEHAN:  That sounds right.

19                    REP. HARPER-BROWN:  And I know that I

20   looked personally and saw where the voting numbers had

21   actually gone up, so it didn't seem to keep people from

22   going to the polls because the voters had increased.

23   And I believe that question, I asked him that question

24   too and he agreed that the numbers had gone up, so it

25   hadn't really hurt them.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00261195

80

1              The other thing is that I think there are

2      a lot of things that we pass laws on down here that we

3      don't have a hard, firm, fast number on.  Children,

4      uninsured children I think is a very good example of

5      that.

6              We have some data, we have some cases of

7      children going in to hospitals without insurance but

8      then we extrapolate a percentage of uninsured children

9      compared to the number of children in the state based on

10     some facts that we use, but not do see say that because

11     five children went into the hospital without insurance,

12     we only have five children in the state that don't have

13     insurance.  That's probably the case too, isn't it?

14              I mean, you at least said earlier it's

15     hard to quantify whether people are voting illegally or

16     not because somebody has to know that that person

17     walking in there is impersonating someone else or has

18     some really good fact behind it.  So I mean, we

19     extrapolate a lot of the numbers and pass a lot of laws

20     based on per formas or on estimates, not on the hard

21     facts.

22              Getting back to the mail-in ballot,

23     because I think that's probably what they were talking

24     about when they said ballots, is it possible --

25              Their claim is that it's possible for a



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

JA_003209

TX_00261196

81

1    vote harvester to take a mail-in ballot and have someone

2    sign four or five of these applications at a time and

3    then they mark which election it's for and mail it back

4    in.  Is that possible?  Because there's not a hard firm

5    data on a request for a ballot for each election.  You

6    could have someone in a nursing home sign one of these

7    four or five times and then just check and mail it in.

8    Is that possible?

9              MS. MCGEEHAN:  I mean, it's possible,

10   sure.  I mean, a campaign could do that and have a voter

11   sign and leave it blank, and then when it came time for

12   a election, submit that ADDM on behalf of that voter.

13             REP. HARPER-BROWN:  Okay, all right.

14   Thank you.

15             MS. MCGEEHAN:  Uh-huh.

16             CHAIRMAN:  Dr. Allen?

17             REP. ALLEN:  Yes, my question is on

18   provisional ballots.  What, if any, impact has

19   provisional ballots had on the election process?  How

20   are they counted, when are they counted, are they

21   counted?

22             MS. MCGEEHAN:  Let me see.  I did get

23   some data.  I figured that question might come up this

24   morning.  In the November, 2009 constitutional amendment

25   election, this is based on what counties have reported



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003210

82

```
 1     to us.  There were 3903 provisionals cast, and out of
 2     that, only 421 were counted.  And that's generally what
 3     we see.  Most provisional ballots are not counted.
 4               In the primaries, the March primaries,
 5     there were, in both parties combined, there was 3110
 6     provisional ballots cast and there were 1402 counted.
 7               REP. ALLEN:  When they are counted, do
 8     they have an impact on the election?
 9               MS. MCGEEHAN:  They certainly can have an
10     impact.  You know, in a close election, the provisionals
11     ballots are required to be reviewed and processed and
12     counted within seven days of the election.
13               REP. ALLEN:  So if I have a contest that
14     I'm contesting, it may have an impact, but it's their
15     example, the election is today and the winner is
16     announced tonight at 7:00 or 8:00, provisional ballots
17     have no impact on the that election?
18               MS. MCGEEHAN:  Well, they have to be
19     counted.  I mean, I wanted to make sure, because a lot
20     of folks think that unless it's a close election, the
21     provisional ballots aren't qualified and counted, and
22     they have to be qualified and counted regardless of the,
23     you know, the margin of victory.
24               What's announced on election night is
25     unofficial election returns, so until the provisional
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003211

83

1    ballots and qualified and counted and until the overseas

2    ballots have come in, because they can come in up to

3    five days after the election, it's not official until

4    the canvas, because the canvas occurs after those two

5    events, after the provisional ballots and overseas

6    ballots have come back in.

7                    So yes, I mean, the press likes to

8    announce on election night.  It's a good indication but

9    it's not the official canvas totals until all the

10   ballots are qualified.

11                   REP. ALLEN:  Okay.  When you say 3110

12   ballots were cast in the March election but only 1000

13   were counted, why might -- that's a large number of

14   people that say, "I want to vote.  I'm at my wrong

15   polling place, let me vote here."

16                   MS. MCGEEHAN:  Yes.

17                   REP. ALLEN:  And I vote provisionally,

18   what is kicking all of these out?

19                   MS. MCGEEHAN:  Well, for the November

20   general election, we do collect the data from the

21   counties on the reason why a provisional ballots weren't

22   counted, and so what our data has shown from '06 and '08

23   is the usually the reason a provisional ballot is not

24   cast is that the person is casting a vote, they're a

25   registered voter but not in that precinct, so they're



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003212

84

1    showing either in a different county or a different

2    precinct from where they're registered to vote so it's

3    not counted.  It does serve, by voting provisionally,

4    that serves to get them registered in that new precinct

5    but their ballot is not counted.

6                    REP. ALLEN:  So it becomes a registration

7    process too?

8                    MS. MCGEEHAN:  Yes.  The affidavit serves

9    as basically a voter registration application.  So it

10   will serve to get them registered for future elections

11   but it does not cure it for that election.

12                   REP. ALLEN:  Okay.

13                   CHAIRMAN:  Just to be clear, that

14   situation, even if I vote for president, if I'm in the

15   wrong precinct, my vote for president doesn't count?

16                   MS. MCGEEHAN:  That's correct, it does

17   not count.

18                   CHAIRMAN:  Earlier, you said when you

19   registered to vote, you check to make sure that their

20   driver's license matches the person who's registering or

21   that their Social Security number matches the person who

22   registered.  If they don't have either of those things,

23   are they registered anyway?

24                   MS. MCGEEHAN:  Yes.  But in that

25   situation, where they don't have either one of those



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003213

85

1        identification numbers, they are registered but they are

2        marked as ID required, which means that when that voter

3        votes, they have to produce evidence of their identity.

4        And it's the same list that's authorized in state law

5        for a voter who doesn't have their voter registration

6        certificate, so whether they vote by mail or in person,

7        they have --

8                    CHAIRMAN:  I'm trying to understand how

9        that's different than just voting period.

10                   MS. MCGEEHAN:  Well, the difference is

11       they can't show their voter registration certificate.

12                   CHAIRMAN:  Okay.

13                   MS. MCGEEHAN:  So they can't come in with

14       that.  It has to be something other than their voter

15       registration.

16                   CHAIRMAN:  That's the only difference?

17                   MS. MCGEEHAN:  Yes.

18                   CHAIRMAN:  Okay.  Yes, Representative.

19                   REP. HEFLIN:  Real quickly, and I should

20       have asked this earlier.  You know, the attorney general

21       has jurisdiction of prosecuting these cases.  Has there

22       been any attempt to survey the 254 counties and all the

23       little cities as to actual allegations of fraud that did

24       not go to the Attorney General or that did not report to

25       the Secretary of State things that either they blew off



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

FINAL - COMMITTEE ON ELECTIONS MEETING 6/14/10                    JUNE 14, 2010

86

1    or tried to prosecute locally, or anything like that,

2    has there been a survey done as to what's happening out

3    in the field?

4            MS. MCGEEHAN:  I'm not aware of any

5    survey like that.

6            REP. HEFLIN:  Would that be beneficial?

7    I mean, you know, if that's what we're looking at, maybe

8    we need to survey our prosecutors out there, see if it's

9    out there, why aren't they doing it.

10           MS. MCGEEHAN:  Uh-huh.  Okay, we can look

11   into that.

12           REP. HEFLIN:  Thank you.

13           MS. MCGEEHAN:  Uh-huh.  That's all I

14   have.

15           REP. BOHAC:  Members, are there any other

16   questions?  If not, Committee on Elections stands

17   adjourned.

18               (End of recording.)

19

20

21

22

23

24

25



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003215

TX_00261202

87

1    IN THE COUNTY OF TRAVIS    )

2    STATE OF TEXAS             )

3        I, Lynne Rodriguez, Certified Shorthand Reporter in

4    and for the State of Texas, hereby certify to the

5    following:

6            That the CD entitled, "Committee on Elections

7    Meeting, 6/14/10" was transcribed at the request of Anne

8    Wilson, 209 West 14th Street, Attorney General's Office,

9    Austin, Texas 78701, and the amount due is

10   $_____.

11       That the aforementioned CD was transcribed

12   to the best of my ability to hear and understand the

13   CD;

14       That the transcript was submitted by

15   E-trans on May 10, 2012, to Anne Wilson, 209 West

16   14th Street, Attorney Generals' Office, Austin,

17   Texas  78701;

18       I further certify that I am neither

19   counsel for, related to, nor employed by any of the

20   parties or attorneys in the action in which this

21   proceeding was taken, and further that I am not

22   financially or otherwise interested in the outcome

23   of the action.

24       Certified to by me, this 9th day of

25   May, 2012.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003216

TX_00261203

88

1

2

3

4



_Lynne M. Rodriguez_
Lynne Rodriguez, Texas CSR No.
Expiration Date 12/31/13
FIRM REGISTRATION NO: 283
ESQUIRE DEPOSITION SERVICES
100congress, Suite 2000
Austin, Texas   78701
(512) 328-5557

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00261204

FINAL - COMMITTEE ON ELECTIONS MEETING 6/14/10                    JUNE 14, 2010

89

**A**

ability
18:15 19:11
87:12
able
6:22 24:11
31:14 35:10
39:5 41:24
73:7,20
absentee
49:16 51:11
51:16,20
56:3 59:10
60:2
Absolutely
5:24 6:6 7:3
14:18 24:20
accompanied
47:25
accused
7:7
acquittal
9:17
act
34:17 45:14
64:16
action
87:20,23
actual
9:17 20:10
51:20 85:23
add
3:10
addition
12:18,20
60:5
additional
10:21
ADDM
81:12
address
25:18 32:25
34:1 36:5
39:25 74:13
addressed
38:20 39:22
addresses

30:1
adduced
19:23
adjourned
86:17
administr...
44:22
admissible
34:17
admitted
16:6
adopt
73:14,21
advance
4:9
affidavit
30:23 36:18
37:1,15,22
38:4,7
42:12 69:11
69:12,14,15
69:16,25
70:11,12,16
70:16,25
71:2,13,16
71:18 72:5
73:5,13,25
74:13,14,17
76:6 77:2,7
77:23,24,25
78:1 84:8
affidavits
37:5,11
affirmati...
25:11
aforement...
87:11
agency
23:9 24:12
aggressive
59:15
ago
4:1
agree
14:6 65:5
79:9
agreed
79:24

agreement
13:13,19
AG's
14:24 48:2
ahead
12:7 29:21
aliens
19:19,20
alive
57:22
allegation
8:1 18:4
26:25 27:4
60:19,21
allegations
11:21,23
26:2 27:20
46:20 47:12
64:10 85:23
Allen
2:6,7 60:10
60:11,23
81:16,17
82:7,13
83:11,17
84:6,12
allow
6:22 36:25
40:9 42:22
57:10 74:24
77:6 78:4
allowed
39:18 73:11
allows
40:1 70:8
71:16
amendment
81:24
amount
47:24 87:9
analysis
9:2 11:6
Anchia
2:8,9 14:7,8
14:12,15,19
14:23 15:4
15:9 20:2,3
20:4,8,13

20:15,20
21:6,11
22:4 24:17
24:18,21
25:11 26:3
26:24 27:12
27:16,19
28:4,7,18
29:5 30:15
30:22 31:12
31:22 32:1
32:12,15,19
32:22 33:4
33:22 34:12
34:21 36:21
36:25 37:8
48:12,16,19
48:22,25
49:5,7 50:2
56:15 58:4
60:8,9 61:1
61:2,12,14
61:18,23
62:9,14,17
63:3,5,8,17
63:21,23
64:7,11,17
64:22,25
65:17,25
66:8,12,17
66:21 67:22
68:2,9,14
68:17,21,25
69:6,17,22
70:2,5,10
70:13,19,22
71:6,9,12
71:21,23
72:3,7,15
72:20,25
73:6 74:2
74:20,23
75:1,6,9,13
75:20,23
76:1,21
77:1,8,14
79:10
and/or
25:2

Ann
36:1,3 37:10
77:15
Anne
87:7,15
announce
83:8
announced
82:16,24
anonymous
63:6 65:6
answer
14:1,2 23:16
45:6 51:13
52:1 66:13
answering
35:20
anybody
3:12 25:6
42:7 78:15
anyway
28:11 58:15
84:23
Apart
13:18
apparently
11:14 19:22
29:23 57:14
78:11
appeal
41:12
appeals
41:7
appeared
4:1
applicant
53:5
application
18:8 27:2,7
50:19 52:25
55:15 84:9
applications
81:2
applies
9:3
appreciate
24:19 77:15
appropriate



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

```
    39:9              Austin            21:25,25          better            49:25
approval          87:9,16 88:7      27:21 49:17       66:1 76:12        briefly
44:6              authorities       61:9,21           beyond            3:21
approved          65:22             62:21 80:24       11:3 16:13        brought
78:25             authority         81:18,19          27:15             27:5
April             66:5              82:3,6,11         big               Brown
19:17 40:24       authorized        82:16,21          41:17 68:14       2:12,13
area              85:4              83:1,2,5,6        68:20             21:18 79:7
8:12              automatic         83:10,12,21       bigger            bulk
areas             57:4              bank              68:17             23:13 25:24
47:7              automatic...      39:23             bill              Bureau
articulated       55:12             base              39:23 44:7        53:15 57:17
25:22             available         53:11,16          44:10 78:25       57:23 58:2
aside             31:10 62:18       58:3 65:19        bills             58:10
43:22             aware             based             28:22 31:17       burglary
asked             86:4              5:4 11:5          31:20 32:4        23:25
3:2 22:4                            20:25 23:11       32:7 61:6,8       Bush
31:5 73:18            B             26:9 31:19        61:19 64:1        44:22 45:2
79:23 85:20       back              32:1,16           birth             45:19
asking            22:3 28:5         57:18 64:3        30:2 33:2,24      bust
69:17,21          37:5,6,17         73:2 80:9         38:13 39:20       71:1
assorted          39:5 49:9         80:20 81:25       bit               buzz
49:24             49:13 59:8        baseless          10:17 22:15       31:23
assume            63:15 66:16       8:12              24:1 37:3         bypass
77:22,23          67:23 74:16       bases             37:14             73:13 77:2
assumes           75:2 80:22        57:23             blank
39:15             81:3 83:6         basically         81:11                 C
attempt           background        56:5 84:9         blew              call
51:11 85:22       3:22              basis             85:25             2:2 3:15
attorney          ballot            26:15 53:18       Bohac             12:12 69:15
3:16,20 4:5       18:5,6,8          64:7              2:10,11           called
4:13 5:1          22:18 25:23       Beall             24:24 86:15       18:24 19:2
44:1 46:15        27:2,7,9          36:8              boldface          69:15
46:18 47:17       28:9,9 50:3       behalf            8:11              calling
64:4 85:20        50:10,19,20       3:20 81:12        Bonnen            52:1
85:24 87:8        51:11,16,20       belief            2:12              calls
87:16             54:23,24          20:25             book              35:25
attorneys         55:11,12,18       believe           29:22,24          campaign
6:16 36:8         55:19 56:3        7:25 9:24         30:3 31:5         48:12,13
46:8 87:20        59:10,21          19:19 27:14       33:1,7,18         58:20 59:18
audit             60:2 61:15        44:14 71:22       33:23 69:11       65:4 81:10
56:18 58:5        62:4,18,25        79:23             borne             campaigns
58:17,21          63:13,18          beneficial        25:21             59:15 60:6,6
59:1              69:14,16          86:6              bottom            cancel
auditable         80:22 81:1        Berman            74:11             57:21 59:20
72:22             81:5 83:23        3:5               briberies         candidate
August            84:5              best              50:8              20:16 21:1
7:15 14:10        ballots           75:25 87:12       bribery           59:20
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00261206

canvas
83:4,4,9
card
30:13,16
  35:13 58:12
  58:25 59:2
care
78:3
Carol
28:16 29:13
  29:18,21
  30:5,24
  31:15 32:5
Carolina
77:10
case
16:4 21:5
  23:24 28:12
  28:15,19,21
  29:10 30:24
  31:13 33:12
  33:13 34:23
  41:1,12
  49:3 56:16
  57:2,12
  64:20,23
  80:13
cases
5:12 6:17,18
  13:11 14:20
  15:24 16:13
  16:16 17:2
  19:14,15
  20:6 21:20
  22:6,12,17
  27:3 28:24
  34:20,24
  48:20 49:1
  49:5 54:6
  73:9 80:6
  85:21
cast
15:6 22:4
  66:9 67:1,8
  67:12,14
  82:1,6
  83:12,24
casting

27:21 83:24
catch
33:1 59:9
categories
11:8,13
  26:18
categorize
27:8
category
13:1,3 43:16
  49:23 78:1
  78:19
caught
50:11 51:10
  51:22 56:2
  56:11 58:14
CD
87:6,11,13
central
66:5
certain
37:20 38:3
  39:4 45:11
  59:18
certainly
16:21 22:17
  26:15 27:13
  34:20 35:15
  57:10 79:10
  82:9
certificate
29:15 39:16
  39:17,21
  62:3 69:19
  69:25 70:18
  72:17 76:5
  85:6,11
Certified
87:3,24
certify
87:4,18
chain
50:22
Chair
3:15 35:25
  79:5
chairman
2:1,17 3:1

3:18 5:20
  5:23,25
  6:19 7:2,19
  8:9,23 9:8
  9:12,19
  10:2,10,13
  10:19 11:7
  11:19,22,25
  12:5,7,9,10
  12:14,18,23
  13:1,6,10
  13:21,24
  14:3,7
  15:11 16:9
  16:12,19,23
  16:24,25
  18:1,15
  19:3,7,11
  20:1,2,3
  21:16,17
  23:1 24:8
  24:16,18
  25:14 34:22
  35:3,6,18
  35:21,25
  37:10,19,25
  38:2,6,14
  38:17,22
  39:1,4,8,11
  40:18,22
  41:22 42:3
  42:7,11,15
  42:24 43:1
  43:12,19
  44:3,13,21
  45:4,13,17
  45:22 47:8
  47:11 48:3
  49:15,21
  50:9,23
  51:8,15
  52:3,4,5,7
  55:24 56:15
  56:22 57:1
  58:4,11,23
  59:6,9 60:1
  60:4,8,10
  61:1 66:24
  67:5,11,15

67:18,21
  76:13,16
  77:17 78:7
  78:15 79:6
  79:9 81:16
  84:13,18
  85:8,12,16
  85:18
Chairman's
61:3
challenge
41:6 69:15
chance
19:13
change
45:11,11
  63:11 65:8
changes
3:7 47:6
  50:16
characterize
16:13 41:23
  76:8
character...
44:5
charge
2:23,25 3:3
  25:15 36:6
  45:24
charged
21:10,13
  30:6,20
charges
27:1,5,24
chart
36:9 37:8
  76:11 77:5
charts
37:3,4
check
39:24,24
  81:7 84:19
checked
31:1,2
children
80:3,4,7,8,9
  80:11,12
circumsta...

5:7
cities
85:23
citizens
20:24 46:7
  53:20
citizenship
39:21 53:17
  53:23
city
49:4 62:25
  64:21
claim
80:25
clarify
56:16
clear
5:21 8:18
  14:16 18:18
  22:13 24:8
  34:22 37:10
  54:18 84:13
clearly
32:19,21
  34:3 43:10
  51:15 64:10
clerk
2:2,4,6,8,10
  2:12,15
  62:12,24
clerks
53:17
close
58:21 82:10
  82:20
closed
18:14
clothes
48:5
code
3:23 4:14
  5:1,8,19
  6:8,10 8:2
  8:5 16:6
  18:5,11,24
  24:2 46:10
  46:14 52:12
  73:5



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

coin
65:20
collect
83:20
columns
37:4
combat
47:7
combined
82:5
come
2:2 4:17 5:4
23:20 39:5
42:22 43:21
45:1 47:1,2
48:10,11
59:15 75:2
81:23 83:2
83:2,6
85:13
comes
8:2,19 24:2
comfortable
52:2
coming
54:13 60:21
comments
3:12
committed
11:6
committee
1:7 2:1,25
3:4 4:2,12
19:17 20:5
24:9 25:6
45:25 86:16
87:6
committing
34:16 56:3
communica...
49:13
community
54:6
compare
56:23 57:24
compared
80:9
comparison

57:5
compiled
7:12
complaint
7:21 8:10,13
8:16 46:8,9
46:11 47:18
48:1,7 55:5
complaints
5:9 23:20
26:9 46:22
46:24 47:1
47:1,2,4
48:16 54:16
55:9 61:15
63:12,18,24
68:3,3,5,6
79:16
complete
50:18
completely
8:12 63:5
completeness
18:3
complied
5:8 32:17
concept
18:19
concerned
5:19 73:19
conclude
30:4
conclusion
10:18 25:7
65:16
confirm
17:16
confirmation
44:16
confused
10:2 17:1
consent
28:9
consider
42:11 60:12
considering
4:25
consistent

26:3
constitut...
41:2 81:24
contain
54:24
contains
69:11
contention
25:20
contest
82:13
contesting
82:14
contests
65:23
context
22:18
contextua...
24:22
continue
2:21 5:23
18:1 35:18
conversat...
23:19
convicted
27:21 53:13
conviction
11:9
copies
41:18
copy
39:22
corollary
65:2
correct
8:16 11:15
14:22 20:13
20:18 22:9
24:15 25:8
25:25 29:12
30:9 43:15
45:20 54:17
61:9,16,21
63:14 69:4
69:11,12,25
70:3,20
71:7,19
72:23 75:21

84:16
correctly
20:8
counsel
87:19
count
7:14 13:7
37:2 42:18
43:4,6,9
77:4 84:15
84:17
counted
81:20,20,21
82:2,3,6,7
82:12,19,21
82:22 83:1
83:13,22
84:3,5
counties
45:12 81:25
83:21 85:22
country
73:16
counts
27:5,25 43:4
county
6:16 8:25,25
16:5 24:6,7
28:15 29:9
41:1 45:11
49:3 52:24
53:1 54:23
58:6,8
62:24 84:1
87:1
couple
48:14 79:9
course
7:18 36:11
39:13 40:24
41:20 45:24
46:5
court
14:4 40:25
41:5,7,13
44:8 79:2
covered
44:19,20

45:12
cracks
73:16
Crawford
41:1
crazy
68:9
crime
11:6 23:4,5
47:19
criminal
4:6,15,18
6:17 7:4,12
7:13 8:6
34:18 46:7
46:14
criteria
58:1
Crowder
28:16 29:13
29:18,21
30:5,24
31:15 32:5
56:17
CSR
88:4
cure
38:8,15 39:1
40:19 74:24
75:2,10,11
84:11
curious
33:12 73:22
current
39:23 69:10
currently
10:24 16:1
25:17 69:4
71:13
custody
50:22

---
D
---
DA
8:24 24:1,7
Dallas
54:22
DAs



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00261208

```
 14:20
data
30:3 46:1,3
 53:11,16
 57:23 58:3
 65:15,18,18
 65:18,22,23
 66:1,2 75:1
 80:6 81:5
 81:23 83:20
 83:22
database
57:24
date
30:2 33:2,24
 38:12 57:7
 88:5
day
5:16 19:2
 40:9,14,16
 40:19 42:1
 43:8 48:5
 59:22 60:13
 74:6 77:9
 77:10 87:24
days
37:16,18
 39:5 41:25
 42:18,22
 43:7 74:24
 74:24 82:12
 83:3
day-to-day
26:15
DA's
6:16 14:20
 23:19
dead
58:24
deal
11:9 14:24
dealing
14:17 23:12
 24:23 65:15
 65:17
deals
18:5
dealt

23:14
deaths
53:14
deceased
29:19,19
 33:19 56:17
 56:19,24
 57:2,7,8,21
decentral...
66:4
decide
27:14
decided
2:20 11:5
 13:16 15:23
decides
4:22
decisions
65:19
defendant
13:13
defer
60:9
define
12:11 52:7
defined
52:11
definitely
44:18 74:16
definitiv...
32:10
degree
10:4
delineated
18:10
Democrat
29:13
Democratic
29:11,11
department
44:7 45:3,20
 79:1
dependent
5:17
depending
16:21
DEPOSITION
88:6

Deputy
4:5
describe
11:21 26:5,8
described
25:22
designed
74:4
detail
41:18 47:23
detect
50:10 51:7
determina...
8:4
determine
43:2,24
 51:17 52:23
 56:24
determines
59:1
determining
51:9
deterrents
62:1,17
deterring
62:1
dialogue
6:15
died
57:14
dies
58:11
difference
10:20 51:22
 56:1 61:25
 65:10,11
 85:10,16
differences
65:12
different
2:24 11:7
 18:25 19:1
 26:18 29:3
 30:2 37:3
 37:14 38:10
 38:19,21
 69:2,18
 74:19 84:1

84:1 85:9
difficult
18:17 54:7,9
 59:5 79:11
direct
6:7
directly
24:4
director
45:1
directs
45:24
disabled
73:17
disagreement
25:5
discovery
51:1
discuss
7:8
discussed
25:14 49:3
 55:13
discusses
25:15,17
discussing
4:25
discussion
26:16
dismissal
9:21 13:20
dismissals
17:12
dismissed
9:16,23 10:7
 10:11 17:5
 17:6,7,23
distingui...
78:22
district
44:8 46:8
 53:17 79:1
division
4:16,16,18
 4:19,21,23
divisions
4:13 7:13
document

39:24 50:20
documenta...
50:17,24
 76:14,17
 77:20 78:3
 78:16
doing
48:15 77:18
 86:9
doubt
11:4 27:15
DPS
53:13
Dr
60:10 81:16
drive
61:7 72:8
driver's
20:23 31:2,7
 31:16 32:6
 32:11,14
 33:17 39:19
 53:3,4,5
 58:2 70:3
 70:24 72:1
 84:20
due
87:9
Dyer
3:16,18,19
 5:22,24 6:6
 6:24 7:3,22
 8:17,24 9:9
 9:13,21
 10:6,11,15
 10:22 11:17
 11:20,23
 12:1,6,8,12
 12:15,20,24
 13:4,7,12
 13:23 14:1
 14:5,10,14
 14:18,22
 15:1,8,17
 16:10,16,20
 17:3,7,11
 17:15,22,25
 18:2,17
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

FINAL - COMMITTEE ON ELECTIONS MEETING 6/14/10                    JUNE 14, 2010

94

19:5,10,13
20:7,12,14
20:19 21:4
21:8,14
22:10,20
23:15 24:15
24:20 25:9
26:1,12
27:11,13,17
28:2,5,17
29:4 30:10
30:17 31:9
31:21,24
32:9,13,16
32:21 33:3
33:21 34:8
34:14,25
35:14,19,24
46:1 49:3
D.C
44:8 79:1

**E**
earlier
29:19 34:24
45:3 59:23
75:16 80:14
84:18 85:20
early
5:16 27:2,7
50:13 59:24
62:24 77:10
easier
35:15 50:10
63:12
easy
54:2 57:24
effect
19:24
effective
40:8,12
effort
46:25 58:16
efforts
3:23 5:3,17
15:2
eight
14:12,15

15:7
either
5:16 7:16
9:14 10:7
10:25 11:1
11:9 12:24
13:12,19
15:23 17:20
40:20 42:18
44:7 46:7
48:19 54:11
62:24 65:10
77:9 79:1
84:1,22,25
85:25
elaborate
35:17
elderly
59:16
election
3:23 4:14
5:1,8,11,16
5:19 6:8,10
8:2,5 16:6
18:5,11
19:2 23:24
24:2 26:19
26:21 29:22
30:6 37:17
40:15,16
41:25 42:1
42:23 43:8
45:1 46:4
46:10,14
50:15 51:7
52:12,18
54:25,25
55:3,20
58:13,21
59:22 62:12
62:12 65:22
70:20 72:12
77:10 81:3
81:5,12,19
81:25 82:8
82:10,12,15
82:17,20,24
82:25 83:3
83:8,12,20

84:11
electione...
18:13 49:25
elections
1:7 2:1 6:21
7:6 55:16
66:5 67:2
67:14,24
79:15 84:10
86:16 87:6
eligibility
52:23
eligible
20:17 21:1
26:21 30:5
32:24 52:14
57:22 70:19
72:11
eliminate
15:12
else's
62:3
employed
8:10 87:19
encapsulate
19:1
encourage
47:22
enforcement
3:23 4:14
5:11 6:11
9:1,3 22:24
enforcing
41:14
engaged
47:14
engaging
51:23
entire
36:10 46:3
entirely
5:17
entitled
73:20 87:6
entity
39:22
equivalent
9:19

Eric
4:4
ESQUIRE
88:6
establish
24:9 46:13
estimates
80:20
event
27:10
events
83:5
everybody
50:17 54:5
evidence
13:15 16:5
16:21 17:5
23:7 24:10
25:9 34:18
37:16 47:19
85:3
exact
24:5 34:2
exactly
22:21 28:1
37:25
examine
6:19 45:25
example
6:15 7:23
8:24 27:6
59:21 73:11
80:4 82:15
exception
55:9
exceptions
43:13,18
76:19
excessive
54:9
exclusive
6:9 14:20
excuse
32:3 57:9
excused
53:19,22
exemptions
43:15

exercise
73:8
existing
78:12
exists
18:23 25:6
experience
6:10,11
22:14 43:20
Expiration
88:5
extent
6:13,20 23:2
24:9 25:14
47:15 56:1
66:4
extrapolate
80:8,19
E-trans
87:15

**F**
face
46:12
fact
8:14 20:22
20:24 21:12
22:16,17
26:8,10
29:12,14,18
31:15,16
32:5,16,23
33:9,16
58:18 69:16
74:2 79:14
80:18
facts
4:20 7:16
9:6 10:25
11:2,3
15:23 19:14
21:3 30:8
46:13 47:21
54:19 80:10
80:21
factual
47:19
fail



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003223

TX_00261210

FINAL - COMMITTEE ON ELECTIONS MEETING 6/14/10                          JUNE 14, 2010

95

72:5
fair
11:12 16:18
  17:21 47:24
  49:15,19
fairly
78:18
fall
73:15
false
27:1,6 28:8
falsely
73:4
familiar
35:16 39:13
  43:18
far
5:19 46:18
  53:9 55:25
  58:21 61:12
  68:20
fast
80:3
father
29:17 33:4
  33:19
father's
57:13
favorite
24:24,25
feature
74:8
feel
52:2 59:14
feelings
51:10
feels
27:15
felons
27:21 53:13
felony
30:7 62:6
  71:6,8
felt
9:5 31:23
FEMALE
13:25
field

5:19 9:4
  23:12 86:3
figure
28:24 31:6
  33:8 36:22
  36:23
figured
66:12 81:23
file
46:7,9,10
filed
65:23
finally
5:10 7:4
  53:12 79:15
financially
87:22
find
3:9 23:2,4
  24:3 59:6
finding
9:20 12:24
  15:13 50:21
findings
16:2
fine
62:5 63:11
  71:9 72:10
firm
80:3 81:4
  88:5
first
5:2,6 36:5
  52:25 69:7
fit
43:16
five
37:16,18
  40:14,19
  41:25 43:7
  63:21 64:2
  64:17 74:24
  80:11,12
  81:2,7 83:3
fledged
7:17
flip
65:20

Florida
38:13,24
  42:5 43:11
  43:21 44:16
  44:18,23
  45:5,13
Florida's
44:24
folks
28:8 47:22
  59:13 62:25
  73:19 75:7
  76:20 82:20
follow
22:11 61:2
following
87:5
forgery
27:4 28:7
forget
43:7
form
29:23 31:4,8
  36:12,16
  37:1 39:19
  72:9 75:17
  76:17 77:20
formal
15:18 49:13
formas
80:20
forms
40:2
forwarded
48:2
fought
73:16
found
10:4,8 11:10
  11:14 13:22
  28:21 56:20
founded
68:4
four
18:25 26:22
  67:13,16
  81:2,7
fourth

45:2
frame
14:8
franchising
73:8
fraud
3:5 6:20,21
  8:1 9:20
  10:5,14,21
  11:9,15
  13:2,11
  14:24 15:13
  15:14 16:3
  18:16 19:2
  23:2,8,8,13
  23:18,24
  24:10 25:6
  25:10,12,15
  25:20,23
  27:10 32:7
  33:11 45:25
  46:4 47:7
  49:22 50:3
  50:10,11
  51:1,11,12
  51:17,20,21
  51:23,24
  54:10 56:3
  56:4,11
  59:10 60:2
  60:12,16
  61:4,16
  62:1 63:9
  63:13,18,24
  65:2,14,15
  85:23
fraudulently
21:25
free
46:23
Fresh
2:18
friends
63:2
frivolous
8:11
front
19:17 40:17

40:23 53:9
  62:10,10,11
  65:9
full
7:16 23:17
  64:5
fully
6:22
furnish
29:25
furnished
31:15
further
11:5 22:15
  87:18,21
future
84:10

          G
gender
32:25 34:2
general
3:16,20 4:6
  4:13 11:12
  16:2 37:19
  44:1 46:18
  47:17 64:4
  66:20,22,23
  67:2,13
  68:2 70:15
  83:20 85:20
  85:24
generally
30:8,10 44:4
  58:19 82:2
Generals
87:16
General's
5:1 46:15
  87:8
gentleman
79:13
George
45:2
Georgia
38:23 42:5
  42:21 43:11
  43:20 44:16



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00261211

FINAL - COMMITTEE ON ELECTIONS MEETING 6/14/10                    JUNE 14, 2010

44:17,21
45:21 79:13
**getting**
15:20 16:8
53:10 56:2
57:16 58:10
80:22
**give**
2:21 3:21,24
14:14 33:9
36:17 41:18
78:12
**given**
21:1 34:10
**gives**
40:14
**giving**
52:2
**go**
12:7 31:4
36:10 37:5
37:6,17
44:10 68:10
68:11 69:23
74:16 78:8
78:15 85:24
**goes**
8:21 46:6
62:21
**going**
5:18 15:25
22:3 23:8
24:11 33:13
39:15 58:14
59:2,25
64:5 66:16
67:23 73:5
79:22 80:7
**good**
2:17 3:17,18
7:23 23:16
36:1,3
57:19 80:4
80:18 83:8
**gotten**
63:12 73:6
**government**
39:9,23,24

58:16 70:9
72:1
**governmental**
39:22
**grand**
4:20,21,22
11:4 13:15
15:25 16:15
16:18 27:18
**grandad's**
59:1
**granddad**
58:11
**grand-dad**
58:24
**greater**
50:25 51:19
**grounds**
41:7
**group**
42:10
**guess**
8:18 11:20
15:20 16:7
30:7 31:3
32:10 43:12
56:10 57:1
57:10 58:19
64:8 65:21
72:21 74:11
76:18
**guessing**
17:16
**guesstima...**
68:13
**guilt**
12:25
**guilty**
10:4,8 13:22
**gun**
33:15 34:5
**guy**
48:4,4

**H**

**habit**
2:19
**half**

17:14 49:19
49:22
**hand**
51:1 70:22
**handful**
9:23 12:2,11
12:11,12
**handle**
6:12 24:4
**handles**
4:16 26:13
**hands**
6:22 25:13
**happen**
7:24 39:2
**happened**
16:7 19:21
33:19 43:22
**happening**
54:22 86:2
**happens**
52:24 58:20
71:2 74:10
**happy**
41:17,19
74:22
**hard**
27:11 32:9
41:23 42:16
44:5,6
51:25 54:5
80:3,15,20
81:4
**Harper**
2:12 21:17
79:6
**Harper-Brown**
2:14 21:16
21:19 22:19
22:25 35:4
35:5 52:4,5
52:6,17
53:21,25
54:8,15,20
55:4,14,17
55:19,22
56:4 79:5,8
79:19 81:13

**Harris**
28:15 29:9
49:3
**harvester**
81:1
**haste**
34:4
**hate**
65:16 66:6
**head**
42:4 56:11
**heads-up**
66:10
**hear**
87:12
**hearing**
2:20
**Heflin**
2:15,16
85:19 86:6
86:12
**held**
67:2
**HELFIN**
12:10 16:24
17:1,4,9,13
17:18,24
**help**
24:22 34:15
34:19
**helpful**
24:22
**helping**
50:21
**helps**
50:18,19
**hesitant**
57:20
**hesitate**
65:13
**hey**
56:19
**high**
67:9
**higher**
66:16
**highlight**
47:6

**home**
50:14 51:2
59:15 62:21
63:1 65:7
81:6
**honest**
26:12 43:17
**horrible**
73:10
**hospital**
80:11
**hospitals**
80:7
**housekeeping**
4:3
**Houston**
60:24,25
**hundreds**
21:23
**hung**
15:20 16:8
**hurt**
79:25

**I**

**ID**
1:8 2:21
20:22,23
25:16 29:23
29:25 31:4
31:7,8,16
31:17 32:5
33:10,17
35:8,13
36:14,16,19
36:24 37:1
37:12,20,21
37:24 38:24
38:25 39:8
39:10,14
40:5,9,10
40:13,14,15
41:2,8,14
41:24 42:15
42:16,17,23
42:24 43:5
44:5,6,9
52:10 61:6



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00261212

FINAL - COMMITTEE ON ELECTIONS MEETING 6/14/10                    JUNE 14, 2010

97

61:8 64:1
69:3,9,10
69:23 70:3
70:9 72:2,6
72:9,17,17
73:15 74:3
74:12 76:9
76:19,20,22
77:6,13,22
78:12,14,17
78:25 79:15
85:2
Idaho
40:8 43:11
73:22,23
77:2
idea
24:12
identical
2:24
identific...
3:7 25:16,18
28:22 29:8
34:7 36:12
36:16 37:17
39:14,20
40:2 61:19
61:20 70:23
70:23 71:16
71:18 75:18
76:22 85:1
identify
34:16
identity
41:10,11
85:3
ID's
20:23 41:23
III
29:21 30:5
30:24 31:15
32:5
illegal
18:9,21,24
19:9 26:5,7
26:9,18,25
27:4,8
28:12,14

32:19 34:17
34:23 49:10
50:6 52:15
71:4
illegally
21:22 80:15
imagine
9:2,4 56:10
impact
81:18 82:8
82:10,14,17
impartial
41:9
impersonated
54:3
impersona...
26:21 52:12
52:14 54:1
56:13 80:17
impersona...
18:16,20,22
19:8,12
28:14 31:14
32:7 33:13
46:21 47:3
47:13,24
48:20 49:9
49:22 50:11
51:6,12,17
52:7,8
54:10 56:3
56:11 61:6
63:14,24,25
64:10 65:14
73:9
importance
5:2
important
4:24 5:13
7:8,10
imposed
41:4
impressed
79:12
Inaudible
13:25
incidence
61:4 65:1

incidences
50:3
incident
60:11
incidents
26:7
include
52:8 61:20
included
32:2 50:7
61:8
includes
39:19 70:8
75:20
including
36:11 39:20
68:6
increased
79:22
independent
58:16
Indiana
41:1,6,6,13
42:4 43:13
43:14,16,18
43:20 44:13
indicated
10:25 56:5
indication
11:8 51:19
51:21 59:25
83:8
indicative
46:3
indicted
12:3 13:8,14
indictment
4:23 9:24
10:7,12
12:17,21
13:16 17:19
individual
7:24 21:20
21:22 65:4
indulge
25:3
informal
47:2

information
3:22 6:2
7:12 20:25
27:2,6,18
30:11,18
31:10 45:4
50:23 53:12
53:14 54:25
57:16 58:9
69:1
initiate
58:22
initiatives
14:23
injustice
73:10
inside
60:11,12
instance
19:25 34:19
35:6 65:8
instances
9:22 10:13
10:21 28:12
33:9 47:23
insurance
80:7,11,13
integrity
7:6
interaction
24:1
interest
41:2 60:7
interested
28:18 29:10
58:13 75:2
75:11 78:20
87:22
interesting
74:7
interests
7:7 63:10
interim
2:23 3:1,4
interrupt
5:20
intervening
15:7

intimidation
50:7
introduced
31:18
invalidating
73:1
investigate
24:3 54:16
54:18
investigated
11:24 16:14
16:17 25:2
30:24
investigates
4:17
investiga...
16:4
investiga...
4:19 7:13
11:1 56:20
57:11
investiga...
4:15 7:4,9
12:1 15:19
15:21 16:1
26:14 48:15
investiga...
5:15
involve
10:20 21:23
46:19,20
47:24 49:16
64:12,15
involved
3:24 18:4,7
19:8,12
22:8,10,18
22:22 47:13
49:4 64:10
involves
18:7
involving
18:9
in-person
33:13 61:5
irregularity
22:1
isolate



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00261213

FINAL - COMMITTEE ON ELECTIONS MEETING 6/14/10                    JUNE 14, 2010

98

```
    15:12              11:4 13:12        4:4,5 5:18        label              9:15 15:2
issue               13:15,19,21       9:16 15:4,6       57:20              30:4
58:15               15:25 16:15       15:8 17:8         lack               left
issued              16:18 27:18       19:21,21          17:5               72:22
39:10 72:2          27:18 53:19       21:8,15           landscape          legal
issues            justice             22:5,16,16        23:17              20:11,17,22
24:22 65:24       4:6 44:7,22         23:13,15          language           21:2
items               45:2,19           24:7,10,12        2:24 70:14         legally
3:2 39:18           79:1              28:2 30:11        large              52:19 73:20
    70:8          justifies            30:13,17          63:13,18,19       legislation
i.e               34:10               31:10 32:22         63:24 83:13      29:1,2 34:10
60:12             justify              33:4 34:6        larger               79:3
                  34:6 41:3           35:15 37:16       6:12               legislative
_____            _____          38:19,20         largest            40:4 46:16
       J                 K            39:12 42:3        49:23              legislature
Jack              keep                42:19,21         Lavaca             31:18 64:1
28:16 29:13       4:25 7:10           43:20,25          19:16               74:9
    29:18,21        75:7 79:21        44:22,23         law                legitimacy
    30:4,24       Ken                 45:1,5,5,7       4:20 5:10          8:16
    31:15 32:4    36:8                47:25 48:4         7:16 9:1,3       legitimate
    56:16         key                 48:11,19,21        9:6 10:25        8:12
jail              65:24               49:14 50:17        15:23 22:23      Leo
62:4 63:11        kicking             50:20 54:1         32:11,18         3:5
    72:10         83:18               54:3,12,13         39:13,15,19      let's
Jay               kind                55:1 56:12         39:25 40:12      29:3,5 39:18
3:15,19 14:9      3:13 4:8            57:12,14,21        41:2,6,7,8         43:19 69:7
    20:4 24:19      8:13 9:7          58:12 59:11        41:19 42:21        75:13
    43:25 46:1      18:12,18          60:15,19          43:18 44:24      level
    49:3,9          22:11 26:13       62:6,7,23         45:14 50:16      6:18 8:5,9
John                26:16 28:13       64:6 68:7,9         70:8 73:4         8:20 9:2,7
56:6,7,7,8,9        30:11 32:9        68:10,22          76:3 78:12         13:9,13,17
joined              34:10,15          69:20 71:24       79:15 85:4         18:4 30:13
42:7                38:20 40:6        72:9 73:3        laws                 47:13 58:6
Jr                  41:16 48:7        74:3,4,13        3:6 36:6            58:6
29:18               50:21 55:24       74:16 75:3         40:5 45:9       liberty
judge               55:25 57:11       75:4,10,11         80:2,19         60:14
60:14 62:12         58:15,25          77:17 78:16      lead               license
    62:20           60:16 65:16       78:24 79:19      34:17              31:2,8,16
July                72:5,15           80:16 82:10      leadership         32:6,11,14
40:8                74:18 76:2        82:23 85:20      3:4                33:17 39:19
jurisdiction        77:24 78:12       86:7             leaks              53:3,4,5
6:8,9,17            79:2             knowingly          19:25             58:2 70:3
    23:22,24      kinds               27:6             leave              70:25 72:1
    45:10 85:21   19:1,21           knowledge          34:9 43:22        84:20
jurisdict...        40:13             23:12 61:8         81:11           licenses
44:19             knew               Korean            leaves            20:23
jury              54:5                72:8             59:18             likelihood
4:21,22,22        know                _____        led               51:22 56:2
    9:15,18                                  L
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_003227

TX_00261214