Melnick, Helaine   (Self),  Austin, TX

Michol, Tracey   (SILC),  Fort Worth, TX

Mills, Karla   (ACORN),  Hou, TX

Miragliotta, Sharlene   (Self),  Frisco, TX

Mohlman, Dean   (Self),  Austin, TX

Money, Joseph   (Senate District 22),  Waco, TX

Mora, Sergio   (Self),  Laredo, TX

Morris-Parker, J. Laverne   (Self),  Austin, TX

Morrow, Christine C.   (ARCIL),  Austin, TX

Murph, Leonard C.   (Self),  N. Richland Hills, TX

Murphy, Theresa   (Self),  Smithville, TX

Nathan, Catherine S.   (Self),  Spring Branch, TX

Nathan, Richard D.   (Self),  Spring Branch, TX

Norton, LMSW, John,   (Self),  Austin, TX

Overstreet, Morris L.   (Self),  Prairie View, TX

Padma-Munyon, Leashya   (Self),  Austin, TX

Page, Dan   (Self),  Austin, TX

Painchaud, Kathy   (UMW),  Bellville, TX

Paul, Gilbert   (Self),  West Columbia, TX

Pena, Roman   (LULAC),  SA, TX

Perez, Mirella   (The ARC of Texas),  Austin, TX

Pina, Johanna   (The ARC of Texas),  Austin, TX

Poplawsky, Amanda   (La Fe Policy Research and Education Center),  Boerne, TX

Powell, Milton E.   (Killeen GOTV),  Killeen, TX

Ray, Ryan   (Tarrant County Democratic Party),  Fort Worth, TX

Rendon, Manuel   (LULAC),  Austin, TX

Renick, Karen   (Vote Rescue),  Austin, TX

Revely, Porshe   (Huston Tilliston University),  Austin, TX

Rhea, Paul   (Self),  Austin, TX

Richie, Boyd   (Texas Democratic Party),  Austin, TX

Riegel, Daniel   (Self),  Austin, TX

Riker, Jennifer   (Self),  Austin, TX

Rizzo, Melissa   (ARC of TX),  Georgetown, TX

Roberts, Patricia   (Bell County Democratic Women),  Harker Heights, TX

Roberts, Susan K.   (Self; Women for Good Government),  Austin, TX

Rochester, Liz   (Self),  Dallas, TX

Rodriguez, Chris   (Self),  Austin, TX

Rovezzi, Cynthia M.   (People with Disabilities),  Plano, TX

Rovezzi, Kristen   (Disabled constituents),  Plano, TX

Rowland, Brian   (Texas NAACP),  Prairie View, TX

Ruiz, Lilia   (Camino Real Mexican American Democrats El Paso),  El Paso, TX

Ruiz, Philip A.   (Texas Democratic County Chairs Assn. (TDCCA)),  Lockhart, TX

Saenz, Danny   (Self),  Austin, TX

Salvatore, Robert   (S.A. Building Trades Cafb-CIO),  San Antonio, TX

Sanchez, Claudia   (LULAC),  San Antonio, TX

Scott, Roseanne   (Self),  Austin, TX

Sells, Greg   (Self),  Austin, TX

Shelton, Susan   (Self),  Austin, TX

Sibbet, Byron   (Self),  North Richland Hills, TX

Sikes, Vanessa M.   (Self),  Austin, TX

Silva, Omar   (Self),  San Antonio, TX

Silver, Paul   (Common Cause of TX),  Austin, TX

Simpson, Dee   (AFSCME, AFL-CIO),  Austin, TX

Sirianni, Susi   (Self),  Austin, TX

Smith, Briana   (Blind),  New Caney, TX

Smith, Russell N.   (TX Freedom),  Austin, TX

Smith, Wanda   (Parent),  Austin, TX

Sneed, L. Randy   (ARCIL, Inc.),  Pflugerville, TX

Snider, Stewart   (Self),  Austin, TX

Speight, Dennis   (Self),  Austin, TX

Stafford, Mildred   (ACORN),  Houston, TX

Statman, Rona   (Self),  Austin, TX

Steele, Borrell   (ADAPT),  Austin, TX

Steele, Mary   (ADAPT),  Austin, TX

Stephenson, R. Robert   (Self),  Austin, TX

Stevens, D. Shawn   (Self),  Dallas, TX

Stine, Daniel   (Self),  Austin, TX

Tafoye, Marcelo   (LULAC, District 12),  Austin, TX

Tapia, Michael   (Self),  San Antonio, TX

Telge, Judy   (Self; C.B D. Ctr. for Independent Living),  Corpus Christi, TX

Terrazas, Erica   (Self),  Austin, TX

Terrell, Randall   (Equality Texas),  Austin, TX

Thelen, Michael   (Self),  McQueeney, TX

Thomas, David R.   (Self),  Austin, TX

Thomas, Delisha   (Self),  Austin, TX

Thomas, Stephanie   (National ADAPT),  Austin, TX

Thompson, Mary E.   (Self),  Austin, TX

Tilley, Tracy   (TX SILC),  Belton, TX

Torres, Margaret   (ACORN),  Houston, TX

Torres, Richard   (Self),  Round Rock, TX

Toussaint, Aerin-Renee   (Self),  Austin, TX

Traynham, Warner   (Self),  SA, TX

True-Courage, Zada   (Self),  San Antonio, TX

Tucker, M.D., Byron   (Self),  San Antonio, TX

Urby, M.D., Rodolfo M.   (La Fe Policy and Education Research Center),  San Antonio, TX

Vackimes, Alexandra   (Self),  Manor, TX

Van Praag, Jane Leatherman   (Self),  Bartlett, TX

Varela, Ralph   (Self),  Austin, TX

Vasquez, Peggy   (LULAC),  Austin, TX

Vaughn, Mercedes   (Self),  Austin, TX

Viagran, Crystal   (Travis County PCT 426),  Austin, TX

Villarreal, Jesse   (Self; Senate District 22),  Waco, TX

Vo, Ramey   (Self),  Austin, TX

Vodnick, Lynn   (Self),  Austin, TX

Vogel, Vickie   (SD 18),  La Grange, TX

Wagoner, Jordan   (Self),  Austin, TX

Walters, Barbara Boyden   (TX Democratic Women of Collin County),  Plano, TX

Whalen, Suzanne   (Self),  Dallas, TX

Wheeler, Dianne H.   (TX Freedom Network),  Austin, TX

Williams, B.J.   (NAACP Garland Branch),  Garland, TX

Williams, Doris   (Self),  Austin, TX

Williams, Janice   (Self),  Austin, TX

Williams, Robert Wayne   (Self),  Austin, TX

Wilson, Andy   (Public Citizen, Common Cause),  Austin, TX

Windberg, Thomas J.   (Self),  Spicewood, TX

Wisdom, Barbara R.   (Self),  Austin, TX

Wittie, David   (ADAPT of Texas),  Austin, TX

Woods, Traci   (Tarrant County Democratic Party),  Fort Worth, TX

Wygal, Shondra E.   (Texas Young Democrats),  Houston, TX

Yarber, John   (Self),  Austin, TX

Yarbrough, Christianna   (South Denton County Democrats and TX Precinct 307
),  Flower Mound, TX

Yeaman, John F.   (Self),  Austin, TX

Young, Deana   (Private Citizen),  Houston, TX

On:

Banks, Annie M.   (Texas Alliance for Retired Americans),  Houston

Curry, Susan   (Self),  Alpine, TX

Harris, R.D.   (Cover Texas NOW/Dallas ACORN),  Dallas, TX

Higgins, Carlos   (Texas Silver-Haired Legislature),  Austin, TX

Mays Sr., Kenneth W.   (Self),  Dallas, TX

Sepehri, John   (Secretary of State),  Austin, TX

Providing written testimony:

For:

Alvarez, Rosario   (Granada Homes, Laborer, LU1095),  San Antonio, TX

Gebolys, Paul J.   (PCT 4, Montgomery County),  The Woodlands, TX

Harding, James C.   Presiding Judge  (Harris County - Rep.),  Kingwood, TX

Lannon, Robert "Grant"   (Texas Borders Volunteers),  Austin, TX

Lindsey, Shirley   (Self),  League City, TX

McDonald, Tony   (Young Conservatives of Texas),  Austin, TX

Mikus, Jr., Jerry J.   (Self),  Pflugerville, TX

Opiela, Eric   (Republican Party of Texas),  Austin, TX

Wallace, Skipper   (Texas Republican County Chairs Association),  Lampasas, TX

Against:

Bell, Doug   (Travis County Democrats),  Austin, TX

Burke, Terri   (ACLU of Texas),  Austin, TX

Dickinson, Glenda   (Self),  Sealy, TX

Dodd, Daniel   (Democratic Party of Collin County),  McKinney, TX

Flores, Jr., Enrique   (UAW and Labor Council for Latin American Advancement),  Arlington, TX

Ford, Rachel Baker   (Self),  Garland, TX

Gauthier, Lloyd   (Self),  Houston, TX

Glasscock, Nancy   (Self),  Temple, TX

Henderson, Elaine   (Self),  Lago Vista, TX

Hinojosa, Gilberto   (Cameron County Democratic Party - Committee Member, Democratic National Committee),  Brownsville, TX

Korbel, George   (Self; LULAC),  San Antonio, TX

Leeder, Jennie Lou   (Llano County),  Llano, TX

Mainard, Marcia   (TDW),  Greenville, TX

Resa, Arthur   (Bell County Democratic Party),  Belton, TX

Sanders-Castro, Judith   (LULAC and Rosa Rosales, Nat'l Pres.),  San Antonio, TX

Spoon, Harley   (Self),  Austin, TX

Vera, Jr., Luis   (League of United Latin American Citizens),  Washington, DC

Whichard, Steve   (Self),  Austin, TX

On:

Dean, Sheila   (Self),  Austin, TX

TRANSCRIPT OF PROCEEDINGS BEFORE

THE SENATE OF THE STATE OF TEXAS

EIGHTY-FIRST LEGISLATURE

(COMMITTEE OF THE WHOLE SENATE)

AUSTIN, TEXAS

IN RE:                          §
                                §
CONSIDERATION OF                §
SENATE BILL 362                 §

**COMMITTEE OF THE WHOLE SENATE**

**TUESDAY, MARCH 10, 2009**

BE IT REMEMBERED THAT AT 12:38 p..m., on Tuesday, the 10th day of March 2009, the above-entitled matter was heard at the Texas State Capitol Senate Chamber, Austin, Texas, before the Committee of the Whole Senate; and the following proceedings were reported by Aloma J. Kennedy, a Certified Shorthand Reporter of:

VOLUME 1A                          PAGES 1 - 208

## KENNEDY
## REPORTING
## SERVICE
### *a record of excellence*

1801 Lavaca • Suite 115 • Austin, Texas 78701 • 512-474-2233

ORIGINAL

i

TABLE OF CONTENTS

PAGE

**VOLUME 1A**

PROCEEDINGS, TUESDAY, MARCH 10, 2009                          2

ROLL CALL NO. 1                                               2

OPENING INSTRUCTIONS BY SEN. DUNCAN                           5

OBJECTION TO FURTHER CONSIDERATION OF SB 362
(SEN. WEST)                                                  12

ROLL CALL NO. 2                                              38

LAYING OUT OF SENATE BILL 362
(SEN FRASER)                                                 44

QUESTIONS FROM SENATE FLOOR                                  53

**VOLUME 1B**

INVITED TESTIMONY                                           210

    TESTIMONY BY HANS VON SPAKOVSKY                         210
    QUESTIONS FROM SENATE FLOOR                             218

    TESTIMONY BY TOVA ANDREA WANG                           277
    QUESTIONS FROM SENATE FLOOR                             287

    TESTIMONY BY CAMERON QUINN                              300
    QUESTIONS FROM SENATE FLOOR                             306

    TESTIMONY BY TOBY MOORE                                 336
    QUESTIONS FROM SENATE FLOOR                             344

    TESTIMONY BY FRANK B. STRICKLAND                        373
    QUESTIONS FROM SENATE FLOOR                             417

    TESTIMONY BY ADAM SKAGGS                                408
    QUESTIONS FROM SENATE FLOOR                             417

    TESTIMONY OF ROBERT A. SIMMS
    SUBMITTED BY WES TAILOR                                 435

    TESTIMONY BY J. GERALD HEBERT                           442
    QUESTIONS FROM SENATE FLOOR                             450

1

TABLE OF CONTENTS

2                                                                PAGE

3                           **VOLUME 2**

4   PROCEEDINGS, WEDNESDAY, MARCH 11, 2009              482

5
        QUESTIONS FROM SENATE FLOOR (CONTINUED)     482
6

7       TESTIMONY BY THOMAS WHEELER                  502
        QUESTIONS FROM SENATE FLOOR                  510
8
        TESTIMONY BY CHANDLER DAVIDSON               521
9       QUESTIONS FROM SENATE FLOOR                  527

10      TESTIMONY BY ED JOHNSON                      559
        QUESTIONS FROM SENATE FLOOR                  566
11
        TESTIMONY BY DANIEL B. KOHRMAN               621
12      QUESTIONS FROM SENATE FLOOR                  628

13      TESTIMONY BY COBY SHORTER                    653
        QUESTIONS FROM SENATE FLOOR                  655
14
        TESTIMONY BY DENNIS BOREL                    706
15      QUESTIONS FROM SENATE FLOOR                  713

16      TESTIMONY BY GARY GLEDSOE                    724
        QUESTIONS FROM SENATE FLOOR                  731
17
        TESTIMONY BY ERIC NICHOLS                    742
18      QUESTIONS FROM SENATE FLOOR                  750

19

20  PUBLIC TESTIMONY                                 771

21      CLAIRE OXLEY GLUCK                           771

22      HAZEL COTTON                                 773
        QUESTIONS FROM SENATE FLOOR                  775
23
        KATHY HICKS                                  776
24      JAMES E. CARTER                              779
        RUSTY HICKS                                  781
25

TABLE OF CONTENTS

PAGE

PUBLIC TESTIMONY (CONTINUED)

    TINA BENKISER                              784
    B.R. SKIPPER WALLACE                        787
    ANITA PRIVETT                              789
    MARY ANN COLLINS                            792

    ROSA ROSALES                               794
    QUESTIONS FROM SENATE FLOOR                797

    DUSTIN RYNDERS                             800

    MARSHA CORREIRA                            803
    QUESTIONS FROM SENATE FLOOR                806

    RENE LARA                                  807
    LEE MEDLEY                                 810
    JOHN WATKINS                               811
    KENNETH FLIPPEN                            813
    ANNIE BANKS                                816
    RACHEL HERNANDEZ                           817
    RENATO DE LOS SANTOS                       819
    JUDY HOLLOWAY                              823
    LYDIA CAMARILLO                            825
    EDWARD B. WILLIAMS                         828
    MADELEINE DEWAR                            830
    HELEN VILLARREAL                           833
    MARK WILLIAMSON                            835
    VANESSA FOSTER                             838

    LUIS FIGUERO                               840
    QUESTIONS FROM SENATE FLOOR                844

    PATTI EDELMAN                              844
    SYLVIA MENDOZA                             846
    KENNETH KOYM                               848
    KAREN RENICK                               850
    JONI ASHBROOK                              853
    DUANE RAWSON                               856
    ROD FLUKER                                 858

ROLL CALL NO. 3                                864

PROCEEDINGS CONCLUDED                          869

TX_00003860
JA_003283

iv

EXHIBIT INDEX

|  |  | MARKED | ADMITTED |
|---|---|---|---|
| 1A | Sen. Van de Putte 3/3/09 Memo to Sen. Duncan re ground rules for Committee of the Whole Pubic hearing | 21 | 21 |
| 1B | Sen. Duncan 3/5/09 Memo to Sen. Van de Putte re response to concerns about ground rules for the Committee of the Whole Senate | 21 | 21 |
| 2. | Letter to Texas Attorney General Greg Abbott re:  Hearing on SB 362, signed by 11 Senators | 21 | 21 |
| 3. | Senate Notice of Public Hearing on SB 362 for 3/10/09 | 21 | 21 |
| 4. | Texas Senate Agenda, 3/10/09 | 21 | 21 |
| 5A | 3/10/09 Tag Form signed by Sen. Royce West, et al | 21 | 21 |
| 5B | 3/10/09 Tag Form signed by Sen. Mario Gallegos | 21 | 21 |
| 6. | Roll Call No. 2 - Sen. Gallegos' Appeal of Ruling of Chair on Sen. West's Point of Order | 120 | 120 |
| 7. | Institute of Public Policy Publication entitled "The Effects of Photographic Identification on Voter Turnout in Indiana:  A County-Level Analysis" by Jeffrey Milyo, Report 10-2007, Revised December 2007 | 120 | 120 |

v

EXHIBIT INDEX (continued)

| | | | MARKED | ADMITTED |
|---|---|---|---|---|
| 8. | AU News publication entitled "Much-hyped Turnout Record Fails to Materialize - Convenience Voting Fails to Boost Balloting" | | 120 | 120 |
| 9. | Symposium paper entitled "The Empirical Effects of Voter-ID Laws:  Present or Absent?" by Jason D. Mycoff, Michael W. Wagner and David C. Wilson | | 120 | 120 |
| 10. | 9/10/07 Report of the Heritage Center for Data Analysis entitled "New Analysis Shows Voter Identification Laws Do Not Reduce Turnout" by David B. Muhlhausen and Keri  Weber Sikich | | 120 | 120 |
| 11. | *New York Times* article - September 23, 2005 - entitled "Voting Reform is in the Card's," by Jimmy Carter and James A. Baker III | | 160 | 160 |
| 12. | Harvey Kronberg's Quorum Report April 23, 2007, entitled "Royal Masset:  The Voter ID Bill Will Kill My Mother's Right to Vote" | | 160 | 160 |
| 13. | 2/3/08 article entitled "A Clearer Picture on Voter ID" by Jimmy Carter and James A. Baker III | | 160 | 160 |
| 14. | Testimony of Hans A. von Spakovsky, March 10, 2009, re SB 362 | | 217 | 217 |

KENNEDY REPORTING SERVICE, INC.
512.474.2233

vi

EXHIBIT INDEX (continued)

|  |  |  | MARKED | ADMITTED |
|---|---|---|---|---|
| 15A | 6/11/07 Letter to Senate Committee on Rules and Administration re Hans A. von Spakovsky nomination |  | 254 | 254 |
| 15B | 6/12/07 Article entitled "Obama Raises Concerns Over FEC Nominee's Record of Partisanship" |  | 254 | 254 |
| 15C | 10/3/07 Letter to the U.S. Senate from Public Citizen |  | 254 | 254 |
| 16. | Institute of Public Policy Publication entitled, "The Effects of Photographic Identification on Voter Turnout in Indiana:  A County-Level Analysis" by Jeffrey Milyo, Report 10-2007, Revised December 2007 **(SAME AS EXHIBIT 7)** |  | 265 | 265 |
| 17. | Testimony of Tova Andrea Wang, Vice President, Research Common Cause, March 10, 2009, re SB 362 |  | 300 | 300 |
| 18. | Report of the Commission on Federal Election Reform entitled, "Building Confidence in U.S. Elections," September 2005 |  | 313 | 313 |

```
 1                     EXHIBIT INDEX (continued)

 2                                          MARKED   ADMITTED

 3       19.   Fifteen letters to the Hon.
               Dianne Feinstein, Chair, and the
 4             Hon. Robert F. Bennett, ranking
               minority member, U.S. Senate
 5             Committee on Rules and
               Administration:
 6
               1.   6/29/07 letter from Hans
 7                  A. von Spakovsky
               2.   3/22/07 letter from various
 8                  members of Congress
               3.   3/13/07 letter from William
 9                  H. Jordan
               4.   2/08/07 letter from Gary J.
10                  Smith
               5.   2/26/07 letter from P. K.
11                  Brunelli
               6.   3/01/07 letter from J. A.
12                  Borras
               7.   2/21/07 letter from Trey
13                  Grayson
               8.   2/20/07 letter from Beverly
14                  B. Kaufman
               9.   2/19/07 letter from Todd
15                  Rokita
              10.   2/16/07 letter from Frank
16                  B. Strickland
              11.   2/14/07 letter from Tom Lowe
17            12.   2/13/07 letter from
                    T. Rogers Wade
18            13.   2/14/06 letter from Johnny
                    Isakson
19            14.   2/09/07 letter from Wesley
                    R. Kliner, Jr.
20            15.   3/13/07 letter from Ray
                    Martinez III             333      333
21
         20.   Brennan Center For Justice letter
22             dated October 3, 2007, by
               Executive Director Michael
23             Waldman, with attachments      335      335

24

25
```

EXHIBIT INDEX (continued)

|  |  | MARKED | ADMITTED |
|---|---|---|---|
| 21. | Prepared Remarks of Dr. Toby Moore, Research Triangle, regarding "Evidence of the impact of voter ID requirements and the prospects of US DOJ preclearance," March 10, 2009 | 358 | 358 |
| 22. | Harris County Map submitted by Sen. Gallegos | 366 | 366 |
| 23. | Testimony of Frank B. Strickland re SB 362 March 10, 2009 | 373 | 373 |
| 24. | Testimony of Adam Skaggs, Counsel, Democracy Program, Brennan Center for Justice at NYU School of Law, regarding *The Myth of Voter Impersonation Fraud at the Polls* March 10, 2009 | 408 | 408 |
| 25. | Written Testimony of Robert A. Simms, Georgia Deputy Secretary of State, presented to the United States Senate Committee on Rules and Administration, submitted by Wes Tailor | 435 | 435 |
| 26. | Testimony of J. Gerald Hebert re SB 362, March 10, 2009 | 442 | 442 |
| 27. | Letter from Rene Guerra (March 6, 2009) Criminal District Attorney of Hidalgo County, Submitted by Sen. Lucio | 479 | 479 |
| 28. | 3/4/09 Letter from Todd Rokita, Indiana Secretary of State, to Sen. Fraser re SB 362 | 502 | 502 |

TX_00003865

EXHIBIT INDEX (continued)

                                              MARKED   ADMITTED

29.  Testimony of Chandler Davidson,
     Tsanoff Professor of Public
     Affairs Emeritus, Rice University,
     regarding "The Historical Context
     of Senate Bill 362," March 10,
     2009                                       521       521

30.  3/06 Printout from Texas AG
     Website entitled "Helping Stamp
     Out Voter Fraud in Texas," by
     Greg Abbott, Attorney General
     of Texas, submitted by
     Sen. Shapleigh                             550       550

31.  Dashwood case documents
     submitted by Ed Johnson, Harris
     County Tax Assessor-Collector
     and Voter Registrar's Office               559       559

32.  Records from specific Harris
     County voting documents,
     submitted by Ed Johnson                    559       559

33.  Harris County Deceased
     Voting History, miscellaneous
     registration applications,
     submitted by Ed Johnson                    559       559

34.  Texas Voter Registration
     Application form submitted
     by Sen. Huffman                            570       570

35.  Testimony of Daniel B.
     Kohrman, Senior Attorney,
     AARP Foundation, re SB 362
     March 10, 2009                             621       621

36.  Photographs of Voter Education,
     Anderson County Workshop, 2008   724       724

37.  Testimony of Gary L. Bledsoe,
     President, Texas NAACP,
     re SB 362, March 10, 2009        724       724

EXHIBIT INDEX (continued)

| | | MARKED | ADMITTED |
|---|---|---|---|
| 38. | Number of voters who have registered since 2006 without a driver's license number, submitted by Sen. Watson | 767 | 767 |
| 39. | The Special Investigations Unit Role and Investigative Efforts and Funding, submitted by Sen. Huffman | 767 | 767 |
| 40. | Slip Opinion, U.S. Supreme Court, Crawford vs. Marion County Election Board, October Term, 2007 | 768 | 768 |
| 41. | U.S. Supreme Court, Crawford vs. Marion County Election Board, on Writ of Certiorari to U.S. Court of Appeals for the Seventh Circuit, Brief of Texas, Alabama, Colorado, Florida, Hawaii, Michigan, Nebraska, Puerto Rico and South Dakota, as *Amici Curiae* Supporting Respondents | 768 | 768 |
| 42. | Written Testimony of Claire Oxley Gluck from Boerne, in Kendall County, re SB 362 | 773 | 773 |
| 43. | Written Testimony of Hazel Cotton of Texarkana, Texas re SB 362 | 775 | 775 |
| 44. | Written Testimony of Kathy Hicks of Texarkana, Texas re SB 362 | 779 | 779 |
| 45. | Written Testimony of Donald Giles of Texarkana, Texas re SB 362 | 783 | 783 |
| 46. | Written Testimony of Anita Privett, League of Women Voters of Texas, re SB 362 | 789 | 789 |

KENNEDY REPORTING SERVICE, INC.
512.474.2233

xi

```
1                    EXHIBIT INDEX (continued)

2                                        MARKED    ADMITTED

3    47.  Written Testimony of Rosa
          Rosales, League of United
4         Latin American Citizens,
          National President
5         re SB 362                         794        794

6    48.  Written Testimony of Dustin
          Rynders, Advocacy, Inc.,
7         re SB 362                         800        800

8    49.  Written Testimony of Marsha
          Correira re SB 362                804        804
9

10   50.  Written Testimony of Rachel
          A. Hernandez re SB 362            817        817
11

     51.  10/17/08 Article by Nelda
12        Wells Spears, Voter Registrar,
          Travis County, entitled "40,000
13        Voter Registration Applications
          Processed in Time For Early
14        Voting"                           825        825

15   52.  Written Testimony of Lydia
          Camarillo, SVREP Vice
16        President, re SB 362              826        826

17   53.  Written Testimony of Luis
          Figueroa, Mexican American
18        Legal Defense and Education
          Fund (MALDEF), re SB 362          841        841
19
     54.  Written Testimony of Sylvia
20        Mendoza re SB 362                 848        848

21   55.  Written Testimony of Dr. Rod
          Fluker, Sr., Executive Director
22        for Texas Association of Black
          Personnel in Higher Education,
23        re SB 362                         861        861

24

25
```

2

## P R O C E E D I N G S

### TUESDAY, MARCH 10, 2009

(12:38 p.m.)

PRESIDENT DEWHURST:  Members, the Senate
will come to order.  Pursuant to a resolution
previously adopted, the Senate resolves itself into
the Committee of the Whole for the consideration of
Senate Bill 362.  The senator from Lubbock,
Sen. Duncan, will please take the chair for the
duration of the proceedings in the Committee of the
Whole.

(Off the record:  12:38 p.m. to
12:42 p.m.)

SEN. DUNCAN:  The Committee of the Whole
Senate will come to order.  The secretary will call
the roll.

### ROLL CALL NO. 1

SECRETARY SPAW:  Averitt?

SEN. AVERITT:  (Indicated presence)

SECRETARY SPAW:  Carona?

SEN. CARONA:  (Indicated presence)

SECRETARY SPAW:  Davis?

SEN. DAVIS:  (Indicated presence)

SECRETARY SPAW:  Deuell?

SEN. DEUELL:  (Indicated presence)

3

1          SECRETARY SPAW:  Duncan?

2          SEN. DUNCAN:  (Indicated presence)

3          SECRETARY SPAW:  Ellis?

4          SEN. ELLIS:  (Indicated presence)

5          SECRETARY SPAW:  Eltife?

6          SEN. ELTIFE:  (Indicated presence)

7          SECRETARY SPAW:  Estes?

8          SEN. ESTES:  (Indicated presence)

9          SECRETARY SPAW:  Fraser?

10         SEN. FRASER:  Here.

11         SECRETARY SPAW:  Gallegos?

12         SEN. GALLEGOS:  (Indicated presence)

13         SECRETARY SPAW:  Harris?

14         SEN. HARRIS:  (Indicated presence)

15         SECRETARY SPAW:  Hegar?

16         SEN. HEGAR:  (Indicated presence)

17         SECRETARY SPAW:  Hinojosa?

18         SEN. HINOJOSA:  (Indicated presence)

19         SECRETARY SPAW:  Huffman?

20         SEN. HUFFMAN:  (Indicated presence)

21         SECRETARY SPAW:  Jackson?

22         SEN. JACKSON:  (Indicated presence)

23         SECRETARY SPAW:  Lucio?

24         SEN. LUCIO:  (Indicated presence)

25         SECRETARY SPAW:  Nelson?

4

```
 1              SEN. NELSON:  (Indicated presence)

 2              SECRETARY SPAW:  Nichols?

 3              SEN. NICHOLS:  (Indicated presence)

 4              SECRETARY SPAW:  Ogden?

 5              SEN. OGDEN:  (Indicated presence)

 6              SECRETARY SPAW:  Patrick?

 7              SEN. PATRICK:  (Indicated presence)

 8              SECRETARY SPAW:  Seliger?

 9              SEN. SELIGER:  Here.

10              SECRETARY SPAW:  Shapiro?

11              SEN. SHAPIRO:  (Indicated presence)

12              SECRETARY SPAW:  Shapleigh?

13              SEN. SHAPLEIGH:  (Indicated presence)

14              SECRETARY SPAW:  Uresti?

15              SEN. URESTI:  (Indicated presence)

16              SECRETARY SPAW:  Van de Putte?

17              SEN. VAN de PUTTE:  (Indicated presence)

18              SECRETARY SPAW:  Watson?

19              SEN. WATSON:  (Indicated presence)

20              SECRETARY SPAW:  Wentworth?

21              SEN. WENTWORTH:  Here.

22              SECRETARY SPAW:  West?

23              SEN. WEST:  (Indicated presence)

24              SECRETARY SPAW:  Whitmire?

25              SEN. WHITMIRE:  (Indicated presence)
```

```
 1              SECRETARY SPAW:  Williams?

 2              SEN. WILLIAMS:  (Indicated presence)

 3              SECRETARY SPAW:  Zaffirini?

 4              SEN. ZAFFIRINI:  (Indicated presence)

 5              SEN. DUNCAN:  The Chair present.

 6              SECRETARY SPAW:  Mr. President?

 7              PRESIDENT DEWHURST:  (Indicated

 8  presence)

 9              SEN. DUNCAN:  A quorum is present.
```

10              **OPENING INSTRUCTIONS BY SEN. DUNCAN**

```
11              SEN. DUNCAN:  Members, before we get

12  started, I wanted to kind of briefly discuss how we

13  will proceed here.  And I think you all know the

14  resolution gives the Chair the power to allow time

15  limits.  Many of you have wanted to bring and begin

16  with invited testimony, and those would be persons

17  with expertise that can help the body understand the

18  issues involved in the legislation that we are about

19  to consider, and that will be honored.  Each side has

20  submitted a list of witnesses, and I assume the order

21  of those witnesses is available to us at this time.

22              After the author of the bill is

23  recognized to lay out the bill, then I will recognize

24  the proponents' first witness, their expert in support

25  of their bill.  And then after that, we will go in
```

1    alternating order so that then those who are in

2    opposition to the bill, if they want to bring witness

3    expert or invited witness in, then we would go in that

4    order.

5              So, in other words, we'll have one for

6    and one against, one for and one against as we go

7    through.  There are several of those witnesses.  I

8    believe there are eight witnesses that have been

9    identified by those in opposition to the bill, and

10   there are about seven that have been identified for

11   those in favor of the bill.  So we will move that on.

12             The Chair will impose on each one of

13   those witnesses a 10-minute time limit.  However, Sen.

14   Van de Putte indicates that they have one witness that

15   may take longer than that.  And if you'll approach the

16   bench before, or the dais before that person comes on,

17   Sen. Van de Putte, we will adjust that time limit to

18   accommodate the concerns that you raised.

19             Members, I'm going to refrain from

20   recognizing any member to interrupt a witness during

21   their initial time limit.  In other words, we will

22   allow the witnesses to complete their testimony, and

23   then you can ask questions after that.  You will be

24   recognized in order of your pressing your call button

25   on your desk.

7

```
 1              And I will remind each and every one of
 2    you, we have a number of guests who are here today, or
 3    members of the public who wish to testify as well, and
 4    they have been here since about 8 o'clock in the
 5    morning and they would like to testify on this bill.
 6    And so what we are trying to do is accommodate their
 7    interest as well.
 8              I know that you all have important
 9    questions to ask of the invited witnesses, but I would
10    ask you to keep in mind that we have members of the
11    public who have also traveled here from other cities
12    and other areas of the state that would like to have
13    their voices heard today as well.  So if we could
14    respect that as well.
15              Once we conclude with the invited
16    testimony, then we will start the process for public
17    testimony.  The Chair intends to impose a three-
18    minute time limit on public testimony.  As with
19    invited witnesses, the Chair will not entertain any
20    questions of the witness until they have completed
21    their three-minute testimony or concluded prior to the
22    three minutes.
23              As the persons have enrolled to testify,
24    the resolution requires -- and I think our rules have
25    always required -- that before a witness can testify,
```

1   they sign an affirmation that is more or less an oath,

2   or is an oath before they testify.  Persons who have

3   been filling out their cards have been doing that all

4   day long, and we have a procedure in there for them to

5   sign up to testify.

6            It's my understanding that the Secretary

7   of the Senate has done a nice job of preparing

8   instructions for them on how the process will work.

9   And they have been given written instructions on how

10  they will be called.  It is the Chair's intention to

11  call the witnesses in the order in which they arrived

12  and registered to be witnesses today.  Each one of

13  those cards was given a number, and those witnesses

14  will be called in order.

15           And there is always a problem with

16  witnesses who are not available at the time they're

17  called.  We will have witnesses hopefully in the

18  gallery.  The gallery is not full.  So if you know

19  you're going to testify and your number is fairly

20  close, you should be in the gallery.  We also have an

21  overflow room in the auditorium.  Everybody has been

22  instructed as to that.  It's the Chair's intention to

23  call witnesses in advance of their being on the floor,

24  and they are to report in the back hallway.  And then

25  there is a process for security and a process for

1    admitting them to the floor.

2               We will have them come through here and

3    give us testimony in an orderly fashion.  And if

4    someone does not arrive at the time their name is

5    called or within 30 minutes of their name -- let me

6    repeat that and be clear.  If a witness does not

7    arrive within 30 minutes of the time their name will

8    be called, then they will lose their opportunity to

9    testify.  So we're going to try to be very flexible in

10   trying to allow people time to get here.  But we need

11   to be able to stay on schedule and move -- and respect

12   every other witness' right to be heard.

13               Time limits are -- I think all of our

14   committees observe time limits.  At least the ones

15   that I serve on do.  And time limits are not designed

16   to limit the testimony that witnesses have to say;

17   it's designed to allow everyone who has presented to

18   testify, if possible.  And so what I'm concerned

19   about, in putting a time limit in, is that people

20   understand that your time limit is based on the fact

21   that there are many people that want to testify, and

22   so we need to allow them to have their opportunity as

23   well.

24               Finally, we had a little discussion

25   about this in the discussion on the resolution when we

1  were in session.  The rules of decorum of the Senate

2  will be enforced.  And that means for those in the

3  gallery, that we -- the rules of the Texas Senate do

4  not permit clapping or applause, when we're in a

5  deliberative session like this, do not permit

6  clapping, applause or demonstrations.  There may be

7  times when you wish to be excited about something you

8  agree with or disagree with, but it is inappropriate

9  in the Senate chamber to express that.  There will be

10  no placards or billboards or things dropped over the

11  rail.  Any of that will subject the person doing it to

12  being expelled from the Senate gallery.

13           And I'm sure it won't come do this, but

14  if it comes to this, it comes to a point in time to

15  where, after warning, the gallery generally is not

16  observing the rules of the Senate with regard to

17  decorum, well, then, the Chair would entertain a

18  motion at that time or may, on sua sponte, request

19  that the gallery be cleared.  The only reason I say

20  that is, is that the decorum and the ability to hear

21  witnesses and to deliberate in a professional way on

22  this is very important.  And those rules were designed

23  to allow us to do that, and they will be enforced.

24           So those in the gallery and those

25  watching on TV, please understand that.  I would hate

```
 1    to have to make a ruling or to have anyone removed
 2    from the gallery, but we will need to do that if it
 3    gets out of hand.
 4              I need to clarify that the witnesses
 5    should report to the front of the chambers.  And I
 6    always am confused about east, west, south, north or
 7    front or back.  But the front of the Senate chambers,
 8    that would be the west doors next to the witness
 9    registration desk, and that would be the door that's
10    closest to the rotunda in our Texas Senate.
11              Members, I want to introduce to you
12    today our court reporter, Aloma J. Kennedy of Kennedy
13    Reporting Service.  She is an independent certified
14    shorthand court reporter, and she will be taking down
15    the testimony today.  So it will be necessary for
16    either me or you to identify yourself in the record
17    whenever you speak or rise to testify or rise to ask a
18    question.
19              I'll probably just recognize you by
20    name, and the court reporter will get that.  Because
21    the court reporter is a human being, we will need to
22    take a rest every now and then for her to rest her
23    fingers and arms, because she has a hard job.
24    Normally with a court reporter, every hour and a half
25    to two hours, and I'll let her kind of give me a
```

```
 1   signal whenever she is ready to take a five-minute
 2   break.
 3               Members, that's more or less the --
 4   those are the issues and those are kind of the way
 5   we're going to run things.  So having explained that,
 6   the Chair lays out Senate Bill 362 and recognizes
 7   Sen. Fraser to explain the bill.
```

**OBJECTION TO FURTHER CONSIDERATION OF SB 362**

```
 9               SEN. WEST:  Mr. Chairman?
10               SEN. DUNCAN:  Sen. West, for what
11   purpose?
12               SEN. WEST:  Objection on further
13   consideration -- any consideration of Senate Bill 362
14   in that it violates Rule 11.18 and also would raise
15   Rule 11.10.  Rule 11.18 is, "No bill may be reported
16   to the Senate before it has been the subject of an
17   open public hearing before a committee or
18   subcommittee."
19               My specific objection deals with the
20   notice.  "Notice of the hearing on the bill must be
21   posted in a public place at lease 24 hours before the
22   hearing is to begin."  The posting of notice on this
23   particular bill was at 6:22 p.m. on March the 9th;
24   therefore, any consideration before that would be in
25   violation of that rule.
```

13

```
 1                    SEN. DUNCAN:  Sen. West, bring your
 2   point of order forward.
 3                    (Off the record:  12:55 p.m. to
 4   12:58 p.m.)
 5                    SEN. WEST:  Mr. Chairman?
 6                    SEN. DUNCAN:  Sen. West, for what
 7   purpose?
 8                    SEN. WEST:  Mr. Chairman, for further
 9   clarification on my point of order for further
10   consideration of this bill at this time, I would raise
11   Rule 13.04.  13.04 governs the procedure in a
12   committee of the whole:  "The rules of the Senate, as
13   far as applicable, shall be observed in Committee of
14   the Whole Senate."
15                    And then I would raise our Rule No.
16   11.18 as relates to the posting of the bill being at
17   least 24 hours before the hearing is to begin.  And
18   specifically the notice of the hearing must be posted
19   in a public place.
20                    And then also I would raise Rule 11.10
21   in terms of the, "No committee or subcommittee, except
22   a conference committee, shall meet at least without 24
23   hours public notice."
24                    (Off the record:  12:58 p.m. to
25   1:14 p.m.)
```

14

```
 1              SEN. DUNCAN:  Members, a point of order
 2    has been raised.  Rules 11.10 and 11.18 do not control
 3    meetings of the Committee of the Whole and are
 4    inapplicable.  13.01 reflects the Senate's manifest
 5    right to resolve itself into committee of the whole at
 6    any time after the morning call.  The Senate has
 7    resolved into the Committee of the Whole by Senate
 8    resolution.  The Chair may neither call a meeting of
 9    the Committee of the Whole or schedule a bill for
10    hearing.
11              Article XI, standing and special
12    committees operate without direct day-to-day
13    supervision of the Senate.  Standing and special
14    committees have the ability to meet, subject to the
15    call of the chair so long as the Senate is not
16    meeting.
17              Committee of the Whole presents the
18    obverse situation to standing and special committees.
19    The tag rule is intended to give each member 48-hour
20    written notice of the time and place of a public
21    hearing of standing and special committees.  The rules
22    directly conflict with Rule 13.01 and the Senate's
23    right to resolve into the committee of the Whole at a
24    moment's notice if the Senate so desires.  Every
25    member of the Senate is a member of the Committee of
```

1   the Whole, having equal rights of notice and

2   participation.

3                    Your point of order is respectfully

4   overruled.

5                    SEN. WEST:  Mr. Chairman?

6                    SEN. DUNCAN:  Sen. West, for what --

7                    SEN. WEST:  Parliamentary inquiry.  So

8   that I can understand this, under Rule 13.04, it says

9   that, "The rules of the Senate, as far as applicable,

10  shall be observed in the Committee of the Whole . . ."

11  So by your very ruling, you're saying that the posting

12  notice to the public is a rule that the Committee of

13  the Whole does not have to abide by?

14                    SEN. DUNCAN:  Senator, that would

15  conflict with the ability in the rules of the Senate

16  to resolve into a committee of the whole at any time

17  it desires.  So in its conflict, it would be

18  inapplicable.

19                    SEN. WEST:  So public notice does not

20  apply to the Committee of the Whole, even though we

21  are taking substantive testimony on this issue?

22                    SEN. DUNCAN:  Public notice laid out by

23  the rules that you have cited does not.

24                    SEN. WEST:  Okay.  So for future

25  generations of legislators, specifically the Senate,

1    posting notice does not apply to the Committee of the

2    Whole?  That's essentially the ruling?  Let me ask

3    this question:  Once . . .

4                    SEN. DUNCAN:  Go ahead, Senator.

5                    SEN. WEST:  You have cited Rule 13.01

6    that talks about resolving.  Is resolving synonymous

7    with hearing a bill?

8                    SEN. DUNCAN:  Senator, the Senate can

9    resolve for whatever purpose it desires.

10                   SEN. WEST:  Right.  And the question is,

11   you cited in your ruling that 13.01 provides the basis

12   for your ruling.  And as I understand it, resolving is

13   coming into the Committee of the Whole, hearing a bill

14   that's separate from resolving.  It's a separate act

15   than just resolving.

16                   SEN. DUNCAN:  Well, Senator, we can

17   resolve for any purpose, and the purpose was to hear

18   the bill.  Moreover -- and I will remind you that a

19   courtesy posting on the date, time and location of the

20   hearing was performed over a week ago, which is well

21   in advance of any public notice that would be required

22   of a standing committee.  And so the only change that

23   you have referred to was a courtesy posting that was

24   done yesterday with regard to the change of time that

25   occurred whenever there was a motion to adjourn until

1    10:00 instead of 9:00, and so we're talking about an

2    hour's difference here.  So, again, I think that we

3    have resolved by resolution of the Senate to deal with

4    this.  The Senate certainly was in session pursuant to

5    the constitution and the rules of the Senate.

6              SEN. WEST:  Yes, sir, Mr. Chairman.  But

7    the broader question, though, is one of resolving and

8    hearing the bills and whether or not public notice of

9    bills that are to be considered by the Committee of

10    the Whole are required by the Senate rules.

11              I mean, essentially you're saying that

12    the Committee of the Whole, by your ruling, that we

13    don't have to provide the public notice, there is

14    no -- we don't have to deal with transparency as

15    relates to considering bills in this committee, we can

16    just do it at our own whim, and that's inconsistent

17    with everything we've been doing in this body in terms

18    of transparency.  If I'm wrong about it -- I just want

19    to make sure the record is clear.

20              And historically, Mr. Chairman, when we

21    have had bills in the Committee of the Whole, we have

22    provided notice to the public so that the public could

23    be here like they are now.  And what I'm hearing today

24    is, is that that notice provision is not applicable

25    anymore as a result of the ruling of the Chair.  I

1    mean, correct me if I'm wrong.

2              SEN. DUNCAN:  Senator, we are resolved

3    into a Committee of the Whole by the resolution we

4    adopted which laid out the bill that was to be

5    considered.  As a result, we thought we were following

6    the rules by resolving into a Committee of the Whole

7    which would apply at any time we so desire; therefore,

8    the rules that you're citing to would conflict with

9    the ability of the Senate to freely resolve into a

10   Committee of the Whole to more informally discuss and

11   debate witnesses -- or the issues, including the

12   invitation of witnesses to come in and testify, as we

13   have done here.

14             SEN. WEST:  Does it also conflict with

15   Rule 13.04?

16             SEN. DUNCAN:  Senator, 13.04 provides

17   the -- it provides for the conflicts that may occur

18   with the concept of committee of the whole and other

19   rules, by saying that the rules of the Senate apply,

20   if applicable.  And if they conflict -- where they

21   conflict, those rules wouldn't apply.

22             SEN. WEST:  And this is my last

23   question.  So you're saying that the notice provision,

24   the notice to the public concerning legislation at the

25   Committee of the Whole will take up conflicts, with

1    the Committee of the Whole's right to resolve?

2                    SEN. DUNCAN:  Senator, the way the

3    Committee of the Whole operates and the design of that

4    from time immemorial would -- giving the Senate the

5    ability to resolve into itself as a Committee of the

6    Whole to informally debate an issue at any time it

7    desires would conflict with those posting rules.

8                    SEN. WEST:  Thank you, Mr. Chairman.

9                    SEN. SHAPLEIGH:  Mr. Chairman?

10                    SEN. DUNCAN:  Sen. Shapleigh, for what

11    purpose?

12                    SEN. SHAPLEIGH:  During the Senate

13    portion of this, before we got into committee, we had

14    a discussion there about some housekeeping matters

15    that I think we need to make very clear for this

16    record.  This portion is being kept for the official

17    record by a stenographer hired by the Senate.  Is that

18    correct?

19                    SEN. DUNCAN:  That's correct.

20                    SEN. SHAPLEIGH:  And for the purposes of

21    the official record, should it be transmitted to any

22    third party, we have agreed that the stenographer's

23    record may be utilized?

24                    SEN. DUNCAN:  I'm not sure I understand

25    your question.  Would you repeat it?

1          SEN. SHAPLEIGH:  If we have to establish

2     the official proceedings of what's happened here today

3     for, for example, the Department of Justice in

4     Washington, D.C., the record that is being made by the

5     stenographer whose equipment is there and who sits in

6     Patsy Spaw's office can be used to establish that

7     record?

8          SEN. DUNCAN:  Senator, it's my

9     understanding that this will be a record that can be

10    used to establish the record of the testimony that is

11    given to the Senate, and the debate.

12         SEN. SHAPLEIGH:  Now, for the purposes

13    of making sure that we have the record to send, I

14    would like to talk a little bit about the procedure

15    for the Secretary of the Senate to take documents and

16    keep them to append to the record.  We've had

17    discussions already about several documents, the

18    letters to and from Sen. Van de Putte and yourself,

19    the letter to AG Abbott, the notice of the posting

20    that Sen. West was talking about, and this green Texas

21    Senate agenda.  Am I to understand that if we want

22    these made a part of the record, we can deposit them

23    with the Secretary of the Senate?

24         SEN. DUNCAN:  I would suggest that you

25    do that, but I would also suggest that you identify

TX_00003887

1   and just move to put them into the record so that you

2   have a clear marker of where they are and at what time

3   they came in so that whoever is reading the record

4   will have an opportunity to relate the documents to

5   the testimony.

6           SEN. SHAPLEIGH:  Well, at this time I

7   would like to, with your permission, mark and deliver

8   to her Exhibits 1A and B, Sen. Van de Putte's letter

9   to you and your response to her; as Exhibit 2, her

10  letter to AG Abbott; as Exhibit 3, the notice of the

11  posting time that Sen. West has talked about; as

12  Exhibit 4, the Senate agenda that was distributed

13  today; and Exhibit 5, the signed tag that brought this

14  point of order to the Chair.

15          SEN. DUNCAN:  Your evidence is received.

16          (Exhibit Nos. 1 through 5 marked and

17  admitted)

18          SEN. DUNCAN:  And it may be that what we

19  would do is just keep a numerical order of those

20  exhibits when they come in.  But I put the challenge

21  on you to make sure that you get them marked and

22  submitted to the Secretary so they get into the record

23  appropriately.

24          SEN. SHAPLEIGH:  Thank you.

25          SEN. DUNCAN:  Sen. Gallegos, for what

22

1    purpose?

2              SEN. GALLEGOS:  Parliamentary inquiry.

3    Mr. Chairman, in lieu -- on the ruling on

4    Sen. West's -- what he asked for, I want to appeal the

5    ruling of the Chair on this issue.

6              SEN. WILLIAMS:  Mr. President?

7              SEN. DUNCAN:  Sen. Williams of Harris --

8    or Montgomery, rather.

9              SEN. WILLIAMS:  I would move to table

10   the motion that Sen. Gallegos just made.

11             SEN. DUNCAN:  Sen. Williams,

12   Sen. Gallegos.

13             (Off-the-record discussion at the bench)

14             SEN. WILLIAMS:  Mr. Chairman -- or

15   Mr. President -- or Mr. Chairman, I guess I should

16   say.

17             SEN. DUNCAN:  Sen. Williams.

18             SEN. WILLIAMS:  Mr. Chairman, I

19   respectfully will withdraw my motion to table.  As I

20   understand, it's not appropriate to have a motion to

21   table an appeal to the ruling of the chair in

22   committee.  However, I also believe that the rules

23   provide that that motion would be in order were we on

24   the floor.  So it's my mistake.  I withdraw my motion.

25             SEN. DUNCAN:  Sen. Williams withdraws

```
 1   his motion to table.  Sen. Gallegos sends up an appeal
 2   to the ruling of the Chair.
 3                 Sen. West, for what purpose?
 4                 SEN. WEST:  Out of all due respect,
 5   Mr. Chairman, I'm trying to figure out what rules
 6   apply and what rules don't.  And if we could just get
 7   some idea of what Senate rules are going to apply and
 8   then, you know, all of us will know exactly what the
 9   rules are.
10                 So I just need to know what rules apply.
11   I thought the Senate rules applied.  But again,
12   there's some wiggle room in there, and I just want to
13   know how to proceed.  As an example, the Attorney
14   General -- well, I'll come back to that.  But again, I
15   just need to know what rules apply as it relates to --
16   you know, we can do anything we want to do, we can
17   resolve and pretty much do what we want to do.  I'm
18   trying to figure out why his motion wouldn't be
19   honored.
20                 SEN. DUNCAN:  Senator, currently we are
21   in the motion of -- Sen. Gallegos has a motion to
22   appeal before the body.  You have a parliamentary
23   inquiry.  Why don't we handle that as those issues
24   come up.  Let's go ahead and deal with the appeal of
25   the ruling of the Chair that has been raised by
```

24

1    Sen. Gallegos.

2              Sen. Gallegos, you're recognized to

3    speak on that.

4              (Brief pause)

5              SEN. WENTWORTH:  Sen. Gallegos, you're

6    recognized to argue in favor of your motion.

7              SEN. GALLEGOS:  Mr. Chairman, the reason

8    for my appeal is that evidently the rules are unclear

9    on what rules that we're going by on major

10   legislation, I think and I believe that the Senate

11   rule should be applicable to major legislation, such

12   as the bill that is trying to be laid out before us,

13   that any major piece of legislation under the Senate

14   rules, the ones that Sen. Royce West said.  And I've

15   got another tag on similar rules, that I believe that

16   the Senate rules are applicable to major legislation

17   that's heard on this floor, whether it be Committee of

18   the Whole or regular Senate committee hearings.

19              And that is why, you know, until we find

20   out what rules that we're working on, I believe that

21   the rules of the Senate should be applicable to this

22   bill here, and that's why I'm appealing the ruling of

23   the Chair.

24              SEN. WENTWORTH:  Okay.  Members, a

25   motion -- I'm sorry.  The Chair recognizes Sen.

1    Williams.

2              SEN. WILLIAMS:  Mr. Chairman, I would

3    like to speak on Sen. Gallegos' motion that's before

4    us.

5              SEN. WENTWORTH:  You're recognized.

6              SEN. WILLIAMS:  Thank you.

7              Respectfully, Sen. Gallegos, I would

8    encourage you to read the rules that we have on the

9    Committee of the Whole.  And before I made this rule

10   change at the beginning of the session, I very

11   carefully looked at the rules of the Committee of the

12   Whole.  And we also considered how that has worked,

13   because I wasn't familiar with it, quite frankly.

14             And it's clear to me, after reading this

15   and other documents that relate to parliamentary law,

16   that a ruling other than what the Chair has made would

17   put the body in conflict with itself.  The purpose of

18   the Committee of the Whole is to allow the body to

19   dissolve into that committee and consider important

20   matters before the entire body.

21             And to require that the posting rule

22   apply before we could do that would be to restrict the

23   body's inherent ability to dissolve into the Committee

24   of the Whole.  And so the standing committee rules, as

25   I understand it, don't apply universally to this

1    proceeding that we're in.

2              And I think it would be a grave mistake

3    for this body to try to impose upon ourselves a

4    posting rule so that if there's some important matter

5    that we need to consider in an informal basis like a

6    committee hearing, is not as we hear it on the floor,

7    it would unnecessarily restrict our ability to do so.

8              And there are many examples in our

9    history as a Senate where we have resolved into the

10   body of the whole and considered bills and legislation

11   without posting those things.  So respectfully I just

12   wanted to point that out to the body, Mr. Chairman.

13             SEN. WEST:  Will Sen. Williams yield?

14             SEN. WILLIAMS:  I yield.

15             SEN. WENTWORTH:  Sen. West, for what

16   purpose?

17             SEN. WEST:  Question of Sen. Williams.

18             SEN. WENTWORTH:  Do you yield to Sen.

19   West?

20             SEN. WILLIAMS:  I yield.

21             SEN. WENTWORTH:  He yields.

22             SEN. WEST:  Sen. Williams, I recognize

23   that oftentimes we resolve and we don't post to take

24   up -- we resolve into the Committee of the Whole to

25   take up issues.  But in this instance, we decided to

27

```
 1    post, follow the Senate rules and post.  And then we
 2    decided to repost.  And now we're hearing that posting
 3    is not applicable to the Committee of the Whole.  And
 4    that's why I'm taking so much time on this, given the
 5    issues of transparency that the public demands and I
 6    know that you support.
 7                The issue in my mind is, is that once we
 8    set up and make this ruling, we're now telling the
 9    public, we're now telling the State of Texas that this
10    committee can take up legislation without giving the
11    public notice.  That's what we're saying.
12                SEN. WILLIAMS:  Well, Sen. West,
13    respectfully, I think you turn the intent of the
14    posting rule on its head with your logic.  And if the
15    purpose of the posting rule is so that the public can
16    have adequate notice, there is no argument that can be
17    made.  This has been widely disseminated over the
18    Internet, in the popular media.
19                And, in fact, the posting here was
20    merely a courtesy.  The purpose of the posting rule is
21    not primarily to notify the public.  The primary
22    purpose of the posting rule is to make sure that the
23    other members of the body know what's going on when
24    you have a standing committee that comes together and
25    it's subject to the call of the chair.
```

```
1              It is an important secondary thing that
2      we also give notice to the public.  But I don't think
3      you can reasonably argue that the public wasn't aware
4      of what proceedings were going to be taking place.  We
5      have over 100 witnesses that have testified.  And
6      surely you don't think, because it wasn't posted in
7      the back hall, that somebody didn't show up for this
8      meeting.
9              SEN. WEST:  Sen. Williams, I understand
10     your logic.  And, frankly, I'm kind of baffled by it.
11     The reality is, is that the decision that y'all are
12     going to make today is that the posting notice does
13     not apply to the Committee of the Whole.  That's this
14     argument.  And the reality is, is that when you decide
15     to post, there is a certain amount of things that we
16     have to do according to our rules.  There are certain
17     rights and privileges and all of that that are tied to
18     that posting.  When you repost, it resets the clock;
19     it resets the clock.
20             Here is the way I look at it:  The
21     reality is this -- and you and I had this debate, you
22     and I had this debate when we were going through the
23     rules change -- you guys -- the majority of the body
24     decided to change the rules.  Okay.  And you have the
25     votes, you have the gavel, you change the rules.  And
```

1    that's fine.  I can deal with that.  But those are the

2    rules.

3              I'm just saying, let's make certain

4    that, given the rules that we now have, that all of us

5    can apply those rules to this situation.  And when we

6    sit up and say that the Senate of the whole -- the

7    Senate can resolve itself into the whole committee and

8    these rules, posting is not applicable, I think we

9    need to think about it.

10             I understand that we're dealing with

11   issues, you know, voting issues that was always

12   something that was very divisive in this body.  But

13   what I'm saying to you, as my desk mate and as a

14   colleague, we're got to really think about the

15   decision that we're making today saying that when we

16   take up these types of issues, that posting should not

17   be applicable.

18             SEN. WILLIAMS:  Sen. West, I appreciate

19   the courtesy that you've shown me in explaining your

20   side of this.  And what I would politely try to point

21   out to you is that I don't believe that we are today

22   deciding that the posting rule doesn't apply to the

23   Committee of the Whole.  That has been decided a long

24   time ago.

25             SEN. WEST:  When was it decided?

```
 1                    SEN. WILLIAMS:  That is a part of the
 2   body of parliamentary law that exists already.  And it
 3   is in the spirit of what's in the rules that relate to
 4   the Committee of the Whole and the purpose.  So, yes,
 5   we're reaffirming that that doesn't apply today.  And
 6   the mere act of giving public notice does not then
 7   subject you to a rule that didn't apply before.  And I
 8   think that's the ruling that the Chair has made, and I
 9   think correctly so.
10                    Thank you, Sen. West.
11                    SEN. WEST:  Look forward to the vote.
12                    SEN. WENTWORTH:  The Chair recognizes
13   Sen. Lucio of Cameron County.
14                    SEN. LUCIO:  Will Sen. Williams please
15   yield for a question?
16                    SEN. WENTWORTH:  Sen. Williams, you
17   yield?
18                    SEN. WILLIAMS:  I yield.
19                    SEN. WENTWORTH:  Sen. Williams yields.
20                    SEN. LUCIO:  Thank you, Sen. Williams.
21                    I think all of us will agree that rules
22   are important to this process and if we're not to
23   follow them, then as a point of clarification, maybe
24   you could tell me what other rules do not apply to
25   this extraordinary piece of legislation?
```

1           SEN. WILLIAMS:  Well, Sen. Lucio, it

2    wouldn't be appropriate for me -- I'm not presiding

3    over this -- it wouldn't be appropriate for me to

4    presume the role of the chair of this Committee of the

5    Whole.  I think it's up to his discretion on that.

6    And I think that my -- I'll leave it to -- rather than

7    say "to his discretion," I think I'll leave that to

8    the Chair to make those rulings as the issues come

9    forward.

10           My response was really centered at --

11   since the issues that Sen. Gallegos raised when he

12   explained his appeal to the ruling of the Chair.  And

13   I would reiterate again that it's not my belief that

14   all of the standing committee rules apply to the

15   Committee of the Whole, that we should not restrict

16   ourselves on the ability to resolve into the body of

17   the whole.  It is designed for the Senate to be able

18   to rapidly take up an issue with everyone involved.

19   It is a unique situation, much different than a

20   standing committee is.

21           And so there is a long history, as I

22   said, of this body resolving into the Committee of the

23   Whole to consider matters, resolutions and legislation

24   where no posting was done whatsoever.  And to say that

25   the mere act of giving public notice then subjects you

1    to that rule is to turn the Senate rules on their

2    head, in my opinion.

3              SEN. LUCIO:  Well, but, you know, they

4    shouldn't have been posted, then if that would have

5    been the case, in my opinion, as well.  You're a very

6    good student of the rules, and that's why I asked this

7    question.  I think we need to revisit the rules, and

8    we need to rewrite the rules so it can be very clear

9    and not have to waste the public's time next time we

10   have a proceeding as such.

11             SEN. WILLIAMS:  Thank you, Sen. Lucio.

12             SEN. WENTWORTH:  Sen. Van de Putte.

13             SEN. VAN de PUTTE:  Thank you,

14   Mr. President.  I would like to speak -- appeal -- and

15   not maybe particularly at Sen. Williams, but he brings

16   up some very interesting comments.  According to our

17   Senate rules on 13.04, "The rules of the Senate, as

18   far as applicable, shall be observed in the Committee

19   of the Whole Senate."

20             So as far as applicable.  And although

21   this question on this appeal is about posting, we

22   don't post when we go into Committee of the Whole.

23   And probably, as Sen. Williams has said, because we

24   don't know when we're going into the Committee of the

25   Whole.  We don't know when we're going to go back into

33

1    the Committee of the Whole and resolve to talk about

2    the Easter vacation schedule and whether we should be

3    off on Holy Thursday and Good Friday.  And although

4    that is important, it is about the logistics and the

5    work schedule.

6              This is very different.  When the rules

7    of the Senate were changed on the first week of the

8    session, it was done so to circumvent our normal

9    two-thirds rule on one particular issue, voter ID.

10   And because there is a bill -- this is a legislative

11   bill -- it is not the Senate resolving to talk about a

12   holiday schedule; it is not the Senate that is

13   resolving to talk about should we go and attend

14   someone on the Senate, their parent's funeral and the

15   logistics for that; it is not the Senate resolving to

16   plan the retirement party for our former secretary of

17   the Senate, Betty King.

18             Those are the things that we do because

19   it is the business of the Senate.  This is the

20   business of the people.  And we are going to add

21   another barrier to the basic right to vote; and, yet,

22   by the ruling, we are going to say the people have no

23   business knowing that we're going to take up a

24   legislative bill.

25             And so maybe for the purposes of this

34

1    appeal -- this is special.  You made it special.  You
2    said this was more important than anything else.  And
3    so we are taking up -- and maybe the posting is not --
4    Sen. Williams, I vehemently disagree with you.  The
5    posting is not for our convenience.  We're here; we
6    have staff.  We know when we're going to meet.  It is
7    for the public.  It is because we are going to add
8    barriers to their basic right to vote, but they ought
9    to have the posting if the Senate is going resolve
10   into the Committee of the Whole to change the way and
11   the possess that they vote.  It is their business.
12              And so this is very different from the
13   Committee of the Whole resolving to discuss a work
14   schedule or to plan a party or to make funeral
15   arrangements.  This is the people's business.  And I
16   would ask you to think on this appeal.  What we are
17   saying is that when there is legislation before the
18   Committee of the Whole, that we don't have to give
19   notice.
20              Although notice was given -- and it is
21   very much appreciative -- to have this ruling set in
22   our Senate rules for the senators that may not even be
23   born yet, is a terrible precedent.  It shuts the
24   public out.  So because of the special order and
25   because we're meeting in the Committee of the Whole

1    for one bill that was deemed so important that it

2    couldn't go by regular Senate rules, didn't go to the

3    Committee of Jurisdiction, we changed that.

4              But we ought to at least afford the

5    public the opportunity to know, in future generations

6    when they're about to be asked, to change how they

7    vote and what processes are used.  And so when I ask

8    you to think about the appeal, don't think about us,

9    think about all the wonderful Texans here who always

10   exercise their right to vote.

11             SEN. WENTWORTH:  The Chair recognizes

12   Sen. Williams.

13             SEN. WILLIAMS:  Thank you.

14             Well, Sen. Van de Putte, respectfully, I

15   would say they're here.  People from both sides of the

16   issue are here.  And I think the effect of Sen.

17   Gallegos's appeal would be to send them home so that

18   they couldn't participate in this process today.

19             SEN. WENTWORTH:  Members, Sen. Gallegos

20   has appealed the ruling of the Chair.  The Secretary

21   will call the roll.  A vote of "Aye" --

22             SEN. GALLEGOS:  Mr. Chairman?

23             SEN. WENTWORTH:  Sen. Gallegos.

24             SEN. GALLEGOS:  May I -- I want to reply

25   to Sen. Williams, if I may.

TX_00003902

1          SEN. WENTWORTH:  The Chair recognizes

2    Sen. Gallegos.

3          SEN. GALLEGOS:  Sen. Williams, you know,

4    I respect your remarks.  And let me just say what my

5    colleagues have already told you in their remarks.

6    You said it's a unique situation.  It is.  And you

7    said that there was Internet postings, the media that

8    has posted so, you know, everybody is supposed to

9    know.

10          Well, I beg to differ with you.  This is

11   an issue that is unique because you made it unique

12   when we passed that resolution that completely did

13   away with the two-thirds rule.  So when you said it's

14   a unique situation, it is, because only -- and only on

15   this issue do we do away with the two-thirds rule that

16   has always been a tradition of the Texas Senate.

17          And let me remind you, Senator, that we

18   got elected here, everybody on this floor, to notify

19   and at least let our constituents know what's going on

20   here.  And I will be the last one to say to them that

21   I'm going to depend on Internet postings and the media

22   to post, you know, this unique bill that you have made

23   unique by the resolutions that we passed earlier this

24   session and doing away with the two-thirds rule on

25   this issue.

1           So I would really tell you,

2    Sen. Williams, that the only really way to tell the

3    people that elected you and me about this unique

4    situation that we have on this floor today is by

5    public posting, something that we were elected to do,

6    to tell them -- not the Internet, not the media or

7    anybody else, or the grapevine or whatever else you

8    want to call it.

9           It's a public posting; that's what it

10   is.  And I will refer in my appeal to the rules that

11   Sen. Van de Putte did, 13.04.  And it says, "The rules

12   of the Senate, as far as applicable, shall be observed

13   in Committee of the Whole Senate."  And also on Rule

14   20.02, it says, "The President's ruling is subject to

15   appeal to the entire Senate."

16           And that's what I'm doing right now,

17   Mr. Chairman and Sen. Williams.  With all due respect,

18   I do appeal the ruling of the Chair.

19           SEN. WENTWORTH:  All right.  Members,

20   Sen. Gallegos has appealed the ruling of the Chair.  A

21   vote of "aye" will sustain the Chair; a vote of "nay"

22   will overturn the Chair.

23           The Secretary will call the roll.

24

25

## ROLL CALL NO. 2

1

2      SECRETARY SPAW:  Averitt?

3      SEN. AVERITT:  I confirm.

4      SECRETARY SPAW:  Carona?

5      SEN. CARONA:  (Indicated "aye" vote)

6      SECRETARY SPAW:  Davis?

7      SEN. DAVIS:  Nay.

8      SECRETARY SPAW:  Deuell?

9      SEN. DEUELL:  (Indicated "aye" vote)

10      SECRETARY SPAW:  Duncan?

11      SEN. DUNCAN:  (Present, not voting)

12      SECRETARY SPAW:  Ellis?

13      SEN. ELLIS:  (Indicated "nay" vote)

14      SECRETARY SPAW:  Eltife?

15      SEN. ELTIFE:  (Indicated "aye" vote)

16      SECRETARY SPAW:  Estes?

17      SEN. ESTES:  (Indicated "aye" vote)

18      SECRETARY SPAW:  Fraser?

19      SEN. FRASER:  Aye.

20      SECRETARY SPAW:  Gallegos?

21      SEN. GALLEGOS:  (Indicated "nay" vote)

22      SECRETARY SPAW:  Harris?

23      SEN. HARRIS:  (Indicated "aye" vote)

24      SECRETARY SPAW:  Hegar?

25      SEN. HEGAR:  (Indicated "aye" vote)

```
 1              SECRETARY SPAW:  Hinojosa?

 2              SEN. HINOJOSA:  (Indicated "nay vote)

 3              SECRETARY SPAW:  Huffman?

 4              SEN. HUFFMAN:  (Indicated "aye" vote)

 5              SECRETARY SPAW:  Jackson?

 6              SEN. JACKSON:  (Indicated "aye" vote)

 7              SECRETARY SPAW:  Lucio?

 8              SEN. LUCIO:  (Indicated "nay" vote)

 9              SECRETARY SPAW:  Nelson?

10              SEN. NELSON:  (Indicated "aye" vote)

11              SECRETARY SPAW:  Nichols?

12              SEN. NICHOLS:  (Indicated "aye" vote)

13              SECRETARY SPAW:  Ogden?

14              SEN. OGDEN:  (Indicated "aye" vote)

15              SECRETARY SPAW:  Patrick?

16              SEN. PATRICK:  (Indicated "aye" vote)

17              SECRETARY SPAW:  Seliger?

18              SEN. SELIGER:  (Indicated "aye" vote)

19              SECRETARY SPAW:  Shapiro?

20              SEN. SHAPIRO:  (Indicated "aye" vote)

21              SECRETARY SPAW:  Shapleigh?

22              SEN. SHAPLEIGH:  (Indicated "nay" vote)

23              SECRETARY SPAW:  Uresti?

24              SEN. URESTI:  (Indicated "nay" vote)

25              SECRETARY SPAW:  Van de Putte?
```

```
 1                    SEN. VAN de PUTTE:  (Indicated "nay"
 2     vote)
 3                    SECRETARY SPAW:  Watson?
 4                    SEN. WATSON:  (Indicated "nay" vote)
 5                    SECRETARY SPAW:  Wentworth?
 6                    SEN. WENTWORTH:  (Indicated "aye" vote)
 7                    SECRETARY SPAW:  West?
 8                    SEN. WEST:  (Indicated "nay" vote)
 9                    SECRETARY SPAW:  Whitmire?
10                    SEN. WHITMIRE:  No.
11                    SECRETARY SPAW:  Williams?
12                    SEN. WILLIAMS:  (Indicated "aye" vote)
13                    SECRETARY SPAW:  Zaffirini?
14                    SEN. ZAFFIRINI:  (Indicated "nay" vote)
15                    SECRETARY SPAW:  Mr. President?
16                    PRESIDENT DEWHURST:  (Indicated "aye"
17     vote)
18                    SEN. WENTWORTH:  There being 19 ayes, 12
19     nays and one present, not voting, the ruling of the
20     Chair is sustained.
21                    SEN. SHAPLEIGH:  Mr. Chair?
22                    SEN. DUNCAN:  Sen. Shapleigh?
23                    SEN. SHAPLEIGH:  Welcome back.
24                    SEN. DUNCAN:  Thank you.
25                    SEN. SHAPLEIGH:  Can we make that vote,
```

1  since we don't have electronically recorded votes, an

2  Exhibit 6?

3                SEN. DUNCAN:  Yes, Senator.  I think all

4  votes should be made part of the record, and they are

5  part of the record.

6                Sen. Fraser.  The Chair recognizes

7  Sen. Fraser to lay out Senate Bill 362.

8                SEN. GALLEGOS:  Mr. President?

9                SEN. DUNCAN:  Sen. Gallegos, for what

10  purpose?

11                SEN. GALLEGOS:  Mr. Chairman, I want to

12  tag this Senate Bill on Ruling 11.19 on 48-hour notice

13  to all Senate members, and I believe that's 11.19.

14                SEN. DUNCAN:  Senator, bring your point

15  of order forward.

16                SEN. GALLEGOS:  My tag is already up

17  there.

18                (Brief pause)

19                SEN. GALLEGOS:  Mr. President, I would

20  move to tag the bill and request a 48-hour notice to

21  all Senate members pursuant to Rule 11.19.

22                SEN. DUNCAN:  Senator, are you rising on

23  a point of order?

24                SEN. GALLEGOS:  I'm tagging the bill.

25                SEN. DUNCAN:  Let me rephrase the

42

```
 1    question.  I think you would have to raise a point of
 2    order on further consideration of the bill, based on
 3    the tag.
 4                 SEN. GALLEGOS:  Well, I raise the point
 5    of order to disallow any further consideration of
 6    Senate Bill 362.
 7                 SEN. DUNCAN:  Okay.
 8                 SEN. GALLEGOS:  And I have done that in
 9    reference by submitting a tag to the Secretary of the
10    Senate.
11                 SEN. DUNCAN:  Thank you, Sen. Gallegos.
12                 For the reasons previously stated in the
13    prior point of order raised by Sen. West, your point
14    of order is respectfully overruled.
15                 SEN. GALLEGOS:  Thank you,
16    Mr. President.
17                 SEN. DUNCAN:  Thank you, Senator.
18                 SEN. WEST:  To make sure the record is
19    clear --
20                 SEN. DUNCAN:  Sen. West.
21                 SEN. WEST:  Parliamentary inquiry.
22    Sen. Gallegos, as well as some other members of the
23    Senate, filed a motion to tag for further
24    consideration of Senate Bill 362.  Your ruling would
25    be the same as it relates to that motion, to tag also?
```

43

```
 1   There were two motions to tag filed.
 2               SEN. DUNCAN:  Senator, the
 3   interpretation and the basis for the overruling of
 4   Sen. Gallegos' motion and your motion and a motion
 5   with regard to the tag rule would be that the rules do
 6   not apply -- are not applicable, and I've made that
 7   ruling.  And that would be -- the ruling would be
 8   consistent with the earlier ruling I made on your
 9   motion.
10               SEN. WEST:  Okay.  And I just wanted to
11   make certain that we're basically dealing with all the
12   tagged motions that were up there.  So tagged rules
13   don't apply to a committee whole either when we're
14   taking up substantive legislation?  And that's, in
15   essence, the ruling?
16               SEN. DUNCAN:  Senator, for the reasons
17   that we explained earlier and I think for the reasons
18   that were abated by the Senate and prevailed in the
19   appeal, that the tag would not apply, the tag rule
20   would not apply to the Committee of the Whole.
21               SEN. WEST:  Thank you.
22               SEN. DUNCAN:  Sen. Fraser, you are once
23   again recognized.  You have the floor with regard to
24   laying out Senate Bill 362.
25
```

## LAYING OUT OF SENATE BILL 362

1

2          SEN. FRASER:  Thank you, members.  The

3   three-minute rule is in effect.

4          I've been sitting here for four hours

5   waiting to lay this out.  And, actually, we have a lot

6   of discussion about how I should lay this out,

7   discussion on it.  And I think the bill speaks for

8   itself.  And I am going to be very brief, probably

9   three or four minutes, and allow the witnesses to move

10  forward, because I think we've wasted enough of the

11  public's time and that we should move forward with

12  hearing from the witnesses.

13          Members, this bill, I think probably

14  most of you are going to be very familiar with it.

15  It's something we've talked about a lot.  Someone back

16  a while ago when we were having lunch asked me the

17  question, said, "How did the talk about this bill get

18  started"?

19          And I actually came back and sat down,

20  and I've got probably, interestingly, more research

21  and more reading and debate on this bill maybe than

22  one I've ever done, because I'm very interested in the

23  concept.  But I think probably if you track it back in

24  our nation's history, is that we look at the ongoing

25  threat of voter fraud that this country has addressed

45

1   really since the start, it goes all the way back.

2              And we've got many places where we look.

3   One of them would be Tammany Hall, possibly the Kansas

4   City Pendergast machine.  Here in Texas, we probably

5   should look no further to the 1948 Senate race when

6   the Duke of Duval delivered 201 of the 203 registered

7   voters in Box 13 in Jim Wells County in the race

8   between LBJ and Coke Stevenson.  Maybe we refer back

9   to Mayor Richard Daley's Chicago machine in the 1960

10  presidential election where it was alleged that at

11  least one in every 10 votes potentially was a

12  fraudulent or illegal vote, and including multiple

13  votes by the dead that continues throughout our Texas

14  history, even looking at the activity over the

15  indictments and the convictions over the last several

16  years, clarifying that voter fraud not only is alive

17  and well in the United States, it's very alive and

18  well in Texas.

19              And I think that brings us forward to

20  why we're here today.  I believe the danger of the

21  voter fraud has threatened the integrity of the entire

22  electoral process for the entire history of the United

23  States.

24              In 2005, I think a lot of you are

25  familiar with the fact that the Federal Election

1    Commission asked a bipartisan commission, and they

2    went out and they tried to get someone to head that up

3    from what I'll call the left, the former President of

4    the United States, Jimmy Carter, a Democrat president

5    that had been the governor of a state, Georgia, that

6    was a Section 5 Voter Rights Act state.  They asked

7    him to be one of the co-chairs of a bipartisan

8    commission.  Secretary of State James Baker was the

9    other side.  That Commission was put in place to look

10   at voter fraud in the United States and come back with

11   a recommendation of how we address that.

12            That commission in, you know, their

13   reaffirming the danger said, "The elections are at the

14   heart of democracy.  Americans are losing confidence

15   in the fairness of elections.  And while we do not

16   have a crisis today, we need to address the problems

17   of our electoral system."

18            During that same time, the Supreme Court

19   made a ruling in Purcell and Gonzalez stating the

20   "Confidence in the integrity of our electoral

21   processes is essential to the functioning of our

22   participatory democracy.  Voter fraud drives honest

23   citizens out of the democratic process and breeds

24   distrust of our government.  Voters who fear" -- and I

25   emphasize the word "fear" -- "Voters who fear their

47

1   legitimate votes will be outweighed by fraudulent ones
2   will feel disenfranchised.  '[T]he right of suffrage
3   can be denied by a debasement or dilution of the
4   weight of a citizen's vote just as effectively as by
5   wholly prohibiting the free exercise of the
6   franchise.'"
7           It hit very close to home in 2003 when
8   we had a member of our body that I served with.  My
9   chairman when I was in the House of Representatives,
10  Steve Wolens, a Democratic House of Representative
11  member and a chairman from the Dallas area, in 2003,
12  he laid out a bill and made a passionate plea to the
13  Legislature because he believed that through voter
14  fraud, that there had been an effort not only for him
15  but also his wife that was the mayor of Dallas.
16          And he says in the bill that he laid out
17  in his appeal, "Rigged elections in Dallas with people
18  harvesting votes have destroyed our" -- he said, "The
19  ability to cast a vote and have our vote counted is
20  the bedrock of our democracy.  We must do everything
21  possible to ensure the sanctity of the vote in our
22  state.  And as a society, we must not tolerate the
23  disenfranchisement of our citizens any longer in
24  accusing a group in a Democratic primary of rigging
25  the election and harvesting votes."

48

```
 1              That same Baker Commission, the Carter-
 2    Baker Commission, in an editorial that President
 3    Carter and Baker co-wrote, said, "At the end of the
 4    day, there is considerable national evidence of
 5    in-person voter fraud.  And regardless of whether one
 6    believed that voter impersonation is widespread or
 7    relatively rare, there can be no serious dispute that
 8    it is a real effect that can be substantial, because
 9    in a close election, even a small amount of fraud
10    could make the margin of difference."
11              In 2005 that bipartisan commission that
12    was created by the election reform, recommended that a
13    fair, a free and fair election requires both ballot
14    security and access to voting.  "We as a commission
15    have offered to bridge" or "a proposal to bridge the
16    partisan divide by suggesting a uniform voter ID."
17              That recommendation came from a former
18    President of the United States, had been put on a
19    commission by the Federal Election Commission.  The
20    recommendation came because of a concern about voter
21    fraud.  And he recommended in 2005 that we develop a
22    program for a uniform voter photo ID.  The bill that I
23    lay out today is in response to that.
24              Senate Bill 362 is really pretty
25    straightforward.  It's nothing more than when I walk
```

1    in to vote and I lay out my voter registration, that

2    that person across from me can recognize that I am who

3    I represent to be, that I am that person on the roll.

4    And I feel I have an obligation to represent that I am

5    a legal living person that has the right to vote and I

6    am that person on that roll.

7              Under Texas law today, we do not have

8    that ability.  We're going to have witnesses come

9    forward today, and they're going to tell you about

10   cases.  I have questions that I'm going to ask, and

11   one of the ones is going to be to the Secretary of

12   State.  We're going to ask about if, when we go into a

13   voting booth, if someone could impersonate me and

14   steal my vote and what they could do about it.

15             And I think a lot of you are going to be

16   shocked at what our current law in Texas is today.

17   Without a doubt, there is the ability in Texas from a

18   lot of different directions or a different way for

19   someone to steal your identity, your right by your

20   voter registration and can vote, identify themselves

21   as you.

22             The Baker Commission -- and I'm sorry.

23   Let me back up a second and say one of the other

24   things that you're going to hear today is that we have

25   representatives from Indiana and Georgia.  After the

56

1    Baker Commission recommended that the photo ID be

2    implemented, one of the first states to do a strict

3    photo ID was the State of Indiana.  Theirs is very

4    straightforward.  It says that the citizens, when they

5    vote, will show a photo ID.  If someone doesn't have a

6    photo ID, the state will pay for it.

7              That law that was put in place actually

8    was in place during the 2006 election, and then again

9    in the 2008 election.  It has withstood the challenges

10   through the court system.  And this last year, the

11   U.S. Supreme Court confirmed a decision on the Indiana

12   bill in a majority opinion that was giver by John Paul

13   Stevens, which is generally considered a moderate to

14   left-leaning justice.  He issued the majority opinion,

15   and the opinion was six to three confirming the voter

16   ID bill for Indiana.

17             Since then, there have been two election

18   cycles.  I'm not going to go into the results of that,

19   because we have someone from Indiana that is going to

20   testify to that.  But I think it's going to clearly

21   show that instead of somehow discouraging someone to

22   vote, it did just the opposite, that the vote total --

23   in fact, I'm going to go ahead you give you those,

24   because I think they're very important.

25             In Indiana over the last two election

57

1    cycles, Indiana had the fifth largest increase of

2    voter increase in the United States in the 2008

3    election.  In the Democratic votes that were cast,

4    they were No. 1 in the nation.  They were the largest

5    increase of Democrat votes in the nation, even though

6    next door in Illinois, where the presidential

7    candidate was from, had no photo ID registration.

8    Indiana had a strict photo ID registration.  Indiana

9    doubled the increase of Illinois.  It clearly showed

10   that there was not a suppression there.

11            Georgia, a Section 5 voter rights state,

12   they also implemented a strict voter photo ID bill.

13   This last election cycle, Georgia was the largest

14   increase in vote totals in the nation.  Of all the

15   states, of the other states that did not have it,

16   Georgia, after they implemented their photo ID

17   legislation, had the largest increase in vote totals

18   in the nation.  And we have people from Georgia here.

19            I think probably a brief description of

20   my bill, and we'll get into that.  And if someone has

21   questions about 362 and what my bill does, but it's

22   really pretty straightforward.  It just says that when

23   someone goes in to vote, they have not only the choice

24   of showing their photo ID, driver's license, but we're

25   also giving them secondary choices, and those

52

1  secondary choices are a lot of secondary choices.

2             They could show their library card.

3  They could show any government piece of mail that was

4  mailed to them.  Basically anything that would show

5  their identification as a secondary source of

6  identification is going to be allowed under my bill.

7  And when we start discussing that, I'll be glad to go

8  over the list that is listed of things.  But in Texas,

9  the bill that we are laying out actually has a

10 secondary choice.  Then if someone doesn't have a

11 photo ID, there is a secondary choice to identify

12 themselves.

13            I should also clarify that we are only

14 addressing the in-person voting; we are not addressing

15 mail-in ballots, early voting, any of the other things

16 in the election cycle.

17            I think I'm going to go ahead and close

18 so we can start either the questions and/or bring in

19 the witnesses.  But I think it's important to note

20 that in upholding Indiana's photo ID law, in the

21 decision that was given by John Paul Stevens in his

22 majority opinion, he stated, "Confidence in the

23 integrity of our election process is essential to the

24 functioning of our participatory democracy.  Voter

25 fraud drives honest citizens out of the democratic

53

```
1    process and breeds distrust of our government.  Voters

2    who fear their legitimate votes will be outweighed by

3    fraudulent ones will feel disenfranchised."

4              We believe Senate Bill 362 goes a long

5    ways for correcting that concern.

6                    QUESTIONS FROM SENATE FLOOR

7              SEN. DUNCAN:  Thank you.

8              Sen. Lucio of Cameron.

9              SEN. LUCIO:  Thank you, Mr. President.

10             For a question.

11             SEN. DUNCAN:  Sen. Lucio.

12             SEN. LUCIO:  The request was made

13   earlier today to see if we could have the Attorney

14   General here to answer any legal questions we might

15   have on this legislation.  As I look around the

16   chamber, I don't see the Secretary of State, my good

17   friend Hope Andrade who I can -- well, who is the

18   Chief Elections Officer of the state, as you well

19   know.  And I'm wondering if she will be present maybe

20   to respond to any questions that the members might

21   have, or the Department of Public Safety or any other

22   agency that might come into play with this piece of

23   legislation.  Will that be the case?

24             SEN. FRASER:  I'll address the first

25   question first.  The Secretary of State, I share your
```

54

```
 1    interest in that.  And, actually, when that person
 2    comes up, I have a lot of questions that I would like
 3    to ask also.  Unfortunately, the Secretary of State,
 4    Hope Andrade, is on an airplane as we speak, out of
 5    the country.  But the No. 2, the Assistant Secretary
 6    is here.  Coby Shorter is over on the side right now
 7    and will be available for any questions that would
 8    come up.
 9                Actually, that is one of my invited
10    persons for questions.  I have him scheduled in the
11    mix.  But I think any member that has a question of
12    the Secretary of State's office would be free at any
13    time for a resource.
14                The DPS, I have not personally asked
15    them to be here to testify, but I believe probably
16    they're monitoring this as we speak.  And I would
17    suspect if we wanted somebody from the DPS to answer
18    questions about motor voter or any of those issue, I
19    feel sure that we could get them over.  I have not
20    invited them.
21                SEN. LUCIO:  Thank you.
22                Mr. Chairman, you also mentioned that
23    voter ID proposal for bipartisan and serve the public
24    interest by protecting the integrity of the ballot,
25    and you also mentioned the Commission on Federal
```

```
 1    Election reform that was co-chaired by former

 2    President Jimmy Carter and former Secretary of State

 3    Jim Baker supported laws that required voters to show

 4    a voter ID before voting.

 5              I just want to ask you that, that in the

 6    days after the release of the commission's report, I'm

 7    informed that President Carter and former Secretary

 8    Baker stated in an op ed in the New York times that

 9    their intent had been misconstrued and clarified that

10    until we have universal registration, we cannot make

11    having such an ID be a condition of voting.  Are you

12    aware of that op ed?

13              SEN. FRASER:  Tell me, where was that?

14              SEN. LUCIO:  That op ed?

15              SEN. FRASER:  What was the date on that?

16    Tell me the date on that, please.

17              SEN. LUCIO:  The source is Jimmy Carter

18    and James Baker III, "Voting Reform Is in the Cards,"

19    The New York Times, September 23rd -- September 23,

20    2005.

21              SEN. FRASER:  And I guess I would

22    defer -- I obviously can't get in the minds -- and, by

23    the way, we do have someone from that commission here

24    that we can question, will be the second person that I

25    will call up.  And so you'll have the right to ask
```

56

1    them, because they're from that commission.

2              All I can go by is a newer -- you know,

3    everyone has a right to, you know, their developing

4    thoughts.  But the newest thing I have on record was

5    February 3, 2008.  It was an op ed contribution, "A

6    Clearer Picture on Voter ID" by Jimmy Carter and James

7    A. Baker III, which I'm assuming -- February 3, 2008

8    is after September 23, 2005.  So this would be their

9    more current thoughts.

10             And in that current editorial that I

11   have here in my hand, it said, "In 2005, we led a

12   bipartisan Commission . . ."  And I'm not going to

13   read the whole thing, but it says:  "We bridged a

14   partisan divide by suggesting a uniform voter photo

15   ID."  And this is February 8 (sic), 2008.

16             SEN. LUCIO:  2008?

17             SEN. FRASER:  2008.  Yours is 2005.  So

18   I don't know what to say, other than my story is three

19   years newer than yours.

20             SEN. LUCIO:  Well, I guess they changed

21   their minds after two thousand --

22             SEN. FRASER:  Everybody gets to change

23   their mind.  All I know is that this is the most

24   current thing that I have on file.  But that was a op

25   ed contribution to the New York Times February 3,

KENNEDY REPORTING SERVICE, INC.
512.474.2233

57

```
1    2008, you know.  I'm --
2                   SEN. LUCIO:  Thank you very much,
3    Senator.
4                   SEN. FRASER:  Thank you.
5                   SEN. WATSON:  Mr. President?
6                   SEN. DUNCAN:  Sen. Watson of Travis.
7                   SEN. WATSON:  Thank you, Mr. Chairman.
8    I just want to ask a couple of question.
9                   And first, let me say that I think you
10   and I probably agree that there is not a senator in
11   this room that doesn't want to protect the sanctity of
12   the ballot box, regardless of how they might feel
13   about 362.
14                  SEN. FRASER:  I would share we, without
15   a doubt -- we've had this conversation -- is that I
16   think we both have the same intent, is that neither
17   one of us want voter fraud and we would do anything we
18   could to stop voter fraud in Texas.  And I think
19   that's --
20                  SEN. WATSON:  Nobody wants --
21                  SEN. FRASER:  I think we agree with
22   that.
23                  SEN. WATSON:  Nobody wants voter fraud.
24   And there may be some disagreements about how we go
25   about that.  Let me ask a couple of questions about
```

58

```
 1    the bill.  And first let me mention something about

 2    the Carter-Baker Commission.  I'm not sure there was a

 3    change in opinion.  But what they said in that

 4    February 2008 is, they were looking for a universal

 5    voter identification.  Is that correct?

 6                   SEN. FRASER:  I believe the term was

 7    "uniform" --

 8                   SEN. WATSON:  Uniform.

 9                   SEN. FRASER:  -- "voter ID."  And,

10    actually, what they suggested --

11                   SEN. WATSON:  Was REAL ID.

12                   SEN. FRASER:  -- is that the federal

13    government would issue a photo ID to every person in

14    the United States.

15                   SEN. WATSON:  And what they've actually

16    indicated is that in order to be in favor of a uniform

17    voter ID, they believe that what needs to happen is,

18    the government would be in a position to give everyone

19    an identification so that you wouldn't run into

20    situations where there might be discrimination.  Is

21    that correct?

22                   Well, for example, they're affirmatively

23    said --

24                   SEN. FRASER:  They have affirmatively

25    said that somebody should pay for it, the federal
```

TX_00003925

59

1   government or the states, but they would issue a photo

2   ID.

3                    SEN. WATSON:   So that everybody would

4   have a uniform identification?

5                    SEN. FRASER:   Exactly what I'm laying

6   out in this bill.

7                    SEN. WATSON:   And I don't disagree.

8                    SEN. FRASER:   I --

9                    SEN. DUNCAN:   Senators, senators --

10                   SEN. FRASER:   I can answer you.   Just a

11  second.

12                   SEN. DUNCAN:   May I interrupt?

13                   SEN. FRASER:   Sure.

14                   SEN. DUNCAN:   You've got a court --

15                   SEN. WATSON:   Well, we're both

16  interrupting.   Why don't you?

17                   SEN. DUNCAN:   Well, no.   I'm just trying

18  to help you out.   The court reporter can only type

19  down one person talking at a time, and so you have a

20  tendency --

21                   SEN. WATSON:   Fair enough.

22                   SEN. DUNCAN:   -- to talk over each

23  other.   So if you could observe that rule, it will

24  help the record.

25                   SEN. WATSON:   And we do that even in

60

1    private conversations, I might add.

2                SEN. FRASER:  Unfortunately, we are on

3    the committee together, and this is a common

4    occurrence, so we will have to try to control

5    ourselves.

6                SEN. WATSON:  I think you were the last

7    one talking.

8                SEN. FRASER:  The final statement, 1

9    think they say -- let me read this.  Actually, it's

10   interesting that the last -- this was in -- they were

11   writing this in response, urging the Supreme Court to

12   validate the Indiana law.  And it says that -- they

13   are suggesting that states should move to implement

14   photo IDs gradually, that a free ID should be

15   available.  But they're also saying that the Supreme

16   Court can lead the way on the voter ID issue by

17   validating the Indiana ruling, which is the photo ID.

18                And, again, it's the thing I just read.

19   It will move ".  .  . our national leaders and the

20   entire country to bridge the partisan divide on a

21   matter that is important to our democracy."  The

22   Supreme Court should ".  .  . support voter ID laws that

23   make it easy to vote but tough to cheat," from their

24   editorial.

25                SEN. WATSON:  And they had indicated --

61

1    I'm sure we'll hear some other testimony about this.

2    But the Carter-Baker Commission had indicated that

3    they believed the way Georgia had set theirs up was

4    discriminatory in part because the government wasn't,

5    as you just indicated, making it easy for people to

6    be -- all people to be able to get a uniform

7    identification.

8              SEN. FRASER:  They want it to be easy

9    to -- their suggestion was have a photo ID, have

10   someone pay for it, make it easy for them to get it.

11   But they say, "Here is what we want to do.  We want a

12   voter ID law that makes it easy to vote but tough to

13   cheat."

14             SEN. WATSON:  Well, let's talk about

15   what the current situation is so that we can be clear

16   on what it is that we would be doing if Senate Bill

17   362 were to pass.  Currently we have a form of voter

18   identification in Texas.  And what it is, is we have

19   an identifying document that we call a voter

20   registration certificate.  Isn't that right?  The

21   state provides a voter registration certificate to

22   those who register to vote?

23             SEN. FRASER:  The answer to that

24   probably is "Yes" and "No," is that the way we

25   currently identify ourself when we go in is a voter

62

```
1    registration certificate.  The problem with current

2    law is, there is no way that that person that is

3    behind the voting booth knows, "Are you really that

4    person?" because -- hold on a second -- you know,

5    there is nothing to say that I couldn't pick up my

6    brother Steve's voter ID and walk in and lay it on the

7    table and the -- we're going to ask the Secretary of

8    State this -- but I think the procedure in law says

9    identify:

10                   Are you on the list?  Yes.

11                   Is this your correct address?  Yes.

12                   Are you in this precinct?  Yes.

13                   Here is your ballot -- even though I'm

14   voting with my brother's card.

15                   SEN. WATSON:  I ought to give you a flag

16   so I know when you're done.  But, Senator, the point

17   is, I want to try to set what the benchmark is for

18   what is required now when someone goes in to vote.

19   And when someone goes in to vote right now, as you

20   just indicated, all they have to do is show that

21   certificate.  The election officer sees their name and

22   sees that their name is on a list of registered

23   voters, and then they're able to vote.  Is that

24   correct?

25                   SEN. FRASER:  Well, let me ask you --
```

63

```
 1    the Secretary of State will clarify this.  But if
 2    you're look in Section -- is 63.001?
 3                    SEN. WATSON:  It is.
 4                    SEN. FRASER:  -- of the election -- and
 5    if you've got it in front of you, you can read along.
 6    It says bring your card, registration card, hand it to
 7    them.  They verify:  Is the name on the card on the
 8    list?  Is Kirk Watson on the card?  Are they also
 9    listed as registered?  Yes, it is.  They say,
10                    "Is this your current address?"
11                    "Yes, it is."
12                    "This is the proper precinct you're
13    going to be voting in?"
14                    "Yes, it is."
15                    "Here is your ID (sic)."
16                    SEN. WATSON:  And then you get to vote.
17                    SEN. FRASER:  I mean, "Here is your" --
18    can I keep going, though?  The interesting thing on
19    this, though, is, Senator, that -- let me give you a
20    hypothetical -- and we'll ask the Secretary of State
21    to verify this -- is that let's assume that they
22    mailed you your voter registration to your mailbox,
23    but your next door neighbor saw them dropping it off
24    and he walked over and picked it up out of box.  And
25    he beat you to the polling place.  And he walked in
```

64

1    where someone didn't know who Kirk Watson was and he

2    laid it on the table, and he said, "I'm Kirk Watson,"

3    and they went through all those scenarios, that person

4    would be given a ballot and would vote for you, that

5    put it in the pile.  And they would walk out the door,

6    and that vote would count in the selection.  Now,

7    we'll verify with the Secretary of State that that's

8    correct, but I believe that's the way it happens right

9    now.

10            SEN. WATSON:  And that really wasn't my

11    questions.  So let me ask my --

12            SEN. FRASER:  I'm practiced with a

13    lawyer where you don't answer the question that was

14    asked.

15            SEN. WATSON:  I notice you've been

16    trying to do that.  Let's just walk through what the

17    process is and the change in the law.  Currently all

18    that is required is to show the certificate, walk

19    through the way you just did, and then you can vote.

20    Senate Bill 362 changes that.

21            And it says that while you would still

22    submit the voter registration certificate and that

23    part is the same, it then adds the requirement that in

24    addition to the current standard practice or procedure

25    of presenting that voter registration certificate, you

1    must also submit either a picture identification or

2    two types of other identification that's listed in

3    Senate Bill 362.

4              SEN. FRASER:  Senator, I guess I would

5    ask you -- I'm assuming -- you travel a lot.  You've

6    flown since 911?

7              SEN. WATSON:  I'm not sure how that is

8    answering my question.  Is that what your bill does or

9    doesn't do?

10             SEN. FRASER:  I'm saying that this is

11   going to be a whole lot like -- even if you were

12   getting a library card, they're going to say, "We need

13   a form of photo identification, and they're going to

14   do -- like they do at the airport, they're going to

15   look at the card, they're going to look at you,

16   they're going to look back at the card and say, "Yes,

17   you are the person that you are pretending," or "you

18   say you are.  You" -- Kirk Watson is the person on the

19   photo; kirk Watson is the person on the registration

20   files.  And the answer is yes, that would be the way

21   this would work.

22             SEN. WATSON:  So the answer is yes, that

23   there is an additional requirement so that people who

24   could vote under the current voting standard practice

25   and procedure will be precluded from voting if they

1    don't meet these new requirements.  Is that correct?

2                SEN. FRASER:  I'm sorry.  I was talking

3    to staff.  Ask that again, please.

4                SEN. WATSON:  People who could vote

5    under the current voting standard practice and

6    procedure will be precluded from voting, if Senate

7    Bill 362 passes, if they don't meet those new

8    requirements?

9                SEN. FRASER:  No one is going to be

10   precluded from voting.  Everyone that walks in --

11   under 362, every person that walks in to vote will be

12   allowed to vote.

13               SEN. WATSON:  If they meet the new

14   requirements?

15               SEN. FRASER:  Every person that --

16               SEN. WATSON:  That's provisional

17   balloting.

18               SEN. FRASER:  -- walks in --

19               SEN. WATSON:  Is that what you're

20   talking about?

21               SEN. FRASER:  Every person that walks

22   into the registration to vote can vote.  No one will

23   leave the voting place without being able to vote.

24               SEN. WATSON:  Let me ask my question

25   differently.  If they don't -- if someone walks in

1    today, under 362 -- let's say 362 passes -- and they

2    don't have the new requirements that are set forth in

3    362, they will not be able to vote a regular ballot

4    the same way people today, with just a voter

5    registration certificate, are allowed to vote a

6    regular ballot?

7            SEN. FRASER:  Okay.  If someone walks in

8    and -- I think right now the data is showing the last

9    year of the people that signed up, 98.5 percent of the

10   people that registered to vote had a driver's license

11   and they registered that way.  So if they didn't have

12   that, if they're one of that one or two percent that

13   did not have a driver's license, they have a long

14   laundry list of things that they could use to identify

15   themselves to show that they are, in fact, who they

16   say they are.  If for some reason they didn't have any

17   of that, they will be given a ballot.  The ballot will

18   be marked a provisional ballot, and then we will have

19   the ability then to identify:  Are they who they say

20   they are?  So the answer is no, they're not going to

21   leave without being able to vote.

22           SEN. WATSON:  And maybe I didn't ask my

23   question well and so you didn't understand it.  My

24   question is, under 362, if they don't meet the new

25   requirements, there will be people that otherwise

1    today would be able to vote by just showing a voter

2    registration certificate that will not be able to vote

3    a regular ballot.  Is that correct?

4              SEN. FRASER:  Everyone leaving the

5    polling place will be able to vote.

6              SEN. WATSON:  But it may be a

7    provisional ballot.  Is that right?

8              SEN. FRASER:  Provisional ballot,

9    though, once they verify their identification and they

10   show that they are who they say they are, the vote

11   counts.  So the answer is, everyone that leaves will

12   be able to vote.

13             SEN. WATSON:  Let me ask you a question

14   about the statistics you just mentioned.  Do you have

15   any data regarding the racial composition of those

16   people who are currently in Texas that are without a

17   driver's license or other photo ID?

18             SEN. FRASER:  Unfortunately, no, that

19   data is not, I don't think, readily available.  If it

20   is, no one has given it to me.  All I can go by is the

21   number -- they gave me the raw numbers of who had a

22   photo ID that was registered in, you know, the last

23   year.  2006 is the latest number.  And of those, you

24   know, you had 1.5 percent of the population that

25   registered to vote that it appeared didn't have or

1    didn't offer their driver's license up as a deal.  So

2    it's a very small segment, and I don't believe they

3    broke down the racial composition of that.

4                    SEN. WATSON:  Where did that data come

5    from?

6                    SEN. FRASER:  DPS, motor voter.

7                    SEN. WATSON:  DPS.  And how many people

8    would that be?

9                    SEN. FRASER:  I may need to correct

10   that.  I stand corrected.  That came from the

11   Secretary of State's office.  It was the total number

12   of people registered with a Texas driver's license.

13   I'm sorry.  I stand corrected.

14                    SEN. WATSON:  Let me make sure I

15   understand the number that you're indicating.  What

16   you're indicating is that of the total population

17   that's registered to vote, the Secretary of State's

18   office is providing data that says 98.5 percent of

19   those have a driver's license?

20                    SEN. FRASER:  I don't think I said that.

21                    SEN. WATSON:  Okay.  Well, that's what

22   I'm trying to find out.  I want to be clear what you

23   said.

24                    SEN. FRASER:  Okay.  Well, let's do it

25   again.  Last year, in 2006, the number of people that

TX_00003936

70

1    registered to vote in 2006, that registered to vote

2    that year, of those totals, there were 2,419,188 that

3    registered with a driver's license.  There were 37,490

4    that didn't use their driver's license to register.

5                    SEN. WATSON:  So that would not --

6                    SEN. FRASER:  So that --

7                    SEN. WATSON:  That wouldn't be taking

8    into account any long-time voters who might no longer

9    have driver's licenses or have allowed their driver's

10   license to be expired for more than two years or that

11   nature.  Is that correct?

12                    SEN. FRASER:  I actually have that data,

13   too.

14                    SEN. WATSON:  Good.  Why don't you give

15   that to me.

16                    SEN. FRASER:  Total number of people on

17   their staff -- now, have to keep in mind that some of

18   these people that have been on the rolls for 30, 40,

19   50, 60 years, some of this has changed.  And so some

20   of them that signed up, once they were okayed and

21   identified, they stayed on the roll and they didn't

22   have to add it.

23                    My mother would be a good example, but

24   she didn't get her driver's license until well into

25   her married life.  On her registration form, she is

TX_00003937

71

```
 1    not registered as showing to have a photo ID; but, in

 2    fact, I do know that she has one.  The ones in the

 3    records that show that, they show that there were

 4    5,601,000 that have a license.  The ones that neither

 5    numbers show up, either social security number or

 6    voter ID, 809,000.  So in their records, it's about

 7    88 percent of the people, in their records, give the

 8    driver's license as their identification source.

 9    There's 12 percent they don't know about.  But in

10    that, the assumption is, a great many of those now

11    have a photo ID, people like my mother.

12                    SEN. WATSON:  But we don't know what

13    that number is?

14                    SEN. FRASER:  We don't know for sure.

15                    SEN. WATSON:  And how many people are we

16    talking about when we talk about 12 percent?

17                    SEN. FRASER:  Well, in the records, they

18    have 809,041 that they don't have in their records a

19    number registered, but they also readily will admit

20    that those records are very outdated because what

21    happens when someone is registered, as soon as they're

22    approved as a registered voter, they don't ever have

23    do go through this again.  So --

24                    SEN. WATSON:  Right.

25                    SEN. FRASER:  You can't automatically
```

```
 1   make the assumption that there's 809,000 people that
 2   don't have it.  I think the belief -- probably one of
 3   the things that we may be having a lot of these
 4   questions you're asking that could be answered by
 5   other states.  Georgia has a very close makeup of the
 6   way our population is made up.  Indiana is a little
 7   different.  But in those cases -- I think the
 8   registrar of both of those states are going to be
 9   here, and they're going to tell you they went through
10   the cycle and identified the ones that didn't have it.
11   And I believe they're going to tell you they were
12   shocked at how few people didn't have a photo ID.
13               SEN. WATSON:  Well, one of the things
14   that I think we need to be concerned about before we
15   vote on this floor is whether or not, when the changes
16   that you propose get made, whether or not that's going
17   to have a negative impact on certain populations.  And
18   the 12 percent that you're talking about there, the
19   800,000 to a --
20               SEN. FRASER:  The unknown category.
21               SEN. WATSON:  The 800,000 to a million
22   people, do we know what the racial breakdown is of
23   that?  Do you know how many African-Americans, how
24   many Hispanics, those that speak only Spanish?
25               SEN. FRASER:  I'm not advised, because I
```

73

1    don't -- at least I don't remember on the -- I can't

2    remember on either the driver's license and/or the

3    voter that it had a place in there to click, you know,

4    Anglos.

5                SEN. WATSON:   Are you familiar,

6    Senator, with any statistical analysis that's been

7    done regarding the potential effect of Senate Bill

8    362's new requirements on African-Americans?

9                SEN. FRASER:   A lot of what I'm at least

10   observing, you will hear today from Indiana and

11   Georgia, two states that implemented it.  And they're

12   going to talk about the people that voted in the

13   racial breakdown before they implemented it and after

14   they implemented it and what happened in --

15               SEN. WATSON:   Again, I would --

16               SEN. FRASER:   So I think -- what I'm

17   hoping to do is have facts speak for themselves.

18               SEN. WATSON:   Well, and I'm looking

19   forward to that.  I'm saying you, though, with regard

20   to your bill, Senate Bill 362, are you familiar with

21   any data or study that's been done with regard to some

22   sort of statistical analysis concerning the effect of

23   the new requirements of Senate Bill 362 on -- and I'll

24   just mention a couple of populations -- African-

25   American population, Hispanic, people making less than

74

```
 1   $35,000 a year, people who speak only Spanish, any
 2   statistical analysis of the effect of these new
 3   requirements on those people?
 4              SEN. FRASER:  Well, I guess the
 5   assumption would be, the people in Texas, even though
 6   we're independent, we're also a whole lot like the
 7   people in the rest the nation.  Those statistics are
 8   available nationwide, because we already have this
 9   being implemented other places.  We're going to have
10   witnesses that are going to testify to that.  And I
11   think you're asking a subjective question that we have
12   objective data that is available that the witnesses
13   are going to lay out.  You're asking have I done that?
14   The answer is no, but I am pulling data from the
15   academics that have done that and have delivered back.
16              SEN. WATSON:  As it applies to Texas?
17              SEN. FRASER:  Well, you assume it would
18   apply to Texas, if they're citizens of the United
19   States.  And, you know, I don't know why it wouldn't
20   apply.
21              SEN. WATSON:  Well, so that I'm clear,
22   what we can expect to hear is data related to states
23   other than Texas.  But you're not familiar with any
24   statistical analysis that's been done regarding the
25   impacts or effects of the new requirements of Senate
```

TX_00003941

75

1   Bill 362 on minority populations in the State of

2   Texas?

3                SEN. FRASER:  Actually, Senator, you're

4   going to hear some testimony from some people from the

5   major cities in Texas and things that have happened

6   and what, you know, possibly they believe.  But I

7   don't know that I can answer your question.

8                SEN. WATSON:  All right.  Fair enough.

9   Let me ask a quick question about funding under this.

10  Can you point me in this bill, Senate Bill 362, where

11  there is any provision to educate voters about this

12  change requirement for more identification?

13               SEN. FRASER:  Do you see the section

14  that says "Education" --

15               SEN. WATSON:  Yes, I do.

16               SEN. FRASER:  -- "Voted Education"?

17               SEN. WATSON:  And tell me -- what that

18  says is that the Secretary of State and voter

19  registrars are going to put it on their website.  Is

20  that correct?

21               SEN. FRASER:  Yes.

22               SEN. WATSON:  Is that the only education

23  that's identified in this bill?

24               SEN. FRASER:  We are anticipating a --

25  you know, we're going to have to educate not only the

1    registrars, the poll workers, we're going to have

2    posting outside of the voting place of the

3    requirements of this.  I would assume one of the

4    things that you're going to ask is, in Ohio and

5    Georgia, both that they had mailers to the voters

6    talking about these changes.  Obviously, the specifics

7    of that are not included in this bill.  But as a

8    member of the Senate and assuming this bill passes,

9    that I think I am assuming everyone in this body would

10   be sympathetic, that we should include some funding to

11   make sure that voters are educated.

12            SEN. WATSON:  So you anticipate that

13   there would be some fiscal note to this bill?

14            SEN. FRASER:  Well, no.  This bill only

15   has -- it has no fiscal implications.

16            SEN. WATSON:  And that's because there's

17   no money put into it for any of the things you just

18   talked about in terms of educating voters?

19            SEN. FRASER:  And again, if there was

20   education, obviously, the education, depending on how

21   much education it was, there could either be no fiscal

22   impact or it could be some.  Again, you're being

23   subjective.

24            SEN. WATSON:  All right.  I'm not sure

25   that's the case, but let me make sure I'm clear.

77

```
 1   Under the current bill, there's not any ability to
 2   educate the voters about these new requirements, other
 3   than that it would be posted on the Secretary of
 4   State's or a county voter registrar's website?
 5               SEN. FRASER:  We would -- actually --
 6   let me ask a question of staff.
 7               (Brief pause)
 8               I think the question you're asking is
 9   that every time a registration card is sent out, there
10   will be an explanation with that registration card,
11   which I'm assuming you're calling the education part
12   of that.  So the answer is yes, there will be an
13   education go out when the registration cards are- sent
14   out.  So a person's --
15               SEN. WATSON:  So if somebody registers
16   newly, they'll get that information?
17               SEN. FRASER:  I get a registration card
18   every two years.
19               SEN. WATSON:  So every time that -- what
20   you're suggesting is, that's going to be -- the
21   substance and sum of the education will be on new
22   registration cards?
23               SEN. FRASER:  And, quite frankly, you're
24   getting into an area of the technical part of the way
25   this would be administered by the election division.
```

1   In the bill we do specify that when a registration

2   card is sent out.  All I know is, I get one every two

3   years, I get a new registration card.  It couldn't be

4   real difficult in that to include an explanation of

5   this bill, what will be included, and make sure that

6   they understand that whenever they show up at the

7   polls, you need to do this.

8              So the answer of -- the language of the

9   bill says that is anticipated.  Now, the actual agency

10  itself that administers, the Secretary of State's

11  office, I think probably would be the one to answer

12  that question.

13             SEN. WATSON:  And we don't know -- you

14  don't know, as we stand here today, how much that

15  costs?

16             SEN. FRASER:  What it will cost?  Well,

17  right now we have given them funds to send out that

18  registration card.  And if all they're doing is

19  putting another piece of paper in that registration

20  card, I just can't imagine that they can't take care

21  of it out of their regular budget.

22             So I think where you're trying to go --

23  will there be an appropriation for that? -- I don't

24  anticipate that that's necessary.  But you're a member

25  of this body.  And if you want to recommend that,

 1     after this bill passes, that if you want to offer up

 2     to the Appropriation Committee and talk to Chairman

 3     Ogden, I think you have every right to do that.   I

 4     can't speak for the Secretary of State the way this

 5     will be administered.

 6                    SEN. WATSON:   Well, I'm just accustomed

 7     to when bills come into committee, we tend to know or

 8     are supposed to know what the fiscal note is at that

 9     time so that we don't vote on something, only to later

10     have a new fiscal note come in.

11                    SEN. FRASER:   Did you get a copy of the

12     fiscal note?

13                    SEN. WATSON:   Yes, and it said zero.

14                    SEN. FRASER:   There is your answer.

15                    SEN. WATSON:   Well, and what that means

16     is, there's going to be little education, and we'll

17     talk about -- Chairman Duncan has made a good point,

18     that the court reporter has now been going -- and

19     while you and I may be enjoying our repartee, she

20     probably needs a break.

21                    So with the Chair's permission and with

22     Sen. Fraser's permission, I'll be more than happy to

23     yield the floor for the time being so that we can take

24     a break for the court reporter.

25                    SEN. DUNCAN:   Thank you, Sen. Watson.

1    And, members, we'll stand at ease for 10 minutes.

2    We'll go back in at exactly 2:50.

3                    (Recess:  2:42 p.m. to 2:56 p.m.)

4                    SEN. DUNCAN:  The Committee of the Whole

5    will come back to order.

6                    Sen. Watson.

7                    SEN. WATSON:  Mr. Chairman, I'll yield

8    for other staff's questions, so we can move forward.

9                    SEN. DUNCAN:  All right.

10                   Sen. Shapleigh.

11                   SEN. SHAPLEIGH:  Thank you, Mr. Chair.

12                   If I may, some questions of the author.

13                   SEN. FRASER:  I would love to answer

14   questions.

15                   SEN. SHAPLEIGH:  Senator, you, in laying

16   out your basis for filing this bill, talked

17   extensively about the Carter and Baker Commission.  Do

18   you remember the year that commission -- when they

19   issued their report?

20                   SEN. FRASER:  Senator, there is a

21   reference in the forward to the report that I believe

22   says 2005.  And I'm assuming the Commission was formed

23   that year, and I'm assuming they also issued the

24   report.  But I'm also going to punt on that one,

25   because we have someone from the Carter-Baker

81

```
1    Commission that is here, that if we can get past these
2    questions and get to our witnesses, I've got people
3    that can answer that question a lot better.
4              SEN. SHAPLEIGH:  Okay.  You quoted from
5    their words in an op ed article.  And what I would
6    like to do is give you a copy of an op ed article that
7    they put in The New York Times one week after issuing
8    the report, so that we can talk about what their
9    intent or what they thought about this report.  You
10   have their -- what we just pulled off what Sen. McCain
11   would call the Google, an editorial from Jimmy Carter
12   and James Baker themselves dated September 23, 2005,
13   which was the week after they produced this report.
14   And I would like you to, if you would, see if I'm
15   reading this correctly.
16              "This week, we issued a report that
17   bridges the gap between the two parties' perspectives
18   and offers a comprehensive approach that can help end
19   the sterile debate between ballot access ballot
20   integrity.  Unfortunately, some have misrepresented
21   one of our 87 recommendations.  As a result, they have
22   deflected attention from the need for comprehensive
23   reform."
24              "Since we presented our work to the
25   president and Congress, some have overlooked almost
```

```
 1    all of the report to focus on a single proposal - a
 2    requirement that voters have driver's licenses or
 3    government-issued photo IDs.  Worse, they have
 4    unfairly described our recommendation.
 5                "Here's the problem we were addressing:
 6    24 states already require that voters prove their
 7    identity at the poll - some states request driver's
 8    licenses, others accept utility bills, affidavits or
 9    other documents - and 12 others are considering it.
10    This includes Georgia, which just started demanding
11    that voters have a state-issued photo ID, even though
12    obtaining one can be too costly or difficult for poor
13    Georgians.  We consider Georgia's law discriminatory."
14                Are these the same guys that issued the
15    report that you're relying on?
16                SEN. FRASER:  And I guess I would remind
17    you that the Georgia law, they're a Section 5 voter
18    rights state, and they were approved.  As of
19    February 8, 2008 of this year, I believe they were --
20    that final appeal was -- you know, they ruled with
21    Georgia.  And Georgia's act -- both was approved
22    through DOJ, approved through Section 5 and was
23    approved through the courts.
24                Again, I don't -- all the things that
25    you're asking, you address several different issues
```

83

1  that we have witnesses here that actually know the

2  details of this.  You're asking me, from 2005, to get

3  in either President Carter or James Baker or staff or

4  the other 21 members on the commission, what was in

5  their head then and what was in their head in 2008

6  when they released the article to The New York Times,

7  the guest editorial.  I think those would be better

8  answered by our witness that is here that is sitting

9  in the back waiting to testify.  We also have Indiana,

10  and we've got those Georgia people.  There's two from

11  Georgia that will tell you how this impacted their

12  voters, including minorities.

13            SEN. SHAPLEIGH:  Let's go if we can --

14  do you have the fiscal note on this bill, the one that

15  came with our packet?  I'm looking at the last

16  paragraph that describes the costs in this bill and

17  what the anticipated fiscal note might be.

18            SEN. FRASER:  I've got it.  What are you

19  referring to?

20            SEN. SHAPLEIGH:  Well, when you look at

21  the top, it says "No fiscal impact implication to the

22  state is anticipated."  Is that correct?

23            SEN. FRASER:  That is correct.

24            SEN. SHAPLEIGH:  And when we look at the

25  bottom, after it describes putting up a website which

1    would be part of the state's obligation, then at the

2    bottom it says, "Based on responses from a sampling of

3    election authorities and county clerks, fiscal impact

4    from implementing provisions of the bill would vary by

5    county.  Costs would include at a minimum those for

6    printing signs to post at each polling place, which

7    would not be significant.  Other potential costs would

8    be associated with additional training and posting

9    information to the county website.  Again, those costs

10   are not expected to be significant.  One smaller

11   county response anticipates that the new provisions

12   regarding casting a provisional ballot would require

13   hiring additional staff, resulting in a moderate to

14   significant cost."

15           Now, my question is, where is the

16   training going to be done?  Who will do the training

17   with respect to those that will administer and enforce

18   the rules that you propose to pass today?

19           SEN. FRASER:  And I will tell you again

20   that we have an expert resource witness that can

21   answer that question, that if we can get on with the

22   testimony, that the persons we have here I think are

23   prepared to answer that question.

24           SEN. SHAPLEIGH:  But as the author of

25   the bill -- and your intent is important in

1    establishing this -- in this fiscal note, there is no

2    money for training at the state level, that in this

3    fiscal note it's contemplated that locals in a broad

4    verify of the polling places around the state would be

5    responsible for the training under this bill.  Is that

6    correct?

7               SEN. FRASER:  My intent of this bill is

8    to establish a system of voter identification to try

9    to eliminate fraudulent voting and would be

10   implemented by the Secretary of State.  The fiscal

11   note to the bill is like we always do on every piece

12   of legislation.  It is sent back in.  And the fiscal

13   note, as delivered back to the members of the

14   Legislature, it says there is -- no significant fiscal

15   implication to the state is anticipated.

16              SEN. SHAPLEIGH:  Okay.  Well, let's get

17   down, if we may, to a "Yes" or "No" answer.  The

18   fiscal note on your bill says, "Each county clerk

19   would be required to provide a session of training

20   using the standards adopted by and the materials

21   developed by the Secretary of State as soon as

22   practicable as well."  Is that your intent under the

23   bill that you drafted?

24              SEN. FRASER:  I guess I would refer you

25   back to the bill itself.  We've got the training

1   section, the wording of the bill.  If you would

2   like -- I'll read it to you if you would like for me

3   to.  But the wording of the bill is the instruction to

4   the Secretary of the State and the counties.  And then

5   the Secretary of State would be -- I think it's their

6   job to implement.  But, again, the expert witness can

7   answer that.

8              SEN. SHAPLEIGH:  In your opening, in

9   talking about the need for this bill, you referred to

10  Cooke County, you referred to LBJ and Duval County.

11  Are you aware of and do you personally know Royal

12  Masset?

13             SEN. FRASER:  And I guess I would ask

14  what Royal Masset has to do with Cooke County?

15             SEN. SHAPLEIGH:  Well, nothing.  But

16  your examples came from other places to lay the basis

17  for the need for this bill.  And my question is, do

18  you know, were you aware that Royal Masset was the

19  political director of the Republican Party for 15

20  years?

21             SEN. FRASER:  Well, I guess the fact

22  that I recognize that his name is Royal "Ma-say"

23  rather than Royal "Mas-et" would give some indication

24  that I know Royal "Ma-say."

25             SEN. SHAPLEIGH:  So if Royal "Mas-et" in

1   something that was posted on line last time this bill

2   came up, who was the political director of the

3   Republican Party, if he were to say, "Anyone who says

4   all legal voters under this bill can vote," doesn't

5   know what he was talking about and, "Anyone who says

6   that a lack of IDs won't discriminate against

7   otherwise legal minority votes" is lying, do you have

8   any way -- do you have any way of determining why he

9   would say that?

10          SEN. FRASER:  I have no input.

11          SEN. SHAPLEIGH:  If Royal Masset were

12  quoted in this account as saying, "In my involvement

13  with over 5,000 Republican candidates, I have never

14  seen one case of Republicans committing voter fraud,"

15  do you have any idea why he would say that?

16          SEN. FRASER:  I am not advised.

17          SEN. SHAPLEIGH:  If Royal Masset said in

18  his quote, "When voting in America is only allowed to

19  healthy and wealthy people than (sic) the America I

20  know is far sicker than my mother.  House Bill 218" --

21  which is the bill that came up last session, identical

22  I believe to the bill that you're carrying -- "is a

23  direct descendent of poll taxes, and of allowing only

24  white male property owners to vote.  In its effect it

25  is racist, barbaric, antidemocratic and contrary to

88

1    everything that made America great."

2              Do you have any idea why a former

3    political director of the Republican Party would make

4    that statement?

5              SEN. FRASER:  No other advice other than

6    to say that the three sources that I quoted in my

7    opening remarks, two were Democrats and one was a

8    left-leaning Supreme Court Justice that all make, you

9    know, comments the other direction.  And, actually,

10   Rep. Steve Wolens commented about the fraud and the

11   voter harvesting that happened in a Democratic

12   primary.  So I'm assuming people on both sides of this

13   issue have opinions.

14             SEN. SHAPLEIGH:  Now, I think -- I

15   thought I heard you mention the name Karl Rove as

16   one --

17             SEN. FRASER:  I don't think I mentioned

18   Karl Rove.

19             SEN. SHAPLEIGH:  Okay.  Let me ask, are

20   you personally, other than the hearsay statements from

21   Steve Wolens and others, are you personally

22   acquainted, do you know of any voter fraud, you

23   yourself?

24             SEN. FRASER:  Well, the hearsay

25   statements, those were actually statements by Steve

1    Wolens he made -- I think he made those on the House
2    Floor in laying out his bill, so I don't think those
3    are hearsay.  He represented them as facts.
4              SEN. SHAPLEIGH:  In connection with your
5    investigation and your desire to pass this bill, did
6    you talk to the Attorney General of the State of
7    Texas?
8              SEN. FRASER:  Ask that question again.
9              SEN. SHAPLEIGH:  In your investigation
10   of this bill as you worked it up, did you consult with
11   the Attorney General of the State of Texas?
12             SEN. FRASER:  I guess I need a clear
13   question.  You know, what -- "consult" is a very broad
14   lawyer term.
15             SEN. SHAPLEIGH:  Did you talk to him?
16   Did you ask him about voter fraud?
17             SEN. FRASER:  I talk to the Attorney
18   General quite often on a full range of issues.
19             SEN. SHAPLEIGH:  Did you talk to him
20   about this issue?
21             SEN. FRASER:  I have talked to the
22   Attorney General about a wide range of issues.
23             SEN. SHAPLEIGH:  Did you talk to him
24   about voter fraud and the nature, scope and extent of
25   it here in Texas?

1           SEN. FRASER:  No.

2           SEN. SHAPLEIGH:  Okay.  Were you aware

3    that he did a rather extensive investigation searching

4    for voter fraud in Texas and spent approximately

5    $1.4 million on that investigation?

6           SEN. FRASER:  I guess I would dispute

7    the statement that you just made, is that the

8    Secretary of State was giving an appropriation of

9    $1.4 million that they used in the special

10   investigation, unit investigation.  Within that

11   $1.4 million, it came from federal funds that were

12   spent on election fraud.  The issues they used that on

13   was the Eldorado YZF Ranch case, the Texas Youth

14   Commission, the hurricane-related rapid response

15   efforts, the market manipulation and penny stock fraud

16   case, the ERCOT case, the cyber case, (inaudible)

17   unit, identity theft, public corruption, money

18   laundering and election fraud.

19          SEN. SHAPLEIGH:  Okay.  So I'm looking

20   at Attorney General Greg Abbott's press release from

21   March of 2006 where he announces, "In Texas, an

22   epidemic of voter fraud is harming the electoral

23   process and it's time we rooted it out."  Do you

24   recall when he launched that investigation?

25          SEN. FRASER:  I do.

9

1          SEN. SHAPLEIGH:  And reading further in

2   his press release, "At first glance, these might seem

3   to be like isolated events in far-flung towns.  Step

4   back and the picture looks just as sinister as it did

5   60 years ago.  For example, Texas has long been a

6   haven for paid political operatives who target seniors

7   and the disabled to handle their mail-in ballots for

8   them.  Many of the cases referred to my office by the

9   Secretary of State fall into this category."

10          Do you remember that press release?

11          SEN. FRASER:  And I think you're going

12   back and addressing the case of the Steve Wolens' bill

13   that he filed on the mail-in ballots, and I don't

14   think that particular issue has anything to do with

15   Senate Bill 362.  My bill relates to the voter

16   identification issue when we're investigating --

17          SEN. SHAPLEIGH:  Well, I --

18          SEN. FRASER:  I make reference to the

19   Wolens bill because it is part of the fraud history

20   and voter fraud.  But the investigation you're talking

21   about has nothing to do with the bill we're laying out

22   right now.

23          SEN. SHAPLEIGH:  Well, here is his press

24   release.  Here is the title of it:  "Helping Stamp Out

25   Voter Fraud in Texas."  That's exactly what you're

1    bringing forward today.  Right?  Is that what you're

2    trying to address in your bill?

3                SEN. FRASER:  Could we get a copy of

4    that?  You're referencing something.  We're looking

5    through.  And for some reason -- is all the

6    information we have.  For some reason I can't find

7    that one.  We thought we had them all.  But I'm sorry.

8    I don't have that one.

9                SEN. SHAPLEIGH:  Okay.  This is his

10   press release off of the website when he launched his

11   investigation in March of 2006.

12               SEN. FRASER:  And, Senator, out of

13   fairness, I don't regularly go to the Attorney

14   General's website to read every press release that

15   comes out.  So I'm sorry, I don't --

16               SEN. SHAPLEIGH:  I understand.  But

17   you're bringing a bill and you led this Senate to

18   believe and you're laying out the case for widespread

19   voter fraud in the State of Texas.  And we've had, to

20   my knowledge in the last two years, one major

21   investigation by the Attorney General of the State of

22   Texas.  And I want to get into exactly what that

23   widespread voter fraud looks like after that

24   investigation.  That's where I'm going.  That's what I

25   want to find out.

1          So in this press release, he's laying

2    out the basis for widespread voter fraud, and he

3    launched -- his investigation spans, as you say, among

4    other things -- investigating other issues,

5    $1.4 million.  And by my account here, that

6    investigation produced exactly 13 indictments.  Twelve

7    of the 13 were minorities; nine, Hispanics; three,

8    African-Americans.  Thirteen of 13 of the indictments

9    were Democrats.  Now, do you have any reason to

10    dispute those numbers with us here today?

11          SEN. FRASER:  Yes, I do.  The exact

12    numbers are 30 suspects, 22 that have already been

13    prosecuted.

14          SEN. SHAPLEIGH:  In terms of the

15    indictments, when he brought the indictments --

16          SEN. FRASER:  Indictments on 30

17    suspects.

18          SEN. SHAPLEIGH:  How many of those were

19    minority?

20          SEN. FRASER:  I'm not advised.

21          SEN. SHAPLEIGH:  How many of those were

22    Democrats?

23          SEN. FRASER:  I'm not advised.  I don't

24    know that they asked him what their --

25          SEN. SHAPLEIGH:  Well, do you have any

1  witness here today who can confirm how many of those

2  were minorities and how many were Democrats?

3          SEN. FRASER:  I have not called a

4  witness, you know, for that.  It's possible that -- we

5  have two people from the registrar's office in

6  Houston, and I know Houston was one of the places that

7  had a problem.  And I would suggest that you ask the

8  expert witness from the Houston registrar's office.  I

9  suspect they probably would have some information.

10          SEN. SHAPLEIGH:  Well, I think this

11  issue of that investigation is the proof that we have

12  of how widespread fraud is in the State of Texas.  I

13  think we have a perfect right to ask those questions.

14  And I want to know if you as a chairman will

15  participate with us in getting a live witness that we

16  can ask about those cases on this floor?

17          SEN. FRASER:  And I'm being advised --

18  let me just confirm.

19          (Brief pause)

20          I'm being advised that the Attorney

21  General's office is willing to answer your question,

22  to clarify the questions you have.

23          SEN. SHAPLEIGH:  And will that Attorney

24  General bring us, with time to review the file on each

25  of these 13 indictments so that we can determine for

1  ourselves and can effectively cross-examine him or her

2  on the real nature of these cases?  Will we have that

3  file in time to really do the job we need to do to get

4  at the heart of this massive voter fraud that we have

5  in the State of Texas?

6              SEN. FRASER:  You know, I don't think

7  that the indictments on those -- we're in a case that

8  the ability to game the system by representing

9  yourself as someone else.  I've got one area of the

10  voter fraud in this that we're addressing, and it is

11  voter ID, identifying that when you walk in for

12  in-person voting, you are who you say you are.

13              SEN. SHAPLEIGH:  In connection with the

14  indictments brought, even your number, which differs

15  from my number, did a single one, would a single

16  indictment have been resolved by this photo ID or were

17  they all mail-in ballots or other issues?

18              SEN. FRASER:  I am not advised.  My goal

19  on this is to look at the law itself, of implementing,

20  people identifying themselves for the ability to vote.

21  We were looking at the Indiana law that is a strict

22  photo ID, the Georgia law that is a strict photo ID

23  that have been in place, Indiana for two election

24  cycles, Georgia for the last.  And we're going to hear

25  from expert witnesses of how that not only didn't

1      suppress voting, it actually increased voting because

2      it increased voter confidence.

3                      SEN. SHAPLEIGH:  So are you aware of any

4      other investigations, other than what Attorney General

5      Abbott has done here in Texas, with respect to voter

6      fraud?

7                      SEN. FRASER:  I'm not advised.

8                      SEN. SHAPLEIGH:  So if we hear from this

9      witness that's going to come here and share with us

10     the nature and extent of voter fraud in the State of

11     Texas, and not a single one relates to photo ID, will

12     that make a difference in the way you prosecute this

13     bill?

14                     SEN. FRASER:  Again, we're going to have

15     the expert witnesses come forward.  But I think what

16     you're going to hear is the case -- or the example

17     that I used with Sen. Watson of someone stealing his

18     identification, going and voting and, you know,

19     representing themself as Kirk Watson and being able to

20     vote.

21                     I think what you're going to hear -- and

22     I don't want to put words in the mouth of the

23     Secretary of State or the other witnesses -- but I

24     think you're going to find that it is extremely hard

25     to identify and even harder to prosecute those cases,

1   because we have a huge flaw in Texas law.  We have not

2   given them the ability to even identify that someone

3   is breaking the law.  And if you can't identify

4   they're breaking the law, then prosecuting that person

5   becomes even harder.  So I think the point that's

6   going to be made through the testimony on this is that

7   we have a huge deficiency in current law in

8   identifying voters when they come for in-person

9   voting.

10              SEN. SHAPLEIGH:  You had mentioned and

11  laid out some statistics on those that have photo IDs

12  in the State of Texas and said that your information

13  came from the DPS.  Is that correct?

14              SEN. FRASER:  I don't think I

15  represented anything came from DPS.  I think the data

16  we had I represented came from the Secretary of State.

17              SEN. SHAPLEIGH:  Okay.  Are you aware of

18  any other data from Texas with respect to those that

19  hold photo IDs that are of voting age?

20              SEN. FRASER:  Help me with that.  I --

21              SEN. SHAPLEIGH:  Well, for example, are

22  you aware of, say, the Texas Conservative Research

23  Institute's finding -- the Texas Conservative

24  Coalition Research Institute finding that 37 percent

25  of Texas residents over the age of 80 do not have a

```
 1    driver's license?
 2                 (Brief pause)
 3                 SEN. FRASER:  I'm not advised.  And I
 4    don't think, unless they called every one of those
 5    people, they could verify that.  My mother is over 80
 6    and she still has a driver's license, I believe, but
 7    she votes by mail.
 8                 SEN. SHAPLEIGH:  So which is the number,
 9    the number that the Texas Conservative Coalition
10    Research Institute has for us, 37 percent don't have a
11    driver's license, or the number that you're bringing
12    to us?
13                 SEN. FRASER:  I don't think I brought
14    anything forward.
15                 SEN. SHAPLEIGH:  Okay.  Thank you,
16    Senator.  I look forward to another --
17                 SEN. FRASER:  You're cutting me short.
18    You told me that I would be here till midnight on your
19    questionings.
20                 SEN. SHAPLEIGH:  We've still got eight
21    hours.
22                 SEN. FRASER:  That's enough time.
23                 SEN. SHAPLEIGH:  We're ready.
24                 SEN. FRASER:  Thank you.
25                 SEN. SHAPLEIGH:  Thank you.
```

1                    SEN. DUNCAN:  Sen. Zaffirini.

2                    SEN. ZAFFIRINI:  Thank you,

3       Mr. President.

4                    SEN. FRASER:  Is this a test to see if I

5       really have this information in the books?

6                    SEN. ZAFFIRINI:  Yes, it is.  I'm going

7       to ask you questions about Page 218, Line 4, and what

8       it's on.

9                    SEN. FRASER:  The book that I shared

10      with you --

11                   SEN. ZAFFIRINI:  Yes.

12                   SEN. FRASER:  -- and showed you all my

13      data.

14                   SEN. ZAFFIRINI:  It's a wonderful book,

15      and I congratulate you and your staff for developing

16      such thorough information, very impressive.  My staff

17      is not happy to know about it, however.

18                   Sen. Fraser, you were the Senate sponsor

19      of House Bill 218 that never made it to the Senate

20      floor in 2007.  Correct?

21                   SEN. FRASER:  That is correct.  I was

22      the sponsor of the --

23                   SEN. ZAFFIRINI:  Do you know the main

24      differences, if any, between the bill that you

25      sponsored in 2007 and the bill that we are considering

1    today regarding voter ID?

2                SEN. FRASER:  I'm going to clarify with

3    staff.  I think I know the answer, but . . .

4                (Brief pause)

5                I'm being advised that the bill that

6    we're filing is very, very close.  There are very,

7    very small changes in the bill.

8                SEN. ZAFFIRINI:  Well, that's what I

9    thought.  I looked at the two bills and I looked at

10   the two bill analyses and I looked at the two fiscal

11   notes.  But what surprised me more than anything is

12   that the bill that we considered in 2007 had a fiscal

13   note of $671,000 in each year over a five-year period,

14   but the fiscal note for the bill that we are

15   considering today says "No Fiscal Implications."

16   Could you explain the difference in the fiscal note?

17               SEN. FRASER:  Good research.  And it's

18   exactly the same thing that I -- I looked at the two.

19   I asked the same question.  We called about the fiscal

20   note.  Evidently in the research of this -- and again,

21   we've got an expert witness that is sitting -- or they

22   were sitting right over here, the Secretary of State.

23   I think they will answer that.  And I think the answer

24   is, again, I don't want to put words in their mouth,

25   but I think in doing more research, they found out

1    that a lot of these things are available for them to

2    do within their current budget, and it does not create

3    additional expense.

4              SEN. ZAFFIRINI:  Well, I certainly do

5    want to follow up with the LBB to ask them

6    specifically, since they write the fiscal notes, why

7    such an enormous difference.  It's just amazing.  I

8    would like the name of the person who developed the

9    new fiscal note.  I might want to work with that

10   person for my bills.

11             SEN. FRASER:  Well, as thorough as you

12   are on finance, because I've sat there and watched

13   you, and you do a wonderful job in looking at these.

14   And I know exactly the questions you'll be asking in

15   Finance, and I would encourage you to do that.  But I

16   also, being a former member of Finance, did the same

17   thing, asked the questions.  And my response back was,

18   is that after further examination, they realized that

19   this had no fiscal impact.

20             SEN. ZAFFIRINI:  I'll be asking them to

21   look at some of mine further and see what they can

22   come up with.

23             SEN. FRASER:  Thank you, Senator.

24             SEN. ZAFFIRINI:  Thank you, Senator, for

25   that particular answer.  But looking at the bill --

1    and Senators Watson and Shapleigh touched upon these

2    issues -- there will be some costs to the local

3    officials, will there not -- the posting of signs, the

4    training will be provided by the state, but the local

5    officials will have to engage in a lot of

6    verification, participate in that training, the

7    posting of signs and development of material, or will

8    the state cover that expense?

9                SEN. FRASER:  I expect that is; correct,

10   is that, you know.  But that also is not unusual in

11   that the local elected officials, any time there is

12   something for notification, they do that.  And so it's

13   not -- I'm being told not unusual, wouldn't be

14   expected.

15               SEN. ZAFFIRINI:  There was much

16   discussion yesterday and today and even before that,

17   including by Sen. Duncan and Sen. Van de Putte,

18   Sen. West and others regarding the need for each side

19   to make a record, and then each side, those who

20   support this legislation and those who oppose it are

21   making a record for two purposes:  No. 1, because a

22   lawsuit is expected; No. 2, because we will be dealing

23   with challenges before the Department of Justice.

24   Would you agree with that?

25               SEN. FRASER:  You know, again, you're

```
 1    projecting some what-ifs.
 2              SEN. ZAFFIRINI:  I thought it --
 3              SEN. FRASER:  I would suggest that my
 4    intention today is not to make a record.  I'm not in
 5    any way trying to develop any kind of record, other
 6    than trying to inform my fellow other 30 senators that
 7    the bill that I'm laying out will increase voter
 8    participation rather than the people that believe that
 9    their vote is not going to count.
10              And so the expert witnesses that I have
11    brought today are the Secretary of State to talk about
12    the fact that we've got a problem, the Houston
13    registrar that says that they've had a problem there
14    in voter fraud.  We've got people from Indiana to talk
15    about the fact that after we implemented this law,
16    they had the largest increase in Democratic votes in
17    the nation.  We've got two people from Georgia that
18    are going to say that they had a huge increase in
19    voter participation, and they're going to talk about
20    the minority increases, because, evidently, Georgia
21    had a huge increase because the Hispanic and the
22    African-American voters were encouraged that their
23    vote was, in fact, going to count.
24              SEN. ZAFFIRINI:  But what years are you
25    comparing, a huge increase from what year to what
```

1    year?

2                 SEN. FRASER:  You and I have been in

3    politics a long time, and we know that presidential

4    year elections are the comparison.  So if you're

5    comparing 2008, you would look at 2004.  If you look

6    at 2006, you would look at 2002.  In Indiana after the

7    bill was implemented, if you compare 2002 to 2006,

8    after it went into place, there was a two percent

9    increase in the voter participation.  All of it came

10   in democratic voters.  There were three new

11   congressional people elected in Indiana in 2006.

12                 In 2008, during that same election

13   cycle, the vote total in Indiana was over double the

14   increase of next door Illinois.  They had a 6.7

15   percent increase in all voting.  It all came in the

16   Democrat election.  They had 6.9 percent in Indiana

17   increase, even though Republican voting actually

18   stayed stable or went down a little bit.

19                 SEN. ZAFFIRINI:  Well, we looked at the

20   data, but we would disagree on the interpretation of

21   the data because we, the Democrats, believe that that

22   was the impact of President Obama, and that it was

23   President Obama who brought out the African-Americans

24   and the Hispanics and the minorities and that he was

25   the motivation and the reason that there was such an

1      increase in turnout.

2                    SEN. FRASER:  I'm glad you brought that

3      up, because the good thing is, we got Indiana here to

4      verify that.  But I think they're going to tell you

5      that Obama was from Illinois.  He was a senator from

6      his home state next door where we had this

7      repressive -- or the alleged oppressive voter ID bill

8      that was put in place.  The increase in Indiana was

9      more than double the increase in Illinois, which was

10     the president-elect's home state that he was serving

11     in.

12                    I believe the facts are going to show

13     just the obvious.  Not only did they not depress

14     voting, those voters were encouraged that their votes

15     were going to count, and it doubled in Indiana over

16     what it was in Illinois.  So I would love for you to

17     make that case, because I think it's going to show

18     that just the opposite happened.  I think they were

19     encouraged to vote and they voted in great numbers.

20                    SEN. ZAFFIRINI:  And perhaps if the

21     voter ID hadn't been in place, the turnout would have

22     tripled or quadrupled.  So we don't know that, but we

23     will look into it and pursue those issues with the

24     expert voters.  Thank you, Senator.

25                    SEN. FRASER:  All right.

 1             SEN. ZAFFIRINI:  Now, going back to the

 2    cost of this particular legislation, have you

 3    considered at all the cost to the State of Texas to

 4    participate in a lawsuit, to defend a lawsuit related

 5    to this particular bill if it passes?

 6             SEN. FRASER:  No.  And I have -- the

 7    answer is no.  As you know, it's part of the

 8    legislative process.

 9             SEN. ZAFFIRINI:  Yes.

10             SEN. FRASER:  Any time the State of

11    Texas is litigated against, we have an obligation to

12    defend ourselves.  And, as you know, since you've been

13    in the Legislature -- you have been here a long time

14    and you've seen it multiple times -- and if the

15    lawsuit is filed, then the state has to defend itself.

16             SEN. ZAFFIRINI:  Have you considered at

17    all the cost to the State of Texas to dealing with the

18    challenge that would be issued with the Department of

19    Justice regarding this particular legislation if it

20    passes?

21             SEN. FRASER:  I guess the question I

22    would ask you, if you're asking me if I've looked at

23    the cost, I would ask you the question, have you

24    looked at if someone lost an election because someone

25    cheated, because they misrepresented themself and they

1    weren't allowed to serve -- and one of the things
2    we're going to be talking about is, there is somebody
3    in this room today that won a very narrow election and
4    would not be here today if someone had cheated on a
5    very few votes.
6                So I guess the question I'll ask you,
7    what is the cost of the State of Texas if someone is
8    allowed to cheat, that would change history, someone
9    else to represent them, there is a huge cost to the
10   state in the fact that you change history by rigging
11   an election.
12               SEN. ZAFFIRINI:  But basically what
13   we're focusing on at this point in the debate is the
14   cost related to this particular bill, not to history
15   and not to the future but the costs associated with
16   this particular bill.  On a related note, were any of
17   your expert witnesses brought in at any expense to the
18   State of Texas or the Senate in particular?
19               SEN. FRASER:  I'm sorry.  I've got two
20   people asking questions.  Please ask it again.
21               SEN. ZAFFIRINI:  Were any of your expert
22   witnesses for today brought in at the expense of the
23   State of Texas or the Senate in particular?
24               SEN. FRASER:  No.
25               SEN. ZAFFIRINI:  No?

1          SEN. FRASER:  Were any of your expert

2    witnesses brought in at the expense of the state or

3    the expense of the Senate?

4          SEN. ZAFFIRINI:  That is my question.

5          SEN. FRASER:  No.  I was asking you

6    that.

7          SEN. ZAFFIRINI:  Oh, I didn't bring in

8    any expert witnesses except one from Austin, who I

9    am --

10          SEN. FRASER:  None of my expert

11    witnesses were at the expense of the state.

12          SEN. ZAFFIRINI:  Good.

13          SEN. FRASER:  Let me clarify that.  Not

14    unless Coby Shorter is on expense report for driving

15    his car in to the Capitol this morning.  I don't think

16    so.

17          SEN. ZAFFIRINI:  All right.  Senator,

18    you talked about vote fraud and you referenced the

19    Duke of Duval and something that happened in 1948.

20    That's a long time ago.  You and I discussed other

21    allegations of fraud, including one election in which

22    someone apparently bubbled in.  The bubbles were

23    erased on ballots that the respective voters had not

24    bubbled in.

25          In other words, there were many ballots

1   that indicated that a voter had not voted in a

2   particular race, and apparently someone else went in

3   and bubbled in and, in effect, impacted the results of

4   the race.  In that particular race, there were

5   allegations that there were more votes than ballots

6   counted in a recount.  But your bill would not have

7   anything to do with correcting that kind of voter

8   fraud that was alleged at that point, would it?

9           SEN. FRASER:  If you go back and examine

10  my opening comments, I said how did I move toward even

11  starting thinking about this?  And I reflected that in

12  the history of the United States, there's been a lot

13  of cases where there was either voter fraud, voter

14  manipulation, stolen election, voter harvesting, that

15  there is a history out there of people attempting to

16  steal elections.

17           I also made the observation that that

18  has moved people toward losing faith in the system.

19  And if they lose faith in the system and they think

20  their vote is not going to count, they don't go vote.

21  That might have something to do with the fact that we

22  have some elections that there's only eight percent of

23  the people that vote because they have no faith that

24  their vote is going to count.

25           I'm addressing one small area of the

1    law, and that is something that I think I can impact;

2    and that is, when Judy Zaffirini walks into your

3    polling place at home and you put your voter

4    registration down there, I want them to know without a

5    doubt that that is Judith Zaffirini that is voting and

6    not Tom Smith that is borrowing her -- or Thomasina

7    Smith borrowing -- it would probably be -- it would be

8    better if it was a woman, I guess, in the example.

9              SEN. ZAFFIRINI:  That's all right.  I

10   understand, Senator.  Don't worry about it.

11             SEN. FRASER:  If someone else is using

12   your card to vote, then I think you need that

13   assurance that you've got to make sure that when you

14   go to vote, that somebody has not been there, you

15   know, impersonating you, stealing your ability to

16   vote.

17             SEN. ZAFFIRINI:  Quite frankly, Senator,

18   that never ever crossed my mind, except in relation to

19   the point that you're making.  But never ever did I

20   feel threated in any way.

21             My other question for you is, do you

22   have any examples at all of any Texas election in

23   which the outcome was impacted by voter impersonation?

24             SEN. FRASER:  I'm going to wait until we

25   have all of our expert witnesses.  They're going to

117

```
 1    answer questions, and we're going to talk about the
 2    election system in Texas and the ability not only to
 3    impact elections but also the extreme difficulty in
 4    identifying that someone cheated, and prosecuting
 5    them.
 6                    (Brief pause)
 7                    SEN. ZAFFIRINI:  You ready?
 8                    SEN. FRASER:  Yes.
 9                    SEN. ZAFFIRINI:  Senator, have you
10    considered at all the questions that many of us have
11    raised -- we who are Democrats, we who are
12    minorities -- regarding the impact, the negative
13    impact of this legislation on the turnout of
14    minorities, specifically African-Americans and
15    Mexican-Americans, and specifically in South Texas?
16    Have you considered those concerns that we have
17    raised?
18                    SEN. FRASER:  Senator, actually I
19    considered a lot.  And I think -- you know, first of
20    all, I'm going to make a blanket statement:  I want a
21    large turnout of all Texans, and I want a large
22    turnout of minorities, making sure that they are
23    encouraged to vote.
24                    And again, I would encourage you to
25    listen to the testimony of Indiana and Georgia of what
```

1   happened when they implemented a fair system where

2   people were comfortable that their vote was going to

3   count and what happened to the minority turnout.  And

4   so the answer to your question is, absolutely.  I want

5   to make sure that -- I want everyone in Texas to vote

6   in large numbers, and I want the minorities, the

7   African-Americans and the Hispanics, to increase their

8   numbers.

9              And I really believe in my heart that

10  the bill that I am laying out today will do that,

11  because I think they are frustrated that their vote is

12  not counting, that there are people cheating in the

13  elections and have been cheating for a long time.  And

14  if they know that their vote is going to count, I

15  think they'll be encouraged, and I think more will

16  turn out.  So the answer to your question is --

17             SEN. ZAFFIRINI:  I certainly have not

18  seen evidence of that cheating that you're referring

19  to, not in terms of voter impersonation.  But I

20  certainly will be interested in hearing if there is

21  any.  On the other hand, if our experts prove to you

22  that your bill will have a negative impact on Mexican-

23  Americans, on African-Americans, will you consider

24  amendments to alleviate our concerns?

25             SEN. FRASER:  Well, first of all, in

1    response to it, I have four different papers from

2    academics around the country that address the issue

3    that you're talking about of the fact that actually

4    the minority -- impact is that minorities will turn

5    out more, and it's from actual data of what's happened

6    since these laws have been input.

7                    Mr. Chairman, could I possibly move that

8    these be added or entered into the record?

9                    SEN. DUNCAN:  You can do that at this

10   time.  I think we'll have -- those will be Exhibits --

11   what numbers?  We'll bring them down to the front and

12   mark them.

13                   SEN. ZAFFIRINI:  Thank you, Senator.

14   I've asked you about the negative impact on Mexican-

15   Americans, on Hispanics in general, on African-

16   Americans.  Have you considered the negative impact on

17   the elderly, specifically persons over the age of 65,

18   and how they will be able to prove their

19   identification?  What about --

20                   SEN. FRASER:  Senator, I don't know

21   about you, but I'm getting close to that range.  And,

22   obviously, I am concerned about people in that range.

23   I'm concerned about my mother that is in a retirement

24   center and are there, and I spend a lot of hours at

25   the retirement center talking to those people,

```
 1    asking -- I've asked them -- you can't imagine the
 2    number of questions I've asked about the way they
 3    vote, what they're following -- you know, what the
 4    habits are.
 5                 And I think the assurance I can give to
 6    you is that, first of all, the bulk of the people that
 7    are over 65 -- some that have stopped driving -- the
 8    bulk of those and probably a high, high percentage
 9    vote by mail.  I am not impacting that in this
10    legislation.  So everything they have done in the past
11    in the ability to vote to mail stays exactly the same.
12                 SEN. ZAFFIRINI:  Have you considered a
13    possible negative impact on persons with disabilities,
14    including those who live in institutions such as
15    nursing homes?
16                 SEN. FRASER:  And again, I guess I would
17    throw my mother in that category.  My mother is
18    wheelchair-bound.  I know that just even me trying to
19    get her into my car to take to the doctor is a huge
20    problem.  She, you know, like most of her friends,
21    votes by mail, and so she is in that category of the
22    disabled.  And her voting rights will continue, as
23    will all of her friends in the retirement center.
24                 SEN. ZAFFIRINI:  Senator, going back to
25    your bill, on Page 6, Line 14 of your bill, you
```

1    itemize --

2                    SEN. FRASER:  I'm getting heckled over

3    here.  People from the other side are moving over

4    to -- he's trying to implement the egg-timer rule of

5    three minutes.

6                    SEN. ZAFFIRINI:  I see.

7                    SEN. FRASER:  I'm for that.

8                    SEN. ZAFFIRINI:  Well, on Page 6, Line

9    14 of your bill, you list types of documentation that

10   you acceptable as proof of identification under this

11   chapter.  In 2007, in House Bill 218 which you

12   sponsored in the Senate, you included a student

13   identification card as proof of identification, as

14   acceptable documentation, but a student ID card is not

15   included in your 2009 bill.  Could you explain why?

16                   SEN. FRASER:  Senator, could I refer you

17   to Section 6.

18                   SEN. ZAFFIRINI:  What line, what page,

19   Senator?

20                   SEN. FRASER:  It is -- just a second.

21   The reference you're making is the public institutions

22   of higher learning, the student ID card is still

23   included.  The wording changed, but it's covered by

24   No. (6)(A).

25                   SEN. ZAFFIRINI:  So you're saying that

1    on Page 6, beginning at Line 8 where it reads, "a

2    valid identification card that contains the person's

3    photograph and is issued by:

4                     (A)  An agency or institution of

5    the federal government; or

6                     (B)  An agency, institution, or

7    political subdivision of this state," you're saying

8    that that would include institutions of higher

9    education and that, therefore, student identification

10   cards would be acceptable proof of identification?

11              SEN. FRASER:  Yes.

12              SEN. ZAFFIRINI:  Good.

13              SEN. FRASER:  Isn't that what that says?

14   It says "an agency, institution or political

15   subdivision of this state."  The University of Texas

16   is considered a subdivision of the state.  It says

17   that an identification card that contains a person's

18   photograph that is issued by.  I think the answer to

19   your question is "Yes."

20              SEN. ZAFFIRINI:  All right.  In your old

21   bill -- I'm looking at it now -- you have this

22   language -- and in addition to that, you specified the

23   student identification card.  But so long as you

24   clarify your legislative intent, that's acceptable to

25   me.

1              But a related question, Senator:  In

2       that section, you list many, many types of acceptable

3       proof of identification, including a certified copy of

4       a birth certificate, United States citizenship papers,

5       an original or certified copy of the person's marriage

6       license or divorce decree.  And finally on Page 7,

7       Lines 1 and 2, you include court records of the

8       person's adoption, name change or sex change.  Could

9       you explain why you included sex change as an

10      acceptable documentation and proof of identification?

11              SEN. FRASER:  I believe we're going to

12      punt to the House sponsor.  This was the language that

13      was passed out of the Texas House last year.  We

14      picked up the bill from an amendment that was added in

15      the House.  And as our starting point, the legislation

16      that we never voted on last year that we brought over

17      from the House, that language is in there.  So I guess

18      I would say I'm not advised.

19              SEN. ZAFFIRINI:  All right.  And I'm

20      sure that you can find out why, perhaps, and answer me

21      on the floor --

22              SEN. FRASER:  Some of it was being

23      inclusive.

24              SEN. ZAFFIRINI:  -- through the Senate

25      debate.

1          I do have a related question.  Going

2     back to our student identification card, that

3     references public universities.  But what about

4     students in private institutions.

5               SEN. FRASER:  Not included.

6               SEN. ZAFFIRINI:  They're not included.

7     Was that an oversight?  Do you intend to include them

8     at a later date?

9               SEN. FRASER:  The answer to that is that

10    it's not an intentional exclusion.  The concern on it

11    is us not knowing every private institution in the

12    state and the way their IDs are administered.  A state

13    institution, we have some input and control.  And I

14    guess the answer to that is, if you have a mechanism

15    for that, I'm willing to listen.  It is not -- the

16    answer is not that we're -- we're not trying to

17    prohibit.  It's just that those particular groups, we

18    don't have the ability to at least observe or regulate

19    the IDs they're putting out.

20              SEN. ZAFFIRINI:  But to summarize, then,

21    and to make sure that I understands, a student

22    identification card issued by a public institution

23    would be considered proof of identification that is

24    acceptable under your bill.  But a student

25    identification card issued by a private institution of

1   higher education would not be?

2                   SEN. FRASER:  As the bill is currently

3   written.

4                   SEN. ZAFFIRINI:  Thank you very much,

5   Senator.  I appreciate your courtesy.

6                   SEN. FRASER:  Yes.

7                   SEN. DUNCAN:  Before we go to the next

8   questioner, let me just kind of clarify the record.  I

9   have some -- Sen. Shapleigh -- and I think if you're

10  going to put something in the record, you need to

11  identify it.  Sen. Shapleigh had submitted Exhibit 6,

12  which is the vote tally on the Gallegos motion to

13  appeal the ruling of the Chair.  Exhibit 7 is a

14  document, "The Effects of Photographic Identification

15  on Voter Turnout in Indiana," submitted by

16  Sen. Fraser.  Exhibit 8 is an article or a document

17  entitled "Much-hyped [up] Turnout Record Fails to

18  Materialize, Convenience Voting Fails to Boost

19  Balloting."  Exhibit 8.  And then Exhibit 9 submitted

20  by Sen. Fraser is "The Empirical Effects of Voter-ID

21  Laws:  Present or Absent?"

22                  I think Exhibit No. -- yes, No. --

23  that's all there are.  So those will be in the record.

24                  Exhibit 10 is "A Report of the Heritage

25  Center for Data Analysis" submitted by Sen. Fraser.

1                    (Exhibit Nos. 6 through 10 marked and

2       admitted)

3                    SEN. DUNCAN:  Sen. Ellis.  Or I'm sorry.

4       Sen. Whitmire.

5                    SEN. WHITMIRE:  Thank you,

6       Mr. President.

7                    Sen. Fraser, to clarify a few things

8       that you mentioned earlier, you mentioned that Indiana

9       and Georgia voting occurrence.  What year was that?

10                   SEN. FRASER:  The Indiana voting, the

11      first one was in 2006.  The second was in 2008.

12                   SEN. WHITMIRE:  I think I --

13                   SEN. FRASER:  Excuse me a second.  And

14      Georgia was in 2008.

15                   SEN. WHITMIRE:  Well, don't you agree

16      that everywhere in the country, every state had a

17      greater participation this year, primarily because of

18      the popularity of our presidential candidates and also

19      the severe economic conditions?  Particularly I would

20      focus on Indiana.  Why would you use the Indiana

21      increase in voting as an indication of anything, other

22      than they were very energized about the selection of

23      candidates and because of their unemployment rate and

24      their severe economic downturn?  Wouldn't that --

25                   SEN. FRASER:  Senator, you're making

121

1    wonderful subjective argument.  We have an objective

2    person that is about to testify before us that will

3    give you very clear answers that the Indiana guy

4    knows --

5                   SEN. WHITMIRE:  Sure.

6                   SEN. FRASER:  -- what their results were

7    and he knows what the surrounding states were.

8                   SEN. WHITMIRE:  Well, I haven't heard

9    from him.  I can only go by your trying to compare

10   Indiana to Illinois, and that you said Indiana had

11   such an increase over Illinois.  And I think empirical

12   data, would you not agree, would show that Indiana or

13   Illinois always has high voter participation?

14                  What also I would like to ask you, would

15   you not agree that Georgia, it has been well recorded

16   that the African-American vote this year, because of

17   President Obama, was a significant increase in

18   turnout?  So I just really don't know if that's an

19   indication that your new mechanism works so well in

20   those two states.

21                  And, in fact, I would ask you:  Do you

22   think it's even a reasonable comparison -- Georgia and

23   Indiana with Texas -- when you look at our size, our

24   diversity, our language issues?  Why would you use

25   those two to indicate what Texas is going to follow?

1          SEN. FRASER:  You know, the great thing

2     about this, Dean, is that we're allowed to bring in

3     experts from those states.

4          SEN. WHITMIRE:  We're going to listen to

5     them?

6          SEN. FRASER:  We have the person that

7     runs the elections in those states that can answer

8     your question.  And I -- you know, I think it's great

9     that they're here today.

10          SEN. WHITMIRE:  Well, I assume they're

11     partisan officials as well.  How about elected

12     officials?  Did I not read your county clerk said in

13     her long tenure as your county clerk had never seen

14     anyone impersonating a voter in your own district?

15     Did I not read that correctly?

16          SEN. FRASER:  You know, someone reported

17     to me that she had said that she had not identified

18     it.  But she also said she was supporting the bill --

19          SEN. WHITMIRE:  She supports the bill.

20          SEN. FRASER:  Just a second.  You asked

21     me the question; I get to answer it.  She said that

22     she supports the concept --

23          SEN. WHITMIRE:  Sure.

24          SEN. FRASER:  -- of voter

25     identification.  The question was asked by the

```
 1    reporter, "Have you caught someone impersonating
 2    someone?"  The thing that she didn't add to that, that
 3    if the reporter would have asked that, "Does the state
 4    and your office have the mechanism to identify if
 5    someone is voting illegally?" and here would be the
 6    example that I would use, is that if Tom Smith came in
 7    with Bill White's identification card and Bill White
 8    is on the registration roll --
 9                   SEN. WHITMIRE:  I've heard it.  You said
10    it --
11                   SEN. FRASER:  But just a second.
12                   SEN. WHITMIRE:  You've done that two or
13    three times.  I'm familiar with that.  You used it
14    earlier.
15                   SEN. FRASER:  Okay.
16                   SEN. WHITMIRE:  And that leads me to my
17    question.
18                   SEN. FRASER:  You wanted an answer to
19    the question.
20                   SEN. WHITMIRE:  No.  I understand.
21    You've used about three examples of where someone runs
22    to the mailbox and gets someone else's certificate and
23    then runs and votes.  It's the same identical example
24    you're using right now, which leads me to a very
25    specific question:
```

124

1              Do you not know that that is against the
2    law and it's a third degree felony?
3              SEN. FRASER:  Okay.  And I would ask
4    you --
5              SEN. WHITMIRE:  What you're trying to
6    address is against the law.  And would it make a
7    difference to you and would you still be in favor of
8    your bill if I told you we can enhance that penalty?
9              SEN. FRASER:  Dean, I think if we can
10   get past this portion of this, that y'all are asking
11   me questions that could be asked of an expert witness.
12   We have somebody from the Secretary of State's office
13   that is going to clarify:  Is that possible and is it
14   possible to catch them and is it possible to
15   prosecute?  And I think you're going to be surprised
16   at the answer.
17             SEN. WHITMIRE:  No, I'm not going to be
18   surprised at the answer, because I've been running for
19   office 36 years.  It's not only -- Troy, would you not
20   agree, my duty and your duty as public officials is to
21   prevent fraud, but we have a very special reason --
22   because on the ballot.  I have been in barnburners.  I
23   have been in close elections.  I have tried to
24   identify voter fraud.  And that leads me -- and it's
25   never existed in the tough races that I've been in.

1            And I would suggest, can any one of the

2  31 senators document and demonstrate where voter fraud

3  has been an issue in their election?  I would suggest

4  to you early on, perhaps in mail-in ballots, we were

5  concerned.  But on Election Day, there is safeguard

6  after safeguard.

7            But I do agree with you -- and each and

8  every one of us I think would agree -- if we could

9  identify fraud, we would want to prosecute.  But the

10  interesting thing is, I'm going to ask you before I

11  sit down, give me a recent occurrence of voter fraud.

12            SEN. FRASER:  Johnny --

13            SEN. WHITMIRE:  The cite in Duval

14  County, that was the year I was born.  Then you cited

15  dead people voting.  Would a voter ID have helped

16  those people, prevented them from voting?  Give me an

17  example.

18            SEN. FRASER:  I hate to keep giving you

19  the answer, but you're about to have the registrar

20  from Houston that's about to come up here and testify,

21  and they're going to talk about the dead people that

22  voted.  And I'm going to show you --

23            SEN. WHITMIRE:  That --

24            SEN. FRASER:  Just a second.  You asked

25  a question.  Right here in my records, I've got it

126

1    here, but I had rather wait on the expert witness, but

2    this is a dead person that voted in person.

3                    SEN. WHITMIRE:  Were they prosecuted?

4    The person that voted them fraudulently, was that

5    person prosecuted?  And if she shows up and she didn't

6    file charges against them, we ought to all be

7    outraged.  I'm just curious.  What are you trying

8    to --

9                    SEN. FRASER:  Ask that question.

10                    SEN. WHITMIRE:  What are you trying

11   to --

12                    SEN. FRASER:  Ask that question of the

13   witness.

14                    SEN. WHITMIRE:  I look forward to it.

15   This is my concern:  What are you trying to fix?  Can

16   you point to a recent fraudulent act that would

17   justify us changing the Senate rules, having a special

18   order, not addressing property tax increases, highway

19   funding?  What are you trying to address that is such

20   a high priority?

21                    SEN. FRASER:  John, this, you know --

22                    SEN. WHITMIRE:  No.  I'm really serious.

23                    SEN. FRASER:  I know.  But --

24                    SEN. WHITMIRE:  We just went through a

25   historical election --

1    SEN. FRASER:  Do you want me to answer?

2    Would you like for me to answer or do you want to

3    interrupt me?

4    SEN. WHITMIRE:  Yes, yes.  What are you

5    fixing that would shove everything else aside and take

6    this up today?

7    SEN. FRASER:  This is not rocket

8    science.  What I am fixing is the very real:  Is there

9    a possibility -- of which we're going to show that it

10   is -- that someone could steal your registration card

11   and they could go and vote, representing to be you,

12   and that there is no way to identify when it's

13   happening.  And once it happens, it's almost

14   impossible then to prosecute after the fact.

15   SEN. WHITMIRE:  Okay.  Let me ask you

16   this -- and I look forward to hearing our witness.

17   Let me ask you this:  When you compare Indiana and

18   Georgia, are you familiar at all with how they conduct

19   their elections in terms of their poll workers, their

20   training, their compensation, any qualifications to

21   hold an election?  What are the requirements in

22   Georgia, Indiana, relative to our qualifications?

23   SEN. FRASER:  Dean, one of the great

24   things -- the answer I just gave Sen. Zaffirini -- the

25   great thing about this process, we bring in expert

1    witnesses from those states.

2                    SEN. WHITMIRE:  Yes.

3                    SEN. FRASER:  They know the answers to

4    those questions.  My expert witness is about --

5    they'll answer that exact question that you have.

6                    SEN. WHITMIRE:  Because I think what

7    you're going to find is, in these other states, they

8    compensate them in a greater detail, they have

9    training for them.  And we depend on volunteers, often

10   our senior citizens.  And often we have precincts in

11   Harris County that we literally cannot find people to

12   serve, and we actually merge and combine precincts

13   because of the lack of individuals available to run

14   these elections.  And then you're proposing an

15   elaborate documentation.

16                   SEN. FRASER:  Dean, you're my friend.  I

17   respect your right to ask this.  But the last three

18   persons have all asked the same questions.  And my

19   responses have been the same:  We have expert

20   witnesses that are about to show up that can answer

21   your questions.  And I guess I tell you no matter how

22   many ways you ask it, my response is going to be the

23   same.  I think we need to cut this off and start the

24   witnessing.

25                   SEN. WHITMIRE:  Well, I look forward to

1    talking to the person from Harris County.  And if

2    someone fraudulently voted for someone who is

3    deceased, I would hope we find out why they weren't

4    prosecuted.  And I would also -- as we continue, I

5    wish you would ask your witnesses for the most recent

6    incidence of voter fraud that they're familiar with

7    and the outcome in terms of prosecution.

8              We've had a senator -- Sen. Williams was

9    rightfully concerned about some allegations he had

10    heard.  The same question was to him at that moment a

11    couple of months ago:  Were the people prosecuted?  I

12    think we've got the toughest Penal Code in the United

13    States, 10 to 20 for fraudulently voting for someone.

14    And I think we ought to actively prosecute them,

15    because none of us want to participate in a campaign

16    or serve in a body that is governed or controlled or

17    influenced by voter fraud.

18              I don't think it exists.  And I think

19    the harm is being done because we're not in Finance

20    this afternoon, we're not dealing with Texas Youth

21    Commissions this afternoon, we're dealing in fighting

22    something that does not exist.  And as it is going to

23    be documented by our witnesses, going to create a

24    hardship for thousands of Texans.

25              SEN. DUNCAN:  Sen. Ellis?

1            SEN. ELLIS:  Thank you, Mr. President.

2            Senator, I know you're tired.  I'll try

3    not to take too long.  One question I want to ask you

4    is about the provisional ballot.  You said when you

5    first began answering questions from Sen. Watson, that

6    everyone would be able to vote, no one would be turned

7    away.  Now, how would that process work if someone

8    doesn't have the forms of identification that are laid

9    out in your bill.

10           SEN. FRASER:  I believe Coby Shorter is

11   right over here.  He's going to be coming up to visit

12   with you in just a second.  He will give you all that

13   data.  And I believe our expert witnesses -- and I

14   think I told Sen. Watson that.

15           SEN. ELLIS:  Well, now, here is what I'm

16   getting at:  I know you're tired, Senator.

17           SEN. FRASER:  No.  I'm doing good.

18           SEN. ELLIS:  The only reason I'm asking

19   you this is because you're carrying the bill, not your

20   resource witnesses, so it's not personal.  Here is

21   what I'm getting at:  I'm assuming, the way I read

22   your bill, if somebody does not have the forms of ID

23   you lay out, they will be told, "You can cast a

24   provisional ballot."  So here is my question:  When

25   does that ballot get counted?  What does it take for

1    that provisional ballot to be counted?

2              SEN. FRASER:  And when my witness comes

3    up -- that is the Assistant Secretary of State -- they

4    will tell you the procedure that is used for that.

5              SEN. ELLIS:  Okay.  I'm guessing, but I

6    assume that if somebody does that have that ID and

7    they cast a provisional ballot, the burden is on them.

8    The bill doesn't lay it out, but I assume the burden

9    is on them to then go home or go somewhere and prove

10   who they are or that ballot will not be counted.  And

11   that's what my question was.

12             SEN. FRASER:  Let me ask you, if you

13   were getting on an airplane and you didn't take your

14   ID, is the burden on the airport to run to your house

15   to get your ID for you?

16             SEN. ELLIS:  Well, here is a minor

17   distinction.  I don't have a constitutional right to

18   get on an airplane.  That's a big difference.  Let me

19   give you, if I might, a few other points, Senator.

20   You used Georgia a number of times as, I guess, a

21   building block for this legislation.  Is that a fair

22   assessment?  You were saying that they do this in

23   Georgia, Georgia is comparable to Texas?

24             SEN. FRASER:  I don't know that we use

25   it as a building block.  I said that they have passed

1    a near identical bill.  It has passed DOJ.  It has

2    passed the court system and been put into law.  And

3    they've had an election cycle.  And we have the

4    voting -- the people that ran the election in Georgia,

5    here.  And I guess I would lay it out that I think the

6    facts will speak for themselves.  I don't think I'm

7    laying out Georgia as an example; I think Georgia is

8    their own example.

9              SEN. ELLIS:  Well, I want to make sure

10   that you and other members do understand a basic

11   distinction between Georgia and Texas.  The State of

12   Texas is the third minority -- majority minority state

13   in the country -- new Mexico, California and then

14   Texas.  Georgia's population at best, Hispanic

15   population, may be 7, may be 9 percent.  There is a

16   big distinction between Georgia and Texas.

17              When you came up, Senator, you made

18   reference to -- I guess giving us a history lesson

19   about voter fraud issues, and you mentioned Duval

20   County in particular.  And being a proud graduate of

21   the LBJ School and a beneficiary of the great

22   legislation that President Johnson signed into law

23   after an historic march that went on this past weekend

24   across the Edmund Pettis Bridge, I want to give you a

25   little bit of a history lesson.

1           Do you have any idea in what year the

2    State of Texas enacted the poll tax?

3                SEN. FRASER:  I'm sorry.  I'm not

4    advised.  I don't have that number.

5                SEN. ELLIS:  The State of Texas enacted

6    the poll tax in 1901.  Do you have any idea when the

7    Democratic Party, not just in Texas but in a number of

8    states, enacted the while-only primary system where

9    you have to be white in order to vote in a primary?

10               SEN. FRASER:  Still I'm sorry.  I don't

11   have that number.

12               SEN. ELLIS:  1923.  It was not abolished

13   until 1944.  The poll tax, of course, was not

14   abolished until 1966.  I want to say that to you,

15   Senator, because when this bill didn't open up, 1885

16   or whenever it opened up, there were people who sat in

17   desks, these desks, in chairs not quite as comfortable

18   as the ones that you and I are sitting in today, or

19   standing on this floor, didn't have this nice carpet,

20   something, didn't have the padding under it.  But

21   decisions were made over the history of this state

22   which is why we have to be pre-cleared before making

23   this change or any other one.

24               Now, Georgia is similar to Texas in one

25   way.  It, alone with a number of other southern

1    states, do have to be pre-cleared because of their

2    legacy of putting hurdles in the path of people to be

3    able to vote.

4              SEN. FRASER:  We recognize they are a

5    Section 5 voting rights state, that the two states

6    are, you know, alike in that way.

7              SEN. ELLIS:  Are you aware -- you

8    mentioned that the Department of Justice pre-cleared

9    Georgia's voter ID plan.  You do know Georgia had not

10   one but two voter identification bills.  You are aware

11   of that, I assume.  The first bill that Georgia had

12   was pre-cleared by the Justice Department by someone

13   who is one of your witnesses today, by the way, a

14   political appointee at the Justice Department.  And

15   then the state and federal courts struck it down, and

16   then Georgia went back and redid their voter

17   identification law.  Are you aware of how much they

18   spent on informing voters how to comply with their

19   voter identification law in Texas?

20             SEN. FRASER:  And again, same answer

21   I've given the last three, now you're fourth, is that

22   my witness from Georgia is very prepared to go over

23   the details of that rather than you asking me, because

24   I can't be an expert on the Georgia law.

25             SEN. ELLIS:  And only -- as painful as

1    it is to do it, particularly with you being my desk

2    mate -- it is your bill -- Georgia spends $500,000.

3    Now, I'm only making that point because you put

4    Georgia on our mind, not me.  Georgia is probably --

5                SEN. FRASER:  I --

6                SEN. ELLIS:  -- a great state, might be

7    one-fifth, one-sixth the size of Texas.  They spent a

8    half a million dollars a year to make sure people know

9    the provisions under that law.  Senator, you made

10   reference to the Carter-Baker Commission when you

11   initially started.  Do you know the genesis of that

12   commission?  Do you know --

13               SEN. FRASER:  We're about to have a lady

14   come up here in just a minute that is from that

15   commission that I bet will give us the entire genesis.

16               SEN. ELLIS:  I'm going to ask her a lot

17   of questions.  The only reason I raise it to you is,

18   sometimes -- not all the time, but sometimes these

19   senators tend to listen to other senators,

20   particularly the person who is carrying the bill, as

21   opposed to somebody who has testified for it.

22               That bill was created, that commission

23   was created in part to try and restore confidence in

24   the American electoral system, not just in our eyes

25   but in the eyes of people all around the world,

1    Senator, because of the election of 2000 in which a

2    lot of people think there were serious problems in

3    that election of 2000, and that's why this Commission

4    was established, a very bipartisan commission.

5              Even if President Jimmy Carter and

6    Secretary Baker were on different sides in their 2000

7    race, they realized, when developing nations were

8    saying, "Y'all need to have President Carter send a

9    group down here to monitor elections in America,"

10   instead of going to developing countries.  Do you have

11   any idea who some of the other people were Senator, on

12   the Carter-Baker Commission?

13             SEN. FRASER:  I bet we're going to hear

14   that from my expert witness.

15             SEN. ELLIS:  Raul Yzaguirre.  I mention

16   that because he's one of the most noted Hispanic civil

17   rights leaders in the country.  I don't mention that

18   to help your side to this argument.  Also former

19   Congressman Bob Michel, a very distinguished group of

20   American citizens from both sides of the aisle.  Do

21   you have any idea, Senator, how many pages were in the

22   Carter-Baker Commission Report?

23             SEN. FRASER:  I didn't get that quite.

24   How many what?

25             SEN. ELLIS:  130.  I only read -- 113.  I

1    was going to say, I thought it was 115.  If you count

2    the nice pictures in the back --

3                      SEN. FRASER:  Are you --

4                      SEN. ELLIS:  115 pages.  Senator, do you

5    have any idea how many recommendations there were in

6    the Carter-Baker Commission Report?

7                      SEN. FRASER:  I would suspect that the

8    lady coming up from the Carter-Baker Commission could

9    possibly have that information if you asked her.

10                     SEN. ELLIS:  Do you have any idea what

11   the real name of that Commission was?

12                     SEN. FRASER:  I'm not advised.

13                     SEN. ELLIS:  It was the Help America

14   Vote Act and the Voting Rights Act.  That's what the

15   Commission was created for.  Senator --

16                     SEN. FRASER:  And I would suspect that

17   the recommendations was made for vote identification

18   that increased the voter turnout in Indiana and in

19   Georgia for record turnout, they were successful that

20   they encouraged -- "We're going to help people vote,"

21   and they encouraged people to feel more comfortable

22   about their voting rights.

23                     SEN. ELLIS:  But --

24                     SEN. FRASER:  And I suspect my witnesses

25   that you're going to hear are going to tell you that.

138

1           SEN. ELLIS:  Good try but not quite.

2    You referenced a New York Times editorial a little

3    earlier.  I'm going to try to be a little more

4    balanced than you were, my desk mate, in reading your

5    provision from that editorial, that op ed by President

6    Carter and Secretary Baker.  It was titled, "A Clearer

7    Picture on Voter ID," February 3, 2008.  Here is just

8    a snippet that I think gives a pretty good --

9           SEN. FRASER:  Is that about a snippet?

10          SEN. ELLIS:  -- of both sides of the

11   issue.  It says in the fourth paragraph, "No state has

12   yet accepted our proposal.  What's more, when it comes

13   to ID laws, confusion reigns.  The laws on the books,

14   mainly backed by Republicans, have not made" -- I

15   don't want to lick my finger here and try to turn this

16   page, so don't give me a hard time -- "have not made

17   it easy for voters to acquire an ID.  At the same

18   time, Democrats have tended to try to block voter ID

19   legislation outright -- instead of seeking to revise

20   that legislation to promote accessibility."

21          Here is the point that they were trying

22   to make, Senator.  Out of those 113, or 115 pages if

23   you count the pictures, they had a series of things to

24   help Americans have more confidence in their voting

25   system and also to encourage more people to vote,

1    things like say their registration, restoration of

2    ex-offenders' right to vote, states spending

3    significant amounts of money in educating people on

4    how to vote.  And, Senator, the most important part

5    was having a uniform, universal form of

6    identification, HAVA, as we have referred to it a

7    number of times.

8              Sen. Estes, my other desk mate here, may

9    have forgotten this.  But last session you were quoted

10   in the paper as saying, "It will cost too much money

11   for the State of Texas to comply with the HAVA

12   legislation."

13             What I'm saying to you, Senator, is I

14   don't think it's appropriate to pick and choose which

15   parts of the Carter-Baker recommendation, their

16   report, you want to implement, because when you do,

17   you don't do justice to it.  Senator, you made

18   reference to not using this legislation to impact

19   mail-in ballots.  Why?

20             SEN. FRASER:  Is this a question or were

21   you --

22             SEN. ELLIS:  Why is it that your bill

23   does not touch mail-in ballots?

24             SEN. FRASER:  Why?

25             SEN. ELLIS:  Yes.

```
 1              SEN. FRASER:  Well, it's like a lot of
 2    legislation we pass.  We fix a piece of the puzzle at
 3    a time.  The mail-in ballot is a huge problem.  It is
 4    something absolutely that at some point we're going to
 5    have to address.
 6              SEN. ELLIS:  Senator --
 7              SEN. FRASER:  But today I'm addressing
 8    the recommendation of -- the Carter-Baker Commission
 9    recommended that we put in voter photo ID legislation.
10    And I'm moving toward what other states have done,
11    which is Indiana and Georgia, that I'm taking a baby
12    step today toward that.  But I think what I'm doing
13    will encourage all turnout, but more especially
14    minority turnout in Texas.
15              SEN. ELLIS:  You made reference to Steve
16    Wolens' comment earlier.  Are you aware that the
17    reference, the comment that you are taking was
18    referring to mail-in ballots?
19              SEN. FRASER:  Absolutely.  And I would
20    also remind you, you voted for that bill --
21              SEN. ELLIS:  Oh, I did.
22              SEN. FRASER:  -- because he had been
23    fraud -- his exact statement was, is "They are
24    harvesting" --
25              SEN. ELLIS:  Yes.
```