1          SEN. FRASER:  -- "votes to steal the
2     election in a democratic primary in Dallas, Texas,"
3     and he brought that forward.  And you're one of the
4     persons that voted for that --
5          SEN. ELLIS:  That's correct.
6          SEN. FRASER:  -- bill, as I did --
7          SEN. ELLIS:  Senator, you --
8          SEN. FRASER:  -- to address voter fraud.
9          SEN. ELLIS:  Are you aware of how a
10    puzzle works?
11         SEN. FRASER:  I'm sorry?
12         SEN. ELLIS:  Are you aware of how a
13    puzzle works, a puzzle, p-u-z-z-l-e, puzzle?
14         SEN. FRASER:  Puzzle?
15         SEN. ELLIS:  Yes.
16         SEN. FRASER:  Well, if you're asking,
17    maybe I don't.
18         SEN. ELLIS:  If you take a certain piece
19    of what someone has said out of context, Senator, what
20    you're doing is distorting what they intended to say.
21    So here is my point:  Your bill does not touch mail-in
22    ballots.  You used a quote by Steve Wolens to try and
23    augment your position.  Your bill does not touch
24    mail-in ballots.  Most of the cases of fraud that your
25    witnesses are going to talk about are going to involve

1    mail-in ballots, but this bill does not do anything to

2    touch that.

3                SEN. FRASER:  Again, you're being

4    subjective.  Let's wait for the objective testimony of

5    the witnesses.  You're being a good lawyer and

6    projecting what the witnesses might say.  And I would

7    suggest probably the thing we should do is listen to

8    the testimony that's given, and you will have the

9    right to question them.  But I think the witnesses are

10   going to make a very clear case that we've got a huge

11   problem in Texas.  There's a huge gap in Texas law.

12   There's every possibility for someone to walk in and

13   vote -- Craig Estes could take your voter ID and

14   register himself in Houston in a ballot box that they

15   don't, you know, know him.  And he could register as

16   Rodney Ellis and he could vote for Rodney Ellis.  That

17   could happen if, you know --

18               SEN. ELLIS:  Senator, in your mind, just

19   based on your best guess, do you think that this bill

20   would have a more positive impact on one party or the

21   other in terms of Democrats or Republicans?

22               SEN. FRASER:  I'm not going to project

23   about who might benefit from the passage of this.  But

24   I wish you would listen to the results in Georgia and

25   Indiana.  And I don't want to put words in their

```
 1    mouth, but I've seen the numbers.  The ones in Georgia
 2    and the ones in Indiana, the increase, the greatest
 3    increase came in Democratic votes, it came in
 4    minorities.  And I hope -- in Texas my hope would be,
 5    I want African-American votes to increase in Texas.
 6    That's my goal.  And if I can create something for
 7    your voters --
 8                 SEN. ELLIS:  This bill is going to
 9    increase the number of African-Americans and Hispanics
10    that vote in Texas?
11                 SEN. FRASER:  Absolutely.
12                 SEN. ELLIS:  That's what you believe?
13                 SEN. FRASER:  I do believe that; yes, I
14    do.
15                 SEN. ELLIS:  You made reference to the
16    last election in terms of the turnout increasing.  Do
17    you think that that record increase had anything to do
18    with Barack Obama being the Democratic nominee and
19    Sen. McCain, John McCain being the Republican nominee?
20                 SEN. FRASER:  Let me ask you this a
21    different way.  Did Barack Obama run in Illinois and
22    Indiana both?  Did he run in both states?
23                 SEN. ELLIS:  Senator --
24                 SEN. FRASER:  Was he from -- since you
25    asked me the question, I get to answer.
```

1          SEN. ELLIS:  I can --

2          SEN. FRASER:  You said was the --

3          SEN. ELLIS:  I can assure you the people

4  in Illinois knew Barack Obama was going to win the

5  State of Illinois.  I can assure you that.

6          SEN. FRASER:  You're saying they didn't

7  feel comfortable voting for him because they knew him?

8          SEN. ELLIS:  No, I'm not saying that at

9  all.  Let you ask you this:  Do you know what the

10 increase in vote was in Texas?

11         SEN. FRASER:  All the questions you're

12 covering is the same thing that was asked about the

13 last four -- you're the fifth person.

14         SEN. ELLIS:  600,000 additional votes.

15         SEN. FRASER:  We're going to have

16 witnesses from Indiana and Georgia --

17         SEN. DUNCAN:  Senators, you're taking

18 over each other and the court reporter only has two

19 hands.

20         SEN. ELLIS:  Okay.  You all right?

21         SEN. FRASER:  I'm going to vacate the

22 premise so you can talk.

23         SEN. ELLIS:  I think I've completed my

24 questions.  I think I've made the point.  I would like

25 to ask the author of the bill about a historic bill

1    that he's carrying that in my judgment would

2    negatively impact minority voters in Texas.

3                    SEN. FRASER:  As you know, the way this

4    system works, we have witnesses come in, they tell

5    their story, you get to ask them questions.  When

6    that's over, I'll close, we'll have a vote.  It will

7    come to the floor.  If I'm successful, once we get on

8    the floor and I lay it out, we get to do this again.

9    And I would suspect at some point you and I will have

10   a discussion.  But I would like for you to ask the

11   questions of the expert witnesses, because I think

12   you're going to be shocked at what they say about what

13   the impact would be on minority voting in both those

14   states, what happened and how it would be increased.

15                    SEN. ELLIS:  All right.  Thank you.

16                    SEN. DUNCAN:  Sen. Davis?

17                    SEN. DAVIS:  Sen. Fraser --

18                    SEN. FRASER:  You didn't get the rule

19   about freshmen?

20                    SEN. DAVIS:  No.  I'm sorry.  I didn't

21   get that rule.

22                    (Laughter)

23                    SEN. FRASER:  I'll be glad to accept

24   your questions.

25                    SEN. DAVIS:  Thank you.

146

```
 1              Would you agree that the provisions of

 2   the Carter-Baker comprehensive proposal are proposals

 3   that you are using in support for the legislation that

 4   you have introduced on this issue?

 5              SEN. FRASER:  Senator, I took the

 6   information that I read -- I read the report; I read

 7   what they included in print; I read their press

 8   release -- I took my highlighter and highlighted

 9   things that came from either what they had written

10   down and they put their name on, and I repeated and

11   read.  I didn't project what I thought Jimmy Carter

12   was thinking or what Jim Baker was thinking.  I read

13   what they put in print in that, and that's what I did

14   today.  There is going to be someone here hopefully,

15   if we ever get to that point, from that Commission

16   that you can ask that exact question.

17              SEN. DAVIS:  You made a statement a

18   moment ago that in this legislation that you have

19   proposed, you are addressing the recommendations of

20   the Carter-Baker Report for voter ID, did you not?

21              SEN. FRASER:  Say that again.

22              SEN. DAVIS:  You made a statement

23   previously, when you were speaking with Sen. Ellis,

24   that you are addressing the recommendations of the

25   carter-Baker Report for purposes of proposing your
```

1   voter ID bill?

2           SEN. FRASER:  I am proposing a voter ID

3   law and laying it out.  I used as a reference a

4   document that is in the public spectrum, something

5   that I've pulled off -- I think off the Internet, of

6   that report.  I highlighted a statement that was made,

7   and I read that statement.

8           SEN. DAVIS:  And you mentioned that you

9   highlighted not only that report but you also

10  highlighted the editorial of February 3, 2008, titled

11  "A Clearer Picture on Voter ID."  Correct?

12          SEN. FRASER:  What was the last part of

13  that?  But what?

14          SEN. DAVIS:  You mentioned a moment ago,

15  when you had your highlighter out, you went through

16  the report, the Baker-Carter Report.  You also went

17  through an editorial that was written by both of them

18  in February of 2008, and you also made highlights to

19  that editorial?

20          SEN. FRASER:  I highlighted a lot.

21          SEN. DAVIS:  But you highlighted those?

22          SEN. FRASER:  Well, I can get my book

23  out and I can show you what I highlighted, yes.

24          SEN. DAVIS:  I'm curious as to whether,

25  when you had your highlighter out, you highlighted

TX_00004014

148

1    this particular statement that was made in their

2    editorial, that the groups least likely to have valid

3    photo IDs are women, African-Americans and Democrats.

4    Did you highlight that statement?

5                 SEN. FRASER:  I am not advised.  I'm

6    sorry.  I don't have that.  I did not say that.  Did

7    you hear me say that?

8                 SEN. DAVIS:  No.  I'm asking you whether

9    you highlighted that.

10                SEN. FRASER:  I'm not --

11                SEN. DAVIS:  Do you remember reading

12   that?

13                SEN. FRASER:  I'm sorry?

14                SEN. DAVIS:  Do you recall reading that

15   from their editorial, that the groups least likely to

16   have valid photo IDs are women, African-Americans and

17   Democrats?

18                SEN. FRASER:  The answer is yes.  And

19   again, it's the question that Sen. Ellis just asked,

20   is that it was included in the paragraph above and

21   below.  But I think I do remember seeing that in that

22   editorial.

23                SEN. DAVIS:  Do you recall also seeing

24   their statement that the current crop of laws,

25   including those that we've been discussing today --

149

```
 1                    SEN. FRASER:  Senator, I'm sorry.  You
 2   know I have a hearing problem, and I'm only getting
 3   about half of what you're saying.  So if you can --
 4                    SEN. DAVIS:  I'm sorry.  I will speak
 5   up.
 6                    SEN. FRASER:  I have trouble -- I'm
 7   sorry -- sometimes with women's voices, and I'm just
 8   not getting it.
 9                    SEN. DAVIS:  I will speak up.
10                    Do you call reading in that editorial
11   that they also stated that the current crop of laws
12   are not being phased in gradually and in a fair manner
13   that would increase rather than decrease voter
14   participation?
15                    SEN. FRASER:  I'm not getting it.  I'm
16   sorry.
17                    SEN. ELLIS:  I thought I heard my wife's
18   voice.  Was she calling me?
19                    SEN. FRASER:  My wife says this is a
20   trained response.
21                    SEN. DAVIS:  Would you like me to repeat
22   my last question?
23                    SEN. FRASER:  Please.
24                    SEN. DAVIS:  Do you recall reading in
25   the editorial a statement made by Secretary Baker and
```

1    former President Carter that the current crop of laws

2    that are being put in place by states are not being

3    phased in gradually and in a fair manner that would

4    increase not reduce voter participation?

5              SEN. FRASER:  No, I do not remember

6    seeing that.

7              SEN. DAVIS:  You also stated that you

8    read the report and that you highlighted particular

9    provisions of that report in formulating your bill

10    that you have proposed today and your reasons for

11    supporting that bill.

12              SEN. FRASER:  I don't think I said that

13    at all.  I didn't read that report in formulating my

14    bill.  The bill that I laid out is very, very

15    straightforward.  All it says is that when Wendy Davis

16    goes to vote, they want to know -- they want to see

17    your picture ID or other forms of identification to

18    verify that you are who you say you are and that --

19    it's not rocket science.

20              SEN. DAVIS:  When you began your

21    comments on the floor today in laying out your bill,

22    you quoted from the Carter-Baker Report as well as

23    from the editorial that I read from a moment ago.  In

24    answering Sen. Ellis' questions, you said you were

25    addressing the recommendations of the Carter-Baker

TX_00004017

1    Report in implementing your proposal for voter ID.

2            SEN. FRASER:  I don't think I said that.

3    I said -- I think I referenced things that were said

4    in that report.  I referenced the Supreme Court

5    Justice, John Paul Stevens, again a left-leaning

6    Supreme Court Justice that wrote the majority report

7    that validated the Virginia -- or the Indiana law that

8    put in place a strict photo ID.  I referenced that

9    that had been done, their comments.  I referenced the

10    Commission, things that they had said.  I referenced

11    the bill that was proposed by Rep. Steve Wolens, a

12    Democrat in Dallas near your area that was -- or may

13    be in your district, where he suggested that with vote

14    harvesting and voter fraud, those are all stories that

15    were -- that I had data on.

16            SEN. DAVIS:  In referencing the

17    Carter-Baker Report, I wonder if you came across this

18    statement by them:  "To prevent the ID from being a

19    barrier to voting, we recommend that states use the

20    registration and ID process to enfranchise more voters

21    than ever."  Do you recall that?

22            SEN. FRASER:  Why don't you ask that

23    question of the expert witness that I have informed

24    the last five Senators that are coming up, that I

25    don't have any idea what she is going to say.  She is

152

```
 1    going to be under oath, and she would love to answer

 2    your questions that you're asking, and I think that is

 3    where we should go from here.

 4              SEN. DAVIS:  Well, for purposes of

 5    discussion or furthering our discussion and my

 6    questions for you, let me read some of the

 7    recommendations that Carter-Baker report made.

 8              SEN. FRASER:  Are you going to ask me

 9    questions --

10              SEN. DAVIS:  I'm going to ask you

11    questions.

12              SEN. FRASER:  -- or are you going to --

13    you have the right at any time to put stuff on the

14    record.  But you --

15              SEN. DAVIS:  I'm going to ask you

16    questions.

17              SEN. FRASER:  -- had asked the Chairman

18    if you could ask me questions.

19              SEN. DAVIS:  I'm going to ask you

20    questions.

21              SEN. FRASER:  Thank you.

22              SEN. DAVIS:  "States should play an

23    affirmative role in reaching out to non-drivers by

24    providing more offices . . ."  That's one of the

25    recommendations in this report.  Does the bill that
```

1    you have placed in front of us today on voter ID have

2    an affirmative role for states in recommending that

3    they reach out to non-drivers by providing more

4    offices?

5                 SEN. FRASER:  I'm sorry.  I'm not even

6    getting close to following the question you're asking.

7    The bill that I'm laying out today says that when

8    Wendy Davis walks into the voting booth, you've got to

9    prove that you're really Wendy Davis.  It's that

10   simple.

11                SEN. DAVIS:  And the bill does not

12   include a request of the state that it open more

13   offices for the purposes of obtaining a photo ID for

14   non-drivers, it does not include that proposal.

15   Correct?

16                SEN. FRASER:  They can use non-photos.

17   I mean, there is no provision right now, there is

18   nothing in the bill that every person in the state

19   could not comply with, because you can use a piece of

20   mail that had been mailed to you, your library card.

21   There's a long, long list of things that you could

22   use.  You could even use as your piece of

23   identification the mail that the registrar sent to you

24   for your voter registration.  That's a form of

25   identification.

154

```
 1                    SEN. DAVIS:  And I'm going to ask you
 2      about that list in a moment.  Let me ask you another
 3      question about what your bill includes.  Does your
 4      bill include a proposal that the state should create
 5      mobile offices for the purpose of reaching out to
 6      persons without photo ID, to create those photo IDs?
 7                    SEN. FRASER:  Would you ask that
 8      question again, please?
 9                    SEN. DAVIS:  Yes.  Does the bill that
10      you're proposing include a request of the state that
11      they create mobile offices that would go out into the
12      communities for purposes of helping voters obtain
13      photo IDs?
14                    SEN. FRASER:  Were you here earlier when
15      that question was asked by another senator?
16                    SEN. DAVIS:  I do not recall that
17      question being asked.  I would appreciate it if you
18      would answer it.
19                    SEN. FRASER:  The Secretary of State has
20      been asked to come here.  The Secretary of State will
21      implement this transaction.  The wording of the bill
22      that is in the bill is very clear of what we would ask
23      them to do.  The implementation of that would be, you
24      can ask the Secretary of State, please.
25                    SEN. DAVIS:  Okay.  But I'm asking you
```

1    if your bill includes that proposal?

2              SEN. FRASER:  My bill has language that

3    clarifies that there will be an education program of

4    the people to implement this bill.  It lays out the

5    instructions on that, but it will leave it to the

6    Secretary of State to implement.

7              SEN. DAVIS:  Does your bill contain a

8    proposal that would provide the ability for voters to

9    register and to provide photo IDs to those voters free

10   of charge?

11             SEN. FRASER:  Try it again.  I didn't

12   get it.

13             SEN. DAVIS:  Does your bill include a

14   proposal that would allow voters to register and be

15   provided photo IDs free of charge?

16             SEN. FRASER:  The photo ID is free of

17   charge.

18             SEN. DAVIS:  It is free of charge?

19             SEN. FRASER:  Yes.

20             SEN. DAVIS:  Who is going to pay for

21   that?

22             SEN. FRASER:  We are advised that --

23   first of all, that there are very few people that

24   would need that, is that the bulk of the population of

25   Texas already has a driver's license or a photo ID.

```
 1   And we're advised that, you know, the cost of that
 2   would be implemented through -- I guess it's DPS.  So
 3   it is built into the budget.
 4               You know, I know you're new to the
 5   Legislature.  But the fiscal impact on the bill, that
 6   is determined if there is a cost to the state.  And
 7   they said there is no impact, because it could be
 8   absorbed in current budget.
 9               SEN. DAVIS:  Believe it or not, I
10   understand that fiscal impact is based on whether
11   there is a cost to the state.  What I'm asking you is
12   if your bill proposes free voter ID cards that could
13   be made to anyone who requests them and whether there
14   has been a cost put to that proposal?
15               SEN. FRASER:  I'm sorry.  I'm getting
16   members, people talking to me.  Try it again, please.
17   I can't hear you.
18               SEN. DAVIS:  I'm asking you, in your
19   bill, the bill that you've authored, the bill that
20   you've laid out, the bill that you are standing in
21   front of us defending today, is there a proposal in
22   your bill that anyone who wishes to register to vote
23   would be provided a voter ID card free of charge?
24               SEN. FRASER:  The answer is yes, that
25   anyone that is a registered voter will be given a
```

1   photo ID free of charge.  So I think the answer to

2   your question is yes.

3                 SEN. DAVIS:  And yet, do you have any

4   idea how many people might come forward and request a

5   free voter ID?

6                 SEN. FRASER:  I would suggest you ask

7   the Secretary of State that.

8                 SEN. DAVIS:  I will.  But I'm asking

9   you, because it's your bill.  I'm asking you.  Do you

10  have any idea?

11                SEN. FRASER:  And I'm responding to you

12  that I'm going to punt to the Secretary of State

13  because they're the ones that keep that data.

14                SEN. DAVIS:  Was that question asked of

15  you by the LBB when they were preparing the fiscal

16  note for your bill?

17                SEN. FRASER:  We didn't talk to LBB.

18  That's not the process.

19                SEN. DAVIS:  Okay.  Turning to Section

20  63.0101, Sections (a) and Sections (b) of your bill,

21  would you agree that this list of proof of

22  identification that can be provided to a poll worker

23  includes a multiple of standards that those poll

24  workers could apply?

25                SEN. FRASER:  Do I agree that there's a

```
 1    lot of choices?
 2              SEN. DAVIS:  Yes, a multiplicity of
 3    standards --
 4              SEN. FRASER:  A multitude of choices.
 5    That I think is one of the beauties of the bill, is
 6    that there's a lot of ways that people could identify
 7    themselves.
 8              SEN. DAVIS:  Okay.  In reading the
 9    Carter-Baker proposal, was it your understanding that
10    the proposal they advanced was the creation of a
11    universal voter ID that would, No. 1, provide more
12    offices for people to receive those IDs, including
13    mobile ones; No. 2, that would allow the registration
14    and free federal ID for anyone wishing to seek one;
15    and that there would be much less discrimination
16    against minorities if there were a single uniform ID
17    rather than poll workers applying multiple standards?
18              SEN. FRASER:  I'm not advised.  I can't
19    speak for the commission.  We have an expert witness
20    who will be here in a minute, and I will be glad for
21    you to ask her.
22              SEN. DAVIS:  Would you agree that if
23    those proposals were put in place, that it would
24    create costs in implementing such a system?
25              SEN. FRASER:  Again, Senator, we have a
```

 1    system here where they look at the bill, any potential

 2    cost to the state.  They come back with the fiscal

 3    impact on that.  And the statement we received back

 4    from, you know, on the fiscal impact was no impact.

 5                  SEN. DAVIS:  Thank you.  I'm going to

 6    complete my questions for now in order to give the

 7    court reporter a break.  Thank you, Sen. Fraser.

 8                  SEN. FRASER:  Thank you.

 9                  SEN. SHAPLEIGH:  I've got three

10    exhibits.

11                  SEN. DUNCAN:  Members, we have several

12    folks who want to talk.  And we've been going now for

13    about an hour and 45 minutes, and I want to try to

14    pace the court reporter.  Before we go to a short

15    break, though, Sen. Shapleigh had some exhibits he

16    wanted to introduce.  So we'll do that and then take

17    a -- we'll be at ease for a few minutes.

18                  Sen. Shapleigh.

19                  SEN. SHAPLEIGH:  Thank you, Mr. Chair.

20                  If I could, as Exhibits 11, 12 and 13,

21    respectively, the copy of The New York Times op ed by

22    Baker and Carter, '05; copy of Royal Masset's quote;

23    and editorial from the quorum report and The New York

24    Times' editorial of '08, all discussed on the floor.

25                  SEN. DUNCAN:  Okay.  They will be placed

160

```
 1   in the record.
 2              Members, have those copies been provided
 3   to the Secretary?
 4              They're on their way?  Okay.  Thank you.
 5              Members, we will take a -- we'll stand
 6   at ease for approximately 10 minutes.  We'll reconvene
 7   at 4:45.
 8              (Exhibit Nos. 11, 12 and 13 marked and
 9   admitted)
10              (Recess:  4:36 p.m. to 4:51 p.m.)
11              SEN. DUNCAN:  The Senate Committee of
12   the Whole will come to order.
13              If those in the gallery could be seated
14   and we could have order in the chamber.
15              Sen. West.
16              SEN. WEST:  Thank you very much,
17   Mr. Chairman.
18              Sen. Fraser, I'm going to try not to be
19   repetitious.  Can you hear me now?
20              SEN. FRASER:  If you use the Barry White
21   voice, I think we're okay.
22              SEN. WEST:  The Barry White voice.
23              SEN. FRASER:  You know, I've told you
24   that before --
25              SEN. WEST:  All right.
```

161

```
 1                  SEN. FRASER:  -- that that's your best
 2      Barry White voice.
 3                  SEN. WEST:  Well, I --
 4                  SEN. FRASER:  I've got your vote.  I can
 5      hear you well.
 6                  SEN. WEST:  Barry was able to -- has
 7      been very convincing at times.  Can I convince you to
 8      pull this bill down?
 9                  SEN. FRASER:  Now yet.
10                  SEN. WEST:  Oh, okay.  All right.  I
11      want to go through the bill with you.  On Page 3 of
12      the bill, Line 1 --
13                  SEN. FRASER:  If you would hold one
14      second so I can get a copy of it.
15                  SEN. WEST:  Sure.
16                  SEN. FRASER:  You're reading from what?
17                  SEN. WEST:  Page 3, Lines 1 through 4.
18                  SEN. FRASER:  I'm not sure ours is going
19      to match up, but we'll try.  Page 3 -- where are you
20      referencing?  Okay.  There we go.  Okay.  That's what
21      I needed.  This is what we're used to.
22                  SEN. WEST:  Okay.  We talked about the
23      use of identification.
24                  SEN. FRASER:  Yes, sir.
25                  SEN. WEST:  If you're going under
```

162

1   Subdivision (1), you say, "one form of identification

2   listed in 63.0101(a)," and if you're going to go under

3   No. (2), you say two forms of identification under

4   63.0101(b).  And I'm trying to -- why the difference

5   between the two types of identification in terms of

6   the number that you have to use for purposes of

7   identification?

8            SEN. FRASER:  Well, I think the easy

9   explanation is that I think you know, under the

10  Indiana and the Georgia laws, they have a strict photo

11  ID.  Obviously, my preference on this would be a

12  strict photo ID.

13           In the language that came from the bill

14  that came over from the House, they offered an

15  exception with two other forms of ID.  But since

16  they're not a photo, where you could identify someone,

17  I can't speak for the House, but I'm assuming that

18  option was given so you would have two different ways

19  to identify someone to verify for sure that that's who

20  they were.

21           SEN. WEST:  So the only reason the

22  requirement for two different forms is in this bill is

23  because that's the way it came over from the House?

24           SEN. FRASER:  The bill was passed in the

25  House in this form and came over.  And because it had

1    already passed one body in that form, and we had not

2    voted on it, we made the decision to pick up the bill

3    that came over last year from the House.

4              SEN. WEST:  And that's the sole reason.

5    Is that correct?

6              SEN. FRASER:  No.

7              SEN. WEST:  What was the other reason?

8              SEN. FRASER:  The other reason is, is we

9    think this is a very fair -- you know, it's a very

10   fair way, is that -- you know, I would love to see a

11   strict photo ID bill like Indiana and Georgia.  But

12   the bill that we're laying out gives a second

13   opportunity for someone to identify themselves, which

14   would be a secondary form of identification.

15             SEN. WEST:  Okay.  But again, the reason

16   that it's in there is because it came over from the

17   House that way and some other reasons.  And I'm trying

18   to figure out what are all the reasons that you put

19   the requirement for two forms in there, other than it

20   came over from the House that way?

21             SEN. FRASER:  Again, the goal of my bill

22   is that I don't want somebody to go into the polling

23   place saying they're Royce West and use your voter ID.

24   I think if you had a photo ID -- both of us are big

25   people -- and if we came in, it would be easy for

1    someone to identify our features, that we are who we

2    say we are.

3                    SEN. WEST:  Yes.

4                    SEN. FRASER:  But if you don't have some

5    form of identification, then there is every ability

6    for someone to steal your voter registration --

7                    SEN. WEST:  Okay.

8                    SEN. FRASER:  -- and go and vote in

9    person, representing themself to be Royce West.

10                   SEN. WEST:  Okay.  Let's look at this

11   right here.  So your Section (a) specifically deals

12   with, under that -- I'm sorry.

13                   SEN. FRASER:  (a)?

14                   SEN. WEST:  Section (a) under 63.0101 --

15                   SEN. FRASER:  Where are you?  What page?

16                   SEN. WEST:  I'm actually on Page 5 now.

17                   SEN. FRASER:  Okay.  Page 5.  Which

18   line?

19                   SEN. WEST:  Well, this whole section,

20   starting from I guess 9 -- and Section 10 of the bill.

21                   SEN. FRASER:  Got it.

22                   SEN. WEST:  Everything in there deals

23   with some sort of photo identification.  Right?

24                   SEN. FRASER:  Yes, that's correct.

25                   SEN. WEST:  And everything in Section

 1    (b) deals with some documentary identification?

 2              SEN. FRASER:  I do believe you're --

 3              SEN. WEST:  Section (b) is on .

 4              SEN. FRASER:  All of (a) is photo and

 5    everything else is an alternate form of

 6    identification.

 7              SEN. WEST:  Okay.  Now, as it relates to

 8    section; I'm still on Page 5 and 6.  As it relates to

 9    the forms of identification that you have amended into

10    the bill, did you make any --

11              SEN. FRASER:  Well, I haven't amended

12    anything into the bill.

13              SEN. WEST:  Well, I'm sorry.  Drafted.

14    Drafted.

15              SEN. FRASER:  The bill was filed.

16              SEN. WEST:  Okay.  As filed in this

17    bill.  Did you make any determination as to how it

18    would impact ethnic minorities in the State of Texas?

19    And, if so, what did you do to make a determination as

20    to the impact?

21              SEN. FRASER:  The answer I'm going to

22    give you is the same answer I've given now to the last

23    six witnesses, is that the way we help determine that

24    was what happened in Indiana and what happened in

25    Georgia.  I have invited one person from Indiana and

1    two persons from Georgia.  The persons from Georgia
2    are a Section 5 voter rights state.
3                And I think those would be very good
4    questions to ask them, that if we implement a voter
5    identification bill, how did it impact their voters?
6    And I think they're going to tell you that their voter
7    response went up because those people felt very, very
8    good -- just a second.  You're about to interrupt me.
9    They felt very good that -- they felt before --
10   weren't comfortable because they were afraid their
11   vote was going to be stolen.  But after we implement
12   the voter identification, they felt good about it.
13   And voter results for all classes, but more especially
14   for African-Americans and Hispanics, increased.  And I
15   believe that's what they're going to tell you.  I
16   don't want to speak for them.
17                SEN. WEST:  Okay.  And so then we should
18   extrapolate from their testimony that the experiences
19   in a Section 5 state -- Georgia -- and a non-Section 5
20   state would be applicable to the State of Texas?
21                SEN. FRASER:  Senator, my wishes on this
22   and my goal, if I could project the absolute best
23   thing that could happen, is that the people of Oak
24   Cliff that are in your area representing --
25                SEN. WEST:  By the way, have you talked

1    with any people in Oak Cliff about this bill?

2                  SEN. FRASER:  That we would have record

3    turnout by the people in Oak Cliff --

4                  SEN. WEST:  Have you talked to any of

5    the minorities -- I'm sorry.

6                  SEN. FRASER:  Have I talked to any?

7                  SEN. WEST:  Have you talked to any

8    ethnic minorities about this particular bill?  Have

9    they had input into this bill at all?

10                 SEN. FRASER:  And I don't want to get

11   cute with you, but you are an ethnic minority, and you

12   and I have had a conversation about it.

13                 SEN. WEST:  Oh, no.  I'm talking

14   about --

15                 SEN. FRASER:  So the answer to that

16   would have to be yes.

17                 SEN. WEST:  Okay.  Well, let me be more

18   specific then.  Have you talked to any ethnic

19   minorities that support your bill?

20                 SEN. FRASER:  The answer is yes.

21                 SEN. WEST:  All right.  Are they

22   Hispanics and African-Americans?

23                 SEN. FRASER:  Yes.

24                 SEN. WEST:  Was it an African-American

25   that supports your bill?

1               SEN. FRASER:  What did you say?

2               SEN. WEST:  All right.  I'm going to be

3  more specific now.  Have you talked to an African-

4  American, African-Americans that support your bill?

5               SEN. FRASER:  Yes.

6               SEN. WEST:  Okay.  Have you talked to

7  Hispanics that support your bill?

8               SEN. FRASER:  Yes.

9               SEN. WEST:  Are they here to testify in

10  support of your bill?

11               SEN. FRASER:  Let me think about -- the

12  invited testimony --

13               SEN. WEST:  Yes.

14               SEN. FRASER:  -- of the invited

15  testimony, we have an African-American, I think, that

16  is going to testify on this bill.

17               SEN. WEST:  Is that African-American

18  with the Secretary of State's office?

19               SEN. FRASER:  Yes, he is.

20               SEN. WEST:  He is a resource, isn't he?

21  He's not coming to testify --

22               SEN. FRASER:  Did I say that -- I didn't

23  say he was going to testify.  I said he was going to

24  testify on the bill.

25               SEN. WEST:  All right.  Now, let me go

```
 1    back to my question.  Maybe it wasn't specific enough.
 2    Have you talked to any African-Americans or Hispanics
 3    that are in support of your bill --
 4                    SEN. FRASER:  Yes.
 5                    SEN. WEST:  -- support?  And will they
 6    be here to testify?
 7                    SEN. FRASER:  I'm not advised.  I --
 8                    SEN. WEST:  Okay.  Have you talked to
 9    any African- --
10                    SEN. FRASER:  I haven't looked at the
11    list of who is going to testify.
12                    SEN. WEST:  Have you talked to any
13    African-Americans or Hispanics about the impact that
14    your bill will have on their right to vote?
15                    Let me tell you what I'm getting to.
16    Have you talked to any African-Americans?  Have you
17    done an assessment in terms of whether or not this
18    particular bill and the methods that you are employing
19    will be retrogressive as it relates to the minority
20    voters of the State of Texas?
21                    SEN. FRASER:  I think the answer is the
22    same answer I gave you about four questions ago, is
23    that I looked at -- and I've spent a lot of time
24    examining the data of actual voter turnout that
25    happened after the implementation of a photo ID bill
```

1    in Indiana and in Georgia.  And I have invited the

2    election judges from both states to come and share

3    that with you today, and I feel sure that they will be

4    glad to answer your questions.

5                SEN. WEST:  And based on your

6    observation of what occurred in those particular

7    states, you believe that your bill, if enacted in law,

8    will not have any retrogressive impact on the minority

9    voters of the State of Texas?

10               SEN. FRASER:  I think my bill is going

11   to increase African-American and Hispanic turnout in

12   Texas.  I think those people today feel

13   disenfranchised because they feel like there is fraud

14   going on in votes today --

15               SEN. WEST:  Well, have you talked to

16   any --

17               SEN. FRASER:  Are you interrupting me?

18               SEN. WEST:  Yes.  I --

19               SEN. FRASER:  Just a second.  I get to

20   finish.

21               SEN. WEST:  But you say you feel like

22   those people.  My question is, who have you spoken to,

23   to come to that assertion that those people feel as

24   though that there's fraud and all that stuff?  What

25   African-Americans and Hispanics -- have you spoken to

171

1    some to make that assertion, in the State of Texas?

2              And I'll listen to you now.  I'll listen

3    to you now respond to my question.

4              SEN. FRASER:  I have laid out a bill and

5    researched, asked questions about the way people vote.

6    I believe I have a bill that will encourage people

7    that their vote will count and their vote is not going

8    to be diluted by those that cheat.  I think that will

9    encourage voters, as it did in Indiana and in Georgia.

10             And I believe that this bill is not only

11   good for the people of the State of Texas, but I'm

12   pretty familiar with the ethnic makeup of the people

13   you represent.  And I think this bill will be

14   extremely good for Royce West's senatorial district.

15             SEN. WEST:  Well, and I appreciate your

16   thoughts.  But let me ask you again, you made some

17   assertions that you believe that it's going to be good

18   for every one of Royce West's district and ethnic

19   minorities in the State of Texas.  You made assertions

20   that this will prevent people from cheating and all

21   that other stuff.  And I'm asking you, as relates to

22   voter impersonation, have you talked to any African-

23   Americans or Hispanics that said there was a problem

24   in the state, that this is a problem in the state?

25   Have you talked to any African-Americans in the state?

```
 1              SEN. FRASER:  Without a doubt, the
 2   way -- and I think after we hear the testimony of the
 3   witnesses here, and the Secretary of State, it's going
 4   to be hard for you to disagree that there is not a
 5   problem and the people you represent are not being not
 6   served correctly by the current law of Texas.  And as
 7   a reasonable person -- which I know you are.  I know
 8   you -- you know, you and I have served together for
 9   the last 12 years --
10              SEN. WEST:  Oh, yes.
11              SEN. FRASER:  -- and I respect you a
12   lot, you know.  And I think once you listen to the
13   testimony, you're going to have trouble not agreeing
14   that the people you represent will be well-served by
15   this bill, and I believe that.
16              SEN. WEST:  Okay.  And, you know, that's
17   fine.  But the answer to my question is, have you
18   spoken to anyone?
19              SEN. FRASER:  Yes, I have.
20              SEN. WEST:  African-Americans and
21   Hispanics --
22              SEN. FRASER:  Yes.
23              SEN. WEST:  -- that say that cheating is
24   a problem in the State of Texas, that voter
25   impersonation is a problem in the State of Texas, have
```

```
1    you've spoken with anyone?
2                SEN. FRASER:  I have spoken to --
3                SEN. WEST:  African-Americans and
4    Hispanics?
5                SEN. FRASER:  -- African-Americans and
6    Hispanics --
7                SEN. WEST:  In the State of Texas?
8                SEN. FRASER:  -- in the State of Texas.
9    And, you know, I have spoken to a lot of people in
10   different classes.  And the people of this state
11   believe that -- 88 percent of the people polled
12   believe that a photo or a voter ID in Texas should be
13   something we should implement.
14               SEN. WEST:  Sir, but --
15               SEN. FRASER:  And of those -- just a
16   second.  Of those -- and the number I saw -- and I
17   believe it was 74 person of the people surveyed were
18   African-American that said they believe that we should
19   implement a voter ID in Texas because they are
20   concerned about the --
21               SEN. WEST:  Do you have a copy of that
22   study?
23               SEN. FRASER:  Yes.  I do have -- we have
24   a Rasmussen study, and then there is a secondary study
25   and we will get that -- I will get that for you, yes.
```

```
1              SEN. WEST:  Mr. Chairman, I would like
2    to see that.
3              SEN. FRASER:  I will be glad to show it
4    to you.
5              SEN. WEST:  So you've depending upon a
6    survey that was done?  You're depending upon a survey
7    that was done in order to make the statement that
8    you're making in terms of talking to African-Americans
9    and Hispanics?
10             SEN. FRASER:  No.  I'm relying on actual
11   data of people that voted this election cycle that
12   didn't vote in the election cycles before, because
13   they were encouraged that their vote was going to
14   count.
15             SEN. WEST:  Okay.  And going back to --
16   and let me make sure I understand your response to
17   this question.  You've said that in order to get an
18   answer as relates to whether or not any less
19   regressive means were considered by you as the author
20   of this bill would have to talk to the Secretary of
21   State?
22             SEN. FRASER:  I don't think I said that
23   at all.  I don't think --
24             SEN. WEST:  Well, and you --
25             SEN. FRASER:  We even talked about less
```

1    regressive means.  I said the Secretary of State is

2    going to tell you the current state of the law in

3    Texas and tell you we've got a big problem --

4              SEN. WEST:  As it relates to regressive

5    means and an aggressive -- a regressive analysis in

6    terms of the impact that it has on minority voters.

7    Who on your panel would be able to answer that

8    question?  What experts would be able to answer that

9    question?

10             SEN. FRASER:  I suspect probably every

11   witness that is --

12             SEN. WEST:  Every witness?

13             SEN. FRASER:  I think so.

14             SEN. WEST:  Okay.

15             SEN. FRASER:  I think so.  I suspect

16   that -- we've got two personal -- or three personal

17   examples, because we've got Indiana and Georgia.

18   We've got the registrar from Houston that, you know,

19   you can ask those questions.  We've got the Secretary

20   of State's office, and then we've got the Carter-

21   Baker administration -- or the --

22             SEN. WEST:  Does your bill do anything

23   about fraud as it relates to denying people the right

24   to vote?

25             SEN. FRASER:  Say it again.

1          SEN. WEST:  Does your bill do anything

2   about fraud as relates to denying people the right to

3   vote?  You know, there may very well be individuals

4   that come into precincts and -- you know, back in

5   Dallas -- because you've talked about it a couple of

6   times.  I think it was in 1984, we had a bunch of

7   judges come down to African-American precincts and put

8   up signs basically saying, "You can go to jail."  Were

9   you aware of that?

10          SEN. FRASER:  No, I'm not.

11          SEN. WEST:  Okay.  This bill does

12   nothing about that type of behavior, though.  Right?

13          SEN. FRASER:  This bill --

14          SEN. WEST:  Okay.

15          SEN. FRASER:  -- is really straight-

16   forward, Senator.  This only addresses one narrow part

17   of the election code, and that is the fact that when

18   you walk into that voting place, you're going to

19   identify that when you vote as Royce West, they are

20   verify you are who you say you are.

21          SEN. WEST:  Those poll workers, how much

22   do we pay poll workers, Senator?

23          SEN. FRASER:  I'm not advised, but I bet

24   the Secretary of State knows.

25          SEN. WEST:  Okay.  And so those poll

TX_00004043

1    workers will make that determination -- right? -- as

2    to whether or not a person has the proper

3    identification?  Let me ask you this:  Let's say that

4    Troy Fraser's name was misspelled on the voter

5    registration list, and you came in with your driver's

6    license and it's correctly spelled.  What would happen

7    in that circumstance?

8              SEN. FRASER:  And again, I'm going to

9    punt to the Secretary of State, that they would make

10   the determination.  But I think likely the easy answer

11   is, is that there is a system today under current law

12   for a determination of that, that -- and I'll give you

13   this example.  I'm not real good about taking my voter

14   registration card.  I usually take my driver's license

15   in.  And if they had me on the rolls as F-r-a-z-e-r

16   and my driver's license says F-r-a-s-e-r, there is a

17   provision today under current law to manage that.  I

18   bet you that the --

19             SEN. WEST:  I do the same thing.  I

20   normally just take my driver's license in.

21             SEN. FRASER:  Well, but there's --

22             SEN. WEST:  And some people just take a

23   utility bill in.

24             SEN. FRASER:  And the answer to your

25   question is, I'm not addressing that.  That is --

1    under current law, the Secretary of State has the
2    ability to address that.  And I think the answer is
3    that if they can't determine your exact -- you know,
4    who you are, they could provide a provisional ballot,
5    do their research, find out you are okay and then let
6    you vote.
7                    SEN. WEST:  And I think that's exactly
8    the way that it plays out.  But as it relates to
9    provisional ballots -- and I think Sen. Ellis raised
10   this question a few moments ago.  What happens in that
11   circumstances?  You have a poll worker make a
12   determination that Fraser is spelled wrong, you do the
13   affidavit, you do a provisional ballot.  When is that
14   ballot counted under your bill?
15                   SEN. FRASER:  The Secretary of State --
16   I mean --
17                   SEN. WEST:  The Secretary of State's
18   office?
19                   SEN. FRASER:  -- will be glad to answer
20   that for you.
21                   SEN. WEST:  Okay.  That's fair.  Okay.
22                   Thank you very much, Sen. Fraser.
23                   SEN. FRASER:  Thank you.
24                   SEN. DUNCAN:  I will remind the members
25   that we still have invited testimony, numerous

1   witnesses, and then also public testimony, who have

2   been waiting here today to testify.

3             So we'll move now -- Sen. Hinojosa,

4   you're recognized.

5             SEN. HINOJOSA:  Thank you,

6   Mr. President.

7             Sen. Fraser?

8             SEN. FRASER:  I'm sorry, Senator, I

9   didn't hear him introduce you.  I'll be glad to answer

10  your questions.

11            SEN. HINOJOSA:  I only have a few

12  questions for you.

13            SEN. FRASER:  And, Senator, I'm sorry.

14  Let me get my head piece.  I can already anticipate

15  I'm going to have trouble hearing you.  Just a second.

16            (Brief pause)

17            Are you there?

18            SEN. HINOJOSA:  Yes, sir.

19            SEN. FRASER:  Do a little mike test.  It

20  still is not working.

21            Can you give me a mike test?  One, two,

22  three, four, five.

23            SEN. HINOJOSA:  Is it working now?  Can

24  you hear me?

25            SEN. FRASER:  No, it's not working.

```
 1                    (Brief pause)
 2                    Senator, let's try that one.
 3                    SEN. HINOJOSA:  Okay.  Can you hear me
 4       now?
 5                    SEN. FRASER:  I've got you now.  Thanks.
 6                    SEN. HINOJOSA:  Okay.  Thank you,
 7       Senator.
 8                    SEN. FRASER:  I'm --
 9                    SEN. HINOJOSA:  I just have a few
10       questions, and they deal more with the process and
11       trying to identify people who come to vote, with a
12       photo ID identification.  What type of training will
13       poll watchers have in order to determine whether or
14       not a photo ID is valid or a fraud?
15                    SEN. FRASER:  Senator, I don't want to
16       be cute or cut you off, but that's the same question
17       the last seven people have asked.  And the Secretary
18       of State has been invited here to answer that
19       question, and they can answer it a lot better than I
20       can.
21                    SEN. HINOJOSA:  Well, but in your
22       legislation, do you have provisions to provide some
23       type of detection equipment to be able to tell whether
24       or not a photo ID is fake?
25                    SEN. FRASER:  My bill is very straight-
```

1   forward in what will be required to identify.  But the

2   implementation of that and the training of the people

3   will be left up to the Secretary of State.  And I

4   would bet you the Secretary of State would love to

5   answer your question on that.

6            SEN. HINOJOSA:  Well, let me follow up

7   again.  You know, it's very easy to get a fake ID at

8   the flea markets and pay 20 bucks for them.  And my

9   question is, if you don't provide any legislation for

10  any type of equipment to be able to detect whether or

11  not that is a fake ID, then it defeats the whole

12  purpose of your legislation.

13           SEN. FRASER:  And, Senator, I think you

14  have just made my case for me.  That's the exact

15  reason that we're doing this bill, is that there are

16  people out there, unscrupulous people doing exactly

17  what you just said, that they are taking

18  identification of the people you represent and they

19  are going and fraudulently voting and that we don't

20  have the ability to either recognize that they have

21  done that or to prosecute them after they have.  Thank

22  you for bringing that up.

23           SEN. HINOJOSA:  Senator, that's not the

24  question that I asked.  That's not what I asked.  I

25  said do you have provisions in your legislation to

182

```
 1    provide the funding for the local precincts to

 2    purchase equipment to be able to detect whether or not

 3    a photo ID is a fake?

 4                   SEN. FRASER:  Senator, I'm sorry.

 5                   Did you get another head thing?

 6                   Senator, let's try it one more time.

 7    Would you ask that question again, please.

 8                   SEN. HINOJOSA:  Can you hear me?

 9                   SEN. FRASER:  This receiver is a bad

10    receiver.  I'm getting nothing but interference.

11                   Can somebody get one of these that

12    works?

13                   Let me try without it.

14                   SEN. HINOJOSA:  Okay.

15                   SEN. FRASER:  Where is Lucio's?

16                   Go ahead.

17                   SEN. HINOJOSA:  I will repeat my

18    question, Sen. Fraser.  And what I'm asking is whether

19    or not in your legislation you have provisions to fund

20    the detection equipment that will be able to tell

21    whether or not an ID is a fake one?

22                   SEN. FRASER:  Senator, again, I think

23    that would be a question of the Secretary of State, is

24    that -- I think you could ask him how they're going to

25    do it.  But we -- as you know, the way this works --
```

1    you have been here like I have, a long time -- we lay

2    this legislation out.  They come back with a fiscal

3    note of the impact to the state.  They said there is

4    no impact to the state, that they have sufficient

5    money within their budget to handle it.  And I would

6    suggest you ask that question of the Secretary of

7    State.

8                    SEN. HINOJOSA:  Well, I think that it's

9    very important that you have provisions in your

10   legislation to deal with this issue.  When you travel

11   by airplane, by air, as you well know, they scan your

12   driver's license and they can tell whether or not it's

13   a fake driver's license.  And what I'm asking of you

14   is whether or not you have provisions in your

15   legislation to deal with fake IDs from the flea

16   market, for example?  I guess not.

17                   SEN. FRASER:  I don't want to dodge your

18   question.

19                   SEN. HINOJOSA:  But you are.

20                   SEN. FRASER:  But you're asking a

21   question that is a technical question of the agency.

22   And again, I don't want to speak for my witnesses.

23   But the guy that's going to speak from Houston,

24   Houston is, in fact, using that exact same thing right

25   now.  So in some areas, it's already in place.

184

1          SEN. HINOJOSA:  Well, think about this:

2     How many precincts do we have here in the State of

3     Texas?  And if we are going to check on IDs and

4     whether or not they're fake, you need to have the

5     proper equipment in place.  How much are they going to

6     cost and who is going to pay for it?

7          SEN. FRASER:  Senator, you need to ask

8     the Secretary of State.  And, you know, that is a

9     technical question that the agency is going to have to

10    answer.

11         SEN. HINOJOSA:  Well, I guess the real

12    answer, it may be an unfunded mandate on the counties.

13         SEN. FRASER:  Well, I don't think

14    there's something in the bill that places a mandate on

15    them to buy equipment for that.  You know, I would

16    suspect that there is a system within the DPS to help

17    identify that.  And I think -- I don't want to over-

18    project, but I suspect that between the Secretary of

19    State's office and in the counties, that there is a

20    system that if you input a number, that they can tell

21    whether they're a real number or not.  And I'm sorry.

22    You're getting into an area that I don't have

23    expertise in.

24         SEN. HINOJOSA:  Well, I think it's very

25    important to have some provisions in your legislation

TX_00004051

185

1    dealing with this issue because, otherwise, there is

2    no way that you can have a poll worker know whether or

3    not a photo ID is a fake one or not.

4              Let me also ask another question.  Have

5    you considered how much longer it would take for

6    voters to vote, where the lines would be longer and it

7    would discourage people to vote?

8              SEN. FRASER:  Why don't you ask that of

9    the Indiana and the Georgia people.  They just went

10   through two election cycles in Indiana, one in

11   Georgia.  They have already done this.  That would be

12   an excellent question for them.

13             SEN. HINOJOSA:  But, Sen Fraser, you are

14   the one carrying the legislation, not them.

15             SEN. FRASER:  And that's the reason I

16   invited expert witnesses in, of people that have

17   already put this in place.  The advantage we've got is

18   that we're not reinventing the wheel on that.  We can

19   find out their information of what happened.

20             SEN. HINOJOSA:  Well, I think your bill

21   really needs a lot of work.  It has a lot of

22   shortcomings with it in the way it's going to be

23   implemented.

24             And thank you for answering my

25   questions.

TX_00004052

1           SEN. FRASER:  Thank you.

2           SEN. DUNCAN:  Sen. Uresti.

3           SEN. URESTI:  Thank you, Mr. President.

4           Sen. Fraser, I just have a few

5    questions.  I know it's been a long day, but I would

6    like to ask a few questions more specific to my

7    district.

8           But as a backdrop to my questions, not

9    only to you but to the witnesses that you've been

10   referencing all day, you have probably heard me speak

11   to this session, my senatorial district is the largest

12   geographical district in Texas.

13          SEN. FRASER:  I know your district well.

14   There's a lot of it that I used to represent, so I'm

15   very familiar with it.

16          SEN. URESTI:  And it's actually larger

17   than about 24 states in the country.

18          SEN. FRASER:  It's a great district,

19   good people.

20          SEN. URESTI:  It is a beautiful

21   district.  And one of the reasons I stand today to ask

22   you these questions is, I represent the constituents

23   of my district.  In addition to being the largest

24   district in Texas, it's also the second poorest

25   district in Texas.  The per capita income, the average

1    per capita for my constituents is $12,484 per year.

2                   SEN. FRASER:  Are you aware of the fact

3    that just right below, right above that is the

4    district that I represent?  And so we have a lot in

5    common in the people that I represent and the people

6    you represent, because our districts touch.  And a lot

7    of the people that you represent now are people that I

8    used to.  So we have a very like district.

9                   SEN. URESTI:  And even more reason why I

10   think you will appreciate the questions that I have of

11   you, Sen. Fraser.  In my district, the poverty rate is

12   approximately 24 percent.  So when you couple the

13   poverty rate with the vast area of my district, you

14   see the challenges that my constituents face.

15                  And I tell you that because when we talk

16   about photo ID and the necessity to obtain an ID,

17   whether it be a driver's license or whether it be an

18   actual Texas photo ID, knowing the area as well as you

19   do, when you look at some of the counties in my

20   district, I think you probably, better than most,

21   fully appreciate the distances that one has to travel

22   in order to get an ID.  And I'll just give you a few

23   examples.  In addition to that, though, the fact that

24   many of these DPS offices are only open on very

25   sporadic days and times.

1          For example, in Bandera County, it's

2    open -- the DPS office is only open on Wednesdays from

3    9:00 to 4:00.  In Culberson County, it's only open --

4    the DPS office is only open on Thursdays from 9:00 to

5    5:00.

6          In Kinney County, which is where

7    Brackettville is located, the DPS office is only open

8    the first and third Tuesday of each month from 9:00 to

9    4 o'clock.  And then one other example of many,

10   Terrell County, which is down where Sanderson is

11   located, the DPS office is only open one Monday a

12   month from 9:30 to 3:30.

13         So having said that, my concern is the

14   fact that if an individual needs to obtain a photo ID

15   or a Texas driver's license, the challenges that they

16   will face in, one, having to go to those offices; two,

17   the distances that they'll have to travel; and then

18   three, if they're not familiar with the dates or the

19   times that they are open, the fact that they may have

20   to go back.

21         And if they're not registered or they do

22   not obtain that in a timely manner, which I understand

23   it could take up to 60 days or so to receive your

24   photo ID, there is a very good chance that they will

25   not be able to have that ID when they do go to vote.

1    Would you agree with me on that, Sen. Fraser?

2              SEN. FRASER:  Well, that was a

3    consideration in looking at the parameters, is that

4    the good news for you is, we still have all the same

5    parameters for mail-in ballots.  We haven't changed

6    that.  And all these other forms, there is just a

7    multitude of things they can use for a secondary form

8    of identification.  So if for some reason they

9    couldn't get to that -- and I would -- you know, you

10   and I know that most of those people out there drive

11   and they do have cars, the bulk of them do, and they

12   would be -- they would really like to go and get that

13   driver's license.  But if they couldn't and they were

14   going to vote, there is a multitude of things they can

15   use for identification to make it really, really easy,

16   or they could do a mail-in ballot.  We've made it easy

17   for them.

18             SEN. URESTI:  And I appreciate you

19   bringing that up, because that's a good segue into my

20   next question.  But again, going back to the poverty

21   rate, I would respectfully disagree with you,

22   Sen. Fraser, that they all have cars, because most of

23   them can't afford cars, at least in my district.

24             On Page 5 of your bill, Senator, you

25   reference -- Page 5, Line 20, under "Documentation of

1   Proof of Identification," you reference "a United

2   States military identification card that contains the

3   person's photograph."  And I just want to make sure

4   that I clearly understand what you have in your bill,

5   and that for those military individuals, whether they

6   be active duty, reservists, retired, et cetera, if

7   there is no photograph on their military ID, then they

8   would not be able to use that ID under your bill.  Is

9   that correct?

10          SEN. FRASER:  I'm sorry, Senator.  I

11   think you probably have misread this.  You're under

12   the section that lays out the acceptable form of photo

13   ID.  But if it doesn't have a photo on it, it could be

14   used as one of the non-photo IDs, plus one other form

15   of identification.  So the answer to your question is,

16   yes, they could use it.

17          SEN. URESTI:  Okay.  So a military ID

18   that does not have a photo could be used?

19          SEN. FRASER:  Yes.  It's a form of

20   government identification.

21          SEN. URESTI:  Okay.  That's not the way

22   I read it, but I'm glad you cleared that up for me.

23          SEN. FRASER:  Under the (2), it would be

24   one of their forms of identification.  It is a

25   government-issued form of identification.  And under

1   the non-photo area, it would be used.

2           SEN. URESTI:  And just so I'm clear, it

3   reads "a United States military identification card

4   that contains the person's photograph."  What my

5   question is, if there is a military ID card that does

6   not have a photograph, then you're saying that those

7   military individuals, whether they be active duty,

8   whether they be reservists, whether they be retired,

9   would not be able to vote with that form of ID.  Is

10  that correct?

11          SEN. FRASER:  That is not correct.  That

12  would be one of their forms of ID.  And if they had

13  one other piece of identification, their utility bill,

14  with that military ID, they're fine.

15          SEN. URESTI:  Whether it has a

16  photograph or no?

17          SEN. FRASER:  Yes.

18          SEN. URESTI:  Okay.  Very good.  That's

19  good to know.

20          Going into the alternative forms of

21  documentation, specifically on Page 6, what I'm trying

22  to reconcile and what is confusing to me, and I

23  believe would be very confusing to the voters of

24  Texas, and complicated, on Page 6, Line 14, you list

25  the following documents -- I beg your pardon -- "The

1    following documentation is acceptable as proof of

2    identification under this chapter."

3                    Then it goes on to read, Subparagraph

4    (1), a copy of a current utility bill; Paragraph (2),

5    official mail; Paragraph (3), a certified copy;

6    Paragraph (4), United States citizenship papers;

7    Paragraph (5), an original or certified copy; and then

8    No. (6,) court records.

9                    And so I'm trying to reconcile those

10   different terms in that you have a copy, you have

11   official document, you are certified document, you

12   have papers, you have original or certified copy, and

13   then you have court records.

14                    And to me, that's confusing as an

15   attorney, much less I think to my constituents.  And

16   so specifically -- this is my question, Sen. Fraser --

17   on No. (16) (sic) under the Paragraph (b) where it

18   reads, "a copy of a current utility bill, bank

19   statement, government check, paycheck, or other

20   government document," that leads me to believe that if

21   they brought the original document, they would not be

22   able to use the original document, it would have to be

23   a copy of that document.  Is that correct?

24                    SEN. FRASER:  I think you're over-

25   reading the issue, because this is current law.  This

1    is current law that we're operating.  If you voted in

2    this last election, you voted under this.  If you will

3    look at that -- and I believe -- is that not taken

4    from current law?  So if you're confused about it

5    today, you were confused about it yesterday, because

6    it was -- that's current law.

7                 SEN. URESTI:  Well, let me tell you why

8    I'm confused, Sen. Fraser, because if you go on into

9    Paragraph (2) that's not current law, and Paragraph

10   (3) that's not current law, for specifically Paragraph

11   (3,) you insert "a certified copy."  Paragraph (5),

12   you put "an original or certified copy."  So that's

13   why it's confusing, Sen. Fraser, and that's why I'm

14   trying to clarify it, because you use a copy in one

15   instance, then you use a certified copy in another

16   instance.  But here is my question.  I want to go back

17   to my question.

18                 SEN. FRASER:  Wait, wait, wait.  Hold on

19   a second.  You've got to answer the one that you just

20   asked.  One of the great things about these

21   hearings -- and it's the same answer I gave now to the

22   last eight people I've talked to -- I'm about to have

23   the Secretary of State come up here.  The Secretary of

24   State's job is to issue the clarification of adopting

25   rules to clarify the implementation of the law we

TX_00004060

1    passed.  And I would -- I don't want to put words in

2    their mouth, but I would assume they're going to say,

3    "We can handle that."

4              SEN. URESTI:  Okay.  And I appreciate

5    that.  And because you can't speak for the Secretary

6    of State and because you are the author of this bill,

7    I just wanted to ask you, so I could clarify and so I

8    can explain it to the voters of Texas and to my

9    constituents, then -- and I think you understand now

10   what I'm trying to reconcile in that you asked for

11   different documentation.  And, one, it can be a copy

12   or it can be the official mail, et cetera.  And I will

13   ask the specific questions of the Secretary of State.

14             SEN. FRASER:  I think it would be a good

15   idea to do that.

16             SEN. URESTI:  But because you are the

17   author, I wanted to ask you specifically.  And then I

18   think my last question, Sen. Fraser, if you bear with

19   me one second.  I beg your pardon.

20             On Page 4 under Section 8, on Line 20

21   where it reads "did not deliberately provide false

22   information to secure registration in a precinct in

23   which the voter does not reside," I'm trying to

24   understand what you mean when you put "deliberately

25   provide false information."

1           SEN. FRASER:  Senator, again --

2           SEN. URESTI:  And (2) --

3           SEN. FRASER:  -- I don't want to

4    interrupt you here, but you're quoting current law.

5    That's law right now that we have been living under

6    for some period of time.  And if you've got a question

7    about the interpretation of the Secretary of State's

8    rule on that, I bet they would answer it.

9           SEN. URESTI:  And I hope they can.  But,

10   Senator, this is part of your bill, though.  (1) --

11          SEN. FRASER:  Now, just a second.  You

12   know the way this works in legislation is that if it's

13   current law, you reprint current law.  And if you're

14   going to make a change, you insert it and underline.

15   And all we're doing there -- we could have left all

16   that out and make you work and go see how it fits

17   together.  But, you know, you have been here a long

18   time, and you know that's the way it works is, we go

19   ahead and tell you what current law is so it reads

20   correctly.  I didn't make that law up.  It's just a

21   law that is there.  And I think you could ask the

22   Secretary of State the way it's interpreted.

23          SEN. URESTI:  And I appreciate that.

24   But did you not strike certain language from current

25   law in this bill, Sen. Fraser?

```
 1                    SEN. FRASER:  If it was struck -- did we
 2     strike -- just a second.
 3                    (Brief pause)
 4                    I'm not advised as to whether we struck
 5     something.  I believe the language that you're
 6     referring to on Line 20 is current law and above and
 7     below it is current law.  And I, to my knowledge --
 8     but again, I think you should ask the Secretary of
 9     State that.
10                    SEN. URESTI:  And I'll do that.  Thank
11     you, Sen. Fraser.
12                    SEN. FRASER:  You bet.  Thank you.
13                    SEN. DUNCAN:  Sen. Van de Putte.
14                    SEN. VAN de PUTTE:  Thank you,
15     Mr. President.
16                    And, Sen. Fraser, I'm . . .
17                    SEN. FRASER:  It was wishful thinking.
18                    SEN. VAN de PUTTE:  And I would have
19     hoped that this question would have been asked before,
20     and I've listened and it's not, and I know that we
21     would love to --
22                    SEN. FRASER:  I would love to have a new
23     question.
24                    SEN. VAN de PUTTE:  Well, thank you.
25     I'm going to be very, very quick.  I am looking at
```

TX_00004063

1    Page 5, Line 27.

2              SEN. FRASER:  Just a second.  Let me get

3    my glasses, Senator.  Hold on.  I'm deaf and blind.

4              SEN. VAN de PUTTE:  Section 10 of the

5    bill.

6              SEN. FRASER:  Section 10.  What page?

7              SEN. VAN de PUTTE:  Page 5, Line 27.

8              SEN. FRASER:  Got it.

9              SEN. VAN de PUTTE:  In that section,

10   there is a change from the United States citizenship

11   papers -- and you strike that -- to certificate.  Tell

12   me, what is the difference between a certificate and

13   the papers?

14             SEN. FRASER:  Senator, again, you and I

15   have served together a long time.  And you know when

16   these bills come from Leg. Council, that if there is

17   clean-up legislation, they need to clarify something

18   that is either case law.  The answer is, I don't know

19   why they struck that.

20             SEN. VAN de PUTTE:  Well, it --

21             SEN. FRASER:  It was not our

22   recommendation.  This came from Leg. Council this way.

23   I can find out the answer to that --

24             SEN. VAN de PUTTE:  Okay.

25             SEN. FRASER:  -- but I can honestly say

1    I don't know.

2              SEN. VAN de PUTTE:   Okay.  Well, I think

3    there is different terminology.   It is my

4    understanding, since I represent a Hispanic

5    district -- and many of the senators here have a

6    number of Hispanics -- this is especially important

7    for naturalized citizen.   It is my understanding that

8    the certificate means the 8-by-11 certificate with a

9    photo that is given at the time of naturalization.  So

10   it does have a photo, and it's under your section that

11   it would be okay for a photo.  My question is that the

12   government also issues a wallet-sized card that is

13   listed as a paper.  That could be part of the paper,

14   but it has no ID.

15             On the section of the bill that you talk

16   about non-photo, which would be Page 6, Line 24, it

17   says "United States citizenship papers."  Papers I

18   think are the card.  But the papers, are they the

19   certificate?  And the reason I ask is, because at the

20   time of naturalization -- and many of us have

21   Hispanics in our district that as young children were

22   naturalized.  That picture is of a child and doesn't

23   match up.  So how --

24             SEN. FRASER:  Senator -- and again, I

25   don't want to dodge your question.  I think probably

1    this is a legitimate question to ask the Secretary of

2    State.

3                    SEN. VAN de PUTTE:  Okay.

4                    SEN. FRASER:  I'm not sure they can

5    answer that one.  But I will tell you my intent on

6    this is not to deny any legal voter that should have

7    the right to vote, and that if someone is using this

8    as a source of documentation and it is a legal

9    documentation that proved they are who they say they

10   are, I want them to be able to use it.  I want all

11   Hispanics that you represent --

12                   SEN. VAN de PUTTE:  Yes.

13                   SEN. FRASER:  -- to have the ability to

14   vote under this bill, and my intent is to increase

15   their right to do that.  So if there is a tweak needed

16   there, I can tell you I'm open to it.  I don't know

17   the answer to the question you're asking.

18                   SEN. VAN de PUTTE:  Well, thank you.  In

19   researching that, there is a difference between

20   "certificate" and "paper."  On one, the certificate

21   does have a photo ID; the paper does not.  And I think

22   that's probably why Leg. Council did that.

23                   SEN. FRASER:  You and I could probably

24   sit down with a Leg. Council lawyer, ask them what

25   happened, the meaning of that.  And it is certainly

1    not my intent in any way to deny someone the right to

2    vote.  My intentions are exactly the opposite.  I want

3    them to be able to identify themself and vote.

4              SEN. VAN de PUTTE:  Well, thank you,

5    Senator, because the picture photo for many of my

6    constituents who have been naturalized and are now

7    adults or maybe even elderly does not match up,

8    because that was taken at the time of naturalization.

9              And my fear was that an election clerk,

10   having to know the difference between certificates and

11   paper and then maybe the name not matching up,

12   particularly for women who then would be -- the

13   naturalization paper certificate would never match up

14   with your married name if you were naturalized as a

15   child, and that would be extremely discriminatory

16   toward Hispanic citizens and particularly to this

17   state, which may not have been a problem in Georgia or

18   Indiana but is definitely a problem here, and I

19   appreciate that.

20             SEN. FRASER:  Not a -- absolutely, we

21   want -- if someone is a legal citizen and has

22   identification and they're registered to vote, then I

23   want them to have the ability to do that.

24             One of the questions you just asked

25   about the picture not matching up, I would also advise

1    you to ask the Secretary of State that, is that I

2    think there's methodology, that it's even addressed --

3    it was anticipated -- in some of the things I read,

4    that if I grew a beard and I don't look like I used

5    to, a methodology to make sure that we could verify

6    who you say you are.

7                SEN. VAN de PUTTE:  Thank you, Senator.

8    And I have one follow-up question.  You and I have the

9    luxury and the blessing of representing many now Texas

10   residents who are voting in the state who happen to be

11   military families and military members.  And I know

12   you are well aware of Fort Hood and Sen. Shapleigh at

13   Fort Bliss.  My question is a follow-up to Sen.

14   Uresti's questions on military ID.

15               Many times the identification of record

16   doesn't have the address of the voting.  So if they

17   were voting here but their address of record is at --

18   how would, under your bill, a clerk treat that

19   inconsistency of a nonmatch-up for our military

20   members?

21               SEN. FRASER:  Again, Senator -- and I

22   thank you for acknowledging my district being

23   impacted.  I believe that I have the largest number of

24   ex-military in the state living in my senate district,

25   you know, former military.  I want to make sure that

1    they have the right to vote.

2                Yes, they do change addresses, but this

3    is something that we have been coping with for years,

4    even under our current system.  Again, I think the

5    Secretary of State is capable of not only answering

6    that question but also making sure we have a seamless

7    transition to this, because it's extremely important

8    to me, and I know it is to you, is that I want to make

9    sure that our brave men and women that have served

10   this country preserve that very basic right in making

11   sure they get to vote in elections.

12               SEN. VAN de PUTTE:  Thank you, Senator.

13   I appreciate that.  And I want to clarify, just for

14   the last time, so that I understand.  With the changes

15   that you are proposing, every Texan who wishes to cast

16   a ballot would have to bring both their certificate,

17   voter certificate that's issued by the jurisdiction

18   that they've registered in, and some sort of photo

19   identification.  Is that correct?

20               SEN. FRASER:  Well, that's not exactly,

21   the way you phrased that.  Actually, for someone to

22   vote, all they've got to do is show up.  So that

23   the -- I need to ask a question.  I just thought of

24   something.

25               (Brief pause)

1          Okay.  I'm sitting here having a
2     discussion with my staff, clarifying that that is the
3     case.  And I can tell you, my intent on this would be
4     that it's -- here would be the example I would give
5     you.  I go to Marble Falls or Horseshoe Bay to vote.
6     I never have my voter ID.  I always just pull out my
7     driver's license.  Let's just say for some reason I
8     forgot my driver's license.  My intent would be, if I
9     have two other pieces of identification listed here
10    and they match up with the voter roll and it says,
11    "Troy Fraser, 103 Lighthouse," a particular precinct,
12    it would be my intention you should vote.
13          SEN. VAN de PUTTE:  Well, that's --
14          SEN. FRASER:  I'm not clear -- I want to
15    make sure, as you do -- and I think what you're
16    raising is making sure that the bill absolutely says
17    that, and that is the intent.
18          SEN. VAN de PUTTE:  Well, thank you,
19    Sen. Fraser, because the way I looked at this, I
20    thought that every Texan who wants to cast a ballot
21    now will have to present with both the voter
22    certificate and a photo ID or the certificate and two
23    alternate forms.  So you either have a two-fer or a
24    three-fer.  And I'm just wondering if that's correct
25    or if someone shows up and they do not have their

```
 1    certificate, do they just need a photo ID?  And if

 2    they show up and they don't have their certificate or

 3    a photo, what other two --

 4                SEN. FRASER:  I don't have the answer

 5    for you today.  I'll be honest with you, that I've got

 6    to look at that.  I wish I could give you an answer on

 7    that, but I don't have an answer right now.  And I've

 8    got to look at the bill, talk to the Secretary of

 9    State's office, see how that flows together, look at

10    the election official and determine how we blend that

11    together.

12                My intention is that I want everyone to

13    vote.  I'll give you that as a blanket answer.  My

14    intention is that if someone can prove who they say

15    they are, I want them to vote.

16                SEN. VAN de PUTTE:  Thank you,

17    Sen. Fraser.

18                SEN. FRASER:  Thank you.

19                SEN. DUNCAN:  Nobody else?

20                All right, members.  Sen. Gallegos -- I

21    thought I had lost count.

22                SEN. GALLEGOS:  A question of the

23    author.

24                SEN. FRASER:  This is the three-minute

25    rule.  Are we using the egg timer rule?
```

```
 1              SEN. GALLEGOS:  Well, you already
 2    surpassed that, so I thought I would --
 3              SEN. FRASER:  No.  I'm still just
 4    answering your questions.
 5              SEN. GALLEGOS:  Well, Senator, let me
 6    ask you, have you thought about the state of our
 7    economy and the steadily rising number of foreclosures
 8    taking place?  And I'm talking about this bill.  Just
 9    last week, the Dallas Morning News reported that the
10    Carrollton-Farmers Branch School District has seen
11    185 percent increase in the 2008-2009 school year of
12    homeless students.
13              SEN. FRASER:  Senator, can you help me
14    here?  I'm having trouble.  I'm looking at the bill,
15    and I'm having trouble finding the place that has to
16    do with foreclosures.
17              SEN. GALLEGOS:  Well, no, no, no.  I'm
18    getting to my question, if you allow me.
19              SEN. FRASER:  I will.
20              SEN. GALLEGOS:  These are people in the
21    State of Texas whose entire families are affected.
22    And the homeless, as you know, well know, they move
23    around a lot.  They're U.S. citizens, and they move
24    around a lot and stay in cars, in shelters and
25    sometimes relatives' houses.  But the important thing
```

1    is that they do not have a permanent residence, even

2    though they're U.S. citizens.

3                And I guess -- and they don't have

4    utility bills, they aren't on a current regular

5    schedule.  And to show, if that is asked for when they

6    go to a precinct to vote, I guess my question is,

7    under your bill, under this scenario, is there a limit

8    on how many times they can get an official DPS ID to

9    vote every couple of weeks?

10                SEN. FRASER:  Well, first of all, I'm

11   confused in your description of this, because for

12   someone to register to vote and be legal to vote, they

13   have to specify the precinct that they're in.  And

14   that's one -- I think one of the requirements that the

15   Secretary of State looked for, is that you have to be

16   a resident voting in a specific precinct, and they had

17   to mail that to somewhere.  But the answer to your

18   question that you were getting to is, is there a limit

19   on the number of IDs they can get?  And, no, there is

20   no limit.

21                SEN. GALLEGOS:  There is no limit under

22   your bill?

23                SEN. FRASER:  No limit.

24                SEN. GALLEGOS:  Okay.  All right.  Thank

25   you.

1              SEN. FRASER:  Unlimited IDs.

2              SEN. GALLEGOS:  There's unlimited ID.

3     Okay.  All right.  Thank you.

4              SEN. FRASER:  Thank you.

5              SEN. DUNCAN:  Okay, members.  If there

6     are no other questions, we are now ready to move into

7     the invited testimony phase of the hearing.  So at

8     this point in time, I think I have been submitted --

9     actually, we had the Secretary of State collect the

10    list from the author and those who might be opposed to

11    the bill.

12             And, as stated earlier, I will first

13    invite -- we'll have Hans von Spakovsky to testify

14    first.  He is proposed by Sen. Fraser.  And then

15    followed by that, we'll have Tova Andrea Wang, who is

16    proposed by Sen. Van de Putte.  If we could bring them

17    into the chamber.  And we will have a timer that will

18    be 10 minutes.

19             Sen. Van de Putte, I believe you had a

20    witness that you needed a little bit longer time.  Is

21    this the witness?

22             Okay.  And, members, again I'll state

23    again, we will not recognize anybody for a question

24    during the 10-minute period of time for layout.

25    Thereafter, we will allow questions.  I'll remind you

1    that we have the public testimony that will follow

2    after the invited testimony, so be efficient.  But,

3    you know, you're entitled to ask your questions.

4                   So is Mr. von Spakovsky in the chamber?

5                   And for the sake of time, if we could go

6    ahead and bring Tova Andrea Wang into the chamber.

7                   Is this -- who is this?

8                   (Off-the-record discussion)

9                   SEN. DUNCAN:  Mr. von Spakovsky.

10                   Okay.  She will go second.

11                   Okay, Mr. von Spakovsky, you're

12   recognized.  You need to state your name and who you

13   represent.  I believe you have turned in a witness

14   affirmation card.  You have 10 minutes.  That will be

15   strictly enforced.  And you have a timer there in

16   front of you.  You can begin.

17                   (Proceedings continued in Volume 1B)

18

19

20

21

22

23

24

25

TRANSCRIPT OF PROCEEDINGS BEFORE

THE SENATE OF THE STATE OF TEXAS

EIGHTY-FIRST LEGISLATURE

(COMMITTEE OF THE WHOLE SENATE)

AUSTIN, TEXAS


IN RE:                          §
                                §
CONSIDERATION OF                §
SENATE BILL 362                 §


## COMMITTEE OF THE WHOLE SENATE

### TUESDAY, MARCH 10, 2009


BE IT REMEMBERED THAT AT 5:50 p..m., on

Tuesday, the 10th day of March 2009, the above-

entitled matter continued at the Texas State Capitol

Senate Chamber, Austin, Texas, before the Committee of

the Whole Senate; and the following proceedings were

reported by Aloma J. Kennedy, a Certified Shorthand

Reporter of:

VOLUME 1B                          PAGES 209 - 480



KENNEDY

REPORTING

SERVICE

*a record of excellence*

1801 Lavaca • Suite 115 • Austin, Texas 78701 • 512-474-2233

ORIGINAL

TX_00004076
JA_003499

TX_00004076

i

TABLE OF CONTENTS

PAGE

**VOLUME 1A**

PROCEEDINGS, TUESDAY, MARCH 10, 2009                    2

ROLL CALL NO. 1                                         2

OPENING INSTRUCTIONS BY SEN. DUNCAN                     5

OBJECTION TO FURTHER CONSIDERATION OF SB 362
(SEN. WEST)                                            12

ROLL CALL NO. 2                                        38

LAYING OUT OF SENATE BILL 362
(SEN FRASER)                                           44

QUESTIONS FROM SENATE FLOOR                            53

**VOLUME 1B**

INVITED TESTIMONY                                      210

    TESTIMONY BY HANS VON SPAKOVSKY                    210
    QUESTIONS FROM SENATE FLOOR                        218

    TESTIMONY BY TOVA ANDREA WANG                      277
    QUESTIONS FROM SENATE FLOOR                        287

    TESTIMONY BY CAMERON QUINN                         300
    QUESTIONS FROM SENATE FLOOR                        306

    TESTIMONY BY TOBY MOORE                            336
    QUESTIONS FROM SENATE FLOOR                        344

    TESTIMONY BY FRANK B. STRICKLAND                   373
    QUESTIONS FROM SENATE FLOOR                        417

    TESTIMONY BY ADAM SKAGGS                           408
    QUESTIONS FROM SENATE FLOOR                        417

    TESTIMONY OF ROBERT A. SIMMS
    SUBMITTED BY WES TAILOR                            435

    TESTIMONY BY J. GERALD HEBERT                      442
    QUESTIONS FROM SENATE FLOOR                        450

ii

# TABLE OF CONTENTS

PAGE

**VOLUME 2**

PROCEEDINGS, WEDNESDAY, MARCH 11, 2009                    482

    QUESTIONS FROM SENATE FLOOR (CONTINUED)    482

    TESTIMONY BY THOMAS WHEELER              502
    QUESTIONS FROM SENATE FLOOR              510

    TESTIMONY BY CHANDLER DAVIDSON            521
    QUESTIONS FROM SENATE FLOOR              527

    TESTIMONY BY ED JOHNSON                  559
    QUESTIONS FROM SENATE FLOOR              566

    TESTIMONY BY DANIEL B. KOHRMAN            621
    QUESTIONS FROM SENATE FLOOR              628

    TESTIMONY BY COBY SHORTER                653
    QUESTIONS FROM SENATE FLOOR              655

    TESTIMONY BY DENNIS BOREL                706
    QUESTIONS FROM SENATE FLOOR              713

    TESTIMONY BY GARY GLEDSOE                724
    QUESTIONS FROM SENATE FLOOR              731

    TESTIMONY BY ERIC NICHOLS                742
    QUESTIONS FROM SENATE FLOOR              750


PUBLIC TESTIMONY                              771

   CLAIRE OXLEY GLUCK                        771

   HAZEL COTTON                              773
   QUESTIONS FROM SENATE FLOOR              775

   KATHY HICKS                               776
   JAMES E. CARTER                           779
   RUSTY HICKS                               781

# TABLE OF CONTENTS

PAGE

PUBLIC TESTIMONY (CONTINUED)

TINA BENKISER ................................ 784
B.R. SKIPPER WALLACE ........................ 787
ANITA PRIVETT ............................... 789
MARY ANN COLLINS ............................ 792

ROSA ROSALES ................................ 794
QUESTIONS FROM SENATE FLOOR ................. 797

DUSTIN RYNDERS .............................. 800

MARSHA CORREIRA ............................. 803
QUESTIONS FROM SENATE FLOOR ................. 806

RENE LARA ................................... 807
LEE MEDLEY .................................. 810
JOHN WATKINS ................................ 811
KENNETH FLIPPEN ............................. 813
ANNIE BANKS ................................. 816
RACHEL HERNANDEZ ............................ 817
RENATO DE LOS SANTOS ........................ 819
JUDY HOLLOWAY ............................... 823
LYDIA CAMARILLO ............................. 825
EDWARD B. WILLIAMS .......................... 828
MADELEINE DEWAR ............................. 830
HELEN VILLARREAL ............................ 833
MARK WILLIAMSON ............................. 835
VANESSA FOSTER .............................. 838

LUIS FIGUERO ................................ 840
QUESTIONS FROM SENATE FLOOR ................. 844

PATTI EDELMAN ............................... 844
SYLVIA MENDOZA .............................. 846
KENNETH KOYM ................................ 848
KAREN RENICK ................................ 850
JONI ASHBROOK ............................... 853
DUANE RAWSON ................................ 856
ROD FLUKER .................................. 858

ROLL CALL NO. 3 ............................. 864

PROCEEDINGS CONCLUDED ....................... 869

iv

EXHIBIT INDEX

| | | | MARKED | ADMITTED |
|---|---|---|---|---|
| 1A | Sen. Van de Putte 3/3/09 Memo to Sen. Duncan re ground rules for Committee of the Whole Pubic hearing | | 21 | 21 |
| 1B | Sen. Duncan 3/5/09 Memo to Sen. Van de Putte re response to concerns about ground rules for the Committee of the Whole Senate | | 21 | 21 |
| 2. | Letter to Texas Attorney General Greg Abbott re:  Hearing on SB 362, signed by 11 Senators | | 21 | 21 |
| 3. | Senate Notice of Public Hearing on SB 362 for 3/10/09 | | 21 | 21 |
| 4. | Texas Senate Agenda, 3/10/09 | | 21 | 21 |
| 5A | 3/10/09 Tag Form signed by Sen. Royce West, et al | | 21 | 21 |
| 5B | 3/10/09 Tag Form signed by Sen. Mario Gallegos | | 21 | 21 |
| 6. | Roll Call No. 2 - Sen. Gallegos' Appeal of Ruling of Chair on Sen. West's Point of Order | | 120 | 120 |
| 7. | Institute of Public Policy Publication entitled "The Effects of Photographic Identification on Voter Turnout in Indiana:  A County-Level Analysis" by Jeffrey Milyo, Report 10-2007, Revised December 2007 | | 120 | 120 |

v

EXHIBIT INDEX (continued)

|  |  | MARKED | ADMITTED |
|---|---|---|---|
| 8. | AU News publication entitled "Much-hyped Turnout Record Fails to Materialize - Convenience Voting Fails to Boost Balloting" | 120 | 120 |
| 9. | Symposium paper entitled "The Empirical Effects of Voter-ID Laws:  Present or Absent?" by Jason D. Mycoff, Michael W. Wagner and David C. Wilson | 120 | 120 |
| 10. | 9/10/07 Report of the Heritage Center for Data Analysis entitled "New Analysis Shows Voter Identification Laws Do Not Reduce Turnout" by David B. Muhlhausen and Keri  Weber Sikich | 120 | 120 |
| 11. | *New York Times* article - September 23, 2005 - entitled "Voting Reform is in the Card's," by Jimmy Carter and James A. Baker III | 160 | 160 |
| 12. | Harvey Kronberg's Quorum Report April 23, 2007, entitled "Royal Masset:  The Voter ID Bill Will Kill My Mother's Right to Vote" | 160 | 160 |
| 13. | 2/3/08 article entitled "A Clearer Picture on Voter ID" by Jimmy Carter and James A. Baker III | 160 | 160 |
| 14. | Testimony of Hans A. von Spakovsky, March 10, 2009, re SB 362 | 217 | 217 |

vi

EXHIBIT INDEX (continued)

|     |     | MARKED | ADMITTED |
|-----|-----|--------|----------|
| 15A | 6/11/07 Letter to Senate Committee on Rules and Administration re Hans A. von Spakovsky nomination | 254 | 254 |
| 15B | 6/12/07 Article entitled "Obama Raises Concerns Over FEC Nominee's Record of Partisanship" | 254 | 254 |
| 15C | 10/3/07 Letter to the U.S. Senate from Public Citizen | 254 | 254 |
| 16. | Institute of Public Policy Publication entitled, "The Effects of Photographic Identification on Voter Turnout in Indiana:  A County-Level Analysis" by Jeffrey Milyo, Report 10-2007, Revised December 2007 **(SAME AS EXHIBIT 7)** | 265 | 265 |
| 17. | Testimony of Tova Andrea Wang, Vice President, Research Common Cause, March 10, 2009, re SB 362 | 300 | 300 |
| 18. | Report of the Commission on Federal Election Reform entitled, "Building Confidence in U.S. Elections," September 2005 | 313 | 313 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1                    EXHIBIT INDEX (continued)

2                                        MARKED   ADMITTED

3     19.   Fifteen letters to the Hon.
            Dianne Feinstein, Chair, and the
4           Hon. Robert F. Bennett, ranking
            minority member, U.S. Senate
5           Committee on Rules and
            Administration:

6
            1.   6/29/07 letter from Hans
7                A. von Spakovsky
            2.   3/22/07 letter from various
8                members of Congress
            3.   3/13/07 letter from William
9                H. Jordan
            4.   2/08/07 letter from Gary J.
10               Smith
            5.   2/26/07 letter from P. K.
11               Brunelli
            6.   3/01/07 letter from J. A.
12               Borras
            7.   2/21/07 letter from Trey
13               Grayson
            8.   2/20/07 letter from Beverly
14               B. Kaufman
            9.   2/19/07 letter from Todd
15               Rokita
            10.  2/16/07 letter from Frank
16               B. Strickland
            11.  2/14/07 letter from Tom Lowe
17          12.  2/13/07 letter from
                 T. Rogers Wade
18          13.  2/14/06 letter from Johnny
                 Isakson
19          14.  2/09/07 letter from Wesley
                 R. Kliner, Jr.
20          15.  3/13/07 letter from Ray
                 Martinez III                   333       333
21
      20.   Brennan Center For Justice letter
22          dated October 3, 2007, by
            Executive Director Michael
23          Waldman, with attachments          335       335

24

25

```
 1                    EXHIBIT INDEX (continued)

 2                                        MARKED   ADMITTED

 3     21.  Prepared Remarks of Dr. Toby
            Moore, Research Triangle,
 4          regarding "Evidence of the
            impact of voter ID requirements
 5          and the prospects of US DOJ
            preclearance," March 10, 2009      358       358
 6
       22.  Harris County Map submitted
 7          by Sen. Gallegos                   366       366

 8     23.  Testimony of Frank B.
            Strickland re SB 362
 9          March 10, 2009                     373       373

10     24.  Testimony of Adam Skaggs,
            Counsel, Democracy Program,
11          Brennan Center for Justice at
            NYU School of Law, regarding
12          The Myth of Voter Impersonation
            Fraud at the Polls
13          March 10, 2009                     408       408

14     25.  Written Testimony of Robert A.
            Simms, Georgia Deputy Secretary
15          of State, presented to the
            United States Senate Committee
16          on Rules and Administration,
            submitted by Wes Tailor           435       435
17
       26.  Testimony of J. Gerald Hebert
18          re SB 362, March 10, 2009         442       442

19     27.  Letter from Rene Guerra (March 6,
            2009) Criminal District Attorney
20          of Hidalgo County,
            Submitted by Sen. Lucio           479       479
21
       28.  3/4/09 Letter from Todd
22          Rokita, Indiana Secretary
            of State, to Sen. Fraser
23          re SB 362                         502       502

24

25
```

ix

EXHIBIT INDEX (continued)

|  |  | MARKED | ADMITTED |
|---|---|---|---|
| 29. | Testimony of Chandler Davidson, Tsanoff Professor of Public Affairs Emeritus, Rice University, regarding "The Historical Context of Senate Bill 362," March 10, 2009 | 521 | 521 |
| 30. | 3/06 Printout from Texas AG Website entitled "Helping Stamp Out Voter Fraud in Texas," by Greg Abbott, Attorney General of Texas, submitted by Sen. Shapleigh | 550 | 550 |
| 31. | Dashwood case documents submitted by Ed Johnson, Harris County Tax Assessor-Collector and Voter Registrar's Office | 559 | 559 |
| 32. | Records from specific Harris County voting documents, submitted by Ed Johnson | 559 | 559 |
| 33. | Harris County Deceased Voting History, miscellaneous registration applications, submitted by Ed Johnson | 559 | 559 |
| 34. | Texas Voter Registration Application form submitted by Sen. Huffman | 570 | 570 |
| 35. | Testimony of Daniel B. Kohrman, Senior Attorney, AARP Foundation, re SB 362 March 10, 2009 | 621 | 621 |
| 36. | Photographs of Voter Education, Anderson County Workshop, 2008 | 724 | 724 |
| 37. | Testimony of Gary L. Bledsoe, President, Texas NAACP, re SB 362, March 10, 2009 | 724 | 724 |

EXHIBIT INDEX (continued)

|   | | MARKED | ADMITTED |
|---|---|---|---|
| 38. | Number of voters who have registered since 2006 without a driver's license number, submitted by Sen. Watson | 767 | 767 |
| 39. | The Special Investigations Unit Role and Investigative Efforts and Funding, submitted by Sen. Huffman | 767 | 767 |
| 40. | Slip Opinion, U.S. Supreme Court, _Crawford vs. Marion County Election Board_, October Term, 2007 | 768 | 768 |
| 41. | U.S. Supreme Court, _Crawford vs. Marion County Election Board_, on Writ of Certiorari to U.S. Court of Appeals for the Seventh Circuit, Brief of Texas, Alabama, Colorado, Florida, Hawaii, Michigan, Nebraska, Puerto Rico and South Dakota, as _Amici Curiae_ Supporting Respondents | 768 | 768 |
| 42. | Written Testimony of Claire Oxley Gluck from Boerne, in Kendall County, re SB 362 | 773 | 773 |
| 43. | Written Testimony of Hazel Cotton of Texarkana, Texas re SB 362 | 775 | 775 |
| 44. | Written Testimony of Kathy Hicks of Texarkana, Texas re SB 362 | 779 | 779 |
| 45. | Written Testimony of Donald Giles of Texarkana, Texas re SB 362 | 783 | 783 |
| 46. | Written Testimony of Anita Privett, League of Women Voters of Texas, re SB 362 | 789 | 789 |

1          EXHIBIT INDEX (continued)

2                                    MARKED    ADMITTED

3    47.  Written Testimony of Rosa
          Rosales, League of United
4         Latin American Citizens,
          National President
5         re SB 362                     794        794

6    48.  Written Testimony of Dustin
          Rynders, Advocacy, Inc.,
7         re SB 362                     800        800

8    49.  Written Testimony of Marsha
          Correira re SB 362            804        804
9

10   50.  Written Testimony of Rachel
          A. Hernandez re SB 362        817        817
11

12   51.  10/17/08 Article by Nelda
          Wells Spears, Voter Registrar,
13        Travis County, entitled "40,000
          Voter Registration Applications
14        Processed in Time For Early
          Voting"                       825        825

15   52.  Written Testimony of Lydia
          Camarillo, SVREP Vice
16        President, re SB 362          826        826

17   53.  Written Testimony of Luis
          Figueroa, Mexican American
18        Legal Defense and Education
          Fund (MALDEF), re SB 362      841        841
19

20   54.  Written Testimony of Sylvia
          Mendoza re SB 362             848        848

21   55.  Written Testimony of Dr. Rod
          Fluker, Sr., Executive Director
22        for Texas Association of Black
          Personnel in Higher Education,
23        re SB 362                     861        861

24

25

```
 1              P R O C E E D I N G S
 2           TUESDAY, MAY 10, 2009
 3                (5:50 p.m.)
 4              INVITED TESTIMONY
 5      TESTIMONY BY HANS VON SPAKOVSKY
 6              MR. von SPAKOVSKY:  Thank you,
 7   Mr. Chairman, senators.  I appreciate the invitation
 8   to testify here today.  My name is Hans von Spakovsky.
 9   I'm a legal scholar at the Heritage Foundation,
10   although the opinions here today are my own.
11              Just by background, I've got extensive
12   experience in voting and election issues.  I spent
13   four years at the Department of Justice as a voting
14   counsel.  I spent two years on the Federal Election
15   Commission.  I also spent five years as a member of a
16   county election board in Atlanta, Georgia, in Fulton
17   County, which is the largest county in the state, and
18   it's a county that's about half African-American.
19              Guaranteeing the integrity of elections
20   requires having security throughout the entire
21   election process, from the voter registration to
22   voting in the polls on Election Day to counting the
23   ballots.  I doubt any of you here would think it would
24   be a good idea to give worldwide Internet access to
25   the computers that are in a county election department
```

1  that tabulate the vote.

2           Requiring someone to authenticate their

3  identity in the polling place is part and parcel of

4  the same kind of security.  Every illegal vote steals

5  a vote from a legitimate voter.  And voter ID doesn't

6  just prevent impersonation fraud at the polls, it also

7  can prevent people from voting under fictitious voter

8  registrations and also double voting by individuals

9  who are registered in more than one state.

10          Voter fraud does exist, and criminal

11 penalties imposed after the fact are not sufficient to

12 protect against it.  That claim was, in fact, raised

13 in the Indiana case, and the Supreme Court said that

14 despite such criminal penalties, there are flagrant

15 examples of such fraud that have been documented

16 throughout this nation's history by respected

17 historians and journalists.  They not only demonstrate

18 the risk of voter fraud is real, but it could affect

19 the outcome of a close election.

20          You've had some questions about why have

21 there not been more prosecutions of voter

22 impersonation.  Well, as the Seventh circuit said in

23 the Indiana case, it's hard to prosecute something

24 when you don't have the tool to detect it, voter ID.

25          However, if you want a good example of

212

1    this, I wrote a paper last year for the Heritage

2    Foundation that detailed a publicly released state

3    grand jury report in New York City, 1984, which

4    detailed a successful and undetected 14-year

5    conspiracy in which impersonation fraud was carried on

6    at the poll and thousands of fraudulent ballots were

7    cast in not just state legislative primary elections

8    but also in congressional elections.

9              Crews of from five to eight people were

10   recruited and sent from polling place to polling place

11   where they voted in the names of legitimate voters,

12   people who were dead but still on the registration

13   lists, individuals who had moved and also under the

14   names of fictitious voter registration names that had

15   been successfully registered.

16             According to the grand jury, the advent

17   of mail-in registration was a key factor in this

18   fraud.  It could have been easily stopped if New York

19   had had voter ID.  In recent elections, as you know,

20   thousands of fraudulent voter registration forms were

21   detected by election officials.  But given the minimal

22   screening efforts in many election jurisdictions,

23   there is no way to know how many others slipped

24   through.  In states with ID, election officials --

25   without ID, election officials have no way to prevent

TX_00004090

1    bogus votes from being cast.

2           The problem of double voting -- well,

3    I'll give you an example of that.  In the Indiana

4    Supreme Court case, the League of Women Voters filed

5    an amicus brief against the law.  And in it they

6    illustrated an Indiana voter, an elderly woman who

7    they said had had problems voting.  The local paper

8    went and interviewed here.

9           The reason she had had problems voting,

10   she tried to use a Florida driver's license when she

11   went to her polling place in Indiana.  Not only did

12   she have a Florida driver's license, she was

13   registered to vote in Florida.  In fact, she owned a

14   home in Florida and had claimed a homestead exemption

15   which, as you know, you can only do if you are a

16   resident of the state.  So the law actually worked to

17   prevent someone who could have voted twice without

18   detection.

19          I don't mean to single out Texas.  But

20   just like Indiana, New York and Illinois, Texas has a

21   long and unfortunate history of voter fraud.  In the

22   late 1800's, for example, Harrison County was so

23   infamous that the phrase "Harrison County methods"

24   became synonymous with election fraud.  Box 13 has

25   already been mentioned.  The point is that there are

1    individuals who are willing to break the law to try to

2    steal an election.

3              I don't claim that there is massive

4    voter fraud in Texas or elsewhere.  In fact, I'm a

5    former election official, and I think most of our

6    elections are run pretty well.  But the potential for

7    abuse exists, and there are many close elections that

8    could turn on just a handful of votes.  And there are

9    enough incidents of voter fraud to make it very clear

10   we should take steps to stop that.

11             Now, the biggest thing I've heard today

12   is that voter ID will suppress the votes of voters,

13   particularly the poor or the elderly.  That is untrue.

14   Social science research shows that that's not the

15   case.  And the actual election results in the two

16   states with the strictest voter ID in the country show

17   that is not true.

18             The Heritage Foundation released a study

19   in September 2007 that looked at voter turnout in

20   every state in the country in the 2004 election,

21   comparing those states who had voter ID to those

22   states who do not.  They found that voter ID laws do

23   not reduce the turnout of voters, including African-

24   Americans and Hispanics, that those voters were just

25   as likely to vote in states with ID as in states where

1      just their name was asked.

2                  A study by professors at the University

3      of Delaware and Nebraska-Lincoln examined data from

4      the 2000, 2002, 2004 and 2006 elections.  The study

5      found that voter ID laws do not affect turnout,

6      including across racial lines, ethnic lines and

7      socioeconomic lines.  The study concluded -- and I'll

8      give you their quote -- the "concerns about voter ID

9      laws affecting turnout are much ado about nothing."

10                 A professor at MIT, as part of the

11     CalTech Voting Project, did a survey of 36,000

12     individuals to see what their Election Day experience

13     was like.  Overwhelming support for voter ID.  Only 23

14     individuals who had a problem voting because of voter

15     ID.  And there was no indication in the survey if they

16     were actually eligible voters.

17                 A lot of talk has been here about

18     election results in Georgia and Indiana.  In Georgia,

19     there was record turnout in the 2008 presidential

20     primary after the voter ID law went into effect, a

21     million more voters than in 2004, when there was no

22     voter ID law in effect.

23                 The number of African-Americans voting

24     in the 2008 presidential primary doubled from 2004

25     when there was no voter ID law in effect.  In fact,

1    there were 100,000 more votes in the Democratic

2    Primary in Georgia than in the Republican Primary.

3    The general election in Georgia, one of the strictest

4    voter ID laws in the country, largest turnout in its

5    history.  Democratic turnout was up 6.1 percentage

6    points from the 2004 election when there was no voter

7    ID.  Overall turnout in Georgia was 6.7 percentage

8    points higher than in 2004, the second highest

9    increase of any state in the country.

10          The Georgia law has been upheld in every

11    federal and state court.  And, in fact, the Georgia

12    judge, who is a former Democratic legislator appointed

13    by Jimmy Carter, pointed out that in two years of

14    litigation, none of the organizations who sued,

15    including the NAACP, could come up with a single

16    witness, a single individual who could not vote

17    because of the voter ID requirement.

18          In Indiana, Democratic presidential

19    preference primary last year, Democratic turnout

20    quadrupled from the 2004 election.  In fact, it was up

21    8.32 percentage points from 2004, the largest increase

22    in Democratic turnout of any state in the country.

23    And the Supreme Court said, "Indiana has the strictest

24    voter ID law in the country."

25          We are only one of about 100 democracies

1    that do not require photo ID.  Our southern neighbor,

2    Mexico, which has a much larger population in poverty,

3    requires both a photo ID and a thumb print when people

4    go to vote.  Since they put that provision in, in the

5    mid-1990s, turnout has increased in their elections.

6                Requiring voters to authenticate their

7    identity is a perfectly reasonable and easily met

8    requirement.  It's supported by the vast majority of

9    voters.  All the polling data shows that.  And it

10   protects the integrity and reliability of the

11   electoral process, as the Supreme Court said, and it

12   also maintains the confidence of individuals in the

13   security of their elections.

14                And I'm done, Mr. Chairman.

15                SEN. DUNCAN:  Thank you, Mr. von

16   Spakovsky.  Before I entertain any questions, you have

17   written testimony.  Do you wish to submit that into

18   the record?

19                MR. von SPAKOVSKY:  I would like to

20   submit it.  I believe I gave it to the Clerk, Mr.

21   Chairman.

22                (Exhibit No. 14 marked and admitted)

23                SEN. DUNCAN:  Okay.  We have it marked

24   as Exhibit 14.

25                Members, are there any questions for

```
 1   Mr. Von Spakovsky?

 2                   Sen West.

 3                   SEN. WEST:  Will we be asking questions

 4   from the chair or standing up?

 5                   SEN. DUNCAN:  Standing up.

 6                   QUESTIONS FROM SENATE FLOOR

 7                   SEN. WEST:  Okay.  Sir, let's talk about

 8   your background.  We've met before, back in 2003 I

 9   think it was.  As it relates -- are you coming as a

10   neutral and detached witness or have some sort of bias

11   one way or the other for this particular issue?

12                   MR. von SPAKOVSKY:  I'm not quite sure

13   how to answer that question.

14                   SEN. WEST:  Well, let me ask the

15   question this way:  You are a former Republican chair,

16   are you not?

17                   MR. von SPAKOVSKY:  I was a county party

18   Republican chair over 10 years ago.

19                   SEN. WEST:  Okay.  Have you authored

20   studies or position papers on requiring voter IDs at

21   polling locations?

22                   MR. von SPAKOVSKY:  I have.  In fact, I

23   wrote an article for a Texas Law Review on it.

24                   SEN. WEST:  Have you authored articles

25   on requiring the verification of social security
```

1    numbers of voters?

2              MR. von SPAKOVSKY:  I have.  And, in

3    fact, that's now a federal requirement under the Help

4    America Vote Act.

5              SEN. WEST:  Have you authored articles

6    on eliminating no-fault absentee voting?

7              MR. von SPAKOVSKY:  I believe I have,

8    yes.

9              SEN. WEST:  And what's the rationale --

10   what is your rationale for no-fault absentee voting?

11   And let's define it first of all.  As I understand

12   no-fault absentee voting, that basically means that a

13   person should not be able to give any reason not to --

14   any reason in order to cast an absentee ballot.  So a

15   person who may very well have business outside of the

16   county on Election Day, if you had your way, they

17   would not be able to vote.  Correct?

18             MR. von SPAKOVSKY:  That's incorrect,

19   Senator.

20             SEN. WEST:  Okay.  Then what is the

21   elimination of no-fault absentee voting?

22             MR. von SPAKOVSKY:  There are some

23   states -- in most states, you have to have a reason to

24   vote absentee:  You're disabled, you're elderly,

25   you're going to be out of town on business.  I

```
 1    completely agree with those, plus the fact if you're a
 2    military voter.  There are some states where you don't
 3    have to have any reason to vote absentee.
 4                    SEN. WEST:  Is Texas one of those
 5    states?
 6                    MR. von SPAKOVSKY:  I'm not sure what
 7    the rule is in Texas.
 8                    SEN. WEST:  If we were, then you would
 9    want to eliminate that.  Right?
10                    MR. von SPAKOVSKY:  Well, there are two
11    things there, Senator.  The first is that absentee
12    ballot fraud is one of the biggest sources of voter
13    fraud.  In fact, I've written a paper about that.
14    And, second, there's more than one study -- in fact,
15    one by the Center For the Study of the American
16    Electorate which indicates that states that have put
17    in no-fault absentee balloting, in fact, it has
18    possibly hurt the turnout of their voters.
19                    SEN. WEST:  In terms of other articles
20    that you have worked on, the white papers that you
21    have written eliminating motor voter registration --
22                    MR. von SPAKOVSKY:  That's incorrect.
23                    SEN. WEST:  Okay.  You're not for
24    eliminating motor voter registration?
25                    MR. von SPAKOVSKY:  I think there are
```

221

```
 1    problems with mail-in voter registration, but I also
 2    think that the provisions of motor voter which require
 3    you to be able to get registered to vote when you go
 4    get your driver's license or when you go to a public
 5    assistance office, I think those are very good
 6    provisions.
 7              SEN. WEST:  What about the requirement
 8    of two witnesses on a notary to sign an absentee
 9    ballot, are you for?  Have you advocated that or what?
10              MR. von SPAKOVSKY:  I believe that
11    because of the problems with absentee ballots and
12    voter fraud, that having either a witness or a notary
13    for an absentee ballot is a good idea.
14              SEN. WEST:  You have indicated that
15    there's numerous studies that show that there has been
16    no impact, negative impact on the minority vote in
17    several states, and you've alluded to some 2008
18    elections.  Let me put a pin in that for a second.
19    Have you been the author of any of the studies that
20    you have mentioned as relates to voter suppression?
21              MR. von SPAKOVSKY:  To voter
22    suppression?
23              SEN. WEST:  Right -- oh, I'm sorry.  I
24    should not have said that.
25              MR. von SPAKOVSKY:  I --
```

TX_00004099

1              SEN. WEST:  I should not have said voter

2    suppression.  I apologize.  Have you been the author

3    of any studies that deal with the impact of voter ID

4    on minority votes?

5              MR. von SPAKOVSKY:  Yes.

6              SEN. WEST:  And which studies have those

7    been?

8              MR. von SPAKOVSKY:  I wrote a paper that

9    looked at the State of Georgia and some other states

10   that had voter ID laws.  And I looked at turnout of

11   African-American voters, both before the law went into

12   effect and after the law went into effect.

13             SEN. WEST:  In the State of Georgia?

14             MR. von SPAKOVSKY:  And, yes, I looked

15   at the State of Georgia.

16             SEN. WEST:  For what year -- years?

17             MR. von SPAKOVSKY:  I started with the

18   first voter ID law that went into effect in Georgia in

19   1999, which was then amended later on, and I looked at

20   the effects of all of those laws.

21             SEN. WEST:  Okay.  Did you also look at

22   2008?

23             MR. von SPAKOVSKY:  The paper was

24   written before the 2008 election.

25             SEN. WEST:  Have you looked at any --

1    have you been the author of any studies that looked at

2    the 2008 election?

3                MR. von SPAKOVSKY:  I've written several

4    articles about that, yes, sir.

5                SEN. WEST:  As relates to those

6    articles, did you conclude that -- was that in the

7    State of Indiana or Georgia or what?

8                MR. von SPAKOVSKY:  In some of the

9    articles I've written, I've mentioned election results

10    in both Indiana and in Georgia.

11                SEN. WEST:  And so it's your testimony

12    that voter ID had no negative impact on the minority

13    vote in either one of those states in 2008?

14                MR. von SPAKOVSKY:  That's what the

15    facts and figures from the election show.

16                SEN. WEST:  Did you take into

17    consideration who the candidates were at that time in

18    Indiana and Georgia.  And --

19                MR. von SPAKOVSKY:  Yes, Senator.

20                SEN. WEST:  -- did that have an impact?

21    Were you able to check out the influence of President

22    Barack Obama being on the ballot?

23                MR. von SPAKOVSKY:  Senator, turnout was

24    up all over the country, particularly in the minority

25    community, because of Sen. Barack Obama.  The point,

```
 1    however, is that the two states with the strictest

 2    voter ID laws in the country had turnout that was

 3    records and ahead of other states where turnout was

 4    also up, because of Barack Obama being on the ballot;

 5    and, yet, those states don't have voter ID.  If the

 6    claim, which I know you believe is true, that voter

 7    ID --

 8                 SEN. WEST:  You don't know what I

 9    believe, first of all.

10                 MR. von SPAKOVSKY:  If people are going

11    to claim that voter ID suppresses the vote of minority

12    voters, then why would, in Georgia, they have a record

13    turnout, for example, in the Democratic turnout where,

14    you know, 95 percent of African-Americans there vote,

15    in a state where the African-American population is

16    about 26-27 percent; and, yet, they have record

17    turnout.  If, in fact, voter ID --

18                 SEN. WEST:  Let me ask you -- let me

19    finish --

20                 MR. von SPAKOVSKY:  May I answer the

21    question?

22                 SEN. WEST:  Well, hold on.  Let me --

23    answer my question.  I would appreciate it.  All

24    right.  The question is real simple.  Did you consider

25    the influence -- in coming to the conclusion that you
```

1    did on the studies, did you consider the influence

2    that President Barack Obama had on energizing the

3    Democratic base in both of those states?

4                   MR. von SPAKOVSKY:  Yes, sir, I did.

5                   SEN. WEST:  And were you able to factor

6    that out before you came up with your conclusions, by

7    using a valid statistical model?  And, if so, what was

8    that statistical model?

9                   MR. von SPAKOVSKY:  I did not do a

10   statistical analysis.  I used figures put out by

11   Curtis Gans at American University who has election

12   return figure from every state in the country.

13                  SEN. WEST:  So your study -- and I have

14   not read your study.  So your study was a compilation

15   of election results?  You --

16                  MR. von SPAKOVSKY:  I wrote an article

17   in which I looked at the election results all around

18   the country.  And those election results, as reported

19   by American University, indicated that Indiana, for

20   example, had the largest increase in Democratic

21   turnout of any state in the country from the --

22                  SEN. WEST:  I understand that; I

23   understand exactly what you're saying.  But I'm just

24   trying to make certain I understand the study.  You

25   took the results of the elections and then used that

TX_00004103

1    in order to craft, analyze it and then craft a

2    conclusion based on those election results.  Is that

3    what you're telling me?

4              MR. von SPAKOVSKY:  Yes, sir.

5              SEN. WEST:  Okay.  So how did you factor

6    in the influence that then Sen. Barack Obama had on

7    energizing the election base?

8              MR. von SPAKOVSKY:  The point, Senator,

9    is that the State of Indiana has the strictest photo

10   ID law in the country; and, yet, they had the largest

11   increase in turnout in the Democratic primary of any

12   state in the country.  So if, in fact, that photo ID

13   laws was going to suppress the vote of minority

14   voters, they would not have had such a huge increase

15   in that state.

16             SEN. WEST:  So you have not had an

17   opportunity to look at it in an election where the

18   Democratic base isn't as energized as it was with

19   Barack Obama to determine whether or not it has any

20   impact?

21             MR. von SPAKOVSKY:  Senator, I think, in

22   fact, one of the studies that I mentioned, which there

23   was a study that was done in Missouri looking at the

24   2006 election which, as you know, was an off-year

25   election.  Barack Obama was not on the ballot.  And,

227

1    in fact, in 2006, when the photo ID law in Indiana was

2    in -- was finally in effect, not only did turnout go

3    up two percent, but the only statistically

4    significant -- let me find this.  Here we go.

5             In fact, this is a quote from the study.

6    "There is no evidence that counties with higher

7    percentages of minority, poor, elderly or less

8    educated populations suffered any reduction in voter

9    turnout."  This was in 2006.  In fact, quote, "The

10   only consistent and statistically significant impact

11   of photo ID in Indiana is to increase voter turnout in

12   counties with a greater percentage of Democrats

13   relative to other counties."

14             SEN. WEST:  Now, let me ask you this:

15   Isn't it a fair statement that there are those in

16   academia that disagree with your conclusions?

17             MR. von SPAKOVSKY:  There may be, yes.

18             SEN. WEST:  You don't know of any?

19             MR. von SPAKOVSKY:  There may be some

20   studies that do.  Most of the studies say that it

21   doesn't --

22             SEN. WEST:  So there are those that

23   disagrees with your conclusions.  Is that correct?

24             MR. von SPAKOVSKY:  I'm sure there's

25   always people that --

```
 1              SEN. WEST:  Are there some social
 2   scientists that disagree with your conclusions, sir?
 3              MR. von SPAKOVSKY:  You'll have to look
 4   that up, Senator.
 5              SEN. WEST:  Okay.
 6              SEN. DUNCAN:  Senator, y'all are talking
 7   over each other a little bit.  So if you could allow
 8   the witness --
 9              SEN. WEST:  And I apologize.
10              SEN. DUNCAN:  -- room before you --
11              SEN. WEST:  We've got two lawyers up
12   here.  Yes, sir.
13              All right.  So there are individuals of
14   noted reputations in academia that disagree with your
15   conclusions?
16              MR. von SPAKOVSKY:  Senator, I have
17   spoken about and testified about the various studies
18   that I have seen, which I think are valid studies
19   which show that there is no effect.
20              SEN. WEST:  Sir, that was not the
21   question.  The question was, is do you know of persons
22   in academia that disagree with your conclusions?
23              MR. von SPAKOVSKY:  There may be, yes.
24              SEN. WEST:  So the answer to the
25   question is yes, there are persons that disagrees with
```

1    your conclusions?

2              MR. von SPAKOVSKY:  I'm sure there are.

3              SEN. WEST:  Okay.  Very good.  Now, as

4    it relates to the issue of retrogression, help me walk

5    through this.  Which should we be considering in terms

6    of whether or not this particular piece of legislation

7    is, in fact -- you have been at the Department of

8    Justice.  Correct?

9              MR. von SPAKOVSKY:  Yes, sir.  I worked

10   there for four years as a career lawyer.

11             SEN. WEST:  Okay.  You have had to

12   overrule some of the professional staff sometimes when

13   they come to their different conclusions than you

14   otherwise came to.  Is that correct?

15             MR. von SPAKOVSKY:  I did not overrule

16   anyone.  I made recommendations to the Assistant

17   Attorney General on matters.

18             SEN. WEST:  You've had to make

19   recommendations counter to recommendations made by

20   you -- made to you by staff that was reporting to you,

21   though.  Isn't that correct?

22             MR. von SPAKOVSKY:  Yes.

23             SEN. WEST:  Okay.  And some of it has

24   been in the area of voters' right -- most -- oh, all

25   of it has been in the area of votes' rights.  Is that

1    correct -- specifically Section V?

2              MR. von SPAKOVSKY:  Sir, that is

3    incorrect.  I was the voting counsel.  All I worked on

4    were voting issues.

5              SEN. WEST:  That's exactly right.  Okay.

6    Now, in that capacity, what would you advise us -- I'm

7    going to say take your hat off as a Republican, take

8    your hat off as any affiliation law.  What specific

9    advice would you give this body as it relates to

10   analyzing the legislation before us?

11             MR. von SPAKOVSKY:  Well, under

12   Section 5, you use the retrogression standard, which

13   means that you can't do something that's going to have

14   a disparate impact on minority voters.  And, you know,

15   everything I've seen, certainly based on the Georgia

16   legislation, which is stricter than this, there is no

17   disparate impact.

18             SEN. WEST:  And so there is no disparate

19   impact.  Is that what you're saying --

20             MR. von SPAKOVSKY:  Correct.

21             SEN. WEST:  -- based on the legislation?

22   Okay.  Now, let me ask you this:  What have you seen

23   that leads you to that conclusion?

24             MR. von SPAKOVSKY:  The Georgia bill --

25   the Georgia legislation, in fact, is stricter

231

1    legislation.  It has fewer IDs that meet the

2    requirements of the law.  That law did not have a

3    retrogressive impact.  In fact, the election results

4    show that clearly.  Arizona is another state that put

5    in a voter ID law.  It also was pre-cleared by the

6    Justice Department.  And it also was recently upheld

7    by a federal district court who said that it did not

8    violate any voting right statutes and was perfectly

9    constitutional.

10            SEN. WEST:  So then your comment about

11   what we're doing here is not going to be retrogressive

12   is based on the Georgia statute.  Is that what you're

13   saying?

14            MR. von SPAKOVSKY:  It's based on my

15   experience in this area, all the studies I've seen,

16   the results of elections, that this statute is not

17   going to be shown to be retrogressive.

18            SEN. WEST:  Let me ask you this:  Some

19   of the career -- help us understand the Justice

20   Department, specifically the voting rights section.

21   You have career employees there.  Right?

22            MR. von SPAKOVSKY:  Yes.  I was a career

23   employee there.

24            SEN. WEST:  Okay.  And are some of those

25   employees still there that were with you at the time

1    that you were there?

2                    MR. von SPAKOVSKY:  I'm sure there are,

3    yes.

4                    SEN. WEST:  Okay.  Some of those

5    employees that you've had to overrule their analysis,

6    are they still there?

7                    MR. von SPAKOVSKY:  I don't know.  I

8    haven't worked there since 2005, so I really don't

9    know who is still there.

10                    SEN. WEST:  Okay.  All right.  But it's

11   a different Justice Department -- right? -- Department

12   of Justice.  Right?

13                    MR. von SPAKOVSKY:  The career staff at

14   the Justice Department -- the Justice Department is

15   made up of around 99 percent career staff.  Political

16   appointees are a very small percentage.  So from year-

17   to-year, administration-to-administration, the career

18   staff, with some turnover, pretty much stays the same.

19                    SEN. WEST:  How long were you in the

20   Department of Justice?

21                    MR. von SPAKOVSKY:  Four years.

22                    SEN. WEST:  Four years.  When did you go

23   into the Department of Justice?

24                    MR. von SPAKOVSKY:  2001.

25                    SEN. WEST:  And what position was that?

1           MR. von SPAKOVSKY:  I was a trial

2   attorney in the Civil Rights Division.

3           SEN. WEST:  In the Civil Rights

4   Division.  Okay.  Thank you very much, sir.

5           SEN. DUNCAN:  Sen. Shapleigh.

6           SEN. SHAPLEIGH:  Thank you, Mr. Chair.

7           Mr. Spakovsky, I would like to go over

8   some testimony that you just laid out with your

9   handout here that we have.  I'm looking at Page 3

10  specifically.  And when you're talking about Texas, as

11  far as I can tell, in connection with the problem of

12  voter fraud here, you're saying in the late 1800's,

13  Harris County was infamous for massive election fraud

14  such that "Harrison County Methods" became synonymous

15  with election fraud, and then Ballot Box 13 in Lyndon

16  Johnson's 1948 race, to reports of illegal aliens in

17  Bexar County.  What reports are you referring to on

18  illegal aliens in Bexar County?

19          MR. von SPAKOVSKY:  There were newspaper

20  reports indicating that -- I believe the clerk there

21  had found individuals who were not U.S. citizens who

22  had both registered and voted in elections there.

23          SEN. SHAPLEIGH:  And were any cases

24  brought in connection with those newspaper reports, to

25  your knowledge?

1          MR. von SPAKOVSKY:  I don't know,

2     Senator.

3          SEN. SHAPLEIGH:  So what you represent

4     here as illegal aliens voting and risking criminal

5     prosecution, you're telling us now you don't know

6     whether anything came of that at all?

7          MR. von SPAKOVSKY:  I don't know what

8     the end results were of the investigations there.

9          SEN. SHAPLEIGH:  Do you know anything

10    else about Texas voter fraud allegations, other than

11    what you've laid out in your report --

12         MR. von SPAKOVSKY:  I believe one of

13    your -- I've read testimony by a Mr. Bettencourt who I

14    believe was in -- may have been in Harris County who

15    testified at a House committee meeting hearing in

16    Washington about finding individuals who were not U.S.

17    citizens who had registered and voted in elections in

18    his county.

19         SEN. SHAPLEIGH:  Are you aware of the

20    investigation done here by the Attorney General of the

21    State of Texas in 2006?

22         MR. von SPAKOVSKY:  No, sir, I have not

23    done a detailed study of that.

24         SEN. SHAPLEIGH:  Would it surprise you,

25    with what you're saying in this report, that not a

```
1    single prosecution brought in this state would have

2    been solved by this voter ID; that is, mail-in ballots

3    and other issues were the issues at the root of these

4    indictments and not a single case has been brought in

5    the State of Texas on vote fraud that photo ID would

6    solve?  Would that surprise you?

7              MR. von SPAKOVSKY:  No.  As I said,

8    Senator -- and I refer you again to the Supreme Court

9    case -- as they pointed out, it's very hard to detect

10   a problem like that if you don't have the tool

11   necessary to detect it, which is photo ID.

12             SEN. SHAPLEIGH:  Let me go to your

13   career.  You come here from The Heritage Foundation.

14   Is that correct?

15             MR. von SPAKOVSKY:  That's correct, sir.

16             SEN. SHAPLEIGH:  And would you say

17   you're here as a fair and balanced witness whose

18   testimony is designed to move us to a non-partisan

19   correct decision that would serve the State of Texas

20   in this matter?

21             MR. von SPAKOVSKY:  As I said before,

22   I'm here testifying on my own behalf, not on behalf of

23   The Heritage Foundation.  And I think all of the

24   evidence on photo ID indicates that it should be a

25   bipartisan solution, because not only can it prevent
```

1    voter fraud but it does not hurt turnout.

2                    And, in fact, I believe in Indiana, for

3    example -- again, the state with the strictest photo

4    ID law in the country -- they for the first time in I

5    don't know how many decades actually voted for a

6    Democratic presidential candidate.  So it clearly had

7    no effect and it may have helped the Democratic Party

8    in that state.

9                    SEN. SHAPLEIGH:  So in connection with

10   your reputation as you come here, you're coming, in

11   your words, as a fair and balanced witness?

12                   MR. von SPAKOVSKY:  I believe so,

13   Senator, yes.

14                   SEN. SHAPLEIGH:  Who is Joseph Rich?

15                   MR. von SPAKOVSKY:  He was former Chief

16   of the Voting Section who now works for the Lawyers'

17   Committee for Civil Rights, which is a liberal

18   advocacy organization.

19                   SEN. SHAPLEIGH:  So he was the Chief of

20   the Voting section.  He was a career, as you describe

21   it, attorney in the Justice Department and Chief of

22   the Voting Section from 1999 to 2005.  Is that

23   correct?

24                   MR. von SPAKOVSKY:  He was a career

25   lawyer, as I was a career lawyer at the section.

237

1          SEN. SHAPLEIGH:  Who is Robert Kengle?

2          MR. von SPAKOVSKY:  He is also a former

3     career lawyer.

4          SEN. SHAPLEIGH:  And he was Deputy Chief

5     of the Voting Section, 1999 to 2005.  Correct?

6          MR. von SPAKOVSKY:  I don't remember the

7     exact years.  I know he was a career lawyer there.

8          SEN. SHAPLEIGH:  And Jon Greenbaum,

9     Senior Trial Attorney, Voting Section, 1997 to 2003,

10    your colleague when you were at the Department of

11    Justice.  Correct?

12         MR. von SPAKOVSKY:  Mr. Greenbaum was a

13    lawyer for the Lawyers' Committee for Civil Rights and

14    was the lawyer who brought the lawsuit in Georgia

15    against the photo ID law which was eventually

16    completely dismissed by the federal court there.

17         SEN. SHAPLEIGH:  But he was your

18    colleague in the Department of Justice.  "Yes" or

19    "No"?

20         MR. von SPAKOVSKY:  He was a trial

21    lawyer there.

22         SEN. SHAPLEIGH:  When you were there?

23         MR. von SPAKOVSKY:  At some point, yes.

24         SEN. SHAPLEIGH:  And David J. Becker,

25    Senior Trial Attorney, Voting Section, 1998 to 2005,

238

1    your colleague at the Department of Justice.  "Yes" or

2    "No"?

3                    MR. von SPAKOVSKY:  He was a trial

4    attorney there, too.

5                    SEN. SHAPLEIGH:  Bruce Adelson, Senior

6    Trial Attorney, Voting Section, 2000 to 2005, your

7    colleague at the Department of Justice?

8                    MR. von SPAKOVSKY:  He was a trial

9    attorney there, yes.

10                    SEN. SHAPLEIGH:  Toby Moore, Voting

11    Section, 2000 to 2006, Political Geographer,

12    Department of Justice?

13                    MR. von SPAKOVSKY:  Yes.

14                    SEN. SHAPLEIGH:  Now, you were nominated

15    to serve, I believe, for the Federal Election

16    Commission, were you not?

17                    MR. von SPAKOVSKY:  I was.

18                    SEN. SHAPLEIGH:  Did these attorneys

19    deliver a letter to the Chairman of that committee,

20    Dianne Feinstein, in connection with your nomination?

21                    MR. von SPAKOVSKY:  They did, Senator.

22    And I wrote a response to that letter which is on file

23    at the committee, as is their letter, because, frankly

24    their letter was filled with misrepresentations, and

25    it had a lot of things in it that were not true and

1    which were proveably not true about the administration

2    of the Civil Rights Division.

3                SEN. SHAPLEIGH:  Well, if you have that

4    letter, we would I think at this point like to see it,

5    because I'm about to go through their letter where

6    one, two, three, four, five, six of your colleagues

7    signed a letter -- I think this is an unprecedented

8    act in the Department of Justice to sign a letter on a

9    nomination of a colleague that works with them in the

10   Voting Section of the Department of Justice.  And I

11   want to quote from this.

12               "We are deeply disturbed that the

13   tradition of fair and vigorous enforcement of this

14   nation's civil rights laws and the reputation for

15   expertise and professionalism of the Division and the

16   Department has been tarnished by partisanship.  Over

17   the past five years, the priorities of the Voting

18   Section have shifted from its historic mission to

19   enforce the nation's civil rights laws without regard

20   to politics, to pursuing an agenda which placed the

21   highest priority on the partisan political goals of

22   the political appointees who supervised the Section.

23   We write to urge you not to reward one of the

24   architects of that unprecedented and destructive

25   change with another critical position enforcing our

1    country's election laws."

2                    Were they talking about you in this

3    letter?

4                    MR. von SPAKOVSKY:  Senator, that letter

5    was full of misrepresentations and, frankly, outright

6    lies.

7                    (Simultaneous discussion)

8                    MR. von SPAKOVSKY:  Senator, I'll be

9    glad to talk to you about voter ID.  But, you know,

10   I'm a lawyer.  And one thing I have found in the

11   courtroom is that, quite frankly, when the lawyer on

12   the other side has neither the facts nor the law on

13   their side, that's when they usually resort to

14   personal attacks.

15                   (Applause)

16                   SEN. DUNCAN:  (Raps gavel)

17                   SEN. SHAPLEIGH:  Mr. von Spakovsky --

18   and, Mr. Chair, I would ask if we could have a

19   direction to the witness to answer the questions

20   presented.  The simple question was, "Is the person

21   they're referring to in this letter you?"

22                   MR. von SPAKOVSKY:  And as I told you,

23   Senator, I wrote a full response to that letter

24   pointing out all of the inaccuracies and

25   misrepresentations in that letter.

241

1              SEN. SHAPLEIGH:  So this is about you,
2       this is directed at your behavior in that Department
3       of Justice?  Does it say that?
4              MR. von SPAKOVSKY:  It is a letter about
5       a fictional person that they say is me but is not.
6              SEN. SHAPLEIGH:  It is a fictional
7       person that they worked with for four years, but it's
8       not you.  Is that what you're saying?
9              MR. von SPAKOVSKY:  I'm saying, Senator,
10      that that letter was written by individuals who now
11      work for very liberal advocacy groups, one of them,
12      for example, working for a group that lost in Federal
13      Court in Georgia when it sued over voter ID law that
14      they didn't like.  And, you know, if that's a
15      reflection of his legal judgment on matters like that,
16      I think that says a lot about the inaccuracies in that
17      letter.
18             SEN. SHAPLEIGH:  Well, I'm just going to
19      take it that they're talking about you.  "After
20      careful review" -- I'm now on Page 3 -- "of the
21      Georgia voter ID law, career staff responsible for the
22      review came to a near unanimous decision, consistent
23      with the precedent established by the Department in
24      previous reviews; that the Georgia provision would
25      negatively affect minority voting strength.  Four of

```
 1    the five career professionals on the review team
 2    agreed.  The one who did not had [almost] no
 3    experience in enforcing §5 and had been hired only
 4    weeks before the review began through the political
 5    hiring process described" in this letter.  "The
 6    recommendation to object to the law, detailed in a
 7    memo exceeding 50 pages was submitted on August 25,
 8    2005.  The next day, Georgia submitted corrected data
 9    on the number of individuals who had state-issued
10    photo identification.  The career review team was
11    prevented by Mr. von Spakovsky from analyzing this
12    data and incorporating the corrected data into their
13    analysis.  Instead, there was an unnecessary rush to
14    judgment and the law was summarily precleared on
15    August" the 25th, the day after their monologue was
16    delivered to you.  The law was pre-cleared by you the
17    same day the corrected data had been submitted.
18    "Subsequent analysis of this data by a Georgia
19    political scientist revealed that hundreds of
20    thousands of voters did not have the required voter
21    ID, a disproportion number of whom were poor, elderly
22    and, most importantly for the Voting Rights Act
23    review, minorities.  In short, this data provided
24    further evidentiary support for the objection
25    recommended by the professional staff.  Subsequently,
```

1    a federal court in Georgia found that this law

2    violated the poll tax provision of the Constitution."

3              Are they referring to actions taken by

4    you on August the 25th and 26th of 2005?

5              MR. von SPAKOVSKY:  Senator, there are

6    so many facts wrong and so many misrepresentations in

7    that letter, and you've also gotten a lot of other

8    facts incorrect, that it would take me at least

9    probably half an hour to answer everything you've got

10   wrong in that case, the more important of which is

11   that the career Chief of the Voting Section who was a

12   30-year veteran of the Department of Justice, someone

13   who had been enforcing the Voting Rights Act and

14   filing suits in southern states like Mississippi and

15   Alabama for 30 years, sent a recommendation that said

16   that the law should be approved, that there was no

17   evidence of retrogression.

18             And I would be happy to give you some of

19   the data, Senator.  For example, the Department of

20   Driver Services, which is I believe the same as the

21   department here that gives your driver's license, has

22   showed that there were 6.5 -- 6.4 million individuals

23   in Georgia who had driver's licenses and photo IDs.

24   There were only 4.5 million registered voters.

25             That department had racial data.  For

1   60 percent of the cardholders, they found that

2   28 percent of the individuals who held driver's

3   licenses were African-American, which was higher than

4   the black percentage of the voting age population in

5   Georgia, indicating that African-Americans in Georgia

6   held driver's licenses at a slightly rate than white

7   Georgians.

8            They also submitted student photo ID

9   information.  The student photo ID issued by a state

10  university is an accepted ID under the law.  The

11  information from the state colleges showed that black

12  students represented 26.8 percent of public college

13  students in the state, which was slightly more than

14  their share of the voting age population.

15           Finally, the census data that was

16  submitted showed that 19.4 percent of African-

17  Americans in Georgia worked for the government, either

18  at a local, state or federal level, while only 14

19  percent of whites did.  Government-issued employee IDs

20  were also acceptable.  So all of the information

21  submitted indicated that African-Americans in the

22  State of Georgia had voter ID at the same rates or, in

23  fact, slightly higher than white Georgians.

24           The election results in the state since

25  then showed that that was, in fact, true.  There was a

245

1    preliminary injunction issued in the federal lawsuit

2    that was filed.  If you read that case carefully, you

3    will find that the Judge said that he made no finding

4    and was not basing his preliminary injunction on the

5    Voting Rights Act because there was no racial

6    discrimination proven in the case.

7            He did find a constitutional violation.

8    But the Supreme Court said in a case called Reno vs.

9    Bossier Parish some years ago that when the Justice

10   Department is reviewing a Section 5 submission, they

11   can only use the voting rights retrogression standard.

12   They cannot refuse to pre-clear a law because of a

13   constitutional violation.  And as for any

14   constitutional violation, as you know, the Supreme

15   Court took care of that recently in the Indiana case

16   when it said there is no constitutional violation by a

17   photo ID law.

18           And I would mention that in the final

19   decision by the federal judge, not a preliminary

20   injunction, but the final decision, the Judge found

21   there was no violation of the Voting Rights Act, there

22   was no constitutional violation.

23           And on the issue of a poll tax, I would

24   be happy to read to you what the Court said about

25   that.  He said -- because the plaintiffs were trying

1    to argue that because of incidental costs, like having

2    to travel to an office to get an ID or obtaining a

3    birth certificate, that that was a poll tax.

4              The federal courts dismissed the claim,

5    saying, "That argument represents a dramatic

6    overstatement of what fairly constitutes a poll tax;

7    thus, the imposition of tangential cost does not

8    transform a regulation into a poll tax.  Moreover, the

9    cost of time and transportation cannot possibly

10   qualify as a prohibited poll tax because those same

11   costs also result from voter registration and

12   in-person voting requirements which one would not

13   reasonably construe as poll tax."

14             SEN. SHAPLEIGH:  Let me ask you this:

15   Were you in Florida in 2000?

16             MR. von SPAKOVSKY:  I went down briefly

17   as an observer, as did a lot of people, to watch the

18   counting of the vote.

19             SEN. SHAPLEIGH:  This was before you got

20   into the Voting Rights Section of the Justice

21   Department?

22             MR. von SPAKOVSKY:  I did lawyering in

23   Atlanta at the time when that occurred.

24             SEN. SHAPLEIGH:  Now, let me continue

25   with this letter from your colleagues.

1              "Mr. von Spakovsky drafted legal briefs

2    in lawsuits between the Republican and Democratic

3    parties in three battleground states" -- this is

4    during the 2004 election cycle -- "Ohio, Michigan and

5    Florida, just before the election, all in favor of the

6    Republican party's position and included a position

7    that the Civil Rights Division had never taken

8    [before] with regards to the statutes it enforcers,

9    i.e. that there was no private right of action to

10   enforce HAVA.  These briefs ran counter to the well-

11   established practice of the Civil Rights Division not

12   to inject itself into litigation or election

13   monitoring on the eve of an election where it could be

14   viewed as expressing a political preference or could

15   have an impact on a political dispute."

16             Did you participate in the drafting of

17   these briefs?

18             MR. von SPAKOVSKY:  Well, I'm very glad

19   you brought that up, Senator.  The briefs that were

20   filed in that case, the Justice Department made the

21   argument that there was no private right of action

22   under the Help America Vote Act, which was a federal

23   law passed in 2002.

24             It just so happens that a week before

25   this past November election, the Democratic Secretary

1    of State of the State of Ohio filed the exact same

2    type of lawsuit, also claiming that there was no

3    private right of action under the Help America Vote

4    Act, after she was sued by local party officials in

5    Ohio.

6              And the Supreme Court, in fact, issued a

7    decision saying, "There is no private right of action

8    under the Help America Vote Act.  So, you see, if the

9    career lawyers whose letter you are discussing, at the

10   time they wrote their letter, they said it was their

11   legal opinion that that position was wrong.  Well, it

12   turns out they were wrong.  In fact, the Supreme Court

13   has said the position that the Justice Department took

14   in that brief, all three briefs, were the correct

15   position.

16             SEN. SHAPLEIGH:  Was there any career

17   DOJ lawyer who signed your letter, your response to

18   Dianne Feinstein in connection with your nomination at

19   the FEC?

20             MR. von SPAKOVSKY:  I had letters of

21   recommendation --

22             SEN. SHAPLEIGH:  Did anyone --

23             MR. von SPAKOVSKY:  -- from many

24   different officials, and I was the one that was asked

25   to respond to that letter.

1              SEN. SHAPLEIGH:  Let me see if I can't

2    get you to answer the questions I'm asking.  Did

3    anyone sign your letter in response to these six

4    career officials at DOJ to say what they're saying is

5    not true?

6              MR. von SPAKOVSKY:  Senator, I sent a

7    letter to the committee.

8              SEN. SHAPLEIGH:  So no one signed your

9    letter, just you?

10             MR. von SPAKOVSKY:  I was the one asked

11   to respond to the committee, Senator.

12             SEN. SHAPLEIGH:  Let me ask you about

13   your participation in the 2003 Texas case, the

14   redistricting case.  There was a consensus of opinion

15   by the career DOJ officials in that case, was there

16   not?

17             What I am looking at here is DOJ career

18   lawyers submitting a unanimous recommendation to

19   object to an unprecedented mid-decade redistricting

20   plan that Texas submitted in 2003, submitted by the

21   career staff, a unanimous recommendation.  That was

22   rejected by political appointees, including yourself.

23   Is that true or not true?

24             MR. von SPAKOVSKY:  Senator, I was not a

25   political appointee at the department.  I have said

1    that several times.  And if you want to talk about the

2    Texas redistricting case, I would point out --

3                    SEN. SHAPLEIGH:  I just need to

4    understand this --

5                    MR. von SPAKOVSKY:  No.  I --

6                    SEN. SHAPLEIGH:  -- was there a

7    unanimous recommendation --

8                    MR. von SPAKOVSKY:  That unanimous --

9                    SEN. SHAPLEIGH:  -- by --

10                    MR. von SPAKOVSKY:  That recommendation

11   was incorrect, Senator.

12                    SEN. DUNCAN:  Hang on a minute.  We're

13   talking over each other.  One at a time.

14                    Senator, you've got a question on the

15   floor.

16                    MR. von SPAKOVSKY:  May I answer?

17                    SEN. DUNCAN:  The witness can answer.

18                    SEN. SHAPLEIGH:  Let me ask, if I may,

19   Mr. Chairman.

20                    SEN. DUNCAN:  All right.

21                    SEN. SHAPLEIGH:  This letter from six

22   DOJ career lawyers says that a unanimous

23   recommendation to object to the mid-decade

24   re-redistricting plan in Texas was submitted and later

25   rejected by political appointees.  True or not true?

1          MR. von SPAKOVSKY:  Mr. Chairman, I

2    can't answer that question "Yes" or "No."  The only

3    way to answer it properly and to get all the facts out

4    is to give a detailed explanation of the legal review

5    and the court case decisions in the Texas

6    congressional redistricting plan.  I would be happy to

7    do that if you would like me to do so.

8          SEN. SHAPLEIGH:  Well, let me just get

9    one question answered.  Did the career team -- not the

10   political appointees -- have a unanimous position that

11   the re-redistricting plan of 2003 did not comply with

12   the Voting Rights Act and unanimously said, "We ought

13   to reject it," and take that position?  "Yes" or "No"?

14         MR. von SPAKOVSKY:  Senator, the

15   recommendation that they made was that there were 11

16   majority/minority districts in Texas that needed to be

17   protected under Section 5 of the Voting Rights Act.

18   As you probably well know, a federal court in 2001

19   found that there were not 11 districts that needed to

20   be protected in this state.  A three-judge panel said

21   there were eight districts in this state that needed

22   to be protected.

23         And when the Supreme Court issued its

24   final decision in the LULAC v. Perry case, the Supreme

25   Court said, "No, there are only eight protected

1    districts."  So if you want to be able to show that

2    the legal opinions of those career lawyers were not

3    only wrong but, in fact, you know, the Supreme Court

4    and other judges have said that they were legally

5    incorrect, I would be happy to agree with you.

6              SEN. SHAPLEIGH:  When you were nominated

7    to the FEC, a United States senator from Illinois

8    submitted a letter to the committee, and I would like

9    to read from that.

10             "Mr. von Spakovsky's role in supporting

11   the Department of Justice's quixotic efforts to attack

12   voter fraud raises significant questions about his

13   ability to interpret and apply the law in a fair

14   manner, as does his decision to ignore the

15   recommendations of long-serving career attorneys on

16   several occasions.  Moreover, his role in the creation

17   of the Georgia voter ID law should have led to his

18   recusal from the Department of Justice's evaluation of

19   the law.  His failure to recuse himself from that case

20   further demonstrates a lack of judgment that is not

21   befitting an FEC Commissioner."

22             Do you recall getting this letter?

23             MR. von SPAKOVSKY:  I don't recall the

24   letter.  But I would say, Senator, that the claim that

25   I was involved in creating the Georgia voter ID law is

TX_00004130

253

```
 1    factually completely incorrect.  At the time the

 2    Georgia voter ID law was being pushed through the

 3    Legislature in 2005 in Georgia, I had been in

 4    Washington working for the Department of Justice since

 5    2001.  So the letter is based, frankly, on a

 6    complete -- frankly, a lie, saying that I had any

 7    involvement, and that is completely untrue.

 8                 SEN. DUNCAN:  Senator, before you -- and

 9    you can keep going.  But I just wanted to give you a

10    little bit of a notice, at 6:45 I think it will be two

11    hours since we've had a break for the court reporter.

12    So I just wanted to give you, if you wanted to -- you

13    can resume or whatever, but I wanted to give you a

14    little bit of notice of that.

15                 SEN. SHAPLEIGH:  I think I'm done.  If I

16    could mark these as the next exhibit -- I think it's

17    Exhibit 15 -- the letters to the committee with

18    respect to the nomination at the federal level.

19                 SEN. WEST:  Mr. President --

20    Mr. Chairman, would the Senator yield?

21                 SEN. SHAPLEIGH:  Yes.

22                 SEN. WEST:  Who was the senator who

23    authored that letter?

24                 SEN. SHAPLEIGH:  The senator was Barack

25    Obama.
```

254

```
 1              SEN. WEST:  Oh, okay.  Thank you.
 2              So he was a liar.  Okay.
 3              SEN. DUNCAN:  Being as we're not subject
 4    to the hearsay rule, I'll go ahead and admit this
 5    evidence.
 6              Are you bringing them down?
 7              (Exhibits handed to Secretary Spaw)
 8              SEN. DUNCAN:  Senator, I have here
 9    Exhibit 15, which is a letter dated June 11, 2007, to
10    Diane (sic) Feinstein.  And then there is another
11    letter in there.
12              SEN. WILLIAMS:  Mr. Chairman?
13              SEN. DUNCAN:  We'll have Exhibit 15A, B
14    and C.  Exhibit A is the June 11, 2007 letter.
15    Exhibit B is the -- is this a blog or -- this is
16    signed by him?  Okay.  Or it's an e-mail from --
17    okay -- from Barack Obama, June 12, 2007, and then
18    also a letter from Public Citizen dated October 3,
19    2007, which will be Exhibit 15C.
20              (Exhibits Nos. 15A, 15B and 15C marked
21    and admitted)
22              SEN. DUNCAN:  Members, we've been going
23    for about two hours.  It's my plan to try to give the
24    court reporter a break every hour and 45 minutes to
25    two hours, as necessary.  It will be a 10-minute
```

1    break --

2                   SEN. WENTWORTH:  Mr. President, could I

3    ask one before we break?

4                   SEN. DUNCAN:  Sen. Wentworth.

5                   SEN. WENTWORTH:  I don't believe our

6    witness came prepared to defend himself from attacks

7    like this, and I would like to give him the

8    opportunity to file, as part of the record, his

9    response to the letters that have just been filed as

10   exhibits.

11                  SEN. WEST:  Mr. President?

12                  SEN. DUNCAN:  Is there any objection?

13                  SEN. WEST:  There is objection.

14                  SEN. DUNCAN:  Why is there objection?

15                  SEN. WEST:  Well, first of all, the

16   characterization that he has been attacked, I object

17   to that.

18                  SEN. DUNCAN:  Well, we'll --

19                  SEN. WEST:  Like any other witness, we

20   should be able to cross-examine him like we cross-

21   examined other witnesses.  I resent the

22   characterization of him being attacked.

23                  SEN. WENTWORTH:  Well, you can resent it

24   all you want.

25                  SEN. WEST:  Well, you can say it all you

1    want to also.  He wasn't attacked, fellow.

2              SEN. DUNCAN:  Let's take one thing at a

3    time.  Is there any objection to the witness being

4    able to submit testimony to the committee --

5              SEN. WEST:  There is objection.

6              SEN. DUNCAN:  -- to be received in the

7    record post- --

8              SEN. WEST:  There is objection, yes.

9              SEN. WENTWORTH:  Mr. Chairman, I move

10   that the witness be permitted to respond in writing to

11   the letters that have been obviously not to his

12   advantage.

13             SEN. WEST:  This man has characterized

14   the President of the United States as a liar.

15             SEN. DUNCAN:  All right.  We're going to

16   take a break and we will be back in session at

17   seven -- rather, 6:50 -- 6:55.  I'm sorry.

18             (Recess:  6:46 p.m. to 7:06 p.m.)

19             SEN. DUNCAN:  The Senate Committee of

20   the Whole will come to order.  If we could get our

21   witness back up here.  I think Sen. Shapleigh rested.

22   And we will call Sen. Williams.

23             SEN. WILLIAMS:  Thank you, Mr. Chairman.

24   When the witness returns, I have some questions for

25   him.

257

```
1                    (Brief pause)
2                    SEN. DUNCAN:  The witness is present.
3     You can ask your questions.
4                    SEN. WILLIAMS:  Thank you, Mr. Chairman.
5                    Mr. Spakovsky, I don't want to butcher
6     your name.  Would you pronounce it for me once.  I
7     know I'm doing --
8                    MR. von SPAKOVSKY:  You did a great job.
9     "Spa-kos-ski."
10                   SEN. WILLIAMS:  Say it again.
11                   MR. von SPAKOVSKY:  "Spa-kos-ski."
12                   SEN. WILLIAMS:  "Spa-kos-ski."  Okay.
13    von "Spa-kos-ski."  Okay.
14                   I had some questions for you about a
15    report that I think you referred to earlier in your
16    testimony.  Are you familiar with the report by
17    Jeffrey Milyo of the effects -- it's titled "The
18    Effects of Photographic Identification on Voter
19    Turnout in Indiana:  A County-Level Analysis."  Are
20    you familiar with that report?
21                   MR. von SPAKOVSKY:  Yes, Senator.  In
22    fact, that's the report I was referring to that took a
23    look at what happened in Missouri in I believe 2006
24    when the photo ID law went into effect for the first
25    time.
```

1          SEN. WILLIAMS:  Now, just for the

2     record -- and I'm going to submit this report into the

3     record in a moment.  And I think there are plenty of

4     copies floating around here.  I think everybody has

5     got one.

6          Mr. Milyo is a professor in the Truman

7     School of Public Affairs and the Department of

8     Economics at the University of Missouri.  And he's a

9     Hanna Family Scholar in the Center for Applied

10    Economics at the University of Kansas School of

11    Business.  And he's a Senior Fellow at the Cato

12    Institute in Washington, D.C.

13          Would it be your opinion that Mr. Milyo

14    has written an academic study, that this would qualify

15    as what one might commonly refer to as an academic

16    study of the effects of photo ID in Indiana?

17          MR. von SPAKOVSKY:  Yes, sir, he is a

18    very good researcher.

19          SEN. WILLIAMS:  Okay.  Now, before we

20    get into the report, in one of the press releases that

21    I've seen about this report, he asserts that,

22    "Previous studies have examined the effects of voter

23    ID laws more generally but none of these separately

24    analyzes the effects of so-called 'mandatory photo ID'

25    on turnout in Indiana."

```
 1              He goes on to say that, "I examine a
 2    variety of models of voter turnout," and after
 3    controlling for several factors that influence
 4    countywide turnout, there is no consistent or
 5    statistically significant evidence that photo ID law
 6    depressed turnout in counties with greater percentages
 7    of minority, poor or elderly voters.  Contrary to
 8    conventional wisdom, turnout in Democratic-leaning
 9    counties actually increased in the wake of the new
10    photo ID requirements, all else constant.
11              Now, what's interesting about this
12    report to me as I reviewed it is, there's been a lot
13    that's been said on this floor about the effect of
14    President Obama's election on the turnout,
15    particularly in Georgia, because there is a large
16    African-American population there.  And, of course,
17    people turned out in record numbers.  But this report
18    is actually -- the time period, as I understand it,
19    includes two election cycles.  In neither one of
20    those, Mr. Obama wasn't running for president during
21    either one of those election cycles, so this report
22    wouldn't be influenced by that.  Would that be your
23    understanding?
24              MR. von SPAKOVSKY:  That is my
25    understanding, Senator.
```

```
 1              SEN. WILLIAMS:  Okay.  And in the
 2   report -- and I just want to get this into the record
 3   here, and I would like for you to comment on this if
 4   you would, please.  "In order to measure" -- he says
 5   in his report, "In order to measure the overall effect
 6   of photo ID on voter turnout across the 92 Indiana
 7   counties, I estimate an ordinary least squares
 8   regression controlling for county-fixed effects and
 9   year effects.  The county-fixed effects account for
10   factors such as demographic differences across
11   counties, while the year effects account for the
12   different composition of state races in each election
13   year.  However, there has only been one general
14   election in Indiana post-photo ID, so it is not
15   possible to separately identify the overall effects of
16   photo ID on voter turnout absent additional
17   assumptions.  For this reason, the present analysis
18   focuses on the effects of photo ID on different groups
19   of eligible voters.
20              "I evaluate claims about the relative
21   effects of voter ID on racial and ethnic minorities,
22   the poor, the elderly, persons without a high school
23   diploma and Democrats by estimating the effects of
24   photo ID on turnout in counties with greater
25   percentages of those groups as a percent of county
```

1    population.  However, these demographic variables do

2    not vary over time, since they are taken from the 2000

3    U.S. Census.  This means that it is not possible to

4    control for county-fixed effects when estimating the

5    effects of photo ID on these particular demographic

6    groups.  For this reason, I account for differences in

7    the demographic composition of counties by including

8    control variables for per capita income and the

9    percent of county population by several categories,

10    including:  Age, education, ethnicity, female labor

11    force participation, military status, non-citizens,

12    party, poverty, race, and rural status."

13               All of that is included in the appendix

14    to this report.  And he also goes on to say, "I also

15    check the sensitivity of results when this list of

16    control variables is pared down to just age,

17    education, ethnicity, income, and race."

18               I don't know if you have a copy, but I

19    believe that's on Page 4 and 5 of the report.  Do you

20    have a copy of it up there?

21               MR. von SPAKOVSKY:  I don't have a copy

22    of the report.

23               SEN. WILLIAMS:  Would you like it?

24               MR. von SPAKOVSKY:  But I've read it.

25               SEN. WILLIAMS:  Okay.  Now, what I would

1    like for you to comment on -- and that's a mouthful

2    that I just read -- but what I would like for you to

3    comment on is, how does the statistical analysis that

4    this academic has performed, would this be something

5    that would be comparable to the regression analysis

6    that we've heard talked about?  Are we looking at the

7    same kinds of things here, how this would influence

8    minority turnout?  Can you comment on that for me?

9                  MR. von SPAKOVSKY:  Well, I'm not an

10   expert on statistical analysis.  But my understanding,

11   from reading that and many other reports is that, yes,

12   that's the kind of analysis he was doing to try to see

13   if the photo ID law of Indiana would have any effect,

14   particularly on different groups, because he was

15   looking, as you read it, different groups:  The poor,

16   elderly, different minority groups.  And he found that

17   it did not have any effect on depressing their

18   turnout.

19                  SEN. WILLIAMS:  So it would be a

20   reasonable conclusion for somebody to draw, after

21   reading this report, that the effect of the Indiana

22   voter ID law, it had really no effect on the turnout

23   among any of the groups that the DOJ Civil Rights

24   Department would be concerned about when they're doing

25   an analysis?

1              MR. von SPAKOVSKY:  Under Section 5,

2      that's correct.

3              SEN. WILLIAMS:  Under Section 5.  That

4      would be your conclusion?

5              MR. von SPAKOVSKY:  That is correct.

6              SEN. WILLIAMS:  Okay.  And so he goes

7      on -- if I would -- if you could just bear with me a

8      few minutes.  There's a couple of other points that I

9      want to make sure that you have an opportunity to

10     comment on.  He says in his conclusion, the

11     discussion, that "Given the context of the existing

12     research on voter turnout, my findings for Indiana are

13     completely unsurprising.  Despite the attention-

14     grabbing and often strident claims that voter

15     identification is the modern version of the poll tax

16     and the like, nothing could be further from the truth.

17     Existing theory and evidence from decades of social

18     science research do not support the contention that

19     photo ID requirements are likely to have a large and

20     detrimental impact on turnout; nor does the previous

21     empirical evidence find any significant impact of

22     photo identification on racial or ethnic minorities.

23     Further, the best previous evidence to date also finds

24     no significant impact of photo ID on the poor or the

25     elderly."

1          He goes on to say that the findings that

2     emerge are, I believe, four-fold:  One, that an

3     overall county-level turnout -- he did a county-level

4     analysis.  Now, I think that's important when he's

5     looking at it for all 92 counties.  Do you know if

6     that would be more or less detailed than they would do

7     at the Department of Justice?  Would they do a

8     statewide analysis or would they do it on a county-by-

9     county analysis?  Do you know?

10          MR. von SPAKOVSKY:  I guess it would

11     just depend on the particular case.

12          SEN. WILLIAMS:  Okay.  And then an

13     insignificant increase in the relative turnout for

14     counties with a greater percentage of minority and

15     poor populations; three, no consistent or significant

16     impact on the relative turnout in counties with a

17     greater percentage of less educated and elderly

18     voters; and finally, No. 4, no significant -- excuse

19     me -- a significant relative increase in turnout for

20     counties with a higher percentage of Democratic

21     voters.  His final conclusion is that you actually had

22     more turnout in Democratic precincts on a county level

23     after this law was enacted than you did before.  Does

24     that surprise you?

25          MR. von SPAKOVSKY:  It does not surprise

1    me, because my experience in the election area,

2    frankly, is that when people have confidence that

3    their vote is going to count, they go to the polls.

4              SEN. WILLIAMS:  Thank you very much.

5              Mr. Chairman, I would like to submit

6    this report with whatever our next exhibit number is.

7              SEN. DUNCAN:  Senator, that would be 16.

8    And will you state the title of the report and the

9    date.

10             SEN. WILLIAMS:  The report is "The

11   Effects of Photographic Identification on Voter

12   Turnout in Indiana:  A county-level Analysis," by

13   Jeffrey Milyo.

14             SEN. DUNCAN:  Okay.  What's the date of

15   the article?

16             SEN. WILLIAMS:  The report is dated --

17   it was revised December of 2007.

18             SEN. DUNCAN:  Okay.  It will be received

19   into the record.

20             (Exhibit No. 16 marked and admitted)

21             SEN. DUNCAN:  Are you completed with

22   your -- Senator Watson.

23             SEN. WATSON:  Thank you, Mr. Chairman.

24             I just have a couple of questions.

25   First of all, who funded the Milyo study that we just

1    talked about?  Do you know?

2            MR. von SPAKOVSKY:  I don't know.

3            SEN. WATSON:  Do you know whether it was

4    ever peer-reviewed?

5            MR. von SPAKOVSKY:  I don't know the

6    answer to that.

7            SEN. WATSON:  Okay.  Just so that I'm

8    clear on why you're here today, first of all, you've

9    not done any sort of statistical analysis of the

10   effect that the new requirements of proposed Senate

11   Bill 362 would have on African-Americans in Texas?

12           MR. von SPAKOVSKY:  I have not done a

13   study.

14           SEN. WATSON:  And you haven't done that

15   with regard to Hispanics?

16           MR. von SPAKOVSKY:  No.

17           SEN. WATSON:  Or people making less than

18   $35,000 in the State of Texas?

19           MR. von SPAKOVSKY:  No.

20           SEN. WATSON:  You've not done any

21   statistical analysis, nor been asked to, about the

22   effect of the new requirements of the proposed Senate

23   Bill 362 on people who speak only Spanish or

24   Vietnamese in the State of Texas?

25           MR. von SPAKOVSKY:  I have not.

267

1              SEN. WATSON:  Have you done any sort of

2      statistical analysis with regard to the potential

3      impact of the new requirements of proposed Senate Bill

4      362 on seniors or students or people with disabilities

5      in the State of Texas?

6              MR. von SPAKOVSKY:  I have not, Senator.

7              SEN. WATSON:  Do you have any knowledge

8      that you can share with us regarding the impact that

9      this proposed legislation would have on people who

10     live along the border of Texas?

11             MR. von SPAKOVSKY:  Is that somehow

12     different than --

13             SEN. WATSON:  Well, you may have just

14     answered my question.

15             MR. von SPAKOVSKY:  Well, you know, I

16     have not done a study of Texas.

17             SEN. WATSON:  Okay.

18             MR. von SPAKOVSKY:  But there have been

19     plenty of other studies done, all of which have been

20     mentioned, that have looked at these issues.

21             SEN. WATSON:  Fair enough.  And that's

22     part of what I want to make sure is that we're clear,

23     because since we are in Texas and we're talking about

24     the impact on Texans -- for example, do you have any

25     data with you today on whether or not African-

1    Americans of Texas are more or less likely to have

2    driver's licenses than whites?

3                   MR. von SPAKOVSKY:  I haven't seen that

4    data.  I did take a look, Senator, before I came down,

5    at some data that is available from the United States

6    Government.  And the U.S. Department of

7    Transportation, the Federal Highway Administration

8    highway statistics for 2006 showed that the total

9    number of licensed drivers in Texas, age 18 and over,

10   is 14.6 million.

11                  The Census Bureau, current population

12   survey, also for 2006, shows that the number of

13   citizen voting age population is 14 million four.  So

14   there are actually more driver's licenses issued in

15   the State of Texas than there are individuals eligible

16   to vote in the State of Texas.

17                  SEN. WATSON:  And, of course, 16-year-

18   olds are available to get licenses in Texas, even

19   though they're not eligible to vote.  How many --

20                  MR. von SPAKOVSKY:  The numbers --

21                  SEN. WATSON:  -- licenses were lost in

22   the State of Texas last year?

23                  MR. von SPAKOVSKY:  I don't know,

24   Senator, but the numbers I gave for the total licensed

25   drivers were licensed drivers age 18 and up.

1           SEN. WATSON:  All right.

2           MR. von SPAKOVSKY:  I took out the

3  numbers for individuals who were below the age of 18.

4           SEN. WATSON:  How many of those licenses

5  were lost last year?

6           MR. von SPAKOVSKY:  I have no idea.

7           SEN. WATSON:  How many of them were

8  duplicate licenses?

9           MR. von SPAKOVSKY:  I don't know.

10           SEN. WATSON:  Thank you, Mr. Chairman.

11           SEN. DUNCAN:  Senator Ellis.

12           SEN. ELLIS:  Thank you, Mr. President.

13           Mr. von "Kosky" -- did I get that right?

14           MR. von SPAKOVSKY:  "Spa-kos-ski."

15           SEN. ELLIS:  "Spa-kos-ski."  I'm sorry.

16  Is this your first time in Texas?

17           MR. von SPAKOVSKY:  No, sir.

18           SEN. ELLIS:  Have you been a frequent

19  visitor to the Lone Star state?

20           MR. von SPAKOVSKY:  I've been down here

21  before on business.

22           SEN. ELLIS:  Well, welcome back.  I know

23  you are familiar with the Carter-Baker Commission

24  Report.  And I'm wondering, of the 87 recommendations

25  in that report, other than the one relating to voter

270

```
 1    identification, are you in favor of the other 86 in

 2    that report?

 3              MR. von SPAKOVSKY:  Well, Senator, if

 4    you want to ask me about each one, one at a time --

 5              SEN. ELLIS:  Okay.

 6              MR. von SPAKOVSKY:  -- I would be happy

 7    to tell you, but I --

 8              SEN. ELLIS:  Any there any of them that

 9    you are against?

10              MR. von SPAKOVSKY:  Senator, I read the

11    report quite some time ago.  In fact, if you look at

12    the end of the report, you'll see me listed as one of

13    the advisers to the Commission.  I think there were

14    lots of reports -- lots of recommendations in there I

15    agreed with.  I don't recall what all the different

16    recommendations were.  I think in many ways, you know,

17    it was a pretty good report.

18              SEN. ELLIS:  I assume you've gone around

19    the country testifying on this subject --

20              MR. von SPAKOVSKY:  I --

21              SEN. ELLIS:  -- not the first time at

22    this rodeo?

23              MR. von SPAKOVSKY:  This is the first

24    time I've really testified in a State Legislature

25    about this issue.
```

1          SEN. ELLIS:  You heard some of the

2     discussion earlier where we were reading excerpts from

3     editorials by President Carter and Secretary Baker.

4     Is it a fair characterization that they were

5     recommending voter ID as part of a package, and part

6     of the package would be for states to comply with the

7     REAL ID Act?  Is that a fair is assessment?

8          MR. von SPAKOVSKY:  I believe there

9     was -- if I recall, I think there was a recommendation

10    in there about that REAL ID Act.  I don't remember the

11    detail.

12         SEN. ELLIS:  I know.  But I'm saying, do

13    you think it is a fair representation of the position

14    of the two principals from the Carter-Baker

15    Commission, that they were saying voter ID was part of

16    a package and that states should adopt the REAL ID

17    provisions, not have these different standards all

18    around the country?  Their purpose was so that more

19    people would be able to vote, or a concentrated effort

20    to make sure that people were aware of the new

21    requirements.  Is that a fair assessment or not?

22         MR. von SPAKOVSKY:  Senator, as I told

23    you, it's been a while since I read the report.  I,

24    frankly, don't remember.  You know, there is another

25    witness here who I think is going to testify about it

1    that could probably answer that question.

2              SEN. ELLIS:  But you are for the voter

3    ID part, you read that part basically.  You know

4    you're for that part, though.  Right?

5              MR. von SPAKOVSKY:  I recall that part,

6    because I was asked about it.

7              SEN. ELLIS:  Okay.  I have read that you

8    were involved in an effort or have done some writing

9    for the Georgia Public Policy Foundation to encourage

10   an aggressive campaign to purge the election rolls of

11   felons.  Is that correct?

12             MR. von SPAKOVSKY:  I wrote a paper

13   about 12 years ago, Senator.  And one of the

14   recommendations I made in the paper was that the

15   state's voter registration list should be compared on

16   a regular basis with the computer records of the

17   Department of Corrections so that any individuals who

18   had become felons and were, therefore, not entitled to

19   vote under Georgia law, that that kind of data

20   matching should be done.  You may know that's a

21   recommendation that Congress implemented into federal

22   law in 2002 in the Help America Vote Act.

23             SEN. ELLIS:  Are you aware that as a

24   result of your article, you were given credit for a

25   very aggressive effort to remove felons off the roll

1    in Florida, and it also led to a major voter

2    disenfranchisement where they made mistakes and they

3    took Ron Ellis off the rolls, even if that was not the

4    person that committed a felony?  And there were a

5    number of people who were denied the right to vote in

6    the 2000 election.  Are you aware of that?

7              MR. von SPAKOVSKY:  Senator, there was a

8    newspaper article written some time ago claiming that

9    I was somehow involved with that effort in Florida.

10   That is completely untrue.  I was not an election

11   official in Florida.  I had no involvement with that.

12   I simply wrote a paper in Georgia recommending that

13   the Georgia Legislature and Secretary of State

14   consider running monthly computer comparisons between

15   the state voter registration list and state

16   corrections records which now, you know, all states

17   are supposed to be doing that by federal law.

18             SEN. ELLIS:  Maybe your reputation as a

19   guru on these subjects -- this subject -- has preceded

20   you around the country.  You made a reference to the

21   Lawyers' Committee on Civil Rights earlier at the

22   beginning of your testimony.  Do you remember that

23   characterization?

24             MR. von SPAKOVSKY:  I do.

25             SEN. ELLIS:  What was that, if you would

274

1      just repeat that for my colleagues again.

2                    MR. von SPAKOVSKY:   It's an advocacy

3      group based in Washington.

4                    SEN. ELLIS:   I think you described that

5      as a liberal advocacy organization.

6                    MR. von SPAKOVSKY:   Well, I would tend

7      to think they probably are liberal.

8                    SEN. ELLIS:   All right.   How would you

9      describe the advocacy organization that you work for?

10                   MR. von SPAKOVSKY:   It's a conservative

11     foundation.   It's the largest -- has the largest

12     support of any foundation in the country.   It has

13     400,000 contributors, two-thirds of whom are

14     individuals.

15                   SEN. ELLIS:   Okay.   So the lawyers you

16     meet on civil rights you characterize as a liberal

17     advocacy organization and the Heritage Foundation you

18     would describe as the best funded and extremely

19     conservative public policy out there?

20                   MR. von SPAKOVSKY:   I did not say

21     extremely conservative.   I think they're a --

22                   SEN. ELLIS:   But conservative?

23                   MR. von SPAKOVSKY:   I think they're a

24     rule of law organization who believes in the

25     constitution and the principles this country was

1    founded on.
2              SEN. ELLIS:  Are you familiar with the
3    history of the Lawyers' Committee on Civil Rights?
4              MR. von SPAKOVSKY:  I know some of it,
5    yes.
6              SEN. ELLIS:  But what do you know about
7    their history?
8              MR. von SPAKOVSKY:  It's an organization
9    born, I think, during the civil rights movement to
10   help individuals who were having their voting rights
11   denied.
12             SEN. ELLIS:  Yes.  Just for your
13   edification and the members of this body, it was
14   founded in 1963 as a result of a meeting that
15   President Kennedy and Attorney General Kennedy and
16   Vice President Lyndon Johnson, had at the White House,
17   in which they summoned all of the major law firms in
18   America to get involved and use their legal skills as
19   a way of ending some of the demonstrations on the
20   streets, to remove people who were pushing
21   discriminatory practices all around the country, in
22   Alabama in particular.
23             And only because you described them as a
24   liberal organization, as though for some reason they
25   ought to be dismissed, I just wanted to point out that

```
 1    the who-is-who silk stocking law firms in America were
 2    in that room.  Most of the bar associations around the
 3    country were involved, the ABA, and it is quite a
 4    distinguished history.  And I just wanted to make sure
 5    that I added that to the record.  Maybe you should do
 6    a little research on the --
 7                   MR. von SPAKOVSKY:  Senator, I certainly
 8    don't disagree with you.  But if you're recall, what I
 9    said about the Lawyers' Committee For Civil Rights was
10    in the context of explaining that two of the lawyers
11    who had complained about me, in fact, worked for the
12    Lawyers' Committee For Civil Rights and, in fact, were
13    lawyers who were the litigators in the federal lawsuit
14    in Georgia against the Georgia voter ID law.  And, in
15    fact, they lost that suit.  And, in fact, the legal
16    claims that they made were dismissed by the judge
17    there.
18                   SEN. ELLIS:  Are you familiar with The
19    Federalist Society?
20                   MR. von SPAKOVSKY:  I am a member of The
21    Federalist Society.
22                   SEN. ELLIS:  And how would you
23    characterize that organization?
24                   MR. von SPAKOVSKY:  It's a group of
25    lawyers who get together and discuss many different
```

1   issues.  And one of the good things about the

2   Federalist Society, if you ever come to one of its

3   panel discussions is, and like a lot of organizations,

4   The Federalist Society tries to get people on both

5   sides of an issue so that you can have a good

6   discussion and get different points of view.

7                SEN. ELLIS:  Thank you.

8                SEN. DUNCAN:  Members, there's no other

9   persons registered, so the witness will be excused.

10               MR. von SPAKOVSKY:  Thank you,

11   Mr. Chairman.

12               SEN. DUNCAN:  Thank you, sir.

13               The Chair calls Tova Andrea Wang.

14   Ms. Wang, you have 10 minutes.  And you can begin.

15   And state your name and who you represent.

16            **TESTIMONY BY TOVA ANDREA WANG**

17               MS. WANG:  Sure.  Thank you.  My name is

18   Tova Andrea Wang.  Thanks very much for allowing me to

19   come testify today.  I'm Vice President for Research

20   at Common Cause, a non-partisan national organization

21   with 36 state chapters, including one right here in

22   Texas.  And I have spent the last several years doing

23   research and writing and speaking on elections issues

24   and voting rights issues.

25               I want to start out talking about the

1    disenfranchising impacts of voter ID such as this.   I

2    know that for probably all of you in the room -- and I

3    would include myself -- it seems so easy.   You have an

4    ID in your pocket right now, probably several.   But I

5    have to really emphasize to you all that it's not the

6    case for everybody.   For some people they don't have

7    their ID, and it would be a real hardship for them to

8    get that ID, and we need to understand this group in

9    our society.   In fact, about 10 percent of the

10   American people don't have government-issued photo ID.

11   And as has been pointed out repeatedly today, this is

12   disproportionally the case with African- Americans,

13   immigrants, the poor, people with disabilities, senior

14   citizens and students.

15            There have been numerous studies to this

16   effect.   I want to point out one in particular,

17   Brennan Center survey talking just about income.

18   People with incomes lower than $35,000 a year are

19   twice as likely not to have the kind of ID we're

20   talking about.   38 percent of Texans have incomes that

21   are less than $35,000 a year.   African-Americans are

22   three times less likely to have ID than whites.   And,

23   in fact, one-fourth of African-Americans don't have

24   government-issued photo ID.

25            So this is what I'm talking about when

```
 1     I'm talking about thinking about a group in our
 2     society that maybe some of us don't have every day
 3     interaction with.  People always talk about how
 4     everyone has ID, you need it to fly and rent a DVD and
 5     all of these kinds of things.
 6                 Now, I know Hurricane Katrina is
 7     starting to seem like a long time ago now, but I want
 8     us to think back for a second about all those people
 9     in the Astrodome.  They were there because they
10     couldn't get out, because they don't have driver's
11     licenses, they don't have cars, they're not going out
12     and renting DVDs on the weekends and flying on
13     vacations.  So this whole notion that everyone has ID
14     is just untrue.  Many poor people don't.
15                 We talked a lot about fraud today, too.
16     There is also a lot of mythology around that.  I want
17     to point out to you that the U.S. Department of
18     Justice has never brought a case in the last several
19     years of the type that would be addressed by a voter
20     ID law such as this.
21                 Now, we know this was in an environment
22     in the last several years in which U.S. attorneys were
23     under tremendous pressure to bring cases of voter
24     fraud against people, and people were -- allegedly at
25     least -- fired for not doing so; and, yet, not one
```

1    case.

2              It is also especially telling that in

3    all of the litigation, federal litigation over voter

4    ID that's taken place, not one of the states defending

5    these laws has come up with a single case of fraud

6    that would have been addressed by a voter ID law.  In

7    fact, in Crawford versus Marion County, the Indiana

8    case that we've heard a lot about today, Justice

9    Stevens himself, in writing the opinion essentially

10   admitted this, because the only incident of fraud that

11   he really -- were impacted that I noticed -- we've

12   reached back into the past for examples a lot today --

13   was Boss Tweed in the 19th Century and one possible

14   case that has gone unproven in Washington State in

15   2004.

16             There is another thing I want to

17   underscore about the fraud thing.  Problems with -- or

18   even fraud in the voter registration process is a

19   fully unrelated, although very worrisome problem in

20   itself.  There is no available evidence that faulty or

21   even false registration forms lead to fraudulent

22   voting.

23             Even advocates from across the spectrum,

24   academics and, more importantly, elections officials

25   and registrars, as I have done in the course of my

1  work, and they will tell you that they have not seen a

2  case of voter registration fraud that led to a false

3  vote.

4          I just want to talk to you even about --

5  the most extreme discussion about voter registration

6  just this last year around the organization ACORN;

7  and, yet, I have not heard of one case of someone who

8  was accused of having registered falsely through

9  ACORN, actually showing up at the polls to vote.

10          Now, voter registration fraud is a

11  problem.  It should be taken seriously and it should

12  be prosecuted, but voter identification will do

13  nothing about voter registration fraud.

14          Now, it seems to me that because

15  proponents of ID have not been able to demonstrate

16  that fraud is actually a problem, they're claiming

17  that we need to have voter ID laws because the

18  American people believe it's a problem.  And if they

19  believe it's a problem, they won't have confidence in

20  the system and they won't turn out to vote.

21          Well, we now have actual studies done

22  that show that belief in the existence of fraud has

23  zero impact on voting behavior.  And, in fact,

24  professors at MIT and Columbia conducted a survey

25  published recently in the Harvard Law Review that

1    found that perceptions of fraud have no relationship

2    at all to someone's likelihood of voting.

3                And it's very convenient that the people

4    that are making this perception that all about -- this

5    is all about instilling confidence -- are the people

6    who made people believe in the first place falsely

7    that there was this fraud problem.  So it's

8    questionable what this is all really about.

9                I also want to point out to you that

10   many states do not have a photo identification

11   requirement and so -- in fact, most states don't have

12   a photo identification requirement, and they don't

13   have any problem with polling place fraud, as Texas

14   does not have such a problem.  And they are a diverse

15   set of states, many with immigrant populations and

16   they have no great problem with voter fraud.

17               And I believe that those states care

18   just as much as the State of Texas about the integrity

19   of their elections, and they don't feel that a voter

20   ID requirement such as this is necessary, and they're

21   right.  And even in those states that do require a

22   photo ID, they still allow someone to fill out an

23   affidavit if they don't have the ID.  And they are

24   allowed to cast a regular -- not a provisional -- but

25   a regular ballot.

1          I also want to talk about this idea,

2     giving people free IDs is somehow the solution.  The

3     truth is, ID is never free.  It's not free for the

4     voter and it's not free for the state either.  I'm

5     going to use Indiana as an example, to show why voter

6     ID is never really free for the voter, as Texas is

7     likely to have a similar program.

8          In order to get the so-called free ID,

9     you have to do to DMV during working hours and present

10    the primary document, a secondary document and a proof

11    of residency or two primary documents and one proof of

12    residency document.  The only documents basically that

13    count are passports and birth certificates.

14          Most people -- and I include myself in

15    this -- don't have their birth certificate handy at

16    home, so they have to go out and buy it.  Well, in

17    Texas it costs $22 to get a birth certificate, and in

18    many places it's much more than that and also can be

19    very time-consuming, so that someone who needs to

20    register and vote is going to have to do this well in

21    advance.

22          And there are additional difficulties if

23    your name has changed at all since you got your birth

24    certificate, which means that particularly women who

25    have married and have changed their name will

284

1    encounter further difficulties.

2              I also heard you talking earlier today

3    about the cost.  For constitutional reasons, as was

4    demonstrated by the Georgia litigation over this

5    issue, you will need to ensure that every eligible

6    voter in Texas can easily obtain a free photo

7    identification card and to do that right and to do it

8    within the mandates of the Voting Rights Act against

9    poll taxes is going to require enormous resources.

10             In 2005, Georgia found this out the hard

11   way.  And I would refer you to my written testimony.

12   I have in there in the end notes all the various steps

13   that Georgia had to take in order to comply with the

14   constitution, to educate people on it.  It goes far

15   beyond anything I think you discussed today does.

16             Now, we don't know exactly how much in

17   dollars this is going to cost you.  As we've talked

18   about today, there has not been a financial impact

19   analysis.  But I will say that this is a recurring

20   cost; this isn't going to be $600,000 or whatever was

21   discussed just this year.  It's going to be $600,000

22   this year or a million dollars this year and a million

23   dollars next year.

24             So there's going to have to be this

25   ongoing campaign in order to comply with the

1    constitution.  And so I think that this will end up

2    costing millions of dollars over the course of the

3    next few years.  And I say this as an outsider and

4    perhaps, as such, it's not my place.  But I do have to

5    wonder how Texans will feel about millions of dollars

6    being spent on a phantom problem when people are

7    losing their jobs.  And as you probably know, Texas

8    actually is No. 1 in the number of people who don't

9    have health insurance.

10           I want to make one other point about

11   voter ID, that I don't think Texas might really want

12   to get involved with right now.  Studies of real

13   elections show that whether it's purposeful or not --

14   and I know I'm going to go overtime, so tell me if --

15   I only have a little bit more.

16           Studies of elections show that whether

17   it's purposeful or not, poll workers demand photo

18   identification much more often from African-Americans

19   and Latinos than white voters.  Now we're talking

20   about implementation on the ground at the polling

21   place.

22           In a study conducted by a Harvard

23   professor of tens of thousands of voters in the 2006

24   general election, 47 percent of whites were asked for

25   photo identification whether it was required or not,

1    compared to 54 percent of Hispanics and 55 percent of

2    African-Americans.

3              Harvard did a survey of thousands of

4    voters in the 2008 Super Tuesday primary -- and I am

5    wrapping up.  53 percent of whites were asked for

6    photo ID, compared with 58 percent of Hispanics and a

7    staggering 73 percent of African-Americans.  And this

8    was true even after controlling for factors such as

9    income, education, age and region.

10             Again, another study in New Mexico in

11   2006 again found Latinos were disproportionally asked

12   for ID when they weren't supposed to be, and this is

13   true in the Super Tuesday and 2007 gubernatorial

14   elections as well.

15             Now, the point is that most states run

16   their elections without the kind of laws that you're

17   talking about here in Texas, and they do just fine.

18   They have very honest elections, and I believe Texas

19   can do just as well.

20             Texas has a very low turnout, voter

21   turnout rate; in fact, one of the lowest in the

22   country.  Even in the historic election of 2008 when

23   voters came out in unprecedented numbers, less than

24   55 percent of Texans voted, earning it the dubious

25   distinction of ranking 48th in turnout nationally.

1          It's my opinion that if the Texas State

2    Legislature is concerned about the fairness of its

3    elections, it would be better off using all of its

4    energies and resources to do something about that

5    problem rather than a problem it does not have.

6          Thank you very much.

7          SEN. CARONA:  Ms. Wang, we thank you for

8    your testimony.

9          The Chair at this time calls upon

10   Sen. Gallegos.  Senator, for what purpose?

11         SEN. GALLEGOS:  To ask the witness some

12   questions, Mr. Chairman.

13         SEN. CARONA:  Please proceed.

14         SEN. GALLEGOS:  Thank you.

15         **QUESTIONS FROM SENATE FLOOR**

16         SEN. GALLEGOS:  Ms. Wang, thank you for

17   being here.  I've got several questions that I would

18   like to ask you.  The first one is, doesn't it solve

19   the problem for those lacking a photo ID, that under

20   this legislation as presented before us today, that

21   you can produce two other forms of ID?

22         MS. WANG:  You know, certain groups

23   don't possess government-issued photo IDs.  They're

24   also much less likely to have two forms of

25   identification that are on the list of other possible

288

1    ID forms.  And basically what you're asking people to

2    do is, is sort of bring a file folder full of

3    identification documents and engage in a huge campaign

4    to make sure people know what they are.

5              And there is no affidavit option like

6    there is in other places, if you cast a provisional

7    ballot if you don't have ID.  As I understand Texas

8    law, they automatically won't get counted.  If you

9    cast a provisional ballot because you didn't have the

10   requisite ID, the ballot will not count.

11             Now, I can go through the list of the

12   various types of ID that a person can use if they have

13   two forms of it and talk about why each one of them

14   might be difficult.  For example, one of them is, you

15   know, using a copy of a current utility bill or a bank

16   statement, et cetera.  Well, not everyone has such

17   documents in their name.  For example, married women

18   whose bills come in their husband's names or poor

19   people who quite often live in multi-family homes.

20             I can go through the list and talk about

21   why poor people or different groups of people won't

22   have any one given form.  And to ask them for two plus

23   their voter registration certificate, as I understand

24   it, is really asking people to just sort of dump

25   everything they have in a folder -- and they may not

289

```
 1    have them at all -- and hope that they get past the
 2    poll worker with them.
 3              And, as I say, there will be many groups
 4    that don't have them.  I've talked about the birth
 5    certificate and the fact that you had to pay $22 to
 6    get it.  A divorce decree and a marriage license, a
 7    copy of a marriage license costs $20 in Texas.  A copy
 8    of a divorce decree costs $20 in Texas, as I
 9    understand it at least.  And so, you know, there are
10    difficulties in obtaining all of these types of IDs,
11    so it really doesn't solve the problem at all.
12              SEN. GALLEGOS:  Thank you.  Let me ask
13    you this:  There has been a lot of debate today on
14    voter fraud -- and, you know, there is a lot of it; in
15    some cases, there is none of it.  Let me ask you, is
16    there a great deal of voter fraud in the United States
17    that justifies a voter ID?
18              MS. WANG:  I won't come out here and
19    tell you that there's not voter fraud.  I will come
20    here and tell you that there is not the type of voter
21    fraud that a voter identification requirement such as
22    that proposed in this legislation would do anything
23    about.
24              And we are talking about an environment
25    in the last several years in which you've never seen
```

1    such an aggressive operation by law enforcement to

2    ferret out instances just like what we're talking

3    about here today, and they didn't come up with

4    anything.

5               I'm hearing examples today.  I think

6    Mr. von Spakovsky even couldn't come up with anything

7    in Texas since the 1800s and a ballot box stuffing

8    case from 60 years ago.  And there's just no evidence

9    of it.  There is simply no evidence of polling place

10   fraud.  Now, there are a lot of other problems in the

11   voting system that can alter the outcome of an

12   election.  And I think it would be great if the

13   Legislature was discussing those issues here today,

14   but that's not what we're discussing.  We're

15   discussing something that isn't a problem.

16               SEN. GALLEGOS:  Let me ask you, another

17   issue that's being debated on the floor is financial

18   cost.  And I guess if you can explain to us, or just

19   let us know that if there -- what financial cost is

20   there to the state if it enacts -- let's say we enact

21   this bill today, I would like to know what financial

22   cost is on the voter ID and if there is any -- is this

23   a one-time cost or have you seen in other states that

24   the costs continue to rise or any -- not direct by the

25   bill being passed but any indirect costs?

1          MS. WANG:  Yes.  I mean, as I said, this

2     will be a recurring cost to the state.  I can only

3     tell you what Georgia has had to go through in order

4     to make sure that the voters are educated and the poll

5     workers trained.

6          Before the election, the Secretary of

7     State sends a reminder letter to over 80,000 active

8     and inactive registered voters across the state who

9     might not have ID.  They received informational

10    brochures and postcards leading up to the election.

11    They contacted hundreds of thousands of voters,

12    reminding them to bring the ID with them.  They

13    advertised extensively on radio and on cable

14    television.  They distributed information all over the

15    state and public facilities.

16          And, of course, they had to go through a

17    whole new separate type of training for elections

18    officials and poll workers who -- you know, frankly,

19    you're asking to be quasi-law enforcement authorities

20    in determining the validity of a government-issued

21    identification card.  And all of that will have to be

22    done every single year, and that doesn't take into

23    account the cost of providing the so-called free ID.

24          SEN. GALLEGOS:  So you're saying extra

25    costs?

1          MS. WANG:  It's going to cost quite a
2   lot, and it's going to cost every year.
3          SEN. GALLEGOS:  You couldn't give us a
4   figure, could you?
5          MS. WANG:  It's several hundred thousand
6   dollars a year in Georgia, which it has been pointed
7   out is quite a smaller state than Texas is, so I would
8   have to guess -- and I would be totally guessing --
9   but at least a million dollars.
10         SEN. GALLEGOS:  All right.  Let me ask
11  you, Ms. Wang, how many cases of election fraud
12  brought by the United States Department of Justice
13  over the last let's say several years were of the type
14  that would have been addressed by voter ID?
15         MS. WANG:  None.
16         SEN. GALLEGOS:  None?
17         MS. WANG:  None.
18         SEN. GALLEGOS:  All right.  Let me ask
19  you, are there laws on the books right now that allow
20  for prosecution of people who commit voter fraud, and
21  is there any proof of these laws that are not working?
22         MS. WANG:  Well, you know, that's one of
23  the kind of astonishing things to me about all of
24  this.  You know, you're asking us, or people who are
25  advocating for the ID are trying to persuade us that

```
 1    someone would go into a polling place to affect one
 2    vote, change one vote.
 3              And basically if they're caught, which
 4    given the enormous efforts that have gone on in this
 5    state to catch people doing this, they may be -- risk
 6    going to jail for up to ten years and a minimum of two
 7    and a fine of $10,000.  I don't know what kind of
 8    lunacy that would be, to risk spending ten years in
 9    jail to change one vote at the polling place.  So I
10    think that's quite an effective deterrent, and I think
11    it has been.
12              SEN. GALLEGOS:  Okay.  Ms. Wang, let me
13    ask you, do most states have a photo ID requirement?
14    And do the states that don't impose photo ID
15    requirements have huge fraud problems?
16              MS. WANG:  Well, as I said, about half
17    the states have basically next to no identification
18    requirement, and that includes states like California,
19    and North Carolina.  And, actually, while I have North
20    Carolina on my mind, just in sort of response to
21    things that have been said earlier, you know, the
22    state that had the highest increase, greatest increase
23    in turnout in the last election in 2008 was North
24    Carolina.  And not only did they not impose a voter ID
25    requirement such as what you're discussing here today,
```

294

1    but they did initiate same-day registration, which is

2    a much more fruitful thing for you to be perhaps

3    discussing.

4              But, as I say, about half the states

5    don't have strict voter ID requirements.  There are

6    seven states that require a photo ID.  And in four of

7    those states, they allow a person to simply fill out

8    an affidavit if they don't have the ID, and they are

9    able to cast a regular ballot.  And so we are talking

10   about a very small universe of states that feel it

11   necessary to put people through these hoops and

12   hurdles in order to exercise their right to vote.

13             SEN. GALLEGOS:  Ms. Wang, let me ask

14   you, you heard the author of the bill say that we

15   could probably give free IDs when needed.  If a

16   state -- let me ask:  If a state provides a free ID to

17   everyone, would it really be free?  And with a

18   follow-up, wasn't Indiana's ID free?  And how did the

19   free ID work in that state?

20             MS. WANG:  Well, it depends on what

21   you're going to ask people to do in order to get the

22   free ID.  I take it that there are not plans to go

23   door-to-door to every household in the State of Texas

24   distributing identification cards to anyone who needs

25   one.

1          And so I imagine that people will have

2   to go to DMV during working hours.  If they work on an

3   hourly wage job, that's probably difficult.  If they

4   have small children, that's probably difficult.  If

5   they have a job that relies on tips, that's probably

6   difficult.

7          And then they will have to present all

8   sorts of identification in order to get the

9   identification.  I imagine, if this works anywhere

10  close to the program in Indiana, they will probably

11  have to present their birth certificate.  And getting

12  a certified copy of your birth certificate costs $22.

13  How that is not a cost, how that is not ultimately a

14  poll tax is really beyond me.

15          SEN. GALLEGOS:  Well, I mean, I just

16  want to tell you that a lot of the process in this

17  giving a free voter ID, I mean, that was just told to

18  us.  We really don't know how the process is going to

19  work on anybody asking you for a free photo ID.

20  That's not explained in the bill.

21          MS. WANG:  I would actually make one

22  follow-up point to that, which is that even in the

23  Indiana law, someone who comes to the polls without ID

24  is allowed to cast a provisional ballot and return

25  within 10 days, either to present identification or

1   fill out an affidavit attesting to their indigency,

2   that they are too poor to have ID.  There isn't even

3   that in this current bill, to allow for the

4   possibility that there are poor people in our

5   community who might not have the identification.

6                   SEN. GALLEGOS:  Let me ask you this:

7   Let's say I'm given a free ID and I go to the polls,

8   but I only speak Spanish, only, and the precinct

9   worker cannot speak Spanish.  Even though I have been

10  given a free ID from the state, can that precinct --

11  under this bill, can that precinct judge, worker, deny

12  me the right and say, "I can't -- I don't understand

13  you.  You're going to have to give me other forms of

14  ID"?

15                  MS. WANG:  Well, whether the law allows

16  it or not, as I've indicated, that's what, practically

17  speaking, happens all the time.  What you find is, is

18  that blacks and Latinos are far more likely to be

19  asked by poll workers for identification, whether it

20  is required of them or not.  That's just a reality,

21  and it's just a road that seems so unnecessary to go

22  down.

23                  SEN. GALLEGOS:  But as open-ended as

24  this bill is, that happens to me, in the example I

25  just gave you, and the ID was given to me by the

1     state.  And they, you know, obviously took all the

2     data that they needed and knew I was a U.S. citizen

3     and everything.  If I speak Spanish only and I'm

4     rejected at the polls, I'm rejected at the polls

5     because the poll worker does not speak Spanish, is

6     that a denial of my voting rights?

7                MS. WANG:  Yes, of course.

8                SEN. GALLEGOS:  Okay.  Let me ask you

9     this:  In states that have voter ID requirements, are

10    there any studies that have been done which show that

11    the ID requirements in those states have not been

12    applied even-handedly?

13               MS. WANG:  Yes.  As I said, there now

14    have been several studies done that look at thousands

15    and thousands of voters that show pretty dramatic

16    disparities between African-American voters and Latino

17    voters and white voters.

18               SEN. GALLEGOS:  Let me ask this, if you

19    can explain to me and discuss the problems with

20    vesting thousands of election judges with the

21    authority to verify additional requirements?

22               MS. WANG:  Yes.  I mean, that is a huge

23    problem.  You're leaving a lot of decisionmaking

24    authority with poll workers who are often,

25    unfortunately, not very well-trained to begin with or

1   often not terribly on the younger side, who will have

2   to be given tremendous training in order to even hope

3   that this will be applied in a consistent manner.

4            And, as I said, you're basically asking

5   them -- I mean, another scenario I envision is,

6   someone comes in with their government-issued photo ID

7   that was taken 10 years ago and maybe they've gotten a

8   little grayer or added a few pounds and don't look

9   exactly the same as they used to.  And the poll worker

10   will say, "This isn't you."  I don't know what happens

11   in that situation.

12            SEN. GALLEGOS:  One last question,

13   Ms. Wang.  Let me ask you, it's kind of like sort of

14   the question that you already answered, only can you

15   comment on the likelihood of election judges dealing

16   with African-Americans, Hispanic and aged Americans,

17   that they will ask for proof of their ID at a higher

18   rate than others?

19            MS. WANG:  Yes.  I mean, that's clearly

20   borne out by the surveys that have been done to date.

21   We've known this anecdotally for years.  And I don't

22   want to presume any particular motivation or reason

23   for this.  All I know is that as a practical matter,

24   that's what you see.

25            SEN. GALLEGOS:  Ms. Wang, thank you very

1    much.

2                    MS. WANG:  Thank you.

3                    SEN. DUNCAN:  Sen. Lucio.

4                    SEN. LUCIO:  Thank you, Mr. President.

5    And I'll be brief.

6                    I understand you spent several years

7    doing research and writing on election reform and the

8    voting rights issue.  And you're a member of -- excuse

9    me.  Your organization has got a membership in 36

10   state chapters.  How extensive have your studies been

11   in Texas on voter ID?  And, actually, what I really

12   want to know is, along the border of Texas, do you

13   have any information that would allow me to better

14   understand how this issue pertains to minorities or

15   Hispanics along the Texas-Mexico board and to that of

16   other states such as Indiana, Georgia, given the

17   cultural value as a way of life, et cetera, taking

18   into consideration how this would impact those that I

19   represent compared to an Hispanic, let's say, in

20   Indiana or Georgia?

21                   MS. WANG:  I have not looked at that,

22   and I think that that would be something that would be

23   very important for someone to analyze before passing

24   such a law and submitting it for pre-clearance.

25                   SEN. LUCIO:  I guess I can download a

300

1    lot of information on your website in terms --

2                   MS. WANG:  Sure.

3                   SEN. LUCIO:  -- of what you discuss here

4    this evening?

5                   MS. WANG:  Sure.

6                   SEN. LUCIO:  Thank you very much.

7                   SEN. DUNCAN:  Ms. Wang, we have a copy

8    of your written testimony exhibit which will be

9    submitted in the record as Exhibit 17, dated March 10,

10   2009.

11                  (Exhibit No. 17 marked and admitted)

12                  MS. WANG:  Thank you very much.

13                  SEN. DUNCAN:  Thank you.  You're

14   excused.

15                  The next witness will be Cameron Quinn.

16                  Sen. Fraser.

17                  Ms. Quinn, you have 10 minutes.

18                  **TESTIMONY BY CAMERON QUINN**

19                  MS. QUINN:  Thank you very much,

20   Senator.  It's a pleasure to be here on behalf of the

21   Carter-Baker Commission on Federal Election Reform,

22   which was formed and issued a report in 2005.  My name

23   is Cameron Quinn.  I am, among other things, a former

24   chief state election official for the Commonwealth of

25   Virginia.  In Virginia, that's the Secretary of the

301

```
 1    State Board of Elections as opposed to the Secretary
 2    of State.
 3                I'm also a former Department of Justice
 4    voting election official and spent three years as the
 5    U.S. elections advisor for IFES, which is formally
 6    known as the International Foundation For Election
 7    Systems.
 8                I'm here today on behalf of the
 9    Commission, however, and I want to make sure that you
10    know a little bit about the Commission that issued the
11    study.  In addition to President Carter and Secretary
12    Baker, there were two former Secretaries of State -- a
13    Republican and a Democrat -- a journalist, four former
14    members of Congress -- including two Democrats and two
15    Republicans:  Reps. Molinari, Michel, Hamilton and
16    Sen. Daschle -- six academics, including the President
17    of Rice University, and five other people who were
18    either appointed or elected in the political process,
19    including your former Supreme Court Chief Justice, Tom
20    Phillips.  In fact, Texas was very well represented.
21    There were four of the 21 members of the commission
22    who, in fact, were Texans.
23                The commission was formed, organized by
24    the American University Center for Democracy and
25    Election Management, and it was in association with
```

302

1    Rice University's Baker Institute for Public Policy

2    and the Carter Center.  And the activities of the

3    Commission were supported by funding a research by the

4    Carnegie Corporation of New York, the Ford Foundation,

5    the Knight Foundation, the Omidyar Network and The Pew

6    Charitable Trusts.

7                There's been a lot of reference to the

8    report.  I understand everyone is receiving a copy if

9    they didn't already have it.  In the interest of time,

10   I'm not going to go through a lot of the details in

11   the report but will focus on the particular issue at

12   hand.

13               When the report was issued, there was a

14   letter at the front of it signed by President Carter

15   and Secretary Baker.  It starts out, "Elections are

16   the heart of democracy."

17               "If elections are defective, the entire

18   democratic system is at risk.

19               "Americans are losing confidence in the

20   fairness of elections, and while we do not face a

21   crisis today, we need to address the problems of our

22   electoral system."

23               It goes on to say, "Benefitting from

24   Commission members with diverse perspectives, we have

25   proposed, for example, a formula for transcending the

TX_00004180

1    sterile debate between integrity and access."

2                "We are recommending a photo ID system

3    for voters designed to increase registration with a

4    more affirmative and aggressive role for states in

5    finding new voters and providing free IDs for those

6    without driver's licenses.  The formula we recommend

7    will result in both more integrity and more access."

8                "We present this report because we

9    believe the time for acting to improve our election

10   system is now."

11               I also want to read from one other

12   portion of the report that I think is really

13   fundamentally at stake here, and that is that the

14   commission, under its provisions related to voter

15   identification says, "While the Commission is divided

16   on the magnitude of voter fraud -- with some believing

17   the problem is widespread and others believing that it

18   is minor -- there is no doubt that it occurs.  The

19   problem, however, is not the magnitude of the fraud.

20   In close or disputed elections, and there are many, a

21   small amount of fraud could make the margin of

22   difference.  And second, the perception of possible

23   fraud contributes to low confidence in the system.  A

24   good ID system could deter, detect, or eliminate

25   several potential avenues of fraud -- such as multiple

1    voting or voting by individuals using the identities

2    of others or those who are deceased -- and thus it can

3    enhance confidence.  We view the other concerns about

4    IDs -- that they could disenfranchise eligible voters,

5    have an adverse effect on minorities, or be used to

6    monitor behavior -- as serious and legitimate, and our

7    proposal below aims to address each concern."

8               There has already been reference to the

9    reliance on REAL ID.  This was a portion of the report

10   recommendation.  But it goes on to say, "Reliance on

11   REAL ID, however, is not enough."

12              "Where they will need identification for

13   voting, IDs should be easily available and issued free

14   of charge."

15              I can go into any number of things

16   related to the report.  I know that there has been

17   reference to some of the other provisions.  But

18   recognizing that time is short, I want to also

19   reference a letter to the editor that was written by

20   Andrew Young, the former Mayor of Atlanta, who had

21   spoken to the commission, actually not at a public

22   hearing but at a private dinner they had ahead of

23   time.  And he wrote this in September of 2005.

24              "Why did I give conditional support to

25   the Commission on Federal Election Reform for its

1    recommendation of the required federal ID when I met

2    with members last month?  First, because there is

3    already a photo ID requirement in federal law, the new

4    REAL ID requirement.  Why not use it to improve the

5    voter registration and election administration?

6                    "Second, any required photo ID must be

7    made widely available, easily accessible and free of

8    cost.  A photo ID is a weapon against the bondages of

9    poverty.  Low income neighborhoods have ubiquitous

10   predatory check-cashing centers which thrive because

11   other establishments won't cash checks without a

12   standard photo ID."

13                    And finally, the Commission was rather

14   pleased at the time the Supreme Court issued the

15   Crawford vs. Marion County case, that, in fact, the

16   commission's work was recognized -- in fact, in a

17   dissent written by Justice Breyer, who writes toward

18   the end of his dissent, "Of course, the Carter-Baker

19   Report is not the Constitution of the United States.

20   But its findings are highly relevant to both

21   legislative and judicial determinations of the

22   reasonableness of a photo ID."

23                    While Justice Breyer did not support the

24   Indiana voter ID law, he does seem to suggest that

25   trying to conform it with Carter-Baker's

1    recommendations would have been, in his opinion,

2    appropriate.

3              Mr. Chairman, I am delighted to answer

4    questions.  But I think in the interest of time, I'll

5    stop there.

6              SEN. DUNCAN:  Thank you, Ms. Quinn.

7              Sen. Ellis?

8              SEN. ELLIS:  Thank you, Mr. President.

9              **QUESTIONS FROM SENATE FLOOR**

10             SEN. ELLIS:  Thank you, Ms. Quinn, for

11   coming.

12             What position did you play with the

13   Baker-Carter Commission, or Carter-Baker Commission?

14   What was your role?

15             MS. QUINN:  My title was an Academic

16   Advisor.  I was not on the commission, but I was one

17   of a host of people, including some of the people here

18   today, who helped advise the commission.

19             SEN. ELLIS:  Do you have any idea how

20   many academic advisors they had?

21             MS. QUINN:  It was somewhere in the

22   range of a couple of dozen.  There is a list at the

23   end of the report.  And I can't say that I've

24   memorized the list or counted them today.

25             SEN. ELLIS:  I was told maybe somewhat

307

1    in the neighborhood of 100.  Do you know?

2                    MS. QUINN:  If there were, I never saw a

3    list that was that long, but that doesn't mean that's

4    not the case.

5                    SEN. ELLIS:  Okay.  And what is your

6    position now?  What do you do now?

7                    MS. QUINN:  Currently, sir, I'm an

8    independent consultant.

9                    SEN. ELLIS:  You are a consultant?

10                   MS. QUINN:  Yes. sir.

11                   SEN. ELLIS:  And who are some of your

12   clients?

13                   MS. QUINN:  Well, at the moment I am

14   working with the Republican Lawyers.

15                   SEN. ELLIS:  I couldn't hear you.

16                   MS. QUINN:  The Republican lawyers.

17                   SEN. ELLIS:  Republican lawyers.

18                   MS. QUINN:  The Republican National

19   Lawyers Association.

20                   SEN. ELLIS:  That's a good group.

21                   MS. QUINN:  It is a good group.  They

22   fight very hard --

23                   SEN. ELLIS:  They didn't give me an

24   interview when I got out of law school.

25                   MS. QUINN:  Did they?

1           SEN. ELLIS:  But it's a good group.

2           And in your capacity here today --

3           MS. QUINN:  Yes, sir.

4           SEN. ELLIS:  -- are you representing the

5    Carter-Baker Commission or are you just testifying

6    from the vantage point of someone?

7           MS. QUINN:  No, sir.  I am here and was

8    requested by Secretary Baker's staff to be here on

9    behalf of the Carter-Baker Commission.

10          SEN. ELLIS:  Okay.  You heard my

11   discussion earlier, and you made reference to the

12   totality of the recommendations in the report --

13          MS. QUINN:  Yes.

14          SEN. ELLIS:  -- 86 or 87, somewhere in

15   that neighborhood.

16          MS. QUINN:  I believe it was 87.  I will

17   say that I did not go back to double check today.

18          SEN. ELLIS:  That's okay.  What would

19   you characterize as the major recommendations in the

20   report?  Obviously, voter ID has gotten the attention

21   of a number of states for some reason.

22          MS. QUINN:  Well, let me say that the

23   Executive Summary nicely summarizes them.  And they

24   propose a voter registration system in which the

25   states, not the localities, are responsible for the

1    accuracy and quality of the voter lists, and other

2    ways to improve voter registration.  They propose the

3    voter ID requirements.

4                SEN. ELLIS:  The REAL ID Act?

5                MS. QUINN:  The REAL ID Act.

6                SEN. ELLIS:  You heard the discussion,

7    maybe heard the discussion between Sen. Fraser and me

8    a bit earlier in which he quoted an opinion editorial

9    and I quoted one.  Now, I tried, to the best of my

10   ability, to be balanced, because I made reference to

11   the section in which they said both Republicans and

12   Democrats were at fault or something to the effect, if

13   I can paraphrase it, that Republicans were pulling out

14   the ID provision.  Based on the comment, I took it to

15   mean because they felt it would give them an electoral

16   advantage.  And it said Democrats were criticizing the

17   voter ID provision and not making the case to go and

18   do all of the other things, I assume making reference

19   to the REAL ID provision.  Was that a fair

20   characterization of what they were saying in that

21   opinion editorial?

22               MS. QUINN:  I think it is fair to say

23   that for some reason, election reform tends to divide

24   Republicans and Democrats, probably because they

25   recognize it may have an effect on their elections,

1    and that generally speaking, Democrats seem to be more

2    concerned about access and Republicans more concerned

3    about integrity.  But I would say to you that it's my

4    impression, from talking to many Democrats and

5    Republicans, both elected and election officials, that

6    they all agree that both are important.

7           SEN. ELLIS:  Well, from your vantage

8    point as an advisor, or one of the academic advisors

9    to the commission, would it be fair to say that you --

10   not the commission -- you would have some concerns

11   about whether or not there would be a disproportionate

12   impact on certain groups if you don't adopt more than

13   the voter identification provision?  REAL ID provision

14   in the major one that both President Carter and

15   Secretary Baker made reference to in that editorial.

16   Do you have any concerns about a state just adopting

17   the voter ID provision and that concern being whether

18   or not it would have a disproportionate impact on

19   certain groups, whatever they are, people who have --

20   students from abroad, any concerns on your part about

21   a disproportionate impact on certain groups?

22          MS. QUINN:  Senator, I would say that I

23   always, when I was an election official, was concerned

24   about trying to make sure that we enfranchised as many

25   voters as possible.  And I understand that you're

311

1    asking me about this particular bill, but I think it

2    needs to be looked at in totality of other Texas

3    election law and procedure.  And I do believe that

4    Texas has a number of other -- of these provisions.  I

5    know, for example, that under the Help America Vote

6    Act, they already have adopted a statewide system.

7    Now, I can't recall the details of their statewide

8    system, and there may be some issues with it, but I

9    know that they've already adopted provisional

10    balloting.  That's also required by the Help America

11    Vote Act.

12            SEN. ELLIS:  Well, the reason I'm asking

13    you the question that I asked is because you are here,

14    and it says Academic Advisor, Carter-Baker Commission.

15            MS. QUINN:  Yes, sir.

16            SEN. WHITMIRE:  So I'm assuming that

17    Secretary Baker didn't ask you to just come here for

18    the weather in Texas.

19            MS. QUINN:  No, sir!

20            SEN. ELLIS:  So it would give the

21    impression somehow that you are endorsing or you are

22    for just having Texas adopt the Voter ID Act.  I mean,

23    that would be the impression that a reasonable member

24    of this body would get.

25            So I'm asking you, since you say

312

1    Secretary Baker asked you to come, to comment on the

2    opinion editorial that I could give you again to look

3    at in which he and President Carter said they were

4    concerned that a voter ID bill by itself would have a

5    disproportionate impact on certain groups and that

6    states ought to adopt the REAL ID Act, and there are

7    other recommendations.  They were concerned, based on

8    that opinion editorial -- I think you heard me read it

9    earlier -- about just picking out one piece.

10            MS. QUINN:  I agree that that's the

11   case.  They are concerned that people focus on only

12   one or two of the requirements.

13            SEN. ELLIS:  Any guess why people maybe

14   in the Lone Star State -- I know maybe you don't come

15   here that often -- would just pick this part, the

16   voter ID part?

17            MS. QUINN:  Sir, it is my understanding

18   that this state has not only picked that, that there

19   are other provisions from the Carter-Baker Report That

20   have been addressed by the state.  I don't know most

21   of them, because I'm not someone who is frequently in

22   Texas.  The longest time I spent in Texas was five

23   weeks once when I was summer-clerking.  So I can't say

24   that I know Texas law or Texas procedure, but I do

25   know certain things that they have adopted that are

313

```
 1    part of the report.
 2                    SEN. ELLIS:  And what are those?
 3                    MS. QUINN:  Well, as I said, I know that
 4    you-all have some form of provisional balloting.  I
 5    know that you-all have some kind of statewide voter
 6    registration database.  I don't know the particulars,
 7    but I do know that those are in effect.
 8                    SEN. ELLIS:  Enjoy your stay in Texas.
 9    Thank you very much.
10                    MS. QUINN:  Thank you, sir.
11                    SEN. DUNCAN:  We have from Ms. Quinn an
12    exhibit that I think is entitled "Building Confidence
13    in U.S. Elections," and I believe it is the Carter-
14    Baker Commission Report.  Is that correct?
15                    You need to say that into the --
16                    MS. QUINN:  Yes, sir.
17                    SEN. DUNCAN:  All right.  We will submit
18    that in the record as Exhibit 18.
19                    (Exhibit No. 18 marked and admitted)
20                    SEN. DUNCAN:  Sen. Fraser.
21                    SEN. FRASER:  Cameron, thank you for
22    being here today.  We're honored to have you with us.
23    I was actually sitting, listening to your conversation
24    with Sen. Ellis.  And you said one thing that I want
25    to make sure that we give, you know, an "attaboy" to,
```

314

1   because it's something that -- the message that I
2   continue trying to project is the fact that your goal
3   at the Commission was to enfranchise as many voters as
4   possible.  And I think that is my goal by the
5   legislation I'm laying out, that I'm hoping by the
6   bill that I am laying out that we will encourage
7   people that have been discouraged in the past and give
8   them a reason to go back and vote.
9              MS. QUINN:  Yes, sir.
10             SEN. FRASER:  I really just have a
11  couple of questions I wanted to clarify.  I'm looking
12  at the data that came back -- obviously, we had the
13  discussion about the editorials, and then I had the
14  Executive Summary of the report.  But on the letters
15  from the co-chair that is signed by both President
16  Jimmy Carter and Secretary of State James Baker, right
17  in the middle of the letter the statement, "We are
18  recommending a photo ID system for voters designed to
19  increase registration with a more affirmative and
20  aggressive role for states in finding new voters and
21  providing free IDs for those without driver's
22  licenses."
23             I believe I heard you say, and it
24  appears that has been somewhat of a theme, is that,
25  obviously, the totality of the entire report,

315

1    everybody would like to get all of that put together.

2    But as we do in legislation, we don't get everything

3    we want.  We take what we can get, put the small

4    pieces together, put some of the bricks in place and

5    hope we keep stacking them up.  I'm assuming that was

6    what you're saying, based on the fact that we're only

7    addressing a photo ID bill today, that it was the goal

8    of the commission?

9              MS. QUINN:  Yes, sir.  My understanding

10   is that, as I've said, Texas has certain pieces of

11   this already in place.  This is another piece of it

12   that Texas is trying to put in place.

13             SEN. FRASER:  And I would add to that,

14   in the Executive Summary, you know, they had multiple

15   things, then a first, second and third.  The second

16   thing that is listed in the Executive Summary is to

17   make sure that a person arriving at the polling site

18   is the same one who is named on the list.  And of the

19   common things or the things that I continues to try to

20   emphasize today, that's what this bill is all about.

21             My goal is that when someone walks in

22   and represents them to be, you know, Tom Jones, I want

23   them to make sure that is really Tom Jones and they

24   have some way of verifying it.  I believe, by reading

25   what you're saying, that was the intent of the REAL ID

316

1    and the fact that y'all are trying to -- based on what

2    you say, you want to make sure that the person

3    arriving at the polling site is the same one who is

4    named on the list.  Is that --

5              MS. QUINN:  That's certainly one of

6    those points.  I think the other important point is

7    that the perception that such kinds of things cannot

8    occur is also important.  And I have read before the

9    quote from Page 18 of the report:  "While the

10   Commission is divided on the magnitude of other

11   fraud . . . there is no doubt that it occurs.  The

12   problem, however, is not the magnitude of the fraud.

13   In close or disputed elections, and there are many, a

14   small amount of fraud could make the margin of

15   difference.  And . . . the perception of possible

16   fraud contributes to low confidence in the system."

17             SEN. FRASER:  In the research that the

18   commission did during the time the commission was in

19   place, did y'all get into the area of trying to look

20   at and identify that there was in-person voter fraud

21   either suspected or going on in the United States?

22             MS. QUINN:  The report actually talks in

23   an earlier provision on Page 4 about some of the fraud

24   that they had found and talked about the Washington

25   State and Wisconsin elections in 2004.  And

1    specifically says, "In Milwaukee, Wisconsin . . . more

2    than 100 people who voted twice" -- excuse me.  I'm

3    taking this out of context.

4              In Milwaukee, Wisconsin, investigators

5    said they found clear evidence of fraud, including

6    more than . . . 100 people who voted twice, used fake

7    names or false addresses, or voted in the name of a

8    dead person."

9              SEN. FRASER:  Now, these were in-person

10   votes?

11             MS. QUINN:  Well, as far as I can tell,

12   that's the case.  You know, this has been a few years,

13   and I don't recall all the details behind the report

14   they cited, and I had not brought that with me to

15   check today.  I would be more than happy to check it

16   and get back to you.

17             SEN. FRASER:  Thank you very much.

18   Thank you for being here today.

19             MS. QUINN:  It's my pleasure.

20             SEN. DUNCAN:  Sen. Van de Putte.

21             SEN. VAN de PUTTE:  Thank you,

22   Mr. President.

23             Thank you very much for coming to appear

24   today.  And if you saw me going like this

25   (indicating), it's because you have a really nice soft

318

1    voice, but I was straining on this side.  So I wanted

2    to ask for some clarification.

3              I really had heard about the

4    commission's work and the validity of the report, and

5    they made several recommendations.  First of all, I

6    think the recommendation concluded that we needed to

7    have a REAL ID to possibly use for voting purposes.

8    Is that not correct?

9              MS. QUINN:  They recommended that that

10   was a very good choice to use, yes.

11             SEN. VAN de PUTTE:  And I'm looking at

12   the report here on Page 19 that said, "For the next

13   two federal elections, until January 1, 2010, in

14   states that require voters to present ID at the polls,

15   voters who fail to do so should nonetheless be allowed

16   to cast a provisional ballot, and their ballot would

17   count if their signature is verified.  After the REAL

18   ID is phased in," and they think it's -- according to

19   this report, it was supposed to have been phased in in

20   January of 2010 -- that "voters without a valid photo

21   ID, meaning a REAL ID or an EAC-template ID, could

22   cast a provisional ballot, but they would have to

23   return" in 48 hours to present something.  Was that

24   the recommendation?

25             MS. QUINN:  That's certainly covered on

1    Page 19 of the report, yes, ma'am.

2              SEN. VAN de PUTTE:  My question is, in

3    all of this, was there ever any work done to account

4    for the number of naturalized citizens that would be

5    participating that would not have the type of

6    documentation that would be required?

7              MS. QUINN:  I'm not aware of such

8    information.  That doesn't mean it's not here.  And

9    again, I would be happy to look into that and get back

10   to you.

11             SEN. VAN de PUTTE:  Was there ever any

12   work done before the commission recommendations

13   about -- because it talked about in particular

14   African- American voters -- but the access to get an

15   ID for Hispanic voters?

16             MS. QUINN:  Again, ma'am, I do not

17   recall any such thing, but I would be happy to check

18   into it and get back to you.

19             SEN. VAN de PUTTE:  However, the report

20   did note that the priority population gender-wise who

21   did not have photo ID was women.  Is that not correct,

22   as affirmed in the report?

23             MS. QUINN:  They were concerned about

24   any population that would have trouble getting voter

25   identification, and that's why they suggested that it

320

1    should be free and that states should affirmatively

2    try to make sure they're reaching out to populations

3    that would be less likely to have identification.

4              SEN. VAN de PUTTE:   And identifies in

5    the commission report the No. 1 population that lacks

6    a photo ID as women?

7              MS. QUINN:   Correct.

8              SEN. VAN de PUTTE:   Yes.

9              MS. QUINN:   I'm relying on the fact that

10   you think there is a place in here where it says that.

11   I do not specifically recall it.   But I'm happy to

12   agree with you, that they were concerned about all

13   populations.

14             SEN. VAN de PUTTE:   I wanted to ask you,

15   the commission's report also asked that states use a

16   unique identifier.   Can you quantify for us, with

17   regard to photo IDs, what is a unique identifier?

18             MS. QUINN:   I think the reference to

19   unique identifiers was talking about a number, a

20   unique number identifier.   I will say, however, that

21   photographs are, in their own way, a unique

22   identifier.

23             SEN. VAN de PUTTE:   Well, I think,

24   according to the commission, the unique identifier has

25   to be a number.   In the case of the REAL ID, that

321

1    number is dictated to be your social security number.

2            MS. QUINN:  Yes.

3            SEN. VAN de PUTTE:  Other states have

4    chosen the route of privacy and not having identify

5    some sort of numbering system that they have.  But, of

6    course, as we know with the rulemaking currently

7    having gone forward on REAL ID, that is a social

8    security.  My question is, on the unique identifier

9    that's a social security number and with the photo ID,

10   was there ever any work done when naturalized

11   citizens' names do not correspond to the identifier?

12           MS. QUINN:  Not that I'm aware of, but

13   I'm happy to check into that and get back to you.

14           SEN. VAN de PUTTE:  And the reason I ask

15   you is, for naturalized citizens, particularly those

16   coming from Spanish speaking counties, the mother's

17   maiden name is the last name.

18           MS. QUINN:  Yes, I know.

19           SEN. VAN de PUTTE:  So the father's name

20   is actually in the middle name.  So when you're a

21   naturalized citizen, your papers or your identifier, I

22   would have been listed as Leticia San Miguel Aguilar,

23   even though Aguilar, my mother's maiden name, not part

24   of any identification or any papers that I would have

25   here; and, yet, the unique identifier would be a

322

1    social security.

2              For our naturalized citizens, which last

3    year were 53,000 in this state -- the biggest increase

4    that we've ever had -- the identifier would not match

5    up with the name, because in Spanish surnamed

6    individuals, the mother's maiden name goes last.

7              Was there any work done, to your

8    knowledge, at the commission or any work that you know

9    of to note that this would be a very different type of

10   discrimination to be able to prove up simply because

11   the cultural norm is one which the mother's maiden

12   name is last?

13             MS. QUINN:  Again, Senator, not that I'm

14   aware of, but I would be happy to check into it.

15             SEN. VAN de PUTTE:  Thank you.  The last

16   question that I have is, since in Texas -- you do know

17   our demographics?

18             MS. QUINN:  Not particularly well,

19   ma'am.  I would be happy, if you want to refresh my

20   recollection.

21             SEN. VAN de PUTTE:  Well, my work is

22   that I understand that in the commission there was a

23   former Atlanta mayor, Andrew Young on the commission.

24   Is that correct?

25             MS. QUINN:  No, ma'am.  He actually --

323

```
 1                    SEN. VAN de PUTTE:  Was he an advisor?
 2                    MS. QUINN:  No, ma'am.  He appeared
 3      before the commission at a private dinner and spoke
 4      with them.
 5                    SEN. VAN de PUTTE:  So the document that
 6      you have on the commission and the recommendations on
 7      the voter integrity, which commissioners were that,
 8      that were Hispanic?
 9                    MS. QUINN:  Hold on just one second, and
10      I will tell you those who seemed to have an Hispanic
11      surname.  I cannot tell you necessarily that they are
12      the only commission members who are Hispanic.
13                    What did I do with that?  Here we go.
14                    The only one who has an Hispanic
15      surname, and he was President of the National Council
16      of La Raza, is Raul -- Yzaguirre?
17                    SEN. VAN de PUTTE:  That's correct.
18      Thank you.  I wanted to make sure that the
19      recommendations fit, because there's very little in
20      the commission.  And part of our job here is to make
21      sure that whatever we enact doesn't unduly burden.
22      And most of the work cited has been done using
23      African-American and not Hispanic populations, given
24      that the states that have enacted these types of laws
25      have not had a significant amount of Hispanics.  So I
```

324

1    appreciate that and hope that your visit here

2    continues to be fun for you.

3                MS. QUINN:  Thank you very much.

4                SEN. VAN de PUTTE:  Thanks.

5                SEN. DUNCAN:  Sen. Williams.

6                SEN. WILLIAMS:  Thank you, Mr. Chairman.

7                And, Ms. Quinn, thank you for joining us

8    today.  I'm sorry for the late hour.  I would like to

9    direct the committee's attention to the report.

10   You've made several references to different portions

11   of it.  But on Page 69 of the report where the

12   conclusions are drawn, if you would join me there.

13             And I would ask the committee to direct

14   their attention to Page 69.  And they refer to here --

15   really, we've heard about 87 recommendations in all

16   this.  There's really five pillars, as they refer to

17   them here, five main themes that run throughout this

18   entire report about the recommendation, and I would

19   like to visit with you about those a little bit.

20             They say in the first one, ". . . we

21   propose a universal, state-based, top-down,

22   interactive, and interoperable registration list that

23   [will], if implemented successfully, [will] eliminate

24   the vast majority of complaints currently leveled

25   against the election system."

```
 1            Now, that is very lofty language and
 2    lofty goals that we have here.  But I believe -- my
 3    recollection -- I've served on the State Affairs
 4    Committee here which considers election-related
 5    legislation.  And my recollection is that the HAVA
 6    legislation that we considered there, the Help America
 7    Vote Act, which we were required to implement and
 8    phase in over a couple of election cycles, is what
 9    addressed this concern.
10            We refer to it in Texas as the TEAM
11    project over at the Secretary of State's office.  So
12    is that what you were making reference to?  You were
13    making a more broad reference.  I'm trying to get a
14    little more specific here.
15            MS. QUINN:  Yes, Senator.  When you
16    mentioned TEAM, I remembered that Ann McGeehan, when
17    she would come to the elections meetings would talk
18    about TEAM.
19            SEN. WILLIAMS:  Okay.  And then secondly
20    is the issue about photo ID.  And, of course, that's
21    what we're debating here with 362.  And, of course,
22    we're still struggling with the implementation of the
23    REAL ID Act, as many states are, but we're making
24    progress toward that.
25            And then third and finally -- or not
```

1    third and finally -- but thirdly, they say they would

2    propose measures that would increase voting

3    participation by connecting registration and the ID

4    process.  Now, I don't know that we've implemented

5    anything new since the Carter-Baker Report came out.

6    But would this include -- you know, we have here in

7    Texas a couple of weeks of early voting where you can

8    go and -- convenience voting it's often referred to.

9           So the election really doesn't happen on

10    one day; it happens over a couple of weeks.  And

11    typically, what happens, it will start on a Monday, it

12    will include a weekend voting time.  And then

13    convenience voting will often conclude on the Friday

14    before the election following on Tuesday.  Would that

15    be the sort of thing that they're referring to here,

16    to make it more convenient for people to vote?  I

17    mean, that's not something new that we've done, but

18    we've had that here for a long time.

19           MS. QUINN:  Well, I believe that would

20    be one of the kinds of things they were referring to.

21    There's a fairly significant number of them.

22           I think also you-all have a witness

23    coming from Houston who will be talking about the

24    electronic votes that I think they are experimenting

25    with.  That certainly is the same kind of thing --

1              SEN. WILLIAMS:  Right.

2              MS. QUINN:  -- that ties voter

3    registration and identification and is intended to

4    make things easier.

5              SEN. WILLIAMS:  Right.  What I was going

6    to say here, we have so many people now in our state

7    registered to vote when they get their driver's -- if

8    they have a change of address, and that's something

9    that we actually implemented when the motor voter laws

10   came into effect back in the mid-nineties sometime.

11             MS. QUINN:  Yes.

12             SEN. WILLIAMS:  So those are the kinds

13   of things that we're referring to here, I think.  And

14   I just want to make sure that -- and then the fourth

15   thing is this component -- I would refer to it as an

16   educational component, and that is to help voters

17   become more aware of voting and what they need to do

18   and what's involved in all that.

19             And so we have -- the Secretary of

20   State's office -- and I don't pretend that I would be

21   an expert on it -- but our Vote Texas Project that

22   worked through the Secretary of State's office was a

23   HAVA-compliant voter education project.  Was that

24   commonly done when HAVA was enacted, to try to move

25   these things forward?

328

1           MS. QUINN:  A lot of states, after the

2      passage of HAVA, used some of their HAVA funds to, in

3      fact, increase voter communications and voter

4      education, because in many cases -- and I know it's

5      certainly true in Virginia -- at the state level, I

6      have not only zero budget for voter education, but it

7      was not considered to be part of my mandate as a state

8      official prior to HAVA.

9           SEN. WILLIAMS:  Right.  And then their

10     final recommendation was the restructuring of the

11     system by which elections have been administered in

12     our country.  They propose the Election Assistance

13     Commission and so forth.  I'm not sure what all this

14     means.  I would have to dig into the report.  It

15     sounds pretty dramatic.  But would this include things

16     like electronic voting or is that really more in the

17     stuff -- I know we have a lot of educational

18     components in my area related to electronic voting.

19     They make sure -- you know, they put these electronic

20     voting machines in supermarkets and libraries and

21     things like that, where people can try them out before

22     election day gets here.  Is this referring to that or

23     is it a more sweeping change?

24          MS. QUINN:  Well, what they had in mind

25     was the concern that was expressed in 2000 with

1    Catherine Harris and at other times with other

2    election officials who often are, or have been in the

3    past, sharers of a candidate's committee that was

4    running on the ballot.

5              SEN. WILLIAMS:  Yes.

6              MS. QUINN:  That varies across the

7    states.  In Virginia, for example, while I was not

8    legally mandated not to, it was understood and it was

9    tradition and it was always done in Virginia, that no

10   election official at the State Board of Elections

11   would be involved in any ballot on the ticket, from

12   president down do the lowest ballot on -- or the

13   lowest item on any ballot in the state.

14             SEN. WILLIAMS:  Right.

15             MS. QUINN:  So I would not, for example,

16   ever contribute money to any race that was in the

17   state.  I would not be involved as a volunteer.  I

18   would not be involved certainly in any official

19   capacity.  And I think that's the kinds of things that

20   they were getting at, was that election officials,

21   while operating as election officials, should stay out

22   of the partisan political fray, to the extent that

23   they were not themselves on a ticket.  Can I --

24             SEN. WILLIAMS:  So, for instance, in a

25   county like where in live, in Montgomery County, we

1    have an election administrator who doesn't run for
2    office, and it's a non-partisan position.  She's hired
3    by the Commissioners Court or what other places will
4    call the Board of Supervisors that administers the
5    elections in our county.  So that's the sort of thing
6    that you're talking about?
7              MS. QUINN:  Yes, sir.  I love to tell
8    this.  I had a deputy when I was at the state board
9    who had a phrase I loved.  She says, "When I get here
10   in the morning, I park my donkeys at the door."
11             SEN. WILLIAMS:  There you go.  So I
12   guess then in summary, as I look over this -- because
13   it had been asserted by Sen. Ellis earlier that really
14   we were kind of just picking this one requirement out
15   of the report.  It would seam to me that out of the
16   five areas that they have, Texas has actually recently
17   made very substantial progress on at least four of
18   those things and maybe some progress on that fifth.
19   I'm not really sure what that fifth one means.  It
20   seems like it's pretty -- you could pretty broadly
21   define and put a lot of things in that category.
22             So thank you again so much.  Would you
23   agree with my conclusion there, that it's not really
24   fair to say that there's only one thing that we're
25   doing out of this, we've actually made substantial

331

1    progress?  And I'm sure that that will help jog --

2    since Sen. Ellis and I served on that State Affairs

3    Committee together, I'm sure that will help jog his

4    memory about some of the good work we've done together

5    there.  As I recall, all of these measures passed out

6    of the committee without any opposition and passed --

7    my recollection is that they passed this body with a

8    31 to nothing vote.  So thank you very much.

9                    MS. QUINN:  Thank you, Senator.

10                   SEN. DUNCAN:  Thank you, Sen. Williams.

11                   Ms. Quinn, there are no other senators

12   queued up, so you are excused.  Thank you for your

13   testimony.

14                   MS. QUINN:  Thank you, sir.

15                   SEN. DUNCAN:  Sen. Wentworth.

16                   SEN. WENTWORTH:  Mr. President, I offer

17   as exhibit -- and the appropriate number, I think 18

18   or 19 -- letters --

19                   SEN. DUNCAN:  Hold on a minute.  Let's

20   get the correct number so that it will be identified

21   in the record.

22                   The next number is 19, so what you're

23   discussing will be Exhibit 19.

24                   SEN. WENTWORTH:  Yes, sir, letters

25   involving the Federal Election Commission that was

1   discussed by a previous witness.

2                   SEN. DUNCAN:  Well, okay.  Bring it

3   forward.

4                   Okay.  Exhibit 19 is a letter from the

5   letterhead, dated June 29, 2007, to the Honorable

6   Dianne Feinstein and the Honorable Robert Bennett.

7   And it is -- I think the letter is signed by --

8                   SEN. WEST:  Mr. President --

9                   SEN. WENTWORTH:  Signature is shown on

10  Page 18, Hans A. von Spakovsky.

11                  SEN. DUNCAN:  Hans von Spakovsky.

12                  SEN. WENTWORTH:  And in addition,

13  Mr. President, there were letters also recommending

14  his appointment to the Federal Election Commission.

15                  SEN. DUNCAN:  All right.  There are

16  several letters that are, I think, attached as

17  exhibits to the letter dated --

18                  SEN. WENTWORTH:  Yes, sir.

19                  SEN. DUNCAN:  -- June 29, 2007.

20                  SEN. WENTWORTH:  Actually, there are a

21  couple of attachments to that, and then there are

22  other separate letters of recommendation to the

23  Federal Election Commission.

24                  SEN. DUNCAN:  Okay.  So those would be

25  separate letters, not attached to 19?

333

1          SEN. WENTWORTH:  Yes, sir.  There are 14
2    such separate letters.
3          SEN. DUNCAN:  So you're going to present
4    all of those letters as one exhibit, Exhibit 19?
5          SEN. WENTWORTH:  Yes, sir; yes, sir.
6          SEN. DUNCAN:  All right.  It will be
7    received.
8          (Exhibit No. 19 marked and admitted)
9          SEN. DUNCAN:  Sen. Gallegos.
10         SEN. GALLEGOS:  Mr. Chairman, whatever
11   was just introduced by Sen. Wentworth, I would like to
12   see a copy of whatever was introduced.
13         SEN. WENTWORTH:  Well, Mr. President, I
14   would like to see a copy of the other 18 exhibits that
15   have been submitted to the Secretary, without any of
16   us seeing any copies of them.
17         SEN. LUCIO:  I would like.
18         SEN. GALLEGOS:  I mean, you know, I just
19   don't know what was -- but if it's entered into the
20   record, I would like to see a copy of it.
21         SEN. WENTWORTH:  I'll be glad to make a
22   copy for him, Mr. President.
23         SEN. DUNCAN:  We'll make a copy for you,
24   Senator.  We'll make copies for whomever wants one.
25   Of if everybody wants one, that will be fine.

334

1              SEN. WENTWORTH:  That's fine with me.

2              SEN. DUNCAN:  Sen. Shapleigh?

3              SEN. SHAPLEIGH:  Mr. Chair,

4    Sen. Wentworth's offer of that letter has jogged my

5    memory.  Here are letters from the Brennan Center

6    against Mr. Spakovsky, members, signed by one, two,

7    three, four, five, six, seven, eight, nine, ten,

8    eleven, twelve, thirteen, fourteen, fifteen --

9    seventeen members of Congress against his nomination,

10   letters from Common Cause against his nomination,

11   letters from the Civil Rights Committee -- Lawyers

12   Civil Rights Committee against his nomination --

13   letters by the Campaign for Legal Center and Common

14   Cause against his nomination and letters from the

15   members of the United States -- I'm sorry -- from the

16   Campaign Legal Center that I would like to include in

17   the record, to make it more complete, as Exhibit 19.

18              SEN. DUNCAN:  Well, I think yours would

19   be a separate exhibit.  Sen. Wentworth has offered up

20   an Exhibit 19, which would be admitted into the

21   record.  And you are offering Exhibit No. 20, which

22   contain the letters that you have just described to

23   the body.  Is that correct?

24              You'll need to say that on a mike,

25   please.

```
 1              SEN. SHAPLEIGH:  I would offer these
 2    letters to make them a part of the record.
 3              SEN. DUNCAN:  All right.  Thank you very
 4    much.  Bring them forward and well put them in the
 5    record.
 6              (Exhibit No. 20 marked and admitted)
 7              SEN. WENTWORTH:  Mr. Chairman?
 8              SEN. DUNCAN:  Sen. Wentworth.
 9              SEN. WENTWORTH:  Could I, since
10    Sen. Shapleigh has been more precise about the
11    letters, may I do the same for Exhibit 19?
12              SEN. DUNCAN:  You have the floor.
13              SEN. WENTWORTH:  One letter is co-signed
14    by six members of Congress, recommending his
15    nomination to the Federal Election Commission.  We
16    have letters from the Secretary of State of Kentucky;
17    Secretary of State of Indiana; the County Clerk of
18    Harris County, Texas; the Chairman of the Forsyth
19    County Board of Elections in Georgia; Mr. P. K.
20    Brunelli with the Federal Voting Assistance Program of
21    the Department of Defense at the Pentagon; from
22    Mr. Wendron Close from the United Kingdom; from Tom
23    Lowe, Fulton County Commissioner in Georgia; Mr. Frank
24    Strickland, who is Chairman of the Board of Directors
25    of the Legal Services Corporation; United States
```

TX_00004213

336

1    Senator Johnny Isakson; T. Rogers Wade, President of

2    the Georgia Public Policy Foundation; Wesley Kliner,

3    Vice Chairman of the United States Election Assistance

4    Commission Board of Advisors; and, finally, Ray

5    Martinez III, former Commissioner of the United States

6    Election Assistance Commission.

7            Thank you, Mr. Chairman.

8            SEN. DUNCAN:  It will be submitted.

9    Record noted.

10           Members, our next witness is Dr. Toby

11   Moore.  Will Mr. Moore step up.

12           And you have 10 minutes, Mr. Moore.

13   Thank you.

14           DR. MOORE:  Thank you.  And thank you to

15   the senators for the opportunity to speak to you

16   today.

17           SEN. DUNCAN:  You need to state your

18   name, too, and who you are representing.

19           **TESTIMONY BY TOBY MOORE**

20           DR. MOORE:  My name is Toby Moore, and

21   I'm a Project Director in Elections Research for the

22   Research Triangle Institute, a non-profit,

23   non-partisan research institute.  I'm speaking on my

24   own behalf today.

25           Before joining RTI in 2007, I was a

337

1    project manager for the Carter-Baker Commission on

2    election reform at American University.  From 2000 to

3    2006, I was the geographer of the voting section of

4    the Civil Rights Division of the U.S. Department of

5    Justice.  My Ph.D. is from the University of Iowa in

6    geography, which makes me the first non-attorney

7    witness you've had.  When we get to the questions, I

8    guess we'll find out if that's a help or a hindrance.

9              My experience is in election data.  I'm

10   currently conducting the U.S. Election Assistance

11   Commission's 2008 Election Day Survey.  In that

12   capacity, I've had the pleasure of working with Ann

13   McGeehan, Kim Thole and the very fine staff in the

14   Elections Division.  I became involved in voter ID

15   research for the first time in 2005, as part of the

16   team that conducted the review of the 2005 Georgia ID

17   law for the Department of Justice.

18             Voter ID has obviously become a very

19   partisan issue and an emotional one for many people.

20   I think that my testimony today, I'll concentrate on

21   really two things that I think will be the most use

22   for the Senate.  First, I wanted to provide as

23   objective a survey of the current research in the

24   field as I can.  And second, based on my experience

25   working on Section 5 pre-clearance cases at the

1    Department of Justice, I discuss the substantial

2    challenges the state faces in trying to meet its

3    burden under the Voting Rights Act.  I also would be

4    welcome to talk with you about the Carter-Baker

5    Commission and its recommendation, although in the

6    interest of time, I may leave that for the questions.

7             We should know more about the effects of

8    voter ID than we do.  In many ways the research

9    community has failed policymakers by not producing

10   better findings.  However, some recent studies have

11   come up that I think are finally providing us with an

12   initial picture of the group of people who don't have

13   voter ID and the demographics of that group.  To begin

14   with, I think it is clear from public opinion surveys

15   that most Americans support requiring a photo ID in

16   order to vote.

17             There have been kind of three approaches

18   to trying to identify those without IDs and to

19   determine their demographics.  The first approach has

20   been to try to match between data bases, between voter

21   registration databases and Department of Motor Vehicle

22   databases, for example.  That has generally not proven

23   to be successful.  Those databases are very difficult

24   to match between.  There is some interesting

25   information to come out of those attempts.  But in

1     general, I would encourage you to avoid any kind of

2     database matching to arrive at your information.

3               The second approach -- and we've heard

4     much about this today -- has been to look at the

5     impact on turnout.  There are two ways to do that.

6     The first is to use very sophisticated statistical

7     modeling techniques to try to determine before and

8     after ID laws where there is a drop-off in voting.

9     The results have been across the board.  Some studies

10    have found increases, some have found no change, and

11    some studies have found decreases, especially among

12    minority voters.

13              There is a forthcoming paper from

14    Lorraine Minnite and Robert Erickson that assesses

15    these attempts at modeling turnout changes.  They

16    conclude that our tools and data are inadequate for

17    detecting any impact.  I would encourage you to look

18    at that paper.  We simply don't have good enough data

19    or statistical tools that would allow us to detect the

20    changes in turnout that could be traced to voter ID

21    laws.  Even worse, though, are these blunt attempts to

22    use aggregate turnout to try to detect changes in

23    turnout that can be attributed to voter ID?

24              I think it's important to remember that

25    voter ID laws, whether you're in favor or opposed to

340

1    them, are designed to do one thing, and that's to

2    reduce voter turnout, if only among fraudulent voters.

3    That makes it impossible, to my mind, to be able to

4    interpret the results of these findings.

5         If turnout goes up after a voter ID law,

6    then why have you not been able to stop the fraudulent

7    votes and have that appear in the turnout?  Basically

8    what happens, I think, is that voter turnout -- the

9    impact of voter ID is small enough that it's swamped

10   by other factors such as Obama running, such as

11   Georgia and Indiana being seen at battleground states

12   and presidential candidates putting resources in and

13   voters coming out.  I mean, comparing Georgia and

14   Indiana, which we're seeing as competitive states to

15   Mississippi and Illinois, is the sort of facile

16   analysis that I just don't think holds up very well.

17   It's certainly not social science, and I don't think

18   it's even very good rhetoric.

19         On the issue of whether voter ID causes

20   turnout to increase by boosting confidence, I would

21   point you to a recent paper by Ansolabehere and

22   Persily who surveyed voters and found that perceptions

23   of voter fraud had no impact on turnout.  It's an

24   interesting idea, but I know of no reliable

25   information that traces increased willingness to

1    participate to a belief in integrity in elections.

2                        Finally, I think that the survey, the

3    research that's most useful is the survey research

4    that's come out, including one done by the Carter-

5    Baker Commission that I initiated in 2006.  They found

6    that 1.2 percent of registered votes in three states

7    lacked IDs.  This may seem like a small number.  But

8    when applied to Texas in 2008, it would have meant

9    that approximately 162,901 registered voters would

10   have lacked a government-issued photo ID.

11                       Because of the way the study was

12   designed, that is probably a floor, and there is

13   reason to think that the number could be substantially

14   higher in Texas.  But I would think that the 162,000

15   number is a very defensible floor for the population

16   we're talking about.

17                       More importantly, the Carter-Baker

18   sponsored study found that African-Americans were more

19   than four times more likely than whites to lack photo

20   ID.  Women made up nearly all of those who did not

21   have photo ID.  Nearly all of those who lacked ID were

22   Democrats.  And 88 percent of those without photo ID

23   had a household income below $25,000 a year.

24                       Now, this was a survey of registered

25   voters.  When your law goes before the Department of

342

1     Justice, they're also going to be considering its

2     impact on voters who are not registered but who are

3     eligible to vote.  And there is reason to think that

4     that pool of voters is even more disproportionally

5     minority and maybe larger in proportion to their size

6     of people who lack ID.

7                    Now, finally, as we all know, this is a

8     law that will have to go before the Voting Rights

9     Section, Civil Rights Division of the Department of

10    Justice to be cleared under the Voting Rights Act.

11    The state should not take comfort in the Supreme

12    Court's upholding of the Indiana voter ID law.  As the

13    Bush Administration argued when federal courts blocked

14    the 2005 Georgia ID law that had been precleared, the

15    Section 5 analysis is distinct from the constitutional

16    analysis.  The Section 5 review will be a comparison

17    of the current Texas law to the proposed law.  The

18    state will be required to prove that its proposed law

19    does not deny or abridge the right to vote on account

20    of race, color or membership in a language minority

21    group.  I expect that the Obama Justice Department

22    will put the burden on Texas to prove its case, unlike

23    the Bush Administration's handling of the 2005 Georgia

24    law.

25                    Not knowing the effect of the law on

TX_00004220

1   protected groups -- African-Americans, Hispanics,

2   language minority groups and others -- will be an

3   invitation to the Department of Justice to object on

4   the basis of the state having not met its statutory

5   burden.

6            Specifically, based on my experience in

7   the Georgia case and other Section 5 cases, I expect

8   DOJ at a minimum will look for:

9            First, evidence that Texas knows the

10  number and demographic make-up of eligible voters and

11  registered voters who lack the required ID;

12           Second, well-developed and well-funded

13  public education programs to make voters aware of the

14  new requirements, initiated well before the

15  implementation of the new law.  Again, this is what

16  Georgia and Indiana did;

17           Revamped poll worker training to

18  emphasize the correct enforcement of the new, more

19  complicated ID requirements;

20           Well-developed and well-funded programs

21  to distribute the required IDs.  I don't think, from

22  my reading of the current bill, that the provision for

23  free ID will be adequate;

24           Substantial evidence of the voter

25  impersonation problem that the law addresses;

344

1          And finally, a detailed discussion of

2     why less retrogressive alternatives, including use of

3     an affidavit fail-safe, were not adopted.

4          Texas faces a substantial cost on two

5     fronts:  First, to develop and fund the necessary

6     supporting programs to fairly implement any law; and

7     second, to develop a convincing submission to what I

8     would expect to be a skeptical Civil Rights Division.

9          In the questions period, I would be glad

10    to talk about some of the information that I have on

11    the cost of these programs, on the specific

12    recommendation of the Carter-Baker Commission and on

13    some of the less retrogressive alternatives that Texas

14    might want to consider.

15         Thank you.

16         SEN. WENTWORTH:  The Chair recognizes

17    Sen. Van de Putte.

18         SEN. VAN de PUTTE:  Thank you,

19    Mr. Chairman.

20              **QUESTIONS FROM SENATE FLOOR**

21         SEN. VAN de PUTTE:  Dr. Moore, thank you

22    for being here today.  And there are a few things that

23    I would like to ask to make sure that I understand the

24    impact of your testimony.

25         I know that we've said that President

TX_00004222

1   Jimmy Carter advocated for a photo ID as part of the

2   Carter-Baker Commission.  Can you expand a little bit

3   on that?  I know that part of your testimony just

4   touched on it.  But what particular point are you

5   concerned about with regard to the recommendations in

6   the commission that have been part of the record that

7   we are going to put into the Committee of the Whole

8   and your observations as to the implications of such?

9                DR. MOORE:  Thank you.  Again, I was

10  Program Manager at American University and worked on

11  the follow-up work to trying to get the commission's

12  87 recommendations implemented.  And to me, the ID

13  law -- and in our discussions, we worked with Congress

14  in 2006 during the debate on ID laws there and working

15  with members to understand what the Commission was

16  really trying to do.

17               And the commission really had a

18  two-pronged approach.  The first was yes on voter ID,

19  but the second was to use the voter ID as a way of

20  expanding participation and expanding enfranchisement.

21  And it called for a very aggressive role on the part

22  of the states to take the lead in getting people

23  registered and in getting people the voter ID that

24  they would need under the new law.

25               And I think it's telling that the