1    Georgia law of 2005, which I think is very close to

2    the present state of the Texas legislation, triggered

3    the opposition from Secretary Baker and President

4    Carter, because it failed in these important facets.

5             Also, as you talked about earlier, the

6    phased-in implementation to allow voters to cast

7    provisional ballots before they lost their vote.  And

8    the commission was very interested in replacing the

9    patchwork national quilt of ID laws with a national

10   standard.  What the commission was very interested in

11   was one national standard.

12            And so what you have now is I think in

13   some ways exactly what the commission feared, which

14   was a piecemeal approach toward implementing ID laws

15   and which will have very dramatic differences between

16   states such as Georgia and Indiana and other states.

17            SEN. VAN de PUTTE:  Thank you.

18            Dr. Moore, I know that the commission

19   made these recommendations.  But given your work, what

20   evidence is there that those who lack photo ID are

21   more likely to be women?

22            DR. MOORE:  Well, I think some of the

23   best evidence is the survey that the commission

24   sponsored in 2007 which found that nearly all the

25   people who responded to their survey -- and they

1    surveyed 2,000 registered voters in three states --
2    almost all of their respondents who did not have ID
3    were, in fact, women.
4              This is doubly troubling when you're
5    talking about ID, because women run into name
6    problems.  Women's names change.  They marry; they
7    divorce.  And if your ID doesn't match the name on
8    your registration, then you run into more confusion
9    from that, so that's another reason to take that
10   problem even more seriously.
11             SEN. VAN de PUTTE:  And, Dr. Moore, I
12   know that we probably don't have the data in Texas,
13   but if you were to use that American University survey
14   approach that you described and apply it to Texas, do
15   you have some sort of idea, given that that is a good
16   survey instrument, how many voters in Texas would
17   totally lack a photo ID?
18             DR. MOORE:  AS a minimum, I think
19   somewhere around 162,900, which is applying that same
20   ratio.  That ratio is probably low for Texas, because
21   that survey was based in states like Indiana which had
22   a very high ID ownership as a result, in part, because
23   of the voter ID law.  So I would expect that Texas'
24   actual number would be somewhat higher than that.
25             SEN. VAN de PUTTE:  Well, if it was even

1   8 percent and we have about 13.7, 13.6 million voters,

2   if it was even a more conservative estimate that only

3   8 percent, would that be a substantial number that

4   would have difficulty in meeting any pre-clearance

5   from the Department of Justice?

6                   DR. MOORE:  Yes.  I think that's

7   actually a higher estimate, the 8 percent.  I think

8   that if you -- if Texas were to investigate this and

9   come up with that figure and the demographics of the

10  group without ID, you would have a very, very

11  difficult time getting it through pre-clearance or

12  through federal courts if nearly one in 10 voters

13  lacked ID.

14                  SEN. VAN de PUTTE:  And as we know that

15  this is a foregone conclusion, at least here in the

16  Texas Senate, in the event that our state would seek

17  approval from the Department of Justice, who bears the

18  burden of proving up the effects of the photo

19  identification?

20                  DR. MOORE:  Well, unlike in the federal

21  court cases under Section 5 pre-clearance review, the

22  State of Texas would have that burden.

23                  SEN. VAN de PUTTE:  So those of us or

24  those groups who would claim that it would be

25  discriminatory do not bear the burden, it's the state

 1   that would have to prove that the voter ID requirement

 2   does not have a discriminatory impact.  Is that

 3   correct?

 4             DR. MOORE:  That's correct.

 5             SEN. VAN de PUTTE:  So the Department of

 6   Justice -- help me understand -- the Department of

 7   Justice doesn't have to produce affirmative evidence

 8   of how the ID laws will discriminate against minority

 9   voters to deny pre-clearance, does it?

10             DR. MOORE:  No.

11             SEN. VAN de PUTTE:  So the Department of

12   Justice can block a photo ID bill from taking effect

13   if they find that the state has failed to show that

14   the law is free of a discriminatory purpose or effect.

15   Correct?

16             DR. MOORE:  That's correct.

17             SEN. VAN de PUTTE:  So what kind of data

18   would the state need to prove it up?

19             DR. MOORE:  Well, I don't think that the

20   threshold will be a definitive answer.  I mean, I

21   don't think there is a definitive answer.  Even if you

22   funded a well-funded survey, you would still have

23   error rates around your survey responses and so on.

24             But I think what the Department of

25   Justice will look for, which is what we looked for

1    when I was there, would be a good-faith effort to

2    identify that population and then have built the

3    legislation to address any problems you found with it.

4    But I think the first step is to try to identify that

5    pool of people who don't have ID and find out what is

6    their makeup in regards to the protected groups under

7    Section 5.

8              SEN. VAN de PUTTE:  So if the data is

9    not known by the state or cannot be proved or produced

10   by the state, they cannot show that the voter ID bill

11   meets the requirements of the Voting Rights Act

12   requirement?

13             DR. MOORE:  That's right.

14             SEN. VAN de PUTTE:  And so should we be

15   concerned, as a state, about eligible but

16   non-registered voters in this?

17             DR. MOORE:  Eligible but non-registered

18   voters would be protected by this Section 5 of the

19   Voting Rights Act.

20             SEN. VAN de PUTTE:  So, in other words,

21   this would be folks that would be eligible, but for

22   our efforts would really not end up being able to cast

23   a ballot.  Is that correct?

24             DR. MOORE:  That's right.  They will

25   enter into the analysis.

1          SEN. VAN de PUTTE:  You mentioned just

2     briefly at the end that other states that have

3     implemented this, Indiana, of course, didn't have to

4     go through the process that we do.  But, you know,

5     Georgia had somewhat.  I don't know if they have the

6     language diversity that we have, in particular these

7     language-based groups.

8          But because we have that in our state

9     and we are -- the new data shows that over half of our

10    first graders are actually Hispanic, and because of

11    our high number of naturalized citizens that are in

12    Texas, what would it cost a state like Texas, given

13    what's occurred in other states, to develop and

14    implement the public education component that again

15    the Department of Justice would say would prove up the

16    state's ability to ensure that there wouldn't be

17    discrimination?  I mean, what kind of costs are we

18    talking about?

19          DR. MOORE:  Well, if you look at

20    Georgia's example -- and again, Georgia is a Section 5

21    state -- and remember that the 2005 law that Georgia

22    passed, which is similar I think in many ways to this

23    law and that was pre-cleared by the Justice

24    Department, was blocked by federal and state courts

25    and abandoned by Georgia itself.

1          In fact, the Bush Administration is

2     pretty much the only people left to defend the 2005

3     Georgia law.  They went back to the courts with a

4     revamped 2006 law.  This law had provision for free

5     ID.  This law opened offices across the state in every

6     county.  And this law included a public education

7     campaign of half a million dollars a year targeted

8     just to informing voters of the effects of voter

9     education.

10          Now, as you said, Texas being a much

11     larger state and with the language diversity that you

12     have, with the multiple media markets you have, you're

13     talking about some multiplier of that half million, I

14     think, if you're going to make an effective effort to

15     inform people of the new voter ID requirements.

16          SEN. VAN de PUTTE:  And let me clarify

17     this, because what you're telling us is that the

18     Department of Justice said that Georgia had to go back

19     and revamp because they didn't have these efforts.

20     And, Dr. Moore, I don't know if you've seen, but our

21     fiscal note, which is the estimate of our Legislative

22     Budget Board, to implement the provisions of this bill

23     is zero -- zero, nada, nothing, zilch, nada.

24          And so if a state like Georgia, which is

25     much smaller, was required, because of pre-clearance

1   and Voting Rights Act, to put an effort, you would

2   assume that it would take Texas a little bit more than

3   zero dollars to do the outreach, to inform the voters,

4   to do the training of our thousands and thousands of

5   election judges at the polling precincts.  Is that

6   correct?

7           DR. MOORE:  Yes.  I think that unless

8   that is part of the legislation and that funding is

9   provided for before it goes to pre-clearance, the

10  Justice Department will be very skeptical that that

11  would ever be really implemented effectively.

12          SEN. VAN de PUTTE:  So it's not just the

13  costs that would be incurred in the change in the

14  laws, the training, the outreach, but -- for example,

15  in the State of Texas, in our major metropolitan

16  areas, the locations at where citizens can go get a

17  driver's license are all outside the loops.  In Bexar

18  County, there is one inside Loop 410.  I think in

19  Houston, there may be -- I don't know if there are

20  any -- but these are where the majority of African-

21  Americans, Hispanics live; yet, there is no office to

22  go get the driver's license or the voter ID.  Would

23  this be a significant problem in the viewpoint of the

24  Department of Justice?

25          DR. MOORE:  I think if the minority

1    populations were, you know, very well integrated and

2    there was no correlation between the absence of an

3    office in minority communities, then, no, that would

4    not be a problem.  But if Texas has a situation in

5    which you have large minority communities that don't

6    have equal access to DPS offices where they can go and

7    get the ID, then, yes, I would think that is really

8    going to be a red flag for the Department of Justice.

9              SEN. VAN de PUTTE:  Now, our bill, with

10   the military, the institutional type IDs, the

11   certificates versus papers of naturalized citizens,

12   it's a little more complex than what we've seen in

13   other states.  Is that correct?

14             DR. MOORE:  Yes, I think that's true.

15             SEN. VAN de PUTTE:  And so since it's

16   more complex, would you think that that would probably

17   require a little bit more training of those election

18   judges in the polling precincts?

19             DR. MOORE:  I certainly would think so.

20   I mean, I was in Indiana in 2006, in Indianapolis, and

21   observed the election after their ID law.  And even in

22   Indiana where they did a pretty good job of

23   instructing poll workers, there was still ample

24   confusion.  And what happens is, the first high

25   turnout you'll have, you'll have much longer lines and

355

1    room for conflict if care is not taken to train poll

2    workers to be able to fairly implement this new law.

3                    SEN. VAN de PUTTE:   And my other

4    question is, again from the other surveys, if

5    8 percent of the folks lack a photo identification --

6    and we have about 13 -- what? -- million plus voters,

7    and not the conservative estimate, that would be a

8    million Texans who are currently registered to vote

9    who don't have a photo ID.

10                   DR. MOORE:   Yes.   And I think what I

11   would say is that the important thing is not for me to

12   have an answer on the estimates of people who don't

13   have an ID but for Texas to have a good estimate.

14   That's what the Department of Justice is going to be

15   looking for.   And that's going to be, you know, a

16   significant piece of evidence when this comes to

17   pre-clearance.

18                   SEN. VAN de PUTTE:   Well, what this

19   fiscal note tells me is that my state is unwilling to

20   put one penny into any efforts to train, to do

21   information, to do education.   And certainly if we're

22   providing maybe the one million who don't have them

23   now, with free IDs, what kind of costs -- I mean,

24   given the costs that were in Georgia for this or in

25   other states, what sort of costs are we looking at?

356

 1    Yet, I guess we're coming up with imaginary numbers
 2    here.  Who is absorbing this cost?  How much do you
 3    think it would cost in Texas?
 4              DR. MOORE:  Well, it depends on how you
 5    provide the free IDs.  The legislation, as I read it
 6    now, does not actually provide free IDs.  It provides
 7    only free IDs to those who will only use the ID in
 8    order to vote, which is very different from Indiana
 9    and the 2006 Georgia law.
10              Indiana, when it provided free ID cards
11    when it was considering its legislation, it estimated
12    that the state would lose more than $700,000 annually
13    in lost revenue and additional expenses from providing
14    free ID.  Again, you can do the math in Texas, and I
15    expect it would be considerably higher.  But I would
16    expect that, you know, free ID -- if the Texas
17    legislation, as passed and sent to the Department of
18    Justice, does not have a strong free ID provision,
19    then it would be markedly different from even the
20    Georgia and Indiana laws.
21              SEN. VAN de PUTTE:  And in your
22    estimate, Dr. Moore, when you've looked at the
23    research and the statistics, a lot of our statistics,
24    we had a lot of new voters in this last election year.
25    But that doesn't account for the citizens of the third

1    age, our senior citizens that are already registered

2    but don't have the type of identification required in

3    this bill.  Is that correct?

4                 DR. MOORE:  I think there is a general

5    agreement that elderly people are more susceptible to

6    not having proof of ID and proof of citizenship.  But,

7    you know, I think the numbers again are difficult to

8    come by good, solid information on that.  But yes.

9                 SEN. VAN de PUTTE:  Thank you,

10   Dr. Moore.  I appreciate your answers.

11                SEN. DUNCAN:  Okay.  Members, I see a

12   lot of lights still on this witness.  We've been going

13   now for two hours and 15 minutes.  We need to take a

14   short break for our court reporter.

15                I'll remind you that we have witnesses

16   in the gallery that are continuing to -- that will be

17   public testimony -- that are continuing to wait to be

18   heard.

19                The Senate Committee of the Whole will

20   stand at ease until 9:25.

21                (Recess:  9:16 p.m. to 9:29 p.m.)

22                SEN. DUNCAN:  The Senate Committee of

23   the Whole will come back to order.

24                Senator Williams, you have the floor.

25                Oh, before you do that, before I forget

```
 1   to do this, if you wouldn't mind, let me retract that.
 2                  SEN. WILLIAMS:  Sure.
 3                  SEN. DUNCAN:  Dr. Moore has submitted
 4   his written testimony for the record as Exhibit 21,
 5   and that will be received in the record.
 6                  (Exhibit No. 21 marked and admitted)
 7                  SEN. DUNCAN:  Sen. Williams.
 8                  SEN. WILLIAMS:  Thank you.
 9                  Dr. Moore, I would like to direct your
10   attention and the committee's attention to Page 6 of
11   your testimony where you draw your conclusions.  And
12   there's a couple of things I wanted to explore with
13   you there.  Where you say, "In fact, there are many
14   ways to reasonably ensure the identity of voters
15   without disenfranchising those without ID an or
16   placing unnecessary barriers to the voting booth.  The
17   use of affidavits, in particular, creates a paper
18   trail that allows for the enforcement and analysis.  A
19   state could run its elections under this sort of law
20   for an election or two, and then survey those voters
21   who vote via the affidavit.  This is the pool of
22   voters who would be affected by an absolute photo ID
23   requirement.  If the survey finds evidence of fraud,
24   if the affidavit voters were not citizens or voted on
25   bad voter registrations, the law can be tightened."
```

359

```
 1              So I'm trying to understand what you're
 2    suggesting there.  Are you suggesting that if we
 3    suspect that there is some voter fraud going on, that
 4    it's okay to have a little bit of it, until we
 5    determine whether it's really there or not?
 6              DR. MOORE:  Yes, in a way.  I mean, I
 7    think what I'm saying is that, given the little that
 8    we know about voter fraud, voter impersonation fraud,
 9    and the risk of substantial disenfranchisement, that
10    it's worth continuing what has been I think a fairly
11    successful system of elections, in order to get us the
12    data that would allow us to make better public policy
13    choices.
14              SEN. WILLIAMS:  Okay.  Well, I think
15    that's -- you know, it's striking to me, in light of
16    some of the conclusions.  I mean, the letter from the
17    co-chairs of the Baker-Carter Commission said that,
18    "Elections are the heart of democracy.  They are the
19    instrument for the people to choose leaders and hold
20    them accountable.  At the same time, elections are a
21    core public function upon which all other government
22    responsibilities depend.  If elections are defective,
23    the entire democratic system is at risk."
24              And then in the U.S. Supreme Court
25    decision on the Indiana case, in the majority opinion,
```

1    they specifically talk about voter fraud.  And they go

2    on to say that, "It remains true [however] that

3    flagrant examples Of such fraud in [other] parts of

4    the country have been documented throughout the

5    Nation's history by respected historians and

6    journalists, that occasional examples have surfaced in

7    recent years, and that Indiana's own experience with

8    fraudulent voting in the 2003 Democratic primary . . .

9    demonstrate that not only [is] the risk of voter fraud

10   [is] real but that it could affect the outcome of a

11   close election.

12             "There is no question about the

13   legitimacy or importance Of the state's interest in

14   counting only the votes of eligible Voters.  Moreover,

15   the interest in orderly administration and accurate

16   recordkeeping [is] a sufficient justification for

17   carefully identifying all voters participating in the

18   election process.  While the most effective method of

19   preventing election fraud may well be debatable, the

20   propriety of doing so is perfectly clear."

21             And it just seems incredible to me that

22   you would propose that we allow a little bit of fraud

23   until we figure out another way.  It just seems very

24   inconsistent with both the Baker-Carter Commission and

25   the Supreme Court decision.

TX_00004238

1          DR. MOORE:  I'm sorry.  Was there a --

2          SEN. WILLIAMS:  I mean, do you care to

3     comment on that?

4          DR. MOORE:  I don't think we know enough

5     about voter impersonation fraud, notwithstanding the

6     Supreme Court's decision or Carter-Baker, to

7     enforce -- to effectively draw up a good voter ID

8     regime.  There is more than one way to make a bad

9     election system.  One bad election system is one

10    riddled with fraud.  Another bad election system is

11    one we've had in the United States for many decades

12    prior to the 1960s, which was one that was riddled

13    with disenfranchisement.

14          So I think it's a balancing act.  And I

15    think as policymakers, you would be justified in

16    instituting a law that would allow you to gather

17    better data.  For instance, the Carter-Baker

18    Commission themselves wanted to phase in their voter

19    ID requirement and allow people to vote provisionally

20    and have that ballot counted.  So I think the

21    Carter-Baker Commission is doing the same thing you're

22    shocked that I would do, but you seem to like their

23    recommendation.  They would seem to be willing to

24    tolerate that same risk for a couple of elections in

25    order to move you toward both a fair and safe election

TX_00004239

1    system.

2              SEN. WILLIAMS:  You know, I think it is

3    a balancing act.  And although there is a lot you've

4    said tonight that I don't agree with, I do agree with

5    that one point.  And, you know, they go on to say in

6    this same Supreme Court opinion that I quoted from

7    earlier that the severity of the burden, of course, is

8    mitigated by the fact that if eligible voters without

9    photo identification may cast provisional ballots that

10   will be ultimately counted, it's unlikely that such a

11   requirement would pose a constitutional problem unless

12   it's wholly unjustifiable.  And even assuming that the

13   burden may not be justified as to a few voters, the

14   conclusion is by no means sufficient to establish the

15   Petitioner's right to relief they seek in this

16   litigation.

17             And so it seems to me that the Court

18   directly addressed that balancing act that you're

19   talking about between the risk of disenfranchising

20   people, which none of us want to do on this floor, and

21   the risk of having an election stolen by false voting,

22   voter impersonation or other things that may go on.

23             And I don't know.  Maybe you don't

24   realize that this bill that we're considering

25   contains -- you know, we already have in state law

1    provisional voting requirements that are consistent

2    with the HAVA requirements.  So there is no instance

3    where someone would not be able to go in and cast a

4    ballot under this bill.  Are you aware of that?

5              DR. MOORE:  But if the person didn't

6    have ID, what would happen to their provisional ballot

7    after they cast it?

8              SEN. WILLIAMS:  Well, and I think we'll

9    have the Secretary of State testify about that.  It's

10   a process where there is a determination made by the

11   election judge whether that person was who they said

12   they were or not.  And there is actually a process

13   that all of us voted for.  All 31 of us voted for our

14   provisional voting process that we have here in Texas,

15   and it's been cleared through the Department of

16   Justice.  So that provisional voting that we have in

17   Texas is cleared by DOJ.  It meets the Section 5

18   requirements, and everybody in this chamber voted for

19   it.

20             DR. MOORE:  Well, I mean, but that's

21   under a different ID regime.  Is that right?  I mean,

22   what was pre-cleared was --

23             SEN. WILLIAMS:  Under our current ID

24   regime.  But the provisional voting -- the law on

25   provisional voting doesn't change under this bill.  So

1    whoever goes to vote will still be able to cast a

2    provisional ballot and then an election judge, the

3    appropriate official -- I need to let the Secretary of

4    State speak to it, because I don't want to -- I might

5    not have the specific terms correct.  But there is a

6    process that has been cleared that we use to determine

7    whether that's an eligible vote.  That's under current

8    law.  That process isn't touched top or bottom by

9    this.  At worst, at the worst, you might have a few

10   more provisional ballots.

11            DR. MOORE:  I'm not understanding how

12   you change the IDs that are required without changing

13   the provisional ballot system.

14            SEN. WILLIAMS:  Well, I would suggest

15   you read our bill and then you would understand it.

16            DR. MOORE:  Well, I did read the bill.

17   Maybe I need to talk to the Secretary of State's

18   office to get a better understanding of that.

19            SEN. WILLIAMS:  Right.  Okay.  And then

20   finally, a couple of other things that I wanted to

21   just point out.  You commented with Sen. Van de Putte

22   extensively about voter education and how important

23   that was.  And, you know, the way this fiscal note

24   process works here in our state, there is a careful

25   look at an independent non- -- independent

1    non-partisan group, the Legislative Budget Board, they

2    work for every one of us here, and they make a

3    determination.

4              And when I went back and looked at this

5    bill, you know, the reason there's no cost here is,

6    this bill doesn't address voter education, and so

7    there would be no additional expense.  However, what

8    you may not know is that the Secretary of State

9    already has a line item in their budget for voter

10   education.  I'm working to get that number for us now.

11   We don't know -- I can't tell you off the top of my

12   head what it is.  But it's not as if the state is not

13   already spending money on voter education.  Were you

14   aware of that?

15             DR. MOORE:  I would have assumed that

16   you were already spending money on voter education.

17             SEN. WILLIAMS:  Okay.  And so what I

18   think we're going to hear in testimony from the

19   Secretary of State is that they can absorb the cost of

20   this in their existing budget.

21             Thank you.

22             SEN. DUNCAN:  The Chair recognizes

23   Sen. Gallegos.

24             SEN. GALLEGOS:  Thank you, Mr. Chairman.

25             Dr. Moore, I have a couple of questions,

366

 1     kind of like in the line of questions that Sen. Van de

 2     Putte gave you.  I do want to, at the proper time,

 3     Mr. Chairman, submit the map I'm fixing to talk about

 4     as an example.  And I've got a copy for all the

 5     members.

 6               SEN. DUNCAN:  Why don't you go ahead and

 7     send it up now and let's mark it so we'll have a

 8     proper reference in the record.

 9               SEN. GALLEGOS:  Give one to Dr. Moore.

10               SEN. DUNCAN:  Exhibit 22 is a map

11     submitted by Sen. Gallegos.  It will be submitted into

12     the record.

13               (Exhibit No. 22 marked and admitted)

14               SEN. DUNCAN:  Senator, you can ask your

15     questions.

16               SEN. GALLEGOS:  Okay.  Thank you,

17     Mr. Chairman.

18               Dr. Moore, the data that I'm passing

19     out -- and I will relate to two other maps, because

20     the one from Houston will suffice.  That's my

21     hometown.  And the data is from the Texas Department

22     of Public Safety, shows that in my home city of

23     Houston, it is very -- under this bill, Dr. Moore,

24     that if you look -- members, if you look at the map,

25     there is no DPS center inside the 610 loop, and the

1    same is for Fort Worth.

2                Sen. Davis, there is none inside the 610

3    loop in Fort Worth.

4                And, Sen. West, there's only one in the

5    City of Dallas, a DPS center.

6                What my question is to you, Dr. Moore,

7    if we pass this legislation that mandates that every

8    Texan that wants to vote get a photo ID, that if you

9    look at the map, especially the City of Houston -- or

10   the Houston map -- that most of these folks that

11   probably are going to have to have voter ID are

12   minorities, live inside the 610 loop, socioeconomic

13   welfare is low.  They'll probably have no methods of

14   transportation and depend on public transportation to

15   move around.

16               If we pass the bill, as what you see on

17   that map that I just gave you, Dr. Moore, and the

18   other cities that I described, which inside those 610

19   loops, the majority of the population is minority in

20   those cities.  In looking at preliminary numbers that

21   I've already gotten on total population, in the last

22   10 years, in Houston, Texas, from 2000 to upcoming

23   2010 when the census is taken, just in Houston alone

24   the preliminary numbers are 1.1 million in the last 10

25   years, the majority of those Latino, in Houston -- in

1    Houston.

2              So with that in mind, Dr. Moore, what I

3    would like to ask you is, do you believe that if

4    there's no DPS centers, were this bill by Sen. Fraser,

5    if there's no DPS centers in that 610 loop, that that

6    will become a hardship -- if the state mandates for a

7    photo ID and I, living inside the loop, without a car,

8    public transportation only, it's going to create a

9    hardship for me to get to that DPS center, especially

10   if there's none inside the 610 loop in Houston, in

11   Fort Worth, only one in Dallas, Texas.  And that's

12   going to create a hardship for me as living inside the

13   city, low income, try to catch public transportation

14   and at least try to get to one of these that are

15   outside the loop.  Let me ask you, in your

16   professional opinion, Dr. Moore, do you consider that

17   a hardship for those people living in there if we pass

18   this piece of legislation, that creates a hardship on

19   these people?

20             DR. MOORE:  I'll answer in this way:

21   The Justice Department has a very sophisticated

22   geographic information system with all the census data

23   loaded into it, because of the redistricting work.

24   And it's a very simple matter to sit down and, within

25   15 minutes, create buffers around each of these points

1    and calculate the minority population and how much of

2    the minority population lives within one mile or

3    10 miles or whatever.

4              Those numbers were a serious detriment

5    to Georgia in 2005, where Georgia didn't have

6    Department of Motor Vehicle offices in many counties

7    or in the City of Atlanta.  It was a problem for the

8    federal judge who struck down Georgia's law, and I

9    think it's something that's going to take close

10   analysis to determine the differential impact that is

11   certainly going to be a red flag and something the

12   Department of Justice is going to look at very

13   closely.

14             SEN. GALLEGOS:  Okay.  So the answer is

15   yes on -- let's say a potential hardship for those

16   folks in there if we mandate every Texan to get a

17   photo ID that wants to vote?

18             DR. MOORE:  Lack of access to the places

19   to go to get that ID will be seen as a hardship on

20   minority voters, who tend to be poor, tend to have

21   less access to transportation.

22             SEN. GALLEGOS:  Thank you, Dr. Moore.

23             SEN. DUNCAN:  Sen. Shapleigh.

24             SEN. SHAPLEIGH:  Thank you, Mr. Chair.

25             Toby, in your testimony I think you're

1    the only witness who to date has come forward to give

2    us a number.  And what you're saying is that

3    approximately 162,901 registered voters in the 2008

4    election in Texas would have lacked a

5    government-issued photo.  And I think your testimony

6    is, this is the minimum number and almost surely

7    under-estimates that population.  Give us the range.

8    What would be the outside number?

9                    DR. MOORE:  Well, the Carter-Baker study

10   survey looked at Indiana, Mississippi and Maryland and

11   found that the number of people without ID varied from

12   I think 0.2 percent, or very little in Indiana, up to

13   close to 4 percent, I believe, in Maryland.  I will

14   have to go back and look.  So there was a range there

15   of states.  The average of all the people they

16   surveyed, all 2,000 voters, was 1.2 percent, and

17   that's percentage I apply.

18                    However, because that number includes

19   Indiana, which has a very high rate of ID ownership,

20   there is reason to believe that the number would be

21   higher than the 1.2 percent in Texas.  But I would

22   only have confidence in saying that as a minimum, that

23   162,901, based on the AU survey.

24                    SEN. SHAPLEIGH:  But you can't offer an

25   opinion as to a number?  When you look at the

1   demographic breakdown of Texas -- and here you're

2   saying African-Americans are four times more likely

3   than whites to lack a photo ID -- 88 percent of those

4   without a photo ID had household incomes below $25,000

5   a year.  In my own community, I think something like

6   73 percent of the population makes less than $35,000 a

7   year by household.

8             So is there a formula, is there a way

9   that you can look at the demographics of the 2003

10  census, extrapolate the 2008 and say this is your high

11  number with respect to the number of folks that are

12  going to lack a photo ID in Texas?

13            DR. MOORE:  Well, it always scares me a

14  little bit when I hear people use the word

15  "extrapolate."  I think I'll stick with my

16  conservative low threshold, knowing that it's probably

17  higher, could be considerably higher.  But until

18  somebody does the analysis, does the survey work,

19  there is no way to know.

20            SEN. SHAPLEIGH:  Okay.  Now, you are the

21  only witness that was part of the Carter-Baker

22  Commission.  From your testimony, I think you were the

23  Project Director.  Is that correct?

24            DR. MOORE:  I was Project Manager after

25  the release of the study.  So I managed the follow-up

1    work.

2              SEN. SHAPLEIGH:   And you've also served

3    for six years as the geographer of the Voting Section

4    of the Civil Rights Division?   In connection with that

5    service, in connection with your professional

6    expertise, do you have a number with respect to

7    Hispanics?   I notice that you've opined here as to

8    African-Americans, how many lack a photo ID.   We've

9    talked about women; we've talked about folks making

10   less than $25,000 a year.   What is that number for

11   Hispanics?

12             DR. MOORE:   Hispanics are a very

13   difficult group to survey, especially impoverished

14   Hispanics who may not have landlines.   They're hard to

15   reach.   There are language difficulties.   I don't know

16   of any kind of full-fledged scientifically credible

17   survey that would allow you to get at that number,

18   because from what we know of ID ownership and how it

19   correlates with low incomes, we would expect that

20   number to be considerably higher for Hispanics than

21   for other groups.

22             On the other hand, Hispanic citizens may

23   have higher levels of documentation, because they need

24   to prove their citizenship where they have gone

25   through the naturalization.   There are a lot of

```
1    variables in that.  But we just don't know for
2    Hispanics how many people don't have an ID.
3                   SEN. SHAPLEIGH:  Are you familiar with
4    the Texas colonias?
5                   DR. MOORE:  Very little.
6                   SEN. GALLEGOS:  Thank you.
7                   SEN. DUNCAN:  Thank you, Dr. Moore.
8                   There are no other witnesses or members
9    queued up, so you are excused.
10                   The next witness is Dr. Frank
11   Strickland.
12                   Dr. Strickland, you will approach, state
13   your name and who you represent.  Turn your testimony
14   over to the -- written testimony, if any.
15                   Do we have that?
16                   I'll go ahead and introduce that as
17   Exhibit 23, would be the testimony of Frank B.
18   Strickland.
19                   (Exhibit No. 23 marked and admitted)
20                   SEN. DUNCAN:  State your name, please,
21   and who you represent.  You have 10 minutes.
22            TESTIMONY BY FRANK B. STRICKLAND
23                   MR. STRICKLAND:  Thank you,
24   Mr. Chairman.  And, by the way, it's not
25   Dr. Strickland.
```

374

1              Sen. Duncan and members of the Senate,

2    my name is Frank Strickland.  I'm a partner in the law

3    firm of Strickland Brockington Lewis in Atlanta,

4    Georgia, a firm which, together with its predecessors,

5    dates back to 1971.  My experience with elections

6    comes primarily from two sources:  Serving as a member

7    of the election board for the largest county in

8    Georgia and litigating various election and other

9    political cases over a period of many years.

10             Although I am not here in an official

11   capacity, I'm one of five members of the Fulton County

12   Board of Registration and Elections which is a

13   bipartisan board appointed by the Board of

14   Commissioners of Fulton County, which has general

15   supervision over all voter registration and election

16   processes in Georgia's largest county.  I previously

17   served on the Election Board from 1971 to 1977.

18   Substantially all of the City of Atlanta is located in

19   Fulton County.

20             The Election Board is independent in

21   that it does not report to the Board of Commissioners,

22   and its decisions on registration and election matters

23   in Fulton County, including the appointment of the

24   department director, are final.  Fulton County is

25   Georgia's largest county, with a population of

1    approximately 850,000.  And there are approximately

2    552,000 registered voters in the county.

3              In 2005 Georgia first adopted a law

4    requiring a form of photo identification when voting.

5    A substantial number of persons over age 18 already

6    had a Georgia driver's license, which is one of the

7    acceptable forms of identification.  The 2005 statute

8    provided for issuance of a state voter ID for a

9    nominal fee to persons who did not have a driver's

10   license or other acceptable form of photo ID, such as

11   a government employment ID card, voter ID card, United

12   States military ID card, tribal ID card or a United

13   States passport.

14             As a result of federal court litigation

15   before United States District Judge Harold Murphy in

16   Rome, Georgia, the law was changed in 2006 to provide

17   for the issuance of a free photo ID card at any

18   registrar's office in one of Georgia's 159 counties.

19             Notwithstanding the availability of a

20   free photo ID to anyone who did not have another

21   acceptable form of identification, the 2006 statute

22   was also litigated before Judge Murphy in a case

23   entitled Common Cause vs. Billups which is found at

24   504 F.Supp. 1333.  Judge Murphy was a Carter appointee

25   to the federal bench, and he recognized the state's

 1    interest in passing a photo identification law to

 2    prevent fraud when he said -- and I quote --

 3    "Additionally, Plaintiffs have failed to demonstrate

 4    that the Photo ID requirement is not reasonably

 5    related to the state's interest in preventing fraud in

 6    voting."

 7              Other plaintiffs filed suit in state

 8    courts to challenge the photo ID statute under state

 9    law.  These efforts were also unsuccessful after

10    appeal to the Supreme Court of Georgia.

11              In addition to arguing that in-person

12    voter fraud does not occur and remedies like voter

13    identification laws are unnecessary, opponents of

14    photo identification requirements have long argued --

15    quite vocally and emphatically -- that these laws

16    would lead to disenfranchisement of, in Georgia's

17    case, hundreds of thousands of voters.  But when the

18    State of Georgia finally had its day in court, it

19    became clear that emotional and hyperbolic arguments

20    used to argue against the state's photo identification

21    law were simply empty rhetoric.

22              Judge Murphy also addressed this

23    argument in his decision for the state -- and I

24    quote -- "As the Rekita court noted, voters who lack

25    Photo ID undoubtedly exist somewhere, but the fact

1    that Plaintiffs, in spite of their efforts, have

2    failed to uncover anyone 'who can attest to the fact

3    that he/she will be prevented from voting' provides

4    significant support for a conclusion that the Photo ID

5    requirement does not unduly burden the right to vote."

6              Judge Murphy further stated, quote,

7    "Plaintiffs have failed to produce any evidence of any

8    individual ... who would undergo any appreciable

9    hardship to obtain photo identification in order to be

10   qualified to vote."

11             The plaintiffs' inability to produce a

12   single voter who would be adversely impacted by the

13   law was important to Judge Murphy's determination that

14   there was no significant burden posed by the photo ID

15   law and should also be a very important consideration

16   for the Texas Senate.

17             Of the two individual plaintiffs named

18   in the Common Cause case, one individual testified

19   that she didn't mind getting a photo identification

20   and she didn't think it would be hard to get one.  The

21   other Plaintiff said that he thought he could get a

22   photo ID and it would probably help him a lot.

23   Interestingly, the same lawyers who argued that

24   Plaintiff simply could not find a way to travel seven

25   miles to his registrar's office to get a photo ID also

```
 1    drove that Plaintiff nearly 200 miles to testify at
 2    trial, traveling past many locations where he could
 3    have obtained a free photo ID on the way to the trial.
 4              Likewise, the other witnesses relied
 5    upon by the lawyers for the Plaintiff to establish
 6    that obtaining a photo ID was too burdensome
 7    ultimately agreed that, in fact, they were perfectly
 8    capable of obtaining the ID.  One woman who signed an
 9    affidavit prepared by the Plaintiff's counsel
10    asserting that it was too far to go to the county
11    courthouse to get a photo ID from the registrar,
12    freely admitted on her deposition that she regularly
13    traveled to the courthouse and could pick up an ID the
14    next time she was there.
15              Another witness who also gave an
16    affidavit that he would have a hard time obtaining a
17    photo ID testified differently on deposition.  When
18    asked if he thought he could get a ride to the
19    registrar's office to get a photo ID, he replied that
20    he didn't need a ride and he could get one any time,
21    because the registrar's office was within walking
22    distance of his home.
23              Judge Murphy's decision in the Common
24    Cause case, which is found at 554 F.3d 1340 -- I beg
25    your pardon.  This is the Court of Appeals decision --
```

379

```
 1    it was upheld on January 14, 2009, in a unanimous
 2    opinion of a three-judge panel of the United States
 3    Court of Appeals for the 11th circuit.  The Court
 4    stated -- and I quote -- "We conclude, based on the
 5    [evidence] in Crawford v. Marion County Election
 6    Board . . . which upheld a similar law in Indiana,
 7    that the burden imposed by the requirement of photo
 8    identification is outweighed by the interest of
 9    Georgia in safeguarding their right to vote."
10              The Plaintiffs have filed a petition for
11    certiorari.  But because the Crawford case is really
12    on all fours with Georgia's case -- except Georgia's
13    law was deemed less strict by Justice Kennedy -- a
14    grant of that petition application for cert is
15    unlikely.
16              After Judge Murphy's September 2007
17    decision upholding the photo ID law, Georgia held
18    numerous elections during 2007 and 2008.  In
19    November 2007, more than 100 Georgia counties and
20    municipalities held elections with the photo
21    identification law in place.  Every one of these
22    elections occurred without incident or legal challenge
23    related to the photo ID requirement.  In July 2008,
24    partisan primaries were held with a large turnout; and
25    again, no problems related to photo ID.
```

TX_00004257

380

1           Most importantly, in the 2008 General

2    Election, with the highest turnout ever seen in

3    Georgia -- more than 3.9 million voters -- the photo

4    ID law posed no problem.  That fact is particularly

5    important because of the 3.9 million votes cast, 92

6    percent were cast in person, meaning that the voter

7    had to show a proper form of photo ID.  Again, no

8    problems.  Although the turnout was much lighter for

9    the December 2nd runoff, the fact remained constant

10   that the photo ID requirement did not result in any

11   disenfranchisement statewide.

12           From the perspective of an elections

13   administration official in Fulton County, I can also

14   say without hesitation that countywide, the photo ID

15   requirement did not result in the mass

16   disenfranchisement its opponent predicted.  The

17   requirement did not result in any disenfranchisement

18   at all.

19           Focusing on the general election in

20   November 2008, the voter turnout war 405,000 out of

21   552,000 registered voters, which is a turnout of

22   approximately 73 percent, a record for Fulton County,

23   both in terms of the number of registered voters and

24   voter turnout.  Only 93 voters did not have an

25   acceptable form of photo ID.  Each voter was given a

1    provisional ballot and, in accordance with the

2    statute, was instructed to present a valid photo ID

3    within 48 hours.  While only one did so, there is no

4    way to know why the others did not.

5              SEN. DUNCAN:  Mr. Strickland, your time

6    has expired.

7              MR. STRICKLAND:  All right, sir.

8              SEN. DUNCAN:  We have Sen. Watson.

9              **QUESTION FROM SENATE FLOOR**

10             SEN. WATSON:  Welcome to Texas.

11             MR. STRICKLAND:  Thank you, sir.

12             SEN. WATSON:  I appreciate your being

13   here.  I just have one thing I want to ask you about.

14   You didn't bring any information or statistics or

15   anything at all related to Texas and the impact that

16   this proposed bill would have on African-Americans or

17   Hispanics or people that don't speak English, anything

18   like that, did you?

19             MR. STRICKLAND:  Nothing having to do

20   with Texas, no, sir.

21             SEN. WATSON:  Thank you very much for

22   being here.

23             SEN. DUNCAN:  Sen. Williams.

24             SEN. WILLIAMS:  Thank you.

25   Mr. Chairman.

```
 1                Mr. Strickland, you have -- I don't know
 2      if you got to it in your remarks, because the time
 3      expired, but I did read your written testimony.  And
 4      you make three points at the end of your report, and
 5      one is that you talk about how important an
 6      educational program is when any photo ID law is put
 7      into place.
 8                And I just wanted to share with you some
 9      of the things that we're doing in Texas through the
10      Secretary of State's office that have to do with voter
11      education and the kinds of things that we could easily
12      incorporate any change in the election law into these
13      sorts of things and see if this was the soar of thing
14      you were referring to.
15                In television and radio ads, we have
16      three different 60-second spots in English.  "High
17      Tech", "Special Needs" and "New Voter" are the titles
18      of those.  I'm not going to play them for the
19      committee, but they're available on the Secretary of
20      State's website in Spanish.  We also have three
21      60-second radio spots:  A father-daughter, a special
22      needs voting radio spot and a man on the street.
23                In addition, we have one, two, three,
24      four, five -- six English version television spots and
25      four Spanish version 15-second spots:  "Learn How to
```

1    Vote," "Special Needs Voters," "Voting Machines,"

2    "Register By," the Secretary of State saying, "You can

3    vote," "Learn How to Vote," "Vote in Spanish" and

4    "Register By" and then the "You Can Vote," also those

5    last four in Spanish so that we have the same ad

6    sometimes in English and Spanish.

7            And then we also have on that same

8    website, you know, a number of links -- Voter Facts.

9    Where Do I Vote?  What's my District?  How Do I Vote

10   Early? -- that sort of thing that is on the Secretary

11   of State's website.  Are those just generally --

12   without getting too specific, because our states are

13   different -- generally speaking, are those the kinds

14   of voter education projects that you ran in your

15   state?

16           MR. STRICKLAND:  Yes.  And I would say

17   that the program you just outlined goes considerably

18   beyond what was done in Georgia.

19           SEN. WILLIAMS:  Is that right?  Now, one

20   other thing that you mentioned in your remarks that I

21   wanted to follow up on -- give me just a second.  It's

22   also near the end of your remarks.

23           And beginning on Page 6, at the very

24   last line, you say, "While critics of the photo ID law

25   contend that it will be administered in a racially

1  discriminatory fashion, there is absolutely no support

2  for that allegation, just as there is no support for

3  the notion that requiring a photo ID is

4  unconstitutionally burdensome."

5          Are you familiar with the Crawford vs

6  Marion County Supreme Court case?

7          MR. STRICKLAND:  Yes, generally

8  speaking.

9          SEN. WILLIAMS:  Okay.  And I believe --

10  well, I know.  I've got a copy of the case here.  And

11  then the Supreme Court said about this very issue, "A

12  photo identification requirement imposes some burdens

13  on voters that other methods of identification do not

14  share.  For example, a voter may lose his photo

15  identification, may have his wallet stolen on the way

16  to the polls, or may not resemble the photo in the

17  identification because he [has] recently [grown] a

18  beard," all things that we've heard these sorts of

19  problems on the floor today.

20          But the Supreme Court concluded, as you

21  did in your remarks, that "Burdens of that sort

22  arising from life's vagaries, however, are neither so

23  serious nor so frequent as to raise any question about

24  the constitutionality . . .; the availability of the

25  right to cast a provisional ballot provides an

1    adequate remedy for problems of that character."

2            And I believe you say in your remarks

3    that you have that same kind of provisional voting in

4    the Georgia law.  Would you describe for the committee

5    briefly what that entails.

6            MR. STRICKLAND:  Yes, sir.  It's a

7    48-hour requirement.  In other words, if the voter,

8    using one of the hypotheticals that you presented, has

9    a difficulty that you outlined, then that person is

10   instructed by the poll worker to return to a

11   registrar's office within 48 hours to validate his or

12   her identification.

13           SEN. WILLIAMS:  And Fulton County is the

14   most populous county in the State of Georgia.  And how

15   many people have you had come back to -- that have

16   been challenged -- first of all, how many people have

17   been challenged on that?  And then I'm curious how

18   many have actually come back.

19           MR. STRICKLAND:  Out of the statistics I

20   presented a moment ago, with well over 400,000 voters,

21   there were 93 people who did not have a photo ID.

22   Each was instructed to present a photo ID within 48

23   hours.  Only one did.

24           SEN. WILLIAMS:  Okay.

25           MR. STRICKLAND:  As a follow-up to that,

1    each person who did not appear was sent a letter

2    reminding that voter of the process and of the photo

3    ID requirement.

4              SEN. WILLIAMS:  Now, our provisional

5    voting that we have here in Texas does not require the

6    voter to come back so that their vote may be counted.

7    Wouldn't you think that would be even less burdensome

8    than what you have in Georgia?

9              MR. STRICKLAND:  No question.

10             SEN. WILLIAMS:  And then we also, under

11   the provisions of this bill, allow alternative forms

12   of identification that would include government

13   documents and official papers -- I don't want to go

14   through the whole list, because it's so late -- but

15   one photo ID or two of any of the following, a laundry

16   list, do you think that also would relieve the burden

17   from some of those folks that might not have a photo

18   ID?  Would it make it less burdensome?

19             MR. STRICKLAND:  Less burdensome.  It is

20   less stringent than the Georgia law or the Indiana

21   law.

22             SEN. WILLIAMS:  Okay.  Thank you so

23   much.  I appreciate you being here with us tonight.

24             MR. STRICKLAND:  Thank you, sir.  By the

25   way, the president pro tem of the Georgia Senate is

387

1    Tommy Williams.

2               SEN. WILLIAMS:  Yes.  I run in to him

3    all the time at conferences and see his name on the

4    Internet.  We spell our first name differently,

5    though.

6               MR. STRICKLAND:  I noticed that.

7               SEN. WILLIAMS:  He's an "ie," and I'm a

8    "y."

9               SEN. WHITMIRE:  Mr. President, Chairman?

10              SEN. DUNCAN:  Sen. Whitmire.  State your

11   purpose.

12              SEN. WHITMIRE:  Mr. Strickland, on Page

13   6 --

14              SEN. DUNCAN:  Well, hold a minute.  I

15   think you're out of order.  I'm sorry, Senator.

16   You're not -- I thought you had an inquiry.

17              SEN. WHITMIRE:  Oh, no.  I'm sorry.

18              SEN. DUNCAN:  Sen. Ogden is next in

19   line.  I'm sorry.

20              SEN. OGDEN:  I yield to Sen. Whitmire.

21              SEN. DUNCAN:  Senator Whitmire.

22              SEN. WHITMIRE:  The education component

23   you emphasize is so important, and on Page 6 you give

24   great credit to the Georgia Secretary of State, her

25   staff and the members of the State Election Board.

1    Could you tell us what the entity, the State Election

2    Board, consists of, how they're chosen and what are

3    their responsibilities?

4              MR. STRICKLAND:  The State Election

5    Board is appointed by the Governor, and the Secretary

6    of State is the Chairman of that board.  And in

7    general, they do not run the elections as such.

8    They're more of a review body for problems in

9    connection with the election.

10             The elections are run, as I'm sure is

11   the case in -- as far as I know is the case in Texas,

12   by the county election boards --

13             SEN. WHITMIRE:  You also mentioned your

14   county election officials.  Would it impact your

15   judgment, what you're here speaking and recommending

16   for Texas, to know that we do not have such an entity,

17   we do not have a state election board, which you said

18   played a vital role in the education of your voters?

19             MR. STRICKLAND:  I think the role of the

20   Secretary of State was considerably more important

21   than the State Election Board.  I just included them

22   in the list of persons who were involved.  But our

23   Secretary of State, Karen Handel, really stepped out

24   and took a leadership role.  And I would say the State

25   Election Board --

```
 1                    SEN. WHITMIRE:  Do you have an

 2      approximate --

 3                    MR. STRICKLAND:  -- incidental.

 4                    SEN. WHITMIRE:  Do you have an

 5      approximate what your budget was to carry out this

 6      educational process that you speak of?

 7                    MR. STRICKLAND:  The number that I

 8      recall -- and I was not directly involved in that --

 9      is around $600,000.  Now, the director of our

10      Elections Division is a witness that will testify

11      later here and give you the number.

12                    SEN. WHITMIRE:  Of course, you obviously

13      realize Texas would be much larger and it would be

14      logical to assume it would be probably several times

15      that cost?

16                    MR. STRICKLAND:  I would assume that to

17      be the case.

18                    SEN. WHITMIRE:  And my colleague was

19      referencing that we have spots prepared.  I was

20      anxious to ask him -- you know, it's great that we

21      have the spots.  But, obviously, we have to have the

22      budget and the implementation to make that redundant

23      enough.  Like any other campaign, the voters are going

24      to have to hear that numerous times.  I do not

25      believe, looking at our Secretary of State's budget,
```

1   that that is accounted for.

2                   SEN. WILLIAMS:   I'll put it in.

3                   SEN. WHITMIRE:   Beg your pardon?

4                   SEN. WILLIAMS:   I'll put it in.

5                   SEN. WHITMIRE:   You will put it in the

6   budget?   Well, I'm sure we will have a chance to

7   discuss that.   In fact, I'm going to yield to our

8   Chairman of Finance.

9                   I appreciate you being here and I know

10  you mean well.   I just pause because I think Georgia

11  is a fine state.   And we're just so much more diverse,

12  larger and in some instances maybe more complicated

13  than you.   So I look forward to my colleagues telling

14  me what we're going to do with all of those spots.   If

15  they remain in the can and do not have the proper

16  budget, I don't think they will ever be nearly as

17  successful as you speak of in Georgia.

18                  SEN. DUNCAN:   Sen. Ogden.

19                  SEN. OGDEN:   Mr. Strickland, thank you.

20                  Sen. Williams alluded to this, and I

21  want to go back to a question that Sen. Watson asked a

22  minute ago.   And I may ask -- if I get the question

23  incorrect, I would ask Sen. Watson to correct me.   But

24  I think he asked if, in your testimony, you said

25  anything about the potential for ethnic discrimination

```
 1    in Texas, I think was his question.
 2                    Is that right?
 3                    MR. STRICKLAND:  That's pretty close.
 4                    SEN. OGDEN:  And your answer was "No"?
 5                    MR. STRICKLAND:  Correct.
 6                    SEN. OGDEN:  But I would at least like
 7    to say -- and I would like you to comment on this --
 8    is that in your written testimony you basically
 9    address that issue from a Georgia perspective.  And on
10    Page 6, you say that, "From time to time, the argument
11    has been made that no matter how much election
12    officials and poll workers are educated on the topic,
13    the requirement will be administered in a racially
14    discriminatory fashion.  That argument is a red
15    herring," and I would like you to amplify that,
16    please.
17                    MR. STRICKLAND:  Well, the example I
18    gave in my testimony -- and I may have run out of time
19    before I got to it -- was the election Board with
20    which I'm involved in Fulton County, which is a
21    racially diverse county.  And, as I said, we have a
22    bipartisan board and our board appoints the director
23    of the department.
24                    And for a number of years, that person
25    has been an African-American woman, and that's the
```

392

 1    case today.  And what I said was that approximately

 2    95 percent of the full-time Election Department staff

 3    is African-American.  And also that during our primary

 4    general elections, the demographics of the poll

 5    workers is in excess of 50 percent African-American.

 6    So I took the position that it simply does not make

 7    sense that that group of people is going to

 8    discriminate against minority voters.

 9                    SEN. OGDEN:  Okay.  Thank you.

10                    SEN. DUNCAN:  Sen. Ellis.

11                    SEN. ELLIS:  Thank you, Mr. Strickland;

12    thank you for being here.

13                    Briefly, you mentioned some 89 or 75

14    provisional ballots, I think.  I can't remember the

15    number.

16                    MR. STRICKLAND:  93.

17                    SEN. ELLIS:  93 that were --

18                    MR. STRICKLAND:  What I said was, there

19    were 93 persons out of over 400,000 in Fulton County

20    that did not have an acceptable form of photo ID.

21                    SEN. ELLIS:  And you said under your

22    statute in Georgia, they have 48 hours --

23                    MR. STRICKLAND:  Correct.

24                    SEN. ELLIS:  -- to bring something to

25    prove they are that person, only one person came in?

1          MR. STRICKLAND:  Right.

2          SEN. ELLIS:  Okay.  Now, in your statute

3    it lays out the process, unlike -- although I know you

4    have not read it -- the Texas statute is quiet on

5    that, the bill that he has here.  Now, out of the ones

6    that didn't come in, does anyone go do an analysis if

7    part of the rational behind the statute in Georgia is

8    to deal with the issue of voter fraud, did anybody go

9    and check, someone go and check and see what was up

10   with the ones who did not come back and prove they

11   were who they said they were when they voted?

12         MR. STRICKLAND:  Not to my knowledge.

13   As I mentioned a moment ago, a follow-up letter was

14   sent to the people; that is, the 92 that did not

15   return.

16         SEN. ELLIS:  Yes.  And only 92 out of

17   400,000 in Fulton County voting may not seem like a

18   lot, but -- my mother-in-law lives in Atlanta -- if

19   there is a close legislative race or Senate race or

20   city council race, as we had here.  We had one

21   election for a House seat -- they have been enlarging

22   House seats in Georgia, about 150,000 people per House

23   seat -- it could determine whether or not someone won.

24   Does anybody do an analysis to see the ethnic or

25   racial makeup of those folks who did the provisional

```
 1    ballot but didn't show up to prove they were who they
 2    said they were?
 3                     MR. STRICKLAND:  I don't know the answer
 4    to that, Senator.  I'm sorry.
 5                     SEN. OGDEN:  Okay.  Thank you for
 6    coming.
 7                     MR. STRICKLAND:  Thank you, sir.
 8                     SEN. DUNCAN:  Sen. Hinojosa.
 9                     SEN. HINOJOSA:  Thank you, Mr. Chairman.
10            Mr. Strickland, I think Sen. Williams
11    was asking you a question concerning the educational
12    programs by your Secretary of State, and you mentioned
13    that they were using websites.  And you said you
14    really didn't know the cost of a training program, so
15    educational programs.  Do you know they provided
16    computers for people who could not afford computers?
17                     MR. STRICKLAND:  I don't.
18                     SEN. HINOJOSA:  Also I guess in the
19    State of Georgia, do you have poll watchers?
20                     MR. STRICKLAND:  Poll watchers?
21                     SEN. HINOJOSA:  Yes, who they show the
22    voter ID to?
23                     MR. STRICKLAND:  Oh, they show that
24    to -- when you walk in the polling place, you sign a
25    voter certificate, indicating your name, your address,
```

395

1    and you say you're eligible to vote in that election.

2    That begins the voting process.

3              And in my own polling place, at that

4    particular step I'm asked to produce a photo ID.  And

5    that really carries over to the -- we have a device

6    called an express poll.  It's a little touch screen

7    device that verifies that -- in other words, if I

8    present my voter certificate with my name on it, then

9    the poll worker who has seen my photo ID then punches

10   my name or the first two or three letters of my name

11   into the express poll machine, which is really the

12   database of registered voters, and confirms the fact

13   that I am a properly qualified voter to vote at that

14   precinct.  So I'm showing the identification to the

15   poll worker, as distinguished from a poll watcher who

16   in Georgia would be a volunteer for each political

17   party who is observing the election but is not, in

18   fact, a poll official.

19             SEN. HINOJOSA:  So I guess, are you

20   using a driver's license or some type of photo ID --

21             MR. STRICKLAND:  Yes.

22             SEN. HINOJOSA:  -- that has some type of

23   information on the back that can be scanned?

24             MR. STRICKLAND:  Unfortunately, we do

25   not have the ability to scan.  That would considerably

TX_00004273

1   increase the speed of processing.  In other words,

2   we're using this thing that I describe as an express

3   poll.  If we had the bar code on the back, it would be

4   a matter of zipping it through that device and

5   verifying it that way.  It would be much faster than

6   the manual punching.

7                SEN. HINOJOSA:  And do you know what the

8   cost would be of that express poll that you're using

9   in Georgia?

10               MR. STRICKLAND:  The express poll

11   device?  I don't know.  We spent a lot of money to go

12   to the touch screen voting, and the express poll

13   machines were acquired at about the same time, at

14   considerable cost.  And I do not recall the cost.

15               SEN. HINOJOSA:  And do you have those

16   express polls in each precinct?

17               MR. STRICKLAND:  Yes, several of them,

18   depending on the number of registered voters at that

19   precinct.

20               SEN. HINOJOSA:  And you said the cost

21   was considerable.  Do you know how much, a ballpark

22   figure?

23               MR. STRICKLAND:  I cannot give you a

24   ballpark.  I'm sorry.

25               SEN. HINOJOSA:  So for us who want to do

1    the same thing, even though it slows down the process,

2    would have to invest quite a bit of money in providing

3    the funds to the precincts in our state?

4                MR. STRICKLAND:  Well, I think in every

5    polling place, there has to be some verification of

6    the voter being on the registered voters list for that

7    particular precinct.  So this is a form of

8    verification.  It happens to be computer-driven.  But

9    as far as I know, in every polling place in every

10   state, there has to be verification that the voter is,

11   in fact, on the registered voters list.

12               SEN. HINOJOSA:  Yes.  And one of the

13   questions that I asked the author of this legislation

14   here is that we don't have a way to verify whether or

15   not the photo ID is fake or a bad one, because here in

16   Texas, you can go buy a fake photo ID at a flea

17   market.

18               MR. STRICKLAND:  I'm not a computer

19   expert, but I would think the problem with a fake

20   photo ID would be the bar code.

21               SEN. HINOJOSA:  And you're right, you're

22   exactly right, the bar code.  But the problem is that

23   we're not using the type of equipment that you're

24   using in Georgia to verify whether or not that's a

25   valid ID.  So that's a problem that we have in the

```
 1    present legislation, the way it's drafted.

 2                    MR. STRICKLAND:  Yes.  I think

 3    verification is an important part of the process.  And

 4    I will take your word for it on how it's done in

 5    Texas.

 6                    SEN. HINOJOSA:  Thank you.

 7                    SEN. DUNCAN:  Sen. Watson.

 8                    SEN. WATSON:  Yes.  Thank you,

 9    Mr. Chairman.

10                    I'm sorry.  I thought I was done.  But

11    since Chairman Ogden asked a question and called out

12    something related to what I had asked you, I thought I

13    need to follow up.

14                    He pointed to a part of your testimony

15    on Page 6 where he specifically quoted language

16    regarding where you said that the requirement will be

17    administered in a -- it talks about the requirement

18    being administered in a racially discriminatory

19    fashion.  And, of course, you go on to say that that

20    is a red herring and, frankly, nonsense, to use your

21    words.

22                    So in that area, in answer to Chairman

23    Ogden's questions, you were talking about the

24    administration of it being done in a racially

25    discriminatory fashion.  Is that correct?
```

```
 1              MR. STRICKLAND:  What I meant to say,
 2    the way the sentence is constructed, it really means
 3    in a non-discriminatory fashion.
 4              SEN. WATSON:  Gottcha!  But in any
 5    event, it's talking about how it's administered.
 6    Right?
 7              MR. STRICKLAND:  Yes.
 8              SEN. WATSON:  And, of course, you -- and
 9    maybe you don't know.  But are you aware that under
10    Section 5 of the federal Voting Rights Act, it isn't
11    just about whether it's administered in a
12    discriminatory fashion, it's whether or not it has the
13    purpose or effect.  Are you familiar with that?
14              MR. STRICKLAND:  I am familiar with
15    that.
16              SEN. WATSON:  And when I ask you about
17    Texas and your familiarity with Texas, you wouldn't
18    know, for example, whether in Texas, in other things,
19    other issues related to voting, you wouldn't know
20    whether Texas has some history of folks removing the
21    names of eligible voters from the list of registered
22    voters where the poll list of precincts, in a way
23    where they would then not be allowed to vote, do you?
24              MR. STRICKLAND:  I have no knowledge of
25    that.
```

1          SEN. WATSON:  You don't have any

2    knowledge about poll workers refusing to accept people

3    for voting, even though their acceptance might be

4    required?

5          MR. STRICKLAND:  No knowledge of that.

6          SEN. WATSON:  About whether people have

7    provided false information to voters about voting

8    procedures resulting in people failing to then go

9    ahead and vote?

10          MR. STRICKLAND:  I'm not familiar with

11    that.

12          SEN. WATSON:  Or anything like providing

13    false information about where a voting place is or

14    what day people might vote?

15          MR. STRICKLAND:  I have not made a study

16    of Texas voting procedures.

17          SEN. WATSON:  Okay.  Now, although you

18    indicate that you don't believe that in Georgia the

19    requirement has been administered in a racially

20    discriminatory fashion, at least in your area of

21    Georgia, you are familiar with studies such as that

22    put out by the Brennan Center where it indicated that

23    in Georgia in 2007, in some local elections, some

24    limited turnout elections, there were voters' ballots

25    rejected because of the voter ID law, weren't you?

```
 1                    MR. STRICKLAND:  I'm not familiar with
 2      the Brennan Center study, though.
 3                    SEN. WATSON:  Okay.  So you wouldn't
 4      know whether, in that Brennan Center study, it also
 5      pointed out in the 2008 presidential primary that
 6      number of people that were -- ballots that were
 7      rejected because of Georgia's voter ID law grew into
 8      the hundreds, and you just wouldn't have any way of
 9      knowing anything about that?
10                    MR. STRICKLAND:  As I said a moment ago,
11      I'm not familiar with the Brennan Center study.
12                    SEN. WATSON:  Okay.  Fair enough.  Since
13      we were talking about Texas a minute ago -- and I want
14      to be clear on what it was that I was asking questions
15      about that Sen. Ogden decided that he needed to ask
16      about, too.  Let me ask this more specifically.
17                    You're not here tonight able to provide
18      the folks that are going to vote on whether to
19      implement SB 362, which would put new requirements on
20      people in Texas trying to vote, you're not here
21      providing us with any sort of statistical analysis of
22      the effect -- administration or not, but of the effect
23      of that new requirement on African-Americans,
24      Hispanics, people making less than $35,000 a year,
25      people who speak only Spanish or Vietnamese or senior
```

402

1    citizens, anybody like that, are you?

2              MR. STRICKLAND:  I can't comment on how

3    things would work in Texas.  What I did try to say in

4    my testimony and otherwise is that a number of similar

5    arguments were made in Georgia, and we just simply

6    have not had that experience.

7              SEN. WATSON:  And one of the

8    differences, of course, in Georgia versus Texas is,

9    Georgia's Hispanic population is what, about

10   7 percent?

11             MR. STRICKLAND:  That sounds about

12   right.

13             SEN. WATSON:  Do you know anything about

14   colonias in Texas?

15             MR. STRICKLAND:  I do not.

16             SEN. WATSON:  How many media markets are

17   there in Georgia?

18             MR. STRICKLAND:  Well, there's one

19   gigantic market in the Atlanta area, and the others I

20   would consider submarkets.  Perhaps a half dozen.

21             SEN. WATSON:  All right.  Do you know

22   whether that's different than in Texas?

23             MR. STRICKLAND:  Well, I know Texas has

24   some much larger cities than our other cities in

25   Georgia besides Atlanta.  I don't know the exact

```
1    number of media markets, though.
2                SEN. WATSON:  Well, I'll let you know
3    that it's quite a bit more media markets, and so it
4    might also make a big difference with regard to that
5    education requirement you talked about.
6                Appreciate your being here tonight.
7    Thank you very much.
8                MR. STRICKLAND:  Thanks so much.
9                SEN. DUNCAN:  The Chair recognizes
10   Sen. Uresti.
11               SEN. URESTI:  Mr. Strickland, good
12   evening and welcome to Texas.
13               MR. STRICKLAND:  Thank you, sir.
14               SEN. URESTI:  Thank you for being here.
15   I know you've come a long way, and we do appreciate
16   your testimony.
17               Mr. Strickland, I just have a few
18   questions for you with regard to some of the comments
19   you mentioned earlier that I read in your written
20   testimony, specifically with regard to a couple of, I
21   believe, plaintiffs that you referenced.  There were
22   two in particular that I think you indicated could
23   have obtained their photo ID.  One was within seven
24   miles and I think was one within walking distance.  Is
25   that correct, Mr. Strickland?
```

1          MR. STRICKLAND:  That's correct.

2          SEN. URESTI:  And what I'm trying to do

3   is draw the distinction and to kind of follow on what

4   Dean Whitmire mentioned earlier, draw a distinction

5   between the different -- State of Georgia, which I

6   know is a beautiful state, and Texas, specifically

7   with regard to the geographical area that is included

8   in both the states.

9          Would you agree with me that distance

10  could become a barrier with regard to obtaining an

11  individual's photo ID?

12         MR. STRICKLAND:  I suppose it's

13  possible.  As I pointed out in my testimony, we don't

14  have as many counties as you do, but we are the second

15  largest in number of counties, with 159.  So we have

16  159 locations where a free photo ID can be obtained if

17  people don't already have some form of photo ID.

18         SEN. URESTI:  Well, and I think the

19  biggest distinction would be, though, even though you

20  have 159 counties and we have 254 counties, is the

21  fact that Georgia, although I believe is a large

22  state, compared to Texas is a much smaller state, I

23  looked up Fulton County, which I understand is

24  Georgia's largest county, and the square mileage for

25  Georgia (sic) County is 520 miles.  Is that correct?

1            MR. STRICKLAND:  I'm sorry.  I didn't

2    understand that question.

3            SEN. URESTI:  The size of Georgia -- I

4    beg your pardon -- of Fulton County is 529 square

5    miles.  Is that true?

6            MR. STRICKLAND:  Yes, I believe that's

7    correct.

8            SEN. URESTI:  And, in fact, the size of

9    Georgia, the State of Georgia, is 59,424 square miles.

10   Is that correct?

11           MR. STRICKLAND:  Yes.  It's the largest

12   state east of the Mississippi River.

13           SEN. URESTI:  And the reason I point

14   that out -- and I don't know if you heard my testimony

15   earlier when I was talking to Sen. Fraser.  And, in

16   fact, as a backdrop to my questions was the size of my

17   senatorial district, which is almost the size of the

18   State of Georgia.  The size of my senatorial district

19   graphically is 55,000 square miles, and the size of

20   the State of Georgia is 59,424 miles.  So you can

21   almost fit the State of Georgia into my senatorial

22   district.

23           And so I throw that out to again ask the

24   question:  Do you believe, now knowing the size of

25   just my district and, of course, the size of Texas,

1    would that be a challenge and, therefore, a barrier to

2    somebody obtaining a photo ID?

3             MR. STRICKLAND:  I suppose it could be.

4    But it seems to me that most people at sometime or

5    other go to the population center where, at least in

6    Georgia, a free photo ID could be issued.

7             And as I think another witness

8    testified, in Georgia, the statistics were that there

9    were six and a half million driver's licenses in place

10    versus about 4,500,000 registered voters.  So I think

11    that demonstrates that a substantial majority of

12    registered voters already had a form of photo ID; in

13    other words, this was not a new requirement, that

14    every voter in Georgia go out and obtain an entirely

15    different kind of photo ID.  It didn't demonstrate

16    that 100 percent of registered voters had a photo ID,

17    just that in my view a substantial majority already

18    did.

19             SEN. URESTI:  And I understand that,

20    Mr. Strickland, though your DPS offices, I assume, are

21    open Monday through Friday, 8:00 to 5:00?

22             MR. STRICKLAND:  Well, we're not using

23    DPS offices; we're using the county voter registrar,

24    which keep normal business hours.

25             SEN. URESTI:  Okay.

1              MR. STRICKLAND:  And most likely they're

2    in the county courthouse of the county.

3              SEN. URESTI:  Would it concern you,

4    though, if, in my district at least, some of the

5    counties, they have their DPS offices only open one

6    day a month?  Do you think that would be a barrier for

7    somebody obviously trying to obtain their photo ID?

8              MR. STRICKLAND:  Well, it certainly

9    could be.

10             SEN. URESTI:  Mr. Strickland, I

11   appreciate it, and thank you very much.  And welcome

12   to Texas.

13             MR. STRICKLAND:  Thank you, Senator.

14             SEN. DUNCAN:  Thank you, Mr. Strickland.

15   There are no other members queued up to speak, so you

16   will be excused.  Appreciate your testimony.

17             MR. STRICKLAND:  Thank you, sir.

18             SEN. DUNCAN:  The Chair calls Mr. Adam

19   Skaggs.

20             MR. SKAGGS:  Thank you, Mr. Chairman.

21   Thank you, Senators, for giving me the opportunity to

22   speak with you today.

23             SEN. DUNCAN:  Mr. Skaggs, if you would,

24   let me do a little housekeeping.  I think we have

25   Exhibit 24, which is your written testimony.  Is that

408

1    correct?

2                    MR. SKAGGS:  Yes, sir.

3                    SEN. DUNCAN:  Okay.  We'll go ahead and

4    put that in the record.

5                    (Exhibit No. 24 marked and admitted)

6                    SEN. DUNCAN:  And then if you will state

7    your name and who you represent.  You have 10 minutes.

8                    **TESTIMONY BY ADAM SKAGGS**

9                    MR. SKAGGS:  Certainly.  Thank you,

10   Mr. Chairman.

11                   My name is Adam Skaggs.  I am counsel at

12   the Brennan Center for Justice at NYU School of Law in

13   New York City.  Brennan Center is a non-profit,

14   non-partisan public policy and legal advocacy

15   organization, and we focus on fundamental issues of

16   justice and democracy.  Among other things, we promote

17   policies that ensure fair and accurate elections and

18   that maximize citizen participation in the electoral

19   process.  Our work toward these goals has included

20   extensive research and the publication of studies and

21   reports, assistance to state and federal policymakers

22   and advice on electoral legislation and, when it's

23   become necessary, participation in litigation to

24   protect the fundamental right to vote.

25                   As part of this work, we have paid

1    particular attention to the debate over strict voter

2    identification policies.  We've commissioned research

3    on the number of citizens who lack documentary proof

4    of identity, and we have participated as an amicus in

5    litigation over strict voter ID policies in Indiana,

6    Georgia, Arizona and Albuquerque, New Mexico.

7              A central part of these efforts has been

8    our research on allegations of voter fraud.  We've

9    analyzed claims of rampant voter fraud in order to

10   distinguish unfounded and exaggerated tales of fraud

11   from reliable, verified claims of election misconduct.

12             We published the results of this

13   analysis in a monograph entitled "The Truth About

14   Voter Fraud," which compiles methodological flaws that

15   have led to allegations of voter fraud and debunks

16   baseless -- though often repeated -- reports of voter

17   fraud.  In my testimony today, I want to share some of

18   our findings.

19             Our findings illustrate the SB 362 makes

20   little sense as a matter of policy, for three reasons.

21   First, SB 362 does not fix any notable problem that

22   Texans have experienced.  Second, to bolster their

23   case, supporters of SB 362 cite a number of problems

24   that the bill would not correct and would not address,

25   and that misleads the public into thinking that the

1   proposal would accomplish more than it ever possibly

2   could.

3              The last and perhaps the most important

4   reason that SB 362 is likely to create problems, the

5   problems it creates are going to be far worse than the

6   single problem that it even has the potential to cure.

7   Some of my colleagues have already discussed that

8   third issue.  I'll focus my testimony on the first

9   two.

10              Because we have found virtually no fraud

11  of the type that a voter identification requirement

12  could fix, the Brennan Center is frequently charged

13  with denying the existence of voter fraud.  This is

14  inaccurate, and I want to state that this evening with

15  absolute clarity.  Unfortunately, some forms of

16  election fraud and misconduct do occur with some

17  frequency.  Last year, for example, as in the past,

18  there were repeated instances of voter misinformation

19  and intimidation, such as when voters were told

20  erroneously that they would be arrested if they tried

21  to vote and had any unpaid parking tickets, or when

22  voters were given misinformation about where they

23  could vote, where their precincts were, the hours they

24  were open.

25              We've seen repeated instances in which

1    election officials, without justification, have denied

2    registration to individuals who are eligible to

3    register and vote.  In the last year, for instance, we

4    saw this problem with college students in a number of

5    different communities.  Occasionally we've seen

6    individuals offer to sell their votes, and we've seen

7    individuals vote in jurisdictions in which they do not

8    reside.

9            And there have also been confirmed

10   examples of fraud and misconduct involving absentee

11   ballots.  Some of this fraud has involved coercion or

12   bribing of absentee voters.  Some of these instances

13   have involved schemes to submit multiple fraudulent

14   absentee ballots.  All these acts should be and must

15   be condemned.  When it exists, election fraud and any

16   kind of electoral misconduct should be investigated

17   and it should be published, and it often is.

18            Finally, I want to just observe that

19   there are some examples of mistakes made by

20   individuals who register to vote when they're not

21   eligible but without realizing that they're

22   ineligible.  We saw examples in Arizona, for example,

23   where individuals who were applying to become citizens

24   and who had received letters from the immigration

25   authorities congratulating them and telling them that

412

1    their application for citizenship had been approved,

2    registered to vote but before they had actually

3    formally taken the oath of citizenship.

4            And we saw an example in Wisconsin where

5    somebody showed up to vote, presented his prisoner

6    identification card that had the word "OFFENDER"

7    stamped in bold face across the face of it, and that

8    individual was actually allowed to vote.

9            Now, that's unfortunate.  Obviously,

10   that individual shouldn't have been able to vote, and

11   those folks who hadn't completed the application for

12   citizenship should not have been registered.  But

13   these are examples of error; they're not examples of

14   anyone trying to misrepresent their status or trying

15   to intentionally commit fraud.  These folks shouldn't

16   be allowed to register to vote.  But publicizing the

17   eligibility requirements and training poll workers is

18   a far more effective answer to those issues, those

19   human errors, than it is to require every single

20   eligible citizen in the state to present documentary

21   proof of identification of the sort that's proposed

22   here.

23           As to allegations of other types of

24   voter fraud, including many of the ones we've heard

25   discussion about today, our research has indicated

1    that these claims proved baseless in all but the most

2    limited exceptions.  Except in the rarest of cases,

3    these involve crying wolf.  This is true of the most

4    frequently reported forms of punitive voter fraud --

5    double voting, voting in the names of dead people and,

6    most importantly, for the purposes of this hearing,

7    impersonation of registered voters at the polls.

8              Our exhaustive research reveals that

9    there is little to no credible evidence of

10   impersonation fraud in Texas or anywhere else in the

11   country, and that's the only form of misconduct that

12   this proposal would address.  This is worth repeating:

13   The only problem that a voter ID requirement like SB

14   362 could possibly fix doesn't exist.  Texans are

15   struck and killed by lightning more often than

16   impersonation fraud occurs, and there are far, far

17   more reports of UFOs every year than there are

18   instances of impersonation at the polls.

19             There are a number of reasons why

20   reports of fraud, impersonation fraud at the polling

21   place occur, but that they crumble when they're

22   subjected to scrutiny.  First, a number of these

23   claims are based on attempts at data matching.  We've

24   heard a bit about this today.  This is when you

25   attempt to use computerized matching of data from the

1    voter rolls against some other source of data; for

2    example, death records.  And because of problems with

3    this data matching, the protocols that are used, it

4    often results in false positives, false indications of

5    somebody on the vote rolls who is also on one of these

6    lists.

7            For example, if matching is conducted

8    without controlling for a suffix like "Jr.," then John

9    Smith, Jr., may be thought to be the same person as

10   John Smith, Sr., who has died, and that will result in

11   a false report of somebody casting a vote in the name

12   of someone who is ineligible.

13           In Florida in 2000, we saw a matching

14   protocol used that only required a match of 80 percent

15   of the letters in the last name.  So, for example,

16   someone with the last name of Ellis would be matched

17   with someone with the last name of Ellison.  20,000

18   voters, more than 20,000 voters were purged from the

19   rolls in that instance, and many of them were

20   frequently revealed to be inaccurate.

21           There are also a number of erroneous

22   reports of impersonation fraud that result from

23   clerical errors either on the part of poll workers or

24   on the part of the voter, such that when somebody

25   signs their name on the wrong line next to a voter

415

```
 1    with a very similar name or when a poll worker at the
 2    end of the day scans the wrong bar code for a voter
 3    and ends up recording erroneously that somebody voted
 4    when they didn't.
 5              Both of these sorts of problems turned
 6    up in the claims of impersonation fraud that were
 7    lobbed about before the 2008 election by the Texas
 8    Watchdog website.  They had a big story with a
 9    dramatic headline -- "Dead Voters Cast Ballots in
10    Dallas County" -- and they provided 48 specific votes
11    that were questioned.  Poll books and signature
12    rosters were available for 47 of these.  And after a
13    very careful review, the Dallas Morning News concluded
14    that none involved a fraudulently cast vote.
15              So there are numerous since-debunked
16    reports of voter fraud, and these reveal that there
17    are very few, little to no examples of any confirmed
18    impersonation fraud.  That's not for lack of trying.
19    You've heard about the five-year investigation by the
20    Department of Justice which failed to charge any
21    individual with impersonation fraud.
22              Here in Texas, Attorney General Abbott
23    spent two years and $1.4 million fighting voter fraud,
24    didn't indict a single person for impersonation fraud.
25    There are obvious reasons -- I just want to mention
```

TX_00004293

1    the obvious reasons why impersonation fraud occurs so

2    rarely, if ever.  The risk of getting caught for

3    attempting this crime is particularly high.  The

4    penalties are very strict.  And there's hardly any

5    payout.  Under federal law, anybody that attempts this

6    is subject to imprisonment for five years, fine of

7    $10,000.  Under Texas law, that's 10 years in prison.

8    And if you're not an American citizen, you'll be

9    deported if you try and get away for this.

10            And bear in mind, the payoff for this is

11   extremely limited -- one single vote.  If you were

12   really intent on defrauding the electoral system,

13   would you not choose a crime that gave you more bang

14   for the buck?  Or would you risk 10 years in jail and

15   a $10,000 fine to, as we heard earlier today, go over

16   to your neighbor's house, steal their voter

17   certification out of their mailbox and then attempt to

18   cast a ballot in that person's name?

19            I think the answer to that is obvious,

20   and I think that goes a long way in explaining why

21   impersonation fraud rarely, if ever, occurs in spite

22   of all the heated and ultimately misguided rhetoric

23   that we hear on this issue.

24            I see that my time is up, so I will end

25   there and would welcome any questions.  Thank you.

1          SEN. AVERITT:  Sen. Davis, for what

2     purpose?

3          SEN. DAVIS:  May I please ask questions

4     of this witness?  Thank you, Mr. President.

5          **QUESTIONS FROM SENATE FLOOR**

6          SEN. DAVIS:  Mr. Skaggs, I have a few

7     follow-up questions for you.  And thank you for being

8     here and for your testimony before this body today.

9          What did the Brennan Center's 2006

10    national survey show about the percentage of people

11    who cannot prove citizenship or who lack government-

12    issued photo ID?

13          MR. SKAGGS:  Well, it concluded a number

14    of things.  First of all, the basic conclusion was as

15    many as 11 percent of U.S. citizens.  And according to

16    census data at that times, that's more than 20 million

17    individuals didn't possess government-issued photo

18    identification.  So that's the baseline, and that's

19    consistent with research that a number of other

20    studies have concluded.

21          But I think as much as that is an

22    alarming figure and as much as a 10 or 11 percent

23    figure would suggest, an unacceptably high number of

24    Texans who lack the kind of government-issued

25    documentary identification that will be required under

418

1    SB 362, as much as the gross figures are cause for

2    alarm, the distinctions within that data are equally

3    alarming.

4               For example, elderly citizens are much

5    more likely to lack the kind of government-issued

6    identification that would be required under this bill.

7    18 percent, our survey found, of American citizens

8    above the age of 65 did not have government-issued

9    photo ID.   That's true of photo ID.

10              And we've also heard anecdotally this

11   afternoon, or this evening, that many senior citizens

12   living, for example, at assisted living facilities

13   also lack a number of the non-photo forms of

14   identification that this bill could contemplate.   They

15   may not have utility bills in their name.   They may no

16   longer have bank statements.   Certainly pay stubs

17   often they wouldn't have.   So that's a concern for

18   seniors.

19              Minority citizens, citizens of color are

20   also disproportionately likely to lack these sorts of

21   government-issued identification documents.   Our

22   survey found that 25 percent of African-American

23   citizens lacked the sort of ID that we're talking

24   about here.

25              And finally, the other issue of concern

419

```
1    which we've heard about today is that citizens with
2    low incomes are much, much more likely to lack the
3    sorts of ID that we're talking about.  Our survey
4    found that citizens making less than $35,000 per year
5    are more than twice as likely to lack
6    government-issued identification as citizens making
7    more than that.  And we've heard already today in
8    testimony from some of my colleagues about the huge
9    number of Texans who fall beneath that income level.
10             SEN. DAVIS:  With that being said, how
11   is it that voter fraud is not a problem, if both the
12   U. S. Department of Justice and the Texas Attorney
13   General have launched widespread investigations and
14   prosecutions of voter fraud?
15             MR. SKAGGS:  Well, I think it's
16   important to be careful about the term we use here.
17   And I think it goes a bit far to say that voter fraud
18   isn't a problem.  I think -- certainly I've tried to
19   make clear in my testimony that there are numerous
20   types of fraud that are problematic, that do cause
21   real threats to the integrity of our electoral system.
22   And I would encourage this body to take up some
23   policies that might address those sorts of things:
24   Voter intimidation, misinformation, denial of the
25   right to register to citizens based on illegal
```

1    reasons.

2              I think the point I'm trying to make is

3    that the form of fraud, the only form of fraud that's

4    at issue here with a big little SB 362, the

5    impersonation of a registered voter at the polls is

6    not a problem.  It simply doesn't occur with any

7    frequency that would be sufficient to justify a bill

8    like this that has the potential to disenfranchise

9    many thousands of Texans.

10             So it's not fair really to say that

11   voter fraud isn't a concern.  It's simply important, I

12   think, to speak in specific terms without generalizing

13   and muddying the waters, because when you're talking

14   about a bill like this that has the real potential to

15   disenfranchise many, many eligible Texas citizens,

16   it's got to be justified by something important.  It's

17   got to be justified by a real problem, and that just

18   isn't the case here.

19             SEN. DAVIS:  And in the State of Texas,

20   with the Attorney General investigations, can you

21   point to, given the result of those investigations,

22   the failure to demonstrate a problem with voter

23   impersonation?

24             MR. SKAGGS:  Well, I think the results

25   of that investigation that I referred to by Attorney

```
 1    General Abbott, as well as the national investigations
 2    that the Department of Justice has sort of inspired
 3    and that U.S. attorneys across the country have
 4    focused their efforts on, I think the results of those
 5    speak for themselves.
 6              They have in the end uncovered
 7    wrongdoing and misconduct surrounding elections.  They
 8    have indicted folks for such things as vote-buying
 9    schemes, campaign finance irregularities, a number of
10    different sorts of crimes of the sort that just aren't
11    addressed by a voter identification law of the sort
12    that we're talking about tonight.
13              So the fact that these huge substantial
14    resources were put into these efforts, the amount of
15    publicly, the amount of effort, and though they came
16    up with certain problems that aren't at issue tonight,
17    they couldn't come up with a single indictment for
18    anybody who was actually guilty of impersonation fraud
19    I think speaks for itself.
20              SEN. DAVIS:  And in your opinion, does
21    the Senate Bill 362 that's before us today address any
22    of the issues of fraud that were uncovered by the
23    Texas Attorney General in that lengthy investigation?
24              MR. SKAGGS:  No.
25              SEN. DAVIS:  Now, regarding the Indiana
```

1    case and the Supreme Court case, no party or amicus

2    cited even one case of impersonation at the polls in

3    Indiana, to the Supreme Court.  Would it surprise you,

4    Mr. Skaggs, to learn that more Indiana voters have

5    been disenfranchised by the law in the last two years

6    than the number of reported cases of impersonation at

7    the polls cited to the Supreme Court or from anywhere

8    in the country in the last two decade?

9              MR. SKAGGS:  No, I don't think that's

10   surprising.  I think it's entirely consistent with the

11   point I was making earlier, that for all the rhetoric,

12   there's just not -- there's not any record of any

13   impersonation fraud.  You're absolute right.  During

14   the briefing presented to the Supreme Court -- and

15   there were briefs presented not only by the parties

16   but by dozens and dozens of groups on both sides of

17   the issue from all over the country, the Brennan

18   Center being one of those -- not a single one of the

19   briefs that were submitted had any confirmed evidence

20   of impersonation fraud.

21             But one of the groups in Indiana, the

22   Marion County Election Board, which was actually one

23   of the parties to the case, presented a brief in which

24   they represented to the Supreme Court that during the

25   2000 election, during some local elections in 2000, in

1    that one single county, in Indiana, Marion County,

2    32 voters cast ballots that were rejected, ballots

3    that didn't get counted because the voters had failed

4    to comply with the voter ID requirements.

5              And that's not unique to Indiana.  If I

6    could expand on that, we heard a moment ago about some

7    of the numbers out of Georgia, the 33 voters that had

8    their votes thrown out because they lacked ID in 2007.

9    And we heard that that, in the 2008 primary, was up to

10   254, 254 Georgians who, because they lacked a

11   government-issued ID of the sort that was required,

12   had their votes thrown out.

13             The gentleman who testified before me

14   said he was unfamiliar with those figures which were

15   published, among other places, in a Brennan Center

16   report.  He may be more familiar -- if he's not

17   familiar with Brennan Center's report, he might be

18   more familiar with the Houston Chronicle which just

19   this morning undated those figures with figures from

20   the 2008 General Election.  So we saw in the primary

21   last year 254.  During the general election, that

22   number rose up to 700 Georgia voters, more than 700,

23   who had their votes go uncounted because they were

24   unable to comply with these ID requirements.

25             Now, we also heard that out of I believe

1    it was 93 voters who showed up at the polls did their

2    honest best to try and cast a ballot, were forced to

3    vote a provisional ballot and that only one of those

4    individuals came back after the fact to actually

5    present the identification that was required.  So

6    that's 92 out of 93 that had their votes cast away.  I

7    don't think that's good math, that that many -- I

8    don't know what that is -- 98 percent, 97 percent.  I

9    don't know what 92 out of 93 is -- but that that many

10   voters who cast their provisional ballot would have

11   their votes cast out I think should not be cause for

12   comfort, it should be cause for alarm.

13            MR. DAVIS:  I think you're probably very

14   well aware of the fact that those of us on this Senate

15   floor who are concerned about the impact of adopting a

16   bill like Senate Bill 362 is the risk of

17   disenfranchising honest citizens in the State of Texas

18   and taking away from them the very precious right to

19   vote.

20            Given the numbers that you provided a

21   moment ago in terms of those who have been turned away

22   who were legally able to vote and, yet, under the new

23   photo ID requirements were not allowed to vote, how do

24   those numbers compare, those disenfranchised numbers

25   compare to real-world evidence in those particular

TX_00004302

425

1    states of voter impersonation that was documented to

2    be happening at their polls?

3                 MR. SKAGGS:  Well, one side of the

4    ledger, we've got -- in one case 33 in Fulton County,

5    92 in the State of Georgia last year -- over 700.

6    That's on one side of the ledger.  Those are just

7    votes that were tossed out because of this

8    requirement.  On the other side we have zero.  So the

9    balancing act is pretty clear if you ask me.

10                Now, it may be true that 92 or 93 votes

11   out of 400,000 is a pretty small percentage.  I don't

12   think any of us would argue that.  I would argue that

13   92 people having their votes thrown out because they

14   lacked some sort of government identification is

15   completely unacceptable.  But that said, it is true

16   that in Georgia they did have an opportunity, even

17   though none of them took advantage of it, to show up

18   within a couple of days afterward and present some

19   sort of identification.  Maybe they didn't show up to

20   do that because they weren't told clearly that they

21   had to do it.  Maybe they didn't do that because they

22   didn't have the time or they didn't have the ability

23   to get off work to make many extra trip.  And maybe

24   they just didn't have the documentary proof, so maybe

25   that's the reason.  We don't know.  As we heard, there

TX_00004303

426

```
 1    was no investigation done as to why those 92 people
 2    were disenfranchised.  We don't know.  But at least in
 3    Georgia, they had the opportunity to present that
 4    identification and have their vote count, even if only
 5    one of them did it.
 6              It's interesting to me to hear just a
 7    few minutes ago that Texas' provision for provisional
 8    balloting is somehow less burdensome than what is the
 9    policy in Georgia, because in Georgia at least these
10    voters are given the chance to make their vote count,
11    by coming in.  Now again, it's difficult apparently
12    for them to do it.  Most of them don't.  At least they
13    have the opportunity.
14              This bill that is under consideration
15    tonight has no such provision.  So a voter who doesn't
16    have the identification at the poll and is forced to
17    vote a provisional ballot under SB 362 has no
18    opportunity to show up and provide evidence to get
19    that vote counted.  So it's hard for me, I guess, to
20    conceptualize how something would be less burdensome
21    that categorically gives you no chance of having that
22    provisional ballot get counted.  To me that's not a
23    provisional ballot; that's a placebo ballot.
24              SEN. DAVIS:  Very good point.
25              Also, Mr. Skaggs, voter ID advocates
```

1    cite studies that attempt to show voter ID laws do not

2    suppress turnout, and they even try to claim that

3    turnout increases in Indiana and Georgia were caused

4    by the voter ID laws.  What are your thoughts on that

5    claim?

6              MR. SKAGGS:  You know, again, I suppose

7    it's a good rhetorical point for proponents of such

8    policies, but I think it's a specious argument, and it

9    just doesn't withstand any kind of scrutiny,

10   statistically or otherwise.  Any social science

11   methodology would suggest that those studies are

12   completely incredible.

13             Bear in mind that the main study we're

14   talking about that the first witness here this evening

15   discussed concluded that voter ID policies in Georgia

16   and Indiana actually drove voter turnout up, that

17   there was a casual relationship between adopting these

18   strict ID policies and turnout going up.  And it came

19   to its conclusion by comparing Indiana with Illinois

20   and Georgia with Mississippi.

21             When asked about the possible

22   methodological flaws, Mr. von Spakovsky said, "We

23   controlled for any impact that Barack Obama's presence

24   on the ticket would have had in skewing this data,

25   because then Sen. Obama was not only on the ticket --

1   on the ballot in Indiana and Georgia, but he was also

2   on the ballot in Illinois and Mississippi.  And that's

3   true insofar as it goes, but I don't think that goes

4   very far in explaining why we should give any

5   credibility to these studies.

6          What these studies didn't take account

7   of at all is the status of these states, the swing

8   states, the status of these as hotly contested

9   elections.  There was no controlling for the amount of

10  advertising that was run in Indiana versus Illinois.

11  There was no taking account for number of candidate

12  appearances in Indiana versus Illinois of Georgia

13  versus Mississippi, the number of ads run by the

14  campaigns that are ads run by other interested groups.

15         So any study that fails to take account

16  this sort of intense mobilization efforts that were

17  poured into these states as compared to states,

18  Mississippi and Illinois, that one campaign had

19  essentially conceded and were ready hardly contested

20  at all because the results were a foregone conclusion,

21  any study that doesn't look at those factors -- the

22  amount of mobilization, the amount of money spent by

23  the campaigns and others -- is simply incredible.

24         Now, I'm not suggesting that changes in

25  turnout were caused specifically by the number of

1    appearances that the candidates made or their proxies

2    or the amount of advertising that either of the

3    campaigns put up.  But what I am suggesting is that

4    first, those are much more I think credible

5    explanations of why voter turnout went up in those two

6    states and, secondly, that we simply can't -- the

7    point is that you can't prove what the causation was

8    in any of these cases.  There are too many factors.

9    The studies that have been conducted are far too

10   crude.

11            So if there is any single take-away, I

12   would just suggest that any of these claims that voter

13   turnout actually goes up because of strict voter ID

14   requirements and some resulting increase in confidence

15   amongst the voting population should just simply be

16   looked at with a tremendous amount of skepticism.

17            SEN. DAVIS:  Are you aware in your work

18   on behalf of the Brennan Center, are you aware of any

19   empirical data -- exit polling, surveys or

20   otherwise -- in which people were asked whether their

21   appetite for voting indeed increased by virtue of the

22   passage of photo ID laws in the states in which

23   they're voting?

24            MR. SKAGGS:  I am aware of one study in

25   particular on that subject.  We've heard about it from

1    a couple of the folks that have testified here before

2    this me evening, and that's a study that was published

3    in the Harvard Law Review not long ago.  And the

4    conclusion that that came to was that there was simply

5    no correlation, there was no increase in voting based

6    on any feelings of the possibility of fraud or the

7    possibility that fraud would be addressed by voter ID.

8              MR. DAVIS:  Do you think it might be a

9    more valid analysis to compare states with and without

10   photo ID requirements over a period spanning several

11   election cycles in the same -- or the same national

12   election cycle in order to determine the impacts of

13   voter ID?

14             MR. SKAGGS:  I think it would.  And I

15   think -- I'll echo an observation made by Dr. Moore

16   earlier this evening which is that it's a shame that

17   the empirical data is not there to the extent it could

18   be.  And I think studies of the sort that you've just

19   described, Senator, would be very helpful in that

20   regard.

21             The one thing I would add to the sort of

22   proposed research that you talked about would be

23   factors such as candidate campaign mobilization, the

24   number of resources that were poured into the states.

25   I think the more variables that you can plug into

431

1    these studies that look at issues that actually have

2    an impact on voters being mobilized, the more accurate

3    the data would be.

4             SEN. DAVIS:  I want to ask you for a

5    moment about claims that are made that support the

6    argument for voter ID.  I would like to hear your

7    thoughts on claims that are made by voter ID

8    supporters that suggest that thousands of dead people

9    or non-citizens are registering and possibly voting.

10            MR. SKAGGS:  Well, we hear these sorts

11   of claims all the time.  And what a detailed analysis

12   of these claims proves again and again and again is

13   that there is no "there" there.  These are erroneous

14   reports.  The biggest reason why we have these sorts

15   of claims and why they ultimately fail when they're

16   scrutinized is the data-matching that I talked about

17   earlier, the attempt to compare voter lists, list of

18   voters who cast ballots against lists of dead people

19   or felons, for example, that in many states are

20   disenfranchised.

21             And what we see again and again is that

22   initial data-matching comes up with huge numbers,

23   thousand of voters, and that when resources are

24   dedicated to actually going record-by-record and

25   case-by-case and match-by-match and investigating

1   this, it ends up that virtually all these fall away.

2                One of the most well-known examples is

3   an article in the <u>Atlanta Journal-Constitution</u> that

4   came out with a huge dramatic headline that over 5,000

5   dead voters had voted in Georgia over a number of

6   years.  And the specific example that was cited in

7   that article was a gentleman by the name of Allen J.

8   Mandel, M-a-n-d-e-l, who was decreased and who the

9   article claimed someone had definitely voted in his

10  name.

11               An investigation was conducted and it

12  turned out there was actually an Allen J. Mandell,

13  M-a-n-d-e-l-l -- two l's as opposed to one -- who was

14  very much alive and well, and he was actually the

15  gentleman that cast a vote, eligible citizen, no

16  wrongdoing at all.

17               But these sorts of claims, this 5,000

18  number was latched onto by elected officials,

19  advocates, partisans, and was repeatedly trumpeted.

20  And, of course, once the careful analysis is done and

21  once each of these cases is looked at and it turns out

22  that, in fact, there really is no problem, oftentimes

23  those reports and those studies don't get as much air

24  play.

25               SEN. DAVIS:  You've mentioned the

1    Indiana experience in your comments and in your

2    answers to my questions today.  But even Appeals Judge

3    Posner, an outspoken conservative appointee, said in

4    his Opinion upholding the Indiana photo ID law -- and

5    I quote him -- "No doubt, most people who don't have

6    photo ID are low on the economic ladder and, thus, if

7    they do vote, are more likely to vote for Democratic

8    than Republican candidates.  Thus, the new law injures

9    the Democratic Party by compelling the party to devote

10   resources to getting to the polls those of its

11   supporters who would otherwise be discouraged by the

12   new law from bothering to vote," end quote.

13          His comment seems to illustrate why

14   Republicans use voter fraud claims to justify vote

15   suppression activities that date back decades and that

16   continue today.  Do you know of any evidence of

17   systematic voter fraud to contradict findings from

18   academic studies that suggests that the only real

19   reason for the photo ID push is to provide Republicans

20   a partisan advantage?

21          MR. SKAGGS:  I don't.  The answer would

22   be no.  I don't pretend to understand why certain

23   folks would support theses policies.  There's

24   certainly some obvious explanations of the sort that

25   you just gave.  But I think Judge Posner was actually

434

1    right in the selection that you read.  I think where

2    he was wrong was when he went on later in the Opinion

3    to say, "And that's not a problem."  That's where I

4    disagree with him.

5              And I don't disagree with Judge Posner,

6    because I think anything that hurts the Democrats

7    should be rejected.  That's not why I disagree with

8    him.  My fundamental disagreement is because there is

9    a certain cavalier attitude towards any sort of policy

10    that disenfranchises people as long as it's just a

11    small number of them.  And I don't think 92 notes or

12    33 notes or 700 votes is an acceptable number of

13    voters to be disenfranchised, particularly when the

14    excuse for doing so just doesn't hold any water.

15              SEN. DAVIS:  Thank you very much for

16    your testimony and your answer to my questions.

17              I have no more questions for this

18    witness, Mr. President.

19              SEN. DUNCAN:  Thank you, Mr. Skaggs.

20    There are no other members queued up, so you are

21    excused.  Thank you for your appearance here today.

22              MR. SKAGGS:  Thank you, Mr. Chairman.

23              SEN. DUNCAN:  The Chair calls Wes

24    Tailor.

25              Mr. Tailor, you have 10 minutes.  Let me

1    introduce your written testimony first.  I've got an

2    Exhibit 25, which is the written testimony of Robert

3    Simms.  Is that --

4                    MR. TAILOR:  Yes, sir.  That's our

5    Deputy Secretary of State.

6                    SEN. DUNCAN:  Okay.  Would you

7    explain -- well, go ahead and state your name and who

8    you represent.

9                    MR. TAILOR:  Yes, sir.  My name is Wes

10   Tailor.  I am the Elections Director for the State of

11   Georgia, and I was appointed to that position by the

12   Secretary of State.

13                   SEN. DUNCAN:  And you have given us

14   Exhibit 23 -- or 25, rather -- as the written

15   testimony of Robert Simms, the Georgia Deputy

16   Secretary of State, before the United States Committee

17   on Rules and Administration.  We'll submit that to the

18   record.

19                   (Exhibit No. 25 marked and admitted)

20   **TESTIMONY BY ROBERT A. SIMMS (SUBMITTED BY WES TAILOR)**

21                   MR. TAILOR:  Thank you.

22                   Well, thank you-all very much for having

23   me in the great State of Texas.  I will try not to

24   take up too much of your time.  Obviously, I can't,

25   since I only have 10 minutes.  But I did want to

TX_00004313

436

1    describe Georgia's experience with our photo ID law.

2    And, obviously, it is up to you as legislators in the

3    great State of Texas to decide whether that experience

4    in Georgia has application for the voters in Texas

5    while you consider this bill.

6                    One of the things that you may want to

7    consider is that I am an actual elections

8    administrator.  I have administered several elections

9    under a photo ID statute.  In Georgia, prior to the

10   implementation of our photo ID law in August of 2007,

11   voters could use, actually much like this current

12   Texas bill, 17 forms of voter identification when they

13   were voting in person.

14                   The current statute allows generally in

15   Georgia six forms of photo identification:  A driver's

16   license, a U.S. passport, government employee photo

17   identification, a valid federal or state government

18   photo ID, a military photo ID or a tribal photo ID.

19                   If a voter shows up at the polls, much

20   like has been discussed here, and they do not have one

21   of those appropriate forms of ID, they may cast a

22   provisional ballot and return within two days after

23   the election to verify their information or verify who

24   they are, at which point their ballot would be

25   counted.

437

1        And I'm going to take issue right here

2   with the previous testimony talking about provisional

3   ballots and the allowance of provisional ballots and

4   the failure of people to then either return to the

5   registrar's office, as disenfranchisement.  That is

6   not disenfranchisement.  Those people -- everyone in

7   Georgia is allowed the ability to cast a vote.

8        Now, with the provisional ballots, under

9   federal statute, however a provisional ballot is cast,

10  there is an opportunity to then verify the individual

11  or verify the information.  That's true in Georgia.

12  Those people were not disenfranchised; they were given

13  every opportunity to have their vote count.  Now, why

14  they didn't return, we don't know yet.  That is true.

15  But to say it's only because that they couldn't get a

16  ride, we don't know.  They could have not been the

17  people that they said they were when they arrived at

18  the polls, but we don't know that at this point.

19       Now, the entire State of Georgia has

20  been set as a Section 5 state, and DOJ did pre-clear

21  our current statute.  I will note, by the way, that

22  DOJ did pre-clear the broader statute which is more

23  akin to the current Texas Senate Bill, back early on,

24  well before 2006.

25       But let me tell you about Georgia's

1    experience with the photo ID.  The arguments that have

2    been raised are numerous, that in-person voter fraud

3    doesn't exist or it's not such a problem that you

4    should think to address it.  Well, I can tell you, as

5    an elections official, that I take voter fraud very

6    seriously.  I also take each and every person in

7    Georgia's ability to cast a vote very seriously.  I

8    would equal and hold those two on equal footing.

9               And what we have found in the

10   administration of photo ID in Georgia is that it does

11   not disenfranchise voters, but it does serve as a true

12   barrier to voter fraud, an in-person voter fraud.

13   Another argument that I've heard is that it will place

14   an undue burden on however many people folks have come

15   up with.  In the litigation in Georgia, it was

16   hundreds of thousands of individuals and you've heard,

17   and so I won't go over and belabor that after four

18   years of litigation, the most prominent lawyers in

19   Georgia, one being a former governor, failed to find

20   even one single individual who was unduly burdened by

21   Georgia's photo ID statute.  We've conducted 15

22   elections with photo ID.  Georgia voters have cast

23   more than nine and a half million ballots under photo

24   ID, without a single issue or problem.

25               Looking at the 2008 General Election, we

1    had, as has been stated, the highest turnout we've
2    ever seen, and it was about 700,000 more votes cast in
3    2008 than ever before in Georgia.  By registration
4    deadline, we had 550,000 new voter registration
5    applications in 2008, as compared to 480,000 in 2004.
6            You heard that during the presidential
7    prejudices primary, we had more than one million
8    votes -- or I'm sorry -- 2.2 million votes cast in the
9    presidential preference primary, which was more than a
10   million than we had ever had cast in the presidential
11   preference primary before, with photo ID requirement
12   in place.
13            What's really interesting is that
14   100,000 more ballots were cast for the Democratic
15   candidates than for the Republican candidates.  For
16   the General Election, Georgia has the option to mail
17   in ballots without a photo ID or to show up in person
18   with a photo ID.  92 percent of Georgians decided,
19   elected, chose to show up in person with a photo ID
20   when they had the choice not to do so.
21            Another argument I've heard today is
22   that photo ID requirements place an undue burden on
23   minority and elderly voters, and I've also heard that
24   it places an undue burden on female voters.  Well,
25   I've heard all the reasons why you should discount the

TX_00004317

1    statistics, but let me just give you what Georgia saw,

2    based on 2004 to 2008.

3                Hispanic Latino votes cast went up by

4    140 percent from 2004 to 2008 in Georgia, with photo

5    ID.  Black votes, African-American votes went up by

6    42 percent.  The white vote went up by 8 percent.

7    Those casting votes who were 65 and older went up by

8    24 percent.  And 65 and older voters still make up the

9    single largest category of voters in the State of

10   Georgia.

11               With respect to the increase in voting

12   between male and female voters, male voters, the votes

13   cast increased by about 17 percent, and female voters

14   went up by 18 percent.  So at least on the face of the

15   votes and the number of votes cast with photo ID and

16   without, there was no correlation with a suppression

17   of any votes.

18               The other argument I've heard, that

19   photo ID is designed to favor one party over another.

20   And we'll tell you that in Georgia, we do not register

21   by party.  As I said, in the 2008 presidential

22   preference primary, almost 100,000 more ballots were

23   cast for the Democratic primary than the Republican

24   primary.  In the General Election, Sen. McCain did

25   receive a majority of the votes for president.

1  However, Georgia's sitting Republican incumbent

2  senator was forced into a runoff with his Democratic

3  opponent very close behind in the vote totals.

4              At least from those figures, there does

5  not appear to be a favoritism of one party over

6  another with the photo ID requirement.  I can tell you

7  that Georgia's experience statewide shows that common

8  sense voter ID requirements are needed and do not

9  unduly burden voters.  The arguments against that have

10  been stated here by certain groups do not appear and

11  still do not have any basis in fact and are pure

12  hyperbole and empty rhetoric and are not seen by

13  actual elections administrators on the ground.

14              Thank you.

15              SEN. DUNCAN:  Thank you, Mr. Tailor.

16  There are no members queued up for questions.  I

17  appreciate your testimony.

18              MR. TAILOR:  Thank you.

19              SEN. DUNCAN:  The next witness will be

20  J. Gerald Hebert.

21              Mr. Hebert, if you will approach.  And

22  do you have written testimony?  You do?

23              And just for the record, Exhibit 26 is

24  the written testimony of J. Gerald Hebert and will be

25  submitted to the record.

1          (Exhibit No. 26 marked and admitted)

2          SEN. DUNCAN:  Go ahead and state your

3   name and who you represent.  And you have 10 minutes.

4          **TESTIMONY BY J. GERALD HEBERT**

5          MR. HEBERT:  My name is Joe Hebert, and

6   I'm a voting rights attorney.  I'm also Executive

7   Director and Director of Litigation at the campaign

8   legal center.  Today I am here representing myself.

9          I've spent over 20 years at the U. S.

10  Department of Justice as a federal prosecutor of

11  voting rights cases.  I've taught courses on voting

12  rights at Georgetown Law School and University of

13  Virginia, among other schools.

14          But I want to start my testimony today a

15  little different than most of the other witnesses.

16  I'm going to start by making clear what I think is

17  really going on here with the Texas voter ID bill.

18  You see, this is just the latest in a series of

19  measures taken by Texas Republicans in the state to

20  harm voters within their own state, particularly

21  minority voters being the real targets.  And it was

22  just a few years ago you enacted a redistricting

23  bill --

24          (Applause from the gallery)

25          SEN. DUNCAN:  (Raps gavel)

1           MR. HEBERT:   -- that was aimed at --

2           SEN. DUNCAN:  Just a minute, Mr. Hebert.

3           Any more outbursts, and the persons that

4     are participating in that will be asked to leave the

5     gallery.  Thank you.

6           You can proceed.

7           MR. HEBERT:  In 2003, there was a

8     redistricting bill that was needlessly passed that was

9     aimed at minimizing not only Democratic influence but

10    hurting minority voters.  Republicans in the State of

11    Texas today, and particularly in the Senate, are using

12    their majority status to enact legislation that can't

13    be justified by urgency or need.  Instead, it will

14    simply make it harder for hundreds of thousands

15    perhaps of Texans to vote.

16           They cast aside the bipartisan

17    legislative tradition or rule, the two-thirds rule, to

18    take up this issue so that they can ramrod the voter

19    ID bill down the throats of the minority.  And they've

20    done so even though implementation of a photo ID bill

21    will cost the state millions of dollar.  So you Texans

22    out there, that's where your tax dollars are going to

23    go, to defend the measure before the Department of

24    Justice and in the federal courts and then to

25    implement and approve -- and implement it and

444

```
 1    administer it if it ever is approved.
 2                Now, I realize that saying these raw
 3    partisan politics is largely motivating this is a
 4    pretty serious charge, and so I'm going to take a few
 5    minutes to tell you on what I base them.  First of
 6    all, understand that voter ID bills are of recent
 7    vintage and they've only been enacted in states where
 8    Republicans control the entire process in the state,
 9    they control the Governor's chair, the Senate and the
10    House.  That's where this has come up recently, And
11    it's not by accident.  It's being considered in Texas,
12    as it was in those other states, without policy
13    substance.  There simply is no widespread organized or
14    even occasional voter impersonation fraud in Texas
15    that will be addressed by this bill.
16                Now, I have personal experience with
17    this in Texas, because I filed a lawsuit against Greg
18    Abbott and the Secretary of State challenging their
19    assertions that there was a voter fraud epidemic here
20    in the state.  And guess what?  There isn't.  I've
21    also led Attorney General Abbott to admit that persons
22    that he prosecuted for what he called in various press
23    releases an epidemic of voter fraud -- and they were,
24    by the way, with one exception all elderly black and
25    Latino political activists, and all of them were
```

1    Democrats -- that they hadn't engaged in any fraud at
2    all whatsoever.
3                The particular type of voter fraud that
4    this legislation is purported to address, voter
5    impersonation, is virtually unheard of.  There is
6    considerable evidence -- and you've heard it today --
7    that enacting a voter ID bill will create a series of
8    barriers that make it harder for senior citizens,
9    younger voters, poor people, people of color, women in
10   general, to exercise their right to vote.
11               Now, the fact is that most, if not all,
12   of these groups are growing as a percentage of Texas'
13   voting population, and most of them tend to vote
14   Democratic.  So that skew tends to explain to me the
15   urgency of Republican leadership in pushing this bill.
16   This is about partisan politics and protecting
17   political power and marginalizing your opposition,
18   exactly what you did in the redistricting bill.  And I
19   have personal experience with that as well, because I
20   was one of the lawyers who bought a suit against that
21   and took it to the Supreme Court where we did prove
22   that it discriminated against Latinos in South Texas.
23   That's what this is about.
24               Now, the Republican members of this
25   Senate and in the House, they can go ahead if they

1    want to and choose to use their majority status to
2    waste Texas' tax dollars of hard-working Texans during
3    the short legislative session in this way.  That's
4    their choice.  They have that power.
5              But it's important to realize that the
6    path being taken and the methods used by Republicans
7    have ramification that extend beyond politics.  What's
8    at stake is much bigger than a Republican majority
9    imposing its will on a Democratic majority.
10             The path and method in enacting the
11   photo ID bill is the latest in a long series of
12   relentless attacks on minority voters by this state,
13   which is covered by the Voting Rights Act, because you
14   have a long history of denying minority people the
15   right to vote.  That's a simple fact.
16             Now, Texas, along with other deep south
17   states, has a long dark history of using voting as a
18   way to keep people on the reservation.  Let me give
19   you, however, more recent examples than ancient
20   history involving the office of your current Attorney
21   General who has used his office to manufacture false
22   claims of voter fraud.
23             Take, for example, this:  He created a
24   training manual about main-in balloting to try to go
25   around and inform DAs about how to find voter fraud.

447

1    And on one of his PowerPoint slides, he said, "Hey,

2    they use certain stamps to mail their ballots, these

3    fraudulent people."  And he had a big picture of the

4    stamp, a sickle cell anemia stamp featuring a

5    prominent African-American woman holding her baby.

6    Boy, that's a real subtle indicator, isn't it, of

7    voter fraud and who is committing it.

8                He sent investigators from the Attorney

9    General's office -- get this! -- to peep into the

10   bathroom window of my client, an elderly African-

11   American woman in Fort Worth, when she was coming out

12   of the shower.  And they were there to harass her

13   about whether or not she had helped her neighbors

14   vote.  What a terrible thing to do, help your

15   neighbors to vote if they're shut in and disabled

16   people.

17               The Attorney General here was asked to

18   intervene to help the Prairie View students in Waller

19   County.  In three years he did nothing.  Repeatedly

20   meetings were asked with the Attorney General to ask

21   him to come in and help them.  It took -- get this! --

22   the Bush Justice Department to use Waller County, to

23   step in after two years of inaction by the Attorney

24   General and protect the African-American students at

25   the university.  Ancient history?  No.  2008.

448

1                Now, the cases that were brought against

2      elderly Latino and African-American women by

3      Mr. Abbott, in which he claimed were voter fraud, were

4      the following activities:  They actually had the

5      audacity to go to their neighbors' homes, at the

6      neighbors' homes request, who are often very elderly

7      and disabled people, to pick up their mail-in ballot

8      that had already been sealed and drop it in the mail

9      to them.

10                Notice, I didn't say they marked the

11     ballot for them.  Notice I didn't say that they

12     pressured the neighbor.  They simply mailed a ballot,

13     and then they were prosecuted for vote fraud.  Where

14     is the fraud?  Kind of like the old commercial,

15     "Where's the beef?"

16                And when they stood up and filed a

17     lawsuit saying, "Hey, we weren't -- we didn't engage

18     in voter fraud," Greg Abbott's former Solicitor

19     General, Ted Cruz, put out a press release and said,

20     "Oh, none of their claims have any merit, because

21     they're all a bunch of criminals."

22                Just last week we find the Attorney

23     General's office failed to comply with a proper open

24     records request from Texas legislators who asked him

25     for records about voter impersonation fraud, the

1    so-called target of this bill.

2              And then there is a glaring example --

3    and it's detailed in my testimony -- where you had

4    voter fraud apparently committed in Highland Park, a

5    very rich areas of Dallas, Texas, where, by the way,

6    George Bush and Dick Cheney lived before they went in

7    the While House, where Republicans engaged in voter

8    fraud and the Attorney General was asked to prosecute

9    and investigate by the DA in Dallas, and he failed to

10   do so.  Explain that lack of even-handedness.

11             Now, these recent actions by the

12   Attorney General should serve as an important warning

13   to those of you who are going to vote on this

14   legislation.  This hearing is a sham, just like your

15   redistricting public hearings were a sham.  You said

16   you wanted to listen to the voters, and 90 percent of

17   Texans said, "Don't do redistricting."  Did you

18   listen?  No.  You were hell bent on enacting Tom

19   DeLay's dirty work, because you couldn't stand up to

20   him and pass the bill.

21             Let me say, since I have only a few

22   minutes left, one minute left to say this:  I can

23   assure you that as a former Justice Department

24   official, all of the actions that I just described,

25   along with your procedural departures from the norm,

450

1     such as abolishing the two-thirds rule, not allowing

2     certain rules to be enforced, even though they're in

3     the Texas rules, as Sen. West said this morning, that

4     all of that will come back to haunt you, because those

5     are indicators under a decision called Arlington

6     Heights, in the Supreme Court that really what's going

7     on here is not about good government reform, this is a

8     measure that has as its root an illicit purpose.  And

9     you-all ought to know a lot about that, because it's

10    been going on in Texas for a long time.

11                 Thank you.

12                 **QUESTIONS FROM SENATE FLOOR**

13                 SEN. DUNCAN:  The Chair recognizes

14    Sen. West.

15                 SEN. WEST:  Thank you very much,

16    Mr. Chairman.

17                 Mr. Hebert, as it relates to

18    non-citizens, what about those who claim that

19    non-citizens are on the voters roll and will a voter

20    ID law for voting stop that?

21                 MR. HEBERT:  A photo ID bill will not

22    affect that whatsoever.  Right now you don't have to

23    be a citizen to get a driver's license.  Many people

24    who are non-citizens, if they end up on the rolls --

25    and this has been true in not only Texas, it's true in

1    other states -- that they go to get a driver's license

2    and there is a -- in many places, you automatically

3    get put on the voter registration rolls if you check a

4    box that says, "Do you want this to double as a voter

5    registration application?"  So they end up being on

6    the rolls.

7              Now, there is no indication in most

8    states that these people ever vote.  But if they do,

9    it's usually because someone has given them -- you

10   know, they've gone to the polls and they've been given

11   a registration card.  But it happens so rarely.  The

12   photo ID bill wouldn't affect that at all, because

13   they get a photo ID.

14             SEN. WEST:  You know, there's been some

15   questions raised about whether you need a photo ID to

16   get on an airplane or cash a check.  What is the

17   answer to that question?

18             MR. HEBERT:  You do not need a photo ID

19   to get on an airplane in this country.  In fact, the

20   Department of Homeland Security's TSA office has

21   regulations that they've issued about this.  If you go

22   to the airport and you don't have your picture ID,

23   they will pull you aside, put you in a room, ask you a

24   series of questions, make you sign a statement, and

25   then you will get on the plane.  In fact, I believe

452

1    Dr. Moore who testified earlier today did not have his
2    picture ID with him when he came down here, and he
3    went through that exact procedure.
4              SEN. WEST:  No photo ID?
5              MR. HEBERT:  Yes, no photo ID.
6              SEN. WEST:  How does the legal --
7              MR. HEBERT:  And he was who he said he
8    was, by the way, so he wasn't impersonating somebody
9    else.
10             SEN. WEST:  Okay.  How does the legal
11   standard that the Department of Justice will employ to
12   any Texas voter ID law differ from the legal standard
13   the Supreme Court used to decide the Indiana case?
14             MR. HEBERT:  The Indiana case was a
15   constitutional challenge, what we call a facial
16   challenge to a statute.  In a lawsuit like that -- it
17   didn't even involve race, by the way.  I mean, we
18   haven't said that in all the debate today.  But the
19   Indiana case, there was no allegations that the
20   Indiana bill violated the Voting Rights Act in the
21   Indiana case.  Instead, it was a challenge that the
22   voter ID bill there burdened the fundamental right to
23   vote, in violation of the constitution.
24             It was challenged even before it went
25   into effect, so that's why I always find it amusing

1    that people quote the Supreme Court that say, "They

2    couldn't produce a single case."  Well, of course.

3    They hadn't had an election yet by the time the case

4    was brought to trial and the decision was made.

5              So the legal standard there is that you

6    have to prove that it's an unconstitutional burden on

7    the right to vote, fundamental right to vote.  It's a

8    very high burden, because the state is given

9    considerable latitude when it comes to regulating

10   elections and voting.

11             In the Department of Justice proceeding,

12   the total focus is on race and ethnicity, something

13   that wasn't at issue in Indiana when the case went to

14   the Supreme Court.  There the state, as was reported

15   earlier, bears the burden of demonstrating that

16   enacting a photo ID bill will not lead to a

17   retrogressive effect from minority voters in the state

18   and is not being enacted with a discriminatory

19   purpose.

20             SEN. WEST:  So the Indiana case is not

21   really applicable to Texas?

22             MR. HEBERT:  Not really.  When it comes

23   to the Section 5 pre-clearance process, it really has

24   very little, if any, relevance.

25             SEN. WEST:  Okay.  Now, what relevance

454

1    is it to obtaining Section 5 pre-clearance if the vast

2    majority of minority legislators vote against a

3    particular bill?

4              MR. HEBERT:  Well, there is a Supreme

5    Court case on point now that's called Georgia vs.

6    Ashcroft where Georgia enacted a redistricting plan.

7    And virtually all but I believe one legislator voted

8    against the bill.  And when the Legislature went for

9    pre-clearance, there were arguments made by

10   Republicans, actually, that the redistricting plan

11   violated the voting rights of minorities.

12              And the State of Georgia produced voting

13   records and statements from minority legislators

14   saying, "We support this redistricting plan.  And the

15   Supreme Court, in fact, cited that as evidence that

16   there was not a retrogressive effect and that, in

17   fact, there was no discriminatory purpose.

18              SEN. WEST:  Have you had a chance to

19   look at the draft of the bill that's being proposed?

20              MR. HEBERT:  I have looked at it, yes.

21              SEN. WEST:  In terms of direction for

22   this legislative body, can you kind of give us your

23   assessment of whether or not this, quote unquote,

24   voter ID bill is needed in the State of Texas?

25              MR. HEBERT:  Well, I mean, I know that

455

1    there are no cases -- in fact, I believe the Attorney

2    General's Deputy Attorney General testified just last

3    year that there were no proven cases of voter

4    impersonation fraud that would be addressed by the

5    photo ID bill.  That was testimony that Mr. Eric

6    Nichols gave last year.  I was at that hearing, by the

7    way, and I brought actually his statement, the news

8    articles that quoted him.

9             So I know that that kind of a problem --

10   this is a bill in search of a problem and doesn't

11   really -- in my mind doesn't really address a lot of

12   what is really voter fraud in Texas, which are things

13   like voter intimidation of minorities -- that's voter

14   fraud -- minorities who are being denied the right to

15   vote, because they're being intimidated and harassed

16   by people.  That's voter fraud, and that ought to be

17   the kind of measure that ought to be enacted by the

18   Texas Legislature.

19             SEN. WEST:  All right.  Thank you very

20   much.

21             SEN. DUNCAN:  Sen. Wentworth.

22             SEN. WENTWORTH:  Welcome to Texas,

23   Mr. Hebert.

24             MR. HEBERT:  Thank you, Senator.

25             SEN. WENTWORTH:  Welcome back, I should

TX_00004333

456

1    say.

2              MR. HEBERT:  Yes, sir.

3              SEN. WENTWORTH:  I gathered from your

4    prepared remarks tonight you were critical and did not

5    approve of the Legislature's drawing of Congressional

6    districts in 2003?

7              MR. HEBERT:  I did not.  That's correct,

8    I did not approve of it.

9              SEN. WENTWORTH:  Now, recognizing that

10   you don't live in Texas, you live in I guess either

11   Maryland or Virginia or Washington, D.C., you may not

12   know the answer to these questions and I don't expect

13   you to, but you might, because you're an expert in

14   redistricting matters and have represented folks in

15   redistricting matters in Texas.

16             Do you happen to know how many statewide

17   elected officials are in Texas?

18             MR. HEBERT:  The total number I don't

19   know.  I believe they're all Republicans.

20             SEN. WENTWORTH:  There are 29, and

21   they're all Republicans and they've all been

22   Republicans for over a decade.

23             Do you remember offhand how many members

24   of Congress we had before the 2000 census?

25             MR. HEBERT:  You had 30, I believe.

457

1          SEN. WENTWORTH:  Yes, sir, we had 30.

2     Do you remember the partisan division of those 30?

3          MR. HEBERT:  It was two-thirds Democrat

4     at least.  21/9 I believe.

5          SEN. WENTWORTH:  It wasn't quite that

6     bad; it wasn't quite.  It was 17 Democrats and 13

7     Republicans.

8          MR. HEBERT:  Prior to 2000?

9          SEN. WENTWORTH:  Yes, sir.

10         MR. HEBERT:  Okay.

11         SEN. WENTWORTH:  And as a result of the

12    2000 census, Texas had two new congressional districts

13    added.  So we went from 30 to 32.  And as a result of

14    the redistricting that was done by federal court in

15    2001 and the election, it became 17 Democrats to 15

16    Republicans --

17         MR. HEBERT:  I remember that.

18         SEN. WENTWORTH:  -- in a state that had

19    29 statewide elected Republicans.  We elected George

20    Bush governor, we re-elected George Bush governor, and

21    this state voted for George Bush as President of the

22    United States.  And, yet, this state, even after 2002,

23    was still sending a Democratic majority congressional

24    delegation to Washington D.C., to fight President

25    Bush.  And it didn't seem to those of us in the

TX_00004335

458

1    majority here that that was fair.  And that,

2    Mr. Hebert, is why we re-drew the lines in 2003.

3                MR. HEBERT:  Do you want me to comment

4    on that or are you --

5                SEN. WENTWORTH:  Be pleased to have you

6    comment on it, yes, sir.

7                MR. HEBERT:  I would just make two

8    points, Sen. Wentworth.  One is that it is true that

9    Democrats controlled 17 of 32, as of 2003.  But in

10   probably five of the districts that Democrats held --

11   for example, Ralph Hall, Max Sandlin, Jim Turner,

12   Charlie Stenholm, all Democrats -- in those districts,

13   the Republicans were winning.  The statewide office-

14   holders you mentioned were carrying those districts,

15   including George Bush, as I recall.

16               So the people who were actually voting

17   in those districts, those five districts or so, were

18   actually splitting their tickets and maybe voting for

19   Republicans at the top of the ticket.  But then when

20   it came to the congressional district, they liked the

21   fact that maybe Charlie Stenholm did support George

22   Bush a lot of the times, or Ralph Hall did, so they

23   ended up splitting their vote.

24               So even though it was 17 Democrats,

25   really the way the districts were drawn to my mind was

459

1    really, a vast majority of them were drawn to skew in

2    favor of the Republicans.  That is to say that they

3    roughly equated with the Republican share of the vote.

4              The second point I would make is that --

5    and a lot of Texans don't know this -- but as a result

6    of the redistricting in 2003, it is true that all the

7    people I justed mentioned, except for Ralph Hall --

8    and I would add Martin Frost to the list -- all left

9    Congress.

10             There was a huge amount of tenure in

11   those people, and power in Washington is given out on

12   the basis of how long you've been there.  So as a

13   result, Martin Frost was bounced out of Congress by

14   the map when he ran.  Charlie Stenholm was.  Martin

15   Frost would be Chairman of the Rules Committee today,

16   because Democrats control the House.  Charlie

17   Stenholm would be Chairman of the Agriculture

18   Committee today, and Jim Turner would be Chairman of

19   the Homeland Security committee, very important

20   committees in Congress, all of whom are now gone

21   because of the redistricting that was done here in

22   2003.  So it really ultimately -- and I know you

23   Texans don't really probably look on New York very

24   favorably, but the Rules Committee, that's now

25   headed by somebody from New York instead of somebody

460

 1   from Texas, as a result of just what I saw was a

 2   partisan power grab in 2003.  That would be my answer.

 3                  SEN. WENTWORTH:  Well, let me give you a

 4   little more history about Texas redistricting when

 5   Democrats controlled the redistricting process.  In

 6   1971 when we had 25 members of Congress, 22 were

 7   Democrats and only three were Republicans.  And the

 8   Democratic majority, after the 1970 census, looked at

 9   those three Republicans and said, "How in the world do

10   we allow three Republicans to be elected from Texas?"

11                  So they sent us out to eliminate those

12   three Republicans.  The three back then were George

13   Bush from Houston, Jim Collins from Dallas and Bob

14   Price from Pampa.  And as they were drawing the lines,

15   they realized too many Texans in Houston were voting

16   Republican, so they couldn't get rid of George Bush.

17   And they realized too many Texans were voting

18   Republican in Dallas and they couldn't get rid of Jim

19   Collins.

20                  But they looked out to the Panhandle and

21   realized that Bob Price from Pampa had his

22   congressional district right next to Wichita Falls,

23   which had as its congressman a Democrat, Graham

24   Purcell, who chaired the House Agriculture Committee.

25   And so the Democratic majority in the Legislature

1    decided that those farmers and ranchers in West Texas

2    would vote for the Chairman of the House Ag Committee,

3    so they paired, intentionally paired those two

4    congressmen to run against each other.

5           But the voters got to vote, and they

6    voted for Bob Price and defeated the Chairman of the

7    House Agriculture Committee.  Thirty years later when

8    my party was in control, one of the congressmen that

9    you failed to mention was targeted for defeat, but he

10   wasn't defeated.  Chet Edwards from Waco was reelected

11   even though he was supposed to lose.

12          So, fortunately, voters had the final

13   say.  And in my judgment, both parties have been

14   guilty of doing things that they probably shouldn't

15   have been doing.

16          I appreciate you being here.

17          MR. HEBERT:  Thank you.  Thank you,

18   Senator.

19          SEN. DUNCAN:  Senator Hegar.

20          SEN. HEGAR:  Thank you, Mr. Chairman.

21          Thank you, Mr. Hebert, for being here.

22   I can tell you're very passionate, and definitely we

23   appreciate that.  So I appreciate you being here and

24   stating everything that you have.

25          I had just a couple of questions as I

462

```
 1    was listening to your testimony.  One, I was curious

 2    on the issue of voter fraud allegations in Highland

 3    Park that you mentioned.  And I just wanted to make

 4    sure that you were aware that Craig Watkins, the

 5    Criminal District Attorney, sent a letter to our

 6    Attorney General on March 14th of '07, formally

 7    thanking for the investigation, yet also declining to

 8    pursue any prosecution in that case.  And I just

 9    wanted to make sure that you were obviously aware of

10    that; so, therefore, the decision was back in the

11    local jurisdiction not to pursue that prosecution.

12                    And if you would like to comment on

13    that, please.

14                    MR. HEBERT:   I am aware that the

15    District Attorney did decline himself to do it.

16    Oftentimes when a local DA makes a decision like that,

17    it's not based, obviously, on whether or not he or she

18    thinks there is voter fraud that has taken place.  But

19    in any event, you know, they often defer to the

20    Attorney General who has far greater resources for

21    prosecuting such cases than the locals do.

22                    I would have to talk to Mr. Watkins and

23    find out precisely what reasons he gave.

24                    SEN. HEGAR:   Right.  And I just wanted

25    to make sure that we're all able to understand that
```

1   there was decisionmaking going on in the local

2   jurisdiction as to how to pursue this matter as well,

3   so it's not just a one-sided street, and make sure

4   that everybody knows that.  And hopefully we can

5   figure out some further discussions on that, because I

6   don't know the exact facts on it either.

7               Another thing I was curious, you

8   mentioned, I guess it was your client, with the window

9   of the bathroom.  Now, I've heard that story before

10  and so I wanted some clarification on that, because

11  since that was your client, you can obviously be the

12  person to tell me this, since I've heard this story

13  before.

14              This situation -- and I wanted to make

15  sure this is the right one -- where people come to the

16  door but the home of the front door is also adjacent

17  to the window.  The window is right immediately next

18  door to the door.  And so, therefore, when anybody is

19  standing at the front door, the lady was going to see

20  them outside her bathroom window, because it's

21  immediately adjacent to the door.  And so somebody was

22  not necessarily going around the fence, over the

23  fence, back through the back of the yard.

24              MR. HEBERT:  Well, they were --

25              SEN. HEGAR:  Is that the structure?

1    I've heard that story before, and I just wanted to

2    make sure, since you were here, I could find out the

3    real facts.

4              MR. HEBERT:  Well, you've got a pretty

5    good handle on it, but let me just give you a little

6    bit more --

7              SEN. HEGAR:  Please; please.

8              MR. HEBERT:  -- facts.  Two

9    investigators come up from the Attorney General's

10   office to interview Gloria Meeks, elderly African-

11   American woman.  She's in the shower.  And as I recall

12   her home -- and I haven't been there in a number of

13   years now -- but you walked up to the front door which

14   is, say, right in front of you here.  On the porch,

15   down a little bit down from there is a window that

16   does go into the bathroom, and the investigators went

17   into the window first.  They didn't knock on the door

18   first; they went into the window first, which just

19   struck me as pretty unusual, because there was

20   actually somebody there in her living room waiting to

21   drive her to the doctor.  And when --

22             SEN. HEGAR:  How far is the window from

23   the front door?

24             MR. HEBERT:  Several feet --

25             SEN. HEGAR:  Okay.

```
 1            MR. HEBERT:  -- a couple of feet.
 2            SEN. HEGAR:  Okay.
 3            MR. HEBERT:  But the guest, who was her
 4   driver taking her -- you know, giving her a lift to
 5   the doctor, I think it was, heard her yell and scream
 6   that there was somebody looking at her while she was
 7   getting out of the shower.  And it turns out it was
 8   the Attorney General's investigator.
 9            SEN. HEGAR:  You know, I would probably
10   scream, too, if y'all were on either side of the
11   window, I can imagine.  I just wanted to make sure
12   everybody understood, if I heard the story correctly.
13   It was very close proximity, and I don't know how
14   anybody walked in the yard.
15            MR. HEBERT:  Well, yes.
16            SEN. HEGAR:  Obviously, I can understand
17   how that happened.  And it would disturb me very much
18   so if someone would go around to the back of the house
19   and peep in windows, which is extremely a long ways
20   off.  And I just wanted to make sure we understood the
21   context.
22            MR. HEBERT:  Well, the explanation by
23   the investigators was almost as bad as the offense,
24   because when she protested to them, they said, "Oh,
25   I'm sorry.  We thought we were looking in your kitchen
```

 1   window."  So I don't know that investigators --
 2              SEN. HEGAR:  I imagine they figured out
 3   pretty quickly that wasn't a kitchen window.
 4              MR. HEBERT:  Yes, they did.
 5              SEN. HEGAR:  At least I hope so.
 6              MR. HEBERT:  I think the door is the
 7   best place to start.
 8              SEN. HEGAR:  Let me ask, if you don't
 9   mind, allegations that are sent to the Attorney
10   General for prosecution -- in other words, they don't
11   go out and seek prosecutions; people send that to
12   them -- and I was curious, you had mentioned about the
13   lawsuit that you had against the Attorney General, and
14   I was curious.  How did that end?
15              MR. HEBERT:  We ended up filing a
16   stipulated dismissal where the Attorney General agreed
17   to modify his prosecution policies in how he would
18   prosecute cases, particularly cases where the only
19   offense was the hyper-technical violation, if you
20   will, of failing to sign the mail-in envelope --
21              SEN. HEGAR:  Okay.
22              MR. HEBERT:  -- which was really
23   important, because that's what most of our clients
24   have been investigated or prosecuted for.
25              SEN. HEGAR:  And so there was something

467

1   entered into the record at the court, and it actually

2   did not go to trial, but there was some settlement

3   prior to, and I guess you had prayer for five or six

4   different issues for relief.  But it was really just

5   an issue put into the record for this one narrow

6   aspect that you were asking for.  Is that correct?

7              MR. HEBERT:  Right.  All the rest of the

8   case we agreed to dismiss our challenges -- similar to

9   Indiana, challenges to the fundamental right to vote

10  of various mail-in ballot --

11             SEN. HEGAR:  Was there an admission on

12  the that the state was violating some statute?

13             MR. HEBERT:  No, no.

14             SEN. HEGAR:  Okay.

15             MR. HEBERT:  If you're going to settle a

16  case, you're not going to make the other side -- you

17  know, let you rub their nose in anything.

18             SEN. HEGAR:  Okay.  Well, let's hope

19  not, but sometimes those things happen.  So anyway,

20  everybody just walked away, and there were some

21  changes, technical changes to the manual and that was

22  the end of that case?

23             MR. HEBERT:  Well, they agreed to

24  redesign the ballot envelope for the mail-in ballots,

25  because the problem was that, as you probably know, in

468

1    a mail-in ballot, there was no place for a person who

2    simply mailed the ballot, to sign it.  You could sign

3    it if you were a witness and you could sign it if you

4    provided assistance.  But there was no place, if you

5    simply mailed it.

6              So we agreed to work with the SOS to

7    modify that and also to change one other procedure in

8    Texas, and talked with them about, you know, better

9    ways to do that.

10             SEN. HEGAR:  Okay.  Well, good.  I just

11   wanted to make sure I had that.  And then one other

12   thing, since you brought up Waller County, and Waller

13   County is a little near and dear to me, since I'm a

14   lifelong resident of Waller County.  And I wanted to

15   make sure that I understood exactly what you're

16   talking about when you were talking about Waller

17   County, if that was in regards to voter eligibility of

18   students at Prairie View campus several years back and

19   to make sure that -- I think Sen. Ellis had asked for

20   back then in maybe '04, if I remember correctly, for

21   some kind of statement to clearly state from the

22   Attorney General what the definition of the law was

23   and that people who reside in a county, intend to

24   reside there, they do reside there, they're eligible

25   to vote.  And that was clearly demonstrated in the

1    Opinion that was given to Sen. Ellis at that time.  Is

2    that the situation that you were talking about?

3                    MR. HEBERT:  The situation in Waller

4    County for Prairie View students has been going on, as

5    you correctly point out --

6                    SEN. HEGAR:  Trust me.  I've lived there

7    all my life.

8                    MR. HEBERT:  Okay.  -- at least since

9    2004.  The issue that I became involved in, and I

10   represented several of the Prairie View students, was

11   last year where a number of them were being denied the

12   right to become deputy registrars, and they were being

13   denied to register voters without certain burdens

14   being put on them, like limits of how many

15   applications and so on.

16                    And when we went to the Justice

17   Department, as a former official of the Justice

18   Department, I was able to go to the federal

19   prosecutors and say, "This is a violation of their

20   fundamental rights here, and it seems to be race-

21   based."  And the Justice Department, to their

22   credit -- you know, I didn't give the Bush

23   Administration much credit for prosecuting voting

24   rights cases on behalf of African-Americans -- but

25   they stepped up and Waller County signed a

```
 1    comprehensive consent judgment in --
 2                 SEN. HEGAR:  Very comprehensive.
 3                 MR. HEBERT:  -- admitting violations.
 4    And --
 5                 SEN. HEGAR:  Well, I think the issue was
 6    expanding the number of voting locations in the county
 7    and trying to make sure everybody was tended to in
 8    dealing with those issues.
 9                 MR. HEBERT:  That was one issue.  But I
10    think the remedy actually also extended to ensuring
11    that they would go on campus, the registration
12    officials --
13                 SEN. HEGAR:  Correct; correct.
14                 MR. HEBERT:  -- and talk --
15                 SEN. HEGAR:  Correct; correct.
16                 MR. HEBERT:  -- more with the students
17    rather than putting barriers up.
18                 SEN. HEGAR:  Correct; correct.  And I
19    can just say this:  If there is anything dealing with
20    the people that I represent in any of the district --
21    and I can tell you, especially with Waller County -- I
22    would appreciate, if you don't mind, calling me,
23    because I will get involved in any form or fashion,
24    because I want to make sure we don't have any issues
25    in the county whatsoever.  So you have my pledge on
```

1    that.

2                    MR. HEBERT:   Thank you.

3                    SEN. HEGAR:   Thank you very much.

4                    MR. HEBERT:   Thank you, Senator.

5                    SEN. DUNCAN:   The Chair recognizes

6    Sen. Shapleigh.

7                    SEN. SHAPLEIGH:   Thank you, Mr. Chair.

8                    Mr. Hebert, we've discussed since the

9    evening started the summary of the Attorney General's

10   investigation and prosecution of some of these cases

11   which he characterized in his March press release as

12   an "epidemic of fraud."  Can you give us an overview

13   of how many cases were brought, how many were actually

14   indicted and who actually was involved in the

15   indictments?

16                   MR. HEBERT:   Well, there have been about

17   30 cases brought, as I understand it, by the Attorney

18   General over the last few years since he launched this

19   voter fraud project initiative, about 30 cases.  My

20   recollection is, there were roughly 50 people involved

21   in these cases.  I may have that part wrong, but

22   that's sticking in my mind.  For the most part, they

23   were issuing involving mail-in balloting, these 30

24   case.  They were not cases -- and not a single

25   instance that I can remember involved voted

1    impersonation of somebody pretending, at the polls, to

2    be somebody else.

3                    SEN. SHAPLEIGH:   How many of these

4    individuals that were indicted were minorities?

5                    MR. HEBERT:   I don't really have a hard

6    figure on that.   What I do know is that of the people

7    who were prosecuted for simply mailing the ballot of

8    other people, there were I believe 13 of those, and 12

9    of them were Latinos or Hispanics or African-

10   Americans, and all 13 were Democrats.   By and large, I

11   don't know of any Republicans in those 30 cases that

12   have been defendants or indictees.

13                   SEN. SHAPLEIGH:   Now, these names I

14   think people here on this floor know, or some of us.

15   Willie Ray, who I think lives in Sen. Eltife's

16   district.

17                   MR. HEBERT:   Willie Ray was my client.

18                   SEN. SHAPLEIGH:   City Councilwoman, 69

19   years old, African-American from Texarkana.   Walter

20   Hinojosa, retired school teacher and labor organizer

21   from here in Austin.   What was the crime of these

22   individuals?   What were they charged with?

23                   MR. HEBERT:   Well, Mr. Hinojosa was

24   never charged with a crime.   He was a plaintiff in the

25   lawsuit, and he was one of my clients.

```
 1              Ms. Ray was charged with mailing --
 2   possessing ballots of other people.  And what was
 3   described in the case, the indictment, and what was
 4   described in our lawsuit was that she had gone to
 5   several shut-ins and taken their ballots and dropped
 6   them in the mail for them, and sometimes put a stamp
 7   on it, because they didn't have the money for a stamp.
 8              SEN. SHAPLEIGH:  And so what's the
 9   alleged violation of the law in that act?
10              MR. HEBERT:  Possessing the ballot of
11   another person and not putting your name on the
12   carrier envelope.
13              SEN. SHAPLEIGH:  And that was what she
14   was prosecuted for?
15              MR. HEBERT:  That's correct.
16              SEN. SHAPLEIGH:  Thank you.
17              SEN. DUNCAN:  Sen. Williams.
18              SEN. WILLIAMS:  Thank you, Mr. Chairman.
19              Is it Mr. "A-bear" or Mr. "He-bert"?
20              MR. HEBERT:  In Louisiana it's "A-bear."
21   In Texas it's "He-bert."
22              SEN. WILLIAMS:  Well, we're in Texas, so
23   you'll be "He-bert" then, I guess, although I have
24   some "A-bears" in my district and it's in Texas.  So I
25   just wanted to be sure I had it right.
```

474

1          Mr. Hebert, I would like to go back to
2     the Texas redistricting, because my recollection is
3     that you represented the Democrats when we did the
4     2003 congressional redistricting.  Is my memory
5     correct about that?
6               MR. HEBERT:  That is correct.
7               SEN. WILLIAMS:  And would it be fair to
8     say that in the -- I'm not an attorney.  So, I mean,
9     I'm going to kind of try to summarize this in
10    non-legal language.  But my recollection is that the
11    basic argument you had was that it was
12    unconstitutional for us to draw a map that reflected
13    the majority voting patterns that Sen. Wentworth
14    referenced, that we had to protect those incumbent
15    Democrats.  Is that the gist of the argument that you
16    had, it was unconstitutional, what we were trying to
17    do to redraw this map so that it reflected the
18    majority will of the state?
19              MR. HEBERT:  No, that was not the claim.
20              SEN. WILLIAMS:  What was it, then?
21              MR. HEBERT:  We had a partisan
22    gerrymandering claim as one of the claims in the
23    lawsuit, which was the allegation that a mid-decade
24    redistricting that was being undertaken solely for the
25    purpose of achieving partisan gain -- that is, to

1    replace Democratic officeholders with Republican

2    officeholders in some districts -- that that was a

3    violation of the 14th Amendment's prohibition on

4    partisan gerrymandering.

5                    SEN. WILLIAMS:  And I think we're saying

6    the same thing.  You're just phrasing it a little

7    differently than I would.  And then in Pennsylvania,

8    you also represented the Democrats up there.  But

9    wasn't the argument in Pennsylvania that it was

10   unconstitutional to have a congressional map that

11   didn't reflect the will of the majority there?

12                   MR. HEBERT:  No.  First, I did not

13   represent the plaintiffs in the Pennsylvania case.  I

14   was not involved in that lawsuit as one of the

15   attorneys.  The claim there was a similar partisan

16   gerrymandering claim, but it did not include the

17   mid-decade aspect of it, which we in Texas took the

18   position that when you do redistricting in mid-decade

19   and you're replacing a perfectly valid map with

20   another map, that that creates a presumption that

21   you're doing it for partisan purposes, because why

22   else would you do redistricting twice?  Most

23   legislatures don't like to even do it once.

24                   SEN. WILLIAMS:  And you mentioned

25   earlier your association with Martin Frost.  Have you

1  represented him?  Are you friend with him?  Can you

2  tell me a little bit more about what your relationship

3  with him is?

4  MR. HEBERT:  Martin Frost is a former

5  client of mine.  I would consider Martin Frost a

6  friend.  I went to his wife's funeral two years ago.

7  I don't socialize with Martin Frost.

8  SEN. WILLIAMS:  I'm sorry.  Could you

9  repeat -- I missed part of what you said.  I think you

10  said he was a client of yours.  And what did you say

11  after that?

12  MR. HEBERT:  He was a former client of

13  mine.

14  SEN. WILLIAMS:  I see.

15  MR. HEBERT:  I said I would consider him

16  a friend, but I don't socialize with him.  I haven't

17  seen him in a couple of years, probably in person.

18  And I think the last time I saw him was when I

19  attended -- I stand corrected.  I saw him about two

20  months ago at a meeting at a law firm.  But I think

21  the time before that was at his wife's funeral that I

22  attended.

23  SEN. WILLIAMS:  And what about Eddie

24  Bernice Johnson, the African-American congresswoman,

25  have you ever represented her?

```
 1            MR. HEBERT:  I have represented her in
 2    the past, yes.
 3            SEN. WILLIAMS:  Okay.  And during a
 4    redistricting trial, isn't it true that she pointed
 5    you out in open court from the witness stand and said
 6    that you had been her attorney and that you had lied
 7    to her and that you had stabbed her in the back and
 8    that you had double-crossed her when she was your
 9    client, because you wanted to curry favor with Martin
10    Frost and the Anglo Democrats with more political
11    power?  Did that happen?
12            MR. HEBERT:  She did make some
13    accusations in open court about me.  I don't remember
14    that precise language.  I thought, frankly, that she
15    made some of those allegations against Martin Frost.
16            SEN. WILLIAMS:  So are you saying she
17    was lying?
18            MR. HEBERT:  I will tell you that I did
19    not -- I never have lied to any client, including
20    Eddie Bernice --
21            SEN. WILLIAMS:  That's not what I asked
22    you.  I ask you, was she lying?
23            MR. HEBERT:  If she said that I lied to
24    her, then she was not telling the truth.
25            SEN. WILLIAMS:  Okay.  And then one last
```

1    thing.  In 2003, is it true, the story that I've

2    heard, that we've got -- that you were caught on tape

3    stealing maps from the redistricting room?  Couldn't

4    you be disbarred for that kind of activity?

5             MR. HEBERT:  I will answer the second

6    part fist.  Yes, you could be disbarred for that

7    activity.  And I never stole any maps.  I was never --

8             SEN. WILLIAMS:  Well, I understand that

9    there is actually a videotape of you taking maps from

10   the redistricting room.  Is that not -- that's not

11   true?  Those videotapes don't exist?

12            MR. HEBERT:  That is not true.  I have

13   never seen such a tape, but I never took any maps from

14   any redistricting room.

15            SEN. WILLIAMS:  Okay.  Thank you.

16            SEN. DUNCAN:  Members, it's 12 o'clock,

17   and the Court Reporter has been serving us well since

18   about 12:30.  And we have a relief coming in at 12:00.

19   She's been going for two and a half hours straight

20   now.  And so I'm going to --

21            SEN. LUCIO:  Mr. President?

22            SEN. DUNCAN:  -- ask the Committee --

23   Sen. Lucio?

24            SEN. LUCIO:  I had asked you earlier --

25   I do have with me the correspondence from my Senate

479

1    district, from the District Attorney there from

2    Hidalgo County.  And I would ask at this time to be

3    able to present it to you and to each member of the

4    Committee of the Whole.  It's addressed to the

5    Committee of the Whole.

6                   SEN. DUNCAN:  Well, certainly.  Bring it

7    down and we will put an exhibit number on it.  And it

8    will be Exhibit No. 27, and it's dated today.  Is that

9    correct?

10                  SEN. LUCIO:  Yes, it's dated -- no.

11   Actually, it's dated March the 6th.

12                  SEN. DUNCAN:  Okay.  And it's from whom?

13                  SEN. LUCIO:  It is from Rene Guerra,

14   Criminal District Attorney, Hidalgo County, Texas.

15                  SEN. DUNCAN:  All right.  If you'll

16   bring that down, we'll submit that into the record as

17   Exhibit No. 27.

18                  (Exhibit No. 27 marked and admitted)

19                  SEN. LUCIO:  Thank you, Mr. President,

20   and thank you, members.

21                  SEN. DUNCAN:  And members, with that, we

22   will take a 10-minute -- we'll stand at ease for 10

23   minutes, until 12:10 a.m., to give our court reporter

24   a break and I think do a transition there.

25                  (Recess:  12:00 midnight to 12:17 a.m.)

480

```
1                    C E R T I F I C A T E

2    STATE OF TEXAS      )

3    COUNTY OF TRAVIS  )

4              I, Aloma J. Kennedy, a Certified

5    Shorthand Reporter in and for the State of Texas, do

6    hereby certify that the above-mentioned matter

7    occurred as hereinbefore set out.

8              I FURTHER CERTIFY THAT the proceedings

9    of such were reported by me or under my supervision,

10   later reduced to typewritten form under my supervision

11   and control and that the foregoing pages are a full,

12   true and correct transcription of the original notes.

13              IN WITNESS WHEREOF, I have hereunto set

14   my hand and seal this 25th day of March 2009.

15

16

17

18              Aloma J. Kennedy
                Certified Shorthand Reporter
19              CSR No. 494 - Expires 12/31/10

20              Firm Certification No. 276
                Kennedy Reporting Service, Inc.
21              Cambridge Tower
                1801 Lavaca Street, Suite 115
22              Austin, Texas   78701
                512.474.2233
23

24

25
```

KENNEDY REPORTING SERVICE, INC.
512.474.2233

TRANSCRIPT OF PROCEEDINGS BEFORE

THE SENATE OF THE STATE OF TEXAS

EIGHTY-FIRST LEGISLATURE

(COMMITTEE OF THE WHOLE SENATE)

AUSTIN, TEXAS

IN RE:                          §
                                §
CONSIDERATION OF                §
SENATE BILL 362                 §

## COMMITTEE OF THE WHOLE SENATE

## WEDNESDAY, MARCH 11, 2009

BE IT REMEMBERED THAT AT 12:17 a.m., on Wednesday, the 11th day of March 2009, the above-entitled matter continued at the Texas State Capitol Senate Chamber, Austin, Texas, before the Committee of the Whole Senate; and the following proceedings were reported by Kim Pence, a Certified Shorthand Reporter of:

VOLUME 2                          PAGES 481 - 870



KENNEDY

REPORTING

SERVICE

*a record of excellence*

1801 Lavaca  •  Suite 115  •  Austin, Texas  78701  •  512-474-2233

ORIGINAL

TX_0000435P
JA_003782

TX_00004359

i

1

TABLE OF CONTENTS

2
PAGE

3
**VOLUME 1A**

4  PROCEEDINGS, TUESDAY, MARCH 10, 2009                          2

5  ROLL CALL NO. 1                                               2

6  OPENING INSTRUCTIONS BY SEN. DUNCAN                           5

7  OBJECTION TO FURTHER CONSIDERATION OF SB 362
   (SEN. WEST)                                                  12
8
   ROLL CALL NO. 2                                              38
9
   LAYING OUT OF SENATE BILL 362
10 (SEN FRASER)                                                 44

11 QUESTIONS FROM SENATE FLOOR                                  53

12
**VOLUME 1B**

13 INVITED TESTIMONY                                           210

14     TESTIMONY BY HANS VON SPAKOVSKY                         210
       QUESTIONS FROM SENATE FLOOR                             218
15
       TESTIMONY BY TOVA ANDREA WANG                           277
16     QUESTIONS FROM SENATE FLOOR                             287

17     TESTIMONY BY CAMERON QUINN                              300
       QUESTIONS FROM SENATE FLOOR                             306
18
       TESTIMONY BY TOBY MOORE                                 336
19     QUESTIONS FROM SENATE FLOOR                             344

20     TESTIMONY BY FRANK B. STRICKLAND                        373
       QUESTIONS FROM SENATE FLOOR                             417
21
       TESTIMONY BY ADAM SKAGGS                                408
22     QUESTIONS FROM SENATE FLOOR                             417

23     TESTIMONY OF ROBERT A. SIMMS
       SUBMITTED BY WES TAILOR                                 435
24
       TESTIMONY BY J. GERALD HEBERT                           442
25     QUESTIONS FROM SENATE FLOOR                             450

ii

1                    TABLE OF CONTENTS

2                                                           PAGE

3                      **VOLUME 2**

4  PROCEEDINGS, WEDNESDAY, MARCH 11, 2009                  482

5
        QUESTIONS FROM SENATE FLOOR (CONTINUED)            482
6

7       TESTIMONY BY THOMAS WHEELER                        502
        QUESTIONS FROM SENATE FLOOR                        510
8
        TESTIMONY BY CHANDLER DAVIDSON                     521
9       QUESTIONS FROM SENATE FLOOR                        527

10      TESTIMONY BY ED JOHNSON                            559
        QUESTIONS FROM SENATE FLOOR                        566
11
        TESTIMONY BY DANIEL B. KOHRMAN                     621
12      QUESTIONS FROM SENATE FLOOR                        628

13      TESTIMONY BY COBY SHORTER                          653
        QUESTIONS FROM SENATE FLOOR                        655
14
        TESTIMONY BY DENNIS BOREL                          706
15      QUESTIONS FROM SENATE FLOOR                        713

16      TESTIMONY BY GARY GLEDSOE                          724
        QUESTIONS FROM SENATE FLOOR                        731
17
        TESTIMONY BY ERIC NICHOLS                          742
18      QUESTIONS FROM SENATE FLOOR                        750

19

20  PUBLIC TESTIMONY                                       771

21      CLAIRE OXLEY GLUCK                                 771

22      HAZEL COTTON                                       773
        QUESTIONS FROM SENATE FLOOR                        775
23
        KATHY HICKS                                        776
24      JAMES E. CARTER                                    779
        RUSTY HICKS                                        781
25

iii

TABLE OF CONTENTS

PAGE

PUBLIC TESTIMONY (CONTINUED)

TINA BENKISER                          784
B.R. SKIPPER WALLACE                   787
ANITA PRIVETT                          789
MARY ANN COLLINS                       792

ROSA ROSALES                           794
QUESTIONS FROM SENATE FLOOR            797

DUSTIN RYNDERS                         800

MARSHA CORREIRA                        803
QUESTIONS FROM SENATE FLOOR            806

RENE LARA                              807
LEE MEDLEY                             810
JOHN WATKINS                           811
KENNETH FLIPPEN                        813
ANNIE BANKS                            816
RACHEL HERNANDEZ                       817
RENATO DE LOS SANTOS                   819
JUDY HOLLOWAY                          823
LYDIA CAMARILLO                        825
EDWARD B. WILLIAMS                     828
MADELEINE DEWAR                        830
HELEN VILLARREAL                       833
MARK WILLIAMSON                        835
VANESSA FOSTER                         838

LUIS FIGUERO                           840
QUESTIONS FROM SENATE FLOOR            844

PATTI EDELMAN                          844
SYLVIA MENDOZA                         846
KENNETH KOYM                           848
KAREN RENICK                           850
JONI ASHBROOK                          853
DUANE RAWSON                           856
ROD FLUKER                             858

ROLL CALL NO. 3                        864

PROCEEDINGS CONCLUDED                  869

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

iv

EXHIBIT INDEX

                                    MARKED     ADMITTED

1A    Sen. Van de Putte 3/3/09 Memo
      to Sen. Duncan re ground rules
      for Committee of the Whole
      Pubic hearing                    21          21

1B    Sen. Duncan 3/5/09 Memo to Sen.
      Van de Putte re response to
      concerns about ground rules
      for the Committee of the Whole
      Senate                           21          21

2.    Letter to Texas Attorney General
      Greg Abbott re:  Hearing on SB
      362, signed by 11 Senators       21          21

3.    Senate Notice of Public
      Hearing on SB 362 for 3/10/09    21          21

4.    Texas Senate Agenda, 3/10/09     21          21

5A    3/10/09 Tag Form signed by
      Sen. Royce West, et al           21          21

5B    3/10/09 Tag Form signed by
      Sen. Mario Gallegos              21          21

6.    Roll Call No. 2 - Sen.
      Gallegos' Appeal of Ruling
      of Chair on Sen. West's
      Point of Order                  120         120

7.    Institute of Public Policy
      Publication entitled "The
      Effects of Photographic
      Identification on Voter
      Turnout in Indiana:  A
      County-Level Analysis"
      by Jeffrey Milyo, Report
      10-2007, Revised December
      2007                            120         120

v

```
 1                    EXHIBIT INDEX (continued)

 2                                        MARKED   ADMITTED

 3    8.    AU News publication entitled
            "Much-hyped Turnout Record
 4          Fails to Materialize -
            Convenience Voting Fails to
 5          Boost Balloting"                120      120

 6    9.    Symposium paper entitled
            "The Empirical Effects of
 7          Voter-ID Laws:  Present or
            Absent?" by Jason D. Mycoff,
 8          Michael W. Wagner and
            David C. Wilson                 120      120
 9
10   10.    9/10/07 Report of the
            Heritage Center for Data
11          Analysis entitled "New
            Analysis Shows Voter
12          Identification Laws Do Not
            Reduce Turnout" by David B.
13          Muhlhausen and Keri  Weber
            Sikich                          120      120
14   11.    New York Times article -
            September 23, 2005 - entitled
15          "Voting Reform is in the
            Card's," by Jimmy Carter
16          and James A. Baker III          160      160
17   12.    Harvey Kronberg's Quorum Report
            April 23, 2007, entitled "Royal
18          Masset:  The Voter ID Bill Will
            Kill My Mother's Right to Vote"  160      160
19
     13.    2/3/08 article entitled "A
20          Clearer Picture on Voter ID"
            by Jimmy Carter and James A.
21          Baker III                       160      160
22   14.    Testimony of Hans A. von
            Spakovsky, March 10, 2009,
23          re SB 362                       217      217
24
25
```

KENNEDY REPORTING SERVICE, INC.
512.474.2233

v:

```
 1              EXHIBIT INDEX (continued)

 2                                      MARKED   ADMITTED

 3    15A   6/11/07 Letter to Senate
            Committee on Rules and
 4          Administration re Hans A.
            von Spakovsky nomination       254       254
 5
      15B   6/12/07 Article entitled
 6          "Obama Raises Concerns Over
            FEC Nominee's Record of
 7          Partisanship"                  254       254

 8    15C   10/3/07 Letter to the U.S.
            Senate from Public Citizen     254       254
 9
      16.   Institute of Public Policy
10          Publication entitled, "The
            Effects of Photographic
11          Identification on Voter
            Turnout in Indiana:  A
12          County-Level Analysis" by
            Jeffrey Milyo, Report
13          10-2007, Revised December
            2007 (SAME AS EXHIBIT 7)       265       265
14
      17.   Testimony of Tova Andrea Wang,
15          Vice President, Research Common
            Cause, March 10, 2009, re SB 362  300     300
16
      18.   Report of the Commission on
17          Federal Election Reform entitled,
            "Building Confidence in U.S.
18          Elections," September 2005     313       313

19

20

21

22

23

24

25
```

vii

EXHIBIT INDEX (continued)

MARKED   ADMITTED

19.  Fifteen letters to the Hon.
     Dianne Feinstein, Chair, and the
     Hon. Robert F. Bennett, ranking
     minority member, U.S. Senate
     Committee on Rules and
     Administration:

     1.  6/29/07 letter from Hans
         A. von Spakovsky
     2.  3/22/07 letter from various
         members of Congress
     3.  3/13/07 letter from William
         H. Jordan
     4.  2/08/07 letter from Gary J.
         Smith
     5.  2/26/07 letter from P. K.
         Brunelli
     6.  3/01/07 letter from J. A.
         Borras
     7.  2/21/07 letter from Trey
         Grayson
     8.  2/20/07 letter from Beverly
         B. Kaufman
     9.  2/19/07 letter from Todd
         Rokita
     10. 2/16/07 letter from Frank
         B. Strickland
     11. 2/14/07 letter from Tom Lowe
     12. 2/13/07 letter from
         T. Rogers Wade
     13. 2/14/06 letter from Johnny
         Isakson
     14. 2/09/07 letter from Wesley
         R. Kliner, Jr.
     15. 3/13/07 letter from Ray
         Martinez III                          333       333

20.  Brennan Center For Justice letter
     dated October 3, 2007, by
     Executive Director Michael
     Waldman, with attachments               335       335

viii

EXHIBIT INDEX (continued)

                                         MARKED    ADMITTED

21.  Prepared Remarks of Dr. Toby
     Moore, Research Triangle,
     regarding "Evidence of the
     impact of voter ID requirements
     and the prospects of US DOJ
     preclearance," March 10, 2009      358        358

22.  Harris County Map submitted
     by Sen. Gallegos                   366        366

23.  Testimony of Frank B.
     Strickland re SB 362
     March 10, 2009                     373        373

24.  Testimony of Adam Skaggs,
     Counsel, Democracy Program,
     Brennan Center for Justice at
     NYU School of Law, regarding
     *The Myth of Voter Impersonation
     Fraud at the Polls*
     March 10, 2009                     408        408

25.  Written Testimony of Robert A.
     Simms, Georgia Deputy Secretary
     of State, presented to the
     United States Senate Committee
     on Rules and Administration,
     submitted by Wes Tailor           435        435

26.  Testimony of J. Gerald Hebert
     re SB 362, March 10, 2009         442        442

27.  Letter from Rene Guerra (March 6,
     2009) Criminal District Attorney
     of Hidalgo County,
     Submitted by Sen. Lucio           479        479

28.  3/4/09 Letter from Todd
     Rokita, Indiana Secretary
     of State, to Sen. Fraser
     re SB 362                         502        502

EXHIBIT INDEX (continued)

|  |  | MARKED | ADMITTED |
|---|---|---|---|
| 29. | Testimony of Chandler Davidson, Tsanoff Professor of Public Affairs Emeritus, Rice University, regarding "The Historical Context of Senate Bill 362," March 10, 2009 | 521 | 521 |
| 30. | 3/06 Printout from Texas AG Website entitled "Helping Stamp Out Voter Fraud in Texas," by Greg Abbott, Attorney General of Texas, submitted by Sen. Shapleigh | 550 | 550 |
| 31. | Dashwood case documents submitted by Ed Johnson, Harris County Tax Assessor-Collector and Voter Registrar's Office | 559 | 559 |
| 32. | Records from specific Harris County voting documents, submitted by Ed Johnson | 559 | 559 |
| 33. | Harris County Deceased Voting History, miscellaneous registration applications, submitted by Ed Johnson | 559 | 559 |
| 34. | Texas Voter Registration Application form submitted by Sen. Huffman | 570 | 570 |
| 35. | Testimony of Daniel B. Kohrman, Senior Attorney, AARP Foundation, re SB 362 March 10, 2009 | 621 | 621 |
| 36. | Photographs of Voter Education, Anderson County Workshop, 2008 | 724 | 724 |
| 37. | Testimony of Gary L. Bledsoe, President, Texas NAACP, re SB 362, March 10, 2009 | 724 | 724 |

EXHIBIT INDEX (continued)

| | | MARKED | ADMITTED |
|---|---|---|---|
| 38. | Number of voters who have registered since 2006 without a driver's license number, submitted by Sen. Watson | 767 | 767 |
| 39. | The Special Investigations Unit Role and Investigative Efforts and Funding, submitted by Sen. Huffman | 767 | 767 |
| 40. | Slip Opinion, U.S. Supreme Court, Crawford vs. Marion County Election Board, October Term, 2007 | 768 | 768 |
| 41. | U.S. Supreme Court, Crawford vs. Marion County Election Board, on Writ of Certiorari to U.S. Court of Appeals for the Seventh Circuit, Brief of Texas, Alabama, Colorado, Florida, Hawaii, Michigan, Nebraska, Puerto Rico and South Dakota, as Amici Curiae Supporting Respondents | 768 | 768 |
| 42. | Written Testimony of Claire Oxley Gluck from Boerne, in Kendall County, re SB 362 | 773 | 773 |
| 43. | Written Testimony of Hazel Cotton of Texarkana, Texas re SB 362 | 775 | 775 |
| 44. | Written Testimony of Kathy Hicks of Texarkana, Texas re SB 362 | 779 | 779 |
| 45. | Written Testimony of Donald Giles of Texarkana, Texas re SB 362 | 783 | 783 |
| 46. | Written Testimony of Anita Privett, League of Women Voters of Texas, re SB 362 | 789 | 789 |

EXHIBIT INDEX (continued)

|  |  | MARKED | ADMITTED |
|---|---|---|---|
| 47. | Written Testimony of Rosa Rosales, League of United Latin American Citizens, National President re SB 362 | 794 | 794 |
| 48. | Written Testimony of Dustin Rynders, Advocacy, Inc., re SB 362 | 800 | 800 |
| 49. | Written Testimony of Marsha Correira re SB 362 | 804 | 804 |
| 50. | Written Testimony of Rachel A. Hernandez re SB 362 | 817 | 817 |
| 51. | 10/17/08 Article by Nelda Wells Spears, Voter Registrar, Travis County, entitled "40,000 Voter Registration Applications Processed in Time For Early Voting" | 825 | 825 |
| 52. | Written Testimony of Lydia Camarillo, SVREP Vice President, re SB 362 | 826 | 826 |
| 53. | Written Testimony of Luis Figueroa, Mexican American Legal Defense and Education Fund (MALDEF), re SB 362 | 841 | 841 |
| 54. | Written Testimony of Sylvia Mendoza re SB 362 | 848 | 848 |
| 55. | Written Testimony of Dr. Rod Fluker, Sr., Executive Director for Texas Association of Black Personnel in Higher Education, re SB 362 | 861 | 861 |

482

```
 1                P R O C E E D I N G S

 2            WEDNESDAY, MARCH 11, 2009

 3                 (12:17 a.m.)

 4            SEN. DUNCAN:  The Committee of the Whole

 5    will come back to order.  Members, we -- our very

 6    capable court reporter, Ms. Kennedy is -- we're doing

 7    a transition, and we let her have the rest of the

 8    night off.

 9            And we have Kim Pence who is with us,

10    who will continue taking our testimony, and if --

11    we'll continue to observe that so that she can get a

12    good record.

13            The next person on the queue is

14    Sen. Zaffirini.  Sen. Zaffirini, you are recognized.

15            SEN. ZAFFIRINI:  Thank you,

16    Mr. President.  And first, could we recognize the

17    court reporter who has been with us for 12 hours?  She

18    certainly does deserve a round of applause.

19            (Applause)

20            SEN. ZAFFIRINI:  Thank you.

21    **QUESTIONS FROM SENATE FLOOR (CONTINUED)**

22            SEN. ZAFFIRINI:  Mr. Hebert, I know that

23    you have read the bill.  Have you also read the fiscal

24    note?

25            MR. HEBERT:  Yes, I have.
```

```
 1                SEN. ZAFFIRINI:  And did you see that it
 2    says that there would be no fiscal implications to the
 3    State if this bill were passed?
 4                MR. HEBERT:  I did see that.
 5                SEN. ZAFFIRINI:  Do you believe that
 6    fiscal note?
 7                MR. HEBERT:  While I accept it at face
 8    value, I think it's preposterous.
 9                SEN. ZAFFIRINI:  Do you -- why do you
10    believe that that -- that if we pass the lot it will
11    cost the State millions of dollars, according to your
12    testimony?
13                MR. HEBERT:  Well, I think it will cost
14    money because notwithstanding the fact there may some
15    line item in the Secretary of State's budget, I can't
16    believe that there's a line item that would cover the
17    cost of seeking pre-clearance and gathering all of the
18    data necessary, all the staff time to do that; and
19    then to go to the Justice Department, which is going
20    to have a very skeptical eye about this bill.
21    Remember, they recommended -- the career staff
22    recommended that the Georgia map be blocked.  And if
23    you read their memo, which is now a matter of public
24    record, there was -- I think there was like 55
25    single-spaced pages of all of the data that they
```

484

1   forced the State of Georgia to come up with.  And even

2   in the end of having them produce all that data,

3   Georgia still couldn't get pre-clearance from the

4   career people.

5             The process as it turns out, we now

6   know, is somewhat corrupt there, but I think the Texas

7   bill could very well suffer the same effects, not to

8   mention all the time, of course, the State is taking

9   to enact the bill; and then, of course, ultimately if

10  it does get approved, to defend it in court for the

11  inevitable legal challenge that will follow; and then,

12  of course, administering and implementing the bill at

13  the local level, it requires extensive training of

14  local Election Officials to ensure that they know how

15  to administer a very complicated set of identification

16  provisions.

17            SEN. ZAFFIRINI:  And that is on Page 3

18  of your written testimony.  You wrote "though

19  implementation of a photo ID bill will cost the State

20  of Texas millions of dollars to defend the measure

21  before the Department of Justice and in federal

22  courts, and then to implement and administer it if

23  ever approved."  What do you think it would cost the

24  State to defend this lawsuit?

25            MR. HEBERT:  Well, to defend the lawsuit

1    if one is challenged and assuming the bill is enacted

2    exactly as it appears in the bill pending before you,

3    you know, to bring such a lawsuit and to challenge it,

4    I can tell you on the plaintiff's side costs a quarter

5    of a million dollars, at least on the plaintiff's

6    side.  I suspect the defendants usually spend more.

7    So I would say, you know -- and it also depends

8    whether there's an appeal, which usually there is.

9    The more appeals there are, the more it costs.  So

10   usually litigation of this nature costs like, you

11   know, probably half a million dollars is what -- is

12   what the bill is.

13                SEN. ZAFFIRINI:  Okay.  Thank you.  On

14   Page 4 of your written testimony, you write that

15   "There is considerable evidence, however, that

16   enacting a Voter Photo ID bill will create a series of

17   barriers making it harder for senior citizens, younger

18   voters, poor people, people of color, and women in

19   general to exercise their right to vote."  Precisely

20   what barriers are you talking about?

21                MR. HEBERT:  Well, as Ms. Wang testified

22   earlier, you and I may have IDs in our pockets, in our

23   purses, but poor people don't oftentimes have those.

24   And the burdens and barriers that they face are that

25   they have -- if they don't have a photo ID now, and we

486

1    now know that there are thousands of Texans who vote

2    and don't have a photo ID, that they're going to now

3    presumably have to get one or make sure that they

4    carry around these two other methods of identification

5    with them.  So that's -- you know, we're putting up --

6    we're putting up conditions on people exercising the

7    fundamental right to vote.  We're putting the burden

8    on them to do more than just show up at the polls and

9    vote.

10                  You know, I heard earlier, for example,

11   I think it was Sen. Fraser say, you know, to

12   Sen. Davis, you know, when Wendy Davis goes the polls

13   and votes, I want to make sure that, you know, it is

14   Wendy Davis.  And the fact is that we don't really

15   have any examples right now of where somebody is

16   showing up pretending to be Wendy Davis who is not

17   Wendy Davis.

18                  And so when you don't have a lot of

19   those situations happening, forcing people to have a

20   photo ID when it really isn't going to accomplish --

21   the kind of alleged fraud that exists, it really, I

22   think, ends up putting people in a burdensome

23   situation where they have to then go out and do

24   something to get the right documentation.

25                  And I think that -- you know, in

1    Georgia, I mean, there were -- I believe I saw a

2    statistic in the Houston Chronicle this morning that

3    there were roughly -- I think it was like a little

4    over a thousand, I think it was 1100 voters who had to

5    vote a provisional ballot in Georgia in 2008 because

6    they didn't have the requisite photo ID.  And of that

7    number, I believe only 300 came back after the

8    election and produced within 48 hours the necessary

9    documentation.

10                Once the election is over, there's not

11   as much incentive for people to come back and do

12   whatever it is they need to do to validate their vote.

13                SEN. ZAFFIRINI:  Thank you.  Isn't it

14   interesting that every minority member of the Texas

15   Senate, every Hispanic and the two African-Americans,

16   oppose the effort to re-redistrict, as I'd like to

17   call it, and today every minority member of the Texas

18   Senate, the two African-Americans and every

19   Hispanic-American in the Texas Senate, oppose this

20   bill.  Some coincidence, wouldn't you say?

21                MR. HEBERT:  I would say not very

22   coincidental at all actually.  I think it's

23   understandable given the ultimate impacts of what I

24   see the two bills having.

25                SEN. ZAFFIRINI:  Mr. Hebert, you heard

 1    my question to Sen. Fraser asking him why he included

 2    documentation of a sex change as proof of

 3    identification.  He said in response that he would

 4    punt to the House author of the bill considered in

 5    2007.  Can you explain to us why that language would

 6    be in the bill?

 7              MR. HEBERT:  No.  I mean, it's -- you

 8    know, I don't really know about a lot of the documents

 9    on that list of things you can produce, why producing

10    two of those documents is, you know, a reliable way of

11    proving who you are.  For example, we won't allow

12    people now, if this bill goes into effect, to use

13    their voter ID card, their voter registration card,

14    when they show up even if their name is on the books

15    and their card matches that name, but we'll allow them

16    to use a court record from a sex change operation and

17    a library card to vote.

18              Now, you know, the last time I checked a

19    library card to me doesn't seem to be as reliable as a

20    government-issued voter registration card.  So, you

21    know, there's some real questionable things like that

22    in the bill.  Sen. Duncan -- I mean, Sen. Fraser would

23    probably know why he put it in there, but for the life

24    of me -- I haven't seen that in a bill before I have

25    to say.

489

```
 1                    SEN. ZAFFIRINI:  You haven't?

 2                    MR. HEBERT:  No.

 3                    SEN. ZAFFIRINI:  Thank you very much.

 4      Thank you.

 5                    MR. HEBERT:  Thank you.

 6                    SEN. DUNCAN:  The Chair recognizes

 7      Sen. Gallegos.

 8                    SEN. GALLEGOS:  Thank you, Mr. Chairman.

 9      Gerry, let me ask you going back on redistricting and

10      let's go to those states that have enacted -- well,

11      let's go to the states that have enacted photo ID

12      laws.  Some of those states I understand were red

13      states and all of a sudden they turned to blue.  And

14      it's my understanding that in a lot of those states

15      the Latino population has surged.  Is that -- is that

16      your understanding?

17                    MR. HEBERT:  Well, the Latino population

18      is surging in Georgia.  I wouldn't describe Georgia as

19      a state that's gone from red to blue.

20                    SEN. GALLEGOS:  I understand, but

21      Indiana --

22                    MR. HEBERT:  I mean, I would -- Indiana

23      is no longer completely controlled by Republicans, I

24      don't think.  So you have a situation there where

25      maybe they've gone from red to purple trending, you
```

```
 1   know, obviously in both of those states and in other
 2   states that have considered voter ID, and I believe
 3   it's now pending in the Utah legislature.  Republicans
 4   have controlled and had a monopoly on the entire state
 5   government.
 6                 SEN. GALLEGOS:  I guess what I'm trying
 7   to ask you is that in these state that are all of a
 8   sudden turning minority, what I would say minority,
 9   the Latino population coupled with the
10   African-American population is outranking the Anglo
11   population in those states, and it's showing in the --
12   at the ballot box especially during this last
13   election.  Would you -- would you agree?
14                 MR. HEBERT:  Well, certainly in Georgia
15   the Latino population has been growing substantially
16   in recent years.  I'm not familiar that much with
17   Indiana's demographics as I am with Georgia's.
18                 SEN. GALLEGOS:  Well, let's just stay
19   with Indiana.  You know, what we saw on CNN and some
20   of the other figures that we're seeing is there was a
21   tremendous increase in Latino votes in that state that
22   turned it -- a red state into a blue state.  And what
23   I'm looking at here, Mr. Hebert, is that as these
24   states grow all of a sudden -- for example, Indiana,
25   as they grow into -- the population increased in the
```

1    Latino community.  Like Indiana all of a sudden, they

2    introduced and passed a voter ID bill, a photo -- a

3    voter ID bill.  And I guess what I'm concerned is that

4    it's starting a pattern as where the Latino population

5    is increasing, that all of a sudden you have proposed

6    legislation on photo ID.

7                 And now we're in Texas.  Let me just

8    give you some early numbers that we've gotten before

9    we get into the census and before the Secretary of

10   Commerce approves numbers.  The State of Texas in the

11   last ten years from 2000 to 2010 over 90 percent of

12   the Texas growth will be minority.  There's an

13   indication of projected growth by 4 million in the

14   last ten years out of -- for 4 million.  Out of those

15   4 million, 3,158,077 Hispanic, 3 million -- over

16   3 million of that 4 million is Hispanic.  Now -- and

17   that's just projected.  I think it's going to be

18   higher after the Secretary of Commerce confirms the

19   numbers.

20                 Now, in Houston, we're looking at --

21   we're looking at a 1.1 -- in the last ten years -- in

22   the last ten years a 1.1 million increase in ten

23   years.  Now, I'll tell you that the Secretary of

24   Commerce has not confirmed those numbers.  I believe

25   that number will be 1.5 million.

1            So what I'm getting at here and I'd like
2    you to answer is that all of a sudden we have a Latino
3    explosion population here -- which by the way, we
4    probably will get minimum three, probably maximum four
5    congressional districts in Texas, one for sure in
6    Houston and one for sure in Dallas.  Now, the
7    others -- I don't know where the others go, and
8    probably additional Latino seats -- and I'm talking
9    about these will be Latino seats, additional Latino
10   seats in Houston, maybe two, and another extra Senate
11   seat -- another Senate seat belt for Dallas, Latino,
12   and probably four other State Rep seats in Houston,
13   Latino.
14            So my concern is looking at these
15   patterns all over the country with Latino explosion in
16   population, and all of a sudden voter ID legislation
17   in these areas, in these states, all of a sudden we
18   have an explosion like this.  Oh, yeah, we'll take the
19   money from Washington after the census is taken and
20   those educational monies, those transportation monies,
21   education monies and healthcare monies, we'll take it,
22   we'll take it.  But all of a sudden, we have a voter
23   ID bill that's on the table here before us.  Because
24   of this Latino explosion, they know that we're going
25   to get these congressional districts, which is going

493

1    to empower Latinos.

2              And in redistricting -- and I was there

3    with you.  Troy Fraser was a co-chairman with me, and

4    I saw what happened.  I saw what happened, this little

5    debate you had with Sen. Wentworth, I saw what

6    happened.  Who really lost were the Latinos.  They

7    were the ones that lost.  They got cut up three ways

8    in Dallas.  They tried to cut us up in Houston, and

9    they tried to cut us up in some other areas.  What

10   they do is put us in areas to elect whoever and cut us

11   up and keep us -- and keep us separated.  I saw that,

12   and you saw that.

13             So what I'm asking you is that this

14   pattern -- this pattern where Latino explosion

15   population and all that is do you see a pattern of

16   where that growth is?  All of a sudden we want voter

17   ID, voter ID to suppress -- that's my guess -- is to

18   not only suppress our votes, but also try to suppress

19   our empowerment.

20             MR. HEBERT:  Well, let me say that there

21   clearly is a surging Latino population in Texas and in

22   other states that have seen a photo ID bill go into

23   effect.  And as I testified earlier, Sen. Gallegos,

24   the fact is that most, if not all, of the groups that

25   are going to be adversely affected -- and I'll single

494

```
 1    out Latinos because that's your question -- that they

 2    are growing, and they are growing fast, and they are

 3    growing as a percentage of the Texas voting

 4    population, and they tend to skew Democratic, at least

 5    now.  And so that to me explains the urgency that

 6    Republicans have in these states to enact a voter ID

 7    bill.

 8              SEN. GALLEGOS:  Mr. Hebert, what I'm --

 9    I mean, what I meant and really wanted your opinion is

10    that as this population grows and all this population

11    is coming to Texas, which obviously enriches us with

12    four more congressional seats, these other seats I

13    spoke about, plus the money that the census gives us

14    in those numbers -- what I'm saying is that Texas is

15    benefiting from that population increase, not only in

16    empowerment, but also in money.

17              And for some reason, like in Indiana

18    where the Latino population is increasing, Denver and

19    those other states that were red, now going blue, that

20    legislation is proposed or being proposed in these

21    states that all of a sudden are turning

22    minority/majority.

23              My concern is that Texas will take the

24    population increase, they'll take the empowerment,

25    they'll take the four congressional districts, they'll
```

495

1    take the money from the census, yet they introduce a

2    bill to suppress the Latino and the minority

3    community.  That's my concern on the pattern.  So

4    wouldn't you agree with me or at least give me your

5    opinion that that's the type of pattern we're seeing?

6    Increase in Latino population?  All of a sudden we've

7    got a suppression bill here.  They might as well put

8    an amendment to suppress -- that this bill suppresses

9    all Latinos, the elderly and the African-Americans.

10   You might as well.  That's what I see here.  That's

11   the pattern I'm seeing.  I just want your opinion.

12             MR. HEBERT:  Well, my opinion is that

13   voter ID bills, including the one in Texas, are a part

14   of a pattern of suppressing minority votes, and that's

15   what this bill will do in my opinion, and I've

16   testified to that effect.  And I agree with you that

17   the surging Latino population here will likely justify

18   the creation of additional Latino seats when

19   redistricting comes around.  And it goes counter to

20   the fact that you have the Latino population growing

21   as fast as it is as a proportion of the state, and at

22   the same time that they're growing and giving benefits

23   to the State of Texas, as you point out, that we end

24   up with a photo ID bill that actually will target them

25   and suppress a lot of people's voting rights.

496

```
 1                    SEN. GALLEGOS:  Thank you for
 2     your opinion, Gerry.  Thank you.
 3                    SEN. DUNCAN:  The Chair recognizes
 4     Sen. Shapiro.
 5                    SEN. SHAPIRO:  Thank you,
 6     Mr. President -- Mr. Chairman and Members.  I have a
 7     couple of issues that I'd just like to visit with you
 8     about, Mr. Hebert.  I do remember very closely the
 9     debate and the dialogue on redistricting and your role
10     in that.  And certainly one of the issues that still
11     kind of gnaws at me is the idea -- and I just want a
12     yes or a no answer.  I don't want anything else.  Did
13     you take maps from the offices in this building during
14     redistricting?  Yes or no?
15                    MR. HEBERT:  Yes.
16                    SEN. SHAPIRO:  Okay.  That's all I
17     needed to hear.  So you did take maps that were not
18     yours out of this building?
19                    MR. HEBERT:  Now you're adding more
20     facts.  No, I did not take maps that were not mine.  I
21     took my maps, or maybe my client's maps maybe.
22                    SEN. SHAPIRO:  Did you get permission to
23     take those maps, or did you just take them?
24                    MR. HEBERT:  The maps that I took I had
25     permission to have in my possession.
```

TX_00004385

```
 1                    SEN. SHAPIRO:  And who gave you
 2     permission to take those maps?
 3                    MR. HEBERT:  My clients.
 4                    SEN. SHAPIRO:  Your clients gave you
 5     permission.  Okay.  So you did take maps?
 6                    MR. HEBERT:  I did.
 7                    SEN. SHAPIRO:  Okay.  That's what I need
 8     to know.
 9                    The second question I have is completely
10     different, and that is why do you believe the federal
11     government has rules in place, laws in place, that
12     actually say that when you go to an airport you must
13     have a photo ID?
14                    MR. HEBERT:  For security purposes.
15                    SEN. SHAPIRO:  For security purposes.
16     And you testified earlier that someone came through --
17     I'm sorry I don't remember who you said -- came
18     through, did not have to use their photo ID, went
19     back, was integrated, came back out and went through
20     as they did.
21                    MR. HEBERT:  Correct.
22                    SEN. SHAPIRO:  It's ironic because about
23     a week ago I was going through, as we all do so often,
24     and I happened to see a sign up right there at that
25     isle as you -- before you give your ID.  And the note
```

```
 1    on the poster says "Why" -- with a question mark --
 2    "Why do I have to show my ID?  Identity matters.  We
 3    need to make sure your ID and your boarding pass
 4    match."  And it's signed Transportation Security
 5    Administration.
 6                These rules, these laws that are put in
 7    place have exceptions, as you mentioned earlier, and
 8    it seems to me the correlation between what this bill
 9    is saying and what we are trying to do and what maybe
10    the federal government has done are very similar
11    because in essence it's the same methodology.
12                We have a law.  We say we want you to
13    have a photo ID.  You don't have it.  In this
14    particular bill, it says here are the other options
15    that you can go through in order to qualify.  I don't
16    think there's a whole lot of difference between the
17    two.
18                And I think that we're doing what you're
19    asked to do with a Sam's card.  As we mentioned
20    earlier, I can't charge on my Cosco card unless my
21    picture is on it.  Identity matters.  I can't go to my
22    bank and cash a check or another bank without my photo
23    ID.  Identity matters.  I mean, you could go on and
24    on.  The library books, identity matters.
25                And in this case, I think that's, in
```

1    fact, what we're doing.  Do you agree that identity

2    matters?

3                    MR. HEBERT:  I agree that identity

4    matters, but I disagree that what you're doing in this

5    bill is similar to what, say, the TSA is doing at the

6    airport.

7                    SEN. SHAPIRO:  Okay.  The methodology is

8    the same.  It may not be the same heightened awareness

9    or the same difficulty with security, but we happen to

10   believe that the integrity of the vote is just as

11   important and just as secure.

12                   MR. HEBERT:  I see the procedures as

13   being different at the airport than they are in

14   voting.

15                   SEN. SHAPIRO:  And how -- and how is

16   that?

17                   MR. HEBERT:  Well, for example, at the

18   airport when you go through security and you don't

19   have a picture ID, they pull you aside and they ask

20   you questions.  And if they're satisfied, you can get

21   on, you get on.

22                   SEN. SHAPIRO:  That's what I just said.

23                   MR. HEBERT:  Well, the difference is

24   that in Texas if you go to show up at the polls and

25   you have a voter -- valid voter registration card

500

1   under this bill and that's all the information you

2   have, you have to cast a provisional ballot, and

3   that's not going to get counted.  So the difference is

4   that in one, you're getting on the plane, and in the

5   example of the voter ID, you're not getting on the

6   plane.

7              SEN. SHAPIRO:  And you wouldn't have the

8   opportunity then to say "Here is my valid information.

9   Here is my check.  Here is my electricity bill"?  I

10  mean, there's a whole litany of things that you could

11  have with you at the same time that you went to go

12  vote.

13             MR. HEBERT:  Right, but if you go to the

14  airport with nothing, you get to get on the plane if

15  you can establish, through questions, that you're not

16  a security risk.  If you go to the polls with no ID

17  except for your voter card, you're not going to be

18  able to vote except for a provisional ballot, and

19  there's no procedure in the bill for how to rectify

20  that situation once your provisional ballot is

21  counted.  70 percent of the provisional ballots never

22  get counted.

23             SEN. SHAPIRO:  Well, I think the issue

24  here is identity matters, and I think what we're

25  trying to do is just make sure that everybody's

501

```
 1    identity matches who they are.  That's not -- that is

 2    not out of line with about 25 other things that we do

 3    currently under laws or procedures or rules that exist

 4    throughout this country on lots of different issues.

 5    It was just ironic that you mentioned the airport

 6    because I just happen to have written that down while

 7    I was at the airport.  Thank you.

 8                  MR. HEBERT:  Thank you.  You know,

 9    Sen. Shapiro, I own a restaurant, and we check IDs for

10    people who we think are underage drinking.  And when I

11    went through the ABC training course, the alcoholic

12    beverage, and they showed me fake IDs, I could not

13    tell the difference between a valid driver's license

14    and a fake one.  So I agree identity matters, but it's

15    often very difficult to base that decision on a photo

16    ID, including a driver's license.

17                  SEN. DUNCAN:  Mr. Hebert, there are no

18    other Members in queue to question you.  So you are

19    free to leave.

20                  MR. HEBERT:  Thank you.

21                  SEN. DUNCAN:  Thank you.

22                  Mr. Patrick, for what purpose --

23    Sen. Patrick?

24                  SEN. PATRICK:  I was going to ask

25    Mr. Hebert a question, but I don't think (inaudible).
```

502

## TESTIMONY BY THOMAS WHEELER

1

2      SEN. DUNCAN:  Our next witness, Members,

3  is Thomas Wheeler.  Mr. Wheeler, you have written

4  testimony that you've submitted.  It will be

5  Exhibit 28, and it will be entered into the record.

6      (Exhibit No. 28 marked and admitted)

7      SEN. DUNCAN:  If you'll state your name

8  and who you represent?  You have ten minutes.

9      MR. WHEELER:  Thank you, Mr. Chairman,

10  Members of the Committee.  My name is Tom Wheeler.  I

11  represent myself.  I am the Chairman of the Indiana

12  State Election Commission.  I have held that position

13  for the last five years.

14      The Indiana State Election Commission is

15  a bipartisan Commission, it is made up of two

16  Republicans and two Democrats, and as I mentioned I am

17  the Chair of the Commission.  We share responsibility

18  for elections, campaign finance, candidate inquiries

19  and related matters with the Indiana Secretary of

20  State.

21      The document and the statement that has

22  been introduced as Exhibit 28 is a statement prepared

23  by the Indiana Secretary of State Todd Rokita, whose

24  name is -- it probably won't be unfamiliar to you for

25  those of you who have read the Crawford decision.

```
 1                I'm not going to engage in a polemic
 2    here this evening.  I know we're late at night, and a
 3    lot of people are still behind us queued up ready to
 4    speak.  What I would like to do, though, is spend just
 5    a couple of minutes telling you in Indiana how we got
 6    to where we are and how well it has worked in Indiana.
 7    I would not presume to lecture the legislators here
 8    from the great State of Texas about how that's going
 9    to work here.  That's your job as elected officials.
10    But what I can do is tell you how -- why we
11    implemented what we did and how well it worked.
12                Let me take to you 2003, Lake County,
13    Indiana, City of East Chicago.  Lake County, a pretty
14    industrial area just outside Chicago filled with steel
15    mills and industrial area.  The situation is a
16    contested Democratic Primary race for the Mayor
17    of East Chicago.  Mr. Pabey, the Police Chief, is
18    running against the long-time Mayor Mr. Pastrick.
19    Mr. Pastrick was actually filmed and documented in a
20    documentary called The King of Steel Town.  For those
21    of you who are involved in the election-related issue,
22    it's a fairly fascinating documentary about how to
23    move forward with election fraud.
24                In this particular case, on election
25    day, May 6, 2003, Jose Torres walked into the Roberto
```

1    Clemente Center in East Chicago.  He signed his name.

2    He cast a vote in this hotly contested Democratic

3    Primary battle for Mayor.  In fact, he was one of four

4    people, four family members from the same address who

5    also voted in that election.

6              The problem, Mr. Torres died on December

7    26, 1997 in the Chicago Hospital.  Indeed his family

8    had moved out of East Chicago in 1998, yet they kept

9    voting, religiously going to the polls and voting up

10   to 2003.  Interesting enough, Mayor Pastrick, the

11   individual who was running as Incumbent Mayor, was

12   actually a funeral home owner where Mr. Torres and

13   many other voters in East Chicago had been prepared

14   for burial.

15             The issue in this case, this was a hotly

16   contested election.  It was in a Democratic Primary.

17   Very frankly, the Republicans had no idea that there

18   was any fraud going on.  This was whistle blowing

19   between two Democratic candidates.

20             Mr. Pastrick, Mayor Pastrick, lost on

21   election day by 199 votes.  He challenged that loss.

22   He alleged wide spread and systemic fraud by

23   Mr. Pabey.  Mr. Pabey alleged the same by him.  This

24   went to the Indiana Supreme Court.  The Indiana

25   Supreme Court found, and I quote, "There was an

1    occurrence of a deliberate series of actions that
2    perverted the voting process and compromised the
3    integrity and results of the election.  In view of the
4    uncontested factual findings of the trial court, the
5    contestant established that a deliberate series of
6    actions occurred, making it impossible to determine
7    the candidate who received the highest number of legal
8    votes."
9              When our Supreme Court said to us the
10   fraud was so bad -- "We didn't just have dead people
11   voting.  The fraud was so bad that we can't even
12   figure out who won this election, we're going to do it
13   over," that caught the attention of the people of the
14   State of Indiana and the General Assembly.
15             The second factor that caused us to look
16   at our -- look at photo ID as an option was the fact
17   that in Indiana we learned -- and this is set forth in
18   the statement of Secretary Rokita -- we learned that
19   voter registration rates in many of our counties
20   exceeded 100 percent of the estimated voting eligible
21   population.  It was opined during the Pabey/Pastrick
22   matter that these excessive voter registration rates
23   encouraged precisely the kind of fraud that we saw
24   during the Pabey/Pastrick election and the subsequent
25   litigation.

506

1          Taking those two together, the Indiana

2     General Assembly made a determination based upon the

3     concerns about outright fraud, clearly what the

4     Indiana Supreme Court had found in our case, that

5     there was a need to instill voter confidence in the

6     integrity of our election process and in the manner in

7     which we conducted that election process particularly

8     with respect to the in-person voting.

9          As a consequence, the Indiana General

10    Assembly adopted what is the nation's most restrictive

11    photo ID law.  I would note that it's far more

12    restrictive than many of the provisions that you have.

13    For example, we don't have an opt-out provision where

14    an individual can bring two forms of various different

15    pieces of ID, including as I believe one of the

16    Senators referred to, a court document related to a

17    gender change.  We don't have any of those.  Basically

18    you have to -- you have to come forward with a

19    state-issued ID that displays the voter's photo and

20    expiration date and the voter's name.

21          Now, if I might, stepping forward,

22    recognizing my limited time, you've spent some time

23    talking about -- and I believe Mr. Von Spakovsky

24    discussed the University of Missouri study.  What have

25    we learned over the course of this?  We've had now

TX_00004395

507

1    three elections in which we've done photo ID, and what
2    we've learned is that there haven't been any problems.
3    The Secretary of State in his notation in the 2008
4    election, for example, received 1300 calls, complaints
5    from voters.  Two dealt with photo ID.  It's not a
6    situation where we're having massive problems.
7            The case that went to Crawford -- the
8    Crawford case, the ACLU and the various litigants,
9    including the Indiana Democratic party, referred to a
10   apocalyptic disenfranchisement of voters.  The simple
11   fact is that hasn't happened in Indiana.  It just
12   hasn't happened.
13           Now, with respect to the impact of this
14   on minority voters, we do know from the University of
15   Missouri study that Indiana voter registration and
16   Indiana turnout has increased rather dramatically.
17   Indeed attached to Secretary Rokita's statement, the
18   2004 General Election, 58 percent; 2008 General
19   Election, 62 percent.  Now, I've heard some of the
20   Senators say "Well, that was because Barack Obama was
21   on the ticket."
22           The key factor -- and this is what the
23   University of Missouri report looked at was that 2002,
24   which was an off-year election, pre-Barack Obama,
25   which was nonphoto ID, our turnout was 34 percent.

508

1   The 2006 General Election, again pre-Barack Obama, a

2   comparable off-year election, turnout was 40 percent.

3   We went up 6 percent after implementing photo ID.

4   That certainly wasn't the kind of disenfranchisement

5   that was predicted, the apocalyptic prediction of

6   disenfranchisement.  Indeed we had a better voter

7   turnout.  I would suggest that that's counter to most

8   of the states within the union.

9            Now, what happened there?  I don't know

10  what the answer is.  I mean, there's been speculation,

11  and there's been discussion and studies that talk

12  about voter confidence.

13           What I can tell you and one of the most

14  interesting things is the conclusion in the University

15  of Missouri report, that, in fact, photo ID actually

16  benefits Democrat -- traditional Democratic voters,

17  minorities and otherwise.  And one of the interesting

18  parts that has not been referenced in this -- and it's

19  in this report at -- under Section 4.  They refer to

20  the fact that on the other hand, the fact that there

21  were no Democratic candidates in the 2006 Senate race

22  might have led to a lower turnout than otherwise.  In

23  fact, my examination of historical Senate election

24  data does indeed suggest that state voter turnout

25  tends to be lower when there's an uncompetitive Senate

509

1    election at the top of the state ticket, all else
2    constant.  Assuming that this phenomenon occurred in
3    2006 in Indiana, then the photo ID likely led to an
4    even greater increase in the voter turnout than the
5    2 percent observed in the raw data.
6             So the University of Missouri study said
7    we saw 2 percent because there was -- and in 2006 very
8    frankly Democrats really didn't run anybody on a
9    statewide thing, yet the Democratic voter turnout went
10   up.  Well, it doesn't sound like photo ID has pushed
11   Democratic turnout down, at least based upon the
12   University of Missouri study which was focused purely
13   upon Indiana.
14            Now, I'm not going to make predictions
15   about what's going to happen in Texas.  That's your
16   responsibility to take this information and figure out
17   if it works for Texas, but I can tell you that with
18   respect to us it's worked pretty well.
19            And let me tell you the other thing that
20   photo ID does, and this is the most significant thing
21   that photo ID did in Indiana.  You guys have spent the
22   last 14 or so hours -- we've got Republicans pointing
23   at Democrats and saying "Voter fraud."  We've got
24   Democrats pointing at Republicans and saying "Voter
25   suppression."

TX_00004398

510

```
 1              Well, what photo ID has done in Indiana,
 2     it's taken that argument off the table.  We've been
 3     unable to engage in election reform, and we in Indiana
 4     weren't able to do that for years because we just
 5     pointed at each other that way.  Photo ID brought
 6     confidence to the parties, to the Republicans, to the
 7     Democrats, to allow us to engage in meaningful
 8     election reform.  A, we were allowed -- we began
 9     purging our voter rolls.  B, we went to satellite
10     voting.  We went to early voting.  We've got no
11     absentee balloting.  I mean, we've been able to do
12     that because photo ID built a trust level between our
13     legislators to allow us to engage in other election
14     reforms and needed election reforms.  And I would
15     suggest to you that's probably the most valuable part
16     of photo ID is it allows you to get past the finger
17     pointing you've been doing for the last 14 hours of
18     voter suppression versus voter fraud.  It gets you
19     past that and allows you to engage in meaningful
20     election reform.
21              I see that my time is up.  I'd be happy
22     to answer any questions.
23                  **QUESTIONS FROM SENATE FLOOR**
24              SEN. WENTWORTH:  Thank you.  The Chair
25     recognizes Sen. Whitmire.
```

TX_00004399

511

1          SEN. WHITMIRE:  Mr. Wheeler?

2          MR. WHEELER:  Yes, sir?

3          SEN. WHITMIRE:  Thank you for appearing.

4    I was curious listening to your describing what

5    instigated your program in Indiana.  You were talking

6    about this massive fraud that the Supreme Court said

7    they couldn't even determine who the winner was.

8    Could you describe the massive fraud that was so

9    prevalent?

10         MR. WHEELER:  The massive fraud as

11   described by this?

12         SEN. WHITMIRE:  Yeah.  You went through

13   this long scenario about an election that was settled

14   by a hundred votes, and it went to the Supreme Court,

15   and the Supreme Court said it was so bad they just

16   really couldn't hardly tell who won.  What are the

17   facts of that massive fraud?  I'm trying to see --

18   I've never heard of anything like that in Texas.  I'm

19   trying to appreciate what you were facing.

20         MR. WHEELER:  Absolutely.  In the Pabey

21   case, we saw fraud in two areas:  We saw some

22   in-person fraud, and we saw a lot of absentee fraud.

23   What they did is they used our bloated voter

24   registration list to engage in both absentee ballot

25   fraud and direct in-person voting, according to the

1    record that was in -- before the Indiana Supreme

2    Court, which was --

3                    SEN. WHITMIRE:  Where -- do you-all

4    have -- do you-all have laws against voter fraud?

5                    MR. WHEELER:  Absolutely we do.

6                    SEN. WHITMIRE:  Was anyone prosecuted?

7                    MR. WHEELER:  Not that I'm aware of,

8    Senator.

9                    SEN. WHITMIRE:  Why not?

10                   MR. WHEELER:  Well, I believe the record

11   showed that a gentleman by the name of Bernard Carter

12   was the Lake County Prosecutor at the time.  According

13   to the records in the case, he owned several of the

14   apartment buildings that were vacant but were used as

15   home addresses for fraudulent voters.  Now, I don't

16   believe that Mr. Carter, in fact, was ever implicated

17   in that, but I do believe that a lot of those

18   fraudulent addresses did take place at --

19                   SEN. WHITMIRE:  Is it fair to say

20   you-all have pretty laxed prosecution of criminal

21   acts?

22                   MR. WHEELER:  I'd say it's very fair

23   that there's laxed prosecution of voter fraud,

24   absolutely.

25                   SEN. WHITMIRE:  Well, would you -- have

1    you learned -- been in the state long enough to know

2    that we don't tolerate it?  And if you could show us

3    instances of fraud -- do you know of any fraud that's

4    been alleged in the State of Texas?

5                 MR. WHEELER:  I believe there's a

6    witness coming up immediately after me that is

7    familiar with fraud in Texas.

8                 SEN. WHITMIRE:  Do you know in that

9    instance was someone prosecuted?

10                MR. WHEELER:  No, sir, I don't.

11                SEN. WHITMIRE:  Well, it makes a big

12   difference if you're trying to fix something and if

13   you can discover the fraud and you don't prosecute it,

14   I think you've got a criminal justice problem, which

15   we don't have in the State of Texas.

16                Do you have a significant bilingual

17   speaking population in Indiana?

18                MR. WHEELER:  We have a 5 percent

19   Hispanic population.

20                SEN. WHITMIRE:  Are you familiar with

21   our numbers in the State of Texas?

22                MR. WHEELER:  Yes.  If you'll give me

23   just a moment.

24                SEN. WHITMIRE:  Well, let me just help

25   you.  Would you not agree that Texas is much more

```
 1    diverse and has many more Spanish-speaking residents
 2    than you'd find in Indiana?
 3                    MR. WHEELER:  I'm told 36 percent.
 4                    SEN. WHITMIRE:  What about the cost of
 5    introducing your ID program in Indiana, what did you
 6    approximately spend?
 7                    MR. WHEELER:  That's an excellent point,
 8    and that is, if you'll look at Secretary Rokita's
 9    statement -- I don't know if you happen to have it in
10    front of you.
11                    SEN. WHITMIRE:  Yeah, I've read it.
12                    MR. WHEELER:  We spent about
13    1.25 million in HAVA Funds, which were federally
14    provided funds.  So we were lucky enough not to have
15    to use our own state funds.  I have no idea whether
16    you have HAVA Funds that are available for this
17    particular use, but the --
18                    SEN. WHITMIRE:  Well, we've been
19    promised.  Are you familiar with how they intend to
20    fund the plan that you're here endorsing?
21                    MR. WHEELER:  I have no idea.
22                    SEN. WHITMIRE:  Well, it's pretty much a
23    promise by Senator Williams that he would work with us
24    to get those funds and that we've got some spots, but
25    we haven't scheduled those spots, nor do we know the
```

1    amount.  Do you think that would be significant?

2              MR. WHEELER:  I think it's significant

3    to make those expenditures because I think it makes it

4    work.  If you'll look at Indiana, what you heard again

5    and again earlier that Indiana was special because we

6    had 99 percent of people that had photo IDs, and I'd

7    suggest it's even higher than that, and that's

8    specifically because of this outreach.

9              SEN. WHITMIRE:  One last thing that

10   you've got my attention on at this late hour.  You

11   keep being so impressed with the turnout in 2008.

12             MR. WHEELER:  I think I mentioned --

13             (Simultaneous discussion)

14             SEN. WHITMIRE:  Don't you think the

15   2004 -- and I was reading the Secretary of State's

16   comparison about the Presidential Election in 2004,

17   particularly the Democratic Primary.  Surely would you

18   not agree with me that's not apples and apples

19   comparing turnout and the dynamics and the reasons for

20   the 2004 election versus the 2008 when you had such a

21   contested Presidential Primary?

22             MR. WHEELER:  Let me tell you the most

23   amazing thing about the 2008 race.  If you buy into

24   the argument that photo ID in Indiana was designed to

25   suppress African-American and Hispanic voters and

516

1    typical Democratic voters, that's the first year in

2    the last 40 years that Indiana went Democratic in the

3    Presidential Election.

4                SEN. WHITMIRE:  Well, probably because

5    of the state -- wouldn't you agree that your economy,

6    your unemployment and the elements that were a part of

7    that campaign caused that turnout and also for sure

8    the selection and opportunity to vote for the --

9    whether it be Mrs. Clinton or Obama or others?  I

10   mean, everywhere in the country they were experiencing

11   huge additional turnouts.  And, in fact, I will turn

12   and ask you, how do you know it wouldn't have been

13   greater had you not had the voter ID?

14               MR. WHEELER:  I'll tell you why I know

15   that, because the governor of the State of Indiana won

16   by almost 20 points, Republican governor.  Every

17   statewide --

18               SEN. WHITMIRE:  No, we're talking

19   about -- you're talking about the General Election.

20   I'm talking about -- I'm talking about the Primary.

21   You like to point out your great increase in numbers

22   in 2008.  How do you know it wouldn't have been

23   greater if you had not had the voter ID?

24               MR. WHEELER:  I have no idea.  What I

25   will tell you --

517

1          SEN. WHITMIRE:  You have no idea.

2     Repeat that for me.  You sit up there and say you had

3     an outstanding turnout.

4          MR. WHEELER:  Can I finish my

5     question -- my answer?

6          SEN. DUNCAN:  Hold on a minute, sir.

7     You're talking over each other, and the court reporter

8     can't get a record.  Senator, if you-all could

9     exchange questions and answers?

10          SEN. WHITMIRE:  I'm sorry.  Is it not

11     true you have no way of knowing whether you would have

12     had a greater turnout if you had not had the voter ID

13     in the Democratic Primary in 2008?

14          MR. WHEELER:  In the Democratic Primary?

15          SEN. WHITMIRE:  Yeah.

16          MR. WHEELER:  We had 73 percent

17     Democratic turnout in the Primary.

18          SEN. WHITMIRE:  And I think I -- and you

19     probably know the reason because of the opportunity to

20     vote for those outstanding candidates.  It was a very

21     contested Presidential Democratic Primary much more so

22     than the 2004 experience, but you keep pointing to

23     that as such a success for the voter ID.  And I would

24     just ask you, how do you know it would not have been

25     greater had you not had the obstacles of a voter ID?

```
 1              MR. WHEELER:  How do I know it wouldn't
 2    have been less?  I mean, the University of Missouri
 3    study tells me that but for photo ID it should have
 4    been less.
 5              SEN. WHITMIRE:  Do you-all have --
 6              MR. WHEELER:  If I can answer -- answer
 7    the question that you had asked?  What I do know is
 8    that in 2008 in the General Election we had massive
 9    turnout.
10              SEN. WHITMIRE:  Yeah.
11              MR. WHEELER:  Barack Obama won in
12    Indiana, the first Democrat in the last 40 years.  We
13    also had -- and you asked me if I could control for
14    economic conditions.  You said, "Well, couldn't it
15    have been bad economic conditions that caused that?"
16              SEN. WHITMIRE:  Sure.
17              MR. WHEELER:  And the answer is no.  The
18    governor of the State of Indiana won re-election by 20
19    points.  Every Republican officeholder won in Indiana
20    other than Barack Obama.  So what I would answer your
21    question is no, it was not economic conditions.
22              SEN. WHITMIRE:  Without -- excuse me.
23    Without knowing the circumstances of the contested
24    races and the popularity of your governor who may
25    have, you know, adopted Democratic policies for all I
```

519

1    know --

2                  MR. WHEELER:  This was Mitch Daniels.

3    He did --

4                  SEN. WHITMIRE:  You know, I do not know

5    the circumstances.  All I'm simply saying is

6    everywhere in the country, Texas included, we

7    experienced greater turnout because of the shape of

8    the country, the opportunity to vote for the popular

9    candidates on both sides.  So the fact that you -- the

10   fact that you're trying to attribute voter ID to

11   allowing a greater turnout, we experienced it in

12   Texas, and we don't have voter ID.

13                  MR. WHEELER:  Senator, I did not --

14                  SEN. WHITMIRE:  One last thing I want to

15   ask you about.  Did you say your reforms did away with

16   absentee voting, your voters?

17                  MR. WHEELER:  No.  We were able to

18   get -- we went to no-fault absentee voting.

19                  SEN. WHITMIRE:  You went to what?

20                  MR. WHEELER:  We have no-fault absentee

21   voting, which is to say that basically all you have to

22   do is say "I'm going to be out on election day," and

23   you may go vote.

24                  SEN. WHITMIRE:  We have that.  Do you

25   have mail-in early voting?

```
 1                    MR. WHEELER:  We do.
 2                    SEN. WHITMIRE:  Do you ever experience
 3      any alleged fraud in that area?
 4                    MR. WHEELER:  I think in Pabey vs.
 5      Pastrick there's documentation of it.
 6                    SEN. WHITMIRE:  Why didn't you address
 7      that?
 8                    MR. WHEELER:  Because there was a
 9      political compromise.
10                    SEN. WHITMIRE:  Oh, really?  You-all do
11      that, too?
12                    MR. WHEELER:  Occasionally.
13                    SEN. WHITMIRE:  All right.  Thank you
14      for being here.
15                    MR. WHEELER:  Thank you, Senator.
16                    SEN. DUNCAN:  The Chair recognizes
17      Sen. Watson.
18                    SEN. WATSON:  I appreciate you being
19      here.  Senator Whitmire covered most of what I wanted
20      to ask, but I just want to make sure I'm clear.  You
21      came here to give some very specific examples about
22      Indiana, but you don't have any statistical analysis
23      or data about the effects that Senate Bill -- proposed
24      Senate Bill 362 would have on Texas, African-Americans
25      in Texas or Hispanics in Texas or anybody else in
```

```
 1    Texas, do you?
 2              MR. WHEELER:  Absolutely not.  I served
 3    as an elected official prior to resigning to taking
 4    this Commission job.  That's your job.  That's the job
 5    of you guys.  I wouldn't presume to tell you that.
 6              SEN. WATSON:  I appreciate you being
 7    here.  Thank you very much.
 8              MR. WHEELER:  Thank you.
 9              SEN. DUNCAN:  Thank you, Mr. Wheeler.
10    There are no other members queued up to ask questions.
11              MR. WHEELER:  Thank you.
12              SEN. DUNCAN:  We appreciate your
13    appearance, and welcome to Texas.
14              TESTIMONY BY CHANDLER DAVIDSON
15              SEN. DUNCAN:  The next witness we'll
16    have is Chandler Davidson.  Mr. Davidson, as you're
17    approaching, you have submitted written testimony.
18    That will be Exhibit 29.
19              (Exhibit No. 29 marked and admitted)
20              SEN. DUNCAN:  And you are -- if you
21    will, state your name and who you represent, and you
22    have ten minutes.
23              MR. DAVIDSON:  Honorable Senators, I'm
24    privileged to be here at your invitation.  Thank you.
25    Between 1966 and 2003, I taught politics and sociology
```

1   at Rice University and specialized in voting behavior

2   and voting rights.

3           When I joined the Rice University

4   faculty in 1966, two persons I made a point of meeting

5   because of my research interests both had offices on

6   Lyons Avenue in Houston's Fifth Ward.  One was a

7   charming, if rather formidable young woman, who had

8   just been nominated for a seat in this body and with

9   whom I enjoyed a friendship that lasted the rest of

10  her life, Barbara Jordan.  I see her smiling face over

11  there.  She had twice previously failed to win

12  nomination for a House seat in a heavily white

13  district in which racially polarized voting prevailed.

14  Her Senate district, however, was almost half black,

15  and she was able to win.

16          The other person I met was a dentist,

17  also a charming individual, Dr. Lonnie Smith, the

18  named plaintiff in Smith v. Allright, the case

19  Thurgood Marshall successfully argued before the

20  Supreme Court in 1944 invalidating the Texas White

21  Primary.  Ladies and gentlemen, I feel their presence

22  today in this room.

23          Given the long history of legally

24  sanctioned disfranchisement of large and disparate

25  groups of citizens from the founding of the Republic

1    to the recent past, Senate Bill 362 raises important

2    questions to scholars of voting rights.  Indeed the

3    bill brings to mind events during the half century

4    following the Civil War when the language of

5    progressive reform in Texas cloaked the

6    disfranchisement of blacks, Latinos and poor whites,

7    those most likely to vote for Republican or populist

8    candidates.  Actually adopted for partisan and

9    racially discriminatory purpose, these laws were often

10   presented as high-minded attacks on fraud, efforts to

11   purify the electorate that would only inconvenience

12   vote sellers or the ignorant and shiftless.

13           The poll tax was one of the most

14   notorious disfranchising mechanisms of its day.  The

15   current debate over Senate Bill 362 as well as similar

16   bills in other states has led to claims that they are

17   a modern day poll tax.  This implies that the Texas

18   bill, too, falls within the ignominious American

19   tradition of disfranchising laws passed under the

20   guise of good government reform.

21           Frederick Ogden, perhaps the foremost

22   scholar of the poll tax, wrote in the 1950s, I quote,

23   "While critics of legalized restrictions on Negro

24   voting may find it hard to discover any high moral

25   tone in such activities, these restrictions reflected

1    a movement for purifying the electoral process in

2    southern states."

3                    Ogden quotes the editor of the

4    San Antonio Express writing in 1902, "By requiring a

5    poll tax receipt, secured six months previous to an

6    election, fraudulent elections can be prevented almost

7    entirely."

8                    The most accessible photo ID required by

9    Bill 362 probably consists of the state's driver's

10   license.  Obtaining one has been shown in other states

11   to be a good deal more difficult for some people than

12   it might seem at first glance.  For example, at least

13   43,000 persons of voting age in Indiana are estimated

14   to have neither a driver's license or the other most

15   likely form of photo ID in that state.  The number

16   of -- the number in Texas would probably be

17   significantly greater.

18                    The demographic characteristics of

19   persons lacking the requisite ID are suggested by a

20   November 2006 telephone survey of 987 randomly

21   selected voting-age American citizens by the

22   independent Opinion Research Corporation conducted for

23   the Brennan Center for Justice at NYU School of Law.

24   11 percent did not have valid government-issued photo

25   ID, while 18 percent of citizens 65 years of age or

525

1    older lacked it, as did 25 percent of

2    African-Americans.  The latter two demographic groups,

3    the elderly and African-Americans, are more likely to

4    self-identify as Democrats, African-Americans

5    disproportionally so.  There is no reason to believe

6    that this national pattern is much different than that

7    in Texas.

8              Have supporters of Senate Bill 362

9    demonstrated that there is a significant degree of

10   fraud of the kind -- that the bill is fashioned to

11   prevent?  Others today and tonight have described

12   Attorney General Abbott's unsuccessful effort to

13   uncover personal impersonation fraud.

14             Suffice it to say that Senate Bill 362

15   is designed solely to prevent voter impersonation at

16   the polls.  In both 2005 and 2007 Republicans in the

17   legislature introduced similar photo ID bills.  In

18   2007, according to a newspaper reporter, Republicans

19   liked the voter ID bill because they believe it will

20   weaken Democrats, but can argue that it is a

21   reasonable requirement because it would prevent vote

22   fraud.

23             Not all Republicans, however, shared the

24   belief that it would curtail fraud.  Royal Masset,

25   Former Political Director of the Texas Republican

1    Party, was one.  He told a reporter that among his

2    fellow Republicans it was an article of religious

3    faith that voter fraud is causing us to lose

4    elections.  Masset did not share that faith.  He did

5    believe, however -- he told the reporter, that

6    requiring photo IDs could cause enough of a dropoff in

7    legitimate Democratic voting to add 3 percent to the

8    Republicans vote.

9              When Mr. Abbott's failure to find almost

10   any voter impersonation fraud is placed alongside the

11   fact that the previous legislative votes for a Texas

12   photo ID bill were almost entirely along partisan

13   lines and that the people most likely to be

14   disfranchised by it would be Democratic voters,

15   particularly African-Americans and Latinos as well as

16   lower income, elderly and disabled citizens, Texas

17   Senate Bill 362 appears to fit comfortably within the

18   long and sad history of those in positions of power

19   disfranchising the above populations for partisan

20   gain.

21             Moreover, today's Republicans' attempt

22   at justifications of the bill with claims of voter

23   fraud are at least as dubious as those which attempted

24   to justify the now and unconstitutional poll tax at

25   the beginning of the 20th century.

527

1     If Texas enacts a photo ID bill, it will

2  join only seven other states that request a photo ID

3  to vote, states disproportionally among the 11 states

4  of the former Confederacy.  This, in my opinion, as a

5  scholar whose work is focused on the protection of

6  minority voting rights for more than 40 years, would

7  be an egregious step backward for my native state, one

8  which harks back to the post-reconstruction era

9  disfranchisement whose effects Barbara Jordan and

10  Dr. Lonnie Smith fought with such courage to put

11  behind us.  Thank you.

12                **QUESTIONS FROM SENATE FLOOR**

13                SEN. DUNCAN:  The Chair recognizes

14  Sen. Shapleigh.

15                SEN. SHAPLEIGH:  Thank you, Mr. Chair.

16                Dr. Davidson, let's go over your CV and

17  see just exactly what you've done to get your

18  reputation here in Texas as the leading expert on

19  these issues.  You since the '90s have joined with

20  Professor Bernard Grofman with the University of

21  California to do a multi-year study on the Voting

22  Rights Act of 1965, have you not?

23                MR. DAVIDSON:  Yes, sir.

24                SEN. SHAPLEIGH:  And how many people

25  were involved in that, political scientists,

1    historians, sociologists, voting rights lawyers,

2    others?

3                   MR. DAVIDSON:  About 30 people, yes,

4    sir.

5                   SEN. SHAPLEIGH:  And what was the result

6    of that multi-year study?  Did you write a book?  Did

7    you put out a paper?

8                   MR. DAVIDSON:  We wrote a book entitled

9    Quiet Revolution in the South, published by Princeton

10   University Press.  And in 1994, it had funding from

11   the National Science Foundation and the Rockefeller

12   Foundation.  And it was designed to measure the impact

13   of the Voting Rights Act of 1965 on the states that

14   were covered by it -- no, the southern states, the

15   states that are covered by Section 5 of the Voting

16   Rights Act.

17                  SEN. SHAPLEIGH:  Now, has this work been

18   cited in Supreme Court opinions, United States Supreme

19   Court opinions?

20                  MR. DAVIDSON:  Senator, I can't

21   remember.  A number of pieces of my research have, but

22   I'm not sure that that one has.  It was entered in its

23   entirety into the congressional record in 2006 when

24   the question of reauthorizing the nonpermanent

25   features of the Voting Rights Act were under

1    discussion and when those features were coming up for

2    renewal.

3                SEN. SHAPLEIGH:  Were you asked to serve

4    on and did you serve on the National Commission on the

5    Voting Rights Act?

6                MR. DAVIDSON:  Yes, sir.

7                SEN. SHAPLEIGH:  And what was the result

8    of that work?

9                MR. DAVIDSON:  The Commission held ten

10   hearings around the state -- around the country,

11   various parts of the nation to hear people testify as

12   to problems of voting that they encountered.  And on

13   the basis of those hearings and other research, I was

14   tasked with drafting the report that the Commission

15   ultimately published entitled Protecting Minority

16   Voters.

17               SEN. SHAPLEIGH:  Now, we've heard from a

18   bunch of folks from Indiana, a bunch from Georgia.  Is

19   it safe to say you're the leading expert in Texas on

20   the Voting Rights Act?

21               MR. DAVIDSON:  I am one expert, yes.

22               SEN. SHAPLEIGH:  Let me ask you this:

23   You've recited in your paper, you've recited in your

24   testimony here the long and sad and dark history of

25   voter suppression in the State of Texas.  Do you have

530

1    any doubt having looked at what is going on here today

2    that this bill is in line with that long, dark history

3    as an act of voter suppression?

4                MR. DAVIDSON:  Senator, it looks to me

5    as though it does fall within that historical

6    framework.

7                SEN. SHAPLEIGH:  Let me ask you this:

8    When we look at this bill and based on your Texas

9    studies, as this bill will be enforced, we've looked

10   at the fiscal note, this is going to be enforced by

11   poll workers all across the vast diverse state, 24

12   million people from the border to the Panhandle, is

13   there serious potential for discriminatory enforcement

14   of the ID requirements that are contained in this bill

15   at the polls?

16               MR. DAVIDSON:  Yes, sir, I think there

17   are.  One of the things that came through in the

18   hearings which the National Commission on the Voting

19   Rights held across the country and especially in areas

20   with significant Hispanic populations was that there

21   is still a great deal of difficulty that Hispanics

22   encounter voting.

23               When they get to the polls -- there was

24   a study that was presented by a former member of the

25   Justice Department and a special -- and another who is

1    a specialist in voting at the University of Arizona

2    which looked into the question of how well the Voting

3    Rights Act law regarding language minorities was being

4    conducted at the polling places.  And it was found

5    that a significant percentage of Latinos in many of

6    these areas experienced difficulties, and that the

7    actual laws governing language for Latinos and some of

8    the other ethnic minorities were not being enforced.

9                 SEN. SHAPLEIGH:  Let me ask you this:

10   You are from Texas.  Is that correct?

11                 MR. DAVIDSON:  Yes, sir.

12                 SEN. SHAPLEIGH:  As a matter of fact,

13   you've spent a lot of time right in these border

14   counties that Sen. Watson has been talking about.  Is

15   that true?

16                 MR. DAVIDSON:  That's correct.  I was

17   born on a cattle ranch between Alpine and Fort Davis,

18   Texas.

19                 SEN. SHAPLEIGH:  So you do know what a

20   colonia is?

21                 MR. DAVIDSON:  I do indeed.

22                 SEN. SHAPLEIGH:  Let me ask you this:

23   Let's talk about the Hispanics in the State of Texas.

24   I represent a community that is 77 percent Hispanic.

25   55 percent make less than $35,000 a year.  I just

1    looked that up in the 2000 census numbers.  73 percent

2    speak Spanish as a primary language.  So you've got --

3    in addition to the income issues that we see in some

4    of these other cases, you've got the language barrier

5    issues that are not common in Georgia, not common in

6    Indiana.  Based on your studies, what potential exists

7    under this bill for discriminatory enforcement of ID

8    requirements at the polls given that language barrier?

9              MR. DAVIDSON:  I think there's a

10   significant possibility of problems there, and that

11   goes back to what I mentioned just a minute ago with

12   regard to the finding of how Latinos are treated at

13   polling places.

14             SEN. SHAPLEIGH:  Let me ask this

15   question:  Many here on this floor have made the

16   allegation and believe that noncitizen Hispanics are

17   voting in large numbers in the State of Texas.  We've

18   heard from the Attorney General that there is an

19   epidemic of voter fraud, many quotes in different

20   publications about illegal aliens coming and voting in

21   the State of Texas.  Based on your studies and what

22   you know, is there any evidence whatsoever that

23   noncitizen Hispanics are voting in large numbers

24   illegally in this state?

25             MR. DAVIDSON:  Well, first of all,

1    Senator, I have not directly addressed that question

2    in any of my studies.  So I can't -- I really can't

3    provide an answer based on that.  But I will say that

4    it seems to me that given the $1.4 million that

5    General Abbott spent trying to -- trying to uncover

6    voter fraud and the fact that over a three-year period

7    he has essentially not done so, and to my knowledge,

8    this is the largest effort by the State of Texas in

9    modern history, perhaps ever, to uncover voter fraud,

10   it strikes me as not very plausible that there is much

11   voting going on among illegals in the state, although

12   there's a significant number of them, perhaps as many

13   as 2 million according to the anti-immigration group

14   FAIR.

15               SEN. SHAPLEIGH:  Let me ask you this:

16   There has been much made about a free ID being offered

17   in connection with the administration of this act.

18   What, in your opinion, are the hidden costs of getting

19   such a free ID?

20               MR. DAVIDSON:  Well, several people have

21   mentioned some of the hurdles and, of course, one of

22   them is just the difficulty that people who don't have

23   automobiles and are poor have in getting a driver's

24   license, the of lack accessibility of DPS and things

25   of that sort.

1          SEN. SHAPLEIGH:  When one goes to get

2    one of the other documents that are permitted under

3    this bill, a birth certificate, for example, is there

4    a cost attached to getting that to produce that for

5    the free ID?

6          MR. DAVIDSON:  What was the example that

7    you gave, sir?

8          SEN. SHAPLEIGH:  Birth certificate.

9          MR. DAVIDSON:  Yes, that -- that can be

10   rather expensive.  And, in fact, some of the -- some

11   of the studies that were done in the Indiana case

12   where the ID was -- the government issued ID was all

13   supposed to be free indicated that people often had to

14   spend a good deal of money and a good deal of time

15   getting birth certificates and/or material that

16   indicated that they were born in the United States.

17          SEN. SHAPLEIGH:  In my district, I

18   believe the charge is $22 for a birth certificate to

19   get one in order to go get the free ID.  Would that,

20   in your opinion, be a barrier to folks trying to

21   achieve a constitutional right to vote?

22          MR. DAVIDSON:  When the 24th Amendment

23   outlawed the poll tax in Texas in the middle 1960s,

24   the tax, as I recollect, was $1.50, and in some

25   counties there was a 25 percent surcharge, so that

1    would bring it to $1.75.  And in today's dollars, that

2    would be somewhere around $11.  So the figure that you

3    have quoted is almost twice as high as the poll tax

4    laws in current buying power when it was abolished.

5                     SEN. SHAPLEIGH:  Thank you, sir.  Thank

6    you for coming.

7                     MR. DAVIDSON:  Thank you.

8                     SEN. DUNCAN:  The Chair recognizes

9    Sen. Williams.

10                     SEN. WILLIAMS:  Thank you,

11    Mr. President.

12                     Mr. -- Dr. Davidson.  Correct?  I want

13    to be sure.  Is that --

14                     MR. DAVIDSON:  Yeah.

15                     SEN. WILLIAMS:  Do I have your name

16    right?  Okay.  Thank you.

17                     A couple of questions.  As I read your

18    written testimony, you say some things here that

19    really call up some unfortunate parts of our history

20    here in Texas with relation to racial issues and

21    voting.  And I think the one that strikes me the most

22    is the poll tax.  And you say that the poll tax is --

23    was one of the most disenfranchising mechanisms of

24    its day.  Tell me how you think this bill, Senate

25    Bill 362, help me understand how you believe that this

536

1    imposes a poll tax on voters.

2              MR. DAVIDSON:  Well, as I explained to

3    the other Senator just a minute ago, it is sometimes

4    expensive to get various forms of photo ID that are

5    required to vote.

6              SEN. WILLIAMS:  Well, have you read our

7    Senate Bill 362?  Have you reviewed the bill?

8              MR. DAVIDSON:  Yes.  I reviewed it

9    briefly, yes.

10             SEN. WILLIAMS:  Well, did you read the

11   whole bill?

12             MR. DAVIDSON:  Yes.

13             SEN. WILLIAMS:  You did?  And did you

14   note in the bill that you don't need a photo ID to

15   vote?  You can also bring alternate forms --

16             MR. DAVIDSON:  Yes.

17             SEN. WILLIAMS:  -- of information, like

18   a utility bill and a government check or a social

19   security document, or it could be a Medicare

20   enrollment card, those kinds of things that might be

21   very common for people, especially the kinds of folks

22   that you're talking about, to have?  And you still

23   think this imposes a poll tax even in light of the

24   alternate forms?  All you talked about and all you

25   referenced in the paper here is the cost of a photo

1   ID.  But isn't it true, in fact, that there are

2   alternate forms of identification that are available

3   that would be available to most people at no cost?

4                MR. DAVIDSON:  In that case, if it's not

5   a photo ID that's shown at the polls, isn't one

6   required to cast a provisional ballot?

7                SEN. WILLIAMS:  No.

8                MR. DAVIDSON:  No?

9                SEN. WILLIAMS:  No, if you bring two

10  alternate forms of identification -- and there's a

11  list in the bill.  I'd be glad to read them to you if

12  you'd like for me to do that.

13                MR. DAVIDSON:  Could you do that,

14  please?

15                SEN. WILLIAMS:  Yes, yes, give me just a

16  second to get that in front of me.  Okay.  "the

17  following documentation is acceptable as proof of

18  identification under this chapter.  Any two of these

19  items would be sufficient:  A copy of a current

20  utility bill; a bank statement; a government check, a

21  paycheck or other government document that shows the

22  name and address of the voter; official mail addressed

23  to the voter -- addressed to the person by name from a

24  governmental entity; a certified copy of a birth

25  certificate or other document confirming birth that is

```
 1    admissible in a court of law and establishes the
 2    person's identity; United States citizenship papers;
 3    an original or certified copy of a marriage license or
 4    a divorce decree; court records of the person's
 5    adoption, name change or sex change; an identification
 6    card issued to the person by a governmental entity of
 7    this state or the United States for the purpose of
 8    obtaining public benefits, including veterans'
 9    benefits, Medicaid or Medicare; a temporary driving
10    permit issued to the person by the Department of
11    Public Safety; a pilot's license; a library card that
12    contains the person's name issued to the person by a
13    public library located in this state; or a hunting and
14    fishing license issued by the Parks & Wildlife
15    Department."
16            Now, really, Dr. Davidson, do you think
17    it's so burdensome that if we're going to allow
18    someone to bring a copy of a government-issued
19    document of any type plus a library card or anything
20    issued by a government entity like that, I mean,
21    that's a pretty long list, is that really that
22    burdensome?  All the things that you talked about, how
23    do you call this a poll tax if we're giving these
24    alternate forms of ID?
25            MR. DAVIDSON:  I think for some people
```

1    it will be difficult to get those kinds of things.

2              SEN. WILLIAMS:  But is it a poll tax?

3    That's my question.

4              MR. DAVIDSON:  Well, it's not officially

5    a poll tax.

6              SEN. WILLIAMS:  No, it wouldn't be a

7    poll tax.

8              MR. DAVIDSON:  It would be a burden of

9    time or in some cases money, yes.

10             SEN. WILLIAMS:  Yes.  And didn't the

11   Supreme Court speak to that very point in their

12   opinion in the Crawford case?  Are you familiar with

13   that?

14             MR. DAVIDSON:  Yes.

15             (Simultaneous discussion)

16             SEN. WILLIAMS:  Okay.  And I believe

17   that what the Supreme Court said that burdens of that

18   sort arising from life's vagaries, however, are

19   neither so serious nor frequent to raise any question

20   about the constitutionality.  The availability of the

21   right to cast a provisional ballot provides an

22   adequate remedy to the problems of that character.

23             So in addition to the long list of

24   alternative documents that we would allow under the

25   provisions of Senate Bill 362, we also have the

```
 1    provisional ballot provisions that are referenced

 2    here, and we don't require them to come back like the

 3    other states do.

 4                Now, I just fail to see -- I think it's

 5    very inflammatory for you to come before this body and

 6    talk about the legislature imposing a poll tax when

 7    the bill doesn't provide for that at all, and, in

 8    fact, recognizes that the very things that

 9    Sen. Shapleigh has been talking about over here, the

10    burden of having to come up with some of these

11    documents might be too much, and we provided these

12    alternate forms.  I just don't think that's fair at

13    all.

14                MR. DAVIDSON:  Well, we disagree on

15    that, and four members of the Supreme Court apparently

16    disagreed, too, with regard to the issue --

17                SEN. WILLIAMS:  Now --

18                MR. DAVIDSON:  -- that it was not a poll

19    tax.

20                SEN. WILLIAMS:  I believe that you

21    referenced also in your remarks earlier the Attorney

22    General and the record that he had in his failure to

23    find any voter fraud after expending a vast sum of

24    money, I believe you said $1.9.  I think it's actually

25    $1.4 million that the Special Investigations Unit
```

541

```
 1    spent.  Did you speak of that earlier?  Did I --
 2              MR. DAVIDSON:  I believe I did, yes.
 3    $1.4 million, yes.
 4              SEN. WILLIAMS:  Right.  Okay.  Maybe I
 5    misunderstood you, but it was, in fact, $1.4 million
 6    that was erroneously reported in a newspaper that the
 7    funds were spent on election fraud and enforcement.
 8    In '03 the Office of the Attorney General launched a
 9    Special Investigations Unit.  Initially it was funded
10    by a Justice Department grant that's administered by
11    the Governor's Office.  Contrary to the reports that
12    you seem to have bought into without any real digging
13    into the facts is that the SIU, the Special
14    Investigations Unit, it handles many types of cases,
15    not just election fraud.
16              Here are some of the cases that they
17    were involved in:  The El Dorado YFZ Ranch, we had
18    three Special Investigation Unit investigators that
19    are currently assigned there full time to that case;
20    the Texas Youth Commission, including a case where a
21    TYC officer was indicted for drug possession, they
22    handled more than 840 abuse allegations; hurricane
23    related rapid response efforts, including serving
24    subpoenas on potential price gougers; market
25    manipulation and penny stock fraud case that was
```

1    jointly pursued with the Securities and Exchange

2    Commission; an ERCOT case; the Cyber Crimes Unit and

3    Fugitive Unit assistance for combined arrests of over

4    100 cyber predators and child pornographers and more

5    than 1,000 fugitives; identity theft; public

6    corruption, including a Bastrop County case and the

7    Potter County Sheriff's case; money laundering,

8    including investigations into the bulk transportation

9    of drug currency, money couriers and money services

10   businesses; and then finally election fraud.

11            Now, I don't think it's fair for you to

12   come before this body and characterize that

13   $1.4 million as an investigation into election fraud

14   when, in fact, some of the most horrific things that

15   have happened in this state that the AG has had to get

16   involved in, that's what they've been spending that

17   money on.

18            MR. DAVIDSON:  "Vote fraud has been an

19   epidemic in Texas for years, but it hasn't been

20   treated like one, Abbott said, in announcing the SIU.

21   It's time for that to change.  He promised that his

22   newly created Special Investigations Unit would help

23   the Police Departments, Sheriff's Offices and District

24   and County Attorneys successfully identify,

25   investigate and prosecute various types of voter fraud

1    offenses.  Established with a $1.4 million grant from

2    the Governor's Office, the SIU would have as one of

3    its prime responsibilities investigating voter fraud

4    allegations, he said.  Abbott targeted 44 counties

5    containing 78 percent of registered voters in the

6    state.  According to the Austin American Statesman,

7    complaints originate from voting officials, District

8    Attorneys or citizens and are sent to the Secretary of

9    State or the Attorney General.  Each complaint is

10   evaluated by a professional employee to determine

11   whether the complaint is legitimate and warrants

12   further investigation."

13             Now, that sounds to me like the Attorney

14   General was certainly representing this as a major

15   effort to uncover voter fraud.

16             SEN. WILLIAMS:  So whatever you read in

17   the paper, that's what you pretty much take at its

18   face value?

19             MR. DAVIDSON:  Most of what I quoted,

20   Senator, is taken from the Attorney General's Website

21   when he was announcing this voter fraud initiative.

22             SEN. WILLIAMS:  Dr. Davidson, for the

23   record, to date the Office of the Attorney General has

24   resolved 22 election fraud prosecutions at a cost of

25   approximately $600,000.  There are an additional eight

544

```
 1   election fraud indictments that are pending currently.
 2   There has been approximately $100,000 spent on those
 3   eight cases.  And of the 700,000 -- of $700,000 spent
 4   on election code investigations, about $93,000 of that
 5   came from Department of Justice grants.  DOJ grants
 6   aren't used to fund these Special Investigations Units
 7   any longer, and it's now funded with general revenue
 8   from the state.
 9               So I just felt like when you come before
10   this body and you make allegations about a poll tax
11   being levied on voters and you haven't even read the
12   bill to know what the alternative voting provisions
13   are, and you then come and accuse our Attorney General
14   of doing something with that Special Investigations
15   Unit without even really looking into what the unit
16   had really cost, I just felt like the record needed to
17   be set straight.
18               Thank you very much.  I appreciate you
19   being here so late at night.
20               MR. DAVIDSON:  Thank you, sir.
21               SEN. CARONA:  Sen. Van de Putte, for
22   what purpose?
23               SEN. VAN de PUTTE:  I would like to
24   hold, Mr. President, until -- Sen. Shapleigh, I think,
25   would like to continue on this, and then I have a
```