1    separate set of questions for the professor.

2              SEN. CARONA:  Okay.  Sen. Ellis, for

3    what purpose do you wish to be recognized?

4              SEN. ELLIS:  On this point to just ask a

5    couple of questions.

6              SEN. CARONA:  Certainly.

7              SEN. ELLIS:  Dr. Chandler, thank you for

8    being here at this late hour.  I know you've been here

9    all day.  I think you mentioned the year the poll tax

10   was enacted in Texas.  I think you said it was 1901.

11             MR. CHANDLER:  Yes, sir.

12             SEN. ELLIS:  And then it was abolished

13   by the courts in 1966, so from about --

14             MR. CHANDLER:  It was the 24th

15   Amendment.

16             SEN. ELLIS:  Yeah.  So I guess the 24th

17   Amendment abolished it, but I think it took us a

18   little longer to --

19             MR. CHANDLER:  It was actually the

20   result -- I mean, once that had been abolished, there

21   was a court case that was heard --

22             SEN. ELLIS:  Yeah.

23             MR. CHANDLER:  -- in Texas I think right

24   after the Voting Rights Act was passed, yeah.

25             SEN. ELLIS:  So I assume the Attorney

1    General in Texas at the time or the Members of this

2    body didn't see fit to come in and abolish it right

3    away?

4              MR. CHANDLER:  That's correct.

5              SEN. ELLIS:  It was a long and tortious

6    road to get there.  So about 62 years we had a poll

7    tax in Texas.

8              Now, I assume you're guessing, but I

9    just want your opinion on, do you think anybody on

10   this floor has pulled up the legislation and read the

11   poll tax bill in Texas?  Just a guess.

12             MR. CHANDLER:  I doubt it.  I don't

13   know.

14             SEN. ELLIS:  Okay.  Just as someone was

15   asking you whether or not you read every word in this

16   bill, I happen to agree with you, this bill is nothing

17   more than a modern day poll tax.  And if it hurts

18   somebody's feelings because it's referred to as that,

19   well, let their feelings fall where they may.

20             You're a student of history, a great and

21   respected student of government and history.  I assume

22   when Members sat in these chairs on this floor at

23   these desks in 1901, 1902 or maybe 1899 in a session,

24   maybe a special session -- I don't know if they had to

25   suspend the rules to do it by 16 votes or if they

```
 1   could get their 21 or 31 pretty darn easily.  Do you
 2   have any sense -- could you give us some sense of what
 3   you think the discussion was like, or do you think
 4   anybody got up in one of these -- behind one of these
 5   desks and said "Maybe if we have a poll tax it will
 6   have a disproportionate impact on certain groups of
 7   people"?
 8              MR. CHANDLER:  I think that was
 9   certainly well understood whether it was said on the
10   floor or not.
11              SEN. ELLIS:  If you were guessing, what
12   kind of people probably would not have had a sex
13   change or have two forms of government -- two letters
14   that they can bring in, maybe they wouldn't have a
15   light bill or maybe they wouldn't have a library card
16   because they're not reading books, would you assume
17   that most of those people are probably low income?
18              MR. CHANDLER:  Yes, sir.
19              SEN. ELLIS:  Most of them are probably
20   African-American or Hispanic?
21              MR. CHANDLER:  Yes, sir.
22              SEN. ELLIS:  Would you assume that most
23   of them would probably vote in the Democratic Party
24   for whatever reason?
25              MR. CHANDLER:  Now, we're talking about
```

1    1901?

2                    SEN. ELLIS:  No, no, we're talking about

3    this bill.

4                    MR. CHANDLER:  Oh, now, yes.  I'm sorry.

5                    SEN. ELLIS:  I'm sorry.  Yes, under this

6    bill.

7                    MR. CHANDLER:  Yes.

8                    SEN. ELLIS:  Yeah, I know my colleague

9    went through a long litany of things.  And as I

10   listened to him, I was thinking maybe some of our

11   colleagues on this floor don't run into people who

12   fall into those categories because they don't get

13   invited to dinner parties, or maybe they don't show up

14   at the legislature.  Maybe they don't have the ID to

15   get a Southwest Airlines flight to get here.  Maybe

16   they don't like getting searched or going into the

17   back room.  Maybe they don't have the money to get a

18   ticket on Southwest Airlines.

19                   So my question was, do you think most of

20   those people who would fall under that laundry list of

21   people who wouldn't have those forms of identification

22   would probably be African-American or Hispanic?

23                   MR. CHANDLER:  Yes, sir.

24                   SEN. ELLIS:  So there is a corollary

25   between the people who would not meet the requirements

549

1    laid out in this bill and the people who would not

2    comply with the requirement to pay a dollar or dollar

3    and a half to pay a poll tax?

4              MR. CHANDLER:  Yes, sir.

5              SEN. ELLIS:  Okay.  I think it's a

6    perfect analogy, and I appreciate you being here.

7              MR. CHANDLER:  Thank you.

8              SEN. CARONA:  Senator Shapleigh, do you

9    wish to be recognized?

10             SEN. SHAPLEIGH:  I do, Mr. Chair.

11             SEN. CARONA:  You're recognized.

12             SEN. SHAPLEIGH:  Dr. Davidson, you were

13   questioned about representations by the Attorney

14   General, and I think you accurately had actually read

15   his press release.  Do you recall that he sent out a

16   press release in connection with his investigation

17   launch that he intended to do in March of 2006?

18             MR. CHANDLER:  Yes, sir.  In fact I went

19   back and just tread it a couple of days ago.  It's on

20   his Website.

21             SEN. SHAPLEIGH:  And do you recall him

22   in that press release saying "In Texas an epidemic of

23   voter fraud is harming the electoral process"?

24             MR. CHANDLER:  Yes, sir.

25             SEN. SHAPLEIGH:  And it's in his own

```
 1    press release where he announces he's going to

 2    dedicate a $1.5 million grant from the Governor's

 3    Office.  That's where that number came from.  Correct?

 4              MR. CHANDLER:  That's correct.  Not out

 5    of the newspaper, but from him.

 6              SEN. SHAPLEIGH:  Mr. Chair, if I may,

 7    I'd like to make this a part of the record as

 8    Exhibit 30, which is the Attorney General's press

 9    release titled Helping Stamp Out Voter Fraud in Texas

10    from March of 2006.

11              (Exhibit No. 30 marked and admitted)

12              SEN. CARONA:  Senator Shapleigh, if

13    you'd bring it forward, please?  Have you concluded

14    your remarks?

15              SEN. SHAPLEIGH:  Yes, sir.

16              SEN. CARONA:  The Chair recognizes

17    Sen. Van de Putte.

18              SEN. VAN de PUTTE:  Thank you,

19    Mr. Chairman.

20              Professor, thank you for being here.  I

21    know that it has been a long day and now I guess

22    beginning a couple hours into the second day.  You are

23    probably one of the best national scholars on historic

24    suppression and disenfranchisement of certain classes

25    of voters.  Is that correct?
```

551

```
 1              MR. CHANDLER:  Yes, ma'am.
 2              SEN. VAN de PUTTE:  And because of that
 3   you are now -- you are considered Professor Emeritus
 4   at Rice, one of our prestigious universities here in
 5   Texas and one that is nationally and internationally
 6   renowned.  And is that right, you are --
 7              MR. CHANDLER:  Yes, ma'am.
 8              SEN. VAN de PUTTE:  -- Emeritus?  With
 9   the work that you have done, much of what had been
10   documented in other states was a poll tax.  I would
11   like for you to comment on literacy tests and how they
12   were used.  And I think one reason why that is so
13   important is because for the first time the State of
14   Texas was called into that Section 5 on Hispanics and
15   language barriers because not just of the poll tax,
16   but because of the literacy test.
17              And I'm going to explain what happened
18   to my own very mother, and if you could elaborate in
19   your research if this was something that occurred
20   rarely or something that occurred pretty often.  My
21   mother in 1952 was going to cast her first vote in a
22   presidential ballot.  My mother, a college sophomore
23   at the time, went to the polls with her poll tax to
24   cast that ballot.
25              Now, in San Antonio, what they used to
```

1   do with people who had Spanish names is they put them

2   in a room until enough people got there, and then

3   somebody would go administer a reading test.  And for

4   my mother she was one of about ten or twelve she said,

5   and she waited and then she got administered a reading

6   test.  Now, she was in a group of she said ten or

7   twelve, she didn't remember, and being a college

8   sophomore she thought she probably had a pretty good

9   chance of passing that reading test.  But because she

10  had the audacity to be in a group with someone who

11  supposedly failed, none of those people were allowed

12  to vote, none of them.  That's how they

13  disenfranchised my mother and people with Spanish

14  surnames.

15          And so when I took my mom to the

16  Democratic National Convention in August of last year,

17  she cried every day because she was at a convention,

18  and the first time she tried to cast a ballot she was

19  discriminated against because her maiden name was

20  Aguilar, and her name was Maria Isabella Aguilar.

21          Knowing now what you know about my

22  family, and some of my colleagues just can't seem to

23  understand why we just can't get over it, that

24  happened a long time ago, and they keep questioning

25  "Why do we have to go to the Justice Department?  Why

553

1    do we have to do this?"  Well, that's what happened to

2    my family, and yet we know there are records not only

3    of poll tax, but we have pretty good accounts of what

4    occurred in South Texas communities as well.

5              Given the fact that that's just personal

6    family history and that you have studied this, how

7    prevalent was that discrimination and those tools, not

8    just the poll tax, but reading tests and literacy

9    tests and not just owning property, but how was that

10   used and how is that different from just one more

11   barrier, one more hoop to jump for someone to cast a

12   ballot as proposed in this bill today?

13             MR. CHANDLER:  Well, it's certainly true

14   that Latinos in Texas have been severely discriminated

15   against.  The White Primary, the Democratic Party, in

16   most places allowed Latinos as distinct from blacks

17   from voting, but they were local White Primaries along

18   the border that were set up by individual counties.

19   And so they suffered much of the same discrimination

20   in that regard that blacks did.

21             The State of Texas officially did not

22   have a literacy test like some of the other southern

23   states did, but at the same time there is much

24   anecdotal evidence of the kind that you have just

25   described about Hispanics being treated differently

5b4

1    and being required essentially to pass an informal

2    literacy test.

3              And continuing up into the current time,

4    there are efforts that have been documented to put the

5    fear of God into Latinos going to vote, such things as

6    people standing outside the polling place and taking a

7    video -- videos of them and of their license plates.

8    There have been incidents of people dressing up in

9    official looking outfits, police-appearing uniforms

10   and informing Latinos who come up to the polls that

11   they better look out.  If they are not legal, they may

12   be in big trouble.  And some of my historian

13   colleagues and I at Rice a few year ago uncovered a

14   number of those instances in Texas and throughout the

15   southwest with regard to Latinos.

16             So this is not -- what your mother

17   experienced, well, it is not ancient history that

18   Latinos are still being discriminated against at

19   polling places in the southwest, including the State

20   of Texas.

21             SEN. VAN de PUTTE:  Professor, I know

22   that you've done a lot of work in this, and certainly

23   the books that you've used and much of the case law

24   and much of the folks that studied this have said that

25   you are pretty much the expert on this.  And although

1    reading our bill I'm still a little bit confused

2    because as I read it, everybody is going to have to

3    have at least that voting -- the certificate that's

4    issued by the elections administrator of that

5    jurisdiction and a photo identification.  But I worry

6    that if you don't have that with you and with no money

7    put in to the fiscal note to do any education,

8    training of poll workers, when in your work, in your

9    research, is there any effect when those officials who

10   are supposed to be administering the election, the

11   election clerks and judges, is there any evidence to

12   show us when there is not sufficient training of

13   those?

14          And particularly with the litany of

15   documents that could be possibly used, is that --

16   should that give us pause with no training about how

17   this is going to be enacted and what's going to happen

18   basically at the grassroots level?  Does this have the

19   potential to cause further disenfranchisement of

20   Hispanics, blacks and those people in poverty, given

21   the fact that we have zero dollars in that fiscal note

22   for the training?

23          MR. CHANDLER:  That would certainly be

24   my supposition, Senator.

25          SEN. VAN de PUTTE:  Thank you,

556

```
 1    Professor.  I appreciate you being here till two in
 2    the morning.
 3                 MR. CHANDLER:  Thank you.
 4                 SEN. CARONA:  Members, is there anyone
 5    else with a question for the professor?
 6                 SEN. LUCIO:  Mr. President?
 7                 SEN. CORONA:  It appears not.
 8                 SEN. LUCIO:  Mr. President?
 9                 SEN. CORONA:  Senator, for what purpose?
10                 SEN. LUCIO:  Just to ask a question or
11    two.  I might not have another chance to do this with
12    this professor.  I'd like to ask a question.
13                 SEN. CARONA:  You're recognized.
14                 SEN. LUCIO:  Thank you, Mr. President.
15    And very briefly, Professor, thank you.  I join my
16    colleagues in welcoming you here and commending you
17    for all your studies over the years.
18                 MR. CHANDLER:  Thank you.
19                 SEN. LUCIO:  Leticia Van de Putte,
20    Senator Van de Putte, reflected on literacy tests.  My
21    father worked at the Sheriff's Office for 30 years in
22    Cameron under about four different Sheriffs and, of
23    course, he took me to a lot of political parties in
24    the old days when I was just a kid, and I heard many
25    stores obviously along the way.
```

1          And I want to ask you, in your

2     studies -- you also included some of these studies,

3     and one was when the poll tax was in effect, I'm told

4     that the politicos, those obviously in power, would

5     buy all the poll taxes that people needed as long as

6     obviously they had control over those votes.

7               MR. CHANDLER:  Yes, there were machines

8     along -- along the border, yes.

9               SEN. LUCIO:  Exactly.  Now, that being

10    the case and putting it -- comparing that to today's

11    standards in terms of illegal activities during the

12    election -- during the elections that took place then,

13    buying or purchasing the poll tax for somebody and

14    then driving them to the polls and then making sure

15    they voted a certain way, what kind of -- what kind

16    of -- let's say the Attorney General -- what kind of

17    prosecution would those individuals be -- you know, be

18    in effect -- be affected by under the laws of today?

19    How could they be prosecuted?  I mean, in today's --

20    with today's laws, how would those people back then be

21    prosecuted?  Could they be prosecuted?

22               MR. CHANDLER:  You mean the bosses who

23    would buy poll taxes?

24               SEN. LUCIO:  What would they be subject

25    to in terms of today's laws and being prosecuted for

```
 1    those kinds of political activities?  Is what I'm
 2    trying --
 3                  MR. CHANDLER:  Well, they -- I mean, it
 4    would certainly be illegal, and they would be -- if
 5    the law were carried out like it was supposed to be,
 6    they would certainly be prosecuted if their behavior
 7    came to light.
 8                  SEN. LUCIO:  And the point I wanted to
 9    make is simply this:  That that, in fact, took place.
10                  MR. CHANDLER:  Yes.
11                  SEN. LUCIO:  And that was part of the
12    suppression.  That was part of what Hispanics or
13    Latinos or Mexican-American citizens on the north side
14    of the border, Texas-Mexico border went through, and
15    maybe some of the Members here on this floor are
16    not -- are not aware of, and I wanted to share that
17    because that was just rampant.  That was just part of
18    any politics at the time in the 19 what, '40s, '50s?
19                  MR. CHANDLER:  Into the '50s certainly.
20    The old machines were the Patrones, and it was almost
21    a feudal relation.  And the Latinos were looked upon
22    as inferior, as foreign in some sense, as people to be
23    manipulated and used for the purposes of the -- of the
24    Patrones, and that's -- that is undeniable Texas
25    history.
```

1          SEN. LUCIO:  I lived those days as a

2     young boy.  I remember them, and I think that's what

3     Sen. Van de Putte was pointing out as to bad memories

4     of past.  Thank you.

5          MR. CHANDLER:  Yes.  Thank you.

6          SEN. DUNCAN:  There are no more -- no

7     more questions in the queue.  So you are free to -- or

8     excused.  Thank you for your testimony.

9          MR. CHANDLER:  Thank you, sir.

10          **TESTIMONY BY ED JOHNSON**

11          SEN. DUNCAN:  The Chair calls

12     Ed Johnson.  Okay.  Mr. Johnson, I think you have some

13     documents you'd like to introduce into the record.

14     We'll mark those as Exhibit No. 31, and they'll be in

15     the record.

16          (Exhibit No. 31 marked and admitted)

17          SEN. DUNCAN:  Identify -- let me

18     identify these as it looks like records that are from

19     specific voting documents.  So at some time in your

20     testimony I assume you'll explain these.  Exhibit 27

21     or -- 32?  I'm sorry.  Exhibit 32 will be received in

22     the record.

23          (Exhibit No. 32 and 33 marked and

24     admitted)

25          SEN. DUNCAN:  You have ten minutes.

1    State your name and who you represent.

2             MR. JOHNSON:  Okay.  Good morning.  My

3    name is Ed Johnson.  I'm with the Harris County Tax

4    Office, and in Harris County the Tax Office does voter

5    registration.  I have worked for the voter

6    registration department for eight years now at the

7    Harris County Tax Office.  I was asked to come and

8    present to you-all today some cases of voter rarity or

9    voter registration fraud that we have presented to the

10   House in previous testimony.  We have a sampling of it

11   to show you here today.  I was asked by the new Tax

12   Assessor/Collector of Harris County, Leo Vasquez, who

13   was just appointed this last December the 23rd.  So

14   he's only been in a couple of months, and he asked me

15   to give the, I guess, testimony today.

16             One of the things that Leo is real proud

17   of and really works on hard on our voter registration

18   staff is -- his goal for us is to have every citizen

19   that is eligible to vote registered.  That is his

20   goal, and we are making all kinds of strides to make

21   that possible in voter registration.  On the same

22   note, he also doesn't want any of these real, valid

23   voter registrations to be disenfranchised by someone

24   taking their vote.  So the integrity of the voter roll

25   is also very important to us.

1          The first case that I was going to lay

2     out is a case of voter fraud.  It was committed by a

3     volunteer deputy, Janice Shelvin.  Janice Shelvin was

4     a college student that became a volunteer deputy in

5     one of her college classes.  And according to her

6     testimony, her professor asked her to do a voter

7     registration drive as part of her, I guess, class for

8     credit or some course.  Ms. Shelvin unfortunately

9     procrastinated in her testimony and waited to the last

10    day and realized that she had to turn in quite a few

11    applications.

12          She then stated that she pulled out her

13    phone book and started filling in voter registration

14    cards.  After 25 names she ran out of names in her

15    phone book and then proceeded on with the other 36,

16    making up names and filling them in.  She turned this

17    in.  I think several of her classmates were all

18    gathered into one bundle and were delivered to the

19    Harris County Tax Office to be registered.

20          It was the, I guess, observance or

21    diligence of one of our very good clerks as they were

22    processing these applications actually started to note

23    that these applications all had very similar

24    handwriting and were all used by the same pen.  So

25    there was a red flag waived in her head that there's

1    something amiss here and brought it to the attention

2    of her supervisor, where we then challenged these

3    applications because they did appear to be all signed

4    by the same person and written all in the same

5    penmanship.  So there were 61 cases.

6                    We, under the I guess Texas Election

7    Code, sent these voters a letter challenging these

8    applications thinking they were fraudulent.  We got 25

9    replies from voters, and then the other 36 were -- no

10   reply was found.  In fact, the post office were sent

11   certified mail as part of the documentation that

12   you-all received, and the post office said that there

13   was no residence there to deliver it to.  So they were

14   returned.  So I think that those were the fraudulent

15   ones.

16                    This was sent to the Harris County

17   District Court, and Ms. Shelvin, I guess, pleaded

18   guilty to this offense and was convicted for 61 cases

19   of voter fraud.  If -- and this was back in the year

20   2000.  At that point in time as in the election code,

21   voter registration cards are accepted on face value.

22   When the voter signs the bottom, or the alleged voter,

23   when the alleged voter signs the cards, they are

24   accepted on face value until they are challenged.  So

25   that's what happened to these.

1          And if they were not caught by our clerk

2     that had the real judgment here, these people would

3     have become registered voters.  We would have sent

4     them voter registration cards with the possibility of

5     someone collecting those cards and possibly voting

6     them in an early voting scenario or something like

7     that.

8          The second case I would like to present

9     is -- we refer to it as the Dashwood case.  This

10    happened in 2006.  We received 121 voter registration

11    applications.  The resident address that they -- these

12    vultures were trying to use was a street called

13    Dashwood.  There is a street in Houston called

14    Dashwood, but the address range that they were writing

15    on the voter registration card was nonexistent.  There

16    isn't that address block on Dashwood.

17          And in our office, the procedures are

18    when our processors can't find it in the database, the

19    street database, a street range, they send it to our

20    mapping department who has all the plots and the plats

21    and all the new maps and everything, and they start

22    researching to find it.  They found out that this

23    address of Dashwood is nonexistent and then really

24    quickly realized "Oh, boy, I have a whole bunch of

25    applications here all in this block range of

564

1    Dashwood."  And so we started looking at them and

2    found that, once again, they were similar penmanship,

3    the wide variations of the name, they switched the

4    first name, last name, they would turn the dates of

5    the birth date around.  They had them all just jumbled

6    up trying to register a whole bunch of different

7    people that were fraudulent at this address on

8    Dashwood.

9         Thank goodness they didn't know Houston

10   that well to know that that was a nonexistent address,

11   or we never would have caught these for that.  But the

12   only other characteristic they had was all these

13   applications were actually mailed from El Paso to us.

14   So whoever was doing it was mailing them from El Paso

15   here.  And those were turned over to our D.A., and

16   they are still under investigation.  I think they took

17   it to the D.A. in El Paso where they did have some

18   people that were questioned.  I don't know what the

19   final outcome of that one was.

20        Then the last case I'd like to present

21   is we have 24 examples here of deceased -- people that

22   are deceased, and they voted after their date of

23   death.  These are 24 examples that, once again, we had

24   a diligent clerk as we were going through and cleaning

25   up our voter roll, taking the social security death

565

1  list and matching it to voters to send notices, that
2  she started to realize that some of these people had
3  voting history after their date of death on the social
4  security list.  And some of these 24 people voted
5  numerous times here.
6             I can tell you that these were
7  registered voters in Harris County, and they are now
8  deceased, and they do have a voting history.  Our
9  County Clerk keeps our voting history records, and the
10 County Clerk has voting history for these people in
11 elections that were past their date of death.
12            In this documentation, you will see that
13 we have a complete voter file for each one of these
14 voters.  It's their voter registration application,
15 how they get registered, if they had any changes of
16 address.  It will have a front cover page that has the
17 computer screen shot of that voter's record in our
18 office, and then also on the bottom corner it will
19 show what elections they voted in and the date of
20 those elections.  And then on the last page is a
21 notice from the social security department of their
22 date of death, and you can go through these, and
23 you-all can get the documents and look at them.
24            Several of these voters voted early in
25 person during early election.  We had a couple of them

1    on election day and a couple by ballot by mail.  The

2    majority of them were done early in person in early

3    voting.

4              And I know it's getting late, and so

5    I'll stop with this fine set of documents.

6              **QUESTIONS FROM SENATE FLOOR**

7              SEN. DUNCAN:  The Chair recognizes

8    Sen. Huffman.

9              SEN. HUFFMAN:  Mr. Johnson, thanks for

10   staying with us so late.

11             MR. JOHNSON:  You bet.

12             SEN. HUFFMAN:  I appreciate it.  I want

13   you to go over again that last group that you were

14   talking about to make sure that it's clear.  I'm not

15   sure that it was.  As I understood your testimony,

16   you've established that, in fact, that last group

17   of 24, at least some of those people, or someone,

18   actually cast a ballot in Harris County after it was

19   determined that they were dead.  Is that correct?

20             MR. JOHNSON:  That is correct.

21             SEN. HUFFMAN:  Okay.  And what are the

22   numbers?  How many of those were you able to

23   establish?

24             MR. JOHNSON:  Well, we have proof here

25   that 24 -- and this is just a random, you know,

1    sampling that we found -- 24 of these people are

2    deceased, were registered voters in Harris County they

3    are deceased now, and they had voting history after

4    their date of death on the social security list.

5              SEN. HUFFMAN:  And how was it that you

6    came to investigate that particular group of people?

7              MR. JOHNSON:  This is something that we

8    routinely do.  Almost on a daily basis now in our

9    office we get probate court records and go through

10   them to find if any of those people were registered

11   voters to remove them from the voter roll.  Right now

12   what we're working on is we get notes in poll books,

13   family members will write notes in poll books, you

14   know, this was my husband or wife and is deceased, and

15   we go through these, we mail these people letters

16   asking them to confirm this information.

17              And this particular project we actually

18   purchased a copy of the social security death database

19   and started comparing our voter roll to it to see if

20   we had any matches to clean our voter roll up.

21              SEN. HUFFMAN:  Is that a procedure

22   that's required by the Secretary of State, or is that

23   something that Harris County has taken on?

24              MR. JOHNSON:  That's something that

25   Harris County took on as an attempt to, like I said,

```
 1   make a clean and accurate voter roll.  It actually

 2   cost our department quite a bit of money to make that

 3   purchase and to do that work.

 4            SEN. HUFFMAN:  And is that a cost that

 5   Harris County has taken on itself?

 6            MR. JOHNSON:  Yes.

 7            SEN. HUFFMAN:  Do you have knowledge as

 8   to whether or not there are other counties in the

 9   state that are taking this additional obligation on?

10            MR. JOHNSON:  Yes, in fact -- yes, there

11   are other counties that take this on.  In fact this

12   particular run here, we did this in partnership with

13   Tarrant County at the time.

14            SEN. HUFFMAN:  Okay.  Do you know

15   whether or not all the other counties in the State of

16   Texas are participating in this?

17            MR. JOHNSON:  No, I do not know if all

18   the other counties in the State of Texas are.

19            SEN. HUFFMAN:  Okay.  Do you believe

20   that there could be some counties that are not purging

21   their rolls of deceased individuals?

22            MR. JOHNSON:  I would believe that

23   that's very possible.

24            SEN. HUFFMAN:  Okay.  I want to go

25   through something with you because I think you've
```

```
 1    established through some of the cases that you've
 2    brought to us and the investigations that have been
 3    done that there are, in fact, people being registered
 4    in Harris County who -- in some fraudulent manner.
 5    But let's take an example, and I'm going to ask you
 6    about a situation where an individual would fill out
 7    the -- a Texas Voter Registration Application.  This
 8    is just a form that is provided by the Secretary of
 9    State.  Is that correct?
10              MR. JOHNSON:  Yes.
11              SEN. HUFFMAN:  And do you have one of
12    those forms in front of you?
13              MR. JOHNSON:  I have several copies.
14    Would you like for --
15              SEN. HUFFMAN:  Okay.  All right.  If you
16    could just make those available?  And if anyone who
17    would like to look at this, we'll provide you a copy.
18    And these are the original ones.  Actually you brought
19    a stack from Harris County.  Is that correct?
20              SEN. DUNCAN:  Senator, do you want to
21    put these in the record?
22              MR. JOHNSON:  These were actually
23    produced by the Secretary of State's Office.
24              SEN. HUFFMAN:  Yes?  Yes, sir?  Yes,
25    Mr. Chair?
```

1          SEN. DUNCAN:  Do you want to put that in

2     the record?

3          SEN. HUFFMAN:  Yes, could we put this in

4     the record and mark it as an exhibit?  I don't know

5     what number we're on.

6          SEN. DUNCAN:  It will be Exhibit No. 34,

7     and describe it, if you would.

8          (Exhibit No. 34 marked)

9          SEN. HUFFMAN:  Yes, it is a Texas Voter

10    Registration Application.  This is one that is

11    particularly from Harris County, but it's -- I believe

12    it would be produced by the Secretary of State.  Is

13    that -- is that correct, Mr. Johnson?

14          MR. JOHNSON:  Yeah, these are produced

15    by the Secretary of State, and they can be used in any

16    county across the State of Texas.

17          SEN. HUFFMAN:  All right.

18          SEN. DUNCAN:  It will be -- it will be

19    received in the record.

20          (Exhibit No 34 admitted)

21          SEN. HUFFMAN:  All right.  Thank you,

22    sir.

23          Just to see how this process would work,

24    let's just pretend that -- let's pretend that I'm

25    Elvis Presley.  Okay?  And let's say I fill out this

```
 1    Texas Voter Registration Application and I mark -- and
 2    there's a place at the bottom that provides space to
 3    present a Texas driver's license number and a social
 4    security number.  Is that correct?
 5              MR. JOHNSON:  Yeah, that's Step No. 9.
 6    Let me have my glasses -- let me put my glasses on.
 7              SEN. HUFFMAN:  All right.
 8              MR. JOHNSON:  Or 8 -- that's 8.
 9              SEN. HUFFMAN:  That's No. 8.
10              MR. JOHNSON:  Sorry.
11              SEN. HUFFMAN:  And at the bottom of
12    No. 8 is an option "Check if you do not have a Texas
13    driver's license or Texas personal identification
14    number," and then next to it is "Check if you do not
15    have a social security number."  So let's say I do not
16    have either one of those, either one, do not have a
17    TDL or an ID card, nor do I have a social security
18    number.  So I check both, I sign it and I mail it off.
19    Where does it go?  Does it go to your office?
20              MR. JOHNSON:  Yes.
21              SEN. HUFFMAN:  And then what would
22    happen when it arrived at your office with that
23    information from me asking to register to vote?
24              MR. JOHNSON:  The first thing when one
25    of these applications comes into our office, we check
```

1    it for what the date is on it because if you mailed

2    it, it becomes effective 30 days from the date it was

3    postmarked or the date we receive it from a volunteer

4    deputy or some other government agent.  We check it

5    for completeness, make sure all the boxes are filled

6    in.  If the application is not complete, we'll mail

7    them a letter of incomplete and ask -- with another

8    application in it and ask them to try again and make

9    sure they fill all the required boxes out.

10                  In the scenario you were talking about,

11   if you checked the box that said "I do not have a

12   Texas driver's license" and you checked the box that

13   said "I do not have a social security number," under

14   the Help America Vote Act, the Secretary of State is

15   supposed to provide a unique ID number for this voter,

16   and they do.  They provide a state voter ID number,

17   and this person becomes registered.

18                  SEN. HUFFMAN:  Okay.  So that is

19   happening, and that is the law in the State of Texas

20   at this point.  Is that correct?

21                  MR. JOHNSON:  Correct.

22                  SEN. HUFFMAN:  Okay.  Once they provide

23   that unique ID number, then what would happen?

24                  MR. JOHNSON:  Well, then we mail them a

25   voter certificate card.

```
 1              SEN. HUFFMAN:  Okay.  What form of
 2     identification would they then need to vote with that
 3     voter registration card?
 4              MR. JOHNSON:  In this particular
 5     example, you are marked on the poll book.  When we
 6     print the poll book or the list of registered voters
 7     for an election, you would be marked as not being ID
 8     compliant because you haven't shown ID to who you are.
 9     And in the state law, what it states there is that you
10     can use any one of the currently prescribed IDs with
11     the exception of the voter registration card.  I have
12     the list here.  You know, you can use your driver's
13     license.  Most people do something like that.  You can
14     use, you know, birth certificate, citizenship papers,
15     you know, a passport.  The one that I find real
16     interesting is you can use a letter, an official
17     letter mailed from a government entity.  So if I had
18     mailed them a letter saying that they hadn't had a
19     complete application to try again, that is a letter
20     from a government entity, and they could use it
21     for proof.
22              SEN. HUFFMAN:  So if I had no other form
23     of ID, I could use the letter that you had sent to me
24     as meeting the requirements under 63.0101 described as
25     official mail addressed to the person by name from a
```

```
 1    governmental entity.  Is that correct?
 2                MR. JOHNSON:  That is correct.  That is
 3    an acceptable form of ID.
 4                SEN. HUFFMAN:  Okay.  So a person who
 5    wanted to commit fraud could, in fact, send in
 6    applications -- is that correct -- using false names
 7    as long as they had an address where they could
 8    receive mail, go through this dance with the Secretary
 9    of State and the tax assessors and get voter
10    registration cards along with letters from your
11    office, and they could use those things to get
12    individuals to go in to the poll to vote, and it would
13    be virtually impossible under the current state of the
14    law for them to be detected.  Is that correct?
15                MR. JOHNSON:  Correct.  The election
16    judge could not deny them the right to vote.  They are
17    on the poll book.  They are listed as a registered
18    voter.  They have shown one of the acceptable forms of
19    ID, and they would be allowed to vote on election day.
20                SEN. HUFFMAN:  Okay.  So that's just one
21    way that voter fraud can be committed in the State of
22    Texas under the current law, and no one would know
23    actually that it was going on probably other than the
24    individuals involved with the committing the offense.
25    Is that correct?
```

1          MR. JOHNSON:  That is correct.

2          SEN. HUFFMAN:  All right.  One of the

3    other records that you provided to us was the young

4    woman, I believe, who was registering people for a

5    school project.  I think you indicated that she as

6    well managed to successfully register some individuals

7    who you believed were nonexistent individuals.  Is

8    that correct?

9          MR. JOHNSON:  No, she was never able to

10   register anybody.

11         SEN. HUFFMAN:  All right.

12         MR. JOHNSON:  We caught them before.

13   Like I said, the clerk that was working these

14   applications noticed this pattern before we mailed any

15   voter registration certificates out, and we were able

16   to stop them and challenge these voters.  But we had

17   officially accepted the applications and noticed

18   everything being complete, and they were in the

19   process of being registered.

20         SEN. HUFFMAN:  All right.  What is your

21   experience as you find cases that you believe are

22   cases of voter fraud and you bring them to the

23   District Attorney's Office?  Has it been your

24   experience that those cases had been difficult to

25   prosecute?

 1              MR. JOHNSON:  Yes, we have turned quite
 2      a few cases over to the District Attorney, and I will
 3      tell you our District Attorney has made attempts to
 4      prosecute this, going back to one of our long-time
 5      District Attorneys Johnny Holmes.  And he basically
 6      said that there is not the tools in the election law
 7      to prosecute a voter.  Basically in order to get voter
 8      fraud prosecuted, you have to have that person
 9      committing the offense confess to that offense for
10      prosecution.
11              One of the things they always state was
12      because -- just a signature on the poll book is not
13      really enough evidence for them so far to get a
14      conviction, that if we ever had some other form of ID
15      that they contend it was a harder match, you could
16      actually have successful convictions probably on some
17      of these voter fraud issues.
18              SEN. HUFFMAN:  Isn't it true that the
19      current state of the law does not facilitate proof
20      that a particular person cast a ballot?  Is that -- is
21      that a fair statement?
22              MR. JOHNSON:  Yes.
23              SEN. HUFFMAN:  Do you think that the
24      current Public Integrity Division of the Harris County
25      District Attorney's Office is meeting the same

```
 1    problems that were met, as you mentioned, back in
 2    Johnny Holmes' days?
 3                    MR. JOHNSON:  Correct.
 4                    SEN. HUFFMAN:  All right.
 5                    MR. JOHNSON:  There was a recent case
 6    that I just saw pending on a Website.  We had an open
 7    record request for -- right before this last
 8    November 2008 election from Texas Watchdog.  They sent
 9    us a list of over 4,000 voters that they believed to
10    be deceased.  This was information that they found
11    from the social security death list.  We are currently
12    working that list trying to, you know, find out if
13    they are deceased or not, and several of them we have
14    removed from the rolls.
15                    Texas Watchdog also gave that same list
16    to one of our local news stations, Channel 2 in
17    Houston.  Channel 2 did an investigation and actually
18    found two of the voters on that list as being deceased
19    and voting during the Primary, and that was after they
20    had passed away.  They actually placed a vote in the
21    Primary, and they had interviews with the family
22    members showing the death certificates and everything.
23    And the family members were really upset about this,
24    that someone would steal or fraud their deceased
25    relative's name.
```

 1              Watchdog actually turned these over to

 2    the District Attorney's Office, these cases, and they

 3    were unable to -- the District Attorney had to put a

 4    comment back they were unable to get any prosecution

 5    on these cases because they didn't have anyone to

 6    prosecute nor anyone to confess to the crime.

 7              SEN. HUFFMAN:  All right.  So each one

 8    of these cases is actually pretty much a "Who done

 9    it?"  Is that correct?

10              MR. JOHNSON:  That is correct.

11              SEN. HUFFMAN:  And just like any other

12    criminal case, the State of Texas has to prove these

13    cases beyond a reasonable doubt.  Is that correct?

14              MR. JOHNSON:  I believe that is correct.

15              SEN. HUFFMAN:  So they have to prove

16    identity, they have to prove intent, they have to

17    prove the elements of the offense.  And many times

18    they're confronted with a situation where they just

19    don't have any way to prove it.  Is that correct?

20              MR. JOHNSON:  That's what I have been

21    told.

22              SEN. HUFFMAN:  All right.  Do you think

23    that just because -- you know, we've had a lot of talk

24    today about the fact that there's just -- there's no

25    evidence that there's any kind of voter fraud or voter

1    impersonation going on because if there -- if it was

2    happening, then there would be all these convicted

3    cases out there.  Do you think that because it is so

4    difficult to prove these cases and because the law

5    does not facilitate the proof, that that may be one of

6    the reasons why there aren't a lot of convictions that

7    have been shown through the records?  Would you agree

8    with that?

9              MR. JOHNSON:  Yes.  I will say that the

10   Texas Election Code does not give us the tools to

11   really do the job that we're, you know, trying to do,

12   even the D.A.'s Office.  It's very difficult to get

13   prosecution in these cases.

14             SEN. HUFFMAN:  All right.  Would it

15   surprise you to know that this -- well, in the General

16   Election in November of '04 that the Harris County

17   District Attorney's Office received 3,324 electric

18   fraud complaints for that one election, or that for

19   the Primary Election in March of '08 that they

20   received 1,502 complaints of election fraud that came

21   in as -- I would assume slightly -- during the

22   election and probably for a couple of days thereafter?

23   Do those numbers surprise you?

24             MR. JOHNSON:  No, they do not.

25             SEN. HUFFMAN:  As the election is taking

1    place, does your office along with the D.A.'s Office

2    and Beverly Kaufman's Office monitor the situations

3    that are going on, try to field phone calls and

4    receive complaints of election fraud violations?

5              MR. JOHNSON:  Well, I can speak for our

6    office, the tax office.  We're actually by election

7    code obligated to review the poll book and all the

8    documents from the election after the election has

9    taken place, to validate that everybody that was

10   marked as voting were registered voters.  If we find

11   someone that had been written into the poll book and

12   wasn't a registered voter and allowed to vote, we're,

13   by the Texas Election Code, supposed to turn those

14   names over to the District Attorney, and we do that

15   after every election, and, you know, they do their

16   best in trying to work this.  And I know Beverly

17   Kaufman's Office, who runs the election, has the same

18   responsibilities for any voter fraud that goes on.

19   They compile a report after every election and submit

20   it to the D.A.'s Office.

21             SEN. HUFFMAN:  Just a couple of more

22   quick questions, Mr. Johnson.  Based on your

23   experience, your years at the Tax Assessor's Office

24   and working on these issues all these years, do you

25   believe -- in your opinion, do you believe that there

1    is a voter fraud problem in Harris County?

2              MR. JOHNSON:  I will tell you there is

3    voter fraud in Harris County.  We have one of the few

4    convicted cases of it.  We have examples here.  I

5    can't tell you how extensive it is.  We have never

6    done a voter fraud study on our voter roll.  The cases

7    that I presented to you here today were just found due

8    to workers, clerks in our office being diligent and

9    accidentally stumbling across these records to

10   discover them.

11             SEN. HUFFMAN:  Does current law actually

12   make it difficult to assess the scope of the problem?

13             MR. JOHNSON:  Yes.  The current election

14   law is very loose and makes it very difficult to --

15   doesn't give us the tools to do the types of

16   investigations needed for these projects.

17             SEN. HUFFMAN:  All right.  Thank you

18   very much, Mr. Johnson.  And thank you, Members, for

19   bearing with me.  Thank you, Mr. Chairman.

20             SEN. DUNCAN:  Thank you Senator.

21   Members, we've been going for over two hours, and we

22   need to give our court reporter an at ease.  So we'll

23   be at ease for ten minutes.  That will be until 2:35.

24             (Recess:  2:25 a.m. to 2:38 a.m.)

25             SEN. DUNCAN:  The Committee of the Whole

582

```
 1    will come back to order.  Sen. Gallegos, did you want
 2    to yield to Sen. West?
 3                    (No response heard)
 4                    SEN. DUNCAN:  Sen. West?
 5                    SEN. WEST:  Thank you, Mr. Chairman.
 6    Mr. Johnson --
 7                    SEN. DUNCAN:  If we could have order,
 8    please.  Go ahead, sir.
 9                    SEN. WEST:  It's Mr. Johnson.  Is that
10    correct?
11                    MR. JOHNSON:  Yes.
12                    SEN. WEST:  Okay.  I'm sorry.  Your
13    position there in Harris is --
14                    MR. JOHNSON:  I'm sorry I didn't say
15    that earlier.  I'm the Associate Director of Voter
16    Registration in Harris County.
17                    SEN. WEST:  Okay.  Is it true that at
18    least 13,000 timely voter registration applications
19    had not been processed when early voting began in
20    Harris County during the fall of 2008 elections, and
21    that many of them were not processed before early
22    voting concluded?
23                    MR. JOHNSON:  I do not have those
24    figures, you know, right off the top of my head.  I
25    could find those answers out for you, but I can't --
```

TX_00004471

583

1              SEN. WEST:  But let me ask it this way:

2     Was there a substantial number of voter registration

3     applications not processed during that particular time

4     period?

5              MR. JOHNSON:  You know, that's -- you

6     have to define "a substantial number."  We received

7     about 120,000 voter registration applications the

8     day -- the day of and day after the cutoff.  By the

9     start of early voting, we had probably 95 percent of

10    those worked.  And by the time we got to election day,

11    all of them were complete.

12             SEN. WEST:  So you did have a backlog

13    prior to the start of early voting?  You only had --

14    I'm sorry.  You had only completed about 95 percent of

15    the voter registration applications at the time that

16    early voting started?

17             MR. JOHNSON:  Correct.

18             SEN. WEST:  Okay.  Do you know that

19    Harris County disqualified nearly 70,000 voter

20    registration applications that were received in time

21    for the 2008 election?  Do you know that?

22             MR. JOHNSON:  No, I do not know that.

23             SEN. WEST:  Were a substantial number of

24    people disqualified?

25             MR. JOHNSON:  I do not -- you know, you

TX_00004472

584

1   have to define what is "disqualified."  What's your
2   definition of "disqualified"?
3                    SEN. WEST:  Seventy thousand.  You know,
4   in terms -- were there --
5                    MR. JOHNSON:  Are you talking about we
6   received 70,000 applications that were incomplete, or
7   are you telling me that we didn't --
8                    SEN. WEST:  You disqualified.
9                    MR. JOHNSON:  -- register and rejected
10  70,000 applications?  There's a big difference between
11  the two.
12                   SEN. WEST:  Did you know that Harris
13  County disqualified nearly 70,000 voter registration
14  applications that were received in time for the 2008
15  election?
16                   MR. JOHNSON:  I will tell you we had
17  quite a few applications that were not completed
18  correctly, and we mailed those people letters, the
19  letter with a new application, and they had ten days
20  to reply, and they received the original date of the
21  first application, which still made them qualify.
22                   SEN. WEST:  So there's a process?
23                   MR. JOHNSON:  Yes, there's a process.
24                   SEN. WEST:  Okay.  All right.  Now, did
25  you know that Harris County Election Officials have

1    acknowledged that in many polling locations in Harris

2    County when voters were in line to vote at

3    seven o'clock and had the right to cast a ballot, that

4    they were routinely given provisional ballots rather

5    than standard ballots?

6                    MR. JOHNSON:   That unfortunately is not

7    my department.   You would have to ask the County Clerk

8    about that.   The tax office just handles voter

9    registration.

10                   SEN. WEST:   Okay.   But you have

11   processes in place in your office to handle different

12   types of election-related issues?

13                   MR. JOHNSON:   Yes.   On election day for

14   that scenario you were just talking about, we had over

15   240 people on the phone, and we actually answered

16   close to almost 60,000 -- I guess 55,000 phone calls

17   on election day, helping people find their polling

18   locations, helping the election judge qualify voters

19   they were having problems with.

20                   SEN. WEST:   In terms of -- my colleague

21   Senator Huffman went methodically through the voter

22   registration application card, and I assume that you

23   have processes in place there to verify all the

24   information necessary to determine whether or not a

25   person should be issued a voter -- voting registration

```
1   certificate?
2              MR. JOHNSON:  We follow the Texas
3   Secretary of State -- I mean, the Texas state law on
4   elections.
5              SEN. WEST:  But you do have processes in
6   place in order to --
7              MR. JOHNSON:  Yes.  We have manuals that
8   we have for all of our employees on the processes to,
9   you know, handle voter registration applications.
10              SEN. WEST:  All right.  In terms of the
11   handling of these applications, are individuals given
12   certain specific duties as it relates to the
13   applications, or do they just kind of look at the
14   application, you have individuals looking at
15   application after application?
16              MR. JOHNSON:  With the volume that we
17   handle, yes, you know, the assembly line method is
18   proven to be the most efficient for handling high
19   volumes, you know, in a quick manner.  So, yes, we
20   have different departments that do different tasks in
21   each one.  And the very first step when we receive an
22   application is it is validated to make sure it is
23   complete.  And then after it's completed, even after
24   that, they put a document number on it and image it,
25   and that is cataloged in our voter registration system
```

1   even on the incomplete ones so we can refer back at

2   any point in time and find out if a voter submitted a

3   complete or incomplete.  But that is the very first

4   step when they come through the door of our office.

5           SEN. WEST:  Is there a statutory duty

6   imposed by Texas law to go through and purge the voter

7   registration rolls of persons that are deceased?

8           MR. JOHNSON:  If you're referring to --

9   and the definition of "purge" in the Texas Election

10  Code is by the National Voter Registration Act when

11  you have reached the end of your suspense cycle.

12          SEN. WEST:  Explain "suspense."

13          MR. JOHNSON:  Okay.  I'll start at the

14  beginning on the definition of "purge" in the election

15  code.

16          SEN. WEST:  Okay.

17          MR. JOHNSON:  If every two years we

18  mail -- and this is where the majority of people end

19  up on suspense.  Every two years we mail every voter,

20  registered voter, a new voter registration certificate

21  or renewal certificate, the card that you get in the

22  mail.  If that card -- and it has instructions on that

23  card.  If the postman cannot deliver it, if the

24  resident no longer lives at that address they're

25  trying to mail it to, then the post office is

TX_00004476

```
 1    instructed to return it to our office as being
 2    undeliverable.
 3              When your voter registration card is
 4    returned to our office as being undeliverable, that
 5    you no longer live at that address, we put you on
 6    what's called "suspense."  You're still a registered
 7    voter.  You can still vote.  When you walk into a
 8    polling location, you're on the poll book, you're
 9    going to have an "s" by your name, which stands for
10    "suspense."  And the election judge will ask you,
11    "Sir, would you please fill out a statement of
12    residence?"  An address correction card is basically
13    what that is with your new address.  Once you fill out
14    that card or any other voter application, your name is
15    removed off suspense.
16              By the National Voter Registration Act,
17    once you go on suspense and you remain on suspense
18    without updating your address, without filling out a
19    change of address card or application for two General
20    Election cycles, you are then removed from the voter
21    roll.
22              SEN. WEST:  Okay.  Thank you.  As it
23    relates to checks and balances, do you have checks and
24    balances in your office?
25              MR. JOHNSON:  Yes, we do.
```

```
1              SEN. WEST:  Describe those checks and
2   balances.
3              MR. JOHNSON:  I mean, are you asking me
4   what the procedure is that I'm checking and balancing?
5              SEN. WEST:  Of the registration cards.
6              MR. JOHNSON:  We probably have the most
7   robust in the state.  And the fact that every document
8   that comes through our door, the very first thing that
9   happens to it is I give it a document number and I
10  image it, and then it is logged into our computer
11  system, and I can find that document at any point in
12  time.  So I have a count of how many documents I
13  receive.
14             As the processors are working these
15  documents, it records all the steps that happened to
16  it throughout the way and will finally record when it
17  is completed and the person is registered or they have
18  been sent some notice of incomplete.  I can run a
19  report at any time and find out how many applications
20  I have and what status.
21             SEN. WEST:  Okay.  As it relates to --
22  you have several -- I think you have about three
23  different exhibits up there, and I'll refer to them
24  that way.  One of them you have -- I think it's 121
25  applications.
```

TX_00004478

1          MR. JOHNSON:  Yeah, we referred to that

2     as the Dashwood.

3          SEN. WEST:  Dashwood, okay.  Let's talk

4     Dashwood.

5          MR. JOHNSON:  Okay.

6          SEN. WEST:  Did the system -- did your

7     system work in terms of the Dashwood applications?

8     And what I mean by that --

9          MR. JOHNSON:  Yes, it did.

10         SEN. WEST:  What I mean by that -- hold

11    on for one second.  And what I mean by that when those

12    applications came in, I assume that you assigned them

13    a number, you imaged them and then sent them through

14    the process to determine whether they were complete?

15         MR. JOHNSON:  Yes.  One of the hearts of

16    any voter registration system is what we call the

17    street guide, the list of streets broken into what

18    streets and block ranges belong to a precinct.

19    Because in order to register a voter, you have to

20    assign them to some precinct so they receive the

21    correct ballot, so they're voting for the correct

22    districts and correct members, you know.

23         SEN. WEST:  And that would be one of

24    the, I guess, checks so to speak?

25         MR. JOHNSON:  Correct.

```
 1                SEN. WEST:  All right.

 2                MR. JOHNSON:  So that is the heart of

 3   any voter registration system is the street guide.

 4                These particular -- these particular

 5   addresses or cards when they came in, the processor

 6   could not find this -- these streets, these addresses

 7   in our master list of addresses.  Now, we get new

 8   streets all the time, so that's why we have a whole

 9   separate mapping department.  These applications were

10   sent to our mapping department so that they could do

11   research to find this address.  They did extensive

12   research, actually drove to the street to look it up

13   and found that this block range of that street did not

14   exist.

15                SEN. WEST:  Okay.  And were all of the

16   applications properly filled out?

17                MR. JOHNSON:  Not all of them were

18   properly filled out.

19                SEN. WEST:  In fact the majority of them

20   were not properly filled out.  Is that correct?

21                MR. JOHNSON:  I have not done a count on

22   it.  I would say, you know, a good percentage of them

23   were not properly filled out.

24                SEN. WEST:  Okay.  So in that instance,

25   the system worked?
```

1           MR. JOHNSON:  Yes.

2           SEN. WEST:  Okay.  And so the process

3   worked, and you were able to stop those particular

4   applications from being processed.

5           As it relates to the issues where we had

6   people that were voting that were deceased, can you

7   tell us whether or not -- you can't tell us whether --

8   how those persons appeared, whether they went to the

9   polling place, anything like that.  Your records just

10  indicate that someone voted.  Is that correct?

11          MR. JOHNSON:  No.  Now, the voting

12  information actually comes from our County Clerk's

13  Office.

14          SEN. WEST:  Okay.

15          MR. JOHNSON:  They are in charge of

16  elections, but it does appear on our computer system.

17  We did a screen shot of those in these records.  So if

18  you want to -- I mean, I can go through the first one.

19          SEN. WEST:  I mean, just a question.

20  Can you tell us whether --

21          MR. JOHNSON:  Yes, and let me just

22  describe the code for any of you-all that have it.

23          SEN. WEST:  Well, hold on; hold on for

24  one second because I just want to know whether you can

25  tell us whether or not they voted at the -- someone

```
 1    voted at the poll.
 2                    MR. JOHNSON:  Yes, we have a code.
 3                    SEN. WENTWORTH:  Okay.  Now, let me --
 4                    MR. JOHNSON:  In the very first
 5    column -- let me tell you something.
 6                    SEN. WEST:  Hold on for a second; hold
 7    on for a second, please.  You can tell us that.
 8    That's all I wanted to know.
 9                    MR. JOHNSON:  Okay.
10                    SEN. WEST:  Now, as it relates to your
11    office's responsibility for doing any type of check --
12    well, let me back up.
13                    Does your office have a process that you
14    utilize on a regular basis to check the probate --
15    check the probate court, anything like that, or check
16    any type of records to determine whether persons on
17    the voter roll are now deceased?
18                    MR. JOHNSON:  Correct.
19                    SEN. WEST:  How often -- you do have a
20    process?
21                    MR. JOHNSON:  We have several processes.
22                    SEN. WEST:  Okay.
23                    MR. JOHNSON:  And to start with the --
24    you asked first about the probate.  Probate courts
25    are, in the Texas Election Code, required to send us
```

1    their cases that they process.

2                    SEN. WEST:  Okay.

3                    MR. JOHNSON:  We receive that

4    documentation probably once a week from the probate

5    courts.

6                    SEN. WEST:  Once a week?

7                    MR. JOHNSON:  Yeah, I would say roughly,

8    from Harris County.

9                    Then our office takes this upon

10   ourself -- because I will tell you it's probably one

11   of the things that's most upsetting to a voter is when

12   they come in and see their deceased familiar member on

13   the roll.  It's really upsetting.  So we actually go

14   through the Houston newspaper every day and cut out --

15                    SEN. WEST:  Every day?

16                    MR. JOHNSON:  Every day.

17                    SEN. WEST:  Okay.

18                    MR. JOHNSON:  -- and cut out the copies

19   of the obituaries to check for those people to see if

20   they're registered, to remove them.

21                    And then the final way that this happens

22   is actually through the Secretary of State's Office.

23   They are really now the voter registrar for the State.

24   They received from -- I believe it's the health

25   department, the list on -- I don't know if it's weekly

1    or monthly basis, but some basis they receive the
2    records from the health department of the people that
3    have passed away, and they pass that through the
4    statewide system and send us notification.
5              SEN. WEST:  Let me ask you something.
6    Is that the three methods that you utilized, the
7    Secretary of State --
8              MR. JOHNSON:  Yeah.
9              SEN. WEST:  -- the obituaries and also
10   the probate records, court records?
11             MR. JOHNSON:  Yeah.  Then the other one
12   that I found that is currently not being recorded that
13   we do periodically is we also go get the
14   secretary's -- I mean not the Secretary's -- the
15   Social Security Administration's death list.
16   Unfortunately our Texas Secretary of State just
17   receives death notices from the State of Texas.
18             SEN. WEST:  How long --
19             MR. JOHNSON:  So if you pass from
20   outside the state, you would not be on that list.
21             SEN. WEST:  How long has that process or
22   those processes been in place?
23             MR. JOHNSON:  They had been in place --
24   Help America Vote went into place in what, 2004.  They
25   probably didn't get the computer system implemented

```
 1    until 2006.

 2                   SEN. WEST:  Until 2006?

 3                   MR. JOHNSON:  Yes.

 4                   SEN. WEST:  And so when you look at

 5    the -- those persons that -- quote-unquote that are

 6    dead and someone else is voting, how far back does

 7    that go?

 8                   MR. JOHNSON:  I believe most of these

 9    people were canceled in the year 2000.

10                   SEN. WEST:  I'm sorry?

11                   MR. JOHNSON:  I believe most of the

12    people on this list were canceled in the year 2000.

13                   SEN. WEST:  They were canceled?  When

14    you say "canceled," they were purged from your roll?

15                   MR. JOHNSON:  Yes.  Well, a purge is for

16    suspense voters.

17                   SEN. WEST:  Okay.  What I --

18                   MR. JOHNSON:  Cancellations are for --

19    you know, if they are a deceased, felon, noncitizen --

20                   (Simultaneous discussion)

21                   SEN. WEST:  Okay.  So they were canceled

22    using the process or at least part of the process you

23    just mentioned?

24                   MR. JOHNSON:  Yes.

25                   SEN. WEST:  And part of it had not been
```

1    implemented by that time, probably 2005, but at least

2    maybe the Secretary of State going through the

3    obituaries was utilized for purposes of canceling

4    those individuals?

5         MR. JOHNSON:  You know, since I have

6    been working in our office, we have -- we have done

7    all four of those activities before -- before TEAM

8    came into place where the state was in charge of it.

9    We used to get records on about a monthly, quarterly

10   basis from the health department that we would run

11   against our voter roll, too.  We requested those

12   records, and we'd run them against our voter rolls to

13   try to clean them up, but that was basically

14   implemented in about the year 2000 when

15   Mr. Bettencourt became the Tax Collector/Assessor.

16        SEN. WEST:  Would it be a fair statement

17   that -- say that at least as it relates to those two

18   that Dashwood and those persons that have been

19   canceled that there were processes in place in your

20   office that enabled you, "you" being the office

21   generically, to find those individuals -- find out

22   those applications and then turn around and deal with

23   them?

24        MR. JOHNSON:  Well, we found these

25   cases.

```
 1                SEN. WEST:  Okay.
 2                MR. JOHNSON:  And we found these cases,
 3     you know, I believe just by the due diligence of a
 4     good processor.
 5                SEN. WEST:  Okay.  But you --
 6                MR. JOHNSON:  I think this is probably
 7     the tip of the iceberg --
 8                SEN. WEST:  Okay.
 9                MR. JOHNSON:  -- because we're not out
10     looking for these cases.  They were just ones we came
11     across.
12                SEN. WEST:  Okay.  But the reality is
13     that if someone submits a voter registration
14     application that's not filled out correctly, that goes
15     into a pile?
16                MR. JOHNSON:  Well, that day we actually
17     generate a letter out of our system, a letter of
18     incomplete --
19                SEN. WEST:  Okay.  But I mean --
20                MR. JOHNSON:  -- and we mail it to the
21     voter.
22                SEN. WEST:  But if you have an
23     application that's not complete --
24                MR. JOHNSON:  That's correct.
25                SEN. WEST:  -- you will not issue any
```

```
1    type of voter registration card.  Right?
2                   MR. JOHNSON:  That is correct.
3                   SEN. WEST:  Okay.  You have a process in
4    place that you can cancel out persons that are
5    deceased also.  Is that correct?
6                   MR. JOHNSON:  That is correct.
7                   SEN. WEST:  All right.  And so you have
8    obviously competent individuals working these
9    processes because otherwise you wouldn't have them in
10   your office.  Now, so there are processes in place as
11   it relates to those two?
12                  MR. JOHNSON:  That is correct.
13                  SEN. WEST:  Okay.  Now, as it relates to
14   the young lady that was -- received deferred
15   adjudication, she wasn't convicted, she received
16   deferred adjudication --
17                  MR. JOHNSON:  Okay.
18                  SEN. WEST:  -- what type of case was
19   that?  I me, what actually did your records show to
20   lead you to believe she had done something?
21                  MR. JOHNSON:  What made us discover the
22   case?
23                  SEN. WEST:  Yeah, what made you think
24   that there was some fraud going on?
25                  MR. JOHNSON:  Like I said, a
```

600

```
 1    processor --

 2                    SEN. WEST:  Okay.

 3                    MR. JOHNSON:  -- one of the ladies that

 4    actually keys in all the information into our computer

 5    system from the cards, received -- went over to the

 6    tray to be worked, picked up this pile.  And as she's

 7    flipping through these cards processing them, she

 8    noticed right off the bat that these were all the same

 9    handwriting.  You know, when you're looking at card

10    after card --

11                    SEN. WEST:  Okay.

12                    MR. JOHNSON:  -- you notice that it's

13    the same handwriting.  In fact it was the same pen.

14    You know, normally when you pick up a stack of cards,

15    one would be blue, one would be black --

16                    SEN. WEST:  Sure.

17                    MR. JOHNSON:  -- you get purple, pastel,

18    all kinds of colors.  Now, they were all the exact

19    same pen.  You know, 60 of them in a row, the same

20    writing, same pen, it sends off a red flag.

21                    SEN. WEST:  Okay.  And I agree with you

22    on that.  And so again, the process was able to pick

23    that up?

24                    MR. JOHNSON:  Correct.

25                    SEN. WEST:  Okay.  All right.  Now, you
```

```
 1    would agree with me -- you may agree with me, I'll put
 2    it like that -- that you have processes in place in
 3    order to make certain that you don't certify or
 4    provide a voter registration card for someone that
 5    doesn't complete the application appropriately; that
 6    you have a process in place to cancel out individuals
 7    that are deceased; and you have competent individuals
 8    working within your establishment to -- if they see
 9    instances of what they believe rises to the level of
10    voter fraud, that they take those cards out and review
11    them or investigate them.  Is that correct?
12                  MR. JOHNSON:  We have processes to try
13    to catch, you know, voter registration fraud when it
14    comes through.  I will tell you the election code is
15    written real loosely and doesn't give us the proper
16    tools to do this job, I would say, in the best manner
17    it could be done.
18                  SEN. WEST:  Okay.  Let's -- you said
19    "the tools."  What tools would you need?
20                  MR. JOHNSON:  Well, this one -- one that
21    was just brought up here for an example, that you can
22    take our current voter registration application, write
23    any name you want to on here, check the boxes that you
24    don't have a driver's license or a citizenship,
25    there's no validation check at all.  All I'm looking
```

```
 1    for is did you fill in every box on here, and you're

 2    registered to vote.  And there's nothing -- there's no

 3    tools, there's nothing in the law that allows me to

 4    validate this.  There's no list to validate it against

 5    that this is a real person.  So I consider that kind

 6    of a hole in the -- in the system.

 7              SEN. WEST:  Now, would you agree or

 8    disagree that most states have the same process,

 9    though?

10              MR. JOHNSON:  I'm not real familiar

11    with all states' laws.  I do know that all state laws

12    have to comply with the National Voter Registration

13    Act and Help America Vote.

14              SEN. WEST:  Does this particular voter

15    registration card comply with that act?

16              MR. JOHNSON:  It does comply with that

17    act, but I will tell you there are a lot of different

18    voter registration cards.  I do see other states'

19    applications because they can mail them to me.  You do

20    not have -- in Texas you do not have to use this

21    official card to register.  As long as you have the

22    information that's required to register written on a

23    piece of paper, we can use it as a voter registration

24    card.

25              SEN. WEST:  But it does comply with the
```

603

```
1    national act?
2                MR. JOHNSON:  This does.
3                SEN. WEST:  All right.  Thank you on
4    that.  I don't think I have any other questions.
5    Thank you.
6                MR. JOHNSON:  All right.  Thank you.
7                SEN. DUNCAN:  The Chair recognizes
8    Senator Gallegos.
9                SEN. GALLEGOS:  Thank you, Mr. Chairman.
10               Mr. Johnson, you said you're the
11   Assistant Registrar at Harris County?
12               MR. JOHNSON:  Associate Director.  I
13   have one person above me.  Then he reports -- that
14   person above me reports to the Tax Collector/Assessor.
15               SEN. GALLEGOS:  Who is the Director?
16               MR. JOHNSON:  Leo Vasquez is the Tax
17   Collector/Assessor in Harris County now.
18               SEN. GALLEGOS:  So he's the one right
19   above you?
20               MR. JOHNSON:  No.  I have a person in
21   between us.
22               SEN. GALLEGOS:  Oh, who is the one in
23   between?
24               MR. JOHNSON:  His name is George
25   Hammerlein.
```

```
1                SEN. GALLEGOS:  Who?

2                MR. JOHNSON:  His name is George

3    Hammerlein.

4                SEN. GALLEGOS:  Oh, okay.  All right.

5    But I mean, you work in the registrar's office?

6                MR. JOHNSON:  Yes.  George was not able

7    to make it today --

8                SEN. GALLEGOS:  Okay.

9                MR. JOHNSON:  -- as your colleague

10   behind you knows because of a knee injury.

11               SEN. GALLEGOS:  But he's lucky; he's

12   lucky, let me tell you.  Okay.  So you work in the

13   registrar's office.

14               Now, Sen. West asked you about these

15   first -- one of the first questions he asked you

16   about these -- and I live in Harris County, by the

17   way.

18               MR. JOHNSON:  Yes, sir.

19               SEN. GALLEGOS:  And that 13 timely --

20   13,000 timely voter registration applications had not

21   been processed for early voting.  That came out in the

22   news.  You worked under Bettencourt.  Right?

23               MR. JOHNSON:  Yes, sir.

24               SEN. GALLEGOS:  Okay.  It came out in

25   the news.  Bettencourt was there.  We had no answer
```

1   from him.  You didn't know that?  You told Sen. West

2   you didn't know that.  You're the Assistant Registrar,

3   or whatever your title is, and you didn't know that?

4   I was there.  Were you there?

5            MR. JOHNSON:  Where is "there" that

6   I'm --

7            SEN. GALLEGOS:  In Harris County, that's

8   where "there" --

9            MR. JOHNSON:  I'm there in Harris

10   County.  Now, you know what I need is --

11            SEN. GALLEGOS:  Well, if you didn't know

12   that and you're the Assistant Registrar, is that your

13   job?

14            MR. JOHNSON:  If you give me a date --

15            SEN. GALLEGOS:  Is that your job?

16            MR. JOHNSON:  No, it's not my job.

17            SEN. GALLEGOS:  It's not your job to

18   look at these?

19            MR. JOHNSON:  It's my job to process

20   those voter registrations.

21            SEN. GALLEGOS:  I understand that, sir.

22            MR. JOHNSON:  If you tell me a date --

23   sir, if you tell me a date, I can tell you exactly how

24   many cards we had worked and not worked.

25            SEN. GALLEGOS:  Well, I can tell you

```
 1   this:  If I had your job, somebody asked me that
 2   question, about 13,000, the majority of them
 3   minorities that had not been processed when early
 4   voting started, I would know that because that's my
 5   job.  That's what the taxpayers pay me for.
 6               MR. JOHNSON:  Can I ask you a question?
 7               SEN. GALLEGOS:  You didn't know that?
 8               MR. JOHNSON:  Can I ask you a question?
 9   How do you --
10               SEN. GALLEGOS:  No, no, no.  I'm asking
11   the questions.  You cannot ask questions.  You're a
12   witness.  I'm asking the questions.
13               Now, answer me yes or no.  Is that your
14   job?
15               MR. JOHNSON:  I have not seen the
16   article that you're referring to.
17               SEN. GALLEGOS:  There's no article.  It
18   was in the papers.  Everybody, everybody, everybody
19   was arguing with Bettencourt.
20               MR. JOHNSON:  Well, in the paper there
21   was an article.
22               (Simultaneous discussion)
23               SEN. GALLEGOS:  Obviously you were on
24   vacation.  I'm sorry.
25               SEN. DUNCAN:  Let me please instruct
```

```
 1    both of you to allow -- or not talk at the same time
 2    because the court reporter can't get your testimony.
 3                    SEN. GALLEGOS:  I'll ask you again.
 4    Were you -- were you on vacation during that period?
 5                    MR. JOHNSON:  In which period of time
 6    are you referring to?
 7                    SEN. GALLEGOS:  Well, the election.
 8    That's exactly the question that Sen. West asked you,
 9    the election -- the election in the fall, the
10    Presidential Election when early voting started.
11                    MR. JOHNSON:  If you're talking about
12    the month before the election, no, I was not on
13    vacation.
14                    SEN. GALLEGOS:  Well, then you should
15    know these answers.  That's what we pay you for.  Is
16    that not correct?
17                    MR. JOHNSON:  I'm sorry, sir.  I have
18    not seen that article.  I don't know what you're
19    referring to.
20                    SEN. GALLEGOS:  All right.
21                    MR. JOHNSON:  If you would like to know
22    how many people -- how many voter registration cards I
23    had on any particular day, you know, I can -- when I
24    get back to the office, I can look that up for you.
25                    SEN. GALLEGOS:  That's not -- that's not
```

1    the question I asked you.  That is not --

2                 MR. JOHNSON:  Well, you're asking me

3    about how many applications we --

4                 (Simultaneous discussion)

5                 SEN. GALLEGOS:  That is not the question

6    I asked you.

7                 Okay.  Let me -- let me go to the second

8    question where Sen. West asked you and you did not

9    answer him, and you're the Assistant Registrar in

10   Harris County being paid by taxpayers, that Harris

11   County disqualified nearly 70,000 -- 70,000

12   applications, the majority minority.  I mean, you

13   didn't know about this?  That's a lot -- that's a lot

14   of disqualifications.  And you're the assistant

15   registrar.  You didn't know that?

16                MR. JOHNSON:  What is the time period

17   that you're talking about there in the article?

18                SEN. GALLEGOS:  I just told you, right

19   before -- right before the General Election in the

20   fall of '08.

21                MR. JOHNSON:  Is that -- is the month

22   before the General Election, two months, three months?

23   You know, I have to know a timeframe, and I can tell

24   you exactly how many letters we sent out of incomplete

25   during that time.

```
1              SEN. GALLEGOS:  Right before the
2    election.
3              MR. JOHNSON:  And that is not a -- that
4    is not a disqualification.  A letter of incomplete
5    just says that you have missed one of the required
6    fields in the application.  It gives them another
7    opportunity to register to vote.
8              SEN. GALLEGOS:  These applications,
9    these people were disqualified.  Either way you call
10   it, you can call it -- you sent out a letter, whatever
11   you say, they were disqualified.  They couldn't vote.
12             All right.  Let me -- let me go to
13   another question.
14             MR. JOHNSON:  Can I ask you a question
15   while that --
16             SEN. GALLEGOS:  No, no, you can't ask me
17   a question.  I'm the one asking the questions.
18   Obviously whoever told you you could testify here
19   didn't tell you the rules of the Senate, whether we're
20   in the Committee of the Whole or in a Committee.
21             Now, let me ask you, I'm looking at a
22   document that Paul Bettencourt put out, and I was
23   there because he did -- he did a PowerPoint on -- and
24   I don't know if you were there with him when he did
25   this PowerPoint.  It was called the Texas Voter
```

```
1    Registrar, Keeping It Real.  Do you remember that one?
2                    MR. JOHNSON:  I have seen that
3    PowerPoint.
4                    SEN. GALLEGOS:  Have you seen the
5    PowerPoint?
6                    MR. JOHNSON:  Yes, I have.
7                    SEN. GALLEGOS:  All right.  In his
8    PowerPoint -- okay.  I'm going by his document, the
9    document he passed out to everybody there.  I'm going
10   by his -- it says "Paul Bettencourt" on there.  He was
11   the registrar, wasn't he?
12                   MR. JOHNSON:  Yes, he was.
13                   SEN. GALLEGOS:  Okay.  It says here
14   "City of Houston Case Study."  This is his document,
15   not mine.  "The General Election of November 2001 and
16   Runoff Election December 2001, these are results of
17   the Harris County book audit on potential fraud in
18   these elections."  He said the majority of what he
19   found was the wrong precinct.  And there's another
20   column that a majority of what he found was not
21   registered.  And in another column, the majority of
22   what he found was deleted.  And then the graph goes
23   from zero to 700.  It says "moved out of county" --
24   that was another one that he found -- "was right
25   under 100."
```

```
 1              Now, the real things that we're looking
 2    for and what this bill is trying to clear up is felons
 3    and not a citizen and deceased, which I'm going to get
 4    to in a minute.  On felons it looks here barely ten,
 5    about ten per Paul Bettencourt's graph; not a citizen,
 6    it's barely a speck on this chart; and deceased, none.
 7    This is per his PowerPoint that he passed out at the
 8    seminar that I was at.  These are his numbers, not
 9    mine, that say there was hardly anything from felon to
10    not a citizen to deceased is almost zero.  It's almost
11    zero per his chart.
12              MR. JOHNSON:  Can I explain this part?
13              SEN. GALLEGOS:  And have you even seen
14    this chart?  Do you know about this chart?
15              MR. JOHNSON:  I've seen that chart.  Can
16    I explain that chart, sir?
17              SEN. GALLEGOS:  Go ahead and explain it.
18              MR. JOHNSON:  Okay.  That is a -- what
19    we refer to as a poll book audit that happened after a
20    City of Houston election in 2001.  After every
21    election I told you we review the poll book -- this is
22    after the election is over with -- we review the poll
23    book to find voter registration problems or
24    discrepancies.  One of the things we checked for since
25    it was a City of Houston election, they have what they
```

```
1    call split precincts, not the whole precinct can
2    possibly be in the city.  So you can have a precinct
3    that's voting, but you cannot live in the City of
4    Houston.  That's what those out-of-precincts are, is
5    those people were in that precinct voting --
6                    SEN. GALLEGOS:  I know what they are.
7                    MR. JOHNSON:  -- but they didn't live in
8    the City of Houston, but they voted in the City of
9    Houston election.  That is -- that is someone voting
10   in the wrong district.  That is against the law.
11                   The ones that moved out of county, they
12   didn't live in Harris County, and they voted in Harris
13   County.  That is someone that is not registered here
14   or should not have been registered here that voted in
15   our county.
16                   SEN. GALLEGOS:  Were any of these --
17   were any of these what you're saying voted in the
18   wrong county, were they convicted?
19                   MR. JOHNSON:  They were all turned
20   over -- that whole report was turned over to the
21   District Attorney's Office, and once again --
22                   SEN. GALLEGOS:  All right.
23                   MR. JOHNSON:  -- they didn't have the
24   evidence to make the prosecution.
25                   SEN. GALLEGOS:  That leads me to my next
```

1   question.  You said you had 133 complaints that are

2   still at the District Attorney's Office.  Do we know

3   if any of those were convicted?  Do you know that?

4              MR. JOHNSON:  No, I do not know the

5   status.

6              SEN. GALLEGOS:  But you did say there

7   was 133 complaints at the D.A.'s Office, and you can't

8   tell us yes or no?  You don't know?

9              MR. JOHNSON:  No, the D.A. does not

10  report to me.

11             SEN. GALLEGOS:  Okay.  All right.  All

12  right.  Let's go back to your deceased.  I don't know

13  how you explained it to Sen. West.  Tell me the

14  process on how you -- okay.  You go through the

15  Chronicle, you go through the obituaries.  Is that

16  correct?

17             MR. JOHNSON:  In our office our

18  procedures for finding out or trying to discover

19  deceased voters is, yes, we go through the obituaries

20  of the Houston Chronicle every day.

21             SEN. GALLEGOS:  So you go through the

22  obituaries and you find out who died?

23             MR. JOHNSON:  We get the probate records

24  from the probate court, and we get a list --

25             SEN. GALLEGOS:  And you put them up

```
 1    against -- up against your list on your registrar
 2    list?
 3                MR. JOHNSON:  Correct.
 4                SEN. GALLEGOS:  Okay.  And you
 5    determine --
 6                MR. JOHNSON:  We get the list from -- we
 7    get the list from the Texas Health Department of the
 8    deceased voters here in Texas, and then periodically
 9    we also purchase the social security death index and
10    run it against the voter roll to try to find matches.
11                SEN. GALLEGOS:  And that's how you
12    determine that they are deceased?
13                MR. JOHNSON:  We determine that they are
14    possibly deceased.  Then on those voters we actually
15    send them notices to the last known address.  We call
16    it "To The Family Of" letters asking the family
17    members if they're still there to confirm our
18    findings.
19                SEN. GALLEGOS:  Okay.  But the 24 in
20    your testimony, that's kind of like the process you
21    went through.  You went through the newspaper, you
22    went through the --
23                MR. JOHNSON:  That is correct.
24                SEN. GALLEGOS:  Okay.  All right.  Now,
25    that's a "yes."  Right?
```

```
 1                    MR. JOHNSON:  Yes.
 2                    SEN. GALLEGOS:  Okay.  Well, let me --
 3      Mr. Johnson, would it interest you to know that right
 4      before the end of the year it was time for me to renew
 5      my license, and I went to your office and --
 6                    MR. JOHNSON:  Can I make a correction?
 7      We do not do driver's license renewals.
 8                    SEN. GALLEGOS:  Well, no, no, no, it's
 9      under -- it's under the registrar's office.
10                    MR. JOHNSON:  No, we do not -- that's
11      under the Department of Public Safety.  We do not do
12      driver's license renewals.
13                    SEN. GALLEGOS:  Well, it was Bettencourt
14      that called me.
15                    MR. JOHNSON:  If Mr. Bettencourt called
16      you, he wasn't affiliated with our office.
17                    SEN. GALLEGOS:  Well, he's the one that
18      called me.  Are you sure you're not -- you're not with
19      the driver's license renewals?
20                    MR. JOHNSON:  Are you talking about --
21      now, are you talking about your driver's license, or
22      are you talking about your --
23                    SEN. GALLEGOS:  No, no, no.  I'm talking
24      about -- excuse me -- my license on my car.
25                    MR. JOHNSON:  Your auto plates?
```

1                    SEN. GALLEGOS:  Yeah.

2                    MR. JOHNSON:  The plates on your car?

3    Yes, we do do --

4                    SEN. GALLEGOS:  That's what you're in

5    charge of.  Right?

6                    MR. JOHNSON:  We do do that in our

7    office.

8                    SEN. GALLEGOS:  Okay.  That's a "yes."

9    Right?

10                    MR. JOHNSON:  Yes.

11                    SEN. GALLEGOS:  Okay.  Would it interest

12   you to know that when I went to renew my license and

13   entered your office there at the registrar's office

14   that they told me I could not renew, and they told me

15   the reason was because on their rolls it showed that I

16   was deceased?  Did you know that?

17                    MR. JOHNSON:  No, I did not know that.

18                    SEN. GALLEGOS:  Okay.

19                    MR. JOHNSON:  That is -- that is a whole

20   different department, and that is actually run by

21   TxDOT.

22                    SEN. GALLEGOS:  Well, wait, wait, wait

23   a minute.

24                    MR. JOHNSON:  And if that was a TxDOT

25   record that showed you --

617

```
 1                    SEN. GALLEGOS:  I went to the
 2     registrar's office.  It was your office.  It's was --
 3                    MR. JOHNSON:  The TxDOT --
 4                    SEN. GALLEGOS:  At that time, was
 5     Paul Bettencourt your boss or not?
 6                    MR. JOHNSON:  Yes, he was --
 7                    SEN. GALLEGOS:  Okay.
 8                    MR. JOHNSON:  -- but we report to TxDOT.
 9     TxDOT runs that organization.  If there was your
10     record marked as deceased, it was TxDOT that marked
11     it.
12                    SEN. GALLEGOS:  Well, why would
13     Paul Bettencourt call me and apologize?
14                    MR. JOHNSON:  We are -- we are an agent
15     of theirs.  I guess he was being --
16                    SEN. GALLEGOS:  Well, then it was your
17     people.
18                    (Simultaneous discussion)
19                    SEN. DUNCAN:  Okay.  Let me -- let me
20     interrupt.  I hate to interrupt, but you're not making
21     a record.  And if you want to make a record, you
22     really need -- both of you need to maintain the
23     decorum of one speaking at a time.  The court reporter
24     cannot get your testimony if you're speaking over each
25     other, and both of you are doing it.  It's not just
```

```
 1    one of you, both of you are.  So if you could slow it
 2    down a little bit and let the court reporter keep up
 3    with you, that would be helpful for the record.
 4              SEN. GALLEGOS:  Mr. Chairman, I'm trying
 5    to make a point here that it was the registrar's
 6    office that was handling -- that was handling my
 7    renewal of my license tag, and Mr. Johnson says that's
 8    TxDOT, but it's the registrar that's handling that,
 9    all the information on the registrar's computer -- on
10    the registrar's computer in that -- in that county
11    office.  Is that correct?  Is that yes or no?
12              MR. JOHNSON:  That is a "yes" --
13              SEN. GALLEGOS:  Okay.
14              MR. JOHNSON:  -- that it's in our
15    office, but, sir --
16              SEN. GALLEGOS:  All right.
17              MR. JOHNSON:  -- you were just talking
18    about things that I need, and that's the tools I need.
19    TxDOT will not let us link into their system to copy
20    or get access to those records so that we can match it
21    up to voter rolls to find out when people move so that
22    we can send them notices or applications to try to get
23    them re-registered.  So if you would like to help us,
24    pass a bill that would allow TxDOT to give us that
25    information.
```

```
 1              SEN. GALLEGOS:  But it was your
 2    computer, not TxDOT's.
 3              MR. JOHNSON:  No, it's TxDOT's
 4    computers.  The computers that we use in our office
 5    belong to TxDOT.
 6              SEN. GALLEGOS:  But it was your agents
 7    that were handling it.
 8              MR. JOHNSON:  Yes, they work for the
 9    Harris County Tax Office.
10              SEN. GALLEGOS:  Okay.  All right.
11              MR. JOHNSON:  The computer system is
12    TxDOT's, and it's closed, and they do not let us have
13    access to it.
14              SEN. GALLEGOS:  Well, if you had me
15    deceased there on that computer at the registrar's
16    office, whether it's TxDOT or not, and your agents
17    were handling it, if I had -- if I had voted during
18    that time that you had me deceased, would I show up --
19    would I show up on your rolls?
20              MR. JOHNSON:  You were still a
21    registered voter on our rolls.  That TxDOT record has
22    nothing to do with your voter registration.
23              SEN. GALLEGOS:  That's not what -- that
24    wasn't my question.  On your computer, the computer
25    that your agents handle --
```

620

1                MR. JOHNSON: On the computer that I'm

2       in charge of that handles the voter registration roll,

3       you are an active voter.

4                SEN. GALLEGOS:  How do you know that?

5                MR. JOHNSON:  Did you vote?

6                SEN. GALLEGOS:  I'm talking -- yeah, I

7       voted, but I'm talking about during the time --

8                MR. JOHNSON:  Then you're an active

9       voter.

10               SEN. GALLEGOS:  -- during the time that

11      the computer showed that I was deceased, had I voted,

12      would I be on that list with those 24?  Yes or no?

13               MR. JOHNSON:  No, you would not have

14      been on that list.

15               SEN. GALLEGOS:  Are you sure?

16               MR. JOHNSON:  I'm sure.

17               SEN. GALLEGOS:  You're positive?

18               MR. JOHNSON:  I'm positive.

19               SEN. GALLEGOS:  Okay.  All right.  So --

20      and your office is not -- so you're saying it's

21      Beverly Kaufman's Office that's in charge of the last

22      question that Sen. West asked you on the provisionary

23      ballots given after seven o'clock instead of letting

24      them cast their ballots.  Is that correct?

25               MR. JOHNSON:  That is correct.

```
 1              SEN. GALLEGOS:  Okay.  Mr. Johnson,
 2   thank you.
 3              SEN. DUNCAN:  Mr. Johnson, I don't think
 4   there's any other queued up.  If you want to -- you
 5   are excused.  Thank you for your testimony.
 6              MR. JOHNSON:  Thank you.
 7         TESTIMONY BY DANIEL B. KOHRMAN
 8              SEN. DUNCAN:  The Chair calls
 9   Daniel Kohrman.  Mr. Kohrman, do you have written --
10   you have written testimony, I believe.  It will be
11   Exhibit No. --
12              MR. KOHRMAN:  Yes, sir.
13              SEN. DUNCAN:  -- 35.  We'll go ahead and
14   put that in the record.
15              (Exhibit No. 35 marked and admitted)
16              SEN. DUNCAN:  If you'll state your name
17   and who you represent, and you have ten minutes.
18              MR. KOHRMAN:  Thank you.  Good morning,
19   Mr. Chairman, Members of the Committee.  My name is
20   Daniel Kohrman.  I'm a senior attorney with the AARP
21   Foundation.  The foundation is the charitable arm of
22   AARP.  I represent AARP, AARP's members and older
23   persons generally.
24              One of my responsibilities is to
25   represent the cause of access to the ballot for older
```

1    voters.  By way of background, I'm one of the lawyers

2    for voters, including older voters, in the litigation

3    regarding photo ID in Arizona and in Georgia.  I've

4    also filed briefs on behalf of AARP in photo ID cases

5    in Michigan and Missouri in the state courts and also

6    in the U.S. Supreme Court in the Indiana case that

7    we've discussed.  Finally, AARP has filed a brief

8    supporting the senior citizen plaintiffs in the

9    absentee ballot case here in Texas, the Ray case that

10   we discussed a little earlier this evening.

11            And just so that you know a bit more

12   about me before I came to AARP, about seven years ago

13   I worked for a big law firm, a civil rights

14   organization, the lawyers committee that you heard

15   about before, and also for the U.S. Department of

16   Justice.

17            As you know, AARP members vote in very

18   large numbers and are very proud of their active

19   participation in the political process at all levels,

20   state, local and federal.  I work out of the

21   headquarters in D.C., but today I'm here representing

22   AARP of Texas, which is one of 53 state offices we

23   have across the U.S.

24            I want to say that given the intense

25   partisanship that we've seen here today and that has

1   developed around this issue of voter ID, photo ID, I

2   want to emphasize that AARP is a nonprofit nonpartisan

3   organization dedicated to addressing the needs and

4   interests of Americans age 50 and older.  AARP has no

5   interest in the partisan aspects of the photo ID

6   issue.

7           What we do care about is representing

8   the interests of older Americans.  We have more than

9   40 million members nationwide and about two and a half

10  million here in Texas, and both in this state and

11  across the U.S.  We're the largest membership

12  organizations of older persons and older voters.

13          All right.  While I appreciate the

14  opportunity to speak with you here so late and so

15  early about Senate Bill 362, just to start, I want to

16  say that AARP's overall perspective is that the right

17  to vote is the most basic right in our Democratic

18  system, and our view is that legislative bodies and

19  politicians should tread carefully in the field of

20  voting rights.  Voting rights should not be casually

21  restricted.

22          Now, we understand that historically and

23  under our Constitution the states are the principle

24  sources of laws and regulations in the area of voting,

25  but we do not conclude from this that states should

1    feel free to take whatever action is expedient.

2    Certainly where there's a need to act to protect

3    voters, there's a duty to step forward.  But absent

4    such a need, our view is that states have a duty not

5    to rush in.  And as it is said of doctors, so it is

6    true in the field of voting and elections, first do no

7    harm.

8                AARP policy is clear.  We have focused

9    on trying to encourage simple, fair procedures.  And

10   most relevant for our purposes here today our policy

11   states that state government should adopt procedures

12   to detect and prevent voter fraud, but policies that

13   do not permit arbitrary and discriminatory reviews, ID

14   challenges and misuse of provisional ballots in ways

15   that discourage voter registration and turnout.  And

16   our concern about photo ID laws is that they do just

17   that.

18                Just this past Sunday in the Rio Grande

19   Guardian, the paper reported one in five senior woman

20   don't have a driver's license, quoting the U.S. Census

21   Bureau.  18 percent of Americans over age 65 don't

22   have a driver's license, quoting the Brennan Center

23   from whose representative you heard earlier today, and

24   also that 37 percent of Texans over 80 don't have a

25   driver's license.

1          We did some surveys in connection with

2    some of the litigation matters you've heard about.   In

3    Indiana our survey suggested that 3 percent of people

4    over 65 have neither a driver's license nor a

5    state-issued ID, and that's about 23,000 people.   In

6    Georgia our estimates suggested over 100,000 over age

7    65 lack a driver's license and the number is something

8    like double that in Missouri.

9          What's hard to understand for us is why

10   public officials would embrace measures that have this

11   kind of impact on older voters when in the next couple

12   of decades the older population will be growing by

13   leaps and bounds so that most of the growth in the

14   voting population will be among the older voters.

15          I want to refer you to testimony that

16   AARP Texas' Advocacy Director Amanda Fredericksen gave

17   to a House Committee in 2006 noting some of the harms

18   and difficulties posed for older persons who seek to

19   access the ballot, but are caught up in photo ID

20   requirements and are precluded from voting.

21          There was an 80 year old who sought a

22   state-issued ID card in Indiana.   We put this in our

23   Supreme Court brief.   She finally succeeded only after

24   paying multiple fees, navigating a maze of public

25   record laws and making multiple trips to public

626

1   offices.  And then there was a 61-year-old social

2   security recipient who was barred from voting in the

3   lobby of her retirement home as she had done for past

4   elections.  Poll workers who had known her for years

5   were not allowed to let her vote because she didn't

6   have the form of ID, and we're concerned that's going

7   to happen in Texas.

8                Now, let me cut to the chase here, and

9   I've summarized in my testimony some major concerns we

10  have with this law in particular.  We've talked about

11  big picture issues, other states, other cases and

12  we've talked, to some degree, precious little about

13  the actual bill that's before this chamber.

14               The first concern is that the law does

15  very little to educate the public about the changes it

16  proposes to make.  It relies almost exclusively on the

17  individual voter registration renewal process.  It

18  relies on Websites, the Secretary of State and the

19  counties, but as far as I understand it, only

20  one-third of the counties actually have Websites.

21               Our members in particular, I would have

22  the concern, would both be adversely affected by a

23  process that relies on a routine mailing procedure.

24  They have voted for many, many years and cannot be

25  expected to automatically pick up on all the new

627

```
1    changes.  More likely they're going to assume that
2    their registration is just as it has been before.  And
3    as far as Websites, our members are getting ever more
4    tech savvy, but relying on the Internet to serve older
5    voters is a dangerous proposition.
6                    The second concern is a related one.
7    There's lack of plans for public outreach.  One way to
8    describe the approach of this bill, in our frame of
9    thinking, is that it's completely passive.  You get a
10   mailing, you have a bit of information posted on a
11   Website.  There's nothing going out to the public.
12   There's nothing going out in terms of mobile vans as
13   there was in Georgia or other public education.  We
14   heard about advertisements.  I noted that nothing of
15   that was planned to involve photo ID in particular.
16                    As far as the substantive concern about
17   what the experience is like for voters, I just want to
18   make two quick points.
19                    SEN. DUNCAN:  I've been holding
20   everybody pretty strict.  If somebody wants to ask a
21   question --
22                    MR. KOHRMAN:  Okay.
23                    SEN. DUNCAN:  I think Sen. Uresti --
24   your time has expired.
25
```

TX_00004516

**QUESTIONS FROM SENATE FLOOR**

1

2          SEN. DUNCAN:  Sen. Uresti, you're

3    recognized.

4          SEN. URESTI:  Thank you, Mr. Chairman.

5          Mr. Kohrman, good morning, and I'll

6    follow up on what you were just completing in a

7    moment, but I wanted to go back to something that you

8    just talked about with regard to the Websites.  And I

9    think you mentioned in your testimony one-third of the

10   counties have Websites.  But do you have an idea of

11   how many of your members actually have a computer much

12   less access to the Internet?

13         MR. KOHRMAN:  Well, I would say two

14   things:  One, I think it's very easy to stereotype

15   older voters and older people.  I think more and more

16   of them -- the profile is more typical of the average

17   population than what most people think.  But the plain

18   fact of it is when you look at people who are infirm,

19   older people with disabilities that is, older people

20   in assisted living or nursing homes, those kinds of

21   residential situations, people of low income

22   certainly, they are very unlikely to have access to

23   the Internet and very unlikely to benefit from that

24   kind of information.

25         SEN. URESTI:  And one of the reasons I

629

1   bring that up, and I realize many of our seniors are

2   more advanced when it comes to the Internet, but

3   speaking about my parents specifically and they're in

4   their 70s, very intelligent.  However, my father

5   refuses to use a computer, probably because he doesn't

6   know how, much less accessing the Internet.  So I'm

7   sure that there are many other seniors in Texas,

8   specifically in the district that I represent, that

9   don't have access.

10           You were about to complete a sentence,

11  and I know the time cut you off.  Would you like to

12  finish that thought?

13           MR. KOHRMAN:  No.  I just -- that the

14  public outreach activities that were demanded by the

15  court in Georgia, in effect, are very much relevant

16  here because what we have is a law that proposes to

17  take effect at the very beginning of 2010 and yet

18  relies almost completely on a notification process in

19  the course of renewing registrations that has, as I

20  understand it, a two-year cycle.

21           Therefore, in our view, the minimum time

22  that should be required for this set of new

23  requirements to be effective should be at least two

24  years and probably longer than that so that you have a

25  whole cycle.  If you're going to rely on mailings that

TX_00004518

1   people will only get some time in the next two years,

2   it should be a cycle that long at least before this

3   law takes effect.

4          SEN. URESTI:  And the reason for the two

5   years is so that you can allow for training and

6   outreach?

7          MR. KOHRMAN:  Well, in the first place,

8   there's no guarantee that people will be notified of

9   the requirements of the law at all.  Given that

10  there's nothing in this bill by way of funding or

11  programs, at least as far as I can tell, to contact

12  voters about the specific requirements of photo ID,

13  people won't know.  And what you will have is people

14  showing up at the polls, registered voters who have --

15  who expect that they can vote on the terms they always

16  have.  And what they will find -- in particular in

17  some circumstances, they will come perhaps without

18  their registration.  And under current law if you come

19  without your registration but you're on the rolls, you

20  sign an affidavit and you cast a regular ballot.  But

21  under the law as it would be revised, you have to show

22  photo ID.

23          Now, if you haven't had notice except if

24  you read the papers closely enough to know what this

25  body and the House may pass someday, you're not going

1    to know that requirement.  And so what you're going to

2    do is you're going to show up -- and we think that's

3    typical of our members.  They are going to do what

4    they've always done, they're going to show up, they

5    may forget, they may misplace, they may lose, they may

6    not get in time their certificate.  They show up to

7    vote and whereas in the past they could just sign an

8    affidavit, cast a regular ballot, they'll have to file

9    a provisional ballot that won't be counted, and that's

10   a big problem for us.

11           SEN. URESTI:  And we've heard over the

12   past several hours of testimony from some of my

13   colleagues that it's no big deal, that you can just

14   show up with an electricity bill or another piece of

15   documentation, but I would assume that many of our

16   seniors may be widowed, and some of the documentation

17   that they have was in their husband's name, for

18   instance, or perhaps in their wife's name.  And as you

19   said, Mr. Kohrman, they may show up, they may be

20   waiting for a ride from one of their sons or their

21   neighbors at the end of the day.  By the time they do

22   show up to vote, they will not have that

23   documentation.  Do you think that's going to be a

24   problem for our seniors when it comes time for voting?

25           MR. KOHRMAN:  Well, we've heard from a

1    number of people about problems with some of the

2    specific alternative forms of identification that have

3    been alluded to by some of the proponents.  And of

4    course older voters have and older persons have

5    particular problems with some of those forms of ID,

6    very much so.  Older women may have been -- have moved

7    into the state from other states.  They may have

8    marriage certificates from -- with a name that's -- in

9    other words, the documents that they might need to get

10   a birth certificate are different in name than their

11   current married name, they've changed their name.  And

12   so if they have to get an out of state marriage

13   document or divorce decree or birth certificate,

14   they're going to have trouble.

15            We've had problems in many of these

16   southern states with older -- older woman, older men

17   who were born -- and this really applies to people of

18   color in particular who were born outside of hospitals

19   and may not even be able to get a birth certificate.

20            SEN. URESTI:  Do you see any potential

21   barriers for our seniors that are trying to obtain a

22   photo identification?

23            MR. KOHRMAN:  Well, what is of concern,

24   as I've said, is the fact that there's no -- there's

25   no effort to notify them, and there's not a realistic

1    set of measures that will likely notify them.

2              Furthermore, there appears to be no plan

3    or money for training of the actual people who will

4    interact most often and most intensely at the polling

5    place with all voters, but particularly older voters,

6    election officers so called.  There appears to be no

7    money or plan for training these folks so that when

8    people show up at the polls surprised by the new laws

9    and the changes, what we're concerned about is that

10   our people will have particular troubles, especially

11   if a lot of folks that they're going to have to

12   interact with are given insufficient training.

13             SEN. URESTI:  Mr. Kohrman, do you think

14   there will be additional barriers if this legislation

15   does pass for the voters that may reside with family

16   members who are in an assisted living facility or in a

17   nursing home?

18             MR. KOHRMAN:  Well, that raises the

19   issue of outreach again.  Our fundamental view is

20   that -- and you've heard this from many people -- that

21   this is an issue that is a solution that's looking for

22   a problem.  Our view of it is that what this chamber

23   should focus on is the fact that there are lots of

24   voters who need assistance and encouragement and

25   facilitation to get them to vote.

1          We have lots of people, for instance,

2     who change addresses when they move into different

3     residential facilities when they become somewhat more

4     infirm or interested in finding a situation where they

5     can age in place and have access to medical care.

6     When they change their address and if they don't have

7     family who are looking out for them, what they may

8     need is registrars who are going out to facilities

9     where older people are to register people to vote and

10    to help them to vote.

11          There are states across this country

12    that have allocated resources, not to these ID checks

13    that we feel are not very productive and not likely to

14    solve this supposed problem of fraud, but instead of

15    allocating their resources to seek out voters who

16    have -- who are not participating but want to

17    participate.  So we would like -- we would like state

18    officials and county officials to be seeking out older

19    voters who are still capable of voting, but may have

20    mobility challenges that keep them from voting like

21    they did 10, 20 years ago.

22          SEN. URESTI:  Mr. Kohrman, we've heard

23    testimony about different forms of nonphoto

24    identification, and one example that I heard earlier

25    was Texas -- was a Medicaid card.  Do you know if

1    Texas actually issues a Medicaid card?

2              MR. KOHRMAN:  Well, I apologize.  I

3    don't really know that, but there may be -- there may

4    be some forms of this photo ID that are available to

5    many seniors, and we're not saying that this is an

6    impossible situation, but I will say about the best

7    you can say about this photo ID proposal is that it is

8    not as harsh and not as bad as the most restrictive

9    laws in a few states, but it imposes all kinds of

10   burdens on voters who are the most committed to

11   participating in our democracy, which are older

12   voters, and it's going to make a lot of unnecessary

13   impediments.

14             If you imagine the situation -- another

15   situation that's covered by the law, which is someone

16   who shows up at the polls who has their voting card

17   but isn't on the rolls, and that's, I think, Section 9

18   of the bill.  Right.  It seems to me that that would

19   be another situation where instead of requiring a

20   photo ID, what you should require is a -- is an

21   affidavit, which under other circumstances is provided

22   for under current law.

23             A lot of these older voters are well

24   known to people at their polling place.  There's no

25   need to impose these additional requirements.  I would

1   find it highly dubious if I were to hear that there is

2   any evidence or any record that older voters in

3   particular pose a problem of fraud, that there's any

4   worry that people 50 -- age 50 and older are the ones

5   who have been identified as posing a risk of illegal

6   voting activities.

7            What we need to do is to reach out, take

8   advantage of the fact that these mature voters are

9   very committed to participating and yet face a variety

10  of challenges over time as they age that makes it more

11  difficult for them to participate.  This law raises

12  barriers where there need be no such barrier.

13           SEN. URESTI:  And, Mr. Kohrman, by

14  placing those additional barriers through this bill on

15  our seniors, do you -- is it your opinion that there

16  will be some seniors that may not be able to vote come

17  election day?

18           MR. KOHRMAN:  Well, it's interesting.

19  We've heard a lot of back and forth about what

20  aggregate data shows.  You know, a state -- a state

21  shows big increases in turnout, and some people think

22  they know exactly what the sole cause of that is, and

23  supposedly it's photo ID.

24           I think -- and this is by way of

25  answering your question.  I think what we -- what

1   we -- what's most important here is what we don't see

2   in the numbers.  You can't measure the effect on

3   people who are deterred from voting particularly when

4   their numbers are swamped by turnout increases that

5   result from a variety of causes.  And what we fear is

6   that lots of older voters -- and remember older voters

7   are going to be a growing population.  So to some

8   degree if you just have a gradual growth in the

9   turnout of older voters, that's a problem because

10  that -- this should be a very significant growth trend

11  as the population ages.

12          So what we're concerned about is that

13  people will -- whether they're in their 50s and have

14  disabilities, whether they're in their 40s, for that

15  matter, but certainly greater numbers in their 60s and

16  70s who are very avid voters, you know, voting for

17  some of our seniors is the highlight of the year or a

18  highlight of their life.  It shows that they are still

19  active, they're still engaged, they're still

20  contributing to society.  And what we fear is that if

21  the impediments grow and become more diverse, they're

22  just not going to show up.  And so what is important

23  is what we won't see.

24          And again, when the numbers are growing

25  in terms of older voters, what you'll see is an

1   increase.  And so people will say, "Well, older voters

2   are growing in greater numbers, so there's no

3   problem," and we think that's just a very

4   short-sighted and narrow view that isn't called for.

5                SEN. URESTI:  That's all the questions I

6   have, and thank you, Mr. Kohrman.  Thank you,

7   Mr. Chairman.

8                MR. KOHRMAN:  Thank you.

9                SEN. DUNCAN:  The Chair recognizes

10  Sen. Ogden.

11               SEN. OGDEN:  Mr. Kohrman, I represent a

12  lot of people in the AARP, and I wonder --

13               MR. KOHRMAN:  Glad to hear that.

14               SEN. OGDEN:  I wonder how you purport to

15  represent them.  How does the AARP, when you talk on

16  behalf of the AARP, come to the position that you have

17  espoused?

18               MR. KOHRMAN:  Well, you may know, you

19  may be surprised, I don't know.  We spend a great deal

20  of time and effort surveying our membership.  I would

21  venture to say more so than any membership

22  organization in the United States we allocate more

23  resources.

24               SEN. OGDEN:  So you surveyed your

25  membership on this state law?  Did you survey the

1   Texas membership, or did you just survey the

2   membership of the Continental United States?   What

3   membership did you survey?

4           MR. KOHRMAN:   Well, now you're -- now

5   you're taking what is a huge allocation of resources

6   suggesting it should be even probably more than anyone

7   would suggest reasonable.   No, Senator, we don't -- we

8   do not every year survey nationally and statewide --

9           SEN. OGDEN:   All right.   So then --

10          MR. KOHRMAN:   -- on every proposal, but

11  we have surveyed on the specific issue of photo ID.

12  I'm sorry.   I'm not trying to filibuster here.   I just

13  want to answer on photo ID, but also more generally on

14  government integrity.

15          SEN. OGDEN:   All right.   So what was the

16  result of your survey on the Texas voter

17  identification bill?

18          MR. KOHRMAN:   Well, we haven't surveyed

19  on the Texas bill because, of course, I don't think

20  it's been out there very long, but we have the Georgia

21  law, we have the Arizona law.   And frankly, Senator,

22  there is a commonality to a lot of these laws, and

23  that's what we built on.

24          SEN. OGDEN:   Okay.   So what was the

25  result of your survey amongst Texans who are members

TX_00004528

```
 1    of the AARP who you stand up here purporting to
 2    represent?  What is their opinion on the photo ID
 3    bill?  How do you know and how do you get -- how does
 4    your organization determine that you have the right to
 5    stand up and speak for them, some of whom are on this
 6    floor right now and I think have absolutely no idea
 7    that the AARP has the position that you've espoused?
 8              MR. KOHRMAN:  Well, you know, Senator,
 9    we have an even more quick turnaround accountability
10    system than even elected representatives who stand for
11    election every two or four or six years, which is that
12    our members can fire us at any time, and so --
13              SEN. OGDEN:  Okay.  So would it be
14    correct to say that there is nothing specific in your
15    organization rules that sets out a specific case that
16    this is the position of the AARP, and it's based on a
17    survey where the majority of the members or it's based
18    on the majority of members expressing their opinion to
19    you and you're just relaying what the majority told
20    you?
21              MR. KOHRMAN:  We have a several hundred
22    page policy book.
23              SEN. OGDEN:  Okay.
24              MR. KOHRMAN:  And I quoted to you the
25    two fundamental propositions in that book about
```

1    election restrictions, and they are that voting should

2    be fair, easy and accessible.  And that in regard to

3    the -- I'm sorry.  The second one is in regard to

4    issues of fraud that it's an important priority, but

5    never should be stressed to the exclusion of the

6    principle of expanding access to the ballot.

7              SEN. OGDEN:  Okay.  I understand that

8    general statement, but I'm going to say that the many

9    thousand people in my district who are members of the

10   AARP, I believe that they do not support this

11   position, and I believe that you do not have any

12   evidence to counter my statement.

13             MR. KOHRMAN:  Well, we also have a

14   process that is a grassroots process.

15             SEN. OGDEN:  Okay.

16             MR. KOHRMAN:  Every year we go state by

17   state, we go policy by policy and we go soup to nuts

18   ground up, and all of our policies are subject to

19   review, analysis by all of our members.

20             SEN. OGDEN:  All right.

21             MR. KOHRMAN:  And, Senator, I have had

22   to answer innumerable criticisms, complaints and

23   questions from individual members over the seven years

24   I've been with the organization about sentences,

25   words, paragraphs in that policy book.

1          SEN. OGDEN:  Okay.  Mr. Kohrman, I

2    understand and think I made my point, and I hope I've

3    given you a fair opportunity to respond.

4          MR. KOHRMAN:  No, no, I --

5          SEN. OGDEN:  Let me ask, how do you know

6    who your members are?

7          MR. KOHRMAN:  Well, I'm not quite sure.

8    I see someone holding up a card up in the gallery, so

9    I guess that's one way.

10          SEN. OGDEN:  How do you --

11          MR. KOHRMAN:  I'm not sure I get your

12    drift.  I'm not trying to be evasive.

13          SEN. OGDEN:  How do you sign up for the

14    AARP?  How do you even know who is eligible to be in

15    the AARP?

16          MR. KOHRMAN:  Well, you know, that's an

17    interesting mystery that the membership people handle,

18    and I'm not trying to be cute.  I don't know.  I

19    assume we gather all kinds of information about

20    individuals through various mailing lists and send out

21    lots and lots of direct mail.  But we know who our

22    members are because we spend a lot of effort keeping

23    track of them, and we know where they live and what

24    their interests are.

25          SEN. OGDEN:  Is it possible that -- is

1    it possible that you use forms of identification to

2    identify your members, and is it possible that you

3    send out membership cards that identify your members?

4              MR. KOHRMAN:  Sure, sure.

5              SEN. OGDEN:  And do you have a

6    reasonable level of confidence that these people are

7    who they say they are?

8              MR. KOHRMAN:  Sure.

9              SEN. OGDEN:  Okay.  So --

10             MR. KOHRMAN:  Can I just add there,

11   Senator?  We have no reason to believe that people

12   would impersonate someone else in taking an AARP

13   membership, and I think that principle is the same one

14   applicable here.

15             SEN. OGDEN:  I understand that, but what

16   I'm saying is you know who your members are because

17   you require some form of identification in order to

18   sign them up.

19             MR. KOHRMAN:  No, we don't.

20             SEN. OGDEN:  That identification is

21   either through some sort of list that you've obtained

22   identifying people who are over a certain age; that

23   identification is associated with a form they fill out

24   to sign; that identification is associated with a

25   membership card; that identification is associated

644

1  with maybe some commercial transaction; I mean,

2  identification is involved throughout this process.

3  So my question is, can you think of a single member in

4  the AARP that could not meet the requirements in this

5  bill, a single one?  And tell me who that is.

6          MR. KOHRMAN:  Well, I would point --

7          SEN. OGDEN:  Give us one person who

8  could not -- could not meet the requirements of this

9  bill if they are members of the AARP and have an

10  identification card that says "I'm a card-carrying

11  member of the AARP."  Give me one person who couldn't

12  meet the requirements in this bill.

13          MR. KOHRMAN:  Well, I tell you that I

14  think that's a good question, and I regret not

15  checking all the people mentioned in my testimony so

16  that I could answer that question.

17          SEN. OGDEN:  Well, I'm going to suggest

18  to you that there's not a single member in the AARP

19  who could not meet the requirements in this bill.

20          MR. KOHRMAN:  Well, Senator, that may be

21  right, but I doubt it, and I think you have no basis

22  for that statement.

23          SEN. OGDEN:  Yes, I do.

24          MR. KOHRMAN:  And if there is a basis

25  for that statement, it's that frankly our members are

```
 1    among the most energetic, active seniors there are in

 2    the country.  They are also more on average well off

 3    than your typical senior.  They're probably more

 4    healthy than your typical senior, and they don't have

 5    a lot of the challenges.

 6              One of the things that AARP has done in

 7    the last two years is to put on our priority list in

 8    the AARP Foundation where all the legal advocates are

 9    like me, a new focus on low-income seniors, and the

10    focus is on people who we're not likely to get as

11    members because for them maybe even $12 a year is more

12    than they want to contribute.

13              SEN. OGDEN:  Well, okay, and I

14    understand that we're talking about all the voters,

15    but as a representative of the AARP, I assume you're

16    speaking on behalf of your membership using a very

17    vague standard of what it is that they support and not

18    support, and that there is no evidence in your

19    testimony or in my questions to suggest that there's a

20    single member in the AARP who couldn't meet the

21    requirements of this bill.  And so I don't have

22    anything else to add.

23              MR. KOHRMAN:  Well, I'm not sure what

24    the point is, Senator.  It seems to me --

25              SEN. OGDEN:  The point is that this
```

1    testimony is -- well, I don't have any more to add.

2                MR. KOHRMAN:  Well, let me just respond.

3    It seems to me when you come to fundamental rights,

4    the burden is on the proponents of this bill to

5    justify it.  If we were talking about regulating

6    advertising or some other interest that is not

7    fundamental to what it is to be an American, I would

8    take on the burden and acknowledge that it's, you

9    know, my burden to perhaps justify in excruciating

10   detail the names and addresses of people who couldn't

11   be covered by your bill.  But it seems to me the shoe

12   is on the other foot when it comes to voting.

13                And to say that when there is no

14   evidence of harm, but it is speculative harm that

15   frankly -- another thing that concerns us, Senator, is

16   that proponents of these bills are creating their own

17   problem to be solved by complaining and suggesting to

18   our members and other seniors and voters all over the

19   country that there is a fraud problem that cannot be

20   demonstrated, that then needs to be solved by forcing

21   voters to jump through additional hoops.  That seems

22   to us is an unnecessary --

23                SEN. OGDEN:  Okay.

24                MR. KOHRMAN:   -- an unnecessary and

25   unfortunate misallocation of time.

```
 1              SEN. OGDEN:  All right.  Mr. Kohrman,
 2    and I would suggest to you that the hoops that you've
 3    got to jump through to become a member of the AARP are
 4    more onerous than the hoops you've got to jump through
 5    in order to vote under this bill.  And I would also
 6    suggest to you that you're perfectly within your
 7    rights to testify as an individual, but I think your
 8    testimony representing the AARP lacks merit and
 9    substance.
10              MR. KOHRMAN:  Well, we're very
11    comfortable with our position on this bill, and we
12    feel very confident that our members believe in an
13    expansion of political participation rather than
14    measures likely to discourage it and reduce it.
15              SEN. DUNCAN:  Thank you, Sen. Ogden.
16              Senator Patrick?
17              SEN. PATRICK:  Thank you, Mr. Chairman.
18    I've heard a number of witnesses continue to say
19    something that I believe our last witness shows it is
20    not correct.  You said there's no evidence of
21    fraudulent voting, and our last witness from Harris
22    County clearly showed there was fraudulent voting
23    there.  So would you like to correct that statement?
24              MR. KOHRMAN:  On the contrary, he showed
25    no evidence whatsoever of fraudulent voting.  What he
```

1    showed was evidence of fraudulent registrations, and

2    those are two very different things.

3              Moreover, what's so stunning about this

4    whole debate is that there are innumerable forms of

5    electoral malfeasants, but this kind of law gets at

6    none of those.  The only thing it does, as Ms. Wang

7    said at the very beginning of this long debate, the

8    only thing that this bill can prevent is in-person

9    impersonation, and the notion that people --

10             SEN. PATRICK:  Let me -- excuse me.  I

11   didn't ask that question.  The question was our last

12   witness clearly indicated, proved that people voted on

13   behalf of dead people.  So don't sit there and say

14   there's been no evidence.

15             Secondly, in terms of AARP, did I

16   clearly hear you say to Sen. Ogden that AARP members

17   are more affluent, more well informed, very active,

18   and basically what I heard you say was AARP members

19   wouldn't be impacted by this bill.  Is that correct?

20             MR. KOHRMAN:  Well, let me answer --

21             SEN. PATRICK:  That's a yes or no.  Is

22   that correct?

23             MR. KOHRMAN:  Well, you asked me two

24   questions.

25             SEN. PATRICK:  I'm asking you one

```
 1    question now.  Based on your testimony previously --
 2                   MR. KOHRMAN:  Uh-huh.
 3                   SEN. PATRICK:  -- you said that your
 4    concern was for those members that may not -- or those
 5    people who may not be -- can't afford $12 a month to
 6    be in AARP, that AARP members wouldn't be impacted.
 7    So is your testimony that AARP members won't be
 8    impacted?  That's what you said a moment ago.
 9                   MR. KOHRMAN:  They will be impacted
10    in -- to a lesser degree on average than seniors
11    generally and certainly --
12                   SEN. PATRICK:  How much is lesser,
13    5 percent?
14                   MR. KOHRMAN:  -- low-income seniors.
15                   SEN. PATRICK:  5 percent?  What's
16    lesser, 99, 1 percent?
17                   MR. KOHRMAN:  There's no disputing that
18    this is a small percentage of the overall electorate,
19    and the question is whether the proponents of this
20    bill care about the absolute number of people.
21                   SEN. PATRICK:  And do you have any proof
22    of even a lesser percent?  Can you present any
23    evidence, solid evidence, that any member of AARP will
24    be impacted by this bill?  Do you have any evidence?
25                   MR. KOHRMAN:  Our surveys shows that
```

```
 1   small percentages consistent with all the surveys --
 2               SEN. PATRICK:  Is there a name?
 3               MR. KOHRMAN:  -- have concerns that they
 4   would not be able to provide --
 5               SEN. PATRICK:  Is there a name?
 6               MR. KOHRMAN:  -- the kind of ID that is
 7   required in these laws.
 8               SEN. PATRICK:  So you don't have any
 9   names.  You just have this kind of general small
10   percentage.
11               So let me ask you this question:  Have
12   you done a survey of Senate District 7 in Harris
13   County?
14               MR. KOHRMAN:  Can I answer?  Because my
15   answer was just given to me when it was not the answer
16   I would have given.
17               SEN. PATRICK:  Let me -- let me ask
18   another question.  Did you survey any one in Senate
19   District 7 in Harris County who is a member of AARP?
20               MR. KOHRMAN:  Not as far as I know.
21               SEN. PATRICK:  Okay.  Would it shock you
22   if I told you that the majority of seniors in Senate
23   District 7 support voter ID?
24               MR. KOHRMAN:  I would challenge you to
25   demonstrate that you've surveyed them and know who
```

651

```
 1    those members are.
 2                SEN. PATRICK:  Oh, I can -- oh, I can
 3    assure you I meet with hundreds, thousands, I talk
 4    with them, I know my district, I'm very well connected
 5    to the people in my district.  And the seniors of my
 6    district, many who are members of AARP, support this
 7    bill.  Thank you.
 8                MR. KOHRMAN:  Okay.  All I can --
 9                SEN. PATRICK:  I have no further
10    questions.  Thank you.
11                SEN. DUNCAN:  Sen. Williams, you're
12    recognized.
13                SEN. WILLIAMS:  Thank you, Mr. Chairman.
14    You know, I've just -- during this discussion I've
15    just been on your Website here, and I've gone to the
16    policy and research, and I went to election issues and
17    scanned every article that you have on your Website
18    here under that category, and there is not a single
19    article in here about photo ID voting.  And so I put
20    that under the search, policy and research, and I came
21    up with one article that says "the Supreme Court
22    upholds the voter -- voting ID laws.  The U.S. Supreme
23    Court upheld an Indiana law despite acknowledging it
24    burdens poor people."  I mean, you've got one article
25    on here that you have to really go to a lot of
```

652

1  trouble.

2           I think it's so disingenuous for you to

3  come here and say that you represent all the members

4  of AARP when I have done surveys in my district -- you

5  know, I've got 750,000 constituents just like every

6  other member of the Senate does here -- and I find

7  consistently across all age brackets and across all

8  ethnic lines, they all support this measure.  I

9  just -- I don't see how you can sit here and assert

10  this and offer no statistical proof or anything in

11  writing that you've ever surveyed any of our

12  districts.  This is ridiculous.  You are a political

13  hack coming in here and asserting this stuff that you

14  don't have any basis for whatsoever.

15           MR. KOHRMAN:  Senator, I'd be happy to

16  help you with your Internet search skills any time and

17  provide you with a lengthy list of the Web links to

18  the various articles on the various cases, but --

19           SEN. WILLIAMS:  You know, I've just

20  searched your Website.

21           MR. KOHRMAN:  I understand, Senator, and

22  obviously you have some limitations in your search

23  skills because we have -- I've told you the number of

24  cases on this issue that we have, and you haven't

25  found them.

```
1                    SEN. DUNCAN:  Sir, I'm sorry, I think

2       the question --

3                    MR. KOHRMAN:  Okay.

4                    SEN. DUNCAN:  -- there is no other

5       members queued up, so you are excused.  Thank you for

6       your testimony.

7                    MR. KOHRMAN:  Thank you.

8                    TESTIMONY BY COBY SHORTER

9                    SEN. DUNCAN:  The Chair calls Coby

10      Shorter.  Mr. Shorter, I think, has been listed as a

11      resource witness.

12                   MR. KOHRMAN:  Actually, Mr. Chairman --

13      Mr. Chairman?

14                   SEN. DUNCAN:  Sir, you're not recognized

15      at this point, at this time.

16                   MR. KOHRMAN:  I've been -- I've been

17      criticized without a chance to respond by three

18      Senators.

19                   SEN. DUNCAN:  You're out of order;

20      you're out of order.  You'll have to leave.

21                   MR. KOHRMAN:  Okay.

22                   SEN. DUNCAN:  Thank you.

23                   MR. KOHRMAN:  I was just going to

24      request a chance to respond in writing.

25                   SEN. DUNCAN:  Mr. Shorter, you'll need
```

1  to state your name and the office that you're with,

2  and you'll have ten minutes as the other witnesses,

3  and then you'll be subject to questions at that time.

4  Go ahead.  Do you have any written materials?

5              MR. SHORTER:  No, sir.

6              SEN. DUNCAN:  Okay.

7              MR. SHORTER:  Thank you, Mr. Chairman

8  and Senators.  I am Coby Shorter, the Deputy Secretary

9  of State for the State of Texas, and it's a pleasure

10  to be here with you this morning.

11              First of all, I just want to say on

12  behalf of Secretary Andrade, she sends her regrets for

13  not being here, and I have been invited here to be a

14  resource to you on some of the issues that you are

15  debating, and hopefully the information that I am able

16  to provide through answering your questions will help

17  you in your deliberations.

18              I only say this:  It is our goal as the

19  Secretary of State's Office, the chief elections

20  office, to make sure that every election in Texas is

21  fair, every election in Texas is credible and

22  accessible to all the Texas voters.  And our office

23  recognizes the importance of protecting the integrity

24  of elections and ensuring that all eligible Texans

25  have the opportunity to participate in the Democratic

1    process.

2              So with that said, please know that

3    whatever deliberations and whatever bills you pass

4    related to elections, we look forward to working with

5    you and helping you to -- helping you in terms of

6    implementing the bills that you pass.

7              With that, I would ask that since I am a

8    resource, that I'm here to answer questions.  We also

9    have, Mr. Chairman, our General Counsel John Sepehri

10   here to answer questions as well, but we are open now

11   to any questions we may -- you may have for us today,

12   this morning.

13                  **QUESTIONS FROM SENATE FLOOR**

14              SEN. DUNCAN:  The Chair recognizes

15   Sen. Fraser.

16              SEN. FRASER:  Deputy Secretary Shorter,

17   thank you for being here.  We -- it doesn't escape us

18   that you've been sitting over here since ten o'clock

19   this morning being available to this body.  And as

20   someone that serves the state, we appreciate you being

21   here.

22              The questions that I have today for you

23   are -- I think I want some clarification, making sure

24   that the bill that I'm laying out that I am

25   understanding correctly the interpretation of someone

1    that fills out an application, sends it in, receives a

2    registration card and then takes that registration

3    card and attempts to vote with that.

4              MR. SHORTER:  Yes, sir.

5              SEN. FRASER:  And I guess the first

6    question I would have is the election code is under

7    Chapter 63 and, in fact, the start of that is

8    Section 63.001, the Regular Procedure for Accepting a

9    Voter.  Do you happen to have that --

10             MR. SHORTER:  Yes, sir, I do.

11             SEN. FRASER:  -- that law in front of

12   you?  And I would ask you -- if possible I'd like to

13   walk through and make sure I understand the Texas law

14   and what provides for the ability for someone to vote.

15             Here in my hand I have the voter

16   registration card that I believe that is issued.  Is

17   that correct?  It is issued to a voter.  It looks like

18   it is mailed out, and this would be the card that I

19   would use when I would walk into the --

20             MR. SHORTER:  Senator, that does appear

21   to be our voter registration card.

22             SEN. FRASER:  And it looks like -- it

23   says "Except as otherwise provided, acceptance of

24   voters shall be conducted as provided" under this

25   section.  "(b) On offering to vote, a voter must

```
 1   present the voter's voter registration certificate to
 2   an election officer at the polling place."  So it
 3   appears to me that if I walk in a polling place and I
 4   take this voting card and I show it to the person at
 5   the polling place, the first thing they're going to do
 6   is accept this card that I'm offering.
 7              MR. SHORTER:  That is correct, sir.
 8              SEN. FRASER:  Okay.  "(c) On
 9   presentation of a registration certificate, an
10   election officer shall determine whether the voter's
11   name is on the registration certificate is on the list
12   of registered voters for the precinct."  So I'm
13   assuming that after I hand him the card, if I remember
14   correctly, they've got a list in front them, they look
15   and find my name on the list, they look at my address
16   and they determine am I voting in the right precinct.
17   I think -- is that what they're looking for?
18              MR. SHORTER:  Yes, sir.
19              SEN. FRASER:  Okay.  "(d) If the voter's
20   name on the precinct list of registered voters, the
21   voter shall be accepted for voting."
22              MR. SHORTER:  That is correct.
23              SEN. FRASER:  Now, is that what happens?
24              MR. SHORTER:  Yes, sir, that is the --
25   what it's going to say on that.
```

1          SEN. FRASER:  Okay.  I want to clarify.

2    On this card, there's several other things on the

3    card.  One of them is, it has date of birth.  Now, is

4    the person that I'm giving this to looking at that

5    date of birth, and has it been reflected in state law

6    that that's something they check?

7          MR. SHORTER:  According to state law

8    right now, as it is written now, date of birth is not

9    something that is checked.

10          SEN. FRASER:  On this card, it has an

11    area for my sex.  We've had a lot of fun today with

12    the sex change argument, but on the card it says that

13    there is a registration for someone's sex.  My card

14    says "male," and I put it there.  Is that something

15    when I hand this card to the registration person that

16    they would be verifying on the card?

17          MR. SHORTER:  They would not be

18    verifying it under current law.

19          SEN. FRASER:  Okay.  So let me -- let me

20    make sure I understand the way this works.  I have a

21    card in my possession.  I walk in and I give this to

22    the person.  They look at the list, they determine I'm

23    in the right precinct.  If I'm on the list and I'm in

24    the right precinct, they hand me my card back, and

25    they hand me a ballot, and I go over and vote.  Is

```
 1    that correct?
 2                   MR. SHORTER:  Yes, sir.
 3                   SEN. FRASER:  Okay.  Well, I'm a little
 4    confused about how -- what could happen because let me
 5    continue this questioning here.  I live in Horseshoe
 6    Bay, Texas.  It is a small community, a retirement
 7    community, which by the way, most of them are AARP
 8    members.  And the retirement people there that still
 9    are going to vote, when they walk in, the people in
10    the polling place, they know me as their Senator.  And
11    if I walked in and I brought my voting card and I put
12    it in, they'd say "Senator, it's good to have you
13    today," and I would register and I would vote and then
14    I would walk back out to my car.
15                   But what would happen after I voted
16    that -- in my car I had my brother Steve's voter
17    registration card, and I walked back into that polling
18    place that I just left and I laid Steve Fraser's
19    voting card down and said "I'm here to vote."  Now,
20    the registrar probably would say "Well, Senator, you
21    were just here, and you just voted."  And I said "No,
22    I'm Steve Fraser.  I'm his twin brother.  I'd like to
23    vote."  What authorization under state law does that
24    polling place person have to tell me that I am not
25    authorized to vote?
```

```
 1              MR. SHORTER:  Under current state law,
 2   there is no authorization to prevent that polling
 3   person from --
 4              SEN. FRASER:  So if I present my
 5   brother's card and even though they know or they
 6   suspect -- greatly suspect that I am not Steve Fraser,
 7   do they have the authorization under state law to stop
 8   me from voting?
 9              MR. SHORTER:  I don't think -- based on
10   my understanding of state law and based on my
11   consultation with our staff, they don't have the
12   authorization to stop you.
13              SEN. FRASER:  Okay.  Let me -- let me
14   carry it a step further.  Let's say that I'm not in
15   Horseshoe Bay.  I'm in Houston, Texas.  And in
16   Houston, Texas if I was voting, probably they wouldn't
17   have any idea who I was.  And I walked in the voting
18   booth and I didn't have my card or my brother's card,
19   I had my wife Linda's card, and I went in to vote.
20   And my name -- Linda Fraser's name was on the list in
21   the precinct.  They would check and see if her name
22   was there, and they would check the address, and I'm
23   in the right place, would they hand me a ballot and
24   allow me to vote?  Is there anything under state law
25   that they would check the person verifying the -- you
```

1    know, that I'm not Linda Fraser in that?  Is there

2    anything under state law that would cause them or

3    allow them not to allow me to vote?

4              MR. SHORTER:  Senator, under these

5    provisions of the law as they are, there are no

6    provisions that would prevent that.

7              SEN. FRASER:  Okay.  Let's carry it a

8    step further.  There was a case that was represented

9    to me this week -- there have been a lot of these now

10   that we've been working on this -- this happened in

11   Plano.  A poll worker in Plano had a lady came in,

12   bright red hair, big blue hat, feathers on the hat,

13   one of those people you would remember when they came

14   in.  She voted.  An hour later she came back in with

15   somebody else's registration card, went down to the

16   next poll person and was registering to vote.

17             The person she just voted with went to

18   the election judge and said "This person was just

19   here.  They just voted.  She's trying to vote again,"

20   and the election judge told them "I'm sorry.  We have

21   nothing under state law to stop them.  You have to

22   allow them to vote."  Now, is that -- under current

23   law could that have happened?

24             MR. SHORTER:  Under current law as it is

25   written, that could have happened, yes, sir.

1          SEN. FRASER:  Okay.  Let's carry it a

2    step further.  Let's assume there's an unscrupulous

3    person that has the address of someone that they know

4    was a registered voter and that person has passed

5    away.  Let me back up and ask the question.

6          My understanding is that when someone

7    dies that your office requests death records, and that

8    you now have the ability to try to take people off the

9    roll.  Is that correct?

10         MR. SHORTER:  Well, Senator, what

11   happens on a weekly basis, the Bureau of Vital

12   Statistics submits to our office their records on

13   deceased individuals, and we forward that information

14   to the counties for that person to be taken off the

15   roll.

16         SEN. FRASER:  How long does it take for

17   that data to -- to have the person deceased till you

18   get it and you get them taken off, what is the time

19   lag?

20         MR. SHORTER:  Senator, I don't know the

21   exact timeline that it takes, but the challenge that

22   we sometimes have is that the information that is

23   forwarded to our office from vital statistics, there's

24   a lag between the time that we get it and the time the

25   individual sometimes actually has expired.

1          SEN. FRASER:  I've been told it's six

2  months.  Is that the average time that it takes to

3  remove them off the roll?

4          MR. SHORTER:  We do have instances of

5  knowing it has taken six months.

6          SEN. FRASER:  Okay.  If it took six

7  months and if someone died and if someone sent in a

8  letter of a change of address and said that person

9  just died, asked for a new registration card to be

10  sent to X address and they did that with every one

11  that died during that period, and there were as many

12  as 30 or 40 or 50 of these people and the same

13  address -- request change that went to the same

14  address, do you have the ability or does the County

15  Clerk have the ability to catch that under our current

16  system?

17          MR. SHORTER:  If they all went to the

18  same address?

19          SEN. FRASER:  If someone sent in a

20  change of address --

21          MR. SHORTER:  Yes, sir.

22          SEN. FRASER:  -- of a valid voter and

23  said "Send me their registration card and send it to

24  this address" --

25          MR. SHORTER:  Yes, sir.

1          SEN. FRASER:  -- and whether it was one

2     or two or ten or thirty or fifty, that they change

3     that address, if someone sends you in a change of

4     address, would you likely send it to that address?

5          MR. SHORTER:  Yes, sir, we would.

6          SEN. FRASER:  So it's possible that

7     someone could collect, could harvest multiple cards at

8     this address.  Hypothetically is it possible they

9     could hand them out to random people that didn't

10    belong to the card, and that person -- the random

11    person could walk in with the fake card and give it to

12    the person at the polling place and vote that card?

13         MR. SHORTER:  Hypothetically, yes,

14    Senator.

15         SEN. FRASER:  Well, hypothetically if it

16    could happen and someone could do it, we have to

17    assume that somebody has thought about that, and that

18    some of these people that we've heard on these stories

19    of people that were dead that voted multiple times

20    possibly that could have been what happened.  Is that

21    correct?

22         MR. SHORTER:  Yes, sir.

23         SEN. FRASER:  Okay.  If Senate Bill 362

24    was in place and that person that stole that

25    identification or stole the card or the Troy Fraser

665

```
 1    that was voting Steve Fraser's card, if they had to
 2    come in and show either a photo ID proving who they
 3    were or they had other means of identification that
 4    they would have to show, would that not give us a lot
 5    better chance of identifying that that person is
 6    fraudulently voting?
 7              MR. SHORTER:  Yes, sir, if you could
 8    verify that.
 9              SEN. FRASER:  Okay.  Well, let's change
10    this for a second.  I have the -- your voter
11    registration card here in front of me.  I know it
12    looks like it's got a lot of spaces for things to fill
13    out, but down at the bottom it's got a place to fill
14    in your driver's license number, and there's another
15    place that says your social security card number.
16              MR. SHORTER:  Yes, sir.
17              SEN. FRASER:  The data that I received
18    from you it looked like that because of motor voter
19    we're receiving about -- I think the number is
20    somewhere in the high 80s.  You know, 75 to 80 percent
21    of people right now are using their driver's license
22    number.  There is a smaller number, you know, 10,
23    15 percent uses a social security number, but there
24    were a number of people -- I think there were 3,700
25    people in Texas last year -- 37,000 people in Texas
```

```
 1    last year that used neither.  They said "I don't have
 2    a driver's license.  I don't have a social security
 3    card," and they turned this in.
 4              Now, if they turn this in to the
 5    Secretary of State or to the registrar in Houston, the
 6    guy that was just up, once they do that, would this be
 7    processed, and will they be issued -- even though they
 8    have no forms of identification, they don't give you a
 9    driver's license number or a social security card, all
10    they gave you was just a blank card, will they be
11    issued a voter registration card?
12              MR. SHORTER:  Senator, they will be
13    issued a voter registration card if they sign the
14    affirmation statement at the bottom.
15              SEN. FRASER:  If they sign the bottom
16    saying "I'm who I say I am" on the bottom, they send
17    this in, they're going to get a registration card?
18              MR. SHORTER:  That is correct.
19              SEN. FRASER:  Okay.  But I also
20    understand that when they go to vote there's going to
21    be a flag on that, and when they come in they've got
22    to show something to prove that they are who just
23    signed up.  Is that correct?
24              MR. SHORTER:  Yes, sir, they will have
25    to --
```

```
 1              SEN. FRASER:  Okay.  But you also -- if
 2   I understood the person from Houston, is that when
 3   they fill this out, they mail them a notice that
 4   they're going to have to provide some kind of
 5   identification.  And if they took that letter that
 6   they just mailed them in and said "Here is my proof of
 7   identification.  They just mailed this to me,"
 8   basically they could game the system by showing no
 9   identification, mail it to the address, take that as
10   their form of identification, and they could use --
11   and let me give you kind of a ridiculous case.  But if
12   I filled this out as Mickey Mouse and it was 103
13   Lighthouse Drive and I sent it in, would you send me a
14   card for Mickey Mouse?
15              MR. SHORTER:  You would get a card,
16   Senator, if you have a -- have signed the affirmation.
17              SEN. FRASER:  If I sign the bottom of
18   it, you're going to send me a card for Mickey Mouse.
19   Okay.  Now I've got a registration card that says
20   Mickey Mouse.  I'm going to walk in to my precinct
21   with that card, and you've also sent me a notice
22   saying I've got to show other identification.  I take
23   the letter you just mailed me, walk in to my polling
24   place, I lay down my Mickey Mouse card, I also lay
25   down the letter you just mailed me, if I give them
```

1   that, are they going to allow me to vote?

2              MR. SHORTER:  If you're using that

3   letter -- if we're talking about the letter from the

4   government agency, it will be counted as a form of

5   identification.

6              SEN. FRASER:  Okay.  So if someone is

7   unscrupulous and they know how to do this, let's say

8   some random group like ACORN that decided they wanted

9   to try to use something to register people to try to

10  get a card and to game the system and then to go in

11  and vote and falsify that vote by not giving the

12  proper identification, the scenario that I just laid

13  out, is that possible under current law?

14             MR. SHORTER:  It is possible, Senator.

15             SEN. FRASER:  Okay.  In the this last

16  election cycle -- and I'm sorry.  I'm not going to ask

17  you that question there.  We should have asked the

18  registrar because of the people that voted late in

19  this last election cycle I have been told that they

20  suspected thousands and thousands of that scenario

21  that I just suggested.

22             But if I took that Mickey Mouse voter ID

23  and I laid it in front of the person, would the person

24  say "Thank you, Mr. Mouse.  Here is your card," and

25  they would allow me to vote?  Is that not correct?

```
 1              MR. SHORTER:  Theoretically, Senator,
 2   that -- that could happen.
 3              SEN. FRASER:  Okay.  So I guess what I'm
 4   trying to establish with you is that it sounds like
 5   today if I want to game the system and I want to
 6   cheat, it's very difficult for either the Secretary of
 7   the State or that election clerk or that election
 8   judge to identify that I'm cheating and know for sure.
 9   Is that correct?  Especially if I'm voting in Houston
10   or Dallas or someplace where they have no reason to
11   know who I am, is it difficult -- would you say that
12   it is difficult for them to identify, to determine for
13   sure, that that person representing themself as Mickey
14   Mouse really is Mickey Mouse?
15              MR. SHORTER:  Senator, I would say that
16   there may be -- they may have an opportunity to
17   identify it.  However, to do something about it based
18   on what is currently in statute would be difficult.
19              SEN. FRASER:  Okay.  Well, actually that
20   was the next question.  It's difficult to identify,
21   but it sounds like it's even more difficult to proceed
22   to prosecute because if you can't identify it, you
23   don't have the authority to ask them questions to
24   prove who they are.  And even if you think you know
25   that it's the wrong person, if you accuse them of
```

670

1    doing that, there's really nothing under current law

2    to allow you to do that, is there?

3                    MR. SHORTER:  Well, they're a registrar

4    who has some concerns, has reasonable concerns, does

5    have the capacity to challenge, but there's not

6    provisions for once those challenges are made for you

7    to do much with it.

8                    SEN. FRASER:  Okay.  Under current law,

9    as we say here, even if there's a challenge -- and

10   let's say that -- let's go back to the Horseshoe

11   Bay -- let's go to the Horseshoe Bay example.

12                   MR. SHORTER:  Yes, sir.

13                   SEN. FRASER:  If I voted twice there,

14   they'd know it was me and probably they would say it's

15   a challenge, and they probably could call the D.A. and

16   say "The Senator just voted twice.  We need to check

17   into it."  But the question is, I just voted twice, I

18   just placed two ballots, what would happen to those

19   ballots?  Would they be put in the pile to be counted?

20                   MR. SHORTER:  Yes.

21                   SEN. FRASER:  Okay.  So I just voted

22   illegally.  You knew I voted illegally.  You're going

23   to report me to the D.A., but I just voted.  And if

24   that is a close election, that County Commissioner

25   that I voted for, and they're going to be within one

1    or two votes, I just impacted an election by voting

2    illegally.

3                    MR. SHORTER:  Would you allow me to

4    defer to my general counsel on whether or not that

5    actual vote would count twice?

6                    SEN. FRASER:  I'm sorry.  I didn't say

7    it was going to count twice.  I voted twice.  I'm

8    saying I voted as Troy Fraser and I voted as Steve

9    Fraser, and both of those votes I voted under current

10   law.  The vote, my understanding is, and I've asked

11   the registrar of these counties what they would do, if

12   someone comes and votes and they place a vote, they

13   have to put it in the pile to count.  But even if

14   there's appeal, they could pursue it and possibly get

15   an indictment.  But I think what you're saying is if

16   it's hard to catch them, it's even much harder to

17   prosecute.

18                   MR. SHORTER:  And, Senator, on that --

19   on that particular question, I think my best response

20   to you is for you to allow me the opportunity to

21   research that one and get back with you as soon as

22   possible --

23                   SEN. FRASER:  Okay.  Okay.  That's good.

24                   MR. SHORTER:  -- because I'm really not

25   clear on that one.

```
1            SEN. FRASER:  The other question I would
2    ask you and that I want to clarify, if someone
3    suspects the scenario that we just talked about where
4    they suspect somebody has voted illegally, it got put
5    in the pile to count and they think that they voted
6    twice like the lady with the big hat, if that is
7    referred to someone to check it out, if it happens in
8    Dallas, probably that's going to go to the District
9    Attorney, or they could send it to -- directly to the
10   Attorney General, or it's possible it could be sent to
11   you, but if they send it to you, aren't you going to
12   refer it to the District Attorney and the AG?  Is that
13   correct?
14            MR. SHORTER:  If a complaint is sent to
15   the Secretary of State's Office, our office looks at
16   the complaint, and there's a general assumption among
17   the staff and the Secretary of State's Office and that
18   assumption is if the information that is being
19   presented on that -- on that complaint is actually
20   considered true, and if it's true we -- of course
21   understand, Senator, our office does not do the
22   investigation.  But if the allegations as presented
23   would present a crime under the elections code, our
24   office would refer it to the Attorney General's
25   Office.
```

673

1          SEN. FRASER:  Okay.  And I guess the

2     follow-up question to that is if it's hard to identify

3     and it's hard to prosecute and there's two other

4     sources, the assumption is that the number of these

5     going to your office probably -- is it great?  If

6     they're having trouble identifying it and they're

7     having trouble prosecuting it, do you --

8          MR. SHORTER:  Correct.  Senator, the

9     number -- in terms of -- I can give you some

10    statistics.  In terms of the Secretary of State's

11    Office since September 1, 2007, there were 50 written

12    complaints sent to our office, and those -- those

13    were -- our office looked through those.  We looked at

14    them to see if there was merit.  Actually related

15    to -- complaints related to voter impersonation, we

16    found about seven of those complaints.  Two of them

17    were actually referred, one was not referred, and one

18    is pending.  One is pending with our office now to be

19    actually referred to the AG's Office.

20         SEN. FRASER:  Thank you, Mr. Shorter.  I

21    do appreciate the information.

22         SEN. DUNCAN:  Sen. Van de Putte or --

23    Sen. Van de Putte?  And the court reporter has been

24    going for about almost two hours.  If we could -- you

25    take as long as you need, but I would propose that we

```
 1    let her take a break in about ten minutes, if we
 2    could.
 3                    SEN. VAN de PUTTE:  Thank you,
 4    Mr. Chairman, and thank you very much for being here
 5    particularly in the late -- excuse me -- the early
 6    hour that we're in now in the next day.
 7                    I wanted to ask a few of the questions
 8    earlier yesterday.  In speaking to Sen. Fraser when he
 9    laid out the bill, I asked several questions at that
10    time.  He said that the Secretary of State's Office
11    would be the most appropriate.  So the questions that
12    I'm asking you are actually the ones that Sen. Fraser
13    had asked me to ask.
14                    You.  And please give our regards to my
15    dear friend and fellow San Antonian Hope Andrade.
16                    I wanted to ask you if you would just
17    take a look at the bill, and hopefully you have a copy
18    of that or your general counsel has that for you.  On
19    the first page in Section 15.005 --
20                    MR. SHORTER:  Uh-huh.
21                    SEN. VAN de PUTTE:  -- there's a
22    timeline between the requirements when each voter
23    registration certificate issued under Section 13.142
24    or renewal registration certificate issued under
25    Section 14.001.  In the Senate Bill that is proposed,
```

```
 1    we have to do a lot of changes to educate our election
 2    judges and our clerks.  What happens in the timeframe
 3    between the people with current registrations that are
 4    caught between the renewal for purposes of education?
 5                    MR. SHORTER:  For purposes of
 6    education of --
 7                    SEN. VAN de PUTTE:  Yeah.
 8                    MR. SHORTER:  -- of the new bill?
 9                    SEN. VAN de PUTTE:  Yeah.
10                    MR. SHORTER:  Well, Senator, what we
11    would do -- what our office is planning on doing for
12    all elections-related bills, we're in the process
13    right now of doing the long-term planning for voter
14    education for our office.  And voter education in our
15    office deals with some specific things.  Voter
16    education in our office deals with we want -- we want
17    to talk about where to vote, how to vote, what do you
18    need to vote, what are the items that you need to
19    vote, all the resources.  So we're planning that now.
20                    If this bill were passed or any other
21    bill that you would pass related to changes in a
22    requirement for voting, as we continue to develop our
23    module for voter education, we would be able to put
24    the requirements that this bill or any other bill has
25    into our planning module for voter education that
```

1   we're currently developing.

2           SEN. VAN de PUTTE:  Since the proposed

3   regulations and rules would be greatly changed from

4   the process that Texas voters have used in the past

5   several years with the requirements of the voter

6   certificate and a photo identification, how would the

7   Secretary of State's Office propose to inform voters

8   of these changes?

9           MR. SHORTER:  Senator, we would inform

10  through the existing process that we have, which is a

11  pretty extensive process.  For instance, during the

12  last year on voter education, it was a $3 million

13  process that we undertook to inform voters of what's

14  going to be going on in the election cycle that ended

15  in November of 2008.  We're doing that now.

16          It would mean that our office would have

17  to make sure that all of the changes are implemented,

18  and implementation would mean all notifications that

19  would need to be made, we would have to get that done.

20  All training for county Election Officials through our

21  current -- through our current system of educating

22  county workers, election workers, which we hold

23  periodically through the year, we would implement or

24  make sure that this new information is a part of that

25  process.  Poll worker training, which we're looking at

1    right now, we would also make sure that those things

2    within the bill that actively affect poll workers,

3    those changes will be put into what we're doing now or

4    what we're planning to do.

5                    Generally after -- during a session when

6    a session is over, there are a lot of election bills

7    that are passed, and our pattern of preparing for

8    coming out of session, going into a season of getting

9    ready for elections, we start looking at what bills

10   have been passed.  We're putting together the

11   structure now on what we're doing on voter education

12   and then fit those into the model.  Sometimes when

13   there are major changes like this, it does require

14   more work on our -- a heavier workload on our staff,

15   but the staff at the agency has proven time after time

16   that they're capable of doing it.

17                   SEN. VAN de PUTTE:  Well, I believe that

18   the Secretary of State's Office and particularly this

19   Secretary of State, is more than willing and it's been

20   shown.  My concern is that -- have you seen the fiscal

21   note that is attached to the implementation of this

22   bill?

23                   MR. SHORTER:  Yes, ma'am, I have.

24                   SEN. VAN de PUTTE:  According to the

25   fiscal note, your -- the Office of the Secretary of

```
 1   State.
 2                  MR. SHORTER:  Uh-huh.
 3                  SEN. VAN de PUTTE:  -- is to absorb the
 4   cost.  Given that, how do you plan to notify each of
 5   the voters, given that in Indiana and Georgia
 6   individual mailings were made to each registered voter
 7   informing them of the change in voter ID?  And since
 8   we have no legal, I guess, basis, at least in our
 9   fiscal note, for the Secretary of State to implement
10   that, how would the Secretary of State's Office plan
11   to inform each voter, which were the requirements that
12   they felt under -- to get pre-clearance under the
13   Voting Rights Act, how would you-all achieve that with
14   zero money?
15                  MR. SHORTER:  Senator, we would -- we
16   would achieve that by using the funds that we've been
17   using to do it in the past.  We would use the HAVA
18   Funds that have been set aside for voter education.  I
19   remember your asking this question earlier about the
20   zero fiscal note that our office put on it.  We put it
21   on there, and when this bill -- when a similar bill
22   was filed like this in the previous session, staff
23   shared with me that there was a zero fiscal note on it
24   as well, and it was because HAVA dollars were able to
25   be used.
```

1          SEN. VAN de PUTTE:  I believe the fiscal

2   note for the voter ID bill in the 80th Legislative

3   Session that was passed by the House was at $600,000,

4   and so we --

5          MR. SHORTER:  Yes, ma'am.

6          SEN. VAN de PUTTE:  So that's what I

7   wanted to ask is that -- I know that Hope is very good

8   at squeezing dollars, but how do you -- how does the

9   Secretary of State's Office plan to inform -- and it's

10  not just the training.  From what we understand of all

11  voter ID laws that have been passed, each of those

12  Secretaries of State have done an individual mailing,

13  not just posting on the Web, not that.  Do you plan to

14  send an individual mailing to each voter with or

15  without the passage of this bill?

16          MR. SHORTER:  That -- first of all, that

17  would be, of course, Secretary Andrade's decision.

18          As for that $600,000 fiscal note in the

19  previous bill, that was not a fiscal note that was

20  put on by the Secretary of State's Office.  My

21  understanding is that was a fiscal note that was put

22  on by DPS.  Even though that fiscal note was $600,000

23  put on by DPS, our fiscal note on that previous bill,

24  if I'm understanding correctly, is that it was still

25  zero because we were not looking at those funds to --

1              SEN. VAN de PUTTE:  Okay.

2              MR. SHORTER:  -- and we do still now.

3    For instance, right now in voter education, in HAVA

4    dollars, we still have $2 million left.  Our staff, in

5    anticipation of bills coming out of the session, we've

6    been working with the EAC already to see -- make sure

7    that bills that are passing through the House and

8    through the Senate or through the Legislature of Texas

9    would be able to -- we would be able to use HAVA

10   dollars for that.  We feel comfortable that we can,

11   but we don't want to get towards the end of the

12   session and find out that we were incorrect.

13             SEN. VAN de PUTTE:  Thank you.  I would

14   also ask the questions that I asked Sen. Fraser that

15   they said that the Secretary's Office would be more

16   appropriate.  With regard to naturalized citizens,

17   what is the difference between a certificate -- a

18   citizenship certificate, which is in the first section

19   of the bill that's allowable with the photo ID, and

20   citizenship papers, which is allowed under the second

21   part of the bill?

22             MR. SHORTER:  Senator, I remember your

23   asking that question earlier today, and I asked our

24   staff today to help me and answer that question.  They

25   have not gotten back to me, of course, at four o'clock

1    this morning.  But if you would allow me to get you

2    the answer to that in a few hours, I will provide that

3    for you.

4                    SEN. VAN de PUTTE:  Thank you.  That

5    would be helpful to us since we have 56,000

6    naturalized citizens.  And I believe the certificate

7    is the eight by eleven certificate that is issued at

8    the time of naturalization, which has a photo, but in

9    the case of many of our constituents who have been

10   naturalized it is a photo of them when they were a

11   young child or a young adult, and the citizenship

12   papers may be the little wallet size card.  So it

13   doesn't have a photo.

14                    MR. SHORTER:  Yes, ma'am.

15                    SEN. VAN de PUTTE:  But I think because

16   of the language and since it's each of those

17   documents, it would be very helpful to us.

18                    And I know that there are probably some

19   more questions from other members, but I know that our

20   Stenographer has been there, but when you come back, I

21   know that some of the questions, if I have the chance

22   to ask, or maybe one of the other members, is the

23   statistical and demographic data of our current Texas

24   voters and who are registered.

25                    MR. SHORTER:  Yes, ma'am.

1        SEN. VAN de PUTTE:  So I will stop at

2   this point the questions so that we can take a break,

3   but just to let you know that's probably coming up.

4        MR. SHORTER:  Thank you.

5        SEN. VAN de PUTTE:  Thank you,

6   Mr. Chairman.  I'll proceed after.

7        SEN. DUNCAN:  Do you want to maintain

8   the floor when you come back?

9        SEN. VAN de PUTTE:  I would love to

10  maintain the floor after just to continue, but I don't

11  want to go beyond the 4:40 a.m.

12        SEN. DUNCAN:  Okay.  We will then --

13  Members, with that we will stand at ease for ten

14  minutes and be back at 4:50.

15        (Recess:  4:41 a.m. to 4:53 a.m.)

16        SEN. DUNCAN:  Okay.  Members, we'll come

17  back to order.  Sen. Van de Putte has the floor.

18        Before she begins again, we'll have -- I

19  need to make this announcement to the folks who are in

20  the gallery or who are waiting to be in public

21  testimony.  The Chair would request that anyone

22  wishing to testify return to the registration desk and

23  check in with the clerk.  This will allow the clerk to

24  pull the relevant witness cards, and we can proceed

25  through public testimony more efficiently.  All

1   witness information will be entered into the record

2   and witnesses present and testifying will be noted as

3   such.  Those who do not testify will be entered into

4   the record as nontestifying but registering their

5   position for or against the Senate Bill 362.  We think

6   this will be a way to help facilitate those and also

7   give us a little better idea of how to manage yours

8   and our time.

9               Sen. Van de Putte, you're recognized.

10              SEN. VAN de PUTTE:  Thank you,

11   Mr. Chairman.

12              Thank you.  It's good to be back with

13   you again.  Before I ask some of the demographic data,

14   there was one part that I forgot to ask that I had

15   asked Sen. Fraser and wanted to reiterate.  Under the

16   proposed bill, we have two different types of military

17   ID as well:  Those military IDs that have a photograph

18   and the military IDs that do not have a photograph,

19   and they are listed, I think, in two different

20   sections of the bill.

21              My question is having to deal with the

22   inconsistencies of addresses with our military

23   members, not veterans.  Once they're veterans, they're

24   living in Texas and not here because of the duty

25   station.  Under the provisions of this bill or maybe

1    even currently, but currently our military members do

2    not have to show a photo identification.  Under this

3    bill they would.  How would a clerk or election judge

4    treat the inconsistencies in nonalignment of address

5    on the photo ID with the -- with the certificate?

6                   MR. SHORTER:  Senator, I don't have that

7    answer, but I will get it for you, and that would

8    involve -- and I'll tell you what I will go through:

9    Asking my staff and also visiting with the clerks to

10   see have they seen this, is this something that has

11   happened already, or based on this particular

12   bill would it happen.

13                  SEN. VAN de PUTTE:  Well, I don't think

14   we know because they don't have to show a photo ID.

15                  MR. SHORTER:  Correct; you're right;

16   you're right; absolutely.

17                  SEN. VAN de PUTTE:  And because many of

18   those members that are here still have their own

19   state's driver's license because -- or they're issued

20   the DOD license on some installations, it doesn't

21   reconcile with the voter certificate.

22                  MR. SHORTER:  Right.

23                  SEN. VAN de PUTTE:  And particularly for

24   those career military who then become civilian, they

25   keep their -- that because they may be going to

1    retire, and it's particular.  So if you would do that?

2                MR. SHORTER:  Yes, ma'am.

3                SEN. VAN de PUTTE:  And in that also how

4    would, under the proposed bill, we treat the

5    inconsistencies in addresses in college students who

6    may still keep their primary place of residence, which

7    is their home and the home of their parents, for

8    purposes of their driver's license because that's

9    their permanent address and they are only temporary,

10   yet choose to register in the town that they are now

11   going to college.  So the photo identification or

12   driver's license does not match up with the

13   certificate.  So those are two instances where how

14   would that -- those be treated.

15               MR. SHORTER:  Yes, ma'am.

16               SEN. VAN de PUTTE:  My other question

17   is -- we know from some of the data that the affected

18   groups and what we -- what is the state's burden to

19   prove at the Department of Justice is the availability

20   for African-Americans, Hispanics, language groups to

21   be afforded the same ability, in other words, no

22   discrimination?  Can you tell us of the 13 million

23   plus voters, do we know how many voters are

24   African-American in the State of Texas?

25               MR. SHORTER:  Senator, we don't know

1    because that data is not tracked on race and ethnicity

2    right now.  The only thing that is tracked is we

3    can -- based on our new TEAM system, we can

4    cross-reference Hispanic surnames, but that's

5    inconclusive, so --

6                    SEN. VAN de PUTTE:  Van de Putte.

7                    MR. SHORTER:  Exactly.  So the answer is

8    right now there's not a mechanism to track race or

9    ethnicity.

10                   SEN. VAN de PUTTE:  So how would we be

11   able -- if we don't know -- if we're not capturing the

12   data, the data is not available as a base point of how

13   many registered voters we have who are

14   African-American or Latino or Spanish speaking, how

15   can we benchmark and prove up to the Justice

16   Department and support litigation that there will not

17   be a negative effect since we have no data?

18                   MR. SHORTER:  I would assume that our

19   staff has been using some other means to do that.  I

20   don't know what that is, but I will find out for you.

21                   SEN. VAN de PUTTE:  Okay.  So what I

22   have so far is that you will get back to us on

23   certificate versus papers --

24                   MR. SHORTER:  Yes, ma'am.

25                   SEN. VAN de PUTTE:  -- for naturalized

TX_00004575

```
 1    citizens --
 2                   MR. SHORTER:  Yes, ma'am.
 3                   SEN. VAN de PUTTE:  -- since the other
 4    states that have passed this so far do not have nearly
 5    the degree of those naturalized citizens as we do; and
 6    that you will also check on the incongruencies of
 7    address for both our military members and college
 8    students.
 9                   MR. SHORTER:  Yes, ma'am.
10                   SEN. VAN de PUTTE:  And you will also
11    get back with us the data, if it exists, of how many
12    voters we have that are indeed African-American and
13    Hispanic so that we can have a benchmark.  We need
14    that data to be able to prove that.  So those are the
15    things that you are going to be helping us with.
16                   MR. SHORTER:  Yes, ma'am, I will; we
17    will.  John and I will be notifying staff so they can
18    get on it and hopefully give you an answer before the
19    end of the day.
20                   SEN. VAN de PUTTE:  Well, thank you, but
21    I know you haven't gone to sleep yet, so I appreciate
22    the hard work of your staff.  And again, my regards to
23    my dear friend, our Secretary of State.
24                   MR. SHORTER:  Thank you.
25                   SEN. VAN de PUTTE:  Thank you.
```

688

 1          SEN. WENTWORTH:  The Chair recognizes
 2   Sent. Whitmire.  Sen. Whitmire?  John?  The Chair
 3   recognizes Sen. Whitmire.
 4          SEN. WHITMIRE:  No, I'll pass
 5   (inaudible) I've got a quick question, quick, quick,
 6   quick.  You were responding to Sen. Fraser's
 7   hypotheticals, and he was talking about if he ran in
 8   and voted and then he went back out and got his
 9   brother's card and voted again that nothing could be
10   done.  Is it not true, sir, that the election officer
11   is in total control of his precinct?  I've seen folks
12   be arrested for handing out cards too close, poll
13   watchers for harassing voters.  Isn't it true that if
14   you try to go in and vote twice in the same timeframe
15   that you could be arrested for voter fraud at that
16   moment and maybe even have a mental warrant served on
17   you if you tried to do it like he described it?  So
18   aren't we -- aren't we really being a little
19   ridiculous at five in the morning with some of our
20   hypotheticals?
21          MR. SHORTER:  Sir, I'm not --
22          SEN. WHITMIRE:  You were being awful
23   nice.  I realize you're in a difficult position, but I
24   don't -- is it realistic that someone, the same person
25   could vote twice within a 30-minute timeframe?

```
 1              MR. SHORTER:  It's possible, sir.
 2   Whether --
 3              SEN. WHITMIRE:  It's possible to get
 4   arrested for doing it, too, is it not?
 5              MR. SHORTER:  That is correct.
 6              SEN. WHITMIRE:  Okay.  That's all I
 7   wanted to clear up because -- and I could go through
 8   his other hypotheticals.
 9              What really concerns us and I guess it's
10   been somewhat addressed is the cost and the commitment
11   to educate the public.
12              MR. SHORTER:  Yes, sir.
13              SEN. WHITMIRE:  Have you been in any
14   planning sessions where you're going to have the
15   resources and you have the spots, as Sen. Williams
16   pointed out?  I mean, are we really serious and ready
17   to go with that, or is that a hypothetical, too?
18              MR. SHORTER:  No, sir.  Our office is
19   actively planning our voter education program for the
20   next cycle now.
21              SEN. WHITMIRE:  Well, that's great, but
22   what's the provisions for doing a voter ID plan?
23              MR. SHORTER:  What we're doing now is
24   looking at -- because this is one of our new bills
25   that we're working on and that has been brought to us
```

TX_00004578

1    for us to look at, we're looking at what costs would

2    be associated with doing those things within the bill

3    and fitting those into the funds that we have

4    available.  Based on the fact that it is not a

5    Presidential Election year, we feel that the funds

6    that we have available now we could -- we could

7    theoretically -- we could undertake this.

8              There are -- in terms of training for --

9    training for elections and new initiatives, that's

10   already -- we're already directed to do that.  So our

11   agency as a whole is -- there's some things you

12   anticipate and you know and you plan for, and we're

13   already there, sir.  Because what we will have to do

14   is we'll have to prioritize in terms of maybe some new

15   initiatives versus -- that are not legislatively

16   mandated versus those that you-all mandate to us.

17             SEN. WHITMIRE:  Okay.  I yield at this

18   time.

19             SEN. DUNCAN:  Sen. Watson, you're

20   recognized.

21             SEN. WATSON:  Thank you, Mr. Chair, and

22   thank you for being here.  I know it's been very long.

23             And, Members, one bit of information.

24   Yesterday, not today, but yesterday, although it feels

25   like one day, was his ten-year old son's birthday, and

1   he stayed with us all during that period of time,

2   snuck away I think briefly to wish him a happy

3   birthday, but we really appreciate your being with

4   us --

5           MR. SHORTER:  Thank you.

6           SEN. WATSON:  -- and hope you will tell

7   him we said happy birthday.

8           Just a couple of quick questions.  One

9   is you shared with me some numbers on a piece of

10  paper, and I don't know what the paper was created

11  for, but it has at the top of the page the number 5,

12  and then it says "Number of voters who have registered

13  since 2006 without a driver's license number."  What

14  was this document created for?

15          MR. SHORTER:  Sir, this document was

16  created -- Senator, this document was created in a

17  response to questions that were asked of our staff

18  last week by House Elections.

19          SEN. WATSON:  Okay.  And in that, what

20  you did is you created two sets of numbers:  One was a

21  set of numbers of voters who registered since

22  January 1, 2006.  And explain for me again why that's

23  an important number date.

24          MR. SHORTER:  When the Help America Vote

25  Act was passed in 2002, there was a requirement put in

1    the provisions of the Help America Vote Act for

2    uniformity standard purposes for the driver's license

3    to be a required form of ID in terms of registration.

4    Prior to January 1, 2006, it was optional as to

5    whether or not you included your driver's license on

6    your voter registration application.

7              The voter registration application

8    now -- the first thing it asks for in Section 8 is

9    either your driver's license and your Texas -- or your

10   Texas ID, and that's a requirement if you have one.

11   Prior to January 1, 2006 it was optional.

12             SEN. WATSON:  Okay.  So the numbers you

13   came up with you demonstrated -- and I think we had

14   had some conversation -- Sen. Fraser and I had had

15   some conversation earlier in the day.  And when you

16   look at those who have registered since January 1,

17   2006, the key date that you mentioned, and you look at

18   those numbers, about 91.9 percent have registered

19   using a driver's license.  Is that correct?

20             MR. SHORTER:  Using a driver's license

21   or social security number.

22             SEN. WATSON:  Well, here is the way --

23   let's make sure we're clear on this.  The first

24   category of numbers who registered with a driver's

25   license, and I guess that's with a driver's license

```
 1    exclusively.   Is that correct?
 2                   MR. SHORTER:   That is correct, sir.
 3                   SEN. WATSON:   And then the second
 4    category is those who registered with a social
 5    security number, and that would be exclusively with a
 6    social security number?
 7                   MR. SHORTER:   That is correct.
 8                   SEN. WATSON:   And then the third
 9    category would be those who did something you don't
10    really have to do, but they did it, and they filled in
11    both driver's license and social security?
12                   MR. SHORTER:   That is correct.
13                   SEN. WATSON:   So if I wanted to identify
14    the number of people who registered with a Texas
15    driver's license and get a total number, I would add
16    Category 1 and Category 3?
17                   MR. SHORTER:   That is correct, Senator.
18                   SEN. WATSON:   Now, something else you
19    did in response to the question from House Elections
20    was you said "In addition agency staff queried the
21    entire statewide file which reflects the following
22    breakdowns concerning identification numbers for all
23    voters."   So that would be folks with voter
24    registration certificates, voter registration
25    certificates including those from before January 1,
```

1    2007?

2               MR. SHORTER:  That is correct.  That's

3    everyone in our vote registration system.

4               SEN. WATSON:  And those folks weren't

5    required, as you've said, to utilize a driver's

6    license or social security number?

7               MR. SHORTER:  Yes, sir.

8               SEN. WATSON:  And that -- when we look

9    at those numbers, and you have the same categories,

10   you have number of voters with a driver's license,

11   again exclusively, number of voters with a social

12   security number exclusively, number of voters with

13   both and the number of voters with neither.  When we

14   put those numbers together, we know that about

15   25 percent of the population that have voter

16   registration certificates don't indicate that they

17   have -- that they didn't use a Texas driver's license

18   to get that.  Is that right?

19              MR. SHORTER:  Yes, sir.

20              SEN. WATSON:  Now, you also would have

21   no way of knowing in either of those that have been

22   registered since January 1, 2006 or those that have

23   been registered since well before that time who might

24   have lost their driver's license during that period of

25   time?

```
 1                MR. SHORTER:  No, sir.
 2                SEN. WATSON:  And the Secretary of
 3      State's Office wouldn't have any way of knowing whose
 4      driver's license might have been expired for over two
 5      years now?
 6                MR. SHORTER:  If they already have their
 7      voter registration card.
 8                SEN. WATSON:  Right.  So, for example,
 9      if I registered to vote, let's say ten years ago, just
10      to use a round number, I wouldn't have been required
11      to use a driver's license to register.  Is that
12      correct?
13                MR. SHORTER:  Correct.
14                SEN. WATSON:  And if I continue to vote
15      on a regular basis, as I understand it, I am
16      re-registered each time I register to vote or I go
17      vote.  Right?
18                MR. SHORTER:  Yes, sir.
19                SEN. WATSON:  So if I lost my driver's
20      license nine years ago but I continue to register, I
21      might be a registered voter in the State of Texas
22      maybe even use my driver's license when I registered,
23      but I no longer would have a driver's license?
24                MR. SHORTER:  That's a possibility, sir.
25                SEN. WATSON:  No one has asked the
```

1    Secretary of State's Office to do any sort of studies

2    or provide any information demonstrating whether there

3    are certain populations or demographic groups in Texas

4    that are less likely to have a driver's license and

5    use their driver's license when they apply for a voter

6    registration certificate, have they?

7              MR. SHORTER:  To my knowledge, no, sir.

8              SEN. WATSON:  And the truth is you

9    wouldn't have any way of putting that data together,

10   would you?

11             MR. SHORTER:  Not as an agency alone.

12             SEN. WATSON:  Well, if I told you that

13   the Texas Department -- you'd have to go to DPS?

14             MR. SHORTER:  Probably.  That's one of

15   the agencies that pops into my head.

16             SEN. WATSON:  And I think we talked a

17   little bit earlier today -- I think I showed you an

18   answer that DPS has given.  You wouldn't be surprised

19   to know that DPS is not aware of any studies regarding

20   a way to demonstrate whether certain populations or

21   demographic groups are less likely to secure a

22   driver's license than others, you weren't surprised

23   when I shared that with you earlier today, were you?

24             MR. SHORTER:  No, sir.  I recall.

25             SEN. WATSON:  Yeah.  Thank you very

1   much, and I really do appreciate it along with

2   everybody that you've given us so much time.

3                    SEN. DUNCAN:  Thank you, Sen. Watson.

4   The Chair recognizes Sen. Patrick.

5                    SEN. PATRICK:  Thank you, Mr. Chairman.

6   Just a quick question.  There was an earlier comment

7   made that it was very unlikely that someone would vote

8   twice in 30 minutes.  But the truth is if someone did

9   fraudulently get, let's just say ten voter

10  registrations, and they didn't send in a name like

11  Mickey Mouse but sent in a very normal name that

12  wouldn't catch anyone's attention.  And if I had ten

13  cards or that person had ten cards, they could go to

14  one precinct and vote, and they could go down the

15  street to another precinct and vote --

16                   MR. SHORTER:  (Nodded)

17                   SEN. PATRICK:  -- and another precinct

18  and vote because they'd go in over a different

19  registration card each time.

20                   MR. SHORTER:  Okay.

21                   SEN. PATRICK:  So a person could, if

22  they wanted to, or they could register in the same

23  precinct and go back three days later if they started

24  during early voting.  Right?

25                   MR. SHORTER:  Repeat your -- repeat the

1    last part of your question.

2                 SEN. PATRICK:  The last part of the

3    question, if you had registrations in the same

4    precinct, you could go back over a period of multiple

5    days if you were willing to take that risk and vote.

6    So a person could vote more than once.  I mean, it's

7    not an extreme thought that someone could register

8    under several different names.

9                 MR. SHORTER:  It's a hype -- it is one

10   of those hypotheticals that could happen.

11                SEN. PATRICK:  All right.  Thank you.

12                SEN. DUNCAN:  Thank you, Sen. Patrick.

13   The Chair recognizes Senator -- do you want to go

14   ahead, Sen. Watson, and enter -- you've got a document

15   you want to enter?

16                SEN. WATSON:  Yeah, let me just ask a

17   quick question.  I should have done that.  Do you have

18   a clean copy of the sheet that has Question No. 5, the

19   answer from the House Elections Committee that we

20   could make an exhibit for our record?

21                MR. SHORTER:  Yes, sir.

22                SEN. WATSON:  Okay.  We'll wait until

23   you're done, but if you'll just remind me of that,

24   we'll attach that after your testimony.

25                MR. SHORTER:  Yes, sir.

1          SEN. WATSON:   Thank you very much.

2     Thank you, Mr. Chair, for letting me do that out of

3     order.

4          SEN. DUNCAN:   The Chair recognizes

5     Sen. Davis.

6          SEN. DAVIS:   Good morning.

7          MR. SHORTER:   Good morning.

8          SEN. DAVIS:   I join my colleagues in

9     saying thank you to you for staying so long with us.

10    And I have a very quick question for you.   I apologize

11    if you've already asked -- been asked this question

12    and answered it, but what is the amount of money that

13    the Secretary of State has set aside in anticipation

14    of the possibility of having to educate our voter

15    community about the requirements -- the new

16    requirements that would be placed upon them under the

17    Senate Bill that we're looking at today?

18          MR. SHORTER:   We haven't determined the

19    actual amount, Senator.   We are looking at all of our

20    opportunities and looking at the available resources

21    we already existed -- already have.   We know right

22    now -- if there were no other funding, we know that we

23    have access to $2 million through our current HAVA

24    Funds for voter education.

25          What we need to do now is -- and we feel

1    comfortable based on the projections -- being that it

2    is not a Presidential Election year, we feel

3    comfortable that we can do what needs to be done

4    within that window.  There are also some opportunities

5    potentially for us to maybe draw down some additional

6    HAVA Funds.  We're not -- we're investigating that as

7    well.

8              So what we're looking at is if this bill

9    is passed as it is, staff is looking at, based on

10   access to HAVA dollars, what would it cost to do this,

11   to implement this, to do the training, to do the voter

12   education statewide.  We don't have those figures yet.

13   However, based on past precedent within the agency and

14   with the access to those federal funds, we feel like

15   we can do it with those funds and be consistent with

16   how we've done it every year.

17             SEN. DAVIS:  Let's say we weren't

18   examining the issue that's before us right now and we

19   weren't going to create any kind of new voter ID

20   requirement in the State of Texas.  What would the

21   Secretary of State's Office have used that $2 million

22   amount for?  What kind of educational programs do you

23   typically engage in?

24             MR. SHORTER:  Well, we don't -- we don't

25   anticipate this particular bill consuming all of

701

1    that -- those funds.  For instance, our entire effort

2    last year would focused on some key things.  And if

3    you don't mind, I'd like to kind of just --

4                    SEN. DAVIS:  I'd appreciate that.

5                    MR. SHORTER:  -- share with you some of

6    the ideas from talking with our staff on voter

7    education.  In 2008 we have what's called a Vote Texas

8    Program.  That's our voter education program.  That

9    focuses on newspaper, radio, TV, PSAs, interactive

10   Web.  It allows us an opportunity to be creative to

11   reach the people where they are, and we do several

12   things:  We focus on the basics of education.  Number

13   one, how to vote, what needs to happen to vote, where

14   to vote, where are you going to vote, what do you

15   bring -- what do you need to bring with you to vote.

16   If this were -- if this bill were to pass, what would

17   you need to bring to vote would be the -- it would

18   change.

19                    We're at a point in our development

20   where we can now make those changes.  Theoretically

21   what happens in the Secretary of State's Office is we

22   get through with the session, we look at all of the

23   changes and we use the summer months -- we use the

24   spring to answer all your questions and start

25   planning.  We have certainty after the session as to

1    what you as a legislative body have given us, the

2    mandates and directions you have given us.  We use

3    that time then to start implementing, plugging in.

4              One of the other things we do is what is

5    the process and -- what is the actual process and then

6    what are the rights of the voters.  So based on that,

7    it seems very plausible that we would be able to take

8    the directives of this bill or any bill that you as a

9    legislature provide and fit it into that formula and

10   meet HAVA requirements for what we are mandated to do

11   in terms of educating our voters.

12             SEN. DAVIS:  And in the past when you've

13   implemented a program like that, and I gather from

14   what you're saying you've engaged in exactly this kind

15   of --

16             MR. SHORTER:  Yes, ma'am.

17             SEN. DAVIS:  -- education effort before,

18   what would the cost be in a typical election cycle for

19   you to administer that program?

20             MR. SHORTER:  Last year we -- last

21   year -- the last election cycle was $3 million.

22             SEN. DAVIS:  It was $3 million.  And

23   that's $3 million educating a voter group that has for

24   many years been operating under the same rules

25   repeatedly.  Correct?

```
1              MR. SHORTER:  Yes, if there were -- I
2    came to the agency during the middle of that process.
3    If there were legislative changes during the last
4    legislative cycle, those changes were intertwined into
5    the voter education process.  I'm not -- I'll have to
6    go back and ask what changes were made during the last
7    legislative session that would have affected how we
8    rolled out this particular -- last year's initiative.
9              For instance, within all of that,
10   there's also the Project Vote where we start -- the
11   education process of educating voters starts also at
12   the age of educating our school-aged kids.
13   1.1 million people -- 1.1 million students in over 300
14   school districts last year participated in Project
15   Vote.  So those were some extra things that we've
16   always done even with legislation like this we will
17   still be able to do because we have it down to a
18   science now on how to do it, and we've been able to
19   bring those costs down.
20              SEN. DAVIS:  And now that you have it
21   down to a science and in the last election cycle given
22   that you have it down to a science, you've spent, you
23   said, about $3 million on the program.  Could you
24   anticipate a scenario where with a new voter ID
25   requirement, one that is, well, quite lengthy in terms
```

1    of the amount of paper that it this takes up on the

2    bill that's been proposed, could you anticipate given

3    the need to educate on so many new features of a voter

4    program that it might cost you more than $3 million to

5    educate Texans on that program?

6                    MR. SHORTER:  Senator, based on past

7    precedent, I think it will be highly unlikely that the

8    expenses would increase that much because many of the

9    things that this bill is requiring us to do we're

10   already doing it on legislation that has existed for a

11   long time.

12                   When we have a poll -- when we have the

13   poll worker training or the training for Election

14   Officials, it's very detailed information, and there

15   are little tweaks that the legislature makes, and

16   these are not 30-minute trainings.  These are

17   generally two- to three-day trainings.  So it's not

18   like if we -- if this bill were implemented the

19   training needs would be -- or the training modules

20   that will be developed would be any different than the

21   modules that we are already developing because the

22   ones we're developing now are pretty extensive.

23                   SEN. DAVIS:  And did the $3 million

24   figure that you -- that you cited a moment ago on your

25   voter outreach program in the last election cycle, did

```
 1    that include the costs of training poll workers on
 2    whatever tweaks came in the last legislative session?
 3                    MR. SHORTER:  It is my understanding
 4    that it did, but, Senator, I don't mind verifying that
 5    for you to make sure that it's all-inclusive.
 6                    SEN. DAVIS:  I would appreciate that.
 7    And if you could provide us with information in terms
 8    of exactly what that poll training looked like, the
 9    poll worker training looked like, I would appreciate
10    that.
11                    MR. SHORTER:  Senator, we're very
12    excited about our poll worker training because we have
13    two aspects:  It can be done in person, but we also
14    have poll worker training now that can be done on
15    line.  And one of the things we're really trying to
16    do -- and with the hope of encouraging more people to
17    volunteer or sign up to be poll workers.
18                    SEN. DAVIS:  Would you anticipate that a
19    bill suggesting the changes of this magnitude might be
20    a more complex training program -- that might require
21    a more complex training program than you've had to
22    engage in in the past where the legislature may have
23    tweaked, to use your word, the voter requirements?
24                    MR. SHORTER:  And maybe, Senator, using
25    the word "tweaked" was not probably the appropriate
```

1   word to use.  I don't see anything at this point that

2   would cause me as the operations person within the

3   agency to be alarmed.

4                SEN. DAVIS:  Okay.  Thank you.  I

5   appreciate it.

6                SEN. DUNCAN:  All right.  Thank you,

7   Sen. Davis.  There are no other members in the queue

8   to ask questions.  So, Mr. Shorter, you are excused.

9   Thank you for your testimony.

10               MR. SHORTER:  Thank you, Mr. Chairman.

11            **TESTIMONY BY DENNIS BOREL**

12               SEN. DUNCAN:  The Chair calls Dennis

13   Borel.  Mr. Borel, do you have written testimony?

14               MR. BOREL:  (Inaudible)

15               SEN. DUNCAN:  Do you have pictures for

16   us?  All right.  We'll need to get those marked at the

17   right time.

18               MR. BOREL:  Good morning.  My name is

19   Dennis Borel with the Coalition of Texans with

20   Disabilities.  Yes, I am from the Texas --

21               SEN. DUNCAN:  Hang on just a minute.

22               MR. BOREL:  Sure.

23               SEN. DUNCAN:  We need to get your timer

24   started.

25               MR. BOREL:  Okay.

```
 1              SEN. DUNCAN:  All right.  You're off.
 2              MR. BOREL:  Dennis Borel with the
 3    Coalition of Texans with Disabilities, a cross
 4    disabilities statewide organization, and I think
 5    listening to this day has been tremendously
 6    interesting.  I haven't heard a lot of talk about
 7    people with disabilities.  We've talked about a lot of
 8    different demographic groups.  So I will use my time
 9    to talk about people with disabilities and my
10    experiences with them and how I think this bill may
11    impact them.
12              It's been -- one of the most fun things
13    I've done for the last about four or five years is
14    work with the Secretaries of State, starting with
15    Mr. Conner, then Roger Williams and Phil Wilson.  I
16    met Secretary Andrade recently and look forward to
17    working with her, but working on HAVA stuff and most
18    specifically the opportunities to go around the state
19    and do training sessions on accessible voting and
20    accessible voting technology to disability groups
21    around the state.  I've been from El Paso to Beaumont
22    to Laredo to Odessa and Dallas, points in between.
23    It's been a pretty interesting experience, and I've
24    met some incredible people doing that, and it's been
25    inspiring.
```

708

```
 1              In a few of the -- a few of the most
 2   inspiring ones, I've worked with a lady that was
 3   totally without sight, and she was able to use the new
 4   voting technology to cast a private ballot for the
 5   first time.  I met another guy with very significant
 6   cerebral palsy.  He didn't even have enough control to
 7   speak, and he had -- he wore a cap with a stick that
 8   came perpendicular out of his forehead, and he would
 9   use a speak synthesizer, but his brain was clear and
10   fine.  And using that stick out of his cap he was able
11   to work a voting machine on his own.
12              But to me the best was a gentleman I met
13   who was a member of the paralyzed -- Texas Paralyzed
14   Veterans.  He had broken his neck very high up, and he
15   has no movement below the shoulders.  He operates his
16   power wheelchair with a sip and puff device.  And
17   incredibly he told me this story about going to his
18   polling place and hooking up his sip and puff device
19   to his machine, and for the first time since he broke
20   his neck was able to cast a secret ballot.  And, yes,
21   there were tears in his eyes when he told me this
22   story.  These are the kinds of things that I have
23   really loved doing for several years now.
24              To me perhaps the most amazing one was
25   out in Palestine.  I was invited to come out there and
```

TX_00004597

```
 1    do a training.  I went out there and I -- there's some
 2    photographs you're looking at.  I didn't give you
 3    written stuff.  By this time of night, it's better to
 4    look at photographs anyway.  But I went out to
 5    Palestine and I got there and they said "Okay.  Now
 6    we're going to take off and take you where you're
 7    going to go for your training, and we went to a
 8    sheltered workshop, which, you know, is not something
 9    I particularly like.  It's a place where people with
10    disabilities, cognitive disabilities spend the day.
11    They were assembling nuts and bolts all day, and they
12    get some piece -- piece of work payment out of it.
13              But going in there I was kind of
14    wondering "Well, how am I going to -- how am I going
15    to do this training?"  I had the local County Clerk
16    with me and an accessible machine, and we set it up.
17    And I quickly found out that even though I work with
18    people with disabilities all the time I'm capable of
19    making misassumptions.  Even though these were folks
20    with cognitive disabilities, they knew who McCain was,
21    they knew who Obama was, they knew a Presidential
22    Election was coming up.  A handful of them were
23    already registered.  The others got registered there
24    by the County Clerk, and they were tremendously
25    enthusiastic.  In fact they were the most enthusiastic
```

1    group I trained in the four years I've been doing

2    this.  They loved working the machine.  They were

3    excited about it.  It told me a lot.

4              You know, this group, I'm quite sure

5    that not a single one of them had a driver's license.

6    I'm quite sure that none of them had a passport.  I

7    doubt that any had utility bills in their name.  I

8    don't think any of them were licensed hunters,

9    fishers, carry a concealed weapon.  Some may have

10   Medicaid cards.

11             But the thing I was left with at the end

12   of that day as I was left with at every single one of

13   these trainings is all of us see the right to vote as

14   something precious.  I think for our citizens with

15   disabilities it's at an even higher level.  It's even

16   more precious to them, how much they value it and to

17   be able to do it on their own.

18             You know, I mentioned that they don't

19   often have photo IDs, in fact they rarely do.  And I

20   tried to find some statistics on this and, you know,

21   I've heard a few people talk about that some things

22   are not tracked.  Well, one thing I found out that we

23   don't track is whether a driver has a disability or

24   not.  We track if they need corrective lenses of other

25   things like that, but not disabilities.  So I have to

1    rely on only my observations and spending the last

2    nine years going around Texas and working with groups

3    of people with disabilities and my own anecdotal ideas

4    about it.  And I'd have to say that there's no doubt

5    that people with disabilities just don't have a

6    driver's license like the rest of the population.

7    They simply maybe cannot operate a vehicle, maybe they

8    don't see well enough, maybe they don't have enough

9    manual dexterity, but their incidents of driver's

10   license is certainly far below that of the general

11   population.

12              As far as things like passports, people

13   with disabilities are three times as likely to be

14   living in poverty as a general population.  They're

15   not doing a whole lot of international travel.  That's

16   not to say that there aren't people with disabilities

17   doing that, not to say that people with even very

18   significant disabilities have driver's licenses, even

19   quadraplegics, but as a general -- a generalization

20   they're less likely to have those kinds of photo IDs.

21              You know, I was thinking about this, and

22   I think that there's probably only one other

23   demographic group that has maybe a lesser

24   participation in driving and passports, and I think

25   that would be the very elderly.  You know, I think

1    those two groups are kind of off by themselves of

2    having a little bit less access to that.

3              Now, I do think that there are some of

4    those alternative credentials that could work, but I

5    think in almost every single case the likelihood of a

6    person with a disability having one of those

7    alternative credentials is far less than in the

8    general population with the sole exception of the

9    Medicaid card.

10             And the other thing is in our state,

11   Texas is better than some other states.  Some other

12   states do not allow people with cognitive disabilities

13   to vote.  We do in Texas; we do.  But, you know,

14   people with cognitive disabilities are recently

15   returned veterans with traumatic brain injuries.

16   Sometimes their ability to gather all the documents

17   they need to go somewhere is not so good.  Sometimes

18   they're not so good at doing that.  Sometimes they

19   might end up at the polling place and maybe they

20   forgot one of the things they need.  Or if they had

21   that traumatic brain injury and they have a short-term

22   memory condition, they just simply forgot to bring

23   them, forgot their ID.

24             You know, to me it comes down -- the one

25   question I keep coming down to is in any piece of

713

1    legislation, would this affect people with

2    disabilities more than other groups?  And I think this

3    one does, and I think it does that.  There would be a

4    level of effort required of them to line up everything

5    they need more so than other segments of our

6    population.

7            With that, I'll take any questions if

8    you have them.

9            **QUESTIONS FROM SENATE FLOOR**

10            SEN. DUNCAN:  Thank you, sir.

11   Sen. Zaffirini, you're recognized.

12            SEN. ZAFFIRINI:  Thank you,

13   Mr. Chairman.

14            Mr. Borel, thank you for your very

15   compelling testimony.  I hope that everyone listened

16   to you and listened to you carefully.  Are persons

17   with disabilities less likely to have photo IDs?

18            MR. BOREL:  Yeah, absolutely, certainly

19   in the case of the driver's licenses.  Obviously one

20   of my member organizations is the American Council for

21   the Blind of Texas.  I mean, 100 percent of them don't

22   have driver's licenses.  Other people with cerebral

23   palsy, quadraplegic spinal cord injuries, amputations,

24   cognitive disabilities, traumatic brain injury, all

25   have far less likelihood of driver's licenses and

714

```
 1    passports.  It's more a function of the fact that --
 2    generally considered to be the lowest income
 3    demographic group in our society and, therefore, less
 4    likely to travel.
 5              SEN. ZAFFIRINI:  Have you read Senate
 6    Bill 362?
 7              MR. BOREL:  I have; I have, yes.
 8              SEN. ZAFFIRINI:  So you're familiar with
 9    the other forms of documentation that can be used to
10    prove one's identity?
11              MR. BOREL:  Pretty much.  I don't know
12    if I can recall every single one of them off the top
13    of my head.
14              SEN. ZAFFIRINI:  Are persons with
15    disabilities less likely to have that kind of
16    documentation available to prove their identity?
17              MR. BOREL:  Yeah, absolutely.  You know,
18    very few would have a permit to carry a concealed
19    handgun.  There are people, even people visually
20    impaired, even people totally blind, even people with
21    quadraplegics, that do have hunting licenses.  But
22    I'll tell you as a rule, they're far less likely to
23    have hunting licenses.  They're also far less likely
24    to have utility bills in their name.
25              SEN. ZAFFIRINI:  What additional
```

1    barriers do persons with disabilities have in

2    obtaining the kinds of identification required in this

3    bill?

4            MR. BOREL:  Uh-huh.  Well, there is the

5    monetary thing as an extremely low-income group, and

6    then just getting around and gathering that

7    information, you know, being reliant on public

8    transportation or transportation provided by other

9    people or having to have the caregiver with you, or

10   perhaps a person is living in an institution like a

11   nursing facility or intermediate care facility for the

12   mentally retarded or even in an assisted living

13   center.  These are all folks that just are not as

14   mobile as the rest of us, and they're not getting

15   around as well as the rest of us.

16           SEN. ZAFFIRINI:  Thank you.  Is the

17   notice provided for in Senate Bill 362 sufficient to

18   ensure access to accurate information about this new

19   ID requirement for the full range of persons with

20   disabilities with whom you work?

21           MR. JOHNSON:  No, not in my mind.  I

22   think we have a pretty aggressive campaign, the HAVA

23   campaign.  And like the gentleman in front of me,

24   Coby, was talking about the Vote Texas, those things.

25   The first Vote Texas effort was a $5 million effort.

716

1    The second was a $3 million effort, and that was about

2    accessible voting for the most port.  But that

3    actually took stuff around, put stuff on PSAs, on TV.

4    It did radio ads.  It funded people like me to go out

5    and do hands-on types of training.  All those kinds of

6    things, all those variety of things are needed.  I

7    think the written notice is just inadequate frankly.

8              SEN. ZAFFIRINI:  What else would be

9    needed if this bill were passed to ensure persons with

10   disabilities really understood this law?

11             MR. BOREL:  Well, I would -- well, I

12   believe the Vote Texas campaign was successful, but

13   you know, even though we're, I believe, five years in

14   to Vote Texas I still think there's an additional need

15   just for the accessibility components of HAVA.  So I

16   think it's not a short-term deal.  I think this would

17   need to be planned over perhaps several biennium.  I

18   really believe in the traveling road show, the

19   hands-on deal where you go out to disability groups

20   and out to their communities and find out where they

21   are and do it face to face.  That would be my

22   recommendation.

23             SEN. ZAFFIRINI:  What effect do you

24   believe that this bill, if it becomes law, would have

25   on the turnout of persons with disabilities on

TX_00004605

```
1    election day or early voting?
2              MR. BOREL:  Yeah, that's -- I've thought
3    about this a lot, Senator.  I would say at the -- at
4    the beginning of HAVA, I would have said that there
5    were two groups of voters with disabilities.  The
6    first group had gone to vote and voted, but had a hard
7    time doing it and was less likely to go back, and the
8    second group never went because they heard their
9    friends talk about how they couldn't get in the
10   polling place or couldn't get a private ballot.  So
11   there was kind of like this word of mouth negativity.
12             I think in the last few years as
13   successful voting technology has come into play,
14   polling places have become more accessible, I'm seeing
15   a third category of voters with disabilities, ones
16   that are telling their friends that "I did have a
17   successful experience."
18             And I think if we set up experiences
19   where voters with disabilities go to the poll and they
20   don't have the right ID, and they will be less likely
21   to have this ID and they haven't learned about it and
22   they do a provisional ballot or they just simply
23   leave, then those kinds of word of mouth stories will
24   spread, and I think that will have an affect on some,
25   a negative side frankly.
```

1           SEN. ZAFFIRINI:  Thank you.  Thinking

2    specifically of Advocacy, Incorporated, do you believe

3    that persons with disabilities who work with Advocacy,

4    Incorporated would be able to meet the identification

5    standards of this bill?

6           MR. BOREL:  You know, the ones who work

7    with Advocacy, Incorporated, I bet they would because

8    in many ways activists people with disabilities are

9    going to -- have figured out some way to get a photo

10   ID, whether it's like the DPS, the state

11   identification.  I'd be more concerned about the

12   people who aren't necessarily activists who are more

13   maybe staying in their communities and their home most

14   of the time, maybe in an institution, maybe in an

15   assisted living center.

16          SEN. ZAFFIRINI:  What effect do you

17   believe the bill would have on the number of

18   provisional ballots cast by voters with disabilities?

19          MR. BOREL:  Well, I think it would

20   clearly increase them because they would be casting

21   them instead of just a regular ballot.  I'm a little

22   unclear about whether they would have to then go back

23   again and show correct ID -- is that correct -- or is

24   it -- would it be counted just as the initial

25   provisional ballot?  That I'm a little unclear about.

```
 1              But if they would have to go back, you
 2    know, return back and show correct ID, now that's
 3    another trip.  And for people that aren't all that
 4    mobile who have to rely on others, who don't see well,
 5    who use wheelchairs, who use walkers, who are 85, 90
 6    years old, any time you're making a second trip to go
 7    do something, you're less likely to do it.
 8              SEN. ZAFFIRINI:  What are the most
 9    pressing issues reported by voters with disabilities
10    in using the Advocacy, Incorporated hotline?
11              MR. BOREL:  I think they need to know
12    more about it, but I tell you the one I hear more
13    about is poll workers, you know, that -- the poll
14    workers are -- haven't perhaps set up the site as well
15    to make it as accessible as possible, don't understand
16    the accessibility features of the voting machines,
17    haven't had enough training on how to effectively
18    interact with a voter with a disability and how to
19    deal with someone who perhaps has a speech impediment,
20    who doesn't hear, who has very limited use of their
21    arms and hands.  The poll worker issue and poll worker
22    training is, in my opinion, the top issue for voters
23    with disabilities.
24              SEN. ZAFFIRINI:  And, of course, the
25    bill doesn't address any of those issues?
```

720

```
 1              MR. BOREL:  Not that I'm aware of, no.
 2              SEN. ZAFFIRINI:  Not that I'm aware of
 3    either.
 4              MR. BOREL:  Yeah.
 5              SEN. ZAFFIRINI:  You looked at the bill
 6    and you looked at the fiscal note, and I know that you
 7    heard our discussion regarding the cost of
 8    implementing Senate Bill 362.  I am one of many
 9    persons I know who do not believe the fiscal note that
10    indicates that there would be no fiscal impact to the
11    state.  How would you better use that money, the money
12    that would be used to implement Senate Bill 326, in
13    terms of working with persons with disabilities and
14    ensuring their access to vote?
15              MR. BOREL:  Good question.  I'm really
16    glad that I followed Coby here because he was talking
17    about how they had a budget for this kind of stuff,
18    the HAVA money.  And it's still my opinion that the
19    accessibility, the polling place features, the
20    accessible technology, voting technology features that
21    are part of HAVA, we're not done with that project.
22    There's a lot more out there.  Whenever I go out,
23    there's just, you know -- I mean, we could be doing
24    this several more years at the same level, I think.
25              You know, I want to encourage people to
```

TX_00004609

1   vote.  I want to encourage people with disabilities to

2   go out and vote.  And to me the Vote Texas projects

3   have done that.  That's what I'd like to see happen.

4           SEN. ZAFFIRINI:  Thank you very much for

5   your testimony and for answering my questions.  You

6   certainly are an inspiration.

7           MR. BOREL:  So are you, Senator.

8           SEN. DUNCAN:  Senator Ogden?

9           SEN. OGDEN:  Mr. Borel, thank you for

10  your testimony.  And, Sen. Zaffirini, thank you for

11  your good and detailed questions.  I mean, you raise

12  some very important issues, but I'd like to clarify

13  that the type of documentation that can be used in

14  lieu of a photo ID is very similar to the type of

15  documentation that somebody -- or is the same as the

16  type of documentation of an individual who has some

17  sort of cognitive disability or other kind of

18  disability that they must produce in order to

19  receive state services or in order to receive

20  healthcare, whether you're talking about a Medicaid

21  card or Medicare card, correspondence from the

22  State Department of Health and Human Services,

23  correspondence from the Social Security

24  Administration, a social security card.

25           So I would think that it -- and I would

1    ask you this:  It would be very, very rare based on

2    the way I read this bill to find an individual who

3    wouldn't have several of the types of identification

4    that are acceptable, even if they don't have a

5    driver's license.  Wouldn't you agree?

6              MR. BOREL:  Well, what I would say,

7    Senator, is if you took a population -- a group of

8    people from the general population and a group of

9    Texans with disabilities and lined them up on every

10   one of those types of credentials with the exception

11   of the Medicaid card, I think the general population

12   would be more likely to have them.

13             SEN. OGDEN:  Well, but you can't make

14   that exception because the Medicaid card is just as

15   valid as any other.

16             MR. BOREL:  It is.

17             SEN. OGDEN:  If fact if you have a

18   Medicaid card, you will get monthly correspondence

19   from the state notifying you that you're still

20   eligible for Medicaid, and that's your two

21   requirements, you're done.

22             MR. BOREL:  Well, that's true, sir.  But

23   again, if you look at the full list of alternative

24   credentials, that's perhaps two of the alternative

25   credentials where the person with the disability might

```
 1    have the access edge whereas the others, they do not.
 2                SEN. OGDEN:  Might have the what?
 3                MR. BOREL:  An edge in having access to
 4    those things like a Medicaid card.
 5                SEN. OGDEN:  Well --
 6                MR. BOREL:  I mean, they'd be less
 7    likely to have it.
 8                SEN. OGDEN:  You know, maybe, maybe.  I
 9    mean, the people of which you speak are going to have
10    more access to some of those cards than somebody like
11    me, for example.  I know I've got a driver's license,
12    so it's not a problem, but --
13                MR. BOREL:  I was referring to the whole
14    list.
15                SEN. OGDEN:  I guess the point is while
16    we're going through the discussion here is that it
17    seems to me like almost every -- if not every single,
18    almost every single individual which you described who
19    is receiving some sort of state assistance or needs
20    medical assistance almost certainly has to have the
21    type of documentation needed to receive those
22    circumstances -- that assistance, which will also be
23    more than adequate to vote, in my opinion.
24                MR. BOREL:  Well, Senator, I know you're
25    aware that to be Medicaid eligible in this state you
```

TX_00004612

1    really are the very poorest of the poor.  And if
2    you're just plain poor and not the very poorest of the
3    poor, you don't have a Medicaid card.  Thank you.
4                 SEN. DUNCAN:  There are no other members
5    in the queue.  You can be excused.  Before you do
6    that, though, we will introduce Exhibit 36, which is
7    the photograph that you provided, and that will be in
8    the record.
9                 (Exhibit No. 36 marked and admitted)
10   **TESTIMONY BY GARY BLEDSOE**
11                SEN. DUNCAN:  The Chair calls Gary
12   Bledsoe.  Mr. Bledsoe, before you begin, let's -- you
13   have written testimony as well.
14                MR. BLEDSOE:  I do.
15                SEN. DUNCAN:  And we will submit that in
16   the record as Exhibit 37.
17                (Exhibit No. 37 marked and admitted)
18                MR. BLEDSOE:  Thank you.
19                SEN. DUNCAN:  Yes, sir.  If you'll state
20   your name and who you represent, and you'll have ten
21   minutes.
22                MR. BLEDSOE:  Okay.  Thank you,
23   Mr. Chairman.  My name is Gary Bledsoe.  I'm President
24   of the NAACP here in Texas.  I want to thank all of
25   you for staying here so long.  Obviously this is a

1    very important matter.  I probably can't be held to be

2    responsible for what I say at this time, but I will

3    try to be as clear as possible.

4                The NAACP is a 100-year old

5    organization.  We have always been a multiracial

6    organization, and indeed we've been present here in

7    Texas since 1915 and have a long history with voting

8    rights within this state.  And indeed we try to

9    identify issues that are problematic without regard to

10   any partisan issues, and I'm hoping that the

11   information that I provide here can provide a good

12   discourse and understanding of how we see the

13   legislation that is at issue here.

14                I know some years back when the Wolens

15   bill was up for consideration, we thought that would

16   be problematic.  His party didn't make a difference,

17   and we were there to oppose that legislation, and we

18   feel the same way about the bill here, SB 362.

19                And I took a little bit of a different

20   tact in how I prepared the written testimony, but

21   based on a number of things that I've been hearing

22   today and maybe some of the questions that some of you

23   have had, I thought maybe what I would do here is

24   somewhat try to focus on a couple of those issues

25   because I think they are important.

726

1            You know, to begin with, I think that we

2     have to look at this matter in terms of what the

3     constitutional requirements might be and secondarily

4     what the requirements of the Voting Rights Act might

5     be.  And in that regard, if we can say that there is

6     an impact, a noticeable impact on African-Americans or

7     Latinos, that we have to look at the question of

8     whether or not there might be retrogression or whether

9     or not there might have been a way of narrowly -- more

10    narrowly tailoring the actual statute that we're

11    talking about.

12            Now, I think that for a number of just

13    very clear reasons to me we would have a negative

14    impact on people of color.  I think -- number one, I

15    think you've heard many people say today that indeed

16    that there's a lower percentage of individuals who

17    have driver's licenses or photo identification cards

18    and I think that's a fact.

19            I think we've also done -- when we did

20    one of our racial profiling studies with the

21    Department of Public Safety or data, one of the things

22    we were able to determine is that the actual car

23    ownership data indicated that minorities had less

24    access to automobiles and owned fewer automobiles and

25    more were without automobiles at all in their home,

TX_00004615

```
 1    and so this creates more of a burden in terms of the

 2    ability to travel.

 3              I think also one of the other things

 4    that I see in the bill is the -- is the affidavit.  So

 5    if you look at the affidavit and the affidavit that

 6    you have to sign when you don't have the proof

 7    according to the bill, that affidavit makes you make a

 8    representation that you are -- that you are eligible

 9    to vote right then and there.  And I know the problems

10    I've had getting people to register to vote who might

11    have had felony histories or what have you, there's a

12    little intimidation.  And with the nature of the

13    wording, I think it's very intimidating and

14    threatening and will make individuals feel challenged

15    to sign that particular affidavit.

16              I think also there's the issue with

17    communicating the new requirements of the law so

18    people can be prepared when they go to the polling

19    place in order to vote, in order to be able to vote

20    effectively.  And because I think of the nature of how

21    it's been done with the likelihood of not being able

22    to reach all voters the way they need to be reached, I

23    think that when the voters turn out and the ones who

24    will be rejected on election day I think will show --

25    it will show clearly there will be a disparate impact
```

TX_00004616

728

```
 1    on racial and ethnic minorities.
 2              And one of the things that I can say
 3    that also I feel will be a major problem is that --
 4    and I went down to Venezuela to be an official
 5    election observer down there, and I saw people in
 6    lines for eight hours, you know.  And they have all
 7    these incredible requirements there where you've got
 8    to give your thumb print.  You have untrained people
 9    trying to determine if your thumb print is the same
10    one that's in the computer, you have to show different
11    forms of identification, and it takes a long time to
12    get through those lines.  And so you have people in
13    those lines -- they start lining up like 3 or 4 a.m.
14    in the morning.
15              And I think -- not that this would be
16    that burdensome, but I think that we already see in
17    too many minority areas where there's not enough
18    ballots, there are not enough voting machines at the
19    specific locations, the lines are already too long,
20    it's already a major problem.  And I think when you
21    add this kind of requirement there, it's going to make
22    it a lot longer and make it more difficult for folks
23    to desire to stay and to be part of the process.  So I
24    think indeed that -- for many reasons even beyond
25    that, I think we would have a clear discouraging or
```

729

```
 1    discouragement of African-American voters.
 2                 Now, there are a couple of things I
 3    wanted to mention here.  I think that when you look at
 4    the law -- when I looked at the bill analysis, the
 5    bill analysis talked about problems with registration.
 6    It said that because no identification is required
 7    during registration, it makes it possible or likely
 8    that you will have people who can get -- who can get
 9    voter registration cards who may not actually be the
10    person.
11                 And so the first thing that grabbed out
12    of me was well, if there is a problem -- but I don't
13    think it's really been shown -- but if there is a
14    problem, why isn't it addressed at the point where
15    there is a problem?  And if the point of the problem
16    is at registration, instead of something that will be
17    discouraging to people who are registering to vote,
18    then that is where the focus would be, in my mind.
19                 The affidavit again is intimidating.  I
20    think I mentioned the long lines.
21                 Another thing is when we looked at the
22    categories of information for the nonphoto ID items
23    that are provided for in the bill, there are a couple
24    of things that leap out at me:  The general provision
25    that would allow a catch-all because when you're
```

1   writing a bill, it's kind of hard to envision and know

2   all the different circumstances where indeed a

3   situation where a person might present something that

4   should be considered proper proof.  And I think the

5   fact that there was kind of a laundry list provision

6   that's deleted and not allowed to be used, I think

7   that is problematic.

8            Secondarily, the list of items that are

9   actually there are not really properly comprehensive,

10   in my mind, and they really would discriminate against

11   a number of individuals because of the types of items

12   that are there.  And some of the things that are there

13   are kind of private, some things that people may not

14   want to produce or show someone at a polling place.

15   And so I think that by the nature of the documents

16   that are listed there, that they're not reasonable in

17   terms of how they're fashioned.

18            And the bill doesn't state exactly how

19   it will be executed.  It leaves a lot of things up to

20   be determined later by the Secretary of State.  So

21   exactly how the law will be applied, how it will be

22   interpreted will be a big problem.

23            One of the things that we've seen around

24   the state is -- and we've done -- we've had about five

25   different hearings around the state relating to

731

```
 1    election irregularities, and we've found just
 2    incredible things all around our state to indicate
 3    there's still a real problem with folks understanding
 4    and appreciating minorities being able to vote.
 5                In this last election cycle, we saw a
 6    particular problem with Election Officials.  Because
 7    of the different ways Election Officials are selected,
 8    we had a number of people that were rejected and had
 9    real conflicts with individuals who were Election
10    Officials.
11                And I might say it was really
12    broad-based kinds of things that we've seen over the
13    last few years.  We've seen hate crimes where white
14    supporters of a black candidate had their home burned.
15    We've seen situations where people were purged from
16    voting lists when they should not have been.  We've
17    seen the improper use of off-duty police officers, the
18    use of mailboxes to put intimidating communications.
19    We've seen a lot.
20                    QUESTIONS FROM SENATE FLOOR
21                SEN. WENTWORTH:  Thank you.  The Chair
22    recognizes Sen. Ellis of Harris.
23                SEN. ELLIS:  Thank you, Mr. President,
24    and thank you President Bledsoe for being so patient.
25    I know you were here earlier today.  And you were
```

732

1   wrapping up your testimony, you can submit it, of

2   course.  I have some questions I want to ask, but if

3   you just have some summation that you want to add in

4   addition to your testimony, I'd like to hear that.

5            MR. BLEDSOE:  Sure.  Thank you, Senator.

6   What I was trying to complete was the types of things

7   that we have found around the state in our inquiries

8   in terms of both our -- every election we have a group

9   of lawyers that volunteer and run an 800 line, and we

10  take calls from around the state.  And we also have

11  had those five hearings, a couple in Houston, Dallas,

12  Fort Worth, Texarkana out in East Texas, and we found

13  that people were not allowed to tender -- challenge

14  ballots according to law.  We've seen individuals that

15  were soldiers in Fort Hood who had their voter

16  registrations who were wrongfully purged from the

17  voting rolls.  We've seen just a number of problems

18  that have disenfranchised African-American voters, and

19  it still is a major, major problem throughout the --

20  throughout the state but particularly in the urban

21  areas and East Texas.

22           SEN. ELLIS:  Thank you.  Mr. Bledsoe,

23  some people would say that the Voting Rights Act is no

24  longer needed, that it's a thing of the past

25  particularly as it relates to Texas.  Can you cite

1   some examples or give reasons that would show why we

2   still need the Voting Rights Act protection in Texas?

3                 MR. BLEDSOE:  Well, you know, we have

4   had a number of -- you know, I'll thank Attorney

5   General Abbott.  You know, he assisted the folks in

6   Prairie View when a situation arose where you had a

7   number of people who were wrongfully purged from the

8   rolls who could not vote in the city election, and you

9   also had I think about a thousand ballots -- I mean

10  voter registration applications that were just sat on,

11  that no one -- just sat on, so the folks were not able

12  to vote in a particular election, but they were found

13  there in a county office, and they were -- and the

14  Attorney General had them file them.  But, you know,

15  that was a clear violation of the Voting Rights Act.

16                 And we have the situation I mentioned

17  earlier in Wharton County where an African-American

18  candidate for Sheriff had a white couple that were

19  working on the campaign, one was a County

20  Commissioner, and they received a number of hate crime

21  calls, and their home burned down as a result of that.

22                 You know, we've had problems in Fort

23  Bend County with there being changes in polling places

24  much too late and not properly publicized in the

25  newspaper.  We've had problems there in terms of

```
 1    individuals who wanted to file -- challenge ballots,
 2    and they were not allowed to.  We've had problems
 3    there where people were sent to the wrong polling
 4    places and they ultimately could not vote.
 5              We've had all the problems in Dallas
 6    County where indeed there are too few ballots that
 7    have shown up a number of occasions in Dallas County,
 8    and so the lines get long, people get frustrated,
 9    people leave.
10              We've had people hire off-duty police
11    officers, and that's in conjunction with making
12    contact with an African-American newspaper, having
13    articles in the newspaper talking about if you have an
14    outstanding warrant, you're going to be arrested.  And
15    so you go and hire all the off-duty police officers
16    and stand them outside the polling places to
17    intimidate individuals from voting.
18              So I mean it's just -- there's just a
19    huge number of things that have occurred and have
20    occurred in most places around the state.
21              SEN. ELLIS:  Mr. Bledsoe, is there a
22    well-documented history of voter suppression that is
23    specifically related to race and ethnicity in Texas?
24    And how would this voter ID law fit into that history?
25              MR. BLEDSOE:  Well, there is a long
```

1  history, and our state still hasn't come to where our

2  state needs to be.  You know, that's one of the issues

3  before the United States Supreme Court in a case that

4  the NAACP is involved in, and it's going to be argued

5  in April of this year relating to the need for the

6  continued existence of the Voting Rights Act.

7          I think when we look at the history and

8  the continued problems that we've had in a number of

9  areas and fronts and we see the problems with language

10  voters, we see the problem with racial minority

11  voters, those things, the problems are never -- never

12  alleviated because we've continued to have voter

13  intimidation.

14          And when you have voter intimidation --

15  and the record is really replete.  I mean, I don't

16  think there's any question that when we look at what's

17  occurred and -- let's take a look at Harris County.

18  This is kind of an unpopular thing to say, but I know

19  there's a coalition that's running a group countywide,

20  and the only ones to lose are really minority

21  candidates that makes you think -- and I talked to

22  Dr. Davidson about that.  That cries out to me is

23  there something wrong with that particular election

24  there when you've got a coalition of people running.

25  And people like Goodwill Pierre or people like the

1   District Attorney actually lose, they happen to be

2   people of color, and so that makes you want to look

3   further at those issues.

4              But we do have the problem all around

5   the state.  It continues to be a problem.  We've made

6   gains.  It's not the same state it was in 1960, but

7   it's not nearly where it needs to be.

8              SEN. ELLIS:  That's an interesting

9   comment, and I might add a bipartisan comment because

10  in Harris County where there was a Democratic sweep,

11  for some strange reason the candidates that didn't win

12  in that sweep were the candidates of color primarily.

13             MR. BLEDSOE:  And there were also

14  problems when there were -- when there was a

15  Republican sweep with the Republican blacks not

16  winning as well.  So that's been a problem both ways

17  in Harris County.

18             SEN. ELLIS:  How would this voter ID

19  law, this specific law -- I know you've looked at the

20  statute -- discriminate against people of color?

21             MR. BLEDSOE:  Well, what this specific

22  law will do is it will clearly reduce the minority

23  vote, both because of the pressure that will be put on

24  the polling place that will cause the longer lines,

25  that will give more discretion to -- it will give a

1    lot more discretion to Election Officials that are

2    already having problematic relationships with people

3    of color, and it will -- it has intimidating

4    provisions that will make individuals take a look at

5    the law and say "Well, I'm not sure I want to sign

6    that document."  And it will prevent people who were

7    there in good faith from being able to come up with

8    the right information to be able to vote because of

9    the great burdens it will place on them.

10            I know that I got -- I visited with a

11   former official in the Department of Justice Civil

12   Rights Division.  They indicated like how in Presidio

13   County it's 3800 square miles in the county and the

14   high number of language minorities in the county and

15   the real difficulty in that county in making it to a

16   location to get a driver's license.  So -- or to get a

17   photo identification.  So there will be a real problem

18   that way.  So I think it clearly will cause

19   retrogression.

20            But secondly, the other point that I

21   wanted to make was that not just the Voting Rights Act

22   and the retrogression, it clearly will show a drop in

23   the vote -- in the African-American vote, but I think

24   that it could have been a lot more narrowly tailored.

25   It could have been focused specifically on the problem

```
 1    that's at hand, that's at issue, and it's not focused
 2    on the problem at hand in the kind of narrow way that
 3    I think that it should.  So it unnecessarily tramples
 4    upon rights of minorities that it doesn't need to.
 5                    SEN. ELLIS:  I think I saw you in the
 6    room when the testimony was given from the person from
 7    AARP.  And despite some of the questions that were
 8    asked from present counsel, I assume that there will
 9    be an attempt to maybe exempt the elderly out of this
10    bill in this great deliberative body.  After being
11    here 24 hours, there might be an attempt to do that.
12                    My question is if the legislature does
13    decide to exempt certain classes of voters, like maybe
14    seniors or some others from this in bill, would that
15    direct -- in your judgment, would that direct an even
16    greater amount of its potential to disenfranchise
17    voters of African-American and Hispanic ancestry?
18                    MR. BLEDSOE:  Well, I will say that -- I
19    don't know if I'll say it will be greater, but it
20    won't dilute it because the impact that would be
21    illegal or unconstitutional will be just the same
22    because the -- you'll be taking out one group, but
23    when you look at those who are younger than -- younger
24    than 65, you have an enormous problem with racial and
25    ethnic minorities.
```

```
 1              I think in one sense it makes it worse

 2    in that the other group that might be -- one of the

 3    other groups that might be unnecessarily adversely

 4    impacted will no longer be adversely impacted.  So it

 5    will be primarily blacks and browns that will be

 6    negatively impacted by the bill.  So I don't think

 7    that that would go far enough.  There would still be a

 8    deleterious impact on the African-American community.

 9              SEN. ELLIS:  Did you see the press

10    accounts from '05 and '06 of the Attorney General's

11    highly publicized campaign against voter fraud?

12              MR. BLEDSOE:  I haven't actually seen

13    them.  I've discussed some parts of them with

14    different individuals.

15              SEN. ELLIS:  If you can, I just want to

16    get a sense of based on what you know about that

17    anti-voter fraud campaign, that the Attorney General

18    used materials that included images of sickle cell

19    stamps based on press accounts and photos of

20    African-Americans to illustrate signs of voter fraud.

21    And my question is, what does that tell you about the

22    state's attitude and enforcement of voter fraud?  And

23    did the conduct and targets of those prosecutions fit

24    into a pattern of voter suppression in Texas?

25              MR. BLEDSOE:  Well, I think it's very
```

 1    disappointing that that would be used because

 2    obviously that makes a suggestion.  Whether it was

 3    intentional or not, one cannot know, but it's clear

 4    that you send a certain signal when you use things

 5    like that.  And something so innocent as a sickle cell

 6    stamp to be used there would be completely

 7    inappropriate, and I don't understand how that could

 8    be there.  So obviously that would be offensive and

 9    problematic.

10              And I do know that -- I think the data I

11    looked at in terms of the prosecutions were 18 out

12    of 19 or something along those lines were racial and

13    ethnic minorities, and that is one of the reasons why

14    we opposed the bill.  When Representative Wolens had

15    put the bill together, you know, we were one of the

16    groups that vehemently opposed it because what we

17    feared at that time when he put that bill forth was

18    that it was going to be disparately used against

19    racial and ethnic minorities, and indeed I think that

20    was probably the case.

21              SEN. ELLIS:  One last question.  You may

22    have heard some of the testimony from Indiana and

23    Georgia from the experts of representatives that were

24    here.  So what I want to ask you is you suggest the

25    photo ID law would suppress the African-American

1    turnout, but some voter ID advocates claim that a

2    voter ID law does not suppress turnout and even claim

3    that turnout increased in Indiana and Georgia in '08

4    and that it was caused by voter ID laws compared to

5    the 2004 turnout when there was no voter ID law in

6    place in those states.

7              Obviously turnout can vary a lot between

8    the election cycles based on a lot of factors like

9    who is in the race, but my question is, did

10   African-American turnout in Texas increase in '08

11   without a voter ID law?  And do you think the reason

12   might be the same as the real reason for reports of

13   higher turnout in Indiana and Georgia?

14             MR. BLEDSOE:  Well, the African-American

15   turnout did increase greatly this past election in the

16   State of Texas, and obviously it wasn't due to a voter

17   ID law, and I think it increased greatly nationally,

18   including many states that did not have voter ID laws.

19   So I think it really would be completely inaccurate to

20   say that the voter ID laws had anything to do with an

21   increase.

22             I do know that they did cause folks to

23   be turned away from the polls in Georgia from my

24   communications with the Georgia State Conference.  The

25   reason why you had the increased turnout was the Obama

```
 1   candidacy joined with an effective Obama campaign that

 2   in many ways would be very hard to duplicate because

 3   it wasn't just the Obama candidacy, but you had a

 4   great deal of finances assisting the folks in getting

 5   out votes in different communities.

 6               So there was a real green element to

 7   that turnout as well.  So that went well beyond any

 8   voter ID law.  And I think that when the proof is in

 9   ultimately there will be absolutely no question that

10   the voter ID law will have a negative impact on the

11   African-American vote in Georgia and I would presume

12   Indiana as well.

13               SEN. ELLIS:  Mr. Bledsoe, thank you for

14   being so patient and being here.

15               To all Members present, thank you.  And

16   with that, good morning.  I'm signing off and good

17   night.

18               MR. BLEDSOE:  Thank you, Senator.

19               SEN. DUNCAN:  Thank you, Mr. Bledsoe.

20   The queue is clear.  You're excused.

21               MR. BLEDSOE:  Okay.

22               SEN. DUNCAN:  We appreciate your

23   presence today.

24               **TESTIMONY BY ERIC NICHOLS**

25               SEN. DUNCAN:  The next witness will be
```

1    Eric Nichols with the Attorney General's Office.

2    Mr. Nichols, if you'll approach?  Mr. Nichols is being

3    presented as a resource witness.  If you'll state your

4    name and the office that you are with, please?

5                    MR. NICHOLS:  Thank you, Mr. Chairman.

6    Eric Nichols, Deputy Attorney General for Criminal

7    Justice with the Office of Attorney General.

8                    SEN. DUNCAN:  Mr. Nichols, you have ten

9    minutes, and then we'll open it up for questions.

10                    MR. NICHOLS:  Thank you, sir.

11   Regardless of the hour, I'm pleased to appear before

12   the Committee of the Whole, and I've had the

13   opportunity to speak with many of you individually as

14   well as Senate and House Committees on the topic that

15   I've been asked to be a resource on tonight, which is

16   the election code enforcement activity that has

17   occurred at the Office of the Attorney General.

18                    By way of background, I've spent a good

19   deal of my legal career working in the legal justice

20   system, previously on the federal side as an Assistant

21   United States Attorney and now on behalf of the State

22   of Texas.

23                    As part of my duties at the AG's office,

24   I oversee the agency's Criminal Justice Divisions,

25   including the two divisions of that office that are

1   principally responsible for matters arising under the

2   Texas Election Code that come to our attention.  Our

3   Criminal Investigations Division investigates election

4   code cases that are referred to our office.  The

5   Criminal Prosecutions Division brings criminal

6   prosecutions and election code cases on behalf of the

7   state when an investigation reveals facts that warrant

8   prosecution.

9           Again, I understand from discussion

10  among the committee members earlier here today that

11  I'm here to be a resource on the issue of the election

12  code enforcement that's occurred through our agency,

13  and so I'm prepared to give you some historical data.

14  But before I do that, I want to provide three caveats

15  that I've provided to many of you before, and I

16  apologize to those of you who have heard these

17  caveats, but I think they are important to put the

18  data in context.

19          First, it's important for anyone looking

20  at data that comes out of our office to keep in mind

21  that our agency's election code enforcement efforts

22  are entirely referral driven.  What does that mean?

23  We do not currently have nor have we ever had any

24  officers, investigators, prosecutors or any kind of

25  officers, agents or employees watch, supervise or

1    otherwise monitor a polling place, voting station or

2    voter roster during any election in this state.

3              We, therefore, depend on third parties

4    to make us aware of alleged election code violations.

5    Accordingly, if a third party does not for whatever

6    reason detect a potential violation of the election

7    code or if they do detect a potential violation of the

8    election code but choose not to file a complaint or

9    make a referral to our office, then our office is

10   obviously unaware and unable to investigate what would

11   have been the underlying subject matter.

12             Referrals to our office on potential

13   election code cases come from three primary sources.

14   As you've heard, the Secretary of State is the state's

15   chief elections officer.  Under the election code, the

16   Secretary of State takes questions and referrals from

17   a variety of sources, including members of the public.

18   The Secretary of State's Office reviews those matters,

19   and under the statute when they determine that there

20   is "reasonable cause to suspect that the alleged

21   criminal conduct occurred," the SOS then refers the

22   matter to our office for further investigation.

23             There are also provisions in the

24   election code that allow concerned local registered

25   voters to file complaints about alleged wrongdoing

1    directly with our office by filing sworn affidavits.

2    And then finally the third, another primary referral

3    source for election code cases, are local elections

4    officials and local law enforcement.

5              Given our office's role in coordinating

6    on law enforcement generally with local law

7    enforcement agencies and officials, including local,

8    District and County Attorneys, Sheriffs and Police

9    Departments, we receive direct referrals from these

10   local officials.

11             The second point for context is this:

12   The legislature -- this legislature has given the

13   Attorney General's Office direct authority and

14   jurisdiction to prosecute election code cases, but our

15   authority and jurisdiction in this area is not

16   exclusive.  Local prosecutors at the county level also

17   have jurisdiction to prosecute election code cases,

18   and they do, in fact, as you've heard in testimony

19   today, exercise that jurisdiction.

20             We do, in fact, coordinate with local

21   prosecutors.  And as in the case of that Dallas County

22   case you heard about earlier, we do not generally move

23   forward on a case if a local prosecutor decides -- or

24   declines to prosecute.

25             A quick review of available new stories

1    in addition to what you've heard today shows that from

2    Hidalgo County to Harris County there is local

3    election code enforcement going on by local

4    prosecutors.  With all this in mind, to get a complete

5    picture of all of the prosecutions in Texas under the

6    election code would require you to collect data from

7    all 254 counties.  So I can only give you a piece of

8    the statewide picture here tonight.

9              The last context point that I always

10   give, and I apologize again for those of you who have

11   heard it, is that for obvious reasons of law

12   enforcement and respecting the rights of those who may

13   be under active investigation or prosecution, I can

14   talk publicly in terms of numbers and largely general

15   fact scenarios rather than talk in a public hearing

16   about specific investigations or cases.

17             So with all that being said, I'd like to

18   provide you-all with historical data that dates from

19   August 2002 to present.  In that time period, the

20   Office of Attorney General has received 192 referrals

21   of potential election code violations from the three

22   sources I mentioned previously.  There have been some

23   statements made before the committee about the Office

24   of the Attorney General engaging in a lengthy

25   statewide investigation.  Those comments are not quite

1    accurate in terms of what our office does in terms of

2    reacting to referrals.  We only act upon referrals

3    that we receive, and as you would expect having given

4    the office the authority and jurisdiction to

5    investigate these matters, our charge is to thoroughly

6    investigate the matters that come to our attention.

7                    Those 192 referrals break down as

8    follows by source:  82 came from the Secretary of

9    State, 44 came from voters in the method I described

10   earlier, and 66 came from local officials and law

11   enforcement.

12                    Furthermore, those 192 referrals break

13   down by the type of election as follows:  82 involved

14   Party Primary Elections, 33 involved General

15   Elections, and 77 involved other Local or Special

16   Elections.  And so only about 15 percent of the

17   referrals to our office deal with issues arising in

18   General Elections, and 85 percent arise in either

19   Party Primary or Local Special Elections.

20                    Now, of course, once these

21   investigations are conducted by our office, a

22   significant number of these cases are going to be

23   determined to not rise to the level of an election

24   code violation either based on the facts or law.

25   However, these 192 referrals have to date resulted in

1    30 prosecutions of offenses under the election code by

2    prosecutors from the Office of Attorney General,

3    again, often working in conjunction with local

4    prosecuting attorneys in Texas counties.  And in terms

5    of the cases that have been prosecuted, three of those

6    cases involved General Elections, the other 27 involve

7    Party Primary or Special or Local Elections.

8           The 30 cases involved in general, fact

9    scenarios such as these, unlawful abuse of the mail-in

10   ballot process, campaign finance violations, unlawful

11   conduct at the polling place and other obstruction of

12   the elections process.

13          Finally to give you a general idea of

14   the kinds of cases that go behind these numbers, I

15   just want to briefly lay out a couple of fact patterns

16   for you.  The first fact pattern that I've talked

17   about in the House Elections Committee before resulted

18   in a five-year sentence by a jury for a defendant who

19   was involved in a scheme that resulted in two resident

20   aliens voting improperly in a Local Party Primary

21   Election.  This case arose out of Calhoun County.  It

22   was tried in Jackson County.

23          The second fact pattern concerns persons

24   who fill out voter registration applications using

25   names and/or addresses of nonexistent persons.  We've

1   had several cases that have involved that fact

2   scenario.

3               The third fact pattern involves

4   situations in which a person attempts to impersonate

5   or does impersonate others in casting a ballot.

6   There's one case that's been prosecuted that I think

7   you-all have heard about involving an attempt to vote

8   a mail-in ballot of a deceased mother.

9               SEN. DUNCAN:  I'm sorry.  Your time has

10  expired.

11              Senator Huffman, you're recognized.

12              **QUESTIONS FROM SENATE FLOOR**

13              SEN. HUFFMAN:  Thank you, Mr. Chair.

14              Mr. Nichols, did you want to just finish

15  quickly?

16              MR. NICHOLS:  Just real quick.

17              SEN. HUFFMAN:  Okay.

18              MR. NICHOLS:  I just wanted to finish

19  that.  On the fact pattern is also evident in cases

20  that are under investigation by our office where there

21  are allegations that votes were cast at the polling

22  place by persons other than the registered voter.

23              And with that, there were some

24  additional items that I want to speak about, but I'll

25  be happy to answer questions.

1            SEN. HUFFMAN:  All right.  Basically I

2    just want to summarize that it is -- the way that the

3    Attorney General starts investigating the case is

4    always through a referral from the local officials.

5    Is that correct?

6            MR. NICHOLS:  Yes, Senator.  It can come

7    from the Secretary of State, from voters through the

8    election code or from local Election Officials or

9    other local law enforcement.

10           SEN. HUFFMAN:  Has the AG taken on the

11   responsibility of going out into the communities and

12   sitting up at polling places or going to the

13   registrar's office in any way, shape or form?

14           MR. NICHOLS:  No, Senator.  That's not

15   our charge.

16           SEN. HUFFMAN:  All right.  In looking at

17   the numbers that you've given us and that you've

18   summarized, it's clear that, in fact, there are a lot

19   of difficulties in prosecuting these cases.  Is that

20   correct?

21           MR. NICHOLS:  It is.  It depends on the

22   kind of violation involved, but all cases of this type

23   are difficult to both investigate and prosecute.

24           SEN. HUFFMAN:  And is that just the

25   nature of the cases and the fact that, of course, they

752

 1    have to be proved like any other criminal case, and

 2    that is, you have to -- the level of proof is proof

 3    beyond a reasonable doubt.  Is that correct?

 4              MR. NICHOLS:  Absolutely.  As you know,

 5    there are certain screenings that go on through the

 6    investigation of a case, both internally and of the

 7    law enforcement agency.  All the cases that we

 8    prosecute are eventually -- if there is a decision

 9    made to proceed to a grand jury, to present it to a

10    grand jury which makes the decision as to whether

11    charges will issue.  And then, of course, you've got

12    ultimately a jury trial where those allegations don't

13    mean anything unless a jury of that person's peers

14    enters a conviction.

15              SEN. HUFFMAN:  Would the bill that's

16    being proposed that would establish or attempt to

17    establish voter identity assist in the prosecution of

18    at least some of these cases to help to establish the

19    identity element that is often missing or just

20    impossible to prove under current law?

21              MR. NICHOLS:  Well, Senator, I don't

22    understand that I'm here to testify about the bill one

23    way or the other.

24              What I would say just generally speaking

25    any effort that would assist in detecting persons who

1   attempt to vote illegally could conceivably give rise

2   to evidence that would be useful in a criminal case.

3                    SEN. HUFFMAN:  All right.  I want to ask

4   you about a document that we have and ask you if it is

5   a work product of the AG's Office that we can enter

6   into the record.

7                    Mr. Chair, may I have permission to

8   approach the witness?  Mr. Chair, may I approach the

9   witness briefly to show him --

10                   SEN. WHITMIRE:  Sen. Duncan, she wants

11  to approach the witness.

12                   SEN. HUFFMAN:  I can?  Okay.  May I

13  approach the witness briefly to show him a document?

14                   SEN. DUNCAN:  Yes.

15                   SEN. HUFFMAN:  Thank you, sir.

16                   (Discussion off the record)

17                   SEN. HUFFMAN:  All right.  If I may

18  proceed?  What I'd like you to clarify, there's been a

19  lot of testimony, I guess, in the last 20 hours or so

20  about money that was spent by the AG's Office in

21  investigation of voter fraud cases.  I want to make

22  sure that the record is clear what the actual facts

23  are.  So if we could go through those, or if you have

24  a summary of that and you want to give that to me for

25  the record, we could do that and go through that

1   quickly.

2                   MR. NICHOLS:  I can.

3                   SEN. HUFFMAN:  Please do that.

4                   MR. NICHOLS:  It has -- it has been

5   reported initially in the media and has been repeated

6   by certain folks that the AG's Office spent

7   1.4 million on cases that the AG's Office has

8   prosecuted under the election code.  This information

9   that apparently has been provided to members of this

10  body is inaccurate.  The confusion stems, I think,

11  from the fact that there were references to the grant

12  funding when the Special Investigations Unit of the

13  Criminal Investigations Division was created.  And

14  people reached the conclusion that because it was

15  funded through grant funding that all that money was

16  used to prosecute and investigate election code cases,

17  which is inaccurate.

18                  As a matter of fact, if you go to the

19  grant package that sought that funding, the grant

20  package made it clear that that funding would be used

21  to prosecute not just election code cases, but cases

22  of public corruption, fugitive apprehension, child

23  protection such as on-line solicitation and child

24  pornography cases, as well as a host of other matters.

25                  And so, in fact, if you crunch the

755

 1    numbers and trace those grant funds, you'll find at

 2    the end of the day that with respect to the OAG's

 3    election code prosecutions, $93,579 of that grant

 4    funding can be traced to those prosecutions.  And so

 5    it's just an example, in my mind, of how everyone,

 6    including members of this body through no fault of

 7    their own, need to be careful about information that's

 8    being provided to them about the OAG's enforcement

 9    efforts because sometimes that information can be less

10    than accurate.

11              SEN. HUFFMAN:  All right.  Thank you,

12    sir.  One last question.  There's also been some

13    testimony about a depiction of a sickle cell anemia

14    stamp that was shown I believe on a PowerPoint

15    presentation that was presented perhaps from someone

16    from the AG's Office at some point somewhere.  Are you

17    familiar with why a sickle cell anemia stamp was used

18    in a presentation from the AG's Office?  And explain

19    that, please.

20              MR. NICHOLS:  Yes, I am.  That slide

21    actually took evidence from an actual case.  It was

22    the Willie Ray case that you-all heard a little bit

23    about today.  And that stamp that was actual evidence

24    from a criminal case was included on a slide that had

25    as one of the bullet points the words "unique stamp."

756

1              The point of that PowerPoint that was
2    produced was to try to educate law enforcement
3    officers about ways they could investigate potential
4    cases of election code violations.  The point of
5    including that evidence was to show that in a
6    particular case, in the Willie Ray case, a key facet
7    of that case was the use of the unique stamp.  It
8    didn't matter if it was a sickle cell stamp, a Lou
9    Gehrig stamp, an Abraham Lincoln stamp, it wouldn't
10   matter.
11             The point is that the fact that that
12   stamp was used on a number of mail-in ballots allowed
13   the investigators to go trace those ballots back to a
14   single source, which of course is the charge that
15   Willie Ray was ultimately charged with.
16             So first of all, I wasn't at the office
17   at the time.  In hindsight I can see how somebody
18   would look at a PowerPoint like that, and frankly
19   given the sensitivities involved, somebody might be
20   offended by that, but it is important to understand
21   exactly why that PowerPoint was put together.
22             SEN. HUFFMAN:  All right.  Thank you.
23   Thank you very much, Mr. Nichols.
24             SEN. DUNCAN:  Thank you, Senator.
25             Sen. Hegar?