757

1          SEN. HEGAR:  Thank you, Mr. Chairman.

2          Mr. Nichols, I was curious, you were

3    talking about Port Lavaca -- the Port Lavaca case, and

4    that's in Senate District 18, which I represent, and

5    you were finishing your comments on that or part way

6    through, and I just wanted to make sure that you were

7    able to finish your comments on that particular case.

8    And I was also curious when you were finishing those

9    comments, because that was a really unique set of

10   circumstances in a three-way race, if I remember, did

11   the voter fraud change the outcome of that election?

12   If you could finish that up for me, please?

13          MR. NICHOLS:  Yes, sir.  Just very

14   briefly that case involved a situation where the

15   defendant in the case presented voter registration

16   applications to seven persons who were not qualified

17   to vote because they were noncitizens.  The facts of

18   the case as presented at trial showed that the

19   defendant filled out the application on behalf of

20   these persons who were resident aliens, but were not

21   qualified to vote or eligible.  The defendant

22   basically misrepresented facts to these resident

23   aliens and took those completed applications to the

24   local elections office to be processed.

25          And the evidence further revealed that

1     of the folks that were registered, two of the

2     noncitizens, in fact, voted early in person at a Party

3     Primary Election.  And because the defendant had

4     misrepresented things to these resident aliens, it was

5     a situation where not only the election system was put

6     in jeopardy, but these victims -- we considered the

7     resident aliens to be victims because, in fact, she

8     had subjected them to a situation where, if they were

9     prosecuted, there could be ramifications for them as

10    well.

11              In terms of the outcome of the election

12    which you asked about, the testimony at trial showed

13    that the noncitizen votes did affect the outcome of

14    the election.  In that case, it was a three-way race.

15    The defendant received 229 votes.  Her runners up

16    received 211 and 210 respectively.  And after the

17    count was had, the two lower tallied candidates had to

18    do a coin flip in order to determine who was going to

19    be in the runoff.  And then as the D.A -- local D.A.

20    who helped prosecute the case said the defendant's

21    conduct "would have swayed the entire election."

22              SEN. HEGAR:  Thank you.  I really

23    appreciate that.  And one thing that you said I wanted

24    to make sure I heard that correctly, did you say that

25    your office prosecuted the case or it was the locals,

1    or did you say that was joint?  I was just curious on

2    that.

3                 MR. NICHOLS:  We did it together as we

4    often do.  In many of these cases, we prosecute in

5    conjunction with -- actually in that case it was two

6    local D.A.s.

7                 SEN. HEGAR:  Okay.

8                 MR. NICHOLS:  The case originated in

9    Calhoun County.  That was where the city councilwoman

10   was from where the election was had.  The case was

11   moved under change of venue to Jackson County, and so

12   we actually had two local elected D.A.s that were

13   involved in that case.

14                SEN. HEGAR:  Okay.  Great.  Thank you

15   very much for your testimony.  I appreciate it.  Thank

16   you.

17                SEN. DUNCAN:  Sen. Davis?

18                SEN. DAVIS:  Hello, Mr. Nichols.  Thank

19   you for waiting so long to come before us today and

20   present your testimony.  I just have a couple of

21   questions for you.  A moment ago -- I want to make

22   sure I heard you correctly.  You said that from August

23   of 2002 to the present 192 referrals of voter fraud --

24   alleged voter fraud had been made to the Office of the

25   Attorney General?

```
1              MR. NICHOLS:  That's correct, alleged
2   election code violations.
3              SEN. DAVIS:  Okay.  And that you act
4   only on referrals because you don't have the manpower
5   and the ability to go out policing polling places
6   through the Attorney General's Office?
7              MR. NICHOLS:  And, Senator, it's not
8   really just a manpower issue, but it's just a mandate
9   issue.  We're not intended to be the -- a front-line
10  monitor of the elections.
11             SEN. DAVIS:  Understood.  Of those 192
12  referrals, you broke them down in terms of where the
13  referrals came from.  You also broke them down with
14  regard to the type of elections in which those
15  referrals occurred.  Can you tell me -- and I'm sure
16  you said this a moment ago, but I didn't catch it --
17  how many prosecutions resulted from those 192
18  referrals?
19             MR. NICHOLS:  It was 30.
20             SEN. DAVIS:  Thirty, okay.  And I think
21  you did this a moment ago, too, but I didn't catch all
22  of it.  Can you break down of the 30 prosecutions the
23  categories in which each of those were prosecuted?
24             MR. NICHOLS:  Categories as with respect
25  to the type of election or --
```

1              SEN. DAVIS:  Exactly -- no, not the type

2     of election, but the type of fraud that occurred that

3     you were prosecuting.

4              MR. NICHOLS:  I don't have those figures

5     for you.  I can tell you generally that some involved

6     the abuse of the mail-in ballot process, some involved

7     campaign finance violations, unlawful conduct of

8     polling places and other obstruction, but I could

9     break those down for you further if you want me to get

10    you that information.

11             SEN. DAVIS:  Okay.  I would appreciate

12    it if you would do that breakdown for us and supply it

13    to the Members.

14             You did say I think a moment ago that

15    one of those cases involved a voter impersonation, and

16    that was the situation where a woman sent in a mail-in

17    ballot of her deceased mother.  Correct?

18             MR. NICHOLS:  That's one of the cases,

19    yes.

20             SEN. DAVIS:  Okay.  I am reading a

21    communication from our Attorney General Greg Abbott.

22    It was an Internet communication titled Let's Stamp

23    Out Voter Fraud in Texas.  And in that communication

24    the Attorney General states that "Voter fraud is

25    occurring on a large scale when viewed statewide, and

1    consequently our state elections are significantly

2    impacted.  We must redouble our efforts to stem this

3    epidemic."  And again, that's dated March 1, 2006.

4    But I want to make sure I understood you a moment ago.

5    This epidemic involved 192 referrals made from your --

6    made to your office from August 2002 to the present?

7              MR. NICHOLS:  If your question is did we

8    receive -- did our office receive 192 referrals during

9    that period you mentioned, that's correct.

10             SEN. DAVIS:  Okay.  And then further in

11   that communication -- and this goes to support the

12   answers that you gave to Senator Huffman a moment ago.

13   Attorney General Abbott talks about the $1.5 million

14   grant and the way in which he's going to use that

15   grant through the powers of his office.  And he states

16   that "Officers from the Special Investigation Unit

17   have been visiting key counties across the state to

18   conduct voter fraud training for law enforcement.

19   Included among these counties are the 14 where my

20   office has previously investigated or prosecuted

21   alleged election code violations.  In addition to the

22   ones mentioned above, the list includes comal, Floyd,

23   Harris, Hidalgo, Jim Wells, Parker, Robertson, Tarrant

24   and Waller Counties.  Criminal investigators from SIU

25   are also visiting 30 other Texas counties with

1    populations of at least 100,000.  Together these 44

2    counties contain more than three quarters of eligible

3    registered voters in the state.  As of mid February, a

4    total of 519 officers had attended 76 sessions

5    offered."  And again, this was a communication on

6    March 1, 2006.

7              With the expenditure of that

8    $1.5 million grant which went to aggressively train

9    law enforcement throughout our state and which, of

10   course, was used in part, I think you said, for

11   purposes of rooting out and prosecuting voter fraud to

12   quote the statement by the Attorney General in this

13   communication, with all of that money and all of that

14   training and all of this focus on what is an effort

15   "to stem an epidemic," from August 2002 to the

16   present, there were only 192 referrals made and

17   investigations pursued by the Attorney General's

18   Office of election fraud allegations in the State of

19   Texas?

20             MR. NICHOLS:  Senator, it was a lot in

21   that question, but I think I tried to clarify in

22   response to an earlier question about the 1.5.  So to

23   the extent that anyone is operating under a

24   misapprehension that that 1.5 million was spent on

25   election code cases alone, that's what I was trying to

Case 2:13-cv-00193   Document 725-26   Filed on 11/17/14 in TXSD   Page 8 of 168

764

1    clear up for the record.

2              But again, if your question to me is not

3    taking into account local prosecutors, what referrals

4    our agency has seen to the three sources I talked

5    about, you're correct, it's 192 over the time period

6    August 2002 to the present.

7              SEN. DAVIS:  Thank you very much,

8    Mr. Nichols.  I don't have any further questions.

9              SEN. DUNCAN:  The Chair recognizes

10   Sen. Wentworth.

11             SEN. WENTWORTH:  Mr. Nichols, it's

12   pretty late, and I didn't hear everything that was

13   said, but I want to make sure I did understand because

14   I had heard it repeated several times that your office

15   hadn't spent $1.4 million on this.  I think in

16   response to Senator Huffman you reported that, in

17   fact, it's not $1.4 million.  It's not even $100,000.

18   It's less than $100,000.  So $1,300,000 plus went to

19   other things from that grant rather than election

20   fraud cases.  Did I -- did I hear that correctly?

21             MR. NICHOLS:  Yes, sir.  And in fact --

22             SEN. WENTWORTH:  What was -- what was

23   the exact figure?

24             MR. NICHOLS:  Yes, sir.  There were two

25   figures.  The initial grant was funded at 1.4.  It was

```
 1    renewed for another year through the Governor's Office

 2    for 1.9.  So actually ultimately there was a total of

 3    3.3 in grant funding for the Special Investigations

 4    Unit, which $3.1 million was ultimately spent by the

 5    SIU.  And of that $3.1 million, $93,579 was spent on

 6    election code cases.  Now, of course, we've spent more

 7    money than that on election code cases and

 8    prosecutions, but the suggestion that $1.4 million in

 9    grant funding was spent to prosecute 30 cases is -- is

10    completely inaccurate.

11              SEN. WENTWORTH:  Thank you, sir.

12              SEN. DUNCAN:  The Chair recognizes

13    Sen. Shapleigh.

14              SEN. SHAPLEIGH:  Thank you, Mr. Chair.

15              Mr. Nichols, I believe Sen. Huffman is

16    going to offer this exhibit.  You and I looked at it.

17    This was prepared by you and your office.  I think

18    it's going to be hopefully Exhibit No. 38.  I'm

19    looking here at SIU funding.  Here is what this says.

20    "The initial $1.9 million DOJ grant was renewed for

21    approximately $2.0 million.  To date the OAG has

22    resolved 22 election fraud prosecutions at a cost of

23    $600,000.  Of those 22, eight election fraud

24    indictments are now pending."

25              So can you tell us of the 22 election
```

1    fraud prosecutions, which are the sum of the activity

2    from the 192 referrals, how many involved minorities?

3                    MR. NICHOLS:  How many involved what,

4    sir?

5                    SEN. SHAPLEIGH:  Minorities.

6                    MR. NICHOLS:  I can't tell you.  I don't

7    track cases by that.  I would never do that.

8                    SEN. SHAPLEIGH:  Okay.  Thank you.

9                    SEN. DUNCAN:  There are no other members

10   in queue for this witness.  You are excused,

11   Mr. Nichols.

12                   MR. NICHOLS:  Thank you.

13                   SEN. DUNCAN:  Thank you for your

14   testimony.

15                   The Chair recognizes Sen. Watson to

16   introduce an exhibit.

17                   SEN. WATSON:  Thank you, Mr. Chairman.

18   When the Deputy Secretary of State was here, I

19   identified with him an exhibit that was a page from

20   the House, a report that they had made from the

21   Secretary of State's Office to the House Elections

22   Committee that had two categories.  It was voter --

23   registered voters since January 1, 2006 was in the

24   upper category, and then there was a breakdown, and

25   then all statewide voters.  That has been marked as

767

```
1    Exhibit No. 38, and I would offer that as part of the
2    record.
3                  SEN. DUNCAN:  All right.  Senator, it
4    will be made a part of the record, Exhibit 38.
5                  (Exhibit No. 38 marked and admitted)
6                  SEN. DUNCAN:  Sen. Huffman, for what
7    purpose?
8                  SEN. HUFFMAN:  Yes, Mr. -- I just need
9    to offer the exhibit that Mr. Nichols testified from.
10   It will be Exhibit No. 39 for the record.
11                 SEN. DUNCAN:  Would you describe it?
12                 SEN. HUFFMAN:  It is the facts of the
13   Special Investigations Unit that gave the numbers of
14   the amounts spent on the prosecutions that Mr. Nichols
15   testified to, and he was questioned by Sen. Davis and
16   Sen. Shapleigh.
17                 SEN. DUNCAN:  That will be Exhibit 39.
18   Correct?
19                 SEN. HUFFMAN:  Yes, yes.
20                 SEN. DUNCAN:  All right.  It will be
21   placed into the record.
22                 (Exhibit No. 39 marked and admitted)
23                 SEN. HUFFMAN:  Thank you, sir.
24                 SEN. DUNCAN:  Sen. Williams, for what
25   purpose?
```

```
1              SEN. WILLIAMS:  Mr. Chairman, I have two
2    documents that I'd like to enter into the record.  One
3    is the Supreme Court Case William Crawford vs. Marion
4    County Election Board, and the other document is the
5    amicus brief that the State of Texas filed with the
6    Supreme Court of the United States in the same case.
7              SEN. DUNCAN:  Okay.  I believe the case
8    would be Exhibit No. 40, and the amicus brief that you
9    referred to would be Exhibit 41.
10             SEN. WILLIAMS:  Thank you, Mr. Chairman.
11             SEN. DUNCAN:  And they will be admitted
12   in the record.
13             (Exhibit Nos. 40 and 41 marked and
14   admitted)
15             SEN. DUNCAN:  All right.  Members, that
16   concludes the invited testimony.  I will now at this
17   point in time -- here is the intent of the Chair, is
18   to move into our public testimony.  We have been going
19   about two hours, so it's time for our court reporter
20   to take a break.
21             But before we do that, I'm going to read
22   the names of those ten witnesses that we will ask for
23   you to come to the registration desk, and you'll be
24   admitted and made ready to enter the chamber and give
25   your testimony.  And then as that process goes on,
```

1    we'll sooner -- we will call at some time later ten

2    more witnesses and ask you to report.

3                    Again, at this point in time, we will

4    invoke the 30-minute rule again.

5                    (Inaudible)

6                    SEN. DUNCAN:  No, the 30-minute rule

7    will mean that if you -- if your name is called and

8    you haven't arrived in 30 minutes, then you would lose

9    your opportunity to testify.  So please -- please try

10   to adhere to that.  Each witness will have three

11   minutes, and that limit will be strictly enforced.

12                    The first witness I'll call is Claire

13   Oxley Gluck; the second witness, Hazel Cotton; the

14   third witness, Cathy Hicks; the next witness

15   James E. Carter; the next is Rusty Hicks; the next

16   is Tina Benkiser; the next is B.R. Skipper Wallace;

17   the next witness is Anita Pruett -- or Privett, I'm

18   sorry, P-R-I-V-E-T-T, 1212 Guadalupe, No. 107, Austin,

19   Texas, League of Women Voters; Mary Ann Collins of

20   Dumas Texas; Rosa Rosales, and those will be the

21   first -- that will be the first panel of witnesses to

22   bring into the chamber one at a time.

23                    SEN. FRASER:  Mr. Chairman?

24                    SEN. DUNCAN:  Who is this,

25   Sen. Williams?  Sen. Fraser?

```
 1                    SEN. FRASER:  A question of the Chair,
 2     please.
 3                    SEN. DUNCAN:  State your question.
 4                    SEN. FRASER:  Could we get a
 5     clarification on the intent of the Chair, is that
 6     obviously these people that have been here all night
 7     and have registered, obviously we want to hear from
 8     all of them, but the question would be that the people
 9     that have registered, are those the people that will
10     be testifying on the bill?  And the question would be
11     if someone came in two hours from now and attempted to
12     register, are we -- the testimony that we're hearing,
13     is it going to be for the people that have registered
14     for the bill right now?
15                    SEN. DUNCAN:  It is for people that have
16     registered for the bill.
17                    SEN. FRASER:  If someone attempted to
18     register an hour from now --
19                    SEN. DUNCAN:  Senator, we're still open
20     for public testimony.
21                    SEN. FRASER:  Thank you.
22                    SEN. DUNCAN:  The committee will stand
23     at ease until 7 a.m.
24                    (Recess:  6:50 a.m. to 7:03 a.m.)
25
```

1                    **PUBLIC TESTIMONY**

2              SEN. DUNCAN:  Okay.  Members, we are now

3    ready to begin our public testimony.  I'll give you

4    just a second to take your seats.

5              (Brief pause)

6              All right.  The Chair will call the

7    first public witness, Claire Oxley Gluck.  Ms. Gluck,

8    please approach, state your name, who you represent.

9    You have three minutes.

10           **TESTIMONY BY CLAIRE OXLEY GLUCK**

11             MS. GLUCK:  Mr. President, Distinguished

12   Senators, I'm Claire Oxley Gluck from Boerne in

13   Kendall County, Sen. Wentworth's district.  Thank

14   you -- I'm representing myself.  Thank you for this

15   opportunity to testify on an issue of fundamental

16   importance to our democracy, the right to vote.

17             My husband, who is Jewish, has often

18   quoted a poem from Martin Niemoller which I would like

19   to paraphrase to illustrate what is at stake.  "In

20   Texas they first disenfranchised the homeless, and I

21   did not speak up because I was not homeless.  Then

22   they disenfranchised the poor and elderly, and I

23   didn't speak up because I wasn't poor or elderly.

24   Then they disenfranchised the students, and I didn't

25   speak up because I wasn't a student.  And then they

1    disenfranchised me, and there was no one left who

2    would speak up."  So I must now speak up clearly.

3             We in this chamber are, for the most

4    part, people of privilege.  We are educated and so we

5    know how to fight for our rights.  We have homes and

6    so we have addresses.  We have cars so we have

7    driver's licenses.  We would not be affected

8    personally by Senate Bill 362, but we have a duty to

9    ensure that no Texan is prevented from voting for lack

10   of a government-issued photo ID.

11            It's important to reiterate that we all

12   want fair elections.  They are the cornerstone of our

13   democracy.  One element of fairness is the prevention

14   of fraud.  An equally important element is universal

15   suffrage.  The problem with Senate Bill 362 is that it

16   would reduce fairness rather than promote it.  This

17   bill would hinder universal suffrage without

18   addressing the main sources of voter fraud.

19            According to the witnesses we've heard

20   over the last 24 hours and academic studies,

21   nonpartisan studies, voter fraud is most likely to

22   occur in absentee ballots, which this bill would not

23   affect.  Those studies also indicate that it is

24   extremely rare for a person to go to a polling place

25   and vote using someone else's voter registration card.

```
 1              I urge you not to pass Senate Bill 362.
 2    It poses a sure threat of disenfranchising legitimate
 3    voters in order to prevent a hypothetical risk of
 4    fraud that has not been shown to occur.  Thank you
 5    very much.
 6              SEN. DUNCAN:  Thank you, Ms. Gluck.  Any
 7    questions, Members?
 8              (No response)
 9              SEN. DUNCAN:  The Chair the hears none.
10    I appreciate your testimony today.
11              The next witness is -- I think she has a
12    handout, and that will be exhibit -- Ms. Oxley's
13    handout is Exhibit No. 42, and it will be admitted
14    into the record.
15              (Exhibit No. 42 marked and admitted)
16              **TESTIMONY BY HAZEL COTTON**
17              SEN. DUNCAN:  The Chair calls Hazel
18    Cotton.  Ms. Cotton, you have three minutes.  State
19    your name and who you represent.
20              MS. COTTON:  I'm Hazel Cotton.  I'm from
21    Texarkana, Texas.  I am an election judge now.  I have
22    worked elections since the year 2000 in every capacity
23    imaginable, clerk, poll worker, alternate judge,
24    presiding judge.  I have been presiding judge over
25    eight elections starting in May 2006, which was a
```

1   local election.

2              Sen. Fraser talked about a lady in a

3   funny hat that came to the poll twice with two

4   different voter registration cards and attempted to

5   vote both.  I have a similar situation that happened

6   to me in the 2000 General Election.  It was my first,

7   and the day was barely two hours old when a man came

8   in in an unusual western shirt.  He presented me with

9   his voter card.  I looked him up on the roll, found

10  him and he voted.

11             You can imagine my surprise when an hour

12  later he came in again and got in the other line as we

13  were working two lines at the same time.  He was going

14  to vote.  I saw him, and the election judge also saw

15  him.  She stared him down, and he left in a hurry.  He

16  was going to vote twice if he had not had on that

17  unusual shirt.  This could have been prevented had we

18  had a decent voter ID law in place.

19             A lot of issues have been raised in the

20  past 24 hours regarding ID cards.  This is the 21st

21  century.  In theory everyone should have a picture ID.

22  We use them for everything, as we mentioned earlier,

23  from cashing a check to going through an airport.

24  There are people who don't drive or can't drive.  They

25  can go to the Department of Public Safety and get an

1    ID card at a reasonable cost.

2             There is a blind woman who votes at my

3    poll nearly every election.  She uses such an ID card.

4    I also am legally blind, and I have an ID, a picture

5    ID that I wouldn't leave home without.  I do use it,

6    and I would encourage you-all to -- for the reasons I

7    have stated to pass the voter ID bill.  Thank you very

8    much.

9             SEN. DUNCAN:  Thank you, Ms. Cotton.

10   Ms. Cotton has written testimony.  It's marked as

11   Exhibit No. 43.  It will be admitted into the record.

12             (Exhibit No. 43 marked and admitted)

13             SEN. DUNCAN:  Are there any questions of

14   the witness?  The Chair hears none.

15             SEN. SHAPLEIGH:  Mr. Chair?  Mr. Chair,

16   may I ask one question?

17             **QUESTIONS FROM SENATE FLOOR**

18             SEN. DUNCAN:  Sen. Shapleigh, you're

19   recognized.

20             Ms. Cotton, your -- we have a question.

21             SEN. SHAPLEIGH:  I'm sorry.  I just need

22   to know the final end of the story here.

23             MS. COTTON:  Oh.

24             SEN. SHAPLEIGH:  Did you let him vote

25   the second one -- the second time?

1          MS. COTTON:  Okay.  The second time the

2    presiding judge saw the man, and they got into a

3    staring contest at which time he left the poll.

4          SEN. SHAPLEIGH:  So he did not vote the

5    second time?

6          MS. COTTON:  He did not vote.  He

7    actually left in a hurry.  He left in a dead trot.

8          SEN. SHAPLEIGH:  Thank you.

9          MS. COTTON:  Uh-huh.

10          SEN. DUNCAN:  Thank you, Ms. Cotton.

11          MS. COTTON:  Anything else?

12          SEN. DUNCAN:  Members, any other

13    questions?

14          (No response)

15          SEN. DUNCAN:  All right.  The Chair

16    hears none.

17          The next witness is Kathy Hicks.

18          **TESTIMONY BY KATHY HICKS**

19          MS. HICKS:  I would like to thank

20    everyone.

21          SEN. DUNCAN:  Ms. Hicks, state your name

22    and who you represent.  You have three minutes.

23          MS. HICKS:  My name is Kathy Hicks.  I'm

24    from Bowie County.  I would like to thank all the

25    Texas Senators here for the opportunity to speak in

```
 1   front of you.
 2                I have been studying election
 3   irregularities since 1992 and a poll watcher since
 4   1996.  I have a sworn affidavit from a Mr. Ira Stewart
 5   of Bowie County that was made available to me through
 6   American International Investigators out of De Leon,
 7   Texas.
 8                On Mr. Ira Stewart's absentee by mail
 9   application that he did not request nor did he sign,
10   the name "Ora Stewart" is filled in and the signature
11   is signed.  There was no registration number or
12   application on the application by mail nor one filled
13   in when stamped by the clerk.
14                I would like to read you his statement.
15   "My name is Ira Stewart.  I'm above the age of 18
16   years and am of sound mind.  I have a personal
17   knowledge of the facts stated herein under oath as
18   follows:  I live at 104 Brown in Texarkana, Bowie
19   County, Texas.  I received an absentee ballot in the
20   mail.  I don't remember how a ballot was mailed to me
21   or why.  Willie Ray came by my house and asked me to
22   sign the blank ballot.  I did not fill it in.  The
23   ballot -- I did not fill the ballot in.  The ballot --
24   but I did sign it.  Ms. Ray then took my ballot and
25   told me that she would take care of it.  Mr. Don
```

1    Praiznor wrote this statement for me at my request.

2    This completes my statement."

3                    As you-all will see, I made 40 copies.

4    Everybody has one.  He cannot barely even sign his

5    name.  On his applications, they are signed as it was

6    on his voter registration card back in 1988.

7                    Back in 1996 we had a County Clerk named

8    Marylene Megason.  She was indicted.  She was removed.

9    I don't have a fact -- you will see as his voter

10   registration card will show, there is an "i" inside of

11   that "o."  We believe that the County Clerk was in on

12   helping change his application.

13                   I also have here a Ms. Doris Harene

14   Miles where she states she did not request or fill out

15   an application for ballot by mail, and she doesn't

16   know why she received an absentee ballot by mail.  She

17   stated that Willie Ray got her to fill out the

18   absentee ballot, and Ms. Ray put the postage stamp on

19   it, a sickle cell postage stamp, and took it.  She

20   later on went to the polls, and they said "oh, no, you

21   have voted."  So she did not get to vote, but actually

22   she did vote, but she was confused because she didn't

23   request the ballot, but the ballot came to her.

24                   Also here I have a statement -- I'm

25   going to leave it with you because I didn't make 40

779

1    copies -- which shows that Willie Ray came by another

2    lady's house by the name of the Jolene -- did the same

3    set up, she came by, she got the application, she came

4    back when the ballot got there, but she told her how

5    to vote because Murphy could care less how she voted.

6    I'd like to leave this with you.

7                    SEN. DUNCAN:  All right.  Thank you for

8    your testimony.  Ms. Hicks has presented written

9    testimony, which will be Exhibit No. 44.  It will be

10   admitted into the record.

11                   (Exhibit No. 44 marked and admitted)

12                   SEN. DUNCAN:  Are there any questions of

13   Ms. Hicks?

14                   (No response)

15                   SEN. DUNCAN:  Thank you, Ms. Hicks, for

16   your testimony in the Texas Senate.

17            **TESTIMONY BY JAMES E. CARTER**

18                   SEN. DUNCAN:  The next witness is

19   James E. Carter.  Mr. Carter, would you please

20   approach, state your name, who you represent?  And you

21   have three minutes.

22                   MR. CARTER:  James Carter.  I'm going to

23   be speaking to you from two positions.  One I have --

24   I am serving as the training officer for the Bell

25   County Republican Executive Committee under the

1    provisions of 32.113 of the election code, which

2    mandates that training be provided; secondly as an

3    election judge, and I have been an election clerk and

4    judge since about 1990 on my own in the precinct.

5              The training that I mentioned is given

6    to the election judges and clerks.  It is based on

7    material provided by the Secretary of State and a

8    handbook that's called the -- Training for the Judges

9    and Clerks put out every two years.  The current

10   version is 2008-2009.  A copy of that is provided to

11   each election worker.  It is of such a nature that it

12   can be taken to the polls for reference purposes.

13             However, here is the key thing:  The

14   majority of these election workers may have worked

15   only one, two, possibly three elections in a two-year

16   period.  Some are working for the first time, and yet

17   they are expected to perform and serve anywhere from

18   30 to 50 percent of their precinct's eligible voters

19   on election day.  That is a tremendous amount of

20   people to process in a short period of time, and yet

21   they're expected to do it perfectly.

22             They take an oath to protect the

23   integrity and purity of the election before the polls

24   open.  They take that oath very seriously and become

25   very concerned when they lack a key tool to prove that

1    the individual appearing before them is who they

2    represent themselves to be.  That is a photo ID that

3    verifies that person is exactly whom they represent.

4              After the polls have closed a couple

5    weeks later, we have become aware that judges and

6    clerks come in and say "I saw a person vote twice."

7    In the Primary, we're told that one person voted in

8    the Republican Primary.  Subsequently later that

9    person was seen to exit the Democrat side on the other

10   side.

11             We need to pass this bill to prevent

12   consternation and protect the integrity of our

13   election process.  Thank you.

14             SEN. DUNCAN:  Thank you, Mr. Carter.

15   Members, are there any questions of Mr. Carter?

16             (No response)

17             SEN. DUNCAN:  All right.  The Chair

18   hears none.  Thank you for your testimony.

19             **TESTIMONY BY RUSTY HICKS**

20             SEN. DUNCAN:  Rusty Hicks?  Mr. Hicks,

21   you have three minutes.  Please state your name and

22   who you represent.

23             MR. HICKS:  My name is Rusty Hicks.  I'm

24   a resident of Texarkana, Texas, in Bowie County.  I've

25   been active and concerned about the integrity of the

1    election process for many years.  Over this time, I

2    have discovered many irregularities in the voting

3    process of Bowie County and the City of Texarkana,

4    Texas.  After inspecting the sign-in sheets of early

5    voting in person, including the '08 Primary, it was

6    discovered that three voters voted early in person

7    claiming residency at an address no one seems to live.

8              After further inquiry into this matter,

9    it was determined that this location was vacant and

10   currently vacant to this day.  This location is 1617

11   Gatling Street in Texarkana, Texas, which is owned by

12   a standing city council member, Willie Ray, who voted

13   using this address.  It has been discovered that

14   Ms. Ray actually resides at 574 County Road 1224

15   outside of Texarkana, Texas, outside the city limits

16   since the year 2000.

17             If a proper and accurate and current

18   photo ID was given at the polling place, the election

19   judge would have discovered that these voters were

20   ineligible to vote from this location.  It is also a

21   major concern that Ms. Ray is not eligible to obtain

22   the city's council status.  What is most alarming

23   about this matter is that Ms. Ray had a lawsuit, state

24   versus -- Ray vs. the State of Texas and claims

25   residency owned -- under oath at 1617 Gatling Street

1    in this federal lawsuit.

2                      I appreciate the opportunity to testify

3    in front of the Texas Senate.  As you hear testimony

4    for and against this voter ID bill, it is my

5    experience that voter identification can only improve

6    the integrity of the election process.  My

7    recommendation would be to vote yes for SB 362.  And I

8    do have an exhibit -- two exhibits of current next

9    door neighbors to this Ms. Ray.  They are sworn and

10   notarized testimony that they have been living next to

11   her for nine years.

12                      SEN. DUNCAN:  All right.  Thank you,

13   Mr. Hicks.  That will be Exhibit 45, and it will be

14   admitted into the record.

15                      (Exhibit No. 45 marked and admitted)

16                      SEN. DUNCAN:  Do you have anything --

17   anything further?

18                      MR. HICKS:  No, sir.

19                      SEN. DUNCAN:  Okay.  Members, are there

20   any questions for Mr. Hicks?

21                      (No response)

22                      SEN. DUNCAN:  All right.  The Chair

23   hears none.  Thank you for your testimony.

24                      Members and also guests, we have -- I'll

25   read the next ten witnesses.  And if you'll report to

1    the registration desk in the front, then you'll be

2    admitted to the chamber:  Dustin Rynders; Marcia

3    Correira of Elgin, Texas; Rene Lara of Austin, Texas;

4    Lee Medley of Santa Fe, Texas; John Watkins of Wells

5    Point; Kenneth Flippin of Austin; Annie M. Banks of

6    Houston; Rachel Hernandez, San Antonio; Renato de los

7    Santos from Dallas; and Judy Holloway of Lakeway.

8    Please report to the registration desk and you'll be

9    admitted.

10                   **TESTIMONY BY TINA BENKISER**

11              SEN. DUNCAN:  The next witness is

12   Tina Benkiser.  Ms. Benkiser, please state your name,

13   who you represent, and you have three minutes.

14              MS. BENKISER:  Thank you, Mr. Chairman,

15   Senators.  My name is Tina Benkiser, and I'm Chairman

16   of the Republican Party of Texas.  I'm here to talk

17   about election integrity, specifically safeguarding

18   one of our most precious rights, the right to govern

19   ourselves.

20              In choosing leaders, nothing is more

21   important than voter confidence that our elections are

22   fair and just.  Vote fraud erodes that confidence, and

23   in close races can result in unjust results.

24   Moreover, every single fraudulent vote cancels out a

25   valid vote by a hard-working Texan and undermines the

election process.  Requiring a photo ID is a simple common-sense tool to help ensure fair elections and just outcomes.

The majority of votes in an election are still cast on election day or at the polling place, and the process is vulnerable to fraud.  In person, voter fraud is nearly impossible to detect at the time if no photo ID is required, and it's rarely detected afterwards unless an election contest occurs, and those are rare, they are time consuming, and they are expensive.  And only in such cases can the immediate effects of the fraud be reversed.

Requiring photo ID simply helps election workers make sure that the person casting the vote at the ballot box is the same qualified registered voter that's listed in the poll book.  In this age with more than 40 million Americans moving every year and about 13 million voters in Texas, election judges just cannot know everyone that comes to the polls, especially in urban areas.  So it's just common sense that presenting a photo ID that matches the poll book will better protect voters' rights.

Where photo ID has been instituted, the process has been fairly easy.  Contrary to critic-style warnings, experience has shown no real

1    problems in requiring photo ID to vote.  In Indiana

2    and Michigan, it went into effect, 99 percent of the

3    voting age population already had the required ID.

4    Those who didn't voted a provisional ballot, and if

5    they were eligible, the vote counted.

6                In looking at the impact of photo ID on

7    voting behavior, one scholar has noted that critics'

8    claims of coming to disenfranchisement are nothing

9    more than irresponsible and ignorant exaggeration.

10   You've heard testimony today that voter turnout

11   increases, and the effect of photo ID was positive for

12   counties with greater percentage of minorities and

13   families in poverty.

14               In last year's election, states with the

15   most stringent requirements had significantly higher

16   turnout than did neighboring states with similar

17   demographics that did not require the same.  The real

18   problem is that identity theft and voter impersonation

19   are still alive and well.  We've seen that in New

20   York, we've seen huge scandals in Washington,

21   Michigan, Missouri, Wisconsin and even next door in

22   Louisiana.

23               The widespread popularity of voter ID

24   suggests the general public is concerned about voter

25   dilution for ineligible voters.  Photo ID is common

```
 1    sense.  To ensure public confidence, I ask that you
 2    support Senate Bill 362.  Thank you.
 3                   SEN. DUNCAN:  Thank you, Ms. Benkiser.
 4                   Are there any questions of the witness?
 5                   (No response)
 6                   SEN. DUNCAN:  All right.  The Chair
 7    hears none.  Thank you for your testimony.
 8              TESTIMONY BY B.R. SKIPPER WALLACE
 9                   SEN. DUNCAN:  The Chair calls B.R.
10    Skipper Wallace of Lampasas.  Mr. Wallace, state your
11    name and who you represent, and you have three
12    minutes.
13                   MR. WALLACE:  My name is Skipper
14    Wallace.  I represent the Texas Republican County
15    Chairmen's Association.  I've been a county chairman
16    for 17 years.
17                   Since the days of LBJ in Duval County in
18    1948, we've known we've had a problem with voter
19    identification at the polls.  We've had a recent
20    Rasmussen Poll on January 22, 2008 that showed
21    67 percent overall favored voter ID, 75 percent
22    Republicans, 63 percent Democrats and Independents,
23    and they all support voter ID.
24                   Indiana -- we have an Indiana Supreme
25    Court decision that says it's not a substantial burden
```

1   to have to get a voter ID.  We have 12.7 million

2   registered voters at the last Primary.  We have

3   14 million DPS driver's licenses that are issued.  We

4   have 4 million Texas ID cards that have been issued,

5   and we have another 5.3 million governmental IDs

6   issued.  The voting age population is 17.7 million.

7   You guys can the do the math.  I don't have to add it

8   up for you.

9              I have a brother Sam.  He has cerebral

10  palsy.  I've heard lots of testimony about the

11  handicap and elderly.  I have a mother that's 87 years

12  old.  Both of them have photo IDs.  I asked them how

13  much trouble it was to get them.  They said "Well, all

14  you had to do was go down to the DPS office.  That was

15  the biggest problem."  I asked my brother -- the only

16  thing he can do for himself is breathe and work the TV

17  controller.  And he said it was some trouble getting

18  down to the -- to the DPS office.  However, he said

19  his right to vote and maintaining that right to vote

20  was much more important than any inconvenience that he

21  would have to go through to get his photo ID.

22             I've been an Election Official for 17

23  years.  It is a simple fact that unless you know the

24  person coming in to the polling place personally that

25  you cannot refute who they are.  It's impossible to

1   prove voter impersonation at the polls unless you

2   personally know the person or the ID card.  It just --

3   and that's the reason we don't have any cases.

4              I have confidence in the voting system.

5   I think we need to take an ounce of prevention instead

6   of a pound of cure and pass this Senate Bill 362.

7   Thank you.

8              SEN. DUNCAN:  Thank you, Mr. Wallace.

9   Members, are there any questions of Mr. Wallace?

10             (No response)

11             SEN. DUNCAN:  The Chair hears none.

12   Thank you for your appearance at the Texas Senate.

13             MR. WALLACE:  Thank you.

14             **TESTIMONY BY ANITA PRIVETT**

15             SEN. DUNCAN:  The Chair calls Anita

16   Privett.  Ms. Privett, please state your name and who

17   you present.  Before you begin, we have your written

18   testimony as Exhibit 46.  It will be admitted into the

19   record.

20             (Exhibit No. 46 marked and admitted)

21             SEN. DUNCAN:  Thank you.  You have three

22   minutes.

23             MS. PRIVETT:  I'm Anita Privett.  I

24   represent the League of Women Voters of Texas.  The

25   League of Women Voters of Texas supports full voter

1    participation and opposes efforts that may create

2    barriers blocking this participation.

3                    We have real concerns that Senate

4    Bill 362 creates needless barriers to citizen voter

5    participation and does not address the issue of

6    election fraud.  It's been suggested that with the

7    requirement of a photo ID at the polling place

8    election fraud will be eliminated.

9                    However, researchers have not found

10   widespread fraud that would be caught by photo --

11   photo ID.  If we are to rely on a driver's license for

12   a photo ID, we find that those who do not have a

13   driver's license are more likely to be elderly,

14   disabled, poor, a member of a minority community or

15   have an illness that makes it unsafe to drive.

16                    Also there are many Texas woman who have

17   both a valid voter registration card and a Texas

18   driver's license, but the names do not match because

19   of a recent divorce or marriage.  These woman will be

20   inconvenienced when they attempt to vote, and it is

21   entirely possible that it could keep some of them away

22   from the polls.

23                    Currently the Texas on-line poll workers

24   training can be completed in 60 minutes or less.

25   Section 3E of this training, qualified voters,

791

1    indicates that there are ten possibilities with
2    instructions on how to handle each one.  What would it
3    take to get this training expanded to include the many
4    possibilities to look for while determining whether
5    the photo and accompanying documents meets the photo
6    ID requirements?  The goal must be to provide training
7    so that reasonable people will come to the same
8    conclusion when qualifying voters.
9              Obviously there are costs to Texas in
10   this bill that are not addressed.  Some costs include
11   issuing photo IDs for those who don't have them,
12   writing and providing training and making sure that
13   each citizen knows about these changes.  Only
14   one-third of the counties in Texas have Websites that
15   can get information to their citizens in this
16   country -- in their county.  I'm sorry.
17             Voting is the most fundamental
18   expression of citizenship.  Breaking down barriers to
19   citizen voter participation, from literacy tests to
20   poll taxes, has been a constant battle for those of
21   who believe that all citizens should be able to
22   exercise their right to vote.  We support full voter
23   participation by all eligible Americans, not
24   restrictions.  Thank you for this opportunity to share
25   our views.

```
 1              SEN. DUNCAN:  Thank you, Ms. Privett.
 2    We appreciate your appearance today.  Are there any
 3    questions for Ms. Privett?
 4              (No response)
 5              SEN. DUNCAN:  All right.  The Chair
 6    hears none.
 7         TESTIMONY BY MARY ANN COLLINS
 8              SEN. DUNCAN:  The Chair calls Mary Ann
 9    Collins.  Ms. Collins, you have three minutes.  State
10    your name and who you represent.
11              MS. COLLINS:  I'm Mary Ann Collins.  I
12    represent myself.  I have been an election judge for
13    27 years and a poll watcher at early voting and the
14    ballot board off and on for years.
15              In '06 I was a poll watcher at a
16    location in Dallas and just standing there watching,
17    and all of a sudden here comes this lady with purple
18    hair.  Needless to say that got my attention, just
19    went on.  That afternoon I look around and here comes
20    the purple hair again.  I thought "No, that can't be
21    because she's already been through the qualifying
22    table," and that's what I naively thought.  It dawned
23    on me later she was voting on somebody else's
24    certificate.
25              So several days after the whole election
```

1   was over, a clerk at that polling place who was there
2   the day that I was called me about a completely
3   unrelated matter, and I said to her "I think there was
4   a lady there who voted twice."  She said, "Oh, yes, I
5   know exactly who you mean.  I asked her if she hadn't
6   been here before, and she said no."
7              Now, I will say that after -- I figured
8   out what happened on the day I saw all this.  I did
9   call the District Attorney's Office.  Of course, it's
10  what we've already said today, it's very hard to
11  prosecute these things because I had no information.
12  I didn't know the lady's name.  It didn't dawn on me
13  until too late about what happened.
14             But my point about all of this is
15  anybody that has got more than one voter registration
16  card, no matter where they got it, could make the
17  rounds of at least six early voting locations in one
18  day in Dallas.  So that is where we have a huge
19  problem.
20             Just one other little sideline that I
21  would like to mention is that I was a poll watcher for
22  the ballot board in Dallas County.  This ballot board
23  is chaired by a Democrat.  And in order to be a poll
24  watcher on that board, I had to submit a voter
25  registration card and a picture ID.  Thank you.

```
 1              SEN. DUNCAN:  Thank you, Ms. Collins.
 2    Are there any questions of the witness?
 3              (No response)
 4              SEN. DUNCAN:  All right.  The Chair
 5    hears none.  We appreciate your testimony today.
 6              TESTIMONY BY ROSA ROSALES
 7              SEN. DUNCAN:  The Chair calls Rosa
 8    Rosales of Washington, D.C., the League of United
 9    Latin American Citizens.  Would you please -- before
10    you begin, you have written testimony.  That will be
11    admitted as Exhibit 47.
12              (Exhibit No. 47 marked and admitted)
13              MS. ROSALES:  Thank you.
14              SEN. DUNCAN:  Hold on just a second.
15              MS. ROSALES:  And I'm from San Antonio,
16    Texas.  The main office is in Washington, D.C.
17              SEN. DUNCAN:  And if you could just for
18    the record, state your name and --
19              MS. ROSALES:  My name is Rosa Rosales.
20    I'm the National President of the League of United
21    Latin American Citizens.  On behalf of the League of
22    United Latin American Citizens, I thank the Texas
23    State Committee of the Whole for providing me this
24    opportunity to discuss our concerns in opposition to
25    the Texas Senate Bill 362.
```

1           We firmly believe that this legislation
2     will disenfranchise thousands of Texas voters, many of
3     them minority and elderly, disabled and women.  We
4     also believe that this legislation will have little
5     impact in reducing the alleged in-person voting fraud
6     which the bill is supposed to be designed to prevent.
7     As made clear by your two-year one point million
8     investigation by the Attorney General Greg Abbott,
9     in-person voting fraud is virtually nonexistent in
10    Texas under existing voter regulation.
11          My organization advances the economic
12    condition, educational attainment, political
13    influence, health and civil rights of Hispanic
14    Americans to community-based programs operating in
15    more than 700 LULAC councils nationwide, including
16    over 200 here in Texas.  Among many other activities,
17    LULAC has sought to help Latinos become citizens and
18    registered to vote.  Since our founding in 1929 -- we
19    are 80 years old this year we celebrate -- we have
20    also had to bring the State of Texas to court
21    repeatedly for violating voting rights of Latino
22    citizens within the state.  In the vast majority of
23    the states, these cases we have prevailed, costing the
24    state millions of dollars in legal fees that could
25    have been spent on education and other beneficial

```
 1   programs.
 2                Let me state for the record that if the
 3   Texas Legislature passes and the Governor signs
 4   legislation that is similar in nature to how -- Senate
 5   Bill 362, LULAC will take the State of Texas to court
 6   yet again.  We will prevail, and it will cost the
 7   state several million more dollars in legal fees at a
 8   time when Texas taxpayers can least afford it.
 9                The Texas Election Code already requires
10   the voters -- well, if my time is up, let me just say
11   that we really feel that this Senate Bill 362 does
12   discriminate against minorities, particularly Latinos
13   and blacks and women, disabled, and we strongly urge
14   to reconsider.
15                One of the things -- and they said it
16   before and I'll say it again -- we've come a long ways
17   from the times they used to say that --
18                SEN. DUNCAN:  Ms. Rosales --
19                MS. ROSALES:  -- no dogs, no Mexicans
20   and no blacks allowed in restaurants, drinking
21   fountains and swimming pools.  And we just feel this
22   is another barrier that we do not need.  Thank you so
23   much.
24                SEN. DUNCAN:  Members, are there any
25   questions of the witness?
```

1                    (No response)

2                    SEN. DUNCAN:  Okay.  The Chair hears

3      none.

4                    SEN. URESTI:  Mr. Chairman?

5                    **QUESTIONS FROM SENATE FLOOR**

6                    SEN. DUNCAN:  Oh, I'm sorry.  We do --

7      Ms. Rosales, we do have a question.

8                    Senator Uresti, you're recognized.

9                    SEN. URESTI:  Thank you, Mr. Chairman.

10                   Thank you, Ms. Rosales.  I want to thank

11     you for spending the evening with us, and I also want

12     to thank all of the guests that are here that are

13     either for or against this bill for staying with us

14     and watching the process.  And I say that because all

15     of us appreciate this process.  And so again, for

16     those that spent the evening with us and that are in

17     the gallery, thank you very much.

18                   Ms. Rosales, I know time is short.  I

19     just want to ask a few questions, if I may, to follow

20     up on some of the comments you made earlier.  In

21     particular on Page 3 of your brilliant testimony, you

22     mention that as many as 11 percent of the United

23     States citizens, more than 30 million individuals do

24     not have a government-issued photo identification.

25     And you also mention that 18 percent of seniors,

1  25 percent of African-Americans and 16 percent of

2  Latinos lack a current government-issued photo ID.  If

3  you could, could you just expand on that a little bit

4  and why LULAC is taking the position that they are

5  with regard to opposing this bill?

6           MS. ROSALES:  One of the reasons that

7  LULAC is opposing this bill is the fact that we want

8  everyone to have that opportunity to vote.  And

9  studies have shown, that our attorneys have looked

10 over, where those figures -- those statistics that you

11 just mentioned aren't true.  And if you don't have any

12 kind of an ID, whether it's a driver's license or

13 other identification, you will have problems.

14           As it is right now, when a lot of

15 Latinos go to vote and even if they have the voter

16 registration, sometimes there's problems with that,

17 and they've been asked "Do you have still live at this

18 address?"  The question -- there is some kind of

19 intimidation there, but we strongly feel that it is

20 important that every voter votes, and it's important

21 not to have barriers, you know.  We feel that this is

22 just another barrier.  Somebody has said it before,

23 it's like bringing back the poll tax.  You know, a lot

24 of our elderly don't have that money to go get and pay

25 for that ID.

799

```
 1              And also, you know, we talk about this
 2    epidemic of voter fraud, and that's one of the reasons
 3    for this bill when I've been hearing testimony that it
 4    was 192 cases that they found some kind of fraud, and
 5    out of the 192 cases only 30 cases were convicted or
 6    something like that.  To me when millions of Texans
 7    have voted, that is not an epidemic.
 8              SEN. URESTI:  Very well.  Thank you,
 9    Ms. Rosales.
10              SEN. DUNCAN:  Members, before we go to
11    the next witness, let me call out another round of
12    cards.  And if you'll report to the registration
13    desk then you'll be admitted to the chamber:
14    Lydia Camarillo; Edward B. Williams, Kilgore;
15    Madeline Dewar of San Antonio; Helen Villarreal
16    of San Antonio; Roxann Lewis, Galveston County;
17    Mark Williamson of Katy; Vanessa Edwards Foster of
18    Houston; Luis Figuero of San Antonio; Patti Edelman
19    of Austin; Kenneth Koym of Austin; and Joni Ashbrook
20    of Bastrop; and finally Karen Renick of Austin.  Will
21    you please report to the registration desk?
22              Again, I'm going to make one last call
23    for any persons who would wish to testify.  If you're
24    here and you want to testify, please report to the
25    registration desk.
```

800

**TESTIMONY BY DUSTIN RYNDERS**

SEN. DUNCAN:  The next -- okay.  The
next witness is Dustin Rynders of Austin.  Please
state your name, who you represent.  Before you begin,
Mr. Rynders has an exhibit, which is his testimony.
It will be admitted as Exhibit 48.

(Exhibit No. 48 marked and admitted)

SEN. DUNCAN:  You have three minutes.
State your name and who you represent.

MR. RYNDERS:  Yes, my name is
Dustin Rynders, and I'm an attorney with Advocacy,
Incorporated, which is the protection and advocacy
system for the State of Texas.  We protect the legal
rights of people within disabilities within the state
I'm here today testifying not only on behalf of
Advocacy, Incorporated, but also on behalf of the
Disability Policy Consortium, which is a consortium of
over 24 disability rights organizations in the State
of Texas.

AI is charged with ensuring individuals
with disabilities full participation in the electoral
process as a part of the Help America Vote Act.  Both
AI and the Disability Policy Consortium oppose Senate
Bill 362 which burdens Texas voters in our sense
because of unnecessary and erroneous voter ID

KENNEDY REPORTING SERVICE, INC.
512.474.2233
TX_00004689
JA_004112

TX_00004689

1    restrictions and requirements, risks disenfranchising

2    hundreds of thousands of voters with disabilities and

3    waste resources that could be redirected at other

4    problems facing the state.

5              We've heard a lot today about differing

6    opinions on what the evidence is of fraud, and my

7    guess is that most of you have made your

8    determinations of what you think that evidence is.  I

9    will tell you that in running a voter hotline across

10   the State of Texas, the majority of calls and

11   complaints we receive and the complaints that we've

12   reviewed from the Secretary of State's Office showed

13   that the real problems in elections in Texas still

14   involve poor handling of voter registration, lack of

15   access to absentee ballot applications, voter

16   intimidations, inaccessible polling places, poorly

17   trained poll workers and violations of the right to

18   assistance for people with disabilities.

19             Texas should address these problems

20   instead of looking at adding barriers to the ballot

21   box, in our view.  Texas already has strong criminal

22   laws to deal with any fraud that does occur, and at

23   least 8 percent or 1,270,000 voting age Texans do not

24   have the most common two forms of a photo

25   identification.

```
 1              Texans with disabilities are among the
 2   least likely to have a form of state-issued photo ID
 3   because many do not drive.  We need photo ID for
 4   banking or other activities, which others often assist
 5   them with.  While Senate Bill 362 allows those with
 6   photo -- without photo identification to present two
 7   current nonpreferred forms of ID, such as a utility
 8   bill or other piece of government mail, this provision
 9   does little to expand access in practical terms.
10   After all, many people with disabilities are less
11   likely to have the numerous forms of nonpreferred
12   identification.
13              For example, many people with
14   disabilities live with relatives in group homes and
15   nursing homes, don't have utility bills.  Even for
16   those who do have two of these documents, many have
17   voted for many years without knowledge of these
18   changing laws.  We've heard a lot today about what has
19   been done and what hasn't been done in this bill as
20   far as voter education.
21              In our experience, training voters with
22   disabilities across the state, written notice is not
23   going to be sufficient.  You're going to need the kind
24   of in-person training that Dennis Borel spoke about
25   earlier, and I would trust that you would consider
```

```
1    that.
2                    Also consider the expense.  HAVA Funds
3    were used to train voters with disabilities in this
4    state at a cost of $3.5 to $3.6 million each year,
5    more than the Secretary of State has said they
6    currently have left in HAVA Funds.
7                    SEN. DUNCAN:  Thank you, Mr. Rynders.
8    We appreciate your testimony.  Is there anyone in
9    the -- any member that would like to ask a question?
10                   (No response)
11                   SEN. DUNCAN:  The Chair hears none.
12   Thank you for your testimony today.
13                   One of the cards that I think got stuck
14   to another card awhile ago, and this is when we were
15   calling persons down to the front registration desk, I
16   would like to add to the names that we previously
17   called, Sylvia A. Mendoza.  Ms. Mendoza, please arrive
18   at the Senate -- at the Senate chamber and the front
19   registration desk, and you'll be admitted to the
20   chamber.
21                 TESTIMONY BY MARSHA CORREIRA
22                   SEN. DUNCAN:  The next witness is
23   Marsha Correira.  And please forgive me for my tongue
24   not working right then.  Please state your name and
25   who you represent.  Before you begin, though, let me
```

1    introduce your written testimony.  Ms. Correira has

2    written testimony, which will be Exhibit 49.  It will

3    be in the record.

4                    (Exhibit No. 49 marked and admitted)

5                    SEN. DUNCAN:  Okay.  Go ahead.  You can

6    begin.

7                    MS. CORREIRA:  My name is Marsha

8    Correira.  I'm from Bastrop County.  Greetings to

9    Senator Hegar.

10                    I want to tell you about Mrs. Amanda

11   Jones.  Mrs. Amanda Jones of Bastrop County never

12   drove a car, never had a driver's license nor a

13   passport.  Mrs. Jones was one of the fortunate ones.

14   She had a large loving family network who took care of

15   her -- who took her to DPS and got her photo

16   identification card.  If Mrs. Jones had been without

17   family to help her out and this bill had been in

18   effect last year, she couldn't have cast her last

19   ballot.  It was cast by mail, and she died at

20   (crying).  I'm sorry.

21                    There are senior citizens all over Texas

22   just like her, and I'm going to be one if I'm not one

23   already.  I'm sorry.  It's been a long day and a long

24   night.

25                    First of all, I want to say if there's a

1    criminal out there that's smart enough to get their

2    hands on my voter ID, don't you think -- my voter

3    ID -- my voter certificate, don't you think they'd be

4    clever enough to take my bank statement out of my

5    mailbox or maybe my utility bill?  If it's not photo

6    ID, it's not photo ID.

7              And the purchase of a State of Texas

8    provided ID card and the purchase of the supporting

9    documents to obtain that ID amounts to a fee to vote,

10   a poll tax.  The 24th amendment to the U.S.

11   Constitution in 1964 overturned the poll tax.  The

12   burden and expense of acquiring these documents would

13   be onerous for some voters, especially for the poor,

14   minority, the very young and senior citizens.

15             The poll tax was prohibited, but some

16   states continued to assess it.  And there was a court

17   case before the Supreme Court, and they said that once

18   the franchise is granted to the electorate, lines

19   which determine who may vote may not be drawn so as to

20   cause invidious discrimination.  This would be

21   invidious discrimination.

22             The interest of the state, the Court

23   said, when it comes to voting registrations is limited

24   to the fixing of standards related to the applicant's

25   qualifications as a voter.  In an earlier case, they

806

```
 1    said undoubtedly the right of suffrage is a

 2    fundamental matter in a free and Democratic society,

 3    especially since the right to exercise the franchise

 4    in a free and unimpaired manner --

 5              SEN. DUNCAN:  Ms. Correira, your time

 6    limit is up.  I think you have written testimony for

 7    us, and I know you didn't get through it, but you need

 8    to go this way.

 9                QUESTIONS FROM SENATE FLOOR

10              SEN. SHAPLEIGH:  Chair, I'd like to ask

11    her a question.

12              SEN. DUNCAN:  Sen. Shapleigh?

13              SEN. SHAPLEIGH:  She's been here all

14    night.

15              MS. CORREIRA:  Thank you --

16              SEN. DUNCAN:  Sure.

17              SEN. SHAPLEIGH:  -- and you had to take

18    a little time.  Could we finish her statement?

19              SEN. DUNCAN:  Sure.  Sen. Shapleigh is

20    recognized to request an extension of the time for the

21    witness.

22              MS. CORREIRA:  Thank you.  They said

23    undoubtedly the right of suffrage is a fundamental

24    matter in a free and Democratic society, especially

25    since the right to exercise the franchise (crying) I'm
```

1   sorry; I'm sorry -- especially since the right to

2   exercise the franchise in a free and unimpaired manner

3   is preservative of our basic civil and political

4   rights.  Any alleged infringement of the right of

5   citizens to vote must be carefully and meticulously

6   scrutinized.  The Court said, to repeat, "Wealth or

7   fee paying has, in our view, no relation to voting

8   qualifications.  The right to vote is too fundamental

9   to be so burdened or so conditioned."

10          It is obvious that SB 362 is an illegal

11  attempt at voter suppression and infringement of the

12  right to vote, and it's unconstitutional.  Please vote

13  against this unconstitutional bill.  And I'm really

14  sorry.  I've been here since yesterday at 8:30, and

15  I'm just exhausted.

16          SEN. DUNCAN:  Thank you for your

17  testimony in front of the Texas Senate.  We appreciate

18  your waiting with us.  If we could get her some

19  assistance, please?

20                  **TESTIMONY BY RENE LARA**

21          SEN. DUNCAN:  The Chair calls Rene Lara.

22  Please state your name and who you represent.  I

23  believe you have written testimony.

24          MR. LARA:  (Inaudible)

25          SEN. DUNCAN:  Okay.  That will be fine.

```
 1   Thank you.  You have three minutes.  Thank you.
 2              MR. LARA:  Mr. President, Members, this
 3   has been a long 24 hours since we registered to
 4   testify.  It's been a long hearing, and it's been
 5   emotional.  My name is Rene Lara.  I'm with the Texas
 6   AFL/CIO here representing over 200,000 members in our
 7   state, including refinery workers, teachers, plumbers,
 8   nurses, theatrical workers, correctional officers,
 9   firefighters, as a way to describe my purpose here
10   today, not to certainly think that this is, you know,
11   testimony that is more valuable than some of the very
12   emotional testimony we've heard already.
13              Our organization, through the United
14   Labor Legislative Committee, has taken a position
15   opposing Senate Bill 362 for some of the same reasons
16   that you heard yesterday and today, and I'm not going
17   into -- into those issues.  In short, for many people
18   we think that this bill makes it more difficult, not
19   easier to vote, and that's the wrong direction to take
20   our democracy, we believe.
21              There is another issue that we'd like to
22   bring up and concern about the bill.  It does require
23   an official ID in order for a person to vote, and
24   among the various forms of identification authorized
25   for voting, the most commonly used and recognized
```

```
 1    would be the driver's license or personal ID card

 2    issued by the Department of Public Safety.  This

 3    legislation strongly encourages those without an ID to

 4    eventually obtain a state ID if they want to vote, and

 5    that, Members of the Legislature, we think would -- in

 6    doing so would be taking a big step towards

 7    establishing a state ID, and a state ID system is one

 8    computer connection away from a national ID system.

 9                    Members, the National AFL/CIO and the

10    Republican Party of Texas have a policy/position in

11    common.  They both oppose a national ID program and

12    the REAL ID Act.  And as you may know, the federal

13    government expects Texas to comply about the REAL ID

14    Act, which envisions that all states be linked through

15    a national database by requiring an official state ID

16    as the most commonly recognized document for voting.

17    We are, in effect, we believe, moving one big step

18    closer towards that national ID system, and that

19    greatly concerns us.

20                    That is my testimony, and I am open to

21    any friendly questions.

22                    SEN. DUNCAN:  Thank you, Mr. Lara.  Are

23    there any questions of the witness?

24                    (No response)

25                    SEN. DUNCAN:  All right.  The Chair
```

1    hears none.  Thank you for your appearance today.

2                    **TESTIMONY BY LEE MEDLEY**

3                    SEN. DUNCAN:  The Chair calls Lee

4    Medley.  Mr. Medley, please state who you represent --

5    your name, who you represent, and you have a

6    three-minute limit.

7                    MR. MEDLEY:  My name is Lee Medley.  I'm

8    with the United Steelworkers.  I represent the

9    Steelworkers District Council.  I'm a good tax-paying

10   Texan of which I just paid some taxes.  Nobody asked

11   me for two forms of identification, and of course they

12   didn't ask me for two forms when I paid my tags or my

13   hunting license or anything like that.

14                    That's not why I'm here, though, this

15   morning.  Now, I work in a plant.  I work on the

16   Houston Ship Channel, and I'll be back in that plant

17   probably this weekend.  And when the guys and the

18   women I work with ask me "Well, what are they doing in

19   Austin?"  I'm going to say "Well, they're working on

20   some mythical twin brother voting conspiracy while our

21   brothers and sisters in Lone Star, Texas are getting

22   laid off; while Rockdale, Texas, the Alcoa plant is

23   being shut down; while Dow Chemical is laying people

24   off left and right in Freeport," and the best thing we

25   can figure out to work on is some mythical voter fraud

1   that still -- I mean, I think I've heard 23 people at
2   the most.
3                   750 people got laid off in Lone Star,
4   Texas two weeks ago.  Those are tax-paying citizens.
5   Those are good benefit-bearing jobs.  They don't --
6   excuse me -- they don't care about this.  What they're
7   concerned about is putting food on the table for their
8   families.  That's what you-all are elected to do, is
9   represent those people, not political parties, not
10   playing these games, it's to represent working
11   families in the State of Texas.  That's why you're
12   here.  That's what I want to go back and tell my
13   brothers and sisters at my plant, that they're working
14   hard for you and your family, but right now I don't
15   think I could say that.
16                   And that's my testimony.  I will tell
17   you right now Rome burns, the Senate is fiddling.
18   Thank you.
19                   SEN. DUNCAN:  Thank you, Mr. Medley, for
20   your testimony.  Are there any questions?
21                   (No response)
22                   SEN. DUNCAN:  All right.  The Chair
23   hears none.
24                   **TESTIMONY BY JOHN WATKINS**
25                   SEN. DUNCAN:  The Chair calls John

```
 1    Watkins.  Mr. Watkins?
 2                  MR. WATKINS:  Hello.  My name is
 3    John Watkins.  I'm from Wells Point, Texas.  I
 4    appreciate the opportunity, Mr. President and
 5    Senators, to speak before you.
 6                  On this bill that's before us, the
 7    Senate 362, I have worked -- my background is I have
 8    worked as an alternate judge, as a clerk and a Spanish
 9    language translator.  I see very little difference
10    between present practice and what we're doing and what
11    is offered in this bill as far as a photo ID.  This
12    bill does not require a photo ID.  It makes it a first
13    choice.
14                  The big difference I see in this bill
15    and present practice is in the certificate.  When
16    someone comes to us presently using no certificate, we
17    look them up on the rolls.  We check a block on the
18    sheet stating that they did not have or did not
19    present a certificate so that they'll get mailed a new
20    one presumably.  And then after verifying with some ID
21    that was approved already by the state, and there's
22    various ones, then we verify them, and we get them to
23    vote.
24                  And this bill, by requiring -- from the
25    way I read the bill, it requires them to have in their
```

```
 1    hand that certificate.  And I believe Ms. Huffman --
 2    or no -- well, it was Sen. Fraser and another Senator
 3    from this side, which I couldn't see from where I was
 4    at in the balcony, and they had an exchange about a
 5    2fer or a 3fer, and that is pertinent because that's
 6    the key issue here.
 7                  Probably 30 percent of the people that I
 8    meet when I'm working in the poll do not have their
 9    certificates with them, and it's not just minorities,
10    it's everybody.  So that's one reason that I'm --
11    unfortunately I'd like to say yes, vote for this bill,
12    but personally I cannot do that because of that
13    particular issue.  And hopefully those two Senators
14    will work that out because we do need some sort of
15    control in the polls to avoid it, to avoid fraud.
16    Thank you.
17                  SEN. DUNCAN:  Thank you, Mr. Watkins.
18    Are there any questions of the witness?
19                  (No response)
20                  SEN. DUNCAN:  The Chair hears none.
21    Thank you for your appearance today in the Texas
22    Senate.
23                  TESTIMONY BY KENNETH FLIPPIN
24                  SEN. DUNCAN:  The Chair calls Kenneth
25    Flippin.  Mr. Flippin, state your name and who you
```

1    represent, and you have three minutes, please.

2              MR. FLIPPIN:  Thank you.  My name is

3    Ken Flippin.  I represent myself.  I'm from all over

4    Texas.  I'm a native Texan, but I've lived in at least

5    seven of your districts throughout my life.  I'm a

6    community organizer, and I've worked in politics since

7    I was about 16 years old.  So I know you-all have been

8    hearing a lot of different arguments over the last

9    day.

10             And so I guess I'm going to make more of

11   a political appeal and say, you know, as we think

12   about the campaign process, the political process,

13   this process, it's all really the same, it's a

14   Democratic process.  It's our effort to make our union

15   a little bit more perfect.  And I believe that

16   Senators on both sides really do want to make our

17   union more perfect.

18             And the question really isn't whether or

19   not we're trying to find just the right balance.  The

20   question is is this something that's going to make our

21   union more perfect, or is it going to be something

22   that's going to disenfranchise more voters than we end

23   up getting out of the system that shouldn't be there?

24             I think that most of us that have worked

25   in campaigns know that it takes a lot of work to get

```
 1   people that are eligible citizens to get registered,
 2   to get involved, to get educated, to get to the polls,
 3   and it's even more effort to get somebody obviously
 4   who is not a citizen or somebody that wants to vote to
 5   get them to vote twice.  In fact it's a ludicrous
 6   thing that a campaign would try to do, and I'm sure
 7   none of you have tried to do that.  And why would you?
 8   And that's why it's so rare because it's not the
 9   objective of a campaign.  The objective is to get
10   people out to vote because you're the best person for
11   the job.
12            And I dare say that as good a campaign
13   manager I might be or as great a politician that some
14   of you may be that have run and will run again, the
15   fact is no matter how great you are, you're probably
16   not going to persuade too many people to break the law
17   and vote for you twice or to vote for you when it's
18   not legal.
19            And the reality is we can as a state
20   vote to maintain the integrity of the ballot by doing
21   other things that can solve the problems that you're
22   concerned about, but more importantly we can keep from
23   disenfranchising voters.
24            I think what you're fearing by proposing
25   this bill is really a problem that barely exists, if
```

```
 1   at all, but the problem that you're going to create is
 2   bigger than the problem you see existing.  One thing I
 3   know is that if you want to get people organized and
 4   excited, disenfranchise them.  Whether it's the
 5   private school kids that their IDs don't count or it's
 6   that elderly lady that maybe she does have the
 7   documents at home, but she forgets them and when she
 8   gets to the poll there's not enough time for her son
 9   who brought her to get her back.  Those are the folks
10   you'll get organized.
11              SEN. DUNCAN:  Thank you, Mr. Flippin.
12   Are there any questions for Mr. Flippin?
13              (No response)
14              SEN. DUNCAN:  We appreciate your
15   testimony today.
16            TESTIMONY BY ANNIE BANKS
17              SEN. DUNCAN:  The Chair calls Annie
18   Banks.  Ms. Banks, you have three minutes, please.
19   And would you please state your name and who you
20   represent?
21              MS. BANKS:  My name is Annie Banks, and
22   I represent the Texas Alliance for Retired Americas.
23   I am the President of the Texas Alliance for Retired
24   Americas, and I'm here to say that we are voting
25   against this.  We have 86,000 members thus far.  We do
```

1    educate our members.  Every Friday they have a Friday

2    alert, and we do send out by snail mail any

3    information that they want to know about.

4            And our seniors are really having a hard

5    time.  Their hurdles are many, and their hurdles

6    entail their healthcare, their prescription drugs and

7    all of these things, and you've just give us another

8    piece of paper or something else to deal with.  But

9    when you get over 65, you'll understand a whole lot of

10   things by then, but I just want to say thank you for

11   allowing me to say that we are here.  And if we can

12   help, let us know.  Thank you.

13           SEN. DUNCAN:  Thank you, Ms. Banks.  Are

14   there any questions for Ms. Banks?

15           (No response)

16           SEN. DUNCAN:  The Chair hears none, and

17   we appreciate your appearance today.

18           **TESTIMONY BY RACHEL HERNANDEZ**

19           SEN. DUNCAN:  The Chair calls Rachel

20   Hernandez.  Ms. Hernandez, state your name, please,

21   and who you represent.  Before you do that, though,

22   you have an exhibit.  You have your written testimony,

23   which will be admitted into the record as Exhibit 50.

24   Okay.  You can begin.

25           (Exhibit No. 50 marked and admitted)

1           MS. HERNANDEZ:  Thank you.  Thank you

2    very much for allowing me to speak today.  My name is

3    Rachel Hernandez, and I'm a service coordinator with

4    Granada Homes in San Antonio, Texas.  Granada Homes is

5    an apartment complex for senior citizens ages 62 and

6    older.  It's an independent living facility.  We don't

7    have any nursing facilities at our location.  We're

8    located in downtown San Antonio, and because of the

9    parking situation, 99 percent of our residents have no

10   vehicles or use public transportation to get around or

11   their families.

12           My job as a service coordinator is to

13   help our residents and any issues that would normally

14   be taken care of by their children or by another loved

15   one, and that would be anything from reading their

16   mail to checking their bank statements to making sure

17   that their needs are met, whether by a provider or

18   other services.

19           One of the things that I've experienced

20   as a service coordinator with senior citizens is that

21   obtaining documents that are necessary for what we

22   would consider daily needs become much more difficult.

23   They have more difficulty getting to their locations

24   or taking the bus, and something like this bill would

25   not be a positive direction on their behalf.  They're

```
 1   very proud people.  They vote.  In fact we make sure
 2   that we take them to vote, and it's something they
 3   look forward to.  Adding another obstacle to getting
 4   them in a vehicle to getting them to a polling place
 5   and then requiring something additional that they may
 6   have forgotten only gives them a deterrent to wanting
 7   to do it again.  Whether they present identification
 8   or not, this Bill S-362 would have an adverse impact
 9   on the senior community.
10            And in closing, I believe that no
11   legislation should be allowed or supported if the end
12   result is a stifling of the voice of any American and
13   their constitutional right to vote.  Thank you.
14            SEN. DUNCAN:  Members, are there any
15   questions of Ms. Hernandez?
16            (No response)
17            SEN. DUNCAN:  The Chair hears none.
18   Thank you for your appearance today.
19        TESTIMONY BY RENATO DE LOS SANTOS
20            SEN. DUNCAN:  The Chair calls Renato de
21   los Santos.
22            MR. DE LOS SANTOS:  Good morning,
23   Mr. President and Honorable Members of the Senate.  I
24   live in the 23rd Senatorial District and have the
25   privilege of serving as the Director of the LULAC
```

1  National Education Service Center, an educational
2  nonprofit agency based in the Oak Cliff section of
3  Dallas.
4          As director of the LULAC, I have the
5  privilege of working on a daily basis with some of the
6  neediest families in the D/FW Metroplex, families who
7  are daily forced to make choices between buying food
8  for their families or gas for their vehicles or
9  perhaps paying for a traffic fine or replacing a lost
10 or stolen ID or driver's license.
11         Given the new regulations that are being
12 enforced in Dallas and I believe the rest of the state
13 that deny a renewal of an ID or a driver's license for
14 those who have outstanding traffic fines or tickets, I
15 believe that we are setting a dangerous precedent by
16 potentially disenfranchising people many times who are
17 very fragile voters who need a small incentive like
18 this or a disincentive to discourage them from voting.
19         However, this morning I am here not to
20 talk about these people, but because of my own family
21 and the tragedy that happened a few years ago.  My
22 mother died in 1992 in Corpus Christi after a year and
23 a half of a battle with bone cancer.  As part of that,
24 she found herself in M.D. Anderson Hospital in
25 Houston, Texas.  Shortly before -- immediately before

1    the elections in 1992 she returned to Corpus Christi

2    for Hospice care, and she died December 1st of that

3    year.

4            One of the biggest privileges and one of

5    the few joys that she had was she had lasted until

6    that time to vote in that election.  It was a major

7    point.  I talked to my sister this morning -- or last

8    night rather, and she was telling me she remembered

9    clearly having taken my mother to vote.

10           And what really made it special was

11    that -- unfortunately when we returned from M.D.

12    Anderson, my mother's house had been burglarized.

13    Things had been taken we couldn't believe that they

14    would want, but amongst the things were all of her

15    IDs, the birth certificates, records.  We don't have

16    anything left of what my mother -- the legacy of my

17    mom there, but because she was known to the voter --

18    to the precinct people there, she was allowed to vote,

19    but only because she was known to them personally

20    because she didn't have any ID that could have proven

21    who she was.  And if this law had been in place then,

22    she would have been disenfranchised, and it would have

23    taken a last bit of joy that we celebrated as a family

24    that she got to vote in that election.

25           Please do not disenfranchise people.

```
 1    Please do not vote for -- for this bill.
 2                SEN. DUNCAN:  Thank you for your
 3    testimony.  Is there anyone who would wish to question
 4    Mr. de los Santos?
 5                (No response)
 6                SEN. DUNCAN:  Thank you, Mr. de los
 7    Santos.  We appreciate your appearance here today.
 8                Before we call the next witness, I want
 9    to go ahead and make one last call, and we normally
10    say this in all of our committee meetings.  Are
11    there -- is there anyone else who would wish to
12    testify for, against or on Senate Bill 362?  And the
13    reason I'm making that call right now is we have about
14    13 or 14 more witnesses left, and it will take about
15    30 minutes, and we've given the witnesses 30 minutes
16    to report to the desk.  So if you will -- this is the
17    last call for any additional witnesses to appear
18    before the committee.
19                The next witness -- and this was made at
20    8:10.  So that will be -- 8:40 would be the cutoff
21    deadline for those in the front.
22                The next witness is Judy Holloway.
23    Ms. Holloway, please state your name, who you
24    represent.
25
```

1       **TESTIMONY BY JUDY HOLLOWAY**

2              MS. HOLLOWAY:  My name is Judy Holloway.

3    I live in Lake Travis -- around Lake Travis, and I

4    represent myself.  I was a poll watcher during the

5    last Presidential Election.  On October 13th past the

6    deadline for voter registration, I had an occasion to

7    visit the Travis County Voter Registration Department.

8    As it happened, a reporter was there interviewing a

9    spokeswoman -- I'll settle down in a second -- for the

10   department regarding the number of registered voters

11   in Travis County.  She told the reporter the total

12   number of voters was 531,000.  She also said that

13   there were -- that there were an additional 800

14   applications received in the mail that would not be

15   counted because they were postmarked after the

16   deadline.  They could not be counted because the

17   deadline had passed.

18              On November 4th, I logged on to the

19   Travis County Website and discovered a letter from

20   Nelda Wells Spears that said Travis County had a total

21   of 611,024 registered voters, a record, "It was a

22   record breaking number."  Based on the official number

23   used for the voting age population, the 2000 census

24   data, the registration rate was 98 percent.  I had to

25   pick my mouth -- I had to pick my mouth up off the

1    floor -- kind of like now.  That number, 611,024, was

2    80,000 votes -- voters more than what was supposed to

3    be the final count.

4            I also had the opportunity to talk with

5    several employees at the registration offices.  They

6    told me that 95 percent of the employees during the

7    Presidential Election who were processing the

8    applications were temporary workers.  When asked if

9    all the information on the voters' applications had

10   been verified, the answer was no.  I was told that

11   every applicant signs an affidavit, and that was proof

12   enough to obtain a voter registration card.  How does

13   that prove anything?

14           Just this past week I talked with

15   someone else who was a supervisor with Travis

16   County -- Travis County voter registration.  I asked

17   her if all applications were verified.  She said no.

18   Who were these additional people who voted last fall?

19   I don't know.  Do you?  The truth is we don't know,

20   but what we do know is that we can't have dead people

21   voting in our elections, we can't have noncitizens

22   voting in our elections, we can't have felons voting

23   in our elections.

24           The only way we're going to know who is

25   voting in our elections is to be able to verify that

825

1    the person who is voting is who they say they are.

2    And the best way to do that is to require photo

3    identification.  Please help us to ensure the

4    integrity of our voting process.  This isn't about

5    suppression.  This is about protection.

6                   SEN. DUNCAN:  Thank you, Ms. Holloway.

7    We appreciate your testimony.  Are there any questions

8    for Ms. Holloway?

9                   (No response)

10                  SEN. DUNCAN:  The Chair hears none.  We

11   appreciate you being here in the Texas Senate.

12              **TESTIMONY BY LYDIA CAMARILLO**

13                  SEN. DUNCAN:  The Chair calls Lydia

14   Camarillo.  Ms. Camarillo, please state your name and

15   who you represent, and we have a three-minute limit.

16                  MS. CAMARILLO:  Thank you, Mr. Chairman.

17                  SEN. DUNCAN:  Just a minute.  I'm sorry

18   to interrupt you.  We have an exhibit for

19   Ms. Holloway, and we need to get that in the record.

20   So Ms. Holloway's exhibit is a Travis County Voter

21   Registrar document, Exhibit 51.

22                  (Exhibit No. 51 marked and admitted)

23                  SEN. DUNCAN:  Then Ms. Camarillo has a

24   witness -- or has an exhibit as well, and it will be

25   entered into the record as Exhibit No. 52.

```
1              (Exhibit No. 52 marked and admitted)
2              SEN. DUNCAN:  All right.  Finally here
3    we go.  You can begin, Ms. Camarillo.
4              MS. CAMARILLO:  Thank you, Mr. Chairman.
5    Buenos dias, Senators.  I am Lydia Camarillo,
6    Vice-President of Southwest Voter Registration
7    Education Project, the largest and oldest nonpartisan,
8    nonprofit organization of its kind with a simple
9    mission, to increase the number of Latino and other
10   ethnic communities who are registered to vote and
11   participate in America's democracy as full and equal
12   partners.
13             Founded in San Antonio Texas by the late
14   William C. Velasquez, Southwest Voter has registered
15   over 2.3 million Latino voters throughout Texas, the
16   Southwest and since 2000 the Southeast including
17   Florida.  Southwest Voter has won over 80 voting
18   rights lawsuits and has prepared over 100,000 leaders
19   to organize their communities.
20             In Gonzalez vs. Arizona, MALDEF
21   challenges in federal court the voter registration and
22   identification provisions of Arizona Proposition 200.
23   Southwest Voter is a plaintiff for that case as in the
24   case for the Florida case against a similar issue on
25   the voter ID.
```

```
 1                I am here to advise you of Southwest
 2    Voters' strong opposition to SB 362.  Southwest Voter
 3    opposes this bill because it would have a negative
 4    impact on the Latino voter registration and
 5    potentially violate election laws, including the
 6    Voting Rights Act, the National Voting Right
 7    Registration Act and the Help America Vote Act that
 8    everybody has talked about this last 24 hours, HAVA.
 9    This bill will only serve to depress voter
10    registration of Latinos, other ethnic communities and
11    the poor.  For these reasons, Southwest Voter opposes
12    SB 362 and urges your opposition.
13                Texas Legislators must take affirmative
14    steps to promote the participation of American
15    citizens voting and participating in America's
16    democracy and should, in its wisdom, oppose the
17    legislation that only serves to confuse citizens,
18    contradict federal law, create undue financial burden
19    to the poor, Latinos, African-American citizens who
20    want to register and to vote.
21                And finally, it will create a financial
22    burden to Texas counties and taxpayers.  SB 326 is a
23    bill that creates redundancy and multiple
24    identification requirements for voters.  Southwest
25    Voter believes that Texas law provides for proof of
```

1    identification, and this bill will only create

2    confusion.  It will create more burdensome voting

3    experiences for both the voter and the polling worker.

4            Texas law requires that voter

5    registration applicants must affirmatively mark their

6    U.S. citizenship under penalty of perjury and submit

7    their affidavit application, either in person or by

8    the post card, according to the election code,

9    Section 13.121.

10            In our experience of 35 years, we find

11    that people do not carry their passports or any

12    identification in many cases, or they have lost them,

13    and this may cause disenfranchisement.

14            SEN. DUNCAN:  Thank you, Ms. Camarillo.

15    Your time has expired.  Let me ask if there are any

16    questions of the witness.

17            (No response)

18            SEN. DUNCAN:  All right.  The Chair

19    hears none.  We do have your -- I think your written

20    testimony in the record.  We appreciate your

21    appearance here today.

22            MS. CAMARILLO:  Thank you.

23            **TESTIMONY BY EDWARD B. WILLIAMS**

24            SEN. DUNCAN:  All right.  The Chair

25    recognizes Edward B. Williams.  Mr. Williams, please

```
 1    state your name and who you represent.  You have a
 2    three-minute time limit.
 3                   MR. WILLIAMS:  Thank you, Mr. Chairman.
 4    My name is Edward Williams.  I'm from Kilgore, Texas,
 5    and I represent the interest of Edward Smith deceased.
 6                   To begin with, I would like to thank
 7    those of you Senators who are troopers and stayed with
 8    us, and I appreciate the time that you've put forth
 9    and the respect that you're showing by being here on
10    the Senate floor today.
11                   I also want to make a comment to the Tax
12    Assessor's Office in Harris County.  If more tax
13    assessors and voter registrar's took their jobs as
14    seriously as they do in Harris County, we would not
15    have the voter fraud problems throughout the state
16    that we do.
17                   I'd like to take you back about 14 hours
18    to our first witness.  And I'm from Harrison County,
19    which is -- Marshall is the county seat.  He referred
20    to Harrison County or the Harrison County method as
21    being a notorious term to represent voter fraud that
22    occurs within the State of Texas.
23                   My grandfather, Edward Smith, died
24    in 1935.  My mother was just a child, two or three
25    years old.  In 1989 he received a jury summons.  My
```

1   grandmother was a little bit bewildered that he had

2   received his jury summons, and we called the District

3   Clerk's Office to notify him that he had passed away

4   in 1935.  They informed us that he had been voting

5   regularly in person in the last -- in all of the

6   elections since 1935.  It was not until 1994 that he

7   stopped voting.  And in 1995 we removed the house from

8   the property that he was registered to vote at.  My

9   grandfather died in '35.  He voted for 59 years after

10  his death in person, either on election day or during

11  early voting.

12          I hope that each of you will consider

13  this, the testimony that's come before in regards to

14  identity theft or the use of voter registration cards

15  by the deceased, and I hope that you will vote in

16  support of Senate Bill 362.  Thank you.

17          SEN. DUNCAN:  Members, are there any

18  questions of the witness?

19          (No response)

20          SEN. DUNCAN:  Thank you, Mr. Williams.

21  It's good to see you.

22          **TESTIMONY BY MADELEINE DEWAR**

23          SEN. DUNCAN:  The Chair recognizes

24  Madeleine Dewar.  Ms. Dewar, you have three minutes.

25  Please state your name and who you represent.

831

```
 1              MS. DEWAR:  My name is Madeline Dewar,
 2    and I represent myself.  I'm also a member of Bexar
 3    County Democratic Women and San Antonio Area
 4    Progressive Action Coalition.
 5              I live in a working class barrio in San
 6    Antonio.  Many of my neighbors work two and sometimes
 7    three jobs.  Others are elderly on a very limited
 8    income.  Even if the photo ID were available for free,
 9    the documents required to obtain those IDs are not.
10    If you have to choose between food for your children
11    or medicines for yourself, obtaining birth
12    certificates or other documents would not be a
13    priority.  Taking time off from work from a minimum
14    wage hourly worker's job is often not feasible.
15              Some of you may consider obtaining a
16    driver's license or Texas ID a simple matter.  For the
17    poor and many elderly, it can be a complex, time
18    consuming and relatively costly process.
19              By the way, for a number of reasons, my
20    own 38-year old Caucasian son does not have a driver's
21    license, nor does he have access to any of the
22    alternatives mentioned today except for his birth
23    certificate and his voter registration card.  He would
24    no longer be able to vote.
25              If we had evidence of tens or thousands
```

1    or even hundreds of fraudulent voters that would be

2    resolved by this bill, I would be standing here

3    working very hard to answer -- for an answer to ensure

4    ballot integrity, but it has been clearly shown that

5    there is no voter fraud in Texas that would be

6    eliminated by SB 362 despite the inappropriate use of

7    a portion of taxpayer dollars designated for major

8    crimes that was diverted to investigate and search out

9    alleged voter fraud.

10                This bill clearly is not intended to

11    reduce nonexistent voter fraud.  Sen. Fraser

12    repeatedly referred to an increase in Democratic votes

13    in Indiana and Georgia, but failed to mention that

14    those increases were present across the country and

15    inarguably attributed to Barack Obama and the overall

16    2008 political environment.

17                This bill is a blatant partisan effort

18    to disenfranchise minorities, the elderly and the poor

19    of Texas with a backdoor poll tax.  This bill's

20    political direction -- this bill is -- real intent is

21    to suppress the Democratic votes in order to stem the

22    political direction of the great State of Texas.  I'm

23    here to ask every single Senator present this morning

24    look in your hearts and do the right thing for the

25    many voters of Texas who are less fortunate than

1    themselves.  Thank you.

2              SEN. DUNCAN:  Thank you, Ms. Dewar.  Are

3    there any questions for Ms. Dewar?

4              (No response)

5              SEN. DUNCAN:  The Chair sees or hears

6    none.  Thank you for your appearance today.

7              **TESTIMONY BY HELEN VILLARREAL**

8              SEN. DUNCAN:  The Chair calls Helen

9    Villareal.  Ms. Villarreal, would you state your name

10   and who you represent, and please observe the

11   three-minute time limit?

12             MS. VILLARREAL:  Good morning, Members

13   of the Senate, Citizens of Texas.  My name is Helen

14   Villarreal, and I am here to represent myself.  I'm

15   going to talk quickly about three items.

16             Number one, my mother.  My mother is 85

17   years old.  She's lucky she's healthy.  She's got her

18   voter ID.  She's got her voter certification, but not

19   all senior citizens in Texas are as lucky as she is,

20   and that's the ones I'm worried about.  Some of them

21   don't have sons or daughters that live in the same

22   city or near their parents.  Some live in other

23   states, maybe in other countries.  Some of these

24   elderly citizens live at home alone, and getting extra

25   documents or certification is hard for them

```
 1    financially and also physically.  Say they have to get
 2    the bus an hour and a half to go one way and an hour
 3    and a half to come back.  If you've ever been in San
 4    Antonio via bus, you'll know.  And it's dangerous.
 5    It's plain dangerous for some of them to go somewhere
 6    alone to get this document.
 7               Also, now I want to talk -- and my
 8    mother is not irresponsible.  She's been responsible
 9    all of her life.
10               My husband recently -- about a year ago
11    I went and got his birth certificate because we might
12    travel someday.  There were three errors on it, his
13    last name -- our last name has two "r's."  Sometimes
14    Villarreal is spelled with one "r," and ours is
15    spelled two "r's," and it only had one "r" on the
16    birth certificate.  They messed up his mother's maiden
17    name, and there was one other error.
18               My husband did not vote in the -- the
19    last time he voted was in the 2000 election, and he
20    will not vote gain because he thinks the system is all
21    messed up.  If I should tell him "Well, you know, go
22    vote," and they say "Well, you've only got one 'r'
23    there, oh, it will be counted provisionally," that's
24    going to turn him off.
25               Thirdly, this SB 362 might cause lines.
```

1  There's important elections, and they're just having

2  to check one document.  Can you imagine if they're

3  checking two?  The line is going to back up.  Anyway,

4  that might discourage people, and they might just get

5  out of line and turn away.

6          So that is why I am against Senate

7  Bill 362.  Thank you.

8          SEN. DUNCAN:  Thank you, Ms. Villarreal.

9  Are there any questions for the witness?

10          (No response)

11          SEN. DUNCAN:  Okay.  The Chair hears

12  none.  Thank you for your appearance today.

13          Members, for the record, we -- in

14  response to a call, we have the card for Duane Rawson,

15  and he, I think, is in the back -- in the back haul --

16  or the front haul rather.

17          **TESTIMONY BY MARK WILLIAMSON**

18          SEN. DUNCAN:  The next witness is

19  Helen -- or I'm sorry -- Mark Williamson.

20  Mr. Williamson, please state your name and who you

21  represent, and please observe the three-minute time

22  limit.

23          MR. WILLIAMSON:  I'm Mark Williamson,

24  the founder of Federal Intercessors.  I'm honored to

25  be here and to testify on behalf of the voter ID bill.

```
 1                I'm a minister and approach this perhaps
 2   differently than most.  I feel it is imperative to
 3   pass this legislation as weak as it is and as limited
 4   as it is.  It is time to secure the vote.
 5                The Biblical command to do everything
 6   decently and in order is not just a rule for churches,
 7   it is a life principle, and it is particularly
 8   applicable to civil government and its processes.
 9   Roman's 13 says that "Civil rulers" -- and that
10   includes you senators -- "are the ministers of God to
11   reward good and punish evil."  You are stewards before
12   God with the great weight of responsibility that you
13   will answer for.  Do not take it lightly.  Do not
14   reduce it to cheap political advantage.  God is a God
15   of standards and boundaries from Mt. Sinai to the
16   borders of nations and the boundaries of one man/one
17   woman marriage and even salvation.
18                One standard universally applied, is a
19   photo ID really such an unbearable burden when one
20   can't effectively function in our modern society
21   without it?  This is not even a serious question.
22                The Bible also states that "Whoever
23   resists the ordinance of God will bring judgment on
24   themselves," and that's whether you're a citizen or a
25   ruler.  God hates unjust weights and measures.  That
```

837

1    is the lack of integrity.  That means he is for a

2    single universally applied standard equal for and

3    protective of everyone, not just your constituents.

4    I say again, secure the vote.

5              Mexico is in danger of imploding.  Our

6    borders are porous, and ACORN is increasingly seeking

7    to do their mischief in Texas.  They would see the

8    failure of this bill as a green light, and we all know

9    it.

10             The last line of defense is to secure

11   the vote.  If we can send men and woman to fight and

12   die in Iraq to secure their vote, I don't think a

13   photo ID is too much to ask to secure ours.

14             If I for whatever reason were unable to

15   produce my driver's license at the polling booth, I

16   would gladly sacrifice my vote to be confident that

17   the electoral process was sound and secure, no matter

18   the outcome.  One vote per one legal citizen.

19             I say again, secure the vote, for my

20   right to vote means not much if there's no integrity

21   in the system.  Thank you very much.  God bless you

22   all, and God bless Texas.

23             SEN. DUNCAN:  Thank you, Mr. Williamson.

24   Are there any questions for Mr. Williamson?  You need

25   to go to the right.

1          (No response)

2          SEN. DUNCAN:  The Chair hears no

3    questions of -- thank you for your appearance today.

4          **TESTIMONY BY VANESSA FOSTER**

5          SEN. DUNCAN:  The next witness is

6    Vanessa Edwards Foster.  Ms. Foster, please approach

7    and state your name and who you represent, and please

8    observe the three-minute time limit.

9          MS. FOSTER:  Thank you, Mr. President.

10   My name is Vanessa Edwards Foster, and I am

11   representing the Texas Gender Advocacy and Information

12   Network.  And typically I don't do this, but I am a

13   transsexual.  I understand a couple of you have

14   mentioned the sex change issue and had a little bit of

15   fun with it a couple of times.

16          I want to tell you about my personal

17   story with regards to this.  In 1996 I found out

18   exactly what it's like not to be able to vote.  I went

19   to vote for the Presidential Election, and at that

20   point in time, I did not have my name and gender

21   change to my current presentation.  I had my male

22   voter certificate and my male driver's license.  I

23   went in and I presented my certificate.  The lady took

24   one look at that, took a look at the name, took a look

25   at me and said "Do you have some identification or

1    something?"

2              I showed her my identity, and I

3    explained to her exactly what the situation was.  And

4    she took a look at that and took a look at me and said

5    "No, this does not look like you."  This is my

6    identity, and yet even though I'm presenting my legal

7    identity, I did not have the right to vote.

8              Now, I was a little bit timid at that

9    time, and I went ahead and walked away.  There were

10   people in back of me, so I didn't want to draw a

11   scene.  I'm not so timid any more.

12             And one of the things that I do know is

13   that we've been trying here in the State of Texas to

14   get uniformity and some kind of clarity with regards

15   to name and gender changes the way they have in other

16   states where you basically present a letter to the DPS

17   and you get the name and gender change on your ID.

18   We've been trying for this well over a decade.  As

19   Sen. Shapiro mentioned, identity matters.  And, yes,

20   it does matter, it's mattered to us for quite a number

21   of years.  In fact, she said "We're just trying to

22   make sure that everyone's ID matches who they are."

23             Well, that's exactly what we wanted, and

24   we have been trying for that for over a decade and

25   have not an been able to achieve that yet, and we

1   still have that bill pending right now as we speak.

2   I don't know that it will pass, and I certainly don't

3   know that it will pass before this passes.  But the

4   one thing that I can guarantee you, I've got two

5   friends of mine in Houston right now, they have

6   transitioned, they are living as female, but their

7   presentation does not match their ID per court decree.

8   Both of them right now are going through divorces, and

9   per their Judge's decree, they must remain in their

10  current gender and their current name until their

11  divorce is final.

12              Now, if this means that they have no

13  opportunity to vote, I have let them know that they

14  are being disenfranchised and prepare to file a

15  federal lawsuit.  And indeed, Senator Fraser, you will

16  be popular.

17              SEN. DUNCAN:  Thank you, Ms. Foster.

18  Members -- you need to go to the right.

19              Are there any questions for the witness?

20              (No response)

21              SEN. DUNCAN:  The Chair hears none.

22  Thank you for your appearance.

23              **TESTIMONY BY LUIS FIGUERO**

24              SEN. DUNCAN:  The Chair calls Luis

25  Figuero.  Mr. Figuero has written testimony that he

```
 1    would like to enter into the record as Exhibit 53.
 2                    (Exhibit No. 53 marked and admitted)
 3                    SEN. DUNCAN:  Mr. Figuero, go ahead and
 4    state your name, who you represent, and please observe
 5    the three-minute time limit.
 6                    MR. FIGUERO:  Thank you, Chairman
 7    Duncan, Members of the Senate.  I am Luis Figuero, a
 8    Legislative Staff Attorney for the Mexican-American
 9    Legal Defense and Educational Defense Fund, a
10    nonpartisan legal voting rights -- legal organization
11    founded in Texas in 1968 to protect and defend Latino
12    civil rights, including voting rights.
13                    We recognize the Senate today as trying
14    to find that balance between security and access.  It
15    is extremely important in the issue of voting rights.
16    We believe that Senate Bill 362 swings the pendulum
17    too far and risk potential disenfranchisement by
18    creating more harms than benefits that will be
19    achieved.
20                    The best information we have about the
21    impact of voter identification laws comes from
22    litigation which MALDEF represents eligible voters who
23    are turned away from the polls as well as voter
24    organizations.  These cases include Gonzalez vs.
25    Arizona in which MALDEF attorneys served as lead
```

1    counsel for the plaintiffs.

2           Importantly, at the trial of this case,

3    Arizona could not produce any example of impersonation

4    of voter fraud to justify its voter ID law.  The lack

5    of evidence or even a single incident of impersonation

6    voter fraud is consistent with the U.S. Supreme

7    Court's observation in the Indiana voter ID case, that

8    the record contains no evidence of any such fraud

9    actually occurring in Indiana at any time in history.

10   And that is actually in the opinion in Crawford vs.

11   Marion County Elections Board.

12          In Arizona across three federal

13   elections, 4,194 voters cast conditional provisional

14   ballots that were never counted because the voter

15   could not provide the required ID.  In Texas 42,000

16   provisional ballots were cast in the 2008 General

17   Election, but only 9,444 were counted.  We can only

18   imagine that the numbers would rise by increasing the

19   ID requirements.

20          The examples of disenfranchisement in

21   Arizona include Karen Lewsader, a police officer and

22   registered Republican, who was forced to cast a

23   conditional provisional ballot because her driver's

24   license listed a different address than the voter

25   rolls.  Ms. Lewsader, while she was at the poll, went

```
 1    back to her car to try to find another form of
 2    identification with the correct name and address so
 3    she could cast a regular ballot, but the vehicle
 4    registration information she found was under her
 5    husband's name.  When the demands of her job prevented
 6    her from returning to the county to show additional
 7    ID, her vote was not counted.
 8              Georgia Morrison-Flores was a newlywed
 9    when she registered to vote, and she registered under
10    a married name.  However, when she went to vote, her
11    maiden name on her driver's license did not match her
12    married name in which she was registered.  Because the
13    names did not match, even though her valid ID showed
14    her birth, photo and first name, she was turned away
15    by an election poll worker who had been her childhood
16    neighbor, and she was unable to cast a ballot of any
17    kind despite her status as a qualified voter.
18              So for these reasons, we find it
19    disheartening and such a restrictive government
20    response to an unproven problem of potential voter
21    fraud, and we ask and we urge this committee to
22    reject the voter identification provisions of Senate
23    Bill 362.  And we're open for any questions or
24    concerns that may be from the Senate regarding this
25    legislature or our litigation in Arizona or in Texas.
```

1    Thank you very much.

2              SEN. DUNCAN:  Members, you've heard the

3    testimony.  Do you have any questions of the witness?

4              (No response)

5              SEN. DUNCAN:  Thank you for your

6    appearance today.

7              SEN. SHAPLEIGH:  Mr. Chair?

8              **QUESTIONS FROM SENATE FLOOR**

9              SEN. DUNCAN:  Oh, I'm sorry.  Excuse me.

10   Sen. Shapleigh?

11             SEN. SHAPLEIGH:  Can we just mark this

12   as an exhibit and make it part of the record?  Is it

13   already admitted?

14             SEN. DUNCAN:  I think -- have we not

15   done that?  We've already admitted that, Senator.

16             SEN. SHAPLEIGH:  Thank you.

17             SEN. DUNCAN:  Yes, sir.  Thank you.

18             **TESTIMONY BY PATTI EDELMAN**

19             SEN. DUNCAN:  Patti Edelman?

20   Ms. Edelman --

21             MS. EDELMAN:  Thank you.

22             SEN. DUNCAN:  -- name and address -- or

23   name and who you represent, and please observe the

24   time limit.

25             MS. EDELMAN:  My name is Patti Edelman,

845

1    and I'm a resident of Austin, Texas.  I'm here
2    representing myself.  Mr. President and Senators,
3    thank you for the opportunity to speak today.  It
4    looks like we've been here so long that I'm about
5    ready to join AARP.
6              I have an elderly mother that lives in
7    East Texas, and as a lot of people have stated, it
8    would be a hardship for her to have to produce a
9    driver's license or some other form of picture ID.  At
10   her age, she doesn't get out much, and she certainly
11   hasn't driven in years, and I know the drivers in her
12   community are thankful for that.
13             Having been an Election Official and a
14   poll worker here in Travis County, I can assure you
15   that no dead people have come to vote at the precincts
16   where I have worked.  Nothing is more sacred to
17   Americans than the right to vote, and I believe it is
18   the responsibility of all citizens to vote.
19             This bill does not address voters who
20   use mail ballots to vote in Texas, but are not -- not
21   residents of Texas and, in fact, have voted in more
22   than one state, such as a number of Republicans in
23   Polk County who are members of a group called The
24   Escapees.
25             Lastly, I ask that -- oh, I want to

```
 1    state that anyone who has run a campaign, especially

 2    like you, Lieutenant Governor Dewhurst, that's run a

 3    statewide campaign, knows the expense of putting out

 4    information to voters in multiple media markets in a

 5    state the size of ours.  And the cost that will be

 6    borne by the citizens of the State of Texas in order

 7    to educate the voters of this state to the changes and

 8    the requirements in order for them to do what they've

 9    been able to do very easily and freely for a long

10    time, it's a shame that we would be spending our

11    hard-earned tax dollars on such -- I won't call it

12    frivolous, but I think quite unnecessary expenditure

13    at this point in time.

14              We have lots of other budget -- budget

15    problems, many constraints, a lot of people hurting,

16    and to use our tax dollars in this manner I find is

17    unconscionable.  Thank you.

18              SEN. DUNCAN:  Thank you for your

19    testimony.  Hold on.  Are there any questions of the

20    witness?

21              (No response)

22              SEN. DUNCAN:  The Chair hears none.

23    Thank you for your appearance today.

24              **TESTIMONY BY SYLVIA MENDOZA**

25              SEN. DUNCAN:  The Chair calls Sylvia
```

```
 1    Mendoza.  Ms. Mendoza, please state your name and who
 2    you represent, and please observe the three-minute
 3    time limit.
 4                MS. MENDOZA:  My name is Sylvia Mendoza,
 5    and I represent myself.  Do you know what the
 6    definition of "illegal" is?  It is "banned, forbidden,
 7    prohibited, unlawful, not legal, wrong, unjust and
 8    unconstitutional."  Even though it is
 9    unconstitutional, voter fraud has been committed.  One
10    reason there may not be too many documented cases of
11    voter fraud is because exactly that, it was fraud,
12    some got away with it.
13                I'm a 54-year-old third generation
14    American.  I've had a social security card since about
15    the age of 14, but you see, one of these is a fake,
16    yet they all look the same.  It was easy to acquire
17    and it is accepted as valid.  That means there could
18    be a traitor somewhere.
19                Right now it is almost as easy to
20    sometimes get by without having the legal right to
21    vote.  A lot of people voted this Presidential
22    Election, people who had never voted before.  Yes, I
23    know a lot of people voted for the reason of who we
24    would be voting for.  Some of those people did not
25    honor and respect the right to vote before.  They
```

848

1    didn't love America until now.  What a shame.

2            I feel now is the time for voter ID to

3    prepare for the future.  If you do it now -- if you

4    don't do it now, you will be voting for it later.

5    You-all have a duty to us citizens as lawmakers, so do

6    your job and make this a deterrent to prepare and to

7    make it nearly impossible for voter fraud.  Anyone who

8    votes against it is not doing everything within their

9    power for this great state within this great country.

10   Vote for voter ID, SB 362.

11           On the national level, the government

12   says the system is broken on certain aspects of it.

13   Do not make the same mistake.  Pass Senate Bill 362.

14   Thank you.

15           SEN. DUNCAN:  Thank you.  Members, are

16   there any questions of Ms. Mendoza?

17           (No response)

18           SEN. DUNCAN:  The Chair hears none.

19   Thank you for your appearance today.  You had an

20   exhibit.  She does have an exhibit, or she has -- she

21   wants to put her testimony in.  We'll mark that as

22   Exhibit 54, Ms. Mendoza's statement or testimony.

23           (Exhibit No. 54 marked and admitted)

24           **TESTIMONY BY KENNETH KOYM**

25           SEN. DUNCAN:  The Chair calls Kenneth

```
 1    Koym.  Mr. Koym, state your name, who you represent,
 2    and please observe the three-minute time limit.
 3                   MR. KOYM:  Creating barriers and hate
 4    crime is not the part of a Texas Legislature.  It
 5    should not be done.  Passing SB 362 is a hate crime,
 6    and I urge that you get honest, very honest with
 7    yourselves.
 8                   My name is Kenneth Koym.  I'm a
 9    psychotherapist, and I am licensed by this state.  I'm
10    licensed by other countries.  It is irrational to do
11    what this Senate is talking about doing.  I do not
12    accept it.  It is unbecoming, Tommy, for you to call
13    somebody a political --
14                   SEN. DUNCAN:  I'm sorry, sir, you
15    addressed a Senator by his formal name.  And also if
16    you could -- I understand your passion for the issue,
17    but please observe the decorum of the Senate.  You can
18    have an extension of about -- well, you're running
19    okay.  We'll give you a little bit more over your time
20    limit.
21                   MR. KOYM:  I have served the United
22    States professionally.  I'm a military research
23    scientist retired.  I'm a marriage and family
24    therapist.  I feel that it is time that every law
25    comes under the task of the Hate Crimes Act of the
```

1    United States.  It is a federal law, and I urge that

2    this bill be reviewed in that term.  It is absolutely

3    the requirement of this nation to stop all this hate.

4              I saw it here.  I had my white cap on to

5    keep me warm through the night.  I froze, and I feel

6    cold despair.  I feel the despair, though, that the

7    U.S. citizens are feeling with regard to more and more

8    hate crimes.  And this -- this Senate should not pass

9    this bill and pass -- and commit a hate crime.  It is

10   dishonorable, it is un-American, and I urge that it

11   not happen.  Please vote against this bill.

12             SEN. DUNCAN:  Thank you, Mr. Koym.  Are

13   there any questions of the witness?

14             (No response)

15             SEN. DUNCAN:  The Chair hears none.

16   Thank you for your appearance here today.

17             MR. KOYM:  I will (inaudible) by mail.

18             SEN. DUNCAN:  You can send it to the

19   Secretary of the Senate.  It will not be in the

20   record.

21             MR. KOYM:  Fine.

22             **TESTIMONY BY KAREN RENICK**

23             SEN. DUNCAN:  All right.  Ms. Karen

24   Renick?  Ms. Renick, please state your name and who

25   you represent, and please observe the three-minute

851

```
 1    time limit.
 2              MS. RENICK:  My name is Karen Renick.  I
 3    am the founder and current Director of Vote Rescue, a
 4    nonpartisan citizens' group based here in Austin.  We
 5    are concerned with election integrity and
 6    transparency.
 7              Since early 2005 we've been alerting the
 8    public and our government officials about the serious
 9    assault on our voting rights by the total absence of
10    both integrity and transparency in the voting process
11    used throughout Texas today.
12              Before I continue with my contents --
13    comments specific to SB 362, I feel compelled to first
14    set the record straight about the infamous misdeeds in
15    a certain Senate Primary Election here in Texas 61
16    years ago in 1948.  I feel compelled because these
17    misdeeds have been incorrectly used as an example of
18    voter fraud when, in fact, it was clearly election
19    fraud committed by Election Officials, not voters.
20              The Senate Primary race was between
21    Lyndon Johnson and Coke Stevenson, who was a popular
22    conservative governor.  I'd like to read now from the
23    book called Steal This Vote, Dirty Elections and the
24    Rotten History of Democracy in American, written by
25    the well-known journalist Andrew Gumbel.
```

1          "On election night, Stevenson was ahead
2    by 854.  The following night Johnson made up almost
3    all the difference thanks to late-breaking returns
4    from Houston and one precinct in Duval County.  Four
5    days after the election, though, Stevenson was up
6    again by a seemingly insurmountable 362.  After six
7    days with nothing obvious left to count, Stevenson was
8    still leading by 113.  Johnson needed a miracle and
9    got one courtesy of an election enforcer by the name
10   of Luis Salas in Jim Wells County, one county over
11   from Duval."
12          "At the 13th precinct in Alice, the Jim
13   Wells County Seat, Salas artfully had a seven in one
14   of the vote totals changed into a nine by the addition
15   of a simple loop giving Johnson an extra 200 votes and
16   with them the election.  Stevenson traveled down to
17   Alice, examined the electoral register and noticed
18   that at least -- or that the last 200 names appeared
19   in strict alphabetical order and were written in a
20   different color ink from the rest."
21          "Legal challenges continued for a while,
22   but increasingly frustrated Stevenson then sued to
23   have the ballot boxes opened and the votes examined
24   and recounted, but in the absence of concrete proof of
25   fraud, he could not make up the case -- make the case.

1   When even the Supreme Court refused to hear him, he

2   gave up for good, and the rest is history."

3                SEN. DUNCAN:  Thank you, Ms. Renick.

4   Members, are there any questions for Ms. Renick?

5                (No response)

6                SEN. DUNCAN:  The Chair hears none.  We

7   appreciate your appearance here today.

8                Members, just out of an abundance of

9   caution, I'm going to make one last call for a Roxann

10  Lewis.  I think we called her earlier, but if she is

11  in the building, she needs to report immediately.  And

12  if she does not report before we close or hear the

13  last witness, then she'll miss her opportunity to

14  testify live, and we'll just put her card in.

15               The next witness -- Members, we have

16  three more, I think, that would love to -- that are

17  here to testify before us.

18               **TESTIMONY BY JONI ASHBROOK**

19               SEN. DUNCAN:  Joni Ashbrook?

20  Ms. Ashbrook, would you please state your name and who

21  you represent?  And please observe the three-minute

22  time limit.

23               MS. ASHBROOK:  Yes, sir.  My name is

24  Joni Ashbrook.  I represent myself.  I'm a precinct

25  chair, and I have been an election judge in Bastrop

1    County.

2              I appreciate Sen. Fraser's comments that

3    the intent of this bill is to help people vote.

4    However, I'm having an incredibly hard time

5    understanding how this bill will actually do that.

6              I often walk.  I don't understand how it

7    will help the very poor, elderly and disabled people

8    in my precinct that I often walk and see.  I see how

9    incredibly difficult their circumstances are.  And

10   when they're trying to just keep a crumbling roof over

11   their heads, how is keeping -- or how is asking them

12   or requiring them to have more paperwork and possibly

13   more cost help them with their sacred right to vote?

14             Sen. Fraser also said that voter fraud,

15   no matter how small, should be addressed.  I totally

16   agree, but since there's no real threat -- or excuse

17   me -- no real evidence of voter fraud in Texas that

18   this bill would address, why isn't this body looking

19   for the real threats to the integrity of our

20   elections?

21             The first and foremost threat to the --

22   to our elections is the use of electronic voting

23   machines that count our votes in secret and run

24   software that we, the people, are not allowed to see.

25   There have been studies done by the GAO, the Brennan

1    Center for Justice, Princeton, Carter-Baker

2    Commission, just to name a few that have concluded

3    that these machines are not secure and can be

4    manipulated.

5              This is not a trumped-up charge about

6    one person risking deportation or prosecution to cast

7    a single vote.  This is the ability for one person to

8    manipulate millions of votes in secret.  When Senator

9    Fraser spoke of loss of voter confidence in our

10   electoral system, this is enemy number one.

11             There's another real problem that I

12   would like to see this body address, and that -- and

13   the Secretary of State even admits can cause multiple

14   votes.  It happened -- an incident happened in my

15   precinct in 2008, the General Election.  My polling

16   place had two computers.  That was the database where

17   people would come to check in.  A man came through

18   early in the morning, he voted.  He came back through,

19   he happened to be a friend of the election judge, the

20   Republican.  And he said "I want to test the system."

21   So he went through again at the same computer that he

22   went to.  He was not allowed to vote.  He went to the

23   next computer.  He was allowed to vote.  We stopped it

24   when it came to the ticket that was coming out, the

25   sticker, but he was allowed -- he would have been

```
1    allowed to vote.
2             I called the Secretary of State's
3    Office.  They agreed with me that this is possible.
4    The machines do not talk to one another.  So I think
5    that's probably what those other two people were
6    talking about.  Is that my time?
7             SEN. DUNCAN:  Ms. Ashbrook, I'm sorry,
8    your time is up.  Let me ask if there are any members
9    who would like to ask a question.
10            (No response)
11            SEN. DUNCAN:  The Chair hears none.  We
12   appreciate your appearance in the Texas Senate today.
13            MS. ASHBROOK:  Thank you.
14            TESTIMONY BY DUANE RAWSON
15            SEN. DUNCAN:  The Chair calls Duane
16   Ronson -- Rawson.  Mr. Rawson, please state your name
17   and who you represent, and please observe the
18   three-minute time limit.
19            MR. RAWSON:  My name is Duane Rawson
20   from Goldthwaite, Texas, Mills County, and I'm Mills
21   County Republican Chairman there, and I've been here
22   since yesterday.  Oh, I'm sorry.  I've been here since
23   yesterday about between 9:30 and ten o'clock.  I have
24   sat -- I've listened to all reasoning why this should
25   be approved, why it shouldn't be approved.
```

857

```
 1              But the main thing that they were saying
 2     as far as for voter fraud, you have people that say it
 3     doesn't exist, but yet we've had the Secretary of
 4     State that showed examples why it did -- why we did
 5     need something like this.
 6              The voters registration is -- it's an
 7     easy thing to copy.  Voters ID there's -- it's a law,
 8     first of all, that you're supposed to have some type
 9     of ID with you when the authorities pull you over.
10     And if you don't, by rights they have to take you to
11     jail because you don't have the proper means of ID,
12     which causes the state money having to do that.
13              If you look at it, if you have -- if the
14     people -- as people are saying, $35,000 or less can't
15     afford this, which I don't see what there is to afford
16     because it's free.  If they have the opportunity to
17     have the proper ID, it may help them to want to keep
18     their ID card with them and help taxpayers as far as
19     not having to pay the law enforcement, the extra money
20     of having to arrest that individual, taking them to
21     jail, booking them, returning them after the court
22     trial.
23              There's a lot of reasons why I feel that
24     we do need it.  I am a disabled vet.  I've been in the
25     military for 16-1/2 years.  I continue to support my
```

```
 1    country.  And if this is what I need to do to be able
 2    to have my constitutional right to vote, by God I'll
 3    be -- I'll do it with pride.  I keep two forms of ID
 4    with me anyway.  So having to carry ID with me to vote
 5    it's not -- it shouldn't be a problem.
 6                We can always find a reason to fight
 7    against something.  What about trying to find a reason
 8    to work together to try to make something work that's
 9    going to better us?
10                I spoke to veterans and law enforcement
11    from my county, Mills County, and they state the same
12    thing.  They feel that this bill should be approved.
13    That's all I have.
14                SEN. DUNCAN:  Thank you, Mr. Rawson.
15    Members, do you have any questions for Mr. Rawson?
16                (No response)
17                SEN. DUNCAN:  The Chair hears none.
18    Thank you for your appearance today, and I think you
19    go out to the -- to the right.
20                **TESTIMONY BY ROD FLUKER**
21                SEN. DUNCAN:  The Chair recognizes
22    Dr. Rod Fluker.  Mr. Fluker, state your name, who you
23    represent, and please observe the three-minute time
24    limit.
25                MR. FLUKER:  To the distinguished and
```

1    shall I say sleep-deprived Members of the Texas

2    Senate, my name is Dr. Rod Fluker, and I am a Past

3    President of the organization and now Executive

4    Director of the Texas Association of Black Personnel

5    in Higher Education.

6              Today I bring you greetings from our

7    State Board of Directors and from Dr. Felicia Scott,

8    our State President.  The Texas Association of Black

9    Personnel in Higher Education, or TABPHE as we call

10   it, is an educational organization of faculty, staff

11   and administrators that numbers hundreds statewide.

12   TABPHE was founded 36 years ago to address pertinent

13   issues that impact African-Americans in particular and

14   people of color in general.

15             Senate Bill 362 or the voter ID bill

16   causes our members and many others grave concerns

17   about the negative impact of passing such useless and

18   harmless legislation will have on the voting rights of

19   millions of already disenfranchised Texans.

20             We believe that laws should be created

21   to promote civil living and/or right a wrong.  The

22   voter ID bill does neither.  Promoting civil living

23   would mean to make it easier for Texans to vote, not

24   make it more difficulty.  Adding new barriers such as

25   additional ID requirements is likened to the Negro

860

1   poll taxes and voting competency tests used during the

2   days of the Jim Crow Laws and as recently as the

3   1960s.  So this legislation works against promoting

4   civil living.

5                    This useless and harmless legislation

6   also fails to right any wrong.  The fact is that there

7   is no evidence of significant voter fraud, period.  Of

8   millions of votes cast in Texas during the last six

9   years, voter impersonation is practically nonexistent,

10  both in Texas and across our nation.

11                   Therefore, the Texas Association of

12  Black Personnel in Higher Education ask that all state

13  Senators, both Republican and Democrat, as good

14  ambassadors of the people of Texas to vote against

15  Senate Bill 362.  Thank you.

16                   SEN. DUNCAN:  Thank you, Dr. Fluker.

17  Are there any questions for Dr. Fluker?

18                   (No response)

19                   SEN. DUNCAN:  All right.  The Chair

20  hears none.  Thank you for your appearance today in

21  the Texas Senate.

22                   Members, we had a number of people

23  testify or signed up to testify -- oh, excuse me.

24  Dr. Fluker wants to submit Exhibit 64 as his

25  testimony.  Thank you, Dr. Fluker.  Exhibit 54,

1    5-4 (sic).  Okay.

2                    (Exhibit No. 55 marked and admitted)

3                    SEN. DUNCAN:  Members, there were a

4    number of people that signed up to testify but who did

5    not come when called to do so, either because they

6    left or couldn't be here.  We will enter their names

7    in the record and record the position as indicated on

8    their card.

9                    We also have a number of cards that --

10   quite a number of cards of people who have registered

11   a position on the bill but do not wish to testify, and

12   those will be made a part of the record as well.

13                   Members, I think one thing I want to

14   maybe -- it might be a good idea for us to set aside

15   the decorum rule a little bit and clap for those

16   witnesses who stayed here and listened to our

17   testimony.  I think that was --

18                   (Applause)

19                   SEN. DUNCAN:  Members, the Chair will --

20   there being no other witnesses to come before the

21   Committee, the Chair will close public testimony.

22                   Members, we'll stand at ease for a few

23   minutes.  The court reporter has been going for a

24   couple of hours, and I would -- we'll be back in --

25   we'll go back in session at 9:15 -- or I'm sorry.

1    Excuse me.  It's been a long day.  The Senate will
2    stand at ease until 9:15.
3                    Sen. Deuell, for what purpose?
4                    SEN. DEUELL:  Mr. President, before we
5    come back and we address the vote, I just wanted to
6    say how proud I am of the Members of the Texas Senate.
7    We have debated a very, very sensitive issue that has
8    votes strong sides -- strong feelings on both sides,
9    and I just wanted to express my appreciation to the
10   Members and to the public that was here.  I think that
11   this was an example of how democracy in this country
12   is supposed to work.
13                   SEN. DUNCAN:  Thank you, Senator.  I
14   agree.
15                   Members, we'll stand at ease.  Let's
16   make it -- let's make it -- hang on a minute.  I'm
17   sorry.
18                   Sen. Zaffirini?
19                   SEN. ZAFFIRINI:  I'm glad that
20   Sen. Deuell is happy because today is his birthday.
21   We should all join in wishing him a very happy
22   birthday.
23                   (Applause)
24                   SEN. DUNCAN:  Members, we've been taking
25   a ten-minute break.  Instead of 15, let's just go and

1    stand at ease until 9:10.

2                    SEN. PATRICK:  Mr. Chairman?

3    Mr. Chairman?

4                    SEN. DUNCAN:  Sen. Patrick?

5                    SEN. PATRICK:  I just wanted to thank

6    the staff from our Sergeant-at-Arms to our messenger.

7    I know -- I think Courtney just left.  She was here

8    from six o'clock last night as our messenger until

9    seven this morning, and all the staff members.  I know

10   we're still continuing, but I want to thank everyone

11   who stayed here throughout the night.

12                   SEN. DUNCAN:  Thank you.  Stand at ease

13   until 9:10 a.m.

14                   (Recess:  9:00 a.m. to 9:12 a.m.)

15                   SEN. DUNCAN:  The Committee of the Whole

16   will come back to order.  Members, if you could take

17   your seats?

18                   Sen. Fraser, you're recognized for a

19   motion.  He isn't here.  Sen. Fraser, you're

20   recognized for a motion.

21                   SEN. FRASER:  And if you don't mind, I'm

22   waiting for all the Senators that came in, that stayed

23   here all night.

24                   Members, I -- it was a pretty amazing

25   night, and it makes me remember why I'm so proud to be

1   a member of this body.  I appreciate so much the -- I

2   appreciate so much everyone, the way they conducted

3   themselves.  Thank you.  Thank you to the staff.

4   Thank you for the witnesses.  We appreciate it.

5                   I would now move to report Senate

6   Bill 362 to the full Senate with the recommendation

7   that it do pass and be printed.

8                   SEN. DUNCAN:  Sen. Fraser moves that

9   Senate Bill 362 be reported to the full Senate with

10  the recommendation that it do pass and be printed.

11  The clerk -- the secretary will call the roll.

12                   **ROLL CALL NO. 3**

13                   SECRETARY SPAW:  Averitt?

14                   SEN. AVERITT:  (Indicated "aye" vote)

15                   SECRETARY SPAW:  Carona?

16                   SEN. CARONA:  (Indicated "aye" vote)

17                   SECRETARY SPAW:  Davis?

18                   SEN. DAVIS:  (Indicated "nay" vote)

19                   SECRETARY SPAW:  Deuell?

20                   SEN. DEUELL:  (Indicated "aye" vote)

21                   SECRETARY SPAW:  Duncan?

22                   SEN. DUNCAN:  (Indicated "aye" vote)

23                   SECRETARY SPAW:  Ellis?

24                   SEN. ELLIS:  (Indicated "nay" vote)

25                   SECRETARY SPAW:  Eltife?

```
1                    SEN. ELTIFE:  (Indicated "aye" vote)

2                    SECRETARY SPAW:  Estes?

3                    SEN. ESTES:  (Indicated "aye" vote)

4                    SECRETARY SPAW:  Fraser?

5                    SEN. FRASER:  (Indicated "aye" vote)

6                    SECRETARY SPAW:  Gallegos?

7                    SEN. GALLEGOS:  (Indicated "nay" vote)

8                    SECRETARY SPAW:  Harris?

9                    SEN. HARRIS:  (Indicated "aye" vote)

10                   SECRETARY SPAW:  Hegar?

11                   SEN. HEGAR:  (Indicated "aye" vote)

12                   SECRETARY SPAW:  Hinojosa?

13                   SEN. HINOJOSA:  (Indicated "nay" vote)

14                   SECRETARY SPAW:  Huffman?

15                   SEN. HUFFMAN:  (Indicated "aye" vote)

16                   SECRETARY SPAW:  Jackson?

17                   SEN. JACKSON:  (Indicated "aye" vote)

18                   SECRETARY SPAW:  Lucio?

19                   SEN. LUCIO:  (Indicated "nay" vote)

20                   SECRETARY SPAW:  Nelson?

21                   SEN. NELSON:  (Indicated "aye" vote)

22                   SECRETARY SPAW:  Nichols?

23                   SEN. NICHOLS:  (Indicated "aye" vote)

24                   SECRETARY SPAW:  Ogden?

25                   SEN. OGDEN:  (Indicated "aye" vote)
```

1            SECRETARY SPAW:  Patrick?

2            SEN. PATRICK:  (Indicated "aye" vote)

3            SECRETARY SPAW:  Seliger?

4            SEN. SELIGER:  (Indicated "aye" vote)

5            SECRETARY SPAW:  Shapiro?

6            SEN. SHAPIRO:  (Indicated "aye" vote)

7            SECRETARY SPAW:  Shapleigh?

8            SEN. SHAPLEIGH:  (Indicated "nay" vote)

9            SECRETARY SPAW:  Uresti?

10           SEN. URESTI:  (Indicated "nay" vote)

11           SECRETARY SPAW:  Van de Putte?

12           SEN. VAN de PUTTE:  (Indicated "nay"

13   vote)

14           SECRETARY SPAW:  Watson?

15           SEN. WATSON:  (Indicated "nay" vote)

16           SECRETARY SPAW:  Wentworth?

17           SEN. WENTWORTH:  (Indicated "aye" vote)

18           SECRETARY SPAW:  West?

19           SEN. WEST:  (Indicated "nay" vote)

20           SECRETARY SPAW:  Whitmire?

21           SEN. WHITMIRE:  No.

22           SECRETARY SPAW:  Williams?

23           SEN. WILLIAMS:  (Indicated "aye" vote)

24           SECRETARY SPAW:  Zaffirini?

25           SEN. ZAFFIRINI:  (Indicated "nay" vote)

```
 1                    SECRETARY SPAW:  Mr. President?

 2                    SEN. DUNCAN:  (Indicated "aye" vote)

 3                    SECRETARY SPAW:  That was the vote, 20

 4       to 12; 20 "ayes" and 12 "nays".

 5                    SEN. DUNCAN:  There being 20 "ayes" and

 6       12 "nos", Senate Bill 362 will be reported to the full

 7       Senate with the recommendation it do pass and be

 8       printed.

 9                    Sen. Whitmire, for what purpose?

10                    SEN. WHITMIRE:  I was going to recognize

11       this body for it's outstanding work.  I've been here

12       36 years, 26 in the Senate.  I've seen filibusters go

13       all night long and Members just kind of scatter and

14       are on call, but I have never -- and would be

15       surprised if anyone, Patsy, can recall the body

16       starting one day, going all night, all Members

17       present, conducting themselves like ladies and

18       gentlemen.  So I'm just real proud, Troy and

19       Lieutenant Governor, each and every one of you.  Our

20       two freshmen made outstanding contributions.

21                    And I just really stood up -- really

22       stood up to recognize Sen. Duncan, a very tough job,

23       it was very fair, and we're really proud of you as a

24       Member of the Senate.

25                    (Applause)
```

1              SEN. DUNCAN:  Thank you.

2              SEN. DEUELL:  Mr. President?

3              SEN. DUNCAN:  Sen. Deuell?

4              SEN. DEUELL:  A parliamentary inquiry.

5    The vote was 20 to 12.  I understand that the

6    Lieutenant Governor takes your seat.  Does that

7    exclude you from voting?  Have we acted properly in

8    that regard?

9              SEN. DUNCAN:  Yes, Senator.

10             SEN. DEUELL:  I understand there's 31

11   with that vote, but --

12             SEN. DUNCAN:  The Chair and the

13   President are entitled to vote --

14             SEN. DEUELL:  Okay.

15             SEN. DUNCAN:  -- in the Committee of the

16   Whole.

17             SEN. DEUELL:  I just wanted to clarify

18   that.

19             SEN. DUNCAN:  Yes, sir.  Thank you.

20             All right, Members, the Chair happily

21   recognizes Sen. Wentworth for a motion.

22             SEN. WHITMIRE:  Mr. President, I move

23   the Committee of the Whole Senate rise and report.

24             SEN. DUNCAN:  Members, you've heard the

25   motion.  Is there any objection?

869

1                    (No response)

2                    SEN. DUNCAN:   There is no objection.

3    The Senate will rise and report.

4                    (Proceedings concluded for purposes of

5    this record at 9:18 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

870

```
1                    C E R T I F I C A T E

2

3    STATE OF TEXAS      )

4    COUNTY OF TRAVIS    )

5

6              I, KIM PENCE, a Certified Shorthand

7    Reporter in and for the State of Texas, do hereby

8    certify that the above-mentioned matter occurred as

9    hereinbefore set out.

10             I FURTHER CERTIFY THAT the proceedings

11   of such were reported by me or under my supervision,

12   later reduced to typewritten form under my supervision

13   and control and that the foregoing pages are a full,

14   true and correct transcription of the original notes.

15             IN WITNESS WHEREOF, I have hereunto set

16   my hand and seal this 25th day of March 2009.

17

18

19   KIM PENCE
     Certified Shorthand Reporter
20   CSR No. 4595-Expires 12/31/09

21   Firm Certification No. 276
     Kennedy Reporting Service, Inc.
22   Cambridge Tower
     1801 Lavaca Street, Suite 115
23   Austin, Texas 78701
     512.474.2233

24

25
```

# SENATE JOURNAL

## EIGHTY-FIRST LEGISLATURE — REGULAR SESSION

### AUSTIN, TEXAS

### PROCEEDINGS

### TWENTY-FIRST DAY
(Tuesday, March 10, 2009)

The Senate met at 10:21 a.m. pursuant to adjournment and was called to order by the President.

The roll was called and the following Senators were present: Averitt, Carona, Davis, Deuell, Duncan, Ellis, Eltife, Estes, Fraser, Gallegos, Harris, Hegar, Hinojosa, Huffman, Jackson, Lucio, Nelson, Nichols, Ogden, Patrick, Seliger, Shapiro, Shapleigh, Uresti, Van de Putte, Watson, Wentworth, West, Whitmire, Williams, Zaffirini.

The President announced that a quorum of the Senate was present.

The Reverend Jacqueline Baker, Hyde Park Christian Church, Austin, offered the invocation as follows:

Gracious and loving God, for this time and place, we give thanks. For this day and this opportunity to work together in harmony and with hope for the future, we are grateful. For the privilege of being called to serve the public, we are ever mindful. May we ever realize the worth and place and value and purpose of each and every person. May we ever understand that the work we do also has worth and value and purpose, and with this in mind, let us join together to work side by side and shoulder to shoulder to meet the needs of those we are called to represent. Heart to heart and hand in hand let us respond to the challenges we face with innovative, creative solutions. Let us be determined not to become locked in negative or destructive patterns but instead finding new and courageous ways of working together and touching the future. With this in mind, help us to find common ground. Help us to seek a common goal and identify a common good. Help us to see all faces and hear all voices. Help us to work together, always mindful of the future and of the fact that our words and actions today make a real difference and that we are charged with the responsibility of planting seeds which will bear good fruit. May we ever realize that our presence here truly matters. May future generations look to us as an example of unity and constructive cooperation. May our children look to us as examples of peace and reconciliation. With humble hearts then, let us serve. With gracious and gentle spirits, let us work together. With mindful

TX_00002797

and caring intent, let us seek the well-being of all those people, Your people, our people, all people that we are called to tend. We pray all these things in a spirit of love and service. Amen.

Senator Whitmire moved that the reading of the Journal of the proceedings of yesterday be dispensed with and the Journal be approved as printed.

The motion prevailed without objection.

### CO-AUTHOR OF SENATE BILL 362

On motion of Senator Fraser, Senator Nelson will be shown as Co-author of **SB 362**.

### PHYSICIAN OF THE DAY

Senator Huffman was recognized and presented Dr. Jimmy Clay Burns of West Columbia as the Physician of the Day.

The Senate welcomed Dr. Burns and thanked him for his participation in the Physician of the Day program sponsored by the Texas Academy of Family Physicians.

### RESOLUTIONS SIGNED

The President announced the signing of the following enrolled resolutions in the presence of the Senate: **SCR 18**, **SCR 29**, **SCR 31**, **SCR 36**, **HCR 46**.

### GUESTS PRESENTED

Senator Shapiro was recognized and introduced to the Senate a delegation of students from Hillcrest High School in Dallas.

The Senate welcomed its guests.

### GUESTS PRESENTED

Senator Carona was recognized and introduced to the Senate a delegation representing Young Professionals of Greater Dallas.

The Senate welcomed its guests.

### SENATE RESOLUTION 408

Senator Duncan offered the following resolution:

WHEREAS, Article III, Section 9, and Article IV, Section 16 of the Texas Constitution, and Article XIII of the Senate Rules recognize the existence of the Committee of the Whole Senate; and

WHEREAS, Pursuant to Senate Rule 7.06, the President referred Senate Bill 362, relating to voter identification requirements, directly to the Committee of the Whole Senate; and

WHEREAS, Senate Rule 13.01 provides that it is in order for the Senate at any time after bills and resolutions have been called to resolve itself into a Committee of the Whole Senate; and

WHEREAS, The Senate may adopt by resolution specific procedures to govern the operation of the Committee of the Whole Senate during its consideration of Senate Bill 362; now, therefore, be it

RESOLVED, That the Senate resolve itself into a Committee of the Whole Senate on Tuesday, March 10, 2009, at the conclusion of the morning call, for the consideration of Senate Bill 362; and, be it further

RESOLVED, That the Senate may meet as in Committee of the Whole Senate from day to day as necessary; and, be it further

RESOLVED, That the following procedures shall apply when in Committee of the Whole Senate for the duration of its consideration of Senate Bill 362:

1. The Committee shall afford reasonable opportunity to interested parties to appear and testify before the Committee.

2. The Chair shall require all parties appearing at the meeting to swear or affirm that the testimony they give to the Committee is true and correct.

3. The Chair may fix the order of appearance and time allotted for each witness unless a majority of the members present directs otherwise.

4. Senate Rules addressing access to the Senate Floor shall be enforced by the Chair while the Committee is meeting, except as follows:

(a) Witnesses appearing before the committee may be admitted to the floor of the Senate as their names are called by the Chair, and may remain only until their testimony is completed.

(b) Each Senator may be assisted by one employee of the Senate within the brass rail at any given time. The Sergeant-at-Arms shall provide seating next to a requesting senator for such authorized employees.

5. Senate Rule 3.04, relating to posters, placards, banners and signs, and Senate Rule 3.05 relating to applause, outbursts, and demonstrations shall be strictly enforced by the Chair. Subject to approval by the Chair, witnesses may use visual aids as necessary in the presentation of their testimony.

6. Senate Rule 3.01, relating to attire, shall not apply to witnesses.

**SR 408** was read and was adopted by the following vote: Yeas 19, Nays 12.

Yeas: Averitt, Carona, Deuell, Duncan, Eltife, Estes, Fraser, Harris, Hegar, Huffman, Jackson, Nelson, Nichols, Ogden, Patrick, Seliger, Shapiro, Wentworth, Williams.

Nays: Davis, Ellis, Gallegos, Hinojosa, Lucio, Shapleigh, Uresti, Van de Putte, Watson, West, Whitmire, Zaffirini.

## REMARKS ORDERED PRINTED

On motion of Senator Van de Putte and by unanimous consent, all remarks regarding **SR 408** were ordered reduced to writing and printed in the *Senate Journal* as follows:

**President:** Senator Van de Putte, did you wish to, to rise on this?

**Senator Van de Putte:** Thank you Mr. President. I'd like to ask the author of the resolution a few questions.

**President:** Will Senator Duncan yield to Senator Van de Putte?

**Senator Duncan:** I yield.

**Senator Van de Putte:** Thank you, Senator Duncan, and thank you, Mr. President. Senator Duncan, your resolution is a culmination of a lot of discussions between our colleagues, both Democrats and Republicans, is it not?

**Senator Duncan:** Yes, Senator. I tried to collect ideas from everybody, about the, at least what should be in the resolution.

**Senator Van de Putte:** And, Senator, there came a point in the deliberations and the discussions, after which, consulting with my Democratic colleagues, I delivered a memo dated March the 3rd to you with respect to our specific requests. Is that not correct?

**Senator Duncan:** That's correct.

**Senator Van de Putte:** And, Senator Duncan, among those, we requested more time to prepare for this Committee of the Whole hearing on, at that time, in that memo we renewed our protests that the Texas Senate has no business taking up and considering voter identification legislation before addressing other issues of broad importance to Texans. Was that in the memo? Do you remember that?

**Senator Duncan:** I believe you mentioned something like that in your memo to me and others.

**Senator Van de Putte:** And, Senator Duncan, if, do you remember that back in the very first week of the session as the, my Republican colleagues in this Senate were changing the rules to make sure that voter ID would pass the Senate, that the Democratic colleagues voted unanimously to also take up as a special order, so that it would be easier to pass other pieces of legislation addressing the issues important to Texans?

**Senator Duncan:** I remember there was some discussion about that in the debate on January the 14th.

**Senator Van de Putte:** Do you remember, Senator Duncan, what those issues which we proposed were?

**Senator Duncan:** No, that was a long day, and I don't, I couldn't be specific to recite those to you.

**Senator Van de Putte:** Well, Senator Duncan, let me briefly state, they, Democrats unanimously supported and were unanimously voted down by the Republicans to make it easier for the Senate to pass legislation on the following issues: full restoration of the Children's Health Insurance Program funding, lowering tuition costs, lowering homeowners' insurance rates, preventing foreclosures, economic development and job creation, funding our neighborhood public schools, and enhancing benefits for veterans. Does that refresh your memory a little bit? Do you remember what those issues were?

(Applause)

**Senator Duncan:** I remember discussions concerning that. And, Members, could I, and I think for the day, while we're talking about this—

**President:** (Gavel) It's probably going to be a long day, and the Chair is going to enforce respect for, so if, if we could not have reactions from the gallery, I'd appreciate it.

**Senator Duncan:** Senator, I believe those issues were raised and those votes, whatever, if there were amendments that were added, I think they were not adopted by the body. I do know that the committees have been meeting and deliberating on those very issues all session long, and, typically, those kinds of bills take a while and they get to the floor in due course of time.

**Senator Van de Putte:** Thank you, Senator Duncan, and out of the issues that we, as Democrats and Republicans, brought forward as issues that were, seemed so important that it needed to be considered via a special order and considered by the full Senate Committee of the Whole, there was only one surviving issue from that discussion, was it not?

**Senator Duncan:** Well, I think so. This issue was the one that survived the debate.

**Senator Van de Putte:** So, the only issue that survived all of the special orders was the issue of voter identification. Is that not true?

**Senator Duncan:** I think that the bill, that the resolution, or at least the rule that was adopted, dealt with this this particular issue on special order, yes.

**Senator Van de Putte:** Senator Duncan, back to the memorandum and our requests that I delivered to you last week, I wanted to remind you that the first week to explain why that protest was made in the memo and why we were protesting the artificial elevation of this issue above all orders and, as all others, as something that somehow deserves all this attention. And that request, the one to give us more time to prepare for this hearing and, frankly, to give the Texas Senate more time to make progress on the other issues that today are in the back seat, in favor of this issue. What was the response to our request to give us more time and to put off the voter ID hearing today so that we could take up more important issues?

**Senator Duncan:** Well, I think that there was not a consensus to extend the time for hearing it. And I think I responded to you that Senator Fraser, I think, had visited with each Member of the Senate, or at least provided a letter on February 26th, providing notice that he intended to take, request that this bill be taken up on this date. And then, also, a public notice was posted on March the 4th of the hearing. So, that's normally more, lot more time than we usually have for any sort of legislation that is going to be heard in public hearing during a legislative session and much more than is required by the rules.

**Senator Van de Putte:** And thank you, Senator Duncan, but, basically, our request was denied that we put other issues that are very important to the citizens of this state. The second request–

**Senator Duncan:** There wasn't a consensus to do that. I would agree with that.

**Senator Van de Putte:** Thank you. The second request in my memo was that in response to your original offer that each side be given three or four slots for expert witnesses, I had requested eight slots per side. Is that correct?

**Senator Duncan:** I think you, I think that's what is, I think your letter requested as many as eight, if I recall correctly. Let me get my glasses on, but I'll take your word for it.

**Senator Van de Putte:**  And those eight people that I asked for are in the building today, some of whom have flown in from across the country, and they're still waiting to see if they'll be afforded the respect of their national stature on the associated issues that, that are demanding. They still don't know if they'll be able to, allowed to testify as an invited expert witness.

**Senator Duncan:**  Well, Senator, I think I had asked you last night, and I think both the proponents of this issue and the opponents of the issue have, or the opposition, have submitted a list of witnesses to the Secretary of the Senate, and I think I have a list of that for everyone, and I think each one of your witnesses is listed on that. And, certainly, they will be considered invited testimony and will appear.  It would be my plan, if this resolution is adopted, that those witnesses be allowed to testify at the front, and I would propose that we would allow alternating witnesses.  In other words those, one in favor of the bill and one opposed to the bill, so that we get a good feel for this as we go through. So, yes, they will be allowed to testify.

**Senator Van de Putte:**  Well, thank you for clarifying that, because as we stand here this morning, I wasn't sure how many expert witnesses that were going to be allowed–

**Senator Duncan:**  Well, I apologize–

**Senator Van de Putte:**  For us.

**Senator Duncan:**  I thought I made clear that we really weren't going to limit–

**Senator Van de Putte:**  Okay.

**Senator Duncan:**  Try to limit that part of your testimony. But I think if you've got these eight, well, then that would be appropriate for us to move forward with those eight. I think the proponents of the legislation have less than that, but then after that, and what we want to know here, we have a lot of people that want to testify as well–

(Applause)

**Senator Duncan:**  And so, we want to make sure and, and as you know, too, there's, and I want to talk a little bit about this, to make sure there's some understanding. We want those witnesses to testify, we want to have a good, high quality debate here with regard to this bill, yet, we really, one of the things that I am going to ask the Senate to, and the Sergeant to enforce as we go through, is that we not have applause or demonstrations in the gallery and that we strictly enforce that, so that out of respect for the witnesses who'll be testifying and out of respect for the time that we need to be able to deliberate this, this bill–

**Senator Van de Putte:**  Thank you–

**Senator Duncan:**  And the decorum of this, this beautiful Chamber.

**Senator Van de Putte:**  Thank you, Senator Duncan. I'm glad to have an answer on that, and we certainly believe that the decorum of the Senate, and that our guests will be invited to give that testimony, and we are in accordance with your wishes that we adhere to the decorum of the Senate. Senator, the next request on my memo to you was that the Senate provide qualified legal representation to each side on this debate. There are many constitutional issues at stake. We already know from experience in Indiana and Georgia that the results of what this legislation might pass will go straight

to the U.S. Department of Justice and into the federal courts. We know that for a fact. And yet, we will not have, on both sides, any of this fight, a qualified legal representation. Is that true?

**Senator Duncan:** The party caucuses will not be provided qualified legal representation. That's correct. Or any legal, I mean, the Senate will not provide independent counsel for the party caucuses. That's correct.

**Senator Van de Putte:** Thank you, Senator. Next, we requested that a stenographer be provided to record all the proceedings of the Committee of the Whole testimony and deliberations, and the subsequent deliberations of the Texas Senate on this legislation. Because of the certainty of the Department of Justice and federal litigation on this, you indicated in your response that the prospects, that it looked good at the time. Are we now prepared with a stenographer to record these proceedings and include them in the committee report and in the *Senate Journal* in full?

**Senator Duncan:** Senator, that, we have worked and Secretary of the Senate's office and my staff have worked together to arrange for a stenographic, or stenographer to be present to record the official record of the hearing.

**Senator Van de Putte:** Thank you, at least that's one thing we got in our requests. Senator, I also wanted to, for the record, state that since we are in the Senate Chamber, that all the proceedings can be viewed currently on the Internet, as we normally do with video streaming. Since the Committee of the Whole will resolve, but will be so in this Chamber, will that free access to the public be accorded when we resolve into the Committee of the Whole?

**Senator Duncan:** Free access to the Chamber will be afforded, or to the gallery, as normal, with normal security procedures. There will also be an overflow room that will accommodate, if there is a need for that, will accommodate our guests here, too, and our constituents, and they can be watching this on TV at the same time. The process will also provide that when we call names for witnesses, we will try to make sure that each of the witnesses have an opportunity to arrive at the Chamber and be admitted. But as far as the floor, the Senate floor will remain under strict, you know, under our decorum rules that we normally abide by during a session of the Senate.

**Senator Van de Putte:** And, Senator Duncan, for the record, all of the proceedings now and the Committee of the Whole will be able to have that transparency of Texas public government, as it will be available live video streamed on the Internet?

**Senator Duncan:** I am not, I would assume that that's the case, and I understand that this will be done as our normal sessions are, under a live video stream, is what I'm advised.

**Senator Van de Putte:** So, Senator Duncan, that is an affirmative?

**Senator Duncan:** That's the nod I got (laughter), and I think you did, too.

**Senator Van de Putte:** Thank you, Senator Duncan. Senator, we requested in that memo that the Attorney General make himself available as a resource witness in the Committee of the Whole, and you responded at the time that you were doubtful. You said, given the fact that the Office of the Attorney General will represent the State of Texas in litigation, if any, arising out of this legislation, it would be inappropriate to

present the Attorney General at this time. Senator Duncan, is it true that the Attorney General or his designee testified at several points in the process during the 2001 redistricting hearings, which were sure to go to court?

**Senator Duncan:** Senator, I'm, I don't know. I don't recall and I wouldn't want to answer that without going back and looking at the record. I don't recall, but again, I haven't looked at the record to determine that.

**Senator Van de Putte:** And, Senator, isn't it also true that the Attorney General or his designee testified during the 2003 redistricting hearings, that were sure to go to court, and it was true that the Attorney General or his designee testified on this very same voter ID legislation in the last session of the Legislature?

**Senator Duncan:** Senator, I, again, I would have to go back and look at the records. I haven't done that. I understand it's generally a policy that they, if litigation is imminent on a piece of legislation, that they typically don't testify.

**Senator Van de Putte:** Well, Senator Duncan, I'm surprised, because suddenly we don't want our Attorney General to comment on anything that would go to court. And, Senator, with all due respect, the Attorney General is the state's lawyer. Don't you think it would be helpful for the state's lawyer, in the State Senate, to hear his views on the laws that we're about to change, so that, that he will have to defend?

**Senator Duncan:** Well, Senator, I think there's a process that normally and, I think, should always be involved, is that opinions of the attorney, the Attorney General has an opinion process for advising on issues that are before the, the body. I've always had a concern as the attorney, with the Attorney General appearing as a witness in a legislative deliberation or debate, if he is going to be the actual attorney who will representing the people of the State of Texas in litigation arising out of that. So, you know, typically just, I'm not going to speak for the Attorney General here, but I'll speak for myself, I think that the Attorney General is not a proper witness in a case where we know that the, and I think everyone has made it clear that whatever we do in resolution of this issue, if it is passed, that there will be a review by the court system and certainly with D.O.J., or through the preclearance process. So, I think that certainly litigation of some type is imminent. In my view, it would be inappropriate for the Attorney General to be a witness in that legislative debate.

**Senator Van de Putte:** Well, Senator Duncan, I know that for a fact the Attorney General did participate in this very same piece of legislation last year in the House and had his designee in the House hearings. I thought, now, I'm not an attorney, but I thought when something goes to litigation that that's why we have the solicitor general argue those cases, that it is standard practice. But, Senator Duncan, I believe you, but you may or may not know that the Senate Democrats faxed a letter to General Abbott late yesterday evening extending the request directly to him. And I guess you're not prepared to produce the Attorney General so that we can get the benefits of his experience after his office and he spent over 1.4 million tax dollars looking for the sort of voter fraud that this legislation would address and not getting a single conviction for that sort of fraud for his efforts. I just thought his experience in that would be relevant to what we're about to discuss. And so, you're not going to produce him, and he is ignoring our request.

**Senator Duncan:** Well, Senator, I'm not the author of the bill, nor, and, do I have the power to compel the Attorney General to appear. So, you know, I guess that would have to be my response to your question. I think that was a question. (Laughter)

**Senator Van de Putte:** Well, Senator Duncan, I really believe you when you say that you want to proceed in a constructive way, and I think all of our colleagues believe in your abilities. But to tell you the truth, out of all of the important requests regarding the ground rules, which we believe as important components toward representing our constituents, we've gotten our, a little more, I mean, we've got our extra expert witnesses and a court reporter, and that, I just wanted to note that might help explain why I think the Democrats will respectfully vote "No" on the resolution. But beyond the specifics of our request regarding the process for considering this bill, let me respectfully offer maybe an insight as to one of the reasons that, respectfully, we will vote "No" on this resolution. It's because, Senator Duncan, it's not about voter ID. I've always looked forward to the day when discrimination and voter suppression are things of the past. But the fact that we have to debate voter ID tells me that we aren't there yet. This voter ID bill echoes a history of voter suppression in our great state, but, unfortunately, it's not just minority voting rights that are threatened by the voter ID bill. The laws threaten seniors and lower income Texans who don't drive and don't have a photo ID and have no easy or free way to get one. Your proposals for debate are taken into consideration, but, Senator, the proposed voter ID law would force thousands of poll workers to enforce the new ID requirements, and this is just a recipe for catastrophe, for confusion that could deny a ballot to women and to students whose names or address and ID doesn't match on the name and address the voter rolls. Senator Duncan, are you aware that it's more likely for a person to be struck by lightning than to impersonate a voter?

**Senator Duncan:** I have–

**Senator Van de Putte:** And by–

**Senator Duncan:** Senator, I have no data to support that.

**President:** (Gavel)

**Senator Williams:** Mr. President.

**Senator Van de Putte:** By contrast, Senator Duncan, over a million Texans registered to vote who had no driver's license last year.

**Senator Williams:** Mr. President.

**Senator Van de Putte:** I will continue on my questions of Senator Duncan.

**President:** Senator Williams, for what purpose do you rise, Sir?

**Senator Williams:** Mr. President, I rise to request that you instruct the Sergeant-at-Arms to strictly enforce Rule 3.05, no applause, outburst, or other demonstration by any spectator shall be permitted during the Senate, session of the Senate, and that this rule shall be strictly enforced.

**President:** So ordered.

**Senator Van de Putte:**  Thank you Mr. President. Senator Duncan, I, most of us take a photo ID for granted. There's no public policy reason for this, and I understand the difficulty that you've been placed with in offering this resolution.  Because that partisanship alone is the reason voter ID was singled out to be considered outside the traditional Senate Two-thirds Rule. Senator Duncan, I know that you've put a lot of time into this resolution and into the requests and deliberate, but I hope you will understand why we will vote "No" on the resolution, not to disrespect you, but of our real need to unite to solve Texas' real problems. It's the special treatment of this voter ID bill that proves some politicians still don't get the message that the voters sent to us in this last election cycle. With all due respect, Senator Duncan, that's why we cannot support your resolution. That's why we cannot support this resulting process and ultimately why we cannot support the resulting legislation.

**Senator Duncan:**  Thank you, Senator, and I appreciate your position, and I also, but I will say this, too, I also appreciate the fact that you have allowed me to sit down with you and members of your caucus, so that at least I can understand your concerns and, hopefully, we can have a very orderly hearing and treat our guests and each other with appropriate decorum. And I appreciate your approach here. Thank you very much.

**Senator Van de Putte:**  Senator Duncan, following our conversations on this Senate floor today, and particularly our conversations about the court reporter, I'd like to move that the entirety of our dialogue this morning and the testimony that we will be hearing be reduced to writing and placed into the committee report for this legislation.

**President:**  Would Senator Van de Putte approach the podium for a moment?

(Pause)

**President:**  (Gavel) Senator Van de Putte, if I understand, you're going to withdraw your motion, and you're going to make a new motion.

**Senator Van de Putte:**  Yes, Mr. President, if I could be allowed to–

**President:**  You're recognized.

**Senator Van de Putte:**  Ask questions of the Chairman? Senator Duncan, I know that it has been affirmed that all of this is proceedings today, and when we resolve into the Committee of the Whole, that this will be available for video streaming and accessibility and transparency to our Texans. And following our conversation earlier about a court reporter, I would like to move that the entirety of the dialogue and the questions that we have had here this morning be reduced to writing and placed into the journal. And at, then at the appropriate time when we resolve into the Committee of the Whole, that the discussion about the court reporter and what will be the record of the Committee of the Whole will be discussed at that time. Is that correct?

**Senator Duncan:**  That's my understanding.

**Senator Van de Putte:**  Thank you, Senator Duncan. I appreciate and I deeply respect you. I know that this is a difficult task, and I do not look forward to the day's proceedings.

TX_00002806
JA_004192

**Senator Duncan:**  Well, thank you, Senator, and I look forward, though, to working with each and every one of you to try to resolve this through the committee in an orderly fashion. And I appreciate your help.

**President:**  Senator Ellis, for what purpose do you rise, Sir?

**Senator Ellis:**  Ask a couple of questions of Senator Duncan.

**President:**  Will Senator Duncan yield to Senator Ellis?

**Senator Ellis:**  Senator, Senator Van de Putte made reference to a request that the Attorney General come over. Now, if my memory serves me correctly, the last time we met in Committee of the Whole was on the issue of redistricting. And I'm relatively sure that the Attorney General or a representative did participate in those proceedings. So, I want to hone in on this a little bit more so I get a sense of if there's a precedent being established that if it's a matter that will possibly go to litigation, the Attorney General will not come. I saw in one of the press accounts that the Attorney General was asked not to come. Now, from you all's discussion, I got the impression that you couldn't speak for the Attorney General, and maybe the Attorney General was declining to come. So, my question is, did you ask that the Attorney General not come or not?

**Senator Duncan:**  No, no. I, that's not my decision about whether or not the Attorney General comes or not. That's his.

**Senator Ellis:**  Okay. So, as the–

**Senator Duncan:**  His–

**Senator Ellis:**  Presiding Officer–

**Senator Duncan:**  His office is an independent office, and if he desires to be here, he can. If he desires not to be here, I would assume that he would not, not be compelled to come, as I understand the rules in a Committee of the Whole.

**Senator Ellis:**  Okay.

**Senator Duncan:**  My, what I have laid out would be my, my personal position would be is that if the Attorney General does have, if litigation is imminent with regard to legislation that we may be considering, that it would be inappropriate for the Attorney General to appear as a witness in the deliberations over that bill. And that's where my objections (inaudible, overlapping conversation)–

**Senator Ellis:**  Well, if the Attorney General were not appearing as a witness, would you have any personal objection to the Attorney General appearing as a resource? You know, I'm thinking, Jessica's Law, last session, which was already the subject of a case pending before the United States Supreme Court. You know, whether Attorney General is there as a witness or not, I mean, I just think both sides ought to have some sense–

**Senator Duncan:**  Senator, I think–

**Senator Ellis:**  Of the law from our state's chief–

**Senator Duncan:**  Either side is–

**Senator Ellis:**  Law enforcement officer.

**Senator Duncan:**  I think, to answer your question, I think either side is entitled to extend an invitation to the Attorney General, and I think that being an independent elected official and the Attorney General, which is in the executive branch of the government, that he could respond accordingly, but–

**Senator Ellis:**  Because I would hope–

**Senator Duncan:**  That's as far as I'd go with it.

**Senator Ellis:**  When we do start our proceedings that the Attorney General's office is listening, because I think that is important, whether it is the actual Attorney General or a representative.  And I'm sure whether someone agrees with your position or mine on this issue, clearly, Members would give that office the respect that it deserves.  But I just think on a issue that is important, that's controversial, whether it goes to court or not, where there are legal implications, both sides, before they cast a vote ought to get a sense of what our chief lawyer, the state's lawyer, regardless of what party that person is in, has to say about it.  Because if not, I dare say that we start a precedent where the Attorney General would have a lot more time to focus on other things than giving us legal advice, because, as you know, there are many issues that come before this body, in committee or Committee of the Whole, or that are subject to end up in a court of law. And I just want to make sure that it's clear that you did not ask Attorney General not to come.  So those press accounts that I have read on my BlackBerry in the last hour are apparently wrong, or there's a miscommunication there somewhere, because–

**Senator Duncan:**  I can't believe there's any miscommunication in the world about in the media; they usually always get it right.  But the, the answer to the question is, No, I did not request the Attorney General to refuse to appear.

**Senator Ellis:**  Okay.

**Senator Duncan:**  In fact, that's–

**Senator Ellis:**  I would hope that if you get a call, because I'm certainly going to call. I mean, there are issues that I agree with the Attorney General on.  Sometimes I may disagree, but he is my lawyer–(inaudible, overlapping conversation)

**Senator Duncan:**  The only communication–

**Senator Ellis:**  In the Senate.

**Senator Duncan:**  The communication that I had with you or with Senator Van de Putte, Senator West, and others is my position on whether or not the Attorney General should appear, and that is clear as I can make it, and does state my–

**Senator Ellis:**  I got it.

**Senator Duncan:**  (Inaudible, overlapping conversation)

**Senator Ellis:**  And so, for the record, I'm saying that he should come as a resource. As you know, last week when, when I was in Washington, my staff drafted a letter that I sent to our U.S. Attorney General, the initial draft said, come as a witness–

**Senator Duncan:**  I think–

**Senator Ellis:** And I said, I don't think so.

**Senator Duncan:** Again, I'll reiterate.

**Senator Ellis:** He can come as a resource. So, that's what our request is, that our Attorney General be here as a resource, and not just to our side, to both sides, whether it's him or someone from his office. So, I'm hoping that that can be worked out, and, to be honest with you, I think that'd be some bipartisan agreement, does not have to come as a witness, obviously, answer questions, but be our resource. Because if not, when we have your committee meetings of State Affairs on this floor on issues that oftentimes are going to end up in litigation as soon as the bill is signed, we want the Attorney General to give us input on both sides. So, I hope that happens today. In, on the second page, page 2 under 4(a), you have witnesses appearing in order be admitted to the floor. I mentioned to you when we were huddling at the President's desk a little earlier, I think this gives you enough discretion. And if not, I want to encourage some discretion so that if one of the experts invited from either side, after they testify, if it doesn't crowd the floor–I'm sure there'll be 31 Members here most of the time–but if it doesn't crowd the floor, I hope there'll be some leniency so we don't have to have someone run back from somebody's office, below us or above us, in case there's a question, that some Member thinks of something. I mean, not to fill up the floor and not to have them create a ruckus or a demonstration, anyway, but I hope that you'll have some flexibility on that, for both sides, for expert witnesses to come in.

**Senator Duncan:** I will consider that as we go through. I don't think that's unreasonable. And I think that we'll, again, want to have a high quality debate on the issues.

**Senator Ellis:** Under Section (b), 4(b), it says that we can have one employee of the Senate within the brass rail at any given time. I'm wondering are you going to be checking the ID, or how will you know that they are employees of the Senate?

**Senator Duncan:** We–

**Senator Ellis:** Government-issued ID.

**Senator Duncan:** They can–

**Senator Ellis:** Because I wanted to make sure all my staffers did–

**Senator Duncan:** I–

**Senator Ellis:** To poke at the idea, I was talking to Chairman Williams earlier about my wife not having an ID to get in here, so I just–

**Senator Duncan:** The–

**Senator Ellis:** Wanted to make sure.

**Senator Duncan:** The rules of the Senate apply to that particular provision, and our staffs will be permitted if they have the green badge. And if they're on the floor, they'll have to have a green badge, other than our Sergeants, who have white badges. So, if you see a person on the floor without a green badge or a white badge, if you'll report that to the Chair or the Sergeant-at-Arms, we'll see that that is taken care of.

**Senator Ellis:** Well, let the record reflect that because I hope that, despite the fact that this bill can pass with a simple majority, I hope this is a deliberative process. So, anyone sitting by your desk, whether they have their ID or their green badge or their white badge, I, for one, would not object to them being here, because I want you to get all the good advice before you cast that bad vote, that you can get.

**Senator Duncan:** I usually–

**Senator Ellis:** Thank you.

**Senator Duncan:** Need all the advice I can get, Senator, and you usually give it to me. So, I appreciate the offer.

**President:** Senator West, for what purpose do you rise, Sir?

**Senator West:** Question of the author.

**President:** Will Senator Duncan yield to Senator West?

**Senator Duncan:** I yield.

**Senator West:** Senator Duncan, I'm going to follow up on some of the questions that Senator Ellis was raising as it relates to the Attorney General. Now, I think in the exchange between you and Senator Van de Putte, you said that you could not compel the Attorney General to come over and be a witness or a resource. Of the decision to not compel, invite, whatever the case may be, the Attorney General, is that a decision of the Chair, is that your personal preference, or do you believe that that is the preference of the committee?

**Senator Duncan:** Well, I believe that the ability or authority to compel by subpoena is not granted or does not exist in the Committee of the Whole. It only exists in standing committees, and so to the extent that one would wish to compel any witness to appear before the Senate Committee of the Whole, there is no authority granted in the rules for that.

**Senator West:** As it relates to the rules, I mean, I thought that the resolution, or at least some iteration of something I've seen as it relates to the procedure that we would be following, would be if there was not anything specific in the resolution, then we would follow the general rules of the Senate. Is that correct?

**Senator Duncan:** Well, no, that's not correct, and again, I'm going to, you know, I'm not going to give advisory opinions. I think it'd be inappropriate in the resolution with–

**Senator West:** I'm just trying–

**Senator Duncan:** Regard to–

**Senator West:** To figure out what rules we're going to go by.

**Senator Duncan:** The, well, the rules are in the, in the red book and–

**Senator West:** Okay.

**Senator Duncan:** I think it's Article 13, if I remember correctly–

**Senator West:** Okay.

**Senator Duncan:**  Of the–

**Senator West:**  Alright.

**Senator Duncan:**  And I'm sure you've studied it.

**Senator West:**  So, if in Rule 13, or whatever the case may be, as in terms of the Committee of the Whole, it says that we will follow the other rules of the Senate, then that's what we'll do. Is that correct?

**Senator Duncan:**  Well, I, we'll follow the rule, and we'll–

**Senator West:**  Okay.

**Senator Duncan:**  Look at the rule and see what it says.

**Senator West:**  If there's, now, let me get back to the Attorney General.  Your apprehension, in terms of having the Attorney General over here, is based on a personal apprehension, or something that you claim that the committee wants to do?

**Senator Duncan:**  Senator, as I stated, I think, to Senator Van de Putte, you know, I think any Member of the Senate or any side of this bill would be entitled to invite the Attorney General over as a witness or a resource. I think it's up to him to say yes or no on that. I don't think it's, we can compel him, in my personal opinion, I think it's always unwise if the Attorney General is going to be defending the State of Texas, or at least advancing the State of Texas' interest as expressed by this Legislature, not be a witness in the legislative debate.

**Senator West:**  Okay.  Would you go, do you have your Senate Rules with you?

**Senator Duncan:**  Probably somewhere.

**Senator West:**  I'd ask you to look at Senate Rule 11.20, Subsection (b).

**Senator Duncan:**  What page?

**Senator West:**  Page 89.

**Senator Duncan:**  Eighty-nine.

**Senator West:**  Eighty-nine. It appears as though, if I'm reading this correctly, a Committee Chair may summon the governing board or other representative of a state agency, state agencies or an executive branch of government, to appear and testify before the committee without issuing process, that being a subpoena, under Subsection (a).  The summons may be communicated in writing, orally, or electronically. Does that appear to give you the authority to do that, if you so decide to do it as the Chairman? (inaudible, overlapping conversation)

**Senator Duncan:**  Senator, I've looked at that, and I'm familiar with that, and I don't believe that the committee, that the power to, the power to subpoena arises through the standing committees and not the Chair. This would authorize the Chair to, through the standing committees, to do that.  But the Committee of the Whole in, as general, doesn't have, in my view, and I've looked at this, actually, the power to subpoena witnesses who appear before us in, in a–

**Senator West:**  So, if–

**Senator Duncan:**  In a committee, pure Committee of the Whole, as we're going into.

**Senator West:** So, if indeed there is authority to do it, would you communicate to the Attorney General the desire of the committee to appear before the committee?

**Senator Duncan:** Well, if the committee had, Committee of the Whole had authority to issue a subpoena, then the subpoena would have to be approved by the body, so–

**Senator West:** Well, this particular provision that I just mentioned is an alternative, though, to issuing a subpoena. It gives the Chair the, basically, the discretion to ask that a witness appear–

**Senator Duncan:** Well.

**Senator West:** Not by subpoenaing, just by, basically, the Chair communicating that you want him over.

**Senator Duncan:** Senator.

**Senator West:** That's an alternative method of getting–

**Senator Duncan:** Well–

**Senator West:** Him before the committee.

**Senator Duncan:** Let's look at it this way. I'm not in the Chair right now. I'm sitting out here with you, and so, it, I think it's inappropriate for me to make a ruling out here at, in the cheap seats, so–

**Senator West:** Okay, but you, you will–

**Senator Duncan:** Uhm–

**Senator West:** Well, then, alright then, alright, it's not right yet. Is that what you're saying?

**Senator Duncan:** Right.

**Senator West:** Alright. It soon will be right. Now, let me get back then to the procedures. Would you go with me to section, Rule 13.04 on page 97.

**Senator Duncan:** What page?

**Senator West:** Ninety-seven. That rule says the rules of the Senate, as far as applicable, shall be observed in the Committee of the Whole. What's your interpretation of that?

**Senator Duncan:** Well, I think that the, again, I'm not in the Chair at this point in time. I think I'll read the rule as it states, the rules of the Senate, as far as applicable, shall be observed in Committee of the Whole–

**Senator West:** Okay.

**Senator Duncan:** Session, or Whole Senate.

**Senator West:** And it seems as though, to the extent that we have specificity in the resolution, and the resolution we control, and to the extent that there's nothing in a resolution, the Senate Rules will control the procedure for the Committee of the Whole. That's the way that I read that. How do you read it?

**Senator Duncan:** Senator, I'm sure we'll have an opportunity to debate that if I'm in the Chair.

**Senator West:**  I look forward to it. Thank you, Sir.

**President:**  Senator Shapleigh, for what purpose do you rise, Sir?

**Senator Shapleigh:**  Some questions of the author.

**President:**  Will Senator Duncan yield to Senator Shapleigh?

**Senator Duncan:**  I yield.

**Senator Shapleigh:**  Senator, there've been a lot of questions about the participation of the AG and your personal feeling, obviously, prior to taking the Chair, that his testimony would present a conflict in any later litigation.

**Senator Duncan:**  Well, Senator, that's my personal, my personal observation is that the Attorney General should not be a witness in a legislative debate over which he will have jurisdiction to defend the position of the state at future times.

**Senator Shapleigh:**  Would you agree that if the Attorney General undertook a rather extensive investigation of voter fraud, that that file and his findings would be relevant to the benchmark which is essential to establish, in this case, to change current procedures in the Voting Rights Act?

**Senator Duncan:**  Senator, I, you know, I would assume that if there were public records available of that particular, any sort of effort or initiative to understand voter fraud, that those would be available to the committee, and if requested, they would be made available.

**Senator Shapleigh:**  And if we were to subpoena him or his deputy for the purpose of bringing those records here so that we could examine them during the course of this committee, that would be relevant to our proceedings on whether or not voter fraud exists in the State of Texas?

**Senator Duncan:**  I don't know whether or not it would.

**Senator Shapleigh:**  And would you agree that a Committee Chair could issue that subpoena for the purposes of the Committee of the Whole?

**Senator Duncan:**  Senator, I, we have discussed this generally, and I think it would be inappropriate at this point in time to give you an advance, a ruling without bringing the issue formally before the body, and this would not be the right forum to do that in.

**Senator Shapleigh:**  This proceeding is articulated in the Constitution itself, I believe in Section 16. We had some discussion of that when the special order was issued back in January, and I want to talk a little bit about the participation and your interpretation of how the Lieutenant Governor participates in the Committee of the Whole. In the Section 16, it states that the Lieutenant Governor, when in the Committee of the Whole, has the right to debate and vote on all questions. Does that right extend to amendments?

**Senator Duncan:**  That would be an advisory opinion. We'd have to take that up at the time you wanted to raise it before the Committee of the Whole.

**Senator Shapleigh:**  Okay.  Thank you.

**President:**  Senator Gallegos, for what purpose do you rise, Sir?

**Senator Gallegos:** To ask questions of–

**President:** Will Senator Duncan yield–

**Senator Gallegos:** The author of–(inaudible, overlapping conversation)

**President:** To Senator Gallegos?

**Senator Duncan:** I yield.

**Senator Gallegos:** Senator Duncan, let me go back a little bit. During the redistricting process, almost 10 years ago, when I was Co-chair and Senator Fraser was Co-chair, and you oversaw the process in those redistricting hearings. Is that correct?

**Senator Duncan:** I was just a member of the committee in 2001.

**Senator Gallegos:** Okay. Well, you were a member of the committee?

**Senator Duncan:** Yes, Sir.

**Senator Gallegos:** Let me ask you this, because then, and it relates to the questions that Senator West and the initial request by Senator Van de Putte and some of the other questions as far as the process in this resolution that you have, is that whenever you take up an issue like a procedure that's going to tell Texans how they can or cannot vote or what they must do on how to vote, and under the Voting Rights Act, like redistricting is, is that during that process that we went all over the state, had numerous public hearings and dealings with redistricting and those issues relating to redistricting, that during that process that we were allowed legal representation on both sides. Is that correct?

**Senator Duncan:** Senator, I believe that both sides are entitled to employ at their own expense independent counsel to represent their interest or advise them in any way possible. I, I'm not at, I recall 2003 because I was directly involved in that, and I don't recall that in that process that the Senate provided independent counsel for the party caucuses.

**Senator Gallegos:** But there was legal counsel present?

**Senator Duncan:** There was legal–

**Senator Gallegos:** Yes or no.

**Senator Duncan:** The committee employed legal counsel, correct.

**Senator Gallegos:** Okay. Now, on as far as the, in going back to Senator West's inquiries, Senator Ellis' inquiries, and this procedure on this resolution that you're introducing right now, that when it comes to the Attorney General and that he was or his office was present at those hearings, is that yes or no?

**Senator Duncan:** I don't know.

**Senator Gallegos:** Well, I believe it was yes, and he was there. And I guess my concern, along with Senator Ellis, Senator West, Senator Van de Putte, and the other colleagues that agree with me, is that the Attorney General is the legal representative for the citizens of the State of Texas. Is that not correct?

**Senator Duncan:**  Senator, and let me go back to the last question you had. I don't know if they were there or not, meaning physically present or observing. I don't recall them testifying in 2003. I would, somebody might want to correct me, but I just simply don't recall it. So–

**Senator Gallegos:**  Well–

**Senator Duncan:**  I'm sorry, I just want to make sure you–

**Senator Gallegos:**  Well, and–

**Senator Duncan:**  Understand my answer.

**Senator Gallegos:**  And you know, I, I'm trying to think back, too.  I believe they were.

**Senator Duncan:**  A lot of water's been under the bridge.  A lot of–

**Senator Gallegos:**  I mean, and what we're seeing.

**Senator Duncan:**  Water went under the bridge during that time.

**Senator Gallegos:**  Understand me, Senator, overseeing a process like redistricting or voter ID or anything having to do with the Texans' right to vote, under the Voting Rights Act that, yeah, I mean, it's common sense you've got to have legal counsel there, especially when you're having public testimony and allow everybody that wants to testify in front of the committee that is overseeing redistricting, voter ID, or whatever the issue is, when under the Voting Rights Act, that an attorney should be present that's going to oversee the process, like was during those hearings that we had all over the state. Now, my second question is back to the Attorney General. Now, he is the attorney for the State of Texas, and in this process that we're fixing to go through, as soon as we oversee your resolution and the procedures, is there no way, you're introducing this resolution, that you can put in there, as the Attorney General of the State of Texas overseeing Texans' rights, that either he or a representative of his office should be there and oversee Texans' rights as we, not only the resolution that you are presenting here before the floor but also that their rights be overseen?  He was elected to oversee and protect us as the Attorney General of the State of Texas.  I feel he should be on this floor protecting all citizens' rights whether they're for the bill or against the bill. It, I mean, but I'm asking you if you can add that to your resolution.

**Senator Duncan:**  Senator, I guess, if you had, I mean, you can offer an amendment if you wish, but I don't intend to add that to the resolution.

**Senator Gallegos:**  Well, wouldn't you agree with me, is he not the Attorney General of the State of Texas?

**Senator Duncan:**  Yes, I will.  I will agree with that.

**Senator Gallegos:**  Did he not litigate the redistricting issue that we passed on this floor? And wasn't he our legal counsel in that court case?

**Senator Duncan:**  In–

**Senator Gallegos:**  Well, then I feel, if this is going to go to court–

**Senator Duncan:** What–

**Senator Gallegos:** He needs to be our legal counsel on this issue.

**Senator Duncan:** Okay.

**Senator Gallegos:** And then that's why I think that he should. If he doesn't show up, then he's neglecting his duties that the Attorney General of the State of Texas overseeing this emotional issue on how to tell Texans how to vote. Now, don't you agree with me that he is the Attorney General of the State of Texas and is legal counsel for the State of Texas here on, and us, on any issue that we bring up before the state, before this floor, or over in the House? Yes or no?

**Senator Duncan:** I don't know that I entirely agree. I think that there are certain duties that the Attorney General has that are much different from–(inaudible, overlapping conversation)

**Senator Gallegos:** Did he not litigate redistricting case for us?

**Senator Duncan:** Once we, once the state, once the Legislature approved a redistricting plan that became the law of the State of Texas, it was his duty to defend that law.

**Senator Gallegos:** Well, that's what I'm saying here. As soon as this becomes, if he doesn't oversee the process, he is the one that's going to oversee this process and do the litigation for us if this issue goes to court. Is that not true?

**Senator Duncan:** Well, I think it's our duty to pass the law, and it's his duty, then, to represent the state in court, with regard to that law.

**Senator Gallegos:** So, what you're telling me, you will entertain an amendment to have the Attorney General present before we lay out this bill?

**Senator Duncan:** No, that's not what I said. I said that if you want to offer an amendment, you can do so.

**Senator Gallegos:** So, you're telling–

**Senator Duncan:** I–

**Senator Gallegos:** Well, let me make this perfectly–

**Senator Duncan:** That I–

**Senator Gallegos:** Clear–

**Senator Duncan:** I would not vote for it, but–

**Senator Gallegos:** You're telling me and everybody on this Senate floor that if I or any of my colleagues produce an amendment, or at, or introduce an amendment to have the Attorney General here, that you're going to, are you going to deny me that right or any of my colleagues' rights?

**Senator Duncan:** Senator, is–(inaudible, overlapping conversation)

**Senator Gallegos:** Are you going to vote "Yes" or "No"?

**Senator Duncan:**  When you call it up, I will, I would prefer the amendment or the resolution to go through as I have proposed it.

**Senator Gallegos:**  Thank you, Senator.

### MESSAGE FROM THE HOUSE

HOUSE CHAMBER
Austin, Texas
March 10, 2009

The Honorable President of the Senate
Senate Chamber
Austin, Texas

Mr. President:

I am directed by the House to inform the Senate that the House has taken the following action:

THE HOUSE HAS PASSED THE FOLLOWING MEASURES:

**HCR 80,** Recognizing March 2009 as National Women's History Month.

**HCR 85,** Declaring March 10, 2009, as Matagorda County Day at the State Capitol.

**HCR 87,** Declaring March 10, 2009, Brazoria County Day at the State Capitol.

**SCR 30,** In memory of Jess M. Irwin, Jr.

Respectfully,

/s/Robert Haney, Chief Clerk
House of Representatives

### SENATE RESOLUTION 205

Senator Ogden offered the following resolution:

WHEREAS, The Senate of the State of Texas is pleased to recognize the Boys and Girls Clubs of Texas for the valuable contribution they make to the young people of this state; and

WHEREAS, Boys and Girls Clubs provide services to over 418,000 school-aged young people in 172 cities in Texas; their goal is to inspire all young people, especially those who need it most, to realize their full potential as productive, responsible, and caring citizens; and

WHEREAS, Through strong, evidence-based, and proven-effective youth development programs, leaders in the Boys and Girls Clubs stress character and leadership development, education and career advancement, and health and life skills; they encourage an appreciation for the arts and provide programs in sports, fitness, and recreation; and

WHEREAS, The programs promote a better self-image and improved educational, social, emotional, and cultural awareness while encouraging community involvement, strong moral values, and enhanced life management skills; and

WHEREAS, On March 10, 2009, one of eight finalists from Texas will be chosen as Texas State Youth of the Year to represent the State of Texas in the National Youth of the Year contest for Boys and Girls Clubs of America; and

TX_00002817
JA_004203

WHEREAS, Through the years, Boys and Girls Clubs have encouraged young people to aspire to the highest level of personal development and to become good citizens who are involved in their communities; now, therefore, be it

RESOLVED, That the Senate of the State of Texas, 81st Legislature, hereby commend Boys and Girls Clubs across Texas for the outstanding services they provide young people and their families; and, be it further

RESOLVED, That a copy of this Resolution be prepared for the organization as an expression of high regard from the Texas Senate.

**SR 205** was read and was adopted without objection.

### SENATE RESOLUTION 307

Senator Huffman offered the following resolution:

WHEREAS, Proud citizens from Brazoria County are coming to Austin on March 10, 2009, to celebrate Brazoria County Day at the Texas State Capitol, and this occasion provides an opportunity to pay tribute to this important region of the Lone Star State; and

WHEREAS, Located along the Gulf Coast, Brazoria County has been blessed with 20 miles of natural beach; encompassing both the Brazoria and San Bernard National Wildlife Refuges, this notable Texas county boasts spectacular flora and fauna as well as excellent opportunities for hunting and fishing; and

WHEREAS, Before being settled by members of Stephen F. Austin's "Old 300" colonists in the early 1820s, this geographically diverse region was inhabited by members of the Karankawa tribe; officially created in 1836, the county was the site of General Santa Anna's signing of the Treaties of Velasco that same year, which effectively granted Texas its independence; and

WHEREAS, Angleton, the county seat, was founded in 1890 and today is an award-winning Keep Texas Beautiful city which offers visitors a host of interesting attractions, including antique shops, parks, and the Brazoria County Historical Museum; the town's annual events include the Brazoria County Fair and Christmas on the Square; and

WHEREAS, The populous Brazosport area is home to more than 58,000 people who live in eight adjacent cities: Clute, Freeport, Jones Creek, Lake Jackson, Oyster Creek, Quintana, Richwood, and Surfside Beach; Brazosport's diverse economy includes chemical processing, shipping via its deepwater seaport, commercial fishing, and tourism; other sizable cities in Brazoria County include Alvin, the hometown of Baseball Hall of Famer Nolan Ryan, and Pearland, a center for the chemical and oil industries; and

WHEREAS, From the pioneer era to the present, Brazoria County has been home to industrious and innovative citizens, and their many contributions to the Lone Star State are truly worthy of recognition; now, therefore, be it

RESOLVED, That the Senate of the 81st Texas Legislature hereby recognize March 10, 2009, as Brazoria County Day at the State Capitol and extend a warm welcome to the citizens who have traveled to Austin to celebrate this occasion.

HUFFMAN
JACKSON

**SR 307** was read and was adopted without objection.

### SENATE RESOLUTION 284

Senator Jackson offered the following resolution:

WHEREAS, The Senate of the State of Texas is pleased to recognize the Brazoria County Cavalry for its impressive support of the men and women of the armed forces, veterans, police officers, fire fighters, and emergency service responders; and

WHEREAS, Composed of more than 400 motorcyclists from Southeast Texas, the Brazoria County Cavalry provides gratitude and respect to those who serve our state and nation in military and public service; and

WHEREAS, The members of this exceptional organization show their dedication to those who serve by appearing in force at the homecoming of soldiers and at funerals of the fallen, offering support and admiration in times both joyful and solemn; and

WHEREAS, The members of the Brazoria County Cavalry put aside their own interests in the wake of Hurricane Ike to help repair and rebuild a fence in Angleton decorated with crosses representing each soldier killed in Iraq and Afghanistan; their generosity and pride of service embodies the ideals of our state and nation; now, therefore, be it

RESOLVED, That the Senate of the State of Texas, 81st Legislature, hereby commend the members of the Brazoria County Cavalry on their dedication to the men and women who serve our state and nation and extend to them gratitude and appreciation for their devotion and service; and, be it further

RESOLVED, That a copy of this Resolution be prepared for this outstanding organization as an expression of esteem from the Texas Senate.

JACKSON
HUFFMAN

**SR 284** was read and was adopted without objection.

### CONCLUSION OF MORNING CALL

The President at 11:55 a.m. announced the conclusion of morning call.

### AT EASE

The President at 11:56 a.m. announced the Senate would stand At Ease subject to the call of the Chair.

### IN LEGISLATIVE SESSION

The President at 12:35 p.m. called the Senate to order as In Legislative Session.

### COMMITTEE OF THE WHOLE SENATE

The President at 12:35 p.m. announced that the Senate would resolve into the Committee of the Whole Senate with President Pro Tempore Duncan presiding.

### IN LEGISLATIVE SESSION

The President called the Senate to order at 9:29 a.m. **Wednesday, March 11, 2009,** as In Legislative Session.

## COMMITTEE OF THE WHOLE SENATE REPORT

Senator Duncan was recognized and reported that the Committee of the Whole Senate had met and reported **SB 362** to the Senate with the recommendation that it do pass and be printed.

## MOTION IN WRITING

Senator Fraser offered the following Motion In Writing:

Mr. President:

I move that **SB 362**, relating to voter identification requirements, be made a special order for Monday, March 16, 2009, and thereafter until disposed of on second and third readings.

FRASER

The motion prevailed by the following vote: Yeas 19, Nays 12.

Yeas: Averitt, Carona, Deuell, Duncan, Eltife, Estes, Fraser, Harris, Hegar, Huffman, Jackson, Nelson, Nichols, Ogden, Patrick, Seliger, Shapiro, Wentworth, Williams.

Nays: Davis, Ellis, Gallegos, Hinojosa, Lucio, Shapleigh, Uresti, Van de Putte, Watson, West, Whitmire, Zaffirini.

## SENATE RESOLUTION 410

Senator Lucio offered the following resolution:

WHEREAS, Proud residents of the Mid-Valley region of Texas are gathering in Austin on March 11, 2009, to celebrate Mid-Valley Day at the State Capitol; and

WHEREAS, Located in the Rio Grande Valley, the Mid-Valley region includes the towns of Alamo, Donna, Mercedes, Progreso, Progreso Lakes, San Juan, and Weslaco; this area is a center for agribusiness, with farmers producing sugarcane, grains, and citrus fruit such as grapefruits and oranges; and

WHEREAS, The City of Alamo has been undertaking a far-reaching revitalization plan that has resulted in the construction of a new city hall, public library, and public works center; in addition, the town is making significant improvements to its infrastructure and fire department and police facilities; and

WHEREAS, Upholding the motto "the City with a Heart in the Heart of the Rio Grande Valley," Donna looks forward to the completion of the Donna International Bridge to Mexico; the eight-lane bridge is expected to bolster the city's economy because of the increased number of shoppers and tourists traveling to and from Mexico; and

WHEREAS, Mercedes has long been a major center for the processing and marketing of livestock, cotton, and vegetables, and it is also known for its boot makers and the shopping opportunities at the Rio Grande Valley Premium Outlets; the annual Rio Grande Valley Livestock Show and Rodeo draws more than 200,000 people to town each year, and the event provides valuable scholarship funds for 4-H and Future Farmers of America students; and

WHEREAS, In addition to being centers for the sugarcane business, Progreso and Progreso Lakes have been serving as gateways to the Rio Grande Valley since the opening of the Progreso-Nuevo Progreso International Bridge in 2003; and

WHEREAS, Fast-growing San Juan is the home of the Virgen de San Juan del Valle Shrine, which attracts multitudes of pilgrims from throughout the United States and Mexico, and the town has also installed a landmark flagpole that pays tribute to the men and women who have served in the nation's armed forces; and

WHEREAS, The City of Weslaco has become a favorite destination for tourists, golfers, retirees, and birders and is the location of two important Texas A&M University research stations; the annual Onion Fest celebrates the development of the famous Texas 1015 onion in Weslaco, and this popular event brings many visitors to the city; and

WHEREAS, Throughout the Mid-Valley region, great emphasis is placed on the value of education, and one particularly striking example of the Mid-Valley's educational achievements came in December of 2008, when *U.S. News & World Report* ranked the Science Academy of South Texas in Mercedes among the nation's top 100 high schools; and

WHEREAS, The residents of this dynamic region of the Lone Star State are justifiably proud of their hard work, civic commitment, and innovative spirit, and their efforts have created a group of notable Texas communities that are well prepared to meet the challenges and opportunities of the future; now, therefore, be it

RESOLVED, That the Senate of the State of Texas, 81st Legislature, hereby recognize March 11, 2009, as Mid-Valley Day at the State Capitol and extend to the visiting delegation best wishes for an informative and enjoyable stay in Austin.

SR 410 was read and was adopted without objection.

### GUESTS PRESENTED

Senator Lucio was recognized and introduced to the Senate Mid-Valley region Mayors Omar Vela, Pedro Contreras, Rudy Villarreal, Joel Quintanilla, and Buddy de la Rosa, accompanied by a delegation of citizens from the Mid-Valley region.

The Senate welcomed its guests.

### RESOLUTION SIGNED

The President announced the signing of the following enrolled resolution in the presence of the Senate:  **SCR 30**.

### SENATE RESOLUTION 409

Senator Uresti offered the following resolution:

WHEREAS, The Senate of the State of Texas is pleased to join the citizens of Uvalde County and Texans across the state in celebrating March 11, 2009, as Uvalde County Day at the State Capitol; and

WHEREAS, Created by the Texas Legislature in the mid-1850s out of territory from Bexar County, Uvalde County was named for the Spanish governor of Coahuila, Juan de Ugalde, who had led troops to a decisive victory over Apache warriors in 1790; and

WHEREAS, The City of Uvalde is the county seat; founded by Reading W. Black in the 1850s, it is known for its four public plazas and its picturesque architecture; and

WHEREAS, Uvalde County was home to Garner Army Air Field during World War II; the former airfield is now the site of Southwest Texas Junior College; and

WHEREAS, Known as the County of 1,000 Springs, Uvalde County is also a center for wool and mohair production, and its agricultural output plays a major role in the county's economy; and

WHEREAS, The citizens of Uvalde County are justly proud of its long and distinguished history and the many achievements its citizens have made to further the growth and progress of our state; now, therefore, be it

RESOLVED, That the Senate of the State of Texas, 81st Legislature, hereby commend the citizens of Uvalde County on their many contributions to our state and extend to them a heartfelt welcome to Austin for Uvalde County Day at the State Capitol; and, be it further

RESOLVED, That a copy of this Resolution be prepared in honor of this special day.

**SR 409** was read and was adopted without objection.

## GUESTS PRESENTED

Senator Uresti was recognized and introduced to the Senate representatives of Uvalde County:  Uvalde Mayor Cody Smith, County Commissioner Jesse Moreno, County Attorney John P. Dodson, Sheriff Charles Mendeke, and Uvalde Mayor Pro Tempore Raul T. Flores, accompanied by a delegation of citizens from Uvalde County.

The Senate welcomed its guests.

## SENATE RESOLUTION 412

Senator Zaffirini offered the following resolution:

WHEREAS, On March 11, 2009, people from across Atascosa County are traveling to the State Capitol to celebrate their community's heritage and to share with fellow Texans their history, traditions, and achievements; and

WHEREAS, The name Atascosa, derived from the Spanish word for boggy terrain, was used to describe the area as early as 1788; during the first part of the 19th century, this grassy prairie region of South Texas attracted Spanish, Mexican, and Anglo-American settlers, and by the time of the Texas Revolution, its ranching industry was flourishing; and

WHEREAS, In 1856, the region was sufficiently populated to be sectioned off from Bexar County; the original county seat at Navatasco was later permanently moved to the centrally located town of Jourdanton; and

WHEREAS, Situated next to the famous Camino Real, the county has long benefited from its proximity to major transportation arteries linking it with the Gulf Coast, the Rio Grande Valley, and Mexico, as well as other major population centers; and

WHEREAS, Atascosa County enjoys the economic benefits reaped by an abundance of natural resources and, blessed with productive range and irrigated farmland, the area is known for its farming and ranching industries; and

WHEREAS, Proud of its ranching heritage, Pleasanton, the county's trading center, bills itself as the birthplace of the cowboy, a designation symbolized by a large bronze statue in front of city hall; in nearby Poteet, known to many as the Strawberry Capital of the World, a seven-foot, 1,600-pound monument to the fruit graces the front lawn of city hall, and a Strawberry Festival, the fourth-largest agricultural festival in the state, takes place in April; and

WHEREAS, Other resources such as oil and gas also play a significant role in the county's ongoing development, but the most important asset in the area's increasingly diverse economy is undoubtedly its industrious citizenry; and

WHEREAS, For more than a century, residents of Atascosa County have contributed to the economic and cultural development of Texas, and they are justifiably proud of their rich history; it is indeed appropriate that they be honored on this day; now, therefore, be it

RESOLVED, That the Senate of the State of Texas, 81st Legislature, hereby recognize March 11, 2009, as Atascosa County Day at the State Capitol and extend a warm welcome to all visitors from that fine county.

SR 412 was read and was adopted without objection.

### GUESTS PRESENTED

Senator Zaffirini was recognized and introduced to the Senate Diana J. Bautista, Atascosa County Judge; Lon Gillespie, County Commissioner; Diane Gonzales, County Clerk; Michael Lambaria, Veterans County Service Officer; and Roger Garza, Pleasanton City Councilmember.

The Senate welcomed its guests.

### SENATE RESOLUTION 411

Senator Lucio offered the following resolution:

WHEREAS, Kingsville is truly an "All American City," having been founded on the Fourth of July in 1905; and

WHEREAS, Kingsville is home to the world-famous King Ranch, which developed the Santa Gertrudis and Quarter Horse breeds, produced the Triple Crown winner Assault, and has been a world leader in agriculture for over 150 years; and

WHEREAS, Kingsville is home to Texas A&M University–Kingsville and its world renowned Frank H. Dotterweich College of Engineering, Dick and Mary Lewis Kleberg College of Agriculture, Caesar Kleberg Wildlife Research Institute, and Irma Rangel College of Pharmacy; and

WHEREAS, The city is also known for producing the Star Ruby red grapefruit and its university has won seven National College Football Championships and has been the flagship of higher education in South Texas since 1925; and

WHEREAS, Kingsville is home to the nation's premier undergraduate pilot training facility, Naval Air Station Kingsville, which trains pilots in the United States Navy and Marine Corps; and

WHEREAS, Kingsville has volunteered its sons and daughters in defense of our nation through every major conflict in the past 100 years, including native son General Dickie Cavazos, the first person of Mexican-American descent to become a four star general in the United States Army; and

WHEREAS, Kingsville today is a thriving community with diversified industries powered by multiple energy sources, including oil and gas, uranium, and wind and solar power; and

WHEREAS, Kingsville's economy has continued to grow, creating new jobs, increased construction, an expanded tax base, and improved quality of life; now, therefore, be it

RESOLVED, That the Senate of the State of Texas, 81st Legislature, hereby declare March 11, 2009, to be Kingsville Day and urge all citizens of this state to join in recognizing the countless contributions that the City of Kingsville and Kleberg and Kenedy Counties have made to the growth and development of the region, the state, and the country; and, be it further

RESOLVED, That a copy of this Resolution be prepared in honor of this special day.

SR 411 was read and was adopted without objection.

## GUESTS PRESENTED

Senator Lucio was recognized and introduced to the Senate Kleberg County Judge Pete De La Garza, accompanied by a delegation of citizens from Kleberg County.

The Senate welcomed its guests.

## RESOLUTIONS OF RECOGNITION

The following resolutions were adopted by the Senate:

### Memorial Resolutions

SR 401 by Nelson, In memory of Vyarl Wayne Martin of Hurst.

SR 407 by Ellis, In memory of John Cleveland Hooper of Columbus, Mississippi.

SR 413 by Zaffirini, In memory of María Rosa Ramírez of Laredo.

### Congratulatory Resolutions

SR 398 by Nichols, Congratulating Jean Paul Destarac of Tyler for being named a Distinguished Finalist by the Prudential Spirit of Community Awards program.

SR 399 by Nichols, Congratulating Russell Frautschi and Katie Stark of Athens High School for advancing to the state University Interscholastic League debate competition.

SR 402 by Nelson, Congratulating Jim McDermott for receiving a 2009 Lifetime Achievement Award for Staff Leadership from the National Council for Community Behavorial Healthcare.

SR 403 by Nelson, Recognizing Richard Stephen Kitchen on the occasion of his retirement from the North Richland Hills Police Department.

SR 404 by Nelson, Recognizing Theressa Bilger on the occasion of her retirement from the North Richland Hills Police Department.

SR 405 by Deuell, Congratulating Patrick Foster of Sachse for being honored by the Prudential Spirit of Community Awards program.

**SR 414** by Shapiro, Recognizing Von William Byer for his work in Senator Shapiro's office.

**SR 415** by Shapiro, Recognizing Tara Korstad for her work in Senator Shapiro's office.

### Official Designation Resolution

**SR 400** by Nichols, Recognizing April 10, 2009, as Texas Folklore Society Day.

### RECESS

On motion of Senator Whitmire, the Senate at 9:54 a.m. recessed until 10:00 a.m. Friday, March 13, 2009.

————————

### APPENDIX

————————

### BILL ENGROSSED

March 9, 2009

**SB 643**

### RESOLUTIONS ENROLLED

March 9, 2009

**SCR 18**, **SCR 29**, **SCR 31**, **SCR 36**, **SR 369**, **SR 377**, **SR 383**, **SR 384**, **SR 385**, **SR 386**, **SR 387**, **SR 388**, **SR 389**, **SR 390**, **SR 391**, **SR 392**, **SR 393**, **SR 395**, **SR 396**

### SENT TO SECRETARY OF STATE

March 10, 2009

**SCR 36**

### SENT TO GOVERNOR

March 10, 2009

**SCR 18**, **SCR 29**, **SCR 31**

March 11, 2009

**SCR 30**

TX_00002826
JA_004212

TX_00002826

## TESTIMONY FOR LULAC AND THE NATIONAL PRESIDENT
## BY JUDITH SANDERS-CASTRO
## ON ~~HB 101, HB 218, and HB 625~~ *SB 362*

### Before the Senate Committee of the Whole
### Tuesday, March 10, 2009

My name is Judith Sanders-Castro.  I am an attorney who has practiced in the area of Voting Rights litigation for almost three decades.  I have served as the State Legal Counsel for LULAC in the past, represented LULAC in Voting Rights litigation and testified before this legislature on behalf of LULAC concerning changes in election practices and procedures.  I am here at the request of the National President, Rosa Rosales.

My comments are presented on behalf of the League of United Latin American Citizens (LULAC) and the national president, Rosa Rosales.  President Rosales and LULAC have been at the forefront of challenging discriminatory election practices and systems for the past three decades in Texas.  At all levels, LULAC has advocated for increased access for minority populations to the voting and electoral processes and engaged in legal challenges to discriminatory laws, practices and procedures in Austin and throughout the *SB 362* state.  The bills before this committee today, ~~HB 101, HB 218 and HB 625~~ present some of the most onerous restrictions for minority voters in Texas seen in half a century.

The State of Texas has a bleak history of burdening the rights of people of color to vote.  In 1966, the U.S. Supreme Court declared that a poll tax to vote violated the Equal Protection Clause of the 14th Amendment in *Harper v. Virginia Board of Elections*.  Subsequently, Texas had the questionable distinction of being among the last four states to maintain a poll tax for voting.  Even after the poll tax had been declared an unconstitutional burden on the right to vote by the Supreme Court, Texas only changed the requirement after being ordered to do so by a federal court in a later action declaring the poll tax unconstitutional.

Today, the legislature proposes again severely burdening the rights of people in Texas to register to vote and participate in the voting process.  The bills before this committee, ~~HB~~ *SB 362* ~~101, HB 218 and HB 62~~5, create a process of registration that retrogresses from the postcard registration available for residents of Texas for decades.  Calling for presentation of photo identification and other governmental documents information in order to register to vote completely eviscerates the current open and liberalized system of voter registration in Texas.  The identification requirements for voting place unnecessary obstacles to the most fundamental of rights, the right to vote.

Essentially, these bills will require a re-registration of voters in Texas and make initial registration for new or first time voters a logistical nightmare.  The state will reduce the location for voter registration to a few locations throughout the state, the Department of Public Safety offices for driver's license applications.  Deputy registrars will not be able to conduct field registration; voter registration drives like those conducted by Southwest

Voter Registration Project that has worked for decades to increase the Hispanic voter registration in our state, will not be possible because the new law requires on-site registration at limited locations.

Access to the registration sites, without significant expansion of locations with accompanying personnel, will pose the greatest burdens on poor and minority populations. None of the major cities in the state have a viable public transportation system, and those that exist provide limited service making use of the systems costly, time consuming and extraordinarily inefficient. In Texas, being poor equates with being people of color, Hispanics and African Americans. People of color are less likely to have personal transportation and much more likely to use public transportation than the Anglo population. Access to the voter registration sites alone will significantly discourage voter registration for these populations.

As several speakers have noted, there are many groups who will have difficulty with the changed requirements, producing the kind of government-issued identification required by these bills in order to register to vote or to vote. Of all the groups identified, for the reasons set forth in these comments, i.e. lower socio-economic status of minority populations, people of color will be the most heavily impacted group, reducing registration rates and voter participation rates of Hispanics and African Americans more than any other identified group.

It is not accidental that these changes have been proposed as the decennial census approaches and statistics show that the minority populations, particularly the Hispanic population, have been the growth in Texas over the past decade. It is not accidental as, on the tail of the 2008 elections, the magnificent increase of the number of elected Hispanic and African American officials have swept through the metropolitan areas of Texas is followed by state efforts to suppress minority participation in the electoral process.

The effect of these bills and the burdensome changes in voter registration and electoral participation is entirely foreseeable. These changes are undeniably aimed at the swelling increase of minority participation in the political processes in Texas over the past few decades. The changes are retrogressive and intended to discriminate against minority populations. As such, these changes will violate constitutional protections for minority voters and those afforded under the federal Voting Rights Act.

TX_00003310

# Some Thoughts On

# The Proposed Texas

# Photo-ID Bill.

TX_00003311

1.  The first Consideration should be whether there is a problem with persons who vote multiple times— or of non-citizens voting for that matter. Everyone agrees that there are no documented cases where either of these has been done on any large scale in recent years. Many people refer to the Box 13 in Duval County during the Coke Stevenson vs Lyndon Johnson election in 1948.  That was 59 years ago.

2.  It is a serious violation of law to vote multiple times.  While there have been a limited number of charges of multiple voting, nothing on any large scale.  The limited interest by District Attorneys indicates that there is no ground swell of support from the law enforcement community.

On these two grounds alone, the Photo ID bill ought to be rejected.

TX_00003312

3.  Nor would one expect that would be a large problem here. Multiple voting is not a very efficient way to commit fraud in an election. For example if you had 50 people who were willing to vote multiple times and they were able to get to 5 different voting precincts in one election day, you would have 250 votes.

4.  Only very small city and school board elections would be affected by this level of fraud. Obviously in a small city or school district everyone knows everyone and this would be impossible.

Besides any criminal attorney will tell you that a conspiracy— which is what this would be-- works only if there a limited number of conspirators. 50 is not a limited number.

The Next Question is Who is Burdened by a Photo ID requirement—
Who is Likely Not to Have a Driver's License?

5. Everyone agrees that the elderly would be burdened and that those who do not have cars. This means the elderly poor and the poor in general.

6. the poverty and lower income rate is significantly higher among Hispanics and African American, they are less likely to have a vehicle and a Driver's License. And therefore more likely to obtain an Identity card.

7. Studies indicate a strong correlation between

   ✓ Race/ethnicity and car ownership

   ✓ Income and car ownership

   ✓ Education and Car Ownership

TX_00003314

For Example:

"For all whites in our sample, 76 percent own cars, compared with 47 percent of blacks, and 52 percent of Latinos. Moreover, within educational attainment categories whites have higher (and statistically distinguishable) car ownership rates than do blacks and Latinos. For example, 51 percent of whites with less than 12 years of education own cars, compared with 28 percent of blacks and 44 percent of Latinos with comparable educations. Similarly, among individuals with 16 plus years of schooling, 87 percent of whites, 71 percent of blacks, and 64 percent of Latinos own cars."

**Can Boosting Minority Car-Ownership Rates Narrow Inter-Racial Employment Gaps?** Steven Raphael Goldman School of Public Policy University of California, Berkeley raphael@socrates.berkeley.edu Michael Stoll School of Public Policy and Social Research University of California, Los Angeles mstoll@ucla.edu June 2000 at 12

# Consider These Studies Correlating Income, Education and Race/Ethnicity in the Context of the 2000 Census

TX_00003316



**The Hispanic Functional Illiteracy Rate Is Just Under Ten Times That Of The Anglo Population**

31.5%

6.5%

3.5%

State of Texas
Functional Illiteracy Persons 25+ by Race and Ethnicity

Hispanic          Af.Am.          Anglo



25% of Minority Texans
Live in Poverty

State of Texas
Persons by Race and Ethnicity Below Poverty

25.4%

23.4%

7.8%

Hispanic          Af.Am.          Anglo

Source: 1990 Census of Population





8.   This racial/ethnic differential in income increases with age.  For example Hispanics and African Americans tend to rely almost entirely on Social Security for retirement income.

9.  Next consider these facts on poverty and income in the context of how does one obtain a Photo ID of one does not drive.

10. The location of places where the identification card is available has been mapped out for 4 counties.  The number of locations is limited and in most cases not within the traditional minority area.  Given the differential in income identified in the charts, the burden of travel would fall most heavily on the minority persons.

11. In urban areas it is not unusual to take more than an hour of waiting to get a license or renewal.  One of my friends recounts that recently he went with his daughter to pick up her first driver's license.  He timed it and it took just over 45 minutes.  He drove to the DPS registration office and that took 26 minutes.

12. But he is an attorney and has a car.  I am familiar with the urban bus systems in Texas.  Had he taken the bus with waiting and transfer times, the travel time would likely have been more in the neighborhood of an hour each way.

13. He told me that persons in line ahead of he and his daughter were turned away because they did not have all of the documents required. One of the biggest problems seemed to be in producing a Social Security card. I received my paper Social Security card many years ago. It has long since disintegrated. I know the number but it is never necessary to have the actual card. In fact I recall that on my card it specifically said not for identification.

TX_00003323

14. I would not  carry a social security card with me specifically to guard against identity theft. Besides, it is difficult to imagine why a Social Security number would be necessary to issue and identification card or a driver's license.

- These are the sort of thing that would seriously discourage getting an identity card.

- Then there is the problem with how difficult will it be to obtain an identity card.  The Locations of where to get this card follow.

- Note how inconvenient these offices are to the minority population of our largest cities.  Again consider the burden of transportation.

- Obtaining an identity card would be a full day process.

- Recall that the poll tax was Unconstitutional *not* because of the cost—although that was certainly a problem.  It was because the poll tax discouraged minority registration and hence voting.



According to the DPS Website, there are no places to obtain a Identity Card within Loop 610 in Harris County.  This is probably the greatest minority concentration in the state.



According to the DPS Website, there are no places to obtain a Identity Card within IH 820 in Tarrant County



According to the DPS Website, there is only one place in inner-city Dallas to obtain an Identity Card. This is clearly the second largest concentration of minority population in the state.



This is an example of a fairly large rural area in Frio County where the second largest town in the county is about 15 miles from the Pearsall Driver License Office.

TX_00003328

14. Obviously, the locations make it more difficult for minority Texans to participate in the political process.

15. Lets think again about the social security number.

16. Recall that in one of the first Voting Rights Section 5 Objections, Texas was specifically restrained from requiring a social security number connected with voter registration.

17. In order to obtain a Texas Identification card, the applicant must fill out a form. Some years ago Texas passed a statute that required that persons re-register on forms that would be sent to them. Because of the differential in literacy and education, the Department of Justice was concerned and issued another Section 5 Objection. The earlier charts show that this level of differential in literacy and education still exists.

18. There are some documents that can be used in lieu of presenting a photo id. These include a letter or a bill in the voter's name and addressed to him/her from a Federal or a state agency. These sorts of notices have been substantially reduced with the advent of direct deposit. Many times several families or parts of families will live in the same house or in smaller houses on the same lot. The bills would likely be addressed to only one of the persons living there

19. One of the arguments that has been advanced is that the Department of Justice will certainly approve (preclear) this photo id bill because the Courts have approved such a bill in a few other states and there was no Section 5 Voting Rights Objection to a similar law recently passed in Georgia.

20. To begin with, Texas had a poll tax which was invalidated by the Courts. The state then passed an annual registration bill that was stricken as unconstitutional with the observation by the Court that it was more restrictive than the poll tax. The legislature then passed a biannual registration bill that was also stricken by the Federal Courts as too restrictive. Texas then passed a permanent voter registration bill. However a few years later the state passed a purge and re-registration requirement that was invalidated by a Voting Rights Objection.

21. Another differential with Georgia is the sheer size of Texas. The minority population of just Harris County is as large as the minority population of Georgia. And most of that population is crowded into the area within Loop 610 where there is not a single place to obtain a Texas Identification card.

22. I suspect that if there were no convenient places for the minority population in Georgia to get the identification cards, there would have been no preclearance.

# Compare Minority Population of Harris County With That of the 50 States

**Harris County has virtually the same Minority Population as the Entire State of Georgia**

**Dallas County has a Larger Minority Population than South Carolina, Alabama, Mississippi and Alaska**

| State | Total | At-least 1 | Hispanic | Minority |
|---|---|---|---|---|
| California | 33,871,648 | 2,253,382 | 10,966,556 | 13,230,483 |
| Texas | 18,276,457 | | | |
| New York | 18,976,457 | 3,014,385 | 2,867,583 | 5,881,568 |
| Florida | 15,982,378 | 2,335,505 | 2,682,715 | 5,018,220 |
| Illinois | 12,419,298 | 1,876,875 | 1,530,262 | 3,407,137 |
| Georgia | | | | 2,333,063 |
| **Harris County** | 3,634,566 | 648,568 | 1,489,965 | 2,333,063 |
| New Jersey | 8,414,350 | 1,141,821 | 1,117,191 | 3,259,012 |
| North Carolina | 8,049,313 | 153,544 | 378,956 | 2,115,508 |
| Maryland | 5,296,486 | 147,411 | 227,916 | 1,555,397 |
| Michigan | 9,938,444 | | 323,877 | 1,481,078 |
| Pennsylvania | 12,281,054 | 1,224,612 | 394,088 | 1,615,759 |
| Ohio | 11,353,140 | 1,301,307 | 217,123 | 1,518,430 |
| **Dallas County** | 2,392,573 | 460,108 | 834,465 | 1,418,867 |
| Tennessee | 5,689,283 | 821,809 | 123,838 | 1,055,697 |
| Colorado | 4,301,261 | 165,063 | 735,601 | 960,664 |
| New Mexico | 1,819,046 | 34,343 | 765,386 | 799,729 |
| Massachusetts | 6,349,097 | 341,654 | 428,729 | 770,383 |
| Missouri | 5,595,211 | 612,381 | 118,592 | 747,983 |
| Indiana | 6,080,485 | 510,034 | 214,536 | 724,570 |
| Washington | 5,894,121 | 190,267 | 441,509 | 631,776 |
| Connecticut | 3,405,565 | 309,843 | 320,323 | 630,166 |
| Nevada | 1,998,257 | 135,477 | 393,970 | 529,447 |
| Arkansas | 2,673,400 | 418,950 | 86,866 | 505,816 |
| Wisconsin | 5,363,675 | 304,460 | 192,921 | 497,381 |
| Oklahoma | 3,450,654 | 269,968 | 179,304 | 449,272 |
| Kentucky | 4,041,769 | 295,994 | 59,939 | 355,933 |
| Kansas | 2,688,418 | 154,198 | 188,252 | 342,450 |
| Oregon | 3,421,399 | 55,462 | 275,314 | 330,974 |
| Minnesota | 4,919,479 | 171,731 | 143,382 | 315,113 |
| Utah | 2,233,169 | 17,557 | 201,559 | 219,116 |
| Delaware | 783,600 | 150,666 | 37,277 | 187,943 |
| Nebraska | 1,711,263 | 65,541 | 94,425 | 160,966 |
| Iowa | 2,926,324 | 61,853 | 82,473 | 144,326 |
| Rhode Island | 1,048,319 | 46,908 | 90,820 | 137,728 |
| Hawaii | 1,211,537 | 22,003 | 87,699 | 109,702 |
| Idaho | 1,293,953 | 5,456 | 101,690 | 107,146 |
| West Virginia | 1,553,944 | | | 45,811 |
| Wyoming | 493,782 | 3,722 | 31,669 | 35,391 |
| New Hampshire | 1,235,786 | 8,035 | 20,489 | 28,524 |
| Montana | 902,195 | 2,692 | 18,081 | 20,773 |
| Maine | 1,274,923 | 4,760 | 9,360 | 14,120 |
| South Dakota | 754,844 | 4,685 | 10,903 | 15,588 |
| North Dakota | 642,200 | 2,916 | 7,786 | 11,702 |
| Vermont | 608,827 | 1,051 | 5,504 | 5,557 |

■ States entirely subject to Section 5

Compare 2008 Harris County Population w/ 2000 Census for States