requested and minimum required) and five types of identification requirements (stating name, signing name, signature match, present ID, and photo ID).[50] It is important to note that in 2004, there were no states that had photo ID as a minimum requirement. All states that had a photo ID requirement permitted voters who did not have such documentation to present alternative forms of ID or sign an affidavit attesting to their identity.[51]

By the maximum requested, the Eagleton Institute study refers to the most identification that an individual can be asked to present in order to vote using a regular ballot. Conversely, the minimum is the least identification that will be accepted to vote.[52] For example, when voting in Louisiana in 2004, a voter would be asked by poll workers to present photo identification. If the individual was unable to present an acceptable form of ID, he was allowed to vote after signing an affidavit stating he is the person he claims to be.[53] In that case, photo ID would be the maximum requested, and affidavit would be the minimum required.

Within the states that require some form of documentation as proof of identity, there are also significant differences. For instance, some states, like Massachusetts, "may" ask that a voter show identification, but identification is not automatically requested of all voters.[54] In Alabama and Alaska, two states that request identification, this requirement can be waived if a poll worker knows the voter and can attest to his identity.[55] This is an important issue to consider because it means that different voters within the same state may be affected by different identification requirements.

Furthermore, by the 2004 election, many states had become compliant with certain provisions in the Help America Vote Act (HAVA) which required identification at the polls from first-time voters who registered by mail and who did not show identification at the time of registration. One state, Pennsylvania, actually went above and beyond HAVA requirements and mandated that all first-time voters needed to show identification at the polls regardless of whether they showed identification when they registered to vote.[56] Because of HAVA, many first-time voters had to show identification at the polls even in states that did not otherwise require identification from all voters.

Even among states that require documentation, there is great variability in the types of documentation that is accepted. Some accept only a government-issued photo identification, while others accept almost any document that demonstrates a person's identity. For example, in 2004, acceptable documentation in Florida ranged from a driver's license and passport to credit card and buyer's club card to utility bill, bank statement, or paycheck (as long as they contained the name and address of the individual).[57] In contrast, some states that required identification to vote are much more restrictive with respect to acceptable forms of identification. One such state, Virginia, only allowed voters to present a voter registration card, Social Security card, employer-issued identification card (as long as it contained a photo), Virginia driver's license, or other Commonwealth or government-issued identification.[58] Furthermore, in many states, individuals who are unable to provide the appropriate documentation are given an alternative, such as signing

---

48. Alabama, Alaska, and Connecticut are just a few of the states that required voters to show some form of identification at the polls in 2004.

49. Florida, Hawaii, Louisiana, South Carolina, and South Dakota were all of the states requiring photo ID during the 2004 election.

50. *Report to the U.S. Election Assistance Commission on Best Practices to Improve Voter Identification Requirements Pursuant to the Help America Vote Act of 2002*, p. 8.

51. *Ibid*, p. 9.

52. *Ibid*.

53. La. R.S. 18:562.

54. 950 C.M.R. § 53.03(5B); 950 C.M.R. § 54.04(6B).

55. Ala. Code § 17-9-30; Alaska Statute § 15.15.225.

56. Pa. Stat. Ann. Tit. 25 § 3050.

57. West's Fla. Stat. Ann § 101.043.

58. Va. Code Ann. § 24.2-643.

TX_00001794

an affidavit, in order to vote. Finally, Section 302 of HAVA requires that an individual who fails to meet the identification requirements of voting can still vote using a provisional ballot.[59]

The key aspects of this brief overview of identification requirements of voting is that there is a lot of variability by states as to what is required, and not all identification requirements are created equal. By that we mean that required identification documentation for one state may not meet the identity requirements in another state. This is just one of the reasons that it is particularly difficult to study the effect of such laws on voter turnout.

## THE DATA

In order to analyze individual voter turnout, this study uses data from the U.S. Census Bureau's Current Population Survey, November 2004: Voting and Registration Supplement File.[60] The November 2004 CPS voting supplement contains interviews from about 57,000 households. Based on self-described registered voters, the data allow us to model the decision to vote based on individual and household characteristics.

**Dependent Variable.** The dependent variable is whether or not the respondent reported that he or she voted in the November 2004 election. Respondents who admitted to not being registered voters were omitted, along with those reporting that they were not United States citizens. We also omitted those reported to be voting through absentee ballots.[61]

According to the U.S. Census Bureau's analysis of the November 2004 CPS data, 89 percent of registered voters voted in the November 2004 election.[62] This estimate is drawn from a sample of respondents reporting to be registered voters and is much higher than estimates based on samples of the voting-age population. However, the EAC estimates that 70.4 percent of registered voters turned out to vote.[63] The CPS estimate of 89 percent may be biased upward because it is based on the reported vote, which may be overstated because survey respondents may be disinclined to admit that they did not vote.[64] When turnout is based on the total population over 18 years old, 55.8 percent of persons over age 18 voted.[65]

**Voter Identification Requirements.** The voter identification requirements included in the analysis capture the degree to which a registered voter has to prove his or her identity at the polling station. Two sets of five dichotomous voter identification variables are used in the analysis. The first set is based on the maximum amount of identification that the voter is required to produce in order to prove his or her identity. The maximum state voter identification requirements are broken down into the following classification: state name, sign name, match signature, provide non-photo identification, and provide photo identification. Table 1 presents the voter identification classifications by state used by the Eagleton Institute and the Moritz College of Law at Ohio State University.

For all but two of the states, Illinois and Arizona, we used the classifications that were provided to us by the Eagleton Institute. We recoded these two states because upon researching state election laws, we discovered that the Eagleton Institute had erroneously reported the identification requirements for these two states. The Eagleton Institute study has Illinois listed as a "state name" state. In actuality, Illinois poll workers match a prospective voter's signature to a signature already on file, making Illinois a "match signature" state.[66]

The Eagleton Institute has Arizona listed as a "provide ID" state although Arizona was a "sign

59. Public Law 107-252.

60. Current Population Survey, November 2004: Voting and Registration Supplement.

61. To account for Oregon's elections that are conducted entirely through mail, Oregon voters are treated in this analysis as if they vote in person in the polling both. Oregon is classified as a signature match state for voter identification purposes.

62. U.S. Census Bureau, "U.S. Voter Turnout Up in 2004, Census Bureau Reports," press release, May 26, 2004, at *www.census.gov/Press-Release/www/releases/archives/voting/004986.html* (July 2, 2007).

63. Kimball W. Brace and Michael P. McDonald, *Final Report of the 2004 Election Day Survey*, U.S. Election Assistance Commission, September 27, 2005, at *www.eac.gov/election_survey_2004/pdf/EDS-Full_Report_wTables.pdf* (July 5, 2007).

64. William H. Flanigan and Nancy H. Zingale, *Political Behavior of the American Electorate*, 11th edition (Washington, D.C.: CQ Press, 2006).

65. Brace and McDonald, *Final Report of the 2004 Election Day Survey.*

THE HERITAGE CENTER FOR DATA ANALYSIS

**▲ Table 1**                                                                                      CDA 07-04

## Maximum and Minimum Voter Identification Requirements, November 2004 Election

| State | Eagelton Institute Maximum Requirement | Corrected Maximum Requirement | Eagelton Institute Minimum Requirement |
|---|---|---|---|
| Alabama | Provide non-photo ID | Provide non-photo ID | Provide non-photo ID |
| Alaska | Provide non-photo ID | Provide non-photo ID | Provide non-photo ID |
| Arizona | Provide non-photo ID | Sign name | Provide non-photo ID |
| Arkansas | Provide non-photo ID | Provide non-photo ID | State name |
| California | Sign name | Sign name | Sign name |
| Colorado | Provide non-photo ID | Provide non-photo ID | Provide non-photo ID |
| Connecticut | Provide non-photo ID | Provide non-photo ID | Provide non-photo ID |
| Delaware | Provide non-photo ID | Provide non-photo ID | State name |
| District of Columbia | Sign name | Sign name | Sign name |
| Florida | Provide photo ID | Provide photo ID | Swear affidavit |
| Georgia | Provide non-photo ID | Provide non-photo ID | Provide non-photo ID |
| Hawaii | Provide photo ID | Provide photo ID | Provide non-photo ID |
| Idaho | Sign name | Sign name | Sign name |
| Illinois | State name | Match signature | State name |
| Indiana | Sign name | Sign name | Swear affidavit |
| Iowa | Sign name | Sign name | Sign name |
| Kansas | Sign name | Sign name | Sign name |
| Kentucky | Provide non-photo ID | Provide non-photo ID | Provide non-photo ID |
| Louisiana | Provide photo ID | Provide photo ID | Swear affidavit |
| Maine | State name | State name | State name |
| Maryland | Sign name | Sign name | Sign name |
| Massachusetts | State name | State name | State name |
| Michigan | Sign name | Sign name | Sign name |
| Minnesota | Sign name | Sign name | Sign name |
| Mississippi | Sign name | Sign name | Sign name |
| Missouri | Provide non-photo ID | Provide non-photo ID | Provide non-photo ID |
| Montana | Provide non-photo ID | Provide non-photo ID | Provide non-photo ID |
| Nebraska | Sign name | Sign name | Sign name |
| Nevada | Match signature | Match signature | Match signature |
| New Hampshire | State name | State name | State name |
| New Jersey | Match signature | Match signature | Match signature |
| New Mexico | Sign name | Sign name | Sign name |
| New York | Match signature | Match signature | Sign name |
| North Carolina | State name | State name | State name |
| North Dakota | Provide non-photo ID | Provide non-photo ID | Swear affidavit |
| Ohio | Match signature | Match signature | Match signature |
| Oklahoma | Sign name | Sign name | Sign name |
| Oregon | Match signature | Match signature | Match signature |
| Pennsylvania | Match signature | Match signature | Match signature |
| Rhode Island | State name | State name | State name |
| South Carolina | Provide photo ID | Provide photo ID | Provide non-photo ID |
| South Dakota | Provide photo ID | Provide photo ID | Provide non-photo ID |
| Tennessee | Provide non-photo ID | Provide non-photo ID | Match signature |
| Texas | Provide non-photo ID | Provide non-photo ID | Provide non-photo ID |
| Utah | State name | State name | State name |
| Vermont | State name | State name | State name |
| Virginia | Provide non-photo ID | Provide non-photo ID | Provide non-photo ID |
| Washington | Sign name | Sign name | Sign name |
| West Virginia | Match signature | Match signature | Sign name |
| Wisconsin | State name | State name | State name |
| Wyoming | State name | State name | State name |

**Sources:** Eagleton Institute of Politics, Rutgers; State University of New Jersey; and Moritz College of Law, Ohio State University, *Report to the U.S. Election Assistance Commission on Best Practices to Improve Voter Identification Requirements Pursuant to the Help America Vote Act Of 2002,* June 28, 2006, at *www.eac.gov/docs/VoterIDReport%20062806.pdf* (July 30, 2007), and author's personal communication with Timothy Vercellotti (June 1, 2001).

TX_00001796

name" state at the time of the 2004 election.[67] Identification laws did not go into effect in Arizona until some time after the 2004 election. Arizona could not have been a "provide ID" state before the November 2004 election because Arizonans voted on and approved Proposition 200 on the November 2004 ballot. This initiative is the impetus for the requirement that voters show identification before voting as proof of citizenship.[68]

The second set of voter identification variables recognizes that some states allow voters without proper identification to vote after demonstrating their identity through other means. This minimum requirement set of variables includes state name, sign name, match signature, provide non-photo identification, and swear affidavit. For the probit regressions, the variable for voters stating their names for identification is omitted for reference purposes.

**Individual Factors.** The individual factors included in the analysis capture differences in the race and ethnicity, age, education, household income, marital status, gender, employment status, citizenship, residential mobility, and home ownership of the individual respondents. Controlling for such variables as education and age is important because research indicates that these variables are good predictors of voting turnout.[69] The analysis controls for the effect of the individual's race and ethnicity through a set of mutually exclusive dichotomous variables for the following categories: non-Hispanic white, non-Hispanic African-American, Hispanic, non-Hispanic American Indians, non-Hispanic Asians (including Hawaiians/Pacific Islanders), and other races, including those reporting multiple races and ethnicities. The specification

of these variables allows us to compare the voting patterns of minorities to those of whites.

A set of dichotomous variables control for the age of the individual respondents that fall into the following categories: 18- to 24-year-olds, 25- to 44-year-olds, 45- to 64-year-olds, and 65 years and older. For education, the respondents were classified as either having less than a high school diploma, high school diploma or equivalent, some college, bachelor's degree, or a graduate school degree.

For family income, the Eagleton Institute study used an ordinal family income variable as an interval-ratio variable.[70] The family income variable is coded as 1 through 16 with units containing unequal income ranges. For the purposes of this analysis, the effect of family income is controlled for by the inclusion of a series of income range dichotomous variables: under $15,000, $15,000 to $29,999, $30,000 to $49,999, $50,000 to $74,999, $75,000 to $149,999, and $150,000 or more.

To control for the influence of marital status, five dichotomous variables signifying being single, married, separated, divorced, and widowed are included in the model. Single individuals are the default. A dichotomous variable identifying the gender of the individual as a female is also included in the models.

Two dichotomous variables are included to control for the effect of employment. The first is a dichotomous variable signifying whether or not the individual is employed; the second is a dichotomous variable for whether or not the person is in the labor force.

To control for whether native-born citizens are more likely to vote than naturalized citizens, a dichotomous variable identifying native-born citi-

---

66. Documentation supporting the signature match requirement can be found at the following: ILCS 5/6-66; electionline.org, Election Reform Briefing, April, 2002, p. 12, at *www.electionline.org/Portals/1/Publications/ Voter%20Identification.pdf*; Punchcard Manual of Instructions for Illinois Election Judges, 2005, at *www.elections.il.gov/Downloads/ ElectionInformation/ PDF/03selfsec.pdf*; and Election Law @ Moritz, 50 Questions for 5 States, Illinois, last updated 1/19/07, at *moritzlaw.osu.edu/ electionlaw/election06/50-5_Illinois.php#14*.

67. Arizona Secretary of State, 2004 Ballot Propositions, "Instructions to Voters and Election Officers," September, 2004, at *www.azsos.gov/election/2004/Info/PubPamphlet/Sun_Sounds/english/contents.htm*.

68. The text of Proposition 200 is available at *www.pan2004.com/docs/initiative_petition.pdf*.

69. Flanigan and Zingale, *Political Behavior of the American Electorate*.

70. The variable "HUFAMINC" in the November 2005 CPS has the following coding: 1 for less than $5,000; 2 for $5,000 to $7,499; 3 for $7,500 to $9,999; 4 for $10,000 to $12,499; 5 for $12,500 to $14,999; 6 for $15,000 to $19,000; 7 for $20,000 to $24,999; 8 for $25,000 to $29,999; 9 for $30,000 to $34,999; 10 for $35,000 to $39,999; 11 for $40,000 to $49,999; 12 for $50,000 to $59,999; 13 for $60,000 to $74,999; 14 for $75,000 to $99,999; 15 for $100,000 to $149,999; and 16 for $150,000 or more.

zens is included. Two dichotomous variables are included to control for community ties. The models control for whether or not the individual has moved within the last year and whether or not the individual owns or rents his or her home. These two variables are included to help control for social connectedness under the theory that those with stronger community ties will be more likely to vote.

**State Political Factors.** As with the Eagleton Institute study, two dichotomous variables indicate whether a state is considered a battleground state and a competitive state. A state is designated as a battleground state if the margin of victory for the winning 2004 presidential candidate was 5 percent or less. A state was designated as competitive if the margin of victory for governor and/or U.S. Senate races was 5 percent or less.

## FINDINGS

The probit regression analyses that follow examine the effects of voter identification requirements on voter turnout. Table 2 presents the original findings of the Eagleton Institute's probit regression analysis. Table 3 presents the descriptive statistics

of the data used in Table 4. Based on our analyses, six sets of probit regression models are presented in Tables 4 to 9.

The first set of probit regressions contains our replication of the Eagleton Institute study for their analysis of all voters (Table 4). The second set of probit regressions presents the findings for all voters under a different model specification and the corrected classification of state identification requirements for Arizona and Illinois (Table 5). The sixth through ninth sets of probit regressions present our findings for the different model specification and corrected coding for state identification requirements for whites, African–Americans, Hispanics, and Asians (Tables 6 through 9).

For all of the models, robust standard errors are estimated to correct for correlated error terms within each state. For tests of statistical significance, the standard two-tailed tests are used. See below for a discussion of one-tailed versus two-tailed tests of statistical significance. The calculations in Tables 3 through 9 use the CPS weight, PWSSWGT, as recommended by the Bureau of the Census.

## ONE-TAILED VERSUS TWO-TAILED TESTS OF STATISTICAL SIGNIFICANCE

When doing tests of statistical significance for hypotheses, social scientists generally use two-tailed tests. Two-tailed tests are used to check for a difference while ignoring in which direction the difference lies.

For example, a social scientist would use a two-tailed test to determine whether voters in photo identification and give name states have different probabilities of reporting having voted in the 2004 election, regardless of the direction of the relationship. By using a two-tailed test, the 5 percent probability is split between both ends of the bell-shaped curve. (See Figure A in Chart 1.) That is, 2.5 percent of the probability that the difference is due to chance is placed in the side that represents respondents in photo identification states being less likely to vote, while 2.5 percent is placed in the side that represents respondents in photo identification states being more likely to vote. If the probit coefficient for photo identification states falls within either of the 2.5 percent shaded regions, this finding is determined to be statistically significant. If the coefficient falls within the left (right) tail, photo identification requirements have a negative (posi-

tive) relationship with reported voter turnout. If the coefficient falls between the 2.5 percent shaded regions, photo identification requirements are said have no relationship with voter turnout.

When one-tailed tests are used, social scientists are hypothesizing that the relationship between photo identification requirements and reported voting has a specific direction: for example, voter identification requirements decrease (increase) reported voting. As determined by the social scientist, all of the 5 percent of chance is placed in one end of the bell-shaped curve. If the direction of the relationship is as hypothesized, placing the entire 5 percent chance in one side makes it is *twice as easy* to achieve a statistically significant finding with a one-tailed test as with a two-tailed test. Figure B in Chart 1 is an example of a one-tailed test where the researcher believes a negative relationship exists. In the case of photo identification requirements and voter turnout, if the coefficient falls within the 5 percent shaded region of the left tail, photo identification requirements would then be said to have a negative relationship. If the coefficient does not fall within the 5 percent region, then photo identifica-



**Chart 1**                                                                                      CDA 07-04

## Two-Tailed Versus One-Tailed Hyphothesis Tests

Figure A:
Two-Tailed Test

Figure B:
One-Tailed Test
(Left-Tailed Test)

2.5%          2.5%

5.0%

0

0

Source: The Heritage Foundation.

tion requirements are said to have no relationship with voter turnout.

According to norms of the social sciences, researchers generally use two-tailed tests. When they deviate from this norm, social scientists gen-erally provide a justification for why they have done so. Consumers of statistical research should be skeptical of findings based on one-tailed tests, especially when such findings do not hold up under two-tailed testing.

### Replicating the Eagleton Institute's Findings for All Voters

Table 2 contains the findings from the Eagleton Institute's probit regression for all registered voters as presented in their paper. Table 3 presents the find-ings from our attempt to replicate the Eagleton Insti-tute study findings for all voters. In our attempt at replicating the Eagleton Institute's study, we could not entirely match the same number of respondents. The Eagleton Institute's probit regression of all voters is based on 54,973 respondents.[71] Our best attempt at replicating their analysis produced 54,829 respondents—144 fewer respondents. In addition, the results reported in Table 3 use the more com-monly accepted two-tailed significance tests.

While the Eagleton Institute reported that states with sign name, non-photo identification, and photo identification requirements have lower voter turnout than states with only the state name requirement, only the photo identification coeffi-cient in our attempt at replication (Model 1) is sta-tistically significant at the 95 percent confidence level. Respondents from photo identification states are less likely to have reported voting compared to respondents in states that only required voters to say their names at the polling stations. The magni-tude of the negative relationship between photo identification requirements and voter turnout is dif-ficult to interpret with probit coefficients, so the elasticity was calculated. The elasticity figures used in this analysis represent the percentage change in the probability of reporting to vote given a one-unit change in a particular dichotomous independent variable. The survey respondents in photo identifi-cation states are 0.002 percent less likely to report voting than respondents from states that only required voters to give their name for identification.

Model 2 corrects for the Eagleton Institute study's misclassification of the voter identification require-ments in Arizona and Illinois. With the correction, all of the state voter identification variables are sta-tistically insignificant—meaning that none of these requirements has a statistically measurable relation-ship with voting turnout.

---

71.  Vercellotti and Anderson, "Protecting the Franchise, or Restricting It?" Table 3, p. 23.

TX_00001799

Model 3 attempts to replicate the findings of the Eagleton Institute's examination of the effect of minimum requirements. As seen in Table 2, the Eagleton Institute found that the coefficients for sign name, non-photo identification, and swear affidavit states had statistically significant, negative relationships with voter turnout using one-tailed significant tests. However, our analysis presented in Model 3 using two-tailed statistical significance tests finds only the swear affidavit coefficient to be statistically significant at the 95 percent confidence level. The survey respondents in swear affidavit states are 0.002 percent less likely to report voting than respondents from states that only required voters to state their name for identification.

It should be noted that although we ran the minimum identification requirement model using the classifications assigned to the states by the Eagleton Institute study, there are some issues with the states considered to have an affidavit as the minimum requirement. These issues should be addressed in follow-up studies. First, the Eagleton Institute study identified only four states as having a minimum requirement of sign affidavit. They are Florida, Indiana, Louisiana, and North Dakota. All but one of these states, Indiana, require some form of identification as the maximum requested. This puts Indiana in the precarious position of requiring, at a maximum, that a voter sign his name before receiving a ballot; if he is unable to do so, he can sign an affidavit and vote. This does not make sense, because Indiana in 2004 did not require identification before voting (other than for those affected by HAVA requirements).

We believe this to be another classification error on the part of the Eagleton Institute. According to the "2004 Indiana Election Day Handbook," the procedure for signing an affidavit only applies to challenged voters who are then given a provisional ballot if they sign the affidavit.[72] This voting method would not fall under the guidelines set forth by the Eagleton Institute because it applies to provisional, and not regular, ballots.[73] For these reasons, we believe Indiana should have a minimum identification requirement of sign name, the same as its maximum.

Additionally, there are five other states (Connecticut,[74] Delaware,[75] Georgia,[76] South Dakota,[77]

| | Table 2 | | | CDA 07-04 |
|---|---|---|---|---|

### Copies of Eagleton Institute's Probit Models of Voter Turnout

| Variable | Maximum Requirement | | Minimum Requirement | |
|---|---|---|---|---|
| | Coefficient | Robust S.E. | Coefficient | Robust S.E. |
| Sign name | -0.11* | 0.05 | -0.08* | 0.04 |
| Match signature | -0.04 | 0.05 | -0.03 | 0.05 |
| Non-photo ID | -0.16** | 0.06 | -0.15** | 0.05 |
| Photo ID | -0.17** | 0.07 | -- | -- |
| Affidavit | -- | -- | -0.23** | 0.06 |
| Hispanic | -0.08 | 0.05 | -0.08 | 0.05 |
| African–American | 0.24** | 0.04 | 0.24** | 0.04 |
| Asian American | -0.37** | 0.07 | -0.38** | 0.07 |
| Age 25–44 | 0.004 | 0.02 | 0.003 | 0.02 |
| Age 45–64 | 0.26** | 0.03 | 0.26** | 0.03 |
| Age 65+ | 0.43** | 0.03 | 0.43** | 0.03 |
| High school | 0.31** | 0.02 | 0.31** | 0.02 |
| Some college | 0.57** | 0.03 | 0.57** | 0.03 |
| College | 0.88** | 0.04 | 0.88** | 0.04 |
| Graduate school | 0.98** | 0.05 | 0.98** | 0.05 |
| Household income | 0.03** | 0.003 | 0.03** | 0.003 |
| Married | 0.23** | 0.02 | 0.23** | 0.02 |
| Female | 0.10** | 0.01 | 0.10** | 0.01 |
| Battleground state | 0.17** | 0.04 | 0.18** | 0.04 |
| Competitive race | 0.05 | 0.06 | 0.05 | 0.05 |
| Employed | 0.05 | 0.05 | 0.05 | 0.05 |
| Member of workforce | -0.05 | | -0.05 | 0.05 |
| Native-born citizen | 0.02 | 0.04 | 0.02 | 0.04 |
| Moved within past 6 months | -0.29** | 0.03 | -0.29** | 0.03 |
| Constant | -0.09 | 0.10 | -0.09 | 0.09 |
| Pseudo R-squared | 0.09 | | 0.10 | |
| N | 54,973 | | 54,973 | |

\* p < 0.05  \*\* p < 0.01  \*\*\* p < 0.001

**Note:** One-tailed significance tests were used.

**Source:** Timothy Vercellotti and David Anderson, "Protecting the Franchise, or Restricting It? The Effects of Voter Identification Requirements on Turnout," American Political Science Association conference paper, Philadelphia, Pa., August 31–September 3, 2006, p. 23, Table 3.

---

72. Indiana Election Division, "2004 Indiana Election Day Handbook: A Guide for Precinct Election Boards and Poll Workers," December 2003, pp. 13–17.

73. *Report to the U.S. Election Assistance Commission on Best Practices to Improve Voter Identification Requirements Pursuant to the Help America Vote Act of 2002*, p. 8.

THE HERITAGE CENTER FOR DATA ANALYSIS

| ▆ Table 3 | | | | | | CDA 07-04 |
|---|---|---|---|---|---|---|

### Replicating Vercellotti: Probit Models of Overall Voter Turnout Based on the Eagleton Institute's Specification

| | Maximum Requirement | | | | Minimum Requirement | |
| | Model 1 Replication | | Model 2 Recoded States | | Model 3 Replication | |
| Variable | Coefficient | Robust S.E. | Coefficient | Robust S.E. | Coefficient | Robust S.E. |
|---|---|---|---|---|---|---|
| Sign name | -0.08 | 0.04 | -0.06 | 0.06 | -0.03 | 0.05 |
| Match signature | -0.01 | 0.05 | 0.01 | 0.06 | -0.02 | 0.07 |
| Non-photo ID | -0.10 | 0.06 | -0.10 | 0.07 | -0.08 | 0.06 |
| Photo ID | -0.10* | 0.05 | -0.10 | 0.06 | -- | -- |
| Affidavit | -- | -- | -- | -- | -0.10* | 0.05 |
| Hispanic | -0.08 | 0.05 | -0.08 | 0.05 | -0.08 | 0.05 |
| African–American | 0.29*** | 0.04 | 0.29*** | 0.05 | 0.24** | 0.05 |
| Asian American | -0.45*** | 0.07 | -0.45*** | 0.08 | -0.46** | 0.07 |
| Age 25–44 | -0.01 | 0.02 | -0.01 | 0.03 | -0.11 | 0.03 |
| Age 45–64 | 0.27*** | 0.03 | 0.27*** | 0.03 | 0.27*** | 0.03 |
| Age 65+ | 0.44*** | 0.03 | 0.44*** | 0.03 | 0.45*** | 0.03 |
| High school | 0.32*** | 0.03 | 0.32*** | 0.25 | 0.32*** | 0.03 |
| Some college | 0.61l*** | 0.03 | 0.61*** | 0.03 | 0.61*** | 0.03 |
| College | 0.90*** | 0.04 | 0.90*** | 0.04 | 0.90*** | 0.04 |
| Graduate school | 1.04*** | 0.05 | 1.04*** | 0.05 | 1.05*** | 0.05 |
| Household income | 0.04*** | 0.003 | 0.04*** | 0.003 | 0.04*** | 0.003 |
| Married | 0.21*** | 0.03 | 0.21*** | 0.03 | 0.21*** | 0.03 |
| Female | 0.10*** | 0.02 | 0.10*** | 0.02 | 0.10*** | 0.02 |
| Battleground state | 0.20*** | 0.04 | 0.20*** | 0.04 | 0.21*** | 0.05 |
| Competitive race | -0.03 | 0.06 | -0.02 | 0.06 | -0.02 | 0.06 |
| Employed | 0.03 | 0.05 | 0.03 | 0.05 | 0.03 | 0.05 |
| Member of workforce | 0.07 | 0.06 | 0.07 | 0.06 | 0.07 | 0.07 |
| Native-born citizen | -0.02 | 0.05 | -0.01 | 0.05 | -0.02 | 0.05 |
| Moved within past 6 months | -0.36*** | 0.04 | -0.36*** | 0.04 | -0.36*** | 0.04 |
| Constant | -0.11 | 0.09 | -0.12 | 0.10 | -0.13 | 0.09 |
| Pseudo R-squared | 0.10 | | 0.10 | | 0.10 | |
| N | 54,829 | | 54,829 | | 54,829 | |

$* \ p < 0.05 \ \ ** \ p < 0.01 \ \ *** \ p < 0.001$

**Note:** Two-tailed significance tests were used. Robust standard errors adjusted for state clustering are reported. The CPS population weights were used.

**Source:** Heritage Foundation calculations.

and Virginia[78]) that require some form of identification but make exceptions and allow voters without the required documentation to sign an affidavit in order to vote. To be classified correctly, these states should also be considered to have a minimum requirement of sign affidavit as they too provide opt outs for voters unable to show appropriate forms of identification.

As for the socioeconomic variables in Models 1 through 3, African–Americans are more likely to have reported voting in the election than a grouping of non-Hispanic whites, American Indians, Hawaiians/Pacific Islanders, and others. In contrast, Asians are less likely to report voting. Respondents aged 45 and above are more likely to report voting than those 18 to 24 years old. Those with an

---

74.  Conn. Gen. Stat. Ann. § 9-261.

75.  15 Del. Code. § 4937.

76.  Ga. Code. Ann. § 21-2-417.

77.  S.D. Codified Laws § 12-18-6.2.

78.  Va. Code. Ann. § 24.2-643.

education at or above a high school diploma are more likely to report voting than those without a high school degree. Family income has a positive relationship with the probability of reporting having voted. Married and female respondents are more likely to report voting than not married and male respondents, respectively. Respondents residing in battleground states are more likely to vote, while respondents who moved within the last six months are less likely to report voting.

## Alternative Model Specifications

Concerns regarding some of the variables used in the Eagleton Institute study led us to estimate alternative specifications that use the November 2004 CPS data more appropriately.

*First,* the Eagleton Institute's race and ethnicity dichotomous variables compare African–Americans, Hispanics, and Asians to the default group of whites, American Indians, Alaskan Natives, Hawaiians/Pacific Islanders, and those reporting to be more than one race and/or ethnicity. For example, the Eagleton Institute found that African–Americans were more likely to report voting compared to whites, American Indians, Alaskan Natives, Hawaiians/Pacific Islanders, and those reporting to be more than one race and/or ethnicity.

The descriptive statistics of the data used for the alternative specifications are presented in Table 4. The analyses in Table 5 control for the effect of the individual's race and ethnicity through a set of mutually exclusive dichotomous variables for the following categories: non-Hispanic whites, non-Hispanic African–Americans, Hispanics, non-Hispanic American Indians and Alaskan Natives, non-Hispanic Asians (including Hawaiians/Pacific Islanders), and other races, including those reporting multiple races and ethnicities. For example, this division of race and ethnic groups allows us to present clearer estimates of how voter identification laws affect the voting probabilities of minorities compared to whites.

*Second,* the Eagleton Institute study used an ordinal family income variable as an interval-ratio variable. Using categorical variables as interval-ratio variables can lead to estimation problems, so for the purposes of this analysis, the effect of family income is controlled for by the inclusion of a series of income range dichotomous variables.

| | | | | | CDA 07-04 |
|---|---|---|---|---|---|

**Table 4**

### Descriptive Statistics

| Variable | Mean | Standard Deviation | Minimum | Maximum |
|---|---|---|---|---|
| Voted | 0.87 | 0.33 | 0 | 1 |
| Sign name | 0.26 | 0.44 | 0 | 1 |
| Match signature | 0.17 | 0.38 | 0 | 1 |
| Non-photo ID | 0.26 | 0.44 | 0 | 1 |
| Photo ID | 0.09 | 0.28 | 0 | 1 |
| Recoded sign name | 0.27 | 0.44 | 0 | 1 |
| Recoded match signature | 0.21 | 0.41 | 0 | 1 |
| Recoded non-photo ID | 0.25 | 0.43 | 0 | 1 |
| Recoded photo ID | 0.09 | 0.28 | 0 | 1 |
| Hispanic | 0.05 | 0.21 | 0 | 1 |
| African–American | 0.09 | 0.29 | 0 | 1 |
| American Indian | 0.01 | 0.09 | 0 | 1 |
| Asian American | 0.02 | 0.14 | 0 | 1 |
| Other race | 0.02 | 0.12 | 0 | 1 |
| Age 25–44 | 0.37 | 0.48 | 0 | 1 |
| Age 45–64 | 0.38 | 0.48 | 0 | 1 |
| Age 65+ | 0.17 | 0.37 | 0 | 1 |
| High school | 0.30 | 0.46 | 0 | 1 |
| Some college | 0.31 | 0.46 | 0 | 1 |
| College | 0.20 | 0.40 | 0 | 1 |
| Graduate school | 0.10 | 0.31 | 0 | 1 |
| Family income, $15,000–$29,999 | 0.15 | 0.36 | 0 | 1 |
| Family income, $30,000–$49,999 | 0.22 | 0.42 | 0 | 1 |
| Family income, $50,000–$74,999 | 0.22 | 0.42 | 0 | 1 |
| Family income, $75,000–$149,999 | 0.24 | 0.42 | 0 | 1 |
| Family income, $150,000 or more | 0.06 | 0.24 | 0 | 1 |
| Married | 0.63 | 0.48 | 0 | 1 |
| Widowed | 0.06 | 0.24 | 0 | 1 |
| Divorced | 0.10 | 0.30 | 0 | 1 |
| Seperated | 0.02 | 0.13 | 0 | 1 |
| Female | 0.53 | 0.50 | 0 | 1 |
| Battleground state | 0.28 | 0.45 | 0 | 1 |
| Competitive race | 0.19 | 0.39 | 0 | 1 |
| Employed | 0.69 | 0.46 | 0 | 1 |
| Member of workforce | 0.72 | 0.45 | 0 | 1 |
| Native-born citizen | 0.96 | 0.20 | 0 | 1 |
| Moved within last year | 0.13 | 0.33 | 0 | 1 |
| Home ownership | 0.80 | 0.40 | 0 | 1 |
| N = 54,695 | | | | |

**Source:** Heritage Foundation calculations based on U.S. Census Bureau, Current Population Survey, November 2004: Voting and Registration Supplement, 2005.

THE HERITAGE CENTER FOR DATA ANALYSIS

| ☎ Table 5 | | | | | | | | | CDA 07-04 |

## Alternative Specifications of Probit Models of Overall Voter Turnout

| | Maximum Requirement | | | | | | | | Minimum Requirement | |
| | Model 4 Vercellotti Categories | | Model 5 Vercellotti Categories | | Model 6 Recoded States | | Model 7 Recoded States | | Model 8 Vercellotti Categories | |
| Variable | Coefficient | Robust S.E. | Coefficient | Robust S.E. | Coefficient | Robust S.E. | Coefficient | Robust S.E. | Coefficient | Robust S.E. |
|---|---|---|---|---|---|---|---|---|---|---|
| Sign name | -0.07 | 0.05 | -0.07 | 0.05 | -0.06 | 0.06 | -0.06 | 0.06 | -0.03 | 0.05 |
| Match signature | -0.001 | 0.06 | -0.00003 | 0.06 | 0.01 | 0.07 | 0.01 | 0.06 | -0.01 | 0.07 |
| Non-photo ID | -0.10 | 0.06 | -0.10 | 0.06 | -0.11 | 0.07 | -0.11 | 0.07 | -0.08 | 0.06 |
| Photo ID | -0.10* | 0.05 | -0.10 | 0.05 | -0.10 | 0.06 | -0.095 | 0.06 | -- | -- |
| Affidavit | -- | -- | -- | -- | -- | -- | -- | -- | -0.10* | 0.05 |
| Hispanic | -0.07 | 0.06 | -0.07 | 0.06 | -0.07 | 0.06 | -0.07 | 0.06 | -0.7 | 0.06 |
| African–American | 0.30*** | 0.05 | 0.29*** | 0.05 | 0.30*** | 0.05 | 0.29*** | 0.05 | 0.29*** | 0.05 |
| American Indian | -0.10 | 0.08 | -0.10 | 0.08 | -0.11 | 0.08 | -0.11 | 0.07 | -0.11 | 0.08 |
| Asian American | -0.43*** | 0.07 | -0.44*** | 0.07 | -0.44*** | 0.07 | -0.44*** | 0.07 | -0.45*** | 0.07 |
| Other race | -0.02 | 0.06 | -0.02 | 0.06 | -0.02 | 0.06 | -0.02 | 0.06 | -0.03 | 0.06 |
| Age 25–44 | -0.01 | 0.03 | 0.05 | 0.03 | -0.01 | 0.03 | 0.05 | 0.03 | 0.06 | 0.03 |
| Age 45–64 | 0.25*** | 0.03 | 0.33*** | 0.04 | 0.25*** | 0.04 | 0.33*** | 0.04 | 0.33*** | 0.04 |
| Age 65+ | 0.40*** | 0.03 | 0.53*** | 0.04 | 0.40*** | 0.03 | 0.53*** | 0.04 | 0.53*** | 0.04 |
| High school | 0.33*** | 0.03 | 0.32*** | 0.03 | 0.33*** | 0.03 | 0.32*** | 0.03 | 0.32*** | 0.03 |
| Some college | 0.62*** | 0.03 | 0.61*** | 0.03 | 0.62*** | 0.03 | 0.61*** | 0.03 | 0.61*** | 0.03 |
| College | 0.91*** | 0.04 | 0.90*** | 0.04 | 0.91*** | 0.04 | 0.90*** | 0.04 | 0.90*** | 0.04 |
| Graduate school | 1.05*** | 0.05 | 1.04*** | 0.05 | 1.05*** | 0.05 | 1.04*** | 0.05 | 1.04*** | 0.05 |
| Family income, $15,000–$29,999 | 0.17*** | 0.02 | 0.16*** | 0.02 | 0.17*** | 0.02 | 0.16*** | 0.02 | 0.16*** | 0.02 |
| Family income, $30,000–$49,999 | 0.21*** | 0.03 | 0.19*** | 0.03 | 0.21*** | 0.03 | 0.19*** | 0.03 | 0.20*** | 0.03 |
| Family income, $50,000–$74,999 | 0.24*** | 0.03 | 0.23*** | 0.03 | 0.24*** | 0.03 | 0.23*** | 0.03 | 0.23*** | 0.03 |
| Family income, $75,000–$149,999 | 0.39*** | 0.04 | 0.38*** | 0.04 | 0.39*** | 0.04 | 0.38*** | 0.04 | 0.39*** | 0.04 |
| Family income, $150,000 or more | 0.37*** | 0.05 | 0.36*** | 0.05 | 0.37*** | 0.05 | 0.36*** | 0.05 | 0.36*** | 0.05 |
| Married | 0.20*** | 0.03 | 0.10** | 0.04 | 0.20*** | 0.03 | 0.11** | 0.04 | 0.10** | 0.04 |
| Widowed | -- | -- | -0.24*** | 0.04 | -- | -- | -0.24*** | 0.04 | -0.25*** | 0.04 |
| Divorced | -- | -- | -0.10** | 0.04 | -- | -- | -0.10** | 0.04 | -0.11** | 0.04 |
| Seperated | -- | -- | -0.24*** | 0.04 | -- | -- | -0.24*** | 0.04 | -0.24*** | 0.04 |
| Female | 0.10*** | 0.02 | 0.11*** | 0.02 | 0.10*** | 0.02 | 0.11*** | 0.02 | 0.11*** | 0.02 |
| Battleground state | 0.20*** | 0.04 | 0.19*** | 0.04 | 0.19*** | 0.04 | 0.19*** | 0.04 | 0.20*** | 0.05 |
| Competitive race | -0.03 | 0.06 | -0.03 | 0.06 | -0.02 | 0.06 | -0.02 | 0.06 | -0.02 | 0.06 |
| Employed | 0.03 | 0.05 | 0.04 | 0.05 | 0.03 | 0.05 | 0.04 | 0.05 | 0.04 | 0.05 |
| Member of workforce | 0.08 | 0.06 | 0.07 | 0.06 | 0.08 | 0.06 | 0.07 | 0.06 | 0.06 | 0.06 |
| Native-born citizen | -0.02 | 0.05 | -0.02 | 0.05 | -0.02 | 0.05 | -0.02 | 0.05 | -0.03 | 0.05 |
| Moved within last year | -0.27*** | 0.03 | -0.27*** | 0.03 | -0.27*** | 0.03 | -0.27*** | 0.03 | -0.27*** | 0.03 |
| Home ownership | 0.16*** | 0.03 | 0.17*** | 0.03 | 0.16*** | 0.03 | 0.17*** | 0.03 | 0.17*** | 0.03 |
| Constant | -0.08 | 0.09 | -0.05 | 0.09 | -0.11 | 0.09 | -0.06 | 0.11 | -0.07 | 0.09 |
| Pseudo R-squared | 0.10 | | 0.10 | | | | 0.11 | | 0.10 | |
| N | 54,695 | | 54,695 | | 54,695 | | 54,695 | | 54,695 | |

\* p < 0.05   ** p < 0.01   *** p < 0.001

**Note:** Two-tailed significance tests were used. Robust standard errors adjusted for state clustering are reported. The CPS population weights were used.

**Source:** Heritage Foundation calculations.

TX_00001803

*Third,* the effect of photo identification variables on voter turnout is very sensitive to how the models control for marriage. In addition to a dichotomous variable for whether or not the respondent reported being married, additional dichotomous variables were added for those reporting to be widowed, separated, and divorced. This minor change in marital control variables has a significant impact on the results for the relationship between voter turnout and some of the voter identification variables.

*Fourth,* the alternative models control for whether or not the individual has moved within the last year instead of the six-month time period used by the Eagleton Institute.

*Fifth,* a variable indicating whether or not the respondent owns or rents his or her home was added to the alternative models. The residential mobility and home ownership variables help to control for how connected the respondents are to their communities.

Table 5 presents the findings of the alternative model specification for all respondents. Model 4 contains the revised race/ethnicity and income variables along with the variables for residential mobility and home ownership. Of the four voter identification variables, only the photo identification variable is statistically significant. Photo identification states have respondents that are less likely to have reported voting compared to respondents in states that only required voters to say their names at the polling stations. However, the difference is very small. The survey respondents in photo identification states are 0.002 percent less likely to report voting than respondents from states that only required voters to state their name for identification.

A slight change in how marital status is controlled for in Model 5 makes the findings in Model 4 for photo identification requirements disappear. The inclusion of dichotomous variables to identify respondents if they are widowed, divorced, or separated, in addition to being married, significantly changes the results for the photo identification variable. A photo identification requirement no longer has a statistically significant relationship with voter turnout. Thus, the finding that photo identification requirements reduce voter turnout in Model 4 is not robust to an alternative model specification.

In Models 6 and 7, Arizona and Illinois are reclassified correctly as requiring voters at polling stations to sign their name and match signatures, respectively. As with Model 4, Model 6 uses only a married dichotomous variable to control for marital status. Model 7 includes additional marital status as used in Model 5. After correctly designating Arizona and Illinois, the different ways to control for marital status have no effect on the outcomes for the voter identification variables. All of the state voter identification variables are statistically insignificant—meaning that none of these requirements has a statistically measurable relationship with voter turnout.

Model 8 uses the minimum requirements for voter identification as used by the Eagleton Institute. The only voter identification coefficient to be statistically significant is the swear affidavit coefficient. The survey respondents in swear affidavit states are 0.002 percent less likely to report voting than respondents from states that only require voters to state their name for identification.

As for the socioeconomic variables in Models 4 through 8, the findings are similar to the previous findings. African–Americans are more likely to have reported voting in the election than non-Hispanic whites, while Asians are less likely to report voting. Older respondents and those with higher incomes and more education are more likely to report voting. Widowed, divorced, and separated respondents are less likely to report voting than singles, while married respondents are more likely to report voting. Female respondents are more likely to report voting than male respondents. Respondents residing in battleground states are more likely to vote, while respondents who moved within the last twelve months are less likely to have reported voting.

### Findings by Race and Ethnicity

The impact of voter identification requirements on minority voters has received much media attention recently.[79] To analyze the relationship between race and ethnicity and voter identification requirements, Tables 6 through 9 present the findings of the probit analyses.

---

79. Tom Baxter and Jim Galloway, "Wonk Alert: Study Says the Heavier the Voter ID Requirements, the Lower Turnout"; Wolf, "Study: Stricter Voting ID Rules Hurt '04 Turnout"; and Dave Zweifel, "Voter ID Reducing Minority Turnout," *The Capital Times* (Madison, Wisconsin), February 28, 2007, p. A6.

THE HERITAGE CENTER FOR DATA ANALYSIS

| ▇ Table 6 | | | | | | CDA 07-04 |
|---|---|---|---|---|---|---|

### Alternative Specifications of Probit Models of Voter Turnout of Whites

| | Maximum Requirement | | | | Minimum Requirement | |
| | Model 9 | | Model 10 | | Model 11 | |
| | Vercellotti Categorizations | | Recoded States | | Vercellotti Categorizations | |
| Variable | Coefficient | Robust S.E. | Coefficient | Robust S.E. | Coefficient | Robust S.E. |
|---|---|---|---|---|---|---|
| Sign name | -0.05 | 0.05 | -0.06 | 0.07 | -0.02 | 0.05 |
| Match signature | 0.01 | 0.06 | -0.01 | 0.07 | -0.01 | 0.08 |
| Non-photo ID | -0.04 | 0.07 | -0.06 | 0.08 | -0.05 | 0.07 |
| Photo ID | -0.12* | 0.05 | -0.14* | 0.06 | -- | -- |
| Affidavit | -- | -- | -- | -- | -0.13** | 0.04 |
| Age 25–44 | 0.05 | 0.04 | 0.05 | 0.04 | 0.05 | 0.04 |
| Age 45–64 | 0.34*** | 0.04 | 0.34*** | 0.04 | 0.34*** | 0.04 |
| Age 65+ | 0.54*** | 0.05 | 0.54*** | 0.05 | 0.54*** | 0.05 |
| High school | 0.38*** | 0.03 | 0.38*** | 0.03 | 0.38*** | 0.03 |
| Some college | 0.70*** | 0.03 | 0.70*** | 0.03 | 0.70*** | 0.03 |
| College | 1.00*** | 0.04 | 1.00*** | 0.04 | 1.00*** | 0.04 |
| Graduate school | 1.13*** | 0.05 | 1.13*** | 0.05 | 1.13*** | 0.05 |
| Family income, $15,000–$29,999 | 0.16*** | 0.04 | 0.16*** | 0.04 | 0.16*** | 0.03 |
| Family income, $30,000–$49,999 | 0.22*** | 0.03 | 0.22*** | 0.03 | 0.22*** | 0.03 |
| Family income, $50,000–$74,999 | 0.24*** | 0.03 | 0.24*** | 0.04 | 0.24*** | 0.03 |
| Family income, $75,000–$149,999 | 0.36*** | 0.05 | 0.36*** | 0.05 | 0.36*** | 0.05 |
| Family income, $150,000 or more | 0.36*** | 0.05 | 0.36*** | 0.05 | 0.36*** | 0.05 |
| Married | 0.16** | 0.04 | 0.17** | 0.04 | 0.16** | 0.04 |
| Widowed | -0.20*** | 0.04 | -0.20*** | 0.04 | -0.20*** | 0.04 |
| Divorced | -0.10** | 0.04 | -0.10** | 0.04 | -0.10** | 0.04 |
| Seperated | -0.33*** | 0.07 | -0.33*** | 0.07 | -0.33*** | 0.07 |
| Female | 0.09*** | 0.01 | 0.09*** | 0.01 | 0.09*** | 0.03 |
| Battleground state | 0.19*** | 0.05 | 0.19*** | 0.05 | 0.19*** | 0.05 |
| Competitive race | -0.04 | 0.06 | -0.04 | 0.06 | -0.04 | 0.06 |
| Employed | 0.08 | 0.08 | 0.08 | 0.06 | 0.08 | 0.06 |
| Member of workforce | -0.001 | 0.06 | -0.001 | 0.06 | 0.002 | 0.06 |
| Native-born citizen | 0.09 | 0.09 | 0.09 | 0.09 | -0.09 | 0.09 |
| Moved within last year | -0.25*** | 0.03 | -0.25*** | 0.03 | -0.25*** | 0.03 |
| Home ownership | 0.15*** | 0.03 | 0.15*** | 0.03 | 0.15*** | 0.03 |
| Constant | -0.05 | 0.12 | -0.05 | 0.13 | -0.26* | 0.12 |
| Pseudo R-squared | 0.11 | | 0.11 | | 0.11 | |
| N | 44,762 | | 44,762 | | 44,762 | |

* p < 0.05  ** p < 0.01  *** p < 0.001

**Note:** Two-tailed significance tests were used. Robust standard errors adjusted for state clustering are reported. The CPS population weights were used.

**Source:** Heritage Foundation calculations.

**Non-Hispanic Whites.** The probit regression results presented in Table 6 contain data for respondents reporting to be non-Hispanic whites. Models 9 and 10 present the findings for the maximum requirements with Model 10 including the correct voter identification classifications for Arizona and Illinois. Except for the photo identification coefficient, none of the coefficients for the voter identification variables are statistically different from zero. In both Models 9 and 10, white respondents in photo identification states are less likely to have reported voting compared to white respondents in states that only required voters to say their names at the polling stations. Under both models, white survey respondents in photo identification states are 0.002 percent less likely to report voting than white respondents from states that only required voters to state their name.

The analysis of minimum voter identification requirements in Model 11 finds that white respondents are less likely to vote when the minimum requirement entails a sworn affidavit. White survey respondents in swear affidavit states are 0.002 percent less likely to report voting than white respondents from states that only required voters to give their name.

| ▓ Table 7 | | | | | | CDA 07-04 |
|---|---|---|---|---|---|---|

### Alternative Specifications of Probit Models of Voter Turnout of African–Americans

| | Maximum Requirement | | | | Minimum Requirement | |
| | Model 12 | | Model 13 | | Model 14 | |
| | Vercellotti Categories | | Recoded States | | Vercellotti Categories | |
| Variable | Coefficient | Robust S.E. | Coefficient | Robust S.E. | Coefficient | Robust S.E. |
|---|---|---|---|---|---|---|
| Sign name | -0.20 | 0.12 | -0.09 | 0.11 | -0.03 | 0.14 |
| Match signature | -0.13 | 0.10 | -0.06 | 0.11 | -0.03 | 0.15 |
| Non-photo ID | -0.30*** | 0.09 | -0.19* | 0.08 | -0.12 | 0.12 |
| Photo ID | -0.15 | 0.15 | -0.03 | 0.14 | -- | -- |
| Affidavit | -- | -- | -- | -- | 0.0002 | 0.21 |
| Age 25–44 | 0.03 | 0.10 | 0.03 | 0.10 | 0.03 | 0.10 |
| Age 45–64 | 0.13 | 0.11 | 0.13 | 0.11 | 0.13 | 0.11 |
| Age 65+ | 0.35* | 0.14 | 0.35* | 0.14 | 0.36* | 0.14 |
| High school | 0.30*** | 0.05 | 0.30*** | 0.05 | 0.30*** | 0.05 |
| Some college | 0.44*** | 0.08 | 0.44*** | 0.08 | 0.44*** | 0.08 |
| College | 0.70*** | 0.10 | 0.70*** | 0.10 | 0.69*** | 0.10 |
| Graduate school | 0.88*** | 0.13 | 0.89*** | 0.13 | 0.86*** | 0.13 |
| Family income, $15,000–$29,999 | 0.21** | 0.08 | 0.21** | 0.08 | 0.21** | 0.08 |
| Family income, $30,000–$49,999 | 0.27** | 0.08 | 0.27** | 0.08 | 0.28*** | 0.08 |
| Family income, $50,000–$74,999 | 0.39** | 0.13 | 0.38** | 0.13 | 0.39*** | 0.12 |
| Family income, $75,000–$149,999 | 0.68*** | 0.14 | 0.67*** | 0.14 | 0.68*** | 0.14 |
| Family income, $150,000 or more | 0.82* | 0.32 | 0.82** | 0.32 | 0.83* | 0.32 |
| Married | 0.03 | 0.08 | 0.03 | 0.08 | 0.03 | 0.08 |
| Widowed | -0.10*** | 0.11 | -0.10*** | 0.11 | -0.10*** | 0.11 |
| Divorced | 0.13 | 0.07 | 0.13 | 0.07 | 0.12 | 0.07 |
| Seperated | -0.11 | 0.09 | -0.11 | 0.09 | -0.09 | 0.10 |
| Female | 0.16 | 0.07 | 0.16 | 0.07 | 0.16 | 0.07 |
| Battleground state | 0.15 | 0.11 | 0.11 | 0.11 | 0.16 | 0.13 |
| Competitive race | -0.01 | 0.11 | 0.04 | 0.11 | 0.02 | 0.10 |
| Employed | -0.10 | 0.13 | -0.11 | 0.13 | -0.10 | 0.13 |
| Member of workforce | 0.37** | 0.13 | 0.38** | 0.13 | 0.37** | 0.13 |
| Native-born citizen | 0.22 | 0.13 | 0.25 | 0.13 | 0.21 | 0.14 |
| Moved within last year | -0.31*** | 0.07 | -0.31*** | 0.07 | -0.33*** | 0.07 |
| Home ownership | 0.20*** | 0.07 | 0.20*** | 0.07 | 0.19*** | 0.07 |
| Constant | 0.07 | 0.17 | 0.08 | 0.17 | 0.06 | 0.18 |
| Pseudo R-squared | 0.11 | | 0.11 | | 0.10 | |
| N | 4,958 | | 4,958 | | 4,958 | |

\* p < 0.05  \*\* p < 0.01  \*\*\* p < 0.001
**Note:** Two-tailed significance tests were used. Robust standard errors adjusted for state clustering are reported. The CPS population weights were used.
**Source:** Heritage Foundation calculations.

**Non-Hispanic African–Americans.** The probit regression results presented in Table 7 contain data for respondents reporting to be non-Hispanic African–Americans. Models 12 and 13 present the findings for the maximum requirements with Model 13 including the correct voter identification classifications for Arizona and Illinois. Except for the non-photo identification coefficient, none of the coefficients for the voter identification variables are statistically different from zero. In both Models 12 and 13, African–American respondents in non-photo identification states are less likely to have reported voting compared to African–American respondents in states that only required voters to say their names at the polling stations. In Model 12, African–American respondents in non-photo identification states are 0.019 percent less likely to report voting than African–American respondents from states that only required voters to state their name. For Model 13, the elasticity for non-photo identification states is 0.012 percent.

The analysis of minimum voter identification requirements in Model 14 fails to find any statistically significant relationships between African–American voter turnout and the minimum voting requirements.

TX_00001806

THE HERITAGE CENTER FOR DATA ANALYSIS

| ☎ Table 8 | | | | | | CDA 07-04 |
|---|---|---|---|---|---|---|

### Alternative Specifications of Probit Models of Voter Turnout of Hispanics

| | Maximum Requirement | | | | Minimum Requirement | |
| | Model 15 | | Model 16 | | Model 17 | |
| | Vercellotti Categories | | Recoded States | | Vercellotti Categories | |
| Variable | Coefficient | Robust S.E. | Coefficient | Robust S.E. | Coefficient | Robust S.E. |
|---|---|---|---|---|---|---|
| Sign name | -0.27 | 0.14 | -0.11 | 0.18 | -0.21 | 0.14 |
| Match signature | -0.16 | 0.14 | 0.03 | 0.18 | -0.16 | 0.14 |
| Non-photo ID | -0.44** | 0.15 | -0.35* | 0.18 | -0.40* | 0.15 |
| Photo ID | -0.12 | 0.16 | -0.02 | 0.18 | -- | -- |
| Affidavit | -- | -- | -- | -- | -0.16 | 0.16 |
| Age 25–44 | 0.08 | 0.08 | 0.09 | 0.08 | 0.08 | 0.08 |
| Age 45–64 | 0.38*** | 0.07 | 0.39*** | 0.07 | 0.39*** | 0.07 |
| Age 65+ | 0.40** | 0.12 | 0.40*** | 0.12 | 0.41*** | 0.12 |
| High school | 0.11 | 0.07 | 0.10 | 0.07 | 0.11 | 0.07 |
| Some college | 0.44*** | 0.04 | 0.43*** | 0.04 | 0.44*** | 0.04 |
| College | 0.53*** | 0.10 | 0.52*** | 0.10 | 0.53*** | 0.10 |
| Graduate school | 0.78*** | 0.20 | 0.78*** | 0.20 | 0.78*** | 0.20 |
| Family income, $15,000–$29,999 | 0.12 | 0.08 | 0.13 | 0.08 | 0.12 | 0.08 |
| Family income, $30,000–$49,999 | 0.01 | 0.15 | 0.001 | 0.15 | 0.01 | 0.15 |
| Family income, $50,000–$74,999 | 0.21** | 0.08 | 0.20** | 0.07 | 0.21** | 0.08 |
| Family income, $75,000–$149,999 | 0.40*** | 0.10 | 0.39*** | 0.09 | 0.40*** | 0.10 |
| Family income, $150,000 or more | 0.09 | 0.16 | 0.08 | 0.16 | 0.09 | 0.16 |
| Married | -0.12 | 0.08 | -0.11 | 0.08 | -0.12 | 0.08 |
| Widowed | -0.40*** | 0.13 | -0.40*** | 0.13 | -0.41*** | 0.13 |
| Divorced | -0.14 | 0.11 | -0.13 | 0.11 | -0.14 | 0.11 |
| Seperated | -0.001 | 0.10 | -0.003 | 0.10 | -0.01 | 0.10 |
| Female | 0.16*** | 0.04 | 0.16*** | 0.04 | 0.16*** | 0.04 |
| Battleground state | 0.41*** | 0.08 | 0.39*** | 0.08 | 0.42*** | 0.08 |
| Competitive race | -0.29** | 0.11 | -0.23** | 0.11 | -0.25* | 0.11 |
| Employed | -0.17 | 0.09 | -0.17 | 0.10 | -0.18 | 0.09 |
| Member of workforce | -0.11 | 0.09 | -0.11 | 0.10 | -0.12 | 0.09 |
| Native-born citizen | -0.26*** | 0.08 | -0.25*** | 0.08 | -0.27*** | 0.08 |
| Moved within last year | -0.26*** | 0.07 | -0.26*** | 0.07 | -0.27*** | 0.07 |
| Home ownership | 0.32*** | 0.04 | 0.34*** | 0.05 | 0.31*** | 0.04 |
| Constant | 0.53** | 0.19 | 0.38 | 0.20 | 0.51** | 0.19 |
| Pseudo R-squared | 0.11 | | 0.11 | | 0.11 | |
| N | 2,862 | | 2,862 | | 2,862 | |

* p < 0.05  ** p < 0.01  *** p < 0.001
**Note:** Two-tailed significance tests were used. Robust standard errors adjusted for state clustering are reported. The CPS population weights were used.
**Source:** Heritage Foundation calculations.

**Hispanics.** The probit regression results presented in Table 8 contain data for respondents reporting to be Hispanic. Models 15 and 16 present the findings for the maximum requirements with Model 16 including the correct voter identification classifications for Arizona and Illinois. Model 17 presents the findings for the minimum voter identification requirements. All three models find that Hispanics reported lower voter turnout rates in states with non-photo identification requirements compared to states that only require voters to state their names at the polling stations. All three of these findings are statistically significant at the 95 percent confidence level. Hispanic respondents in non-photo identification states are 0.035 percent to 0.049 percent less likely to report voting than Hispanic respondents from states that only required voters to state their name.

**Asian Americans.** The probit regression results presented in Table 9 contain data for respondents reporting to be non-Hispanic Asian American (including Hawaiians/Pacific Islanders). Models 18 and 19 present the findings for the maximum requirements with Model 19 including the correct voter identification classifications for Arizona and Illinois. Model 20 presents the findings for the

THE HERITAGE CENTER FOR DATA ANALYSIS

| ▓ Table 9 | | | | | | CDA 07-04 |

### Alternative Specifications of Probit Models of Voter Turnout of Asians

| | Maximum Requirement | | | | Minimum Requirement | |
| | Model 18 | | Model 19 | | Model 20 | |
| | Vercellotti Categories | | Recoded States | | Vercellotti Categories | |
| Variable | Coefficient | Robust S.E. | Coefficient | Robust S.E. | Coefficient | Robust S.E. |
|---|---|---|---|---|---|---|
| Sign name | -0.19 | 0.19 | -0.22 | 0.28 | -0.20 | 0.19 |
| Match signature | 0.14 | 0.19 | 0.06 | 0.29 | 0.10 | 0.19 |
| Non-photo ID | -0.28 | 0.21 | -0.33 | 0.29 | -0.30 | 0.21 |
| Photo ID | -0.09 | 0.21 | -0.13 | 0.29 | -- | -- |
| Affidavit | -- | -- | -- | -- | 0.19 | 0.21 |
| Age 25–44 | -0.39** | 0.15 | -0.39** | 0.15 | -0.37* | 0.15 |
| Age 45–64 | -0.04 | 0.19 | 0.03 | 0.19 | -0.005 | 0.19 |
| Age 65+ | -0.001 | 0.32 | -0.005 | 0.32 | -0.04 | 0.32 |
| High school | 0.46 | 0.28 | 0.47 | 0.28 | 0.47 | 0.28 |
| Some college | 0.21 | 0.43 | 0.21 | 0.43 | 0.22 | 0.43 |
| College | 0.42 | 0.33 | 0.42 | 0.33 | 0.42 | 0.33 |
| Graduate school | 0.39 | 0.37 | 0.39 | 0.37 | 0.39 | 0.37 |
| Family income, $15,000–$29,999 | -0.06 | 0.24 | -0.06 | 0.25 | -0.05 | 0.24 |
| Family income, $30,000–$49,999 | -0.37 | 0.19 | -0.36 | 0.19 | -0.35 | 0.19 |
| Family income, $50,000–$74,999 | -0.30 | 0.23 | -0.30 | 0.23 | -0.29 | 0.23 |
| Family income, $75,000–$149,999 | 0.26 | 0.23 | 0.27 | 0.24 | 0.25 | 0.23 |
| Family income, $150,000 or more | 0.09 | 0.26 | 0.09 | 0.27 | 0.10 | 0.26 |
| Married | 0.36* | 0.18 | 0.36* | 0.18 | 0.34 | 0.18 |
| Widowed | -0.43 | 0.32 | -0.43 | 0.32 | -0.43 | 0.32 |
| Divorced | 0.13 | 0.23 | 0.12 | 0.23 | 0.08 | 0.23 |
| Seperated | 0.19 | 0.41 | 0.18 | 0.41 | 0.15 | 0.41 |
| Female | 0.13 | 0.07 | 0.14*** | 0.07 | 0.13 | 0.07 |
| Battleground state | 0.23 | 0.13 | 0.24 | 0.13 | 0.17 | 0.13 |
| Competitive race | 0.30 | 0.21 | 0.30 | 0.20 | 0.21 | 0.21 |
| Employed | -0.28 | 0.37 | -0.28 | 0.37 | -0.28 | 0.37 |
| Member of workforce | 0.59 | 0.43 | 0.59 | 0.43 | 0.58 | 0.43 |
| Native-born citizen | 0.11 | 0.14 | 0.11 | 0.14 | 0.13 | 0.14 |
| Moved within last year | -0.41** | 0.13 | -0.42*** | 0.13 | -0.45*** | 0.13 |
| Home ownership | -0.09 | 0.10 | -0.09 | 0.10 | -0.11 | 0.10 |
| Constant | 0.40 | 0.48 | 0.44 | 0.55 | 0.46 | 0.48 |
| Pseudo R-squared | 0.11 | | 0.11 | | 0.10 | |
| N | 1,029 | | 1,029 | | 1,029 | |

* $p < 0.05$  ** $p < 0.01$  *** $p < 0.001$
**Note:** Two-tailed significance tests were used. Robust standard errors adjusted for state clustering are reported. The CPS population weights were used.
**Source:** Heritage Foundation calculations.

minimum voter identification requirements. All three models find that the various state voter identification requirements do not have a statistically measurable relationship with voter turnout of Asian Americans.

## DISCUSSION

The findings of this analysis suggest that voter identification requirements, such as requiring non-photo and photo identification, have virtually no suppressive effect on reported voter turnout.

Caution is needed in interpreting the Eagleton Institute's findings, for at least three reasons.

*First,* their study used one-tailed significance tests that can be used to double the chances of finding statistically significant findings.

*Second,* the voter identification laws for two states, Arizona and Illinois, were incorrectly classified. From our modeling, this misclassification leads to a negative and statistically significant relationship between photo identification requirements and voter turnout for all registered voters. When Arizona and Illinois are correctly classified, the relationship in our modeling is statistically indistinguishable from zero.

*Third,* the findings for photo identification requirements are sensitive to model specification. Us-

ing the Eagleton Institute's state voter identification classifications and controlling for marriage with a married or not dichotomous variable, our analysis of overall voter turnout finds that photo identification requirements have a negative and statistically significant relationship with overall voter turnout. However, when additional marital status variables—widowed, divorced, separated—are included, the statistically significant relationship for photo identification requirements disappears.

Controlling for factors that influence voter turnout, states with stricter voter identification laws largely do not have the claimed negative impact on voter turnout when compared to states with more lenient voter identification laws. Based on the Eagleton Institute's findings, some members of the media have claimed that voter identification law suppress voter turnout, especially among minorities.[80] Their conclusion is unfounded. When statistically significant and negative relationships are found in our analysis, the effects are so small that the findings offer little policy significance.

More important, minority respondents in states that required photo identification are just as likely to report voting as are minority respondents from states that only required voters to say their name.

Nevertheless, using data from the November 2004 CPS to study the impact of voter identification requirements on voter turnout does have its limitations. The November 2004 CPS is a cross-sectional data set that does not allow social scientists to estimate the effect of changing voter identification requirements within states over time. Studies using the November CPS can only provide information on how voter patterns differed between states with different voter identification requirements. These studies cannot provide information on how enacting stiffer voter identification requirements will affect voter turnout within states over time. While it is reasonable to assume that voters will respond to stricter voter identification requirements by obtaining the necessary documentation, we would need to use panel data sets that consist of cross-sectional and time-series data in order to conduct such an analysis. Panel studies observe multiple units (e.g., individual

voters, voting precincts, and counties) over several time periods.

To the best of our knowledge, there is only one voter identification study that utilizes the benefits of panel data. The study, by John R. Lott of the University of Maryland Foundation, analyzed the effect of stricter voter identification requirements on U.S. primary and general elections from 1996 to 2006.[81] Dr. Lott found little support for the notion that non-photo and photo identification requirements suppress voter turnout.

As states adopt stricter voter identification requirements to deter voter fraud, future research needs to adopt panel data methods to determine how the laws affect voter turnout.

## CONCLUSION

Controlling for factors that influence voter turnout, voter identification laws largely do not have the claimed negative impact on voter turnout based on state-to-state comparisons. When statistically significant and negative relationships are found, the effects are so small that the findings offer little policy significance. White survey respondents in photo identification states are 0.002 percent less likely to report voting than white respondents from states that only required voters to state their name. African–American respondents in non-photo identification states are 0.012 percent less likely to report voting than African–American respondents from states that only required voters to state their name.

In other cases, no effect was found. In general, respondents in photo identification and non-photo identification states are *just as likely* to report voting compared to respondents from states that only required voters to state their name. African–American respondents in photo identification states are *just as likely* to report voting compared to African–American respondents from states that only required voters to state their name. Hispanic respondents in photo identification states are *just as likely* to report voting compared to Hispanic respondents from states that only required voters to state their name.

—*David B. Muhlhausen, Ph.D., is a Senior Policy Analyst and Keri Weber Sikich is a research assistant in the Center for Data Analysis at The Heritage Foundation.*

---

80.   Baxter and Galloway, "Wonk Alert: Study Says the Heavier the Voter ID Requirements, the Lower Turnout"; Wolf, "Study: Stricter Voting ID Rules Hurt '04 Turnout"; and Zweifel, "Voter ID Reducing Minority Turnout."

81.   Lott, "Evidence of Voter Fraud and the Impact that Regulations to Reduce Fraud Have on Voter Participation Rates."

TX_00001809

**The New York Times**
nytimes.com

PRINTER-FRIENDLY FORMAT
SPONSORED BY


---

September 23, 2005
**Voting Reform Is in the Cards**
By JIMMY CARTER and JAMES A. BAKER III

WE agreed to lead the Commission on Federal Election Reform because of our shared concern that too many Americans lack confidence in the electoral process, and because members of Congress are divided on the issue and busy with other matters.

This week, we issued a report that bridges the gap between the two parties' perspectives and offers a comprehensive approach that can help end the sterile debate between ballot access and ballot integrity. Unfortunately, some have misrepresented one of our 87 recommendations. As a result, they have deflected attention from the need for comprehensive reform.

Our recommendations are intended to increase voter participation, enhance ballot security and provide for paper auditing of electronic voting machines. We also offer plans to reduce election fraud, and to make the administration of elections impartial and more effective.

Most important, we propose building on the Help America Vote Act of 2002 to develop an accurate and up-to-date registration system by requiring states, not counties, to organize voter registration lists and share them with other states to avoid duplications when people move. The lists should be easily accessible so that voters can learn if they're registered, and where they're registered to vote.

Some of our recommendations are controversial, but the 21 members of our bipartisan commission, which was organized by American University, approved the overall report, and we hope it will break the stalemate in Congress and increase the prospects for electoral reform.

Since we presented our work to the president and Congress, some have overlooked almost all of the report to focus on a single proposal - a requirement that voters have driver's licenses or government-issued photo ID's. Worse, they have unfairly described our recommendation.

Here's the problem we were addressing: 24 states already require that voters prove their identity at the polls - some states request driver's licenses, others accept utility bills, affidavits or other documents - and 12 others are considering it. This includes Georgia, which just started demanding that voters have a state-issued photo ID, even though obtaining one can be too costly or difficult for poor Georgians. We consider Georgia's law discriminatory.

Our concern was that the differing requirements from state-to-state could be a source of discrimination, and so we recommended a standard for the entire country, the Real ID card, the standardized driver's licenses mandated by federal law last May. With that law, a driver's license can double as a voting card. All but three of our 21 commission members accepted the proposal, in part because the choice was no longer whether to have voter ID's, but rather what kind of ID's voters should have.

Yes, we are concerned about the approximately 12 percent of citizens who lack a driver's license. So we proposed that states finally assume the responsibility to seek out citizens to both register voters and provide them with free ID's that meet federal standards. States should open new offices, use social service agencies and deploy mobile offices to register voters. By connecting ID's to registration, voting participation will be expanded.

Our proposal would allow voters without photo ID's to be able to cast provisional ballots until 2010. Their votes would count if the signature they placed on the ballot matched the one on file, just as the case for absentee ballots. After that, people who forgot their photo ID's could cast provisional votes that would be counted if they returned with their ID's within 48 hours. Some have suggested we use a signature match for provisional ballots after 2010, but we think citizens would prefer to get a free photo ID before then.

In arguing against voter ID requirements, some critics have overlooked the larger benefit of government-issued ID's for the poor and minorities. When he spoke to the commission, Andrew Young, the former mayor of Atlanta, supported the free photo ID as a way to empower minorities, who are often charged exorbitant fees for cashing checks because they lack proper identification. In a post-9/11 world, photo ID's are required to get on a plane or into a skyscraper.

We hope that honest disagreements about a photo ID will not deflect attention from the urgency of fixing our electoral system. While some members of Congress may prefer to block any changes or stand behind their particular proposals rather than support comprehensive reforms, we hope that in the end they will work to find common ground. The American people want the system fixed before the next election, and that will require a comprehensive approach with a bipartisan voice in favor of reform.

Jimmy Carter was the 39th president. James A. Baker III was secretary of state in the George H. W. Bush administration.

---

Copyright 2005 The New York Times Company | Home | Privacy Policy | Search | Corrections | XML | Help | Contact Us | Work for Us | Site Map |

-

E+ 11

# HARVEY KRONBERG'S QUORUM REPORT

TEXAS POLITICS REPORTING SINCE 1981
PO BOX 8 AUSTIN, TEXAS 78767
VOICE: 512.292.8191
FAX: 512.292.0099
EMAIL: HKRONBERG@QUORUMREPORT.COM

**Close this Page**      **Print this Page**

*April 23, 2007    7:49 AM*

© Copyright April 23, 2007, Harvey Kronberg, www.quorumreport.com, All rights are reserved

# ROYAL MASSET: THE VOTER ID BILL WILL KILL MY MOTHER'S RIGHT TO VOTE

## Long time Republican consultant debunks arguments behind Voter ID bill to be considered on House floor today

I was a big fan of voter ID until the federal government declared my mother **Aimee** dead. The reason I've not been heavily involved in the political arena for the last three years is because I've been taking care of my 91-year-old mother who is a complete invalid but is very much alive.

I found there was no way of proving her alive. Invalid 91 year olds do not have driver's licenses, passports, employment badges, gun permits & etc. Since I'm taking care of her in my home she has no bills with her name and address. I can't even get her a birth certificate since she lacks the ID necessary for a notary to verify. Under **HB 218** my mother, who is a registered voter in Austin, cannot vote in Texas. Anyone who says all legal voters under this bill can vote doesn't know what he is talking about. And anyone who says that a lack of IDs won't discriminate against otherwise legal minority voters is lying.

I agree with **David Dewhurst's** comments that we should "ensure that we maximize the number of voters, which is all in our best interests, but that we limit our elections to American citizens. I can't imagine anyone who could be against that concept." I agree with David 100%. And if he is a man of intelligence and integrity he will not support HB 218 since it does the exact opposite of what he says he wants. HB 218 will lower voter turnout. There is no evidence on the record that non-American citizens have voted in past Texas elections in a manner that would have been stopped by HB 218.

Bills should only be passed if they solve problems or otherwise make our lives better. No testimony was given on HB 218 proving a problem exists that can be solved by requiring extra Voter ID. I have no doubt that HB 218 does not solve any problems. It will create new problems.

## VOTER FRAUD IS A PROBLEM

In the 15 years I worked for the *Republican Party of Texas*, mostly as Political Director, ballot security was always one of my top jobs. People who believe voter fraud doesn't exist are naïve.

Former Congressman **Joe Kilgore**, who represented TX-15, the Rio Grande Valley 1947-1955, told me that during the counting in the 1948 US senate race **John Connally** told him "They stole the last election from us (**LBJ**) and I'm not going to let them steal this election." The election judge for Alice ballot box 13 made a deathbed confession that he did indeed fabricate the votes that gave LBJ his winning margin.

Human nature has not changed in 60 years. Buying votes with suitcases of money and forging signatures in alphabetical order are no longer in vogue. I believe elections have been stolen through illegal mail absentee ballots harvesting, deliberate miscounting that was never discovered and punching out chads with fingernails. However, voter fraud by individual voters is extremely rare.



TX 00001811
JA 004570

TX_00001811

# VOTER FRAUD IS RARE

In my involvement with over 5000 Republican candidates I have never seen one case of Republicans committing voter fraud. This isn't a matter of moral superiority. Using voter fraud is an incredibly stupid way to win an election. Almost all candidates and activists think their candidate will win. Why cheat and possibly destroy your candidate? It is one hundred times easier to get a legal voter to the polls than it is to get someone to illegally register and then talk them into voting for your candidate then getting them to vote. If someone exists who is hell-bent in stealing an election they aren't going to risk participating in criminal conspiracies with dozens of ignorant people who might become disgruntled at any time, want more money or feel the need to confess. Today's election thief is more likely to act alone by mis-programming a computer or making an "innocent error" in vote counting. Anyone with long fingernails can invalidate dozens or hundreds of votes on punch cards.

In 1996 I was put in charge of canvassing the votes for the Republican Primary. All the newspapers proclaimed **Judge Mike Keasler**, in his first race *for Court of Criminal Appeals*, as being in a runoff the day after the election. When I did the canvass a few days later it turned out that he had erroneously received 4000 extra votes in Hidalgo County. Without those votes he failed to make the runoff, which had already cost him well into six figures. I was always impressed by the fact that while greatly hurt by this "surprise" Judge Keasler showed himself to be a true believer in the rule of law and accepted the outcome. I am sure hundreds of people stood in my position of being able to determine the outcome of an election by ignoring or miscounting something. I know of one 2000-vote error in a small county for a statewide office that was not caught in the state canvass.

**Although vote fraud is very rare, the belief that a close election was lost by fraud is common. Human Beings do not accept defeat easily. After every election about 20-50 candidates and activists would phone me at the RPT convinced that their election was stolen and wanting their DA to prosecute.** (On a national level I assume similar calls are made all the time to federal prosecutors.) I'd make sure they fully participated in their canvass and, where appropriate, pay for a recount. Recounts in fact changed many outcomes. If they still felt their election was stolen I'd tell them that an Election contest requires sworn evidence proving more votes were cast illegally than the margin of defeat. At this point 99% of our candidates couldn't meet the burden of proof needed to win an election contest. They would talk about illegal aliens mass voting (South Texas) or **Jesse Jackson** marching illegal voters to early voting locations (East Texas). But outside of vague hearsay allegations, they almost never could produce sworn testimony about specific conversations, actions, or names of illegal voters. Losing an election does not prove election fraud.

# REPORTS SHOW ABSENCE OF MISUSED REGISTRATION CARDS

**The most credible recent study on illegal voting in Texas was done by Attorney General Greg Abbott last year.** As best I can determine he found no cases of illegal aliens casting votes with fraudulent registration cards. At best maybe 5 illegally cast votes he found could have been prevented because of HB 218, though I suspect the real number would have been 0.

**The second most credible study was done by Will Hartnett in his Finding of Master Report, January 7, 2005, Heflin v. Vo, Election Contest District 149.** Master **Will Hartnett** concluded that Heflin produced "no evidence of any intentional voter fraud which affected the final vote tally to his detriment. Contestant's challenge to the vast bulk of the votes in question is based on technical, and apparently unintentional, violations of election law."

The **Burkablog** last week summed up these findings when it reported "The U.S. Election Assistance Commission reported in December 06 (see page 10) that in its wide reaching interviews of election officials and scholars, 'Many asserted that the impersonation of voters is probably the least frequent type of fraud because it is the most likely to be discovered, there are stiff penalties associated with this type of fraud, and it is an insufficient means of influencing an election'."

Even the excellent report by the **Texas Conservative Coalition Research Institute**, which supports voter ID, admits, "The items acceptable as ID in lieu of a Drivers License or SSN have nothing to do with the

TX_00001812

citizenship status of the applicant." They also point out that even Drivers licenses and other photo IDs do not prove citizenship.

## HB 218 WILL CAUSE PROBLEMS

Even without the other arguments on this page, HB 218 is a bad bill because it won't work. For one thing every illegal alien I've ever met has several pieces of ID. More important, how does an election judge determine if an ID is valid? HB 218 requires that "...the voter's identity can be verified from the proof presented." This verification will be arbitrary and capricious. Hairstyling, contact lenses, makeup and Botox make photo IDs almost worthless. How does one verify the genuineness of non-photo Ids, almost all of which can be computer generated in seconds? I believe that the integrity of the ballot box will be compromised much more by Bill 218 and its arbitrary enforcement than by fraud involving phony registered voters.

Proponents of HB 218 talk about how they need ID cards everyday for things like banking. Their logic eludes me. For one thing none of my credit and bankcards have photos on them or require backup ID. Many businesses obviously need one piece of ID and many need to know how old you are. **For the purpose of voting your Voter registration card provides all the ID you need. I wholeheartedly support tightening up the requirements to get a voter card. CSHB 626 is a step in the right direction,** although even in this bill I would make sure there were a reasonable way people without birth certificates could prove citizenship. Millions of American citizens whose parents have been here for generations don't have birth certificates and are undocumented. **Voter registration should require proof of age, residence and citizenship. But requiring that you prove your identity and citizenship every few months at every election is bureaucratic overkill.**

Many proponents of HB 218 talk about how easy it is to get photo ID. In doing so they show how out of touch they are with many Americans such as my mother. If any of them ever cared for an invalid family member, besides talking a good game, they would know invalids don't have recent ID cards and may not even pay bills. When voting in America is only allowed to healthy and wealthy people than the America I know is far sicker than my mother. HB 218 is a direct descendent of poll taxes, and of allowing only white male property owners to vote. In its effect it is racist, barbaric, antidemocratic and contrary to everything that made America great. My mother has sacrificed her life raising my severely handicapped sister and I and making this a better country. She and all mothers like her deserve the right to vote.

Copyright © *Quorum Report* 2007

© Copyright April 23, 2007, Harvey Kronberg, www.quorumreport.com, All rights are reserved

# A Clearer Picture on Voter ID

By JIMMY CARTER and JAMES A. BAKER III
Published: February 3, 2008

THIS is a major election year. Unfortunately, our two major political parties —
Democratic and Republican — continue to disagree on some of the rules that apply to the
administration of our elections. This divide is perhaps most contentious when the issue
becomes one of whether voters should present photo identification to vote.



Harry Campbell

Twenty-seven states require or request some form of ID to vote. Supporters of this policy
argue that if voters identify themselves before voting, election fraud will be reduced.
Opponents of an ID requirement fear it will disenfranchise voters, especially the poor,
members of minority groups and the elderly, who are less likely than other voters to have
suitable identification. The debate is polarized because most of the proponents are
Republicans and most of the opponents are Democrats.

In 2005, we led a bipartisan Commission on Federal Election Reform and concluded that
both parties' concerns were legitimate — a free and fair election requires both ballot
security and full access to voting. We offered a proposal to bridge the partisan divide by
suggesting a uniform voter photo ID, based on the federal Real ID Act of 2005, to be
phased in over five years. To help with the transition, states would provide free voter
photo ID cards for eligible citizens; mobile units would be sent out to provide the IDs and
register voters. (Of the 21 members of the commission, only three dissented on the
requirement for an ID.)

No state has yet accepted our proposal. What's more, when it comes to ID laws,
confusion reigns. The laws on the books, mainly backed by Republicans, have not made

Ex 13

it easy enough for voters to acquire an ID. At the same time, Democrats have tended to try to block voter ID legislation outright — instead of seeking to revise that legislation to promote accessibility. When lower courts have considered challenges to state laws on the question of access, their decisions have not been consistent. And in too many instances, individual judges have appeared to vote along partisan lines.

Fortunately, the Supreme Court has taken on a case involving a challenge to Indiana's voter ID law. The court, which heard arguments last month and is expected to render a judgment this term, has the power finally to bring clarity to this crucial issue. A study by American University's Center for Democracy and Election Management — led by Robert Pastor, who also organized the voting commission — illustrates the problem at hand. The center found that in three states with ID requirements — Indiana, Mississippi and Maryland — only about 1.2 percent of registered voters lacked a photo ID. While the sample was small, and the margin of error was therefore high, we were pleased to see that so few registered voters lacked photo IDs. That was pretty good news.

The bad news, however, was this: While the numbers of registered voters without valid photo IDs were few, the groups least likely to have them were women, African-Americans and Democrats. Surveys in other states, of course, may well present a different result.

We hope the court will approach the challenges posed by the Indiana law in a bipartisan or nonpartisan way. As we stated in our 2005 report, voter ID laws are not a problem in and of themselves. Rather, the current crop of laws are not being phased in gradually and in a fair manner that would increase — not reduce — voter participation. The recent decision by the Department of Homeland Security to delay putting in place the Real ID Act for at least five years suggests that states should move to photo ID requirements gradually and should do more to ensure that free photo IDs are easily available.

The Supreme Court faces a difficult and important decision. If the justices divide along partisan lines, as lower courts have, they would add to the political polarization in the country. We hope that they will find a nonpartisan path that combines both legitimate concerns — ballot security and full access to voting — and underscores the importance of applying these laws in a fair and gradual way. It is also important to remember that our commission's report addressed other pressing election concerns. There is much more that Congress and state legislatures need to do to improve the electoral process and restore confidence in our democracy. We have outlined 87 such steps in our commission report.

In the meantime, the Supreme Court can lead the way on the voter ID issue. It has the opportunity to inspire the states, our national leaders and the entire country to bridge the partisan divide on a matter that is important to our democracy. It can support voter ID laws that make it easy to vote but tough to cheat.

Jimmy Carter was the 39th president. James A. Baker III was the secretary of state in the George H. W. Bush administration.

## TESTIMONY OF HANS A. von SPAKOVSKY

**LEGAL SCHOLAR**
**CENTER FOR LEGAL AND JUDICIAL STUDIES**
**THE HERITAGE FOUNDATION**[*]
**214 Massachusetts Avenue, NE**
**Washington, DC 20002**

**BEFORE THE TEXAS SENATE**
**March 10, 2009**

**REQUIRING IDENTIFICATION BY VOTERS, S.B. 362**

I appreciate the invitation to be here today to discuss the importance of states such as Texas requiring individuals to authenticate their identity at the polls through photo and other forms of identification.

By way of background, I have extensive experience in voting matters, including both the administration of elections and the enforcement of federal voting rights laws. Prior to becoming a Legal Scholar at the Heritage Foundation, I was a member for two years of the Federal Election Commission. I spent four years at the Department of Justice as a career lawyer, including as Counsel to the Assistant Attorney General for Civil Rights. I also spent five years in Atlanta, Georgia, on the Fulton County Board of Registration and Elections, which is responsible for administering elections in the largest county in Georgia, a county that is almost half African-American. I have published extensively on election and voting issues, including on the subject of voter ID.

Guaranteeing the integrity of elections requires having security throughout the entire election process, from voter registration to the casting of votes to the counting of ballots at the end of the day when the polls have closed. For example, jurisdictions that use paper ballots seal their ballot boxes when all of the ballots have been deposited, and election officials have step-by-step procedures for securing election ballots and other materials throughout the election process.

I doubt any you think that it would be a good idea for a county to allow world wide Internet access to the computer it uses in its election headquarters to tabulate ballots

---

[*] The title and affiliation are for identification purposes. The staff of The Heritage Foundation testify as individuals. The views expressed here are my own, and do not reflect an institutional position for The Heritage Foundation or its board of trustees, and do not reflect support or opposition for any specific legislation. The Heritage Foundation is a public policy, research, and educational organization. It is privately supported and receives no funds from government at any level; nor does it perform any government or other contract work. Heritage is also the most broadly supported think tank in the United States, with over 400,000 supporters in every state, 67% of whom are individuals.

and count votes – we are today a computer-literate generation and you understand that allowing that kind of outside access to the software used for counting votes would imperil the integrity of the election.

Requiring voters to authenticate their identity at the polling place is part and parcel of the same kind of security necessary to protect the integrity of elections.  Every illegal vote steals the vote of a legitimate voter.  Voter ID can prevent:

- impersonation fraud  at the polls;
- voting under fictitious voter registrations;
- double voting by individuals registered in more than one state or locality; and
- voting by illegal aliens.

As the Commission on Federal Election Reform headed by President Jimmy Carter and Secretary of State James Baker said in 2005:

> The electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters. Photo identification cards currently are needed to board a plane, enter federal buildings, and cash a check. Voting is equally important.

Voter fraud does exist, and criminal penalties imposed after the fact are an insufficient deterrent to protect against it.  In the Supreme Court's voter ID case decided last year, the Court said that despite such criminal penalties:

> It remains true, however, that flagrant example of such fraud in other parts of the country have been documented throughout this Nation's history by respected historians and journalists, that occasional examples have surfaced in recent years, and that…demonstrate that not only is the risk of voter fraud real but that it could affect the outcome of a close election.

The relative rarity of voter fraud prosecutions for impersonation fraud at the polls, as the Seventh Circuit Court of Appeals pointed out in the Indiana case, can be explained in part because the fraud cannot be detected without the tools – a voter ID –  available to detect it.  However, as I pointed out in a paper published by the Heritage Foundation last year, a grand jury in New York released a report in the mid-1980's detailing a widespread voter fraud conspiracy involving impersonation fraud at the polls that operated successfully for 14 years in Brooklyn without detection.  That fraud resulted in thousands of fraudulent votes being cast in state and congressional elections and involved not only impersonation of legitimate voters at the polls, but voting under fictitious names that had been successfully registered without detection by local election officials.  This fraud could have been easily stopped and detected if New York had required voters to authenticate their identity at the polls.  According to the grand jury, the advent of mail-in registration was also a key factor in perpetrating the fraud.  In recent elections, thousands of fraudulent voter registration forms have been detected by election officials.  But given the minimal to nonexistent screening efforts engaged in by most election jurisdictions,

TX_00001817

there is no way to know how many others slipped through.  In states without identification requirements, election officials have no way to prevent bogus votes from being cast by unscrupulous individuals based on fictitious voter registrations.

The problem of possible double voting by someone who is registered in two states is illustrated by one of the Indiana voters who was highlighted by the League of Women Voters in their amicus brief before the Supreme Court in the Indiana case.  After an Indiana newspaper interviewed her, it turned out that the problems she encountered voting in Indiana stemmed from her trying to use a Florida driver's license to vote in Indiana.  Not only did she have a Florida driver's license, but she was also registered to vote in Florida where she owned a second home.  In fact, she had claimed residency in Florida by claiming a homestead exemption on her property taxes, which as you know is normally only available to residents.  So the Indiana law worked perfectly as intended to prevent someone who could have illegally voted twice without detection.

I don't want to single out Texas, but just like Indiana, New York, and Illinois, Texas has a long and unfortunate history of voter fraud.  In the late 1800's, for example, Harrison County was so infamous for its massive election fraud that the phrase "Harrison County Methods" became synonymous with election fraud.  From Ballot Box 13 in Lyndon Johnson's 1948 Senate race, to recent reports of voting by illegal aliens in Bexar County, Texas does have individuals who are willing to risk criminal prosecution in order to win elections.  I do not claim that there is massive voter fraud in Texas or anywhere else.  In fact, as a former election official, I think we do a good job overall in administering our elections.  But the potential for abuse exists, and there are many close elections that could turn on a very small number of votes.  There are enough incidents of voter fraud to make it very clear that we must take the steps necessary to make it hard to commit.  Requiring voter ID is just one such common sense step.

Not only does voter ID help prevent fraudulent voting, but where it has been implemented, it has **not** reduced turnout.  There is no evidence that voter ID decreases the turnout of voters or has a disparate impact on minority voters, the poor, or the elderly -- the overwhelming majority of Americans have photo ID or can easily obtain one.

Numerous studies have borne this out.  A study by a University of Missouri professor of turnout in Indiana showed that turnout actually increased by about two percentage points overall in Indiana after the voter ID law went into effect.  There was no evidence that counties with higher percentages of minority, poor, elderly or less-educated populations suffered any reduction in voter turnout.  In fact, "the only consistent and statistically significant impact of photo ID in Indiana is to increase voter turnout in counties with a greater percentage of Democrats relative to other counties."

The Heritage Foundation released a study in September of 2007 that analyzed 2004 election turnout data for all states.  It found that voter ID laws do not reduce the turnout of voters, including African-Americans and Hispanics – such voters were just as likely to vote in states with ID as in states where just their name was asked at the polling place.

TX_00001818

A study by professors at the Universities of Delaware and Nebraska-Lincoln examined data from the 2000, 2002, 2004, and 2006 elections.  At both the aggregate and individual levels, the study found that voter ID laws do not affect turnout including across racial/ethnic/socioeconomic lines.  The study concluded that "concerns about voter identification laws affecting turnout are much ado about nothing."

In 2007 as part of the MIT/CalTech Voter Project, an MIT professor did an extensive national survey of 36,500 individuals about Election Day practices.  The survey found:
- overwhelming support for photo ID requirements across ethnic and racial lines with "over 70% of Whites, Hispanics and Blacks support[ing] the requirement;" and
- Only 23 people out of the entire 36,500 person sample said that they were not allowed to vote because of voter ID, although the survey did not indicate whether they were even eligible to vote or used provisional ballots.

A similar study by John Lott in 2006 also found no effect on voter turnout, and in fact, found an indication that efforts to reduce voter fraud such as voter ID may have a positive impact on voter turnout.  That is certainly true in a case study of voter fraud in Greene County, Alabama that I wrote about recently for the Heritage Foundation.  In that county, voter turnout went up after several successful voter fraud prosecutions instilled new confidence in local voters in the integrity of the election process.

Recent election results in Georgia and Indiana also confirm that the suppositions that voter ID will hurt minority turnout are incorrect.  Turnout in both states went up dramatically in 2008 in both the presidential preference primary and the general election.

In Georgia, there was record turnout in the 2008 presidential primary election – over 2 million voters, more than twice as much as in 2004 when the voter photo ID law was not in effect.  The number of African-Americans voting in the 2008 primary also doubled from 2004.  In fact, there were 100,000 more votes in the Democratic Primary than in the Republican Primary.  And the number of individuals who had to vote with a provisional ballot because they had not gotten the free photo ID available from the state was less that 0.01%.

In the general election, Georgia, with one of the strictest voter ID laws in the nation, had the largest turnout in its history – more than 4 million voters.  Democratic turnout was up an astonishing 6.1 percentage points from the 2004 election.  Overall turnout in Georgia went up 6.7 percentage points, the second highest increase of any state in the country.  The black share of the statewide vote increased from 25% in 2004 to 30% in 2008.  By contrast, the Democratic turnout in the nearby state of Mississippi, also a state with a high percentage of black voters but without a voter ID requirement, increased by only 2.35 percentage points.

TX_00001819

I should point out that the Georgia voter ID law was upheld in final orders issued by every state and federal court in Georgia that reviewed the law, including most recently by the Eleventh Circuit Court of Appeals. Just as in Texas, various organizations in Georgia made the specious claims that there were hundreds of thousands of Georgians without photo ID. Yet when the federal district court dismissed all of their claims, the court pointed out that after two years of litigation, none of the plaintiff organizations like the NAACP had been able to produce a single individual or member who did not have a photo ID or could not easily obtain one. The district court judge concluded that this "failure to identify those individuals is particularly acute in light of the Plaintiffs' contention that a large number of Georgia voters lack acceptable Photo ID...the fact that Plaintiffs, in spite of their efforts, have failed to uncover anyone who can attest to the fact that he/she will be prevented from voting provides significant support for a conclusion that the photo ID requirement does not unduly burden the right to vote."

In Indiana, which the Supreme Court said has the strictest voter ID law in the country, turnout in the Democratic presidential preference primary in 2008 quadrupled from the 2004 election when the photo ID law was not in effect – in fact, there were 862,000 more votes cast in the Democratic primary than the Republican primary. In the general election in November, the turnout of Democratic voters increased by 8.32 percentage points from 2004, the largest increase in Democratic turnout of any state in the nation. The neighboring state of Illinois, with no photo ID requirement and President Obama's home state, had an increase in Democratic turnout of only 4.4 percentage points – nearly half of Indiana's increase.

Just as in the federal case in Georgia, the federal court in Indiana noted the complete inability of the plaintiffs in that case to produce anyone who would not be able to vote because of the photo ID law:

> Despite apocalyptic assertions of wholesale vote disenfranchisement, Plaintiffs have produced not a single piece of evidence of any identifiable registered voter who would be prevented from voting pursuant to [the photo ID law] because of his or her inability to obtain the necessary photo identification.

One final point on the claims that requiring an ID, even when it is free, is a "poll tax" because of the incidental costs like possible travel to a registrar's office or obtaining a birth certificate that may be involved. That claim was also raised in Georgia. The federal court dismissed this claim, pointing out that such an "argument represents a dramatic overstatement of what fairly constitutes a 'poll tax'. Thus, the imposition of tangential burdens does not transform a regulation into a poll tax. Moreover, the cost of time and transportation cannot plausibly qualify as a prohibited poll tax because those same 'costs' also result from voter registration and in-person voting requirements, which one would not reasonably construe as a poll tax."

We are one of only about one hundred democracies that do not uniformly require voters to present photo ID when they vote. All of those countries administer that law without any problems and without any reports that their citizens are in any way unable to

vote because of that requirement. In fact, our southern neighbor Mexico, which has a much larger population in poverty than Texas or the United States, requires both a photo ID and a thumbprint to vote – and turnout has increased in their elections since this requirement went into effect in the 1990's.

Requiring voters to authenticate their identity is a perfectly reasonable and easily met requirement. It is supported by the vast majority of voters of all races and ethnic backgrounds. As the Supreme Court said, voter ID protects the integrity and reliability of the electoral process. Texas has a valid and legitimate state interest not only in deterring and detecting voter fraud, but in maintaining the confidence of its citizens in the security of its elections.



June 11, 2007

The Honorable Diane Feinstein
The Honorable Bob Bennett
Senate Committee on Rules and Administration
SR-305 Russell Senate Office Building
Washington, DC 20510

Dear Chairperson Feinstein and Ranking Member Bennett:

As former career professionals in the Voting Section of the Department of Justice's Civil
Rights Division, we urge you to reject the nomination of Hans A. von Spakovsky to the
Federal Election Commission (FEC). Prior to his current role as a recess appointee to the
FEC, Mr. von Spakovsky oversaw the Voting Section as Voting Counsel to the Assistant
Attorney General of the Civil Rights Division from early in 2003 until December, 2005.
While he was at the Civil Rights Division, Mr. von Spakovsky played a major role in the
implementation of practices which injected partisan political factors into decision-making
on enforcement matters and into the hiring process, and included repeated efforts to
intimidate career staff. Moreover, he was the point person for undermining the Civil
Rights Division's mandate to protect voting rights. Foremost amongst his actions was his
central decision-making role on a matter where he clearly should have recused himself.
We urge you to use this confirmation process as an opportunity to thoroughly examine
Mr. von Spakovsky's tenure at the Department of Justice and how his commitment to
party over country will affect his decision making at the FEC.

Each of us came to the Voting Section to participate in the crucial role the Department of
Justice plays in protecting all Americans without fear or favor. We saw this as an honor.
Our commitment to public service was grounded in the belief that every American should
have an equal opportunity to participate in our political process. We sought to work for
the Civil Rights Division because of our patriotism, because of the honor of service and
because of our commitment to the historic and heroic work of our predecessors in the
Division. We are deeply disturbed that the tradition of fair and vigorous enforcement of
this nation's civil rights laws and the reputation for expertise and professionalism at the
Division and the Department has been tarnished by partisanship. Over the past five
years, the priorities of the Voting Section have shifted from its historic mission to enforce
the nation's civil rights laws without regard to politics, to pursuing an agenda which
placed the highest priority on the partisan political goals of the political appointees who
supervised the Section. We write to urge you not to reward one of the architects of that
unprecedented and destructive change with another critical position enforcing our
country's election laws.

$Ex 15 A$

Next →
**1** 2 3 4 5 6

TX_00001822
JA_004581

3/10/2009

TX_00001822

During his three years in the front office of the Civil Rights Division, Mr. von Spakovsky assumed primary responsibility for the day to day operation of the Voting Section. His superiors gave him the authority to usurp many of the responsibilities of the career section chief and institute unprecedented policies that have led to a decimation of the Section and its historic and intellectual resources.

Personnel management decisions in place at the Justice Department were abandoned during Mr. von Spakovsky's tenure. Rules designed to shield the civil service from the political winds of changing administrations were cast aside in favor of a policy designed to permit partisanship to be inserted into career hiring decisions. In the past, career managers took primary responsibility for the hiring decisions of the civil service. During Mr. von Spakovsky's tenure that changed. Career managers were shut out of the process and criteria for hiring career staff shifted from rewarding legal capacity, experience and especially commitment to civil rights enforcement, to prioritizing a candidate's demonstrated fidelity to the partisan interests of the front office. Mr. von Spakovsky vigorously carried out this policy in hiring interviews he conducted.

Mr. von Spakovsky also corrupted the established personnel practices that led to a productive working environment within the Section. He demanded that the Chief of the Section alter performance evaluations for career professionals because of disagreements with the legal or factual conclusions of career attorneys and differences with the recommendations they made, not the skill and professionalism with which these attorneys did their jobs. Such changes in performance evaluations by political appointees had never occurred in the past. There is good reason for giving deference to the section chief's judgment in performance given that political appointees lack the day to day work experience that a section chief possesses in his work with all members of the section. Not surprisingly, actions such as these undermined Section morale.

The matter which best demonstrates Mr. von Spakovsky's inappropriate behavior was his supervision of the review of a Georgia voter ID law in the summer of 2005. It demonstrates the unprecedented intrusion of partisan political factors into decision-making, the cavalier treatment of established Section 5 precedent of the Voting Section, and the unwarranted and vindictive retaliation against Voting Section personnel who disagreed with him on this matter.

Prior to his coming to the Civil Rights Division in 2001, Mr. von Spakovsky had vigorously advocated the need to combat the specter of voter fraud through restrictive voter identification laws. In testimony before legislative bodies and in his writings, Mr. von Spakovsky premised his conclusions upon the notion – not well-supported at the time and now discredited – that there was a widespread problem with ineligible voters streaming into the polling place to influence election outcomes. In this same period, starting in 1994, the Voting Section had on several occasions reviewed other voter ID laws pursuant to its responsibility under § 5 of the Voting Rights Act, to determine if they had a negative impact on the ability of minority voters to participate in elections. Precedent from these prior reviews was clear: changes requiring voters to provide government-issued photo identification without permitting voters to attest to their identity

2

TX_00001823
JA_004582

3/10/2009

TX_00001823

Americans.  In addition, more than half of the Section's attorneys have left the Section since 2005.

Of equal concern, is an action taken against one of the career professionals on the Georgia review team, a career professional who had participated in the recommendation to object to the Georgia voter ID law.  After the decision to preclear in August, 2005, this career employee filed a complaint with the Office of Professional Responsibility (OPR) directed at the inappropriate actions taken during this review, a complaint that remains pending, more than 18 months since it was filed.  About three months later, Mr. von Spakovsky, along with Deputy Assistant Attorney General Bradley Schlozman, filed an OPR complaint against this employee.  The complaint was based solely on emails that they had obtained from this person's records without his authorization.  Such an intrusion of privacy is unprecedented in our experience and caused an increased level of distrust in the Voting Section.  OPR recognized the frivolous nature of this complaint and dismissed it within three months.

Other decisions reflect similar inappropriate behavior.  A unanimous recommendation to object to the unprecedented mid-decade redistricting plan that Texas submitted in 2003 by career staff was rejected by a team of political appointees that included Mr. von Spakovsky.  Subsequently, the plan was found by the Supreme Court to violate the voting rights of Latino voters.  Mr. von Spakovsky also rushed through a preclearance of the harsh and discriminatory Arizona voter ID and proof of citizenship law over the recommendation by career staff to seek more information to determine its impact on minority voters.

Mr. von Spakovsky's involvement concerning enforcement of the Help America Vote Act ("HAVA") raises several other concerns.  He violated decades-long traditions and policies of the Voting Section against issuing advisory opinions by sending a series of letters to state officials which had the effect of forcing states to implement HAVA in an exceedingly restrictive way.  For example, in one letter, he advocated for a policy keeping eligible citizens off the voter rolls for typos and other mistakes by election officials.  When Washington State followed this advice, the rule was struck down by a federal court.  He also usurped the role explicitly set forth in Section 214(a)(13) of HAVA that the Voting Section chief serve on the EAC Advisory Board, and exclusively handled, with no consultation of the section chief, all communications for the Division with the EAC.  According to e-mails that have been made public, Mr. von Spakovsky tried to pressure the Chairman of the EAC, Paul deGregorio, to rescind a letter stating that Arizona had to accept federal voter registration forms that did not include documentary proof of citizenship.  The emails further indicate that he proposed to the Chairman "trading" the EAC's rescinding the letter mentioned above for the Department's rescinding a letter the Civil Rights Division had earlier issued which improperly stated that Arizona voters had to provide identification before they could cast a provisional ballot.  Mr. von Spakovsky's attempt to bargain over the interpretation of federal law was specifically criticized by Mr. DeGregorio.

4

TX_00001824
JA_004583

3/10/2009

TX_00001824

Mr. von Spakovsky adopted the same restrictive approach during the 2004 election cycle when he once again broke with established Department policy by getting involved with contentious and partisan litigation on the eve of an election. Mr. von Spakovsky drafted legal briefs in lawsuits between the Republican and Democratic parties in three battleground states, Ohio, Michigan and Florida, just before the election, all in favor of the Republican party's position and included a position that the Civil Rights Division had never taken before with regards to statutes it enforces, i.e. that there was no private right of action to enforce HAVA. These briefs ran counter to the well-established practice of the Civil Rights Division not to inject itself into litigation or election monitoring on the eve of an election where it could be viewed as expressing a political preference or could have an impact on a political dispute. Moreover, in another case between the Republican and Democratic parties which concerned an Ohio law that permitted political parties to challenge voters, he drafted a letter that was sent to the court which supported the Republican Party position even though the law did not implicate any statute that the Department enforces.

He also changed the enforcement direction of the Department regarding the National Voter Registration Act. In 2005, Mr. von Spakovsky introduced a new initiative to target states to demand that they purge their voter lists under Section 8 of the Act. This was done despite a lack of evidence that registration deadwood leads to invalid votes and instead of enforcing important federal requirements that states make voter registration more accessible to all its citizens. Moreover, the cases filed seeking large-scale purges were in states with a tight partisan split – like Missouri and New Jersey – rather than states like Texas and Utah where the rolls were equally or more inflated. A federal court in Missouri recently threw out the Department of Justice's complaint because the Department insisted on suing on only the (Democratic) Secretary of State, instead of those counties with actual deadwood problems, also noting that there was no evidence of voter fraud or evidence that any voter was denied the right to vote.

Finally, Mr. von Spakovsky never appeared to understand that his role as a Department of Justice attorney was to represent the "United States of America." Instead, on several occasions he took actions indicating a stubborn view that the Department represented the Bush Administration, the Republican Party or the Assistant Attorney General. For example in the *Georgia v. Ashcroft* litigation, Mr. von Spakovsky took a leading role in the case on remand. In that case, he proposed that the United States sign a joint co-counsel agreement with the defendant-intervenors – who were represented by top lawyers for the Georgia Republican Party -- which would have been an unprecedented and inappropriate political action. At a court hearing in the case he insisted on sitting at counsel with the Voting Section's attorneys but refused to file a notice of appearance for the United States, bizarrely claiming that he represented the Assistant Attorney General. Such a gross misunderstanding of the proper role of a Department of Justice attorney typifies his shortcomings.

We have served the Department through Democratic and Republican administrations, consistently seeking to protect minority voters regardless of the impact of these actions on the political parties. While the priorities of the front offices in these administrations

5

TX_00001825
JA_004584
//....../.....:/..... letter/?resultpage=5&

3/10/2009

if they did not have the required ID have a greater negative impact on minority voters than white voters because minority voters are less likely to have the government issued photo identification required by these laws.

Despite his firm position on voter ID laws and his partisan ties to his home state of Georgia, Mr. von Spakovsky refused to recuse himself from considering a Georgia law that would be the most restrictive voter identification law in the country. To the contrary, he was assigned the task of managing the process by the front office. Most disturbing was that just before the Department began consideration of the Georgia law, Mr. von Spakovsky published an article in a Texas law journal advocating for restrictive identification laws. Possibly understanding the impropriety of a government official taking a firm stand on an issue where he was likely to play a key role in the administrative decision concerning that issue, as the Department does under §5, Mr. von Spakovsky published the article under a pseudonym, calling himself "Publius." Such a situation -- where the position he espoused in an article that had just been published is directly related to the review of the Georgia voter ID law -- requires recusal from Section 5 review of this law, either by Mr. von Spakovsky or by his superiors. No such action was taken.

After careful review of the Georgia voter ID law, career staff responsible for the review came to a near unanimous decision, consistent with the precedent established by the Department in previous reviews; that the Georgia provision would negatively affect minority voting strength. Four of the five career professionals on the review team agreed. The one who did not had almost no experience in enforcing §5 and had been hired only weeks before the review began through the political hiring process described above. The recommendation to object to the law, detailed in a memo exceeding 50 pages was submitted on August 25, 2005. The next day, Georgia submitted corrected data on the number of individuals who had state-issued photo identification. The career review team was prevented by Mr. von Spakovsky from analyzing this data and incorporating the corrected data into their analysis. Instead, there was an unnecessary rush to judgment and the law was summarily precleared on August 26, the same day the corrected data had been submitted. Subsequent analysis of this data by a Georgia political scientist revealed that hundreds of thousands voters did not have the required voter ID, a disproportionate number of whom were poor, elderly and, most importantly for the Voting Rights Act review, minorities. In short, this data provided further evidentiary support for the objection recommended by professional staff. Subsequently, a federal court in Georgia found that this law violated the poll tax provision of the Constitution.

The personnel fallout after this review is at least as disturbing as the decision-making process. The Deputy Chief for the Section 5 unit who led the review, a 28 year Civil Rights Division attorney with nearly 20 years in the Voting Section, was involuntarily transferred to another job without explanation. The three other professionals who recommended an objection left the Voting Section after enduring criticism and retaliation, while the new attorney who was the only one not to recommend an objection received a cash award. The Section 5 unit suffered serious morale problems and it has lost at least four analysts with more than 25 years of experience, all of whom are African-

3

TX_00001826

change based on the results of the elections, never before has professionalism given way to partisanship. We may have disagreed with our front office colleagues, but those disagreements were given a forum and, between professionals, we found resolution. Mr. von Spakovsky and others in this front office violated the sacred rule that partisanship should be checked at the door of the Justice Department so the business of protecting the American people through federal law enforcement can be honored without prejudice. We urge you to explore Mr. von Spakovsky's role in this unfortunate endeavor and refuse to reward him for this dubious stewardship.

Sincerely,

Joseph D. Rich
Chief, Voting Section, 1999-2005
Civil Rights Division Attorney, 1968-2005

Robert A. Kengle
Deputy Chief, Voting Section, 1999-2005
Voting Section Attorney, 1984-2005

Jon Greenbaum
Senior Trial Attorney, Voting Section, 1997-2003

David J. Becker
Senior Trial Attorney, Voting Section, 1998-2005

Bruce Adelson
Senior Trial Attorney, Voting Section, 2000-2005

Toby Moore
Political Geographer, Voting Section, 2000-2006

6

TX_00001827
JA_004586

3/10/2009

TX_00001827

## Obama Raises Concerns Over FEC Nominee's Record of Partisanship

By Barack Obama, United States Senator from Illinois
June 12, 2007

U.S. Senator Barack Obama (D-IL) today sent the following letter to Senate Rules Committee Chairwoman Dianne Feinstein (D-CA) and Ranking Member Robert Bennett (R-UT), raising concerns about the nomination of Hans von Spakovsky to the Federal Elections Commission. In the letter, Obama says that nominees to the Commission should demonstrate a consistent ability to uphold the law and overcome partisan biases, but von Spakovsky's tenure at the Justice Department and as a Georgia election official do not reflect a record of nonpartisanship, fairness, and judgment necessary to enforce election laws. Obama previously sent a letter to President Bush in December 2005 expressing concerns about von Spakovsky's potential nomination to the FEC.

*The text of the letter is below:*

Dear Chairwoman Feinstein and Ranking Member Bennett:

I am writing to express my serious concerns about the nomination of Hans von Spakovsky to the Federal Election Commission (FEC).

The FEC is an independent regulatory agency tasked with the enforcement and administration of the Federal Election Commission Act. Individuals named to the Commission should have a demonstrated record of fair administration of the law and an ability to overcome partisan biases. Unfortunately, Mr. von Spakovsky's experience both as Counsel to the Assistant Attorney General for Civil Rights in the Department of Justice and as a Republican appointee to the Fulton County Registration and Election Board in Atlanta, Georgia, do not demonstrate the evenhandedness required of an FEC Commissioner.

As you know, Mr. von Spakovsky played an active role in not only the creation of the Georgia voter identification law, which required all voters to provide certain government-provided identification at the polls, but also played a role in the approval of that law by the Department of Justice. Reports indicate that Mr. von Spakovsky joined other senior officials in overruling the recommendations of several career staff lawyers who had reviewed the Georgia voter ID law and determined that it would unduly hinder the ability of black voters to cast their ballots. After Mr. von Spakovsky reached his decision, both federal and state courts found that the Georgia voter ID law was unconstitutional and should be enjoined. Recent reports also indicate that Mr. von Spakovsky played a role in other apparently political decisions in the Department, including overriding staff recommendations on a Texas congressional redistricting plan, as well supporting the Department of Justice's failed attempts to purge the Missouri eligible voter rolls.

Ex 15B



**Public Citizen 35 YEARS**

*Protecting Health,
Safety & Democracy*

Auto Safety Group • Congress Watch • Energy Program • Global Trade Watch • Health Research Group • Litigation Group
**Joan Claybrook, President**

United States Senate                                                    October 3, 2007
Washington, D.C. 20510

Dear Senator:

    Public Citizen writes today to urge you to oppose the confirmation of Hans von Spakovsky as commissioner on the Federal Election Commission (FEC). Von Spakovsky has a long and demonstrated record of excessive partisanship and unfair acts toward political adversaries. This record makes him particularly unsuitable for appointment to an elections agency charged with ensuring fairness and inspiring confidence in what will inevitably be a very contentious 2008 election.

    The unprecedented movement of von Spakovsky's nomination through the Senate Rules Committee without recommendation indicates just how much of a partisan lightening rod his appointment to the FEC has become. The FEC is already struggling to prove it can be even-handed in interpreting the law and settling partisan disputes. A vote allowing von Spakovsky to move from a temporary recess appointment by President Bush to a full-term commissioner would bode poorly for both the reputation of the FEC and the future integrity of our elections.

    Von Spakovsky is, in fact, an extremist and a partisan. For many years, he helped to disenfranchise voters from election rolls, targeting mostly poor and minority voters who tend to vote Democratic. We would like to point to some of the following troubling aspects of his involvement:

(1)   **Georgia and Florida 2000.** A Republican appointee to the Fulton County Registration and Elections Board, von Spakovsky also joined the "Voting Integrity Project" (VIP). VIP was founded by a Republican party official and was dedicated to fighting what it labeled as "voter fraud." An article that von Spakovsky wrote for the Georgia Public Policy Foundation, a conservative research group, called for an aggressive campaign to "purge" the election rolls of felons. VIP ran with this idea and met with the company that designed the process for removing scores of voters from Florida's election rolls in 2000, a process that led to the mistaken disenfranchisement of mostly Democratic voters in Florida. During the Florida recount, he worked as a volunteer on the Bush campaign, and was quickly propelled to the Voting Section of the Department of Justice (DOJ) soon after. [Jeffrey Toobin, "Poll Position," *The New Yorker*, Sept. 20, 2004.]

(2)   **Texas 2003.** According to testimony submitted by six former DOJ officials who had worked under both Democratic and Republican administrations, von Spakovsky assumed unprecedented micro-management authority over the Civil Rights Division Voting Section, frequently clashing and over-riding decisions of the career staff. One such decision was to allow the highly partisan 2003 Texas redistricting plan promoted by former Rep. Tom DeLay (R-Texas) and other Republican party officials. The staff unanimously objected to pre-clearance of the mid-decade redistricting plan, but the

*Exhibit 16*

# The Effects of Photographic Indentification on Voter Turnout in Indiana: A County-Level Analysis

Jeffrey Milyo

Report 10–2007
Revised December 2007

*A publication from:*
*Institute of Public Policy*
*University of Missouri*
*137 Middlebush Hall*
*Columbia, MO 65211*



INSTITUTE *of*
PUBLIC POLICY
*Harry S Truman School of Public Affairs*

## Abstract:

I examine the change in voter turnout across Indiana counties before and after the implementation of photo ID requirements. Overall, statewide turnout increased by about two percentage points after photo ID; further, there is no consistent evidence that counties that have higher percentages of minority, poor, elderly or less-educated population suffer any reduction in voter turnout relative to other counties. In fact, the estimated effect of photo ID on turnout is positive for counties with a greater percentage of minorities or families in poverty. The only consistent and frequently statistically significant impact of photo ID in Indiana is to increase voter turnout in counties with a greater percentage of Democrats relative to other counties. These findings run counter to some recent and prominent concerns that have been raised about voter identification reforms; however, these results are consistent with both existing theory on voter behavior and the most recent and reliable empirical evidence on the effects of voter identification requirements on turnout.



Institute of Public Policy

# The Effects of Photographic Indentification on Voter Turnout in Indiana: A County-Level Analysis

## Jeffrey Milyo

### 1. Introduction

This study evaluates the effects of photographic voter identification requirements implemented in Indiana prior to the 2006 general election. Previous studies have examined the effects of voter identification laws more generally, but none of these separately analyzes the effects of so-called "mandatory photo ID" (hereafter simply, "photo ID") on turnout in Indiana.[1] Nevertheless, the existing scholarly literature on voter identification does strongly suggests that photo ID requirements are likely to have only a negligible impact on overall voter turnout; further, previous studies indicate that photo ID is unlikely to reduce the relative participation of minorities (e.g., Alvarez et al. 2007 and Mycoff et al. 2007). Given that these lessons from social science research run counter to the conventional wisdom, at least that espoused in some quarters,[2] I first review the most recent and relevant literature on the effects of voter identification on turnout, then present the findings from my empirical analysis of turnout in Indiana.

The change in voter turnout from the 2002 to 2006 general elections provides a nearly ideal natural experiment for estimating the effects of photo ID on voter turnout across the 92 counties in Indiana. Both years were midterm election years and in neither year was there a major contested statewide race (i.e., for governor or U.S. Senate); however, 2006 was the first general election year in which Indiana's photo ID law was actually implemented. I exploit this natural experiment to identify the effects of photo ID on turnout in counties with a greater percentage of minority, poor, elderly, or less educated populations.

I examine a variety of models of voter turnout and control for the influence of several other factors that may influence turnout. Overall, voter turnout in Indiana increased about two percentage points from 2002 to 2006; however, in counties with greater percentages of minority or poor voters, turnout increased by even more, although this increase is not statistically significant. For counties with greater percentages of elderly or less educated voters, results are more mixed, but not consistently significant or negative. The only consistent and frequently significant effect of voter ID that I find is a positive effect on turnout in counties with a greater percentage of Democrat-leaning voters.

### 2. Voter ID and Turnout: Lessons from the Social Science Literature

The public debate over photo identification requirements for voters has been marked by oft-repeated concerns about the possible dramatic and detrimental effects of state voter identification requirements on voter turnout. The political rhetoric has become so super-heated that recent attempts to reform voter identification laws have been met with explicit accusations of racism on the part of reformers, dire warnings of a coming "disenfranchisement," and assertions that such reforms, though popular across party lines, are a "thinly veiled" attempt to prevent Democrats from voting.

In contrast, political theory suggests that the effects of voter identification laws on voter turnout are ambiguous. Such reforms increase the effort required to vote for some persons without proper identification (at least one time, anyway). Of course, some of these persons may be eligible voters and others will be ineligible voters. However, voter identification reforms may also instill greater confidence in the electoral process among eligible voters, making them more willing to participate in elections. Consequently, the actual impact of voter identification on turnout is an

TX_00001832

empirical question; and even if turnout decreases with voter identification laws, it is by no means apparent that it is eligible voters that are being affected.

Until very recently, there were no systematic statistical studies of the effects of photo ID requirements for voting, although it is has long been understood that many other countries both require such identification and experience higher rates of turnout than in the U.S. Studies of voter turnout across countries have instead focused on voter registration, the frequency of elections, non-compulsory voting, and single-member districts (as opposed to proportional representation) as reasons that turnout in the U.S. is low relative to other developed democracies (Powell 1986 and Blaise 2006). The fact that such cross country studies do not even entertain the possibility that photo ID requirements reduce turnout is itself informative about the long-standing opinion of the political science profession regarding the relative unimportance of such laws for turnout.

In contrast, numerous studies analyze the effects of voting institutions other than voter identification on turnout. In general, these studies find at best very modest effects of post-registration laws such as time off work for voting, opening polls early or keeping polls open late, mailing sample ballots, etc. (Primo, et al. 2007). This is because voter registration is a relatively high hurdle compared to these post-registration requirements; adding or removing some marginal costs of voting beyond registration has virtually no observable effect on turnout. Applying these lessons to voter identification, it is highly unlikely that anyone sufficiently motivated to register to vote, inform themselves about the current election issues, and transport themselves to a polling place will then be deterred by the incremental requirement of presenting proper identification at the polls.

In fact, there is an even more fundamental reason to expect that the impact voter identification requirements on turnout are likely to be negligible. This is because very few eligible voters lack official identification and presumably even fewer (if any) lack the capacity to produce sufficient identification should they have a need and inclination to do so.[3] Finally, the ability to cast a provisional ballot reduces further the potential for a legitimate voter to be disenfranchised, even when that person lacks proper identification.

On this point, Ansolabehere (2007) notes that in a recent national survey with 36,500 respondents, only 23 persons self-reported that they were not permitted to cast a regular ballot at the polls in 2006 because of identification problems. Further, it is not clear how many of these 23 persons cast a provisional ballot, although it appears that most did;[4] nor is it ascertainable from the survey whether any of these persons were actually eligible to vote, or whether they were honestly reporting problems at the polls.[5]   It is nonetheless apparent that recent claims of a coming "disenfranchisement" are nothing more than irresponsible and ignorant exaggerations (e.g., Schulz 2007).

On the other hand, the widespread popularity of voter identification requirements suggests that the general public is indeed concerned about vote dilution from ineligible votes.[6]   Lott (2006) has argued that confidence in the fairness of elections translates directly into higher voter turnout; such an effect, if it existed, might also reasonably be expected to be most pronounced for groups that tend to have less trust in the efficacy American democracy (e.g., racial and ethnic minorities, the poor and the less educated).

In fact, scholars of American politics generally agree that voter turnout is determined largely by idiosyncratic factors, such as an individual's intrinsic value of voting (i.e., does the individual feel a duty to vote) as opposed to political institutions (Matsusaka and Palda 1999; Mycoff et al., 2007).[7]   For this reason, factors that influence trust and confidence in the integrity of the electoral process are generally thought to be important determinants of an individual's decision to vote (Putnam 2000).[8]   For all these reasons, it is theoretically plausible that photo identification requirements actually increase voter turnout.   Consequently, there exists a long-standing political science literature that does not support recent assertions that photo ID requirements have dramatic and detrimental effects on turnout.

*Recent empirical studies of state voter identification laws*

In the wake of recent legislation implementing voter identification reforms in the states, a flurry of new empirical studies have appeared that more directly address the question of how state voter identification laws impact voter turnout.   Unfortunately, the two



studies that have received the most coverage in the press (Eagleton 2006 and Vercellotti and Anderson 2006; hereafter, the "Rutgers studies") are fatally flawed on several counts.[9]  For example, several authors note that these studies examine only a single cross-section of turnout data from 2004, so cannot properly estimate the treatment effect of state voter identification laws; nor can these studies properly estimate the effects of mandatory photo ID requirements (Alvarez, et al 2007, Mycoff, et al 2007 and Muhlhausen and Sikich 2007).  Further, the Rutgers studies miscode several state identification laws (Mycoff, et al. 2007 and Muhlhausen and Sikich 2007).  Finally, the findings reported in the Rutgers studies are not robust to reasonable changes in their statistical model (Alvarez, et al. 2007 and Muhlhausen and Sikich 2007).

The flawed Rutgers studies are also the only systematic studies of voter identification for which the authors conclude that ID laws have strong or consistently negative consequences for voter turnout overall, and especially for minorities.  However, even ignoring the methodological problems with the Rutgers studies, the authors do an additional disservice to the public debate by mischaracterizing their own findings.  For example, taken at face value, the results presented in the Rutgers studies imply that the most strict forms of voter identification laws examined in their data (voluntary photo ID) are associated with higher voter turnout among Black, Hispanic and Asian minorities than are the next most strict category of identification laws that they examine (non-photo ID).  Further, the Rutgers studies also find that voluntary photo ID requirements yield no difference in overall turnout compared to non-photo ID requirements.  The authors of the Rutgers studies fail to note any of these findings; this is a serious error that leads them to make conclusions that are not supported by their own evidence.

In contrast to the Rutgers studies, more recent studies stand out for both their methodological rigor and the fact that they examine voter turnout through the 2006 general elections (Alvarez, et al. 2007 and Mycoff, et al 2007).  However, both of these studies are work in progress, so results must be interpreted with care.

Mycoff et al. (2007) examine the effects of voter identification laws on state level voter turnout, as well as individual-level self-reported voter

turnout from the National Election Studies (a large national survey that is conducted each election year).  The authors examine turnout from 2000 to 2006 using a random-effects model; they find that voter ID laws are not significantly related to turnout in either the aggregate state data or the individual level data.  The individual-level analysis in Mycoff et al. is a particularly valuable innovation, since it allows the researchers to more confidently discuss the impacts of voter identification on minorities, the poor, the elderly, etc.  However, the original analysis in Mycoff et al. does not examine these differential effects, nor do the authors separately investigate the effects of photo ID apart from other voter identification requirements.

More recently, however, Mycoff et al. have analyzed the effects of mandatory photo ID on individual level turnout after controlling for state fixed effects.  In this most recent analysis, Mycoff et al. cannot reject the null hypothesis that the within state effects of photo ID on overall turnout are zero; likewise, the null of zero effect cannot be rejected for turnout across race, ethnicity, income or age categories.[10]  Overall, Mycoff et al. (2007) find that idiosyncratic factors, such as an individual's interest in politics, are far more important determinants of turnout than are institutional factors like voter identification.

The most recently available study of the effects of voter identification on voter turnout is by Alvarez, et al. (2007); these authors also examine the effects of voter identification on both state-level turnout and individual level turnout (from the Current Population Survey).  Alvarez et al. control for state fixed effects in their analysis, but they fail to control for the presence and competitiveness of statewide races in the different states and years in their study.  This unfortunate oversight should be corrected in future iterations of the study, but for now this shortcoming undermines the usefulness of the authors' findings.  Ignoring this methodological problem, Alvarez et al. (2007) report that voter ID laws are associated with higher (albeit not significant) voter turnout in the analysis of state-level turnout from 2000-2006.  The individual-level analysis suggests that voter identification requirements have a modest negative impact on overall turnout, no differential impacts by race or ethnicity and a slightly more negative impact on elderly or poor voters.

The results reported in Alvarez et al. (2007) also suggest that there is no significant change in voter turnout for any population subgroup when comparing the effects of mandatory photo ID laws to voluntary photo ID, although the authors do not conduct a formal test of this hypothesis. However, it is unclear at this point how sensitive the estimates reported by Alvarez et al. will be to the inclusion of controls for the presence and competitiveness of statewide races. Consequently, the recent and on-going study by Mycoff et al. (2007) remains the most reliable and thorough systematic evaluation of the effects of photo ID laws on voter turnout to date.

In this review, I have demonstrated that both theory and the best evidence to date strongly suggest that the effects of photo ID on overall turnout are likely to be very modest (and may even be positive). Further, the best analyses of the differential impact of photo ID indicate no deleterious effects on minorities, the poor, or the elderly. In the next section, I demonstrate that these conclusions are borne out in the county-level election returns for Indiana.

## 3. Data and Methods

The subsequent empirical analysis examines the effects of photographic identification requirements on county-level turnout in Indiana. I analyze the change in voter turnout in the general midterm elections of 2002 and 2006; these elections offer a nearly ideal natural experiment for identifying the effects of photo ID on turnout. This is because there were no other major changes in Indiana election laws during this time period, so the impact of photo ID will not be confounded with other changes in state election administration. Further, because some demographic groups tend to have higher turnout in presidential election years, it is appropriate to compare turnout in the two most recent midterm elections. Finally, these two midterm elections are also relatively comparable since there were no major contested statewide races in either year.[11] Even so, I also check the whether the resulting estimates are sensitive to the inclusion of additional midterm and\or presidential election years; to preview: they are not.

I measure voter turnout as the percent of voting age population (VAP) in each election year; VAP is estimated by the U.S. Census as of July 1st of the election year.[12] This measure is commonly employed in studies of voter turnout in aggregate data, since voter registration data is not of a consistent quality across time or jurisdiction. However, voting age population estimates including non-citizens and other persons that are not eligible to vote. While this is more problematic for studies of turnout in states with larger populations of ineligible voters, it is less likely to be a concern in a state like Indiana. Further, to the extent that the number of non-citizens is growing over time, and is disproportionately of Hispanic ethnicity, this has the effect of understating overall turnout in 2006, especially in areas with higher Hispanic populations.

For this reason, I also measure voter turnout as the percentage of the estimated number of citizens of voting age (CVAP) in each year. However, reliable estimates of CVAP at the county-level are not readily available, so I generated my own estimate based upon U.S. Census counts of non-citizens in 2000. In order to estimate CVAP by county in each year, I first calculate the ratio of citizens of voting age population to all the total voting age population for each county in 2000 from Census data. I then multiply the estimated VAP for each county and year by this ratio. However, the question of whether voter turnout should be measured as a percentage of VAP or CVAP is not surprisingly a non-issue in the present context; the correlation between the two measures is better than 98% for the time periods examined in this study.

In order to measure the overall effect of photo ID on voter turnout across the 92 Indiana counties, I estimate an ordinary least squares regression controlling for county-fixed effects and year effects. The county fixed-effects account for factors such as demographic differences across counties, while the year effects account for the different composition of state races in each election year. However, there has only been one general election in Indiana post-photo ID, so it is not possible to separately identify the overall effects of photo-ID on voter turnout absent additional assumptions. For this reason, the present analysis focuses on the effects of photo ID on different groups of eligible voters.

I evaluate claims about the relative effects of voter ID on racial and ethnic minorities, the poor, the elderly, persons without a high school diploma and Democrats by estimating the effects of photo ID on

turnout in counties with greater percentages of those groups as a percent county population. However, these demographic variables do not vary over time, since they are taken from the 2000 U.S. Census. This means that it is not possible to control for county-fixed effects when estimating the effects of photo ID on these particular demographic groups. For this reason, I account for differences in the demographic composition of counties by including control variables for per capita income and the percent of county population by several categories, including: age, education, ethnicity, female labor force participation, military status, non-citizens, party, poverty, race, and rural status (see Appendix). I also check the sensitivity of results when this list of control variables is pared down to just age, education, ethnicity, income and race.

Despite the plethora of county-level control variables described above, it is possible that there remain some unobserved county-level phenomena that may bias the estimated effects of photo ID on turnout in some unknown way. For this reason, I also examine the effects of photo ID on the within-county change in voter turnout since the most recent general election (i.e., the change in voter turnout from 2004 to 2006 compared to the change from 2000 to 2002). This alternative model effectively purges voter turnout of the county-specific factors mentioned above and so provides an important check on the estimates obtained form the basic model. Finally, because repeated observations at the county-level over time are not necessarily independent observations, I also control for clustering of standard errors by county in every regression model.

While most authors examine the effects of voter identification on voter turnout, some (e.g., Alvarez et al. 2007) look at the effects on the natural logarithm of voter turnout (i.e. "log turnout"); for this reason, I use both of these measures in my analysis. Therefore, in the next section I present estimates for four basic statistical models, where the dependent variable is i) turnout, ii) log turnout, iii) change in turnout, and iv) change in log turnout. I also discuss the sensitivity of these results to different measures of turnout, time periods or sets of control variables; for the most part, the key findings are quite robust to these alternative specifications.

## 4. Results

Voter turnout as a percentage of VAP in Indiana was about 2 percentage points higher in 2006 compared to 2002. This increase in turnout was fairly uniform across all counties; the mean within-in county change in turnout was +1.76% (p<.001). However, it is not possible to discern how much of this increase in turnout is attributable solely to the effects of photo ID; this is because there was also an uncompetitive Senate race in 2006. For example, the presence of a U.S. Senate election in 2006 might have led to an increase in turnout above what it would have been otherwise. On the other hand, the fact that there was no Democrat candidate in the 2006 Senate race might have led to lower turnout than otherwise. In fact, my examination of historical Senate election data does indeed suggest that state voter turnout tends to be lower when there is an uncompetitive Senate election at the top of the state ticket, all else constant. Assuming that this phenomenon occurred in 2006 in Indiana, then the photo ID likely led to an even greater increase in voter turnout than the 2% observed in the raw data.

Even so, I prefer to err on the side of caution in this report, so I focus only on the differential impact of photo ID across Indiana counties. In contrast to the situation for overall turnout in 2006, there is no a priori reason to believe that the uncompetitive 2006 Senate election influenced voter turnout in some counties more than others. Consequently, the effects of photo ID on turnout across counties with differing populations of minority, poor, low education, elderly voters, or Democrat voters can be identified and estimated in the available election data.

In Table 1A, I report the estimated effects of photo ID on both turnout and the change in turnout for counties with higher proportions of minority population. The table is divided into two panels; one for each model. For example, the results in the top panel of the table under column one indicate that photo ID increased voter turnout in counties with higher percentage of black population, albeit this estimate is not statistically significant (t=1.23). However, the estimated magnitude of this effect is quite large; for each percentage point increase in black population in a county, voter turnout increases by 0.1 percentage points. Looking to the bottom panel of Table 1A under the same column, the estimated effect

of photo ID on the change in turnout for counties with a higher percentage of Black population is also positive, nearly identical in magnitude, although again not statistically distinguishable from zero (t=0.59).

Moving to column two of Table 1A, the estimated effect of photo ID on voter turnout (top panel) for counties with larger Hispanic populations is negative, but much smaller in magnitude than that for Black population and also statistically insignificant. However, the impact of voter ID on the change in voter turnout for counties with greater Hispanic population is positive (even more so than for Black population), but once again not significantly different from zero (bottom panel).

In column three, I report the estimated effects of photo ID for both the Black and Hispanic variables; this model exhibits a similar pattern as when the variables are estimated separately. In all but one case the estimated effect of photo ID on turnout is positive for counties with more Black or Hispanic population. However, in no case are these variables individually or jointly significant.

The final column of Table 1A reports the effects of photo ID on turnout in counties with higher total minority population (non-white and\or Hispanic). The estimates are identical for both turnout and the change in turnout models. For each one percentage point increase in minority population, county turnout increases by 0.7 percentage points after the implementation of photo ID. Again, these effects are imprecisely estimated, so the null hypothesis of a zero differential effect of voter ID on turnout in counties with higher minority populations cannot be rejected.

My analysis of the effects of photo ID on turnout by race and ethnicity continues with an examination of the impact on both the log of turnout and the change in the log of turnout. The results of this estimation are reported in Table 1B; however, because this is a non-linear model, the coefficients do not have a similarly straightforward interpretation as before. For example, the point estimate of .003 for %Black in the top panel under column one of Table 1B has the following interpretation: for each percentage point increase in Black population in a county, voter turnout increases by .003 times voter turnout in 2002. For example, given a county-wide voter turnout rate of 30% in 2002, the implementation of photo ID is associated with a .09 percentage point increase in 2006

turnout for each percentage point of black population (or a nearly identical effect as was observed in Table 1A).

Given the complexity of interpreting the estimates in Table 1B, and the fact that none of these estimates are significantly different from zero (either individually, or in the case of column three, jointly), I will only note that the pattern of qualitative results obtained in the log models of turnout is very similar to that seen in Table 1A. In fact, the only substantive difference is that the effect of photo ID on Hispanic population is uniformly more positive.

To this point, there is no evidence that photo ID requirements in Indiana reduced voter turnout, either overall, or in counties with relatively larger racial or ethnic minority populations. Re-estimating these models for the three most recent midterm elections (1998, 2002 and 2006) yields a similar pattern of results, with one exception: the effect of photo ID on counties with more Hispanic population is consistently positive. Similarly, including presidential election years, along with additional controls for the differing turnout tendencies in midterm versus presidential election years, likewise produces nearly identical results. Finally, substituting citizen voting age population (CVAP) for VAP in any of the models discussed above has the effect of making the estimated effects of photo ID on Hispanic population positive, but otherwise yields no appreciable difference.

The analysis above is repeated for other demographic groups in Tables 2A and 2B. Specifically, I examine the effects of photo ID on turnout in counties with higher percentages of families below the poverty line (%Poverty), persons with less than a high school degree (%No High School) education, and persons over 65 years of age (%Elderly). These demographic variables are never statistically significant in the turnout models shown in panel one of Table 2A. although both the percent of county population in poverty or elderly approach statistical significance (p<.15). The effect of photo ID on turnout in counties with more poor families is positive, while the effect on turnout in counties with more elderly population is negative. However, these effects are largely attenuated for the change in turnout, and especially so for the percentage elderly (bottom panel of Table 2B). The effect of photo ID on turnout in counties with relatively fewer high school graduates exhibits a similar

TX_00001837
JA_004596

TX_00001837

pattern; it is negative and insignificant in panel one, but closer to zero and less precisely estimated in panel two. Further, these three demographic variables are jointly insignificant in both models. Finally, all of the race, ethnicity and demographic variables examined to this point are also not jointly significant when they are all simultaneously included in these turnout models.

As was the case for the race and ethnicity variables, the same general pattern of qualitative effects are observed in the log turnout and change in log turnout models (Table 2B); in addition, the demographic variables (poverty, no high school and elderly) are not jointly significant, nor is the combination of these demographic variables with the race and ethnicity variables examined in Table 1A and 1B. Re-estimating these four models for additional years, and\or substituting CVAP for VAP likewise yields no major changes, although the estimated effects of photo ID on counties with more elderly or low-education population become more positive and less precisely estimated.

The final variable examined is the extent of Democrat voting preferences in a county; this is measured using a common proxy in the political science literature, the county vote percentage for the Democrat presidential candidate in 2004 (John Kerry). The results for this variable are found in column four of Tables 2A and 2B. In all but one case, the effect of voter ID on turnout in highly Democrat-leaning counties is statistically significant or marginally so (p<.10 or better). In every case examined in Tables 2A and 2B, photo ID is associated with higher turnout in counties with a greater share of Democrat leaning voters. The magnitude of this estimated effect is about 0.1 percentage points higher voter turnout in 2006 per percentage point increase in John Kerry's 2004 vote percentage in the county. [This result holds up even when the model is estimated using additional election years or citizen voting age population, as above.]

I have also estimated all of the models described above with a more sparse set of control variables, only including controls for age, education, ethnicity, income, and race. However, the choice of these control variables does not yield any notable changes in the pattern of results discussed here.

As a final sensitivity check, all of the models above have been estimated without the adjustment for clustering of observations at the county level. This does not affect the estimated coefficients in these models but in general will affect the standard errors of the estimates. The effect of the cluster-adjustment to standard errors is to make some of the key estimates described above more precise; without the cluster-adjustment, none of the coefficients on percent elderly or percent poor remain even marginally statistically significant (i.e., p>.10 in every case). The only coefficient estimates that remain statistically significant without the cluster-adjustment are those for the percent Democrat in the county.

## 5. Discussion

Given the context of the existing research on voter turnout, my findings for Indiana are completely unsurprising. Despite the attention-grabbing and often strident claims that voter identification is the modern version of the poll tax and the like, nothing could be further from the truth. Existing theory and evidence from decades of social science research do not support the contention that photo ID requirements are likely to have a large and detrimental impact on turnout; nor does the previous empirical evidence find any significant impact of photo identification on racial or ethnic minorities. Further, the best previous evidence to date also finds no significant impact of photo ID on the poor or the elderly.

In this study, I exploit the existence of a natural experiment on the impact of photo ID: the change in turnout between the 2002 and 2006 midterm elections in Indiana. My analysis is novel not only for its focus on the effects of photo ID in Indiana, but because I subject my findings to a battery of sensitivity checks. This is also the first study to analyze the differential impact of photo ID requirements on turnout among more Democrat-leaning voters.

The findings that emerge from my analysis are that photo ID is associated with: i) an overall county-level turnout increase of almost two percentage points, ii) an insignificant increase in relative turnout for counties with a greater percentage of minority and poor population, iii) no consistent or significant impact on relative turnout in counties with a greater percentage of less educated or elderly voters, and iv) a significant relative increase in turnout for counties with a higher percentage of Democrat voters.

TX_00001838
JA_004597

TX_00001838

1 The term "mandatory" is a misnomer, since voters without proper photo ID are still allowed to cast a provisional ballot at the polls.

2 For example, see the recent brief for certiorari submitted to the U.S. Supreme Court by the Indiana Democratic Party and Marion County Democratic Central Committee (Indian Democratic Party, et al. v. Todd Rokita, et. al.).

3 Hood and Bullock (2007) argue that about 5% of registered voter names in Georgia do not have a valid driver's license or state identification card; however, the authors make no attempt to investigate how many of the registered voter names are actually attached to eligible voters. This is a rather egregious error, since it is well known that voter registration lists overstate, sometimes quite dramatically, the number of valid eligible voters due to duplicate, erroneous, out-dated and even fraudulent registrations. For example, in Indiana, the number of registered voters exceeds the number of voters that report being registered by more than 40% (Schulz 2007).

4 Ansolabehere (2007) does not explicitly report how many of the 23 persons with voter identification issues cast provisional ballots, although it would appear to be nearly all of them, since elsewhere he writes: "an almost immeasurably small number of people who tried to vote were excluded because of identification requirements or questions with their qualifications;" also, Ansolabehere notes that only three persons did not vote because of any problems with their voter registration.

5 Given the bitter partisan debate over voter identification, it would not be surprising if a handful of respondents chose to exaggerate their experience at the polls; in light of this, it is quite amazing that so few respondents self-report problems voting.

6 Ansolabehere (2007) reports that large majorities support voter identification reforms, including 70% of Blacks, 78% of Hispanics and 67% of all Democrats; in fact, persons who were asked to show identification when voting in 2006 were even more supportive of voter identification requirements than other respondents.

7 Also, see Primo and Milyo 2006a,b on the effects of political institutions on citizen trust and voter turnout.

8 For example, influential evidence on the importance of the intrinsic value of voting comes from field experiments in which those individuals that receive reminders about their civic duty to vote are more likely to do so (Gerber and Green 2000). Further evidence comes from Ansolabehere, et al (1999); they argue that negative campaign advertising reduces voter turnout primarily because of its detrimental effect on public trust in the political process.

9 In fact, the two studies are nearly identical, as Vercellotti and Anderson were part of the research team that produced the Eagleton (2006) report.

10 Personal communication with Jason Mycoff (November 9, 2007).

11 There was not a gubernatorial or U.S. Senate election in Indiana in 2002. In 2006, there was a U.S. Senate race in which Richard Luger, a Republican, was not opposed by a Democrat; Lugar defeated his closest opponent, a Libertarian candidate, by 87.3% to 12.6% of the total vote.

12 All data employed in this study were provided by Polidata (www.Polidata.org).

## REFERENCES

Alvarez, Michael, Delia Bailey, Jonathan Katz 2007. "The Effect of Voter Identification Laws on Turnout," Working Paper #57 in the Caltech/MIT Voting technology Project (California Institute of Technology: Pasadena, CA).

Ansolabehere, Stephen 2007. "Access Versus Integrity in Voter Identification Requirements," Working Paper #58 in the Caltech/MIT Voting Technology Project (California Institute of Technology: Pasadena, CA).

Ansolabehere, Stephen D., Shanto Iyengar, and Adam Simon 1999. "Replicating Experiments Using Aggregate and Survey Data: The Case of Negative Advertising and Turnout" American Political Science Review, 93: 901-909.

Blais, Andre (2006). "What Affects Voter Turnout?" Annual Review of Political Science, 9: 111-125.



Eagleton Institute 2006. "Report to the U. S. Election Assistance Commission: Best Practices to Improve Voter Identification Requirements," Eagleton Institute of Politics (Rutgers University: New Brunswick, NJ).

Gerber, Alan and Donald Green 2000. "The Effect of a Non-Partisan Get-Out-the-Vote Drive: An Experimental Study of Leafletting," Journal of Politics, 62(3): 846-857.Hood, M.V. and Charles Bullock 2007. "Worth a thousand Words?: An Analysis of Georgia's Voter Identification Statute," working paper (University of Georgia: Athens, GA).

Lott, John R. 2006. "Evidence of Voter Fraud and the Impact that Regulations to Reduce Fraud have on Voter Participation Rates" working paper (University of Maryland: College Park, MD).

Matsusaka, John and Filip Palda 1999. "Voter Turnout: How Much Can We Explain?" Public Choice 98: 431-446

Muhlhausen, David B. and Keri Weber Sikich 2007. "New Analysis Shows Voter Identification Laws Do Not Reduce Turnout." (Heritage Foundation: Washington, D.C.).

Mycoff, Jason, Michael W. Wagner and David C. Wilson 2007. "Do Voter Identification Laws Affect Voter Turnout?" working paper (University of Delaware: Newark, DE).

Powell, G. Bingham, Jr. (1986). "American Voter Turnout in Comparative Perspective." American Political Science Review 80: 17-44.

Primo, David, Matthew L. Jacobsmeier and Jeffrey Milyo 2007. "Estimating the Effects of State Policies and Institutions with Mixed Level Data," State Politics and Policy Quarterly, 7(4): 447-461.

Primo, David and Jeffrey Milyo 2006a. "Campaign Finance Laws and Political Efficacy: Evidence from the States," Election Law Journal, 5(1): 23-39.

Primo, David and Jeffrey Milyo 2006b. "The Effects of State Campaign Finance Laws on Voter Turnout," working paper (University of Missouri: Columbia, MO).

Putnam, Robert 2000. Bowling Alone: The Collapse and Revival of American Community. (Simon and Schuster: New York).

Schulz, David 2007. "Less than Fundamental: The Myth of Voter Fraud and the Coming of the Second Great Disenfranchisement," working paper (Hamline University: St Paul, MN).

Vercelli, Timothy and David Anderson 2006. "Protecting the Franchise, or Restricting It? The Effects of Voter Identification Requirements on Turnout," working paper (Rutgers university: New Brunswick, NJ).



Institute of Public Policy

TX_00001840
JA_004599

TX_00001840

## Table 1A: Effects of Photo ID by Race and Ethnicity
### (County Turnout in 2002 and 2006)

| | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| *Panel One: % Voting Age Pop. (%VAP)* | | | | |
| %Black*PhotoID | 0.10 | | 0.12 | |
| | (1.23) | | (1.44) | |
| %Hispanic*PhotoID | | -0.03 | -0.15 | |
| | | (0.21) | (0.97) | |
| %Minority*PhotoID | | | | 0.07 |
| | | | | (1.27) |
| | | | | |
| *Panel Two: Change in % Voting Age Pop.* | | | | |
| %Black*PhotoID | 0.09 | | 0.08 | |
| | (0.59) | | (0.45) | |
| %Hispanic*PhotoID | | 0.13 | 0.06 | |
| | | (0.83) | (0.28) | |
| %Minority*PhotoID | | | | 0.07 |
| | | | | (0.72) |

NOTES: Absolute values of t-statistics in parentheses (adjusted for clustering by counties). The estimated effects of photo ID interacted with percent Black and Hispanic are also not jointly significant in either panel above. All models include controls for year and characteristics of county population, including: age, education, ethnicity, female labor force participation, income per capita, military status, non-citizens, party, poverty, race, and rural status.



Institute of Public Policy

10

TX_00001841

## Table 1B: Effects of Photo ID by Race and Ethnicity
### (Natural Logarithm of County Turnout in 2002 and 2006)

|  | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| *Panel One: Log of % Voting Age Pop. (%VAP)* | | | | |
| %Black*PhotoID | .003 | | .004 | |
|  | (1.42) | | (1.50) | |
| %Hispanic*PhotoID | | .000 | -.003 | |
|  | | (0.08) | (0.82) | |
| %Minority*PhotoID | | | | .002 |
|  | | | | (1.55) |
| | | | | |
| *Panel Two: Change in Log of % Voting Age Pop.* | | | | |
| %Black*PhotoID | .002 | | .002 | |
|  | (0.67) | | (0.58) | |
| %Hispanic*PhotoID | | .002 | -.000 | |
|  | | (0.55) | (0.00) | |
| %Minority*PhotoID | | | | .002 |
|  | | | | (0.82) |

NOTES: Absolute values of t-statistics in parentheses (adjusted for clustering by counties). The estimated effects of photo ID interacted with percent Black and Hispanic are also not jointly significant in either panel above. All models include controls for year and characteristics of county population, including: age, education, ethnicity, female labor force participation, income per capita, military status, non-citizens, party, poverty, race, and rural status.

TX_00001842
JA_004601

TX_00001842

### Table 2A: Effects of Photo ID by Poverty, Education, Age, and Party
### (County Turnout in 2002 and 2006)

|  | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| *Panel One: % Voting Age Pop. (%VAP)* | | | | |
| %Poverty*PhotoID | 0.29 | | | |
|  | (1.67) | | | |
| %NoHighSchool*PhotoID | | -0.08 | | |
|  | | (1.25) | | |
| %Elderly*PhotoID | | | -0.36 | |
|  | | | (1.89) | |
| %Democrat*PhotoID | | | | 0.10 |
|  | | | | (2.22) |
| *Panel Two: Change in % Voting Age Pop.* | | | | |
| %Poverty*PhotoID | 0.17 | | | |
|  | (0.98) | | | |
| %NoHighSchool*PhotoID | | -0.01 | | |
|  | | (0.11) | | |
| %Elderly*PhotoID | | | -0.08 | |
|  | | | (0.41) | |
| %Democrat*PhotoID | | | | 0.11 |
|  | | | | (1.59) |

NOTES: Absolute values of t-statistics in parentheses (adjusted for clustering by counties). The estimated effects of photo ID interacted with percent poverty, no high school degree and elderly are also not jointly significant in either panel above. All models include controls for year and characteristics of county population, including: age, education, ethnicity, female labor force participation, income per capita, military status, non-citizens, party, poverty, race, and rural status.

## Table 2B: Effects of Photo ID by Poverty, Education, Age, and Party
### (Naural Logarithm of County Turnout in 2002 and 2006)

|  | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| *Panel One: Log of % Voting Age Pop. (%VAP)* | | | | |
| %Poverty*PhotoID | .007 | | | |
|  | (1.56) | | | |
| %NoHighSchool*PhotoID | | -.003 | | |
|  | | (1.60) | | |
| %Elderly*PhotoID | | | -.011 | |
|  | | | (2.08) | |
| %Democrat*PhotoID | | | | .003 |
|  | | | | (2.28) |
| *Panel Two: Change in Log of % Voting Age Pop.* | | | | |
| %Poverty*PhotoID | .004 | | | |
|  | (0.88) | | | |
| %NoHighSchool*PhotoID | | -.001 | | |
|  | | (1.05) | | |
| %Elderly*PhotoID | | | -.005 | |
|  | | | (0.99) | |
| %Democrat*PhotoID | | | | .003 |
|  | | | | (1.87) |

NOTES: Absolute values of t-statistics in parentheses (adjusted for clustering by counties). The estimated effects of photo ID interacted with percent poverty, no high school degree and elderly are also not jointly significant in either panel above. All models include controls for year and characteristics of county population, including: age, education, ethnicity, female labor force participation, income per capita, military status, non-citizens, party, poverty, race, and rural status.

**APPENDIX :**

The following county-level census variables are included
as controls in the statistical analysis:

Percent non-Hispanic Black
Percent Hispanic
Percent non-white and\or Hispanic

Natural logarithm of per-capita income
Percent of families in poverty

Percent without a high school degree (omitted category)
Percent with at most a high school degree
Percent with some college education
Percent with college degree
Percent with post-graduate education

Percent age less than 5 years (omitted category)
Percent age between 5 and 17 years
Percent age between 19 and 24 years
Percent age between 25 and 44 years
Percent age between 45 and 64 years
Percent age 65 or more

Percent voting for John Kerry in 2004 (of those casting
votes in 2004)

Percent active military
Percent female labor force participation
Percent non-citizens
Percent retired military
Percent rural

Jeffrey Milyo is a professor in the Truman School of
Public Affairs and the department of economics at the
University of Missouri; he is also the Hanna Family
Scholar in the Center for Applied Economics at the
University of Kansas School of Business and a Senior
Fellow at the Cato Institute in Washington, D.C.
Comments are welcome; please contact the author at:
milyoj@missouri.edu.

**Suggested Citation**

Milyo, Jeffrey. (2007). "The Effects of Photographic Indentification
on Voter Turnout in Indiana: A County-Level Analysis." Report
10-2007.   Retrieved [Month Day, Year], from University of
Missouri Columbia, Institute of Public Policy Web site: http://
www.truman.missouri.edu/ipp/products

Institute of Public Policy
137 Middlebush
University of Missouri
Columbia, MO 65211
http://www.truman.missouri.edu/ipp



Exhibit 17

Testimony of

Tova Andrea Wang

Vice President, Research

Common Cause


Before the Committee of the Whole

of the Texas State Senate


Regarding Voter Identification


March 10, 2009

Thank you very much to the Senate for allowing me to testify today about the voter identification bill you are considering. My name is Tova Wang, and I am Vice President for Research at Common Cause, a national nonpartisan organization that has 36 state chapters, including one here in Texas. I have spent the last several years researching and writing on election reform and voting rights issues.

## DISENFRANCHISEMENT

For the distinguished senators in this room, requiring identification in order to exercise the right to vote is probably no big deal. But for some people it is.

The potential for strict ID laws to skew election outcomes is significant. About 10% of Americans do not have a driver's license or non-driver's government ID. Voters without such documentation are far more likely to be African American, an immigrant, poor, have disabilities and be senior citizens. Study after study has shown this. A national survey by the Brennan Center found that Americans earning less than $35,000 were twice as likely to lack ID as Americans who earned more than that. Over 38% of Texans earn less than $35,000 according to 2007 census data.[i] African Americans are more than three times as likely as whites not to have ID. Indeed, the survey found that one-fourth of African Americans do not own government issued photo ID.

That poorer people don't have these kinds of identity documents isn't very surprising. A lot of people go around saying everyone has ID – that you need it to fly, rent DVDs and get into federal buildings, etc. First of all it isn't true that you need identification to engage in these activities, that's another myth. But more importantly, didn't Hurricane Katrina teach us anything about poor people? Many poor people don't have cars, fly or go to Blockbuster to rent the latest DVD every weekend. So this whole notion that everybody's got ID is just untrue. Many poor people don't.

## ABSENCE OF FRAUD

The idea that there is a great deal of fraud that could be addressed through a photo identification requirement is also a myth.

Not one case of election fraud brought by the United States Department of Justice over the last several years was of the type that would have been addressed by voter identification. This was the case even in an environment in which we now know that Assistant U.S. Attorneys were under enormous pressure to pursue these types of cases.

It is also especially telling that in every one of the federal lawsuits regarding voter ID, the states defending such rules have not come up with one case of voter fraud that would have been prevented by the new voter identification laws. In Crawford v. Marion County, the Supreme Court case regarding Indiana's strict voter ID law, Justice Stevens essentially admitted that there is no in person voter fraud in the court's opinion. He could find two examples of fraud to support the state's – and his -- justification for the law: the

TX_00001847

Boss Tweed regime in the 19th century and a single case of possible impersonation fraud in the Washington State gubernatorial election of 2004.

And let me underscore this point: problems with or even fraud in the voter registration process is a wholly unrelated, though worrisome problem. There is no available evidence that faulty or false registration forms lead to fraudulent voting. You can ask advocates from across the spectrum, academics, and most importantly elections officials and registrars – as I have done for my research -- and they will tell you that they have not seen a case of voter registration fraud lead to a false vote. Voter registration fraud may be a problem and it should be watched for and when criminal elements are present in the act, prosecuted. But a voter identification requirement will do nothing to assist in that process.

ID proponents now seem to have beaten a tactical retreat and are claiming we need to have voter ID laws because voters **perceive** this type of fraud to be a problem, and we cannot allow their confidence in the system to wane. But studies show that belief in the existence of fraud has zero impact on voting behavior. Indeed professors at MIT and Columbia conducted a survey published in the Harvard Law Review that found that perceptions of fraud have no relationship to a voter's likelihood of turning out to vote and voters subject to strict ID laws have the same beliefs about fraud as voters with less strict provisions.

And how convenient that the people making this new argument are the very ones that hit people over the head with the false idea that it was a problem, leading them to this MISperception.

So what is this all really about?

OTHER STATES

It is also important to point out to you that most states do not have a photo identification requirement, and, like all states, do not report any problem with polling place fraud. The truth is almost half the states currently have essentially no identification requirement. Among these states are ones that like Texas that have large immigrant populations, such as California, Nevada and North Carolina. As I have said, these states report no greater difficulty in implementing honest and fair elections than any other. Do you believe that half the states of the United States do not care about the possibility of fraud in our elections, do not care about ensuring the integrity of our democratic process? They do and they also know what is effective and what is not in making sure that the election is fair and accurate. They know that voter identification requirements are not an effective tool in that cause.

Only a very small handful of states require photo ID, but almost all of them have enacted policies that allow an eligible American voter to cast a regular ballot on election day even if they fail to bring or do not have the ID required. 4 states request all voters show photo

TX_00001848

ID but voters without the proper ID can simply sign affidavits – under penalty of perjury-- and cast regular (non-provisional) ballots.

The bottom line is that the overwhelming majority of states have lenient to no requirements for showing ID at the polls in order to vote and none report polling place fraud as being a problem.

ID IS NOT FREE FOR ANYONE

*Voters*

Many people believe that the answer to the problem of disenfranchisement through voter identification laws is to provide free identification. But the truth is that the ID is never free – not for the voter and certainly not for the state that has to provide it.

Let me use Indiana as an example to show why ID is never free for the voter, as the Texas program is likely to be similar.

In order to get the so-called free ID, you have to go to DMV during working hours and present a primary document, a secondary document, and a proof of residency, or two primary documents and one proof of residency document. The only items that count as primary documents essentially are an original, stamped birth certificate or a passport. Many people will not have their original birth certificate at home. And only about a quarter of Americans have passports. So the voter without their birth certificate handy will have to go out and buy one – in Indiana that costs between $12 and $20 and much more if the voter was not born in Indiana. In Texas, it costs $22. (In many states, a would-be voter must pay up to $45 for a birth certificate, $97 for a passport, and over $200 for naturalization papers.) Moreover, the process for getting a birth certificate requires the voter to present identification! Many identifying documents cannot be issued immediately, so potential voters must allow for processing and shipping, which may take several weeks or even months. And you may experience additional difficulties getting photo ID if you got married or for some other reason your name is at all different on your birth certificate than what it is on other documentation, such as your voter registration. This of course disproportionately impacts women.

*The State*

Less discussed in this debate are the costs to you, the state, if you should choose to enact a photo ID requirement. For constitutional reasons, as was demonstrated by the Georgia litigation over this issue, you will need to ensure that every eligible voter in Texas can easily obtain a free photo identification card. And to do that, and to do it right and within the mandates of the Voting Rights Act against poll taxes, is going to require enormous resources.

In 2005, Georgia found this out the hard way.  In order to provide free ID services to the estimated 300,000 Georgians without ID, the state created a mobile ID program that consisted of one bus that traveled to a location for a day or two during the middle of the day.  While the bus had the capacity to issue two hundred photo identification cards a day, it issued fewer than five hundred licenses in three months.  Even Governor Purdue, a great supporter of the law, was forced to admit, "We've got to start with the resources we've got and can't spend money we don't have."[ii]  It was during that time that a federal judge in Georgia ruled the ID law an unconstitutional poll tax.

While we do not know exactly how much in dollars a photo ID law would cost the state,[iii] we do know that setting up a voter ID plan is not going to cost you a one-time fee.  The costs are recurring.  The state must continuously, year after year, provide new voters free identification.  Moreover, the state will have to continuously give extra poll worker training to poll workers about the requirements and how to implement them.  After all, you are essentially requiring them to engage in a quasi-law enforcement capacity in checking the validity of individuals' identification documents.  Finally, you will need to engage in an ongoing, massive voter education campaigns to ensure voters know they must obtain and bring their required identification to the polls on election day, including sending letters to everyone suspected of not having the identification, advertising in print and on the air, and sending out information packets and reminders, as the Secretary of State is doing in Georgia.[iv]  So I believe we can with some confidence say that the kind of voter ID program that is being considered will cost the Texan taxpayers many millions of dollars over the course of the years to come.

In this economy does the Texas state legislature really want to spend millions of dollars chasing a phantom problem?  As an outsider, I wonder how Texans will feel about that, especially the ones without a job right now – a number that is rapidly rising in the state -- or those who are struggling to pay health care costs or for an education.[v]  As you know, Texas leads the nation in the number of people without health insurance.[vi]

ID REQUIREMENTS CAN LEAD TO RACIAL DISCRIMINATION AT THE POLLING PLACE

Recent research suggests another element of voter ID that the state of Texas might want to consider before acting on this measure.  Studies of real elections show that, whether it is purposeful or not, poll workers demand photo identification much more often from African Americans and Latinos than white voters. In a survey conducted by a Harvard professor of tens of thousands of voters in the 2006 general election, 47% of whites were asked for photo identification whether it was required or not, compared to 54% of Hispanics and 55% of African Americans.  MIT's survey of thousands of voters in the 2008 Super Tuesday primary, 53% of whites were asked for photo ID, compared with 58% of Hispanics and a staggering 73% of African Americans.  This was true even after controlling for factors such as income, education, age and region.[vii]

TX_00001850

In a study of the election in New Mexico in 2006, a state that does not have a strict ID law, researchers found strong evidence that Latinos were far more likely to have be asked for identification in order to vote than any other group.[viii]  In an evaluation of the 2007 gubernatorial elections and the 2008 Super Tuesday primary, researchers from MIT, Caltech, and the University of Utah found that African American voters were 14% points more likely to be asked for photo identification than whites and  Latinos were 18% more likely to be asked for photo ID in some states.[ix]

I wonder if this is something that Texas wants to deal with, unnecessarily, at this time.


CONCLUSION

Most states run their elections without photo ID requirements, and they all do just fine.  I believe Texas can be just as effective in running clean but fair and honest elections as any other state in the nation.  Texas' voter turnout rate is quite low – one of the lowest in the country.  Even in the historic election of 2008 when voters came out at unprecedented numbers, less than 55% of Texans voted, earning it the dubious distinction of ranking 48th in turnout nationally.[x] It is my opinion that if the Texas state legislature is concerned about the fairness of its elections, it would be better off using all of its energies and resources to do something about that problem rather than a problem it does not have.

---

[i] S1901. Income in the Past 12 Months (In 2007 Inflation-Adjusted Dollars), Data Set: 2005-2007 American Community Survey 3-Year Estimates, Survey: American Community Surveyhttp://factfinder.census.gov/servlet/STTable?_bm=y&-geo_id=04000US48&-qr_name=ACS_2007_3YR_G00_S1901&-ds_name=ACS_2007_3YR_G00_

[ii] Spencer Overton, *Voter Identification*, Michigan Law Review, Vol. 105:631, February 2007, 631-681, at 676.

[iii] Texas state senators just recently have been quoted as saying implementation of the REAL ID plan in Texas would cost between $100 million and $142.6 million, with additional annual expenses of $67 million. See "Brenda McKenna, "States Get a Breather on Starting Real ID," The Dallas Morning News, January 11, 2008, quoting State Senator John Carona, R-Dallas; Luke O'Brien, "Senate Looks into Real ID," Wired Magazine, quoting State Senator Leticia Van De Putte.

[iv] According to press reports,

> The Secretary of State's Office is sending reminder letters to 80,149 active and inactive registered voters across the state. The voters receiving this letter were identified through a database match of active and inactive registered voters and Georgia Department of Drivers Services (DDS) records.

> These voters may not have a Georgia driver's license or identification card issued

TX_00001851

through the Department of Driver Services, and either do not live in counties targeted during previous phases or registered to vote after the September and November county and municipal elections.

"Georgians who may not have participated in the September and November 2007 local elections will be voting in the Presidential Preference Primary," Handel said. "It is important that they are aware of the photo identification requirement for voting in person."

These registered voters who may not have a driver's license or identification card issued through the Department of Driver Services will also receive an informational brochure and postcard in the weeks leading up to the February 5 election.

In addition, Handel's office will contact 254,465 registered voters who were contacted in previous outreach phases as a reminder to bring photo identification with them when voting in-person.

The Secretary of State's Office is advertising extensively on radio and placing public service announcements on cable television reminding voters of the photo ID requirement. In addition, information is being distributed to public libraries and other public facilities across the state.

Handel's office also partnered with utility companies to include educational inserts about photo ID in utility bills. The Secretary of State's Elections Division is offering training sessions to county elections officials and poll workers.

Katie Highsmith, "Handel Begins Phase Three of Voter ID Outreach," AccessNorthGA.com, January 21, 2008

[v] "The Texas unemployment rate jumped to 6.0 percent in December and the state lost jobs for the third time in four months, the Texas Workforce Commission said Friday. The unemployment rate was a sharp jump from 5.7 percent in November and 4.2 percent a year ago. It was the first time the state's jobless rate hit 6 percent since 2004, said commission labor representative Ronny Congleton. The state lost 25,700 nonagricultural jobs in December, the second consecutive monthly drop after the commission revised November figures from a gain of 7,300 jobs to a loss of 11,300. The monthly job loss in September was the first in more than a year, according to the commission.  Associated Press, "Texas Unemployment Shoots Up to 6 Percent," January 23, 2009.

[vi] Jason Roberson, "Texas Still Leads Nation in Rate of Uninsured Residents," Dallas Morning News, August 27, 2008

[vii] Stephen Ansolobehere, "Effects of Identification Requirements on Voting: Evidence from the Experiences of Voters on Election Day," PS: Political Science & Politics (2009), 42:127-130 Cambridge University Press, The American Political Science Association 2009

[viii] Atkeson, et.al, New Barriers to Participation: Application of New Mexico's Voter Identification Law," Caltech/MIT Voting Technology Project, 2008.

[ix] Stewart, et. al, "Evaluating the Performance of Election Administration Across the States: Lessons from the 200 Gubernatorial Elections and the 2008 Super Tuesday," Paper prepared for the American Political Science Association, August 27-September 1, 2008.

[x] George Pillsbury, "America Goes to the Polls: 2008 Voter Turnout Brief," Nonprofit Voter Engagement Network, November 19, 2009

TX_00001853



**Senator Fraser**





# Building Confidence in U.S. Elections

   

SEPTEMBER 2005

ORGANIZED BY
Center for Democracy and Election Management
American University

SUPPORTED BY
Carnegie Corporation of New York
The Ford Foundation
John S. and James L. Knight Foundation
Omidyar Network

RESEARCH BY
Electionline.org/The Pew Charitable Trusts

TX_00001854





# Building Confidence in U.S. Elections

## REPORT OF THE COMMISSION ON FEDERAL ELECTION REFORM

### SEPTEMBER 2005

**ORGANIZED BY**
Center for Democracy and Election Management
American University

**SUPPORTED BY**
Carnegie Corporation of New York
The Ford Foundation
John S. and James L. Knight Foundation
Omidyar Network

**RESEARCH BY**
Electionline.org/The Pew Charitable Trusts

TX_00001855
JA_004614

TX_00001855

# Building Confidence in U.S. Elections
## REPORT OF THE COMMISSION ON FEDERAL ELECTION REFORM
# Table of Contents

Letter from the Co-Chairs ........................................ ii

Preface by the Executive Director ........................... iii

Executive Summary ................................................ iv

**1: Goals and Challenges of Election Reform** ........... **1**
   1.1 Help America Vote Act: Strengths and Limitations .... 2
   1.2 Learning from the World ............................. 5
   1.3 Transforming the Electoral System – Five Pillars ... 6
   1.4 Urgency of Reform .................................. 7

**2: Voter Registration and Identification** ................ **9**
   2.1 Uniformity Within States – Top-Down Registration Systems ... 10
   2.2 Interoperability Among States ..................... 12
   2.3 Provisional Ballots ............................... 15
   2.4 Communicating Registration Information ............ 16
   2.5 Voter Identification .............................. 18
   2.6 Quality in Voter Registration Lists .............. 22

**3: Voting Technology** ......................................... **25**
   3.1 Voting Machines ................................... 25
   3.2 Audits ............................................ 28
   3.3 Security for Voting Systems ....................... 28
   3.4 Internet Voting ................................... 32

**4: Expanding Access to Elections** ......................... **33**
   4.1 Assured Access to Elections ....................... 33
   4.2 Vote by Mail ...................................... 35
   4.3 Vote Centers ...................................... 36
   4.4 Military and Overseas Voting ...................... 37
   4.5 Access for Voters with Disabilities ............... 39
   4.6 Re-Enfranchisement of Ex-Felons ................... 40
   4.7 Voter and Civic Education ......................... 41

**5: Improving Ballot Integrity** ............................. **45**
   5.1 Investigation and Prosecution of Election Fraud ... 45
   5.2 Absentee Ballot and Voter Registration Fraud ..... 46

**6: Election Administration** ................................ **49**
   6.1 Institutions ...................................... 49
   6.2 Poll Worker Recruitment ........................... 54
   6.3 Polling Station Operations ........................ 56
   6.4 Research on Election Management ................... 57
   6.5 Cost of Elections ................................. 59

**7: Responsible Media Coverage** ........................... **61**
   7.1 Media Access for Candidates ....................... 61
   7.2 Media Projections of Election Results ............. 62

**8: Election Observation** .................................. **65**

**9: Presidential Primary and Post-Election Schedules** ... **67**
   9.1 Presidential Primary Schedule ..................... 67
   9.2 Post-Election Timeline ............................ 68

Conclusion ........................................................ 69

Appendix .......................................................... 71
   Estimated Costs of Recommended Improvements

Endnotes .......................................................... 72

Summary of Recommendations ................................. 79

Additional Statements .......................................... 88

About the Commission on Federal Election Reform ....... 92

# LETTER FROM THE CO-CHAIRS

Elections are the heart of democracy. They are the instrument for the people to choose leaders and hold them accountable. At the same time, elections are a core public function upon which all other government responsibilities depend. If elections are defective, the entire democratic system is at risk.

Americans are losing confidence in the fairness of elections, and while we do not face a crisis today, we need to address the problems of our electoral system.

Our Commission on Federal Election Reform was formed to recommend ways to raise confidence in the electoral system. Many Americans thought that one report — the Carter-Ford Commission — and one law — the Help America Vote Act of 2002 (HAVA) — would be enough to fix the system. It isn't. In this report, we seek to build on the historic achievement of HAVA and put forward a bold set of proposals to modernize our electoral system.

Some Americans will prefer some of our proposals to others. Indeed, while all of the Commission members endorse the judgments and general policy thrust of the report in its entirety, they do not necessarily support every word and recommendation. Benefitting from Commission members with diverse perspectives, we have proposed, for example, a formula for transcending the sterile debate between integrity and access. Twenty-four states now require identification for voters, with some systems likely to restrict registration. We are recommending a photo ID system for voters designed to increase registration with a more affirmative and aggressive role for states in finding new voters and providing free IDs for those without driver's licenses. The formula we recommend will result in both more integrity and more access. A few of our members have expressed an alternative view of this issue.

Still, our entire Commission is united in the view that electoral reform is essential and that our recommended package of proposals represents the best way to modernize our electoral system. We urge all Americans, including the legislative and executive branches of government at all levels, to recognize the urgency of election reform and to seriously consider the comprehensive approach outlined herein.

We present this report because we believe the time for acting to improve our election system is now.


Jimmy Carter                                    James A. Baker, III

*Co-Chairs of the Commission on Federal Election Reform*

# PREFACE BY THE EXECUTIVE DIRECTOR

Polls indicate that many Americans lack confidence in the electoral system, but the political parties are so divided that serious electoral reform is unlikely without a strong bipartisan voice. Our country therefore owes a great debt to former President Jimmy Carter and former Secretary of State James A. Baker, III for leading this Commission and forging a plan for election reform.

To build confidence, the Commission recommends a modern electoral system built on five pillars: (1) a universal and up-to-date registration list, accessible to the public; (2) a uniform voter identification system that is implemented in a way that increases, not impedes, participation; (3) measures to enhance ballot integrity and voter access; (4) a voter-verifiable paper trail and improved security of voting systems; and (5) electoral institutions that are impartial, professional, and independent. Democrats, Republicans, and Independents tend to prefer different elements of this package, but President Carter and Secretary Baker drew strength rather than stalemate from the diverse perspectives in fashioning an approach that is greater than the sum of these parts.

Our Commission was fortunate to have an outstanding staff and academic advisors, and we have benefited from advice by Members of Congress and staff, election officials, and representatives of a wide range of non-governmental organizations devoted to improving our democracy. See our website for a list of advisors and the studies and testimony: www.american.edu/Carter-Baker.

We acknowledge the support of many at the end of this report, but let me identify here a few people whose work was crucial to the Commission: Daniel Calingaert, the Associate Director of American University's Center for Democracy and Election Management, Doug Chapin of Electiononline.org, John Williams, Senior Advisor to Secretary Baker, Kay Stimson, Media Liaison, and Murray Gormly, Administrative Coordinator. The Commission was organized by American University's Center for Democracy and Election Management. We are also grateful to the James A. Baker III Institute for Public Policy of Rice University and The Carter Center for hosting the other two meetings.

Finally, the Commission could not have accomplished its goal without the generosity of its funders and the advice and support of the following individuals: Geri Mannion of the Carnegie Corporation; Thomasina Williams of the Ford Foundation; Julie Kohler of the John S. and James L. Knight Foundation; Dena Jones of Omidyar Network, and The Pew Charitable Trusts.

At AU's Center for Democracy and Election Management, we view this Commission as a major step toward developing the educational foundation for students, professionals, and the public to deepen our understanding of democracy and elections in the United States and the world.

*Robert A. Pastor*

Robert A. Pastor,
*Executive Director*

# EXECUTIVE SUMMARY

Building confidence in U.S. elections is central to our nation's democracy. At a time when there is growing skepticism with our electoral system, the Commission believes that a bold new approach is essential. The Commission envisions a system that makes Americans proud of themselves as citizens and of democracy in the United States. We should have an electoral system where registering to vote is convenient, voting is efficient and pleasant, voting machines work properly, fraud is deterred, and disputes are handled fairly and expeditiously.

This report represents a comprehensive proposal for modernizing our electoral system. We propose to construct the new edifice for elections on five pillars:

First, we propose a universal voter registration system in which the states, not local jurisdictions, are responsible for the accuracy and quality of the voter lists. Additionally, we propose that the U.S. Election Assistance Commission (EAC) develop a mechanism to connect all states' list. These top-down and interoperable registration lists will, if implemented successfully, eliminate the vast majority of complaints currently leveled against the election system. States will retain control over their registration list, but a distributed database can remove interstate duplicates and help states to maintain an up-to-date, fully accurate registration list. This would mean people would need to register only once in their lifetime, and it would be easy to update their registration information when they move. We also propose that all states establish uniform procedures for counting provisional ballots, and many members recommend that the ballots should be counted if the citizen has voted in the correct jurisdiction.

Second, to make sure that a person arriving at a polling site is the same one who is named on the list, we propose a uniform system of voter identification based on the "REAL ID card" or an equivalent for people without a drivers license. To prevent the ID from being a barrier to voting, we recommend that states use the registration and ID process to enfranchise more voters than ever. States should play an affirmative role in reaching out to non-drivers by providing more offices, including mobile ones, to register voters and provide photo IDs free of charge. There is likely to be less discrimination against minorities if there is a single, uniform ID, than if poll workers can apply multiple standards. In addition, we suggest procedural and institutional safeguards to make sure that the rights of citizens are not abused and that voters will not be disenfranchised because of an ID requirement. We also propose that voters who do not have a photo ID during a transitional period receive a provisional ballot that would be counted if their signature is verified.

Third, we propose measures that will increase voting participation by having the states assume greater responsibility to register citizens, make voting more convenient, and offer more information on registration lists and voting. States should allow experimentation with voting centers. We propose ways to facilitate voting by overseas military and civilians and ways to make sure that people with disabilities have full access to voting. In addition, we ask the states to allow for restoration of voting rights for ex-felons (other than individuals convicted of capital crimes or registered sex offenders) when they have fully served their sentence. We also identify several voter and civic education programs that could increase participation and inform voters, for example, by providing information on candidates and the voting process to citizens before the election. States and local jurisdictions should use Web sites, toll-free numbers, and other means to inform citizens about their registration status and the location of their precinct.

TX_00001859
JA_004618

To improve ballot integrity, we propose that federal, state, and local prosecutors issue public reports on their investigations of election fraud, and we recommend federal legislation to deter or prosecute systemic efforts to deceive or intimidate voters. States should not discourage legal voter registration or get-out-the-vote activities, but they need to do more to prevent voter registration and absentee ballot fraud.

Fourth, we propose ways to give confidence to voters using electronic voting machines that their votes will be counted accurately. We call for an auditable backup on paper at this time, but we recognize the possibility of alternative technologies to audit those machines in the future. We encourage independent testing of voting systems (to include voting machines and software source code) under EAC supervision.

Finally, we recommend strengthening and restructuring the system by which elections have been administered in our country. We propose that the EAC and state election management bodies be reconstituted on a nonpartisan basis to become more independent and effective. We cannot build confidence in elections if secretaries of state responsible for certifying votes are simultaneously chairing political campaigns, and the EAC cannot undertake the additional responsibilities recommended by this report, including critical research, without gaining additional funds and support. Polling stations should be organized to reduce the chances of long lines; they should maintain "log-books" on Election Day to record complaints; and they need electronic poll-books to help voters find their correct precinct. HAVA should be fully funded and implemented by 2006.

The Commission puts forward 87 specific recommendations. Here are a few of the others:

- We propose that the media improve coverage of elections by providing at least five minutes of candidate discourse every night in the month preceding the election.

- We ask news organizations to voluntarily refrain from projecting presidential election results until polls close in the 48 contiguous states.

- We request that all of the states provide unrestricted access to all legitimate domestic and international election observers, as we insist of other countries, but only one state currently permits; and

- We propose changing the presidential primary schedule by creating four regional primaries.

Election reform is neither easy nor inexpensive. Nor can we succeed if we think of providing funds on a one-time basis. We need to view the administration of elections as a continuing challenge, which requires the highest priority of our citizens and our government.



(American University Photo/Jeff Watts)

# 1. Goals and Challenges of Election Reform

The vigor of American democracy rests on the vote of each citizen. Only when citizens can freely and privately exercise their right to vote and have their vote recorded correctly can they hold their leaders accountable. Democracy is endangered when people believe that their votes do not matter or are not counted correctly.

Much has happened since November 2000, when many Americans first recognized that their electoral system had serious problems with flawed voter registration lists, obsolete voting machines, poorly designed ballots, and inadequate procedures for interpreting disputed votes. Congress and the President, Democrats and Republicans, responded with a truly historic initiative – the Help America Vote Act of 2002 (HAVA), the first comprehensive federal law in our nation's history on electoral administration. The law represents a significant step forward, but it falls short of fully modernizing our electoral system.

On the eve of the November 2004 election, a *New York Times* poll reported that only one-third of the American people said that they had a lot of confidence that their votes would be counted properly, and 29 percent said they were very or somewhat concerned that they would encounter problems at the polls. Aware of this unease, the U.S. Department of Justice deployed 1,090 election observers — more than three times the number sent in 2000.[1] After the election, a minority of Americans — only 48 percent — said they were very confident that the votes cast across the country were accurately counted, according to a Pew Research Center survey. Thirty-seven percent had doubts (somewhat confident), and 14 percent were not confident that the votes were accurately counted.[2]

With a strong desire to contribute to building confidence in our electoral process, this Commission came together to analyze the state of the electoral system, to assess HAVA's implementation, and to offer recommendations for further improvement. Public confidence in the electoral system is critical for our nation's democracy. Little can undermine democracy more than a widespread belief among the people that elections are neither fair nor legitimate. We believe that further important improvements are necessary to remove any doubts about the electoral process and to help Americans look upon the process of casting their ballot as an inspiring experience — not an ordeal.

Former President Jimmy Carter and former Secretary of State James A. Baker, III
(AP Photo/Charles Dharapak)

We address this report to the American people and to the President, Congress, U.S. Election Assistance Commission, states, election administrators, and the media. Our recommendations aim both to increase voter participation and to assure the integrity of the electoral system. To achieve those goals, we need an accurate list of registered voters, adequate voter identification, voting technology that precisely records and tabulates votes and is subject to verification, and capable, fair, and nonpartisan election administration.

While each state will retain fundamental control over its electoral system, the federal government should seek to ensure that all qualified voters have an equal opportunity to exercise their right to vote. This will require greater uniformity of some voting requirements and registration lists that are accurate and compatible among states. Greater uniformity is also needed within states on some voting rules and procedures. The federal government should fund research and development of voting technology that will make the counting of votes more transparent, accurate, and verifiable.

## 1.1   HELP AMERICA VOTE ACT: STRENGTHS AND LIMITATIONS

The Help America Vote Act of 2002 (HAVA) established numerous federal requirements for state and local election administration in exchange for a promise of $3.97 billion in federal funding, of which approximately $3.1 billion has been appropriated to date. These requirements reflected a national consensus on the general outline of reform, best represented by the 2001 report of the National Commission on Federal Election Reform, co-chaired by former Presidents Jimmy Carter and Gerald Ford. HAVA's mandates were adopted as part of a compromise between the parties on the divisive issue of access to the ballot (largely championed by Democrats and their allies) versus protecting the integrity of the electoral process (generally favored by Republicans and their supporters).



Commissioners Susan Molinari and Tom Daschle
(American University Photo/Wilford Harewood)

Under this compromise, described by its sponsors as making it "easier to vote and harder to cheat," HAVA sought to lower barriers to voting while establishing somewhat tighter controls on registration and voter identification. Consequently, HAVA's mandates focused on four major requirements: (1) statewide computerized voter lists; (2) voter ID for individuals who register by mail but do not provide it when registering; (3) provisional ballots for voters whose names are missing from the registration rolls on Election Day; and (4) measures to make voting more accessible for voters with disabilities. The main provisions of HAVA are as follows:

- Voter registration lists, which were typically maintained at the local level, are now being consolidated into statewide voter databases.

- All states are required to provide provisional ballots on Election Day to citizens who believe they are registered but whose names do not appear on the registration lists.

- HAVA provides federal funding — for the first time — to create statewide voter databases and to replace old voting machines.

- All voting systems used in federal elections are required to meet minimum standards for voter verification of ballots, accessibility for voters with disabilities and language minorities, notification of over-votes, and auditing procedures.

TX_00001863
JA_004622

TX_00001863



(Getty Images Photo/Mike Simons)

- HAVA calls for the testing and certification of voting systems as a way to make sure they operate properly on Election Day.

- The U.S. Election Assistance Commission (EAC) was created to disburse federal funds, develop guidelines for voting systems, serve as a clearinghouse of information to improve election administration throughout the country, and study and report on how to make elections more accessible and accurate.

Under HAVA, states are required to complete their statewide voter databases by January 1, 2006, and some expenditures of HAVA funds will extend well beyond that date. Our Commission therefore calls for full implementation and full funding of HAVA.

The first presidential election after HAVA became law — on November 2, 2004 — brought to light as many problems as in 2000, if not more. HAVA, which will take years to be fully implemented, was not responsible for most of the complaints. Instead, voters were discouraged or prevented from voting by the failure of election offices to process voter registration applications or to mail absentee ballots in time, and by the poor service and long lines at polling stations in a number of states. There were also reports of improper requests for voter ID and of voter intimidation and suppression tactics. Concerns were raised about partisan purges of voter registration lists and about deliberate failures to deliver voter registration applications to election authorities. Moreover, computer malfunctions impugned election results for at least one race, and different procedures for counting provisional ballots within and between states led to legal challenges and political protests. Had the margin of victory for the presidential contest been narrower, the lengthy dispute that followed the 2000 election could have been repeated.

The November 2004 elections also showed that irregularities and fraud still occur. In Washington, for example, where Christine Gregoire was elected governor by a 129-vote margin, the elections superintendent of King County testified during a subsequent unsuccessful election challenge that ineligible ex-felons had voted and that votes had been cast in the names of the dead. However, the judge accepted Gregoire's victory because with the exception of four ex-felons who admitted to voting for Dino Rossi, the authorities could not determine for whom the other illegal votes were cast. In Milwaukee, Wisconsin, investigators said they found clear evidence of fraud, including more than 200 cases of felons voting illegally and more than 100 people who voted twice, used fake names or false addresses, or voted in the name of a dead person. Moreover, there were 4,500 more votes cast than voters listed.[3] One potential source of election fraud arises from inactive or ineligible voters left on voter registration lists. By one estimate, for example, there were over 181,000 dead people listed on the voter rolls in six swing states in the November 2004 elections, including almost 65,000 dead people listed on the voter rolls in Florida.[4]



Commissioners Bob Michel and Shirley Malcom
(American University Photo/Wilford Harewood)

Some of these problems may be addressed by the full implementation of HAVA, but it is clear that others will not. Due to vague mandates on provisional voting and identification cards, counties and states applied different standards. This led to a significant proliferation of legal challenges. A closer presidential election likely would have brought an avalanche of litigation. HAVA does not address interoperable registration lists among states, and it is also vague as to whether states should create a top-down, state-controlled registration list or a bottom-up list controlled by local election administrators. The weak structure of the U.S. Election Assistance Commission, a product of a HAVA compromise, has stymied its ability to be clear or authoritative on almost any subject, even on whether to verify electronic machine votes with paper ballots. Thus, there is a compelling need for further election reform that builds on HAVA.

One of the most important laws on the right of Americans to vote is the Voting Rights Act of 1965. Key provisions of the Act are due to expire in 2007. These include the language provision (Section 203), which requires jurisdictions to provide voting materials in minority languages in areas where language minority groups make up a significant portion of the population, and the pre-clearance provision (Section 5), which requires federal pre-clearance for all changes to voting rules or procedures made by specified jurisdictions with a history of voter discrimination. Our Commission believes this Act is of the utmost importance.

---

### Recommendations on the Help America Vote Act and the Voting Rights Act

**1.1.1**  The Help America Vote Act should be fully implemented by 2006, as mandated by the law, and fully funded.

**1.1.2**  The Commission urges that the Voting Rights Act be vigorously enforced and that Congress and the President seriously consider reauthorizing those provisions of the Act that are due to expire in 2007.

TX_00001865

## 1.2  LEARNING FROM THE WORLD

In its deliberations, our Commission considered the best practices of election systems around the world. Many other democracies achieve significantly higher levels of voter participation due, in part, to more effective voter registration. Election authorities take the initiative to contact and register voters and conduct audits of voter registration lists to assure that they are accurate. In addition, voter registration in many countries is often tied directly to a voter ID, so that voter identification can enhance ballot integrity without raising barriers to voting. Voters in nearly 100 democracies use a photo identification card without fear of infringement on their rights.[5]

Nonpartisan election administration has also proved effective abroad. Over the past three decades, election management institutions have evolved in many other democracies. Governments had previously conducted elections, but as concern was raised that they might give advantage to incumbents, independent election commissions were formed. Initially, election commissioners in other countries frequently represented political parties, but they often stalemated or reached agreement with each other at the public's expense. This explains why the trend in the world is toward independent election commissions composed of nonpartisan officials, who serve like judges, independently of the executive or legislative branches (see Table 5 on page 52). Political party representatives can observe deliberations on these commissions but not vote on decisions. Nonpartisan election officials are generally regarded as fair arbiters of the electoral process who make their best efforts to administer elections impartially and effectively.



Mexico's Federal Electoral Institute (IFE)
(AP Photo/Marco Ugarte)

## 1.3  TRANSFORMING THE ELECTORAL SYSTEM — FIVE PILLARS

The recommendations of our Commission on Federal Election Reform aim both to increase voter participation and to assure the integrity of the electoral system. To accomplish these goals, the electoral system we envision should be constructed on the following five sturdy pillars:

Voter registration that is convenient for voters to complete and even simpler to renew and that produces complete, accurate, and valid lists of citizens who are eligible to vote;

Voter identification, tied directly to voter registration, that enhances ballot integrity without introducing new barriers to voting, including the casting and counting of ballots;

Measures to encourage and achieve the greatest possible participation in elections by enabling all eligible voters to have an equal opportunity to vote and have their votes counted;

Voting machines that tabulate voter preferences accurately and transparently, minimize under- and over-votes, and allow for verifiability and full recounts; and

Fair, impartial and effective election administration.

An electoral system built on these pillars will give confidence to all citizens and will contribute to high voter participation. The electoral system should also be designed to reduce the possibility or opportunity for litigation before, and especially after, an election. Citizens should be confident that the results of the election reflect their decision, not a litigated outcome determined by lawyers and judges. This is achieved by clear and unambiguous rules for the conduct of the election established well in advance of Election Day.

The ultimate test of an election system is its ability to withstand intense public scrutiny during a very close election. Several close elections have taken place in recent years, and our election system has not always passed that test. We need a better election system.



Common Cause President Chellie Pingree (American University Photo/Jeff Watts)

TX_00001867
JA_004626

TX_00001867

## 1.4  URGENCY OF REFORM

Although the public continues to call for election reform, and several election bills have been introduced, the issue is low on the Congress's agenda at this time. Some congressional leaders believe that further reform should wait until HAVA is fully implemented. We believe that the need for additional electoral reform is abundantly clear, and our recommendations will bolster HAVA to further strengthen public confidence in the electoral process. If we wait until late 2006, we will lose the opportunity to put new reforms in place for the 2008 elections, and as a result, the next presidential election could be fraught with problems. Electoral reform may stay out of public view until the 2006 elections begin to approach, but by that time, it may be too late. We need Congress to press ahead with election reform now. Indeed, election reform is best accomplished when it is undertaken before the passions of a specific election cycle begin.

We are Republicans, Democrats, and Independents. But we have deliberately attempted to address electoral issues without asking the question as to whether a particular political party would benefit from a particular reform. We have done so because our country needs a clear unified voice calling for serious election reform. Congress has been reluctant to undertake reform, in part because members fear it could affect their chances of re-election and, when finally pressed by the public, Democrats and Republicans have addressed each reform by first asking whether it would help or harm each party's political prospects. This has proven to be not only a shortsighted but also a mistaken approach. Despite widespread belief that two recent reforms — the National Voter Registration Act of 1993 and the Bipartisan Campaign Finance Reform of 2002 — would advantage Democrats at the expense of Republicans, evidence suggests such beliefs were wrong. Having a fair electoral process in which all eligible citizens have an opportunity to participate freely is a goal that transcends any individual partisan interest. This assures the winning candidates the authority to legitimately assume office. For the losing candidate it assures that the decision can be accepted as the will of the voters.



League of Women Voters President Kay Maxwell at the April 18 hearing (American University Photo/Jeff Watts)

Our recommendations are aimed at several timeframes and audiences. Some require immediate action, and others can be considered later. We propose some for the federal government and some for the states. But we have offered all the recommendations based on our views as to how they can best help our country — not our political parties. Together, these reforms should catalyze a shift in the way that elections are administered. We hope they will not only restore American confidence in our elections, but also strengthen the respect from those in the world who look to our democracy as a model.



(AP Photo/Ric Francis)