# 2. Voter Registration and Identification

Effective voter registration and voter identification are bedrocks of a modern election system. By assuring uniformity to both voter registration and voter identification, and by having states play an active role in registering as many qualified citizens as possible, access to elections and ballot integrity will both be enhanced. These steps could help bring to an end the sterile debate between Democrats and Republicans on access versus integrity.

The most common problems on Election Day concern voter registration (see Table 1 on page 17). Voter registration lists often are riddled with inaccuracies because Americans are highly mobile, and local authorities, who have maintained most lists, are poorly positioned to add and delete names of voters who move within or between states. To comprehend the magnitude of this challenge, consider the following. During the last decade, on average, about 41.5 million Americans moved each year. Of those, about 31.2 million moved within the same state, and 8.9 million moved to a different state or abroad. Young Americans (aged 20 to 29), representing 14 percent of the U.S. population, moved to a different state at almost three times the rate of the rest of the population.[6] The process of registering voters should be made easier, and renewal due to a change of address should be made still easier.

In response to the challenge of building and maintaining better registration lists, HAVA requires states to establish statewide, computer-based registration lists that are interactive within each state by January 1, 2006. HAVA also requires provisional ballots for eligible voters who seek to vote within their jurisdiction but who are denied a ballot because their name is not found on the voter roll or because they are otherwise challenged by an election official as being ineligible to vote.

Although few states have completed their new statewide voter databases, the limitations of the existing efforts are already clear. Several states have left the primary responsibility for voter lists in the hands of counties and municipalities. There is little if any effort to assure quality in statewide voter databases. The U.S. Election Assistance Commission (EAC) has not assessed the quality of statewide voter databases and is unlikely to do so in the future. Moreover, it has provided only vague guidance to states on how to organize their voter registration lists — on even the most basic question as to whether states or counties should be in charge.



Commissioner Robert Mosbacher
(American University Photo/Wilford Harewood)

In addition to statewide registration systems and provisional ballots, HAVA requires that states insist on voter identification only when a person has registered by mail for the first time in a federal election. This provision, like the others, was implemented very differently across the country, with some areas not even applying the minimum requirement. Since HAVA, an increasing number of states have insisted on stringent, though very different, ID requirements for all voters. This, in turn, has caused concern that such requirements could erect a new barrier to voting for people who do not have the requisite identification card. Georgia, for example, introduced a new law in July 2005 that requires all voters to show a government-issued photo ID at the polls.

Although there are 159 counties, only 56 locations in the entire state issue such IDs, and citizens must either pay a fee for the ID or declare indigence.

While states will retain principal responsibility for the conduct of elections, greater uniformity in procedures for voter registration and identification is essential to guarantee the free exercise of the vote by all U.S. citizens. The EAC should facilitate greater uniformity in voter registration and identification procedures and should be empowered to do so by granting and withholding federal funds to the states. If Congress does not appropriate the funds, then we recommend that it amend the law to require uniformity of standards.

## 2.1 UNIFORMITY WITHIN STATES — TOP-DOWN REGISTRATION SYSTEMS

A complete, accurate, and current voter roll is essential to ensure that every eligible citizen who wants to vote can do so, that individuals who are ineligible cannot vote, and that citizens cannot vote more than once in the same election. A voter registration list must contain all eligible voters (including new registrants) and must contain correct information concerning the voter's identity and residence.

Incomplete or inaccurate registration lists lie at the root of most problems encountered in U.S. elections. When a voter list omits the names of citizens who believe they properly registered or contains incorrect or out-of-date information on registered voters, eligible citizens often are denied the right to vote. Invalid voter files, which contain ineligible, duplicate, fictional, or deceased voters, are an invitation to fraud.



Commissioner Benjamin Ladner
(American University Photo/Jeff Watts)

One reason for flawed lists is decentralized management. Local authorities often fail to delete the names of voters who move from one jurisdiction to another, and thus the lists are often inflated. For this reason, the Carter-Ford National Commission on Federal Election Reform recommended the creation of statewide voter registration systems, and this recommendation was codified into law in HAVA.

HAVA requires each state to create a "single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the state level." But states have not carried out this requirement in a consistent manner. Some are creating a "top-down" voter registration system, in which local election authorities supply information to a unified database maintained by the state. Others rely on a "bottom-up" system, whereby counties and municipalities retain their own registration lists and submit information to a state compilation of local databases at regular intervals. Top-down databases typically deliver information in real time — counties can see changes from other localities as these changes are made to the voter list. Bottom-up systems may continue

TX_00001871
JA_004630

TX_00001871

the problems that gave rise to flawed registration lists — i.e., counties retain control of the lists. Counties might not delete the names of voters who move or might not add the names of voters who register at motor vehicle bureaus or other state agencies under the National Voter Registration Act (NVRA or "Motor Voter"). Thus, the statewide lists might be different from the controlling county lists. Having two inconsistent voter lists is like a person with two watches who never knows what time it is. It is essential to have a single, accurate, current voter list.



Commissioners Kay Coles James and Raul Yzaguirre
(American University Photo/Wilford Harewood)

As of June 2005, 38 states were establishing top-down voter registration systems. The remaining states were either (a) building bottom-up systems; or (b) creating systems with both top-down and bottom-up elements. Three states had not finalized plans.[7] The EAC, in its interpretation of the HAVA requirement on statewide voter databases, expressed a preference for top-down systems for voter registration but did not insist on it and did not rule out bottom-up systems.

In the judgment of our Commission, bottom-up systems are not capable of providing a complete, accurate, current, and valid voter registration list. They are ineffective in removing duplicate registrations of individuals who move from one county to another and in coordinating with databases of other state agencies. Even in the best of circumstances, with excellent cooperation and interaction between states and counties — an unlikely scenario with the bottom-up system — there will be a time lag in updating voter files in a bottom-up system. This time lag could be particularly harmful in the period approaching the deadline for voters to register.

---

### Recommendation on Uniformity Within States

**2.1.1** The Commission recommends that states be required to establish unified, top-down voter registration systems, whereby the state election office has clear authority to register voters and maintain the registration list. Counties and municipalities should assist the state with voter registration, rather than have the state assist the localities. Moreover, Congress should appropriate funds for disbursement by the U.S. Election Assistance Commission (EAC) to states to complete top-down voter registration systems.

---

## 2.2  INTEROPERABILITY AMONG STATES

Interoperable state voter databases are needed to facilitate updates in the registration of voters who move to another state and to eliminate duplicate registrations, which are a source of potential fraud. Approximately 9 million people move to another state or abroad each year, or about one in eight Americans between each presidential election. Such interoperability is possible because state voter databases that are centralized can be made to communicate with each other.

The limited information available on duplicate registrations indicates that a substantial number of Americans are registered to vote in two different states. According to news reports, Florida has more than 140,000 voters who apparently are registered in four other states (in Georgia, Ohio, New York, and North Carolina).[8] This includes almost 46,000 voters from New York City alone who are registered to vote in Florida as well. Voting records of the 2000 elections appear to indicate that more than 2,000 people voted in two states. Duplicate registrations are also seen elsewhere. As many as 60,000 voters are reportedly registered in both North Carolina and South Carolina.[9]

Current procedures for updating the registration of voters who move to another state are weak or nonexistent. When people register to vote, they are usually asked to provide their prior address, so that the jurisdiction where they lived can be notified to delete their names from the voter list. Such notification, however, often does not occur. When a voter moves from Virginia to Illinois, for example, a four-step process is required to update voter registration: (1) election authorities in Illinois must ask for prior address; (2) the voter must provide prior address; (3) Illinois election authorities must notify the correct election authorities in Virginia; and (4) Virginia election authorities must remove the voter from its list. Unless all four steps are taken, this voter will remain on the voter list in Virginia. In fact, states often fail to share data or notify each other of voters who move. As a result, a substantial number of Americans are registered to vote in more than one state.



From left to right, Ken Smukler, Michael Alvarez, Paula Hawthorn, and Robert Stein at the June 30 hearing (Rice University Photo/Jeff Fitlow)

Duplicate registrations have accumulated over the years not just because there are no systems to remove them other than the one described above, but also because people who own homes in two states can register to vote in both places. In fact, when 1,700 voters who were registered in both New York and Florida requested absentee ballots to be mailed to their home in the other state, no one ever bothered to investigate.[10]

Interoperability among state voter databases is needed to identify and remove duplicate registrations of citizens who are registered to vote in more than one state. To make the state voter databases interoperable, the Commission recommends the introduction of a uniform template, shared voter data, and a system to transfer voter data across states.[11]

The template will define a common set of voter data that all states will collect in their voter databases and will share with each other. This set of data will consist of each person's full legal name, date and place of birth, signature captured as a digital image, and Social Security number. The signature is needed to confirm the identity of voters who vote by mail.

Under HAVA, voter databases need a "unique identifier," which is a number used to distinguish each individual, particularly those with the same or similar names. Some states use the driver's license number as the unique identifier for voter registration. In other states, the unique identifier is the Social Security number. Efforts to match voter registrations in states that use different identifiers are complicated and may fail. Take, for example, the problem of figuring out whether Paul Smith in Michigan is the same person as Paul Smith in Kentucky. Since the unique identifier for voter registration is the driver's license number in Michigan but the Social Security number in Kentucky, an accurate match of the two registered Paul Smiths is not likely. Any match will need to rely on Paul Smith's date of birth to estimate, based on some level of probability, whether the Paul Smith in each state is the same person or not.

To make different state voter databases interoperable, therefore, they must use the same unique identifier, and this identifier must distinguish each American from every other voter in the country. The state voter databases will need to use a nationwide identifier. Since the same driver's license number might be used in different states, the Social Security number provides the most feasible option for a federal unique identifier.

While the use of Social Security numbers for voter registration raises concerns about privacy, these concerns can be adequately addressed by the measures the Commission recommends to ensure the security of voter databases. The Commission stresses the importance for states to allow only authorized election officials to use the Social Security numbers. States should not provide Social Security numbers in the voter lists they release to candidates, political parties, or anyone else. This should not be hard to do. Forty-nine states collect Social Security numbers for driver's licenses,[12] and they have protected the privacy of the Social Security numbers.



Commissioners Jack Nelson, Ralph Munro, and Spencer Overton (American University Photo/Wilford Harewood)

Congress should direct that all states use the same unique identifier — i.e., the voter's Social Security number — and template, but a new system will also be needed to share data on voters among states. Such a system should maintain a uniform state voter list while allowing systematic updating of lists to take into account moves between states. The Commission proposes using a model similar to the one supervised by the U.S. Department of Transportation (DOT) to make sure that commercial drivers have only one license. The Commercial Driver's License Information System (CDLIS) shares data among states on commercial driver's licenses, using a "distributed database" — a collection of 51 databases (the 50 states and Washington, D.C.) that are linked to each other. When state officials want to check a particular driver's record, they go to the central site, which then connects them to the database of the state that issued a commercial license to that particular driver. Since all of the state databases are inter-connected, an update in one state database is immediately available to all other states. CDLIS is operated by the American Association of Motor Vehicle Administrators under the supervision of the U.S. Department of Transportation.

Similarly, our Commission recommends a "distributed database" that will connect all states' registration lists. The creation of a computerized system to transfer voter data between states is entirely feasible. This system could be managed either by the EAC or by an interstate compact or association of state officials under EAC supervision.

Implementation of the Commission's recommendation on cross-state interoperability of voter databases will require state election authorities to collect Social Security numbers and digital images of signatures for all registered voters. While many states use the driver's license number as their unique identifier, they can collect Social Security numbers from their state's department of motor vehicles (a Social Security number is required by 49 states to issue a driver's license).[13]



Commissioner Nelson Lund with Commission
Co-Chair James A. Baker, III (American University
Photo/Wilford Harewood)

We recommend that the EAC oversee the adoption of the template for voter data and for assisting states in the creation of a new system to share voter data among states, including for setting up a distributed database.

Congress should appropriate federal funds to complete top-down state voter databases, cover the costs of adding Social Security numbers and digital images of signatures to the databases, and create and maintain the federal distributed database system for sharing voter data among states. Congress should provide these funds to the EAC for distribution to states that adopt the uniform template for voter data and join the system for data sharing. Federal funds would be withheld from states that do not make their voter files interoperable with the voter databases of other states.

As states make their voter databases interoperable, they will retain full control over their registration lists. They will only need to add to their current databases the voter data required to complete the uniform template.

Two additional innovations might help to eliminate registration problems that voters have encountered. First, voters should have an opportunity during the registration process and before Election Day to review the registration online list to see whether their name is correctly inscribed and to check their proper precinct for voting.[14] Whenever an error is discovered, voters should notify the statewide registration office to correct it, and every statewide registration office should have procedures in place to correct such an error in a timely manner. Second, precincts should have an "electronic poll-book" that connects them to the statewide registration list and allows them to locate the correct polling site for each voter. For those precincts that are small, lack the resources for such an instrument, or do not have online access, precinct officials should telephone to a neighboring jurisdiction to obtain the correct information. Poll workers should also have a dedicated phone number to contact local election officials in case assistance is needed. This phone number should be different from the number provided to the public. Too often, poll workers cannot connect with election officials when assistance is needed because public phone lines are overwhelmed.

The entire system should permit state-of-the-art, computer-based registration lists that will be accurate and up-to-date for the entire nation.

## Recommendations on Interoperability Among States

**2.2.1**   In order to assure that lists take account of citizens moving from one state to another, voter databases should be made interoperable between states. This would serve to eliminate duplicate registrations, which are a source of potential fraud.

**2.2.2**   In order to assist the states in creating voter databases that are interoperable across states, the EAC should introduce a template for shared data and a format for cross-state data transfers. This template should include a person's full legal name, date and place of birth, signature (captured as a digital image), and Social Security number.

**2.2.3**   With assistance and supervision by the EAC, a distributed database system should be established to make sure that the state lists remain current and accurate to take into account citizens moving between states. Congress should also pass a law mandating that states cooperate with this system to ensure that citizens do not vote in two states.

**2.2.4**   Congress should amend HAVA to mandate the interoperability of statewide registration lists. Federal funds should be appropriated for distribution by the EAC to states that make their voter databases interoperable, and the EAC should withhold federal funds from states that fail to do so. The law should also provide for enforcement of this requirement.

**2.2.5**   With proper safeguards for personal security, states should allow citizens to verify and correct the registration lists' information on themselves up to 30 days before the election. States should also provide "electronic poll-books" to allow precinct officials to identify the correct polling site for voters.

**2.2.6**   With interoperability, citizens should need to register only once in their lifetime and updating their registration will be facilitated when they move.

## 2.3   PROVISIONAL BALLOTS

Because of flaws in registration lists and other election administration procedures, HAVA mandated that any eligible voter who appears at the polls must be given a provisional ballot if his or her name does not appear on the voter registration list or an election official asserts that the individual is not eligible to vote. November 2, 2004, marked the first time that all states were supposed to offer provisional ballots in a general election. Out of 1.6 million provisional ballots cast, more than one million were counted.[15] The 1.6 million provisional ballots do not include an unknown number of voters who were encouraged by poll workers to go to other polling sites where they might be registered.

Practices for offering and counting provisional ballots in the 2004 presidential election varied widely by state and by county. Around the country, the percentage of provisional ballots counted ranged from a national high in Alaska of 97 percent to a low of 6 percent in Delaware.[16]



Provisional ballots cast during the 2004 presidential election (AP Photo/Tony Dejak)

This was due in part to whether a state accepted a provisional ballot cast outside of a voter's home precinct. In other situations, provisional ballots were counted without first having been verified as eligible ballots.

If the recommendations for strengthening the registration lists are approved, the need for provisional ballots will be reduced. In 2004, provisional ballots were needed half as often in states with unified databases as in states without.[17] Nonetheless, in the absence of the reforms recommended by this Commission, or in the period before they come fully into effect, provisional balloting will continue to be a crucial safety net. During the interim, in order to reduce the chances that elections are litigated, we need consistent procedures for handling provisional ballots and full training for poll workers who carry out these procedures.

---

**Recommendations on Provisional Ballots**

**2.3.1** Voters should be informed of their right to cast a provisional ballot if their name does not appear on the voter roll, or if an election official asserts that the individual is not eligible to vote, but States should take additional and effective steps to inform voters as to the location of their precinct.

**2.3.2** States, not counties or municipalities, should establish uniform procedures for the verification and counting of provisional ballots, and that procedure should be applied uniformly throughout the State. Many members of the Commission recommend that a provisional ballot cast in the incorrect precinct but in the correct jurisdiction should be counted.

**2.3.3** Poll workers should be fully trained on the use of provisional ballots, and provisional ballots should be distinctly marked and segregated so they are not counted until the eligibility of the voter is determined.

---

## 2.4 COMMUNICATING REGISTRATION INFORMATION

The hotlines set up by nonprofit organizations to assist voters on Election Day received hundreds of thousands of calls (see Table 1 on page 17). Most of the callers had two simple questions: Am I registered to vote? And where do I go to vote? Answers to these questions, however, too often were difficult to obtain. Only nine state election Web sites were able to provide voters with their registration information or with the address of their polling site. Information was equally difficult to obtain from election offices by telephone. One Election Day hotline transferred callers to their county board of elections, but barely half of these calls were answered, and of the other half, few provided the information that was requested.[18]

Failure to provide voters with such basic information as their registration status and their polling site location raises a barrier to voting as significant as inconsistent procedures on provisional ballots or voter ID requirements. As states gain responsibility for voter registration, they will be well positioned to inform voters if they are listed in the voter files. The Web sites of local jurisdictions should allow voters to check whether they are registered and the location of their precinct. This precinct-locator feature should be added to state elections Web sites. In addition, information on how to register and where to vote should be disseminated in local media, on posted lists, and in other government offices, including welfare and social services agencies.

Since election officials may have difficulty responding to telephone calls on Election Day as they are conducting the election, states and local jurisdictions should encourage voters to inquire about their registration status and the location of their polling place considerably before Election Day.

| TABLE 1 : Voter Calls to the MYVOTE1 Hotline on Election Day 2004 | |
|---|---|
| Topic of Question or Complaint on Election Day 2004 | Percent of Total |
| Registration Issues/Poll Access | 43.9% |
| Absentee Voting | 24.2% |
| Coercion/Intimidation | 4.9% |
| Mechanical | 4.5% |
| Identification | 2.5% |
| Provisional Ballots | 1.9% |
| Ballot/Screen | 1.3% |
| Other | 16.8% |
| TOTAL | 100.0% |

**NOTES:** Totals are based upon an analysis of 55,000 phone calls to the MYVOTE1 hotline on November 2, 2004. Two major, nonpartisan hotlines and the U.S. Election Assistance Commission received a total of approximately 255,000 voter calls on Election Day 2004.

**SOURCES:** Testimony before the Commission on Federal Election Reform by Ken Smukler, President of Info Voter Technologies, on June 30, 2005; Testimony before the U.S. House of Representatives Administration Committee by the U.S. Election Assistance Commission, on February 9, 2005.

---

### Recommendation on Communicating Registration Information

**2.4.1** States and local jurisdictions should use Web sites, toll-free numbers, and other means to answer questions from citizens as to whether they are registered and, if so, what is the location of their precinct, and if they are not registered, how they can do so before the deadline.

TX_00001878

## 2.5  VOTER IDENTIFICATION

A good registration list will ensure that citizens are only registered in one place, but election officials still need to make sure that the person arriving at a polling site is the same one that is named on the registration list. In the old days and in small towns where everyone knows each other, voters did not need to identify themselves. But in the United States, where 40 million people move each year, and in urban areas where some people do not even know the people living in their own apartment building let alone their precinct, some form of identification is needed.

There is no evidence of extensive fraud in U.S. elections or of multiple voting, but both occur, and it could affect the outcome of a close election.[19] The electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters. Photo IDs currently are needed to board a plane, enter federal buildings, and cash a check. Voting is equally important.



Commissioner Lee Hamilton
(American University Photo/Wilford Harewood)

The voter identification requirements introduced by HAVA are modest. HAVA requires only first-time voters who register by mail to show an ID, and they can choose from a number of different types of identification. States are encouraged to allow an expansive list of acceptable IDs, including those without a photograph, such as utility bills or government checks. These requirements were not implemented in a uniform manner and, in some cases, not at all. After HAVA was enacted, efforts grew in the states to strengthen voter identification requirements. While 11 states required voter ID in 2001, 24 states now require voters to present an ID at the polls.[20] In addition, bills to introduce or strengthen voter ID requirements are under consideration in 12 other states.[21]

Our Commission is concerned that the different approaches to identification cards might prove to be a serious impediment to voting. There are two broad alternatives to this decentralized and unequal approach to identification cards. First, we could recommend eliminating any requirements for an ID because the evidence of multiple voting is thin, and ID requirements, as some have argued, are "a solution in search of a problem." Alternatively, we could recommend a single national voting identification card. We considered but rejected both alternatives.

We rejected the first option — eliminating any requirements — because we believe that citizens should identify themselves as the correct person on the registration list when they vote. While the Commission is divided on the magnitude of voter fraud — with some believing the problem is widespread and others believing that it is minor — there is no doubt that it occurs. The problem, however, is not the magnitude of the fraud. In close or disputed elections, and there are many, a small amount of fraud could make the margin of difference. And second, the perception of possible fraud contributes to low confidence in the system. A good ID system could deter, detect, or eliminate several potential avenues of fraud— such as multiple voting or voting by individuals using the identities of others or

TX_00001879
JA_004638

TX_00001879

those who are deceased — and thus it can enhance confidence. We view the other concerns about IDs — that they could disenfranchise eligible voters, have an adverse effect on minorities, or be used to monitor behavior — as serious and legitimate, and our proposal below aims to address each concern.

We rejected the second option of a national voting identification card because of the expense and our judgment that if these cards were only used for each election, voters would forget or lose them.

We therefore propose an alternative path. Instead of creating a new card, the Commission recommends that states use "REAL ID" cards for voting purposes. The REAL ID Act, signed into law in May 2005, requires states to verify each individual's full legal name, date of birth, address, Social Security number, and U.S. citizenship before the individual is issued a driver's license or personal ID card. The REAL ID is a logical vehicle because the National Voter Registration Act established a connection between obtaining a driver's license and registering to vote. The REAL ID card adds two critical elements for voting — proof of citizenship and verification by using the full Social Security number.



Former Atlanta Mayor Andrew Young addresses the Commission on August 30 at The Carter Center (American University Photo/Wilford Harewood)

The REAL ID Act does not require that the card indicates citizenship, but that would need to be done if the card is to be used for voting purposes. In addition, state bureaus of motor vehicles should automatically send the information to the state's bureau of elections. (With the National Voter Registration Act, state bureaus of motor vehicles ask drivers if they want to register to vote and send the information only if the answer is affirmative.)

Reliance on REAL ID, however, is not enough. Voters who do not drive,[22] including older citizens, should have the opportunity to register to vote and receive a voter ID. Where they will need identification for voting, IDs should be easily available and issued free of charge. States would make their own decision whether to use REAL ID for voting purposes or instead to rely on a template form of voter ID. Each state would also decide whether to require voters to present an ID at the polls, but our Commission recommends that states use the REAL ID and/or an EAC template for voting, which would be a REAL ID card without reference to a driver's license.

For the next two federal elections, until January 1, 2010, in states that require voters to present ID at the polls, voters who fail to do so should nonetheless be allowed to cast a provisional ballot, and their ballot would count if their signature is verified. After the REAL ID is phased in, i.e., after January 1, 2010, voters without a valid photo ID, meaning a REAL ID or an EAC-template ID, could cast a provisional ballot, but they would have to return personally to the appropriate election office within 48 hours with a valid photo ID for their vote to be counted.

TX_00001880

To verify the identity of voters who cast absentee ballots, the voter's signature on the absentee ballot can be matched with a digitized version of the signature that the election administrator maintains. While such signature matches are usually done, they should be done consistently in all cases, so that election officials can verify the identity of every new registrant who casts an absentee ballot.

The introduction of voter ID requirements has raised concerns that they may present a barrier to voting, particularly by traditionally marginalized groups, such as the poor and minorities, some of whom lack a government-issued photo ID. They may also create obstacles for highly mobile groups of citizens. Part of these concerns are addressed by assuring that government-issued photo identification is available without expense to any citizen and, second, by government efforts to ensure that all voters are provided convenient opportunities to obtain a REAL ID or EAC-template ID card. As explained in Section 4.1, the Commission recommends that states play an affirmative role in reaching out with mobile offices to individuals who do not have a driver's license or other government-issued photo ID to help them register to vote and obtain an ID card.



Commissioners David Leebron, Betty Castor, and Tom Phillips (American University Photo/Wilford Harewood)

There are also longstanding concerns voiced by some Americans that national identification cards might be a step toward a police state. On that note, it is worth recalling that most advanced democracies have fraud-proof voting or national ID cards, and their democracies remain strong. Still, these concerns about the privacy and security of the card require additional steps to protect against potential abuse. We propose two approaches. First, new institutional and procedural safeguards should be established to assure people that their privacy, security, and identity will not be compromised by ID cards. The cards should not become instruments for monitoring behavior. Second, certain groups may see the ID cards as an obstacle to voting, so the government needs to take additional measures to register voters and provide ID cards.

The needed measures would consist of legal protections, strict procedures for managing voter data, and creation of ombudsman institutions. The legal protections would prohibit any commercial use of voter data and impose penalties for abuse. The data-management procedures would include background checks on all officials with access to voter data and requirements to notify individuals who are removed from the voter registration list. The establishment of ombudsman institutions at the state level would assist individuals to redress any cases of abuse. The ombudsman would be charged with assisting voters to overcome bureaucratic mistakes and hurdles and respond to citizen complaints about the misuse of data.

TX_00001881
JA_004640

TX_00001881

The Commission's recommended approach to voter ID may need to adapt to changes in national policy in the future. Since the attacks of September 11, 2001, concerns about homeland security have led to new policies on personal identification. Under a presidential directive, about 40 million Americans who work for or contract with the federal government are being issued ID cards with biometrics, and the REAL ID card may very well become the principal identification card in the country. Driven by security concerns, our country may already be headed toward a national identity card. In the event that a national identity card is introduced, our Commission recommends that it be used for voting purposes as well.

---

## Recommendations on Voter Identification

**2.5.1**  To ensure that persons presenting themselves at the polling place are the ones on the registration list, the Commission recommends that states require voters to use the REAL ID card, which was mandated in a law signed by the President in May 2005. The card includes a person's full legal name, date of birth, a signature (captured as a digital image), a photograph, and the person's Social Security number. This card should be modestly adapted for voting purposes to indicate on the front or back whether the individual is a U.S. citizen. States should provide an EAC-template ID with a photo to non-drivers free of charge.

**2.5.2**  The right to vote is a vital component of U.S. citizenship, and all states should use their best efforts to obtain proof of citizenship before registering voters.

**2.5.3**  We recommend that until January 1, 2010, states allow voters without a valid photo ID card (Real or EAC-template ID) to vote, using a provisional ballot by signing an affidavit under penalty of perjury. The signature would then be matched with the digital image of the voter's signature on file in the voter registration database, and if the match is positive, the provisional ballot should be counted. Such a signature match would in effect be the same procedure used to verify the identity of voters who cast absentee ballots. After January 1, 2010, voters who do not have their valid photo ID could vote, but their ballot would only count if they returned to the appropriate election office within 48 hours with a valid photo ID.

**2.5.4**  To address concerns about the abuse of ID cards, or the fear that it could be an obstacle to voting, states should establish legal protections to prohibit any commercial use of voter data and ombudsman institutions to respond expeditiously to any citizen complaints about the misuse of data or about mistaken purges of registration lists based on interstate matching or statewide updating.

**2.5.5**  In the event that Congress mandates a national identification card, it should include information related to voting and be connected to voter registration.

## 2.6 QUALITY IN VOTER REGISTRATION LISTS

Voter registration lists provide the basis for determining who is qualified to vote. Yet only a few states, notably Oregon and North Carolina, have assessed the quality of their lists, or have developed plans to do so. This is also true as states rush to complete statewide voter databases before the January 1, 2006, deadline. Moreover, the EAC does not assess the quality of voter files.

The little information available on the quality of voter files is not reassuring. The creation of statewide voter databases allows for the elimination of duplicate registrations within states, but attempts to match voter files with records of other state agencies are often ineffective. Death records, for example, sometimes are not provided to election officials for three or four months, and information on felons is usually incomplete.[23] Comparison with U.S. Census Bureau statistics also points to extensive "deadwood" on the voter registration lists. Some states have a large portion of inactive voters on their voter registration lists. One in four registered voters in Oregon is inactive, as is one in every three registered voters in California.[24] There also are numerous jurisdictions, such as Alaska, where the number of registered voters is greater than the number of voting-aged citizens.[25] These jurisdictions clearly have not updated their voter registration lists by removing the names of voters who have died or have moved away.



An elections clerk in Detroit gives a voter an absentee ballot after verifying her registration status (AP Photo/Carlos Osorio)

Voter registration lists are often inflated by the inclusion of citizens who have moved out of state but remain on the lists. Moreover, under the National Voter Registration Act, names are often added to the list, but counties and municipalities often do not delete the names of those who moved. Inflated voter lists are also caused by phony registrations and efforts to register individuals who are ineligible. Registration forms in the names of comic figures, for example, were submitted in Ohio in 2004. At the same time, inaccurate purges of voter lists have removed citizens who are eligible and are properly registered.

From what little is known, the quality of voter registration lists probably varies widely by state. Without quality assurance, however, cross-state transfers of voter data may suffer from the problem of "garbage in, garbage out." They may pass on inaccurate data from certain states to the rest of the country. The overall quality of a system to share voter data among states will only be a strong as the quality of the worst state voter database.

Each state needs to audit its voter registration files to determine the extent to which they are accurate (with correct and current information on individuals), complete (including all eligible voters), valid (excluding ineligible voters), and secure (with protections against unauthorized use). This can be done by matching voter files with records in other state agency databases in a regular and timely manner, contacting individuals when the matches are inconclusive, and conducting survey research to estimate the number of voters who believe they are registered but who are not in fact listed in the voter files. Other countries regularly conduct such audits.[26]

TX_00001883
JA_004642

TX_00001883

Effective audits assess not only the quality of voter files but also the procedures used to update, maintain, and verify data and to ensure security of voter databases. To assure continual quality of voter databases, effective procedures are needed to maintain up-to-date lists of eligible voters, verify the accuracy of those lists, and remove voters who have become ineligible. These should include procedures to delete those who have moved out of state and to effectively match voter files with records of driver's licenses, deaths, and felons. Given the controversial "purges" that have occurred, special care must be taken to update the lists in a fair and transparent manner. States should adopt uniform procedures and strong safeguards against incorrect removal of eligible voters. Every removal should be double-checked before it is executed, and a record should be kept of every action. The process of updating the lists should be continuous, and before each statewide election the voter rolls should be audited for accuracy.

In addition, states need to assure the privacy and security of voter files. There is no justification for states to release voter files for commercial purposes. However, components of voter files should remain public documents subject to public scrutiny. States must carefully balance the right to privacy of registered citizens with the need for transparency in elections when they decide what information on voter registration to make available to the public. Procedures are also needed to protect voter files against tampering or abuse. This might be done by setting up the voter database to make an automatic record of all changes to the voter files, including a record of who made the changes and when.

---

### Recommendations on Quality in Voter Registration Lists

**2.6.1**  States need to effectively maintain and update their voter registration lists. The EAC should provide voluntary guidelines to the states for quality audits to test voter registration databases for accuracy (correct and up-to-date information on individuals), completeness (inclusion of all eligible voters), and security (protection against unauthorized access). When an eligible voter moves from one state to another, the state to which the voter is moving should be required to notify the state which the voter is leaving to eliminate that voter from its registration list.

**2.6.2**  All states should have procedures for maintaining accurate lists such as electronic matching of death records, drivers licenses, local tax rolls, and felon records.

**2.6.3**  Federal and state courts should provide state election offices with the lists of individuals who declare they are non-citizens when they are summoned for jury duty.

**2.6.4**  In a manner that is consistent with the National Voter Registration Act, states should make their best efforts to remove inactive voters from the voter registration lists. States should follow uniform and strict procedures for removal of names from voter registration lists and should adopt strong safeguards against incorrect removal of eligible voters. All removals of names from voter registration lists should be double-checked.

**2.6.5**  Local jurisdictions should track and document all changes to their computer databases, including the names of those who make the changes.

---



(AP Photo/Rich Pedroncelli)

# 3. Voting Technology

The Help America Vote Act of 2002 authorized up to $650 million in federal funds to replace antiquated voting machines throughout the country. States are using these funds and their own resources to upgrade voting technology, generally to replace punch card and lever voting machines with new optical scan and electronic voting systems. As a result, voting technology is improving,[27] but new concerns related to electronic voting systems have arisen. These concerns need to be addressed, because it is vital to the electoral process that citizens have confidence that voting technologies are registering and tabulating votes accurately.

## 3.1   VOTING MACHINES

The purpose of voting technology is to record and tally all votes accurately and to provide sufficient evidence to assure all participants — especially the losing candidates and their supporters — that the election result accurately reflects the will of the voters.

Voting machines must be both accessible and transparent. As required by HAVA, the machines must be accessible to language minorities and citizens with disabilities, including the blind and visually impaired citizens, in a manner that allows for privacy and independence. Voting machines must also be transparent. They must allow for recounts and for audits, and thereby give voters confidence in the accuracy of the vote tallies.

Two current technology systems are optical scan and direct recording electronic (DRE) systems. Optical scan systems rely on preprinted paper ballots that are marked by the voter, like the ovals students fill in with a No. 2 pencil on a standardized exam, and then are run through an optical scan machine that determines and tallies the votes. Such systems provide transparency because the paper ballots can be recounted and audited by hand. Under HAVA, all aspects of the voting system, including the production of audit trail information, must be accessible to voters with disabilities.

DRE machines present voters with their choices on a computer screen, and voters choose by touching the screen or turning a dial. The vote is then recorded electronically, usually without ballot paper. DREs make up a growing share of voting equipment. Nearly 30 percent of voters live in jurisdictions that use DREs, compared to 17 percent in the 2000 election (see Table 2 on page 27).[28] DREs allow voters with disabilities to use audio prompts to cast ballots privately and independently, and they facilitate voting by non-English speakers by offering displays of the ballot in different languages. DREs also provide greater accuracy in recording votes, in part by preventing over-votes, whereby people mistakenly vote for more than one candidate, and by discouraging accidental under-votes by reminding voters when they overlooked one or more races.

The accessibility and accuracy of DREs, however, are offset by a lack of transparency, which has raised concerns about security and verifiability. In most of the DREs used in 2004, voters could not check that their ballot was recorded correctly. Some DREs had no capacity for an independent recount. And, of course, DREs are computers, and computers malfunction. A malfunction of DREs in Carteret County, North Carolina, in the November 2004 elections caused the loss of more than 4,400 votes. There was no backup record of the votes that were cast. As a result, Carteret County had no choice but to rerun

the election, after which it abandoned its DREs. Other jurisdictions have lost votes because election officials did not properly set up voting machines.[29]

To provide backup records of votes cast on DREs, HAVA requires that all voting machines produce a "permanent paper record with a manual audit capacity." This requirement is generally interpreted to mean that each machine must record individual ballot images, so that they can be printed out and examined in the event of a disputed result or of a recount. This will make DREs somewhat more transparent, but it is still insufficient to fully restore confidence.

One way to instill greater confidence that DREs are properly recording votes is to require a paper record of the ballot that the voter can verify before the ballot is cast. Such a paper record, known as a voter-verifiable paper audit trail (VVPAT), allows the voter to check that his or her vote was recorded as it was intended.

Because voter-verifiable paper audit trails can permit recounts, audits, and a backup in case of a malfunction, there is a growing demand for such paper trails. As of early August 2005, 25 states required voter-verifiable paper ballots, and another 14 states had proposed legislation with such a requirement.[30]

Since very few of the DREs in use today are equipped to print voter-verifiable paper audit trails, certain bills before Congress would require election authorities to "retrofit" DREs with such printers. In 2004, DREs with voter-verifiable paper audit trails were used only in Nevada. They appear to have worked well.[31] When Nevadans went to the polls and made their selection, a paper record of their vote was printed behind a glass cover on a paper roll, like the roll of paper in a cash register. Voters were able to view the paper record and thereby check that their vote was recorded accurately before they cast their ballot. The paper record was saved in the machine and thus was available for later use in recounts or audits. After the 2004 elections, Nevada election officials conducted an internal audit, which confirmed the accuracy of the votes recorded by the DREs. While less than one in three Nevada voters reportedly looked at the paper record of their ballot, these voters had the opportunity to confirm their vote, and the paper allowed a chance to verify the computer tallies after the election.

While HAVA already requires that all precincts be equipped with at least one piece of voting equipment that is fully accessible to voters with disabilities for use in federal elections by January 1, 2006, must be accessible to voters with disabilities, the Commission believes that transparency in voting machines should also be assured in time for the 2008 presidential election. With regard to current technology, states will need to use either DREs with a voter-verifiable paper audit trail and an audio prompt for blind voters or optical scan voting systems with at least one computer-assisted marking device for voters with disabilities to mark their ballot. To ensure implementation of this requirement, Congress will need to appropriate sufficient funds to cover the costs of either retrofitting DREs with voter-verifiable paper audit trails or purchasing a computer-assisted marking device for each polling place that uses optical scan voting systems.

Concerns have been raised that the printers could malfunction just as computers do. Of course, the previous ballot papers will be available, and the operators will know when the printers fail. Still, precincts should have backup printers for that contingency. A second concern is that the length of the ballot in some areas — such as California, which frequently

TX_00001887
JA_004646

TX_00001887

has referenda — would require paper trails that would be several feet long. In the case of non-federal races, state law would determine whether the non-federal portion of the ballot would similarly be required to provide a voter-verified paper audit trail. That is not a perfect solution, but it is still better than having no paper backup at all.

The standards for voting systems, set by the EAC, should assure both accessibility and transparency in all voting machines. Because these standards usually guide the decisions of voting machine manufacturers, the manufacturers should be encouraged to build machines in the future that are both accessible and transparent and are fully capable of meeting the needs of Americans with disabilities, of allowing voters to verify their ballots, and of providing for independent audits of election results.

| TABLE 2: Types of Voting Equipment Used in Recent Presidential Elections | | |
|---|---|---|
| Type of Voting Equipment | Registered Voters in 2000 (by percentage) | Registered Voters in 2004 (by percentage) |
| Punch Card | 27.9% | 12.4% |
| Lever | 17.0% | 14.0% |
| Paper Ballots | 1.3% | 0.7% |
| DataVote | 2.8% | 1.3% |
| Optical Scan | 29.5% | 34.9% |
| Electronic | 12.6% | 29.4% |
| Mixed | 8.9% | 7.4% |
| TOTAL | 100.0% | 100.0% |

SOURCE: Election Data Services, Voting Equipment Summary by Type, 2004.  Election Data Services, New Study Shows 50 Million Voters Will Use Electronic Voting Systems, 32 with Punch Cards in 2004.

### Recommendations on Voting Machines

3.1.1  Congress should pass a law requiring that all voting machines be equipped with a voter-verifiable paper audit trail and, consistent with HAVA, be fully accessible to voters with disabilities. This is especially important for direct recording electronic (DRE) machines for four reasons: (a) to increase citizens' confidence that their vote will be counted accurately, (b) to allow for a recount, (c) to provide a backup in cases of loss of votes due to computer malfunction, and (d) to test — through a random selection of machines — whether the paper result is the same as the electronic result. Federal funds should be appropriated to the EAC to transfer to the states to implement this law. While paper trails and ballots currently provide the only means to meet the Commission's recommended standards for transparency, new technologies may do so more effectively in the future. The Commission therefore urges research and development of new technologies to enhance transparency, security, and auditability of voting systems.

3.1.2  States should adopt unambiguous procedures to reconcile any disparity between the electronic ballot tally and the paper ballot tally. The Commission strongly recommends that states determine well in advance of elections which will be the ballot of record.

## 3.2  AUDITS

While voter-verifiable paper ballots will contribute to strengthening public confidence in DREs, regular audits of voting machines are also needed to double-check the accuracy of the machines' vote tallies. Such audits were required by law in 10 states as of mid-August 2005.[32] To carry out such audits, election officials would randomly select a sample of voting machines and compare the vote total recorded by the machines with the vote total on the paper ballots. The audits would test the reliability of voting machines and identify problems, often before a close or disputed election takes place. This, in turn, would encourage both suppliers and election officials to effectively maintain voting machines.

Some concern has been expressed about the possibility of manipulation of paper audit trails.[33] If DREs can be manipulated to alter the vote tallies, the same can be done with paper audit trails. Such manipulation can be detected and deterred by regular audits of voting machines. Regular audits should be done of all voting machines, including DREs and optical scan systems.

---

**Recommendation on Audits**

**3.2.1**  State and local election authorities should publicly test all types of voting machines before, during, and after Election Day and allow public observation of zero machine counts at the start of Election Day and the machine certification process.

---

## 3.3  SECURITY FOR VOTING SYSTEMS

DREs run on software that can be compromised. DRE software may get attacked or hacked by outsiders, perhaps through the Internet. As experience in computer security shows, it is often difficult to defend against such attacks. Hackers often are creative and determined, and voting systems provide a tempting target. However, while some DREs send their results to election headquarters over the Internet, they are not connected to the Internet during voting.

The greater threat to most systems comes not from external hackers, but from insiders who have direct access to the machines. Software can be modified maliciously before being installed into individual voting machines. There is no reason to trust insiders in the election industry any more than in other industries, such as gambling, where sophisticated insider fraud has occurred despite extraordinary measures to prevent it. Software can also be programmed incorrectly. This poses a likely threat when local programmers who lack the necessary skills nonetheless modify the ballot for local offices, and many might not have the sophistication required for the new machines.

In addition to the output of DREs, which can be verified through a paper audit trail, the inside process of programming DREs should be open to scrutiny by candidates, their supporters, independent experts, and other interested citizens, so that problems can be detected, deterred, or corrected, and so that the public will have confidence in the machines.

TX_00001889
JA_004648

TX_00001889

At the same time, manufacturers of voting machines have legitimate reason to keep their voting machine software and its source code proprietary. The public interest in transparency and the proprietary interests of manufacturers can be reconciled by placing the source code in escrow with the National Institute of Standards and Technology (NIST), and by making the source code available for inspection on a restricted basis to qualified individuals. NIST might make the source code available to recognized computer security experts at accredited universities and to experts acting on behalf of candidates or political parties under a nondisclosure agreement, which would bar them from making information about the source code public, though they could disclose security flaws or vulnerabilities in the voting system software.



Stanford University Professor David Dill at the April 18 hearing (American University Photo/Jeff Watts)

Doubt has been raised that some manufacturers of voting machines provide enough security in their systems to reduce the risk of being hacked. Such concerns were highlighted after a group of computer security experts examined a voting system source code that was accidentally left on the Internet.[34] Independent inspection of source codes would strengthen the security of voting systems software by encouraging manufacturers to improve voting system security. Expert reviews may also detect software design flaws or vulnerabilities. This, in turn, could bolster public confidence in the reliability of DREs to accurately record and tally the vote in elections.

In addition to the source codes, the software and the voting machines themselves are potentially vulnerable to manipulation. Security for voting systems should guard against attempts to tamper with software or individual voting machines. When voting machines are tested for certification, a digital fingerprint, also known as a "hash," of their software is often sent to NIST. Following the delivery of new voting machines, a local jurisdiction can compare the software on these machines to the digital fingerprint at NIST. This comparison either will identify changes made to the software before delivery or, if the software is unaltered, will confirm that the software on the individual machines meets the certified standards.

Once voting machines arrive at the local jurisdiction, election officials must take precautions to ensure security by restricting access to authorized personnel and by documenting access to the machines.

The process of testing and certifying voting machines is designed mainly to ensure their reliability. Testing and certification is conducted under EAC supervision, although some states require additional testing and certification. The state testing can make the process more rigorous, particularly when voting machines are field tested. When California conducted a mock election with new voting machines in July 2005, it found unacceptable rates of malfunctions that were not apparent in lab tests.[35]

No matter how secure voting machines are or how carefully they are used, they are liable to malfunction. To avoid a situation where a machine malfunction will cause a major disruption, local jurisdictions need to prepare for Election Day with a backup plan, including how the vendor will respond to a machine malfunction and what alternatives, including paper ballots, should be made available.

---

**Recommendations on Security for Voting Systems**

**3.3.1** The Independent Testing Authorities, under EAC supervision, should have responsibility for certifying the security of the source codes to protect against accidental or deliberate manipulation of vote results. In addition, a copy of the source codes should be put in escrow for future review by qualified experts. Manufacturers who are unwilling to submit their source codes for EAC-supervised testing and for review by independent experts should be prohibited from selling their voting machines.

**3.3.2** States and local jurisdictions should verify upon delivery of a voting machine that the system matches the system that was certified.

**3.3.3** Local jurisdictions should restrict access to voting equipment and document all access, as well as all changes to computer hardware or software.

**3.3.4** Local jurisdictions should have backup plans in case of equipment failure on Election Day.

---

## 3.4  INTERNET VOTING

The Internet has become such a pervasive influence on modern life that it is natural for the public and election officials to begin considering ways to use it to facilitate voting. The first binding Internet election for political office took place in 2000, when the Arizona Democratic Party used it during its primary. In 2004, the Michigan Democratic Party allowed voting by Internet during its caucuses. Meanwhile, Missouri announced that any member of the U.S. military serving in combat areas overseas could complete an absentee ballot for the general election and email a scanned copy to the Department of Defense, which then would forward it to the appropriate local election offices.

Despite these much-publicized trials, serious concerns have been raised about the push for a "digital democracy." In 2004, the Department of Defense cancelled its $22 million Secure Electronic and Voting Registration Experiment (SERVE) program designed to offer Internet voting during the presidential election to members of the U.S. military and other overseas citizens. The cancellation came after a group of top computer scientists who reviewed the system reported that without improved security, Internet voting is highly susceptible to fraud.

TX_00001891
JA_004650

TX_00001891

First, there are the issues of privacy and authentication. When using the Internet, one cannot assure voters that their ballot will remain secret. Second, the current system is not fully secure. Although data sent via the Internet can be encrypted and then decoded by local election administrators, hackers can compromise the system. This was the conclusion of the computer scientists who reviewed the SERVE program for the Pentagon. Due to security threats, some state and local election offices do not allow vote totals to be transmitted via the Internet. Third, no government or industry standards specifically apply to Internet voting technology. The EAC may begin developing such standards, but that work has not begun. Finally, Internet voting from homes and offices may not provide the same level of privacy as the voting booth.

To date, the most comprehensive study of Internet voting is contained in a 2001 report sponsored by the National Science Foundation.[36] This report urges further research and experimentation to deal with the problems posed by this form of voting. Its authors suggest that it will take at least a decade to examine the various security and authentication issues. Our Commission agrees that such experimentation is necessary, and that the time for Internet voting has not yet arrived.



Harris County (TX) election official Elsa Garcia, far right, demonstrates an electronic voting machine for Commissioners (l-r) Susan Molinari, Tom Daschle, and Betty Castor (Rice University Photo/Jeff Fitlow)



(AP Photo/Julia Cumes)

# 4. Expanding Access to Elections

The Commission believes that the vitality of America's democracy depends on the active participation of our citizens. Yet, even in the presidential election in 2004, when voter interest was higher than normal, more than one in three eligible voters did not participate. We need to do more to increase voter participation, and we have considered numerous methods. None of them will solve the problem, but we encourage states to experiment with alternatives to raise the level of voter participation.

Recent elections have seen a substantial increase in early voting and in voting by mail. While only 8 percent of ballots were cast before Election Day in 1994, by 2004 the percentage of ballots cast before Election Day had risen to 22 percent. This increase in early and convenience voting has had little impact on voter turnout, because citizens who vote early or vote by mail tend to vote anyway.[37] Early and convenience voting are popular, but there is little evidence that they will significantly expand participation in elections.[38]



Commissioner Rita DiMartino
(American University Photo/Wilford Harewood)

There are other measures that can be taken to expand participation, particularly for military and overseas voters and for citizens with disabilities. There is also much to do with regard to civic and voter education that could have a long-term and lasting effect, particularly on young people. However, we first need to reach out to all eligible voters and remove any impediments to their participation created by the registration process or by identification requirements.

All citizens, including citizens with disabilities, need to have access to polling places. Polling places should be located in public buildings and other semipublic venues such as churches and community centers that comply with the Americans with Disability Act (ADA). Additionally, polling places should be located and protected so that voters can participate free of intimidation and harassment. Polling places should not be located in a candidate's headquarters or in homes or business establishments that are not appropriately accessible to voters with disabilities.

## 4.1 ASSURED ACCESS TO ELECTIONS

The Commission's proposals for a new electoral system contain elements to assure the quality of the list and the integrity of the ballot. But to move beyond the debate between integrity and access, specific and important steps need to be taken to assure and improve access to voting.

States have a responsibility to make voter registration accessible by taking the initiative to reach out to citizens who are not registered, for instance by implementing provisions of the National Voter Registration Act that allow voter registration at social-service agencies or by conducting voter registration and REAL ID card drives with mobile offices. Michigan, for



A woman in St. Louis goes door-to-door soliciting new voter registrants for the 2004 election (AP Photo/Ron Edmonds)

example, uses a mobile office to provide a range of services, including driver's licenses and voter registration. This model should be extended to all the states.

Political party and nonpartisan voter registration drives generally contribute to the electoral process by generating interest in upcoming elections and expanding participation. However, they are occasionally abused. There were reports in 2004 that some party activists failed to deliver voter registration forms of citizens who expressed a preference for the opposing party. During the U.S. House Administration Committee hearings in Ohio, election officials reported being deluged with voter registration forms at the last minute before the registration deadline, making it difficult to process these registrations in a timely manner. Many of the registration forms delivered in October to election officials were actually collected in the spring.

Each state should therefore oversee political party and nonpartisan voter registration drives to ensure that they operate effectively, that registration forms are delivered promptly to election officials, that all completed registration forms are delivered to the election officials, and that none are "culled" and omitted according to the registrant's partisan affiliation. Measures should also be adopted to track and hold accountable those who are engaged in submitting fraudulent voter registrations. Such oversight might consist of training activists who conduct voter registration drives and tracking voter registration forms to make sure they are all accounted for. The tracking of voter registration forms will require better cooperation between the federal and state governments, perhaps through the EAC, as the federal government puts some registration forms online. In addition, states should apply a criminal penalty to any activist who deliberately fails to deliver a completed voter registration form.

---

### Recommendations on Assured Access to Elections

**4.1.1** States should undertake their best efforts to make voter registration and ID accessible and available to all eligible citizens, including Americans with disabilities. States should also remove all unfair impediments to voter registration by citizens who are eligible to vote.

**4.1.2** States should improve procedures for voter registration efforts that are not conducted by election officials, such as requiring state or local registration and training of any "voter registration drives."

**4.1.3** Because there have been reports that some people allegedly did not deliver registration forms of those who expressed a preference for another party, states need to take special precautions to assure that all voter registration forms are fully accounted for. A unique number should be printed on the registration form and also on a detachable receipt so that the voter and the state election office can track the status of the form.[31] In addition, voter registration forms should be returned within 14 days after they are signed.

TX_00001895

## 4.2  VOTE BY MAIL

A growing number of Americans vote by mail. Oregon moved entirely to a vote-by-mail system in 1998, and the practice of casting ballots by mail has continued to expand nationwide as voters and election officials seek alternatives to the traditional system of voting at polling stations. The state legislatures of California and of Washington state have considered legislation to expand the use of vote by mail, and in 24 states no excuse is required to vote absentee.

The impact of vote by mail is mixed. Proponents argue that vote by mail facilitates participation among groups that experience low voter turnout, such as elderly Americans and Native Americans.

While vote by mail appears to increase turnout for local elections, there is no evidence that it significantly expands participation in federal elections.[40] Moreover, it raises concerns about privacy, as citizens voting at home may come under pressure to vote for certain candidates, and it increases the risk of fraud. Oregon appears to have avoided significant fraud in its vote-by-mail elections by introducing safeguards to protect ballot integrity, including signature verification. Vote by mail is, however, likely to increase the risks of fraud and of contested elections in other states, where the population is more mobile, where there is some history of troubled elections, or where the safeguards for ballot integrity are weaker.



An Oregon voter drops off his mail ballot (AP Photo/Rick Bowmer)

The case of King County, Washington, is instructive. In the 2004 gubernatorial elections, when two in three ballots there were cast by mail, authorities lacked an effective system to track the number of ballots sent or returned. As a result, King County election officials were unable to account for all absentee ballots. Moreover, a number of provisional ballots were accepted without signature verification.[41] The failures to account for all absentee ballots and to verify signatures on provisional ballots became issues in the protracted litigation that followed Washington state's 2004 gubernatorial election.

Vote by mail is popular but not a panacea for declining participation. While there is little evidence of fraud in Oregon, where the entire state votes by mail, absentee balloting in other states has been one of the major sources of fraud. Even in Oregon, better precautions are needed to ensure that the return of ballots is not intercepted.

The evidence on "early" voting is similar to that of vote by mail. People like it, but it does not appear to increase voter participation, and there are some drawbacks. It allows a significant portion of voters to cast their ballot before they have all of the information that will become available to the rest of the electorate. Crucial information about candidates may emerge in the final weeks or even days of an election campaign. Early and convenience voting also detracts from the collective expression of citizenship that takes place on Election

Day. Moreover, the cost of administering elections and of running campaigns tends to increase when early and mail-in voting is conducted in addition to balloting on Election Day. Early voting should commence no earlier than 15 days prior to the election, so that all voters will cast their ballots on the basis of largely comparable information about the candidates and the issues.

---

**Recommendation on Vote by Mail**

**4.2.1**  The Commission encourages further research on the pros and cons of vote by mail and of early voting.

---

## 4.3  VOTE CENTERS

Another alternative to voting at polling stations is the innovation of "vote centers," pioneered by Larimer County, Colorado. Vote centers are larger in size than precincts but fewer in number. They are dispersed throughout the jurisdiction, but close to heavy traffic routes, larger residential areas, and major employers. These vote centers allow citizens to vote anywhere in the county rather than just at a designated precinct. Because these vote centers employ economies of scale, fewer poll workers are required, and they tend to be more professional. Also, the vote centers are reported to use more sophisticated technology that is more accessible to voters with disabilities. Vote centers eliminate the incidence of out-of-precinct provisional ballots, but they need to have a unified voter database that can communicate with all of the other centers in the county to ensure that eligible citizens vote only once.

While vote centers appear to have operated effectively in Larimer County, further research is needed to determine if the costs of establishing vote centers are offset by the savings of eliminating traditional polling sites. Moreover, because vote centers replace traditional voting at precincts, which are generally closer to a voter's home, it is not clear that citizens actually view them as more convenient.

---

**Recommendations on Vote Centers**

**4.3.1**  States should modify current election law to allow experimentation with voting centers. More research, however, is needed to assess whether voting centers expand voter participation and are cost effective.

**4.3.2**  Voting centers need a higher quality, computer-based registration list to assure that citizens can vote at any center without being able to vote more than once.

---

TX_00001897
JA_004656

TX_00001897

## 4.4  MILITARY AND OVERSEAS VOTING

Military and overseas voting present substantial logistical challenges, yet we cannot overstate the imperative of facilitating participation in elections by military and overseas voters, particularly by service men and women who put their lives on the line for their country. The Commission calls on every state, with federal government assistance, to make every effort to provide all military and overseas voters with ample opportunity to vote in federal elections.

More than six million eligible voters serve in the Armed Forces or live overseas. These voters include 2.7 million military and their dependents and 3.4 million diplomats, Peace Corps volunteers, and other civilian government and other citizens overseas.[42]



A U.S. Army officer stationed in Bosnia fills in his 2004 voting forms (AP Photo/Amel Emric)

Voter turnout among members of the armed forces is high. So is the level of frustration they experience when their votes cannot be counted. This happens largely because of the time required by the three-step process of applying for an absentee ballot, receiving one, and then returning a completed ballot. The process is complicated by the differences among states and among localities in the registration deadline, ballot format, and requirements for ballot return, and it is exacerbated because of the mobility of service men and women during a time of conflict. Since September 11, 2001, more than 500,000 National Guard and Reserve personnel have been mobilized, and many were relocated before they received their absentee ballots.

Congress passed the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) in 1986 to help eligible members of the armed services and their families, and other citizens overseas, to vote. UOCAVA required each state to have a single office to provide information on voter registration and absentee ballot procedures for military voters. The Help America Vote Act of 2002 (HAVA) recommended — but did not require — that this state office should coordinate voting by military personnel by receiving absentee ballot applications and collecting voted ballots. The introduction of statewide voter registration databases under HAVA provides an opportunity to put this recommendation into practice. But aside from Alaska, which already had a single state office, no state has centralized the processing of absentee ballots. This is another example as to why recommending, rather than requiring, a course of action is insufficient.

The Commission recommends that when registering members of the armed forces and other overseas voters, states should inquire whether to send an absentee ballot to them automatically, thus saving a step in the process.

In the 2004 presidential election, approximately one in four military voters did not vote for a variety of reasons: The absentee ballots were not returned or arrived too late; they were rejected for procedural deficiencies, such as a signature not properly witnessed on the back of the return envelope; blank ballots were returned as undeliverable; or Federal Post Card Applications were rejected.[43]

TX_00001898

The U.S. Department of Defense's Federal Voting Assistance Program, which assists military and overseas voters, tried to reduce the time lag for absentee voting by launching an electronic voting experiment. However, this experiment was ended because of fundamental security problems (see above on "Internet voting").[44] In the meantime, the Federal Voting Assistance Program encouraged states to send blank ballots out electronically and to accept voted ballots by fax. There now are 32 states that permit fax delivery of a blank ballot to military voters and 25 states that allow military voters to return their voted ballot by fax. In addition, some jurisdictions allow the delivery of blank ballots by email.[45] The return of voted ballots by fax or email, however, is a violation of the key principle of a secret ballot, and it is vulnerable to abuse or fraud.

Although the Uniformed and Overseas Citizens Absentee Voting Act applies to both military and nonmilitary voters overseas, procedures to facilitate overseas voting serve military voters better than civilians. To provide civilian overseas voters with equal opportunities to participate in federal elections, new approaches are needed at both the federal and state levels.

---

### Recommendations on Military and Overseas Voting

**4.4.1**  The law calling for state offices to process absentee ballots for military and overseas government and civilian voters should be implemented fully, and these offices should be under the supervision of the state election offices.

**4.4.2**  New approaches should be adopted at the federal and state levels to facilitate voting by civilian voters overseas.

**4.4.3**  U.S. Department of Defense (DOD) should supply to all military posted outside the United States a Federal Postcard Application for voter registration and a Federal Write-in Absentee Ballot for calendar years in which there are federal elections. With adequate security protections, it would be preferable for the application forms for absentee ballots to be filed by Internet.

**4.4.4**  The states, in coordination with the U.S. Department of Defense's Federal Voting Assistance Program, should develop a system to expedite the delivery of ballots to military and overseas civilian voters by fax, email, or overnight delivery service, but voted ballots should be returned by regular mail, and by overnight mail whenever possible. The Defense Department should give higher priority to using military aircraft returning from bases overseas to carry ballots. Voted ballots should not be returned by email or by fax as this violates the secrecy of the ballot and is vulnerable to fraud.

**4.4.5**  All ballots subject to the Uniform and Overseas Civilians Absentee Voting Act must be mailed out at least 45 days before the election (if request is received by then) or within two days of receipt after that. If the ballot is not yet set, due to litigation, a late vacancy, etc., a temporary ballot listing all settled offices and ballot issues must be mailed.

---

**4.4.6**  States should count the ballots of military and overseas voters up to 10 days after an election if the ballots are postmarked by Election Day.

**4.4.7**  As the technology advances and the costs decline, tracking systems should be added to absentee ballots so that military and overseas voters may verify the delivery of their voted absentee ballots.

**4.4.8**  The Federal Voting Assistance Program should receive a copy of the report that states are required under HAVA to provide the EAC on the number of absentee ballots sent to and received from military and overseas voters.

## 4.5  ACCESS FOR VOTERS WITH DISABILITIES

There are almost 30 million voting-aged Americans with some kind of disability—about 15 percent of the population (see Table 3 on page 40). Less than half of them vote. There are federal laws to facilitate voting and registration by eligible Americans with disabilities, but these laws have not been implemented with any vigor. As a result, voters with disabilities still face serious barriers to voting.[46] Congress passed the Voting Accessibility for the Elderly and Handicapped Act in 1984 and the Americans with Disabilities Act of 1990, which required local authorities to make polling places physically accessible to people with disabilities for federal elections. Yet a Government Accountability Office survey of the nation's polling places in 2000 found that 84 percent of polling places were not accessible on Election Day. By 2004, accessibility for voters with disabilities had improved only marginally. Missouri, for example, surveyed every polling place in the state and found that 71 percent were not accessible. Most other states have not even conducted surveys.[47]



A voter tries out a disability-accessible voting machine (AP Photo/Mike Derer)

There is similarly weak implementation of laws designed to facilitate voter registration by citizens with disabilities. Section 7 of the National Voter Registration Act (NVRA) requires state-funded agencies which provide services to citizens with disabilities to offer the opportunity to register citizens to vote. Implementation of this requirement, according to advocates for voters with disabilities, is rare or poor.[48]

HAVA provided additional support to Section 7 of NVRA by including social-service agencies as places to register voters, but only one state, Kentucky, has complied with Section 7, according to advocates for voters with disabilities. Moreover, at the current time, there is not a single case where the new statewide voter databases comply with Section 7.[49] Thus, 12 years after the National Voter Registration Act was passed, voters with disabilities still cannot apply for voter registration at all social service offices.

| TABLE 3: Estimates of U.S. Voting Population with Disabilities by Type | | |
|---|---|---|
| Disability Type | Population Age 16 and Older (in millions) | Percent of Total Voting Age Population |
| Sensory, Physical, Mental or Self-Care Disability | 29.5 | 15% |
| Self-Care Disability | 6.4 | 3% |
| Physical Disability | 12.5 | 6% |
| Mental Disability | 4.0 | 2% |
| Sensory Disability | 3.9 | 2% |
| Sensory and Physical Disability | 2.5 | 1% |
| Sensory, Physical, and Mental Disability | 2.0 | 1% |
| Total Voting Age Population in the U.S. (18 and older) | 203.0 | 100% |

NOTES: Respondents were able to report more than one type of disability.

SOURCES: U.S. Census Bureau, Selected Types of Disability for the Civilian Noninstitutionalized Population 5 Years and Over by Age: 2000; U.S. Census Bureau, Voting and Registration in the Election of November 2000.

## Recommendations on Access for Voters With Disabilities

**4.5.1**  To improve accessibility of polling places for voters with disabilities, the U.S. Department of Justice should improve its enforcement of the Americans with Disabilities Act and the accessibility requirements set by the Help America Vote Act.

**4.5.2**  States should make their voter registration databases interoperable with social-service agency databases and facilitate voter registration at social-service offices by citizens with disabilities.

**4.5.3**  States and local jurisdictions should allow voters with disabilities to request an absentee ballot when they register and to receive an absentee ballot automatically for every subsequent election. Local election officials should determine which voters with disabilities would qualify.

## 4.6   RE-ENFRANCHISEMENT OF EX-FELONS

Only Maine and Vermont allow incarcerated citizens to vote. In all other states, citizens who are convicted of a felony lose their right to vote, either temporarily or permanently. An estimated 4.65 million Americans have currently or permanently lost their right to vote as a result of a felony conviction. Most states reinstate that right upon completion of the full sentence, including of parole, but three states — Florida, Kentucky, and Virginia — permanently ban all ex-felons from voting, and another 10 states have a permanent ban on

TX_00001901
JA_004660

TX_00001901

voting by certain categories of ex-felons.[50] These laws have a disproportionate impact on minorities.

Some states impose a waiting period after felons complete their sentence before they can vote. Few states take the initiative to inform ex-felons when their voting rights are restored. As a result, only a small portion of the ex-felons who have regained their voting rights are registered to vote.

Proponents of re-enfranchisement argue that ex-felons have paid their debt to society when they have completed their full sentence. Restoring their right to vote would encourage them to reintegrate into society. Each state therefore should automatically restore the voting rights of ex-felons who have completed their full sentence, including any terms of parole and compensation to victims. Opponents of re-enfranchisement, however, see this as a "punishment" issue rather than a "voting rights" issue. They believe that each state should be free to decide whether to restore the voting rights of ex-felons. States set punishment for state crimes, and this often extends beyond the completion of a felon's sentence. Ex-felons are, for instance, usually barred from purchasing firearms or from getting a job as a public-school teacher. Nonetheless, weighing both sides of the debate, the Commission believes that voting rights should be restored to certain categories of felons after they served the debt to society.

---

### Recommendations on Re-Enfranchisement of Ex-Felons

**4.6.1** States should allow for restoration of voting rights to otherwise eligible citizens who have been convicted of a felony (other than for a capital crime or one which requires enrollment with an offender registry for sex crimes) once they have fully served their sentence, including any term of probation or parole.

**4.6.2** States should provide information on voter registration to ex-felons who have become eligible to vote. In addition, each state's department of corrections should automatically notify the state election office when a felon has regained eligibility to vote.

---

## 4.7  VOTER AND CIVIC EDUCATION

Among the simplest ways to promote greater and more informed participation in elections is to provide citizens with basic information on voting and the choices that voters will face in the polling booth. HAVA requires only that basic voter information, including a sample ballot and instructions on how to vote, be posted at each polling site on Election Day. However, additional voter information is needed.

States or local jurisdictions should provide information by mail and on their Web sites to educate voters on the upcoming ballot — on the issues and the candidates, who will provide the information about themselves. Local election officials should set limits on the amount — but not the content — of information to be provided by the candidates. In Washington state, for example, every household is mailed a pamphlet with information on how to register, where to vote, and texts of election laws and proposed ballot initiatives and



A college student in New Mexico registers to vote as part of a campaign to reach new voters (AP Photo/*Las Cruces Sun-News*, Norm Dettlaff)

referendums. This voter's pamphlet also has a picture of each candidate for statewide office and a statement of the candidate's goals for the office they seek. In addition, there should be greater use of the radio and television to communicate these messages.

Efforts to provide voter information and education to young Americans merit particular attention. Voter turnout among youth declined steadily from the 1970s to 2000, when it was 24 percent lower than turnout of the entire electorate. In 2004, however, there was a surge of 11 percent in voter turnout among Americans aged 18 to 24, and the gap between youth turnout and overall turnout dropped to 17 percent (see Table 4).[51]

While participation by youth increased significantly in the last election, it continues to lag far behind the rest of the population. It can and should be increased by instructing high school students on their voting rights and civic responsibilities. Just one course in civics or American government can have a strong influence on youth participation in elections. According to a 2003 survey, about twice as many young Americans who have taken a civics course are registered to vote and have voted in all or most elections than young Americans who have never taken such a course.[52]

Moreover, Americans want public schools to prepare their children for citizenship and to provide better civic education. While most Americans believe that the most important goal of public schools is to develop basic skills, seven in 10 respondents to a 2004 survey agreed that preparing students to become responsible citizens is a "central purpose of public schools." When asked to grade the civic education programs of public schools, 54 percent of respondents give these programs a "C" and 22 percent give them a "D."[53]

It is difficult to assess the current efforts of state and local voting and civic education programs because only one state, Florida, publishes a report on its activities and spending in this area. We recommend that more states and local jurisdictions follow Florida's example in order to generate more information on the most effective methods for voter and civic education.

| Age Range | 1972 | 1976 | 1980 | 1984 | 1988 | 1992 | 1996 | 2000 | 2004 |
|---|---|---|---|---|---|---|---|---|---|
| **TABLE 4:** Voter Turnout in Presidential Elections by Age, 1972-2004 | | | | | | | | | |
| 18 to 24 years | 49.6 | 42.2 | 39.9 | 40.8 | 36.2 | 42.8 | 32.4 | 32.3 | 41.9 |
| 25 to 44 years | 62.7 | 58.7 | 58.7 | 58.4 | 54.0 | 58.3 | 49.2 | 49.8 | 52.2 |
| 45 to 64 years | 70.8 | 68.7 | 69.3 | 69.8 | 67.9 | 70.0 | 64.4 | 64.1 | 66.6 |
| 65 years+ | 63.5 | 62.2 | 65.1 | 67.7 | 68.8 | 70.1 | 67.0 | 67.6 | 68.9 |

**SOURCE:** U.S. Census Bureau (2004).

TX_00001903
JA_004662

TX_00001903

## Recommendations on Voter and Civic Education

**4.7.1**   Each state should publish a report on its voter education spending and activities.

**4.7.2**   States should engage in appropriate voter education efforts in coordination with local election authorities to assure that all citizens in their state have the information necessary to participate in the election process.

**4.7.3**   Each state should use its best efforts to instruct all high school students on voting rights and how to register to vote. In addition, civic education programs should be encouraged in the senior year of high school, as these have been demonstrated to increase voter participation by youth.

**4.7.4**   Local election authorities should mail written notices to voters in advance of an election advising the voter of the date and time of the election and the polling place where the voter can cast a ballot and encouraging the citizens to vote. The notice should also provide a phone number for the voter to contact the election authorities with any questions.

**4.7.5**   States should mail pamphlets to voters, and post the pamphlet material on their Web sites, to provide information about the candidates for statewide office and about ballot initiatives and referenda.

**4.7.6**   The federal government should provide matching funds for the states to encourage civic and voter education and advertisements aimed to encourage people to vote.



(AP Photo/Julia Cumes)



(AP Photo/Rogelio Solis)

# 5. Improving Ballot Integrity

Because the integrity of the ballot is a hallmark of democracy, it is imperative that election officials guarantee eligible voters the opportunity to vote, but only once, and tabulate ballots in an accurate and fair manner.

## 5.1 INVESTIGATION AND PROSECUTION OF ELECTION FRAUD

While election fraud is difficult to measure, it occurs. The U.S. Department of Justice has launched more than 180 investigations into election fraud since October 2002. These investigations have resulted in charges for multiple voting, providing false information on their felon status, and other offenses against 89 individuals and in convictions of 52 individuals. The convictions related to a variety of election fraud offenses, from vote buying to submitting false voter registration information and voting-related offenses by non-citizens.[54]

In addition to the federal investigations, state attorneys general and local prosecutors handle cases of election fraud. Other cases are never pursued because of the difficulty in obtaining sufficient evidence for prosecution or because of the low priority given to election fraud cases. One district attorney, for example, explained that he did not pursue allegations of fraudulent voter registration because that is a victimless and nonviolent crime.[55]

Election fraud usually attracts public attention and comes under investigation only in close elections. Courts may only overturn an election result if there is proof that the number of irregular or fraudulent votes exceeded the margin of victory. When there is a wide margin, the losing candidate rarely presses for an investigation. Fraud in any degree and in any circumstance is subversive to the electoral process. The best way to maintain ballot integrity is to investigate all credible allegations of election fraud and otherwise prevent fraud before it can affect an election.

Investigation and prosecution of election fraud should include those acts committed by individuals, including election officials, poll workers, volunteers, challengers or other nonvoters associated with the administration of elections, and not just fraud by voters.

---

**Recommendations on Investigation and Prosecution of Election Fraud**

**5.1.1**  In July of even-numbered years, the U.S. Department of Justice should issue a public report on its investigations of election fraud. This report should specify the numbers of allegations made, matters investigated, cases prosecuted, and individuals convicted for various crimes. Each state's attorney general and each local prosecutor should issue a similar report.

**5.1.2**  The U.S. Department of Justice's Office of Public Integrity should increase its staff to investigate and prosecute election-related fraud.

---

TX_00001906

> **5.1.3**  In addition to the penalties set by the Voting Rights Act, it should be a federal felony for any individual, group of individuals, or organization to engage in any act of violence, property destruction (of more than $500 value), or threatened act of violence that is intended to deny any individual his or her lawful right to vote or to participate in a federal election.
>
> **5.1.4**  To deter systemic efforts to deceive or intimidate voters, the Commission recommends federal legislation to prohibit any individual or group from deliberately providing the public with incorrect information about election procedures for the purpose of preventing voters from going to the polls.

## 5.2   ABSENTEE BALLOT AND VOTER REGISTRATION FRAUD

Fraud occurs in several ways. Absentee ballots remain the largest source of potential voter fraud.[56] A notorious recent case of absentee ballot fraud was Miami's mayoral election of 1998, and in that case, the judge declared the election fraudulent and called for a new election. Absentee balloting is vulnerable to abuse in several ways: Blank ballots mailed to the wrong address or to large residential buildings might get intercepted. Citizens who vote at home, at nursing homes, at the workplace, or in church are more susceptible to pressure, overt and subtle, or to intimidation. Vote buying schemes are far more difficult to detect when citizens vote by mail. States therefore should reduce the risks of fraud and abuse in absentee voting by prohibiting "third-party" organizations, candidates, and political party activists from handling absentee ballots. States also should make sure that absentee ballots received by election officials before Election Day are kept secure until they are opened and counted.

Non-citizens have registered to vote in several recent elections. Following a disputed 1996 congressional election in California, the Committee on House Oversight found 784 invalid votes from individuals who had registered illegally. In 2000, random checks by the Honolulu city clerk's office found about 200 registered voters who had admitted they were not U.S. citizens.[57] In 2004, at least 35 foreign citizens applied for or received voter cards in Harris County, Texas, and non-citizens were found on the voter registration lists in Maryland as well.[58]

The growth of "third-party" (unofficial) voter registration drives in recent elections has led to a rise in reports of voter registration fraud. While media attention focused on reports of fraudulent voter registrations with the names of cartoon characters and dead people, officials in 10 states investigated accusations of voter registration fraud stemming from elections in 2004, and between October 2002 and July 2005, the U.S. prosecuted 19 people charged with voter registration fraud.[59] Many of these were submitted by third-party organizations, often by individuals who were paid by the piece to register voters.

States should consider new legislation to minimize fraud in voter registration, particularly to prevent abuse by third-party organizations that pay for voter registration by the piece. Such legislation might direct election offices to check the identity of individuals registered through third-party voter registration drives and to track the voter registration forms.

HAVA requires citizens who register by mail to vote in a state for the first time to provide

an ID when they register or when they vote. Some states have interpreted this requirement to apply only to voter registration forms sent to election offices by mail, not to forms delivered by third-party organizations. As a result, neither the identity nor the actual existence of applicants is verified. All citizens who register to vote with a mail-in form, whether that form is actually sent by mail or is instead hand-delivered, should comply with HAVA's requirements or with stricter state requirements on voter ID, by providing proof of identity either with their registration application or when they appear at the polling station on Election Day. In this way, election offices will be obliged to verify the identity of every citizen who registers to vote, whether or not the registration occurs in person.



John Fund and Colleen McAndrews at the April 18 hearing (American University Photo/Jeff Watts)

In addition, states should introduce measures to track voter registration forms that are handled by third-party organizations. By assigning a serial number to all forms, election officials will be able to track the forms. This, in turn, will help in any investigations and prosecutions and thus will serve to deter voter registration fraud.

Many states allow the representatives of candidates or political parties to challenge a person's eligibility to register or vote or to challenge an inaccurate name on a voter roll. This practice of challenges may contribute to ballot integrity, but it can have the effect of intimidating eligible voters, preventing them from casting their ballot, or otherwise disrupting the voting process. New procedures are needed to protect voters from intimidating tactics while also offering opportunities to keep the registration rolls accurate, and to provide observers with meaningful opportunities to monitor the conduct of the election. States should define clear procedures for challenges, which should mainly be raised and resolved before the deadline for voter registration. After that, challengers will need to defend their late actions. On Election Day, they should direct their concerns to poll workers, not to voters directly, and should in no way interfere with the smooth operation of the polling station.

---

### Recommendations on Absentee Ballot and Voter Registration Fraud

**5.2.1**  State and local jurisdictions should prohibit a person from handling absentee ballots other than the voter, an acknowledged family member, the U.S. Postal Service or other legitimate shipper, or election officials. The practice in some states of allowing candidates or party workers to pick up and deliver absentee ballots should be eliminated.

**5.2.2**  All states should consider passing legislation that attempts to minimize the fraud that has resulted from "payment by the piece" to anyone in exchange for their efforts in voter registration, absentee ballot, or signature collection.

**5.2.3**  States should not take actions that discourage legal voter registration or get-out-the-vote activities or assistance, including assistance to voters who are not required to vote in person under federal law.

---