

(AP Photo/J. Pat Carter)

# 6. Election Administration

To build confidence in the electoral process, it is important that elections be administered in a neutral and professional manner. Election officials, from county clerks and election board members to secretaries of state and U.S. Election Assistance Commission members, generally have shown great skill and dedication in administering elections in a fair and impartial manner. The institutions of election administration, however, are in need of improvement, so that they may instill greater public confidence in the election process and allow election officials to carry out their responsibilities more effectively (see Table 5 on page 52).

Elections are contests for power and, as such, it is natural that politics will influence every part of the contest, including the administration of elections. In recent years, some partisan election officials have played roles that have weakened public confidence in the electoral process. Many other partisan election officials have tried to execute their responsibilities in a neutral manner, but the fact that they are partisan sometimes raises suspicions that they might favor their own party. Most other democratic countries have found ways to insulate electoral administration from politics and partisanship by establishing truly autonomous, professional, and nonpartisan independent national election commissions that function almost like a fourth branch of government. The United States, too, must take steps to conduct its elections impartially both in practice and in appearance.

Impartial election administration, however, is not enough. Elections must also be administered effectively if they are to inspire public confidence. Long lines at polling stations, inadequately trained poll workers, and inconsistent or incorrect application of electoral procedures may have the effect of discouraging voter participation and may, on occasion, raise questions about bias in the way elections are conducted. While problems at polling stations usually reflect a shortage of trained poll workers or poor management of polling station operations, rather than an attempt to seek partisan advantage, the result is much the same. Such problems raise public suspicions or may provide grounds for the losing candidate to contest the result in a close election.

## 6.1 INSTITUTIONS

The intense partisanship and the close division of the American electorate, coupled with the Electoral College system, raise the possibility of another presidential election decided by a razor-thin margin in one or more battleground states. Although voting technology is improving, presidential elections are held in a decentralized system with a patchwork of inconsistent rules. In addition, in recent years, election challenges in the courts have proliferated.

Close elections, especially under these conditions, put a strain on any system of election administration, and public opinion demonstrates this. Significant segments of the American public have expressed concern about voter fraud, voter suppression, and the fairness of the election process in general.[60] While substantially more Democrats than Republicans surveyed in national polls considered the 2004 presidential election unfair, 41 percent more Republicans than Democrats said the electoral process was unfair in Washington state's 2004 gubernatorial election, which the Democratic candidate won by a very narrow margin.[61] The losing side, not surprisingly, is unhappy with the election result, but what is new and dangerous in the United States is that the supporters of the losing side are beginning to believe that the process is unfair. And this is true of both parties.

TX_00001910

At its base, the problem is a combustible mixture of partisan suspicion and irregularities born in part from a decentralized system of election administration with differing state laws determining voter registration and eligibility and whether a ballot is actually counted. The irregularities, by and large, stem from a lack of resources and inadequate training for election workers, particularly those who work just on Election Day. In other countries, such irregularities sometimes lead to street protests or violence. In the United States, up until now, we have been relatively fortunate that irregularities are addressed in court. The dramatic increase in election-related litigation in recent years, however, does not enhance the public's perception of elections and may in fact weaken public confidence. The average number of election challenges per year has increased from 96 in the period of 1996 to 1999 to 254 in 2001 to 2004.[62]



Elections manager Lori Augino, left, Pierce County Auditor Pat McCarthy, U.S. EAC Commissioners Ray Martinez, III, and Paul DeGregorio, right, observe the 2004 manual gubernatorial recount in Washington (AP Photo/*The News Tribune*, Janet Jensen)

Another major source of public mistrust of the election process is the perception of partisanship in actions taken by partisan election officials. In a majority of states, election administration comes under the authority of the secretary of state. In 2000 and 2004, both Republican and Democratic secretaries of state were accused of bias because of their discretionary decisions — such as how to interpret unclear provisions of HAVA. The issue is not one of personality or a particular political party because allegations and irregularities dogged officials from both parties. The issue is the institution and the perception of partiality that is unavoidable if the chief election officer is a statewide politician and the election is close, has irregularities, or is disputed. The perception of partiality is as important, if not more so, than the reality.

Bipartisan election administration has the advantage of allowing both parties to participate, but the flaws of such a system are evident in the experience of the Federal Election Commission (FEC). The FEC has often become deadlocked on key issues. In the cases when the FEC commissioners agree, they sometimes protect the two parties from enforcement rather than represent the public's interest in regulating campaign finance.

**NONPARTISAN ELECTION ADMINISTRATION.** To minimize the chance of election meltdown and to build public trust in the electoral process, nonpartisan structures of election administration are very important, and election administrators should be neutral, professional, and impartial. At the federal level, the U.S. Election Assistance Commission should be reconstituted on a nonpartisan basis to exercise whatever powers are granted by law, and the EAC chairperson should serve as a national spokesperson, as the chief elections officer in Canada does, for improving the electoral process. States should consider transferring the authority for conducting elections from the secretary of state to a chief election officer, who would serve as a nonpartisan official.

States could select a nonpartisan chief elections officer by having the individual subject to approval by a super-majority of two-thirds of one or both chambers of the state legislature. The nominee should receive clear bipartisan support. This selection process is likely to yield a respected consensus candidate or, at least, a nonpartisan candidate.

The EAC, in its 18 months of operation, has managed to make its decisions by consensus. While this is a significant accomplishment for a bipartisan, four-member commission, it has come at a cost. The EAC has been slow to issue key guidance, and the guidance it has issued has often been vague. The process of forging consensus among the EAC's commissioners appears to have slowed and watered down key decisions, particularly as they have come under pressure from their respective political parties. If the EAC were reconstituted as a nonpartisan commission, it would be better able to resist partisan political pressure and operate more efficiently and effectively.

To avoid the dangers of bipartisan stalemate, the EAC should be reconstituted as a five-member commission, with a strong chairperson and nonpartisan members. This would be done initially by adding a fifth position to the EAC and making that position the chairperson, when the current chairperson's term ends. The new EAC chairperson would be nonpartisan, nominated by the President, and confirmed by the U.S. Senate. Later, as the terms of other EAC commissioners expired, they would be replaced by nonpartisan commissioners, subject to Senate confirmation as well.



Kansas Secretary of State Ron Thornburgh at the April 18 hearing (American University Photo/Jeff Watts)

**INDEPENDENCE AND AUTHORITY.** For the positions of EAC commissioners and state chief elections officers to remain both nonpartisan and effective, they must be insulated from political pressure. This can be done by the terms of appointment and the lines of responsibility. The EAC commissioners and state chief elections officers should receive a long-term appointment, perhaps 10 years. The grounds for dismissal should be limited, similar to the rules for removal of a federal or state judge. The EAC should have the autonomy to oversee federal election laws that Congress directs it to implement and advise Congress and the President on needed improvements in election systems. State chief elections officers should have similar autonomy.

Under HAVA, the EAC distributes federal funds to the states, issues voluntary guidance on HAVA's mandates, and serves as a clearinghouse for information on elections. In addition, it develops standards for voting equipment and undertakes research on elections.

The flaws identified in the electoral system described in this report were due in large part to a very decentralized system with voting standards implemented in different ways throughout the country. If HAVA is fully and effectively implemented, states should be able to retrieve authority to conduct elections from counties and impose a certain degree of uniformity.

In this report, we have proposed the kinds of reforms needed to improve significantly our electoral process. To implement those reforms, a new or invigorated institution like the EAC is needed to undertake the following tasks:

- Statewide registration lists need to be organized top-down with states in charge and counties assisting states rather than the other way around;

- A template and a system is needed for sharing voter data across states;

- The "REAL ID" needs to be adapted for voting purposes and linked to the registration list;

- To ensure that the new requirements — ID and registration list — do not impede access to voting, an expanded effort is needed to reach out and register new voters;

- Quality audits of voter databases and certification of voting machine source codes is essential;

- Voting machines need a voter-verifiable audit trail; and

- Extensive research on the operations and technology of elections is needed.

**TABLE 5: Types of Electoral Administration**

| Type of Institution | The Americas | Asia & the Pacific | East & Central Europe | Sub-Saharan Africa | Total Number of Cases (percent of total) |
|---|---|---|---|---|---|
| Government | 5* | 9 | 0 | 3 | 17 (14%) |
| Government supervised by judges or others | 6 | 2 | 6 | 14 | 28 (23%) |
| Independent electoral commission | 25 | 19 | 12 | 19 | 75 (63%) |

\* The U.S. is included in this category.

**SOURCE:** Rafael López-Pintor. *Electoral Management Bodies as Institutions of Governance* (NY: United Nations Development Programme, Bureau for Development Policy, 2000).

These reforms, but particularly those that require connecting states, will not occur on their own. The EAC needs to have sufficient authority to assure effective and consistent implementation of these reforms, and to avoid repeating past problems, its guidance must be clear and compelling. A stronger EAC does not mean that the states will lose power in conducting elections. To the contrary, the authority of state election officials will grow with the creation of statewide voter databases, and their credibility will be enhanced by the new nonpartisan structure and professionalism.

**CONFLICT-OF-INTEREST RULES.** No matter what institutions are responsible for conducting elections, conflict-of-interest standards should be introduced for all federal, state, and local election officials, including some of the provisions in Colorado's new election law and of the Code of Conduct prepared by the International Institute for Democracy and Electoral Assistance (IDEA).[63] This Code of Conduct requires election administrators to avoid any activity, public or private, that might indicate support or even sympathy for a particular candidate, political party, or political tendency.

Election officials should be prohibited by federal and/or state laws from serving on any political campaign committee, making any public comments in support of a candidate, taking a public position on any ballot measure, soliciting campaign funds, or otherwise campaigning for or against a candidate for public office. A decision by a secretary of state to serve as co-chair of his or her party's presidential election committee would clearly violate these standards.

---

## Recommendations on Institutions

**6.1.1** To undertake the new responsibilities recommended by this report and to build confidence in the administration of elections, Congress and the states should reconstitute election management institutions on a nonpartisan basis to make them more independent and effective. U.S. Election Assistance Commission members and each state's chief elections officer should be selected and be expected to act in a nonpartisan manner, and the institutions should have sufficient funding for research and training and to conduct the best elections possible. We believe the time has come to take politics as much as possible out of the institutions of election administration and to make these institutions nonpartisan.

**6.1.2** Congress should approve legislation that would add a fifth member to the U.S. Election Assistance Commission, who would serve as the EAC's chairperson and who would be nominated by the President based on capability, integrity, and nonpartisanship. This would permit the EAC to be viewed more as nonpartisan than bipartisan and would improve its ability to make decisions. That person would be subject to Senate confirmation and would serve a single term of ten years. Each subsequent vacancy to the EAC should be filled with a person judged to be nonpartisan so that after a suitable period, all the members, and thus the institution, might be viewed as above politics.

**6.1.3** States should prohibit senior election officials from serving or assisting political campaigns in a partisan way, other than their own campaigns in states where they are elected.

**6.1.4** States should take additional actions to build confidence in the administration of elections by making existing election bodies as nonpartisan as possible within the constraints of each state's constitution. Among the ways this might be accomplished would be if the individuals who serve as the state's chief elections officer were chosen based on their capability, integrity, and nonpartisanship. The state legislatures would need to confirm these individuals by a two-thirds majority of one or both houses. The nominee should receive clear bipartisan support.

**6.1.5** Each state's chief elections officer should, to the extent reasonably possible, ensure uniformity of voting procedures throughout the state, as with provisional ballots. Doing so will reduce the likelihood that elections are challenged in court.

## 6.2  POLL WORKER RECRUITMENT

For generations, civic-minded citizens, particularly seniors, have served as poll workers. The average age of poll workers is 72.[64] Poll workers generally are paid minimum wages for a 15-hour day. Not surprisingly, recruitment has proven more and more difficult. For the 2004 election, the United States needed 2 million poll workers, but it fell short by 500,000.

Effective administration of elections requires that poll workers have the capability and training needed to carry out complex procedures correctly, the skills to handle increasingly sophisticated voting technology, the personality and skills to interact with a diversity of people in a calm and friendly manner, and the energy to complete a very long and hard day



Commissioner Sharon Priest, Daniel Calingaert, Michael Alvarez, and Election Center Executive Director Doug Lewis (Rice University Photo/Jeff Fitlow)

of work on Election Day. Poll workers must administer complex voting procedures, which are often changed with each election. These procedures include issuing provisional ballots, checking voter identification in accordance with state law, and correctly counting the votes after the polling station closes. Poll workers must also set up voting machines, instruct voters to use these machines, and provide helpful service to voters, including to voters with disabilities and non-English speakers.

A broad pool of potential recruits, drawn from all age groups, is needed to meet the demands made on today's poll workers. To adequately staff polling stations, states and local jurisdictions must offer better pay, training, and recognition for poll workers and recruit more citizens who have full-time jobs or are students. Recruitment of teachers would serve to spread knowledge of the electoral process, while recruitment of students would educate future voters and attract individuals who may serve as poll workers for decades to come.

Local election authorities should also consider providing incentives for more rigorous training. Guilford County, North Carolina, for example, initiated a "Precinct Officials Certification" program in cooperation with the local community college. The program requires 18 hours of class and a final exam. While voluntary, more than 80 percent of Guilford County's 636 permanent precinct officials completed the course. Certified officials receive an additional $35 per election in pay. Retention of officials has risen from roughly 75 percent to near 95 percent.

In addition, poll workers deserve greater recognition for their public service. States might establish a Poll Worker Appreciation Week and issue certificates to thank poll workers for their contribution to the democratic process.

Several states have passed laws to provide paid leave for state and local government workers who serve as poll workers on Election Day. A pilot program titled "Making Voting Popular" was implemented in 1998 in six counties surrounding the Kansas City metropolitan area to encourage employers to provide a paid "civic leave" day for employees who work as poll workers. Many states have introduced laws to encourage the recruitment of student poll workers. Partnered with experienced poll workers, student poll workers can learn about elections while contributing their technological skills.

TX_00001915

It will be easier to recruit skilled poll workers if they are given flexibility in the terms of their service by working part of the day. Since a large proportion of voters arrive either at the beginning or the end of the day, it would make sense to hire more poll workers for those periods, although this is not now the case. Bringing poll workers in from other jurisdictions might also serve to provide partisan balance in jurisdictions where one party is dominant. Flexibility in the terms of service by poll workers is often restricted by state laws. Where this is the case, states should amend their laws to allow part-day shifts for poll workers on Election Day and to permit state residents to staff polling stations in a different jurisdiction.

In addition, states might consider a new practice of recruiting poll workers in the same way that citizens are selected for jury duty. This practice is used in Mexico, where citizens are selected randomly to perform what they consider a civic obligation. About five times as many poll workers as needed are trained in Mexico, so that only the most skilled and committed are selected to serve as poll workers on Election Day. The process of training so many citizens serves the additional purpose of educating the public in voting procedures. This practice both reflects and contributes to a broad civic commitment to democracy.

---

### Recommendations on Poll Worker Recruitment

**6.2.1**  States and local jurisdictions should allocate sufficient funds to pay poll workers at a level that would attract more technologically sophisticated and competent workers. Part-time workers should also be recruited for the beginning and the end of Election Day. States should amend their laws to allow shifts for part of the day for poll workers on Election Day.

**6.2.2**  States and local jurisdictions should implement supplemental training and recognition programs for poll workers.

**6.2.3**  To increase the number and quality of poll workers, the government and nonprofit and private employers should encourage their workers to serve as poll workers on Election Day without any loss of compensation, vacation time or personal time off. Special efforts should be made to enlist teachers and students as poll workers.

**6.2.4**  Because some jurisdictions have large majorities of one party, which makes it hard to attract poll workers from other parties, local jurisdictions should allow poll workers from outside the jurisdiction.

**6.2.5**  States should consider legislation to allow the recruitment of citizens as poll workers as is done for jury duty.



A long line of Ohio voters on Election Day 2004
(AP Photo/Mark Duncan)

### 6.3 POLLING STATION OPERATIONS

A visible problem on Election Day 2004 was long lines. This should have been anticipated because there was a surge in new registrations and people expected a close election, particularly in "battleground states." Still, too many polling stations were unprepared. While waiting until 4 a.m. to vote was an extreme case, too many polling stations experienced long lines at the beginning of the day when people went to work or at the day's end when they returned. Fast-food chains hire extra workers at lunchtime, but it apparently did not occur to election officials to hire more workers at the times when most people vote. Long lines were hardly the only problem; many polling stations had shortages of provisional ballots, machines malfunctioned, and there were too many inadequately trained workers on duty. Although most states ban campaigning within a certain distance of a polling station, other states or counties permit it, though many voters find it distasteful if not intimidating.

Problems with polling station operations, such as long lines, were more pronounced in some places than in others.[65] This at times gave rise to suspicions that the problems were due to discrimination or to partisan manipulation, when in fact the likely cause was a poor decision by election administrators. The U.S. Department of Justice's investigation into the allocation of voting machines in Ohio, for example, found that problems were due to administrative miscalculations, not to discrimination.[66]

The 2004 elections highlighted the importance of providing enough voting machines to each polling place. While voter turnout can be difficult to predict, the ratio of voters per machine can be estimated. Texas, for example, has issued an administrative rule to estimate the number of machines needed per precinct at different rates of voter turnout.[67]

The impression many voters get of the electoral process is partially shaped by their

TX_00001917
JA_004676

TX_00001917

experience at the polling station, and yet, not enough attention has been given to trying to make them "user-friendly." Elementary questions, which most businesses study to become more efficient and responsive to their customers, are rarely asked, let alone answered by election officials. Questions like: How long does it normally take for a citizen to vote? Would citizens prefer to go to a neighborhood precinct, or to a larger, more service-oriented but more distant "voting center"? How many and what kinds of complaints and problems do polling stations hear in an average day? How do they respond, and are voters satisfied with the response? How many citizens find electronic machines useful, and how many find them formidable? By answering these fundamental questions, we might determine ways to provide efficient and courteous service at polling locations

A simple way to compile useful information about problems voters face on Election Day would be to require that every voting station maintain a "log book" on Election Day to record all complaints from voters or observers. The log book would be signed by election observers at the end of the day to make sure that it has recorded all the complaints or problems. An analysis of the log books would help identify common problems and help design more efficient and responsive polling sites.

---

**Recommendations on Polling Station Operations**

**6.3.1**  Polling stations should be made user-friendly. One way to do so would be to forbid any campaigning within a certain distance of a polling station.

**6.3.2**  Polling stations should be required to maintain a "log-book" on Election Day to record all complaints. The books should be signed by election officials and observers and analyzed for ways to improve the voting process.

**6.3.3**  Polling stations should be organized in a way that citizens would not have to wait long before voting, and officials should be informed and helpful.

---

## 6.4  RESEARCH ON ELECTION MANAGEMENT

Despite the wealth of expertise and literature on U.S. elections and voting behavior, little research focuses on the administration or conduct of elections. Until the 2000 election stirred interest in the subject, we had no information on how often votes went uncounted. Today, we still do not know how many people are unable to vote because their name is missing from the registration list or their identification was rejected at the polls. We also have no idea about the level of fraud or the accuracy and completeness of voter registration lists.

To effectively address the challenges facing our election systems, we need to understand better how elections are administered. The log books and public reports on investigations on election fraud, described above, can provide some good raw material. But we need more systematic research to expand knowledge and stimulate needed improvements in U.S. election systems. Moreover, beyond the reforms needed today, U.S. election systems will need to adapt in the future to new technology and to social changes.



A North Dakota election judge on Election Day 2004 (AP Photo/Will Kincaid)

The Center for Election Systems at Kennesaw State University in Georgia is the first university center established to study election systems and to assist election administration. With funding from the state government, this Center develops standards for voting technology used in Georgia and provides an array of other services, such as testing all election equipment, providing training, building databases, and designing ballots for many counties. The Center thus provides critical services to state election authorities and supports constant improvements in election systems. Since election laws and procedures vary significantly, each state should consider supporting university centers for the study of elections.

In addition to research on technology, university election centers could assist state governments on issues of election law, management, and civic and voter education. They could assemble experts from different disciplines to assist state governments in reviewing election laws, improving administrative procedures, strengthening election management, and developing programs and materials to train poll workers.

Comparative research is also needed on electoral systems in different states, and national studies should be conducted on different elements of election administration and causes of voter participation. These studies might address such questions as: What factors stimulate or depress participation in elections? How do voters adapt to the introduction of new voting technologies? And what are the costs of conducting elections? Research on these and a host of other questions is needed at the national, state, and local levels, with findings shared and efforts coordinated. Moreover, federal, state, and private foundation funds are needed to generate the research our election systems require to effectively inform decision-making, to monitor and advance best practices, and to measure implementation and enforcement.[68]

## Recommendation on Research on Election Management

**6.4.1**  The Commission calls for continuing research on voting technology and election management so as to encourage continuous improvements in the electoral process.

## 6.5  COST OF ELECTIONS

Based on the limited available information, the cost of elections appears to vary significantly by state. Wyoming, for example, spent $2.15 per voter for the 2004 elections, while California spent $3.99 per voter.[69] Information on the cost of elections is difficult to obtain, because both state and local authorities are involved in running elections, and local authorities often neglect to track what they spend on elections. At the county level, elections typically are run by the county clerk and recorder, who rarely keeps track of the staff time and office resources allocated to elections as opposed to other office responsibilities.

Election administration expenditures in the United States are on the low end of the range of what advanced democracies spend on elections. Among advanced democracies, expenditures on election administration range from lows of $2.62 in the United Kingdom and $3.07 in France for national legislative elections, through a midrange of $4.08 in Spain and $5.68 in Italy, to a high of $9.30 in Australia and $9.51 in Canada.[70] While larger expenditures provide no guarantee of greater quality in election administration, they tend to reflect the priority given to election administration. The election systems of Australia and Canada are the most expensive but are also considered among the most effective and modern election systems in the world. Both local and state governments should track and report the cost of elections per registered voter. This data would be very important in offering comparisons on alternative and convenience voting.

---

### Recommendations on Cost of Elections

**6.5.1**  As elections are a bedrock of our nation's democracy, they should receive high priority in the allocation of government resources at all levels. Local jurisdictions, states, and the Congress should treat elections as a high priority in their budgets.

**6.5.2**  Both local and state governments should track and report the cost of elections per registered voter.



(AP Photo/Hidajet Delic)

# 7. Responsible Media Coverage

The media's role in elections is of great consequence. Effective media coverage contributes substantially to the electoral process by informing citizens about the choices they face in the elections and about the election results. In contrast, irresponsible media coverage weakens the quality of election campaigns and the public's confidence in the electoral process.

## 7.1 MEDIA ACCESS FOR CANDIDATES

More than $1.6 billion was spent on television ads in 2004 by candidates, parties, and independent groups.[71] This was a record for any campaign year and double the amount spent in the 2000 presidential election.

The pressure to raise money to pay for TV ads has tilted the competitive playing field in favor of well-financed candidates and has created a barrier to entry in politics. Moreover, TV ads tend to reduce political discourse to its least attractive elements—campaign spots are often superficial and negative. This has a significant impact on the quality of campaigns, as television is the primary source of campaign information for about half of all Americans.[72]

Broadcasters receive free licenses to operate on our publicly owned airwaves in exchange for a pledge to serve the public interest. At the heart of this public interest obligation is the need to inform the public about the critical issues that will be decided in elections.

In 1998, a White House advisory panel recommended that broadcasters voluntarily air at least five minutes of candidate discourse every night in the month preceding elections. The goal of this "5/30 standard" was to give television viewers a chance to see candidates in nightly forums that are more substantive than the political ads that flood the airwaves in the final weeks of election campaigns. National networks were encouraged to broadcast a nightly mix of interviews, mini-debates, and issue statements by presidential candidates, and local stations were asked to do the same for candidates in federal, state, and local races. Complete editorial control over the forums for candidate discourse was, of course, left to the national networks and local stations, which would decide what campaigns to cover, what formats to use, and when to broadcast the forums.

In 2000, about 103 television stations pledged to provide at least five minutes of campaign coverage every night in the final month of the election campaign, yet they often fell short of the 5/30 standard. Local news broadcasts of these 5/30 stations provided coverage, on average, of only two minutes and 17 seconds per night of candidate discourse.[73] On the thousand-plus stations that did not pledge to meet the 5/30 standard, coverage of candidate discourse was minimal.

During the 2004 campaign, substantive coverage of candidate discourse was still modest:[74]

- Little attention was given to state and local campaigns. About 92 percent of the election coverage by the national television networks was devoted to the presidential race. Less than 2 percent was devoted to U.S. House or U.S. Senate races.

- The presidential campaign also dominated local news coverage, but the news focuses on the horse race between candidates rather than on important

issues facing Americans. While 55 percent of local news broadcasts contained a story about the presidential election, only 8 percent had one about a local race. About 44 percent of the campaign coverage focused on campaign strategy, while less than one-third addressed the issues.

- Local campaign coverage was dwarfed by other news. Eight times more local broadcast coverage went to stories about accidental injuries, and 12 times more coverage went to sports and weather than to all local races combined.

- Only 24 percent of the local TV industry pledged to meet the "5/30" standard.

Notwithstanding the dramatic expansion of news available on cable television, broadcasters can and should do more to improve their coverage of campaign issues. Some propose to require broadcasters to provide free air time to candidates, but others are concerned that it might lead toward public financing of campaigns or violate the First Amendment.

---

### Recommendations on Media Access for Candidates

**7.1.1** The Commission encourages national networks and local TV stations to provide at least five minutes of candidate discourse every night in the month leading up to elections.

**7.1.2** The Commission encourages broadcasters to continue to offer candidates short segments of air time to make issue statements, answer questions, or engage in mini-debates.

**7.1.3** Many members of the Commission support the idea that legislation should be passed to require broadcasters to give a reasonable amount of free air time to political candidates, along the lines of the provisions of the Our Democracy, Our Airwaves Act of 2003 (which was introduced as S.1497 in the 108th Congress).

---

## 7.2  MEDIA PROJECTIONS OF ELECTION RESULTS

For decades, early projections of presidential election results have diminished participation in the electoral process. Projections of Lyndon Johnson's victory in 1964 came well before the polls closed in the West. The same occurred in 1972 and in 1980. In all of these cases, candidates further down the ballot felt the effect. In 1980, the estimated voter turnout was about 12 percent lower among those who had heard the projections and not yet voted as compared with those who had not heard the projections.[75]

On Election Night in 2000, the major television news organizations — ABC, CBS, NBC, CNN, and Fox — made a series of dramatic journalistic mistakes. While polls were still open in Florida's panhandle, they projected that Vice President Gore had won the state. They later reversed their projection and predicted that Governor Bush would win Florida and, with it, the presidency. Gore moved to concede the election, beginning with a call to Bush. Gore later withdrew his concession, and the news organizations had to retract their projection of Bush's victory. The first set of mistakes may have influenced voters in Florida and in other states where the polls were still open. The second set of mistakes irretrievably influenced public perceptions of the apparent victor in the election, which then affected the subsequent controversy over the outcome in Florida.

Having made these mistakes in 2000, most television news organizations were cautious about projecting presidential election results in 2004. This caution is worth repeating in future elections and should become a standard media practice.

The Carter-Ford Commission was highly critical of the practice of declaring a projected winner in a presidential election before all polls close in the contiguous 48 states of the United States. In the Commission's view, this practice discourages voters by signaling that the election is over even before some people vote.

Voluntary restraint by major media organizations is a realistic option. National news networks in the last several presidential elections have voluntarily refrained from calling the projected presidential winner in the Eastern Standard Time zone until after 7:00 p.m. (EST). In addition, as a result of the mistakes they made in 2000, the networks have now agreed to refrain from calling the projected presidential winner in states with two time zones until all of the polls across the state have closed.

Media organizations should exercise similar restraint in their release of exit poll data. The Carter-Ford Commission noted the mounting body of evidence that documents the unreliability of exit polls. In 2000, exit polls conflicted with the actual election results in many states — and in five specific instances by as much as 7 percent to 16 percent. Network news organization officials acknowledged that exit polls have become more fallible over the years as more and more voters have refused to take part. In 2000, only about half of the voters asked to participate in exit polls agreed to do so, and only 20 percent of absentee and early voters agreed to participate in telephone "exit" poll interviews. That response rate is too low to assure reliability in exit polls.

Despite the effort made to improve exit polls for the 2004 presidential election, they were well off the mark and misled some Americans about the election's outcome. By now it should be abundantly clear that exit polls do not reliably predict election results. While exit polls can serve a useful purpose after Election Day in providing data on the composition and preferences of the electorate, they lack credibility in projecting election results, and they reflect poorly on the news organizations that release them prematurely. This ought to give news organizations sufficient reason to abandon the practice of releasing exit poll data before elections have been decided.

Government cannot prohibit news organizations from irresponsible political reporting, and efforts to legislate a delay in the announcement of projected election results are problematic. Voluntary restraint on the part of news organizations offers the best recourse. By exercising voluntary restraint, news organizations will enhance their credibility and better serve the American people by encouraging participation and public confidence in elections.

---

## Recommendations on Media Projections of Election Results

**7.2.1**  News organizations should voluntarily refrain from projecting any presidential election results in any state until all of the polls have closed in the 48 contiguous states.

**7.2.2**  News organizations should voluntarily agree to delay the release of any exit poll data until the election has been decided.

---



(Carter Center Photo/Mario Tapia)

TX_00001925

# 8. Election Observation

In too many states, election laws and practices do not allow independent observers to be present during crucial parts of the process, such as the testing of voting equipment or the transmission of results. In others, only certified representatives of candidates or political parties may observe. This limits transparency and public confidence in the election process. Above all, elections take place for the American people, rather than for candidates and political parties. Interested citizens, including those not affiliated with any candidate or party, should be able to observe the entire election process, although limits might be needed depending on the size of the group.

Although the United States insists on full access by its election observers to the elections of other countries, foreign observers are denied or granted only selective access to U.S. elections. Observers from the Organization for Security and Cooperation in Europe (OSCE), who were invited to the United States in 2004, were not granted access to polling stations in some states, and in other states, their access was limited to a few designated polling stations. Only one of our 50 states (Missouri) allows unfettered access to polling stations by international observers. The election laws of the other 49 states either lack any reference to international observers or fail to include international observers in the statutory categories of persons permitted to enter polling places.

To fulfill U.S. commitments to the OSCE "Copenhagen Declaration" on International Standards of Elections, accredited international observers should be given unrestricted access to U.S. elections. Such accreditation should be provided to reputable organizations which have experience in election observation and which operate in accordance with a recognized code of conduct. The National Association of Secretaries of State has encouraged state legislatures to make any necessary changes to state law to allow for international observers.[76]

---

**Recommendation on Election Observation**

**8.1.1** All legitimate domestic and international election observers should be granted unrestricted access to the election process, provided that they accept election rules, do not interfere with the electoral process, and respect the secrecy of the ballot. Such observers should apply for accreditation, which should allow them to visit any polling station in any state and to view all parts of the election process, including the testing of voting equipment, the processing of absentee ballots, and the vote count. States that limit election observation only to representatives of candidates and political parties should amend their election laws to explicitly permit accreditation of independent and international election observers.

---



A presidential elector casts a ballot (AP Photo/Seth Perlman)

TX_00001927

# 9. Presidential Primary and Post-Election Schedules

## 9.1 PRESIDENTIAL PRIMARY SCHEDULE

The presidential primary system is organized in a way that encourages candidates to start their campaigns too early, spend too much money, and allow as few as eight percent of the voters to choose the nominees. The Commission believes that the scheduling of the presidential primary needs to be changed to allow a wider and more deliberate national debate.

In 2000, the presidential primaries were effectively over by March 9, when John McCain ended his bid for the Republican nomination and Bill Bradley left the race for the Democratic nomination. This was less than seven weeks after the Iowa caucus. In 2004, the presidential primary process was equally compressed. Less than 8 percent of the eligible electorate in 2004 cast ballots before the presidential nomination process was effectively over.

The presidential primary schedule has become increasingly front-loaded. While 8 states held presidential primaries by the end of March in 1984, 28 states held their primaries by March in 2004. The schedule continues to tighten, as six states have moved up the date of their presidential primary to February or early March while eight states have decided to cancel their presidential primary.[77]

Because the races for the presidential nominations in recent elections have generally concluded by March, most Americans have no say in the selection of presidential nominees, and intense media and public scrutiny of candidates is limited to about 10 weeks. Moreover, candidates must launch their presidential bids many months before the official campaign begins, so that they can raise the $25 to $50 million needed to compete.

The presidential primary schedule therefore is in need of a comprehensive overhaul. A new system should aim to expand participation in the process of choosing the party nominees for president and to give voters the chance to closely evaluate the presidential candidates over a three- to four-month period. Improvements in the process of selecting presidential nominees might also aim to provide opportunities for late entrants to the presidential race and to shift some emphasis from Iowa and New Hampshire to states that more fully reflect the diversity of America.

Most members of the Commission accept that the first two states should remain Iowa and New Hampshire because they test the candidates by genuine "retail," door-to-door campaigning. A few other members of the Commission would replace those states with others that are more representative of America's diversity, and would especially recommend a change from Iowa because it chooses the candidate by a public caucus rather than a secret ballot, the prerequisite of a democratic election.

While the presidential primary schedule is best left to the political parties to decide, efforts in recent years by political parties have failed to overhaul the presidential primary schedule. If political parties do not make these changes by 2008, Congress should legislate the change.

---

> ## Recommendation on Presidential Primary Schedule
>
> **9.1.1**  We recommend that the Chairs and National Committees of the political parties and Congress make the presidential primary schedule more orderly and rational and allow more people to participate. We endorse the proposal of the National Association of Secretaries of State to create four regional primaries, after the Iowa caucus and the New Hampshire primary, held at one-month intervals from March to June. The regions would rotate their position on the calendar every four years.

## 9.2   POST-ELECTION TIMELINE

As the nation saw in 2000, a great deal of bitterness can arise when the outcome of a close presidential election turns on the interpretation of ambiguous laws. Had the U.S. Supreme Court not resolved the principal controversy in 2000, the dispute would have moved to Congress pursuant to Article II and the Twelfth Amendment. Unfortunately, the relevant provisions of the Constitution are vague or ambiguous in important respects, and the implementing legislation adopted by Congress over a century ago is not a model of clarity and consistency. If Congress is called upon to resolve a close election in the future, as could well happen, the uncertain meaning of these legal provisions is likely to lead to a venomous partisan spectacle that may make the 2000 election look tame by comparison.

After the debacle following the election of 1876, Congress spent more than a decade fashioning rules and procedures that it hoped would allow future disputes to be settled by preexisting rules. Those rules and procedures have remained on the books essentially unchanged since that time. The core provision (3 U.S.C. § 5) invites the states to establish appropriate dispute-resolution mechanisms by promising that Congress will give conclusive effect to the states' own resolution of controversies if the mechanism was established before the election and if the disputes are resolved at least six days before the electoral college meets. This "safe-harbor" provision appropriately seeks to prevent Congress itself from having to resolve election disputes involving the presidency, and every state should take steps to ensure that its election statutes qualify the state for favorable treatment under the safe-harbor provision.

Unfortunately, even if all the states take this step, disputes requiring Congress to ascertain the meaning of unclear federal rules could still arise. Although it may not be possible to eliminate all possible sources of dispute, significant steps could be taken to improve the clarity and consistency of the relevant body of federal rules, and Congress should undertake to do so before the next presidential election.

> ## Recommendations on Post-Election Timeline
>
> **9.2.1**  Congress should clarify and modernize the rules and procedures applicable to carrying out its constitutional responsibilities in counting presidential electoral votes, and should specifically examine the deadlines.
>
> **9.2.2**  States should certify their presidential election results before the "safe harbor" date. Also, every state should take steps, including the enactment of new statutes if necessary, to ensure that its resolution of election disputes will be given conclusive effect by Congress under 3 U.S.C. § 5.

TX_00001929

JA_004688

# Conclusion

Building confidence in U.S. elections is central to our nation's democracy. The vigor of our democracy depends on an active and engaged citizenry who believe that their votes matter and are counted accurately. The reforms needed to keep our electoral system healthy are an inexpensive investment in the stability and progress of our country.

As a nation, we need to pursue the vision of a society where most Americans see their votes as both a right and a privilege, where they cast their votes in a way that leaves them proud of themselves as citizens and of democracy in the United States. Ours should be a society where registering to vote is convenient, voting is efficient and pleasant, voting machines work properly, fraud is minimized, and disputes are handled fairly and expeditiously.



Commission Co-Chair Jimmy Carter and Executive Director Robert Pastor (American University Photo/Wilford Harewood)

This report represents a comprehensive proposal for accomplishing those goals and modernizing our electoral system. We have sought to transcend partisan divides with recommendations that will both assure the integrity of the system and widen access. No doubt, there will be some who prefer some recommendations and others who prefer other proposals, but we hope that all will recognize, as we do, that the best way to improve our electoral system is to accept the validity of both sets of concerns.

The five pillars of our proposal represent an innovative and comprehensive approach. They break new ground in the following ways:

First, we propose a universal, state-based, top-down, interactive, and interoperable registration list that will, if implemented successfully, eliminate the vast majority of complaints currently leveled against the election system. States will retain control over their registration lists, but a distributed database offers a way to remove interstate duplicates and maintain an up-to-date, fully accurate registration list for the nation.

Second, we propose that all states require a valid photo ID card, which would be a slightly modified REAL ID or a photo ID that is based on an EAC-template (which is equivalent to the REAL ID without the drivers license). However, instead of allowing the ID to be a new barrier to voting, we propose using it to enfranchise new and more voters than ever before. The states would play a much more affirmative role of reaching out to the underserved communities by providing them more offices, including mobile ones, to register them and provide photo IDs free of charge. In addition, we offer procedural and institutional safeguards to make sure that the card is not abused and that voters will not be disenfranchised because of the need for an ID.

Third, we propose measures that will increase voting participation by connecting registration and the ID process, making voting more convenient, diminishing irregularities, and offering more information on voting.

Fourth, we propose ways to give confidence to voters that use the new electronic voting machines to ensure that their vote will be recorded accurately and there will be an auditable backup on paper (with the understanding that alternative technologies may be available in the future). Our proposals also aim to make sure that people with disabilities have full access to voting and the opportunity to do so privately and independently like other voters.

Finally, we recommend a restructuring of the system by which elections have been administered in our country. We propose that the Election Assistance Commission and state election management bodies be reconstituted on a nonpartisan basis to become more professional, independent, and effective.

Election reform is neither easy nor inexpensive. Nor can we succeed if we think of providing funds on a one-time basis. We need to view the administration of elections as a continuing challenge for the entire government, and one that requires the highest priority of our citizens and our government.

For more than two centuries, our country has taught the world about the significance of democracy, but more recently, we have evinced a reluctance to learn from others. Typical of this gap is that we insist other countries open their elections to international observers, but our states close their doors or set unfair restrictions on election observing. We recommend changing that provision and also building on the innovations of the new democracies by establishing new election management bodies that are independent, nonpartisan, and effective with a set of procedures that would make American democracy, once again, the model for the world.

The new electoral edifice that we recommend is built on the five pillars of reforms. Democrats, Republicans, and Independents may differ on which of these pillars are the most important, but we have come to understand that all are needed to improve our electoral system. Indeed, we believe that the structure is greater than the sum of its pillars. Substantively, the system's integrity is strengthened by the increased access of its citizens, and voter confidence is raised by accuracy and security of new technology and enforcement of election laws. And the political support necessary to implement these reforms is more likely to materialize if all the pillars are viewed as part of an entire approach. If adequately funded and implemented, this new approach will move America down the path of transforming the vision of a model democracy into reality.

# APPENDIX

# Estimated Costs of Recommended Improvements

The Commission's recommendations are estimated to cost $1.35 billion to implement. This estimate is the sum of the cost of making state voter databases interoperable and upgrading voting machines to make them both accessible and transparent.

The total cost for making voter databases interoperable is estimated at $287 million. This cost breaks down as follows:

- The 11 states without top-down voter registration systems will need to spend a total of $74 million to build such systems.[78]

- The system to share voter data among states is estimated to cost $77 million.[79]

- The cost for all states to adopt the recommended template for shared voter data is estimated at $21 million. Since every state except Vermont requires a Social Security number to issue a driver's license, states will need to collect Social Security numbers from only a small portion of the adult population.[80]

- Since all states currently collect digital images of signatures when they issue driver's licenses, there will be no significant cost for collecting signature images for voter registration.

- For voter identification, states that use REAL ID for voting purposes will need additional funds only to provide a template form of ID to non-drivers. The template form of ID will be issued to an estimated 23 million U.S. citizen non-drivers at a cost of $115 million.[81]

The total cost for upgrading voting machines, to make them both accessible and transparent, is estimated at $1.06 billion. This is the amount needed, in addition to the HAVA funds already obligated, to replace remaining punch card and lever machines with direct recording electronic (DRE) systems or with optical scan systems with a computer-assisted marking device for blind and visually impaired voters, to retrofit DREs with a voter-verifiable paper audit trail, and to add a ballot marking device for blind voters to existing optical scan systems. The estimates are based on current distributions of various voting machines and on current costs for DREs, voter-verifiable paper audit trails, and ballot-marking devices for optical scan systems.

The Commission recommends that Congress provide $1.35 billion in funding over a two-year period, so that voter databases will be made interoperable and voting machine upgrades will be completed before the 2008 elections.

# ENDNOTES

[1]  Adam Nagourney and Janet Elder, "Late Poll Still Shows Sharp Split in U.S. Vote," *International Herald Tribune,* November 1, 2004; and Dan Eggen, "Justice Department Triples Election Monitors: More than 1,000 Head to Polls," *The Washington Post,* October 29, 2004, p. A6.

[2]  The Pew Research Center for the People and the Press, "Voters Liked Campaign 2004, But Too Much 'Mud-Slinging'," November 11, 2004, available at <http://people-press.org/reports/display.php3?ReportID=233>.

[3]  Milwaukee Police Department, Milwaukee County District Attorney's Office, Federal Bureau of Investigation, and United States Attorney's Office Task Force, *Preliminary Findings of Joint Task Force Investigating Possible Election Fraud.* May 10, 2005. Available at <http://www.wispolitics.com/1006/electionfraud.pdf>.

[4]  "Dead voters on rolls," *Chicago Tribune,* December 4, 2004.

[5]  The following democracies constitute some of the nearly 100 countries that utilize a national ID system: Belgium, Cost Rica, Germany, India, Italy, the Netherlands, Portugal, South Africa, and Spain. See Privacy.org, "Identity Cards: FAQ," August 24, 1996, available at <http://www.privacy.org/pi/activities/idcard/idcard_faq.html>

[6]  Jason P. Schacter, "Geographical Mobility: 2002 to 2003." *Current Population Reports.* US Census Bureau (March 2004). Available at: http://www.census.gov/prod/2004pubs/p20-549.pdf.

[7]  In addition to the 38 states with top-down voter registration systems, 6 states are developing bottom-up systems, 2 will use systems with both top-down and bottom-up elements, and 3 have yet to finalize their plans. North Dakota does not require voter registration. See Electionline.org, *Assorted Rolls: Statewide Voter Registration Databases Under HAVA,* June 2005, p. 3, available at <www.electionline.org/Portals/1/Assorted percent20Rolls.pdf>.

[8]  "Exposed: Scandal of double voters," *New York Daily News,* August 21, 2004 and "Double votes taint Florida, records show," *Orlando Sentinel,* October 23, 2004.

[9]  "Report: As many as 60,000 people file to vote in both Carolinas," Associated Press, October 24, 2004.

[10]  "Exposed: Scandal of Double Voters," *New York Daily News,* August 21, 2004.

[11]  The introduction of electronic transaction standards would also facilitate cross-state exchanges of voter data, see R. Michael Alvarez and Thad E. Hall, "The Next Big Election Challenge: Developing Electronic Data Transaction Standards for Election Administration," Caltech/MIT Voting Technology Project, July 2005, pp. 19-21.

[12]  "Overview of States Driver's License Requirements", National Immigration Law Center, July 12, 2005, available at <www.nilc.org/immspbs/DLs/state_dl_rqrmts_ovrvw_071205.pdf>. Alabama also collects Social Security numbers for driver's licenses, according to Commission staff conversation with Alabama's Motor Vehicle Division in August 2005.

[13]  Except for Vermont, all states require a Social Security Number for a driver's license, at least from people who were assigned a Social Security Number or are eligible for one.

TX_00001933
JA_004692

TX_00001933

[14] Voters should also have the opportunity to check their registration over the phone, via a toll-free number, or in person at the elections office.

[15] Electionline.org, *Solution or Problem? Provisional Ballots in 2004*, April 2005, p. 2, available at <http://electiononline.org/Portals/1/Publications/ERIP10Apr05.pdf>.

[16] Ibid, p.5.

[17] In states with unified databases, provisional ballots constituted .85 percent of the total ballots cast whereas in the states without unified databases, provisional ballots constituted 1.76 percent of the total. See Electionline.org, *Solution or Problem? Provisional Ballots in 2004*, Washington, D.C., April 2005.

[18] Testimony before the Commission by Ken Smukler, President of Info Voter Technologies, on June 30, 2005.

[19] Details were provided in Section 1.1.

[20] ID is required of all voters in 22 states and of all first-time voters in another two states, according to Electionline.org, <http://electiononline.org/Default.aspx?tabid=364>.

[21] Provided by Electionline.org, <www.electiononline.org/Default.aspx?tabid=473>.

[22] A comparison of driver's license records and census data for 2003 suggests that about 88 percent of Americans aged 18 and over have a driver's license, see U.S. Department of Transportation, Federal Highway Administration, *Licensed Total Drivers, By Age, 2003*, Table DL-22, Oct. 2004, at <www.fhwa.dot.gov/policy/ohim/hs03/htm/dl22.htm>, and U.S. Census Bureau, *Annual Estimates of the Population by Selected Age Groups and Sex for the United States: April 1, 2000 to July 1, 2004*, (June 2005), available at <www.census.gov/popest/national/asrh/NC-EST2004-sa.html>.

[23] U.S. Government Accountability Office, *Elections: Additional Data Could Help State and Local Elections Officials Maintain Accurate Voter Registration Lists*, GAO-05-478, June 2005, pp. 13-29.

[24] U.S. Election Assistance Commission, *The Impact of the National Voter Registration Act, 2003–2004*, June 30, 2005, pp. 16 and 20.

[25] Data on voter registration in Alaska is contained in U.S. Election Assistance Commission, "The Impact of the National Voter Registration Act of 1993 on the Administration of Elections for Federal Office: 2003-2004," Table 1: Registration History. Other examples include 34 of the 82 counties in Mississippi and the City of East St. Louis, see Emily W. Pettus, "Secretary of state seeks proposals on statewide voter roll," *Associated Press*, September 1, 2004, and Mike Fitzgerald, "Dual registration: a recipe for fraud?" *Belleview News-Democrat*, November 28, 2004.

[26] For example, see Australian National Audit Office, *Integrity of the Electoral Roll*, April 2002: <www.anao.gov.au/WebSite.nsf/Publications/4A256AE90015F69BCA256B9E007B5F52>. This audit estimated that Australia's electoral rolls were 96 percent accurate, 95 percent complete, and 99 percent valid.

[27] The residual vote rates fell by 0.79 percent in counties where lever machines were replaced by direct recording electronic (DRE) machines and by 1.46 percent in counties where punch cards were replaced by DREs, according to Charles Stewart, *Residual Vote in the 2004 Election*, Caltech/MIT Voting Technology Project Working Paper, February 2005, Table 2.

TX_00001934

28   Election Data Services, <www.electiondataservices.com/VotingSummary2004_20040805.pdf>.

29   Dan Keating, "Lost Votes in N.M. a Cautionary Tale," *Washington Post*, August 22, 2004, and "Nearly 40 votes may have been lost in Palm Beach County," *Associated Press*, November 2, 2004.

30   Electionline.org, <http://www.electionline.org/Default.aspx?tabid=290>.

31   Ted Selker, "Processes Can Improve Electronic Voting," Caltech/MIT Voting Technology Project, October 2004, available at <http://www.vote.caltech.edu/media/documents/vtp_wp17.pdf>.

32   Manual audits of voting machines are required in Colorado, Connecticut, Hawaii, Illinois, Minnesota, New Mexico, New York, North Carolina, Washington, and West Virginia, according to Verified Voting Foundation, "Manual Audit Requirement," August 18, 2005, available at <www.verifiedvoting.org/downloads/Manual_Audit_Provisions.pdf>.

33   Ted Selker and Jon Goler, "Security Vulnerabilities and Problems with VVPT," Caltech/MIT Voting Technology Project, April 2004, available at <http://vote.caltech.edu/media/documents/wps/vtp_wp16.pdf>.

34   "Voting Machine Fails Inspection," *CNETNews.com*, July 23, 2003 and "New Security Woes for E-Vote Firm," *WiredNews.com*, August 7, 2003.

35   In California's field test, about one in ten machines malfunctioned, see "Voting Machines Touch and Go," *Associated Press*, July 30, 2005.

36   Internet Policy Institute, *Report of the National Workshop on Internet Voting: Issues and Research Agenda*, March 2001. Available at <http://news.findlaw.com/hdocs/docs/election2000/nsfe-voterprt.pdf>.

37   Curtis Gans, "Making it Easier Doesn't Work: No Excuse Absentee and Early Voting Hurt Voter Turnout," Center for the Study of the American Electorate, September 13, 2004, available at <http://www.american.edu/ia/cfer/research/csae_09132004.pdf >.

38   Testimony before the Commission by Robert Stein, Dean of Social Sciences at Rice University, on June 30, 2005.

39   *Balancing Access and Integrity: The Report of the Century Foundation working Group on State Implementation of Election Reform* (N.Y. the Century Foundation Press, 2005), pp. 25-26.

40   Curtis Gans, "Making it Easier Doesn't Work: No Excuse Absentee and Early Voting Hurt Voter Turnout," Center for the Study of the American Electorate, September 13, 2004, available at <http://www.american.edu/ia/cfer/research/csae_09132004.pdf >.

41   Superior Court of the State of Washington for Chelan County, Final Judgment Dismissing Election Contest with Prejudice and Confirming Certification of Election of Christine Gregoire, Court Decision No. 05-2-00027-3, June 6, 2005.

42   United States General Accounting Office. "Elections: Issues Affecting Military and Overseas Absentee Voters," May 2001, available at: <http://www.gao.gov/new.items/d01704t.pdf>, p.1.

43   National Defense Committee, *Military and Overseas Absentee Voting in the 2004 Presidential Election*, March 30, 2005, available at <www.nationaldefensecommittee.org/media/pdf/NDCmavexecsumfinal-33005.pdf>.

44  David Jefferson, Aviel D. Rubin, Barbara Simons, and David Wagner, *A Security Analysis of the Secure Electronic Registration and Voting Experiment*, January 20, 2004, <www.servesecurityreport.org/>.

45  Information provided to the Commission by the Federal Voting Assistance Program.

46  Testimony before the Commission by James Dickson, Vice President at the American Association of People with Disabilities, on April 18, 2005.

47  Ibid.

48  Ibid.

49  Ibid.

50  Alabama, Arizona, Delaware, Maryland, Mississippi, Nebraska, Nevada, Tennessee, Washington, and Wyoming have a permanent ban on voting by certain categories of ex-felons, according to the Sentencing Project, <www.sentencingproject.org/pdfs/1046.pdf>.

51  Census data provided by the Center for Information and Research on Civic Learning and Engagement (CIRCLE), available at <www.civicyouth.org/PopUps/ReleaseCPS04_Youth.pdf>.

52  Karl T. Kurtz, Alan Rosenthal, and Cliff Zukin, *Citizenship: A Challenge for All Generations*, National Conference of State Legislatures, September 2003, available at <www.ncsl.org/public/trust/citizenship.pdf>.

53  Campaign for the Civic Mission of Schools and Alliance for Representative Democracy, "From Classroom to Citizen: American Attitudes on Civic Education," December 2004, available at <www.representativedemocracy.org/CivicEdSurveyReport.pdf>.

54  U.S. Department of Justice press release, "Department of Justice to Hold Ballot Access and Voting Integrity Symposium," August 2, 2005.

55  U.S. Government Accountability Office, *Elections: Additional Data Could Help State and Local Elections Officials Maintain Accurate Voter Registration Lists*, GAO-05-478, June 2005, pp. 59-60.

56  *Balancing Access and Integrity: The Report of the Century Foundation working Group on State Implementation of Election Reform* (N.Y. the Century Foundation Press, 2005), pp. 67-69.

57  John Fund, *Stealing Elections: How Voter Fraud Threatens Our Democracy* (San Francisco: Encounter Books, 2004), p. 103.

58  Joe Stinebaker, "Loophole lets foreigners illegally vote," *Houston Chronicle*, January 16, 2005, and Robert Redding, "Purging illegal aliens from voter rolls not easy: Maryland thwarted in tries so far," *Washington Times*, August 23, 2004.

59  Susan Greene and Karen E. Crummy, "Vote Fraud Probed In State," *Denver Post*, March 24, 2005; Brendan Farrington, "Fla. Officials Asked To Probe Vote Fraud," *Associated Press*, October 7, 2004; Dawson Bell, "Campaign Workers Suspected Of Fraud," *Detroit Free Press*, September 23, 2004; "Man Pleads Guilty In Voter Registration Scam," *Associated Press*, December 7, 2004; Robert Patrick, "Jury Finds Montgomery Guilty In Vote Fraud Case," *St. Louis Post-Dispatch*, February 11, 2005; Nevada Secretary Of State, "Alleged Vote Fraud Investigations Ongoing," Press Release, October 28, 2004; Dan McKay, "Election 'Mischief' Under Scrutiny," *Albuquerque Journal*, September 10, 2004; "Voter Registration Investigation One Of Largest In Recent Years," *Associated Press*, September 23, 2004; Greg

J. Borowski, "Inquiry Finds Evidence Of Fraud In Election," *Milwaukee Journal Sentinel*, May 11, 2005; U.S. Department of Justice, Criminal Division, Public Integrity Section, *Election Fraud Prosecutions and Convictions: Ballot Access & Voting Integrity Initiative*, October 2002 - July, 2005.

[60]   A Rasmussen Reports poll just before the November 2004 elections showed that 58 percent of American voters believed there was "a lot" or "some" fraud in U.S. elections, and in a post-election NBC News/*Wall Street Journal* poll, more than a quarter of Americans worried that the vote count for president in 2004 was unfair, quoted in Rick Hasen, "Beyond the Margin of Litigation: Reforming Election Administration to Avoid Electoral Meltdown," Paper prepared for American Political Science Association meeting, September 1, 2005, pp. 7-8, available at
<http://convention2.allacademic.com/getfile.php?file=apsa05_proceeding/2005-07-29/41404/apsa05_proceeding_41404.pdf&PHPSESSID=c47830ae1716d461356f998599faea17 >.

[61]   Ibid, p. 9.

[62]   Ibid, p. 29.

[63]   International IDEA, Code of Conduct for the Ethical and Professional Administration of Elections, 1997, <www.idea.int/publications/conduct_admin/upload/adm_english.pdf>.

[64]   United States Election Assistance Commission, *Background on the Help America Vote College Poll Worker Program*. <http://www.eac.gov/coll_poll_background.asp>; Associated Press, "US short of poll workers" November 1, 2004, *Fox News*. Available at:
<http://www.foxnews.com/story/0,2933,137242,00.html>

[65]   The Voting Rights Institute, *Democracy at Risk: the 2004 Election in Ohio* (Washington, D.C.: Democratic National Committee, 2005).

[66]   U.S. Department of Justice's investigations in Franklin County and in Knox County, Ohio found no evidence that the allocation of voting machines was conducted in a discriminatory manner, see <www.usdoj.gov/crt/voting/misc/franklin_oh.htm> and <www.usdoj.gov/crt/voting/misc/knox.htm>. In fact, the distribution of voting machines was determined by each county's Board of Elections, and half the members of each Board of Elections are Democrats.

[67]   Rule §81.125 of Texas Administrative Code, available at
<http://info.sos.state.tx.us/pls/pub/readtac$ext.TacPage?sl=R&app=9&p_dir=&p_rloc=&p_tloc=&p_ploc=&pg=1&p_tac=&ti=1&pt=4&ch=81&rl=125>.

[68]   A strong example of funding for elections research is the $7.5 million awarded by the National Science Foundation on August 15, 2005 for a collaborative project of six institutions to study the reliability, security, transparency, and auditability of voting systems.

[69]   California Secretary of State *Historical Close Of Registration Statistics: Presidential General Elections*, May 2004, available at <www.ss.ca.gov/elections/ror/reg_stats_10_18_04.pdf>; Wyoming Secretary of State, *Profile of Wyoming's Voters: Voter Registration and Voter Turnout, Associated Press*, 2004. Available at <soswy.state.wy.us/election/profile.htm>. *Election cost — $4 billion and climbing: most money went for ads, but other expenses not chicken feed*. Available at <www.msnbc.msn.com/id/6388580/>.

[70] IFES, Cost of Registration and Elections (CORE) for election costs in Australia and Spain; Elections Canada, <www.elections.ca/>; Electionguide.org, <www.electionguide.org/resultsum/canada_par04.htm>; UK Electoral Commission, 2002, *Funding Democracy: Providing Cost-Effective Electoral Services*, available at <www.electoralcommission.org.uk/files/dms/funding_csltppr_6642-6213__E__N__S__W__.pdf>; Electionguide.org, EPIC Project, available at <epicproject.org/ace/compepic/en/getAnswer$ALL+EM10>.

[71] Alliance for Better Campaigns, <www.bettercampaigns.org/standard/display.php?StoryID=322>.

[72] Fox New/Opinion Dynamics poll, March 25, 2004, <www.foxnews.com/story/0,2933,115208,00.html>.

[73] Analysis by the Norman Lear Center at the Annenberg School for Communication of the University of Southern California, <www.bettercampaigns.org/standard/display.php?StoryID=328>.

[74] Alliance for Better Campaigns, <www.bettercampaigns.org/standard/display.php?StoryID=326>, and Lear Center, "Local News Coverage of the 2004 Campaigns."

[75] National Commission on Federal Election Reform, *To Assure Pride and Confidence in the Electoral Process*, August 2001, p. 63.

[76] National Association of Secretaries of State, "International Election Protocol Resolution," and supporting language, July 24, 2005, available at <www.nass.org/International Election Protocol Resolution.pdf> and <www.nass.org/International Elections Protocol Language.pdf>.

[77] Six states passed measures to move forward the date of their presidential primaries and eight states passed measures to cancel their presidential primary for 2004, see <www.ncsl.org/programs/legman/elect/taskfc/Changing-EliminatingPP.htm>.

[78] Estimate is based on the average amounts other states are currently spending to build top-down voter registration systems and excludes HAVA funds that have already been disbursed for this purpose see Electiononline.org, *Assorted Rolls: Statewide Voter Registration Databases Under HAVA*, <http://electionline.org/Portals/1/Assorted Rolls.pdf>.

[79] Figure includes both the cost to upgrade existing state databases to make them interoperable in real time and the cost to build a voter registration distributed database linked to the individual state servers. The former ($48 million) is based on the average cost to make existing state driver's license databases interoperable with each other as determined by the Congressional Budget Office, see "H.R. 418: REAL ID Act of 2005," Congressional Budget Office, <http://www.cbo.gov/showdoc.cfm?index=6072&sequence=0>. The latter ($29 million) is based on the market cost to purchase, secure, maintain, and link to the states through leased lines a central database that benchmarks 57,346 transactions per minute.

[80]   The cost to collect Social Security numbers is tantamount to registering voters. The Office of the Chief Electoral Officer of Canada calculates the cost to registering 19.6 million voters in the 1997 national elections at approximately $18 million. This produces a statistic of $0.92 to register each person, see *Voter Turnout*, electionguide.org, <http://www.electionguide.org/turnout.htm> and *Voting for Democracy: Notes on the Canadian Experience*, Office of the Chief Electoral Officer of Canada, March 1998, <http://www.aceproject.org/main/samples/vr/vrx_w005.pdf>. For data on the distribution of driver's licenses, see "Highway Statistics 2003," U.S. Department of Transportation, <http://www.fhwa.dot.gov/policy/ohim/hs03/htm/dl22.htm>.

[81]   The cost per card is estimated at $5. This figure includes approximate administrative, infrastructure, and issuance costs, see Stephen Moore, "Congressional testimony before the U.S. House of Representatives Subcommittee on Immigration and Claims, Judiciary Committee," May 13, 1997, available at <http://www.cato.org/testimony/ct-sm051397.html> and "The debate over a national identification card," The Century Foundation, Homeland Security Project, available at <http://www.tcf.org/Publications/HomelandSecurity/National_ID_Card.pdf>.

[82]   The estimated costs for the various voting machines are as follows: Direct Recording Electronic with a Voter-Verified Paper Audit Trail (DRE/VVPAT)—$4,000; retrofitting a DRE machine with a VVPAT—$1,000; optical scanner (OS)—$5,000; and ballot marking device for an optical scan system—$4,500. Machine cost data is collected from many sources, including: Verifiedvoting.org, "Appendix 4: Cost Comparison of Alternative Solutions," <http://www.verifiedvoting.org/downloads/CT SOTS1appendix_43.pdf>; Caleb Kleppner, *State of the Industry: Compatibility of Voting Equipment with Ranked Ballots*, Center for Voting and Democracy, 2001, <http://www.fairvote.org/administration/industry.rtf>; Bo Lipari, "Analysis of Acquisition Costs of DRE and Precinct Based Optical Scan Voting Equipment for New York State," New Yorkers for Verified Voting, 2005, <http://www.nyvv.org/doc/AcquisitionCostDREvOptScanNYS.pdf>. For details on the distribution of machine technology, see Election Data Services, *Voting Equipment Summary by Type*, 2004, <http://www.electiondataservices.com/VotingSummary2004_20040805.pdf>.

# Summary of Recommendations

## 1: GOALS AND CHALLENGES OF ELECTION REFORM

### 1.1 HELP AMERICA VOTE ACT: STRENGTHS AND LIMITATIONS

1.1.1 The Help America Vote Act should be fully implemented by 2006, as mandated by the law, and fully funded.

1.1.2 The Commission urges that the Voting Rights Act be vigorously enforced and that Congress and the President seriously consider reauthorizing those provisions of the Act that are due to expire in 2007.

## 2: VOTER REGISTRATION AND IDENTIFICATION

### 2.1 UNIFORMITY WITHIN STATES — TOP-DOWN REGISTRATION SYSTEMS

2.1.1 The Commission recommends that states be required to establish unified, top-down voter registration systems, whereby the state election office has clear authority to register voters and maintain the registration list. Counties and municipalities should assist the state with voter registration, rather than have the state assist the localities. Moreover, Congress should appropriate funds for disbursement by the U.S. Election Assistance Commission (EAC) to states to complete top-down voter registration systems.

### 2.2 INTEROPERABILITY AMONG STATES

2.2.1 In order to assure that lists take account of citizens moving from one state to another, voter databases should be made interoperable between states. This would serve to eliminate duplicate registrations, which are a source of potential fraud.

2.2.2 In order to assist the states in creating voter databases that are interoperable across states, the EAC should introduce a template for shared data and a format for cross-state data transfers. This template should include a person's full legal name, date and place of birth, signature (captured as a digital image), and Social Security number.

2.2.3 With assistance and supervision by the EAC, a distributed database system should be established to make sure that the state lists remain current and accurate to take into account citizens moving between states. Congress should also pass a law mandating that states cooperate with this system to ensure that citizens do not vote in two states.

2.2.4 Congress should amend HAVA to mandate the interoperability of statewide registration lists. Federal funds should be appropriated for distribution by the EAC to states that make their voter databases interoperable, and the EAC should withhold federal funds from states that fail to do so. The law should also provide for enforcement of this requirement.

2.2.5 With proper safeguards for personal security, states should allow citizens to verify and correct the registration lists information on themselves up to 30 days before the election. States should also provide "electronic poll-books" to allow precinct officials to identify the correct polling site for voters.

2.2.6 With interoperability, citizens should need to register only once in their lifetime, and updating their registration will be facilitated when they move.

## 2.3 PROVISIONAL BALLOTS

2.3.1 Voters should be informed of their right to cast a provisional ballot if their name does not appear on the voter roll, or if an election official asserts that the individual is not eligible to vote, but States should take additional and effective steps to inform voters as to the location of their precinct.

2.3.2 States, not counties or municipalities, should establish uniform procedures for the verification and counting of provisional ballots, and that procedure should be applied uniformly throughout the State. Many members of the Commission recommend that a provisional ballot cast in the incorrect precinct but in the correct jurisdiction should be counted.

2.3.3 Poll workers should be fully trained on the use of provisional ballots, and provisional ballots should be distinctly marked and segregated so they are not counted until the eligibility of the voter is determined.

## 2.4 COMMUNICATING REGISTRATION INFORMATION

2.4.1 States and local jurisdictions should use Web sites, toll-free numbers, and other means to answer questions from citizens as to whether they are registered and, if so, what is the location of their precinct, and if they are not registered, how they can do so before the deadline.

## 2.5 VOTER IDENTIFICATION

2.5.1 To ensure that persons presenting themselves at the polling place are the ones on the registration list, the Commission recommends that states require voters to use the REAL ID card, which was mandated in a law signed by the President in May 2005. The card includes a person's full legal name, date of birth, a signature (captured as a digital image), a photograph, and the person's Social Security number. This card should be modestly adapted for voting purposes to indicate on the front or back whether the individual is a U.S. citizen. States should provide an EAC-template ID with a photo to non-drivers free of charge.

2.5.2 The right to vote is a vital component of U.S. citizenship, and all states should use their best efforts to obtain proof of citizenship before registering voters.

2.5.3 We recommend that until January 1, 2010, states allow voters without a valid photo ID card (Real or EAC-template ID) to vote, using a provisional ballot by signing an affidavit under penalty of perjury. The signature would then be matched with the digital image of the voter's signature on file in the voter registration database, and if the match is positive, the provisional ballot should be counted. Such a signature match would in effect be the same procedure used to verify the identity of voters who cast absentee ballots. After January 1, 2010, voters who do not have their valid photo ID could vote, but their ballot would count only if they returned to the appropriate election office within 48 hours with a valid photo ID.

2.5.4 To address concerns about the abuse of ID cards, or the fear that it could be an obstacle to voting, states should establish legal protections to prohibit any commercial use of voter data and ombudsman institutions to respond expeditiously to any citizen complaints about the misuse of data or about mistaken purges of registration lists based on interstate matching or statewide updating.

2.5.5 In the event that Congress mandates a national identification card, it should include information related to voting and be connected to voter registration.

TX_00001941

## 2.6 QUALITY IN VOTER REGISTRATION LISTS

2.6.1 States need to effectively maintain and update their voter registration lists. The EAC should provide voluntary guidelines to the states for quality audits to test voter registration databases for accuracy (correct and up-to-date information on individuals), completeness (inclusion of all eligible voters), and security (protection of unauthorized access). When an eligible voter moves from one state to another, the state to which the voter is moving should be required to notify the state which the voter is leaving to eliminate that voter from its registration list.

2.6.2 All states should have procedures for maintaining accurate lists such as electronic matching of death records, drivers licenses, local tax rolls, and felon records.

2.6.3 Federal and state courts should provide state election offices with the lists of individuals who declare they are non-citizens when they are summoned for jury duty.

2.6.4 In a manner that is consistent with the National Voter Registration Act, states should make their best efforts to remove inactive voters from the voter registration lists. States should follow uniform and strict procedures for removal of names from voter registration lists and should adopt strong safeguards against incorrect removal of eligible voters. All removals of names from voter registration lists should be double-checked.

2.6.5 Local jurisdictions should track and document all changes to their computer databases, including the names of those who make the changes.

# 3: VOTING TECHNOLOGY

## 3.1 VOTING MACHINES

3.1.1 Congress should pass a law requiring that all voting machines be equipped with a voter-verifiable paper audit trail and, consistent with HAVA, be fully accessible to voters with disabilities. This is especially important for direct recording electronic (DRE) machines for four reasons: (a) to increase citizens' confidence that their vote will be counted accurately, (b) to allow for a recount, (c) to provide a backup in cases of loss of votes due to computer malfunction, and (d) to test — through a random selection of machines — whether the paper result is the same as the electronic result. Federal funds should be appropriated to the EAC to transfer to the states to implement this law. While paper trails and ballots currently provide the only means to meet the Commission's recommended standards for transparency, new technologies may do so more effectively in the future. The Commission therefore urges research and development of new technologies to enhance transparency, security, and auditability of voting systems.

3.1.2 States should adopt unambiguous procedures to reconcile any disparity between the electronic ballot tally and the paper ballot tally. The Commission strongly recommends that states determine well in advance of elections which will be the ballot of record.

## 3.2 AUDITS

3.2.1 State and local election authorities should publicly test all types of voting machines before, during, and after Election Day and allow public observation of zero machine counts at the start of Election Day and the machine-certification process.

## 3.3 SECURITY FOR VOTING SYSTEMS

3.3.1 The Independent Testing Authorities, under EAC supervision, should have responsibility for certifying the security of the source codes to protect against accidental or deliberate manipulation of vote results. In addition, a copy of the source codes should be put in escrow for future review by qualified experts. Manufacturers who are unwilling to submit their source codes for EAC-supervised testing and for review by independent experts should be prohibited from selling their voting machines.

3.3.2 States and local jurisdictions should verify upon delivery of a voting machine that the system matches the system that was certified.

3.3.3 Local jurisdictions should restrict access to voting equipment and document all access, as well as all changes to computer hardware or software.

3.3.4 Local jurisdictions should have backup plans in case of equipment failure on Election Day.

# 4: EXPANDING ACCESS TO ELECTIONS

## 4.1 ASSURED ACCESS TO ELECTIONS

4.1.1 States should undertake their best efforts to make voter registration and ID accessible and available to all eligible citizens, including Americans with disabilities. States should also remove all unfair impediments to voter registration by citizens who are eligible to vote.

4.1.2 States should improve procedures for voter registration efforts that are not conducted by election officials, such as requiring state or local registration and training of any "voter registration drives."

4.1.3 Because there have been reports that some people allegedly did not deliver registration forms of those who expressed a preference for another party, states need to take special precautions to assure that all voter registration forms are fully accounted for. A unique number should be printed on the registration form and also on a detachable receipt so that the voter and the state election office can track the status of the form. In addition, voter registration forms should be returned within 14 days after they are signed.

## 4.2 VOTE BY MAIL

4.2.1 The Commission encourages further research on the pros and cons of vote by mail and of early voting.

## 4.3 VOTE CENTERS

4.3.1 States should modify current election law to allow experimentation with voting centers. More research, however, is needed to assess whether voting centers expand voter participation and are cost effective.

4.3.2 Voting centers need a higher-quality, computer-based registration list to assure that citizens can vote at any center without being able to vote more than once.

## 4.4 MILITARY AND OVERSEAS VOTING

**4.4.1** The law calling for state offices to process absentee ballots for military and overseas government and civilian voters should be implemented fully, and these offices should be under the supervision of the state election offices.

**4.4.2** New approaches should be adopted at the federal and state levels to facilitate voting by civilian voters overseas.

**4.4.3** The U.S. Department of Defense (DOD) should supply to all military posted outside the United States a Federal Postcard Application for voter registration and a Federal Write-in Absentee Ballot for calendar years in which there are federal elections. With adequate security protections, it would be preferable for the application forms for absentee ballots to be filed by Internet.

**4.4.4** The states, in coordination with the U.S. Department of Defense's Federal Voting Assistance Program, should develop a system to expedite the delivery of ballots to military and overseas civilian voters by fax, email, or overnight delivery service, but voted ballots should be returned by regular mail, and by overnight mail whenever possible. The Defense Department should give higher priority to using military aircraft returning from bases overseas to carry ballots. Voted ballots should not be returned by email or by fax as this violates the secrecy of the ballot and is vulnerable to fraud.

**4.4.5** All ballots subject to the Uniform and Overseas Civilians Absentee Voting Act must be mailed out at least 45 days before the election (if request is received by then) or within two days of receipt after that. If the ballot is not yet set, due to litigation, a late vacancy, etc., a temporary ballot listing all settled offices and ballot issues must be mailed.

**4.4.6** States should count the ballots of military and overseas voters up to 10 days after an election if the ballots are postmarked by Election Day.

**4.4.7** As the technology advances and the costs decline, tracking systems should be added to absentee ballots so that military and overseas voters may verify the delivery of their voted absentee ballots.

**4.4.8** The Federal Voting Assistance Program should receive a copy of the report that states are required under HAVA to provide the EAC on the number of absentee ballots sent to and received from military and overseas voters.

## 4.5 ACCESS FOR VOTERS WITH DISABILITIES

**4.5.1** To improve accessibility of polling places for voters with disabilities, the U.S. Department of Justice should improve its enforcement of the Americans with Disabilities Act and the accessibility requirements set by the Help America Vote Act.

**4.5.2** States should make their voter registration databases interoperable with social-service agency databases and facilitate voter registration at social-service offices by citizens with disabilities.

**4.5.3** States and local jurisdictions should allow voters with disabilities to request an absentee ballot when they register and to receive an absentee ballot automatically for every subsequent election. Local election officials should determine which voters with disabilities would qualify.

## 4.6 RE-ENFRANCHISEMENT OF EX-FELONS

**4.6.1** States should allow for restoration of voting rights to otherwise eligible citizens who have been convicted of a felony (other than for a capital crime or one

which requires enrollment with an offender registry for sex crimes) once they have fully served their sentence, including any term of probation or parole.

4.6.2 States should provide information on voter registration to ex-felons who have become eligible to vote. In addition, each state's department of corrections should automatically notify the state election office when a felon has regained eligibility to vote.

## 4.7 VOTER AND CIVIC EDUCATION

4.7.1 Each state should publish a report on its voter education spending and activities.

4.7.2 States should engage in appropriate voter education efforts in coordination with local election authorities to assure that all citizens in their state have the information necessary to participate in the election process.

4.7.3 Each state should use its best efforts to instruct all high school students on voting rights and how to register to vote. In addition, civic education programs should be encouraged in the senior year of high school, as these have been demonstrated to increase voter participation by youth.

4.7.4 Local election authorities should mail written notices to voters in advance of an election advising the voter of the date and time of the election and the polling place where the voter can cast a ballot and encouraging the citizens to vote. The notice should also provide a phone number for the voter to contact the election authorities with any questions.

4.7.5 States should mail pamphlets to voters, and post the pamphlet material on their Web sites, to provide information about the candidates for statewide office and about ballot initiatives and referenda.

4.7.6 The federal government should provide matching funds for the states to encourage civic and voter education and advertisements aimed to encourage people to vote.

# 5: IMPROVING BALLOT INTEGRITY

## 5.1 INVESTIGATION AND PROSECUTION OF ELECTION FRAUD

5.1.1 In July of even-numbered years, the U.S. Department of Justice should issue a public report on its investigations of election fraud. This report should specify the numbers of allegations made, matters investigated, cases prosecuted, and individuals convicted for various crimes. Each state's attorney general and each local prosecutor should issue a similar report.

5.1.2 The U.S. Department of Justice's Office of Public Integrity should increase its staff to investigate and prosecute election-related fraud.

5.1.3 In addition to the penalties set by the Voting Rights Act, it should be a federal felony for any individual, group of individuals, or organization to engage in any act of violence, property destruction (of more than $500 value), or threatened act of violence that is intended to deny any individual his or her lawful right to vote or to participate in a federal election.

5.1.4 To deter systemic efforts to deceive or intimidate voters, the Commission recommends federal legislation to prohibit any individual or group from deliberately providing the public with incorrect information about election procedures for the purpose of preventing voters from going to the polls.