## 5.2 ABSENTEE BALLOT AND VOTER REGISTRATION FRAUD

5.2.1 State and local jurisdictions should prohibit a person from handling absentee ballots other than the voter, an acknowledged family member, the U.S. Postal Service or other legitimate shipper, or election officials. The practice in some states of allowing candidates or party workers to pick up and deliver absentee ballots should be eliminated.

5.2.2 All states should consider passing legislation that attempts to minimize the fraud that has resulted from "payment by the piece" to anyone in exchange for their efforts in voter registration, absentee ballot, or signature collection.

5.2.3 States should not take actions that discourage legal voter registration or get-out-the-vote activities or assistance, including assistance to voters who are not required to vote in person under federal law.

# 6: ELECTION ADMINISTRATION

## 6.1 INSTITUTIONS

6.1.1 To undertake the new responsibilities recommended by this report and to build confidence in the administration of elections, Congress and the states should reconstitute election management institutions on a nonpartisan basis to make them more independent and effective. U.S. Election Assistance Commission members and each state's chief elections officer should be selected and be expected to act in a nonpartisan manner, and the institutions should have sufficient funding for research and training and to conduct the best elections possible. We believe the time has come to take politics as much as possible out of the institutions of election administration and to make these institutions nonpartisan.

6.1.2 Congress should approve legislation that would add a fifth member to the U.S. Election Assistance Commission, who would serve as the EAC's chairperson and who would be nominated by the President based on capability, integrity, and nonpartisanship. This would permit the EAC to be viewed more as nonpartisan than bipartisan and would improve its ability to make decisions. That person would be subject to Senate confirmation and would serve a single term of ten years. Each subsequent vacancy to the EAC should be filled with a person judged to be nonpartisan so that after a suitable period, all the members, and thus the institution, might be viewed as above politics.

6.1.3 States should prohibit senior election officials from serving or assisting political campaigns in a partisan way, other than their own campaigns in states where they are elected.

6.1.4 States should take additional actions to build confidence in the administration of elections by making existing election bodies as nonpartisan as possible within the constraints of each state's constitution. Among the ways this might be accomplished would be if the individuals who serve as the state's chief elections officer were chosen based on their capability, integrity, and nonpartisanship. The state legislatures would need to confirm these individuals by a two-thirds majority of one or both houses. The nominee should receive clear bipartisan support.

6.1.5 Each state's chief elections officer should, to the extent reasonably possible, ensure uniformity of voting procedures throughout the state, as with provisional ballots. Doing so will reduce the likelihood that elections are challenged in court.

## 6.2 POLL WORKER RECRUITMENT

6.2.1 States and local jurisdictions should allocate sufficient funds to pay poll workers at a level that would attract more technologically sophisticated and competent workers. Part-time workers should also be recruited for the beginning and the end of Election Day. States should amend their laws to allow shifts for part of the day for poll workers on Election Day.

6.2.2 States and local jurisdictions should implement supplemental training and recognition programs for poll workers.

6.2.3 To increase the number and quality of poll workers, the government and nonprofit and private employers should encourage their workers to serve as poll workers on Election Day without any loss of compensation, vacation time or personal time off. Special efforts should be made to enlist teachers and students as poll workers.

6.2.4 Because some jurisdictions have large majorities of one party, which makes it hard to attract poll workers from other parties, local jurisdictions should allow poll workers from outside the jurisdiction.

6.2.5 States should consider legislation to allow the recruitment of citizens as poll workers as is done for jury duty.

## 6.3 POLLING STATION OPERATIONS

6.3.1 Polling stations should be made user-friendly. One way to do so would be to forbid any campaigning within a certain distance of a polling station.

6.3.2 Polling stations should be required to maintain a "log-book" on Election Day to record all complaints. The books should be signed by election officials and observers and analyzed for ways to improve the voting process.

6.3.3 Polling stations should be organized in a way that citizens would not have to wait long before voting, and officials should be informed and helpful.

## 6.4 RESEARCH ON ELECTION MANAGEMENT

6.4.1 The Commission calls for continuing research on voting technology and election management so as to encourage continuous improvements in the electoral process.

## 6.5 COST OF ELECTIONS

6.5.1 As elections are a bedrock of our nation's democracy, they should receive high priority in the allocation of government resources at all levels. Local jurisdictions, states, and the Congress should treat elections as a high priority in their budgets.

6.5.2 Both local and state governments should track and report the cost of elections per registered voter.

# 7: RESPONSIBLE MEDIA COVERAGE

## 7.1 MEDIA ACCESS FOR CANDIDATES

7.1.1 The Commission encourages national networks and local TV stations to provide at least five minutes of candidate discourse every night in the month leading up to elections.

7.1.2 The Commission encourages broadcasters to continue to offer candidates short segments of air time to make issue statements, answer questions, or engage in mini-debates.

7.1.3 Many members of the Commission support the idea that legislation should be passed to require broadcasters to give a reasonable amount of free air time to political candidates, along the lines of the provisions of the Our Democracy, Our Airwaves Act of 2003 (which was introduced as S.1497 in the 108th Congress).

## 7.2 MEDIA PROJECTIONS OF ELECTION RESULTS

7.2.1 News organizations should voluntarily refrain from projecting any presidential election results in any state until all of the polls have closed in the 48 contiguous states.

7.2.2 News organizations should voluntarily agree to delay the release of any exit poll data until the election has been decided.

## 8: ELECTION OBSERVATION

8.1.1 All legitimate domestic and international election observers should be granted unrestricted access to the election process, provided that they accept election rules, do not interfere with the electoral process, and respect the secrecy of the ballot. Such observers should apply for accreditation, which should allow them to visit any polling station in any state and to view all parts of the election process, including the testing of voting equipment, the processing of absentee ballots, and the vote count. States that limit election observation only to representatives of candidates and political parties should amend their election laws to explicitly permit accreditation of independent and international election observers.

## 9: PRESIDENTIAL PRIMARY AND POST-ELECTION SCHEDULES

### 9.1 PRESIDENTIAL PRIMARY SCHEDULE

9.1.1 We recommend that the Chairs and National Committees of the political parties and Congress make the presidential primary schedule more orderly and rational and allow more people to participate. We endorse the proposal of the National Association of Secretaries of State to create four regional primaries, after the Iowa caucus and the New Hampshire primary, held at one-month intervals from March to June. The regions would rotate their position on the calendar every four years.

### 9.2 POST-ELECTION TIMELINE

9.2.1 Congress should clarify and modernize the rules and procedures applicable to carrying out its constitutional responsibilities in counting presidential electoral votes, and should specifically examine the deadlines.

9.2.2 States should certify their presidential election results before the "safe harbor" date. Also, every state should take steps, including the enactment of new statutes if necessary, to ensure that its resolution of election disputes will be given conclusive effect by Congress under 3 U.S.C. § 5.

# Additional Statements

All of the Commission Members are signatories of the report. Some have submitted additional or dissenting statements, which they were asked to limit to 250 words.

For alternative views and additional comments on the Commission's report, see our Web page at www.american.edu/ia/cfer/comments.

## 2.3 PROVISIONAL BALLOTS

*Kay Coles James*

I strongly support the recommendation that states adopt uniform procedures for determining the validity of provisional ballots, and I join a majority of members who support counting provisional ballots when they are cast in the wrong precinct where multiple precincts vote at a single polling place.

However, out-of-precinct voting, in which a voter uses a provisional ballot to cast a ballot in the incorrect precinct, raises four substantial problems: (1) The voter is denied opportunity to vote for all candidates and issues or else casts a vote in a race in which the voter is not qualified to vote. (2) Election officials will not be able to anticipate the proper number of voters appearing at any given polling place and will not be able to allocate resources properly among the various polling places with the result that voters will face long lines and shortage of voting supplies. (3) The post-election evaluation of provisional ballots cast in the wrong polling place is time-consuming, error prone, subject to manipulation, undermines the secrecy of the ballot and will delay the outcome of the election. (4) It is settled law that HAVA does not mandate out-of-precinct voting.

The fact that many members of the Commission support limited out-of-precinct voting should not be understood as this Commission is recommending out-of-precinct voting because a substantial number of Commission members oppose it.

*See Daschle, et. al. below for an alternative view of this recommendation.*

## 2.5 VOTER IDENTIFICATION

*Tom Daschle joined by Spencer Overton and Raul Yzaguirre*

The goals of ballot access and integrity are not mutually exclusive, and the ultimate test of the Commission's success will be whether voters from diverse backgrounds view its recommendations in their totality as providing them with a fair opportunity to participate in their democracy. Most of the recommendations in this report, such as the recommendation for a voter verified paper audit trail, meet that standard, but others do not. For voters who have traditionally faced barriers to voting – racial and ethnic minorities, Native Americans, the disabled and language minorities, the indigent and the elderly – these recommendations appear to be more about ballot security than access to the ballot.

The call for States to use the new REAL ID driver's license for voter identification at the polls is the most troublesome recommendation in the Report. While this statement identifies some of its problems, unfortunately the space allotted for dissent is inadequate to fully discuss all of the shortcomings of the Commission's ID proposal.

HAVA addresses the potential for fraudulent registration by individuals claiming to be someone they are not, and the Report contains no evidence that this reform is not working or that the potential for fraud in voter registration or multiple voting will not be addressed once the States fully implement the HAVA requirement for computerized, statewide registration lists. In fact, it offers scant evidence that this problem is widespread or that such a burdensome reform is required to solve it.

REAL ID is a driver's license, not a citizenship or a voting card. The Report notes that 12% of the voting age population lack a driver's license. While it recommends that States provide an alternative photo voting card to non-drivers free of charge, States are likely to require the same documentation that is required of drivers.

The documents required by REAL ID to secure a driver's license, and consequently a photo ID to vote under this recommendation, include a birth certificate, passport or naturalization papers, a photo identity document, and proof of Social Security number. Obtaining such documents can be difficult, even for those not displaced by the devastation of Hurricane Katrina. For some, the Commission's ID proposal constitutes nothing short of a modern day poll tax.

Important omissions raise doubts about the completeness of this Report. The lack of a recommendation on counting provisional ballots in Federal and statewide races is unfortunate. Our goal should be to ensure that the maximum number of eligible ballots are counted. Eligibility to vote for President is not dependent upon the precinct in which the voter resides. Similarly, reforms that expand access to the ballot box for working people, the disabled, elderly and minorities, such as early voting and vote-by-mail, are inadequately addressed by this Report.

Election reform must be about empowerment, not disenfranchisement. Raising needless impediments to voting or creating artificial requirements to have one's vote counted are steps backward. The mere fear of voter fraud should never be used to justify denying eligible citizens their fundamental right to vote.

### *Spencer Overton*

I am a professor who specializes in election law, and I am writing separately to express my dissenting views to the Carter-Baker Commission's photo ID proposal. Unfortunately, the Commission rejected my 597-word dissent and allowed me only 250 words (this limitation on dissent was first announced at our final meeting). I believe that the issues before the Commission are of great consequence to our democracy and deserve more discussion. Thus, my concerns with the Commission's ID proposal and the shortcomings of the Commission's deliberative process are examined in greater detail at www.carterbakerdissent.com.

*Susan Molinari*

Opponents of a voter photo ID argue that requiring one is unnecessary and discriminatory.

Numerous examples of fraud counter the first argument. In 2004, elections in Washington state and Wisconsin were decided by illegal votes. In Washington, this fact was established by a lengthy trial and decision of the court. In Wisconsin, this fact was established by a joint report written by the U.S. Attorney, FBI, Chief of Police and senior local election official – both Republicans and Democrats. In other states, most notably the states of Ohio and New York, voter rolls are filled with fictional voters like Elmer Fudd and Mary Poppins.

Addressing the second concern, the Commission recommendation is for states to adopt safeguards that guarantee all Americans equal opportunity to obtain an ID required for voting. The safeguards include initiatives to locate those voters without IDs and to provide them one without cost. Under the recommendation, eligible voters can cast a provisional ballot that will be counted if they present their photo ID within 48 hours. Far from discriminatory, a mandatory voter ID provides means by which more Americans may obtain the identification already required for daily functions -- such as cashing a check, entering a federal building, or boarding an airplane.

We present this recommendation on a nationwide basis so that states can avoid some of the problems previously highlighted.

## 3.1  VOTING MACHINES

*Ralph Munro*

I have given the majority of my career to the fair and impartial oversight and conduct of elections, serving 20 years as an elected Secretary of State. It has been an honor to serve on the Carter-Baker Commission and I believe this report is timely, accurate and will provide our country with new ideas to continually reform and improve our elections.

My only exceptions to this report are found in Section 3.1 and Section 4.2. Numerous countries are moving ahead of America in the field of election technology. On voting machines and electronic voting devices, limiting voter verified audit trails only to paper is a mistake. New technology has far greater potential than paper in this arena.

## 4.2  VOTE BY MAIL

*Ralph Munro*

It is my strong belief that the expansion of voting by mail, under strict guidelines to prevent fraud, will ensure that our voting participation will increase dramatically, especially in local and off-year elections.

## 4.6  RE-ENFRANCHISEMENT OF EX-FELONS

*Nelson Lund*

I support the Commission's major recommendations, especially those dealing with improved registration systems and the prevention of election fraud. I have reservations about several other proposals, among which the following require specific comment: Recommendations 4.6.1 and 4.6.2. Substantive decisions about criminal penalties are outside the scope of this Commission's mission, which deals with election administration. Uniformity should not be imposed on the states, some of which may have very sound policy reasons for denying the franchise to all felons or to a larger class of felons than this Commission prefers.

## 6.1  INSTITUTIONS

*Nelson Lund*

Recommendations 6.1.1, 6.1.2, and 6.1.4. The Commission mistakenly assumes that putatively nonpartisan election administration is necessarily preferable to other approaches. Moreover, the Commission's proposal to add to the EAC a fifth, putatively nonpartisan member (who would serve as the chair) is profoundly misguided. All the functions that the EAC has, or could sensibly be given, can be carried out under the current bipartisan, four-member structure. If the EAC were reconstituted in the way proposed by this Commission, it would naturally become a magnet for additional functions, and would probably come eventually to serve as a national election administrator, thus displacing the states from their proper role in our decentralized system of governance. I believe this would be a terrible mistake.

## 7.1  MEDIA ACCESS FOR CANDIDATES

*Nelson Lund*

Recommendation 7.1.3. This proposal calls for an inappropriate and constitutionally dubious interference with the freedom of the press.

## 9.1  PRESIDENTIAL PRIMARY SCHEDULE

*Shirley Malcom*

With regard to Recommendation 9.1.1, I agree on the need for regional presidential primaries, but I disagree that Iowa and New Hampshire should come first. At present the barriers to candidates unaffiliated with the major political parties gaining a place on the presidential ballot are substantial. Thus, the primary system is the major way for the American people to participate in the process of selecting candidates for president. But it gives disproportionate influence to those states that go first. One problem with Iowa is that the state decides by a caucus rather than a secret ballot, but the bigger problem with Iowa and New Hampshire is that these states have demographic profiles that make them very different from the rest of the country. Iowa and New Hampshire, according to the 2003 census, have populations that are around 94-95 percent White, while nationally Whites are 76 percent of the population. Hence, the debates are shaped in ways that do not necessarily reflect the interests of minority populations or of our diverse nation.

# About the Commission



**TOP ROW (L-R):** Ralph Munro, Kay Coles James, Raul Yzaguirre, Tom Phillips, Spencer Overton, Lee Hamilton, Sharon Priest, Rita DiMartino, Robert Mosbacher, and Jack Nelson
**BOTTOM ROW (L-R):** Betty Castor, Shirley Malcom, Bob Michel, Robert Pastor, Jimmy Carter, James A. Baker, III, Benjamin Ladner, Tom Daschle, Susan Molinari, and David Leebron

# Commission Members

## CO-CHAIRS:



**FORMER PRESIDENT JIMMY CARTER** served as the 39th President of the United States. Among his administration's accomplishments were the Panama Canal treaties, the Camp David Accords, and the SALT II treaty with the Soviet Union. He began his political career in the Georgia Senate and was elected governor of Georgia in 1970.

In 1982 after leaving the White House, he founded The Carter Center, which he dedicated to resolving conflict, fighting disease, strengthening democracy, and advancing human rights. He received the Nobel Peace Prize in 2002 for his efforts.



**FORMER SECRETARY OF STATE JAMES A. BAKER, III** has served in senior government positions in three presidential administrations. In 1989, President George H.W. Bush appointed him to serve as the nation's 61st Secretary of State. During his tenure at the U.S. Department of State, he traveled to 90 foreign countries as the U.S. confronted the challenges and opportunities of the post-Cold War era.

Mr. Baker led presidential campaigns for Presidents Ford, Reagan, and Bush over the course of five consecutive presidential elections from 1976 to 1992. He is presently a senior partner in the law firm of Baker Botts and serves as honorary chairman of the James A. Baker III Institute for Public Policy at Rice University.

## EXECUTIVE DIRECTOR:



**ROBERT PASTOR** is Director of the Center for Democracy and Election Management, Professor of International Relations, and Vice President of International Affairs at American University. From 1985 until coming to AU in 2002, Dr. Pastor was Fellow and Founding Director of The Carter Center's Latin American Program and its Election Monitoring Initiatives. He served as President Carter's representative on the Carter-Ford Commission on Election Reform. He has taught at Harvard University, where he received his Ph.D. in Government, and is the author of 16 books.

## OTHER COMMISSION MEMBERS:



**BETTY CASTOR** was the 2004 Democratic candidate for U.S. Senate in Florida. She has held prominent leadership positions in education, most recently as president and CEO of the National Board for Professional Teaching Standards in Arlington, Virginia. Before joining the National Board, Ms. Castor served as president of the University of South Florida and as Florida Commissioner of Education. She is the founder and president of a political action committee called Campaign for Florida's Future, dedicated to increasing citizen participation in public life.



**TOM DASCHLE** served as a U.S. Senator from South Dakota for 18 years and held a number of Democratic leadership positions, including Senate Majority Leader and Senate Minority Leader. Before entering the Senate, Mr. Daschle served four terms in the U.S. House of Representatives and quickly became part of the Democratic leadership. His support for the Help America Vote Act of 2002 helped bring the landmark election reform law to passage in the U.S. Senate. In 2005, Senator Daschle joined the Legislative and Public Policy Group of the law firm Alston & Bird, LLP.



**RITA DIMARTINO** is the former vice president of congressional relations for AT&T. As AT&T's in-house resource on Hispanic affairs, she provided guidance to senior management about this growing segment of the population and offered leadership on multicultural issues. In 2002, Ms. DiMartino was appointed principal U.S. delegate to the Inter-American Commission of Women and also principal representative to the Inter-American Children's Institute. Active at all levels of Republican politics, she was elected executive vice chair of the New York State Republican Committee in 1988.



**LEE HAMILTON** is president and director of the Woodrow Wilson International Center for Scholars. Prior to becoming director of the Wilson Center in 1999, he represented Indiana's Ninth District in the U.S. House of Representatives for 34 years. During his tenure, Mr. Hamilton served as chairman and ranking member of the House Committee on Foreign Affairs, chairing the Subcommittee on Europe and the Middle East and the Permanent Select Committee on Intelligence. He is currently serving as co-chair of the National Commission on Terrorist Attacks in the U.S.



**KAY COLES JAMES** was director of the U.S. Office of Personnel Management from 2001 to 2005. She was a senior fellow and director of The Citizenship Project at the Heritage Foundation, leading efforts to restore a strong ethic of citizenship and civic responsibility nationwide. Ms. James is also the former dean of the school of government at Regent University and has served under President George H. W. Bush as associate director of the White House Office of National Drug Control Policy and as assistant secretary for public affairs at the Department of Health and Human Services.



**BENJAMIN LADNER** has been President and Professor of Philosophy and Religion at American University since 1994. He chairs the Board of Trustees of the Consortium of Universities of the Washington Metropolitan Area, comprised of fourteen colleges and universities, with 130,000 students. Before coming to American University, Dr. Ladner was president of the National Faculty, a national association of university professors founded by Phi Beta Kappa.



**DAVID LEEBRON** is President of Rice University in Houston, Texas. He is the former dean of the Columbia University School of Law, where he worked from 1989 to 2004. From 1983 to 1989, he was a professor of law at New York University and director of NYU's International Legal Studies Program. He is a member of the American Bar Association's Standards Review Committee and the American Law Deans Association's Board of Directors. Mr. Leebron has taught and published in areas of corporate finance, international economic law, human rights, privacy, and torts.



**NELSON LUND** is the Patrick Henry Professor of Constitutional Law and the Second Amendment at George Mason University in Virginia, where he teaches on topics that include federal election law. Mr. Lund served as a law clerk to the Honorable Patrick Higginbotham of the United States Court of Appeals for the Fifth Circuit and to the Honorable Sandra Day O'Connor of the United States Supreme Court. Following his clerkship with Justice O'Connor, Mr. Lund served in the White House as associate counsel to the president from 1989 to 1992.



**SHIRLEY MALCOM** is head of the Directorate for Education and Human Resources Programs of the American Association for the Advancement of Science (AAAS). The Directorate includes AAAS programs in education, activities for underrepresented groups, and public understanding of science and technology. Dr. Malcom serves on several boards -- including the Howard Heinz Endowment and the H. John Heinz III Center for Science, Economics and the Environment -- and is an honorary trustee of the American Museum of Natural History. She is a trustee of the California Institute of Technology and a regent of Morgan State University.



**BOB MICHEL** served as a member of the U.S. House of Representatives from Illinois from 1957 to 1993. During that time he held a number of leadership roles, including those of Minority Whip and Minority Leader. Mr. Michel was a delegate to the Republican National Convention from 1964-1992 and permanent chairman of the Republican National Conventions of 1984, 1988, and 1992. He served with the Thirty-Ninth Infantry Regiment as a combat infantryman in England, France, Belgium, and Germany from 1943 to 1946.



**SUSAN MOLINARI** is the President and CEO of the Washington Group, a government relations and lobbying firm. She was a member of Congress from New York from 1990 to 1997. In 1994, she was elected to the Republican Majority Leadership, making her the highest-ranking woman in Congress. In 1996, she was selected by Robert Dole to be the Keynote Speaker at the Republican National Convention in San Diego, California. Prior to Congress, Molinari was twice elected to the New York City Council, where she was Minority Leader.



**ROBERT MOSBACHER** is Chairman of Mosbacher Energy Company. He is the past chairman of the Republican National Committee and served as national finance chairman for the election campaigns of Presidents Ford and George H. W. Bush. Mr. Mosbacher served as Secretary of Commerce under President Bush from 1989 to 1992, and was awarded the Aztec Eagle Award from Mexico President Ernesto Zedillo for his role in developing the North American Free Trade Agreement (NAFTA). He is a trustee emeritus for the Aspen Institute for Humanistic Studies and past chairman of the Americas Society/Council on the Americas.



**RALPH MUNRO** served as Washington Secretary of State from 1980 to 2001. His achievements include implementing a presidential primary allowing independent voters to participate in the nomination process; transitioning election equipment from lever machines to optical scan systems; designing a "Motor Voter" registration system; and supporting a program that allowed Desert Storm troops to vote in Washington elections via fax from the Persian Gulf. Mr. Munro currently serves on the Board of Directors of numerous technology companies, including Dategrity, a provider of secure Internet technology systems.



**JACK NELSON** is a Pulitzer Prize-winning journalist and former Washington bureau chief for the Los Angeles Times. He covered the past six presidents and every presidential campaign from 1968 through 1996. Since retiring in December 2001, he has taught at the University of Southern California's School of Journalism. In 2002, Mr. Nelson was a Shorenstein Fellow at Harvard University's Kennedy School of Government. He was presented the Drew Pearson Award for Investigative Reporting and the Robert F. Kennedy Award for Lifetime Achievement in Journalism.



**SPENCER OVERTON** is a professor at The George Washington University Law School who specializes in voting rights and campaign finance law. His academic articles on election law have appeared in several leading law journals, and his book "Stealing Democracy: The New Politics of Voter Suppression," will be published and released by W.W. Norton in June 2006. Professor Overton formerly taught at the University of California, Davis, and served as the Charles Hamilton Houston Fellow at Harvard Law School. He currently serves on the boards of Common Cause, the National Voting Rights Institute, and the Center for Responsive Politics.



**TOM PHILLIPS** is a partner in the law firm of Baker Botts LLP. From 1988 to 2004, he was Chief Justice of the Supreme Court of Texas, and was elected and re-elected four times. During his tenure, he served as president of the National Conference of Chief Justices (1997-98), a member of the Committee on Federal-State Relations of the Judicial Conference of the United States, and an advisor to the Federal Judicial Code Project of the American Law Institute.



**SHARON PRIEST** is the former Arkansas Secretary of State and the first woman to hold that position. Prior to her election to statewide office in 1994, she has served as mayor of Little Rock. She is also the former president of the National Association of Secretaries of State. Currently, Ms. Priest chairs the Arkansas State Election Improvement Study Commission, the State Board of Election Commissioners, and the Capitol Arts and Grounds Commission. She has also received the TIME/NASBE Award for Outstanding Leadership in Voter Education.



**RAUL YZAGUIRRE** is presidential professor of practice in community development and civil rights at Arizona State University. He has devoted his career to advocacy issues facing the Hispanic community. He is the founder of Interstate Research Associates, a Mexican-American research association and nonprofit consulting firm. From 1974 to 2004, Mr. Yzaguirre was president of the National Council of La Raza. In addition to his work with La Raza, he helped establish the National Hispanic Leadership Agenda and the New American Alliance, among other organizations.

## COMMISSION STAFF

**DANIEL CALINGAERT** is the Associate Director of the Center for Democracy and Election Management at American University and Associate Director of the Commission. He has served as Program Director for Asia and Deputy Director for Eastern Europe at the International Republican Institute, where he designed and managed a wide range of programs to promote democracy. Dr. Calingaert previously directed programs to reform social science education at universities across Eastern Europe and Eurasia.

**DOUG CHAPIN** is Director of electionline.org and Research Director for the Commission. He has worked on election issues for more than 15 years, with extensive experience that includes positions with the Federal Election Commission, the U.S. Senate Rules Committee, and Election Data Services, Inc. Before becoming electionline.org's first director, he worked at Skadden, Arps, Slate, Meagher & Flom LLP.

**KAY STIMSON** is the Associate Director of Media and Public Affairs to the Commission. She has served as Director of Communications at both the U.S. Election Assistance Commission and the National Association of Secretaries of State, where she served as the association's spokesperson and managed its voter outreach efforts. Prior to joining NASS, Ms. Stimson spent more than five years in the field of television journalism as a news anchor and political reporter.

**MARGARET MURRAY GORMLY** is the Administrative Coordinator for Dr. Robert A. Pastor, Executive Director of the Commission, and as such, she has handled the senior-level administrative affairs of the Commission. She serves as the manager of the Office of International Affairs and has provided senior-level administrative support for the Commission. Before joining the AU staff, she was the executive assistant to the CEO and COO of GW Solutions.

**MEEGAN MCVAY** is the Grants and Proposals Manager for the Commission. Since 2003, she has served as the primary fundraiser in the Office of International Affairs, working with the Center for North American Studies and the Center for Democracy and Election Management. Ms. McVay is a Certified Fund Raising Executive with more than eight years of development experience, including positions with the Brookings Institution and ACCION International.

**PAULINA PUIG** is the Web Master for the Commission, managing Web operations for the Office of International Affairs, Center for Democracy and Election Management, and Center for North American Studies. She is also responsible for the Web sites of the AU Abroad and Abroad at AU programs, as well as the ABTI-American University of Nigeria. Ms. Puig previously worked as a technology consultant for a government agency and was a senior Web developer for Discovery.com.



Back row, left to right: Leslie Wong, Kay Stimson, Paulina Puig, Jimmy Carter, James A. Baker, III, Daniel Calingaert, Doug Chapin, Benjamin Ladner, Vassia Gueorguieva, Katherine Kirlin, and Robert Pastor

Front row, left to right: Nicole Byrd, Kimberly Carusone, Meegan McVay, Murray Gormly, and Lisa Arakaki

**VASSIA GUEORGUIEVA** is a Ph.D. candidate in public administration at the AU School of Public Affairs and a Graduate Research Assistant for the Commission. She has worked for the Bulgarian Parliament and the Organization for Security and Cooperation in Europe.

**NICOLE BYRD** is a M.A. candidate in International Peace and Conflict Resolution/Foreign Policy at the AU School of International Service and a Graduate Research Assistant for the Commission. She is also vice-president of the Graduate Student Council.

**JOHN HENDERSON** is a Junior Fellow at the Center for Democracy and Election Management and a Graduate Research Assistant for the Commission. As a Rhodes Scholar, he completed a graduate degree in Comparative Politics at the University of Oxford.

**KIMBERLY CARUSONE** is a M.A. candidate in International Education at American University and the Assistant Web Master for the Commission. She previously worked in publishing and marketing and is a graduate of Pennsylvania State University.

**ZACHARY PFISTER** is a B.A. candidate in Conflict Studies at DePauw University in Indiana, where he is also the student body president. He was a Summer Research Assistant to the Commission.

TX_00001959
JA_004718

TX_00001959

## ORGANIZING AND SUPPORTING INSTITUTIONS

The Commission on Federal Election Reform is organized by American University's Center for Democracy and Election Management.



Robert Pastor, James A. Baker, III, and Jimmy Carter  (American University Photo/Jeff Watts)

The Center for Democracy and Election Management, established in September 2002, is dedicated to educating students and professionals about best practices in democracy and conducting public policy-oriented research on the management of elections. In addition, the Center seeks to serve as a venue for public policy discussion on these topics and to provide an institutional base for international scholars to study and teach about democratic processes. Dr. Robert A. Pastor serves as its Director. The Center is part of American University in Washington, DC.

**IN ASSOCIATION WITH THE FOLLOWING ORGANIZATIONS:**
Rice University's James A. Baker III Institute for Public Policy
The Carter Center

**SUPPORTED BY:**
Carnegie Corporation of New York
The Ford Foundation
John S. and James L. Knight Foundation
Omidyar Network

**RESEARCH BY:**
Electionline.org/The Pew Charitable Trusts

## CONTRIBUTORS TO THE COMMISSION'S WORK: HEARINGS

# Hearing: How Good Are U.S. Elections?

April 18, 2005
American University (Washington, DC)

### Panel I: Elections and HAVA: Current Status

Gracia Hillman, Chair, U.S. Election Assistance Commission

Chellie Pingree, President, Common Cause

Kay J. Maxwell, President, League of Women Voters of the U.S.

Henry Brady, Professor of Political Science and Public Policy,
University of California

### Panel II: Access and Integrity

Barbara Arnwine, Executive Director, Lawyers' Committee for Civil Rights Under Law

John Fund, Wall Street Journal Editorial Board

Colleen McAndrews, Partner, Bell, McAndrews & Hiltachk, LLP

Arturo Vargas, Executive Director, National Association of Latino
Elected and Appointed Officials

### Panel III: Voting Technology and Election Administration

Jim Dickson, Vice President for Governmental Affairs, American
Association of People with Disabilities

David Dill, Professor of Computer Science, Stanford University

Hon. Ron Thornburgh, Secretary of State, State of Kansas

Richard L. Hasen, Professor of Law, Loyola Law School



U.S. Election Assistance Commission Chair Gracia Hillman testifies at the April 18 hearing. Professor Jamin Raskin is to her left, and Hon. John Anderson is to her right. (American University Photo/Jeff Watts)

TX_00001961
JA_004720

TX_00001961

# Hearing: How Can We Improve U.S. Elections?

June 30, 2005
Rice University (Houston, TX)

### Panel I:  *Voter Registration, Identification, and Participation*

Ken Smukler, President, InfoVoter Technologies

Michael Alvarez, Professor of Political Science, California Institute of Technology

Paula Hawthorn, Former Manager of Operating Systems Research,
  Hewlett-Packard Laboratories

Robert Stein, Dean of Social Sciences and Professor of Political Science,
  Rice University

### Panel II:  *Voting Technology*

Dan Wallach, Associate Professor of Computer Science, Rice University

Beverly Kaufman, Clerk, Harris County, Texas

Special thanks to Harris County, Texas, and the Nevada Secretary of State Office's Elections
  Division for providing electronic voting machines that were demonstrated for the
  Commission during this session.

### Panel III:  *Election Management and Election Reform*

Donald J. Simon, Partner, Sonosky, Chambers, Sachse, Endreson, & Perry, LLP

Louis Massicotte, Professor of Political Science, University of Montreal

Norman Ornstein, Resident Scholar, American Enterprise Institute



(L-R)Donald Simon, Louis Massicotte, and Norman Ornstein at the
June 30 hearing (Rice University Photo/Jeff Fitlow)

**MEETINGS AND PRESENTATIONS**

# Congressional Meeting

July 15, 2005
Woodrow Wilson International Center for Scholars
Washington, DC

Special thanks to the following Members of Congress for their comments and participation, including related committee staff participation: Rep. Robert Ney (R-OH), Rep. Steny Hoyer (D-MD), Rep. Juanita Millender-McDonald (D-CA), Rep. Rush Holt (D-NJ), and Rep. John Conyers (D-MI).

# Common Cause Meeting with Advocates for Election Reform

July 16, 2005
Common Cause Headquarters
Washington, DC

Special thanks to Ed Davis and Barbara Burt of Common Cause for organizing this meeting.

# National Association of State Election Directors

August 13, 2005
Beverly Hilton Hotel
Los Angeles, CA

# Academic Advisors

Throughout the course of its research and deliberations, the Commission benefitted greatly from the substantial contributions of academic advisors and other experts, as well as opinions shared by citizens around the country. While we wish to acknowledge the distinguished individuals who aided our work, this does not imply that they agree with all of the report's recommendations. Nonetheless, their work was invaluable and we want to express our gratitude.

**ALAN ABRAMOWITZ**
Professor of Political Science
Emory University

**MICHAEL ALVAREZ**
Professor of Political Science
California Institute of Technology

**CURTIS GANS**
Director of the Center for the Study
of the American Electorate
American University

**MARK GLAZE**
Director of Public Affairs
The Campaign Legal Center

**PAUL GRONKE**
Associate Professor of Political Science
Reed College

**RICHARD HASEN**
Professor of Law, Loyola Law School
and Editor of *Election Law Journal*

**PAULA HAWTHORN**
Former Manager of Operating Systems Research
Hewlett-Packard Laboratories

**MARK F. HEARNE II**
Partner
Lathrop and Gage LC

**STEVEN HOCHMAN**
Research Director
The Carter Center

**ROBIN LEEDS**
Scholar-in-Residence, Women & Politics Institute
American University

**R. DOUG LEWIS**
Executive Director
The Election Center

**DAVID LUBLIN**
Associate Professor of Government
American University

**JENNIFER MCCOY**
Director of the Americas Program
The Carter Center

**KAREN O'CONNOR**
Professor of Government and Director of the
Women & Politics Institute
American University

**NORMAN ORNSTEIN**
Resident Scholar
American Enterprise Institute

**CAMERON QUINN**
U.S. Elections Advisor
International Foundation for Election Systems

**JAMIN RASKIN**
Professor of Law
American University Washington College of Law

**ROB RICHIE**
Executive Director
Center for Voting and Democracy

**JOHN SAMPLES**
Director of the Center for Representative Government
CATO Institute

**LEONARD SHAMBON**
Counsel
Wilmer Cutler Pickering Hale and Dorr LLP

**RICHARD G. SMOLKA**
Professor Emeritus of Political Science
American University

**ROBERT STEIN**
Dean of Social Sciences and Professor of
Political Science
Rice University

**JAMES THURBER**
Director of the Center for Congressional and
Presidential Studies
American University

**DAN WALLACH**
Associate Professor of Computer Science
Rice University

**TRACY WARREN**
Director
Pollworker Institute

## EXPERTS CONSULTED BY THE COMMISSION

**KIMBALL W. BRACE**
President
Election Data Services

**CRAIG S. BURKHARDT**
Chief Counsel for Technology
U.S. Department of Commerce

**STEPHEN E. FIENBERG**
Professor of Statistics and Social Science
Carnegie Mellon University

**JONATHAN FRENKEL**
Director for Law Enforcement Policy
U.S. Department of Homeland Security

**JOHN MARK HANSEN**
Dean of the Social Sciences Division
University of Chicago

**PAUL HERRNSON**
Director of the Center for American
  Politics and Citizenship
University of Maryland

**THERESE LAANELA**
Senior Program Officer
International Institute for Democracy
  and Electoral Assistance

**HERBERT LIN**
Senior Scientist
National Research Council

**THOMAS MANN**
Senior Fellow
Brookings Institution

**ROBERT MONTJOY**
Professor of Public Administration
University of New Orleans

**M. GLENN NEWKIRK**
Principal
InfoSENTRY Services

**JACQUELINE PESCHARD**
Professor
Universidad Nacional Autónoma de México

**JOHN PETTY**
Chairman
TecSec

**AVIEL RUBIN**
Professor of Computer Science
Johns Hopkins University

**ROBERT SAAR**
Executive Director
DuPage County Election Commission, Illinois

**FRITZ SCHEUREN**
President
American Statistical Association

**ARI SCHWARTZ**
Associate Director
Center for Democracy and Technology

**MICHAEL D. SIEGEL**
Principal Research Scientist at the Sloan
  School of Management
Massachusetts Institute of Technology

**HANS A. VON SPAKOVSKY**
Counsel to the Assistant Attorney General
  for Civil Rights
U.S. Department of Justice

**JOHN THOMPSON**
Executive Vice President of the National
  Opinion Research Center
University of Chicago

**DAN TOKAJI**
Assistant Professor of Law at Moritz
  College of Law
Ohio State University

**WAI L. TSANG**
Principal Engineer
TecSec

**TOVA WANG**
Democracy Fellow
The Century Foundation

**HON. ANDREW YOUNG**
Professor of Policy Studies
Georgia State University

## ADDITIONAL ACKNOWLEDGEMENTS

**AMERICAN UNIVERSITY STAFF:** Lisa Arakaki, Keith Costas, Marilee Csellar, Clark Gregor, Katherine Kirlin, Todd Sedmak, David Taylor, Leslie Wong, and Julie Weber.

**CARTER CENTER STAFF:** Nancy Koningsmark, Faye Perdue, Jane Quillen, and Lisa Wiley.

**JAMES A. BAKER III INSTITUTE FOR PUBLIC POLICY STAFF:** B.J. Almond, Charlotte Cheadle (Baker Botts), Maggie Cryer, Sonja Dimitrijevich, Kathryn Hamilton, Molly Hipp, and Ryan Kirksey.



CENTER FOR DEMOCRACY AND ELECTION MANAGEMENT
American University
4400 Massachusetts Avenue, NW
Washington, DC 20016-8026

JA_004725

TX_00001966



**FEDERAL ELECTION COMMISSION**
Washington, DC  20463

June 29, 2007

The Honorable Dianne Feinstein
Chairman
Committee on Rules and Administration
United States Senate
Washington, D.C.  20510-0504

The Honorable Robert F. Bennett
Ranking Minority Member
Committee on Rules and Administration
United States Senate
Washington, D.C.  20510-4403

Dear Chairman Feinstein and Senator Bennett:

At the end of my nomination hearing, I was asked to provide a rebuttal to claims made in a letter sent to the Rules Committee dated June 11, 2007 ("the Letter"). The Authors of the Letter ("the Authors") sent a subsequent letter to the Rules Committee on June 18.  I wish to note for the Committee that pursuant to Rule 1.6 of the Model Rules of Professional Conduct[1] and applicable rules of the states in which I am licensed to practice law, I am not able to reveal information regarding the contents of the legal advice I provided while employed at the Department of Justice due to attorney-client privilege.  To the extent that the information requested has been revealed by the Department publicly or in response to Congressional oversight and inquiries, or otherwise waived, I will certainly provide that information.

With regard to the specific matters referenced in the Letter:

**<u>Hiring Practices and Personnel Matters</u>**

I did not make final decisions on who was hired in the Civil Rights Division or the Voting Section.  Like other career employees, I was occasionally asked to interview candidates along with the Deputy Assistant Attorney General and/or the Section Chief.  I provided my recommendations and observations on the candidate to the Deputy.  Politics was not a part of the hiring process, no political litmus test existed, and no questions about any applicant's own political views were asked in any interview in which I participated.

---

[1] Model Rule 1.6, Confidentiality of Information (2007 version), is available on the American Bar Association's website, at http://www.abanet.org/cpr/mrpc/rule_1_6.html.

Exhibit 19

My own observation of the Deputies and the Assistant Attorney Generals for whom I worked is that they were interested in only one thing – hiring the best and brightest attorneys with demonstrated legal skills and abilities. Attorneys from a wide variety of educational backgrounds and professional experiences were always considered.

I refer the Committee to the written responses provided to the Senate Judiciary Committee by Assistant Attorney General Wan Kim, the last Assistant Attorney General for whom I worked before leaving the Division, following his oversight hearing on November 16, 2006. Mr. Kim stated that he was not aware of a change in the hiring process for lateral attorneys and that Section chiefs play a central role in the hiring of attorneys through both the Honors Program and lateral hiring process, including active participation in interviewing both lateral and Honors Program applicants. Mr. Kim added that he takes "very seriously the recommendations of Section Chiefs in all personnel matters."

The Letter alleges that a large number of employees have left the Voting Section. Since I am no longer employed at the Division, I do not have access to personnel information. However, in the previously referenced responses, Assistant Attorney General Kim stated that the "average Division attorney attrition rate from FY 2001 through FY 2005 was between 12 and 13 percent." The attrition rate during the previous Administration was virtually the same. Assistant Attorney General Kim added that "In FY 2005, the attrition rate was approximately 17 percent (16.6 percent for career attorneys), with 63 attorneys, 59 of whom were career attorneys, leaving the division that year." However, this rise in the attrition rate was apparently due to a special early retirement package that was offered to selected components within the Department of Justice by OPM, including the Civil Rights Division. A number of employees in the Division took advantage of this special program, including I believe, both Mr. Rich and Mr. Kengle. The Letter also states that a large number of attorneys have left the Voting Section since 2005. I have no information about that since I also left the Division in the first week of 2006.

The Letter discusses the alleged involuntary transfer of the Deputy Chief of the Voting Section. Although not identified by name, I assume the Authors are referring to Robert Berman. As I have stated, I had no hiring or firing authority within the Division, and no authority to transfer any employees. As I recall, Mr. Berman received approval from the Assistant Attorney General for his request to enter a special Department of Justice training program for the Senior Executive Service. Mr. Berman then requested a detail to the Administrative Office of the U.S. Courts in September of 2005 as part of the qualification process for the SES. He was still on that detail when I left the Department of Justice and started at the Federal Election Commission. I have no knowledge regarding his subsequent transfer when he returned to the Voting Section or the reasons for that transfer since it occurred after I left the Division.

The Letter also falsely states that I engaged in "retribution" against certain employees. That is simply untrue, particularly since I had no authority to transfer or terminate the employment of any employee. The Authors complain that performance evaluations were changed to supposedly "retaliate" against employees for disagreeing with the legal conclusions of the Front Office. That is categorically untrue and there is no evidence that any information included in any evaluation was false. The standard form used to evaluate attorney performance requires approval by both a rating official and a

2

TX_00001968

reviewing official. In the Civil Rights Division, the rating official is typically the Section Chief who supervises the line attorneys. The reviewing official is usually one of the Deputy Assistant Attorney General's to whom the Section reports. I was tasked with looking at the evaluations forwarded by the Section Chief for review by the Deputy Assistant Attorney General and providing the Deputy Assistant Attorney General with my advice and opinion as to whether evaluations accurately reflected the performance of the employees that I had observed.

I reviewed evaluations for accuracy in rating the performance of the employee. For example, if an employee had written a legal memorandum that recited the wrong holding of an applicable legal case, or failed to discuss relevant case law, I might recommend that information be included in the performance evaluation. The vast majority of performance evaluations were ultimately approved with no changes; a small number that failed to include certain legal errors that had been made by the employee were brought to the attention of the Deputy Assistant Attorney General and the Chief of the Section. The Deputy Assistant Attorney General made the final decision on the content of the performance evaluation after discussions with the Section Chief. Under the rules governing career employees, they have the ability to appeal any part of their performance evaluations with which they disagree. I am unaware of any such appeals that were successful. I advised both the Section Chief and the Deputy Assistant Attorney General of instances in which material information regarding the legal performance of employees was not included in a performance evaluation. There was absolutely nothing improper in doing so – it was my job.

With regard to the issue of complaints filed with the Office of Professional Responsibility ("OPR"), I would respectfully refer the Committee to the letter of June 11, 2007, sent to the Senate Judiciary Committee by the Department of Justice that I understand provides information about these matters.

## Redistricting and Section 5 Preclearance

### 1. Georgia's Voter Identification Statute

I answered extensively questions about the Division's review under Section 5 of a voter identification law submitted by the Georgia Attorney General during my nomination hearing. I would simply add that the Principal Deputy Assistant Attorney General as the Acting Assistant Attorney General approved the recommendation made by the Chief of the Voting Section to preclear this statute without objection.[2] I provided the Principal Deputy with my legal advice and recommendations on this case. Contrary to the Authors' claims, I was not required to recuse myself and I acted entirely in an ethical and professional manner when I was at the Division and published a law review article, in full compliance with 5 C.F.R. 2635.703(a) and 2635.807(b). In my article, I recommended very generally that voter identification requirements be adopted to improve the integrity of elections from a public policy standpoint. Most of the lawyers I worked with at the Division also had opinions on how certain laws could be improved or changed, and these opinions in no way

---

[2] Information about the recommendation of the Voting Section Chief that would normally be privileged has been previously provided to Congress by the Department of Justice.

3

interfered with their ability to enforce the requirements of the law. I have written extensively on public policy issues related to voting and elections. Writing on such issues does not pose a conflict of interest under any applicable rule of professional conduct and did not interfere with my ability to objectively review the application of Section 5 to a specific statute.

As a legal matter, the Authors are simply incorrect with respect to what constitutes a conflict of interest requiring recusal or disqualification. To borrow from a parallel situation, a judge is not required to recuse himself from a case simply because he has expressed views on the subject at issue. In fact, the Sixth Circuit specifically held that a judge was not required to recuse himself in an eminent domain case simply because he had previously written a law review article on the general subject. *See Goodpasture v. Tennessee Valley Authority*, 434 F.2d 760, 765 (6th Cir. 1970) ("We hold that District Judge William E. Miller did not err in failing to recuse himself because of a law review article written by him entitled 'Federal and State Condemnation Proceedings – Procedure and Statutory Background.'"). *See also Laird v. Tatum*, 409 U.S. 824, 831 (1972) (memorandum of Justice Rehnquist) ("My impression is that none of the former Justices of this Court since 1911 have followed a practice of disqualifying themselves in cases involving points of law with respect to which they had expressed an opinion or formulated policy prior to ascending to the bench."); *Rosquist v. Soo Line R.R.*, 692 F.2d 1107 (7th Cir. 1982) ("Judge Grady had, in the past, written and spoken on the subject of contingent fees. He was not required, however, to recuse himself merely because he holds and had expressed certain views on that general subject."); *U.S. v. Crowell*, 586 F.2d 1020, 1027 (4th Cir. 1978) ("The fact that the district judge had researched the problems in advance and was able to make an immediate ruling does not establish prejudgment."); *Lawton v. Tarr*, 327 F.Supp. 670, 673 (E.D.N.C. 1971) ("I do not believe that my strong aversion to the Vietnam War and my belief that it is the most tragic national mistake made in my lifetime will have the slightest effect or influence upon my judgment as to the time of termination of exposure under the selective service law. It is hornbook law that attitude or feeling a judge may entertain toward the subject matter of a case does not disqualify him.").

I would also note that Mr. Greenbaum, one of the Authors, was working for the Lawyers Committee for Civil Rights at the time this statute was being reviewed by the Division, and his organization participated in bringing suit against the State of Georgia over the statute. Mr. Greenbaum's name is on the Complaint that was filed in federal court in Georgia against the statute claiming that it violated various Constitutional provisions as well as the Voting Right Act.[3]

The Authors assert that the Division must have erred in approving this law because the "federal court in Georgia found that this law violated the poll tax provision of the Constitution." Even if a law violated the poll tax provision of the Constitution, that would have been completely irrelevant for Section 5 preclearance purposes. Under applicable Supreme Court precedent, the Division was not permitted in 2005 to consider constitutional violations (or violations of *other* provisions of the Voting Rights Act) when reviewing for preclearance a change in voting laws under Section 5 of the VRA. *See Reno v. Bossier Parish School Board*, 520 U.S. 471 (1997). In fact, the Department of Justice published a Notice on January 18, 2001, providing guidance to the public on the retrogression standard

---

[3] *See* http://moritzlaw.osu.edu/electionlaw/litigation/documents/CorrectCompleteComplaint.pdf at p. 45.

4

under Section 5. *See Guidance Concerning Redistricting and Retrogression Under Section 5 of the Voting Rights Act*, 66 Fed.Reg. 5412. This Guidance specifically explained that under the *Bossier Parish* decision, "[r]edistricting plans that are not retrogressive in purpose or effect *must be precleared, even if they violate other provisions of the Voting Rights Act or the Constitution.*" (emphasis added). The individual listed in the Guidance for anyone seeking further information was Joseph D. Rich, one of the Authors.

In *Bossier Parish*, the Supreme Court specifically stated that the Justice Department may only consider the retrogression standard of Section 5. Not only was the Department forbidden from considering possible constitutional violations when conducting a Section 5 review, it could not even consider possible violations of other provisions of the VRA, such as Section 2. In a second decision, *Reno v. Bossier Parish School Board*, 528 U.S. 320 (2000), the Supreme Court held that Section 5 requires preclearance of a redistricting plan enacted with a discriminatory but nonretrogressive purpose. The court in the Georgia identification case, *Common Cause/Georgia v. Billups*, 406 F.Supp.2d 1326 (N.D. Ga. 2005), entered its preliminary injunction based solely on the 14th and 24th Amendments of the U.S. Constitution. The court specifically refused to grant an injunction under Section 2 of the VRA because the plaintiffs failed to demonstrate "a substantial likelihood of succeeding on the merits," *i.e.*, it found an insufficient basis in the claim of racial discrimination. *Id.* at 1375. The court's finding on the constitutional issues which did not involve racial discrimination were completely irrelevant and unrelated to the Division's review and could not lawfully have served as the basis for a Department denial of preclearance under Section 5. To the extent that the Authors' suggest otherwise, they would appear to be taking the position that the Department should have disregarded the Supreme Court's decisions.

The Division's Section 5 analysis was based on the information received in the submission from Georgia's Attorney General, including four sets of data received from the state on driver's licenses. As the Assistant Attorney General of the Office of Legislative Affairs, William Moschella, explained in a letter to Senator Christopher Bond dated October 7, 2005, the data received by the Division showed the following:

- Almost 6.5 million Georgians possessed identification from the Department of Motor Vehicles ("DMV") acceptable under the state statute– more than the Census total projected voting age population of Georgia when ineligible individuals such as noncitizens and prisoners are subtracted.
- Thus, there were 2 million more issued state DMV identification cards then there were registered voters.
- The racial composition of the DMV data indicated that 28% were African American, a percentage slightly higher than the African-American percentage of the voting age population in Georgia.
- Information from the state university system, which issues identification cards to all students that are acceptable under the law, showed that the number of African-American students enrolled and thus possessing acceptable identification was slightly higher than the percentage of African-American students in the voting age population.
- Census data showed that about 14.3% of whites and 19.4% of African-American Georgians worked for governments at the local, state or federal level; therefore, a

5

TX_00001971

higher percentage of African-Americans than whites would have access to acceptable government-issued employee identification cards.

- Individuals who were unable to afford an identification card could receive one without paying a fee and the state had a mobile licensing program traveling to counties without licensing offices.
- No identification card was needed to vote by absentee ballot.

Mr. Moschella's letter also cites other factors that were taken into account by the Division in making its decision. Applying the applicable retrogression standard under Section 5, as interpreted by the Supreme Court, the Section Chief concluded that the State of Georgia had met its burden and that no objection was warranted.

The facts and the applicable law make it clear that the Division's decision was entirely reasonable and well within the standards that applied to Section 5 reviews. The Georgia district court's issuance of a preliminary injunction based on the plaintiffs' ultimate likelihood of success on certain constitutional violations are not relevant to a Section 5 analysis under applicable Supreme Court precedent.[4] While Congress subsequently rejected certain aspects of the Supreme Court's Section 5 jurisprudence in 2006 when it renewed Section 5, the Division cannot be faulted for adhering to the law as it existed at the time.

## 2.    Texas Redistricting Submission

I must point out as a general matter on the issue of redistricting, before discussing specifically the Texas redistricting submission, that while I was at the Division, the Voting Section reviewed literally hundreds of city, county, state and congressional redistricting plans drawn by both Republican and Democratic legislators and officials. Of course, hundreds of plans drawn by Democratic officials were precleared by the Division while I was there, without any objection by the Front Office. The Authors claim "partisanship" and "politics" played a role in the "unprecedented mid-decade" Texas redistricting submission and all other matters handled by the Division. If that is the case, however, why do the Authors not complain that the Division engaged in supposed "partisanship" in every other redistricting plan it reviewed? Obviously, the supposed "mishandling" of the many redistricting plans submitted to the Division could have dramatically affected elections throughout the states covered under Section 5 of the Voting Rights Act. When considering only congressional redistricting plans, for example, the Division approved plans without objection drawn by Democratic legislatures in States such as Alabama, Georgia, Louisiana, and North Carolina. In my experience, the Assistant Attorney Generals for whom I worked and the Front Office of the Division applied the applicable law and precedent without regard to politics, partisanship or which political party might benefit from a particular redistricting plan.

---

[4] Notably, other Federal courts have disagreed with the Georgia court when confronted with the question of the constitutionality of voter identification requirements. The Seventh Circuit Court of Appeals found no violation of any federal law or constitutional provisions when it reviewed a very similar photo identification law enacted in the State of Indiana. *See Crawford v. Marion County Election Board*, 472 F.3d 949 (7th Cir. 2007) *petition for rehearing en banc denied* 484 F.3d 436; *see also Purcell v. Gonzalez*, 549 U.S. _____(2006) (Supreme Court vacated preliminary injunction issued by 9th Circuit against Arizona voter identification law).

6

TX_00001972

I replied extensively at the hearing to questions raised over the Division's review of the Texas redistricting plan under Section 5. The final decision on this matter was made by the Principal Deputy Assistant Attorney General because Assistant Attorney General Acosta had recused himself from the matter. The Authors cite the subsequent Supreme Court decision as somehow indicative that the Division erred in preclearing the plan, implying that the real reason was political. That is simply not the case.

I provided my legal advice and recommendations to the senior leadership of the Division when the Chief of the Voting Section sent his memorandum on the Texas redistricting submission to the Front Office. The advice followed a very deliberate and careful review of every relevant fact, along with the governing legal standards under Section 5 of the Voting Rights Act. The preliminary internal legal memorandum that was leaked to the press did not reflect the Division's final analysis of the redistricting plan. The leaked memorandum contained several incorrect assessments. Most significantly, it asserted that Texas had eleven majority-minority congressional districts. As the subsequent courts decisions make perfectly clear, Texas had only eight majority-minority districts. This error was the basis for the staff recommendation to object to the redistricting plan.

Subsequent events, including two decisions by a three-judge panel finding no violation of the Voting Rights Act, the 2004 elections held under the new plan that resulted in the election of an additional African American legislator, Al Green, in the 9th District, and the Supreme Court's decision, prove that the Division's conclusion to preclear the redistricting plan was correct and the earlier recommendations made by staff attorneys in the leaked memorandum were flawed.

As noted above, the applicable standard under Section 5 was whether there would be retrogression (or backsliding) in the position of racial minorities in their effective exercise of the electoral franchise when compared to the existing or benchmark plan. *See Beer v. United States*, 425 U.S. 130 (1976); *Reno v. Bossier Parish School Board*, 520 U.S. 471 (1997) (The timing of the redistricting –even if it was an "unprecedented mid-decade redistricting plan" – is completely irrelevant to a Section 5 preclearance determination.) "Retrogression, by definition, requires a comparison of a jurisdiction's new voting plan with its existing plan." *Reno*, 520 U.S. at 478. The benchmark redistricting plan in Texas at the time the new plan was submitted for review to the Division was the plan that had been drawn by a three-judge federal panel in 2001 in *Balderas v. Texas*, Case No. 6:01-158, 2001 WL 35673968 (E.D. Tex. Nov. 14, 2001) (*per curiam*) *summarily aff'd*, 536 U.S. 9191 (2002). The three-judge panel in *Balderas* found that eight of the 32 congressional districts allocated to Texas were minority districts protected by the Voting Rights Act – six districts for Hispanic voters and two districts for African American voters. The congressional districting plan submitted by Texas to the Division in 2003, preserved, without question, eight minority districts - the sole requirement under Section 5. In fact, as the election of Congressman Al Green (TX-9) demonstrates, Texas actually created a third district in which African American voters could elect their candidate of choice. Far from being retrogressive, the plan that DOJ precleared was actually progressive under Section 5 with respect to minority voting rights.

After preclearance was granted, a group of plaintiffs filed suit under Section 2 of the Voting Rights Act alleging, *inter alia*, that Texas had not created enough minority

TX_00001973
JA_004732

TX_00001973

districts, *i.e.*, that eight districts were not enough districts given demographics and other factors present in the state.[5]  Of course, Section 2 and Section 5 have different requirements and standards, and while Section 5 only requires preservation of the status quo, Section 2 involves a complex analysis under three factors set forth in *Thornburg v. Gingles*, 478 U.S. 30 (1986), as well as the "totality of circumstances," that in layman's terms prohibits not retrogression but dilution of minority voting strength.

However, even the plaintiffs' Section 2 claim that there were more than eight majority-minority districts in Texas was denied by a three-judge panel in 2004. *Session v. Perry*, 298 F.Supp.2d 451 (E.D.Tex. 2004).  The court's denial of the claim under Section 2 lends support to the Division's decision under Section 5 to preclear the plan as non-retrogressive.  Under established Supreme Court precedent, to obtain preclearance under the retrogression standard of Section 5, Texas was required to preserve the number of existing minority districts in the benchmark plan.  As the court's Section 2 ruling confirmed, there were only eight protected minority districts in Texas.  A second decision was issued by the same court in 2005 following remand from the Supreme Court, holding that there was no valid constitutional claim with respect to this redistricting plan. *Henderson v. Perry*, 399 F.Supp.2d 756 (E.D. Tex. 2005).

In 2006, the Supreme Court issued a 5-4 decision featuring opinions written by Chief Justice Roberts and Justices Kennedy, Stevens, Souter, Breyer and Scalia, holding that only one of the redistricting plan's newly formed Hispanic district was an insufficient substitute for another Hispanic district, and therefore violated Section 2 (not Section 5). That one district excepted, the rest of the redistricting plan was upheld.  *See League of United Latin American Citizens (LULAC) v. Perry*, 126 S.Ct. 2594 (2006).

The Supreme Court's decision also lends support to the Division's Section 5 preclearance determination since it upheld the view that there were a total of eight protected minority districts in Texas, not eleven as was mistakenly asserted by staff attorneys in the leaked memorandum.  In just one example of the mistakes made in the memorandum, it was claimed that there were four protected African-American districts in the benchmark plan, not two as had been determined in 2001 in the *Balderas* decision.  The memorandum asserted that in addition to the two districts represented by African-American Congresswomen Sheila Jackson Lee and Bernice Johnson, districts 24 and 25, represented by Anglo Democrats Martin Frost and Chris Bell, were also protected minority districts because – supposedly – African-Americans in those districts were able to elect their candidates of choice (the key test for determining whether a district is a protected minority district).

The Supreme Court's Section 2 analysis considered whether Congressman Frost's district was a minority district and rejected that claim, affirming the lower court's decision that it was not a minority district.  *See LULAC v. Perry*, 126 S.Ct. at 2624-2625 (citing testimony of Congresswoman Eddie Bernice Johnson that District 24 was drawn for an

---

[5] The three-judge panel that first heard the lawsuit filed in response to Texas' 2003 redistricting plan described plaintiff's challenge as follows: "Plaintiffs allege that Plan 1374C is invalid because (1) Texas may not redistrict mid-decade; (2) the Plan unconstitutionally discriminates on the basis of race; (3) the Plan is an unconstitutional partisan gerrymander; and (4) various districts in Plan 1374C dilute the voting strength of minorities in violation of §2 of the Voting Rights Act." *See Session v. Perry*, 298 F.Supp.2d 451, 457 (E.D.Tex. 2004).

8

TX_00001974

Anglo Democrat (Martin Frost, in particular) in 1991 by *splitting* a minority community and testimony of State Representative Ron Wilson that African-Americans did not have the ability to elect their preferred candidate, particularly an African-American candidate, in District 24). The leaked memorandum also asserts that district 25, represented by Chris Bell, was a protected minority district, which was simply untenable under the facts and the law. Bell had been elected in an open seat race in 2002 in which his African-American Democratic opponent who lost had received the majority of the African-American vote – Bell was thus obviously not the "candidate of choice" of African-American voters. Yet the memorandum mistakenly claimed that this was a protected minority district in which African-American voters could elect their candidate of choice. The staff's "unanimous recommendation" was rejected not because of politics but because it was demonstrably wrong.

The Supreme Court did find that a new Hispanic District, number 25 under the new plan, was not a proper substitute for a Hispanic district established in the benchmark plan and represented by Henry Bonilla. The Court did not determine, however, that Texas must have seven Hispanic districts under Section 2 – as was claimed by the plaintiffs and in the leaked memorandum. Instead, the new district was considered not compact enough to substitute for the changes made in Congressman Bonilla's district. The view of the Division that there were six Hispanic districts in the benchmark plan that must be preserved in the new redistricting plan in order for Section 5 preclearance to be granted, was correct.

## Help America Vote Act

### 1.    Guidance Letters

The Authors' allegation that I "violated" decades-long traditions and policies against issuing advisory opinions by sending a series of letters to state officials on the requirements of the new Help America Vote Act ("HAVA") is incorrect. President Bush signed HAVA into law on October 29, 2002. Title III of HAVA contained a series of new requirements for states in the areas of provisional balloting, computerized voter registration lists, voter identification requirements, and others. All of the states and territories covered by these new federal requirements needed to pass implementing legislation and regulations if their state laws did not match the new requirements of HAVA. The Division began receiving telephone calls, emails, and letters from state and local election officials and legislators all over the country making inquiries about this new federal law and what its provisions required. Unfortunately, the new Election Assistance Commission ("the EAC") created by the statute was not yet in existence and did not start its operations until almost a year and a half later, and was not empowered by Congress to issue regulations, provide legal opinions, or enforce the statute.

The Division's leadership was very concerned with ensuring that the states implemented the new requirements of the law as soon as possible and apparently felt that objective would be handicapped if no one in the federal government in Washington could answer the numerous questions that state and local officials had regarding implementation. The Division attempted to provide guidance to state and local officials on the requirements of the law based on how the Division intended to enforce it. To that end, the Division established a web page devoted to explaining HAVA's requirements that provided answers

9

to some of the most commonly asked questions, and where the Division could post its responses to specific inquiries.[6] Contrary to the assertions made in the Letter, these were not "advisory opinions," as the letters themselves are careful to state. For example, one of these letters reads:

> The Attorney General has assigned to the Civil Rights Division the Department's enforcement responsibilities under Section 401 of HAVA. Although the Department states its formal positions with respect to statutes it enforces only through case-by-case litigation, the Department does on occasion offer its general views on the manner in which it intends to enforce a particular statue or set of laws. Therefore, while we cannot issue a formal advisory opinion, we will attempt to answer the questions posed in your letter to the extent we can based on our responsibilities to enforce Title III of HAVA, which imposes uniform and nondiscriminatory election technology and administration requirements on the 55 States and Territories..

*See Letter of May 20, 2003 to Ann McGeehan, from Joseph D. Rich, Chief, Voting Section,* available at http://www.usdoj.gov/crt/voting/hava/tx_ltr.pdf.[7]

On January 18, 2001, the Voting Section published a document for the States and local jurisdictions covered by Section 5 that stated "it is *appropriate* to issue guidance concerning the review of redistricting plans submitted to the Attorney General for preclearance pursuant to Section 5 of the Voting Rights Act." 66 Fed. Reg. 5412 (emphasis added).[8] Another example of guidance provided by the Division was the "ADA Checklist for Polling Places," released on February 20, 2004, which was intended to improve accessibility at polling places for disabled voters and available at http://www.usdoj.gov/crt/ada/votingck.htm.

The Authors' assertions that there was something wrong with the Division trying to provide guidance to the States on how to implement these new federal requirements is simply wrong. A review of the guidance letters on the Voting Section's webpage makes it clear that there is nothing improper about them, and that they are, in fact, rather unexceptional. The letters represent an attempt by the Division to carry out the intent of Congress in passing HAVA by helping the states come into compliance with a new federal statute that changed the way local jurisdictions administered federal elections. I think the Assistant Attorney General correctly decided to provide such guidance which not only helped states implement the law, but avoided forcing the Division having to file *more* enforcement actions under HAVA. The decision preserved Division resources. This was part of a comprehensive attempt to educate state and local officials on the requirements of HAVA that also included numerous presentations at meetings of election official

---

[6] *See* http://www.usdoj.gov/crt/voting/hava/hava.html and
http://www.usdoj.gov/crt/voting/misc/faq.htm#faq22.

[7] Additional letters signed by Mr. Rich include *Letter of August 24, 2004 to Donald H. Dwyer, Jr., from Joseph D. Rich, Chief, Voting Section available at* http://www.usdoj.gov/crt/voting/hava/MD_ltr2.pdf and *Letter of February 11, 2004 to William F. Galvin, from Joseph D. Rich, Chief, Voting Section available at* http://www.usdoj.gov/crt/voting/hava/MA_ltr.pdf.

[8] Mr. Rich was Chief of the Voting Section when this guidance was issued. Another example of such information provided by the Division is "Guidance Regarding the Use of Race by Federal Law Enforcement Agencies," issued in June 2003 and available on the Division's web site.

10

organizations, such as the National Association of Secretaries of State, the National Association of State Election Directors, the National Association of County Officials, the Election Center, and state election official associations.

The letters attempt to explain the requirements of different provisions of Title III and are signed by various officials at the Division, including Mr. Rich and me. The vast majority of these letters were produced after consultation and discussion by the lawyers assigned to enforcement of HAVA on what was the legally correct response.

Two letters in particular have attracted attention. As I informed the Committee at my hearing, I drafted two letters sent to Arizona on provisional balloting requirements at the direction of my supervisors. As I recall, I may not have consulted with the Section prior to drafting the first letter. I believe, however, that I did consult with the Section on the second letter and incorporated suggested edits. (The second letter is available at http://www.azsos.gov/Releases/2005/pressrelease10/DOJ_Opinion_on_PROP200.pdf.) Mr. Rich has erroneously claimed that Sheldon Bradshaw, the Principal Deputy Assistant Attorney General, could not have signed the letter of April 15, 2005, because he was no longer at the Division at the time. That is categorically untrue. Mr. Bradshaw can easily confirm that he was still at the Division on April 15 and that he both authorized and signed the letter in question.

The Authors raise in their letter a specific and similar guidance letter that I signed on September 8, 2003, in response to an inquiry from the Attorney General of Maryland. The Authors claim this letter "advocated for a policy keeping eligible citizens off the voter rolls for typos and other mistakes by election officials." That claim is completely false. The letter speaks for itself and is available on the Voting Section's web page at http://www.usdoj.gov/crt/voting/hava/maryland_ltr.pdf. The letter carefully cites the applicable provisions of both the National Voter Registration Act and HAVA. First of all, it explains that under the NVRA, covered States must "ensure that any eligible applicant is registered to vote in an election" if the "valid voter registration form of the applicant" is submitted, accepted, received or postmarked, as the case may be, within 30 days before the federal election in question. Second, it cites to the new provisions in HAVA that require state election officials and state motor vehicle officials "to match information in the database of the statewide voter registration system with information in the database of the motor vehicle authority to the extent required to enable each such official to **verify the accuracy of the information** provided on applications for voter registration." Section 303(a)(5)(B)(i) (emphasis added). Section 303(a)(5)(B)(ii) of HAVA also provides that state motor vehicle officials and the federal commissioner of Social Security shall "enter into an agreement...for the purpose of verifying applicable information" provided by voter registration applicants.

The September 8 letter makes it very clear that HAVA requires states to undertake the verification process outlined by Congress, but that the statute "leaves the ultimate decision of whether to register the applicant, including the decision of whether the information provided by the voter has been sufficiently verified, up to the State or local election official charged with that responsibility under State law." Nowhere in the letter do I state that States should refuse to register applicants because of "typos and mistakes by election officials."

TX_00001977
JA_004736

TX_00001977

2.        **The U.S. Election Assistance Commission**

I am accused of "usurping" the role of Mr. Rich on the Board of Advisors of the U.S. Election Assistance Commission and failing to "consult" with him over EAC matters. Section 214 of HAVA provides that the Department of Justice has two representatives on the Board of Advisors, the Chief of the Office of Public Integrity and the Chief of the Voting Section or their "designees." 42 U.S.C. § 15344. The Assistant Attorney General of the Division made the decision that I would serve as the designated representative on behalf of the Voting Section and sent a letter to the EAC notifying the Commission of that decision.

As outlined in Section 202 of HAVA, Congress intended the EAC to help improve the administration of federal elections. 42 U.S.C. § 15322. The Board of Advisors was tasked in Section 212 with providing its best advice and recommendations to the EAC in preparing voluntary voting system guidelines, voluntary guidance under Title III of HAVA, and best practices recommendations for election administration. Unlike Mr. Rich, I have real-world experience in election administration and considerable knowledge of voting system guidelines. I served as a member of two separate committees developing standards for voting equipment and electronic data interchange in the election area: the Voting Standards Committee of the Institute of Electrical and Electronics Engineers (IEEE) and the Election and Voter Service Technical Committee of the Organization for the Advancement of Structured Information Standards (OASIS). Due to my experience, the Assistant Attorney General apparently believed I was better suited to serve on the Board of Advisors.

The Authors also criticize certain email communications between me, the EAC Commissioners and the leadership of the Board of Advisors. There was nothing inappropriate about that correspondence. First, there is nothing unusual or untoward about discussions occurring between two federal agencies with overlapping jurisdiction over a federal statute, particularly when the two agencies may have differing views on the statute's requirements. In fact, under such circumstances, one would hope that the agencies would consult with one another to reach consensus so the public and the regulated community are not faced with differing interpretations of the same statute. That is what in fact occurred on more than one occasion. Second, I was a member of the Board of Advisors that is *supposed* to give advice to the EAC Commissioners. I sent such advice and recommendations to the Commissioners and the Board on a number of issues – there was nothing inappropriate about that, either.

3.        *Amicus* **Briefs**

The Authors accuse me of personally violating "established Department policy" by supposedly involving the Division in "contentious and partisan litigation" and for allegedly "draft[ing] legal briefs in lawsuits between the Republican and Democratic parties…all in favor of the Republican party's position." Though the Authors do not provide details, these accusations apparently refer to litigation filed in 2004 by private plaintiffs under HAVA over the new statute's provisional balloting requirements.

*Amicus* briefs are prepared by the Appellate Section and then reviewed by the senior leadership of the Division for final approval. No brief can be filed without the

12

Assistant Attorney General's authorization. A simple review of the briefs reveals the names of the attorneys at the Division who prepared and approved these briefs on behalf of the Department of Justice – they included Assistant Attorney General R. Alexander Acosta and the head of the Appellate Section, David K. Flynn, along with the lawyers in the Section who drafted the briefs, David White and Chris Wang. My name appears nowhere in the briefs, although I reviewed drafts prepared by Mr. Flynn and his Appellate Section lawyers, as did other lawyers in the Front Office of the Division. Decisions regarding the contents of these briefs, and whether to file them, were made by the Assistant Attorney General and the Principal Deputy Assistant Attorney General. This is entirely consistent with the law, regulations, and the usual and customary practices of the Division. The Authors vastly overstate my influence.

The cases in which these *amicus* briefs were filed in Florida, Michigan, and Ohio (including the Sixth Circuit) were the first major cases under HAVA. Each raised significant issues about the availability of a private right of action and the Section 302 requirement that states provide provisional ballots to certain voters. 42 U.S.C. §15482. The briefs at issue are available on the HAVA web page of the Voting Section at the Division's website at http://www.usdoj.gov/crt/voting/hava/hava.html.

Section 401 of HAVA gives the Attorney General authority to enforce the statute, so it should come as no surprise that the Assistant Attorney General believed it was important to provide the courts with the Department's views on the issues raised in the lawsuits. In fact, the Division files *amicus* briefs in a wide variety of cases that affect voting rights. The gravamen of the Authors' complaint is really that they disagree with the Division's position that HAVA did not permit a private right of action with respect to the statute's provisional balloting section. Once again, their criticism is policy-driven and they characterize these differences in policy as malfeasance. The briefs speak for themselves and in my opinion present a reasoned argument based on the text and structure of the statute, as well as its legislative history. In these briefs, the Department noted that other voting rights statutes, namely the Voting Rights Act and the National Voter Registration Act, clearly recognize a private right of action, while HAVA does not. This issue was even debated by members of Congress and Senator Dodd, one of HAVA's main sponsors, indicated that HAVA was not privately enforceable. Senator Dodd stated:

> While I would have preferred that we extend [a] private right of action…, the House simply would not entertain such an enforcement provision. Nor would they accept federal judicial review of any adverse decision by a State administrative body.

148 Cong. Rec. S10488-02, S10512 (Oct. 16, 2002).

The Sixth Circuit ultimately disagreed with the Department's position and held that although "HAVA does not create a private right of action," HAVA does create a right to cast a provisional ballot under certain circumstances that is enforceable against state officials under 42 U.S.C. § 1983.[9] While the Authors' preferred policy position may have prevailed on this issue, they are absolutely incorrect that the Division came to its position as a result of political considerations or that that position was unreasonable.

---

[9] *See Sandusky Co. Democratic Party v. Blackwell*, 387 F.3d 565,572-573 (6th Cir. 2004).

13

TX_00001979

With respect to the second issue raised in these cases, provisional ballots, the Authors fail to inform the Rules Committee that in each of these three cases, the Division's position prevailed. The Florida federal district court and the Sixth Circuit (which decided both the Ohio and Michigan cases) agreed with the Division's position on provisional balloting. *See Florida Democratic Party v. Hood*, 342 F.Supp.2d 1073 (N.D. Fla.2004); *Sandusky County Democratic Party v. Blackwell*, 386 F.3d 815 (6th Cir. 2004) and 387 F.3d 565 (6th Cir. 2004).

The issue in each of these cases was whether Section 302 of HAVA requires states to count the provisional ballots of individuals who voted outside of their assigned precincts. The Division's *amicus* briefs addressed only the very narrow federal question – they did not address whether or not precinct-based voting is appropriate in any particular state. The Division's briefs argued that HAVA requires a state to provide a provisional ballot to an individual who does not appear on the registration list at a polling place, but believes he or she is registered and eligible to vote there. However, Congress did not prohibit a state from declining to count that ballot if the voter is not, in fact, eligible to vote at that polling place. The Sixth Circuit rejected the arguments advanced by the plaintiffs, and held that Congress did not intend to override traditional precinct-based voting by the states when it passed HAVA and that HAVA does not require a state to count a provisional ballot "if it is cast outside the precinct in which the voter resides." Thus, every final court of record in each of these cases agreed with the Division's position on provisional ballots.

### 4.    *Spencer v. Blackwell*

The Authors also fault me for drafting a letter in another Ohio case, *Spencer v. Blackwell.* This letter was authorized and signed by the Assistant Attorney General and is available on the Voting Section's HAVA web page at http://www.usdoj.gov/crt/voting/hava/spencer.pdf and speaks for itself. It brought to the federal court's attention the new provisional balloting requirements set forth in HAVA and noted that if voters were challenged in the November 2 election pursuant to state law, "as a matter of federal law those challenged voters must be given the opportunity to cast a provisional ballot even if they are unable to answer the specific questions posed by election judges." *See Letter of October 29, 2004, from R. Alexander Acosta to Judge Susan J. Dlott.* The Authors claim that the Division's letter was somehow improper because "the law did not implicate any statue that the Department enforces." The state challenge law at issue, the Division noted, implicated HAVA's provisional balloting requirements. There was absolutely nothing improper about the Assistant Attorney General's decision to provide information to the judge in this case on the Division's views about a new federal statute. The Sixth Circuit found against the plaintiffs in their request for injunctive relief. *Spencer v. Blackwell*, 388 F.3d 547 (6th Cir. 2004).

### National Voter Registration Act

The Authors accuse me of "chang[ing] the enforcement direction of the Department regarding the National Voter Registration Act." This complaint amounts to nothing more than the fact that the Division enforced Section 8 of the NVRA. Among its other requirements, Section 8 requires states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible

14

voters by reason of (A) the death of the registrant; or (B) a change in the residence of the registrant." 42 U.S.C. § 1973gg(a)(4). Section 8 is an important part of the nation's voter rights laws, and the low esteem in which the Authors hold it is perplexing.

First, the Authors vastly overstate my authority. The enforcement priorities of each Section at the Division, including the Voting Section, are determined by the Assistant Attorney General, not a career Counsel. I certainly made recommendations to the senior leadership on what those priorities should be – that was part of my job - but I had no final decision making authority.

Second, under the current Administration, the Division has an outstanding NVRA enforcement record. The prior Administration did not file a single lawsuit to enforce the NVRA during the period 1997 to 2000. The first new lawsuits to enforce the statute were filed in 2001 against the State of Tennessee and the City of St. Louis, Missouri. Suit was filed against Tennessee over the state's failure to implement voter registration opportunities in state public assistance and driver's licenses offices. Suit was filed against St. Louis because of the city's failure to follow the specific notice provisions of Section 8 of the NVRA before removing voters from the registration list.

The Division also filed NVRA suits against New York for failing to offer voter registration to disabled students at public colleges and universities and against Pulaski County, Arkansas for violating a number of provisions of Section 8. The Division additionally settled two other NVRA problems out of court that involved jurisdictions not properly registering new voters.

The Authors complain specifically about a lawsuit filed against Missouri for the state's failure to properly maintain voter registration lists as required under Section 8, as well as improperly removing voters by failing to follow the required notice provisions.[10] This enforcement action was the result of an investigation conducted by career lawyers within the Voting Section (as described in the complaint) that showed that the Secretary of State and certain Missouri counties were not complying with the law. The suit had absolutely nothing to do with politics or partisanship or the fact that the Missouri Secretary of State is a Democrat – in fact, the Division filed an almost identical suit under the NVRA for the same failure to properly maintain the voter registration list against the Indiana Secretary of State, who happened to be a Republican.[11] The Authors criticize the filing of the Missouri suit because a federal judge dismissed the case, holding that DOJ needs to sue the individual counties at fault. However, it is my understanding that the dismissal is being appealed by the Division.

In the identical Indiana NVRA suit, the Secretary of State agreed to remedy the violation and entered into a Consent Decree that was approved by a federal judge. *See*

---

[10] The complaint is available at http://www.usdoj.gov/crt/voting/nvra/mo_nvra_comp.htm. Paragraph 13 of the complaint states, in part, that there are local election jurisdictions that "have not always followed the notice and timing requirements of Section 8 of the NVRA with respect to voters who may have moved. These practices have resulted in the removal of voters from voter registration lists in elections for federal office prematurely in a manner not consistent with federal law."

[11] *See* http://www.usdoj.gov/crt/voting/nvra/in_nvra_comp.htm. The Indiana case was filed in 2006 when I was no longer at the Division, although the investigation that led to the suit was authorized by the Acting Assistant Attorney General while I was still at the Division.

15

TX_00001981

http://www.usdoj.gov/crt/voting/nvra/in_nvra_cd.pdf. The same is true of the NVRA lawsuit in New Jersey mentioned by the Authors – the defendants entered into a Consent Decree approved by a federal court.[12]

The Authors criticize these three NVRA lawsuits, two of which were settled with the explicit approval of federal judges and one of which is on appeal. They fail to acknowledge that these three lawsuits were *not* the only NVRA lawsuits brought by the Division. Their disagreement is nothing more than a public policy dispute. They would have ordered the Division's enforcement priorities differently than did the leadership of the Division and the Department of Justice. The Division could not willfully ignore the list maintenance requirements of the NVRA, requirements that were reinforced by Congress in Section 303 of HAVA. List maintenance is required in both the NVRA and HAVA and it is the responsibility of DOJ to enforce those laws.

### *Georgia v. Ashcroft*

Finally, the Authors claim that I failed to understand "that [my] role as a Department of Justice attorney was to represent the 'United States of America.' Instead, on several occasions [I] took actions indicating a stubborn view that the Department represented the Bush Administration, the Republican Party or the Assistant Attorney General." I agree that a DOJ lawyer represents the United States, and I also believe that the Executive Branch should be run by the appointees of the President of the United States.

The President's appointees are vested with decision-making authority. During my time at the Department of Justice, I represented the United States, but I also represented the Bush Administration – which appointed my superiors, including the Assistant Attorney General to whom I reported. Every federal employee in the Executive Branch represents *both* his country and whichever Administration happens to occupy the White House. (The suggestion that I neglected my duties as a Department employee to instead serve as a Republican Party operative while I worked at the Division is insulting.) I do not believe that any "career professional" (myself included) has the right to disobey, or otherwise disregard, a politically-appointed superior simply because he disagrees with that superior's policy choices and believes that he "represents the United States."

The final allegation the Authors bring to the Committee's attention is that I "took a leading role" in the *Georgia v. Ashcroft* case and somehow violated the Federal Rules of Civil Procedure by attending an oral hearing held in this case when it was on remand before the district court. One of my duties as a career Counsel in the Front Office of the Division was monitoring all litigation in which the Voting Section was involved and reporting developments to my superiors, including the Deputy Assistant Attorney General and the Assistant Attorney General. I did not take an active role in the litigation itself, such as taking depositions, interviewing witnesses, signing pleadings, or presenting oral arguments to the judges, as the trial attorneys assigned to the case were, although I certainly reviewed the work done in the case. I was under no obligation to file a Notice of Appearance under the applicable federal rules and I certainly was not required to do so

---

[12] *United States v. State of New Jersey*, Civil No. 06-4889 (D. N.J. October 12, 2006). This lawsuit was filed over violations of Section 8 of the NVRA as well Section 303(a) of HAVA.

TX_00001982
JA_004741

TX_00001982

simply because I attended an oral hearing (as did other Voting Section career lawyers whose names were not on the pleadings filed with the court). I made no presentations of any kind to the judges in the matter and did not in any other way put in an appearance in the case.

## Conclusion

I have been a lawyer for over two decades. I have always practiced law in a professional and completely ethical manner, and that includes the four years I worked at the Department of Justice. Partisanship and politics played no part in the decisions I made or the legal advice and recommendations that I gave to my supervisors at the Civil Rights Division, including all three of the Assistant Attorney Generals for whom I worked. I applied the law and prior precedent as I understood it to every case I was presented. I believe the facts and the subsequent court decisions show that the decisions the Division made while I worked there were reasonable, easily defensible, and legally correct, contrary to the claims made by the Authors.

The FEC can only function well when its commissioners engage in bipartisan consensus building to issue regulations, conduct audits, and enforce the law when conducting investigations of violations. The record that the four nominees have established over the past 18 months while they have served on the Commission demonstrates our ability to work together to enforce the Federal Election Campaign Act.

### Enforcement

In enforcement matters, for example, we have cast 1,094 votes. Votes on enforcement matters are a true test of the ability of Commissioners to work together on a nonpartisan basis, because these are votes that determine whether or not the Commissioners believe that a political candidate or political party or political committee have violated the law based on the investigation conducted by the FEC's Office of General Counsel. In 2006, the percentage of split votes was only 0.9%, and in 2007, it was only 0.2% through June 5. This is a remarkable achievement that shows that the Commissioners of both parties are intent on enforcing the law without regard to partisan advantage.

### Advisory Opinions

The current Commission has voted on 42 Advisory Opinions. *See* Attachment A. Twenty-three of these opinions were adopted unanimously. Nine were adopted with only one dissenting vote. In three cases, the Commission split and was unable to approve a response to the requestor. Of the 39 cases in which the Commission issued an Opinion, I have cast only five dissenting votes. The record shows that every current Commissioner has dissented more than once during this period. There is a healthy diversity of opinion among the Commissioners which is invaluable when considering the issues that come before us. Overall, I think this record demonstrates a remarkable ability on the part of each Commissioner to work with his colleagues to reach agreement on difficult issues.

17

**Regulations**

Since I was appointed to this position, the Commission has adopted seven (7) new Final Rules, and I voted as part of a bipartisan majority in each of those instances. The Commission also voted twice to retain existing rules. I dissented in one of those matters because I believed the Commission should undertake a rulemaking to produce *additional* regulations to provide guidance to the regulated community on the subject of when a 527 organization becomes a federally regulated "political committee."[13] The Commission's rulemakings arc detailed at Attachment B.

I am proud of my record at the Commission because it shows in concrete terms that I work together with my fellow Commissioners every day to achieve our common goals and objectives. This record also refutes any suggestion that I am unable or unwilling to enforce the law as it is written. I thank the Committee for this opportunity to respond to the criticisms that have been leveled against me.

Sincerely yours,

Hans A. von Spakovsky

---

[13] My statement on this matter has previously been provided to the Committee and is available at http://www.fec.gov/members/von_Spakovsky/speeches/statement20060531.pdf.

18

## ADVISORY OPINIONS

| *Date* | *AO Number* | *AO Requestor* | *Vote* | *Dissenter(s)* |
|--------|-------------|----------------|--------|----------------|
| 1/19/2006 | 2005-20 | Pillsbury Winthrop Shaw Pitman | 6-0 | |
| 3/9/2006 | 2006-01 | PAC For A Change (Boxer) | 6-0 | |
| 3/9/2006 | 2006-02 | Robert Titley | 5-1 | Toner |
| 3/9/2006 | 2006-06 | Francine Busby for Congress | 4-2 | Toner, Mason |
| 3/23/2006 | 2006-03 | Whirlpool Corp. PAC | 6-0 | |
| 3/29/2006 | 2006-04 | Tancredo for Congress Committee | 4-2 | Toner, von Spakovsky |
| 4/20/2006 | 2006-07 | J.D. Hayworth for Congress | 4-1 | Weintraub |
| 4/20/2006 | 2006-09 | American Institute for Certified Public Accountants PAC | 3-2 | *AO not adopted.* |
| 4/20/2006 | 2006-11 | Washington Democratic State Central Committee | 4-1 | Lenhard |
| 4/20/2006 | 2006-12 | International Association of Machinists & Aerospace Workers | 5-0 | |
| 5/4/2006 | 2006-08 | Matthew Brooks | 4-2 | Weintraub, Walther |
| 5/4/2006 | 2006-13 | Dennis Spivak | 6-0 | |
| 5/9/2006 | 2006-16 | Nancy Detert | 6-0 | |
| 5/18/2006 | 2006-15 | TransCanada Corp. | 5-1 | Walther |
| 6/5/2006 | 2006-19 | Los Angeles County Democratic Party Central Committee | 5-1 | Walther |
| 6/22/2006 | 2006-14 | National Restaurant Association PAC | 3-2 | *AO not adopted.* |
| 6/22/2006 | 2006-17 | Berkeley Electric Cooperative Inc. | 5-0 | |
| 6/22/2006 | 2006-18 | Kay Granger Campaign Fund | 4-1 | Lenhard |
| 6/30/2006 | 2006-10 | EchoStar Satellite LLC | 5-1 | Toner |
| 8/29/2006 | 2006-21 | Cantwell 2006 | 6-0 | |
| 8/29/2006 | 2006-26 | Texans for Henry Bonilla | 6-0 | |
| 9/6/2006 | 2006-25 | Jon Kyl for US Senate | 6-0 | |
| 9/14/2006 | 2006-22 | Wallace for Congress | 6-0 | |
| 10/4/2006 | 2006-20 | Unity '08 | 5-1 | von Spakovsky |
| 10/4/2006 | 2006-24 | National Republican Senatorial Committee | 4-2 | Toner, von Spakovsky |
| 10/13/2006 | 2006-31 | Bob Casey for Pennsylvania Committee | 3-3 | *AO not adopted.* |
| 11/2/2004 | 2006-29 | Rep. Mary Bono | 6-0 | |
| 11/9/2006 | 2006-30 | ActBlue | 4-2 | Mason, Weintraub |

*Attachment A*

| Date | AO Number | AO Requestor | Vote | Dissenter(s) |
|---|---|---|---|---|
| 11/21/2006 | 2006-32 | Progress for America | 4-2 | Toner, von Spakovsky |
| 12/21/2006 | 2006-33 | National Association of Realtors PAC | 4-2 | Weintraub, Walther |
| 1/25/2007 | 2006-35 | Kolbe for Congress | 4-0 | |
| 1/25/2007 | 2006-37 | Kissin for Congress | 4-0 | |
| 2/8/2007 | 2006-34 | Working Assets, Inc. | 6-0 | |
| 2/8/2007 | 2006-36 | Green Senatorial Campaign Committee | 6-0 | |
| 2/8/2007 | 2006-38 | Sen. Casey State Committee | 6-0 | |
| 3/1/2007 | 2007-03 | Obama Exploratory Committee | 5-0 | |
| 3/8/2007 | 2007-02 | Arizona Libertarian Party | 5-0 | |
| 3/22/2007 | 2007-01 | Sen. Claire McCaskill | 5-0 | |
| 4/19/2007 | 2007-04 | Atlatl, Inc. | 4-1 | von Spakovsky |
| 5/3/2007 | 2007-05 | Erik Iverson | 4-0 | |
| 5/3/2007 | 2007-06 | Libertarian Party of Indiana | 5-0 | |
| 5/31/2007 | 2007-07 | Craig for US Congress | 5-0 | |

*Attachment B*

### Rulemaking Votes

1.   Revised Explanation and Justification for Definitions of "Agent" for BCRA Regulations on Non-Federal Funds or Soft Money and Coordinated and Independent Expenditures (11 CFR 109.3 and 300.2(b)), 71 Fed. Reg. 4,975 (Jan. 31, 2006).
   - Final vote, 4-2, taken January 23, 2006.  Commissioners Lenhard, Mason, Toner and von Spakovsky voted affirmatively for the decision.  Commissioners Walther and Weintraub dissented.

2.   Final Rules and Explanation and Justification on the Definition of Federal Election Activity (11 CFR 100.24), 71 Fed. Reg. 8,926 (Feb. 22, 2006).
   - Final vote, 6-0, taken February 9, 2006.  Commissioners Lenhard, Mason, Toner, von Spakovsky, Walther, and Weintraub voted affirmatively for the decision.

3.   Interim Final Rule on the Definition of Federal Election Activity (Modifying the Definition of "In Connection with an Election in which a Candidate for Federal Office Appears on the Ballot" (11 CFR 100.24(a)(1)(iii)), 71 Fed. Reg. 14,357 (Mar. 22, 2006).
   - Final vote, 4-2, taken February 9, 2006.  Commissioners Mason, Toner, von Spakovsky, and Walther voted affirmatively for the decision.  Commissioners Lenhard and Weintraub dissented.
   - Final Explanation and Justification adopted on March 16, 2006.  Commissioners Mason, Toner, von Spakovsky, and Walther voted affirmatively for the decision.  Commissioners Lenhard and Weintraub dissented.

4.   Final Rules on the Definitions of "Solicit" and "Direct" (11 CFR 300.2(m) and (n)) , 71 Fed. Reg. 13,926 (Mar. 20, 2006).
   - Final vote, 4-2, taken March 13, 2006.  Commissioners Mason, von Spakovsky, Toner, and Walther voted affirmatively for the decision.  Commissioners Lenhard and Weintraub dissented.

5.   Final Rules and Explanation and Justification on Internet Communications, 71 Fed. Reg. 18,589 (April 12, 2006).
   - Final vote, 6-0, taken March 27, 2006.  Commissioners Lenhard, Mason, Toner, von Spakovsky, Walther, and Weintraub voted affirmatively for the decision.

6.   Final Rules on Coordinated Communications, 71 Fed. Reg. 33,190 (June 8, 2006).
   - Final vote, 6-0, taken April 7, 2006.  Commissioners Lenhard, Mason, Toner, von Spakovsky, Walther, and Weintraub voted affirmatively for the decision.

- Final Explanation and Justification adopted, 6-0, on June 2, 2006. Commissioners Lenhard, Mason, Toner, von Spakovsky, Walther, and Weintraub voted affirmatively for the decision.

7.      Final Rules on Increase in Limitation on Authorized Committees Supporting Other Authorized Committees, 71 Fed. Reg. 54,899 (Sept. 20, 2006).
- Final vote, 6-0, taken September 14, 2006.  Commissioners Lenhard, Mason, Toner, von Spakovsky, Walther, and Weintraub voted affirmatively for the decision.

8.      Supplemental Explanation and Justification on Political Committee Status, 72 Fed. Reg. 5,595 (Feb. 7, 2007).
- Final vote, 4-2, taken January 31, 2007.  Commissioners Lenhard, Mason, Walther, and Weintraub voted affirmatively for the decision. Commissioners Toner and von Spakovsky dissented.

9.      Finals Rules on Best Efforts in Administrative Fines Challenges, 72 Fed. Reg. 14,662 (March 29, 2007).
- Final vote, 5-0, taken on March 22, 2007.  Commissioners Lenhard, Mason, von Spakovsky, Walther, and Weintraub voted affirmatively for the decision.

# Congress of the United States
## Washington, DC 20515

March 22, 2007

The Honorable Dianne Feinstein
Chair
United States Senate
Rules and Administration
305 Russell Senate Building
Washington, D.C. 20510

The Honorable Robert Bennett
Ranking Member
United States Senate
Rules and Administration
305 Russell Senate Building
Washington, D.C. 20510

Dear Chairwoman Feinstein and Ranking Member Bennett:

Members of the Georgia Delegation strongly support Senate confirmation of Commissioner Hans A. von Spakovsky to a full term on the Federal Election Commission.

The right to vote has rightly been called the "crown jewel" of all our civil rights. Without adequate protections for the right to vote and full disclosure of the interests involved, our democratic system would quickly disintegrate into a rule of the few. Through his years of public service, Commissioner von Spakovsky has demonstrated his commitment to this sacred right, and upholding the laws related to its protection.

For over twenty years, Hans has dedicated himself to both private and public service. In private practice he has represented clients on corporate, legislative, and regulatory matters before county commissions, state agencies, and the Georgia General Assembly. Hans also served as the Executive Director of the Voting Integrity Project Legislative Alliance, a nonpartisan organization that focused on encouraging accessibility, accountability, and oversight of our election system. In addition, he served on the Fulton County Board of Registration and Elections, which supervises elections in the City of Atlanta and the largest county in Georgia. Due to his expertise, he was invited to testify before the Senate Governmental Affairs Committee on May 9, 2001, as well before the Senate Rules Committee itself in a field hearing in Atlanta on "Federal Election Reform" on July 23, 2001.

Before being nominated to the Federal Election Commission, Hans served our nation for more than four years at the Department of Justice. As a trial attorney for the Voting Reform Initiative in the Department, Hans provided valuable advice during the creation of the Help America Vote Act (P.L. 107-252). As you are aware, this important bill was the central response to the voting problems of the 2000 election. As part of a large overhaul of our nation's election system, HAVA created the Election Assistance Commission to serve as a clearinghouse for election administration information, provided

funds to states to improve election administration and replace outdated voting systems, and created minimum standards for states to follow in several key areas of election administration.

After playing a vital role to ensure fairness in our election system, Hans took a position at the DOJ's Civil Rights Division as the Counsel to the Assistant Attorney General. In that capacity he oversaw the Voting Section and provided legal analysis and policy recommendations on the complex issues surrounding the interaction of civil rights issues with elections, redistricting, and voting. While he was at DOJ, Hans served as a member of the first Board of Advisors of the U.S. Election Assistance Commission, as well as the Voting Standards Committee of the Institute of Electrical and Electronics Engineers and the Election and Voter Service Technical Committee of the Organization for the Advancement of Structured Information Standards.

Hans manifests a rare trait in Washington—he is willing to take a stand based on his understanding of the law without concern for the politics of a situation. In a city driven by politics, his service is a beacon to all of us as to how we are to serve our constituents.

Commissioner von Spakovsky's dedication, understanding, and sense of professionalism when approaching laws related to protecting our most important right is unsurpassed. It is without reservation that we fully support the confirmation of Hans A. von Spakovsky to a full term and ask for your favorable consideration.

Sincerely,

Lynn A. Westmoreland
Member of Congress

Jack Kingston
Member of Congress

Thomas Price
Member of Congress

John Linder
Member of Congress

Nathan Deal
Member of Congress

Phil Gingrey
Member of Congress

# ALSTON&BIRD LLP

One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309-3424

404-881-7000
Fax: 404-881-7777
www.alston.com

William H. Jordan                    Direct Dial: 404-881-7850                    E-mail: bill.jordan@alston.com

March 13, 2007

*Via Facsimile* **202-228-3954**

Honorable Diann Feinstein
Chairman
Senate Rules Committee
United States Senate
Washington, D.C. 20510-0504

*Via Facsimile* **202-228-1168**

Honorable Robert F. Bennett
Ranking Minority Member
Senate Rules Committee
United States Senate
Washington, D.C. 20510-4403

Re:   Nomination of Hans von Spakovsky to the Federal Elections Commission

Dear Chairman Feinstein and Senator Bennett:

I am writing to you to express my enthusiastic support for the nomination of Hans von Spakovsky as a Commissioner on the Federal Elections Commission. As you know, Mr. von Spakovsky has been serving as a recess appointee on the FEC, during which time he has demonstrated superb judgment and has exhibited a high level of energy that brings credit to that body. In fact, I was recently elected as the Chairman of the Georgia State Ethics Commission, the entity in Georgia that regulates political giving and expenditures as well as lobbyist activity, and I frequently consult with Mr. von Spakovsky regarding the similarities and differences between the federal election laws and the Georgia Ethics and Government Act, which my Commission administers. He has been unfailingly generous of his time and experience in these matters.

In addition, I have had the good fortune to know Mr. von Spakovsky for years, both when he was an attorney in Atlanta and a colleague at the Department of Justice in

Bank of America Plaza
101 South Tryon Street, Suite 4000
Charlotte, NC 28280-4000
704-444-1000
Fax: 704-444-1111

90 Park Avenue
New York, NY 10016
212-210-9400
Fax: 212-210-9444

3201 Beechleaf Court, Suite 600
Raleigh, NC 27604-1062
919-862-2200
Fax: 919-862-2260

The Atlantic Building
950 F Street, NW
Washington, DC 20004-1404
202-756-3300
Fax: 202-756-3333

Honorable Diann Feinstein
Chairman
Senate Rules Committee
Honorable Robert F. Bennett
Ranking Minority Member
Senate Rules Committee
March 13, 2007
Page 2

Washington, D.C. In Atlanta, Mr. von Spakovsky and I were both concerned with actual and potential voter fraud and intimidation (regardless of the party that was affected) and participated in a variety of activities to help ensure that all Georgians who are legally entitled to vote were able to vote without fear of intimidation or having their vote diluted. Further, Mr. von Spakovsky and I both served as counsel to the late Senator Coverdell's state political action committee, the "Good Government for Georgia Committee," which continues to this day to provide leadership training through the Coverdell Leadership Institute to individuals who may one day decide to enter public service or run for office. This is an extremely valuable organization in the state and has served to engage many young professionals in the political process.

Mr. von Spakovsky and I were also able to serve together in the Department of Justice. I served as the Senior Counsel to the Assistant Attorney General for the Civil Division and then as Senior Counsel to the Associate Attorney General at the Department from 2001 through the end of 2003. Mr. von Spakovsky served as the Counsel to the Assistant Attorney General for the Civil Rights Division. We had the opportunity to work on a variety of matters together, and what always impressed me was Hans's strong work ethic and his commitment to the mission of Civil Rights Division and the Department of Justice.

Hans is also a dedicated husband and loving father. He has made and will continue to make an excellent public servant. I hope that the Committee will favorably consider him as a permanent appointee.

Thank you very much for your consideration.

Sincerely yours,

William H. Jordan

WHJ:mmf

LEGAL02/30291415v1



**Forsyth County
Registrations and Elections**



110 EAST MAIN STREET
SUITE 200
CUMMING, GEORGIA 30040
(770) 781-2118
FAX (770) 886-2825

February 8, 2007

The Honorable Robert F. Bennett
Ranking Minority Member
Senate Rules Committee
United States Senate
Washington, D.C. 20510-4403

Reference – Confirmation of Hans A. von Spakovsky to Federal Election Commission

Dear Senator Bennett,

I am requesting that you approve the confirmation of Hans von Spakovsky, currently a
Commissioner of the FEC. In my current position of Chairman of the Forsyth County
Georgia Board of Elections, I have known Mr. von Spakovsky for more than 10 years.

During that time, we have interfaced on numerous issues with regard to elections and the
legal issues related to the implementation of the Help America Vote Act. He has been a
highly regarded speaker at various national election meetings that I have attended as well
as at our own Georgia Election Officials Association. His experience and insight has
helped all of us deal with the complexities of HAVA as well as the related Voting Rights
Act of 1965.

I think my own background as an election official in Georgia, a member of the National
Committee to Review the 2004 Election and testifying before the House Administration
Committee on election related issues gives me some insight into what we need as
members of the FEC. Hans von Spakovsky has a unique set of experiences that will help
all election officials of any party or race.

Thank you for the consideration.

Sincerely yours,

Gary J. Smith
Chairman – Forsyth County Board of Elections



**FEDERAL VOTING ASSISTANCE PROGRAM**
DEPARTMENT OF DEFENSE
WASHINGTON, DC  20301-1155

February 26, 2007

The Honorable Dianne Feinstein
Chair
Committee on Rules and Administration
United States Senate
Washington, D.C. 20510

Dear Madam Chairman:

This is in reference to Mr. Hans A. von Spakovsky whose nomination as Commissioner to the Federal Election Commission is pending before the Senate Rules Committee.  In an official capacity Mr. von Spakovsky and I worked together on joint Department of Defense (DoD) and Department of Justice (DOJ) initiatives when he was the DOJ Counsel to the Assistant Attorney General for Civil Rights.  This working relationship produced successful results as we asked the states for their cooperation in ensuring that uniformed service members, their family members, and overseas citizens would have a full opportunity to vote in the 2004 elections.

The Secretary of Defense is responsible for administering the federal responsibilities of the *Uniformed and Overseas Citizens Absentee Voting Act*.  The *Act* protects the voting rights of all active duty uniformed services members, the Merchant Marine, the eligible family members of the foregoing, the Commissioned Corps of the Public Health Service and the National Oceanic and Atmospheric Administration, and all U.S. citizens residing outside the U.S.  As the Director, Federal Voting Assistance Program, I administer the provisions of the *Act* on behalf of the Secretary of Defense.  The DOJ Civil Rights Division is charged with enforcing the *Act*.

In the 2004 election year, Mr. von Spakovsky and his staff worked closely with my office as we wrote joint letters from our Departments to all state chief election officials about recommendations for improvements to the absentee voting process.  The letters recounted how closely the Departments worked with many state and local election officials to eliminate absentee ballot transit problems and delays exacerbated by uncertain mail delivery in many parts of the world.  The Departments continued to support and encourage state-sponsored initiatives to allow at least 45-day ballot transit time, use expedited postal or courier methods to deliver ballots to voters, use back-up or special write-in absentee ballots, and seek legislative or regulatory authorization to permit voters covered under the *Act* to apply for, receive and return absentee ballots by facsimile or electronic mail methods in addition to traditional mail delivery.

Many states adopted these recommendations.  The adoption of instantaneous methods of transmittal such as faxing and email, with appropriate safeguards to protect the integrity and

security of ballots, ensured that absentee voters were not disenfranchised due to mail delays, especially in remote or combat areas. In the 2004 general election the voting participation rates among uniformed service members and overseas citizens were the highest in the history of the Federal Voting Assistance Program. Enfranchising these citizens is a shared concern of the Departments and state and local government officials. Mr. von Spakovsky was resourceful, conscientious and tireless in his efforts to ensure that all citizens covered by the *Act* had an equal opportunity to register and vote absentee.

Sincerely,

*P.K. Brunelli*

P.K. Brunelli

1, Wendron Close
Woking
Surrey
United Kingdom
GU21 3PB

1 March 2007

The Honorable Dianne Feinstein
Chair
Senate Rules Committee
United States Senate
Washington, D.C.

Dear Madam

**Hans Von Spakovsky**
**FEC Commissioner Nomination**

I am writing to support the nomination of Hans Von Spakovsky as a Commissioner to the Federal Election Commission.  I am the chair of the OASIS[1] Election & Voter Services Technical Committee and worked with Hans on this committee for a number of years.  During the time I worked with Hans, he was at the Department of Justice and I was the Director of Technology in the UK Government's Cabinet Office with responsibilities for their e-government and e-voting programmes.  I have since taken early retirement but continue to chair the committee.

During the time that Hans participated in the committee I found him to be a man of great integrity and honesty, and he displayed great patience in expressing the needs of the USA in the lengthy development of our global e-voting standard.  He clearly has a great knowledge of the USA's voting rules, practices and legislation and was able to present them to the committee in a concise and understandable manner.  He was also able to recognise that different parts of the world have different practices and used his intellect and experience to help us reach a compromise that was acceptable to all but one that did not undermine the USA's needs.

In my opinion Hans is someone who would be an asset to the FEC and I have no hesitation in supporting him for the post of Commissioner.

Yours Sincerely

J A Borras

---

[1] The Organization for the Advancement of Structured Information Standards (www.oasis-open.org)



TREY GRAYSON
SECRETARY OF STATE

**COMMONWEALTH OF KENTUCKY**
## OFFICE OF THE SECRETARY OF STATE

February 21, 2007

SUITE 152, STATE CAPITOL
700 CAPITAL AVENUE
FRANKFORT, KY 40601-3493
(502) 564-3490
FAX (502) 564-5687
WEBSITE: WWW.SOS.KY.GOV

The Honorable Robert F. Bennett
Ranking Minority Member, Senate Rules Committee
United States Senate
Washington, DC 20510-4403

Dear Senator Bennett:

I know that you have before the Senate Rules Committee the nomination of Hans A. von Spakovsky to be a Commissioner of the Federal Elections Commission. In my capacity as Kentucky's Secretary of State and chief elections official, I worked closely with Mr. von Spakovsky during his tenure with the U.S. Department of Justice.

I was elected in 2003 and took office in January 2004 just as the implementation of the Help America Vote Act (HAVA) was beginning. At the time, the Kentucky State Board of Elections, which I chair, was very concerned about the 2004 and 2006 deadlines for HAVA implementation. We worried that we might have trouble meeting the deadlines because of the delays in the formation of the EAC and the fact that HAVA had not been fully funded. Also, there were many questions about some of the mandates, such as provisional balloting.

As a result, the Board often sought guidance from the Department of Justice and specifically, Mr. von Spakovsky, about how to proceed. At each and every opportunity, Mr. von Spakovsky was reassuring, helpful and fair. Moreover, he clearly possessed a passion for, and keen knowledge of, election laws and administration. Through my involvement with the National Association of Secretaries of State, I know that this was the experience of many of my colleagues. That's why I was excited to hear that he had been nominated for the FEC. I believe he will be an excellent Commissioner and urge you to give him strong consideration.

Thank you for taking the time to read my letter. I hope that you find my observations helpful in your confirmation process. Please contact me if you have any questions about this letter or my experiences with Mr. von Spakovsky.

Sincerely,

Trey Grayson
Secretary of State

cc:   Honorable Mitch McConnell
      Mr. Hans A. von Spakovsky

**Kentucky**
UNBRIDLED SPIRIT

AN EQUAL OPPORTUNITY EMPLOYER M/F/D

JA_004756



# BEVERLY KAUFMAN COUNTY CLERK

February 20, 2007

The Honorable Dianne Fenstein, Chair
Senate Rules Committee
United States Senate
Washington, D.C.20510-0504

The Honorable Robert F. Bennett
Ranking Minority Member
Senate Rules Committee
United States Senate
Washington, D.C. 20510-4403

Dear Senators Fenstein and Bennett:

It is with great confidence that I offer my support of Hans A. von Spakovksy as a commissioner
on the Federal Election Commission. I have had the distinct pleasure of working with Mr. von
Spakovsky on various occasions, one of which included the Election Assistance Commission
Board of Advisors. Without a doubt, he was one of the most reliable and reasonable persons with
whom I have had the privilege of working while I chaired the Board.

Mr. von Spakovksy's strong moral work ethic and invaluable insights have proven to be a
tremendous asset to the many programs and departments with which he has been involved.

I am certain Mr. von Spakovksy would continue to serve this commission with the utmost
integrity and grace that he demonstrates on a daily basis. Therefore, I believe his record merits
the highest recommendation possible and that he deserves your approval.

Sincerely,

Beverly B. Kaufman
County Clerk, Harris County, Texas

BBK/kjh

cc: Hans A. von Spakovksy



## SECRETARY OF STATE
### STATE OF INDIANA

**Todd Rokita**
Secretary of State

February 19, 2007

The Honorable Dianne Feinstein
Chair
Senate Rules Committee
United State Senate
Washington, D.C. 20510-0504

Dear Senator Feinstein,

I am pleased to offer this recommendation in support of Mr. Hans A. von Spakovsky to serve as Commissioner for the Federal Election Commission. I have worked with Mr. Spakovsky professionally for several years and know him to be an excellent advisor to election officials and a devoted public servant.

Mr. Spakovsky has worked closely with state and local election officials to explain and encourage compliance with the requirements of federal laws like HAVA and NVRA. His expertise was an invaluable asset for officials across the country, and Hans always made a significant effort to personally reach as many of us on the state and local level as possible.

Hans spoke numerous times to meetings of the National Association of Secretaries of State on several topics, and his insight was always well received. In addition to these presentations, Hans went above and beyond what was required of him by making himself available to election officials by both email and telephone.

I have no doubt that he will be excellent addition to the Federal Election Commission, and I ask that you give him the utmost consideration. If I can be of further assistance, please do not hesitate to contact me at 317.232-6536.

Sincerely,

Todd Rokita
Indiana Secretary of State



**STRICKLAND
BROCKINGTON
LEWIS LLP**

Midtown Proscenium Suite 2000
1170 Peachtree Street NE
Atlanta, Georgia 30309-7691
678.347.2200 tel | 678.347.2210 fax
www.sbllaw.net

Frank B. Strickland
678.347.2211 direct
fbst@sbllaw.net

February 16, 2007

The Honorable Robert F. Bennett
Ranking Minority Member
Senate Rules Committee
United States Senate
Washington, D.C.  20510-4403

      Re: Hans A. von Spakovsky

Dear Senator Bennett:

      I am writing to support the nomination of Hans A. von Spakovsky to be a Commissioner of the Federal Election Commission. Although I am not writing in my official capacity, I am chairman of the board of directors of the Legal Services Corporation, having been nominated by President George W. Bush and confirmed by the Senate in 2003.

      I met Hans in the mid-1990s when he was selected to participate in the Coverdell Leadership Institute (CLI), founded by our late U.S. Senator Paul D. Coverdell. It has been my privilege to serve as a director and officer of CLI since its inception. Hans was an outstanding participant in the CLI program and later became counsel to Senator Coverdell's political action committee.

      Hans has been active in the political process and in his community. He served as a an officer and member of the Fulton County Board of Registration and Elections; Chairman of the Fulton County Republican Party; President of the Sandy Springs Civic Roundtable; and trustee of the Sandy Springs Historic Community Foundation.  He has served on the board of advisors of the Georgia Pubic Policy Foundation as well as the national advisory board of the Voter Integrity Project.

      Hans has had a variety of legal experience, including private practice, corporate practice and important duties in the Civil Rights Division at the Justice Department. He also has considerable public policy experience.

      Finally, Hans is currently serving with distinction as an FEC Commissioner under a recess appointment. He knows his job and performs it with great competence and professionalism. During his career, he has achieved significant positive changes in the area of election law at the community, local, state and national level. Without question, he has the qualifications and experience to continue to serve as an outstanding Commissioner.

The Honorable Robert F. Bennett
February 16, 2007
Page 2 of 2

    I recommend Hans von Spakovsky without hesitation and urge your favorable consideration of his nomination.

    Please let me know if you need additional information.

    Best regards.

                                    Sincerely,

                                    Frank B. Strickland

# BOARD OF COMMISSIONERS OF FULTON COUNTY

FULTON COUNTY GOVERNMENT CENTER
141 PRYOR STREET, S.W.
## ATLANTA, GEORGIA 30303

**Tom Lowe**
Commissioner



**FULTON COUNTY**

Telephone
(404)-730-8218

February 14, 2007

The Honorable Dianne Feinstein
Chair
Senate Rules Committee
United States Senate
Washington, D.C. 20510-0504

Via Facsimile 202.228.3954

The Honorable Robert F. Bennett
Ranking Minority Member
Senate Rules Committee
United States Senate
Washington, D.C. 20510-4403

Via Facsimile 202.228.1168

Re: Nomination of Hans A. von Spakovsky to the Federal Election Commission

Dear Chairman Feinstein and Senator Bennett:

It is my honor and privilege to recommend Hans A. von Spakovsky to you for confirmation to the Federal Election Commission as a Commissioner.

I have served on the Fulton County Board of Commissioners for over 32 years and have known Mr. von Spakovsky for the last 20 years through his involvement in Fulton County. Before he moved to Washington, D.C. to take a job at the Department of Justice, Mr. von Spakovsky was one of the most active members of his community here in Atlanta. He was a member of numerous civic and community organizations, including the Boards of the Sandy Springs Historic Community Foundation, the Sandy Springs Civic Roundtable, Leadership Sandy Springs, and Sandy Springs Revitalization, and helped found his neighborhood's residential association.

The Honorable Dianne Feinstein
The Honorable Robert F. Bennett
February 14, 2007
Page 2

Our county government, which is the largest county government in Georgia, also has a number of advisory and other boards that are essential to providing county commissioners with advice and counsel on governance. Mr. von Spakovsky served on three different county boards and did so with integrity and initiative. From 1997 to 1999, he served on the Fulton County Department of Parks and Recreation Advisory Board. From 1996 to 2001, he served on the Fulton County Board of Registration and Elections, ending his final year in 2001 as the Vice Chairman of the Commission. Due to his outstanding work on these two Boards, I also nominated him in August of 2001 to serve on the Fulton County Public-Private Housing Initiative Board. His appointment was unanimously approved by the Fulton County Board of Commissioners, a bipartisan board of Republicans and Democrats.

On all of these Boards, Mr. von Spakovsky exhibited strong leadership and showed a dedication to helping the citizens of Fulton County that was keenly appreciated. In his work on the bipartisan Registration and Election Board, he helped oversee the registration of hundreds of thousands of Fulton County voters, as well as the administration of over 300 precincts on Election Day. Our elections ran smoothly, efficiently and fairly because of the work done by Mr. von Spakovsky and his fellow commissioners. Due to his extensive work for Fulton County, the Board of Commissioners unanimously adopted a resolution before he moved to Washington thanking him for his service.

I strongly recommend that you confirm Hans von Spakovsky as a Commissioner on the Federal Election Commission. In addition to his demonstrated expertise and experience in the elections process, he is a man of integrity, initiative, and common sense. His work on various Fulton County Boards demonstrated his diplomatic skills and ability to work with members of both political parties to get the job done. He will be a positive addition to the Federal Election Commission and will work to uphold and administer our campaign laws.

Respectfully,

Tom Lowe

Tom Lowe
Fulton County Commissioner
District 4

TL/epg

**Georgia**
**Public Policy**
**Foundation**



Via Email

February 13, 2007

The Honorable Dianne Feinstein
Chair
Committee on Rules and Administration
United States Senate
Washington, D.C. 20510

Dear Madam Chairman:

It is my understanding that the President is nominating Mr. Hans A. von Spakovsky of Georgia to serve on the Federal Elections Commission. On behalf of myself and over four thousand members of the Georgia Public Policy Foundation, I urge you to strongly support his nomination. As you know, Commissioner von Spakovsky has served on the Commission since his recess appointment in January of 2006. His record has clearly demonstrated that he is qualified and committed to service on the Commission and to carrying out his duties as a Commissioner.

In addition to his distinguished service with the U.S. Department of Justice, Mr. von Spakovsky has been a tireless advocate of good public policy and is an expert on election law, voter fraud and e-commerce matters. He has served as a lawyer, research director and spokesman for our Foundation and has always demonstrated all the attributes of great integrity and character.

I have no doubt that he will serve his country well on the Federal Elections Commission and I hope that you will support his nomination.

With best wishes, I am,

Sincerely,

*Rogers*

T. Rogers Wade
President

Georgia Public Policy Foundation, 6100 Lake Forrest Drive, Suite 110, Atlanta, Georgia 30328
Phone: 404-256-4050, Fax: 404-256-9909
www.gppf.org

JOHNNY ISAKSON
GEORGIA

120 RUSSELL SENATE OFFICE BUILDING
WASHINGTON, DC 20510
(202) 224-3643

ONE OVERTON PARK
3625 CUMBERLAND BOULEVARD, SUITE 970
ATLANTA, GA 30339
(770) 661-0999

HEALTH, EDUCATION,
LABOR, AND PENSIONS
SUBCOMMITTEE ON
EMPLOYMENT AND WORKPLACE
SAFETY, CHAIRMAN

ENVIRONMENT AND PUBLIC WORKS

VETERANS' AFFAIRS

SMALL BUSINESS AND
ENTREPRENEURSHIP

# United States Senate
WASHINGTON, DC 20510

February 14, 2006

The Honorable Bob Bennett
Ranking Member, Committee on Rules and Administration
United States Senate
Washington, D.C. 20510

Dear Mr. Ranking Member:

I write today to express my strong support for Presidential nominee Mr. Hans A. von Spakovsky of Georgia. As you know, Mr. von Spakovsky has served on the Federal Election Commission since his recess appointment in January 2006. I urge you to quickly confirm him so that he may continue his work as a commissioner on the Federal Election Commission. I believe that Mr. von Spakovsky's record demonstrates he has the qualifications and commitment necessary to serve the Commission and our nation ably.

In addition to his service as a commissioner, Mr. von Spakovsky has distinguished himself as an expert on election law, voter fraud and e-commerce. He has shown a keen interest in these and other public policy issues and has numerous publications and public appearances to his credit. A lawyer and self-employed governmental affairs consultant, Mr. von Spakovsky is an articulate, competent and enthusiastic individual whom we believe would serve the country well.

I respectfully request that this nomination be given your highest consideration.

Sincerely,

Johnny Isakson
U.S. Senate

FROM : W.R.Kliner                    PHONE NO. : 423 238 4544          Feb. 09 2007 01:59PM P3

## Wesley R. Kliner, Jr.
Attorney at Law
100 Cherokee Blvd., Suite 301
Chattanooga, Tennessee 37405

February 9, 2007

*VIA Facsimile - 202.228.3954*

The Honorable Diane Feinstein
Chair
Senate Rules Committee
United States Senate
Washington D.C. 20510-4403

Re:  Letter of Recommendation – Hans von Spakovsky

Dear Senator Feinstein:

It is my pleasure and my privilege to commend Commissioner Hans von Spakovsky to you for confirmation as a Commissioner with the Federal Election Commission. My recommendation is based on three essential personal qualities I believe Hans possesses in equal parts: Intelligence, Integrity, and Initiative. Please allow me to expound.

I first met Commissioner von Spakovsky when he was the United States Department of Justice's designated representative to the Board of Advisors of the United States Election Assistance Commission (EAC). At the time, he was assigned as the lead attorney for the Voting Section of the Civil Rights Division.

During our board meetings, Commissioner von Spakovsky displayed a keen grasp of the complexities associated with enforcement of our nation's election laws, especially with respect to the Help America Vote Act and the National Voter Registration Act. He always cautioned the board to not over step its mission of providing advice to the Commissioners that would be in concert with Congress's expressed intent as set forth in HAVA. When passions flared, it was Hans who in quite, articulate, fashion encouraged the members to disagree agreeably and come back to the main point of discussion. In short, he was able to articulate -- with reasoned intellect -- positions that ensured that the Board advanced the causes underlying basis for the Help America Vote Act.

Moreover, throughout these board meetings, I watched as then-DOJ attorney Hans von Spakovsky carefully avoided participating in discussion that would conflict with his role as chief enforcement officer for the DOJ Civil Rights Division. It was apparent to all that he cherished his solemn duty to refrain from bias and prejudice in order to avoid the appearance of impropriety. He did not try to influence policy decisions that he would then be tasked with enforcing. One would expect an attorney who is governed by the legal profession's rules of ethical conduct to exhibit these qualities. But in him we sensed it was because of who he is, not because of some imposed requirement of his profession. Commissioner von Spakovsky has operated at the highest levels of our government's chief enforcement office to ensure the preservation of the sacred right of all United States citizens, the Right to Vote. And he has done so with an extra measure of integrity.

The Hon. Diane Feinstein
        Re:  Letter of Recommendation - Hans von Spakovsky
2/9/2007
Page 2

Finally, Commissioner von Spakovsky has displayed great initiative throughout his distinguished
career.  He started out as a practicing attorney who saw the election process as essential to the
preservation of our nation.  He became involved as a volunteer poll worker and poll watcher and
eventually became a local election commissioner in Fulton County (Atlanta) Georgia.  As an
attorney, he held his election commission to a higher standard of conduct ensuring compliance
with all state and federal election laws.  Hans went on to work with Georgia state government
and subsequently moved to the District of Columbia to work with the Department of Justice first
in the DOJ's Voting Reform Initiative, then with the Civil Rights Division.  It takes great
initiative to move outside your practice area and become expert in a new field.  When he began
the process, Hans was corporate counsel for a multi-billion dollar insurance company.  Yet, he
took the initiative to apply his legal knowledge and advocacy skills to help conduct fair elections.
It is uncommon that you would find someone with such drive and initiative to engage in
preserving the election process at great cost to their personal financial success.  Yet he did so
then and does so now with passion, intelligence, integrity and consistency.

Senator, most of the time, individuals who are nominated to these positions have been selected
because of their past affiliation with and loyalty to a particular party through service to the
national party organization.   And when such individuals are nominated they bring their
experience at the national level but are often unfamiliar with what really happens at the state and
local level.  Hans von Spakovsky "cut his teeth" at the local level and has "risen through the
ranks" rather than starting from a position of privilege.  We need him on the FEC to ensure that
when the FEC promulgates regulations, someone will ask what effect it will have at the state and
local level.  His would be a voice of reason on the FEC.

Senator, I heartily recommend Commissioner Hans von Spakovsky to you and the Senate Rules
Committee for favorable consideration and forwarding to the full Senate for confirmation as
Commissioner with the United States Federal Election Commission.  He will serve the
Commission and the citizens of the Untied States with keen intellect, impeccable integrity, and
great initiative.

With great respect, I am,

Very truly yours,

Wesley R. Kliner, Jr.
Vice-Chairman
United States Election Assistance Commission Board of Advisors

cc:    Commissioner Hans von Spakovsky

# MARTINEZ POLICY GROUP

### GOVERNMENT RELATIONS ★ POLICY IMPLEMENTATION

**WWW.MARTINEZCONSULTINGGROUP.COM**

RAY MARTINEZ III
EMAIL: raymartinezlaw@msn.com

500 WEST 13TH STREET
AUSTIN, TEXAS 78701
TELEPHONE (512) 233-5787
MOBILE   (512) 653-3331

March 13, 2007

The Honorable Diane Feinstein
Chair
Senate Rules Committee
United States Senate
Washington, D.C. 20510-0504

The Honorable Robert F. Bennett
Ranking Minority Member
Senate Rules Committee
United States Senate
Washington, D.C. 20510-4403

Dear Senators Feinstein and Bennett:

I write today to strongly endorse Commissioner Hans A. von Spakovsky for a full term on the Federal Election Commission (FEC).

I have known Commissioner von Spakovsky for three years now and have come to admire his diligence, intellect, and commitment to public service.

My recent work as a former commissioner and vice chairman of the U.S. Election Assistance Commission (EAC) required that I work closely with the U.S. Department of Justice (DOJ) on matters pertaining to implementation of the Help America Vote Act of 2002 (HAVA) and the National Voter Registration Act of 1993 (NVRA). It was during this period that I came to know Commissioner von Spakovsky, as he was serving as Counsel to the Assistant Attorney General for Civil Rights at DOJ and as a member of the EAC Board of Advisors. Although he and I occasionally had clear – and at times, significant – differences of opinion regarding interpretation of both HAVA and NVRA, I came away from such deliberations convinced that Commissioner von Spakovsky and I share a common sense of purpose and commitment to fulfilling our professional responsibilities.

I am aware that Commissioner von Spakovsky has come under particularly close scrutiny by some who have questioned whether he appropriately separates partisan considerations from sound public policy. While I will not attempt to rebut such concerns, I can speak

1

TX_00002008

with confidence as to my own personal and professional experiences in dealing with Commissioner von Spakovsky. In short, in the many instances in which I dealt with Commissioner von Spakovsky during my tenure on the EAC, I found him to be fully informed, extremely knowledgeable of pertinent Federal law and appropriately objective in his analysis and decision-making. Moreover, during this time, I was always impressed with the effort Commissioner von Spakovsky made to actively seek my opinion on a wide array of policy matters, despite the well-known fact that our political views differed significantly on a number of "hot button" issues confronting the field of election administration. I found Commissioner von Spakovsky to be deliberative in his decision-making, loyal to his long-held views of jurisprudence and legal theory and yet, willing to listen – and be persuaded – by compelling opposing views.

I am proud to say that throughout the past three years, my personal friendship with Commissioner von Spakovsky has strengthened, while our professional relationship has grown in mutual admiration. Without any hesitation, I recommend his appointment to a full term on the FEC.

Please feel free to call me if I can provide any further assistance on this matter.


Respectfully,


RAY MARTINEZ III
Former Commissioner, U.S. Election Assistance Commission

2

# BRENNAN
# CENTER
# FOR JUSTICE

Brennan Center for Justice
*at New York University School of Law*

161 Avenue of the Americas
12th Floor
New York, New York 10013
212.998.6730  Fax 212.995.4550
www.brennancenter.org

October 3, 2007

Dear Senator:

Four candidates for the Federal Election Commission (FEC) were recently reported
out of committee without recommendation, which amounts to an unprecedented and
significant vote of no confidence based on one particularly controversial nominee.
We believe that each candidate should be considered individually, on his own merits.
In particular, we believe that one of the nominees, Mr. Hans von Spakovsky, has
failed to allay concerns that he will be able to administer the nation's election laws
fairly and without prejudgment or undue partisan interest.  We therefore urge you to
oppose Mr. von Spakovsky's appointment to the FEC.

In committee, substantial and justifiable concerns were raised with respect to Mr. von
Spakovsky's record of using federal government office to promote an agenda adverse
to American voters.  Documents that Mr. von Spakovsky has acknowledged drafting
or signed as his own, as Counsel to the Assistant Attorney General for the Civil
Rights Division, demonstrate that he repeatedly advanced policies that closed poll site
and courthouse doors to eligible American voters.  For example, Mr. von Spakovsky
claimed that states need not provide "fail-safe" provisional ballots to certain voters,
despite a new federal law demanding "fail-safe" ballots to avert the demonstrated
disenfranchisement that occurred in elections when no such ballots were available.
He also enthusiastically promoted registration policies keeping new registrants off the
voter rolls if their registration information did not "match" that in another government
database, effectively disenfranchising voters in the event of a typographical error.

Though we find Mr. von Spakovsky's preferred policies seriously misguided, ours is
not merely a policy dispute.  In addition to disturbing personnel-related allegations
well-publicized by others, Mr. von Spakovsky has also been involved in decisions
that have called into question his ability to collect and dispassionately analyze data
relevant to government action affecting elections.  For example, two months after the
passage of a controversial photo identification law from his home state, which was
subject to preclearance by his office, Mr. von Spakovsky published a highly unusual
anonymous law review article extolling the virtues of photo identification
requirements.  In the preclearance process, only one day after career voting rights
staff submitted a detailed 51-page factual analysis of the law and its likely

*Exhibit 20*

BRENNAN CENTER FOR JUSTICE

retrogressive effect on racial minorities, Mr. von Spakovsky apparently acceded to a decision reversing the career staff recommendation. In response to questions from Members of the Senate Rules Committee, Mr. von Spakovsky provided no confidence that the law was carefully evaluated on its own merits. Rather, it appears now as it appeared then that, despite the data available at the time, the decision regarding the photo identification law was predetermined to fit the prevailing ideology.

The Federal Election Commission is charged, *inter alia*, with enforcing the federal campaign finance laws, and in the course of these duties, Commissioners must gather and weigh detailed evidence concerning entities' compliance with these laws. They must be able to evaluate claims carefully and on their merits alone, in order to give the public confidence that election campaigns are conducted fairly and with integrity. We submit that given the controversy surrounding Mr. von Spakovsky's tenure at the Department of Justice, and his failure to alleviate that controversy in his responses to questions submitted in committee, serious questions remain concerning his ability to discharge his duties on the FEC with the unbiased care required. Our elections deserve better.

We therefore urge you to oppose Mr. von Spakovsky's appointment to the Federal Election Commission.

Respectfully submitted,

Michael Waldman
Executive Director

# Congress of the United States
## Washington, DC 20515

September 25, 2007

The Honorable Diane Feinstein, Chairwoman
Senate Committee on Rules and Administration
305 Russell Senate Office Building
The United States Senate
Washington, DC 20510

The Honorable Harry Reid, Majority Leader
528 Hart Senate Office Building
The United States Senate
Washington, DC 20510

Dear Chairwoman Feinstein and Majority Leader Reid:

On behalf of several states and millions of disenfranchised voters across the United States, we respectfully ask that the Senate Rules Committee oppose the appointment of Hans von Spakovsky – who holds a recess appointment to the Federal Election Commission (FEC) – to serve a full term at the FEC.

By virtue of his actions in the Justice Department, Hans von Spakovsky had done irreparable damage to the course of democracy and voting rights all over the United States. This damage invalidates his ability to serve as an FEC Commissioner. Enclosed with this letter – compiled by six career attorneys at the Justice Department – is a detailed version of events in which Mr. von Spakovsky personally intervened inappropriately in voting rights matters at the Justice Department.

We implore the Senate Committee on Rules and Administration to take a strong stand against the damage Hans von Spakovsky did to voting rights and electoral processes around the nation at the Justice Department, when he substituted his short term political judgment for professional, reasoned judgment of longtime attorneys who knew the law and the Constitution.

Please oppose Mr. von Spakovsky's nomination to the FEC. If there is any place (besides the Justice Department) Mr. von Spakovsky should not serve, it is the Federal Election Commission.

Sincerely,

Solomon Ortiz

Eddie Bernice Johnson

Sanford Bishop

Marcy Kaptur

Rush Holt

Raúl Grijalva

Page 2
Chairwoman Diane Feinstein
Majority Leader Reid
September 25, 2007

Sheila Jackson Lee

Jim Marshall

Chet Edwards

Albie Sires

David Scott

Gene Green

Nick Lampson

Kendrick Meek

Silvestre Reyes

Charlie Gonzalez

Lloyd Doggett

Ciro Rodriguez

Debbie Wasserman Schultz

Donald Payne

# Common Cause Letters

October 3, 2007

Dear Senator:

Common Cause urges you to reject an extraordinarily inappropriate nominee for a seat on the Federal Election Commission. Hans von Spakovsky, both in his current role as an FEC commissioner and in his former job at the Department of Justice, has demonstrated contempt for the rule of law and acted in an extreme partisan manner during his time in government.

We urge the Senate to reject efforts to "package" the four pending FEC nominations to avoid a separate vote on Mr. von Spakovsky. As Common Cause and other reform groups noted in an earlier letter, this would not only be unfair and undemocratic, but would conflict with a precedent established the last time the Senate considered a controversial FEC nominee.

Common Cause has worked for decades in support of a strong, independent enforcement agency for our nation's important campaign finance laws. We have been deeply disappointed in the efforts by both parties to appoint commissioners who were beholden to partisan interests rather than the public interest.

But Mr. von Spakovsky's nomination is especially disrespectful of the public interest. Mr. von Spakovsky's several years in government have been marked by activities that undermine the voting rights and campaign finance laws that are essential to our democratic system.

We urge the Senate to reject the nomination of Hans von Spakovsky to the Federal Election Commission.

Sincerely,

Bob Edgar
President and CEO
Common Cause



LAWYERS' COMMITTEE FOR
**CIVIL RIGHTS**
U N D E R   L A W

1401 New York Avenue, NW
Suite 400
Washington, DC 20005-2124

Tel: 202.662.8600
Fax: 202.783.0857
www.lawyerscommittee.org

October 3, 2007

Dear Senator,

*Co-Chairs*
Marsha E. Simms
Nicholas T. Christakos

*Secretary*
Robert A. Murphy

*Treasurer*
William L. Robinson

*Counsel*
Hamilton P. Fox

*Executive Director*
Barbara R. Arnwine

*Regional Vice-Chairs*

*Midwest Region*
Jack Block
Teresa J. Kimker

*Northeastern Region*
Gregory P. Hansel
Neil V. McKittrick

*Mid-Atlantic Region*
Brooks R. Burdette
John McKeever
Bettina B. Plevan

*Southeastern Region*
Paul W. Rebein
Michael W. Tyler

*Western Region*
Paul F. Eckstein
Bradley S. Phillips

*Chesapeake Region*
Jonathan L. Greenblatt
Kim Keenan

On behalf of the Lawyers' Committee for Civil Rights Under Law, I am writing to urge you to vote against Hans von Spakovsky when his nomination to the Federal Election Commission (FEC) is considered on the Senate floor. As a former political appointee in the Department of Justice's Civil Rights Division, von Spakovsky was the architect of a plan to use the Department's power to enforce our nation's historic civil rights protections to further partisan goals. As the political arm of the Civil Rights Division recovers from this historic mismanagement with the departure of almost all the key players, von Spakovsky is the last man standing. Unlike his former colleagues who have left the Department in shame because they put politics ahead of Americans' most fundamental rights, von Spakovsky is on the cusp of being confirmed to the powerful post of FEC commissioner, where he will once again have control over enforcing voting protections. During his stewardship of our most fundamental right – the right to vote – von Spakovsky has proved untrustworthy in handling that solemn duty. It is that track record that necessitates a vote against him, sending a clear message that our right to vote is more important than partisan squabbling; it is the foundation of our democratic structure.

Mr. von Spakovsky was not just a participant in the program to politicize civil rights enforcement. He orchestrated the role the Department's Voting Section played in that process. During his tenure with the Department of Justice, von Spakovsky was part of a conscious effort to purge the section of the talent and dedication of long time civil servants; punished career staff when they recommended a course of action that diverted from the political goals of the Department's political appointees; politicized substantive law enforcement decisions; and shifted the priorities of the section away from protecting the participatory rights of America's voters. His actions while at the Department raise serious questions about his professionalism and commitment to serve his country before his party.

During his time overseeing the Voting Section, enforcement of federal civil rights protections took a back seat to politics as the priorities of the section shifted to combating unfounded claims of voter fraud. As a result, the Department overruled decades of precedent by using the Department's authority pursuant to Section 5 of the Voting Rights Act to approve discriminatory legislation, such as the Georgia photo identification requirement, over the near unanimous objection of career staff. Mr. von

Spakovsky's Voting Section turned the purpose of the statute the section enforces on its head by using it to remove voters from the process instead of ensuring all eligible voters may vote. This agenda appears to have a direct relationship with the prominent role voter fraud played in the developing story concerning the firing of at least eight United States Attorneys. In both the Civil Rights Division and United States Attorney program federal resources were committed to chasing the phantoms of election fraud. At the Voting Section, that program was coordinated by von Spakovsky.

The Lawyers' Committee is a non-partisan, not for profit legal organization formed at the direction of President John F. Kennedy to involve the private bar in the protection of civil rights. We pair the nation's largest *pro bono* network with expert staff to remedy civil rights violations across a broad spectrum of issues. Our cornerstone has been protecting the right to vote. For over four decades, the Lawyers' Committee has worked with the best and brightest to ensure all eligible voters can cast a ballot. To that end, we are fortunate to have Joe Rich, a former chief of the Voting Section, Bob Kengle, a former deputy chief at the Voting Section, and Jon Greenbaum, a former senior trial attorney at the Voting Section guiding our work on voting rights. Together they have nearly 70 years of experience in the Civil Rights Division. Each worked with von Spakovsky. As they have made clear, together with a number of their former career colleagues at DOJ, in two letters sent to the Senate Rules Committee, von Spakovsky frustrated the enforcement of the critical civil rights statutes that have protected Americans for a generation. The letters are available at http://ncffe.org/page/-/Letter1.pdf and http://ncffe.org/page/-/Letter2.pdf.The first hand exposure of these former DOJ officials to von Spakovsky's priorities and management style has led to our strong opposition to his nomination.

The dedicated civil servants who authored the letters devoted their careers to ensuring all eligible Americans have an equal opportunity to cast a meaningful ballot. As the letters discuss, their noble pursuit was frustrated by von Spakovsky's control over the enforcement of voting rights protections. Hans von Spakovsky should be held responsible for his role in the corruption of justice. He should not be rewarded with a high profile position on the FEC.

Please contact Jonah Goldman, Director of the Lawyers' Committee's National Campaign for Fair Elections at 202.662.8321 if you have any questions.

Sincerely,

Barbara R. Arnwine, Esq.
Executive Director
Lawyers' Committee for Civil Rights Under Law

---

**Campaign Legal Center ● Common Cause ● Democracy 21
League of Women Voters ● Public Citizen ● U.S. PIRG**

---

October 1, 2007

The Honorable Harry Reid
Senate Majority Leader
S-221, The Capitol
Washington, DC 20510

Dear Senate Majority Leader Reid,

Our groups strongly urge you to take the steps necessary to ensure that separate votes are held in the Senate on the nominations of Robert Lenhard, David Mason, Hans von Spakovsky and Steven Walther to serve as Commissioners on the Federal Election Commission.

The organizations include the Campaign Legal Center, Common Cause, Democracy 21, the League of Women Voters, Public Citizen and U.S. PIRG.

The FEC is an ineffective enforcement agency that lacks public credibility. Citizens are entitled to know where their Senators stand on the confirmation to the FEC of each of the nominees to the Commission, whose responsibilities include overseeing the campaign finance activities of Senators and their campaign opponents.

As you know, the pending FEC appointments include a controversial nomination. It appears that efforts are being made to bypass the normal process used to confirm Presidential appointments in order to ensure this controversial nominee's confirmation by packaging him with the other FEC nominees to have just one vote on all four of the nominees together, thereby evading a specific vote on the controversial nominee.

This would not only be unfair and undemocratic, but also would be in direct conflict with the precedent established the last time the Senate considered a controversial nominee to the FEC.

In 2000, then-Senate Majority Leader Trent Lott (R-MS) provided for a separate vote in the Senate for a controversial FEC nominee. That nominee was confirmed by a vote of 64 to 35.

As far as we can see, the only reason for forcing the Senate to take a single bloc vote on the four pending FEC nominees appears to be to prevent a majority of the Senators from voting to reject one of the nominees. This is an unjustifiable and indefensible basis for denying regular order in the Senate and preventing individual votes on each of the four FEC nominees.

2

We strongly urge you to prevent a manipulative, undemocratic and unfair process from being used to confirm a nominee who otherwise might be rejected if regular order prevailed and separate votes took place on each of the FEC nominees.

We strongly urge you to ensure that separate votes occur in the Senate on each of the four nominees to serve on the FEC.

Campaign Legal Center          League of Women Voters
Common Cause                   Public Citizen
Democracy 21                   U.S. PIRG



# THE CAMPAIGN LEGAL CENTER

CLC Blog

BCRA/McCain-Feingold

Court Cases of Interest

FEC Proceedings

Media Policy Program

IRS Proceedings

Ethics in Government

Redistricting

Legislation

Weekly Reports

Press Releases

Articles of Interest

Links

About Us

Contact Us



**Sep 28, 2007 -- Legal Center Sends Letter to Sen. Harry Reid Urging Separate Vote on Hans von Spakovsky**

The Honorable Harry Reid
528 Hart Senate Office Building
Washington , DC 20510

Dear Senator Reid,

On behalf of the Campaign Legal Center I a writing to strongly urge you hold a separate vote in the Senate on the nomination of Hans von Spakovsky to the Federal Election Commission. This has happened previously with controversial nominees to the FEC, and seems particularly appropriate here given the compilation of misdeeds by this nominee that has been presented to the Senate.

Mr. von Spakovsky's lengthy record of minority vote suppression has been well documented and leaves him singularly unqualified to serve in a position interpreting and enforcing our nation's election laws. His nomination was condemned not only by a number of retired career-Justice Department prosecutors who worked with the nominee, but also by the Leadership Conference on Civil Rights, which represents hundreds of civil and human rights organizations and unions - including the NAACP, the National Council of La Raza, the ACLU, AARP, the National Organization for Women, the AFL-CIO, the NEA, the United Mineworkers, and the Teamsters. The Conference has never weighed in before on an FEC nomination, normally advocating for or against U.S. Supreme Court nominees, but its membership was so offended by Mr. von Spakovsky's record that they have urged the rejection of his nomination.

The nomination of Mr. von Spakovsky deserves an individual vote on the floor of the Senate. Constituents nationwide are entitled to know where their Senators stand on a nominee who is not just a party operative, but who has worked both in the private sector and while serving at the Justice Department to suppress minority voting by disenfranchising and intimidating potential voters, particularly those who are poor and elderly

As noted above, there is precedent for having an individual vote on Mr. von Spakovsky. In 2000, the Rules Committee reported out two nominees to the Federal Election Commission: Mr. Danny McDonald and Mr. Bradley Smith. Mr. Smith's record was of such concern that Senators insisted on an individual vote in the full Senate. While Mr. Smith was eventually confirmed, Senators who had bona fide concerns that Mr. Smith would not enforce the law were at least given the opportunity to vote on his nomination separately. The same thing should happen with regard to Mr. von Spakovsky's nomination.

The Campaign Legal Center strongly urges you to conduct a separate vote in the full Senate on the nomination of Hans von Spakovsky. Voters nationwide deserve to know if their Senator votes in favor of this nominee who is wholly unqualified, having devoted much of his professional career to undermining minority voting rights.

SIGN UP

*Sign up for the Center's Weekly Reports, News Alerts, and Blog*

1640 Rhode Island Ave., NW
Suite 650
Washington, DC 20036

Phone: (202) 736 - 2200

Fax: (202) 736 - 2222

Send an Email

Case 2:13-cv-00193   Document 725-32   Filed on 11/17/14 in TXSD   Page 75 of 80

Sincerely,

J. Gerald Hebert

Executive Director

cc Members of the United States Senate

---

Prepared remarks
of

Dr. Toby Moore
Research Triangle Institute

before the
Committee of the Whole
of the Texas Senate

regarding

*"Evidence of the impact of voter ID requirements, and
the prospects of US DOJ preclearance"*

March 10, 2009



Good morning.

Thank you for the opportunity to appear before you today. My name is Toby Moore and I am a project director in elections research with the Research Triangle Institute (RTI International), a non-profit, non-partisan research organization headquartered in North Carolina. Before joining RTI in 2007, I was project manager for the Carter-Baker Commission on election reform at American University, and from 2000 to 2006 I served as the geographer of the voting section of the Civil Rights Division of the U.S. Department of Justice. My Ph.D. is from the University of Iowa in political geography.

I am currently directing the U.S. Election Assistance Commission's 2008 Election Day Survey, and in that capacity have had the pleasure to work with Ann McGeehan, Kim Thole and the very fine staff in the Elections Division of your Secretary of State's office. I first became involved in voter ID research in 2005, as part of the team of analysts and attorneys that conducted the review of the 2005 Georgia ID law for the Department of Justice. At American University in 2006, I designed and implemented a survey research project on voter ID, in conjunction with NuStats, a survey firm based in here in Austin.

Voter ID has obviously become a very partisan issue, and an emotional one, and the research community has struggled to inform the policy debate without becoming embroiled in it. My testimony today offers three perspectives I hope the Senate will find useful. First, I provide as objective a survey of the current research in the field as I can. Second, based on my experience working on Section 5 preclearance cases at the Department of Justice, I discuss the substantial challenges the state faces in trying to meet its burden under the Voting Rights Act. Finally, and briefly, I describe the voter ID proposal made by the Carter-Baker Commission

**Effects of voter ID legislation**

I will focus today on voter ID and leave the discussion of voter impersonation fraud for other witnesses. However, it is my view that allegations of voter impersonation have almost uniformly failed to hold up under scrutiny, and as a threat to the overall health of the election system, it is negligible compared to other vulnerabilities, such as absentee ballot fraud or technology failures or hacking.

We should know more about the effects of voter ID than we do. In many respects, the research community has failed policy makers by not producing better data. The research community does appear to be catching up, and notable and reliable research is becoming available.

To begin, it is clear from public opinion polls that most Americans support requiring a photo ID in order to vote. Numerous public opinion surveys have established this. Opponents argue that poll taxes and literacy tests once enjoyed broad support as well, but the fact remains that ID requirements are popular.

Research on potential and actual effects of voter ID laws is diverse and often contradictory, and like much of election research, too often influenced by partisan and ideological motives. There have been three basic approaches attempted:

1. The first approach has been to match records in voter registration databases with records from motor vehicle agencies. This has been almost wholly unsuccessful in telling us how many lack the necessary IDs. I would point to two studies out of Georgia, one by University of Georgia political scientists Hood and Bullock and the other by the state itself. Both studies found that elderly and minority voters are more likely to lack ID. There is no reason to suspect that bad records or database matching problems would cause this evidence of disparate impact.

2. The second approach has been to use sophisticated statistical modeling to try to detect changes in turnout caused by new ID laws. The results of these studies have found everything from slight increases in turnout, to no change in turnout, to slight decreases in turnout among minority voters. I would suggest reading a forthcoming paper from Lorraine Minnite and Robert Erickson that assesses these attempts at modeling turnout changes; they conclude that our tools and data are inadequate for detecting an impact.

Blunter attempts that cite aggregate increases in turnout statewide over one or two elections are rhetoric, not analysis. In Indiana and Georgia in 2008, both battleground states in which the Obama campaign invested heavily, the close nature of the race and the decision by Democrats to spend campaign funds obviously dictated the greater turnout.

I confess that I find this line of research to be of little use for a conceptual reason. Voter ID laws are designed explicitly to reduce turnout: to prevent fraudulent voters from casting ballots. If turnout increases or stays the same, what use is the law?[1]  If it were true that voter ID laws boosted turnout, could that increase not swamp the disenfranchisement of minority voters?

3. Finally, and I think most fruitfully, we now have a series of survey projects that have provided valuable information, despite the difficulties in reaching the targeted population. The Brennan Center found in 2006 in a nationwide survey that 7% of voting-age Americans lack ready access to proof of citizenship papers, and as many as 11% lack government issued photo ID. The survey found African-Americans, the poor and the elderly were more likely to lack such documentation. The survey I initiated at the Center for Democracy and Election Management at American University, which surveyed registered voters in three states, estimated that 1.2% of voters lacked IDs. [2]

Like the Brennan Center, the AU survey found a disparate impact:

---

[1]  Some defenders of voter ID laws argue that ID laws increase turnout by boosting confidence in the electoral system. We have no evidence of this, but even if it were true, could that increase mask the disenfranchisement of other voters?  In any case, it makes interpreting changes in turnout, to my mind, impossible.

[2]  A second set of surveys has focused on exit polling of voters. Particularly important is the work by Barreto, Nuno and Sanchez, three professors who analyzed the results of exit polls in New Mexico, California and Washington. They found that 88% of voters said they had a valid driver's license, while African-Americans, Latinos and Asian-Americans lacked ID at a higher rate than whites. Voters in these groups were less likely to have other forms of ID as well.

TX_00002023

- African-Americans were more than four times more likely than whites to lack photo ID;

- women made up nearly all of those who did have photo ID;

- nearly all of those who lacked ID were Democrats;

- 88% of those without photo ID had household incomes below $25,000 a year.

The finding that women are so much more likely to lack photo ID is worth elaboration. On top of the problem with lacking photo, women also will face problems because their names are more likely to change through marriage or divorce. A significant number of women voters will come to the polls with IDs that do not match their names on the registration rolls, and they will be at a serious risk of losing their vote.

Applying the 1.2% rate to Texas provides a rough floor for estimating the number of Texas voters who lack ID. Since the AU survey included Indiana, where an ID law was already in effect, it is almost certain that Texas's rate is higher. Even at this low percentage, though, approximately 162,901 registered voters in the 2008 election would have lacked a government issued photo ID. Again, this is a minimum number and almost surely underestimates the population.

While our estimates of how many people lack government-issued photo ID are still rough, there is now a solid body of evidence that a small but significant percentage of eligible voters do lack ID, and those people are more likely to be poor, minority, or elderly. There is some evidence that Democrats are more effected than Republicans. While our understanding of voter ID ownership is not totally clear, it is more substantial than any evidence of significant fraud from non-citizen voting or voter impersonation. For this reason, the research suggests that policy makers should tread cautiously.

We know even less about how many voters lack the secondary, non-photo forms of ID allowed in the bill. The problem here is that if, as the evidence suggests, photo ID discriminates against specific groups, including minorities, than they are still facing an additional hurdle than other voters in the requirement to produce multiple ID. This may be problematic under Section 5 of the Voting Rights Act.

**The prospects for preclearance under Section 5 of the Voting Rights Act**

As we all know, any change to elections laws in Texas must be "precleared" by the U.S. Department of Justice under the Voting Rights Act.[3] The state should not take comfort in the Supreme Court's upholding of the Indiana voter ID law. As the Bush Administration argued when federal courts blocked a 2005 Georgia ID law that it had precleared, the Section 5 analysis is distinct from the constitutional analysis. The Section 5 review will be a comparison of the

---

[3] This may change depending on the resolution of the NAMUDNO case now before the Supreme Court, but for the sake of this testimony I am assuming that the preclearance requirement will be in effect.

current Texas law to the proposed law, and the state will be required to prove that its proposed law does not deny or abridge the right to vote on account of race, color or membership in a language minority group.

Given the new Administration and its statements on voting rights enforcement, and on the lack of reliable data, I think it is safe to assume that Texas faces a significant challenge in meeting its burden of proof under the Voting Rights Act. Not knowing the effect of the law on protected groups, including language minority groups and African-Americans and Hispanics, will be an invitation to the Department of Justice to object to the change on the basis of the state not meeting its statutory burden.

Specifically, based on my experience in the Georgia case and other Section 5 cases, I expect DOJ at a minimum will look for:

- o Evidence that Texas knows the **number and demographic make-up of eligible voters and registered voters** who lack the required ID, and that population is not skewed toward minority voters protected by the VRA;

- o Well-developed and well-funded **public education programs** to make voters aware of the new requirements, initiated well before the implementation of the new law;

- o **Revamped poll worker training** to emphasize the correct enforcement of the new, more complicated ID requirements;

- o Well-developed and well-funded **programs to distribute the required IDs**, free of charge, to those who do not have them;

- o Substantial **evidence of the voter impersonation problem** that the law addresses;

- o And finally, a detailed discussion of why **less retrogressive alternatives**, including use of an affidavit fail-safe, were not adopted.

Texas faces a substantial cost on two fronts: first, to develop and fund the necessary supporting programs to fairly implement the law; and second, to develop a convincing submission to what I expect to be a skeptical Civil Rights Division.

The cost of implementing a legal photo voter ID law, based on the Indiana and Georgia experiences, will be significant. Indiana estimated that providing free ID cards would cost the state more than $700,000 annually in lost revenue and additional expenses.[4] When Georgia finally offered free ID after federal courts blocked earlier laws, the Secretary of State told the Georgia League of Women Voters that it estimated that equipment costs alone would total nearly $1 million.[5] In addition, states taking on new photo voter ID laws or their local governments face increased costs for poll worker training and public education; Georgia planned on spending more than $500,000 annually to educate voters about their new vote law. Finally, the legal and

---

[4] Fiscal Impact Statement, April 19, 2005, Indiana Legislative Services Agency.
[5] "Legislature approves new voter ID law," press release, Jan. 26, 2006, Georgia League of Women Voters.