SOUTER, J., dissenting

Court has long made a careful, ground-level appraisal both of the practical burdens on the right to vote and of the State's reasons for imposing those precise burdens. Thus, in *Burdick*:

> "A court considering [such] a challenge . . . must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" 504 U. S., at 434 (quoting *Anderson* v. *Celebrezze*, 460 U. S. 780, 789 (1983)).

The lead opinion does not disavow these basic principles. See *ante*, at 6–7 (discussing *Burdick*); see also *ante*, at 7 ("However slight [the] burden may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation" (internal quotation marks omitted)). But I think it does not insist enough on the hard facts that our standard of review demands.

## II

Under *Burdick*, "the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights," 504 U. S., at 434, upon an assessment of the "character and magnitude of the asserted [threatened] injury," *ibid*. (quoting *Anderson, supra*, at 789), and an estimate of the number of voters likely to be affected.

### A

The first set of burdens shown in these cases is the travel costs and fees necessary to get one of the limited variety of federal or state photo identifications needed to

4        CRAWFORD *v.* MARION COUNTY ELECTION BD.

SOUTER, J., dissenting

cast a regular ballot under the Voter ID Law.[3]  The travel is required for the personal visit to a license branch of the Indiana Bureau of Motor Vehicles (BMV), which is demanded of anyone applying for a driver's license or non-driver photo identification.  See *Indiana Democratic Party* v. *Rokita*, 458 F. Supp. 2d 775, 791 (SD Ind. 2006).  The need to travel to a BMV branch will affect voters according to their circumstances, with the average person probably viewing it as nothing more than an inconvenience. Poor, old, and disabled voters who do not drive a car, however, may find the trip prohibitive,[4] witness the fact that the

---

[3] Under Indiana's law, an ID does not qualify as proof of identification unless it "satisfies all [of] the following":

"(1) The document shows the name of the individual to whom the document was issued, and the name conforms to the name in the individual's voter registration record.

"(2) The document shows a photograph of the individual to whom the document was issued.

"(3) The document includes an expiration date, and the document:

"(A) is not expired; or

"(B) expired after the date of the most recent general election.

"(4) The document was issued by the United States or the state of Indiana." Ind. Code Ann. §3–5–2–40.5 (West 2006).

[4] The State asserts that the elderly and disabled are adequately accommodated through their option to cast absentee ballots, and so any burdens on them are irrelevant.  See Brief for Respondents in No. 07–25, p. 41.  But as petitioners' *amici* AARP and the National Senior Citizens Law Center point out, there are crucial differences between the absentee and regular ballot.  Brief for AARP et al. as *Amici Curiae* 12–16.  Voting by absentee ballot leaves an individual without the possibility of receiving assistance from poll workers, and thus increases the likelihood of confusion and error.  More seriously, as the Supreme Court of Indiana has recognized, Indiana law "treats absentee voters differently from the way it treats Election Day voters," in the important sense that "an absentee ballot may not be recounted in situations where clerical error by an election officer rendered it invalid." *Horseman* v. *Keller*, 841 N. E. 2d 164, 171 (2006).  The State itself notes that "election officials routinely reject absentee ballots on suspicion of forgery."  Brief for Respondents in No. 07–25, p. 62.  The record indicates that voters in Indiana are not unaware of these risks.  One

SOUTER, J., dissenting

BMV has far fewer license branches in each county than there are voting precincts.[5]  Marion County, for example, has over 900 active voting precincts, see Brief for Respondents in No. 07–21, p. 4,[6] yet only 12 BMV license branches;[7] in Lake County, there are 565 active voting precincts, see n. 6, *supra*, to match up with only 8 BMV locations;[8] and Allen County, with 309 active voting precincts, see *ibid.*, has only 3 BMV license branches.[9]  The same pattern holds in counties with smaller populations. Brown County has 12 active voter precincts, see *ibid.*, and only one BMV office;[10] while there were 18 polling places available in Fayette County's 2007 municipal primary,[11]

---

elderly affiant in the District Court testified: "I don't trust [the absentee] system. . . . Because a lot of soldiers vote like that and their votes wasn't counted in the last election according to what I read, absentee." App. 209 (deposition of David Harrison).

It is one thing (and a commendable thing) for the State to make absentee voting available to the elderly and disabled; but it is quite another to suggest that, because the more convenient but less reliable absentee ballot is available, the State may freely deprive the elderly and disabled of the option of voting in person.

[5]Under Indiana law, county executives must locate a polling place within five miles of the closest boundary of each voting precinct, and, with limited exceptions, no precinct may cover more than 1,200 active voters at the time it is established.  See Brief for Respondents in No. 07–21, p. 3 (citing Ind. Code Ann. §§3–11–8–3(b), 3–11–1.5–3).  The result is that the number of polling places tends to track the number of voting precincts in a county.  In Henry County, for example, there are 42 active precincts, see n. 6, *infra*, and 42 polling places have been approved for the 2008 elections, see n. 13, *infra*.

[6]See also Count of Active Precincts by County, online at http://www.in.gov/sos/pdfs/Precincts_by_County_and_State_022706.pdf (all Internet materials as visited Apr. 21, 2008, and available in Clerk of Court's case file).

[7]See Marion County License Branches, http://www.in.gov/bmv/3134.htm.

[8]See Lake County, http://www.in.gov/bmv/3150.htm.

[9]See Allen County, http://www.in.gov/bmv/2954.htm.

[10]See Brown County, http://www.in.gov/bmv/3302.htm.

[11]See   http://www.co.fayette.in.us/2007%20polling_locations_munic.

6          CRAWFORD *v.* MARION COUNTY ELECTION BD.

SOUTER, J., dissenting

there was only 1 BMV license branch;[12] and Henry County, with 42 polling places approved for 2008 elections,[13] has only 1 BMV office.

The burden of traveling to a more distant BMV office rather than a conveniently located polling place is probably serious for many of the individuals who lack photo identification.[14] They almost certainly will not own cars, see Brief for Current and Former State Secretaries of State as *Amici Curiae* 11, and public transportation in Indiana is fairly limited. According to a report published by Indiana's Department of Transportation in August 2007, 21 of Indiana's 92 counties have no public transportation system at all,[15] and as of 2000, nearly 1 in every 10

---

htm.

[12] See Fayette County, http://www.in.gov/bmv/3246.htm.

[13] See News Release, Henry County, Indiana, Polling Places Approved for the 2008 Elections, http://www.henryco.net/cm/node/52.

[14] The travel burdens might, in the future, be reduced to some extent by Indiana's commendable "BMV2You" mobile license branch, which will travel across the State for an average of three days a week, and provide BMV services (including ID services). See http://www.in.gov/bmv/3554.htm. The program does not count in my analysis, however, because the program was only recently opened in August 2007, see Indiana BMV Opens License Branch at State Fair, http://www.in.gov/newsroom.htm?detailContent=93_10400.htm, and its long-term service schedule has yet to be determined.

[15] Indiana Public Transit: Annual Report 2006, p. 29, http://www.in.gov/indot/files/INDOT_2006.pdf (hereinafter Annual Report). The 21 counties with no public transportation, according to the study, are: Adams, Blackford, Brown, Carroll, Clay, De Kalb, Gibson, Jennings, Lagrange, Parke, Perry, Posey, Putnam, Rush, Spencer, Steuben, Tipton, Vermillion, Warren, Warrick, and Whitley Counties. See *ibid.*

A Website of the American Public Transportation Association, which compiles public transit information across the States, confirms that each of those 21 counties lacks any public transportation offerings, and in fact adds another 13 counties to this category: Boone, Decatur, Fayette, Fulton, Hancock, Hendricks, Huntington, Miami, Morgan, Noble, Pike, Shelby, and Wells. See Transit Systems in Indiana, http://www.publictransportation.org/systems/state.asp?state=IN#A44.

SOUTER, J., dissenting

voters lived within 1 of these 21 counties.[16]  Among the
counties with some public system, 21 provide service only
within certain cities, and 32 others restrict public trans-
portation to regional county service, leaving only 18 that
offer countywide public transportation, see n. 15, *supra.*
State officials recognize the effect that travel costs can
have on voter turnout, as in Marion County, for example,
where efforts have been made to "establis[h] most polling
places in locations even more convenient than the statu-
tory minimum," in order to "provid[e] for neighborhood
voting." Brief for Respondents in No. 07–21, pp. 3–4.

   Although making voters travel farther than what is
convenient for most and possible for some does not amount
to a "severe" burden under *Burdick*, that is no reason to
ignore the burden altogether.  It translates into an obvious
economic cost (whether in work time lost, or getting and
paying for transportation) that an Indiana voter must bear
to obtain an ID.

   For those voters who can afford the roundtrip, a second
financial hurdle appears: in order to get photo identifica-
tion for the first time, they need to present "'a birth cer-
tificate, a certificate of naturalization, U. S. veterans
photo identification, U. S. military photo identification, or
a U. S. passport.'" *Ante*, at 14, n. 16 (lead opinion) (quot-
ing Ind. Admin. Code, tit. 140, §7–4–3 (2008)).  As the lead
opinion says, the two most common of these documents
come at a price: Indiana counties charge anywhere from
$3 to $12 for a birth certificate (and in some other States
the fee is significantly higher), see *ante*, at 14, n. 16, and

---

The discrepancy appears to arise, in part, from the fact that the Ameri-
can Public Transportation Association has not counted demand re-
sponse systems that have been established in at least 6 of these 13
counties.  See Annual Report 36, 50, 56, 96, 110, 144.

   [16] In 2000, approximately 9% of Indiana's population lived within 1 of
these 21 counties.  See County and City Extra: Special Decennial
Census Edition 169, 176 (D. Gaquin & K. DeBrandt eds. 2002).

8      CRAWFORD *v.* MARION COUNTY ELECTION BD.

SOUTER, J., dissenting

that same price must usually be paid for a first-time pass-
port, since a birth certificate is required to prove U.S.
citizenship by birth. The total fees for a passport, more-
over, are up to about $100.[17]  So most voters must pay at
least one fee to get the ID necessary to cast a regular
ballot.[18]  As with the travel costs, these fees are far from
shocking on their face, but in the *Burdick* analysis it
matters that both the travel costs and the fees are dispro-
portionately heavy for, and thus disproportionately likely
to deter, the poor, the old, and the immobile.

### B

To be sure, Indiana has a provisional-ballot exception to
the ID requirement for individuals the State considers
"indigent"[19] as well as those with religious objections to
being photographed, see *ante*, at 15 (lead opinion), and
this sort of exception could in theory provide a way around
the costs of procuring an ID. But Indiana's chosen excep-
tion does not amount to much relief.

---

[17] See Department of State, How to Apply in Person for a Passport,
http://travel.state.gov/passport/get/first/first_830.html; Department of
State, Passport Fees (Feb. 1, 2008), http://travel.state.gov/passport/
get/fees/fees_837.html (total fees of $100 for a passport book and $45 for
a passport card for individuals 16 and older).

[18] The lead opinion notes that "the record does not provide even a
rough estimate of how many indigent voters lack copies of their birth
certificates." *Ante*, at 19, n. 20. But the record discloses no reason to
think that any appreciable number of poor voters would need birth
certificates absent the Voter ID Law, and no reason to believe that poor
people would spend money to get them if they did not need them.

[19] To vote by provisional ballot, an individual must (at the circuit
court clerk's office) sign an affidavit affirming that she is "indigent" and
"unable to obtain proof of identification without payment of a fee." Ind.
Code Ann. §3–11.7–5–2.5(c)(2)(A). Indiana law does not define the key
terms "indigent" or "unable," but I will assume for present purposes
that the Indiana Supreme Court will eventually construe these terms
broadly, so that the income threshold for indigency is at least at the
federal poverty level, and so that the exception covers even individuals
who are facing only short-term financial difficulties.

TX_00002544

Cite as: 553 U. S. ____ (2008)    9

SOUTER, J., dissenting

The law allows these voters who lack the necessary ID to sign the poll book and cast a provisional ballot. See 458 F. Supp. 2d, at 786 (citing Ind. Code Ann. §3–11–8–25.1 (West Supp. 2007)). As the lead opinion recognizes, though, *ante,* at 15, that is only the first step; to have the provisional ballot counted, a voter must then appear in person before the circuit court clerk or county election board within 10 days of the election, to sign an affidavit attesting to indigency or religious objection to being photographed (or to present an ID at that point),[20] see 458 F. Supp. 2d, at 786. Unlike the trip to the BMV (which, assuming things go smoothly, needs to be made only once every four years for renewal of nondriver photo identification, see *id.*), this one must be taken every time a poor person or religious objector wishes to vote, because the State does not allow an affidavit to count in successive elections. And unlike the trip to the BMV (which at least has a handful of license branches in the more populous counties), a county has only one county seat. Forcing these people to travel to the county seat every time they try to vote is particularly onerous for the reason noted already, that most counties in Indiana either lack public transportation or offer only limited coverage. See *supra,* at 6–7.

That the need to travel to the county seat each election amounts to a high hurdle is shown in the results of the 2007 municipal elections in Marion County, to which Indiana's Voter ID Law applied. Thirty-four provisional ballots were cast, but only two provisional voters made it

___

[20] Indiana law allows voters to cast a provisional ballot at the county clerk's office starting 29 days prior to election day until noon of the day prior to election day, see Ind. Code Ann. §3–11.7–5–2.5, and this might enable some voters to make only one burdensome trip to the county seat. But for the voters who show up at the polls to vote and are there told that they lack the photo identification needed to cast a regular ballot, the Voter ID Law effectively forces them to make two trips.

TX_00002545
JA_005304

TX_00002545

10      CRAWFORD *v.* MARION COUNTY ELECTION BD.

SOUTER, J., dissenting

to the County Clerk's Office within the 10 days. See Brief for Respondents in No. 07–21, pp. 8–9. All 34 of these aspiring voters appeared at the appropriate precinct; 33 of them provided a signature, and every signature matched the one on file; and 26 of the 32 voters whose ballots were not counted had a history of voting in Marion County elections. See *id.*, at 9.

All of this suggests that provisional ballots do not obviate the burdens of getting photo identification. And even if that were not so, the provisional-ballot option would be inadequate for a further reason: the indigency exception by definition offers no relief to those voters who do not consider themselves (or would not be considered) indigent but as a practical matter would find it hard, for nonfinancial reasons, to get the required ID (most obviously the disabled).

C

Indiana's Voter ID Law thus threatens to impose serious burdens on the voting right, even if not "severe" ones, and the next question under *Burdick* is whether the number of individuals likely to be affected is significant as well. Record evidence and facts open to judicial notice answer yes.

Although the District Court found that petitioners failed to offer any reliable empirical study of numbers of voters affected, see *ante*, at 17 (lead opinion),[21] we may accept that court's rough calculation that 43,000 voting-age residents lack the kind of identification card required by Indiana's law. See 458 F. Supp. 2d, at 807. The District

---

[21] Much like petitioners' statistician, the BMV "has not been able to determine the approximate number of Indiana residents of voting age who are without an Indiana driver's license or identification card," 458 F. Supp. 2d 775, 791 (SD Ind. 2006), but the BMV does acknowledge "that there are persons who do not currently have [the required ID] and who are, or who will be, eligible to vote at the next election," *ibid.*

SOUTER, J., dissenting

Court made that estimate by comparing BMV records reproduced in petitioners' statistician's report with U. S. Census Bureau figures for Indiana's voting-age population in 2004, see *ibid.*, and the State does not argue that these raw data are unreliable.

The State, in fact, shows no discomfort with the District Court's finding that an "estimated 43,000 individuals" (about 1% of the State's voting-age population) lack a qualifying ID. Brief for Respondents in No. 07–25, p. 25. If the State's willingness to take that number is surprising, it may be less so in light of the District Court's observation that "several factors . . . suggest the percentage of Indiana's voting age population with photo identification is actually lower than 99%," 458 F. Supp. 2d, at 807, n. 43,[22] a suggestion in line with national surveys showing

---

[22] The District Court explained:

"[O]ur simple comparison of raw numbers does not take into account: individuals who have died but whose Indiana driver's license or identification cards have not expired; individuals who have moved outside the state and no longer consider themselves Indiana residents but who still retain a valid Indiana license or identification card; individuals who have moved into Indiana and now consider themselves Indiana residents but have not yet obtained an Indiana license or identification; and individuals, such as students, who are residing in Indiana temporarily, are registered to vote in another state, but have obtained an Indiana license or identification." *Id.*, at 807, n. 43.

The District Court also identified three factors that, in its view, might require deductions of the 43,000 figure. First, the District Court noted that BMV records do not cover all forms of identification that may be used to vote under the Voter ID Law (*e.g.*, federal photo identification, such as a passport). This is a valid consideration, but is unlikely to overcome the additions that must be made for the various factors listed above. Second, the court noted that the BMV records do not account for the exceptions to the photo identification requirement (such as the indigency and absentee-ballot exceptions). This factor does not warrant a deduction of the 43,000 number because, as I have argued, the indigency exception imposes serious burdens of its own, see *supra*, at 8–10, and the absentee-ballot exception is not a wholly adequate substitute for voting in person, see n. 4, *supra*. Finally, the

12      CRAWFORD *v.* MARION COUNTY ELECTION BD.

SOUTER, J., dissenting

roughly 6–10% of voting-age Americans without a state-issued photo-identification card.   See Brief for Petitioners in No. 07–21, pp. 39–40, n. 17 (citing National Commission on Election Reform, To Assure Pride and Confidence: Task Force Reports, ch. VI: Verification of Identity, p. 4 (Aug.  2001),  http://webstorage3.mcpa.virginia.edu/commisions/comm_2001_taskforce.pdf).   We have been offered no reason to think that Indiana does a substantially better job of distributing IDs than other States.[23]

So a fair reading of the data supports the District Court's finding that around 43,000 Indiana residents lack the needed identification, and will bear the burdens the law imposes.   To be sure, the 43,000 figure has to be discounted to some extent, residents of certain nursing homes being exempted from the photo identification requirement.   458 F. Supp. 2d, at 786.   But the State does not suggest that this narrow exception could possibly reduce 43,000 to an insubstantial number.[24]

---

District Court noted that many individuals are not registered to vote.   For reasons I lay out in note 24, *infra,* I am not convinced that this fact is relevant at all.

[23] Although the lead opinion expresses confidence that the percentage of voters without the necessary photo ID will steadily decrease, see *ante,* at 4, n. 6, and suggests that the number may already have dropped, see *ante,* at 18, n. 20, there is reason to be less sanguine.   See ACLU Sues To Halt License Revocation, Fort Wayne J. Gazette, Feb. 9, 2008, p. 3C ("The American Civil Liberties Union is suing the state to prevent the possible revocation of up to 56,000 driver's licenses that don't match information in a Social Security database.   Many of the mismatches were created by typographical errors or by people getting married and changing their last names, the [BMV] said last week when it announced it had sent warning letters to about 206,000 people in Indiana"); see also Dits, Court Date Set for Bid To Stop BMV, South Bend Tribune, Feb. 21, 2008; Who To Blame in Name Game?   Many Caught in Name Game; Merging BMV, Social Security Databases Forcing Many To Hire Lawyers, The Post-Tribune, Jan. 8, 2008, p. A5; Snelling, Name Issue Blocks License, Merrillville Post-Tribune, Jan. 7, 2008, p. A6.

[24] The State does imply that we should further discount the 43,000

SOUTER, J., dissenting

The upshot is this. Tens of thousands of voting-age residents lack the necessary photo identification. A large proportion of them are likely to be in bad shape economically, see 472 F. 3d 949, 951 (CA7 2007) ("No doubt most people who don't have photo ID are low on the economic ladder"); cf. *Bullock* v. *Carter*, 405 U. S. 134, 144 (1972) ("[W]e would ignore reality were we not to recognize that this system falls with unequal weight on voters . . . according to their economic status").[25] The Voter ID Law places hurdles in the way of either getting an ID or of voting provisionally, and they translate into nontrivial economic costs. There is accordingly no reason to doubt that a significant number of state residents will be discouraged or

_____

estimate to exclude citizens who are not registered to vote, or who are registered but not planning to vote. See Brief for Respondents in No. 07–25, p. 25; see also *ante*, at 17 (lead opinion) ("[T]he evidence in the record does not provide us with the number of registered voters without photo identification"). But that argument is flatly contradicted by this Court's settled precedent. As our cases have recognized, disfranchisement is disfranchisement, whether or not the disfranchised voter would have voted if given the choice. That is why in *Dunn* v. *Blumstein*, 405 U. S. 330 (1972), the Court did not ask whether any significant number of individuals deprived of the right to vote by durational residence requirements would actually have chosen to vote. And in *Harper* v. *Virginia Bd. of Elections*, 383 U. S. 663 (1966), the Court did not pause to consider whether any of the qualified voters deterred by the $1.50 poll tax would have opted to vote if there had been no fee. Our cases make clear that the Constitution protects an individual's ability to vote, not merely his decision to do so.

[25] Studies in other States suggest that the burdens of an ID requirement may also fall disproportionately upon racial minorities. See Overton, Voter Identification, 105 Mich. L. Rev. 631, 659 (2007) ("In 1994, the U. S. Department of Justice found that African-Americans in Louisiana were four to five times less likely than white residents to have government-sanctioned photo identification"); *id.*, at 659–660 (describing June 2005 study by the Employment and Training Institute at the University of Wisconsin-Milwaukee, which found that while 17% of voting-age whites lacked a valid driver's license, 55% of black males and 49% of black females were unlicensed, and 46% of Latino males and 59% of Latino females were similarly unlicensed).

TX_00002549

14      CRAWFORD *v.* MARION COUNTY ELECTION BD.

disabled from voting.  Cf. 458 F. Supp. 2d, at 823 ("We do
not doubt that such individuals exist somewhere, even
though Plaintiffs were unable to locate them"); 472 F. 3d,
at 952 ("No doubt there are at least a few [whom the law
will deter from voting] in Indiana . . ."); see also *ante,* at 15
(lead opinion).

Petitioners, to be sure, failed to nail down precisely how
great the cohort of discouraged and totally deterred voters
will be, but empirical precision beyond the foregoing num-
bers has never been demanded for raising a voting-rights
claim.  Cf. *Washington State Grange* v. *Washington State
Republican Party,* 552 U. S. ___, ___ (2008) (ROBERTS,
C. J., concurring) (slip op., at 4) ("Nothing in my analysis
requires the parties to produce studies regarding voter
perceptions on this score"); *Dunn* v. *Blumstein,* 405 U. S.
330, 335, n. 5 (1972) ("[I]t would be difficult to determine
precisely how many would-be voters throughout the coun-
try cannot vote because of durational residence require-
ments"); *Bullock, supra,* at 144 (taking account of "the
obvious likelihood" that candidate filing fees would "fall
more heavily on the less affluent segment of the commu-
nity, whose favorites may be unable to pay the large
costs").  While of course it would greatly aid a plaintiff to
establish his claims beyond mathematical doubt, he does
enough to show that serious burdens are likely.

Thus, petitioners' case is clearly strong enough to
prompt more than a cursory examination of the State's
asserted interests.  And the fact that Indiana's photo
identification requirement is one of the most restrictive in
the country, see Brief for Current and Former State Secre-
taries of State as *Amici Curiae* 27–30 (compiling state
voter-identification statutes); see also Brief for Texas et al.
as *Amici Curiae* 10–13 (same),[26] makes a critical examina-

───────────

[26]Unlike the Help America Vote Act of 2002, 116 Stat. 1666, 42
U. S. C. §5301 *et seq.* (2000 ed., Supp. V), which generally requires

SOUTER, J., dissenting

tion of the State's claims all the more in order.  Cf. *Ran-*

---

proof of identification but allows for a variety of documents to qualify, see *ante*, at 8–9 (lead opinion), Indiana accepts only limited forms of federally issued or state-issued photo identification, see n. 3, *supra*, and does not allow individuals lacking the required identification to cast a regular ballot at the polls.  Only one other State, Georgia, currently restricts voters to the narrow forms of government-issued photo identification.  See Ga. Code Ann. §21–2–417 (Supp. 2007).  But a birth certificate is not needed to get a Georgia voter identification card.  See Ga. Code Ann. §21–2–417.1 (Supp. 2007); Ga. Comp. Rules & Regs., Rule 183–1–20.01 (2006).

Missouri's Legislature passed a restrictive photo identification law comparable to Indiana's, but the Missouri Supreme Court struck it down as violative of the state constitution.  *Weinschenk* v. *State*, 203 S. W. 3d 201 (2006) *(per curiam)*.  Florida requires photo identification, but permits the use of several forms, including a debit or credit card; military identification; student identification; retirement center identification; neighborhood center identification; and public assistance identification.  See Fla. Stat. Ann. §101.043(1) (West Supp. 2008).  Moreover, a Florida voter who lacks photo identification may cast a provisional ballot, and that ballot will be counted so long as the signature on the ballot matches the one on the voter's registration. §§101.043(2), 101.048.

All other States that require identification at the polls either allow voters to identify themselves using a variety of documents, see Ala. Code §17–9–30 (2007); Alaska Stat. §15.15.225 (2006); Ariz. Rev. Stat. Ann. §16–579 (West 2006); Ark. Code Ann. §7–5–305(a)(8) (2007); Colo. Rev. Stat. §§1–1–104(19.5), 1–7–110 (2007); Ky. Rev. Stat. Ann. §117.227 (Lexis 2004); Mont. Code Ann. §13–13–114 (2007); N. M. Stat. Ann. §§1–1–24, 1–12–7.1, as amended by 2008 N. M. Laws ch. 59; §1–12–8 (Cum. Supp. 2007); Ohio Rev. Code Ann. §§3503.16(B)(1), 3505.18 (Lexis Supp. 2007); S. C. Code Ann. §§7–5–125, 7–13–710 (Cum. Supp. 2007); Tenn. Code Ann. §2–7–112 (2003); Texas Elec. Code Ann. §§63.001–63.009 (West 2003 and Supp. 2007); §63.0101 (West Supp. 2007); Wash. Rev. Code §29A.44.205 (2006), or allow voters lacking identification to cast a regular ballot upon signing an affidavit (or providing additional identifying information), see Conn. Gen. Stat. §9–261 (2007); Del. Code Ann., Tit. 15, §4937 (2007); Haw. Rev. Stat. §11–136 (2006 Cum. Supp.); La. Rev. Stat. Ann. §18:562 (West Supp. 2008); Mich. Comp. Laws Ann. §168.523(1) (West Supp. 2007); N. D. Cent. Code Ann. §16.1–05–07 (Lexis Supp. 2007); S. D. Codified Laws §§12–18–6.1, 12–18–6.2 (2004); Va. Code Ann. §24.2–643 (Lexis 2006).

16      CRAWFORD *v.* MARION COUNTY ELECTION BD.

*dall* v. *Sorrell*, 548 U. S. 230, 253 (2006) (plurality opinion)
(citing as a "danger sig[n]" that "contribution limits are
substantially lower than . . . comparable limits in other
States," and concluding that "[w]e consequently must
examine the record independently and carefully to deter-
mine whether [the] limits are 'closely drawn' to match the
State's interests"); *id.*, at 284, 288 (SOUTER, J., dissenting)
(finding that deference was appropriate on the reasoning
that limits were "consistent with limits set by the legisla-
tures of many other States, all of them with populations
larger than Vermont's," and that "[t]he Legislature of
Vermont evidently tried to account for the realities of
campaigning in Vermont").

### III

Because the lead opinion finds only "limited" burdens on
the right to vote, see *ante*, at 18, it avoids a hard look at
the State's claimed interests. See *ante*, at 7–13. But
having found the Voter ID Law burdens far from trivial, I
have to make a rigorous assessment of "'the precise inter-
ests put forward by the State as justifications for the
burden imposed by its rule,' [and] 'the extent to which
those interests make it necessary to burden the plaintiff's
rights.'" *Burdick*, 504 U. S., at 434 (quoting *Anderson*,
460 U. S., at 789).

As this quotation from *Burdick* indicates, the interests
claimed to justify the regulatory scheme are subject to
discount in two distinct ways. First, the generalities
raised by the State have to be shaved down to the precise
"aspect[s of claimed interests] addressed by the law at
issue." *California Democratic Party* v. *Jones*, 530 U. S.
567, 584 (2000) (emphasis omitted); see *ibid.* (scrutiny of
state interests "is not to be made in the abstract, by ask-
ing whether [the interests] are highly significant values;
but rather by asking whether the *aspect* of [those inter-
ests] addressed by the law at issue is highly significant"

SOUTER, J., dissenting

(emphasis in original)). And even if the State can show particularized interests addressed by the law, those interests are subject to further discount depending on "the extent to which [they] make it necessary to burden the plaintiff's rights." *Burdick, supra,* at 434 (internal quotation marks omitted).

As the lead opinion sees it, the State has offered four related concerns that suffice to justify the Voter ID Law: modernizing election procedures, combating voter fraud, addressing the consequences of the State's bloated voter rolls, and protecting public confidence in the integrity of the electoral process. See *ante,* at 7–13. On closer look, however, it appears that the first two (which are really just one) can claim modest weight at best, and the latter two if anything weaken the State's case.

## A

The lead opinion's discussion of the State's reasons begins with the State's asserted interests in "election modernization," *ante,* at 8–10, and in combating voter fraud, see *ante,* at 11–13. Although these are given separate headings, any line drawn between them is unconvincing; as I understand it, the "effort to modernize elections," Brief for Respondents in No. 07–25, p. 12, is not for modernity's sake, but to reach certain practical (or political) objectives.[27]  In any event, if a proposed modernization were in fact aimless, if it were put forward as change for change's sake, a State could not justify any appreciable burden on the right to vote that might ensue; useless technology has no constitutional value. And in fact that is not the case here. The State says that it adopted the ID law principally to combat voter fraud, and it is this claim,

---

[27] See generally R. Saltman, The History and Politics of Voting Technology: In Quest of Integrity and Public Confidence (2006) (tracing the history of changes in methods of voting in the United States, and the social and political considerations behind them).

18      CRAWFORD *v.* MARION COUNTY ELECTION BD.

SOUTER, J., dissenting

not the slogan of "election modernization," that warrants attention.

1

There is no denying the abstract importance, the compelling nature, of combating voter fraud. See *Purcell,* 549 U. S., at 4 (acknowledging "the State's compelling interest in preventing voter fraud"); cf. *Eu* v. *San Francisco County Democratic Central Comm.,* 489 U. S. 214, 231 (1989) ("A State indisputably has a compelling interest in preserving the integrity of its election process"). But it takes several steps to get beyond the level of abstraction here.

To begin with, requiring a voter to show photo identification before casting a regular ballot addresses only one form of voter fraud: in-person voter impersonation. The photo ID requirement leaves untouched the problems of absentee-ballot fraud, which (unlike in-person voter impersonation) is a documented problem in Indiana, see 458 F. Supp. 2d, at 793; of registered voters voting more than once (but maintaining their own identities) in different counties or in different States; of felons and other disqualified individuals voting in their own names; of vote buying; or, for that matter, of ballot-stuffing, ballot miscounting, voter intimidation, or any other type of corruption on the part of officials administering elections. See Brief for Brennan Center for Justice et al. as *Amici Curiae* 7.

And even the State's interest in deterring a voter from showing up at the polls and claiming to be someone he is not must, in turn, be discounted for the fact that the State has not come across a single instance of in-person voter impersonation fraud in all of Indiana's history. See 458 F. Supp. 2d, at 792–793; see also *ante,* at 11–13 (lead opinion). Neither the District Court nor the Indiana General Assembly that passed the Voter ID Law was given any evidence whatsoever of in-person voter impersonation fraud in the State. See 458 F. Supp. 2d, at 793. This

TX_00002554

SOUTER, J., dissenting

absence of support is consistent with the experience of
several veteran poll watchers in Indiana, each of whom
submitted testimony in the District Court that he had
never witnessed an instance of attempted voter imper-
sonation fraud at the polls. *Ibid.* It is also consistent with
the dearth of evidence of in-person voter impersonation in
any other part of the country. See *ante*, at 11, n. 11 (lead
opinion) (conceding that there are at most "scattered
instances of in-person voter fraud"); see also Brief for
Brennan Center for Justice, *supra*, at 11–25, 25 (demon-
strating that "the national evidence—including the very
evidence relied on by the courts below—suggests that the
type of voting fraud that may be remedied by a photo ID
requirement is virtually nonexistent: the 'problem' of voter
impersonation is not a real problem at all").[28]

The State responds to the want of evidence with the
assertion that in-person voter impersonation fraud is hard
to detect. But this is like saying the "man who wasn't
there" is hard to spot,[29] and to know whether difficulty in
detection accounts for the lack of evidence one at least has
to ask whether in-person voter impersonation is (or would
be) relatively harder to ferret out than other kinds of fraud
(*e.g.*, by absentee ballot) which the State has had no trou-
ble documenting. The answer seems to be no; there is
reason to think that "impersonation of voters is . . . the
most likely type of fraud to be discovered." U. S. Election
Assistance Commission, Election Crimes: An Initial Re-

---

[28] The lack of evidence of in-person voter impersonation fraud is not
for failure to search. See, *e.g.*, Lipton & Urbina, In 5-Year Effort, Scant
Evidence of Voter Fraud, N. Y. Times, Apr. 12, 2007, p. A1 ("Five years
after the Bush Administration began a crackdown on voter fraud, the
Justice Department has turned up virtually no evidence of any organ-
ized effort to skew federal elections, according to court records and
interviews").

[29] "As I was going up the stair / I met a man who wasn't there."  H.
Mearns, Antigonish, reprinted in Best Remembered Poems 107 (M.
Gardner ed. 1992).

20        CRAWFORD v. MARION COUNTY ELECTION BD.

view and Recommendations for Future Study 9 (Dec. 2006), http://www.eac.gov/clearinghouse/docs/reports-and-surveys-2006electioncrimes.pdf/attachment_download/file (hereinafter EAC Report).  This is in part because an individual who impersonates another at the polls commits his fraud in the open, under the scrutiny of local poll workers who may well recognize a fraudulent voter when they hear who he claims to be.  See Brief for Respondents in No. 07–21, p. 6 ("[P]recinct workers may recognize an imposter, and precinct election workers have the authority to challenge persons appearing to vote if the election board member 'is not satisfied that a person who offers to vote is the person who the person represents the person to be'" (quoting Ind. Code Ann. §3–11–8–27 (West 2006))).

The relative ease of discovering in-person voter impersonation is also owing to the odds that any such fraud will be committed by "organized groups such as campaigns or political parties" rather than by individuals acting alone. L. Minnite & D. Callahan, Securing the Vote: An Analysis of Election Fraud 14 (2003).  It simply is not worth it for individuals acting alone to commit in-person voter impersonation, which is relatively ineffectual for the foolish few who may commit it.  If an imposter gets caught, he is subject to severe criminal penalties.  See, e.g., Ind. Code Ann. §3–14–2–9 (making it a felony "knowingly [to] vot[e] or offe[r] to vote at an election when the person is not registered or authorized to vote"); §3–14–2–11 (with certain exceptions, "a person who knowingly votes or offers to vote in a precinct except the one in which the person is registered and resides" commits a felony); §3–14–2–12(1) (making it a felony "knowingly [to] vot[e] or mak[e] application to vote in an election in a name other than the person's own"); §3–14–2–12(2) (a person who, "having voted once at an election, knowingly applies to vote at the same election in the person's own name or any other name" commits a felony); see also 42 U. S. C. §1973i(e)(1)

SOUTER, J., dissenting

(any individual who "votes more than once" in certain federal elections "shall be fined not more than $10,000 or imprisoned not more than five years, or both"). And even if he succeeds, the imposter gains nothing more than one additional vote for his candidate. See EAC Report 9 (in-person voter impersonation "is an inefficient method of influencing an election"); J. Levitt, The Truth about Voter Fraud 7 (2007) ("[F]raud by individual voters is a singularly foolish and ineffective way to attempt to win an election. Each act of voter fraud in connection with a federal election risks five years in prison and a $10,000 fine, in addition to any state penalties. In return, it yields at most one incremental vote. That single extra vote is simply not worth the price" (footnote omitted)); cf. 472 F. 3d, at 951 ("[A] vote in a political election rarely has any *instrumental* value, since elections for political office at the state or federal level are never decided by just one vote" (emphasis in original)).

In sum, fraud by individuals acting alone, however difficult to detect, is unlikely. And while there may be greater incentives for organized groups to engage in broadgauged in-person voter impersonation fraud, see Minnite & Callahan, *supra*, at 20, it is also far more difficult to conceal larger enterprises of this sort. The State's argument about the difficulty of detecting the fraud lacks real force.

2

Nothing else the State has to say does much to bolster its case. The State argues, for example, that even without evidence of in-person voter impersonation in Indiana, it is enough for the State to show that "opportunities [for such fraud] are transparently obvious in elections without identification checks," Brief for Respondents in No. 07–25, p. 54. Of course they are, but Indiana elections before the Voter ID Law were not run "without identification checks";

22      CRAWFORD *v.* MARION COUNTY ELECTION BD.

SOUTER, J., dissenting

on the contrary, as the Marion County Election Board informs us, "[t]ime-tested systems were in place to detect in-person voter impersonation fraud before the challenged statute was enacted," Brief for Respondents in No. 07–21, p. 6. These included hiring poll workers who were precinct residents familiar with the neighborhood, and making signature comparisons, each effort being supported by the criminal provisions mentioned before. *Id.*, at 6–8.

For that matter, the deterrence argument can do only so much work, since photo identification is itself hardly a failsafe against impersonation. Indiana knows this, and that is why in 2007 the State began to issue redesigned driver's licenses with digital watermarking.[30]  The State has made this shift precisely because, in the words of its BMV, "visual inspection is not adequate to determine the authenticity" of driver's licenses. See Indiana BMV, *supra*, n. 30. Indeed, the BMV explains that the digital watermarks (which can be scanned using equipment that, so far, Indiana does not use at polling places) is needed to "tak[e] the guesswork out of inspection." *Ibid.*[31]  So, at least until polling places have the machines and special software to scan the new driver's licenses, and until all the licenses with the older designs expire (the licenses issued after 2006 but before the 2007 redesigning are good until 2012, see 458 F. Supp. 2d, at 791), Indiana's law does no more than assure that any in-person voter fraud will take place with fake IDs, not attempted signature forgery.

---

[30] See Indiana BMV, Digital Drivers License: Frequently Asked Questions, "What is a digital watermark and why is Indiana incorporating it into their driver license?", http://www.in.gov/bmv/3382.htm.

[31] In the words of Indiana's Governor, Mitch Daniels: "'Not very long ago, Indiana driver's licenses were a late-night talk show joke [because of] the ease of their fraudulent issuance and also their duplication . . . . [The new design] will make particularly their duplication dramatically more difficult.'" Udell, Digital Driver's Licenses Designed To Stem ID Theft, Evansville Courier, June 7, 2007, p. B6.

SOUTER, J., dissenting

Despite all this, I will readily stipulate that a State has an interest in responding to the risk (however small) of in-person voter impersonation. See *ante*, at 12 (lead opinion). I reach this conclusion, like others accepted by the Court, because "'[w]here a legislature has significantly greater institutional expertise, as, for example, in the field of election regulation, the Court in practice defers to empiri-cal legislative judgments.'" *Randall*, 548 U. S., at 285 (SOUTER, J., dissenting) (quoting *Nixon* v. *Shrink Missouri Government PAC*, 528 U. S. 377, 402 (2000) (BREYER, J., concurring)). Weight is owed to the legislative judgment as such. But the ultimate valuation of the particular interest a State asserts has to take account of evidence against it as well as legislative judgments for it (certainly when the law is one of the most restrictive of its kind, see n. 26, *supra*), and on this record it would be unreasonable to accord this assumed state interest more than very modest significance.[32]

### 3

The antifraud rationale is open to skepticism on one further ground, what *Burdick* spoke of as an assessment of the degree of necessity for the State's particular course of action. Two points deserve attention, the first being that

---

[32] On such flimsy evidence of fraud, it would also ignore the lessons of history to grant the State's interest more than modest weight, as the interest in combating voter fraud has too often served as a cover for unnecessarily restrictive electoral rules. See F. Ogden, The Poll Tax in the South 9 (1958) ("In Arkansas and Texas, the argument was fre-quently presented that a poll tax payment prerequisite would purify elections by preventing repeaters and floaters from voting"); see also Brief for Historians and Other Scholars as *Amici Curiae* 4–15 (detailing abuses); R. Hayduk, Gatekeepers to the Franchise: Shaping Election Administration in New York 36 (2005) ("In both historical and contem-porary contexts certain groups have had an interest in alleging fraud and thereby shaping electoral rules and practices in a restrictive direction, and other groups have had an opposite interest").

SOUTER, J., dissenting

the State has not even tried to justify its decision to im-
plement the photo identification requirement immediately
on passage of the new law. A phase-in period would have
given the State time to distribute its newly designed li-
censes, and to make a genuine effort to get them to indi-
viduals in need, and a period for transition is exactly what
the Commission on Federal Election Reform, headed by
former President Carter and former Secretary of State
Baker, recommended in its report. See Building Confi-
dence in U. S. Elections §2.5 (Sept. 2005), App. 136, 140
(hereinafter Carter-Baker Report) ("For the next two
federal elections, until January 1, 2010, in states that
require voters to present ID at the polls, voters who fail to
do so should nonetheless be allowed to cast a provisional
ballot, and their ballot would count if their signature is
verified"). During this phase-in period, the report said,
States would need to make "efforts to ensure that all
voters are provided convenient opportunities to obtain" the
required identification. *Id.*, at 141. The former President
and former Secretary of State explained this recommenda-
tion in an op-ed essay:

> "Yes, we are concerned about the approximately 12
> percent of citizens who lack a driver's license. So we
> proposed that states finally assume the responsibility
> to seek out citizens to both register voters and provide
> them with free ID's that meet federal standards.
> States should open new offices, use social service
> agencies and deploy mobile offices to register voters.
> By connecting ID's to registration, voting participa-
> tion will be expanded." Carter & Baker, Voting Re-
> form is in the Cards, N. Y. Times, Sept. 23, 2005, p.
> A19.

Although Indiana claims to have adopted its ID require-
ment relying partly on the Carter-Baker Report, see Brief
for Respondents in No. 07–25, pp. 5, 13, 49; see also *ante*,

TX_00002560

SOUTER, J., dissenting

at 10 (lead opinion), the State conspicuously rejected the Report's phase-in recommendation aimed at reducing the burdens on the right to vote, and just as conspicuously fails even to try to explain why.

What is left of the State's claim must be downgraded further for one final reason: regardless of the interest the State may have in adopting a photo identification requirement as a general matter, that interest in no way necessitates the particular burdens the Voter ID Law imposes on poor people and religious objectors. Individuals unable to get photo identification are forced to travel to the county seat every time they wish to exercise the franchise, and they have to get there within 10 days of the election. See *supra*, at 8–10. Nothing about the State's interest in fighting voter fraud justifies this requirement of a post-election trip to the county seat instead of some verification process at the polling places.

In briefing this Court, the State responds by pointing to an interest in keeping lines at polling places short. See Brief for Respondents in No. 07–25, p. 58. It warns that "[i]f election workers—a scarce resource in any election—must attend to the details of validating provisional ballots, voters may have to wait longer to vote," and it assures us that "[n]othing deters voting so much as long lines at the polls." *Ibid.* But this argument fails on its own terms, for whatever might be the number of individuals casting a provisional ballot, the State could simply allow voters to sign the indigency affidavit at the polls subject to review there after the election.[33] After all, the Voter ID Law already requires voters lacking photo identification to

[33]Florida has accommodated voters in this manner. In Florida a voter who casts a provisional ballot may have that vote counted if the voter's signature on the provisional-ballot certification matches the signature on the voter's registration. See Fla. Stat. Ann. §§101.043, 101.048. The voter is not required to make a second trip to have her provisional ballot counted.

SOUTER, J., dissenting

sign, at the polling site, an affidavit attesting to proper registration. See 458 F. Supp. 2d, at 786.

Indeed, the State's argument more than fails; it back-fires, in implicitly conceding that a not-insignificant number of individuals will need to rely on the burdensome provisional-ballot mechanism. What is more, as the District Court found, the Voter ID Law itself actually increases the likelihood of delay at the polls. Since any minor discrepancy between a voter's photo identification card and the registration information may lead to a challenge, "the opportunities for presenting challenges ha[ve] increased as a result of the photo identification requirements." *Id.*, at 789; cf. 472 F. 3d, at 955 (Evans, J., dissenting) ("The potential for mischief with this law is obvious. Does the name on the ID 'conform' to the name on the voter registration list? If the last name of a newly married woman is on the ID but her maiden name is on the registration list, does it conform? If a name is misspelled on one—Schmit versus Schmitt—does it conform? If a 'Terence' appears on one and a shortened 'Terry' on the other, does it conform?").

### B

The State's asserted interests in modernizing elections and combating fraud are decidedly modest; at best, they fail to offset the clear inference that thousands of Indiana citizens will be discouraged from voting. The two remaining justifications, meanwhile, actually weaken the State's case.

The lead opinion agrees with the State that "the inflation of its voter rolls is further support for its enactment of" the Voter ID Law. *Ante*, at 12. This is a puzzling conclusion, given the fact, which the lead opinion notes, that the National Government filed a complaint against Indiana, containing this allegation:

"Indiana has failed to conduct a general program that

SOUTER, J., dissenting

makes a reasonable effort to identify and remove in-
eligible voters from the State's registration list; has
failed to remove such ineligible voters; and has failed
to engage in oversight actions sufficient to ensure that
local election jurisdictions identify and remove such
ineligible voters." App. 309, 312.

The Federal Government and the State agreed to settle
the case, and a consent decree and order have been en-
tered, see *ante*, at 12–13, requiring Indiana to fulfill its
list-maintenance obligations under §8 of the National
Voter Registration Act of 1993, 107 Stat. 82, 42 U. S. C.
§1973gg–6.

How any of this can justify restrictions on the right to
vote is difficult to say. The State is simply trying to take
advantage of its own wrong: if it is true that the State's
fear of in-person voter impersonation fraud arises from its
bloated voter checklist, the answer to the problem is in the
State's own hands. The claim that the State has an inter-
est in addressing a symptom of the problem (alleged im-
personation) rather than the problem itself (the negli-
gently maintained bloated rolls) is thus self-defeating; it
shows that the State has no justifiable need to burden the
right to vote as it does, and it suggests that the State is
not as serious about combating fraud as it claims to be.[34]

The State's final justification, its interest in safeguard-
ing voter confidence, similarly collapses. The problem
with claiming this interest lies in its connection to the
bloated voter rolls; the State has come up with nothing to
suggest that its citizens doubt the integrity of the State's

---

[34] The voting-rolls argument also suggests that it would not be so
difficult to detect in-person voter fraud after all. If it is true that
practitioners of fraud are most likely to vote in the name of registered
voters whom they know to have died or left the jurisdiction, then
Indiana could simply audit its voting records to examine whether, and
how often, in-person votes were cast using these invalid registrations.

TX_00002563

28      CRAWFORD *v.* MARION COUNTY ELECTION BD.

electoral process, except its own failure to maintain its
rolls.  The answer to this problem is not to burden the
right to vote, but to end the official negligence.

It should go without saying that none of this is to deny
States' legitimate interest in safeguarding public confi-
dence.  The Court has, for example, recognized that fight-
ing perceptions of political corruption stemming from large
political contributions is a legitimate and substantial state
interest, underlying not only campaign finance laws, but
bribery and antigratuity statutes as well.  See *Nixon* v.
*Shrink Missouri Government PAC*, 528 U. S. 377, 390
(2000).  But the force of the interest depends on the facts
(or plausibility of the assumptions) said to justify invoking
it.  See *id.,* at 391 ("The quantum of empirical evidence
needed to satisfy heightened judicial scrutiny of legislative
judgments will vary up or down with the novelty and
plausibility of the justification raised").  While we found in
*Nixon* that "there is little reason to doubt that sometimes
large contributions will work actual corruption of our
political system, and no reason to question the existence of
a corresponding suspicion among voters," *id.,* at 395, there
is plenty of reason to be doubtful here, both about the
reality and the perception.  It is simply not plausible to
assume here, with no evidence of in-person voter imper-
sonation fraud in a State, and very little of it nationwide,
that a public perception of such fraud is nevertheless
"inherent" in an election system providing severe criminal
penalties for fraud and mandating signature checks at the
polls.  Cf. *id.,* at 390 ("[T]he perception of corruption [is]
'inherent in a regime of large individual financial contri-
butions' to candidates for public office" (quoting *Buckley* v.
*Valeo,* 424 U. S. 1, 27 (1976) *(per curiam)).*

C

Without a shred of evidence that in-person voter imper-
sonation is a problem in the State, much less a crisis,

SOUTER, J., dissenting

Indiana has adopted one of the most restrictive photo
identification requirements in the country.   The State
recognizes that tens of thousands of qualified voters lack
the necessary federally issued or state-issued identifica-
tion, but it insists on implementing the requirement im-
mediately, without allowing a transition period for tar-
geted efforts to distribute the required identification to
individuals who need it.   The State hardly even tries to
explain its decision to force indigents or religious objectors
to travel all the way to their county seats every time they
wish to vote, and if there is any waning of confidence in
the administration of elections it probably owes more to
the State's violation of federal election law than to any
imposters at the polling places.   It is impossible to say, on
this record, that the State's interest in adopting its sig-
nally inhibiting photo identification requirement has been
shown to outweigh the serious burdens it imposes on the
right to vote.

   If more were needed to condemn this law, our own
precedent would provide it, for the calculation revealed in
the Indiana statute crosses a line when it targets the poor
and the weak.   Cf. *Anderson* v. *Celebrezze*, 460 U. S. 780,
793 (1983) ("[I]t is especially difficult for the State to
justify a restriction that limits political participation by an
identifiable political group whose members share a par-
ticular viewpoint, associational preference, or economic
status").   If the Court's decision in *Harper* v. *Virginia Bd.
of Elections*, 383 U. S. 663 (1966), stands for anything, it is
that being poor has nothing to do with being qualified to
vote.   *Harper* made clear that "[t]o introduce wealth or
payment of a fee as a measure of a voter's qualifications is
to introduce a capricious or irrelevant factor."   *Id.*, at 668.
The State's requirements here, that people without cars
travel to a motor vehicle registry and that the poor who
fail to do that get to their county seats within 10 days of
every election, likewise translate into unjustified economic

30      CRAWFORD *v.* MARION COUNTY ELECTION BD.

SOUTER, J., dissenting

burdens uncomfortably close to the outright $1.50 fee we
struck down 42 years ago. Like that fee, the onus of the
Indiana law is illegitimate just because it correlates with
no state interest so well as it does with the object of deter-
ring poorer residents from exercising the franchise.

\*      \*      \*

The Indiana Voter ID Law is thus unconstitutional: the
state interests fail to justify the practical limitations
placed on the right to vote, and the law imposes an unrea-
sonable and irrelevant burden on voters who are poor and
old. I would vacate the judgment of the Seventh Circuit,
and remand for further proceedings.

Cite as: 553 U. S. ____ (2008)          1

BREYER, J., dissenting

# SUPREME COURT OF THE UNITED STATES

Nos. 07–21 and 07–25

WILLIAM CRAWFORD, ET AL., PETITIONERS
07–21          *v.*
MARION COUNTY ELECTION BOARD ET AL.

INDIANA DEMOCRATIC PARTY, ET AL., PETITIONERS
07–25          *v.*
TODD ROKITA, INDIANA SECRETARY OF STATE,
ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SEVENTH CIRCUIT

[April 28, 2008]

JUSTICE BREYER, dissenting.

Indiana's statute requires registered voters to present photo identification at the polls. It imposes a burden upon some voters, but it does so in order to prevent fraud, to build confidence in the voting system, and thereby to maintain the integrity of the voting process. In determining whether this statute violates the Federal Constitution, I would balance the voting-related interests that the statute affects, asking "whether the statute burdens any one such interest in a manner out of proportion to the statute's salutary effects upon the others (perhaps, but not necessarily, because of the existence of a clearly superior, less restrictive alternative)." *Nixon* v. *Shrink Missouri Government PAC*, 528 U. S. 377, 402 (2000) (BREYER, J., concurring); *ante,* at 6–7 (lead opinion) (similar standard); *ante,* at 2–3 (SOUTER, J., dissenting) (similar standard). Applying this standard, I believe the statute is unconstitutional because it imposes a disproportionate burden upon

TX_00002567

2        CRAWFORD *v.* MARION COUNTY ELECTION BD.

BREYER, J., dissenting

those eligible voters who lack a driver's license or other statutorily valid form of photo ID.

Like JUSTICE STEVENS, I give weight to the fact that a national commission, chaired by former President Jimmy Carter and former Secretary of State James Baker, studied the issue and recommended that States should require voter photo IDs. See Report of the Commission on Federal Election Reform, Building Confidence in U. S. Elections §2.5 (Sept. 2005) (Carter-Baker Report), App. 136–144. Because the record does not discredit the Carter-Baker Report or suggest that Indiana is exceptional, I see nothing to prevent Indiana's Legislature (or a federal court considering the constitutionality of the statute) from taking account of the legislatively relevant facts the report sets forth and paying attention to its expert conclusions. Thus, I share the general view of the lead opinion insofar as it holds that the Constitution does not *automatically* forbid Indiana from enacting a photo ID requirement. Were I also to believe, as JUSTICE STEVENS believes, that the burden imposed by the Indiana statute on eligible voters who lack photo IDs is indeterminate "on the basis of the record that has been made in this litigation," *ante,* at 18, or were I to believe, as JUSTICE SCALIA believes, that the burden the statute imposes is "minimal" or "justified," *ante,* at 1 (opinion concurring in judgment), then I too would reject the petitioners' facial attack, primarily for the reasons set forth in Part II of the lead opinion, see *ante,* at 7–13.

I cannot agree, however, with JUSTICE STEVENS' or JUSTICE SCALIA's assessment of the burdens imposed by the statute. The Carter-Baker Commission *conditioned* its recommendation upon the States' willingness to ensure that the requisite photo IDs "be easily available and issued free of charge" and that the requirement be "phased in" over two federal election cycles, to ease the transition. Carter-Baker Report, at App. 139, 140. And as described

BREYER, J., dissenting

in Part II of JUSTICE SOUTER's dissenting opinion, see *ante*, at 3–16, Indiana's law fails to satisfy these aspects of the Commission's recommendation.

For one thing, an Indiana nondriver, most likely to be poor, elderly, or disabled, will find it difficult and expensive to travel to the Bureau of Motor Vehicles, particularly if he or she resides in one of the many Indiana counties lacking a public transportation system. See *ante,* at 6–7 (SOUTER, J., dissenting) (noting that out of Indiana's 92 counties, 21 have no public transportation system at all and 32 others restrict public transportation to regional county service). For another, many of these individuals may be uncertain about how to obtain the underlying documentation, usually a passport or a birth certificate, upon which the statute insists. And some may find the costs associated with these documents unduly burdensome (up to $12 for a copy of a birth certificate; up to $100 for a passport). By way of comparison, this Court previously found unconstitutionally burdensome a poll tax of $1.50 (less than $10 today, inflation-adjusted). See *Harper* v. *Virginia Bd. of Elections,* 383 U. S. 663, 664 n. 1, 666 (1966); *ante,* at 30 (SOUTER, J., dissenting). Further, Indiana's exception for voters who cannot afford this cost imposes its own burden: a postelection trip to the county clerk or county election board to sign an indigency affidavit *after each election.* See *ante,* at 8–10 (same).

By way of contrast, two other States—Florida and Georgia—have put into practice photo ID requirements significantly less restrictive than Indiana's. Under the Florida law, the range of permissible forms of photo ID is substantially greater than in Indiana. See Fla. Stat. §101.043(1) (West Supp. 2008) (including employee badge or ID, a debit or credit card, a student ID, a retirement center ID, a neighborhood association ID, and a public assistance ID). Moreover, a Florida voter who lacks photo ID may cast a provisional ballot at the polling place that will be

BREYER, J., dissenting

counted if the State determines that his signature
matches the one on his voter registration form.
§§101.043(2); 101.048(2)(b).

Georgia restricts voters to a more limited list of accept-
able photo IDs than does Florida, but accepts in addition
to proof of voter registration a broader range of underlying
documentation than does Indiana. See Ga. Code Ann.
§21–2–417 (Supp. 2007); Ga. Comp. Rules & Regs., Rule
183–1–20.01 (2008) (permissible underlying documents
include a paycheck stub, Social Security, Medicare, or
Medicaid statement, school transcript, or federal affidavit
of birth, as long as the document includes the voter's full
name and date of birth). Moreover, a Federal District
Court found that Georgia "has undertaken a serious,
concerted effort to notify voters who may lack Photo ID
cards of the Photo ID requirement, to inform those voters
of the availability of free [State-issued] Photo ID cards or
free Voter ID cards, to instruct the voters concerning how
to obtain the cards, and to advise the voters that they can
vote absentee by mail without a Photo ID." *Common
Cause/Georgia* v. *Billups,* 504 F. Supp. 2d 1333, 1380 (ND
Ga. 2007). While Indiana allows only certain groups such
as the elderly and disabled to vote by absentee ballot, in
Georgia *any* voter may vote absentee without providing
any excuse, and (except where required by federal law)
need not present a photo ID in order to do so. Compare
Ind. Code §3–11–4–1 (West 2006) with Ga. Code Ann.
§21–2–381 (Supp. 2007). Finally, neither Georgia nor
Florida insists, as Indiana does, that indigent voters travel
each election cycle to potentially distant places for the
purposes of signing an indigency affidavit.

The record nowhere provides a convincing reason why
Indiana's photo ID requirement must impose greater
burdens than those of other States, or than the Carter-
Baker Commission recommended nationwide. Nor is
there any reason to think that there are proportionately

Cite as: 553 U. S. ____ (2008)          5

BREYER, J., dissenting

fewer such voters in Indiana than elsewhere in the country (the District Court's rough estimate was 43,000).  See 458 F. Supp. 2d 775, 807 (SD Ind. 2006).  And I need not determine the constitutionality of Florida's or Georgia's requirements (matters not before us), in order to conclude that Indiana's requirement imposes a significantly harsher, unjustified burden.

Of course, the Carter-Baker Report is not the Constitution of the United States.  But its findings are highly relevant to both legislative and judicial determinations of the reasonableness of a photo ID requirement; to the related necessity of assuring that all those eligible to vote possess the requisite IDs; and to the presence of alternative methods of assuring that possession, methods that are superior to those that Indiana's statute sets forth.  The Commission's findings, taken together with the considerations set forth in Part II of JUSTICE STEVENS' opinion, and Part II of JUSTICE SOUTER's dissenting opinion, lead me to the conclusion that while the Constitution does not in general forbid Indiana from enacting a photo ID requirement, this statute imposes a disproportionate burden upon those without valid photo IDs.  For these reasons, I dissent.

**American Bar Association**
**www.supremecourtpreview.org**

Nos. 07-21 & 07-25

## In the
## Supreme Court of the United States

WILLIAM CRAWFORD, ET AL.,
*Petitioners,*

v.

MARION COUNTY ELECTION BOARD, ET AL.,
*Respondents.*

INDIANA DEMOCRATIC PARTY, ET AL.,
*Petitioners,*

v.

TODD ROKITA, ET AL.,
*Respondents.*

On Writ of Certiorari to the
United States Court of Appeals for the Seventh Circuit

BRIEF OF TEXAS, ALABAMA, COLORADO, FLORIDA, HAWAII, MICHIGAN, NEBRASKA, PUERTO RICO, AND SOUTH DAKOTA AS *AMICI CURIAE* SUPPORTING RESPONDENTS

GREG ABBOTT
Attorney General of Texas

KENT C. SULLIVAN
First Assistant Attorney
General

DAVID S. MORALES
Deputy Attorney General for
Civil Litigation

R. TED CRUZ
Solicitor General
*Counsel of Record*

PHILIP A. LIONBERGER
Assistant Solicitor General

P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
(512) 936-1700

[Additional counsel listed on
inside cover]

Exhibit 41

### ADDITIONAL COUNSEL FOR AMICI

TROY KING
Attorney General of Alabama

JOHN W. SUTHERS
Attorney General of Colorado

BILL McCOLLUM
Attorney General of Florida

MARK J. BENNETT
Attorney General of Hawaii

MICHAEL A. COX
Attorney General of Michigan

JON BRUNING
Attorney General of Nebraska

ROBERTO J. SÁNCHEZ-RAMOS
Secretary of Justice of the Commonwealth of Puerto Rico

LAWRENCE E. LONG
Attorney General of South Dakota

i

## TABLE OF CONTENTS

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . .   i

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . .   iii

Interest of *Amici Curiae*. . . . . . . . . . . . . . . . . . . . . . .   1

Summary of the Argument. . . . . . . . . . . . . . . . . . . . . .   1

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

  I.    Voter Fraud Is a Serious Concern.. . . . . . . . . . .   2

    A.  The History of Our Nation Demonstrates the Ongoing Threat of Voter Fraud.. . . . . . . . . . . .   3

    B.  Voter Impersonation at the Polls Is Likewise a Serious Threat to the Integrity of Our Electoral Process.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

    C.  Congress and All 50 States Have Legislated to Prohibit and Prevent Voter Fraud.. . . . . . . . . . .   9

  II.   The Seventh Circuit Was Correct to Apply the "More Flexible" Standard of the "Ordinary Litigation" Test to Indiana's Photo-ID Requirement.. . . . . . . . . . . . . . . . . . . . . . . . .   14

  III.  Indiana's Photo-ID Requirement Passes Constitutional Muster Under the Ordinary Litigation Test.. . . . . . . . . . . . . . . . . . . . . . . .   17

ii

A. Requiring Photo ID Imposes a Negligible Burden on the Right to Vote.... . . . . . . . . . . . . . . . . . . .  17

B. Photo-ID Requirements Curtail Voting Fraud and Help to Promote Voter Confidence in the Electoral Process.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

C. The Substantial State Interests Outweigh the Slight Burden on Petitioners' Interests.. . . . . .  30

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

iii

## TABLE OF AUTHORITIES

**Cases:**

*Anderson* v. *Celebrezze*,
  460 U.S. 780 (1983). . . . . . . . . . . . . . . 14-17, 24, 26, 30

*Burdick* v. *Takushi*,
  504 U.S. 428 (1992). . . . . . . . . . . .   14, 16, 17, 26, 30, 31

*Clingman* v. *Beaver*, 544 U.S. 581 (2005). . . . . . . . . .   15

*Common Cause/Georgia* v. *Billups*,
  504 F.Supp.2d 1333 (N.D. Ga. 2007). . . . . . . . . . . . .   10

*Crawford* v. *Marion County Election Bd.*,
  472 F.3d 949 (CA7 2007). . . . . . . . . . .   14-15, 18, 27, 28

*Eu* v. *San Francisco County Democratic
  Cent. Comm.*, 489 U.S. 214 (1989). . . . . . . . . . . . .   1, 27

*FCC* v. *Beach Commc'ns*, 508 U.S. 307 (1993). . . . . . .   30

*Ill. State Bd. of Elections* v. *Socialist Workers Party*,
  440 U.S. 173 (1979). . . . . . . . . . . . . . . . . . . . . . . . . .   15

*Ind. Democratic Party* v. *Rokita*,
  458 F.Supp.2d 775 (S.D. Ind. 2006). . . . . . . . . . .   30, 31

*McIntyre* v. *Ohio Elections Comm'n*,
  514 U.S. 334 (1995). . . . . . . . . . . . . . . . . . . .   14, 16, 17

iv

*Munro* v. *Socialist Workers Party*,
   479 U.S. 189 (1986)................... 15, 29, 30

*Norman* v. *Reed*, 502 U.S. 279 (1992). ......... 14, 16

*Purcell* v. *Gonzalez*, 127 S.Ct. 5 (2006).......... 2, 27

*Reynolds* v. *Sims*, 377 U.S. 533 (1964)............. 2

*Storer* v. *Brown*, 415 U.S. 724 (1974)........ 15, 16, 30

*Tashjian* v. *Republican Party of Conn.*,
   479 U.S. 208 (1986)......................... 15

*Timmons* v. *Twin Cities Area New Party*,
   520 U.S. 351 (1997).................... 14, 16, 30

*Weinschenk* v. *State*,
   203 S.W.3d 201 (Mo. 2006)................. 10, 30

**Statutes, Rules, and Constitutional Provisions:**

10 ILL. COMP. STAT. ANN. 5/4-105................ 11

108-00-009 ARK. CODE R. §901................... 11

21-000-021 MISS. CODE R. §§1-13................ 11

25 PA. CONS. STAT. ANN. §3050(a)-(a.1). ........... 13

42 U.S.C. §15301, *et seq*...................... 9, 13

TX_00002577
JA_005336

TX_00002577

v

42 U.S.C. §15483(b).............................. 9

42 U.S.C. §15484................................ 9

42 U.S.C. §15485................................ 9

950 Mass. Code Regs. 52.03(5B)................. 11

Ala. Code §17-9-30(b)........................... 13

Ala. Code §17-9-30(f)........................... 13

Alaska Stat. §15.15.225(a)-(b).................. 13

Ariz. Rev. Stat. Ann. §16-579(A)................ 13

Ark. Code Ann. §7-5-305(a)..................... 11

Cal. Code Regs. tit. 2, §20107.................. 11

Cal. Elec. Code §14243......................... 12

Colo. Rev. Stat. Ann. §1-1-104(19.5). ........... 13

Colo. Rev. Stat. Ann. §1-7-110(1)-(2)........... 13

Conn. Gen. Stat. Ann. §9-261(a)................ 13

D.C. Code §1-1001.7(i)(1), (3).................... 12

D.C. Code §1-1001.7(i)(6)....................... 11

Del. Code Ann. tit. 15, §4937(a). ............... 13

vi

FLA. STAT. ANN. §101.043. . . . . . . . . . . . . . . . . . . . . . .  10

FLA. STAT. ANN. §101.048. . . . . . . . . . . . . . . . . . . . . . .  10

FLA. STAT. ANN. §97.0535. . . . . . . . . . . . . . . . . . . . . . .  10

GA. CODE ANN. §21-2-417. . . . . . . . . . . . . . . . . . . . . . .  10

GA. CODE ANN. §21-2-417.1. . . . . . . . . . . . . . . . . . . . . .  10

GA. CODE ANN. §21-2-417(b). . . . . . . . . . . . . . . . . . . . .  10

HAW. REV. STAT. ANN. §11-136. . . . . . . . . . . . . . . . . . .  11

Help America Vote Act of 2002 (HAVA),
   Pub. L. 107-252, 116 Stat. 1666. . . . . . . . . . . . . . . . .  9

IDAHO CODE §34-410. . . . . . . . . . . . . . . . . . . . . . . . . .  11

IND. CODE ANN. §3-11.7-5-2.5. . . . . . . . . . . . . . . . . . . .  10

IND. CODE ANN. §3-11-10-1.2. . . . . . . . . . . . . . . . . . . . .  32

IND. CODE ANN. §3-11-10.5. . . . . . . . . . . . . . . . . . . . . .  17

IND. CODE ANN. §3-11-8-16. . . . . . . . . . . . . . . . . . . . . .  17

IND. CODE ANN. §3-11-8-18. . . . . . . . . . . . . . . . . . . . . .  17

IND. CODE ANN. §3-11-8-25.1(a). . . . . . . . . . . . . . . . .  10

IND. CODE ANN. §3-11-8-25.1(d). . . . . . . . . . . . . . . . .  10

TX_00002579
JA_005338

TX_00002579

vii

IND. CODE ANN. §3-5-2-40.5. . . . . . . . . . . . . . . . . . . . . 10

IND. CODE ANN. §9-24-16-10. . . . . . . . . . . . . . . . 25, 32

IND. CODE ANN. §§3-11.7-1-2 to -6-3. . . . . . . . . . . . . 17

IND. CODE ANN. §§3-11-8-7 to -8. . . . . . . . . . . . . . . . 17

IND. CODE ANN. §§3-7-10-1 to -48-10. . . . . . . . . . . . 17

IOWA CODE ANN. §49.77(1). . . . . . . . . . . . . . . . . . . . . 12

IOWA CODE ANN. §49.77(4)(a). . . . . . . . . . . . . . . . . . . 12

KAN. STAT. ANN. §25-2908(c)(4). . . . . . . . . . . . . . . . 13

KAN. STAT. ANN. §25-2908(d). . . . . . . . . . . . . . . . . . 13

KAN. STAT. ANN. §25-2908(h). . . . . . . . . . . . . . . . . . 13

KY. REV. STAT. ANN. §117.227. . . . . . . . . . . . . . . . . . 13

LA. REV. STAT. ANN. §18:562(A). . . . . . . . . . . . . . . . 12

MASS. GEN. LAWS ANN. ch.54, §76B(a). . . . . . . . . . . . 11

MD. CODE ANN., ELEC. LAW §10-312. . . . . . . . . . . . . 12

ME. REV. STAT. ANN. tit. 21-A, §121(1-A). . . . . . . . . . 12

MICH. COMP. LAWS ANN. §168.523(1). . . . . . . . . . . . . 12

MINN. R. 8200.5500. . . . . . . . . . . . . . . . . . . . . . . . . . . 12

TX_00002580
JA_005339

TX_00002580

viii

MINN. STAT. ANN. §201.061(3). . . . . . . . . . . . . . . . . . . 12

MISS. CODE ANN. §23-15-169.5. . . . . . . . . . . . . . . . . . 11

MO. ANN. STAT. §115.427. . . . . . . . . . . . . . . . . . . . . 10

MO. ANN. STAT. §115.427(5). . . . . . . . . . . . . . . . . . . 10

MONT. ADMIN. R. 44.3.2102(6). . . . . . . . . . . . . . . . . 13

MONT. CODE ANN. §13-13-114(1)(a). . . . . . . . . . . . . . 13

N.C. GEN. STAT. §163-166.12(a). . . . . . . . . . . . . . . . . 11

N.D. CENT. CODE §16.1-05-07(1)-(3). . . . . . . . . . . . . . 12

N.H. REV. STAT. ANN. §654:12(III). . . . . . . . . . . . . . . 12

N.H. REV. STAT. ANN. §654:7-a(II). . . . . . . . . . . . . . . 12

N.H. REV. STAT. ANN. §659:13. . . . . . . . . . . . . . 11, 12

N.J. STAT. ANN. §19:15-17(b). . . . . . . . . . . . . . . . . . . 11

N.M. STAT. ANN. §1-1-23. . . . . . . . . . . . . . . . . . . . . . 13

N.M. STAT. ANN. §1-1-24. . . . . . . . . . . . . . . . . . . . . . 13

N.M. STAT. ANN. §1-12-7.1(D). . . . . . . . . . . . . . . . . . 13

N.Y. COMP. CODES R. & REGS. tit. 9, §6217.6(k). . . . . 11

N.Y. ELEC. LAW §8-302(2). . . . . . . . . . . . . . . . . . . . . 11

ix

N.Y. ELEC. LAW §8-302(2-a). . . . . . . . . . . . . . . . . . . . .   11

N.Y. ELEC. LAW §8-303(1)-(2)(a)(1). . . . . . . . . . . . . . .   11

NEB. REV. STAT. ANN. §32-914(2)(a)-(b). . . . . . . . . . .   11

NEB. REV. STAT. ANN. §32-914(2)(c). . . . . . . . . . . . . .   11

NEV. REV. STAT. ANN. §293.2725(1)(a). . . . . . . . . . . .   11

OHIO ADMIN. CODE §111-12-03(C)(8). . . . . . . . . . . . .   13

OHIO REV. CODE ANN. §3505.18(A)(1).. . . . . . . . . . . .   13

OKLA. ADMIN. CODE §230:35-5-113.3. . . . . . . . . . . . .   11

OKLA. STAT. ANN. tit. 26, §7-115.2. . . . . . . . . . . . . .   11

OR. REV. STAT. §254.385(1). . . . . . . . . . . . . . . . . . . .   12

OR. REV. STAT. §254.465. . . . . . . . . . . . . . . . . . . . . .   12

OR. REV. STAT. §254.474. . . . . . . . . . . . . . . . . . . . . .   12

P.R. LAWS ANN. tit. 16, §3059. . . . . . . . . . . . . . . . . .   13

P.R. LAWS ANN. tit. 16, §3061. . . . . . . . . . . . . . . . . .   13

R.I. GEN. LAWS §17-20-6.2. . . . . . . . . . . . . . . . . . . . .   11

S.C. CODE ANN. §7-13-710. . . . . . . . . . . . . . . . . . . . .   13

S.C. CODE ANN. §7-5-620. . . . . . . . . . . . . . . . . . . . . .   13

TX_00002582

x

S.D. ADMIN. R. 5:02:05:25. . . . . . . . . . . . . . . . . . . . . . . 12

S.D. CODIFIED LAWS §12-18-6.1. . . . . . . . . . . . . . . . 12

S.D. CODIFIED LAWS §12-18-6.2. . . . . . . . . . . . . . . . 12

TENN. CODE ANN. §2-7-112(a)(1). . . . . . . . . . . . . . . . 13

TEX. ELEC. CODE ANN. §63.008(a). . . . . . . . . . . . . . 13

TEX. ELEC. CODE ANN. §63.0101. . . . . . . . . . . . . . . 13

U.S. CONST. art. I, §4, cl.1. . . . . . . . . . . . . . . . . . . . . 15

UTAH CODE ANN. §20A-3-104(1)(a)-(c). . . . . . . . . . . 13

UTAH CODE ANN. §20A-3-105.5(4). . . . . . . . . . . . . . 13

VA. CODE ANN. §24.2-643(B). . . . . . . . . . . . . . . . . . . 13

VT. STAT. ANN. tit. 17, §2563. . . . . . . . . . . . . . . . . . 11

W. VA. CODE ANN. §3-2-10(g). . . . . . . . . . . . . . . . . . 11

WASH. REV. CODE ANN. §29A.08.113(1). . . . . . . . . . . 13

WASH. REV. CODE ANN. §29A.44.205. . . . . . . . . . . . . 13

WIS. STAT. ANN. §6.34(2)-(3). . . . . . . . . . . . . . . . . . 11

WYO. STAT. ANN. §22-3-118(b). . . . . . . . . . . . . . . . . 11

TX_00002583

xii

*Commissioner Given Probation for Voting Fraud,*
Nov. 10, 2005, Assoc. Press, http://abclocal.go.
com/ktrk/story?section=state&id=3622674 . . . . . . . 5-6

David B. Muhlhausen & Keri Weber Sikich,
A Report of the Heritage Center for Data Analysis:
"New Analysis Shows Voter Identification Laws
Do Not Reduce Turnout," (2007), http://www.
heritage.org/Research/LegalIssues/upload/
cda_07-04.pdf.. . . . . . . . . . . . . . . . . . . . . . .  19, 20, 23

Debate, Prof. Bradley A. Smith of Capital Univ.
Sch. of Law & Prof. Edward B. Foley of Ohio
State Univ., "Voter ID: What's at Stake?,"
156 U. Pa. L. Rev. (PENNumbra) 241 (2007),
at http://www.pennumbra.com/debates/pdfs/
voterid.pdf. . . . . . . . . . . . . . . . . . . . . . . . . . 24-25, 26

Derrick Nunnally, *Man Covicted of Double Voting:
"I Forgot" Dosen't Get Toas Resident Off Hook,*
Milwaukee J. Sentinel, Aug. 22, 2007,
http://www.jsonline.com/story/index.aspx?
id=651215. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Five Rio Grande Valley Residents Indicted for
Voter Fraud Allegedly from 2006 Election Cycle,*
June 1, 2007, http://www.edinburgpolitics.com/
?p=82. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Former Port Lavaca Councilwoman Briseno to
Serve Five Years in Prison for Voter Fraud,*
June 25, 2007, http://www.freerepublic.com/
focus/f-news/1856131/posts. . . . . . . . . . . . . . . . . . . 5

TX_00002584

xiii

Frank B. Strickland & Anne W. Lewis,
*It's About Fraud, Not Jim Crow*,
WASH. POST, Aug. 30, 2005 . . . . . . . . . . . . . . . . . . . . .   8

Ga. S. Res. 4, R.S. (2007). . . . . . . . . . . . . . . . . . . . .   14

Greg Reeves, *One Person, One Vote? Not Always*,
KANSAS CITY STAR, Sept. 5, 2004,
http://www.angelfire.com/pa/sergeman/issues
/elections/onevote.html. . . . . . . . . . . . . . . . . . . . . . .   7-8

Hearing on Non-Citizen Voting Before the
Comm. on House Admin., 109th Cong. (2006) . . . . . . .   4

Ill. H.B. 3418, 95th Leg., R.S. (2007). . . . . . . . . . . . .   14

Iowa S.F. 84, 82d Leg., R.S. (2007).. . . . . . . . . . . . . .   14

Jeffrey Milyo, Draft Policy Rep. for the Inst. of
Pub. Pol'y in theTruman Sch. of Pub. Affairs,
Univ. of Mo.: "The Effects of Photographic
Identification on Voter Turnout in Indiana:
A County-Level Analysis" (2007). . . . . . . . . . . . . . .   24

Jennifer Liberto, *Vote Illegally, Get Caught:
What Happens? Very Little*, ST. PETERSBURG
TIMES, July 18, 2004, http://www.sptimes.com/
2004/07/18/State/ Vote_illegally__get_c.shtml. . . . .   28

John Fund, *Jimmy Carter Is Right*,
WALL ST. J., May 22, 2006, http://www.opinion
journal.com/diary/?id=110008411. . . . . . . . . . . . . . . .   31

xiv

JOHN FUND, STEALING ELECTIONS:
   HOW VOTER FRAUD THREATENS
   OUR DEMOCRACY (2004). . . . . . . . . . . . . . . . . . . . . .   31

John R. Lott, Jr., Report: "Evidence of Voter
   Fraud and the Impact That Regulations to
   Reduce Fraud Have on Voter Participation
   Rates" (Rev. ed. 2006), http://www.vote.
   caltech.edu/VoterID/ssrn-id925611.pdf. . . . .   20, 23, 27

Kan. S.B. 169, R.S. (2007). . . . . . . . . . . . . . . . . . . . . .   14

LARRY J. SABATO & GLENN R. SIMPSON,
   DIRTY LITTLE SECRETS: THE PERSISTENCE OF
   CORRUPTION IN AMERICAN POLITICS (1996). . . . . . . . .   3

Manny Garcia and Tom Dubocq, *Unregistered
   Voters Cast Ballots in Dade: Dead Man's Vote,
   Scores of Others Were Allowed Illegally,
   Herald Finds*, MIAMI HERALD, Dec. 24, 2000, http:
   //www.englishfirst.org/ballots/deadvote.htm. . . . . . . .   8

Mary Ann Cavazos, *Robstown Woman Indicted
   and Jailed in Voter-Fraud Case*, CALLER-TIMES,
   June 16, 2006, http://www.caller.com/ccct/
   local_news/article/0,1641,CCCT_811_4779588,00.
   html. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

Mass. S.B. 440, 185th Leg., R.S. (2007). . . . . . . . . . . .   14

Md. S.B. 597, R.S. (2007). . . . . . . . . . . . . . . . . . . . . . .   14

Minn. H.F. 121, 85th Leg., R.S. (2007). . . . . . . . . . . .   14

xv

Miss. H.B. 309, 824, 920, 1386, 1388,
    1408, S.B. 2038, 2121, 2256, 2617, 2700,
    R.S. (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

N.C. H.B. 185, R.S. (2007). . . . . . . . . . . . . . . . . . . . . 14

N.M. H.B. 628, 48th Leg., R.S. (2007). . . . . . . . . . . . 14

Nev. S.B. 385, 74th Leg., R.S. (2007). . . . . . . . . . . . . 14

*Nueces County Indictment in Voter Fraud
    Investigation*, Assoc. Press, Jan. 19, 2007,
    http://www.kristv.com/global/story.
    asp?s=4263338. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-6

Okla. S.B. 15, 51st Leg., R.S. (2007). . . . . . . . . . . . . 14

Reeves County Woman Convicted for Voter Fraud,
    June 28, 2006, http://www.brackettville.info/
    modules/news/article.php?storyid=1186. . . . . . . . . . 6

*Refugio County Commissioner Pleads Guilty to
    Election Fraud Scheme*, Oct. 9, 2007,
    http://www.setexasrecord.com/news/
    202316-refugio-county-commissioner-
    pleads-guilty-to-election-fraud-scheme. . . . . . . . . . . 5

Report of Nat'l Comm'n on Fed. Election
    Reform: Building Confidence in
    U.S. Elections (2005). . . . . . . . . . . . . . . . . . . 9, 25, 27

xvi

Report to the U.S. Election Assistance
 Comm'n on Best Practices to Improve
 Voter Identification Requirements Pursuant
 to the Help America Vote Act of 2002,
 Eagleton Inst. of Pols., Rutgers, The State
 Univ. of N.J., & Moritz College of Law,
 Ohio State Univ. (2006). . . . . . . . . . . . . . . . . . . . . . .   18

Sara Perkins, *Hidalgo County DA: Convictions
 Hard to Get in Voter Fraud Cases*, THE MONITOR,
 Aug. 4, 2007, http://www.themonitor.com/
 onset?id=4277&template=article.html. . . . . . . . . . .   28

Sara Perkins, *Valley Officials, Observers at
 Odds Over Need for New Voter ID Laws*,
 THE MONITOR, Apr. 24, 2007, http://www.
 themonitor.com/common/printer/
 view.php?db=monitortx&id=1855. . . . . . . . . . . . . . .   8

Stephen Ansolabehere, Elting R. Morison
 Professor, Dep't of Pol. Sci., MIT, Paper
 Presented at  N.Y.U. Ann. Surv. Am. L.
 Symp.: "Access Versus Integrity in Voter
 Identification Requirements" (2007),
 http://web.mit.edu/polisci/portl/cces/material/
 NYU_Identification1.pdf. . . . . . . . . . . . . . . . . . .   22, 32

Steven F. Huefner, *Remedying Election Wrongs*,
 44 HARV. J. ON LEGIS. 265 (2007). . . . . . . . . . . . . . . .   3-4

xvii

Task Force on Fed. Election Sys.,
 John Mark Hansen, *Chap. VI: Verification
 of Identity* (2001), http://www.tcf.org/
 publications/electionreform/
 ncfer/hansen_chap6_verification.pdf. . . . . . . . . . . .  23

Tenn. H.B. 938, S.B. 227,
 105th Leg., R.S. (2007). . . . . . . . . . . . . . . . . . . . . . .  14

Tex. H.B. 218, 80th Leg., R.S. (2007). . . . . . . . . . . . .  14

Timothy Vercellotti & David Anderson,
 Paper Presented at 2006 Ann. Meeting
 of Am. Pol. Sci. Ass'n, Philadelphia, Pa.,
 Aug. 31-Sept. 3, 2006: "Protecting the
 Franchise, or Restricting It?: The
 Effects of Voter Identification Requirements
 on Turnout," http://moritzlaw.osu.edu/blogs/
 tokaji/voter%20id%20and%20turnout
 %20study.pdf. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18-19

TRACY CAMPBELL, DELIVER THE VOTE:
 A HISTORY OF ELECTION FRAUD, AN AMERICAN
 POLITICAL TRADITION—1742-2004 (2005) . . . . . . .  3, 4

Wash. H.B. 1468, 60th Leg., R.S. (2007). . . . . . . . . . .  14

## INTEREST OF *AMICI CURIAE*

*Amici* States have a compelling interest in safeguarding the integrity of democratic elections. *Eu* v. *San Francisco County Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989). All 50 States, the District of Columbia, and Puerto Rico have enacted laws concerning voter qualifications, ballot security, and voter fraud. Indiana's photo-ID statute reflects that tradition, ensuring that every qualified voter's vote counts and that those votes are not diluted by illegal votes cast by others.

Voter fraud undermines respect for democracy and public confidence in the electoral process. *Amici* States have a strong interest—indeed, an obligation—to combat voter fraud and to protect the fundamental right to vote for every citizen.

## SUMMARY OF THE ARGUMENT

Voter fraud is a serious concern, and Congress and every State in the Union have legislated to address it. The bipartisan Commission on Federal Election Reform, co-chaired by former President Jimmy Carter and former Secretary of State James Baker, expressly urged that States require photo IDs for voting, and several States, including Indiana, have followed that recommendation.

Requiring a photo ID to vote serves important government interests. It protects the integrity of elections, promotes confidence in the democratic process, and avoids diluting the votes of legal voters. And the burden on voters is slight. In our modern age, photo IDs are required for the most mundane activities, from driving a car to entering a government building to renting a DVD. As recommended by the Carter-Baker Commission, Indiana has provided photo IDs *without cost*, and so the burden of securing one is minimal.

2

Under longstanding precedent, the States have substantial leeway to balance competing policy interests, and Indiana has implemented a commonsense measure to prevent fraud in democratic elections. Nothing in the Constitution prohibits this law.

## ARGUMENT

### I.   VOTER FRAUD IS A SERIOUS CONCERN.

The foundation of Petitioners' challenge is the notion that voter fraud, and in particular in-person voter fraud, is not a very serious problem. They urge that "the record is . . . bereft of evidence suggesting any fraud problem," and that Indiana in particular lacks "any reasonable basis to suspect that such fraud is a risk in Indiana." Pet'r Br. (07-021), at 46-47, 54. Petitioners are incorrect.

At the most general level, the falsity of Petitioners' position is easily demonstrated. Voter fraud is a serious problem. Just last Term, the Court explained,

> "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy. *Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government.* Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised. '[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.'" *Purcell* v. *Gonzalez*, 127 S.Ct. 5, 7 (2006) (per curiam) (emphasis added) (quoting *Reynolds* v. *Sims*, 377 U.S. 533, 555 (1964)).

Indeed, the threat of voter fraud is sufficiently pronounced that the Carter-Baker Commission was

TX_00002591

3

convened to carefully study the issues and to make recommendations. That Commission, in turn, issued a final report in 2005 entitled "*Building Confidence in U.S. Elections*." The bipartisan report began,

> "[e]lections are at the heart of democracy . . . . *Americans are losing confidence in the fairness of elections*, and while we do not face a crisis today, we need to address the problems of our electoral system . . . ." REPORT OF NAT'L COMM'N ON FED. ELECTION REFORM: BUILDING CONFIDENCE IN U.S. ELECTIONS, at ii (2005) [CARTER-BAKER COMM'N REP.].

## A. The History of Our Nation Demonstrates the Ongoing Threat of Voter Fraud.

From New York's Tammany Hall to the Kansas City Pendergast machine, from Alice, Texas and the 1948 Senate race between Lyndon B. Johnson and Coke Stevenson to Mayor Richard Daley's Chicago machine in the 1960 presidential race, the specter of voter fraud has threatened the integrity of the electoral process for the entire history of our Nation. And that threat continues to this day. *See, e.g.*, TRACY CAMPBELL, DELIVER THE VOTE: A HISTORY OF ELECTION FRAUD, AN AMERICAN POLITICAL TRADITION—1742-2004, at xvi-xvii (2005) [CAMPBELL, ELECTION FRAUD] (noting that the American political process has been "deeply corrupted . . . for over two hundred years" and that voting fraud "is a deeply embedded culture within American politics that considers cheating fully justifiable"); LARRY J. SABATO & GLENN R. SIMPSON, DIRTY LITTLE SECRETS: THE PERSISTENCE OF CORRUPTION IN AMERICAN POLITICS 276 (1996) ("Our nation has a long and depressing history as a happy haven for the vote thief."); Steven F. Huefner, *Remedying*

4

*Election Wrongs*, 44 HARV. J. ON LEGIS. 265, 271 (2007) ("Voting fraud of course is a long-standing plague on democratic elections.").

Recent notorious instances of alleged voting fraud include the 1996 Dornan-Sanchez congressional race for California's 46th District, in which investigators turned up evidence of at least 784 illegal votes cast by noncitizens, *see* Hearing on Non-Citizen Voting Before the Comm. on House Admin., 109th Cong. 2 (2006) (testimony of Dan Stein); the 2000 Miami mayor's race between Joe Carollo and Xavier Suarez involving tainted absentee ballots, CAMPBELL, ELECTION FRAUD, at 286-91; and the 2004 Washington gubernatorial race, where a state judge determined that 1,678 votes had been illegally cast, *see* CARTER-BAKER COMM'N REP., at 4. In addition, since October 2002 the U.S. Department of Justice has launched more than 180 investigations into election fraud that have resulted in charges against 89 individuals and 52 convictions. *Id.*, at 45. These events serve as sad reminders that voting fraud is a real and persistent part of American politics and that, even assuming that voting fraud is not as widespread as it was in decades past, it can still affect the outcome of a close election. *Id.*, at 18.

Petitioners' claim that voting fraud is largely chimerical is belied by the facts. For example, for decades, the State of Texas has grappled with the challenges of voting fraud. Lyndon B. Johnson's 1946 Senate campaign is only the most infamous instance, but serious allegations of voter fraud have persisted, especially in South Texas, for more than a century.

Over the past five years, the Texas Attorney General's Office has vigorously enforced the voter-fraud laws, and

5

has obtained numerous indictments, guilty pleas, and convictions. In one case, a city councilwoman was convicted and sentenced to five years in prison for registering noncitizens to vote and then facilitating noncitizen voting by tampering with government documents. *See Former Port Lavaca Councilwoman Briseno to Serve Five Years in Prison for Voter Fraud*, June 25, 2007, http://www.freerepublic.com/focus/f-news/1856131/posts. Another instance of voter fraud involved allegations that a woman escorted voters into polling sites and illegally marked ballots without their consent. *See* Mary Ann Cavazos, *Robstown Woman Indicted and Jailed in Voter-Fraud Case*, CALLER-TIMES, June 16, 2006, http://www.caller.com/ccct/local_news/article/ 0,1641,CCCT_811_4779588,00.html. In yet another case, a man was indicted for double voting in the November 2006 general election. *See Five Rio Grande Valley Residents Indicted for Voter Fraud Allegedly from 2006 Election Cycle*, June 1, 2007, http://www.edinburgpolitics.com/ ?p=82. There was also a Refugio County Commissioner who pled guilty to the felony of tampering with government documents during a primary election, an East Texas former State Senator who was indicted for official oppression in trying to keep two candidates for a water board off the ballot, and a Beeville, Texas resident who pleaded guilty to casting ballots for her deceased mother. And many more instances of voting fraud relating to the illegal possession, handling, and transport of mail-in ballots have occurred. *See, e.g., Refugio County Commissioner Pleads Guilty to Election Fraud Scheme*, Oct. 9, 2007, http://www.setexasrecord.com/news/202316-refugio-county-commissioner-pleads-guilty-to-election-fraud-scheme; *Nueces County Indictment in Voter Fraud Investigation*, ASSOC. PRESS, Jan. 19, 2007, http://www.kristv.com/

6

global/story.asp?s=4263338; *Reeves County Woman Convicted for Voter Fraud*, June 28, 2006, http://www.brackettville.info/modules/news/article.php?storyid=1186; *Commissioner Given Probation for Voting Fraud*, Nov. 10, 2005, Assoc. Press, http://abclocal.go.com/ktrk/story?section=state&id=3622674.

**B.    Voter Impersonation at the Polls Is Likewise a Serious Threat to the Integrity of Our Electoral Process.**

Petitioners could be heard to answer, no doubt, that while voter fraud writ large might perhaps be a problem, the specific problem of fraudulent voting at the polls—which photo-ID laws seek to prevent—is not at all significant.  Again, Petitioners are incorrect.

Although the precise magnitude of voter-impersonation fraud has been disputed, "there is no doubt that it occurs." *See* Carter-Baker Comm'n Rep., at 18.  For example, witnesses who testified during the last Regular Session of the Texas Legislature on proposed photo-ID legislation reported that voter impersonation, in which people's IDs or voter-registration cards have been stolen and false votes had been cast in those persons' names, is not uncommon.  *See A Bill Relating to Requiring a Voter to Present Proof of Identification: Hearing on Tex. H.B. 218 Before the House Comm. on Elections*, 80th Leg., R.S. (Feb. 28, 2007), http://www.house.state.tx.us/committees/broadcasts.php?session=80&committeeCode=240 (testimony of Ed Johnson of the Harris County Tax Office); *id., Hearing on Tex. H.B. 218 Before S. Comm. on State Affairs*, 80th Leg., R.S. (Apr. 30, 2007), http://www.senate.state.tx.us/avarchive/?yr=2007&lim=200 (testimony of Skipper Wallace, State Legislative

TX_00002595

7

Chairman for the Republican County Chairmans Association).

In Harris County, for example, there was an instance in which one candidate in a primary election registered hundreds of voters, changed their addresses, and then voted for them on election day. *See* A Bill Relating to Requiring a Voter to Present Proof of Identification: Hearing on Tex. H.B. 218 Before the House Comm. on Elections, 80th Leg., R.S. (Feb. 28, 2007), http://www.house.state.tx.us/committees/broadcasts.php?session=80&committeeCode=240 (testimony of Ed Johnson). There have also been reports of stolen voter-registration cards, *see id.* (testimony of Skipper Wallace), a crime that makes sense only if one is intending to impersonate legal voters.

Other examples abound. Consider the case of Michael Zore who voted twice in 2006 by going to the polling stations of two Milwaukee, Wisconsin suburbs in the space of six hours. His excuse: "I forgot." The evidence against him, however, showed that he signed up to vote using a false address from one precinct when he already voted in another precinct. Derrick Nunnally, *Man Covicted of Double Voting: "I Forgot" Dosen't Get Toas Resident Off Hook*, MILWAUKEE J. SENTINEL, Aug. 22, 2007, http://www.jsonline.com/story/index.aspx?id=651215.

Another double voter was James Scherzer, an attorney, who cast two ballots in the same election several times in 2000 and 2002; he did this by voting in Kansas and then crossing the state line and voting again in Missouri. Mr. Scherzer acknowledged, "I was wrong in what I did." Greg Reeves, *One Person, One Vote? Not Always*, KANSAS CITY STAR, Sept. 5, 2004, http://www.angelfire.com/pa/sergeman/

8

issues/elections/onevote.html. And his case was but one of dozens of potential double-voting cases in Kansas City. *Id*.

Besides double voting, dead people casting votes is not an uncommon type of voting fraud. For example in the 2000 election, André Alismé, who died of cancer in 1997, had a ballot cast in his name in the presidential election. Manny Garcia & Tom Dubocq, *Unregistered Voters Cast Ballots in Dade: Dead Man's Vote, Scores of Others Were Allowed Illegally, Herald Finds*, MIAMI HERALD, Dec. 24, 2000, http://www.englishfirst.org/ballots/deadvote.htm. A November 2000 Atlanta Journal-Constitution report showed that between 1980 and 2000, there were more than 5,000 documented cases of people voting in Georgia after their deaths. Frank B. Strickland & Anne W. Lewis, *It's About Fraud, Not Jim Crow*, WASH. POST, Aug. 30, 2005, at A17. And in South Texas, as one local government watchdog stated, it is well known that "[d]own here, we have dead people vote," referring to the fraudulent practice of using dead voters' registration cards to cast extra ballots. Moreover, voter registration cards have been issued to imaginary voters and then distributed to real people who were not registered. Sara Perkins, *Valley Officials, Observers at Odds Over Need for New Voter ID Laws*, THE MONITOR, Apr. 24, 2007, http://www.themonitor.com/common/printer/view.php?db=monitortx&id=1855.

At the end of the day, there is considerable national evidence of in-person voter fraud. And, regardless of whether one believes that voter impersonation is widespread or relatively rare, there can be no serious dispute that its real effect can be substantial because, in a close election, even a small amount of fraud could make

TX_00002597

9

the margin of difference. CARTER-BAKER COMM'N REP., at 18.

### C.  Congress and All 50 States Have Legislated to Prohibit and Prevent Voter Fraud.

Congress and all 50 States, the District of Columbia, and Puerto Rico have enacted some form of voter-ID law. Collectively, these laws provide a continuum of regulatory responses to polling-place fraud and ballot security.

At the federal level, the Help America Vote Act of 2002 (HAVA), Pub. L. 107-252, 116 Stat. 1666 (codified at 42 U.S.C. §15301, *et seq.*), mandated that all States require photo ID, or in lieu of a photo ID some other form of approved nonphotograhic ID, from first-time voters who registered to vote by mail and did not provide verification of their identity with their mail-in registration. *See* 42 U.S.C. §15483(b). Congress explicitly provided, however, that this requirement was only a "minimum requirement[]," that States could establish "requirements that are more strict," and that States have "discretion" in implementing HAVA's requirements. *Id.* §§15484, 15485.

Even after HAVA, the Commission on Federal Election Reform expressly found that"[t]he electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters." CARTER-BAKER COMM'N REP., at 18.  Pursuant to that finding, the Carter-Baker Commission explicitly recommended as follows:

> "[T]o make sure that a person arriving at a polling site is the same one who is named on the lists, *we propose a uniform system of voter identification* based on the 'REAL ID card' or an equivalent for people without a drivers license." *Id.*, at iv (emphasis added).

TX_00002598

10

Consistent with both the federal mandate of HAVA and with the recommendation of the Carter-Baker Commission, the Indiana Legislature has chosen to require a valid photo ID at the ballot box.[1] Similarly, both Georgia and Missouri have enacted laws that strictly enforce a photo-ID requirement.[2] All of these laws allow a voter without ID to nonetheless cast a provisional ballot, but then count that provisional ballot only if either the voter's signature on file with the election authority can be verified or if the voter presents a valid photo ID to election officials within the time period for verifying provisional ballots.[3] Florida likewise requires all in-person voters to present a "current and valid picture identification."[4] And, like Indiana, Georgia, and Missouri, Florida allows a voter without photo ID to cast a provisional ballot, and that ballot will be counted only if the voter's signature on the provisional-ballot certification and affirmation matches the signature on the voter's registration or if written evidence confirms the voter's identity.[5]

---

1.   *See* IND. CODE ANN. §§3-5-2-40.5, & 3-11-8-25.1(a).

2.   *See* GA. CODE ANN. §§21-2-417, & 21-2-417.1; MO. ANN. STAT. §115.427. In 2006, the Missouri Supreme Court declared §115.427's photo-ID requirement to be invalid under that State's constitution. *See Weinschenk* v. *State*, 203 S.W.3d 201, 204, 221-22 (Mo. 2006). Recently, the United States District Court for the Northern District of Georgia upheld Georgia's photo-ID requirement, finding that the plaintiffs did "not demonstrate[] that the Photo ID requirement place[d] an undue or significant burden on the right to vote" and that the Plaintiffs' equal-protection challenge was meritless. *See Common Cause/Georgia* v. *Billups*, 504 F.Supp.2d 1333, 1382 (N.D. Ga. 2007).

3.   *See* GA. CODE ANN. §21-2-417(b); IND. CODE ANN. §§3-11-8-25.1(d), & 3-11.7-5-2.5; MO. ANN. STAT. §115.427(5).

4.   *See* FLA. STAT. ANN. §§97.0535, 101.043.

5.   *See id.* §101.048.

11

At the other end of the continuum are jurisdictions that have currently chosen to require less rigorous measures for ballot security. These jurisdictions include Arkansas, California, the District of Columbia, Hawaii, Idaho, Illinois, Iowa, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Jersey, New York, North Carolina, North Dakota, Oklahoma, Oregon, Rhode Island, South Dakota, Vermont, West Virginia, Wisconsin, and Wyoming. Collectively, these States employ an array of voter-ID laws, including: (i) relying on an honor system of announcing one's identity and matching the person's name on the registration list,[6] (ii) requiring compliance with HAVA's minimum identification standards for first-time voters who registered by mail,[7] (iii) requesting but not requiring that a person provide photo or written ID,[8] (iv) asking for ID and a written affirmation of identity if a person does not

---

6. *See, e.g.,* NEB. REV. STAT. ANN. §32-914(2)(a)-(b); N.H. REV. STAT. ANN. §659:13; N.Y. ELEC. LAW §8-302(2); VT. STAT. ANN. tit. 17, §2563.

7. *See, e.g.,* CAL. CODE REGS. tit. 2, §20107; D.C. CODE §1-1001.7(i)(6); IDAHO CODE §34-410; 10 ILL. COMP. STAT. ANN. 5/4-105; MISS. CODE ANN. §23-15-169.5; 21-000-021 MISS. CODE R. §§1-13; NEB. REV. STAT. ANN. §32-914(2)(c); NEV. REV. STAT. ANN. §293.2725(1)(a); N.J. STAT. ANN. §19:15-17(b); N.Y. ELEC. LAW §§8-302(2-a), & 8-303(1)-(2)(a)(1); N.Y. COMP. CODES R. & REGS. tit. 9, §6217.6(k); N.C. GEN. STAT. §163-166.12(a); OKLA. STAT. ANN. tit. 26, §7-115.2; OKLA. ADMIN. CODE §230:35-5-113.3; R.I. GEN. LAWS §17-20-6.2; VT. STAT. ANN. tit. 17, §2563; W. VA. CODE ANN. §3-2-10(g); WIS. STAT. ANN. §6.34(2)-(3); WYO. STAT. ANN. §22-3-118(b).

8. *See* ARK. CODE ANN. §7-5-305(a); 108-00-009 ARK. CODE R. §901 (Ar. State Bd. Election Comm'rs); HAW. REV. STAT. ANN. §11-136; MASS. GEN. LAWS ANN. ch.54, §76B(a); 950 MASS. CODE REGS. 52.03(5B).

12

appear on the election register,[9] (v) asking for ID and an attestation of identity if a person's identity is challenged,[10] (vi) requiring a person to sign an oath if their identity is challenged,[11] (vii) requiring a person to sign a poll book,[12] (viii) allowing a person without ID to vote if the voter provides his or her birth date and if a member of the election board or a clerk vouches for the individual,[13] or (ix) allowing a person without photo ID to vote, subject to challenge, if the voter executes an affidavit swearing to his or her identity.[14]

Between the two ends of the ballot-security continuum lie the voter-ID laws of Alabama, Alaska, Arizona, Colorado, Connecticut, Delaware, Kansas, Kentucky, Montana, New Mexico, Ohio, Pennsylvania, Puerto Rico, South Carolina, Tennessee, Texas, Utah, Virginia, and Washington. These laws do not employ the same rigor as a strict photo-ID requirement, but they incorporate more numerous and greater ballot-security controls than other States. For instance, several States take an intermediate approach that requires all persons to present either photographic ID, written ID, or another form of unique

---

9. *See* Iowa Code Ann. §49.77(4)(a); Me. Rev. Stat. Ann. tit. 21-A, §121(1-A); Minn. Stat. Ann. §201.061(3); Minn. R. 8200.5500; N.H. Rev. Stat. Ann. §§654:7-a(II), 654:12(III), 659:13.

10. *See* Md. Code Ann., Elec. Law §10-312.

11. *See, e.g.,* Cal. Elec. Code §14243; D.C. Code §1-1001.7(i)(1), (3); Iowa Code Ann. §49.77(1).

12. *See* Or. Rev. Stat. §254.385(1). Oregon is unique in that all elections there are conducted by mail. *See id.* §254.465. Nevertheless, "[a]t each primary election and general election, the county clerk [still must] maintain voting booths . . . ." *Id.* §254.474.

13. *See* N.D. Cent. Code §16.1-05-07(1)-(3).

14. *See* La. Rev. Stat. Ann. §18:562(A); Mich. Comp. Laws Ann. §168.523(1); S.D. Codified Laws §§12-18-6.1, -6.2; S.D. Admin. R. 5:02:05:25.

TX_00002601

13

identifier before casting an in-person ballot.[15] Among
these States, Arizona is unique in that it requires either
one form of photo ID or *two* forms of written ID.[16]
Alabama, Alaska, and Kentucky also require either photo
or written ID, but the requirement will be waived if one or
more election officers confirm the voter's identity.[17]
Kansas and Pennsylvania require either photo ID or other
written identification to cast an in-person ballot, but only
for certain first-time voters.[18] Puerto Rico requires voters
to present a photo ID issued by the Commonwealth's
Election Commission.[19] Utah requires "valid voter
identification" from an in-person voter only if it is
indicated on the official register or if the poll worker does
not know the voter and has reason to doubt the voter's
identity.[20] And Texas requires that all in-person voters
present their voter-registration cards to election officials.[21]
If a voter does not have their registration card, he or she
must execute an affidavit and present an accepted form of
photo or written ID.[22]

---

15. *See* ARIZ. REV. STAT. ANN. §16-579(A); COLO. REV. STAT. ANN.
§§1-1-104(19.5), & 1-7-110(1)-(2); CONN. GEN. STAT. ANN. §9-261(a);
DEL. CODE ANN. tit. 15, §4937(a); MONT. CODE ANN. §13-13-114(1)(a);
MONT. ADMIN. R. 44.3.2102(6); N.M. STAT. ANN. §§1-1-24, 1-1-23, & 1-
12-7.1(D); OHIO REV. CODE ANN. §3505.18(A)(1); OHIO ADMIN. CODE
§111-12-03(C)(8); S.C. CODE ANN. §§7-5-620, & 7-13-710; TENN. CODE
ANN. §2-7-112(a)(1), (c); VA. CODE ANN. §24.2-643(B); WASH. REV. CODE
ANN. §§29A.08.113(1), & 29A.44.205.

16. *See* ARIZ. REV. STAT. ANN. §16-579(A).

17. *See* ALA. CODE §17-9-30(b), (f); ALASKA STAT. §15.15.225(a)-(b);
KY. REV. STAT. ANN. §117.227.

18. *See* KAN. STAT. ANN. §25-2908(c)(4), (d), (h); 25 PA. CONS. STAT.
ANN. §3050(a)-(a.1).

19. P.R. LAWS ANN. tit. 16, §§3059, 3061.

20. *See* UTAH CODE ANN. §§20A-3-104(1)(a)-(c), & 20A-3-105.5(4).

21. *See* TEX. ELEC. CODE ANN. §63.008(a).

22. *See id.* §§63.008(a), .0101.

TX_00002602

14

Of course, none of these laws is static.  Following the recommendation of the Carter-Baker Commission, a significant number of state legislatures are actively debating whether to require a photo ID to vote,[23] much as Indiana, Georgia, Missouri, and Florida have already done.  Thus, the laws are in flux, with the legislatures of the several States vigorously fulfilling their constitutional roles as Justice Brandeis's famous laboratories to determine the precise policy prescriptions that best protect democratic integrity.

## II.   THE SEVENTH CIRCUIT WAS CORRECT TO APPLY THE "MORE FLEXIBLE" STANDARD OF THE "ORDINARY LITIGATION" TEST TO INDIANA'S PHOTO-ID REQUIREMENT.

In analyzing Indiana's photo-ID requirement, the Seventh Circuit refused to apply strict scrutiny and instead applied the "more flexible"[24] standard of the "ordinary litigation" test for statutes that "control the mechanics of the electoral process,"[25] as articulated in *Anderson* v. *Celebrezze*, 460 U.S. 780 (1983), and its progeny.[26] *See Crawford* v. *Marion County Election Bd.*,

---

23. *See , e.g.,*Ala H.B. 381, R.S. (2007); Cal. A.B. 9, R.S. (2007); Cal. S.B. 173, R.S. (2007); Ga. S. Res. 4, R.S. (2007); Ill. H.B. 3418, 95th Leg., R.S. (2007); Iowa S.F. 84, 82d Leg., R.S. (2007); Kan. S.B. 169, R.S. (2007); Md. S.B. 597, R.S. (2007); Mass. S.B. 440, 185th Leg., R.S. (2007); Minn. H.F. 121, 85th Leg., R.S. (2007); Miss. H.B. 309, 824, 920, 1386, 1388, 1408, S.B. 2038, 2121, 2256, 2617, 2700, R.S. (2007); Nev. S.B. 385, 74th Leg., R.S. (2007); N.M. H.B. 628, 48th Leg., R.S. (2007); N.C. H.B. 185, R.S. (2007); Okla. S.B. 15, 51st Leg., R.S. (2007); Tenn. H.B. 938, S.B. 227, 105th Leg., R.S. (2007); Tex. H.B. 218, 80th Leg., R.S. (2007); Wash. H.B. 1468, 60th Leg., R.S. (2007).

24. *Burdick* v. *Takushi*, 504 U.S. 428, 434 (1992).

25. *McIntyre* v. *Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995).

26. *Norman* v. *Reed*, 502 U.S. 279, 288-89 (1992); *Burdick*, 504 U.S., at 434-40; *Timmons* v. *Twin Cities Area New Party*, 520 U.S. 351,

15

472 F.3d 949, 952-53 (CA7 2007).  The Seventh Circuit was correct to do so.  It cannot be that strict scrutiny applies—as Petitioners seem to claim—whenever so much as a single voter's ability to exercise his or her fundamental right to vote is burdened.  Such a rule would be inconsistent with well-established precedent of this Court.

The right to vote is of course fundamental.  *Burdick* v. *Takushi*, 504 U.S. 428, 433 (1992); *Ill. State Bd. of Elections* v. *Socialist Workers Party*, 440 U.S. 173, 184 (1979).  But that right is not absolute.  *Burdick*, 504 U.S., at 433; *Munro* v. *Socialist Workers Party*, 479 U.S. 189, 193 (1986).  Under the Constitution, States are expressly authorized to regulate the times, places, and manner of holding elections, U.S. CONST. art. I, §4, cl.1; *Tashjian* v. *Republican Party of Conn.*, 479 U.S. 208, 217 (1986), and, indeed, are compelled to take "an active role in structuring elections," *Burdick*, 504 U.S., at 433 (1992), to assure that the electoral process is orderly, fair, and honest.  *Storer* v. *Brown*, 415 U.S. 724, 730 (1974).

All "[e]lection laws will invariably impose some burden upon individual voters."  *Burdick*, 504 U.S., at 433.  But there is no right to be free from any inconvenience or burden in voting.   Indeed, a contrary rule would impermissibly "tie the hands of States seeking to assure elections are operated equitably and efficiently."   *Id.* Thus, "the right to vote is the right to participate in an electoral process that is necessarily structured to maintain the integrity of the democratic system."  *Id.*, at 441 (citing *Anderson*, 460 U.S., at 788; *Storer*, 415 U.S., at 730).

---

359-64 (1997); *Clingman* v. *Beaver*, 544 U.S. 581, 591-97 (2005).

16

In assessing a challenge to an election-law provision that regulates the electoral process, the Court's analysis focuses on "the relative interests of the State and the injured voters" and "evalute[s] the extent to which the State's interests necessitated the contested restrictions." *McIntyre*, 514 U.S., at 345. Specifically, the Court "must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Anderson*, 460 U.S., at 789. Next, the Court "must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Id.* The Court "determine[s] the legitimacy and strength of each of those interests," and "consider[s] the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* All of these factors are weighed "to decide whether the challenged provision is unconstitutional." *Id.*

When weighing the competing interests, a "'severe' restriction[]" upon the plaintiff's First and Fourteenth Amendment rights requires the challenged state election-law provision to be "narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S., at 434; *Norman*, 502 U.S., at 289. But a "reasonable, nondiscriminatory restriction[]" triggers a "less exacting review," *Timmons*, 520 U.S., at 358, and will generally be upheld if "important regulatory interests" support the State's election-law provision. *Burdick*, 504 U.S., at 434; *Anderson*, 460 U.S., at 788 & n.9. In making these determinations, "[n]o bright line separates permissible election-related regulation from unconstitutional infringements on First Amendment freedoms." *Timmons*, 520 U.S., at 358 (citing *Storer*, 415 U.S., at 730).

17

The Seventh Circuit correctly applied the ordinary-litigation test because Indiana's photo-ID requirement is a component of that State's comprehensive scheme controlling participation in the electoral process. *See, e.g.*, *McIntyre*, 514 U.S., at 345 (explaining that because Ohio's statute prohibiting the distribution of anonymous campaign literature was not an election-law provision that controlled the mechanics of the electoral process but, rather, was a regulation of pure speech, the ordinary-litigation test did not apply). Other components of that scheme include extensive voter-registration laws, *see, e.g.*, IND. CODE ANN. §§3-7-10-1 to -48-10, regulations governing polling places, *see, e.g., id.*, §§3-11-8-7 to -8, -10.5, & -16 to -18, and laws on casting provisional ballots, *see, e.g., id.*, §§3-11.7-1-2 to -6-3, to name but a few.  Like these other components of the State's scheme, the photo-ID provision is a type of time-place-and-manner restriction subject to the ordinary-litigation test of the *Anderson-Burdick* line of cases.  The question thus reduces to whether the Seventh Circuit correctly assessed Indiana's photo-ID requirement under that test.

### III.   INDIANA'S PHOTO-ID REQUIREMENT PASSES CONSTITUTIONAL MUSTER UNDER THE ORDINARY LITIGATION TEST.

#### A.   Requiring Photo ID Imposes a Negligible Burden on the Right to Vote.

Application of the ordinary-litigation test to Indiana's photo-ID provision starts with an assessment of the "character and magnitude" of Petitioners' asserted injury to their right to vote under the First and Fourteenth Amendments. The Seventh Circuit correctly identified the extent of the burden on the right to vote when it observed that "[t]here is not a single plaintiff who intends not to

TX_00002606

18

vote because of the new law—that is, who would vote were it not for the law," and that "the sponsors of this litigation" found no "such person to join as a plaintiff." *Crawford*, 472 F.3d, at 952. This fact suggests that the burden here has more to do with "the Democratic Party and other organizational plaintiffs [having] to work harder to get every last one of their supporters to the polls," than it does with any voters being actually disenfranchised. *Id.*

Petitioners have not met their burden of demonstrating a significant burden on the individual right to vote. And, even apart from the slight evidence proffered by Petitioners on this question, the empirical data contradict their claim.

Although the data are subject to competing interpretations, the research as a whole suggests that voter-ID laws do not have any significant dampening effect on voter turnout. The strongest support for Petitioners can be found in a "preliminary" study conducted for the U.S. Election Assistance Commission by Rutgers University's Eagleton Institute of Politics and the Moritz College of Law at Ohio State University ("Eagleton Study"). In that study, Professor Timothy Vercellotti conducted a statistical analysis of the effect of voter-ID requirements on voter turnout in each State and the District of Columbia during the 2004 election. *See* Report to the U.S. Election Assistance Comm'n on Best Practices to Improve Voter Identification Requirements Pursuant to the Help America Vote Act of 2002, Eagleton Inst. of Pols., Rutgers, The State Univ. of N.J., & Moritz College of Law, Ohio State Univ. (2006). Professor Vercellotti and David Anderson presented a new version of the analysis to the 2006 American Political Science Association conference. *See* Timothy Vercellotti & David Anderson, Paper

19

Presented at 2006 Ann. Meeting of Am. Pol. Sci. Ass'n, Philadelphia, Pa., Aug. 31-Sept. 3, 2006: "Protecting the Franchise, or Restricting It?: The Effects of Voter Identification Requirements on Turnout," http://moritzlaw.osu.edu/blogs/tokaji/voter%20id%20and%20turnout%20study.pdf. The Eagleton Study found that more stringent voter-ID requirements exerted some negative influence on turnout in the 2004 election. *See id.*, at 13. It determined that "[t]he overall effect for all registered voters was fairly small, but still statistically significant." *Id.*

Significant doubt, however, has been cast on the validity of the Eagleton Study's findings. *See* Jeffrey Milyo, Draft Policy Rep. for the Inst. of Pub. Pol'y in the Truman Sch. of Pub. Affairs, Univ. of Mo.: "The Effects of Photographic Identification on Voter Turnout in Indiana: A County-Level Analysis," at 6 (2007) [Milyo, "Effects of Photo ID on Voter Turnout"]. The methodology of the Eagleton Study has been criticized for its use of a one-tailed hypothesis test, instead of the more commonly accepted two-tailed test; for its misclassification of some 2004 voter ID laws; and for the inappropriate use of some variables. *See* David B. Muhlhausen & Keri Weber Sikich, A Report of the Heritage Center for Data Analysis, "New Analysis Shows Voter Identification Laws Do Not Reduce Turnout," at 6 (2007), http://www.heritage.org/Research/LegalIssues/upload/cda_07-04.pdf [Muhlhausen & Sikich, "Voter ID Laws Do Not Reduce Turnout"] (stating that Eagleton Study is "fatally flawed"). Particularly problematic is the Eagleton Study's use of the one-tailed test because it "allows researchers to double their chances of finding statistically significant results." *Id.*, at 2.

In 2007, a reanalysis of the Eagleton Study by David Muhlhausen and Keri Sikich of the Center for Data

20

Analysis at the Heritage Foundation ("Heritage Foundation Study"), using a two-tailed test, found "that voter identification requirements, such as requiring nonphoto and photo identification, have virtually no suppressive effect on reported voter turnout." *Id.*, at 21. The Heritage Foundation Study reported that when "[c]ontrolling for factors that influence voter turnout, states with stricter voter identification laws largely do not have the claimed negative impact on voter turnout when compared to states with more lenient voter identification laws," and that "minority respondents in states that required photo identification are just as likely to report voting as minority respondents from states that only required voters to say their name." *Id.*, at 22. Finally, the report also noted that "[w]hen statistically significant and negative relationships [were] found in [its] analysis, the effects [were] so small that the findings offer[ed] little policy significance." *Id.*

Another study by Professor John Lott of the State University of New York-Binghampton, Department of Economics ("Lott Study"), found that election regulations that can affect the cost of voting have no statistically significant negative impact on voter turnout. John R. Lott, Jr., Report: "Evidence of Voter Fraud and the Impact That Regulations to Reduce Fraud Have on Voter Participation Rates," at 11 (Rev. ed. 2006), http://www.vote.caltech.edu/ VoterID/ssrn-id925611.pdf [Lott, "Voter Participation Rates"]. The Lott Study examined existing election regulations including nonphoto-ID laws that affected the cost of voting during the decade of 1996 to 2006, which although not as strict as mandatory photo-ID laws like those enacted in Indiana, Georgia, Missouri, and Florida, still made it more difficult for some people to vote. *See id.*, at 5. The study found that adopting a photo-ID

21

requirement "produced a drop in voter participation of 1.5 percent, a statistically insignificant change." *Id.*, at 7. And it found "only minimal support for the notion that IDs—whether photo IDs with substitution or non-photo IDs—reduce voting participation rates." *Id.*, at 8. But even more telling was its finding that nonphoto-ID requirements in areas identified as voter-fraud "hot spots" actually *increased* voting participation, supporting the hypothesis that "[g]reater confidence that the election is fair and that votes will be counted accurately encourages additional voter participation." *Id.*, at 10; *see also id.*, at 4.

Yet another study examined the change in voter turnout across Indiana counties before and after the implementation of photo-ID requirements prior to the 2006 general election. Milyo, "Effects of Photo ID on Voter Turnout," at 1. The study concluded that overall statewide turnout increased by 2% from 2002 to 2006 and that no consistent evidence existed to support the theory that counties with higher percentages of minority, poor, elderly, or less-educated population suffered a reduction in voter turnout relative to other counties. *Id.*, at 2, 18-19. In fact, the only consistent and statistically significant impact of photo ID in Indiana was to increase voter turnout for counties with a higher percentage of Democrat voters. *Id.*

In February of 2007, Professor Stephen Ansolabehere presented a paper at the New York University Law School's Election Law Symposium for the Annual Survey of American Law. His paper presented the findings of a 2006 collaborative survey project among 37 universities involving a 36,500-person national sample survey conducted over the Internet, which included a battery of

22

questions to gauge election-day practices and a handful of questions probing the use of voter ID. Stephen Ansolabehere, Elting R. Morison Professor, Dep't of Pol. Sci., MIT, Paper Presented at N.Y.U. Ann. Surv. Am. L. Symp.: "Access Versus Integrity in Voter Identification Requirements," at 3 (2007), http://web.mit.edu/polisci/portl/cces/material/NYU_Identification1.pdf [Ansolabehere, "Access Versus Integrity in Voter ID Requirements"]. In looking at the rate at which voter-ID requirements excluded or prevented people from voting, the survey found "[o]nly 23 people in the entire 36,500 person sample said they were not allowed to vote because of voter identification requirements," which "translates into approximately one-tenth of one percent of voters." *Id.*, at 7. According to the researchers, "[t]he real lesson from the data is that the total number of people who said they were not allowed to vote because of voter identification requirements [was] trivially small." *Id.* These findings and others led the survey to conclude that "[v]oter identification is the controversy that isn't," and the fact "[t]hat almost no one is prevented from voting because of voter ID requirements casts doubt on arguments from the left that this amounts to a new poll tax or literacy test." *Id.*, at 9.

Despite studies like these that show no statistically significant negative effect on voters because of voter-ID requirements, opponents of voter ID still maintain that requiring in-person voters to establish their identity by presenting an accepted form of photo ID negatively impacts the ability of minorities, the elderly, the disabled, and the poor to vote. *See, e.g.*, Brennan Ctr. for Just. at N.Y.U. Sch. of Law & Spencer Overton, Response to Report of 2005 Comm'n on Fed. Election Reform 3 (2005), http://www.carterbakerdissent.com/final_carterbaker_re

23

buttal092005.pdf.  These voters, the argument goes, are
less likely to possess driver's licenses or other forms of
acceptable photo ID.  *Id.*  Pointing to research showing
that between 6 and 10% of voting-age Americans do not
have a driver's license or a state-issued non-license photo
ID, these critics argue that those numbers translate into
approximately 20 million eligible voters.  *Id.*  They also
argue that, in terms of both time and money, the costs of
obtaining such identification would deter voting and likely
cause lower voter turnout among poor voters and those
who do not have easy access to government offices.  *See*
Task Force on Fed. Election Sys., John Mark Hansen,
*Chap. VI: Verification of Identity*, 4 (2001), http://www.tcf.
Lorg/publications/electionreform/ncfer/hansen_chap6_ve
rification.pdf.

But these figures can be misleading.   For several
reasons, they substantially overstate the magnitude of any
effect on voter turnout.  First, long history unfortunately
demonstrates that a significant number of eligible voters
will choose not to vote, regardless of whether there is any
photo-ID requirement. Lott, "Voter Participation Rates,"
at 3.  Second, of those who do choose to vote, many of those
currently lacking photo IDs will choose to obtain photo IDs
if needed to vote.  *Id.*; Muhlhausen & Sikich, "Voter ID Laws
Do Not Reduce Turnout," at 5.  And third, the critics' figures
do not address whether those individuals without driver's
licenses have other accepted forms of photo ID or may
otherwise cast valid ballots via absentee voting or
exceptions for indigency.  *See* Muhlhausen & Sikich,
"Voter ID Laws Do Not Reduce Turnout," at 5.[27]

---

27.  Perhaps a better measure of the difficulty voters face in
meeting the photo-ID requirement is the percent of registered voters
who have driver's licences. Lott, "Voter Participation Rates," at 3. But
even this measure fails to take into account that people who currently

24

In sum, there is no study or other empirical data that definitively supports the claim that a photo-ID requirement will result in significant voter self-disenfranchisement. *See* Milyo, "Effects of Photo ID on Voter Turnout," at 2, 18-19. And the balance of the data is to the contrary.

Nevertheless, even assuming *arguendo* that there exists some hypothetical set of voters who (i) would have voted without a photo-ID law, but (ii) will not vote because of the time and effort required to obtain a photo ID, Petitioners' claim nonetheless fails, for three reasons.

*First*, every regulation on voting necessarily imposes some burden on voters. *See Anderson*, 460 U.S., at 788; *Burdick*, 504 U.S., at 433. Requiring preregistration burdens voters, setting Election Day on a Tuesday burdens voters, fixing a limited number of polling places burdens voters, keeping the polls open principally during business hours burdens voters, and restricting who is eligible for absentee voting burdens voters.

"In fact, all democracies in history have placed restrictions on the power to vote. In modern times, the United States and other democracies have gone much further than ever before, and almost entirely for the good, in expanding the franchise. But restrictions on voting remain. Even the concept of 'adult' is up for grabs—how old must one be? Sixteen? Eighteen? Twenty-one? And why only citizens, a somewhat arbitrary concept that itself can be influenced—and limited—by law?" Debate, Prof. Bradley A. Smith of

lack a photo ID may get one once it is required. *Id.* Not to mention, this measure can be exaggerated because the lists of registered voters may not be updated to eliminate people who have died or changed addresses. *Id.*

TX_00002613

25

Capital Univ. Sch. of Law & Prof. Edward B. Foley of
Ohio State Univ., "Voter ID: What's at Stake?," 156 U.
PA. L. REV. (PENNUMBRA) 241, 252 (2007), at
http://www.pennumbra.com/debates/pdfs/voterid.pdf
[Debate].

The point is that each restriction drives up the time and
expense of exercising the franchise, and yet each of these
regulations is undoubtedly constitutional. The
requirement of photo ID is not qualitatively different.

*Second*, the requirement of a photo ID is becoming all
but ubiquitous in the modern age. Photo IDs are required
to drive a car; to board an airplane; to travel abroad; to
enter many state and federal government buildings; to buy
alcohol or cigarettes; to purchase firearms; to obtain a
hunting or fishing license; to open a bank account; to
purchase medical prescriptions; to obtain most health care
or dental care; to rent a hotel room, a car, or a DVD from
Blockbuster; and even to watch an R-rated movie at the
cinema. *See Crawford*, 472 F.3d, at 951 (stating that "it is
exceedingly difficult to maneuver in today's America
without a photo ID . . . and as a consequence the vast
majority of adults have such identification").

And *third*, and most critically, Indiana has ensured that
voters without a photo ID can obtain one *without cost*.
IND. CODE ANN. §9-24-16-10. This case would be
altogether different—and might even present serious
issues under the Twenty-Fourth Amendment—if the State
were to require a photo ID for voting and then to charge a
significant amount to obtain a photo ID. But, following
the Carter-Baker Commission's express recommendation,
Indiana has ensured that government-issued photo IDs
can be obtained free of cost. *See* CARTER-BAKER COMM'N
REP., at 20 (stating that concerns over voter-ID

TX_00002614

26

requirements presenting a barrier to voting can be addressed in part by assuring that government-issued photo ID is available without expense to any citizen).

In every election, some voters undoubtedly choose to disenfranchise themselves because of the perceived inconvenience or burden of voting. That is a disappointing fact of life, and turnout suffers for it. *See* Debate, at 253 ("[Photo ID] may keep a small number from voting, but it is not quite the same as denying them the vote. Every restriction on voting will burden the franchise, and at each step some small number of voters may decide voting is not worth the effort."). But it is no answer to have no controls or such low standards that the entire electoral process is vulnerable to manipulation and fraud. If such were the case, the voters' faith in our elections would be considerably shaken. And "[l]ittle can undermine democracy more than a widespread belief among the people that elections are neither fair nor legitimate." CARTER-BAKER COMM'N REP., at 1.

Thus, both the empirical data and the practical realities demonstrated that any burden on voting caused by the Indiana statute is negligible.

**B.   Photo-ID Requirements Curtail Voting Fraud and Help to Promote Voter Confidence in the Electoral Process.**

On the other side of the scale is the State's interests that have been put forward as justifications for the photo-ID requirement. *See Burdick*, 504 U.S., at 434; *Anderson*, 460 U.S., at 789. As the Seventh Circuit recognized, "the purpose of the [photo-ID law] is to reduce voting fraud, and voting fraud impairs the right of legitimate voters to vote by diluting their votes—dilution being recognized to

TX_00002615

27

be an impairment of the right to vote." *Crawford*, 472 F.3d, at 952. Voting fraud compromises the integrity of the electoral process, and preserving the integrity of that process is indisputably a compelling state interest. *Purcell*, 127 S.Ct., at 7; *Eu*, 489 U.S., at 231. Concomitantly, fear of voting fraud can breed a lack of voter confidence in the integrity of the electoral process, driving honest voters away from the polls and breeding a distrust of government. *Id.*; *see* CARTER-BAKER COMM'N REP., at 18 ("The electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters."); Lott, "Voter Participation Rates," at 11 ("Regulations meant to prevent fraud can actually increase the voter participation rate[,]" especially "on turnout in counties where fraud is alleged to be rampant."). These interests are weighty and amply justify enactment of a photo-ID requirement.

Nevertheless, Petitioners question the legitimacy and strength of these interests, arguing that there is little or no evidence of voter-impersonation fraud, either in Indiana or about the country, that very few people have been convicted of illegal voting since 2002, and that claims of voting fraud are based largely on rumor, anecdote, and

28

speculation.[28]   These claims are false, as has been demonstrated exhaustively in Part I, *supra*.

Moreover, unlike with many other forms of voting regulations, with photo-ID requirements the fundamental right to vote appears on both sides of the ledger: as a

---

28. Petitioners place great reliance on the relative scarcity of criminal convictions for in-person voter fraud. *See* Pet'r Br. (07-025), at 43, 45, 48; Pet'r Br. (07-021), at 7. But other factors account for the difficulty of obtaining convictions in this area. Unsurprisingly, harried election officers often do not report incidents of voting impersonation and fraud, and law-enforcement officials frequently choose not to pursue such cases because they are not high on the D.A.'s priority list, are too onerous to prove, and are viewed as victimless crime that are treated leniently by judges and juries. *See, e.g.*, Sara Perkins, *Hidalgo County DA: Convictions Hard to Get in Voter Fraud Cases*, THE MONITOR, Aug. 4, 2007, http://www.themonitor.com/onset?id=4277&template=article.html.; Jennifer Liberto, *Vote Illegally, Get Caught: What Happens? Very Little*, ST. PETERSBURG TIMES, July 18, 2004, http://www.sptimes.com/2004/07/18/State/Vote_illegally_get_c.shtml; A Bill Relating to Requiring a Voter to Present Proof of Identification: Hearing on Tex. H.B. 218 Before S. Comm. on State Affairs, 80th Leg., R.S. (testimony of Skipper Wallace) ("[As a]n election worker, if you've ever worked as an election judge, you understand the hectic nature of the balloting process itself. It's very hurried, there are people waiting in lines. You want to move them through as fast as you can. You think this guy is impersonating somebody else but you don't have a lead pipe proof of stench, so you go ahead and let it ride. Well, then later you find out, well he did it. Well, you don't have any proof to be able go to a DA with to document that. There is a significant amount of evidence you have to take to actually prove up one of these cases—which makes it very difficult."). As the Seventh Circuit appropriately recognized, "the absence of prosecutions is explained by the endemic underenforcement of minor criminal laws (minor as they appear to the public and prosecutors, at all events) and by the extreme difficulty of apprehending a voter impersonator." *Crawford*, 472 F.3d, at 953. Indeed, this difficulty in obtaining convictions after the fact is yet another reason for the Indiana Legislature to have focused on preventing the crime *ex ante*.

TX_00002617

29

potential cost, if eligible voters are in fact kept away from the polls, but also as a potential benefit, if increased voter confidence increases turnout and avoids dilution of legal votes.  Thus, both the supporters and the detractors of photo ID often focus on the same broad concern—protecting against vote dilution.[29]  On the one hand, "[e]xcluding [otherwise] qualified voters from the polls . . . eliminates those votes from the count[] and dilutes the value of others who voted for the same candidate or party."[30]  On the other hand, ballots that are cast unlawfully "dilute the value of qualified votes."[31]

At the end of the day, regardless of whether there are a multitude of people in Indiana or elsewhere who have been convicted for voting fraud or voter impersonation, that does not impugn the legitimacy of the State's interests in preventing voter fraud.  The State need not "make a particularized showing" of the existence of voter impersonation and "does not have the burden of demonstrating empirically the objective effects on [the electoral process] that were produced by" the photo-ID requirement.  *See Munro*, 479 U.S., at 195.  Requiring States to show substantial evidence of voter impersonation

---

29. Ansolabehere, "Access Versus Integrity in Voter Identification Requirements," at 1.

30. *Id.*

31. *Id.*; *see also, e.g.*, 148 CONG. REC. S10488 (Oct. 16, 2002) ("[I]llegal votes dilute the value of legally cast votes—a kind of disenfranchisement no less serious than not being able to cast a ballot.") (statement of Sen. Bond); *id.*, at S2529 (Apr. 11, 2002) ("These twin goals—making it easier to vote and harder to corrupt our Federal elections system—underpin every provision of [the HAVA of 2002]. These goals are fundamental to ensuring that not only does every eligible American have an equal opportunity to vote and have that vote counted, but that the integrity of the results is unquestioned.") (statement of Sen. Dodd).

TX_00002618

30

as a predicate to the imposition of reasonable photo-ID requirements would "invariably lead to endless court battles over the sufficiency of the 'evidence' marshaled by a State to prove the predicate" and would require "a State's political system sustain some level of damage before the legislature could take corrective action." *Id.* State legislatures are not required to do that; instead, they are permitted to respond to potential voting fraud "with foresight rather than reactively." *Id.*; *see also Timmons*, 520 U.S., at 364 (stating that there is no requirement of "elaborate, empirical verification of the weightiness of the State's asserted justifications"); *Ind. Democratic Party* v. *Rokita*, 458 F.Supp.2d 775, 826 (S.D. Ind. 2006) (same); *Weinschenk*, 203 S.W.3d, at 229 (Limbaugh, J., dissenting) (same); *cf. FCC* v. *Beach Commc'ns*, 508 U.S. 307, 315 (1993) (regarding rational-basis review of an equal-protection challenge: "a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data").

## C. The Substantial State Interests Outweigh the Slight Burden on Petitioners' Interests.

Given all that has already been said about burdens and interests, all that remains is to weigh the respective advantages and disadvantages. *Burdick*, 504 U.S., at 434; *Anderson*, 460 U.S., at 789. No bright line demarcates the boundary between a constitutional and unconstitutional election regulation, and this weighing is not susceptible of a "litmus-paper test," *Timmons*, 520 U.S., at 358; *Storer*, 415 U.S., at 730. No judgment will be "automatic," *Anderson*, 460 U.S., at 789, but when an election law "imposes only reasonable, nondiscriminatory restrictions" on the right to vote, "'the State's important regulatory

31

interests are generally sufficient to justify' the restrictions." *Burdick*, 504 U.S., at 434.

For the reasons given above, the burden on Petitioners' stated interest of voting in person without having to establish one's identity by presenting an accepted form of photographic likeness—and its purported effect of inducing eligible voters without ID to disenfranchise themselves—can only be characterized as negligible. Common sense and experience tell us that a government-issued photo ID is something that is readily available and easily obtainable. The fact that the vast majority of Indiana's registered voters, not to mention American adults, have one proves that. *See Ind. Democratic Party*, 458 F.Supp.2d, at 824.

Indeed, this commonsense balance is reflected in the widespread attitudes of American voters. For example, a Wall Street Journal/NBC poll in 2006 "found that 80% of voters favored a photo ID requirement, with 62% favoring it strongly. Only 7% were opposed."[32] Another poll similarly found that 82% of Americans, including 75% of Democrats, believe that "people should be required to show a driver's license or some other form of photo ID before they are allowed to vote."[33] And a recent survey found: (1) 95% of people who identify themselves as conservatives or as Republicans supported voter ID requirements; (2) slightly more than 70% of moderates and Independents expressed support; and (3) two-thirds of Democrats supported the idea, as did 60% of people who identified themselves as liberal and 50% who identified

---

32. John Fund, *Jimmy Carter Is Right*, WALL ST. J., May 22, 2006, http://www.opinionjournal.com/diary/?id=110008411.
33. JOHN FUND, STEALING ELECTIONS: HOW VOTER FRAUD THREATENS OUR DEMOCRACY 5, 136 (2004).

32

themselves as very liberal.[34]  When respondents were categorized by race, the findings were that over 70% of Whites, Hispanics, and Blacks support the requirement, and Black and Hispanic voters did not express measurably less support for voter ID requirements than Whites.[35]

This popular consensus is also reflected in the recommendations of the Carter-Baker Commission, which explicitly urged the adoption of photo-ID legislation. Thus, Petitioners' stated fears that photo-ID requirements are merely cloaked attempts at voter suppression are belied by the fact that requiring a photo ID to vote was urged by, *inter alia*, former President Jimmy Carter—surely not a proponent of suppressing minority and Democratic votes.

Because the burden on Petitioners' rights is slight, the weight of the State's interests need not be overwhelming. Even so, here the State's interest is substantial.  The photo-ID requirement is reasonable and nondiscriminatory.  It is an evenhanded regulation that applies equally to all voters regardless of party affiliation or any suspect classification.  To the extent that the indigent lack the means to pay for a photo ID, Indiana's law provides them with a government-issued ID card free of charge, IND. CODE ANN. §9-24-16-10, and others may vote absentee without having to show proof of ID, *id.* §3-11-10-1.2.    Preventing  in-person  voting  fraud  is undeniably an important state interest.  Indeed, the State's compelling interest in protecting the integrity of the electoral process could well satisfy strict scrutiny, and *a fortiori* it suffices under the "more flexible" test of

---

34.   Ansolabehere, "Access Versus Integrity in Voter ID Requirements," at 4-5.

35.   *Id.*, at 5.

33

*Burdick.* Because Indiana's voter-ID law is a reasonable, nondiscriminatory measure directed at the important state interest of preventing voting fraud, it is more than sufficient to outweigh the slight interest of those who wish to vote in person without having to show a photo ID. Indiana's photo-ID requirement should be upheld.

### CONCLUSION

The Court should affirm the judgment of the Seventh Circuit.

Respectfully submitted,

<table>
<tr><td>GREG ABBOTT<br>Attorney General of<br>Texas</td><td>R. TED CRUZ<br>Solicitor General<br>*Counsel of Record*</td></tr>
<tr><td>KENT C. SULLIVAN<br>First Assistant Attorney<br>General</td><td>PHILIP A. LIONBERGER<br>Assistant Solicitor<br>General</td></tr>
<tr><td>DAVID S. MORALES<br>Deputy Attorney General<br>for Civil Litigation</td><td>P.O. Box 12548 (MC 059)<br>Austin, Texas 78711-2548<br>(512) 936-1700</td></tr>
</table>

December 2007



Mr/Mme President and distinguished Senators,

I am Claire Oxley Gluck, from Boerne, in Kendall County.   Thank you for this opportunity to testify on an issue of fundamental importance to our democracy: the right to vote.

My husband, who is Jewish, has often quoted a poem of Martin Niemoller, which I would now like to paraphrase to illustrate what is at stake:

*In Texas, they first disenfranchised the homeless, and I didn't speak up because I wasn't homeless.*

*Then they disenfranchised the poor and elderly, and I didn't speak up because I wasn't poor or elderly.*

*Then they disenfranchised the students, and I didn't speak up because I wasn't a student.*

*And then they disenfranchised me, and there was no one left who would speak up.*

So, I must now speak up.

We in this room are, for the most part, people of privilege.  We are educated, and so we know how to fight for our rights.  We have homes, and so we have addresses.  We have cars and so we have driver's licenses.  We would not be affected personally by Senate Bill 362.  But with our privilege comes responsibility.

It is our duty to ensure that the no Texan is prevented from voting for lack of a government-issued photo ID.

It is important to reiterate that we all want fair elections: they are a cornerstone of our democracy.  One element of fairness in elections is the *prevention of fraud*.  An equally important element is *universal suffrage*.

The problem with S.B. 362 is that it would *reduce fairness*, rather than promoting it.  This bill would hinder universal suffrage without addressing the main source of voter fraud.  According to academic and nonpartisan studies, voter fraud is most likely to occur in absentee ballots, which would not be affected by this bill.  Those studies indicate that it is extremely rare that a person would go to a polling place and vote using someone else's voter registration card.

I urge you not to pass S.B. 362.  It poses a sure risk of disenfranchising legitimate voters in order to prevent a hypothetical risk of fraud that has not been shown to occur.

Thank you.

## THE CASE FOR VOTER I.D. IN THE STATE OF TEXAS

I have served as a poll worker in all capacities (poll watcher, clerk, alternate judge, presiding judge) since the November, 2000 General Election.  I have seen it all.

In that first election, I worked as a clerk at a poll in the Liberty Eylau community in Bowie County.  The day was less than two hours old when a man in a unique Western shirt presented his voter registration card.  I found his name on the roll and cleared him to vote.  He did.  The perfect voter, or so we thought.

We had two lines to speed the process.  Imagine my surprise when I saw this same person reenter the poll about an hour later, getting in the other line.  The Presiding Judge also recognized him, stared him down and he left in a hurry.

Later, the Presiding Judge and I concluded that this man was going to use his real picture I.D. to cast his ballot the second time.  As the law stands now, I had no right to question his voter registration.  With a voter I.D. law in place, this potential vote fraud could have been avoided.

Opponents of such a law believe the elderly, minorities, the handicapped and disabled would be disenfranchised.  I disagree.  This proposal would cut vote fraud, allowing everyone's vote to count.  For every fraudulent cast vote, a legitimate one is cancelled out.

In the twenty-first century, everybody needs a photo I.D.  If you can not or do not drive, you can get an I.D. card from the Department of Public Safety  at a reasonable cost.  There is a blind woman who votes at  my poll nearly every election, who uses such a document.  As a legally blind person, myself, I won't leave home without one.  The excuse that people do not or can  not get a photo I.D. is a non-starter.

Please consider passing the Voter I.D. bill for the reasons I have stated.  Thank you.

Hazel Cotton
3725 Rio Grande Ave.
Texarkana, TX   75503
903-793-2015

3-9-09

My name is Kathy Hicks. I have been studying election irregularities since 1992 and a pollwatcher since 1996. I have a sworn affadavit from a Mr. Ira Stewart of Bowie County that was made available to me threw American International Investigations out of De Leon Texas. On Mr. Ira Stewarts absentee by mail application that he did not request the name Ora Stewart is filled in and the signature signed. There was no registration number on application by mail nor one filled in when stamped for a ballot to be sent out by mail. I would like to read you his statement.

In this incident where two different names are used in the absentee by mail application process and the voter registration number is not furnished by voter it is sure to cause confusion. If a photo Id was required to vote by mail the Integrity of the election process would strengthen and those not requesting nor wanting to vote by mail would not receive a ballot. My grandparents are 86 an 87 yrs of age an absolutely support SB 362.

Kathy Hicks
Texarkana, TX 75501

State of Texas

County of Bowie

## AFFIDAVIT

My name is _IRA STEWART_. I am above the age of 18 years and am of sound mind. I have personal knowledge of the facts stated herein under oath as follows:

I live at _104 BROWN_ in Texarkana, Bowie County, Texas.

I RECEIVED A ABSENTEE BALLOT IN THE
MAIL. I DON'T REMEMBER HOW A BALLOT WAS
SENT TO ME, OR WHY.
WILLIS RAY COME BY MY HOUSE AND HAD ME
SIGN THE BLANK BALLOT! I DID NOT FILL IN
THE BALLOT, BUT I DID SIGN IT. MR RAY THEN
TOOK THE BALLOT AND TOLD ME SHE WOULD TAKE
CARE OF IT. MR. DON PRAIZNOR WROTE THIS
STATEMENT AT MY REQUEST.

This completes my statement.

Signed _____

March _23_, 1996

Subscribed and sworn to be the undersigned authority on this the _23_ day of
_March_, 1996.

_____

Notary Public, Bowie County, Texas



APPLICATION FOR BALLOT BY MAIL
(SOLICITUD PARA RECIBIR UNA BOLETA POR CORREO)
COMPLETE ALL INFORMATION. PLEASE PRINT OR TYPE.
(COMPLETE TODA LA INFORMACION. FAVOR DE ESCRIBIR EN LETRA DE MOLDE O A MAQUINA.)

NAME (Nombre)
ORA Stewart 776

RESIDENCE ADDRESS AS REGISTERED TO VOTE
(Dirección de residencia de inscripción como votante)
04 Brown
Texarkana Tx. 75501

MAIL BALLOT TO (if different from above)
(Que enviar mi boleta a la siguiente dirección (si es distinta)
Same

TYPE & DATE OF ELECTION
(Tipo y Fecha de Elección)
Primary
3-12-96

☒ Check here if you wish to receive ballots for both the main election and runoff elections, if applicable.
(Ponga un 'V' aquí si quiere recibir una boleta para la elección principal y otra boleta para la elección decisiva, si hay una.)

Party Preference (Primary Election only)
(Preferencia de Partido. Solamente en Elecciones Primarias)
Demo

TELEPHONE NUMBER (OPTIONAL)
(NUMERO TELEFONICO) (FACULTATIVO)

Prescribed by Secretary of State. 993
ELEC 0291

YOU MUST CHECK THE REASON YOU ARE APPLYING FOR AN EARLY BALLOT. (DEBERA INDICAR LA RAZON POR LA CUAL SOLICITA UNA BOLETA DE VOTACION ADELANTADA.)

1. ☑ 65 years of age or older.    (65 años de edad o más.)
2. ___ Confinement in jail.    (Detención carcelaria.)
3. ___ Disability. (Incapacitación.)
4. ___ Expected absence from county on election day and during clerk's regular office hours for the remainder of the early voting period. Application must be received from outside county if submitted after early voting in person has begun. YOUR BALLOT MUST BE MAILED TO AN ADDRESS OUTSIDE THE COUNTY.
(Ausencia anticipada del condado el día de elecciones y durante las horas de oficina regulares de la secretaria en el resto del período de votación temprana...)

"I CERTIFY THAT THE INFORMATION GIVEN IN THIS APPLICATION IS TRUE, AND I UNDERSTAND THAT GIVING FALSE INFORMATION IN THIS APPLICATION IS A CRIME." ("YO CERTIFICO QUE LA INFORMACION DE QUE DOY EN ESTA SOLICITUD ES VERDADERA, Y COMPRENDO QUE ES UN CRIMEN DAR INFORMACION FALSA SOBRE ESTA SOLICITUD.")

X Ora Stewart Jr
SIGNATURE OF APPLICANT (FIRMA DEL SOLICITANTE)

Signature of Witness, if required
(Firma del Testigo, si es requerido)

Print Full Name of Witness
(Escriba en Letra del Molde el Nombre Completo del Testigo)

Residence Address of Witness or Title of Witness if an Election Official (Dirección de residencia de Testigo o Título)

VOTER REGISTRATION APPLICATION (SOLICITUD PARA REGISTRO DE VOTANTE)

For Official Use Only
PCT 29  Cert. Num. 80309

PLEASE COMPLETE ALL OF THE INFORMATION BELOW. PRINT IN INK OR TYPE.
(POR FAVOR COMPLETE LA SIGUIENTE INFORMACION. TECNICA EN LETRA DE MOLDE)

Last Name (Apellido) Stewart
First Name (NOT HUSBAND'S) (Nombre) Ora
Middle Name (if any) (Segundo Nombre) (Si tiene)
Maiden Name (Apellido de Soltera)

Sex (Sexo) M
Date of Birth (Fecha de Nacimiento) 10
Place of Birth (Lugar de Nacimiento) Texarkana 7577
County or foreign country, state or foreign country
(condado o condado estado o país extranjero)

County and Address of Former Residence
04 Brown
FOR 104 Brown

Permanent Residence Address: Street Address and Apartment Number, City, State, and ZIP.
(Dirección de Residencia Permanente: Calle y Número de Departamento...)
104 Brown 75501

Mailing Address, City, State and ZIP. If mail cannot be delivered to your permanent residence address.
(Dirección Postal, Ciudad, Estado...)
104 Brown

The applicant is a citizen of the United States and a resident of the county...

X Ora Stewart Jr
Signature of Applicant or Agent or Printed Name of Applicant

OCT 14 1988

Social Security Number (Optional)
Telephone Number (Optional)
Precinct Number

EDR 11/3/88
County and Address of Former Residence
FOR 104 Brown

590026278
005388

**APPLICATION FOR BALLOT BY MAIL**
(SOLICITUD PARA RECIBIR UNA BOLETA POR CORREO)

COMPLETE ALL INFORMATION PLEASE PRINT OR TYPE.
(COMPLETE TODA LA INFORMACION. FAVOR DE ESCRIBIR EN LETRA DE MOLDE O A MAQUINA.)

NAME (Nombre)
IRA Stewart

**RESIDENCE ADDRESS AS REGISTERED TO VOTE**
(Direccion de residencia en la que esta registrado como votante)

304 Brown St.
Texarkana Tex 75501

**MAIL MY BALLOT TO** (if different from above)
same

County Election Precinct number
Bowie ## 80309

**TYPE & DATE OF ELECTION**
(Tipo y Fecha de Eleccion)
General
Nov. 5, 1996

☐ Check here if you wish to receive ballots for both the main election and runoff elections, if applicable.

☐ (Haga un 'V' aqui si quiere recibir una boleta para la eleccion principal y otra boleta para la eleccion directiva, si hay una.)

Party Preference (Primary Election only)
(Preferencia de Partido- Solamente en Elecciones Primarias)

TELEPHONE NUMBER (OPTIONAL)
NUMERO TELEFONICO (FACULTATIVO)

Prescribed by Secretary of State 9/93
ELEC 02391

**YOU MUST CHECK THE REASON YOU ARE APPLYING FOR AN EARLY BALLOT.** (DEBERA INDICAR LA RAZON POR LA CUAL SOLICITA UNA BOLETA DE VOTACION ADELANTADA.)

1. ☐ 65 years of age or older.  (65 años de edad o mas.)

2. ☐ Confinement in jail.  (Detencion carcelaria.)

3. ☐ Disability. (Incapacidad.)

4. ☐ Expected absence from county on election day and during clerk's regular office hours for the remainder of the early voting period. Application must be submitted from outside county if submitted after early voting in person has begun. YOUR BALLOT MUST BE MAILED TO AN ADDRESS OUTSIDE THE COUNTY.
(Quienes anticipan estar fuera del condado el dia de las elecciones y durante las horas normales de su administracion, durante todo el resto del periodo de votacion adelantada. Deberan enviar su solicitud desde fuera del condado si el periodo de la votacion adelantada en persona a empezado. Deberá enviársele su boleta a una direccion que esté fuera del condado.)

If checked, give date you can receive mail at the address given
(Si marca No. 4, indique la fecha en que puede recibir su correo en la direccion que da.)

"I CERTIFY THAT THE INFORMATION GIVEN IN THIS APPLICATION IS TRUE, AND I UNDERSTAND THAT GIVING FALSE INFORMATION IN THIS APPLICATION IS A CRIME." ("YO CERTIFICO QUE LA INFORMACION DOY EN ESTA SOLICITUD ES VERDADERA Y COMPRENDO QUE ES UN CRIMEN DAR INFORMACION FALSA SOBRE ESTA SOLICITUD.")

X Ira Stewart
SIGNATURE OF APPLICANT (FIRMA DEL SOLICITANTE)

Signature of Witness, if required
(Firma del Testigo, si es requerida)

Print Full Name of Witness
(Escriba en Letra de Molde el Nombre Completo del Testigo)

Residence Address of Witness or Title of Witness if an Election Official (Direccion de Residencia del Testigo o Titulo del Testigo Si Es Un Oficial Electoral)

X FOR WITNESS: Applicant, if unable to sign, shall make mark in presence of witness. If applicant is unable to make mark, the witness shall check here _____.

X Relationship to Applicant (Circle one: parent, grandparent, spouse, child, sibling, other.)
(PARA EL TESTIGO: Si el solicitante no puede firmar, deberá hacer una marca ante un testigo. Si el solicitante no puede hacer una marca, el testigo debe marcar aqui _____.)
(Parentesco al Solicitante (Indique por hacer un circulo: padre, madre, abuelo, esposo, esposa, hijo, hija, hermano, hermana, otro.))

A-1672          TEXAS COUNTY PRINTING & SERVICES          8/5

JA_005387

**INTERVIEW STATEMENT**
**DORIS HARENE MILES**

Date of Interview:   November 26, 1996
Interviewed by:      Joe B. Horn

Ms. Doris Harene Miles was interviewed at her residence located at
1601 Allen Lane, Apartment #103, Texarkana, Texas.  This interview
was tape recorded.  (See Transcript attached hereto).  Ms. Miles made
the following statements and representations:

Ms. Miles stated that she did not request or fill out an Application
for Ballot by Mail and she doesn't know why she received an Absentee
Ballot by mail.  She stated that Willie Ray got her to fill out the
Absentee Ballot and Ms. Ray put the postage stamp on it and took the
Ballot with her.  She further stated that she went to the polls to
vote and they would not allow her to vote.  They told her she had
already voted by mail.  Ms. Miles said that she told Willie Ray not
to bother her at home.  She stated that she likes to go to the polls
and vote.

**END INTERVIEW**

BY: _Joe B. Horn_  A-5281
      Joe B. Horn

American International Investigations
Lic. No. A-5281
817- 893 - 3815

1

Donald Giles                                        March 03, 2009
340 CR 1224
Texarkana ,Texas 75501
903-838-2668

I  Donald Giles of 340 county road 1224 Texarkana, Texas 75501 , would
like to make this statement. Being of sound mind and body and willingly
making these  statements on my own free will .I would like to testify that
Texarkana City Council member Willie Ray has been my next door neighbor
since the year of 2000 outside the city limits.

I have been observing her reside at 574 county road 1224 daily. Our
property lines join each other and have had the opportunity to visit with her
on several occasions through the years .

Ms. Willie Ray first moved out here in the year 2000  , but had a single wide
home at the time. In the year 2007 Posey mobile home service located in
Texarkana installed her  a brand new double wide manufactured home  from
Investment Housing .

As the Texas election code and City Residence code for officers state I
myself who is Ms. Ray's next door neighbor of nine years cannot even vote
in the city elections much less be qualified for a City Council member.  I am
writing this statement for the proper authorities to look into these matters to
see if  Ms. Willie Ray is qualified under the Tx. Residency Election and City
codes to maintain and hold her City Council position. I would like
clarification on these matters to see if  Ms. Willie Ray has committed
perjury for signing sworn campaign documents  and falsifying her voter
registration location.

Sincerely ,
Donald Giles

*Donald Giles*

Exhibit 45

Brenda Giles                                   March 03, 2009
340 CR 1224
Texarkana ,Texas 75501
903-838-2668

I  Brenda Giles of 340 county road 1224 Texarkana, Texas 75501 , would
like to make this statement. Being of sound mind and body and willingly
making these  statements on my own free will .I would like to testify that
Texarkana City Council member Willie Ray has been my next door neighbor
since the year of 2000 outside the city limits.

I have been observing her reside at 574 county road 1224 daily. Our
property lines join each other and I can see her home from mine.

Ms. Willie Ray first moved out here in the year 2000  , but had a single wide
home at the time. In the year 2007 Posey mobile home service located in
Texarkana installed her  a brand new double wide manufactured home  from
Investment Housing .

As the Texas election code and City Residence code for officers state I
myself who is Ms. Ray's next door neighbor of nine years cannot even vote
in the city elections much less be qualified for a City Council member.  I am
writing this statement for the proper authorities to look into these matters to
see if  Ms. Willie Ray is qualified under the Tx. Residency Election and City
codes to maintain and hold her City Council position. I would like
clarification on these matters to see if  Ms. Willie Ray has committed
perjury for signing sworn campaign documents  and falsifying her voter
registration location.

Sincerely ,
Brenda Giles

*Brenda Giles*



## LEAGUE OF WOMEN VOTERS®
OF TEXAS

Testimony
SB 362
Committee of the Whole Senate
March 10, 2009

The League of Women Voters of Texas supports full voter participation and opposes efforts that may create barriers blocking this participation. We have real concerns that SB 362 does create needless barriers to citizen voter participation and does not address the issue of election fraud.

It has been suggested that, with the requirement of a photo ID at the polling place, election fraud will be eliminated; however, Attorney General Greg Abbott, after a $1.4 million investigation, found only 26 minor cases of election fraud, mostly involving mail-in ballots. In all of these cases, a photo ID would not have reduced fraud.

If we are to rely on a driver's license for a photo ID, we find that those who do not have a driver's license are more likely to be elderly, disabled, poor, a member of a minority community, or have an illness that makes it unsafe to drive. Also, there are many Texas women who have both a valid voter registration card and a Texas driver's license, but the names do not match because of marriage or divorce. These women will be inconvenienced when they attempt to vote, and it is entirely possible it could keep some away from the polls.

Currently the Texas OnLine Poll Worker Training can be completed in 60 minutes or less. Section 3E of this training, **"Qualify Voters,"** indicates that there are 10 possibilities, with instruction on how to handle each one. What would it take to get this training expanded to include the many possibilities to look for while determining whether the photo and accompanying documents meet the photo ID requirements? The goal must be to provide training so that reasonable people will come to the same conclusion when qualifying voters.

Obviously there are costs to Texas in this bill that are not addressed. Some costs include issuing photo ID's for those who don't have them, writing and providing training, and making sure that each citizen knows about any changes that have been thrust upon them. Only 1/3 of the counties in Texas have websites that can get information to the citizens in their county.

Voting is the most fundamental expression of citizenship. Breaking down barriers to citizen voter participation, from literacy tests to the poll tax, has been a constant battle for those of us who believe that all citizens should be able to exercise their right to vote. We support full voting participation by all eligible Americans, not restrictions.

Thank you for the opportunity to share our views.

1212 Guadalupe St., Suite 107 ★ Austin, TX 78701 ★ 512 472-1100 ★ 512 472-4114 fax ★ lwvtexas@lwvtexas.org ★ www.lwvtexas.org

TX_00002632



## *League of United Latin American Citizens*

**Testimony of**
**Rosa Rosales**
**National President**
**League of United Latin American Citizens**

**Before the**
**Texas State Senate Committee of the Whole**

**SB 362:**
**The Minority & Elderly Disenfranchisement Bill**

**March 10, 2009**

On behalf of the League of United Latin American Citizens, I thank the Texas State Senate Committee of the Whole for providing me the opportunity to discuss our concerns and opposition to Texas Senate Bill 362. We firmly believe that this legislation would disenfranchise hundreds of thousands of Texas voters, many of them minority and elderly. We also believe that this legislation will have little impact in reducing alleged in-person voting fraud which the bill is supposedly designed to prevent. As made clear by a two-year $1.4 million investigation by Attorney General Greg Abbott; in-person voting fraud is virtually non-existent in Texas under existing voting regulations.

My name is Rosa Rosales, and I am the National President of the League of United Latin American Citizens. LULAC is the largest and oldest Latino organization in Texas and in the United States. My organization advances the economic condition, educational attainment, political influence, health and civil rights of Hispanic Americans through community-based programs operating at more than 700 LULAC councils nationwide including over 200 here in Texas. Among many other activities, LULAC has sought to help Latinos become citizens and register to vote. Since our founding in 1929, we have also had to bring the State of Texas to court repeatedly for violating the voting rights of Latino citizens within the state. In the vast majority of these cases we have prevailed, costing the state millions of dollars in legal fees that could have been spent on education or other beneficial programs.

---

**2806 Fredericksburg Rd, #3 • San Antonio, TX 78201**

Let me state for the record, that if the Texas legislature passes and the Governor signs legislation that is similar in nature to SB 362, LULAC will take the State of Texas to court yet again, we will prevail, and it will cost the state several million more dollars in legal fees at a time when Texas taxpayers can least afford it.

**A Solution in Search of a Problem**

Texas Election Code already requires that voters at the polls prove their identity by showing their voter registration cards, driver's licenses or another identity document from a list created by this body. SB 362 requires additional burdensome identification at the polling place in order to prevent what its supporters claim is "wide-spread" voter fraud. However, the only kind of fraud that these additional voting requirements could possibly prevent is in-person voting fraud where an individual voter misrepresents their identity at the polls.

There is no question that election misconduct exists, including improper purges of eligible voters, distributing false information about when and where to vote, stuffing of ballot boxes, tampering with registration forms, voter intimidation at the polls and clerical errors. But the incidence of actual in-person voter fraud at the polls that SB 362 would supposedly prevent is extraordinarily rare. In fact the Brennan Center for Justice reviewed the allegations of in-person voter fraud made during the Supreme Court case *Crawford v. Marion County Election Board* and found that only a "handful out of hundreds of millions of votes" represented potential cases of in-person voter fraud. Closer to home, Texas Attorney General Greg Abbott could not find a single case of in-person voting fraud after a two-year $1.4 million investigation into fraud came up with only a handful of cases, none of which would have been prevented by SB 362.

**Restrictive Voter ID Requirements: A 21st Century Poll Tax**

Restrictive voter ID requirements are more likely to disenfranchise people of color, the elderly, individuals with disabilities, rural voters, young people, the homeless, low-income people, frequent movers, married women, and persons in large households.

TX_00002634
JA_005393

TX_00002634

## League of United Latin American Citizens

As many as 11 percent of United States citizens – more than 30 million individuals – do not have government-issued photo identification. Eighteen percent of seniors, 25% of African-Americans, and 16% of Latinos lack a current government-issued photo ID. Citizens earning less than $35,000 per year are more than twice as likely to lack current government-issued photo identification as those earning more than $35,000.

SB 362 would require voters to pay for a photo ID, if they don't already have one. Getting the required forms of ID, such as drivers' licenses and passports, costs money and time away from work the value of which can easily exceed $500. In some cases, it takes ID to get ID — for example, a certified birth certificate may be required to obtain government-issued photo identification, but government issued photo identification may be required to get a certified birth certificate. As a result, not all eligible voters in this state can afford to purchase a photo ID, and many who can may have difficulty coming up with the documents needed to obtain one.

### SB 362 is Costly and Ineffective

The costs of re-training Texas poll workers, educating the public, providing free government-issued voter identification, and defending SB 362 in court would cost Texas millions of dollars while failing to improve the integrity of the electoral process. The Texas Senate should think twice about spending millions of taxpayer dollars to defend voter ID requirements that are unnecessary in the first place.

### SB 362 Violates Federal Law

The excessive voter identification requirements contained within SB 362 would likely violate several federal laws including the Help America Vote Act, the 24th Amendment, and the Voting Rights Act. Under Sec. 5 of the Voting Rights Act, Texas has the burden to prove that any voter ID plan it seeks to institute is not discriminatory. Yet the disproportionate number of Latinos and African Americans who do not have photo IDs makes it clear that SB 362 would "lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise" in the state of Texas.

TX_00002635

## League of United Latin American Citizens

The available empirical research shows that although in-person impersonation fraud is an occurrence of extraordinary rarity, it has been used to justify legislation like SB 362 that appear to offer little benefit and impose substantial cost. The existing law in Texas has been successful in preventing in-person impersonation fraud; further measures are not only unnecessary, but risk compromising the integrity of our elections to the extent that they shut out eligible citizens.

Given its disproportionate impact on low-income, elderly, disabled and minority communities, the potential for SB 362 to skew election outcomes in Texas is huge. In fact, it is my belief that skewing elections…not eliminating fraud…is really what this bill is all about. I am deeply troubled that some elected leaders in this state would deliberately seek to discourage eligible citizens from participating in our democracy just to gain a partisan edge for themselves at a time when Texas men and women are giving their lives to preserve democracy half a world away. We should be doing everything we can to get more Texas citizens to the polls, not less. I urge all of you to vote no on SB 362 and get back to work on the pressing issues impacting our state.

Thank you.

TX_00002636
JA_005395

TX_00002636



7800 Shoal Creek Blvd., Suite 171-E
Austin, TX 78757
voice/tdd: 512.454.4816
intake: 800.252.9108
fax: 512.323.0902
drynders@advocacyinc.org
www.advocacyinc.org

**Testimony on SB 362**
**Senate Committee of the Whole**
**March 10, 2009**

My name is Dustin Rynders. I am an attorney with Advocacy, Inc, the statewide Protection &
Advocacy (P&A) system for Texans with disabilities. I am testifying today on behalf of both
Advocacy, Inc (AI) and the Disability Policy Consortium (DPC). Under the Help America Vote
Act (HAVA), AI is charged with ensuring individuals with disabilities enjoy "full participation
in the electoral process."[1] Both AI and the DPC oppose SB 362, which burdens Texas voters
with unnecessary and onerous identification (ID) requirements, risks disenfranchising hundreds
of thousands of voters with disabilities, and wastes resources that should be directed at real
problems facing the state.

Supporters of more restrictive identification requirements cite the *potential* for fraud, especially
among noncitizens, as the reason why more onerous ID requirements are needed. The only type
of potential fraud addressed by requiring photo identification is voter impersonation. There have
been no prosecutions for voter impersonation in the entire state of Texas and no prosecutions for
noncitizens trying to vote.[2] AI's own voter hotline and the complaints received by the Secretary
of State's office after the November 2008 election reveal the real problems in elections surround
poorly handled voter registration, lack of access to absentee ballot applications, voter
intimidation, inaccessible polling places, poorly trained poll workers, and violations of the right
to receive assistance. Texas should address these problems, instead of adding barriers to the
ballot box. Texas already has strong criminal laws already on the books to address any fraud that
is identified.[3]

**At least 8% or 1,270,268 voting age Texans do not have the two most common types of preferred
photo ID being requested by this bill.[4]**

---

[1] The Help America Vote Act of 2002 (HAVA), 42 U.S.C. § 15301-15545.
[2] *See*, Justin Levitt, THE TRUTH ABOUT VOTER FRAUD, The Brennan Center for Justice at New York University
School of Law available at http://brennan.3cdn.net/e20e4210db075b482b_wcm6ib0hl.pdf (accessed on 03/09/2009)
(Providing an analysis of allegations of voter fraud from across the county).
[3] *See*, TEX ELEC. CODE § 64.012 (2009) (making it a Class A misdemeanor with a penalty of up to a year in jail and
a $4,000 fine, to illegal vote by impersonation, vote more than once in an election, vote when a person knows they
are not eligible, or mark another's ballot without permission).
[4] The implementation of HAVA required that all new voter registration applications include a driver's license or
state identification number of any applicant who had such an ID. Through a public information request, Advocacy,
Inc. obtained the Secretary of State data showing that showing that 8%, or 290,772 people, who have registered to
vote in Texas since January 1, 2006, did not have a driver's license or state identification card. The U.S. Census
reports that there are 15,878,347 voting age Texans, which means an estimated 1,270,268 do not have a driver's
license or state identification card.

Texans with disabilities are among the least likely to have a form of state-issued photo ID, because many do not drive or need photo ID for banking or other activities which others assist them with. While SB 362 allows those without photo identification to present two "current" non-preferred forms of identification, such as a utility bill and official piece of government mail, this provision does little to expand access in practical terms. After all, many people with disabilities are also less likely to have numerous forms of non-preferred identification. For example, many people with disabilities, who live with relatives, in group homes, or in nursing homes, do not have utilities in their own name. Even people who have two or more documents, such as a Social Security check or Medicaid cards, may have more trouble understanding the new requirements, keeping their records together, and remembering to bring the documents to the polling place when they have never needed them in the past.

And, even if they bring their documents, poll workers will have trouble with the new requirements. Can someone's identity be "verified" if their last name has changed due to marriage, or if their appearance has changed due to changes in weight or hair? Also, what makes a utility bill or bank statement "current"? Already many election complaints relate to poll worker error, and SB 362 would increase the possibility for additional error in future elections.

National studies show that more restrictive ID standards negatively affect turnout, especially among the elderly and those with disabilities.[5] Practically, if SB 362 passes, voter turnout among those with disabilities will decrease and more individuals will show up without the appropriate ID, forcing them to cast provisional ballots that will not be counted unless they can quickly obtain an ID and make another trip to provide it to the county.

To pass constitutional standards, the new ID requirement includes offering free photo IDs which would cost at least $4 million over five years. The identification expense of this legislation will be ongoing, because free photo identification will always have to be available. Additionally, millions more would be required to offer adequate voter training in our large state with many separate media markets. To get an idea of the public education expenditure that is required when election laws are changed, consider that the spent over $3.5 million in federal HAVA funds each year in voter education to introduce HAVA reforms such as accessible voting machines to the public.[6] With such a drastic change in election law, which requires education before arriving at the poll, much more would likely be required to adequately insure voters receive accurate information. This does not include the resources that will be spent trying to pre-clear this change in policy with the Department of Justice, or defend the bill against legal challenges. These funds and your time would better be spent on the real issues affecting Texas such as the need for improvements and reforms in education, health care, and the State School system.

---

[5] *See*, Thomas O'Neil, Tim Vercellotti, BEST PRACTICES TO IMPROVE VOTER IDENTIFICATION REQUIREMENTS PURSUANT TO THE HELP AMERICA VOTE ACT OF 2002 (June 28, 2006), available at http://www.eac.gov/clearinghouse/docs/eagletons-draft-voter-id-report/attachment_download/file. (comparing turnout among states with varying voter identification requirements. *But see,* David Muhlhausen and Keri Weber Silkich , Heritage Foundation, NEW ANALYSIS SHOWS VOTER IDENTIFICATION LAWS DO NOT REDUCE TURNOUT (basing its conclusions on less reliable respondent information instead of turnout data.)
[6] *See*, Election Assistance Commission, Reports on State Expenditures of HAVA Funds , available at http://www.eac.gov/program-areas/research-resources-and-reports/reports-on-state-expenditures-of-hava-funds-1/reports-on-state-expenditures-of-hava-funds-texas (accessed on 03/09/09).

TX_00002638

Furthermore, the "free" ID that SB 362 provides is not necessarily free or readily available to all who would need it. It can be very difficult to come up with the documents that are required to get a photo ID. For example, even if you were able to leave your home to get a free photo ID, you would be expected to have a birth certificate, which can still be costly and difficult to obtain (especially if you were born in another state or not born in a hospital). In addition to a birth certificate, a person must produce another two official documents with their name and date of birth. Applicants also have to find accessible transportation to go get the location where their "free ID" is provided. In some areas, this can be a long journey without the benefit of public transportation.

Thank you for your attention and for considering the needs of voters with disabilities. I am happy to answer any questions you may have.


**Dustin Rynders**
Policy Specialist/ Attorney
Advocacy, Inc.
drynders@advocacyinc.org
Voice/TDD: (512) 454-4816
Fax: (512) 323-0902

# Testimony of Marsha Correira

Mrs. Amanda Jones of Bastrop County never drove a car and never had a driver's license.  Nor a passport.  But Mrs. Jones was fortunate to have a large, loving family network who took her to DPS and got her a photo identification card.  If SB362 had been in effect last year, and if Mrs. Jones had been without family to take care of her needs, she would not have been able to vote in the 2008 elections.  Mrs. Jones was in poor health and died shortly after casting her ballot by mail, at 110 years old.

The purchase of the State of Texas-provided i.d. card, and the purchase of the supporting documents to obtain that i.d. card, amounts to a fee to vote -- essentially, a poll tax.  The burden and expense of acquiring these documents would be onerous for some voters, especially for the poor, minorities, the very young and senior citizens.

The poll tax was prohibited by the 24th Amendment to the U.S. Constitution in 1964.  When some states continued to assess the poll tax, the U.S. Supreme Court held that a state which requires the payment of a fee to vote "violates the Equal Protection Clause of the Fourteenth Amendment."  *Harper v. Virginia Board of Elections*, 383 U.S. 663 (1966)

The Court continued, "Once the franchise is granted to the electorate, lines which determine who may vote may not be drawn so as to cause invidious discrimination." 383 U.S. 668.  If SB362 passes, a lot of senior citizens who've voted for decades, will be disenfranchised.  That's "invidious discrimination."

In a later paragraph, the Court stated, "The interest of the State, when it comes to voting registration, is limited to the fixing of standards related to the applicant's qualifications as a voter." 383 U.S. 668

In an earlier case, *Reynolds v. Simms* 377 U.S. 533; 561-562, the Court said, "Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society.  Especially since the right to exercise the franchise in a free and unimipaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized."

The Court, in *Harper*, reiterated, "...to repeat, wealth or fee paying has, in our view, no relation to voting qualifications; the right to vote is too fundamental to be so burdened or conditioned."

It is obvious that SB362 is an illegal attempt at voter suppression, an infringement of the right to vote.  Please vote against this unconstitutional bill.

Exhibit 49

# Testimony
## Of
## Rachel A. Hernandez
## Senate Committee of the Whole
## March 10, 2009

Hello.  My name is Rachel A. Hernandez; I reside at 718 Northstar Drive, San Antonio.  I am a member of Laborer's Local Union 1095 and am employed by Granada Homes, Inc. for 2 years.

I speak today in opposition to any legislation which would require voters to present additional identification in order to vote.

As a Resident Service Coordinator for Granada Homes, my job is to assist the residents who are all senior citizens (62 and older) with various daily issues.  I have found that approximately 30 percent of the complex population (of 250 residents) does not have valid identification; meaning that their licenses or identification is expired.  Renewal fees and difficulty with obtaining transportation to state offices is just a couple of reasons behind the lack of current identification.

We live in a time where voting and voter registration are at an all time high.  Legislation which would create additional obstacles for senior citizens' right to vote is not equitable and poses no positive outcome for those who already struggle to have their voices heard.



*Travis County Voter Registrar*
*Nelda Wells Spears*

*Contact: Tina Morton 854-9706*

## *Record Breaking Numbers!*
# *40,000 Voter Registration Applications Processed In Time For Early Voting*

OCTOBER 17, 2008 AUSTIN – More than 40,000 applications have been entered into the county's voter registration records in time for the start of early voting on Monday, October 20. (retrieve deadline photos) Not only have they been entered, the vast majority have been validated by the Secretary of State TEAM system.

"We want everyone to know all applications have been entered in time for early voting. Also, we want them to know there is no question about the validity of voter records," stated Voter Registrar Nelda Wells Spears. "Our data uploads every day to the state-wide voter registration system called TEAM. TEAM verifies each registrant matching name and date of birth with Texas Driver's license data or Social Security data," she said.

The majority of applications were received on October 6 and 7. On the last day to register for the November election, Monday October 6, hundreds of volunteers registered voters all day and up until the midnight deadline.

Travis County now has 603,289 validated registered voters. There are 7734 pending validation from the TEAM system. Once validated, the total number of registered voters in Travis County will be 611,024 registered voters – a record breaking number! Based on the official number used for voting age population, the 2000 census data, the registration rate is 98%.

Certificates are mailed daily (retrieve image) with a final mailing of 9000 scheduled for Saturday. "We know voters are excited about voting based on the number of contacts we received, both by telephone and email," said Nelda Wells Spears. She adds, "Don't forget, if you don't have your voter certificate, you can cast a ballot with your driver's license or other form of identification." (retrieve ID list)

Anxious voters who wish to confirm their registration status make check online at www.traviscountytax.org/showVoterSearch.do . If a voter cannot find his or her record on the Travis County database, they may check the Secretary of State's database of all counties at https://voterinfo.sos.state.tx.us/voterws/viw/faces/SearchSelectionVoter.jsp

Contact Travis County Voter Registration at 854-9473 or www.traviscountytax.org for voter registration information and assistance. Retrieve Fact Sheet.
-30-



TX_00002642
JA_005401

Exhibit 51



# Southwest Voter Registration Education Project

## TESTIMONY OF THE SOUTHWEST VOTER REGISTRATION EDUCATION PROJECT (SVREP) ON SB 362

### Committee of the Whole Senate
### 81st Legislature Regular Session
### Austin, Texas

### Tuesday, March 10, 2009

Testimony Prepared and Presented by
Lydia Camarillo
SVREP Vice President

**SVREP**
**National Office**
206 Lombard Street, 2nd Floor
San Antonio, Texas 78226
800-404-VOTE
210-922-0225
www.svrep.org

National Office • 206 Lombard, 2nd Floor• San Antonio, TX 78226 • (210) 922-0225 • Fax (210) 932-4055
California Office • 2914 N. Main St., 2nd Floor • Los Angeles, CA 90031 • (323) 343-9299 • Fax (323) 343-9100

# THE TESTIMONY OF THE
# SOUTHWEST VOTER REGISTRATION EDUCATION PROJECT (SVREP)
# ON SB 362

### 81st Legislature Regular Session
### Committee of the Whole Senate
### Austin, Texas

### Tuesday, March 10, 2009

Testimony Prepared and Presented by
Lydia Camarillo
SVREP Vice President

Greetings, Senate President Pro Tem Robert Duncan and Senators of the 81st Legislative
session. I am Lydia Camarillo, Vice President for Southwest Voter Registration Education
Project (SVREP), the largest and oldest nonpartisan, nonprofit organization of its kind with a
simple mission to increase the number of Latino and other ethic communities who are
registered to vote and participate in America's democracy as full and equal partners.  Founded
in San Antonio, Texas, by the late William C. Velásquez, SVREP has registered over 2.3
million Latino voters throughout Texas, the southwest and since 2000 the southeast.  SVREP
has won over 80 voting rights lawsuits and has prepared over 100,000 leaders to organize
their communities. In *Gonzalez vs. Arizona,* Mexican American Legal Defense and Educational
Fund (MALDEF) challenges in federal court the voter registration and identification provisions
of Arizona's Proposition 200, SVREP is one of the plaintiffs for the case.

I am here to advise you of SVREP's strong opposition to SB362. SVREP opposes this
bill because it would have a negative impact on Latino voter registration and potentially violate
federal election laws including the Voting Rights Act, the National Voting Registration Act, and
the Help America Vote Act.  This bill will only serve to depress voter registration of Latino,
other ethic communities, and the poor. For these reasons, SVREP opposes SB362 and urges
your opposition.  Texas legislators must take affirmative steps to promote the participation of
American citizen's voting and participating in America's democracy and should in its wisdom

oppose legislation that only serves to confuse citizens, contradict federal law, create undo financial burden to poor white, Latino and African American citizens who register to vote and creates undo financial burden to Texas counties. More over counties are facing financial shortfalls; this will create further financial burden to counties and the taxpayers.

SB362 is a bill that creates redundancy and multiple identification requirements for voters. SVREP believes that Texas law provides for proof of identification and this bill will only create confusion; create a more burdensome voting experience for both the voter and the poll workers. Texas law requires that voter registration applicants must affirmatively mark their US citizenship under penalty of perjury and submit their affidavit application either in person or by a business reply postcard. Elec. Code Section 13.121. In our extensive experience in registering voters, over the last 35 years, it is rare for a voter to have their naturalization, passport or birth certificate on hand when a voter registers to vote. Many eligible United States citizens have trouble accessing these documents at all, including senior citizens that have lost or had their documents damaged over time. Any extra steps in the registration process will only serve to needlessly disenfranchise voters.

Once the voter is registered, the voter should be able to vote at the polls with either a voter registration card or a range of identifying documents. Elec. Code 63.0101. The range of identification is meant to be broad and includes a person's utility bill and/or a bank statement because different voters have access to different documents. A voter that has had his or her wallet stolen, a voter that does not drive, or newly married and not updated his or her driver's license should not have their right to vote infringed upon.

SVREP's analysis of SB362 clearly reveals that this bill would only contradict the spirit of author's intent which we believe is to ensure that voter's rights are protected, facilitate the voting process and increase the universe of eligible voters who are voting and participating in America's democracy. The intent of this bill could only be to decrease the number of American citizens who take the opportunity to vote in Texas elections and it would be harmful to Latino voters.

Senate President Pro Tem Duncan and Members of the Committee of the Whole Senate, we urge you to oppose SB362. This bill will only suppress Latino, African American, and poor and elderly white voter registration and contradict Federal election laws. Respectfully submitted and thank you.

**Testimony of the Mexican American Legal Defense and Education Fund
(MALDEF) on SB 362
Senate Committee of the Whole, March 10, 2008**

Chairman Duncan and Members of the Senate, I am Luis Figueroa, a Staff Attorney of
the Mexican American Legal Defense and Educational Fund, a non-partisan legal
organization founded in Texas in 1968 to defend and protect Latino civil rights, including
voting rights.

Under current law, Texas voters may vote at the polls by providing a vote registration
certificate or another identifying document including a driver's license, utility bill, birth
certificate, passport, naturalization certificate, bank statement, government check or
official mail. Election Code 63.008, 63.0101.  SB 362 eliminates the ability to be
accepted for voting by using a voter registration card and requires either picture
identification card in the form of a driver's license, passport, employee identification
card, a student identification card or concealed handgun permit or two forms of non-
photo identification from a more extensive list.

The best information we have about the impact of voter identification laws comes from
the litigation in which MALDEF represents eligible voters who were turned away from
the polls as well as voter organizations.  These cases include *Gonzalez v. Arizona* in
which MALDEF attorneys served as lead counsel for the plaintiffs.

Importantly, at the trial of this case, Arizona could not produce any example of
impersonation voter fraud to justify its voter ID law.  The lack of any evidence of even a
single incident of impersonation voter fraud is consistent with the U.S. Supreme Court's
observation in the Indiana voter ID case that "the record contains no evidence of any such
fraud actually occurring in Indiana at any time in its history." *Crawford v. Marion
County Election Board*, 553 U. S. ____ (2008) (slip op at 11).   What we have learned
about voter ID laws is that they are unsupported by real incidents of impersonation voter
fraud and are thus a solution in search of a problem.

Although unsupported by any evidence of a problem with voter impersonation, Arizona's
voter ID law has resulted in thousands of voters being turned away from the polls.
During these elections, a voter whose name was on the rolls but who could not provide
the required ID was given a conditional provisional ballot and told to return within five
days with ID or the ballot would not be counted.

Across three federal elections – the 2006 Primary Election, the 2006 General Election,
and the 2008 Presidential Preference Election -- 4,194 voters cast conditional provisional
ballots that were never counted because the voter could not provide the required ID.  In
Texas 42,010 provisional ballots were cast in the 2008 General Election, but only 9,444
were counted.  The Secretary of State is currently compiling how many were cast for lack
of identification under the current Texas voter identification law.

Because of Arizona's voter ID law, many perfectly eligible voters whose names were on the voter rolls found themselves suddenly unable to vote because of one problem -- they did not have the specific combination of documents required by the voter ID law. These citizens- all ages, races, party affiliations and income levels- did not represent a small wrinkle in the system. Their circumstances were not unique and are by no means exceptions to the rule. They are just like you or me, people in our family and our neighbors who, simply by leading normal lives, found themselves unable to participate in the democratic process.

For example,

- Karen Lewsader, a police officer and registered Republican, was forced to cast a conditional provisional ballot because her driver's license listed a different address than the voter rolls. She had previously moved and changed her address with the Motor Vehicles Department, but the practice of the agency is to change the records and not replace the physical driver's license unless the driver pays an additional fee. When she was at the poll Ms. Lewsader went back to her car to try to find another form of identification with the correct name and address so she could cast a regular ballot, but the vehicle registration information she found was under her husband's name. When the demands of her job prevented her from returning to the county to show additional ID, her vote was not counted.

- Kristopherlee Russell, a registered Democrat, was forced to cast a provisional ballot because his driver's license and the voter rolls listed him under different addresses. His license had the address from his time as a student at the University of Arizona. After graduation he went to the DMV to update his information, but did not pay for a replacement license. When he went to vote the voter rolls and his voter registration card listed Mr. Russell's new address. The registration card alone was not sufficient proof of identification, even when used in tandem with his license. Mr. Russell did not have any other acceptable form of identification on him at the time and ultimately cast a provisional ballot. Minutes after leaving the polling place he found his Vehicle Registration and Proof of Insurance information in his car and attempted to present them at the same polling place as proper forms of identification, but the poll workers did not allow him to change ballots. Mr. Russell's vote did not count.

- Caleb LaPorte is a technician who works in chemical pumps and mines in Phoenix. Poll workers gave him a provisional ballot because the address on his license did not match the address on the rolls, even though he brought a letter from the voting bureau that stated it received his change of address and that he could use the letter as a form of identification. Mr. LaPorte was living with his girlfriend in her apartment at the time, and all the utility bills were in her name. When a poll worker explained that any form of mail would suffice as identification for voting, Mr. LaPorte returned with the only mail he received at that address- junk mail. Upon showing the envelope to the poll workers, they

concluded it was not acceptable and gave him a conditional provisional ballot.
The poll workers told Mr. LaPorte that the only way he could "cure" his ballot
was to get a new driver's license. Mr. LaPorte did not have the time to do this
before the deadline and his ballot was not counted.

- Georgia Morrison-Flores was a newlywed when she registered to vote and she
  registered under her married name. However, when she went to vote her maiden
  name on her driver's license did not match her married name under which she was
  registered. Because the names did not match, even though her valid ID showed
  her photo, birth date and first name, Ms. Morrison-Flores was turned away from
  the poll by an election worker who had been her childhood neighbor. Ms.
  Morrison-Flores was unable to cast a ballot of any kind, despite her status as a
  qualified voter.

Maricopa County, which includes the City of Phoenix and just over half the state's
voters, performed an analysis of the partisan impact of the Arizona voter ID law. The
analysis showed that voter ID had little to no partisan impact. In Arizona's 2008
Presidential Preference Election, 47% of the voters whose ballots went uncounted were
Republicans and 53% were Democrats.

In Texas, because the bill imposes additional identification requirements, the bill will
inevitably prevent some voters from casting a ballot on Election Day. The voter
identification provision of SB 362 will prevent voters, who already receive a free voter
registration certificate in the mail, from using that certificate when they go to vote. By
removing the ability to present a document that every voter receives free of cost, and
forcing voters to secure other forms of identification, most of which cost money, the
voter identification provision of HB 218 imposes a modern "poll tax" in Texas.
Although SB 362 requires that the Department of Public Safety (DPS) provide free
identification certificates to voters under certain limited circumstances, SB 362 does not
address the fact that DPS itself requires costly identification documents as a prerequisite
for obtaining a state identification certificate. For example, a 20 year-old born in Texas
who has no drivers' license would still have to produce either a passport or birth
certificate to obtain a state identification certificate from DPS.[1] Thus, if SB 362 becomes
law, Texas voters who do not have a photo ID or birth certificate on hand must either
apply and pay for a new birth certificate, spend significant time and money to obtain
either a passport or other government identity documents, or try to find two copies of
others documents, such as bank statements or utility bills, when they may or may not be
the person in their household who pays the bills. All of this must be done prior to going
to vote.

A number of voters only have their voter registration card to demonstrate their
qualification to vote. These voters include: elderly voters who no longer drive, non-
drivers who live in urban areas, and students who possess their school identification card

---

[1] www.txdps.state.tx.us/administration/driver_licensing_control/pages/identification
requirements.htm

TX_00002648

that may not include a picture. By and large, the impact of this bill's state issued identification requirement will fall on the physically disabled, the elderly, and the poor. While many people cannot understand why a person would not have a driver's license or a state issued identification card, it is not that unusual.

The bill before the committee today would force these voters to take additional steps to acquire an acceptable form of identification or exclude these voters from voting altogether. In addition, because the bill would create longer lines at the polls and force some voters to return home for more documentation and then present themselves for voting a second time, the bill will discourage voters from exercising the franchise.

The bill also creates the likelihood that election officials will refuse to accept voters whose photo identifications list an address or name that does not match their address or name on the voter rolls. For example, a voter who changes addresses before his driver's license expires will have an address on that license that differs from the address in the voter rolls. If you want a license that reflects your new address, you have to pay additional funds. This fee is not addressed by the voter ID bill presented in today's hearing. The bill before the Committee today, because it is unclear about what to do when a voter's photo identification lists a different name from that on the voter rolls, introduces the possibility that voters will be turned away, or offered only provisional ballots, when this situation arises at the polls.

The cost estimate of implementing this bill could be exceedingly expensive in establishing new regulations and procedures, training elections officials, recreating and distributing voter education materials, and lost revenue from providing free state identification cards. A better use of the state monies is to maintain an effective statewide voter registration database accessible by election officials throughout the state and to focus on training poll workers and educating the public on their voting rights and responsibilities.

The result of the legislation might decrease voter turnout, create undue problems for voters and possibly result in the elimination of many votes from minorities and the poor who may not currently have an ID card. Every time we place a restriction on the fundamental right to vote, we are undermining it. Requiring voters to present specific type of proof of identity before voting will not necessarily deter voter fraud.

It is disheartening to see such a restrictive governmental response to an unproven "problem" of potential voter fraud. A good government seeks to limit the barriers to voting – and doesn't require more bureaucracy than it needs to carry out its functions. The bill before the Committee today places more burdensome requirements on voters, particularly the disable, elderly and the poor and lacks justification in any sufficient evidence of impersonation fraud by voters.

For these reasons, MALDEF opposes this bill and if it passes, will actively monitor the potential legal issues raised by this legislation. MALDEF urges the Committee to reject the voter identification provision of SB 362.

Some of those people did not have the
right to vote before.

Do you know what the definition of illegal is? It is banned,
forbidden, prohibited, unlawful, not legal, wrong, unjust, and
unconstitutional. Even though it is unconstitutional, voter
fraud has been committed. One reason, there may not be too
many documented cases of voter fraud is because exactly
that; it was fraud, some people got away with it.

I am a 54 yr old 3rd generation American, I've had
a social security card since about the age of 14.
but you see, one of these 3 is fake, yet they all look
the same. It was easy to acquire, + it is accepted
as valid. That means there could be a traitor somewhere
Right now, it is almost as easy to sometimes get by without
having the legal right to vote.

A lot of people voted this Presidential Election,
people who had never voted before. Yes, I know a lot
of people voted for the reason of who we would
be voting for (up top) They didn't love AMERICA until
now. What a SHAME!

I feel now is the time for the Voter I.D.
to prepare for the future. If you don't do it now,
you will be voting for it later. You all have a
a duty to us citizens as law makers, so do
your job and make this a deterrent to prepare
+ to make it nearly impossible for voter fraud.
Anyone who votes against it is not doing everything
within their power for this great state within this great
country. I believe they do not have this state
best interest in mind

Vote for Voter I.D.
SB 362
On the National level, the government says the system is broken
on certain aspects of it. Do not make the same mistake.

Exhibit 54        PASS  SB 362        Thank You!

To the Distinguished Members of the Texas Senate:

My name is Dr, Rod Fluker, Sr., and I am Executive Director for the Texas Association of Black Personnel in Higher Education.  Today, I bring you greetings from our State Board of Directors and from Dr. Felicia Scott, TABPHE State President.

The Texas Association of Black Personnel in Higher Education, or "TABPHE," as we call it, is an educational organization of faculty, staff and administrators that number over 500 statewide.  TABPHE was founded 36 years ago to address pertinent issues that impact African Americans in particular, and people of color in general.  SB 362, or the "Voter ID Bill," causes our members, and many others grave concerns about the negative impact that the passing of such useless and harmless legislation will have on the voting rights of millions of already disenfranchised Texans.

We believe that laws should be created to promote civil living and/or to right a wrong.  The Voter ID Bill does neither.  Promoting civil living would mean to make it <u>easier</u> for Texans to vote, not make it more difficult.  Adding new barriers such as additional ID requirements is likened to Negro poll taxes and voting competency tests used during the days of "Jim Crow Laws."  So, this legislation works <u>against</u> promoting civil living.

This useless and harmful legislation also fails to right any wrong.  The fact is that there is <u>no</u> evidence of significant voter fraud, period.  Of the millions of votes cast in Texas during the last 6 years, voter impersonation is practically non-existent, both in Texas and across our nation.

Therefore, the Texas Association of Black Personnel in Higher Education, asks that all State Senators, both Republican and Democrat, as good ambassadors of the people of Texas, vote AGAINST Senate Bill 362.  Thank you.


**Dr. Rod C. Fluker, Sr.**
Executive Director
Texas Association of Black Personnel in Higher Education
1700 Broadmoor Drive
Austin, Texas 78723
Travis County
flukerconsulting@hotmail.com
512-294-3292 (cell)

Exhibit 55

# SENATE JOURNAL

## EIGHTY-FIRST LEGISLATURE — REGULAR SESSION

### AUSTIN, TEXAS

### PROCEEDINGS

_____

**TWENTY-SECOND DAY**
(Tuesday, March 17, 2009)

The Senate met at 9:10 a.m. pursuant to adjournment and was called to order by the President.

The roll was called and the following Senators were present: Averitt, Carona, Davis, Deuell, Duncan, Ellis, Eltife, Estes, Fraser, Gallegos, Harris, Hegar, Hinojosa, Huffman, Jackson, Lucio, Nelson, Nichols, Ogden, Patrick, Seliger, Shapiro, Shapleigh, Uresti, Van de Putte, Watson, Wentworth, West, Whitmire, Williams, Zaffirini.

The President announced that a quorum of the Senate was present.

The Reverend Dr. Jacquelyn Donald-Mims, Imani Community Church, Austin, offered the invocation as follows:

> Good and gracious God, eternal God, our Lord, we praise You for the glory of this outstanding new day, a day of opportunity and a day of the good life. O Lord, we pray, seek, and invite, therefore honor Your presence to superintend the proceedings, deliberation, and the decisions of the session. God, we pray You endow each official with Your wisdom, Your justice, Your will, Your compassion, Your grace, so that there might be for all people of this state and all families, all individuals, a cataclysmic eruption of hope for the future and, certainly, the abundant life that You designed for every life from the very beginning. Continually remind us that they that wait upon the Lord shall renew their strength, they will mount up with wings as eagles, they will run and not be weary, they will walk and not faint. In this we pray, in the name of our lord and savior.  Amen.

Senator Whitmire moved that the reading of the Journal of the proceedings of yesterday be dispensed with and the Journal be approved as printed.

The motion prevailed without objection.

### CO-AUTHOR OF SENATE BILL 9

On motion of Senator Zaffirini, Senator Gallegos will be shown as Co-author of **SB 9**.

### CO-AUTHORS OF SENATE BILL 19

On motion of Senator Patrick, Senators Carona, Eltife, Estes, Hegar, Huffman, Jackson, Nelson, Nichols, and Van de Putte will be shown as Co-authors of **SB 19**.

## CO-AUTHOR OF SENATE BILL 21

On motion of Senator Zaffirini, Senator Gallegos will be shown as Co-author of **SB 21**.

## CO-AUTHOR OF SENATE BILL 41

On motion of Senator Zaffirini, Senator Gallegos will be shown as Co-author of **SB 41**.

## CO-AUTHORS OF SENATE BILL 49

On motion of Senator Zaffirini, Senators Gallegos and West will be shown as Co-authors of **SB 49**.

## CO-AUTHOR OF SENATE BILL 89

On motion of Senator Van de Putte, Senator Carona will be shown as Co-author of **SB 89**.

## CO-AUTHORS OF SENATE BILL 90

On motion of Senator Van de Putte, Senators Carona, Gallegos, Lucio, Seliger, Watson, and West will be shown as Co-authors of **SB 90**.

## CO-AUTHOR OF SENATE BILL 182

On motion of Senator Patrick, Senator Lucio will be shown as Co-author of **SB 182**.

## CO-AUTHOR OF SENATE BILL 451

On motion of Senator Van de Putte, Senator West will be shown as Co-author of **SB 451**.

## CO-AUTHOR OF SENATE BILL 499

On motion of Senator Lucio, Senator Gallegos will be shown as Co-author of **SB 499**.

## CO-AUTHORS OF SENATE BILL 605

On motion of Senator Deuell, Senators Carona, Lucio, and Watson will be shown as Co-authors of **SB 605**.

## CO-AUTHOR OF SENATE BILL 688

On motion of Senator Wentworth, Senator Van de Putte will be shown as Co-author of **SB 688**.

## CO-AUTHOR OF SENATE BILL 843

On motion of Senator Uresti, Senator Watson will be shown as Co-author of **SB 843**.

## CO-AUTHOR OF SENATE BILL 1060

On motion of Senator Ellis, Senator Lucio will be shown as Co-author of **SB 1060**.

### CO-AUTHOR OF SENATE BILL 1146

On motion of Senator Zaffirini, Senator Uresti will be shown as Co-author of **SB 1146**.

### CO-AUTHOR OF SENATE BILL 1425

On motion of Senator Williams, Senator Watson will be shown as Co-author of **SB 1425**.

### CO-AUTHOR OF SENATE BILL 1569

On motion of Senator Eltife, Senator Watson will be shown as Co-author of **SB 1569**.

### CO-AUTHOR OF SENATE BILL 1659

On motion of Senator Averitt, Senator Shapiro will be shown as Co-author of **SB 1659**.

### CO-AUTHOR OF SENATE BILL 1785

On motion of Senator Carona, Senator Wentworth will be shown as Co-author of **SB 1785**.

### CO-AUTHOR OF SENATE BILL 1923

On motion of Senator Watson, Senator Davis will be shown as Co-author of **SB 1923**.

### CO-AUTHOR OF SENATE JOINT RESOLUTION 14

On motion of Senator Wentworth, Senator Zaffirini will be shown as Co-author of **SJR 14**.

### MESSAGE FROM THE HOUSE

HOUSE CHAMBER
Austin, Texas
March 17, 2009

The Honorable President of the Senate
Senate Chamber
Austin, Texas

Mr. President:

I am directed by the House to inform the Senate that the House has taken the following action:

THE HOUSE HAS PASSED THE FOLLOWING MEASURES:

**HCR 63,** Honoring former first lady Laura Bush and welcoming her back to Texas.

**HCR 68,** In memory of Leslie Nix of Clarksville.

**HCR 69,** In memory of Douglas Keith Parsons of Pattonville.

Respectfully,

/s/Robert Haney, Chief Clerk
House of Representatives

## MESSAGES FROM THE GOVERNOR

The following Messages from the Governor were read and were referred to the Committee on Nominations:

Austin, Texas
March 12, 2009

TO THE SENATE OF THE EIGHTY-FIRST LEGISLATURE, REGULAR SESSION:

On March 5, 2009, I submitted the name of Robert E. Tesch for appointment to the Central Texas Regional Mobility Authority for a term to expire February 1, 2011.

Because he resigned, I hereby withdraw this nomination and request that the Senate return the appointment to me.

On January 22, 2009, I submitted the name of Charles Frederick Wilson, Jr., for appointment to the Industrialized Building Code Council for a term to expire February 1, 2010.

Because he resigned, I hereby withdraw his nomination and request that the Senate return the appointment to me.

Respectfully submitted,

/s/Rick Perry
Governor

Austin, Texas
March 13, 2009

TO THE SENATE OF THE EIGHTY-FIRST LEGISLATURE, REGULAR SESSION:

On January 22, 2009, I submitted the name of Thomas H. Gann for appointment to the Angelina and Neches River Authority Board of Directors for a term to expire September 5, 2013.

Because he resigned, I hereby withdraw his nomination and request that the Senate return the appointment to me.

Respectfully submitted,

/s/Rick Perry
Governor

Austin, Texas
March 13, 2009

TO THE SENATE OF THE EIGHTY-FIRST LEGISLATURE, REGULAR SESSION:

I ask the advice, consent and confirmation of the Senate with respect to the following appointments:

To be a member of the Angelina and Neches River Authority Board of Directors for a term to expire September 5, 2013:
    Joseph Anderson II
    Lufkin, Texas
(Mr. Anderson is replacing Tom Gann who resigned)

To be members of the Texas Department of Housing and Community Affairs for terms to expire January 31, 2015:

    C. Kent Conine
    Dallas, Texas
(Mr. Conine is being reappointed)

    Thomas H. Gann
    Lufkin, Texas
(replacing Sonny Flores of Houston whose term expired)

To be members of the Texas Southern University Board of Regents for terms to expire February 1, 2015:

    Dionicio "Don" Flores
    El Paso, Texas
(replacing E. Javier Loya of Houston whose term expired)

    Curtistene McCowan
    DeSoto, Texas
(Ms. McCowan is being reappointed)

    Tracye McDaniel
    Houston, Texas
(Ms. McDaniel is being reappointed)

                             Respectfully submitted,

                             /s/Rick Perry
                             Governor

                             Austin, Texas
                             March 16, 2009

TO THE SENATE OF THE EIGHTY-FIRST LEGISLATURE, REGULAR SESSION:

    I ask the advice, consent and confirmation of the Senate with respect to the following appointments:

To be members of the Texas Racing Commission for terms to expire February 1, 2015:

    Vicki Smith Weinberg
    Colleyville, Texas
(replacing Charles Sowell of Houston whose term expired)

    Thomas R. Latham
    Sunnyvale, Texas
(replacing Jesse Adams of Helotes whose term expired)

                             Respectfully submitted,

                             /s/Rick Perry
                             Governor

## MESSAGE FROM THE ATTORNEY GENERAL

The following Message from the Attorney General was read and was referred to the Committee on Nominations:

ATTORNEY GENERAL OF TEXAS
GREG ABBOTT

March 3, 2009

The Honorable Patsy Spaw
Secretary of the Texas Senate
Texas State Capitol
Room 2E.22
1200 Congress Avenue
Austin, Texas 78701

Madam Secretary and Members of the Senate Nominations Committee:

The Office of the Attorney General of Texas has made the following reappointment which requires the advice and consent of the Senate:

To the School Land Board of Texas:
    Mr. David Herrmann
    6 Renwick Court
    San Antonio, Texas  78218

Appointments to the School Land Board by the Attorney General are governed by Section 32.012(a)(3) of the Texas Natural Resources Code.  In February 2007, I appointed Mr. Herrmann for a two-year term that will expire on August 31, 2009.

Should you have any questions regarding this reappointment please contact Amy Jones in my Intergovernmental Relations Division at (512) 936-7940.  The advice, consent, and confirmation of the Senate is requested for this reappointment.

Sincerely,

/s/Greg Abbott
Attorney General of Texas

## PHYSICIAN OF THE DAY

Senator Fraser was recognized and presented Dr. Todd Howell of Fredericksburg as the Physician of the Day.

The Senate welcomed Dr. Howell and thanked him for his participation in the Physician of the Day program sponsored by the Texas Academy of Family Physicians.

## INTRODUCTION OF
## BILLS AND RESOLUTIONS POSTPONED

The President announced that the introduction of bills and resolutions on first reading would be postponed until the end of today's session.

There was no objection.

## SENATE CONCURRENT RESOLUTION 44

The President laid before the Senate the following resolution:

WHEREAS, The Texas Legislative Council is marking the 60th anniversary of its founding in 2009; and

WHEREAS, Created by statute in 1949, the council was established to gather information for the use of the legislature and to assist in drafting legislation; the agency operates under the guidance of a 14-member governing body composed of the lieutenant governor and the speaker, who serve as joint chairs, together with the chair of the house administration committee, five other state representatives, and six senators; the agency's executive director oversees the council staff, which is organized into six major divisions: administration, document production, information systems, legal, policy and planning, and research; and

WHEREAS, Through the years, the council has continued to evolve to meet the needs of the legislative branch; today, its staff conducts research, drafts legislation, provides computer services, offers technical support for redistricting, produces publications, reports, and maps, and maintains a number of public and legislative websites; moreover, the council is responsible for the engrossing and enrolling of house bills and resolutions and for the distribution of all house documents; additionally, since 1963 the council has been charged with operating a permanent statutory revision program that involves reorganizing the statutes in topical codes, eliminating invalid, duplicative, and other ineffective provisions, and improving the draftsmanship of the law if practicable, and thus far, 25 codes have been adopted; and

WHEREAS, Over the course of its history, the Texas Legislative Council has remained a nonpartisan, professional organization committed to the highest standards of public service, and it is indeed fitting that the agency be recognized for its immeasurable contributions to the Lone Star State; now, therefore, be it

RESOLVED, That the 81st Legislature of the State of Texas hereby commemorate the 60th anniversary of the creation of the Texas Legislative Council and extend to the council and its staff sincere appreciation for their exemplary efforts.

NELSON

**SCR 44** was read.

On motion of Senator Nelson, the resolution was considered immediately and was adopted by a viva voce vote.

All Members are deemed to have voted "Yea" on the adoption of the resolution.

## GUESTS PRESENTED

Senator Nelson was recognized and introduced to the Senate representatives of the Texas Legislative Council: Carolyn Trigg, Debbie Irvine, Kathy Clarkson, and Rita Arneil, accompanied by a delegation of Texas Legislative Council employees.

The Senate welcomed its guests.

## SENATE RESOLUTION 394

Senator Gallegos offered the following resolution:

WHEREAS, The Senate of the State of Texas takes pleasure in recognizing Dr. Joseph S. Galati for his outstanding work as a physician, clinical researcher, and medical director; and

WHEREAS, A native of Long Island, New York, Joseph Galati graduated from Saint George's University School of Medicine and was a resident in internal medicine at State University of New York Health Science Center-Brooklyn and Kings County Hospital Center; he pursued fellowship training in gastroenterology, hepatology, and transplant medicine at the University of Nebraska Medical Center; and

WHEREAS, In 1994, Dr. Galati was recruited by The University of Texas Medical School at Houston, and in 1996, he became medical director of Transplant Hepatology; in 1999, he was named medical director of Saint Luke's Texas Liver Institute, and in 2001, he formed Liver Specialists of Texas, one of America's largest liver practices; and

WHEREAS, He was appointed medical director of the Center of Liver Disease and Transplantation at Methodist Hospital in Houston in 2007; renowned as a clinical researcher, he has conducted numerous studies in viral hepatitis and other forms of liver disease; he has collaborated with colleagues in his field from around the world and is a much-sought-after speaker nationally and internationally; he is also a founding board member of the Texas Liver Coalition; and

WHEREAS, In addition, Dr. Galati is a leader in his community, and for the past five years, he has been working with Clear Channel Radio to create consumer-oriented radio programming that covers topics of health and wellness; now, therefore, be it

RESOLVED, That the Senate of the State of Texas, 81st Legislature, hereby commend Dr. Joseph S. Galati on his exceptional career in the field of liver disease and transplantation and on his many contributions to his profession; and, be it further

RESOLVED, That a copy of this Resolution be prepared for Dr. Galati as an expression of esteem from the Texas Senate.

SR 394 was read and was adopted without objection.

## GUESTS PRESENTED

Senator Gallegos, joined by Senators Deuell, Whitmire, and Zaffirini, was recognized and introduced to the Senate Dr. Joseph S. Galati; his wife, Geraldine Galati; and his children, Joseph and Elizabeth.

The Senate welcomed its guests.

## CONCLUSION OF MORNING CALL

The President at 9:39 a.m. announced the conclusion of morning call.

## SENATE BILL 362 ON SECOND READING

The President laid before the Senate SB 362 by Senator Fraser at this time on its second reading (set as special order):

SB 362, Relating to requiring a voter to present proof of identification.

The bill was read second time.

## POINT OF ORDER

**Senator West:**  I raise a point of order that this bill not be considered, pursuant to Senate Rule 7.09, more specifically, the fiscal note rule that we commonly refer to, and that it violates the fiscal rule.  Two things, there has been testimony during the hearing that many of the core principles associated with this bill were considered during the 80th legislative session with a similar type bill.  In addition to that, I would raise the issue for consideration specifically under 7.09(f) basically saying that a fiscal note for a bill or joint resolution which authorizes or requires expenditure or diversion of any state funds for any purpose shall estimate the fiscal implications and probable cost of the measure each year.  Yesterday in Finance, the Finance Committee took up and passed a contingency rider for Senate Bill 362 and let me, for purposes of the record, let me read it in here:  Contingent upon the passage of Senate Bill 362, similar legislation relating to requiring a voter to present proof of identification by the 81st Legislature, Regular Session, the Secretary of State is appropriated $2 million for fiscal year 2010 from the General Revenue Fund for voter education.  If indeed the testimony of the Secretary of State is correct as it relates to putting together the fiscal note that LBB has provided for this particular bill, that there's no fiscal implication, then the issue of appropriating $2 million is certainly evidence that there is, in fact, a fiscal note and thus is violative of the particular rule that I just quoted.  And for those reasons, I would ask that this bill not be considered.

## POINT OF ORDER RULING

**President:**  After conferring with you, several other Senators, and the Parliamentarian, Rule 7.09, in my judgment, has been complied with.  Therefore your point of order is overruled.

## POINT OF ORDER AND RULING ORDERED PRINTED

On motion of Senator West and by unanimous consent, his point of order and the ruling by the President were ordered reduced to writing and printed in the *Senate Journal.*

Senator Fraser offered the following amendment to the bill:

**Floor Amendment No. 1**

Amend **SB 362** (Senate committee printing) as follows:

(1)  In SECTION 6 of the bill, in amended Section 63.001(b), Election Code (page 1, lines 57-58), strike "the voter's voter registration certificate and either" and substitute "either [the voter's voter registration certificate]".

(2)  In SECTION 8 of the bill, in amended Section 63.007(a), Election Code (page 2, lines 26-27), strike "a voter registration certificate indicating that" and substitute "documentation required under Section 63.001(b) that indicates [a voter registration certificate indicating that]".

(3)  In SECTION 8 of the bill, in amended Section 63.007(a), Election Code (page 2, lines 31-32), strike "presented under Section 63.001(b)".

(4)  Strike SECTION 9 of the bill (page 2, lines 44-55).

(5) In SECTION 10 of the bill, in proposed Section 63.0101(b)(1), Election Code (page 3, line 21), following "(1)", insert "the voter's voter registration certificate or".

(6) In SECTION 11 of the bill, in amended Section 63.011(a), Election Code (page 3, lines 52-53), strike "63.001(g), 63.008(b), or 63.009(a)" and substitute "63.001(g) [63.008(b) or 63.009(a)]".

(7) Insert the following appropriately numbered SECTIONS:

SECTION ____. Effective January 1, 2010, Section 63.0011(a), Election Code, is amended to read as follows:

(a) Before a voter may be accepted for voting, an election officer shall ask the voter if the voter's residence address on the precinct list of registered voters is current and whether the voter has changed residence within the county. If the voter's address is omitted from the precinct list under Section 18.005(c), the officer shall ask the voter if the voter's residence as listed on identification presented by the voter under Section 63.001(b) [the voter's voter registration certificate] is current and whether the voter has changed residence within the county.

SECTION ____. Effective January 1, 2010, Sections 63.008 and 63.009, Election Code, are repealed.

(8) Renumber the SECTIONS of the bill accordingly, and in SECTION 14(b) of the bill (page 4, lines 20-21), correct the cross-references to the SECTIONS of the bill accordingly.

The amendment to **SB 362** was read and was adopted by the following vote: Yeas 31, Nays 0.

Senator Fraser offered the following amendment to the bill:

**Floor Amendment No. 2**

Amend **SB 362** (Senate committee printing) by striking SECTION 2 of the bill (page 1, lines 20-27), and substituting the following:

SECTION 2. Subchapter A, Chapter 31, Election Code, is amended by adding Section 31.012 to read as follows:

Sec. 31.012. VOTER IDENTIFICATION EDUCATION. (a) The secretary of state and the voter registrar of each county that maintains a website shall provide notice of the identification requirements for voting prescribed by Chapter 63 on each entity's respective website. The secretary of state shall prescribe the wording of the notice to be included on the websites.

(b) The secretary of state, in cooperation with appropriate nonprofit organizations as determined by the secretary of state and with each party whose nominee for governor in the most recent gubernatorial general election received 20 percent or more of the total number of votes received by all candidates for governor in the election, shall establish a statewide effort to educate voters regarding the identification requirements for voting prescribed by Chapter 63. The secretary of state may use any available funds, including federal funds, for the purposes of this section.

**(Senator Carona in Chair)**

The amendment to **SB 362** was read and was adopted by the following vote: Yeas 19, Nays 12.

Yeas: Averitt, Carona, Deuell, Duncan, Eltife, Estes, Fraser, Harris, Hegar, Huffman, Jackson, Nelson, Nichols, Ogden, Patrick, Seliger, Shapiro, Wentworth, Williams.

Nays: Davis, Ellis, Gallegos, Hinojosa, Lucio, Shapleigh, Uresti, Van de Putte, Watson, West, Whitmire, Zaffirini.

### (President in Chair)

On motion of Senator Fraser and by unanimous consent, the caption was amended to conform to the body of the bill as amended.

**SB 362** as amended was passed to engrossment by the following vote: Yeas 19, Nays 12.

Yeas: Averitt, Carona, Deuell, Duncan, Eltife, Estes, Fraser, Harris, Hegar, Huffman, Jackson, Nelson, Nichols, Ogden, Patrick, Seliger, Shapiro, Wentworth, Williams.

Nays: Davis, Ellis, Gallegos, Hinojosa, Lucio, Shapleigh, Uresti, Van de Putte, Watson, West, Whitmire, Zaffirini.

### REMARKS ORDERED PRINTED

On motion of Senator Williams and by unanimous consent, his remarks and exhibits regarding **SB 362** were ordered reduced to writing and printed in the *Senate Journal.*

The remarks will be printed in an addendum to this day's journal.

On motion of Senator Shapleigh and by unanimous consent, all other remarks regarding **SB 362** were ordered reduced to writing and printed in the *Senate Journal.*

The remarks will be printed in an addendum to this day's journal.

### GUEST PRESENTED

Senator Zaffirini was recognized and introduced to the Senate Brennan Mohrer, her nephew and a student at United Day School in Laredo, serving today as an Honorary Senate Page.

The Senate welcomed its guest.

### GUESTS PRESENTED

Senator Van de Putte was recognized and introduced to the Senate Angel Ortiz and Andrew Villarreal, students at Central Catholic High School in San Antonio, serving today as Honorary Senate Pages.

The Senate welcomed its guests.

### GUESTS PRESENTED

Senator Huffman was recognized and introduced to the Senate a delegation of students from The University of Texas Medical Branch at Galveston.

The Senate welcomed its guests.

## GUESTS PRESENTED

Senator Ellis, joined by Senator Shapiro, was recognized and introduced to the Senate a delegation representing Teach For America, Incorporated.

The Senate welcomed its guests.

## MESSAGE FROM THE HOUSE

HOUSE CHAMBER
Austin, Texas
March 17, 2009

The Honorable President of the Senate
Senate Chamber
Austin, Texas

Mr. President:

I am directed by the House to inform the Senate that the House has taken the following action:

THE HOUSE HAS PASSED THE FOLLOWING MEASURES:

**HCR 97,** Welcoming German exchange student Carolin Bosche on the occasion of her visit to the State Capitol on March 16 and 17, 2009.

**HCR 98,** Commending Michael William Heskett for his 26 years of service to the Texas State Library and Archives Commission.

Respectfully,

/s/Robert Haney, Chief Clerk
House of Representatives

## GUESTS PRESENTED

Senator West was recognized and introduced to the Senate Pastor Anthony Noland, Sr., accompanied by a delegation representing Paradise Missionary Baptist Church in Dallas.

The Senate welcomed its guests.

## COMMITTEE  SUBSTITUTE
## SENATE BILL 90 ON SECOND READING

On motion of Senator Van de Putte and by unanimous consent, the regular order of business was suspended to take up for consideration **CSSB 90** at this time on its second reading:

**CSSB 90**, Relating to adoption of the Interstate Compact on Educational Opportunity for Military Children.

The bill was read second time.

Senator Van de Putte offered the following amendment to the bill:

**Floor Amendment No. 1**

Amend **CSSB 90** (committee printing) by striking all text below the enacting clause and substituting the following:

SECTION 1. Title 4, Education Code, is amended by adding Chapter 162 to read as follows:

CHAPTER 162. INTERSTATE COMPACT ON EDUCATIONAL OPPORTUNITY FOR MILITARY CHILDREN

Sec. 162.001. DEFINITIONS. In this chapter:

(1) "Compact" means the Interstate Compact on Educational Opportunity for Military Children executed under Section 162.002.

(2) "Compact commissioner" means the individual appointed under Section 162.004.

Sec. 162.002. EXECUTION OF COMPACT. This state enacts the Interstate Compact on Educational Opportunity for Military Children and enters into the compact with all other states legally joining in the compact in substantially the following form:

INTERSTATE COMPACT ON EDUCATIONAL OPPORTUNITY FOR MILITARY CHILDREN

ARTICLE I. PURPOSE

It is the purpose of this compact to remove barriers to educational success imposed on children of military families because of frequent moves and deployment of their parents by:

A. Facilitating the timely enrollment of children of military families and ensuring that they are not placed at a disadvantage due to difficulty in the transfer of education records from the previous school district(s) or variations in entrance/age requirements.

B. Facilitating the student placement process through which children of military families are not disadvantaged by variations in attendance requirements, scheduling, sequencing, grading, course content or assessment.

C. Facilitating the qualification and eligibility for enrollment, educational programs, and participation in extracurricular academic, athletic, and social activities.

D. Facilitating the on-time graduation of children of military families.

E. Providing for the promulgation and enforcement of administrative rules implementing the provisions of this compact.

F. Providing for the uniform collection and sharing of information between and among member states, schools, and military families under this compact.

G. Promoting coordination between this compact and other compacts affecting military children.

H. Promoting flexibility and cooperation between the educational system, parents, and the student in order to achieve educational success for the student.

ARTICLE II. DEFINITIONS

As used in this compact, unless the context clearly requires a different construction:

A. "Active duty" means: full-time duty status in the active uniformed service of the United States, including members of the National Guard and Reserve on active duty orders pursuant to 10 U.S.C. Sections 1209 and 1211.

B. "Children of military families" means: a school-aged child(ren), enrolled in kindergarten through twelfth (12th) grade, in the household of an active duty member.

C. "Compact commissioner" means: the voting representative of each compacting state appointed pursuant to Article VIII of this compact.

D. "Deployment" means: the period one (1) month prior to the service members' departure from their home station on military orders through six (6) months after return to their home station.

E. "Education(al) records" means: those official records, files, and data directly related to a student and maintained by the school or local education agency, including but not limited to records encompassing all the material kept in the student's cumulative folder such as general identifying data, records of attendance and of academic work completed, records of achievement and results of evaluative tests, health data, disciplinary status, test protocols, and individualized education programs.

F. "Extracurricular activities" means: a voluntary activity sponsored by the school or local education agency or an organization sanctioned by the local education agency. Extracurricular activities include, but are not limited to, preparation for and involvement in public performances, contests, athletic competitions, demonstrations, displays, and club activities.

G. "Interstate Commission on Educational Opportunity for Military Children" means: the commission that is created under Article IX of this compact, which is generally referred to as Interstate Commission.

H. "Local education agency" means: a public authority legally constituted by the state as an administrative agency to provide control of and direction for kindergarten through twelfth (12th) grade public educational institutions.

I. "Member state" means: a state that has enacted this compact.

J. "Military installation" means: a base, camp, post, station, yard, center, homeport facility for any ship, or other activity under the jurisdiction of the Department of Defense, including any leased facility, which is located within any of the several states, the District of Columbia, the Commonwealth of Puerto Rico, the United States Virgin Islands, Guam, American Samoa, the Northern Marianas Islands and any other United States territory. Such term does not include any facility used primarily for civil works, rivers and harbors projects, or flood control projects.

K. "Non-member state" means: a state that has not enacted this compact.

L. "Receiving state" means: the state to which a child of a military family is sent, brought, or caused to be sent or brought.

M. "Rule" means: a written statement by the Interstate Commission promulgated pursuant to Article XII of this compact that is of general applicability, implements, interprets, or prescribes a policy or provision of the compact, or an organizational, procedural, or practice requirement of the Interstate Commission, and has the force and effect of statutory law in a member state, and includes the amendment, repeal, or suspension of an existing rule.

N. "Sending state" means: the state from which a child of a military family is sent, brought, or caused to be sent or brought.

O. "State" means: a state of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the United States Virgin Islands, Guam, American Samoa, the Northern Marianas Islands and any other United States territory.

P. "Student" means: the child of a military family for whom the local education agency receives public funding and who is formally enrolled in kindergarten through twelfth (12th) grade.

Q. "Transition" means: (1) the formal and physical process of transferring from school to school; or (2) the period of time in which a student moves from one school in the sending state to another school in the receiving state.

R. "Uniformed service(s)" means: the Army, Navy, Air Force, Marine Corps, Coast Guard, as well as the Commissioned Corps of the National Oceanic and Atmospheric Administration, and Public Health Services.

S. "Veteran" means: a person who served in the uniformed services and who was discharged or released therefrom under conditions other than dishonorable.

### ARTICLE III. APPLICABILITY

A. Except as otherwise provided in Section B, this compact shall apply to the children of:

1. active duty members of the uniformed services as defined in this compact, including members of the National Guard and Reserve on active duty orders pursuant to 10 U.S.C. Sections 1209 and 1211;

2. members or veterans of the uniformed services who are severely injured and medically discharged or retired for a period of one (1) year after medical discharge or retirement; and

3. members of the uniformed services who die on active duty or as a result of injuries sustained on active duty for a period of one (1) year after death.

B. The provisions of this interstate compact shall only apply to local education agencies as defined in this compact.

C. The provisions of this compact shall not apply to the children of:

1. inactive members of the national guard and military reserves;

2. members of the uniformed services now retired, except as provided in Section A;

3. veterans of the uniformed services, except as provided in Section A; and

4. other U.S. Department of Defense personnel and other federal agency civilian and contract employees not defined as active duty members of the uniformed services.

### ARTICLE IV. EDUCATIONAL RECORDS AND ENROLLMENT

A. Unofficial or "hand-carried" education records–In the event that official education records cannot be released to the parents for the purpose of transfer, the custodian of the records in the sending state shall prepare and furnish to the parent a complete set of unofficial education records containing uniform information as determined by the Interstate Commission. Upon receipt of the unofficial education records by a school in the receiving state, the school shall enroll and appropriately place the student based on the information provided in the unofficial records pending validation by the official records, as quickly as possible.

B. Official education records/transcripts–Simultaneous with the enrollment and conditional placement of the student, the school in the receiving state shall request the student's official education record from the school in the sending state. Upon receipt of this request, the school in the sending state will process and furnish the official education records to the school in the receiving state within ten (10) days or within such time as is reasonably determined under the rules promulgated by the Interstate Commission.

C. Immunizations–Compacting states shall give thirty (30) days from the date of enrollment or within such time that does not exceed thirty (30) days as is reasonably determined under the rules promulgated by the Interstate Commission, for students to obtain any immunization(s) required by the receiving state. For a series of immunizations, initial vaccinations must be obtained within thirty (30) days or within such time that does not exceed thirty (30) days as is reasonably determined under the rules promulgated by the Interstate Commission.  The collection and exchange of information pertaining to immunizations shall be subject to confidentiality provisions prescribed by federal law.

D. Kindergarten and first grade entrance age–Students shall be allowed to continue their enrollment at grade level in the receiving state commensurate with their grade level (including kindergarten) from a local education agency in the sending state at the time of transition, regardless of age. A student that has satisfactorily completed the prerequisite grade level in the local education agency in the sending state shall be eligible for enrollment in the next highest grade level in the receiving state, regardless of age. A student transferring after the start of the school year in the receiving state shall enter the school in the receiving state on their validated level from an accredited school in the sending state.

ARTICLE V.  PLACEMENT AND ATTENDANCE

A. Course placement–When the student transfers before or during the school year, the receiving state school shall initially honor placement of the student in educational courses based on the student's enrollment in the sending state school and/or educational assessments conducted at the school in the sending state if the courses are offered. Course placement includes but is not limited to honors, international baccalaureate, advanced placement, vocational, technical, and career pathways courses. Continuing the student's academic program from the previous school and promoting placement in academically and career challenging courses should be paramount when considering placement. This does not preclude the school in the receiving state from performing subsequent evaluations to ensure appropriate placement and continued enrollment of the student in the course(s).

B. Educational program placement–The receiving state school shall initially honor placement of the student in educational programs based on current educational assessments conducted at the school in the sending state or participation/placement in like programs in the sending state. Such programs include, but are not limited to: (1) gifted and talented programs; and (2) English as a second language (ESL). This does not preclude the school in the receiving state from performing subsequent evaluations to ensure appropriate placement of the student.

C. Special education services–(1) In compliance with the federal requirements of the Individuals with Disabilities Education Act (IDEA) (20 U.S.C. Section 1400 et seq.), the receiving state shall initially provide comparable services to a student with disabilities based on his/her current Individualized Education Program (IEP); and (2) In compliance with the requirements of Section 504 of the Rehabilitation Act (29 U.S.C.A. Section 794), and with Title II of the Americans with Disabilities Act (42 U.S.C.A. Sections 12131-12165), the receiving state shall make reasonable accommodations and modifications to address the needs of incoming students with disabilities, subject to an existing 504 or Title II Plan, to provide the student with equal access to education. This does not preclude the school in the receiving state from performing subsequent evaluations to ensure appropriate placement of the student.

D. Placement flexibility–Local education agency administrative officials shall have flexibility in waiving course/program prerequisites, or other preconditions for placement in courses/programs offered under the jurisdiction of the local education agency.

E. Absence as related to deployment activities–A student whose parent or legal guardian is an active duty member of the uniformed services, as defined by the compact, and has been called to duty for, is on leave from, or immediately returned from deployment to a combat zone or combat support posting, shall be granted additional excused absences at the discretion of the local education agency superintendent to visit with his or her parent or legal guardian relative to such leave or deployment of the parent or guardian.

ARTICLE VI. ELIGIBILITY

A. Eligibility for enrollment

1. Special power of attorney, relative to the guardianship of a child of a military family and executed under applicable law, shall be sufficient for the purposes of enrollment and all other actions requiring parental participation and consent.

2. A local education agency shall be prohibited from charging local tuition to a transitioning military child placed in the care of a non-custodial parent or other person standing in loco parentis who lives in a jurisdiction other than that of the custodial parent.

3. A transitioning military child, placed in the care of a non-custodial parent or other person standing in loco parentis who lives in a jurisdiction other than that of the custodial parent, may continue to attend the school in which he/she was enrolled while residing with the custodial parent.

B. Eligibility for extracurricular participation–State and local education agencies shall facilitate the opportunity for transitioning military children's inclusion in extracurricular activities, regardless of application deadlines, to the extent they are otherwise qualified.

ARTICLE VII. GRADUATION

In order to facilitate the on-time graduation of children of military families, states and local education agencies shall incorporate the following procedures:

A. Waiver requirements–Local education agency administrative officials shall waive specific courses required for graduation if similar coursework has been satisfactorily completed in another local education agency or shall provide reasonable

justification for denial. Should a waiver not be granted to a student who would qualify to graduate from the sending school, the local education agency shall provide an alternative means of acquiring required coursework so that graduation may occur on time.

B.  Exit exams–States shall accept: (1) exit or end-of-course exams required for graduation from the sending state; or (2) national norm-referenced achievement tests; or (3) alternative testing, in lieu of testing requirements for graduation in the receiving state. In the event the above alternatives cannot be accommodated by the receiving state for a student transferring in his or her senior year, then the provisions of Article VII, Section C, shall apply.

C.  Transfers during senior year–Should a military student transferring at the beginning or during his or her senior year be ineligible to graduate from the receiving local education agency after all alternatives have been considered, the sending and receiving local education agencies shall ensure the receipt of a diploma from the sending local education agency, if the student meets the graduation requirements of the sending local education agency. In the event that one of the states in question is not a member of this compact, the member state shall use best efforts to facilitate the on-time graduation of the student in accordance with Sections A and B of this article.

The commissioner of education shall adopt a passing standard on one or more national norm-referenced achievement tests for purposes of permitting a student to whom this compact applies to meet that standard as a substitute for completing a specific course or achieving a score on an assessment instrument otherwise required by this state for graduation. Each passing standard must be at least as rigorous as the applicable requirement otherwise imposed by this state for graduation, and be consistent with college readiness standards adopted under Section 28.008. Before adopting or revising a passing standard, the commissioner of education must consider any comments submitted by the Texas Higher Education Coordinating Board or the State Board of Education.

A passing standard adopted by the commissioner of education is available only for a student who enrolls in a public school in this state for the first time after completing the ninth grade or who reenrolls in a public school in this state at or above the 10th grade level after an absence of at least two years from the public schools of this state. Each passing standard in effect when a student first enrolls in a public high school in this state remains applicable to the student for the duration of the student's high school enrollment, regardless of any subsequent revision of the standard.

The commissioner of education may adopt rules as necessary to implement the commissioner's duties and authority under this article of the compact.

The Texas Higher Education Coordinating Board shall monitor the postsecondary educational performance in this state of students permitted to graduate in accordance with passing standards adopted by the commissioner of education for purposes of this compact. Based on the educational performance of those students in private and public institutions, the coordinating board shall make recommendations to the commissioner of education regarding appropriate revisions of the passing standards.

ARTICLE VIII.  STATE COORDINATION

A.  Each member state shall, through the creation of a State Council or use of an existing body or board, provide for the coordination among its agencies of government, local education agencies, and military installations concerning the state's participation in, and compliance with, this compact and Interstate Commission activities. While each member state may determine the membership of its own State Council, its membership must include at least: the state superintendent of education, superintendent of a school district with a high concentration of military children, representative from a military installation, one representative each from the legislative and executive branches of government, and other offices and stakeholder groups the State Council deems appropriate. A member state that does not have a school district deemed to contain a high concentration of military children may appoint a superintendent from another school district to represent local education agencies on the State Council.

B.  The State Council of each member state shall appoint or designate a military family education liaison to assist military families and the state in facilitating the implementation of this compact.

C.  The compact commissioner responsible for the administration and management of the state's participation in the compact shall be appointed by the governor or as otherwise determined by each member state.

D.  The compact commissioner and the military family education liaison designated herein shall be ex-officio members of the State Council, unless either is already a full voting member of the State Council.

ARTICLE IX.  INTERSTATE COMMISSION ON EDUCATIONAL
OPPORTUNITY FOR MILITARY CHILDREN

The member states hereby create the "Interstate Commission on Educational Opportunity for Military Children." The activities of the Interstate Commission are the formation of public policy and are a discretionary state function. The Interstate Commission shall:

A.  Be a body corporate and joint agency of the member states and shall have all the responsibilities, powers, and duties set forth herein, and such additional powers as may be conferred upon it by a subsequent concurrent action of the respective legislatures of the member states in accordance with the terms of this compact.

B.  Consist of one Interstate Commission voting representative from each member state who shall be that state's compact commissioner.

1.  Each member state represented at a meeting of the Interstate Commission is entitled to one vote.

2.  A majority of the total member states shall constitute a quorum for the transaction of business, unless a larger quorum is required by the bylaws of the Interstate Commission.

3.  A representative shall not delegate a vote to another member state. In the event the compact commissioner is unable to attend a meeting of the Interstate Commission, the governor or State Council may delegate voting authority to another person from their state for a specified meeting.

4.  The bylaws may provide for meetings of the Interstate Commission to be conducted by telecommunication or electronic communication.

C. Consist of ex-officio, non-voting representatives who are members of interested organizations. Such ex-officio members, as defined in the bylaws, may include but not be limited to, members of the representative organizations of military family advocates, local education agency officials, parent and teacher groups, the U.S. Department of Defense, the Education Commission of the States, the Interstate Agreement on the Qualification of Educational Personnel, and other interstate compacts affecting the education of children of military members.

D. Meet at least once each calendar year. The chairperson may call additional meetings and, upon the request of a simple majority of the member states, shall call additional meetings.

E. Establish an executive committee, whose members shall include the officers of the Interstate Commission and such other members of the Interstate Commission as determined by the bylaws. Members of the executive committee shall serve a one year term. Members of the executive committee shall be entitled to one vote each. The executive committee shall have the power to act on behalf of the Interstate Commission, with the exception of rulemaking, during periods when the Interstate Commission is not in session. The executive committee shall oversee the day-to-day activities of the administration of the compact including enforcement and compliance with the provisions of the compact, its bylaws and rules, and other such duties as deemed necessary. The U.S. Department of Defense shall serve as an ex-officio, non-voting member of the executive committee.

F. Establish bylaws and rules that provide for conditions and procedures under which the Interstate Commission shall make its information and official records available to the public for inspection or copying. The Interstate Commission may exempt from disclosure information or official records to the extent they would adversely affect personal privacy rights or proprietary interests.

G. Give public notice of all meetings and all meetings shall be open to the public, except as set forth in the rules or as otherwise provided in the compact. The Interstate Commission and its committees may close a meeting, or portion thereof, where it determines by two-thirds vote that an open meeting would be likely to:

1. Relate solely to the Interstate Commission's internal personnel practices and procedures;

2. Disclose matters specifically exempted from disclosure by federal and state statute;

3. Disclose trade secrets or commercial or financial information which is privileged or confidential;

4. Involve accusing a person of a crime, or formally censuring a person;

5. Disclose information of a personal nature where disclosure would constitute a clearly unwarranted invasion of personal privacy;

6. Disclose investigative records compiled for law enforcement purposes; or

7. Specifically relate to the Interstate Commission's participation in a civil action or other legal proceeding.

H. Shall cause its legal counsel or designee to certify that a meeting may be closed and shall reference each relevant exemptible provision for any meeting, or portion of a meeting, which is closed pursuant to this provision. The Interstate

Commission shall keep minutes which shall fully and clearly describe all matters discussed in a meeting and shall provide a full and accurate summary of actions taken, and the reasons therefore, including a description of the views expressed and the record of a roll call vote. All documents considered in connection with an action shall be identified in such minutes. All minutes and documents of a closed meeting shall remain under seal, subject to release by a majority vote of the Interstate Commission.

I.  Shall collect standardized data concerning the educational transition of the children of military families under this compact as directed through its rules which shall specify the data to be collected, the means of collection and data exchange, and reporting requirements. Such methods of data collection, exchange, and reporting shall, in so far as is reasonably possible, conform to current technology and coordinate its information functions with the appropriate custodian of records as identified in the bylaws and rules.

J.  Shall create a process that permits military officials, education officials, and parents to inform the Interstate Commission if and when there are alleged violations of the compact or its rules or when issues subject to the jurisdiction of the compact or its rules are not addressed by the state or local education agency. This section shall not be construed to create a private right of action against the Interstate Commission or any member state.

ARTICLE X.  POWERS AND DUTIES OF THE INTERSTATE COMMISSION

The Interstate Commission shall have the following powers:

A.  To provide for dispute resolution among member states.

B.  To promulgate rules and take all necessary actions to effect the goals, purposes, and obligations as enumerated in this compact. The rules shall have the force and effect of statutory law and shall be binding in the compact states to the extent and in the manner provided in this compact.

C.  To issue, upon request of a member state, advisory opinions concerning the meaning or interpretation of the interstate compact, its bylaws, rules, and actions.

D.  To enforce compliance with the compact provisions, the rules promulgated by the Interstate Commission, and the bylaws, using all necessary and proper means, including but not limited to the use of judicial process.

E.  To establish and maintain offices which shall be located within one or more of the member states.

F.  To purchase and maintain insurance and bonds.

G.  To borrow, accept, hire, or contract for services of personnel.

H.  To establish and appoint committees including, but not limited to, an executive committee as required by Article IX, Section E, which shall have the power to act on behalf of the Interstate Commission in carrying out its powers and duties hereunder.

I.  To elect or appoint such officers, attorneys, employees, agents, or consultants, and to fix their compensation, define their duties, and determine their qualifications; and to establish the Interstate Commission's personnel policies and programs relating to conflicts of interest, rates of compensation, and qualifications of personnel.

J.  To accept any and all donations and grants of money, equipment, supplies, materials, and services, and to receive, utilize, and dispose of it.

K.  To lease, purchase, accept contributions or donations of, or otherwise to own, hold, improve or use any property, real, personal, or mixed.

L.  To sell, convey, mortgage, pledge, lease, exchange, abandon, or otherwise dispose of any property, real, personal or mixed.

M.  To establish a budget and make expenditures.

N.  To adopt a seal and bylaws governing the management and operation of the Interstate Commission.

O.  To report annually to the legislatures, governors, judiciary, and state councils of the member states concerning the activities of the Interstate Commission during the preceding year. Such reports shall also include any recommendations that may have been adopted by the Interstate Commission.

P.  To coordinate education, training, and public awareness regarding the compact, its implementation and operation for officials and parents involved in such activity.

Q.  To establish uniform standards for the reporting, collecting, and exchanging of data.

R.  To maintain corporate books and records in accordance with the bylaws.

S.  To perform such functions as may be necessary or appropriate to achieve the purposes of this compact.

T.  To provide for the uniform collection and sharing of information between and among member states, schools, and military families under this compact.

ARTICLE XI.  ORGANIZATION AND OPERATION OF THE INTERSTATE COMMISSION

A.  The Interstate Commission shall, by a majority of the members present and voting, within 12 months after the first Interstate Commission meeting, adopt bylaws to govern its conduct as may be necessary or appropriate to carry out the purposes of the compact, including, but not limited to:

1.  Establishing the fiscal year of the Interstate Commission;

2.  Establishing an executive committee, and such other committees as may be necessary;

3.  Providing for the establishment of committees and for governing any general or specific delegation of authority or function of the Interstate Commission;

4.  Providing reasonable procedures for calling and conducting meetings of the Interstate Commission, and ensuring reasonable notice of each such meeting;

5.  Establishing the titles and responsibilities of the officers and staff of the Interstate Commission;

6.  Providing a mechanism for concluding the operations of the Interstate Commission and the return of surplus funds that may exist upon the termination of the compact after the payment and reserving of all of its debts and obligations;

7.  Providing "start up" rules for initial administration of the compact.

B.  The Interstate Commission shall, by a majority of the members, elect annually from among its members a chairperson, a vice-chairperson, and a treasurer, each of whom shall have such authority and duties as may be specified in the bylaws. The chairperson or, in the chairperson's absence or disability, the vice-chairperson, shall preside at all meetings of the Interstate Commission.  The officers so elected shall serve without compensation or remuneration from the Interstate Commission;

provided that, subject to the availability of budgeted funds, the officers shall be reimbursed for ordinary and necessary costs and expenses incurred by them in the performance of their responsibilities as officers of the Interstate Commission.

    C.  Executive Committee, Officers, and Personnel

        1.  The executive committee shall have such authority and duties as may be set forth in the bylaws, including but not limited to:

            a.  Managing the affairs of the Interstate Commission in a manner consistent with the bylaws and purposes of the Interstate Commission;

            b.  Overseeing an organizational structure within, and appropriate procedures for the Interstate Commission to provide for the creation of rules, operating procedures, and administrative and technical support functions; and

            c.  Planning, implementing, and coordinating communications and activities with other state, federal, and local government organizations in order to advance the goals of the Interstate Commission.

        2.  The executive committee may, subject to the approval of the Interstate Commission, appoint or retain an executive director for such period, upon such terms and conditions and for such compensation, as the Interstate Commission may deem appropriate.   The executive director shall serve as secretary to the Interstate Commission, but shall not be a member of the Interstate Commission.  The executive director shall hire and supervise such other persons as may be authorized by the Interstate Commission.

    D. The Interstate Commission's executive director and its employees shall be immune from suit and liability, either personally or in their official capacity, for a claim for damage to or loss of property or personal injury or other civil liability caused or arising out of or relating to an actual or alleged act, error, or omission that occurred, or that such person had a reasonable basis for believing occurred, within the scope of Interstate Commission employment, duties, or responsibilities; provided, that such person shall not be protected from suit or liability for damage, loss, injury, or liability caused by the intentional or wilful and wanton misconduct of such person.

        1.  The liability of the Interstate Commission's executive director and employees or Interstate Commission representatives, acting within the scope of such person's employment or duties for acts, errors, or omissions occurring within such person's state may not exceed the limits of liability set forth under the constitution and laws of that state for state officials, employees, and agents.   The Interstate Commission is considered to be an instrumentality of the states for the purposes of any such action. Nothing in this subsection shall be construed to protect such person from suit or liability for damage, loss, injury, or liability caused by the intentional or wilful and wanton misconduct of such person.

        2.  The Interstate Commission shall defend the executive director and its employees and, subject to the approval of the attorney general or other appropriate legal counsel of the member state represented by an Interstate Commission representative, shall defend such Interstate Commission representative in any civil action seeking to impose liability arising out of an actual or alleged act, error, or omission that occurred within the scope of Interstate Commission employment, duties, or responsibilities, or that the defendant had a reasonable basis for believing

occurred within the scope of Interstate Commission employment, duties, or responsibilities, provided that the actual or alleged act, error, or omission did not result from intentional or wilful and wanton misconduct on the part of such person.

3. To the extent not covered by the state involved, the member state, or the Interstate Commission, the representatives or employees of the Interstate Commission shall be held harmless in the amount of a settlement or judgment, including attorney's fees and costs, obtained against such persons arising out of an actual or alleged act, error, or omission that occurred within the scope of Interstate Commission employment, duties, or responsibilities, or that such persons had a reasonable basis for believing occurred within the scope of Interstate Commission employment, duties, or responsibilities, provided that the actual or alleged act, error, or omission did not result from intentional or wilful and wanton misconduct on the part of such persons.

ARTICLE XII. RULEMAKING FUNCTIONS OF THE INTERSTATE COMMISSION

A. Rulemaking Authority–The Interstate Commission shall promulgate reasonable rules in order to effectively and efficiently achieve the purposes of this compact. Notwithstanding the foregoing, in the event the Interstate Commission exercises its rulemaking authority in a manner that is beyond the scope of the purposes of this Act, or the powers granted hereunder, then such an action by the Interstate Commission shall be invalid and have no force or effect.

B. Rulemaking Procedure–Rules shall be made pursuant to a rulemaking process that substantially conforms to the "Model State Administrative Procedure Act," of 1981 Act, Uniform Laws Annotated, Volume 15, page 1 (2000), as amended, as may be appropriate to the operations of the Interstate Commission.

C. Not later than thirty (30) days after a rule is promulgated, any person may file a petition for judicial review of the rule; provided, that the filing of such a petition shall not stay or otherwise prevent the rule from becoming effective unless the court finds that the petitioner has a substantial likelihood of success. The court shall give deference to the actions of the Interstate Commission consistent with applicable law and shall not find the rule to be unlawful if the rule represents a reasonable exercise of the Interstate Commission's authority.

D. If a majority of the legislatures of the compacting states rejects a rule by enactment of a statute or resolution in the same manner used to adopt the compact, then such rule shall have no further force and effect in any compacting state.

ARTICLE XIII. OVERSIGHT, ENFORCEMENT, AND DISPUTE RESOLUTION

A. Oversight

1. The executive, legislative, and judicial branches of state government in each member state shall enforce this compact and shall take all actions necessary and appropriate to effectuate the compact's purposes and intent. The provisions of this compact and the rules promulgated hereunder shall have standing as statutory law.

2. All courts shall take judicial notice of the compact and the rules in any judicial or administrative proceeding in a member state pertaining to the subject matter of this compact which may affect the powers, responsibilities, or actions of the Interstate Commission.

3. The Interstate Commission shall be entitled to receive all service of process in any such proceeding, and shall have standing to intervene in the proceeding for all purposes. Failure to provide service of process to the Interstate Commission shall render a judgment or order void as to the Interstate Commission, this compact, or promulgated rules.

B. Default, Technical Assistance, Suspension, and Termination–If the Interstate Commission determines that a member state has defaulted in the performance of its obligations or responsibilities under this compact, or the bylaws or promulgated rules, the Interstate Commission shall:

1. Provide written notice to the defaulting state and other member states, of the nature of the default, the means of curing the default and any action taken by the Interstate Commission.  The Interstate Commission shall specify the conditions by which the defaulting state must cure its default.

2. Provide remedial training and specific technical assistance regarding the default.

3. If the defaulting state fails to cure the default, the defaulting state shall be terminated from the compact upon an affirmative vote of a majority of the member states and all rights, privileges, and benefits conferred by this compact shall be terminated from the effective date of termination.  A cure of the default does not relieve the offending state of obligations or liabilities incurred during the period of the default.

4. Suspension or termination of membership in the compact shall be imposed only after all other means of securing compliance have been exhausted. Notice of intent to suspend or terminate shall be given by the Interstate Commission to the governor, the majority and minority leaders of the defaulting state's legislature, and each of the member states.

5. The state which has been suspended or terminated is responsible for all assessments, obligations, and liabilities incurred through the effective date of suspension or termination including obligations, the performance of which extends beyond the effective date of suspension or termination.

6. The Interstate Commission shall not bear any costs relating to any state that has been found to be in default or which has been suspended or terminated from the compact, unless otherwise mutually agreed upon in writing between the Interstate Commission and the defaulting state.

7. The defaulting state may appeal the action of the Interstate Commission by petitioning the U.S. District Court for the District of Columbia or the federal district where the Interstate Commission has its principal offices.  The prevailing party shall be awarded all costs of such litigation including reasonable attorney's fees.

C. Dispute Resolution

1. The Interstate Commission shall attempt, upon the request of a member state, to resolve disputes which are subject to the compact and which may arise among member states and between member and non-member states.

2. The Interstate Commission shall promulgate a rule providing for both mediation and binding dispute resolution for disputes as appropriate.

D. Enforcement

1. The Interstate Commission, in the reasonable exercise of its discretion, shall enforce the provisions and rules of this compact.

2. The Interstate Commission may, by majority vote of the members, initiate legal action in the U.S. District Court for the District of Columbia or, at the discretion of the Interstate Commission, in the federal district where the Interstate Commission has its principal offices, to enforce compliance with the provisions of the compact, its promulgated rules and bylaws, against a member state in default. The relief sought may include both injunctive relief and damages. In the event judicial enforcement is necessary, the prevailing party shall be awarded all costs of such litigation including reasonable attorney's fees.

3. The remedies herein shall not be the exclusive remedies of the Interstate Commission. The Interstate Commission may avail itself of any other remedies available under state law or the regulation of a profession.

ARTICLE XIV. FINANCING OF THE INTERSTATE COMMISSION

A. The Interstate Commission shall pay, or provide for the payment of the reasonable expenses of its establishment, organization, and ongoing activities.

B. The Interstate Commission may levy on and collect an annual assessment from each member state to cover the cost of the operations and activities of the Interstate Commission and its staff, which must be in a total amount sufficient to cover the Interstate Commission's annual budget as approved each year. The aggregate annual assessment amount shall be allocated based upon a formula to be determined by the Interstate Commission, which shall promulgate a rule binding upon all member states.

C. The Interstate Commission shall not incur obligations of any kind prior to securing the funds adequate to meet the same; nor shall the Interstate Commission pledge the credit of any of the member states, except by and with the authority of the member state.

D. The Interstate Commission shall keep accurate accounts of all receipts and disbursements. The receipts and disbursements of the Interstate Commission shall be subject to the audit and accounting procedures established under its bylaws. However, all receipts and disbursements of funds handled by the Interstate Commission shall be audited yearly by a certified or licensed public accountant and the report of the audit shall be included in and become part of the annual report of the Interstate Commission.

ARTICLE XV. MEMBER STATES, EFFECTIVE DATE, AND AMENDMENT

A. Any state is eligible to become a member state.

B. The compact shall become effective and binding upon legislative enactment of the compact into law by no less than ten (10) of the states. The effective date shall be no earlier than December 1, 2007. Thereafter it shall become effective and binding as to any other member state upon enactment of the compact into law by that state. The governors of non-member states or their designees shall be invited to participate in the activities of the Interstate Commission on a non-voting basis prior to adoption of the compact by all states.

C. The Interstate Commission may propose amendments to the compact for enactment by the member states. No amendment shall become effective and binding upon the Interstate Commission and the member states unless and until it is enacted into law by unanimous consent of the member states.

ARTICLE XVI. WITHDRAWAL AND DISSOLUTION

A. Withdrawal

1. Once effective, the compact shall continue in force and remain binding upon each and every member state; provided that a member state may withdraw from the compact by specifically repealing the statute which enacted the compact into law.

2. Withdrawal from this compact shall be by the enactment of a statute repealing the same, but shall not take effect until one (1) year after the effective date of such statute and until written notice of the withdrawal has been given by the withdrawing state to the governor of each other member jurisdiction.

3. The withdrawing state shall immediately notify the chairperson of the Interstate Commission in writing upon the introduction of legislation repealing this compact in the withdrawing state. The Interstate Commission shall notify the other member states of the withdrawing state's intent to withdraw within sixty (60) days of its receipt thereof.

4. The withdrawing state is responsible for all assessments, obligations, and liabilities incurred through the effective date of withdrawal, including obligations, the performance of which extend beyond the effective date of withdrawal.

5. Reinstatement following withdrawal of a member state shall occur upon the withdrawing state reenacting the compact or upon such later date as determined by the Interstate Commission.

B. Dissolution of Compact

1. This compact shall dissolve effective upon the date of the withdrawal or default of the member state which reduces the membership in the compact to one (1) member state.

2. Upon the dissolution of this compact, the compact becomes null and void and shall be of no further force or effect, and the business and affairs of the Interstate Commission shall be concluded and surplus funds shall be distributed in accordance with the bylaws.

ARTICLE XVII. SEVERABILITY AND CONSTRUCTION

A. The provisions of this compact shall be severable, and if any phrase, clause, sentence, or provision is deemed unenforceable, the remaining provisions of the compact shall be enforceable.

B. The provisions of this compact shall be liberally construed to effectuate its purposes.

C. Nothing in this compact shall be construed to prohibit the applicability of other interstate compacts to which the states are members.

ARTICLE XVIII. BINDING EFFECT OF COMPACT AND OTHER LAWS

A. Other Laws

1. Nothing herein prevents the enforcement of any other law of a member state that is not inconsistent with this compact.

2. All member states' laws conflicting with this compact are superseded to the extent of the conflict.

B.   Binding Effect of the Compact
1.   All lawful actions of the Interstate Commission, including all rules and bylaws promulgated by the Interstate Commission, are binding upon the member states.
2.   All agreements between the Interstate Commission and the member states are binding in accordance with their terms.
3.   In the event any provision of this compact exceeds the constitutional limits imposed on the legislature of any member state, such provision shall be ineffective to the extent of the conflict with the constitutional provision in question in that member state.
Sec. 162.003.   EFFECT ON TEXAS LAWS. If the laws of this state conflict with the compact or a rule adopted under that compact, the compact or rule controls, except that if a conflict exists between the compact or rule and the Texas Constitution, as determined by the courts of this state, the Texas Constitution controls.
Sec. 162.004.   COMPACT COMMISSIONER. (a) The governor shall appoint a compact commissioner to be responsible for administration and management of this state's participation in the compact.
(b)   If the compact commissioner is unable to attend a specific meeting of the Interstate Commission created under the compact, the governor shall delegate voting authority for that meeting to another individual from this state.
(c)   The compact commissioner serves at the will of the governor.
Sec. 162.005.   STATE COORDINATION. (a) The Texas Education Agency shall provide for coordination among state agencies, school districts, and military installations concerning this state's participation in and compliance with the compact and compact activities, as required by Article VIII of the compact.
(b)   To the extent that the compact requires or authorizes a State Council created in accordance with Article VIII of the compact to perform a duty or function, the Texas Education Agency or the commissioner of education, as appropriate, shall perform that duty or function.
SECTION 2.   Section 25.005(a), Education Code, is amended to read as follows:
(a)   To facilitate the transfer of military personnel and their dependents to and from the public schools of this state, the agency shall pursue reciprocity agreements [with other states] governing the terms of those transfers with other states that are not parties to the Interstate Compact on Educational Opportunity for Military Children adopted under Chapter 162.
SECTION 3.   This Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution.  If this Act does not receive the vote necessary for immediate effect, this Act takes effect September 1, 2009.

The amendment to **CSSB 90** was read and was adopted by a viva voce vote.

All Members are deemed to have voted "Yea" on the adoption of Floor Amendment No. 1.

On motion of Senator Van de Putte and by unanimous consent, the caption was amended to conform to the body of the bill as amended.

**CSSB 90** as amended was passed to engrossment by a viva voce vote.

All Members are deemed to have voted "Yea" on the passage to engrossment.

## COMMITTEE SUBSTITUTE
## SENATE BILL 33 ON SECOND READING

On motion of Senator Zaffirini and by unanimous consent, the regular order of business was suspended to take up for consideration **CSSB 33** at this time on its second reading:

**CSSB 33**, Relating to school district requirements regarding parental notification and documentation in connection with disciplinary alternative education programs.

The bill was read second time and was passed to engrossment by a viva voce vote.

All Members are deemed to have voted "Yea" on the passage to engrossment.

## COMMITTEE SUBSTITUTE
## SENATE BILL 33 ON THIRD READING

Senator Zaffirini moved that Senate Rule 7.18 and the Constitutional Rule requiring bills to be read on three several days be suspended and that **CSSB 33** be placed on its third reading and final passage.

The motion prevailed by the following vote: Yeas 30, Nays 1.

Nays: Wentworth.

### Reason for Vote

Senator Wentworth submitted the following reason for vote on suspension of the Constitutional Three-day Rule:

I cast a "No" vote on the procedural motion to suspend the Constitutional Rule requiring that bills be read on three several days in order to take up and consider **CSSB 33**, because in my judgment no circumstance exists in this case to justify the extraordinary act of suspending a requirement of the Texas Constitution. The suspension of this Constitutional Rule has the direct and immediate effect of denying the people of Texas knowledge and notice of the passage of this measure until it has already been finally passed on third reading. Were we to have followed the requirement of the Texas Constitution, third reading and a vote on **CSSB 33** would have occurred on the next legislative day, allowing for Texans to have learned through news reports of our second reading vote exactly what we had tentatively passed. Third reading and a vote on the next legislative day would also have allowed our professional staff an opportunity overnight to make sure any amendments passed on second reading are technically correct.

/s/Jeff Wentworth
Senator, District 25

The bill was read third time and was passed by the following vote: Yeas 31, Nays 0.

### SENATE BILL 189 ON SECOND READING

On motion of Senator Shapleigh and by unanimous consent, the regular order of business was suspended to take up for consideration **SB 189** at this time on its second reading:

**SB 189**, Relating to the extension of consumer credit to certain members of the Texas National Guard and armed forces of the United States and their dependents; providing a penalty.

The bill was read second time and was passed to engrossment by a viva voce vote.

All Members are deemed to have voted "Yea" on the passage to engrossment.

**SENATE BILL 189 ON THIRD READING**

Senator Shapleigh moved that Senate Rule 7.18 and the Constitutional Rule requiring bills to be read on three several days be suspended and that **SB 189** be placed on its third reading and final passage.

The motion prevailed by the following vote: Yeas 30, Nays 1.

Nays:  Wentworth.

**Reason for Vote**

Senator Wentworth submitted the following reason for vote on suspension of the Constitutional Three-day Rule:

I cast a "No" vote on the procedural motion to suspend the Constitutional Rule requiring that bills be read on three several days in order to take up and consider **SB 189**, because in my judgment no circumstance exists in this case to justify the extraordinary act of suspending a requirement of the Texas Constitution.  The suspension of this Constitutional Rule has the direct and immediate effect of denying the people of Texas knowledge and notice of the passage of this measure until it has already been finally passed on third reading.  Were we to have followed the requirement of the Texas Constitution, third reading and a vote on **SB 189** would have occurred on the next legislative day, allowing for Texans to have learned through news reports of our second reading vote exactly what we had tentatively passed. Third reading and a vote on the next legislative day would also have allowed our professional staff an opportunity overnight to make sure any amendments passed on second reading are technically correct.

/s/Jeff Wentworth
Senator, District 25

The bill was read third time and was passed by the following vote: Yeas 31, Nays 0.

**COMMITTEE  SUBSTITUTE**
**SENATE BILL 93 ON SECOND READING**

On motion of Senator Van de Putte and by unanimous consent, the regular order of business was suspended to take up for consideration **CSSB 93** at this time on its second reading:

**CSSB 93**, Relating to tuition and fee exemptions for certain military personnel and their dependents.

The bill was read second time and was passed to engrossment by a viva voce vote.

All Members are deemed to have voted "Yea" on the passage to engrossment.

## COMMITTEE SUBSTITUTE
## SENATE BILL 93 ON THIRD READING

Senator Van de Putte moved that Senate Rule 7.18 and the Constitutional Rule requiring bills to be read on three several days be suspended and that **CSSB 93** be placed on its third reading and final passage.

The motion prevailed by the following vote:  Yeas 30, Nays 1.

Nays:  Wentworth.

### Reason for Vote

Senator Wentworth submitted the following reason for vote on suspension of the Constitutional Three-day Rule:

I cast a "No" vote on the procedural motion to suspend the Constitutional Rule requiring that bills be read on three several days in order to take up and consider **CSSB 93**, because in my judgment no circumstance exists in this case to justify the extraordinary act of suspending a requirement of the Texas Constitution.  The suspension of this Constitutional Rule has the direct and immediate effect of denying the people of Texas knowledge and notice of the passage of this measure until it has already been finally passed on third reading.  Were we to have followed the requirement of the Texas Constitution, third reading and a vote on **CSSB 93** would have occurred on the next legislative day, allowing for Texans to have learned through news reports of our second reading vote exactly what we had tentatively passed. Third reading and a vote on the next legislative day would also have allowed our professional staff an opportunity overnight to make sure any amendments passed on second reading are technically correct.

/s/Jeff Wentworth
Senator, District 25

The bill was read third time and was passed by the following vote: Yeas 31, Nays 0.

### REPORT OF COMMITTEE ON NOMINATIONS

Senator Jackson submitted the following revised report from the Committee on Nominations:

We, your Committee on Nominations, to which were referred the following appointments, have had same under consideration and report them back to the Senate with a recommendation that they be confirmed:

Member, State Preservation Board:  Charlotte C. Foster, Harris County.

Presiding Judge, First Administrative Judicial Region: John David Ovard, Dallas County.

Members, Advisory Board of Athletic Trainers: Martin Ray Akins, Travis County; Rebecca Spurlock, Tarrant County.

Commissioners, Board of Pilot Commissioners for Galveston County Ports: Vandy Anderson, Galveston County; Sally H. Prill, Galveston County; James Earl Toups, Galveston County.

Members, Board of Directors, Gulf Coast Waste Disposal Authority: Zoe Milian Barinaga, Harris County; Randy Jarrell, Galveston County; Lamont Edward Meaux, Chambers County.

Member, Gulf States Marine Fisheries Commission: David Austin McKinney, Blanco County.

Commissioners, Board of Pilot Commissioners for Jefferson and Orange County: Martin E. Broussard, Jefferson County; George W. Brown III, Jefferson County; Russell S. Covington, Orange County; Travis Miller, D.D.S., Orange County; William F. Scott, Jefferson County.

Members, Public Safety Commission: Carin Marcy Barth, Harris County; Ada Brown, Dallas County; Carleton Thomas Clowe, Jr., McLennan County; John Thomas Steen, Jr., Bexar County.

Member, State Cemetery Committee: Scott Philen Sayers, Jr., Travis County.

Members, Task Force on Indigent Defense: Jon H. Burrows, Bell County; Knox Fitzpatrick, Dallas County; Anthony C. "Tony" Odiorne, Potter County; Olen U. Underwood, Montgomery County; B. Glen Whitley, Tarrant County.

Members, Telecommunications Planning and Oversight Council: Jennifer Nash Anderson, Chambers County; Dennis M. Donelson, Bexar County; Johanne Ibsen-Wolford, Travis County; Alice E. Owen, Ph.D., Dallas County.

Members, Texas Alcoholic Beverage Commission: Melinda Susan Fredricks, Montgomery County; Steven M. Weinberg, Tarrant County.

Members, Texas Funeral Service Commission: Elwynn "Gene" Allen, Kerr County; Carol M. Becker, Parker County; Sue Evenwel, Titus County; Jess Alan Fields, Sr., Harris County; Joyce McCown Odom, Bexar County; Norberto Salinas, Hildago County.

Members, Texas Historical Commission: Thomas E. Alexander, Kerr County; A. Mario Castillo, Tom Green County; Leslie "Kirk" Courson, Ochiltree County; John W. Crain, Dallas County; David Alfred Gravelle, Dallas County; Jon T. Hansen, El Paso County; Lisa A. Hembry, Dallas County; Steven Lee Highlander, Travis County; Sheri Shelby Krause, Travis County; Gilbert Eric Peterson III, Brewster County; Nancy M. Steves, Bexar County.

Members, Texas State Board of Plumbing Examiners: Dave Lilley, Wichita County; Alejandro "Alex" Meade III, Cameron County; Edward Don Thompson, Smith County.

Members, Board of Directors, Texas Underground Facility Notification Corporation: Christian A. Alvarado, Travis County; Joseph F. Berry, Brazoria County; Barry Calhoun, Dallas County; Judith H. Devenport, Midland County; John Linton, Denton County; James "Jim" Wynn, Midland County.

## SENATE RULE 11.13 SUSPENDED
### (Consideration of Bills in Committees)

On motion of Senator Carona and by unanimous consent, Senate Rule 11.13 was suspended to grant all committees permission to meet while the Senate is meeting today.

## SENATE RULE 11.18(a) SUSPENDED
### (Public Hearings)

On motion of Senator Nelson and by unanimous consent, Senate Rule 11.18(a) was suspended in order that the Committee on Health and Human Services might consider **SB 680** today.

## MOTION TO ADJOURN

On motion of Senator Whitmire and by unanimous consent, the Senate at 12:58 p.m. agreed to adjourn, in memory of John Andrew Collins of The Woodlands and Matthew Virgel of Greenville, upon completion of the introduction of bills and resolutions on first reading, until 11:00 a.m. tomorrow.

## RECESS

On motion of Senator Whitmire, the Senate at 12:58 p.m. recessed until 5:00 p.m. today.

## AFTER RECESS

The Senate met at 5:55 p.m. and was called to order by Senator Huffman.

## SENATE BILLS ON FIRST READING

The following bills, filed on or before Friday, March 13, 2009, were introduced, read first time, and referred to the committees indicated:

**SB 1221** by Shapiro
Relating to the exclusion of certain commercial lease revenue in determining a taxable entity's total revenue for purposes of the revised franchise tax.
To Committee on Finance.

**SB 1222** by Eltife
Relating to certain powers of the Red River Redevelopment Authority.
To Committee on Intergovernmental Relations.

**SB 1223** by Eltife
Relating to the creation, administration, powers, duties, and operation of the Riverbend Water Resources District; providing authority to issue bonds and exercise the power of eminent domain.
To Committee on Natural Resources.

**SB 1224** by Huffman
Relating to a waiver of the fee imposed for certain expunctions.
To Committee on Criminal Justice.

**SB 1225** by Huffman, Hinojosa
Relating to faculty temporary licenses to practice medicine.
To Committee on Health and Human Services.

**SB 1226** by Fraser
Relating to the authority of certain counties to regulate the location of wind energy electric generating facilities.
To Committee on Business and Commerce.

**SB 1227** by Fraser
Relating to the location of wind energy electric generating facilities.
To Committee on Business and Commerce.

**SB 1228** by Hinojosa
Relating to the jurisdiction of the State Office of Administrative Hearings in contested case hearings involving certain contract claims against the state.
To Committee on State Affairs.

**SB 1229** by Van de Putte
Relating to creating an advisory committee on child protective services in the region that includes Bexar County for the Department of Family and Protective Services.
To Committee on Health and Human Services.

**SB 1230** by Van de Putte
Relating to the establishment of the Legislative Committee on Aging.
To Committee on Health and Human Services.

**SB 1231** by Watson
Relating to a requirement that a school district develop and adopt a site selection policy before selecting a site for construction of a new school; providing a penalty.
To Committee on Education.

**SB 1232** by Watson
Relating to increasing public awareness of the benefits of native plant species.
To Committee on Agriculture and Rural Affairs.

**SB 1233** by Davis
Relating to the use of certain money received by the Texas Department of Transportation from certain transportation projects or systems.
To Committee on Transportation and Homeland Security.

**SB 1234** by Davis
Relating to the allocation of the distribution of surplus revenue of a toll project or system.
To Committee on Transportation and Homeland Security.

**SB 1235** by Davis
Relating to the issuance and use of temporary tags on vehicles.
To Committee on Transportation and Homeland Security.

**SB 1236** by Seliger
Relating to admonishments given to a person charged with a misdemeanor.
To Committee on Criminal Justice.

**SB 1237** by Estes
Relating to the authority of certain juvenile probation officers to carry firearms.
To Committee on Criminal Justice.

**SB 1238** by Ogden
Relating to a study regarding the Carrizo-Wilcox aquifer.
To Committee on Natural Resources.

**SB 1239** by Van de Putte
Relating to discount programs for certain veterans provided by toll project entities.
To Committee on Veteran Affairs and Military Installations.

**SB 1240** by Van de Putte, Shapleigh
Relating to the temporary occupational licensing of members of the military and their spouses.
To Committee on Veteran Affairs and Military Installations.

**SB 1241** by Hegar
Relating to the creation of the Fort Bend County Water Control and Improvement District No. 10; providing authority to impose a tax and issue bonds; granting a limited power of eminent domain.
To Committee on Natural Resources.

**SB 1242** by Carona
Relating to the area near a polling place within which electioneering and loitering are prohibited.
To Committee on State Affairs.

**SB 1243** by Wentworth
Relating to the regulation of heir finders by the Texas Private Security Board.
To Committee on Jurisprudence.

**SB 1244** by Carona
Relating to the regulation of investigations companies and the performance of investigative services.
To Committee on Business and Commerce.

**SB 1245** by Carona
Relating to the regulation of the business of private security.
To Committee on Business and Commerce.

**SB 1246** by Jackson
Relating to fees for certain licenses issued by the Texas Parks and Wildlife Department.
To Committee on Natural Resources.

**SB 1247** by Harris
Relating to the definition of eligible central municipality for purposes of the municipal hotel occupancy tax.
To Committee on Economic Development.

**SB 1248** by Zaffirini
Relating to the reimbursement rate for certain ambulance services provided under the medical assistance program.
To Committee on Health and Human Services.

**SB 1249** by Zaffirini
Relating to the creation of a pilot program to improve curricula alignment between junior colleges and general academic teaching institutions for engineering degree programs.
To Committee on Higher Education.

**SB 1250** by Zaffirini
Relating to the administration of certain programs to assist certain foster children in obtaining postsecondary education and training.
To Committee on Health and Human Services.

**SB 1251** by Zaffirini
Relating to information submitted to, maintained in, and released from the immunization registry.
To Committee on Health and Human Services.

**SB 1252** by Zaffirini
Relating to improving application and eligibility determination processes and efficiencies for certain benefits programs.
To Committee on Health and Human Services.

**SB 1253** by Seliger
Relating to the repeal of the power of certain districts and water supply corporations to allow the use of right-of-way easements for certain energy-related purposes.
To Committee on Natural Resources.

**SB 1254** by Seliger
Relating to limits on the purpose and power of a fresh water supply district.
To Committee on Natural Resources.

**SB 1255** by Shapiro
Relating to additional guarantees for certain bonds issued by school districts.
To Committee on Education.

**SB 1256** by Carona, Davis, Hegar, Huffman, Nelson, Shapiro
Relating to the prosecution of and punishment prescribed for engaging in organized criminal activity in a gang-free zone.
To Committee on Criminal Justice.

**SB 1257** by Averitt
Relating to the regulation of certain market conduct activities of certain life, accident, and health insurers and health benefit plan issuers; providing civil liability and administrative and criminal penalties.
To Committee on State Affairs.

**SB 1258** by Hegar
Relating to identification requirements for certain fire hydrants and flush valves.
To Committee on Intergovernmental Relations.

**SB 1259** by Hegar
Relating to the electronic storage of records by the clerks of the supreme court and the courts of appeals.
To Committee on Jurisprudence.

**SB 1260** by Duncan
Relating to the abolishment of the Lower Concho River Water and Soil Conservation Authority.
To Committee on Natural Resources.

**SB 1261** by Uresti
Relating to the ineligibility for employment by a school district, open-enrollment charter school, or shared services arrangement of persons convicted of certain offenses.
To Committee on Education.

**SB 1262** by Uresti
Relating to a documented member of the Kickapoo Traditional Tribe of Texas hunting certain deer.
To Committee on Natural Resources.

**SB 1263** by Watson
Relating to certain mass transit entities.
To Committee on Transportation and Homeland Security.

**SB 1264** by Watson
Relating to the participation of certain transportation entities in the comptroller's travel services contracts.
To Committee on Government Organization.

**SB 1265** by Watson
Relating to obtaining an exemption from the motor vehicle sales tax for motor vehicles driven by persons who have orthopedic handicaps.
To Committee on Finance.

**SB 1266** by Watson
Relating to erecting an off-premise sign adjacent to and visible from certain roads.
To Committee on Transportation and Homeland Security.

**SB 1267** by Hinojosa
Relating to transfer of certain probate matters and guardianship matters.
To Committee on Jurisprudence.

**SB 1268** by Shapleigh
Relating to an exemption from ad valorem taxation of the residence homesteads of certain totally disabled veterans and to continuing the exemption on the same property for the surviving spouse of such a veteran, and to the amount of the exemption from ad valorem taxation to which a disabled veteran is entitled based on disability rating.
To Committee on Finance.

**SB 1269** by Shapleigh
Relating to setting aside for TEXAS grant funding tuition paid by students at campuses maintained by public institutions of higher education outside the United States.
To Committee on Higher Education.

**SB 1270** by Shapleigh
Relating to the online availability of state agency reports required by law.
To Committee on Government Organization.

**SB 1271** by Uresti
Relating to the requirement that an orthotist or a prosthetist be licensed as a device manufacturer if fabricating or assembling without an order from certain health care professionals.
To Committee on Health and Human Services.

**SB 1272** by Carona
Relating to ad valorem and sales and use tax exemptions for high-speed passenger rail facilities.
To Committee on Finance.

**SB 1273** by Carona
Relating to the prosecution of and punishment for the theft of certain electronic equipment and interference with certain radio frequencies.
To Committee on Criminal Justice.

**SB 1274** by Gallegos
Relating to the summoning of jurors to justice of the peace courts in certain counties.
To Committee on Jurisprudence.

**SB 1275** by Gallegos
Relating to the first day of instruction for a school year in certain school districts.
To Committee on Education.

**SB 1276** by Gallegos
Relating to the regulation of service of process; providing criminal and administrative penalties.
To Committee on Jurisprudence.

**SB 1277** by Gallegos
Relating to birth records of adopted children.
To Committee on Jurisprudence.

**SB 1278** by Huffman, Deuell
Relating to the authority of a judge to suspend the imposition of a sentence and place a defendant on community supervision.
To Committee on Criminal Justice.

**SB 1279** by Shapiro
Relating to the deadline for providing absentee ballots for the general election for state and county officers; making conforming changes.
To Committee on State Affairs.

**SB 1280** by Shapiro
Relating to the establishment of a program to provide a ballot by electronic mail to military personnel serving overseas.
To Committee on State Affairs.

**SB 1281** by Williams
Relating to the fraudulent obtaining of a controlled substance from a practitioner; providing a penalty.
To Committee on Criminal Justice.

**SB 1282** by Williams
Relating to the powers of certain freight rail districts.
To Committee on Transportation and Homeland Security.

**SB 1283** by Williams
Relating to the supervision by the Texas Department of Transportation of money appropriated by the federal government for the construction and maintenance of rail facilities.
To Committee on Transportation and Homeland Security.

**SB 1284** by Shapleigh
Relating to home loans and foreclosures on residential real property.
To Committee on Business and Commerce.

**SB 1285** by Davis
Relating to the interest and fees that may be charged for certain consumer loans; providing a criminal penalty.
To Committee on Business and Commerce.

**SB 1286** by West
Relating to the continuity of care for juveniles with mental impairments in the juvenile justice system.
To Committee on Criminal Justice.

**SB 1287** by West
Relating to certain health-related reports, records, and information.
To Committee on Health and Human Services.

**SB 1288** by West
Relating to the floodplain management account.
To Committee on Finance.

**SB 1289** by West
Relating to the fee based on admissions to certain sexually oriented businesses.
To Committee on Criminal Justice.

**SB 1290** by Van de Putte
Relating to authorization for school districts to provide mentors for teachers assigned to a new subject or grade level.
To Committee on Education.

**SB 1291** by Van de Putte
Relating to access to certain licensed mental health practitioners.
To Committee on State Affairs.

**SB 1292** by Hinojosa
Relating to the calculation of current market value of certain water rights by the Rio Grande Regional Water Authority.
To Committee on Natural Resources.

**SB 1293** by Jackson
Relating to the duty of the General Land Office to clean, maintain, and clear debris from a public beach affected by a declared disaster.
To Committee on Natural Resources.

**SB 1294** by Jackson
Relating to the deadline for reallocating local sales and use taxes.
To Committee on Finance.

**SB 1295** by Hegar
Relating to the creation of the Aliana Management District; providing authority to impose a tax and issue bonds.
To Committee on Intergovernmental Relations.

**SB 1296** by Hegar
Relating to the certification of a county jailer as a special officer for offenders with mental impairments.
To Committee on Criminal Justice.

**SB 1297** by Huffman
Relating to the imposition of consecutive fines in sentencing a defendant for offenses arising out of the same criminal episode.
To Committee on Criminal Justice.

**SB 1298** by Huffman
Relating to the authority of an animal control officer to carry a bite prevention stick in the performance of official duties.
To Committee on Criminal Justice.

**SB 1299** by Watson
Relating to the regulation of stormwater management by certain counties.
To Subcommittee on Flooding and Evacuations.

**SB 1300** by Watson
Relating to the duty of the comptroller to provide sales and use tax information to an emergency services district.
To Committee on Intergovernmental Relations.

**SB 1301** by Shapiro
Relating to the accessibility of services for certain students with autism or autism spectrum disorder.
To Committee on Education.

**SB 1302** by Shapiro
Relating to the accessibility of services for certain students with autism or autism spectrum disorder.
To Committee on Education.

**SB 1303** by Seliger
Relating to the requirement that certain state and local governmental entities designate a firearms proficiency officer and require weapons proficiency.
To Committee on Criminal Justice.

**SB 1304** by Patrick
Relating to eliminating the set-aside of a portion of designated tuition for student financial assistance at public institutions of higher education.
To Committee on Higher Education.

**SB 1305** by Patrick
Relating to insurance premium payment assistance for certain persons who have hemophilia and are unable to pay the entire cost of treatment.
To Committee on State Affairs.

**SB 1306** by Carona
Relating to the punishment for the offense of employment harmful to children.
To Committee on Criminal Justice.

**SB 1307** by Carona
Relating to activities that constitute common nuisance.
To Committee on Criminal Justice.

**SB 1308** by Carona
Relating to the on-premises consumption of certain alcoholic beverages; providing a penalty.
To Committee on Business and Commerce.

**SB 1309** by Hegar
Relating to the regulation of commercial fertilizer.
To Committee on Agriculture and Rural Affairs.

**SB 1310** by Duncan
Relating to a program allowing for countywide voting locations in certain elections.
To Committee on State Affairs.

**SB 1311** by Duncan
Relating to the authority of the commissioners court of a county to enter into an ad valorem tax abatement agreement with certain property owners.
To Committee on Economic Development.

**SB 1312** by Shapiro
Relating to programs and funding to support adult and postsecondary education and workforce development at public junior colleges and public technical institutes.
To Committee on Higher Education.

**SB 1313** by Shapiro, Harris
Relating to the quality and accessibility of public school career and technical education programs.
To Committee on Education.

**SB 1314** by Harris
Relating to the regulation of the practice of acupuncture.
To Committee on Economic Development.

**SB 1315** by Wentworth
Relating to the computation of taxable margin for purposes of the franchise tax by a taxable entity principally engaged in Internet hosting.
To Committee on Finance.

**SB 1316** by Wentworth
Relating to the appraisal for ad valorem tax purposes of certain open-space land devoted principally to ecological research.
To Committee on Finance.

**SB 1317** by Wentworth
Relating to education and examination requirements for the issuance of a driver's license to certain persons.
To Committee on Transportation and Homeland Security.

**SB 1318** by Wentworth
Relating to erecting an off-premise sign adjacent to and visible from certain roads.
To Committee on Transportation and Homeland Security.

**SB 1319** by Wentworth
Relating to the prohibition of signs along certain roads.
To Committee on Transportation and Homeland Security.

**SB 1320** by Wentworth
Relating to notice by a governmental entity regarding certain geospatial data products.
To Committee on Intergovernmental Relations.

**SB 1321** by Whitmire
Relating to discharging or releasing inmates from the Texas Department of Criminal Justice at or near certain department facilities.
To Committee on Criminal Justice.

**SB 1322** by Whitmire
Relating to the exchange of information among certain governmental entities concerning at-risk youth.
To Committee on Criminal Justice.

**SB 1323** by Whitmire
Relating to the amount of a surcharge assessed on conviction of certain intoxicated driver offenses on the driver's license of certain persons who complete a drug court program.
To Committee on Criminal Justice.

**SB 1324** by Nelson
Relating to enhancing penalties for assaulting a family member by strangulation or suffocation.
To Committee on Criminal Justice.

**SB 1325** by Nelson
Relating to the creation of a mental health intervention program for military veterans.
To Committee on Veteran Affairs and Military Installations.

**SB 1326** by Nelson
Relating to the functions of the Statewide Health Coordinating Council; providing civil penalties.
To Committee on Health and Human Services.

**SB 1327** by Nelson
Relating to the disposition of surplus data processing equipment of a university system or an institution or agency of higher education.
To Committee on Higher Education.

**SB 1328** by Nelson
Relating to a study on the feasibility of providing vaccines to first responders deployed to a disaster area.
To Committee on Health and Human Services.

**SB 1329** by Nelson
Relating to control of food-borne illnesses and microorganisms that cause food-borne illnesses or are otherwise injurious to health.
To Committee on Health and Human Services.

**SB 1330** by Nelson
Relating to mutual aid agreements for newborn screening laboratory services.
To Committee on Health and Human Services.

**SB 1331** by Nelson
Relating to the creation of the Texas Physician Health Program.
To Committee on Health and Human Services.

**SB 1332** by Nelson
Relating to the placement of certain children who are in the managing conservatorship of the state.
To Committee on Health and Human Services.

**SB 1333** by Nelson
Relating to the purchase and sale of certain alcoholic beverages by the holder of a winery permit.
To Committee on Business and Commerce.

**SB 1334** by Hegar
Relating to continuation of the intercollegiate athletics fee for students at Prairie View A&M University.
To Committee on Higher Education.

**SB 1335** by Hegar
Relating to notice of acceptance or rejection of an insurance claim.
To Committee on Business and Commerce.

**SB 1336** by Carona
Relating to the tax imposed on certain tobacco products.
To Committee on Finance.

**SB 1337** by Estes
Relating to the creation of the Van Alstyne Municipal Utility District No. 1 of Grayson County; providing authority to impose a tax and issue bonds; granting a limited power of eminent domain.
To Committee on Intergovernmental Relations.

**SB 1338** by Whitmire
Relating to the rights of certain county law enforcement officers.
To Committee on Criminal Justice.

**SB 1339** by Gallegos
Relating to authorizing the issuance of revenue bonds for the University of Houston Multi-Cultural Studies and Classroom Complex.
To Committee on Finance.

**SB 1340** by Gallegos
Relating to the holidays for members of fire and police departments in certain municipalities.
To Committee on Intergovernmental Relations.

**SB 1341** by Gallegos
Relating to work performed in sports and community venue districts in certain municipalities.
To Committee on Economic Development.

**SB 1342** by Hinojosa
Relating to authorization for an exemption from tuition and fees charged by a junior college district for employees of the district and for state reimbursement of the district's revenue loss from the exemption.
To Committee on Higher Education.

**SB 1343** by Hinojosa
Relating to the formula funding for public institutions of higher education for certain credit hours that do not count toward a degree.
To Committee on Higher Education.

**SB 1344** by Watson
Relating to an alcohol awareness component of the health curriculum used in public schools.
To Committee on Education.

**SB 1345** by Watson
Relating to health benefit plan coverage for certain orally administered anticancer medications.
To Committee on State Affairs.

**SB 1347** by Van de Putte
Relating to the imposition of the sales and use tax on taxable items sold or provided under certain contracts.
To Committee on Finance.

**SB 1348** by Van de Putte
Relating to health benefit plan coverage for acquired brain injuries.
To Committee on State Affairs.

**SB 1349** by Van de Putte
Relating to eligibility for public school prekindergarten classes of children residing with a grandparent.
To Committee on Education.

**SB 1350** by Carona
Relating to the creation, administration, financing, and use of a Texas Transportation Revolving Fund; granting the authority to issue bonds.
To Committee on Finance.

**SB 1351** by Carona
Relating to the terms of the members of the Texas Transportation Commission.
To Committee on Transportation and Homeland Security.

**SB 1352** by Carona
Relating to the authority of certain counties to construct, acquire, improve, operate, or maintain causeways, bridges, tunnels, turnpikes, ferries, and highways.
To Committee on Transportation and Homeland Security.

**SB 1353** by Carona
Relating to contract provisions in comprehensive development agreements.
To Committee on Transportation and Homeland Security.

**SB 1354** by Jackson
Relating to the licensing and regulation of plumbers.
To Committee on Business and Commerce.

**SB 1355** by Lucio
Relating to the authority of an ad valorem tax collector to waive penalties for failing to file certain statements.
To Committee on Finance.

**SB 1356** by Lucio
Relating to a fee associated with the assignment of a vehicle identification number by the Texas Department of Transportation.
To Committee on Transportation and Homeland Security.

**SB 1357** by Lucio
Relating to a joint statement relating to the transfer of a motor vehicle as the result of a gift.
To Committee on Transportation and Homeland Security.

**SB 1358** by Seliger
Relating to optional annuity increases for certain retirees and beneficiaries of the Texas Municipal Retirement System.
To Committee on State Affairs.

**SB 1359** by Seliger
Relating to forfeiture of remedy for nonpayment of ad valorem taxes.
To Committee on Finance.

**SB 1360** by Nichols
Relating to the deadlines for commencement and completion of the Lake Columbia reservoir project.
To Committee on Natural Resources.

**SB 1361** by Nichols
Relating to certificates of public convenience and necessity for water or sewer services.
To Committee on Natural Resources.

**SB 1362** by Shapiro
Relating to a Texas Youth Commission comprehensive plan to improve student reading skills and behavior.
To Committee on Education.

**SB 1363** by Shapiro
Relating to clarification of the essential knowledge and skills of the public school curriculum and the evaluation of conforming curriculum management systems.
To Committee on Education.

**SB 1364** by Shapiro
Relating to minimum public school attendance for class credit or a grade.
To Committee on Education.

**SB 1365** by Shapleigh
Relating to development regulations in certain flood-prone counties; providing civil and criminal penalties.
To Subcommittee on Flooding and Evacuations.

**SB 1366** by Ellis
Relating to health benefit plan coverage for certain serious mental illnesses and mental disorders.
To Committee on State Affairs.

**SB 1367** by Carona
Relating to parking placard applications by persons with a mobility problem caused by an impairment of vision.
To Committee on Transportation and Homeland Security.

**SB 1368** by Shapleigh
Relating to the creation of a county ethics commission in certain counties; providing civil and criminal penalties.
To Committee on International Relations and Trade.

**SB 1369** by Lucio
Relating to the appointment of attorneys ad litem.
To Committee on Jurisprudence.

**SB 1370** by Lucio
Relating to authorizing certain counties and municipalities to regulate land development; providing a penalty.
To Committee on International Relations and Trade.

**SB 1371** by Lucio
Relating to the colonia self-help program.
To Committee on International Relations and Trade.

**SB 1372** by Lucio
Relating to withdrawal and restriction plans for certain insurers.
To Committee on Business and Commerce.

**SB 1373** by Lucio
Relating to the operation and continuation of the law authorizing the issuance of oversize or overweight vehicle permits by certain port authorities.
To Committee on International Relations and Trade.

**SB 1374** by West
Relating to community-based programs for juveniles in certain counties.
To Committee on Criminal Justice.

**SB 1375** by West
Relating to the establishment of the Texas savvy homeowner program.
To Committee on Intergovernmental Relations.

**SB 1376** by Uresti
Relating to the care and protection of foster children committed to or released under supervision by the Texas Youth Commission.
To Committee on Criminal Justice.

**SB 1377** by Harris, Seliger
Relating to the administration of the compensation to victims of crime fund and the compensation to victims of crime auxiliary fund.
To Committee on Criminal Justice.

**SB 1378** by Duncan, Averitt
Relating to the plugging of inactive oil or gas wells.
To Committee on Natural Resources.

**SB 1379** by Hinojosa, Williams
Relating to the establishment, funding, and operation of the Texas natural disaster catastrophe fund and the disaster preparedness and mitigation grant council.
To Committee on Business and Commerce.

**SB 1380** by Shapiro
Relating to the right of certain child crime victims to a speedy trial and to be considered with respect to a defendant's motion for continuance.
To Committee on Criminal Justice.

**SB 1381** by Shapiro
Relating to the conditions of bond for a defendant charged with committing certain offenses against a child and to the denial of bail pending trial with respect to certain defendants who violate those conditions.
To Committee on Criminal Justice.

**SB 1382** by Carona
Relating to the coordination of the planning, construction, operation, and maintenance of a statewide passenger rail system by the Texas Department of Transportation.
To Committee on Transportation and Homeland Security.

**SB 1383** by Carona
Relating to the creation and administration of the Texas Local Participation Transportation Program.
To Committee on Transportation and Homeland Security.

**SB 1384** by Huffman
Relating to permissive interlocutory appeals in civil actions.
To Committee on Jurisprudence.

**SB 1385** by Seliger
Relating to the calculation of the rollback tax rate of a school district.
To Committee on Finance.

**SB 1386** by Seliger
Relating to priority groundwater management areas.
To Committee on Natural Resources.

**SB 1387** by Seliger
Relating to the injection and geologic storage of anthropogenic carbon dioxide.
To Committee on Natural Resources.

**SB 1388** by Wentworth
Relating to process server certification and the establishment of a certification division within the Office of Court Administration of the Texas Judicial System.
To Committee on Jurisprudence.

**SB 1389** by Wentworth
Relating to the penalty for the offense of reckless driving.
To Committee on Transportation and Homeland Security.

**SB 1390** by Wentworth
Relating to the regulation of fireworks during a declared local state of disaster.
To Committee on Intergovernmental Relations.

**SB 1391** by Wentworth
Relating to the prosecution and punishment of the offense of criminal trespass.
To Committee on Criminal Justice.

**SB 1392** by Wentworth
Relating to toll collection and enforcement.
To Committee on Transportation and Homeland Security.

**SB 1393** by Wentworth
Relating to the conditions for release on bond of a defendant charged with certain intoxication offenses.
To Committee on Criminal Justice.

**SB 1394** by Zaffirini
Relating to notification of an applicant for admission to a general academic teaching institution regarding the availability of degree programs in the applicant's preferred major field of study offered by other institutions.
To Committee on Higher Education.

**SB 1395** by Zaffirini
Relating to the use of person first respectful language in reference to individuals with disabilities.
To Committee on Health and Human Services.

**SB 1396** by Deuell
Relating to required procedures regarding the ranking of physicians by health benefit plan issuers.
To Committee on State Affairs.

**SB 1397** by Deuell
Relating to establishing the equivalency of competency-based nursing education programs in other states that meet standards of quality equivalent to nursing education programs approved by the Texas Board of Nursing.
To Committee on Health and Human Services.

**SB 1398** by West
Relating to the requirement by a municipality of a license or permit to occupy or lease a residence.
To Committee on Intergovernmental Relations.

**SB 1399** by Seliger
Relating to delinquent payment of an alcoholic beverage retailer's account for liquor.
To Committee on Business and Commerce.

**SB 1400** by Van de Putte
Relating to excused absences from public schools for voting in certain elections.
To Committee on Education.

**SB 1401** by Deuell
Relating to taking or attempting to take a weapon from an employee or official of a correctional facility that is operated by a county or municipality.
To Committee on Criminal Justice.

**SB 1402** by Hinojosa
Relating to requiring certain political subdivisions to enter a contract with the county elections administrator to perform election services.
To Committee on State Affairs.

**SB 1403** by Averitt
Relating to changing the Texas Health Insurance Risk Pool to the Texas Health Insurance Pool, and to the operation of that pool.
To Committee on State Affairs.

**SB 1404** by Duncan
Relating to the powers and duties of the Employees Retirement System of Texas.
To Committee on State Affairs.

**SB 1405** by Shapleigh
Relating to the establishment of an advisory committee to assist the Texas Water Development Board in incorporating the potential effects of climate variability into the state water plan.
To Committee on Natural Resources.

**SB 1406** by Shapleigh
Relating to the consideration of the effects of climate variability on water supplies in regional and state water plans.
To Committee on Natural Resources.

**SB 1407** by Shapleigh
Relating to the creation of the State Developmental Center Evaluation Authority and the residential placement of individuals with mental retardation.
To Committee on Health and Human Services.

**SB 1408** by Shapleigh
Relating to compensation and employment benefits for members of the Texas State Guard called to state active duty.
To Committee on Veteran Affairs and Military Installations.

**SB 1409** by Shapleigh
Relating to the definition of first responder for purposes of the immunization registry.
To Committee on Health and Human Services.

**SB 1410** by Jackson
Relating to the licensing and regulation of plumbers.
To Committee on Business and Commerce.

**SB 1411** by West
Relating to financial assistance programs in connection with certain children in the conservatorship of the Department of Family and Protective Services.
To Committee on Health and Human Services.

**SB 1412** by Williams
Relating to scholarships for fifth-year accounting students.
To Committee on Higher Education.

**SB 1413** by Williams
Relating to the punishment for tampering with certain governmental records concerning forensic analyses.
To Committee on Criminal Justice.

**SB 1414** by Williams
Relating to the regulation of certain aggregate production operations by the Texas Commission on Environmental Quality; providing penalties.
To Committee on Natural Resources.

**SB 1415** by Hegar
Relating to the creation of a pilot program on deferred disciplinary action.
To Committee on Health and Human Services.

**SB 1416** by Hegar
Relating to certain contracts between pharmacy benefit managers and the Employees Retirement System of Texas, the Teacher Retirement System of Texas, The Texas A&M University System, or The University of Texas System.
To Committee on State Affairs.

**SB 1417** by Shapiro
Relating to transportation planning and the creation and membership of planning organizations and funding allocations for transportation projects.
To Committee on Transportation and Homeland Security.

**SB 1418** by Shapiro
Relating to the issuance of AMBER alert system specialty license plates.
To Committee on Transportation and Homeland Security.

**SB 1419** by Lucio
Relating to this state's goal for renewable energy.
To Committee on Business and Commerce.

**SB 1420** by Lucio
Relating to the sale of electric energy produced by distributed renewable generation owners.
To Committee on Business and Commerce.

**SB 1421** by Lucio, Ellis, Van de Putte
Relating to the adoption of modernizations to unemployment compensation benefit eligibility.
To Committee on Economic Development.

**SB 1422** by Huffman
Relating to the eligibility of certain persons to receive a sentence of community supervision, including deferred adjudication community supervision.
To Committee on Criminal Justice.

**SB 1423** by Huffman
Relating to goals for renewable energy capacity derived from renewable energy sources other than sources using wind energy.
To Committee on Business and Commerce.

**SB 1424** by Seliger
Relating to a person's eligibility to possess or carry a concealed handgun or other firearm.
To Committee on Criminal Justice.

**SB 1425** by Williams
Relating to the creation of alternative fuel programs to be funded by the Texas Emissions Reduction Plan Fund.
To Committee on Natural Resources.

**SB 1426** by Williams
Relating to the installation, operation, and maintenance of automatic license plate identification cameras on a highway.
To Committee on Transportation and Homeland Security.

**SB 1427** by Williams
Relating to the regulation of staff leasing services.
To Committee on Business and Commerce.

**SB 1428** by Williams
Relating to the power of the Texas Department of Licensing and Regulation to issue emergency orders and temporary and emergency licenses.
To Committee on Business and Commerce.

**SB 1429** by Williams
Relating to tax credits for business development in low-income communities.
To Committee on Economic Development.

**SB 1430** by Williams
Relating to election through secret ballot of a labor union as the exclusive bargaining representative.
To Committee on State Affairs.

**SB 1431** by Hinojosa
Relating to the licensing and regulation of towing companies and vehicle storage facilities; providing penalties.
To Committee on Transportation and Homeland Security.

**SB 1432** by Nichols
Relating to the investigation, prosecution, and punishment of criminal Medicaid fraud and certain other offenses related to Medicaid fraud; providing penalties.
To Committee on Health and Human Services.

**SB 1433** by Watson
Relating to the delivery of prescription drugs for certain state health plans by mail order; providing an administrative penalty.
To Committee on State Affairs.

**SB 1434** by Watson
Relating to the administration of and eligibility for the child health plan program.
To Committee on Finance.

**SB 1435** by Watson
Relating to family violence and protective orders.
To Committee on Criminal Justice.

**SB 1436** by Watson
Relating to the appeal of a censure issued by the State Commission on Judicial Conduct.
To Committee on Jurisprudence.

**SB 1437** by Watson
Relating to the powers of an associate judge in a Title IV-D case.
To Committee on Jurisprudence.

**SB 1438** by Watson
Relating to compliance requirements for candidates for judicial office.
To Committee on State Affairs.

**SB 1439** by Watson
Relating to the travel, board, and lodging expenses of a person appointed to assist the State Commission on Judicial Conduct.
To Committee on Jurisprudence.

**SB 1440** by Watson
Relating to orders and judgments rendered by associate judges in child support and child protection cases.
To Committee on Jurisprudence.

**SB 1441** by Watson
Relating to the terms of the members of the Court Reporters Certification Board.
To Committee on Jurisprudence.

**SB 1442** by Fraser
Relating to business entities and associations.
To Committee on Business and Commerce.