# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# CORPUS CHRISTI DIVISION

| | |
|---|---|
| **MARC VEASEY,** *et al.*, | |
| **Plaintiffs,** | |
| **v.** | Civil Action No. 2:13-cv-193 (NGR) |
| **RICK PERRY,** *et al.*, | |
| **Defendants.** | |

## REBUTTAL DECLARATION OF M.V. HOOD III

I, M.V. Hood III, do hereby declare the following:

2:13-cv-193
09/02/2014
**DEF0007**

## I.      INTRODUCTION AND BACKGROUND

My name is M.V. (Trey) Hood III, and I am a tenured professor at the University of Georgia with an appointment in the Department of Political Science. I also serve as the Director of Graduate Studies for the Department. I have been a faculty member at the University of Georgia since August of 1999. I am an expert in American politics, specifically in the areas of electoral politics, racial politics, election administration, and Southern politics. I teach courses on American politics, Southern politics, and research methods and have taught a graduate seminar on the topic of election administration.

I have received research grants from the National Science Foundation and the Pew Charitable Trust. I have also published peer-reviewed journal articles specifically in the areas of election administration and voter ID laws. My academic publications are detailed in a copy of my vita that is attached at the end of this document. Currently, I serve on the editorial boards for *Social Science Quarterly* and *Election Law Journal*. The latter is a peer-reviewed academic journal focused on the area of election administration.

During the preceding four years, I have offered expert testimony in six cases, *State of Florida v. United States* (No. 11-1428, D.D.C.), *NAACP v. Walker* (11-CV-5492, Dane County Circuit Court), *Jones v. Deininger* (12-CV-00185-LA), *Frank v. Walker* (2:11-CV-01128-LA), *South Carolina* v. *United States* (No. 12-203, D.D.C), and *Rios-Andino v. Orange County* (6:12-cv-1188-Orl-22KRS). In assisting the defendants in analyzing the potential impact of the Texas voter identification statute, I am receiving $300 an hour for this work and $300 an hour for any testimony associated with this work.  In reaching my conclusions, I have drawn on my training, experience, and knowledge as a social scientist who has specifically conducted research in the area under examination in this expert report.

## II.  SCOPE AND OVERVIEW

I have been asked by counsel for the State of Texas to opine on the effects of Texas' voter ID statute. More specifically, I have been asked to evaluate the export reports of Professors Stephen Ansolabehere and Professors Matt Barreto and Gabriel Sanchez and their efforts to estimate the number of Texans who may potentially be affected by SB14. In doing so I also offer my opinion on the effect of the Texas voter ID statute.

In Section III of this report, I outline the major components relating to Texas' photo identification statute (SB 14). Section IV provides a comparison of the Texas statute with similar laws implemented in Georgia in 2007 and South Carolina in 2013. Section V provides a synopsis of academic research related to the study of voter ID laws. In Section VI of this report, I provide an analysis of the expert reports submitted by Professor Ansolabehere and Professors Barreto and Sanchez. The following section (VII) analyzes implementation of the Texas voter ID statute to date and also provides my overall conclusions in this case.

III.    **THE TEXAS VOTER ID STATUTE**

*Background*

On May 27, 2011, Senate Bill 14 (SB 14), an act that amended various sections of the Texas Election Code, was signed into law.[1] The changes outlined require that electors voting in-person must present a government-issued photo identification card.[2] Prior to passage of SB 14, electors could prove identity by presenting a variety of photo or non-photo documentation including a driver's license, state identification card, birth certificate, utility bill, or bank statement. The November 5, 2013 constitutional amendment election (and corresponding early voting period) was the first statewide election under SB 14.

*Types of Valid Identification*

Following implementation of SB 14, an elector casting an in-person ballot must present one of seven types of government-issued photo identification. The types of valid identification under the statute include the following, issued by the Texas Department of Public Safety: a driver's license, personal identification card, an election identification certificate, and a Texas concealed hand gun license. Other forms of valid SB 14 identification include a U.S. military ID (with photo)[3], a U.S. passport, and a U.S. citizenship certificate (with photo). With the exception of the U.S. citizenship certificate, all other forms of identification must be current or have expired within 60 days of the date they are being presented at the polls.[4]

*Procedure for Electors Who do not Possess SB 14 Identification*

The Act provides that those electors lacking valid SB 14 identification will be allowed to cast a provisional ballot after execution of an affidavit. These voters will then have the opportunity to return to their respective county registrars' office and present valid SB 14 identification within six days of the date of the election in question. In such cases the elector's ballot will be converted from a provisional to a regular vote.[5]

---

[1]Texas Legislature Online (www.capitol.state.tx.us).

[2]SB 14 applies to any elector casting an in-person ballot either during the early voting period or at their precinct on election-day. Voters casting ballots absentee by mail are not subject to the identification requirements in SB 14.

[3]Identification cards issued by the Department of Veterans Affairs are valid for use under SB 14.

[4]Texas Election Code, Section 63.0101.

[5]Texas Election Code. Sections 63.011 and 65.0541.

*Accommodations*

SB 14 provides for a number of accommodations for particular classes of electors or types of circumstances. Any elector voting absentee by mail is not subject to the photo ID requirement.[6] Although Texas does not have no-excuse absentee balloting, anyone 65 years or older is eligible to cast a mail-in ballot.[7] In addition, any registrant lacking acceptable SB 14 ID and who is disabled according to the Social Security Administration or the U.S. Department of Veterans Affairs can apply to be permanently exempt from the requirements of SB 14.[8] Electors who may find themselves without SB 14 ID following a natural disaster or who may have a religious objection to being photographed may also be exempted from the requirement to present photo identification when voting in-person.[9]

For those electors who do not possess the requisite form of identification to cast a ballot in person, SB 14 provides for the issuance of a <u>free</u> form of valid identification known as an Election Identification Certificate or EIC. EICs are issued by the Texas Department of Public Safety[10] and are available at any DPS office throughout the State.[11] Otherwise-qualified electors seeking to obtain an EIC must fill out an application form[12] and present documentation to verify both proof of U.S. citizenship and proof of identity.[13] Five different documents can be used to verify proof of citizenship with two common examples being a birth certificate issued by a U.S. state or territory or a U.S. Certificate of Naturalization/Citizenship. There are a variety of ways in which an applicant could provide proof identity. For example, in addition to a document verifying proof of U.S. Citizenship (i.e. birth certificate), the applicant could provide two additional documents. Such documents include a Social Security Card, a voter registration card, a W-2, a marriage license, or a Texas driver's license or identification card that had been expired for more than two years. In all, there are a total of 27 forms of these documents. Most of the fees required to obtain a certified birth certificate for an EIC have been waived under rules announced by the Texas Department of Health Services.[14] Instead of the normal $22 fee, the fee for an EIC-related birth certificate is between $2 and $3.[15]

---

[6] Texas Secretary of State website (http://votetexas.gov/register-to-vote/need-id).

[7] Texas Secretary of State website (http://votetexas.gov/faq/).

[8] Texas Election Code, Section 13.002(i).

[9] In the case of religious objections or a natural disaster, the elector may cast a provisional ballot at the polls and then return to the voter registrars' office within six days following the election and execute and affidavit attesting to the relevant facts. Once the affidavit is signed the ballot will be converted from provisional to a regular vote. Texas Election Code, Section 65.054(b).

[10] General information about the EIC application process can be found at: http://www.txdps.state.tx.us/DriverLicense/electionID.htm.  Authorization for the DPS to issue EICs: Texas Transportation Code, Ch. 521A and 37 Texas Administrative Code, Sections 15.181-85.

[11] DPS offices are not located in all of Texas' 254 counties. In 61 counties where there is not a DPS office alternative sites where an elector may obtain an EIC are available (for a list of these sites see: http://www.txdps.state.tx.us/DriverLicense/documents/EICCountyrun.pdf). The DPS also operates a number of mobile units that have been used to issue EICs throughout the State.

[12] Application can be found at: http://www.txdps.state.tx.us/internetforms/forms/DL-14C.pdf.

[13] A full list of all documents that can satisfy these requirements can be found at: http://www.txdps.state.tx.us/DriverLicense/eicDocReqmnts.htm.

[14] Texas Department of Health Services website (http://www.dshs.state.tx.us/Layouts/ContentPage.aspx?PageID=56719&id=8589981487&terms=eic).

[15] Texas Administrative Code, Section 181.22(t); Texas Health and Safety Code, Section 191.0045.

*Voter Notification and Education Programs*

The Texas voter identification statute also requires local election officials to provide notice to electors of the change in identification requirements.[16] The statute also mandates a statewide effort led by the Texas Secretary of State to educate voters concerning the new requirements as required by SB 14. Local election officials are also tasked with participating in this educational campaign by altering websites and posting physical notice of the new voter identification standards.[17]

*Training of Local Election Officials*

SB 14 mandates that training will be provided for local election officials pertaining to the implementation of the new voter ID statute[18] and increases funding for activities related to voter registration.[19]

## IV.  COMPARISONS TO THE GEORGIA AND SOUTH CAROLINA VOTER IDENTIFICATION STATUTES

In this section I will provide a comparison of the Texas' voter ID statute with those currently in place in Georgia and South Carolina. The Georgia statute has been in place since 2007, and the South Carolina law was implemented in January of 2013. While Section 5 of the Voting Rights Act was in place, the Georgia law was precleared twice by the U.S. Department of Justice. The South Carolina statute was cleared for implementation by the District Court of the District of Columbia in 2012. SB 14 was blocked from implementation by the District Court of the District of Columbia in 2012.

*Fundamentals*

In many respects all three of these laws are very similar in that they all require the presentation of government-issued photo identification for voting in-person (either early or on election-day). The process is also similar for those voters who fail to present a valid form of identification at the polls. In those cases, a voter may cast a provisional ballot. The voter can then have the provisional ballot converted to a regular ballot by presenting valid identification within a specified period of time (this time period varies by state).

---

[16]Texas Election Code, Section 15.005(a) and 63.0012(a).
[17]Texas Election Code, Section 31.112(a), (b), and (c).
[18]Texas Election Code, Section 32.111 (c) and Section 32.114(a).
[19]Senate Bill 14, Section 24.

Table 1. Types of Identification Allowed to Vote by State

|  | **Texas** | **Georgia** | **South Carolina** |
|---|---|---|---|
| Drivers' License | X | X | X |
| State ID Card | X | X | X |
| U.S. Passport | X | X | X |
| U.S. Military ID | X | X | X |
| Free Photo ID for Purposes of Voting | X | X | X |
| U.S. Citizenship Certificate | X |  |  |
| Concealed Weapons Permit | X |  |  |
| Tribal ID |  | X |  |
| Federal/State/Local Government Employee ID |  | X |  |

*Types of Identification*
In terms of allowable identification, all three states allow a driver's license, state identification card, U.S. passport, U.S. military ID, or a free photo ID card issued for the purpose of voting. Beyond that, Texas and Georgia offer two additional forms, although these vary. The final category listed in Table 1 for Georgia technically includes any "valid photo ID from any branch, department, agency, or entity of the U.S. Government, Georgia, or any county, municipality, board, authority or other entity of this state."[20] This category also includes identification cards issued by state universities or colleges. In South Carolina all forms of ID must be valid and current. In Georgia, the driver's license can be expired. Again, in Texas, with the exception of the U.S. Citizenship Certificate that has no expiration date, identification cannot be expired for more than 60 days from the date of the election.

---

[20]Georgia Secretary of State website:
http://sos.ga.gov/index.php/elections/georgia_voter_identification_requirements2.

*Exceptions*

For all three states, there is no identification requirement for voting absentee by mail.[21] Outside of this exception, both Texas and South Carolina have additional exceptions in place. South Carolina allows a registrant with a religious objection to sign an affidavit and vote a provisional ballot. In addition, South Carolina allows registrants who do not possess identification to execute what is called a *reasonable impediment* affidavit and cast a provisional ballot.[22] In Texas, those electors with a qualified disability, who find themselves lacking identification in the aftermath of a natural disaster, or who may have a religious objection may be exempted from the law.

*Free ID Programs*

All three states have a free ID program in place. In South Carolina and Georgia, free identification cards for the purpose of voting are available from county voter registrars or from state offices that issue driver's licenses. In Texas, the EIC is available from either a Department of Public Safety Office or a second set of state or county offices in counties where there is no DPS office. In terms of underlying documentation, Georgia requires proof of name and date of birth and Texas requires proof of citizenship. Both of these requirements are often met through presentation of a birth certificate. Texas also requires documentation for proof of identity. In South Carolina voters can appear in-person to obtain a voter registration card with photograph without providing a birth certificate. Obtaining a free state ID card issued by the South Carolina Department of Motor Vehicles does require underlying documentation.

*Summation*

In comparing the Texas voter ID statute with the South Carolina and Georgia voter ID statutes there are differences between the laws to be sure. At the base level, however, all three of these states require the presentation of a limited set of government issued photo identification for in-person voting. In addition, the laws associated with all three states contain a variety of mitigating factors. Registrants needing to comply have access in all three states to programs designed to distribute free identification cards and educational campaigns have accompanied the roll-out of these laws as well. Electors failing to meet identification requirements at the polls are allowed to cast provisional ballots, and those voting absentee by mail are not subject, in any way, to identification requirements. All three states were also formerly covered by Section 5 of the Voting Rights Act and all have sizable minority voting populations. In this light, the law currently under legal challenge in Texas (SB 14) is not all that distinct from voter ID statutes in analogous states.[23]

---

[21]Georgia has no-excuse absentee voting by mail while Texas and South Carolina require an excuse. In both Texas and South Carolina being 65 or older is considered an excuse.

[22]In the specific cases of a South Carolina registrant executing a religious objection or reasonable impediment affidavit the provisional ballot will be counted by the county board of registration and elections *unless the board has grounds to believe the affidavit is false*. South Carolina Code 7-13-710.

[23]Neither the South Carolina or Georgia voter ID laws are currently being challenged in federal or state courts.

As I stated, there are some distinctions between the three statutes under discussion. In terms of acceptable forms of government-issued identification Georgia has the most expansive list followed by Texas and then South Carolina. In terms of exceptions, Texas again finds itself in the middle, allowing the disabled, disaster victims, and those with religious exemptions to actually be exempted from the law. On the other hand, South Carolina's short list of IDs is to some degree counterbalanced by allowing affidavits to be executed for religious or other reasons (reasonable impediments). Georgia, conversely, allows no specific exceptions. In terms of absentee voting by mail, Georgia is the most lenient in that its registrants do not have to offer an excuse. In both Texas and South Carolina registrants are allowed to provide a range of excuses, including being 65 or older, for obtaining an absentee ballot.

## V.    ACADEMIC RESEARCH ON VOTER ID

The plaintiffs in this case assert that SB 14 will produce a racially disparate impact for minority voters. Both Professor Ansolabehere's report and the report produced by Professors Barreto and Sanchez make this claim by attempting to demonstrate a gap in ID possession among racial/ethnic classifications in Texas. ID disparity only matters; however, if it ultimately causes a disparity in voter turnout. As well, to matter in a legal sense this turnout gap must fall disproportionately on minority registrants. In other words, even if a gap in ID possession is definitively demonstrated in this case, that fact alone would not *a priori* translate into a gap in voter turnout, much less a produce a disparate racial/ethnic effect on turnout.

*Research Related to ID Possession*
To date, a number of peer-reviewed academic studies have documented a gap in government-issue photo identification between Anglos (non-Hispanic whites) and various racial/ethnic groups (notably blacks and Hispanics).[24] Indeed, some of my own academic work falls into this category. Prior to implementation of a voter ID statute in Georgia, I determined that the probability of a white registrant not possessing a driver's license or state ID card to be .037, compared with .07 and .074 for black and Hispanics respectively.[25] Likewise, in *S.C. v. U.S.*[26] evidence produced at trial indicates that a gap in ID possession among racial groups existed among South Carolina registrants prior to implementation of that state's voter ID law (Act R54).[27] In a match between the South Carolina voter registration database and other databases containing information on various forms of Act R54 identification, I found that the non-possession rate for white registrants to be 4.32%, as compared to 6.22% for black registrants, 7.13% for Hispanic registrants, and 2.67% for Asian registrants.[28] But this gap in ID possession does not necessarily lead to a turnout gap.

---

[24]For other examples of the racial gap in ID possession see Barreto, Matt A., Stephen A. Nuno, and Gabriel R. Sanchez. 2007. "Voter ID Requirements and the Disenfranchisements of Latino, Black and Asian Voters." Prepared for the Annual Meeting of the American Political Science Association; Barreto, Matt A., Stephen A. Nuno, and Gabriel R. Sanchez. 2009. "The Disproportionate Impact of Voter-ID Requirements on the Electorate—New Evidence from Indiana." *PS: Political Science & Politics* 42 (January): 111–6.
[25]Charles S. Bullock, III and M.V. Hood III. 2008. "Worth a Thousand Words?: An Analysis of Georgia's Voter Identification Statute." *American Politics Research* 36(4): 555-579.
[26]*South Carolina* v. *United States* (No. 12-203, D.D.C.)
[27]Again, it is important to note the South Carolina voter registration database contains information on the race/ethnicity of registrants along with their full Social Security number. In other words, it is a straightforward process in the case of South Carolina to determine which registrants may lack acceptable identification and from that the racial/ethnic breakdown of this distribution. In the South Carolina case then one could be fairly confident in the

*Voter ID Laws and Turnout*

Other academic research has moved beyond simply analyzing rates of ID possession in an attempt to determine if voter turnout is affected by the implementation of a voter ID law. Most of these studies have found statistically inconclusive results regarding whether the overall turnout rate is affected or if minority registrants may be more adversely impacted. Below I will outline the findings from academic research on these questions before turning to a study I wrote that examines implementation of the Georgia voter ID statute.

One analysis using the Census Bureau's Current Population Survey found no relationship between identification requirements and turnout at the aggregate level. Using individual-level data, the authors did find an inverse relationship between stricter identification requirements and turnout in general. However, there were no differential effects observed for minority registrants in regard to ID requirements and turnout.[29] Another academic study relying on CPS data from 2004 through 2006 also failed to find any relationship between turnout and identification laws. Looking specifically at race and ethnicity, this study did find that Hispanic registrants residing in a state that had implemented new ID requirements in 2006 to be about 2% less likely to turnout as compared to Hispanics in states with requirements predating 2006 (in this study identification requirements included both photo and non-photo variants). No differential effects were found for black or Asian registrants. The authors conclude that some groups may adapt slower to the implementation of new voter identification requirements.[30]

Another set of researchers used both aggregate data from 2000 to 2006 and individual-level data from the 2006 Cooperative Congressional Election Study (CCES) to study the effects of voter identification requirements on turnout. At both levels of analysis, they fail to find any significant relationships between the stringency of identification requirements or, more specifically the presence of a photo ID law, on turnout. Interestingly, in the individual-level models these researchers note the variable measuring political interest has the strongest effect on voter turnout. The authors conclude, *thus, we fail to reject the null hypothesis that voter-ID laws do not significantly affect turnout* (2009:125).[31]

---

determination of ID possession rates and whether these rates varied by race.  In the case of Texas even coming up with a list of registrants on the no-match list is hampered by the lack of unique identifiers across databases. In addition, segmenting such a list by race/ethnicity requires some estimation technique to be applied.

[28] Table 5. Hood Supplemental Report. *SC v. US*.

[29] R. Michael Alvarez, Delia Bailey, and Jonathan Katz. 2008. *The Effect of Voter Identification Laws on Turnout*. Pasadena, CA: CalTech/MIT Voting Technology Project.

[30] Timothy Vercellotti and David Anderson. 2009. "Voter-Identification Requirements and the Learning Curve." *PS: Political Science & Politics* 42(January): 117–20.

[31] Jason D. Mycoff, Michael W. Wagner, and David C. Wilson. 2009. "The Empirical Effects of Voter-ID Laws: Present or Absent?" *PS: Political Science & Politics* 42(January): 121–6.

Another analysis used CPS data from the 2002 through the 2006 elections to examine change over time as related to new identification requirements at the state-level. The analyses presented control for a variety of factors including minority status. They report that movement from lenient to strict identification requirements appears to dampen turnout by a few percentage points. However, they also note that this relationship is *statistically inconclusive*. This dampening effect then is statistically insignificant, an indication that one cannot reject the null hypothesis that more restrictive identification standards do not depress turnout.[32]

Ansolabehere uses the Cooperative Congressional Election Study (CCES) from 2006 to 2008 to examine a number of questions related to turnout and voter ID laws.[33] He finds that few registrants were denied the ability to vote due to lack of valid identification. Specifically, he states that in 2006, 0.1% were unable to cast a ballot because of ID issues, and in the 2008 election, he described the corresponding figure as being *a fraction of a percentage point* (2009:129). He also finds little evidence that potential voters are deterred from showing up at the polls because of voter ID. Four survey respondents, accounting for less than .2% of the total, indicated that lack of identification was a reason they did not vote. Ansolabehere's conclusions about voter ID and turnout are summarized below:

> Voter ID does not appear to present a significant barrier to voting….Although the debate over this issue is often draped in the language of the civil and voting rights movements, voter ID appears to present no real barrier to access (2009:129).

An even more recent study analyzing turnout rates by race/ethnicity across states relies on the Current Population Survey (CPS) of Voting and Registration from 1980 through 2010.[34] Rocha and Matsubayashi find that the presence of a photo ID requirement has no apparent statistical effect on turnout, whether white, black, or Hispanic.  On this point they conclude *more stringent ID requirements for voting have no deterring effect on individual turnout across different racial and ethnic groups* (2013:10).

---

[32]Robert S. Erikson and Lorraine C. Minnite. 2009. "Modeling Problems in the Voter Identification—Voter Turnout Debate." *Election Law Journal* 8(2): 85–101.

[33]Stephen Ansolabehere. 2009. "Effects of Identification Requirements on Voting: Evidence from the Experiences of Voters on Election Day." *PS: Political Science & Politics* 42(January): 127–30.

[34]Rene R. Rocha and Tetsuya Matsubayashi. 2013. "The Politics of Race and Voter ID Laws in the States: The Return of Jim Crow? *Political Research Quarterly* 20(10): 1-14.

*Georgia's Voter ID Statute: Pre- and Post-implementation Study*

Following implementation of the Georgia voter ID statute, I conducted my own study to determine the effect that the law produced on voter turnout.[35] Georgia, like Texas, has a sizable minority population and until 2013 was covered by Section 5 of the Voting Rights Act. Unlike Texas, the Georgia voter registration database contains data on the race/ethnicity of registrants. Unlike the other academic studies cited above, I rely on individual-level observations from the voter registration and history databases from the Georgia Secretary of State for my analyses. Using these data makes concerns over self-reported turnout moot and, in addition, I am able to analyze the full universe (population) of registrants in the state. In 2007 a federal court injunction barring the implementation of the Georgia voter ID law was lifted, allowing the law to go into effect prior to the 2008 presidential election. In this study I sought to answer a number of questions including:

    1.    the extent to which implementation of the new law may have depressed voter turnout, and

    2.    the possibility that the law may have produced a disparate impact in reference to racial minorities.

Using an identified group of registrants lacking photo identification by the State in 2007, I compare turnout for this group from the previous presidential election cycle in 2004 (prior to implementation) to the 2008 presidential cycle (post-implementation). At the same time I am also able to compare turnout for all other registrants during these same election cycles. It is critical in this type of policy impact analysis to be able to compare not only turnout rates for registrants lacking photo identification before and after implementation of the statute, but turnout rates for other registrants over the same time period. This study is the only academic research I am presently aware of that uses individual-level population data of registrants to examine the effects of a photo identification law before and after implementation. The findings from the academic journal article are primarily based on statistical models that calculate the probability of turnout while controlling for a variety of factors including income and age. In this report I will present both the published findings based on empirical modeling and a second set of findings in tabular format. These additional findings are based on an analysis I performed since publication of the article, using the same dataset.

First, I turn to the question of the effect of the law on overall turnout (see Table 2). From the model results I calculated the probability of turnout for registrants lacking photo identification in the 2004 general election to be 0.54, compared to 0.76 for all other registrants. The difference between the two being 0.22. In 2008, turnout for registrants without photo ID was 0.45. For registrants with ID, turnout was 0.73, producing a difference of 0.28. The difference of these two intra-election differences is -0.065.[36] This is the inter-election difference measure which takes into account the effect of identification possession on turnout comparing the 2004 election (pre-implementation) to the 2008 election (post-implementation). While turnout for both groups dropped from 2004 to 2008, the decline was greater for those lacking photo ID as denoted by the negative sign.

---

[35] M.V. Hood III and Charles S. Bullock, III. 2012. "Much Ado About Nothing?: An Empirical Assessment of the Georgia Voter ID Statute." *State Politics and Policy Quarterly* 12:394-414.
[36] Inter-election Difference calculated as: [(0.76-.054) - (0.73-0.45)].

In the article I go on to estimate that implementation of the Georgia voter identification law depressed turnout in the 2008 general election by 0.43%. Stated otherwise, turnout in Georgia would have been about four-tenths of a percentage point higher had the voter identification statute remained enjoined.[37]

Table 2. Probability of Turnout for Georgia Registrant by Identification Status and Race

| Race/Ethnicity | ID Status | Election | Turnout Rate | Intra-Election Difference | Inter-Election Difference |
|---|---|---|---|---|---|
| All registrants | No ID | 2004 | .542 | | |
| | ID | 2004 | .761 | .219 | |
| | No ID | 2008 | .451 | | |
| | ID | 2008 | .735 | .284 | |
| | | | | | **-.065** |
| White | No ID | 2004 | .558 | | |
| | ID | 2004 | .774 | .216 | |
| | No ID | 2008 | .414 | | |
| | ID | 2008 | .724 | .310 | |
| | | | | | **-.095** |
| Black | No ID | 2004 | .519 | | |
| | ID | 2004 | .725 | .207 | |
| | No ID | 2008 | .475 | | |
| | ID | 2008 | .755 | .280 | |
| | | | | | **-.073** |
| Hispanic | No ID | 2004 | .428 | | |
| | ID | 2004 | .668 | .239 | |
| | No ID | 2008 | .287 | | |
| | ID | 2008 | .616 | .329 | |
| | | | | | **-.089** |

Source: Figures 1 and 3 and Table 2. Hood and Bullock (2012).

In addition, I also produced frequency counts of turnout by identification status for the 2004 and 2008 election cycles and present these in tabular format in Table 3. As shown, the inter-election difference of -5.1% generated using raw numbers supports the same pattern and conclusions as that derived from the statistical model.

[37]See pages 408-409 for an explanation of how this estimate was derived.

Table 3. Turnout Rates for Georgia Registrant by Identification Status and Race

| Race/Ethnicity | ID Status | Election | Turnout Rate | Intra-Election Difference | Inter-Election Difference |
|---|---|---|---|---|---|
| All registrants | No ID | 2004 | 47.6% | | |
| | ID | 2004 | 72.9% | 25.3% | |
| | No ID | 2008 | 39.6% | | |
| | ID | 2008 | 70.0% | 30.4% | |
| | | | | | **-5.1%** |
| White | No ID | 2004 | 52.1% | | |
| | ID | 2004 | 75.7% | 23.6% | |
| | No ID | 2008 | 39.0% | | |
| | ID | 2008 | 71.1% | 32.1% | |
| | | | | | **-8.5%** |
| Black | No ID | 2004 | 44.8% | | |
| | ID | 2004 | 67.8% | 23.0% | |
| | No ID | 2008 | 41.8% | | |
| | ID | 2008 | 71.2% | 29.4% | |
| | | | | | **-6.4%** |
| Hispanic | No ID | 2004 | 34.4% | | |
| | ID | 2004 | 60.1% | 25.7% | |
| | No ID | 2008 | 23.0% | | |
| | ID | 2008 | 55.6% | 32.6% | |
| | | | | | **-6.9%** |

Source: Calculated by author.

Looking again at Tables 2 and 3 we can answer the question of whether Georgia's voter ID law disproportionately impacted minorities using the same difference in difference analysis. Turning first to Table 2, which is a set of estimates derived from a model of turnout, one can note that the inter-election difference measure for white registrants is -0.095. Again, the negative sign is an indication that the turnout gap between those with and without ID widened across the election cycles between implementation of the law. The comparable inter-election difference for blacks and Hispanics is -0.073 and -0.089 respectively. Looking at Table 3, which again relies simply on percentages produced using raw frequencies, one can denote the same pattern. White registrants have an inter-election difference score of -8.5%, as compared to -6.4 for blacks and -6.9% for Hispanics. Both sets of figures then indicate that while all racial/ethnic categories were affected by implementation of the law, it was the turnout of non-Hispanic whites who were impacted the most. Based on this evidence, the Georgia voter ID law **did not** disproportionately affect minority registrants.

Another study I conducted that has some bearing on this question focused on black turnout in Georgia. Because Georgia records the race/ethnicity of registrants these figures are not estimates, but actual registration and turnout rates for blacks. Black turnout rates documented in this journal article are reproduced in Figure 1 below. Of particular note is a sizable increase in both black registration and turnout rates from 2004 to 2008 (again these are the election cycles that span implementation of the voter ID law). For example, from 2004 to 2008 black registration increased from 64% to 78% and turnout over the same period from 72% to 76%. These jumps in registration and turnout occurred across the same presidential election cycle that saw full implementation of the photo identification law in Georgia. Further, it is important to note that new registrants accounted for 24% of the total turnout for this racial group in 2008. In this study new registrants were defined as those who had registered since January 1, 2008. A sizable segment of black turnout in 2008 then was attributable to political newcomers who were able to successfully participate within the confines of the new voter identification law.[38]



Figure 1. Black Registration and Turnout in Georgia, 2004-2008

---

[38]Seth C. McKee, M.V. Hood III, and David Hill. 2012. "Achieving Validation: Barack Obama and Black Turnout in 2008." *State Politics and Policy Quarterly* 12:3-22.

*Post-Implementation Evidence from South Carolina and Mississippi*

One way to analyze the effect of the law in this state would be to examine the number of voters affected through an examination of reasonable impediment affidavits executed. The South Carolina voter ID law has been in effect since January of 2013. In South Carolina there are two reasons a registrant may need to cast a provisional ballot related to identification issues. First, if an elector has valid ID under the South Carolina statute but has forgotten to bring it with them to the polls, they can cast a provisional ballot. A provisional ballot cast for this reason will be counted if the registrant presents proper identification to the county election commission prior to certification of the vote.  Second, a voter who does not possess proper identification under the statute can execute a reasonable impediment affidavit attesting to their identity and inability to obtain identification. These individual can then cast a provisional ballot that will be counted unless the affidavit is proven false.

In the spring of 2013, a special election was held to fill the seat vacated by Tim Scott in the 1st congressional district. Connected with this special election were a primary, primary run-off, and general election. Contacting election supervisors from the five counties that comprise CD1, I was able to collect information on the number of reasonable impediment affidavits that had been executed for these elections. These are displayed below in Table 4. Examining reasonable impediment affidavits is one manner in which to gauge the number of voters who do not possess proper photo identification, but who wish to participate in the electoral process.

Table 4. Reasonable Impediment Affidavits as a Percentage of Total Votes Cast from South Carolina Congressional District 1 Special Election, 2013

|  | Affidavits Executed | Total Vote | Percentage | Rate per 10,000 Votes |
|---|---|---|---|---|
| Primary Total | 10 | 70,278 | 0.014% | 1.42 |
| (R) Primary Run-Off | 3 | 46,171 | 0.007% | 0.65 |
| Special Election | 18 | 143,635 | 0.013% | 1.25 |
| Total across Elections | 31 | 260,084 | 0.012% | 1.20 |

Source: Data on reasonable impediment affidavits collected by author from county election supervisors. Data on voter turnout collected from the South Carolina Election Commission.

The special election held for CD1 is the first contest of any size to be held under South Carolina's voter ID statute, so there are no other elections to provide a full comparison. What can be said from the data in Table 4 is that very few registrants in South Carolina were affected by the State's new identification requirement. For all three elections, the number of affidavits executed as a percentage of the total vote cast amounts to a fraction of a percentage point. Combining data across the three elections we see that for every 10,000 votes cast, there was approximately one reasonable impediment affidavit executed.

I was also able to collect some additional data from the South Carolina State Election Commission on the 2014 primary and primary run-off elections. The data in Table 5 below are provisional ballot counts for these two elections. In the 2014 primary election, there were 935 provisional ballots cast amounting to 0.206% of the total vote. Of these, 298 were not converted to regular ballots (0.066% of the total). Of the provisional ballots not counted, 44 were due to

failure to present proper identification (no reasonable impediment affidavits were categorized as false). In the end then, 0.01% of the voters in the South Carolina primary may have been hampered by the State's voter ID statute. The 2014 primary run-off reveals a similar pattern. Of the total number of votes cast, 10 voters (0.006%) were unable to have their vote counted because of issues with identification. As with the primary, no reasonable impediment affidavits were categorized as false in the primary run-off.[39] To conclude, post-implementation evidence from South Carolina indicates that almost no electors are being kept from having their votes counted due to the State's voter identification statute.

Table 5. Provisional Votes Cast in South Carolina Primary and Primary Run-Off, 2014

|  | Total Votes Cast | Provisional Ballots Cast | Provisional Ballots Not Counted | Provisional Ballots Not Counted [ID Issue] |
|---|---|---|---|---|
| 2014 Primary | 452,990 | 0.206% [935] | 0.066% [298] | 0.010% [44] |
| 2014 Primary Run-off | 179,218 | 0.153% [274] | 0.063% [112] | 0.006% [10] |

Notes: Figures are percentages of total votes cast; counts in brackets.
Source: Data collected from the South Carolina Election Commission.

Another southern state, Mississippi, has implemented strict government-issued photo identification at the polls even more recently than South Carolina. So far, party primary elections and run-offs have been held this past June under the new law. A *Washington Post* article indicates that in a study conducted by the Center for the Study of the American Electorate (American University) only three states out of 25 in 2014 actually saw their turnout increase over 2010 levels. Interestingly, turnout in Mississippi for these primary elections was higher than turnout prior to implementation of Mississippi's voter ID law in 2010.[40] I was also able to collect some data on provisional voting from these two elections. In the June 3rd primary election, there were 503 provisional ballots cast related to identification issues. Of these, 185 were counted (cured). This leaves 318 provisional ballots that were not counted, which amounts to 0.079% of the total vote cast. In the June 24th primary run-off, there were a total of 267 provisional ballots cast due to identification issues. For this election, I was unable to obtain the number of provisional ballots that were eventually counted; however, these 267 provisionals amounted to only 0.068% of the total vote cast. For the first two elections following implementation of Mississippi's voter ID statute, more than 99.9% of voters were unaffected by the law on this metric.[41]

---

[39]As of this writing, partial data (33 of 46 counties reporting) are available on the number of reasonable impediment affidavits executed. There were 23 and 8 reasonable impediment affidavits executed in the 2014 primary and primary run-off respectively.
[40]Dan Balz. 2014. "Everyone Says Turnout is Key. So Why Does It Keep Going Down?" *Washington Post*. 26 July.
[41]Data collected by the author from the Mississippi Secretary of State. Information on the total numbers of provisional ballots was not available as of this writing.

## VI.    DETERMINING HOW MANY TEXAS REGISTRANTS HAVE VALID SB 14 IDENTIFICATION

### A.  Analysis of Expert Report Submitted by Professor Ansolabehere

*Background and Findings*

Professor Stephen Ansolabehere submitted an expert report on behalf of the plaintiffs in this case in which he attempts to determine the number of Texas's registrants who may lack a valid form of SB 14 identification. He does so by specifying a series of matching queries to be executed between the Texas voter registration (TEAM) database and databases from the Texas Department of Public Safety, the U.S. State Department, the U.S. Department of Defense, the U.S. Citizenship and Immigration Services Agency, and the Veterans Health Administration. In addition, matching queries were executed between the TEAM database and the Social Security Administration and the Veterans Benefits Administration in order to determine which registrants may qualify for a disability exemption under SB 14. The protocol for these matching algorithms is detailed in *Plaintiff' Database Matching Protocol* which is attached as an appendix to this document.

Multiple queries were executed and any record in the TEAM database matching at least one record in the DPS or federal databases were denoted as a match. For these cases the registrant is denoted as possessing valid SB 14 identification and/or as qualified to apply for a disability exemption. Some registrants were matched across multiple databases, an indication that they possessed more than one form of SB 14 identification.

At the conclusion of these matching queries, Professor Ansolabehere found that 1,232,242, or 9.08%, of registrants in the TEAM database lacked a valid SB 14 ID.[42] Including those registrants who may qualify for a disability exemption along with those registrants thought to possess valid SB 14 identification produces an estimate of 1,117,496 affected registrants (8.24%).[43]

*Replication of the U.S. No-Match List*

On June 4, 2014 I received an encrypted hard drive from the Texas Attorney General's Office containing the results of Professor Ansolabehere's matching analysis between the TEAM, DPS, and various federal databases. I also received supporting documentation outlining the match process and results from each agency. I was able to aggregate data from these separate files and create a "global" no-match list. This no-match list was almost identical in number to the aggregate numbers presented in Professor Ansolabehere's expert report. On July 1, 2014, I received a second file, which is the file that Professor Ansolabehere used in his analyses presented in his expert report. Any additional analyses I present in this report of the no-match list are based on this file, which should be analogous to the dataset Professor Ansolabehere used.

---

[42]Table V.3 Ansolabehere Expert Report.
[43]Table V.4 Ansolabehere Expert Report.

*Issues with Matching to the TEAM Database*

Below I outline a number of issues that make producing matches between the TEAM database and other databases difficult to accomplish. These issues will often result in the generation of "false-negatives"—the failure to match a record in the TEAM database to one of the other databases when a match does, in reality, exist. As such, despite best efforts, the summary figure for the total number of records that fail to match will be inflated.[44]

## 1. There is no unique and permanent identifier between databases.

Producing an accurate match between the TEAM, DPS, and federal databases is hampered by the fact that a unique, permanent identifier does not exist across all databases. If each record in each database contained a full Social Security number, then matching would be a straightforward task. Unfortunately, the primary database in this case, TEAM, does not contain a full Social Security Number for each record. Of the 13,546,416 records in the TEAM database, 6,930,603 or 51.09% do not have a unique nine-digit Social Security Number.[45] Database matches between other state's voter registration databases and other databases (i.e. Department of Motor Vehicles) that contain full social security numbers have produced much higher match rates (and consequently much lower no-match rates) than those found using the TEAM database.

For example, in South Carolina where the State's voter registration database contains a full Social Security number for virtually all registrants, it was determined that only 4.89% of registrants lacked valid government-issued photo identification. This no-match rate was achieved using only four forms of identification: a South Carolina driver's license or state ID, a U.S. military ID, and a U.S. passport.[46] Likewise, Georgia's voter registration database also contains full Social Security numbers for registrants. Using data for only two forms of identification (Georgia driver's license or ID cards) from the Georgia Department of Driver's Services found a no-match rate of 6.04%.[47] In this light, Professor Ansolabehere's no-match rate using seven forms of government-issued ID of 9.08% is surely inflated.

## 2. The TEAM database field for state identification numbers is not fully populated.

Beyond Social Security numbers which could be used to link records across these databases, a second unique identifier that could be used is a state identification number issued by the Department of Public Safety. While this identifier would not help match records in TEAM to the federal databases utilized, they would be helpful in matching records the DPS database to locate registrants who may possess a driver's license, state identification card, a concealed weapons permit, or an EIC. As with Social Security numbers, state identification numbers are not available for a considerable number of records in the TEAM database. A quarter of the records in TEAM (24.69%) do not contain a unique state identification number.[48]

---

[44]See the following report from the National Research Council titled "State Voter Registration Databases, Immediate Actions and Future Improvements" for a general discussion of issues related to matching state voter registration databases to other government databases.
[45]Table A.V.I. Ansolabehere Expert Report.
[46]Table 3. Hood Supplemental Expert Report. *SC v. US*.
[47]"Worth a Thousand Words?: An Analysis of Georgia's Voter Identification Statute."
[48]Table A.V.I. Ansolabehere Expert Report.

**3. The databases being used for matching contain inconsistent data within fields.**

If available, using a unique identifier for matching is preferable to using other fields such as name and date of birth. Because of the problems noted in Points 1. and 3. of this section, other fields must necessarily be used for matching. It must be noted that any difference, however slight, between any of the strings created for matching will result in a non-match (even if a true match exists). Reliance on these types of fields for matching will, therefore, lead to an undercount of the true match number.

As an example, imagine a case where the DPS database contained the following hypothetical entry:

> First Name: James
> Last Name: Smith
> DOB: 2/1/1980
> SSN (last four): 1532

For the same individual the TEAM database contained the following information:

> First Name: Jim
> Last Name: Smith
> DOB: 2/1/1980
> SSN (last four): 1532

In a case where a match was being run on the following fields the match strings created would appear as such:

<JamesSmith020119801532> and < JimSmith020119801532>.

In this hypothetical example, these two records (representing the same individual) would not produce a match as the individual has listed James as a first name in the DPS database, but Jim in the TEAM database. In this case then a false-negative would result where this registrant, who has SB 14 ID, is not matched to the DPS database. If James (Jim) Smith's full Social Security number had been populated in both the TEAM and DPS databases, the fact that first names might be slightly different would be irrelevant.

**4. Information for some records in the TEAM database is erroneous.**

Beyond issues of incomplete or missing data, data for some records is clearly erroneous and, as a consequence, useless for the purposes of trying to match records across databases. Inaccurate data can also be introduced through data entry errors. As an example, one key field for producing matches in the absence of a unique identifier would be a registrant's date of birth. In the team database, 18,432 registrants have a date of birth listed as January 1, 1900. If one were to truncate the age of registrants on January 15, 2014 to range from 17 to 105, fully 26,320 cases (0.19%) contain missing or erroneous data.[49] The date of birth field was one of the identifiers used in the U.S. matching protocol.

**5. Data on decedents is incomplete.**

Professor Ansolabehere did remove decedents from the TEAM database using information located in the DPS database. Since the information on decedents is from the DPS database and not the TEAM database, only records where a match was obtained between the two can be eliminated. In other words, while records matched to the DPS database have been flagged as deceased, it is not possible to flag unmatched records. As a consequence, an unknown number of those registrants on the no-match list are probably deceased. This process can inflate the percentage of no-matches as it can only decrease the base number (denominator), but not the number of registrants thought to lack identification. While Professor Ansolabehere did make use of Catalist data to flag those on the no-match list as being possibly deceased, this is a different process from using data from a state agency.

**6. The State of Texas does not record a registrant's race or ethnicity.**

Unlike other states such as Georgia or South Carolina, Texas does not record the race/ethnicity of registrants. In states that do record this information it is a relatively straightforward process to produce frequency breakdowns by race/ethnicity. In Texas these measures are estimates. To the degree that racial estimates are calculated on a quantity that itself, is an estimate, an even larger degree of uncertainly is introduced. I have already raised questions concerning the precision of the U.S. no match list. If one has an inaccurate measure of ID possession and then layers an additional estimate of race on top of that, the possibility or error could be magnified.

**7. No post-estimation validation was undertaken on the U.S. no-match list.**

It is possible to undertake estimates of the numbers of false matches (or false no-matches) following a database match. I did not see in his report where Professor Ansolabehere undertakes any such analysis. Doing so would have helped to validate the matching protocol outlined by the Department of Justice.[50]

---

[49]Calculated by author using U.S. no-match list.

[50]For examples of these techniques see Thomas R. Belin and Donald B. Rubin. 1995. "A Method for Calibrating False-Match Rates in Record Linkage." *Journal of the American Statistical Association* 90(430); 694-707; William E. Winkler. "Automatically Estimation Record Linkage False Rates." *Proceedings of the Section on Survey Research Methods, American Statistical Association*; William E. Winkler. 1995. "Matching and Record Linkage," In *Business Survey Methods.* New York: Wiley; and William E. Winkler. 2004. "Approximate String Comparator

*Additional Analysis of the U.S. No-Match List*

In this section I will present some additional analysis of the U.S. no-match list generated by Professor Ansolabehere. I begin by sub-setting the no-match list based on various criteria to create a new indicator, which will be used to denote whether the registrant may be part of the registrant population affected by implementation of SB 14. First, I make use of any registrant on the no-match list who was identified as being disabled. In total, 114,750 registrants (or 9.3% of the total no-match list) have a qualifying disability. Registrants with a qualifying disability can be permanently exempted from the identification requirements in SB 14. Second, I identified any registrant who was 65 years or older as of January 1, 2014.[51]  Any registrant falling into this category is excused to vote an absentee ballot by mail. Those casting ballots by this method are not subject to the identification requirements in SB 14.

Finally, using voter history files from the Texas Secretary of State, I identified registrants on the no-match list who voted since implementation of SB 14. The elections I canvassed are the November 2013 constitutional amendment election, a special election for Texas Senate District 4 in 2014, the 2014 statewide party primaries, and the 2014 statewide primary run-off elections. In the constitutional amendment election, 32,129 (or 2.61%) of the registrants on the U.S. no-match list voted. Six hundred and seventy-three or 0.05% voted in the special election for SD 4. 69,915 (or 5.67%) voted in the March primary. And 27,798 (or 2.26%) voted in the May primary run-off. Across the four elections combined, there were a total of 91,815 unique registrants on the U.S. no-match list who voted in at least one post-implementation election.[52] This figure is equivalent to 7.45% of the total no-match list. This fact raises an interesting question concerning how someone identified on the no-match list was able to participate in an election following implementation. There would appear to be two logical answers: (1) the identified registrant should not have appeared on the no-match list (false-positive), or (2) the identified registrant made adjustments to comply with SB 14 in order to vote. The first case points to the no-match list being less reliable for identifying registrants lacking SB 14 identification. The second lends support to the idea that registrants lacking SB identification who desire to cast an in-person ballot will obtain proper identification (perhaps a free EIC) to allow them to do so.

Using information on disability status, age, and turnout I created a new indicator, *Affected Population*, to denote those registrants on the no-match list who were not disabled, were less than 65, and who had not voted in any post-implementation election. This is the segment of

---

Search Strategies for Very Large Administrative Lists." Proceedings of the Section on Survey Research Methods. American Statistical Association.

[51]Ages for approximately 1.3% of registrants on the no-match list could not be calculated due to erroneous data in the date of birth field. The age range was truncated to range between 17 and 105. Registrants with erroneous date of birth information were excluded from some analyses.

[52]One possible retort to this fact is that these registrants were making use of absentee voting by mail. Only 8,456 registrants (8.37% of 91,815 unique votes cast since implementation) voted solely absentee by mail. If one were to further subset this figure, only 772 (0.84% of 91,815 unique votes cast since implementation) voters under 65 voted using only the absentee by mail method. Again, those over 65 are already qualified under Texas law to vote absentee by mail. So, less than 1% of the unique votes cast by those on the no-match list were via the absentee by mail method from registrants under 65. Conversely, 99% of unique votes cast since implantation were either in-person (election-day or early) or absentee by those 65 and older.

registrants thought to lack proper SB 14 identification and who might be impacted by the law's implementation. Conversely, the indicator labeled *Unaffected Population* is the mirror opposite in that it includes any registrants who is disabled, is 65 or older, or has already voted in a post-implementation election. Of the 1,232,244 registrants on the U.S. no-match list 357,518 or 29.0% should not be affected by SB 14, while 860,120 or 69.8% remain part of a segment of registrants who may be potentially impacted by the Texas voter ID statute.[53] Using Professor Ansolabehere's no-match estimate, the size of the affected population of registrants would equal **6.34%** of the total number of Texas registrants as of January 15, 2014.

Table 6. Estimating the Number of Texas Registrants who May be Affected by SB 14

|  | Frequency | Percent of Total |
|---|---|---|
| Identified as Disabled | 114,750 | 9.31% |
| 65 or Older | 203,584 | 16.5% |
| Voted since Implementation of SB14 | 91,815 | 7.45% |
|     2013 Constitutional Amendment Election | 32,129 | 2.61% |
|     2014 Special Election-Texas Senate District 4 | 673 | 0.05% |
|     2014 Primary | 69,915 | 5.67% |
|     2014 Primary Run-Off | 27,798 | 2.26% |
| Unaffected Population | 357,518 | 29.01% |
| Affected Population | 860,120 | 69.80% |
| Indeterminate (Due to Missing Data) | 14,606 | 1.19% |
| Total Cases: U.S. No-Match List | 1,232,244 | ---- |

Notes: Unaffected Population category comprised of any registrant on U.S. no-match list who is disabled, is 6 or older, or has voted since implementation of SB14.

Next, I examine the number of records in the U.S. no-match list that have a state identification number.[54] The presence of a state identification number is an indication that the registrant in question possessed (or possesses) some form of identification issued by Texas Department of Public Safety. While the registrant may not currently possess a form of DPS identification, such would suggest that they should have the ability to obtain identification if necessary to comply with SB 14 (i.e. an EIC). The table below provides a report of registrants thought to lack ID who have a state identification number.

---

[53]While I undertook no analysis of the racial/ethnic characteristics of the U.S. no-match list, I did run some statistics on the confidence level in the classification of records by race as determined by Catalist. Of the affected population of no-match registrants, only 44.4% are labeled by Catalist as being *highly likely* in terms of the confidence of racial categorization. The confidence level of the Catalist racial classification for more than 55% of the records in the affected population of registrants is *likely*, *possibly*, or *uncoded* [indeterminate].

[54]In this case I am referring to the field in the U.S. no-match list labeled: official_id.

Table 7. U.S. No-Match List, State Identification Numbers, and Source of Registration

|  | Frequency | Percent within Category |
|---|---|---|
| Total Cases with State ID Number | 818,186 | 66.40% |
| Affected Population with State ID Number | 611,084 | 71.05% |
| Affected Population without State ID Number | 249,036 | 28.95% |
| Unaffected Population with State ID Number | 206,924 | 57.88% |
| Unaffected Population without State ID Number | 150,594 | 42.12% |
| Unaffected Population | 357,518 | ---- |
| Affected Population | 860,120 | ---- |
| Total Cases: No-Match List | 1,232,244 | ---- |

As reported in the Table, two-thirds (66.4%) of records on the U.S. no-match list contain a state identification number. Again, this is an indication that the registrant at one time, or possibly currently, possesses a form of identification that could be used to comply with SB 14. If one further subdivides those on the no-match list into the affected and unaffected population segments, 7 out of 10 records in the affected population group contain a state identification number. Even if the registrant in question does not have a current form of SB 14 identification, the presence of a state identification number is at least an indication that at one time they did. Consequently, this same subset of registrants should possess the necessary underlying documentation to apply for a free EIC if necessary. The other possibility that exists with these cases is that the registrant in question actually does possess a valid and current form of SB 14 identification, but they were not properly matched back to the DPS database. Looking back at the table again, the number of records in the affected population category that do not contain a state identification number is just under a quarter of a million registrants (249,036) or 20.21% of registrants on the no-match list. This same group would account for 1.84% of total registrants in Texas.

One final factor I would like to examine concerns where registrants were recorded by the TEAM database as having registered to vote. Specifically, I am going to focus on voter registrations occurring at DPS office locations. While it is possible that a citizen may travel to a DPS location solely to register to vote, the much more likely scenario would involve registering to vote as a consequence of obtaining a license or state ID card. The TEAM database indicates that a total of

136,896 of the affected population of registrants were reported as having registered to vote at a DPS location. This amounts to about a sixth (15.92%) of this subgroup.[55]

*Summary*

Having examined the U.S. no-match list I conclude that the number of records present is not an accurate reflection of the number of Texas registrants who may lack valid SB 14 identification. Known issues with matching the TEAM database to other state and federal databases precludes a precise count of registrants falling into this category. Further, taking into consideration other known factors allows a division of the no-match list into those registrants who may be affected by implementation of SB 14 and those who will not. Even relying on what is an inflated no-match list, I find that almost 30% of these registrants should be wholly unaffected by the identification requirements of SB 14. By these calculations almost 94% of Texas registrants are able to, or are not required to, comply with SB 14. Given the issues I have raised concerning the matching process and the presence of state identification numbers for a large share of registrants on the no-match list, it is my opinion that the true estimate of those registrants who may be affected by SB 14 lies below the 6.3% figure derived in the discussion above.

---

[55]Of the 136,896 records falling into the affected category who registered to vote at a DPS location, 128,051 (or 93.54%) contained a state identification number.

## B. Analysis of Expert Report Submitted by Professors Barreto and Sanchez

Professor Matt A. Barreto and Professor Gabriel R. Sanchez conducted a telephone survey of Texas residents in an attempt to learn the number in the State's voting eligible/registered population who may lack valid SB 14 identification. The survey also queried respondents concerning underlying documentation necessary to obtain a free Election Identification Certificate. The survey was conducted from March 16, 2014 through April 18, 2014 and included a total of 2,344 unweighted respondents. I was provided with these survey data on which the Barreto-Sanchez report was based by the Texas Attorney General's Office. I also received some supporting documentation in the form of the survey instrument and ancillary tables.

Given the oversamples of blacks and Hispanics included in the survey it was necessary for the investigators to construct a weight to adjust the sample proportions in the survey to match known population parameters. In this case the survey needs to be reflective of the voting eligible population (citizens of voting age) in Texas, especially in terms of race and ethnicity. This is a standard and widely accepted procedure; however, as will become evident the findings from the survey depend heavily on the weight variable. The table below reports the distribution of the voting eligible population.

Table 8. Estimates of the Citizen Voting Age Population in Texas

|  | Barreto-Sanchez Report[56] | ACS-Census VAP[57] | ACS-Census VEP[49] | CPC-Census VEP[58] | Weighted Survey Distribution-Survey Weight[59] | Weighted Survey Distribution-Reconstructed Weight[60] |
|---|---|---|---|---|---|---|
| White (Anglo) | 44.8% | 49.53% | 56.31% | 50.36% | 53.52% | 56.31% |
| Black | 11.5% | 11.60% | 12.93% | 12.91% | 10.36% | 12.93% |
| Hispanic | 37.9% | 33.64% | 26.49% | 29.32% | 31.09% | 26.45% |

[56]Barreto-Sanchez Expert Report, p. 11.
[57]U.S. Census Bureau. 2008-20012 American Community Survey. Tables B05003, B055003B, B05503I, B05003H. "Sex by Age by Nativity and Citizenship Status (Hispanic or Latino, White Alone, not Hispanic, Black or African American Alone)."
[58]U.S. Census Bureau. Table 4b. "Reported Voting and Registration by Sex, Race and Hispanic Origin, for States: November 2012." Population Characteristic Reports (P-20), Voting and Registration.
[59]Based on weight variable included with the Barreto-Sanchez survey data.
[60]Reconfigured weight variable based on 2012 ACS figures.

The first column is the VEP breakdown of Texas as reported in the Barreto-Sanchez expert report. They indicate these figures are from the Census Bureau, but do not provide a specific citation. The next two columns are the distribution of the Texas voting age and voting eligible populations respectively. These figures are derived from the Census Bureau's American Community Survey. The next column reports the Texas VEP as derived from the Census Bureau Population Characteristic Reports (P-20) of Voting and Registration from 2012. The ACS and CPC numbers represent the most recent data available at this writing. The next column reports the racial/ethnic breakdown of the survey data using the weight variable provided with the survey data. If one were to use the ACS figures this distribution underestimates the size of the Anglo voting eligible population at 53.52%, by 2.8 points. The size of the black voting eligible population is also underestimated by 2.6 points, while Hispanic VEP is overestimated by 4.6 points.  While these differences may be slight, they can have an impact on our interpretation of the survey findings.

I don't have enough information to fully reconstruct the weight variable that was included with the survey, but from the ACS data I constructed my own weight variable to bring the survey data into line with known population parameters as related to race and ethnicity in the voting eligible population.[61]  At various points in my discussion of the survey findings I will make use of this weight variable. The last column of the table above displays the distribution of survey respondents by race and ethnicity based upon this reconstructed weight. As shown, the survey distribution now exactly matches the 2012 ACS parameters.

I will now produce a number of distributions related to SB 14 ID possession for the total voting eligible and registered populations. The table below provides a map of the statistics that will be discussed.

Table 9. Comparisons to be Made of SB 14 ID Possession using the Barreto-Sanchez Survey

|  | Table | Population | Race/Ethnicity | Survey Weight | Reconstructed Weight |
|---|---|---|---|---|---|
| Estimates in Barreto-Sanchez Report | 10A | VEP, Registrants | Yes | ---- | ---- |
| Attempt to Replicate Survey Findings | 10B | VEP, Registrants | Yes | Yes | Yes |
| Reconfigured ID Possession Variable | 10C | VEP, Registrants | Yes | Yes | Yes |
| Affected Population | 10D | VEP, Registrants | Yes | Yes | Yes |

---

[61]The weight variable that I constructed only corrects for race and ethnicity in the voting eligible population. For other purposes it might be necessary to weight on multiple criteria; however for the purposes before us the distribution of ID possession by race/ethnicity is paramount.

*Findings*

In this section I will summarize the key findings from the Barreto-Sanchez survey in order to establish a baseline for discussion. Table 10A reports the findings for valid SB 14 ID possession by race/ethnicity for the voting eligible population and registered voters.

Table 10A. Reported SB 14 ID Possession Rates

| | Voting Eligible Population | | Registered Voters | |
|---|---|---|---|---|
| | Lack Current, Valid SB 14 ID | Possess Current, Valid SB 14 ID | Lack Current, Valid SB 14 ID | Possess Current, Valid SB 14 ID |
| Total Respondents | 7.2% | 92.8% | 3.8% | 96.2% |
| White (Anglo) | 4.7% | 95.3% | 2.1% | 97.9% |
| Black | 8.4% | 91.6% | 4.9% | 95.1% |
| Hispanic | 11.4% | 88.6% | 6.8% | 93.2% |
| Asian | Not reported. | Not reported. | Not reported. | Not reported. |
| Native American | Not reported. | Not reported. | Not reported. | Not reported. |
| Other Race | Not reported. | Not reported. | Not reported. | Not reported. |

Source: Barreto-Sanchez Expert Report, pp. 18-20 and Appendix A, Table 1. Confidence intervals not reported.

*Replication of Findings*

For any of the analyses I present using the Barreto-Sanchez dataset the results are weighted, either using the weight that accompanied the survey or the reconstructed weight variable.[62] In performing my own analysis, I was unable to fully replicate the findings reported in the Barreto-Sanchez expert report. I should note that being able to replicate findings from research conducted by others is a bedrock component of the scientific process and promotes the ideal of transparency. Although the initial estimates I derived were close to those reported, I was never able to exactly reproduce the numbers (presented in Table 10A) on ID possession rates from the data and the expert report that were forwarded to me. I would also like to note that none of the estimates in the expert report included confidence intervals. Point estimates from surveys may not exactly match the true population value. As such, it is standard practice to present estimates along with confidence intervals. The point estimates I produced for this report are accompanied by 95% confidence bands. In this manner, we can be 95% certain that the true value being estimated is located within the upper and lower confidence bands.  For example, In Table 10B below in the far right column, the estimate of ID non-possession for all respondents is 3.3%. Using the confidence interval, it can also be stated that there is a .95 probability that the true value of ID non-possession falls within the range of 2.54% to 4.06%.

---

[62]I also created a variable for race/ethnicity by following the description outlined in footnote 7 of the Barreto-Sanchez expert report. The five respondents in the survey who classified themselves as both white and Hispanic were recoded to the Hispanic classification.

Using the indicator in the dataset denoting ID possession[63] yields the following results:

Table 10B. Replication of SB 14 ID Non-Possession Rates

| | Percent of Voting Eligible Population Lacking SB 14 ID | | Percent of Registered Voters Lacking SB 14 ID | |
| --- | --- | --- | --- | --- |
| | Survey Weight | Reconstructed Weight | Survey Weight | Reconstructed Weight |
| Total Respondents | 6.7% [5.75-7.65] | 4.9% [4.03-5.77] | 3.3% [2.55-4.05] | 3.3% [2.54-4.06] |
| White (Anglo) | 4.5% [3.42-5.58] | 4.0% [2.94-5.06] | 2.0% [1.20-2.80] | 2.5% [1.62-3.38] |
| Black | 7.3% [4.24-10.36] | 5.3% [2.81-7.79] | 4.5%* [1.90-7.10] | 4.2% [1.92-6.48] |
| Hispanic | 10.4%* [8.31-12.49] | 6.9%* [4.89-8.91] | 5.7%* [3.89-7.51] | 5.1%* [3.22-6.98] |
| Asian | 0% | 0% | 0% | 0% |
| Native American | 0% | 0% | 0% | 0% |
| Other Race | 0% | 0% | 0% | 0% |

Notes: 95% confidence intervals in brackets; *=Difference of means test significant at .05 level.
Source: Calculated by author.

Comparing these figures back to those in Table 10A, the difference between the results reported and those I derive for the overall rate of ID non-possession is .5% (7.2% vs. 6.7%). The corresponding differences for Anglos, blacks, and Hispanics are .2%, 1.1%, and 1.0% respectively. Looking at the figures derived from the reconstructed weight, 4.9% of the voting eligible population or 3.3% of the registered population are estimated to lack SB 14 ID. Dividing the VEP up by race, 4.0% of Anglos, 5.3% of blacks, and 6.9% of Hispanics do not possess identification. Looking only at the population of registrants, 2.5% of whites, 4.2% of blacks, and 5.1% of Hispanics are thought to lack identification.

---

[63]The indicator was labeled in the dataset was labeled *id_type*.

In an attempt to probe the discrepancy between the derived and reported figures, I calculated my own indicator to denote possession of valid, unexpired SB 14 identification. Using indicators to denote whether voting age citizens possess a current driver's license, state ID card, passport, military ID, EIC, concealed weapons permit, or U.S. certificate of citizenship I created a new variable of SB14 ID possession. In doing so, I found two discrepancies. One case in the Barreto-Sanchez dataset was coded as being in possession of a state ID card, however, upon closer examination the respondent reported they did not possess any type of SB 14 identification. I changed this case to reflect a respondent who lacked SB 14 identification. The second discrepancy I found concerned 12 respondents who reported they were in possession of a U.S. certificate of citizenship. This is a valid type of SB 14 identification for in-person voting that does not expire. I recoded these 12 respondents as possessing SB 14 identification (they were coded in the Barreto-Sanchez survey as lacking SB 14 identification). The results from this newly calculated ID possession indicator are as follows:

Table 10C. SB 14 ID Non-Possession Rates using Recalculated ID Possession Variable

| | Percent of Voting Eligible Population Lacking SB 14 ID | | Percent of Registered Voters Lacking SB 14 ID | |
| --- | --- | --- | --- | --- |
| | Survey Weight | Reconstructed Weight | Survey Weight | Reconstructed Weight |
| Total Respondents | 5.7% | 4.6% | 2.8% | 3.1% |
| | [4.81-6.59] | [3.76-5.44] | [2.11-3.49] | [2.36-3.84] |
| White (Anglo) | 4.5% | 4.0% | 2.0% | 2.5% |
| | [3.42-5.58] | [2.94-5.06] | [1.20-2.80] | [1.62-3.38] |
| Black | 7.7%[*] | 5.3% | 4.5%[*] | 4.2% |
| | [4.54-10.86] | [2.81-7.79] | [1.90-7.10] | [1.92-6.48] |
| Hispanic | 7.3%[*] | 5.6% | 3.9%[*] | 4.2%[*] |
| | [5.52-9.08] | [3.79-7.41] | [2.38-5.42] | [2.48-5.92] |
| Asian | 0% | 0% | 0% | 0% |
| Native American | 0% | 0% | 0% | 0% |
| Other Race | 0% | 0% | 0% | 0% |

Notes: 95% confidence intervals in brackets; *=Difference of means test significant at .05 level.
Source: Calculated by author.

Using this new indicator of ID possession, the number lacking ID overall in the voting eligible population is 5.7%. For Anglos 4.5% are thought to lack identification, for blacks it is 7.7% and for Hispanics it is 7.3%. Comparing these results back to those located in Table 10A, the difference between my estimate of ID possession is now 1.5% lower. For Anglos the percentage is 0.2% lower, for blacks 0.7% lower, and for Hispanics 4.1% lower. Looking at those who report being registered to vote, 2.0% of Anglos, 4.5% of blacks, and 3.9% of Hispanics are classified as not being in possession of current, valid SB 14 identification. Comparing the percentages in Table 10C with those from Table 10A, one can note that the number of registered voters lacking SB 14 identification is a point less, at 2.8%. In addition, the differences in the percentages of Anglos, blacks, and Hispanics thought to lack ID has dropped 0.1%, 0.4%, and 2.9% respectively.

Looking at the categories in Table 10C that correspond to the reconstructed weight variable, 4.6% of the total voting eligible population in Texas may lack SB 14 ID, including 4.0% of whites, 5.3% of blacks, and 5.6% of Hispanics. In the registrant population 3.1% are estimated not to possess identification. For Anglos this figure is 2.5%, for blacks 4.2%, and for Hispanics 4.2%.

*Additional Analysis*

In Table 10D below I expand upon my analysis of SB 14 ID possession to examine the universe of those in the voting eligible population and registrants who may be affected by the law. Similar to my analysis of the U.S. no-match list, I create an indicator to measure the population that could be *affected* by SB 14. Any respondent to the survey who has current and valid SB 14 identification, is 65 or older, who is disabled, or who has voted since implementation of the law is placed in the *unaffected* population. Again, the disabled can be exempted from the law and those 65 and older can vote an absentee ballot by mail. Those who report they have voted since implementation of SB 14 have obviously already complied with the statute. The remainder then make up what I label the *affected* population in that they may need to obtain a valid form of SB 14 identification in order to vote. The percentage of the voting eligible population who may be affected by SB 14 is 4.5% using the survey weight or 2.1% using the reconstructed weight. The percentage of the registered population that may be affected by the law stands at 1.8% or .9% depending on the weight applied.

Having defined the potential population that could be affected by SB 14, I next subdivide this group by racial/ethnic classifications. Using the survey weight, among those in the voting eligible population, 3.2% of Anglos, 5.8% of blacks, and 6.3% of Hispanics may be impacted by the law. Using the reconstructed weight these figures are 2.1%, 1.7%, or 2.0% respectively. For registered voters these figures stand at 0.9% for Anglos, 3.3% for blacks, and 3.1% for Hispanics using the survey weight. Using the reconstructed weight these figures are 0.5%, 1.0%, and 2.1% respectively. Overall, blacks and Hispanics are more likely to be affected by SB 14, but the figures for these groups are diminished over simply examining ID possession rates. Based on the survey data, 98.2% to 99.1% of registered voters should not be affected by SB 14—they are already in compliance or can exercise an exemption under the law. Again, as a percentage, more black and Hispanic registrants are affected, but even for these groups 96.7-99.0% of blacks and 96.9-97.9% of Hispanics should not be impacted. As well, no one in the Asian, Native American, or other racial categories should be affected by SB 14.

Table 10D. SB 14 ID Non-Possession Rates using Adjustments for the Affected Population

| | Percent of Voting Eligible Population Affected by SB14 | | Percent of Registered Voters Affected by SB 14 | |
| | Survey Weight | Reconstructed Weight | Survey Weight | Reconstructed Weight |
|---|---|---|---|---|
| Total | 4.5%<br>[3.71-5.29] | 2.1%<br>[1.52-2.68] | 1.8%<br>[1.24-2.36] | **.9%**<br>**[.49-1.31]** |
| White (Anglo) | 3.2%<br>[2.29-4.11] | 1.7%<br>[1.01-2.39] | .9%<br>[.35-1.45] | **.5%**<br>**[.10-.90]** |
| Black | 5.8%*<br>[3.02-8.58] | 2.0%<br>[.47-3.53] | 3.3%*<br>[1.10-5.51] | **1.0%**<br>**[0-2.10]** |
| Hispanic | 6.3%*<br>[4.64-7.96] | 3.2%*<br>[1.80-4.60] | 3.1%*<br>[1.73-4.47] | **2.1%***<br>**[.89-3.31]** |
| Asian | 0% | 0% | 0% | **0%** |
| Native American | 0% | 0% | 0% | **0%** |
| Other Race | 0% | 0% | 0% | **0%** |

Notes: 95% confidence intervals in brackets; *=Difference of means test significant at .05 level.
Source: Calculated by author.

I now want to analyze those who may lack SB 14 identification as well as those who may also not possess the necessary underlying documentation to obtain an EIC, specifically proof of citizenship. In order to obtain an EIC one must present documentation to prove citizenship. These include a U.S. passport book or card, a birth certificate, or a U.S. Certificate of Citizenship.[64] Using the survey I coded any respondent who indicated they had a birth certificate (or Puerto Rican birth certificate) with their current legal name; any respondent who indicated they had a birth certificate and a marriage license (in the case of a name on birth certificate changing due to marriage); or any respondent who indicated they had a U.S. Certificate of Citizenship as possessing the necessary documentation to prove citizenship under the EIC requirements. I then created another indicator to denote any respondent who either had proof of citizenship (as just defined) or who was already found to be in possession of valid and current SB 14 identification. The group left then has neither the necessary proof of citizenship to obtain an EIC nor valid and current SB 14 identification.

---

[64]Source: Election Identification Certificates Documentation Requirements retrieved from:
http://www.txdps.state.tx.us/DriverLicense/eicDocReqmnts.htm.

Table 11A examines those respondents who lack proof of citizenship and who may need to obtain documentation in this area. First, looking at the voting eligible population only 1.8% to 1.4% (depending on the weight used) would need to acquire documentation concerning proof of citizenship. Stated in the affirmative, 98.2% to 98.6% already have SB identification or proof of identity needed to obtain an EIC. The differences by race are also very small with 1.0%-1.1% of whites, 2.0%-2.2% of blacks, and 1.9%-2.4% of Hispanics in need of this type of documentation. Examining responses among registered voters reveals that 1% or less of this group lacks documentation for proof of citizenship. For Anglos, 1.0%-1.2% would need to obtain this type of documentation in order to become SB 14 compliant, compared with 0.8%-1.7% of blacks and .6%-.9% of Hispanics. For a number of these estimates, blacks and Hispanics are more likely to possess proof of citizenship or SB 14 ID than whites.

Table 11A. Respondents Lacking Proof of Citizenship by Race/Ethnicity

| | Percent of Voting Eligible Population | | Percent of Registered Voters | |
|---|---|---|---|---|
| | Survey Weight | Reconstructed Weight | Survey Weight | Reconstructed Weight |
| Total | 1.8% [1.30-2.30] | 1.4% [.92-1.88] | 0.9% [.49-1.31] | 1.0% [.57-1.43] |
| White (Anglo) | 1.0% [.48-1.52] | 1.1% [.55-1.65] | 1.2% [.59-1.81] | 1.0% [.44-1.56] |
| Black | 2.2% [.52-3.88] | 2.0% [.42-3.58] | 0.8% [0-2.07] | 1.7% [.16-3.04] |
| Hispanic | 2.4%[*] [1.36-3.44] | 1.9% [.80-3.00] | 0.6% [0-1.25] | 0.9% [.11-1.69] |
| Asian | 0% | 0% | 0% | 0% |
| Native American | 0% | 0% | 0% | 0% |
| Other Race | 0% | 0% | 0% | 0% |

Notes: Percent of total VEP/registered population who may need to obtain proof of citizenship; 95% confidence intervals in brackets. [*]=Difference of means test significant at p<.05.
Source: Calculated by author.

Table 11B analyzes proof of citizenship documentation by categorizing respondents in terms of whether they may be affected by SB 14. Taking those who already possess valid SB 14 identification or those who already have proof of citizenship documentation I add those who have a disability, are 65 years of age or older, or who have voted since implementation. No one in any of these categorizations is required to provide proof of citizenship in order to comply with SB 14 (to obtain an EIC for example). As is evident from the table, almost no one in the voting eligible population would need to obtain a birth certificate. Estimates range from 0.6 to 1.3% of the total voting eligible population. Of those in the population of registered voters, only 0.2 to 0.6% may need to obtain proof of citizenship documentation. Dividing the voting eligible population by race, 0.2 to 0.5% of whites, 0.7 to 1.5% of blacks, and 1.3 to 1.9% of Hispanics may need to obtain proof of citizenship documentation. Among registered voters, 0.2 to 0.6% of whites, 0.3 to 0.8% of blacks, and 0.4% to 0.5% of Hispanics may lack proof of citizenship documentation.

Table 11B. Affected Respondents Lacking Proof of Citizenship by Race/Ethnicity

| | Percent of Voting Eligible Population | | Percent of Registered Voters | |
|---|---|---|---|---|
| | Survey Weight | Reconstructed Weight | Survey Weight | Reconstructed Weight |
| Total | 1.3% [.87-1.73] | 0.6% [.30-.90] | 0.6% [.29-.91] | 0.2% [0-.41] |
| White (Anglo) | 0.5% [.15-.85] | 0.2% [0-.41] | 0.6% [.17-1.03] | 0.2% [0-.43] |
| Black | 1.5% [.16-2.84] | 0.7% [0-1.59] | 0.8% [0-1.82] | 0.3% [0-.89] |
| Hispanic | 1.9%[*] [.96-2.84] | 1.3%[*] [.43-2.17] | 0.5% [0-1.07] | 0.4% [0-.96] |
| Asian | 0% | 0% | 0% | 0% |
| Native American | 0% | 0% | 0% | 0% |
| Other Race | 0% | 0% | 0% | 0% |

Notes: Percent of total VEP/registered population who may need to obtain proof of citizenship. 95% confidence intervals in brackets. [*]=Difference of means test significant at p<.05.
Source: Calculated by author.

Looking at proof of citizenship documentation in conjunction with possession of SB 14 identification illustrates that the few in either the voting eligible population or the population of registered voters would be affected. The highest estimate for the voting eligible population would amount to less than 2%. If we add those who are disabled, are over 65 years of age, or who have voted since implementation of the law to those who already possess proof of citizenship or valid SB 14 identification, only a little over 1% of the voting eligible population or about half a percent of the registered population would be affected by this requirement.[65] The bottom line is that almost 99% of the voting eligible population in Texas would not need to obtain documentation for proof of citizenship in order to comply with SB 14.

*Other Survey Concerns*

I am not certain as to why Professors Barreto and Sanchez did not undertake any type of post-survey validation process of their data. For example, survey respondents who reported being registered voters in Texas could be cross-referenced with the TEAM database to ensure this is the case. In addition, verification of those reporting that they had voted in a recent election could also be undertaken. Most importantly, those survey respondents who reported that they were registered and did not possess one of the forms of SB 14 identification could have been cross-referenced with the U.S. no-match list for verification. According to the estimates produced by the Barreto-Sanchez report this number would equate to less than 170 respondents. The survey data I received was purged of unique identifiers such as full respondent names. As such, I was unable to perform any validation checks myself. Social scientist have long recognized survey over-reporting rates related to registration and voting.[66] This problem has been noted to be even more acute among minority respondents.[67] Given this fact, to the extent possible the survey data should have undergone a validation process.

The survey did not explicitly ask about one of the forms of valid SB 14 identification, that being an identification card from the Department of Veterans Affairs. Specifically, the question asks respondents if they have a U.S. military ID card, but only the follow-up mentions that a VA card falls under this category. If all respondents who were asked this question were also asked follow-up then I would agree this form of ID was covered. Given that the survey instrument contains the phrase *If necessary* before this prompt I am not certain this was the case. If not all respondents to this question were asked the follow-up some might not consider a VA identification card to fall under the heading of a military ID, resulting in an undercount of respondents who might possess this type of identification.

---

[65] A proof of citizenship document also counts as one of the necessary documents to verify proof of identity as well. If a citizen seeking an EIC presented a birth certificate they would need to provide two other forms of documentation verifying identification. There are currently 27 types of documentation that could be used for these purposes. One of them is a voter registration card, which citizens who are already registered are instructed to bring with them when obtaining an EIC.

[66] Over-reporting refers to a propensity of survey respondents in some cases to respond in a manner less than consistent with the full truth. For example, a survey respondent who did not vote in the last election reporting they had voted.

[67] For a general discussion of survey validation issues see: Seth C. McKee, M.V. Hood III, and David Hill. 2012. "Achieving Validation: Barack Obama and Black Turnout in 2008. *State Politics and Policy Quarterly* 12(1): 3-22.

*Summary*

After examining the Barreto-Sanchez survey, I found that the point estimates of ID non-possession in the VEP can range from 2.1 to 7.3% given the manner in which the ID variable is operationalized, what weight is applied, and which subgroups are denoted as being affected by SB 14. Likewise, the estimate for non-possession for the registered population ranges from .9 to 3.8%. Even using the reported 3.8% figure for ID non-possession in the registered population, I should note that this number is 5.3 percentage points below that of Professor Ansolabehere's 9.1% estimate. Again, for reasons I have described above, I think the more accurate figure may be closer to the 2.8 to 3.1% range. However, even if one accepts the 3.8% figure, this would mean that more than 96% of registrants already possess valid and current SB 14 identification. Sub-setting the population of registrants to include only those thought to be affected by SB 14 we see the percentage drop to under 2%, possibly even to 1%. Even fewer registrants (1% or less of the total) may need to obtain underlying documentation such as a certified birth certificate to comply with SB 14. While gaps in racial ID possession may exist, I would like to note that in most cases the differences are not sizable.  These gaps may be a little as .5% comparing Anglos to blacks (.5% to 1%) or 1.6% comparing Anglos to Hispanics (.5% to 2.1%). One should also note that when taking the confidence bands into account, many of the measures of ID non-possession by race/ethnicity actually overlap with one another.

### C.  Conclusions

After having examined both the expert reports of Professor Ansolabehere and Professors Barreto and Sanchez, it is my opinion that both methods contain shortcomings as discussed above. Estimates generated by database matching are, in some cases, completely incompatible with those produced by the survey and vice-versa.

One interesting point of comparison between these two reports relates to the overall numbers of Texans who may be impacted by SB 14. Professor Ansolabehere indicates that 9.1% of registered voters do not possess valid SB 14 identification. Professors Barreto and Sanchez state that 7.2% of the eligible voter population lack SB 14 identification. Interestingly, after converting these percentages into raw numbers the Ansolabehere estimate would be 1,232,242 and the Barreto-Sanchez estimate would be 1,155,000. These figures appear similar except for the fact that the populations being compared [voting eligible vs. registrants] are not the same. The Barreto-Sanchez survey also estimates that 3.8% of registrants lack SB 14 ID. If we apply this figure to the population of registrants then the aggregate estimate is 514,764. This is less than half (42%) the size of the Ansolabehere estimate. Which of these estimates should we rely on? Is the database matching more accurate than the survey or is it the other way around?

As a second example, the survey also indicates that 2.1% of registered voters in Texas have an Election Identification Certificate (EIC).[68] Professor Ansolabehere reports 163 registrants are in possession of an EIC.[69] If we apply the 2.1% figure to the registrant population the estimate is that more than a quarter of a million (284,852) EICs had been issued. In this case, we know the true number is very close to what Professor Ansolabehere reports based on reports from the Texas Department of Public Safety.

Unfortunately, given the data constraints in the case of Texas, we may never know the real number of registrants who lack valid and current SB 14 identification. But, isn't the real question more about who may be affected by SB 14 and whether such effects are on account of, or because of, race?

## VII.    OVERALL CONCLUSIONS

Unlike other voter ID statutes that have been enjoined before implementation, SB 14 has been implemented and is currently in effect. The law has been in effect for three statewide elections: the 2013 constitutional amendment election; the 2014 party primary, and the 2014 party primary run-off. As such, I would think more focus should be devoted to what has, or hasn't, occurred post-implementation.[70] I conducted a number of sweeps of major Texas newspapers following the three statewide elections for which SB 14 has been in place. I was unable to find any reports of major issues related to SB 14. Certainly, had a large subset of registrants been unable to vote this fact would have been picked up by the press. Likewise, if a large segment of minority voters had been disproportionately affected, one would think this fact would also be made known by the press. I have included some post-implementation examples from my newspaper search below.

---

[68]Calculated by author using the Barreto-Sanchez dataset and included weight.

[69]Ansolabehere Expert Report, Table V.2.

[70]At this juncture let me briefly mention that Texas Administrative Code requires that an elector's name on the identification presented to match their name on list of registered voters. If it does not exactly match, but is *substantially similar* as determined by an election official then the elector can sign the *Similar Name Affidavit* indicating that they are the same person appearing on the list of registered voters and be allowed to cast a regular ballot. The action required by the voter found to fall under this category is minimal, requiring a signature or checking a box. In an effort to have names on identification documents match with names on the list of registered voters, county election officials have been encouraging registrants to make sure their registration record is accurate. Only in the case where an election official determines that the name on the identifying documentation is not *substantially similar* to the name of on the list of registrants is a voter forced to cast a provisional ballot (see Texas Administrative Code Rule §81.71).

From the first statewide election following implementation the *Austin American-Statesman* reported, "Texas' new voter identification requirements presented little trouble during their first statewide test Tuesday." The article also points out that during the early voting period only four provisional ballots were cast in Travis County due to identification issues. Williamson County Election Administrator Jason Barnett stated "everyone is coming prepared, and we haven't had any substantial issues at all."[71] Following the March primary election the *Dallas Morning News* wrote: "Election workers and party officials reported normal turnout and few significant complications in the first major election Under Texas' new voter ID law." The article continues, "Confusion at the polls seemed limited. Dallas County administrators said Wednesday that they had reviewed about a third of provisional ballots cast Tuesday. They counted only five so far that had been submitted because of problems related to the new law."[72] Also from the March primary El Paso County Election Administrator Javier Chacon "described the election as a *very calm day* without major incidents."[73]

Examining provisional votes is another method for assessing the impact of a new voter ID law. I was unable to collect provisional vote data from all of Texas' 254 counties at the level of detail required for such an analysis. I was able to gather detailed provisional vote data from Harris County for the 2013 constitutional amendment election and the 2014 primary election. Harris County is the largest county in Texas in terms of population and contains 14.8% of the State's registered population.[74] Table 12 below provides a breakdown of the number of provisional ballots cast during these elections.

Table 12. Provisional Votes Cast in Harris County

|  | Total Votes Cast | Provisional Ballots Cast | Provisional Ballots Not Counted | Provisional Ballot Cast-ID Issue | Provisional Ballots Not Counted-ID Issue |
|---|---|---|---|---|---|
| 2013 Constitutional Amendment Election[75] | 260,437 | 0.270% [704] | 0.163% [424] | 0.040% [105] | 0.037% [97] |
| 2014 Primary[76] | 193,431 | 0.168% [324] | 0.080% [154] | 0.018% [35] | 0.016% [30] |

---

[71]Kate Alexander. 2013. "Voter ID Appears to Have Trouble-Free Debut." *Austin American-Statesman.* 6 November.

[72]Matthew Watkins. 2014. "Normal Turnout and Few Problems Reported Under Voter ID Law." *Dallas Morning News.* 5 March.

[73]Aileen B. Flores. 2014. "El Paso County Judge Race: Veronica Escobar Defeats Challengers, Wins Second Term." *El Paso Times.* 5 March.

[74]Source: The Texas Secretary of State website indicated that in January of 2014 Harris County had 1,998,264 registrants (http://www.sos.state.tx.us/elections/historical/jan2014.shtml).

[75]E-mail from Mr. Hector de Leon, Director of Communications and Outreach, Office of Harris County Clerk. Bates No. HarrisCounty 003641, HarrisCounty 009979.

[76]E-mail from Mr. Hector de Leon, Director of Communications and Outreach, Office of Harris County Clerk. Bates No. HarrisCounty 011021.

Notes: Figures are percentages of total votes cast; counts in brackets.
Source: Data from Office of the Harris County Clerk.

Of the quarter of a million votes cast in the 2013 constitutional amendment contest, 704 were provisional ballots. Of these, 105 (or 15% of the total provisional ballots cast) were due to voter identification issues. At the close of the canvass 97 of these provisional ballots were not counted, amounting to 0.037% of the total vote. Another way to state this is that for every 10,000 voters, about 4.0 provisional ballots were cast because of an inability to comply with SB 14. The 2014 primary election reveals a lower level of provisional voting as compared to the constitutional amendment election. In this election 324 provisional ballots were cast accounting for 0.168% of the total vote cast. Of these, only 35 (or 11% of the total provisional ballots cast) were due to identification issues. This would equate to a rate of 1.8 per 10,000 ballots cast. In the end, 30 provisional ballots related to ID issues were not cured, accounting for 0.016% of the total vote.

It would appear that voters in Texas' largest county were largely prepared for SB 14 based on the data presented in Table 12. In the first election following implementation, 99.96% of voters were unaffected by the voter ID law and in the March primary the comparable figure stands at 99.98%. One may also note that the percentage of provisional ballots cast falls over the two elections, a possible indication that voters are becoming more acclimated to the requirements of SB 14 with the passage of time.

In addition to Harris County, I was also able to gather provisional vote data for eight of the ten largest counties in Texas (in population terms) for the 2013 constitutional amendment election.[77] Collectively, these nine counties accounted for over half (53.2%) of the votes cast in this election. The results can be found in Table 13 below. In total, there were 1,278 provisional ballots cast in these counties for the 2013 constitutional amendment election. Of these, 206, or 16.1%, were related to voter identification issues. The total number of provisional ballots cast equates to 0.209% of the total vote cast in these counties, while the ID-related provisionals amounted to 0.034% of the total vote recorded. Taking into account provisional ballots that were cured leaves a total of 846, or 0.138% of the total, that were not counted. Of the 206 provisional ballots cast for ID considerations, 182 were not cured. These 182 provisional ballots equaled 0.030% of the total vote cast for the nine counties under study. In summation, for the voters in these nine counties (which again represent 53% of voters in the 2013 constitutional amendment election) fully 99.97% were in no way affected by the ID requirements in SB 14.

---

[77]Provisional vote data for Dallas County were not available. Sources: All data in Table 13 are from public information requests to county election officials. The Bates Numbers are as follows: HarrisCounty 003641; ORT00011697-98; ORT00001081-85; TSC-MALC00002165; ORT00001304-54, 76-81; TSC-MALC00000676; TSC-MALC00001421; TSC-MALC00000490; and TSC-MALC0000026.

Table 13. Provisional Votes Cast in the 2013 Constitutional Amendment Election

| County | Total Votes Cast | Provisional Ballots Cast | Provisional Ballots Not Counted | Provisional Ballot Cast-ID Issue | Provisional Ballots Not Counted-ID Issue |
|--------|-----------------|-------------------------|--------------------------------|----------------------------------|------------------------------------------|
| Harris | 260,437 | 704 | 424 | 105 | 97 |
| Tarrant | 79,779 | 89 | 83 | 11 | 11 |
| Bexar | 57,129 | 61 | 46 | 18 | 18 |
| Travis | 85,005 | 194 | 106 | 45 | 36 |
| Collin | 38,103 | 99 | 76 | 10 | 5 |
| El Paso | 13,855 | 21 | 14 | 3 | 3 |
| Hidalgo | 18,830 | 15 | 10 | 0 | 0 |
| Denton | 28,548 | 77 | 72 | 11 | 9 |
| Fort Bend | 29,815 | 18 | 15 | 3 | 3 |
| **Totals** | **611,501** | **1,278** | **846** | **206** | **182** |
| **Percent of Total** | **----** | **0.209%** | **0.138%** | **0.034%** | **0.030%** |

Source: Information requests to county election officials.

I also make note of two post-implementation surveys that touch on SB 14. The first, the February 2014 Texas Politics Poll asked about public support for the Texas voter ID law. Overall, 66% of respondents had a *very favorable* or *favorable* opinion of the law. The breakdown along racial/ethnic lines revealed that 70% of whites, 51% of blacks, and 63% of Hispanics fell into the *very favorable* or *favorable* categories.[78] Two-thirds of Texans overall and a majority of all racial/ethnic categories supported SB 14 following implementation of the law. A second poll conducted by the Earl Survey Research Center at Texas Tech sought to query voters about whether SB 14 impeded them from voting in the March 2014 primary election. In all, 96.7% of respondents reported that they were able to cast a normal ballot, while 2.0% reported that they were forced to cast a provisional ballot or were not allowed to vote because of identification issues.[79] From these self-reports of voters almost none seem to have been affected by SB 14 during the March primary election.

---

[78]Conducted by the University of Texas. Results at: http://texaspolitics.laits.utexas.edu/11_9_19.html.
[79]Calculations performed by author using data from the spring 2014 survey. Data downloaded from: http://www.depts.ttu.edu/politicalscience/esrl/index.php.

We also know at this point that just under 92,000 unique registrants on the U.S. no-match list, or about 7.5% of the total, have participated in elections since implementation of SB 14. Many of these no-match list registrants have cast ballots in multiple elections.  Again, does this mean these registrants should not have been on the no-match list in the first place or does this point to the fact that voters can, and do, adjust to changes in election law? While this may be an important question at some level, for the purpose of the present case whether these registrants had SB 14 ID all along or they changed their behavior and obtained ID to comply with the law, the fact remains that negative consequences proposed by some are not coming to fruition.

In short, there appears to be little evidence that SB 14 has produced a disparate racial impact since its implementation. One could also argue that SB 14 has had little overall impact on the overall electorate as well.  I will submit there is a group of Texas registrants who currently lack valid SB 14 identification (Given the difficulties that I have already discussed, I should note that the actual size of this group remains very much in question). One cannot, however, simply extrapolate that a gap in ID possession at the present time will directly translate into a parallel disenfranchisement of this same pool of voters at some future point in time. It is quite a leap in causal terms to assert that one can readily predict the actions and behavior of individuals based on a set of current facts about such individuals. Voters can, and do, adjust to changing circumstances.

Post-implementation evidence from South Carolina and Mississippi indicates that almost no electors have been burdened by the implementation of voter ID statutes in those states. As previously noted, in Texas a not insignificant number of registrants thought to be burdened by SB 14 have already cast ballots in elections since implementation. In addition, there are mitigating factors associated with the law which will help to ameliorate any potential disparate impact in the future. These include the ability to cast a provisional ballot, a free identification program available in all 254 of Texas' counties, a reduced cost for a certified birth certificate for those who may require this documentation for an EIC, a statewide educational campaign designed to inform the voting public about the requirements for SB 14, and exemptions for those 65 years and older, the disabled, those with a religious objection, or in the aftermath of a natural disaster.

I will extend my conclusions above with a discussion of the purported racial gap in ID possession among Texas registrants. Add to this the fact that the race/ethnicity of registrants in Texas is unknown and, itself, must be estimated and one is essentially layering uncertainty on top of uncertainty. What can be said about racial gaps in ID possession from what is already known? As with the general population of registrants, there is no reason to believe a gap in ID possession will translate into a gap in voter turnout. A gap in ID possession using vastly superior data was shown in both Georgia and South Carolina. This fact did not prevent federal courts from allowing strict government-issued photo identification statutes to be implemented. Further, post-implementation academic research from Georgia indicates that the gap in ID possession rates among racial groups did not translate into a disparate impact as measured by voter turnout in that state.

In my opinion there is not sufficient evidence to suggest that SB 14 is affecting (or will affect) the ability of registrants in Texas who may currently lack valid SB 14 identification to cast ballots. In addition, there is also insufficient evidence that SB 14 is producing (or will produce) any racially disparate impact as related to the ability of minorities in the State of Texas to fully participate in the electoral process.

**Note:** On July 23, 2014 I was informed that an error had been made in the DPS data extract sent to the U.S. Department of Justice. Some of the analysis presented in this report relies on the U.S. no-match list produced by the plaintiffs. As such, any analysis relying on these data is incomplete at this point. On the evening of July 31, 2014 I received a corrected no-match list, but given the time frame when this report was due (August 1, 2014) I was unable to update/correct any components of this report that made use of these data. Following submission of this report I would ask for the opportunity to amend my findings with the updated no-match list.

## VIII.   <u>DECLARATION</u>

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed on August 1, 2014.

_____

M.V. (Trey) Hood III
Department of Political Science
School of Public and International Affairs
The University of Georgia
104 Baldwin Hall
Athens, GA 30602
Phone: (706) 583-0554
FAX: (706) 542-4421
E-mail: th@uga.edu

## Appendix A: Data Sources

Updated Voter History Files, 2013-14 [Texas Secretary of State].

Voter Registration Database (TEAM) [Produced by the Department of Justice].

U.S. No-Match List [created by Professor Ansolabehere].

Survey Data [produced by Professors Barreto and Sanchez].

**Appendix B**

Curriculum Vitae
(July 2014)

M.V. (Trey) Hood III

**Contact Information:**

Department of Political Science
School of Public and International Affairs
104 Baldwin Hall
The University of Georgia
Athens, GA 30602

Office Phone: (706) 583-0554
Dept. Phone: (706) 542-2057
FAX: (706) 542-4421
E-mail: th@uga.edu

## Academic Positions

University of Georgia
    Professor, 2013-present
    Director of Graduate Studies, 2011-present.
    Associate Professor, 2005-2013
    Assistant Professor, 1999-2005.
Texas Tech University
    Visiting Assistant Professor, 1997-1999.

## Education

| | | | |
|---|---|---|---|
| Ph.D. | Political Science | Texas Tech University | 1997 |
| M.A. | Political Science | Baylor University | 1993 |
| B.S. | Political Science | Texas A&M University | 1991 |

## Peer-Reviewed Books

*The Rational Southerner: Black Mobilization, Republican Growth, and the Partisan Transformation of the American South.* 2012. New York: Oxford University Press. (Quentin Kidd and Irwin L. Morris, co-authors).

## Peer-Reviewed Publications

"True Colors: White Conservative Support for Minority Republican Candidates." Forthcoming 2015. *Public Opinion Quarterly*. (Seth C. McKee, co-author).

"Race and the Tea Party in the Old Dominion: Split-Ticket Voting in the 2013 Virginia Elections." Forthcoming 2014. *PS: Political Science and Politics*. (Quentin Kidd and Irwin L. Morris, co-authors).

"The Damnedest Mess: An Empirical Evaluation of the 1966 Georgia Gubernatorial Election." Forthcoming 2014. *Social Science Quarterly*. (Charles S. Bullock, III, co-author).

"Candidates, Competition, and the Partisan Press: Congressional Elections in the Early Antebellum Era." Forthcoming 2014. *American Politics Research*. (Jamie L. Carson, co-author).

"Strategic Voting in a U.S. Senate Election." 2013. *Political Behavior* 35(4):729-751. (Seth C. McKee, co-author).

"Unwelcome Constituents: Redistricting and Countervailing Partisan Tides." 2013. *State Politics and Policy Quarterly* 13(2):203-224. (Seth C. McKee, co-author).

"The Tea Party, Sarah Palin, and the 2010 Congressional Elections: The Aftermath of the Election of Barack Obama." 2012. *Social Science Quarterly* 93(5):1424-1435. (Charles S. Bullock, III, co-author).

"Much Ado About Nothing?: An Empirical Assessment of the Georgia Voter Identification Statute." 2012. *State Politics and Policy Quarterly* 12(4):394-314.  (Charles S. Bullock, III, co-author).

"Achieving Validation: Barack Obama and Black Turnout in 2008." 2012. *State Politics and Policy Quarterly* 12:3-22. (Seth C. McKee and David Hill, co-authors).

"They Just Don't Vote Like They Used To: A Methodology to Empirically Assess Election Fraud." 2012. *Social Science Quarterly* 93:76-94. (William Gillespie, co-author).

"An Examination of Efforts to Encourage the Incidence of Early In-Person Voting in Georgia, 2008." 2011. *Election Law Journal* 10:103-113. (Charles S. Bullock, III, co-author).

"What Made Carolina Blue? In-migration and the 2008 North Carolina Presidential Vote." 2010. *American Politics Research* 38:266-302. (Seth C. McKee, co-author).

"Stranger Danger: Redistricting, Incumbent Recognition, and Vote Choice." 2010. *Social Science Quarterly* 91:344-358. (Seth C. McKee, co-author).

"Trying to Thread the Needle: The Effects of Redistricting in a Georgia Congressional District." 2009. *PS: Political Science and Politics* 42:679-687. (Seth C. McKee, co-author).

"Citizen, Defend Thyself: An Individual-Level Analysis of Concealed-Weapon Permit Holders." 2009. *Criminal Justice Studies* 22:73-89. (Grant W. Neeley, co-author).

"Two Sides of the Same Coin?: Employing Granger Causality Tests in a Time Series Cross-Section Framework." 2008. *Political Analysis* 16:324-344. (Quentin Kidd and Irwin L. Morris, co-authors).

"Worth a Thousand Words? : An Analysis of Georgia's Voter Identification Statute." 2008. *American Politics Research* 36:555-579. (Charles S. Bullock, III, co-author).

"Gerrymandering on Georgia's Mind: The Effects of Redistricting on Vote Choice in the 2006 Midterm Election." 2008. *Social Science Quarterly* 89:60-77 (Seth C. McKee, co-author).

"Examining Methods for Identifying Latino Voters." 2007. *Election Law Journal* 6:202-208. (Charles S. Bullock, III, co-author).

"A Mile-Wide Gap: The Evolution of Hispanic Political Emergence in the Deep South." 2006. *Social Science Quarterly* 87:1117-1135. (Charles S. Bullock, III, co-author).

"Punch Cards, Jim Crow, and Al Gore:  Explaining Voter Trust in the Electoral System in Georgia, 2000." 2005. *State Politics and Policy Quarterly* 5:283-294. (Charles S. Bullock, III and Richard Clark, co-authors).

"When Southern Symbolism Meets the Pork Barrel: Opportunity for Executive Leadership." 2005. *Social Science Quarterly* 86:69-86. (Charles S. Bullock, III, co-author).

"The Reintroduction of the *Elephas maximus* to the Southern United States: The Rise of Republican State Parties, 1960-2000." 2004.  *American Politics Research* 31:68-101. (Quentin Kidd and Irwin Morris, co-authors).

"One Person, [No Vote; One Vote; Two Votes…]: Voting Methods, Ballot Types, and Undervote Frequency in the 2000 Presidential Election." 2002. *Social Science Quarterly* 83:981-993. (Charles S. Bullock, III, co-author).

"On the Prospect of Linking Religious Right Identification with Political Behavior: Panacea or Snipe Hunt?" 2002.  *Journal for the Scientific Study of Religion* 41:697-710. (Mark C. Smith, co-author).

"The *Key* Issue: Constituency Effects and Southern Senators' Roll-Call Voting on Civil Rights." 2001. *Legislative Studies Quarterly* 26: 599-621. (Quentin Kidd and Irwin Morris, co-authors).

"Packin' in the Hood?: Examining Assumptions Underlying Concealed-Handgun Research." 2000. *Social Science Quarterly* 81:523-537. (Grant Neeley, co-author).

"Brother, Can You Spare a Dime? Racial/Ethnic Context and the Anglo Vote on Proposition 187." 2000. *Social Science Quarterly* 81:194-206. (Irwin Morris, co-author).

 "Penny Pinching or Politics?  The Line-Item Veto and Military Construction Appropriations." 1999. *Political Research Quarterly* 52:753-766. (Irwin Morris and Grant Neeley, co-authors).

 "Of Byrds[s] and Bumpers: Using Democratic Senators to Analyze Political Change in the South, 1960-1995." 1999. *American Journal of Political Science* 43:465-487. (Quentin Kidd and Irwin Morris, co-authors).

"Bugs in the NRC's Doctoral Program Evaluation Data: From Mites to Hissing Cockroaches." 1998. *PS* 31:829-835. (Nelson Dometrius, Quentin Kidd, and Kurt Shirkey, co-authors).

"Boll Weevils and Roll-Call Voting: A Study in Time and Space." 1998. *Legislative Studies Quarterly* 23:245-269.  (Irwin Morris, co-author).

"Give Us Your Tired, Your Poor,...But Make Sure They Have a Green Card: The Effects of Documented and Undocumented Migrant Context on Anglo Opinion Towards Immigration." 1998. *Political Behavior* 20:1-16. (Irwin Morris, co-author).

"¡Quedate o Vente!: Uncovering the Determinants of Hispanic Public Opinion Towards Immigration." 1997. *Political Research Quarterly* 50:627-647. (Irwin Morris and Kurt Shirkey, co-authors).

"¿Amigo o Enemigo?: Context, Attitudes, and Anglo Public Opinion toward Immigration." 1997. *Social Science Quarterly* 78: 309-323. (Irwin Morris, co-author).


## Invited Publications

"Race and the Ideological Transformation of the Democratic Party: Evidence from the Bayou State." 2005. *American Review of Politics* 25:67-78.


## Book Chapters

"The Participatory Consequences of Florida Redistricting." Forthcoming 2015. In *Jigsaw Puzzle Politics in the  Sunshine State*, Seth C. McKee, editor. Gainesville, FL: University of Florida Press. (Danny  Hayes and Seth C. McKee, co-authors).

"Texas: Political Change by the Numbers." 2014. In *The New Politics of the Old South, 5th ed.*, Charles S. Bullock, III and Mark J. Rozell, editors. New York: Rowman and Littlefield Publishers, Inc. (Seth C. McKee, co-author).

"The Republican Party in the South." 2012. In *Oxford Handbook of Southern Politics*, Charles S. Bullock, III and Mark J. Rozell, editors. New York: Oxford University Press. (Quentin Kidd and Irwin Morris, co-authors).

"The Reintroduction of the *Elephas maximus* to the Southern United States: The Rise of Republican State Parties, 1960-2000." 2010.  In *Controversies in Voting Behavior*, 5th ed., David Kimball, Richard G. Niemi, and Herbert F. Weisberg, editors. Washington, DC: CQ Press. (Quentin Kidd and Irwin Morris, co-authors).
[Reprint of 2004 *APR* article with Epilogue containing updated analysis and other original material.]

"The Texas Governors." 1997. In *Texas Policy and Politics*, Mark Somma, editor.  Needham Heights, MA: Simon & Schuster.

**Other Publications**

"Provisionally Admitted College Students: Do They Belong in a Research University?" 1998. In *Developmental Education: Preparing Successful College Students*, Jeanne Higbee and Patricia L. Dwinell, editors. Columbia, SC: National Resource Center for the First-Year Experience & Students in Transition (Don Garnett, co-author).

NES Technical Report No. 52. 1994. "The Reliability, Validity, and Scalability of the Indicators of Gender Role Beliefs and Feminism in the 1992 American National Election Study: A Report to the ANES Board of Overseers." (Sue Tolleson-Rinehart, Douglas R. Davenport, Terry L. Gilmour, William R. Moore, Kurt Shirkey, co-authors).

**Grant-funded Research (UGA)**

Co-Principal Investigator. "An Examination of Non-Precinct Voting in the State of Georgia." Budget: $47,000.  October 2008-July 2009. (with Charles S. Bullock, III). Funded by the Pew Charitable Trust.

Co-Principal Investigator. "The Best Judges Money Can Buy?: Campaign Contributions and the Texas Supreme Court." (SES-0615838) Total Budget: $166,576; UGA Share: $69,974. September 2006-August 2008. (with Craig F. Emmert). Funded by the National Science Foundation. REU Supplemental Award (2008-2009): $6,300.

Principal Investigator. "Payola Justice or Just Plain 'Ole Politics Texas-Style?: Campaign Finance and the Texas Supreme Court." $5,175.  January 2000-Januray 2001.  Funded by the University of Georgia Research Foundation, Inc.

**Curriculum Grants (UGA)**

Learning Technology Grant: "Converting Ideas Into Effective Action: An Interactive Computer and Classroom Simulation for the Teaching of American Politics." $40,000. January-December 2004. (with Loch Johnson). Funded by the Office of Instructional Support and Technology, University of Georgia.

**Dissertation**

"Capturing Bubba's Heart and Mind: Group Consciousness and the Political Identification of Southern White Males, 1972-1994."

Chair: Professor Sue Tolleson-Rinehart

**Papers and Activities at Professional Meetings**

"Race and the Tea Party in the Old Dominion: Split-Ticket Voting in the 2013 Virginia Elections." (with Irwin L. Morris and Quentin Kidd). 2013. Paper presented at the Citadel Symposium on Southern Politics. Charleston, SC.

"Race and the Tea Party in the Old Dominion: Down-Ticket Voting and Roll-Off in the 2013 Virginia Elections." (with Irwin L. Morris and Quentin Kidd). 2013. Paper presented at the Annual Meeting of the Southern Political Science Association. New Orleans, LA.

"Tea Leaves and Southern Politics: Explaining Tea Party Support Among Southern Republicans." (with Irwin L. Morris and Quentin Kidd). 2013. Paper presented at the Annual Meeting of the Southern Political Science Association. Orlando, FL.

"The Tea Party and the Southern GOP." (with Irwin L. Morris and Quentin Kidd). 2012. Research presented at the Effects of the 2012 Elections Conference. Athens, GA.

"Black Mobilization in the Modern South: When Does Empowerment Matter?" (with Irwin L. Morris and Quentin Kidd). 2012. Paper presented at the Citadel Symposium on Southern Politics. Charleston, SC.

"The Legislature Chooses a Governor: Georgia's 1966 Gubernatorial Election." (with Charles S. Bullock, III). 2012. Paper presented at the Citadel Symposium on Southern Politics. Charleston, SC.

"One-Stop to Victory? North Carolina, Obama, and the 2008 General Election." (with Justin Bullock, Paul Carlsen, Perry Joiner, and Mark Owens). 2011. Paper presented at the Annual Meeting of the Southern Political Science Association. New Orleans.

"Redistricting and Turnout in Black and White." (with Seth C. McKee and Danny Hayes). 2011. Paper presented the Annual Meeting of the Midwest Political Science Association. Chicago, IL.

"One-Stop to Victory? North Carolina, Obama, and the 2008 General Election." (with Justin Bullock, Paul Carlsen, Perry Joiner, Jeni McDermott, and Mark Owens). 2011. Paper presented at the Annual Meeting of the Midwest Political Science Association Meeting. Chicago, IL.

"Strategic Voting in the 2010 Florida Senate Election." (with Seth C. McKee). 2011. Paper Presented at the Annual Meeting of the Florida Political Science Association. Jupiter, FL.

"The Republican Bottleneck: Congressional Emergence Patterns in a Changing South." (with Christian R. Grose and Seth C. McKee). Paper presented at the Annual Meeting of the Southern Political Science Association. New Orleans, LA.

"Capturing the Obama Effect: Black Turnout in Presidential Elections." (with David Hill and Seth C. McKee) 2010. Paper presented at the Annual Meeting of the Florida Political Science Association. Jacksonville, FL.

"The Republican Bottleneck: Congressional Emergence Patterns in a Changing South." (with Seth C. McKee and Christian R. Grose). 2010. Paper presented at the Citadel Symposium on Southern Politics. Charleston, SC.

"Black Mobilization and Republican Growth in the American South: The More Things Change the More They Stay the Same?" (with Quentin Kidd and Irwin L. Morris). 2010. Paper presented at the Citadel Symposium on Southern Politics. Charleston, SC.

"Unwelcome Constituents: Redistricting and Incumbent Vote Shares." (with Seth C. McKee). 2010. Paper presented at the Annual Meeting of the Southern Political Science Association. Atlanta, GA.

"Black Mobilization and Republican Growth in the American South: The More Things Change the More They Stay the Same?" (with Quentin Kidd and Irwin L. Morris). 2010. Paper presented at the Annual Meeting of the Southern Political Science Association. Atlanta, GA.

"The Impact of Efforts to Increase Early Voting in Georgia, 2008." (With Charles S. Bullock, III).  2009. Presentation made at the Annual Meeting of the Georgia Political Science Association. Callaway Gardens, GA.

"Encouraging Non-Precinct Voting in Georgia, 2008." (With Charles S. Bullock, III).  2009. Presentation made at the Time-Shifting The Vote Conference. Reed College, Portland, OR.

"What Made Carolina Blue? In-migration and the 2008 North Carolina Presidential Vote." (with Seth C. McKee). 2009. Paper presented at the Annual Meeting of the Florida Political Science Association. Orlando, FL.

"Swimming with the Tide: Redistricting and Voter Choice in the 2006 Midterm." (with Seth C. McKee). 2009. Paper presented at the Annual Meeting of the Midwest Political Science Association. Chicago.

"The Effect of the Partisan Press on U.S. House Elections, 1800-1820." (with Jamie Carson). 2008. Paper presented at the Annual Meeting of the History of Congress Conference. Washington, D.C.

"Backward Mapping: Exploring Questions of Representation via Spatial Analysis of Historical Congressional Districts." (Michael Crespin). 2008. Paper presented at the Annual Meeting of the History of Congress Conference. Washington, D.C.

"The Effect of the Partisan Press on U.S. House Elections, 1800-1820." (with Jamie Carson).  2008. Paper presented at the Annual Meeting of the Midwest Political Science Association. Chicago.

"The Rational Southerner: The Local Logic of Partisan Transformation in the South." (with Quentin Kidd and Irwin L. Morris). 2008. Paper presented at the Citadel Symposium on Southern Politics. Charleston, SC.

"Stranger Danger: The Influence of Redistricting on Candidate Recognition and Vote Choice." (with Seth C. McKee). 2008. Paper presented at the Annual Meeting of the Southern Political Science Association. New Orleans.

"Backward Mapping: Exploring Questions of Representation via Spatial Analysis of Historical
    Congressional Districts." (with Michael Crespin). 2007. Paper presented at the Annual
     Meeting of the American Political Science Association. Chicago.

"Worth a Thousand Words? : An Analysis of Georgia's Voter Identification Statute." (with
    Charles S. Bullock, III). 2007. Paper presented at the Annual Meeting of the Southwestern
    Political Science Association. Albuquerque.

"Gerrymandering on Georgia's Mind: The Effects of Redistricting on Vote Choice in the 2006
    Midterm Election." (with Seth C. McKee). 2007. Paper presented at the Annual Meeting of
    The Southern Political Science Association. New Orleans.

"Personalismo Politics: Partisanship, Presidential Popularity and 21st Century Southern
    Politics." (with Quentin Kidd and Irwin L. Morris). 2006. Paper presented at the
    Annual Meeting of the American Political Science Association. Philadelphia.

"Explaining Soft Money Transfers in State Gubernatorial Elections." (with William
    Gillespie and Troy Gibson). 2006. Paper presented at the Annual Meeting of the
    Midwest Political Science Association. Chicago.

"Two Sides of the Same Coin?: A Panel Granger Analysis of Black Electoral Mobilization
    and GOP Growth in the South, 1960-2004." (with Quentin Kidd and Irwin L.
    Morris). 2006. Paper presented at the Citadel Symposium on Southern Politics.
    Charleston, SC.

"Hispanic Political Emergence in the Deep South, 2000-2004." (With Charles S. Bullock,
    III). 2006. Paper presented at the Citadel Symposium on Southern Politics.
    Charleston.

"Black Mobilization and the Growth of Southern Republicanism: Two Sides of the Same Coin?"
    (with Quentin Kidd and Irwin L. Morris). 2006. Paper presented at the Annual Meeting of
    the Southern Political Science Association. Atlanta.

"Exploring the Linkage Between Black Turnout and Down-Ticket Challenges to Black
    Incumbents." (With Troy M. Gibson). 2006. Paper presented at the Annual Meeting of the
    Southern Political Science Association. Atlanta.

"Race and the Ideological Transformation of the Democratic Party: Evidence from the Bayou
    State." 2004. Paper presented at the Biennial Meeting of the Citadel Southern Politics
    Symposium. Charleston.

"Tracing the Evolution of Hispanic Political Emergence in the Deep South." 2004. (Charles S.
    Bullock, III).  Paper presented at the Biennial Meeting of the Citadel Southern Politics
    Symposium. Charleston.

"Much Ado about Something? Religious Right Status in American Politics." 2003. (With Mark C. Smith). Paper presented at the Annual Meeting of the Midwest Political Science Association. Chicago.

"Tracking the Flow of Non-Federal Dollars in U. S. Senate Campaigns, 1992-2000." 2003. (With Janna Deitz and William Gillespie). Paper presented at the Annual Meeting of the Midwest Political Science Association. Chicago.

"PAC Cash and Votes: Can Money Rent a Vote?" 2002. (With William Gillespie). Paper presented at the Annual Meeting of the Southern Political Science Association. Savannah.

"What Can Gubernatorial Elections Teach Us About American Politics?: Exploiting and Underutilized Resource." 2002. (With Quentin Kidd and Irwin L. Morris). Paper presented at the Annual Meeting of the American Political Science Association. Boston.

"I Know I Voted, But I'm Not Sure It Got Counted." 2002. (With Charles S. Bullock, III and Richard Clark).  Paper presented at the Annual Meeting of the Southwestern Social Science Association. New Orleans.

"Race and Southern Gubernatorial Elections: A 50-Year Assessment." 2002. (With Quentin Kidd and Irwin Morris). Paper presented at the Biennial Southern Politics Symposium. Charleston, SC.

"Top-Down or Bottom-Up?: An Integrated Explanation of Two-Party Development in the South, 1960-2000." 2001. Paper presented at the Annual Meeting of the Southern Political Science Association. Atlanta.

"Cash, Congress, and Trade: Did Campaign Contributions Influence Congressional Support for Most Favored Nation Status in China?" 2001. (With William Gillespie).  Paper presented at the Annual Meeting of the Southwestern Social Science Association.  Fort Worth.

"Key 50 Years Later: Understanding the Racial Dynamics of 21st Century Southern Politics" 2001. (With Quentin Kidd and Irwin Morris). Paper presented at the Annual Meeting of the Southern Political Science Association. Atlanta.

"The VRA and Beyond: The Political Mobilization of African Americans in the Modern South." 2001.  (With Quentin Kidd and Irwin Morris). Paper presented at the Annual Meeting of the American Political Science Association. San Francisco.

"Payola Justice or Just Plain 'Ole Politics Texas Style?: Campaign Finance and the Texas Supreme Court."  2001.  (With Craig Emmert).  Paper presented at the Annual Meeting of the Midwest Political Science Association.  Chicago.

"The VRA and Beyond: The Political Mobilization of African Americans in the Modern South." 2000. (With Irwin Morris and Quentin Kidd). Paper presented at the Annual Meeting of the Southern Political Science Association. Atlanta.

"Where Have All the Republicans Gone? A State-Level Study of Southern Republicanism." 1999. (With Irwin Morris and Quentin Kidd). Paper presented at the Annual Meeting of the Southern Political Science Association. Savannah.

"Elephants in Dixie: A State-Level Analysis of the Rise of the Republican Party in the Modern South." 1999. (With Irwin Morris and Quentin Kidd).  Paper presented at the Annual Meeting of the American Political Science Association. Atlanta.

"Stimulant to Turnout or Merely a Convenience?: Developing an Early Voter Profile."  1998. (With Quentin Kidd and Grant Neeley).  Paper presented at the Annual Meeting of the Southern Political Science Association. Atlanta.

"The Impact of the Texas Concealed Weapons Law on Crime Rates: A Policy Analysis for the City of Dallas, 1992-1997." 1998. (With Grant W. Neeley). Paper presented to the Annual Meeting of the Midwest Political Science Association. Chicago.

"Analyzing Anglo Voting on Proposition 187: Does Racial/Ethnic Context Really Matter?" 1997. (With Irwin Morris). Paper presented to the Annual Meeting of the Southern Political Science Association. Norfolk.

"Capturing Bubba's Heart and Mind: Group Consciousness and the Political Identification of Southern White Males, 1972-1994." 1997. Paper presented at the Annual Meeting of the Midwest Political Science Association. Chicago.

"Of Byrds[s] and Bumpers: A Pooled Cross-Sectional Study of the Roll-Call Voting Behavior of Democratic Senators from the South, 1960-1995." 1996. (With Quentin Kidd and Irwin Morris). Paper presented to the Annual Meeting of the Southern Political Science Association. Atlanta.

"Pest Control: Southern Politics and the Eradication of the Boll Weevil." 1996. (With Irwin Morris). Paper presented to the Annual Meeting of the American Political Science Association. San Francisco.

"Fit for the Greater Functions of Politics: Gender, Participation, and Political Knowledge." 1996. (With Terry Gilmour, Kurt Shirkey, and Sue Tolleson-Rinehart). Paper presented to the Annual Meeting of the Midwest Political Science Association. Chicago.

"¿Amigo o Enemigo?: Racial Context, Attitudes, and White Public Opinion on Immigration." 1996. (With Irwin Morris). Paper presented to the Annual Meeting of the Midwest Political Science Association. Chicago.

"¡Quedate o Vente!: Uncovering the Determinants of Hispanic Public Opinion Towards Immigration." 1996. (With Irwin Morris and Kurt Shirkey). Paper presented to the Annual Meeting of the Southwestern Political Science Association. Houston.

"Downs Meets the Boll Weevil: When Southern Democrats Turn Left." 1995. (With Irwin Morris). Paper presented to the Annual Meeting of the Southern Political Science Association. Tampa.

"¿Amigo o Enemigo?: Ideological Dispositions of Whites Residing in Heavily Hispanic Areas." 1995. (With Irwin Morris). Paper presented to the Annual Meeting of the Southern Political Science Association. Tampa.

Chair. Panel titled "Congress and Interest Groups in Institutional Settings." 1995. Annual Meeting of the Southwestern Political Science Association. Dallas.

"Death of the Boll Weevil?: The Decline of Conservative Democrats in the House." 1995. (With Kurt Shirkey). Paper presented to the Annual Meeting of the Southwestern Political Science Association. Dallas.

"Capturing Bubba's Heart and Mind: The Political Identification of Southern White Males." 1994.  (With Sue Tolleson-Rinehart). Paper presented to the Annual Meeting of the Southern Political Science Association. Atlanta.


**Other Professional Presentations**

"Much Adieu About Nothing?: An Empirical Assessment of Georgia's Voter Identification Statute." 2010. Presentation made to the Department of Political Science, Texas Tech University. Lubbock, TX.

"Report on the Aftermath of the 2010 Midterm Elections." 2010. Presentation made to the Oconee County Republican Party. Watkinsville, GA.

"Non-Precinct Voting in Georgia-A Survey of Voters from the 2008 Election." 2010. Presentation made to the Jeannette Rankin Foundation Program: The Life and Legacy of Jeannette Rankin: Championing Election Reform. Athens, GA.

"Non-Precinct Voting in Georgia, 2008." (With Charles S. Bullock, III). Presentation made at the Annual Meeting of the Georgia Election Officials Association. Savannah.


**Areas of Teaching Competence**

American Politics: Behavior and Institutions
Public Policy
Scope, Methods, Techniques


**Teaching Experience**

University of Georgia, 1999-present.
 Director of Graduate Studies, 2011-present.
 Graduate Faculty, 2003-present.

Provisional Graduate Faculty, 2000-2003.
Distance Education Faculty, 2000-present.

Texas Tech University, 1993-1999.
Visiting Faculty, 1997-1999.
Graduate Faculty, 1998-1999.
Extended Studies Faculty, 1997-1999.
Teaching Assistant, 1993-1997.

Courses Taught:
Undergraduate:
American Government and Politics, American Government and Politics (Honors),
Legislative
Process, Introduction to Political Analysis, American Public Policy, Political Psychology,
Advanced Simulations in American Politics (Honors), Southern Politics, Southern Politics
(Honors)
Graduate:
Election Administration and Related Issues, Political Parties and Interest Groups,
Legislative Process, Seminar in American Politics, Southern Politics

## Editorial Boards

*Social Science Quarterly*. Member. 2011-present.

*Election Law Journal*. Member. 2013-present.

## Institutional Service (University-Level)

University Program Review Committee, 2009-2011.
Chair, 2010-2011
Vice-Chair, 2009-2010.

Graduate Council, 2005-2008.
Program Committee, 2005-2008.
Chair, Program Committee, 2007-2008.

University Libraries Committee, 2004-2014.

Search Committee for University Librarian and Associate Provost, 2014.

HIGHLY CONFIDENTIAL
**Appendix C: Plaintiff's Database Matching Protocol**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | |
|---|---|
| MARC VEASEY, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 2:13-cv-193 (NGR) |
| RICK PERRY, *et al.*, | |
| Defendants. | |
| | |
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| TEXAS LEAGUE OF YOUNG VOTERS EDUCATION FUND, *et al.*, | |
| Plaintiff-Intervenors, | Civil Action No. 2:13-cv-263 (NGR) |
| TEXAS ASSOCIATION OF HISPANIC COUNTY JUDGES AND COUNTY COMMISSIONERS, *et al.*, | |
| Plaintiff-Intervenors, | |
| v. | |
| STATE OF TEXAS, *et al.*, | |
| Defendants. | |

|  |  |
|---|---|
| TEXAS STATE CONFERENCE OF NAACP BRANCHES, *et al.*,<br><br>　　　　　Plaintiffs,<br><br>　　　v.<br><br>NANDITA BERRY, *et al.*,<br><br>　　　　　Defendants. | Civil Action No. 2:13-cv-291 (NGR) |
| BELINDA ORTIZ, *et al.*,<br><br>　　　　　Plaintiffs,<br><br>　　　v.<br><br>STATE OF TEXAS, *et al.*,<br><br>　　　　　Defendants | Civil Action No. 2:13-cv-348 (NGR) |

## United States' Database Matching Protocol

The United States hereby sets out its protocol for comparisons among and between the Texas databases and the federal databases.  The matching process proceeds in four parts, which are explained in detail below.  *First*, databases are prepared and standardized.  *Second*, identifier values are constructed by combining multiple individual fields.  *Third*, one-to-many matches are conducted between databases.  *Fourth*, Texas data concerning deceased individuals is appended to matching output.  Each of the four parts is divided into multiple stages, which in turn are divided into concrete steps.

The database preparation and standardization steps below apply to both the matches requested by the United States and all Plaintiffs, as well as the matches requested by Defendants.

1

## GLOSSARY

The following definitions apply to the terms used in this document.

- **Disability database:** Any federal database containing records that indicate whether an individual has a disability that would permit that individual apply for an exemption from the SB 14 identification requirement.

- **Identification database:**  Any Texas or federal database containing records that indicate whether an individual has identification required by SB 14 in most cases to cast an in-person ballot

- **Protocol:**  The instructions to prepare data for matching and to conduct multiple matching sweeps between databases according to specified search criteria.

- **Sweep:**  A comparison of a set of database fields in the TEAM database against a set of database fields in a disability database or an identification database.

- **TEAM database:** The Texas Election Administration Management database, the state database that contains records of registered voters.

## PART I:  DATABASE PREPARATION

### Stage 1:  Extraction of Available Data from TEAM, Identification & Disability Databases

**Step 1.1.1:**    Extract complete name into separate first name, middle name, and last name fields.

**Step 1.1.2:**    Extract date of birth.

**Step 1.1.3:**    Extract gender.

**Step 1.1.4:**    Extract residential address and mailing address.

**Step 1.1.5:**    Extract social security number.

**Step 1.1.6:**    Extract Texas driver license number (only if present in Federal database).

**Step 1.1.7:**    Extract unique record identifier (such as VUID in the TEAM database).

### Stage 2:  Separate Valid Identification and Disability Records

**Step 1.2.1:**    Remove records from identification database extracts that indicate that an ID has been revoked or has expired more than 60 days before the date of the TEAM database snapshot (which is January 15, 2014).

**Step 1.2.2:**    Remove records from disability database extracts that do not indicate current disability status or indicate a Veterans Administration disability rating of less than 50%.

**Step 1.2.3:**    Separate the identification databases produced by the State of Texas into separate files for each form of state identification at issue, namely driver licenses, identification cards, licenses to carry concealed handguns, and election identification certificates.

3

**Stage 3: Diagnostics**

**Step 1.3.1**:    Report the frequency of missing values for each field.

**Step 1.3.2**:    Report the frequencies of invalid Social Security numbers, such as 111111111 and 123456789.

**Step 1.3.3**:    Report the frequencies of likely invalid dates of birth, such as January 1, 1901 and November 11, 1911.

**Stage 4: Standardize Last Name**

**Step 1.4.1**:    Remove last name suffixes that are contained within the last name field, rather than a distinct suffix field.  *E.g.*, <Smith Jr.> becomes <Smith>.

**Step 1.4.2**:    For last names containing hyphens, populate separate last name fields for all parts of the last name.  *E.g.*, the last name <Smith-Jones> would have the value <Smith> entered into a LastName1 field and the value <Jones> entered into a LastName2 field.

**Step 1.4.3**:    Remove spaces, hyphens, periods, and apostrophes from all last name fields and convert all letters to uppercase.  *E.g.*, <O'Connor> becomes <OCONNOR> and <Smith-Jones> becomes <SMITHJONES>.

**Step 1.4.4**:    Code all missing values as blank fields.

**Stage 5: Standardize First Name and Middle Name**

**Step 1.5.1:**     Remove spaces, hyphens, periods, and apostrophes from the first name field and convert all letters to uppercase.  *E.g.*, <Jean-Paul> becomes <JEANPAUL>.

**Step 1.5.2:**     Parse the first letter of the middle name (if available) and use it to populate a middle initial field.  *E.g.*, <John> would yield <J>.[1]

**Step 1.5.3:**     Code all missing values as blank fields.

**Stage 6:  Standardize Date of Birth**

**Step 1.6.1:**     Convert the date of birth to an eight-digit string of MMDDYYYY.

**Step 1.6.2:**     Code all missing values as blank fields.

 **Stage 7:  Standardize Gender**

**Step 1.7.1:**     Code gender as a string of 1 for females and 0 for males.

**Step 1.7.2:**     Fill missing gender values using the most common gender value for the first name associated with a record.  *E.g.*, if 99% of records with first name <JOHN> are listed as male, assign the male identifier to all records with first name <JOHN> and no listed gender.

**Step 1.7.3:**     If missing values remain, code all missing values as blank fields.

---

[1] The U.S. Department of State does not maintain a separate field for middle names in its database of U.S. Passport and Passport Card holders.  Instead, both first and middle name may be stored in the first name field.  For this database, the following rule will be applied:  treat the first word in the first name field as the first name, and treat the first letter following the first space as the middle initial.

5

**Stage 8:  Standardize Address**

**Step 1.8.1:**   Convert the residential ZIP code to a string if it is stored as a numeric field.

**Step 1.8.2:**   Where the residential address ZIP code is blank, populate that field with the value in the mailing address ZIP code field, if available.[2]

**Step 1.8.3:**   Truncate the residential ZIP code field to the first five digits.  *E.g.*, <77777-1234> becomes <77777>.

**Step 1.8.4:**   Where the residential address field is blank, populate that field with the value in the mailing address field, if available.

**Step 1.8.5:**   Where address field containing street address begins with a street number, isolate the street number.  *E.g.*, <123 Main Street> becomes <123>.

**Step 1.8.6:**   Where the address field begins with recognized strings indicating a mail box, eliminate strings to isolate the box number.  *E.g.*, <PO Box 444> becomes <444>.

**Step 1.8.7:**   If missing values remain, code all missing values as blank fields.

**Stage 9: Standardize Social Security Number**

**Step 1.9.1:**   Convert the social security number to a string if it is stored as a numeric field.

**Step 1.9.2:**   Using full social security number, check for invalid SSNs.  In the case of invalid SSNs, code as missing.  *E.g.*, <123456789> becomes <>.

---

[2] For purposes of this database matching protocol, the only address fields utilized with respect to data regarding U.S. Passports and U.S. Passport Cards are those regarding mailing addresses.

6

**Step 1.9.3:**   Extract the last four digits of full social security number as a four-character string and use them to populate a separate SSN4 field.

**Step 1.9.4:**   Code all missing values as blank fields.

## Stage 10: Identical Records

**Step 1.10.1:**   For the TEAM database, for the small number of records with different VUID but identical first and last name, gender, residential address number and ZIP, date of birth, and SSN, treat these records as identical.

## PART II:  DATABASE PREPARATION

**Stage 1:  Construct Primary Identifier Variables for United States' One-to-Many Sweeps**

**Step 2.1.1:**    Create Combination A: First Name + Last Name + Gender + Date of Birth + Residential ZIP + Residential Street Number.  *E.g.*, the separate fields <JEAN>, <SMITH>, <0>, <01011950>, <77777>, and <123> are combined to a single field <JEANSMITH00101195077777123>.[3]

**Step 2.1.2**:    Create Combination B:  Last Name + Gender + Date of Birth + Residential ZIP + Residential Street Number.

**Step 2.1.3:**    Create Combination C:  Gender + Date of Birth + Residential ZIP + Residential Street Number.

**Step 2.1.4:**    Create Combination D:  First Name + Last Name + Date of Birth + Residential ZIP + Residential Street Number.

**Step 2.1.5:**    Create Combination E:  First Name + Last Name + Gender + Residential ZIP + Residential Street Number.

**Step 2.1.6:**    Create Combination F:  First Name + Last Name + Gender + Date of Birth.

**Step 2.1.7:**    Create Combination M:  Texas Driver License Number (where available).

---

[3] For the U.S. Department of State only, the name portion of any combination is truncated if it is more than 32 characters long.

8

**Stage 2:  Construct Secondary Identifier Variables for United States' One-to-Many Sweeps**

**Step 2.2.1:**     Create Combination G:  First Name + Middle Initial + Last Name + Date of Birth.[4]

**Step 2.2.2:**     Create Combination H:  SSN4 + Date of Birth + Residential ZIP.

**Step 2.2.3:**     Create Combination I:  SSN4 + First Name + Last Name + Date of Birth.

**Step 2.2.4:**     Create Combination K:  First Name + Last Name 1 + Middle Initial + Date of Birth.

**Step 2.2.5:**     Create Combination L:  First Name + Last Name 2 + Middle Initial + Date of Birth.

**Step 2.2.6:**     Full Social Security Number.

**Stage 3:  Establish Identifier Uniqueness**

**Step 2.3.1:**     Within the TEAM database, determine the uniqueness of each primary and secondary identifier variable and mark accordingly.  *E.g.*, if only one record has the string <JEANSMITH01011950012377777> for Combination A, mark that record as unique for Combination A.   By contrast, if multiple records have the string <JOHNSMITHA0101950> for Combination G, mark all such records as non-unique for Combination G.

**Step 2.3.2:**     Within the identification and disability databases, generate a field that establishes the uniqueness of each identifier variable.  For federal databases, for each combination, generate a field that establishes

---

[4] Only for the State Department, create three further variations of Combination G using the State Department's "LFMName" field which contains Last, First, and Middle Names, in that order, truncated to a maximum length of 32 characters.  Combination G1 is DOB + LFMName; Combination G2 is DOB + First two words of LFMName; and Combination G3 is DOB + First two words of LFMName + First character of third word of LFMName.

uniqueness among only Texas records and a field that establishes uniqueness among nationwide records. *E.g.*, if only one record has the string <JEANSMITH01011950012377777> for Combination A, populate the uniqueness field for Combination A for that record as <1>. If four records have the string <JOHNSMITHA0101950> for Combination G, populate the uniqueness field for Combination G for each of those records as <2>, which indicates any number greater than one.

## PART III:  MATCH DATABASES

**Stage 1:  United States' Primary One-to-Many Matching Sweeps**

**Step 3.1.1:**    For each case in which Combination A is unique in the TEAM database, match Combination A against Combination A in the identification or disability database.  For federal databases, use only the subset of records with Texas addresses in the identification or disability database.  Where a match is attempted but no match is found, indicate a zero in the Combination A output field.  Where there is a match, indicate the uniqueness of Combination A in the identification or disability database in the Combination A output field (*e.g.*, in cases where there is one matching record in the Federal database, <1> should be inserted into the Combination A output field, while a <2> should be inserted into the Combination A output field if the TEAM record matched 2 or more records in the Federal database).

**Step 3.1.2:**    Use the procedure in Step 3.1.1 to match Combination B, Combination C, Combination D, Combination E, and Combination F in the TEAM database against the equivalent combination field in the identification or disability database.

**Step 3.1.3**:    Use the procedure in Step 3.1.1 to match Combination M in the TEAM database against the equivalent combination field in the identification databases produced by the State of Texas.

11

**Stage 2:  United States' Secondary One-to-Many Matching Sweeps**

**Step 3.2.1:**   For each case in which no matches were found in the primary one-to-many matching sweeps (A-F, M), and where Combination G is unique in the TEAM database, match Combination G against Combination G in the identification or disability database.  For federal databases, use only the subset of records with Texas addresses in the identification or disability database.  Where a match is attempted but no match is found, indicate a zero in the Combination G output field.  Where there is a match, indicate the uniqueness of Combination G in the identification or disability database in the Combination G output field (*e.g*., <1> if a unique match and <2> if matched to more than one record).

**Step 3.2.2:**   For each case in which no matches were found in the primary one-to-many matching sweeps (A-F, M), use the procedure in Step 3.2.1 to match Combination H, Combination I, and complete social security number[5] in the TEAM database against the equivalent combination/field in the identification or disability database.

**Step 3.2.3:**   For each case in which no matches were found in the primary one-to-many matching sweeps (A-F, M), use the procedure in Step 3.2.1 to match Combination K against Combination G, Combination K, and Combination L in the identification or disability database.

---

[5] The full social security number is not created as a separate "combination" as it is its own field stored within the TEAM database under the field name "ssn".

12

**Step 3.2.4:**    For each case in which no matches were found in the primary one-to-many matching sweeps (A-F, M), use the procedure in Step 3.2.1 to match Combination L against Combination G, Combination K, and Combination L in the identification or disability database.

## Stage 3:  United States' Nationwide Federal Database Sweeps

**Step 3.3.1:**    For each case in which no matches were found in the primary and secondary matching sweeps of Texas records in a federal identification or disability database, and where Combination F is unique, match Combination F against Combination F in the nationwide identification or disability database.  Where a match is attempted but no match is found, indicate a zero in the Combination F nationwide output field.  Where there is a match, indicate the uniqueness of Combination F in the identification or disability database in the Combination F nationwide output field (*e.g.*, <1> if a unique match and <2> if matched to more than one record).

**Step 3.3.2:**    For each case in which no matches were found in the primary and secondary matching sweeps of Texas records in a federal identification or disability database, use the procedure in Step 3.3.1 to match Combination G, Combination I, and full social security number in the TEAM database against the equivalent combination/field in the nationwide identification or disability database.

**Step 3.3.3:**    For each case in which no matches were found in the primary and secondary matching sweeps of Texas records in a federal identification or disability database, use the procedure in Step 3.3.1 to match Combination

13

K against Combination G, Combination K, and Combination L in the

nationwide identification or disability database.

**Step 3.3.4:**     For each case in which no matches were found in the primary and

secondary matching sweeps of Texas records in a federal identification or

disability database, use the procedure in Step 3.3.1 to match Combination

L against Combination G, Combination K, and Combination L in the

nationwide identification or disability database.[6]

---

[6] Step 3.3.5 for the State Department only: Match the following Combination G variations from applicable State Department records, first to include only the subset of records with Texas addresses, and then to include all applicable U.S. Passport and Passport Card records nationwide (*e.g.*, without Texas addresses), against the following fields from the TEAM database:

- Combination G1 to DOB + Last_fix + First_fix + Middle_name from the TEAM database;
- Combination G2 to DOB + Last_fix + First_fix from the TEAM database;
- Combination G2 to DOB + Last_fix + First word of First_name from the TEAM database;
- Combination G3 to DOB + Last_fix + First_fix + Middle_Initial from the TEAM database;
- Combination G3 to DOB + Last_fix + First word of First_name + Middle_Initial  from the TEAM database; and
- Combination G3 to DOB + Last_fix + First word of First_name + First character of Second word of First_fix from the TEAM database.

Attempt matches for all TEAM records, regardless of whether they matched in any prior sweeps.  Indicate <1> if a unique match and <2> if matched to more than one record.

HIGHLY CONFIDENTIAL

## PART IV: DATA GATHERING

**Stage 1: Gather Information Regarding Deceased Individuals**

**Step 4.1.1:** In all instances in which a unique match was achieved between the TEAM database and the Texas Driver License, Texas Identification Card, and Texas Concealed Handgun database, determine whether the identification record at issue has been flagged as deceased in the Texas identification database.

**Step 4.1.2:** Where the driver license, concealed handgun license, or Texas identification card record at issue has been flagged as deceased, append the "deceased" flag to the TEAM record to which the unique match has been made.