# ACCESS VERSUS INTEGRITY IN VOTER IDENTIFICATION REQUIREMENTS[†]

*STEPHEN ANSOLABEHERE*[*]

2:13-cv-193
09/02/2014
DEF0020

## I.
## INTRODUCTION

The Help America Vote Act (HAVA)[1] hit a nearly fatal snag during the final stages of congressional negotiations over the bill in 2002. The problem? Voter ID requirements. Many conservatives in Congress insisted on the inclusion of a requirement that voters show photo identification, and many liberals, including members of the Congressional Black Caucus, saw this as a deal-killer.[2] Ultimately, the two sides reached a compromise that applied the rule to first-time voters, but the battle lines over this question were drawn and they remain in place today.

Both sides of this debate express, at least rhetorically, the same objective: protect the value of the vote. For those on the left, protection of voting rights involves expanding access to the polls and opening up the vote-counting process. "Count all the votes" became the mantra of the election controversies in Florida in 2000 and Ohio in 2004.[3] Excluding qualified voters from the polls or not counting ballots through failures in administrative procedures or machines, of course, eliminates those votes from the count and dilutes the value of others who voted for the same candidates or party. Polemical writings frequently allege that problems with elec-

---

† Paper presented at the *New York University Annual Survey of American Law*'s Election Law Symposium.
  * Elting Morison Professor, Department of Political Science, MIT, sda@mit.edu.
  1. Pub. L. No. 107-252, 116 Stat. 1666 (2002) (codified as amended in scattered sections of 2, 5, 10, 36, and 42 U.S.C.).
  2. *See, e.g.*, 148 CONG. REC. 20215, 20328 (2002) (statement of Rep. Jackson-Lee); *id. at* 20331 (statement of Rep. Solis); Robert Pear, *Senate Sets Aside Its Work on Overhauling Elections*, N.Y. TIMES, Mar. 5, 2002, at A18.
  3. This was exemplified when the Democrats allowed the overseas military ballots to be counted in Florida in 2000, after Senator Lieberman stated that not recognizing these voters would burden military personnel even though many of those ballots were cast late, not signed, or not dated, and they were sufficient to decide the election outcome. *See* Kosuke Imai & Gary King, *Did Illegal Overseas Absentee Ballots Decide the 2000 U.S. Presidential Election?*, 2 PERSP. ON POL. 537–38, 546 n.3 (2004).

613

Imaged with the Permission of N.Y.U. Annual Survey of American Law
HeinOnline -- 63 N.Y.U. Ann. Surv. Am. L. 613 2007-2008

PX 024

toral machinery are the modern-day equivalent of the Jim Crow laws.[4]

A second form of vote-dilution comes from ballots cast unlawfully, especially by people who are not qualified to vote, such as aliens or people at the wrong polling place or, in some states, felons. Illegal votes dilute the value of qualified votes just as surely as failings of machines and errors in registration lists do.[5] Many states go well beyond the rules in HAVA and require that voters show identification at the polls.[6]

Voter ID rules can cut both ways. Identification seems a reasonable requirement for ensuring that only those who are qualified are allowed to vote and that people do not vote in the wrong place, and thus in the wrong elections. Poll workers can check identification to validate both that the individual is properly registered to vote and in the correct polling place.[7] If questions arise, the individual can be allowed to cast a provisional ballot.[8]

Identification and other polling-place administration practices, however, also have an unfortunate history. Challenges to voters' qualifications and improper disqualifications of legal voters have long been used as political tools.[9] The problems arise when the local polling-place operators have too much discretion in determining voters' qualifications.[10] In the mid-nineteenth century, British political parties used challenges to voter registration lists to disqual-

---

4. *See, e.g.*, David J. Becker, *Reviving Jim Crow?*, N.Y. TIMES, Aug 22, 2005, at A17. I would argue, however, that much of the rhetoric on the left is driven by the exaggerated claims of writers unhappy not with the election process but with the election results. *See, e.g.*, Al Franken, Lies and the Lying Liars Who Tell Them: A Fair and Balanced Look at the Right (2003).

5. *See* Crawford v. Marion County Election Bd., 472 F.3d 949, 952 (7th Cir. 2007) (Posner, J.) ("[V]oting fraud impairs the right of legitimate voters to vote by diluting their votes."), *cert. granted*, 128 S. Ct. 33 (2007).

6. *See* THE EAGLETON INST. OF POLITICS, RUTGERS, THE STATE UNIV. OF N.J. & THE MORITZ COLL. OF LAW, THE OHIO STATE UNIV., REPORT TO THE U.S. ELECTION ASSISTANCE COMMISSION ON BEST PRACTICES TO IMPROVE VOTER IDENTIFICATION REQUIREMENTS PURSUANT TO THE HELP AMERICA VOTE ACT OF 2002 18–22 (2006), http://www.eac.gov/clearinghouse/docs/eagletons-draft-voter-id-report/attachment_download/file.

7. *See* 42 U.S.C. § 15483(b) (Supp. IV 2004) (requiring first-time voters who registered by mail to present documents verifying their name and address).

8. *See id.* § 15482(a).

9. *See, e.g.*, Pear, *supra* note 2, at A18.

10. JIMMY CARTER ET AL., TO ASSURE PRIDE AND CONFIDENCE IN THE ELECTORAL PROCESS: REPORT OF THE NATIONAL COMMISSION ON FEDERAL ELECTION REFORM 180–85 (2002).

ify wholesale hundreds of presumably legal voters.[11] The challenges on Election Day could not be resolved until it was too late. Parliament had to limit the use of disqualifications in response.[12] Such practices were widespread in American elections as well.[13] World War II veterans, upon returning to the United States, found themselves purged from registration rolls and systematically excluded from the electoral process.[14] In some instances, veterans' protests to gain back their voting rights led to riots.[15]

Discriminatory election administration practices gained infamy in the American South. Blacks were denied access to registration through limited election office hours, literacy tests, and excessive ID requirements.[16] On Election Day, poll workers selectively applied poll taxes, literacy tests, and other instruments to exclude blacks and many poor whites.[17] Only thirty percent of the southern black population was registered to vote in 1960; a smaller percentage still was allowed to vote.[18]

It is through the lens of this unfortunate history that voter ID requirements are viewed. These new rules may amount to a test that is applied capriciously and discriminatorily at polling places, as were literacy tests and other standards. In addition, ID requirements create a new "qualification" that seems irrelevant to the electoral process: the possession of photo identification. The Report of the National Commission on Federal Election Reform concluded that ID requirements might have disproportionate effects on poorer people and inner-city residents because many of them do not have the most commonly used forms of identification, such as drivers' licenses and state-issued ID cards.[19]

These two views—on the left and the right—paint two quite different pictures of the use of voter identification on Election Day.

---

11. CHARLES SEYMOUR, ELECTORAL REFORM IN ENGLAND AND WALES 133–37 (1915).
12. *Id.* at 138, 160.
13. ALEXANDER KEYSSAR, THE RIGHT TO VOTE: THE CONTESTED HISTORY OF DEMOCRACY IN THE UNITED STATES 65–67 (2000).
14. JENNIFER E. BROOKS, *Defining the Peace: World War II Veterans, Race, and the Remaking of Southern Political Tradition* 33–34 (2005).
15. *Id.* at 14, 177–78 n.24.
16. *See* V.O. KEY, JR., SOUTHERN POLITICS 8 (1949).
17. *See id.*; H. Bailey Thompson, *The Struggle in Alabama for Constitutional Reform*, 7 JONES L. REV. 29, 33–34 (2003).
18. James E. Alt, *The Impact of the Voting Rights Act on Black and White Voter Registration in the South*, *in* QUIET REVOLUTION IN THE SOUTH: THE IMPACT OF THE VOTING RIGHTS ACT, 1965 TO 1990, at 351–77 (Chandler Davidson & Bernard Grofman eds., 1994).
19. CARTER ET AL., *supra* note 10, at 30.

According to those on the left, voter fraud is rare, but identification requirements are used to exclude voters differentially across racial and class lines.[20] According to those on the right, voter fraud is common, and voter ID requirements are applied equitably to prevent illegal voters from participating.[21] By both accounts, a noticeable number of voters are excluded through ID requirements; these two stories differ in terms of who is excluded. A rate of exclusion (either justified because of fraud or unjustified because of intimidation) of even one or two percent could affect elections noticeably.

Relatively little is known about the application of voter ID requirements in the United States. A handful of surveys have found support for the use of voter identification,[22] but nothing is known about the incidence of use or who is excluded through this mechanism. The reason is cost. A very large-scale survey is required to measure factors that affect a small percent of the population. The Current Population Survey, which canvasses 50,000 households, would be the natural vehicle for asking about identification.[23] Alas, while the Survey currently produces a voter supplement, it has not included questions about these new rules.

This Article presents the findings of a new survey designed to achieve a sufficient scale so as to gauge this and other electoral phenomena. In 2006, thirty universities collaboratively conducted a survey project, called the Cooperative Congressional Election Survey, which consisted of a 30,000-person national sample.[24] That survey included a battery of questions to gauge Election Day practices; a handful of questions probed the use of voter identification. In addition, a smaller subset of the larger project asked whether respondents approved of laws requiring voter identification.

I proceed as a naive empiricist. The stark arguments of the advocates and critics of voter ID requirements motivate this research, but I have no particular stake in these claims.

---

20. *See, e.g.*, Amy Goldstein, *Democrats Predict Voter ID Problems; Laws May Create Election Day Turmoil*, WASH. POST, Nov. 3, 2006, at A1.

21. *Id.*

22. *See, e.g.*, Spencer Overton, *Voter Identification*, 105 MICH. L. REV. 631, 657–63 (2007).

23. U.S. Census Bureau, Current Population Survey, http://www.census.gov/cps (last visited Jan. 29, 2008).

24. Cooperative Congressional Election Study, http://web.mit.edu/polisci/portl/cces/index.html (last visited Jan. 12, 2008).

## II.
## DESCRIPTION OF SURVEY

The Cooperative Congressional Election Survey (CCES) was conducted over the Internet by Polimetrix, a non-partisan polling company. Polimetrix uses a matched random sample to construct a nationally representative sample of adults. That is, they randomly sample people from the National Consumer File, which includes approximately 95% of the American adult population. They then match the demographic profiles of those people to individuals who have agreed to participate in Internet surveys, and they conduct the survey of those matched cases. To compensate for low Internet participation among poor and minority communities, Polimetrix more actively recruits respondents with those characteristics.[25]

The survey was fielded in three waves: August–September 2006, October 2006, and November 2006. The first wave profiled the participants, emphasizing demographics. The second wave tapped opinions, attitudes, and beliefs that would shape the vote. The third wave emphasized voting behavior.

The survey consisted of thirty-five separate team surveys of approximately one thousand persons each. Every university-based team purchased a survey and controlled approximately half of the questions asked of their individual team sample, called Team Content. Approximately half of each team's questions were pooled into Common Content. Every Team Survey was a national random matched sample, so the Common Survey was as well.

Common Content consisted of a set of approximately sixty questions asked on every survey. Common Content was designed by a committee consisting of Robert Erikson, Donald Kinder, Jeremy Pope, Wendy Rahn, John Sides, Lynn Vavrek, and me, with input from all of the participating groups. On this common battery, the survey included questions that all teams would want to use, such as vote preferences, party identification, and demographics.

The Common Content included a battery of questions concerning the voting experience. In this Article, I will focus on a handful of items. The post-election wave was conducted the week after the election. The questionnaire administered at this time began with a series of questions about the voting experience and voting behavior. The survey asked whether the person voted in the general election and how the person voted—at the polls on election day, early at an office or kiosk, by mail or absentee, or not at

---

25. For full details, consult the codebook and dataset for the 2006 CCES distributed through the MIT Public Opinion Research Training Lab. *Id.*

all. The survey further probed the experiences of those who went to the polls. Specifically, the survey asked whether the person was asked to show identification, whether the person experienced problems with his or her registration, and how long the line was to vote. These questions were part of the Common Content, asked of the entire 36,500-respondent sample.

The MIT Team Content also included a set of questions designed to gauge opinion about various election-administration practices and reforms. This Article focuses on one such question: whether the person supported or opposed requiring voters to show picture identification at the polls. Other questions in this battery concerned districting practices.

### III. SUPPORT FOR VOTER IDENTIFICATION REQUIREMENTS

A large majority of the sample in the MIT survey expressed support for voter ID requirements. Over 75% of the respondents expressed their support for the idea; 17% were opposed; and 8% were unsure.

Table 1 presents the support for voter identification across various electoral groups.[26] Region, party, ideology, and race show the most interesting splits across electoral groups. Support differs noticeably across groups; however, a majority of every group in the sample supports voter ID requirements. A plausible explanation is that the large number of voters is not affected adversely by this rule, and it provides some protection of the dilution of their votes from illegally cast ballots.

---

26. The appendix to this Article describes the questions that were used to develop the information in Table I.

Table 1. Voter Identification:
Support For, Application of, and Exclusions By.
2006 CCES Sample.

|  | Support the Use of Voter ID | Asked to Show Voter ID | Not Allowed to Vote Bec. of Voter ID |
|---|---|---|---|
| All Respondents (Polling Place and Early Voters) | 77% | 49% | 0.1% |
| Northeast | 68% | 22% | 0.1% |
| Midwest | 76% | 48% | 0.2% |
| South | 81% | 65% | 0.1% |
| West | 76% | 47% | 0.1% |
| Democrats | 67% | 47% | 0.2% |
| Republicans | 95% | 45% | 0.1% |
| Independents | 72% | 49% | 0.1% |
| Very Liberal | 51% | 45% | 0.2% |
| Liberal | 61% | 46% | 0.3% |
| Moderate | 74% | 49% | 0.1% |
| Conservative | 95% | 45% | 0.1% |
| Very Conservative | 95% | 45% | 0.0% |
| Whites | 77% | 45% | 0.1% |
| Blacks | 70% | 53% | 0.4% |
| Hispanic | 78% | 52% | 0.1% |
| Age 18–19 |  | 55% | 0.0% |
| Age 20–24 |  | 55% | 0.6% |
| Age 25–45 |  | 54% | 0.2% |
| Age 35–45 |  | 50% | 0.1% |
| Age 45–55 |  | 46% | 0.1% |
| Age 55–70 |  | 44% | 0.0% |
| Age 70+ |  | 44% | 0.0% |
| Sample Size | 995 | 22,252 | 22,252 |

Support varied across regions in ways that state laws reflect. Respondents from southern states expressed the highest support for voter ID requirements, with fully 81% in favor. In the South, every state provides for some form of ID requirement. Those in the Midwest and West expressed the next-highest levels of support for voter identification, with support from fully three-fourths of the re-

spondents in both regions. Those in the Northeast supported voter ID requirements the least, although two in three agreed with the idea.

Support for this idea is divided generally along ideological and partisan lines. Ninety-five percent of people who identify as conservatives or as Republicans support voter ID requirements. Slightly more than seven in ten moderates and independents supported the voter ID rule. Two-thirds of Democrats supported the idea, as did 60% of people who identify as liberal and 50% of those who identify as very liberal. The very high support among Democratic voters comes as something of a surprise considering the very strong opposition to the voter ID proposal from Democratic congressional leaders and members.

Perhaps the most surprising demographic or political comparison arose with race, and the surprise was the lack of division. Over 70% of whites, blacks, and Hispanics support the requirement. Black and Hispanic voters did not express measurably less support for voter ID requirements than whites. Such findings suggest the Congressional Black Caucus and the Democratic Party leadership may have been wholly out of step with the analogous segments of the electorate on this issue. The lowest levels of support (and, again, a majority still supported ID requirements) came from white Democrats and white liberals.

A multivariate statistical analysis revealed that of all the factors, the most important was ideology. Holding constant region, income, party, and race, ideology has a strong effect on support for voter ID requirements. The difference in support for ID requirements between a very liberal and very conservative person, holding other things constant, is approximately fifty-five percentage points. Region proved marginally significant, with northeasterners expressing support for ID requirements about 10% more often than southerners. No other factors proved statistically significant.

IV.
INCIDENCE OF VOTER IDENTIFICATION

The debate in Congress and among other leaders over voter ID rules revolved not around questions of public support but around questions of the application of the rules in practice.[27] Legal schol-

---

27. *See, e.g.*, 148 CONG. REC. 1926, 1967 (2002) (statement of Sen. Wyden) ("[T]he photo ID provision ... is a poison pill that is going to silence the political voices of seniors, the disabled, young people, and minorities from coast to coast."); Robert Pear, *Civil Rights Groups Say Voter Bill Erects Hurdles Before Ballot Box*, N.Y.

ars and political scientists have catalogued the ID laws used in the states.[28] In practice, poll workers have considerable discretion in the application of ID rules: they might ignore the rule altogether, or they might ask for identification even when the law does not require it or when they are forbidden from doing so.[29]

The Common Content of the CCES survey gauges the frequency with which voters are asked to show identification when they voted. We restrict attention to those who report that they voted on Election Day or "early" (i.e., casting ballots at election offices before Election Day) and exclude from the analysis those who say that they voted absentee, did not vote, or were not sure. Early voting is most common in the South, where roughly a third of ballots are cast early. Absentee voting is most common in the West, where half of all ballots were cast absentee or by mail. More than 85% of ballots cast in the Northeast and Midwest are at polling places on Election Day. We use the same vote questions as the Current Population Survey. The CCES data show that voter identification is widely used.

Half of those who reported that they went to the polls or voted early said that they were asked to show identification. That differed according to how people voted. Sixty percent of those who voted early reported that they were asked to show identification, compared with 46% of those who on Election Day. That difference appears consistent across regions, except in the South, where Election Day and early voters are asked to show identification at similar rates.

The variation in the use of identification across regions is tremendous. Only one in four northeasterners is asked to show identification, compared with half of those in the Midwest and West, and two-thirds of those in the South. Interestingly, this ordering reflects the ordering of public preferences. Voters are most commonly asked to show identification in the South, the region in which the largest fraction of the population favors voter ID requirements, and

---

TIMES, Oct. 8, 2002, at A1 (quoting various civil rights groups who believe the provisions of the bill will have a negative impact on minority groups, the poor, and the elderly).

28. *See, e.g.*, NATIONAL CONFERENCE OF STATE LEGISLATURES, REQUIREMENTS FOR VOTER IDENTIFICATION (2008), http://www.ncsl.org/programs/legismgt/elect/taskfc/voteridreq.htm (last visited February 12, 2008).

29. Daniel P. Tokaji, *Early Returns on Election Reform: Discretion, Disenfranchisement, and the Help America Vote Act*, 73 GEO. WASH. L. REV. 1206, 1233 (2005) (arguing that "the lack of specific standards leaves discretion in the hands of local election officials and poll workers, and may result in the dissimilar treatment of similarly situated individuals from county to county").

in the region where there is the greatest opposition to voter identification, the Northeast, the rule is applied the least.[30]

Trivial partisan and ideological differences arose in the application of this rule. Approximately the same percentages of Democrats and Republicans, and of liberals and conservatives, were asked to show identification. Independents were slightly more likely to have to show identification, but the difference between partisans and independents was small. Voter ID requirements, as they are applied in practice, then have no apparent partisan or ideological effect.

Identification requirements, however, are not applied neutrally. One noticeable difference runs along age lines. About 55% of those younger than thirty were asked to show identification, while only 45% of older age cohorts were asked to present some form of identification when they voted. But a more disquieting discrepancy emerges upon dividing the sample along racial lines.

As feared by civil rights advocates, poll workers apply the regulations differentially along racial lines. Blacks and Hispanics showed their identification 52% of the time during the 2006 election, while whites and other racial groups (i.e., those who identify as Asians, Native Americans, and "other" race) showed their identification 45% of the time.[31] Nationwide, and not controlling for other factors, blacks and Hispanics are asked to show identification 7% more frequently than whites and members of other racial groups.

Although partly linked to region and other factors, race appears to be a substantial factor in the administration of voter ID requirements even after taking other factors into account. Controlling for region, age, party, and income, blacks and Hispanics are asked to show identification 5% more often than whites, a statistically significant difference. The differences appear greatest among low-income groups. Sixty-three percent of the lowest-income (household income less than $20,000) blacks were asked to show identification, compared with 46% of the lowest-income whites.

Differences in the frequency with which members of particular races are asked to show identification echo discriminatory practices that were common before the passage of the Voting Rights Act of

---

30. Interestingly, those who were asked to show voter identification were more likely to support its adoption as a common requirement than were those who had not been asked. This pattern held up controlling for race, region, and income.

31. In these data, 78% of election day and early voters are white, 9% are black, 8% are Hispanic, and 6% are other.

2008]     ACCESS VERSUS INTEGRITY IN VOTER ID LAWS        623

1965.[32] These differences, however, are small relative to the racial discrimination evident before 1965, and they are much smaller than differences across age groups and regions. However, given the history of Jim Crow laws, the differential application of ID requirements does flag a potential problem with the administration of election laws.

## V.
## EXCLUSIONS

The true measure of the effects of ID requirements lies in the rate at which such rules exclude or prevent people from voting. Arguments on both the right and the left suggest that ID requirements would affect a noticeable number of potential voters. Those pushing to require identification assert that fraud is widespread and that ID requirements would stop people from voting illegally.[33] Opposition comes from those who fear that the provisions would lead to a new round of discrimination at polling places and that simple errors in registration rolls would lead to many accidental exclusions from voting.[34]

To prevent just such wrongful exclusions and correct for errors in the registration rolls, the Help America Vote Act put in place what Congress hoped would be a fail-safe mechanism: provisional ballots.[35] If polling-place records do not show the voter on the rolls or if other questions about qualifications arise, then the voter may still cast a paper ballot that is later verified by the local election officials.[36] According to studies commissioned by the Election Assistance Commission, approximately 2.5% of ballots cast in 2004 were provisional, and roughly two-thirds of those were counted.[37] The most common explanation for why provisional ballots were not counted was that the voter was not registered.[38]

Were there significant exclusions on top of that? The CCES reveals the extent to which voters made use of provisional ballots or

---

32. 42 U.S.C. § 1973 (2000).
33. *See, e.g.*, Editorial, *Too Easy to Steal*, WALL ST. J., Dec. 11, 2001, at A18.
34. *See e.g.*, Pear, *supra* note 27, at A1; Editorial, *States Need Guidance on Voter ID Laws*, MIAMI HERALD, Jan. 14, 2008, at A22.
35. 42 U.S.C. § 15482 (Supp. IV 2004).
36. *Id.*
37. KIMBALL W. BRACE ET AL., ELECTION ASSISTANCE COMMISSION, FINAL REPORT OF THE 2004 ELECTION DAY SURVEY, *at* 5 (2005), *available at* http://www.eac.gov/clearinghouse/docs/eds2004/2004-election-day-survey-full-report/?search term=election%20survey%202004.
38. *Id.*

were excluded altogether. One would expect a noticeable rate of exclusions either because of discrimination or fraud.

Simply put, almost no one was excluded from voting. Only twenty-three people in the entire 36,500-person sample said that they were not allowed to vote because of voter ID requirements. That figure translates into approximately 0.1% of voters.

One may attempt to divide the sample further along various social lines, such as race, income, or age. There are, however, so few cases of exclusion that little can be said with any statistical meaning. The rates of exclusion are shown in Table 1. There are some differences some may wish to focus on, but any differences are statistically insignificant. The real lesson from the data is that the total number of people who said they were not allowed to vote because of voter ID requirements is trivially small.

The CCES offers a second perspective on this problem through questions concerning problems with voters' registration. A separate question in the survey asked people whether there was a problem with their voter registration, and if so, whether the person was allowed to vote. Only about 3% of those who cast ballots in precincts or at election offices (early voting said that there was a problem with their registration. Of these people, 86.4% were allowed to vote, 12.6% cast a provisional ballot, and 1% were not allowed to vote. Extrapolating to the entire electorate (not just those who had a problem) reveals that almost 99% of those who voted cast a normal ballot, about 1% cast a provisional ballot, and an almost immeasurably small number of people who tried to vote were excluded because of ID requirements or questions about their qualifications.

The number of people reporting registration problems in the CCES sample is sufficiently large to permit some statistical analysis of differential treatment. The number of exclusions because of questions about qualifications was, again, trivially small. Of the entire sample, 744 people said that they encountered a problem with their registration. Of those who reported problems with their registration, 86% were allowed to vote, 13% were allowed to cast a provisional ballot, and only 0.5% were not allowed to vote.

Interestingly, these figures suggest that when questions arise about voters' registrations poll workers simply allow people to vote. In these instances even provisional ballots are rare, and almost no one in the CCES who said that they voted in precincts on Election Day or early at an election office reported that they were prevented from voting because of questions regarding their registration and qualifications.

Exclusions because of later qualification questions showed no racial differences. Of those Election Day voters whose registration was problematic, 70% were white (compared with 78% of all in-person voters), 16% were black (compared with 10% of in-person voters), and 10% were Hispanic (compared with 8% of in-person voters). Across all racial groups, 85% to 86% were allowed to cast regular ballots and 13% to 14% cast provisional ballots.

Finally, it should be noted that the rate of exclusions seems unrelated to the frequency with which identification is shown. In the Northeast, 0.1% are excluded because of ID requirements, even though only one in five is asked to show identification. In the Midwest and West, the same incidence of exclusion arises, even though more than twice as many voters are asked to show identification. As for registration problems and provisional voting, their rates appear to be independent of region as well. In each of the four regions of the country, 3% of the Election Day voters reported registration problems, and 80% to 90% were allowed to cast regular ballots. Indeed, in the South, where allegations of problems get the most attention, the percentage allowed to cast a regular ballot is the highest, and everyone with a registration problem reported being allowed to vote.

It is rare in survey data that a true zero arises. The number of people who said they were excluded from the polls as a result of voter ID requirements, however, approaches that limit. Only twenty-three people out of 36,500 said that they were excluded from the polls because of voter identification and questions about their qualifications. This number is so small that we are unable to say much. Indeed, one would need a survey more than ten times as large as this one to begin to gauge who was excluded and why. It is just that rare of a phenomenon.

The CCES does not measure a possible discouraging effect of voter ID requirements. It may be that those who are likely to be asked for identification at the polls decide to stay home on Election Day. This argument strikes me as a stretch. First, it is not based on any fact. To my knowledge there is no evidence in any study, or even in any press report, that any person registered to vote decided not to vote because he or she might be asked to show picture identification at the polls. Further survey research might explore the possibility of such deterrence effects.

The Current Population Survey Voter Supplement (CPS) does, however, provide indirect evidence that this deterrence effect is very small, if it exists at all. The CPS asks registered non-voters why they did not vote. Over 75% express some version of alienation,

disaffection, or lack of interest in the political process or the specific election. The remainder blame either practical difficulties (weather and travel) or election administration. The CPS does not even report a category corresponding to this problem. The only possibility is that it might be folded into one of the other categories. Specifically, one in fifteen registered non-voters reports not voting because of registration problems.[39] Prior studies attribute these problems almost entirely to database management.[40] Even still, some of these respondents might be those who felt discouraged by voter ID practices. If such a deterrence effect were important, then the South and North should differ in the rate at which registration would be cited as a reason for non-voting, because two-thirds of southern voters are asked to show identification compared with one-fifth of northern voters. Only a small difference, however, arises between the North and South in the rate at which voters cite registration problems as their reason for not voting. While it is a theoretical possibility that some people might not vote because they would have to show an identification, that consideration seems to have little weight based on the available research on the reasons for non-voting.[41]

## VI.
## CONCLUSIONS

Voter identification is the controversy that isn't. Almost no one is excluded by this requirement, and when problems arise, there is now a reasonable fail-safe mechanism in the form of provisional ballots.[42] It is not surprising, then, that large majorities in the public support proposals to require voters to show some form of identification.

These findings undercut much of the heated rhetoric that has inflated the debate over voter ID requirements in the United States. It is charged that voter ID requirements are used to discriminate against people, especially racial minorities, and that this has a chilling effect.[43] That almost no one is prevented from voting because of voter ID requirements casts doubt on arguments from the left that this amounts to a new poll tax or literacy test. It is also hard to

---

39. Kelly Holder, U.S. Census Bureau, Voting and Registration in the Election of November 2004, at 15 (2006), *available at* http://www.census.gov/prod/2006pubs/p20-556.pdf.
40. CARTER ET AL., *supra* note 10, at 50–53.
41. Holder, *supra* note 39, at 14–16.
42. *See supra* notes 34–35 and accompanying text.
43. Pear, *supra* note 27, at A1.

Imaged with the Permission of N.Y.U. Annual Survey of American Law
HeinOnline -- 63 N.Y.U. Ann. Surv. Am. L. 626 2007-2008

imagine how ID requirements could have a chilling effect if they are rarely used to prevent people from voting. The poll tax, literacy test, and other tools of the Jim Crow laws are powerful metaphors derived from a very ugly period in American history, but ID requirements in practice today bear only the palest resemblance to such discriminatory practices. Blacks and Hispanics are asked to show identification at a somewhat higher rate than whites. However, voter ID requests today result in almost no exclusions from the political process.

These findings should also deflate much of the rhetoric on the right about voter fraud. Like random traffic stops and other means of detecting illegal activities, voter ID requirements were introduced as a device for rooting out crime—people voting in the wrong place or unregistered people voting.[44] But very few people evidently were caught by ID requirements. Almost no one in the survey (less than 0.1% of voters) reported that they could not vote. The Election Assistance Commission's study of actual provisional balloting revealed that less than one-third of one percent of all ballots in 2004 were not counted, and many of those were cast by people who thought they were registered but who actually were not. Either these rules have no teeth when it comes to stopping illegal voting or, more likely, people, by and large, get it right when they vote.

These facts strongly suggest that there may be little or no voting rights issue involved in the dispute over voter ID rules, and no question of fraud either. This is hardly the stuff of the Civil Rights Movement, or the mid-1950s when only 25% of southern blacks were registered, and fewer still were allowed to vote.[45] Nor does this resemble the bad-old days of urban political machines, when fraudulent voting was rampant and, according to some studies, may have accounted for roughly 10% of the total vote.[46] The CCES

---

44. 148 CONG. REC. 20828, 20832, 20833 (2002) (statement of Sen. Bond) ("The security of the registration and voting process is of paramount concern to Congress and the identification provision and the fraud provisions in this bill are necessary to guarantee the integrity of our public elections and to protect the vote of individual citizens from being devalued by fraud."). *But see id.* at 20841 (statement of Sen. Kennedy) ("The bill requires first time-voters . . . to provide specific forms of identification. . . . We all have a strong interest in preventing voter fraud, but these requirements may not be an effective way to verify voter identity and, at the same time, they are very likely to create unnecessary barriers for voters.").

45. Alt, *supra* note 18, at 374.

46. *See, e.g.*, Jerrold G. Rusk, *The Electoral Universe: Speculation and Evidence*, 68 AM. POL. SCI. REV. 1028, 1033, 1041 (noting a study finding that cleaning up the voting registration system to eliminate "corrupt" or "repeat" voters substantially

figures reveal that the rates at which ID requirements exclude voters—either rightly or wrongly—are no higher than a fraction of a percent.

That being said, there are some tricky issues here. ID requirements are administered differently across racial groups. Although almost no one is ever excluded, it is unclear why these differences would arise. Is this evidence of subtle harassment on a small scale or subtle prejudice among election judges? If so, what can be done about it? A more intensive field study that focuses on the race of the poll worker and the voter and measures the incidence of identification would help to address whether this is a real problem and what explains how poll workers apply the law.

In addition, improper exclusions and cases of fraud, while not systemic problems, surely arise in individual cases. Extrapolating the CCES data up to the population as a whole suggests that thousands of people may have been excluded. Again, I have little statistical confidence in the exact number, and this would be a small percent of the 96 million or so voters in 2006.[47] However, each of these involves a possible violation of voting rights that ought to be pursued in a court of law in order to protect an individual's voting rights.

Beyond legal questions of possible individual cases, though, there is an important insight about public policy contained in the CCES data. It is commonplace to debate election regulations as a tradeoff between access and integrity. I infer from the lack of a relationship between the laws and the (non)exclusion of voters that ID rules present little by way of a tradeoff.

The survey and election data show the striking lack of uniformity in election procedures in the United States. In the Northeast, very few voters are asked to show identification, while in the South the large majority is asked. Even without such uniformity, there seems to be relatively little variation in the way in which the law is applied or the extent to which the law excludes voters, illegal or qualified. We could relax the rules, as in the Northeast, or tighten them, as in the South. There would be little effect on the ability of those who came to the polls to cast a valid ballot. Even when questions arose, virtually all votes would be cast as regular ballots, rather than provisionally.

---

contributed to a "[10%] turnout drop in presidential elections in the North between 1896 and 1912").

    47. U.S. CENSUS BUREAU, STATISTICAL ABSTRACT OF THE UNITED STATES, tbl.404 (127th ed. 2008).

   The tradeoff between integrity and access, then, offers no insight about whether the United States ought to have a voter ID requirement. The values of access and integrity simply do not seem to have much play in the actual use of ID requirements. Other principles and values must operate in deciding what the appropriate law or policy ought to be. There are good arguments for moving to a more relaxed system of voter identification, most importantly the argument for protection of civil liberties. There are equally good arguments for creating a uniform national voter identification that is separate from driver licenses. Most notably, a national voter identification would provide a mechanism for constructing a more coherent voter registration system.

   Much of the debate over voter identification, however, has not focused on the questions of civil liberties and coherence of the administration of elections. Rather, the debate has been cast as a question of access and discrimination versus integrity and fraud. These are lofty and profound concerns for a democracy. In the realm of voter identification in the United States, this debate rests more on phantoms of the past than on the realities of the present.

APPENDIX

The following Common Content questions produced the variables analyzed in columns 2 and 3 of Table 1.

**Post-Election Question 3.** How did you vote? Did you vote in person on Election Day at a precinct, in person before Election Day, or by mail?

>   In person on election day (at polling booth or precinct)
>   In person before election day
>   Voted by mail
>   Don't Know
>   I did not vote

**Post-Election Question 4.** Were you asked to show picture identification, such as a Drivers' License, at the polling place this November?

>   Yes
>   No
>   If Yes, were you then allowed to vote? Yes/No.

**Post-Election Question 5.** Was there a problem with your voter registration when you tried to vote?

>   No
>   Yes
>   If yes, were you allowed to vote?
>   I voted,
>   I was allowed to voting using a provisional ballot,
>   No, I was not allowed to vote

The following MIT Content question produced the variables analyzed in column 1 of Table 1.

**Pre-Election Question 34.** Should voters be required to show photo identification, such as a Drivers' License, at the polling place on Election Day?

>   Yes
>   No
>   Not Sure