# American Politics Research

http://apr.sagepub.com/

**Worth a Thousand Words? : An Analysis of Georgia's Voter Identification Statute**

M.V. Hood III and Charles S. Bullock III
*American Politics Research* 2008 36: 555
DOI: 10.1177/1532673X08316608

The online version of this article can be found at:
http://apr.sagepub.com/content/36/4/555

Published by:
**$SAGE**

http://www.sagepublications.com

On behalf of:
APR at the University of Illinois

**2:13-cv-193**
**09/02/2014**

**DEF0023**

exhibitsticker.com

**Additional services and information for *American Politics Research* can be found at:**

**Email Alerts:** http://apr.sagepub.com/cgi/alerts

**Subscriptions:** http://apr.sagepub.com/subscriptions

**Reprints:** http://www.sagepub.com/journalsReprints.nav

**Permissions:** http://www.sagepub.com/journalsPermissions.nav

**Citations:** http://apr.sagepub.com/content/36/4/555.refs.html

>> Version of Record - Jun 9, 2008

What is This?

PX 027

TA_002591

Downloaded from apr.sagepub.com at UNIV OF TEXAS AUSTIN on May 22, 2012

**American Politics Research**
Volume 36 Number 4
July 2008  555-579
© 2008 Sage Publications
10.1177/1532673X08316608
http://apr.sagepub.com
hosted at
http://online.sagepub.com

# Worth a Thousand Words?

## An Analysis of Georgia's Voter Identification Statute

M. V. Hood III
Charles S. Bullock III
*University of Georgia*

Georgia has joined the states seeking to require the presentation of a picture identification (ID) card, such as a Department of Motor Vehicles (DMV)–issued ID, before a person can vote. Opponents charge that this requirement makes it more difficult for minorities, the elderly, the poor, and those living in rural areas to participate. We examine these claims by determining which registered voters lack a DMV-issued photo ID. Multivariate models show that African Americans, Hispanics, and the elderly are less likely to have a DMV-issued photo ID. Having a photo ID is unrelated to income measured at the zip code level. Those registrants lacking photo IDs were less likely to have voted in general elections in 2004 and 2006 compared to other registrants. In addition, voters without photo identification were more likely to have voted in the 2006 but not the 2004 Democratic primary.

*Keywords:*  *election law; election reform; voter identification; provisional ballots*

The long, drawn-out vote count in Florida that resolved the 2000 presidential election has stimulated unprecedented interest in election administration. Concern about the conduct of elections has generated efforts to instill confidence in the electoral system, and this has a dual focus. One goal has been to ensure that every vote gets counted accurately. A second objective has been to have elections free of fraud. Pursuit of the first objective has led to the elimination of punch-card ballots and the latter has prompted a growing number of states to adopt more stringent identification standards for prospective voters. The most demanding prerequisite requires that voters present a form of government-issued photo identification (ID).[1]

Whereas suspicions about electoral fraud run deep in American history, the 2000 results from Florida, where fewer than 600 ballots determined the presidency of the United States, underscored the possibility that a small

Downloaded from apr.sagepub.com at UNIV OF TEXAS AUSTIN on May 22, 2012

555

number of ineligibles could control an outcome. This concern, linked to the broader debate about undocumented immigrants as well as much older suspicions about the political activities of the dead, has stimulated efforts to require more thorough identification of those seeking to cast ballots.

## Identification Requirements and Turnout

Requiring a picture ID is but a new component of a broader set of requirements for participation in the electoral process. Applying a cost–benefit model to political participation prompts those seeking to maximize participation to prefer minimal requirements for casting a ballot. Political science has long recognized that institutional requirements such as voter registration laws designed to reduce fraud can also impose costs on potential voters thereby reducing the probability that some registrants will go to the polls (e.g., see Campbell, Converse, Miller, & Stokes, 1960; Leighley & Nagler, 1992; Nagler, 1992; Rosenstone & Hansen, 1993; Rosenstone & Wolfinger, 1978). Recent confirmation that registration requirements may hinder participation comes from research showing that states permitting election-day registration have higher turnout rates (Knack & White, 2000). Voter ID requirements may act as an additional impediment to the act of voting for some registrants. In contrast, those most concerned about potential voter fraud favor the most demanding standards. A report issued by the Senate Republican Policy Committee concluded that fraud remains a widespread problem in federal elections (U.S. Senate Republican Policy Committee, 2005). Support for this generalization comes from Florida where a dozen noncitizens were convicted for registering and voting and where one ran for the Florida legislature (U. S. Department of Justice, 2005). One national survey found that most Americans believe that the nation's elections are marred by some degree of fraud (Barreto, Nuno, & Sanchez, 2007). Despite widespread suspicion among Americans that elections are vulnerable to fraud, one report identifies only 24 convictions nationwide for voting fraud between 2002 and 2005 (Minnite, 2007).

States have implemented various voter ID requirements as a means of reducing voter fraud at the polls. Vercellotti and Anderson (2006) have grouped state voter identification requirements into five categories ranging from requiring that voters state their name, sign their name, have their signature matched with one on file, provide some form of ID, or provide photo ID.[2] More recently, Alvarez, Bailey, and Katz (2007) offered an eight-part scale for identification requirements, with photo ID ranked as the most stringent.

TA_002593

Downloaded from apr.sagepub.com at UNIV OF TEXAS AUSTIN on May 22, 2012

The objective of this article is to test claims concerning access to photo ID using recent data from Georgia. Specifically, we examine the extent to which Georgia's registered voters lack a valid driver's license or state-issued ID card.[3] Our research considers several types of voters that critics of this legislation and the judges who enjoined implementation contend would be disadvantaged. Specifically, we examine the degree to which African Americans, Hispanics, the elderly, the poor, and those living in rural areas are less likely to possess a driver's license. We also explore the relationship between possession of a driver's license and voter turnout in 2004 and 2006, and finally, we attempt to shed light on the partisan preferences of those Georgians who lack a driver's license or state ID card.

Ours is the most extensive research yet conducted to assess the accuracy of claims concerning the impact of photo ID requirements. As becomes clear in the literature review that follows, previous research that has examined turnout rates and ID requirements has relied on official turnout statistics or exit poll data. These approaches, while valuable, include only those who have actually gone to the polls. Our approach focuses on the full set of potential voters and, thus, is a better test of who may be potentially deterred from voting by more stringent ID requirements. As we note later, one of the reasons that other studies may not have taken the approach used in this article is because they were set in jurisdictions that do not have information about the race or ethnicity of registrants.

## Literature Review

Relatively little research has been done on the impact of various prerequisites for voting. A study of several southern states concluded that requiring voters to present a form of identification did little to reduce participation (von Spakovsky, 2006). One study of the effect of voter requirements on turnout analyzed county-level returns from all 50 states and individual-level data from the 2004 Census Bureau Current Population Survey (Vercellotti & Anderson, 2006). The specific effects related to photo ID requirements were mixed, with no effects present in the county-level data while the individual-level data predicted a 2.9% drop in voter turnout. When registrants were examined separately by race or ethnicity, the photo ID requirement had a negative effect on White but not Black or Hispanic turnout. Vercellotti and Anderson (2006) found non–photo ID requirements, and not the more restrictive photo ID requirements, most consistently depressed voter turnout across all groups analyzed.

TA_002594

Downloaded from apr.sagepub.com at UNIV OF TEXAS AUSTIN on May 22, 2012

Alvarez and his collaborators (2007) also used individual responses to the postelection Current Population Surveys, but they included four general elections from 2000 through 2006. Aggregating results to the state level, they found no relationship between the stringency of voter ID requirements and turnout. Their analysis of individual behavior also uncovers no evidence of racial differences, although registrants who are less educated and have lower incomes turn out at lower rates.

Mycoff, Wagner, and Wilson (2007) examined results from the same four elections as those used by Alvarez et al. (2007), but Mycoff et al. relied on National Election Study data rather than data collected by the Census Bureau. Mycoff et al. used a 6-point Guttman scale to measure voter identification requirements. The aggregate analysis found no significant difference associated with identification requirements across states. The analysis of reported turnout at the individual level also failed to find a statistically significant relationship between participation and requirements for voter ID.

Barreto et al. (2007) collected information via exit polls in California, New Mexico, and Washington on the 2006 general elections. The research examined the type of ID—defined as a driver's license, a passport, a birth certificate, bank statement, utility bill, or property tax statement—voters used at the polls. African Americans and Latinos were no less likely to have a driver's license than were White voters, but they were less likely to possess other forms of ID. Higher income was positively associated with possession of a driver's license and other forms of ID, with the exception of utility bills. Voters over 65 years of age were significantly less likely to have a driver's license or a utility bill. Whereas those who voted Republican in 2006 used a greater range of ID devices compared to Democratic voters, the authors did not indicate whether Democrats and Republicans differed in terms of driver's license possession.

Currently, nine states have enacted laws requiring that voters present photo ID at the polls: Arizona, Florida, Georgia, Hawaii, Indiana, Louisiana, Missouri, Ohio, and South Dakota (National Conference of State Legislatures, 2007). These states can be subdivided into two groups based on requirements for voters who do not come to the polls with valid photo ID. In Arizona, Georgia, Indiana, and Ohio prospective voters lacking proper ID can cast a provisional ballot, which is counted only if the individual presents valid ID before the vote canvass occurs. The remaining states allow voters to swear an affidavit or provide some other form of nonphoto ID to cast a regular ballot.

Variations among states in the type of ID required may become nothing more than historic interest if the recommendations of the Commission on

Downloaded from apr.sagepub.com at UNIV OF TEXAS AUSTIN on May 22, 2012

Federal Election Reform, cochaired by former President Jimmy Carter and James Baker, get implemented. This commission recommended that a uniform means of ID be required in all states and that this be incorporated into the driver's license or ID card in lieu of a driver's license. The card would contain the individual's picture, date of birth, address, and social security number (Commission on Federal Election Reform, 2005). States have not rushed to act on these recommendations and some have balked at implementing the change.

## The Georgia Situation

Georgia is well suited for our study because it is feasible to merge the necessary data from two different agencies. The voter registration file from the secretary of state can be matched with records maintained by the Department of Motor Vehicles (DMV) identifying registrants who posses either a driver's license or a state identification card. Georgia is also one of five states that include a racial identifier on its voter registration files, making it possible to determine the race or ethnicity of registrants in the state.[4]

The state also has a long history of suspicious voting. Jimmy Carter (1992) describes how he almost lost his first election when an election official created 100 votes for his opponent. In 1947, the legislature chose the governor based on 50 highly suspicious votes. Of these voters, 38 lined up and cast their ballots in alphabetical order (Goodwin, 1947). A large-scale vote-buying scheme in 1996 resulted in elections in one county being thrown out (Osinski, 1997a). Twenty-two campaign workers were successfully prosecuted or pled guilty to election fraud charges (Osinski, 1997b) related to this case. Three of the four contenders for the two offices at the heart of the scandal went to prison, and the fourth died.

In the wake of the Dodge County scandal, a 1997 Georgia law required that voters identify themselves using one of 17 forms of ID. Some of these, such as a state-issued driver's license, contain a picture of the prospective voter but others, such as a recent utility bill or a social security card, do not.[5] The first Republican legislature in 130 years modified the law to require a photo ID, prompting claims by Democrats that the new requirement had partisan overtones.

Although photo ID requirements have incited a great deal of passion, they have generated little hard data to support the claims that the requirements discriminate against certain segments of society. Despite hypotheses

TA_002596

Downloaded from apr.sagepub.com at UNIV OF TEXAS AUSTIN on May 22, 2012

that minorities, the elderly, the poor, and Democrats are more likely than are Whites, the young, the more affluent, and Republicans to have trouble presenting a photo ID, no one seems to know how many registered voters lack a photo ID. Governor Sonny Perdue estimated that 300,000 adults in Georgia lack a driver's license, but of these, 1 in 6 was in prison and, therefore, ineligible to vote (Tharpe & Badertscher, 2005). The American Association of Retired Persons estimated that 150,000 elderly Georgians who lacked driver's licenses cast ballots in 2004 ("Feds Should Kill," 2005). By another estimate, more than a third of the electorate older than 75 years lacks a driver's license (Reed, 2005).

The 2005 statute limited acceptable ID to a driver's license, a state-issued ID card for nondrivers, a military ID card, a government employee ID card, a tribal ID card, or any other valid picture ID issued by the state or federal government including an ID card from a state-supported institution of higher education. Voters who lacked acceptable ID could purchase a card valid for 5 years for $20 or a 10-year card for $30. Fees would be waived for prospective voters who provided an affidavit of indigency. Voters who lacked proper ID could cast provisional ballots that would be counted if they provided proper photo ID within 48 hours.[6]

Those who advocated photo ID as a prerequisite to voting argued that this requirement would limit fraud. They worried that under the current system ballots could be cast by noncitizens and by people voting in place of now-dead registrants. Another potential source of fraud might come from ballots cast by individuals whose registration might not be legitimate. An *Atlanta Journal-Constitution* reporter turned up 208 registered voters who all listed the same home address (Judd, 2006). Others on the registration rolls gave public buildings, schools, the election office, and newspaper headquarters as their home addresses. A member of the Fulton County (Atlanta) Board of Elections claimed that almost 2,500 questionable registration applications had been received in his county alone (Wooten, 2005b).

In trying to counter claims that a photo ID was too burdensome, Republicans pointed to polling data that they said showed 82% of all Americans, including three quarters of Democrats, believe that voters should present a photo ID before being allowed to cast ballots (Burmeister, 2005). Supporters of the new requirement noted that many aspects of contemporary life require one to produce a photo ID (Jacobs, 2005). Boarding an airplane, cashing a check, using a credit card, entering the state capitol, and even renting a DVD are contingent on possessing a photo ID.

African Americans were in the forefront of the legislators who opposed the photo ID bill. One Black legislator refused to yield the floor when her

TA_002597

Downloaded from apr.sagepub.com at UNIV OF TEXAS AUSTIN on May 22, 2012

time expired and instead launched into a song from the Civil Rights movement, "Ain't Gonna Let Nobody Turn Me Around" (Campos, 2005). The head of the Georgia Association of Black Elected Officials, who also serves as a state representative, said of the proposal, "It's an erosion of voting rights and the beginning of turning back the clock on voter enfranchisement" (Jacobs, 2005, pp. C1, C5). Another member of the Legislative Black Caucus dropped a set of prisoner shackles on the desk of the House sponsor of the legislation (Wooten, 2005a). Unable to vote the proposal down, African American legislators staged a walkout in the House (Baxter & Galloway, 2005).

Democrats, who generally objected to the photo ID, questioned the need for this provision. Democratic Secretary of State Cathy Cox (1997-2007), the state official responsible for overseeing elections and an opponent of the bill, reported that her office had received no complaints of ballots being cast by individuals impersonating other registered voters (Jacobs & Campos, 2005). Instead, to the extent that Georgia elections had been marred by fraud in recent years, the problem more often came from questionable absentee ballots, and the photo ID requirement did nothing to make it more difficult for those who set out to abuse this option.

Because Georgia is subject to Section 5 of the Voting Rights Act, the photo ID provision had to be precleared by the federal government. Although representatives of civil rights groups contended that African Americans less often have driver's licenses and, therefore, would bear a disproportionate burden in obtaining the necessary photo ID, the Department of Justice approved this requirement.[7] The attorney general's office explained its decision when responding to an inquiry from Senator Christopher Bond (R-MO) concerning approval of Georgia's photo ID requirement (Moschella, 2005). The letter referenced two newspaper accounts that showed 5,412 Georgia ballots had been cast by dead people between 1980 and 2000 and that the state's active voter rolls listed more than 15,000 dead people. The letter went on to indicate that 6,464,319 Georgians had valid driver's licenses, a number only slightly smaller than Georgia's voting-age population of 6,565,095, as estimated by the Census Bureau for July 1, 2005. The number of driver's license holders exceeded the 4.5 million registered voters in the state. The assistant attorney general noted that among those who had valid driver's licenses approximately 28% were African American, almost precisely the share of the voting-age population that is Black.

When the Department of Justice approved the photo ID requirement, attorneys representing groups often associated with the Democratic Party went to federal court seeking to enjoin the implementation of the requirement. They succeeded when Federal District Judge Harold Murphy blocked

Downloaded from apr.sagepub.com at UNIV OF TEXAS AUSTIN on May 22, 2012

implementation on the grounds that the photo ID was a reincarnation of the poll tax because an additional cost might be involved. Accepting the claims made by the plaintiffs, Murphy noted that "the photo ID requirement is most likely to prevent Georgia's elderly, poor and African American voters from voting. For those citizens, the character and magnitude of their injury—the loss of their right to vote—is undeniably demoralizing and extreme" (Rankin, 2005, p. A1).

Although the statute made it possible to have the fee waived for the indigent, Judge Murphy speculated, "Many voters simply may be too embarrassed over their inability to afford a photo ID to request and complete an affidavit for a free card" (Rankin, 2005, p. A11). The judge also noted that these cards were available only at offices operated by the DMV and that most counties had no such office, causing an inconvenience for those who would have to travel some distance to secure the necessary state identification.[8] They also might have to wait in long, slow-moving lines that had become common in driver's license bureaus in most urban areas. The state had refurbished an old school bus that it sent into rural areas that lacked licensing bureaus but Murphy doubted whether a single bus could cover Georgia's 159 counties.

In 2006, the general assembly passed a new version of the photo ID requirement. This one waived any cost for getting the document in lieu of a driver's license and made these documents available in all 159 counties.[9] The new law also provided for a voter education program (per the previous federal court decision) to inform Georgians of changes in the state's voter ID requirements. The Department of Justice approved the new statute, which was then challenged in separate state and federal suits.

Former democratic governor Roy Barnes, who represented plaintiffs in state court, argued that the statute resulted from a Republican effort to exclude likely Democratic voters.[10] Because a photo ID is not among the requirements for voting established in Georgia's constitution, the state court judge found the legislative effort to be unconstitutional (Campos, 2006c). An angry Glenn Richardson, speaker of the Georgia House, responded to the judicial setback. "These actions clearly reveal the intent of Georgia Democrats to secure voting rights for dead people, felons, and illegal immigrants" (Campos, 2006c, p. A5). A unanimous state Supreme Court upheld the injunction as applied to the 2006 election but later dismissed the case (McCaffrey, 2007).

The coalition of groups behind the federal suit included Common Cause, the American Civil Liberties Union, the National Advancement for the Association of Colored People, the League of Women Voters, and the

Downloaded from apr.sagepub.com at UNIV OF TEXAS AUSTIN on May 22, 2012

TA_002599

Georgia Association of Black Elected Officials. Their attorneys asserted that the photo ID requirement would make it more difficult for African Americans, the elderly, the disabled, and the poor to vote because they are less likely to have driver's licenses. Judge Murphy blocked implementation of the 2006 statute on the grounds that it violated the right to petition the government guaranteed by the First Amendment as well as the equal protection and due process clauses of the Fourteenth Amendment (Jacobs & Campos, 2006). He also speculated that there was insufficient time for perspective voters to obtain the necessary ID to participate in the 2006 primary election.

When the federal court finally held a trial on the merits, Judge Murphy upheld the photo ID requirement in part because no plaintiff had standing to challenge it. The lengthy opinion emphasized that the plaintiffs had failed to produce a single individual who either did not already possess a photo ID or who testified that he or she could not obtain one (*Common Cause v. Billups*, 2007). This opinion raises serious questions about claims that a photo ID requirement will prevent prospective voters from participating.

Georgia's requirement of photo ID even became a factor in the renewal of the Voting Rights Act in 2006. A number of legislators who argued that the work of protecting the ballot remained incomplete pointed to the Georgia statute as evidence that African Americans still confront discrimination. Using the Georgia statute to justify the need for a 25-year extension of the Voting Rights Act ignored the fact that the Department of Justice had approved both the 2005 and 2006 versions of the Georgia statute.

## Data and Method

The data for this project come from two primary sources: the voter registration and history databases maintained by the Georgia secretary of state and a report produced by the Georgia DMV. In June 2006, the state elections board requested that the DMV produce a list of registrants who do not possess a valid driver's license or state identification card.[11] Matching records in their database with the voter registration database, the DMV determined that 305,074 registered voters (6.04%) likely did not possess a valid driver's license or state identification card.[12] Of these, it was determined that 106,522 registrants were never issued either of these forms of identification. The remaining 198,552 registrants had licenses that had expired or had been revoked, suspended, cancelled, or surrendered (Campos, 2006b).[13]

In response to the court ruling, the state elections board planned on using information from this query as part of an effort to educate voters about the

TA_002600

Downloaded from apr.sagepub.com at UNIV OF TEXAS AUSTIN on May 22, 2012

new identification law. In October 2006, the state elections board sent out notices to these 305,074 individuals using a mailing list created from the DMV query (Campos, 2006a). Using Georgia's Open Records Act, we requested and received a copy of this mailing list. The secretary of state's office provided a copy of the state's voter registration database.

We added a field to the voter registration database to denote registrants identified as lacking a DMV photo ID by running a series of queries in which names and addresses were matched between the two data sets (see the appendix for more information on this process). Using this method, we were able to match 282,602 of the 305,074 cases (93%) identified in the mailing list produced by the DMV back to our copy of the voter registration database. This dichotomous identifier was used in subsequent analyses to denote registrants who possessed valid state-issued ID (coded 0) from those who did not (coded 1). In the data set we use for our analysis, 5.80% of the cases did not possess a valid driver's license or state ID card.

Using the state registration and history databases gives us some degree of additional leverage over similar studies that have examined effects related to voter requirements. These data sources include information on the population of registrants and voters in Georgia. Whereas it is risky to argue that one has data encompassing the entire population of a given group this large, using such data does make generating inferences about the target population all the more straightforward. Second, whereas other research has made use of individual-level data in this area, we do not have to worry about questions relating to the inflation of self-reported turnout.[14] In addition, as opposed to measuring laws concerning voter identification at the contextual level (i.e., state), we know which Georgia registrants do not possess a valid driver's license or state ID card.

The first model specified is designed to differentiate Georgia registrants who possess a driver's license or state ID card from those who lack these. A number of independent variables relating to registrant race or ethnicity, age, sex, geographic location, and income are included in the model. Using White registrants as the comparison category, we included a series of dummy variables to denote Black, Hispanic, Asian, and registrants of other race or ethnicity in our model.[15] We also included a dummy variable for gender (1 = *male*; 0 = *female*). Age of registrant (18 to 105), calculated from the recorded date of birth, is also included in the analysis.[16]

In addition to these individual-level variables, we also included several contextual variables that may be related to the probability of a registrant possessing a diver's license. One of the assertions made by critics of the photo

Downloaded from apr.sagepub.com at UNIV OF TEXAS AUSTIN on May 22, 2012

ID bills has been that registrants' incomes may be related to whether they own automobiles and, therefore, possess driver's licenses.[17] Unfortunately, we do not know registrants' actual incomes. We can, however, place them within a particular geographic context, which can then be linked to a measure of income. Using a registrant's residential zip code, we included a measure of 2006 per capita income calculated for that geographic unit (*Community Sourcebook of Zip Code Demographics*, 2006). In Georgia, there are 689 valid residential zip codes, which provides a large degree of variation. By zip code, per capita income in Georgia ranges from a low of \$3,784 to a high of \$107,035, with mean and median levels at \$22,651 and \$19,787, respectively.

A second set of contextual measures analyzes the effect of residence on the dependent variable in question. We classified Georgia's 159 counties as rural, suburban, or urban. Urban counties (9) were those that were part of a core metropolitan statistical area using the Census Bureau designation. Suburban counties (30) were those counties located in a metropolitan statistical area but outside the core. Rural counties (120) were those located outside a metropolitan statistical area. For the models specified, dummy variables were included to denote urban and suburban counties, with rural counties serving as the excluded comparison category. Given the binary nature of the dependent variable, we estimated the model presented in Table 1 using probit. To control for issues related to heteroskedasticity, we also used robust standard errors clustered by zip code for all models presented in this manuscript.

Subsequent models use our primary variable of interest, no driver's license, as an independent variable to predict voter turnout in general elections and selection of partisan ballots in primary elections. Specification of such models must take into account the possibility that this may be an endogenous variable and, as such, these models should be estimated using a multiequation method. Using such a setup also requires a modeling technique that can account for the possibility that the disturbances between the two equations may be correlated. To ensure that we are measuring the true effect of the no driver's license variable and because all the dependent variables employed are binary, we estimates the models presented in Tables 2 and 3 using bivariate probit (for a discussion of these models, see Greene, 2003).[18] Using this setup, the first equation models the effects of possessing photo ID and demographic factors on turnout and primary participation. The second equation is analogous to that specified in the first model where possession of a driver's license is explained by race or ethnicity, age, gender, income, and residential location.

TA_002602

Downloaded from apr.sagepub.com at UNIV OF TEXAS AUSTIN on May 22, 2012

566   American Politics Research

**Table 1**
**Probit Model Predicting Georgia Registrants**
**Without Driver's Licenses**

| Variable | Coefficient |
|---|---|
| Black | 0.3048*** (0.0145) |
| Hispanic | 0.3355*** (0.0205) |
| Asian | 0.0506** (0.0189) |
| Other race or ethnicity | 0.1301*** (0.0112) |
| Male | –0.0449*** (0.0052) |
| Age | 0.0054*** (0.0005) |
| Per capita income | –0.00000093 (0.0000011) |
| Suburban | –0.1433*** (0.0194) |
| Urban | 0.0547 (0.0325) |
| Constant | –1.8632*** (0.0456) |
| Log-likelihood | –10200027.8 |
| $N$ | 4,749,472 |

Note: Entries are probit coefficients with robust standard errors in parentheses. Dependent Variable: 1 = *no identification*; 0 = *identification*.
*$p$ < .05. **$p$ < .01. ***$p$ < .001.

## Findings

The first model examines a number of potential correlates related to whether a registrant possessed a valid driver's license or state ID card. The results of this model are presented in Table 1.[19] In comparison to White registrants, all four racial or ethnic categories included in the model have a significantly higher probability of not possessing either a driver's license or state ID card. Women and older Georgians were also significantly more likely to be without a license or ID card. Among the contextual variables, the per capita income of the zip code in which a registrant lived was inversely related to the probably of possessing identification; however, this result was not statistically significant. Counties classified as suburban did have significantly lower rates of registrants without ID compared with both urban and rural counties. The difference between urban and rural counties was not statistically significant.

Because probit coefficients are not directly interpretable, we created a series of comparisons between various groups using simulated probabilities.[20] Holding the other variables in the model at their mean or modal values, we evaluated the change in the probability of a registrant possessing a driver's

Downloaded from apr.sagepub.com at UNIV OF TEXAS AUSTIN on May 22, 2012

TA_002603

**Figure 1**
**Probability of a Georgia Registrant Not**
**Possessing a Driver's License**



Note: PCI = Per capita income.

* = difference in probability significant at $p < .05$, ‡ = comparison category.

license while manipulating values on key variables of interest. Figure 1 presents a series of estimated probabilities based on the results detailed in Table 1.

The largest effects, in terms of probability shifts, are related to race or ethnicity and age. Non-White registrants are less likely to possess a driver's license compared with White registrants. For example, the probability of a Black registrant not possessing a license is .070, a difference of .033 from that of a White registrant at .037. The probability differences between White registrants and all other racial or ethnic groups are statistically significant. Figure 1 also demonstrates that the probability of an 18-year-old registrant in Georgia not possessing a valid license is .027, compared with .037 for someone of average age (46)—a full point higher. The gap is even starker when a registrant at the far end of the spectrum is used for comparison. In this case, the estimated probability for a 95-year-old registrant is .065, a statistically significant difference of .038 compared with an 18-year-old registrant.

The other differences in Figure 1 are not as substantial as those for race and age. Registrants living in the zip code with the lowest per capita income

Downloaded from apr.sagepub.com at UNIV OF TEXAS AUSTIN on May 22, 2012

**Table 2**
**Bivariate Probit Models Predicting Voter Turnout in Georgia**

| Variable | 2004 General Election | 2006 General Election |
|---|---|---|
| Dependent variable: | | |
| Turnout | | |
| No driver's license | –0.8616*** (0.1077) | –1.1849*** (0.0576) |
| Black | –0.1338*** (0.0167) | –0.0882*** (0.0148) |
| Hispanic | –0.3521*** (0.0193) | –0.4222*** (0.0135) |
| Asian | –0.2976*** (0.0198) | –0.5662*** (0.0195) |
| Other race or ethnicity | –0.5030*** (0.0136) | –0.5251*** (0.0121) |
| Male | –0.1315*** (0.0045) | 0.0092* (0.0047) |
| Age | 0.0146*** (0.0002) | 0.0237*** (0.0002) |
| Per capita income | 0.0000066*** (0.00000098) | 0.0000042*** (0.00000074) |
| Suburban | 0.1275*** (0.0175) | 0.0674*** (0.0154) |
| Urban | 0.0597*** (0.0186) | 0.0660*** (0.0177) |
| Dependent variable: | | |
| No driver's license | | |
| Constant | –0.1648*** (0.0255) | –1.3511*** (0.0212) |
| Black | 0.3000*** (0.0153) | 0.3044*** (0.0146) |
| Hispanic | 0.3739*** (0.0216) | 0.3357*** (0.0206) |
| Asian | 0.0753*** (0.0194) | 0.0486** (0.0190) |
| Other Race/Ethnicity | 0.2525*** (0.0123) | 0.1302*** (0.0112) |
| Male | –0.0388*** (0.0051) | –0.0443*** (0.0051) |
| Age | 0.0050*** (0.0006) | 0.0056*** (0.0006) |
| Per Capita Income | –0.00000063 (0.0000011) | –0.00000091 (0.0000011) |
| Suburban | –0.1342*** (0.0191) | –0.1435*** (0.0195) |
| Urban | 0.0572 (0.0326) | 0.0547 (0.0325) |
| Constant | –1.8288*** (0.0499) | –1.8704*** (0.0476) |
| Rho | –0.0664 (0.0454) | 0.0984*** (0.0272) |
| Log-likelihood | –3167831.3 | –3966453.5 |
| N | 4,060,287 | 4,749,469 |

Note: Entries are bivariate probit coefficients with robust standard errors in parentheses. Equation 1 DV: 1 = *voted*; 0 = *did not vote*.
*$p < .05$. **$p < .01$. ***$p < .001$.

are only .007 (not statistically significant) more likely to lack a driver's license compared with registrants residing in the zip code with the highest level of per capita income.[21] Likewise, there is little discernable difference between registrants living in urban and rural counties (.056 vs. .050); however, there is a noticeable decline for those living in suburban counties at .037. The difference between rural and suburban counties at .014 is statistically significant. Contrary to expectations, voters in both rural and urban areas are less likely to possess a driver's license when compared to suburban registrants. Figure 1 also indicates that women are less likely than men are

Downloaded from apr.sagepub.com at UNIV OF TEXAS AUSTIN on May 22, 2012

TA_002605

**Figure 2**
**Probability of Voting Among Georgia Registrants**



Note: ID = identification.

* = difference in probability significant at $p < .05$.

to have a driver's license. The difference, at .003, although very small is, nonetheless, statistically significant.

In the second facet of the analysis, we sought to ascertain the level of prior electoral participation by comparing registrants who possess a driver's license with those who do not. We used the state's voter history file to determine whether a registrant had voted in either the 2004 or 2006 general elections. Models examining turnout in these elections are presented in Table 2.[22] Possession of valid identification becomes an independent variable used to predict whether these Georgians are less likely to have voted. In these models, the dependent variable is coded 1 for those registrants who voted in the election of interest and 0 otherwise. The set of cases for these analyses included only those registrants qualified to vote in the election in question.[23]

The results of the bivariate probit models related to turnout are presented in Table 2. In each election analyzed, registrants who lack a valid driver's license are significantly less likely to vote (as denoted by the negative coefficients for the variable no driver's license across the models presented in Table 2). To examine this particular effect in more detail, another set of probabilities conditioned on possession of a driver's license is presented in

Downloaded from apr.sagepub.com at UNIV OF TEXAS AUSTIN on May 22, 2012

Figure 2. The largest difference is found with turnout in the 2006 general election, where the probability of voting for registrants with ID is estimated to be .471, more than 4 times that of registrants without a driver's license at .104. The turnout differential for 2006 general election, although not as substantial at .321, is nevertheless quite sizable and statically significant. Given that registrants without a driver's license are already less likely to vote, requiring certain forms of photo ID to vote would most likely diminish turnout among this group even further.

Other results from the turnout equations in Table 2 show that minority registrants are significantly less likely to vote in these elections compared to White registrants. Men were more likely to have voted in the 2004 general election, and turnout among women voters was significantly higher in the 2006 general election. For both elections, turnout was positively related to both age and per capita income. In addition, Georgians residing in suburban and urban areas are more likely to vote compared with those living in rural areas. Wald tests of the hypothesis that the two equations are not correlated (rho = 0) indicate that the equations in the 2004 turnout model are not significantly correlated. Significant correlation does exist between the equations used to estimate turnout in the 2006 election, making the use of bivariate probit to obtain unbiased estimates a necessity.

Georgia is an open primary state, which means that voters do not register by party. Voters decide when they arrive at the polls if they want a Republican or Democratic primary ballot.[24] The models in Table 3 help one to determine whether more Democratic than Republican voters may be affected by the state's photo ID law. These models include only registrants who voted in the 2004 and 2006 general primaries. The dependent variable is coded 1 for those who voted in a Democratic primary election and 0 for those who voted in a Republican primary.

The results of the models presented in Table 3 indicate that registrants without a driver's license were more likely to vote in the Democratic as opposed to the Republican primary in 2006. In contrast, registrants lacking a driver's license were not significantly more likely to have requested a Democratic ballot during the 2004 primary. Racial or ethnic minorities, women, older registrants, and urban dwellers were more likely to choose a Democratic ballot; suburbanites and wealthier Georgians were more likely to cast a vote in the GOP primary. Wald tests indicate that rho is not significant in either the 2004 or 2006 primary models.

Figure 3 displays a set of predicted probabilities based on possession of identification and turnout in Georgia's Democratic primary elections in

TA_002607

Downloaded from apr.sagepub.com at UNIV OF TEXAS AUSTIN on May 22, 2012

**Table 3**
**Bivariate Probit Models Predicting Primary Voting in Georgia**

| Variable | 2004 General Primary | 2006 General Primary |
|---|---|---|
| Dependent variable: | | |
| Democratic primary | | |
| No driver's license | 0.0803 (0.0561) | 0.1914* (0.0900) |
| Black | 1.9121*** (0.0340) | 1.9510*** (0.0316) |
| Hispanic | 0.4054*** (0.0397) | 0.4816*** (0.0346) |
| Asian | 0.4515*** (0.0439) | 0.4418*** (0.0411) |
| Other race or ethnicity | 0.6003*** (0.0346) | 0.5228*** (0.0305) |
| Male | –0.0963*** (0.0050) | –0.1357*** (0.0045) |
| Age | 0.0030*** (0.0005) | 0.0023*** (0.0005) |
| Per capita income | –0.000017*** (0.0000031) | –0.000013*** (0.0000028) |
| Suburban | –0.9641*** (0.0718) | –0.3798*** (0.0530) |
| Urban | 0.1651*** (0.0934) | 0.4154*** (0.0782) |
| Constant | 0.2918*** (0.0840) | 0.0330 (0.0732) |
| Dependent variable: | | |
| No driver's license | | |
| Black | 0.3547*** (0.0154) | 0.3329*** (0.0155) |
| Hispanic | 0.3995*** (0.0451) | 0.3885*** (0.0567) |
| Asian | 0.2653*** (0.0460) | 0.2282*** (0.0602) |
| Other race or ethnicity | 0.1919*** (0.0257) | 0.1989*** (0.0293) |
| Male | –0.0908*** (0.0057) | –0.1082*** (0.0065) |
| Age | 0.0140*** (0.0003) | 0.0133*** (0.0004) |
| Per capita income | 0.00000038 (0.00000084) | 0.000000033*** (0.00000075) |
| Suburban | –0.2053*** (0.0177) | –0.1790*** (0.0170) |
| Urban | –0.1453*** (0.0214) | –0.1214*** (0.0217) |
| Constant | –2.6936*** (0.0274) | –2.7718*** (0.0306) |
| Rho | 0.0094 (0.0217) | –0.0478 (0.0352) |
| Log-likelihood | –762166.5 | –537053.7 |
| *N* | 1,303,056 | 894,390 |

Note: Entries are bivariate probit coefficients with robust standard errors in parentheses. Equation 1 DV: 1 = *voted in Democratic primary*; 0 = *voted in Republican primary*. *$p < .05$. **$p < .01$. ***$p < .001$.

2004 and 2006. In 2006 the probability that a registrant lacking a driver's license would choose a Democratic ballot was .303 compared with .239 for other primary voters, a statistically significant gap of .064. Primary voters lacking identification in 2004 were slightly more likely to have voted in the Democratic primary; however, the difference of .019 is not significant. The results of these models lend mixed support to the contention that a photo ID requirement would more likely affect Democratic partisans.

Downloaded from apr.sagepub.com at UNIV OF TEXAS AUSTIN on May 22, 2012

**Figure 3**
**Probability of Choosing a Democratic Ballot**
**in Georgia Primary Elections**



Note: ID = identification.
* = difference in probability significant at $p < .05$.

## Discussion and Conclusion

Several of the suppositions concerning the effect of requiring a driver's license or other government-issued photo ID card as a prerequisite to voting are supported by this research. Registered voters are significantly less likely to possess a driver's license if they are from minority groups, especially Black and Hispanic, and if they are older. This finding provides some degree of corroboration for plaintiffs who have challenged Georgia's photo ID laws, claiming these requirements would not affect voters of different ages and races equally. When affluence is measured in terms of the per capita income of a zip code area, no evidence is found to support the supposition that requiring a photo ID such as a driver's license would discriminate against the poor. The idea that rural residents might be less likely to have access to driver's licenses because many rural counties do not have a state highway patrol post where one can obtain a license also found little support in this research. Whereas suburbanites were significantly more likely to have driver's licenses than were rural residents, rural residents were no worse off than were urban dwellers in these terms.

TA_002609

Downloaded from apr.sagepub.com at UNIV OF TEXAS AUSTIN on May 22, 2012

Georgia's voter ID legislation drew opposition from leading Democrats, and the litigation in this matter has been filed by groups associated with liberal causes. The evidence does lend mixed support to the idea that it is, indeed, Democrats who are less likely to be in possession of a valid driver's license. Unlicensed voters were more likely to be Democratic as opposed to Republican primary voters in 2006 but not in 2004. Plaintiffs in the lawsuits challenging Georgia's photo ID requirement have also contended that the statute would lead to lower voter turnout, with those without a valid driver's license significantly less likely to participate than licensed drivers. Our research revealed a sizable turnout differential between Georgia registrants with and without driver's licenses, even after controlling for a number of factors. This finding suggests that those registrants who lack driver's licenses are generally less engaged politically and may be even less apt to participate if more ID restrictions are put in place.

Our findings generally support the claims of those who fear that requiring a government-issued photo ID as a prerequisite to voting would deter participation, but our research is not conclusive. We have no information on the extent to which those who may lack driver's licenses might have other acceptable forms of ID, such as a passport or a student ID card from a public institution of higher education. It is almost certain that the numbers of individuals who would be affected by the legislation are smaller than the figures for registrants without a valid driver's license or state-issued ID card. Again, we know many of these registrants are not as likely to vote even with fewer restrictive ID requirements in place. It is possible that tightening ID requirements might affect only a fraction of Georgia registrants, namely those who regularly participate on election day but lack some form of sanctioned photo ID.

Finally, it should be noted that concerns over voter disenfranchisement must be viewed in the same context with efforts to reduce voter fraud. Social scientists are beginning to provide some degree of insight concerning the effects of voter identification laws but little systematic research has been performed to determine the extent to which voter fraud may exist and what types of voter fraud may be more prevalent than others. For example, in the Georgia case, any registrant can request an absentee ballot by mail without providing photo ID. If research finds evidence of voter fraud and such fraud is primarily confined to the area of absentee voting by mail, the ability of voter ID requirements to curb this type of fraud would rightly be called into question. As such, future research efforts in this area must also concentrate on the issue of voter fraud, as any policy evaluation of voter ID requirements must also weigh the ability of these statutes to offset or counteract fraud.

TA_002610

Downloaded from apr.sagepub.com at UNIV OF TEXAS AUSTIN on May 22, 2012

# Appendix
## Linking the Voter Registration Database With State Board of Election Mailing List

### Step 1: Select Query

To link the voter registration database with the mailing list created for the state board of elections, we used Microsoft Access to run a series of queries to match common fields between the two tables. The mailing list itself was created from one version of the voter registration database and contained the following fields: Registrant First Name, Registrant Middle Name, Registrant Last Name, Residential Street Number, Residential Street, Residential City, Residential Zip Code, and Residential Zip Code Plus.

The select query returned a table of all records where a one-to-one match for the fields outlined above existed (those connected by a doubled-headed arrow in the diagram). Stated otherwise, the query produced a list of registrants from the registration database who did not possess a driver's license or state identification (ID) card. In addition to the name and address fields, we were also able to add the voter registration number field for each registrant. This is a unique 8-digit code assigned to Georgians when they register to vote and, as such, no two registrants should have the same voter registration ID number.

### Step 2: Eliminate Duplicates Query

The next step checked for and eliminated any duplicates on this list using additional queries. One query searched for any two or more records with duplicate voter registration numbers. A second query searched for duplicates based on name and address. This event did occur in a small number of cases where both father and son had the same first, middle, and last names and lived at the same residential address. For these cases, it was not possible with the information present to determine whether it was the father or the son who lacked a driver's license. These cases were, therefore, eliminated from the database.

### Step 3: Update Query

After cleaning the list of registrants identified as lacking ID, we used this revised list to run one final query. This query updated our original copy of the voter registration database to include a new field to indicate those registrants who lacked a driver's license or state ID card. As both the cleaned list of registrants lacking a driver's license and the original voter ID database contain the common voter registration ID field (and at this point neither data set should contain any duplicates), we can easily link the two tables using this field as the primary key.

TA_002611

Downloaded from apr.sagepub.com at UNIV OF TEXAS AUSTIN on May 22, 2012

**Figure A1**
**Steps in the Data-Linkage Process**



Note: SBOE = state board of elections; SOS = secretary of state; ID = identification; DL = driver's license.

## Notes

1. For a discussion of various state requirements for casting a ballot, see Alvarez, Bailey, and Katz (2007) or Mycoff, Wagner, and Wilson (2007).

2. The National Conference of State Legislatures (2007) has a comprehensive and up-to-date summary of state voter identification requirements in their online report, *Requirements for Voter Identification*.

3. In the interest of brevity, we sometimes refer only to possession of a driver's license, using that term to also include the state-issued card in lieu of a driver's license.

Downloaded from apr.sagepub.com at UNIV OF TEXAS AUSTIN on May 22, 2012

TA_002612

4. The other states are Louisiana, Florida, North Carolina, and South Carolina.

5. The valid forms of identification required for a voter area Georgia driver's license; an identification (ID) card issued by the state or federal government; a U.S. passport; an employee photo ID; a student ID card from any public or private college, university, or technical school in Georgia; a Georgia license to carry a pistol; a pilot's license issued by the Federal Aviation Administration; military ID card; a certified copy of a birth certificate; a Social Security card; naturalization papers; a certified copy of court records showing an adoption or a name or sex change; a recent utility bill; a nursing home identification; a bank statement that shows the name and address of the voter; a government check that shows the name and address of the voter; or any other government document that contains the name and address of the voter. Voters lacking any of these forms of identification can cast a provisional ballot that will be counted if they return and provide one of the accepted modes of identification.

6. Voters in Georgia can cast a ballot on election day in person, in person prior to election day (termed in-person absentee voting), or via absentee ballot by mail. It is important to note that the photo ID requirement applied to those registrants voting in person prior to or on the day of an election but not to those voting absentee by mail. In 2005, Georgia also passed legislation providing for no-excuse absentee voting by mail whereby anyone can request such a ballot without providing a justification.

7. In approving the Georgia statute, top Department of Justice officials overrode the negative evaluation made by the Section 5 staff (Eggen, 2005).

8. Only 50 of Georgia's 159 counties had a Department of Motor Vehicle Safety where one could get a state-issued photo ID (Reed, 2005).

9. Voters lacking proper photo ID for voting would be allowed to obtain such ID at their respective county registrars' offices.

10. An embarrassing moment occurred when Barnes's lead plaintiff had to be replaced. After claiming that she would be unable to vote because she lacked a photo ID, Margaret Berry cast an absentee ballot for which no photo ID is required (Georgia Republican Party, 2006).

11. The Federal Highway Administration calculated that 89.8% of Georgia's voting-age population had a driver's license in 2004 (von Spakovsky, 2006). Georgia registrants were more likely to have a driver's license than were the voters who participated in the exit poll conducted in three western states where 88% had a driver's license (Barreto, Nuno, & Sanchez, 2007).

12. An initial list of registrants compiled by Secretary of State Cathy Cox (D) indicated that 675,684 Georgia registrants (or 1 in 7) lacked a driver's license (Harris, 2006). In the aftermath of that startling announcement, questions arose that suggested problems with the matching. A Republican member of the state elections board challenged the results, noting that the list of voters without driver's licenses included his father and a neighbor, both of whom were licensed drivers (Evans, 2006). There was even evidence presented at a hearing suggesting that Judge Murphy had shown up among those without a driver's license (von Spakovsky, 2006). Our analysis relies on the more refined list produced by the state elections board discussed in the text.

13. Although the voter ID statute does allow registrants to use an expired license to vote, Jennifer Ammons (personal communication, October 5, 2006), general counsel for the Department of Driver Services, stated that individuals in this category were included in the mailing list because of concern over whether these registrants may have discarded their expired licenses. In addition, the statute does not allow one to use an expired ID card to vote.

14. An exception is the three-state study done by Barreto et al. (2007) that relied on exit poll data.

Downloaded from apr.sagepub.com at UNIV OF TEXAS AUSTIN on May 22, 2012

15. For purposes of this analysis, we combined registrants from the Other and Unknown categories.White, Black, Hispanic, Asian, Other, and Unknown are the options available on Georgia's voter registration form, which does not include separate categories for White non-Hispanic or Black non-Hispanic.

16. The voter registration database contained a number of obvious errors related to age. Although it is difficult to know exactly where to truncate the age range, we set the upperbound on age at 105.

17. The cost to obtain either a driver's license or state ID card valid for a 5-year period is $20.

18. The model presented in Table 1 was estimated in Stata 9.0 using the probit procedure. Models in Tables 2 and 3 were estimated using the biprobit procedure.

19. Given that the dependent variable in this model is extremely skewed with 5.8% of registrants not possessing a driver's license, we also specified a rare events logit model to compensate for this issue (King & Zeng, 2001). The results of both the rare events logit and the probit model presented are identical in terms of sign and significance of coefficients. Translation of the rare events coefficients into probabilities yielded virtually identical results to those presented in Figure 1. We opt, therefore, to present the results from the probit model. Output for the rare events logit specification is available upon request from the authors.

20. We estimated probabilities of interest for Model 1 using CLARIFY (Tomz, Wittenberg, & King, 2003).

21. This finding does not rule out the possibility that a relationship between income and possession of a driver's license may exist at the individual level.

22. In the 2004 and 2006 general elections, registrants did not have to present photo ID to vote but could use any of the 17 forms of identification detailed in Note 5.

23. As required by Georgia law, a potential voter must be registered 30 days prior to an election to participate.

24. A third option does exist in that Georgia voters can select a nonpartisan ballot to vote on issues unrelated to party primaries. Those few voters who selected the nonpartisan ballot option were not included in the models presented in this analysis.

# References

Alvarez, R. M., Bailey, D., & Katz, J. N. (2007). *The effect of voter identification laws on turnout* [Social Science Working Paper 1267]. Pasadena, CA: Division of Humanities and Social Sciences, California Institute of Technology.

Barreto, M. A., Nuno, S. A., & Sanchez, G. R. (2007, September). *Voter ID requirements and the disenfranchisement of Latino, Black and Asian voters*. Paper presented at the annual meeting of the American Political Science Association, Chicago, IL.

Baxter, T., & Galloway, J. (2005, March 15).Views of past closed in walkout. *Atlanta Journal-Constitution*, p. B4.

Burmeister, S. (2005, April 3). Photo requirement will add to elections' security. *Atlanta Journal-Constitution*, pp. F1, F4.

Campbell, A., Converse, P. E., Miller, W. E., & Stokes, D. (1960). *TheAmerican voter.* New York: Wiley.

Campos, C. (2005, March 24). Firebrand "standing up." *Atlanta Journal-Constitution*, pp. C1, C5.

Campos, C. (2006a, October 7). Despite letter, no photo ID required. *Atlanta-Journal Constitution*, p. A1.

Downloaded from apr.sagepub.com at UNIV OF TEXAS AUSTIN on May 22, 2012

578    American Politics Research

Campos, C. (2006b, September 2). Fight over photo ID resumes. *Atlanta-Journal Constitution*, p. D1.

Campos, C. (2006c, July 8). Voter ID law on hold. *Atlanta Journal-Constitution*, pp. A1, A5.

Carter, J. (1992). *Turning point.* New York: Times Books.

Commission on Federal Election Reform. (2005). *Report of the Commission on Federal Election Reform: Building confidence in U.S. elections*. Available at http://www.american .edu/ia/cfer/report/full_report.pdf

Common Cause v. Billups. Civil Action No. 4:05-CV-0201-HLM (N.D.GA. 2007)

*Community Sourcebook of Zip Code Demographics* (20th ed.). (2006). Vienna, VA: ESRI Press.

Eggen, D. (2005, November 17). Criticism of voting law was overruled. *Washington Post*, p. A1.

Evans, R. (2006, July 2). Voter ID law will instill confidence. *Atlanta Journal-Constitution*, p. C9.

Feds should kill voter ID law [Editorial]. (2005, July 31). *Atlanta Journal-Constitution*, p. B6.

Georgia Republican Party. (2006, July 3). *Did you hear the one about the trial lawyer who lost his client?* [Press release]. Atlanta, GA: Author.

Goodwin, G. (1947, March 2). What journal prober found in Telfair. *Atlanta Journal*, pp. A1, A10.

Greene, W. H. (2003). *Econometric analysis* (5th ed.). Upper Saddle River, NJ: Prentice Hall.

Harris, L. V. (2006, July 2). Law threatens the right to vote. *Atlanta Journal-Constitution*, p. C8.

Jacobs, S. (2005, March 24). Photo ID bills leave lawmakers in a lurch. *Atlanta Journal-Constitution*, pp. C1, C5.

Jacobs, S., & Campos, C. (2005, March 30). Voter bill stirs furor. *Atlanta Journal-Constitution*, pp. A1, A10.

Jacobs, S., & Campos, C. (2006, July 13). Photo ID law suffers 2 set backs. *Atlanta Journal-Constitution*, pp. B1, B3.

Judd, A. (2006, January 10). Bogus addresses cloud voter rolls. *Atlanta Journal-Constitution*, pp. A1, A6.

King, G., & Zeng, L. (2001). Logistic regression in rare events data. *Political Analysis*, *9*, 137-163.

Knack, S., & White, J. (2000). Election day registration and turnout in equality. *Political Behavior*, *22*, 1.

Leighley, J. E., & Nagler, J. (1992). Individual and systematic influences on turnout: Who votes? *Journal of Politics*, *54*, 718-740.

McCaffrey, S. (2007, August 11). State wants voters aware of ID law. *Athens Banner-Herald*, p. A9.

Minnite, L. (2007). *The politics of voter fraud*. Retrieved September 10, 2007, from http:// projectvote.org/publications/reports-guides.html

Moschella, W. E. (2005, October 7). *Letter from the United States Assistant Attorney General to Honorable Christopher S. Bond*. Retrieved March 17, 2007, from http://www.usdoj .gov/crt/voting/misc/ga_id_bond_ltr.htm

Mycoff, J. D., Wagner, M. W., & Wilson, David C. (2007, September). *Do voter identification laws affect voter turnout?* Paper presented at the annual meeting of the American Political Science Association, Chicago, IL.

Nagler, J. (1992). The effect of registration laws and education on U.S. voter turnout. *American Political Science Review*, *85*, 1393-1405.

National Conference of State Legislatures. (2007). Requirements for voter identification. Retrieved March 13, 2007, from http://www.ncsl.org/programs/legismgt/elect/taskfc/ voeteridreq.htm

TA_002615

Downloaded from apr.sagepub.com at UNIV OF TEXAS AUSTIN on May 22, 2012

Osinski, B. (1997a, July 6). Dodge County: A legacy of lawlessness; seedy side of politics. *Atlanta Journal-Constitution*, p. B4.

Osinski, B. (1997b, September 6). Vote-buying sentences handed out. *Atlanta Journal-Constitution*, p. C9.

Rankin, B. (2005, February 19). Judge halts voter ID law. *Atlanta Journal-Constitution*, pp. A1, A11.

Reed, K. (2005, April 3). A problematic solution for nonexistent problem. *Atlanta Journal-Constitution*, pp. C1, C4.

Rosenstone, S. J., & Wolfinger, R. E. (1978). The effect of registration laws on voter turnout. *American Political Science Review*, *72*, 22-45.

Rosenstone, S. J., & Hansen, J. M. (1993). *Mobilization, participation, and democracy in America.* New York: McMillan.

Tharpe, J., & Badertscher, N. (2005, April 2). Voter ID bill likely to be law. *Atlanta Journal-Constitution*, pp. D1, D4.

Tomz, M., Wittenberg, J., & King, G. (2003). *CLARIFY: Software for interpreting and presenting statistical results, Version 2.1*. Cambridge, MA: Stanford University, University of Wisconsin, and Harvard University. Retrieved March 13, 2007, from http://gking .harvard.edu/

U.S. Department of Justice, Criminal Division, Public Integrity Section. (2005). *Election fraud prosecutions and convictions, ballot access and voting integrity initiative, October 2002-September 2005*. Washington, DC: Author.

U.S. Senate Republican Policy Committee. (2005). *Putting an end to voter fraud*. Retrieved September 10, 2007, from http://rpc.senate.gov/files/feb1504VotedFraudSDsd.pdf

Vercellotti, T., & Anderson, D. (2006, August-September). *Protecting the franchise or restricting it? The effects of voter identification requirements on turnout*. Paper presented at the annual meeting of the American Political Science Association, Philadelphia, PA.

vonSpakovsky, H. A. (2006). *Increasing the security of elections: The effect of identification requirements on turnout of minority voters*. Paper prepared for the Federalist Society for Law and Public Policy Studies. Retrieved March 13, 2007, from http://www.fed-soc.org/ publications/pubID.179/pub_detail.asp

Wooten, J. (2005a, March 22). Democrats' histrionics misguided. *Atlanta Journal-Constitution*, p. A19.

Wooten, J. (2005b, August 2). Opponents of voter IDs thrive on fear. *Atlanta Journal-Constitution*, p. A13.

**M. V. Hood III** is an associate professor of political science at the University of Georgia, where he conducts research in American politics and policy. He has recently published articles in *Political Analysis* and *Social Science Quarterly*.

**Charles S. Bullock III** is the Richard Russell Professor of Political Science and the Josiah Meigs Distinguished Teaching Professor at the University of Georgia. His research and teaching interests are related to southern politics, elections, voting rights, and legislative politics. The third edition of *The New Politics of the Old South* that he coedits was published in 2007.

Downloaded from apr.sagepub.com at UNIV OF TEXAS AUSTIN on May 22, 2012