# Effects of Identification Requirements on Voting: Evidence from the Experiences of Voters on Election Day

**Stephen Ansolabehere,** *Harvard University*

2:13-cv-193
09/02/2014
DEF0034

PX 038

At the heart of the efforts to improve elections in the United States are two important values: access and integrity. To guarantee the right to vote, the polls must be accessible to all who wish to vote. To guarantee legitimate elections, only eligible people should be allowed to vote, and all votes must be tabulated correctly. These values have different implications for administrative procedures, ranging from the implementation of registration systems to the choice of voting equipment to the set up of polling places and training of poll workers. Often these values work hand in hand, but at times they are at odds. Such is the case with the authentication of voters at the polls (see National Commission on Federal Election Reform 2002).

The debate over voter identification is usually framed as a tradeoff between the goals of guaranteeing access and ensuring integrity. Stricter authentication procedures, including photographic identification and proof of citizenship, provide high levels of assurance that those voting are in fact legal voters. Such procedures may, however, create burdens that prevent many legitimate voters from participating. The debate further divides along partisan lines, as it is commonly conjectured that those least likely to have the required identification readily available are disproportionately poor, racial minorities, and elderly, and, thus, more likely Democratic. Consequently, efforts to create voter-authentication procedures in states quickly become partisan political matters.

State laws stipulate the acceptable ways that poll workers may verify that an individual is a legitimate voter, and is who he or she claims to be. There is considerable variation among the states in the methods allowed. The different rules group roughly into two polar cases: (1) those states that allow poll workers to request identification, and (2) those states that do not. The most stringent form of authentication currently in use requires that all voters present a government-issued photographic identification at the polls. Only two states currently have such laws, although another two dozen allow poll workers the discretion to request identification. In these states, voters may ultimately be asked for identification in order to vote. The other 25 states employ a range of less stringent identification rules, including signature on an affidavit or a registration list; providing proof of residence, such as a utility bill; or simply stating one's name and address. In these states, voters need not present identification in order to vote. Before 2000, less stringent identification rules were the norm, but the election-reform efforts following the 2000 election led many states to adopt stricter voter-authentication rules.

Not surprisingly, these laws have been challenged in court, and the question before the Supreme Court was how to balance the twin goals of access and integrity. Those challenging photo-ID laws argued that they place undue burden on voters and have discriminatory consequences; those defending the laws argued that they are essential to ensure the legitimacy of elections. The State of Missouri struck down a Missouri photo-identification law as too restrictive, but ithe federal courts let stand such laws in Arizona and Indiana and left open the possibility of further challenges to identification laws in other contexts. The majority opinion in the Indiana case (*Crawford v. Marion County*) further redefined the tradeoff. Voter-identification laws, although they may place some burdens on voters, must be weighed against not just actual instances of fraudulent voting but against the potentially corrosive effects of the perception of corruption in the electoral process. The Court's reformulation of the objectives, which ironically echoes *Buckley v. Valeo* (424 US 1 [1976]), the signature case in campaign finance, raises a host of fundamentally empirical questions about the use of identification procedures:

1. Are poll workers in compliance with their own state laws? Are voter-ID requests equitably applied across groups?
2. Do voter-identification procedures affect turnout of legal voters? Do they prevent and deter people from voting?
3. Do identification procedures improve confidence in the election? Do those asked to show ID or in states with more stringent ID laws express lower beliefs in the incidence of fraud?

The answer to all three of these questions appears to be *no*, a conclusion that ought to cause legal scholars, political strategists, state legislators, and jurists to rethink the justification for and likely consequences of voter-identification rules.

TA_001472

doi:10.1017/S1049096509090313   PS • January 2009   **127**

**METHODOLOGY**

These are empirical questions of the sort that political scientists are quite good at addressing. I and colleagues affiliated with the Cooperative Congressional Election Study and the Caltech/MIT Voting Technology Project decided to examine these questions directly using a simple battery of questions about voters' election experiences in the 2006 general election and the 2008 presidential primaries on Super Tuesday.[1] Specifically, the battery of questions asks whether the respondent (1) is registered; (2) voted in the election in question; (3) voted at the polls, early, or absentee; (4) was asked to show photo ID; (5) had a registration problem or difficulty obtaining a ballot; and (6) waited to vote. Of particular importance for this issue, the surveys asked respondents whether they were asked to show *photographic* identification at the polls when they voted. Follow up questions were asked of those who showed ID or had registration problems to ascertain whether they were, then, not allowed to vote, voted a provisional ballot, or allowed to vote.

The surveys were conducted over the Internet by YouGov/Polimetrix over the course of the week following each of the elections. The 2006 sample consisted of 36,500 adults; the 2008 sample contained 4,000 adults. An additional sample was conducted over the phone in 2008 to cross-validate the Internet survey. Although reported turnout was slightly lower among those in the phone survey, the proportions reporting being asked for identification, having registration problems, and so forth were not statistically distinguishable across the two modes. At the time of this writing, similar studies are underway for the 2008 general election.

In addition, 1,000 subjects from the 2006 survey were interviewed again in 2007. These respondents were asked their beliefs about the incidence of voter fraud and election tampering as well as their intentions to vote in the future. This sample allows us to address whether those actually asked to show ID feel that fraud is less of a problem.

Finally, data on state laws come from the National Council of State Legislatures (2008) and Alvarez, Bailey, and Katz (2008). These laws divide roughly into two categories: those states that allow poll workers to request voter identification and those that do not. I will refer to these below as Voter ID states and Non-ID states.

**RESULTS**

**1. What Is the Incidence of Voter-ID Requests?**

Half of all voters are asked to show photographic identification at the polls. In the 2006 sample, 49% of respondents reported that the poll workers asked them to show photo ID when they voted. In the 2008 sample that figure had risen to 56%. This rate is strikingly high. In 2006 only two states actually required photo identifications; the other Voter ID states allowed poll workers to request ID. In other words, poll workers are using their discretion and asking voters to show photo ID.

The incidence of requests for ID varies considerably across states, with requests exceeding 90% of all voters in some states and below 10% in others. The main reason for the variation is state law. In the Voter ID states, nearly 80% of voters on average are asked to show ID. In the Non-ID states, less than 20% are asked to show ID (see Ansolabehere 2008). This pattern suggests that simply allowing poll workers to request voter ID triggers a very high rate of requests for photographic identification at the polls. The 2008 Super Tuesday survey probed whether voters showed photo ID because that was convenient or because that was what the poll worker requested. Approximately half of those who showed ID said that they did so because photo ID was convenient, but half said that the poll worker asked for photo ID.

The incidence of requests for photo ID at the polls also varies across region. In the Northeast 22% reported that poll workers asked for photo ID in the general election, compared with 65% in the South. Approximately 45% were asked for ID in the West and Midwest.

Regional variation in requests for photo identification at the polls mainly reflects the laws. Southern states tend to have more restrictive voter-ID laws. Only Mississippi and North Carolina do not ask for voter ID at the polls. The Northeast is the opposite. Only Connecticut does allow poll workers to request ID. As a result, relatively few voters are asked for ID in the North, but most voters are asked for ID in the South. The pattern of ID laws is less uniform among the Western states and among the midwestern states.

For voting-rights advocates, racial differences in these data are of greatest concern. Differential application of election laws at the polling places was the target of the Voting Rights Act and civil rights litigation from the 1940s onward. The Voting Rights Act expressly forbids the use of "tests" at the polls, and the U.S. Supreme Court has struck down the use of poll taxes as violations of equal protection. Literacy tests, poll taxes, and other administrative procedures were widely used before the 1960s to keep certain groups, especially southern blacks, from voting. There is the very real possibility that voter-ID laws provide an opening for the reemergence of such practices.

Both the 2006 and 2008 surveys show considerable racial differences. In the 2006 general election, 47% of white voters reported being asked to show photo identification at the polls, compared with 54% of Hispanics and 55% of African Americans. In the 2008 Super Tuesday primary states, 53% of whites were asked to show photo ID, compared with 58% of Hispanics and a staggering 73% of African Americans. These racial differences persisted upon holding constant income, education, party identification, age, region, state laws, and other factors (see Ansolabehere and Persily 2008 for details). Opponents of voter-identification laws charge that they amount to a new form of "test" or "tax." These surveys provide the first individual-level data that poll workers commonly ask voters for photo identification, even in places where they are not allowed to. The data further show that poll workers do not administer this procedure fairly or without regard to race, which raises the important possibility that in practice voter-identification procedures violate the Voting Rights Act.

**2. What Is the Effect of Voter ID Requests on Access?**

The immediate voting-rights concern with photo-identification laws is that they prevent people from voting and affect the

TA_001473

access to the polls of different groups or classes of voters. How many people were denied the vote as a result of voter-identification requests?

The answer is—very few. If respondents reported that they were asked to show photo identification, the 2006 and 2008 surveys probed whether the respondents were then allowed to vote. In the 2006 survey, out of 22,211 voters only 25 said that they were asked for identification and, then, disallowed from voting—that is one-tenth of 1% of the sample of voters. In the 2008 survey, three out of 2,564 respondents said that they tried to vote but were not allowed because of voter ID, a fraction of a percent.

This is an exceptionally low rate of denial of access to the vote. Some of these denials may have been legitimate, and some may have been erroneous. But the actual denials of the vote in these two surveys suggest that photo-ID laws may prevent almost no one from voting.

One rejoinder to these findings is that the very presence of ID laws may discourage some voters from even attempting to vote. To examine this possibility we asked registered non-voters in the 2008 survey why they did not vote. This question parallels the question on the Current Population Survey with the addition of "I did not have proper identification." Of the 1,113 non-voters in the survey, four cited this as a reason, and these individuals cited other reasons as well—"bad weather" and "forgot to vote." All told, then, only seven out of 4,000 people (less than two-tenths of 1% of the electorate) could be considered non-voters at least in part because of voter identification.

Voter ID does not appear to present a significant barrier to voting. Although poll workers widely request ID, such requests rarely result in voters denied the franchise. Moreover, very few people chose not vote in the 2008 primaries for lack of identification. Although the debate over this issue is often draped in the language of the civil and voting rights movements, voter ID appears to present no real barrier to access. An important caveat accompanies these findings. These surveys covered a midterm election and presidential primary elections. Although the particular elections drew relatively high numbers of voters, the turnout was not nearly as high as in presidential general elections. High turnout is widely thought to put additional strains on the election-administration system. Some have argued that the denial of access is most likely to occur in those circumstances. Whether that is true is the subject for further study. At the time of this writing, the 2008 Cooperative Congressional Election Survey (CCES) and a separate survey sponsored by the Pew Charitable Trusts are planned for the 2008 general election and will replicate these questions and methods.

### 3. Voter ID and Confidence

The justification for photo-identification requirements rests on concerns about voter fraud. Requiring all voters to show photo identification at the polls may be justified in order to prevent people from impersonating actual voters or committing other sorts of voter fraud. Voter fraud has been perhaps been the most elusive election-related phenomenon on which to get hard facts. Large majorities believe that fraud occurs at least somewhat often in elections, but social scientists have been unable to develop unambiguous measures of the incidence of fraud, and legal cases find very little hard evidence on the matter. In fact, the case in *Crawford v. Marion County Board of Election* (553 US [2008]) produced no actual instances of voter fraud occurring. Even still the courts upheld the law.

The justification for the law in the majority opinion of the Supreme Court arises not necessarily from the fact of fraud but from the perception of or belief in fraud. The opinion in *Purcell*, and later *Crawford*, argues that the government's interest in limiting corruption or perceived corruption of the electoral process must be weighed against the constitutionally guaranteed right to vote.[2]

The Court's concern with the perception of corruption certainly receives support from the public opinion surveys. In a follow-up survey to the 2006 CCES, the 2007 CCES asked about people's perceptions of fraud. Over half of respondents felt that voter fraud, as occurs when ineligible people vote, occurs "somewhat often" or "very often." Similar majorities felt that election fraud, such as occurs when ballots are tampered with, also occurs somewhat or very often. Only about one in 10 respondents believe that such fraud occurs "rarely" (See Ansolabehere and Persily 2008, 1754).

The opinion of the Court, however, asserts that a widely held belief that fraud occurs often will erode the legitimacy of elections. People will come to view elections as illegal or not reflecting the will of the people. This will discourage people from voting, further weakening the democratic process. Stronger identification laws offer a cure, as they can reassure voters that only legitimate votes are cast.

These claims are testable. First, those who believe that fraud is common ought to be less likely to vote. Second, those in states with stricter ID laws ought to perceive less fraud in their elections. Neither appears true.

The first claim asserts a mechanism through which fraud lowers voting. Those who see fraud as occurring often in elections, it is argued, will view elections as less legitimate and their votes as less effective. As a result, those who believe that fraud is common ought to be less likely to vote. In the 2007 survey, of those who thought fraud a very common occurrence, 47% voted, and of those who thought fraud rare, 44% reported voting.[3] Controlling for education, income, partisanship, and other factors did not change this non-finding. Belief in the frequency of election fraud is uncorrelated with propensity to vote.

The second claim asserts a solution—stricter identification will shore up confidence in the process and, hence, turnout. This claim also lacks empirical support. Those voters living in states with stricter identification laws did not report higher levels of confidence or higher rates of voting than those living in states with relatively weak identification rules. In states with the weakest ID rules, 26% think fraud occurs very often and 10% think it occurs rarely. In states with the strictest ID rules, 29% think fraud occurs very often and 9% think it occurs rarely. Moreover, individual voters who were asked to show ID at the polls in 2006 were not more likely to assert higher levels of confidence in the electoral process or higher intentions to vote than those who were not asked to show ID (Ansolabehere and Persily 2008).

TA_001474

These twin findings reveal that ID laws will have little or no effect on the confidence in the electoral system or the belief in the incidence of fraud. Those beliefs, wherever they come from, are no different when a stricter ID law is in place and enforced than when less invasive voter-authentication methods are used. These findings also call into question the assumptions underlying the majority's opinion in *Crawford*. People may think voter fraud occurs often, but that belief appears disconnected from the likelihood that someone engages with politics and votes.

### DISCUSSION

The experience of individuals at the polls on Election Day suggests that there is much less to the voter-identification controversy than appears in the pages of the court decisions or the debates in public forums. Approximately half of all people are asked for ID when they vote, but almost no one reports subsequently being denied the vote or reports that lack of ID was a reason for not attempting to vote. A majority of Americans say that voter fraud is common, but voter-identification laws and practices have little effect on those beliefs, and those beliefs have no effect on rates of electoral participation.

This is the picture that emerges from voters' reports about what actually happened at the polls on Election Day. Most studies of aggregate election returns are consistent with such non-findings, but some researchers do find that the state law used corresponds to lower turnout rates (e.g., Alvarez, Bailey, and Katz 2008). Why the inconsistency? One possibility is methodological—aggregate indicators do not measure who is asked for ID and run the risk of committing the ecological fallacy (even when the aggregate indicator is used in a survey). The survey data are superior, as they reveal whether voter-identification requests are in fact an instrument of exclusion.

There is another possibility. Both sets of results may be right. It may be the case that total votes cast drop once states adopt identification requirements and that only a very small number of individuals are prevented from voting at the polls by such rules. Two potential explanations may resolve this difference. First, identification requirements may deter people from voting without actually excluding them at the polls. Second, identification requirements may reduce the incidence of voting among those not registered or eligible to vote, that is, fraud.

The first of these explanations looks like it has no basis in fact, as the 2008 survey found that almost no one reported that they stayed away from the polls for want of appropriate identification. That leaves the tantalizing, yet unresolved, possibility that the differences between aggregate results and individuals' experiences at the polls may reflect a reduction in fraud. To date, there are certainly cases of fraud, but no evidence of systematic or extensive voting fraud, despite concerted investigations by the Department of Justice. It will require more intensive survey research to track the voters' (and non-voters') experiences and careful modeling of aggregate election returns to determine whether the introduction of ID laws caused a drop in the total number of votes recorded. The conclusion supported by the data examined here, however, is that voter-ID laws have no effect on turnout, and hence little or no fraud, little or no denial of access, and little or no effect of on confidence in the electoral system. ■

### NOTES

1. The Cooperative Congressional Election Study of 2006 was created through the consortium of 37 different universities. The 2008 Super Tuesday survey was paid for through a grant from the Pew Foundation.

2. *Purcell v. Gonzalez* 127 S. Ct. 5, 7 (2006).

3. The 2006 CCES includes validated vote, and the numbers reported are of actual votes, not reported. These figures come from the MIT Module of the 2007 CCES.

### REFERENCES

Alvarez, R. Michael, Delia Bailey, and Jonathan Katz. 2008. "The Effect of Voter Identification Laws on Turnout." Voting Technology Project Working Paper #57, December 2. www.votingtechnologyproject.org/media/documents/wps/vtp_wp57b.pdf.

Ansolabehere, Stephen. 2008. "Access versus Integrity in Voter Identification Requirements." *New York University Annual Survey of American Law* 63 (4): 613–30.

Ansolabehere, Stephen, and Nathaniel Persily. 2008. "Vote Fraud in the Eye of the Beholder: The Role of Public Opinion in the Challenge to Voter Identification Requirements." *Harvard Law Review* 121 (7): 1737–74.

National Commission on Federal Election Reform. 2002. *To Assure Pride and Confidence in the Electoral Process.* Washington, D.C.: Brookings Institution Press.

National Council of State Legislatures. 2008. "Requirements for State Voter Identification." www.ncsl.org/programs/legismgt/elect/taskfc/voteridreq.htm.

TA_001475