**Nos. 07-21 and 07-25**

# In the Supreme Court of the United States

WILLIAM CRAWFORD, ET AL., PETITIONERS

*v.*

MARION COUNTY ELECTION BOARD, ET AL.

INDIANA DEMOCRATIC PARTY, ET AL., PETITIONERS

*v.*

TODD ROKITA, INDIANA SECRETARY OF STATE, ET AL.

*ON WRITS OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT*

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE
SUPPORTING RESPONDENTS**

PAUL D. CLEMENT
  *Solicitor General
    Counsel of Record*
GRACE CHUNG BECKER
  *Acting Assistant Attorney
    General*
GREGORY G. GARRE
  *Deputy Solicitor General*
DOUGLAS HALLWARD-DRIEMEIER
  *Assistant to the Solicitor
    General*
DIANA K. FLYNN
CHRISTY A. MCCORMICK
  *Attorneys*

  *Department of Justice
  Washington, D.C. 20530-0001
  (202) 514-2217*

2:13-cv-193
09/02/2014
DEF0036

PX 040

**QUESTION PRESENTED**

Whether an Indiana statute mandating that those seeking to vote in person produce a government-issued photo identification on its face violates the First and Fourteenth Amendments to the Constitution.

(I)

## TABLE OF CONTENTS

Page

Interest of the United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Summary of argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
   I.   Petitioners have failed to show that the Voter ID
       Law is invalid on its face . . . . . . . . . . . . . . . . . . . . . . . 11
  II.   The Voter ID Law is a reasonable administrative
       rule that furthers the State's compelling interest in
       combating voter fraud . . . . . . . . . . . . . . . . . . . . . . . . . 18
      A.   States have broad authority to establish
           rules to ensure the integrity of elections . . . . . 18
      B.   Because the Voter ID Law is neither
           discriminatory nor a severe burden on the
           franchise, heightened scrutiny is
           unwarranted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
           1.   The Voter ID Law does not discrim-
               inate with respect to the right to vote . . . . 20
           2.   The Voter ID Law does not impose a
               severe burden on the right to vote . . . . . . . 23
      C.   The Voter ID Law serves the State's
           compelling interest in preserving the
           integrity of the electoral process . . . . . . . . . . . 28
 III.   HAVA's identification requirements do not
       preempt Indiana's Voter ID Law . . . . . . . . . . . . . . . 31
Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

(III)

IV

**TABLE OF AUTHORITIES**

Page

Cases:

*Anderson* v. *Celebrezze*, 460 U.S. 780 (1983) . . . . . . . . .  9, 19

*Ayotte* v. *Planned Parenthood*, 546 U.S. 320 (2006)  .  13, 16

*Broadrick* v. *Oklahoma*, 413 U.S. 601 (1973)  . . . . . . . . .  13

*Bullock* v. *Carter*, 405 U.S. 134 (1972)  . . . . . . . . . . . . . . .  20

*Burdick* v. *Takushi*, 504 U.S. 428 (1992)  . . . . . . . . . .  *passim*

*Carrington* v. *Rash*, 380 U.S. 89 (1965)  . . . . . . . . . . . . . .  18

*City of Cleburne* v. *Cleburne Living Ctr.*, 473 U.S. 432
    (1985)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

*City of Mobile* v. *Bolden*, 446 U.S. 55 (1980)  . . . . . . . . . .  21

*Clements* v. *Fashing*, 457 U.S. 954 (1982)  . . . . . . . . . . . .  19

*Common Cause/Ga.* v. *Billups*, 504 F. Supp. 2d 1333
    (N.D. Ga. 2007)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

*Cutter* v. *Wilkinson*, 544 U.S. 709 (2005)  . . . . . . . . . . . . .  24

*Eu* v. *San Francisco County Democratic Comm.*,
    489 U.S. 214 (1989)  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

*FEC* v. *National Right to Work Comm.*, 459 U.S. 197
    (1982)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

*Foti* v. *McHugh*, No. 05-16079, 2007 WL 2472340
    (9th Cir. Aug. 28, 2007)  . . . . . . . . . . . . . . . . . . . . . . . . .  23

*Gilmore* v. *Gonzales*, 435 F.3d 1125 (9th Cir. 2006),
    cert. denied, 127 S. Ct. 929 (2007)  . . . . . . . . . . . . . . . .  23

*Gonzalez* v. *Arizona*, 485 F.3d 1041 (9th Cir. 2007)  . . . . .  24

*Gonzalez* v. *Carhart*, 127 S. Ct. 1610 (2007)  . . . . . . . . . . .  18

*Harper* v. *Virginia Bd. of Elections*, 383 U.S. 663
    (1966)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

V

Cases–Continued:                                                   Page

*Harris* v. *McRae*, 448 U.S. 297 (1980) . . . . . . . . . . . . . . .   20

*Kimel* v. *Florida Bd. of Regents*, 528 U.S. 62 (2000)  . . . .   20

*Kramer* v. *Union Free Sch. Dist.*, 395 U.S. 621 (1969)  . .   24

*Lassiter* v. *Northampton County Bd. of Elections*,
   360 U.S. 45 (1959)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

*Mason* v. *Missouri*, 179 U.S. 328 (1900)  . . . . . . . . . . . . .   18

*Massachusetts* v. *Oakes*, 491 U.S. 576 (1989)  . . . . . . . . .   12

*McDonald* v. *Board of Election Commr's*, 394 U.S. 802
   (1969)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

*Munro* v. *Socialist Workers Party*, 479 U.S. 189
   (1986)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29

*New York* v. *Ferber*, 458 U.S. 747 (1982)  . . . . . . . . . . . .   12

*Norman* v. *Reed*, 502 U.S. 279 (1992) . . . . . . . . . . . . . . .   19

*Pabey* v. *Pastrick*, 816 N.E.2d 1138 (Ind. 2004)  . . . . . . . .   3

*Personnel Adm'r* v. *Feeney*, 442 U.S. 256 (1979)  . . . . . .   21

*Purcell* v. *Gonzalez*, 127 S. Ct. 5 (2006)  . . . . . . . . . . .   18, 28

*Reno* v. *Bossier Parish Sch. Bd.*, 520 U.S. 471 (1996)  . . .   21

*Reynolds* v. *Sims*, 377 U.S. 533 (1964)  . . . . . . . . . . . . .   18, 28

*Rodriguez* v. *Popular Democratic Party*, 457 U.S. 1
   (1982)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

*Rust* v. *Sullivan*, 500 U.S. 173 (1991)  . . . . . . . . . . . . . . .   16

*Sabri* v. *United States*, 541 U.S. 600 (2004)  . . . . . . . . .   12, 13

*United States* v. *Raines*, 362 U.S. 17 (1960)  . . . . .   12, 13, 14

*United States* v. *Salerno*, 481 U.S. 739 (1987)  .   10, 11, 16, 17

*Village of Arlington Heights* v. *Metropolitan Hous.
   Dev. Corp.*, 429 U.S. 252 (1977)  . . . . . . . . . . . . . . . . . .   21

*Village of Hoffman Estates* v. *Flipside, Hoffman
   Estates, Inc.*, 455 U.S. 489 1982)  . . . . . . . . . . . . . . .   11, 12

VI

Cases–Continued:                                           Page

   *Virginia* v. *Hicks*, 539 U.S. 113 (2003)  . . . . . . . . . . . . . . .  12

   *Warth* v. *Seldub*, 422 U.S. 490 (1975)  . . . . . . . . . . . . .  12, 13

   *Washington* v. *Davis*, 426 U.S. 229 (1976)  . . . . . . . . . . . .  21

   *Wisconsin* v. *City of New York*, 517 U.S. 1 (1996)  . . . . . .  21

Constitution, statutes and regulations:

   U.S. Const.:

      Art. I, § 4, Cl. 1  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

      Amend. I  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

      Amend. XIV  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

   Help America Vote Act of 2002, Pub. L. No. 252, 116
   Stat. 1666 (42 U.S.C. 15301
   *et seq.*)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

      42 U.S.C. 15483(a)(4)(A) (Supp. IV 2004)  . . . . . . . . . .  3

      42 U.S.C. 15483(a)(5)(A) (Supp. IV 2004)  . . . . . . .  2, 3

      42 U.S.C. 15483(b) (Supp. IV 2004)  . . . . . . . . . . . . . .  5

      42 U.S.C. 15483(b)(1)-(4) (Supp. IV 2004)  . . . . . . . . .  3

      42 U.S.C. 15483(b)(2)(A) (Supp. IV 2004)  . . . . . . .  2, 3

      42 U.S.C. 15483(b)(2)(A)(i)(II) (Supp. IV 2004)  17, 32

      42 U.S.C. 15483(b)(3)(A) (Supp. IV 2004)  . . . .  2, 3, 32

      42 U.S.C. 15484 (Supp. IV 2004)  . . . . . . . . . .  3, 10, 32

      42 U.S.C. 15485 (Supp. IV 2004)  . . . . . . . . . . . . . . .  32

      42 U.S.C. 15511 (Supp. IV 2004)  . . . . . . . . . . . . . . . .  2

   National Voter Registration Act of 1993, 42 U.S.C.
   1973gg *et seq.*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

      42 U.S.C. 1973gg(b)(1)  . . . . . . . . . . . . . . . . . . . . . . . . .  2

      42 U.S.C. 1973gg(b)(3)  . . . . . . . . . . . . . . . . . . . . . . . . .  2

      42 U.S.C. 1973gg-3(a)(1)  . . . . . . . . . . . . . . . . . . . . . . . .  2

TA_001509

VII

Statutes and regulations–Continued:                                Page

        42 U.S.C. 1973gg-3(c)(2)(B)(ii) . . . . . . . . . . . . . . . . .  2

        42 U.S.C. 1973gg-4(c)(1)(A) . . . . . . . . . . . . . . . . . . . .  2

        42 U.S.C. 1973gg-4(c)(1)(B) . . . . . . . . . . . . . . . . . . . .  2

        42 U.S.C. 1973gg-7(b)(1) . . . . . . . . . . . . . . . . . . . . . .  2

        42 U.S.C. 1973gg-9 . . . . . . . . . . . . . . . . . . . . . . . . . . . .

        42 U.S.C. 1973gg-10(c) . . . . . . . . . . . . . . . . . . . . . . . .  2

Voting Rights Act of 1965, 42 U.S.C. 1973 *et seq.*:

        42 U.S.C. 1973i(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

        42 U.S.C. 1973i(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

Pub. L. No. 103-2005, § 4, 2005 Ind. Acts 1948 . . . . . . . . . .  4

Pub. L. No. 109-2005, 2005 Ind. Acts 2005 . . . . . . . . . . . . .  4

Ind. Code:

        § 3-5-2-40.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

        § 3-6-5-34 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

        § 3-10-1-7.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

        § 3-11-4-1(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

        § 3-11-4-2(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

        § 3-11-4-2(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

        § 3-11-4-3(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

        § 3-11-8-25.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

        § 3-11-8-25.1(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

        § 3-11-8-25.1(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

        § 3-11-8-25.1(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

        § 3-11-10-24(a)(3)-(5) . . . . . . . . . . . . . . . . . . . . . . . . .  5

        § 3-11-10-24(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

        § 3-11-10-24(a)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

VIII

Statutes and regulations–Continued:                                    Page

   § 3-11-10-26(a)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

   § 3-11-10-26(c)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

   § 3-11.7-5-1  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

   § 3-11.7-5-2.5(c)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

   § 9-24-16-10(b)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

8 C.F.R.:

   Section 1274a.2(b)(1)(i)  . . . . . . . . . . . . . . . . . . . . . . . . . .  24

   Section 1274a.2(b)(1)(v)  . . . . . . . . . . . . . . . . . . . . . . . . . .  24

Miscellaneous:

   R. Michael Alvarez et al., *CalTech/MIT Voting
      Technology Project, Working Paper #57, Version 2*
      (Oct. 2007) <http://www.vote.caltech.
      edu/media/documents/wps/vtp_wp57.pdf> . . . . . . . . . .  22

   Commission on Federal Election Reform, *Building
      Confidence in U.S. Elections:  Report of the
      Commission on Federal Election Reform* (2005)
      <http://www.american.edu/ia/cfer/report/
      full_report.pdf>  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

   148 Cong. Reg. (2002):

      p. 20,832  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

      p. 20,833   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

      p. 20,834  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

   Memorandum from Dale Simmons and Cody Kendall,
      Co-Counsels, Ind. Election Div., to J. Bradley King
      and Kristi Robertson, Co-Directors, Ind. Election
      Div., regarding *Photo ID Interpretations* (May 1,
      2006) <http://www.in.gov/sos/elections/pdfs/
      PhotoIDAdvisory_4_30_06.pdf>  . . . . . . . . . . . . . . . . . 5, 16

IX

Miscellaneous—Continued:                                    Page

Jeffrey Milyo, *The Effects of Photographic
    Identification on Voter Turnout in Indiana:
    A County-Level Analysis, Report 10-2007*
    (Nov. 2007) <http://www.truman.
    missouri.edu/uploads/publications/
    report%2010-2007.pdf> ........................ 2, 16

Todd Rokita, Ind. Sec'y of State, *PhotoID.IN.gov:  Are
    There Exemptions?* <http://www.in.gov/sos/
    photoid/exemptions.html> .................. 6, 15, 16

United States Election Assistance Comm'n,
    *EAC Advisory 2005-006: Provisional Voting
    and Identification Requirements* (2005)
    <http://www.eac.gov/election/
    advisories%20and%20guidance/
    EAC%20Advisory%202005-006%20
    Provisional%20Voting.pdf> ...................... 32

# In the Supreme Court of the United States

------------

No. 07-21

WILLIAM CRAWFORD, ET AL., PETITIONERS

*v.*

MARION COUNTY ELECTION BOARD, ET AL.

------------

No. 07-25

INDIANA DEMOCRATIC PARTY, ET AL., PETITIONERS

*v.*

TODD ROKITA, INDIANA SECRETARY OF STATE, ET AL.

------------

*ON WRITS OF CERTIORARI*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE SEVENTH CIRCUIT*

------------

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE**
**SUPPORTING RESPONDENTS**

------------

### INTEREST OF THE UNITED STATES

This case concerns a facial challenge to a state law that requires those who vote in person in federal elections to present a government-issued photo identification and, more generally, the appropriate constitutional standard for reviewing such a law. Congress has enacted numerous requirements, including registration and identification requirements, designed to "increase

(1)

2

the number of eligible citizens who register to vote" while simultaneously "protect[ing] the integrity of the electoral process." 42 U.S.C. 1973gg(b)(1), (3). In 2002, Congress enacted the Help America Vote Act of 2002 (HAVA), Pub. L. No. 107-252, 116 Stat. 1666 (42 U.S.C. 15301 *et seq.*), to establish and modernize various minimum election administration standards for federal elections. Among other things, HAVA requires voters to provide proof of identification before registering or casting their first ballot, see 42 U.S.C. 15483(a)(5)(A), (b)(2)(A), (3)(A). The Attorney General is responsible for enforcing those provisions. 42 U.S.C. 1973gg-9, 15511. The Attorney General also has authority to prosecute voter fraud in federal elections. See, *e.g.*, 42 U.S.C. 1973i(c), (e), 1973gg-10(c).

## STATEMENT

1. In 1993, Congress enacted the National Voter Registration Act of 1993 (NVRA), 42 U.S.C. 1973gg *et seq.* One of the Act's purposes was to "increase the number of eligible citizens who register to vote." 42 U.S.C. 1973gg(b)(1). The NVRA facilitated voter registration by, among other things, requiring that state motor vehicle driver's license applications also serve as voter registration applications. 42 U.S.C. 1973gg-3(a)(1). At the same time, Congress emphasized the need to "protect the integrity of the electoral process." 42 U.S.C. 1973gg(b)(3). Thus, the NVRA authorizes States to require information necessary to "assess the eligibility of the applicant." 42 U.S.C. 1973gg-3(c)(2)(B)(ii), 1973gg-7(b)(1). The Act also specifies that States may require individuals who have submitted their voter registration by mail "to vote in person" the first time they vote. 42 U.S.C. 1973gg-4(c)(1)(A), (B).

3

In 2002, Congress enacted HAVA.  HAVA requires States to maintain accurate statewide voter registration lists, by making a "reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters." 42 U.S.C. 15483(a)(4)(A).  In addition, HAVA requires States to verify the voter registration information of new registrants. 42 U.S.C. 15483(a)(5)(A), (b)(1)-(4).  A State must require a person who submits a voter registration by mail to submit, either as part of the registration or the first time the individual votes, proof of identity.  *Ibid.*  Acceptable forms of identification under HAVA are "a current and valid photo identification" or "a current utility bill, bank statement, government check, paycheck, or government document that shows the name and address of the voter."  42 U.S.C. 15483(b)(2)(A), (3)(A).  HAVA specifies that States may establish "more strict" standards that are not inconsistent with the federal law's "minimum requirements," 42 U.S.C. 15484.

2.  Indiana determined that it faced a serious problem of actual and potential election fraud.  In 2004, the Indiana Supreme Court invalidated the 2003 East Chicago mayoral primary based on evidence of rampant absentee-ballot fraud, which included the use of vacant lot or former addresses and casting of ballots by nonresidents.  *Pabey* v. *Pastrick*, 816 N.E.2d 1138, 1145, 1153.  The Indiana Supreme Court found that the widespread fraud had rendered the election results "inherently deceptive and unreliable." *Id.* at 1151.

At the same time, the State was experiencing highly inflated voter registration rolls, thus creating a risk of further voter fraud.  Indeed, a report shows that more than 35,000 deceased individuals were on the rolls Statewide, and that, in 2004, the list of registered voters was

4

inflated by some 41%, including well over 200,000 dupli-
cate voter registrations.  07-21 Pet. App. 40 (Pet. App.).
On April 7, 2005, the United States Department of Jus-
tice informed the Indiana Secretary of State that numer-
ous counties had registration totals that exceeded their
voting age populations and noted the State's obligations
under federal law to maintain accurate voter registra-
tion lists.  J.A. 312-313.[1]

Shortly thereafter, Indiana responded to those and
other concerns by enacting a number of election re-
forms.  In particular, Indiana enacted Senate Enrolled
Act No. 483 (Voter ID Law), Ind. Pub. L. No. 109-2005,
2005 Ind. Acts 2005, which, in order to deter voter fraud,
requires those who vote in-person to present photo iden-
tification, issued either by the United States or Indiana.
See Ind. Code 3-11-8-25.1(c) and 3-5-2-40.5; Pet. App.
106.  On the same day, the legislature also placed new
restrictions on absentee voting and the handling of ab-
sentee ballots.  Ind. Pub. L. No. 103-2005 § 4, 2005 Ind.
Acts 1948; Ind. Code 3-11-4-2(c), (d).

Under the Voter ID Law, an acceptable ID must con-
tain the photograph and name of the individual to whom
it was issued, which must conform to that on the regis-
tration rolls.  The ID must also have an expiration date
and be either unexpired or have expired after the most
recent general election.  See Ind. Code. 3-5-2-40.5.  Nu-
merous forms of identification may qualify, including an
Indiana driver's license, a non-license photo identifica-
tion issued by the State's Bureau of Motor Vehicles
(BMV), a student ID issued by a State-sponsored college

---

[1] The United States Department of Justice brought suit against the
State for violating the NVRA's requirements regarding the removal of
ineligible voters from the voter registration list. J.A. 309-317. That suit
was resolved through a consent decree.  J.A. 299-307.

5

or university, a passport, or military ID. See Dale Simmons and Cody Kendall, co-counsels, Indiana Election Division, *Photo ID Interpretations* 3-4 (2006) (*Photo ID Interpretations*) <www.in.gov/sos/elections/pdfs/PhotoIDAdvisory_4_30_06.pdf>.

Indiana provides alternatives for those who do not already possess an acceptable ID. The State will provide, free of charge, a photo ID that satisfies the requirements to any individual who will be at least 18 years of age at the next election and does not have a valid Indiana driver's license. See Ind. Code 9-24-16-10(b). To obtain a photo ID, the BMV requires first-time applicants to produce one primary document (such as a certified birth certificate or certain immigration documents), one secondary document (such as non-photo government documents, bank statements, school documents, or credit card statements), and one proof of Indiana residency; or two primary documents and one proof of Indiana residency. Pet. App. 32-35.

For certain voters, state law provides ways for those individuals to vote without producing photo identification. Those who are over 65, disabled, or confined by illness or injury may cast an absentee ballot by mail. See Ind. Code 3-11-10-24(a)(3)-(5). Indiana's photo ID law does not apply to absentee balloting by mail. See *id.* 3-10-1-7.2, 3-11-8-25.1; Pet. App. 25.[2] The Voter ID Law also does not apply to individuals "who vote in person at a precinct polling place that is located at a state licensed care facility where the voter resides." Ind. Code. 3-11-8-25.1(e). See Pet. App. 25.

---

[2] A voter casting an absentee ballot by mail the first time that person votes after having registered to vote by mail may be required to present identification pursuant to HAVA. See 42 U.S.C. 15483(b).

6

Those who object to having their pictures taken on religious grounds or do not have and cannot afford to obtain the necessary documentation may execute affidavits regarding their status and cast their ballots without presenting a photo ID.  Ind. Code 3-11.7-5-2.5(c); Pet. App. 25-26.  State law allows such individuals to vote without presenting an ID in either of two ways.  First, such voters may exercise the right of any Indiana voter to vote an "absentee" ballot in person at the office of the circuit court clerk or board of elections on any date between 29 days and one day before the election.  See Ind. Code 3-11-4-1(a), 3-11-10-26(a), (c).  Voters who choose to do so may file an absentee application, cast their ballot, and sign an affidavit of indigency or religious objection on a single trip to the local election office.  See *id.* 3-11-4-3(2),  3-11.7-5-2.5(c);  <www.in.gov/sos/photoid/exemptions.html>.

Second, any voter who appears at the polls without the requisite identification, either because an exemption applies or because the person does not have an ID in his or her possession at the time, may cast a provisional ballot.  See Ind. Code 3-11-8-25.1(d).  A provisional ballot will be counted so long as the voter appears before the circuit court clerk or the county election board no later than ten days following the election, and executes an affidavit that he or she is the same person who cast the provisional ballot, and either:  (a) presents acceptable photo identification; or (b) executes an affidavit of indigency or religious objection.  Ind. Code 3-11.7-5-1; 3-11.7-5-2.5(c); Pet. App. 25-26.  If the county election board rejects the ballot, the individual may obtain judicial review in the local circuit court.  Ind. Code 3-6-5-34.

3.  Two different plaintiff groups—the Indiana Democratic Party and the Marion County Democratic Cen-

7

tral Committee; and two elected officials, along with several nonprofit organizations, including the Indianapolis Branch of the NAACP, the United Senior Action of Indiana, the Indianapolis Resource Center for Independent Living, and Concerned Clergy of Indianapolis—brought suit alleging that the Voter ID Law violates the First and Fourteenth Amendments to the Constitution because it imposes an unwarranted burden upon the right to vote.  On April 14, 2006, the district court granted summary judgment in favor of the State, holding that the Voter ID Law is a permissible time, place, and manner restriction on voting.  Pet. App. 16-149.

The district court stressed that petitioners had failed to "introduce[] evidence of a single, individual Indiana resident who will be unable to vote as a result of [the Voter ID Law,] or who will have his or her right to vote unduly burdened by its requirements."  Pet. App. 18. The court found that petitioner's expert report, which attempted to estimate the number of Indiana registered voters without a BMV-issued photo ID by comparing the voter registration rolls and BMV records in Marion County, was "utterly incredible and unreliable" and reflected "a conscious effort  *  *  *  to report the largest possible number" of impacted individuals.  *Id.* at 60-62. To the extent that it shed any credible light on the matter, the court found that petitioners' report actually supported the State's position that its law had "no potential disparate impact  *  *  *  based on a voter's race or education level," and that "to the extent [the report] is accurate, [it] actually indicates that voters without photo identification are not significantly more likely to come from low income segments of society."  *Id.* at 70, 72.

4.  The court of appeals affirmed.  Pet. App. 1-15. The court concluded that the Voter ID Law was not sub-

8

ject to strict scrutiny because the record at most revealed only a "slight" effect of eligible voters "disenfranchis[ing] themselves," and that negligible concern was outweighed by the State's interest in combating "voting fraud." *Id.* at 6-7.  Furthermore, the court observed that the State was free to "take preventive action" to deter voter fraud and, with it, the dilution of legitimate votes. *Id.* at 8.

Judge Evans dissented.  He would have subjected the Voter ID Law to "strict scrutiny" or at least "strict scrutiny light," Pet. App. 11, and concluded that the law failed that test, see *id.* at 11-15.

5.  A petition for rehearing en banc was denied, with four judges dissenting.  Pet. App. 151-155.

## SUMMARY OF ARGUMENT

The court of appeals correctly held that petitioners have not carried the heavy burden of showing that the Voter ID Law is invalid on its face.

I.  This Court requires a particularly demanding showing in facial challenges because such attacks run counter to numerous principles of judicial restraint: prudential standing, ripeness, and invalidating no more of a legislature's enactment than necessary.  Petitioner's facial challenge to the Voter ID Law raises all of those concerns.  Indeed, petitioners have failed to identify a single individual in Indiana who would vote if, but only if, the Voter ID law were invalidated.  And, as the district court found, petitioners have utterly failed to show that the Voter ID law has had a discriminatory impact on any segment of society.  Invalidating the Indiana law on its face would therefore require this Court to invert the analysis that it customarily applies to facial challenges, in which a law is constitutional unless there are

9

*no* circumstances in which it can be constitutionally applied.

II.  In any event, the Voter ID Law clearly satisfies the inquiry established by this Court for reviewing the constitutionality of election laws.  Because any election regulation necessarily imposes some burden on voters' exercise of the franchise, the Court has rejected the argument that "a law that imposes any burden upon the right to vote must be subject to strict scrutiny." *Burdick* v. *Takushi*, 504 U.S. 428, 432 (1992).  Instead, "when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions'" on voting, "'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Id.* at 434 (quoting *Anderson* v. *Celebrezze*, 460 U.S. 780, 788 (1983)).

Petitioners have failed to demonstrate that the Voter ID law imposes a severe burden on the right to vote.  Photo ID requirements are ubiquitous in American society today.  For the 99% of voters in Indiana who already have a photo ID, the law requires no more than that the voter present the ID at the polls.  For the less than 1% of Indiana voters who do not yet have an ID, the State offers them such an ID free of charge.  And for those who are most likely to find it difficult to obtain even a free ID, State law provides alternative methods of voting that do not require presenting identification.  Because petitioners have not shown that the Voter ID law imposes a severe burden on the right to vote, it is subject to more generous review under the *Burdick* balancing analysis.

Any burden that is imposed by the Voter ID law is more than justified by the State's interest in combating in-person voter fraud.  Voter fraud itself constitutes an

10

impairment of the right to vote. In a close race, even a handful of fraudulent votes could invalidate the entire election, as has happened in Indiana. Moreover, the well-publicized fact of voter registration lists with fraudulent, deceased, or otherwise invalid names undermines the public confidence in the electoral process that is the lifeblood of democratic institutions. Particularly given that in-person voter fraud is difficult to detect without rigorous ID requirements and that as a practical matter it is important for the State to deter, not just detect and punish, voter fraud, the State has amply demonstrated its interest in passing its Voter ID law.

III. HAVA does not preempt the Voter ID Law. HAVA explicitly states that its requirements do not prevent States from adopting administrative requirements that are "more strict" than HAVA's. 42 U.S.C. 15484. While Indiana's ID requirement is "more strict" than HAVA's, it is in no way "inconsistent with the Federal requirements." *Ibid.* A contrary interpretation would deprive the States of the flexibility that Congress intended to preserve under HAVA in enacting laws that would modernize and improve the electoral process as our democracy enters the 21st century.

## ARGUMENT

Petitioners elected to bring a facial challenge to Indiana's Voter ID law, and to bring such an action before the statute had ever been implemented in practice. Such a challenge is "the most difficult challenge to mount." *United States* v. *Salerno*, 481 U.S. 739, 745 (1987). Petitioners' facial challenge is fatally undercut by the undisputed fact that they have failed to identify a single individual in Indiana whose ability to vote depends on that law. In light of that fact, petitioners' challenge flunks

11

any reasonable formulation of this Court's standard for evaluating facial constitutional challenges to legislative acts. Petitioners would avoid that conclusion by having this Court revamp the settled framework for evaluating First Amendment challenges to election laws and hold that a law that imposes any burden on the right to vote—indeed, as in this case, even a *hypothetical* one—subjects a law to strict scrutiny. This Court rejected precisely such a proposal in *Burdick*, 504 U.S. at 432, and petitioners provide no reason for the Court to reverse course here. Any individual is free to bring an as-applied challenge to Indiana's Voter ID Law grounded in their particular circumstances or actual experience and attempt to demonstrate that the law imposes an unconstitutional burden on his or her right to vote. But the court of appeals properly rejected petitioners' facial challenge to the Voter ID Law on the record here.

## I. PETITIONERS HAVE FAILED TO SHOW THAT THE VOTER ID LAW IS INVALID ON ITS FACE

A. The only question presented for the Court's review is the constitutionality of the Voter ID Law *on its face*. See Dem. Br. i; Crawford Br. i. This Court long ago explained that "[a] facial challenge to a legislative Act is * * * the most difficult challenge to mount." *Salerno*, 481 U.S. at 745. "The fact that [a statute] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid." *Ibid.* Rather, in the typical case, to succeed in a facial challenge, "the challenger must establish that no set of circumstances exists under which the Act would be valid." *Ibid.* See *Village of Hoffman Estates*

12

v. *Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n.5
(1982).[3]

The rule disfavoring facial invalidation is animated
by several related principles of judicial restraint. First,
as a matter of prudential standing, "a person to whom a
statute may constitutionally be applied may not chal-
lenge that statute on the ground that it may conceivably
be applied unconstitutionally to others in situations not
before the Court." *New York* v. *Ferber*, 458 U.S. 747,
767 (1982); *Warth* v. *Seldin*, 422 U.S. 490, 499 (1975);
*United States* v. *Raines*, 362 U.S. 17, 21 (1960). Second,
facial invalidation raises ripeness concerns because it
invites "'premature interpretatio[n] of statutes' on the
basis of factually barebones records." *Sabri* v. *United*

---

[3]   Although the Court has recognized that "[t]he First Amendment
doctrine of overbreadth is an exception to [the] normal rule regarding
the standards for facial challenges," *Virginia* v. *Hicks*, 539 U.S. 113, 118
(2003), petitioners' invocation of the First Amendment as a source of
their constitutional claims, Dem. Br. 1, 44; Crawford Br. 2, does not
bring them within that exception.  The overbreadth doctrine has been
applied "only where its effect might be salutary," *Massachusetts* v.
*Oakes*, 491 U.S. 576, 582 (1989) (plurality opinion), such as, for example,
where threat of enforcement of a law that "punishes  *  *  *  protected
free speech," "especially" one that "imposes criminal sanctions," may
"deter or 'chill'" the speech, and individuals cannot be expected to "un-
dertake the considerable burden (and sometimes risk) of vindicating
their rights through case-by-case adjudication." *Hicks*, 539 U.S. at 118-
119.  The Voter ID Law does not threaten to "punish" anyone, and
there is no "risk" to an individual (or association with standing to re-
present that individual) who challenges the law as applied to their
circumstances.  Moreover, the ability to cast a provisional ballot means
even someone unsure of the law need not suffer any loss of voting
rights.  In any event, to the extent the doctrine applies, petitioners in-
ability to identify a single individual who is unable to vote as a result of
the Voter ID Law fatally undercuts any suggestion of overbreadth
here.

13

*States*, 541 U.S. 600, 609 (2004) (quoting *Raines*, 362 U.S. at 22). Third, facial invalidation conflicts with the Court's practice not to "nullify more of a legislature's work than is necessary." *Ayotte* v. *Planned Parenthood*, 546 U.S. 320, 329 (2006). Relatedly, a facial challenge short-circuits the process by which potential constitutional questions are avoided when a statute is narrowed through the course of its application. *Broadrick* v. *Oklahoma*, 413 U.S. 601, 613 (1973).

B. Petitioners' facial challenge to the Voter ID Law highlights all of those concerns.

1. As respondents have explained, serious questions exist regarding petitioners' constitutional standing to bring this suit at all. See Resp. Br. 14-19. Petitioners' suit also implicates prudential standing concerns because of the significant divergence between the facts on which petitioners base their claims of standing and the types of injuries they highlight in their broad attack on the Voter ID Law. Cf. *Warth*, 422 U.S. at 499 ("the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on legal rights or interests of third parties"). For example, whereas the Democratic Party of Indiana asserts associational standing to represent individuals affiliated with the party, Dem. Br. 58-59, each of the individual voters the party identified as being burdened by the law and who consented to representation by the party is over 65 years of age and therefore has a right under Indiana law to vote absentee by mail, without producing a photo ID. See Pet. App. 80-81; p. 5, *supra*. Those voters, because they have that option, would seem to have a markedly weaker claim. Indeed, the party's argument with respect to the constitutional adequacy of *that* alternative voting method is confined to a footnote, see Dem. Br. 32

14

n.17, and the party instead focuses its argument on those who "simply cannot vote" or who "will not * * * successfully complete all the steps needed to vote." *Id.* at 23; see *id.* at 31-41. Yet, the party was unable to identify any such individual, much less one who it could represent through associational standing. See Pet. App. 80-81. Similarly, the individual plaintiffs themselves have failed to demonstrate that they have been directly injured by the Voter ID law. See Resp. Br. 15-16.

2. Petitioners' inability to identify any concrete harms stemming from the Voter ID Law renders petitioners' arguments largely theoretical and speculative. Petitioners failed to identify any individual who would not vote as a result of the statute, Pet. App. 80-81, 94; *id.* at 5, and rely instead on their mere assertion that "there can be no doubt that these people exist." Dem. Br. 59; Crawford Br. 26, 27, 32, 37 ("the Indiana law will deter some people from voting" (quoting the court of appeals' opinion, Pet. App. 3)). But, as this Court has stressed, "[t]he delicate power of pronouncing an [act] unconstitutional is not to be exercised with reference to hypothetical cases thus imagined." *Raines*, 362 U.S. at 22. See *McDonald* v. *Board of Election Commr's*, 394 U.S. 802, 808 (1969) ("Faced as we are with a constitutional question, we cannot lightly assume, with nothing in the record to support such an assumption, that [a statute] has in fact precluded [petitioners] from voting.").

The abstract quality of petitioners' challenge is exacerbated by their decision to attack the statute before it went into effect. Without any experience under the statute, petitioners premised their challenge on an expert's statistical analysis of registration rolls and BMV records. But the district court found that report to be "utterly incredible and unreliable." Pet. App. 60. And,

15

in any event, the report revealed "no potential disparate impact * * * based on a voter's race or education level and only a small potential disparate impact based on income level." *Id.* at 70. Having failed to provide proof of a burden on voting in the district court, petitioners now ask this Court to decide the constitutionality of the Voter ID Law on the basis of reports that post-date the district court ruling and have never been subjected to cross-examination or peer review. See, *e.g.*, Dem. Br. xiv-xvi (citing no fewer than 11 publications that post-date the district court decision); *id.* at 34-35 (citing October 2007 "working paper" as "evidence" that Indiana's law "placed significant burdens on voters" (quotation marks omitted)); *id.* at 12 (citing November 2006 report as evidence regarding incidence of lack of identification); Crawford Br. 15, 40 n.19, 41 n.20 (same). As we discuss below, see p. 22, *infra*, an even more recent unpublished study that focuses exclusively on Indiana's experience points in the opposite direction. But, more fundamentally, such speculation and as-yet untested evidence cannot satisfy the standard for proving a statute facially unconstitutional.

The premature nature of petitioners' challenge has also caused them and their amici to posit constructions of the Voter ID Law that are contrary to the State's own interpretation and application of the statute. For example, the Democratic Party repeatedly asserts (Dem. Br. 11, 16) that indigent persons without identification and those with religious objections may not execute affidavits to that effect before the election, at the same time the individual casts an in-person absentee ballot. See also Lawyers' Comm. Br. 27 (same). But the State's published guidance is to the contrary. See <www.in.gov/sos/photoid/exemptions.html>. Likewise, the League

16

of Women Voters suggests (Br. 24-29) that recently married individuals, or others whose IDs vary slightly from the names on the rolls, will be rejected because the names do not "conform," but the Indiana Election Division's Guidance says otherwise. *Photo ID Interpretations* 2.

3.  The remedy petitioners seek—facial invalidation of the Voter ID law—also bears no relation to the constitutional harms petitioners assert.  If, as petitioners contend, it is unconstitutional to require a homeless person to vote absentee in person (or at the polls with subsequent validation by affidavit) because he is unable to obtain a BMV-issued ID (see, *e.g.*, Crawford Br. 18 (citing case of Kristjan Kogerma, J.A. 67), then a narrower remedy would be to enjoin the BMV from denying an ID on the ground that a person has no address, or to enjoin the IDOH from collecting a search fee for a birth certificate in that circumstance.  Such challenges should await actual circumstances in which those difficulties may or may not arise.  But at a minimum, as the Court reiterated in *Ayotte*, courts should "enjoin only the unconstitutional applications of a statute while leaving other applications in force." 546 U.S. at 329.

C.  Petitioners not only have not identified a single individual who would be unable to vote because of the Voter ID Law, but they make no serious argument that the Voter ID Law imposes an unconstitutional burden on the more than 99% of Indiana voters who already possess an ID that satisfies the statutory requirements. Accordingly, instead of attempting to carry the "heavy burden," *Rust* v. *Sullivan*, 500 U.S. 173, 183 (1991), to "establish that no set of circumstances exists under which the Act would be valid," *Salerno*, 481 U.S. at 745, petitioners effectively ask this Court to invert the set-

17

tled inquiry and hold that the Voter ID Law must be struck down *in toto* "[e]ven if only a *single* citizen is deprived completely of her right to vote."  Dem. Br. 33 (emphasis added; brackets in original) (quoting dissent from denial of rehearing, Pet. App. 154); see Crawford Br. 37 (focusing on the "burdens on individual voters"); *id.* at 38 ("[t]hat Indiana's photo identification law may affect few voters is irrelevant").  That argument not only has no footing in this Court's case law, but could have an extraordinary impact on election laws.

For example, although the Democratic Party suggests that HAVA's ID requirement (see p. 3, *supra*) is a valid example of an acceptable "less-restrictive voter-identification rule[]," Dem. Br. 37-39, 51, petitioners' theory of the case—that an election law is invalid if one can hypothesize any single individual who would be prevented from voting by the burden it creates—would cast serious doubt on the constitutionality of HAVA as well. HAVA's ID requirements pose no serious obstacle to the 99% of the population with photo IDs or alternative means of proving their residence and identification.  But one can just as easily hypothesize a theoretical individual who would be prevented from registering to vote by HAVA because he lacks the documentation it requires. Compare 42 U.S.C. 15483(b)(2)(A)(i)(II) (accepting non-photo ID that "shows the name and address of the voter"), with J.A. 67 (affidavit of individual denied BMV-issued ID because he "did not have anything on it with proof of my address").  But that is not the test.  Rather, to make out a facial challenge, it is petitioners' burden to "establish that no set of circumstances exists under which the Act would be valid," *Salerno*, 481 U.S. at 745.

Because petitioners have not come close to meeting the high threshold set for facial invalidation of a legisla-

18

tive act, petitioners' facial challenge to the Voter ID Law must be rejected.  As with any statute, the Voter ID Law remains "open to a proper as-applied challenge in a discrete case," *Gonzales* v. *Carhart*, 127 S. Ct. 1610, 1639 (2007), but this facial challenge lacks merit.

## II.  THE VOTER ID LAW IS A REASONABLE ADMINISTRA-TIVE RULE THAT FURTHERS THE STATE'S COMPEL-LING INTEREST IN COMBATING VOTER FRAUD

### A.  States Have Broad Authority To Establish Rules To En-sure The Integrity Of Elections

The Constitution expressly provides that state legis-latures are to prescribe "[t]he Times, Places and Man-ner of holding Elections for Senators and Representa-tives."  U.S. Const. Art. I, § 4, Cl. 1.  And this Court has long recognized that States "have broad powers to de-termine the conditions under which the right of suffrage may be exercised," *Carrington* v. *Rash*, 380 U.S. 89, 91 (1965) (quoting *Lassiter* v. *Northampton County Bd. of Elections*, 360 U.S. 45, 50 (1959)); *Mason* v. *Missouri*, 179 U.S. 328, 335 (1900)), and a "compelling interest in preserving the integrity of [the] election process," *Purcell* v. *Gonzalez*, 127 S. Ct. 5, 7 (2006) (per curiam) (citation omitted).  This authority reflects the fact that "[v]oter fraud drives honest citizens out of the demo-cratic process and breeds distrust of our government," and that "[t]he right of suffrage can be denied by a de-basement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise."  *Ibid.* (quoting *Reynolds* v. *Sims*, 377 U.S. 533, 555 (1964)).

Because States must necessarily "play an active role in structuring elections" to ensure that they are "fair and honest  *  *  *  rather than chaos," and because

19

"[e]lection laws will invariably impose some burden upon individual voters," this Court has stressed that a citizen's "right to vote in any manner" is not "absolute." *Burdick*, 504 U.S. at 433. Likewise, the Court has held that not every voting regulation that "imposes [a] burden upon [individual voters] must be subject to strict scrutiny." *Id.* at 432. See *Clements* v. *Fashing*, 457 U.S. 957 965-966 (1982) (plurality opinion); *Bullock* v. *Carter*, 405 U.S. 134, 143 (1972). Rather, "a more flexible standard applies." *Burdick*, 504 U.S. at 434. Under that approach, "when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions'" on an individual's right to vote, "'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Ibid.* (quoting *Anderson*, 460 U.S. at 788). In contrast, when the right to vote is "subjected to 'severe' restrictions," "the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" *Ibid.* (quoting *Norman* v. *Reed*, 502 U.S. 279, 289 (1992)).

Petitioners point to the fact that *Burdick* mentions the "extent to which [the States'] interests make it necessary to burden the plaintiff's rights," *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789), and mistakenly characterize that and similar statements as establishing a "less restrictive[]" alternative standard for analyzing electoral regulations. Dem. Br. 26; *id.* at 27 (emphasizing "*necessary*"); *id.* at 41 (same). But this Court rejected that interpretation of the standard in *Burdick* itself, in which it characterized the dissenting opinion's test as a form of "strict scrutiny" analysis precisely because it faulted the State for failing to pursue "less drastic means." 504 U.S. at 440 n.10. In short, because election laws "invariably impose *some* burden

20

upon individual voters," heightened scrutiny is reserved only for those laws that impose "'severe' restrictions" on the right to vote. *Id.* at 433-434 (emphasis added).

**B. Because The Voter ID Law Is Neither Discriminatory Nor A Severe Burden On The Franchise, Heightened Scrutiny Is Unwarranted**

Petitioners and their amici argue that the Indiana Voter ID law imposes any number of severe burdens on the right to vote. But as the district court found, the fact is that, "[d]espite apocalyptic assertions of wholesale voter disenfranchisement, [petitioners] have produced not a single piece of evidence of any identifiable registered voter who would be prevented from voting" by the Indiana law. Pet. App. 101.

*1. The Voter ID Law does not discriminate with respect to the right to vote*

a. Petitioners contend that the Voter ID Law should be subjected to heightened scrutiny because it has a "discriminatory impact" on "persons in lower socioeconomic brackets." Dem. Br. 35-36. That argument fails on at least two counts. First, the Court has refused to recognize poverty, without more, as a suspect classification that warrants heightened scrutiny. *Harris* v. *McRae*, 448 U.S. 297, 323 (1980). And the same is true of the other groups that are alleged to suffer disparate impact of the Voter ID Law: the elderly and disabled. *Kimel* v. *Florida Bd. of Regents*, 528 U.S. 62, 83 (2000) (age); *City of Cleburne* v. *Cleburne Living Ctr.*, 473 U.S. 432, 441-442 (1985) (mental retardation). Second, even with respect to a protected class, disparate impact alone does not trigger heightened scrutiny under the Fourteenth Amendment. *Personnel Adm'r* v. *Feeney*, 442 U.S. 256, 271-272 (1979); *Village of Arlington Heights* v.

21

*Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977); *Washington* v. *Davis*, 426 U.S. 229, 237-239 (1976). Rather, "[s]trict scrutiny of a classification affecting a protected class is properly invoked only where a plaintiff can show intentional discrimination by the Government." *Wisconsin* v. *City of New York*, 517 U.S. 1, 18 n.8 (1996). Petitioners offer no evidence that the Indiana legislature harbored such an improper purpose.

Petitioners contend that, notwithstanding the general rule that a plaintiff must show discriminatory intent, "[u]nder the *Burdick* standard, election laws that exhibit  *  *  *  discriminatory effects" are subject to heightened scrutiny, and "must be justified as necessary to serve very substantial state interests." Dem. Br. 36. But this Court has applied the general equal protection rule to voting cases as well.  As the Court recognized in *Reno* v. *Bossier Parish School Board*, 520 U.S. 471 (1996), "[s]ince 1980, a plaintiff bringing a constitutional vote dilution challenge, whether under the Fourteenth or Fifteenth Amendment, has been required to establish that the State or political subdivision acted with a discriminatory purpose," *id.* at 481 (citing *City of Mobile* v. *Bolden*, 446 U.S. 55, 62, 66 (1980) (plurality opinion)).

b.  In any event, petitioners have failed to demonstrate a discriminatory impact as well.  The district court found that petitioners' own expert's report regarding the effect of the Voter ID Law—which it found "utterly incredible and unreliable," Pet. App. 60—nevertheless "revealed no potential disparate impact  *  *  *  based on a voter's race or education level and only a small potential disparate impact based on income level." *Id.* at 70; see *id.* at 72; J.A. 279 (expert's deposition testimony:  "we could not conclude one way or the other in terms of the distinction in terms of racial categories").

22

That failure of proof should be the end of the matter for purposes of determining what level of review applies.

In an attempt to fill that evidentiary void, petitioners rely in this Court on studies and reports produced since the trial court litigation that have yet to be subjected to cross-examination or peer review. See Dem. Br. 12 & n.8 (citing Nov. 2006 survey); Crawford Br. 15, 40 n.19, 41 n.20 (same). There is no basis to consider such extra-record materials, but the most recent studies nevertheless *undermine* petitioner's assertion of disparate impact. The Cal. Tech./M.I.T. study petitioners cite as evidence of the statute's burden (Dem. Br. 34), actually states that "there does not seem to be a discriminatory impact of the requirements for some subgroups, such as nonwhite registered voters." R. Michael Alvarez et al., *CalTech/MIT Voting Technology Project, Working Paper #57, Version 2*, at 21 (Oct. 2007) <http://www.vote.caltech.edu/media/documents/wps/vtp_wp57.pdf>. Likewise, the one report that has been conducted looking exclusively at voting in Indiana before and after the Voter ID Law found "no consistent evidence that counties that have higher percentages of minority, poor, elderly, or less-educated population suffer any reduction in voter turnout relative to other counties." Jeffrey Milyo, *The Effects of Photographic Identification on Voter Turnout in Indiana: A County-Level Analysis, Report 10-2007* 1 (Nov. 2007) (Milyo Report) <http://www.truman.missouri.edu/uploads/publications/report%2010-2007.pdf.>

Thus, even if impact alone were sufficient to warrant applying heightened scrutiny to the Voter ID Law, there is no evidence to support a finding of such impact.

> **2.** ***The Voter ID Law does not impose a severe burden on the right to vote***

23

a. Petitioners have also failed to show that the Voter ID Law imposes a severe burden on the right to vote. It is commonplace in virtually every polling place in America that voters are asked to identify themselves before they may cast a vote. Petitioners cannot seriously take issue with a requirement that someone arriving at the polls produce some indication of identity and residence. Indiana's choice of a means to enforce such an identification requirement does not cross any constitutional line, especially in light of the commonsense reality that a photo ID requirement is familiar in numerous other facets of everyday life, and is a particularly effective means of verifying a voter's identity.

The record establishes that "the vast majority of Indiana's voting age population"—"an estimated 99%"—"possesses the requisite photo identification." Pet. App. 68-69. And being asked to present a photo ID as a means of verifying identity cannot be regarded as a severe burden in any legal or practical sense. Indeed, as the district court noted, "presentation of photo identification is routinely required for a multitude of everyday activities—from boarding a plane, entering a federal building, to cashing a check." *Id.* at 108. See *Foti* v. *McHugh*, No. 05-16079, 2007 WL 2472340 (9th Cir. Aug. 28, 2007) (rejecting constitutional challenge to federal courthouse's requirement that visitors show photo ID); *Gilmore* v. *Gonzales*, 435 F.3d 1125 (9th Cir. 2006) (rejecting constitutional challenge to requirement to show ID to board an airplane), cert. denied, 127 S. Ct. 929 (2007). Federal law likewise requires any employee to show identification at the time of hire for purposes of Form I-9. See 8 C.F.R. 1274a.2(b)(1)(i), (v). The Constitution does not require that we afford less security to the important civic task of voting, especially in light of

24

the obvious state interest in ensuring electoral integrity. See Pet. App. 3; *id.* at 109.

b.  Nor does the Voter ID law impose a severe burden on the 1% of the voting age population in Indiana that—it is assumed—does not already have a photo ID. To begin with, as discussed, the fact that 1% of the State presumably faces an additional hurdle to voting as a result of the Voter ID law itself provides no basis for invaliding the Indiana statute on its face.  See pp. 13-18, *supra*.  But even putting that to one side, petitioners have failed to demonstrate that the Voter ID Law imposes an impermissible burden on the at most 1% of the Indiana voters who do not already possess a photo ID.

At the outset, there is no evidence of what portion of the 1% without a BMV-issued ID may have a federal government ID or already possess the documents necessary to obtain a BMV photo ID, which Indiana provides for free.  See Pet. App. 106 n.75.  Accordingly, it is "*factually impossible * * * at this juncture*" to conclude that the Voter ID Law's requirements impose an impermissible burden on anyone's right to vote.  *Cutter* v. *Wilkinson*, 544 U.S. 709, 725 (2005) (internal quotation marks and citation omitted).  As the court of appeals noted, petitioners did not identify "a single plaintiff * * * who would vote were it not for the law." Pet. App. 5; *id.* at 101.  Plaintiffs challenging other voter ID laws have likewise failed to identify such an individual.  See *Gonzalez* v. *Arizona*, 485 F.3d 1041, 1050 (9th Cir. 2007) (Arizona law); *Common Cause/Ga.* v. *Billups*, 504 F. Supp. 2d 1333, 1380 (N.D. Ga. 2007) (Georgia law).

Petitioners also complain (Dem. Br. 31-32; Crawford Br. 41-42) about the time, cost, and inconvenience that may be required of these voters to obtain a free photo ID from BMV.  Such inconveniences, however, do not

25

trigger heightened scrutiny. "Election laws will invariably impose some burden upon individual voters" and strict scrutiny is not triggered merely because a law makes casting a ballot marginally more difficult for some voters. *Burdick*, 504 U.S. at 433; *Kramer* v. *Union Free Sch. Dist.*, 395 U.S. 621, 626 n.6 (1969). Indeed, it is hard to imagine any election regulation that does not limit the opportunity of, or cause some inconvenience to, at least some citizens who choose to vote. A state's choice of poll locations and hours of operation will inconvenience some voters and could require them to find child care, incur transportation costs, or even miss work in order to vote in-person. Some citizens may also need to stand in long lines to vote in-person depending on where and when they go to the polls. And any identification requirement—photo or otherwise—will inconvenience some voters. Such routine costs and inconveniences, however, do not render a state's electoral process constitutionally defective.

Petitioners maintain (Pet. App. 45) that a disproportionate number of the 1% of prospective voters without a BMV-issued photo ID are elderly, disabled and poor voters. But to the extent such voters are disproportionately elderly and disabled that fact hurts petitioners' claim because such voters automatically qualify to vote absentee, see Ind. Code 3-11-10-24(a)(4), (5); and accordingly can cast a ballot by mail without obtaining any photo ID. See Pet. App. 81-82. Indiana law also allows an indigent person to vote in multiple ways, even without obtaining an ID. See p. 6, *supra*. Accordingly, because the right to vote does not include the right to vote in-person, or by any particular method, the Voter ID Law does not impose *any* burden on the right to vote for a majority of the 1% of Indiana voters who do not have

26

a photo ID, but may nonetheless vote absentee or by provisional ballot. Cf. *Rodriguez* v. *Popular Democratic Party*, 457 U.S. 1, 9 (1982) (the Constitution does not "compel[] a fixed method of choosing state or local officers or representatives").

In order to bolster their claim of burden, petitioners again rely on unreviewed studies that were not subjected to the district court's scrutiny to demonstrate a purported burden. See Dem. Br. 12; Crawford Br. 15. But as discussed, those studies—which were not considered below and are not part of the record—provide no basis for invalidating the Indiana law. In addition, the one study focused on the Indiana Voter ID Law found "no consistent evidence that counties that have higher percentages of minority, poor, elderly or less-educated population suffer any reduction in voter turnout relative to other counties." Milyo Report abstract.[4]

c. Petitioners also contend (Dem. Br. 27; Crawford Br. 51-52) that the Voter ID Law imposes *per se* a severe burden because it is analogous to a poll tax. That contention is mistaken. As this Court has held, the prototypical poll tax is a "capricious or irrelevant factor" that is "not germane" to one's qualification to vote. *Harper* v. *Virginia Bd. of Elections*, 383 U.S. 663, 668 (1966). The Voter ID Law is the opposite. It is designed to ensure that the enforcement of concededly legitimate restrictions on the franchise—*viz.*, limiting eligible votes to registered voters in the relevant district—in a manner that directly promotes the integrity of the electoral process. The law does not impose a tax on any citizen, much less condition voting on payment of a fee.

---

[4] In his study of the effects of the Voter ID Law, Professor Milyo discusses what he views as flaws in the methodology of certain studies on which petitioners and their amici rely. See Milyo Report 2-4.

27

Moreover, the State will issue a photo ID *free of charge* to every registered voter who will be over the age of 18 at the next election and does not have an Indiana driver's license.  Nor is any indigent voter who does not possess a photo ID excluded from voting because he or she is unable to pay for the documentation that would be necessary to obtain one.  Those voters can vote an in-person absentee ballot at the courthouse before election day and sign an affidavit of indigency or vote at the polls and go to the courthouse thereafter.  See p. 6, *supra*.  In short, the Indiana Voter ID imposes no more of a "tax" on the right to vote than the fact that to get to the polls a voter may need to pay for bus fare, parking, or a baby sitter.  In other words, it is not a poll tax at all.

d.  The conclusion that the Indiana Voter ID Law does not impose a severe burden on the right to vote follows *a fortiori* from *Burdick*.  In that case, the Court held that a Hawaii law that banned write-in voting "impose[d] only a limited burden on voters' rights to make free choices and to associate politically through the vote."  504 U.S. at 439.  Justice Kennedy, joined by Justices Blackmun and Stevens, disagreed.  In their view, the Hawaii law imposed a "significant burden" on the right to vote because, as a result of the ban on write-in voting, a plaintiff had "*no way* to cast a meaningful vote" for a candidate who was not on the ballot.  *Id*. at 442 (emphasis added).  Under the Indiana law at issue in this case, Indiana voters are not barred from voting for any candidate.  They simply must present a photo ID at the polls, and if they do not have or cannot afford such an ID, the State has provided a number of reasonable options to ensure that they can obtain one or submit a

28

provisional ballot that can be counted upon subsequent proof of identification.  See pp. 5-6, *supra*.[5]

### C. The Voter ID Law Serves The State's Compelling Interest In Preserving The Integrity Of The Electoral Process

The State's interest in preventing actual or threatened voter fraud is more than sufficient to justify any burden that is imposed by Indiana's Voter ID Law.  As this Court has recognized, "[a] State indisputably has a compelling interest in preserving the integrity of its election process."  *Purcell*, 127 S. Ct. at 7 (quoting *Eu* v. *San Francisco County Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989)).  Indeed, as the court of appeals explained, "voting fraud impairs the right of legitimate voters to vote by diluting their votes—dilution being recognized to be an impairment of the right to vote."  Pet. App. 6 (citing, *e.g.*, *Purcell*, 127 S. Ct. at 7; *Sims*, 377 U.S. at 555).  As the district court found, the Indiana Voter ID Law advances the State's interest in preventing voter fraud in a way that strikes a "reasonable" balance "between discouraging fraud * * * and encouraging turnout."  Pet. App. 106-107.

While recognizing a powerful state interest in deterring election fraud, see Dem. Br. 42; Crawford Br. 46,

---

[5]  The *Burdick* dissenters noted that Hawaii's prohibition on write-in voting was at odds with the trend in "new democracies in foreign countries."  504 U.S. at 444.  Here, it is just the opposite.  Photo ID requirements are prevalent in other countries' elections.  As the Commission on Federal Election Reform, chaired by President Carter and former Secretary of State Baker, noted in support of its recommendation that the United States adopt a photo identification requirement, "[v]oters in nearly 100 democracies use a photo identification card without fear of infringement on their rights."  *Building Confidence in U.S. Elections* 5, 25 (2005) <http://www.american.edu/ia/cfer/report/full_report. pdf>.

29

petitioners contend that Indiana lacks an interest in deterring the particular type of fraud to which the Voter ID Law is addressed—in-person voter impersonation—because of the lack of reported incidences of such fraud in Indiana. See Dem. Br. 43; Crawford Br. 47. Further, petitioners argue that, to the extent the State has a legitimate interest in combating such fraud, the Voter ID Law is not "necessary" to serve that interest because less restrictive tools are available. Dem. Br. 41; Crawford Br. 55-56. Both arguments are mistaken.

There is no requirement that the State show evidence of past in-person voter impersonation for the State's interest in preventing such fraud to qualify as important. A State need not wait to suffer a harm; it can adopt prophylactic measures to prevent it from occurring in the first place. That is particularly true in a situation, like voter fraud, where the temptation is obvious and the consequences of undeterred and undetected violations are enormous. Thus, legislatures may "respond to potential deficiencies in the electoral process with foresight rather than reactively, provided that response is reasonable and does not significantly impinge on constitutionally protected rights." *Munro* v. *Socialist Workers Party*, 479 U.S. 189, 195-196 (1986). This Court has declined to "second-guess" legislative determinations on the "need for prophylactic measures where corruption is the evil feared." *FEC* v. *National Right to Work Comm.*, 459 U.S. 197, 210 (1982).

The State's interest in deterring voter fraud before it happens is evident from the monumental harm that can come from such fraud. The East Chicago mayoral primary in Indiana proves the point. Although the plaintiff was only able to show 155 invalid absentee votes, the court found that the "[w]idespread corrup-

30

tion" had left the putative winner's 278-vote victory "inherently deceptive and unreliable," and the court invalidated the entire election. *Pabey*, 816 N.E.2d at 1151, 1154. Thus, the fraudulent votes of even a small number can, in a close election, invalidate the votes of every other citizen who participated in the election. Even when the election is not so close, "[e]very false registration and every fraudulent ballot cast harms the system by cancelling votes cast by legitimate voters." 148 Cong. Rec. 20,833 (2002) (HAVA conference report) (statement of Sen. Bond). "If your vote is canceled by the vote of a dog or a dead person, it is as if you did not have a right to vote." *Id.* at 20,832 (same). Moreover, whatever its exact incidence, even the prospect of voter fraud may undermine the integrity of the voting process. In light of the obvious temptation to engage in such fraud and the enormous costs if the integrity of the process is undermined, State have an obvious incentive to deter such violations before they happen.

In any event, as the Carter-Baker Commission found, there is "no doubt" that in-person voter fraud occurs. J.A. 138. Moreover, the record includes reported incidents of in-person voting fraud in nine states, Pet. App. 109, and there is no reason to believe that Indiana is immune from such fraud. If anything, as the district court noted, *ibid.*, there is a greater "opportunity for in-person voter fraud to occur" in Indiana since the State's voter rolls are "significantly inflated." That evidence, combined with the fact that impersonation fraud is extremely difficult to detect in the absence of some reliable means of checking the voter's identity (like a photo ID), provides more than ample support for the State's legislative judgment that a photo ID requirement was warranted to combat voter fraud in Indiana.

31

Petitioners contend that signature matching is an adequate alternative to verify voters' identities at the polls and point to the fact that a photo is not required for absentee ballots.  Dem. Br. 51-52; Crawford Br. 55-56.  But a photo ID requirement is less easily administered in the case of absentee ballots as opposed to in-person voting and a State may deal with the added risk of fraud in the absentee context by limiting it, as Indiana has, to special contexts.

Petitioners' amici suggest other alternatives, including affidavits, utility bills, social security numbers, or dates of birth (see AALDEF Br. 9-11; Lawyers' Comm. Br. 29-31; NLCHP Br. 25-28; Secretaries of State Br. 24; Brennan Ctr. Br. 33), but none of those methods is as reliable as a photo ID.  In addition, under petitioners' analysis, those methods would themselves be subject to constitutional challenge.  Indeed, a utility bill requirement might be more burdensome than a photo ID requirement for, say, a homeless person.  A State might reasonably rely on one (or more) of those methods, but the Constitution does not require Indiana to use the least restrictive alternative in establishing the time, place, and manner of its elections.

### III.   HAVA'S IDENTIFICATION REQUIREMENTS DO NOT PREEMPT INDIANA'S VOTER ID LAW

Petitioners' amici (Sen. Feinstein Br. 2-3, 19) argue that HAVA's identification requirements preempt Indiana's stricter requirements.  That argument—which was neither raised nor decided below—is without merit.  By its terms, mandatory "minimum" voter identification requirements and explicitly provides that "nothing in [it] shall be construed to prevent a State from establishing  *  *  *  requirements that are more

32

strict." 42 U.S.C. 15484. See 148 Cong. Rec. at 20,834 ("this bill in no way limits the ability of the states from taking steps beyond those required") (statement of Sen. Bond); U.S. Election Assistance Commission, *EAC Advisory 2005-006: Provisional Voting and Identification Requirements* 1 (2005).

While Indiana's requirements are "more strict" than those of HAVA, they are not "inconsistent with the Federal requirements." 42 U.S.C. 15484. HAVA's identification requirements, which apply only to first-time voters who registered by mail and whose identities were not established from information submitted at that time, 42 U.S.C. 15483(b)(3)(A), (B), relate to authentication of a voter's *registration*, whereas the Voter ID Law confirms the identity of those casting ballots. Amici's argument would convert HAVA into both a floor *and a ceiling*, thereby divesting States of the flexibility that Congress intended them to retain. See 42 U.S.C. 15485.

33

**CONCLUSION**

The judgment of the court of appeals should be affirmed.

Respectfully submitted.

PAUL D. CLEMENT
*Solicitor General*

GRACE CHUNG BECKER
*Acting Assistant Attorney
General*

GREGORY G. GARRE
*Deputy Solicitor General*

DOUGLAS HALLWARD-DRIEMEIER
*Assistant to the Solicitor
General*

DIANA K. FLYNN
CHRISTY A. MCCORMICK
*Attorneys*

DECEMBER 2007