Westlaw.

2:13-cv-193
09/02/2014
DEF0105
exhibitsticker.com

Page 1

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

⚑

United States District Court,
S.D. Indiana, Indianapolis Division.
INDIANA DEMOCRATIC PARTY, et al.,
Plaintiffs,
v.
Todd ROKITA, et al., Defendants.

No. 1:05-CV-0634-SEB-VSS.
April 14, 2006.

**Background:** Political party, party committee, state representative, elected public official, and nonprofit organizations brought action against county election board, Secretary of State, and Election Division directors to challenge photo identification requirement as unconstitutional and a violation of Voting Rights Act (VRA). Attorney General intervened on behalf of state. Defendants moved for summary judgment.

**Holdings:** The District Court, Barker, J., held that:
(1) offense alone in response to government policies or requirements does not suffice to create standing;
(2) party, committee, potential voters, representative, and official had standing with respect to some aspects of their claims;
(3) organizations lacked standing;
(4) the statute does not burden right to vote in violation of First and Fourteenth Amendments and is a reasonable time, place, and manner election regulation;
(5) the requirement is not a poll tax;
(6) it does not violate the VRA;
(7) it does not violate state constitution.

Motion granted.

West Headnotes

**[1] Evidence 157 ☞555.2**

157 Evidence

157XII Opinion Evidence
157XII(D) Examination of Experts
157k555 Basis of Opinion
157k555.2 k. Necessity and sufficiency. Most Cited Cases

Expert's report that at least 51,000 registered voters and as many as 141,000 registered voters in Marion County and up to 989,000 registered voters in Indiana did not currently possess a driver's license or photo identification failed to satisfy reliability requirements for expert testimony in suit challenging constitutionality of statute requiring registered voters to present photo identification at polls in order to vote; report failed to account for voter roll inflation, compared demographic data from years without qualification or analysis, drew obviously inaccurate and illogical conclusions, and failed to qualify the statistical estimates based on socioeconomic data. West's A.I.C. 3-11-8-25.1.

**[2] Federal Civil Procedure 170A ☞103.2**

170A Federal Civil Procedure
170AII Parties
170AII(A) In General
170Ak103.1 Standing
170Ak103.2 k. In general; injury or interest. Most Cited Cases

To satisfy the injury-in-fact requirement for Article III standing, plaintiffs must establish that they have sustained or are immediately in danger of sustaining some direct injury; mere speculation is not enough to establish an injury in fact. U.S.C.A. Const.Art. 3, § 1 et seq.

**[3] Associations 41 ☞20(1)**

41 Associations
41k20 Actions by or Against Associations
41k20(1) k. In general. Most Cited Cases

A plaintiff which is an association has Article III standing to represent the interests of its members if (1) the conduct challenged is injurious to its

PX 103

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

members, (2) the claim asserted is germane to the association's purposes, and (3) the cause can proceed without the participation of the individual members affected by the challenged conduct. U.S.C.A. Const.Art. 3, § 1 et seq.

**[4] Associations 41 ⬡20(1)**

41 Associations
    41k20 Actions by or Against Associations
        41k20(1) k. In general. Most Cited Cases

"Representational standing" requires association to demonstrate that the members whose rights it is asserting are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit.

**[5] Federal Civil Procedure 170A ⬡103.4**

170A Federal Civil Procedure
    170AII Parties
        170AII(A) In General
            170Ak103.1 Standing
                170Ak103.4 k. Rights of third parties or public. Most Cited Cases

A plaintiff may have standing to raise the rights of third parties not otherwise before the court if (1) the plaintiff has suffered an injury in fact; (2) the plaintiff has a close relationship to the injured third party; and (3) there was some hindrance to the third parties in asserting their own rights.

**[6] Federal Civil Procedure 170A ⬡103.4**

170A Federal Civil Procedure
    170AII Parties
        170AII(A) In General
            170Ak103.1 Standing
                170Ak103.4 k. Rights of third parties or public. Most Cited Cases

When the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish.

**[7] Constitutional Law 92 ⬡703**

92 Constitutional Law
    92VI Enforcement of Constitutional Provisions
        92VI(A) Persons Entitled to Raise Constitutional Questions; Standing
            92VI(A)3 Particular Questions or Grounds of Attack in General
                92k703 k. Elections. Most Cited Cases
    (Formerly 92k42.3(1))

Voters' mere offense at need to present photo identification in order to vote was insufficient injury for Article III standing to challenge constitutionality of statute requiring registered voters to present photo identification at polls. U.S.C.A. Const.Art. 3, § 1 et seq.; West's A.I.C. 3-11-8-25.1.

**[8] Federal Civil Procedure 170A ⬡103.2**

170A Federal Civil Procedure
    170AII Parties
        170AII(A) In General
            170Ak103.1 Standing
                170Ak103.2 k. In general; injury or interest. Most Cited Cases

Offense alone in response to government policies or requirements does not suffice to create standing; otherwise there would be universal standing since anyone could contest any public policy or action he disliked, and there must be a concrete injury.

**[9] Federal Civil Procedure 170A ⬡103.2**

170A Federal Civil Procedure
    170AII Parties
        170AII(A) In General
            170Ak103.1 Standing
                170Ak103.2 k. In general; injury or interest. Most Cited Cases

The psychological consequence presumably produced by observation of conduct with which one disagrees is not an "injury in fact" for purposes of Article III standing. U.S.C.A. Const.Art. 3, § 1 et seq.

**[10] Constitutional Law 92 ⬡728**

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

92 Constitutional Law
   92VI Enforcement of Constitutional Provisions
      92VI(A) Persons Entitled to Raise Constitutional Questions; Standing
         92VI(A)4 Particular Constitutional Provisions in General
         92k728 k. Freedom of association. Most Cited Cases
   (Formerly 92k42.2(1))

Political party and committee challenging statute that required registered voters to present photo identification at polls suffered direct injury to right to freely associate and had Article III standing for associational rights claim; the statute impeded party's ability to permit citizens without photo identification to vote in their primary elections, and that in turn interfered with right to freely associate with those citizens for political purposes. U.S.C.A. Const.Art. 3, § 1 et seq.; West's A.I.C. 3-11-8-25.1.

**[11] Constitutional Law 92 ⟲703**

92 Constitutional Law
   92VI Enforcement of Constitutional Provisions
      92VI(A) Persons Entitled to Raise Constitutional Questions; Standing
         92VI(A)3 Particular Questions or Grounds of Attack in General
         92k703 k. Elections. Most Cited Cases
   (Formerly 92k42.3(1))

Political party committee could not establish Article III standing based on alleged injuries to its members in action challenging constitutionality of statute requiring registered voters to present photo identification at polls in order to vote; all members had the necessary photo identification. U.S.C.A. Const.Art. 3, § 1 et seq.; West's A.I.C. 3-11-8-25.1.

**[12] Constitutional Law 92 ⟲703**

92 Constitutional Law
   92VI Enforcement of Constitutional Provisions
      92VI(A) Persons Entitled to Raise Constitutional Questions; Standing
         92VI(A)3 Particular Questions or Grounds of Attack in General

         92k703 k. Elections. Most Cited Cases
   (Formerly 92k42.3(1))

A voter's mere desire to vote for political party's candidate would not make that voter a member of the party and would not confer Article III standing on party to assert that voter's rights in constitutional challenge to statute requiring registered voters to present photo identification at polls in order to vote. U.S.C.A. Const. Art. 3, § 1 et seq.; West's A.I.C. 3-11-8-25.1.

**[13] Constitutional Law 92 ⟲703**

92 Constitutional Law
   92VI Enforcement of Constitutional Provisions
      92VI(A) Persons Entitled to Raise Constitutional Questions; Standing
         92VI(A)3 Particular Questions or Grounds of Attack in General
         92k703 k. Elections. Most Cited Cases
   (Formerly 92k42.1(1))

Political party in action challenging constitutionality of statute that required registered voters to present photo identification at polls in order to vote lacked Article III standing to raise rights of voters unable to obtain photo identification; the party failed to show existence of such voters. U.S.C.A. Const.Art. 3, § 1 et seq.; West's A.I.C. 3-11-8-25.1.

**[14] Constitutional Law 92 ⟲703**

92 Constitutional Law
   92VI Enforcement of Constitutional Provisions
      92VI(A) Persons Entitled to Raise Constitutional Questions; Standing
         92VI(A)3 Particular Questions or Grounds of Attack in General
         92k703 k. Elections. Most Cited Cases
   (Formerly 92k42.1(1))

Political party in action challenging constitutionality of statute that required registered voters to present photo identification at polls in order to vote had Article III standing to raise third-party rights of voters unable to present photo identification at the polls on election day; party shared common interest with their affected supporters, i.e., the ability of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

such supporters to vote for their preferred candidates. U.S.C.A. Const.Art. 3, § 1 et seq.; West's A.I.C. 3-11-8-25.1.

**[15]** Constitutional Law 92 ⟷703

92 Constitutional Law
    92VI Enforcement of Constitutional Provisions
        92VI(A) Persons Entitled to Raise Constitutional Questions; Standing
            92VI(A)3 Particular Questions or Grounds of Attack in General
            92k703 k. Elections. Most Cited Cases
      (Formerly 92k42.3(1))

Potential voters who were over the age of 65 and automatically qualified to vote by absentee ballot lacked Article III standing to challenge constitutionality of statute requiring registered voters to present photo identification at polls; voting by absentee ballot instead of in person did not, by itself, constitute an injury in fact since there was no established constitutional right to vote in person, and voting absentee was not shown to be an actual hardship. U.S.C.A. Const.Art. 3, § 1 et seq.; West's A.I.C. 3-11-8-25.1.

**[16]** Constitutional Law 92 ⟷923

92 Constitutional Law
    92VI Enforcement of Constitutional Provisions
        92VI(A) Persons Entitled to Raise Constitutional Questions; Standing
            92VI(A)11 Equal Protection
            92k923 k. Elections. Most Cited Cases
      (Formerly 92k42.3(1))

Potential voters without photo identification that statute required them to present at polls had Article III standing to assert an equal protection claim on the grounds that they were disadvantaged relative to certain classes of voters who possessed photo identification or were not required to present photo identification. U.S.C.A. Const.Art. 3, § 1 et seq.; U.S.C.A. Const.Amend. 14; West's A.I.C. 3-11-8-25.1.

**[17]** Constitutional Law 92 ⟷915

92 Constitutional Law
    92VI Enforcement of Constitutional Provisions
        92VI(A) Persons Entitled to Raise Constitutional Questions; Standing
            92VI(A)11 Equal Protection
            92k915 k. In general. Most Cited Cases
      (Formerly 92k42.2(2))

When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing; the injury in fact in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit. U.S.C.A. Const.Art. 3, § 1 et seq.; U.S.C.A. Const.Amend. 14.

**[18]** Constitutional Law 92 ⟷703

92 Constitutional Law
    92VI Enforcement of Constitutional Provisions
        92VI(A) Persons Entitled to Raise Constitutional Questions; Standing
            92VI(A)3 Particular Questions or Grounds of Attack in General
            92k703 k. Elections. Most Cited Cases
      (Formerly 92k42.3(3))

Elected public officials' speculations that statutory requirement of photo identification in order to vote created risk they would receive fewer votes did establish injury in fact necessary for Article III standing to challenge the requirement. U.S.C.A. Const.Art. 3, § 1 et seq.; West's A.I.C. 3-11-8-25.1.

**[19]** Constitutional Law 92 ⟷703

92 Constitutional Law
    92VI Enforcement of Constitutional Provisions
        92VI(A) Persons Entitled to Raise Constitutional Questions; Standing
            92VI(A)3 Particular Questions or Grounds of Attack in General

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

92k703 k. Elections. Most Cited Cases
(Formerly 92k42.3(3))

Elected public officials challenging constitutionality of statute that required registered voters to present photo identification at polls in order to vote lacked Article III standing to assert the third-party rights of hypothetical voters in their respective districts; nothing indicated that the voters could not assert their own rights, and the officials did not identify voters who would be harmed. U.S.C.A. Const.Art. 3, § 1 et seq.; West's A.I.C. 3-11-8-25.1.

**[20] Constitutional Law 92 ⟶703**

92 Constitutional Law
　92VI Enforcement of Constitutional Provisions
　　92VI(A) Persons Entitled to Raise Constitutional Questions; Standing
　　　92VI(A)3 Particular Questions or Grounds of Attack in General
　　　　92k703 k. Elections. Most Cited Cases
(Formerly 92k42.3(3))

Elected public officials challenging constitutionality of statute that required registered voters to present photo identification at polls in order to vote had Article III standing to assert the third-party rights of voters who, through inadvertence, were unable to present photo identification at the polls. U.S.C.A. Const.Art. 3, § 1 et seq.; West's A.I.C. 3-11-8-25.1.

**[21] Constitutional Law 92 ⟶703**

92 Constitutional Law
　92VI Enforcement of Constitutional Provisions
　　92VI(A) Persons Entitled to Raise Constitutional Questions; Standing
　　　92VI(A)3 Particular Questions or Grounds of Attack in General
　　　　92k703 k. Elections. Most Cited Cases
(Formerly 92k42.1(1))

Nonprofit organizations lacked Article III standing in their own right to challenge constitutionality of statute that required registered voters to present photo identification at polls in order to vote, even if the law would require them to shift re-

sources away from their existing programs and into efforts aimed at helping voters comply with the requirements; upholding the law would not cause direct injury to organizations. U.S.C.A. Const.Art. 3, § 1 et seq.; West's A.I.C. 3-11-8-25.1.

**[22] Constitutional Law 92 ⟶703**

92 Constitutional Law
　92VI Enforcement of Constitutional Provisions
　　92VI(A) Persons Entitled to Raise Constitutional Questions; Standing
　　　92VI(A)3 Particular Questions or Grounds of Attack in General
　　　　92k703 k. Elections. Most Cited Cases
(Formerly 92k42.3(1))

Nonprofit organizations lacked representational standing to assert their members' rights to challenge constitutionality of statute that required registered voters to present photo identification at polls in order to vote; the organizations failed to show a single member who lacked photo identification and Article III standing. U.S.C.A. Const.Art. 3, § 1 et seq.; West's A.I.C. 3-11-8-25.1.

**[23] Constitutional Law 92 ⟶703**

92 Constitutional Law
　92VI Enforcement of Constitutional Provisions
　　92VI(A) Persons Entitled to Raise Constitutional Questions; Standing
　　　92VI(A)3 Particular Questions or Grounds of Attack in General
　　　　92k703 k. Elections. Most Cited Cases
(Formerly 92k42.3(1))

Nonprofit organizations challenging constitutionality of statute that required registered voters to present photo identification at polls in order to vote lacked representational standing to bring case on behalf of persons served by them. U.S.C.A. Const.Art. 3, § 1 et seq.; West's A.I.C. 3-11-8-25.1.

**[24] Evidence 157 ⟶318(7)**

157 Evidence
　157IX Hearsay

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

157k315 Statements by Persons Other Than Parties or Witnesses
157k318 Writings
157k318(7) k. Certificates and affidavits. Most Cited Cases

**Federal Civil Procedure 170A 2545**

170A Federal Civil Procedure
170AXVII Judgment
170AXVII(C) Summary Judgment
170AXVII(C)3 Proceedings
170Ak2542 Evidence
170Ak2545 k. Admissibility. Most Cited Cases

Unsubstantiated hearsay statements alleging that unnamed individuals would be burdened by statutory requirement of photo identification in order to vote were totally lacking in fending off summary judgment that nonprofit organizations lacked Article III standing. U.S.C.A. Const. Art. 3, § 1 et seq.; West's A.I.C. 3-11-8-25.1.

**[25] Constitutional Law 92 1460**

92 Constitutional Law
92XVII Political Rights and Discrimination
92k1460 k. In general. Most Cited Cases
(Formerly 92k91)

**Constitutional Law 92 1466**

92 Constitutional Law
92XVII Political Rights and Discrimination
92k1466 k. Voting rights and suffrage in general. Most Cited Cases
(Formerly 92k91)

**Constitutional Law 92 1467**

92 Constitutional Law
92XVII Political Rights and Discrimination
92k1467 k. Ballots and ballot access. Most Cited Cases
(Formerly 92k82(8))

**Elections 144 10.5**

144 Elections
144I Right of Suffrage and Regulation Thereof in General
144k10.5 k. Constitutional guaranties in general. Most Cited Cases
(Formerly 92k82(8))

There is no absolute constitutional right to vote in any specific manner an individual may desire, and there is no absolute right to associate, without restriction, for political purposes through the ballot. U.S.C.A. Const.Art. 1, § 4, cl. 1; Const.Amend. 1.

**[26] Elections 144 15**

144 Elections
144I Right of Suffrage and Regulation Thereof in General
144k14 Power to Restrict or Extend
144k15 k. In general. Most Cited Cases

Pursuant to federal constitutional authority to prescribe the times, places, and manner of holding elections for senators and representatives, state legislatures may, without transgressing the Constitution, impose extensive restrictions on voting. U.S.C.A. Const. Art. 1, § 4, cl. 1.

**[27] Constitutional Law 92 1461**

92 Constitutional Law
92XVII Political Rights and Discrimination
92k1461 k. Elections in general. Most Cited Cases
(Formerly 92k91)

**Constitutional Law 92 1466**

92 Constitutional Law
92XVII Political Rights and Discrimination
92k1466 k. Voting rights and suffrage in general. Most Cited Cases
(Formerly 92k91)

**Elections 144 24**

144 Elections
144I Right of Suffrage and Regulation Thereof in General

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

144k23 Power to Regulate Conduct of Election

144k24 k. In general. Most Cited Cases
(Formerly 92k82(8))

A state's broad authority to regulate elections is tempered by constitutional provisions which protect individual citizens' rights; the power to regulate the time, place, and manner of elections does not justify, without more, the abridgment of fundamental rights, such as the right to vote or the freedom of political association. U.S.C.A. Const. Art. 1, § 4, cl. 1; U.S.C.A. Const.Amend. 1.

**[28] Constitutional Law 92 ☞1461**

92 Constitutional Law
    92XVII Political Rights and Discrimination
        92k1461 k. Elections in general. Most Cited Cases
    (Formerly 92k82(8))

**Constitutional Law 92 ☞4230**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G) Particular Issues and Applications
            92XXVII(G)9 Elections, Voting, and Political Rights
                92k4230 k. In general. Most Cited Cases
    (Formerly 92k274.2(1))

**Elections 144 ☞9**

144 Elections
    144I Right of Suffrage and Regulation Thereof in General
        144k8 Statutory Provisions Conferring or Defining Right
            144k9 k. Constitutionality and validity. Most Cited Cases
    (Formerly 92k82(8))

A court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the state as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights. U.S.C.A. Const.Amends. 1, 14.

**[29] Constitutional Law 92 ☞1050**

92 Constitutional Law
    92VII Constitutional Rights in General
        92VII(A) In General
            92k1050 k. In general. Most Cited Cases
    (Formerly 92k82(1))

Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest; lesser burdens, however, trigger less exacting review, and a state's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions.

**[30] Constitutional Law 92 ☞1466**

92 Constitutional Law
    92XVII Political Rights and Discrimination
        92k1466 k. Voting rights and suffrage in general. Most Cited Cases
    (Formerly 92k82(8))

**Elections 144 ☞9**

144 Elections
    144I Right of Suffrage and Regulation Thereof in General
        144k8 Statutory Provisions Conferring or Defining Right
            144k9 k. Constitutionality and validity. Most Cited Cases
    (Formerly 92k82(8))

Strict scrutiny of an election law is not warranted merely because it may prevent some otherwise eligible voters from exercising right to vote; any election restriction is going to exclude, either de jure or de facto, some people from voting, and the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

constitutional question is whether the restriction and resulting exclusion are reasonable given the interest the restriction serves.

**[31] Constitutional Law 92 ⟜1053**

92 Constitutional Law
   92VII Constitutional Rights in General
     92VII(A) In General
      92k1053 k. Strict or heightened scrutiny; compelling interest. Most Cited Cases
    (Formerly 92k82(1))

    "Strict scrutiny" of allegedly unconstitutional law means the state must show that the regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.

**[32] Constitutional Law 92 ⟜1466**

92 Constitutional Law
   92XVII Political Rights and Discrimination
     92k1466 k. Voting rights and suffrage in general. Most Cited Cases
    (Formerly 92k82(8))

**Constitutional Law 92 ⟜4232**

92 Constitutional Law
   92XXVII Due Process
     92XXVII(G) Particular Issues and Applications
      92XXVII(G)9 Elections, Voting, and Political Rights
       92k4232 k. Voters, candidates, and elections. Most Cited Cases
    (Formerly 92k274.2(3))

**Elections 144 ⟜19**

144 Elections
   144I Right of Suffrage and Regulation Thereof in General
     144k19 k. Power to require registration or proof of qualifications. Most Cited Cases
    (Formerly 92k82(8))

    Statute that requires registered voters to present photo identification at polls in order to vote does

not impose severe burden on right to vote and is not subject to strict scrutiny in suit alleging violation of First and Fourteenth Amendment rights. U.S.C.A. Const.Amends. 1, 14; West's A.I.C. 3-11-8-25.1.

**[33] Constitutional Law 92 ⟜1466**

92 Constitutional Law
   92XVII Political Rights and Discrimination
     92k1466 k. Voting rights and suffrage in general. Most Cited Cases
    (Formerly 92k82(8))

**Elections 144 ⟜9**

144 Elections
   144I Right of Suffrage and Regulation Thereof in General
     144k8 Statutory Provisions Conferring or Defining Right
      144k9 k. Constitutionality and validity. Most Cited Cases
    (Formerly 92k82(8))

    The mere fact that a voting regulation excludes some voters is not enough to warrant strict scrutiny in determining constitutionality.

**[34] Constitutional Law 92 ⟜1466**

92 Constitutional Law
   92XVII Political Rights and Discrimination
     92k1466 k. Voting rights and suffrage in general. Most Cited Cases
    (Formerly 92k82(8))

**Constitutional Law 92 ⟜4232**

92 Constitutional Law
   92XXVII Due Process
     92XXVII(G) Particular Issues and Applications
      92XXVII(G)9 Elections, Voting, and Political Rights
       92k4232 k. Voters, candidates, and elections. Most Cited Cases
    (Formerly 92k274.2(3))

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

**Elections 144 ☞19**

144 Elections
    144I Right of Suffrage and Regulation Thereof in General
        144k19 k. Power to require registration or proof of qualifications. Most Cited Cases

Statutory requirement to present photo identification at polls in order to vote is reasonable to protect state's interests in ascertaining voter's identity and preventing fraud, does not burden right to vote in violation of First and Fourteenth Amendments, and is a reasonable time, place, and manner election regulation. U.S.C.A. Const. Art. 3, § 1 et seq.; U.S.C.A. Const.Amends. 1, 14; West's A.I.C. 3-11-8-25.1.

**[35] Constitutional Law 92 ☞2509**

92 Constitutional Law
    92XX Separation of Powers
        92XX(C) Judicial Powers and Functions
            92XX(C)2 Encroachment on Legislature
                92k2499 Particular Issues and Applications
                    92k2509 k. Elections. Most Cited Cases
    (Formerly 92k70.3(14))

In examining constitutionality of an election regulation aimed at combating fraud, courts are well advised to pay additional deference to the legislative judgment because the striking of the balance between discouraging fraud and other abuses and encouraging turnout is quintessentially a legislative judgment with which judges should not interfere unless strongly convinced that the legislative judgment is grossly awry.

**[36] Elections 144 ☞18**

144 Elections
    144I Right of Suffrage and Regulation Thereof in General
        144k18 k. Power to prescribe qualifications. Most Cited Cases

Statutory requirement to present photo identi-

fication at polls in order to vote is not a "poll tax"; any person who meets the age eligibility requirement to vote can obtain photo identification from the Bureau of Motor Vehicles (BMV) without paying a fee, and even though a birth certificate requires a fee, other documents are acceptable for obtaining photo identification. U.S.C.A. Const.Amend. 24; West's A.I.C. 3-11-8-25.1, 9-24-16-10.

**[37] Elections 144 ☞18**

144 Elections
    144I Right of Suffrage and Regulation Thereof in General
        144k18 k. Power to prescribe qualifications. Most Cited Cases

The imposition of tangential burdens on voting does not transform a regulation into a poll tax. U.S.C.A. Const.Amend. 24.

**[38] Constitutional Law 92 ☞3648**

92 Constitutional Law
    92XXVI Equal Protection
        92XXVI(E) Particular Issues and Applications
            92XXVI(E)9 Elections, Voting, and Political Rights
                92k3647 Qualifications of Voters
                    92k3648 k. In general. Most Cited Cases
    (Formerly 92k225.2(6))

**Elections 144 ☞19**

144 Elections
    144I Right of Suffrage and Regulation Thereof in General
        144k19 k. Power to require registration or proof of qualifications. Most Cited Cases

Incidental impact that statutory requirement of photo identification could have on voters without identification on election day did not violate equal protection clause; voters could vote by provisional ballot and present photo identification within two

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

weeks. U.S.C.A. Const.Amend. 14; West's A.I.C. 3-11-8-25.1.

**[39] Constitutional Law 92 ⟨⟩3039**

92 Constitutional Law
  92XXVI Equal Protection
    92XXVI(A) In General
      92XXVI(A)5 Scope of Doctrine in General
        92k3038 Discrimination and Classification
        92k3039 k. In general. Most Cited Cases
    (Formerly 92k211(1))

Unavoidable inequalities in treatment, even if intended in the sense of being known to follow ineluctably from a deliberate policy, do not violate equal protection. U.S.C.A. Const.Amend. 14.

**[40] Constitutional Law 92 ⟨⟩3648**

92 Constitutional Law
  92XXVI Equal Protection
    92XXVI(E) Particular Issues and Applications
      92XXVI(E)9 Elections, Voting, and Political Rights
        92k3647 Qualifications of Voters
        92k3648 k. In general. Most Cited Cases
    (Formerly 92k225.2(6))

**Elections 144 ⟨⟩19**

144 Elections
  144I Right of Suffrage and Regulation Thereof in General
    144k19 k. Power to require registration or proof of qualifications. Most Cited Cases

The mere fact that statutory requirement of photo identification applies only to in-person voters and not to absentee voters does not offend the equal protection clause; election officials cannot compare identification included with absentee ballot with face of voter. U.S.C.A. Const.Amend. 14; West's

A.I.C. 3-11-8-25.1.

**[41] Constitutional Law 92 ⟨⟩3648**

92 Constitutional Law
  92XXVI Equal Protection
    92XXVI(E) Particular Issues and Applications
      92XXVI(E)9 Elections, Voting, and Political Rights
        92k3647 Qualifications of Voters
        92k3648 k. In general. Most Cited Cases
    (Formerly 92k225.2(6))

**Elections 144 ⟨⟩19**

144 Elections
  144I Right of Suffrage and Regulation Thereof in General
    144k19 k. Power to require registration or proof of qualifications. Most Cited Cases

Requiring photo identification to vote in person, but not in nursing home, does not violate equal protection; nursing home officials would have intimate, objective, and verifiable information concerning the identity of residents. U.S.C.A. Const.Amend. 14; West's A.I.C. 3-11-8-25.1.

**[42] Constitutional Law 92 ⟨⟩1466**

92 Constitutional Law
  92XVII Political Rights and Discrimination
    92k1466 k. Voting rights and suffrage in general. Most Cited Cases
    (Formerly 92k82(8))

**Elections 144 ⟨⟩19**

144 Elections
  144I Right of Suffrage and Regulation Thereof in General
    144k19 k. Power to require registration or proof of qualifications. Most Cited Cases

Indigency exception to statutory requirement to present photo identification at polls in order to vote could not be set aside as unconstitutionally vague in

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

the absence of evidence of indigent individuals, or possibly indigent or confused indigent individuals, actually impacted by the statute. West's A.I.C. 3-11-8-25.1, 9-24-16-10.

**[43] Statutes 361 ⟫47**

361 Statutes
    361I Enactment, Requisites, and Validity in General
       361k45 Validity and Sufficiency of Provisions
         361k47 k. Certainty and definiteness. Most Cited Cases

Speculation about possible vagueness in hypothetical situations not before the court will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications.

**[44] Constitutional Law 92 ⟫1466**

92 Constitutional Law
    92XVII Political Rights and Discrimination
       92k1466 k. Voting rights and suffrage in general. Most Cited Cases
    (Formerly 92k82(8))

**Elections 144 ⟫19**

144 Elections
    144I Right of Suffrage and Regulation Thereof in General
       144k19 k. Power to require registration or proof of qualifications. Most Cited Cases

Statutory requirement to present photo identification at polls in order to vote was not made unconstitutionally vague by lack of definition of "conform" in statute defining "proof of identification" as a document with a name that conformed to voter's name on registration record; argument was based on speculation about possible vagueness in hypothetical situations not before the court, and proper resolution of the challenge was to allow Secretary of State to effect uniform standards. West's A.I.C. 3-5-2-40.5, 3-11-8-25.1.

**[45] Constitutional Law 92 ⟫1466**

92 Constitutional Law
    92XVII Political Rights and Discrimination
       92k1466 k. Voting rights and suffrage in general. Most Cited Cases
    (Formerly 92k82(8))

**Elections 144 ⟫19**

144 Elections
    144I Right of Suffrage and Regulation Thereof in General
       144k19 k. Power to require registration or proof of qualifications. Most Cited Cases

Statutory requirement to present photo identification at polls in order to vote was not made unconstitutionally vague by lack of standards for comparing photo to the voter. West's A.I.C. 3-11-8-25.1.

**[46] Elections 144 ⟫12(4)**

144 Elections
    144I Right of Suffrage and Regulation Thereof in General
       144k12 Denial or Abridgment on Account of Race
         144k12(2) Discriminatory Practices Proscribed
           144k12(4) k. Election officials' actions; registration; voting procedures. Most Cited Cases

Statutory requirement of photo identification to vote in person, but not by absentee ballot, does not violate Voting Rights Act (VRA) prohibition against standard, practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals within the same county, parish, or similar political subdivision; absentee voting is an inherently different procedure from voting in person, requiring a state which allows both in-person and absentee voting to apply different standards, practices, or procedures to these two groups of voters. 42 U.S.C.A. § 1971(a)(2)(A); West's A.I.C. 3-11-4-21,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

3-11-8-25.1, 3-11-10-16, 3-11-10-17(6).

**[47] Elections 144 ☞12(4)**

144 Elections
   144I Right of Suffrage and Regulation Thereof in General
      144k12 Denial or Abridgment on Account of Race
         144k12(2) Discriminatory Practices Proscribed
           144k12(4) k. Election officials' actions; registration; voting procedures. Most Cited Cases

The act of presenting photo identification in order to prove identity at polls is not "error or omission on any record or paper" within the meaning of Voting Rights Act (VRA) prohibition against denying the right to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting. 42 U.S.C.A. § 1971(a)(2)(B); West's A.I.C. 3-11-8-25.1.

**[48] Elections 144 ☞12(4)**

144 Elections
   144I Right of Suffrage and Regulation Thereof in General
      144k12 Denial or Abridgment on Account of Race
         144k12(2) Discriminatory Practices Proscribed
           144k12(4) k. Election officials' actions; registration; voting procedures. Most Cited Cases

Voting Rights Act (VRA) prohibition against denying the right to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting was intended to address the practice of requiring unnecessary information for voter registration with the intent that such requirements would increase the number of errors or omissions on the application forms, thus providing an excuse to disqualify potential voters. 42 U.S.C.A. §

1971(a)(2)(B).

**[49] Elections 144 ☞12(4)**

144 Elections
   144I Right of Suffrage and Regulation Thereof in General
      144k12 Denial or Abridgment on Account of Race
         144k12(2) Discriminatory Practices Proscribed
           144k12(4) k. Election officials' actions; registration; voting procedures. Most Cited Cases

Statutory requirement to present photo identification at polls in order to vote did not violate Voting Rights Act (VRA) prohibition against denying the right to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if the error or omission was not material to qualification to vote; verifying voter's identity was material, state could choose to require photo identification for most voters, and the requirements of photograph, expiration date, and issuance by state or United States government related to establishing identity. 42 U.S.C.A. § 1971(a)(2)(B); West's A.I.C. 3-11-8-25.1.

**[50] Elections 144 ☞19**

144 Elections
   144I Right of Suffrage and Regulation Thereof in General
      144k19 k. Power to require registration or proof of qualifications. Most Cited Cases

Despite Indiana's constitutional requirement that elections be free and equal, the General Assembly has wide latitude to adopt reasonable voting regulations; it is for the legislature to furnish a reasonable regulation under which the right to vote is to be exercised, and it may adopt registration laws if they merely regulate in a reasonable and uniform manner how the privilege of voting will be exercised. West's A.I.C. Const. Art. 2, § 1.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

**[51] Elections 144 ⟲⟶19**

144 Elections
    144I Right of Suffrage and Regulation Thereof in General
        144k19 k. Power to require registration or proof of qualifications. Most Cited Cases

Statutory requirement to present photo identification at polls in order to vote did not violate Indiana's constitutional requirement that elections be free and equal; plaintiffs failed to produce even a single affidavit from an individual attesting to his/her inability to vote as a result of the requirement. West's A.I.C. Const. Art. 2, § 1; 3-11-8-25.1.

**[52] Elections 144 ⟲⟶19**

144 Elections
    144I Right of Suffrage and Regulation Thereof in General
        144k19 k. Power to require registration or proof of qualifications. Most Cited Cases

Statutory requirement to present photo identification at polls in order to vote does not violate Indiana's constitutional provision setting voting age at eighteen and requiring residency for at least thirty days in voting precinct; any requirement that voters validate their identity necessarily implies that any voter unable to do so will not have his/her vote counted. West's A.I.C. Const.Art. 2, § 2; West's A.I.C. 3-11-8-25.1.

**[53] Elections 144 ⟲⟶18**

144 Elections
    144I Right of Suffrage and Regulation Thereof in General
        144k18 k. Power to prescribe qualifications. Most Cited Cases

Indiana legislature has power to determine what regulations shall be complied with by a qualified voter in order that his ballot may be counted, so long as what it requires is not so grossly unreasonable that compliance therewith is practically impossible.

**[54] Elections 144 ⟲⟶19**

144 Elections
    144I Right of Suffrage and Regulation Thereof in General
        144k19 k. Power to require registration or proof of qualifications. Most Cited Cases

Newspaper articles, transcribed oral statements, letters/press releases, committee reports, websites, polls, and journal articles which principally documented reports of voter fraud in jurisdictions other than Indiana were admissible in action challenging constitutionality of Indiana's statutory requirement to present photo identification at polls to extent the submissions established reasonable justification for the statute; statute was not subject to strict scrutiny, and the state was thus entitled to rely on legislative facts to support its proffered justifications, rather than being required to produce adjudicative facts. West's A.I.C. 3-11-8-25.1.

**[55] Constitutional Law 92 ⟲⟶1055**

92 Constitutional Law
    92VII Constitutional Rights in General
        92VII(A) In General
            92k1055 k. Reasonableness or rationality. Most Cited Cases
        (Formerly 92k82(1))

Legislative facts cited by legislature are not necessary to uphold statute under rational basis test; legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.

*782 Barry A. Macey, Macey Swanson and Allman, Geoffrey S. Lohman, William R. Groth, Fillenwarth Dennerline Groth & Towe, Kenneth J. Falk, ACLU of Indiana, Indianapolis, IN, for Plaintiffs.

Douglas J. Webber, Thomas M. Fisher, Indiana State Attorney General, James B. Osborn, Office of Corporation Counsel, Indianapolis, IN, for Defendants.

*ENTRY GRANTING DEFENDANTS' MOTIONS*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

*FOR SUMMARY JUDGMENT, DENYING
PLAINTIFFS' MOTIONS FOR SUMMARY JUDG-
MENT, AND DENYING PLAINTIFFS' MOTIONS
TO STRIKE* [FN1]

> **FN1.** Defendants' Motion for Oral Argu-
> ment (Dkt.# 114) is denied as moot in light
> of this entry.

**BARKER**, District Judge.

This matter is before the Court on Plaintiffs'
and Defendants' cross motions for summary judg-
ment. Plaintiffs have brought their constitutionally-
based lawsuit seeking injunctive relief and declarat-
ory judgment to challenge the recent enactment by
the Indiana General Assembly requiring that re-
gistered voters present photo identification at the
polls in order to vote, pursuant to Senate Enrolled
Act No. 483, codified at Ind.Code §§ 3-5-2-40.5;
3-10-1-7.2; 3-10-8-25; scattered sections of
Ind.Code ch. 3-11-8; several sections of Ind.Code
art. 3-11.7; and Ind.Code § 9-24-16-10 [FN2]
(hereinafter collectively referred to as "SEA No.
483," the "Voter ID Law," or the "Law"). Plaintiffs
contend that this law violates the First and Four-
teenth Amendments of the United States Constitu-
tion as well as 42 U.S.C. § 1971, and Article 2,
Sections 1 and 2 of the Indiana Constitution.

> **FN2.** Related matters were also passed by
> the Indiana General Assembly in Senate
> Enrolled Act No. 15, §§ 14, 16, and 17, co-
> dified at Ind.Code § 3-11-10-26; House
> Enrolled Act 1407, §§ 56, 142 and 143, co-
> dified at Ind.Code §§ 9-16-1-7; 9-16-4-1;
> and 3-11.7-5-1.

There are two groups of plaintiffs who have
brought this consolidated action: The first group is
comprised of the Indiana **\*783** Democratic Party
and the Marion County Democratic Central Com-
mittee (collectively the "Democrats"); the second
group (the "ICLU Plaintiffs") [FN3] is comprised of
two elected public officials, State Representative
William Crawford and Trustee Joseph Simpson,
and several nonprofit organizations: Concerned

Clergy of Indianapolis ("CCI"), Indianapolis Re-
source Center for Independent Living ("IRCIL"),
Indiana Coalition on Housing and Homeless Issues
("ICHHI"), Indianapolis Branch of the NAACP
("NAACP"), and United Senior Action of Indiana
("USA") (collectively the "Organization
Plaintiffs"). There are also two sets of defendants in
this case: the Marion County Election Board
("MCEB") and Todd Rokita, in his official capacity
as Indiana Secretary of State, J. Bradley King and
Kristi Robertson, in their official capacities as Co-
Directors of the Indiana Election Division. In addi-
tion, the Indiana Attorney General has intervened in
the case on behalf of the State of Indiana to defend
the constitutionality of SEA 483.

> **FN3.** We have coined this group the
> "ICLU Plaintiffs" because State Represent-
> ative William Crawford, Trustee Joseph
> Simpson and the "Organization Plaintiffs"
> are all represented by the ICLU.

This litigation is the result of a partisan legis-
lative disagreement that has spilled out of the state
house into the courts. Plaintiffs (with one possible
exception) became engaged in this dispute while it
was still being debated by the Indiana General As-
sembly [FN4] and, in moving to this judicial forum,
in many respects they have failed to adapt their ar-
guments to the legal arena. Plaintiffs, for example,
have not introduced evidence of a single, individual
Indiana resident who will be unable to vote as a re-
sult of SEA 483 or who will have his or her right to
vote unduly burdened by its requirements. Plaintiffs
also have repeatedly advanced novel, sweeping
political arguments which, if adopted, would re-
quire the invalidation, not only of SEA 483, but of
other significant portions of Indiana's election code
which have previously passed constitutional muster
and/or to which Plaintiffs do not actually object; in-
deed, they offer them as preferable alternatives to
the new Voter ID Law. In so doing, Plaintiffs' case
is based on the implied assumption that the Court
should give these Constitutional and statutory pro-
visions an expansive review based on little more

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

than their own personal and political preferences. FN5

> FN4. Representatives from CCI, ICHHI, IRCIL, NAACP, and USA all lobbied against the passage of SEA 483 and/or testified in opposition to it before the Indiana General Assembly. *See* ICLU's Brief in Supp. at 26-27; Reinke Dep. at 17; Niemier Dep. at 15; Madill Dep. at 11. USA also ran articles voicing its concerns about SEA 483. Trustee Simpson may be the only named plaintiff who did not formally take part in the dispute over SEA 483 while it was pending before the Indiana General Assembly, although even he did contact the ICLU "about midway through the [legislative] process" to express his interest in being a plaintiff in a lawsuit if SEA 483 were to pass. Simpson Dep. at 11.

> FN5. We find ourselves constrained, in responding to Plaintiffs' broad-based challenge, by the following admonition of Chief Judge Kozinski, who wrote:

>> It is wrong to use some constitutional provisions as springboards for major social change while treating others like senile relatives to be cooped up in a nursing home until they quit annoying us.... Expanding some [provisions] to gargantuan proportions while discarding others like a crumpled gum wrapper is not faithfully applying the Constitution; it's using our power as federal judges to constitutionalize our personal preferences.

>> *Silveira v. Lockyer,* 328 F.3d 567, 568-69 (9th Cir.2003) (C.J. Kozinski dissenting).

Plaintiffs have mounted a facial challenge to the validity of SEA 483, raising a variety of related issues about the Voter ID Law, including that it substantially burdens**\*784** the fundamental right to vote, impermissibly discriminates between and among different classes of voters, disproportionately affects disadvantaged voters, is unconstitutionally vague, imposes a new and material requirement for voting, and was not justified by existing circumstances or evidence. Defendants deny all of these criticisms, defending the enactment of SEA 483 as being justified by legitimate legislative concern for in-person voting fraud and a reasonable exercise of the State's constitutional power to regulate the time, place, and manner of elections. Defendants also claim that Plaintiffs lack standing to bring this attack on the statute, and that, in any event, the Secretary of State and the Co-Directors of the Indiana Election Division are not proper defendants in this action. FN6

> FN6. We pause at the outset to remark that our task in ruling on the complicated issues in this case has been impeded, not so much by the expansive scope of the litigation as by the haphazard, "shot gun" approach utilized by the attorneys in raising these difficult issues and then leaving them unsupported by evidence or controlling legal precedent. The briefing was fraught with inaccurate citations to the record, mischaracterized evidence in the record, and misrepresented holdings in the case law. Particularly troublesome was the fact that the two sets of plaintiffs consistently spoke independently of one another often raising the same argument but in slightly different fashion and without informing the court whether they were adopting or incorporating the claims of their co-plaintiffs. Plaintiffs also made no apparent effort to match individual plaintiffs to specific claims or arguments. What the court faced, as a result, was the gargantuan task of sorting through the hodge-podge of individual plaintiffs, their claims, and their evidence and then trying to make sense of it all. To

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

require the Court to sort everything out and make legal sense of it, is a dereliction of counsels' responsibilities and an abuse of the court's scarce resources. None-the-less, we have done the best we can under the circumstances.

For the reasons elaborated below, we hold that SEA 483 is a constitutionally-valid, reasonable time, place, and manner restriction on voting and on voters and, therefore, we *GRANT* Defendants' Motions for Summary Judgment and *DENY* Plaintiffs' Motions for Summary Judgment.

### Factual Background

The parties agree that there are no material facts in dispute that preclude summary judgment of this case. Even so, they have filed a total of eight summary judgment briefs, incorporating in excess of ninety pages of material facts not in dispute. In an effort to bring clarity to this deluge of data, we have grouped the facts into the following seven categories: (I) Indiana election law and procedures, (II) Requirements for obtaining photo identification documents from the BMV, (III) Evidence regarding voter fraud, (IV) Evidence about potential impacts of SEA 483 on Indiana voters, (V) the Defendants, (VI) the Plaintiffs, and (VII) the Report submitted by the Democrats' expert, Kimball W. Brace (the "Brace Report"). There being no need to recount the voluminous facts marshaled by the parties, we have distilled and summarized the relevant facts by topic in the following section.

**I. Indiana Election Law and Procedures.**

There are certain aspects of Indiana election law and procedure which are relevant to this case, including: (A) Indiana constitutional provisions; (B) composition and responsibility of the precinct election board; (C) the responsibilities of the State Election Division; (D) the requirements of SEA 483; (E) the requirements and procedures for voting by absentee ballot; and (F) Indiana election law prior to enactment of SEA 483. Each aspect is addressed below.

**\*785** A. *Constitutional Provisions.*

Article I, section four of the United States Constitution empowers the States to determine the "Times, Places and Manner of holding Elections for Senators and Representatives," subject to Congressional oversight. U.S. CONST., art I, § 4, cl. 1.

The Indiana Constitution, Art. 2, § 2 sets out the basic requirements for voting in Indiana:

(a) A citizen of the United States, who is at least eighteen (18) years of age and who has been a resident of a precinct thirty (30) days immediately preceding an election may vote in that precinct at the election.

(b) A citizen may not be disenfranchised under subsection (a), if the citizen is entitled to vote in a precinct under subsection (c) or federal law.

(c) The General Assembly may provide that a citizen who ceases to be a resident of a precinct before an election may vote in a precinct where the citizen previously resided if, on the date of the election, the citizen's name appears on the registration rolls for the precinct.

Indiana Constitution, Art. 2 § 14 allows the Indiana General Assembly to provide for registration of persons otherwise entitled to vote. Pursuant to Indiana Code §§ 3-7-13-1 through 3-7-24-17, and the National Voter Registration Act, 42 U.S.C. § 1973gg, there are a host of ways individuals may register to vote at various venues and offices including registering by mail. There is no requirement that identification be shown when one is registering in-person to vote. Deposition of Marion County Clerk Doris Ann Sadler ("Sadler Dep.") at 8-9. The registration form is signed under penalties of perjury. *Id.* at 9. There is also no requirement that an individual who is registering to vote by mail provide identification. *See* Ind.Code § 3-7-22-1, et seq.

B. *Precinct Election Board.*

At polling places on election day, there are five

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

local election officials present: an inspector, appointed by the political party whose candidate for Secretary of State received the most votes in the last election in the county; two clerks, one from each major party, who are in charge of the poll book and who check voters in and issue the ballots; and, two judges, one from each major party, who administer the voting machine. Sadler Dep. at 10–11. Each County Election Board appoints these officials. Ind.Code §§ 3-6-6-1, 2. The inspector and the judges jointly comprise the precinct election or poll board that resolves disputes that arise during the polling process. Indiana Code § 3-6-6-1; Sadler Dep. at 11.

C. *Indiana Election Division.*

The Indiana Election Division provides advice and instruction to county election officials and publishes information and forms for use in Indiana elections. *See* Ind.Code § 3-6-4.2-1, et seq.; Deposition of Co-Director J. Bradley King, Attachment 2 ("King Dep.") at 7. The Division has no direct role in enforcing election laws, nor does the Secretary of State. However, in providing advice and instruction to county election officials, the Election Division, in conjunction with the Secretary of State, has instituted several programs to educate both voters and poll workers about the requirements of SEA 483.[FN7] The Election Division's manuals and training, however, are advisory only, as the administration of any election and *786 its oversight is the responsibility of the County Election Board. Ind.Code § 3-6-15-14; Sadler Dep. at 6. County Election Boards can take, and have taken, positions about election laws and procedures contrary to the position advanced by the State Election Division. *See, e.g.,* Sadler Dep. at 52.

> FN7. The Election Division has published a 2006 Indiana Voter Information Guide, which summarizes the Voter ID Law, (*see* State's Ex. 45), and agents of the Secretary of State's Office plan to educate voters and poll workers about SEA 483 utilizing some $4 million in Federal HAVA grants. State's

Ex. 46 ("Fanger Aff.") at ¶¶ 11-13.

D. *Requirements of SEA 483.*

The Voter ID Law requires citizens voting in-person at precinct polling places on election day, or casting an absentee ballot in person at a county clerk's office prior to election day, to present election officials with some form of valid photo identification, issued by the United States or the State of Indiana. Ind.Code § 3-11-8-25.1. This photo identification card must contain the following information and meet the following conditions:

> (1) A photograph of the individual to whom the "proof of identification" was issued;

> (2) The name of the individual to whom the document was issued, which "conforms to the name in the individual's voter registration record";

> (3) An expiration date;

> (4) The identification must be current or have expired after the date of the most recent general election; and

> (5) The "proof of identification" must have been "issued by the United States or the state of Indiana."

> Ind.Code § 3-5-2-40.5.

Pursuant to SEA 483, Indiana voters are required to produce acceptable photo identification before signing the poll book. Ind.Code § 3-11-8-25.1(c). SEA 483 applies to voting at both primary and general elections. Ind.Code §§ 3-10-1-7.2; 3-11-8-25.1. SEA 483 does not apply, however, to receiving and to casting an absentee ballot sent by the county to the voter through the U.S. mail (hereinafter the "absentee ballot exception" or the "absentee exception"); or to "a voter who votes in person at a precinct polling place that is located at a state licensed care facility where the voter resides" (hereinafter the "nursing home exception"). Ind.Code §§ 3-10-1-7.2(e), 3-11-8-25.1(f); 3-11-10-1.2. If a voter falls within either of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

these exceptions, the voter is not required to provide any proof of identification in order to vote in-person and to have his vote counted. King Dep. at 98-99; Robertson Dep. at 36.

If a voter does not produce acceptable photo identification at the polls, a member of the precinct election board "shall challenge the voter." Ind.Code § 3-11-8-25.1(d)(2).FN8 If so challenged, the voter may sign an affidavit attesting to the voter's right to vote in that precinct, whereupon the voter may then sign the poll book and cast a provisional ballot. Ind.Code § 3-11-8-25.1(e). In order to have the provisional ballot counted, the voter who is challenged for failure to provide acceptable photo identification and casts a provisional ballot must appear before the circuit court clerk or the county election board by noon on the second Monday following the election to prove the voter's identity. Ind.Code § 3-11-7-5-2.5(a). If at that point the voter provides acceptable photo identification and executes an affidavit that the voter is the same individual who cast the provisional ballot on election day, then the voter's provisional ballot will be opened, processed, and counted so long as there are no other non-identification challenges. Ind.Code §§ 3-11.7-5-1; 3-11.7-5-2.5.

> FN8. A member of the precinct election board may be subject to criminal prosecution for knowingly failing to comply with SEA 483's provisions. King Dep. at 58; Ind.Code § 3-14-2-14.

The provisional ballot of a voter who is challenged for failing to show acceptable **\*787** photo identification at the polls on election day may also be opened and processed if, by noon on the second Monday following election day, the voter appears before the county clerk of courts or the county election board and executes an affidavit that the person is the same as the person who cast the provisional ballot and either (1) the person is indigent and is "unable to obtain proof of identification without payment of a fee" (hereinafter the "indigent exception" or the "indigency exception"); or (2) has a re-

ligious objection to being photographed. Ind.Code §§ 3-11.7-5-1; 3-11.7-5-2.5(c). The indigency and religious objection affidavits are not available for voters to sign at the polls; they are available only at election board offices after Election Day. King Dep. at 73; Robertson Dep. at 37.

If, notwithstanding a voter's attempt to validate a provisional ballot using one of these methods, the election board determines that the voter's provisional ballot is not valid, the voter may file a petition for judicial review in the local Superior or Circuit court.FN9 Ultimately, therefore, the meaning of any particular term within the Voter ID Law is subject to the interpretation of the Indiana Supreme Court.

> FN9. Defendants contend, therefore, that "the meaning of any particular term within the Voter ID Law is subject to the interpretation of the Indiana Supreme Court." MCEB's Brief in Supp. at 4-5.

E. *Voting by Absentee Ballot.*
"A voter who wants to vote by absentee ballot must apply to the county election board for an official absentee ballot." Ind.Code § 3-11-4-2. The absentee ballot application must be received by the circuit court clerk no earlier than ninety (90) days before election day and no later than the date between midnight on the eighth day before election day or noon on election day, depending on how the voter registered to vote, how the application is delivered, and how the absentee ballot is requested to be delivered. Ind.Code § 3-11-4-3.FN10

> FN10. When an absentee vote is cast, the voter must seal the ballot and sign his or her name on the outside of the envelope containing the ballot and complete an affidavit printed on the envelope. Sadler Dep. at 24; Ind.Code § 3-11-4-21 (prescribing the form of the affidavit). Before the absentee ballot is counted, the county election board or its designates examine the signature and, if it does not match, it can

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

be challenged. The precinct election board of the precinct where the voter lives will determine if the challenged ballot will be counted or not. Sadler Dep. at 24-26. The signature comparison permits election officials to ensure that there is no fraud and that the election is both safe and secure. King Dep. at 126. There is no requirement that individuals voting via absentee ballot produce identification, except that, if a voter registers to vote by mail and votes for the first time thereafter in a federal election, the voter must present certain identification, as required by the Help America Vote Act of 2002 ("HAVA"), Public Law 107-252, 42 U.S.C. § 15483(b).

Under Indiana law, a voter who satisfies any of the following is entitled to vote absentee:

(1) The voter has a specific, reasonable expectation of being absent from the county on election day during the entire twelve (12) hours that the polls are open;

(2) The voter will be absent from the precinct of the voter's residence on election day because of election day service (i.e. as a precinct election officer, a watcher, a challenger, a pollbook holder, or a person employed by the election board to administer absentee ballots);

(3) The voter will be confined on election day to the voter's residence, to a health care facility, or to a hospital because of an illness or injury during the entire twelve (12) hours that the polls are open.

(4) The voter is a voter with disabilities.

(5) The voter is an elderly voter.

(6) The voter is prevented from voting due to the voter's care of an individual confined to a private residence because of illness or injury during the entire twelve (12) hours that the polls are open.

(7) The voter is scheduled to work at the person's regular place of employment during the entire twelve (12) hours that the polls are open.

(8) The voter is eligible to vote under IC 3-10-11 or IC 3-10-12 (governing procedures for voters who have changed their precinct of residence prior to election day).

(9) The voter is prevented from voting due to observance of a religious discipline or religious holiday during the entire twelve (12) hours that the polls are open.

(10) The voter is an address confidentiality program participant.

Ind.Code § 3-11-10-24.

**\*788 F.** *Indiana Election Law Prior to SEA 483.*

Under prior Indiana law, a voter seeking to vote in-person at a polling place would be required to present himself or herself to the clerks and sign the poll book. Sadler Dep. at 11; King Dep. at 28. There was no requirement that a voter show any form of identification in order to vote after the prospective voter signed in with the clerk. Sadler Dep. at 11.[FN11] At that point, there would generally be a photographic copy of the signature that would be compared. Sadler Dep. at 11. Any member of precinct election boards (the inspector and two judges) could challenge a voter suspected of misrepresenting his identity for voting purposes, as could political party challengers. *See* King Dep. at 44, 46, 89. Either political party's clerk could also challenge a voter based on a comparison of the voter's signature to the signature contained in the voter registration records. King Dep. at 44. A voter who misrepresented his identity for purposes of casting a fraudulent

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

ballot is now and has for decades been subject to a felony charge and conviction. Ind.Code § 3-14-2-16 ; King Dep. at 32.

> FN11. As mentioned in footnote 10, *supra*, a limited class of voters were already required to present some form of identification pursuant to HAVA.

Prior to 2004, Indiana law did not provide for the casting of a "provisional" ballot. Instead, a member of the precinct election board, or the election clerk, who wished to challenge the eligibility of a voter would be required to swear out an affidavit under the penalties of perjury. *See* King Dep. at 49, Ex. 2. The challenged voter could then swear out a counter-affidavit which had to contain the following information under the penalties of perjury: (1) the voter's name, (2) date of birth, (3) present address, (4) prior address (if applicable), (5) that the voter is a citizen, (6) that the voter has resided in the precinct for at least 30 days, and (7) that the voter has not already voted in any other precinct. *See* King Dep. at 50-51; Ex. 2; Ind.Code § 3-11-8-23. The voter would then be permitted to vote using a regular ballot after signing the poll book. King Dep. at 49. The challenging affidavits were required to be sent to the prosecuting attorney for investigation. King Dep. at 49, 56-57; Ind.Code §§ 3-14-5-2 and 3.[FN12]

> FN12. There appears to be an ongoing dispute as to whether a voter challenged under the prior law had to vote by provisional ballot. *See* King Dep. at 53-54; Sadler Dep. at 13, 52; Robertson Dep. at 20-22.

In 2004, following the passage and implementation of the Help America Vote Act of 2002 ("HAVA"), Public Law 107-252, provisional voting for the first time became an available option. Provisional ballots are reviewed by the county election board following election day to determine whether they should be counted. Ind.Code § 3-11.7-5-2.

In the 2004 general election, 82% of the provi-

sional ballots cast in Marion County were not counted. Statewide, only about 15% of all provisional ballots were counted. Marion County Clerk Doris Ann Sadler, by **\*789** affidavit, explained that the primary reasons for provisional ballots were: first, because of "poll worker or voter error in filling out the paperwork;" second, because the person "simply was not registered to vote;" and, third, "a person was in the wrong polling place in the wrong precinct and insisted ... on voting a provisional ballot in that precinct." Sadler Dep. at 15-17, 20, 44.

In her deposition, Clerk Sadler also attested to the fact that challenges can take up to one-half ( 1/2 ) hour to resolve, especially if lines at the polls are long. Sadler Dep. 19. When asked whether she believed the new requirements imposed on voters and precinct board workers by SEA 483 would slow down the voting process, Clerk Sadler opined that she did not think so, "unless there's a huge challenge effort made by either of the [political] parties, which is typically where those challenges are generated." Sadler Dep. at 48-49. Sadler agreed that the opportunities for presenting challenges has increased as a result of the photo identification requirements of SEA 483.

## II. Requirements for Obtaining Photo Identification Documents.

As indicated above, in order to vote in person, Indiana voters who do not reside in nursing homes, must present a current photo identification, with an expiration date, issued by the State or federal government. The federally issued identification includes passports as well as military identification. King Dep. at 60. State identification could for example, include university-issued identification cards, if the cards contain an expiration date. King Dep. at 61. The parties agree that the most likely source of acceptable identification is either drivers' licenses or identification cards issued by the Indiana Bureau of Motor Vehicles ("BMV"); indeed, the text of SEA 483 focuses on identification cards issued by the BMV. *See,* SEA 483 §§ 15-18. We therefore begin by reviewing the requirements for

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

obtaining such photo identification from the BMV, and then examine the tangential requirements for obtaining an Indiana birth certificate.

A. *Obtaining Photo Identification from the BMV.*

In order to obtain a driver's license or identification card from the BMV, an applicant must personally visit a BMV branch office [FN13] and produce certain forms of identification. [FN14] BMV rules require that a first-time Indiana driver's license or non-license identification-card applicant [FN15] present,**790** among other things, either: one primary document, one secondary document, and one proof of Indiana residency requirement or two primary documents and one proof of Indiana residency. [FN16] Deposition of BMV Designee Carol Redman ("Redman Dep.") at 5, Ex. 2. The requirements for obtaining each of these documents are laid out below, as well as some of the difficulties in obtaining photo identification which have been identified by Plaintiffs.

> FN13. The General Assembly passed a law in 2005 prohibiting Internet renewal of driver's licenses. All individuals are now required to appear at a license branch to renew their licenses. HEA 1073 (2005), codified at Ind.Code § 29-24-12-5.

> FN14. The parties note that in August 2005, the Indiana Court of Appeals held that the identification requirements imposed by the BMV are invalid because they had not been properly promulgated as administrative rules. *See Villegas v. Silverman,* 832 N.E.2d 598, 610 (Ind.Ct.App.2005). The BMV is seeking discretionary review by the Supreme Court. The Court of Appeals has not yet certified its decision in *Villegas* and the BMV continues to enforce its documentation policy because it has not yet been enjoined from doing so. *See* Ind. R.App. Pro. 65(E). The BMV has also undertaken the process of formally promulgating administrative rules, requiring driver's license and

identification-card applicants to present specified documents to the BMV. After a public comment period, the rules are expected to be finalized in 2006. The contours of this collateral dispute, however, are beyond the scope of the case at hand.

> FN15. In addition, if the applicant does not have a current license or identification card, or the license or card has been expired for over ten years, an applicant must present documentation as a first-time applicant. *See* Ind. Reg. 64 (140 IAC 7-4-2 (f)(1), (3)).

> FN16. A first-time license applicant must also provide the BMV with proof of a valid Social Security number. *See* Ind. Reg. 64 (140 IAC 7-4-2(b)(1)).

1. *Primary Document.*

A primary document used to verify identity, date of birth, and citizenship, may include a United States Birth Certificate with a stamp or seal, documents showing that the person was born abroad as an American citizen or is a naturalized citizen, a passport, or a U.S. military or merchant marine photo identification. Redman Dep. Ex. 2 ("BMV Identification Document List").

2. *Secondary Document.*

Secondary documents are currently defined as:

- Bank Statement

- Certified Academic Transcript

- Confirmation of Registration Letter from an Educational Institution

- Court Documentation with Stamp or Seal

- Foreign Consulate-Issued ID Card

- Government-Issued License or ID Card

- Hoosier RX Plan Card [with] imprinted name

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

- Hoosier Works Card [with] imprinted name

- Indiana County Pre-sentence Investigation Report with clerk stamp or seal

- Indiana gun permit (Valid)

- Indiana probation photo ID card

- Indiana professional/occupational license (Valid)

- Indiana BMV Title Application [with] BMV valid stamp

- Indiana BMV Title or Registration (Valid)

- Insurance Card

- Letter from Probation Officer or Government Caseworker on letterhead stationary, certified with court or government stamp or seal with the applicant's name, and signature of the probation officer or caseworker

- Major Credit or Bank Card (MC, VISA, AE, and Discover ONLY)(valid)

- Original Out-of-State Driving Record

- Out-of-State Driver License, Identification Card or Permit with photograph

- Pay Check Stub-Computer generated

- Prison Release Documentation/Photo ID

- School Report Card (dated within 12 mos.)

- School Photo ID Card

- Selective Service Acknowledgment Card-SSS Form 3A

- U.S. Divorce Decree certified by court of law with stamp or seal

- U.S. Application of Marriage/Record of Marriage (Certified copy). Must contain the stamped

seal and be signed by clerk.

- U.S. District Court Pre-Sentence Investigation Report with clerk stamp or seal

**\*791** - U.S. Military Discharge or DD214 Separation papers

- U.S. Veterans Universal Access ID card with photo

- W-2 Form (Federal or State) of 1099 Federal tax form.

BMV Identification Document List

3. *Proof of Indiana Residency Document.*
The proof of Indiana residency requires that an applicant present some proof of a residential address, although a post office box is not acceptable. Redman Dep. Ex. 2. Proof of residency documents include any primary or secondary document that contains the applicant's name and residential address as well as documents including, but not limited to:

- Child Support Check from the [Family and Social Services Administration] with name and address of the applicant attached

- Change of Address Confirmation form (CNL 107) from U.S. Postal Service listing old and new address

- CURRENT Bill or Benefit Statement (within 60 days of issuance)

- Indiana Driver's License, Identification Card or Permit with Photograph

- Indiana Property Deed or Tax Assessment

- Indiana Residency Affidavit

- Voter Registration Card

BMV Identification Document List.[FN17]

FN17. The proposed amended rule adds

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

two additional documents to prove Indiana residency-a valid Indiana vehicle title or water craft registration. Redman Dep. at 6.

In order to obtain an identification card or license from the BMV, an applicant must personally appear at the branch. Redman Dep. at 8. An identification card costs $10 and a driver's license costs $14. The identification is valid for four years. Redman Dep. at 13. As of January 1, 2006, a driver's license expires after six years. *See* Ind.Code § 9-234-12-1(c). SEA 483 provides that an individual who does not have a valid driver's license and will be at least eighteen (18) years of age at the next general, municipal, or special election must be issued an identification card from the BMV without cost. Ind.Code § 9-24-16-10; Affidavit of BMV Assistant Commissioner Stephen Leak at ¶¶ 8-11.

4. *Potential Difficulties in Obtaining Photo Identification from the BMV.*

The BMV is aware that there are persons who do not currently have a driver's license or identification card and who are, or who will be, eligible to vote at the next election. Redman Dep. at 21-22. The BMV, however, has not been able to determine the approximate number of Indiana residents of voting age who are without an Indiana driver's license or identification card. *See* Redman Dep. at 22-30. The BMV is also apparently aware of persons who have tried to obtain a driver's license or identification card and have been turned away because they do not have an original birth certificate or because they do not have the required secondary documentation or proof of Indiana residency. Redman Dep. at 18.[FN18]

>   FN18. For example, Lafayette Urban Ministries, an organization that provides assistance to needy families, assisted approximately 150 individuals in 2004 in an effort to obtain photo identification cards. Affidavit of Mary M. Anderson ("Anderson Aff.") at ¶¶ 2-5. About half of these individuals failed to obtain identification cards, allegedly because they did not have

photo identification to obtain a birth certificate. Anderson Aff. ¶¶ 2-5. It is unclear if these individuals attempted to obtain a birth certificate from the Indiana Department of Health, which allows for nonphotographic forms of identification, *see infra* note 20 and accompanying text, or a county health department and, if the latter, what the required forms of identification were.

***792** Plaintiffs contend that obtaining photo identification from the BMV can be a difficult and frustrating process. For example, we were told of one Theresa Clemente, a 78-year-old woman residing in Fort Wayne but originally from Massachusetts, who recently attempted to obtain a photo ID from the BMV so she could vote in Indiana. Clemente Aff. ¶¶ 1-8. After three separate visits to the BMV over a period of many weeks and obtaining a certified copy of her birth certificate, the BMV still refused to issue her photographic identification purportedly on the grounds that her birth certificate contains only her maiden name. Clemente Aff. ¶¶ 1-8.

Plaintiffs also note that the BMV has recently closed numerous branches throughout the State, thereby increasing travel costs for some individuals in order to reach a branch. *See* Redmond Dep. 34.

B. *Requirements for obtaining an Indiana birth certificate.*

A citizen born in Indiana who needs to obtain a birth certificate as a primary document for obtaining a license or non-license photo-identification card may obtain a birth certificate from either the Indiana Department of Health ("IDOH") or the Department of Health of the county of birth. *See* State's Exs. 48, 49. By virtue of a statutory amendment in 2003, the IDOH must charge a fee of $10.00 for conducting a birth-certificate search. Ind.Code §§ 16-37-1-11; 16-37-1-11.5. Local health departments establish and collect fees for records which are not to exceed the cost of the services provided. Ind.Code § 16-20-1-27. Fees vary

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

among county departments of health from $2.00 to $10.00. *See* State's Ex. 49.[FN19] In its "frequently-asked questions" publication, the IDOH states that applicants may present a combination of non-photo identification documents to obtain a birth certificate, including a Social Security card, a credit card, a bank card, a motor vehicle registration, a housing lease, a military identification, an Indiana professional license, an original employment application, and a voter registration card. *See* http:// www. in. gov/ isdh/ bdcertifs/ faq. htm# VitalFAQ6.[FN20]

> FN19. For individuals born in other states, the cost may be more. For instance, the cost of obtaining a certified birth certificate from Boston, Massachusetts is $28. Clemente Aff. ¶ 5. *See also* Affidavit of Robert Andrew Ford ("Ford Aff.") at ¶ 9 (noting the fee to obtain a birth certificate in California, Michigan, New York, and Oregon).

> FN20. The State has cited to this page as an exhibit in their briefs; however, we are unable to find it anywhere in the record.

### III. Voter Fraud.

The parties have submitted evidence that paints contrasting pictures concerning whether in-person voter fraud is or should be a concern in Indiana. The arguments concerning voter fraud tend to unfold as follows: (A) Plaintiffs note that there is no evidence of any instance of in-person voter fraud in Indiana; (B) Defendants counter that, even though there is no evidence of voter fraud as such, there is significant inflation in the Indiana voter registration lists; and in any event, based on reports documenting cases of in-person voter fraud from other states, (C) Defendants maintain that voter fraud is or should be a concern in Indiana.

### A. *No Documentation of Instances of In-Person Voter Fraud in Indiana.*

Defendants concede that "the State of Indiana is not aware of any incidents or person attempting

vote, or voting, at a voting place with fraudulent or otherwise **\*793** false identification." ICLU Ex. 18 ("MCEB's Response to Interrogatories") at ¶ 2. Plaintiffs further note that no voter in Indiana history has ever been formally charged with any sort of crime related to impersonating someone else for purposes of voting. King Dep. at 95. Plaintiffs submitted testimony from several veteran poll watchers who confirmed they have never seen any instances of attempted in-person voter fraud in Indiana. *See* Haith Aff. at ¶ 17; Crawford Dep. at 45 and Ex. B at 10; Bohannan Dep. Ex. H at 12. Plaintiffs further contend that no evidence of in-person voting fraud was presented to the Indiana General Assembly during the legislative process leading up to the enactment of SEA 483. *See* Mahern Aff. ¶¶ 2-3. Plaintiffs do note, however, there is evidence of absentee voter fraud in Indiana and that pervasive fraud regarding absentee balloting led the Indiana Supreme Court recently to vacate the results of the mayoral election in East Chicago. *See Pabey v. Pastrick,* 816 N.E.2d 1138 (Ind.2004).

### B. *Inflation of Indiana's Voter Registration Rolls.*

Defendants submitted evidence that Indiana's voter registration rolls are significantly inflated. Defendants hired Clark Benson, a nationally recognized expert in the collection and analysis of voter-registration and population data, who conducted an examination of Indiana's voter registration lists and concluded that they are among the most highly inflated in the nation. State's Ex. 27 ("Benson Report") at 9. Specifically, when Benson compared actual voter registration with self-reported registration rates, he found that there were 4.3 million registered voters in 2004, while there were only 3 million residents who reported being registered, resulting in estimated inflation of 41.4%. Benson noted Indiana had the largest discrepancy in the nation between official registration numbers and self-reported rate of registration. Benson Report at 6. Benson also reported, with a high rate of confidence, that he found at least 35,699 Indiana registered voters who are now deceased. Benson Report at 8.[FN21] Additionally, his research indicated

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

that in 2004 there were 233,519 potential duplicate voter registrations. Benson Report at 9.

> FN21. The Defendants also note that, in 2000, the Indianapolis Star investigated the accuracy of Indiana's voter rolls and found that more than 300 dead people were re-gistered. State's Ex. 25, p. 3.

C. *National Reports of In-Person Voter Fraud.*

The State has also produced evidence of published books and media reports discussing allegations and instances of in-person voter fraud in several other states. *See* Larry J. Sabato & Glenn R. Simpson, *Dirty Little Secrets* 292 (1996) (noting that documentation of in-person voter fraud often occurs only when a legitimate voter at the polls hears a fraudulent voter trying to use her name, as happened to a woman in California in 1994); John Fund, *Stealing Elections* 64 (2004) (noting in the St. Louis fourteen dead people "voted" in the 2000); State's Ex. 2, p. 23 (describing recent U.S. Department of Justice investigations into election fraud, which, as of August 2005, had resulted in 52 convictions); State's Ex. 3, pp. 4-5, 19 (court findings that in the State of Washington's 2004 gubernatorial elections more than 1,600 fraudulently cast ballots, including 19 ballots cast by dead voters, six double votes, and 77 votes unaccounted for on the registration rolls); State's Ex. 4, pp. 2-4 (joint task force findings describing instances in the 2004 elections in Wisconsin where individuals voted twice by using fake names and addresses**\*794** and citizens who told investigators that they did not vote, even though the report showed that someone voted in their names); State's Ex. 6, pp. 42-43 and State's Ex. 7, pp. 3-6 (describing an investigation by the Missouri Secretary of State after the 2000 elections of two of counties which revealed over 1,000 fraudulent ballots, including at least 68 multiple votes, 14 dead person votes, and 79 vacant-lot voters, with another 200 sites requesting further review); State's Ex. 10, pp. 1-2 (newspaper reports that dozens, possibly hundreds, of people who lived outside the city limits illegally cast votes at the polls in Miami's mayoral elections in 1997); State's Ex. 11, p. 1-2 (Johns Hopkins University study which found that in Maryland at least 63 votes were cast in the name of deceased individuals between the 1980's and 2004). The State has produced newspaper reports recounting that in recent elections votes were cast in the names of dead people in Georgia, Illinois, and Pennsylvania. *See* State's Exs. 12-14, 18. The report from the Commission on Federal Election Reform (known as the Baker-Carter Commission) recently concluded that "there is no doubt that [in-person voter fraud] occurs." State's Ex. 1, p. 18.FN22

> FN22. Although the Baker-Carter report was released after SEA 483 was enacted, the report's conclusions substantiate the myriad of news reports of in-person voter fraud predating the passage of SEA 483.

D. *The Impact of the Perception of Voter Fraud on the Confidence of the Electorate.*

The State submitted several polls indicating voter concern about election fraud and support for photo identification requirements at the polls. For example, prior to the 2000 election, a Rasmussen Reports poll showed that 59% of voters believed there was "a lot" or "some" fraud in elections. State's Ex. 22, p. 1. Similarly, a Gallup Poll showed that, after the 2000 election, 67% of adults nationally had only "some" or "very little" confidence in the way the votes are cast in our country. State's Ex. 23, pp. 8-9. A 2004 Zogby Poll found that 10% of voters believe that their votes are not counted accurately (John Fund, *Stealing Elections* 2 (2004)), and according to election-law scholar Richard Hasen, more than 13.6% of Americans worried that the 2004 presidential vote was unfair. State's Ex. 24, p. 1. A Rasmussen Reports 2004 survey of 1000 likely voters, indicated that 82% of respondents (including 89% of Bush supporters and 75% of Kerry supporters) favored photo identification at the polls. *See* Fund at 5. Adding weight to these findings, the Baker-Carter Commission recently concluded that, based on its studies, the perception

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

of fraud, "contributes to low confidence in the system." State's Ex. 1, p. 19.

**IV. Impact of SEA 483 on Voters.**

The parties again paint contrasting pictures regarding the impact of SEA 483 on Indiana voters. Defendants submitted evidence of the impact of SEA 483 when it was enforced in three municipal elections in 2005. Plaintiffs submitted evidence and testimony concerning the potential negative impacts of SEA 483 on various groups of disadvantaged voters in Indiana.

A. *Enforcement of SEA 483 in Municipal Elections.*

On November 8, 2005, three municipalities enforced SEA 483 at contested local elections. *See* State's Ex. 47 ("Bauer Aff.") Ex. C. Unscientific exit polling data showed that of the 105 respondents, 21 voters learned about the Voter ID Law listening to the radio, 12 from watching television, 23 from direct mailings, and almost half, (49), had read about the law in **\*795** the newspaper. In all, 83% of those surveyed were aware of the Voter ID Law before arriving at the polling place. Bauer Aff. Ex. C at 2. Also, in both of the towns holding regular off-year elections, the number of votes cast increased over the prior election. Bauer Aff. Ex. C at 3 (noting Cambridge City's number of votes cast increased 10% over 2001 and Montezuma saw an increase of 98% over 2001).

B. *Potential Negative Impacts of SEA 483.*

Plaintiffs identify several groups they claim will be particularly disadvantaged by the photo identification requirements of SEA 483, including homeless, low-income, elderly, disabled, and minority individuals.

Professor Marjorie Hershey of Indiana University submitted a report which states because SEA 483 increases the costs of voting through the imposition of additional requirements and barriers, it is likely to decrease voter turnout, particularly among voters of lower socio-economic status. Hershey Report at 12-17. Prof. Hershey contends that the costs imposed by SEA 483, in terms of time,

transportation, fees and obtaining all of the necessary information, threaten to be most difficult for the disabled, homeless, persons with limited income, those without cars, people of color, those who are part of "language minorities," and the elderly. Hershey Report at 17.

Plaintiffs cite a number of informal and formal surveys which tend to support Hearshey's conclusions. Plaintiffs note a survey conducted by plaintiff Indiana Coalition on Housing and Homeless Issues ("ICHHI") of its members, providers of services to homeless and low-income persons, in which providers of services responded that they were aware of clients who had neither licenses nor identification cards. Deposition of Michael Reinke, ("Reinke Dep.") at 60-67, Ex. I; State's Ex. 69 ("ICHHI Survey Responses").[FN23] In this same vein, Brenda Thompson and Robert Andrew Ford, case managers at Horizon House,[FN24] a day center in Indianapolis for homeless persons, testified concerning the hardships they believe SEA 483 will impose on homeless individuals, noting, for example, that homeless persons often have lost all their possessions, including any identification. Ford Aff. at ¶¶ 1-5; Thompson Aff. at ¶¶ 1-5. Thompson also testified that, in her experience, homeless individuals frequently walk everywhere they go. Thus, according to Thompson:

FN23. Question Four of the survey asks, "Are you personally aware that many homeless persons do not have current drivers license?" and Question Five of the survey asks, "Are you personally aware that many homeless persons do not have current identification cards?" ICHHI Survey Responses.

FN24. Horizon House is a member of ICHHI, one of the Organization Plaintiffs in this case. *See* Affidavit of Michael Reinke.

(E)ven if they present themselves to vote and are challenged under the new identification law and are informed that in order for their ballot to count

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

they must go get identification and then go to the Clerk's office, or even if they were to be told that they just had to go to the Clerk's office, homeless persons probably will not do so because of transportation difficulties.

Thompson Aff. at ¶¶ 16-17. Ford noted that, in his experience, it is "quite likely that a homeless person who is faced with a challenge to his or her ability to vote will not pursue his or her right to vote but will leave the poll rather than face a situation of confrontation.... [A]nything which makes voting more difficult will probably deter many, if not most, homeless persons from voting." Ford ¶¶ 17, 19.

*796 Plaintiffs further note that a survey released on October 28, 2005 by AARP Indiana reports that 3% of Indiana registered voters over the age of 60 do not have a drivers license or identification card. *See* Affidavit of June Lyle and attached AARP Indiana survey. Similarly, the director of plaintiff United Senior Action of Indiana ("USA") concludes, based on her experience with the organization and the conversations she has had over the last 16 years with her members, that there are many senior citizens who do not have either a valid license or identification card. Deposition of Michelle Niemier ("Niemier Dep.") at 23-24.

The executive director of plaintiff Indianapolis Resource Center for Independent Living ("IRCIL") notes that it is very common for persons with disabilities not to have identification. Deposition of Melissa Madill ("Madill Dep.") at 13. IRCIL further contends that persons who are blind or visually impaired often do not know that their identification cards, if they have them, have expired. Madill Dep. at 47.

Plaintiffs also submitted testimony from several poll workers or poll observers who testified that in the poor and minority community in the past, when a provisional ballot did not require additional efforts on the voters' part, prospective voters were extremely intimidated by challenges and frequently did not vote and just left the polls, even when the

challenges were not meritorious. *See* Affidavit of Aaron E. Haith ("Haith Aff.") at ¶¶ 2-10; Deposition of Roderick E. Bohannan ("Bohannan Dep.") at 50-54; Deposition of Margie Oakley ("Oakley Dep.") at 20-21; Deposition of Joseph Simpson ("Simpson Dep.") at 62-64. According to poll observer Aaron Haith, frequently the potential voters who are being challenged are on their way to work or on their way home to take care of families and they do not want to take the 15-30 minutes to go through the challenge process in order to vote. Haith Aff. at ¶¶ 7, 11.[FN25]

> FN25. The Democrats submitted an expert report from Kimball W. Brace (the "Brace Report") concerning the number of potential Indiana voters who do not already possess photo identification. His report is addressed separately in Factual Background Section, *infra.*

## V. The Plaintiffs

There are two groups of plaintiffs in this consolidated case. The first group is comprised of the Indiana Democratic Party and the Marion County Democratic Central Committee (together, the "Democrats"), and the second (the "ICLU Plaintiffs") is comprised of two elected public officials, State Representative William Crawford and Trustee Joseph Simpson, and several nonprofit organizations-Concerned Clergy of Indianapolis, Indianapolis Resource Center for Independent Living, Indiana Coalition on Housing and Homeless Issues, Indianapolis Branch of the NAACP, and United Senior Action of Indiana (collectively the "Organization Plaintiffs").[FN26] The relevant facts about each group are as follows.

> FN26. We have coined this group the "ICLU Plaintiffs" because State Representative William Crawford, Trustee Joseph Simpson and the "Organization Plaintiffs" are all represented by the ICLU.

### A. *The Democrats.*

According to their Second Amended Com-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

plaint, these two plaintiff groups are "political party organizations dedicated to electing candidates of the Democratic Party to public office in Marion County, and throughout Indiana, and with which are associated hundreds of thousands of registered voters who regularly support and vote for candidates who are affiliated with the Democratic Party." Democrats' Second**\*797** Am. Compl. at ¶ 2. The Democrats claim that all voters who cast ballots for a Democratic Party hopeful in a primary election "associate[ ] themselves with the Democratic Party." State's Ex. 50 ("Indiana Democratic Party's Responses to Request for Production") at ¶ 2.

In response to whether it has any members, the Indiana Democratic Party observed that "[i]n Indiana, voters do not 'register' as members of a political party but express their allegiance to a political party by asking for that party's ballot at the primary election, attending party meetings or events, contributing to the party's candidates and casting votes for candidates in the general election, among other things." *See Id.* at ¶ 3. According to the Rules of the Indiana Democratic Party, "any legally qualified Indiana voter who supports the purposes of the Party may be a member," *see* State's Ex. 52 ("Rules of the Indiana Democratic Party") at 2, but those rules do not otherwise state how such a voter voluntarily becomes a member or voluntarily ceases to be a member.

The Marion County Democratic Central Committee (MCDCC) is currently comprised of four members: Edward Treacy, Billie Breaux, Barbara Lawrence, and Tony Duncan. The MCDCC does not have bylaws or policies acknowledging the existence of any other members. State's Ex. 53 ("MCDCC Responses to Defendant's Interrogatories") at ¶ 2. Edward Treacy, the Chairperson of the Marion County Democratic Central Committee ("MCDCC"), has provided affidavit testimony that the Photo ID Law will require the MCDCC to divert its limited resources away from its primary activities, such as "get-out-the-vote" efforts and helping to elect its candidates to public office, into

efforts to inform its voters of the Law's photo identification requirements and to ensure that it is not selectively enforced during the 2006 general election. Democrats' Ex. 23.

Regarding the identity of individuals "associated with the Democratic Party" who would allegedly be injured by the implementation of the Voter ID Law, the Democrats initially identified nine citizens: David Harrison, Constance Andrews, Barbara J. Smith, Imogene M. Chapman, Ernest L. Pruden, Helen L. Wright, Lois E. Holland, Ronald Yancey, and Bettie L. Weiss. Indiana Democratic Party's Responses to Request for Production at ¶ 8; MCDCC Responses to Defendant's Interrogatories at ¶ 8. In a supplemental filing, the Democrats identified three additional individuals associated with the Democratic Party who would allegedly be injured. Those individuals are: Christina Bohlander, Thelma Ruth Hunter, and Corinne Collins. *See* State's Ex. 70 (collectively these twelve individuals are hereinafter referred to as the "Named Individuals"). The Democrats identified these allegedly injured citizens by examining responses to a post card survey of their Marion County poll workers. Indiana Democratic Party's Responses to Request for Production at ¶ 7. Unfortunately, Bettie Weiss has now died and no information was submitted to the Court concerning either Christina Bohlander or Corinne Collins. Following are the pertinent details concerning the remaining nine individuals:

1. *The Named Individuals.*

Constance Andrews is an employee of the Bureau of Motor Vehicles who frequently works at the polls on election day as a Judge for the Democratic Party. Andrews Dep. at 7, 13. Although Ms. Andrews declared in response to the Democrats' postcard survey that she did not have a driver's license or any other government-issued photo identification, at her deposition she testified that she did indeed **\*798** have a valid driver's license. When asked why she responded as she did to the survey, she said "I may have made a mistake there." Andrews Dep. at 17-18.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

Imogene Chapman is an 84-year-old woman who resides in Marion County and has worked at the polls for fifteen years. State's Ex. 57 ("Chapman Dep.") at 6-7, 10. She has no license or photo identification from either Indiana or the federal government. Ms. Chapman has previously voted absentee but said she did not like to. Ms. Chapman splits her ticket between the Democrats and other parties when she can. Ms. Chapman said she believes SEA 483 "is an infringement of my Civil Rights to vote." Chapman Dep. at 6-7, 10, 13.

Theresa Clemente is 78 years old and, although now residing in Indiana, she previously lived in Boston. In her Affidavit, she described how, after paying $28.00 to obtain a certified copy of her birth certificate from the State of Massachusetts and making three trips to the BMV, she had still not received a photo ID. *See generally* Clemente Aff.

David Harrison, a Marion County resident, is a 75-year-old military veteran. State's Ex. 5 ("Harrison Dep.") at 7-8, 17. He is a registered voter but has neither a license nor identification card. He also does not have an original birth certificate or the money to secure a birth certificate, although he thinks a church might help him by giving him the money. He does not want to vote absentee because he does not trust that form of voting. Harrison Dep. at 12-16.

Lois Holland is 69 years of age and lives in Indianapolis. State's Ex. 59 ("Holland Dep.") at 4-5. She has no identification containing her photograph. The only birth certificate that she has is copied from the family Bible. She votes in both the primary and general elections. Holland Dep. at 13, 16, 19. Ms. Holland works at the polls as a clerk for the Democratic Party and, as a result, has voted absentee in the past. Holland Dep. at 9. Ms. Holland says she usually votes for Democrats but does not always vote a straight-party ticket. Holland Dep. at 13, 15.

Thelma Ruth Hunter is an 85-year-old woman who has resided and voted in person in Indianapolis

her entire life. She was born at home in Tennessee and to her knowledge, no current certificate of her birth exists. Ms. Hunter has attempted to obtain a "delayed certificate of birth" from Tennessee but has been unable to do so. Hunter claims she is a longtime supporter of Democratic candidates. *See generally* Hunter Aff.

Ernest Pruden is a 74-year-old Marion County resident who has worked at the polls previously and does not have the necessary identification to vote under SEA 483. State's Ex. 58 ("Pruden Dep.") at 7, 12-15. He reports that he does not have a birth certificate and is uncertain as to what he would need to do to obtain a certified copy of his birth certificate from North Carolina, the state where he was born. He works at the polls in the apartment building (Lugar Towers) where he lives. Mr. Pruden typically votes in both the primary and general elections. Pruden Dep. at 17-18, 24, 26-27.

Barbara Smith is 71 years of age and resides in Marion County. State's Ex. 56 ("Smith Dep.") at 5-6, 13. She does not have a driver's license or state-issued photo identification card. She has a photo identification card issued to her by the federal government to her as a retiree, but as it lacks an expiration date, it will not suffice under SEA 483. However, she does have access to transportation by family members whenever she needs it and she has a certified birth certificate. *Id*. at 17. Ms. Smith frequently works at a precinct polling place on election day as a Judge for the Democratic Party and, as a **\*799** result, has voted absentee. Smith Dep. at 7-8, 13. Ms. Smith intends to vote in the May primary but claims she does not want to vote absentee. Smith Dep. at 7-9, 14.

Helen Wright suffered a heart attack in recent weeks and was unavailable to be deposed. She will be 65 years of age in 2006. State's Ex. 75 (Wright's postcard survey response to the Democrats).

Robert G. Yancey, a poll worker for the Democrats, (State's Ex. 60 ("Yancey Dep.") at 9), has a non-license photo-identification card issued by the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

BMV that does not expire until 2009. Yancey Dep. at 7-8.

B. *ICLU Plaintiffs.*

1. *Representative William Crawford and Trustee Joseph Simpson.*

Representative William Crawford ("Rep.Crawford") is a member of the Indiana House of Representatives, representing House District 98. See State's Ex. 61 ("ICLU Compl.") at ¶ 27. Rep. Crawford possesses the photo identification required by the Voter ID Law. Rep. Crawford states that he has been told by a number of persons that they do not have the required identification to be able to vote, Crawford Dep. at 22, 80; however, he has not identified any such persons by name to the Court. *See* State's Ex. 62 ("Crawford's Response to Interrogatories and Request for Production") at ¶ 1. Rep. Crawford believes that SEA 483 will be an obstacle to poor persons seeking to vote, which concerns him as a politician because in his experience the more people who come out to vote, the better it is for his electoral chances. Crawford Dep. at 32, 127, 130. As a civil rights advocate, Rep. Crawford finds SEA 483 to be "patently offensive," Crawford Dep. at 47-48, and, as a personal matter, he regards having to produce identification in order to vote "offensive." Crawford Dep. at 31.

Plaintiff Joseph Simpson has been an elected Washington Township Trustee for over twelve years and also serves as an elected precinct committee-person. Simpson Dep. at 11-13. Trustee Simpson has a driver's license issued by the BMV. State's Ex. 63 ("Simpson's Response to Interrogatories and Request for Production"), at ¶ 7. Like Rep. Crawford, Trustee Simpson has generally alleged that some citizens who have voted for him in the past do not have the sort of photo identification required by SEA 483; also, like Rep. Crawford, he was unable to identify any such voters by name to the Court. Simpson Dep. at 79, Ex C; Simpson's Response to Interrogatories and Request for Production ¶ 1, 3. Simpson fears that some people will

walk away from the polls once they are challenged and he also believes that SEA 483 will increase the number of voter challenges. Trustee Simpson Dep. at 41-42, 62-64, 77. Simpson believes that the more people who are able to vote, the more votes he will receive. Simpson Dep. at 18-19. On a personal basis, Simpson strongly objects to having to show his identification in order to vote. Trustee Simpson Dep. at 21-23.

2. *The Organization Plaintiffs.*

Concerned Clergy of Indianapolis ("CCI") is an organization "dedicated to advancing social justice issues, particularly issues affecting the poor in Indianapolis." ICLU Compl. at ¶ 51. CCI asserts that its members include "poor persons in the City of Indianapolis." *Id.* at ¶ 52. CCI also has elected officers and formal members who join after being voted into membership. Deposition of Margie Oakley ("Oakley Dep.") at 10-13 and Ex. G (Interrogatories). CCI does not maintain any records identifying its members who do or do not possess driver's licenses or non-license photo identification. State's Ex. 66 ("CCI Responses to Interrogatories and Request for Production") at ¶ 6. Margie Oakley, CCI's designated deponent, conceded**800** that no CCI members have indicated to her that they do not have photo identification and that no CCI members have told her that SEA 483 will prevent them from voting. Oakley Dep. at 16, 20. However, CCI asserts that some of its members have indicated that they would be discouraged from voting because of SEA 483. Oakley Dep. at 17. FN27 One of CCI's officers is Rev. Leroy Dinkins, the current vice president. Although Rev. Dinkins has a valid driver's license, he is strongly opposed to any law that requires him, or any other person, to show photo identification in order to vote and prefers not to have to show photo identification in order to vote. Dinkins Aff. at ¶¶ 1, 3, 4, 6. CCI contends that, in response to the passage of the Voter ID law, it will have to expend its limited financial resources to assist persons with paying the costs of birth certificates so they can vote. Oakley Aff. at ¶¶ 3, 5. FN28 CCI also contends that, to extent SEA

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

483 lessens the political clout of minorities and poor persons, it lessens CCI's effectiveness as well. Oakley, Ex. G at ¶ 8.

> FN27. It is unclear from Ms. Oakley's deposition why these individuals will be discouraged from voting. She suggests a variety of explanations, including offense over SEA 483's requirements, as well as, the hassle in obtaining and presenting a photo identification at the polls. Oakley Dep. 17-19. As we previously mentioned, however, Ms. Oakley has testified that no members have actually told her they do not already possess the requisite photo identification.

> FN28. CCI also offered unsubstantiated allegations concerning the impact of SEA 483 on the ability of "poor persons" to vote.

The Indianapolis Resource Center for Independent Living ("IRCIL") is a center for independent living funded by the federal government through Title 7 of the Rehabilitation Act. Deposition of Melissa Madill ("Madill Dep.") at 72. According to the IRCIL's bylaws, its members include its board of directors and "the people with disabilities whom we serve." State's Ex. 65 ("IRCIL's Response to Interrogatories and Request for Production"), at ¶ 2. IRCIL asserts that many of its members "may not have ... valid photo identification" and "will be discouraged from voting" by SEA 483. ICLU Compl. at ¶¶ 45, 48. However, IRCIL has not identified any such member to the Court. IRCIL's Response to Interrogatories and Request for Production at ¶ 4. In fact, Melissa Madill, IRCIL's designated deponent, said that none of the 15 members with whom she had spoken concerning the Voter ID Law since it was enacted have said that they would be unable to vote because of the law. Madill Dep. at 23. The IRCIL assists its clients in obtaining identification cards from the BMV, although it does not pay the cost of the underlying documents, such as birth certificates. Affidavit of Melissa Madill ("Madill Aff.") at ¶¶ 2, 3. The IRCIL states that, with the passage of the Voter ID law, it will have to devote more of its staffing resources to working with clients in order to try to collect the information necessary to obtain an identification card which, they say, will inevitably mean that staff will be less able to devote their time to other issues of importance to IRCIL's clients. Id. at ¶¶ 4, 5.

The Indiana Coalition on Housing and Homeless Issues ("ICHHI") is a statewide coalition of organizations and individuals who advocate for persons who experience homelessness as well as low-income persons and families across Indiana. Deposition of Michael Reinke ("Reinke Dep.") at 6. ICHI's members include paid members who generally are organizations such as homeless shelters, day shelters, and mental health centers, among others. Reinke Dep. at 10-12. ICHHI considers all homeless persons who receive services **\*801** to be members as well. Reinke Dep. at 11. ICHHI states that it is aware that "many homeless and impoverished persons do not have valid driver's licenses and state identification cards" and that SEA 483 "will prohibit members of ICHHI from voting because they will not be able to timely satisfy the identification requirements." Id., at ¶¶ 71, 78. However, ICHHI has been unable to identify any such affected individuals members. State's Ex. 68 ("ICHHI's Response to Interrogatories and Request for Production"), at ¶ 5. In response to a survey, several of ICHHI's member organizations stated they were aware that many homeless persons do not have photo identification. However, those surveys do not identify any such individuals by name, nor do they indicate whether such homeless persons are members of ICHHI or one of its member organizations. See State's Ex. 69 ("ICHHI Survey Responses"). ICHHI contends that SEA 483 will reduce the political power of homeless persons and, thus, will make it more difficult for ICHHI and its member organizations to advocate on issues affecting homeless persons. Reinke Dep. at 8-9.

The Indianapolis Branch of the NAACP

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

("NAACP") is the local branch of the well-known, national civil rights organization. ICLU Compl. at ¶ 61. The NAACP has 1500 members in Marion County. Deposition of Roderick Bohannan ("Bohannan Dep.") at 16. It is non-partisan and registers persons to vote and encourages persons to vote. Bohannan Dep. at 25, 47. The NAACP alleges that SEA 483 will "make it more difficult for NAACP members ... to participate in elections." *Id.* at ¶ 65. However, the NAACP has not identified any individual members who allegedly will be harmed by SEA 483. State's Ex. 67 ("NAACP's Responses to Interrogatories and Request for Production") at ¶¶ 5, 7. Roderick Bohannan, the NAACP's designated deponent, testified that he has heard some members say, "I don't think I'll be able to vote the way the statute is construed," but he could not identify anyone in particular who had made such assertions. Bohannan Dep. at 19. Bohannan strongly objects to being required to show his BMV issued identification in order to vote. Bohannan Aff. at ¶¶ 1, 3, 4. The NAACP maintains that to, the extent that SEA 483 diminishes the political clout of African-Americans, it renders the NAACP and its branches less effective in arguing in support of their issues. (Bohannan Dep. Ex. H at ¶ 9). Finally, Bohannan contends that in response to the passage of SEA 483, the NAACP will have to divert funds and energies into educational and outreach efforts to inform the public about the law so as to maximize the number of persons who will be able to vote. *Id.* at ¶ 5.

United Senior Action of Indiana ("USA") is a 15,000 member, not-for-profit organization that is designed to promote and advocate issues of interest and importance to senior citizens. Deposition of Michelle Niemier ("Niemier Dep.") at 17 and Ex. D, Request No. 1. USA's members join the organization by paying dues. State's Ex. 64 ("USA Response to Interrogatories and Request for Production") at ¶ 2. USA states that it has received complaints from its members to the effect that SEA 483 would prevent people from being able to vote or will discourage people from voting; however, USA

has not identified any specific members and USA does not have any records identifying members who have or do not have driver's licenses or non-license photo identification. Niemier Dep. at 24, 38-39; USA Response to Interrogatories and Request for Production at ¶¶ 5, 6. Michelle Niemier, the Executive Director of USA, testified that she has "not spoken to any individual members [of USA who said that they] will not be able to **802** vote because of [SEA 483], since it's enacted." Niemier Dep. at 24-25.[FN29] USA is also concerned that the organization's effectiveness as an advocate for the elderly will be diminished as its members' ability to vote is diminished. Niemier Dep. Ex. D Interrogatories ¶ 7.

> FN29. Niemier further testified that USA has not conducted a survey to determine whether any seniors will be affected by the law, and the assertion in Paragraph 38 of the ICLU Complaint that many seniors do not have driver's licenses or other photo identification is based only on her "experience with the organization and conversations over the last 16 years [with] our members." Niemier Dep. at 23.

## VI. The Defendants.

The two sets of defendants in this case are the Marion County Election Board ("MCEB") and Todd Rokita, in his official capacity as Indiana Secretary of State, defendants J. Bradley King and Kristi Robertson, in their official capacities as Co-Directors of the Indiana Election Division.

### A. *Marion County Election Board.*

The defendants The Marion County Election Board is, as indicated above, the entity that is responsible for the oversight of elections in Marion County, Indiana. Sadler Dep. 6. The Election Board consists of the Marion County Clerk and two other persons. Sadler Dep. 6-7. The Clerk acts as election administrator in Marion County. Sadler Dep. 6.

### B. *The Secretary of State and the Co-Directors Of The Indiana Election Division.*

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

Plaintiffs have also named as defendants Todd Rokita, in his official capacity as Indiana Secretary of State, defendants J. Bradley King and Kristi Robertson, in their official capacities as Co-Directors of the Indiana Election Division.[FN30] As indicated above, The Indiana Election Division provides advice and instruction to county election officials and publishes information and forms for use in Indiana elections. *See* Ind.Code § 3-6-4.2-1, *et seq.*; Deposition of Co-Director J. Bradley King, Attachment 2 ("King Dep.") at 7. Rokita, as Indiana Secretary of State, is the state's chief election official for all purposes (except for the coordination of State responsibilities under the National Voter Registration Act ("NVRA"), *see* Ind.Code § 3-6-3.7-1 ), and is broadly charged with performing all ministerial duties related to the administration of elections by the state, Ind.Code § 3-6-4.2-2(a), and serves as one of the three members of the Indiana State Recount Commission, Ind.Code § 3-12-10-2.1 (a) and (b); and Ind.Code § 3-12-10-4(a).

> FN30. On May 20, 2005, Defendants moved to dismiss the Secretary of State and the Co-Directors of the Election Division as defendants. In our July 1, 2005, Entry we held:
>
> > [A]t this juncture, we are unable to say definitively that enforcement of SEA 483 will not implicate at least some of the official statutory responsibilities of Defendants Rokita, King, and Robertson. Such a determination requires an in-depth, overarching understanding of the election process and state election laws which this court does not possess at the outset of this litigation. Consequently, we shall hold the motion to dismiss under advisement and stay a final ruling, thus requiring these defendants to remain as parties to defend their interest, if any, as it may present itself ... [however] we can and shall relieve Defendants Rokita, King, and Robertson of the ob-

> ligation to actively participate in the development of this litigation, unless and until otherwise ordered by the Court.
>
> July 1, 2005, Entry at 2-3. In light of our present ruling in favor of Defendants, the Motion to Dismiss is hereby *DENIED* as moot.

**\*803 VII. Brace Report.**

[1] The Democrats submitted an expert report prepared by Kimball W. Brace (the "Brace Report") reflecting his conclusion that at least 51,000 registered voters and as many as 141,000 registered voters in Marion County, and up to 989,000 registered voters in the State of Indiana, do not currently possess a BMV-issued driver's license or photo identification. Brace Report at 8-10. Brace also claims to have determined that registered voters who reside in census block groups with a median household income of less than $15,000 are more than twice as likely not to possess photo identifications as are registered voters who reside in census block groups with a median household income of more than $55,000. Brace Report at 9-10, Tables F and G.

We have not included the Brace Report in our determinations because we view the analysis and conclusions set out in it as utterly incredible and unreliable. Reliability is the fundamental principle upon which the admissibility of expert opinions and testimony is based, pursuant to Federal Rule of Evidence 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

The Brace report fails to satisfy the latter two of these requirements. We lack the time and space to discuss the numerous flaws in Brace's report; instead, we shall highlight the report's most significant failings, including: (1) failing to account for voter roll inflation, (2) comparing demographic data from different years without qualification or analysis, (3) drawing obviously inaccurate and illogical conclusions, and (4) failing to qualify the statistical estimates based on socioeconomic data. Moreover, to the extent that the data on which Brace based his report is admissible, it actually strengthens the Defendants' contentions, not the Plaintiffs. We discuss each of these weaknesses in greater depth below.

A. *Brace failed to correct for voter roll inflation.*

The major flaw in Brace's report is that, while he concedes there is some inflation of the Marion County voter rolls, his analysis includes absolutely no attempt to correct for such surplusage. Inflation of voter rolls directly impacts Brace's conclusions because his analytical method consists of tabulating and characterizing voter registrations that cannot be matched to BMV records. Inflated voter registration thus leads to inflated conclusions regarding the number of voters without a state driver's license or identification card whom Brace claims to have identified. Borrowing the apt computer expression: "garbage in, garbage out."

Brace's decision not to compensate for excess voter registrations is even more confusing (and inexcusable) in light of the fact that he adjusted the BMV records to remove duplicate records FN31 without performing a similar adjustment to the voter registration list. As far as we can discern, the only adjustments that Brace performed to the voter registration list were (1) prior to conducting the income and **\*804** education level analysis, Brace omitted the entries for registered voters whose listed addresses did not correspond to a census block that had any voting age population reported by the 2000 Census (presumably because he was "not able to associate income characteristics to them"); and

(2) Brace removed the "inactive" voter registrations from the list of unmatched voters produced using "tightened criteria." However, in reporting his conclusions as to the total number of "affected individuals," Brace once again included the voter registrations which were inactive and/or corresponded to unpopulated census blocks. All of these adjustments and this methodology reveal a conscious effort by Brace to report the largest possible number of "individuals impacted by the implementation of SEA 483," regardless of the reliability of that number.

FN31. "In most instances this was due to the fact that an individual had both a commercial driver's license as well as a regular driver's license." *Id.* at 5.

Brace's decision to adjust the BMV records, which no one has argued are inflated, contrasted with his obvious failure to adjust the voter registration records, which all the parties appear to agree are inflated in Indiana, "indicates a failure to exercise the degree of care that a statistician would use in his scientific work, outside of the context of litigation." *Sheehan v. Daily Racing Form, Inc.,* 104 F.3d 940, 942 (7th Cir.1997). As the Seventh Circuit has explained: "In litigation an expert may consider (he may have a financial incentive to consider) looser standards to apply. Since the expert's statistical study would not have been admissible at trial, it was entitled to zero weight in considering whether to grant or deny summary judgment." *Id.*

B. *Brace's report compares demographic information from varying years without analysis or qualification.*

Another significant failure in Brace's report is that he attempted to compare BMV and voter registrations records from 2005 to Census population numbers from the year 2000, without attempting to adjust for the time difference. We suspect that such temporal variations play a role in creating some of the incredible numbers Brace has included in his report, such as his claim that in census blocks with median incomes over $55,000 there were 8,000

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

more BMV records (for individuals over the age of eighteen) and 10,000 more voter registrations than actual voting age individuals recorded by the Census; (the BMV and voter registration records representing 106.4% and 107.9%, respectively, of the voting age population). *See* Brace Report, Tables D and F.[FN32] Since Marion County's total population was relatively static between 2000 and 2004,[FN33] Brace's numbers suggest either that BMV and/or voter registration records are significantly inflated, the Census significantly undercounted high-income individuals (a claim we have not heard levied before), or that there was significant net migration into higher income census blocks during the intervening five years. Brace's report does not address any of these incongruities nor does it include any effort to otherwise adjust, explain, or qualify his results in light of the obvious temporal difference in his data sources. Such failures again demonstrate "a failure to exercise the degree of care that a statistician would use in his scientific**805** work, outside of the context of litigation." *Sheehan,* 104 F.3d at 942.

> **FN32.** Brace lists the voting age population as 127,554, the number of BMV records as 135,780, and the number of registered voters as 137,633. Brace Report, Table D and F.

> **FN33.** The Census estimates indicate that Marion County's population growth between April 1, 2000, and July 1, 2004, was 0.4%, resulting in slightly over 3,000 additional residents living in Marion County in 2004 than 2000. *See* Marion County Quick Facts, available at: http:// quickfacts. census. gov/ qfd/ states/ 18/ 18097. html

C. *The conclusions of Brace's report are totally unreliable.*

Further undermining the reliability of Brace's report is the fact that he apparently did not make any attempt to determine if his conclusions were in any way realistic, which they clearly are not. In his conclusion, Brace states:

> Based on our analysis to date, it is clear that there will be a significant number of individuals impacted by the implementation of SEA 483. Our research shows that at least 51,000 registered voters and more likely 141,000 registered voters, in Marion County alone would have to obtain a drivers license or ID in order to vote. If these patterns were to hold true for the rest of the state, as many as 989,000 registered voters in the state could be challenged when they try to go vote in November, 2006.

> Brace Report at 10.

Brace's prediction of 989,000 voters who likely will be challenged at the next general election is obviously unbelievable for several reason. First, in his report, Brace specifically notes that Marion County is not representative of the other counties in Indiana and, in particular, Brace "assumed that [Marion County] would have a higher number of non-drivers, compared to other jurisdictions in the state." *Id.* at 5. Given that even Brace himself believes that the Marion County data will not "hold true for the rest of the state," we are at a loss to understand why in his Conclusion he uncritically provides estimates which assume otherwise. At the very least, Brace should have included a discussion comparing the demographic data for Marion County with the data for the rest of the counties in Indiana in order to provide some reasonable basis on which the conclusions based on the former could be extended to the latter.

Second, Brace apparently did not undertake even the most rudimentary effort to test the reliability of his theoretical conclusions. For example, in his report, Brace indicates that, as of August 2005, there were 4,569,265 Indiana driver's license or identification cards possessed by individuals over the age of eighteen.[FN34] By adding in Brace's estimated 989,000 registered voters without licenses, the total is 5,558,265 individuals over the age of eighteen who either are registered to vote in Indiana

or possess an Indiana driver's license or identification card. This number represents an incredible 123% of Indiana's entire voting age population, as reported by the 2000 Census, and 120% of the Census's estimate for Indiana's voting age population as of July 1, 2004.[FN35] Brace's report fails to explain where or how this bonanza of hitherto unaccounted for individuals occurred or how his conclusions are reconcilable with the Census data.

FN34. This number is reached by taking 5,196,162 total records minus 309,759 duplicate records minus 317,138 records for individuals under the age of eighteen. Brace Report at 5.

FN35. The 2004 Census estimates the population of Indiana, at 6,237,569, minus the 25.9% of the population estimated to be below age eighteen leaves us with 4,622,039 Indiana residents at least eighteen-years-old. *See* Indiana Quick Facts, available at http:// quickfacts. census. gov/ qfd/ states/ 18000. html. (The 25.9% was obtained from 2000 Census data). We recognize there is an increased degree of uncertainty surrounding this estimate since it relies on combining numbers from different Census years. Moreover, since Indiana's population is estimated to have grown by approximately 150,000 between 2000 and 2004, using a 2004 estimate may make Brace's conclusions appear marginally more reasonable. Brace's report relies on 2005 BMV records.

**\*806** Brace's conclusions regarding only Marion County are equally unreliable. If the number of affected individuals Brace claimed to have identified is combined with the number of individuals with Indiana driver's licenses or identification cards, the result is between 103% and 116% of the voting age population of Marion County.[FN36] Once again, Brace's report provides no explanation as to how these results can be reconciled with the Census data.

FN36. The results are 102.9% for the "loose match," 116.4% for the "tightened criteria," and 106.7% for the "tightened criteria" minus inactive voters. In the case of the Marion County data, there is little difference using the 2004 estimated population, as opposed to the 2000 Census number, since the county's population is estimated to have grown only 0.4% in the intervening four years. All Marion County data was obtained from the Census Bureau's Marion County Quick Facts and is available at http:// quickfacts. census. gov/ qfd/ states/ 18/ 18097. html.

The fact that Brace's mathematical extrapolations are in conflict with the Census results should not come as a surprise. As mentioned above, Brace has admitted that he believes the Indiana voter rolls are inflated, making it entirely logical and predictable that his analysis would produce inflated numbers of affected voters. These obvious and otherwise unexplained analytical failures, once again, represent "a failure to exercise the degree of care that a statistician would use in his scientific work, outside of the context of litigation." *Sheehan,* 104 F.3d at 942.

D. *Brace's failure to qualify his statistical estimates based on socioeconomic data.*

In addition to the above, Brace's statistical estimates based on socioeconomic data are even more suspect for several reasons: (1) Brace's economic (and education) analysis appears to suffer from aggregation bias because he was forced to aggregate his data to census block groups instead of focusing only on individuals,[FN37] a matter left unaddressed by Brace in his report; (2) there is no indication in the report whether Brace's socioeconomic results are statistically significant and Brace does not mention performing any generally accepted estimates of significance or uncertainty;[FN38] and (3) Brace made no attempt to factor in the impact of SEA 483's exceptions, such as the indigent exception, which would directly effect his computations, espe-

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

cially with respect to Census blocks with median incomes below $15,000. These methodological failings are of the same sort that led the Seventh Circuit to exclude the expert report in *Sheehan* and to remark that the report "was entitled to zero weight in considering whether to grant or deny summary judgment." *Sheehan,* 104 F.3d at 942.

> FN37. *See* Katz report at 6.

> FN38. *See* Katz report at 7. Such an analysis is especially warranted with respect to Brace's consideration of census blocks with median incomes less than $15,000, which account for only 1% of the Marion County voter registrations and voting age population in Brace's analysis, but are the centerpiece of his socioeconomic conclusions. *See* Brace Report, Tables D, F, G.

E. *Brace's Report actually strengthens the State's arguments.*

To the extent that Brace's results are admissible evidence, the findings do not help the Plaintiffs' case, indeed, they strengthen the State's contentions.

Brace's report reveals several important reasons to question the reliability and accuracy of Indiana's voter rolls. For example, Brace reports there are tens of thousands of voter registrations in Marion County alone which list their address as being within an unpopulated census block and there are additional thousands of voter registrations whose existence cannot be **\*807** reconciled with BMV records and/or Census numbers. FN39

> FN39. It is also possible that Indiana's BMV records are significantly inflated or that the Census Bureau undercounted Indiana's population; however, all the parties and experts appear to agree that Indiana's voter rolls are inflated.

Brace's report also suggests that the vast majority of Indiana's voting age population already pos-

sesses the requisite photo identification required by SEA 483. Comparing the number of 2005 BMV records in Brace's report to Census' estimates for Indiana's voting age population indicates that, as of 2005, there were only 43,000 Indiana residents without a state-issued driver's license or identification card. FN40 In other words, an estimated 99% of Indiana's voting age population already possesses the necessary photo identification to vote under the requirements of SEA 483. FN41 Moreover, Brace's report suggests that the fewer than 1% of individuals without acceptable Indiana photo identification are substantially concentrated in Marion County, FN42 which has a metro bus system and multiple BMV branch locations thereby greatly facilitating the ability of these affected individuals to obtain the necessary photo identification. FN43

> FN40. Brace reported that there were 4,569,265 non-duplicate 2005 BMV records for individuals over the age of eighteen. Brace Report at 5. The 2004 Census estimate for the voting age population of Indiana is 4,590,851, or 21,586 more than the number of 2005 BMV records. Still, there remains the problem of comparing 2005 BMV numbers with 2004 Census estimates. Perhaps the best approach is to compensate for that intervening year by assuming Indiana maintained its 2000 to 2004 annual growth rate, which would add approximately 21,500 additional individuals to the voting age population by August 2005. This produces an estimated total of 43,000 more Indiana residents than Indiana had issued photo identifications. *See* Indiana Quick Facts, available at http:// quickfacts. census. gov/ qfd/ states/ 18000. html. We note that the BMV representative testified that the BMV was unable to determine the number of Indiana residents without an Indiana driver's license or identification card. *See* Redman Dep. at 22-30.

> FN41. The 43,000 estimated individuals

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

without identification comprise 0.9% of the Census 2004 Indiana estimated voting age population of 4,590,851. Adjusting the estimated voting age population to account for 2004 to 2005 population growth would also produce a result of 0.9% of the voting age population. *See* Indiana Quick Facts, available at http:// quickfacts. census. gov/ qfd/ states/ 18000. html.

FN42. Brace reported a total of 609,961 non-duplicate BMV records for individuals over the age of eighteen who list addresses in Marion County. Brace Report at 5. The 2004 Census estimated voting age population of Marion County is 640,778, adjusted for population growth between year 2004 and 2005; we estimate the 2005 voting age population is roughly 641,400. The difference between Census estimated population and number of BMV records is 31,500. All Marion County data obtained from the Census Bureau's Marion County Quick Facts and is available at http:// quickfacts. census. gov/ qfd/ states/ 18/ 18097. html.

FN43. We do not believe our simple analysis is in anyway complete or definitive. We recognize there are several factors which suggest the percentage of Indiana's voting age population with photo identification is actually lower than 99%; for example our simple comparison of raw numbers does not take into account: individuals who have died but whose Indiana driver's license or identification cards have not expired; individuals who have moved outside the state and no longer consider themselves Indiana residents but who still retain a valid Indiana license or identification card; individuals who have moved into Indiana and now consider themselves Indiana residents but have not yet obtained an Indiana license or identification; and individuals, such as students, who are residing in Indi-

ana temporally, are registered to vote in another state, but have obtained an Indiana license or identification.

On the other hand, there are several factors which suggest our analysis may overstate the number of individuals impacted by SEA 483, such as: BMV records do not encompass the other forms of state and federal photo identification acceptable under SEA 483; BMV records do not account for the various exceptions to the photo identification requirement, such as the exception for indigent and absentee voters; and the Census population estimates include thousands of Indiana residents who are not registered to vote and thus will not be able to vote regardless of SEA 483's photo identification requirements.

We do not have the resources to evaluate and weigh these various factors; however, a serious analysis of SEA 483's impact on Indiana voters should attempt to take at least some of these factors into account.

**\*808** To the extent that Brace's socioeconomic analysis is accurate, his report revealed no potential disparate impact of SEA 483 based on a voter's race or education level and only a small potential disparate impact based on income level, specifically, in census blocks with median incomes below $15,000. FN44 However, as noted above, Brace's conclusions with respect to income are even more suspect than his report in general.

FN44. Brace's "loose match" found that the percentage of voter registrations which could not be matched to a BMV record was higher in census blocks with median incomes below $15,000 and lower in census blocks with median incomes above $55,000. The census blocks with intermediate median incomes were generally com-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

parable to each other. Brace's two "tightened criteria" analyses found the percentage of voter registrations which could not be matched to a BMV record declined as the median income of the census block rose. Brace's "loose match" revealed a slightly increased percentage of "unmatched voters" among census blocks with college and graduate degrees. Brace's two "tightened criteria" analysis, however, found that the percentage of "unmatched voters" decreased as the census block's education level increased. In his report, Brace highlights the results of the "tightened criteria" educational level analysis; however, he does not discuss if, how, or why this data conflicted with the results of the "loose match" analysis. *See generally* Brace Report, Tables D, F, G.

Finally, to the extent that Brace's socioeconomic analysis is accurate, his report confirms that we should not assume disparate impact based on what "common sense" tells us to be true. In interpreting Brace's results, the Democrats argue:

Common experience tells us that the persons without such identification are likely to come from segments of the society that do not drive, including those without the financial ability to afford vehicles. The Brace study confirms what common sense tells us. The Brace study reveals that those registered voters without BMV-issued identification are almost twice as likely to reside in census block groups with a lower median income.

Democrats' Reply Brief at 28. Brace's report, to the extent it is accurate, actually indicates that voters without photo identification are not significantly more likely to come from low income segments of society. Brace's research establishes that, under any of his criteria, less than 2% of his "unmatched voters" reside in census blocks with median incomes below $15,000. [FN45] In fact, under any of Brace's criteria, between 61% and 65%

of his unmatched voters live in census blocks with median incomes above $35,000, which roughly corresponds to the 63.9% of the voting age population he lists as residing in those areas. [FN46] Thus, there is scant support **809** in Brace's report supporting the "common sense" observation that low income individuals will be disproportionately impacted by SEA 483's photo identification requirements. [FN47]

FN45. This is true in large part due to the fact that only approximately 1% of the voting age population lives in such census blocks.

FN46. The "loose match," "tightened criteria," and "tightened criteria minus inactive voters" reported the following percentages of unmatched voters residing in census blocks with median incomes above $35,000: 65%, 60.9%, and 62.3%. According to Brace's report, an estimated 63.9% of the voting age population, and 67.8% of voter registrations, reside in census blocks with median incomes above $35,000. The voter registration percentage, however, is suspect since, as we discussed above, Brace's report also indicates there are more than 10,000 additional voter registrations than estimated voting age individuals residing in census blocks with median incomes above $55,000 (voter registrations correspond to 107.9% of the voting age population). *See* Brace Report, Tables D, F, G. We chose "above $35,000" as a grouping because according to the 2000 Census, the median income in Marion County was $40,421 (1999 data), which falls in the middle of Brace's $35,000 to $45,000 analysis bracket. Marion County median income data obtained from the Census Bureau's Marion County Quick Facts is available at http:// quickfacts. census. gov/ qfd/ states/ 18/ 18097. html.

FN47. Based on the factors mentioned above, we do not believe that Brace's so-

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

cioeconomic conclusions are reliable; however, in the context of this litigation, it is noteworthy that a $40,000 study commissioned by the Plaintiffs so dramatically undercuts the "common sense" arguments on which the Plaintiffs repeatedly urge this court to rely. If nothing else, the Brace report convinces us that speculation as to "likely" impacts of SEA 483 on various demographic groups would be neither judicious nor appropriate.

Although the Brace Report carries some weight, albeit very little, we base our legal analysis primarily on the facts submitted by the parties, as discussed above, including: Indiana election law and procedure, requirements for obtaining photo identification documents from the BMV, evidence regarding voter fraud, evidence of potential impacts of SEA 483 on Indiana voters, and facts related to the parties in this litigation. Based on these facts, we turn now to our discussion and application of the controlling legal principles.

### *Legal Analysis*
**I. Plaintiffs' Article III Standing.**

Before addressing the legal merits of SEA 483, we first must determine whether the named plaintiffs to this litigation have standing to bring it. Defendants challenge the Article III standing of every plaintiff, contending that they lack standing in their own right, standing to assert the rights of third parties or, with regard to the organizations, standing to assert the rights of their alleged members. The only standing which Defendants do not contest is that of the Democrats in bringing their political association claim. Plaintiffs respond, individually and jointly, that all have standing to bring all the claims raised in this lawsuit.

[2] The Seventh Circuit has articulated the standing requirement as follows:

Standing is 'an essential and unchanging part of the case-or-controversy requirement of Article III .' *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The burden to establish standing is on the party invoking federal jurisdiction-here, [Plaintiffs]-and the elements it must show are: (I) an injury in fact, which is an invasion of a legally protected interest that is concrete and particularized and, thus, actual or imminent, not conjectural or hypothetical; (ii) a causal relation between the injury and the challenged conduct, such that the injury can be fairly traced to the challenged action of the defendant; and (iii) a likelihood that the injury will be redressed by a favorable decision.

*DH2, Inc. v. U.S. S.E.C.,* 422 F.3d 591, 596 (7th Cir.2005) (citing *Lee v. City of Chicago,* 330 F.3d 456, 468 (7th Cir.2003) (citing *Lujan,* 504 U.S. at 560-61, 112 S.Ct. 2130)). To satisfy the injury-in-fact requirement, Plaintiffs " 'must establish that [they have] sustained or [are] immediately in danger of sustaining some direct injury.' " *Id.* (quoting *Wis. Right to Life, Inc. v. Schober,* 366 F.3d 485, 489 (7th Cir.2004)) (quoting **\*810***Tobin for Governor v. Ill. State Bd. of Elections,* 268 F.3d 517, 528 (7th Cir.2001)). However, "[m]ere speculation is not enough to establish an injury in fact." *Id.* (quoting *Wis. Right to Life,* 366 F.3d at 489).

[3][4] A plaintiff which is an association has Article III standing to represent the interests of its members if: " '(1) the conduct challenged is injurious to its members, (2) the claim asserted is germane to the association's purposes, and (3) the cause can proceed without the participation of the individual members affected by the challenged conduct.' " *Hope, Inc. v. DuPage County, Ill.,* 738 F.2d 797, 813 (7th Cir.1984) (quoting *Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)); *See also Texas Independent Producers and Royalty Owners Association v. E.P.A.,* 410 F.3d 964, 971 (7th Cir.2005). Representational standing requires that the association demonstrate that the members whose rights it is asserting " 'are suffering immediate or threatened injury as a result of the challenged

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

action of the sort that would make out a justiciable case had the members themselves brought suit.' " *Hope,* 738 F.2d at 813 (quoting *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)).

[5][6] In certain limited situations, a plaintiff may have standing to raise the rights of third parties not otherwise before the court. The Supreme Court has imposed three conditions which must be satisfied before a plaintiff can assert the rights of a third party: (1) the plaintiff has suffered an "injury in fact;" (2) the plaintiff has a "close relationship" to the injured third party; and (3) there was some hindrance to the third parties in asserting their own rights. *Campbell v. Louisiana,* 523 U.S. 392, 397, 118 S.Ct. 1419, 140 L.Ed.2d 551 (1998) (allowing a criminal defendant to raise the rights of jurors). However, "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Id.* (quoting *Lujan,* 504 U.S. at 562, 112 S.Ct. 2130 (quoting *Allen v. Wright,* 468 U.S. 737, 758, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984))).

For clarity of analysis, because the issues are uniformly applicable as to each group, we have categorized the various Plaintiffs into the following three similarly situated groups: the Democrats, Rep. Crawford and Mr. Simpson, and the Organizational Plaintiffs, each of which grouping we discuss below. Prior to analyzing the respective arguments of each group of plaintiffs, we address one principle of standing that cuts across all three groups, namely, that "mere offense" taken or felt in reaction to a statute's requirements is not sufficient injury to confer Article III standing.

**A.** *"Mere Offense" Is Not Sufficient Injury to Confer Standing.*

[7][8][9] Several Plaintiffs attempt to establish standing based on their sense of personal offense at being required to provide identification in order to vote.[FN48] Offense alone in response to government policies or requirements does not suffice to create standing: "Otherwise there would be universal standing: anyone could contest any public policy or action he disliked. There must be a concrete injury." *Books v. Elkhart County, Ind.,* 401 F.3d 857, 870 (7th Cir.2005). Moreover, in determining Article III standing, "the psychological consequence presumably produced by observation of conduct with which one disagrees ... is not an 'injury in fact' for **811** constitutional purposes." *Id.* (internal quotation omitted). Accordingly, no Plaintiff in this case may continue to litigate if the only injury is the offense taken in having to present, or in observing others present, photo identification in order to be permitted to vote.

> FN48. *See, e.g.,* Crawford Dep. at 31; Simpson Dep. at 21-23; Aff. of Rev. Leroy S. Dinkins at ¶¶ 3, 4, 6; Aff. of Roderick Bohannan at ¶¶ 1, 3, 4; Chapman Dep. at 6.

**B.** *The Democrats' Standing.*

1. *Standing for An Associational Rights Claim.*

[10] None of the parties disputes that the requirements of SEA 483 impede the Democrats' ability to permit citizens who do not have photo identification to vote in their primary elections, which in turn interferes with their right to freely associate with those citizens for political purposes. All the parties agree, and we concur, that this constitutes a direct injury to the Democrats' right to freely associate and suffices to confer standing on these parties.[FN49]

> FN49. We note, however, that the Democrats appear to have dropped their associational rights claim in their Reply Brief.

2. *Standing of MCDCC to Assert Rights of Its Members.*

[11] The MCDCC has identified four members; however, all have the necessary photo identification to vote in person under SEA 483. Accordingly, MCDCC cannot establish standing based on alleged

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

injuries to its members. *Hope, Inc. v. DuPage County, Ill.,* 738 F.2d 797, 813 (7th Cir.1984).

3. *Standing to Assert the Rights of Any Voter Who Votes (or Might Vote) Democratic.*

[12] Democrats broadly contend that they "have standing to assert the rights of those registered voters who associate with them and who will be voting, or who desire to vote, in future elections for public office, including the elections scheduled in May and November, 2006." Democrats' Second Am. Compl. at ¶ 3. This assertion is premised on the claim that the mere act of "desiring" to vote for a Democratic candidate makes an individual a "member" of the Democratic party. This argument is a bridge too far in view of applicable law. As the Seventh Circuit notes, "The Supreme Court has not seen fit to extend representational capacity standing to entities other than associations which actually represent interests of parties whose affiliation with the representational litigant is that of membership with the representative or substantial equivalent of membership." *Hope,* 738 F.2d, at 814. Neither "desiring" to vote for a candidate nor actually voting for that candidate constitutes membership or the substantial equivalent of membership in a political party. Indeed, if desire alone were enough, it appears that several of the Democrats' own witnesses would simultaneously be members of multiple political parties. Accordingly, the Democrats' attenuated claim of "membership" for any voter who will be voting or desires to vote for a Democratic candidate fails to confer standing to bring this lawsuit.

[13] Assuming *arguendo* that the Democrats' representational standing claims include third-party voters not actually before the Court but who face insurmountable barriers in obtaining photo identification prior to the election, such voters' injuries resulting from enforcement of the SEA 483 are sufficiently identifiable and concrete as to allow them to assert their own individual claims as voters. Moreover, Democrats have not presented any substantiation that any such voters actually exist. Ac-

cordingly, we conclude that the Democrats are not positioned to **\*812** raise the rights of third-party voters who are unable to obtain photo identification.

[14] The situation is slightly different for voters who have secured or could secure the necessary photo identification but, for some reason, will be unable to present such identification at the polls at the time of voting.[FN50] Under SEA 483, such voters will be allowed to vote, but only by utilizing a provisional ballot. Obviously, the exact identity of voters who will utilize provisional ballots because of their inadvertent lack of photo identification cannot be determined in advance. As a result, such affected voters also cannot assert their own rights in advance. Thus, the potential exclusion of votes by individuals intending to vote for Democratic candidates is sufficient to constitute an injury in fact to the Democrats; moreover, the potential exclusion of votes casts "doubt on the integrity" of the election. *See Campbell v. Louisiana,* 523 U.S. 392, 397, 118 S.Ct. 1419, 140 L.Ed.2d 551 (1998) (holding a criminal defendant "suffers a serious injury in fact because discrimination at the voir dire stage casts doubt on the integrity of the judicial process and places the fairness of a criminal proceeding in doubt"). Much like the criminal defendant in *Campbell,* the Democrats share a common interest with their affected supporters, to wit, the ability of such supporters to vote for their preferred candidates. Accordingly, we conclude that the Democrats have satisfied *Campbell' s* requirements for raising the third-party rights of voters who inadvertently are unable to present photo identification at the polls on election day.[FN51]

FN50. For example, their identification is stolen, forgotten, or lost.

FN51. *See also Sandusky County Democratic Party v. Blackwell,* 387 F.3d 565, 574 (6th Cir.2004) (finding a political party had standing to assert the rights of voters who "cannot know in advance that his or her name will be dropped from the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

rolls, or listed in an incorrect precinct, or listed correctly but subject to a human error by an election worker who mistakenly believes the voter is at the wrong polling place").

4. *Standing to Assert Rights of Named Individuals*

The Democrats claim they also have standing to assert the rights of the Named Individuals in this lawsuit. The Named Individuals all represent themselves to be members of the Democratic party and have consented to their representation by the Democrats in this lawsuit. Accordingly, though we can readily conclude that the Democrats have standing to assert the rights of these individuals, we are less clear concerning the specific rights the Named Individuals may possess in challenging the requirements of SEA 483. Whether the Named Individuals have standing must be assessed in terms of the two categories of claims advanced by the Democrats: first, with regard to the facial challenge to the photo identification requirement and, second, with regard to the equal protection claims under the 14th Amendment.

a. *Standing To Challenge The Photo Identification Requirement*

[15] Our review has brought us to the conclusion that none of the Named Individuals has presented an "injury in fact" sufficient to confer Article III standing to challenge the photo identification requirement. The Democrats have identified twelve individuals whom they contend will be harmed by SEA 483. We note initially that no evidence was adduced concerning either Christiana Bohlander or Corinne Collins, and a third person, Helen Wright, unfortunately, has died since the case was filed. Of the nine remaining Named Individuals whom the Democrats claim will be harmed by the provisions of SEA 483,[FN52] two possess **\*813** the photo identification required by SEA 483 to qualify to vote in person,[FN53] and another possesses a certified birth certificate which enables her to obtain the necessary photo identification from the BMV for free.[FN54] Moreover, all nine of these potential voters

are over the age of 65 and, therefore, automatically qualify to vote absentee, Ind.Code § 3-11-10-24 (a)(5), as at least three of them have done in the past.[FN55] Voting by absentee ballot instead of in person does not, by itself, constitute an injury in fact since there is no established constitutional right to vote in person.[FN56] Further, the Democrats have not presented any evidence to the Court that voting absentee would be an actual hardship for any of the Named Individuals and, as we have noted above, their "mere offense" in having to vote absentee is insufficient to confer Article III standing. *See,* Legal Analysis Section I(A), *supra.* Accordingly, we conclude that the photo identification requirement of SEA 483 will cause none of the Named Individual Plaintiffs any "injury-in-fact," thus depriving them of standing to assert these rights.[FN57]

> FN52. The nine individuals are: David Harrison, Constance Andrews, Barbara J. Smith, Imogene M. Chapman, Ernest L. Pruden, Helen L. Wright, Lois E. Holland, Ronald Yancey, Bettie L. Weiss, and Thelma Ruth Hunter.

> FN53. Constance Andrews and Robert Yancey both have photo identification.

> FN54. Imogene Chapman has a certified birth certificate.

> FN55. Lois Holland, Imogene Chapman, Barbara Smith have all voted absentee in the past.

> FN56. The Seventh Circuit, in *Griffin v. Roupas,* 385 F.3d 1128 (7th Cir.2004), held there was no constitutional right to vote by absentee ballot and, in so doing, implicitly held there was no constitutional right to vote in person. Indeed, the Seventh Circuit has held that with respect to voting methods, "One size need not fit all," noting that while some states allow every registered voter to vote by absentee ballot other states, such as Indiana, "have struck

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

a compromise between concern with fraud and concern with turnout by allowing only certain classes of voter to cast an absentee ballot." *Id.* at 1131 (citing for the former position: Cal. Election Code § 3003; Colo.Rev.Stat. § 1-8-102; Fla. Stat. Ann. § 101.662; Wash. Rev.Code Ann. § 29A.40.010; and for the latter: Ala.Code 1975 §§ 17-10-3(a) and (b); Ark.Code Ann. § 7-5-402; Md.Code Ann., Election Law § 9-304; Minn. St. § 203B.02; N.J. Stat. Ann. § 19:57-3; N.Y. Elec. Law § 8-400; Tex. Election Code Ann. § 82.001 (a)). *Id.* at 1131. Buttressing this logic is the fact that the Seventh Circuit observed, "[i]n Oregon, all ballots are absentee." *Id.* (citing O.R.S. § 254.465).

FN57. Democrats also claim that several of the Named Individuals do not want to vote absentee. However, the frustrated desire to vote in person is not an "injury-in-fact" as there is no recognized legal right to vote in the specific manner an individual may prefer. Indeed, were Democrats correct in their theory that there is a constitutional right to vote in person, in Oregon, where everyone votes by absentee ballot, every single Oregon voter would have had their constitutional rights infringed. *See* note 56, *supra.*

b. *Equal Protection Violation.*

[16][17] The Named Individuals who are without photo identification, however, can assert an equal protection claim on the grounds that they have been disadvantaged relative to certain classes of voters who possess photo identification or are not required to present photo identification. As the Seventh Circuit explained:

When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he

would have obtained the benefit but for the barrier in order to establish standing. The "injury in fact" in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not **\*814** the ultimate inability to obtain the benefit.

*Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton,* 422 F.3d 490, 497 (7th Cir.2005) (citing *Northeastern Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville,* 508 U.S. 656, 666, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993)). Therefore, all the Named Individuals have standing in their own right to bring an equal protection challenge to SEA 483 and the Democrats have standing to assert said rights on their behalf.

C. *Standing of Rep. Crawford and Mr. Simpson.*

Rep. Crawford and Mr. Simpson contend they have individual standing in their own right and standing to assert the rights of voters in their respective constituent districts. We are of the view that Rep. Crawford and Mr. Simpson lack standing both in their own right and in their representative capacities for the reasons we explain below.

1. *Personal Standing*

Both Rep. Crawford and Mr. Simpson already have the photo identification necessary to entitle them to vote in person under SEA 483, although they say they are offended at having to present photo identification. As explained above, the offense they feel does not confer on them Article III standing. *See,* Legal Analysis Section I(A), *supra.* FN58

FN58. Rep. Crawford and Mr. Simpson would have standing to raise an equal protection claim; however, they did not do so themselves nor do they appear to join in the Democrats' equal protection claim.

[18] Both Rep. Crawford and Mr. Simpson also contend that they risk receiving fewer votes if SEA 483 is enacted; however, this claim has not been

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

supported by any evidence or concrete facts. Their speculations about the impact of SEA 483 do not "establish that they have sustained or are immediately in danger of sustaining some direct injury." *See, e.g., Albiero v. City of Kankakee,* 246 F.3d 927, 933 (7th Cir.2001) (holding a plaintiff's self-serving statements, unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment); *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir.1994) (stating: "If the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in her favor on a material question, then the court must enter summary judgment against her."). Thus, Crawford and Simpson have failed to establish that SEA 483 will cause them personally an "injury-in-fact."

2. *Standing Based on Harm to Voters in Their Districts.*

[19] Rep. Crawford and Mr. Simpson also contend they have standing to raise the injuries encountered by voters in their respective districts. With respect to voters who face an insurmountable barrier to obtaining photo identification prior to the election, any injury such voters would suffer as a result of SEA 483 is already identifiable and concrete, and there is no reason to assume they are not able to assert their rights on their own. Moreover, no evidence has been cited that identifies any such voters in either constituency group who stand to be harmed by SEA 483.[FN59] Rep. Crawford and Mr. Simpson have the burden of establishing the third-**\*815** party injuries upon which they base their claim of standing, a burden they have failed to meet. Accordingly, Rep. Crawford and Mr. Simpson lack standing to assert the third-party rights of hypothetical voters in their respective districts.

> FN59. Rep. Crawford and Mr. Simpson maintain that voters in their districts have told them that they will be unable to vote if they are required to present photo identification. Setting aside the obvious hearsay

problem with these statements, neither candidate specifically identified any of these individuals or presented any affidavits in support of his assertion

[20] However, as explained in our prior discussion of standing on the part of the Democrats, the situation is slightly different for voters who have secured or could secure the necessary photo identification but, for some reason, may prove unable to present such identification at the polls at the time of voting. Applying the same reasoning, we hold that Rep. Crawford and Mr. Simpson have standing to assert the rights of voters who, through inadvertence, are unable to present photo identification at the polls. *See* Legal Analysis Section I(B)(3), *supra.*[FN60]

> FN60. That said, we remain unclear whether Rep. Crawford and Mr. Simpson are actually raising a claim based on the rights of inadvertently affected voters.

D. *Standing of Organization Plaintiffs*

The Organization Plaintiffs attempt to establish standing to seek relief (1) in their own right, (2) based on the rights of their members, and (3) based on the rights of the individuals they serve. The legal theories upon which the Organization Plaintiffs rely, however, have all been rejected by the Seventh Circuit, making their efforts to convince this court otherwise, at best, an uphill struggle.

1. *Standing in Their Own Right.*

[21] Although the Organization Plaintiffs have not alleged, much less proven, any direct injury to themselves as a result of SEA 483, they argue that they have standing in their own right because, if the law is upheld, it will require them to shift resources away from their existing programs and into efforts aimed at helping voters comply with SEA 483's requirements. This novel interpretation of "direct injury" is, say the Organization Plaintiffs, premised on *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), where the Supreme Court held:

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities-with the consequent drain on the organization's resources-constitutes far more than simply a setback to the organization's abstract social interests. We therefore conclude, as did the Court of Appeals, that in view of HOME's allegations of injury it was improper for the District Court to dismiss for lack of standing the claims of the organization in its own right.

*Id.* at 379, 102 S.Ct. 1114 (footnote and internal citation omitted). However, the reasoning in *Havens* is not applicable to this case for at least four reasons.

First, the organizational standing recognized in *Havens* and its progeny was specifically limited to the context of fair-housing agencies involved in investigating instances of housing discrimination. *See Village of Bellwood v. Dwivedi,* 895 F.2d 1521, 1526 (7th Cir.1990)* (" *Havens* makes clear, however, that the only injury which need be shown to *confer standing on a fair-housing agency* is deflection of the agency's time and money from counseling to *legal efforts directed against discrimination.*" ) (emphasis added); *see, also, Gorski v. Troy,* 929 F.2d 1183, 1188 (7th Cir.1991) (describing the *Dwivedi* decision as "recogniz[ing] the broad standing principles embodied in the [Fair Housing Act]"). While the Seventh Circuit has continued to apply *Havens* to Fair Housing**816 Act claims, *see City of Chicago v. Matchmaker Real Estate Sales Center, Inc.,* 982 F.2d 1086, 1095 (7th Cir.1992), our research has not uncovered a single Seventh Circuit case in the nearly twenty-four years since *Havens* was decided by the Supreme Court which applied this analysis outside of the context of housing discrimination; indeed, the Organization Plaintiffs have cited no such decision. Accordingly,

there being no support for the Organization Plaintiffs' contention that the Seventh Circuit would extend *Havens* beyond the context of fair-housing agencies investigation housing discrimination, we decline to do so *sua sponte.*

Second, in both *Havens* and *Dwivedi,* plaintiffs had already expended resources in order to investigate and uncover the defendant's illegal discrimination which allowed the Court to rule that the defendants' discrimination had caused the plaintiffs to suffer an injury in fact. In the case at bar, the Organization Plaintiffs vaguely assert that, as a result of SEA 483, they will, under undefined circumstances in the future, be required to divert unspecified resources to various outreach efforts.[FN61] Moreover, to the extent that Plaintiffs have already expended resources investigating the impact of SEA 483, such efforts have apparently uncovered no identifiable persons who will be unable to vote, no evidence of racial discrimination, and no convincing evidence of a disproportionate impact on low-income would-be voters. Such imprecise and speculative claims concerning potential future actions designed to combat speculative discrimination are a far cry from the kind of organizational expenditures found to convey standing in *Havens* and *Dwivedi.* Thus, because the alleged actions of the Organization Plaintiffs are not analogous to actions of the fair-housing agencies in *Havens* and *Dwivedi,* we conclude there is no basis for standing here.[FN62]

FN61. *See, e.g.,* ICLU's Reply Brief at 3-4 (asserting that as a result of SEA 483: "IRCIL will have to devote more of its staffing resource on working with clients to try to collect the information necessary to obtain an identification card.... The passage of the Voter ID law will require Concerned Clergy to expend limited financial resources to assist persons with the costs of birth certificates so that they can vote.... [The Indianapolis NAACP] Chapter will be involved in educational and outreach ef-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

forts to inform the public about the law so as to maximize the number of persons who will be able to vote. These efforts will divert the [NAACP] from engaging in other activities inasmuch as it has limited time and membership resources.") (internal citations omitted).

FN62. In addressing this same argument, the D.C. Circuit reached a similar conclusion, observing:

The Court [in *Havens* ] did not base standing on the diversion of resources from one program to another, but rather on the alleged injury that the defendants' actions themselves had inflicted upon the organization's programs. To be sure, the Court did mention the "drain on the organization's resources". Yet this drain apparently sprang from the organization's need to "counteract" the defendants' assertedly illegal practices, and thus was simply another manifestation of the injury that those practices had inflicted upon "the organization's noneconomic interest in encouraging open housing"....

*Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corp.,* 28 F.3d 1268, 1277 (D.C.Cir.1994).

Third, the claimed injury suffered by the Organization Plaintiffs is entirely of their own making since any future reallocation of resources would be initiated at the Organization Plaintiffs' sole and voluntary discretion. Such an optional programming decision does not confer Article III standing on a plaintiff. As the D.C. Circuit observed: "The diversion of resources ... might well harm the [plaintiff's] other programs,**\*817** for money spent on testing is money that is not spent on other things. But this particular harm is self-inflicted; it results not from any actions taken by [defendant], but rather from the [plaintiff's] own budgetary choices." *Fair Em-*

*ployment Council of Greater Washington, Inc. v. BMC Marketing Corp.,* 28 F.3d 1268, 1276 (D.C.Cir.1994).

Fourth, the interpretation of *Havens* proffered by the Organization Plaintiffs, if accepted, would completely eviscerate the standing doctrine. If an organization obtains standing merely by expending resources in response to a statute, then Article III standing could be obtained through nothing more than filing a lawsuit. Such an interpretation flies in the face of well-established standing principles. Indeed, "[a]n organization cannot, of course, manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit. Were the rule otherwise, any litigant could create injury in fact by bringing a case, and Article III would present no real limitation." *Spann v. Colonial Village, Inc.,* 899 F.2d 24, 27 (D.C.Cir.1990); *see also Fair Housing Council of Suburban Philadelphia v. Montgomery Newspapers,* 141 F.3d 71, 78-79 (3d Cir.1998). We have no indication that either the Supreme Court or the Seventh Circuit is inclined to abolish the standing requirement for federal lawsuits;    FN63   thus, we decline the Organization Plaintiffs' invitation to do so ourselves.

FN63. To the contrary, the Seventh Circuit recently characterized the standing requirement as "essential and unchanging." *DH2, Inc. v. U.S. S.E.C.,* 422 F.3d 591, 596 (7th Cir.2005).

For these reasons, we conclude that the Organization Plaintiffs lack standing in their own right to challenge SEA 483.

2. *Standing to Represent Their Members.*

[22] The Organization Plaintiffs next claim that they have standing because their members have standing as reflected by evidence they have proffered "demonstrat[ing] that members of each organization are facing injury," ICLU's Reply Brief at 11. However, what the Organization Plaintiffs have presented to the Court in this regard is nothing more than unsupported assertions. None of the Or-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

ganization Plaintiffs has identified a single member who does not already possess the required photo identification and has an injury beyond "mere offense" at having to present photo identification in order to vote which, as we have said, does not confer standing. *See* Legal Analysis Section I(A), *supra.* The problem with the Organization Plaintiffs' "standing in [their] representational capacity is that [they have] not alleged, much less proven that any of [their] members or directors either suffered an injury or was threatened with immediate injury to the extent that the member or director would be able to make out a justiciable case had he brought suit himself." *Hope, Inc. v. DuPage County, Ill.,* 738 F.2d 797, 814 (7th Cir.1984). Since the Organization Plaintiffs have failed to demonstrate "that any party that [they] represent[ ] as a 'member' has standing, [they do] not have standing as that member's representative." *See, also, Fund Democracy, LLC v. S.E.C.,* 278 F.3d 21, 27 (D.C.Cir.2002) (holding the plaintiff lacked Article III standing because it did "not identify a single affiliate who has invested or is considering investing in Hillview Funds"); *Doe v. Stincer,* 175 F.3d 879, 886-87 (11th Cir.1999) (explaining: "The right to sue on behalf of its constituents, however, does not relieve the Advocacy Center of its obligation to satisfy Hunt's first prong by showing that one of its constituents otherwise had standing to sue"). Accordingly, the Organization Plaintiffs do not have representational standing to assert **\*818** their members' rights to challenge SEA 483.[FN64]

> FN64. The Organization Plaintiffs would have standing to raise an equal protection claim on behalf of their members; however, they did not raise such a claim themselves and do not appear to have joined in the Democrats' equal protection claim.

3. *Expanded Representational Standing, Including Individuals The Organization Plaintiffs Serve.*

[23] The Organization Plaintiffs attempt to expand their representational capacity by reaching out

to include as members all the individuals they serve;[FN65] however, this approach has been explicitly rejected by the Seventh Circuit. In *Hope, Inc. v. DuPage County, Ill.,* the Seventh Circuit held:

> FN65. *See, e.g.,* ICLU's Reply Brief at 10 ("IRCIL considers its members to be the disabled persons to whom it provides services.") (citing Madill Dep. at 19).

Amicus curiae attempts to expand HOPE's representational capacity, however, by extending it beyond HOPE's members and directors to all persons for whom HOPE seeks housing. This argument ignores the fact that standing in representational capacity requires that the representative litigate on behalf of members who would have standing in their own right, and furthermore, that the group of low and moderate income persons, for which HOPE seeks housing in DuPage County, are not and cannot be considered members of HOPE. *The Supreme Court has not seen fit to extend representational capacity standing to entities other than associations which actually represent interests of parties whose affiliation with the representational litigant is that of membership with the representative or substantial equivalent of membership. We likewise decline to further extend representational standing.* *Hope,* 738 F.2d at 814 (emphasis added). The holding in *Hope* is controlling here: an organization cannot unilaterally expand its representational capacity to include all the individuals it serves. Accordingly, the Organization Plaintiffs lack representational standing to bring this case on behalf of the persons served by them.[FN66]

> FN66. To buttress their contentions, Plaintiffs unconvincingly cite to a line of cases already distinguished by the Seventh Circuit- *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *Oregon Advocacy Center v. Mink,* 322 F.3d 1101, 1110 (9th Cir.2003); and *Doe v. Stincer,* 175 F.3d 879 (11th Cir.1999). All

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

of these cases involved legislatively created agencies tasked with representing specific constituencies which were found to be the equivalent of "members." *See Hope,* 738 F.2d at 814 (explaining how in *Hunt,* the "Supreme Court looked to the fact that the Advertising Commission's constituency was effectively the equivalent of 'members' to justify its holding that the Commission had standing as the growers' representative."); *Oregon Advocacy Center,* 322 F.3d at 1110 (holding: "Given OAC's statutory mission and focus under PAMII, its constituents are the functional equivalent of members for purposes of associational standing."); *Doe,* 175 F.3d at 886 (stating: "In a very real sense ..., as in *Hunt,* the Advocacy Center represents the State's individuals with mental illness and provides the means by which they express their collective views and protect their collective interests.") (internal quotation omitted).

In *Hope,* the Seventh Circuit had the opportunity but declined to expand the *Hunt* reasoning beyond the legislatively created advocacy agencies. Instead, in that case, the Seventh Circuit found that the individuals served by the plaintiff nonprofit advocacy group "are not and cannot be considered members." *Hope,* 738 F.2d at 814. In fact, the Seventh Circuit explicitly rejected the arguments now raised by the Organization Plaintiffs, explaining:

[R]eliance on *Hunt* for extending the reach of representational standing to those individuals who do not have the characteristics of a member of the representative organization is misguided. In *Hunt,* the Court was faced with a state agency, the Washington State Apple Advertising Commission, which was at-

tempting to litigate on behalf of Washington apple growers. According to the Court, the issue was whether the Advertising Commission's status as a state agency "rather than a traditional voluntary membership organization, preclude[d] it from asserting the claims of the Washington apple growers and dealers who form[ed] its constituency."

*Id.* (quoting *Hunt,* 432 U.S. at 344, 97 S.Ct. 2434)

In the case at bar, none of the Organization Plaintiffs has alleged that it is a legislatively created body specifically charged with representing a certain constituency; therefore, the reasoning in *Hope* is controlling here. Accordingly, the Organization Plaintiffs cannot unilaterally assert representational standing for the individuals they serve.

IRCIL attempts to slide into the *Hunt* exception by stating that it receives federal funding under Title 7 of the Rehabilitation Act, 29 U.S.C. § 796f-4, and that this statute imposes certain concurrent obligations on the organization. However, IRCIL points to no federal statute authorizing it or other such "protection and advocacy organizations ... to act as agencies to protect and enforce the rights of individuals." *Doe,* 175 F.3d at 886. As such, IRCIL is not the equivalent of the advocacy groups which are permitted representational standing under *Hunt* and its progeny.

**\*819** [24] Assuming *arguendo* that the Organization Plaintiffs were able to assert representational standing based on the individuals they serve, they still have not made the requisite showing to substantiate their entitlement to standing. Specifically, the Organization Plaintiffs have not been able to provide admissible evidence of any individual

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

who will not be able to vote if required to present a photo identification, let alone to obtain photo identification. The only information provided to the court are the unsubstantiated hearsay statements alleging that unnamed individuals will be burdened by SEA 483; such statements are totally lacking in fending off summary judgment. *See, e.g., Albiero v. City of Kankakee,* 246 F.3d 927, 933 (7th Cir.2001) (holding that a plaintiff's self-serving statements, unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment); *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir.1994) (stating: "If the nonmovant does not come forward with evidence that would reasonably permit the finder of fact to find in her favor on a material question, then the court must enter summary judgment against her.").[FN67]

> [FN67.] Plaintiffs argue they do not have to identify specific individuals whom will be harmed by SEA 483, instead they merely have to demonstrate it is certain that injury will occur. For support, Plaintiffs cite to several the out-of-circuit decisions. *See Sandusky County Democratic Party v. Blackwell,* 387 F.3d 565, 574 (6th Cir.2004) (holding that although it was inevitable that some voters would be impacted, an individual "voter cannot know in advance that his or her name will be dropped from the rolls, or listed in an incorrect precinct, or listed correctly but subject to a human error by an election worker who mistakenly believes the voter is at the wrong polling place."); *Bay County Democratic Party v. Land,* 347 F.Supp.2d 404, 422 (E.D.Mich.2004) (hereinafter " *Bay County*" ) (explaining "The exact identity of the group of qualified voters who will cast provisional ballots from incorrect polling places, by definition, cannot be known.") *Miller v. Blackwell,* 348 F.Supp.2d 916, 920 (S.D.Oh.2004) (relying on *Sandusky* and *Bay County* ). There are several reasons why these cases

are not persuasive authority for this court. First and foremost, those courts were not bound by controlling Seventh Circuit law. Second, the courts in *Sandusky* and *Bay County* conducted their analysis under the more lenient standards applied to motions for preliminary injunctions and motions to dismiss. Third, based on the nature of the statutes challenged in *Sandusky* and *Bay County,* the courts acknowledged that it was impossible to know prior to the election the identity of which voters would be injured. This is not the situation in the case at bar. Indeed, the Democratic Party has attempted to specifically identify individuals who will be injured by SEA 483 and it appears the Organization Plaintiffs have as well. For these reasons, we decline to adopt the reasoning in these out of circuit cases. The Democrats also cite to the district court case of *Smith v. Boyle,* 959 F.Supp. 982, 985 (C.D.Ill.1997). However, in *Smith,* the Court found the Chairman of the Illinois Republican Party has standing to sue and, by extension, the Illinois Republican Party, of which he was a member. In the case at bar, Plaintiffs have not identified any of their members who has standing to challenge SEA 483 in his/her own right.

**\*820** E. *Standing Summary.*

In sum, then, we hold that the Democrats have established standing to assert their own associational rights, the equal protection rights of the Named Individuals, and the rights of voters who through inadvertence will not be able to present photo identification at the polls the day of the election; and that Rep. Crawford and Trustee Simpson have standing to assert the rights of voters who inadvertently cannot present photo identification at the polls. The Organizational Plaintiffs' claims are dismissed for lack of standing to seek the constitutional relief they are claiming.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

II *Plaintiffs' Constitutional Challenges to the Photo Identification Requirement*

Plaintiffs' basic claim in this lawsuit is that the photo identification requirements of SEA 483 violate the First and Fourteenth Amendments to the U.S. Constitution because they place a severe burden on the right to vote. Because of these burdens, Plaintiffs maintain that the law is subject to strict scrutiny; indeed, nearly all of Plaintiffs' myriad constitutional challenges to the photo identification requirement incorporate some version of their strict scrutiny argument. Plaintiffs, however, have failed to demonstrate that strict scrutiny of SEA 483 is warranted, primarily because they have totally failed to adduce evidence establishing that any actual voters will be adversely impacted by SEA 483. Accordingly, for the reasons explained in detail below, Plaintiffs' constitutional challenge is unavailing.

A. *Background on the Right to Vote and a State's Right to Regulate Elections*

[25][26][27] The Supreme Court has recently reiterated this basic democratic principle: "It is beyond cavil that 'voting is of the most fundamental significance under our constitutional structure.' " *Burdick v. Takushi,* 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (quoting *Illinois Bd. of Elections v. Socialist Workers Party,* 440 U.S. 173, 184, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979)). That said, there is no absolute constitutional right to vote in any specific manner an individual may desire nor is there an absolute right to associate, without restriction, for political purposes through the ballot, *id.* (citing *Munro v. Socialist Workers Party,* 479 U.S. 189, 193, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986)). The United States Constitution grants "to the States a broad power to prescribe the 'Times, Places and Manner of holding Elections for Senators and Representatives,' Art. I, § 4, cl. 1, which power is matched by state control over the election process for state offices." *Tashjian v. Republican Party of Connecticut,* 479 U.S. 208, 217, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986). The Constitution itself plainly "compels the conclusion that government must play an active role in structuring elections;" since " 'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.' " *Burdick v. Takushi,* 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (quoting **\*821***Storer v. Brown,* 415 U.S. 724, 730, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974)); *Tashjian,* 479 U.S. at 217, 107 S.Ct. 544; *see also Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 358, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997) (holding "that States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election-and campaign-related disorder."). Pursuant to Art. I, § 4, cl. 1, "state legislatures may, without transgressing the Constitution, impose extensive restrictions on voting." *Griffin v. Roupas,* 385 F.3d 1128, 1130 (7th Cir.2004). A state's broad authority to regulate elections, however, is tempered by the aforementioned provisions of the Constitution which protect individual citizens' rights; specifically, "[t]he power to regulate the time, place, and manner of elections does not justify, without more, the abridgment of fundamental rights, such as the right to vote ... or ... the freedom of political association." *Tashjian,* 479 U.S. at 217, 107 S.Ct. 544 (internal citation omitted).

[28][29] In balancing these potentially conflicting constitutional principles:

A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

*Burdick,* 504 U.S. at 434, 112 S.Ct. 2059 (quoting *Anderson v. Celebrezze,* 460 U.S. 780, 788, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983); citing *Tashjian,* 479 U.S. at 213-14, 107 S.Ct. 544).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

"Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.' " *Timmons,* 520 U.S. at 358-59, 117 S.Ct. 1364 (quoting *Burdick,* 504 U.S. at 434, 112 S.Ct. 2059; *Anderson,* 460 U.S. at 788, 103 S.Ct. 1564; *Norman v. Reed,* 502 U.S. 279, 288-89, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992)). Unfortunately, "no bright line separates permissible election-related regulation from unconstitutional infringements on First Amendment freedoms." *Timmons,* 520 U.S. at 359, 117 S.Ct. 1364 (internal citation omitted).

B. *Standard of Review in passing on the constitutionality of SEA 483*

[30] We begin by noting that Plaintiffs' arguments proceed from the oft-criticized, but nonetheless frequently invoked, "erroneous assumption that a law that imposes any burden upon the right to vote must be subject to strict scrutiny." *Burdick v. Takushi,* 504 U.S. 428, 432, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992).[FN68] As the Supreme Court explained in *Burdick:*

FN68. *See, e.g.,* Democrats' Brief in Supp. at 28 ("As the most elemental expression of civic participation, and the most prominent self-correcting feature of our form of government, any governmental activity which impedes or burdens the right to vote can survive only if the challenged law or procedure both promotes a compelling state interest and is narrowly tailored to achieve that compelling interest."); and ICLU's Reply Brief at 26 ("Given that the statute will prevent some persons from being able to vote and will erect barriers against others, it is clear that the law does impose a serious burden on the right to vote ... if the right to vote is severely burdened, the regulation can be upheld

only if it is narrowly drawn to support a compelling state interest.")

Election laws will invariably impose some burden upon individual voters. Each provision of a code, "whether it governs the registration and qualifications**822 of voters, the selection and eligibility of candidates, or the voting process itself, Inevitably affects-at least to some degree-the individual's right to vote and his right to associate with others for political ends." *Anderson v. Celebrezze,* 460 U.S. 780, 788, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). Consequently, to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest, as petitioner suggests, would tie the hands of States seeking to assure that elections are operated equitably and efficiently.

*Id.* at 433, 112 S.Ct. 2059. Similarly, strict scrutiny of an election law is not warranted merely because it may prevent some otherwise eligible voters from exercising that right. As the Seventh Circuit observed: "Any [election] restriction is going to exclude, either de jure or de facto, some people from voting; the constitutional question is whether the restriction and resulting exclusion are reasonable given the interest the restriction serves." *Griffin v. Roupas,* 385 F.3d 1128, 1130 (7th Cir.2004) (citing *Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 358-59, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997); *Burdick v. Takushi,* 504 U.S. 428, 438-42, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992); *Nader v. Keith,* 385 F.3d 729 (7th Cir.2004); *Libertarian Party v. Rednour,* 108 F.3d 768, 773 (7th Cir.1997); *Werme v. Merrill,* 84 F.3d 479, 483-84 (1st Cir.1996)).

1. *Strict Scrutiny of SEA 483 Is Not Warranted*

[31] Strict scrutiny means "[t]he State must show that the 'regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.' " *Burson v. Freeman,* 504 U.S. 191, 198, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992) (quoting *Perry Ed. Assn. v. Perry Local*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

*Educators' Assn.,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983); citing *Board of Airport Comm'rs of Los Angeles v. Jews for Jesus, Inc.,* 482 U.S. 569, 573, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987); *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.,* 473 U.S. 788, 800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985); *United States v. Grace,* 461 U.S. 171, 177, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983)).

[32] In arguing that SEA 483 should be subject to strict scrutiny, Plaintiffs face enormous challenges based on the evidence they have submitted to the court. In particular, Plaintiffs have failed to submit: (1) evidence of any individuals who will be unable to vote or who will be forced to undertake appreciable burdens in order to vote; and (2) any statistics or aggregate data indicating particular groups who will be unable to vote or will be forced to undertake appreciable burdens in order to vote. Instead, they have concentrated their evidence and arguments on the burdens of obtaining a driver's license or identification card from the BMV, which matter is ultimately irrelevant in this case because of (1) and (2) above. Accordingly, Plaintiffs have not demonstrated that SEA 483 will impose severe burdens on the rights of voters, thereby rendering strict scrutiny unwarranted. We now address each of these points:

a. *Plaintiffs have presented no evidence of any individuals who will be severely burdened by this law.*

Despite apocalyptic assertions of wholesale voter disenfranchisement, Plaintiffs have produced not a single piece of evidence of any identifiable registered voter who would be prevented from voting pursuant to SEA 483 because of his or her inability to obtain the necessary photo identification. Similarly, Plaintiffs have failed to produce any evidence of any individual, registered or unregistered, who would have to obtain photo identification in **\*823** order to vote, let alone anyone who would undergo any appreciable hardship to obtain photo identification in order to be qualified to vote. In contrast to any reliable, specific evidence, nearly all of the ori-

ginal ICLU Plaintiffs assert that they know of people (or know of people who know of people) who claim they will not be able to vote as a result of SEA 483. [FN69] But, *none* of these allegedly affected individuals has been identified by name, let alone submitted an affidavit. [FN70] The Democrats, for their part, submitted the names of several individuals who they claim would be unable to vote as a result of SEA 483; however, each and every one of the individuals identified by the Democrats is either eligible to vote absentee, already had acceptable photo identification or could obtain acceptable photo identification if needed. [FN71]

FN69. *See* ICLU's Brief in Supp. at 13-14, 24-28.

FN70. Kristjan Kogerma submitted an affidavit asserting that he was unable to obtain an identification card from the BMV because he is homeless and thus "did not have anything on it with proof of my address." Kogerma Aff. at ¶¶ 6, 8. Mr. Kogerma's affidavit is problematic for three reasons: First, there is no indication that Mr. Kogerma is registered to vote in Indiana or has any intention to do so. Second, assuming Mr. Kogerma is registered to vote in Indiana, his voter registration card can serve as proof of his Indiana residency. Third, if Mr. Kogerma is indigent, as his homeless status would suggest, he is explicitly exempted from the photo identification requirement of SEA 483.

FN71. There is no evidence that voting absentee would be a burden or hardship for any of these individuals; indeed, three of the Named Individuals disclosed they had voted absentee in past elections. As discussed above, several of the Named Individuals apparently do not wish to vote absentee; however, this abrogation of their personal preferences is not a cognizable injury or hardship.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

Plaintiffs' inability to provide the names or otherwise identify any particular affected individuals persists despite various polls and surveys that were conducted for the specific purpose of discovering such individuals. The Democrats' failure in this regard is particularly acute in light of their assertion that nearly one million of Indiana's registered voters do not possess an Indiana driver's license or photo identification.[FN72]

> **FN72.** As we discuss in Factual Background Factual Background Section VII, *supra,* support for the Democrats' assertion comes from the report of their expert, Kimball W. Brace, whose analysis and conclusions we deemed so utterly unreliable that we omitted them from consideration in reaching our decision.

We do not doubt that such individuals exist somewhere, even though Plaintiffs were unable to locate them. However, it is a testament to the law's minimal burden and narrow crafting that Plaintiffs have been unable to uncover anyone who can attest to the fact that he/she will be prevented from voting despite the concerted efforts of the political party and numerous interested groups who arguably represent the most severely affected candidates and communities. Lacking any such individuals who claim they will be prevented from voting, we are hard pressed to rule that SEA 483 imposes a severe burden on the right to vote. To the contrary, we conclude that Plaintiffs' lack of evidence confirms that SEA 483 is narrowly tailored because every hypothetical individual who Plaintiffs assert would be adversely affected by the law actually benefits from one of its exceptions.

b. *Plaintiffs have not presented statistical evidence of any groups who will be severely or disproportionately burdened.*

Plaintiffs' efforts to introduce statistical data about the number of affected individuals is similarly unavailing. On the one hand, the conclusions of the "expert" report**824** commissioned by the Democrats to account for the number of registered

voters without an Indiana driver's license or identification card are totally unreliable, *see* Factual Background Section VII, *supra.* To the extent that the Brace report reveals anything relevant, it is limited to the fact that the vast majority, which is to say up to 99%, of Indiana's registered voters already possess an Indiana driver's license or an identification card. On the other hand, the ICLU Plaintiffs have submitted the results of polls and surveys, some of them admittedly very informal and unscientific, which purport to establish the impact of SEA 483 on various groups, such as the homeless, low-income, elderly and disabled. However, none of these polls or surveys actually indicates that SEA 483 imposes a severe burden on the rights of the voters in these groups. At best, the ICLU Plaintiffs' information reveals that several groups which are not required under SEA 483 to obtain photo identification in order to vote would be burdened to some extent if they were required to do so.[FN73] Plaintiffs, therefore, have not provided the Court with any evidentiary basis on which to conclude that the rights of Indiana voters, let alone any particular disadvantaged segment of the population, will be severely burdened by the requirements of SEA 483.

> **FN73.** The closest any verifiable poll comes to discussing the impacts of SEA 483 is from AARP Indiana, which represents that 97% of its members over the age of 60 already had acceptable photo identification in order to vote. This poll, however, is tangential to the issues in this case since the elderly are automatically entitled to vote absentee under Indiana law. Ind.Code § 3-11-10-24(a)(5) (the State suggests the word "elderly" refers to individuals over the age of 65, *See* State's Brief in Supp. at 34). Similarly, the IRCIL reported that, although an estimated 10%-15% of its members expressed general concerns about SEA 483, none of its members indicated they would be unable to vote as a result of the legislation. *See*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

Madill Dep. at 11. Moreover, even if members of the IRCIL had indicated they would be unable to vote in person as a result of SEA 483, the disabled are also entitled to vote absentee under Indiana law, *see* Ind.Code § 3-11-10-24(a)(4). Finally, the ICHHI conducted a survey of its members asking, through very leading questions, if they knew of homeless individuals without photo identification and if they were aware of various difficulties homeless individuals face with respect to obtaining photo identification. *See* Reinke Dep., Att. # 3. We are not sure what to make of this survey, beyond the obvious hearsay-within-hearsay-within-hearsay problems since, there is no discussion of whether any of the affected individuals are registered to vote, intend to register to vote, or would qualify for the indigent exception, as their homeless status would suggest.

c. *Plaintiffs' arguments concerning the difficulty of obtaining photo identification are similarly unavailing.*

[33] Plaintiffs have included voluminous argument and discussion in their submissions describing the requirements for obtaining photo identification from the BMV and demonstrating that they are "an onerous and expensive burden for some voters and an impossible one for others." FN74 However, we have no evidence before us that any individual or groups will be required to undertake this "onerous and expensive burden" in order to vote. As previously noted, the vast majority of Indiana's voting age population already appears to possess a driver's license or identification card; thus, SEA 483 cannot be deemed to impose any new burdens on these voters in order to vote. Moreover, the individuals and groups that Plaintiffs contend will be disproportionately impacted by SEA 483 all appear fully capable of availing themselves of the law's exceptions so that they do not need to obtain photo identification in order to vote. Thus, there **\*825** is no

basis to attribute or extend the burdens of obtaining a driver's license or identification card from the BMV to the act of voting.FN75

> FN74. ICLU's Brief in Supp. at 1.

> FN75. We do not doubt that there might be registered voters who do not qualify for any exceptions and, thus, will have to obtain photo identification in order to vote. However, the mere fact that a voting regulation excludes some voters is not enough to warrant strict scrutiny. *Griffin v. Roupas,* 385 F.3d 1128, 1130 (7th Cir.2004). Moreover, any analysis we might attempt to undertake involving such individuals would be purely speculative since no admissible evidence as been adduced to establish their numerosity or even their existence. These failures of proof vividly illustrate the importance of Article III standing: instead of waiting for truly aggrieved parties to bring a lawsuit to redress their real injuries, Plaintiffs have saddled the Court with a weakly conceived lawsuit brought by parties most of whom only marginally satisfy the standing requirements but all of whom obviously strongly dislike the challenged law for partisan and/or personal reasons. As a result, the Court has been repeatedly required to respond to vague hypotheticals and speculation rather than concrete and actual harms.

Accordingly, we conclude that SEA 483's photo identification requirement for in-person voting does not impose a severe burden on the right to vote, thus removing the necessity to subject the law to strict scrutiny.

C. *Reasonable Justification for SEA 483's Photo Identification Requirement.*

[34] Having determined that strict scrutiny is not warranted, "the constitutional question is whether the restriction and resulting exclusion are

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

reasonable given the interest the restriction serves." *Griffin v. Roupas,* 385 F.3d 1128, 1130 (7th Cir.2004). The State argues that it has a recognized interest in ascertaining a voter's identity and discouraging voter fraud which interest fully justifies the photo identification requirements of SEA 483.

[35] It is beyond dispute that Indiana has a compelling interest in ascertaining an individual's identity before allowing the person to vote. FN76 It is also well-established that Indiana has an important interest in preventing voter fraud. As the Supreme Court has observed:

> FN76. *See, e.g.,* ICLU's Reply Brief at 27 (conceding that "protecting against fraud is an important, if not compelling, interest in general").

It cannot be doubted that these comprehensive words [of Article I § 4] embrace authority to provide a complete code for congressional elections, not only as to times and places, but in relation to ... *prevention of fraud and corrupt practices ...* to enact the numerous requirements as to procedure and safeguards which experience shows as necessary in order to enforce the fundamental right involved. *Smiley v. Holm,* 285 U.S. 355, 366, 52 S.Ct. 397, 76 L.Ed. 795 (1932) (emphasis added). Moreover, in examining an election regulation aimed at combating fraud, courts are well advised to pay additional deference to the legislative judgment because "the striking of the balance between discouraging fraud and other abuses and encouraging turnout is quintessentially a legislative judgment with which we judges should not interfere unless strongly convinced that the legislative judgment is grossly awry." *Griffin v. Roupas,* 385 F.3d 1128, 1131 (7th Cir.2004).

We have no basis to conclude that the General Assembly's legislative judgment in enacting SEA 483 was grossly awry. The State Legislature sought through this statute to advance the interest of combating voter fraud by requiring that in-person voters

present a form of photo identification that virtually all registered voters already possess. The State repeatedly notes in defending its enactment that presentation of photo identification is routinely **\*826** required for a multitude of everyday activities-from boarding a plane, entering a federal building, to cashing a check. FN77 The incontrovertible fact that many public and private entities already require individuals to present photo identification substantially bolsters the State's contention that "[a]mong all the possible ways to identify individuals, government-issued photo identification has come to embody the best balance of cost, prevalence, and integrity." State's Brief in Supp. at 23.

> FN77. *See* State's Ex. 1 at 18; *see also* Legal Analysis Section VIII(A), *infra* (discussing Plaintiffs' Motion to Strike this evidence).

We therefore accept and concur in the State's "important regulatory interest" in combating voter fraud and find it sufficient to justify the "reasonable, nondiscriminatory restrictions" contained in SEA 483. *See Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 358-59, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997).

Plaintiffs' response to the State's justification for the voter identification requirements has been that there are no documented cases of in-person voter impersonation in Indiana; that argument misses the point, however, because the State is not required to produce such documentation prior to enactment of a law. The Supreme Court has stressed that there is no requirement of "elaborate, empirical verification of the weightiness of the State's asserted justifications." *Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 364, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997); *See also Munro v. Socialist Workers Party,* 479 U.S. 189, 195-196, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986) (noting: "Legislatures ... should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively, provided that the response is reasonable and does not significantly impinge on

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

constitutionally protected rights").

Assuming *arguendo* that the State was required to empirically substantiate its justification for SEA 483, in our view it has clearly done so. The State cites incidents of reported in-person fraud in recent elections in Florida, Georgia, Missouri, New York, Washington, and Wisconsin as well as reports of individual voters using the names of dead persons, according to published reports in Georgia, Illinois, Maryland, Missouri, Pennsylvania, and Wisconsin. FN78 The State also points to the findings of the Barker-Carter Commission which found that "fraud and multiple voting in U.S. elections" occurs and that such fraud "could affect the outcome of close elections." State's Ex. 1 at 18. Both parties have submitted evidence in this case which indicates that Indiana's voter rolls are significantly inflated, FN79 thereby increasing the opportunity for in-person voter fraud to occur. Finally, as the State maintains, without a photo identification requirement it is nearly impossible to detect in-person voter impersonation. These factual assertions sufficiently establish a justification on the part of the Indiana General Assembly to enact the photo identification requirements in SEA 483.

> FN78. *See* State's Exs. 3-18.

> FN79. *See, e.g.,* State's Ex. 27; discussion of Brace Report contained in Factual Background Section VII, *supra.*

D. *SEA 483 Is Not a Poll Tax.*

[36] Plaintiffs also contend that SEA 483 is unconstitutional because the photo identification requirement essentially constitutes a poll tax. According to Supreme Court precedent, "a State violates the Equal Protection Clause of the Fourteenth Amendment whenever it makes the affluence of the voter or payment of any fee an **\*827** electoral standard. Voter qualifications have no relation to wealth nor to paying or not paying this or any other tax." *Harper v. Virginia State Bd. of Elections,* 383 U.S. 663, 666, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (footnote omitted).

We do not view the photo identification requirement of SEA 483 to be a "poll tax." Importantly, under Ind.Code § 9-24-16-10, the BMV "may not impose a fee for the issuance of [an original, renewal, or duplicate] identification card to an individual ... who ... does not have a valid Indiana driver's license ... and ... will be at least eighteen (18) years of age at the next general, municipal, or special election." Thus, by statute, any individual who meets the age eligibility requirement to vote can obtain photo identification from the BMV without paying a fee. FN80

> FN80. The fee imposed on individuals to obtain a driver's license is a fee for the privilege of driving, not for identification, and if an individual no longer wishes to enjoy the privilege of a driver's license, he/she can obtain an identification card for free.

Plaintiffs also contend that all manner of incidental costs incurred in the process of obtaining the photo identification required by SEA 483 constitute a poll tax. For example, according to the Democrats,

> [T]he other incidental but nonetheless real and substantial costs ... [include] the cost in time and of transportation, especially to those without driver's licenses, who will have to either use public transportation (for a fee) to travel to the BMV location, quite possibly after a trip to the health department to obtain (for a fee) a certified copy of a birth certificate, not to mention the additional costs in time and money for voters who were born in other states.

Democrats' Reply Brief at 21. *See also* ICLU's Brief in Supp. at 29 (mentioning "other costs, such as those for procuring a birth certificate, and transportation costs that will be incurred as a prerequisite to voting").

[37] This argument represents a dramatic overstatement of what fairly constitutes a "poll tax." It

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

is axiomatic that "(e)lection laws will invariably impose some burden upon individual voters," *Burdick v. Takushi,* 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). Thus, the imposition of tangential burdens does not transform a regulation into a poll tax. Moreover, the cost of time and transportation cannot plausibly qualify as a prohibited poll tax because these same "costs" also result from voter registration and in-person voting requirements, which one would not reasonably construe as a poll tax. Plaintiffs provide no principled argument in support of this poll tax theory.

The only incidental cost which might plausibly approach being a poll tax is the fee assessed to obtain a birth certificate, which in turn is used to obtain a photo identification from the BMV. Even here, however, Plaintiffs' argument falls short for several reasons. First, Plaintiffs' contention about the need for individuals to pay a fee for a birth certificate is purely speculative and theoretical, since they have provided no evidence to demonstrate that anyone will actually be required to incur this cost in order to vote. Indeed, the evidence suggests to the contrary-that the vast majority of Indiana's voting age population will not have to obtain a birth certificate since they already possess acceptable photo identification. Second, Plaintiffs' argument completely ignores the fact that SEA 483 permits individuals desiring to vote in-person to present a valid federal identification, e.g. passport, whose requirements to obtain, including any incidental fees, are beyond the control of the State. Third, Plaintiffs' argument overlooks the fact that a valid birth certificate **828 is only one of the primary documents acceptable to the BMV; individuals can present various documents for that purpose, some of which are again issued by the federal government whose requirements and incidental fees are beyond the control of the State. In light of these facts, we shall not prolong this part of our analysis in an effort to determine whether the cost of obtaining a birth certificate is sufficiently tied to the requirements of voting as to constitute a "poll tax." We hold that it does not.

**E.** *Incidental Impact on Voters Who by Inadvertence Cannot Present Photo Identification.*

[38][39] The Democrats argue that SEA 483 is unconstitutional because it burdens the right to vote of a person who, through no fault of his own, may be prevented from presenting acceptable photo identification at the polls on election day. Examples of such fate-stricken voters, they say, would include someone who-

> has recently been the victim of identity fraud or her driver's license may have been stolen, or her personal records destroyed in a fire, hurricane, tornado, or other natural disaster. Or the voter may simply be unaware of the Law's stringent new identification requirements or simply forgot to bring her identifying documents to the polls so near to 6:00 p.m. as to eliminate the possibility of retrieving it before the 6:00 p.m. poll closing.

Democrats' Reply Brief at 34. If these hypothetical situations materialized, they would obviously be unfortunate, but in no event would they rise to the level of a constitutional violation because "unavoidable inequalities in treatment, even if intended in the sense of being known to follow ineluctably from a deliberate policy, do not violate equal protection." *Griffin v. Roupas,* 385 F.3d 1128, 1132 (7th Cir.2004) (citing *Apache Bend Apartments, Ltd. v. U.S. Through I.R.S.,* 964 F.2d 1556, 1569 (5th Cir.1992); *Smith v. Boyle,* 144 F.3d 1060, 1064 (7th Cir.1998); *Bell v. Duperrault,* 367 F.3d 703, 712 (7th Cir.2004) (concurring opinion)). Moreover, none of the hypothetical, would-be voters conjured up by the Democrats would be prevented by SEA 483 from voting, given that all would be permitted to vote through a provisional ballot, after which they would have approximately two weeks to obtain photo identification, appear before the circuit court clerk or county election board, and have their provisional ballot validated. There is no constitutional concern here deserving of a remedy, based on such incidental impact on voters.

**F.** *Reasonable Alternatives to Presentation of Photo Identification.*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

Curiously, the Democrats include the argument that the Voter ID law is unconstitutional due to "the absence of any reasonable alternative to its stringent photo identification requirements such as would permit a voter without one of the narrow forms of identification to exercise his or her right to vote notwithstanding." Democrats' Reply Brief at 31. The Democrats base this contention on precedent, saying: "In an analogous context, the Supreme Court has twice held that restrictive ballot access laws for candidates must contain a reasonable alternative for those candidates who, because of their poverty, cannot afford to pay the costs associated with running for office." Democrats' Reply Brief at 31.

This argument is misguided for three reasons. First, besides the obvious fact that the quoted Supreme Court holding pertains to candidates rather than voters, every individual whom the Democrats identified as unable to vote as a result of SEA 483 was determined, upon examination, to be eligible to vote absentee, and the Democrats have not presented any **\*829** evidence to prove that voting absentee would be a hardship on any of these voters. Second, the groups that Plaintiffs claim would be disproportionately impacted, such as the elderly, disabled, and homeless, can all avail themselves of permissible alternatives to the photo identification requirements.[FN81] Third, SEA 483 contains an explicit exception for indigents.[FN82] Accordingly, we hold the Democrats' arguments based on the lack of a safety valve to the photo ID are unpersuasive and not supported by applicable precedent.

> FN81. *See* Ind.Code § 3-11-10-24 (listing the classes of voters entitled to vote by absentee ballot).

> FN82. *See* Ind.Code § 3-11.7-5-2.5(c)(2).

### G. *Existence of Legislative Alternatives.*

Plaintiffs expend considerable effort in their briefs explaining that there exist effective alternatives to requiring photo identification that the General Assembly could have adopted and that there are additional potential avenues of voter fraud that the General Assembly failed to address with SEA 483.[FN83] These arguments are not relevant, never mind persuasive in view of the fact that the legislature has wide latitude in determining the problems it wishes to address and the manner in which it desires to address them. The Supreme Court could not be clearer than it was in *Williamson v. Lee Optical of Oklahoma*:

> FN83. *See, e.g.,* ICLU's Reply Brief at 28-29 ("But, the point is that the State has chosen to put onerous conditions on the area of voting in-person, where there is absolutely no evidence of fraud, while ignoring fraud prevention procedures in the area of voting absentee, where there is documented proof of fraud. Moreover, the statute dispenses with signature comparison as a fraud safeguard for in-person voters, while trumpeting its utility to detect fraud in the absentee voting area.")

Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. The legislature may select one phase of one field and apply a remedy there, neglecting the others. The prohibition of the Equal Protection Clause goes no further than the invidious discrimination. We cannot say that that point has been reached here.

348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563 (1955) (internal citations omitted).

Plaintiffs have made it abundantly clear that in-person voter fraud is not a problem they would have chosen to address had they been in position to substitute their judgment for that of the General Assembly, and, in fact, had they chosen to address this problem at all, they would not have resolved it by requiring the presentation of photo identification. Plaintiffs must live with their frustrations, however, because these are policy determinations the General

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

Assembly is empowered to make and Plaintiffs' strong desire for a different result does not translate into a constitutional violation.

H. *"Cumulative Burdens" Imposed by Other Voting Statutes.*

The Democrats next urge the Court to examine SEA 483 in the context of "the cumulative burdens imposed by the overall scheme of electoral regulations on the rights of voters and political parties...." Democrats' Brief in Supp. at 43. They attempt to buttress this part of their attack on the statute through a litany of Indiana election law provisions with which they also take issue, including: registra-**830** tion deadlines, polling hours, partisan challengers, absentee balloting restrictions, partisan officials administering the election system, the percentage of provisional ballots counted, as well as recent closings of BMV offices. None of these statutes or practices is at issue in this litigation, however, and the Democrats have made little or no effort to explain how these otherwise unrelated statutes and procedures are relevant to our analysis of SEA 483.[FN84] This "cumulative burdens" argument resembles the college student "wet Kleenex" prank of yore in which as entertainment, a soggy wet tissue mass is thrown against the dorm room wall to see if it will stick. In the context of this much more serious matter, we fear Plaintiffs are engaged in a similar exercise-throwing facts against the courthouse wall simply to see what sticks. For clarity, we repeat: To the extent any of the individual issues are relevant, we have previously taken them into account in their more appropriate analytical context; otherwise, they lack sufficient substance to warrant further discussion.

> FN84. At least one of the Democrats' cited examples is also based on an obvious misreading of the Indiana Code. The Democrats assert that "Indiana voters desiring to vote absentee are now required for the first time to swear under oath that he or she 'has a specific reasonable expectation of being absent from the county on election

day during the entire twelve (12) hours that the polls are open.' " Democrats' Brief in Supp. at 45 (quoting Ind.Code § 3-11-10-24(a)(1); citing Robertson Dep. at 16-17). However, Ind.Code § 3-11-10-24 (a), as Ms. Robertson correctly explained in her deposition, actually requires voters to satisfy only one of ten criteria, the first of which references being absent for all twelve hours that the polls are open.

*Conclusion: The Photo Identification Requirement of SEA 483 is Constitutional.*

For the reasons explained above in subsections A-H, we hold that the photo identification requirements imposed by SEA 483 are constitutionally permissible State regulations of elections.

**III.** *Equal Protection Clause Claims.*

The Democrats raise two principal equal protection arguments in their challenge to SEA 483's photo identification requirement exceptions, to wit, the absentee ballot exception and the nursing home exception.[FN85] Neither of these equal protection challenges is ultimately persuasive, however, for the reasons explained below.

> FN85. The Democrats' also contend that the indigent exception violates the Equal Protection Clause; more precisely, however, this claim is actually a unconstitutional vagueness challenge. *See* Democrats' Reply Brief at 37 (arguing SEA 483 "violate[s] the Equal Protection Clause by discriminating against voters ... to whom the Law gives no standards for determining whether they are 'indigent' and who will thus be unwilling to risk criminal prosecution for perjury in order to have their vote counted.") The vagueness challenge to the indigent exception is dealt with in Legal Analysis Section IV(A), *infra*. The League of Women Voters (the "LWV") also challenges the exception for individuals who refuse to be photographed for religious reasons, contending that it is unduly bur-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

densome, in that each time, such voters must vote by provisional ballot and then, separately, fill out an affidavit before the clerk of the court or the election board. We did not consider this argument because (1) it was not adopted by any of the Plaintiffs in this case; (2) it is not clear the LWV or any of the Plaintiffs have standing to raise such a challenge; and (3) there is no evidence before the court of any individuals holding such religious beliefs, so the challenge is purely hypothetical, insofar as the record of this case is concerned.

A. *Absentee Ballot Exception.*

[40] The primary equal protection challenge advanced by Plaintiffs is that, because SEA 483 does not apply to absentee voters, it is discriminatory and thus violative of the Equal Protection clause of the Fourteenth Amendment. FN86 This argument downplays the obvious fact that absentee voting is an *inherently* different **831 procedure from in-person voting. Indeed, it is axiomatic that a state which allows for both in-person and absentee voting must therefore apply different requirements to these two groups of voters. Not surprisingly, the Democrats cannot cite to a single case in support of their contention that a state may not impose different requirements on absentee and in-person voters, FN87 nor do the Democrats challenge Indiana's authority to allow for absentee voting or Indiana's limitation on the classes of voters who are permitted to vote absentee. Accordingly, the mere fact that SEA 483's photo identification requirements apply only to in-person voters and not to absentee voters does not offend the Equal Protection clause.

FN86. *See, e.g.,* Democrats' Brief in Supp. at 37 (arguing "these exceptions violate the Equal Protection Clause by discriminating against voters who do not or cannot cast an absentee ballot...."). We return to this issue again in Legal Analysis Section VI, *infra* of this opinion.

FN87. Democrats cite *Northeastern Flor-*

*ida Chapter of Associated General Contractors of America v. City of Jacksonville, Fla.,* 508 U.S. 656, 666, 113 S.Ct. 2297, 124 L.Ed.2d 586, (1993) for the following proposition: "The government may not enact barriers making it more difficult for members of one group to obtain a benefit (or exercise a fundamental right) than for members of other groups." Democrats' Brief in Supp. at 37. This case, however, merely discusses the requirements for Article III standing in an Equal Protection case. Similarly, none of the other cases cited by the Democrats remotely pertains to the issue of the constitutional acceptability of different standards for absentee and in-person voters. *See Reform Party of Allegheny Co. v. Allegheny Co. Dept. of Elections,* 174 F.3d 305, 315-18 (3rd Cir.1999) (en banc) (invalidating statute precluding cross-endorsements only for minor party candidates); *Rockefeller v. Powers,* 74 F.3d 1367, 1377 n. 16 (2nd Cir.1995) (upholding a law setting minimum signature requirements for national convention delegates to be eligible for the ballot); *McLaughlin v. N.C. Bd. of Elections,* 65 F.3d 1215, 1223 (4th Cir.1995) (discussing a ballot access provision which requires a party receive a minimum percentage of the popular vote to remain on the ballot).

Even assuming that SEA 483 violated the Equal Protection clause, the State has provided an eminently reasonable explanation for this exception: "[E]lection officials would have no way to compare photo identification included with an absentee ballot ... with the face of the person who actually marked the ballot;" thus "[r]equiring voters to include a photocopy of the identification would ... have little, if any, benefit in terms of fraud prevention and detection." State's Reply Brief at 23-24. While the Democrats question the logic of this explanation, FN88 they have not presented any

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

evidence or argument suggesting that, in not applying the photo identification requirement to absentee voters, the Indiana General Assembly was motivated by discriminatory animus. Accordingly, we find the State's explanation for the absentee ballot exception to be self-evident and non-discriminatory and, thus, overcomes any Equal Protection concerns.

> FN88. *See, e.g.,* Democrats' Brief in Supp. at 21 (arguing that "it is particularly odd that the [Voter] ID Law expressly exempts the one method of voting that has experienced documented instances of fraud" and that "it was wholly irrational ... for the Indiana General Assembly to have excluded absentee voters")

Plaintiffs contend further that absentee voting is a less desirable to in-person voting and one that is imposed unfairly on individuals who do not have photo identification. Again, there is a total lack of any evidentiary support for this contention, despite Plaintiffs' reliance on a district court decision in *Common Cause/Georgia v. Billups,* 406 F.Supp.2d 1326 (N.D.Ga.2005) (hereinafter "*Common Cause*" ).<sup>FN89</sup> The *Common Cause* decision, however, is not **\*832** only not controlling precedent here; the decision's analysis is not even relevant to the case at bar for the following reasons: (1) The *Common Cause* decision involves an analysis of *Georgia's* absentee voter laws and Plaintiffs have not troubled themselves to establish that *Indiana's* absentee voter laws are comparable to Georgia's; (2) The *Common Cause* decision was a ruling on a preliminary injunction, which, of course, presents different evidentiary standards than those on summary judgment; (3) The Court, in *Common Cause,* expressly based its ruling on several factual findings and assumptions for which there is no evidentiary basis in this case;<sup>FN90</sup> (4) One of the concerns expressed in the *Common Cause* decision was that Georgia had recently changed its absentee voter requirements but had not publicized the change,<sup>FN91</sup> and there is no evidence in this case that such circumstance pertains here. The *Common Cause* decision well illustrates the types of evidence and arguments that Plaintiffs in the case at bar could have presented concerning Indiana's absentee voter requirements but regrettably failed to adduce. There being no basis on which to conclude that absentee voting is an unacceptable alternative for individual voters lacking photo identification, we reject this equal protection challenge to SEA 483.

> FN89. Plaintiffs both principally cite the following passage:
>
>> the Court finds that absentee voting simply is not a realistic alternative to voting in person ... for most voters who lack Photo ID. The fact that voters, in theory, may have the alternative of voting an absentee ballot without a Photo ID thus does not relieve the burden on the right to vote caused by the Photo ID requirement.
>
> *Id.* at 1365 (quoted in part at Democrats' Reply Brief at 36; ICLU's Reply Brief at 28).

> FN90. *See, e.g., Id.* at 1364-65 ("The majority of voters-particularly those voters who lack Photo ID-would not plan sufficiently enough ahead to vote via absentee ballot successfully. In fact, most voters likely would not be giving serious consideration to the election or to the candidates until shortly before the election itself. Under those circumstances, it simply is unrealistic to expect that most of the voters who lack Photo IDs will take advantage of the opportunity to vote an absentee ballot.") There is no basis in the record before us to make similar assumptions or findings here.

> FN91. *Id.* at 1364 ("Absent more information indicating that the State made an effort to inform Georgia voters concerning the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

new, relaxed absentee voting procedures, many Georgia voters simply may be unaware that the rules have changed.... Consequently, the Court simply cannot assume that Georgia voters who do not have a Photo ID will make the arrangements necessary to vote via the absentee voting process.")

B. *Nursing Home Exception.*

[41] The Democrats also maintain that the nursing home exception violates the Fourteenth Amendment's Equal Protection clause, claiming that they "can conceive of no rational purpose for this disparate treatment, much less any compelling state interest" to justify the exception. Democrats' Brief in Supp. at 39. The State counters this challenge, arguing that the nursing home exception is supported by several "self-evident realities."

We pause briefly to note that our determination of the constitutionality of the nursing home exception, once again, is limited by the parties' sparse briefing; to further illustrate the difficulties imposed on the Court in this regard, the two above-quoted statements are the extent of the parties' arguments regarding the constitutionality of this exception. The Democrats have not cited to a single case discussing the constitutional limitations on a state imposing different requirements or procedures for different classes of voters [FN92] nor do they discuss the issue of severability. [FN93] **\*833** Instead, the Democrats attempt to bootstrap their objections relative to the nursing home exception into a basis for invalidating the entirety of SEA 483. [FN94] We are unclear from the Democrats' briefs whether their equal protection challenge to the nursing home exception survives our previous ruling that the photo identification requirements of SEA 483 are constitutional. Despite these adversarial failings, we turn our attention to the Democrats' contention that there is no "rational purpose" supporting the nursing home exception.

FN92. *See* note 87, *supra* discussing the equal protection cases cited by the Demo-

crats.

FN93. *See* Ind.Code § 1-1-1-8(b) (providing: "Except in the case of a statute containing a nonseverability provision, each part and application of every statute is severable. If any provision or application of a statute is held invalid, the invalidity does not affect the remainder of the statute ..."); *Pleasureland Museum, Inc. v. Beutter,* 288 F.3d 988, 1004 (7th Cir.2002) (explaining "the severability clause can save the constitutionally viable remainder only if the invalidated elements were not 'an integral part of the statutory enactment viewed in its entirety.' ") (quoting *Zbaraz v. Hartigan,* 763 F.2d 1532, 1545 (7th Cir.1985)).

FN94. *See, e.g.,* Democrats' Brief in Supp. at 37 ("To avoid strict scrutiny, the restrictions imposed by an election law must be both reasonable and non-discriminatory"); and at 39 ("This exception violates the Equal Protection Clause and further demonstrates the unfairness and irrationality of the Photo ID Law"). The ICLU Plaintiffs attack the nursing home exception in the same manner. *See, e.g.,* ICLU's Reply Brief at 21 (arguing that "the identification requirement as imposed by the Voter ID law is certainly not a material requirement.... For the nursing home voter, faith that the poll workers will recognize them is deemed to be sufficient. Yet, neither personal recognition nor signature is sufficient for those other voters voting in-person. Clearly, the specific identification requirement imposed by the challenged statute cannot be deemed to be material.")

Plaintiffs' strategy is a non-starter since we would not invalidate an otherwise constitutional statute simply because one of its severable exemptions might be un-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

constitutional; to the contrary, we would, in all likelihood, find the statute constitutional and sever the unconstitutional portion.

A straightforward reading of SEA 483 reveals that the Indiana General Assembly selected for exception from the statute's requirements a discrete and identifiable category of voters whose ability to obtain photo identification is particularly disadvantaged but for whom sufficiently reliable methods of verifying their identification otherwise exist. Our examination of the record reveals no hint of discriminary intent in the General Assembly's action; instead, we find convincing evidence of a good faith attempt to facilitate disadvantaged voters without compromising the voter fraud prevention intent which underlies SEA 483. As we have previously noted, "[T]he striking of the balance between discouraging fraud and other abuses and encouraging turnout is quintessentially a legislative judgment with which we judges should not interfere unless strongly convinced that the legislative judgment is grossly awry." *Griffin v. Roupas,* 385 F.3d 1128, 1131 (7th Cir.2004). Given the unique confluence of these factors, we are firmly convinced that the Indiana General Assembly was well within its powers to create a reasonable, limited exception to the photo identification requirements for nursing home residents without running afoul of the 14th Amendment.

This conclusion is premised on self-evident facts, particularly that individuals residing in nursing homes require the substantial assistance of others for their daily care; indeed, that is the very reason that most, if not all, individuals enter a nursing home. Also, due to their infirmed circumstances, it is reasonable to assume that nursing home residents are limited with respect to their ability to travel to a BMV location to obtain photo identification. It is also reasonable to assume that many nursing home residents would require some form of assistance from third parties, such as the facility's staff, in order to vote in-person (or even vote absentee for that

**\*834** matter). Thus, it is also reasonable to assume that on election day there would be nursing home staff present in the polling area to assist residents to vote. In addition, because of age and infirmity, the vast majority of nursing home residents are publically supported (e.g. Medicare, Medicaid, Social Security) or have private insurance and, in order to obtain that financial support, nursing home residents would have established their identity to the nursing home and to their benefits provider through some form of certifiable identification process.[FN95] Consequently, the nursing home officials would have intimate, objective, and verifiable information concerning the identity of its residents. When a polling center is located within easy access of nursing home residents, such as in the nursing home facility itself, it is entirely reasonable to assume that there will be neutral third parties available who can readily vouch for a resident's identity. In creating this exception for residents of nursing homes, the State's stated purpose of combating voter fraud is not undermined since there are sufficient guarantees of identity of the voter to exempt them from presenting photo identification.[FN96]

> [FN95]. Moreover, as the executive director of USA noted, "it is not uncommon for disabled persons living in some type of congregate living situation run by a private company to have their identification kept by the company so that the individual is not able to obtain his or her identification card even if one has been issued." ICLU's Brief in Supp. at 20 (citing Madill Dep. at 26-29).

> [FN96]. *See also* State's Brief in Supp. at 29 (discussing other facts supporting the nursing home exception).

Plaintiffs' repeated claim that the nursing home exception is discriminatory because it excludes other groups of individuals whom Plaintiffs contend are similarly situated ignores the justifications for the nursing home exception.[FN97] Nursing home residents represent a discrete and readily identifi-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

able category of voters whose ability to obtain photo identification is particularly disadvantaged, whose qualification for the exception (residing in a nursing home) is not readily susceptible to fraud, and for whom there otherwise exist sufficiently reliable methods of verifying identification. Plaintiffs' feeble effort simply to match one or more of these explanations to a voter who is not eligible for an exemption does not establish that the nursing home exception is discriminatory or unconstitutional.

> FN97. For example, Plaintiffs cite one Ernest Pruden, who works at the polls located in his apartment building but who will not be able vote there in person without presenting photo identification. While Mr. Pruden's situation is certainly analogous in some respects, there is no evidence to indicate that Mr. Pruden has any reason to prove his identity to the other individuals living in his apartment building, that any such individuals would be present at the polls at the time of voting, or that Mr. Pruden is infirmed or otherwise disadvantaged.

Accordingly, the Democrats' equal protection challenge to the nursing home exception is denied.

### IV. *Unconstitutional Vagueness Claims.*

The Democrats have also asserted that SEA 483 is unconstitutionally vague because: (A) it fails to define "indigency," (B) it fails to define "conform," and (C) it fails to provide standards for comparing a voter to the photograph on his identification card. None of these three contentions is convincing as proof that the statute is unconstitutional, for the reasons explained below.

### A. *Failure to Define "Indigency."*

[42][43] The Democrats argue that the indigent exception is vague because "indigency*835 is nowhere defined in the Law...." Democrats' Brief in Supp. at 39. That there is no legal definition is only partly true; actually, the Indiana Code contains several other provisions specifically referencing or tar-

geting indigent individuals. *See, e.g.,* Ind.Code §§ 12-10-7 et seq. (Adult Guardianship Services); 16-21-9 et seq. (Provision of Charitable Care by Nonprofit Hospitals); 34-10 et seq. (Access to Courts by Indigent Persons); 33-40-8 et seq. (Miscellaneous Legal Services for Indigents in Criminal Actions). Thus, SEA 483 is not plowing new ground by utilizing hitherto unknown terms of art. Moreover, the Democrats have omitted from their argument any evidence of individuals who might conceivably be confused by the indigent exception, let alone prosecuted for some improper reliance on this term or statute,FN98 and, in any event, "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended applications.' " *Hill v. Colorado,* 530 U.S. 703, 733, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) (quoting *United States v. Raines,* 362 U.S. 17, 23, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960)). Since Plaintiffs have not provided evidence of indigent individuals, or possibly indigent or confused indigent individuals, actually impacted by SEA 483, all we are left with are hypotheticals. Accordingly, we shall not set aside as unconstitutionally vague the indigency exception.

> FN98. We note that the threat of prosecution is exceedingly small since SEA 483 provides no mechanism for the circuit court clerk or the county election board to investigate or otherwise verify an individual's alleged indigence.

### B. *Failure to Define "Conform."*

[44] The Democrats, along with the League of Women Voters ("LWV") in its amicus brief, argue that SEA 483 is facially unconstitutional because it lacks standards for determining when the name listed on a photo identification "conforms" to an individual's voter registration record.FN99 Their arguments hold that the failure to define or otherwise constrain the word "conform" is a grievous omission in the law which "gives a single precinct offi-

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

cial the unfettered right to determine whether a particular form of identification (comports with) the law's requirements or whether the voter is the person depicted in that document" and thus "has the real potential for being used as a 'backdoor means of imposing impermissible content discrimination.' " Democrats' Brief in Supp. at 43 (quoting *National Coal. of Prayer, Inc. v. Carter,* 2005 WL 2253601, \*13 (S.D.Ind.2005) (Barker J)).

> FN99. *See* Ind.Code § 3-5-2-40.5 (providing, in relevant part: " 'Proof of identification' refers to a document that satisfies all the following: (1) The document shows the name of the individual to whom the document was issued, and the name conforms to the name in the individual's voter registration record.")

The LWV helpfully provided affidavits from actual registered voters who might be impacted by the "conforming" name requirement of SEA 483, citing as examples women whose names on their driver's licenses are hyphenated but should not be, and vice versa, as well as a woman whose last name should contain a space but whose license was printed without one ("de Martinez" is printed as "DEMARTINEZ"). *See* LWV Brief 11-13.[FN100] The LWV also advanced a working definition of "conform" based on *Webster's II New College Dictionary* which defines the term as: "to be similar in form or character" or "to \*836 ... be in compliance." LWV Brief at 10.[FN101]

> FN100. We acknowledge with thanks the care taken by the LWV to actually identify and provide affidavits from specific voters who could be impacted by SEA 483, which made the LWV's amicus brief one of the most useful filings in this action.

> FN101. Similarly, the *American Heritage Dictionary of the English Language* (4th Ed.2000) defines "conform" as: "To correspond in form or character; be similar." The Democrats have not provided their

own definition.

In all of the examples cited by the LWV, we note that the names listed on the photo identification are substantially similar to the names on the voter registration lists. The only potential anomalies Plaintiffs have identified are the trivial additions or subtractions of a hyphen or a space in a voter's last name. Neither the Democrats nor the LWV contends that "conform" means "identical," making us skeptical that the provided examples would run afoul of SEA 483's requirements. Therefore, this line of argument cannot succeed because it is based on "speculation about possible vagueness in hypothetical situations not before the Court [which] will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended applications.' " *Hill v. Colorado,* 530 U.S. 703, 733, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) (quoting *United States v. Raines,* 362 U.S. 17, 23, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960)).

Not giving even a tip of the hat to Article III standing principles, the Democrats contend that the problems created by the statute are not revealed so much in concrete examples of voters who might be impacted by SEA 483's provisions, but rather, by the lack of detailed guidance it provides as to how to define "conform," relying on their amorphous, generalized concern that counties and/or precincts might apply different standards in evaluating the legitimacy of voters' photo identification.[FN102] Continuing, the Democrats argue that the freedom to forgive obvious typographical errors as cited by the LWV "raises the legitimate fear that precinct officials will administer the Law differently from precinct to precinct or even voter to voter, thereby raising equal protection issues far more serious than those found unconstitutional in *Bush v. Gore,* [531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) ]." The Democrats' reliance on *Bush v. Gore* is at best an unsteady footing for this contention.

> FN102. *See, e.g.,* Democrat's Reply Brief at 38 (stating "Under the Photo ID Law, the Legislature's failure to define the word

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

'conform' and the granting to precinct officials of unbridled discretion in making such determinations means that partisan individuals manning the over 900 precincts in Marion County and the thousands more throughout the State will be empowered to make individual decisions whether voters whose driver's license lacks the complete or accurate spelling of the voter's last name 'conforms' to the name of the voter list.")

We begin by noting that all precinct election officers are required to sign an oath of office with regard to the performance of their official duties, which includes the following affirmations: "I will faithfully and impartially discharge the duties of inspector (or judge, poll clerk, assistant poll clerk, or sheriff) of this precinct under the law" and "I will not knowingly permit any person to vote who is not qualified and will not knowingly refuse the vote of any qualified voter or cause any delay to any person offering to vote other than is necessary to procure satisfactory information of the qualification of that person as a voter." Ind.Code § 3-6-6-23. This oath applies to all precinct workers and requires them to act honestly and in good faith in administering the election code. Precinct workers who, as the Democrats fear, use SEA 483 as a "backdoor means of imposing impermissible content discrimination" thus would be acting in violation of their oath of office and contrary to establish Indiana law. Obviously, an oath of office is not an election code cure-all; however, it certainly**837** suffices to assuage the vague, hypothetical concerns cited by Plaintiffs in their arguments to the Court.

The alternatives to photo identification proposed by the Democrats, such as signature comparison, utility bills, employment identification, or recognition by poll workers, are each troubling substitutes. *See* Democrats' Brief in Supp. at 34; Democrats' Reply Brief at 32. The Democrats have not explained how the alternatives they propose are less subject to varying standards and/or selective enforcement then the conforming name requirement

of SEA 483. Indeed, the Democrats' objections, when applied to the State's signature verification procedures as they existed prior to SEA 483, would create the same problem, namely, the absence of detailed instructions by which to compare a voter's signature to the name and signature on the voter registration list. In fact, the prior signature comparison procedures provided even less guidance and guarantee than does SEA 483; consider that, for in-person voters, the relevant statute provides: "In case of doubt concerning a voter's identity, the precinct election board shall compare the voter's signature with the signature on the affidavit of registration or any certified copy of the signature provided under IC 3-7-29. If the board determines the that the voter's signature is authentic, the voter may vote." Ind.Code § 3-11-8-25(c)(2) (superceded by SEA 483). The term "authentic" was not defined in the election code, nor did there appear to be guidance to a precinct worker in determining if a signature was "authentic." Similarly, the signature verification requirement for absentee voters, which was not changed by SEA 483, provides: "Upon receipt of an absentee ballot, a county election board (or the absentee voter board in the office of the circuit court clerk) shall immediately examine the signature of the absentee voter to determine its genuineness." Ind.Code § 3-11-10-4(a). "Genuineness" is not defined in the election code either. The Democrats have not addressed the constitutionality of these existing signature comparison provisions, beyond repeated arguments in their favor, and have advanced no plausible constitutional reason to distinguish the signature comparison provisions from the "conforming" name provisions. We know of no convincing basis for making such a principled distinction.

The Democrats also fear "that precinct officials will administer the law differently from precinct to precinct or even voter to voter, thereby raising equal protection issues," which contention seems to directly contradict their professed reasons for including the Secretary of State and the Co-Directors of the Indiana Election Division as defendants in

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

this action. In arguing against dismissing these defendants, the Democrats stated:

> Indeed, it is imperative that the State actors take an active role in the Law's implementation and administration, as a *laissez faire* approach to the enforcement of this Law or any other state election law could give rise to an equal protection claim, if for example the State's failure to take reasonable measures to ensure that the Photo ID Law is enforced uniformly and equally in all precincts of all 92 counties results in different citizens, due to the vagaries of their residence, being accorded different voting rights.

Democrats' Reply Brief at 14. Regarding SEA 483, either the Secretary of State (and staff) can ensure that uniform standards are applied across the state, or it cannot. If the Secretary of State has the power to administratively enforce standards "uniformly and equally in all precincts of all 92 counties," then the proper resolution of the Democrats' vagueness challenge is to allow the Secretary of State the opportunity to try to do so, rather than **\*838** to invalidate the statute. If the Democrats maintain that the Secretary does not have this power to effect uniformity, then including the Secretary as a defendant in this action was improper.

For those reasons, we reject the Democrats' claim that, because SEA 483 does not define "conform," it is unconstitutionally vague.

C. *Failure to Provide Photograph Comparison Standards.*

[45] The Democrats, again in league with the LWV, challenge the standards, or lack there of, in SEA 483 for comparing voters to their identification photographs to verify identity. Although there is not a specific requirement that a person's appearance "conform" to the photograph on their identification card, SEA 483 does require that the photo identification "show[ ] a photograph of the individual to whom the document was issued." Ind.Code § 3-5-2-40.5(2). The LWV again has helpfully provided specific examples of women

who have changed their appearances since obtaining their photo identifications. *See* LWV's Brief at 15-16. Similar to their arguments regarding the word "conform," the Democrats and the LWV contend that the photograph comparison provision of SEA 483 vests too much discretion in the hands of the local precinct officers.[FN103] This argument fails for the same reasons we rejected the vagueness challenge to the word "conform." Neither the LWV nor the Democrats has provided plausible grounds for believing the photograph comparison standards in SEA 483 are any more vague or subject to abuse than the "time-honored means of confirming a voter's identity through signature comparison." Indeed, comparing a person to the photograph on their identification card is now a routine task in our society, one that occurs countless times as persons board airplanes, cash checks, rent movies, enter federal (and county) courthouses, or engage in any of the numerous other activities that require presentment of photo identification.

> FN103. The LWV contends:
>
> > Again, people, particularly women[,] often change their appearance. There are many women whose hair color and/or hair styles at the time they present themselves to vote will not match the color and/or style of their hair in their driver's license or state-issued identification card. Women and men change their eye color with contact lenses and also utilize the services of plastic surgeons.
>
> LWV's Brief at 15.

Moreover, we are not persuaded that the State is obligated to subsidize a voter who voluntarily changes her appearance so that she is no longer recognizable from her identification photograph. Indeed, a driver's license or identification card which cannot be used for identification purposes fails in its essential purpose which, as we have noted above, for the vast majority of Indiana residents, is a purpose unrelated to voting. Thus, in situations

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

where an identification photograph can no longer be used for identification purposes, Indiana residents would need to replace the identification card for reasons unrelated to voting. FN104

> FN104. Several of the concerns raised by the LWV are directly related to concerns that political challengers present at the polls could challenge a voter based on a perceived deficiency in their photo identification. As the LWV notes in its brief: "The determination of whether a challenge by a political challenger requires a voter to cast a provisional ballot has not yet been litigated." LWV Brief at 6. The political challenger statute is not at issue in this case. Accordingly, these concerns are not material to our determination and have not been addressed by the Court.

**V. Democrats' Associational Rights Claim.**

The Democrats appear to have abandoned their associational rights claim in **\*839** their Reply Brief. Assuming that it has not been dropped, it is denied for the reasons elaborated above.

**VI. 42 U.S.C. § 1971 Claims.**

Plaintiffs next argument is that the photo identification requirements of SEA 483 violate 42 U.S.C. §§ 1971(a)(2)(A) & (B), FN105 because they do not require all voters to present photo identification in order to vote, e.g. absentee voters. There is not support for this theory in § 1971, however, because well-settled law establishes hat § 1971 was enacted pursuant to the Fifteenth Amendment for the purpose of eliminating racial discrimination in voting requirements. FN106 In this case at bar, Plaintiffs have not alleged, much less proven, any discrimination based on race.

> FN105. These provisions provide:
>
> (2) No person acting under color of law shall-
>
> (A) in determining whether any indi-

vidual is qualified under state law or laws to vote in any election, apply any standard, practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals within the same county, parish, or similar political subdivision who have been found by state officials to be qualified to vote;

(B) deny the right to any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

42 U.S.C. § 1971.

FN106. See, e.g., South Carolina v. Katzenbach, 383 U.S. 301, 308, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966) (holding: "The Voting Rights Act was designed by Congress to banish the blight of racial discrimination in voting, which has infected the electoral process in parts of our country for nearly a century.... Congress assumed the power to prescribe these remedies from [§ ] 2 of the Fifteenth Amendment, which authorizes the National Legislature to effectuate by 'appropriate' measures the constitutional prohibition against racial discrimination in voting."); U.S. v. Mississippi, 380 U.S. 128, 138, 85 S.Ct. 808, 13 L.Ed.2d 717 (1965) (holding: "The Fifteenth Amendment protects the right to vote regardless of race against any denial or abridgment by the United States or by any State. Section 1971 was passed by Congress under the authority of the Fifteenth Amendment to enforce that Amendment's guarantee ...") (emphasis added); see also Kirksey v. City of Jackson, Mississippi, 663 F.2d 659, 664-65 (5th Cir.1981)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

(holding that "it is apparent that the language of [Section 2 of the Voting Rights Act] no more than elaborates upon that of the fifteenth amendment, and the sparse legislative history of [Section 2] makes clear that it was intended to have an effect no different from that of the fifteenth amendment itself.") (citing *City of Mobile v. Bolden,* 446 U.S. 55, 60-61, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980); *United States v. Uvalde Consol. Ind. School Dist.,* 625 F.2d 547 (5th Cir.1980)).

Against the great weight of these authorities, Plaintiffs unconvincingly cite several district court cases from the 1970s in support of the proposition that § 1971 can be applied outside the context of racial discrimination. *See, e.g., Ball v. Brown,* 450 F.Supp. 4, 7 (N.D.Ohio 1977); *Frazier v. Callicutt,* 383 F.Supp. 15, 20 (N.D.Miss.1974) (noting, however, that "all discriminates here have been shown to be members of a minority community, and precisely the minority community which the Fifteenth Amendment and the Civil Rights Act of 1964 were primarily designed to protect"); *Sloane v. Smith,* 351 F.Supp. 1299, 1305 (D.C.Pa.1972); *Brier v. Luger,* 351 F.Supp. 313, 316 (M.D.Pa.1972); *Shivelhood v. Davis,* 336 F.Supp. 1111 (D.Vt.1971). We do not regard these holdings as authoritative here.

Apparently, despite their best efforts, Plaintiffs have been unable to uncover any evidence of racial discrimination flowing from the enforcement of SEA 483. At least we have been presented with none. Thus, their reliance on § 1971 is unfounded.

[46] Assuming *arguendo* that § 1971 does apply, it would not afford Plaintiffs the relief they seek. Plaintiffs' arguments regarding § 1971(a)(2)(A) suffer from fundamental**\*840** contradictions which ultimately doom this claim. They

strenuously assert that SEA 483 is invalid under § 1971(a)(2)(A) because it imposes different requirements on in-person and absentee voters;<sup>FN107</sup> as we have acknowledged previously, absentee voting is an *inherently* different procedure from voting in person, requiring a state which allows both in-person and absentee voting to apply different "standards, practices, or procedures" to these two groups of voters. Under Plaintiffs' argument, § 1971(a)(2)(A) requires abolishing all requirements which uniquely apply to only one set of voters,<sup>FN108</sup> an engine that loses its steam so long as Plaintiffs stop short of objecting to the practice of absentee voting or to any of the existing requirements applicable only to in-person or to absentee voters, which they have done. The only "difference" to which Plaintiffs seemingly object is the photo identification requirement, but in doing so they proceed without distinguishing this requirement from the plethora of other "standards, practices, and procedures" applicable to either absentee or in-person voters.<sup>FN109</sup> Plaintiffs' proposed construction of § 1971(a)(2)(A) would compel the invalidation of vast portions of the Indiana Election Code. We will not bring about such a radical departure from settled law by our decisions here.

FN107. *See, e.g.,* Democrats' Brief in Supp. at 19 ("It is clear from the face of the Photo ID Law that not all voters will be required to produce the required form of photo identification in order to vote and to have their vote counted. The Photo ID Law imposes its new identification requirements only (except for the [nursing home exception] ) on those voters who appear in person to cast their ballot, but not on those who cast an absentee ballot by mail."); *Id.* at 20 ("This disparate treatment of in-person voters as compared to mail-in absentee voters on its face offends 42 U.S.C. § 1971(a)(2)(A) ..."); ICLU's Reply Brief at 18 ("Nor is any similar restrictive identification requirement imposed on those who vote via absentee ballot. This violates the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

federal statute.")

FN108. For example, under Indiana law, all voters voting in person are required to vote at the poll in the precinct where they reside, Ind.Code § 3-11-8-2, announce their "full and true name," Ind.Code § 3-11-8-19, and sign their name on the poll list, Ind.Code § 3-11-8-25(g). None of these procedures are required of absentee voters. On the other hand, to have their votes counted, absentee voters are required to sign an affidavit, Ind.Code § 3-11-10-16 referencing Ind.Code § 3-11-4-21, and properly seal their ballot, Ind.Code § 3-11-10-17(6). Neither of these requirements applies to in-person voters.

FN109. Plaintiffs' repeatedly note that SEA 483 imposes a "new" requirement, *see generally* Democrats' Brief in Supp. at 19-22; ICLU's Reply Brief at 18-20, perhaps to distinguish the photo identification requirement from the "time-honored" procedures Plaintiffs do not oppose (e.g. confirming a voter's identity through "affidavit and signature comparisons, as well as all other forms of identification such as utility bills, social security cards, credit cards, employment IDs," Democrats' Brief in Supp. at 34). However, there is nothing in the text of § 1971(a)(2)(A) which privileges older voting procedures over newer ones; indeed, advancing such an argument is obviously misplaced since one of the primary motivations for enacting the Voting Rights Act was to combat the "the blight of racial discrimination in voting, *which has infected the electoral process in parts of our country for nearly a century....*" South Carolina v. Katzenbach, 383 U.S. 301, 308, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966) (emphasis added).

Plaintiffs' arguments regarding § 1971(a)(2)(B) similarly overstate the reach of that portion of the

statute which prohibits the denial of the right to vote "because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." 42 U.S.C. § 1971(a)(2)(B). Plaintiffs contend that SEA 483 violates this part of the statute because otherwise **\*841** qualified, registered voters will be prevented from voting, or forced to use a provisional ballot, if they do not present a qualified photo identification. Defendants assert that § 1971(a)(2)(B) is not applicable to this case because SEA 483 merely changes the manner by which individuals prove their identity and does not require individuals to provide any additional information on any voting application or form.

[47][48][49] We agree with Defendants' assertion that the act of presenting photo identification in order to prove one's identity is by definition not an "error or omission on any record or paper" and, therefore, § 1971(a)(2)(B) does not apply to this case.[FN110] Assuming § 1971(a)(2)(B) does apply, SEA 483 would still not run afoul of those statutory prohibitions. Plaintiffs' arguments are undermined by their concession that "some form of identification is material." ICLU's Reply Brief at 21. By conceding, as they must, that verifying an individual's identity is a material requirement of voting, Plaintiffs have necessarily also conceded that the state may establish procedures to verify this requirement. Plaintiffs' assertion that voters should be able to prove their identity through means other than photo identification is a weak equivocation over the Indiana General Assembly's selection of the allegedly wrong method for determining a material requirement to vote. This court's role is not to impose Plaintiffs' policy preferences (or its own, for that matter) in the absence of any statutory or constitutional deficiency. The decision of the General Assembly to require photo identification does not violate § 1971(a)(2)(B).[FN111]

FN110. As the Eleventh Circuit explained:

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

"This provision was intended to address the practice of requiring unnecessary information for voter registration with the intent that such requirements would increase the number of errors or omissions on the application forms, thus providing an excuse to disqualify potential voters." *Schwier v. Cox,* 340 F.3d 1284, 1294 (11th Cir.2003) (citing *Condon v. Reno,* 913 F.Supp. 946, 949-50 (D.S.C.1995)). SEA 483 does not implicate these concerns.

FN111. Plaintiffs attempt to distinguish SEA 483 by arguing that the requirement of providing photo identification cannot be material in-and-of-itself because not all voters must present photo identification; we regard this argument as unpersuasive for three reasons. First, the Indiana General Assembly has determined that, for the majority of voters, photo identification is highly material to proving their identity; we concur that photo identification is relevant to proving one's identity. This is not to say of course that there are not other methods of proving identification equally reliable and accurate, but the Indiana General Assembly is entitled to make its own judgment as to which method(s) it wishes to employ. The exceptions to the photo identification requirement do not undermine the value of photo identification in proving an individual's identity, nor do they diminish the importance of proving one's identity in order to vote. Second, as discussed above, the Indiana Code includes several other requirements applicable to a single class of voters to which Plaintiffs raise no objections and attempt no distinction. Adopting Plaintiffs' interpretation of § 1971(a)(2)(B) would necessitate a drastic rewrite of Indiana elections law, which Plaintiffs prudently do not advocate. Third, we find nothing in the language of § 1971 or the subsequent case law to indicate that a requirement must be applied to all voters equally in order to be deemed "material."

The Plaintiffs next contend that SEA 483 violates § 1971(a)(2)(B) based on three potential "omissions" from an identification presented by a voter: the lack of a photo, the lack of an expiration date, or presentment of an identification not issued by the Indiana or the United States government. Each of these three statutory requirements is directly related to the material requirement of establishing an individual voter's identity. The photo allows poll workers to compare the individual's face to the identification tendered to ensure the individual is who he/she professes to be; **\*842** the expiration date is relevant to the reliability of the identification presented; and the governmental limitations on the sources of permissible identification also helps ensure that the identification card utilized by a voter is reliable. Because these three requirements directly relate to the process of verifying an individual's identity, they do not violate § 1971(a)(2)(B). Thus, we conclude that SEA 483 does not violate § 1971(a)(2)(B).FN112

FN112. Having determined that § 1971 is not applicable to this case, we decline to address whether Plaintiffs have a private right of action under the statute.

**VII. *Indiana Constitutional Claims.***

Finally, Plaintiffs argue that SEA 483 violates two provisions of the Indiana Constitution: Article II § 1, because the law's requirements are "grossly unreasonable," and Article II § 2, by imposing new, substantive requirements for voting (beyond age or residency). Neither of these assertions is persuasive for the reasons explained below.

A. *SEA 483 Is Not Grossly Unreasonable.*

[50] Indiana Constitution Article II, Section 1 provides: "All elections shall be free and equal." The Indiana Supreme Court has interpreted these twin requirements as follows:

It is said elections are free when the voters are

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

subject to no intimidation or improper influence, and when every voter is allowed to cast his ballot as his own judgment and conscience dictate. That they are equal when the vote of every elector is equal in its influence upon the result to the vote of every other elector; when each ballot is as effective as every other ballot.

*Blue v. State ex rel. Brown,* 206 Ind. 98, 188 N.E. 583, 589 (1934) (overruled on other grounds). Article II § 1 notwithstanding, the Indiana General Assembly has wide latitude to adopt reasonable voting regulations. Indeed, "[i]t is for the Legislature to furnish a reasonable regulation under which the right to vote is to be exercised, and it is uniformly held that it may adopt registration laws if they merely regulate in a reasonable and uniform manner how the privilege of voting shall be exercised." *Id.*

Plaintiffs face a high hurdle in mounting their challenge to voting regulations under Article II § 1. Again, according to the Indiana Supreme Court:

Being charged by the Constitution with the duty to "provide for the registration of all persons entitled to vote," and to enact such laws governing registration and the holding of elections that "all elections shall be free and equal," the Legislature has power to determine what regulations shall be complied with by a qualified voter in order that his ballot may be counted, so long as what it requires is not so grossly unreasonable that compliance therewith is practically impossible.

*Simmons v. Byrd,* 192 Ind. 274, 136 N.E. 14, 17-18 (1922). In addition, SEA 483 comes to us for review cloaked in the presumption of validity, and "[t]he burden is upon those who challenge its validity to make any constitutional defect clearly apparent." *State Election Bd. v. Bartolomei,* 434 N.E.2d 74, 76 (Ind.1982).[FN113]

FN113. Plaintiffs urge us to adopt the standard articulated in *Dobbyn v. Rogers,* 225 Ind. 525, 544-45, 76 N.E.2d 570

(1948); however, that case involves the standard for invalidating a ballot based on a technical violation, when the vote was cast by a voter previously determined to be eligible to vote. This case does not address the standards for determining when and whether a voter is eligible to cast a ballot.

**\*843** [51] Plaintiffs' contention that SEA 483 is "grossly unreasonable" because it "will certainly impose an absolute barrier on voting for those persons who are unable to satisfy the BMV's requirements to obtain identification and it will impose onerous requirements on others" is without merit. ICLU's Reply Brief at 31. We would find this argument more persuasive if Plaintiffs had produced even a single affidavit from an individual attesting to his/her inability to vote as a result of SEA 483. To the contrary, Plaintiffs' own evidence indicates that the vast majority of registered voters already possess some form of photo identification that would comply with the requirements of SEA 483. These submissions reveal that compliance with SEA 483 is not "practically impossible" and, as a result, Plaintiffs' attempts to invalidate SEA 483 under the Indiana Constitution fall far short. Therefore, we hold that SEA 483 does not violate Indiana Constitution Article II § 1.

B. *SEA Does Not Impose A New, Substantive Voting Requirement.*

[52] Plaintiffs next contend that SEA 483 is invalid under Article II § 2 of the Indiana Constitution, which sets the age of eighteen and the precinct residency term of 30 days as requirements for voting. Plaintiffs contend that SEA 483 violates this provision by imposing additional substantive qualifications for voting which impermissibly create a "new public electorate." ICLU's Brief in Supp. at 54 (citing *Board of Election Com'rs of City of Indianapolis v. Knight,* 187 Ind. 108, 117 N.E. 565, 567 (1917)).

[53] Plaintiffs argue that, although "[t]here is obviously implicit in Art [icle] 2, § 2 the notion that the person who is voting is in fact that person ....,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

the new Voter ID law goes far beyond mere identification. For, it demands a particular form of identification and, absent that, the vote is not counted." ICLU's Reply Brief at 32. Contrary to the requirements of SEA 483, Plaintiffs contend that the procedural requirements they prefer "merely satisf [y] the basic notion that the 'citizen of the United States, who is at least (18) years of age' is actually the person voting." *Id.* (citing Ind. Con. Art. 2, § 2). This argument is premised on a distinction without a difference, because any requirement that voters validate their identity necessarily implies that any voter unable to do so will not have his/her vote counted. The fact that Plaintiffs prefer alternative procedures to the photo identification does not create a Constitutional violation in requiring the latter. Nor is a Constitutional violation committed every time the General Assembly enacts a new voting regulation since, as we have previously noted, under Indiana law "the Legislature has power to determine what regulations shall be complied with by a qualified voter in order that his ballot may be counted, so long as what it requires is not so grossly unreasonable that compliance therewith is practically impossible." *Simmons v. Byrd,* 192 Ind. 274, 136 N.E. 14, 17–18 (1922). Accordingly, Plaintiffs have failed to demonstrate that SEA 483 violates Indiana Constitution Article 2, section 2.

## VIII. *Plaintiffs' Motions to Strike.*

A. *Motion to Strike Defendants' Exhibits and Portions of Defendants' Briefs.*

[54] Plaintiffs jointly filed a Motion to Strike, seeking to exclude forty-some exhibits submitted by Defendants which Plaintiffs claim are unsworn, unauthenticated, and contain hearsay.[FN114] The target of Plaintiffs' motion is various newspaper articles, transcribed oral statements, letters**844** /press releases, committee reports, websites, polls, and journal articles which principally document reports of voter fraud in jurisdictions other than Indiana. Defendants maintain that the exhibits are admissible as "legislative facts" which tend to "to support reasonable conclusions that (1) voter fraud exists;

(2) the public is concerned about it; and (3) requiring photo identification at the polls would address these problems." State's Resp. Brief in Opp. to Mot. to Strike at 6. Plaintiffs respond that there is no evidence in the legislative record of the materials submitted by the Defendants that was relied upon by the Indiana General Assembly.

> FN114. The initial motion sought to exclude forty-two of Defendants original seventy-three exhibits. Subsequent to the filing of this motion, Defendants submitted an additional six exhibits. Plaintiffs appear to object to at least one of the additional exhibits, to wit, Exhibit 76; however, since there is no separate discussion of the subsequently submitted exhibits, we are unclear whether Plaintiffs object to any other exhibits.

[55] Plaintiffs' argument against the Court's consideration of these exhibits as legislative facts is largely premised on their assertion that SEA 483 should be subject to strict scrutiny;[FN115] however, having determined that SEA 483 is not subject to strict scrutiny, this argument is unavailing. Thus, the state is entitled to rely on "legislative facts" to support its proffered justifications rather than being required to produce adjudicative facts to be evaluated by this court. Actually, there is no need for any "legislative facts" to have been cited by the General Assembly, based on Supreme Court precedent:

> FN115. *See, e.g.,* Pls.' Joint Reply at 3 ("The State Defendants' assumptions about the applicable evidentiary standards fail to take into account the fact that the Photo ID Law is subject to strict scrutiny because of the severe burden it imposes on the right to vote.")

[B]ecause we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

actually motivated the legislature. Thus, the absence of "legislative facts" explaining the distinction on the record has no significance in rational-basis analysis. In other words, a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data. *F.C.C. v. Beach Communications, Inc.,* 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). This clear and controlling holding dictates that Defendants' submissions are admissible to the extent that they tend to establish a reasonable justification for enacting SEA 483. However, to the extent that Defendants' challenged submissions are used to establish something other than a "legislative fact," [FN116] they are not admissible and have not been considered by us in rendering our decision. [FN117]

> FN116. For example, Exhibit 76 is an unsworn and unauthenticated list of state licensed care facilities that served as polling facilities during the 2004 election.

> FN117. The parties have not undertaken an individualized review of the exhibits and how they are utilized by the Defendants. Thus, without expending considerable time and effort meticulously combing the record, it is exceedingly difficult for this court to determine with precision which exhibits are used to establish legislative facts and which exhibits are used in an attempt to prove adjudicative facts.

Plaintiffs contend further that, because SEA 483 impacts First Amendment rights, we must undertake an independent review of Defendants' proffered factual basis. [FN118] **\*845** To the extent that the court has an independent obligation to review the Defendants' exhibits, our judgment is that the materials provide a reasonable justification and factual basis for the Indiana General Assembly's decision to enact SEA 483.

> FN118. *See Turner Broadcasting System,*

*Inc. v. F.C.C.,* 512 U.S. 622, 658, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (explaining that a court's "obligation to exercise independent judgment when First Amendment rights are implicated is not a license to reweigh the evidence de novo, or to replace Congress' factual predictions with our own. Rather, it is to assure that, in formulating its judgments, Congress has drawn reasonable inferences based on substantial evidence.") (citing *Century Communications Corp. v. F.C.C.,* 835 F.2d 292, 304 (D.C.Cir.1987) ("[W]hen trenching on first amendment interests, even incidentally, the government must be able to adduce either empirical support or at least sound reasoning on behalf of its measures")).

Plaintiffs' Motion to Strike seems more likely premised on their attempt to deny the obvious-that voter fraud has been a topic of national concern and that photo identification requirements in many societal settings, including at the polls, are becoming ubiquitous-than in response to a procedural error. Concerning these facts, the Court could almost take judicial notice that the topics of voter fraud and voter suppression have been widely discussed in the national media, especially in the wake of the 2000 and 2004 Presidential elections. In response to these concerns, an increased demand for photo identification has been widely imposed. Plaintiffs' attempt to exclude evidence of these patently obvious facts makes their motion to strike almost frivolous, but we will stop short of making that assessment.

B. *Motion to Strike Portions of Wendy Orange's Affidavit.*

Plaintiffs also filed a joint motion to strike portions of the Affidavit of Wendy Orange for failure to comply with Federal Rules of Evidence 701 and 702. This motion is *DENIED* as moot since the challenged opinions of Ms. Orange have played no role in our decisions.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

458 F.Supp.2d 775
**(Cite as: 458 F.Supp.2d 775)**

### *Conclusion*

For all the reasons explicated above, we declare that SEA 483 is a reasonable time, place, and manner election regulation. Accordingly, Defendants' Motions for Summary Judgment are *GRANTED* and Plaintiffs' Motions for Summary Judgment are *DENIED*.

IT IS SO ORDERED.

S.D.Ind.,2006.
Indiana Democratic Party v. Rokita
458 F.Supp.2d 775

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.