Nos. 07-21, 07-25

In The
# Supreme Court of the United States

───────── ◆ ─────────

WILLIAM CRAWFORD, *et al.*,

*Petitioners,*

v.

MARION COUNTY ELECTION BOARD, *et al.*,

*Respondents.*

INDIANA DEMOCRATIC PARTY, *et al.*,

*Petitioners,*

v.

TODD ROKITA, in his official capacity as
Indiana Secretary of State, *et al.*,

*Respondents.*

───────── ◆ ─────────

**On Writs Of Certiorari To The
United States Court Of Appeals
For The Seventh Circuit**

───────── ◆ ─────────

**BRIEF *AMICI CURIAE* OF
HISTORIANS AND OTHER SCHOLARS
IN SUPPORT OF PETITIONERS**

───────── ◆ ─────────

J. GERALD HEBERT*
TARA MALLOY
PAUL S. RYAN
CAMPAIGN LEGAL CENTER
1640 Rhode Island Ave., NW,
  Suite 650
Washington, DC 20036
(202) 736-2200
*Attorneys for Amici Curiae*
*Counsel of Record

CHARLES J. OGLETREE, JR.
THE CHARLES HAMILTON
  HOUSTON INSTITUTE
125 Mount Auburn St.
Floor Three
Cambridge, MA 02138
(617) 495-8285
November 2007

═══════════════════════════

COCKLE LAW BRIEF PRINTING CO. (800) 225-6964
OR CALL COLLECT (402) 342-2831

2:13-cv-193
09/02/2014
DEF0110

PX 513

i

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................. ii

STATEMENT OF INTEREST .............................. 1

SUMMARY OF ARGUMENT .............................. 1

ARGUMENT............................................. 4

   I.  Post-Reconstruction "Progressive Reform" Was Typically Used To Disfranchise People of Color and Poor Whites ............................ 4

  II.  The Poll Tax Was Likewise Used from the 1890s to the 1960s to Disfranchise People of Color and Poor Whites ............................ 13

 III.  The Indiana Photo ID Requirement Imposes Significant Burdens on Voters ........... 16

 IV.  Legislative Motives Should Be Considered When Determining The Constitutionality of Any Asserted "Reform" ............................ 23

  V.  Evidence Strongly Suggests Indiana's Photo ID Law Was Enacted With Partisan Intent To Burden Certain Voters ................ 27

 VI.  The Reasons Given for Indiana's Photo ID Law Are Not Credible .................................. 30

CONCLUSION ........................................ 38

ii

## TABLE OF AUTHORITIES

Page

Cases:

*Harper v. Virginia Board of Elections*, 383 U.S. 663 (1966).................................................18

*Thornburgh v. Gingles,* 478 U.S. 30 (1978) ...............24

*Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252 (1977) ....24, 25, 26

*White v. Regester*, 412 U.S. 755 (1973) .....................24

*Zimmer v. McKeithen*, 485 F. 2d 1297 (5th Cir. 1973) (*en banc*) .......................................................24


Statutes:

42 U.S.C. § 15483(b)(2)(A)...........................................19


State Statutes:

Indiana Senate Enrolled Act No. 483, Pub. L. No. 109-2005 ..............................................................1

N.C. Acts, ch. 287, §§ 3, 12 (1889), *in* Frenise A. Logan, The Negro in North Carolina, 1876-1894 (1964).......................................................9

S.C. Acts § 5, p. 1112 (1881-1882) ...............................9


Legislative Materials:

S. Rep. No. 97-417 (1982) .........................................24

H.B. 1318 (Pa. 2006).................................................28

iii

TABLE OF AUTHORITIES – Continued

Page

H.B. 1567 (Fla. 2005)..................................................27

H.B. 2019 (Kan. 2007)................................................27

H.B. 218 (Tex. 2007) ..................................................28

H.B. 244 (Ga. 2005) ...................................................27

H.B. 345 (N.H. 2006) .................................................28

S.B. 1014 (Mo. 2006)..................................................27

S.B. 42 (Wis. 2005).....................................................28

S.B. 483 (Ind. 2005) ...................................................27

S.B. 84 (Ga. 2006) ......................................................27

State Legislative Vote Records:

Florida, http://www.myfloridahouse.gov/Sections/
Bills/billsdetail.aspx?BillId=17234&SessionId=38.......28

Georgia (2005 bill), http://www.legis.state.ga.
us/legis/2005_06/sum/hb244.htm ..........................28

Georgia (2006 bill), http://www.legis.ga.gov/
legis/2005_06/search/sb84.htm ..............................28

Indiana House vote, http://www.in.gov/legislative/
bills/2005/PDF/Hrollcal/0259.PDF.pdf and Senate
vote, http://www.in.gov/legislative/bills/2005/PDF/
Srollcal/0417.PDF.pdf...............................................28

Missouri House vote, http://www.house.mo.gov/
bills061/jrnpdf/jrn073.pdf#page=23 and Senate
vote, http://www.senate.mo.gov/06info/pdf-jrnl/
DAY71.pdf#page=117...............................................28

iv

TABLE OF AUTHORITIES – Continued

Page

Kansas House vote, http://www.kslegislature.org/
journals/2007/hj0403.pdf and Senate vote, http://
www.kslegislature.org/journals/2007/sj0328.pdf ..........28

New Hampshire House vote, http://www.gencourt.
state.nh.us/ie/rollcall/rollcallsbyvotedetail.asp?
sessionyear=2006&voteno=29&body=H and Sen-
ate vote, http://www.gencourt.state.nh.us/ie/rollcall/
rollcallsbyvotedetail.asp?sessionyear=2006&
voteno=66&body=S ...................................................28

Pennsylvania House vote, http://www.legis.state.
pa.us/WU01/LI/HJ/2005/0/20060214.pdf and Sen-
ate vote, http://www.legis.state.pa.us/WU01/LI/SJ/
2005/0/Sj20060215.pdf ..............................................28

Texas House vote, http://tlo2.tlc.state.tx.us/hjrnl/
80r/pdf/80RDAY61FINAL.PDF#page=6 and
Senate vote, http://tlo2.tlc.state.tx.us/sjrnl/80r/pdf/
80RSJ05-15-F.PDF#page=4 ......................................28

Wisconsin House Vote, http://www.legis.state.
wi.us/2005/data/votes/av0219.pdf and Senate
vote, http://www.legis.state.wi.us/2005/data/votes/
sv0123.pdf .................................................................28

OTHER AUTHORITIES:

SPENCER D. ALBRIGHT, THE AMERICAN BALLOT
    (American Council on Public Affairs, 1942).............7

American Institute for Economic Research Cost
    of Living Calculator, http://www.aier.org/research/
    col.php (last visited Oct. 23, 2007) .....................16, 17

v

TABLE OF AUTHORITIES – Continued

Page

*Austin Daily Statesman*, Oct. 19, 1902.....................15

WILBOURN E. BENTON, TEXAS: ITS GOVERNMENT
    AND POLITICS (1961)...................................17

Brennan Center for Justice, *Citizens without
    Proof: A Survey of Americans' Possession of
    Documentary Proof of Citizenship and Photo
    Identification* (Nov. 2006), *available at* http://
    www.brennancenter.org/dynamic/subpages/down
    load_file_39242.pdf......................................29

Brennan Center for Justice & Spencer Overton,
    *Response to the Report of the 2005 Commission
    on Federal Election Reform* (2005), *available at*
    http://www.brennancenter.org/dynamic/subpages/
    download_file_47903.pdf.............................21

Robert Brischetto, David R. Richards, Chandler
    Davidson & Bernard Grofman, *Texas*, *in* QUIET
    REVOLUTION IN THE SOUTH: THE IMPACT OF THE
    VOTING RIGHTS ACT, 1965-1990 (Chandler
    Davidson & Bernard Grofman eds. 1994) ................. 16

Karen Brooks, *House Oks Voter ID Bill*, THE
    DALLAS MORNING NEWS, April 24, 2007, *available
    at* http://www.dallasnews.com/sharedcontent/
    dws/news/texassouthwest/stories/DN-voterid_
    24tex.ART.State.Edition2.4369e98.html.................33

Charles K. Chamberlain, Alexander Watkins
    Terrell, Citizen, Statesman (1956) (unpublished
    Ph.D. thesis, University of Texas).........................15

TABLE OF AUTHORITIES – Continued

Page

THE COALITION ON HOMELESSNESS AND HOUSING
IN OHIO & THE LEAGUE OF WOMEN VOTERS
OF OHIO, LET THE PEOPLE VOTE: A JOINT
REPORT ON ELECTION REFORM ACTIVITIES IN
OHIO (2005)..............................................................37

JOHN R. COMMONS, RACES AND IMMIGRANTS IN
AMERICA (1920)......................................................11

Digital History, http://www.digitalhistory.uh.edu/
historyonline/us34.cfm (last visited Oct. 23, 2007) ......16

Republicans in Texas: Monkey and Other
Business, THE ECONOMIST, May 31, 2007,
available at http://www.economist.com/world/
na/displaystory.cfm?story_id=9264314 .................34

FAIR, Texas: Illegal Aliens, http://www.fairus.org/site/
PageServer?pagename=research_researchab4e
(last visited Nov. 2, 2007)........................................36

JOHN HOPE FRANKLIN & ALFRED A. MOSS, JR.,
FROM SLAVERY TO FREEDOM: A HISTORY OF
NEGRO AMERICANS (Fortieth Anniversary ed.
1988) ........................................................................4

John William Graves, Negro Disfranchisement
in Arkansas, 26 ARKANSAS HISTORICAL
QUARTERLY 212-13 (1967).........................................8

Herman L. Horn, The Growth and Develop-
ment of the Democratic Party in Virginia
Since 1890 (1949) (Ph.D. Dissertation, Duke
Univ.) ......................................................................5

http://people-press.org/commentary/pdf/95.pdf
(last visited Nov. 7, 2007)........................................29

TABLE OF AUTHORITIES – Continued

Page

http://pewresearch.org/pubs/27/politics-and-the-
dotnet-generation (last visited Nov. 1, 2007)........29

http://www.cnn.com/ELECTION/2004/pages/results/
states/US/P/00/epolls.0.html (last visited Nov. 7,
2007)....................................................................30

http://www.sos.state.tx.us/elections/historical/70-92.
shtml (last visited Oct. 25, 2007)......................36, 37

Stanley Kelley, Jr., Richard Ayres & William G.
Bowen, *Registration and Voting: Putting First
Things First*, 67 APSR 359 (1967).........................23

ALEXANDER KEYSSAR, THE RIGHT TO VOTE: THE
CONTESTED HISTORY OF DEMOCRACY IN THE
UNITED STATES (2000)..................................10, 13, 14

J. MORGAN KOUSSER, COLORBLIND INJUSTICE:
MINORITY VOTING RIGHTS AND THE UNDOING
OF THE SECOND RECONSTRUCTION (1999) .................25

J. MORGAN KOUSSER, THE SHAPING OF SOUTHERN
POLITICS: SUFFRAGE RESTRICTION AND THE
ESTABLISHMENT OF THE ONE-PARTY SOUTH,
1880-1910 (1974)..............................................*passim*

La. Constitional Convention Journal (1898),
opposite page 42.........................................................9

Mark Lisheron, *Voter ID bill dies for the session,
Dewhurst says,* AUSTIN AMERICAN-STATESMAN,
May 24, 2007, *available at* http://www.statesman.
com/news/content/region/legislature/stories/05/24/
24voterid.html.........................................................34

TABLE OF AUTHORITIES – Continued

Page

Eric Lipton and Ian Urbina, *In 5-Year Effort, Scant Evidence of Voter Fraud*, N.Y. TIMES, April 12, 2007, *available at* http://www.nytimes.com/2007/04/12/washington/12fraud.html?_r=1&pagewanted=1&hp&adxnnlx=1176372006-q6OHEvb%20ZBH7i2JW5V76Pw&oref=slogin......32, 37

Kristen Mack, *In trying to win, has Dewhurst lost a friend?* HOUSTON CHRONICLE, May 17, 2007, *available at* http://www.chron.com/disp/story.mpl/metropolitan/mack/4814978.html ..........33

*Memphis Daily Appeal*, Nov. 6, 1890 ..........................8

CLIFTON MCCLESKEY, THE GOVERNMENT AND POLITICS OF TEXAS (2d ed.1966).........................17, 18

J.J. McCook, *Venal Voting: Methods and Remedies,* 14 THE FORUM 171-76 (1892)................11

ALBERT J. MCCULLOCH, SUFFRAGE AND ITS PROBLEMS (1929).....................................11

Office of the Texas Attorney General (press release), http://www.oag.state.tx.us/oagnews/ (last visited Oct. 25, 2007) ......................................37

Office of the Texas Attorney General (press release), http://www.oag.state.tx.us/oagnews/release.php?id=1423 (last visited Oct. 25, 2007) ....................................................................34

*New Orleans Daily Picayune*, Feb. 30, 1898...............5

FREDERICK D. OGDEN, THE POLL TAX IN THE SOUTH (1958) .........................................................14

TABLE OF AUTHORITIES – Continued

Page

John B. Phillips, *Educational Qualifications of Voters*, UNIVERSITY OF COLORADO STUDIES (1906)......................................................................11

R.G. Ratcliffe, *Multiple ID voting bill wins preliminary OK*, HOUSTON CHRONICLE, May 2, 2005, *available at* http://www.chron.com/disp/story.mpl/metropolitan/3164795.html......................32

RICHARD VALELLY, THE TWO RECONSTRUCTIONS: THE STRUGGLE FOR BLACK ENFRANCHISEMENT (2004)......................................................................39

Jim Vertuno, *With Filibuster Threat in the Air, Senate Dems Thwart Voter ID Bill,* HOUSTON CHRONICLE, May 28, 2005, *available at* http://www.chron.com/disp/story.mpl/politics/3202473.html ......................................................................32

VERNON LANE WHARTON, THE NEGRO IN MISSISSIPPI (1947)......................................................................6

Alexander Winchell, *The Experiment of Universal Suffrage*, 136 NORTH AMERICAN REVIEW (1883)...........12

1

## STATEMENT OF INTEREST

This *amici curiae* brief in support of Petitioners is filed on behalf of historians and other scholars, twenty-nine in all, who for many years have studied issues concerning voting rights.[1]

The present case raises important questions about the right to vote and the governmental interests that must be present in order for the state to impose restrictions on that right. *Amici* have a longstanding, demonstrated interest in the integrity of elections and the protection of citizens' right to vote and to participate in the political process. Their interest is directly involved in this case.

———————◆———————

## SUMMARY OF ARGUMENT

The issue before the Court is whether a law[2] passed by the Indiana legislature requiring most voters to show a photo ID in order to cast a ballot violates the First and Fourteenth Amendments of the U.S. Constitution. Plaintiffs challenging the law in

———————

[1] These *amici curiae* are listed in Appendix A. *Amici curiae* certify that no counsel for a party authored this brief in whole or in part. A monetary contribution to the preparation and submission of this brief was made by the Center for Voting Rights and Protection. The parties have filed letters consenting to the filing of any *amicus curiae* brief with the Clerk of the Court.

[2] Indiana Senate Enrolled Act No. 483, Pub. L. No. 109-2005 (hereafter, "Indiana photo ID law").

the district court argued that the burdens imposed by the new law work an unfair and unjustified hardship on many people who do not have an Indiana driver's license or other official documents that count as a legitimate photo ID. They argued, *inter alia*, that the photo ID requirement imposes real costs involved in obtaining the right kind of photo ID, costs that unduly burden many eligible citizens in the exercise of their right to participate in the political process. A majority of the appeals court below disagreed with plaintiffs, minimizing the burden imposed and stating that it was justified by the goal of preventing voter fraud, even while admitting that no instance of in-person fraud had been prosecuted in the history of the state.

To scholars of voting rights and election law in the United States, this case raises extremely important questions that the Court would do well to consider in reaching its decision. Given the long history of legally sanctioned disfranchisement of large and disparate groups of Americans from the founding of the Republic to the very recent past, the signatories of this brief – primarily historians and social scientists who have studied disfranchisement – respectfully urge the Court to consider the likelihood that the Indiana law is yet another effort in this tradition, even though it is justified in public debate by laudable goals that fair-minded citizens might well agree with.

This *amici* brief will chronicle this nation's history of disfranchising people of color and poor

whites under the banner of "reform," reviewing disfranchising devices such as secret ballot laws, registration acts, "eight-box" laws, and literacy tests. Such measures were offered under the "reform" banner and billed as anti-fraud or anti-corruption devices; yet through detailed provisions within them, they produced a discriminatory effect (often intended) within the particular historical context. Special attention will be paid to the poll tax, which is often cited as the historical antecedent of the current photo ID laws, and which similarly placed a disproportionate and unconstitutional burden on those with limited resources, particularly racial and ethnic minorities. *See infra* Sections I-III.

The brief will also analyze whether Indiana's photo ID law falls within this unfortunate American tradition of disfranchising laws passed under the guise of electoral reform. *Amici* propose a multi-factor framework for assessing whether a given election law is based on illicit legislative motives notwithstanding a declared "good government" purpose, considering, for example, the law's historical background and actual or foreseeable impact. *See infra* Section IV. In examining the Indiana law within this framework, *amici* focus on whether the law was enacted to advance partisan goals and whether the alleged objectives of the law – deterring in-person voter fraud and ensuring electoral integrity – are credible. After reviewing the partisan nature of the legislative support for the Indiana law and the partisan affiliation of the groups most likely to be burdened by the

law, as well as noting the absence of any convictions in Indiana relating to the type of voter fraud the photo ID law purports to prevent, *amici* conclude that the motives behind the law are particularly suspect. *See infra* Sections V-VI.

In sum, analysis of Indiana's law in light of this country's history of disfranchisement reveals that the photo ID requirement, like the now unconstitutional poll tax, has not been justified by the "reform" objectives asserted by its proponents. The historians and other scholars who are signatories to this *amici* brief therefore urge this Court to reverse the Seventh Circuit decision below, and prevent a repetition of this country's shameful history of suppressing the vote of its most vulnerable citizens.

———————◆———————

## ARGUMENT

## I.  Post-Reconstruction "Progressive Reform" Was Typically Used To Disfranchise People of Color and Poor Whites

No era in American history provides more dramatic examples of this kind of dishonesty and its costs to democracy than the half-century following the Civil War.[3] The language of "progressive reform" was extensively employed in the late nineteenth- and

---

[3] For a summary of this period, see JOHN HOPE FRANKLIN & ALFRED A. MOSS, JR., FROM SLAVERY TO FREEDOM: A HISTORY OF NEGRO AMERICANS, Chap. XIII (Fortieth Anniversary ed. 1988).

early twentieth-century campaigns to disfranchise blacks and poor whites in the South. Actually adopted for partisan and racially discriminatory purposes, and having dramatic partisan and racially discriminatory effects, these laws were often presented as high-minded attacks on fraud – efforts to "purify" the electorate that would only inconvenience "vote sellers" or the ignorant and "shiftless."

To be sure, unlike today, when proponents of voter identification must strain to find the smallest examples of fraud, particularly among those voting in person at the polls, in the nineteenth century there was widespread and readily admitted fraud – *against* African Americans and the Republican party to which they then adhered. Louisiana Senator Samuel D. McEnery stated in 1898 that his state's 1882 election law "was intended to make it the duty of the governor to treat the law as a formality and count in the Democrats."[4] William A. Anderson, author of the 1894 racially discriminatory election law in Virginia, boasted that elections under his law were "crimes against popular government and treason against liberty."[5] A leader of the 1890 Mississippi constitutional convention admitted that "it is no secret that there has not been a full vote and a fair count in Mississippi since 1875," which was the last year until

---

[4] *New Orleans Daily Picayune*, Feb. 30, 1898.

[5] Herman L. Horn, The Growth and Development of the Democratic Party in Virginia Since 1890, 47-48 (1949) (unpublished Ph.D. dissertation, Duke Univ.).

1967 in which African Americans voted at all freely in the state.[6] In other words, there were many examples of the disfranchisers speaking openly about their intentions.

Nonetheless, these same white supremacist Democrats invoked the language of reform in calling for a wide range of restrictions on the suffrage: "eight-box" laws, registration acts, secret ballot laws, poll taxes, literacy and property tests, "understanding" qualifications, and white primaries.

Nowhere did the aura of reform hang so heavily as around the secret or "Australian" ballot, a measure with much to recommend it, in America as elsewhere. Endorsed by the radical English Chartists of the 1840s, American labor leaders, popular reformers like Henry George, and the Populist Party, as well as civic reformers such as Congressman (later Senator) Henry Cabot Lodge, the secret ballot swept across the country after the extremely close and highly controversial presidential election of 1888.[7] (Ironically, that controversy centered on allegations of fraudulent voting in Indiana.) Reformers declared that the secret ballot would diminish corruption and bring the "best men" into politics. Eight southern and thirty

---

[6] VERNON LANE WHARTON, THE NEGRO IN MISSISSIPPI 206 (1947).

[7] J. MORGAN KOUSSER, THE SHAPING OF SOUTHERN POLITICS: SUFFRAGE RESTRICTION AND THE ESTABLISHMENT OF THE ONE-PARTY SOUTH, 1880-1910 51 (1974).

non-southern states adopted the secret ballot between 1888 and 1900.[8]

Advertised as a general anti-fraud measure, just as photo identification measures are today, the nineteenth century secret-ballot laws could be designed, through their detailed provisions, to act as stringent literacy tests. If voters were prohibited from receiving assistance in voting from friends or acquaintances or even from election officials (as in many southern and eight non-southern states), if party labels were prohibited (as in Florida, Louisiana, and Tennessee), if the ballot was exceedingly long (as in Louisiana's 1898 ticket, which contained 92 names, listed alphabetically, for 36 constitutional convention delegate positions), or if the ballot was printed in German *Fractur* script (as in one congressional district in Virginia in 1894), then voters had not only to be literate, but also quite skillful in English.[9] In seven of the eleven ex-Confederate states in 1900, over half of the African-American male adults were illiterate,[10] and in the nation as a whole, about a sixth of white male adults had been born in a non-English-speaking

---

[8] SPENCER D. ALBRIGHT, THE AMERICAN BALLOT 23-29 (American Council on Public Affairs, 1942).

[9] Details about these laws and ballots are taken from KOUSSER, *supra* note 7, at 51-53, 161 and 164.

[10] In the antebellum South, it was illegal to teach a slave to read, and postbellum schools for African Americans were often starved of funds.

8

country. Clever *de facto* literacy tests could disfranchise many people.

And they did. An 1892 Democratic campaign song in Arkansas put the point most memorably:

> The Australian Ballot works like a charm,
> It makes them think and scratch,
> And when a Negro gets a ballot
> He has certainly got his match.[11]

Estimated black turnout in Arkansas dropped from 71 percent before passage of the secret-ballot law to 38 percent in the first election after passage; in Louisiana, from 69 to 24 percent; in Tennessee, from 60 percent to little or nothing.[12] The effects were partisan, as well as racial. In Tennessee, according to the Democratic *Memphis Daily Appeal*, the effect of the 1889 Australian ballot law on the 1890 elections was "most admirable. The vote has been cut down wofully [sic] and wonderfully to be sure, but the ratio of Democratic majorities has been raised at least four-fold. . . . The enemy [*i.e.*, the Republican party] is completely annihilated."[13] In short, a reform measure that in important respects was a major step forward in voting technology was purposely used as a disfranchising tool.

---

[11] John William Graves, *Negro Disfranchisement in Arkansas,* 26 ARKANSAS HISTORICAL QUARTERLY 212-13 (1967).

[12] These estimates appear in KOUSSER, *supra* note 7, at 55 and 121.

[13] *Memphis Daily Appeal*, Nov. 6, 1890.

As with the Australian ballot, certain registration laws, touted as anti-corruption measures, also had significant disfranchising effects, depending on their detailed provisions and the amount of discretion left to election officials. A North Carolina registration law of 1889, for instance, required the voter to prove "as near as may be" his "age, occupation, place of birth and place of residency . . . by such testimony, under oath, as may be satisfactory to the registrar."[14] African Americans born in slavery often did not know their exact age or place of birth, much less have written proof, if the registrar demanded it. In South Carolina, registrars under the state's 1881 law had the power to add names to the registration rolls after the registration period had closed, enabling them to enfranchise whites, while fencing blacks out of the electorate.[15] Re-registration before critical elections was also used to cut down votes of opponents of the ruling party. In Louisiana, black registration dropped by 90 percent in one year (1898) because of a required re-registration.[16]

Another common disfranchising mechanism involved in the registration process was the "immigrant registration" laws. As one scholar describes them:

---

[14] N.C. Acts, ch. 287, §§ 3, 12 (1889), *in* Frenise A. Logan, The Negro in North Carolina, 1876-1894 58-59 (1964).

[15] S.C. Acts § 5, p. 1112 (1881-1882).

[16] La. Constitutional Convention Journal (1898), opposite page 42.

While alien suffrage was being phased out, numerous states placed new obstacles in the path of immigrant voters: most commonly these were supported by some Republicans, opposed by Democrats, and justified on the grounds that they would reduce fraud. One such obstacle was to require naturalized citizens to present their naturalization papers to election officials before registering or voting. Although not unreasonable on its face, this requirement, as lawmakers knew, was a significant procedural hurdle for many immigrants, who might easily have lost their papers or been unaware of the requirement.[17]

The *New York Herald* in 1888 described as "a sad feature" of New Jersey's immigrant registration requirement the fact "that many persons will be deprived of their vote, as their papers are either worn out, lost, or mislaid."[18] Moreover, as historian Alexander Keyssar notes, this requirement, along with the provision allowing anyone present at the polls to challenge immigrant voters' credentials, gave "substantial discretionary power" to officials at the polls.[19]

South Carolina in 1881 instituted the "eight-box" law, requiring different ballots to be deposited in separate ballot boxes for each of the eight offices to be

---

[17] Alexander Keyssar, The Right to Vote: The Contested History of Democracy in the United States 138 (2000).

[18] *Ibid.*

[19] *Ibid.*

voted on. The purported purpose was to prevent illiterate voters from taking to the polls already marked ballots given them by political bosses and simply depositing them, perhaps in return for money. Since the order of the ballot boxes was supposed to be shifted periodically throughout Election Day, fraud by illiterates would be impossible. The law, however, served as a literacy test, and the fact that election officials, who in South Carolina after 1876 were all Democrats, could "assist" illiterates in placing their ballots in the correct boxes indicates the partisan and racial purposes of the nationally famous scheme.[20] Along with a registration law passed at the same time, the eight-box law cut black turnout from 70 percent to 35 percent and finished the chances of the South Carolina Republican party in statewide elections until the 1960s.[21]

Between 1889 and 1913, nine states outside the South made the ability to read English a prerequisite for voting.[22] Literacy tests were said to reduce the influence of immigrants or African Americans who supported "bosses" and "demagogues."[23] Writing in

---

[20] For details of the law, its passage, and its purposes, *see* KOUSSER, *supra* note 7, at 84-91.

[21] *Ibid*. at 92, Table 4.4.

[22] John B. Phillips, *Educational Qualifications of Voters*, UNIVERSITY OF COLORADO STUDIES (1906); ALBERT J. MCCULLOCH, SUFFRAGE AND ITS PROBLEMS 54-58 (1929).

[23] J.J. McCook, *Venal Voting: Methods and Remedies,* 14 THE FORUM 171-76 (1892); JOHN R. COMMONS, RACES AND IMMIGRANTS IN AMERICA 183, 195 (1920).

the reformist *North American Review*, a University of Michigan geologist denounced "the communistic principle of universal and equal suffrage."[24] Disfranchising those who lacked "the highest qualification of intelligence and virtue is not injustice to those who surrender control; it is justice to those who have a right to the best government; it is justice to those whom nature and education have fitted to administer the best government."[25] Between 1890 and 1908, seven of the eleven ex-Confederate states adopted state constitutional amendments allowing only literate voters or those with a certain amount of property to vote, sometimes with loopholes like "understanding" qualifications or grandfather clauses that allowed some whites to vote who could not meet literacy or property tests. Shortly after the passage of these amendments, fewer than 10 percent of African Americans managed to register to vote in most states, and no more than 15 percent in any.[26]

This, then, is an all-too-brief summary of the pattern of post-Reconstruction disfranchising laws, exclusive of the poll tax, as they have been chronicled by numerous twentieth-century historians: the brutal curtailment of the voting rights of people of color and, in many cases, poor or immigrant whites as well. Much of the disfranchisement was racist in origin; but some

---

[24] Alexander Winchell, *The Experiment of Universal Suffrage*, 136 NORTH AMERICAN REVIEW 119-34 (1883).

[25] *Ibid.*

[26] KOUSSER, *supra* note 7, at 60-61.

merely saw political opportunity in disfranchising a vulnerable segment of the population. Sometimes these laws were justified forthrightly in partisan terms, sometimes they were rationalized by appealing to the standards of democracy, electoral reform, fairness, and "purity" of the ballot. Moreover, sometimes the laws were clever variations on unexceptionable principles that violated the voting rights of targeted groups.

## II.  The Poll Tax Was Likewise Used from the 1890s to the 1960s to Disfranchise People of Color and Poor Whites

The current debate over the wisdom and legality of the Indiana photo ID requirement as a prerequisite to voting – as well as similar laws in other states – has led to claims that it is a "modern-day poll tax," implying that the new law, too, falls within the ignominious American tradition of disfranchising laws passed under the guise of "good government" reform.

The poll tax has a long history in the United States, but it took on a new meaning after Reconstruction: "where it once had referred to a head tax that every man had to pay and that sometimes could be used to satisfy a taxpaying requirement for voting, it came to be understood as a tax that one had to pay in order to vote," writes Keyssar.[27] After Reconstruction,

---

[27] On the shift in purpose of the tax, *see* KEYSSAR, *supra* note 17, at 112.

14

the tax was used as a political weapon, targeting especially blacks and poor whites.[28] Sometimes, as with other disfranchising weapons, those favoring it were straightforward in describing their goals.[29] Sometimes, like proponents of other disfranchising measures, they tried to mask their motives.

Frederick Ogden, perhaps the foremost scholar of the poll tax, wrote in the 1950s: "While critics of legalized restrictions on Negro voting may find it hard to discover any high moral tone in such activities, these restrictions reflected a movement for purifying the electoral process in southern states."[30] Ogden quotes the editor of the *San Antonio Express* writing in 1902: "By requiring a poll tax receipt, secured six months previous to an election, *fraudulent elections can be prevented almost entirely*." Almost half a century later, a man who had been a member of the Texas legislature when the poll tax was proposed in 1901 "said the main reason why the legislators approved it was to improve the conduct of elections."[31]

The chief sponsor of the poll tax in Texas, the state's leading "progressive," Alexander Terrell, declared that the purpose of the law was to eliminate

---

[28] Frederick D. Ogden, The Poll Tax in the South 1, 2 (1958).

[29] Keyssar, *supra* note 17, at 112.

[30] Ogden, *supra* note 28, at 7.

[31] *Ibid.* at 10.

"the thriftless, idle and semi-vagrant element of both races. Though liberty requires elections, yet when they are not controlled by intelligence and patriotism they become the most terrible enemy."[32] He enthusiastically promoted disfranchisement as reform, announcing that "Whether universal manhood suffrage is good for the country depends entirely on the sort of men who vote."[33] The Terrell election law of 1903 in Texas cut white turnout from 80 percent in 1900 to 46 percent in 1904 and black turnout from 36 percent to 15 percent in the same elections, and it wiped out the Populists and Republicans.[34]

In summary, the poll tax, like the other disfranchising measures instituted in the same period, clearly was designed to get people who voted "the wrong way" out of the electorate by requiring them to pay enough money to serve as a deterrent, and it had that effect by massively depriving blacks and many poor whites (and, in Texas, Latinos) of their right to vote. As with other disfranchising measures, it was justified in the high-flown language of reform.

---

[32] *Austin Daily Statesman*, Oct. 19, 1902.

[33] Charles K. Chamberlain, Alexander Watkins Terrell, Citizen, Statesman, 493-94 (1956) (unpublished Ph.D. thesis, University of Texas).

[34] KOUSSER, *supra* note 7, at 208.

## III. The Indiana Photo ID Requirement Imposes Significant Burdens on Voters

How does the burden of the historic poll tax compare to the burden imposed by Indiana's photo ID law? This is not an easy question to answer. The tax differed from state to state. Sometimes party operatives, union members, or employers would pay poll taxes for those whom they thought would vote the right way. Moreover, long-term inflation reduced the actual cost of the tax over the decades, as the nominal cost of the tax remained constant.

At the beginning of the twentieth century, however, the tax was a massive burden on those of lesser means. In Texas, for example, it affected not only the poor in general but also the disproportionately poor black and Latino populations.[35] In 1913, nine years after the $1.75 tax went into effect there ($1.50 was imposed by the state, and counties had the option of imposing an additional 25 cents), it had a buying power of $36.36 in today's dollars.[36] In 1912, the average annual wage in the United States was $592, about $13,000 in today's dollars.[37] It was undoubtedly

---

[35] Robert Brischetto, David R. Richards, Chandler Davidson & Bernard Grofman, *Texas*, *in* QUIET REVOLUTION IN THE SOUTH: THE IMPACT OF THE VOTING RIGHTS ACT, 1965-1990, 233-37 (Chandler Davidson & Bernard Grofman eds. 1994).

[36] American Institute for Economic Research Cost of Living Calculator, http://www.aier.org/research/col.php (last visited Oct. 23, 2007).

[37] Digital History, http://www.digitalhistory.uh.edu/historyonline/us34.cfm (last visited Oct. 23, 2007). The 1912 figure was $592

(Continued on following page)

less than that in the South, and much less among blacks and Latinos.

By 1966, while still a disproportionate barrier to poor people, the Texas poll tax was nothing like the barrier it had been fifty years earlier. Its price had diminished to roughly $11 in today's dollars.[38] (The tax was not cumulative in Texas, as it was in some states, *i.e.*, one did not have to pay back taxes for the years one had not voted.) Moreover, only voters between the ages of 21 and 60 were required to pay it, and the percentage of people over 60 years of age had increased with time. Other classes of individuals were exempted as well: Indians, the blind, and the permanently disabled, among others.[39] Taken in their entirety, those exempted from the tax shortly before it was abolished in the mid-1960s were estimated to include from 15 to 30 percent of the state's qualified voters.[40] Yet in spite of the greatly diminished weight of this burden between 1904 and 1966, thirty-eight states, in ratifying the Twenty-fourth Amendment in 1964, still saw fit to abolish the poll tax.[41] Furthermore,

---

in the source cited, and that figure was translated into 2007 dollars by American Institute for Economic Cost of Living Calculator, *supra* note 37.

[38] *Ibid.*

[39] Wilbourn E. Benton, Texas: Its Government and Politics 87 (1961).

[40] Clifton McCleskey, The Government and Politics of Texas 52 (2d ed. 1966).

[41] *Ibid.*

two years later, this Court decided *Harper v. Virginia Board of Elections,* 383 U.S. 663 (1966),[42] declaring Virginia's poll tax unconstitutional.

How do the decreasing burdens of the poll tax at the time they were abolished or struck down by this Court compare to the burdens shouldered by the citizens of Indiana today as a result of the photo ID law? It requires anyone seeking to vote in person, having already registered, to present special kinds of photographic proof of identity (unless the voter is voting in a state-licensed facility where they reside). Any voter failing to present identification may only cast a provisional ballot. No such proof of identity is necessary for those voting by mail (absentee).

Petitioners Indiana Democratic Party, *et al.* (hereafter "IDP") have noted the burdens imposed by those who choose to vote absentee by mail.[43] They note, for example, that one must apply for a ballot at least eight days before the election, wait for the ballot to arrive, complete the ballot and mail it back in a special envelope, attest by affidavit to the voter's

---

[42] While *Harper* focused on the poll tax in Virginia, the Voting Rights Act of 1965 had instructed the U.S. Department of Justice to bring suit challenging the poll tax in state elections, and such a suit was brought in the summer of 1965 in Austin. In February 1966 a three-judge federal panel held the tax requirement violated the Fourteenth Amendment, even before the Supreme Court made the same finding in Virginia. See MCCLESKEY, *supra* note 41, at 53.

[43] *See* IDP Brief at 5-6.

identity, and mail it back so that it arrives by noon on Election Day.[44] No photo ID is required for any part of this absentee ballot process.[45] These requirements of an absentee voter (all of which can be undertaken without a photo ID), are entirely different from the burdens imposed on voters who plan to vote in person on Election Day but who lack the required photo ID.

For the latter, the task of casting a ballot that will be counted can be challenging. There are two options available to such persons: 1) They can attempt to get suitable photo ID before Election Day; or 2) they can cast a provisional ballot on Election Day and then, within ten days of the election, verify their identity.

The most typical photo ID consists either of an Indiana driver's license or a state-issued ID card.[46] At least 43,000 persons of voting age in Indiana are estimated to have neither.[47] For the larger number of persons who do not have a driver's license, getting one will probably be a difficult route.

---

[44] *Ibid.*

[45] *Ibid*. at 6. The one exception is the Help America Vote Act (HAVA), which requires that first-time voters in a federal election who register by mail must provide "a copy of a current and valid photo identification" or a "copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter." 42 U.S.C. § 15483(b)(2)(A).

[46] Petitioner IDP Brief, at 13.

[47] Petitioner Crawford Brief at 12.

The second route, on its face, seems easier, as a state-issued ID card is nominally free. But consider the steps that a potential voter must take to secure such an ID. First, he or she must appear at the Bureau of Motor Vehicles (BMV) and present one of two sets of documents. The first set includes a "primary document," a "secondary document," *and* "proof of Indiana residency." The second alternative set consists of two "primary documents" and one "proof of Indiana residency."[48] Primary documents include a birth certificate of a specified kind, certain documents certifying American citizenship, a passport, or a U.S. military or merchant marine photo ID.[49] Included among secondary documents are bank statements, court documents, certified academic transcripts, and government-issued ID cards.[50] A number of documents are also accepted as proof of Indiana residency.[51] While such requirements might seem reasonable in the abstract, the record in this case shows that approximately 60 percent of the applicants for a photo ID are turned away by the Indiana BMV for lack of the required documents.[52]

For those would-be voters who show up at the polls without sufficient photo ID, the new law requires

---

[48] Crawford Petition for Writ of Certiorari Appendix ("Pet. App.") at 31a-35a.

[49] *Ibid*. at 32a-33a.

[50] *Ibid*. at 33a-34a.

[51] *Ibid.* at 35a.

[52] Andrews Dep. 28-29, *cited in* Petitioner IDP Brief at 13.

that they be challenged, even if they are known by the poll officials.[53] They must then vote using a provisional ballot – a not too promising avenue, given that 85 percent of provisional ballots cast in Indiana in 2004 were not counted, and that was before the new photo ID law had gone into effect.[54] To cast such a ballot, voters must sign an affidavit stating under penalty of perjury that they are eligible to vote in that precinct. Nine different factual statements must be attested to in the affidavit.[55]

With the new law in effect, voters who cast a provisional ballot must, finally, within ten days of the election, travel to the circuit court clerk or the county election board, sign another affidavit swearing they are the person who cast the provisional ballot on election day; and then either show a valid photo ID or swear that they have a religious objection to being photographed or are an indigent unable to obtain proof of identity without paying a fee.[56]

It is evident that this is a significant burden for those who most likely do not possess an Indiana driver's license.[57] The burden for a poor person, an old

---

[53] Petitioner IDP Brief at 10.

[54] *Ibid.* at 5.

[55] *Ibid.* at 11.

[56] *Ibid.*

[57] *See* Brennan Center for Justice & Spencer Overton, *Response to the Report of the 2005 Commission on Federal Election Reform* 4-5 (2005), *available at* http://www.brennancenter. org/dynamic/subpages/download _file_47903.pdf.

person, or an old person who is poor, could be quite substantial. In terms of money, for example, in Marion County (Indianapolis) the cost of a birth certificate – one of the documents that can be purchased to establish one's identity – is $10, which, it will be remembered, is approximately the cost in today's dollars ($11) of the poll tax in Texas at the time it was abolished in 1966.

It is often asserted that the barriers of the sort detailed above should not prevent a truly motivated citizen from voting. In a classic article by political scientists Kelley, Ayres, and Bowen attempting to measure determinants of voter turnout, the authors observe:

> A frequent objection to such efforts [to get out the vote] is that voters not interested enough to vote are not apt to vote wisely and so should be left alone. This view recalls the statement of a New York voter regarding the adequacy of the facilities for registering in New York City in 1964: "I sure do want to vote against that man . . . but I don't think I hate him enough to stand on that line all day long." How much interest should a voter have to qualify him for voting? Enough to stand in line all day? For half a day? For two days? We cannot say, but those who think

voting should be limited to the "interested" ought to be prepared to do so.[58]

The question, posed thus in terms of the burden of time alone, can also be posed with regard to money. Particularly concerning the least well off, what sort of monetary impositions should be placed on the right to vote before they become the functional equivalent of a poll tax? This is a question we believe should be carefully weighed by the Court in this case.

## IV.   Legislative Motives Should Be Considered When Determining the Constitutionality of Any Asserted "Reform"

The problem for this Court, as the Kelley-Ayres-Bowen article quoted above makes clear, is that "electorates are much more the product of political forces than many have appreciated. . . . Within limits, they can be constructed to a size and composition deemed desirable by those in power."[59] Given this Court's important role in protecting the health of our democracy, how can the Court distinguish between unobjectionable, run-of-the-mill regulation and laws designed to restrict partisan participation? What type of analytical framework can be constructed for judges to decide whether a given election law contains illicit

---

[58]  Stanley Kelley, Jr., Richard Ayres & William G. Bowen, *Registration and Voting: Putting First Things First*, 67 APSR 359, 375 (1967).

[59]  *Ibid.*

motives, despite the "good government" reasons presented by its champions?

Happily, manageable doctrinal standards already exist for conducting such an inquiry. This Court has developed a methodological framework in similar cases, such as unconstitutional vote dilution, *see White v. Regester*, 412 U.S. 755 (1973),[60] and Equal Protection Clause cases, *see Village of Arlington Heights v. Metropolitan Housing Corporation*, 429 U.S. 252 (1977).

The judicially-created *White-Zimmer* factors, for instance, have helped courts identify illicit motives in districting cases for decades. These factors, drawn from courts' historical experience adjudicating race discrimination claims in the electoral arena, were later adopted by the Senate Judiciary Committee in its 1982 deliberations on extending certain features of the Voting Rights Act. These warning signs, subsequently known as the "Senate factors," have been considered by courts whenever they determine whether election laws violate the Act's proscription against racial discrimination in voting as contained in Section 2 of the Act.[61] These Senate factors were discussed in detail and approved by this Court in *Thornburgh v. Gingles*, 478 U.S. 30, 43-46 (1978).

---

[60] The Fifth Circuit enunciated a similar multifactor test for measuring vote dilution in *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973) (*en banc*).

[61] For the list of factors, *see* S. Rep. No. 97-417, at 28-29 (1982).

This Court's approach for determining racial intent using the *Arlington Heights*-type inquiry is particularly instructive, for it includes many of the same considerations historians and other scholars believe "ought to be taken into account in any inquiry into the intent to which an electoral rule was adopted or maintained, that is, a framework for organizing the totality of the evidence."[62] The *Arlington Heights* factors include: the impact of the law; the historical background; the sequence of events; departures from procedural or substantive norms; and the reasons given for the law (*e.g.,* legislative or administrative history).

While these factors were delineated in the context of analyzing decisions involving race, they address the same type of evidentiary problem at issue in this case – how to identify the true motive behind a decision – and can be easily adapted to situations involving any political minority. Indeed, history teaches that racial and partisan considerations are often intertwined.

Space does not permit a comprehensive and rigorous examination or application of such factors to the Indiana voter ID law in this brief. However, two

---

[62] *See, e.g.*, J. Morgan Kousser, Colorblind Injustice: Minority Voting Rights and the Undoing of the Second Reconstruction 346 (1999) (proposing a ten-factor test for analyzing intent of electoral laws, including actual and foreseeable impact, motives of political actors, and statements by proponents).

interrelated factors in particular seem crucial to deciding whether that law should be interpreted solely in the "good government" language of its proponents:

- *First*, will the application of the law shape the Indiana electorate "to a size and composition deemed desirable by those in power," as Kelley, Ayres, and Bowen put it? In the language of *Arlington Heights*, was the photo ID bill approved largely along partisan lines and will its impact most likely harm voters of the minority party (*i.e.,* will it disfranchise likely Democratic voters)?

- *Second*, do the law's mechanisms truly address the stated concerns? In other words, can the supporters of photo ID in Indiana point to examples of voter fraud that will be remedied by the law? Under the *Arlington Heights* framework, the sequence of events that led up to the enactment (*e.g.,* prior prosecutions for in-person vote fraud) and statements made by decisionmakers regarding the law's purpose seem particularly relevant.

These two factors were embraced, respectively, as "an important starting ground" and "highly relevant" by this Court in *Arlington Heights, supra* 429 U.S. at 266, 268. As we show below, there are strong indications that the intent of the Indiana photo ID law is highly partisan, and that the asserted justification of preventing vote fraud lacks credibility.

## V. Evidence Strongly Suggests Indiana's Photo ID Law Was Enacted With Partisan Intent To Burden Certain Voters

How does one judge the partisan motives of a bill where the sponsors assert it is designed solely to prevent voter fraud? One method, possibly yielding a suggestive though not definitive answer, would examine the extent to which the bill was passed on a party-line vote. Another would analyze the likely partisan affiliation of those most likely to be burdened by the law. We examine both of these below.

To what extent was the Indiana photo ID bill passed by a partisan vote? It should be noted that Indiana's was one of at least ten bills introduced by Republicans in state legislatures between 2005 and 2007 requiring voters to show a photo ID at the polls. If the house and senate votes for these ten bills are combined, *95.3 percent* of the 1,222 Republicans voting and just *2.1 percent* of the 796 Democrats voting supported the bills. Moreover, in all five cases in which both houses passed them and a Republican was governor, the governor signed them. In the three cases in which both houses passed them and a Democrat was governor, the governor vetoed them. (In two cases, only one house passed the bill.)[63]

---

[63] These calculations were based on the recorded votes for the following ten voter ID bills: *Enacted*: H.B. 244 (Ga. 2005) (enjoined); S.B. 84 (Ga. 2006); H.B. 1567 (Fla. 2005); S.B. 483 (Ind. 2005); S.B. 1014 (Mo. 2006) (enjoined). *Failed*: H.B. 2019

(Continued on following page)

The situation in Indiana was part of this overall pattern, although even more extreme. In the 2005 vote on Senate Bill 483, 85 Republicans supported the bill and none voted against it; 62 Democrats voted against it and none supported it. The Republican governor signed it into law.[64]

Who are most likely to be burdened by the new voter ID laws? A November 2006 survey of 987

_____

(Kan. 2007); H.B. 345 (N.H. 2006); H.B. 1318 (Pa. 2006); H.B. 218 (Tex. 2007); S.B. 42 (Wis. 2005).

Recorded tallies of the legislative votes for these bills are available as follows: Florida, http://www.myfloridahouse.gov/ Sections/Bills/billsdetail.aspx?BillId=17234&SessionId=38; Georgia (2005 bill), http://www.legis.state.ga.us/legis/2005_06/sum/hb244. htm; Georgia (2006 bill), http://www.legis.ga.gov/legis/2005_06/ search/sb84.htm; Indiana House vote, http://www.in.gov/legislative/ bills/2005/PDF/Hrollcal/0259.PDF.pdf and Senate vote, http://www. in.gov/legislative/bills/2005/PDF/Srollcal/0417.PDF.pdf; Missouri House vote, http://www.house.mo.gov/bills061/jrnpdf/jrn073.pdf# page=23 and Senate vote, http://www.senate.mo.gov/06info/pdf-jrnl/ DAY71.pdf#page=117; Kansas House vote, http://www.kslegislature. org/journals/2007/hj0403.pdf and Senate vote, http://www.kslegislature. org/journals/2007/sj0328.pdf; New Hampshire House vote, http://www. gencourt.state.nh.us/ie/rollcall/rollcallsbyvotedetail.asp?sessionyear =2006&voteno=29&body=H and Senate vote, http://www.gencourt. state.nh.us/ie/rollcall/rollcallsbyvotedetail.asp?sessionyear=2006& voteno=66&body=S; Pennsylvania House vote, http://www.legis. state.pa.us/WU01/LI/HJ/2005/0/20060214.pdf and Senate vote, http:// www.legis.state.pa.us/WU01/LI/SJ/2005/0/Sj20060215.pdf;  Texas House vote, http://tlo2.tlc.state.tx.us/hjrnl/80r/pdf/80RDAY61FINAL. PDF#page=6 and Senate vote, http://tlo2.tlc.state.tx.us/sjrnl/80r/ pdf/80RSJ05-15-F.PDF#page=4; Wisconsin House Vote, http://www. legis.state.wi.us/2005/data/votes/av0219.pdf and Senate vote, http:// www.legis.state.wi.us/2005/data/votes/sv0123.pdf.

[64]  Petitioner IDP Brief at 9.

randomly selected voting-age American citizens by the independent Opinion Research Corporation conducted for the Brennan Center for Justice revealed the following subsets of the population:

- 11 percent of voting-age citizens lacked a government-issued photo ID. Using 2000 census data as a basis, this figure translates into 21 million nationwide.

- 15 percent of voting-age citizens earning less than $35,000 annually lacked such ID.

- 18 percent of citizens 65 years of age or older lacked such ID.

- 25 percent of African-American citizens of voting-age lacked such ID.[65]

The latter two demographic groups, the elderly and African Americans, are more likely to self-identify as Democrats – African Americans overwhelmingly so.[66]

---

[65] These figures are statistically significant at the .05 level of confidence. *See* Brennan Center for Justice, *Citizens without Proof: A Survey of Americans' Possession of Documentary Proof of Citizenship and Photo Identification* (Nov. 2006), *available at* http://www.brennancenter.org/dynamic/subpages/download_file_39242.pdf.

[66] For African Americans, *see* http://people-press.org/commentary/pdf/95.pdf (last visited Nov. 7, 2007); for senior citizens, *see* http://pewresearch.org/pubs/27/politics-and-the-dotnet-generation (last visited Nov. 1, 2007). Partisan self-identification, of course, is not the sole determinant of one's voting choice. For example, in the 2004 presidential election, 52% of those 65 years and over supported George W. Bush, while 48% supported John Kerry.

(Continued on following page)

In close elections, the additional burdens placed on both the elderly and African Americans by the photo ID law could benefit Republican candidates. There is no reason to believe this national pattern is much different from that in Indiana.

## VI. The Reasons Given for Indiana's Photo ID Law Are Not Credible

Is the ostensible reason given by proponents of the Indiana law (and less stringent photo ID laws in other states) credible? Their claim is that it is designed to prevent in-person vote fraud.[67] The debate over the extent and kind of vote fraud in the United States today has been loud and acerbic at least since the 2000 presidential election and shows no signs of abating. There are numerous kinds of vote fraud and the distinctions among them – which are necessary to determine the most effective means of their prevention – are often lost in popular debate. "Vote fraud" involves chicanery perpetrated both by voters at the polls or elsewhere and by others (including election officials). As critics of the Indiana law correctly point out, a photo ID requirement solely prevents one type of fraud: would-be voters at the polls on Election Day who are not properly registered yet present themselves to election officials as someone who is.[68] Among

_____

*See* http://www.cnn.com/ELECTION/2004/pages/results/states/US/P/00/epolls.0.html (last visited Nov. 7, 2007).

[67] *See* State Mot. for Summ. J. at 45 (Dec. 1, 2005).

[68] Petitioner IDP Brief at 42-44.

the kinds of voter fraud it does not prevent is that involving mail-in ballots, which some believe to be more common than voters' misrepresenting their identity at the polls.[69]

Another concern of critics of the Indiana law – one that would raise a red flag to historians of disfranchisement as well – is that no apparent effort was made by the legislators pushing the photo ID bill to conduct a study of the kinds and incidence of election fraud in the state before drafting and enacting the bill. A fair and rational approach to revising election laws would include such a study, just as a legislator would conduct a study of the kinds and incidence of environmental pollution in a state before submitting a pollution-control bill.

What makes the statute particularly suspect in the case of Indiana is the fact that there is not a single prosecution for in-person vote fraud in the history of the state – a fact that Judge Posner, author of the court of appeals' split decision below, attributed to lax law enforcement.[70]

Recent experiences in Texas, where Republicans have controlled both branches of the legislature and governorship since 2003, are worth considering in this regard. Statements during the 2004 election season by highly placed officials in the current Washington

---

[69] Petitioner IDP Brief at 7 n.3.

[70] Pet. App. 7a-8a.

administration that vote fraud is a national problem, and extraordinary efforts within the U.S. Department of Justice to prosecute vote fraud in the months leading up to that election,[71] increased interest among Texas Republicans in preventing vote fraud in their own state.

During the 2005 session of the legislature, house Republicans in Texas introduced a photo ID bill less restrictive than that in Indiana – other documents could substitute for a photo ID. The Texas house passed the bill in a vote largely along partisan lines.[72] In the senate, the bill was a victim of parliamentary maneuvering by Democrats, and never came up for a vote.[73]

Texas Republicans, however, remained intent on passing such a bill. In the 2007 legislative session, house members again introduced a photo ID bill. Republican legislators did not hide their motives. According to a reporter, "Republicans like the voter

---

[71] Eric Lipton and Ian Urbina, *In 5-Year Effort, Scant Evidence of Voter Fraud*, N.Y. TIMES, April 12, 2007, *available at* http://www.nytimes.com/2007/04/12/washington/12fraud.html?_r=1&pagewanted=1&hp&adxnnlx=1176372006-q6OHEvb%20ZBH7i2JW5V76Pw&oref=slogin.

[72] R.G. Ratcliffe, *Multiple ID voting bill wins preliminary OK*, HOUSTON CHRONICLE, May 2, 2005, *available at* http://www.chron.com/disp/story.mpl/metropolitan/3164795.html.

[73] Jim Vertuno, *With filibuster threat in the air, Senate Dems thwart voter ID bill*, HOUSTON CHRONICLE, May 28, 2005, available at http://www.chron.com/disp/story.mpl/politics/3202473.html.

ID bill because they believe it will weaken Democrats, but can argue that it is a reasonable requirement" because it would prevent vote fraud.[74]

Not all Texas Republicans, however, shared that belief. Royal Masset, former political director of the Texas Republican Party, agreed that among his fellow Republicans it was "an article of religious faith that voter fraud is causing us to lose elections." Masset was not convinced. He did believe, however, that requiring photo IDs could cause enough of a drop-off in legitimate Democratic voting to add 3 percent to the Republican vote.[75]

In the debate over the Texas bill, Rep. Betty Brown, its sponsor, alleged that "Voter fraud is a serious crime but without photo IDs . . . the election code is a law without meaning." Democrat Rep. Rafael Anchia responded by saying the bill only addressed "voter impersonation," and cited testimony from officials with the state attorney general's office that no case of voter impersonation fraud had ever been prosecuted. In the final house vote, all but two Republicans supported it. No Democrat did.[76]

---

[74] Kristen Mack, *In trying to win, has Dewhurst lost a friend?* HOUSTON CHRONICLE, May 17, 2007, *available at* http://www.chron.com/disp/story.mpl/metropolitan/mack/4814978.html.

[75] *Ibid.*

[76] Karen Brooks, *House Oks Voter ID Bill*, THE DALLAS MORNING NEWS, April 24, 2007, *available at* http://www.dallasnews.com/sharedcontent/dws/news/texassouthwest/stories/DN-voterid_24tex.ART.State.Edition2.4369e98.html.

The emotional climax in the fight over the bill during the 2007 session occurred in the senate – consisting of twenty Republicans and eleven Democrats – where a two-thirds vote is required for a bill to be debated. Every Democrat's vote was needed to prevent passage. One Democrat, Mario Gallegos, was in Houston, fighting the rejection of a liver transplant. Against his doctor's wishes, he went to the statehouse in Austin and a hospital bed was installed for him in the capitol for the remainder of the session, if necessary, to enable him to vote if the bill came to the floor. Gallegos thereby prevented its passage, and the bill died.[77]

After the Republicans' first failure to get a photo ID bill through the Texas senate in 2005, Greg Abbott, the Republican Texas attorney general, attracted public attention by announcing a "training initiative to identify, prosecute [and] prevent voter fraud."[78] If the initiative were successful, it would add credibility to his party's call for a photo ID law. This

---

[77] *Republicans in Texas: Monkey and Other Business*, THE ECONOMIST, May 31, 2007, *available at* http://www.economist.com/world/na/displaystory.cfm?story_id=9264314. *See also* Mark Lisheron, *Voter ID bill dies for the session, Dewhurst says*, AUSTIN AMERICAN-STATESMAN, May 24, 2007, *available at* http://www.statesman.com/news/content/region/legislature/stories/05/24/24voterid.html.

[78] *See* http://www.oag.state.tx.us/oagnews/release.php?id=1423 (last visited Oct. 25, 2007).

was the most ambitious and costly effort in recent Texas history by the state's top law enforcement officer to come to grips with the alleged problem. "Vote fraud has been an epidemic in Texas for years, but it hasn't been treated like one," Abbott said. "It's time for that to change. Trainers from my office are now across the state visiting with prosecutors and law enforcement officers to stop the problem of voter fraud in its tracks. The integrity of our democratic election process must be protected." The announcement was made on January 25, 2006.[79]

To help quell the "epidemic," Abbott promised that his newly-created Special Investigations Unit (SIU) would "help police departments, sheriff's offices, and district and county attorneys successfully identify, investigate and prosecute various types of voter fraud offences."[80] Established with a $1.5 million grant from the governor's office, the SIU would have as one of its prime responsibilities investigating voter fraud allegations, he said. Abbott targeted 44 of Texas' 254 counties, including "18 cities where the Attorney General has previously investigated or prosecuted alleged Election Code violations that were referred by the Secretary of State." The 44 counties contained 78 percent of registered voters in the state, he said.[81]

---

[79] *Ibid.*

[80] *Ibid.*

[81] *Ibid.*

As described by Abbott, the vote fraud training initiative would seem to constitute a model of the aggressive, responsible, multi-level law enforcement effort that Judge Posner below assumed has been lacking in Indiana. What has been the result?

Texas is a large state, with thousands of elections occurring in a four-year period in its numerous governmental units. Texas also has a large population. In 2006, there were 13.1 million persons registered to vote.[82] One study by the anti-immigration group FAIR, estimates that 1.7 million Texas inhabitants reside there illegally in 2007.[83]

Given these facts, one would expect an aggressive, centralized vote-fraud initiative by the state's highest law-enforcement office to result in many prosecutions during the more than twenty-one months of its existence if, in fact, vote fraud had reached "epidemic" proportions. The data presented by the Attorney General on his official Web site tell a different story. Between late January 2006 and late October 2007, 13 persons were mentioned as having been indicted, found guilty, or sentenced for vote fraud, 6 on misdemeanor counts typically involving helping others with mail-in ballots. Of these 13 persons, 4 were accused of having committed fraud

---

[82] *See* http://www.sos.state.tx.us/elections/historical/70-92.shtml (last visited Oct. 25, 2007).

[83] FAIR, *Texas: Illegal Aliens*, http://www.fairus.org/site/PageServer?pagename=research_researchab4e (last visited Nov. 2, 2007).

before 2006, and the remaining 9 in 2006. (A total of 4.4 million Texans voted in the general elections for governor or U.S. Senator that year, in addition to those who voted in primaries.)[84] To date, 6 of the 13 persons prosecuted have not yet been found guilty.[85] Moreover, of the 7 found guilty and the 6 remaining under indictment, *none of the types of fraud they have been charged with would have been prevented by the photo ID requirement advocated by Texas Republicans in the 2007 legislative session.*

These data do not appear to be anomalous. A survey of the director or deputy director of all 88 Ohio boards of election in June 2005 found that a total of only 4 votes cast in the state's general elections in 2002 and 2004 (in which over 9 million votes were cast) were judged ineligible and thus likely constituted actual voter fraud.[86] A similar pattern nationwide has been reported.[87]

While it is possible, as Judge Posner implied in his decision, that aggressive vote-fraud enforcement in Indiana might yield more robust results, the

---

[84] *See* http://www.sos.state.tx.us/elections/historical/70-92.shtml (last visited Oct. 25, 2007).

[85] These data were obtained from press releases of the Texas Attorney General between Jan. 25, 2006 and Oct. 25, 2007. *See* http://www.oag.state.tx.us/oagnews/ (last visited Oct. 25, 2007).

[86] THE COALITION ON HOMELESSNESS AND HOUSING IN OHIO & THE LEAGUE OF WOMEN VOTERS OF OHIO, LET THE PEOPLE VOTE: A JOINT REPORT ON ELECTION REFORM ACTIVITIES IN OHIO (2005).

[87] Lipton and Urbina, *supra* note 70.

burden should rest on those who allege that vote fraud there is widespread and of the kind that is best deterred by a photo ID requirement. Until that burden is responsibly shouldered by state authorities, the question whether the Indiana law has been justified, in the sense of effectively targeting actual voter fraud, must be answered in the negative. This conclusion, combined with the finding that the legislative vote for the law was strictly along partisan lines and that the people most likely disfranchised by it are Democratic voters, demonstrates that Indiana's law is more in line with American disfranchising traditions, sharing much in common with the now unconstitutional poll tax.

———————◆———————

## CONCLUSION

We have considered the Indiana photo ID law as a voting prerequisite by revisiting the history of disfranchisement following the Civil War, and by paying special attention to the poll tax at the time it was adopted and at the time it was proscribed. Our considered judgment is that there is an important similarity between the Indiana law and the poll tax: both of them place a disproportionate burden on those of modest means, and the stated reason for the voter ID law is suspect, to say the least.

The ulterior purpose of the law is perhaps not primarily concerned with racial disfranchisement. But the impact of the photo ID bill seems likely to fall on poor and elderly persons, particularly African

Americans. It is therefore worth considering the words of *amicus* herein Richard Valelly who, in his history of "the two Reconstructions," wrote:

> *No* major social group in Western history, other than African Americans, ever entered the electorate of an established democracy and then was extruded by nominally democratic means such as constitutional conventions and ballot referenda, forcing that group to start all over again.[88]

*Amicus* Valelly does not ignore the checkered histories of democracy in various nations since 1789, including France, "which experienced several [disfranchisements] during the nineteenth century." However, such events in other nations "occurred when the type of regime changed, not under formally democratic conditions. . . . Once previously excluded social groups came into any established democratic system, they stayed in."[89] Valelly also addresses the consequence of this fact for Americans. "The United States is among the last of the advanced democracies to still be at the business of fully including all of its citizens in its electoral politics."[90]

*Amicus* Valelly is speaking primarily of African Americans. But as this brief has indicated, at numerous points in our nation's history, many groups, and

---

[88] RICHARD VALELLY, THE TWO RECONSTRUCTIONS: THE STRUGGLE FOR BLACK ENFRANCHISEMENT 1-2 (2004) (emphasis added).

[89] *Ibid*. at 2.

[90] *Ibid*. at 249.

especially the least well off, have been targets of disfranchisement, barred from participation in the polity by laws that are justified in the language of "good government." It is our hope that the Court, in examining the facts and the law in this case, and applying the intense scrutiny of the political situation in Indiana that an application of an objective, multi-factor test (*see* pages 24-25, *supra*) entails, will be mindful of the baneful history of disfranchisement in America, and take it appropriately into account in reaching a decision.

For all these reasons, *amici* respectfully urge the Court to reverse the Seventh Circuit decision below.

November 2007

Respectfully submitted,

J. GERALD HEBERT
*Counsel of Record*
TARA MALLOY
PAUL S. RYAN
CAMPAIGN LEGAL CENTER
1640 Rhode Island Ave., NW
Suite 650
Washington, DC 20036
(202) 736-2200

CHARLES J. OGLETREE, JR
THE CHARLES HAMILTON
    HOUSTON INSTITUTE
125 Mount Auburn St.
Floor Three
Cambridge, MA 02138
(617) 495-8285

*Counsel for Amici Curiae*

App. 1

# APPENDIX

The following scholars constitute the *amici curiae* who submit the foregoing brief:

- Peter H. Argersinger, Professor of History, Southern Illinois University;

- Joaquin G. Avila, Assistant Professor of Law, Seattle University School of Law;

- Jack Bass, Professor of Humanities and Social Sciences, College of Charleston;

- Vernon Burton, University Distinguished Teacher/Scholar, University of Illinois;

- Dan T. Carter, Educational Foundation University Professor Emeritus, University of South Carolina at Columbia;

- Chandler Davidson, Radoslav Tsanoff Professor of Public Affairs Emeritus, Rice University;

- Rodolfo de la Garza, Eaton Professor of Administrative Law and Municipal Science, Columbia University;

- Rodolfo Espino, Assistant Professor of Political Science, Arizona State University;

- Lorn S. Foster, Professor of Politics, Pomona College;

- Luis Ricardo Fraga, Russell F. Stark University Professor, Professor of Political Science, University of Washington at Seattle;

- Larry Griffin, Reed Distinguished Professor of Sociology, Professor of History, Professor of

App. 2

American Studies, University of North Carolina at Chapel Hill;

- Steven Hahn, Roy F. and Jeannette P. Nichols Professor of History, University of Pennsylvania;

- Ron Hayduk, Associate Professor of Political Science, Borough of Manhattan Community College, City University of New York;

- Thomas C. Holt, James Westfall Thompson Distinguished Service Professor, University of Chicago;

- Harold M. Hyman, William P. Hobby Professor of History Emeritus, Rice University;

- Alexander Keyssar, Matthew W. Stirling, Jr. Professor of History and Social Policy & Chair, Democratic Institutions and Politics, JFK School of Government, Harvard University;

- J. Morgan Kousser, Professor of History and Social Science, California Institute of Technology;

- Steven F. Lawson, Professor of History, Rutgers, The State University of New Jersey;

- Paula D. McClain, Professor of Political Science, Duke University (for identification only);

- Michael P. McDonald, Associate Professor, George Mason University & Non-Resident Senior Fellow, Brookings Institution;

App. 3

- Lorraine C. Minnite, Assistant Professor of Political Science, Barnard College, Columbia University;

- K.C. Morrison, Middlebush Professor of Political Science, University of Missouri-Columbia;

- Spencer Overton, Professor of Law, George Washington University;

- Michael Perman, Professor of History, University of Illinois at Chicago;

- Thomas Fraser Pettigrew, Research Professor of Social Psychology, University of California, Santa Cruz;

- Frances Fox Piven, Distinguished Professor of Political Science and Sociology, City University of New York;

- Kent Redding, Associate Professor and Director of Graduate Studies, Department of Sociology, University of Wisconsin-Milwaukee;

- Rebecca J. Scott, Charles Gibson Distinguished University Professor of History and Professor of Law, University of Michigan; and

- Richard Valelly, Professor of Political Science, Swarthmore College.