found (Miller 1977, 733; Weinzweig 1983, 299-300, 318-19). Even slaveholders might have testified, in racist arguments that many antebellum judges would have found credible, that they were acting from essentially benevolent impulses in giving previously benighted Africans the benefits of Christian civilization and American prosperity. How much less ludicrous was the claim of Los Angeles County redistricters in 1981 to have acted toward Latinos only out of the most beneficent motives? Any reasonable intent standard, therefore, must allow circumstantial evidence and reject a requirement of proof of hostility.[28] This leaves the difficulty of how strong the motive must be shown to be: sole, dominant, necessary, or merely contributing. The Court has been inconsistent here as well, adopting a variation of a "necessary" standard in *Arlington Heights* and, as I will show in the next chapter, a "sole" standard in *Shaw v. Reno* and a "predominant" standard in *Miller v. Johnson*.[29] An even graver practical consideration is what evidence is available. If important decisions were made long ago, as in the Mobile cases, the evidence is likely to be quite sparse; if they are made closer to the present, judges may balk at forcing officials to testify about their actions and feelings, and officials may be reticent or worse about revealing them.[30] Where there are large numbers of actors, for instance, in a state legislature, it will be impractical to examine all the members, and usually only the few who were deeply involved in a piece of legislation will remember much about even very recent events. If the decisions took place over a series of years and were made by a shifting set of members of a governmental body, then it will often be more difficult to assign a single purpose to them, and the number of people and decisions to be analyzed may be unwieldy (Ely 1970, 1219-21). In such instances, rules of thumb in gathering and assessing evidence of their purposes will become even more important than they are in uncovering the reasons for a single decision. However strong the evidence, judges may hesitate to convict officials, in effect, of racism, and the outcomes of cases may turn on different judges' different values (Karst 1978, 1165; *Nevett v. Sides* [1978], 233 [Wisdom, concurring]). Finally, the quality and quantity of information available in each instance will vary so much that no mathematical formula for weighing preassigned categories of it will be practicable. In cases like that in Memphis, the direct evidence of intent was plentiful; in Los Angeles, scarce. In both, I believe, the argument for a racially discriminatory motive was persuasive, but no mechanical test based on one case could fit the other, and a test based on both would be too loose to be of any real use.

WHAT IS possible is to set out factors that ought to be taken into account in any inquiry into the intent with which an electoral rule was adopted or maintained, that is, a framework for organizing the totality of the evidence. Based



EXHIBIT Kousser 3 6-21-12 / PX 543 / 2:13-cv-193 09/02/2014 DEF0112

that effective action against discrimination will be taken. As the history of school segregation and especially of the Fourteenth and Fifteenth Amendments and the VRA makes clear, discrimination against individuals on account of their membership in a group cannot be remedied by ignoring the nature of the discrimination. Instead, group discrimination demands a group remedy. Nor do recent changes in white racial attitudes or the growing class differences within minority communities support the contention that political opportunities for African-Americans and Latinos are now and will remain equivalent to those of Anglos, so that protective rules can safely be overturned, for the changes in white opinions have not yet been sufficiently large, and blacks and Latinos are each still politically united and quite distinct from Anglos. History is not over yet. Americans still need the Reconstruction Amendments to do what they were designed to do—to guarantee those minorities who would otherwise lose out in the political struggle protection from private and public discrimination against them.

*Shaw I* and its progeny are wrong—as wrong as *Plessy*, as wrong as *Dred Scott*. *Dred* attempted to end political controversies over slavery and thereby tighten the shackles around African-Americans by outlawing the positions that Republicans and most northern Democrats had taken on slavery. *Plessy* sought to muffle racial strife by blessing what everyone knew to be the subordination of blacks to whites. *Shaw* aims to reverse the growing power and influence of minority voters, just as, in other decisions, the Rehnquist Court has striven to hamper school integration and governmental enforcement of nondiscrimination in private industry and to torpedo efforts to foster minority businesses (*Freeman v. Pitts* [1992]; *Missouri v. Jenkins* [1995]; *Martin v. Wilks* [1989]; *Patterson v. McLean Credit Union* [1989]; *Ward's Cove Packing Co. v. Atonio* [1989]; *City of Richmond v. Croson* [1989]; *Adarand Constructors, Inc. v. Pena* [1995]). Thus, *Dred, Plessy,* and *Shaw* all buttressed a seemingly uncertain white supremacy.

Many of the flaws in the minority racial gerrymandering cases parallel those in *Dred* and *Plessy*. First, the slavery, segregation, and racial gerrymandering decisions all foundered on the question of whether the parties of concern were individuals, groups, or the nation as a whole. In *Dred*, Chief Justice Roger Brooke Taney treated individual African-Americans as having no rights, whether they were slave or free, northern or southern. He yearned to decide the slavery question for the nation forever by guaranteeing slaveholders' rights against any legal attacks by the national government. To secure the "liberty" of individual southern slaveholders, Taney had to assume that blacks were an undifferentiated mass without any liberties; to "save" the nation, he had to imagine its interests as unitary by denying the political platform of its northern half. In *Plessy*, Justice Henry Billings Brown considered

something to do with irregularly bounded minority opportunity districts or even with the most compact of such districts or that decreasing minority representation would move the society toward, rather than away from, "colorblindness"—were as fanciful as anything Brown or Taney imagined. All three decisions exalted shallow slogans over careful examinations of the facts about rights and equality. Blacks in America, Taney asserted, had never enjoyed any "rights which the white man was bound to respect." Laws, Brown declared, were "powerless to eradicate racial instincts," and the Fourteenth Amendment, "in the nature of things . . . could not have been intended to abolish distinctions based upon color." Minority opportunity districts whose shapes she did not like, O'Connor insisted, did not follow "traditional districting principles." Even though they contained only slight majorities of African-Americans, such districts resembled "political apartheid" and threatened to "balkanize" Americans—who, she implied, had previously ignored race in their political decisions—into "competing racial factions" (*Dred Scott v. Sandford* [1857], 407; *Plessy v. Ferguson* [1896], 1140, 1143; *Shaw v. Reno* [1993], 2827, 2832).

Easy slogans—prejudices disguised as principles—do not make good law or policy. The founding fathers of the Fourteenth Amendment were steeped in the history of the struggle to abolish slavery and establish equal rights for all men because they had participated in that struggle. The founding men and women of the Second Reconstruction were equally aware of its narrative for the same reasons, and they appreciated the history of the institutions they were reforming. Martin Luther King Jr., for example, once termed C. Vann Woodward's *Strange Career of Jim Crow*, originally published in 1955, "the historical Bible of the civil rights movement" (Woodward 1986, 92). The Civil War and the two Reconstructions, more than any other events, have defined America as a nation and built the institutions that undergird our modern law. When radicals purposely distort the history of those times and the repressive intervening years in an effort to wipe out the legacies of those epic struggles, when they employ "colorblind" rhetoric in what is actually an attempt to redeem white supremacy once more, by deconstructing the Second Reconstruction, it becomes the duty of a historian to set the story straight.