IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | |
|---|---|
| MARC VEASEY, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> RICK PERRY, *et al.*, <br><br> Defendants. | Civil Action No. 2:13-cv-193 (NGR) |
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> TEXAS LEAGUE OF YOUNG VOTERS EDUCATION FUND, *et al.*, <br><br> Plaintiff-Intervenors, <br><br> TEXAS ASSOCIATION OF HISPANIC COUNTY JUDGES AND COUNTY COMMISSIONERS, *et al.*, <br><br> Plaintiff-Intervenors, <br><br> v. <br><br> STATE OF TEXAS, *et al.*, <br><br> Defendants, <br><br> TRUE THE VOTE, <br><br> Movant-Intervenors. | Civil Action No. 2:13-cv-263 (NGR) |

2:13-cv-193
09/02/2014
DEF0123


EXHIBIT
Banks 5

TEXAS STATE CONFERENCE OF NAACP
BRANCHES, *et al.*,

                        Plaintiffs,                     Civil Action No. 2:13-cv-291 (NGR)

        v.

JOHN STEEN, *et al.*,

                        Defendants.

**RESPONSE OF PLAINTIFFS TEXAS STATE CONFERENCE OF NAACP
BRANCHES AND THE MEXICAN AMERICAN
<u>LEGISLATIVE CAUCUS TO DEFENDANTS' MOTION TO DISMISS</u>**

Case 2:13-cv-00193   Document 88   Filed in TXSD on 11/22/13   Page 3 of 39

## TABLE OF CONTENTS

Page

BACKGROUND ................................................................................................... 3

ARGUMENT ........................................................................................................ 8

I.   PLAINTIFFS HAVE ADEQUATELY PLEADED STANDING ....................... 9

    A.   Overview ........................................................................................... 9

    B.   Plaintiffs Have Adequately Pleaded Article III "Organizational" Standing ...................................................................................... 11

    C.   Texas NAACP Has Adequately Pleaded Article III "Representational" Standing ................................................................... 13

    D.   Texas' Assertion of Prudential "Third Party" Standing Concerns Is Mistaken ...................................................................................... 14

II.   PLAINTIFFS HAVE A PRIVATE RIGHT OF ACTION UNDER SECTION 2 ........................................................................................ 16

III.   THE COMPLAINT STATES A PRIMA FACIE CASE UNDER SECTION 2 OF THE VOTING RIGHTS ACT ............................................... 18

    A.   The Complaint States a Prima Facie Case of Denial and Abridgement of the  Right to Vote in Violation of the Section 2 Results Standard ................................................................................. 18

    B.   SB 14 Is Not Exempt From Federal Racial Discrimination Challenges ...................................................................................... 23

    C.   The Section 2 Results Standard Is Constitutional .................................... 25

    D.   The Complaint Adequately Pleads the Discriminatory Purpose Behind SB 14 ................................................................................. 26

IV.   PLAINTIFFS PROPERLY NAMED STEVE MCCRAW AS A DEFENDANT ........................................................................................ 28

CONCLUSION ................................................................................................... 29

# TABLE OF AUTHORITIES

Page

## CASES

*Adarand Constructors, Inc. v. Pena,*
515 U.S. 200 (1995)....................................................................................................14

*Alexander v. Sandoval,*
532 U.S. 275 (2001)....................................................................................................16

*Alonzo v. City of Corpus Christi,*
68 F.3d 944 (5th Cir. 1995)........................................................................................17

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)......................................................................................................8

*Ass'n of Cmty. Orgs. for Reform Now v. Fowler,*
178 F.3d 350 (5th Cir. 1999) ("*ACORN*")..............................................9, 10, 11, 15

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007)......................................................................................................8

*Burdick v. Takushi,*
504 U.S. 428 (1992)..............................................................................................24, 25

*Campos v. City of Houston,*
113 F.3d 544 (5th Cir. 1997) .....................................................................................17

*Chisom v. Roemer,*
501 U.S. 380 (1991)....................................................................................................16

*Citizens for a Better Gretna v. City of Gretna,*
834 F.2d 496 (5th Cir. 1987) .....................................................................................17

*Concerned Citizens for Equality v. McDonald,*
63 F.3d 413 (5th Cir. 1995) .......................................................................................17

*Crawford v. Marion Cnty. Election Bd.,*
472 F.3d 949 (7th Cir. 2007), *aff'd.* 553 U.S. 181 (2008)................................12, 15

*Crawford v. Marion Cnty. Election Bd.,*
553 U.S. 181 (2008)..................................................................................10, 24, 25, 28

*Duke Power Co. v. Carolina Environmental Study Group, Inc.,*
438 U.S. 59 (1978).....................................................................................................15

## TABLE OF AUTHORITIES

Page

*East Jefferson Coalition for Leadership & Dev. v. Parish of Jefferson,*
   926 F.2d 487 (5th Cir. 1991) ..................................................................................17

*Florida State Conference of NAACP v. Browning,*
   522 F.3d 1153 (11th Cir. 2008) ...............................................................11, 14, 15

*Harkless v. Brunner,*
   545 F.3d 445 (6th Cir. 2008) .............................................................................11, 15

*Havens Realty Corp. v. Coleman,*
   455 U.S. 363 (1982)..............................................................................................10, 11

*Hunt v. Washington State Apple Adver. Comm.,*
   432 U.S. 333 (1977)..............................................................................................10, 13

*Johnson v. De Grandy,*
   512 U.S. 997 (1994)..............................................................................................16, 19

*Kirksey v. Bd. of Supervisors,*
   54 F.2d 139 (5th Cir. 1977) (en banc) ...................................................................24

*Kowalski v. Tesmer,*
   543 U.S. 125 (2004).....................................................................................................15

*Lane v. Wilson,*
   307 U.S. 268 (1939)....................................................................................................23

*League of United Latin American Citizens (LULAC) of Wisconsin, Inc. v. Deninger,*
   No. 12-C-0185, 2013 WL 5230795 (E.D. Wis. Sept. 17, 2013)..............................12

*League of United Latin American Citizens, Dist. 19 v. City of Boerne,*
   675 F.3d 433 (5th Cir. 2012) ....................................................................................17

*Little v. KPMG LLP,*
   575 F.3d 533 (5th Cir. 2009) ......................................................................................9

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992)................................................................................................9, 10

*LULAC #4552 v. Roscoe Indep. Sch. Dist.,*
   123 F.3d 843 (5th Cir. 1997) ....................................................................................17

*LULAC, Council No. 4386 v. Midland Ind. Sch. Dist.,*
   829 F.2d 546 (5th Cir. 1987) ....................................................................................17

# TABLE OF AUTHORITIES

**Page**

*LULAC, Council No. 4434 v. Clements,*
    999 F.2d 831 (5th Cir. 1993) ...........................................................................................17

*LULAC v. Perry,*
    548 U.S. 399 (2006)........................................................................................................16

*Magnolia Bar Ass'n v. Lee,*
    994 F.2d 1143 (5th Cir. 1993) .......................................................................................17

*Major v. Treen,*
    574 F. Supp. 325 (E.D. La. 1983)..................................................................................24

*Miss. State Chapter, Operation PUSH v. Mabus,*
    932 F.2d 400 (5th Cir. 1991) ....................................................................17, 19, 21, 22

*Morse v. Republican Party of Virginia,*
    517 U.S. 186 (1996)..................................................................................................16, 17

*N.A.A.C.P. v. Fordice,*
    105 F.3d 655 (5th Cir. 1996) .........................................................................................17

*New Hampshire v. Maine,*
    532 U.S. 742 (2001)........................................................................................................18

*Rogers v. Lodge,*
    458 U.S. 613 (1982)........................................................................................................25

*Sandusky Cnty. Democratic Party v. Blackwell,*
    387 F.3d 565 (6th Cir. 2004) .........................................................................................14

*Shelby County v. Holder,*
    133 S. Ct. 2612 (2013)......................................................................................................6

*Texas v. Holder,*
    888 F. Supp. 2d 113 (D.D.C. 2012)..................................................................................6

*Texas v. Holder,*
    Dkt. 1:12-cv-00128-RMC-DST-RLW (D.D.C. Oct. 1, 2012)..............................................18

*Thornburg v. Gingles,*
    478 U.S. 30 (1986).................................................................................16, 18, 19, 20

*True v. Robles,*
    571 F.3d 412 (5th Cir. 2009) ...........................................................................................8

-iii-

Case 2:13-cv-00193   Document 88   Filed in TXSD on 11/22/13   Page 7 of 39

# TABLE OF AUTHORITIES

**Page**

*U.S. v. Marengo Cnty.,*
    731 F.2d 1546 (11th Cir. 1984) ................................................................24

*Veterans for Common Sense v. Shinseki,*
    644 F.3d 845 (9th Cir. 2011) ..................................................................14

*Village of Arlington Heights v. Metropolitan Housing Development Corp.,*
    429 U.S. 252 (1977)...........................................................................26, 27

*Warth v. Seldin,*
    422 U.S. 490 (1975)...........................................................................11, 15

*Westwego Citizens for Better Gov't v. City of Westwego,*
    946 F.2d 1109 (5th Cir. 1991) ................................................................17

STATUTES

42 U.S.C. § 1973.......................................................................................... passim

42 U.S.C. § 1983................................................................................................16

OTHER AUTHORITIES

FEDERAL RULES OF CIVIL PROCEDURE, RULE 8 ...................................................8

UNITED STATES CONSTITUTION

    FOURTEENTH AMENDMENT ............................................................1, 24

    FIFTEENTH AMENDMENT ..............................................................17, 25

S. REP. NO. 97-417, 97th Cong., 2d Sess. (1982) ........................................19

This brief is submitted on behalf of Plaintiffs Texas State Conference of NAACP Branches ("Texas NAACP") and the Mexican American Legislative Caucus of the Texas House of Representatives ("MALC") (collectively, "Plaintiffs") in response to Defendants' Motion to Dismiss (Doc. 52). Plaintiffs seek to enjoin the implementation of SB 14, the photo identification law enacted by Texas in 2011 for voting in-person on Election Day and during the early voting period. SB 14 replaced the prior voter identification requirements the State had used successfully for many years. Plaintiffs allege that the new photo ID requirement has a discriminatory result, in violation of Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, was enacted with a discriminatory purpose, in violation of Section 2 and the Fourteenth and Fifteenth Amendments, and violates the constitutional right to vote, in violation of the Fourteenth Amendment. Texas NAACP and MALC Complaint (Dkt. 2:13-cv-193, Doc. 1) ("Compl."). Plaintiffs are non-profit organizations that have long played active roles in protecting the rights of Texas' minority citizens in the democratic process. They named as Defendants the Texas Secretary of State, John Steen, and the Director of the Texas Department of Public Safety ("DPS"), John McCraw (both sued in their official capacity) (collectively, "Texas").[1]

The starting point for determination of Texas' motion is, of course, the assumption of the veracity of Plaintiffs' well-pleaded factual allegations. Texas, however, barely pays lip service to this standard, and, instead argues for dismissal by debating points never asserted by Plaintiffs, ignoring key and long-standing precedent, and misapplying clear constitutional doctrine.

---

[1] Plaintiffs will respond to only Points III, IV, V, VI, and VIII of Texas' motion, as the remaining points are not addressed to these Plaintiffs.

At the outset, Texas' emphasis on "third-party standing" in Points III and IV raises doubts as to whether Texas has even read Plaintiffs' Complaint.  Plaintiffs have not alleged standing on behalf of injury to "third parties" anywhere in their Complaint.  Rather, in accordance with the settled law, they have plainly asserted organizational and representational standing.  The financial and organizational burdens imposed by SB 14 on Texas NAACP and MALC, and the burdens imposed on Texas NAACP's members' exercise of the right to vote, provide a solid basis for organizational standing for both organizations in their own right, and for representational standing for Texas NAACP.  Moreover, as Texas is forced to acknowledge, it is long-established precedent that private parties, including organizations, may sue to enforce Section 2 claims.

Contrary to Texas' characterization in Point V of its brief, Plaintiffs have properly pleaded a Section 2 violation, over and above and in addition to "disparate impact." Even a cursory review of the Complaint reveals the pleading of detailed facts establishing that SB 14 denies certain voters the equal opportunity "to participate in the political process and to elect representatives of their choice" based on a "totality of the circumstances," as required by the statutory text of Section 2.  42 U.S.C. §1973(b).  Again, inexplicably, Texas fails to mention, let alone discuss, the actual allegations of the Complaint.

Texas' remaining arguments may be given similar short shrift.  Plaintiffs have more than adequately pleaded discriminatory purpose viewed through the prism of the leading Supreme Court decision on discriminatory purpose, a case which Texas fails to cite, let alone discuss, in its brief.  The allegations in the Complaint also support the conclusion that SB 14 specifically burdens the ability and opportunity of African Americans and Latinos to cast their ballots, and

2

most certainly "abridges" their right to vote within the meaning of Section 2 and the Fourteenth and Fifteenth Amendments.  Furthermore, a state's circumscribed authority to adopt certain voting qualifications does not abrogate its obligation to comply with the Fourteenth and Fifteenth Amendments, which prohibit discriminatory treatment of minorities with respect to the right to vote.  Finally, Plaintiffs properly named as a defendant the Director of the Texas Department of Public Safety because he heads the agency that issues the only forms of state-issued identification allowable under SB 14.

For all of these reasons, and as more fully explained below, Plaintiffs respectfully request that this Court deny Texas' motion to dismiss their Complaint.

## **BACKGROUND**

**I.      TEXAS SENATE BILL 14**

Prior to the enactment of SB 14, Texas implemented for many years a voter identification system that successfully protected the integrity of the electoral process and, at the same time, did not interfere with the ability of Texas citizens (whatever their race or ethnicity) to participate effectively in the political process by casting ballots on Election Day or in early voting.

Specifically, a registered voter in Texas was permitted to cast a regular ballot in person after presenting a voter registration certificate (mailed to the voter by election officials) at the voter's Election Day polling place or at an early voting site in the voter's county.  (Compl. ¶ 9.) Registered voters lacking a voter registration certificate were permitted to cast a regular ballot so long as they executed an affidavit stating that they did not have their certificate, and presented one of eight categories of documentation of identification.  The acceptable identification included: (i) a Texas identification card, current or expired, or a similar document from another

3

state; (ii) any other form of identification containing a photograph that establishes a person's identity (such as an employee identification card); (iii) a birth certificate or other document confirming birth that is admissible in a court of law and establishes a person's identity; (iv) United States citizenship papers; (v) a United States passport; (vi) official mail addressed to the person by name from a governmental agency; (vii) a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter; or (viii) any other form of identification approved by the Secretary of State's office. (Compl. ¶ 10.)

In 2011, without any evidence that the existing ID requirements were inadequate, the Texas Legislature enacted SB 14, which significantly restricts the forms of acceptable voter identification required to vote in person on Election Day or during the early voting period. Under SB 14, every voter, subject to three limited exceptions, must present one of six forms of government-issued photo identification in order to vote at the polls, regardless of whether she or he presents a voter identification certificate. (Compl. ¶ 12.) The forms of photo identification required by SB 14 for in-person voting are limited to:

    a. a driver's license or personal identification card issued by DPS that has not expired or is not more than sixty days expired;

    b. a license to carry a concealed handgun issued by DPS that has not expired or is not more than sixty days expired;

    c. a new form of identification created by SB 14, known as an Election Identification Certificate ("EIC"), issued by DPS, that has not expired or is not more than sixty days expired;

    d. a United States military identification card that contains the voter's photo and has not expired or is not more than sixty days expired;

    e. a United States citizenship certificate that contains the voter's photo; and

4

    f.  a United States passport that has not expired or is not more than sixty days
expired.

An EIC may be obtained only at DPS offices, may be issued only to persons who are
already registered to vote or who are registering in conjunction with applying for an EIC, and
may be issued only to persons who lack all of the other forms of photo identification required by
SB 14 for in-person voting.  An EIC may be obtained only by presenting documentary proof of
citizenship and one piece of "primary identification," two pieces of "secondary identification," or
one piece of secondary identification and two pieces of "supporting identification."  Although
DPS does not charge a fee for an EIC, voters who lack the required underlying identification
must bear any costs associated with obtaining those documents.  (Compl. ¶ 15.)

A voter who does not have any of the six forms of photo identification required by SB 14,
and who does not satisfy one specific exemption for persons with certain qualifying disabilities,
may complete a provisional ballot at the polls on Election Day or during early voting.  However,
that ballot will be counted only if the voter subsequently travels to his or her county registrar
within six days after the election and presents one of the six forms of photo identification
required by SB 14.  (Compl. ¶ 17.)[2]

At the time of the enactment of SB 14, Texas was subject to the preclearance
requirements of Section 5 of the Voting Rights Act, 42 U.S.C. § 1973(c), and accordingly was
required to submit for federal preclearance review (by the Attorney General or the United States
District Court for the District of Columbia) all changes in voting practices and procedures.

---

[2]  SB 14 includes two additional exemptions for persons who do not have acceptable ID due to either a religious
objection to being photographed or a natural disaster as declared by the President of the United States or Texas
Governor.  However, persons who meet these exemptions do not receive a regular ballot at the polls; instead, they
must also cast a provisional ballot, which will only be counted if they travel to their county registrar within six days
after the election to sign an affidavit swearing to such religious objection or natural disaster.  (Compl. ¶ 16.)

(Compl. ¶ 19.)  On August 30, 2012, following a week-long trial, the District of Columbia District Court, sitting as a three-judge court, denied preclearance to SB 14 because Texas had failed to demonstrate that the new photo ID requirement would not "lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Texas v. Holder*, 888 F. Supp. 2d 113, 115 (D.D.C. 2012) (quoting *Beer v. United States*, 425 U.S. 130, 141 (1976)), *vacated and remanded*, 133 S. Ct. 2886 (2013).  The district court found that SB 14 "is the most stringent [voter ID law] in the country" and "will almost certainly have [a] retrogressive effect." *Id.* at 144.  The court explained that SB 14 "imposes strict, unforgiving burdens on the poor, and racial minorities in Texas are disproportionately likely to live in poverty." *Id.*  In this regard, the court found that it was "undisputed by Texas" that "a substantial subgroup of Texas voters, many of whom are African American or Hispanic, lack [the] photo ID" required by SB 14, *id.* at 138, that the uncontested facts showed that "the burdens associated with obtaining ID will weigh most heavily on the poor," *id.*, and that "undisputed U.S. Census data" showed that "[i]n Texas . . . the poor are disproportionately racial minorities." *Id.* at 140. (Compl. ¶¶ 22, 23.)  This ruling was vacated, however, following the Supreme Court's decision in *Shelby County v. Holder*, 133 S. Ct. 2612 (2013), which found the geographic coverage formula for Section 5 unconstitutional.  Accordingly, the State of Texas is not presently required to comply with Section 5.  (Compl. ¶ 24.)

Immediately following the Supreme Court's decision in *Shelby County*, the State of Texas announced that it would enforce the photo identification requirements of SB 14 in all future elections in the State.  (Compl. ¶ 25.)  This consolidated litigation followed.

## II.      PLAINTIFFS

Plaintiffs Texas NAACP and MALC, who intervened as defendants in the preceding

Section 5 litigation to oppose preclearance, are not-for-profit organizations active in the political

processes in Texas.  Texas NAACP is a subsidiary of the National Association for the

Advancement of Colored People, Inc., a national non-profit, non-partisan organization.  Texas

NAACP was founded in 1936, and is the oldest and one of the largest and most significant

organizations promoting and protecting the civil rights of African Americans in Texas.  It is

headquartered in Austin and has over sixty branches across the State, as well as members in

almost every Texas county.  (Compl. ¶ 2.)

Texas NAACP's organizational objectives include pursuing the elimination of all racial

discrimination in the democratic process, and seeking enforcement of federal laws and

constitutional provisions securing voting rights.  Texas NAACP's support of the Voting Rights

Act has been central to this mission, and Texas NAACP has participated in numerous lawsuits to

enforce the Voting Rights Act.  Texas NAACP also engages in efforts to register African

American citizens to vote and to encourage African Americans to turn out to vote.  SB 14 is

causing and will continue to cause Texas NAACP to divert a portion of its financial and other

organizational resources to educating Texas citizens about the photo ID requirements of SB 14

and assisting voters in casting in-person ballots in compliance with SB 14.  As a result, Texas

NAACP is limited to devoting fewer resources to its other organizational activities, including

voter registration drives and get-out-the-vote efforts.  (Compl. ¶ 2.)  Texas NAACP's

membership includes registered Texas voters who do not possess any of the forms of photo

identification required by SB 14 for voting in person on Election Day or in early voting. (Compl. ¶ 2.)

MALC is the nation's oldest and largest Latino legislative caucus.  MALC is a non-profit organization established to serve the members of the Texas House of Representatives in matters of interest to Texas' Latino community, including matters relating to the voting rights of Latino citizens residing in Texas.  MALC plays an active role in both legislative and legal initiatives relating to voting rights.  Its forty members are registered voters in Texas and most are elected from districts that are majority Latino in citizen voting age population and in registered voters. Most MALC members are Latino.  SB 14 is causing and will continue to cause MALC to divert a portion of its financial and other organizational resources to educating Texas citizens about the photo ID requirements of SB 14, and assisting voters to cast in-person ballots in compliance with SB 14.  As a result, MALC is limited, and will continue to be limited, to devoting fewer resources to its other organizational activities.  (Compl. ¶ 3.)

## ARGUMENT

Federal Rule of Civil Procedure 8 "requires only a short and plain statement of the claim showing that the pleader is entitled to relief in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation and internal quotation marks omitted).  While "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" will not suffice at the pleading stage, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), a court considering a motion to dismiss must "accept[] all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiff." *True v. Robles*, 571 F.3d 412, 417 (5th Cir. 2009).

8

Further, "'[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *see also Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009) ("At the pleading stage, allegations of injury are liberally construed."). It is in this context which Texas's motion must be assessed.

## I. PLAINTIFFS HAVE ADEQUATELY PLEADED STANDING

### A. Overview

Plaintiffs have standing, first, in their own right and second, on behalf of their organizational members.

As a general matter, "the inquiry as to whether a particular plaintiff has standing has two components, involving 'both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.'" *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999) ("*ACORN*") (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). Article III standing demands that the plaintiff has suffered an "injury in fact" that is "fairly traceable" to the actions of the defendant, and that the injury will likely be redressed by a favorable decision. *Id.* (quoting *Bennett v. Spahr*, 520 U.S. 154, 162 (1999)). Evaluation of any prudential concerns, if relevant, involves determining whether any "judicially self-imposed limits on the exercise of federal jurisdiction," which can be modified or abrogated by Congress, may apply. *Id.* (quoting *Bennett*, 520 U.S. at 162).

The Supreme Court has set forth two clear bases for standing in cases brought by organizations. The first is a "concrete and demonstrable injury to the organization's activities,"

9

Case 2:13-cv-00193   Document 88   Filed in TXSD on 11/22/13   Page 17 of 39

such as a "drain on the organization's resources" or "perceptibl[e] impair[ment]" of the organization's ability to fulfill its mission. *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 378–79 (1982). The second is an assertion of standing on behalf of an organization's members. *Hunt v. Washington State Apple Adver. Comm.*, 432 U.S. 333, 342–43 (1977). The Fifth Circuit describes the former as "organizational" standing and the latter as "representational" standing. *ACORN,* 178 F.3d at 356, 365. Both Texas NAACP and MALC have made sufficient allegations of injury to their own activities to pass muster under Article III, and Texas NAACP has made additional, equally sufficient, allegations as to injuries to its members. Indeed, Texas does not dispute that Plaintiffs have properly alleged Article III standing under *Havens Realty Corp.* and *Hunt.* Instead, the State asserts only that Plaintiffs fall short with regard to the prudential limitation on "third party" standing. However, as discussed below, that doctrine does not apply to this case.

Finally, the standing question is currently before the Court on a motion to dismiss. At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice" to overcome a motion to dismiss based on lack of standing, because the court presumes "that general allegations embrace those specific facts that are necessary to support the claim." *Lujan,* 504 U.S. at 561; *accord ACORN,* 178 F.3d at 357 (specifically distinguishing between the standard applicable in the motion to dismiss stage and the summary judgment stage on the question of organizational standing).[3]

---

[3] In addition, because only prospective relief is sought, if one plaintiff has standing, "there is no need to decide whether the other [plaintiffs] also have standing." *Crawford v. Marion Cnty. Election Bd.,* 553 U.S. 181, 189 n.7 (2008).

**B.** **Plaintiffs Have Adequately Pleaded Article III "Organizational" Standing**

It is settled law that organizations have Article III standing to sue to remedy an injury to the organization itself caused by defendant's conduct. In *Warth v. Seldin*, 422 U.S. 490 (1975), the Supreme Court explained that there is "no question that an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Id.* at 511; *see also Havens Realty Corp.*, 455 U.S. at 379 (fair housing organization properly asserted organizational standing by alleging that it "has had to devote significant resources to identify and counteract the defendant's racially discriminatory steering practices").

This rule fully applies to voting rights litigation. *See ACORN*, 178 F.3d at 356 (on summary judgment, holding that the organizational plaintiff had standing to challenge Louisiana's alleged NVRA violations based on assertion that "it has expended definite resources counteracting the effects of Louisiana's alleged failure to implement" the NVRA, but finding no standing on other claims where facts showed expenditures not traceable to alleged NVRA violation); *Harkless v. Brunner,* 545 F.3d 445, 458–59 (6th Cir. 2008) (holding that district court improperly dismissed complaint and improperly denied leave to amend where the organizational plaintiff alleged (in a proposed amended complaint) that it "would not have expended funds on voter registration activities outside [public assistance] offices but for defendants' . . . violations" of the National Voter Registration Act ("NVRA")); *Florida State Conference of NAACP v. Browning*, 522 F.3d 1153, 1164–66 (11th Cir. 2008) (NAACP and other organizations had organizational standing because they were forced to divert resources from registering voters and election-day activities to addressing problems experienced by registration applicants due to

11

Case 2:13-cv-00193   Document 88   Filed in TXSD on 11/22/13   Page 19 of 39

Florida's new registration procedures); *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949,

951 (7th Cir. 2007) (state political party had organizational standing because Indiana's new voter

identification law compelled "the party to devote resources to getting to the polls those of its

supporters who would otherwise be discouraged by the new law from bothering to vote"), *aff'd*.

553 U.S. 181, 189 n.7 (2008); *League of United Latin American Citizens (LULAC) of Wisconsin,

Inc. v. Deninger*, No. 12-C-0185, 2013 WL 5230795 (E.D. Wis. Sept. 17, 2013) (after discovery,

finding that expenditures to get-out-the-vote gave organizations Article III standing under

Section 2 to challenge voter identification law).

      Here, both Texas NAACP and MALC have adequately pleaded injury to their own

organizational interests.  As set forth in the Complaint, both organizations have pleaded that the

right to vote is an essential aspect of their organizational missions.  Texas NAACP's

organizational objectives include pursuing the elimination of all racial discrimination in the

democratic process and seeking enforcement of federal laws and constitutional provisions

securing voting rights.  Its support of the Voting Rights Act has been central to this mission, and

Texas NAACP has participated in numerous lawsuits to enforce the Voting Rights Act.  Texas

NAACP also engages in efforts to register African American citizens to vote and to encourage

African Americans to turn out to vote.  (Compl. ¶ 3.)  MALC is the nation's oldest and largest

Latino legislative caucus.  MALC is a non-profit organization established to serve the members

of the Texas House of Representatives in matters of interest to Texas' Latino community,

including matters relating to the voting rights of Latino citizens residing in Texas.  The large

majority of MALC members are Latinos.  MALC plays an active role in both legislative and

legal initiatives relating to voting rights.  Its forty members are registered voters in Texas and

most are elected from districts that are majority Latino in citizen voting age population and in registered voters. (Compl. ¶ 4.)

Both Texas NAACP and MALC also pleaded with specificity that SB 14 is injuring them as organizations. SB 14 is causing and will continue to cause Texas NAACP and MALC to divert a portion of their financial and other organizational resources to educating Texas citizens about the photo ID requirements of SB 14, and assisting voters in casting in-person ballots in compliance with SB 14. As a result, both organizations claim that they are limited, and will continue to be limited, to devoting fewer resources to their other organizational activities, including voter registration drives and get-out-the-vote efforts. (Compl. ¶¶ 2–3.) These allegations easily provide a basis for organizational standing.

**C.   Texas NAACP Has Adequately Pleaded Article III "Representational" Standing**

Texas NAACP's allegations provide an additional basis for standing, because of injury to its members germane to its associational mission. Texas NAACP alleges, on information and belief, that its membership includes registered voters who do not possess any of the forms of photo identification required by SB 14 for voting in person on Election Day or during early voting. (Compl. ¶ 2.) An organization may assert standing on behalf of its members if: (1) the members would have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation in the lawsuit of each of the individual members. *Hunt*, 432 U.S. at 343. Clearly, a registered voter who has been or may be prohibited from voting – or whose ability to vote has been or will be burdened – by SB 14 would have standing to sue in his or her own right. Further, Texas NAACP's attempt to protect the interests of such voters is germane

13

Case 2:13-cv-00193   Document 88   Filed in TXSD on 11/22/13   Page 21 of 39

to its mission of eliminating all racial discrimination in the democratic process and seeking enforcement of federal laws and constitutional provisions securing voting rights.

Lastly, because the relief requested is purely prospective and applicable to all voters whose rights are so abridged or denied, the participation in the lawsuit of each individual member is not necessary in order for Texas NAACP to obtain the relief requested. *See Veterans for Common Sense v. Shinseki*, 644 F.3d 845, 862 n.16 (9th Cir. 2011) ("When the alleged harm is prospective, we have not required that the organizational plaintiffs name names [of individual members] because *every* member faces a probability of harm in the near and definite future." (quoting *Browning*, 522 F.3d at 1160)), *rev'd en banc on other grounds*, 678 F.3d 1013 (9th Cir. 2012); *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 574 (6th Cir. 2004) (organization has standing to assert the rights of members who will be injured, without naming specific members, because "by their nature, mistakes [resulting in illegal vote denial] cannot be specifically identified in advance."). To allege that prospective harm is immediate "requires only that the anticipated injury occur within some fixed period of time in the future, not that it happen in the colloquial sense of soon or precisely within a certain number of days, weeks, or months." *Browning*, 522 F.3d at 1161; *see also Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211–12 (1995). Here, the harm to Plaintiffs' members is as immediate as the next time they attempt to vote.

**D.** **Texas' Assertion of Prudential "Third Party" Standing Concerns Is Mistaken**

Texas' argument that Plaintiffs lack standing because they allegedly are raising the claims of "third parties" is meaningless in the context of the claims actually asserted by Plaintiffs. As demonstrated above, it is well-established that organizations fully comply with

14

Case 2:13-cv-00193   Document 88   Filed in TXSD on 11/22/13   Page 22 of 39

standing requirements so long as the challenged voting restrictions injure the organization's
voting-related resources or capabilities and/or are injuring the organization's members (who are
not considered "third parties"). That the voting rights violation asserted by an organization
necessarily involves the voting rights of individuals does not thereby implicate the prudential
doctrine of "third party" standing. *See ACORN*, 178 F.3d at 360–61 (organization of low and
moderate income individuals had standing to assert violations of the NVRA; "third party"
standing not discussed);[4] *see also Harkless,* 545 F.3d at 458–59 (organization had standing to
sue for NVRA violations; "third party" standing not discussed); *Browning*, 522 F.3d at 1164–66
(NAACP and other organizations had standing to challenge Florida voter registration
procedures; "third party" standing not discussed); *Crawford*, 472 F.3d at 951 (political party had
standing to challenge Indiana's photo ID law; "third party" standing not discussed).[5]

    In light of this overwhelming authority, it is not surprising that Texas fails to cite a single
case brought under Section 2 of the Voting Rights Act in which organizational or
representational standing was denied an organization at the motion to dismiss stage. There is no

---

[4] The Fifth Circuit did discuss prudential concerns in *ACORN*, but only with regard to whether Congress' provision in the NVRA that a "person who is aggrieved" by a violation of that statute is permitted to sue to enjoin the violation. 178 F.3d at 363. The counterpart in this case is Texas' claim, discussed below, that only the United States, and not private parties, may sue to enforce Section 2; the counterpart is not "third party" standing, which the *ACORN* court did not discuss.

[5] *Warth v. Seldin* is the only case upon which Texas relies that actually speaks to the issue of organizational standing raised by the Complaint and, as discussed above, it decisively supports denial of Texas' motion. Texas also relies on *Kowalski v. Tesmer*, 543 U.S. 125 (2004), and *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59 (1978), neither of which is relevant. *Kowalski* addressed the relationship between a group of lawyers and "hypothetical future clients," whose claims they were asserting. The Court's analysis focused on the issue of whether the attorneys had a sufficiently close relationship with the persons who actually possessed the right to sue, an issue that does not implicate the established law of organizational and representational standing. Neither the Supreme Court nor the Fifth Circuit has cited *Kowalski* in discussions of organizational and representational standing. *Duke Power* addressed taxpayer standing, another issue unrelated to this litigation.

such authority and no basis in law for this aspect of Texas' motion.   Accordingly, it should be denied.

## II.   PLAINTIFFS HAVE A PRIVATE RIGHT OF ACTION UNDER SECTION 2

In Point IV of its brief, Texas appears to make two arguments:  (1) "The Voting Rights Act establishes a cause of action only for the Attorney General of the United States;" and (2) Plaintiffs "have no cause of action to assert third-party claims."  (Texas Br. 13, 16 and 12-16 generally.)  As Texas is forced to concede, its first argument is foreclosed by unambiguous, existing precedent.  And its second argument is merely a restatement of its same mistaken "third party" standing argument in sheep's clothing.[6]

The Supreme Court has consistently and repeatedly entertained Section 2 suits filed by private organizations.  *See, e.g.*, *LULAC v. Perry*, 548 U.S. 399 (2006); *Johnson v. De Grandy*, 512 U.S. 997 (1994); *Chisom v. Roemer*, 501 U.S. 380 (1991); *Thornburg v. Gingles*, 478 U.S. 30 (1986).[7]  Moreover, as Texas concedes (Texas Br. 13 n.2), the Supreme Court's discussion of this issue in *Morse v. Republican Party of Virginia*, 517 U.S. 186 (1996), is directly at odds with the State's assertion.  *Morse* was not a Section 2 case, and instead presented the question of whether there is a private cause of action under a different provision of the Voting Rights Act.  However, in discussing that question, a majority of the Court expressed the view that

---

[6]  Texas devotes the bulk of its argument to convincing the Court that Plaintiffs cannot "use 42 U.S.C. § 1983 or the Declaratory Judgment Act to assert third-party claims."  (Texas Br. 14-16.)  Plaintiffs wholeheartedly agree, but nowhere in the Complaint do Plaintiffs indicate that their claims are brought under Section 1983, and nowhere in the Complaint do Plaintiffs assert that the Declaratory Judgment Act gives them standing.  The Declaratory Judgment Act provides a remedy if, where as here, Plaintiffs have standing to sue otherwise.

[7]  Oddly, although Texas says that "Supreme Court decisions predating [*Alexander v. Sandoval*, 532 U.S. 275 (2001),] that recognized a right of action in private individuals under Section 2 may no longer be good law in light of *Alexander*," Texas fails to note *LULAC v. Perry*, the very prominent post-*Alexander* Section 2 case heard by the Supreme Court that was brought by a private party against Texas itself.

Case 2:13-cv-00193   Document 88   Filed in TXSD on 11/22/13   Page 24 of 39

Section 2 may be enforced by private plaintiffs. *Id.* at 232 (Opinion of Justice Stevens announcing Court's judgment, joined by Justice Ginsburg) ("Although §2 . . . provides no right to sue on its face, the existence of the private right of action under Section 2 . . . has been clearly intended by Congress since 1965. [Citations omitted.] We, in turn, have entertained cases brought by private litigants to enforce §2. (Internal quotation marks omitted; alterations in original)); *id.* at 240 (Opinion of Justice Breyer, joined by Justices O'Connor and Souter) (agreeing with Justice Stevens's statement regarding private enforcement of Section 2).[8]

It also is instructive to note that, in the Section 5 litigation concerning SB 14, Texas told the District Court that Section 2 *was* an available remedy for private plaintiffs (and thus, Section 5 was not necessary to remedy violations of the Fifteenth Amendment), specifically noting that their right to do so was separate from that of the United States:

> If *minority plaintiffs* are using section 2 to remedy violations of the Fifteenth Amendment, then there is no need for preclearance; litigants can simply challenge the disputed state law in a section 2 lawsuit and move for a preliminary injunction. If the district court decides that the law is more likely than not to violate the Fifteenth Amendment, then it will promptly enjoin the enforcement of that law.

---

[8]  There are numerous examples within the Fifth Circuit of Section 2 cases brought by organizations, without a hint of any question whether organizations and private individuals have a cause of action under Section 2. *League of United Latin American Citizens, Dist. 19 v. City of Boerne*, 675 F.3d 433 (5th Cir. 2012); *LULAC #4552 v. Roscoe Indep. Sch. Dist.*, 123 F.3d 843 (5th Cir. 1997) ; *Campos v. City of Houston*, 113 F.3d 544 (5th Cir. 1997); *N.A.A.C.P. v. Fordice*, 105 F.3d 655 (5th Cir. 1996); *Alonzo v. City of Corpus Christi*, 68 F.3d 944 (5th Cir. 1995); *Concerned Citizens for Equality v. McDonald*, 63 F.3d 413 (5th Cir. 1995); *LULAC, Council No. 4434 v. Clements*, 999 F.2d 831 (5th Cir. 1993); *Magnolia Bar Ass'n v. Lee*, 994 F.2d 1143 (5th Cir. 1993); *Miss. State Chapter, Operation PUSH v. Mabus*, 932 F.2d 400 (5th Cir. 1991); *Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109 (5th Cir. 1991); *East Jefferson Coalition for Leadership & Dev. v. Parish of Jefferson*, 926 F.2d 487 (5th Cir. 1991); *Citizens for a Better Gretna v. City of Gretna*, 834 F.2d 496 (5th Cir. 1987) ; *LULAC, Council No. 4386 v. Midland Ind. Sch. Dist.*, 829 F.2d 546 (5th Cir. 1987).

Case 2:13-cv-00193   Document 88   Filed in TXSD on 11/22/13   Page 25 of 39

(*Texas v. Holder*, Dkt. 1:12-cv-00128-RMC-DST-RLW (D.D.C. Oct. 1, 2012), Texas Sum.

Jdgmt. Brf. (Doc. No. 347), at 42 (emphasis added)).  Texas cannot be heard to argue otherwise

now.  *See New Hampshire v. Maine*, 532 U.S. 742 (2001) (doctrine of judicial estoppel).

    For these reasons, this aspect of Texas's motion should be denied.

**III.**    **THE COMPLAINT STATES A *PRIMA FACIE* CASE UNDER SECTION 2 OF THE VOTING RIGHTS ACT**

    Texas, in Point V of its brief, makes several arguments directed to the *prima facie*

allegations of the Complaint, but those arguments are either wrong as a matter of law, or wrong

because Texas has distorted and/or ignored the allegations in the Complaint, or both.

    **A.**    **The Complaint States a *Prima Facie* Case of Denial and Abridgement of the Right to Vote in Violation of the Section 2 Results Standard**

    In 1982, Congress amended the key provisions of Section 2 of the Voting Rights Act to

add what is known as the "results test."  The statute's original language adopted in 1965

prohibited the imposition or application of voting qualifications or prerequisites to voting "to

deny or abridge the right of any citizen of the United States to vote on account of race or color."

The 1982 Amendments expanded that prohibition to include voting qualifications or

prerequisites to voting that are imposed or applied "*in a manner which results in* a denial or

abridgement of the right of any citizen of the United States to vote on account of race or color, or

[membership in a language minority group]."  (Emphasis added.)  This change, together with the

addition of Section 2(b) (further explaining the results test) and the accompanying legislative

history, "ma[d]e clear that a violation could be proved by showing discriminatory effect alone

and to establish as the relevant legal standard the 'results test.'"  *Thornburg*, 478 U.S. at 35-36.

As amended, Section 2(b) provides that a violation is established if "based on the totality of circumstances," plaintiffs show that "the political processes leading to nomination or election" are "not equally open to participation" for members of racial, ethnic, or language minority groups. 42 U.S.C. §1973(b). For example, the Fifth Circuit has found a violation of the Section 2 results standard involving a limitation on voter access to the ballot. Operation PUSH, 932 F.2d 400 (5th Cir. 1991) (voter registration restrictions). The overarching question is whether the challenged law or practice denies minority voters "an equal measure of political and electoral opportunity." De Grandy, 512 U.S. at 1013.

The Senate Report that accompanied the 1982 VRA Amendments identified nine non-exclusive factors as typically being relevant to the "totality of the circumstances" analysis. Commonly known as the "Senate factors," these were derived directly from federal court decisions involving constitutional challenges to voting practices that had been alleged to be racially discriminatory. See S. REP. NO. 97-417, 97th Cong., 2d Sess., at 28-29 (1982) ("1982 Senate Report").[9] There is no requirement that all Senate factors be proven in a particular case to establish Section 2 liability. Id. at 29 ("The cases demonstrate, and the committee intends that there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other."); see also Thornburg, 478 U.S. at 45 (noting the list is "neither

---

[9] The Senate factors are: (1) the extent of any history of official voting discrimination; (2) the extent to which voting is racially polarized; (3) the extent to which the state or political subdivision has used voting practices or procedures that may enhance the opportunity for discrimination against the minority group; (4) whether minorities have been denied access to any candidate slating process; (5) the extent to which members of the minority group bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate effectively in the political process; (6) whether political campaigns have been characterized by overt or subtle racial appeals; (7) the extent to which members of the minority group have been elected to public office in the jurisdiction; (8) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and (9) whether the policy underlying the use of such voting law is tenuous. Id.

19

Case 2:13-cv-00193   Document 88   Filed in TXSD on 11/22/13   Page 27 of 39

comprehensive nor exclusive"); *id.* ("[T]he Committee determined that the question whether the political processes are equally open depends upon a searching practical evaluation of the past and present reality, and on a functional view of the political process." (quoting 1982 Senate Report, 30 & n.120) (internal citations and quotation marks omitted)). The ultimate issue under the "totality of the circumstances" standard therefore is whether the challenged voting practice functions in a racially discriminatory manner, and the Senate factors identify the typical lines of relevant evidence but are not an exclusive list.

Plaintiffs' Complaint presents a set of well-pleaded facts, which at this stage of the case must be accepted as true and, when read in their entirety, establish a *prima facie* violation of the Section 2 results standard. The allegations include the assertion that, for several reasons, SB 14 has a disparate impact on minority citizens but, contrary to what Texas claims, the Complaint does not stop at disparate impact and includes other allegations relevant to a Section 2 results violation. Thus, Texas' argument that the Section 2 results standard is not violated solely by a showing of disparate impact is not relevant to what Plaintiffs have alleged, and will seek to prove, in this case.

At the outset, the Complaint alleges specific factual reasons why SB 14 bears more heavily upon Texas' racial and language minority citizens than upon other members of the electorate:

1. Hispanic and African American citizens are less likely than white citizens to possess the photo identification required by SB 14 (Compl. ¶¶ 39-41);

2. obtaining the photo identification required by SB 14 involves multiple practical burdens, including the unreimbursed monetary costs required to secure the qualifying "primary" and "secondary" identifying documents, and the impediments related to the time, distance and loss of work required to travel to the motor vehicle facilities, which are the exclusive

20

state agency that provides nominally "free" "voter identification" cards (Compl. ¶¶ 41-45); and

3. Hispanic and African American citizens in Texas are disproportionately poorer than white citizens, including but not limited to having less access to motor vehicles, which hinders them in participating equally in the political process generally, as well as more specifically in overcoming the practical burdens involved in obtaining identification that satisfies SB 14. (Compl. ¶¶ 30-38.)

These factual allegations, when read together, show that SB 14 will have a differential negative effect upon political participation by racial and language minority citizens of Texas, which is the logical starting point for a Section 2 results claim. "It . . . was appropriate for the court to consider evidence of statewide [voter registration] disparity to determine if Mississippi's procedures violated § 2." Operation PUSH, 932 F.2d at 413. In addition to this disparate impact, however, the Complaint sets forth numerous additional well-pleaded allegations of relevant facts which, when considered in their totality, make it more likely than not that SB 14 will function with a bias against racial and language minority citizens.

In particular, paragraphs 49 and 50 of the Complaint detail Texas' long history of de jure voting discrimination, including the use of all-white primaries and poll taxes (the latter postdating the 1965 passage of the Voting Rights Act). Paragraph 51 of the Complaint details a record of adjudicated voting rights violations extending to the present day, including judicial findings of intentional racial voting discrimination during the very legislative session during which SB 14 was adopted. This backdrop of racial voting discrimination is strong circumstantial evidence that SB 14 functions in a racially discriminatory manner that is qualitatively distinct from a case involving incidental statistical artifacts. This distinction is further reinforced by

21

Case 2:13-cv-00193   Document 88   Filed in TXSD on 11/22/13   Page 29 of 39

Paragraph 71 of the Complaint, which describes the derogatory, racially-charged campaign that accompanied the passage of SB 14.[10]

Paragraphs 69 through 77 of the Complaint allege that the justification given for SB 14 by its supporters were tenuous, if not contrived or pretextual. This is not to suggest that Texas has no interest in protecting the integrity of its elections via some form of voter identification; that is not in dispute here. The relevant factual allegations in the Complaint are that the unforgiving and draconian photo ID requirements added by SB 14 – the most restrictive such law in the country at the time of its adoption – are not reasonably related to the justifications that were offered for them, and are therefore suspect.

Paragraphs 30 through 48 of the Complaint document specific socioeconomic disparities between Texas' Latino and African American populations and the state's white population, traceable at least in part to a history of official discrimination in education and employment, which hinder the ability of those groups to participate equally in the political process.[11] For all of these reasons, Texas' motion to dismiss fundamentally mischaracterizes Plaintiffs' Complaint. (Texas Br. 21-26.) Nowhere in its brief does Texas acknowledge, let alone discuss, these numerous factual allegations relevant to the totality of the circumstances.[12] The

---

[10] *See also* Paragraphs 58 through 63, which describe the unusual legislative procedures that were used to pass SB 14 over the objection of nearly all minority legislators; paragraphs 57, 65 and 66, which also detail the Legislature's perfunctory dismissal of the specific concerns that the proposed photo ID law would be racially discriminatory.

[11] Paragraph 53 of the Complaint alleges that there is a history of racially polarized voting in Texas. This Senate factor typically plays a key role in vote dilution challenges to redistricting plans and at-large election systems. While not necessary for liability in vote denial challenges, this Court could take notice that any denial or abridgement caused by SB 14 of the voting rights of individual racial and language minority citizens will diminish the political voice and effectiveness of racial and language minority groups generally if voting is racially polarized.

[12] Accordingly, there is no reason for Plaintiffs to discuss the cases cited by Texas that supposedly support their proposition that disparate impact alone is insufficient to support a finding of a denial or abridgement of the right to vote on account of race or color.

Case 2:13-cv-00193   Document 88   Filed in TXSD on 11/22/13   Page 30 of 39

Complaint is more than adequate to state a Section 2 results claim against SB 14 under the governing totality of the circumstances standard.

### B.   SB 14 Is Not Exempt From Federal Racial Discrimination Challenges

SB 14 is a "prerequisite" to voting that will "deny" and "abridge" the right to vote within the plain meanings of those terms as used in Section 2. There is no textual support for Texas' argument that a racially discriminatory requirement to present photo identification at the polling place may not be challenged as a "denial" or "abridgement" of the right to vote within the meaning of Section 2 or the Constitution. (Texas Br. 17, 18-20.) "The [Fifteenth] Amendment nullifies sophisticated as well as simple-minded modes of discrimination. It hits onerous procedural requirements which effectively handicap exercise of the franchise by the colored race although the abstract right to vote may remain unrestricted as to race." *Lane v. Wilson*, 307 U.S. 268, 275 (1939). Nor does any provision of the Voting Rights Act, which enforces the Fourteenth and Fifteenth Amendments, exempt SB 14 from being treated as a "voting qualification or prerequisite to voting or standard, practice, or procedure." 42 U.S.C. § 1973(a).

At the very least, SB 14 functions as a "prerequisite to voting" that "den[ies]" the right to vote within the meaning of Section 2 when an eligible registered voter is prevented from casting a ballot in person that will be counted, solely because she or he does not present the qualifying identification specified by the statute. SB 14 also "abridge[s]" the right to vote, at the very least, when eligible citizens are deterred from registering or voting because of financial or practical impediments to obtaining the required identification. Thus, if the Court finds, under the totality of the circumstances, that SB 14 leads to such denial or abridgement "on account of race or

23

color, or [membership in a language minority group]," then a violation of the Section 2 results test has been shown.

Texas makes the misplaced argument that voters who are "capable" of complying with SB 14, "but choose not to do so because they would rather spend their limited time and resources on other endeavors," have not had their right to vote denied or abridged within the meaning of Section 2.[13]  (Texas Br. 19.)  This rehashes the "voter apathy" defense to minority vote dilution claims, which consistently has been rejected by courts within and outside this circuit.[14]  *See U.S. v. Marengo Cnty.*, 731 F.2d 1546, 1568-69 (11th Cir. 1984); *Kirksey v. Bd. of Supervisors*, 54 F.2d 139, 145, 150 (5th Cir. 1977) (en banc), *cert. denied*, 434 U.S. 968 (1977); *Major v. Treen*, 574 F. Supp. 325, 351 n. 31 (E.D. La. 1983) (three-judge court).  Plaintiffs respectfully urge the Court to keep this "self-disenfranchisement" argument in mind as the case proceeds, however, because Texas is conceding that SB 14 may force eligible citizens to choose between voting and other uses of their "limited time and resources."[15]

Further, Texas' reliance upon *Crawford* is entirely mistaken when it comes to racial discrimination claims. (Texas Br. 19–20.)  *Crawford* concerned a facial challenge to an Indiana photo identification law that was alleged to be an excessive burden upon the fundamental right to vote under the Fourteenth Amendment.  The Supreme Court held that the Indiana law, which was less restrictive than SB 14, did not impose an excessive burden on its face under *Burdick v.*

---

[13]  Viewed most charitably this might be considered a question of fact Texas will have an opportunity to prove by evidence, but it is not a ground for dismissal as a matter of law.

[14]  Under Texas' theory, virtually any voting restriction, including a poll tax, would not deny or abridge the right to vote of anyone who is technically "capable" of complying.

[15]  Texas' argument also fails to address the case of citizens who are not "capable" of complying with SB 14, for example by reason of the lack of a birth certificate.

24

*Takushi,* 504 U.S. 428 (1992).  No racial discrimination challenge was before the Court in *Crawford,* and nothing in the Court's decision suggested that photo identification laws are exempt – categorically or otherwise – from racial discrimination challenges under the Voting Rights Act or the Constitution.[16]  *Crawford* means simply that photo ID laws are not unconstitutional *per se,* in the same way that at-large (*i.e.,* multi-member district) elections are not unconstitutional *per se,* but may still be challenged if they are racially discriminatory.  *See Rogers v. Lodge,* 458 U.S. 613, 617 (1982) (citing *Whitcomb v. Chavis,* 403 U.S. 124 (1971); *Thornburg v. Gingles,* 478 U.S. 30).

      C.      <u>The Section 2 Results Standard Is Constitutional</u>

Ignoring the fact that courts have never questioned the constitutionality of Section 2's "results" standard, Texas asserts that "[a]ny construction of the Voting Rights Act that precludes Texas from implementing its voter-identification law will exceed Congress' enforcement power under section 2 of the Fifteenth Amendment."  (Texas Br. 26.)  To the contrary, Section 2 directly enforces the Fifteenth Amendment.  See LULAC, Council No. 4434 v. Clements, 986 F.2d 728, 759 (5th Cir. 1993) ("[I]t is clear that, when Congress amended Section 2, it was acting pursuant to its enforcement powers under the Fourteenth and Fifteenth Amendments.")  Again, Texas' argument is built on the straw assertion that Plaintiffs rely solely on a "mere" disparate impact theory.  (Texas Br. 26-28.)  As has already been shown, Congress established a "totality of circumstances" test, which Plaintiffs' Complaint easily meets here with allegations substantially beyond "mere" disparate impact.

---

[16]  It is self-evident that the Supreme Court did not intend its decision in *Crawford* to insulate photo ID laws from federal review.  The Court specifically left open the possibility that discrete classes of Indiana citizens who encounter difficulties in complying with the photo ID law could bring as-applied fundamental right to vote challenges. *See Crawford,* 553 U.S. at 199.

Texas also argues that Congress was required to state its prohibitions in "clear and explicit language and justify this prophylaxis with legislative findings." (Texas Br. 27.) But Congress did make numerous findings as to the necessity of adopting the results standard. See 1982 Senate Report. Texas cites no authority for the proposition that Congress must address every single type of voting practice that might be challenged under Section 2, and there is none.

Finally, it is clear that Texas' broad proposition, that "[t]he States also hold a constitutionally protected prerogative to establish the qualifications for voting in state and federal elections" (Texas Br. 27) is prima facie overbroad. First, SB 14 does not establish "qualifications" for voting. It sets forth a protocol for identifying those who have already met the qualifications to vote. In any event, as Texas tacitly acknowledges in its citation to cases upholding prohibitions on literacy tests and poll taxes, the states' "prerogative" in regard to voting qualifications (assuming arguendo that SB 14 speaks to "qualifications") is circumscribed by other constitutional strictures, notably the Fourteenth and Fifteenth Amendments.

D.    **The Complaint Adequately Pleads the Discriminatory Purpose Behind SB 14**

Texas argues that the Complaint is deficient because nothing in it "comes anywhere close to a plausible allegation that Senate Bill 14 is a racist law." (Texas Br. 28.) Setting aside Texas' attempt to engage in inflammatory rhetoric, the Complaint fully and adequately pleads the discriminatory purpose behind SB 14 in accordance with the seminal Supreme Court case on this issue, *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977) – authority which Texas inexplicably ignores.

In *Village of Arlington Heights*, the Court outlined the analysis to determine whether invidious discriminatory purpose was a motivating factor behind official action. The "starting

26

point," the Court explained was "the impact of the official action," *i.e.*, whether it "bears more heavily on one race than another," because "[s]ometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face." *Arlington Heights*, 429 U.S. at 266. Other, non-exhaustive, factors include: the historical background of the decision, particularly if it reveals a series of official actions taken for invidious purposes; the specific sequence of events leading up to the challenged decision; departures from the normal procedural sequence which might afford evidence that improper purposes are playing a role; substantive departures, particularly if the factors usually considered important by the decision-maker strongly favor a decision contrary to the one reached; and the legislative or administrative history. *Id.* at 267-68.

Plaintiffs' Complaint makes detailed allegations regarding SB 14. These include: (1) the history of discriminatory voting practices in Texas; (2) the Legislature's consideration of progressively more stringent ID requirements alongside mounting concerns regarding their impact on racial and ethnic minorities; (3) the unusual procedural techniques used to rush SB 14 through the Legislature; (4) the pretextual arguments made in favor of SB 14's passage; (5) the summary dismissal of numerous proposed amendments to SB 14 that might have ameliorated its discriminatory impact; (6) the racially charged rhetoric used by the supporters of SB 14; and (7) the disparate impact of SB 14. Plaintiffs' well-pleaded allegations, wholly ignored by Texas, fully meet the *Arlington Heights* standard.

Rather than grappling with precedent unfavorable to its argument, Texas makes a series of mistaken or irrelevant assertions. First, it argues that Plaintiffs do not allege that "anyone" will be unable to obtain the election identification certificate free of charge. In fact, however, the

Complaint details why the allegedly "free" EIC is not free, because of the underlying costs in obtaining it, such as the cost of obtaining a birth certificate, and the costs of traveling to (and missing work in order to travel to) facilities that provide the EIC. (Compl. ¶¶ 15, 45.) The Complaint alleges that Latinos and African Americans, who make up a disproportionate portion of Texas' poor, are likely not to be able to obtain the EIC as readily as are white voters. (Compl. ¶¶ 41-46.) Second, Texas returns to *Crawford* for the proposition that voter-identification laws are legitimate fraud-prevention devices. But, again, the Court in *Crawford* did not have before it Texas' much more stringent photo ID law, and did not consider the specific facts alleged in the Complaint, and, of course, did not consider racial discrimination at all because *Crawford* was not a case in which racial discrimination was alleged.

## IV.     PLAINTIFFS PROPERLY NAMED STEVE MCCRAW AS A DEFENDANT

Steve McCraw, the Director of the Department of Public Safety, in his official capacity, is responsible for administering the agency that issues *all* of the forms of Texas ID that are allowable under SB 14, including driver's licenses, non-driver identification cards, licenses to carry a concealed hand gun, and EICs. As such, the injunction requested in the Complaint against enforcing SB 14 necessarily would issue against him, as well as against the State's chief election officer, the Secretary of State.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court deny Texas' motion to dismiss the Complaint.

Respectfully submitted,

/s/  Ezra D. Rosenberg
Ezra D. Rosenberg
Dechert LLP
902 Carnegie Center, Suite 500
Princeton, New Jersey 08540-6531
(609) 955 3222 (phone)
ezra.rosenberg@dechert.com

Steven B. Weisburd
State Bar No. 24054515
S.D. Tex. ID 1691215
Amy L. Rudd
State Bar No. 24043561
S.D. Tex. ID 1149768
Lindsey B. Stelcen
State Bar No. 24083903
Dechert LLP
500 W. 6th Street, Suite 2010
Austin, TX 78701
Telephone: (512) 394-3000
Facsimile: (512) 394-3001
Lindsey.stelcen@dechert.com

Gary Bledsoe
State Bar No.: 02476500
PotterBledsoe, L.L.P.
316 West 12th Street, Suite 307
Austin, Texas 78701
Telephone: (512) 322-9992
Facsimile: (512) 322-0840
garybledsoe@sbcglobal.net

Wendy Weiser
Myrna Pérez
Vishal Agraharkar
Jennifer Clark
The Brennan Center for Justice at NYU Law
School*
161 Avenue of the Americas, Floor 12
New York, New York 10013-1205
(646) 292-8329 (phone)
wendy.weiser@nyu.edu
myrna.perez@nyu.edu
vishal.agraharkar@nyu.edu
jenniferl.clark@nyu.edu
*This document does not purport to present NYU School of
Law's institutional views, if any on the topic.

Robert A. Kengle
Mark A. Posner
Sonia Gill
Erandi Zamora
Lawyers' Committee for Civil Rights Under Law
1401 New York Ave., NW, Suite 400
Washington, D.C. 20005
(202) 662-8389 (phone)
bkengle@lawyerscommittee.org
mposner@lawyerscommittee.org
sgill@lawyerscommittee.org
ezamora@lawyerscommittee.org

29

Kim Keenan
Marshall Taylor
Victor Goode
Victor L. Goode
State Bar No. 08145525
NAACP National Headquarters
4805 Mt. Hope Dr.
Baltimore, Maryland 21215-3297
(410) 580-5120 (phone)
vgoode@naacpnet.org

Jose Garza
Law Office of Jose Garza
State Bar No. 07731950
7414 Robin Rest Drive
San Antonio, Texas 98209
Telephone: (210) 392-2856
garzapalm@aol.com

Robert S. Notzon
State Bar No. 00797934
Law Office of Robert S. Notzon
1502 West Avenue
Austin, Texas 78701
512-474-7563 (phone)
Robert@notzonlaw.com

Clay Bonilla
State Bar No. 24055193
S.D. Tex. ID 596241
Daniel G. Covich
State Bar No. 04906500
S.D. Tex. ID 10706
The Law Offices of William Bonilla, P.C.
2727 Morgan Ave.
Corpus Christi, Texas 78405

*Counsel for Plaintiffs Texas State Conference*
*of NAACP Branches and the Mexican American*
*Legislative Caucus of the Texas House of Representatives*

**CERTIFICATE OF SERVICE**

I certify that on November 22, 2013, the foregoing Response of Plaintiffs Texas State

Conference of NAACP Branches and the Mexican American Legislative Caucus to Defendants'

Motion to Dismiss was sent by electronic mail to the following Counsel for Plaintiffs,

Defendants, and Plaintiffs-Intervenors.

/s/ Lindsey Stelcen
Lindsey Stelcen

John Scott
Office of the Attorney General of Texas
P.O. Box 12548 (MC 059)
Austin, TX 78711-2548
john.scott@texasattorneygeneral.gov
*Counsel for Defendants*

Meredith Bell-Platts
Elizabeth S. Westfall
Jennifer L. Maranzano
Daniel J. Freeman
Anna Baldwin
Voting Section, Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530
(202) 305-4278 (phone)
meredith.bell-platts@usdoj.gov
elizabeth.westfall@usdoj.gov
jennifer.maranzano@usdoj.gov
daniel.freeman@usdoj.gov
anna.baldwin@usdoj.gov
*Counsel for Plaintiff United States of America*

John Albert Smith, III
Office of the U.S. Attorney
800 N Shoreline Blvd Ste 500
Corpus Christi, TX 78401
361-888-3111 (phone)
john.a.smith@usdoj.gov
*Counsel for Plaintiff United States of America*

Chad W. Dunn
Kembel Scott Brazil
Brazil & Dunn
4201 Cypress Creek Pkwy., Suite 530
Houston, TX 77068
281-580-6310 (phone)
chad@brazilanddunn.com
scott@brazilanddunn.com
*Counsel for Veasey Plaintiffs*

J. Gerald Hebert
Campaign Legal Center
215 E. Street, NE
Washington, D.C. 20002
202-736-2200 ext. 12 (phone)
202-736-2222
GHebert@campaignlegalcenter.org
*Counsel for Veasey Plaintiffs*

31

Case 2:13-cv-00193   Document 88   Filed in TXSD on 11/22/13   Page 39 of 39

Armand Derfner
P.O. Box 600
Charleston, SC 29402
843-723-9804 (phone)
aderfner@dawlegal.com

Neil G. Baron
914 FM 517 Rd W Suite 242
Dickinson, TX 77539
281-534-2748 (phone)
neil@ngbaronlaw.com
*Counsel for Veasey Plaintiffs*

Luis Roberto Vera, Jr.
111 Soledad Ste 1325
San Antonio, TX 78205
210-225-3300 (phone)
lrvlaw@sbcglobal.net
*Counsel for Plaintiff League of United Latin
American Citizens*

Christina A. Swarns
Ryan Haygood
Natasha M. Korgaonkar
Leah C. Aden
NAACP Legal Defense and Educational
Fund, Inc.
40 Rector St 5th Floor
New York, NY 10006
212-965-2200 (phone)
cswarns@naacpldf.org
laden@naacpldf.org
nkorgaonkar@naacpldf.org
rhaygood@naacpldf.org
*Counsel for Plaintiffs Texas League of
Young Voters Education Fund and Imani
Clark*

Rolando L. Rios
115 E Travis Ste 1645
San Antonio, TX 78205
210-222-2102 (phone)
rrios@rolandorioslaw.com
*Counsel for Plaintiffs Texas Assoc. Of
Hispanic County Judges and County
Commissioners*

Danielle Conley
Jonathan E. Paikin
Kelly Dunbar
Sonya Lebsack
Wilmer Hale
1875 Pennsylvania Avenue NW
Washington, DC 20006
202-663-6703 (phone)
danielle.conley@wilmerhale.com
jonathan.paikin@wilmerhale.com
kelly.dunbar@wilmerhale.com
sonya.lebsack@wilmerhale.com
*Counsel for Plaintiffs Texas League of
Young Voters Education Fund and Imani
Clark*

Joseph M Nixon
Bierne Maynard & Parsons
1300 Post Oak Blvd Ste 2500
Houston, TX 77056
713-871-6809 / Fax: 713-960-1527
jnixon@bmpllp.com
*Counsel for Proposed Plaintiff-Intervenors
True The Vote*

Robert M. Allensworth
B14522
BMRCC 251 N IL 37 S
Ina, IL 62846-2419
PRO SE

32