Yannis Banks                                                    May 25, 2012

---

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,

    Plaintiff,

VS.

ERIC H. HOLDER, JR. in his
official capacity as Attorney
General of the United States,

    Defendant,

ERIC KENNIE, et al,

    Defendant-Intervenors,

TEXAS STATE CONFERENCE OF
NAACP BRANCHES,

    Defendant-Intervenors,

TEXAS LEAGUE OF YOUNG VOTERS
EDUCATION FUND, et al,

    Defendant-Intervenors,

TEXAS LEGISLATIVE BLACK
CAUCUS, et al,

    Defendant-Intervenors,

VICTORIA RODRIGUEZ, et al.,

    Defendant-Intervenors.

CASE NO. 1:12-CV-0128
(RMC-PXT-RLW)
Three-Judge Court

**********************************
ORAL DEPOSITION OF
YANNIS BANKS
MAY 25, 2012
**********************************

---

**2**

ORAL DEPOSITION OF YANNIS BANKS, produced as a
witness at the instance of the Defendant, was duly
sworn, was taken in the above-styled and numbered cause
on the MAY 25, 2012, from 9:10 a.m. to 3:52 p.m., before
Chris Carpenter, CSR, in and for the State of Texas,
reported by machine shorthand, at the Offices of the
Attorney General of Texas, first floor conference room,
209 West 14th Street, Austin, Texas 78701, pursuant to
the Federal Rules of Civil Procedure and the provisions
stated on the record or attached hereto.

---

**3**

A P P E A R A N C E S
FOR THE PLAINTIFF, STATE OF TEXAS:
    Matthew Frederick
    OFFICE OF THE ATTORNEY GENERAL OF TEXAS
    P.O. Box 12548
    Austin, TX 78711-2548

    209 West 14th Street
    8th Floor
    Austin, TX 78701
    (512) 475.4330
    matthew.frederick@texasattorneygeneral.gov

FOR THE DEFENDANT-INTERVENOR TEXAS STATE CONFERENCE OF
NAACP BRANCHES AND THE MEXICAN AMERICAN LEGISLATIVE
CAUCUS:
    Amy L. Rudd
    DECHERT, LLP
    300 W. 6th Street
    Suite 2010
    Austin, TX 78701
    (512) 394-3000
    amy.rudd@dechert.com
    Gary L. Bledsoe
    LAW OFFICE OF GARY L. BLEDSOE AND ASSOCIATES
    316 W. 12th Street, Suite 307
    Austin, TX 78701
    (512) 322-9992
    garylbledsoe@sbcglobal.net

    Ian Vandewalker (by telephone)
    Myrna Perez (by telephone)

---

**4**

INDEX

Appearances......................................3
Stipulations pages attached after Page..........166
YANNIS BANKS
    Examination by Mr. Frederick..............6
    Examination by Mr. Vandewalker..........156

Signature and Changes...........................163

Reporter's Certificate..........................165

EXHIBITS

| NO. | DESCRIPTION | PAGE MARKED |
|---|---|---|
| 1 | Notice of Deposition | 11 |
| 2 | Defendant-Intervenor Texas State Conference of NAACP Branches' Responses and Objections to the State of Texas' First Set of Interrogatories | 73 |
| 3 | Brennan Center for Justice Letter, Sept. 14, 2011 | 91 |
| 4 | Brennan Center for Justice Letter, Nov. 16, 2011 | 91 |

---



ESQUIRE
DEPOSITION SOLUTIONS



EXHIBIT
Banks 6

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

2:13-cv-193
09/02/2014
DEF0124

Yannis Banks                                           May 25, 2012

5

1          (at 9:10 a.m.)
2          (Witness sworn.)
3          MR. FREDERICK:  Good morning.  My name is
4    Matt Frederick.  I represent the State of Texas.
5          And I guess maybe we could go around and
6    announce for the record who all is appearing.
7          MS. RUDD:  Amy Rudd from Dechert on behalf
8    of the Texas Conference of the NAACP and Mr. Banks.
9          MR. BLEDSOE:  Gary Bledsoe for the Texas
10   NAACP.
11         MR. VANDEWALKER:  I'm sorry.  For the
12   people on the phone, I don't know if the phone could be
13   maybe arranged more centrally, but I couldn't really
14   hear Amy or Gary very well.
15         MS. RUDD:  Is it better if we talk like
16   this?
17         MR. VANDEWALKER:  Yes, that's much better.
18   Thank you.
19         MS. RUDD:  Okay.  We'll just make sure to
20   speak into the microphone.
21         MR. FREDERICK:  Do you all on the phone
22   want to announce for the record?
23         MR. VANDEWALKER:  Sure.  This is Ian
24   Vandewalker with the Brennan Center representing
25   Defendant Intervenors NAACP and Mexican American --

6

1          MS. PEREZ:  And I'm Myrna Perez.  It's
2    M-y-r-n-a, P-e-r-e-z, also with --
3          MS. RUDD:  You know what, guys, you're
4    cutting out.
5          MR. VANDEWALKER:  Okay.  I'm not sure what
6    the solution to that is.  Did you get our names?
7          THE REPORTER:  Yes.
8          MR. VANDEWALKER:  Okay.  Maybe we'll have
9    to repeat some things.
10         THE REPORTER:  The only thing that didn't
11   come out -- this is Chris Carpenter, the court reporter,
12   and the only thing that didn't come out, you said you
13   were with the NAACP and the Mexican American, and then
14   it cut out.
15         MR. VANDEWALKER:  The Mexican American
16   Legislative Caucus.
17         THE REPORTER:  Got it.  MALC.
18         YANNIS BANKS,
19   having been first duly sworn to testify the truth, the
20   whole truth, and nothing but the truth, testified as
21   follows:
22         EXAMINATION
23   By MR. FREDERICK:
24   Q.   Mr. Banks, will you please state your name for
25   the record?

7

1    A.   Sure.  My name is Yannis Banks, and I'm with
2    the Texas NAACP.
3    Q.   Mr. Banks, have you been deposed before?
4    A.   No, sir.  It's my first time.
5    Q.   Well, I'm going to ask you a couple of
6    preliminary questions --
7    A.   Okay.
8    Q.   -- just to, kind of, tell you the ground rules
9    and make sure we understand each other going forward.
10   A.   Sure.
11   Q.   First, are you suffering from any illness today
12   that would affect your ability to provide accurate
13   answers to my questions?
14   A.   No, sir.
15   Q.   Are you taking any medications that might
16   affect your ability to provide accurate answers to my
17   questions?
18   A.   No, sir.
19   Q.   Are you aware of anything else this morning
20   that might prevent you from accurately answering my
21   questions?
22   A.   I am not aware.
23   Q.   Great.
24         Let me give you a couple of ground rules.
25   The first one, as we've all be figuring out is, I need

8

1    you to answer audibly, just so the court reporter can
2    hear.  So rather than shaking your head or nodding, if
3    you could just say "yes" or "no."
4    A.   Okay.
5    Q.   Second, if you don't understand a question that
6    I ask, please tell me.  I'll be happy to rephrase or
7    clarify.
8    A.   Okay.
9    Q.   And again, for the court reporter, if you would
10   let me finish my question before you answer, just so
11   we're not speaking over each other, and I will try and
12   do the same for you.  I may forget.  But if we can just
13   try and let each other finish, so that he can get an
14   accurate record.
15   A.   Yes, sir.  Not a problem.
16   Q.   Great.
17         Your lawyers may object to my questions.
18   Generally, even if your lawyers object, you can still
19   answer the question.  Do you understand that?
20   A.   I do, yes.
21   Q.   Now, there may be times when your lawyers
22   instruct you not to answer.  In that case, we'll make it
23   clear on the record, but in that instance, you can
24   refuse to answer if you were so instructed.  Do you
25   understand that?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Yannis Banks                                          May 25, 2012

| 9 |
|---|
| 1    A.  Yes, I do. |
| 2    Q.  Thank you.  All right. |
| 3         And are you represented by counsel today? |
| 4    A.  Yes, I am. |
| 5    Q.  And who is that? |
| 6    A.  It would be Gary Bledsoe.  The Brennan Center |
| 7  is on the phone, and Amy as well. |
| 8    Q.  Okay.  Mr. Banks, what did you do to get ready |
| 9  for your deposition today? |
| 10    A.  I had a conversation with my attorneys. |
| 11    Q.  Okay.  And who was at that -- who was a part of |
| 12  that discussion? |
| 13    A.  The same ones that are here present, Gary |
| 14  Bledsoe and Amy and the Brennan Center. |
| 15    Q.  Okay.  Was that conversation in person or by |
| 16  phone? |
| 17    A.  By phone. |
| 18    Q.  Okay.  When did that conversation take place? |
| 19    A.  Last night. |
| 20    Q.  Okay.  About how long did it last? |
| 21    A.  Roughly two hours, maybe. |
| 22    Q.  Okay.  Did you meet with or talk to anyone else |
| 23  to prepare for your deposition? |
| 24    A.  Just my attorneys. |
| 25    Q.  Have you talked to anyone else about, just |

| 11 |
|---|
| 1         MR. FREDERICK:  Mr. Carpenter, if we could |
| 2  mark this as Exhibit 1, please. |
| 3         (Exhibit 1 marked for identification.) |
| 4    Q.  (BY MR. FREDERICK) Mr. Banks, do you recognize |
| 5  this document? |
| 6         MR. VANDEWALKER:  Mr. Frederick, if I can |
| 7  just interrupt quickly, just for the practical purposes, |
| 8  could you, either yourself or have Mr. Banks identify |
| 9  just basically what the document is?  I'm sure you were |
| 10  going to do that anyway, but we would appreciate it. |
| 11         MR. FREDERICK:  Yes, we will do that. |
| 12  Sure. |
| 13         MR. VANDEWALKER:  Thank you. |
| 14    A.  It looks like the -- I guess you would call it |
| 15  an order for a deposition. |
| 16    Q.  (BY MR. FREDERICK) Okay.  Have you seen this |
| 17  document before? |
| 18    A.  No, I don't think I ever looked at it.  I think |
| 19  I was aware of it, but I don't think I actually looked |
| 20  at it. |
| 21    Q.  Do you remember when you became aware of this |
| 22  document? |
| 23    A.  I believe I was told last week about the |
| 24  deposition happening.  Was it last week?  Last week |
| 25  seems right. |

| 10 |
|---|
| 1  about your deposition? |
| 2    A.  Just my attorneys. |
| 3    Q.  Did you review any documents to prepare for |
| 4  your deposition today? |
| 5    A.  I did. |
| 6    Q.  Can you tell me what documents you reviewed? |
| 7    A.  The documents that we submitted.  I don't |
| 8  remember the date that they were submitted by our |
| 9  attorneys, but I reviewed most of those. |
| 10    Q.  Okay.  And when you say "submitted," do you |
| 11  mean documents that were produced for this case? |
| 12    A.  Yes. |
| 13    Q.  Did you bring any documents with you today? |
| 14    A.  I just brought the letters submitted to the |
| 15  DOJ. |
| 16    Q.  Oh, okay.  Great. |
| 17    A.  So that's it. |
| 18    Q.  Okay.  And could you give me dates of those |
| 19  letters? |
| 20    A.  Sure.  September 14th of 2011 and November 16th |
| 21  of 2011. |
| 22    Q.  Did you meet with or talk to anyone else at the |
| 23  NAACP to prepare to testify on specific topics today? |
| 24    A.  No, just my attorneys. |
| 25    Q.  Okay. |

| 12 |
|---|
| 1    Q.  Okay.  Now, are you aware that you have been |
| 2  designated to address specific subjects in today's |
| 3  deposition? |
| 4    A.  Yes. |
| 5    Q.  Okay.  If you would turn with me to Page 2. |
| 6  And this is a list of topics.  Is it your understanding |
| 7  that you have been designated to testify on Topic |
| 8  Number 1? |
| 9    A.  Yes. |
| 10    Q.  Okay.  Did you do anything to prepare for your |
| 11  testimony on Topic Number 1? |
| 12    A.  Just -- besides just looking over documents |
| 13  that we produced, that was basically it, just talking |
| 14  with my lawyers. |
| 15    Q.  Okay.  Are you familiar -- are you familiar |
| 16  with the answer that the Texas NAACP Branches have filed |
| 17  in this litigation? |
| 18    A.  A little bit, yes. |
| 19    Q.  Okay.  Have you -- have you seen it before? |
| 20    A.  Would that be the RF?  What do they call it? |
| 21  RFA, I believe, or -- |
| 22    Q.  No.  This would be the answer that was filed to |
| 23  the State of Texas's complaint. |
| 24    A.  I'm -- I'm not sure, because I would have to -- |
| 25  I'm not a lawyer. |



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Yannis Banks                                          May 25, 2012

**13**

1    Q.  Sure.
2    A.  So the different things I've read and seen, I'm
3    not sure.  I don't want to say yes, and it was something
4    else.  I'm not sure.
5    Q.  Okay.
6    A.  To the question.
7    Q.  Fair enough.  Do you feel like you are prepared
8    to testify about the factual basis of the Texas NAACP's
9    claims or defenses in this lawsuit?
10   A.  Yes.
11   Q.  Now, have you -- have you been designated to
12   testify about Topic Number 2 on this notice?
13   A.  (Reading document.) I don't think I was
14   designated for that one, if I remember correctly.
15   Q.  Okay.  Do you believe that you are prepared to
16   testify to Topic Number 2?
17   A.  No.
18   Q.  Okay.  Is it your understanding that you have
19   been designated to testify about Topic Number 3?
20   A.  Yes.
21   Q.  Did you do anything specific to prepare to
22   testify about Topic Number 3?
23   A.  Just looking over documents that was produced
24   and talking to my attorneys.
25   Q.  Okay.  Do you feel like you're prepared to

**14**

1    testify about Topic Number 3 this morning?
2    A.  To the -- only to the extent that I can.  I'm
3    not 100 percent on that one.  But I can only speak to
4    the knowledge that I do have on it.
5    Q.  Okay.  Is it your understanding that you have
6    been designated to testify as to Topic Number 4?
7    A.  Yes.
8    Q.  Okay.  Other than reviewing the documents that
9    were produced the Texas NAACP in this litigation,
10   have you reviewed anything or done anything specific to
11   prepare to testify on that topic?
12   A.  Just try to reflect mentally what -- what we've
13   done and besides what you stated.
14   Q.  Okay.  And then Topic Number 5, is it your
15   understanding that you have been designated to testify
16   as to that topic?
17   A.  Yes.
18   Q.  Other than the documents that have been
19   produced the Texas NAACP in this litigation, have you
20   done anything to prepare to testify on Topic Number 5?
21   A.  No.
22   Q.  Do you feel that you are prepared to testify as
23   to Topic Number 5 today?
24   A.  Yes.
25   Q.  All right.  Topic Number 6.  Is it your

**15**

1    understanding that you have been designated to testify
2    as to Topic Number 6?
3    A.  Yes.
4    Q.  Okay.  Other than reviewing the documents that
5    have been produced by the Texas NAACP in this
6    litigation, have you done anything specific to prepare
7    for your testimony on Topic Number 6?
8    A.  No.
9    Q.  Okay.  Do you feel that you are prepared to
10   testify as to Topic Number 6?
11   A.  Yes.
12   Q.  Moving down to Topic Number 10.  Is it your
13   understanding that you have been designated to testify
14   as to Topic Number 10?
15   A.  Yes.
16   Q.  And again, other than reviewing the documents
17   that have been produced by the Texas NAACP in this
18   litigation, have you done anything specific to prepare
19   for your testimony on Topic Number 10?
20   A.  No.
21   Q.  Do you feel that you are prepared to testify on
22   Topic Number 10?
23   A.  Yes.
24   Q.  Topic Number 11.  Is it your understanding that
25   you are prepared to testify about Top Number 11?

**16**

1    A.  Yes.
2    Q.  Other than reviewing the documents that have
3    been produced by the Texas NAACP in this litigation,
4    have you done anything specific to prepare for your
5    testimony on Topic Number 11?
6    A.  No.
7    Q.  Do you feel that you are prepared to testify
8    about Topic Number 11 today?
9    A.  Yes.
10   Q.  Is it your understanding that you are here to
11   testify on behalf of the Texas NAACP on all of the
12   topics that we have just gone through?
13   A.  Yes.
14   Q.  Okay.  Mr. Banks, can you tell me what your --
15   do you have a position with Texas NAACP?
16   A.  I do.  It's one of many, many hats.  We are --
17   I'm staffed by them, but it's a one-staff position.  So
18   I handle many roles, whether it's day-to-day operations
19   of the office, I guess you'd call it office manager, if
20   you will, just details, doing everything in the office,
21   making sure whatever supplies we need, we have.
22        I have done the legislative outreach as
23   well during the session.  Done the web master work for
24   them, if you will.  I have attended meetings when
25   President Bledsoe isn't able to go, or even when he can,



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Yannis Banks                                                    May 25, 2012

| 17 | 19 |
|---|---|
| 1  I tend to go -- to go with him. I have kept track of | 1  NAACP objects to that line of questioning as -- |
| 2  his schedule, to a degree that I can, working with his | 2      MS. RUDD: Ian, was that "irrelevant"? |
| 3  paralegal to where he needs to be. I have done, you | 3      MR. VANDEWALKER: Yes. |
| 4  know, other little jobs for them, as well. Just | 4      MR. FREDERICK: Okay. Well, I'm going to |
| 5  whatever comes up that needs to be done, I've done that | 5  ask some questions, and you're free, of course, to |
| 6  as well. So I do quite a few different things for the | 6  object as you see fit. |
| 7  NAACP. | 7      MR. VANDEWALKER: Okay. |
| 8    Q. Do you have a title within NAACP? | 8    Q. (BY MR. FREDERICK) Can you explain your |
| 9    A. It rotates. I have learned -- I have -- | 9  understanding of what the Texas NAACP's position is on |
| 10  depending, I guess, on what the situation or where I | 10  the adequacy of the United States representation in this |
| 11  am. If I've gone to, you know, different meetings, I | 11  litigation? |
| 12  may be there as a representative for the NAACP. | 12      MR. VANDEWALKER: Objection, calls for a |
| 13      I may have done, you know, legislative | 13  legal conclusion, irrelevant. |
| 14  liaison during the session. You know, just depending on | 14      MR. BLEDSOE: Go ahead and answer. |
| 15  where we are, I kind of give myself flexibility to -- | 15    A. Okay. Well, as I am not an attorney, I think |
| 16  since I wear so many hats, it's kind of hard to say, | 16  that whatever answers that we gave, submitted already, |
| 17  well, I'm doing one specific thing. So it kind of | 17  speaks for why that is, because I don't have a legal |
| 18  rotates and floats around to as needed. | 18  background. |
| 19    Q. Are you employed full time by the Texas NAACP? | 19    Q. (BY MR. FREDERICK) Do you know what answers |
| 20    A. Yes. | 20  have been given on that subject before? |
| 21    Q. How long have you been employed by the Texas | 21    A. Off the top of my head, I cannot recall. I've |
| 22  NAACP? | 22  read the document, but I can't recall what was -- what |
| 23    A. I think since 2007. I guess around May of | 23  was said. |
| 24  2007, or maybe June, somewhere in that area. | 24    Q. Okay. But you testified a moment ago that in |
| 25    Q. When you started with the Texas NAACP, did you | 25  your understanding, the Texas NAACP contends that the |

| 18 | 20 |
|---|---|
| 1  have a title at that time or a specific job? | 1  United States does not adequately represent it in this |
| 2    A. When I started, I had been doing an internship, | 2  litigation? |
| 3  so kind of just when I started, I did as needed from the | 3    A. Yes. |
| 4  very beginning. | 4      MR. VANDEWALKER: Objection, misstates |
| 5    Q. So in May 2007, when you started, you were an | 5  prior testimony. |
| 6  intern at that point; is that right? | 6    Q. (BY MR. FREDERICK) Do you -- do you know what |
| 7    A. I had finished the intern. I had to do some | 7  the basis of that contention is? |
| 8  internship for them. But I wasn't employed until May, | 8      MR. VANDEWALKER: Objection, calls for a |
| 9  and it was just a nontitle, just kind of do what you had | 9  legal conclusion. |
| 10  to do at the office. | 10    A. Yeah. As an attorney, I can't really say, |
| 11    Q. So you had been an intern before, and then you | 11  because I don't have the legal expertise to state it. |
| 12  kind of became an employee in May of 2007? | 12    Q. (BY MR. FREDERICK) Well, without giving a legal |
| 13    A. Correct, yes. | 13  conclusion, can you explain, in your own words, how the |
| 14    Q. Other than the roles that you've just gone | 14  United States's representation of the Texas NAACP in |
| 15  through, has there been any other specific job or role | 15  this litigation is inadequate? |
| 16  that you've had at the Texas NAACP? | 16      MR. VANDEWALKER: Objection. The |
| 17    A. None that I am recalling right. It's been many | 17  question, while prefaced with the idea that it doesn't |
| 18  years, but those are the ones that are sticking out at | 18  call for a legal conclusion, still calls for a legal |
| 19  the moment. | 19  conclusion and is irrelevant. |
| 20    Q. Okay. Are you aware of whether the Texas NAACP | 20    A. I would stick with what was -- what was |
| 21  contends that the United States does not adequately | 21  submitted as the answers already for why we feel, how we |
| 22  represent its interests in this litigation? | 22  feel. |
| 23    A. I am, yes. | 23    Q. (BY MR. FREDERICK) Okay. And as you sit here |
| 24      MR. VANDEWALKER: I'm going to have to | 24  today, you can't recall what those answers are; is that |
| 25  object. We talked about -- we had an agreement that the | 25  correct? |



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Yannis Banks                                                        May 25, 2012

| 21 | 23 |
|---|---|
| 1   A.  That is correct. | 1   Q.  Was that live testimony or written testimony? |
| 2   Q.  Can you describe for me the Texas NAACP's | 2   A.  I believe it was live testimony. |
| 3   activities related to voter ID legislation in Texas? | 3   Q.  Okay.  Did you submit any written testimony? |
| 4        MR. VANDEWALKER:  Objection, vague. | 4   A.  I don't think I did. |
| 5   A.  Could you be a little bit more specific as far | 5   Q.  Did the Texas NAACP submit any written |
| 6   as what you're asking? | 6   testimony on SB 14? |
| 7   Q.  (BY MR. FREDERICK) Sure.  Did you understand | 7   A.  Yes.  President Bledsoe.  He did live and he |
| 8   the question? | 8   did written testimony as well. |
| 9   A.  It seemed little too vague for me to really | 9   Q.  Did anyone else submit live -- did anyone else |
| 10  understand, I guess, what you're asking, so I just need | 10  submit written testimony for the Texas NAACP? |
| 11  some clarification. | 11  A.  I think so, but I'm not 100 percent sure.  But |
| 12  Q.  Can you tell me about the Texas NAACP's | 12  I believe -- I know we had people who were there, and I |
| 13  activities related to Senate Bill 14? | 13  think they may have. |
| 14  A.  I guess my -- my -- I'm trying to figure out in | 14  Q.  Did anyone else, to your knowledge, present |
| 15  what aspect of -- are you -- are you asking when it | 15  live testimony for the Texas NAACP in the Legislature in |
| 16  comes to activities.  So could you -- is there another | 16  2011? |
| 17  way the question can be phrased? | 17  A.  Once again, I think so, but I'm not 100 percent |
| 18  Q.  Did you have any involvement with Senate Bill | 18  with that.  I know we had our -- our members there, and |
| 19  14? | 19  I know it was a long hearing, so I can't say with 100 |
| 20  A.  Okay.  Involvement meaning -- I guess | 20  percent accuracy.  But I do believe so. |
| 21  "involvement" is throwing me off.  Involvement.  How you | 21  Q.  Other than providing live and written |
| 22  do mean when you say did I have any involvement? | 22  testimony, what else did the Texas NAACP do in the |
| 23  Q.  Do you know what I mean when I say "Texas | 23  Legislature with respect to Senate Bill 14? |
| 24  Senate Bill 14"? | 24  A.  We worked with different groups to provide |
| 25  A.  I do. | 25  information to legislators to let them know our concerns |

| 22 | 24 |
|---|---|
| 1   Q.  And what is that? | 1   with the bill.  And I'm trying to remember what else |
| 2   A.  That would be the bill that was passed, that's | 2   were done -- was done.  I believe our members contacted |
| 3   concerning the voter ID that was passed by the Texas | 3   their legislators as well to let them know concerns |
| 4   Legislature last session. | 4   about Senate Bill 14 as well.  And that's all I can |
| 5   Q.  Did you give any testimony in the Legislature | 5   recall at the moment. |
| 6   on Senate Bill 14? | 6   Q.  Did the NAACP, the Texas NAACP, provide any |
| 7   A.  Yes. | 7   materials to its members dealing with SB 14? |
| 8   Q.  Can you tell me when you gave testimony? | 8   A.  I think we did, yes. |
| 9   A.  I believe it was for the House hearing on | 9   Q.  Do you recall what those materials were? |
| 10  Senate Bill 14, and I don't recall the date.  But I | 10  A.  It may have just been talking point e-mails |
| 11  believe I did do testimony for the House hearing. | 11  about what's in the bill, so they would be informed and |
| 12  Q.  And was that the House -- that was the House | 12  understanding what -- what the bill entails, and maybe |
| 13  Committee hearing? | 13  even a copy of the bill.  It's possible.  But just so |
| 14  A.  House Committee, yes, I'm sorry. | 14  that when they will have an understanding and be |
| 15  Q.  That's all right. | 15  knowledgeable about what's happening. |
| 16  A.  Yes.  House Committee hearing. | 16  Q.  And when you say talking points, would that be |
| 17  Q.  And you don't remember exactly what date it | 17  sort of a summary or list of issues about the bill? |
| 18  was? | 18  A.  Yes.  It would be a summary and -- yes, a |
| 19  A.  I don't.  It may have been in February.  I | 19  summary and a list of what's in the bill.  I'm pretty |
| 20  think it was in February-ish, but I don't remember the | 20  sure a copy of the bill as well, so that they can read |
| 21  date from last year. | 21  it and have an understanding, but -- because I know, you |
| 22  Q.  But it was in 2011? | 22  know, the language can be kind of confusing and |
| 23  A.  Yes. | 23  difficult to read.  So just so they have a better grasp |
| 24  Q.  And it was during the legislative session? | 24  of it. |
| 25  A.  Yes, sir. | 25  Q.  Other -- other than talking points and maybe a |



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Yannis Banks                                          May 25, 2012

25

1  copy of the bill itself, are you aware of any other
2  materials or information that the Texas NAACP sent to
3  its members about SB 14?
4      A.  No, I can't say I recall any at this moment.
5      Q.  Were there any meetings of the Texas NAACP
6  where SB 14 was discussed?
7      A.  I guess, could you be -- I guess, is there a
8  time period that we're talking about or --
9      Q.  Sure.  Sure.  I guess the time period for SB 14
10  that I would be thinking about, let's say -- I'm trying
11  to decide when the old session would really end and the
12  new one begin.  But let's say since the beginning of
13  January 1st, 2010, through the -- I guess, through the
14  present, have there been any meetings --
15      A.  Okay.
16      Q.  -- of the Texas NAACP in which SB 14 was
17  discussed?
18      A.  I guess from 2010, last year, until now, yes.
19      Q.  Okay.  Can you tell me what those meetings
20  were, just generally?
21      A.  Sure.  At our quarterly meetings that we do
22  have, from -- during that time period, it was brought up
23  at different meetings, one, so people can be informed,
24  and then, two, discussing, you know, after it was
25  passed, what was in the bill so people would know.  And

26

1  then so they have an understanding of the process of how
2  it's -- it hasn't gone into effect.
3          Even though it's passed by the Legislature
4  and signed by the Governor, it still had to -- the steps
5  that it still had to go through to become enacted in
6  law.  And then once, I guess, it was submitted to DOJ
7  about what we're doing with submitting the letters to
8  the DOJ and then, so, we wanted to make sure our members
9  were -- had an understanding of the process, and even to
10  make sure they could inform people in their community
11  about what the voting law still is currently so there
12  wouldn't be any confusion amongst folks.
13      Q.  And the quarterly meetings, generally, who --
14  who attends those meetings?
15      A.  The membership -- well, the membership branches
16  from throughout the state, as well as our executive
17  officers, the elected officers, and the executive
18  committee comprised of the chairs and then
19  representation from the different branches throughout
20  the state.
21      Q.  Other than the quarterly meetings that you just
22  mentioned, can you think of any other meetings during
23  the time period we discussed when SB 14 was discussed?
24      A.  None that I can recall.
25      Q.  Were there any newsletters or -- I'll say

27

1  newsletters generally, or e-mail blasts or anything sent
2  to members dealing with SB 14?
3      A.  None that I recall.  Well, I probably sent out
4  e-mails just informing what was happening during the
5  legislative session, so people would be informed.  But
6  -- so there may have been a few e-mails that did go out
7  about SB 14.
8      Q.  Is it part of your job duties with the Texas
9  NAACP to send out e-mails to the membership?
10      A.  That does occur for -- communication is done
11  through -- a lot of communication can be done through
12  e-mail, so I -- I send out e-mails on a regular basis.
13  I'd say yes.
14      Q.  Are you generally responsible for communicating
15  with the membership for the Texas NAACP?
16      A.  I'd say no.
17      Q.  Who -- who is responsible for that?
18      A.  The state secretary, Linda Lydia does.  She --
19  she does that.
20      Q.  Does the Texas NAACP keep minutes or other
21  records of its quarterly meetings?
22      A.  We do.
23      Q.  If SB 14 were discussed at a quarterly meeting,
24  would it be included in the minutes?
25      A.  Probably.  I get copies of the minutes, but

28

1  I've never read over the minutes, so -- but I would say
2  probably, yeah.
3      Q.  Do you know whether -- do you know whether any
4  e-mails sent to the membership have been produced in
5  this litigation?
6      A.  I can't say.  I'm not aware.
7      Q.  Do you know if any meeting minutes have been
8  produced in this litigation?
9      A.  I am not aware.
10      Q.  Do you know if any talking points -- if any
11  talking points that were sent to the membership, if any
12  of those have been produced in this litigation?
13      A.  I believe so.
14      Q.  Do you recall what -- what the talking points
15  were that were sent to the membership about SB 14?
16      A.  I cannot, no.
17      Q.  You said you had -- well, you said the Texas
18  NAACP had worked with different groups to provide
19  information to legislators.  Do you remember what groups
20  the Texas NAACP worked with?
21      A.  Yes.  Some of them.  I can't remember all of
22  them.
23      Q.  Can you tell me the groups that you can recall?
24      A.  Sure.  I work with MALDEF, the League of Women
25  Voters, the ACLU.  And what's the name?  I believe



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

### 29

1  they're called Disability Rights of Texas. I think
2  that's their new name. Oh, gosh. The League of Young
3  Voters, I believe is what they're called. And that's
4  all I can recall at -- right now.
5      Q. The Disability Rights Texas, was that -- was
6  their old name Advocacy, Inc.?
7      A. I believe so, yes.
8      Q. Okay.
9      A. I think they it changed last year.
10     Q. Can you describe the Texas NAACP's work with
11 MALDEF related to SB 14?
12     A. Sure. We would look over the bills, or
13 whatever bills were filed, and see the different, I
14 guess, concerns we would have with the bill, and, I
15 guess, talk about, you know, how it is -- how we
16 interpreted it and the concerns we would have about the
17 bill, and then -- that may have been it. Yeah, I think
18 that might have been it. That's all I can recall for
19 the time being.
20     Q. Did Texas NAACP's work with MALDEF, was that
21 done by in-person meetings?
22     A. We -- we did meet in person, yes.
23     Q. Do you recall about how many times?
24     A. I -- no, I don't recall. Yeah. I don't recall
25 the number. It was quite a few times. But I don't

### 30

1  remember a specific number.
2      Q. Were those meetings mostly during the
3  legislative session?
4      A. About Senate Bill 14?
5      Q. Yes.
6      A. Yes.
7      Q. Do you recall any meetings other than during
8  the legislative session with MALDEF about SB 14?
9      A. No.
10     Q. Can you describe the Texas NAACP's work with
11 the Texas League of Young Voters regarding SB 14?
12     A. It was -- we had, I guess, direct in-person
13 meetings, and pretty similar with MALDEF as far as
14 talking about the concerns about the bill, and they know
15 our worries about what effect the bills would have on
16 the citizens and the people of Texas.
17     Q. Were the Texas NAACP's meetings about SB 14
18 with the Texas League of Young Voters mostly during the
19 legislative session?
20     A. Yes.
21     Q. Can you recall any -- any meetings that took
22 place not during the legislative session?
23     A. No, I can't recall any.
24     Q. Can you recall what specific concerns were
25 expressed in the Texas NAACP's meetings with Texas

### 31

1  League of Young Voters?
2      A. Disenfranchisement of young voters, the
3  possibility you'd have by not including forms of ID that
4  they would tend to have.
5      Q. Do you recall what kinds of ID those -- what
6  kinds of ID were discussed in relation to young voters?
7          MR. VANDEWALKER: I'm going to have to
8  object. The fact that these meetings took place is
9  certainly fair game, but inasmuch as you're getting into
10 the substance of what was said, we have a common
11 interest with these organizations, which include
12 lawyers, and so these conversations, the subject of
13 these conversations that you're getting into are
14 privileged attorney-client -- the attorney-client
15 privilege. I direct the witness not to answer them.
16     Q. (BY MR. FREDERICK) At the Texas NAACP's
17 meetings with Texas League of Young Voters -- sorry.
18 Let me back up.
19         Are you going to follow your attorney's
20 advice and not answer the question?
21     A. Yes.
22     Q. Okay. In the Texas NAACP's meetings with the
23 League of Young Voters, do you recall who was present at
24 those meetings?
25     A. I do not.

### 32

1      Q. Were there attorneys at those meetings?
2      A. I can't recall who was there representing them,
3  so I -- I don't know.
4      Q. Okay. Do you believe or do you recall that
5  there were any attorneys at those meetings?
6          MR. VANDEWALKER: Objection, calls for
7  speculation.
8      Q. (BY MR. FREDERICK) Did you attend those
9  meetings?
10     A. I did.
11     Q. So as far as you recall, were there any
12 attorneys at those meetings?
13     A. I -- I don't recall.
14         MR. VANDEWALKER: Objection, asked and
15 answered.
16     Q. (BY MR. FREDERICK) Do you recall whether there
17 was any legal advice given at those meetings?
18     A. Not that I recall.
19     Q. Okay. So can you tell me, in terms of
20 disenfranchisement of young voters, what were the
21 specific types of ID discussed by the Texas League of
22 Young Voters in these meetings? What were the specific
23 types of ID --
24         MR. VANDEWALKER: Objection. That's
25 attorney-client privilege, and I instruct the witness



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

|  | 33 |
|---|---|
| 1 | not to answer. |
| 2 | MR. FREDERICK: Can you just let me finish |
| 3 | my question? |
| 4 | MR. VANDEWALKER: I'm sorry. I'm sorry. |
| 5 | I thought you were finished, and I apologize. |
| 6 | MR. FREDERICK: That's all right. |
| 7 | Q. (BY MR. FREDERICK) In the Texas NAACP's |
| 8 | meetings with the Texas League of Young Voters that |
| 9 | we've been talking about, about SB 14, do you recall |
| 10 | what specific kinds of ID were discussed in connection |
| 11 | with young voters? |
| 12 | MR. VANDEWALKER: Same objection. |
| 13 | Q. (BY MR. FREDERICK) And right now, I'm just |
| 14 | asking if you recall or not. So you can answer yes or |
| 15 | no. |
| 16 | A. I don't recall. |
| 17 | Q. Okay. |
| 18 | MR. FREDERICK: So Mr. Vandewalker, it's |
| 19 | the State's position that there has not been a |
| 20 | foundation laid for the attorney-client privilege or any |
| 21 | other privilege that might apply concerning these |
| 22 | meetings between the Texas League of Young Voters and |
| 23 | the Texas NAACP, so I would ask that you allow me to ask |
| 24 | the questions I've been asking. And I'm happy to ask |
| 25 | them again. |

|  | 34 |
|---|---|
| 1 | MR. VANDEWALKER: Yeah. I mean, the -- we |
| 2 | continue to object, the attorney-client privilege covers |
| 3 | the content of those meetings. And, I mean, you're, of |
| 4 | course, free to ask the questions, but we're not |
| 5 | withdrawing that objection or waiving the privilege. |
| 6 | Q. (BY MR. FREDERICK) In these meetings with the |
| 7 | Texas League of Young Voters, do you recall whether |
| 8 | student identification was discussed? |
| 9 | MR. VANDEWALKER: Objection, privilege. I |
| 10 | instruct Mr. Banks not to answer. |
| 11 | A. I will follow the advice of my attorney. |
| 12 | Q. (BY MR. FREDERICK) Do you -- do you recall any |
| 13 | specific kind of identification that was discussed in |
| 14 | meetings with the Texas League of Young Voters with |
| 15 | respect to -- |
| 16 | MR. VANDEWALKER: Objection on the basis |
| 17 | of privilege -- I'm sorry. Was the question finished? |
| 18 | MR. FREDERICK: Not quite. |
| 19 | MR. VANDEWALKER: Okay. |
| 20 | Q. (BY MR. FREDERICK) Do you recall -- do you |
| 21 | recall, in the meetings with Texas League of Young |
| 22 | Voters, any specific form of identification that was |
| 23 | discussed in connection with young voters? |
| 24 | MR. VANDEWALKER: Objection on the basis |
| 25 | of attorney-client privilege, and I instruct Mr. Banks |

|  | 35 |
|---|---|
| 1 | not to answer. |
| 2 | A. I will follow the advice of my attorney. |
| 3 | Q. (BY MR. FREDERICK) In the Texas NAACP's |
| 4 | meetings with the Texas League of Young Voters about SB |
| 5 | 14, was the subject of litigation ever discussed? |
| 6 | MR. VANDEWALKER: Objection. That's |
| 7 | privileged. |
| 8 | Q. (BY MR. FREDERICK) Are you going to follow the |
| 9 | advice of your attorney? |
| 10 | A. I am, sorry. |
| 11 | MR. FREDERICK: Let me make clear. |
| 12 | Mr. Vandewalker, are you instructing the witness not to |
| 13 | answer on the basis of privilege? |
| 14 | MR. VANDEWALKER: Yes, sir. |
| 15 | MR. FREDERICK: Okay. Thank you. |
| 16 | Q. (BY MR. FREDERICK) Was the subject of -- |
| 17 | specifically of Section 5 litigation against the State |
| 18 | of Texas discussed at meetings with the Texas League of |
| 19 | Young Voters? |
| 20 | MR. VANDEWALKER: Objection on the basis |
| 21 | of privilege, and I instruct Mr. Banks not to answer. |
| 22 | A. I will follow the advice of my attorney. |
| 23 | Q. (BY MR. FREDERICK) Other than concerns about |
| 24 | the potential disenfranchisement of young voters, do you |
| 25 | recall any specific issue that was discussed during the |

|  | 36 |
|---|---|
| 1 | Texas NAACP's meetings with the Texas League of Young |
| 2 | Voters? |
| 3 | MR. VANDEWALKER: Objection on the basis |
| 4 | of privilege, and I instruct Mr. Banks not to answer. |
| 5 | A. I will follow the advice of my attorneys. |
| 6 | Q. (BY MR. FREDERICK) I'm going to ask the |
| 7 | question again, and just tell you that at this point, |
| 8 | I'm just asking a yes-or-no question, so I'm not asking |
| 9 | yet what the specific issues were. So let me just ask |
| 10 | again. |
| 11 | Other than potential disenfranchisement of |
| 12 | young voters, do you recall any specific topic that was |
| 13 | discussed at the Texas NAACP's meetings with the Texas |
| 14 | League of Young Voters about SB 14? |
| 15 | MR. VANDEWALKER: I'm going to object. I |
| 16 | believe what you're trying to ask is do you recall or |
| 17 | not. Is that -- |
| 18 | MR. FREDERICK: Correct. |
| 19 | MR. VANDEWALKER: Okay. Objection |
| 20 | withdrawn. |
| 21 | A. Could you rephrase the -- re-ask the question |
| 22 | again. I'm sorry. |
| 23 | Q. (BY MR. FREDERICK) Of course. |
| 24 | Other than the potential |
| 25 | disenfranchisement of young voters, do you recall any |



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

---

37

1  specific topic that was discussed at meetings between
2  the Texas NAACP and Texas League of Young Voters about
3  SB 14?
4      A.  To my recollection right now, no, I -- no.
5      Q.  Okay.  Going back briefly to MALDEF, do you
6  recall what topics were discussed in the Texas NAACP's
7  meetings with MALDEF about SB 14?
8          MR. VANDEWALKER:  Obviously, we have the
9  same objections to the questioning.  Unless you want to
10  clarify the question, it's just what Mr. Banks recalls
11  what was discussed or not as of --
12      Q.  (BY MR. FREDERICK)  Yeah.  Right now, my
13  question is just whether you recall or not.  So let me
14  ask it again --
15      A.  Sure.
16      Q.  -- with that clarification.
17          Do you recall what specific topics or any
18  specific topics that were discussed at meetings with
19  the Texas NAACP and MALDEF about SB 14?
20      A.  Specific topics.  Could you ask it one more
21  time?
22      Q.  Of course.  Do you recall any specific topic
23  that was discussed at meetings between MALDEF and Texas
24  NAACP concerning SB 14?
25      A.  Yes.

---

38

1      Q.  Can you tell me what those topics were?
2          MR. VANDEWALKER:  Objection.  That's
3  privileged, and I instruct the witness not to answer.
4      A.  I will follow the advice of my attorney.
5      Q.  (BY MR. FREDERICK)  Can you describe generally
6  the Texas NCAAP's work with the League of Women Voters
7  concerning SB 14?
8      A.  Could you ask the question again?  I'm sorry.
9      Q.  Sure.  Can you describe the Texas NAACP's work
10  with the League of Women Voters about SB 14?
11      A.  We --
12          MR. VANDEWALKER:  I'm going to have to
13  object on the same basis.
14      A.  I will follow the advice of my attorneys.
15          MR. FREDERICK:  I'll ask a different
16  question.
17          THE WITNESS:  Sure.
18          MR. FREDERICK:  Let's clarify.
19  Mr. Vandewalker, did you instruct the witness not to
20  answer on the basis of privilege?
21          MR. VANDEWALKER:  Yes, sir.
22          MR. FREDERICK:  Okay.  Thanks.
23      Q.  (BY MR. FREDERICK)  Did the Texas NAACP have
24  meetings about SB 14 with the League of Women Voters?
25      A.  Yes.

---

39

1      Q.  Were those in-person meetings?
2      A.  Yes.
3      Q.  Were there also other kinds of meetings, like
4  over the telephone?
5      A.  I don't recall having any over the telephone
6  with -- with -- with them.
7      Q.  Do you recall about how many meetings there
8  were with the League of Women Voters?
9      A.  I couldn't give a -- a number.
10      Q.  Were there more than 10?  Less than 10?
11      A.  Oh.  I couldn't -- it was a few, but I couldn't
12  give -- a idea of numbers, I couldn't really say.
13      Q.  Okay.  Were these -- as far as you recall, were
14  these meetings during the legislative session?
15      A.  Yes.
16      Q.  Do you recall any meetings with the League of
17  Women Voters that were not during the legislative
18  session about SB 14?
19      A.  No, I don't recall any.
20      Q.  Okay.  Do you remember who was at those
21  meetings?
22      A.  Yes, for the most part.  Anita Privett was
23  there at those meetings, and there was other people.
24  The only name I remember is -- is Anita's.
25      Q.  And is Ms. Privett, is she with the Texas

---

40

1  NAACP?
2      A.  No.
3      Q.  Oh, she's with the League of Young -- or, sorry
4  -- League of Women Voters?
5      A.  Yes.
6      Q.  And you don't recall anybody else specifically
7  who was at those meetings?
8      A.  I couldn't recall names, no.
9      Q.  Were you at any of those meetings?
10      A.  Yes.
11      Q.  Were you at all of those meetings?
12      A.  Yes.
13      Q.  Were there any attorneys at those meetings?
14      A.  I couldn't say.  I'm not familiar with who --
15  what the people's specific jobs were.  I never really
16  asked, so...
17      Q.  Were there -- were there any attorneys for the
18  Texas NAACP at those meetings?
19      A.  In regards to SB 14 or the League of Women
20  Voters?  I guess, what's the question?
21      Q.  Sure.  Were there any lawyers for the Texas
22  NAACP present at meetings with the League of Women
23  Voters about SB 14?
24      A.  Not that I recall.
25      Q.  Going back quickly to MALDEF, in the meetings

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Yannis Banks                                                    May 25, 2012

**41**

1   that the Texas NAACP had with MALDEF about SB 14, were
2   there any attorneys for the NAACP at those meetings?
3      A.  Not that I recall, but I'm not sure.
4      Q.  Can you describe just the general subject
5   matter of meetings between Texas NAACP and the League of
6   Women Voters about SB 14?
7         MR. VANDEWALKER:  I'm going to object on
8   the basis of common interest and joint defense privilege
9   and instruct the witness not to answer.
10     A.  I follow the advice of my attorney.
11        MR. VANDEWALKER:  Sorry.  The privilege I
12  was referring to is joint defense and common interest
13  privilege.
14        MR. FREDERICK:  Mr. Vandewalker, I wonder,
15  can you -- can you tell me when you contend the joint
16  defense and common interest privileges attached?  What
17  date?
18        MR. VANDEWALKER:  The group in question
19  have opposed SB 14.  They have been contemplating
20  potential preclearance litigation.
21        MR. FREDERICK:  So, I'm sorry, you cut out
22  a little bit.  Can you give me an idea of when that
23  started?
24        MR. VANDEWALKER:  I don't know the
25  relevant calendar date, but it's the entire existence of

**42**

1   SB 14, at least since January of 2012.
2      Q.  (BY MR. FREDERICK) Can you describe for me
3   generally the -- the work that Texas NAACP did with the
4   ACLU regarding SB 14?
5         MR. VANDEWALKER:  I'm going to object on
6   the basis of common interest privilege as before, and
7   instruct the witness not to answer.
8      A.  And I will follow the advice of my attorney.
9      Q.  (BY MR. FREDERICK) Did the Texas NAACP have any
10  meetings with the ACLU about SB 14?
11     A.  Yes.
12     Q.  Were those in-person meetings?
13     A.  Yes.
14     Q.  Were there any meetings other than in-person
15  meetings, such as telephone?
16     A.  Not that I recall.
17     Q.  Do you recall how many meetings there were
18  between Texas NAACP and the ACLU about SB 14?
19     A.  I -- I couldn't give a -- a number.
20     Q.  Can you say whether or not it was more than 10
21  or less than 10?
22     A.  Yeah, I wouldn't feel comfortable with -- with
23  giving any kind of number.
24     Q.  Do you recall who was present at the Texas
25  NAACP's meetings with the ACLU about SB 14?

**43**

1      A.  I was.
2      Q.  Can you recall anybody else who was there?
3      A.  Sonia for the ACLU, and I can't recall her last
4   name at the moment, she was there.
5      Q.  Do you recall about how many people were there
6   at these meetings?
7      A.  There was a few, but I couldn't give a good
8   number.  But there was a few at the meetings, yes.
9      Q.  Was it less than 20?
10     A.  That's fair to say, I -- I think.
11     Q.  Can you -- as far as you can recall, can you
12  say whether it was less than 10?
13     A.  That I couldn't say.
14     Q.  Were there any lawyers present at the Texas
15  NAACP's meetings with the ACLU about SB 14?
16     A.  I wouldn't know as far as who.  Obviously, we
17  know whose -- what somebody's job title, so I can't say.
18     Q.  As far as you can recall, were there any NAACP
19  lawyers at the meetings with the ACLU about SB 14?
20     A.  I don't recall, but I'm not sure.
21     Q.  Do you recall any specific topics that were
22  discussed at meetings between the Texas NAACP and the
23  ACLU about SB 14?
24        MR. VANDEWALKER:  Objection on the basis
25  of common interest privilege.  I instruct Mr. Banks not

**44**

1   to answer.
2      A.  I will follow the advice of my attorney.
3      Q.  (BY MR. FREDERICK) To clarify the question that
4   I want to ask now is just whether or not you recall
5   without asking what the specific topics were.
6      A.  Okay.
7      Q.  Do you recall any specific topics that were
8   discussed at meetings between the ACLU and Texas NAACP
9   about SB 14?
10     A.  Yes.
11     Q.  What topics were discussed at those meetings?
12        MR. VANDEWALKER:  Objection on the basis
13  of privilege.  I instruct Mr. Banks not to answer.
14        MR. FREDERICK:  Can you please clarify
15  what privilege you're instructing him based on?
16        MR. VANDEWALKER:  Common interest,
17  attorney-client privilege.  Joint defense.  Sorry.  Let
18  me start over.  The same privilege identified before:  A
19  common interest and joint defense attorney-client
20  privilege.
21     Q.  (BY MR. FREDERICK) Now, you said that there
22  were -- that the Texas NAACP worked with Disability
23  Rights Texas with respect to SB 14.  Were -- did the
24  Texas NAACP have meetings with Disability Rights Texas
25  about SB 14?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Yannis Banks                                              May 25, 2012

### 45

1    A.  Yes.
2    Q.  Were those in-person meetings?
3    A.  Yes.
4    Q.  Do you recall if there were any meetings by
5    telephone or other than in person?
6    A.  Not that I recall.
7    Q.  Do you recall how many meetings there were
8    between Texas NAACP and Disability Rights Texas?
9    A.  No, sir, I don't recall how many.
10   Q.  Can you say whether it was less than 10, more
11   than 10?
12   A.  Yeah, I couldn't put a number to -- to that one
13   either.
14   Q.  Okay.  Were the meetings between Texas NAACP
15   and Disability Rights Texas during the 2011 legislative
16   session?
17   A.  Yes.
18   Q.  Can you recall any meetings that were with
19   Disability Rights Texas that were not during the
20   legislative session in 2011?
21   A.  No.
22   Q.  Do you recall who was present at meetings with
23   Disability Rights Texas?
24   A.  I was.  And then I believe Jessica, I want to
25   say Gomez, for Disability Rights Texas was there.

### 46

1    Q.  Can you recall any other people who were at
2    those meetings?
3    A.  Yes.  I believe there also was representation
4    from ACLU, I believe was there, as well as MALDEF and
5    League of Women Voters.
6    MR. VANDEWALKER:  I'm sorry.  Could I,
7    just for the benefit of the people on the phone, make
8    sure we have the microphone pointed at Mr. Banks,
9    because he's fading out a little bit?
10   THE WITNESS:  Sorry.  Can you hear me?
11   MR. VANDEWALKER:  Yes.  Thank you.
12   THE WITNESS:  Okay.  Sorry.
13   Q.  (BY MR. FREDERICK)  Other than yourself and
14   Ms. Gomez, can you recall any specific individuals who
15   were at the meetings with Disability Rights Texas?
16   A.  Yes.  Luis Figueroa was there, Anita Privett,
17   and Sonia.
18   Q.  Were any lawyers for the NAACP present at
19   meetings with Disability Rights Texas?
20   A.  Not that I can recall, but I can't remember all
21   of the...
22   Q.  Can you recall any specific meeting where there
23   was a lawyer for the NAACP present?
24   A.  It's -- I can't recall, but I'm not 100 percent
25   certain on it.

### 47

1    Q.  So there could have been a lawyer present, but
2    you just can't recall specifically?
3    A.  Right.
4    MR. VANDEWALKER:  Mr. Frederick, if I
5    could -- we have been going for about an hour now, if I
6    could suggest taking a break?
7    MR. FREDERICK:  Yeah, that's fine with me.
8    MR. VANDEWALKER:  Okay.  Now is a good
9    time?
10   MR. FREDERICK:  Sure.
11   (Recess from 10:18 a.m. to 10:34 a.m.)
12   MR. FREDERICK:  Let's go back on the
13   record.
14   MR. VANDEWALKER:  Okay.  And if I could
15   just -- I just want take a second to clarify something
16   for the last line of questions.  Just to make things go
17   a little smoother hopefully, Mr. Frederick, I want to
18   clarify that we are not asserting a common interest
19   privilege prior to the date that SB 14 was enacted,
20   which I believe was May of 2011.  So I know that there
21   were some back and forth about dates, and some of your
22   questions seemed to cover any discussions about SB 14 at
23   any time, so I just wanted to clarify that we're not
24   asserting the privilege prior to the enactment of the
25   law.

### 48

1    MR. FREDERICK:  Okay.  I appreciate
2    that.  So does that mean that you would not object to
3    questions about any meetings that took place before the
4    enactment of SB 14?
5    MR. VANDEWALKER:  That's correct.  Not
6    solely on the basis of common interest privilege, yeah.
7    MR. FREDERICK:  Okay.  But it sounds like
8    maybe you would still have an objection.  Would that be
9    based on the attorney-client privilege?
10   MR. VANDEWALKER:  No.  I just didn't want
11   to foreclose.  I have no idea what questions you're
12   going to ask.  I'm not trying to sound mysterious or
13   threatening or anything.  That specific objection that
14   we have been dealing with would not be at present.
15   MR. FREDERICK:  Okay.  Well, thanks.  I
16   appreciate the clarification.
17   Q.  (BY MR. FREDERICK) Mr. Banks, let me circle
18   back on a couple of things.  You mentioned a while ago
19   that there were some talking points that were prepared
20   for -- for members about SB 14.  Do you recall who
21   prepared those talking points?
22   A.  It was me.
23   Q.  Oh, okay.  Did anybody help you work on those
24   or help write them?
25   A.  President Bledsoe, so Gary did, using --



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Yannis Banks                                                May 25, 2012

49

1   quoting things on this -- I'm sorry. Gary Bledsoe,
2   using his testimony he submitted to the Legislature, and
3   I think other notes I probably jotted down, but mostly
4   between me and Gary.
5       Q.  Do you remember generally what the talking
6   points were?
7       A.  From what I remember, and I didn't look over in
8   great detail before coming here, I know I pulled out
9   what was laid out in the bill as far as IDs are
10  necessary -- or the IDs they're saying you can use. And
11  I think it may have been from parts of Gary's speeches
12  of how it compares in -- to other states, if I remember
13  correctly. But that's all I can remember for right now.
14      I think you also said that you had sent maybe
15  some e-mails to members. Did you or anybody else at the
16  Texas NAACP send out kind of a form e-mail that members
17  could then send to legislators?
18      A.  Not that I can recall. I don't know.
19      Q.  Do you recall whether there were any kind of
20  materials that the Texas NAACP gave members for the
21  purpose of then sending on to legislators?
22      A.  Could you ask the question again?
23      Q.  Sure.  Sure. And I'll try and tell you where
24  I'm -- what I'm trying to get at.
25      A.  Sure.

50

1       Q.  I know that oftentimes, groups will kind of
2   prepare, you know, materials for members to send to
3   legislators just so everybody doesn't have to, you know,
4   come up with their own e-mail or letter or whatever.
5       Do you know whether the Texas NAACP
6   provided anything like that to members?
7       A.  I can't recall if we did.  I don't recall.
8       Q.  Okay.  Let me move -- I'm going to backtrack a
9   bit, but hopefully move pretty quickly through this.
10      We were talking a little earlier about the
11  work that Texas NAACP did with various other groups
12  about SB 14.
13      A.  Yes.
14      Q.  And in light of our discussion with your
15  counsel, I want to go back through and kind of see if we
16  can explore some -- some additional areas.
17      A.  Sure.
18      Q.  And I'll try and move quickly.
19      Okay.  So with MALDEF --
20      A.  Uh-huh.
21      Q.  -- what specific topics were discussed in Texas
22  NAACP's meetings with MALDEF?
23      MR. VANDEWALKER:  Objection. If I could
24  get the period of time that you're talking about.
25      Q.  (BY MR. FREDERICK) So I believe the

51

1   clarification requested is if I could specify what
2   period of time I'm talking about.
3       A.  Okay.
4       Q.  I'm happy to do that.
5       In the meetings that we were just
6   discussing a while ago, which I think were -- what I'm
7   asking is during the legislative session.
8       A.  Okay.
9       Q.  What topics were discussed in meetings between
10  the Texas NAACP and MALDEF?
11      A.  Okay.  And I can't remember all of them,
12  because it's been a while, but I think it was -- they
13  were kind of just general concerns of -- of the bill;
14  you know, what could be done to make it -- the bill a
15  better bill, if you will; you know, what provisions are
16  being used to -- that you need to have -- have to
17  vote.  But it was just kind of, you know, general
18  discussions of what we're seeing, what the -- how the
19  bill is shaped and what it's looking like.
20      Q.  To the extent you can recall, were there
21  specific concerns raised in those meetings with MALDEF
22  about SB 14?
23      MR. VANDEWALKER:  I'm going to object
24  again as vague.  Could you clarify the time period that
25  we're talking about?

52

1       MR. FREDERICK:  Of course.
2       Q.  (BY MR. FREDERICK) So consistent with, I think,
3   kind of where we located these meetings earlier, all of
4   these questions I'll be asking, I'm asking about during
5   the legislative session in 2011.
6       A.  Okay.
7       MR. VANDEWALKER:  I appreciate that, and
8   I'm sorry to be a little bit of a stickler, but I would
9   just really like to make sure the record reflects the
10  time period that -- all of the meetings you're asking
11  about.
12      MR. FREDERICK:  I'm sorry.  Can -- you
13  were cutting out a little bit.  Would you mind repeating
14  that, please?
15      MR. VANDEWALKER:  I'm sorry.  Sure.
16      I'm sorry to be a little bit of a
17  stickler, but I just want to make sure that the record
18  reflects the scope of all of these questions and the
19  time period of the meeting you're asking about.  So if
20  you could clarify each time you're talking about during
21  the legislative session, we can keep things moving
22  smoothly hopefully.
23      MR. FREDERICK:  Okay.  Just so I'm clear
24  on what you're asking, I think I am, but you have asked
25  just if I could clarify for each question what time



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Yannis Banks                                                    May 25, 2012

<table>
<tr><td colspan="2" align="center">53</td></tr>
</table>

1    period I'm talking about?
2             MR. VANDEWALKER: Yes, sir. Thank you.
3             MR. FREDERICK: Okay. No problem.
4        Q. (BY MR. FREDERICK) Okay. So going back to
5    MALDEF -- I'm trying to remember my last question.
6        A. Sure.
7        Q. During meetings with MALDEF during the 2011
8    legislative session, what specific concerns were
9    expressed about SB 14?
10       A. Okay. You know, once again, I can't remember
11   them all, because it's been a while and quite a few
12   meetings. I know there was concerns about forms of ID
13   that could be used, if the legislators are being
14   receptive to what we're suggesting could be done to make
15   the bill better, I guess, if you will. And, I mean, I
16   know there -- there was more, but that's just all I'm
17   recalling at -- at this moment.
18       Q. Do you remember -- I'm sticking here to
19   meetings with MALDEF during the session.
20       A. Okay.
21       Q. Do you remember -- when you say "make the bill
22   better," do you remember any specific thing that was
23   suggested that would make the bill better?
24       A. At this moment, I can't recall.
25       Q. Were there any particular studies discussed in

<table>
<tr><td colspan="2" align="center">54</td></tr>
</table>

1    the meetings with MALDEF during the session related to
2    SB 14?
3        A. None that I can recall. There may have been,
4    but I can't remember conversations, if it was brought up
5    or not.
6        Q. Okay. Do you know whether or not MALDEF
7    conducted any studies connected to SB 14?
8        A. Not that I recall.
9        Q. Okay. Do you know if MALDEF conducted any
10   studies about voter ID generally at any time from, let's
11   say, 2007 to the present?
12       A. Not that I recall, that I'm aware of.
13       Q. Okay. So at the meetings with MALDEF, you
14   mentioned some of the concerns were forms of ID in SB 14
15   and the receptiveness of legislators to making the bill
16   better. Can you recall any other concerns or topics
17   that came up in those meetings?
18            MR. VANDEWALKER: And just to clarify,
19   you're talking about meetings during the legislative
20   session; is that right?
21            MR. FREDERICK: Correct.
22       A. Okay. At this moment, I can't recall. It's
23   been a while. But, yeah, I can't recall at this -- at
24   that moment.
25       Q. (BY MR. FREDERICK) Okay. And were you -- were

<table>
<tr><td colspan="2" align="center">55</td></tr>
</table>

1    you present at any meetings with MALDEF about SB 14 that
2    did not occur during the 2011 legislative session?
3        A. I am not sure. With the times that we met, I
4    can't recall. I guess if there were any -- I don't
5    know.
6        Q. Okay. So meetings -- let's move to meetings
7    with the Texas League of Young Voters.
8        A. Okay.
9        Q. In the meetings that the Texas NAACP had with
10   the Texas League of Young Voters during the 2011
11   legislative session, what concerns were expressed during
12   those meetings about SB 14?
13       A. From what I can recall, and I can't remember
14   all of the meetings, but I think with them also it was
15   forms of ID that can be used, and, you know, and then
16   also, I think the consensus was, you know, if the
17   legislators are open and receptive to what can be done
18   to make the bill a better bill and more receptive to
19   everybody, I guess.
20       Q. Were there specific forms of identification
21   that came up during meetings in the session with Texas
22   League of Young Voters?
23            MR. VANDEWALKER: And if I could just
24   clarify, we're talking about still during the
25   legislative session, correct?

<table>
<tr><td colspan="2" align="center">56</td></tr>
</table>

1             MR. FREDERICK: Yes.
2             MR. VANDEWALKER: All right.
3        A. I can't remember all forms, because there's
4    lots of conversations and discussions and things tossed
5    around. But I think college ID was -- was one of them
6    amongst many of the discussions we've had. But I think
7    that was a concern.
8        Q. (BY MR. FREDERICK) Can you -- other than
9    college IDs, can you remember any other specific forms
10   of ID that were just discussed in those meetings with
11   Texas League of Young Voters?
12       A. At this the moment, I -- I can't.
13       Q. And was the concern about college ID, to the
14   extent you can recall, was it that students might have a
15   college ID, but not have another qualifying form of ID
16   under SB 14?
17       A. I can't recall the exact specific conversation,
18   so I'm not comfortable with -- with saying that.
19       Q. Okay. So in the Texas NAACP meetings with the
20   League of Young Voters during the 2011 session, other
21   than potential disenfranchisement of young voters,
22   college ID, and receptiveness of legislators to
23   improvements to the bill, can you remember any other
24   topics that were discussed?
25       A. At this moment, I can't recall from -- from all



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

57

1 the meetings.
2   Q.  Okay.  So moving back to the League of Women
3 Voters, during Texas NAACP's meetings with the League of
4 Women Voters during the 2011 legislative session, what
5 specific concerns about SB 14 were raised in those
6 meetings?
7   A.  I think, once again, you know, from what I can
8 recall, there was concerns about what's being used for
9 forms of ID and the receptiveness of -- of --
10 receptiveness of legislators to changes to make the bill
11 better, more open, is what I can recall for right now.
12   Q.  Okay.  So other than those two at the moment,
13 no more that you can recall specifically?
14   A.  At this moment, no.
15   Q.  Were there any meetings between League of Women
16 Voters and Texas NAACP about SB 14 that occurred outside
17 of the legislative session that you can recall?
18   A.  Not that I can recall.  I don't remember.
19   Q.  During the Texas NAACP's meetings with the ACLU
20 during the 2011 legislative session, what concerns were
21 raised in those meetings about SB 14?
22   A.  From what I can recall from some of the
23 meetings, and I can't remember them all, but I remember
24 it was forms of ID that they are saying, and, you know,
25 how -- if the legislators are open or willing to accept

58

1 our amendments to make the bill better, or if they were
2 or not -- it's -- to -- to make the bill better, from
3 what I can remember.
4   Q.  Other than those two issues, can you recall any
5 specific concerns or topics that were discussed?
6   A.  Not at the present moment, no.
7   Q.  You mentioned amendments.  Were -- I wonder if
8 you can recall any specific amendments or ideas for
9 amendments that -- that were discussed during the
10 meetings with the ACLU?
11       MR. VANDEWALKER:  And just to clarify,
12 we're talking about, again, the meetings during the
13 session?
14       MR. FREDERICK:  Right.  Yes.  Since
15 they're amendments, yeah.
16   A.  Would you re-ask the question again?
17   Q.  (BY MR. FREDERICK) Of course.  Of course.
18       During meetings with ACLU during the
19 session, do you recall specific amendments or ideas for
20 amendments to SB 14 that were discussed?
21   A.  At this present moment, I can't say I recall
22 any one that they -- or either one of us may have said
23 or thrown out there that -- so I can't recall at -- at
24 this moment.
25   Q.  Okay.  Do you recall any meetings between Texas

59

1 NAACP and ACLU about SB 14 that occurred outside of the
2 2011 legislative session?
3   A.  I don't recall of any at the moment.  I'm not
4 sure.
5   Q.  In the meetings between Texas NAACP and
6 Disability Rights Texas during the 2011 legislative
7 session, what specific concerns or topics were discussed
8 in those meetings?
9   A.  It was -- there was concern about the forms of
10 -- of ID that could be used and as well as, you know,
11 legislators are receptive and open to changes to the
12 bill that could make it better and more receptive to
13 everybody, for what I can recall at this time.  And yes,
14 that's really all I can recall at this moment.
15   Q.  And during those meetings with the Disability
16 Rights Texas during this session, do you remember any
17 specific amendments or ideas for amendments that were
18 discussed?
19   A.  No, I can't recall, I don't remember at -- at
20 this moment, but -- no.
21   Q.  So we've been talking about a lot of groups:
22 MALDEF, League of Young Voters, League of Women Voters,
23 ACLU, Disability Rights Texas.  Can you -- can you
24 recall any specific amendments or ideas for amendments
25 that were discussed with any of those groups during the

60

1 2011 legislative session?
2   A.  I -- I can't recall any right now.
3   Q.  Did the Texas NAACP meet with any legislators
4 about SB 14?
5   A.  Is there a specific time we're -- we're talking
6 or --
7   Q.  Not right now.  Just at any time, about SB 14,
8 though.
9   A.  SB 14.  Yes.
10   Q.  And which legislators did Texas NAACP meet
11 with?
12   A.  Let's say, from what I can recall at the
13 moment, Representative Anchia, or at least his office,
14 anyway.  I would say Senator Ellis, and I believe
15 Senator West also.  And I think that may be it.
16   Q.  Did the Texas NAACP provide any information or
17 materials to -- to those legislators?
18   A.  That I can't recall.  I'm not sure.
19   Q.  Did you attend -- well, let me ask first:  Were
20 there in-person meetings between Texas NAACP and
21 Representative Anchia or his staff?
22   A.  Staff.  I -- I think so, but I'm not 100
23 percent sure.  But I think so.
24   Q.  Okay.  Do you know if there were -- if there
25 were telephone meetings with Representative Anchia or



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Yannis Banks                                                    May 25, 2012

---

**61**

1  his staff?
2      A.  I think it may have been just more in person,
3  if -- if anything.
4      Q.  Do you recall who attended meetings with
5  Representative Anchia and his staff?
6      A.  And what time period are we talking?
7      Q.  Let's say -- well, that's -- I can clarify.
8      A.  Sure.
9      Q.  Are you aware of any meetings that Texas NAACP
10  had with Representative Anchia or his staff during the
11  2011 legislative session?
12      A.  Okay.  I believe so, yes.
13      Q.  Are you aware of any meetings with
14  Representative Anchia or his staff outside of the
15  2011 legislative session?
16      A.  I -- I can't recall on that.  Yeah, I can't
17  recall.
18      Q.  So for meetings with Representative Anchia and
19  his staff during the 2011 legislative session, do you
20  recall who was present at those meetings?
21      A.  Yes.  Liz.  And I can't remember that -- she --
22  she's his chief of staff.  I -- I can't remember her
23  last name at the -- at the moment.  She was there.  i
24  can't recall if the Representative was there or not.  I
25  think he may have been at one, but I'm not 100 percent

---

**62**

1  sure.  And I believe that's it.  I can't recall if
2  everybody was there, but i believe that's it.
3      Q.  Do you recall who attended for the Texas NAACP?
4      A.  This is still during the --
5      Q.  During the session.
6      A.  Okay.  It was myself.
7      Q.  Did you personally attend any meetings with
8  Representative Anchia or his staff that -- that took
9  place outside of the 2011 legislative session?
10      A.  i can't recall if the meetings did happen, so
11  I'm -- I'm not sure.
12      Q.  So are you -- do you recall that any meetings
13  took place with Representative Anchia or his staff
14  outside of the 2011 legislative session?
15      A.  That I'm not sure about.
16      Q.  Okay.  What was discussed at the meetings with
17  Representative Anchia's, himself or his staff, during
18  the legislative session?
19      A.  I think it was -- it was -- it was concerns of
20  the bill -- or about the bill and any changes that could
21  be done to -- if there are any changes or if they might
22  be receptive to changes being made to try to make the
23  bill a better bill.
24      Q.  What specific concerns were expressed about the
25  bill in meetings with Representative Anchia during the

---

**63**

1  session?
2      A.  I -- I really can't recall the conversations
3  that there was.  I'm not sure.
4      Q.  Do you recall any specific changes or
5  amendments that were discussed with Representative
6  Anchia or his staff during legislative session?
7      A.  None that I recall.
8      Q.  Did Texas NAACP provide any amendments or draft
9  amendments to any legislator during the 2011 session?
10      A.  None that I recall.
11      Q.  Do you recall how many meetings Texas NAACP had
12  with Senator Ellis during the 2011 legislative session?
13      A.  In reference to?
14      Q.  In reference to SB 14.
15      A.  Okay.  I couldn't give you a number.  I'm not
16  sure of the number.
17      Q.  Do you think it was less than 20?
18      A.  I feel safe saying less than 20, yes.
19      Q.  Can you say whether it was less than 10?
20      A.  That, I'm not too comfortable with, so I'm not
21  sure, but...
22      Q.  Were all of the meetings with Senator Ellis,
23  during the 2011 session, were they all in-person
24  meetings?
25      A.  Yes.

---

**64**

1      Q.  Who attended those meetings?
2      A.  I was there, as well as President Bledsoe.
3      Q.  Was Senator Ellis there?
4      A.  Yes.
5      Q.  Do you recall if he was there for all meetings
6  or just some?
7      A.  Well, that I don't recall.
8      Q.  And what was discussed in those meetings with
9  Senator Ellis about SB 14?
10      A.  I think it laid out -- I know we discussed the
11  concerns about the bill, and -- because I know it was
12  about the bill that -- that we had -- excuse me -- as
13  well as, I guess, talk about the -- the hearing that's
14  going to happen on the Senate floor, and I guess if they
15  would be receptive to any changes or if there's a -- be
16  receptive to changes to try to make the bill better.
17  That's really all I can remember.
18      Q.  Do you recall specific concerns about SB 14
19  that were discussed in meetings with Senator Ellis?
20      A.  Off the top of my head, I don't -- I don't
21  think I can right now at this moment, none that I
22  remember specifically right now.
23      Q.  Do you recall specific changes or potential
24  changes to the bill that were discussed in meetings with
25  Senator Ellis during the session?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Yannis Banks                                                    May 25, 2012

| 65 |
|---|
| 1    A. None that I can recall right now. |
| 2    Q. Did Texas NAACP provide Senator Ellis with any |
| 3   materials concerning SB 14 or voter ID legislation? |
| 4    A. When? |
| 5    Q. During the 2011 session. |
| 6    A. Maybe Gary's testimony, but that would have |
| 7   been at the hearing. I think Gary submitted written |
| 8   testimony, so I think everybody had a copy of that. |
| 9    Q. Okay. |
| 10    A. But besides that, I can't recall. |
| 11    Q. Did Texas NAACP provide Senator Ellis with |
| 12   materials about voter ID legislation at any -- at any |
| 13   time that you can recall? |
| 14    A. I can't recall at this moment. |
| 15    Q. You mentioned the Senate hearing. Do you |
| 16   recall specifically what was discussed with respect to |
| 17   the Senate hearings on SB 14? |
| 18    A. I -- I can't. It was a long day. |
| 19    Q. Did Texas NAACP have any meetings with Senator |
| 20   Ellis about Senate Bill 362? |
| 21    A. Which one is this? I'm sorry. |
| 22    Q. So this would be the voter ID bill that was, I |
| 23   guess, the main voter -- the voter ID bill during the |
| 24   2009 legislative session. |
| 25    A. Okay. |

| 66 |
|---|
| 1    Q. Did Texas NAACP have any meetings with Senator |
| 2   Ellis during the 2009 session about SB 362? |
| 3    A. It's a little hazy. Yeah. 2009 was -- was a |
| 4   blur when it came to the legislative session. But did |
| 5   you say any -- can you ask the question again? |
| 6    Q. Of course. Did Texas NAACP have any meetings |
| 7   with Senator Ellis during the 2009 session about Senate |
| 8   Bill 362? |
| 9    A. Okay. Yes. I believe we did. |
| 10    Q. Okay. Do you recall, roughly, how many |
| 11   meetings you had? |
| 12    A. That I have -- I couldn't say at -- at all. |
| 13    Q. Do you recall what was discussed during |
| 14   meetings with Senator Ellis during the 2009 session? |
| 15    A. I can't say that I do recall. |
| 16    Q. Do you recall whether Texas NAACP provided any |
| 17   materials to Senator -- to Senator Ellis during the 2009 |
| 18   session regarding voter ID? |
| 19    A. I believe we did. As far as Gary's testimony, |
| 20   I do know Gary -- I remember Gary testifying at the |
| 21   Senate hearing. And so I know they --- all senators |
| 22   would have had a copy of Gary's testimony that I do |
| 23   believe it was submitted. Not 100 percent, but I'm |
| 24   pretty sure he -- he did submit it. |
| 25    Q. Do you recall any other materials that -- |

| 67 |
|---|
| 1   provided to Senator Ellis during the 2009 session? |
| 2    A. On? |
| 3    Q. On voter ID. |
| 4    A. Not that I can recall at this moment. |
| 5    Q. And you said that the Texas NAACP met with |
| 6   Senator West during the 2011 session about SB 14; is |
| 7   that right? |
| 8    A. I believe so, yes. |
| 9    Q. Do you recall, roughly, how many meetings you |
| 10   had -- well, I say you, Texas NAACP had with Senator |
| 11   West? |
| 12    A. I don't think it was many, but I don't remember |
| 13   the number. |
| 14    Q. Do you think it was less than 20? |
| 15    A. Yes, I can safely say that. |
| 16    Q. Do you think it was less than 10? |
| 17    A. Actually, I do believe that it was less than -- |
| 18   than 10. |
| 19    Q. Do you remember who attended meetings with |
| 20   Senator West about SB 14 during the 2011 session? |
| 21    A. No, I can't say that I remember who it was. |
| 22    Q. Did you attend any meetings with Senator West |
| 23   in -- |
| 24    A. It would have been, yes, me. Sorry. |
| 25    Q. Did Senator West himself attend any of the |

| 68 |
|---|
| 1   meetings about SB 14? |
| 2    A. I don't believe so. |
| 3    Q. So as far as you recall, meetings were between |
| 4   yourself and Senator West's staff? |
| 5    A. Correct. I believe so, yes. |
| 6    Q. What was discussed in Texas NAACP's meetings |
| 7   with Senator West or his staff about SB 14 during the |
| 8   2011 session? |
| 9    A. I think with Senator West's staff, it was -- I |
| 10   believe, what I can recall, a little fuzzy, but I think |
| 11   it was more or less about how the Senate hearing was |
| 12   going to go for the -- for the bill that day, and a |
| 13   place where I could sit down, and I knew it would be a |
| 14   while, so I was seeing if -- where I could sit and watch |
| 15   because the gallery has no leg room if you're over five |
| 16   foot five, so.... |
| 17    Q. Did you -- did you provide testimony in the |
| 18   Senate in the 2011 session? |
| 19    A. I don't believe I did. |
| 20    Q. So other than -- other than arrangements for |
| 21   where you could sit during the Senate hearing on SB 14, |
| 22   do you recall anything else that was discussed during |
| 23   meetings with Senator West or his staff? |
| 24    A. Nothing I can recall right now. |
| 25    Q. Did Texas NAACP provide Senator West with any |



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Yannis Banks                                                    May 25, 2012

|  | 69 |
|---|---|
| 1 | materials related to SB 14? |
| 2 | A. I think just Gary's written testimony. I |
| 3 | believe he got a copy of, as well as everybody, from |
| 4 | Gary's testimony. |
| 5 | Q. Did Texas NAACP express any concerns about |
| 6 | SB 14 to Senator West or his staff? |
| 7 | A. Not that I recall. |
| 8 | Q. Did Texas NAACP have any meetings with Senator |
| 9 | West or his staff in the 2009 session about SB 362? |
| 10 | A. I'm not 100 percent positive. I'm not sure. I |
| 11 | can't recall at the moment if we did. |
| 12 | Q. Do you recall if Texas NAACP provided any |
| 13 | materials to Senator West during the 2009 session about |
| 14 | SB 362? |
| 15 | A. I believe he did get a copy of Gary's written |
| 16 | testimony or a statement that he had with him, so I |
| 17 | think he got a copy, like everybody else, of what Gary |
| 18 | was saying or said, I should say. |
| 19 | Q. Any other materials provided besides the |
| 20 | testimony? |
| 21 | A. Nothing I can recall at this moment. |
| 22 | Q. Did -- did you provide any testimony on Senate |
| 23 | Bill 362 during the 2009 legislative session? |
| 24 | A. Maybe on the House. I can't remember. I |
| 25 | remember 2009, that those hearings were very, very long |

|  | 71 |
|---|---|
| 1 | or the other. |
| 2 | Q. Does Texas NAACP contend that Senate Bill 14 |
| 3 | was enacted by the Legislature for the purpose of |
| 4 | preventing anyone from voting? |
| 5 | A. Could you restate the question? |
| 6 | Q. Of course. |
| 7 | Does Texas NAACP contend that SB 14 was |
| 8 | enacted for the purpose of preventing members of any |
| 9 | group from voting or harming their voting rights? |
| 10 | A. I feel like it's still just a legal question. |
| 11 | I know we submitted some answers, so I probably would |
| 12 | just stick with what's been submitted that the lawyers |
| 13 | have -- have said. |
| 14 | Q. Okay. You know, it's kind of a habit to use |
| 15 | legal terms, so let me try a couple of more times, just |
| 16 | to maybe make it clearer. |
| 17 | A. Sure. |
| 18 | Q. Does Texas NAACP contend that SB 14 was enacted |
| 19 | with a discriminatory purpose? |
| 20 | A. I still stick with the legal answers that were |
| 21 | submitted in the document, and I'll let that speak for |
| 22 | -- for what we think. |
| 23 | (Mr. Patrick Sweeten joins the |
| 24 | proceedings.) |
| 25 | MR. BLEDSOE: We just had somebody else |

|  | 70 |
|---|---|
| 1 | and hectic. But I can't recall. But maybe on the House |
| 2 | side. |
| 3 | Q. Was there anyone else that provided testimony |
| 4 | in 2009 on SB 362 for the Texas NAACP? |
| 5 | A. Possibly. I'm not quite sure. I know we had |
| 6 | members did, but it could be for themselves or what have |
| 7 | you. But I think when it comes to Texas NAACP, it may |
| 8 | have just been Gary and myself. |
| 9 | Q. Does the Texas NAACP claim that Senate Bill 14 |
| 10 | will have the effect of denying or abridging the right |
| 11 | to vote on account of race, color, or membership in a |
| 12 | language minority group? |
| 13 | A. I'm not an attorney, so I don't know if I can |
| 14 | really answer the question. |
| 15 | Q. Fair enough. I'm happy to rephrase it. |
| 16 | Does Texas NAACP contend that Senate Bill |
| 17 | 14 will disenfranchise or prevent from voting members of |
| 18 | racial or language minorities? |
| 19 | A. I feel like you're still asking for legal |
| 20 | knowledge that I just can't give. |
| 21 | Q. Does -- does Texas NAACP contend that SB 14 |
| 22 | will harm or adversely affect voting rights of African |
| 23 | Americans in Texas? |
| 24 | A. I still feel like it's a legal kind of |
| 25 | question, so I wouldn't be comfortable answering one way |

|  | 72 |
|---|---|
| 1 | come. You want to identify for the record? You had |
| 2 | everyone identify themselves for the record, so you just |
| 3 | had an addition. |
| 4 | MR. FREDERICK: Oh, sure, sure. |
| 5 | MR. SWEETEN: I'm Patrick Sweeten with the |
| 6 | Texas Attorney General's Office. |
| 7 | Q. (BY MR. FREDERICK) I want to shift gears a |
| 8 | bit -- |
| 9 | A. Sure. |
| 10 | Q. -- and talk about kind of general work that the |
| 11 | Texas NAACP does. |
| 12 | A. Okay. |
| 13 | Q. Does Texas NAACP do any -- outside of what |
| 14 | we've been talking about with respect to specific |
| 15 | bills -- |
| 16 | A. Uh-huh. |
| 17 | Q. -- does it do any kind of policy work about |
| 18 | voter ID? |
| 19 | A. I ask, could you be clearer? I ask what you just |
| 20 | mean by "policy work." |
| 21 | Q. Of course. |
| 22 | A. For a second. |
| 23 | Q. I think I can probably ask it a better way. |
| 24 | A. Okay. |
| 25 | Q. Does the Texas NAACP -- has the Texas NAACP |



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Yannis Banks                                      May 25, 2012

<table>
<tr><td>

**73**

1    prepared any papers on voter ID legislation?
2        A.  And what do you mean papers?  I guess, exactly
3    what kind of papers are we talking?
4        Q.  Any -- any studies.
5        A.  Okay.  Not that I'm aware of studies, no.
6        Q.  Okay.  What about op-ed pieces about voter ID
7    legislation?
8        A.  None that I can recall at this moment.  I'm --
9    I'm not recalling any.
10           MR. VANDEWALKER:  Mr. Frederick, if I
11   could, we've been going about another hour.  Could I ask
12   for another break at this time?
13           MR. FREDERICK:  Sure.  That's fine.  Take
14   five, ten minutes.
15           MR. VANDEWALKER:  Thank you.
16           (Recess at 11:22 a.m. to 11:35 a.m.)
17           (Exhibit 2 marked for identification.)
18       Q.  (BY MR. FREDERICK) Mr. Banks, I've given you
19   what's been marked as Deposition Exhibit 2.  And I will
20   represent to you this is the Texas State Conference of
21   NAACP Branches' Responses and Objections to the State of
22   Texas' First Set of Interrogatories.  Is that what
23   you've got?
24       A.  Yes, sir.
25       Q.  Okay.  Have you seen this document before?

</td><td>

**75**

1    reading the sentence and it contends that preventing
2    voter fraud is not the purpose of Senate Bill 14 on the
3    basis of the general knowledge of national wave of
4    support for organizations that support the
5    disenfranchisement of minority voters -- I'm sorry,
6    that's -- that's reading and thinking.
7            Well, I think we looked at it and I guess
8    if you look at what's been happening, notice,
9    nationally, I guess, there's the concern that more and
10   more minorities are voting more and more and there seems
11   to be a concern, I guess, or they're worried about how
12   they will vote or how they are voting will -- how that
13   could affect different things.  So when you look at the
14   bill and you see that there hasn't been any, I guess,
15   you know, saw any examples of voter fraud happening --
16   examples of voter fraud happening, you know, it's --
17   it's hard to say that, you know, this bill will stop
18   something that is -- that isn't happening.  There's
19   been, I guess, a history that's there's been groups who
20   have not been for minorities to have the ability to vote
21   and what have you, and that's something that the NAACP
22   has been fighting for, for -- fighting against, I should
23   say, for years because, you know, to have the
24   enfranchisement of minority voters.  So when we look at
25   the bill and we see that, you know, the people who are

</td></tr>
<tr><td>

**74**

1        A.  I have, yes.
2        Q.  Okay.  Did you -- did you provide any of the
3    answers or help provide any of the answers in this
4    document?
5        A.  I believe so, yes.
6        Q.  I'd like to direct your attention to Page 8.
7        A.  Okay.
8        Q.  And the question I'm paraphrasing is, "If you
9    contend that preventing voter fraud is not the purpose
10   of SB 14, identify the facts and information to support
11   that contention."  And down at the bottom of the page,
12   excuse me, in the last paragraph, it says, "Defendant-
13   Intervenor states that it contends that preventing voter
14   fraud is not the purpose of Senate Bill 14 on the basis
15   of the general knowledge of the national wave of support
16   for organizations that support the disenfranchisement of
17   minority voters through, among other measures, the
18   implementation of voter identification legislation."  Is
19   that -- is that consistent with your copy?
20       A.  Yes.
21       Q.  Okay.  Can you explain to me what -- what that
22   means?
23       A.  Sure.  Give me one second.
24       Q.  Sure take your time.
25       A.  And digest a little bit.  Okay, well, I'm

</td><td>

**76**

1    being affected are -- mostly who will be affected are
2    minorities, it can lead us to thinking or to seeing
3    that.
4        Q.  When you say "organizations" or when this says
5    "organizations that support the disenfranchisement of
6    minority voters," what organizations are those?
7        A.  I don't have a list of them at this moment I
8    can read out and give to you.  In the past, there have
9    been organizations that have been against African
10   Americans or minorities voting.  I'm losing my thought
11   or words, you know, there's been a tradition against
12   minorities voting.  I think of the, I guess, the KKK for
13   one of them, but there have been other white supremacist
14   groups or what have you that's been against minorities
15   voting or having voting rights.  So, but at the moment,
16   I just don't have a list of all of them.
17       Q.  Okay.  Well can you -- can you think of just
18   any -- I don't expect you to be able to provide a
19   comprehensive list, but can you name any specific groups
20   other than the KKK and white supremacist groups who
21   would be included in this -- in organizations that
22   support the disenfranchisement of minority voters?
23       A.  Sure.  Talking to people, you can look at --
24   and I know there's a concern that the bills have been
25   pushed by ALEC, and so I think there's a concern there;

</td></tr>
</table>



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Yannis Banks                                                    May 25, 2012

| 77 |
|---|
| 1  since they, from documents that I've seen, they have a |
| 2  shell, I guess, of what the voter ID bill will -- should |
| 3  look like. But for the most part, so, I think that's |
| 4  another, I guess you could say, organization of sorts |
| 5  that has been really rolled out there pushing this bill. |
| 6     Q. Okay. Any others that you can think of besides |
| 7  ALEC? |
| 8     A. Off the top of my head right now, no I can't |
| 9  recall. |
| 10    Q. Was ALEC involved in SB 14 in any way? |
| 11    A. I would say we -- we know there are members of |
| 12  the Texas Senate and Texas House that are a part of ALEC |
| 13  from information that I -- that we've seen. And I think |
| 14  the bill is very similar to what they had drafted as a |
| 15  shell, so it's, I guess, fair to, guess, deduct, if you |
| 16  will, that there was definitely some influence from them |
| 17  in creating the bill. |
| 18    Q. Okay. So was it your contention that the SB 14 |
| 19  is based on a shell provided by ALECS -- I'm sorry, by |
| 20  ALEC. |
| 21        MR. VANDEWALKER: Objection, calls for |
| 22  speculation. |
| 23    Q. (BY MR. FREDERICK) You can answer. |
| 24    A. I would, from -- from reading different |
| 25  materials, I would say I would think it appears that it |

| 79 |
|---|
| 1  to believe that certain senators were members of ALEC |
| 2  or -- |
| 3     A. I -- oh, wait, I'm sorry. |
| 4     Q. No, no, that's it. |
| 5     A. I couldn't recall the name of the document, of |
| 6  what the document was called, but I had -- I've seen |
| 7  something like that that had their names of the members |
| 8  of the Texas legislators who were part of ALEC. And I |
| 9  can't remember the kind of document it was. |
| 10    Q. Where did you get this document? |
| 11    A. It was -- I believe it was in an e-mail. |
| 12    Q. Do you recall who sent the e-mail? |
| 13    A. Yes. I believe it was from -- Mr. Bledsoe is |
| 14  who I got it from, I believe. |
| 15    Q. And so the document -- is it -- am I correct in |
| 16  understanding that the document that you've referred to |
| 17  that -- was that an attachment to the e-mail? |
| 18    A. That, I don't recall. |
| 19    Q. This document, do you know who prepared the |
| 20  document? |
| 21    A. That, I can't recall. |
| 22    Q. Do you believe that Mr. Bledsoe prepared the |
| 23  document? |
| 24    A. I don't believe so. No. |
| 25    Q. Okay. So was this -- you've said you don't |

| 78 |
|---|
| 1  is from ALEC. Yes. |
| 2     Q. What materials have you read that lead you to |
| 3  believe that SB 14 is based on a bill from ALEC? |
| 4     A. I've looked over what I found online to be, I |
| 5  guess, the shell bill that ALEC put out. I don't |
| 6  remember, in detail, what's in the shell; but I've |
| 7  looked over that and that would -- that leads, and then |
| 8  you look at how many members from, I guess -- since this |
| 9  a Senate bill, on the Senate side, who are members and I |
| 10  think there are co-authors of what have you of the bill, |
| 11  you would, I guess, suspect that. |
| 12    Q. Okay. So you've looked at the -- looked at the |
| 13  shell bill that ALEC has, and then you say that certain |
| 14  Senate members are members of ALEC; is that right? |
| 15    A. From what my understanding, I would say they |
| 16  are members, yes. |
| 17    Q. What's -- can you tell me what that |
| 18  understanding is based on? |
| 19    A. Looking how they are -- I guess, if they were |
| 20  on committees in ALEC, if I remember right from the |
| 21  document I was reading. So just from that understanding |
| 22  of -- that they were members of ALEC, and I'm not an |
| 23  expert on ALEC and their structure and what have you, |
| 24  but that would be my understanding. |
| 25    Q. Okay. What document did you read that led you |

| 80 |
|---|
| 1  remember if it was an attachment. Was it kind of like a |
| 2  forwarded article or story? |
| 3     A. I know it was a forward from him, but I don't |
| 4  recall if it was a document attached or if it was in the |
| 5  e-mail. |
| 6     Q. Do you remember anything about the source of |
| 7  the document, either who wrote it or whether it was from |
| 8  a publication? |
| 9     A. I can't recall from whom it came. |
| 10    Q. Was it a newspaper story? |
| 11    A. Yeah, I can't recall. |
| 12    Q. Do you recall, specifically, what the document |
| 13  said? |
| 14    A. No, not specifically. As far as everything, I |
| 15  remember names of legislators that were -- not their |
| 16  names if you asked me which ones, I couldn't say such |
| 17  and such, but I remember seeing names. And I don't know |
| 18  if it had the states beside them or what, but names that |
| 19  I knew. |
| 20    Q. So there was some kind of list of names or |
| 21  there were -- there were specific legislators identified |
| 22  in this document? |
| 23    A. Yes. |
| 24    Q. Did the document identify legislators outside |
| 25  of Texas? |



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Yannis Banks                                                    May 25, 2012

---

81

1     A.  I -- I don't recall. I was looking for the
2  ones in Texas. I don't remember if it had others or
3  what have you.
4     Q.  So you don't remember, sitting here now,
5  whether this document identified, kind of, nationwide
6  legislators or just Texas legislators?
7     A.  Right. At this moment I can't say any outside
8  of Texas was, or what have you, on the document.
9     Q.  Do you remember when you -- when you received
10  this document?
11     A.  It was this year. I don't remember when, but
12  it was this year.
13     Q.  And by this year, do you mean 2012?
14     A.  2012, yes.
15     Q.  Has anyone told you specifically that SB 14 was
16  based on a shell bill provided by ALEC?
17     A.  Can you be more specific when you say
18  "anyone"? Are we --
19     Q.  Has -- has any person told you specifically
20  that SB 14 was based on a shell bill provided by ALEC?
21     A.  Not that I can recall.
22     Q.  Has anybody told you specifically that Senate
23  Bill 362 was based on a shell provided by ALEC?
24     A.  No, that I can recall.
25     Q.  Do you have any reason to believe that Senate

---

82

1  Bill 362 was based on something prepared by ALEC?
2     A.  I didn't do any studying of 362 since the
3  document had come out, so I can't say.
4     Q.  So then it's your belief that SB 14 is based on
5  a shell prepared by ALEC; is that correct?
6     A.  I believe that there is -- you can see some
7  likeness and similarity from the shell and this bill.
8  So I would say, yeah, we think ALEC's bill played a role
9  in creating SB 14 or the shape of it.
10     Q.  And that's based on -- I mean, you've looked at
11  this shell that ALEC has and then you've also read, or
12  seen, one document that identifies certain Texas
13  legislators as ALEC members; is that right?
14     A.  Yes.
15     Q.  Okay. And you received this document by e-mail
16  sometime in 2012; is that right?
17     A.  Yes.
18     Q.  You can't remember who wrote the document?
19     A.  That, I cannot recall who created it, no.
20     Q.  And you don't recall whether it was -- you
21  don't recall whether it was a newspaper article or a
22  magazine article?
23     A.  I don't know.
24     Q.  Do you remember any specific legislators who
25  were named in this document as being members of ALEC?

---

83

1     A.  At the moment, I couldn't list any names. I
2  wouldn't want to wrongly accuse anybody of being in it
3  or not.
4     Q.  Now do you believe that -- do you believe that
5  ALEC supports the disenfranchisement of minority voters?
6     A.  Looking at the -- the bill, and I think the
7  effects that -- the impacts it would have on minority
8  voters, I would say yes.
9     Q.  Is there anything else besides -- and when you
10  say the bill, this is the shell voter ID bill that ALEC
11  has?
12     A.  The shell and how it's -- and you put it with
13  SB 14. Yes.
14     Q.  Other than this -- this bill, this bill being
15  the shell ALEC bill --
16     A.  Okay.
17     Q.  -- is there anything else that leads you to
18  believe that ALEC supports the disenfranchisement of
19  minority voters?
20     A.  Not that I actually recall at the moment. I'm
21  not an ALEC expert, per se, so I can't say anything at
22  this moment that I can recall.
23     Q.  So what is it about -- can you tell me
24  specifically what is it about the ALEC voter ID bill
25  that leads you to believe ALEC supports the

---

84

1  disenfranchisement of minority voters?
2     A.  Well, I can't remember at this moment how it --
3  it looked when I compared what I could see,
4  specifically, from the shell: This and that and the
5  other. But I think if you look at the shell and what
6  was produced from it, if you will, it looks like it
7  would, you know, affect minority voters from the shape
8  of what we got with the SB 14.
9     Q.  Okay. Let me clarify a little bit. I
10  understand what -- what you've said about the connection
11  between the ALEC shell and SB 14 and I want to confine
12  my question right now just to the ALEC shell.
13     A.  Okay.
14     Q.  So can you tell me what it is, just about that
15  ALEC shell bill, that leads you to believe that ALEC
16  supports the disenfranchisement of minority voters?
17     A.  I can't recall the shell bill in itself right
18  now, so it's still just saying from shell to SB 14 and
19  what you have, so I couldn't sit down and say, "Well,
20  this is -- this is, and -- from the shell bill," at this
21  moment.
22     Q.  Okay. Well, can you tell -- can you tell me,
23  generally, just talking about the ALEC shell bill,
24  what's -- in your view, what's wrong with the ALEC's
25  shell bill -- the ALEC shell bill?

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Yannis Banks                                          May 25, 2012

85

1    A.  Right.  I still couldn't do it with just -- I'm
2    not that fresh on it.  I just know how, just from
3    comparing it.  I couldn't sit back and say "It was this
4    part and that part," but I know just from when I looked
5    over and saw it.  So I wouldn't be comfortable right now
6    saying "This is that part, and this is that part."  I
7    just can't recall at the moment.
8         Q.  Well just so I'm clear, I'm asking you only
9    with respect to the ALEC shell bill.
10        A.  Right.
11        Q.  What is it in that, you know, with that -- you
12   know, setting aside SB 14 for the moment, what is it in
13   that shell bill that you believe -- that you believe
14   would impact minority voters?
15        A.  And I can't recall it well enough right now to
16   sit down and say "This part from the ALEC shell bill."
17   I couldn't sit down and recall the parts right now at
18   the moment.
19        Q.  And when this says -- and I'm going back to
20   Page 8 --
21        A.  Okay.
22        Q.  -- of the exhibit, down at the bottom, where it
23   says, "The general knowledge of the national wave of
24   support for organizations," do you know what -- what
25   "general knowledge" refers to?

86

1    A.  Let's see.  Well, I guess the question is not
2    registering with me.  Is there another way you could, I
3    guess, rephrase it?  I'm just not --
4         Q.  Sure.  So this paragraph on Page 8, it refers
5    to "general knowledge of a national wave of support for
6    certain organizations."  Do you know what it means where
7    it says -- when it says "general knowledge"?
8         A.  Okay.  I guess we're talking about general
9    knowledge.
10        Q.  Maybe I can -- maybe I can ask it a different
11   way.
12        A.  Sure.
13        Q.  So does "general knowledge," does that mean
14   that it's just kind of something that everyone would be
15   aware of?
16        A.  Okay.  Yeah.
17        Q.  Is that fair to say?
18        A.  I would say, yeah, it would be fair to say
19   general knowledge would be something that everybody, the
20   majority of people, would know and be aware of, yes.
21        Q.  And so where, with respect to this, the
22   national wave of support for these organization, where
23   would people get that general knowledge?  Where would
24   it -- how would I know about that?
25        A.  I can't profess to be an expert of the topic,

87

1    but, I guess, my understanding would be news or
2    different media outlets or general conversations that
3    people would have.  I think that's historically been
4    defined as "general knowledge."  Like, if you do a
5    school paper and you don't cite it, it's kind defaulted
6    to well that's just general knowledge.
7         Q.  Okay.  Are you aware -- can you give me, as we
8    sit here, any specific source or reference for the
9    statement that there's a national wave of support for
10   organizations that support the disenfranchisement of
11   minority voters?
12        A.  Ask the question again, please.
13        Q.  Sure.  Can you identify any specific source of
14   information that would show the national wave of support
15   for organizations that support the disenfranchisement of
16   minority voters?
17        A.  I cannot recall any at this moment.  I know I
18   do a lot of reading, but at this exact moment, I don't
19   think I can recall a specific source right now.
20        Q.  So just to cover it:  So I asked about specific
21   organizations that support disenfranchisement of
22   minority voters.  You identified the KKK, white
23   supremacists groups, generally, ALEC.  Are there other
24   organizations that -- that are included in this
25   reference to organizations that support

88

1    disenfranchisement of minority voters?
2         A.  At this moment, none that I could
3    recall.  But...
4         Q.  Are there any groups -- strike that.
5         A.  Okay.
6         Q.  With respect to ALEC, you mentioned the shell
7    bill they prepared, this document indicating that
8    certain legislators are members of ALEC.  Is there
9    anything else -- is there anything else that you're
10   aware of that shows that ALEC was somehow involved in SB
11   14?
12        A.  Nothing that I can recall at the moment.
13        Q.  Okay.  So you mentioned -- we were talking
14   about the ALEC draft legislation SB 14, but let's --
15   let's move specifically to SB 14.
16        A.  Okay.
17        Q.  You mentioned, when we were talking about the
18   other bills, that there would be an impact on minority
19   voters.
20        A.  Yes.
21        Q.  What impact will SB 14 have on minority voters?
22        A.  From my understanding and reading of the bill
23   interpretation, I -- we believe that the impact would be
24   harmful to minority voters, in that, from the standpoint
25   of -- and maybe many more reasons, but from what I can



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Yannis Banks                                          May 25, 2012

<table>
<tr><td colspan="2">89</td></tr>
</table>

1   recall right now, though, is that it could decrease the
2   number of minority voters who are able to participate in
3   expressing their -- their right to vote. And that's a
4   very big concern for us if -- excuse me -- if they -- if
5   they are not able to express their right to vote.
6       Q.   Is there any other impact that you or the Texas
7   NAACP contends SB 14 will have on minority voters?
8       A.   From what I recall, I know there's many, but
9   from what I'm recalling and what I'm remembering right
10  now, is that we're definitely worrying about it being a
11  disenfranchisement and it's very well -- and in the
12  process of even trying to get the required documents to
13  vote, could be a financial impact on the minority
14  voters, depending on what they have to do to try to get
15  documents they even need to have, which is another
16  concern amongst many that I recall at the moment.
17      Q.   So how would SB 14 decrease the number of
18  minority voters who were able to vote?
19      A.   I think if you look at -- one of the things I
20  can think of at moment, if you look at, you know, what
21  you have and how you can vote now it's -- and then what
22  you would need from SB 14, it could decrease the numbers
23  who would be able to participate to vote. So that would
24  have the impact -- it would have the impact that way.
25      Q.   So when you say impact, is the impact that

<table>
<tr><td colspan="2">90</td></tr>
</table>

1   minority voters -- that certain minority voters would
2   not have one of the forms of ID required by SB 14, is
3   that how it would prevent people from voting?
4       A.   I think if you look at the information that the
5   Secretary of State had submitted to DOJ and would have
6   us show that, you know, not everybody would have or has,
7   you know, said IDs that is required. I would say that
8   it would decrease the number or it would have an impact
9   on those who would be able to vote.
10      Q.   Okay. And the impact would be because they --
11  they wouldn't have the ID?
12      A.   Correct.
13      Q.   So -- so that's -- so that's based on numbers
14  that were prepared by the Texas Secretary of State?
15      A.   Secretary of State and I believe a report was
16  done by the Brennan Center that has showed who --
17  different populations of who lack sufficient forms of ID
18  that would be needed to vote.
19      Q.   Was the Brennan Center study, was that specific
20  to Texas or was it nationwide?
21      A.   I can't recall at the moment. I really can't.
22      Q.   Okay. Does the Texas NAACP conduct any studies
23  to determine how SB 14 would impact -- would impact
24  voters?
25      A.   No.

<table>
<tr><td colspan="2">91</td></tr>
</table>

1       Q.   Other than the Texas Secretary of State's --
2   well let me clarify just -- I think I know what you're
3   talking about, but I want to clarify.
4       A.   Okay.
5       Q.   When you say the Texas Secretary of State's,
6   that their analysis, was that -- is that the analysis
7   that was -- or the numbers or whatever it was, that was
8   provided to the Department of Justice --
9       A.   Yes.
10      Q.   -- by the Secretary of State?
11      A.   Yes.
12      Q.   Okay. So other than the Secretary of State's
13  numbers and the Brennan Center report, is there anything
14  else that -- that supports the claim that SB 14 will
15  decrease the number of minority voters who can vote?
16      A.   I -- I would say, well, I guess, you could also
17  include the letters that we also submitted during the
18  preclearance process that we mentioned earlier.
19      Q.   Okay.
20          MR. FREDERICK:  If you don't mind, why
21  don't we mark those as exhibits. I don't have copies
22  with me, but, if that's all right, let's mark them, just
23  so we can talk about them.
24          THE WITNESS:  Sure.
25          (Exhibits 3 and 4 marked for

<table>
<tr><td colspan="2">92</td></tr>
</table>

1   identification.)
2          MS. RUDD:  Matt, do you want to take a
3   break and make copies so you'll have copies to work
4   from?
5          MR. FREDERICK:  Yeah, why don't we do
6   that.
7          MS. RUDD:  We'll stay put if you just want
8   to run and make copies or have someone come and get
9   them.
10          MR. FREDERICK:  Let me just send a quick
11  e-mail and we can have someone bring one down and I
12  think we can keep moving. Let me go ahead and ask.
13      Q.   (BY MR. FREDERICK) So you've got Exhibit 3
14  there, which I believe is the September letter. What I
15  will ask you in a minute and if you can just look in
16  there, I'd like for you to show me what, in that letter,
17  supports the claim that SB 14 will decrease the number
18  of minority voters who can vote. And I'll give you some
19  time to look through it.
20      A.   Sure, sure, sure. (Reading Exhibit 3.)
21      Q.   So Mr. Banks, just to get everybody on the same
22  page, I had asked you to show me in Exhibit 3 what in
23  that letter supported your contention that SB 14 would
24  have a negative impact on minority voters.
25      A.   Sure. I'm on Page 4.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Yannis Banks                                              May 25, 2012

---

93

1    Q.  Okay.
2    A.  Of the September 14th dated document.  And,
3    actually, could probably even start on Page 3 where at
4    the very top how it says, "The Senate Bill 14 photo
5    identification requirements for in-person voting will
6    have a retrogressive affect on African-American or
7    Latino citizens' ability to vote."  I guess is where
8    they start.  And, I guess, the November 2008 current
9    population survey, 54.3 percent of voting-eligible
10   Latinos in Texas said they were registered to vote
11   compared to 73.6 of voting-eligible Whites, 73.7 of
12   voting-eligible African-Americans.  That data would show
13   that voting-eligible Latinos in Texas are significantly
14   less likely to be registered than Whites.  So if you
15   look how it already is, and then if you go to Page 4, it
16   speaks on the how available data show that African
17   Americans and Latino citizens are less likely than White
18   citizens to possess a form of identification required by
19   Senate Bill 14.  And they point to the national data to
20   demonstrate the disproportionate impact of photo ID
21   requirements.  And they quote a national survey from
22   2008 showing 10 percent of registered African-American
23   voters, 5.8 percent Asian-American, and 5.5 percent of
24   Latino voters do not own any form of government-issued
25   photo ID, and in contrast, only 5.2 percent of White

94

1    voters lacked a valid form of photo ID.
2    Q.  Okay.  So is there anything else in that letter
3    that you would point to as supporting the claim that SB
4    14 will have a negative impact on minority voters?
5    A.  Yeah.  I would say the whole letter would be, I
6    guess, the easiest way of doing it.  The whole
7    document.  It speaks for itself.  It stands alone, on
8    its own, without me having to go into detail about it.
9    Q.  The survey that was discussed in that letter is
10   a national survey.  Are there any -- is the Texas NAACP
11   aware of any surveys of Texas voters that show different
12   levels of ID possession by -- by race or ethnicity?
13   A.  I'm not aware of any.  None time that I'm aware
14   of at this moment.  So I'm not sure.
15   Q.  But the NAACP -- the Texas NAACP never
16   conducted that kind of study on ID possession?
17   A.  None that I can recall.
18   Q.  Do you know if the study that's cited in the
19   September --
20   A.  2011.
21   Q.  Yeah, the September 2011 letter, do you know
22   what kinds of ID that study considered?
23   A.  It's a government-issued photo ID in the
24   letter, so I couldn't go into detail about what that
25   would consist of.

95

1    Q.  Okay.  So you can't say whether that, that
2    national study looked specifically at the kinds of ID
3    listed in SB 14?
4    A.  Not with 100 percent certainty.
5    Q.  Okay.  Do you have any reason to believe that
6    it -- that the national survey did consider the forms of
7    ID listed in SB 14?
8    A.  I would --
9        MR. VANDEWALKER:  Objection.
10       MR. FREDERICK:  I'm sorry.  Can you repeat
11   the objection.  You broke up.
12       MR. VANDEWALKER:  I'm sorry.  The
13   objection is asked and answered.
14   Q.  (BY MR. FREDERICK) Okay.  You can answer if you
15   remember the question.  I'm happy to ask it again.
16   A.  Could you ask it again?
17   Q.  Of course.
18       So you -- you said a moment ago that you
19   can't say with 100 percent certainty that that national
20   study in that letter considered forms of ID listed in SB
21   14.  And my question is whether you have any reason to
22   believe, even if it's less than 100 percent, that that
23   national study considered the specific forms of ID
24   listed in SB 14?
25   A.  I would -- yeah.  I would say they looked at

96

1    the governmental ID and that's all I could say -- or
2    government-issued, I should say, IDs and that's left up
3    to interpretation of what is a governmental ID.
4    Q.  Have you looked at the actual study that's
5    referred to in that article -- or that letter rather?
6    A.  I don't believe I have.  Not that I'm aware
7    that I have.  I couldn't say.
8    Q.  Okay.  Do you know what specific forms of ID
9    were considered in the study mentioned in the September
10   2011 letter?
11   A.  Only governmental ID or government-issued IDs.
12   Q.  Okay.  So you don't know what specific types of
13   government-issued IDs that study considered?
14       MR. VANDEWALKER:  Objection, asked and
15   answered.
16   A.  Not that I'm aware of.
17   Q.  (BY MR. FREDERICK) Okay.  Thank you.
18       MR. FREDERICK:  Okay.  I've got a copy
19   now.
20       MR. VANDEWALKER:  I'm sorry, if I could
21   just say I hope we could take a break at half past, if
22   that's a good stopping point.
23       MR. FREDERICK:  Yeah, I think we can do
24   that.
25       MR. VANDEWALKER:  Okay.  I mean, I'm

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Yannis Banks                                            May 25, 2012

97

1    sorry.  I said break, I meant lunch break, a longer
2    break.
3          MR. FREDERICK:  Sure, of course.  Yeah,
4    let me -- I think I can reach a stopping point in just a
5    few minutes.
6          MR. VANDEWALKER:  Okay, great.
7    Q.  (BY MR. FREDERICK)  Let's move on to the other
8    letter.  So this has been marked as Exhibit 4.
9    A.  Yes.
10   Q.  And actually, just to make sure we're looking
11   at the same thing:  This is the November 16, 2000
12   letter?
13   A.  Yes.
14         THE REPORTER:  2000?
15         MR. FREDERICK:  Sorry, 2011.
16   Q.  (BY MR. FREDERICK)  November 16, 2011.  Now and
17   take your time to look at it.  Can you -- can you point
18   me to what it is in this letter that supports the claim
19   that SB 14 will have a negative impact on minority
20   voters?
21   A.  Okey-doke.  I think I have -- would you state
22   your question so I can make sure my response is correct?
23   Q.  Of course.  Can you show me in the November
24   2011 letter, what in that letter supports the claim that
25   SB 14 will have a negative impact on minority voters?

98

1    A.  If we start with Page 2.
2    Q.  Okay.
3    A.  Which is, I guess, for all intents and purposes
4    the beginning of what they're seeing, and I think if you
5    look at the bottom paragraph, it says, "Neither the new
6    EIC program nor the proposed voter education program
7    would cure disparities in photo ID ownership for several
8    reasons."  And they go into lay out the reasons.  And
9    then as you go through the document, it breaks it down
10   to more information when it gets down to, "The available
11   data demonstrates that voters of color disproportionately
12   lack the requisite photo ID."  I think the document once
13   again speaks for itself with all the data that's
14   provided in here.  It shows why it would still have a
15   negative effect on minorities when it comes to voting.
16   Q.  And so it says "disparities in photo ID
17   ownership."  What is -- what is that statement based
18   on?  What is the claim that there is a disparity in
19   voter ID -- in photo ID ownership based on?
20   A.  Well, at the very top, where it says "Overview
21   of the retrogressive effect," that first paragraph, I
22   guess I should say second sentence.  "First, the State's
23   own data demonstrates that, currently, a
24   disproportionate number of minority voters lack the
25   requisite identification."  So I would say it would be

99

1    from the State's data.
2    Q.  Okay.  And is that the Secretary of State data
3    that was submitted to the Department of Justice?
4    A.  That would be my understanding.
5    Q.  Okay.  What -- what does -- what do those data
6    show?  What does the Secretary of State data show about
7    photo ID possession?
8    A.  Well, ask your question again to make sure.  I
9    think I've got the answer for you.
10   Q.  Sure.  The Secretary of State data that are
11   referred to in this letter --
12   A.  Uh-huh.
13   Q.  -- in your understanding, what do -- what do
14   those data show about the levels of photo ID possession?
15   A.  Okay.  I'm trying to think the best way to word
16   it.  Well, if you -- on Page 3, Section 2, it states at
17   the very beginning -- well, it states what the State
18   failed to provide, but the second sentence says
19   "However, the information that the State has provided
20   reveals that Latinos, the largest minority group in the
21   State, are substantially over-represented among the
22   population of Texas voters who currently lack a state-
23   issued ID."
24         So according to the State's own data,
25   which I guess the Spanish-surname voters make up 28.96

100

1    percent of registered voters without a State-issued
2    photo ID.
3    Q.  Do the data submitted by the State show any
4    disparity in photo ID ownership by African-American
5    voters?
6    A.  Well, on Page 4, it says, "Although Texas has
7    failed to provide, or even estimate, the number of
8    African-American, Asia-American, and White voters in the
9    State who currently lack photo ID, its data still firmly
10   rule out the possibility that White voters lack ID at
11   the same rate as Latino voters."  So the State did it
12   because the State doesn't -- didn't have the
13   information, doesn't track that information.
14   Q.  So are you aware of any -- any study that
15   shows, specifically, that African-American voters in
16   Texas disproportionately lack photo ID compared to any
17   other group?
18   A.  Could you repeat the question?
19   Q.  Uh-huh.  Are there any studies that show that
20   African-American voters in Texas lack photo ID
21   disproportionately?
22   A.  Any studies?
23   Q.  Any studies or any data?
24   A.  I think this letter that we submitted states
25   that.  And so I would say that the letters that we



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Yannis Banks                                                    May 25, 2012

| 101 |
|---|
| 1  submitted, but I couldn't -- there's no -- I guess I |
| 2  could recall but... |
| 3      Q.  Okay.  Can you point me to a specific study or |
| 4  set of data in -- anywhere, including in these letters, |
| 5  that -- that concludes that African-American voters in |
| 6  Texas disproportionately lack photo ID? |
| 7      A.  Could you restate your question for me, please? |
| 8      Q.  Yeah.  Could you point me to any study or any |
| 9  data that shows that African-American voters in Texas |
| 10  lack photo ID at a higher rate than other groups? |
| 11      A.  Okay.  I would still -- I'm thinking.  If you |
| 12  just say it one more time to make sure I got it right. |
| 13      Q.  Of course.  Can you identify any study or data |
| 14  that shows specifically that African-American voters in |
| 15  Texas lack photo ID disproportionately at a higher rate |
| 16  than other groups? |
| 17      A.  Well, I think on Page 5 of the -- the November |
| 18  letter we submitted, it -- it's -- to me, my |
| 19  interpretation, it says that -- as my understanding |
| 20  goes, where it says "Absent of any evidence to the |
| 21  contrary provided by the State, it appears that these |
| 22  racial disparities also exist in Texas, not only as to |
| 23  Latino voters, but as to African-Americans and Asia- |
| 24  Americans as well.  This further underscores the |
| 25  retrogressive impact that Senate Bill 14 would have on |

| 102 |
|---|
| 1  minority voter strength if Texas implements the proposed |
| 2  photo ID requirement." |
| 3      Q.  Okay.  And so those two sentences you've just |
| 4  identified there on Page 5 at the top, I'm looking at |
| 5  them.  I don't see any -- any footnotes or citations; is |
| 6  that -- is that correct? |
| 7      A.  That's correct. |
| 8      Q.  Okay.  So this -- this is absent any evidence |
| 9  to the contrary.  I understand that.  Are you aware of |
| 10  any evidence that shows that African-Americans lack |
| 11  photo ID disproportionately in Texas? |
| 12      A.  I -- well, beside these two reports, nothing I |
| 13  can say at the moment. |
| 14      Q.  Okay. |
| 15          MR. FREDERICK:  Okay, I think now is an |
| 16  okay time to break for lunch. |
| 17          MS. RUDD:  All right. |
| 18          MR. FREDERICK:  I've got 12:38.  You want |
| 19  to say 1:45? |
| 20          MS. RUDD:  That would be great. |
| 21          (Recess from 12:38 to 1:50 p.m.) |
| 22      Q.  (BY MR. FREDERICK) Does the Texas NAACP contend |
| 23  that SB 14 will have a negative impact on Asian American |
| 24  voters? |
| 25      A.  We believe so. |

| 103 |
|---|
| 1      Q.  What is the basis for that contention? |
| 2      A.  I think it goes back to the letters we |
| 3  submitted that shows the data of -- is going to affect |
| 4  all minorities.  We didn't just look at African |
| 5  Americans when it came to who the effect would have.  We |
| 6  looked at all minorities.  And we believe that it would |
| 7  have an effect on the Asian Americans as well.  I think |
| 8  even in 2009, a friend of mine -- 2009, a friend of |
| 9  mine, Ramey Ko, had testified how this voter ID bill |
| 10  would have the impact and effect it would have on Asian |
| 11  Americans as well. |
| 12      Q.  Did the Texas NAACP conduct any studies on the |
| 13  impact of SB 14 on Asian American voters? |
| 14      A.  We did not, no. |
| 15      Q.  Did the Texas NAACP conduct any studies on |
| 16  rates of photo ID possession by Asian American voters? |
| 17      A.  We did not, no. |
| 18      Q.  Are you familiar with the polls regarding |
| 19  support for voter ID legislation among Texas residents? |
| 20      A.  Somewhat, yes. |
| 21          MR. VANDEWALKER:  Objection, vague. |
| 22      Q.  (BY MR. FREDERICK) Are you familiar with any |
| 23  the polls that were cited in the legislative record for |
| 24  SB 14? |
| 25      A.  I would have to actually, I guess, see |

| 104 |
|---|
| 1  those.  I couldn't tell you offhand which ones were -- |
| 2  were cited. |
| 3      Q.  Are you aware of polls showing that the |
| 4  majority of Texans support a photographic ID requirement |
| 5  to vote regardless of political affiliation? |
| 6          MR. VANDEWALKER:  I object on the basis of |
| 7  relevance. |
| 8      A.  Okay.  I'm familiar with them, but I look at |
| 9  all polls based on how the question is asked. |
| 10      Q.  (BY MR. FREDERICK) Are you aware of any -- |
| 11  well, can you identify any specific problem or flaw with |
| 12  a poll of Texas voters about support for photo ID? |
| 13          MR. VANDEWALKER:  Objection, vague. |
| 14      A.  Is there a specific poll are we talking about |
| 15  or just -- |
| 16      Q.  (BY MR. FREDERICK) No. |
| 17      A.  Okay.  Well, my understanding would be, I think |
| 18  if you ask the question without going into details of |
| 19  what's going on or what's -- what said bill would look |
| 20  like, then I think that's when you get -- when you just |
| 21  ask general questions about, you know, what something |
| 22  is, then your answer will be very general.  If I asked |
| 23  somebody if it's hot outside, and I don't give them |
| 24  temperature or whatever, then, yeah, I think the |
| 25  majority of people you may poll today will say "It's |



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Yannis Banks                                        May 25, 2012

### 105

1  hot," but there may be a couple who will say that the
2  temperature isn't that bad.
3      Q.  Based on the materials that you've read, is it
4  your understanding that the majority of Texans support
5  the voter ID requirement to vote?
6      A.  I've seen numbers, with a vague question, that
7  may say as such.  But more research will still need to
8  be done on saying, you know, what was told, was anything
9  more told up.  There's still concerns when it just says,
10  flat out, well, how do you feel, there's concerns with
11  that.  So I don't know how reliable some of the polls
12  are.
13     Q.  Are you aware of polls showing that the
14  majority of Texans support photographic ID requirements
15  to vote regardless of race?
16     A.  I think I've heard or seen some -- some of
17  those polls.
18     Q.  Are you aware of polls showing that the
19  majority of Texans support photographic ID requirement
20  to vote regardless of minority language status?
21     A.  I think I've seen some polls saying that.
22     Q.  Does the Texas NAACP contend that African
23  American voters in Texas are -- are more likely than
24  other voters to lack qualifying photo ID under SB 14?
25     A.  Yes, we do.

### 106

1      Q.  And I know we had talked about this some
2  before.  Can you tell me -- can you tell me what that
3  conclusion is based on?
4      A.  I think if you look at data that deals with --
5  socioeconomic data that shows how your lower income
6  population tends to be minority, African American,
7  Hispanic, what have you, it would show that, you know,
8  there -- there -- the data that the people who could be
9  possessing any forms of ID, more likely would be your
10  minorities, when you looks at any form.
11         And then even the access to be able to get
12  documents that would needed to get the ID would be a --
13  could be an issue in itself, if you, you know, have to
14  travel hundreds of miles to get there because of where
15  you live or, you know, you don't have private
16  transportation.  So the public transportation doesn't
17  get you, you know, in a good area to get there, or, you
18  note, the kind of jobs they may have or taking off work
19  to have to travel these many miles could be a hindrance
20  in itself.  And like I say, even getting documents to
21  get it, the cost behind that, the financial strain, that
22  can be placed upon them, will be a burden, just so they
23  can -- and, you know, we feel that it's very important
24  to vote and have your voice heard.  And so for them to
25  be able to do that and have to go through all that.

### 107

1          And then even if they are given
2  provisional ballots, the process that they would have
3  come back and try to verify who they are is cumbersome
4  in itself, and that's a -- that was a concern also.
5      Q.  Does the Texas NAACP contend that -- that an
6  African American voter is less likely -- an African
7  American voter in Texas is less likely to possess a
8  qualifying form of ID, under SB 14, than an Anglo or a
9  Hispanic voter of the same socioeconomic status?
10     A.  Could you say the question again?
11     Q.  Of course.  Of course.  So if had -- well, if
12  you assume -- strike that.  I'll just ask it again.
13     A.  Okay.
14     Q.  Does the Texas NAACP contend that African
15  American voters in Texas, are less likely to possess a
16  qualifying form of photo ID than Anglo or Spanish voters
17  of the same socioeconomic status?
18     A.  I would -- I think so.  I think -- I think even
19  there's been data that show that even if they are the
20  same background or what have you, but it still would be
21  maybe a little bit more, have less access to it or what
22  have you.  So I would think the data will show it.  At
23  least I can say I'm pretty sure compared with Anglos,
24  I'd say yes.  But I'm not 100 percent positive about
25  Hispanics.

### 108

1      Q.  Okay.  And you referred to -- to data.  What --
2  what data were you referring to when you said the data
3  will show that African Americans are less likely to
4  possess photo ID regardless of socioeconomic status?
5      A.  I can't think of any I can cite specifically
6  off the top of my head right now.  But I think from
7  stuff I've seen and read overall, I would believe that
8  they would, even though they're from the same background
9  from different studies, that they still had the
10  disadvantages.  So I would still say yeah.
11     Q.  Okay.  You can't identify a specific study to
12  support that?
13     A.  Not off the top of my head right now, no.
14     Q.  Okay.  Can you identify for us any articles or
15  books or newspaper stories, anything like that?
16     A.  Not that I can call -- recall right now
17  specifically, no.
18     Q.  Does the Texas NAACP contend that Latino voters
19  in Texas are less likely to possess qualifying forms of
20  photo ID, under SB 14, than Anglo and African American
21  voters of the same socioeconomic status?
22     A.  I would probably go back to my previous
23  answer.  And I couldn't say compared with African
24  Americans, but I think when you look at overall data,
25  still that they would more than likely, compared with



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

### 109

1　Anglos, would -- would not have -- even in the same
2　economic area, would still not have the same -- would
3　have ID, the forms of ID.
4　　　Q.　Can you identify any study or paper or anything
5　that supports that conclusion?
6　　　A.　Not at -- at this point, I couldn't, no.
7　　　Q.　Do you think that you have seen a specific
8　study that makes that conclusion?
9　　　A.　I feel like I have, but I'm not -- I've done a
10　lot of reading, and I think it just -- I think -- I
11　think I've seen, you know, data overall stating that
12　even when you look at economic in the same group, for --
13　for whatever reasons, is that minorities still will seem
14　to be worse off overall when even in the same economic
15　group, so...
16　　　Q.　Does Texas NAACP contend that elderly voters
17　are less likely to have qualifying identification under
18　SB 14?
19　　　A.　We believe so, yes.
20　　　Q.　Can you tell me what that conclusion -- or that
21　belief is based on?
22　　　A.　That you will have -- there will still be
23　people around now who may have been born by midwife or
24　what have you.　And so what it comes to, they may have
25　had IDs before, but they could be no longer driving or

### 110

1　have need to drive or what have you, so they let their
2　ID relapse, and now to go get one, and you're asking for
3　records that may not exist anymore because of when they
4　were born and the time period or the hospital that was
5　there could have been burnt down and records lost, and
6　it's never been an issue or a concern before, now to
7　have to do it, so there's a concern that they wouldn't
8　have documentations needed to -- to obtain the IDs
9　mentioned.
10　　　Q.　Can you identify any study or article that
11　supports that?
12　　　A.　At this moment, I could not, no.
13　　　Q.　Do you believe that you have seen a study
14　specifically finding that elderly voters are more likely
15　to lack photo ID?
16　　　A.　I think a newspaper article or -- or a study,
17　it seems like I've -- I've read one, but I can't say
18　with a hundred percent certainty.
19　　　Q.　Does Texas NAACP contend that indigent voters
20　are less likely than nonindigent voters to have a form
21　of ID required by SB 14?
22　　　A.　You said less likely?
23　　　Q.　Yeah.　Are indigent voters less likely to have
24　qualifying ID?
25　　　A.　Yes.

### 111

1　　　Q.　And what is that conclusion based on?
2　　　A.　For the fact that -- well, they're indigent, so
3　they -- they haven't the funds, the excess funds
4　necessary to get, I think, certain things that some
5　people take for -- for granted of, you know, you just
6　have.　But when -- when you set your priorities of what
7　you may need to have to live, you know, the form of ID,
8　may not be on your high list of "I have to have this",
9　but I need to be worried about other things.　So, you
10　know, that's a concern.　Or even if somebody who's been
11　homeless for while and hasn't had to have ID, what have
12　you, that's a concern as well.
13　　　Q.　Can you think of a specific study or article
14　that specifically finds that indigent voters are less
15　likely to have photo ID?
16　　　A.　Not off the top of my head right now, no, I
17　can't.
18　　　Q.　Do you believe that you have seen a study or
19　article at some point that specifically finds indigent
20　voters to be less likely to have photo ID?
21　　　A.　I think I may have seen something, but I can't
22　recall at this moment.
23　　　Q.　Does Texas NAACP contend that disabled voters
24　are less likely than nondisabled voters to have a form
25　of ID required by SB 14?

### 112

1　　　A.　We think it's possible, yes.
2　　　Q.　Has the Texas NAACP conducted any studies about
3　rates of ID possession among disabled voters?
4　　　A.　No, we haven't.
5　　　Q.　To backtrack a bit, has Texas NAACP conducted
6　any studies about rates of ID possession among elderly
7　voters in Texas?
8　　　A.　No, we haven't.
9　　　Q.　Has the Texas NAACP conducted any studies on
10　rates of ID possession among indigent voters in Texas?
11　　　A.　No, we haven't.
12　　　Q.　Can you tell me what -- can you give me the
13　basis for the belief that disabled voters may be less
14　likely to have photo ID?
15　　　A.　With that, you know, it's from a conversation
16　with -- with the disability -- one of the disability
17　group, disability, what -- what are they called?　The
18　disability group.　I think it's Disability Rights of
19　Texas.　And I know they had concerns, so...
20　　　Q.　Do you recall if they -- if Disability Rights
21　Texas showed you any studies about photo ID possession
22　by disabled voters?
23　　　A.　Not that I recall seeing.
24　　　Q.　Does Texas NAACP contend that rural voters are
25　less likely than urban or suburban voters to have



**ESQUIRE**
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Yannis Banks                                                    May 25, 2012

### 113

1  qualifying photo ID under SB 14?
2      A.  I would say so, yes.
3      Q.  And what is that conclusion based on?
4      A.  Locations of DPS offices, the access to be able
5  to -- to get to them, it could be burdensome in itself,
6  where you have to travel hundreds of miles or what you
7  have to get to the offices.
8      Q.  Is that conclusion based on anything else?
9      A.  At this moment, that's all I can recall.
10     Q.  Does Texas NAACP contend that voters without a
11  high school diploma are less likely than voters with a
12  high school diploma to have qualifying photo ID under
13  SB 14?
14     A.  Could you restate -- restate the question?
15     Q.  Of course.  Does Texas NAACP contend that
16  voters without a high school diploma are less likely to
17  have qualifying photo ID under SB 14?
18     A.  I would say yes, they would.
19     Q.  And what is that conclusion based on?
20     A.  I've seen, I guess, different studies about how
21  level of activity, when you're looking at whether you
22  have the high school diploma or equipment to not, when
23  you see how involved civically they are, the chances of
24  their having -- I'm sorry, when you see the level of
25  civic activity, how involved they are, there's a chance

### 114

1  that they may not -- and they also tend to be -- the
2  ones without the high school diploma tends to more be
3  fall back to the indigent or your economically
4  disadvantaged group, so there's a chance of -- having an
5  ID is not one of their focuses whatever.
6      Q.  Has Texas NAACP conducted any studies, that
7  you're aware of, about rates of ID possession among
8  voters with or without a high school diploma?
9      A.  No, we haven't, that I'm aware of.
10     Q.  Has Texas NAACP conducted any studies about
11  rates of ID possession for rural voters?
12     A.  Not that I'm aware of, no.
13     Q.  Does Texas NAACP contend that young voters are
14  less likely than other voters to have qualifying ID
15  under SB 14?
16     A.  Yes.
17     Q.  Can you tell me what that conclusion is based
18  on?
19     A.  You have voters who may be from out of state
20  who are going to school here and may not have the
21  required ID that you're asking for, and so they, you
22  know, may have a hard time as well getting the ID
23  necessary.
24     Q.  Is there any other reason, that you're aware
25  of, that a young voter would be less likely to have an

### 115

1  ID?
2      A.  At the moment, that's -- that's all I can
3  recall at this moment.
4      Q.  Has Texas NAACP conducted any studies of rates
5  of photo ID possession among young voters?
6      A.  No, we haven't.
7      Q.  Okay.  I'm going to move on to talk about the
8  Texas NAACP membership.  Who are -- who are the members
9  of the Texas State Conference of NAACP Branches?
10     A.  We are made up of our elected officers, as well
11  as the appointed members of the executive committee, and
12  then our individual state units.  The local units would
13  comprise the -- the members in the -- in the state will
14  comprise the Texas State conference.
15     Q.  Okay.  So am I correct in understanding that
16  the Texas State Conference of NAACP Branches is made up
17  of other -- other organizations?
18     A.  Not organizations.  We have the state
19  conference, and then we have our chapters of the NAACP.
20  So Austin has a NAACP chapter.
21     Q.  Uh-huh.
22     A.  Killeen, Houston, what have you, and then those
23  all form to make up the Texas State Conference.
24     Q.  Okay.  And so for -- other than officers and
25  the executive committee, are there individuals who are

### 116

1  -- who would be members of the Texas State Conference of
2  NAACP Branches?
3      A.  This is my understanding of -- of our bylaws,
4  as I've read them and try to get familiar with them.  My
5  understanding is our members, individual members will be
6  considered members of the Texas State Conference, if
7  that is --
8      Q.  When you say "our individual members," are you
9  talking about actual individuals or individual branches?
10     A.  Both.
11     Q.  Okay.  Maybe it's --
12     A.  Both.
13     Q.  It's a little bit confusing, because I don't --
14  I'm trying to figure it out myself.
15     A.  Not a problem.
16     Q.  So if -- are individuals, would they be
17  considered members of the individual branches, or would
18  they also be members of the Texas State Conference?
19     A.  Kind of both.
20     Q.  Both?
21     A.  So you're a member of the Austin branch, and by
22  being a member of Austin branch, and Austin branch is a
23  part of the state -- you're a member of the Texas State
24  Conference.
25     Q.  Okay.  It's kind of like if you're a Texas



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Yannis Banks                                            May 25, 2012

---

### 117

1  citizen, you're also a United States citizen?
2      A.  Something similar, yes, sir.
3      Q.  All right.  Okay.
4          I want to give you -- I want to give you
5  an exhibit.  I hope I have one.  Somehow, I lost my
6  extra copies of these.  Oh wait, no, sorry.  We've
7  already marked this.  So I'm -- what I've got is --
8  these are objections, response to objections to the
9  state's first set of interrogatories, and maybe
10  Number 2?
11      A.  2.  Yes.
12      Q.  You got it.  Great.  Thanks.
13          Could I get you to turn to page 10 of
14  that, please.
15      A.  Okay.
16      Q.  All right.  And so the last paragraph --
17          So everybody knows what we're talking
18  about, this is Interrogatory Number 4, which is actually
19  on Page 9, and it says, "State the name and address of
20  each of your members who, A, is registered to vote in
21  Texas, and, B, does not have one or more of the forms of
22  identification listed in Texas Election Code, Section
23  63.0101."
24          So I want to talk about the answer, the
25  part of the answer that is in this last paragraph.

### 118

1      A.  Okay.
2      A.  It says that, "There are broad categories of
3  Texas NAACP's constituency that are adversely affected
4  by Senate Bill 14."  And then it goes on to list
5  categories which are individuals who do not currently
6  have a form of identification prescribed in SB 14,
7  individuals for whom obtaining a form of identification
8  prescribed in Senate Bill 14 would be an unreasonable
9  hardship, and individuals unlikely to be able to obtain
10  a free form of identification.  Do you see that?
11      A.  Yes, sir.
12      Q.  Okay.  First, I want to make sure I understand.
13  So when -- when this says the NAACP's constituency, is
14  that different from its membership?
15      A.  I would say, yes.
16      Q.  Okay.  Can you -- can you tell me -- well, who
17  makes up the constituency?
18      A.  Sure.  Sure.  Our constituency, because there
19  are people who are not members of NAACP that we do help.
20      Q.  Okay.
21      A.  So people who are not members are still
22  considered -- you can call them, I guess, our -- by my
23  understanding of it or definition of it, they would be
24  considered our constituency because we do help them out
25  if they need assistance.  You don't have to be a member of

### 119

1  NAACP for us to help us -- or to help you or for you to
2  reach out to us for help.
3      Q.  Okay.  That makes sense.
4          So is -- is there any kind of list of
5  constituents as opposed to members, or is it just kind
6  of, if somebody calls for help --
7      A.  If somebody --
8      Q.  -- they're a constituent?
9      A.  I'm sorry.  I didn't mean to cut you off.
10      Q.  No, no, no, no.
11      A.  If somebody calls for help or, you know, a
12  letter or whatever, they reach out to us, we'll help.
13      Q.  Okay.  Do you know how many Texas registered
14  voters lack one of the forms of photo ID required by
15  SB 14?
16      A.  I couldn't -- I can't recall that -- that
17  number off the top of my head.  I think it may be in the
18  letter we -- we submitted.  I think.  But I can't recall
19  the number off the top of my head.
20      Q.  But you believe that you have -- have seen a
21  number of registered voters without ID?
22      A.  I do believe I did see a number, yes.
23      Q.  Do you recall where that number came from or
24  how -- what it was based on?
25      A.  I want to say -- I believe it was, like, in a

### 120

1  newspaper, and it was based off just the little
2  information the state turned over to the DOJ, based off
3  of that information, which wasn't even -- they couldn't
4  get the full number, but just an estimate from that or
5  whether it would -- whether it could be figured out from
6  that.  I do believe I did see a number stated.
7      Q.  Moving back quickly to the Secretary of State
8  numbers, do you know how the Secretary of State got
9  whatever number it put in its letter to the DOJ?
10      A.  I believe it was from Spanish surname is what
11  they all could do, but the process and the whole -- how
12  they worked it out, I'm not quite that familiar with,
13  but I do recall reading it.  It mentions Spanish
14  surname.
15      Q.  Do you know what kinds of photo IDs the
16  Secretary of State used to get the number in that
17  letter?
18      A.  It's the information they got from DPS office,
19  so I'm not sure if -- what all IDs it -- it entailed.  I
20  don't -- I didn't read any specifics of which one.  And
21  that may very well be in the letters we submitted to the
22  DOJ as well.  But I can't recall right now.
23      Q.  So you don't know -- you don't know if that
24  number took into account passport holders?
25      A.  I -- I couldn't say.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Yannis Banks                                                    May 25, 2012

| 121 |
| --- |

1  Q.  Okay.  And you don't know if it took into
2  account military ID holders?
3      A.  Yeah, I -- I can't say.  I'm not sure on -- on
4  that.
5      Q.  Do you know how many members of the Texas NAACP
6  do not have one of the forms of ID required by SB 14?
7      A.  I'm not aware.  I couldn't say a number.
8      Q.  Can you identify any member of the Texas NAACP
9  who does not have one of the types of photo ID required
10  by SB 14?
11     A.  At this moment, I couldn't say right now.
12     Q.  Can you identify any member of the Texas
13  NAACP who does not have one of the IDs required by
14  SB 14?
15     A.  I can't say at this moment right now.  I
16  couldn't be able to answer that, that I'm aware of.
17     Q.  Can you identify any Texas registered voter who
18  doesn't have one of the photo ID required by SB 14?
19     A.  I couldn't identify anybody at this moment that
20  I'm aware of.
21     Q.  Do you know how many Texas NAACP members don't
22  have the documents that would be required to get a form
23  of ID required by SB 14?
24     A.  I couldn't tell you right now at this moment.
25     Q.  Can you identify any member of the Texas NAACP

| 122 |
| --- |

1  who doesn't have documents necessary to get a state-
2  issued photo ID for SB 14?
3      A.  I couldn't say at this moment.
4      Q.  Can you identifies constituent of the Texas
5  NAACP who doesn't have the documents necessary to get an
6  ID required by SB 14?
7      A.  I couldn't say at this moment that I'm aware
8  of.
9      Q.  Can you identify any Texas registered voter who
10  does not have documents that would be necessary to get a
11  photo ID required by SB 14?
12     A.  At this moment right now, I could not say I
13  recall.
14     Q.  When you say you can't recall, do you think
15  that you could identify a registered voter who doesn't
16  have the documents at some point and just can't
17  remember?
18     A.  Ask the question again.  I'm sorry.
19     Q.  Well, let me just ask the original one again.
20     A.  Okay.
21     Q.  I think I'm getting a little off track.
22         Can you identify any Texas registered
23  voter who does not have the documents that would be
24  necessary to get a photo ID required by SB 14?
25     A.  I would say not that I'm aware of, to my

| 123 |
| --- |

1  knowledge.
2      Q.  Do you know how many Texas registered voters
3  lack the documents necessary to get a state-issued photo
4  ID -- or I'm sorry.  Let me scratch that.
5         Do you know how many Texas registered
6  voters lack documents necessary to get a form of ID
7  required by SB 14?
8      A.  Ask the question again.
9      Q.  Sure.  Do you know how many Texas registered
10  voters lack the documents that would be necessary to get
11  an ID required by SB 14?
12     A.  Not -- I haven't seen anything that said -- has
13  said so, so I'm not aware.
14     Q.  Okay.  Do you know how many Texas NAACP members
15  lack a Texas driver's license?
16     A.  No, I'm not aware.
17     Q.  Do you know how many Texas NAACP members lack
18  -- how many Texas NAACP members lack either a driver's
19  license or a state-issued personal ID card?
20     A.  No, I am not aware.
21     Q.  Do you know how many Texas NAACP members have a
22  concealed handgun license?
23     A.  No, I'm not aware of that also.
24     Q.  Do you know how many Texas NAACP members have a
25  passport?

| 124 |
| --- |

1      A.  I am not aware of the number, no.
2      Q.  Do you know how many Texas NAACP members have a
3  military identification card with a photograph?
4      A.  I am not aware, no.
5      Q.  Do you know how many of the Texas NAACP's
6  members have a citizenship certificate with a
7  photograph?
8      A.  I am not aware, no.
9      Q.  Are you familiar at all with levels of photo ID
10  possession by voters in Georgia?
11     A.  Ask the question again.  .
12     Q.  Sure.  Are you familiar with the levels of
13  photo ID possession by voters in Georgia?
14         MR. VANDEWALKER:  Objection, relevance.
15     A.  Somewhat.  I'm not an expert on it, but I think
16  so.
17     Q.  (BY MR. FREDERICK) Okay.  Can you tell me --
18  can you tell me what -- what do you know about the
19  levels of photo ID possession by voters in Georgia?
20         MR. VANDEWALKER:  Objection, relevance.
21     A.  If it's my understanding, and I think I
22  understand it, but I'm not 100 percent, but I believe
23  that voters in Georgia had to have a -- had a -- were
24  issued IDs already before the bill went into effect.
25     Q.  (BY MR. FREDERICK) When you say "the bill," you



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Yannis Banks                                          May 25, 2012

### 125

1      mean the Georgia --
2          A.   Yes.
3          Q.   -- photo ID bill?
4          A.   Yes.
5          Q.   And what's that understanding based on?
6          A.   Conversation -- conversations --
7              MR. VANDEWALKER:  Objection, relevance.
8          A.   Conversations that were had.  I think it's also
9      in Mr. Bledsoe's -- one of his testimonies that he gave
10     to the Legislature, I think he mentioned it.  And that
11     I'm not 100 percent, but I think he -- he may have.
12         Q.   (BY MR. FREDERICK) Okay.  What is your
13     understanding about -- scratch that.  I'll ask it
14     another way.
15              Is it your understanding that African
16     American voters in Georgia possess photo ID at a
17     different rate than, say, Anglo voters in Georgia?
18              MR. VANDEWALKER:  Objection, relevance.
19         A.   That -- I haven't seen data that show -- ask
20     the question again so I wrap my head around it.
21         Q.   Sure.  Sure.
22              MR. FREDERICK:  Actually, can you read the
23     question back?
24              (The question was read by the reporter.)
25         A.   Okay.  I haven't seen data from Georgia as far

### 126

1      as how that may go, so I couldn't say.  I wouldn't feel
2      comfortable saying.
3          Q.   (BY MR. FREDERICK) Okay.  Are you familiar with
4      levels of photo ID possession by voters in Indiana?
5          A.   No.
6              MR. VANDEWALKER:  Objection, relevance.
7          Q.   (BY MR. FREDERICK) Are you familiar with levels
8      of photo ID possession by voters in Texas?
9          A.   Would you ask the question again?
10         Q.   Sure.  Are you familiar with the levels of
11     photo ID possession by voters in Texas?
12         A.   And when you say "levels," I guess explain what
13     you mean by levels, levels in Texas.
14         Q.   Sure.  Are you familiar with the percentage of
15     various racial or ethic groups of voters in Texas who
16     possess a photo ID that would qualify under SB 14?
17         A.   Somewhat.  I think I've -- I feel like I've
18     seen information or read about -- read about it, yeah.
19         Q.   Okay.  Can you tell me what that information
20     was?
21         A.   Well, from our report, I think the letters we
22     submitted show that when it comes to having the
23     necessary ID, that minorities rank lower than Anglos
24     when it comes to having photo ID.
25         Q.   Do you know what percentage of African American

### 127

1      registered voters in Texas possess a qualifying form of
2      photo ID under SB 14?
3          A.   Not that I can right now, no.
4          Q.   Do you know what percentage of Anglo voters,
5      registered voters in Texas possess a form of photo ID
6      required by SB 14?
7          A.   Not that I can recall, no.
8          Q.   Do you know what percentage of Asian American
9      voters, registered voters in Texas, possess a qualifying
10     form of photo ID under SB 14?
11         A.   Not that I can recall at this moment, no.
12         Q.   Do you know what percentage of Hispanic voters,
13     registered voters in Texas, possess a qualifying form of
14     photo ID under SB 14?
15         A.   Not that I'm aware of, no.
16         Q.   Does the Texas NAACP contend that minority
17     voters in Texas possess photographic identification at a
18     lower rate than minority voters in Georgia?
19              MR. VANDEWALKER:  Objection, relevance.
20         A.   I don't think that's something we've ever
21     compared or talked about, so I'm not -- I'm not that
22     familiar with, not to my knowledge anyway.
23         Q.   (BY MR. FREDERICK) And does the Texas NAACP
24     contend that minority voters in Texas possess
25     photographic identification at a lower rate than

### 128

1      minority voters in Indiana?
2              MR. VANDEWALKER:  Objection, relevance.
3          A.   Once again, that's -- I don't think that's
4      anything that we've ever -- that I recall us talking
5      about, so I'm not sure.
6          Q.   (BY MR. FREDERICK) All right.  Let's go back to
7      Exhibit 2.
8          A.   Okay.
9          Q.   And I ask you to turn to Page 9.  We were
10     talking about this earlier.  This is interrogatory 3,
11     which is:  If you contend that preventing voter fraud is
12     not the purpose of SB 14 -- I'm paraphrasing -- identify
13     and describe all facts and information that support your
14     contention.  And then on Page 9, let's see, this is the
15     last paragraph before Interrogatory Number 4 starts, and
16     it's the second sentence in that paragraph.  It says,
17     "The forms of identification required by Senate Bill 14
18     are arbitrary and inequitable and appear calculated to
19     marginalize minority voting power."  Do you see that?
20         A.   I do, yes.
21         Q.   How are the forms of identification required by
22     Senate Bill 14 calculated to marginalize minority voting
23     power?
24         A.   Well, if you go back to 2009, when we -- when
25     -- I don't remember the voting bill, the number that was



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Yannis Banks                                                    May 25, 2012

129

1   up in 2009, but the Voter ID bill in '09, we had
2   discussions about other provisions or other forms of ID
3   that can be used as well to try to be more inclusive,
4   whether you have a voter ID or you can bring in two
5   other forms of identification to include -- to include
6   -- to vote.  I'm sorry, I lost my thought.  To vote.
7   You can bring in two other forms of ID to vote.
8          So, and even when -- when offering, I
9   think Gary may have made recommendations in his speech,
10  or when he spoke before the Leg about other forms or
11  what have you that can be used to -- to be more
12  inclusive, and those were ignored or what have you, or
13  -- or not considered.  Then, I guess you could look at
14  it and interpret it that way or -- of it's -- they're
15  not wanting to be inclusive and to say, you know,
16  minorities do not have the forms that you're listing,
17         I think in here, in our report, it speaks
18  about when it comes your hunting license -- excuse me --
19  how it's not something that a lot of minorities, African
20  Americans have.  So I think Gary probably had mentioned
21  other forms or other things that could be more inclusive
22  to say well, if we want to have -- we want to be secure
23  and have people voting, this is how you can still do
24  that, and it was ignored.
25     Q.  Do you recall whether a hunting license was

130

1   included as a qualifying ID in the 2009 bill, SB 362?
2      A.  A hunting license?
3      Q.  Yeah.
4      A.  I don't believe it was.
5      Q.  Did the Texas NAACP provide the Legislature
6   with any data showing the levels of photo ID possession
7   among various groups of voters in Texas?
8      A.  Not that I recall.
9      Q.  So when you say that the Legislature didn't
10  include other forms of ID that would have been more
11  inclusive, has the Texas NAACP conducted any studies
12  about the rates or the percentage of minority voters in
13  Texas who would possess the other forms of ID that
14  weren't included?
15     A.  Ask the question again.  I'm sorry.
16     Q.  Sure.  Did the Texas NAACP conduct any studies
17  on the percentage or proportion of minority voters in
18  Texas who possessed the forms of ID that were not
19  included in SB 14?
20     A.  I don't believe we have, no.
21     Q.  Does the Texas NAACP contend that the Texas
22  Legislature intended to harm African American voters by
23  passing SB 14?
24     A.  Yes.
25     Q.  And what's the basis for that, that contention?

131

1      A.  Well, once again, you go back to -- excuse me
2   -- you see the dates that's shown that shows how it's
3   been -- minorities who will be lacking said
4   identification.  If you go back to 2009, when the bill
5   was being debated, there was some insensitive comments
6   that were made about minorities.  If you look at what --
7   that then Representative Brown made about telling Ramey
8   -- or when Ramey Ko was testifying about how IDs could
9   be a problem with Asian Americans, and she made the
10  comments along the line -- and I don't have the direct
11  quote -- but along the line of, you know, "Why don't
12  y'all change your name to something more American."
13         You see that -- you -- you look at when
14  Gary as testifying and saying how, you know, there's
15  other forms and other things you can do to be more
16  inclusive if you want to make it secure.  Even though he
17  didn't have -- have the data presented, but, you know,
18  you can get the data from DPS or whoever before you pick
19  these forms of ID that you did or that they didn't have
20  the data themselves to show that these will be inclusive
21  forms.  These are just going off of, you know, feeling,
22  I guess, or whatever.  You know, they were saying where
23  they don't have, when it comes to minorities, you know,
24  a gun license and passports and driver license and what
25  have you, and that is something that is always -- that

132

1   everybody has.
2          And I think even when they mentioned,
3   well, there will be a free ID to have, and it was said
4   that, well, even getting a free ID, there's still costs
5   to a free ID, and you should really look into, is that
6   going to fix anything, and that kind of fell on deaf
7   ears, where they didn't want to look into costs that are
8   going to be associated even in that process.  When you
9   mention of distance that has to be traveled by people in
10  rural and low income, what have you, areas, or even in
11  urban, even in -- in cities.  If you live in a place
12  that may have public transportation in it, but the city
13  bus drops you off five, six miles from the DPS office.
14  Then you say well, you can take a bus -- take a bus and
15  then catch a cab.  Well, for them, catching the bus was
16  a cost in itself, and the cab money is not going to be
17  there.  And if your birthday is in the summer, in Texas,
18  a six-mile walk is not very pleasant, so.  And then, you
19  know, the six miles back and the time you have to walk
20  get to the bus.  So, I think when you look at instances
21  like that, there is some concern.
22     Q.  So the comments by Representative Brown, were
23  those directed at Asian American voters?
24     A.  Yeah.
25     Q.  Well, Representative Brown, she was not a



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Yannis Banks                                                    May 25, 2012

---

**133**

1   member of the 82nd, the 2011 Legislature, was she?
2     A. She was not, no.
3     Q. So she, obviously, didn't vote on Senate
4   Bill 14?
5     A. Correct.
6     Q. Are you aware of other insensitive comments,
7   like the one made by Representative Brown in 2009, are
8   you aware of any other insensitive comments made in
9   2011?
10    A. Let me think.
11    Q. Yes. Take your time.
12    A. Sure. Sure. At this moment, I can't recall.
13   I'd really have to do some -- it's been a while, so I
14   would have to do some really good thinking to see what I
15   can recall. But right now, at this moment, I can't
16   recall.
17    Q. Do you contend -- does the Texas NAACP contend
18   that the Texas Legislature intended to harm Hispanic
19   voters by passing SB 14?
20    A. Yes.
21    Q. And can you tell me what that contention is
22   based on?
23    A. I think it goes back to -- just to be basically
24   what I just said earlier. A lot of the same issues of
25   what I said in the answer to your previous question, we

---

**134**

1   felt it was in the same way directed towards Hispanic,
2   and it kind of covered, you know, all minorities,
3   because they fall in the same areas. So when we looked
4   at it -- looked at it, it was -- it appeared that way to
5   us.
6    Q. Okay. So if I understand correctly, it's Texas
7   NAACP's contention that -- that the Texas Legislature --
8   well, let me rephrase.
9     So am I correct in understanding that the
10   contention about intentional harm to African American
11   voters and intentional harm to Hispanic voters are based
12   on the same -- the same evidence?
13    A. Yeah. We believe that it was out to harm
14   minorities, and we looked at it as out to harm Minority
15   voters. And if you break it down by the different
16   groups, that we still look at it as it, it was still the
17   same for one would be the same for others, for the most
18   part. And you know, there's probably something I've
19   forgotten that I just don't remember at this moment, but
20   what I said earlier is what I can remember at this time.
21    Q. Are you aware of any fact or any evidence that
22   would indicate a specific intent to harm African
23   American voters?
24    MR. VANDEWALKER: Objection, vague.
25    A. Well, is there any way you can be, I guess a

---

**135**

1   little more --
2    Q. (BY MR. FREDERICK) Of course. Of course.
3    A. -- specific?
4    Q. Are you aware of any facts or evidence that
5   would indicate a specific intent by the Legislature to
6   harm African Americans voters specifically as opposed to
7   all minority voters?
8    MR. VANDEWALKER: Objection, vague.
9    A. Could you ask that question again?
10    Q. (BY MR. FREDERICK) Uh-huh. Are you aware of
11   any evidence that indicates that the Legislature
12   specifically intended to harm African American voters as
13   opposed to all minority voters, as a larger group?
14    A. Not that I'm aware of at this moment.
15    Q. Are you aware of any evidence that would
16   indicate the Legislature specifically intended to harm
17   Hispanic voters as opposed to all minority voters as a
18   group?
19    A. Not that I can recall at this moment.
20    Q. Does the Texas NAACP contend that the Texas
21   Legislature intended to harm Asian American voters by
22   passing SB 14?
23    A. Yes.
24    Q. And what is that contention based on?
25    A. They would also fall into the group of minority

---

**136**

1   voters, and they would fall into the same reasons stated
2   -- stated previously, early on, before.
3    Q. And so I understand, and the reason that you
4   mentioned some -- you mentioned an insensitive comment,
5   but also, I think you talked about minority voters
6   lacking the photo ID. So would that go for African
7   American, Hispanic, and Asian American voters?
8    A. Yes. I think even when you leave room for the
9   people working the polls at the -- the discretion of if
10   your name matches, what have you, especially when it
11   comes to Asian American voters, as I think Ramey was
12   saying, that it could look different than what's on the
13   polls to what's on an ID -- ID card. So it would be
14   issues there.
15    Q. So is it accurate to say that the Texas NAACP
16   contends that SB 14 was passed with a discriminatory
17   purpose because of the effect it will have on minority
18   voters?
19    MR. VANDEWALKER: Objection vague.
20    A. Yeah. Could you be a little --
21    Q. (BY MR. FREDERICK) Of course. So as I
22   understand, the Texas NAACP contends that part of the
23   problem with SB 14 is that it will have an adverse
24   impact on minority voters?
25    A. Well, we believe that the data we -- we

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Yannis Banks                                                           May 25, 2012

137

1    submitted in -- in the letter to the DOJ shows that it
2    will have an adverse impact on minority voters.
3        Q.  Okay.  And my question is:  Other than the --
4    other than its alleged effect on minority voters, is
5    there any other basis for the Texas NAACP's contention
6    that SB 14 was passed with a discriminatory purpose?
7        A.  Ask the question again.
8        Q.  Other than the alleged effect of SB 14 on
9    minority voters, is there any other evidence that the
10   Texas NAACP relies on for its conclusion that the bill
11   was passed with a discriminatory purpose?
12       A.  I think we've looked at -- there were
13   representatives who were in office in 2009 who may have
14   been against the bill being passed, and I think Tommy
15   Merritt was one of them:  And, you know, he voted that
16   way on the sole purpose of not getting that bill done.
17   It was, you know, nothing else but his.  There was some
18   people saying, you know, he didn't do the bill, and he
19   had -- had an opponent.  He lost because of -- of that.
20       I think the Chairman in '09 was Todd
21   Smith, but that he -- and he tried to work out a deal
22   for the bill that, you know, be agreed upon by
23   everybody, for the most part, I think could be a
24   consensus since it was -- since the shape of the House.
25   And I looked at his race and what his opponent was.

138

1    saying and why people were saying it was solely voter ID
2    driven.  It was, this is, yeah, he didn't do what he --
3    what he should have, he had pushed this through, what
4    have you.  So, I think when we look at what people were
5    saying, I guess folks who either were against the bill
6    or they felt like it push it through or ram it down or
7    whatever, we look at those and that brings concern.  I
8    guess we looked at that as being problematic also.
9        Q.  Okay.  So you said Tommy Merritt?
10       A.  I believe his name is Merritt, yes.
11       Q.  Was he a House member?
12       A.  He was a House member.
13       Q.  And he got voted out after the 2009 session?
14       A.  Yes.
15       Q.  And it's your understanding that he was voted
16   out solely on the issue of voter ID?
17       A.  My understanding was that that was the, the
18   contention.  I think he was actually -- he was -- he was
19   not in favor of voter ID, and he was a Republican from
20   West Texas.  I can't remember exactly where he was
21   from.  But what they were pushing against him for was
22   that he wasn't for -- so the voter ID bill that didn't
23   have, I guess, whatever was talked about it could be a
24   better bill.
25       Q.  And so his opponent in the race made voter ID a

139

1    big issue?
2        A.  Yes.
3        Q.  Specifically, I guess, Tommy Merritt's lack of
4    support for it?
5        A.  Right.  And Todd Smith also.
6        Q.  Okay.  Do you know who replaced Tommy Merritt?
7        A.  David Simpson, I believe.
8        Q.  All right.  So is it the Texas NAACP's position
9    that because David Simpson campaigned on voter ID, that
10   SB 14 has a discriminatory purpose?
11           MR. VANDEWALKER:  Objection.
12           MR. FREDERICK:  Shall I restate the
13   question?
14           MR. VANDEWALKER:  You are welcome to
15   restate the question or give --
16       A.  Oh, I didn't know anything was coming after
17   that objection.  I'm sorry.  Could you restate the
18   question?
19       Q.  (BY MR. FREDERICK) Sure.  Is it the Texas
20   NAACP's position that, because David Simpson campaigned
21   against Tommy Merritt on voter ID, that SB 14 was passed
22   with a discriminatory purpose?
23       A.  I wouldn't say that or wouldn't as that -- I'd
24   say when you look at overall, not just David Simpson,
25   and how Todd Smith had a close primary race and that was

140

1    the focus of what he needed the bill that we wanted
2    passed through -- the focus of his primary, primary race
3    that Todd Smith had.  When you -- when you look at how,
4    you know, the focus was, was the bill that, that we felt
5    was a bad bill, and with the makeup the House that year,
6    could have been a better compromise or makeup or it
7    could have looked better, and there was no -- it's what
8    was done, but what -- should have just been 362 when 362
9    wasn't a good bill.  When you look at that -- and I
10   think it was stated then that how that bill, the effect
11   that it would have on minority voters.  You look at
12   that, and then that becomes a concern.
13       Q.  Is it the Texas NAACP's position that any
14   legislator who voted for SB 14 acted with a
15   discriminatory purpose?
16       A.  I would say yes.  Yes.
17       Q.  And why is that?
18       A.  We feel like it's a discriminatory bill, and I
19   think if you see the discriminatory -- how the bill is
20   going to discriminate against somebody or a group of
21   people, you don't vote for it.  So by voting for it, it
22   was --
23       Q.  Is there anything -- is there anything about
24   SB 14, other than the impact that -- that you think it
25   would have on minority voters, is there anything other



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Yannis Banks                                              May 25, 2012

141

1    than that, that makes it a discriminatory bill?
2         MR. VANDEWALKER:  Objection, asked and
3    answered.
4         A.  Would you rephrase the question?
5         Q.  (BY MR. FREDERICK)  Of course.  So is there --
6    is there anything about Senate Bill 14, other than its
7    alleged effect on minority voters, that makes it a
8    discriminatory bill?
9         MR. VANDEWALKER:  Objection, asked and
10   answered.  Mr. Banks just testified for 20 minutes
11   things other than the effect on --
12        MR. FREDERICK:  All right.  Your objection
13   is on the record.  Thank you.
14        A.  Yeah, I would have to go back to, I think,
15   everything we just had discussed would be how -- how we
16   feel about the bill.
17        Q.  (BY MR. FREDERICK)  I'm going to ask the
18   question again, because I -- I mean, with respect to
19   your lawyer, I'm not sure -- I can't say that I remember
20   exactly what was said, so to make sure I've got the
21   record.
22        A.  Sure.  Sure.  Sure.  Sure.
23        Q.  So bear with me for a minute.
24        A.  Not a problem.
25        Q.  So other than the alleged effect that SB 14

142

1    will have on minority voters, what else about SB 14
2    makes it a discriminatory bill in your view?
3         MR. VANDEWALKER:  Objection, asked and
4    answered and misstates prior testimony.
5         A.  Man, I think -- well, I guess I'd word it as
6    what was previously stated, and I'm going to try to, try
7    to explain, I guess, what I was saying, if I can
8    remember everything I was -- was saying.
9         I think when you look at -- at the
10   treatment of -- of those who were against the bill or
11   who they felt that, I guess, it was negotiating, but
12   didn't go far enough or what have you, whatever, in the
13   treatment of -- of those legislators, you look at
14   insensitive comments that were made in previous times,
15   which -- and those comments could be reflective of folks
16   around her or they might have been just reflective of
17   her -- I said the comments she made may have been
18   reflective of others in the Legislature, maybe not just
19   her, and you -- you couple that with what was said
20   earlier, and I think that would make up how we feel.
21        Q.  (BY MR. FREDERICK)  Tell me what -- tell me what
22   you mean by what was said earlier.  Is that --
23        A.  My prior -- ask the question again.  I'm sorry.
24        Q.  Well, you said that with what was said earlier,
25   and by "what was said earlier," do you mean -- do you

143

1    mean the effect of the bill or did you mean the
2    discussion about Tommy Merritt's campaign and --
3         A.  Probably both or the effect of the bill.  Tommy
4    Merritt's campaign, what happened with Representative
5    Smith -- Smith.  And I think that makes to it your
6    original question is what I'm trying to get at with.  So
7    I think that would be it.
8         Q.  Okay.
9         A.  Or what I can recall at this point.
10        Q.  But what I guess what I'm trying to understand,
11   so I understand what you said, you said there -- you
12   know, there's the effect, there are the insensitive
13   comments, and then there's the treatment of the people
14   who were against the bill?
15        A.  Right.
16        Q.  All right.  So I'm trying to understand that
17   third one, the treatment of people who are against the
18   bill.  Now, I mean, as I understand it, what your
19   position is, is that people who -- well, there were
20   certain people who got mad or wanted to, you know, to
21   vote out of office people who didn't support the bill?
22        A.  Right.
23        Q.  So, and as I understand your contention, it's
24   that kind of strong support for the bill that didn't
25   pass in '09, that's part of the reason that you believe

144

1    that it's a discriminatory bill; is that right?
2         A.  Well, yeah.  We look at it as the bill that
3    came out -- I forget the number now -- SB 14, it's more
4    discriminatory than, I think, what was -- was being
5    worked on in '09.
6         Q.  Okay.
7         A.  So when you look at that with got out the
8    people who were stopping the -- the discriminatory bill
9    in '09, and come back with something, I guess, more
10   discriminatory in 2011, SB 14, that leads us to
11   conclusion.
12        Q.  As I understand your testimony, the position is
13   that the people who supported this bill or voted people
14   out because they didn't get it through before, their
15   support is discriminatory because they supported the
16   bill, and the bill was discriminatory; is that right?
17        MR. VANDEWALKER:  Objection, misstates
18   prior testimony.
19        Q.  (BY MR. FREDERICK)  Well, I guess, I'm trying to
20   understand what -- how the support of certain people for
21   a bill is discriminatory apart from the substance of the
22   bill itself, and here's what I'm trying to figure out.
23        A.  Okay.
24        Q.  So I understand that the position is that, you
25   know, this bill is discriminatory because it, you know,



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Yannis Banks                                        May 25, 2012

145

1  because we believe that it will have a negative impact
2  on certain groups.  So I understand that.
3      A.  Got you.
4      Q.  And so I also -- I mean, it sounds like part of
5  the contention too, is, you know, anybody who would
6  support or vote for that bill, you would contend maybe
7  has a discriminatory purpose because the bill is going
8  to have an effect, so if they're voting for that bill,
9  then maybe they intend to effect to occur?  Is that
10  accurate?
11          MR. VANDEWALKER:  Objections, misstates
12  prior testimony.
13      A.  And I'll see if I can say it so you can
14  understand it.
15      Q.  (BY MR. FREDERICK)  Sure.
16      A.  I'll do my best.
17      Q.  Sure.
18      A.  And maybe in my head, I got it, and it's just
19  not coming out.  But, you know, we look at -- at the
20  bill, and show that the bill is discriminatory.  Sorry.
21  Show that the bill is discriminatory, and its effect,
22  and to vote for a discriminatory bill that I think
23  you're -- it's going to have a discriminatory effect.
24      Q.  Okay.  Thank you.  That I think I understand.
25          And I guess what it sounds like to me and

146

1  what I'm just trying to get straight in my own head is,
2  it sounds to me like what you're saying is the reason
3  that -- basically, it sounds like the problem is with
4  the bill, and the only reason that people who voted for
5  it would be thought to be discriminating is because of
6  the effect of the bill.  So I'm just not totally clear
7  on what the support is adding, when the only reason that
8  it would be discriminatory is because of what's in the
9  bill.
10          And so my question -- my question is:  Is
11  there anything in the bill, other than the effect that
12  it's alleged to have, is there anything else that would
13  make supporting that bill discriminatory?
14          MR. VANDEWALKER:  Objection, asked and
15  answered, misstates prior testimony, and is confusing.
16  We've gone over this, this very thing --
17      A.  I am confused.  At this point, I think I'm...
18      Q.  (BY MR. FREDERICK)  I understand.  Well, let me
19  just -- I think we can close it out.  I understand what
20  you're saying.  I think I am being, perhaps, a little
21  confusing.
22          But is there anything, other than the
23  alleged effect of the bill, the insensitive comments,
24  and the political issues that you talked about, about
25  with the primary races and Tommy Merritt.

147

1      A.  Sure.
2      Q.  Anything other than those three things that the
3  Texas NAACP says show that this bill was passed with a
4  discriminatory purpose?
5          MR. VANDEWALKER:  Objection, asked and
6  answered.
7      A.  Can you ask the question again so I can try
8  to --
9      Q.  (BY MR. FREDERICK)  Sure.  So as I understand it
10  --
11      A.  Uh-huh.
12      Q.  -- the contention is that SB 14 was passed with
13  a discriminatory purpose because the allegation is that,
14  one, it will have a discriminatory effect or a negative
15  effect on minority voters.
16      A.  Uh-huh.
17      Q.  Two, there was an insensitive comment in 2009;
18  and three, the treatment of people who were against the
19  bill.  And my only question is:  Is there anything else
20  that Texas NAACP would rely on for its contention that
21  the bill had a discriminatory purpose?
22      A.  Then, I guess, does that include the --
23          MR. VANDEWALKER:  Objection, asked and
24  answered.
25      A.  When you look at data submitted and shows how

148

1  minorities will be less likely to have the ID that's
2  allowed by the bill, and will have the forms of ID,
3  access to what -- availability to get to locations to
4  get the ID or funds that would be required to get the ID
5  or to get the free ID or to get the documents to get the
6  free ID or to get to the locations, I think when you add
7  in all of that, as far as I can remember at this point,
8  I think that would be it.
9      Q.  (BY MR. FREDERICK)  Okay.  Great.  Thank you.
10          Now, you mentioned a minute ago --
11          MR. VANDEWALKER:  I'm sorry.  I'm sorry to
12  interrupt, Mr. Frederick, but it's been -- we've been
13  going a while.  I was wondering if we could --
14          THE WITNESS:  Can we take a break?  I was
15  about to ask him.
16          MR. FREDERICK:  Sure.  Yeah.  Yeah.  Let's
17  take a break.  I don't have a whole lot more, but I'm
18  happy to take a break.  Sure.  Five, ten minutes.
19          MR. VANDEWALKER:  Okay.  Five, ten
20  minutes.  Thank you.
21          (Recess at 3:15 p.m. to 3:30 p.m.)
22      Q.  (BY MR. FREDERICK)  So a few minutes ago, we
23  were talking about an insensitive comment by
24  Representative Betty Brown, and you mentioned that this
25  comment might have been reflective of others in the



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Yannis Banks                                             May 25, 2012

149

1   Legislature?
2       A.   Yes.
3       Q.   What other legislators do you contend that this
4   insensitive comment was reflective of?
5       A.   I -- I couldn't say.  I couldn't say who else
6   it could be reflective of.  But it's just a thought that
7   she could not be -- she may not be the only person
8   thinking that way or ...
9       Q.   But you don't know of anything specific that
10  would indicate that any other legislators were thinking
11  that way?
12      A.   Nothing I can recall right now.
13      Q.   Does the Texas NAACP contend that the
14  Legislature intended to harm poor or indigent people by
15  passing SB 14?
16      A.   Yes.
17      Q.   Okay.  What's the basis for that?
18      A.   I think once you look at -- there were -- and I
19  can't remember all amendments offered.  But, you know,
20  there were amendments offered that would try to make it
21  more accessible and easier on them to be able to vote.
22  Whether it was saying, you know, you need to have the
23  voting locations in better places.  I know during
24  discussion, it was brought up about how the free ID
25  would not be free, when they would have to, you know,

150

1   pay to get the documents needed to get the free ID,
2   because those documents weren't free, and there was no
3   kind of waiver trying to put it before them saying if
4   you meet the financial requirement you can get since
5   you're trying to vote.  I think it was just some of the
6   -- that's coming to head right now, when you look at
7   those things that could have been done to make it easier
8   and have it accessible to your indigent and low income
9   people, there was -- it was brought to their attention.
10      Q.   Does Texas NAACP contend that the Legislature
11  intended to harm young people, young voters in
12  particular, by passing SB 14?
13      A.   Yes.
14      Q.   And what's the basis for that contention?
15      A.   You look at the forms of ID that is offered to
16  be used, and when it's -- I'm next to positive one of
17  the amendments would have had college ID used, because
18  on college campuses, that's what a lot of students have
19  on them all the time anyway, and you have students who
20  come from out of state who are able to vote where they
21  live, and they are not able to vote or -- sorry --
22  students who -- who come from out of state to -- to
23  Texas, and they are eligible to vote in Texas, is what I
24  was trying to say.  My brain just shut down on me for a
25  second.  You know, so when you take away IDs, the form

151

1   of IDs that they would have or normally have and use,
2   and, you know, we look at the college, the cost of
3   college is going up, so to try to put any more burden on
4   -- on them for what they have to pay, that's
5   unnecessary.
6           There has been -- you know, you -- it seems
7   like, you know, every election cycle, there's always
8   something in Waller County that's happening, when it
9   comes to students being able to vote.  Every election
10  cycle.  And I think in Gary's testimony, he -- I can't
11  remember if it was the 2009 testimony or just 2011
12  testimony, but he had mentioned in there about the
13  Prairie View 19, when you had 19 students who were --
14  who I believe the applications were processed down in
15  Waller County, and the Secretary of State and the AG's
16  Office had to step in to get that done.  But here,
17  you're causing another hurdle.  It seems like every
18  year, every election cycle, we always hear of Waller
19  County, Waller County, Waller County, which is -- I say
20  Waller County because that's where Prairie View A&M
21  University is, just to clarify that.
22          So you don't want to have any other
23  obstacle that could be created to -- that would cause a
24  young person to vote, especially, you know, when it
25  comes to African Americans, then you look at the other

152

1   forms of IDs that are offered, the number that African
2   Americans who have, I guess, the higher percentage of --
3   and I'm sounding confusing -- would be college IDs, when
4   it compares, come down to the others.  So when you take
5   away forms that college students would normally have,
6   that's a concern.
7           And I think even when -- it was a couple
8   of months ago, I can't remember if it was a newspaper
9   article or what it was, where there was a Republican
10  Congressman in D.C., you know, and during one of the
11  committee hearings, it was mentioned, they brought up
12  Texas voter ID, and it was mentioned how -- he made a
13  comment, they mentioned, "What do you think that they
14  can't use college ID?"  He said, "Of course you can use
15  college ID.  I'm sure it's in the bill.  I've seen it."
16  And one of his colleagues read to him, "No, you can't."
17  He said, "No, I know it's there."  And when they read it
18  to him, it then became, "oh, well, I don't think they
19  would do that, but I'm pretty sure I read it, and now
20  I'll read it and find it."  So you have others of the
21  party that said they should pass the bill, push the
22  bill, you know, saying that college ID should be there,
23  I think we get a concern.
24      Q.   Does the Texas NAACP contend that the Texas
25  legislature intended to harm elderly people by passing



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Yannis Banks                                              May 25, 2012

153

1  SB 14?
2    A.  Yes.
3    Q.  Can you explain the basis of that contention?
4    A.  Sure.  Well, once again, you -- you look at --
5  you have elderly who -- who may not be driving anymore
6  and haven't been driving for a while, so they've let
7  their ID lapse, and, you know, they may not have an ID
8  because they're taken care of by family or what have you
9  or whatever.  So they may not have the ID or the ID may
10  have lapsed, so now when it's time to get, go and get an
11  ID, documents even necessary to produce to get the ID,
12  they may not have.  When it comes to if you had a
13  midwife birth, or, you know, your birth certificate
14  could be long lost and gone or, you know, anything, and
15  the hospital where you were born could -- especially if
16  you were born, you know, in maybe in one of the rural
17  areas or what have you, may no longer be operational and
18  hasn't been for a while and you can't get, you know, the
19  necessary documents to get the ID, you know, that's a
20  concern also.
21    Q.  Is there anything other than that, that leads
22  you to believe that the Legislature intended to harm
23  elderly people with SB 14?
24    A.  At the moment, that's all I can recall.
25    Q.  Does Texas NAACP contend that the Legislature

154

1  intended to harm rural voters by passing SB 14?
2    A.  Yes.
3    Q.  Can you explain the basis for that contention?
4    A.  Sure.  There were -- there was amendments
5  offered that would -- that would say that, you know, you
6  would need to have a DPS office in every county, so if I
7  live in one county, I don't have -- have this great area
8  to travel to get what I need to vote.  And we're saying
9  we want to have, make that required.  That's to help
10  them out so they can, you know, have access to get to a
11  DPS office to get their IDs.  Those amendments were --
12  or it may have been just one, I can't remember how many,
13  but the amendment was, you know, voted down.
14       I think there still could be, you know, a
15  cost, the cost of -- of having to get to -- to
16  locations, the cost of having to get documents needed to
17  get the IDs as well, that could be -- that's a factor as
18  well, when you're looking to whatever the burden you are
19  putting on them in that aspect.
20    Q.  Is there anything else that you would point to,
21  to support the contention that the Legislature intended
22  to harm rural voters with SB 14?
23    A.  At the moment, that's -- that's all I can
24  remember at -- at the moment.
25    Q.  Does the Texas NAACP contend that the Texas

155

1  Legislature intended to harm urban voters by passing SB
2  14?
3    A.  Yes.
4    Q.  Can you explain the basis for that contention?
5    A.  Sure.  Once again, there were amendments that
6  were recommended -- or amendments made, I should say,
7  sorry -- that would say, you know, you need to have more
8  locations even in some of your rural cities, I can think
9  of, like Houston.  You know, the DPS offices that you
10  will in Houston may not be in every -- I mean, Houston's
11  a big city.  It takes an hour to go from one half -- to
12  one side to the other side.  So you can live in Houston,
13  and you can use the public transportation and still be
14  far away from a DPS office.  So that amendment was --
15  was made.
16       They can still have the costs would be
17  there for them as well.  The cost, that could be a
18  burden on them if they live in the inner city, and the
19  money that they have is kind of budgeted already for
20  what they need, and they wouldn't have the extra money
21  for -- to get documents or to get a new ID or what have
22  you, whatever.  That could be -- that -- that was a
23  concern of ours.  When you -- and you look how, you
24  know, there was amendments made for that as well -- as
25  well, that were stricken down, and you would -- at the

156

1  moment, that's all I can think of at the moment.
2    Q.  Those are all the questions that I have.
3       Before we go off the record, are there any
4  answers that you want to supplement or change from
5  earlier?
6    A.  Can I have a minute?
7    Q.  Oh, of course.  Take your time.
8    A.  Thank you.
9    Q.  And I don't mean to suggest that you should
10  change any.  I just want to give you the chance.
11    A.  Right.  Okay.  I think I'm okay.
12       MR. FREDERICK:  All right.  Well, thank
13  you very much for your time today.  I appreciate it.
14       MR. VANDEWALKER:  If I could just -- the
15  defendant intervenors have a few questions on redirect.
16       MR. FREDERICK:  Okay.
17       EXAMINATION
18  BY MR. VANDEWALKER:
19    Q.  Mr. Banks, do you remember the Legislature
20  supported SB 14 talking about --
21       THE REPORTER:  I'm sorry.
22       MR. VANDEWALKER:  Let me try to take it
23  off speaker phone.  Is that better?
24       THE REPORTER:  That's much better.
25       MR. VANDEWALKER:  Okay.  Great.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Yannis Banks                                                          May 25, 2012

<table>
<tr><td>

**157**

1   Q.  (By Mr. Vandewalker) So my question is:
2   Mr. Banks, do you remember the justification that the
3   legislators who supported SB 14 offering why did they
4   think it was a good bill?
5   A.  They felt that -- from what I can recall, they
6   thought it was a -- that everybody would have -- access
7   would be there, and they said that there was -- you
8   know, they need to have protection from voter fraud.
9   But when you look at the data that has been produced,
10  voter fraud is not rampant or widespread throughout the
11  state.  There's been -- we haven't seen any cases that
12  -- that's showing there is voter fraud or a need for a
13  voter ID bill.
14  Q.  So just so I can understand, are you expressing
15  doubt that voter fraud is the real reason that SB 14 was
16  enacted?
17  A.  Yes.  I think there hasn't been any evidence
18  shown or proven or otherwise that there is a voter fraud
19  issue in Texas.
20  Q.  Thank you.  And you talked a lot about -- or
21  you talked some about amendments that were offered to SB
22  4 but were rejected, and I believe you said that you
23  think that some of those amendments would have decreased
24  the discriminatory effect on various populations?
25  A.  Yes.

</td><td>

**159**

1   Justice said that the information was insufficient,
2   because it wouldn't show the effects that it would have
3   on the minority population with the data that Texas was
4   able to -- that Texas sent them.
5   Q.  Do you know what the data that Texas submitted
6   did show?
7   A.  I think it -- they sent them the Spanish
8   surname, which would give information about -- it was --
9   it would be limited information of those that just have
10  a Spanish surname, but they can tell they have IDs, but
11  it would not be reflective of African American, Asian,
12  and other communities, and low income communities if
13  they are able to have an ID or not.
14  Q.  And do you recall what the data showed about
15  people with Spanish surnames?
16  A.  It showed that some did have voter ID, but if I
17  remember correctly, and I know it's not a letter, I
18  think there was a larger number of those where they
19  could tell they didn't have a voter ID, or didn't have a
20  government ID.
21  Q.  Do you remember if the rate that Hispanic
22  residents of Texas didn't have a photo ID was more or
23  less than other racial groups?
24  A.  It was less than Anglo.  I think when it came
25  to -- there definitely was disparity between the

</td></tr>
<tr><td>

**158**

1   Q.  Do you think that's also true of African
2   Americans?
3   A.  Yeah.  I think the amendments that were offered
4   would have decreased the discriminatory effect against
5   African Americans.
6   Q.  Thank you.  And do you recall if in passing
7   SB 14, the Legislature changed any of its own rules?
8   A.  Yes, they did.  On the Senate side, they
9   suspended the two-third rule, which two-third votes is
10  needed to bring a bill up on the floor to have floor
11  debate.  They suspended that, that rule and had the
12  debate as the Committee as a Whole on the House -- on
13  the Senate floor.
14  Q.  Thank you.  And do you recall any members of
15  other minority groups testifying about the
16  discriminatory effects that SB 14 might have?
17  A.  Yes.  MALDEF testified of discriminatory
18  effects it would have on Hispanics and minorities.  I do
19  believe the League of Women Voters did, as well as the
20  ACLU.
21  Q.  Thank you.  Do you know whether or not Texas
22  tried to convince the U.S. Department of Justice to
23  allow it to enforce SB 14?
24  A.  Yes.  They did submit information to the
25  Department of Justice, but I believe the Department of

</td><td>

**160**

1   Hispanic surname and the Anglo group, and I think it was
2   able to show that there was a disparity with -- between
3   Anglos and Hispanic groups.
4   Q.  And turning to the concealed handgun license,
5   the data about people who have concealed handgun
6   licenses, do you know anything about the relative
7   proportion of different races within -- I'm sorry,
8   strike that.
9       Do you know anything about the relative
10  proportion of different racial minorities having
11  concealed handgun licenses?
12  A.  Somewhat, yes.  I believe the data that they
13  also submitted showed that African Americans and other
14  minorities are at least likely to have concealed handgun
15  licenses then when compared to Anglos.
16  Q.  Thank you.  Do you know, is SB 14 currently in
17  effect right now?
18  A.  It is not, no.
19  Q.  If SB 14 goes into effect, will the NAACP have
20  to change its programming or activities?
21  A.  We will have to make some adjustments, yes.  We
22  would -- we would definitely need to get our members and
23  constituents informed of what the new law entails.  And
24  so we'll have to use our resources or divert resources
25  that would be used for other things to inform others,

</td></tr>
</table>



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Yannis Banks                                                    May 25, 2012

161

1    and to whatever extent that we could, to -- to help
2    people got to what -- get what they need to be able to
3    vote as well. So it could have an impact on us.
4        Q. When you say get what they need to be able to
5    vote, what do you mean?
6        A. Well, one, we would have to give them the
7    information so they know; you know, which IDs they would
8    need, or it may be having to try to help some of the,
9    you know, elderly, try to track down, if they can, what
10   they need, if not, help them in other ways. Or if it's
11   -- our branches may try to do shuttles or, you know, try
12   to help out some of the people who will be affected, and
13   that would take away resources that they could use
14   implement to help people in other ways would have to be
15   diverted, whether it's doing shuttle services or things
16   of that nature.
17       Q. So if the Texas NAACP has to actually do those
18   kinds of things, do you think you'll find members and
19   constituents who don't have the ID and need those kinds
20   of services.
21       A. I would think so. I think, as of right now,
22   with this not being in force and people are knowing you
23   can vote as you normally do, there's no concern about
24   it. I think once -- or if it becomes enforced, I think
25   more people would come forward and be worried and

162

1    concerned that they cannot vote because they are not
2    able to get -- or able to obtain the necessary forms of
3    identification.
4        MR. VANDEWALKER: Thank you. We have no
5    further questions.
6        MR. FREDERICK: Reserve further questions.
7        MR. VANDEWALKER: We would like to review
8    and sign the transcript. And could the court reporter
9    give us a reading on the time, since this has only been
10   part of this 30(b)(6) deposition.
11       (Signature reserved.)
12       (Deposition concluded at 3:52 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

163

1    CHANGES AND SIGNATURE
2        RE: TEXAS VS. HOLDER, ET AL.
3    PAGE LINE CHANGE        REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20       I, YANNIS BANKS, have read the foregoing deposition
21   and hereby affix my signature that same is true and
22   correct, except as noted above.
23
24       _____
25              YANNIS BANKS

164

1    THE STATE OF _____)
2    COUNTY OF _____)
3
4        Before me, _____, on this day
5    personally appeared YANNIS BANKS, known to me (or proved
6    to me under oath or through _____
7    (description of identity card or other document) to be
8    the person whose name is subscribed to the foregoing
9    instrument and acknowledged to me that they executed the
10   same for the purposes and consideration therein
11   expressed.
12       Given under my hand and seal of office
13   this _____ day of _____, 2012.
14
15
16
17       _____
18       NOTARY PUBLIC IN AND FOR
19       THE STATE OF _____
20
21
22
23
24
25



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Yannis Banks                                                    May 25, 2012

165

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
 2
    STATE OF TEXAS,            )
 3
           Plaintiff,          )
 4
    VS.                        )
 5                             )
    ERIC H. HOLDER, JR. in his )
 6  official capacity as Attorney )
    General of the United States, )
 7                             )
           Defendant,          )
 8                             )
    ERIC KENNIE, et al,        )
 9                             )
           Defendant-Intervenors,  )
10
    TEXAS STATE CONFERENCE OF  )  CASE NO. 1:12-CV-0128
11  NAACP BRANCHES,            )  (RMC-DST-RLW)
                               )  Three-Judge Court
12         Defendant-Intervenors,  )
                               )
13  TEXAS LEAGUE OF YOUNG VOTERS )
    EDUCATION FUND, et al,     )
14                             )
           Defendant-Intervenors,  )
15                             )
    TEXAS LEGISLATIVE BLACK    )
16  CAUCUS, et al,             )
                               )
17         Defendant-Intervenors,  )
                               )
18  VICTORIA RODRIGUEZ, et al., )
                               )
19         Defendant-Intervenors  )
20              REPORTERS CERTIFICATION
                DEPOSITION OF YANNIS BANKS
21                  MAY 25, 2012
22       I, Chris Carpenter, Certified Shorthand Reporter in
23  and for the State of Texas, hereby certify to the
24  following:
25       That the witness, YANNIS BANKS, was duly sworn by
```

166

```
 1  the officer and that the transcript of the oral
 2  deposition is a true record of the testimony given by
 3  the witness;
 4       That the deposition transcript was submitted on the
 5  _____ day of _____, 2012, to the witness or to the
 6  attorney for the witness for examination, signature and
 7  return to _____, by
 8  _____, 2012; and if returned, the original
 9  transcript will forwarded to Matthew Frederick, the
10  custodial attorney;
11       That the amount of time used by each party at the
12  deposition is as follows:
13       Mr. Frederick: 4 hours, 49 minutes
14       Mr. Vandewalker: 10 minutes
15       I further certify that I am neither counsel for,
16  related to, nor employed by any of the parties or
17  attorneys in the action in which this proceeding was
18  taken, and further that I am not financially or
19  otherwise interested in the outcome of the action.
20       Certified to by me this 28th day of May, 2012.
21
22  _____
          Chris Carpenter, Texas CSR 1151
23          Expiration Date: 12/31/2012
            100 Congress Avenue, Suite 2000
24          Austin, TX  78701
            (512)328-5557
25  Firm Registration No. 283
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com