UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| MARC VEASEY, *et al.*, | | |
| Plaintiffs, | | |
| v. | | Civil Action No. 2:13-cv-193 (NGR) |
| RICK PERRY, *et al.*, | | |
| Defendants | | |
| UNITED STATES OF AMERICA | | |
| Plaintiff, | | |
| TEXAS LEAGUE OF YOUNG VOTERS EDUCATION FUND, *et al.*, | | |
| Plaintiff-Intervenors, | | |
| TEXAS ASSOCIATION OF HISPANIC COUNTY JUDGES AND COUNTY COMMISSIONERS, *et al.*, | | Civil Action No. 2:13-cv-263 (NGR) |
| Plaintiff-Intervenors, | | |
| v. | | |
| STATE OF TEXAS, *et al.*, | | |
| Defendants, | | |
| TRUE THE VOTE | | |
| Movant-Intervenor. | | |

REPORT AND DECLARATION OF T. RANSOM CORNISH   Page 1



EXHIBIT
1
T. Cornish

2:13-cv-193
09/02/2014
DEF0233

## DECLARATION OF T. RANSOM CORNISH

Pursuant to 28 U.S.C. §1746, I, T. Ransom Cornish, J.D, C.P.A, declare that:

My name is T. Ransom Cornish. I am an expert witness designated by Plaintiffs in the above referenced case now pending in the United States District Court for the Southern District of Texas Corpus Christi Division.

I hold a B.B.A. in Accounting from the University of Houston and a Doctor of Jurisprudence from the University of Houston. I became a Certified Public Accountant in 1979. A true and correct copy of my resume is attached hereto as Exhibit "B" as a part of my report. Attached hereto as Exhibit "C" is a listing of those cases in which I have been designated as an expert. The following report, a true and correct copy of which is attached as Exhibit "A" and incorporated herein for all purposes, is a general review of evidence relevant to this case and my opinions and conclusions.

I declare under penalty of perjury that the foregoing is true and correct.

This the 26TH day of June 2014.

T. Ransom Cornish, J.D., C.P.A.

## EXHIBIT "A"

## REPORT OF T. RANSOM CORNISH

I hold a B.B.A. in Accounting from the University of Houston and a Doctor of Jurisprudence from the University of Houston. I became a Certified Public Accountant in 1979. A true and correct copy of my resume, which describes my qualifications, is attached hereto as Exhibit "B" and incorporated herein for all purposes.

I have authored no publications within the last ten (10) years.

My compensation for study and testimony in this case is $225.00 per hour plus reimbursement of expenses. I have received a retainer in the amount of $15,000.00 for my services. To date I have spent 58.25 hours on this case. This report contains my opinions, the basis and reasons for them, the facts and data considered by me and exhibits used to summarize or support my opinions. I reserve the right to review additional information, exhibits, depositions or documents as they become available.

I have been designated as an expert witness in other cases. A list of such cases is attached hereto as Exhibit C. I have noted the cases where I have given my deposition.

The data and other information considered by me in forming my opinions are as follows:

(1)    Pleadings of the parties;

(2)    Information received from the following Texas counties: Collin, El Paso, Lubbock, Nueces, Hidalgo, Montgomery, Brazoria, Jefferson, Galveston, Baxer, Fort Bend, Travis, Harris, Tarrant, Denton, and Dallas.

(3)    Deposition testimony of Keith Ingram.

REPORT AND DECLARATION OF T. RANSOM CORNISH - Page 3

(4)     Deposition testimony of Joe Peters.

(5)     TEX_00007419   00007429.

(6)     PDF copies of provisional ballots received from Collin County.

(7)     PDF copies of provisional ballots received from Harris County.

(8)     Information available from Georgia Secretary of State.

(9)     Article "Lessons from the Voter ID Experience in Georgia" By Hans A. von Spakovsky.

(10)    J. Grious discovery responses provided by the State of Texas.

(11)    State of Texas issued Request for Proposal Number 12111 TEX_00312556 00312559.

(12)    Burson-Marsteller (B-M) submission in response RFP 12111.

(13)    Burson-Marsteller 2012 General Election Wrap Up Report.

(14)    State of Texas Fiscal Note of May 11, 2011.

(15)    Senate hearing testimony of Ms. Ann McGeehan.

(16)    Proposed Activity Plan of B-M Schedule D

Although others directed my attention to particular evidence in some instances, I have made my own judgment about the significance of any particular evidence that I have reviewed and I have confirmed information that I relied upon in records or depositions. I understand discovery is ongoing. There are also deposition transcripts which are not yet available to me. I reserve the right to amend, expand, adjust or withdraw any of my opinions herein upon review of new documents, depositions or information.

REPORT AND DECLARATION OF L. RANSOM CORNISH - Page 4

It should be noted that often times the information provided by the state, through depositions and discovery, was sparse and sometimes contradictory.

I have attached hereto some of the documentation I reviewed that assisted me in forming the conclusion and opinions contained herein;

(1)     TKO review and scope of work related to Fall 2013 Voter Education Campaign based on emergency requisition.

(2)     Documents which indicate the cost of the mobile EIC units and their weekly operating costs

(3)     Deposition testimony of Keith Ingram dated April 23, 2014, selected pages

(4)     Information related to cost of cameras in the State of South Carolina.

(5)     E-mails relating to the efforts taken by the State of Texas to provide answers to Bloomberg News inquire relating to issuance of EIC's by DPS.

(6)     DPS Government Relations Action Sheet dated July 17, 2013.

(7)     Documentation related to State of Georgia and that State's implementation of voter education.

(8)     Invoices of TKO related to Fall 2013 Voter Education Campaign.

(9)     Initial request for proposal issued by State of Texas for 2012 Voter Education Campaign for $3,000,000.

(10)    E-mail from Robert Bodisch to MacGregor Stephenson and replies.

(11)    State of Georgia Secretary of State Brian P. Kemp's power point presentation.

(12)    State of Texas Fiscal Note related to SB14.

(13)    Analysis made by Keith Ingram of the 2013 and 2014 Voter Education Campaigns and a synopsis of the planed 2014 Phase II Campaign.

(14)    Recap of the Media/Public Outreach program of the DPS related to the issuance of EIC from August 2012 to May of 2014.

(15)    Transcript of the Proceedings before the Senate of the State of Texas 82 legislature January 25, 2011. Testimony of Ann McGeehan, Director of Elections, Secretary of State. Selected Pages.

I was retained to review and analyze issues related to the number of provisional ballots cast in the State of Texas and the various fiscal considerations related to the moneys promised, budgeted allocated and/or spent on outreach education and implementation of the new voter photo ID law by the State of Texas. Because the State of Texas did not collect statewide data on provisional ballots, and because I was only able to obtain data for a small number of counties, I present only limited findings on the provisional ballot issues. The bulk of this report therefore focuses on the second issue: the comparison between the money promised/budgeted and the money actually spent.

In addition to the analysis and conclusions described below, I intend to describe in my testimony at trial, the various events and monetary transactions of which I am aware. The source for these events and transactions are the document production, depositions and publicly available documents and information.

### Summary of My Analysis and Conclusion

Overall it is my opinion that the State of Texas has failed to effectively budget, allocate and spend sufficient money for voter education outreach and registration. Furthermore, it is clear that the state did not spend all of the money it promised to allocate

REPORT AND DECLARATION OF T. RANSOM CORNISH  Page 6

and it is further my opinion that the state did not work effectively with the counties to assist them in educational outreach and registration issues.

The State of Texas failed to perform any meaningful analysis of the effect of the little amount of spending which has done to educate voters regarding the need for a proper photo ID. It appears that the resources which the State had were spent on ferreting the Secretary of State across Texas to events which had dubious results. The State did not perform any analysis of the results of the significant amount of money wasted in 2012. In addition, no information was noted which detailed the actual number of provisional ballots, not was there a determination as to why such ballots occurred.

Even though the State of Texas had in excess of $46 million of HAVA fund to use after initial capital costs, no amounts of such funds have been spent on voter education after the State began the Photo ID requirement.

**II. Education and Outreach from 2011 to the Present**

In SB 14, the legislature explicitly mandated that the Secretary of State conduct a statewide education campaign on voter ID. Specifically, the statute provided that "The secretary of state shall conduct a statewide effort to educate voters regarding the identification requirements for voting prescribed by Chapter 63." Several other requirements, such as the posting of notices about voter ID requirements on county websites, were also included in the bill. The legislative documents and transcripts suggest that the legislature understood that at least $2 million would be spent on voter education related to photo ID, but the post-enactment implementation shows that far less has actually been spent."

REPORT AND DECLARATION OF L. RANSOM CORNISH - Page 7

## A.  The Funding Promised for Voter Education and Outreach

When the legislature considered SB 14 in 2011, the estimated Two-Year Net Impact to the general revenue related funds was set at $2,024,000.  Prior to passing the legislation, Ann McGeehan, Director of Elections in the Texas Secretary of State's Office, provided testimony regarding several aspects of funding for SB14.   The first issue which Ms. McGeehan gave testimony regarding was related to historical funding of voter education programs. She stated that in each of the three prior election cycles, the State of Texas had used approximately $3,000,000 in each election for "voter education programs, one in 2006, one in 2008, and one in 2010" all using HAVA Federal funds. (Transcript of the Proceedings before the Senate of the State of Texas 82 legislature January 25, 2011 Page 436, 437)

Next Ms. McGeehan testified about the amount of HAVA Federal funds which the State had been allocated and the use of those funds.  The State of Texas was allocated $224,092,477 pursuant to the Help America Vote Act which was passed in 2002.  Ms. McGeehan indicated that, as of the date of the hearing, the State of Texas had spent approximately $177,798,448 of the allocation.  As such, the State still had $46,294,029 HAVA funds remaining. Ms. McGeehan testified that, of the $177,798,488, the State of Texas had spent $9,500,000 on voter education, or about 5.3% of the total between 2006 and 2010.

Ms. McGeehan further testified that, of the $46 million that remained available to the State, about $24 million was to be used for grants to counties for additional voting

equipment. That of the remaining funds, about $5 to $7 million would go for voter education, election official training, and poll worker training.

Ms McGeehan clearly indicated that if the $2 million voter education program (reflected in the Fiscal Note attached to SB14) was added to a planned fourth $3 million historical (each election cycle) voter education program (HAVA) then "you've got a $5 Million program." Transcript of the Proceedings before the Senate of the State of Texas 82 legislature January 25, 2011 Page 448) Ms. McGeehan expressed concern that if the State actually used $5 million and not the normal $3 million to do a general voter education plan (HAVA) and also spent the $2 million that the State allocated then "that might use it up."

Surprisingly Ms McGeehan stated that the State had never appropriated state funds to educate voters. What is of note is that according to the testimony of Keith Ingram, HAVA funds could not be used for education specifically related to photo ID issues but was required to be used for general voter education.

The Secretary of State representative stated in her testimony that the determination of the $2 million fiscal note on the bill was not the result of any analysis or investigation as to the actual need for voter education but was more of a result of the number being consistent with the fiscal note used in the previous legislative session of $2 million.

B. The 2012 Voter Education Campaign

After passage of SB14 in 2011, the State of Texas issued Request for Proposal (RFP) Number 12111 in anticipation of the State's implementation of SB14, including the voter education program called for in the statute. The purpose of the RFP was to educate and train Texans on the voting and election process in Texas. The RFP indicated that the education

campaign should focus but not be limited on four areas: (1) how to register to vote; (2) how to comply with the photo identification requirements; (3) how polling place processes work; and (4) how to properly cast a ballot. The term of the contract was from January 4, 2012 (project start date) to January 31, 2013.  The information provided relating to this RFP indicated that the winning bidder was Burson-Marsteller (B-M) with a total contract price of $3,000,000 maximum.

There were various specific requirements the RFP contained relating to proposal format.  One specific requirement was section 3.4, was that a Proposed Activity Plan which was to be attached to any proposal as an Attachment D.  Such was to contain a timeline of the major tasks to be performed by the proposer was to indicate the proposed tasks and activities envisioned by the proposer.   As such, B-M provided attachment D(attached as Exhibit 16) to their proposal, which in part allocated the estimated $3 million budget among various events tasks and activities.  The proposal did not allocate specific dollar amounts to voter education regarding the photo ID requirements.

A review of the 2012 General Election Wrap Up Report provides detail for the activities promoted by B-M from January of 2012 through November of 2012. The events, activities and media placement all were related to the general election which occurred in November 2012.  None of the information provided by B-M indicated that Voter Photo ID information was included in their advertising campaign.  Of the 3 million dollars spent, no amount was used to provide education or voter awareness regarding the specific requirement of a photo ID.  This was necessary because the State of Texas, after passing SB 14 in 2011, was required under the Voting Rights Act to submit election changes for approval to the

Department of Justice or a three judge court for the U.S. District Court of D.C. Texas initially sought preclearance for SB 14 from the Department of Justice but, before the Department reached a final decision, Texas sought preclearance from the district court. That case was filed in January 2012 and did not conclude until August 30, 2012. That court ultimately denied preclearance (as did the Department of Justice in March 2012) so the law did not go into effect. This appears to be why voter ID was not included in the 2012 education campaign.

C. The State's Actual Voter Education Campaigns

The actual education campaign related to photo ID was divided into three separate campaign phases.

i.      The Fall 2013 Campaign

The first piece of the state's education campaign on photo ID was the Fall 2013 Voter Education Campaign, which budgeted $400,000 (all non-HAVA money, See Exhibit 13-3). The efforts of that campaign are detailed on a summary that was prepared by Keith Ingram, TEX0524736. That program began in September of 2013 and was funded pursuant to an emergency contract with TKO advertising. Testimony given by Keith Ingram, the Director of Elections, was that this campaign was focused on photo ID issues and that all such funds were used for education related to the photo ID requirements. This was the only paid advertising performed before the November 2013 election. Pursuant to TEX00306416 the Secretary of State prepared an analysis of the fall 2013 voter education campaign. It appears that the initial advertising began on September 23, 2013. However there were several elections starting in August of 2013. None of the Fall 2013 Education Campaign did not occur in time

to educate those voters who voted in those smaller elections. This is confirmed by the billings which were submitted by TKO, the contractor hired on an emergency basis to head up the campaign. The first invoice tendered by TKO which indicated any media were for the weeks of 9/16, 9/23, and 9/30 of 2013.

An analysis of the advertising strategy utilized by the State indicated that a significant effort was made to obtain earned media. This strategy was a part of the B-M contract which was discussed earlier. Such efforts during the Fall 2013 Campaign were supposed to result in awareness of the photo ID issue. Earned media was expected after issuing various press releases and after sending letters to elected officials requesting that they issue such statements at the local level. However, there was very little follow-up to see if these earned media strategies worked (i.e. whether any elected officials sent out the press releases, whether newspapers printed the information, whether these methods were effective.

Counties

ii.     The Primary 2014 Campaign

The second piece of the state's campaign was the 2014 Voter Education Campaign Phase 1 – which included about $400,000 (HAVA funds). The efforts of that campaign are detailed on a summary that was prepared by Keith Ingram TEX0524659. Testimony given by Keith Ingram was that such funds were not specifically used on photo ID issues but that all of the advertising mentioned photo ID. No information has been provided to indicate the allocation between the various segments.

iii     The General 2014 Campaign

The third education program is the 2014 Voter Education Campaign Phase II. The testimony of Keith Ingram was that $1.675 million of the SB 14 fiscal note was allocated in a second contract with Burson Marsteller (B-M). A review and analysis of the production by the State of Texas contains no document which indicates that a contract has actually been signed nor has any invoice of Burson Marsteller been noted. (Deposition of Keith Ingram page 345, 346) The difference between the asserted $1.675 million dollar contract and the 2011 Fiscal Note for over 2 million dollars of spending, or about $400,000, has been held back for the Mobile EIC units according to Keith Ingram.

Given that none of the 3 million dollars in the 2012 campaign could be used for voter education of the requirements of presenting a photo ID, the State has spent or will shortly spend less than $800,000 on voter education. Of this amount, only the phase I $400,000 (non-HAVA) which was spent between September 2013 and November 2013 was used specifically for photo ID education, as opposed to general voter education that includes information on topics such as how to register to vote and how to locate polling places. The remaining $400,000 is budgeted to be spent in 2014, however no information was noted as the amount actually spent as of the date of this report.

No information was produced which detailed the actual allocation of such spending between photo ID education and general voter advertising. In fact, testimony was that the remaining $300,000 to $400,000 was reserved for use on the mobile EIC unit program. However no information was provided which disclosed where the approximately $400,000

for the mobile EIC units comes from.  It appears that such funds have already been spent on the Phase I Primary Campaign.

D.  The Effectiveness of the State's Education Campaign

It appears that the State has made no effort during the elections since June 2013 to gather specific information regarding the effectiveness of any advertising campaign that was performed even though the original fiscal note for SB 14 indicated that $500,000 would be used to "research and develop ways to inform the public of the new identification requirements"  The B-M 2012 General Election Wrap-Up Report contained no evaluation as the effectiveness of any of the various advertising strategies but only detailed the number and timing of such.

This is also so, even though the 2012 RFP reflected an intention to conduct surveys and other research methods to assess the effectiveness of certain messages and the actual campaign.  For instance, the B-M proposed activity plan in 2012 contained in its second section the required "Opinion Research and Awareness Tracking" portion of the plan.  Such is best evaluated by noting herein the specific recommendation of B-M.  Their plan stated;

> "Initially, we propose to use Penn, Schoen Berland's Program Impact method to track awareness and impact of our efforts at several points; benchmark wave prior to Phase I, mid-wave at the conclusion of Phase I and post-wave at the conclusion of Phase II.  The tracking polls will be designed to measure KPI's for the program and to specifically track awareness, perceptions of and receptivity toward the new voter ID law throughout the course of the program.  This will help us to understand whether the program is having the desired impact, and to inform course corrections to our efforts as necessary."

REPORT AND DECLARATION OF T. RANSOM CORNISH  Page 14

The B-M proposal indicated that 500 respondents from across the state were to be polled.  A review of the B-M 2012 General Election Wrap-Up Report did not indicate that the tracking polls were performed, nor did it indicate why such polls were not performed.  The amounts which have been spent on advertising by the State of Texas were not entirely focused on issues surrounding photo ID requirement.  The majority of the funds spent have been Federal HAVA funds, which limits the ability to focus the adverting on photo ID.  The state's fiscal note indicated that $2 million would be used on *photo* ID education, but instead, only $400,000 has been spent on photo ID education and none has been spent on general voter education.

E.  Comparisons to Other States

Texas has spent substantially less money than other states on education about photo ID.  In Minnesota, for example, the state has spent and/or budgeted $4,805,000 for the years 2012-2015. (Minnesota Management and Budget, "Consolidated Fiscal Note – 2011-12 Session," Bill#S0509-4E) The state has a registered voter population of about 3,900,000 (**http://www.sos.state.mn.us/Modules/ShowDocument.aspx?documentid=9232**).  Therefore, the state spent $1.23 per registered voter or $.31 per voter per year.  Texas, by comparison, has spent approximately $800,000 on voter education in the first year of implementation (June 2013-June 2014).  The state has about16,000,000 registered voters.  Texas has therefore spent a mere $.05 per registered voter.

Georgia's initial voter education campaign took place from September 2007 to November 2008.  Georgia conducted a statewide, multimedia education campaign that

included sending out over 5 million pieces of direct mail and utility bill inserts to individual voters, as well as 633 packages of 57,000 brochures and other materials to chambers of commerce, churches, libraries, and other nongovernment organizations all over the state. This also included automated reminder phone calls, video and radio public service announcements and press releases.

**III. Efforts to Ensure Voters Have the Necessary ID**

Of the seven approved forms of photo ID, four are issued by the Texas Department of Public Safety (DPS): Texas driver's licenses, Texas personal ID cards, Texas concealed handgun licenses, and the Election Identification Certificate (EIC). Of the 254 counties in Texas, DPS does not operate driver's license offices in 78. This appears to be largely the result of significant closures since 2008.[1]  Even within counties that have DPS driver's license offices, those offices may be far from population centers and difficult to reach via public transportation.

To assist voters that may not have an acceptable form of identification, the State devised a scheme to construct mobile EIC units which could be ferried around the State to visit rural counties which did not have a DPS office and to Zip codes which had a perceived need due to large numbers of voters who could not be matched to DPS ID records.

In June or July 2013, the State began the planning and implementation of a mobile EIC program. It appears the plan began operations in mid-September. As late as March 19, 2014, there were 18 counties that did not have permanent EIC capability. Such lack of

---

[1] In an answer to a Bloomberg News inquiry regarding DPS offices, the State of Texas noted that since 2008 a total of 86 offices, mostly part-time, low volume offices have closed.

REPORT AND DECLARATION OF L. RANSOM CORNISH - Page 16

interest appears to be related to the unwillingness to fund the cost of establishing and maintaining the capability. TEX0525002.

Of significance is the comparison between the State of Texas and the State of Georgia. During the nine month period between June 26, 2013 and March 19, 2014 the State of Texas had only issued 245 Election Identification Certificates. TEX 0525002.  In comparison, the State of Georgia issued 6,411 Voter Identification Cards during 2006 and 2007. (Exhibit 7-3) Assuming that this represented a full 24 months, such indicates that the state was issuing 267 certificates per month. The State of Texas is issuing certificates at an approximate rate of 30 per month.

Initially, 25 mobile EIC units were established for the Secretary of State's Office to use.  These units were owned and operated, in conjunction with the Department of Public Safety, by the Secretary of State's Office.  The testimony of Keith Ingram indicated that the limitation of EIC units had more to do with the lack of being able to man them with DPS employees than the ability to fund additional units. (Ingram Deposition at 66)  In addition, the testimony of Joe Peters, DPS assistant director for driver's license, indicated that in addition to the 25 Secretary of State units, the DPS also had several units but could not recall the total number.

Though specific information was not provided which clearly indicated the cost of the mobile EIC units, information showed that each unit cost approximately $4,100.00 in equipment costs.  As such, Texas spent approximately $103,000.00 in equipment costs alone on Secretary of State EIC units.  Joe Peters testified that the total cost to operate the mobile EIC units during Phase I was $845,000.00. (Peters Deposition at 170) This amount includes

REPORT AND DECLARATION OF T. RANSOM CORNISH - Page 17

both the cost of equipment and personnel. This represents about $33,800 per unit. This cost was paid for by the DPS.

Under Phase III of the mobile EIC program, counties are being enlisted to process applications for EICs. To do so, the counties must sign a contract with the DPS. The counties then receive training to process EIC applications and receive equipment to do so. It appears that such units are able to move around the county to locations determined by local officials. (Peters Deposition @ 171)

The mere operation of a Phase III programs raises the question as to why the State of Texas did not just equip each county with a mobile EIC unit. The program demonstrates that local county employees or even local election offices are clearly capable of performing the duties to properly issue EICs. Having an EIC unit in each county could provide coverage for those counties which do not have a driver's license office, provide an opportunity for local management and evaluation of the issuance of EICs, and give local election officials the ability to meet needs on a timely basis. This would also alleviate the costs associated with taking the mobile devices from county to county and requiring DPS workers to travel from location to location. All of these costs have not been detailed.

Given a cost of $4,100 per unit, the State of Texas could have provided a mobile unit to each of the 254 counties for a total of approximately $1,000,000. The county officials, who already have staff, could process EICs at nominal additional cost. It is worth noting that DPS estimated that Phase 1 alone cost in excess of $800,000.

Other states have taken the relatively low-cost approach of giving equipment to local county offices to issue their free voter photo ID cards. Georgia, for instance, enacted a photo

ID law in 2006 (Senate Bill 84), which required voters to present one of six forms of identifications when voting in person. In contrast to Texas, Georgia purchased machines to issue free identification cards at all 159 Georgia election offices. The cost to purchase and maintain the machines at Georgia's local election offices has been just over $770,000, or less than $5,000 per office. (TX 00007429)

South Carolina followed a similar approach. The state placed two cameras in each of their 46 county offices. (Exhibit 4-2) The local South Carolina Election Commission employees, who work at the county offices, can then take and send digital photos to the SEC. The SEC can then use one of their two printers to process the voter photo ID. The total cost to purchase the cameras and the two printers was $20,471 used by the State of South Carolina of voter photo ID. (Exhibit 4-2)

It is also worth noting that local county offices may be more effective at ensuring that registered voters obtain the necessary IDs to vote. In Georgia, for example, those offices appear to be responsible for the large number of voter IDs that have been issued. Between the passage of the bill in 2006 and January 2013, Georgia issued in excess of 25,000 Voter Identification Cards (analogous to Texas's EICs). Local county election offices issued 24,064 of these (2005 through January 13, 2011), while the Georgia Department of Driver Service Centers issued only 1,052 during the same period. (TX00007421) In other words, , Georgia's county election offices had issued 96% of the free ID cards, while the Department of Driver Services had issued only 4% of the free ID cards.

REPORT AND DECLARATION OF J. RANSOM CORNISH   Page 19

The State of Texas has spent in excess of a million dollars on its complicated mobile EIC program.

It is also interesting to note that DPS was required to play the primary role in the issuance of EICs, even though the agency was not provided any additional funds. DPS therefore had to pay for equipment to establish mobile EIC units, allocate staff to run mobile EIC stations, pay for staff to travel across the state, and extend hours at various locations to include Saturdays. These program costs were significant. DPS estimated, for instance, that the weekly cost to run a Saturday EIC program was in excess of $37,000. (Exhibit 2-3)

**IV. Provisional Ballots**

As mentioned previously, I was asked to analyze the number of provisional ballots cast as a result of an ID issue. Seventeen of the larger Texas counties were initially contacted about information related to provisional ballots cast in four elections: the general elections of 2010, 2012 and 2013 and the primary election of March 2014.

The analysis originally anticipated was not ultimately possible, however, due to a lack of data. Of the counties that were canvassed, only two provided information as to the number of provisional ballots cast on their web-site. Only three other counties were able to provide scanned PDF copies of each provisional ballot affidavit for the 2013 and 2014 elections. The remaining counties did not or were not able to provide complete data. Two counties, for example, failed to respond to a written request for information relating to provisional ballots. One county did not maintain the provisional ballot affidavits and did not

have access to any provisional ballots except for the March primaries. Several other counties were unable to provide complete data because of Texas Election Code Section 66.058.[2]

These counties indicated that information contained on the provisional ballot affidavits were placed with the custodian and could not be retrieved during the preservation period absent a Court Order.

Of significant note is the total lack of consistency between the counties as to whether or not specific information is available, the type of information available and the general policies followed by each county. For example, none of the counties contacted had maintained any statistical information related to the number of provisional ballots required due to either lack of proper photo ID or substantially similar name issues. Such statistical information related to the casting of provisional ballots would surely be relevant to assessing the implementation of SB 14. In fact, the State of Texas produced documents (TEX_0007419 – 00007429), which show that the State of Georgia was able to gather information which specifically tracked the number of provisional ballots that related to lack of photo ID.

---

2 The Election Code states:
Sec. 66.058. PRESERVATION OF PRECINCT ELECTION RECORDS. (a) Except as otherwise provided by this code, the precinct election records shall be preserved by the authority to whom they are distributed:
    (1) in an election involving a federal office, for at least 22 months after election day in accordance with federal law;
The Election Code further states:
On the 61st day after election day, the general custodian of election records may:
    (1) require a person who has possession of a key that operates the lock on a ballot box containing voted ballots to return the key to the custodian; and
    (2) unlock the ballot box and transfer the voted ballots to another secure container for the remainder of the preservation period.
(b-1) Except as permitted by this code, a ballot box or other     secure container containing voted ballots may not be opened during the preservation period.

REPORT AND DECLARATION OF T. RANSOM CORNISH - Page 21

Of the nine counties that responded with information relating to provisional ballots cast in the March 4th primaries, the ratio of provisional ballots cast increased over the November 5, 2013 general election in seven counties. The only counties that experienced a decline in the ratio of provisional ballots were Nueces County and Jefferson County.

An analysis of the actual provisional ballot affidavits for Harris County, one of the counties that I was able to acquire actual copies of the redacted provisional affidavits indicated that there were significant numbers of provisional ballots cast because of the lack of photo ID. During these two elections in Harris County a total of 219,928 votes were cast. The number of rejected provisional ballots totaled 579 for the elections. A review of general election held on November 5, 2013 in Harris County indicated that 22.5% of the rejected provisional ballots cast were due to lack of a photo ID. Similarly in Harris County during the primary elections held on March 4, 2014, 18.8% of the rejected provisional ballots were being cast due to lack of photo ID.

## EXHIBIT B

## T. RANSOM CORNISH, CPA, ATTORNEY AT LAW
*1 Sugar Creek Center Blvd., Suite 475A, Sugar Land Texas 77478*

EXPERIENCE

| | |
|---|---|
| STAFF ACCOUNTANT | YEARS EMPLOYED (EX: 1977-1979) |
| *Main Lafrance & Co.* | *Houston, Texas* |

Staff Audit Accountant.

| | |
|---|---|
| STAFF ACCOUNTANT | YEARS EMPLOYED (EX: 1979-1981) |
| *Lafrance, Walker, Jackley & Seville.* | *Houston, Texas* |

Staff Accountant in Tax and Audit.

| | |
|---|---|
| PARTNER | YEARS EMPLOYED (EX: 1981-1988) |
| *McElhinney Cornish & Reynolds.* | *Houston, Texas* |

Partner in local C.P.A. firm employing 12 Accountants &
    Staff. Practice included audit, tax and accounting
    services.

| | |
|---|---|
| SOLE PRACTITIONER | YEARS EMPLOYED (EX: 1988-PRESENT) |
| *T. Ransom Cornish, C.P.A. Attorney at Law.* | *Sugar Land, Texas* |

Sole practitioner performing both accounting and legal
    services. Primarily serving small to medium sized
    business.

EDUCATION

| | |
|---|---|
| B.B.A. | YEARS ATTENDED (EX: 1973-1977) |
| *University of Houston* | *Houston, Texas* |

Graduated Cum Laude

DOCTORATE OF JURISPRUDENCE
*University of Houston*

YEARS ATTENDED (EX: 1986-1991)
*Houston, Texas*

SKILLS

- Licensed to Practice as a Certified Public Accountant in 1980.

- Licensed to Practice as an Attorney in 1991.

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

MARC VEASEY, *et al.*,

        Plaintiffs,

        v.

RICK PERRY, *et al.*,

        Defendants

Civil Action No. 2:13-cv-193 (NGR)

UNITED STATES OF AMERICA

        Plaintiff,

TEXAS LEAGUE OF YOUNG VOTERS
EDUCATION FUND, *et al.*,

        Plaintiff-Intervenors,

TEXAS ASSOCIATION OF HISPANIC
COUNTY JUDGES AND COUNTY
COMMISSIONERS, *et al.*,

        Plaintiff-Intervenors,

        v.

STATE OF TEXAS, *et al.*,

        Defendants,

TRUE THE VOTE

        Movant-Intervenor.

Civil Action No. 2:13-cv-263 (NGR)

EXHIBIT C

1.  In Re:  Glenn and Cindy Wilson, Debtor
    In the United States Bankruptcy Court Southern District of Texas Houston
    Division
    Case No. 05-81190-H2-7
    Adversary Proceeding No. 06-3078

2.  Adrienne Perry vs. Deutsche Bank National Trust Company, as Trustee for
    Ameriquest Mortgage Securities et al
    In the District Court of Harris County, Texas 281st Judicial District
    Case No. 2011-05871

3.  Christine Skagerberg vs. Wells Fargo Bank, N.A. et al
    In the District Court of Harris County, Texas 133rd Judicial District
    Case No. 2011-52554

4.  Rocky and Julie Emery vs. Wachovia Bank, N.A.
    In the United States Bankruptcy Court Southern District of Texas Houston
    Division
    Case No. 4:10-cv-02213

5.  Tracy Knight vs. Tagt, LP, Yorkshire, LLC et al
    In the District Court of Harris County, Texas 165th Judicial District
    Case No. 2006-61074

6.  William L. Altstaetter vs. Dawn Jackson
    In the District Court of Harris County, Texas 11th Judicial District
    Cause No. 2006-29696

7.  In Re: Port Arthur Interest Development, LLC vs. Hong T. Vo and Kim Nguyen
    In the United States Bankruptcy Court Southern District of Texas Houston
    Division
    Case No. 09-06406
    Adversary Proceeding No. 10-03555
    Depo. Taken 5/31/2012

8.  Taurus Manufacturing Co. vs. Pei Zhou & Shaun White
    In the District Court of Harris County, Texas 151st Judicial District
    Case No. 205-41172

9. Jackson vs. Jackson
   In the District Court of Travis County, Texas 53rd Judicial District
   No. D-1-GN-07-001527
   Depo. Taken 7/17/2008

10. Fernando Garza Rodriguez & Stone Ridge Global vs. Lionel Garza & John Stiles
    In the District Court of Harris County, Texas 61st Judicial District
    Cause No. 2011-65812

11. The GRG Ramirez Group and Gill Ramirez, Jr. vs. HISD, Lawrence Marshall,
    Eva Jackson and RHJ-JOC, Inc.
    United States District Court for The Southern District of Texas   Houston
    Division
    Case No. 4:10-CV-04872

12. IN RE: QUALITY INFUSION CARE, INC., Debtor, RANDY W. WILLIAMS
    CHAPTER 7 TRUSTEE, Plaintiff, vs. WOODLAKE IMAGING, LLC
    In the United States Bankruptcy Court Southern District of Texas Houston
    Division
    Case No. 10-36675, Adversary No. 12-03355

13. Honorable Terry Petteway et al vs. Galveston County et al.
    United States District Court for The Southern District of Texas – Galveston
    Division
    Case No. 3:13-CV-00308
    Deposition and Trial Testimony

*Exhibit 1*                                    1-1



| | |
|---|---|
| **Memo to:** | Alicia Pierce, Communications Director, Office of the Texas Secretary of State |
| **CC:** | Wroe Jackson, General Counsel<br>Leticia Salazar, Elections<br>Dan Blotzer, Purchasing |
| **From:** | Raul Garza, Account Director, TKO Advertising |
| **Re:** | Voter Education Creative + Media Buy<br>August-November 2013 |
| **Date:** | August 26, 2013 |

Alicia and team, thank you for meeting with us this morning to review the scope of work for the Secretary of State's Fall 2013 campaign. The campaign will focus on educating Texans that photo ID is required when voting in Texas elections. Key messages of the campaign will be consistent with photo ID requirements as outlined in your June 25th press release unless you provide other direction. http://www.sos.state.tx.us/about/newsreleases/2013/062513.shtml

This cover letter is designed to accompany your request for an emergency work order to secure funds for this project. This letter revises information in our original scope of work memo provided Aug. 14, based on our phone conversations, emails, our meeting with your team on Aug. 22nd, and our continued negotiations on Aug. 23. Your media buy will reflect additional impression levels and PSA matches, in order to both increase the value of your overall campaign and go deeper with the media buy to reach your target audiences — diversity, seniors, and rural — without increasing costs to the SOS, and without taking away impressions from your general audiences. **This is our final and best offer.**

### Overview of Project

As of June 2013, Photo ID is now required for voting in Texas. The Secretary of State is charged with quickly reaching as many Texans as possible. The SOS is partnering with TKO Advertising to create broadcast, print, digital, and smartphone app creative deliverables that will reach Texans statewide through multiple channels including TV-Cable, radio, online advertising, social media, print, and email.

This education campaign will run in specified channels in specified time lengths, as determined by TKO, leading up to the constitution election in November. TKO is committed to securing additional cost-free coverage, including PSA broadcast as part of our negotiations with the SOS. Additionally, to increase the value of this campaign to the State of Texas, TKO deliverables — when possible — will be evergreen or be adaptable for use in future elections.

TEX00306413



**Deliverables**
- Photo ID broadcast scripts:
  - (1) 30-second radio script in English
  - (1) 30-second radio script in Spanish
  - (1) 30-second television script in English
  - (1) 30-second television script in Spanish
  - Produce 2 radio spots
  - Produce 2 television spots

- Broadcast Media Buy
  - TV/Cable Statewide
    - English
    - Spanish
  - Radio Statewide
    - English
    - Spanish

- Digital Media Buy
  - Static advertising banners in (3) sizes
    - English
    - Spanish
  - Mobile advertising banners in (3) sizes
    - English
    - Spanish

- Poster creative (can be printed or shared digitally)
    - English
    - Spanish
    - Traditional Chinese
    - Vietnamese

- Diversity and Special Populations Media Buy + Creative
  - Print ads in African-American newspapers
  - Create/coordinate online resource materials, such as web-friendly poster on votetexas.gov/voters-with-special-needs/

- SmartTXVoter smartphone application updates to potentially include
  - Changing the name of the app
  - Updating app for dual use of parties/candidates and constitutional amendments
  - All updates will be at minimum for iOS and Android (additional platforms TBD based on budget and timeframe)
  - All updates will be in both English and Spanish

2

TEX00306414

1-3



SOS Texas Voter Education Proposed Campaign Budget — Fall 2013

| DELIVERABLES | ESTIMATED COST |
|---|---|
| **Deliverable 1: Production budget**<br>• 2 30-second radio spots<br>   ○ 1 English<br>   ○ 1 Spanish<br>• 2 30-second TV spots<br>   ○ 1 English<br>   ○ 1 Spanish | $50,000 |
| **Deliverable 2: Digital media buy**<br>online static banners and mobile banners | $40,000 |
| **Deliverable 3: Broadcast media budget**<br>TV-Cable and Radio, statewide | $225,000 |
| **Deliverable 4: Diversity-focused media buy**<br>including AA newspapers | $25,000 |
| **Deliverable 5: Update smartphone app**<br>include both amendments and candidate info | $20,000 |
| **Deliverable 6: Agency services budget**<br> to revamp broadcast script, supervise<br>production, and format/program digital assets,<br>coordinate calendar, client approval, and<br>vendor support | $40,000 |
| **TOTAL** | **$400,000** |

Again, we are very excited to be working with you and look forward to hearing back from you so that we can get started right away.

Sincerely,

Raul Garza
raul@tkoadvertising.com
700 N. Lamar, Suite 200B
Austin, TX  78703
512.472.4856 x304

3

TEX00306415

*Exhibit 2*

2-1

### DRIVER LICENSE DIVISION
### "MOBILE LITE" UNIT EQUIPMENT
### ESTIMATE

| Equipment | Tier 1 | Tier 2 | Tier 3 | TOTAL UNIT COSTS |
|---|---|---|---|---|
| Laptop w/ Asset Tag | 1,185.00 | | | |
| Document Scanner | 1,698.00 | | | |
| *Fingerprint Device | 1,695.00 | | | |
| Surge Protector | 25.00 | | | |
| Digital Camera | | 250.00 | | |
| Camera Tripod | | 25.00 | | |
| Backdrop | | 168.00 | | |
| *Signature Pad | | 200.00 | | |
| Chair | | 225.00 | | |
| Table | | 386.00 | | |
| Guest chairs | | 50.00 | | |
| Printer | | 466.00 | | |
| Tent | | | 150.00 | |
| Banner | | | 200.00 | |
| Table Skirt | | | 215.00 | |
| Storage/Carrier/Lock Box | | | 100.00 | |
| Single "Mobile Lite" Equipment Cost | 4,603.00 | 1,770.00 | 665.00 | 7,038.00 |
| 100 "Mobile Lite" Units | 460,300.00 | 177,000.00 | 66,500.00 | 703,800.00 |

* This device may or may not be necessary

2-2

### DRIVER LICENSE DIVISION
### "MOBILE LITE" UNIT EQUIPMENT
### ESTIMATE

| EQUIPMENT | UNIT COST |
|---|---|
| Laptop w/ Asset Tag | 1,185.00 |
| Document Scanner | 1,698.00 |
| *Fingerprint Device | 1,695.00 |
| Surge Protector | 25.00 |
| Digital Camera | 250.00 |
| Camera Tripod | 25.00 |
| Backdrop | 168.00 |
| *Signature Pad | 200.00 |
| Printer | 466.00 |
| Storage/Carrier/Lock Box | 100.00 |
| Single "Mobile Lite" Equipment Cost | 5,812.00 |
| 30 "Mobile Lite" Units | 174,360.00 |
| One-time office signage cost | 9,935.00 |
| **Total Equipment Cost** | **184,295.00** |

\* This device may or may not be necessary

2-3

### DRIVER LICENSE DIVISION
### ELECTION ID CERTIFICATE
### SATURDAY HOURS ESTIMATE

| | WEEK 1 | WEEK 2 | WEEK 3 | WEEK 4 & FORWARD |
|---|---|---|---|---|
| DL Office Personnel | $ 14,081 | $ 14,081 | $ 14,081 | $ 13,830 |
| DL HQ Personnel | $ 698 | $ 583 | $ 583 | $ 583 |
| IT Service Desk Personnel | $ 114 | $ 114 | $ 114 | $ 114 |
| THP Personnel | $ 9,065 | $ 9,065 | $ 9,065 | $ 8,880 |
| Utilities | $ 2,507 | $ 2,507 | $ 2,507 | $ 2,446 |
| Signage | $ 9,935 | | | |
| Mobile Lite Unit Equipment (50) | $ 290,600 | | | |
| Mobile Lite Unit Personnel* | | $ 5,364.90 | $ 7,894.80 | $ 11,179.35 |
| WEEKLY TOTALS | $ 327,001 | $ 31,715 | $ 34,245 | $ 37,033 |

*Mobile Personnel - Week 2 = 25, Week 3 = 35, Week 4=50

2-4

### DRIVER LICENSE DIVISION
### "MOBILE LITE" UNIT EQUIPMENT
### ESTIMATE

| Equipment | Tier 1 | Tier 2 | Tier 3 | TOTAL UNIT COSTS |
|---|---|---|---|---|
| Laptop w/ Asset Tag | 1,185.00 | | | |
| Document Scanner | 1,698.00 | | | |
| *Fingerprint Device | 1,695.00 | | | |
| Surge Protector | 25.00 | | | |
| Digital Camera | | 250.00 | | |
| Camera Tripod | | 25.00 | | |
| Backdrop | | 168.00 | | |
| *Signature Pad | | 200.00 | | |
| Printer | | 466.00 | | |
| Storage/Carrier/Lock Box | | | 100.00 | |
| Single "Mobile Lite" Equipment Cost | 4,603.00 | 1,109.00 | 100.00 | 5,812.00 |
| 50 "Mobile Lite" Units | 230,150.00 | 55,450.00 | 5,000.00 | 290,600.00 |

* This device may or may not be necessary

*Exhibit 3*                                   *3-1*

KEITH INGRAM                                   4/23/2014

                                                    336
1   media.

2        Q.    Is there a budget for advertising mobile

3   stations?

4        A.    In 2013, no.  We do have part of our money

5   reserved this year for EIC unit program.

6        Q.    How much money is that for 2014?

7        A.    It's not -- it's, you know, however much we

8   need, but we've tried to save back a portion of our

9   $2 million.

10        Q.    Do you know what amount that is, about what

11   amount that is?

12        A.    I don't.  300,000 or 400,000.

13        Q.    Okay.  How is that money used, that $300,000

14   or $400,000?

15        A.    It hasn't been used.

16        Q.    Oh, it hasn't been used at all?

17        A.    That's right.

18        Q.    Okay.  Are there plans to use it specifically?

19        A.    If needed, sure.

20        Q.    Do you -- what kinds of plans in general?

21        A.    Well, if we decide that we need to have an

22   extra budget for mobile EIC units, then it would be for

23   everything associated with them, banners, signage,

24   travel, employee expense.  It would be everything

25   associated with the program.

KEITH INGRAM                                            4/23/2014

344

1    amorphous metric and that's a very difficult thing to
2    evaluate.
3         Q.    Have you given some thought to that?
4         A.    No.
5         Q.    Have you considered what factors you might take
6    into consideration?
7         A.    No.
8         Q.    Did the state have a contract with any vendor
9    or marketing agency to provide a statewide voter
10   education program from June 25, 2013, to the end of 2013?
11        A.    We had a statewide voter education campaign
12   that was in place toward the end of the year, but not
13   from June 25th on.
14        Q.    Do you know when in 2013 it began?
15        A.    I believe it was in September.
16        Q.    Was that pursuant to an RFP?
17        A.    It was not.
18        Q.    Who was the vendor?
19        A.    We did an emergency procurement with TKO since
20   they were involved in our voter education campaign in
21   2012 and were familiar with the requirements of that RFP,
22   which included voter ID education.
23        Q.    How much did it cost?
24        A.    We allocated 400,000 to the    to the effort.
25        Q.    And do you know what it covered?

3-3

KEITH INGRAM                                        4/23/2014

345

1      A.   As much as we could cover for 400,000.  It
2 covered -- it covered --
3      Q.   You and I would spend it quite differently.
4      A.   Yeah, exactly.  It covered paid media,
5 advertising on cable TV and newspapers and radio, and it
6 also covered visits by the secretary -- at that time it
7 was Secretary of State Steen -- to election officials
8 across the state to gather earned media.
9      Q.   And was TKO responsible for placing the ads on
10 radio and television, newspaper, all of that?
11      A.   They were.
12      Q.   On the Burson Marsteller contract, was that
13 pursuant to a public bid?
14      A.   It was.
15      Q.   And have those bidding materials been produced
16 in connection with this litigation; do you know?
17      A.   I don't know.
18      Q.   What was the budget for that?
19      A.   Two million.
20      Q.   And there was a contract, I assume?
21      A.   Yes.
22      Q.   And do you know if that's been produced?
23      A.   I don't.  I believe the contract is for
24 1.675 million.
25      Q.   And the 2 million comes from -- or the

3-4

KEITH INGRAM                                         4/23/2014

                                                            346

1    difference between the 2 million and 1.675 comes from?

2        A.    The money that we've held back if we need it

3    for EIC mobile unit program.

4        Q.    What, to your knowledge, has been the

5    participation of anyone in the Governor's Office in the

6    implementation of SB 14?

7        A.    I don't know what all the governor has done

8    with regard to the implementation of SB 14.    The

9    Governor's Office and MacGregor Stephenson has worked

10   with us on mobile EIC units.    We've talked to, you know,

11   people in the Governor's Office about implementation of

12   the voter ID list to make sure that we were communicating

13   with all the stakeholders about the list of acceptable

14   IDs as we interpreted it.

15       Q.    Anything else?

16       A.    I don't -- I can't think of anything else off

17   the top of my head.

18       Q.    What was the specific participation of the

19   Governor's Office in connection with the mobile EIC

20   units?   What was -- what recommendations did it make?

21             MR. KEISTER:    To the extent that that

22   involves any attorney-client communications or

23   deliberative process communications, I'm going to

24   instruct you not to answer, but if you can give him

25   the --

                 U.S. LEGAL SUPPORT - AUSTIN, TEXAS
                        (800) 734-4995

*Exhibit 4*

4-1



**EVERY VOTE MATTERS.**
EVERY **VOTE COUNTS.**

This message originates from the South Carolina State Election Commission. If you have received this message in error, we would appreciate it if you would immediately notify the South Carolina State Election Commission by sending a reply e-mail to the sender of this message. Thank you.

**From:** Armand Derfner [mailto:aderfner@dawlegal.com]
**Sent:** Wednesday, January 22, 2014 3:52 PM
**To:** Whitmire, Chris
**Cc:** 'Armand Derfner'
**Subject:** Cost of camera capability

Dear Chris:

Thank you for your prompt and helpful information on the cost of the cameras in the registration offices, plus related costs. As we discussed, I would appreciate that information in response to this e-mail. Armand Derfner

2

**From:** Whitmire, Chris [mailto:cwhitmi@elections.sc.gov]
**Sent:** Tuesday, February 11, 2014 4:48 PM
**To:** Armand Derfner
**Subject:** RE: Cost of camera capability

Mr. Derfner,

I'm sorry. It seems I failed to reply to your request in a timely manner. I just noticed that I had not replied. My apologies.

The SEC purchased approximately 100 cameras for $99 each to be distributed to the 46 county offices (at least two each). Approximate cost of cameras = $10,000

The SEC purchased two card printers to be used here at the SEC for printing all plastic photo voter registration cards. Printers cost $5,256 each. Cost of printers = $10,512

Printing of cards cost $1.07 on average. The SEC had printed approximately 13,269 cards as of 2/4/14. Approximate cost of printing = $14,198

The cost of developing the photo ID application in the statewide voter registration system was $20,471.25.

I believe this covers what we talked about in our original conversation.

Again, I apologize for the delayed response.

Thank you.

Chris Whitmire


Chris Whitmire
Director of Public Information & Training

**South Carolina State Election Commission**
Post Office Box 5987
Columbia, S.C. 29250
Tel: 803.734.9070
Fax: 803.734.9366
scVOTES.org

1

*Exhibit 5*                                                                    *5-1*

---

| | |
|---|---|
| **From:** | Vinger, Tom |
| **To:** | SETH STERN, BLOOMBERG/ NEWSROOM: |
| **CC:** | Arriaga, Amanda |
| **Sent:** | 1/13/2012 3:54:01 PM |
| **Subject:** | Bloomberg News DL questions and answers |

.How many DPS offices are there statewide where people can get license::

307 offices statewide. Currently 221 are open to customers and 86 are temporarily out of service.

2. Have offices been closed since the last presidential election in 2008? Yes How many and why?

86 offices, mostly part time, low-volume offices. There were a wide range of issues: outdated equipment, expiring leases, as well as building safety and ADA issues at some locations.

3. Was it a budget or staffing issue?

There have been offices closed temporarily due to staffing issues, but as soon as new employees are hired and trained, these offices have reopened.

There were a wide range of issues: outdated equipment, expiring leases, as well as safety and ADA issues at some locations.

4. Are there plans to close additional locations or open new ones and how many closures/new facilities will there be?

There are currently no plans to close locations. We are in the process of reviewing county population, past issuance number, distance to the closest driver license office to identify possible reopening of offices that were closed. The actual number of offices that will reopen will be determined by equipment availability and cooperation by local government.

4. I saw reference to the legislature approving additional resources to allow for added staff and new large offices in metro areas?

The Texas legislature appropriated $63 million to improve driver license service by increasing staff and adding service capacity. We will add 266 full time DL office employees, open six new mega center offices with 40 or more employees, and acquire new technology to improve service.

5. Are there any plans to provide mobile vans or other means of reaching people in counties where there currently isn't an office or limited hours

There are no such plans. You can contact the Secretary of State's office in reference to voter outreach.

6. Should the law go into effect, are there any special plans in terms of new equipment, form of identification you'll offer or voter education (or is voter education something Secretary of State' office would do?)

The Secretary of State is responsible for the state's voter education program.

If final approval is given for the program to proceed, DPS will issue a no cost election certificate to qualified persons who do not already have acceptable documents for voting. This document will only be valid for voting purposes, as specified in the law. The election certificate will be produced utilizing current resources and equipment.

-Original Message-
From: SETH STERN, BLOOMBERG/ NEWSROOM: [mailto:sstern14@bloomberg.net]
Sent: Wednesday, January 11, 2012 4:36 PM
To: Vinger, Tom

TEX0503915

5-2

Subject: Re:DPS

Hi Tom:

As I mentioned on the phone, I'm doing a story related to Texas' voter ID law and am trying to get some information about DPS offices where voters can get IDs and what IDs they'll be able to get should the law go into effects. As you requested, here's the questions I'm hoping to get answered:

1. how many DPS offices are there statewide where people can get licenses.
2. have offices been closed since the last presidential election in 2008? How many and why; was it a budget or staffing issue? outdated equipment? other reasons?
3. Are there plans to close additional locations or open new ones and how many closures/new facilities will there be? I saw reference to the legislature approving additional resources to allow for added staff and new large offices in metro areas;
4. Are there any plans to provide mobile vans or other means of reaching people in counties where there currently isn't an office or limited hours?
5. Should the law go into effect, are there any special plans in terms of new equipment, form of identification you'd offer or voter education (or is voter education something Secretary of State's office would do?

Thanks for your help.

Seth

----------------------                    ----------------
Seth Stern
Justice Department Reporter
Bloomberg News

o: 202 624 1994
c: 202 236 2935

        riginal Message
From: Tom inquir <Tom.Vinder@dps.texas.gov>
To:  ETH STERN /BLOOMBERG/ NEWSROOM:
At: 1/1  t :25:49


'om inqu r
Asst. Chief of Public Affairs
Public Affairs and Policy
Texas Department  f Public Safety
!51  4.4-2607
tom.vinder@p.     .gov<mailto:tom.vi der@dps.te as.g  >(Please note new  mail address.

TEX0503916

5 − 3

**From:** Terry. Michael
**Sent:** Friday, January 13, 2012 1:49 PM
**To:** Arriaga, Amanda; Vinger, Tom; Davio, Rebecca
**Subject:** Re: Suggested responses for Bloomberg

I agree
Sent via BlackBerry by AT&T

**From:** Arriaga, Amanda
**Sent:** Friday, January 13, 2012 01:44 PM
**To:** Vinger, Tom; Terry, Michael; Davio, Rebecca
**Subject:** RE: Suggested responses for Bloomberg

Looks good to me.

**From:** Vinger, Tom
**Sent:** Friday, January 13, 2012 1:35 PM
**To:** Terry, Michael; Arriaga, Amanda; Davio, Rebecca
**Subject:** Suggested responses for Bloomberg

Here are my thoughts.

1. How many DPS offices are there statewide where people can get licenses?

307 offices statewide. Currently 221 are open to customers and 86 are temporarily out of service.

2. Have offices been closed since the last presidential election in 2008? Yes How many and why?

86 offices, mostly part-time, low-volume offices. that were only open on a limited basis and staffed by employees from other offices. Texas has many rural areas that are sparsely populated and we served many of those customers in offices that were open on a scheduled basis. The equipment we transported to those locations is what became outdated. When parts were no longer available to replace components as they went down, we had to eliminate services in some areas.
There were a wide range of issues: outdated equipment, expiring leases, as well as building safety and ADA issues at some locations.

3. Was it a budget or staffing issue?

There have been offices closed temporarily due to staffing issues, but as soon as new employees are hired and trained, these offices have reopened.

There were a wide range of issues: outdated equipment, expiring leases, as well as safety and ADA issues at some locations.

Outdated/obsolete equipment has been the most common reason for office closures. Additionally, leases have expired and there was not suitable or affordable options for replacement offices in some situations. In some instances, agreements between DPS and counties or local governments that provided office space have expired and the local governments have other needs for space and resources that were provided for DPS services. In

1

TX_00226743

TEX00226743

5-14

some cases we had multiple locations within counties and have consolidated services into
fewer locations at the request of the local governments.

3. Are there plans to close additional locations or open new ones and how many closures/new
facilities will there be?

There are currently no plans to close locations. We are in the process of reviewing county
population, past issuance numbers, distance to the closest driver license office to identify
possible reopening of offices that were closed, due to the equipment failure issues. The
actual number of offices that will reopen will be determined by equipment availability and
cooperation by local governments.

4. I saw reference to the legislature approving additional resources to allow for added staff
and new large offices in metro areas?

The Texas legislature appropriated $63 million to improve driver license services by
increasing staff and adding service capacity. We will add 266 full-time DL office employees,
open six new mega-center offices with 25 or more employees, and acquire new technology to
improve service. such as queuing systems and improved online services.

4. Are there any plans to provide mobile vans or other means of reaching people in counties
where there currently isn't an office or limited hours?

There are no such plans. You can contact the Secretary of State's office in reference to voter
outreach.

There are no plans to deploy mobile units for issuance of election certificates or provide
additional offices to accommodate this specific initiative. DPS was not provided additional
resources for issuance of election certificates. We did receive appropriations to increase
capacity for all driver license customers and election certificate applicants will benefit
from the overall improvements.

5. Should the law go into effect, are there any special plans in terms of new equipment, form
of identification you'll offer or voter education (or is voter education something Secretary
of State's office would do?)

The Secretary of State is responsible for the state's voter education program.

If final approval is given for the program to proceed, DPS will issue a no-cost election
certificate to qualified persons who do not already have acceptable documents for voting.
This document will only be valid for voting purposes, as specified in the law. The election
certificate will be produced utilizing current resources and equipment. as there was not
additional appropriation for DPS to implement this law.

*Tom Vinger*
*Asst. Chief of Public Affairs*
*Public Affairs and Policy*
*Texas Department of Public Safety*
*(512) 424-2607*
tom.vinger@dps.texas.gov(Please note new email address.)

2

TX_00226744

TEX00226744

5-5

| | |
|---|---|
| **From:** | Smith, Janie |
| **Sent:** | Thursday, January 12, 2012 10:41 AM |
| **To:** | Watkins, Paul; Bell, Stephen; Rodriguez, Tony; Stempelmann, Susan |
| **Cc:** | Davio, Rebecca; Terry, Michael; Melcher, Lori |
| **Subject:** | Media questions related to DL offices-RESPONSE REQUIRED |
| **Attachments:** | Voter ID Article SAEN 010912.docx |

Relating to Voter ID: Bloomberg News has posed several questions that are most appropriately answered Customer Operations.
Following are the questions. Lori and I have crafted a couple of responses and have identified information required from Customer Operations. **This is a media question and the response is needed as soon as possible – definitely before COB today.**

1. how many DPS offices are there statewide where people can get licenses? Do you want to provide the answer that OGC gave DOJ through SOS or the current information? If current - Customer Ops needs to provide that number

2. have offices been closed since the last presidential election in 2008? Yes
How many and why? Response required from Customer Operations
Was it a budget or staffing issue? Management/Customer Operations should determine response (no)
outdated equipment? Management/Customer Operations should determine response  (yes)
other reasons? Management/Customer Operations should determine response

3. Are there plans to close additional locations or open new ones and how many closures/new facilities will there be? Lori and I can speak to new facilities, but need an approved response regarding additional location closures
I saw reference to the legislature approving additional resources to allow for added staff and new large offices in metro areas? DPS received $63 million to increase staff and add capacity by opening several large facilities in high volume areas. This was in response to years of stagnant appropriations while the state population grew exponentially.

4. Are there any plans to provide mobile vans or other means of reaching people in counties where there currently isn't an office or limited hours? There are no plans to deploy mobile units for issuance of election certificates or provide additional offices to accommodate this initiative. DPS was not provided additional resources for issuance of election certificates. We did receive appropriations to increase capacity for all driver license customers.

5. Should the law go into effect, are there any special plans in terms of new equipment, form of identification you'll offer or voter education (or is voter education something Secretary of State's office would do?) The Secretary of State is responsible for the state's voter education program. If approved, DPS will issue an election certificate to persons who qualify. This document will be available at no charge and will only be valid for voting purposes, as specified in the law. The election certificate will be produced utilizing current resources and equipment as there was not additional appropriation for DPS to implement this law.

Thank you and please visit with Lori or me if you have questions or would like to discuss.

Janie Smith, Policy Coordinator
Driver License Division
TX Department of Public Safety

1

TX_00223026

TEX00223026

5-6

512.424.2976 office

2

TX_00223027

TEX00223027

*Exhibit 6*                                                        6-1

## DPS Government Relations Action Sheet

| State Official's Office | Date | Time |
|---|---|---|
| Rep Sylvester Turner | 7/17/13 | 12:01 PM |

| Point of Contact | Constituent Information |
|---|---|
| Alison Brock<br>Chief of Staff | N/A |

**Issue:** Alison Brock of Rep Turner's office was seeking clarification regarding EIC procedures:

- Are there any other avenues to apply for an EIC other than entering at DPS office? (No)
- Can individuals apply for an EIC online? (No)
- Under the requirements of an EIC and individual is not eligible for an EIC if their Texas driver license is unexpired or expired less than 60 days or if their Texas personal identification card is unexpired or expired less than 60 days. Can you share with us or clarify for us how this will be implemented?
  - Upon inquiry, the customer service representative will verify the status of any existing ID/DL.
  - If the individual is found to have a valid ID/DL, they are not eligible for an EIC as they can use the ID/DL for voting.
  - If they appear with a valid, but expired DL/ID for less than 60 days, then they will be given the option to renew their expired ID/DL. They can surrender or choose not to renew a DL/ID and obtain a EIC. By surrendering their DL, they will no longer have driving privileges. In addition – the EIC cannot be used as personal identification.
  - A suspended license is still a valid form of ID, the individual's driving privileges are revoked. If they are shown to have outstanding warrants, DPS is obligated by law to arrest them.
- Any issue on whether the notary will be required on the form? The actual application is not required to be notarized, but the applicant is required to sign it in the presence of the Customer Service Representative. The only documentation that requires a notary may be supporting documents proving residency/citizenship. If a person is homeless, or lives with another person (but not on any lease/utility bill) then there are alternatives/waivers that can be taken in to account to address the particular situation.
- Also, is there a law that passed that allows for licenses to be suspended for failure to pay toll road fees? There is no law, however a city or county that owns a toll road may issue a warrant for arrest for unpaid toll fees if they choose – it would appear in our system, could possibly result in a Failure to Appear (FTA), which would prevent them from being eligible for a license.
- What is the procedure for when a person has an outstanding warrant? During the DL/ID transaction, it is standard procedure to verify if there are any warrants. As the CSR enters the applicant's information and moves through the processing screens, there is a specific screen for "External Checks". At this point, the CSR must go through the "External Checks" process before they can continue processing the transaction. The "External Checks" includes searches in  TCIC/NCIC, PDPS and CDLIS.  If the individual is shown to have outstanding warrants, the Customer Service Representative turns over information to Highway Patrol.

- Have there been any individuals that have come in to obtain an EIC that have had outstanding warrants out for their arrest or suspensions on their DL? We do not track information in that manner.
- Also, I recall at one point DPS had mobile vans to assist with doing IDs. Are those still in use? Was their motive equipment use in Bastrop to issue DLs? We had equipment but that equipment has been used to replace failing/broken equipment in existing DL offices.  We have not purchased the same kind of replacement equipment because they no longer make the same system.  We are in the process of purchasing new

HQ-10 (Rev 12/09)

TEX0509002

6-2

equipment but we are going through the process to ensure it will work with existing systems (infrastructure requirements are not identical).

CN Note: Marguerite Binder was looking into how CSRs are notified that the applicant has an outstanding warrant, and what procedure is taken upon discovery of the warrant. Also, if anyone that has inquired about a LIC if they have had a warrant or suspended license. AB wanted figures.

Alison Brock Follow Up Question: Any word on whether the notary will be required on the form? Also, is there a law that passed that allows or licenses to be suspended for failure to pay toll road fees?

Please provide Candace Nolte with the information for her to relay to the Representative's office.

| Division Referred to: DLD |
|---|

**Details of Action Taken:**



| Name/Phone Number/Date Completed: |
|---|

HQ-10 (Rev 12/09)

TEX0509093

EXHIBIT 7

EXHIBIT 7:
    BATES #

TX_00007419   THROUGH

    TX_00007429

*EXHIBIT 8*                                                    8-7

9/30/13 Need RR

# TKO Advertising Inc.

TKO Advertising Inc.
700 N. Lamar
Suite 200B
Austin, TX 78703

(512)472-4856
thinkbig@tkoadvertising.com

## Invoice

| Date | Invoice No. |
|------|-------------|
| 09/16/2013 | 1702 |

| Terms | Due Date |
|-------|----------|
| Net 30 | 10/16/2013 |

**Bill To:**
Texas Secretary of State
Attn: Financial Management
P.O. Box 12887
Austin, TX 78711-2887

4-79

| Service | Quantity | Amount |
|---------|----------|--------|
| Agency Services | Voter Education Creative & Media Buy<br>August 2013 - November 2013<br>• Agency Services<br>Revamp broadcast script, supervise production, and format/prepare print and digital assets for general market and special populations, coordinate calendar, client approval, and vendor support<br><br>Poster creative to be printed or shared digitally in multiple languages:<br>- English<br>- Spanish<br>- Traditional Chinese<br>- Vietnamese | 30,000.00 |
| Production | Diversity and Special Populations Creative<br>• Create/coordinate online resource materials, such as web-friendly poster on votetexas.gov/voters-with-special-needs/<br>• Photo ID broadcast scripts:<br>- (1) :30-second radio script in English<br>- (1) :30-second radio script in Spanish<br>- (1) :30-second television script in English<br>- (1) :30-second television script in Spanish<br>- Produce 2 radio spots<br>- Produce 2 television spots | 50,000.00 |

Please Remit Payment to:
TKO Advertising Inc.
PO Box 30317
Austin, TX 78755

| Total | $80,000.00 |

TEX00306363

# TKO Advertising Inc.

TKO Advertising Inc.
700 N. Lamar
Suite 200B
Austin, TX 78703

(512)472-4856
thinkbig@tkoadvertising.com

*10/10/13-1ccce KK* *8-7-*
*4-79*



## Invoice

| Date | Invoice No. |
|------|-------------|
| 10/07/2013 | 1705 |
| Terms | Due Date |
| Net 30 | 11/06/2013 |

**Bill To:**
Texas Secretary of State
Attn: Financial Management
P.O. Box 12887
Austin, TX 78711-2887

RCV'D FIN MGMT

OCT 07 2013

RL

| Service | Activity | Amount |
|---------|----------|--------|
| Media | • PO #307-4-00079<br><br>Voter Education Media Buy<br>Radio Placements September 2013<br>• Radio Statewide<br> - :30-second Radio spot in English<br> - :30-second Radio spot in Spanish<br><br>Quantity: 3,124,800 impressions<br><br>Weeks of: 9/16, 9/23, 9/30<br><br>Markets: Abilene, Austin, Beaumont, Corpus Christi, Dallas, El Paso, Harlingen, Houston, Laredo, San Antonio, Sherman, Shreveport, Tyler, Victoria, Waco-Killeen, Wichita Falls, Alpine, Amarillo, College Station, Fort Stockton, Pecos, Rockdale, San Angelo, Texarkana, and 100+ rural markets | 36,580.00 |

Please Remit Payment to:
TKO Advertising Inc.
PO Box 30317
Austin, TX 78755

| | Total | $36,580.00 |
|---|-------|------------|

TEX00306362

$8-3$

# TKO Advertising Inc.

TKO Advertising Inc.
700 N. Lamar
Suite 200B
Austin, TX 78703

(512)472-4856
thinkbig@tkoadvertising.com



## Invoice

| Date | Invoice No. |
|---|---|
| 11/06/2013 | 1708 |

| Terms | Due Date |
|---|---|
| Net 30 | 12/06/2013 |

**Bill To**

Texas Secretary of State
Attn: Financial Management
P.O. Box 12887
Austin, TX  78711-2887

| Service | Activity | Amount |
|---|---|---|
| | • PO #907-4-00079 | |
| | Voter Education Creative & Media Buy | |
| Media | • Radio Placements October 2013 | 69,170.00 |
| | Radio Statewide | |
| | - :30-second Radio spot in English | |
| | - :30-second Radio spot in Spanish | |
| | Quantity: 5,907,739 impressions | |
| | Weeks of: 10/7, 10/14, 10/21, 10/28 | |
| | Markets: Abilene, Austin, Beaumont, Corpus Christi, Dallas, El Paso, Harlingen, Houston, Laredo, San Antonio, Sherman, Shreveport, Tyler, Victoria, Waco-Killeen, Wichita Falls, Alpine, Amarillo, College Station, Fort Stockton, Pecos, Rockdale, San Angelo, Texarkana, and 100+ rural markets | |
| Media | • TV/Cable Statewide Placements October 2013 | 119,250.00 |
| | - :30-second Television spot in English | |
| | - :30-second Television spot in Spanish | |
| | Quantity: 11,006,992 impressions | |
| | Weeks of: 10/7, 10/14, 10/21, 10/28 | |
| | Markets: Abilene, Austin, Beaumont, Corpus Christi, Dallas, El Paso, Harlingen, Houston, Laredo, San Antonio, Sherman, Shreveport, Tyler, Victoria, Waco-Killeen, Wichita Falls | |
| | (Continue to the next page | |

TEX00309360

8-4

Page 2 of 2

| Service | Activity | Amount |
|---------|----------|--------|
| Media | · Diversity and Special Populations Media Buy<br>  - Half-page advertisements placed in community newspapers<br><br>  Quantity: maximum placements based on not-to-exceed budget<br><br>  Run Dates: 9/30, 10/1, 10/2, 10/3, 10/9, 10/14, 10/16, 10/17, 10/18<br><br>  Markets: Dallas/Ft. Worth, Houston, San Antonio, Dallas | 25,000.00 |
| Media | · Digital Media Buy<br>  Static advertising banners in (3) sizes<br>  - English<br>  - Spanish<br><br>  Mobile advertising banners in (3) sizes<br>  English<br>  - Spanish<br><br>  Quantity: 5,000,000 impressions<br><br>  Dates: 10/1/13 - 10/31/13<br><br>  Markets: Dallas/ Ft. Worth, Waco, Temple, Bryan, Austin, San Antonio, Houston, Rio Grande<br>  Valley, El Paso, Lubbock, Amarillo, Corpus Christi, Laredo, Brownsville, McAllen | 40,000.00 |
| Production | · SmartTXVoter smartphone application updates to potentially include:<br>  - Changing the name of the app<br>  - Updating app for dual use of parties/candidates and constitutional amendments<br>  - All updates will be at minimum for iOS and Android (additional platforms TBD based on<br>  budget and timeframe)<br>  - All updates will be in both English and Spanish | 20,000.00 |
| Agency Services | · Agency Services<br>  Revamp broadcast script, supervise production, and format/program digital assets, coordinate<br>  calendar, client approval, and vendor support<br><br>  Poster creative to be printed or shared digitally in multiple languages<br>  - English<br>  - Spanish<br>  - Traditional Chinese<br>  - Vietnamese<br><br>  Diversity and Special Populations Creative<br>  - Create/coordinate online resource materials, such as web-friendly poster on<br>  votetexas.gov/voters-with-special-needs/ | 10,000.00 |

Please Remit Payment to:
TKO Advertising Inc.
PO Box 50317
Austin, TX 78755

| | TOTAL | $83,000.00 |
|---|---|---|

TEX00306361

*Exhibit 9*                                                                      *9-1*

## REQUEST FOR PROPOSAL NUMBER 12111

HELP AMERICA VOTE ACT OF 2002 ("HAVA")
VOTER EDUCATION AND OUTREACH OPPORTUNITIES

SECTION ONE          INTRODUCTION AND PURPOSE

**1.1   PURPOSE OF THE REQUEST FOR PROPOSAL (RFP)**
It is the intent of the Office of Secretary of State ("SOS") to obtain proposals to provide continuing voter education and outreach consistent with the Help America Vote Act of 2002 ("HAVA") to educate and train Texans on the voting and election process in Texas.  The voter outreach program should focus on, but not be limited to, four areas: (1) How to register to vote; (2) How to comply with photo identification requirements; (3) Polling place processes and procedures; and (4) How to properly cast a ballot ).

It is the further intent of the SOS to select a proposer to perform research, marketing, production, advertising, communication services and other assistance necessary for successful voter education and outreach. The selected will be the prime source for all services under the contract (though, as further described below, HUB subcontracting is encouraged) and will use communications strategies and messages that are at all times commensurate with the dignity of the State of Texas.

**1.2 BACKGROUND INFORMATION**
On October 29, 2002, President Bush signed HR 3295, the Help America Vote Act ("HAVA").  This federal legislation was in response to the voting irregularities experienced during the 2000 federal election and created many new mandates for state and local government as well as appropriated funding to the states to assist with implementation and compliance.

> Some of the central requirements of HAVA are listed below:
> - The state must maintain an official list of registered voters and must verify the identification numbers of all new voter applicants;
> - Each polling place in the state must have at least one voting system per polling place that is accessible to persons with disabilities;
> - Voters, whose names do not appear on the voter registration roll, must be allowed to vote a provisional ballot, which is not counted until the voter's eligibility is verified after the election;
> - Federal Postcard Applications may under specified circumstances now serve to permanently register the voter as well as serve as a request for a ballot in a limited number of election cycles; and
> - The state establishes and maintains a state-based administrative complaint process for voters who file a sworn complaint that their voting rights have been violated.

**1.3 CONTRACT TERM**
The term of any contract resulting from this RFP shall be from contract award until January 31, 2013, subject to any termination rights provided for in a definitive contract negotiated between SOS and the Contractor.  The term of this contract includes both Phase I and Phase II, as set forth in more detail in Section 1.5 of this RFP.

**1.4 FUNDING AND ELIGIBLE USES**
This project will be financed with federal funding.  Below are the statutory sources, the federal awarding agencies, and the eligible funding activities.  The project budget must include a description of how each deliverable satisfies one or more of the eligible uses listed below.  The state anticipates funding three to five percent of the project from Source 2 (accessibility funds); however, accessibility-related activities may amount for more than five percent of the project activities (Source 1 will cover the balance).

Statutory Authority:              Help America Vote Act ("HAVA"), Public Law 107-252, October 29, 2002; 42 U.S.C. 15301

Federal Awarding Agencies:        Source 1, US Election Assistance Commission ("EAC"); Source 2, US Department of Health and Human Services ("HHS")

TX_00298767

7-2

| | |
|---|---|
| Source 1: | Title I, Section 101 of HAVA; Title II, Section 251 of HAVA (95% federal funding / 5% state match) |
| Source 2: | Title II, Section 261 of HAVA |

Eligible Activities Source 1:

Educate voters concerning voting procedures and voting rights which may include –

- A sample version of the ballot that will be used for that election;
- Information regarding the date of the election and the hours during which polling places will be open;
- Instruction on presenting required photo identification at the polls, per SB 14, 82nd Legislative Regular Session;
- Instructions on how to vote, including how to cast a vote and how to cast a provisional ballot;
- Instructions on how to obtain an election identification card;
- Instructions for mail-in registrants;
- General information on voting rights under applicable Federal and State laws, including information on the right of an individual to cast a provisional ballot and instructions on how to contact the appropriate officials if these rights are alleged to have been violated;
- General information on Federal and State laws regarding prohibitions on acts of fraud and misrepresentation;
- General information regarding the statewide voter registration database, Texas Election Administration Management (TEAM) System, including public utilization; and

Eligible Activities Source 2:

Educate voters regarding accessibility issues which may include –

- Educating the disability community about how and when to register to vote, apply for ballots by mail, where to vote during early voting or on election day, the right to a secret ballot under state law, and methods of voting using available accessible voting machines in certain counties;
- Working with disability advocacy groups based upon the quality and extent of their proposed voter outreach programs for the disabled;
- Working with disability advocacy groups to develop additional, innovative approaches to voter outreach programs for the disabled; and
- Ensure that training materials are available in a number of accessible formats.

## 1.5 PROJECT DESCRIPTION AND REQUIREMENTS
### 1.5.1   Scope and Requirements

It is expected that project requirements for both Phase I and Phase II will be substantially similar, except that Phase I will seek to educate and communicate with Texas voters in the March 2012 primary election (and any subsequent run-off), and Phase II will seek to educate and communicate with Texas voters in the November 2012 general election. Additionally, it is expected that the activities in Phase I will incorporate approximately 40% of the allocated budget and Phase II approximately 60%. Consistent with the broad goals set forth in Section 1.1 of this RFP, and the foregoing, specific tasks to be implemented may include, but are not limited to, the following:

- Develop overall concept and design of voter education materials consistent with current branding/VOTEXAS;
- Provide creative consultation and production consultation with SOS;
- Research, plan and develop voter information/outreach strategies, messages and materials for the general statewide voting population, and various subgroups such as the Spanish-speaking population, special needs population, and young and elderly voters;
- Research, plan, develop and implement strategies, messages and materials to inform the statewide voting population and targeted sub-groups of the photo identification requirements and processes as a result of Senate Bill 14;

TX_00298768



- Plan, design and produce educational voter information/outreach materials in multiple formats, including television, print, radio, electronic formats, Internet and in video formats that are research-based and appropriate for selected venues and media;
- Update the VOTEXAS.org web site as requested by SOS. Updating the SOS main website, www.sos.state.tx.us, is a responsibility of SOS;
- Make recommendations to and assist the SOS as necessary with comprehensive media and community relations support to plan, coordinate, advertise and successfully execute all voter education and outreach events;
- Following coordination and approval by SOS, solicit support and involvement of appropriate partner organizations to maximize voter education and outreach;
- Plan and implement innovative and effective special events and activities that engage the public in meaningful ways and achieve desired results;
- Develop and implement social media opportunities as a way to supplement traditional communications methods to inform all Texans of the registration and voting process;
- Coordinate with the Secretary of State's Office and local election officials to plan, develop, schedule and implement possible voter education telethons that maximize citizen participation;
- Develop materials and activities to enhance participation of military and overseas voters in the opportunities provided through the Military and Overseas Voting Empowerment (MOVE) Act;
- Weekly update meetings, status reports, detailed activity reports for prior weeks, and possible oral presentations to SOS executive staff on a regular basis;
- Provide Awareness Tracking at various stages of the program. Benchmark tracking shall be provided prior to Phase I followed by awareness tracking after Phase I and II. SOS will review awareness tracking after both phases to determine effectiveness of the level of awareness of the program and dissemination of the messages to the public. Contractor may be required to improve and/or modify delivery of messages. SOS Awareness Tracking shall include the engagement of an independent subcontractor, approved by SOS, to conduct awareness tracking. The subcontractor shall provide SOS a copy of the raw data (in electronic form) from the evaluation, as well as a written narrative report. The effectiveness of the program will be analyzed in light of the following:
  - Quality and level of recall for the advertising;
  - Ways in which attitudes about voting have been altered;
  - Key demographic characteristics of target markets/audiences; and
  - Level of awareness and understanding of:
    - How to register to vote;
    - Voter photo identification required by SB14
    - Polling place processes and procedures;
    - How to properly cast a ballot; and
    - MOVE Act;
- Collaborate with SOS and Contractor's research firm to identify and meet research needs, including reviewing survey instruments, discussion guides, and other research tools, preparing concepts or storyboards to test with members of the target audience(s) and applying research findings to overall marketing, advertising and public information strategies;
- Provide media placement at a level established by mutual agreement with SOS and the Contractor;
- Purchase media time or space for programs and messages appropriate to the identified target audience(s). Advertising media may include, but not be limited to:
  - Print, television, and radio advertisements;
  - Outdoor (billboards);
  - Public transit;
  - Internet projects;
  - Soliciting free media time or space for public service announcements as appropriate; and
  - Maintaining records of all contractor-assisted and non-assisted placements, including all print, audio-visual and Internet publicity;
- Provide reports on the types and amount of complimentary promotional assistance provided;
- Evaluate marketing, advertising and public information activities and campaigns for effectiveness using appropriate evaluation processes and measurements. This may include tracking awareness, attitudes, and practices of target audience(s) during various stages of

TX_00298769

*9-4*

campaigns and activities to determine effectiveness in achieving desired goals, objectives and outcomes;

○ Using methods established by mutual agreement between the SOS and the Contractor, to calculate and report, if requested and approved by SOS, the earned media value for all publicity generated;

○ In addition to conducting long term planning to ensure a successful project, the Contractor must effectively address unexpected or unforeseen communication issues, opportunities and needs with regard to voter education issues as requested or identified by SOS, and have budget contingencies for such issues and needs; and

○ Develop and produce four (4) copies of a final report that summarizes the overall voter education and outreach project, including summaries of research, overall project concept, copies (or storyboards) of all final ads and final project materials, media placement, added value media, event summaries, telethon summaries and partnership activities.

Additionally, the Contractor shall:

○ Adhere to the SOS Terms and Conditions identified in this solicitation including (without limitation) any portion of the "Contract" as defined in this solicitation or its attachments;

○ Provide all labor, materials and equipment necessary to meet requirements of the specified services throughout the term of the Contract;

○ Promptly notify SOS in writing of events which have a significant impact on Contractor production, including:

  ▫ Problems, delays or adverse conditions which will prevent the meeting of time or work schedules;

  ▫ Favorable developments which will enable meeting time or work schedules sooner than anticipated; and

  ▫ Provide project briefings upon request.

1.5.2   General Personnel Requirements

The proposer shall have a Project Manager whose primary responsibility shall be the day-to-day operation of the service in accordance with the requirements of the Contract arising out of this RFP:

○ Proposer shall utilize permanent staff members;

○ Proposer's personnel shall effectively communicate orally and in writing; and

○ Refer to Section 3.6, Experience and Capability.

1.5.3   Additional Service Requirements

The Contractor shall:

○ Have the ability to begin work on this project within 15 days of award of the purchase order or on the agreed upon date between SOS and the Contractor;

○ Recommend and develop strategies to most effectively achieve desired results through the creation of marketing, advertising and public information campaigns, initiatives and activities;

○ Provide professional marketing, advertising and communications services to implement strategies and assist SOS in managing communication issues as they arise;

○ Develop targeted information campaigns and activities consistent with the Help America Vote Act of 2002. Applicable marketing, advertising and public information services may include, but not be limited to determining appropriate goals, objectives and strategies for achieving desired outcomes, including identifying concepts, messages, target audiences, activities, rationale and justification for activities, research needs, evaluation processes and measurements, media markets, and all other activities associated with the recommended strategies; and

○ When appropriate, and as required by SOS, the Contractor shall coordinate activities with county election officials, other SOS contracted firms, other state agencies, election advisory committees, and local, regional and state-wide election associations and organizations involved with or affected by services provided under this contract.

1.5.4   SOS Responsibilities

SOS will provide management oversight and written advance approval of all work projects performed by the Contractor and its subcontractors including, but not limited to, release or implementation of any material developed. SOS will provide specific outline of duties with billing instructions per activity prior to activity being undertaken.

TX_00298770

SOS will schedule meetings with the Contractor to monitor progress of work.

SOS will provide advance written approval or disapproval of Contractor's key personnel assigned to the Voter Education and Outreach Program, including any personnel changes.

SOS will evaluate all Contractor services and work products for quality and compliance with the applicable contract requirements.

## 1.6 PROPOSAL EVALUATION AND CONTRACT AWARD

The SOS will conduct a fair, comprehensive and impartial evaluation of all proposals received in response to this RFP using an evaluation committee, and final decision-making authority with respect to the selection of a Contractor rests with the Secretary of State.  The evaluation committee will be selected by the Secretary of State and may consist of SOS employees or outside individuals with expertise in particular areas. SOS's General Counsel, other in-house legal counsel, and outside legal counsel may assist by advising the evaluation committee or sitting on the committee at the request of the Secretary of State.

Each member of the evaluation committee will conduct an independent review of each proposal submitted. All persons involved in this RFP process will sign a non-disclosure statement.  The evaluation committee will make a recommendation based on the procedures set forth in Section 4.2 of this RFP to the Secretary of State concerning its belief which proposers merit further consideration.    Selected proposer(s) may be requested to perform oral presentations, as more fully set forth below in Section 1.7 of this RFP.  SOS may request some or all proposers to make one or more oral presentations.

SOS may request clarification of information or representations in a proposal before completing the initial evaluation.  Refer to Page 1 regarding proposer responses to inquiries and requests.

## 1.7 ORAL PRESENTATIONS

Proposers may be required to make one or more oral presentations.  Proposers must be prepared to be available for such a presentation(s), if requested.

Each Proposer invited to make an oral presentation will be allowed one hour for the presentation, and an additional one half-hour will be provided for questions from SOS.  A schedule will be provided to proposers making an oral presentation giving the exact time of each stage of presentation.

The order of participation in oral presentations will be determined at random.  Oral presentations must substantially represent material included in the original written proposal, with emphasis placed on the creative response aspects of the proposed solution.

Members of the evaluation committee, the Secretary of State and other individuals selected by SOS may be present during the oral presentations.  Oral Presentations will be held at the offices of the Office of Secretary of State in Austin, Texas.  A total of four (4) individuals representing a proposer will be allowed during a presentation.


## SECTION TWO         GENERAL INSTRUCTIONS AND STANDARD PROPOSAL REQUIREMENTS

All proposals in response to this request must meet the following conditions in order to be considered.  Failure to meet these conditions shall result in disqualification of proposal and the proposal shall receive no further consideration.

2.1    NOTICE OF INTENT TO SUBMIT A PROPOSAL; PROPOSAL SUBMISSION; DATE, AND TIME

WITHOUT EXCEPTION:

- NOTICE OF INTENT TO SUBMIT A PROPOSAL FROM PROPOSERS MUST BE RECEIVED BY SOS PURCHASING DEPARTMENT BY 5:00 P.M., OCTOBER 17, 2011 IN AUSTIN, TEXAS; AND

- PROPOSALS MUST BE RECEIVED BY SOS PURCHASING DEPARTMENT BY 5:00 P.M., NOVEMBER 9, 2011 IN AUSTIN, TEXAS.

TX_00298771

7-6

A form of the Notice of Intent to Submit a Proposal is included as Attachment A attached hereto.

Proposals must be submitted with the proposer's name, RFP number and proposal due date prominently visible on the packaging. If multiple packages are used, the proposer should indicate on each package "___ of ___."

Facsimile transmissions (FAX) of proposals will not be accepted under any circumstances.

Proposer must sign the "Execution of Offer, Affirmation of Terms and Conditions, and Proposal Preferences" instrument, included as Attachment B hereto. By signing, the Proposer or the Proposer's legally authorized agent affirms that all statements within the proposal are true and correct. Discovery of any false statement in the proposal is a material breach and shall void the submitted proposal or any resulting contracts.

### 2.1.1   Receipt of Proposals

To be eligible to be considered for funding, proposals must be received in the SOS Purchasing Department on or before November 9, 2011 at 5:00 p.m. local time, Austin, Texas, as set forth above. In establishing the time and date of receipt, the SOS will rely solely on the time/date stamp/signature of the Purchasing Department.

### 2.1.2   Method of Submittal

Regardless of the method of submitting the proposal (i.e., United States Postal Service, United Parcel Service, Federal Express, or any other delivery service), the proposal must be received in the SOS Purchasing Department by 5:00 PM local time, Austin, Texas on or before November 9, 2011 in order to be considered.

SOS will not accept a United States Postal Service postmark and/or round validation stamp, mail receipt with the date of mailing stamped by the United States Postal Service, a dated shipping label, invoice or receipt from a commercial carrier, or any other documentation as proof of receipt of any proposal. Proposers are advised that SOS assumes no responsibility, due to any circumstances, for the receipt of a proposal after the due date of November 9, 2011, as set forth above.

### 2.1.3   SOS Purchasing Department

SOS Purchasing Department is open Monday through Friday, 8:00 a.m. to 5:00 p.m., excluding state holidays. SOS Purchasing Department is located in Suite 405 of the Rudder Building, 1019 Brazos Street, Austin, TX 78701

The mailing address is:

Office of Secretary of State
Purchasing Department
James E. Rudder Building, Suite 405
1019 Brazos Street
Austin, TX 78701-2413
Attn: Mary Jon Urban
Email: RFP#12111@sos.state.tx.us

### 2.1.4   Number of Copies of Proposal

One (1) original copy of the proposal (marked "ORIGINAL") and five (5) copies of the proposal must be submitted. The required number of copies of the proposal must be received in the SOS Purchasing Department by 5:00 p.m. November 9, 2011. Failure to meet this condition shall result in disqualification of the proposal and the proposal shall receive no further consideration.

Photocopying is not available at SOS.

Additions or replacements to the proposal will not be accepted after 5:00 p.m. on November 9, 2011.

### 2.1.5   Notice of Intent to Submit a Proposal

All potential proposers must notify the SOS in writing of their intent to submit a proposal. This notice is included as Attachment A, and must be submitted by October 17, 2011, to SOS Purchasing Department. Failure to so notify SOS will disqualify the proposed vendor from submitting a proposal.

TX_00298772

2.2     SCHEDULE / CRITICAL DATES

| DATE | EVENT |
|------|-------|
| October 3, 2011 | Expected issuance of RFP and publication in the Electronic State Business Daily portion of the Texas Marketplace |
| October 17, 2011 | Notice of Intent to submit a proposal is due in the SOS Purchasing Department at 5:00 p.m., local time, Austin, TX |
| October 24, 2011 | Questions from Proposers due to SOS Purchasing Department |
| October 27, 2011 | SOS responses to questions from proposers answered and posted to ESDB |
| November 9, 2011 | Proposal is due in SOS Purchasing Dept. at 5:00 P.M., local time, Austin, TX |
| November 17, 2011 | Proposals evaluated by SOS evaluation team |
| Dec. 5 - 12, 2011 | Oral Presentations performed and  evaluated by evaluation team |
| December 15, 2011 | Contract award |
| January 4, 2012 | Project start date |
| On or prior to February  6, 2012 | Phase I completed |
| On or prior to October  5, 2012 | Phase II completed |
| January 31, 2013 | Ending date of contract |

*IT SHOULD BE NOTED THAT THE SECRETARY OF STATE MAY VARY ALL OF THESE DATES AS CONDITIONS REQUIRE.*

2.3     QUESTIONS RECEIVED PRIOR TO PROPOSAL DUE DATE & TIME

The sole point of contact for all inquiries or any requests for additional information concerning this RFP shall be made via email to RFP#12111@sos.state.tx.us.

2.3.1   Requests for Additional Information

In order to assure that no prospective vendor may obtain a competitive advantage because of acquisition of information unknown to other prospective vendors, any additional information that is different from or in addition to, information provided in the RFP, will be provided only in response to written inquiries via e-mail as set forth in Section 2.3 of this RFP.  All such inquiries and the written answers prior to the deadline for submission of  the proposers' "Notice of Intent" to submit a proposal will be posted as an addendum to the RFP on the Electronic State Business Daily (ESBD) at http://esbd.cpa.state.tx.us/.  After the deadline date for the Notice of Intent, only those proposers who successfully submitted a "Notice of Intent" will be issued any additional inquiries and corresponding answers.

It is the responsibility of interested parties to periodically check the ESBD for updates to the procurement prior to submitting a bid. The Respondent's failure to periodically check the ESBD will in no way release the selected vendor from "addenda or additional information" resulting in additional costs to meet the requirements of the RFP

2.4     STANDARD PROPOSAL REQUIREMENTS

Proposals that address only part of the requirements contained in this RFP may be considered non-responsive.  SOS reserves the right to reject any and all proposals and to negotiate portions thereof.  The selected proposal may not necessarily be funded for the amounts indicated in any advertised scenario. The budget submitted by the proposed vendor is subject to negotiation by SOS.  SOS reserves the right to select the proposal containing the best value to the state considering the outcomes desired as described herein.   The proposed vendor shall furnish such additional information that SOS may reasonably require.   SOS may, in order to obtain an acceptable definitive contract with the selected Proposer, modify the terms of this RFP through negotiations with respect to such definitive contract before the execution of such contract on terms that are mutually agreeable to both SOS and the selected Proposer.

*9-8*

Responses to this RFP shall include all information as requested in this RFP. Each proposer is responsible for its own thorough understanding of the RFP, including all attachments related thereto. In addition, each proposer is solely responsible for its response and all documentation submitted. Proposers are cautioned to pay particular attention to the clarity and completeness of their response. The clarity and completeness of a response will be considered by the evaluation committee.

## 2.5 STATE NOT RESPONSIBLE FOR PREPARATION COSTS

SOS will not be liable for any costs incurred in the preparation and submittal of a proposal, or costs associated with performing requested oral presentations.

## 2.6 CONFLICT OF INTEREST

Under Section 2155.003 of the TX Gov't Code, a SOS employee may not have an interest in, or in any manner be connected with a contract or bid for a purchase of goods or services by an agency of the state; or in any manner, including by rebate or gift, accept or receive from a person to whom a contract may be awarded, directly or indirectly, anything of value or a promise, obligation, or contract for future reward or compensation.

Proposers represent and warrant that their provision of services or other performance under a Contract arising out of this RFO will not constitute an actual or potential conflict of interest and represent and warrant that it will not reasonably create even the appearance of impropriety. Proposer shall disclose any current or former employees who are current or former employees of the state, or any proposed personnel who are related to any current or former employees of the SOS.

Any individual who interacts with public purchasers in any capacity is required to adhere to the guidelines established in Section 1.2 of the State of Texas procurement manual which outlines the ethical standards required of public purchasers, employees, and vendors who interact with public purchasers in the conduct of state business. Entities who are interested in seeking business opportunities with the state must be mindful of these restrictions when interacting with public purchasers of SOS or purchasers of other state agencies. Proposers must disclose any potential or perceived conflicts of interest that could, directly or indirectly, be implicated by the performance of the requirements under this RFP prior to award and thereafter within five (5) days upon becoming aware of any such conflicts that may arise.

## 2.7 HISTORICALLY UNDERUTILIZED BUSINESS (HUB) SUBCONTRACTING PLAN

Subcontracting opportunities are possible for the Contract arising out of this RFP and proposers are encouraged to subcontract with HUBs. HUBs are defined in Tex. Govt. Code, §2161.001. Proposers may choose to subcontract any portion or all of the services with HUBs.
All Proposers are required to submit a HUB Subcontracting Plan ("HSP") with their response to this RFP.

**Proposers that fail to submit a HSP will be rejected for noncompliance with the advertised RFO specifications.**

The HSP documents a vendor's good faith effort to award subcontracts to HUBs in accordance with the following percentages:  33% for other services contracts

The HSP will be incorporated into a contract arising out of this RFP, between SOS and the selected Proposer.

If a proposer is awarded a contract, it will be responsible for monthly Progress Assessment Reports filed by the 15th of each month for the previous period activities.

To assist the proposer in making a good faith effort, the SOS has identified the following opportunities as potential subcontracting opportunities under this RFP:

o   Class: 915  Communications and Media Related Services
915-04        Advertising, Outdoor Billboard, etc.
914-14        Broadcasting Services, Radio
915-15        Broadcasting Services, Television
915-42        Film Production Services
915-48        Graphic Arts Services (Not Printing)
915-58        Mailing Services
915-71        Newspaper and Publication Advertising
915-73        Public Information Services
915-72        Photography (Not Including Aerial Photography)
915-74        Radio Commercial Production
915-78        Television Commercial Production

RFP 12111
Page 10

TX_00298774

|       |                                |
|-------|--------------------------------|
| 915-82 | Video Production              |
| 915-96 | Web Page Design or Management Services |

- Class: 961 Miscellaneous Services
  | | |
  |--|--|
  | 961-75 | Translation Services |

- Class: 965 Printing Preparations: Etching, Photoengraving, and Preparation of Mats, Negatives and Plates
  | | |
  |--|--|
  | 965-15 | Artwork, Camera Ready |
  | 965-46 | Graphic Design Services for Printing |

- Class: 966 Printing and Related Services
  | | |
  |--|--|
  | 966-59 | Offset Printing, General, Large Press Work (Qty. over 100,000), One or More Colors, No 4 Color Processes or Close Registration; Finished sizes may exceed 11 x 17 |
  | 966-60 | Offset Printing, Large Production Runs (Qty. Up to 100,000); 4 Color Process or Close Registration Required: Color Brochures, Maps, etc. |
  | 966- 61 | Offset Printing, Large Production Runs (Qty. over 100,000); 4 Color Process or Close Registration Required: Color Brochures, Maps, etc. |
  | 966-86 | Specialty Printing; Die Cutting, Laser, Plastic, Thermography, etc. |

A partial list of potential HUBs can be found at http://www.window.state.tx.us/procurement/cmbl/cmblhub.html.  Search "HUBs on CMBL" and "HUBs not on CMBL".  Enter the Class Code and the Item number.  These vendors are registered on the Comptroller of Public Accounts' Centralized Master Bidders List (CMBL) or other related listing.  The SOS does not endorse, recommend nor attest to the capabilities of any company or individual on these lists.

HSP forms and instructional videos can be accessed at http://www.window.state.tx.us/procurement/prog/hub/hub-subcontracting-plan/

## 2.8    INDEPENDENT AUDITING STANDARDS AND CONFLICT OF INTERESTS

If an entity or its subsidiary has or is currently contracted with SOS to perform professional services or consulting (non-audit) services, then they cannot be awarded a contract to provide financial audit, attestation, or performance audit services for two years from finishing an engagement.

An entity or its subsidiary that performed financial audit, attestation, or performance audit services for SOS, may not receive a contract award to perform professional services or consulting (non-audit) services for two years.

## SECTION THREE              PROPOSAL FORMAT AND CONTENT

## 3.1.    PROPOSAL FORMAT AND CONTENT

Proposals must be submitted entirely on 8 ½" X 11" white paper, except the Task Activity Plan which may be a fold-out, and must be limited to 20 pages (10 duplex pages or 20 single-sided pages) not including appendices and attachments.  Proposals should be legible and type no smaller than 9 point font.  Proposer's response to Sections 3.2 Understanding of the Project & Methodology, Section 3.3 Exceptions, Section 3.4 Proposed Activity Plan, and Section 3.6 Experience and Capability count toward the 20 page maximum.  Bios or resumes may be included as attachments but are not to be provided in lieu of the information requested in Section 3.6.  Proposals should be stapled or clipped in some manner; no notebooks or binders.  The proposer shall submit one signed and dated original (marked "Original") and five copies (marked "Copy").  Proposals must be submitted in a manner which does not carry any benefit, keepsake, or value for members of the evaluation team.

In addition, responses to this RFP should also be submitted on a compact disk or USB flash drive in MS Word, Excel and/or Adobe Acrobat  All appendices and attachments must be included on the disk or memory stick.  Label the disk or USB flash drive with Proposer's name.  Only one electronic copy is required.  Discrepancies between the hard copy of any response to this RFP and electronic formats of same will be resolved in favor of the hard copy of the response to this RFP

TX_00298775

9-10

Facsimile transmissions of responses to this RFP will not be accepted under any circumstances.

Refer to Attachments B, 2, MMM regarding designations of material as purportedly proprietary or otherwise confidential in electronic copies or hard copies.

### 3.1.1   Proposal Cover Page & Vendor Identification

Proposals should include a cover page, which includes the information shown on the attached sample cover page. A sample cover page is attached hereto as Attachment C.

Proposer shall provide to SOS its 9-digit Federal Employer's Identification Number (FEI); or 14-digit State of Texas Vendor Identification Number (VIN). Proposer shall also provide to agency the entity's charter number or certificate of registration issued by the Texas Secretary of State's office. The Proposer that is awarded a contract arising out of this RFP must be registered with the Secretary of State to perform business in the state of Texas.

### 3.1.2   Response Checklist

This checklist is to assist vendors in ensuring that all information is included in their response. Vendors must refer to the appropriate section of the RFP for detailed information on the following. Response content should be presented in the order shown below.

| | |
|---|---|
| ☐ Notice of Intent to Submit a Proposal | Sec. 2.1.5 |
| ☐ RFP Cover Page | Sec. 3.1.1; Attachment C |
| ☐ Understanding of the Project and Methodology | Sec. 3.2 |
| ☐ Exceptions | Sec. 3.3 |
| ☐ Proposed Activity Plan with cost proposal | Sec. 3.4 & 3.5; Attachment D |
| ☐ Experience and Capability | Sec. 3.6 |
| ☐ Signed Execution of Offer, Affirmation of Terms and Conditions, and Proposal Preferences | Attachment B |
| ☐ HUB Subcontracting Plan | Sec. 2.8 |
| ☐ Proposal electronic copy | Sec. 3.1 |

Failure to return all information on the checklist may disqualify the proposal.

### 3.2.   UNDERSTANDING OF THE PROJECT AND METHODOLOGY

The proposed vendor must demonstrate how it will achieve the mandatory objectives set forth in Section 1.5, and must specifically commit that the offer to provide services pursuant to this RFP, embodied in the response to this RFP, is valid for 90 days from November 9, 2011. Any proposal containing a term of less than 90 days shall be rejected.

### 3.3.   EXCEPTIONS

If proposer takes any exceptions to any specifications and/or terms and conditions contained in this RFP, these exceptions must be specifically and clearly identified by section in proposer's response and proposer's proposed alternative must also be provided in its response. Proposers cannot take a "blanket exception" to the entire solicitation. AT THE SOLE DISCRETION OF SOS, AN EXCEPTION IN WHOLE OR IN PART MAY RESULT IN THE DISQUALIFICATION OF SUCH PROPOSAL.

### 3.4.   PROPOSED ACTIVITY PLAN

Proposers must plan for the project starting date of no earlier than January 4, 2012, and an ending date of no later than January 31, 2013. The proposer must submit a proposed activity plan (Attachment D) for the scenario identified in Section 3.5, specifying to the degree possible, the tasks and activities which are to be undertaken or delivered (as applicable). Timelines showing beginning and ending dates for each major task are to be included. Activities must be sufficiently designed and outlined in the activity plan that will provide evidence of satisfactory delivery of services and products. Time frames must be logical and appropriate to complete all activities within the beginning and ending dates of the contract. The Tack Activity Plan (Attachment D) may be expanded as determined by the Proposer. Failure to meet this condition shall result in disqualification of proposal and the proposal shall receive no further consideration.

TX_00298776

*9-11*

**3.5.   COST PROPOSAL**

The Proposer must submit a cost proposal it believes is necessary to accomplish the project objectives and activities of this RFP, in the form attached hereto, Attachment D, Proposed Activity Plan. The cost proposal should be itemized by each activity suggested by the proposer to accomplish project objectives.

The vendor's proposal must submit a cost proposal for the following scenario, which is an assumption, made only for evaluation purposes:

- Scenario – Proposer should assume a total budget of no more than $3,000,000.00

**IN NO WAY DOES THE FOREGOING BIND SOS TO ANY TOTAL BUDGET AMOUNT.   THE FOREGOING IS PURELY AN ASSUMPTION TO BE UITLIZED SO THAT SOS MAY COMPARE PROPOSALS FROM DIFFERENT PROPOSERS ON A LIKE BASIS.  THE ACTUAL TOTAL BUDGET MAY BE SIGNIFICALLY GREATER OR SIGNIFICANTLY LESS THAN THE SCENARIO PRESENTED IN THIS SECTION.**

**3.6.   EXPERIENCE AND CAPABILITY**

The Contractor is likely to be a full-service advertising agency, providing account service, media buying, and creative services in-house.

Proposers shall provide:

- Brief profiles on individuals who will be part of Proposer's key personnel on the project, including, but not limited to, the individual's name, title, education, years of experience, role and responsibility on the project and hourly pricing for personnel staff that will work on the project.
  - The proposer's Project Manager shall have a minimum of five (5) years full service marketing experience or comparable experience; and
  - Key personnel shall have a minimum of three (3) years experience in their respective service area(s);
- Information demonstrating it is an established company engaged in the business of developing and implementing public information programs and initiatives for a minimum of five years;

- An example of a similar project of equal size completed in the last five (5) years that includes information on the project's:
  - Goals and objectives of the project, campaign or initiative;
  - Market research approach, to include target audience, stakeholder groups, messaging, campaign strategies and other related information;
  - Project Work Plan with milestones and deliverables;
  - Purchase of air time appropriate for target audience(s), including any "added value";
  - Project budget – was project accomplished within budget and if not explain why;
  - Tools, methods and processes used to evaluate the effectiveness of the project, campaign or initiative; and
  - Approach used to plan and implement innovative and effective advertising and public information strategies to achieve the desired results;

- A list of clients that includes decision-making personnel from at least two (2) previous projects of a similar size and complexity to this project. The project submitted to fulfill the above request may be one of these two project clients. Provide client contacts that have/had hands on, day to day knowledge of that project and your performance. Describe the services provided to those clients.  The services shall have been provided by the proposer to the reference company or entity within five (5) years preceding the issue date of this RFP.  By providing a client list, the proposer agrees that the SOS may contact any or all of the clients for reference regarding activities, performance and services provided; and

- The Proposer must provide a brief company history, including the founding date, the number of years it has been in business as currently constituted, and a brief description of its marketing, education and outreach philosophy.

TX_00298777

9-12

Consistent with the broad based goals set forth in Section 1.1 of this RFP, proposers should demonstrate how they meet the following vendor qualifications:

- Demonstrated experience in designing, managing and implementing statewide advertising campaigns, including but not limited to media buying, direct mail capabilities, online services, TV/radio/print advertising and survey research;

- The proposer's team has the ability to conduct outreach to various subgroups within the general voting population;

- Considerable in-house capabilities for production of collateral materials, literature and research;

- Education and outreach strategy, as well as creative consultation, production consultation and state-wide rollout strategy and associated training capabilities; and

- Experience in planning, creating and designing collateral materials and strategies to inform a statewide audience and various audiences such as those identified in Section 1.5.

The proposer shall submit the most recent three years audited financial statements, or if audited financial statements are unavailable, un-audited financial statements shall be submitted and certified as true, correct, complete, and accurate by the chief financial officer or treasurer of the respondent's company.

- The proposer shall be in good financial standing, not in any form of bankruptcy or insolvency, current in payment of all taxes and fees such as (but not limited to) state franchise fees, current in the payment of all its material debts and not currently involved in any type of litigation; and

- Provide the name, address, phone number, and e-mail address of the person SOS should contact with any questions regarding the response submission.

## 3.7.   HISTORICALLY UNDERUTILIZED BUSINESS (HUB) IDENTIFICATION

HUBs are encouraged to submit a proposal for the services requested in this RFP. Proposers are encouraged to become HUB certified.  Proposers that are not certified and who wish to become certified should complete the HUB Certification application available at http://www.window.state.tx.us/procurement/prog/hub/hub-certification/.  Proposers should also relay this information to any potential subcontractors who wish to become a certified HUB.  Proposers that are certified as a HUB with the State Comptroller of Public Accounts should attach a copy of the certificate to the proposal.

## SECTION FOUR          REVIEW OF PROPOSALS

### 4.1.   REVIEW OF PROPOSALS

Review of proposals will begin as soon as practical after receipt.  The proposers that receive favorable evaluations during the first round of evaluation may be asked to send a representative to Austin, Texas, at a time and place to be arranged, for oral presentation of proposals.  However, SOS shall be under no obligation to request such oral presentations.  Proposals may be re-evaluated and be considered along with the oral presentations, if any, before SOS makes a final award.

The recommendations of the evaluation team will be assembled and be presented to the Secretary of State.  The Secretary of State may then request additional oral presentations from such proposer(s). Following such oral presentations, if applicable, the Secretary of State will:
1.   Approve one proposal in whole or in part; or
2.   Defer action on the proposals for purposes of further evaluation.

SOS reserves the right to utilize any or all presentation evaluation rounds in its final selection.

SOS will notify each proposed vendor in writing via email of its selection or non-selection.  Additional copies of proposals not selected will be destroyed unless the proposer notifies SOS in writing within thirty (30) days of the date of such vendor's receipt of the non-selection letter requesting that the proposals be returned.  Any such returned proposals will be at such proposer's expense.

### 4.2.   SELECTION CRITERIA

Proposals will be selected based on the ability of each proposer to carry out all of the requirements contained in this RFP.

TX_00298778

*9-D*

RESPONSE EVALUATION: Only complete responses with the listed required submittal documents and meeting minimum qualifications will be considered (Ref. Section 3). Failure to meet the minimum qualifications and submit the required documents will result in a response being declared non-responsive/disqualified.

STEP 1 INITIAL EVALUATION: The SOS evaluation committee will evaluate and score each response based on established criteria. Respondents/proposers shall not contact members of the evaluation team. Responses will be evaluated according to the respondent's ability to best satisfy SOS requirements. The evaluative criteria are as follows:

- Quality of response submission will comprise 50 percent of the evaluation total points possible; demonstrates an understanding and ability to plan and implement the project scope and requirements;
- Respondent qualifications will comprise 30 percent of the evaluation total points possible; and
- Pricing elements will be 20 percent of the evaluation total points possible.

STEP 2 ORAL PRESENTATION: SOS may request that a proposer give one or more oral presentations (See Section 1.7). SOS will evaluate each oral presentation. All responses will be evaluated according to the respondent's ability to demonstrate expertise in marketing, advertising and public relations as outlined in the written response. This presentation will aid in determining whether the specific vendor is well-qualified on the basis of ability, creativity and responsiveness.

The proposer and key proposed personnel should be prepared to address any questions that may be asked by SOS.

NEGOTIATIONS: Upon completion of oral presentation evaluations, SOS reserves the right to enter into negotiations with one or more proposers.

STEP 3 BEST AND FINAL OFFER (BAFO): SOS reserves the right to request a BAFO from the selected proposer(s). The selected proposer shall submit a final price and any added value. If more than one respondent reaches this level, the negotiated terms, references, BAFO and added values will be considered in the award. SOS will make the final determination on the best value.

AWARD: SOS reserves the right to award a Contract to the proposer that provides the best value to the state of Texas and SOS in performance of these services. SOS may award to a single vendor, multiple vendors, or use any combination that best serves the interest of SOS.

SECTION FIVE                    CERTAIN CONTRACTUAL REQUIREMENTS

**5.1.   VENDOR'S PROPOSAL**
The selected proposal may be incorporated into a contract prepared by the SOS for signature by the contracting parties.  No terms of proposal shall become terms of any contract arising out of this RFP unless expressly stated to be so in writing by SOS.

**5.2.   TASK ACTIVITY APPROVAL BY SOS**
The Contractor shall develop a Task Activity Plan for the voter outreach project.  SOS and the Contractor shall determine projected timelines.

Every effort must be made to produce public information materials well ahead of the determined deadlines.  Proofs of collateral and other promotional materials shall be submitted to SOS in a timely manner so that editing is implemented, approval given, and deadlines met.

The SOS will expect the Contractor to develop a cost-efficient plan that is responsive to SOS's educational needs.  In addition to identification and scheduling of projected activities, each activity shall include measurable objectives and estimated costs. Cost Estimate Approval forms may be amended as necessary and as mutually agreed to between SOS and the selected proposer.   COSTS NOT APPROVED IN WRITING BY SOS WILL NOT BE ELIGIBLE FOR REIMBURSEMENT OF ANY KIND AND WILL BE THE SOLE PAYMENT OR OBLIGATION OF THE CONTRACTOR.

**5.3.   EXPENDITURE APPROVAL BY SOS**
The Contractor must make recommendations for savings wherever possible. Prior to the development and execution of any activity the Contractor shall present the SOS Cost Estimate Approval forms with a total cost estimate for the activity.  If any particular line-item's cost will exceed the cost estimate, the Contractor must submit a revised cost estimate and obtain SOS approval for the increase.  The SOS will not be responsible for any expenditure that exceeds the amount approved by SOS on any Cost Estimate Approval form.

TX_00298779

Cost Estimate Approval forms shall be submitted to SOS not less than ten (10) calendar days prior to a project. The SOS project manager will approve or deny a project in writing within five (5) state working days of receipt.

All costs, including but not limited to, research, special project work, commissions, shipping, etc. must be completely detailed in any estimate submitted for approval.  The estimate shall include any fee or commission for the Contractor or any subcontractor.

All purchases and expenditures made by the vendor shall be competitively bid, in accordance with current SOS guidelines for procurement of goods and services, and submitted to SOS on Cost Estimate Approval forms.  When SOS guidelines require competitive bids, typically for purchases over $5,000, whenever possible, the vendor shall provide appropriate bid documentation with the Cost Estimate Approval, along with the vendor's recommendation, for SOS's approval.  The Contractor is encouraged to utilize certified HUBs listed in the state's Centralized Master Bidders List or other available HUB lists whenever possible, for all purchases, when the quality and cost is equal to or better than other bids.

### 5.4.   PAYMENT

All payments are made in accordance with Texas Government Code §2251.001 et seq. Payments for Goods and Services (commonly known as the Prompt Payment Law).  According to guidelines set forth by the Texas Comptroller of Public Accounts, the payment scheduling policy requires agencies to pay as close to the due date as possible in order to maximize fiscal benefits to the state.  Payments are due in 30-days.

Unless otherwise indicated by SOS, payment is only by reimbursement upon satisfactory performance and delivery of goods and services.

Payment is contingent upon submission of a properly prepared invoice/expenditure report.  The contract number/purchase order number must be shown on all invoices. The invoice shall include a detailed report indicating timelines for all activities (with associated task numbers) and services provided which are included in the invoice.  Contractor services shall indicate specific personnel, hours worked and hourly rates as quoted.  As noted above, the cost must have been pre-approved by SOS (in writing; hard copy or electronic).  SOS project manager shall approve all activities invoiced before any payment will be processed.  The information provided on each invoice/expenditure report must coincide with the tasks and cost categories outlined in the approved budget, as approved by the SOS.

Invoices may be submitted once every 30 days by email to SOSAccountsPayable@sos.state.tx.us and the SOS Project Manager.  Monthly invoices should be accompanied by the current Task Activity Plan.

The cost of services rendered or materials produced by organizations on SOS's behalf and not a part of the Contractor's organization (out-of-vendor expenditures) shall be billed at actual cost (i.e., long-distance telephone calls, mailing, shipping, photocopying, and printing). Contractor must submit copies of invoices from all subcontractor's work or materials supplied at net cost.

Advance payments for services will be provided to Contractor only for media air time or space when the activity cost is $75,000.00 or more.  Upon Contractor's receipt of printed verification from supplier of the media air time or space, Contractor shall invoice SOS and SOS shall pay such invoice within three business days from receipt.  Other related fees such as Contractor's fees/commissions will be paid using the standard payment methods addressed in the Contract arising out of this RFP.  Prepayments will be made using electronic transfer of state funds by the State Comptroller

### 5.5.   INSURANCE

All required bonds and insurance as specified in this RFP must be issued by companies or financial institutions which are financially rated A or better as rated by A.M. Best Company and duly licensed, admitted, and authorized to do business in the State of Texas.  SOS shall be named as the Obligee in each required bond and as an Additional Insured in each required insurance contract.  Except as otherwise expressly provided herein, required coverage must remain in effect throughout the term of the Contract and provide full coverage for incidents discovered after termination of the contract.  The Contractor must submit copies of each required insurance contract, and any renewals thereof, to SOS no later than January 1 of each year, except for the first year of the Contract in which the copies of the required insurance contracts must be submitted within fifteen (15) days after contract execution, or as otherwise provided herein.  Contractors must submit required bonds when and as required by this RFP  The Contractor and/or insurance carrier must notify SOS of any cancelation of a policy or renewal 30 days prior to any expiration, cancelation and/or renewal date and failure to do so may be grounds for termination.

TX_00298780

7-15

### 5.6. GENERAL LIABILITY INSURANCE

A Contractor must maintain general liability insurance coverage with limits of not less than one million dollars ($1,000,000) for injury to any one person, two million dollars ($2,000,000) for any one occurrence of personal injury, and one million dollars ($1,000,000) for any one occurrence of property damage. A Contractor shall provide SOS with proof of such coverage upon execution of the definitive contract and thereafter no later than January 1st of each year such contract is in force.

### 5.7. ERRORS AND OMISSION INSURANCE

A Contractor must maintain professional liability errors and omissions insurance of not less than five hundred thousand dollars ($500,000), to be in force and effect during the term of a definitive contract including any extension thereof and one year thereafter. **COVERAGE MUST INDEMNIFY SOS FOR DIRECT LOSS DUE TO ANY ERROR OR OMISSION CAUSED BY THE CONTRACTOR PARTIES (AS DEFINED LATER IN THIS RFP) REGARDLESS OF WHETHER SOLE OR CONCURRENT NEGLIGENCE OR FAULT OF ANY KIND ON THE PART OF THE STATE PARTIES (AS DEFINED LATER IN THIS RFP) IS DETERMINED TO EXIST. THE CONTRACTOR SHALL PROVIDE THE SOS WITH PROOF OF COVERAGE UNDER THIS SECTION 5.7 UPON EXECUTION OF SUCH CONTRACT AND THEREAFTER NO LATER THAT JANUARY 1ST OF EACH YEAR SUCH CONTRACT IS IN FORCE.**

### 5.8. PERFORMANCE BOND

Contractor shall, at the time of execution of the Contract, be required to provide a performance bond in the amount of ONE HUNDRED SEVENTY-FIVE THOUSAND DOLLARS ($175,000) during the term of any definitive contract.

The bond must be maintained in full force and effect for the term of such contract. The bond shall be forfeited to SOS if the Contractor fails to perform as required by such contract.

The performance bond must be received by SOS not later than fifteen (15) days after execution of the definitive Contract.

### 5.9. TRAVEL EXPENSES

SOS may require weekly meetings at SOS headquarters and/or teleconferences to discuss status of implementation of the Task Activity Plan(s). Contractor will not be reimbursed for any travel expenses related to these status meetings.

The Contractor is expected to use its best efforts to minimize expenditures of state funds when traveling to fulfill its obligations under any Contract arising out of this RFP. The Contractor shall use its best efforts to secure the most advantageous airline, hotel and ground transportation rates available. Photocopies of receipts are required for all travel reimbursements, including meals. No reimbursement will be made for tips, gratuities, alcohol, valet parking, room service or any purchases not directly related to the purpose of the travel. Mileage reimbursement for use of a personal or company-owned vehicle will be at the rate established by the Texas State Comptroller of Public Accounts. Contractor must adhere to the State's travel guidelines as promulgated by the Texas State Comptroller of Public accounts, where commercially reasonable and obtain prior approval if unable to adhere to such travel guidelines resulting in higher costs.
  https://fmx.cpa.state.tx.us/fmx/travel/textravel/index.php

### 5.10. PERSONNEL CONTINUITY AND REPLACEMENT

SOS recognizes those events beyond the control of the Contractor such as the death, physical or mental incapacity, long-term illness, or the voluntary termination of employment of key personnel will require the Contractor to offer a replacement. In the event such a replacement is necessary, the Contractor agrees that personnel shall not begin work on the project without prior written approval from SOS.

The Contractor agrees that the project manager and key personnel assigned to all projects shall remain available throughout the entirety of each project and throughout the term of the Contract arising out of this RFP as long as those individuals are employed by the Contractor

If SOS determines the project manager or key personnel are unable to perform in accordance with the service requirements or to communicate effectively, the Contractor shall immediately remove that person.

Proposed replacement personnel shall meet minimum qualifications and have experience comparable to the person(s) being replaced. Replacement personnel shall be provided at no additional cost to SOS. Resume(s) and reference(s) will be provided to SOS for the proposed replacement(s). SOS may reject

TX_00298781

9-16

any replacement if references or past working performance is questionable or unfavorable. SOS will be the sole judge of the qualifications of the proposed replacement personnel.

## 5.11. QUALITY ASSURANCE PLAN

The Contractor shall provide a comprehensive, continuous, and measurable quality assurance plan. The plan shall include:

- Strategies and processes to promote quality;
- Procedures to periodically measure and report quality performance to SOS throughout the term of the Contract arising out of this RFP;
- Performing internal audits of the Contractor's operations;
- Employing external audit firms to conduct audits of the Contractor's operations when requested by SOS, provided that no expenditure for such audits shall be made without SOS's prior approval; and
- Controls to assure quality and consistency throughout the term of the contract arising out of this RFP.

## 5.12. DELIVERABLES

The Contractor shall submit:

- Products and materials as determined and agreed on through the task activity plan process;
- All documentation (i.e., reports, task activity plans, monthly reports, final reports) in a format approved by SOS. All documentation delivered shall be clear, concise, complete and in compliance with standards required the SOS Contract Manager;
- The monthly progress reports (described below) not later than ten (10) days after the end of each reporting period, save and except the HUB Progress Assessment Report which is due no later than the 16th day of the month for the prior month reporting period; and
- The final report (described below) summarizing the project activities, accomplishments and recommendations for a possible future voter education and outreach program.

## 5.13. REPORTS

The Contractor shall submit the following reports, as specified.

### 5.13.1 Monthly Reports

These reports shall be delivered to SOS no later than the 10th calendar day of each month and shall include the following:

- Tracking report - includes a log sheet which records all monthly media placements generated during the prior month's period including but not limited to number of media value generated, circulation, title of publication/program, title of article, media type, publication date description of activity that generated article/program;
- On Going and Complete Projects Update - a description and evaluation of all on-going projects and activities completed by the Contractor (including all necessary back-up) during the prior month's period, including but not limited to all services and work products (e.g., materials production/distribution, industry events, research, trade relations, special events, promotions cooperative marketing ventures, etc.);
- Budget Report - a monthly accounting of the prior month's expenditures, including the monthly service fee and all reimbursables by project/task, projected future expenditures, a cumulative total for the fiscal year and contract period, and an available budget balance for the remainder of the contract period and fiscal year;
- Subcontracting Report - a monthly report of all subcontracts awarded during the month, including HUBs and non-HUBs, the amount of each subcontract, subcontractor vendor identification numbers, the total dollar value of all subcontracts, and any payments made to such during the reporting period. The state's HUB Progress Assessment Report form shall be used to report this subcontractor information;
- Anticipated work schedule - identifies all projected activities and includes measurable objectives, an estimated budget, and per project cost estimates for all activities to be performed by the Contractor during the next month. No work on any activities shall be performed without the prior written approval of SOS;
- Complimentary Assistance Generated - total retail dollar value of all complimentary promotional assistance provided by SOS partners participating in cooperative marketing, promotional, and other activities under the contract;

TX_00298782

9-17

- Texas State Library Filings report - a report and listing of all work products (e.g., brochures, films, recordings reports, documents, etc.) produced under the contract that may be subject to filing with the Texas State Library per the Texas Administrative Code, Title 13, Chapter 3, and delivery of sufficient quantities of qualifying products to SOS; and
- Contractor's Evaluations and Recommendations - Contractor's evaluation on all services (including all work projects and work products) performed under the Contractor's plan of action during the previous month and any recommendations for improvements, including plan revisions and additional services proposed for future implementation.

### 5.13.2  Media Reports
- Detailed projected media placement report prior to each phase; and
- Detailed actual media placement report after each phase.

### 5.13.3  Final Report
On or before January 31, 2013, the Contractor shall submit to SOS a written report that provides a comprehensive overview of the performance of the Contractor's representation services, including but not limited to, a review of all project activities, major accomplishments, performance summary (including all performance measures), industry awards received, final public awareness tracking, and recommendations for a possible future voter outreach program.

TX_00298783

Exhibit 1C

Exhibit 1C:

Bates #'s

TEX 0525002 &
          TEX 0525003

Georgia Secretary of State
Brian P. Kemp

11-1

Exhibit 11

# Photo Identification: Voter Identification Cards

| Year | Cards Issued |
|------|--------------|
| 2006 | 2,182 |
| 2007 | 4,229 |
| 2008 | 12,332 |
| 2009 | 2,473 |
| 2010 | 2,683 |
| Grand Total | 23,899 |





Georgia Secreta

## Brian P.

## Photo Identif

**Georgia Voter ID Card Systen**

2006 Initial Contract Amount

Annual Costs and Training, 2008

Election Personnel Online Trainin

**Grand Total**

ary of State

Kemp

## ication: Costs

| n | |
|---|---|
| | $588.965.00 |
| - 2010 | $169,370.25 |
| g | $15,000 |
| | $773,335.25 |





# Georgia Secretary of State
## Brian P. Kemp



### Photo Identification: Outreach and Education Highlights

- ✓ 5,720 radio PSAs featuring then-Secretary of State Karen Handel and Atlanta Falcons players.
  - ✓ Increased awareness of the photo ID requirement, voter registration deadlines, and early voting options.
- ✓ Atlanta Falcons home games featured end zone-to-end zone LED banners directing fans to visit the Secretary of State's website for more information on photo ID, voter registration and early voting.
- ✓ Radio ads were purchased statewide on Clear Channel stations for airing during news casts, traffic reports, Atlanta Braves games, and on Clear Channel websites.
- ✓ 400 ads were placed inside Atlanta's MARTA buses to remind riders of photo ID.






# Georgia Secretary of State
## Brian P. Kemp

## Photo Identification: Outreach and Education

| Media Type | Number |
|---|---|
| Direct Mail and Utility Bill Inserts | Over 5,009,700 pieces |
| Packages of Photo ID Materials to NGOs (Chambers of Commerce, Churches, Libraries) | 633 packages; over 57,000 pieces |
| Automated Reminder Phone Calls | 83,500 |
| Video PSAs | 1,232 |
| Radio PSAs | Over 60, 610 |
| Press releases | 70 |



*Exhibit 12*    *12-1*

**LEGISLATIVE BUDGET BOARD**
Austin, Texas

FISCAL NOTE, 82ND LEGISLATIVE REGULAR SESSION

May 11, 2011

TO: Honorable David Dewhurst, Lieutenant Governor, Senate

FROM: John S O'Brien, Director, Legislative Budget Board

IN RE: SB14 by Fraser (Relating to requirements to vote, including presenting proof of identification; providing criminal penalties. ), **As Passed 2nd House**

---

Estimated Two-year Net Impact to General Revenue Related Funds for SB14, As Passed 2nd House: a negative impact of ($2,024,000) through the biennium ending August 31, 2013.

The bill would make no appropriation but could provide the legal basis for an appropriation of funds to implement the provisions of the bill.

---

**General Revenue-Related Funds, Five-Year Impact:**

| Fiscal Year | Probable Net Positive/(Negative) Impact to General Revenue Related Funds |
|---|---|
| 2012 | ($2,024,000) |
| 2013 | $0 |
| 2014 | $0 |
| 2015 | $0 |
| 2016 | $0 |

**All Funds, Five-Year Impact:**

| Fiscal Year | Probable Savings/(Cost) from *General Revenue Fund* 1 |
|---|---|
| 2012 | ($2,024,000) |
| 2013 | $0 |
| 2014 | $0 |
| 2015 | $0 |
| 2016 | $0 |

**Fiscal Analysis**

The bill would exempt certain disabled voters from presenting additional identification for voting, other than the voter registration certificate, if the voter submits written document from the United States Social Security Administration evidencing the applicant has a disability or the Department of Veterans Affairs evidencing the applicant has a disability rating of at least 50 percent along with a statement that the applicant does not have an acceptable form of identification. The bill would also require voter registration certificates to contain an indication that the disabled voter is exempted from presenting additional identification, other than the voter registration certificate, before being accepted for voting.

The bill would require the voter registrar of each county to provide a notice of identification requirements for voting with each initial voter registration certificate or renewal registration certificate

12-2

issued.  The Secretary of State (SOS) and the voter registrar of each county that maintains a website would be required to post on their websites, in each language in which voter registration materials are available, a notice of the identification requirements, and county clerks would be required to post a physical copy in each language voter registration materials are available. SOS would be required to prescribe the wording of these notices. SOS would also be required to establish a statewide effort to educate voters regarding the identification requirements for voting and would be required to include education targets at low-income and minority voters.

The bill would require training standards to include instructions on the acceptance and handling of the identification presented by a voter to an election officer and each election clerk would be required to complete this training.

The presiding judge at each polling place would be required to post in a prominent location outside of the location a list of the acceptable forms of identification and the list would have to be separate from any other notices.

The Secretary of State would be required to develop standards for accepting voters when determining whether the voter's name on the voter's form of identification is substantially similar when the name does not match exactly with the name on the list of registered voters and the voter submits an affidavit stating that the voter is the person on the list of registered voters.

The Secretary of State would be required to prescribe the wording for written notifications of the identification requirements for voting beginning with elections held after January 1, 2012 and election officers would be required to provide this written notification of voting identification requirements to voters who do not meet identification requirements.  This section would expire September 1, 2017.

The Secretary of State would be required to prescribe procedures for voters who provisionally vote without proper identification to present proof of identification to the voter registrar not later than the sixth day after the date of the election.

The bill would require a temporary license issued by the Department of Public Safety (DPS) to include the photograph of the person to whom the license is issued and would require the temporary license to be issued on the day of application if all application requirements are met.  If the applicant is out of state or a member of the armed forces of the United States, DPS would be allowed to issue a temporary license without a photograph of the license holder until the applicant has time to appear and be photographed and a license with a photograph is issued.

The Department of Public Safety (DPS) would be prohibited from collecting a fee for a personal identification certificate or a duplicate personal identification certificate issued to a person who states that they are obtaining the personal identification certificate to meet voting identification requirements and does not have another form of acceptable identification and that person meets certain other voter registration criteria.

The bill would repeal Sections 63.007 and 63.008 of the Election Code related to voters with incorrect certificates who are not on the voter list and voters without certificates who are not on the voter list.

The Secretary of State (SOS) would be required to adopt the training standards and to develop training materials as soon as practicable after September 1, 2011. Each county clerk would be required to provide a session of training using the standards adopted by and the materials developed by SOS as soon as practicable as well.

The bill would change an offense under this section after January 1, 2012 to a second degree felony from a third degree felony unless the person is convicted of an attempt, in which case, the offense would be a state jail felony instead of a Class A misdemeanor.

The bill would expand the uses of state funds disbursed under Chapter 19 of the Election Code to include additional expenses related to coordinating voter registration drives or other activities designed to expand voter registration.  This section would expire January 1, 2013.

*12-3*

The bill would state that if any provision in the bill is found by a court to be invalid, the remainder of the bill would be allowed to stand alone.

Sections pertaining to providing notice of voter identification requirements, providing voter identification training, providing voter education to the public, and expanding the uses of voter registration funds would be effective September 1, 2011.  The remainder of the bill would be effective January 1, 2012.

Methodology

The fiscal impact of the bill excluding technology costs is estimated to be $2,000,000 million for fiscal year 2012 out of the General Revenue Fund. The estimate includes $0.5 million to research and develop ways to inform the public of the new identification requirements.  Additional costs are estimated to be $1.5 million for media advertisements: television ($750,000), radio ($300,000), print ($300,000), and internet ($150,000).  The Secretary of State indicates that federal funds associated with the Help America Vote Act (HAVA) may be available for use but the agency would first need to verify this with the federal government.

The Secretary of State would also be required to prescribe the wording for voter identification requirement notifications in each language voter registration materials are available, develop training materials on voter identification requirements, and develop standards for accepting voters when determining whether the voter's name on the voter's form of identification is substantially similar to the name on the list of registered voters.  It is assumed that any fiscal implication associated with these responsibilities could be absorbed within existing resources.

The fiscal impact of expanding the uses of funds disbursed under Chapter 19 of the Election Code to include coordinating voter registration drives or other activities designed to expand voter registration is unknown because it is not known how many voter registration drives or other activities designed to expand voter registration would occur.

The fiscal impact of the costs and revenue loss from the prohibition of DPS to collect a fee for a personal identification certificate and duplicate personal identification certificate issued to a person seeking the certificate for the purpose of voting is unknown because it is not known how many people would make a request for a personal identification certificate for voting.

Technology

The technology fiscal impact of the bill is estimated to be $24,000 for programming costs associated with creating an indicator on voter registration certificates for voters with certain disabilities.  The notification would inform election officers at polling places that voters with certain disabilities are exempted from presenting additional identification other than the voter registration certificate.  The Secretary of State indicates that federal funds associated with the Help America Vote Act (HAVA) may be available for use but the agency would first need to verify this with the federal government.

It is assumed that the state's online portal would need to be modified to allow the Department of Public Safety (DPS) to transmit photographs to be printed on duplicate personal identification certificates.  If the DPS and the state's online portal systems are compatible for transmission, it is assumed that the fiscal impact of this could be absorbed within existing resources.  If the systems are not compatible, it is assumed there would be additional costs.

Local Government Impact

The bill would require counties to notify registered voters of changes online if the county maintains a website, at polling locations, and included with voter registration certificates. Election clerks would be required to undergo training regarding accepted forms of voter identification. The bill would also require an applicant who wishes to receive an exemption from certain voter identification requirements on the basis of disability to include with the person's application documentation that the applicant has been determined to have a disability.

*12 – 4*

Texas Association of Counties (TAC) gathered the following information from counties:

Bexar County stated that due to limited space on current registration certificates, larger cards would be necessary resulting in additional costs of $381,256 for cards, printing and postage. Bexar County also reported costs of $1,500 for providing voter ID informational posters in Spanish and English in 24-point font, and $2,500 in new costs per election regarding printing new forms and provisional envelopes for information for voters not accepted for voting because of failure to present the required identification. Bexar County also anticipates $50,000 in new costs associated with scanning disability affidavits and another $50,000 associated with being required to validate provisional envelopes.

Brazoria County estimated that the county clerk would be responsible $1,500 in new costs to reprint provisional envelopes. The Brazoria County Tax Assessor-Collector anticipates $40,159 in new costs associated with printing provisional envelopes, in addition to the costs of printing new voter information (Brazoria County reported that these costs would vary depending on the specific requirements of the information to be provided).

Tarrant County anticipated a one-time cost of $8,000 to reprint provisional balloting materials and provide new notices.

Comal County anticipated approximately $30,000 in new costs per election for staff at voting precincts and the early voting ballot board. The Comal County Tax Office reported costs of $2,860 to print identification requirements, $22,700 for envelopes, and $19,880 for postage to comply with the provisions of the bill.

**Source Agencies:**  307 Secretary of State, 313 Department of Information Resources, 405 Department of Public Safety

**LBB Staff:** JOB, SD, MS, BTA, KKR

*Exhibit 13*                                                    *13-1*

## 2014 Voter Education Campaign Phase 1- about $400,000 (HAVA)

I. Paid Media
   A. Used TV, Radio, Print and Online advertising
   B. Generated more than 14 million impressions
   C. Leveraged PSA to double budget, usually received a 1 for 1 match
   D. Targeted rural voters, African American voters, and Hispanics
   E. All paid media in English and Spanish
   F. The ads polled well in post-phase I research. When shown the TV ad, 4 out of 5 said they felt favorable to the TV ad and 3 out of 4 found the ad informative and easy to understand.

II. Earned Media
   A. Secretary Berry visited more than 7 media markets across the state to promote voter education and knowledge of photo ID requirements
   B. press releases sent and printed throughout the state
   C. Secretary Berry wrote an op-ed which appeared in the Houston Chronicle.
   D. Radio tours where Secretary Steen called radio stations across the state for interviews publicizing the photo ID requirements
   E. Media releases for all our EIC locations, and Houston Press Conference for EIC mobile station kickoff

III. Web and Social Media
   A. frequent photo ID messages and reminders posted to our established VoteTexas twitter and facebook and reweeted through SOS twitter account
   B. early use of VoteTexas Instagram to encourage voting, role will be expanded in phase II of the campaign
   C. VoteTexas app updated and reflected photo ID info

TLX0524659

13-2

## 2014 Voter Education Campaign Phase II- about $1.6 million (HAVA)

### Please note: Phase II is in the planning stage

I.   Paid Media
  A. continue to use TV, Radio, Print and Online advertising
  B. focus outreach on Hispanic voters, African American Voters, rural voters and young voters
  C. Will likely continue to use the same advertisements as phase I as those were well received and effective
  D. May use other forms of paid media such as outdoor advertising and direct mail to get the word out

II.  Earned Media
  A. Secretary Berry will continue to travel the state to promote voter education
  B. PR efforts to remind people of May 10 and May 27 elections
  C. we will continue to distribute and promote press releases sent and printed throughout the state
  D. Op-eds from Secretary Berry and possibly other opinion leaders
  E. Radio tours where Secretary Steen called radio stations across the state for interviews publicizing the photo ID requirements
  F. Media releases for all our EIC locations
  G. outreach and information kits to stakeholders such as faith groups, community groups, elected officials, appropriate opinion leaders
  H. Special events to help promote VoteTexas resources

III  Web and Social Media
  A. frequent photo ID messages  and reminders posted to our established VoteTexas twitter and facebook and reweeted through SOS twitter account
  B. expanded use of Instagram account to compliment other social media activities
  C. Continue to update and promote photo ID educational materials on VoteTexas.gov

TEX0524660

13-3

## FALL 2013 Campaign $400,000 (all non-HAVA money)

I.   Paid Media
  A.  Used TV, Radio, Print and Online advertising
  B.  Generated more than 25 million impressions
  C.  Leveraged PSA to double budget, usually received a 1 for 1 match
  D.  Reached 251 counties through TV or Radio*
  E.  Targeted rural voters, African American voters, and Hispanics
  F.  All paid media in English and Spanish
  G.  Some print items also produced in Vietnamese and Mandarin

II.  Earned Media
  A.  Secretary Steen visited more than one dozen media markets across the state for events to promote voter education and knowledge of photo ID requirements(list below)
  B.  press releases and op-eds from Secretary Steen sent and then printed throughout the state
  C.  Info packets given to House and Senate members including draft releases about photo ID which were distributed and used across the state
  D.  Radio tours where Secretary Steen called radio stations across the state for interviews publicizing the photo ID requirements, redistributed by DPS
  E.  Media releases for all our EIC locations, and Houston Press Conference for EIC mobile station kickoff

III. Web Social Media
  A.  frequent photo ID messages and reminders posted to our established VoteTexas twitter and facebook and reweeted through SOS twitter account
  B.   updates of photo ID info and EIC locations on VoteTexas.gov
  C.  VoteTexas app updated and reflected photo ID info
  D.  Resources such as photo ID TV and Radio educational ads, posters, and other tools were added to the Resources Section of VoteTexas.gov and promoted to county election officials and other stakeholder groups and the media

*The three counties not reached through TV or Radio are: Zavala, Crane, Terrell. These counties were reached through other efforts.

Places Secretary Steen Visited on photo ID education tour: San Antonio, Corpus Christi, Pharr, Fort Bend, Midland, Dallas, Fort Worth, Wichita Falls, Austin, Abilene, Eastland, Weatherford, Amarillo, Lubbock, Del Rio, Kingsville, Houston

TEX0524736

*Exhibit 14*                                                        *14-1*

**Media/Public Outreach: Election Identification Certificates**
*Texas Department of Public Safety*
August 30, 2012 – May 19, 2014

| | |
|---|---|
| **Aug 2012 – Present** | DPS Media and Communications Office fielded a variety of media inquiries related to election identification certificates (EIC) |
| **2012** | Posted language on DPS website explaining the status of SB14, in that it was pending litigation. |
| **06.25.13** | DPS issues statewide press release announcing EICs will be available at all driver license offices beginning 6.26.13. Press release explains that a photo id is now required for voting in elections in Texas; explains eligibility, application process and requirements; and other facts regarding the issuance and use of the EIC |
| **06.25.13 – Present** | SE Troopers conduct various interviews regarding EIC availability |
| 06.25.13 | DPS issues Tweet related to EICs |
| 08.02.13 | DPS issues Tweet related to EICs |
| 08.07.13 | DPS issues Tweet related to EICs |
| 08.21.13 | DPS issues Tweet related to EICs |
| 09.04.13 | DPS issues Tweet related to EICs |
| **09.13.13** | DPS issues statewide press release: "Select Driver License Offices Open Saturdays to Issue Election Identification Certificates" |
| 09.13.13 | DPS issues Tweet related to EICs |
| 09.13.13 | DPS issues Facebook post related to EICs |
| **09.24.13** | DPS issues statewide press release: "Mobile Stations to Issue Election Identification Certificates Across Texas Beginning Oct. 1" |
| 09.20.13 | DPS issues Tweet related to EICs |
| 09.24.13 | DPS issues Tweet related to EICs |
| 09.25.13 | DPS issues Facebook post related to EICs |
| 10.08.13 | DPS issues Tweet related to EICs |
| 10.21.13 | DPS issues Tweet related to EICs |

*14-2*

**Media/Public Outreach: Election Identification Certificates**
*Texas Department of Public Safety*
August 30, 2012 – May 19, 2014

| | |
|---|---|
| 10.22.13 | DPS issues Tweet related to EICs |
| 10.22.13 | DPS issues Tweet related to EICs |
| 10.23.13 | DPS issues Tweet post related to EICs |
| 10.23.13 | DPS issues Tweet post related to EICs |
| 10.23.13 | DPS issues Facebook post related to EICs |
| 10.24.13 | DPS issues Tweet post related to EICs |
| 10.24.13 | DPS issues Facebook post related to EICs |
| 10.25.13 | DPS issues statewide press release: "REMINDER: Select Driver License Offices Open Saturdays to Issue Election Identification Certificates; *Certificates also available at mobile stations, select county locations throughout the state"* |
| **10.25.13 –**<br>**11.05.13** | **DPS issues local press releases announcing county-run**<br>**EIC operations, providing county contact information** |
| **10.25.13 –**<br>**11.05.13** | **DPS issues local press releases announcing DPS**<br>**mobile station locations / schedules in counties w/o a DL Office** |
| **10.25.13 –**<br>**11.05.13** | DPS issues "In Case You Missed It" press releases highlighting Secretary of State press releases, announcing 25 mobile station locations/schedules in select areas of the state |
| 10.25.13 | DPS issues Tweet related to EICs |
| 10.25.13 | DPS issues Tweet related to EICs |
| 10.25.13 | DPS issues Facebook post related to EICs |
| 10.25.13 | DPS issues Facebook post related to EICs |
| 10.28.13 | DPS issues Tweet related to EICs |
| 10.29.13 | DPS issues Tweet related to EICs |
| 10.29.13 | DPS issues Facebook post related to EICs |
| 10.30.13 | DPS issues Tweet related to EICs |

*14-3*

**Media/Public Outreach: Election Identification Certificates**
*Texas Department of Public Safety*
August 30, 2012 – May 19, 2014

| | |
|---|---|
| 10.31.13 | DPS issues Tweet related to EICs |
| 10.31.13 | DPS issues Facebook post related to EICs |
| 11.04.13 | DPS issues Tweet related to EICs |
| 11.04.13 | DPS issues Facebook post related to EICs |
| **01.29.14** | DPS issues statewide <u>press release</u>: "DPS Reminds Texans: Election Identification Certificates Available at Driver License Offices" |
| 01.29.14 | DPS issues Tweet related to EICs |
| 01.29.14 | DPS issues Facebook post related to EICs |
| 01.29.14 | DPS issues Facebook post related to EICs |
| 01.29.14 | DPS issues Facebook post related to EICs |
| **02.03.14** | DPS issues statewide <u>press release</u>: "Select Driver License Offices Open Saturdays to Issue Election Identification Certificates; *Certificates also available at mobile stations, select county locations*" |
| 02.03.14 | DPS issues Tweet related to EICs |
| 02.03.14 | DPS issues Facebook post related to EICs |
| **02.03.14 – 03.04.14** | **DPS issues local press releases announcing county-run EIC operations, providing county contact information** |
| **02.03.14– 03.04.14** | **DPS issues local press releases announcing DPS mobile station locations / schedules in counties w/o a DL Office** |
| 02.05.14 | DPS issues Tweet related to EICs |
| 02.06.14 | DPS issues Tweet related to EICs |
| 02.06.14 | DPS issues Tweet related to EICs |
| 02.06.14 | DPS issues Facebook post related to EICs |
| 02.10.14 | DPS issues Tweet related to EICs |
| 02.10.14 | DPS issues Facebook post related to EICs |

**Media/Public Outreach: Election Identification Certificates**
*Texas Department of Public Safety*
August 30, 2012 – May 19, 2014

| | |
|---|---|
| 02.12.14 | DPS issues Tweet related to EICs |
| 02.14.14 | DPS issues Tweet related to EICs |
| 02.14.14 | DPS issues Facebook post related to EICs |
| **02.18.14** | DPS issues statewide <u>press release</u>: "DPS Reminds Texans: Election Identification Certificates Available at Driver License Offices, Mobile Stations" |
| 02.18.14 | DPS issues Tweet related to EICs |
| 02.18.14 | DPS issues Tweet related to EICs |
| 02.18.14 | DPS issues Facebook post related to EICs |
| 02.19.14 | DPS issues Tweet related to EICs |
| 02.21.14 | DPS issues Facebook post related to EICs |
| 02.21.14 | DPS issues Tweet related to EICs |
| 02.24.14 | DPS issues Tweet related to EICs |
| 02.24.14 | DPS issues Facebook post related to EICs |
| 02.26.14 | DPS issues Tweet related to EICs |
| 03.03.14 | DPS issues Tweet related to EICs |
| 03.03.14 | DPS issues Facebook post related to EICs |
| **04.17.14** | DPS issues statewide <u>press release</u>: "DPS Reminds Texans: Election Identification Certificates Available at Driver License Offices" |
| 04.17.14 | DPS issues Tweet related to EICs |
| 04.17.14 | DPS issues Facebook post related to EICs |
| **04.23.14** | DPS issues statewide <u>press release</u>: "Select Driver License Offices Open Saturdays to Issue Election Identification Certificates; *Certificates also available at mobile stations, select county locations*" |

**Media/Public Outreach: Election Identification Certificates**
*Texas Department of Public Safety*
August 30, 2012 – May 19, 2014

| | |
|---|---|
| 04.23.14 | DPS issues Tweet related to EICs |
| 04.23.14 | DPS issues Facebook post related to EICs |
| **04.23.14** | DPS begins issuing local press releases announcing county-run EIC operations, providing county contact information |
| 04.28.14 | DPS issues Tweet related to EICs |
| 04.30.14 | DPS issues Tweet related to EICs |
| 05.01.14 | DPS issues Facebook post related to EICs |
| 05.02.14 | DPS issues Tweet related to EICs |
| 05.05.14 | DPS issues Tweet related to EICs |
| 05.06.14 | DPS issues Facebook post related to EICs |
| 05.07.14 | DPS issues Tweet related to EICs |
| 05.09.14 | DPS issues Tweet related to EICs |
| 05.12.14 | DPS issues Tweet related to EICs |
| 05.14.14 | DPS issues Tweet related to EICs |
| 05.13.14 | DPS issues Facebook post related to EICs |
| 05.16.14 | DPS issues Tweet related to EICs |
| 05.16.14 - 05.27.14 | DPS to continue issuing regular Tweets and Facebook posts related to EICs |

*Exhibit 15*                                        *157*

TRANSCRIPT OF PROCEEDINGS BEFORE

THE SENATE OF THE STATE OF TEXAS

EIGHTY-SECOND LEGISLATURE

(COMMITTEE OF THE WHOLE SENATE)

AUSTIN, TEXAS

IN RE:                           §
                                 §
CONSIDERATION OF                 §
SENATE BILL 14                   §



U.S. EXHIBIT
287
McGeehan

COMMITTEE OF THE WHOLE SENATE

TUESDAY, JANUARY 25, 2011

BE IT REMEMBERED THAT AT 8:05 a.m., on
Tuesday, the 25th day of January 2011, the above-
entitled matter continued at the Texas State Capitol,
Senate Chamber, Austin, Texas, before the Committee of
the Whole Senate.  The following proceedings were
reported by Aloma J. Kennedy, Lorrie A. Schnoor and Kim
Pence, Certified Shorthand Reporters.

*#22*

VOLUME 2                              PAGES 20 - 542

435

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
 1              SEN. WENTWORTH:  And then you found a new

 2  location on Pat Booker Road out near Randolph Air Force

 3  Base, and my constituents are very pleased with that

 4  improvement and were grateful that that improvement has

 5  been made.

 6              MS. DAVIO:  Thank you so much.

 7              SEN. WENTWORTH:  Thank you.

 8              MS. DAVIO:  I appreciate that.  It's nice

 9  to hear a good story.

10              SEN. WENTWORTH:  You bet.

11              CHAIRMAN DUNCAN:  Thank you, Senator

12  Wentworth.

13              Are there any other questions of the

14  resource witness?

15              (No response)

16              CHAIRMAN DUNCAN:  All right.  Thank you

17  very much, Ms. Davio.

18              MS. DAVIO:  Uh-huh.

19              CHAIRMAN DUNCAN:  All right.  The Chair

20  calls Ann McGeehan, Secretary of State's Office.  If

21  you'll state your name and who you represent, please.

22              TESTIMONY BY ANN McGEEHAN

23              MS. McGEEHAN:  Ann McGeehan, and I'm

24  Director of Elections in the Texas Secretary of State's

25  Office.
```

*15-3*

436

CONSIDERATION OF SENATE BILL 14 1/25/2011

1          CHAIRMAN DUNCAN:  All right.  Thank you,

2   Ms. McGeehan.

3          The Chair recognizes Senator Davis.

4          QUESTIONS FROM SENATE FLOOR

5          SEN. DAVIS:  Hello.  Good evening.  Thank

6   you so much for being here with us to provide answers

7   for our questions.  I know you've had a long day.

8          I just want to ask you a few questions

9   about the current state of voter education as its taking

10  place today in the Secretary of State's Office.  Can you

11  describe for us the use of the HAVA funds and how those

12  are currently being used today?

13         MS. McGEEHAN:  We received -- when

14  Congress passed the Help America Vote Act, the state of

15  Texas received a set amount of funds.  And pursuant to

16  the Help America Vote Act, there are certain purpose

17  areas that we can use those funds for, and one of the

18  purpose areas is voter education.  So since two -- we

19  have conducted three statewide education -- voter

20  education programs, one in 2006, one in 2008 and one in

21  2010 using those federal dollars.  And they have been --

22  we've worked with a public education firm to do

23  research, and then they develop creative material.  We

24  run PSAs on TV, radio.  In this last cycle, 2010, we

25  used the Internet quite a bit as well.

/5-4

437

CONSIDERATION OF SENATE BILL 14 1/25/2011

1    SEN. DAVIS:  And how many people do you

2  think you reach through your voter education efforts

3  right now?  And how much have each of those cycles of

4  voter education effort cost?

5    MS. McGEEHAN:  The average cost is about

6  $3 million for each one, around that amount.  As far as

7  the number of people we've touched through the campaign,

8  we do have some reports on that.  I don't have that

9  number at my fingertip, but we have a report for each

10  one of the voter education campaigns that talks a little

11  bit about the effectiveness and how many people saw the

12  media spots and things of that nature.

13    SEN. DAVIS:  And are the Help America Vote

14  Act funds funds that are continually given to the state

15  from the federal government, or was it a one-time

16  disbursement that's been used over the course of those

17  three cycles?

18    MS. McGEEHAN:  It was authorized in that

19  one bill.  We've received it in about three or four

20  separate payments.  We don't contemplate that we're

21  going to be receiving any more.

22    SEN. DAVIS:  And what was the total amount

23  that was given to Texas?

24    MS. McGEEHAN:  Let me grab that.  The

25  total amount for all the purpose areas is $224,092,477.

15-5

438

CONSIDERATION OF SENATE BILL 14 1/25/2011

1      SEN. DAVIS:  That's the amount that was
2  given to the state of Texas?
3      MS. McGEEHAN:  Yes.
4      SEN. DAVIS:  Okay.  And so of that amount,
5  how much have we spent so far?
6      MS. McGEEHAN:  Let's see here.  We -- I
7  think we have spent $177,798,488.
8      SEN. DAVIS:  Okay.  And you described
9  spending about $3 million over the last three two-year
10 cycles.  How have we spent the balance of that?
11     MS. McGEEHAN:  Well, I mean, the bulk of
12 the money or about half of the money went to counties to
13 obtain HAVA compliant voting systems, electronic voting
14 systems that made -- that complied with HAVA and allowed
15 disabled voters to vote independently.  So let's see.
16 $140 million went to the counties for that purpose.
17     The other program areas are for developing
18 a statewide voter registration system.  We've spent
19 25 million on that.  And then as far as the
20 administrative expenses, we've spent about 2.8 million
21 on that.  For voter education, we've spent 9.5 million
22 so far.
23     SEN. DAVIS:  And what are the -- setting
24 aside the requirements of the bill that's being
25 introduced today, what are the intended plans for the

15-6

439

CONSIDERATION OF SENATE BILL 14 1/25/2011

1   balance of that money?  Were this bill not to come

2   forward to your department, what would the intended use

3   for those funds be?

4          MS. McGEEHAN:  I can't speak necessarily

5   for, you know, exactly what would be done in the next

6   general election cycle, but I would contemplate we would

7   do another statewide voter education program in 2012,

8   and if funds remained in 2014.

9          SEN. DAVIS:  Is there a plan for ongoing

10  capital expenditures as you talked about, which was the

11  use of the bulk of the funds that we've received so far?

12         MS. McGEEHAN:  Yeah.  There are --

13  there's 24 -- roughly $24 million left in the -- in the

14  purpose area for grants to counties to obtain voting

15  equipment.

16         SEN. DAVIS:  Okay.  And so after you take

17  out that 24 million, what will the balance be that

18  remains for voter education efforts?

19         MS. McGEEHAN:  Well, that's -- that's

20  already frozen as far as the -- in order to draw down

21  those funds, the state had to submit a state plan.  We

22  had to meet with stakeholders, publish in the Register

23  and submit it to the Election Assistance Commission.

24  And so pursuant to that state plan, we had to define how

25  we were going to spend the money, and so these -- the

/5-7

440

CONSIDERATION OF SENATE BILL 14 1/25/2011

1  budget that I discussed is following that state plan.

2          SEN. DAVIS:  Okay.  And under that state

3  plan right now, what portion of funding remains for

4  voter education?

5          MS. McGEEHAN:  For voter -- okay.  And

6  actually to be more precise, what the -- the purpose

7  area for voter education is for voter education and also

8  for election official and poll worker training; that's

9  grouped.  And the amount remaining is between 5 and

10 $7 million.

11         SEN. DAVIS:  Okay.  And that is expected

12 to extend us or to take us through the next how many

13 years under that plan?

14         MS. McGEEHAN:  It will -- again, it's

15 going to depend how extensive our next few voter

16 education programs are because that's what the bulk of

17 the money has been spent on, voter education programs.

18 The average is about 3 million.  So I guess the hope

19 might be for at least two other statewide voter

20 education programs.

21         SEN. DAVIS:  Okay.  And I'm sure you've

22 seen the fiscal note that was a part of this bill.  And

23 by the way, I think it would be very helpful if you

24 would enter that state plan into the record as an

25 exhibit for our further use.

15-8

441

CONSIDERATION OF SENATE BILL 14 1/25/2011

1          I'm sure you've seen the fiscal note that
2    came as a part of this bill in terms of the expected
3    expenditures.  Part of that note talks about a fiscal
4    impact that's related to researching and developing ways
5    to inform the public of the new ID requirements.  That's
6    $.5 million expenditure, an additional cost of
7    1.5 million for media advertisements, television, radio,
8    print and Internet.  That's specifically to educate
9    voters about the new requirements under this bill.
10         What will go undone that's currently in
11   the state plan -- if we take 2 million of the 5 million
12   remaining, what will go undone that's currently in the
13   state plan in terms of voter education effort?
14         MS. McGEEHAN:  I don't know that I have an
15   exact answer to that.  If we're able to incorporate the
16   new voter ID requirements that would be required by this
17   bill into a voter education program, then maybe we
18   wouldn't need 2 million just for the voter ID.  We could
19   parlay that into the -- basically the voter education
20   campaigns that we've done or the voter education
21   programs have been to educate voters on the basic rights
22   on how to vote, what you need to vote.  So it may not be
23   such an extension to incorporate these new requirements
24   for voter ID, or they may.  I mean, depending on the
25   research that we get back from stakeholders and whatnot,

15-9

442

CONSIDERATION OF SENATE BILL 14 1/25/2011

 1   but it's hard for me to say today exactly how much that

 2   may take away from future voter education efforts.

 3               SEN. DAVIS:  When was the last time in the

 4   state of Texas we made any changes of significance to

 5   the voter rules?

 6               MS. McGEEHAN:  Probably the -- when we had

 7   to implement the federal Help America Vote Act.  That's

 8   when provisional voting became a requirement.  There

 9   were significant changes to voter registration as to

10   what's required to become a registered voter, and that's

11   why we have these HAVA dollars for voter education.

12               SEN. DAVIS:  And that began in '06.

13   Correct?

14               MS. McGEEHAN:  Correct.

15               SEN. DAVIS:  Okay.  In '06, the Texas

16   voter registration application form changed in

17   accordance with those requirements, it's my

18   understanding, and that's when we began to collect this

19   data that requested a driver's license number or a

20   social security number.  Is that's correct?

21               MS. McGEEHAN:  That's correct.

22               SEN. DAVIS:  Okay.  So we have data, I

23   guess, only from '06, and that would -- would that only

24   be then for new registrants from '06?  If I had already

25   registered to vote prior to that, you wouldn't have that

/5-/C

443

CONSIDERATION OF SENATE BILL 14 1/25/2011

1  information from me.

2              MS. McGEEHAN:  That's right.

3              SEN. DAVIS:  Correct?

4              MS. McGEEHAN:  That's right.  It was

5  voluntary before.  So we have some TDLs and SSN numbers

6  from -- but it wasn't required until 2006.

7              SEN. DAVIS:  So we've been able to gather

8  that information from that point in time for people who

9  are newly registering to vote in the state of Texas.  Of

10 that group, how many people or what percentage of people

11 are answering one or both of those questions in response

12 to No. 8 versus signing the attestation clause in

13 Section No. 9?

14             MS. McGEEHAN:  Are you asking the number

15 of --

16             SEN. DAVIS:  Let me -- let me break it

17 down better.

18             MS. McGEEHAN:  Okay.  Okay.

19             SEN. DAVIS:  So under Question No. 8, what

20 percentage of people currently, who are requesting a

21 voter registration card, who are filling out the

22 application starting in '06 with this new form, what

23 percentage of people are providing their Texas driver's

24 license in response to the questions on the application?

25             MS. McGEEHAN:  Okay.  I don't have the

/5-11

444

CONSIDERATION OF SENATE BILL 14 1/25/2011

1  percent number, but the actual number is 2.3 million
2  since 2006.  Since January 1, 2006 through December 31,
3  2010, 2.3 million, when they registered, provided their
4  driver's license number.
5              SEN. DAVIS:  What's the total number of
6  applications in that time period?
7              MS. McGEEHAN:  And the total number -- I
8  think it's going to be just under 3 million, and I'm
9  doing math on the fly.  I might have to -- I'd prefer to
10 give that --
11             SEN. DAVIS:  Can you provide that
12 information --
13             MS. McGEEHAN:  Yes.
14             SEN. DAVIS:  -- to us?
15             MS. McGEEHAN:  Yes.
16             SEN. DAVIS:  That would be appreciated.
17             So what's the number of people who are not
18 filling out either the driver's license number or the
19 social security number in Section 8 but instead are
20 going to Section 9 and signing the attestation clause of
21 Section 9?
22             MS. McGEEHAN:  And that's the attestation
23 clause saying they have not been issued either form of
24 ID?
25             SEN. DAVIS:  (Nodded)

*15-12*

445

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
 1              MS. McGEEHAN:  Yeah, that number is
 2   34,506.
 3              SEN. DAVIS:  Okay.  Do we have any -- any
 4   estimate of the number of people who are currently
 5   registered today?  If we've only been gathering that
 6   information since 2006, do we have any kind of an
 7   estimate of the number of people who are currently
 8   registered to vote today who do not have a driver's
 9   license number to provide?
10              MS. McGEEHAN:  Well, if we -- if we look
11   at our entire statewide file, we have 5.2 million voters
12   that did provide a driver's license number or an ID
13   number.  We have 2.1 million voters that present -- that
14   provided a social security number.  4 million of them
15   provided both.  And then the numbers that have
16   neither -- or the voters that hadn't provided either one
17   is 690,887.  So it doesn't necessarily mean that those
18   people haven't been issued, but they didn't -- either
19   they don't have those numbers or they registered before
20   it was required, and so they didn't provide them when
21   they registered if it was pre-2006.
22              SEN. DAVIS:  But the question wasn't
23   asked.  It was -- I guess as you said, you could
24   voluntarily provide that information prior to '06.
25              MS. McGEEHAN:  Well, it was asked, but it
```

KENNEDY REPORTING SERVICE, INC.
512.474.2233
TX_00000801

/5-/3

446

CONSIDERATION OF SENATE BILL 14 1/25/2011

1    was optional.  It was on the form.

2                SEN. DAVIS:  Uh-huh.  Okay.  So we really

3    don't know how many of that group were answering the

4    question voluntarily because they have the number versus

5    those who were not answering it, not because they chose

6    to, but because they did have their driver's license

7    number?

8                MS. McGEEHAN:  Yes, you are correct.

9    That's right.

10               SEN. DAVIS:  So when we're putting

11   together an estimate of what the cost to educate our

12   voters is going to be and when we think about how

13   significant the changes are that are addressed in this

14   bill, what's your -- what's your process been to try to

15   determine how many people will be impacted and what that

16   voter education is going to need to look like?

17               MS. McGEEHAN:  Well, we -- I mean, to be

18   very honest, we haven't done much planning yet.  We

19   prepared this fiscal note on Friday.  That would be

20   obviously a very important component is trying to

21   identify who the appropriate audiences are, who you need

22   to get the information out to.

23               Senator Williams had approached us earlier

24   today to see if we could do some comparisons to try and

25   further focus in on who those registered voters are that

15-14

447

CONSIDERATION OF SENATE BILL 14 1/25/2011

1   don't have -- or have not been issued a driver's license

2   or a personal ID number.  So we're trying to run some of

3   those numbers right now.

4            SEN. DAVIS:  I guess a confusion for me is

5   how we came up with the $2 million fiscal note for that

6   and yet we don't really know, as you said a moment ago

7   we don't really know how many people will be impacted by

8   it and what that statewide voter education effort is

9   going to need to look like.  So where did the $2 million

10  number come from?

11           MS. McGEEHAN:  Well, the $2 million number

12  came from the way the bill is written because the bill

13  simply says "a statewide voter education effort."  So

14  there's not too much detail in the bill as to what's

15  required.  Our assumption is that our previous voter

16  education programs might be the model, and they've been

17  around 3 million.  And plus, we also noticed that last

18  session the Senate put a $2 million fiscal note on it.

19  So we thought, well, maybe that's some representation of

20  legislative intent as to what an appropriate voter

21  education program might cost, but --

22           SEN. DAVIS:  So we've had voter education

23  efforts in the past that have cost about $3 million each

24  time we've engaged in the voter education effort.  We're

25  talking today about making some sweeping changes to

/5=/5

448

CONSIDERATION OF SENATE BILL 14 1/25/2011

1    what's required in order to vote in the state of Texas.
2    Why is the number to educate -- on such a sweeping
3    change for what will likely be a much larger group of
4    impacted people in the state of Texas, why is that
5    number so much lower than the $3 million number that's
6    currently being spent for voter education?
7              MS. McGEEHAN:  Well, if the -- if a
8    $2 million program is added into an existing $3 million
9    program, then you've got a $5 million program.  I mean,
10   our voter education under HAVA is directed to all
11   registered voters.  And so, you know, a new voter -- a
12   new photo ID requirement would also need to be directed
13   to all registered voters because it's a change for all
14   voters.
15             SEN. DAVIS:  So we're talking about -- I'm
16   sorry to interrupt you.  We're talking a $2 million
17   addition to the $3 million that was already intended for
18   voter education in this next two-year cycle.
19             MS. McGEEHAN:  Possibly, possibly.  I
20   mean, we -- you know, we've got a communications
21   director that would have some input on that.  This
22   fiscal note represented what we thought might be a
23   reasonable fiscal note.  If we have, you know,
24   legislative direction to take it a different way or do
25   additional outreach, that's fine.  But based on the way

15-16

449

CONSIDERATION OF SENATE BILL 14 1/25/2011

1  the bill was written and based on the fiscal note filed
2  last time, we thought that was a reasonable number.
3            SEN. DAVIS:  So let's say we spend about a
4  total of $5 million in the next two years with our
5  intended voter education effort that's already been
6  planned and with an additional cost for educating on the
7  requirements of this proposed new law.  That's about the
8  balance of the voter education fund right now.  Is that
9  correct?
10           MS. McGEEHAN:  Well, it's about -- we've
11 spent 9 million.  I think the balance -- yeah, the
12 balance is between 5 and 7 million.  That's correct.
13           SEN. DAVIS:  Okay.  So that will take us
14 through about what -- how long of a period of time will
15 that take us through?
16           MS. McGEEHAN:  If we used 5 million to do
17 a voter -- a general voter education plan and then
18 another 2 million to do a detailed photo -- photo
19 identification plan, that might -- that might use it up.
20           SEN. DAVIS:  And if it uses it up, what
21 will we do in future years to educate our voters about
22 these requirements?
23           MS. McGEEHAN:  Well, frankly -- I mean,
24 state law has never appropriated state funds to educate
25 voters.  So, you know, these federal funds have been

KENNEDY REPORTING SERVICE, INC.
512.474.2233
TX_00000805

*1.5-17*

450

CONSIDERATION OF SENATE BILL 14 1/25/2011

1  really nice to have them to do that.  We never had that
2  kind of funding before.  So if there's a desire to do
3  voter education programs of this -- of this type, then
4  we would need state appropriation.
5           SEN. DAVIS:  So these federal funds will
6  take us basically through a one-time voter education
7  drive on the requirements of this new law, but it's not
8  going to take us further than that?
9           MS. McGEEHAN:  Not if we use it all,
10 not -- it could possibly use up the remainder of the
11 voter education funds.
12          SEN. DAVIS:  Okay.  So we've talked about
13 the voter education.  Talk to us a little bit about the
14 costs of training the poll workers and the registrars.
15          MS. McGEEHAN:  We currently have several
16 training programs for -- well, we have training programs
17 for the county election officials and then other
18 training programs for the poll workers.  We have an
19 online training program.  We have a video.  We have
20 handbooks.  So we would have to update all of those --
21 all those different formats of training.
22          SEN. DAVIS:  And what's the anticipated
23 costs for updating all those forms of training?
24          MS. McGEEHAN:  We don't usually put a
25 fiscal note when there's a change in state law and we

KENNEDY REPORTING SERVICE, INC.
512.474.2233
TX_00000808

*15-18*

451

CONSIDERATION OF SENATE BILL 14 1/25/2011

1  have to change and update training like that because at

2  least it's always been considered that is part of our

3  mandate in election administration.  So when we get

4  appropriation under the election administration

5  umbrella, our statutory mandate is to train and assist

6  election authorities.

7        SEN. DAVIS:  And what's happened to

8  your -- your budget, not only in this current biennium

9  that we're in, but the proposed budget going forward?

10        MS. McGEEHAN:  We're still digesting that

11  as far as on the House side.  I don't know about the

12  Senate side yet.  But on the House side, I believe we

13  took about a 14.5 percent budget reduction on the

14  House -- HB 1 bill.

15        SEN. DAVIS:  So we're talking about a

16  fairly dramatic budget cut for your agency while at the

17  same time we are talking about adding some very

18  significant requirements in terms of the changes that

19  you would need to make to your training programs and

20  materials for purposes of educating election workers and

21  county administrators on the new rules that would be

22  implemented in this bill?

23        MS. McGEEHAN:  That's correct.

24        SEN. DAVIS:  And there's no fiscal note

25  currently estimated for what that cost might be?

/5-/9

452

CONSIDERATION OF SENATE BILL 14 1/25/2011

1    MS. McGEEHAN:  It's my understanding that

2  when we've been asked to prepare fiscal notes for these

3  kinds of issues, we have not added a fiscal impact for

4  something that's already a statutory duty.  As we

5  analyze HB 1, maybe we're going to have to revise that,

6  but at least our standing policy was if it was a

7  statutory duty that we're already charged to do, that we

8  don't put an additional fiscal note on it.

9    SEN. DAVIS:  Are you concerned that you're

10  going to find yourselves fairly flatfooted in terms of

11  not being prepared with the resources that you need, to

12  train election workers and to train county

13  administrators on the requirements of this new law

14  facing the budget cuts that you're facing without a

15  fiscal note that's going to add resources to your

16  department for purposes of carrying out these

17  requirements?

18    MS. McGEEHAN:  I think all state agencies

19  in the state have concerns about providing the services

20  they are charged to provide in light of significant

21  budget cuts.  But on the issue of training, the analysis

22  was that that was not going to cost anything additional

23  as to what we've already been appropriated.

24    SEN. DAVIS:  And do you agree with that,

25  that it's not going to cost anything additional for your

15-20

453

CONSIDERATION OF SENATE BILL 14 1/25/2011

1    agency to provide the training for the significant

2    changes in the law that will be imposed if this bill is

3    passed into law?

4              MS. McGEEHAN:  Well, after every session,

5    we have to change all our materials.  And, you know,

6    maybe I can talk to our fiscal officer and maybe we'll

7    start putting in fiscal notes for these kinds of things,

8    but it has been our policy not to add a fiscal note for

9    something we're currently doing under state law and

10   funded for.

11             SEN. DAVIS:  And so the change in

12   materials is all that would occur?  If I'm an election

13   worker in the state of Texas and I'm facing some pretty

14   significant changes -- and I have to tell you I've read

15   this bill numerous times, and I'm still confused in

16   terms of what it would require of me as an election

17   worker.  Is that the only costs that we assume will be

18   incurred, is the cost of the change of the material?

19   Isn't there some training -- active training that has to

20   occur to be able to make sure that the election workers

21   and the county administrators who are tasked with

22   carrying out this new law will understand exactly what's

23   expected of them in terms of its implementation?

24             MS. McGEEHAN:  We do -- we do, I think,

25   pretty extensive training right now.  I mean, in an odd

/5-2/

454

CONSIDERATION OF SENATE BILL 14 1/25/2011

1   numbered year, we hold four seminars, and we have very
2   good attendance from our county election officials.  So
3   I would be certain that our August county election
4   official seminar will be heavily -- if this passes will
5   heavily emphasize these new rules.
6              To go back to the federal funds, which we
7   know are limited, the grant for voter education also
8   includes election official training and poll worker
9   training.  So if there are any remaining HAVA dollars in
10  that category that we don't use on voter education, we
11  could perhaps use to additional -- to develop additional
12  training materials.
13             SEN. DAVIS:  Yes, and we talked about that
14  a moment ago, and you did state on the record that that
15  category of 5 to $7 million that's remaining is the
16  entirety of the federal resource that you have available
17  to you right now, both for voter education and for
18  training purposes.  And we've also talked about the fact
19  that the expectation and the demand on that particular
20  fund for public education is going to take the
21  significant balance that remains there.  Correct?
22             MS. McGEEHAN:  Right.  Well, just to be
23  clear, the remaining balance in the HAVA is all we have
24  for voter education, but there are some state funds -- I
25  don't think it's a lot -- but that would go towards

455

CONSIDERATION OF SENATE BILL 14 1/25/2011

1   updating handbooks and video and things likes that that
2   we normally produce as training materials.
3                SEN. DAVIS:  When the Help America Vote
4   Act was implemented and in '06, as you said, that was
5   the first significant change that's been made or it's
6   the most recent significant change that's been made in
7   election laws in the state of Texas in terms of the
8   requirements of your agency and the training of your
9   agency, did the costs that your agency realize as a
10  result of the training component for HAVA increase as a
11  result of those new requirements?
12               MS. McGEEHAN:  We -- what we did do was
13  develop an online training component.  So we used a
14  portion of the HAVA dollars to develop an online
15  training component, which was in addition to our other
16  training.  I could get -- I don't know the cost of that,
17  but I could get you the cost.
18               SEN. DAVIS:  It would be a helpful number
19  to have.
20               There's also a discussion in terms of the
21  fiscal note on this bill, including a coordinated voter
22  registration drive or other activities that would be
23  designed to expand voter registration.  What would the
24  costs of such a registration drive be?  It's on Page 2
25  of the fiscal note.

/5-23

456

CONSIDERATION OF SENATE BILL 14 1/25/2011

1          MS. McGEEHAN:  Okay.  I think that what
2  that is referring to is that at the end of Senate
3  Bill 14, there's a reference that says county voter
4  registrars can use Chapter 19 funds to defray costs in
5  conducting a voter registration drive.  But I don't see
6  anything -- and I may have missed it -- but I don't see
7  anything in Senate Bill 14 that requires a voter
8  registration drive.  I think it's -- what that section
9  in the bill is doing is trying to make clear that these
10  funds, which are -- go to county voter registrars to
11  enhance voter registration could be used to do voter
12  registration drives, but I don't see anything that
13  requires a voter registration drive in Senate Bill 14.
14          SEN. DAVIS:  What resources currently are
15  expected of our local governments in carrying out the
16  training and the public awareness programs under our
17  election code.
18          MS. McGEEHAN:  The -- there's no state law
19  requirement to do voter education by the county
20  officials.  Most of them do it as a public service
21  because they want to, but there's not a mandate under
22  state law to do that.
23          Under Senate Bill 14, there's required
24  training of poll workers on the new photo ID
25  requirements.  And I may have missed part of your

_15-24_

457

CONSIDERATION OF SENATE BILL 14 1/25/2011

1  question.

2          SEN. DAVIS:  And that required training is

3  to be done at the county level.  It's expected that the

4  county will fulfill that requirement through their own

5  resources?

6          MS. McGEEHAN:  Well, they are required to

7  use the Secretary of State materials.  I think that the

8  election code gives them discretion as to how they

9  implement it and how they conduct their training.

10         SEN. DAVIS:  So it's foreseeable that at

11  the county level increased costs will be realized as a

12  consequence of the expectations of this bill?

13         MS. McGEEHAN:  Most counties conduct

14  training today.  So they would just be incorporating

15  another component into their training program.

16  Depending on how they handled it would impact how

17  significant the fiscal impact would be in that county.

18         SEN. DAVIS:  If I'm a voter today and I

19  want to go to the bill itself in terms of making sure I

20  understand what would be expected of me under today's

21  rules versus under the rules of the new bill, if I'm a

22  voter today and I come in to vote and I don't have my

23  voter registration card, instead I have an ID, I have a

24  state issued ID, I have a valid driver's license, and my

25  driver's license shows a different name than is

15-25

458

CONSIDERATION OF SENATE BILL 14 1/25/2011

 1   currently on the roll because I've married or I've
 2   divorced, how is that situation handled today?
 3           MS. McGEEHAN:  State law doesn't directly
 4   address it.  So I think that as a practical matter
 5   what's happening is the poll workers are making judgment
 6   calls as they qualify those voters for voting.
 7           SEN. DAVIS:  But they are not being given
 8   guidance or rules or requirements in terms of how they
 9   are to deal with that situation today?
10           MS. McGEEHAN:  No.
11           SEN. DAVIS:  It's within their discretion?
12           MS. McGEEHAN:  At this point.  I mean,
13   state law is silent on it, and our office has not issued
14   any guidance on it.  So we're hearing a lot about that
15   today.  That's definitely something we'll probably need
16   to look into, but right now there is no rule or statute
17   on that issue.
18           SEN. DAVIS:  Okay.  And today if I go to
19   vote and my identification that I use for purposes of
20   voting has a different address on it than is listed on
21   the precinct roll, I think it's the interpretation today
22   under 2004 Secretary of State opinion that I am asked
23   for my correct address, and I am to be believed if I say
24   that my address is the address that's on the precinct
25   list as opposed to what might be on my ID?

15-1C

459

CONSIDERATION OF SENATE BILL 14 1/25/2011

1        MS. McGEEHAN:  I think that's basically
2   correct.  The purposes -- you know, showing ID today is
3   only for purposes of proving who you are.  It's not to
4   prove where you live.  So independent from the
5   requirement to show ID, either certificate or one of the
6   other authorized ID, there's a separate requirement in
7   the code where the election -- where the poll worker has
8   to ask every voter "Have you moved," so regardless of
9   what ID they show.  And if they say yes, they've moved,
10  then they have to sign a statement of residence and
11  update their information.  If they say no, they haven't,
12  they still live at the address on the list of registered
13  voters, then they are permitted to vote.
14        SEN. DAVIS:  And what is your
15  understanding of whether -- how or whether that would
16  change under the requirements of the new bill if
17  everyone now is going to come in with a state-issued ID
18  or a driver's license?  If the address on that ID does
19  not match the address that's on the voter file, how is
20  that to be handled going forward if this bill were to
21  pass into law?
22        MS. McGEEHAN:  My current understanding is
23  that that process wouldn't change, that the purpose of
24  SB 14 is, again, just to prove up ID, not prove where
25  you reside.

KENNEDY REPORTING SERVICE, INC.
512.474.2233
TX_00000815

*15-21*

460

CONSIDERATION OF SENATE BILL 14 1/25/2011

1          SEN. DAVIS:  And what steps would the
2   Secretary of State's Office engage in to assure that the
3   ID wasn't being used to establish an understanding of
4   the voter's residency?
5          MS. McGEEHAN:  Would definitely, I think,
6   be included in our training materials to emphasize that.
7          SEN. DAVIS:  Currently, is there any
8   information that the Secretary of State's Office gathers
9   that breaks down by category voters in the state?  And
10  when I say "by category," I mean by race, by gender, by
11  disability, by age.
12          MS. McGEEHAN:  We have some information.
13  We have -- we have age for sure.  On gender -- we have
14  some information on gender, but it's not conclusive
15  because gender is now -- it used to be a required
16  element on the voter registration application.  In 1995,
17  it was taken -- or it became optional after the National
18  Voter Registration Act.  So we have some data on gender,
19  but, again, it's not complete.
20          Regarding ethnicity, we really -- we don't
21  have any information like that because it's not
22  collected when a person applies to register to vote.
23  The only data that we do have is we do have the number
24  of voters that have an Hispanic surname.  And so we can
25  run the list of registered voters against this list of

*15-28*

461

CONSIDERATION OF SENATE BILL 14 1/25/2011

1   Hispanic surnames that is provided by the census
2   department.
3                SEN. DAVIS:  I'm sure you understand that
4   one of the sensitive issues that will arise as a
5   consequence of this legislation will be a question as to
6   whether the implementation of this law creates a
7   disproportionate impact on minorities, on seniors, on
8   the disabled, on women.  How will the Secretary of
9   State's Office work to be able to answer those questions
10  when they are asked if we currently don't track that
11  data?  And is there an intention to track it going
12  forward?
13               MS. McGEEHAN:  When we changed the voter
14  registration application in '94, '95, due to the
15  National Voter Registration Act, there was a long
16  discussion regarding this issue of whether the state
17  application should request a voter's race.  The
18  determination at that time, based on feedback from all
19  the stakeholders, was not to do it because the thought
20  was that might be intimidating to a minority voter, "Why
21  are you asking, you know, what my ethnicity is?  It
22  doesn't impact whether I can register or not."
23               We can revisit that issue because in order
24  to provide data, you know, if the legislature wants data
25  like that from the Secretary of State's Office, we have

*15-29*
462

1  to have some way to collect it.  So we could revisit

2  putting that question or adding that as a question to

3  the voter registration application.  I'd be happy to

4  visit on ways where we could try and collect that, but

5  right now we would not have the tools that we would need

6  to be able to collect that data.

7          SEN. DAVIS:  It seems rather important as

8  implementation of this law advances that that

9  information be made available for the Justice Department

10  review as well as any judicial review that might occur

11  in terms of the impact of the implementation of the law.

12          I believe that's all the questions I have

13  for you.  Thank you so much.

14          MS. McGEEHAN:  Thank you.

15          CHAIRMAN DUNCAN:  The Chair recognizes

16  Senator West.

17          SEN. WEST:  Thank you very much,

18  Mr. Chairman.  Many of the questions Senator Davis has

19  already asked, but have you had a chance to look at the

20  bill as introduced?

21          MS. McGEEHAN:  Yes.

22          SEN. WEST:  Okay.  Do you happen to have

23  it there in front of you?

24          MS. McGEEHAN:  Yes, I do.

25          SEN. WEST:  Okay.  Great.  Before I get

463

CONSIDERATION OF SENATE BILL 14 1/25/2011

1   into it, does this bill provide you any rulemaking

2   authority?

3          MS. McGEEHAN:  No.

4          SEN. WEST:  Okay.  So in interpreting

5   the -- let me back up.  Are you often called upon by

6   county registrars to answer questions concerning issues

7   that arise in local counties?

8          MS. McGEEHAN:  Yes.

9          SEN. WEST:  How do you normally decide

10  those questions?  Do you just look at the black and

11  white law?  Do you issue opinions?  How is that --

12  what's that process?

13         MS. McGEEHAN:  We issue opinions in a

14  couple of different ways.  We have a toll-free number.

15  One is dedicated just for county officials.  So if it's

16  a fairly straightforward, simple question, we give a

17  quick answer over the phone.  If it's a -- if it's a

18  less involved question, we might get an email.  We'll

19  give a response via email.  If it's something that's

20  hard or we're really interpreting several different laws

21  or it's a new law and we feel like it has statewide

22  impact, we want to make sure that everyone is operating

23  under the same understanding, we'll issue an advisory.

24         SEN. WEST:  Okay.  And so an advisory or

25  just depending upon the circumstances maybe an email

15-3/

464

CONSIDERATION OF SENATE BILL 14 1/25/2011

1   opinion or something like that?

2           MS. McGEEHAN:  Well, advisories are

3   usually a little more -- it's like the most formal that

4   we do.

5           SEN. WEST:  Right.

6           MS. McGEEHAN:  Yeah.  Okay.

7           SEN. WEST:  All right.  Let me ask you to

8   go to Page 4 of the bill.

9           MS. McGEEHAN:  Okay.  Can you tell me the

10  section?  Because I think I have a different format.

11          SEN. WEST:  Okay.  It's Section 7, and

12  Section 7(c) and (d).

13          MS. McGEEHAN:  Okay.

14          SEN. DAVIS:  Let me know when you get

15  there.

16          MS. McGEEHAN:  Yes.

17          SEN. WEST:  Okay.  It's my understanding

18  that the election officer that's being referred to in

19  Section (d) is -- is the individual working at the poll.

20  Is that right?

21          MS. McGEEHAN:  Yes.

22          SEN. WEST:  Okay.  That person will be

23  called upon in Section (d) to determine if the voter's

24  name is on the precinct list of registered voters, and

25  the voter's identity can be verified from the

15-22

465

CONSIDERATION OF SENATE BILL 14 1/25/2011

1   documentation presented.  Is that correct?

2              MS. McGEEHAN:  Yes.

3              SEN. WEST:  Okay.  In advising on that,

4   will that be a strict interpretation?  Let me -- this is

5   what I mean.  I think that some of the hypotheticals

6   that were provided by Senator Davis may be illustrative

7   of what I'm asking.  My last name is West, W-e-s-t.  And

8   say that there's a typographical error where my name is

9   spelled W-e-s on the voters' roll, precinct list, and

10  then my -- but my identity I'm using my driver's license

11  and it has "t" on it.  How does a poll -- an election

12  officer in that situation resolve that problem?

13             MS. McGEEHAN:  That's a good question, and

14  I don't think the bill necessarily defines what

15  verification --

16             SEN. WEST:  I know.  Senator Fraser said

17  I'd have to ask the Secretary of State that question.

18  That's why I'm asking you that question.

19             MS. McGEEHAN:  I think -- you know, based

20  on the way the bill is written now and if we had to

21  develop training materials for the poll workers on how

22  to implement this, we would look to the best practices

23  of the states that have implemented.  I heard Indiana

24  testify earlier today that they have written some

25  guidelines.  We'd look to that and try and incorporate

/5-38

466

CONSIDERATION OF SENATE BILL 14 1/25/2011

1   the best practices on reasonable methods to verify the

2   ID document against the list of registered voters.

3            SEN. WEST:  Okay.  But you would agree

4   with me that in interpreting Section (c) and (d) without

5   some sort of guidance would lend itself to a great deal

6   of subjectivity; thus inconsistent application

7   throughout the state?

8            MS. McGEEHAN:  It could, yes.

9            SEN. WEST:  Okay.  As it relates to --

10  let's see.  What page is it on?  The next page, which

11  will be (h), it's in the same section.

12           MS. McGEEHAN:  Okay.

13           SEN. WEST:  Would you read Section (h) and

14  tell me how you interpret that as the chief

15  administrator of the election laws in the state of Texas

16  next to, needless to say, Secretary of State?

17           MS. McGEEHAN:  (h) reads, "The

18  requirements for identification prescribed by Subsection

19  (b) do not apply to a voter who: (1) presents the

20  voter's voter registration certificate on offering to

21  vote; and (2) was 70 years of age or older on January 1,

22  2012, as indicated by the date of birth on the voter's

23  voter registration certificate."

24           The way I had -- until earlier this

25  afternoon when Senator Ellis asked the question, I had

KENNEDY REPORTING SERVICE, INC.
512.474.2233
TX_00000822

15-34

467

CONSIDERATION OF SENATE BILL 14 1/25/2011

1   assumed that anybody that is 70 years of age or older
2   would not have to provide the photo ID.  I think the
3   wording is less than perfect.  I think that's the
4   intent, and I heard Senator Fraser, I think, answer that
5   his intent is it would apply.  You know, even if a
6   person became 70 after January 1, 2012, they could still
7   take advantage of this exception.
8           SEN. WEST:  Okay.  But would it be your
9   suggestion that we need to reword that language to make
10  certain that whether you're there or someone else -- I
11  understand that you're here and you heard the
12  discussion, but if for some reason you're not in the
13  same position you're in right now, there's going to be
14  someone else, and they won't have -- they will not have
15  had the benefit of this discussion.  So, therefore, do
16  you think it would be advisory to -- advisory to reword
17  that to make certain it's perfectly clear?
18          MS. McGEEHAN:  I think so.  If people are
19  reading it inconsistent, it would probably help it if it
20  were.
21          SEN. WEST:  Okay.  Now, a couple of other
22  questions.  As it relates to the counties, it's my
23  understanding that you -- that your agency and maybe
24  either yourself or someone working for you put together
25  the fiscal note.  Is that correct?

_1595_

468

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
1              MS. McGEEHAN:  Yes.  Our agency put it --
2    I helped.
3              SEN. WEST:  Okay.  Did someone under your
4    supervision contact local governments to determine the
5    impact, the fiscal impact, that implementation of this
6    will have?
7              MS. McGEEHAN:  No, we did not.
8              SEN. WEST:  That was done by someone else?
9              MS. McGEEHAN:  I think LBB does that.  We
10   just -- we just --
11             SEN. WEST:  Provided the information?
12             MS. McGEEHAN:  Yeah.  Right.
13             SEN. WEST:  And based on your experience
14   when these types of changes -- let me back up.
15             How much experience have you had in this
16   particular area, that is, the election laws, in
17   administration of election laws?
18             MS. McGEEHAN:  I have been working in the
19   elections division for 21 years.
20             SEN. WEST:  So you've had a little
21   experience, huh?
22             MS. McGEEHAN:  Yes.
23             SEN. WEST:  Okay.  All right.  As it
24   relates to when changes are made in state law of this
25   nature, is there an impact, a fiscal impact, on local
```

KENNEDY REPORTING SERVICE, INC.
512.474.2233
TX_00000824

*15-36*

469

CONSIDERATION OF SENATE BILL 14 1/25/2011

1   units of governments when they have to make changes to

2   comply with these types of changes or laws that are

3   being suggested?

4              MS. McGEEHAN:  I think it really depends

5   on what the change is.  You know, if there's a new

6   mandate for a county or if the county has to do

7   something different, then obviously there would be a

8   fiscal impact.

9              SEN. WEST:  Well, will -- and, again,

10  drawing on your expertise, will counties have to do

11  something different to implement this particular law?

12             MS. McGEEHAN:  They will have to -- they

13  are going to have to post information on their website

14  notifying the public what the new photo ID requirements

15  are.

16             SEN. WEST:  Right.

17             MS. McGEEHAN:  When they issue voter

18  registration certificates, they are going to have to

19  mail out -- which they have to mail out every two years

20  under current law.  The new certificates will have new

21  language, but -- informing voters of the voter ID

22  requirements, but that should be cost neutral because

23  they are already mailing out the voter registration

24  certificates.

25             The piece that I think might have a fiscal

15-37

470

CONSIDERATION OF SENATE BILL 14 1/25/2011

1   impact is the training.  If the counties have to change

2   up their training procedures much or do more training

3   because they want to make sure the word is out to all

4   their -- that might increase their training costs.

5                   SEN. WEST:  Okay.  So there are some

6   factors that need to be taken into consideration as to

7   whether or not counties will be burdened with additional

8   cost to implement this law.  Is that correct?

9                   MS. McGEEHAN:  Yes.

10                  SEN. WEST:  Okay.  And would it be a fair

11  statement to say the larger the county, the more of the

12  burden -- of the financial burden -- well, that's not a

13  fair question.

14                  Would it be a fair statement to say that

15  the larger the county, the larger the potential

16  financial obligation that they would have to encounter

17  in order to implement the law?

18                  MS. McGEEHAN:  I think that's true, but I

19  can hear small counties say that it might be

20  proportional, you know, since their budgets are -- I

21  mean --

22                  SEN. WEST:  Right.  It's all relative to

23  what your budgets are.

24                  MS. McGEEHAN:  Yeah.

25                  SEN. WEST:  But the fact is that that --

KENNEDY REPORTING SERVICE, INC.
512.474.2233
TX_00000826

/5-38

471

CONSIDERATION OF SENATE BILL 14 1/25/2011

1  do you -- is there any -- you've read the fiscal note

2  associated with this bill?

3          MS. McGEEHAN:  Yes.

4          SEN. WEST:  The $2 million that's in the

5  fiscal note, does any of that go to the county to --

6  counties in order to implement this legislation?

7          MS. McGEEHAN:  No.

8          SEN. WEST:  So any cost that is not

9  covered by the state for counties would be -- have to be

10 borne by the counties.  Right?

11         MS. McGEEHAN:  Yes, yes.

12         SEN. WEST:  Okay.  Now, as it relates

13 to -- is there any way that the Secretary of State's

14 Office can give us -- do an analysis or get with the

15 various counties to determine exactly what the fiscal

16 impact of implementing this legislation would be?

17         MS. McGEEHAN:  We could -- we could

18 certainly solicit that information from counties and ask

19 them what -- how they see this impacting them fiscally.

20         SEN. WEST:  You could do that for each and

21 every one of the counties?

22         MS. McGEEHAN:  We can do it.

23         SEN. WEST:  Mr. Chairman, I'd like to

24 request that the Secretary of State's Office provides

25 the Senate an analysis of -- I shouldn't say an

/5-39

472

CONSIDERATION OF SENATE BILL 14 1/25/2011

1   analysis -- at least solicit from the various counties

2   what the fiscal implication is going to be in order to

3   implement this bill.

4           CHAIRMAN DUNCAN:  Okay.  I think, Senator,

5   that will be an individual request from you, and then it

6   can be distributed to all members of the Senate --

7           SEN. WEST:  Okay.

8           CHAIRMAN DUNCAN:  -- whenever it's done.

9   You know, I doubt that that will be done by the time we

10  rise and report to the Senate.

11          SEN. WEST:  Okay.  We can't get it

12  tonight?

13          (Laughter)

14          SEN. WEST:  I'm just joking with you.

15          CHAIRMAN DUNCAN:  You won't be a very

16  popular guy if the --

17          SEN. WEST:  I'd like --

18          (Laughter)

19          SEN. WEST:  I'd like to get it as soon as

20  possible, though.

21          Let's see.  No further questions.  Thank

22  you very much.

23          MS. McGEEHAN:  Thank you.

24          CHAIRMAN DUNCAN:  Thank you, Senator West.

25          Senator Gallegos?

/5240

473

CONSIDERATION OF SENATE BILL 14 1/25/2011

1       SEN. GALLEGOS:  Let me ask you, I don't
2  know if you heard my question earlier to Senator Fraser
3  and he referred to you or the Secretary of State's
4  Office to answer it.  My concern was in the fiscal note
5  that we ranked number two in the country in population.
6  And Missouri ranks number nineteenth, and to implement
7  their voter ID program, they came up with -- they only
8  have 5.9 million people.  We have 25 million.  They came
9  up with a fiscal note of 6 million in the first year and
10  then 4 million in the second year for a total of 10
11  million second and third.  That's $10 million.  And you
12  just -- I think earlier testimony with Senator Davis,
13  you said once the 2 million runs out, that's it.  Is
14  that what you said?
15       MS. McGEEHAN:  For -- yeah, the amount of
16  money we have for voter education is limited.  So when
17  that runs out, that's all we have.
18       SEN. GALLEGOS:  I guess my concern is if
19  Missouri only has 5.9 million people, just to implement
20  their voter ID program they start with 6 million in the
21  first year and 4 million in the second and third year
22  for a total of $10 million, for just 5.9 million folks,
23  what are they -- you know, I don't -- what are they
24  doing as far as when they are reading the bill?  I heard
25  that you said you're going by the bill, and that's how

/5-11

474

CONSIDERATION OF SENATE BILL 14 1/25/2011

1   you came up with your fiscal note.  Is that correct?

2            MS. McGEEHAN:  Yes.

3            SEN. GALLEGOS:  Okay.  Well, then what are

4   they doing that we're not or, you know, how can you --

5   you know, for $10 million for 5.9 million people and

6   we're only going to spend 2 million, I mean, what's the

7   difference?

8            MS. McGEEHAN:  I am not familiar with the

9   Missouri voter identification bill, and I did hear you

10  ask that earlier today, but I've been trying to listen

11  to all the questions.  So we can -- we can research it

12  and see.  Some states actually provide more to their

13  local county governments and print ballots and things

14  like that.  I don't know if that's the situation in

15  Missouri, but I honestly don't know the answer to that

16  question because I don't know what the Missouri voter ID

17  law requires.

18           SEN. GALLEGOS:  Well, it's a substantial

19  more amount of money than we're looking --

20           MS. McGEEHAN:  Yeah.

21           SEN. GALLEGOS:  -- at the fiscal note that

22  you have -- that you've given this committee on Senate

23  Bill 14.  And I just -- it concerns me that that amount

24  of money, if somebody is doing -- in the formula or

25  methodology that you came up with that number -- I mean,

475

CONSIDERATION OF SENATE BILL 14 1/25/2011

1   is that a true number?  I mean, you know, as far as are

2   we really doing voter education that should be done, you

3   know, on 25 million people as opposed to what Missouri

4   is doing with only 5.9?  I mean, it just -- I mean, that

5   would send up a red flag to me.  Wouldn't it you?

6            MS. McGEEHAN:  Sure.  I would like to

7   understand those numbers because they are very

8   different.

9            SEN. GALLEGOS:  You know, I -- if we're

10  going to mandate to Texans, you know, and then do it --

11  do a good educational program and Missouri is spending

12  $10 million on their folks and we're only spending

13  2 million on ours, I'd like to know what the -- what the

14  difference is.  Are their people better than ours?  You

15  know, do they deserve, you know, more education?  You

16  know, I just -- you know, with the population as opposed

17  to our population, you know, I don't -- you know, I'm a

18  little concerned there.  You know, are we cutting our

19  folks short?  Are we really going to do what you're

20  telling us that you're going to do as far as educating

21  the public out there on this bill?

22            And it just concerns me that, you know, we

23  see -- and I haven't even taken a comparison of the

24  other states.  And we're number two, and Missouri is 19,

25  and they are spending 10 million bucks.  You know, that

/.5213

476

CONSIDERATION OF SENATE BILL 14 1/25/2011

 1  would concern me, and I would hope it would concern any
 2  of the other Senators on this floor.  Are we, you know,
 3  really going to do -- in implementing this bill, are we
 4  going to educate those folks out there?
 5              Now, you know -- and I'd like that answer.
 6  I mean, you can't answer it now, I understand, but I
 7  would like an answer to that.
 8              MS. McGEEHAN:  We'll get you an answer.
 9              SEN. GALLEGOS:  And a comparison on what
10  really your states that have implemented voter ID, how
11  much are they paying, you know, to implement the program
12  and what they do.
13              Now, on the fiscal note, it says you're
14  going to do TV and radio and some other things.  I mean,
15  can you explain to this body the process on TV, or is it
16  going to be in different languages, or how are you going
17  to -- how are you going to split up the money?  Who gets
18  the most?  You know, I mean, it's not -- it's not
19  explained to us in the fiscal note how you're going to
20  spread the money around.  And is that going to be
21  accessible to us or how the process is going to be, or
22  how much money are you going to spend in Harris County
23  as opposed to Lubbock, Texas or wherever?
24              MS. McGEEHAN:  Yes, that would be
25  available.  And, you know, the programs that we've done

477

CONSIDERATION OF SENATE BILL 14 1/25/2011

1   previously, we have detailed records that show, you

2   know, where the media ran, and so we would -- that would

3   be a part of any program going future.

4           The way -- the way it has worked thus far,

5   the three statewide voter education programs that we

6   have done, is we've gone out for bid for a public

7   education firm.  And then the first thing that firm does

8   is research, and they meet with stakeholders, and then

9   they craft the creative proposal.  And then they turn

10  that into the actual media and do the media buys for TV,

11  radio and cycle, Internet and also print.

12          For the PSAs -- and I'm not the expert on

13  this -- but I understand that we pay for a certain

14  amount, and then we get some earned credit where TV

15  stations will run them for free.  If you pay them, you

16  know, to run it once, they'll run it three times and

17  only charge you for once, something along those lines.

18          SEN. GALLEGOS:  And is that going to be --

19  is there going to be access as far as different

20  languages in than budget?

21          MS. McGEEHAN:  Oh, yes.  We -- our current

22  programs are in English and in Spanish, and in Harris

23  County, we've had a component for Vietnamese.

24          SEN. GALLEGOS:  Okay.  Now, on Page 2 of

25  the bill under what y'all are going to do under voter --

*15-45*

478

CONSIDERATION OF SENATE BILL 14 1/25/2011

1   under 31.012, Voter Identification, Senator West brought

2   it up about -- it says here you and -- your office and

3   the voter registrar of each county that maintains it

4   shall provide notice of the ID requirements as

5   prescribed by this change.

6          Now, my concern there is, is at the county

7   level -- you know, I think Senator West brought it up --

8   is how much is going to be incumbent on each county, you

9   know?  I and others here on this floor represent the

10  largest county, Harris County, and Harris County is

11  already starting to lay off, and they have a shortfall,

12  and they are laying off as we speak right now.  So, you

13  know -- and I see what it says in the bill, you know,

14  that you're going to get together with them.  I mean,

15  are they going to have the money?  Or where is the -- if

16  they don't have the money, where is the other money

17  going to come from?  Other than the 2 million you

18  already have prescribed here and any federal matches

19  that come in, where is that money going to come if those

20  counties cannot provide?

21         MS. McGEEHAN:  I think that the bill

22  presumes that counties have a website, and so this

23  requirement is that they post, you know, the information

24  about the new photo ID requirements that the Secretary

25  of State's Office will actually prescribe.  So we will

*15-76*

479

CONSIDERATION OF SENATE BILL 14 1/25/2011

1  send that out to the counties, and then they'll have to

2  post it on their website.

3         Now, in light of the fiscal

4  circumstances -- and Senator West has asked us to do a

5  survey -- we'll probably get some very detailed

6  information, you know, as far as the counties' fiscal

7  circumstances, if they are going to have to take down

8  their websites or, you know, where they are going to

9  have to cut.

10         SEN. GALLEGOS:  Well, you know, with all

11 due respect, I mean, we can presume a lot of things, and

12 I could presume a lot of things, you know, just on

13 anything, but I can tell you right now -- I'm not

14 presuming -- I know that they're laying off in Harris

15 County right now.  That's not a presumption.  That's a

16 fact; that's a fact.  And they're also furloughing in

17 the City of Houston.

18         So, I mean, it just concerns me that this

19 section here that says you're going to work hand-in-hand

20 with each registrar in each county, and if those

21 counties are already going through a budget shortfall

22 like we are, then how can you presume that they're going

23 to have -- I'm just saying that this bill presumes that

24 they're going to have a website and they're going to

25 have people to handle the education.

15-47

480

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
 1           You can't presume anything if they're
 2  laying off right now as we speak, and that's a fact.
 3  Like I said, that's not a presumption.  That concerns
 4  me.  And what I'm asking is that if that can't happen in
 5  Harris County or any other county in this state, where
 6  is the extra money?  If they don't have, obviously, the
 7  funds to provide what is prescribed under Senate Bill
 8  14, where is that money going to come from?
 9           MS. McGEEHAN:  Well, you know, Senate Bill
10  14 doesn't make an appropriation to the county, so I
11  don't know the answer to your question on that because,
12  like I said, the bill -- I think the assumption is that
13  counties have a website.  So if they're not going to
14  have a website --
15           SEN. GALLEGOS:  But the bill prescribes
16  that you will work in conjunction with the county
17  registrar.  Is that what I'm reading --
18           MS. McGEEHAN:  Yes.
19           SEN. GALLEGOS:  -- or am I reading the
20  wrong bill?
21           MS. McGEEHAN:  Maybe I'm not -- the way I
22  read that was that we would provide them the wording,
23  the language that they would put up on their website.
24           SEN. GALLEGOS:  Well, you're going to
25  provide them with that.  But what about the bodies and
```

/S-75
481

CONSIDERATION OF SENATE BILL 14 1/25/2011

1  any other education that's prescribed by this bill?  If
2  they don't have the bodies -- they're laying off bodies
3  right now.
4          MS. McGEEHAN:  Yes.
5          SEN. GALLEGOS:  Okay.  And you see where
6  I'm going here?
7          MS. McGEEHAN:  No, I understand.
8          SEN. GALLEGOS:  And if you provided a
9  fiscal note, you know, that we're going by and that's on
10  every website in the State of Texas, everybody that has
11  a computer, then really what I'm asking you, is this a
12  true fiscal note or is it misleading to the voters out
13  there, that it's going to cost more than what you're
14  showing here if other counties are having budget
15  shortfalls like we are?
16          MS. McGEEHAN:  Well, when we're asked to
17  submit a fiscal note to LBB, they want to know what the
18  state impact is.  So generally we don't solicit what the
19  impact is to local government.  And I'm not exactly sure
20  who within LBB does that, if that's LBB or the
21  Comptroller.  But I can tell you -- and maybe we've been
22  doing them wrong, but the way we've understood our
23  requirement in responding to a fiscal note request was
24  to state what the state impact was.  It's specifically
25  for the agent -- you know, like for our agency for the

/5×/5

482

CONSIDERATION OF SENATE BILL 14 1/25/2011

1    Secretary of State's office.

2                SEN. GALLEGOS:  Okay.  So what you're

3    telling me is that outside of the $2 million that's in

4    the fiscal note and that under this section that you're

5    going to work with the registrar in each county, then we

6    just have to roll the dice and hope that the money is

7    there.  Is that what you're telling me?

8                MS. McGEEHAN:  Well, I think this fiscal

9    note that LBB did put -- does indicate that there may be

10   some county costs.  You know, they did put some numbers

11   in for Tarrant County and for Bexar County.  So, you

12   know, it's not -- I don't think it's the number you're

13   looking for.  It's not a comprehensive number, but I

14   think that the fiscal note does indicate that there may

15   be a fiscal impact on counties.

16               SEN. GALLEGOS:  There may be a fiscal

17   impact.  You don't know how much?

18               MS. McGEEHAN:  No, I don't.

19               SEN. GALLEGOS:  So what we're looking at

20   in your fiscal note is just an open-ended fiscal note.

21   Is that what you're telling me?

22               MS. McGEEHAN:  The fiscal note is really

23   showing the impact on the Secretary of State's office.

24   I can't really speak to how the portion of the fiscal

25   note that concerns impact on local government, how

KENNEDY REPORTING SERVICE, INC.
512.474.2233
TX_00000838

-/5-5C

483

CONSIDERATION OF SENATE BILL 14 1/25/2011

1   LBB -- you know, what their process is.  I don't really

2   know.

3             SEN. GALLEGOS:  All right.  Then let me

4   rephrase my question.

5             MS. McGEEHAN:  Okay.

6             SEN. GALLEGOS:  So the $2 million that

7   you're showing is what the state is going to be

8   impacted.  And the language that is showing you're going

9   to work in conjunction with the counties, you know, you

10  cannot speak to that, so we really don't know.  Is that

11  what you're saying?  It could or could not be impacted

12  for a million, two million, three million, whatever the

13  number.  I don't know the numbers that you gave Bexar

14  County and Tarrant County.  I have not been privy to

15  those numbers.  But what I'm saying is, I really would

16  like to know that if my county is going to be impacted,

17  if at all, it's going to be in here, you know.  Do you

18  see what I'm saying?

19            MS. McGEEHAN:  Well, yes, I understand

20  what you're saying.  And we are going to be sending out

21  a survey to try and gather that data from all the

22  counties.

23            SEN. GALLEGOS:  You know, I don't like the

24  mandate to my county, something that this bill said that

25  they will do and then find out that they don't have the

15-51

484

CONSIDERATION OF SENATE BILL 14 1/25/2011

1   funds to do it.  You know, to me, that's an unfunded

2   mandate in really telling Texans that are looking at

3   this debate on computer and that are looking at this

4   bill online, that this $2 million fiscal note that

5   you've provided is only an impact to the state, not the

6   counties, not each county.  Is that correct?

7                 MS. McGEEHAN:  That's correct.

8                 SEN. GALLEGOS:  Okay.  Thank you very

9   much.

10                CHAIRMAN DUNCAN:  Thank you, Senator

11  Gallegos.

12                Senator Van de Putte.

13                SEN. VAN de PUTTE:  Thank you,

14  Mr. Chairman.

15                Ms. McGeehan, you've been an excellent

16  resource witness for us, and there are just two

17  questions that I need to ask to get into the record with

18  regard to a survey.

19                Does Texas participate in the Election

20  Administration and Voting Survey?

21                MS. McGEEHAN:  Yes.

22                SEN. VAN de PUTTE:  When was this survey

23  completed, the last survey was completed?  Was it after

24  the 2008 election?

25                MS. McGEEHAN:  Yes.

/5-5-2-

485

CONSIDERATION OF SENATE BILL 14 1/25/2011

1              SEN. VAN de PUTTE:  So we have that survey
2    available?
3              MS. McGEEHAN:  Yes.
4              SEN. VAN de PUTTE:  Okay.  The question
5    that I have goes to the data on the survey that goes, I
6    think, to all -- and this is the federal commission --
7    dealing with the number of provisional ballots in the
8    State of Texas.  As far as you know, how do we rank in
9    the number of provisional ballots that are used with
10   regard to our voting population?
11             MS. McGEEHAN:  My general recollection is
12   that as far as the total number cast, we're on the lower
13   end.  But as far as the number of provisional votes,
14   meaning that not as many people cast a provisional vote
15   in Texas as in some other states, but as far as the
16   number of provisional ballots that are counted --
17             SEN. VAN de PUTTE:  Yes.
18             MS. McGEEHAN:  -- we have one of the lower
19   rates among the states as to the number of provisional
20   ballots that are counted.  It is my understanding that
21   in the state chart, that we have very high rejection
22   provisional ballot rates.  So, in other words, even
23   right now under this system that we have, that the
24   number of provisional ballots that are cast, we have
25   some of the highest rejection rates for those

/5-53

486

CONSIDERATION OF SENATE BILL 14 1/25/2011

1   provisional ballots in all of the country.

2                    MS. McGEEHAN:  Yes.

3                    SEN. VAN de PUTTE:  At least that's what I

4   understand from the report.

5                    MS. McGEEHAN:  That's correct.

6                    SEN. VAN de PUTTE:  Thank you.  I know

7   that we have the datasets that were put in for 2008, and

8   so hopefully that we will be able to get this and make

9   sure that as we monitor the bill as it progresses and

10  the bill as it's implemented, we certainly don't need to

11  get to the bottom of the bottom of the bottom on

12  rejection of provisional ballots.

13                   Thank you.

14                   CHAIRMAN DUNCAN:  Thank you, Senator Van

15  de Putte.

16                   Senator Fraser.

17                   SEN. FRASER:  Thanks for being here today

18  and waiting all day.

19                   I would like to clarify a point before you

20  sit down.  I think you're aware this morning that we had

21  entered into a record -- the Secretary of State had a

22  letter addressing the $2 million in the HAVA funds that

23  was put into the record.  Our understanding, from

24  talking to the Secretary, the way the HAVA funds work,

25  and also her relationship with the county, that she has

/5-5'

487

CONSIDERATION OF SENATE BILL 14 1/25/2011

1   very broad discretion, assuming that the HAVA people

2   approve the using of this.

3                  The $3 million that you're talking about

4   in voter education, it doesn't necessarily mean that

5   it's three plus two.  It's possible that there's an

6   overlap, that this two million could be folded in --

7   possibly into the three.  But that discretion goes back

8   to the Secretary and they make a determination.  Is that

9   not true?

10                 MS. McGEEHAN:  That's exactly right.

11                 SEN. FRASER:  The other thing that I want

12  to clarify that there is a lot of discussion about, what

13  expense might go to Houston or what expense might go to

14  Bexar.  Right now there is not clear, because I think

15  there's a lot of discussion going on of whether is that

16  Bexar expense or is that Secretary of State expense?

17                 And we've got to determine what those

18  dollars are being spent on.  Can we use Secretary of

19  State dollars and HAVA funds for that?  So I think we're

20  premature of a county saying they've got "X" amount of

21  expenses, because it's possible that some of those

22  expenses flow from the Secretary of State's office, they

23  do not flow to the county, and they could handle that

24  with available people within the county and budget.  Is

25  that not correct?

/5-55

488

CONSIDERATION OF SENATE BILL 14 1/25/2011

1          MS. McGEEHAN:  That's correct.  And just

2   an example of that, the cost that Bexar County put in

3   the fiscal note was -- I think their assumption was that

4   the certificate, the voter registration certificate

5   would have to increase in size.  And I don't see

6   anything in the bill that requires that.  And the

7   Secretary of State prescribes the form.  So once that's

8   explained to the county, they might withdraw that

9   fiscal --

10          SEN. FRASER:  I want to make sure that

11   that's clear, is that some of these assumptions are

12   possibly the-sky-is-falling assumptions that this is --

13   you know, this expense is going to be put on us, and I

14   don't think that's been discussed.  And some of this, I

15   think, can be done by ruling of the Secretary of State,

16   directing them.  And there is a real good chance that a

17   lot of these expenses go away that can be absorbed

18   through the Secretary of State.  And that is correct,

19   isn't it?

20          MS. McGEEHAN:  Yes.

21          SEN. FRASER:  Okay.  I wanted to clear

22   that up.  Thank you so much.

23          CHAIRMAN DUNCAN:  The Chair recognizes

24   Senator Williams.

25          SEN. WILLIAMS:  Thank you, Mr. Chairman.

*15-56*

489

CONSIDERATION OF SENATE BILL 14 1/25/2011

1          Ms. McGeehan, I want to add my thanks for
2  you hanging in here with us all day.  There's about
3  three things that I would like to clear up with you.  I
4  just want to understand unequivocally, HAVA funds can be
5  spent for things like training poll workers.  Is that
6  correct?

7          MS. McGEEHAN:  Yes.

8          SEN. WILLIAMS:  Okay.  Thank you.  Then
9  are you familiar with the voter ID bill that went
10 into -- in Utah recently?  Have you taken a look at
11 that?

12         MS. McGEEHAN:  No, I have not looked at
13 that.

14         SEN. WILLIAMS:  Okay.  I just think it's
15 noteworthy, in light of Senator Van de Putte's comments,
16 because the Salt Lake County Clerk's office -- I've got
17 a news report here -- it's confirmed that there were
18 only 13 cases of voters having to pick up their
19 provisional ballots because they didn't have the proper
20 identification to vote when they put this new law into
21 effect.  So it seems like it's had a great -- again, one
22 more state where the impact has been really minimal.
23 I'm not sure why we're having these other issues, but I
24 don't think its because of this.

25         And then finally I wanted to ask you, we

15-57

490

CONSIDERATION OF SENATE BILL 14 1/25/2011

1    had talked earlier about the project that I asked you to

2    do, to cross-reference the driver's licenses and the

3    voter registration.  How is that coming along?  I know I

4    only asked today, but I just --

5              MS. McGEEHAN:  Yes.

6              SEN. WILLIAMS:  -- but what is a

7    reasonable expectation for us to get that information?

8              MS. McGEEHAN:  I would hope by the end of

9    the week.  One thing that our IT folks and our election

10   experts are trying to struggle with is like matching

11   criteria --

12             SEN. WILLIAMS:  Right.

13             MS. McGEEHAN:  -- you know, which we won't

14   have a TLD number, so we're working through some of

15   that.  But I would expect by the end of the week we

16   would have it, if not earlier.

17             SEN. WILLIAMS:  Okay.  So do you need any

18   further direction from us?  For instance, if we wanted

19   to target that universe of people that we know are out

20   there and maybe make a little extra effort to make sure

21   that they understood they were going to have a new

22   requirement when they went to vote as far as getting a

23   photo ID, if they didn't already have one -- and we've

24   identified who they are -- if we gave legislative intent

25   as a part of the bill tomorrow, would that be sufficient

15-58

491

CONSIDERATION OF SENATE BILL 14 1/25/2011

1   for you-all and the Secretary of State's office to take

2   that direction and know that that's something that we

3   wanted to have done in your training plans and voter

4   education plans?

5               MS. McGEEHAN:  Yes.  I think if there were

6   a statement of legislative intent, we would certainly

7   follow that.

8               SEN. WILLIAMS:  That would be sufficient.

9   Okay.  Thank you very much.  Appreciate your help.

10              CHAIRMAN DUNCAN:  All right.  Members, are

11  there any other questions of Ms. McGeehan?

12              Okay.  The Chair hears none.  Thank you,

13  Ms. McGeehan.

14              The Chair calls David Maxwell, Deputy

15  Director of Law Enforcement, Texas Attorney General's

16  Office.

17              Mr. Maxwell, would you approach and state

18  your name and who you represent, and then we'll open it

19  up for questions.

20              TESTIMONY BY DAVID MAXWELL

21              MR. MAXWELL:  I have a written statement

22  that I would like to put into the record, sir.

23              CHAIRMAN DUNCAN:  Well, we haven't been

24  doing that.

25              MR. MAXWELL:  Okay.

KENNEDY REPORTING SERVICE, INC.
512.474.2233
TX_00000847

PROPOSED ACTIVITY PLAN

RFP12111-Attachment D

| Task | Sub-Task | Task Description | Sub-Task/Activities | Est. Start Date | Est. End Date | Budget |
|---|---|---|---|---|---|---|
| 01 | 01.01 | Opinion Research / Awareness Tracking | Benchmark wave prior to Phase I | Wednesday, January 04, 2012 | Wednesday, January 18, 2012 | $ 45,000.00 |
| 01 | 01.02 | | Mid-wave at the conclusion of Phase I | Monday, March 12, 2012 | Friday, March 16, 2012 | $ 45,000.00 |
| 01 | 01.03 | | Post-wave at the conclusion of Phase II | Thursday, November 12, 2012 | Friday, November 16, 2012 | $ 45,000.00 |
| 02 | 02.01 | Planning and Strategy | Message Development | Monday, January 8, 2012 | Monday, January 23, 2012 | $ 15,000.00 |
| 02 | 02.02 | | Develop creative for print, broadcast and collateral materials | Wednesday, January 04, 2012 | Tuesday, January 31, 2012 | $ 130,000.00 |
| 02 | 02.03 | | Develop creative for online | Wednesday, January 04, 2012 | Friday, January 13, 2012 | $ 50,000.00 |
| 02 | 02.04 | | Spokesperson Training | Thursday, January 16, 2012 | Thursday, January 26, 2012 | $ 10,000.00 |
| 03 | 03.01 | Media Relations | News Bureau Program/Ongoing Media Relations | Monday, January 16, 2012 | Tuesday, November 06, 21012 | $ 125,000.00 |
| 03 | 03.03 | | Virtual Press Conference | Wednesday, February 01, 2012 | Wednesday, February 07, 2012 | $ 15,000.00 |
| 03 | 03.04 | | Media Tours/Deskside Briefings - Phase I | Thursday, February 02, 2012 | Tuesday, March 06, 2012 | $ 18,000.00 |
| 03 | 03.05 | | Media Tours/Deskside Briefings - Phase II | Monday, July 02, 2012 | Tuesday, November 06, 2012 | $ 27,000.00 |
| 04 | 04.01 | Kick-off Event | Media and Community Event - Downtown Dallas | Wednesday, February 01, 2012 | Wednesday, February 01, 2012 | $ 50,000.00 |
| 05 | 05.01 | Paid Media | March Primary - Phase I | Monday, January 16, 2012 | Tuesday, April 03, 2012 | $ 720,000.00 |
| 05 | 05.02 | | November General - Phase II | Monday, July 02, 2012 | Tuesday, November 06, 2012 | $ 1,080,000.00 |
| 06 | 06.01 | Community Outreach | Statewide Mobile Photobooth Community Events - Ongoing | Thursday, February 02, 2012 | Tuesday, November 06, 21012 | $ 250,000.00 |
| 06 | 06.03 | | Community-Based and Faith-Based Outreach - Ongoing | Thursday, February 02, 2012 | Tuesday, November 06, 21012 | $ 50,000.00 |
| 07 | 07.01 | Social Media Program | Program Development and Implementation - Phase I | Thursday, February 16, 2012 | Tuesday, March 06, 2012 | $ 80,000.00 |
| 07 | 07.02 | | Ongoing Implementation - Phase II | Wednesday, March 07, 2012 | Tuesday, November 06, 21012 | $ 120,000.00 |
| 08 | 08.01 | Legislative Outreach | Delivery of Information and Toolkits - Ongoing Outreach | Thursday, February 02, 2012 | Tuesday, November 06, 2012 | $ 35,000.00 |
| 09 | 09.01 | Hispanic Outreach | Media Partnership, Mobile Phone App, Social Media - Ongoing | Monday, January 16, 2012 | Tuesday, November 06, 21012 | $ 70,000.00 |
| Total | | | | | | $ 3,000,000.00 |
| 01 | N/A | Subtotal 01 | | | | $ 135,000.00 |
| 02 | N/A | Subtotal 02 | | | | $ 225,000.00 |
| 03 | N/A | Subtotal 03 | | | | $ 185,000.00 |
| 04 | N/A | Subtotal 04 | | | | $ 50,000.00 |
| 05 | N/A | Subtotal 05 | | | | $ 1,800,000.00 |
| 06 | N/A | Subtotal 06 | | | | $ 300,000.00 |
| 07 | N/A | Subtotal 07 | | | | $ 200,000.00 |
| 08 | N/A | Subtotal 08 | | | | $ 35,000.00 |
| 09 | N/A | Subtotal 09 | | | | $ 70,000.00 |
| Total | | | | | | $ 3,000,000.00 |

RFP 12111
Attachment D

EXHIBIT 16