TRANSCRIPT OF PROCEEDINGS BEFORE

THE SENATE OF THE STATE OF TEXAS

EIGHTY-SECOND LEGISLATURE

(COMMITTEE OF THE WHOLE SENATE)

AUSTIN, TEXAS

IN RE: §
§
CONSIDERATION OF §
SENATE BILL 14 §

COMMITTEE OF THE WHOLE SENATE

TUESDAY, JANUARY 25, 2011

BE IT REMEMBERED THAT AT 8:05 a.m., on Tuesday, the 25th day of January 2011, the above-entitled matter continued at the Texas State Capitol, Senate Chamber, Austin, Texas, before the Committee of the Whole Senate. The following proceedings were reported by Aloma J. Kennedy, Lorrie A. Schnoor and Kim Pence, Certified Shorthand Reporters.

VOLUME 2 PAGES 20 - 542

2:13-cv-193
09/02/2014
DEF0398
exhibitsticker.com

EXHIBIT

P R O C E E D I N G S

TUESDAY, JANUARY 25, 2011

(8:05 a.m.)

CHAIRMAN DUNCAN: The Committee of the Whole will come to order.

OPENING INSTRUCTIONS BY CHAIRMAN DUNCAN

CHAIRMAN DUNCAN: Members, we talked yesterday a little bit about the process, and I thought I would go through that once again so that we'll all kind of know what the plan is.

First of all, I intend to recognize Senator Fraser in just a moment to lay out the specifics of Senate Bill 14. And then after he lays the bill out, then members will be recognized for questions of the author or co-authors. Then after that is finished, then our invited testimony will begin. It's the Chair's intent to place a 10-minute limit on invited testimony. And then there will be no questions to interrupt the invited testimony as they're laying out their positions or their testimony. Then once they're finished, members will be recognized for questions.

When that's done, we'll have a resource witness panel that will be available for you. I'm advised that we have David Maxwell, Deputy Director of Law Enforcement with the Office of the Attorney General;

and Ann McGeehan, Director of Elections, the Secretary of State's office; and Rebecca Davio, Assistant Director for Driver's License with the Department of Public Safety.

When we have completed the invited testimony and you've had an opportunity to question those who have been invited, then I will -- I don't think the list is as long as it was last year, but certainly I'm sure there will be discussion among the members concerning their testimony.

Then we'll open up for public testimony. You will recall last session, we would announce the names of those who were in line, and you are in line in order of your registration at the front desk. We will have those persons escorted down to the well, and then they will be allowed to begin their testimony.

It's the intent of the Chair to impose a three-minute time limit on the public testimony as well, and I will not recognize anyone to interrupt someone giving public testimony until their time has run. There is a timer at the front at the secretary's desk. There will be a warning; I think it's a 30-second warning.

Members, we do have a court reporter, Ms. Kennedy.

Ms. Kennedy, would you stand so everyone

can see you.

Remember Ms. Kennedy from last time. I think she went 12 or 13 hours.

Because we're making a record here, obviously we need to be mindful that the court reporter only has two hands and can only type one person at a time. So the Chair will be careful to help you remember that we cannot have people talking over each other.

Also we need to try to identify each other so that -- or identify yourself when you're speaking or I'll try to do that so that the record will be clear as to the source of the comments being recorded.

We will take periodic breaks in order to allow the court reporter a little time, but we will move expeditiously as we move through the process.

There is a document -- like last session, we will have an orderly process for admitting documents into the record. They will be labeled as exhibits and be referred to in the record and will be received in the record by exhibit number. So when you have an exhibit that you want to introduce into the record, well, then, you'll need to have it marked. And the secretary's desk up here will have a procedure for marking your exhibits and receiving them in the record.

Once we have completed the public

testimony -- and, obviously, we're going to be interrupted by our Senate session which begins at 11:00. Once we finish the public testimony, then it will be appropriate for you to lay out any amendments that you may wish to have considered by the body.

And once that's completed, then, obviously, we will vote on our resolutions to rise and report back to the full Senate.

That is basically the layout of the procedure. Any questions?

Senator Van de Putte.

SEN. VAN de PUTTE: Thank you, Mr. Chairman. Thank you for outlining the process and the procedures that we will be using today. My question is specifically with those members of the public who wish to offer testimony sometimes today who have disabilities. To my knowledge, we have people coming to the floor who are in wheelchairs and will not be able to use the podium. I wanted to ask what sort of amenities or accommodations we will have so that they will be able to have that, but some sort of a table so they can refer to their documents when they're testifying.

CHAIRMAN DUNCAN: Thank you, Senator Van de Putte, an excellent question.

We do have a wireless mic that will be

TX_00000062

LAYING OUT OF SENATE BILL 14

SEN. FRASER: Thank you, members. Obviously, this is an issue that we know a lot about, we had a lot of experience with two years ago. The issue I think has been defined and talked about a lot.

I think we all recognize the dangers of voter fraud has threatened the integrity of the electoral process for the entire history of the United States. The threat continues today. In 2005, there was a Commission, a bipartisan commission, the Carter-Baker Commission, that was appointed by the Election Commission. Of course, President Carter, a past president; James Baker, Secretary of State, they reaffirmed the dangers by saying, "Elections are at the heart of democracy. Americans are losing confidence in the fairness of elections. And while we do not face a crisis today, we need to address the problem of our electoral system."

The Commission concluded at the end of the day, "There is considerable national evidence of in-person voter fraud. And regardless of whether one believes that voter impersonation is widespread or relatively rare, there can be no serious dispute that the real effect can be substantial because in a close election, even a small amount of fraud could make the

margin of difference."

Texas today has a legitimate interest in protecting elections. It is imperative that we protect the public's confidence in elections by deterring and detecting voter fraud.

In upholding the Indiana photo ID law, the U.S. Supreme Court stated, "Confidence in the integrity of our electoral process is essential to the functioning of our participatory democracy. Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government. Voters who fear the legitimate votes will be outweighed by fraudulent ones, will feel disenfranchised."

On October 10, Lighthouse poll, which I have here and be entering into the record -- it's the newest poll that is out -- shows that 86 percent of Texas voters -- that's both Republican and Democrats -- favor voter photo ID laws.

The bill that we're laying out today is in compliance with the U.S. Supreme Court Decision which upheld the Indiana voter ID legislation because it, No. 1, deters and detects fraud; 2, it protects the confidence in elections; and, 3, it counts only eligible voters' votes.

It also complies with the Supreme Court

decision, because it offset burdens on voters by providing access to free ID cards, allowing for provisional ballots and absentee ballots, ensuring that obtaining photo ID is no more inconvenient or burdensome than the usual act of voting and providing an exception for elderly voters.

The current law, as you know, provides that when a voter shows up to vote, he or she must just show a valid voter registration card. If unable to do so, the voter may show a photo ID card or other official mail from a government entity -- utility bill, bank statement, government check, paycheck or other government document with name and address -- and sign an affidavit.

Senate Bill 14, what we're doing with this bill, Senate Bill 14 would require a voter to show a photo ID except that people 70 or older on January 1, 2012, may continue to vote with just a registration card, under current law.

Acceptable ID will include an unexpired card issued by the Department of Public Safety, a military ID, a passport or a citizenship certificate with photo. Voters who cannot produce an acceptable form of photo identification will be allowed to cast a provisional ballot. That ballot will be counted if the

voter returns within six days to show a photo ID.

It would also provide for statewide training and notification of the changes required for the individual to vote with the photo ID. It would provide for a free DPS-issued identification card to any registered voter who requests an identification card.

Every fraudulent vote effectively still is a legitimate vote. Elections are too important to leave unprotected when the Legislature could take proactive steps to prevent fraud and protect our democracy.

Mr. President, that is what Senate Bill 14 does. And if there's no questions, I would move passage.

SEN. WHITMIRE: Mr. President --

SEN. VAN de PUTTE: Yes.

SEN. WHITMIRE: -- could we slow down? Will the gentleman yield?

CHAIRMAN DUNCAN: I think Senator Van de Putte was first on the list, Senator.

Senator Van de Putte.

SEN. VAN de PUTTE: Thank you, Mr. Chairman, I think. Mr, Chairman, inquiry. At what point in the proceedings today would a motion be in order to move that all of the testimony and record from this issue from the 2009 legislative session be made

into the record? Would that be done -- would that motion be proper at the point of original testimony or at the beginning of these questions at this point?

CHAIRMAN DUNCAN: Senator, at any time that one would want to make that motion, it would be recognized.

SEN. VAN de PUTTE: Mr. Chairman, would you recognize me for that motion at this time?

SEN. FRASER: Mr. Chairman --

CHAIRMAN DUNCAN: Before we do that, we do have a motion in writing that Sen. Huffman intends to introduce with the record, so why don't we do that first and then we'll do everything else. And it would be my suggestion to -- and what I had hoped to do was finish the testimony or at least the question and answers on the bill and then start at that point in time putting evidence into the record. So if that's suitable with everyone, it just makes a little more sense to me to keep it in order that way.

SEN. VAN de PUTTE: Thank you, Mr. Chairman.

And then I would like to ask my colleague, the author of the bill, to yield.

CHAIRMAN DUNCAN: Okay.

SEN. FRASER: Mr. Chairman, before we --

CHAIRMAN DUNCAN: Senator Fraser, why don't we approach the chair; approach.

(Off-the-record discussion at bench)

CHAIRMAN DUNCAN: The Chairman recognizes Senator Huffman for motion in writing.

SEN. HUFFMAN: Thank you, Mr. Chairman.

At this time I move that the entire record and transcripts of the hearing related to Senate Bill 362 heard by the Committee of the Whole during the 81st Legislative session be included in the record and would move that it marked as Exhibit No. 1.

Exhibit No. 1 includes all the invited, public and written testimony, in addition to all of the exhibits submitted by the members during the hearing on Senate Bill 362. The previous testimony and debate on Senate Bill 362 is relevant, because then and now the objective is to create legislation that protects the integrity and reliability of the electoral process.

It includes 870 pages of transcribed testimony. There were 13 invited witnesses plus two resource witnesses, 36 public witnesses and 29 written articles presented. So it includes all the exhibits as well, submitted by members during the 81st legislative session on the Committee of the Whole, which totals 55 total exhibits.

At this time I move for introduction of Exhibit No. 1 into the Committee of the Whole's records.

(Exhibit No. 1 marked)

CHAIRMAN DUNCAN: Members, you've heard the motion. Is there any objection to the motion?

SEN. DAVIS: Question.

CHAIRMAN DUNCAN: Senator Davis, do you have a question?

SEN. DAVIS: Yes.

Senator Huffman, during the debate on the Senate floor last session, a number of questions could not be answered by some of the resource witnesses at the moment that they were asked; and, instead, there was a follow-up. For example, the Secretary of State's office and the Attorney General's office wrote follow-up answers to some of the questions that they were not prepared to ask during the hearing. Does your motion in writing include the inclusion of those written responses that were provided to the Senate after the hearing took place?

SEN. HUFFMAN: I am not advised on that, but I would certainly have no objection and would move for all of that to be included in the record, because I think it would certainly make it, you know, more complete and certainly would be relevant.

The record has been certified by Patsy Spaw, the Secretary of the Senate, and so we might check with her to see if that was done. If not, we could certainly make sure that it was placed in Exhibit No. 1 as part of the record.

SEN. DAVIS: Thank you. I would appreciate that.

CHAIRMAN DUNCAN: I suggest that it be Exhibit 1A, if there are additional information, so that it can be kept separate from what you are going to introduce in your motion in writing as Exhibit 1.

SEN. HUFFMAN: Yes, sir.

CHAIRMAN DUNCAN: Okay. Is there any objection to Exhibit 1 being included in the record?

All right. The Chair hears none. Exhibit 1 will be included in the record.

(Exhibit No. 1 admitted)

CHAIRMAN DUNCAN: All right. Sen. Van de Putte.

SEN. VAN de PUTTE: Thank you, Mr. Chairman.

QUESTIONS FROM SENATE FLOOR

SEN. VAN de PUTTE: Would the gentleman yield, the author of the bill yield?

SEN. FRASER: I would yield.

SEN. VAN de PUTTE: Thank you. Thank you, Mr. Chairman.

And thank you, Senator Fraser.

Senator Fraser, this is kind of like a dance where we have another song, another round, and so we find ourselves with another year and this version of the voter identification bill. And I wanted to ask you a few questions.

Given the fact that the bill that was debated during the 81st Legislature was a different bill, can you tell me the model for the bill that was in the 81st Legislature and the differences in what you have proposed in this legislative session?

SEN. FRASER: Well, if you don't mind, the bill before us today is Senate Bill 14, and I will probably spend my time talking about that bill. The bill you're addressing, obviously, didn't get through the process. So I'm going to be addressing the comments on Senate Bill 14 which is before us. So I would be glad to describe it, if you would like.

SEN. VAN de PUTTE: Well, my question has to deal with -- I understand that since last we met, there are two years and different court cases. And the bill that was before this body last legislative session was modeled on a Georgia law and used the template. And

I understand it, this year's model is fashioned after the Indiana law?

SEN. FRASER: And I think you actually have made the point that I was going to make. Two years have passed. Since that time, we've had, you know, obviously, the confirmation by the Supreme Court on the photo ID and then also the preclearance of the Georgia bill by Dale Jays (phonetic).

So looking at, you know, the experience of the bill in place, the simplicity of the photo ID, we chose to go with that. And as you will remember, the recommendation by President Carter and Secretary of State Baker was, you know, the national photo ID, and that's what we're attempting to implement.

SEN. VAN de PUTTE: Thank you. Mr. Chairman.

And a few other questions. With the Carter-Baker Commission, they felt very strongly about encouraging the maximum participation in voter and suggested the type of strategies that we're using. But the addendum for both gentlemen and the members of the commission were that they, as I recall, and entered into the record during last legislative session, was that the conclusion of the commission was that we should not implement the type of photo identification until you had

universal registration, and I believe that was one. But given that or not, what I really wanted to ask you is --

SEN. FRASER: Hold on a second. I'm sorry. I disagree with that. That is not what the commission said. And if you would like to correct that, but I disagree.

SEN. VAN de PUTTE: The State of Georgia is under two sections of the Voting Rights Act, as is Texas. Is that correct?

SEN. FRASER: They are a Section 5 voting rights state like Texas.

SEN. VAN de PUTTE: And to your knowledge, is the State of Indiana subject to Section 5 of the Voting Rights Act?

SEN. FRASER: To my knowledge, they are not.

SEN. VAN de PUTTE: So Indiana would have a different burden of proof under a legal document and a legal challenge than the State of Georgia?

(Brief pause)

SEN. FRASER: I'm sorry. I was asking for some data. Would you reask the question, please.

SEN. VAN de PUTTE: The State of Indiana, which your bill is modeled after, without two alternate forms of identification; whereas, the Georgia bill that

we talked about last legislative session had two -- certainly had a photo identification, but if the voter was unable to produce a photo identification, they could produce for the election judges two forms of identification without, and it was utility bill and -- in fact, the things that you struck here.

But in Indiana that requirement is not there, so we went with the Indiana bill. But my question is, Indiana is not subject to Section 5 of the Voting Rights Act. So their legal hurdle to the Department of Justice challenge is very different than what happened in the State of Georgia. Is that correct?

SEN. FRASER: The Indiana law has been approved by the U.S. Supreme Court, the Georgia law was precleared by the Department of Justice, and both of those have gone through that challenge.

SEN. VAN de PUTTE: Senator Fraser, when this legislature passes the voter identification bill -- and there is no doubt that this bill will pass -- it will have to proceed to the Department of Justice for clearance?

SEN. FRASER: As a Section 5 state, we are subject to Section 5 rules.

SEN. VAN de PUTTE: So, yes, it will proceed to the Department of Justice?

SEN. FRASER: We are a Section 5 voter rights state, and we will be subject to those laws.

SEN. VAN de PUTTE: And do you have any concerns that a Section 5 state as Texas would offer to the Department of Justice a voter identification bill that mirrors a non-Section 5 state rather than something that has already been upheld in the Georgia law, a Section 5 state?

SEN. FRASER: We are offering a bill that has been approved by the U.S. Supreme Court. And the parameters that the Supreme Court set, we meet all of those tests.

SEN. VAN de PUTTE: However, in the Indiana court and in the Supreme Court case on Indiana, what they said was, the undue burden was -- did not be demonstrative because they did not have the level of minority voters, that was never a check point, because they did not have to go through the Department of Justice. Is that correct?

SEN. FRASER: I'm sorry. I'm having equipment failure here. Just a second.

(Brief pause)

SEN. FRASER: Senator, I'm sorry. I'm asking for data, backup data, because the information that you're addressing, my information doesn't agree

with that, is that the Georgia law that I have in front of me said it is a photo ID. Do you have something that shows differently?

SEN. VAN de PUTTE: Yes. In the Georgia bill, you have to have a photo ID. However --

SEN. FRASER: I realize you're saying that, but do you have -- you know, do you --

SEN. VAN de PUTTE: The bill that you introduced last year had the two alternate forms of ID, which was exactly the Georgia bill. We used the model of the Georgia bill.

SEN. FRASER: And that bill is not before us today; Senate Bill 14 is before us.

SEN. VAN de PUTTE: That's correct. And so my question is --

SEN. FRASER: And I would ask you, did you vote for that bill last year?

SEN. VAN de PUTTE: No, sir, I didn't.

SEN. FRASER: Okay.

SEN. VAN de PUTTE: But my question is, do you have any concerns that we will offer to the Department of Justice a bill, a voter identification bill that is modeled after a state law that does not have to go through Section 5, rather than a Georgia model which already has been proven and has been

affirmed, both in the court case and the Department of Justice? That was my question. Do you have any concern that we will have done all of this debate and work, and certainly to ensure the ballot security, only to be shut down at the Department of Justice, because we are a Section 5 state and what we're offering in your bill is not something that has been approved by the Department of Justice?

SEN. FRASER: I have no concern about Senate Bill 14, both going before the U.S. Supreme Court or going before the Department of Justice.

SEN. VAN de PUTTE: Thank you, Senator Fraser. I wanted to ask a little bit of your thinking. And in the bill that you have before us, the student identifications were omitted from your list of acceptable documentation. And could you give me the rationale why a student photo identification is not acceptable form of identification?

SEN. FRASER: The types of identification we've included are one from a government entity that would identify that person as who they are, that they say they are, they're a valid voter and a citizen of the United States, and these are the ones that we have suggested that would be acceptable.

SEN. VAN de PUTTE: So the rationale for

not having student identification cards on the list, since you omitted them, is because they aren't issued by a governmental entity?

SEN. FRASER: I didn't say that.

SEN. VAN de PUTTE: I'm sorry. Can you repeat your answer.

SEN. FRASER: I said I did not say that.

SEN. VAN de PUTTE: So why were the student identifications -- you explained that the student identifications were omitted from the list of acceptable documentation, because it was not a government entity.

SEN. FRASER: The four types of identification that we are offering up we believe are less confusing, they're simpler for both voters and election voters. Everyone knows what they look like. There is a standardization of those, and they all look alike and it would be less confusing for the systems who are accepting the voter IT.

SEN. VAN de PUTTE: And, Senator Fraser, one of the provisions in your bill also omits birth certificates from the list of acceptable forms of identification, even though that does come from government entities. And so why is it that birth certificates were omitted?

SEN. FRASER: This is requiring a photo ID, current photo ID.

SEN. VAN de PUTTE: Senator Fraser, are there any provisions in the bill to accommodate a voter that has a different address on their photo identification and their voter registration card?

SEN. FRASER: The Secretary of State is here as a resource witness, and I'm sure they will be glad to answer that.

SEN. VAN de PUTTE: No, I'm not asking the difference. I'm asking, is there any provision in Senate Bill 14?

SEN. FRASER: It is not addressed, because that is taken care of by the Secretary of State, that we don't address that in the bill. That would be by an interpretation of rule of the Secretary of State. They will be here, and you can ask them that question.

SEN. VAN de PUTTE: So also you would prefer that we ask the Secretary of State what sort of provision, since your bill is silent on different last names?

SEN. FRASER: Again, that's a question that --

SEN. VAN de PUTTE: So, for example, women that got married?

TX_00000398

SEN. FRASER: We've actually got two different -- you know, kind of an overlap here. We've got the Department of Public Safety that I believe Senator Williams is going to be answering questions, because that's his area. And then we also have the Secretary of State available as a resource that I think you can ask that question.

SEN. VAN de PUTTE: Senator Fraser, under Senate Bill 14, your voters can cast a provisional ballot. Under the Indiana bill, that is set at a 10-day cure. Why is it that you chose a six-day cure?

SEN. FRASER: And you'll remember, the Georgia law is only 48 hours, two days. They went 10 days; the Georgia law went two days. We decided that six days should be sufficient to come back.

SEN. VAN de PUTTE: And as I understand it, the Georgia law does have a 48, but they can use two alternate forms of ID which are not in your bill. So what sort of --

SEN. FRASER: I'm sorry. You know, you keep saying that. You need to pull up the data to show me that, please.

SEN. VAN de PUTTE: So to prove their provisional ballot is correct and the six-day cure, what documentation does your bill have that is acceptable?

SEN. FRASER: Photo ID.

SEN. VAN de PUTTE: So only a photo identification. So they would have to --

SEN. FRASER: The acceptable photo IDs that are outlined in the bill would be an acceptable form, yes.

SEN. VAN de PUTTE: Senator Fraser, do you know right now in the State of Texas, we're able to cast provisional ballots? That's correct, isn't it?

SEN. FRASER: I'm sorry. Ask that again.

SEN. VAN de PUTTE: Current election law allows Texas voters to cast a provisional ballot. Is that correct?

SEN. FRASER: I'm sorry. That is another question I think you should ask the Secretary of State. It is my belief that, but I'm sorry, I don't want to answer that. You can, if you don't mind, ask the Secretary of State.

SEN. VAN de PUTTE: Thank you, Senator. Since it's based on Indiana law, do you believe that the State of Texas has a greater minority population than the State of Indiana?

SEN. FRASER: I'm not advised.

SEN. VAN de PUTTE: To your knowledge, have any studies been done to determine if there has

been, under current Texas voter laws, any impact that it would have on affected class of Latino and African-American voters?

SEN. FRASER: The bill that I'm laying out today is a model that has been approved by the U.S. Supreme Court, it has been precleared by the Department of Justice in Georgia. It will deter fraud. We're providing free access of cards. And, yes, we believe this will protect confidence in election in making sure only eligible voters are counted.

SEN. VAN de PUTTE: Senator Fraser, on the availability of free identification cards, is there a means test, or what sort of proof do citizens have to give to the Department of Public Safety to be able to get a free identification card under your bill?

SEN. FRASER: The Department of Public Safety is here as a resources witness. Senator Williams is also here. That's his area of expertise. If you have a question about that, if you would like, I will yield to Senator Williams now or you can wait and ask the DPS when it comes up.

SEN. VAN de PUTTE: Well, right now the DPS I don't think gives free IDs. But in your bill, what sort of process or documentation can voters use to get a free identification card, in your bill? What are

the --

SEN. FRASER: If you would like I can yield to Senator Williams or we can wait and have the DPS. Our instruction is the bill, is that they will issue an ID card and they will not charge. That is very clear to the DPS. And if you want to ask how that will be done, they will be coming up, and you will be able to ask that question. Or if you would like for me to yield to Senator Williams, we'll let him answer that.

SEN. VAN de PUTTE: No, Senator. Thank you. I appreciate this is just a different bill from last legislative session, and I was trying to get at least some of your thinking of why you went with a different bill than last year, a more restrictive, a far more restrictive bill than what we debated last legislative session. And I look forward to the questions, I look forward to the testimony today, but I don't have any other further questions.

And I'm sure some of my colleagues have questions, both of the author of the bill and any of the other senators that have certain sections that they have got expertise on.

But thank you very much, Mr. Chairman. I don't have any other further questions.

CHAIRMAN DUNCAN: Senator Watson?

SEN. WATSON: Thank you, Mr. Chair.

Will the senator yield for a couple of questions? Oh, I'm sorry.

SEN. FRASER: One second, please. Are you wanting me to yield?

SEN. WATSON: Yes --

SEN. FRASER: Hold on a second, please.

SEN. WATSON: -- if you don't mind.

(Brief pause)

(Senator Whitmire speaking without mic)

SEN. FRASER: Do you have the floor now?

(Senator Whitmire speaking without mic)

SEN. FRASER: No, you're asking questions over here.

(Senator Whitmire speaking without mic)

SEN. FRASER: Making sure I get the answers correct.

I will yield now.

SEN. WATSON: Thank you, Chairman Fraser.

I want, if you don't mind, to ask about the fiscal note for just a second. The fiscal note that was attached to your bill, Senate Bill 14, indicates that the fiscal implication to the state is anticipated to be $2 million. Is that correct?

SEN. FRASER: Could you hold one second.

SEN. WATSON: Sure.

SEN. FRASER: I need to pull the data here.

(Brief pause)

SEN. FRASER: Senator, I was just verifying. We spent a lot of time last night talking about this. I think you're aware that the HAVA funds that come from the federal government, which I believe are Help America Vote Institute, I guess it is, Help America Vote, the HAVA, there are funds that come to every state to the secretary of state. We have a fund that is setting in the Secretary of State's office that would be more than sufficient to handle this.

In other states like Indiana and Georgia, the HAVA funds have been used before. We have requested that those funds be available for this. They advised us back, until the passage of the bill, they can't approve the funds. But the assumption is that those funds are before the Secretary of State, and they will be here at some point. You can ask them about those funds, the parameters, but it is our belief that the HAVA funds will be available for this and would offset the fiscal note.

SEN. WATSON: I appreciate that answer. My question was, it's a $2 million fiscal note. Right?

TX_00000404

SEN. FRASER: Right now the fiscal note that was delivered is $2 million, yes.

SEN. WATSON: Okay. And that's what I really wanted to ask about. And I'll talk about the fact that y'all want to take some federal funds, here in a second. But first of all, last session when we were talking about the fiscal note, my memory was and is, that at the beginning of the session when you filed the bill last session, there was a zero fiscal note, and then that got changed to the same as it is right now, a $2 million fiscal note for voter awareness, and it was exclusively for voter awareness in the second fiscal note.

Can you tell me what analysis has gone into coming up with how much money should be spent on voter awareness and voter education regarding this bill, in order to get to that $2 million?

SEN. FRASER: I think the analysis on this comes from the Secretary of State's office, and I'm sure they will be glad to answer your question. Two years ago before we started, we advised them that we needed voter education. If you remember in the bill, we discussed in that when we were discussing that, that we needed to have an appropriation for that.

I think Senator Ogden stood up and talked

about the fact that they would be willing to make sure that there was money there. Since then, we have been made aware that the Secretary of State not only I think has a plan for doing that but also a plan for requesting the funds from HAVA.

SEN. WATSON: Well, I'll ask about that. So, then, let me ask you another question. You indicated in your opening comments that -- and I've read your legislation -- under this bill, everyone gets a free identification card if they come in and ask for a free identification card, they show a voter registration card and/or they apply for a registration card. That $2 million that you've just talked about doesn't include the cost, any of the cost for providing these free identification cards, does it?

SEN. FRASER: I'm sorry. I was doing something else. Would you ask that last question again, please.

SEN. WATSON: Does the $2 million in the fiscal note include any of the cost of providing free identification cards?

SEN. FRASER: To my knowledge, it does not.

SEN. WATSON: And, in fact, there is no means test and your bill forbids DPS from collecting a

fee. If any eligible voter comes in or submits a registration application, they can then avoid what is the typical $15 fee?

SEN. FRASER: Senator, have you seen the numbers that have been collected by DPS on the number of eligible voters that have registered since 2006, the ones that registered with a driver's license or a driver's license and a social security card that identified the number of people registering --

SEN. WATSON: Yes.

SEN. FRASER: -- that already had identification? So the question you're asking is, the universe we're talking about we believe is very, very, very small. In fact, the Carter Commission, after the implementation in both Indiana and Georgia, and actually Mississippi they looked at, they found that only 1.2 percent of people did not have, already have a photo ID available, so the universe of this, so the question you're asking --

SEN. WATSON: Then why don't we talk about specific numbers. With you talking about those numbers, you're probably aware that in 2007, House Bill 218 was offered. It was referred to the committee, the Senate Committee on State Affairs. And in that one, which was HB 218, DPS talked specifically about identification

cards and it put a fiscal note, it believed that it would be $1.3 million per biennium or $4 million every six years out of the highway fund. Were you familiar with that?

SEN. FRASER: Senator, you're getting into an area that's outside of my area of expertise. We have the person that's in charge of that. You've got two choices. Either you can ask that question of DPS as a resource when it comes up, or I will yield to Senator Williams right now and he can answer your question.

SEN. WATSON: Senator, if you would answer that question.

SEN. FRASER: I now yield to Senator Williams.

SEN. WILLIAMS: I just want to be sure I've got your question right.

SEN. WATSON: Sure. Since we're talking about numbers here -- and I'm trying to get a feel for what the cost of this is -- in House Bill 218 in the 2007 -- the 80th legislative session, there was a bill filed that dealt with the provision of identification cards. And in that one, the LBB indicated the fiscal note would be $1.3 million or $4 million every year coming out of the highway fund. Are you familiar with that?

SEN. WILLIAMS: I'm not familiar with House Bill 218. But, you know, I take what you're saying --

SEN. WATSON: Sure. Okay.

SEN. WILLIAMS: -- at value.

SEN. WATSON: And since I anticipate that there would be deferral to you on the next question, too, let me just go ahead and ask that. Last session, in the 81st session, there was a bill by -- it was HB 2335 that indicated, similar to what Senate Bill 14 does not, that there couldn't be a fee charged for issuing a document that someone might use as proof of their identification for purposes of voting. In the fiscal note there, the LBB singled out DPS identification cards, which is what we're talking about here, and assumed that if everyone used those, the number they came up in that fiscal note was $47 million over five years. Are you familiar with that one?

SEN. WILLIAMS: I'm not familiar with that --

SEN. WATSON: Okay.

SEN. WILLIAMS: -- particular bill. But what I can tell you is that the cost to the Department of Public Safety for issuing an ID card is about $1.67. It's a very small amount of money. So $47 million

sounds -- that's a lot of IDs at a buck 67 apiece. And so what I would say is that when I discussed this with the Department of Public Safety recently -- and they'll be here to testify about this in detail more -- I think that it would be difficult for them to determine now how many people might take advantage of the free ID card. I think it's probably not possible for them to estimate that.

But the cost, I think we're all pretty comfortable that it would be fairly negligible. When you look at the universe of registered voters, which is somewhere around 13 million people, I think, and you've got about 15 million people that have either a driver's license -- and I can get you the exact numbers. I have them here -- there are a lot of people that already --

SEN. WATSON: Right.

SEN. WILLIAMS: -- have state ID cards. And a lot of the folks that don't have those would be using a mail-in ballot, and there is no requirement to present any kind of photo identification for a mail-in ballot, and this legislative doesn't touch that. So we think that the chances that there's going to be somebody who is going to want to avail themself, there will be some, but it's going to be a very small number.

SEN. WATSON: Of course, what I'm

attempting to do is not engage in that as I vote no this. What I've tried to go is go back and find out what the LBB, which we rely upon for fiscal notes, has actually said about these sorts of things, with previous legislation that has addressed this, as opposed to speculation.

SEN. WILLIAMS: And, Senator Watson, I understand, and there are a lot of things -- I'm not familiar with those bills. And what I would tell you is that each -- the LBB comes up with their methodology based on what each bill's requirements are. And not being familiar with that --

SEN. WATSON: Sure.

SEN. WILLIAMS: -- I can't tell you what the difference between that and this is. But we did specifically sit down and talk to DPS, and they really don't expect that this is going to be any big burden on the agency that they're not going to be able to handle.

SEN. WATSON: Thank you for your answer.

SEN. WILLIAMS: Yes.

SEN. WATSON: I have a couple more questions for Senator Fraser, if that would be all right.

SEN. FRASER: I'm back with you.

SEN. WATSON: Okay. Great! Thank you,

Senator.

Would the HAVA money that -- first of all, you're familiar that in the base budget that the Senate has but out, the $2 million for this biennium for voter education has been explicitly cut. You're familiar with that. Right?

SEN. FRASER: I don't think the word "explicitly cut," I don't think it's been addressed.

SEN. WATSON: Well, it's been struck through in the base budget. Did you know that?

SEN. FRASER: I'm not advised.

SEN. WATSON: Okay. Are you also familiar that in this budget it calls for a $358 million cut to the DPS budget?

SEN. FRASER: Again, I'm not on Finance; I'm not sure you're on Finance. And so, no, I haven't -- the base bill is the starting point of discussion, so I'm not advised.

SEN. WATSON: All right. So you're not advised whether, out of that 9.5 percent of the cut comes in regulatory and the licensing area for DPS?

SEN. FRASER: Well, and as you know, as we start the session, that's a draft budget as a starting point. We're a long ways from that being concluded. So the answer is no, I'm not aware.

SEN. WATSON: Thank you very much.

Thank you, Mr. Chairman.

SEN. ELTIFE: Senator Whitmire, what purpose do you rise?

SEN. WHITMIRE: Will the gentleman yield?

SEN. ELTIFE: Senator Fraser yield?

SEN. FRASER: Be glad to.

SEN. WHITMIRE: Senator Fraser, a couple of questions about the implementation of your legislation if it passes. First off, I have to make this observation: Have you ever seen the gallery so empty when the Legislature is considering something that's been given such a high billing as Senator Duncan was making yesterday when he asked us to go to Committee of the Whole? I mean, how timely this was and how critical it was? The Governor has made it an emergency, and I don't think I've -- I don't know if there's 20 people in the gallery. If it's so important, can you explain to me why the gallery is empty --

SEN. FRASER: I am not advised.

SEN. WHITMIRE: -- based on --

SEN. FRASER: I'm concentrating on the action on the floor rather than looking up and seeing who is in the gallery.

SEN. WHITMIRE: Well, but it's an

indication, if the public is really concerned, particularly based on your polling data, which I'm sure you would join with, we don't govern in the state by polls normally, do we?

SEN. FRASER: Well, other than I find it interesting, whenever they asked the people of your district that you represent --

SEN. WHITMIRE: Sure.

SEN. FRASER: -- of whether they're in favor, the polls continue to show that the public, both Republican and Democrat --

SEN. WHITMIRE: Well --

SEN. FRASER: -- you say, "Will you support a person voting with a photo ID?"

SEN. WHITMIRE: And did you include in that question and would you be for it if it would disenfranchise senior citizens, students or others? You and I know it's all in how you ask the question. In fact, the way you're stating it, I'm surprised you didn't get 100 percent. If you ask people, "Are you against vote fraud?" I would assume you would get 100 percent.

SEN. FRASER: Here's the question -- here's the question --

SEN. WHITMIRE: It's the unintended

consequences that we're concerned about.

SEN. FRASER: "Do you favor or oppose requiring a photo ID before a person is allowed to vote?" Pretty straightforward.

SEN. WHITMIRE: I'm surprised you didn't get 100 percent if you include "and stop fraud." It's when you add into it, "if it meant disenfranchising senior citizens," and then I think you would have a significant drop.

The bottom line is, Senator Fraser, and we'll have -- and let's have this ballot: Would you concede that we're all, all 31 of us are against election fraud?

SEN. FRASER: I will not concede that until after the vote, and we're assuming the ones that vote for it are --

SEN. WHITMIRE: Well, let me go ahead and speak for the 12 of us that are probably going to vote "No." We're all against election fraud. And I would suggest we've actually seen an election process since we took this up two years ago. Let's look at the most recent election. What fraudulent activity this past November are you so concerned about? I think it's the election -- and maybe I should be more concerned.

If you look at the election results, it

was an overwhelming victorious day for Republicans in November. You replaced 34 Democrats in the house. Now, are you suggesting there was significant fraud on that election day?

SEN. FRASER: Senator, all we're trying to do with this bill is that when you walk into the polling place and represent that you are John Whitmire --

SEN. WHITMIRE: Sure.

SEN. FRASER: -- that you can prove you are who you say you are before you vote, it's a very simple concept.

SEN. WHITMIRE: Except, Senator Fraser, the unintended consequences that you're going to disenfranchise people that have not been able to acquire these cards, and that's what I want to spend a few moments on. Walk me through a real life example of how a senior citizen in my district is going to acquire that card. Do they do it by mail? Do they have to do it in person? What's the process?

SEN. FRASER: Senior citizens over --

SEN. WHITMIRE: Give me a real life. Don't say, "We're going to provide it." Let's break down what an 86-year-old lady in my district, never been required to have one, how is she going to get her card?

SEN. FRASER: She would vote under current

TX_00000416

law because she's exempt.

SEN. WHITMIRE: You've given her an exemption. Does she have to prove, that day, her age? I mean, Troy --

SEN. FRASER: You can ask that question of the Secretary of State. But I'm assuming --

SEN. WHITMIRE: Well, you're the author. And let me just tell you, like I said, we're all against fraud. As elected officials, it's in our own personal self-interest to have honest elections with the highest integrity. We're doing it for the people that we represent as well. So that's not the issue, are we for or against fraud? It's the implementation, it's the disenfranchisement, Troy, that we're fighting for and what we've been fighting for, for the last couple of years. Tell me how we're going to address the unintended consequences of someone not being able to vote on election day, because I know you don't want that. And I --

SEN. FRASER: I was sent down here by the people of my district to represent their views. The polling of my district shows that it's almost 90 percent of the people in favor of it.

SEN. WHITMIRE: Okay.

SEN. FRASER: The district that you

represent, I think if you poll in that district -- and I have used some polling that shows close to the same number -- that say that when they're asked, "Do you think you should have to show a photo ID?" and they say yes.

SEN. WHITMIRE: And my --

SEN. FRASER: So my answer is, we need to pass this, because the people in our district --

SEN. WHITMIRE: Well --

SEN. FRASER: -- believe that they should show a photo ID.

SEN. WHITMIRE: First of all, I don't govern by poll. And if I was at a town hall meeting and I walked through, after they've said they're for voter ID, then I start talking about the implementation of it, they start being just as concerned as I am. So I want to know how people are going to acquire these cards. Forget the 86-year-old. Let's go to a 56-year- old person. How do they acquire the card? Are you familiar in Houston it takes two to three hours to get a driver's license at the DPS office?

SEN. FRASER: John, I was about to ask you, you know, ask you your age, but I know your age. We're both 61. A 61-year-old person in our age group, is it going to be a real problem for you and I to drive

down to the DPS to get --

SEN. WHITMIRE: Well, see, that's what's so sad about this discussion. You're not putting yourself in the shoes of someone who doesn't have the means that you and I have, they have to depend on someone else for transportation. They may not have any resources. How is a 56-year-old person in Houston, Texas, going to acquire this card --

SEN. FRASER: We are not changing --

SEN. WHITMIRE: -- no driver's license.

SEN. FRASER: We are not changing the mail-in ballot. And if someone has a reason that they need to vote by mail --

SEN. WHITMIRE: On a mail-in ballot, how do you prove -- that's early voting. How do you verify who you are in that instance?

SEN. FRASER: I'm sure the Secretary of State would be glad to answer that.

SEN. WHITMIRE: Okay. But that's not what we're talking about. We're talking about on election day, a person in Houston wants to vote, how do they acquire the voter ID, photo ID?

SEN. FRASER: The DPS and the Secretary of State will both be here, and I'm sure they will be glad to answer that question.

SEN. WHITMIRE: Troy, you're proposing this. And before we go forward, I would like to know, do you have to go to the DPS office? Do you order it by mail? That's a critical concern of all of us that are voting "No" against this bill. And I don't --

SEN. FRASER: Senator, did --

SEN. WHITMIRE: -- think you want to disenfranchise anybody, but I'm afraid that there's unintended consequences that you have not envisioned.

SEN. FRASER: Did another senator advise you of what you had to do to go down to the DPS office to get your driver's license?

SEN. WHITMIRE: Well, we're not talking about me. We're fortunate; you and I are fortunate. We probably don't have to wait in lines. In Houston. Texas --

SEN. FRASER: There are 15 million drivers in Texas. Of the 31 Senate districts, I think that would mean there's about 500,000, I believe, in my district. And I don't think I've got a one of them that I instructed on how to go down and get a photo ID.

SEN. WHITMIRE: Okay. Well, let me just tell you about the DPS operations in Harris County. A working person cannot go by and get their license renewed on their lunch hour, before work or after work,

because literally it's a two to three-hour wait. So how do you add this new group of participants that have to show up at a DPS office to get a voter ID.

SEN. FRASER: We have someone coming from the DPS. I think you can ask that question or I'll yield to Senator Williams.

SEN. WHITMIRE: I'm not sure if they're -- I think you as the sponsor ought to explain that.

SEN. FRASER: The bill that I'm laying out is very clear, that it complies with the Supreme Court ramification and it also has been cleared by the Department of Justice.

SEN. WHITMIRE: Okay. So you don't know. Is that your answer?

SEN. FRASER: I said we've got resource witnesses that are coming. I'm not an expert in that area. We do have an expert coming, and they'll be glad to answer your question.

SEN. WHITMIRE: The DPS folks will have to publicly say at Gessner and I-10 or at Tacoma and 290, two sites in my district -- and I complained and asked for more resources -- it's a two- to three-hour wait, Governor Dewhurst, to get your driver's license renewed. So you can't even go over there on your lunch hour and get a driver's license, and now you want the folks to go

over there and, I assume, wait in line to get a voter ID.

Let me ask you another question about the education that you're going to provide. Is it going to be done in bilingual materials with a --

SEN. FRASER: I'm sure the Secretary of State will be glad to answer that question.

SEN. WHITMIRE: Well, you're the sponsor.

SEN. FRASER: And as the sponsor, I invited the Secretary of State as a resource witness, to make sure we have someone that knows the answer to that particular question.

SEN. WHITMIRE: One also is, your bill provides same-day registration. Now, according to you, you're going to have a fail-safe system that you'll know who is showing up to vote. Are you open to the idea that someone who has gotten motivated in the last 30 days, maybe the days just leading up to the election, with this secure form of ID can show up on election day, prove who they are and ask to vote?

SEN. FRASER: The bill does not provide for same-day registration.

SEN. WHITMIRE: I'm sorry. What?

SEN. FRASER: The bill does not provide for same-day registration.

SEN. WHITMIRE: Would you be amenable to us proposing it and --

SEN. FRASER: The bill does not provide, as I -- I filed the bill, and the bill does not provide for same-day registration.

SEN. WHITMIRE: Okay. Thank you for your answers.

CHAIRMAN DUNCAN: Senator Uresti.

SEN. URESTI: Thank you, Mr. Chairman.

Would the gentleman yield for some questions?

SEN. FRASER: I would love to yield.

SEN. URESTI: Thank you, Senator Fraser. I want to ask you a few questions, kind of to follow on what Dean Whitmire asked you specifically regarding the DPS offices. And I don't know if they're here yet or not. But particularly about my district, you know how large it is. It goes from San Antonio all the way to El Paso, and it has 23 counties, as I'm sure you're aware, Senator Fraser.

And one of the concerns that I have is that between here and El Paso -- and you may know this. If not, I would like to let you know and the other members know -- well, let me ask you this: Do you know how many of my 23 counties do not have a DPS office?

SEN. FRASER: Senator, you know, the start of your description of this, I'm very familiar with the district, because I used to represent a lot of it. And that area between -- going out toward El Paso, I've had that when I was a state rep. It was in my state representative district. And then part of your other district was when I was a senator. So, yes, I'm very familiar with it.

The answer to your question that you're asking about driver's license location, we'll have somebody from DPS here, and I'm sure they'll be glad to answer that question for you.

SEN. URESTI: Well, in the meantime, Senator Fraser, let me let you and the members know. There are eight counties in my district out of the 23 that do not have a DPS office. Loving County has no office, Crockett County, Hudspeth County, Jeff Davis County, Kinney County, Real County -- we had some good folks here yesterday representing Real County -- and Terrell County have their offices temporarily closed. And, Senator Fraser, do you know how many people live in those counties? There are 47,000 people that live in those counties in my district that don't have a DPS office.

SEN. FRASER: Do you know how many in

those counties drive that have a license?

SEN. URESTI: No, I don't. Do you know, Senator?

SEN. FRASER: I don't, no. I have been out in those counties and I see people driving. I'm assuming they have a driver's license.

SEN. URESTI: Well, it makes it even more difficult if they don't have a driver's license and they need to get a driver's license or a photo ID to vote. How are they going to drive long distances in order to retrieve that -- or obtain that ID?

SEN. FRASER: Again, the data we've been shown is that people registered to vote -- and I guess I would like to look in your area -- but about 90 percent of the people that are coming in show their driver's license when they register to vote.

You know, yes, there's -- it looks like there's a lot of people or, you know, 47,000, but I'm assuming that the bulk of those, probably a lot of them have IDs.

SEN. URESTI: Well, that's an assumption, Senator Fraser, that you're making that I don't have the luxury of making on behalf of those 47,000 people. But in addition to that, Senator Fraser and members, there's another 70,000, another 70,000 constituents in my

district that have access to only partial or sporadic service; for example, Senator Fraser, the first Tuesday of each month from 9:00 to 4:00. So they have one day a month, members, to go and get an ID, and that's between the hours of 9:00 to 4:00.

Well, if you can't get off of work that one month -- that one Tuesday and that's the only day it's open, what are my constituents supposed to do, Senator Fraser?

SEN. FRASER: I think that's probably a question you would want to ask the DPS. Or, if you would like, I will yield to Senator Williams.

SEN. URESTI: But this isn't their bill; this is your bill, Senator Fraser.

SEN. FRASER: And that's the reason I bring in, you know, knowledgeable witnesses, expert witnesses that can answer these questions. We have someone from DPS that will be here. Or Senator Williams, that's in the area of his committee.

SEN. URESTI: So they're going to answer my question as to what should my constituents do if they can't get off of work that one Tuesday of the month in order to get their ID to vote? That's what you're saying, they're going to answer that question?

SEN. FRASER: You'll just have to ask

them.

SEN. URESTI: This is your bill, Senator Fraser. I'm asking you, because I need to go back to my district and tell them that they have to get a photo ID in order to vote. And their first question to me is going to be, "Well, Senator Uresti, you know that our DPS offices are closed," or "We have no DPS office in our county," or "It's only open on one Tuesday a month." What am I supposed to do, Sen. Uresti"?

SEN. FRASER: Again, the DPS will be here. You can outline the problem, and you can outline the problem with Senator Williams, and you're free to ask them those questions.

SEN. URESTI: Sen. Fraser, in addition to those counties that have no DPS offices, many of my constituents in several other counties are going to have to travel long distances in order to get an ID. For example, my constituents in Crockett County, Ozona, will have to travel 163 miles round trip to San Angelo to get to the nearest DPS office. And if you live in Sanderson in Terrell County, you will have to travel 170 miles round trip to get to Fort Stockton. If you live in Sierra Blanca in Hudspeth County, you have to travel 176 miles to get to El Paso in order to get to the DPS office. Did you know that, Sen. Fraser?

SEN. FRASER: I'm very aware of that, that, you know, the district I represented, there were bus routes that were 80 to 90 miles each way for kids to attend public school, because the people lived out in the country.

SEN. URESTI: And would you agree with me, then, that that's going to be a challenge for those folks?

SEN. FRASER: We're not changing the early voting mail-in ballot rules, and that will still be an option for people.

SEN. URESTI: So they don't need an ID to vote by mail?

SEN. FRASER: By mail? Again, you can ask the Secretary of State. We're not addressing the mail-in ballots. The Secretary of State will be here. Someone from their office, you can ask that question.

SEN. URESTI: Well, let me just mention a few more of my counties. If you live in Van Horn in Culberson County, you have to travel 200 miles round trip to Marfa, which is the nearest DPS office. If you live in Pecos, which is in Reeves County, you have to travel 143 miles to Fort Stockton. If you live in Rocksprings in Edwards County, it's 152 miles round trip to Del Rio, Sen. Fraser. And finally, if you live in

Medina, which is in Hondo, if you live in Hondo, which is in Medina County, you have to travel 84 miles.

And so again my question; Sen. Fraser -- if you can't answer it, just let me know -- what am I supposed to tell my constituents -- because this is your bill; it's not my bill -- how are they supposed to get their Texas ID if their DPS office is --

SEN. FRASER: Senator, if I were you, when the DPS comes up, I would ask them questions and say, "Is there a way that we could do something like a temporary van coming through to accommodate those people?" And if I were the senator from that area, that probably would be a question I would ask the DPS. But again, they're coming forward, and that's a question I think that is appropriate of the DPS of, you know, "How do we make sure that we accommodate those people?"

SEN. URESTI: Well, it's a great suggestion, Senator Fraser. But what if DPS says, "We can't do that. It's not in the budget, the $2 million that we're being allocated"? So then what do I tell my constituents?

SEN. FRASER: Well, you're assuming the answer before you ask the question of the DPS.

SEN. URESTI: Well, you're assuming that they're going to say that they will be able to do it.

SEN. FRASER: No. I'm assuming that the DPS is going to come up and you'll have the opportunity to ask them.

SEN. URESTI: Okay. So then let's assume the DPS spokesperson says, "Great idea that Senator Fraser has. We can do that," there's going to be a cost associated with that. Isn't that correct? That's not included in the fiscal note of $2 million?

SEN. FRASER: Again, I'm not advised, I think the DPS could advise you on that, or Sen. Williams.

SEN. URESTI: Do we know when they're going to be available to answer or --

SEN. FRASER: I think they're on hand. And as soon as we complete these questioning, I think we'll going to bring -- you know, as soon as we start the -- well, I think that the plan -- I'm not speaking for the Chair, but I believe we're going to allow questions from members, then we're going to have invited guests. And then once we start the public testimony, they would be ready to come up, and I think they'll answer any questions you've got.

SEN. URESTI: Senator Fraser, let me ask you a few more questions, if I may, please. And I want to be clear. So as I understand it, in order to vote

with your bill, if your bill passes, you can have a voter registration card and a Texas ID or a driver's license, and you're able to vote with both of those documents. Correct?

SEN. FRASER: Actually, you don't -- if you go in and you're on the voter roll and you have a driver's license, they'll allow you to vote, because I know that's -- you know, I do that now.

SEN. URESTI: So you don't need your voter registration card, is my real question? If you have a valid Texas ID or a valid Texas driver's license, then you do not need --

SEN. FRASER: I think probably if you'll ask the Secretary of State. But my understanding is that you just have to identify yourself with a photo. And if you're on the voter roll and you're at the correct voting location, you live in that precinct and you're on that roll and you show them your ID, I believe you'll be allowed to vote.

SEN. URESTI: And that's my question, but I want to be specific about it. So if I have a valid photo ID or a valid Texas driver's license and I'm on the rolls, then I do not need a voter registration card. Correct?

SEN. FRASER: To my understanding, the

answer is yes. But I still think I would ask that question of the Secretary of State.

SEN. URESTI: Well, I'm pretty sure that's correct. That's what I read. Then why do we need a voter registration card, then? Why are we going to need voter registration cards after your bill passes?

SEN. FRASER: Good question. Why don't you ask that of the Secretary of State. It might be a -- you could offer that as a cost-saving measure.

SEN. URESTI: But it's your bill, Senator Fraser. I mean --

SEN. FRASER: All my bill is addressing is the photo identification when you vote. You know, Carlos, when you walk in and they say, "Senator Uresti, you know, we'll need some identification," and even though you're on the roll, you're going to have to show a photo ID.

SEN. URESTI: And that's correct, and I agree with you, Senator Fraser. But the result will be, you do not need your voter registration card, then?

SEN. FRASER: That is my understanding. But, again, I would ask the Secretary of State.

SEN. URESTI: Okay. That's all the question I have for now, Mr. Chairman.

Thank you, Senator Fraser.

CHAIRMAN DUNCAN: Thank you, Senator. Senator Gallegos.

SEN. GALLEGOS: Senator Fraser, the questions that you're being asked and are asking us to wait for resource witnesses, I'm concerned that we're not getting answers from the author of the bill. Now, Senator Huffman just showed us a box with testimony and questions and supposedly answers that were asked two years ago. And a lot of the questions that you're referring to that we get answers from resource witnesses weren't answered at that time.

I mean, we just want an assurance here that whatever was in that box that Senator Huffman had did not have all the questions answered. I heard what she told Senator Davis, but a lot of the questions that you're being asked today were the same questions that were asked two years ago and have never been answered.

SEN. FRASER: Senator, I stayed up very late last night reading the deposition of the questions that were asked, that you asked me last year, the answers. And I guess if you're concerned about that, maybe you should get that deposition and you read it and that way you can feel more comfortable about what was asked and what was answered. Have you read the deposition?

SEN. GALLEGOS: There will be plenty of time for that. But I'm just asking you, as the author of the bill. You know, I mean, you are laying it out, and you're trying to explain it. And you're asking us to ask resource witnesses on questions, especially the questions that Senator Uresti had. And it concerns me that before we even, you know, lay it out and go forward with a bill, that the people that are here listening, at least they have the right to -- they leave, they have the right to know these questions, especially those questions that Senator Uresti just got through asking you. And it concerns me that we cannot get answers at the time that the bill is laid out, before we even go forward with the witnesses. And that just concerns me, that we're not getting answers.

SEN. FRASER: I think you can take a lot of comfort in the fact that we will not ask you to vote for the bill until we bring up an expert witness and you will be allowed to ask those question and get the answer you're looking for.

SEN. GALLEGOS: Well, I mean, we did that two years ago. And some of the questions that the box that Senator Huffman had still doesn't have answers in that box that she had that's going to be introduced as Exhibit No. 1.

SEN. FRASER: Have you read all the data that was in the box?

SEN. GALLEGOS: I have not read it; I have not read it. But, you know, I would think that, especially some of the questions that I asked and I'm fixing to ask you, you know, that if those answers aren't in that box that Senator Huffman introduced as Exhibit No. 1. I just want to make a point that it concerns me that these questions these senators have about their districts are not being answered. I just wanted to make that point.

And on another question, Senator, on the fiscal note -- and I know that Senator Watson brought it up -- it says that it's $2 million to implement. Now, here is my concern on that, is that Texas is ranked No. 2 nationally in this country as far as population. Missouri is ranked 19th. Yet, the numbers that I'm looking at on the costs that the Secretary of the State of Missouri on implementing -- and Missouri only has 5.9; we have 25 million -- Missouri has 5.9 in population, and the Secretary of the State of Missouri is going it's going to cost $6 million just to implement their voter ID program, and that's just the first year. The second year, another $4 million.

Now, with only 5.9 in population, and I'm

looking at Texas that has 25 million, now, what kind of methodology is the Secretary of State using in Missouri as opposed to the Secretary of State in Texas? To me, that math -- you know, I'm not an expert in math, but I can tell the difference between 5.9 and 25 million to implement a voter ID bill, you know, that obviously there's something wrong here in the numbers. Can you tell me the difference in 6 million for Missouri and 2 million in implementing the cost of voter ID in Texas?

SEN. FRASER: I'm not a citizen of Missouri, so we don't have access to that information. And you and I have been in the Legislature a long time, and you're very aware that your fiscal note -- whenever you file a bill, you get a fiscal note with a bill, they look at the cost, and this is the cost that's been estimated.

SEN. GALLEGOS: You know, Senator, I'm concerned here that this number that has been laid out in this bill -- you know, and we do have -- and I don't know if the rules if we have the Ogden amendment on this bill where you're looking at one number and then all of a sudden, before we start implementing the bill, it's going to cost us $30 million to implement the bill by the numbers -- if we use the formula being used by Missouri that has only 5.9 in population. Now, that

really concerns me. $30 million, Senator Watson could use that here and stop the closure of those Austin Independent School District schools that are being closed. They could use that $30 million that I see as opposed to what I'm seeing as the formula in math that Missouri used.

Now, it concerns me that the fiscal note that's laid out in this bill is misleading, according to the other states that are using more money and less population to implement their voter ID bill. That concerns me, Senator. And, I mean, is there somebody that can answer that question for me, why it costs so little on a state that has 25 million in population as opposed to another state that has 5 million and it's triple the cost?

You know, I mean, that concerns me, and that should concern you, when you're given a number, and we're telling the people in the audience here, the taxpayers, it's only going to cost us $2 million. And we have 25 million in population; Missouri only has 5.9 million, and it's costing them $6 million to implement voter ID. Now, you know, that really concerns me. And I don't want to mislead the public in any form or fashion that it's only going to cost us $2 million to upstart voter ID when that is a misleading number. And

that concerns me, Senator, and it should you. If this number is misleading, now who can answer that question for me?

SEN. FRASER: I think you're very aware of the fact that this number comes from LBB. I believe they probably called the Secretary of State and asked for that number. So if you have a concern about it, probably you should ask the LBB and/or the Secretary of State. I believe the Secretary of State is going to tell you there are HAVA funds that they're requesting that would possibly even eliminate that $2 million.

SEN. GALLEGOS: Well, I mean, I heard you tell Senator Watson about the HAVA funds. I'm just saying on straight-up, straight-up implementation, that $2 million as opposed to $6 million in Missouri, you know, that's without HAVA funds, too. I'm saying that when you come down to it, if that number -- if, when the implementation starts, instead of $2 million it's $30 million, then, you know, I'm concerned.

I believe that the Ogden amendment should go on there and say, you know, if it's going to be over, over what you're showing on the fiscal note, that it shouldn't be implemented if it's going to cost that type of money. That's a lot of money; that's a lot of money to implement voter ID when you're just saying -- well,

not you -- but the fiscal note on this bill is saying only two million bucks. Now, you know, that just concerns me, Senator. And I guess I'll ask that question when the proper resource witness comes up.

Senator Fraser, the other question I had was similar to Senator Uresti's question. Now, two years ago, I put maps up on one of my amendments where the City of Houston has no DPS offices within the 610 loop. The City of Fort Worth, I believe -- let me see here. Let me look at my notes here.

The City of Fort Worth I think doesn't have any either inside -- what is that loop? 82, 182? -- 81. And Dallas, Senator West, only has one -- only has one inside the city, only has one DPS center inside the city. And it concerns me, if we're going to mandate Texans to get a photo ID and you have no place to send them to, especially inside the loop and especially those without transportation, and if they can't get to it on a bus route, to one of the DPS centers --

SEN. FRASER: Senator, if you have evidence that someone in your district has the inability to get a driver's license, I wish you would bring that forward.

SEN. GALLEGOS: I'm talking about your

bill that mandates a photo ID. And if we're going to mandate Texans, then we should at least allow them the opportunity to have places where they can get it, where they don't have to travel 150 miles, like Senator Uresti just said. That's my concern, especially the elderly that don't have any and they're going to have to get a photo ID, that that person is going to have to travel 150 miles, even from their house inside the loop, those people that don't have cars and they have to do public transportation.

Now, I'm looking at the map in the City of Houston, the bus route where it takes them three buses just to get close to a DPS center from anywhere inside the 610 loop. That really concerns me, Senator, on this, and hopefully that -- Senator Fraser?

SEN. FRASER: I'm with you.

SEN. GALLEGOS: Hopefully that you will look at it and maybe in some of our amendments will take that into consideration. I'm just telling you, you know, what's in Houston, not in Horseshoe Bay where you live. And, you know, that is really a problem that we have, especially those of us that represent minority communities like Senator Uresti and me and others on this floor.

There is another issue, Senator Fraser,

that I wanted to ask you. On driver's license, you know, it says on a driver's license that's -- on a driver's license that's pulled from somebody for whatever reason, DPS gives you a temporary, and that temporary is good for about 40 days or in some cases when they've been stopped for a DWI or anything but still have not gone through the legal process, they are given a paper temporary license, and it says on that paper that this is used for identification purposes.

Now, I guess my question to you would be that if that is pulled -- and there's several thousands of drivers, of Texans, that are using this paper ID right now -- that if a driver's license is pulled for whatever reason, that that DPS certification, paper temporary license can be used as an ID to go vote.

SEN. FRASER: Senator, if you don't mind, I'm going to yield to Senator Williams on that question. If you don't mind, he'll answer that question for you.

SEN. WILLIAMS: Senator Gallegos, I had a similar question of what you have as I visited with the Department of Public Safety about this. And, in fact, it had been a while since I had renewed my license. And they now issue -- these temporary licenses actually have a photo on the license, and it would be valid under Sen. Fraser's bill as identification if you went to

vote.

And, you know, in more detail, we could get the Department of Public Safety to give you some more detail on that. But now the temporary licenses actually have a photo on the paper license that you're referring to.

SEN. GALLEGOS: Well, Senator Williams, I'm showing that 98,000 drivers right now have temporary licenses without photo IDs.

SEN. WILLIAMS: Well, you know, I'm not advised about that. I think we ought to get the Department of Public Safety --

SEN. GALLEGOS: Well, I agree.

SEN. WILLIAMS: I'm told that these, you know, temporary licenses you used to get when you were in the process of renewing your licenses now have your ID on them, your photo.

SEN. GALLEGOS: Senator Williams, I understand what you just told me. But, you know, I've known some folks that have had their license pulled and have not gone through the process, and there is no photo ID. All they're given is the sheet of paper that I have right here that they're driving with, 98,184 that are driving with this paper right here, no photo ID.

And it says -- it says here -- well, I'm

not going to read it to you. Just trust me; you can read it yourself. It says that this would be used for identification purposes.

SEN. WILLIAMS: Well, thank you, Senator Gallegos. And I'm glad that you raised this issue, and we ought to ask the Department of Public Safety to clear it up for us. Thank you.

SEN. GALLEGOS: That's why I brought it up, Senator Williams and Senator Fraser. That's being done on temporary suspended license, no photo ID. But on the face of this sheet that DPS has given out, it says that this is for identification purposes. I just wanted to point that out. I do have an amendment that I hope you will take, Senator, that alleviates almost 100,000 that we know of right now.

SEN. FRASER: Have you turned that amendment in? If you get the amendments in so we get a chance to look at them --

SEN. GALLEGOS: Sure.

SEN. FRASER: -- I think there's a better chance for, you know, us to understand what you're trying to do. So if you have an amendment, I would ask you to turn it in.

SEN. GALLEGOS: Sure.

Thank you, Mr. Chairman.

CHAIRMAN DUNCAN: Senator Davis.

SEN. DAVIS: Senator Fraser, will you yield for some questions, please?

SEN. FRASER: If you will allow me one second to get some better headsets on.

SEN. DAVIS: I was going to ask you if you could hear me.

(Laughter)

(Brief pause)

SEN. FRASER: I will now yield.

SEN. DAVIS: Can you hear me okay, Senator Fraser?

SEN. FRASER: Right now I am.

SEN. DAVIS: All right. A couple of questions for you. You've talked earlier this morning about both the Supreme Court opinion in the Indiana case and also the Justice Department review of Georgia. Are you aware that in each of those, there were particular instances that made the acceptance of those particular laws different than yours might be interpreted by those same bodies?

SEN. FRASER: If you don't mind, we've got, you know -- Senator Huffman, I think, is prepared to, you know, answer legal questions. If you've got a question about a -- do you have specific examples --

SEN. DAVIS: Well, I would --

SEN. FRASER: -- that you would like to -- and we also, I believe, are going to have someone from Indiana here this afternoon, and we're also going to have an invited -- an attorney that will address that. So if you have specific questions about that, that might be the appropriate place.

SEN. DAVIS: Well, I'll read to you from those in a moment. But let's start just by talking about what's required on the Texas voter registration application right now. Right now a person may put their driver's license number or their social security number on their registration application to become a voter in the State of Texas. Correct?

SEN. FRASER: You've got the data. And I think probably the best person to ask, and that's the Secretary of State.

SEN. DAVIS: Well, I have it right here. And there are some people who can't provide that information, and there's another opportunity for that person to attest to whom they are, to attest to the fact that they're a legal citizen and not a felon who would be prevented from voting. And I'm sure the Secretary of State probably has a number that shows to us -- and we will ask for this on the record today -- how many people

fill out Section No. 9, the attestation clause, versus the people who are able to fill out Section 8, and what's the gulf between that. Are you aware what the gulf is between those two numbers?

SEN. FRASER: I believe I know the section you're talking about, but I actually would prefer you ask that of the Secretary of State's office.

SEN. DAVIS: Okay. But I'm asking you. Are you aware -- under your bill that you're proposing, are you aware of what the gulf is, the gap is between those two numbers, the people who are able to provide their driver's license or social security number versus those that fill out the attestation clause, because they don't have either?

SEN. FRASER: When you ask the Secretary of State that question, I will be listening very carefully to make sure that I hear what they say.

SEN. DAVIS: And would you agree that it's probably the case that if I fill out Section 9, the attestation clause, because I can't fill out Section 8 with either a social security number or my driver's license number, that I will probably be impacted by a bill that's going to require what your bill requires in order for me to vote?

SEN. FRASER: Again, that would be a good

second of the Secretary of State.

SEN. DAVIS: Well, I'm asking you as the bill's author. Are you concerned that there will be an impact to those people who currently cannot fill out Section 8 but can only fill out the attestation clause in Section 9?

SEN. FRASER: And again, you're making a reference to Section 8 that -- you know, I'm sorry. I don't -- I'm not -- I don't know what you're referring to. The Secretary of State is the expert in that area. And when you ask that question, I'll be listening and will, you know, listen to the response.

SEN. DAVIS: Earlier you talked about the Executive Director from the Carter-Baker Commission, and you cited a statistic, that only 1.2 percent of Americans would be affected by a requirement that a photo ID be required. Correct?

SEN. FRASER: I did make that reference, yes.

SEN. DAVIS: Are you aware that that was limited to a study of only three states, and Texas was not one of them?

SEN. FRASER: Yes, because at that time the Carter-Baker was looking at the states that had issued a photo ID.

SEN. DAVIS: And would you agree that it may be the case that if I live in one of those three states and it's easier for me to get a driver's license in that state, then I may have a lower percentage of citizens who don't have a photo ID than another state might have where it's more difficult to get a driver's license?

SEN. FRASER: I'm not advised.

SEN. DAVIS: Are you aware that even in those states, in the 1.2 percentage number, there was a disparate impact that was found on elderly and women and African-Americans in terms of people who actually had the eligible photo ID that's counted in that percentage?

SEN. FRASER: I'm not advised.

SEN. DAVIS: Does it concern you at all that the bill that we are looking at today, the bill that you filed, might have a disparate impact on women, minorities and senior citizens, possibly disabled people in the State of Texas?

SEN. FRASER: The bill that we're filing today I believe will be approved by the U.S. Supreme Court, and also the bill in Georgia was precleared by the Justice Department. So I believe our bill will comply with both of those.

SEN. DAVIS: Okay. Well, I'm going to

read to you from the Supreme Court opinion, the U.S. Supreme Court opinion when it was reviewing the Indiana law.

They acknowledged that there is evidence in the record, in fact, of which we may take judicial notice that indicates that a somewhat heavier burden may be placed on a limited number of persons by virtue of the photo ID requirement. They include elderly persons born out of state, persons who, because of economic or other personal limitations, may find it difficult either to secure a copy of their birth certificate or to assemble the other required documentation to obtain a state-issued ID, homeless persons and persons with a religious objection to being photographed.

"If we assume, as the evidence suggests, that some members of these classes were registered voters when the Indiana law was enacted, the new identification requirement may have imposed a special burden on their right to vote. The severity of that burden is, of course, mitigated by the fact that if eligible voters without photo ID may cast provisional ballots, that will ultimately be counted."

Are you aware that in the State of Indiana, I can cast a provisional ballot, and the Supreme Court made its decision in terms of whether the

burden was constitutionally acceptable, based on the fact in Indiana, I can cast a provisional ballot, and if I attest to the fact that I'm unable to pay for the cost of getting the underlying documents to receive a photo ID, that I do not, in voting my provisional ballot, have to show a photo ID?

SEN. FRASER: Senator, my observation is that what you've read from the Supreme Court opinion is a portion of it, but it's a snippet. And it also continues to say that these do not present an undue burden for the person to vote.

SEN. DAVIS: That's correct. They said they did not believe that it created a constitutionally prohibited burden, based on the fact that voters in the State of Indiana have the opportunity to vote a provisional ballot even if they don't have a photo ID, if they can show that they were unable to get one, either because of their circumstances as an elderly person or because they're indigent. Does your bill provide a special exception for people under those circumstances to vote a provisional ballot?

SEN. FRASER: The bill that I'm moving forward I believe will be approved by the U.S. Supreme Court and will be precleared by the Department of Justice.

TX_00000450

SEN. DAVIS: Okay. Let's look at the things that are required in your bill in terms of a photo ID. And I appreciate what you said earlier. I think it's true. I think if you ask anybody on the street that you might walk up to at this moment in time whether they think it's a good idea for someone to show a photo ID in order to vote, they would probably agree. What they might not understand in agreeing with that, though, are what the requirements are going to be in the State of Texas in order for them to comply with that particular requirement, and they also might not appreciate the challenge and the difficulty that some people may have in supplying that.

SEN. FRASER: Senator, this is not rocket science. The people of your district understand very clearly that when they walk into that voting booth, they have to show a photo ID proving they are who they say they are. The people in Fort Worth, that area, I have the polling data -- I believe the number is about -- around 90 percent. And of that, that's Republicans and Democrats. So I believe the people that elected you, sent you down here, have said, "We believe that when you go in to vote, you should show identification to prove you are who you say you are." It's a very, very simple concept.

SEN. DAVIS: Are you aware that in the Indiana law and also in the Georgia law, people are allowed to come and vote with a state-issued student ID if they're attending a state university?

SEN. FRASER: I'm not advised.

SEN. DAVIS: And your bill does not allow that kind of a photo ID to be used. Is that correct?

SEN. FRASER: We have four forms of ID that we have laid out as acceptable. Those are all recognized acceptable forms of identification that we have recommended.

SEN. DAVIS: And it does not include that, for the record. Are you also aware that in the Indiana law and in the Georgia law, the ID can be expired and still be utilized, but under the requirements in your bill, that cannot occur?

SEN. FRASER: You know, I think our belief is that someone should have a valid ID that has not expired. "Expired" implies it is not valid, and we in Texas believe you should have a valid ID.

SEN. DAVIS: What will I do if my driver's license expires the day before I go to vote and I'm not aware of it until I show up at the polling place?

SEN. FRASER: And I would ask you, what would happen if you were driving to the polling place

with an invalid driver's license? What would happen?

SEN. DAVIS: I would get a ticket, but I wouldn't be denied my constitutional right to vote as a legal citizen of the United States.

SEN. FRASER: You would not be denied your right to vote. Under this law and under this bill, as you know, if you walk in with an invalid driver's license, you would be allowed to vote. It would be a provision vote, and you would be allowed six days to go back to the place that issues driver's license, get a valid license and come back, and your vote would be counted.

SEN. DAVIS: Well, we had a conversation about that earlier in terms of how difficult and challenging -- for some people it actually is -- to be able to comply with that requirement. But let me ask you for a moment, if I bring in a state-issued Texas driver's license and it expired 30 days ago or 60 days ago or a year ago, how does that fail to prove that I'm the person on the card, simply because it has expired?

SEN. FRASER: Well, I would ask you the same question. If your driver's license expired 30 days ago, is it acceptable to the patrolman that just stopped you? It's expired.

SEN. DAVIS: I'm asking you the question.

The reason that we are advocating or you are advocating for photo ID is so that the person who is receiving my ballot can verify that I am the person casting it. Correct?

SEN. FRASER: Yes.

SEN. DAVIS: And if my driver's license is expired but it's a state-issued driver's license and it has my name and it has my picture on it and my name matches what's on the registrar's -- the precinct rolls, how does that fail to prove that I'm who I am?

SEN. FRASER: I think we go back to the word "valid," do you have a valid Texas driver's license?

SEN. DAVIS: How does it fail to prove that I am who I am?

SEN. FRASER: You don't have a valid Texas driver's license.

SEN. DAVIS: And as I said earlier, in Georgia and in Indiana, under the laws that were deemed acceptable by the Supreme Court and the courts in Georgia received preclearance by the Department of Justice, each of those allows some acceptance of expired IDs.

I want to talk a little bit about how difficult if is, because I really think every one of us

in this room needs to appreciate the burden that people have when they're being asked to supply some of the documentation that's required in your bill. And I've put together a little chart that I just want to go over very quickly. I won't belabor the point.

Can you bring it closer over here, Dan, so I can actually point at it?

Thank you.

Now, each of us, whether we're in the Senate or the House of Representatives in the State of Texas, we each bring unique backgrounds and perspectives to the table. And because of our unique backgrounds and perspectives, we're able to represent people in ways that hopefully contribute to a better understanding for each of us in terms of how we can best serve them.

Senator Fraser, I came from a fairly challenged background before I arrived on the floor of the Texas Senate. I had the opportunity to receive an incredible education that ultimately allowed me the privilege of standing here and having a conversation with you today. But there was a time when I was indigent, there was a time when I was a single mother and I was working a full-time job during the day in Dallas, from which I had to leave my house at 6 o'clock in the morning every morning to arrive at, and I worked

a part-time job four nights a week waiting tables.

If I had been required during that point in time to show some of the ID requirements that are being proposed under your bill, I have to admit to you that I would have been quite challenged in being able to accomplish it. I had gotten divorced, so my name was different on my state ID than was on the registration rolls. And so because of that, I would have had to go through the process of trying to get a new state ID. And, honestly, with my schedule, it would have been fairly impossible for me to achieve it.

I think it's pretty easy for us to stand on the Senate floor where we are today and the shoes we're in today and say, "Why should that be a problem?" But for people who have to take time off of work and for whom that's an unaffordable idea, it can be a very, very real problem.

The other issue, in trying to receive a state ID in the State of Texas is, it's almost a circular process. In order to get the state ID, you have to have underlying ID that provide you with the opportunity to get that ID. And I know we're talking right now in the State of Texas about giving free ID to people who come in to the Department of Motor Vehicles and ask for that ID, based on the fact that they want to

vote.

But if I can't provide underlying documentation, I'm going to have to go get that underlying documentation, and it's going to cost me money, and I'm concerned about that person. I'm concerned that if I need a birth certificate in the State of Texas, it's going to cost me $23. I'm also concerned that I might have a really hard time getting that birth certificate. And if you look to see what you can show in order to get it, you see the circularity of the problem. You can show a driver's license or you can show a state ID. Well, the reason I need the birth certificate is so I can get my driver's license or my state ID.

In order for me to get a birth certificate, I can show a social security card as one of my underlying two documents that are required. But in order to have a social security card, I've got to have a driver's license or a state ID, so it puts me right back at my original problem. To get my driver's license or my state ID, I might be able to use a passport. But in order to use my passport, I'm going to have to have a birth certificate, but I couldn't get my birth certificate because I didn't have a driver's license or a state ID to get my birth certificate.

You see the problem? It's not just the problem of the time one has to take off of work in order to comply with this requirement, it's not just a problem of how much money it costs. Sometimes it can be a problem of almost a near impossibility for a person to be able to provide the underlying documentation in order for them to go and vote.

And my concern about that is, we will disparately impact persons who find greater challenges in fulfilling the underlying documentation requirements; and, yet, we haven't provided anywhere in the bill, as was done in Indiana, a provisional opportunity for someone to come and cast a ballot and say that they were unable to comply with the requirements for a photo ID. Why is that?

SEN. FRASER: Senator, I appreciate the story you just gave. And I would advise you of the other 31 members here. There's a lot of people that can tell like stories. When I was 16 and working on a potato picker in California or when I was 17 working picking cucumbers in Rising Star or when I was 18, picking cotton in West Texas, I figured out a way to have time after work to go get a driver's license, because I really wanted one. I worked that into the schedule, as I think a lot of people do.

I think what I would ask you is to give evidence, either in Indiana or Georgia, of a single person that has come forward and said that they were denied their ability to vote because of these provisions, because in my knowledge, there has not been a single person that came forward.

SEN. DAVIS: And again, you know, when you turn to those two laws, they actually provide some exceptions that are not provided in your bill, and so the instances in which people were excluded or prohibited from exercising their constitutional right to vote won't have been challenged in the same was as being proposed for the State of Texas under this particular bill.

I want to ask you a question about what happens, as a woman, if I come in to vote and I have my state ID, and the name on my state ID is different than my name on the registrar's certificate, because I've either married or divorced. What will happen in that situation?

SEN. FRASER: The question has already been asked twice. We will have someone here from the Secretary of State and the DPS that can answer that question for you.

SEN. DAVIS: Okay. Back to the fiscal

note, Senator Fraser. The fiscal note --

SEN. FRASER: We've also talked about that a couple of times.

SEN. DAVIS: Yes, we did, but I want to ask this question. The fiscal note, of course, described the methodology under which the $2 million figure was compiled, and it specifically states that it left out the cost for training poll workers and election officers. It specifically states that it left out any cost for coordinating voter registration drives. It specifically states that it left out the costs of providing the ID cards, all of that because it is an unknown number.

SEN. FRASER: Well, you're making an assumption, and this amount was brought forward by LBB after they talked to the secretary of the State. The Secretary of State, I think, they can answer that question. But I disagree that it's unknown. I believe the Secretary of State and LBB knew exactly what they were doing when they brought it forward, because that's their job.

SEN. DAVIS: Well, it literally says that. It says, "The fiscal impact of the revenue loss from the prohibition of DPS to collect a fee is unknown because it is not known how many people would make such a

request."

SEN. FRASER: And that is a correct statement.

SEN. DAVIS: And it also says that the cost of coordinating voter registration drives or other activities designed to expand registration is also unknown, and it also says that the cost for responsibilities, the training for people who would be responsible for implementing this is unknown.

Now, if I file a bill this session and I'm challenged, based on the fiscal impact of the bill, clearly this session more than any other will be very, very concerned about that. And the LBB has put a statement on it that they really don't know what the cost is, but intuitively we understand there's going to be a cost. We'll probably have a conversation about that. Right?

SEN. FRASER: And I think the conversation you should have should be the Secretary of State in discussing the HAVA funds that the federal government has provided to both Indiana and Georgia for the implementation of their law that we believe will be approved for that, but it has not been approved, because HAVA has clearly said the bill has to be passed before they could pass judgment on whether those funds could be

used. That amount of money is setting in the Secretary of State's office now, and I think that would be a good question to ask them.

SEN. DAVIS: Let me ask a question about the bill itself. I'm a little confused about a section. This is on Page 5. I'm reading from Section 8, Subsection (a). "If the voter's address is omitted from the precinct list under Section 18.005(c), the officer shall ask the voter if the voter's residence, if listed, on ID presented by the voter under Section 63.001(b) is current and whether the voter has changed residence within the county." What if the answer is "No," what is the election worker to do at that point?

SEN. FRASER: That's a perfect question to ask the Secretary of State.

SEN. DAVIS: It's your bill, though, Senator Fraser, and the language is here. And there is no guidance for someone -- if we were to vote on a bill like this, how are we to know how a situation like that would be handled if it's not addressed in the bill?

SEN. FRASER: Senator, I'm sure you're aware through -- the past session, you were here. You're reading current law. There is one change there where we insert "presented by the voter under Section 63.001," which is the description I think of the photo

ID. But basically that is current law, and I think it would be a good thing to ask the Secretary of State. Everything you've read is current law.

SEN. DAVIS: Well, it's not current law, because it changes it from the difference being on the voter registration certificate versus being on the person's ID. What I'm concerned about is that if I come in with an ID and my address has changed and I have the correct address on the precinct list that's different than what's on my ID, that a poll worker might actually reject my opportunity to vote, because the address on my ID is showing differently than is showing on the precinct list.

SEN. FRASER: And the good thing about that is, these HAVA funds that we're going to request will also train poll workers to make sure they understand it. The ruling would be made by the Secretary of State, and they will train them how to do that, and I feel very comfortable that you would get to vote.

SEN. DAVIS: Well, I'm glad you feel very comfortable, Senator Fraser. I remain very, very concerned about the number of people under the very severe restrictions that are imposed by the bill you have proposed. I'm very concerned about the number of

people who may be impacted by it. And I understand and agree with you, that assuring that voter fraud is not occurring is very, very important, and it's a conversation we should be having and a cure we should all attempt to find.

But in the process, I'm very afraid that we're going to wind up disenfranchising people who currently are legal citizens in the State of Texas who have the legal opportunity to vote and are going to be denied the right for that right under your bill as it's proposed today.

SEN. FRASER: And I believe our bill will be approved by the U.S. Supreme Court and approved in Section 5 by the Department of Justice.

Thank you.

SEN. DAVIS: Thank you.

CHAIRMAN DUNCAN: Senator West.

SEN. WEST: Thank you very much, Mr. Chairman. I would like to ask the author a couple of questions.

Senator Fraser, good morning, sir.

SEN. FRASER: I think we commented about the Barry White voice last year. I was reading the deposition.

SEN. WEST: That was actually Billy Ocean,

which both of us like.

SEN. FRASER: Both of us do like. I agree.

SEN. WEST: Now, we're not going to have any unfunded mandates on counties, are we? This bill would not occasion any unfunded mandates on counties.

SEN. FRASER: This bill?

SEN. WEST: Yes, this bill that you're proposing. The counties will not have to pick up any of this cost -- is that correct -- because that would be an unfunded mandate? And I know you are not for unfunded mandates. Right?

SEN. FRASER: I am not for -- I'm opposed to unfunded mandate, but I'm not advised of whether it would be --

SEN. WEST: So you can tell counties, you can tell all county officials in the sound of my voice and your voice that there will be no unfunded mandates in this bill and counties will not have to spend any money that they don't have right now to implement this particular bill. Correct?

SEN. FRASER: I had my largest county, Bell County, in my office last week, and I told Judge Burrows at that time that I'm opposed to unfunded mandate and, you know, we'll do everything we can to

keep them off the counties.

SEN. WEST: So you're telling county officials there are no unfunded mandates coming from this bill?

SEN. FRASER: I didn't say that.

SEN. WEST: So there may be unfunded mandates coming from this bill?

SEN. FRASER: Not advised.

SEN. WEST: So let me back up. And I want to pursue this just a minute now. You philosophically are not for unfunded mandates. Right?

SEN. FRASER: That's a correct statement.

SEN. WEST: That is a correct statement. And you, by your action in previous legislatures, have made certain that you have not passed any bills that would provide for unfunded mandates on the counties. Right?

SEN. FRASER: I have made an effort not to vote, if possible.

SEN. WEST: Okay. Now, in this particular bill, it is your objective to make certain that there are no unfunded mandates on any county in this entire state. Is that correct?

SEN. FRASER: I'm not advised.

SEN. WEST: You're not advised as to what

your objective is?

SEN. FRASER: No. My philosophy is that I do everything I can trying to keep any unfunded mandates. I'm not advised of how they would be impacted.

SEN. WEST: All right. So you can't tell county officials that there are not unfunded mandates in this bill?

SEN. FRASER: Well, as you know, a lot of times there's unintended consequences, and we don't know until it's passed, the impact.

SEN. WEST: It was your bill, though. This is your bill. You don't know --

SEN. FRASER: My bill says that --

SEN. WEST: I'm just --

SEN. FRASER: -- when you walk into the --

SEN. WEST: I'm just trying to find out whether or not county officials are going to have to pick up any of the cost in terms of putting this bill into effect. You tell me. Tell the county officials that there are no unfunded mandates in this bill. Tell them.

SEN. FRASER: I'm not advised.

SEN. WEST: So what you're telling county officials, that you're not advised as to whether or not

there is any unfunded mandates in this bill. Correct?

SEN. FRASER: I'm sure that there's probably an expert witness coming. You probably can ask a question. Someone, or someone may be coming to testify about that, but --

SEN. WEST: All right. Let's talk about expert witnesses. Did you ask for the fiscal note in this bill?

SEN. FRASER: I'm sorry?

SEN. WEST: Did you ask for the fiscal analysis in this bill -- the fiscal note?

SEN. FRASER: No. I think the committee chairman did. I believe the -- there is a fiscal note requested. I did not request it.

SEN. WEST: Did you review the fiscal note?

SEN. FRASER: The fiscal note was handed to me. I read the fiscal note. I guess reviewing it, yes, I read it.

SEN. WEST: Okay. Go to the local government impact section of it, Page 2 of 3, down at the bottom.

SEN. FRASER: Yes.

SEN. WEST: Okay. Second paragraph, "According to Texas Association of Counties, Tarrant

County anticipated a one-time cost to reprint provisional balloting materials and provides new notices, of $8,000. Bexar County stated that due to limited space on current registration certificate, large cards would be necessary, resulting in additional costs for cards, printing and postage of $381,000," et cetera.

Is that a cost that is going to be picked up by the state or is that going to be a cost that's going to be occasioned by the counties?

SEN. FRASER: Senator, you're on the Finance Committee. You helped with proposing the draft bill, and then you will be voting on the bill coming out of the committee that you send to us, so I think you would be better to answer that. My job is to pass the bill. The implementation of the bill, then, and the cost will have to be considered by the Finance Committee.

SEN. WEST: So let me make sure that I understand this, then. The answer to that question is, you don't know. So if we don't appropriate that money -- that being the Legislature doesn't appropriate that money -- then that's an unfunded mandate. Correct?

SEN. FRASER: My job is to bring the bill forward, put it before the membership, advise what the bill will do. And then if there's a fiscal impact --

SEN. WEST: Advise what the bill will do?

SEN. FRASER: The bill is going --

SEN. WEST: Is that your job? Didn't you just say part of your job is to advise what it will do?

SEN. FRASER: Yes. What it's going to do is that when you walk into --

(Simultaneous discussion)

SEN. WEST: So I'm asking you --

SEN. FRASER: -- in Oak Cliff and want to vote, you're going to have to show your smiling face --

SEN. WEST: And I'm asking what it will do. I'm asking what it will do in terms of unfunded mandates right now.

SEN. FRASER: Not advised about unfunded mandates.

SEN. WEST: Not advised. So where will the counties get this money under the local impact --

(Simultaneous discussion)

SEN. FRASER: And I think that's going to be your responsibility as a member of Finance.

SEN. WEST: Do you know -- then let me ask this question. Do you know where the county will get the money from, counties will get that money from? Under the local government impact, do you know where the counties will get that money from?

SEN. FRASER: You're asking me a question. No, I do not know --

SEN. WEST: Okay. Thank you. Now, as it relates to -- this bill, plus the costs that we don't know, you've said repeatedly that it's going to cost at least $2 million. And we know, based on the fiscal note, that there's still some undetermined cost.

SEN. FRASER: I have not said one time that it's going to cost $2 million. I've said there is a fiscal note that has been projected, but there are dollars in the HAVA fund, federal funds, that are setting in the Secretary of State's office that far exceed that number. And I think the Secretary of State probably will let us know what that is. So there is a pot of money there that we believe will help offset some of the associated expenses. I do not believe the cost will be $2 million.

SEN. WEST: Now, the HAVA funds, is that general revenue or is that federal funds?

SEN. FRASER: Federal funds.

SEN. WEST: Okay.

SEN. FRASER: And I believe I'm right, but again, I would ask that question of the Secretary of State if I were you.

SEN. WEST: Okay. Well, as it relates to

general revenue, now, as I understand and as I've used the term "general revenue" over the last 17 years I've been here -- and maybe Senator Ogden or someone else on the Finance Committee can correct me if I'm wrong -- general revenue basically means state funds -- right -- monies that we get from state --

SEN. FRASER: You are the member of Finance.

SEN. WEST: Well, let me -- general revenue -- okay. Well, then, take my word for it; that's what it means. It means monies that we receive from tax revenues in the State of Texas, not HAVA funds but revenues from taxes and revenues that are -- and sources of revenues that we get from citizens in the State of Texas. And that's what this deals with, it is specifically general revenue-related funds, not HAVA funds. HAVA funds are federal funds. So let's make sure -- in terms of my questions, that's the distinction that I'm making.

SEN. FRASER: Well, the distinction you're not making is that if the HAVA funds are not available, yes, there would be a cost to the state. But if HAVA funds are available, it would offset that cost to the state.

SEN. WEST: Where do you see that in this

fiscal note?

SEN. FRASER: It's not in that. That's conversation --

SEN. WEST: Then how are you making that statement, if it's not in this fiscal note? There's nothing in the fiscal note that says that.

SEN. FRASER: Mr. Chairman?

CHAIRMAN DUNCAN: Senator Fraser.

SEN. FRASER: Could I please enter into the record -- this is information coming that is addressing the questions he's talked about addressing HAVA. I would like to have this added as an exhibit, please.

CHAIRMAN DUNCAN: Bring it forward to the Secretary, if you would, and we'll need to --

SEN. WEST: May we approach on it, Your Honor -- Your Honor -- may we approach on it, Mr. Chairman?

CHAIRMAN DUNCAN: You may.

(Brief pause)

SEN. FRASER: Mr. President?

CHAIRMAN DUNCAN: Senator Fraser, if you'll hold on just a minute. I'm going to allow -- we're already premarked a couple of exhibits. And so just in order to keep the record flowing correctly, I'm

going to recognize Sen. Van de Putte at this point to introduce a motion in writing.

Senator Van de Putte.

SEN. VAN de PUTTE: Thank you, Mr. Chairman. And thank you, Chairman, and the bill author, to yield so that I can move that all actions taken by the Senate on the 81st Legislature on Senate Bill 362, as contained in the official Senate Journal, be included in the record as Exhibit 2. The Senate Journal excerpts shall include motions, remarks, written responses, exhibits and any other material directly related to Senate Bill 362.

Mr. Chairman, I move this motion in writing.

CHAIRMAN DUNCAN: Members, you've heard the motion. Is there any objection?

The Chair hears none. Exhibit 2 will be received into the record.

(Exhibit No. 2 marked and admitted)

CHAIRMAN DUNCAN: Now, Senator Fraser, you're recognized on Exhibit 3, I believe.

SEN. FRASER: And, members, just to clarify, what we're entering here is the answer to the question that we've been discussing. It is a letter from the Secretary of State, Hope Andrade, saying that

the $2 million we're discussing, there is sufficient HAVA funds allocated to voter education and poll worker training that would cover this expense that is available.

Also, in addition to your question, we have been advised by other counties saying they do not expect more than a nominal cost for counties, existing staff and resources should be sufficient to implement the new law.

And I would request this be entered into the record.

CHAIRMAN DUNCAN: Members, Senator Fraser sends up Exhibit No. 3. It will be received into the record.

(Exhibit No. 3 marked and admitted)

CHAIRMAN DUNCAN: Senator Fraser, you still have the floor. Senator West, Senator has yielded to you for questions.

And before we do that, before we do that, let me make an announcement. We typically adjourn 30 minutes ahead of session in order to allow the sergeants and secretary to prepare for the Senate session. So at 10:30, I'll recognize a member on a motion to rise and report progress. So if you can watch the clock. It doesn't mean we're going to cut you off, it just means

at that point in time, we'll have to cease until we finish the Senate session.

SEN. WEST: Thank you, Mr. Chairman.

Senator Fraser?

SEN. FRASER: Yes.

SEN. WEST: Okay. So you've admitted this as part of the record. So these are federal funds and not general revenue. Is that correct?

SEN. FRASER: No. Those are federal funds, as I understand it, yes.

SEN. WEST: It's not general revenue?

SEN. FRASER: Yes.

SEN. WEST: Okay. And the certainty of it is still up in the air. Based on this document from the Secretary of State, they still have to confirm that the funds can, in fact, be used for this particular purpose?

SEN. FRASER: That is correct, and that's what I advised earlier, is that HAVA has said until the passage of the bill, they would not rule, but the funds have been used before in Indiana and Georgia, and it is expected that we will be able to use them here.

SEN. WEST: Okay. Now, you had made mention also that you've talked to some other counties and that there won't be any unfunded mandates on those counties?

SEN. FRASER: You didn't read the rest of the fiscal note, is that Comal County reported the costs associated with the provision would be absorbed within existing revenues. You gave one example, but I think most of the counties expect this to be a nominal cost and that they have existing staff and resources --

SEN. WEST: And then --

SEN. FRASER: To handle this.

SEN. WEST: I'm sorry. You said most of the counties. You've given examples of three. You said most of the counties. Is --

SEN. FRASER: Do you have evidence from others? I --

SEN. WEST: There's 254 counties, and you've just made a statement that most of the counties have said they can absorb it within their normal --

SEN. FRASER: I said I do not expect it to be more than a nominal cost.

SEN. WEST: But otherwise -- now Bexar County is saying it's going to be over $380,000. That's not a nominal cost, is it?

SEN. FRASER: Well, I guess that's something you should consider in the Finance Committee. They have a huge budget, and in --

SEN. WEST: Who has a huge budget?

TX_00000477

SEN. FRASER: The large counties.

SEN. WEST: I'm sorry?

SEN. FRASER: The large counties.

SEN. WEST: They have huge budgets?

SEN. FRASER: Yes. And you will have to make that decision.

SEN. WEST: They don't have budget shortfalls in large counties?

SEN. FRASER: If I were you, then I would discuss that with the chairman --

SEN. WEST: But the reality is, the reality is, is that if -- and I won't belabor the point -- the reality is, if those counties will have to fund this out of existing revenue from their budgets, it's going to be an unfunded mandate on them if the state does not appropriate the money. Is that correct?

SEN. FRASER: Yes. It is expected that it will be a nominal cost for counties. Existing staff and resources should be sufficient to implement the new law.

SEN. WEST: And where are you getting that from?

SEN. FRASER: From the sheet here. If you'll follow, Comal County reported the cost associated with the provision of the bill should be absorbed within existing revenues.

SEN. WEST: But that's Comal County. That's not Travis County, that's not Harris County, that's not Bell County or any of the other counties. That's Comal County. Comal County is not indicative of all of the counties in the State of Texas, is it?

SEN. FRASER: I think what you should do, then, is get 254 counties, if you'll call them all and get that number and --

SEN. WEST: Okay. Well, I mean, it's your bill.

(Simultaneous discussion)

SEN. FRASER: -- Finance.

SEN. WEST: And the reality is, if it's an unfunded mandate, you're responsible for it if this bill passes. Now, let me ask you this: The $2 million, the $2 million that you're talking about, if it does not come from HAVA funds, then it's going to have to come from general revenue. Is that correct?

SEN. FRASER: I'm not advised. I'm not a member of Finance; you are. And I think that would be a decision of Finance.

SEN. WEST: Let's talk about just sections of the bill. Specifically, the issue concerning -- and I think you and Senator Davis have gone over this. And I'm on page, in Section 7 of the bill, specifically (c)

and (d). Let me know when you're with me on it.

SEN. FRASER: What page are you on?

SEN. WEST: I'm in Section 7 of the bill.

SEN. FRASER: That's Section 11.

Six, 7. Okay. Got it. Okay.

SEN. WEST: Okay. As relates to -- let's talk about the election officer. Now, what's the definition of the election officer?

SEN. FRASER: That would be a good question to the Secretary of State.

SEN. WEST: So you don't know what an election officer is?

SEN. FRASER: I've got a witness, you know, an expert witness coming in that -- you know, I think I do, but it would be improper for me to answer. I've got an expert person you can ask.

SEN. WEST: Let me ask this: Did you rely on the Secretary of State's office in helping to draft this bill?

SEN. FRASER: We have had a lot of discussion with the Secretary of State's office over the last three years in the process of drafting bills.

SEN. WEST: So you don't know what an election officer is?

SEN. FRASER: I didn't say I don't know

what the election officer is. But the Secretary of State is coming, and it would be improper for me to answer that if we have an expert witness that can answer it, you know, for sure.

SEN. WEST: So it would be improper for you to answer what an election officer is?

SEN. FRASER: No. We've got an expert witness that would be the better person to ask.

SEN. WEST: Okay. In terms of what an election officer is in your bill. Okay.

As it relates to Section (d), you say that, "If the voter's name is on the precinct list of registered voters and the voter's identity can be verified from the documentation presented under Subsection (b), the voter shall be accepted for voting." But if, indeed -- and the election officer is to make that determination. Is that correct?

SEN. FRASER: Again, that's a great question to ask the Secretary of State's office.

SEN. WEST: How does your bill work? Tell us how your bill works.

SEN. FRASER: You know, it's a --

(Simultaneous discussion)

SEN. WEST: I mean, would that be a great question to ask the Secretary of State?

SEN. FRASER: It's a great concept. You walk in in Oak Cliff to vote. And if you're in the right precinct and your name is on the list and you pull out your driver's license and you show it to them and your smiling face on your driver's license matches you --

SEN. WEST: Well, let me --

SEN. FRASER: -- I think they're going to hand you a ballot and allow you to vote.

SEN. WEST: Then let me ask you this: My last name is spelled W-e-s-t. Suppose there's some typographical error where they spelled it W-e-s, but it's me. I have an ID, but my name is misspelled. What happens then? I have to vote a provisional ballot?

SEN. FRASER: I think that would be a good question for the Secretary of State, because I think they will cover that in the training with the election officials you're discussing.

SEN. WEST: What is your, intent, Senator?

SEN. FRASER: My intent is that the Secretary of State would make a ruling on that.

SEN. WEST: Under those circumstances, what would be your intent, as the author of this bill? If my name is W-e-s-t but there is a typographical error someplace and it's W-e-s, what is the intent. Give the

record your intent as the author of this bill.

SEN. FRASER: My intent, as the author of the bill, is that I'm going to give the authorization to the Secretary Of State to make a ruling and train the poll workers so that it would be clear that they're allowing the proper person to vote.

SEN. WEST: They're allowing the proper person to vote. So in that circumstance, would it be up to the election officer there to determine whether I'm the same person --

SEN. FRASER: I think it would be up to the Secretary of State --

SEN. WEST: Let me finish; let me finish.

-- whose last name is W-e-s, but my identification says W-e-s-t, and I'm presenting that, it would be up to that election worker. Right?

SEN. FRASER: I think that would be a great question to ask the Secretary of State.

SEN. WEST: But what's your intent, though? I'm just asking your intent. I can't ask the Secretary of the Senate what's your -- I mean, Secretary of State what your intent is.

SEN. FRASER: I intend to --

(Simultaneous discussion)

SEN. WEST: You've got to manifest your

intent so the Secretary of State will know, have some guidance in terms of how this bill should be implemented. Don't you agree, as the author of the bill?

SEN. FRASER: My intent is to give the Secretary of State the authorization to determine the rules, train the poll workers. They would make a determination on that.

SEN. WEST: So the poll worker in this instance would be the election officer? I have to ask the Secretary of State?

SEN. FRASER: You need to ask the secretary of State.

SEN. WEST: Okay. Poll workers, let's talk about poll workers. How much do we pay poll workers?

SEN. FRASER: That would be a good question to ask the Secretary of State.

SEN. WEST: Okay. What's the minimum wage? I would ask the Secretary of State?

SEN. FRASER: What does that have to do with this bill?

SEN. WEST: I mean, I'm just trying to understand exactly how much we pay our poll workers.

SEN. FRASER: Again, Senator, you're

 asking the question. I would suspect probably poll workers may be paid different from one county to another. And it's an area -- I think that that's a good question of the Secretary of State.

SEN. WEST: Okay. Now, you keep referring to the Secretary of State. But in the bill analysis, doesn't it also say that this bill does not expressly grant any additional rulemaking authority to the state office -- to a state officer, institution or agency? Does it say that? Do I have to ask the Secretary of State about that also?

SEN. FRASER: Senator, I'm sorry. I'm not advised. I do not have a bill analysis. Do you have one in front of you you would like show me?

SEN. WEST: I do. Look under "Rulemaking Authority."

SEN. FRASER: We don't have it.

SEN. WEST: You don't have a -- okay. In the bill analysis, what it says is that this bill does not expressly grant any additional rulemaking authority to a state officer, institution or agency?

SEN. FRASER: Isn't that standard language that's put on every bill?

SEN. WEST: I don't know. But what I'm asking you is --

SEN. FRASER: You don't know?

SEN. WEST: -- given the fact that you are deferring everything to the Secretary of State, are you going to put some additional language in the bill that provides the Secretary of State some additional rulemaking?

SEN. FRASER: I think the key word there, this does not provide any additional. I think it's assumed that the Secretary of State has that ability under current ability we've given the Secretary of State.

SEN. WEST: Let me ask this, Senator Fraser. Okay. All right. You can't give me what your intent is in that situation. I'll just take that for granted.

You have made reference to the Carter-Baker Commission and recommendations. Is that correct?

SEN. FRASER: I want to make an observation here for Senator Whitmire. If you'll look up, it is filling up, so there must be someone concerned about the legislation we're talking about.

What was the question?

SEN. WHITMIRE: Lubbock.

SEN. FRASER: While Senator West gathers himself, I'll tell you that those are the great people

from West Texas, the City of Lubbock. And they are great voters and very concerned. And I've seen the polling data that shows that West Texas was the highest percentage of people that believe that they should show their ID whenever they show up to vote. I'm really glad to have them at my back.

Go ahead.

SEN. WEST: Do I need to ask the Secretary of State about that, too, or what?

SEN. FRASER: You could. These people respect the opinion of the Secretary of State, and they probably have already asked.

SEN. WEST: Okay. Senator Fraser, a couple of things. As it relates to the Carter-Baker Commission, you've talked about the recommendations, and you are following the recommendations that came out of that commission. Is that correct?

SEN. FRASER: No. I filed a piece of legislation that I believe will be approved by the U.S. Supreme Court and will be cleared by the Department of Justice.

SEN. WEST: Okay. Let me ask you this: Have you made mention of the Carter-Baker Commission?

SEN. FRASER: I have made references a couple of times of things that they mentioned in their

report.

SEN. WEST: Of the recommendations that they mentioned, did you incorporate any of those in your bill?

SEN. FRASER: My bill is a bill I believe that will be approved by the U.S. Supreme Court and be approved by the Department of Justice and will --

SEN. WEST: So the answer to the question is what? Did you incorporate any of the recommendations from the Carter-Baker Commission in your bill?

SEN. FRASER: The bill that we're filing is a bill that I believe will be approved by the U.S. Supreme Court and be approved by the Department of Justice.

SEN. WEST: So the answer to the question is?

SEN. FRASER: That we're filing a bill that's going to be approved by the U.S. Supreme Court.

SEN. WEST: Well, that wasn't the question asked. The question asked, did you incorporate any of the recommendations in the Carter-Baker Commission in your bill? That was the question I asked.

SEN. FRASER: I read the Carter-Baker report. And you know, obviously, I'm aware of the things they're recommending. But the bill that I've

drafted is based on the fact that whenever you walk in to vote, I want you to show an ID proving you are who you say you are, and I believe that bill will be approved by the U.S. Supreme Court.

SEN. WEST: So you don't know whether you did or not. Is that the answer to my question?

SEN. FRASER: My answer is, the bill that we filed, that we brought forward, is a bill that clearly says that whenever you vote, you need to show your ID, and I believe that bill will be approved by the U.S. Supreme Court.

SEN. WEST: Was that one of the recommendations of the commission?

SEN. FRASER: I'm not advised.

SEN. WEST: But you made reference to it as a predicate for why this particular bill --

SEN. FRASER: No. I made a reference to comments that were made by the Carter-Baker Commission.

SEN. WEST: What were those comments that you made?

SEN. FRASER: If you want to go over it again, I can do my opening statement again if you would like.

SEN. WEST: No, just the comments from the Carter-Baker Commission.

SEN. FRASER: Carter-Baker Commission, bipartisan -- Carter-Baker Commission affirms the danger. Elections are at the heart of the democracy. "Americans are losing confidence in the fairness of elections, and while we do not face a crisis today, we need to address the problems of our electoral system."

The Carter-Baker Commission concluded at the end of the day, there's considerable national evidence of in-person voter fraud. And regardless of whether one believes that voter impersonation is widespread or relatively rare, there can be no serious dispute that it is a real effect, can be substantial because, in a close election, even a small amount of fraud could make a margin of difference.

SEN. WEST: Okay.

SEN. FRASER: That was my reference to the commission.

SEN. WEST: Okay. Did they also recommend, though, that we should use some sort of mobile strategy, mobile strategy in order to get vehicles out to different locations to --

SEN. FRASER: I didn't reference that.

SEN. WEST: No. I said did they also recommend that, though?

SEN. FRASER: I'm sorry. I'm not advised.

I didn't reference that.

SEN. WEST: Okay. But if they did make a recommendation that we should do everything we can to make certain people are registered to vote, you would support that, wouldn't you?

SEN. FRASER: The bill I'm filing, that I'm filing today --

SEN. WEST: No. That's not --

SEN. FRASER: -- very clearly says that I think it will be approved by the U.S. Supreme Court and approved by the Department of Justice.

SEN. WEST: And we need to ask the Secretary of State. Okay. I understand that. But what I'm asking is, you would agree that if we are trying to, quote unquote, purify our election process, that we should do everything we can in order to make certain people are registered to vote. Wouldn't you agree with that?

SEN. FRASER: I think probably when the --

SEN. WEST: Well, you would not agree with that?

SEN. FRASER: If you'll allow me to make a statement.

SEN. WEST: Sure.

SEN. FRASER: I think when DPS comes up, I

think there's going to be a lot of discussion about what can they do in the form of either making it easy for people to sign up and/or even, maybe even a temporary van for an area that Senator Uresti had talked about in far West Texas. Those people that are, you know, 100 miles from the nearest location, maybe there's a way to accommodate that. So I think the answer to your question is, I'm anxious to hear the response of the Department of Safety of what they're either able and/or willing to do.

SEN. WEST: And let's assume that they are able and willing to do more than your bill permits. Would you support an amendment that would enable them to do what they're able to do in order to --

SEN. FRASER: Have you prefiled that amendment and have I had a chance to look at it?

SEN. WEST: No. I'm asking you a question right now.

SEN. FRASER: And I'm asking you, have you filed your amendment?

SEN. WEST: Well, you basically said, sir, that you have to wait -- we have to wait until you hear their testimony before we can make a determination as to whether or not they're --

SEN. FRASER: No, I can't tell you --

SEN. WEST: Well, let me finish; let me finish, please. Let me finish.

What you just said a second ago is, is that you want to defer to the Department of Public Safety to make a determination as to whether or not there are things that they can do in order to make certain they're doing the outreach that's necessary to accommodate just some of the concerns that senator Uresti had.

SEN. FRASER: I didn't say that at all. I said --

SEN. WEST: What did you say?

SEN. FRASER: -- I'm anxious to hear their testimony when they're asked and their response of what they are able, capable of doing for that. And then once you do that, if you want to offer an amendment, I will look at every amendment offered. If you'll got one, you need to go ahead and file it.

SEN. WEST: Let me give you a hypothetical, then. If the Department says that they can do much more than your bill currently allows them to do, would you support an amendment that would give them the resources or give them the rulemaking authority to be able to do the outreach?

SEN. FRASER: I'm probably not going to

work in hypotheticals right now. Let's wait until we hear from them. Then we'll determine that.

SEN. WEST: Okay. Well, I'm going to make sure and I'll put that down.

I want to talk about seniors just for one second. How did you come up with 70 years old? Well, hold on. Let me ask you this: Is there a definition, a federal definition under any of our laws, U.S. laws or either state laws, that defines a senior citizen?

SEN. FRASER: It was really actually a very complicated system that we came up with this. It actually was recommended by a democratic member that said, "If you'll put that in the bill, that would help five or six of us vote for the bill." So that was recommended originally to be put in the bill. But the answer to your question is, I'm 61 years old, and I think you're just about as old as I am.

SEN. WEST: No, I'm younger; I'm younger than you are. I'm younger.

SEN. FRASER: Oh, you're 60 -- 59?

SEN. WEST: I'm younger than you are.

SEN. FRASER: How old are you, sir?

SEN. WEST: I'm 58 years old.

SEN. FRASER: Okay. Of the people (laughter) --

SEN. WEST: Ask the Secretary. We're not going to --

SEN. FRASER: I want to see your photo ID.

SEN. WEST: Ask the Secretary.

SEN. FRASER: I need a photo ID.

SEN. WEST: Got to ask the Secretary.

SEN. FRASER: And here, this is a good observation. I live in an area, a retirement community, and I know a lot of the people in that area. And the people that are my age, that are 61 up to 65 up to 70, I think are still very, very capable. It is not an inconvenience on them. There's a lot of people that are 70 --

SEN. WEST: And what community?

SEN. FRASER: You want me to answer the question?

SEN. WEST: I just didn't hear. You said you lived in a retirement --

SEN. FRASER: I live in an area where there's a lot of retired people.

SEN. WEST: People. Okay.

SEN. FRASER: Yes, like myself.

SEN. WEST: Yes.

SEN. FRASER: Those people that I know, people that are up to that age, it would not be an

inconvenience for them, and they're still very, very active. Actually, I've got numerous people that I play golf with often that are above 70 and up to 80. So, actually, the number probably could have been higher, but that number we thought was a fair number and represented a number that we could offer up as a very fair number for an exception to this bill.

SEN. WEST: Let me make sure I understand your answer to that question. You're saying that the age 70 is predicated on people that you know that live in your community?

SEN. FRASER: It is predicated by a democrat member offering me that up as a number, that if we would put that in the bill, there would be five or six Democrats that would vote for the bill. That's the answer to my question.

SEN. WEST: Okay. But you added a lot of other stuff after that. What was all that other stuff?

SEN. FRASER: The other stuff was the people that I know that are capable of that. Now, if someone is not capable, we are not changing the mail-out ballot procedures. And that anyone for some reason that could not vote in person would be allowed to vote like they do today.

SEN. WEST: Don't you think that a better

definition would be 65? Why wouldn't you use 65? And let me give an example.

In the Human Resource Code, elderly person means a person 65 years of age or older. Why wouldn't we use that as an age? Our Penal Code uses elderly individual means a person 65 years of age or older. Our Utility Code means an individual who is 60 years or older. Our Human Resource Code means an elderly person, means a person who 60 years or older. And now we're going to have our election code basically saying a person of 70 years or older. Don't you think -- I'm not going to vote for your bill anyway, but just in case.

SEN. FRASER: You actually were one of the ones that was asking if I would put it in the bill.

SEN. WEST: No, no, no, no, no, no, no, no. Let's get it straight. I didn't ask you that -- okay? -- for the record. Okay? I didn't ask you that.

SEN. FRASER: Okay.

SEN. WEST: But if you're going to put it in there, it seems as though you should have one of a consistent definition with some of the other statutes. You're making an elderly individual for voting purpose more onerous than it is under these other statutes, like in our Penal Code where it says an individual -- elderly person is 65 years old.

SEN. FRASER: I actually believe that the number probably could easily be higher, because --

SEN. WEST: So you would make it 80 years old?

SEN. FRASER: I'm sorry?

SEN. WEST: You would make it 80 years old for election purposes?

SEN. FRASER: I'm saying when I'm 80, I still believe I'll be able to get in the car, go down and get my ID and be able to vote.

SEN. WEST: But, see, you're assuming that all elderly people have cars.

SEN. FRASER: If they don't, they can vote by mail.

SEN. WEST: But you're assuming that they all have cars and that they'll be able to do everything that you'll be able to do at the age of 80. And I'm pretty certain you will be able to do it given, you know, the things that you do to keep yourself in shape and everything.

But I don't think we should be building that definition based on how you perceive yourself and people in your neighborhood. The fact of the matter is, you're more affluent than most other people in the State of Texas. And if you're going to build a definition, I

think what you need to look at is what the average elderly person in the State of Texas, you know, is and the means that they have.

SEN. FRASER: And, Senator, I think, you know, if you're going to consider that, you've got to think about how things have changed. When my parents were 65, they were old. Things have changed a lot with diet and exercise, and people are changing what they can do.

People that are 70 or 75 or 80 are still very, very active today, and I think it's a very fair number. Now, I feel very comfortable that you're probably going to offer an amendment, raising -- or changing that number. And I think probably, if the members of the body, you know, could help us decide that, I think -- myself, I believe that 70 is a very fair number --

SEN. WEST: Let me --

SEN. FRASER: -- exception.

CHAIRMAN DUNCAN: Senator West --

SEN. WEST: Yes.

CHAIRMAN DUNCAN: -- if I might interrupt -- and I don't want to -- we can continue with your line of questions when we reconvene as a Committee of the Whole. It's 20 till. We've gone 10 minutes over

what we previously announced. Would you have any objection if we could continue the dialogue after session?

SEN. WEST: No objection.

CHAIRMAN DUNCAN: Okay. Very good. Why don't we go ahead and do that. Before we do that, let me ask the body if you would, please, if you have amendments that you would wish to -- we're not putting a deadline on amendments, but it will help us if you can deliver your amendments as soon as possible to Jennifer Fagan who is the State Affairs Committee Director, and we will try to collate them and make sure that there are not conflicting amendments. And if you'll do that as soon as possible, that will be helpful.

There are a number of people that are on queue to be recognized, and I will recognize them in order that they're on queue. Now we'll record that and then start. Senator Lucio will be first, Senator Van de Putte, Senator Ellis, Senator Seliger, unless you're just -- you're just on for the motion, so we'll take you off center -- Wentworth. He's just for the motion, so we'll take him off. And then, Senator Zaffirini, you would be in queue at that point in time. And then we'll just start the queue. Whenever we come back in, you can go ahead and hit your button and we'll have the queue.

Exhibits, too. If you have exhibits that you want to enter into the record so that we can make sure we have an orderly transition of those exhibits, would you go ahead and bring those forward, at least during the interim time, so we can go ahead and number them and have them available. It's not absolutely necessary that we introduce them in their chronological order, but it does help have a cleaner record.

Finally, I want to remind you, we did have a little talking over, so we've got to make sure we have a clear record. So please, in the future, remember to speak one at a time.

Senator Zaffirini is recognized for an announcement.

(Announcement by Senator Zaffirini)

CHAIRMAN DUNCAN: Thank you, Senator.

The Chair recognizes Senator Seliger for a motion.

SEN. SELIGER: Mr. President, I move that the Committee of the Whole Senate rise and report progress.

CHAIRMAN DUNCAN: Members, you've heard the motion. Is there objection?

Chair hears none. It's so ordered.

(Recess: 10:43 a.m. to 12:38 p.m.)

TX_00000501

AFTERNOON SESSION

TUESDAY, JANUARY 25, 2011

(12:38 p.m.)

CHAIRMAN DUNCAN: The Committee of the Whole Senate will come to order. The Secretary will call the roll.

ROLL CALL

SECRETARY SPAW: Birdwell?

SEN. BIRDWELL: (Indicated presence)

SECRETARY SPAW: Carona?

SEN. CARONA: (Indicated presence)

SECRETARY SPAW: Davis?

SEN. DAVIS: (Indicated presence)

SECRETARY SPAW: Deuell?

SEN. DEUELL: (Indicated presence)

SECRETARY SPAW: Duncan?

CHAIRMAN DUNCAN: (Indicated presence)

SECRETARY SPAW: Ellis?

SEN. ELLIS: (Indicated presence)

SECRETARY SPAW: Eltife?

SEN. ELTIFE: (Indicated presence)

SECRETARY SPAW: Estes?

SEN. ESTES: (Indicated presence)

SECRETARY SPAW: Fraser?

SEN. FRASER: (Indicated presence)

SECRETARY SPAW: Gallegos?

SEN. GALLEGOS: (Indicated presence)

SECRETARY SPAW: Harris?

SEN. HARRIS: (Indicated presence)

SECRETARY SPAW: Hegar?

SEN. HEGAR: (Indicated presence)

SECRETARY SPAW: Hinojosa?

SEN. HINOJOSA: (Indicated presence)

SECRETARY SPAW: Huffman?

SEN. HUFFMAN: (Indicated presence)

SECRETARY SPAW: Jackson?

SEN. JACKSON: (Indicated presence)

SECRETARY SPAW: Lucio?

SEN. LUCIO: (Indicated presence)

SECRETARY SPAW: Nelson?

SEN. NELSON: (Indicated presence)

SECRETARY SPAW: Nichols?

SEN. NICHOLS: (Indicated presence)

SECRETARY SPAW: Ogden?

SEN. OGDEN: (Indicated presence)

SECRETARY SPAW: Patrick?

SEN. PATRICK: (Indicated presence)

SECRETARY SPAW: Rodriguez?

SEN. RODRIGUEZ: (Indicated presence)

SECRETARY SPAW: Seliger?

SEN. SELIGER: (Indicated presence)

SECRETARY SPAW: Shapiro?

SEN. SHAPIRO: (Indicated presence)

SECRETARY SPAW: Uresti?

SEN. URESTI: (Indicated presence)

SECRETARY SPAW: Van de Putte?

SEN. VAN de PUTTE: (Indicated presence)

SECRETARY SPAW: Watson?

SEN. WATSON: (Indicated presence)

SECRETARY SPAW: Wentworth?

SEN. WENTWORTH: (Indicated presence)

SECRETARY SPAW: West?

SEN. WEST: (Indicated presence)

SECRETARY SPAW: Whitmire?

SEN. WHITMIRE: (Indicated presence)

SECRETARY SPAW: Williams?

SEN. WILLIAMS: (Indicated presence)

SECRETARY SPAW: Zaffirini?

SEN. ZAFFIRINI: (Indicated presence)

SECRETARY SPAW: Lieutenant Governor Dewhurst?

PRESIDENT DEWHURST: (Indicated presence)

CHAIRMAN DUNCAN: Quorum is present.

(Pause)

TX_00000504

QUESTIONS FROM THE SENATE FLOOR (CONTINUED)

CHAIRMAN DUNCAN: Senator Fraser, are you ready?

SEN. FRASER: I am ready.

CHAIRMAN DUNCAN: Senator West, you're recognized to continue your questioning with Senator Fraser.

SEN. WEST: Yes, sir. Thank you very much.

SEN. FRASER: And we're going to try it without earphones. See how that works. I think I'm good with you.

CHAIRMAN DUNCAN: And if I could advise both of you, I had some -- we had some concerns about you were both talking at the same time on your last dialogue. So if each of you could remember that, and I'll try to help you --

SEN. WEST: Okay.

CHAIRMAN DUNCAN: -- if you forget.

SEN. WEST: All right. Thank you.

Senator Fraser, I think, then, when we were looking -- can I ask that the last question be read back?

CHAIRMAN DUNCAN: The -- probably not because we have switched court reporter shifts and so --

SEN. WEST: I was just trying not to be redundant on it.

And, Senator Fraser, if -- if I am being redundant, we talked about --

SEN. FRASER: You are being redundant.

SEN. WEST: Okay. I need to ask the Secretary of State about that.

(Laughter)

SEN. WEST: Wait a minute. Hold on. I'm being redundant?

Senator Fraser, I think I was asking you about the $2 million; and you had indicated that those funds may very well come from the federal funds, but we're not certain at this point. And if they don't come from federal funds, they will have to come from general revenue, and we're at least -- the minimum amount is about $2 million. And I think that I mentioned to you that the average teacher in the state of Texas makes about $48,000.

If we have to appropriate state funds in order to fund this voter ID bill, it will cost a minimum of $2 million, and that's the equivalent of about 40,000 teachers. You do understand and appreciate that. Is that correct?

SEN. FRASER: And I very much appreciate

how valuable our schoolteachers are to the state of Texas. Without a doubt, I'm very, very aware of that.

And, again, the discussion we had prior to us breaking, we believe very, very strongly that there is sufficient funds in the Secretary of State's budget from HAVA funds that would -- that the letter says they have enough funds to cover this. They are going to request of the federal government. It is not unprecedented. They have allowed that to be used before, so we have every reason to believe it will be done. And so the discussion of whether that money would deprive some -- the rest of the budget is speculative us not knowing because we believe very strongly that -- that that money is going to be available.

SEN. WEST: And this may very well be a technical question for the Secretary of State.

If for some reason --

SEN. FRASER: I would never refer anything to --

SEN. WEST: If for some reason the bill is not precleared by Justice, will those HAVA funds be made available?

SEN. FRASER: I'm sorry. That one I, for sure, do not know the answer to that. That would be a great question for the Secretary of State.

SEN. WEST: For sure?

SEN. FRASER: For sure.

SEN. WEST: Okay.

SEN. FRASER: I do not know the answer to that question.

SEN. WEST: Okay. And we need to make certain we do. If -- would you support an amendment, though, that basically says that if general revenue, state revenue, had to be used in order to fund this particular bill, that you would then delay the -- the implementation of it?

And the reason I'm asking that is, surely you don't want to take general revenue from our coffers to fund voter ID when we may end up having to lay off thousands of teachers. I would assume that you would want teachers -- us to appropriate money to make certain that we can fund our education system over funding a voter ID system.

SEN. FRASER: Senator, could I remind you that there was a motion in writing that was entered by Senator Huffman of the -- the testimony of two years ago. And I think if you'll go back and read that testimony, yourself and several others, one of the big arguments you had was making sure that there was sufficient money that went forward for the education of

voters, making sure voters understood and that no one would misunderstand this process. So it's difficult for me when you're arguing both sides of the issue.

I think the answer to your question is, I'm not going to take a position today about whether we should or should not. We are requesting that the Secretary of State do sufficient education so that no one misunderstands the -- the implementation of this bill.

SEN. WEST: Regard --

SEN. FRASER: We're going to give -- we're going to give them that power. And that without a doubt, I would hate for us to be using money that could be used for a schoolteacher, and I'm not going to get into that debate because I'm a great supporter of schoolteachers.

But I still stand by the letter from the Secretary of State. The Secretary of State believes very clearly that they have sufficient funds, the money is available, and it will be made available.

SEN. WEST: So the answer to my question is, is that if there are no federal funds available, you would support an amendment that basically says that we should not use general revenue in order to fund this bill?

SEN. FRASER: And my position is, is that you've taken both sides of that issue. You argued in favor of funds last time. You're -- now you're asking for amendment saying we're not going to use funds. If we don't use funds to educate voters, obviously that's a problem.

And the answer is, no, I believe the instruction to the Secretary of State is that we do need to educate the voters.

SEN. WEST: So you'd be -- you'd be in favor of cutting schoolteachers using -- and, I mean, you agree with me that based on the budget that was introduced by the House and the budget that was introduced by the Senate, that school districts will be under pressure to terminate some of the teachers that would otherwise be in the classroom?

SEN. FRASER: I -- I don't agree with anything other than the fact --

SEN. WEST: Okay. All right.

SEN. FRASER: -- that your own finance, you're going to have to make those decisions; and we've got to make sure that we educate voters, making sure that they understand the implementation of this law.

SEN. WEST: All right. Let me ask the question this way, then: Would you agree with me that

both the House and the Senate have introduced bills that put pressure on school districts to reduce their budgets that would impact the number of teachers that would be in classrooms?

SEN. FRASER: You're a member of the Finance Committee that implemented a draft budget. I am not. I have not advised.

And the answer is, I'm sorry, I don't -- I -- I'm not advised on that issue.

SEN. WEST: If you were so advised -- if you were so advised that both the House and the Senate by -- if you were so advised by me, the Chairman of Finance, the Chairman of Appropriation, that both the House and the Senate have introduced bills that would require us cutting our commitment to our public schools and our teachers, if you were so advised that both houses introduced the budget that did that, would your position still be the same as it relates to the question I asked you concerning whether or not we should be using general revenue in order to fund voter ID implementation over funding our public schools?

SEN. FRASER: I am so advised that you're a member of finance, a very respected member, and you're very capable of making those hard decisions; and I'm sure you'll move forward and make the right decision for

our wonderful schoolteachers across the state.

SEN. WEST: What decision would you make?

SEN. FRASER: I'm sorry?

SEN. WEST: What decision would you make?

SEN. FRASER: I made a decision to support you, as a member of finance, to keep you on the committee.

SEN. WEST: So if you had -- if you had to make a decision, though, if you were on finance and had to make a decision, what decision would you make?

SEN. FRASER: I'm sorry. I'm not sitting on finance. I'm not subject to being able to listen to the debates, so it would be -- wouldn't be right for me to take a position on that.

SEN. WEST: But if you had to make -- take a position on funding voter ID over schoolteachers, which one would you fund?

SEN. FRASER: I'm -- I think the position -- because this bill is before us, it is extremely important that -- that we deter and detect fraud and restore the public confidence in the election system.

SEN. WEST: So that's your answer in terms of -- is that what you're telling the teachers, that you'd rather do that than -- to the extent it's there,

you'd --

(Simultaneous speaking)

SEN. FRASER: Well, unfortunately, since I'm not a member of finance, I don't get to make a choice of what I would rather do. I'm laying -- bringing forward a bill today that would restore the confidence of the public in the election system and -- today, because I'm sponsoring that bill, that I'm going to ask that we -- you know, we restore that confidence.

SEN. WEST: So, I'm trying to -- so let me make certain I understand your answer to my question.

SEN. FRASER: I know you're trying to --

SEN. WEST: Let me -- let me -- hold up. Now, I'm listening, because if you remember, both of us can't talk at the same time because the stenographer's taking it down, and I'm trying to make certain that I am reminded of that fact.

So your answer to that question is that you would prefer to fund the voter ID bill, if need be, with state funds than to put extra money -- take that $2 million, if we need to, and put it back in the budget for our school districts?

SEN. FRASER: You know, the -- you know, the important thing -- or the good thing with the Legislature is you don't get to make -- answer questions

for me, and the -- I did not say that at all.

Today I'm laying -- bringing forward a bill that would deter and detect fraud and restore the public confidence in the election system.

SEN. WEST: How does your bill detect fraud?

SEN. FRASER: Come back? I'm sorry. I didn't hear you. What did you say?

SEN. WEST: How does your bill detect fraud?

SEN. FRASER: The -- the bill is designed to deter and detect fraud and restore --

SEN. WEST: No. I asked you: How does your bill detect fraud?

SEN. FRASER: The -- I think the easy answer to that would be, is that when you walk into the -- into your election booth and you show your driver's license, they know for sure that you're Royce West and that if you're on the precinct list, registered, you're entitled to vote.

SEN. WEST: And so that's -- that's the fraud detection provision in it? And so you'd rather fund --

SEN. FRASER: That's the way the bill works.

SEN. WEST: Now, let me ask you this: If there's empirical evidence that -- in Texas, at least, because, you know, we are -- we are Texas. We are the Lone Star State. The rest of America can go this way, and we'll go that -- the other way. Right? Right. Okay. You're good with that. Right?

SEN. FRASER: I'm sitting here listening.

SEN. WEST: You don't agree with that?

SEN. FRASER: No, I'm listening to you. You're --

SEN. WEST: We are Texans.

SEN. FRASER: You're still answering my questions for me.

SEN. WEST: We're Texans.

SEN. FRASER: Keep going.

SEN. WEST: I'm just asking you whether you agree with it. And so the question I'm asking you is: Is there any indication that we have prosecuted any fraud associated with identification in the state of Texas? Is there any empirical evidence whatsoever?

SEN. FRASER: The bill that I'm bringing forward today will clearly say that when you walk in the voting booth, you identify yourself as who you say you are, and the bill that we're bringing forward we believe will pass the Supreme Court of the United States and be

approved by Department of Justice.

SEN. WEST: I notice you keep on saying that in terms of you believe that the bill is going to pass muster at the Department of Justice and also the United -- the Supreme Court of the United States. Are you anticipating any -- let me -- let me ask this: If the Department of Justice decides not to preclear this legislation, are you anticipating any type of court challenge by the state of Texas?

SEN. FRASER: Senator, I'm starting to have trouble hearing you. Hold on a second. Let me put my earphones on.

(Pause)

SEN. FRASER: Are you there?

SEN. WEST: Yes.

SEN. FRASER: Would you say something?

SEN. WEST: Testing, testing, testing.

SEN. FRASER: Okay. I got you.

SEN. WEST: One, two, three.

SEN. FRASER: Okay. Will you ask your question again?

SEN. WEST: You have consistently indicated that this particular bill will pass the Department of Justice and also the Supreme Court. I'm asking you: Do you anticipate that if the Department of

Justice decides not to preclear this particular legislation, any litigation concerning it?

SEN. FRASER: You're -- you're being subjective about me assuming what's going to happen. I believe the bill that we had -- that we're offering will be precleared.

SEN. WEST: But I'm asking if it's not precleared. Do you want to see us go into litigation with the federal government concerning your bill if it's not precleared?

SEN. FRASER: I don't -- I don't think that's, you know, my choice. I think we -- we will present the bill forward and try to present our best case that it should.

SEN. WEST: Okay. So does your bill anticipate any litigation at all?

SEN. FRASER: The bill in no way addresses or thinks about any litigation. It is clearly just a bill saying this is -- this is what we're asking you to do, to present a photo ID when you vote, and that's the extent of the bill.

SEN. WEST: I know because -- and the reason I ask that question, you continue to make reference to the Department of Justice and the U.S. Supreme Court or --

SEN. FRASER: Only because the -- the bills that have been brought forward by other states, which Indiana was cleared by the -- you know, made it all the way to the U.S. Supreme Court; and then in Georgia, they were precleared from the Department of Justice because a bill -- you know, since we're a Section 5 state, they were precleared.

SEN. WEST: Okay. In Georgia, not Indiana. Indiana's not a Section 5 state?

SEN. FRASER: No, they are not.

SEN. WEST: Okay. Has the Legislature or have you conducted any research on how burdens of the photo ID requirements may fall disproportionately upon racial minorities?

SEN. FRASER: Come back again. I'm sorry. My sound went off.

SEN. WEST: Okay. In drafting your -- in drafting your bill, was there any research conducted on how burdens of -- burdens of photo identification requirements may fall disproportionately on racial minorities?

SEN. FRASER: Probably the best evidence that I could bring forward, that the latest poll that was conducted of Texans, including the people in your area. Of the -- there were 86 percent of the public

that in favor of that. Of that, 82 percent were black, 83 percent were Hispanic.

So I would say the answer to your question is: If you ask someone that is either African American or Hispanic, do they believe that -- "Do you favor/oppose requiring a valid photo ID before a person is allowed to vote?" and you have 82 percent of the public that says that --

SEN. WEST: Right.

SEN. FRASER: -- pretty -- pretty straightforward.

SEN. WEST: You keep referring to that poll. What poll is that, sir, and who was it conducted by?

SEN. FRASER: It was conducted -- this is one of many we had. I've got a whole series of polls. This just happened to be the latest one that was conducted January the 10th, 2011. This one was by the Lighthouse Opinion Polling & Research, LLC.

SEN. WEST: Lighthouse Opinion.

SEN. FRASER: Lighthouse Opinion Polling, LLC.

SEN. WEST: Okay. And --

SEN. FRASER: One that was --

(Simultaneous discussion)

SEN. WEST: Were you finished?

SEN. FRASER: Yeah.

SEN. WEST: Okay. Now, the question, though, that I asked, not -- and I agree with you that most people will say that some form of photo ID is okay. Now --

SEN. FRASER: But what --

SEN. WEST: Let me -- let me finish. Let me finish, though. Hold on for a second.

I would agree with you that, but my question wasn't about their opinion. My question was: Have you conducted any research on how burdens of photo ID requirements may fall disproportionately on racial minorities?

SEN. FRASER: And I think the answer to that, if you look at what happened in Indiana and Georgia is a good example because it is a Section 5 state. In those states, to our -- to my knowledge, there has not been a single person that has came forward to identify themself that they were in any way, you know, in -- you know, kept from voting or inconvenienced by voting.

So the answer to your question is, that I look at the data that has been collected from the states that have implemented, and they're coming forward. That

is the case. Plus the fact that if you ask African Americans or Hispanics in Texas, it's a very straightforward question. When you have 82 percent of the public, the people that you represent, saying, you know, "I think that's a good ideal," I'm having a lot of trouble understanding how -- why you don't understand that.

SEN. WEST: Okay. So the answer to my question is, is that you did not conduct any type of research on it other than looked at opinion polls and referenced what went on in other states?

SEN. FRASER: No, we've done all -- there's been a lot of research done.

SEN. WEST: And that's what I was asking. What research have you done --

SEN. FRASER: I just explained --

SEN. WEST: -- to make that determination?

SEN. FRASER: -- to you what we did. We have looked at the experience of other states. And you're going to have witnesses come from some of the other affected states, and you're going to be able to ask that question: Who has came forward in your state and said it's a problem?

SEN. WEST: Okay. So you're saying, then, that as a result of experiences in other states and an

opinion poll, that that is the sum total of the research that's been done by you in preparation of this bill?

SEN. FRASER: Senator, I think the people in your district understand very clearly. If you ask them a direct question, someone you represent, and said, "Do you favor or oppose requiring a valid photo ID before you're allowed to vote," this is -- that's not rocket science.

SEN. WEST: Well, the --

SEN. FRASER: "Should you be required to show your picture ID when you go into vote?" That's -- that's -- to me, that's -- that's, you know, pretty telling.

SEN. WEST: Well, the great thing about it is, we're going to have an opportunity to do just that. Because guess what? I've got a few people from my district down here to testify, so you'll have an opportunity to ask them that. Okay?

SEN. FRASER: Good.

SEN. WEST: But, again, that's the sum total of your research, though. Right?

SEN. FRASER: I didn't say that was the sum total of my research.

SEN. WEST: Now, would you agree that Texas has a larger proportion of minorities than

Indiana?

SEN. FRASER: Not advised.

SEN. WEST: So if -- if the demographic information that we have from the U.S. Department of Census indicated that, you would not disagree with that. Correct?

SEN. FRASER: Well, I mean, every state has a different demographic of the makeup of people within the state.

SEN. WEST: Sure. I know that, yeah.

SEN. FRASER: Georgia is a -- you know, they're -- they're a Section 5 voter rights state, but their makeup is not exactly like Texas.

SEN. WEST: That's the point. That's what I'm asking you. You said you weren't advised, so I was just trying to point to you some set of facts that all of us commonly know that we get from the Department of Census, U.S. Department of Census. And if they give different demographic information for the states, then that would probably be controlling, and you would agree that that's the best evidence that we have of what the population is in those various states. That's all I'm asking. Now, let me ask this.

SEN. FRASER: But you're trying to answer my question, and I did not say that.

TX_00000523

SEN. WEST: No, I'm not. But are the forms of identification listed in your bill the least restrictive options in order to achieve the goal of avoiding what you call voter identification fraud?

SEN. FRASER: Okay. You're going to have to ask that again.

SEN. WEST: Are the forms of identification that you've listed in the bill the least restrictive options in order to achieve the goal of avoiding what you have said is voter identification fraud?

SEN. FRASER: And I think what you're asking, which is going to be the easiest to use? And the -- the data, if you look back at 2006, the number of people that have registered to vote, about -- I think the number now is 91 percent actually use their driver's license when they registered to vote. So the assumption is at least 91 percent of the people that voted -- or that registered since 2006 had a driver's license. So I'd say that's the -- if it's the -- the easiest thing, I'd say a driver's license.

SEN. WEST: So this -- the list of identifications that you use as the -- is the least restrictive options that you could come up with?

SEN. FRASER: Well, I don't -- I'm not

sure. Your verbiage you're using, I don't know that that's the intent.

SEN. WEST: Well --

SEN. FRASER: I'm saying that the thing that the -- the type of identification that is most readily available appears to be a driver's license. It -- we think, that is.

SEN. WEST: Okay. Now, since there are studies that show that African Americans and Hispanics are more affected by poverty and --

SEN. FRASER: Ask him, then.

We're trying to figure out if this is a filibuster.

SEN. WEST: Is it a what?

SEN. FRASER: A filibuster?

SEN. WEST: Oh, no, this is serious business. This is serious business.

SEN. FRASER: I guess I would remind you that the information that was put into the record this morning by Senator Huffman, the questions you've gone over, I believe we put these --

SEN. WEST: Well, at any -- at any point, you can defer to whomever you want to answer the question.

SEN. FRASER: No, no, I'm saying --

SEN. WEST: You've been referring to the Secretary of State.

SEN. FRASER: -- these -- the questions -- the questions you're asking, the question and the answer are already in the record from two years ago; that you're asking the exact same question, and I'm answering the exact same answer. It's already in the --

SEN. WEST: And it may very well be. I just don't remember. I haven't gone back and read that entire record. It was like 26 hours. So if I'm being a little bit redundant, please give me -- give me a little space on that.

Let me go back to the questions I'm asking. Studies have shown that African Americans and Hispanics are more affected by poverty and, therefore, are more likely to participate in government benefit programs. Will the elimination of the government documents as a form of ID disproportionately affect African Americans and Hispanics?

SEN. FRASER: I'm not advised.

SEN. WEST: Okay. If in fact -- well, let me back up and ask you this question.

Do you agree that African Americans and Hispanics are disproportionately affected by poverty in the state of Texas?

SEN. FRASER: Not advised.

SEN. WEST: Okay. Do you --

SEN. FRASER: I grew up in a pretty poor family, so --

SEN. WEST: Well, that's what I know, and correct me if I'm wrong because we've had our conversations. Your father was a minister, too. Right?

SEN. FRASER: Minster and --

SEN. WEST: Okay. He went to a lot of African American churches?

SEN. FRASER: Yes, he did.

SEN. WEST: Did a little singing and stuff like that?

SEN. FRASER: Yes.

SEN. WEST: Okay. And do you represent a district that has a high poverty level -- or excuse me -- a high ethnic minority population?

SEN. FRASER: Interestingly -- well, and what you call high, it is not one of the highest percentage wise of ethnic minority. But the last figure I was shown, my district is the third poorest district in the state, right behind Senator Uresti's. That that -- that number is a couple of year's old, but I'm -- you know, the --

SEN. WEST: Okay.

SEN. FRASER: -- people in my district are -- are the working poor.

SEN. WEST: Okay. The -- the protected classes, that would be an African American and Hispanics, do you have a high concentration of African Americans and Hispanics in your district?

SEN. FRASER: Well, I don't know what you'll call a high percentage. I've got --

SEN. WEST: Okay. Comparatively speaking.

SEN. FRASER: There -- there are a lot of my voters in my district that, you know, I'm -- I love to say "my constituents" -- that are African American or Hispanic.

SEN. WEST: Are they in poverty or what? I mean, you know what poverty is.

SEN. FRASER: Well, Senator, if --

SEN. WEST: Oh.

SEN. FRASER: If I have the third poorest district in the state, that implies that we have some people that are working poor.

SEN. WEST: Let me just ask you this question.

Do you know whether or not the elimination of the government documents that have hereto before been utilized by voters for identification purposes at the

polls --

SEN. FRASER: Issued before?

SEN. WEST: Yeah, I mean, under current law. Let me back up, then.

Based on current law and the various government identifications that can be used for purposes of voting, by eliminating those, whether they have an adverse impact on ethic minorities in the state?

SEN. FRASER: Let me -- let me tell you that the people in my district voted -- or they're polling that they -- 92 percent of them say that they're in favor of this -- this requirement.

SEN. WEST: Okay. So you don't -- and that's your response to my question?

SEN. FRASER: My response is, is that I think the people of the state of Texas, which makes up -- I think it was 83 percent of -- of African Americans and 85 percent of Hispanics, said that they're in favor of it. I'm sorry. It's 82 percent Hispanic -- I'm sorry -- Hispanic, 80 -- 83 percent Hispanic, the African American, which is -- it's listed as a black vote, is 82 percent say they are in favor of asking for a photo ID.

So it's -- it's -- this is a pretty easy question for them, "Should you have to show your -- your

photo ID, your driver's license, when you come in to vote?" And they said, "Sure. That's" -- you know, "That's fair."

SEN. WEST: And that's your response to my question?

SEN. FRASER: Yes.

SEN. WEST: Okay. No more questions at this time.

SEN. FRASER: Thank you, Senator.

CHAIRMAN DUNCAN: Chair recognizes Senator Lucio for questions.

SEN. LUCIO: Thank you, Mr. Chairman.

Senator Fraser, under this legislation, there are no exceptions at all if you do not have a driver's license -- and correct me if I'm wrong -- military ID, citizenship certificates, or passports. Now, not even Senate IDs are appropriate for the purposes of voting. That means the state employee working in the building wishing to cast a ballot during early voting at the Sam Houston Building couldn't use a combination of their voter registration card and their Senate ID. Further, this bill's requirements for identification are stronger than what's used for new employees in obtaining driver's license, the way we understand it.

Now, I know many people don't think it's all that difficult to get a driver's license and that everyone has one, but that's just not the case. Eleven percent of Americans surveyed by the Brennan Center for Justice do not have government-issued photo ID. Forty percent of those without voter ID are disproportionately the -- the elderly, the -- the students, women, people with disabilities, low-income people, and people of color.

According to disability advocates, nearly 10 percent of the 40 million Americans with disabilities do not have any state-issued photo ID. So I do not see how this legislation is going to ensure that they are not kept from exercising their right to vote. Again, it's a right. It's not a privilege. Plus, according to that same survey, one of every five senior women does not have a license.

What troubles me even more about the legislation is that it could mean, for so many, under this legislation, election workers will be responsible for determining identity; and that has never been part of their job as election clerks.

Now, I got a question.

SEN. FRASER: Is there a question coming? I'm looking for the question.

SEN. LUCIO: Yeah, it's coming up. I had to --

SEN. FRASER: You've got about five or six thoughts. I -- well, I'm going to --

(Simultaneous speaking)

SEN. FRASER: -- one of them. But you're getting so many thoughts, I'll have trouble responding to them.

SEN. LUCIO: What are -- what are they going to do, Senator Fraser, when someone has conflicting last names, conflicting last names on IDs, on their voter rolls, and how many professional ballots will be cast? Are counties ready to resolve all those issues?

That might have been asked, I missed it, and I apologize for that because we've been busy, as we always are. But let me -- let me just ask this question, as a follow-up.

(Simultaneous speaking)

SEN. FRASER: You've asked me 12 --

SEN. LUCIO: Go ahead and address --

SEN. FRASER: -- so far.

SEN. LUCIO: Go ahead and address that one.

SEN. FRASER: Huh?

SEN. LUCIO: Okay. Well --

CHAIRMAN DUNCAN: Wait, wait, wait, wait, wait. Y'all are really crossing over to where you're not making a good record, so one at a time. I think Senator Fraser was answering a question; and if he could answer it and, Senator Lucio, you could follow with another question.

SEN. FRASER: And, Senator, if -- if you really do want an answer to questions, I would love to do one at a time because I actually --

SEN. LUCIO: Okay.

SEN. FRASER: -- you've asked so many questions, I can't remember --

SEN. LUCIO: Okay.

SEN. FRASER: -- the first one.

CHAIRMAN DUNCAN: All right.

SEN. FRASER: But --

CHAIRMAN DUNCAN: Wait. You're doing it again, Senator. If we could -- I'm going to stay on this because we do want a good record.

SEN. FRASER: If you'll just allow me to just answer a couple of them, and then we'll get them out of the way.

SEN. LUCIO: I'll take one at a time.

What are you going to do when someone has

conflicting last names on their ID on the voter rolls?

SEN. FRASER: Okay. I'm going to start even further back than that.

I -- the -- the first observation you made is that we're making it harder than getting a driver's license. That is totally incorrect. Driver's license is one of the things we're offering, so whatever difficulty it is to get a driver's license, once they get it, that is their identification. So this is not in any way harder than getting a driver's license.

No. 2, you made an observation about the elderly. We have two different observations that -- that come into play here. First one is that at -- if they're 70 years old on January 1st, 2012, they are not subject to this bill, so they are -- they are operating under current law. And then, also, we are not in any way impacting the mail-in ballot system that is in place today. Any elderly person that wants to vote by mail would -- would have the ability to do it.

So, you know, those things, I think, are -- the question you're asking, the third question, about if the name does not match on the -- the ballot, that's the same question that's been asked probably five times already today. My answer continues to be the same, as I've told everyone. We have the Secretary of

State coming. I don't -- I don't know the -- the exact ruling of what they -- the Secretary of State, slash, the election administrator is how they determine that; and I would like that question to be asked to the Secretary of State, if possible.

SEN. LUCIO: Okay. That's fine, Senator.

To obtain a driver's license, you could use nonphoto options. Correct?

SEN. FRASER: Senator, you can ask that of the DPS.

SEN. LUCIO: I'm sorry?

SEN. FRASER: If you would -- DPS is going to be here. I would ask you that you could ask the DPS their procedures for -- for getting...

SEN. LUCIO: Okay. Well, I have information to that effect, but it's all right. I'll wait for DPS.

Let me ask a question on -- on where we have been in this country and this state, and we don't want to go.

But do you know what the 24th Amendment did?

SEN. FRASER: I'm sorry. I do not.

SEN. LUCIO: It ended -- it amended the constitution to allow -- outlaw poll taxes; and it did

so, and it ended in 1964. I was a freshman in college at the time, and you must have been junior high.

SEN. FRASER: I was four or five, then, Eddie, I guess. '64, I was 17 years old.

SEN. LUCIO: All right. I did a little research, Senator, on the poll tax in --

SEN. FRASER: 15 years old.

SEN. LUCIO: -- Texas history. It's something that personally hurts me. After all, my dad had to pay a poll tax which wasn't that long ago. I went to some of those elections with him because he wanted to show me and make sure that I got involved in the political process. I remember those elections, and my -- my mother voted, too. But it was -- it was a sacrifice, quite frankly.

Now, Texas adopted a poll tax in 1902. It required that otherwise eligible voters pay between $1.50 and $1.75 to register to vote. Now, $1.75 may not sound like a lot, but for a lot of families living on the breadline, it made voting a privilege instead of a right. Well, 1.75 -- $1.75 adjusted for inflation today is about 40 to $45. That means, Senator, that's a mean instrument -- excuse me -- using several ways of calculating, including the consumer price index.

Now, 40 bucks is a symbolic figure. A

driver's license or ID today costs $25, even for a renewal. And going to the DMV, which is Department of Motor Vehicles, can take time. You're going to get there, wait in line, return home, take off from work, pay for the gas. Now, let's say it takes two hours. Minimum wage in Texas is 7.25 an hour. So if you took off two hours and paid for gas, you're looking at $40, the same amount of the old poll tax would cost today. Don't -- don't you find that kind of ironic? I do.

Under this bill, voters will effectively have to pay the same amount to vote that minorities and the poor had to pay in poll tax in 1902. I'm serious, though. Forty dollars is a lot of money for a lot of people in my district living paycheck to paycheck. You can buy a week's shopping for 40 bucks. You're either going to eat or you're going to -- you're going to vote. That is the choice many will think about making.

The poll tax was outlawed in -- in the 1960s by the 24th Amendment. It was outlawed because the nation understood that poll tax -- taxes served as one purpose, to --

(Simultaneous speaking)

SEN. LUCIO: -- disenfranchise minorities and the vulnerable.

I'm leading to another question, if I may.

Texas has a history, unfortunately, in my opinion of voter suppression. Texas used the poll tax to suppress voters. In fact, Texas only ratified the 24th Amendment in 2009, 2009.

So what is to stop future legislators making a driver's license or an ID cost more than $25? We've talked openly over the last few months about raising fees to cover the back -- the budget hole. So, you know, it's -- it's happened with passports. Passports keep going up and up in price. What if in the future, driver's license cost $125 or $300? Would it be a poll tax then? And would it be a poll tax then, Senator?

SEN. FRASER: Senator, this bill in no way envisions a poll tax. It has nothing to do with the fee that is charged. You're on finance. You're the one that has control over that. The bill we have before us today -- there's nothing you've talked about the last five minutes that has anything to do with this bill -- is that this bill is nothing more than showing your driver's license or a ID that we will give them free of charge that they can pick up after work that -- you know, when I was picking cucumbers and -- you know, in the afternoon, when I got off work, I could -- I still had time before seven o'clock to go down and -- to the

driver's license place to get the driver's license. So this has -- this bill in no way has anything to do with a poll tax.

SEN. LUCIO: Well, and I -- I appreciate, you know, what you're saying. However, I just want to make sure that it doesn't get out of hand. And I would ask you, possibly, if you would vote, you would be prepared to work with me and others to -- in order to draft a constitutional amendment that would make any raise in fees associated with driver's license or state ID only possible by a two-thirds vote of each chamber. You think that we could work to that end?

SEN. FRASER: Senator, I'm -- I'm not going to commit on anything. You're on finance. Y'all are going to have to work through the issues of balancing the budget.

The bill that I'm laying out today, I think, is a very fair way for people to identify themselves, that they can prove they are who they say they are when they go to vote. The -- the thing that I would let you know that, you know, I want to make sure that every -- we've -- we've talked to senator -- you know, the -- Davis has asked about women. I want to make sure that women, men, Hispanics, African Americans, Anglos, everyone in the state has the same opportunity

to go in and make sure that their vote is counted. And I don't -- the things you're talking about really are not part or subject to this bill.

SEN. LUCIO: Well, a driver's license is part of it, I believe, and I'll be --

SEN. FRASER: But -- but the cost of a driver's license is determined by the Finance Committee.

SEN. LUCIO: When -- when -- when does a driver's license expire? I was going to ask you that question.

SEN. FRASER: When does it expire?

SEN. LUCIO: Yes, sir.

SEN. FRASER: You know, interestingly, I was in -- looking at mine just then, in my office. I got a new one this year, and it's good for six years. So every six years, evidently. I'm -- I'm going to ask DPS that, but my assumption is that a driver's license is renewed to last for six years.

SEN. LUCIO: Well, we talked about senior citizens. There are senior citizens, 60, 70 years old, who used an expired driver's license as a form of ID. That's where I'm going with my questions and my remarks. Are they no longer -- they no longer drive, but they still vote.

Now, under this bill, they will have to

renew their license in order to vote. Is that correct?

SEN. FRASER: You -- you've given a hypothetical, and I guess it's one of the things -- actually, we were in the back discussing a question that was brought up by Senator Davis about an expired driver's license and at what point should it be -- how long should it be used. I think someone used it for an extended period, like the example you're giving, for several years. Unfortunately, that's not a valid -- that would be considered a valid license.

SEN. LUCIO: I was under that impression or to renew their passport or -- which are seldom used by seniors.

SEN. FRASER: I disagree with that. I travel with a lot of seniors. I think there's a lot, you know.

SEN. LUCIO: Well, the ID. They use this ID for passports.

Well, I obviously have a bunch of other questions, but in the -- in the interest of time, I will address these to you in writing because I'm very, very concerned about, you know, some of the things that are going to be transpiring. I think Senator Davis touched on marriage -- the marriage -- marriage issues.

Or I'll give you one scenario, if I may.

Two citizens that are getting married. The woman getting married has decided to change her name. They get the marriage certificate. They get married and so on. But when the newlywed wife tries to vote, there is a problem. The name on her voter ID does not match the name on her voter registration. So maybe she did the right thing and changed her name on the voter ID, but before that, when she registered to vote, she had used her maiden name. Maybe she registered to vote with her new married surname but had not had yet changed her voter ID to reflect a change of name. Maybe there is no time to address it because she gets married in October.

SEN. FRASER: Senator, these --

SEN. LUCIO: Those are just scenarios that are coming up.

Others that I'm concerned with are the 18 year olds that are turning 18 thirty days inside of -- you know, between a primary and a general election. Many of them will not be able to register to vote.

There are so many different scenarios, Senator, and I'm very concerned about whether or not they will be disenfranchised. That's all. Thank you very much for your time.

CHAIRMAN DUNCAN: Senator Van de Putte?

SEN. VAN de PUTTE: Thank you,

Mr. Chairman.

Would author of the bill yield for some clarification?

SEN. FRASER: I would yield.

SEN. VAN de PUTTE: Thank you very much, Senator Fraser. I wanted to have a moment to clarify some of the conversation and the points that we had on our discussion earlier.

I thought that I had heard you say that the bill that we had in the 81st Legislature was actually modeled after Georgia. When after comparison, I think that it was actually modeled more closely after the Arizona bill, which is a Section 5 voting rights state as well. And so I wanted to clarify that, but I thought we had talked so much about the Georgia legislation. So the -- the bill, Senate Bill 362, was actually modeled more after Arizona's law.

SEN. FRASER: Senator --

SEN. VAN de PUTTE: And I --

SEN. FRASER: I am -- I don't want to disagree with you, but I don't think Arizona's ever came out of my mouth on this floor of the legislature about last year's bill or this bill.

SEN. VAN de PUTTE: No.

SEN. FRASER: I'm -- the -- the bill that

we modeled last year was a Texas model that we were moving forward, and whenever earlier you were addressing the Georgia bill -- you're a past president of NCSL, and I have the NCSL analysis here. And that's the reason I was confused because you were referencing Georgia, and I've got --

SEN. VAN de PUTTE: That's correct.

SEN. FRASER: The document that came from the organization that you chaired and that was the reason I was confused about what you were representing.

SEN. VAN de PUTTE: Well, Senator, you were confused, and I was confused. However, both -- I think we can both agree that your bill, Senate Bill 14, is more restrictive than current Georgia and Arizona law; that this is based after an Indiana model, but it is even more restrictive. I mean, you have a pretty tight vote --

SEN. FRASER: I -- I --

SEN. VAN de PUTTE: -- of the bill.

SEN. FRASER: I disagree with you on that, that there are -- are small things that we're different on, which basically is the number of things that you can use for identification. But there are a list. I think they have six in Indiana. We have four in Texas. We're under discussion about that four, should it be expanded.

So saying that they're very different is not a correct observation. There is very small differences between the -- the Indiana, Georgia, or Texas. They're actually very, very much alike, and that also gives us the reason we believe it will be approved by the Supreme Court and DOJ.

SEN. VAN de PUTTE: Well, I wanted the opportunity to correct myself because Georgia only allows for an alternate two forms in a provisional ballot for first-time voters only, and so they do not allow -- and I stand corrected. You are correct that they don't have two forms of alternate that are not a photo ID. The only time in the Georgia law that they make reference to two forms -- and that's what I was looking at and they have other things that they can use, a bank statement, a current utility bill, a paycheck -- is when they are casting a ballot for the first time and they have -- they are new registrants and they don't have a photo ID.

So I stand corrected. You are correct in that for a provisional ballot, they do not allow two. The only time they do -- and I'm looking at their Senate -- their -- their bill -- is on a -- and I stand corrected. So I wanted to let you know that I misspoke. That is not correct. It's only the two alternate forms

when they're doing for first-time registrants.

SEN. FRASER: Thank you for that correction, and that -- that is -- the documentation I show does show that they require a photo ID.

SEN. VAN de PUTTE: And so I just want to thank you for the ability to clarify this and know that this is your -- this is a Texas bill, and it'll probably be known as the Texas bill. And -- and -- and to your credit, for every -- all the work that you've done, I believe it is very stringent in small ways in the wording. But for the groups of people that I think will have a burden, they -- they have no alternate means.

So thank you very much for the opportunity to clarify. And, Mr. Chairman, I don't have any other questions of the author.

CHAIRMAN DUNCAN: Senator Ellis?

SEN. ELLIS: Just a couple questions, Senator. I know you're tired. You've been up a long time.

From your opening statement, the primary reason for this bill is because of your concern about voter fraud. Right? Voter fraud, that's the primary reason --

SEN. FRASER: The integrity --

SEN. ELLIS: -- for the --

SEN. FRASER: -- of the ballot, making sure that the person that is trying to vote is who they represent to be.

SEN. ELLIS: And if that's the case, why wouldn't you apply a voter -- photo voter identification requirement to mail-in ballots? Don't you think there's probably room for more fraud for the mail-in ballots?

SEN. FRASER: I will support you a hundred percent. You file that bill, you come forward with it, and we'll talk about it. But this bill does not in any way address mail-in ballots. This is only in-person voter --

SEN. ELLIS: But you -- but you will concede that there's probably room, just from a layperson's perspective? Neither you nor I are experts on it, and I'm just asking you to make the point. Will you concede that there's room -- there's potential for more fraud with a mail-in ballot than with somebody showing up?

SEN. FRASER: I'm going to concede that the bill that I'm laying out today will help a lot with the in-person, you know, potential of fraud, and it will make sure the person there is -- is who they say they are.

SEN. ELLIS: If you just had to guess,

would you think people who are more apt to do a mail-in ballot would be people in the red jersey or the blue jersey?

SEN. FRASER: I wouldn't be apt to guess.

SEN. ELLIS: Do you care?

SEN. FRASER: Oh, I care a lot, but I'm not going to guess.

SEN. ELLIS: Okay. You heard the discussion earlier about the concern -- I think even in your district, some of those DPS offices, I think, on that map may be closing a few days a week. So you -- you did say that you have some concern about access for people to go and get --

SEN. FRASER: It -- it is a discussion going on, and it's -- you know, there -- I actually was grinning as they were talking about the -- the -- you know, the offices, is that I have the same challenge sometime; and, you know, you've got to work to make sure that they're open.

But that's a discussion we're having with -- with Senator Williams. He's having a discussion with DPS, and we're -- we're trying to look at, through his committee, the Finance Committee and communique with DPS, the -- the easiest way to make sure that everyone can -- can comply.

SEN. ELLIS: But you'll agree, it's a problem? There's some concerns about it?

SEN. FRASER: I don't know that I'll agree that it's a problem. Problem implies that, you know, there are -- everyone works through it. I've got a driver's license. You've got a driver's license. Probably, I would love for them to come in my office and take my picture, but it doesn't work that way. I have to go and put out the effort to go and get it. And that's the system we have, and we just need to make it as easy as possible.

SEN. ELLIS: Well, what prompted you, Senator, to carry this bill? I mean, was it something -- just laying up at night? Did somebody come to you? What -- you're such a handsome fellow, but why you?

SEN. FRASER: The -- and actually, I'll go back to -- you asked me the same question two years ago, and it's in the record. We just, you know, entered it.

Actually, this is over a number of years, just watching and looking at articles of things that happened. Obviously, there's a lot of press about the -- the Carter-Baker Commission of concern, and I watched the issue. And it was being asked a lot, as I was speaking out in the district, is that when are we

going to, you know, address it. And I thought -- I thought the issue had matured, and I decided to file it. If you -- if you remember, this is the third session I filed this bill.

SEN. ELLIS: Well, I've always known you to be a member, Senator, who digs into an issue. You -- you read a lot.

Why would you say a new photo ID? Why wouldn't you just make a -- have a bill that has a requirement that we put a photo on the voter registration card? I mean, wouldn't you agree? Probably more people have a voter registration card in Texas than have a driver's license.

SEN. FRASER: That -- well, I don't --

SEN. ELLIS: Okay. All right.

SEN. FRASER: I don't --

SEN. ELLIS: You think more people in Texas --

SEN. FRASER: -- think that's true.

SEN. ELLIS: -- have a driver's license?

SEN. FRASER: I don't -- I'm having the chairman of the committee that is over it -- interestingly, I want you to think about what you just suggested, is that driver's license is going to be the easy form of identification. We -- we know that 90-plus

percent of the people -- and I think the number is probably higher than that -- have a driver's license in Texas.

But if you're going to put a picture on a voter registration, that means that every single person that's registered to vote has to go back in, have a picture made, have the cost of putting it on there. So it's not only the cost --

SEN. ELLIS: Let me try it a different way. Do you think that more people who are registered to vote -- you think that more people who are registered to vote would have the voter registration card than a driver's license?

SEN. FRASER: Say it again. Do it one more time.

SEN. ELLIS: Do you -- would you agree that more people --

CHAIRMAN DUNCAN: Senator? Senator Ellis, y'all are talking over each other. If you --

SEN. ELLIS: Oh, are we? Should I back up?

CHAIRMAN DUNCAN: Yeah -- no. No. Just --

SEN. ELLIS: I'll talk slower.

CHAIRMAN DUNCAN: -- when he starts to

answer the question, let him answer it and then ask another question so only one person is speaking at a time.

SEN. ELLIS: Okay.

CHAIRMAN DUNCAN: Thank you.

SEN. ELLIS: Are you through?

SEN. FRASER: I'm not even sure what the question was.

SEN. ELLIS: The question is, would you agree that more people who vote have a voter registration card than a driver's license? They'd have to because you've got to -- you're supposed to go get a voter registration to be able to vote.

SEN. FRASER: Can I answer your question?

SEN. ELLIS: Yeah.

SEN. FRASER: I'm -- I'm sure everyone at some point were mailed one, but it has been years since I walked in with a voter registration card. I show my driver's license when I vote, and I would say probably that is -- do you show yours, or do you show your driver's license?

SEN. ELLIS: I show my driver's license.

SEN. FRASER: Well, there's -- but you have -- you probably were mailed a voter registration.

SEN. ELLIS: I have both.

SEN. FRASER: Okay.

SEN. ELLIS: Let me ask you this: There's an article in today's paper. It says nearly 650,000 Texans who refuse to pay surcharge penalties for drunken driving, no insurance, and other violations are being offered a one-time amnesty by the state. Those offered amnesty represent just over half of the estimated 1.2 million Texans in default. It talks about what they owe the state. But all of these folks who are in default, because we balanced the budget in '03 with surcharges for people who have a license, all have had their licenses suspended for not paying. So would that concern you any that, at least, according to folks who go get amnesty, that's 1.2 million. That would be more than that. There's 1.2 million owes the state X amount. That's what this article is about.

But would you concede it ought to be a problem because we've got a lot of people who had a driver's license, I assume the one's who owe the surcharges are -- you know, maybe a disproportionate number of them are folks who didn't have the money to pay the surcharges. Maybe some of them were just civil libertarians, didn't like the bill and wouldn't pay it period. But a lot of them are probably working-class people who can't pay it. So at least over 1.2 million

Texans since 2003 have gotten their licenses suspended, so they will no longer have a valid driver's license that they could use to go and vote like you and I do. Does that concern you?

SEN. FRASER: Well, first of all, if -- if some reason it's a felony, that -- of the crime that they're not paying for, I'm not sure that they -- I guess I'd question whether they're eligible. I don't know the answer. We'd ask the Secretary of State that.

SEN. ELLIS: I don't think --

SEN. FRASER: But the easy answer to your question is, we're going to give them an ID free. So if they've lost their driver's license, all they got to do is go back down and get a free ID. We'll hand them a new one.

SEN. ELLIS: So you think the over 1.2 million people who had their licenses suspended because of the surcharges this legislature put on them in 2003 is not -- they haven't been convicted of a -- of a felony. That's not on their record, but their license has been suspended. They're being offered amnesty, according to the article in today's paper. You think that those folks would go and get this new ID? You don't think they'd be worried about showing up and somebody saying, "Hey, by the way, now that I know where

you are, I want my money. I want some of this 1. -- $1.1 billion that you owe to the state"?

SEN. FRASER: I'm not advised.

SEN. ELLIS: Okay. One distinction, obviously, is these people still have a constitutional right to be able to vote.

One last point. On the exemption for the elderly, I don't know if I'm reading this right or not, but in your mind, is that a one-time exemption or would people over -- I think you and Senator West were going through the age deal earlier, and we have to find out from the Secretary of State which one of you hits 70 first. But if you have -- the way I read your bill, if you don't hit 70 before that date in January, I believe, of 2012, then it wouldn't apply. So anybody on this floor who will be over 70 at some point or any of your constituents who will hit 70 after that date in January of 2012, would not have that exemption. Is that correct?

SEN. FRASER: Yes.

SEN. ELLIS: So your intent is that one time.

SEN. FRASER: No, it's not a one-time at all.

SEN. ELLIS: Continuous for people who are

already 70 after January of 2012?

SEN. FRASER: If you're 70 on January 1, 2012, you will be subject to current law the rest of your life.

SEN. ELLIS: Okay. I want to make sure that's clear, because some folks have --

SEN. FRASER: If you're 70 on that --

SEN. ELLIS: -- called my office from AARP --

SEN. FRASER: Yes.

SEN. ELLIS: Okay.

SEN. FRASER: Yes.

SEN. ELLIS: So it's not for all people over 70. Just those who will hit 70 by January of 2012.

SEN. FRASER: If you're 70 on January 1, 2012, you will be subject to the -- the -- not be subject to these provisions. You basically will be operating under current law for the rest of your life.

SEN. ELLIS: Are you confident, Senator, that your bill would not have a disparate impact on the elderly, on women, on those that are physically challenged, on racial ethnic minorities?

SEN. FRASER: I am --

SEN. ELLIS: Are you confident?

SEN. FRASER: -- absolutely sure. I would

TX_00000556

not have filed the bill if I had thought it -- I want to make sure that every person in the state has a right to vote. The -- not -- you know, the right that we extend them, they should have that, and I do not believe that in any way we're impacting that and that -- that -- you know, I want to make sure that the groups you're talking about, you know, women, minority, elderly, that they all have the right to vote; and I believe my bill does that.

SEN. ELLIS: Okay. And I know that's your intent.

SEN. FRASER: Yes.

SEN. ELLIS: But you're confident that it will have no impact?

SEN. FRASER: I'm very confident.

SEN. ELLIS: Okay. To that end, would you have a problem with putting a provision in this bill so that the Secretary of State would do an annual report on whether or not this bill has had a disparate impact?

SEN. FRASER: I think we're going to get our report back from the -- assuming it gets to the Supreme Court and Department of Justice, I believe we'll get our report card from that. And then through time, if there are -- and I'm going to go back to the examples of Indiana and Georgia. To my knowledge, there has never been a person that has reported that had a

problem -- came forward because they had a problem with the laws they've, you know, implemented. We're doing exactly the same thing.

So I think you and I, as legislators, if there's a problem, will hear about it. And I would not want to put the burden on an agency. You know, if we hear about it, then we can do that in the future.

SEN. ELLIS: Maybe I'm just at a loss. If you -- I know your intent, and you are confident your bill will not have a disproportionate impact on certain groups. I mean, were the concern be the methodology, you could design that. But what would be wrong with the Secretary of State doing an annual report on whether or not this bill has a disproportionate impact on any groups of people so that we know? What -- I mean, you know, we -- oftentimes we pass -- I think we even have a -- I think it might have been Shapleigh who put it in some time ago, when we do a tax bill as a requirement, that we have LBB do a disparate impact statement just so we know because as you know, I mean, we're tinkering with a constitutional right.

And, Senator, I might add, we're in a state -- well, you know the history. I mean, initially, you had to be a property owner to vote or you had to be a male to vote, had to be a certain color to vote. Now,

over time, that has gotten better; but in our southern states, in particular, it has not been an easy journey to get to where we are. So what -- what would be wrong with just simply coming up with some simple methodology and let the Secretary of State do that?

SEN. FRASER: We have a simple methodology. It's called going into a session on the second Tuesday of every -- you know, every odd year. And you, as my desk mate, sitting beside me, I feel very comfortable that we'll -- we'll get that -- you know, we'll look at it every couple of years. So I -- I think the fact that we come back in, we're going to be given the opportunity every two years to -- to re-examine. And there will be discussion about this, of whether it's working or not.

SEN. ELLIS: To implement your bill, you're going to use federal money to be able to do it. Where would that money be used if it was not going to be used to implement this new system?

SEN. FRASER: Well, obviously -- and, again, I don't want to speak for the Secretary of State's office. When they're here, they can give you an ideal. But if there's a pretty good-sized pot of money that's sitting there that we haven't spent yet and we're -- you know, we're pretty good about being

creative about, you know, where you spend money. So I'm assuming that money is restrictive about where they can spend it, and I think probably this is a -- an application where it fits.

And I guess to answer to your question, I don't know. You can ask them, but I think this is a good place to spend it.

SEN. ELLIS: Would a new change go into effect in the next cycle?

SEN. FRASER: I'm sorry. Do that again.

SEN. ELLIS: With a new election change, a major requirement going into place for the next cycle with new districts, you and I have new districts, do you think it would make sense to give people the ability to register on that day with the photo ID you're requiring?

SEN. FRASER: No.

SEN. ELLIS: So could you go in and register on that day because some people are just maybe confused about this new requirement we're putting in place?

SEN. FRASER: We're going to spend a lot of time and hopefully dollars educating both the public and the -- the workers, and I think the system will work very well like it is.

SEN. ELLIS: Your bill looks -- I mean,

it's obviously a bit more stringent, bit more onerous than the bill you had last session. And based on the questions with you and, I think, Senator Van de Putte earlier, it looks like this bill is also more stringent than the Indiana bill that you modeled it after.

SEN. FRASER: That -- you missed the conversation we just had with -- with Senator Van de Putte. That is not the case. It actually is -- is a very, very small change between --

SEN. ELLIS: They take student --

SEN. FRASER: Huh?

SEN. ELLIS: They take student IDs --

SEN. FRASER: Well, I --

SEN. ELLIS: -- in Indiana?

SEN. FRASER: We -- we have four forms of IDs in this bill that we're accepting, but we're also listening to the debate. Indiana has six forms. Georgia I think expands it to about eight. So it's the number -- the type of, but they're all photo -- government-issued photo IDs.

SEN. ELLIS: Okay. So I guess when I say it's more onerous, there are more people in Texas who would have a student ID than a passport.

SEN. FRASER: Not advised.

SEN. ELLIS: Okay. Do you know how many

Americans have a passport?

SEN. FRASER: Not advised.

SEN. ELLIS: Well, I know from the press counts, you and I have one. But -- but I'll just tell you --

SEN. FRASER: We don't -- we don't talk about that.

(Laughter)

SEN. ELLIS: We've gone to a few places together.

Six percent of the people, I think, in America have passports. I think about the lowest percentage for most nations in the top 20, 6 percent of the people in America have passports. So I guess I'm saying, why would you choose that as one of your forms of ID as opposed to a student ID when you know we have problems getting young people sometimes to focus for more than a week? But folks who have a passport, you've got to be fairly worldly, shall we say, to go get a passport. And if the number is 6 percent in America, I'm just guessing less than 6 percent of the people in Texas have a passport.

SEN. FRASER: We know the people that are issuing the passports. We don't know where all the student IDs are coming from because not all student IDs

are issued with, you know, our -- our input. So the easy answer to that is that we want to make sure that we have something that is easily recognizable to the poll worker, and we can verify that it is -- it is valid.

SEN. ELLIS: What if we tried to put in a student ID from a state institution so at least we did that.

SEN. FRASER: Senator, if you want to offer amendments, as I told Senator Gallegos, I draw them up, get it to you where I can look at it and get plenty of time to look at it. There's -- you know, we're going to look at every amendment. If you -- you know, you can throw anything out. We'll discuss it.

But, I mean, the thing we're trying to do is we're trying to make it easy as possible on the Secretary of State and the poll worker as we implement, making sure that it's easily identifiable but also, you know, is good public policy.

SEN. ELLIS: Well, I'm just asking -- now, I hate to take your time, but, I mean, you -- you put it on the fast track. I mean, I -- I'd like to be working on the budget or something else, but --

SEN. FRASER: I didn't put it --

SEN. ELLIS: -- since you put it on the fast track.

SEN. FRASER: I didn't put it on the fast track. I'm -- you know, I did not put it on the fast track. I think the -- the person in the center office put it on a -- as an emergency bill and --

SEN. ELLIS: So you really don't want to do this, do you?

SEN. FRASER: I am standing here explaining it to you because I think it's good public policy.

SEN. ELLIS: I'll leave you alone after this one.

But based on the election results of the last cycle, what fraud will your side of the aisle be worried about? Senator Whitmire raised that with me the other day. I'm saying this: As well as your side did, seems like my side ought to be a little bit more worried about if there was some fraud.

SEN. FRASER: I think if you look at the polling in your district, your district is worried because they're telling you you need to vote for it; and I'm telling you, you're on the wrong side of this issue.

SEN. ELLIS: I respectfully would say you ought to be a little careful with that notion of what polling data says. I'm willing to bet you, Troy, when our predecessors stood on this floor and sat in these

seats and passed most of the restrictions, that at some point were in state law, the polling data indicated they were on the right side of history; but you and I know they were on the wrong side of it.

SEN. FRASER: All I can tell you is the question's pretty straightforward. It said -- they asked the people in your area, "Should you have to show a photo ID when you vote?" And the number across, Republican, Democrat, Hispanic, African American, others, were overwhelming.

SEN. ELLIS: Well, let me ask you this: If I come up with some polling data that says they would support same-day registration, recognizing student ID, exempting people over 70 forever, not just for those who hit 70 before the next election cycle, to what extent would you be voting based on what the polling says?

SEN. FRASER: Well, come -- come forward with your data. But I can tell you the things you've mentioned, the only one that is applicable to this bill is the -- the elderly because the same-day voting, those other things, that's another issue for another day. Doesn't fit on this bill.

SEN. ELLIS: Thank you.

CHAIRMAN DUNCAN: Chair recognizes Senator Zaffirini.

SEN. ZAFFIRINI: Thank you, Mr. President -- or Mr. Chairman.

Senator Fraser, my first questions will focus on the criminal justice impact, if you have a copy of that.

SEN. FRASER: Well, excuse me, before you -- what your first question should be, do I still have my thick book that you were impressed with last time. My --

SEN. ZAFFIRINI: Yes. I was --

SEN. FRASER: I reread the data last night that you were going to instruct your staff asking them why you didn't have one.

SEN. ZAFFIRINI: Well, good. I wish you had it again.

SEN. FRASER: I do have it.

SEN. ZAFFIRINI: Good.

SEN. FRASER: Right here.

SEN. ZAFFIRINI: Good.

SEN. FRASER: I was -- oh, go ahead, please.

SEN. ZAFFIRINI: But do you have a copy of your criminal justice impact statement?

SEN. FRASER: I do now.

SEN. ZAFFIRINI: My first questions will

focus on that.

In the first paragraph, you'll see that it states very clearly that the punishment for attempting to vote illegally would be enhanced from a Class A misdemeanor to a state jail felony, and the punishment for illegal voting would be enhanced from a third degree felony to a second degree felony. What would be the impact on our state budget of increasing those penalties?

SEN. FRASER: I'm sorry. I'm not advised as the impact on the budget, as you know. You're on finance, I'm not. You would know that.

The second question I'm assuming you're asking is, why we would consider doing this? Actually, these suggestions were brought forward by Democratic members of your delegation that said, "Why don't we go ahead and increase it?" So we increased the penalties for fraud. So the recommendations on doing this, it actually was across the board. We had people on both sides, but there was recommendations that we increase these penalties.

The impact of the cost to the budget, I'm sorry, I'm not advised. My job is to make sure the public is well served, and if someone commits fraud by -- by voter impersonation, that the penalties are

strict.

SEN. ZAFFIRINI: But I am concerned about this, Senator, and I don't know what Democrat or what Republican asked you to make those changes. I was not privy to that conversation.

But if you look at the last paragraph, it says: Increasing the penalty for any criminal offense is expected to result in increased demands upon the correctional resources of counties or of the state due to longer terms of probation, of longer terms of confinement and county jails or prison. And then it also states: When an offense is changed from a misdemeanor to a felony, there is a transfer of the burden of confinement of convicted offenders from the counties to the state.

So earlier there was senators who talked about unfunded mandates for the counties, but in this case, we are -- we seem to be relieving the county of some of its burden but then increasing the burden to the state. And my question remains: At what cost?

Now, this bill, were it before the Finance Committee, we would have a fiscal note; but because it's not, it's because it's before the Committee of the Whole. We are restricted to the fiscal note that we have here, and it's strange that we don't have a

connection between the cost of the criminal justice impact and the fiscal note. It seems that there's two independent documents, as they should be, but it seems to me, that the fiscal note should reflect the cost that is defined or, at least, specified in the criminal justice impact statement.

SEN. FRASER: Well, and I think the easy answer to that -- I'll -- if someone else, if -- we may defer to Senator Williams, if he wanted to comment, or another member.

But I think the easy answer to this is that if we implement the photo ID, it's pretty straightforward, that someone -- if they're going in, if they have a driver's license and they're -- you're attempting to vote, that there's a good assumption that the driver's license is valid, that they are who they say they are. So I'm -- we're hoping that the deterrent will be that people will not try to vote fraudulently, that the ones that are voting will be valid voters, and we don't have a lot of people going to prison because hopefully, they won't try to vote illegally. I -- that's the hope.

SEN. ZAFFIRINI: Well, actually, Senator, that is why some of us are opposed to this bill because we don't understand the problem that has been defined.

For example, in that same paragraph, it says: In fiscal year 2010, less than five people were under parole or supervision for illegal voting. In fiscal year 2010, five offenders were placed on community supervision, and less than five offenders were released from community supervision for illegal voting or attempting to vote illegally; and then more important, in fiscal year 2010, less than five people were arrested for illegal voting or attempting to vote illegally.

So it seems to me that this criminal justice impact statement makes the point that there isn't a problem, especially if you look at the last sentence: It is assumed the number of offenders convicted under this statute would not result in a significant impact on the programs and workload of state corrections agencies or on the demand for resources and services of those agencies. So if they don't see an increased demand in this area because they don't see people being arrested, then where's the problem?

SEN. FRASER: Well, and I guess I just disagree with your analysis of this, is that voter fraud, under current law, that our laws are so weak, it's virtually impossible to -- to catch one and convict; and that's the problem we're trying to address.

SEN. ZAFFIRINI: Well, okay, Senator.

Thank you.

My next questions will focus on the fiscal note. Do you have a copy of the fiscal note?

SEN. FRASER: I do. Somewhere.

SEN. ZAFFIRINI: I'll wait till you get it.

SEN. FRASER: Yes.

SEN. ZAFFIRINI: You have it?

SEN. FRASER: I have.

SEN. ZAFFIRINI: So the fiscal note shows $2 million but all in fiscal year 2012. Why aren't there recurring costs? Is that because the photo ID card is issued in perpetuity, or it doesn't have to be renewed?

SEN. FRASER: Senator, again, you're -- you're a member of finance who would know. You know, this comes from LBB which did consultation with the affected parties, which are Secretary of State, DPS. We're going to have expert witnesses who will come up in a minute --

SEN. ZAFFIRINI: Okay.

SEN. FRASER: -- and they will explain how they delivered that data. I think probably what you're going to hear from them is that a lot of the initial cost would be in the education of the -- the -- the

Secretary of State educating both voters and poll workers and any initial -- the free cards that we're giving out, there will be more, probably, the first year than other years. I'm -- I'm assuming that's it, but I think I'd ask that question of the Secretary of State and DPS.

SEN. ZAFFIRINI: Well, but, again, the fiscal note is submitted to the chair of the committee that hears the bill. You'll notice at the top of Page 1, it is directed to Robert Duncan, chair of the Senate Committee of the Whole, not to Senator Ogden, chair of Finance. And so it is not for the Finance Committee to consider the costs and the implications of these policy changes, but it's up to the Committee of the Whole; and we are the ones who have this fiscal note.

And I challenged the fiscal note last time. Remember it was zero, and I couldn't believe it? And I asked you questions about that, and I just couldn't believe it. And so now, all of a sudden, it's a fairly similar bill. Many would say more restrictive, but now it has a fiscal note of $2 million.

And did you say earlier, Senator, that this cost would be covered by HAVA funds?

SEN. FRASER: And -- and the difference

between this year and two years ago, I think the assumption last year -- two years ago is that they would just be able to use the HAVA funds. And, again, I think you probably should ask the Secretary of State.

I believe since then, they have made a request of HAVA requesting that, and HAVA's response, I believe, is that they will wait until the bill is passed. And when the bill is passed, then they will make a determination on whether you could use the -- the money. But we're also looking at history of other states. They have been allowed to use HAVA money.

But, again, I think I'd ask the Secretary of State that question.

SEN. ZAFFIRINI: Well, as the author of this bill, would you prefer that the state pay this $2 million in costs, or would you prefer that we use federal funds?

SEN. FRASER: I would prefer the money that's sitting over here in a pot at the Secretary of State -- that has not been spent; obviously, I'd much rather use that.

SEN. ZAFFIRINI: Do you know, Senator, what the HAVA funds are used for?

SEN. FRASER: For educating -- it's the -- help America vote. It's to encourage voting.

SEN. ZAFFIRINI: So basically, if we use the HAVA funds for this purpose, we are repurposing the HAVA funds that are already there and intended for things like new equipment and ongoing training programs?

SEN. FRASER: Senator, I don't think -- I think the decision will be made by the federal agency that sent us the money, the HAVA people; and if they've already authorized other states to use this for voter -- it's for voter education, and this would fall in the area of voter education, I would assume.

SEN. ZAFFIRINI: Well, it's my understanding, Senator, that it is for the state to submit a plan. The federal government doesn't tell us what to do in that area, not that it doesn't tell us in other areas.

SEN. FRASER: And, Senator, I hate -- it's the same answer I've given multiple people before, is that the Secretary of State will be coming up. I think that's the person to address this.

SEN. ZAFFIRINI: Do you have any suggestions regarding the training that is referred to on Page 2 of the fiscal note, local government impact?

SEN. FRASER: I do not. That, again, will -- it is the job of the Secretary of State to administer that, recommend the training, and I believe

they have the authority under current law.

SEN. ZAFFIRINI: And you have no information, then, about any recurring costs that we should worry about?

SEN. FRASER: I have none.

SEN. ZAFFIRINI: And to whom would you refer us on that issue?

SEN. FRASER: On recurring costs?

SEN. ZAFFIRINI: Uh-huh.

SEN. FRASER: Could you give me an example? I don't -- I don't think I --

SEN. ZAFFIRINI: Well, the fiscal note shows all the expense in fiscal year 2012, and then it doesn't show any other expenses --

SEN. FRASER: I --

SEN. ZAFFIRINI: -- beyond that.

SEN. FRASER: I would ask the Secretary of State or DPS.

SEN. ZAFFIRINI: It just seems to me, Senator, that there will be recurring costs because one example would be the State's responsibility to provide free photo ID cards on a recurring basis to the significant portion of our population that moves regularly. They move from one part of the state to another, and they might need a different card in that

area. And that would be a recurring cost, would it not?

SEN. FRASER: Senator, since 2006, there have only been 37,000 people that registered to vote that did not have a current driver's license. That -- that's in the last five years. So the assumption is, the number that is coming into the system that would not have a card, the number is very low. The cost of that card is not a huge number. So actually, the amount that it would cost to take care of them is a -- not a large number.

SEN. ZAFFIRINI: What I'm worried about, Senator, as a member of the Finance Committee, is unintended consequences and unexpected costs. Not unexpected because we don't foresee them and can't identify them, but because of the criminal justice impact statement and because of the fiscal note that we have that simply don't address these issues.

For example, Line 12, Page 12 of the bill, you refer to the cost of the get-out-the-vote efforts; and basically, the fiscal note states: The analysis is incomplete because, quote, it is not known how many voter registration drives or other activities designed to expand voter registration would occur. So we don't even have an estimated cost of one voter registration drive. And if it is our intent to ensure that we have

more, we're not considering the cost, it seems to me that we are being irresponsible in terms of identifying the exact cost or the best estimated cost of this bill.

SEN. FRASER: And we are -- have the benefit of not being the first one to implement this. We don't have to reinvent the wheel. We can look at the history of states that have implemented, like Indiana, Georgia, and others, look at common things that have happened there. We're going to have a person from Indiana here. I think it -- that would probably be a question you might ask, is the reoccurring cost, because they've had this in effect. I believe they passed it in 2006.

SEN. ZAFFIRINI: But, of course, when we talk about other states, including Indiana, we -- Texas is much bigger and much more diverse; and so our problems will be very different, our challenges will be very different, and I believe our costs will be significantly higher. But, again, I'm concerned as a member of the Finance Committee.

But speaking of costs related to other states, are you aware, Senator, that in many, if not all, of the states that have implemented photo ID bills, including those with less restrictive laws than the one that you propose, they have been challenged in court.

What costs are we anticipating regarding being challenged in court because of this bill?

SEN. FRASER: I'm -- I'm not advised, that you're making an assumption we'll be challenged, and I'm -- I do not -- I'm not advised.

SEN. ZAFFIRINI: I think it's a pretty safe assumption. Indiana was challenged, and as I said, many, if not all, of the states that have implemented these bills have been challenged.

So I think, again, as members of the Finance Committee, as members of the Senate, even those who are not members of the Finance Committee, should look at that as a possibility and certainly should consider the costs. Is this where we want to spend our money? Even the $2 million. What if HAVA funds are not used for this purpose? Is this where we want to spend the $2 million and significantly more in defending the bill instead of addressing the other issues that we are facing right now because of economic crisis in Texas?

SEN. FRASER: Was that a question?

SEN. ZAFFIRINI: Yes. Is it?

SEN. FRASER: Is what? Should --

SEN. ZAFFIRINI: Is this where we want to spend our money?

SEN. FRASER: It's -- the decision on

that, you know, I'm not on Finance, you are. You're -- you're -- you're asked to make those hard decisions. So that, I would -- you know, that'll go back to the Finance Committee.

SEN. ZAFFIRINI: Okay.

SEN. FRASER: But you're also making an assumption that there's going to be an expense, which I don't think there will be one because I think we'll be able to spend the HAVA funds.

SEN. ZAFFIRINI: All right. Well, we disagree on those. I think those assumptions are fairly safe.

Senator Fraser, Senator Van de Putte distributed this map earlier. Have you seen this map?

SEN. FRASER: I have not.

SEN. ZAFFIRINI: Basically, it shows her -- if my -- Mr. Chairman?

CHAIRMAN DUNCAN: Senator Zaffirini?

SEN. ZAFFIRINI: If I may direct a question to Senator Van de Putte?

CHAIRMAN DUNCAN: Pardon?

SEN. ZAFFIRINI: If I may direct a question to Senator Van de Putte?

CHAIRMAN DUNCAN: Senator Van de Putte doesn't have the floor.

SEN. ZAFFIRINI: That's why I'm asking.

SEN. FRASER: And -- and I won't yield.

SEN. ZAFFIRINI: You won't yield?

SEN. FRASER: No, I will not yield.

SEN. ZAFFIRINI: All right.

SEN. FRASER: You -- I'll be glad to answer the question.

SEN. ZAFFIRINI: All right. I simply wanted to ask if she planned to distribute this, and if so, I wasn't going to address it.

CHAIRMAN DUNCAN: If you want to introduce the exhibit, you're welcome to do so. We've marked it, I think.

SEN. ZAFFIRINI: All right. Then I would like --

SEN. FRASER: Senator, I'm sorry. I have a map in front of me. I had not seen it, so --

SEN. ZAFFIRINI: All right. Well, Senator Van de Putte has indicated that I can request permission to introduce this as an exhibit.

CHAIRMAN DUNCAN: Okay. I think it's been marked, and would you -- would you bring it down, please?

SEN. ZAFFIRINI: I believe Senator Van de Putte has a clean copy. And this is a map that Senator

Van de Putte had developed, and it's titled, "Counties With Department of Public Safety Driver's License Office Closures."

My question, Senator Fraser, would focus on my district. For example, in my district, which comprises 16 counties and part of Bexar, Northeast Bexar, there is one county that has wheelchair accessibility barriers; there are two counties that have absolutely no driver's license offices; there are four that have offices that are temporarily closed; and there is one that has an office that is open three days or fewer each week. And so you can see the accessibility issues that we're dealing with, and you can -- when you get the map -- oh, you do have a copy of the map. You can see the difference throughout the state. There are some states that you can see have a lot of pink, a lot of blue, a lot of green, and then -- counties, rather -- and there are others that are just white, that have absolutely no barriers.

So, Senator Fraser, looking at this map, are you concerned that this bill would impact certain counties that have a problem related to the accessibility to driver's license offices?

CHAIRMAN DUNCAN: Senator Zaffirini, if I could -- before you get an answer to that question,

let's get it in the record so everybody knows what we're talking about.

SEN. ZAFFIRINI: All right.

CHAIRMAN DUNCAN: It's Exhibit --

SEN. ZAFFIRINI: Mr. Chairman?

CHAIRMAN DUNCAN: It's Exhibit 6, I believe. Is that correct? It's not the two that you've previously submitted.

SEN. ZAFFIRINI: No.

CHAIRMAN DUNCAN: Is that correct?

SEN. ZAFFIRINI: It's Exhibit 6, then, according to --

CHAIRMAN DUNCAN: Okay.

SEN. NELSON: Mr. Chairman?

CHAIRMAN DUNCAN: And for what purpose?

SEN. NELSON: It's me, and to ask Senator Zaffirini a question or to point out that some of us do not have a copy of this map.

CHAIRMAN DUNCAN: Okay. Well, that would be a parliamentary inquiry and --

SEN. NELSON: Then I would like to make that.

CHAIRMAN DUNCAN: That's what I'm trying to clear up, is I'm trying to get the exhibit in so that we can distribute it so that everyone can understand

what the questions are.

Would you identify it, please? What's the title of it?

SEN. ZAFFIRINI: Yes. It is titled, "Counties with Department of Public Safety Driver's License Office Closures." It is a map of Texas showing this -- these issues, and it was developed by Senator Van de Putte. I had assumed that she had introduced it into the record or had planned to, but I'm happy to do it.

CHAIRMAN DUNCAN: Okay. Do we have copies?

SEN. NELSON: We don't. Only the Democrats do.

CHAIRMAN DUNCAN: Okay. Well, here's what I would suggest so that other members have an opportunity to follow your questions and the answers, that we at least get copies of that exhibit and distribute it, if we could do that. And then, so if we could defer on that until we get that done, Senator --

SEN. ZAFFIRINI: Certainly.

CHAIRMAN DUNCAN: -- that would be helpful.

SEN. ZAFFIRINI: Absolutely. No problem, Mr. Chairman.

Moving right along. I do have exhibit -- I guess it's 4 --

CHAIRMAN DUNCAN: We do have --

SEN. ZAFFIRINI: -- and Exhibit No. 5 that I'd like to enter into the record --

CHAIRMAN DUNCAN: Okay.

SEN. ZAFFIRINI: -- at this time. And I'll wait until they're distributed, if you -- if I may be permitted.

CHAIRMAN DUNCAN: Would you identify Exhibit 4, please?

SEN. ZAFFIRINI: Certainly. Exhibit 4 is a copy of a driver's license with personal information obliterated.

CHAIRMAN DUNCAN: Thank you. And Exhibit 5?

SEN. ZAFFIRINI: Exhibit 5 is a letter directed to me, which I received today, from Spencer Overton, professor of law at the George Washington University Law School and a member of the Carter-Baker Commission on federal election reform.

CHAIRMAN DUNCAN: All right. Those exhibits will be received in the record and distributed to the members.

(Exhibit Nos. 4 and 5 marked and admitted)

CHAIRMAN DUNCAN: Senator, you're -- you can --

SEN. ZAFFIRINI: Thank you.

CHAIRMAN DUNCAN: -- continue on those exhibits.

SEN. ZAFFIRINI: Senator Fraser, thank you for your courtesy and for your patience and your stamina. I'm impressed, as always.

On Page 4 of your bill, Senator Fraser, Line 8, it states that "and the voter's identity can be verified from the documentation presented under Subsection (b), the voter shall be accepted for voting." Can you describe what training the poll workers would receive to ensure that they are trained in identification verification?

SEN. FRASER: Senator, you're moving faster than I can. I'm on Page 4. Where are you referring?

SEN. ZAFFIRINI: Line 8 of the bill. Well, basically, that's all it says, that if the voter's -- that "If the voter's identity can be verified from the documentation presented, the voter shall be accepted for voting." That's the only part that I'm quoting, and then I'm asking what kind of training the poll workers would undergo in identification

verification.

SEN. FRASER: Great question to the Secretary of State.

SEN. ZAFFIRINI: To the Secretary of State.

Do you worry at all, Senator, and I know -- I believe it was Senator Davis who asked this question earlier: Do you worry at all about people who don't look like their driver's licenses at all?

SEN. FRASER: I'm sorry. I -- there's so many things to worry about in life, that's -- you know, the -- the question you're asking, I think, is covered by the Secretary of State; and I believe they would make a determination.

SEN. ZAFFIRINI: Well, Senator Fraser, I have distributed Exhibit 4. Would you take a good look at that, please?

And, Members, I ask you to please look at my Exhibit 4 and look at the photograph of this driver's license. Has anyone of you ever seen this person before? He looks familiar?

SEN. FRASER: Yes.

SEN. ZAFFIRINI: Can you identify this person? I'd like to ask this person to stand.

(Unidentified person stands)

SEN. ZAFFIRINI: Take a good look. Look at that picture. Look at him. That's right. That -- and this picture was taken in 2006. Now, if I didn't know Ray, who is my chief of staff, and I were to look at this picture, I would say, "You're not verified. You can't vote. You're an imposter." Look at the difference. Total difference, and yet this photograph was taken in 2006, and so it's current, it's valid. And you can see if we who know him and have seen him, see him every day, don't recognize his picture, imagine what a poll worker would do with a driver's license like this.

UNIDENTIFIED SPEAKER: (Mic off)

SEN. ZAFFIRINI: He's not a Laredoan, so don't worry about it.

(Laughter)

SEN. ZAFFIRINI: Senator Fraser, do you understand why we worry?

(Senator Shapiro speaking without mic)

SEN. ZAFFIRINI: Well, it's a very good point to make, Senator Shapiro, that we should look at our composite photos; and most of us don't look like them, and yet they have the dates like 2008.

SEN. WEST: We keep using those pictures.

SEN. ZAFFIRINI: 2009. We sure keep using

those pictures, so what would happen?

My next question, Senator Fraser, focuses on Exhibit 5.

And, Members, you have a copy of Exhibit 5.

And it is a letter directed to me from Spencer Overton, professor of law from George Washington University. And basically, I received this letter from Professor Overton today, and it directly addresses Senate Bill 14's inconsistency with the Carter-Baker Commission.

Specifically, the letter states that Professor Overton wrote this letter to, quote, Refute claims that Senate Bill 14 is consistent with the recommendations of the Carter-Baker Commission. And according to Professor Overton, quote, The Commissioners recommended requiring photo ID of voters only if state's assumed the responsibility to seek out citizens and provide them with an ID free of charge, if states assume the responsibility to seek out unregistered citizens and register them and automatically update the registration of citizens when they move, and if states allow citizens without a photo ID to vote by signing an affidavit under penalty of perjury for the first two federal elections following adoption of the photo ID.

Now, Senator Fraser, this bill does not meet any of these criteria. Is that correct? Under your bill, the state would not assume any of these responsibilities?

SEN. FRASER: Not advised.

SEN. ZAFFIRINI: Well, I assure you, Senator, that it does not. But Professor --

SEN. FRASER: I disagree.

SEN. ZAFFIRINI: Could you show me it does, where in your bill it would allow this?

SEN. FRASER: I'm not advised. This -- there's been no representation made that we are modeling this bill after the -- the Carter-Baker recommendations. This bill is moving forward as a bill that when someone votes, they will present an ID to show they are who they say they are. The bill that I'm passing we think will be approved by the Supreme Court and will be approved by Department of Justice.

SEN. ZAFFIRINI: Well, then, let me ask you a question. Where in your bill does it specify that the state would assume the responsibility to seek out citizens and provide them with an ID free of charge?

SEN. FRASER: I would think it would be your responsibility to show in the bill, you know, your -- the bill speaks for itself.

SEN. ZAFFIRINI: So you can't tell me if your bill does that?

SEN. FRASER: The bill speaks for itself. The language of the bill is very clear as to what the -- the issues we're addressing.

SEN. ZAFFIRINI: Okay. Do you know, Senator Fraser, if this -- under your bill, the state would assume the responsibility to seek out unregistered citizens and to register them and automatically update the registration of citizens when they move?

SEN. FRASER: I don't believe that is covered in my bill.

SEN. ZAFFIRINI: It is not.

And do you know, Senator Fraser, if your bill -- under your bill, the state would allow citizens without a photo ID to vote by signing an affidavit under penalty of perjury for the first two federal elections following adoption of the photo ID bill?

SEN. FRASER: Every person that votes will be required to have a photo ID.

SEN. ZAFFIRINI: Well, basically, it seems to me, my analysis is that Senate Bill 14, as introduced, does not meet these specifications of the Carter-Baker Commission.

And what's more, in this letter that you

have, Members, Professor Overton states that, quote, Even President Carter and Secretary Baker rejected the strict photo ID requirement initially adopted in Georgia after concluding it was discriminatory because it was costly or difficult for poor Georgians to obtain the identification for voting, unquote. But according to Professor Overton, quote, It devotes insufficient resources to address the burdens it would impose on Texas voters who lack photo ID.

SEN. FRASER: That is absolutely incorrect. The original observation -- the bill that was filed in Georgia was changed, and the bill that originally -- that is in law now, that was not their observation. And that was written in 2005. The bill was replaced 2008. That was not their observation.

SEN. ZAFFIRINI: Well --

SEN. FRASER: That it was -- I saw that comment made in a 2005 comment, but you're also making sure you don't take it out of context. And the -- the law that had been passed by Georgia was revisited. They passed a different law, and then that law was -- that bill was precleared by Department of Justice.

SEN. ZAFFIRINI: But it still required --

SEN. FRASER: So the bill he's --

SEN. ZAFFIRINI: -- photo ID.

SEN. FRASER: -- addressing is not law -- current law in Georgia.

SEN. ZAFFIRINI: But the Georgia law still requires a photo ID.

SEN. FRASER: Yes, it does.

SEN. ZAFFIRINI: It does.

And finally, Professor Overton closes with his statement that the current proposal for a photo ID law in Texas is inconsistent with the recommendations of the Carter-Baker Commission.

SEN. FRASER: I disagree with that.

SEN. ZAFFIRINI: Why, Senator?

SEN. FRASER: I just disagree with that.

SEN. ZAFFIRINI: Are there any specific points that you disagree with that he made or that I quoted in his letter?

SEN. FRASER: I'm -- you know, the letter that you're laying out is -- the first time I've seen it is just then. We're -- our bill is not -- we're not trying to model it after that, but the Carter-Baker Commission very clearly recommended a photo ID.

SEN. ZAFFIRINI: Well, Senator, the reason that we asked for this letter, we followed up on your early statement when you laid out the bill. And you referred to the Carter-Baker Commission, and it was

based on your statement that we followed up and did this immediate research and got this letter written to us.

SEN. FRASER: Will you show me where I referred to it in my opening statement?

SEN. ZAFFIRINI: Well, I don't have the transcript yet; but as I recall, you referred to it in your opening statement.

SEN. FRASER: Do you want me to read what I said again from the opening statement?

SEN. ZAFFIRINI: Yes, would you?

SEN. FRASER: I read two --

SEN. ZAFFIRINI: Your copy to the -- your reference to the Carter-Baker Commission report.

SEN. FRASER: I said, "The Carter-Baker Commission reaffirms the dangers. Elections are at the hard democracy. Americans are losing confidence in the fairness of elections, and while we do not face a crisis today, we need to address the problems of our electoral system. At the end of the day, there's considerable national evidence of in-person fraud; and regardless of whether one believes that voter impersonation is widespread or relatively rare, there can be no serious dispute that -- that real effect can be substantial because in a close election, even a small amount of fraud could take -- be the margin of difference."

SEN. ZAFFIRINI: Well, sir.

SEN. FRASER: That was a quote that was made. It was -- it was used not only there, but it is also used later in the Supreme Court decision.

SEN. ZAFFIRINI: Right. And, Senator Fraser, it is because I was surprised at that statement that we followed up, and it seems that that is in the report. But there is other information in addition to that, so I could turn around and say, "Well, are you taking it out of context?" I won't raise that question as a courtesy, but I could raise it.

But on the other hand, what I want to make very clear is that the reason we followed up was that you made this opening statement.

SEN. FRASER: Your letter is dated January the 24th. I made the statement this morning. Was -- did I make the statement, and then he -- he wrote the letter and sent it to you today?

SEN. ZAFFIRINI: Well, I requested it today, so that's perhaps a typo because we received it today. Let me check. We received it -- we received it this morning.

SEN. FRASER: Before I made the statement?

SEN. ZAFFIRINI: It should be January 25th.

SEN. FRASER: But you -- you said that you responded -- that you requested it after I made the statement in my --

SEN. ZAFFIRINI: I requested --

SEN. FRASER: -- opening comments.

SEN. ZAFFIRINI: I requested this information based on your opening statement, and I received this letter today. That's correct. Okay?

Thank you very much, Senator. I appreciate, as I said, your courtesy and your patience.

SEN. FRASER: Thank you.

CHAIRMAN DUNCAN: Members, we've been going for a while, and I think it would be -- we're kind of at a -- maybe getting close to a breaking point. Why don't we go ahead and take a ten-minute break and then reconvene, give the court reporter and staff a minute or two to rest. So a time certain, we'll stand at ease until 2:30.

(Recess: 2:21 p.m. to 2:34 p.m.)

CHAIRMAN DUNCAN: Senate Committee of the Whole will come back to order. Senator Hinojosa?

SEN. HINOJOSA: Thank you, Mr. Chairman.

Senator Fraser?

SEN. FRASER: These are actually pretty good.

SEN. HINOJOSA: Can you hear me?

SEN. FRASER: Yes, this is -- these are much better. Yes, I do. I can hear you.

SEN. HINOJOSA: I just have a few questions that I'd like to follow up on.

Do you know how many people are registered to vote here in the state of Texas?

SEN. FRASER: Oh, I do -- I'm sorry, I do not know.

SEN. HINOJOSA: Approximately, 13 million.

SEN. FRASER: Okay. 13, yeah. Okay.

SEN. HINOJOSA: Yeah. And do you know how many voted in the last election?

SEN. FRASER: No, I'm not advised on that either. I'm sorry.

SEN. HINOJOSA: Close to 5 million voters voted this last election. And do you know how many people were arrested or prosecuted or indicted for trying to use somebody else's voter registration card?

SEN. FRASER: I'm sorry, not -- no, I do not have that number.

SEN. HINOJOSA: None?

SEN. FRASER: I don't -- I don't have the number, I'm sorry. I'm not advised.

SEN. HINOJOSA: Well, do you have any

evidence?

SEN. FRASER: I'm sorry?

SEN. HINOJOSA: Do you have any evidence?

SEN. FRASER: Evidence?

SEN. HINOJOSA: Yeah, evidence to support your bill about voter fraud when they go to vote?

SEN. FRASER: Senator, you know the thing that we're trying to address here is that, as you know, it's virtually impossible to defect voter fraud because our current law makes it impossible not only to -- to verify that they're voting illegally, but even if you catch them, we don't have the ability to stop them from voting. So the -- the ability to stop someone today voting illegally is almost impossible in Texas. That's the thing that I'm trying to address with my bill, is that we believe if we make them show a voter ID, then we will know that they are who they represent themselves to be.

SEN. HINOJOSA: Actually, Senator Fraser, back home, most of the election judges know who the voters are in their precincts.

SEN. FRASER: Well, that's interesting. Back home, in the area you're from, most of the -- or a lot of the stories that I've seen reported to the media -- and actually, you've got two voter registrars

through your area that have endorsed this concept because they are -- they are having a problem with voter fraud, and I -- that actually -- I'm -- I'm responding to things I've read they've said in the media. But I believe there are numerous registrars that believe this is a -- a large problem.

SEN. HINOJOSA: Well, I hear what you're saying, but I don't see any evidence. There's a lot of anecdote, a lot of rumors and guessing and speculation, which I don't think it's a way to make good public policy.

Are you familiar with the Carter-Baker Commission on federal election reform?

SEN. FRASER: Senator, what are you -- I'm sorry. What --

SEN. HINOJOSA: Are you familiar with the Carter-Baker Commission on federal election reform?

SEN. FRASER: Yes, I am.

SEN. HINOJOSA: Okay. Are you aware that by putting a requirement of having a photo ID to be able to vote, that there are approximately 3 million registered voters in the state of Texas that do not have voter ID?

SEN. FRASER: I don't know where you get that number.

SEN. HINOJOSA: Well, if you look at 3 million people who are going -- who will be kept from voting as compared to you cannot show anybody getting prosecuted -- getting prosecuted and convicted voter fraud, that's one big difference, one big price to pay for a bill that you don't have any evidence to support there's voter fraud.

SEN. FRASER: One second, Senator. My -- my iPhone is interfering with my microphone.

The 3 million number, where do you get that?

SEN. HINOJOSA: That's the estimate by the Carter-Baker Commission on federal election reform that here in Texas --

SEN. FRASER: Can you -- can you show me where it says in that Commission report? I don't remember.

SEN. HINOJOSA: Yes, sir, it's a letter dated January 24th, 2011, from Professor Spencer Overton addressed to Senator Judy Zaffirini where he states that approximately 3 million Texas voters do not have photo ID.

SEN. FRASER: Senator, that is --

(Simultaneous speaking)

SEN. FRASER: -- pure speculation by that

gentleman. He has nothing to base that on, and that is not in reference to the Carter-Baker report. That is a estimation by some, you know, political hack that -- that y'all have asked to write a letter.

SEN. HINOJOSA: Well, actually, I thought it was the opposite. I thought your side was pure speculation. Thank you.

CHAIRMAN DUNCAN: The chair recognizes Senator Williams.

SEN. WILLIAMS: Thank you, Mr. Chairman.

Would Senator Fraser yield for some questions?

SEN. FRASER: I will yield.

SEN. WILLIAMS: Senator Fraser, there's several things that I wanted to clear up for the record.

The first, I'd like to make a reference back to the Secretary of State has recently sent this letter -- she sent it over today -- that indicated that there would be probably $2 million of the HAVA funds that would be available for voter education, to help fund the voter education efforts that we would have in connection with this bill. And it would be -- normally, it would be the Secretary of State's office who would develop what those problem programs are with taking into account our legislative intent about what we're trying

to accomplish. Is that right?

SEN. FRASER: Yes.

SEN. WILLIAMS: The other thing that I wanted to correct, for the record, Senator Watson opined earlier that a lot of this funding for these items had been struck in the budget, and actually, I went back and pulled a copy of the budget. I had not looked at this part, and so there were some budget riders that had expired and that were no longer relevant in the current budget. Those were struck. And under Strategy B.1.4, under elections improvement, administer Federal Help America Vote Act, we actually have, it looks like, a total of about $43 million over the next biennium that's been appropriated in the budget that Senator Ogden laid out for us earlier. So I just wanted to clear that up for the record because that's kind of been a moving target.

Another question that I had for you was the -- I wanted to go back, if I could, and -- and just touch on what my understanding after hearing all this questioning that's gone on, what your -- the purpose of your bill is -- really is to deter and detect fraud in-person voter fraud at the polls. Is that correct?

SEN. FRASER: That is correct.

SEN. WILLIAMS: Okay. And has the United

States Supreme Court -- I believe they've stated that it's been documented throughout our nation's history by respected historians and journalists, and they demonstrate not only that the risk of voter fraud is very real, but they could affect the outcome in a close election. Does Senate Bill 14 provide the kind of safeguard against that fraud that might be crucial in an election?

SEN. FRASER: Yes, it does, Senator.

SEN. WILLIAMS: Now, we've had some close elections, even in the Texas Legislature. I know over in the House right now, there is an election contest that's been -- for Senate, State House District 48. It's being contested. The last numbers that I saw from the Secretary of State showed that Donna Howard had won her seat by 12 votes, which amounts to .02 percent of all the votes cast in that race. And, of course, back in 2008, Linda Harper Brown up in Dallas County defeated her opponent by 19 votes, or .05 percent of the total votes cast in that race.

Are those the kind of close elections you think that the Supreme Court might have been referencing when they said in Crawford 533 U.S. at 11-12 that it's -- the threat's not only real, but it's actually -- you know, it demonstrates it's not real, but it could

affect the outcome of a close election?

SEN. FRASER: The answer is absolutely, yes, and it actually the -- it's even closer to home. Senator Jackson, when he was elected to the Texas House, ended up winning by seven votes.

SEN. WILLIAMS: Landslide Jackson --

SEN. FRASER: Landslide Jackson.

SEN. WILLIAMS: -- I think they called him.

SEN. FRASER: So if -- fraud, in an election like that, could have changed history.

SEN. WILLIAMS: Senator Fraser, Senate Bill 14 provides safeguards to protect the reliability and integrity of our voting system, especially those in close elections like we've just talked about?

SEN. FRASER: Yes.

SEN. WILLIAMS: Okay. I believe in this Crawford v. Marion, on Page 10, the Supreme Court brief, they quoted -- the United States Supreme Court quoted the Carter-Baker report that has been referenced here. And in that report, their quote was, "There's no evidence of extensive fraud in the U.S. elections or of multiple voting, but both occur, and it could affect the outcome of a close election. The electoral system cannot inspire public confidence if no safeguards exist

to deter or detect fraud or to confirm the identity of voters. Photo identification cards currently are needed to board a plane, enter federal buildings, and cash a check. Voting is equally important."

Is that your understanding? Is Senate Bill 14 designed to inspire that public confidence in close elections like --

SEN. FRASER: Yes, it is.

SEN. WILLIAMS: -- we talked about?

Senator Fraser, do you recall the testimony and exhibits that we provided in 2009 -- now it's been admitted earlier today as Exhibit 1 -- that detail the extensive voter fraud in Harris County and other areas of the state?

SEN. FRASER: Yes, I'm very familiar with it.

SEN. WILLIAMS: Okay. Senator, having listened to what I heard and just read a minute ago from the Carter-Baker Commission and the language that was adopted from them in the Supreme Court brief, are you aware of how difficult it is to not only to discover but to prosecute voter fraud?

SEN. FRASER: Yes, it is very difficult.

SEN. WILLIAMS: And having said that, do -- do you think that that's one of the reasons we

don't see many of these cases that are prosecuted because if someone is voting deceptively as someone else, it's going to be very difficult to discover that if they're successful?

SEN. FRASER: And that was recognized by the U.S. Supreme Court in their decision.

SEN. WILLIAMS: So are you offering Senate Bill 14 as a tool for the state of Texas to detect and deter this type of voter fraud and further inspire confidence in our voters and the voting system, to make sure that all Texans and all of our elections are conducted with the upmost integrity and equity to all Texans?

SEN. FRASER: Absolutely. That would be my reasoning.

SEN. WILLIAMS: Okay. Couple of things that I just think that it was important to get back into the record again about what the Supreme Court actually said in Crawford v. Marion; and all of this, of course, was included in the record last time.

I thought it was interesting that Justice Stevens comments about this. He said first, the state has an interest in deterring and detecting voter fraud. They have a valid interest in participating in a nationwide effort to improve and modernize the election

procedures that have been criticized as antiquated and inefficient, and the state, in that case, also argues that it has a particular interest in preventing voter fraud in response to a problem that is, in part, the product of its own maladministration; namely, that in the case -- in this case, Indiana's voter registration roles included a large number of people who were either deceased or no longer live in Indiana.

Now, Senator Fraser, when I look back at the record that we had introduced as Exhibit 1 today, didn't that record include many, many instances where we had people who were registered at fictitious addresses who had been voting or people who were deceased? I think my own brother came and testified that our grandfather had voted for 62 years after his death, and my grandmother had a very difficult time trying to get him taken off the voter roles and, in fact, had not been able to do so.

SEN. FRASER: Yes, I'm -- I'm -- remember that very well.

SEN. WILLIAMS: Okay. And so, you know, there's been a lot of talk about the burden on people, and Senator Davis made some very compelling and interesting remarks in her comments. But I would say that, you know, wouldn't you think that especially for

the elderly, which we've had a big focus on here today, of the inconvenience on elderly voters, people who are age 65, don't they have an opportunity to use a mail-in ballot and they completely bypass any restrictions that your bill or inconveniences that it might cause them?

SEN. FRASER: I'm actually surprised at the percentage now of people that do mail in ballots. That percentage continues to increase, and so someone that did have a problem getting to the polls -- and, you know, I gave the example last year of my -- my mother in the retirement center, that she couldn't get to the -- it was too much -- it's too hard for her to get to the polls, but she voted by mail. And there's -- there are people in that category, and we have that safeguard in Texas.

SEN. WILLIAMS: Well, and -- and I think we all care about everyone being able to exercise their constitutional right to vote, and along with the provisions that you have for people that are 70 and over plus the mail-in ballots and the fact that provisional ballots can be cast and allow people with expired licenses and that sort of thing the opportunity to prove up who they are, don't you think that addresses many of the concerns that have been raised here today?

SEN. FRASER: Absolutely. They -- and

that was our intent, is that obviously, we want to make sure everyone is afforded the -- the ability to vote, and we think we have those provisions in place so that all Texans, every Texan, will be allowed to vote.

SEN. WILLIAMS: Well, I -- I think it's also interesting, and you've noted several times today, that so far as we could determine from our research, there isn't a single voter in Indiana or Georgia who's raised the issue that they've been disenfranchised since those laws have been enacted. Is that true, to the best of your knowledge?

SEN. FRASER: To the best of my knowledge. And we have asked that question repeatedly, and to the best of our knowledge, we have -- not a single person has come forward in either state.

SEN. WILLIAMS: And I think it's -- you know, when I look at the syllabus of the Crawford v. Marion County election board case that went to the Texas Supreme Court, they note in the syllabus that there's no question about the legitimacy or importance of the State's interest in counting only eligible votes. And I think they go on to say that -- that requiring that and the fact that the cards in the Indiana case, as we're doing, they make those cards free. The inconvenience of going -- of gathering the required documents, posing for

a photograph, does not qualify as a substantial burden on most voters' right to vote or represent a significant increase over the usual burdens of voting. And I think that's interesting that that was noted.

And those provisions that we have are essentially -- in your bill, there are very similar provisions with respect to those matters. Correct?

SEN. FRASER: They -- yes, and I want to clarify. The Crawford case went to the U.S. Supreme Court, and those observations were made in the -- the majority opinion.

SEN. WILLIAMS: Now, they go on to say that it's generally applicable, nondiscriminatory voting regulation, it's universally applicable, it's imminently reasonable because the burden of acquiring, possessing, and showing a free photo identification is not a significant increase over the usual voting burdens, and the State's interest are sufficient to sustain whatever those minimal burdens are.

So we know there's some inconvenience, but we've done everything we can to make that inconvenience as insignificant as possible. Is that --

SEN. FRASER: I will actually go with that in the -- the Crawford/Indiana case.

SEN. WILLIAMS: Just in closing, in my

TX_00000609

final comments as -- before we go to take testimony, I just think that it's noteworthy to look back at what the opponents of this legislation have said on the floor thus far today, and what I've heard is very little debate about the actual content of your legislation. And I think that speaks to the fact that it's unequivocally a good idea that people ought to be able to be positively identified as who they say they are when they come to vote.

What I've heard today is a lot of talk about procedures, even though what we're doing is very normal for a Committee of the Whole, and it's the same procedure that we used the last session when we considered this. Is that correct, Senator Fraser?

SEN. FRASER: It is, and I think it's very difficult for a member to argue the merits of the bill when it's so straightforward when you ask someone in their district do they think that someone should -- should have -- be required to show a photo ID when they vote, that you've got near 90 percent of the population across the state of Texas. Again, every one of these members, it's hard to argue of the merits -- argue the merits of the bill.

SEN. WILLIAMS: Yeah, the other thing that I've heard that I think is interesting is fiscal notes.

A lot of talk about fiscal notes, even though we have a letter from the Secretary of State that states that there are going to be HAVA funds that will be available to help with the voter education, and I think we're going to have testimony in a few moments.

And I tried to clarify that early on that the cost of issuing for the state these free ID cards is less than $2. It's a very minimal cost, and with almost 16 million people that we have who have a driver's license or -- or an ID card now, it seems unlikely that there's going to be a whole lot of people out of that 13 million that actually don't already have a driver's license or a state ID card.

In fact, Senator Fraser, I spoke last night with the Department of Public Safety and today with the Secretary of State and just asked them if it would be possible for us to target those voters who are below age 65 and have -- don't have an ID card, a driver's license or an ID card issued by the state; and they said, yes, it would be possible for us to direct our voter education to those people specifically so that we could step it up and let them know before your bill takes effect -- not till, when, in January? Is that -- am I remembering that correctly?

SEN. FRASER: January, 2012.

SEN. WILLIAMS: So a year from now. So we've got a lot of time to let these people know what's coming.

And then the other thing I've heard a lot about is current law, and, you know, there's been a lot of discussion. In fact, a lot of what we've talked about is what's actually on the books right now, and your bill is not touching any of that top side or bottom. Really, most of what you do is very limited by changing what the requirements are when you come to the polls. Is that correct? There's not any other real substantive change to election law here.

SEN. FRASER: We're only addressing the -- the actual in-person voting and the identification required when somebody votes in person. We're not addressing mail-in ballots or any of the other provisions. It's just that one section.

SEN. WILLIAMS: Well, thank you for allowing me to question you about this and I appreciate you bringing this issue before us and I especially appreciate the fortitude that you've shown during this long debate. Thank you.

SEN. FRASER: Thank you, Senator.

CHAIRMAN DUNCAN: Chair recognizes Senator Shapiro.

SEN. SHAPIRO: Thank you, Mr. Chairman.

I would just like to ask one question because we're getting mixed signals, and I just want to make sure. It's just going to take a yes-or-no answer, and I think that will be the easiest.

In Section 7 of your bill, which is actually on Page 5, the requirements for identification prescribed for people who do not have to have a vote -- a photo ID, where it references their age, does the bill require that people 70 or older present a voter registration card and that they be at least 70 years of age on January 1st, 2012?

SEN. FRASER: My understanding and this is, again, something probably the Secretary of State will address, but I believe your age is -- is on the card. So if someone is 70 on January 1, 2012, they will not be asked to show a photo ID.

SEN. SHAPIRO: Okay. And this is something that the Secretary of State has put into this bill?

SEN. FRASER: No. No, I --

SEN. SHAPIRO: This is something that you have --

SEN. FRASER: -- inserted it into the bill. It'd be your interpretation --

SEN. SHAPIRO: I got you.

SEN. FRASER: -- to -- to make sure --

SEN. SHAPIRO: Identify whether it's at hand?

SEN. FRASER: -- that they can identify themselves --

SEN. SHAPIRO: Okay.

SEN. FRASER: -- but it's not intended that they would -- I believe they're --

SEN. SHAPIRO: Separate.

SEN. FRASER: Yes.

SEN. SHAPIRO: It's not intended to be separate. It's intended --

SEN. FRASER: No.

SEN. SHAPIRO: -- to be the same document.

SEN. FRASER: Yes, as long as they're --

SEN. SHAPIRO: Okay.

SEN. FRASER: -- you know, 70 on January 1, 2012.

SEN. SHAPIRO: And the date of birth is on our current voter registration card?

SEN. FRASER: You need to ask that of the Secretary of State.

SEN. SHAPIRO: Okay. And my recollection is it is. Thank you.

SEN. FRASER: Okay.

CHAIRMAN DUNCAN: Chair recognizes Senator Huffman.

SEN. HUFFMAN: Thank you, Mr. Chairman.

Senator Fraser, will you yield for a couple of questions?

SEN. FRASER: I would love to yield.

SEN. HUFFMAN: Thank you, sir. I'd like to commend you, too, for a long day of answering a lot of tough questions.

SEN. FRASER: Thank you.

SEN. HUFFMAN: But I think it's important, as we kind of wrap this part of the procedures up today, that -- that we circle back to -- to the idea and the concept that -- that we got here today. But there is a line of Supreme Court cases that have brought us here. Would you agree with that?

SEN. FRASER: Yes.

SEN. HUFFMAN: And certainly, the Crawford v. Marion case gives us guidance on how to do what we're doing here today properly. Would you agree --

SEN. FRASER: I think that's the one --

SEN. HUFFMAN: -- with that?

SEN. FRASER: -- was referenced, I think, in the Indiana case, I believe.

SEN. HUFFMAN: Okay.

SEN. FRASER: And that's yes.

SEN. HUFFMAN: And did you, as you sat down with your staff and so forth in, you know, pre-session, in the interim, and you started thinking about this bill and so forth, did you and your staff take into consideration Crawford v. Marion and try to follow the law and the rules the Supreme Court has laid out for us?

SEN. FRASER: Yes, without a doubt. That's already been approved by the Supreme Court, and obviously, we wanted to make sure we stayed within those parameters.

SEN. HUFFMAN: All right. Now, you know, the Supreme Court, I think -- we know that the Supreme Court has told us that there is a balancing test, and we understand that the right to vote is sacred. And so we know that the law tells us that if there is a burden placed upon a voter, that they're going to look very carefully at that; and it's going to have weight, but it's going to be balanced against legitimate state interest. And so I think what we need to explore, just briefly, is that, in fact, we -- we have legitimate state interest. The state of Texas has an interest to make sure that our elections are done with -- well, as

perfect as we can get them but with integrity, right, and with voter confidence.

So as you prepared the bill and as you look at the bill -- and the Supreme Court has told us that there are legitimate interests, and they define those for us. So as you prepared the bill and you look at Senate Bill 14 today, do you think that it addresses the relevant and legitimate concerns of deterring and detecting voter fraud? And I know you've been asked this question a lot.

SEN. FRASER: Absolutely.

SEN. HUFFMAN: Right. Do you think that it -- that it's important in that the bill will help to improve and modernize the election procedures of Texas?

SEN. FRASER: Yes.

SEN. HUFFMAN: Do you think that there's a larger scheme nationwide through the Help America Vote Act and the National Voter Registration -- Registration Act to do just that, to make elections come up to modern times?

SEN. FRASER: Absolutely.

SEN. HUFFMAN: Do you think that Senate Bill 14 will help to prevent voter fraud and actually help to ensure that only the votes of eligible Texas voters are counted in these crucial elections that

happen in the state of Texas?

SEN. FRASER: That is our intent, and we believe the bill does that.

SEN. HUFFMAN: And do you believe that once we have established these safeguards, that the voters will feel more confident about their vote being counted and only the votes of registered Texans who can vote to be counted?

SEN. FRASER: Yes, that is our belief.

SEN. HUFFMAN: Do you think that once that's established, that it will actually encourage the democratic process and that it will encourage more voters to go to the polls?

SEN. FRASER: The thing we've seen in other states that have implemented photo ID, the -- the voter turnout actually increased. And so, yes, we believe the confidence in the voters will increase, and we believe it will actually increase the voting percentages.

SEN. HUFFMAN: Now, we've heard comments today from many senators, Senator Whitmire, Senator Davis, Senator Uresti, about hypothetical burdens that may be placed on some hypothetical voter. But taking that into account and looking at and trying to balance it, do you feel like we have a bill here that -- that

presents and moves forward our legitimate interest in Texas as it regards voting?

SEN. FRASER: Without a doubt.

SEN. HUFFMAN: All right.

SEN. FRASER: We believe it does.

SEN. HUFFMAN: Thank you very much, Senator Fraser.

SEN. FRASER: Thank you, Senator.

SEN. HUFFMAN: Thank you.

CHAIRMAN DUNCAN: Chair recognizes Senator Wentworth.

SEN. WENTWORTH: Thank you, Mr. Chairman.

Will the gentleman yield?

SEN. FRASER: I will yield.

SEN. WENTWORTH: Senator, I want to compliment you on your long hours of being on your feet in responding to these questions. I just wanted to touch on a couple of things.

One is we had -- we had some testimony here two years ago on a very similar bill, and I just wanted -- since it's been raised earlier today, the issue about whether or not maybe passage of this bill would reduce voter participation. There are only a couple of other states, Indiana and Georgia, where these sorts of bills have been passed. One of the witnesses

in March of '09 said to us: Not only does voter ID help prevent fraudulent voting, but where it has been implemented, it has not reduced turnout. There is no evidence that voter ID decreases the turnout of voters or has a disparate impact on minority voters, the poor, or the elderly. The overwhelming majority of Americans have photo ID or can easily obtain one.

Now, this is in the record from the 2009 hearing, which we've already adopted, but I just wanted to recall some of the testimony that we had.

Another quote was: Recent election results in Georgia and Indiana also confirmed that the suppositions that voter ID will hurt minority turnout are incorrect.

In addition -- and I'm not sure whether this was part of the record in '09, but there is a study of Indiana's photo ID law that was conducted by a University of Missouri professor. He found that requiring identification doesn't have much impact on voter turnout rates. His name is Jeffery Milyo. He's professor of economics and public affairs at the University of Missouri, a part of the Institute of Public Policy of the Harry S. Truman School of Public Affairs.

And his conclusion is -- if I can find it

quickly -- it's a many-page study, and his conclusion is that the findings that emerge from his analysis are that photo ID is associated with an overall county level turnout increase of almost 2 percentage points -- and this is just in Indiana. This isn't Georgia as well -- an insignificant increase in relative turnout for counties with a greater percentage of minority and poor population; no consistent or significant impact on relative turnout in counties with a greater percentage of less educated or elderly voters; and finally, a significant relative increase in turnout for counties with a higher percentage of Democrat voters.

I was just wondering if you remembered those things that were testified to two years ago or whether you were familiar with this university professor's study.

SEN. FRASER: Thank you for bringing that forward. It -- yes, I -- now, as you mention it, I do remember it. The other thing that comes to mind that was through the testimony two years ago is in the '09 -- I'm sorry -- the '08 president election for '09, that even though the president was from Illinois, the adjoining state, Indiana, had doubled the increase of voting next door in the state -- in Indiana where they had put in photo ID. Illinois did not have it, but the

increase was double the amount of increase next door. So it certainly didn't show that they were hurt by the implementation of the --

SEN. WENTWORTH: Where Indiana has a photo ID law --

SEN. FRASER: Illinois does not.

SEN. WENTWORTH: Thank you very much, Senator.

SEN. FRASER: Thank you, Senator.

CHAIRMAN DUNCAN: Okay. Members, we have -- that completes all of the Members who want to ask questions of the author. You can sit down for a second, Senator, if you want to. Take a rest.

We have a little bit of housecleaning. There's a few witnesses that -- or a few exhibits that may want to go in that we have now made copies of. I think, Senator Van de Putte, you had -- Senator Zaffirini had Exhibit 6 which was a map of the DPS, and we've now had that copied and available to distribute. Do you want to go ahead and offer it into the record?

SEN. VAN de PUTTE: Yes, I will.

CHAIRMAN DUNCAN: Okay. It'll be received.

(Exhibit No. 6 marked and admitted)

CHAIRMAN DUNCAN: And then I believe we

had -- Senator Davis had a chart that -- excuse me.

SEN. VAN de PUTTE: Mr. Chairman, do -- I move to add to Exhibit 6 the counties with Department of Public Safety Driver's License Office Closures prepared by legislative counsel.

CHAIRMAN DUNCAN: Okay. Thank you. That will be received in the record.

Senator Davis, you had an exhibit that you wanted to offer.

SEN. DAVIS: Yes, Mr. Chair. I'd like to add that as -- I guess it would be Exhibit No. 7 to the record.

CHAIRMAN DUNCAN: And I think we have copies to distribute to the Members? Would you describe it, please?

SEN. DAVIS: Yes, I'm sorry. It's the chart that I displayed and talked about earlier in my questions of Senator Fraser. It's exact -- an exact replica of the chart that was displayed on the Senate floor.

CHAIRMAN DUNCAN: It has a -- it's a graphic that has a -- at the top, a title that says, "DL/State ID." Okay. Exhibit 7 will be received in the record.

SEN. DAVIS: Thank you.

(Exhibit No. 7 marked and admitted)

CHAIRMAN DUNCAN: Are there any other exhibits that --

SEN. FRASER: Mr. President?

CHAIRMAN DUNCAN: -- were discussed that we'd like to include? Senator Fraser?

SEN. FRASER: And I had one that I mentioned that I was going to enter in that I have not yet. It is the Lighthouse Opinion Poll. This is the most current poll that is taken and has a very good breakout of not only across the state, the regions, but also has a breakout, Republican, Democrat, and it breaks out for the African American, Hispanic, and --

CHAIRMAN DUNCAN: Do you have copies of that to distribute?

SEN. FRASER: I have one copy.

CHAIRMAN DUNCAN: Okay. Well, Exhibit 8 will be received, but if you'll go ahead and get copies so that we can distribute those at this time.

(Exhibit No. 8 marked and admitted)

SEN. GALLEGOS: Mr. President?

CHAIRMAN DUNCAN: Senator Gallegos, for what purpose?

SEN. GALLEGOS: I have also some diagrams, but I wasn't going to present them until the time of my

amendments. I mean, do they need to be entered now or at the time of the amendment?

CHAIRMAN DUNCAN: I don't see any problem with entering them at the time when it's relevant to what you're trying to do.

SEN. GALLEGOS: Yeah.

CHAIRMAN DUNCAN: You can put them in the record at that time --

SEN. GALLEGOS: Okay.

CHAIRMAN DUNCAN: -- when we're --

SEN. GALLEGOS: Then I'll wait till -- till the time of the amendment. Thank you, Mr. President.

CHAIRMAN DUNCAN: All right. Members, the next phase is the invited testimony.

And Senator Van de Putte and Senator Fraser, if you could come up to the -- make sure we've got everybody in the right order.

And while they're coming up, I want to announce that it's my intention to -- we have about 17 -- last check, 17 registered witnesses for public testimony, and I would like to accommodate those witnesses, if we could. So remember that when you're questioning and -- that we have some folks that would like to testify here later on.