

LDF — DEFEND EDUCATE EMPOWER

the texas league of young voters education fund

## COMMENT UNDER SECTION 5 OF THE VOTING RIGHTS ACT

Chris Herren
Chief, Voting Section
Civil Rights Division
Room 7254 – NWB
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530

September 8, 2011

    Re:    Section 5 Submission No. 2011-2775
            (Submission by the State of Texas Regarding SB 14)

Dear Mr. Herren:

### Introduction

      The NAACP Legal Defense & Educational Fund, Inc. (LDF) and the League of Young Voters Education Fund submit the comment letter regarding the State of Texas's pending Section 5 submission of SB 14 (hereinafter "the photo ID Law"), which requires individuals voting in person to produce a photographic identification card (hereinafter, a "photo ID"), and imposing undue limitations on the acceptable forms of photo ID. As of this date, Texas has not met its burden of showing either that this proposed voting change will not have a retrogressive effect, or that its adoption was free of discriminatory purpose.

      Moreover, the justifications proffered by the State do not help it satisfy its burden of showing the absence of discriminatory purpose. In particular, this letter addresses concerns about the effect that Texas's proposed photo ID law would have on students at historically Black colleges and universities in Texas.



2:13-cv-193
09/02/2014
**DEF0450**



EXHIBIT 6

LYV00000074

## Analysis

### I. Background on Section 5

The implementation of all proposed statewide voting changes in Texas is subject to the requirements of Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c(a). SB 14, which is the subject of this Section 5 submission, was signed into law by the Governor of Texas on May 27, 2011, and submitted for review to the Department of Justice pursuant to Section 5 on July 25, 2011. *See* Section 5 Submission No. 2011-2775.

### II. Retrogressive Effect

Section 5 prohibits voting changes that would result in "a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise."[1] The burden is on the submitting jurisdiction to show an absence of retrogressive effect. As documented below, the State has not demonstrated that this proposed voting change will not have such a retrogressive effect.

#### A. Context – National and Statewide Statistics Concerning Access to Photo ID

Although this letter focuses on the effect of the proposed photo ID law on students at historically Black colleges and universities in Texas, we begin by providing some statistical context as to the racial disparities in access to photo ID nationally and in Texas.

##### 1. National Statistics

Nationwide statistics show substantial racial disparities in rates of photo ID ownership. Nationally, 25% of African-American voting age citizens have no current government-issued photo ID, compared to only 8% of white voting-age citizens.[2] The

---

[1] *Beer v. United States*, 425 U.S. 130, 141 (1976).

[2] *See* Brennan Center for Justice, *Citizens Without Proof: A Survey of Americans' Possession of Documentary Proof of Citizenship and Photo Identification* (Nov. 2006), at 3, *available at* http://www.brennancenter.org/page/-/d/download_file_39242.pdf. *See also Crawford v. Marion County Bd. Of Elections*, 553 U.S. 181, 221 n.25 (2008) (Souter, J., dissenting) (observing that "[s]tudies ... suggest that the burdens of an ID requirement may also fall disproportionately upon racial minorities") (*citing* Spencer Overton, *Voter Identification*, 105 Mich. L. Rev. 631, 659 (2007)). Data from other states also confirms the existence of racial disparities in access to photo ID. In Georgia, for example, African-American registered voters are nearly twice as likely to be without driver's licenses as white registered voters. M.V. Hood, III & Charles S. Bullock, III, *Worth a Thousand Words? An Analysis of Georgia's Voter Identification Statute*, 15 (Apr. 2007), http://www.vote.caltech.edu/VoterID/GAVoterID (BullockHood).pdf. Similarly, a study of California, New Mexico and Washington voters found that minority voters are less likely to have various forms of identification, such as driver's licenses, birth certificates, or bank statements. Matt A. Bareto, et al., *Voter ID Requirements and the Disenfranchisements of Latino, Black and Asian Voters*, Am. Pol. Sci. Ass'n Presentation (Sept. 1, 2007), *available at*

Highly Confidential

LYV00000075

proposed photo ID Law, therefore, will likely have a retrogressive effect insofar as its burdens will fall disproportionately on *qualified* and otherwise eligible African-American voters.

Empirical evidence demonstrates that the effects of the proposed photo ID Law are not limited only to those voters lacking photographic identification; rather, they are felt disproportionately by qualified African-American voters as a whole. Nationally, 70% of all African-American voters were asked to show photo identification at the polls during the 2008 Election, as opposed to only 51% of white voters.[3] Due to the uneven enforcement of photo ID laws, these eligible African-American voters were forced to cast provisional ballots at a rate four times higher than were white voters.[4]

In sum, photo ID laws indisputably burden African-American voters disproportionately.

### 2. Texas Statistics

Although we are presently unaware of any definitive studies concerning racial disparities with respect to photo ID ownership in Texas, it is likely that the national disparities referenced above are replicated in Texas. Texas has one of the highest poverty rates in the country,[5] and Texas's poor are disproportionately minorities. The poverty rate for Latinos and African Americans in Texas are an astonishing 24.8% and 23.8%,

---

http://faculty.washington.edu/mbarreto/research/Voter_ID_APSA.pdf. Evidence from individual counties is also striking: in Milwaukee County, for instance, fewer than 47% of Black adults and 43% of Latino adults, compared to 85% of White adults, have a driver's license, and for young Black males, the difference was even more striking: only 22% of African American men between the ages of 18 and 24 had a driver's license. *See* Daniel P. Tokaji, *If It's Broke, Fix It: Improving Voting Rights Act Preclearance*, 49 Howard L.J. 785, 814 (2006) (citing John Pawasarat, *The Driver License Status of the Voting Age Population in Wisconsin*, available at http://www.uwm.edu/Dept/ETI/barriers/DriversLicense.pdf.).

[3] R. Michael Alvarez, et al., *2008 Survey of the Performance of American Elections: Final Report* 43 (March 1, 2009), *available at* http://www.pewcenteronthestates.org/uploadedFiles/Final%20report20090218.pdf; Charles Stewart III, *et al.*, CalTech/MIT Voting Technology Project, Working Paper #82, *Racial Differences in Election Administration* 29 (July 2009), *available at* http://www.vote.caltech.edu/drupal/node/278.

[4] *See* Stewart, *supra* note 4, at 31.

[5] Nearly one in five people in Texas lives in poverty, and Texas's poverty rate of 17.1% is tied for tenth-highest in the nation. *See* U.S. Department of Agriculture, Economic Research Service, *2009 County-Level Poverty Rates for Texas*, *available at* http://www.ers.usda.gov/Data/povertyrates/PovListpct.asp?st=TX&view=Percent&longname=Texas. With 4.1 million people in poverty, the number of impoverished individuals in Texas is roughly equal to that of the top 7 states combined (Alabama, Arkansas, Kentucky, Louisiana, Mississippi, New Mexico, and West Virginia).

Highly Confidential                                                                                                            LYV00000076

respectively, compared to only 8.4% for whites.[6] Of all Texans living in poverty, 53% are Latino and 16% are African-American,[7] despite the fact that Latinos and African-American comprise only 37.6% and 11.8% of the total population in Texas, respectively.[8] Given this context, the proposed photo ID law will likely impose an undue burden on the right to vote, and will have a racially disproportionate impact.

Although photo ID in Texas is purportedly offered free of charge to those who cannot afford it, in order to obtain a photo ID card from the Texas Department of Motor Vehicles, a person must present another form of government-issued identification such as a passport, or a combination of documents, such as a birth certificate *and* a certified copy of court order indicating the applicant's name and date of birth.[9] These documents are *not* offered free of charge. For example, obtaining a birth certificate in Texas costs $22.[10]

For individuals in Texas living below the federal poverty line—who, as noted, are disproportionately minorities—these underlying costs are, as a practical matter, prohibitive.[11] Although the photo ID law contains some exemptions—for instance, individuals who have a religious objection to being photographed, or those who have lost their identification due to a natural disaster during the preceding 45 days, may cast a provisional ballot—there is no adequate failsafe in place for those who simply cannot afford the real costs associated with obtaining an ID card.

These costs are exacerbated by the additional transportation expenses of traveling to an office of the Department of Motor Vehicles. Given that there are substantial racial disparities in vehicle ownership rates, with 19% of African-Americans and 13.7% of Latinos nationally living in a household without a car (as compared to only 4.6% of

---

[6] *See* University of Texas, Texas Politics, *Poverty in Texas*, available at http://texaspolitics.laits.utexas.edu/12_2_0.html.

[7] *See id.*

[8] *See* U.S. Census Bureau, *QuickFacts: Texas*, available at http://quickfacts.census.gov/qfd/states/48000.html.

[9] *See* Texas Department of Public Safety, *Identification Requirements for a Texas Driver License or Identification Card*, available at http://www.txdps.state.tx.us/DriverLicense/identificationrequirements.htm.

[10] *See* Texas Department of State Health Services, *Certified Copy of a Birth Certificate*, available at http://www.dshs.state.tx.us/vs/reqproc/certified_copy.shtm.

[11] *See Weinschenk v. State*, 203 S.W.2d 201, 214 (Mo. 2006) ("the $15 [that impoverished individuals] must pay in order to obtain their birth certificates and vote is $15 that they must subtract from their meager ability to feed, shelter and clothe their families"); *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 670 (1966) (striking down poll tax of $1.50, and holding that "[w]ealth or fee-paying ... has no relation to voting qualifications; the right to vote is too precious, too fundamental to be so burdened").

Highly Confidential

LYV00000077

whites),[12] the burden of traveling to a DMV office will be felt disproportionately by minority voters.

In sum, it is likely that Texas's proposed photo ID law will have a disproportionate impact on African-American and Latino Texans. At a minimum, the Department should seek more information to determine if the clear racial disparities in access to photo ID at the national level are replicated in Texas.

### B. Burden on Students at Historical Black Colleges and Universities

The proposed photo ID Law also places unique and heightened burdens on students who seek to exercise their voting rights. Unlike many states with similar photo ID laws—such as the State of Georgia, whose photo ID law permits students to use state-issued student ID cards,[13] and was precleared in 2005—Texas's proposed photo ID law does not permit students to rely on their student identification cards—even those issued by the State itself—in order to verify their identities at the polls. *See* SB 14 § 14 (listing acceptable forms of identification). As a result, thousands of students across the state at Texas's historically Black colleges and universities—citizens who are eligible to vote or even already registered to vote—would be disfranchised by the proposed photo ID law.

An investigation conducted by the League of Young Voters Education Fund at historically Black Prairie View A&M University, located in Waller County, Texas, confirmed these concerns. The League of Young Voters Education Fund collected statements from dozens of students at Prairie View A&M indicating that the proposed photo ID law will disfranchise them, because they do not have and cannot obtain a Texas state-issued identification card other than their student ID cards.

Many of these students do not have the underlying documentation necessary to obtain a state-issued photo ID, cannot afford to pay for those underlying documents, come from out of state and cannot locate those underlying documents, or simply lack transportation to obtain a state-issued photo ID.

For example, in explaining the hardship that the proposed photo ID law would impose on them, Prairie View students stated:

- "[M]y hometown is 500 miles away and it will be nearly impossible to get my birth certificate in a timely manner."

- "I am an out of state student and do not have the funds to get my birth certificate."

---

[12] *See* Alan Berube, The Brookings Institution, *et al*, *Socioeconomic Differences in Household Automobile Ownership Rates: Implications for Evacuation Policy* 7 (June 2006), *available at* gsppi.berkeley.edu/faculty/sraphael/berubedeakenraphael.pdf.

[13] *See* Georgia Secretary of State, *Georgia Voter Identification Requirements*, *available at* http://www.sos.ga.gov/gaphotoid/.

Highly Confidential

LYV00000078

- "I will not [be able to] vote because I do not have enough money to get my birth certificate."

- "[H]aving my birth certificate sent here would be too long and [would cost] too much money.... I am now a freshman at Prairie View without the ability to drive, [and] I am not able to get the items that I need" to obtain a state-issued photo ID card.

- "I don't have money to get another birth certificate because I am a college student..."

- "I do not have my birth certificate with me at the university."

- "I don't have a car ... and my birth certificate is in Washington State."

- "I do not have transportation [to travel] to the voter registration building..."

- "This law would prevent me from voting because I don't have a car..."

- "It would be a burden to me to have to obtain the documents necessary.... I do not own a car..."

The League of Young Voters Education Fund took statements from dozens of students along these lines, explaining that they would be effectively prohibited from voting by the proposed photo ID law. The examples above are only a sample of the hundreds of students at Prairie View A&M alone who would likely be denied the opportunity to vote as a result of the proposed photo ID law.

It is important to note that the disfranchisement of even seemingly small numbers of voters can have electoral consequences at the local level. The town of Waller itself has only a few thousand residents, with elections sometimes decided by only a few votes. Earlier this year, for example, an African-American candidate named Sid Johnson, who sought to become the first Black councilperson elected to the Waller City Council, lost by only five votes.[14]

It is noteworthy that these new burdens have been imposed against the backdrop of an unfortunate history of discouraging student voting at Prairie View A&M. For over three decades, Waller County has repeatedly sought to prevent students at Prairie View A&M from voting. Litigation from the late 1970s—including a decision from the Supreme Court[15]—barred Waller County's efforts to block Prairie View A&M students

---

[14] *See* Cindy Horswell, "FBI Help Sought in Alleged Waller Voter Fraud," *Houston Chron.* Aug. 19, 2011, *available at* www.chron.com/disp/story.mpl/metropolitan/7703468.html

[15] *See Symm v. United States*, 439 U.S. 1105 (1979).

Highly Confidential

LYV00000079

from voting in local elections. Nonetheless, in the 1990s and 2000s, local officials indicted students, or threatened them with prosecution, for voting in such elections.[16]

In 1993, 19 students involved in voter registration efforts on campus were indicted for voter fraud; all charges were eventually dropped. In March 2004, Prairie View students were denied the ability to use their campus addresses for purposes of registering to vote, and were wrongfully informed that they could not vote in Waller County on the grounds that there were purportedly not permanent residents of the county. Then-District Attorney Oliver Kitzman also threatened that individuals using "feigned residency" for "illegal voting" would be punished with a 10-year prison sentence and a $10,000 fine.[17]

Although Kitzman eventually reversed course and issued a public apology to Prairie View students,[18] efforts to suppress student voting continued that year when the county commissioners' court, aware that students would be on break the day of the primary, voted to reduce early voting dramatically, and did not submit this voting change for Section 5 preclearance. The county only abandoned this newest effort to suppress Black turnout when the university chapter of the NAACP brought a Section 5 enforcement action.[19]

Then, during the 2006 general election—which included an African-American candidate for District Attorney who had campaigned heavily on Prairie View's campus in its surrounding Black communities—over 2,000 students at Prairie View who had registered to vote went to the polls on Election Day only to discovery that their names were not in the poll books.[20]

And, earlier this year, the FBI apparently opened an investigation into allegations of intimidation of supporters of Sid Johnson, an African-American candidate for city council in Waller.[21]

---

[16] Nat'l Comm. on the Voting Rights Act, *Protecting Minority Voters: The Voting Rights Act at Work, 1982-2005* 65-66 (Feb. 2006), in U.S. House of Rep., *Voting Rights Act: Evidence of Continuing Need, Hrng before the Subcomm. on the Const. of the H. Comm. on the Judiciary, March 8, 2006* 185-86.

[17] *See* Christina D. Sanders and Blake E. Green, From "Block the Vote" to "Protect the Vote": Historically Black Student Voting Suppression and Disenfranchisement in Texas," *Harv. J. of African American Public Pol'y* 51, 53 (June 2008).

[18] *See* Terry Kliewer, "Waller County DA Apologizes in Vote Flap," *Houston Chron.* Feb. 25, 2004, available at http://www.chron.com/news/houston-texas/article/Waller-County-DA-apologizes-in-vote-flap-1957246.php.

[19] *See* Nat'l Comm. on the Voting Rights Act, *supra* note 16.

[20] *See* Sanders and Green, *supra* note 17, at 53.

[21] *See* Horswell, *supra* note 14.

Highly Confidential

LYV00000080

Given this history of efforts to suppress voting by African Americans in Waller County, the State's decision to exclude state-issued student identification cards from the list of acceptable forms of voter identification is deeply problematic. Under Section 5's intent prong, assessing a jurisdiction's motivation in enacting voting changes is a complex task requiring a "sensitive inquiry into such circumstantial and direct evidence as may be available."[22]

The "important starting point" for assessing discriminatory intent is "the impact of the official action whether it 'bears more heavily on one race than another.'"[23] Other considerations relevant to the purpose inquiry include, among other things, "the historical background of the [jurisdiction's] decision."[24]

The Department should consider these factors—particularly the long history of efforts to suppress student voting at historically Black colleges and universities in Texas such as Prairie View A&M—when analyzing SB 14.

### C. The State's Rationale

Although Texas's purported rationale for the proposed photo ID law is to prevent fraud, there is absolutely no record of voter fraud with respect to in-person voting in Texas. As Royal Masset, former Political Director of the Republican Party of Texas has stated in references to rumors of in-person voter fraud in Texas: "It's a lie. It's not true. It does not exist."[25]

---

[22] *Village of Arlington Heights v. Met. Housing Dev. Corp.*, 429 U.S. 252 at 266 (1977). In determining "whether invidious discriminatory purpose was a motivating factor," courts have looked to the *Arlington Heights* framework, at least in part, to evaluate purpose in the § 5 context. *See, e.g., Shaw v. Reno*, 509 U.S. 630, 644, (1993) (citing *Arlington Heights* standard in context of Equal Protection Clause challenge to racial gerrymander of districts); *Rogers v. Lodge*, 458 U.S. 613, 618 (1982) (evaluating vote dilution claim under Equal Protection Clause using *Arlington Heights* test), and has also been used, in part, to evaluate purpose in this Court's earlier § 5 cases. *See also Pleasant Grove v. United States*, 479 U.S. 462, 469-470 (1987) (considering city's history in rejecting annexation of 489 black neighborhood and its departure from normal procedures when calculating costs of annexation alternatives); *see also Busbee v. Smith*, 549 F.Supp. 494, 516-517 (D.C. 1982); *Port Arthur v. United States*, 517 F.Supp. 987, 1019, *aff'd*, 459 U.S. 159 (1982).

[23] *Arlington Heights*, 429 U.S. at 266 (citing *Washington v. Davis*, 426 U.S. 229 (1976)).

[24] *Arlington Heights*, 429 U.S. at 268.

[25] R.G. Ratcliffe, "Voter fraud in Texas: 'It's a lie.'", *Houston Chron.*, May 17, 2007, *available at* http://blog.chron.com/texaspolitics/2007/05/voter-fraud-in-texas-its-a-lie/

Highly Confidential

LYV00000081

In balancing the non-existent harm of in-person vote fraud against the measurable and identifiable record of actual disfranchisement of qualified voters, the Department should err on the side of permitting qualified voters access to the polls.[26]

## Conclusion

In sum, Texas has failed to satisfy its burden of demonstrating that the proposed photo ID law will not have a retrogressive effect, nor that its adoption was free of discriminatory intent. At a minimum, the Department should seek more information from Texas as to the possible racially disproportionate effect of the law.

Should you have any questions regarding the information presented in this Comment Letter, please contact Ryan Haygood at 212-965-2235.

Sincerely,

**NAACP Legal Defense and Educational Fund, Inc.**
Ryan Haygood, Director, Political Participation Group
Dale Ho, Assistant Counsel
Natasha Korgaonkar, Assistant Counsel

**League of Young Voters Education Fund – Texas**
Christina D. Sanders
Blake E. Green

---

[26] See *Purcell v. Gonzalez*, 126 S. Ct. 5, 7 (2006) (*per curiam*) ("[T]he possibility that qualified voters might be turned away from the polls would caution any district judge to give careful consideration to the plaintiffs' challenges").

Highly Confidential					LYV00000082