IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | |
|---|---|
| MARC VEASEY, JANE HAMILTON, SERGIO DELEON, FLOYD J. CARRIER, ANNA BURNS, MICHAEL MONTEZ, PENNY POPE, OSCAR ORTIZ, KOBY OZIAS, JOHN MELLOR-CRUMMEY, PEGGY  HERMAN, EVELYN BRICKNER, GORDON BENJAMIN, KEN GANDY, LEAGUE OF  UNITED LATIN AMERICAN CITIZENS (LULAC), and DALLAS COUNTY, TEXAS, <br><br> Plaintiffs, <br><br> v. <br><br> RICK PERRY, *et al.*, <br><br> Defendants. | Civil Action No. 2:13-cv-193 (NGR) |
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> TEXAS LEAGUE OF YOUNG VOTERS EDUCATION FUND, *et al.*, <br><br> Plaintiff-Intervenors, <br><br> TEXAS ASSOCIATION OF HISPANIC COUNTY JUDGES AND COUNTY COMMISSIONERS, *et al.*, <br><br> Plaintiff-Intervenors, <br><br> v. <br><br> STATE OF TEXAS, *et al.*, <br><br> Defendants. | Civil Action No. 2:13-cv-263 (NGR) |

1



2:13-cv-193
09/02/2014
DEF0465



EXHIBIT  4
WIT: Hamilton
DATE: 6-5-14
JULIE BRANDT, RMR, CRR

TRUE THE VOTE,

     Movant-Intervenor.

TEXAS STATE CONFERENCE OF NAACP
BRANCHES, *et al.*,

     Plaintiffs,

  v.

JOHN STEEN, *et al.*,

     Defendants.

Civil Action No. 2:13-cv-291 (NGR)

## THE VEASEY-LULAC PLAINTIFFS' SECOND AMENDED COMPLAINT

### Introduction

1.  The State of Texas has a long, notorious history of disfranchising voters by various methods and discriminating against classes of voters, especially on account of race and ethnicity. Senate Bill 14 of 2011 ("SB 14") is another effort to achieve those unlawful ends. Accordingly, this suit seeks to enjoin SB 14 as a violation of the Constitution and laws of the United States, as applied to voters and prospective voters who lack one of the few photo IDs listed in SB 14 and voters who possess a qualifying ID but, due to the law's stringent requirements, may be denied their right to vote nonetheless.

2.      SB 14 requires a voter who is already registered to obtain a second registration certificate (containing a photo of the voter) of a type specified in SB 14 ("SB 14 ID"). This certificate is unobtainable at a voter registration office. It is obtainable only from a limited number of sources or locations, which are often inconvenient and expensive. Obtaining the SB 14 ID is the real voter registration in Texas, because merely "registering" at a voter registration office does not entitle a person to vote (except for limited categories of people who may vote by mail). Indeed, under SB 14, county voter registration offices are entirely superfluous, as registration now must, in most circumstances, take place at State driver's licensing offices.

(a)      On information and belief, the number of Texas residents who were "registered to vote" in the Secretary of State's voter registration database as of 2012 was 13,065,504. According to the U.S. Department of Justice, it is estimated that 7,835,055 (61.5%) of these registered voters are Anglo, 1,472,669 (11.6%) are black, and 3,003,059 (23.6%) are Latino (and 2,909,014 (22.25%) have Spanish surnames). Of the total number of registered voters (13,065,504 as of 2012) approximately 1,893,143 could not be matched to a record in either the State's driver's license database or the State's concealed weapons license database. On further information and belief, it has been estimated that, of these 1,893,143 voters who could not be matched, 850,424 (49.0%) are Anglo, 304,931 (17.6%) are black, and 525,503 (30.3%) are Latino. In other words, 20.7% of black voters and 17.5% of Latino voters cannot be matched, while only 10.9% of Anglo voters cannot be matched. In addition, 17.5% of voters with Spanish surnames cannot be matched, whereas 13.6% of voters with non-Spanish surnames cannot be matched. Individuals who cannot be matched to an SB 14 ID issued by the Texas Department of Public Safety (DPS) are unlikely to have the state-issued ID needed to vote pursuant to SB 14.

Even the State of Texas acknowledges that the number of persons who are currently registered to vote but lack a photo ID issued by the State DPS, or at-risk voters, is quite large.  In 2012, the Defendant Texas Secretary of State provided a list of registered voters to the United States Department of Justice whose records were not successfully matched with records in the DPS driver's license database.  The matching criteria consisted of first name, last name, and date of birth, and those individuals who provided a DPS ID number when they registered to vote were counted as matching.  The list created by the Secretary of State showed 795,555 Texas voters who could not be confirmed to possess a DPS-issued photo ID card.

(b)    As described below, in judging the lawfulness of SB 14, this number of voters who lack an SB 14 ID must be measured against the extent of the alleged problem that SB 14 seeks to "fix."

3.    Further, a disproportionate number of registered voters who lack SB 14 ID are racial or ethnic minorities, or are poor, elderly or disabled people.

4.    The Supreme Court has many times addressed Texas' restrictive voting procedures and Texas' history and present-day legacy of discrimination.

(a)    In *White v. Regester*, 412 U.S. 755, 768 (1973), the Supreme Court said Texas had "the most restrictive voter registration procedures in the nation."  SB 14 again gives Texas the distinction of having the most restrictive voter registration procedures in the nation.

(b)    In *White v. Regester*, the Court struck down the voting practice at issue in that case (multi-member election districts), even though the Court had recently upheld the same voting practice in a different state, Indiana.  *Whitcomb v. Chavis,* 403 U.S. 124 (1971).  The Court relied on Texas' history and present-day legacy of discrimination to distinguish the multi-

4

member districts upheld in Indiana from the ones found to be invidiously discriminatory in Texas.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343; and pursuant to 42 U.S.C. §§ 1973, 1973j(f).  Plaintiffs' action for declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.  Venue is proper pursuant to 28 U.S.C. §§ 1391(b).

## PARTIES

### Plaintiffs

6.      Individual Plaintiffs are all citizens and residents of Texas.  All individual Plaintiffs are eligible and registered to vote in Texas.

7.      (a)      Plaintiff Marc Veasey is a resident of Fort Worth, Tarrant County, Texas.  He is African-American.  He is an elected U.S. Representative from the 33d Congressional District of Texas.

        (b)      Plaintiff Floyd James Carrier is a resident of China, Jefferson County, Texas.  He is African-American.  He is physically disabled (wheel-chair-bound).

        (c)      Plaintiff Anna Burns is a resident of Fort Worth, Tarrant County, Texas.  She is Latino.

        (d)      Plaintiff Michael Montez is a resident of Galveston, Galveston County, Texas.  He is Latino.  He is an elected Constable in Galveston County.

        (e)      Plaintiff Penny Pope is a resident of Galveston, Galveston County, Texas.  She is African-American.  She is an elected Justice of the Peace in Galveston County.

(f)     Plaintiff Jane Hamilton is a resident of Dallas, Dallas County, Texas.   She is African-American.  She is active in political organization in her community, including efforts to organize and encourage people to vote.

(g)     Plaintiff Sergio DeLeon is a resident of Fort Worth, Tarrant County, Texas. He is Latino. He is an elected Justice of the Peace in Tarrant County.

(h)     Plaintiff Oscar Ortiz is a resident of Corpus Christi, Nueces County, Texas.  He is Latino. He is an elected County Commissioner in Nueces County.

(i)     Plaintiff Koby Ozias is a resident of Corpus Christi, Nueces County, Texas. He is Anglo.

(j)     Plaintiff John Mellor-Crummey is a resident of Houston, Harris County, Texas. He is Anglo.

(k)     Plaintiff Peggy Draper Herman is a resident of San Antonio, Bexar County, Texas. She is Anglo.

(l)     Plaintiff Evelyn Brickner is a resident of San Antonio, Bexar County, Texas.  She is Anglo.

(m)     Plaintiff Gordon Benjamin is a resident of San Antonio, Bexar County, Texas.  He is African-American.

(n)     Plaintiff Ken Gandy is a resident of Corpus Christi, Nueces County, Texas. He is Anglo.

(o)     Plaintiff League of United Latin American Citizens ("LULAC") is the oldest and largest national Latino civil rights organization.   LULAC is a nonprofit organization, incorporated under the laws of the State of Texas, with a presence in most of the fifty states and

6

Puerto Rico. LULAC has chapters in most Texas counties, including Nueces, Dallas and Harris Counties, and it has individual members who reside and vote in those counties. LULAC has long been active in representing Latinos and other minority interests in all regions of the state. Since 1971, LULAC has filed well over a hundred lawsuits on behalf of Latino voters throughout Texas, and has been successful in many of them.

(p)   Plaintiff Dallas County is one of the largest counties in the State of Texas. It operates a voter registration system within its County Elections Department that complies with state and federal law.

8.   (a).   Plaintiffs have a direct, substantial, and legally protectable interest in the subject matter of this litigation.

(b)   Plaintiff Carrier lacks an SB 14 ID, and SB 14 thus bars him from voting in person. Plaintiff Carrier is a disabled Army veteran who, despite his long military service, lacks an SB 14 ID. His veterans' ID, for instance, lacks a photograph. Consequently, he was denied the right to vote when he showed up at the polls on November 5, 2013, and he will continue to be denied the right to vote in future elections, because of SB 14's stringent requirements.

(c)   Plaintiff Burns does possess a Texas driver's license, which should qualify her under SB 14—but, despite her efforts to change it, the name on her driver's license does not match the full name on her voter registration certificate. The stringent requirements of SB 14 will likely disqualify Plaintiff Burns from voting, and she has a reasonable fear of being injured in this way.

(d)   Plaintiff Ozias does possess a passport, which should qualify him under SB 14— but, despite his efforts to change it, the information on the passport does not match his voter

registration information. The stringent requirements of SB 14 will likely disqualify Plaintiff Ozias from voting, and he has a reasonable fear of being injured in this way.

(e)     Plaintiff Mellor-Crummey does possess a driver's license which should qualify him under SB 14—but, despite his efforts to change it, the name on his driver's license does not match the full name on his voter registration certificate. The stringent requirements of SB 14 will likely disqualify Plaintiff Mellor-Crummey from voting, and he has a reasonable fear of being injured in this way.

(f)     Plaintiff Herman does not possess an SB 14 ID. She is ninety years old. Her Texas driver's license is expired, and therefore does not qualify her to vote. Additionally, despite her efforts to obtain one, she has been unable to obtain an EIC because of the burdens involved. As a result, she did not vote on November 5, 2013, despite her desire to do so. She also does not have the requisite documentation to obtain an EIC for future elections.

(g)     Plaintiff Brickner is ninety-six years old. She did not possess an SB 14 ID on November 5, 2013 and was therefore unable to exercise her right to vote. She had, despite expense, incredible effort, and the assistance of her daughter, been unable to obtain a qualifying ID before those elections. After the election, she determined that it would be easier to obtain a U.S. passport than an EIC. Plaintiff Brickner since obtained a U.S. passport, but the name on the passport does not match the name on the voter list and she therefore reasonably fears that SB 14—which has already disfranchised her once—will again prevent her from casting an effective ballot in the future.

(h)     Plaintiff Benjamin does not have an SB 14 ID. He has two government-issued photo IDs—an unexpired Arizona driver's license and an ID card that allows him to ride for free

8

at certain times on the San Antonio bus system. Neither of these IDs qualifies him to vote under SB 14. He tried to obtain an EIC, but was unable to because he does not have a birth certificate. Consequently, although he normally votes in elections, he was unable to vote on November 5, 2013, and he will not be able to vote in future elections.

(i)     Plaintiff Gandy does not have an SB 14 ID and is therefore unable to vote in person as a result of SB 14's enforcement. He has an expired Texas driver's license, which SB 14 does not allow. Additionally, despite his efforts to obtain one, he has been unable to obtain an EIC from DPS because he lacks the necessary underlying documentation. As a result, he was denied, and will continue to be denied, the ability to vote in person—as others are permitted to do—on Election Day. Though his age permits him to vote absentee, SB 14 effectively treats him as a second-class citizen by denying his right to participate in elections in the same ways that others who possess SB 14 ID are able to participate.

(j)     Until SB 14 took effect, Dallas County used to register its residents to vote in compliance with federal laws, such as the National Voter Registration Act and relevant state laws. Dallas County also used to provide eligible citizens with all of the documentation they needed to vote at the polls. As a result of SB 14, however, the Dallas County Elections Office can no longer provide all of the documents needed to vote. The County's Election offices, for example, do not have the current ability to photograph voters and, even if the county equipped its voter registration offices with cameras and printers to create photo IDs, SB 14 would bar the use of such IDs anyway. Thus, despite Dallas County's desire to maintain its ability to promote and facilitate every voter's ability to vote, it can no longer do so because the State, in enacting SB 14, has tied its hands. Furthermore, despite taking away the county's previous capacity to

9

effectively register its residents, SB 14 substantially increases the county's election costs. Indeed, Dallas County has already expended money to send out a first round of notices to voters who appear to lack SB 14 IDs, because the State has failed to provide this minimum due process notice to voters who will be disfranchised as a result of SB 14.  Additionally, in the future, Dallas County, through its election office, will be required to train poll workers, supervise and ensure rejection of voters at the polls, process a considerable increase in provisional ballots, provide additional staff to allow voters to return to the County's offices with appropriate SB 14 ID after elections, provide additional staff to assist voters in navigating different agencies to obtain SB 14 ID, and take numerous other governmental actions—none of which is funded under SB 14.  The county must incur these costs, even though the new law will cause unnecessary confusion and anger among voters and poll officials.  The county must also incur these costs even though it is being required, through SB 14, to intentionally and unlawfully discriminate against its citizens.  Dallas County also reasonably fears legal liability—and hence monetary liability—for enforcing a law that deprives its citizens of their rights under the U.S. Constitution and federal law.  In short, Dallas County will become an instrumentality of the State's intentional discrimination against its voters, in opposition to the will of the popularly elected local officials and with the commensurate requirement that county tax assessments be used to enforce SB 14.

  (k)  LULAC's mission, among other things, is to increase the political influence of people of color, especially Latinos.  As part of this mission, LULAC conducts various election-related activities, including voter registration.  Due to SB 14's new and stringent requirements, and in light of the State's failure to fulfill its obligations to voters, LULAC will have to divert resources away from its regular activities to (among other things): educate its members and

10

communities of interest about SB 14's requirements, conduct outreach to determine whether previously-registered voters possess SB 14 IDs, facilitate already-registered voters' efforts to obtain SB 14 IDs, assist already-registered voters in their efforts to update their voter registration information or IDs to ensure that the information matches, and provide resources to ensure that voters who are forced to cast provisional ballots are able to return to the county registrars' offices within the limited time period allowed after elections to cure their provisional ballots.  SB 14 thus impairs LULAC's ability to fulfill its mission of increasing voter registration and turnout among Latinos and other minorities.  Moreover, LULAC has: (1) members who do not have SB 14 ID and will find it burdensome or impossible to obtain SB 14 ID and thus be denied the right to vote; and (2) members who do have SB 14 ID, but whose names are not identical and will therefore face a real likelihood that they will not be allowed to vote, especially because the incredible and unprecedented discretion and lack of uniformity in officials' determinations about which voters to "accept" will more heavily impact minority voters with non-Anglo names and nicknames.

(l)     The remaining individual Plaintiffs are office-holders who seek election to their current or other elected offices, and political organizers.  They represent largely minority communities and voters in Texas and, though these individually named Plaintiffs possess SB 14 IDs, they will be injured by SB 14's enforcement because it will increase the costs and effort necessary to register voters, administer elections, run political campaigns, and seek, organize and turn out supporters whom SB 14 allows to vote.

11

**Defendants**

9.    (a)    Defendant Rick Perry is the Governor of Texas and, pursuant to Article IV, Section I of the Texas Constitution, is the chief executive officer of the State of Texas.

(b)    Defendant John Steen is the Secretary of State of Texas and is the State's chief election officer.

## FACTS

### Nature and Operation of SB 14

10.    SB 14 creates a double registration system that strips registered voters of the right to vote unless they obtain a second registration certificate. SB 14 provides that this second certificate is not obtainable at a voter registration office. Rather, SB 14 limits the second registration certificate to one of four Texas-issued IDs or one of three federally-issued IDs. The acceptable Texas-issued IDs are a Texas driver's license, personal identification card, Election Identification Certificate (EIC), or permit to carry a concealed weapon, and they are only obtainable from a DPS office. The federally-issued IDs are a U.S. passport, federal military ID, or a citizenship certificate, and they are only obtainable from certain agencies of the federal government.

### Problems for Voters Who Lack an SB 14 ID

11.    SB 14's statutory scheme severely burdens the million or more registered voters who currently lack such an ID, and will continue to burden vast numbers of potential future-registered voters.

12.    In designating a limited number of IDs as acceptable and designating other government-issued photo IDs as unacceptable, SB 14 picks and chooses among voters to decide who is

12

favored and who is not. Thus, for example, SB 14 decides that U.S. military personnel are favored, but that civilian personnel are not—including civilian employees of the military. Holders of a state agency permit are favored if it is a concealed weapons permit, but not if it is a state hunting or fishing license, a state-college student ID, a state-college faculty or athletic coach ID, or a state employee ID, even if the state employee is a Texas Ranger. The final category, "citizenship certificate," may sound broad, but in fact is available only to non-U.S.-born persons who were citizens at birth (usually because of U.S.-citizen parents residing abroad), and persons who were young children when their parents became naturalized and thus automatically became citizens without taking a separate oath. The citizenship certificate is not available to anyone beyond these two minuscule categories.

13.     As further described below, obtaining the necessary SB 14 ID is inconvenient and expensive for many people, especially racial and ethnic minorities and people who are poor, disabled or elderly.

14.     Inconvenience.  A voter registration office, where a person could formerly qualify to vote, is located in every one of Texas' 254 counties, so every Texas resident could qualify in his or her own county. Some counties have more than one voter registration office (for instance, Harris County has 10), and every one is open during all business hours, usually 9 to 5, Monday through Friday. These offices are now largely irrelevant in the voting process.

15.     SB 14, for most people, requires that they go to a DPS office, where SB 14 IDs are issued. Barely half of Texas' counties have a fully functioning DPS office. Approximately one-third of Texas counties have no DPS office at all. This means that residents of those counties

cannot qualify to vote in their own county.   Another 40 counties have offices open only sporadically, sometimes as little as one day per week.

16.     <u>Expense</u>.  The only one of the SB 14 IDs that can be obtained without cost is the military ID, which is available only to the limited class of voters in active military service.  Several of the other SB 14 IDs have an explicit fee for issuance, which cannot be waived.     Putting aside the costs associated with obtaining the underlying documentation needed to apply for these IDs, the explicit costs for SB 14 IDs include:  Concealed weapons permit:  $140.00, plus the cost of training and ammunition for the qualifying exam;   U.S. Passport: $135.00;   Citizenship certificate (CIS Form I-560):  $59.95;  Driver's license: $25, plus the cost of any training and exam preparation and access to a vehicle for the driving portion of the exam;   Personal identification card: $16.

17.     This leaves the other identification issued by DPS, the "election identification certificate" (EIC), which for some reason is stamped with the words "cannot be used as identification." While there is no charge specifically attached to the *issuance* of an EIC, a voter cannot obtain one without presenting other documents that do cost money and which require significant effort to obtain.

        (a)     Often, the least expensive option for providing the necessary documentation to obtain an EIC is to obtain a certified copy of a birth certificate.  For many voters who currently do not possess a certified copy of their birth certificate, these documents cost money and the costs can be prohibitive to obtaining them.  These voters must also travel to an additional government office from DPS, which in many cases is equally or more inconvenient.  In addition,

there are tens of thousands of eligible Texas citizens who cannot obtain a birth certificate at any cost because one is not available for them.

     (b)    Voters whose legal names have changed since birth and who present a birth certificate to apply for an EIC—most often women who have changed their names as a result of marriage or divorce—must also obtain certified copies of their marriage licenses, divorce decrees, or other legal documents to verify their legal name changes. Some voters cannot obtain these documents at any price, and, even for those voters who *could* obtain these documents, it involves considerable additional burdens and expense. They must contact yet another office and pay still more money. For example, in many Texas counties, a certified copy of a marriage license can cost in excess of $20 and, in some counties, it can cost in excess of $30.

18.    Many voters, including some of the Plaintiffs, have made Herculean efforts to obtain one of the necessary SB 14 IDs, including the elusive EICs, and have been unable to do so.

19.    On information and belief, the requirements for obtaining a driver's license or DPS personal ID card have been made more stringent in the past six years. Because these documents are generally valid for six years, there are people who hold driver's licenses or DPS personal IDs (which qualify them to vote) who obtained them under less stringent requirements than would-be voters face in obtaining them today.

20.    The State's purported measures for mitigating the effects of these burdens and inconvenience on certain classes of voters are also inadequate.

     (a)    <u>Mail-in ballots.</u>  SB 14 allows certain older age and disabled citizens to vote without an SB 14 ID, but only by mail. This is a form of segregation that limits the voting rights of these groups and amounts to second-class citizenship. Moreover, in many cases, such citizens

will be required to vote well before the election campaigning is over and will thus have less opportunity than other voters to make meaningful choices in elections.

(b)   Disabled exemption.  SB 14 allows certain disabled citizens to vote in-person if they obtain a disability designation on their voter registration, but the category of disabled voters able to exercise this option is quite limited, and the process for obtaining this designation is complex and burdensome.

(c)   The Secretary of State's designation of additional photo IDs.  The Secretary of State, purportedly acting pursuant to statutory authority, has listed additional forms of ID that he asserts will qualify voters under SB 14.  But these designations may not in fact allow their holders of such IDs to vote because it is not clear that the Secretary has authority under state law to add to the list of IDs included in the statute.  Even if he does, the additional IDs are not widely available and will do little to mitigate SB 14's widely disfranchising effects.

21.    The State has failed to provide the elemental due process of sending notices to registered voters who are not listed in DPS records to inform them that they must acquire an SB 14 ID in order to keep voting.

## Problems for Voters Who Have an SB 14 ID

22.    The disfranchising effect of SB 14 is not limited to voters who lack SB 14 IDs because SB 14 also requires that the information on a person's ID match the information on the voter registration list.  SB 14 therefore threatens to disfranchise Texas voters who are "no-matches," *i.e.* those whose voter registration information does not match the information on their photo IDs.

23.    On information and belief, the number of "no-match" Texas registered voters is in the millions.

24.    The Secretary of State has issued regulations purporting to mitigate the no-match problem, but these regulations are inadequate to cure SB 14's disfranchising effects on voters. The regulations are vague and invite arbitrary, non-uniform, and discriminatory enforcement between different voters and between different localities in the state.

25.    As a result, voters with "substantially similar" names on their voter registration and photo ID cannot know whether they will be permitted to vote. Even if they are permitted to vote once, they cannot know whether they will be permitted to vote the next time.

26.    The statute's provisions for signing affidavits, casting provisional ballots, or using mail-in balloting for select groups of voters are also inadequate to cure SB 14's disfranchising effects.

(a)    Affidavits.  Certain "no-match voters" can cast regular ballots if poll workers deem their names and other information on their IDs to be "substantially similar" to the information on the voter list, but these voters must undergo additional procedures to be able to cast regular ballots.  Once a poll worker identifies that them as having a match problem, these voters must undergo inspection by one or more election workers to determine whether their information is "substantially similar," and they must then read and sign an affidavit attesting to their identity.  The process may have to be repeated in future elections.  A voter also may try to update their information to create an exact match, but this can be burdensome or difficult. Additionally, some voters have tried to update their information but these attempted updates have been unsuccessful and can create new inconsistencies with other SB 14 qualifying IDs they possess.

17

(b)   <u>Provisional ballots.</u>   For "no-match voters" whose names are not deemed "substantially similar," the provisional ballot process is also wholly inadequate to ensure that these voters are able to cast effective ballots.   These voters face severe burdens, including expense and inconvenience, to ensuring that their ballots are counted.

(c)   <u>Mail-in ballots.</u>   Some "no-match voters" who are elderly or disabled may be able to cast mail-in ballots, but this is an inadequate substitute for the reasons listed in paragraph 20.

27.   The State has failed to provide the elemental due process of sending notice to the "no-match voters" to inform them that they must correct their records to be certain they will be allowed to vote.

28.   In the recent 2013 elections in which SB 14 was in effect, many no-match voters were denied their right to vote.

### Demographic effects

29.   Enforcement of SB 14 will disproportionately disfranchise minority voters, especially African-Americans and Latinos.   This is so for several reasons, all of them growing out of Texas' history and present-day legacy of racial and ethnic discrimination.

30.   The percentage of currently registered voters who lack an SB 14 ID is significantly higher among African-Americans and Latinos than among non-minority voters.

31.   The percentage of currently registered voters who lack an SB 14 ID is significantly higher among poor Texans than non-poor Texans.   African-Americans and Latinos are disproportionately found in the ranks of the poor population.

32.    The scattered location of DPS offices further exacerbates the disproportionate injuries among minority voters, and especially among Latino voters, because the areas lacking DPS offices are disproportionately located in areas heavily populated by Latino voters.

33.    Overcoming the inconvenience and expense of trying to acquire an SB 14 ID will be more difficult for minority voters, especially African-Americans and Latinos, and as a result, the disparity in SB 14 ID possession between them and non-minority voters can be expected to grow.

34.    Even African-Americans and Latinos who have SB 14 ID are disproportionately likely to be denied their right to cast an effective ballot or face additional burdens to casting effective ballots.

35.    Currently registered voters who are elderly or disabled are also injured by SB 14 because they are less likely to possess an SB 14 ID and less likely to be able to overcome the inconvenience and expense of acquiring one.

36.    Although SB 14 allows elderly voters to vote by mail, such an alternative involves burdens on their right to vote and is not an equal substitute to voting in person, as described in paragraph 20.

37.    Women are disproportionately likely to be denied their right to vote or to undergo additional burdens to casting effective ballots.  Women with SB 14 ID are more likely to have name discrepancies between their IDs and the voter list than are men.  Additionally, most women who lack SB 14 ID will have to provide more documentation than men to obtain SB 14 ID, including the EIC, because they are more likely to have legally changed their names as a result of marriage or divorce.

19

**The District of Columbia trial**

38.    When SB 14 was enacted, Section 5 of the Voting Rights Act was in effect, requiring federal preclearance before SB 14 could be enforced. The result was a trial before a three-judge court in the United States District Court for the District of Columbia, in which the State of Texas and the opponents of SB 14 had a full and fair opportunity to put on their case. The trial resulted in a decision, with detailed findings, against SB 14 on grounds of racial discrimination and retrogression, *i.e.*, that SB 14 made the position of minority voters in Texas worse than it had been. *Texas v. Holder*, 888 F. Supp. 2d 113 (D.D.C. 2012). Although the decision has been vacated and remanded for further consideration in light of the Supreme Court's subsequent holding that parts of the Voting Rights Act are unconstitutional, the district court's findings, which were based on extensive testimony and exhibits, are a powerful affirmation that SB 14 is discriminatory as alleged in this Complaint.

39.    Among other things, the D.C. court found "in this particular litigation and on this particular record, Texas has failed to demonstrate that its particular voter ID law lacks retrogressive effect." Rejecting Texas' proffered evidence as "invalid, irrelevant, and unreliable," the court instead credited the evidence of the United States and private intervenors (including some of the Plaintiffs herein) that "SB 14, if implemented, would in fact have a retrogressive effect on Hispanic and African[-]American voters."

40.    In reaching this conclusion, the Court explained that the Texas law "imposes strict, unforgiving burdens on the poor, and racial minorities in Texas are disproportionately likely to live in poverty."

20

41.     Among the hardships imposed by SB 14, the D.C. court emphasized the following:

- Although one of the forms of SB 14 ID (an "election identification certificate" or EIC), is purportedly "free," the applicant would have to present government-issued documentation to receive the EIC, "the cheapest of which, a certified copy of a birth certificate, costs $22."

- EICs (as well as driver's licenses) are available only at DPS offices, and "81 Texas counties have no [DPS] office, and 34 additional counties have [DPS] offices open two days per week or less."

- For some voters, a trip to and from a DPS office would be 200-250 miles.

- Many DPS offices are inaccessible by public transportation.

42.     All these and other facts contributed to the district court's observation that the Texas Legislature had "ignored warnings that SB 14, as written, would disfranchise minorities and the poor," and "defeated several amendments" which would have substantially mitigated the retrogressive effect of the new identification requirement. Now, Texas' movement to immediately enforce SB 14, within hours of the Supreme Court's decision concerning preclearance, demonstrates Texas has again ignored clear evidence and notice of the discriminatory effects of this law, thereby naturally leading to the unmistakable conclusion that Defendants fully intend the racially and non-racially discriminatory effects of SB 14.

**Texas' Interests and Scant Record of Need**

43.     Election fraud should be prevented. However, a fundamental principle of law and common sense is that a solution should fit the problem. Here the problem is the "risk" of in-person impersonation, *i.e.*, the risk that a person will appear at a polling place claiming to be another person. Texas' "solution" to this "problem" was SB 14, so the question is whether the solution is appropriate to the problem.

21

44.     The State has not produced, despite concerted efforts to do so in the D.C. case, evidence of a single incident of voter impersonation that SB 14 would have prevented.  Even if the state could produce such an instance, such events are rare and in no way justify SB 14's onerous burdens.

45.     The reason voter impersonation—the only type of fraud which SB 14 could address—is so rare is because it is extremely difficult to impersonate another voter and not be caught.  In close elections, the campaigns go over the list of successful voters to check for impersonation.  Also, polling locations involve small geographic regions where voters and voting staff recognize one another.  Lastly, there are steep criminal penalties that pre-exist SB 14 that have proven adequate to deter such conduct.  Someone trying to vote on behalf of another must always worry that the person whom they impersonate will have voted earlier  or will attempt to vote later—in either case exposing to election workers that impersonation has occurred or been attempted.

46.     A public official, if acting in good faith, could hardly think that disfranchising and imposing a severe and discriminatory burden on thousands of registered voters is an appropriate solution for a "risk" of the level described above.

47.     It is true that the Supreme Court held in *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008), that Indiana need not show actual incidents of election fraud before adopting a photo ID requirement, but, as noted above in paragraph 4, Texas is not Indiana, and the Supreme Court has previously recognized that Texas' history and legacy of discrimination can make a voting procedure that is valid in Indiana invalid in Texas.

48.     It is also true that Texas, like all states, has an interest in voter confidence in the election process, but that confidence is surely damaged more by the spectacle of a state disfranchising

possibly hundreds of thousands of voters than by a fear of a tiny handful, at most, of imposter voters. Moreover, as described in the *Crawford* case, instilling voter confidence is important largely in order to increase voter participation, yet how is that interest in increased voter participation advanced by disfranchising voters?

### Mitigating Factors and Narrow Tailoring

49.     As the representative of its people, not their master, the State of Texas and its officials have no legitimate interest in depressing or discouraging voter participation, but instead have and must recognize a strong state interest in promoting its citizens' voting participation. Thus, if the Defendants and the state legislators simply believed in good faith that a photo ID requirement is needed, they were obligated to and would have taken steps to promote voters' obtaining the photo IDs that would qualify them to vote under SB 14 and they would have taken steps to ensure that those with SB 14 IDs are able to cast effective ballots.

50.     Texas is one of the lowest-ranking states in the nation for voter registration and voter turnout. If the State were interested in increasing voter participation, as claimed, they would have taken steps to mitigate the disfranchising effects of the photo ID requirement. Instead, the State enacted the strictest photo ID requirement in the country.

51.     In enacting SB 14, Texas chose to deny its citizens' interests by acting and failing to act in a variety of ways that could have mitigated the harshness and discrimination of the law, and advanced the interests of its voters, without impeding the interests it claimed to advance in SB 14.

52.     This is equivalent to the requirement of narrow tailoring, an analysis which is applicable when a state's interest in a law is to be balanced against the interests of those aggrieved by the

law. In a case like this, the degree of narrow tailoring or mitigation of harshness and discrimination is highly relevant.

53.     As noted in paragraph 42, above, Texas chose not to take certain steps that could have mitigated the harshness and discrimination of SB 14. The D.C. court listed some of those steps in its decision and other steps were also available and could have been taken.

54.     Texas could have exempted the elderly and all disabled persons from the requirement, especially inasmuch as they are least likely to have a driver's license or have any other reason to visit a DPS office. Moreover, the elderly are more likely than others to lack the ability to ever obtain a birth certificate, having been born in a time when government record keeping was less robust than today.

55.     Texas could have provided a "reasonable impediment" exemption, as South Carolina has done, allowing a voter to proceed without an SB 14 ID if a reasonable impediment, such as the inability to pay for necessary documentation, prevented the voter from acquiring an SB 14 ID. At the very least, Texas could have taken steps to ensure that the costs associated with obtaining SB 14 ID, including the "free" EIC, were not prohibitive. For example, as the D.C. court noted, "[i]gnoring warnings that SB 14, as written, would disfranchise minorities and the poor, the legislature tabled or defeated amendments that would have: waived all fees for indigent persons who needed the underlying documents to obtain an EIC; [or] reimbursed impoverished Texans for EIC-related travel costs." *Texas v. Holder*, 888 F. Supp. 2d 113, 144 (2012) (internal citations omitted).

56.     Texas could have included additional types of photo IDs in the SB 14 list.

57.     Texas could have kept the current voter registration offices as real registration offices by providing those offices with simple cameras, as South Carolina has done, so that a voter could truly register at the so-called registration office.

58.     Texas could have provided a DPS office in every county, and open every business day, so that voters could qualify in their home county.

59.     With today's technology, Texas could easily provide a photo ID capability at every polling place so that every voter who comes to vote and who does not possess an SB 14 photo ID could have their photo taken by a poll official on an ordinary cellphone camera and entered into the State database.

60.     Texas could have actually funded a legitimate effort to raise public awareness of the new requirements and increase the likelihood citizens would have the necessary identification.  Texas could have, and should have, sent notices to voters likely to be disfranchised as a result of SB 14. Texas had, for instance, generated a list of at least 795,555 voters *it* believed did not possess a DPS-issued ID in the case before the D.C. court, but it did not send notices to these likely affected voters.

61.     At the least Texas could have, and should have, conducted an effective public education program to increase the public's awareness about the new and stringent requirements for participating in elections and exercising their fundamental right to vote.

62.     Texas could have, and should have, funded county election offices to the degree necessary to reasonably and consistently enforce SB 14.

63.     All in all, instead of taking any constructive steps, Texas has acted in every way to punish voters and to pick and choose which voters it will favor and which it will punish, especially

25

choosing to punish African-American and Latino voters, as it has in every redistricting cycle for at least four decades.  SB 14 is designed not to qualify lawful voters, but to disqualify them.

## Discriminatory Purpose

64.     SB 14 was enacted with the purpose and intent to discriminate against racial and ethnic minorities.

65.     This conclusion is supported by Texas' long history of such discrimination, continuing up to the present.  SB 14 was passed at the same time and with the same intent as statewide redistricting maps that have already been adjudicated to be discriminatory by a three-judge federal court in San Antonio, *Perez v. Perry*, No. 11-360 (W.D. Tex.), as well as by a three-judge court in the United States District Court for the District of Columbia, *State of Texas v. Holder*, No. 11-1303 (D.D.C.).

66.     SB 14 was also passed through an unusual series of departures, both procedural and substantive, from the ordinary course of lawmaking in Texas.  Among these departures were the decision to treat the bill as "emergency legislation" and the decision to adopt an election reform that would result in significant voter disfranchisement, even though there were no reported problems that the reform could fix.

67.     Further supporting the conclusion that SB 14 was enacted with the purpose and intent to discriminate is the racially discriminatory effect, and the refusal of the Texas legislature to take any steps to mitigate the burdens, as cited by the D.C. court, and as listed in paragraphs 49-62, above.

68.     Defendants' renewed efforts to implement SB 14 after the D.C. court found it would have a retrogressive effect on minority voters, and immediately after the Supreme Court

26

invalidated the Voting Rights Act's preclearance coverage formula in *Shelby County v. Holder*, 133 S. Ct. 2612 (2013) are additional evidence of intentional discrimination. The Defendants have willfully chosen to ignore what they learned in the D.C. trial and from the D.C. court's opinion.

69.     A well-known principle of law is that a person, such as these Defendants and the Texas legislature, is presumed to intend the natural consequence of their acts. By that standard, enactment of SB 14 was plainly intended to be racially and ethnically discriminatory.

70.     Absent an order granting relief under Section 3(c) of the Voting Rights Act, 42 U.S.C. § 1973a(c), Texas will continue to discriminate on the basis of race and language minority status in violation of the Voting Rights Act and the Fourteenth and Fifteenth Amendments to the United States Constitution.

## CLAIMS

### Count 1

### Race and Language Minority Discrimination, Section 2, Voting Rights Act

71.     Plaintiffs reallege the facts set forth above.

72.     SB 14 violates Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, because it results in a denial of the right to vote on account of race and language minority status, in that, under the totality of the circumstances, Plaintiffs and minority voters are denied an equal opportunity to participate effectively in the political process.

73.     SB 14 also violates Section 2 because it denies and abridges the right to vote on account of race and language minority status.

27

### Count 2

### Race Discrimination, 14th Amendment

74.    Plaintiffs reallege the facts set forth above.

75.    SB 14 violates the Fourteenth Amendment to the Constitution of the United States because it purposely denies equal protection in registering and voting to Plaintiffs and other minority voters on account of race and ethnic origin.

### Count 3

### Race Discrimination, 15th Amendment

76.    Plaintiffs reallege the facts set forth above.

77.    SB 14 violates the Fifteenth Amendment to the Constitution of the United States because it purposely denies and abridges the right to register and vote to Plaintiffs and other minority voters on account of race and ethnic origin.

### Count 4

### Non-Racial Discrimination in Voting, 14th Amendment

78.    Plaintiffs reallege the facts set forth above.

79.    SB 14 violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution because it mandates arbitrary and disparate treatment of voters and denies equal access to the right to vote to eligible citizens.

28

80.     SB 14 imposes severe burdens on voters, in time, inconvenience and expense. The burden is severe whether measured by how it affects a single voter or by how many voters it affects.

81.     SB 14 facially discriminates between classes of voters (such as between those having and those lacking an SB 14 ID, between holders of equivalent forms of photo ID who are treated differently by SB 14 such as federal military employees versus federal civilian employees, between residents of 134 counties who can qualify to vote in their home counties versus residents of the 120 counties who can do so either rarely or never, and other facial classifications).

82.     Either the severe burdens described in paragraph 80, standing alone, or the facial discrimination described in paragraph 81, standing alone, is sufficient to require that SB 14 be judged by strict scrutiny. As a result, SB 14 can survive only if its specific terms meet a compelling state interest (that is actual, not hypothetical) and only if each of its provisions is narrowly tailored to meet that compelling interest in the least restrictive way. In this inquiry, the burden of proof is on Texas. SB 14 cannot meet this exacting test.

83.     Indeed, SB 14 cannot even meet the less exacting test (applicable where a voting regulation is not burdensome and does not classify on its face) of balancing Texas' interest claimed here (which is modest at best) against the critically important interests of Plaintiffs and other Texas registered voters who are disfranchised by SB 14, especially as that balancing test is applied against the background of Texas' longstanding and recent history of purposeful racial and ethnic discrimination, and in light of the number of poor, disabled and elderly voters targeted by SB 14.

### Count 5

#### Deprivation of Due Process, 14th Amendment

84.     The right to vote of a registered voter is a form of liberty and property under Texas and federal law.

85.     On its face, SB 14 deprives Plaintiffs and other Texans of the right to vote without due process in a variety of ways, including, among other ways, failing to provide adequate standards of uniformity in the treatment of voters, vesting excessive discretion in local officials, and arbitrarily picking and choosing which photo IDs would be valid and which would not.

86.     As Defendants have applied SB 14, they have deprived and are depriving Plaintiffs and other Texans of their right to vote without due process, by failing to provide adequate notice—individual or otherwise—to voters who were or will be disfranchised by SB 14.

### Count 6

#### Denial of Free Speech and Association, First Amendment applied through the 14th Amendment

87.     Plaintiffs reallege the facts set forth above.

88.     Voting and participating in the election process is a form of expression which is the ultimate in free speech and association entitled to First Amendment protection.  In light of the Supreme Court's cases giving strong First Amendment protection to campaign funds spent to influence voters, the voters themselves can hardly be entitled to less protection.

89.     As a restriction on free speech and association, SB 14 must be judged by the same strict scrutiny outlined above in paragraph 82, a scrutiny that SB 14 cannot survive.

30

### Count 7

### Poll Tax, 24th Amendment

90.     Plaintiffs reallege the facts set forth above.

91.     SB 14 is an unconstitutional poll tax on the right to vote in violation of the Fourteenth and Twenty-Fourth Amendments to the United States Constitution.

92.     For voters who lack the required identification, SB 14 requires a payment of money in order to vote in violation of the Equal Protection Clauses of the Fourteenth Amendment.

93.     Even if applied equally to all voters, conditioning the right to vote on the payment of a fee conflicts with the Twenty-Fourth Amendment.

### EQUITY

94.     Plaintiffs have no adequate remedy at law.  Unless restrained, Defendants will injure and continue to injure Plaintiffs and other Texas voters in the manner set forth above.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

Issue a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rules of Civil Procedure Rule 57, declaring that SB 14 is illegal and unconstitutional as described above, in violation of Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, and the First, Fourteenth, Fifteenth and Twenty-Fourth Amendments to the United States Constitution;

Enjoin the Defendants, their agents, employees, and those persons acting in concert with them, from enforcing or giving any effect to the requirements of SB 14, including enjoining Defendants from conducting any elections utilizing SB 14;

Make all further orders as are just, necessary, and proper to ensure complete fulfillment of this Court's declaratory and injunctive orders in this case;

Issue an order requiring Defendants to pay Plaintiffs' costs, expenses and reasonable attorneys' fees incurred in the prosecution of this action, as authorized by the Voting Rights Act and the Civil Rights Attorneys Fees Awards Act of 1976, 42 U.S.C. §§ 1973l(e) & 1988;

Retain jurisdiction and require Texas to obtain preclearance pursuant to Section 3(c) of the Voting Rights Act, 42 U.S.C. § 1973a(c) with respect to its voting practices and procedures;

Grant such other and further relief as it deems proper and just.

This the 6th day of December, 2013.

Respectfully submitted,

**BRAZIL & DUNN**

*/s/ Chad W. Dunn*
Chad W. Dunn
State Bar No. 24036507
K. Scott Brazil
State Bar No. 02934050
Brazil & Dunn
4201 Cypress Creek Parkway, Suite 530
Houston, Texas 77068
Telephone: (281) 580-6310
chad@brazilanddunn.com
scott@brazilanddunn.com

J. Gerald Hebert
D.C. Bar No. 447676
Campaign Legal Center
215 E Street, NE
Washington, DC 20002
Telephone (202) 736-2200 ext. 12
Facsimile (202) 736-2222
GHebert@campaignlegalcenter.org
(Pro Hac Vice Motion Granted Dkt. #13)

32

Neil G. Baron
State Bar No. 01797080
Law Office of Neil G. Baron
914 FM 517 W, Suite 242
Dickinson, Texas 77539
Telephone (281) 534-2748
neil@ngbaronlaw.com

David Richards
State Bar No. 16846000
Richards, Rodriguez & Skeith, LLP
816 Congress Avenue, Suite 1200
Austin, Texas 78701
Telephone (512) 476-0005
daverichards4@juno.com

Armand G. Derfner
Derfner, Altman & Wilborn, LLC
P.O. Box 600
Charleston, S.C. 29402
Telephone (843) 723-9804
aderfner@dawlegal.com
(Pro Hac Vice Motion Granted Dkt. # 6)

*Attorneys for Plaintiffs Marc Veasey, Floyd James Carrier, Anna Burns, Michael Montez, Penny Pope, Jane Hamilton, Sergio DeLeon, Oscar Ortiz, Koby Ozias, John Mellor-Crummey, Peggy Herman, Evelyn Brickner, Gordon Benjamin, Ken Gandy, League of United Latin American Citizens ("LULAC") and Dallas County, Texas*

LUIS ROBERTO VERA, JR.
LULAC National General Counsel
State Bar No.  20546740
The Law Offices of Luis Vera Jr., and Associates
1325 Riverview Towers, 111 Soledad
San Antonio, Texas 78205-2260
Telephone (210) 225-3300
Facsimile (210) 225-2060
lrvlaw@sbcglobal.net

*Attorney for LULAC*

33

Craig M. Watkins
Dallas County District Attorney
State Bar No. 00791886
Teresa G. Snelson
Chief, Civil Division
Dallas County District Attorney's Office
State Bar. No. 08577250
411 Elm Street, 5th Floor
Dallas, TX 75202-4606
Telephone (214) 653-7358
Facsimile (214) 653-6134
Teresa.Snelson@dallascounty.org

*Attorneys for Dallas County, Texas*

CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of December, 2013, I served a copy of the foregoing on all counsel of record by filing a copy of the same in this Court's ECF system.  For those attorneys not receiving a copy via ECF, copies were served via email or first-class mail, postage prepaid.

*J. Gerald Hebert*
J. GERALD HEBERT