# HOUSE JOURNAL

## EIGHTY-SECOND LEGISLATURE, REGULAR SESSION

### PROCEEDINGS

### THIRTY-EIGHTH DAY — MONDAY, MARCH 21, 2011

The house met at 11 a.m. and was called to order by the speaker.

The roll of the house was called and a quorum was announced present (Record 101).

Present — Mr. Speaker; Aliseda; Allen; Alonzo; Alvarado; Anchia; Anderson, C.; Anderson, R.; Aycock; Beck; Berman; Bohac; Bonnen; Branch; Brown; Burkett; Burnam; Button; Cain; Callegari; Carter; Castro; Chisum; Christian; Coleman; Cook; Craddick; Creighton; Crownover; Darby; Davis, J.; Davis, S.; Davis, Y.; Deshotel; Driver; Dukes; Dutton; Eiland; Eissler; Elkins; Farias; Farrar; Fletcher; Flynn; Frullo; Gallego; Garza; Geren; Giddings; Gonzales, L.; Gonzales, V.; Gonzalez; Gooden; Guillen; Hamilton; Hancock; Hardcastle; Harless; Harper-Brown; Hartnett; Hernandez Luna; Hilderbran; Hochberg; Hopson; Howard, C.; Howard, D.; Huberty; Hughes; Hunter; Isaac; Jackson; Johnson; Keffer; King, P.; King, S.; King, T.; Kleinschmidt; Kolkhorst; Kuempel; Landtroop; Larson; Laubenberg; Lavender; Legler; Lewis; Lozano; Lucio; Lyne; Madden; Mallory Caraway; Margo; Marquez; Martinez; Martinez Fischer; McClendon; Menendez; Miles; Miller, D.; Miller, S.; Morrison; Muñoz; Murphy; Naishtat; Nash; Oliveira; Orr; Otto; Parker; Patrick; Paxton; Peña; Perry; Phillips; Pickett; Pitts; Price; Quintanilla; Raymond; Reynolds; Riddle; Ritter; Rodriguez; Schwertner; Scott; Sheets; Sheffield; Shelton; Simpson; Smith, T.; Smith, W.; Smithee; Solomons; Strama; Taylor, L.; Taylor, V.; Thompson; Torres; Truitt; Turner; Veasey; Villarreal; Vo; Walle; Weber; White; Woolley; Workman; Zedler; Zerwas.

Absent — Gutierrez.

The invocation was offered by Representative Landtroop.

The speaker recognized Representative Landtroop who led the house in the pledges of allegiance to the United States and Texas flags.

### REGULAR ORDER OF BUSINESS SUSPENDED

On motion of Representative Landtroop and by unanimous consent, the reading and referral of bills was postponed until just prior to adjournment.

### CAPITOL PHYSICIAN

The speaker recognized Representative Lozano who presented Dr. Luis Calo of Harlingen as the "Doctor for the Day."

---

906   82nd LEGISLATURE — REGULAR SESSION

The house welcomed Dr. Calo and thanked him for his participation in the Physician of the Day Program sponsored by the Texas Academy of Family Physicians.

### MESSAGE FROM THE SENATE

A message from the senate was received at this time (see the addendum to the daily journal, Messages from the Senate, Message No. 1).

### NOTICE OF WITHDRAWAL OF ELECTION CONTEST

Upon Representative D. Howard having recused herself from the proceedings and having absented herself from the house chamber, the speaker had read the following statement:

### NOTICE OF WITHDRAWAL OF ELECTION CONTEST FOR THE OFFICE OF THE TEXAS HOUSE OF REPRESENTATIVES, DISTRICT 48

To the Honorable Speaker of the House of Representatives for the State of Texas:

COMES NOW, Dan Neil, Contestant in the above-styled cause of action, against Donna Howard, Contestee, and files this Notice of Withdrawal of Election Contest.

WHEREFORE, PREMISES CONSIDERED, Contestant Dan Neil withdraws his contest in House District 48.

Respectfully submitted,
BEIRNE, MAYNARD & PARSONS L.L.P.
Joseph M. Nixon
State Bar No. 15244800
James E. "Trey" Trainor, III
State Bar No. 24042052
401 W. 15th Street, Suite 845
Austin, Texas 78701
Telephone: (512) 623-6700
Facsimile: (512) 623-6701

Donna Garcia Davidson
State Bar No. 00783931
ATTORNEY AND COUNSELOR AT LAW
P.O. Box 12131
Austin, Texas 78711
Telephone: (512) 775-7625
ATTORNEYS FOR DAN NEIL

### CERTIFICATE OF SERVICE

I certify that on the 18th day of March, 2011, a true and correct copy of the foregoing document has been sent via electronic mail and facsimile transmission to Donna Howard, by and through her attorneys at the law firm of Ray, Wood & Bonilla, 2700 Bee Caves Road, Austin, Texas, 78746.

2:13-cv-193
09/02/2014
DEF0473

Δ π EXHIBIT 163
Deponent Harless
Date 5/15/14  Rptr.
WWW.DEPOBOOK.COM

Exhibit
Harless
5-15-12
ESQUIRE

Monday, March 21, 2011    HOUSE JOURNAL — 38th Day    907

Representative D. Howard was readmitted to the house chamber and announced present.

## HR 500 - PREVIOUSLY ADOPTED
(by Hardcastle)

The chair laid out and had read the following previously adopted resolution:

HR 500, In memory of Texas Department of Public Safety Senior Corporal David Ralph Slaton of Bowie.

On motion of Representative Geren, the names of all the members of the house were added to HR 500 as signers thereof.

### INTRODUCTION OF GUESTS

The speaker recognized Representative Hardcastle who introduced family members and friends of Senior Corporal David Ralph Slaton.

(Price in the chair)

### FIVE-DAY POSTING RULE SUSPENDED

Representative Gallego moved to suspend the five-day posting rule and all necessary rules to allow the Committee on Criminal Jurisprudence to consider HB 2482 at 10:30 a.m. or upon final adjournment tomorrow in JHR 120.

The motion prevailed.

Representative S. Miller moved to suspend the five-day posting rule to allow the Committee on Homeland Security and Public Safety to consider HB 1810 at 2 p.m. or upon final adjournment tomorrow in E1.026.

The motion prevailed.

### HR 939 - ADOPTED
(by J. Davis)

Representative J. Davis moved to suspend all necessary rules to take up and consider at this time HR 939.

The motion prevailed.

The following resolution was laid before the house:

HR 939, Recognizing March 21, 2011, as World Down Syndrome Day.

HR 939 was adopted.

### HR 530 - PREVIOUSLY ADOPTED
(by Schwertner)

The chair laid out and had read the following previously adopted resolution:

HR 530, In memory of J. D. Thomas, Jr., of Georgetown.

On motion of Representative Woolley, the names of all the members of the house were added to HR 530 as signers thereof.

908    82nd LEGISLATURE — REGULAR SESSION

### INTRODUCTION OF GUESTS

The chair recognized Representative Schwertner who introduced family members of J. D. Thomas, Jr.

### HR 490 - PREVIOUSLY ADOPTED
(by Gallego)

The chair laid out and had read the following previously adopted resolution:

HR 490, In memory of Joyce Ann Probst of Alpine.

On motion of Representative McClendon, the names of all the members of the house were added to HR 490 as signers thereof.

### RESOLUTIONS ADOPTED

Representative Dutton moved to suspend all necessary rules to take up and consider at this time HR 938 and HR 947 - HR 951.

The motion prevailed.

The following resolutions were laid before the house:

HR 938 (by Martinez Fischer), Congratulating Ervin J. De Luna of San Antonio on the occasion of his retirement from the Texas Health and Human Services Commission.

HR 947 (by Dutton), Congratulating Brian Wooten on completing the Men at Work program of Star of Hope in Houston.

HR 948 (by Dutton), Congratulating Quinton Smith on completing the Motivational Work program of Star of Hope in Houston.

HR 949 (by Dutton), Congratulating Elvin Adams on completing the Men at Work program of Star of Hope in Houston.

HR 950 (by Dutton), Congratulating Christopher Rainer on completing the Men at Work program of Star of Hope in Houston.

HR 951 (by Raymond), Congratulating Don Jose "Pepe" Diaz on his achievements as a charro.

The resolutions were adopted.

### HR 450 - ADOPTED
(by Bohac and Farias)

Representative Bohac moved to suspend all necessary rules to take up and consider at this time HR 450.

The motion prevailed.

The following resolution was laid before the house:

HR 450, Congratulating Shelly Vasbinder and Manny Salazar III on their wedding.

HR 450 was read and was adopted.

Monday, March 21, 2011    HOUSE JOURNAL — 38th Day    909

## INTRODUCTION OF GUESTS

The chair recognized Representative Bohac who introduced Shelly Vasbinder and Manny Salazar III.

## HR 733 - PREVIOUSLY ADOPTED
(by Garza)

The chair laid out and had read the following previously adopted resolution:

HR 733, Recognizing March 22, 2011, as The University of Texas at Austin Plan II Honors Day.

## INTRODUCTION OF GUESTS

The chair recognized Representative Naishtat who introduced professors, students, and staff from The University of Texas at Austin Plan II Honors Program.

(Speaker in the chair)

## EMERGENCY CALENDAR
## SENATE BILLS
## SECOND READING

The following bills were laid before the house and read second time:

## CSSB 14 ON SECOND READING
(Harless, L. Taylor, Peña, Truitt, T. Smith, et al. - House Sponsors)

CSSB 14, A bill to be entitled An Act relating to requirements to vote, including presenting proof of identification; providing criminal penalties.

Representative Harless moved to postpone consideration of CSSB 14 until 12:12 p.m. today.

The motion prevailed.

## GENERAL STATE CALENDAR
## HOUSE BILLS
## SECOND READING

The following bills were laid before the house and read second time:

## HB 314 ON SECOND READING
(by Hardcastle)

HB 314, A bill to be entitled An Act relating to the designation of a portion of U.S. Highway 81 as the Corporal David Slaton Memorial Highway.

HB 314 was passed to engrossment.

## POSTPONED BUSINESS

The following bills were laid before the house as postponed business:

910    82nd LEGISLATURE — REGULAR SESSION

## CSSB 14 ON SECOND READING
(Harless, L. Taylor, Peña, Truitt, T. Smith, et al. - House Sponsors)

CSSB 14, A bill to be entitled An Act relating to requirements to vote, including presenting proof of identification; providing criminal penalties.

CSSB 14 was read second time earlier today and was postponed until this time.

## CSSB 14 - STATEMENT OF LEGISLATIVE INTENT

REPRESENTATIVE ANCHIA: I wanted to ask you a couple questions about SB 14 and voter impersonation. You alluded to the fact that this bill deals with one specific type of voter fraud, correct?

REPRESENTATIVE HARLESS: Yes, potential voter fraud.

ANCHIA: And that's voter impersonation?

HARLESS: Yes.

ANCHIA: And how does—describe how voter impersonation works.

HARLESS: Someone shows up to the poll with a voter registration card that may not be theirs and passes a vote with that card.

ANCHIA: How often does that happen in the State of Texas, do you think?

HARLESS: I'm not advised.

ANCHIA: Do you have a guess? You've gone back and looked at interim reports and studies on this issue—

HARLESS: Under our current law, there's not really tools necessary to stop this type of voter fraud. In fact, most of this, in voter fraud, we may not even know about until after the election occurs. We have heard from many witnesses over the last couple of sessions who have testified that voter impersonation, in which people's IDs or voter registration card have been used and a vote passed in that person's name, is not uncommon.

ANCHIA: Did they provide any documented cases, or was it anecdotal?

HARLESS: There was information from the secretary of state, but really, we don't have the tools to effectively deter or detect this type of voter fraud.

ANCHIA: I find it interesting that you say that we don't have the tools in current law. Are you pretty familiar with the Election Code?

HARLESS: A little. I've learned more about it the last few months.

ANCHIA: Yeah, me too, me too. What is the penalty for voter impersonation?

HARLESS: As addressed in this bill?

ANCHIA: No, no. Current law.

HARLESS: I think—

ANCHIA: It's under Section 64.012 of the Election Code.

HARLESS: And it would be a second-degree felony, if they're caught?

Monday, March 21, 2011    HOUSE JOURNAL — 38th Day    911

ANCHIA: Okay, so, under current law, just to be clear so the membership knows, it's actually a third-degree felony. So it's two to 10 years in prison and up to $10,000 worth of fines. And in the committee substitute, it's actually bumped up to a third-degree felony so there's a penalty enhancement from third degree to second degree, so increases in severity, and then there's also an increase, a correlating increase with the attempted voter impersonation that gets bumped up as well, from its current penalty to 180 days—it's a state jail felony—180 days to two years in state jail and an optional fine of $10,000. So there are some pretty severe penalties both in current law and in your proposed bill. Correct? A felony?

HARLESS: Yes.

ANCHIA: And, in terms of risk-reward, how many votes can you change with one case of voter impersonation?

HARLESS: How many votes can you change?

ANCHIA: Yes. You were very very concerned about a legitimate voter being disenfranchised by someone conducting voter impersonation. Is it a scalable model, or when you commit an act of voter impersonation, how many votes do you change?

HARLESS: Representative Anchia, this is about restoring confidence in election process—

ANCHIA: No, I understand that—

HARLESS:—one person, one vote, and to get off on the fraud argument or how often it happens or if it even happens—we will never agree on that. The purpose of this legislation is that when you show up to vote, you prove who you say you are. It's a very simple, narrowly defined bill and we could stay here all day long discussing the fraud, but that is not what this bill is about. This bill is about protecting, deterring, and detecting possible fraud in elections.

ANCHIA: You sure? I'm trying to get at that, because you talked about voter impersonation in your layout, and I know the narrative changes, because when—you know, we studied this thing for eight years now, almost six years, seven years actually, and we haven't been able to find much said voter impersonation. Clearly, to support the bill, your narrative has to change so now it's about integrity of elections, I understand that. In going through the current—you said in your layout, we currently don't have tools to prevent this. So, I was trying to get at the tools that are in current state law, and the first one is sort of the deterrent effect of risking a state jail felony, two to 10 years in jail, $10,000 worth of fines, to change what, one vote, right? So we're talking about deterrent effect and risk, and my question to you was, is it scalable? When you commit an act of voter impersonation, how many votes do you change?

HARLESS: I think it's possibly scalable. If you look at Representative Donna Howard's election and Dan Neil, I think that a decision was decided by, what, two votes?

ANCHIA: Were there any cases of voter impersonation there?

912    82nd LEGISLATURE — REGULAR SESSION

HARLESS: I didn't follow it that closely.

ANCHIA: I believe that there weren't

HARLESS: But when elections are won or lost on two votes, we need to put every check and balance we can to restore the public's confidence, and not only does it restore the public's confidence in the election, there's been documented evidence in the two states that have passed this more restrictive photo ID that voter turnout increases. When people have confidence that their vote counts, they are more apt to show up and vote.

ANCHIA: And those talking points are terrific—let's just try to stay on voter impersonation. Right, so you said you're not sure of how often it occurs, you believe the tools aren't in place, you acknowledge there's a pretty significant penalty for doing it, correct? A state jail felony—

HARLESS: As it should be.

ANCHIA: As it should be, correct, so there's a pretty significant penalty for doing it. Now, let's talk about voter impersonation at the polling location. Who's typically at the polling locations?

HARLESS: As far as administrators, or people showing up to vote?

ANCHIA: Yeah, under the Election Code, who's entitled to be at the polling locations?

HARLESS: There are the election judge, the election clerk, election officers—

ANCHIA: And it's your assertion today that those people are powerless to stop voter impersonation, correct?

HARLESS: Powerless is not the word I would use.

ANCHIA: You said helpless earlier, is that a better word? They don't have the tools?

HARLESS: They need some tools.

ANCHIA: Okay, well are you familiar with Section 32.075 of the Election Code?

HARLESS: I am not.

ANCHIA: Section 32.075 of the Election Code discusses the law enforcement duties and powers of the presiding judge, of an election judge, do you know what they are?

HARLESS: No, but I know you're going to tell me.

ANCHIA: Yeah, I will, because I just want to clear up the fact that you're concerned that there are no tools, so I'll read that portion of the Election Code. The presiding judge at the polling place, and in performing those duties, the presiding judge has the power of a state district judge, including the power to issue an arrest warrant. Were you aware of that?

HARLESS: No.

Monday, March 21, 2011   HOUSE JOURNAL — 38th Day   913

ANCHIA: Do you think issuing an arrest warrant to stop some of this purported voter impersonation is a powerful tool?

HARLESS: I think that the testimony that we've heard and the articles that have been reported on over the last few years, there have been a number of election officers and election judges that said there were people that came in to vote, they had a voter registration, they returned and voted again with a different voter registration, and they felt they didn't have the tools—

ANCHIA: And none of those cases were documented, right? None of them.

HARLESS: They were reported on.

ANCHIA: They were reported, maybe complaints, possibly investigated by the attorney general, but none of them ever documented or conclusively prosecuted, correct?

HARLESS: I don't know if that's correct or not. It was not part of our testimony.

ANCHIA: But don't you think, having the power as an election judge to issue an arrest warrant to satisfy, to enforce the provisions of the Election Code—that's not—you claim that these people are helpless, they don't have the tools. But you don't think that's a tool?

HARLESS: I don't think it's a tool when they're not required to show a photo ID when they show up to vote that says they are who they—

ANCHIA: If you're an election judge and you know you have the power of a state district judge to issue an arrest warrant and you see somebody who is potentially committing voter impersonation, and you don't do anything about it, whose fault is that?

HARLESS: I think that is the legislature's fault—

ANCHIA: It's our fault?

HARLESS:—for not putting checks and balances in place that we can require voters to prove who they are when they show up to vote.

ANCHIA: Do you have—and I noticed you avoided presenting any evidence of voter impersonation in your layout—do you have any cases of voter impersonation?

HARLESS: I'm sure you know more about that than I do.

ANCHIA: Okay, okay. You're concerned about legitimate voters being disenfranchised, right? That's really important to you.

HARLESS: I am concerned about protecting the public's trust and the integrity in the elections process.

ANCHIA: I understand, as am I, as am I. And you believe that passage of this bill will restore confidence among members of the public in the voting process and restore integrity, correct? That's what you said in your layout?

HARLESS: I do.

ANCHIA: And you believe that?

914   82nd LEGISLATURE — REGULAR SESSION

HARLESS: I do.

ANCHIA: Why does it ignore mail-in ballots?

HARLESS: This bill is only interested in one type of potential fraud, in-person voter fraud.

ANCHIA: That's really interesting to me, because we've got a bill that addresses a narrow type of fraud that you even acknowledged you had no cases of.

HARLESS: I did not say I have no cases.

ANCHIA: Then give me a case.

HARLESS: I said that they were not part of our testimony.

ANCHIA: Did you run across a case?

HARLESS: There was, media reported on it, but continue.

ANCHIA: Okay, so you have no cases of voter impersonation?

HARLESS: I have no cases we're going to discuss on the house floor.

ANCHIA: So the author has no cases on the house floor of voter impersonation, you are, yet, very, very concerned about the integrity of elections. Correct? Yet this bill doesn't deal with the type of voter fraud that we've seen most prevalently in the State of Texas, which is mail-in ballots. Correct?

HARLESS: There are other pieces of legislation that—

ANCHIA: Have you filed a bill on mail-in ballots?

HARLESS: No, sir.

ANCHIA: But you're concerned about legitimate votes that are cast being cancelled out by voter fraud, are you not?

HARLESS: I am concerned about public confidence in the election and verifying that you are who you say you are when you show up to vote. This is not the venue to discuss mail-in ballots.

ANCHIA: Well, I think it is, because, if—now the narrative has changed. Before it used to be, hey, we're really concerned about all these illegal aliens coming across the border and voting and then, when there was little to no evidence of that, then the narrative changed, and now it's the integrity of elections. Well the integrity of the elections, if you believe that narrative, also includes fraud that would cancel out a person's legitimately cast vote. Am I correct?

HARLESS: This is not the venue to discuss mail-in ballots.

ANCHIA: Where do we discuss it? Do we discuss it in the senate? Do we discuss it in the back hall?

HARLESS: On another piece of legislation, we can discuss it in all those places if you would like.

ANCHIA: If you have opened the door to the integrity of elections, then I think it's fair game to discuss that type of fraud, which we actually do see in the State of Texas—

Monday, March 21, 2011   HOUSE JOURNAL — 38th Day   915

HARLESS: I look forward to you bringing that bill to the Texas House.

ANCHIA:—which is specifically ignored by your bill. But this is really about a desire to make sure that legitimately cast votes are not counter balanced or offset, and to really restore integrity of elections. Why don't you do anything about mail-in ballots in your bill?

HARLESS: This bill is to address in-person possible voter fraud. I appreciate you bringing up the mail-in ballots, and I look forward to your bill that you will bring addressing that type of fraud.

ANCHIA: I actually chair the select committee on that, and I've had, in the past, mail-in ballot bills.

HARLESS: I think that's great legislation, I look forward to helping you with it.

ANCHIA: Here's the quandary for this body. If you say passing this bill is going to restore integrity of elections, you do nothing in this bill to deal with mail-in ballots and 70 percent of all the prosecutions by the attorney general have been mail-in ballots, then you're really not restoring integrity of elections because people, like they have for the last six years, will be reading about mail-in ballot fraud, mail-in ballot fraud, mail-in ballot fraud. Let's talk a little bit about the Voting Rights Act, if you don't mind. How much money is in the bill for informing Texans about the change in the law?

HARLESS: The fiscal note on the bill is $2,024,000.

ANCHIA: Okay, and where's that money going to come from?

HARLESS: That money is already appropriated in our base budget that Chairman Pitts presented. We have, officially, $43 million of HAVA funds, Help America Vote funds, leftover from past sessions, and we are pretty confident once we request the approval of use of those funds that we can use those funds to offset the costs of this fiscal note.

ANCHIA: And what is that request going to entail?

HARLESS: It entails writing to the department of elections assistance.

ANCHIA: The Elections Assistance Commission? The EAC?

HARLESS: Yes.

ANCHIA: And does it also require an amendment of our state plan?

HARLESS: I'm not advised.

ANCHIA: Okay, let me ask you about how those HAVA funds are going to be spent? How many of those HAVA funds that are appropriated in this bill are going to be dedicated to educating Latinos, African Americans, and Asians on the new photo identification requirement under SB 14?

HARLESS: The methodology and the fiscal note says that there will be $2 million for the fiscal year 2012 and an estimated half a million dollars to research and develop ways to inform the public on new identification requirements. Additional cost of $1.5 million in media advertising, television,

916   82nd LEGISLATURE — REGULAR SESSION

of—a breakdown of that: $750,000 on television, $300,000 in radio, and $300,000 in print, and internet of $150,000. The secretary of state indicates that federal funds associated with Help America Vote Act may be available for use, but the agency will need to verify that with the federal government once this is passed.

ANCHIA: And the Voting Rights Act covers the State of Texas, correct?

HARLESS: Excuse me?

ANCHIA: I'm sorry, the Voting Rights Act covers the State of Texas, correct?

HARLESS: Yes.

ANCHIA: And there are protected classes under the Voting Rights Act, correct?

HARLESS: Yes.

ANCHIA: So my question didn't relate generally to what the fiscal note said, it related specifically to Latinos and African Americans. I also included Asian Americans because of your home county, Harris County, has a significant Asian American population. So what percentages of the $2 million will be dedicated to those protected classes?

HARLESS: It is not broken out specifically in the bill. I think this bill will increase turnout and education among all voters.

ANCHIA: Okay, but there's nothing in your bill dealing specifically with Latinos or African Americans, correct?

HARLESS: It will increase turnout of all voters and education of all voters.

ANCHIA: But is there—I'll rephrase the question in case we don't understand—

HARLESS: I'm a blonde, and that happens.

ANCHIA: Is there anything in your bill that specifically requirs education of Latinos and African Americans covered under the Voting Rights Act? I'll throw in Asians as well.

HARLESS: The bill that we filed is modeled on the Georgia and Indiana legislation that have both been upheld by the U.S. Constitution and pre-cleared by the Department of Justice.

ANCHIA: Do you know what's in your bill?

HARLESS: I think I do, I've read it several times.

ANCHIA: If you know what's in your bill, then you can answer this question. Is there any funding specifically dedicated to Latinos, or African Americans, or Asians which are protected classes under the Voting Rights Act? I mean, it's either in there or it's not.

HARLESS: The funding in the bill provided education for all voters across the State of Texas.

ANCHIA: Okay, but not specifically, not specifically correct?

HARLESS: It does not specifically carve anything out. This will increase voter turnout and education for all voters.

ANCHIA: Will the educational materials and promotional materials be presented in English, Spanish, and Vietnamese, with respect to Harris County?

HARLESS: They will be printed in the language that the counties are required to provide language in.

ANCHIA: But there's nothing in your bill that specifically states that you will have bilingual Spanish, English, Vietnamese documents, correct?

HARLESS: There was an amendment that was added in the senate that says the website in each language in which the voter registration materials are available.

ANCHIA: Right, and the website is—

HARLESS: Is that what you're asking?

ANCHIA:—slightly different, the website is a little bit different than the promotional and educational materials that are going to be distributed to people who may be in the protected classes. So I was just trying to get at whether your bill includes anything related to promotional materials in English, Spanish, and Vietnamese.

HARLESS: It allows for the printing in the language that the counties are required to on all the notices at the polling places and that the county registrar will provide.

ANCHIA: And that language is in your bill?

HARLESS: Yes.

ANCHIA: Okay, can you tell me where?

HARLESS: Well, Section 31.012—

ANCHIA: On what page, really quickly.

HARLESS: Page 3, under Section 5, talks about the languages.

ANCHIA: In each language in which voter registration materials are available, I do see it in your bill.

HARLESS: And that is also a requirement of the federal voter right act, I mean that's—

ANCHIA: The Voting Rights Act?

HARLESS: Right—

ANCHIA: But, I'm asking a slightly different question. Will the, for example, TV and radio, and additional notices that are above and beyond this section of your bill which is the posted notice, is TV and radio going to be done in multiple languages?

HARLESS: To my understanding, the testimony that we had in committee, where you were at, the secretary of state said that they would look at the best practices of other states and decide the best way to accommodate that, so I don't know that that specific question was answered from the testimony in committee. You were there.

ANCHIA: I don't believe it was. And I don't think it's included in the bill either.

HARLESS: The next question?

ANCHIA: What efforts will be made to ensure African Americans and Latinos will be able to access free identification documents? Will there be mobile units or any specific outreach?

HARLESS: There was no testimony on that.

ANCHIA: Yes, but what does your bill say?

HARLESS: There is no specifics in that. That will be up to the secretary of state to decide those procedures.

ANCHIA: Have you—I know you've done a lot of work on this bill, a lot of research. What academic studies have you run across to determine the number of minorities that lack required photo identification?

HARLESS: From all the testimony that we've had in committee, there was no possible way to determine that.

ANCHIA: And you're not aware of any academic studies—is what my question was asking—any academic studies that deal with that issue?

HARLESS: There are so many studies out there, that no, they all look the same in my head. And I only have this notebook, so I couldn't bring everything.

ANCHIA: Are you aware of any studies conducted by a state agency to project the number of voters that lack the required identification and what percentage of these voters are African American or Hispanic? Are you aware of any studies like that?

HARLESS: I did not see that in testimony.

ANCHIA: But, are you aware of any studies? Above and beyond the testimony?

HARLESS: No. Not advised.

ANCHIA: Why are the identification requirements of **SB 14** more restrictive than **SB 362** from last session? Is there any evidence to suggest something's changed?

HARLESS: We've had two additional years to see that photo ID is working in other states. We've also had two additional years to hear from the public on their concerns of the integrity of the ballot box. Only a true photo ID bill can deter and detect fraud at the polls and can protect the public's confidence in the election.

ANCHIA: Is it possible that Latinos and African Americans in Texas will be put in a worse position in terms of electoral power as a result of SB 14?

Monday, March 21, 2011    HOUSE JOURNAL — 38th Day    919

HARLESS: I believe with all my heart that this bill will increase turnout of all voters in the State of Texas.

ANCHIA: But what if you're wrong? Are there any safeguards in the bill to remedy the situation, for example, a Sunset provision, if we see that there's a substantial number of African Americans or Latinos that are disenfranchised by this bill?

HARLESS: In the two states that have passed this type of voter, similar bills to our bill, they have showed increase in election for the minorities, and I think that we will see the same results in Texas. This will increase turnout of all voters because of the restored confidence that their vote counts.

ANCHIA: Okay, and just to be clear, Indiana, which is one of the states, is not a Voting Rights Act covered jurisdiction, right? And Georgia, which is Voting Rights Act covered, doesn't have as large a Latino population as Texas, correct?

HARLESS: I have no idea.

ANCHIA: Okay, I would submit to you it doesn't. Is there any trigger mechanism for more funding or increased outreach if something does go wrong in the bill and it turns out Latinos and African Americans are disenfranchised?

HARLESS: The testimony of the LBB—

### REMARKS ORDERED PRINTED

Representative Anchia moved to print remarks between Representative Harless and Representative Anchia.

The motion prevailed.

### Amendment No. 1

Representative Anchia offered the following amendment to CSSB 14:

Amend CSSB 14 (house committee printing) by striking the enacting clause (page 1, line 4).

Amendment No. 1 was withdrawn.

### Amendment No. 2

Representative Giddings offered the following amendment to CSSB 14:

Amend CSSB 14 (house committee printing) as follows:
(1) In the recital to SECTION 9 of the bill (page 5, line 1), strike "(g) and (h)" and substitute "(g), (h), and (i)".
(2) In SECTION 9 of the bill, in amended Section 63.001(b), Election Code (page 5, line 2), strike "Subsection (h)" and substitute "Subsection (h) or (i)".
(3) In SECTION 9 of the bill, following added Section 63.001(h), Election Code (page 6, between lines 23 and 24), add the following:
    (i) A voter who would otherwise be accepted for voting under this chapter but for the requirements of Subsection (b) shall be accepted for voting if, instead of presenting the identification required by Subsection (b), the voter executes an affidavit under penalty of perjury that asserts that the voter's

---

920    82nd LEGISLATURE — REGULAR SESSION

proof of identification meeting the requirements of Subsection (b) has been stolen and the voter presents to an election officer a copy of an official police report, dated not earlier than the 45th day before the date on which the voter seeks to vote, alleging that the voter was a victim of an offense described by Sections 31.03 or 32.51, Penal Code. The voter may redact personal information on the police report relating to the voter, other than the voter's name, address, or date of birth. A police report presented under this section is not required to contain the voter's date of birth.

### CSSB 14 - POINT OF ORDER

Representative Martinez raised a point of order against further consideration of CSSB 14 under Rule 4, Section 32(c)(2) and Rule 4, Section 32(f) of the House Rules on the grounds that the bill analysis is incorrect.

The speaker sustained the point of order, speaking as follows:

Mr. Martinez raises a point of order under Rule 4, Section 32(c)(2) and Rule 4, Section 32(f) in that the bill analysis is substantially or materially misleading, specifically because the bill analysis refers to six business days while the text of the bill refers only to six days.

The chair has reviewed the bill and bill analysis and finds the reference in the bill analysis to be materially or substantially misleading in the context of the bill. The point of order is sustained.

CSSB 14 was returned to the Select Committee on Voter Identification and Voter Fraud.

### LEAVE OF ABSENCE GRANTED

The following member was granted leave of absence for today because of important business:

Gutierrez on motion of Burnam.

### COMMITTEE MEETING ANNOUNCEMENTS

The following committee meetings were announced:

Business and Industry will reconvene 10 minutes after adjournment today.

Ways and Means will reconvene 15 minutes after adjournment today.

Border and Intergovernmental Affairs, 2 p.m. today.

### ADJOURNMENT

Representative L. Taylor moved that the house adjourn until 10 a.m. tomorrow.

The motion prevailed.

The house accordingly, at 1:51 p.m., adjourned until 10 a.m. tomorrow.

Monday, March 21, 2011   HOUSE JOURNAL — 38th Day   921

## ADDENDUM

### MESSAGES FROM THE SENATE

The following messages from the senate were today received by the house:

**Message No. 1**

MESSAGE FROM THE SENATE
SENATE CHAMBER
Austin, Texas
Monday, March 21, 2011

The Honorable Speaker of the House
House Chamber
Austin, Texas

Mr. Speaker:

I am directed by the senate to inform the house that the senate has taken the following action:

THE SENATE HAS PASSED THE FOLLOWING MEASURES:

HCR 47          Guillen          SPONSOR: Zaffirini
In memory of U.S. Army Private First Class Ira Benjamin Laningham IV of Zapata.

SB 160          Williams
Relating to the regulation of certain aggregate production operations by the Texas Commission on Environmental Quality; providing penalties.

SB 173          West
Relating to civil remedy of violations of certain municipal health and safety ordinances.

SB 312          Seliger
Relating to the exemption of certain electric cooperatives from certain regulations.

SB 350          Williams
Relating to the restructuring of fund obligations and accounts of the Texas Municipal Retirement System and related actuarial and accounting procedures.

SB 361          Duncan
Relating to indemnification provisions in construction contracts.

SB 370          Seliger
Relating to the authority of the Texas Water Development Board to provide financial assistance for certain projects if the applicant has failed to complete a request for information relevant to the project.

SB 425          Carona

---

922   82nd LEGISLATURE — REGULAR SESSION

Relating to property and casualty certificates of insurance and approval of property and casualty certificate of insurance forms by the Texas Department of Insurance; providing penalties.

SB 527          Fraser
Relating to projects funded through the Texas emissions reduction plan.

SB 566          Williams
Relating to the regulation of the practice of public accountancy.

SB 605          Rodriguez
Relating to the creation of an appellate judicial system for the Eighth Court of Appeals District.

SB 781          Carona
Relating to the repeal of certain legislative oversight committees.

Respectfully,
Patsy Spaw
Secretary of the Senate

---

## APPENDIX

### STANDING COMMITTEE REPORTS

Favorable reports have been filed by committees as follows:

**March 17**

Criminal Jurisprudence - HB 341, HB 350, HB 690

Public Education - HB 1703

State Affairs - HB 888, HB 1064, HB 1165

Ways and Means - HB 234, HB 252, HB 361

**March 18**

Agriculture and Livestock - HB 92

Business and Industry - HB 681

Culture, Recreation, and Tourism - HB 308, HB 790, HB 1301, HB 1346, HB 1843, HB 1844, HCR 33

Higher Education - HB 9, HB 10

Licensing and Administrative Procedures - HB 378, HB 457, HB 510, HB 1510

Public Education - HB 675, HB 861, HB 1130

Public Health - HB 549, HB 670

State Affairs - HB 51, HB 183, HJR 65

Transportation - HB 238
Ways and Means - HB 499

### ENROLLED

March 17 - HCR 10, HCR 28

### SENT TO THE GOVERNOR

March 17 - HCR 10, HCR 28, HCR 40, HCR 56, HCR 59, HCR 76

### SENT TO THE SECRETARY OF THE STATE

March 17 - HCR 58

### SIGNED BY THE GOVERNOR

March 18 - HCR 49, HCR 70