an electronic or "e-poll book," the election worker may be able to scan the identification's bar code to pull-up the voter's information or electronically search the list of registered voters to find the voter in the e-poll book.)

4.   In locating the voter on the list of registered voters, the election worker will compare the voter's name as provided on their acceptable identification to their name as provided on the list of registered voters per §63.001(c).   If the voter's names are identical and the voter's identity is verified, the voter will vote a regular ballot, as detailed in step 6a.   If the voter's names are "substantially similar" and voter's identity is verified, the voter will vote a regular ballot, as detailed in step 6b.   If the voter's names listed are not identical or substantially similar, the voter will be offered a provisional ballot and has the right to appear at the Voter Registrar's office to "cure" his ballot, as detailed in step 6c.   The guidelines for determining if a voter's name is "substantially similar" have been adopted as 1 TAC §81.71, and are as follows:

a.      Identical: The full name as listed between the voter's identification and list of registered voters agree exactly.

b.      Substantially Similar: The guidelines for determining if a voter's name is "substantially similar" have been adopted as 1 TAC § 81.71.   There are four categories of names that will be considered substantially similar by the election worker:

i.   Slightly Different: A voter's name as listed on their identification may be slightly different from their name as listed on the list of registered voters if there are minor misspellings, typographical errors, or commonly used different spellings of a name.

ii. <u>Customary Variation</u>: A voter's name as on their identification may be a customary variation from their name as listed on the list of registered voters. Customary variations include variations in spellings of a name in a different language, e.g., Enrique for Henry.

iii. <u>Initial, Middle or Former Name</u>: A voter's name as on their identification may include an initial, middle name or former name that is not included on the list of registered voters, or vice versa. Under this category a voter's maiden name or former name may appear on their identification/list of registered voters, but not on both.

iv. <u>Different Field</u>: A Voter's name as on their identification may occupy a different field than as on the list of registered voters. Under this category a voter's former name or maiden name may appear as a middle name, or a voter's maiden name has been hyphenated to include their current last name.

c.     Not identical or Substantially Similar: In a situation where a voter's name as it appears on their identification is not identical and does not fit into one of the four categories of a substantially similar name.

If the election worker is trying to determine if a voter's name fits into one or more categories of substantially similar names, the election worker should use the "totality of the circumstances" method to verify the voter's identity. This means that the election worker should compare all available information on the list of registered voters and the voter's identification, such as date of birth, address, and other information to assist in making a determination. For example, if the voter's names as listed are spelled differently, the election

worker may see that the voter's address as listed on their identification matches their address as listed on the list of registered voters, thereby assisting the election worker in determining the names are substantially similar and verifying the voter's identity. However, the "totality of circumstances" as applied to a voter's name cannot be used to the detriment of the voter. There is no legal requirement for a voter's address, date of birth, or gender to match between the voter's identification and list of registered voters. Therefore, comparing the information and using the "totality of the circumstances" is for the assistance of the voter.

5.  After the election worker has found the voter on the list of registered voters, the election worker will verify the voter's identity by confirming that the photograph on the identification is that of the voter at the polling place per §63.001(d). The guideline an election worker should use in making this determination is: "Can this photograph be that of the voter?"  Training materials issued by the Secretary of State account for the fact that individuals change over time, and the fact that a picture on an acceptable identification may have been taken several years prior to the voter appearing in person. Therefore, if an election worker is trying to verify the identity of the voter, and has determined that the photograph on the voter's identification may be that of the voter, but the voter has moderately modified their appearance since the time their photograph was taken, the election worker may use the "totality of the circumstances" to assist in verifying a voter's identity. For example, a voter may have changed their hair color since the time of their identification photograph, and to assist the voter and the election worker, the election worker may look to a voter's date of birth, address or other available information in determining if the voter's identity can be verified. If the voter's identity cannot be verified,

Defendants' Objections and Responses to Plaintiffs and Plaintiff-Intervenors'
First Set of Interrogatories

the voter will be offered a provisional ballot and has the right to appear at the Voter Registrar's office to "cure" their ballot, as detailed in step 6d.

6. After the election worker has reviewed the voter's acceptable identification, the following steps will be taken depending on the situation:

a.        If the voter's names, as listed on the identification and list of registered voters, are identical and voter's identity can be verified, the voter will be accepted for casting a regular ballot. At this point, the election worker will add the voter's name to the "combination form" (the document that provides for a signature roster and poll list under § 63.004). After their name has been added, the voter will sign their name next to their printed name, and then cast their ballot.

b.        If the voter's names, as listed on the identification and list of registered voters, are determined to be substantially similar, and the voter's identity can be verified, the voter will be accepted for casting a regular ballot. The process is the same as 6a, but the voter will be asked to review and accept the "similar name affidavit." The voter will just need to initial the box next to their name, signifying their acceptance of the affidavit.

c.        If the election worker determines that the voter's names, as listed on the identification and list of registered voters, are neither identical nor substantially similar, the voter will be offered a provisional ballot. As detailed in the answer to Interrogatory No.10, the voter will be provided a "Notice to Provisional Voter" with more details on the location of the Voter Registrar and procedure for "curing" their ballot. Further, under 1 TAC §81.71, the voter may bring to the Voter Registrar a court order reflecting a name change or a marriage license to allow the Voter Registrar to confirm the identity

of the voter.  Finally, the voter may execute an affidavit stating that they are the same person as named on the identification provided.

d.      If the election worker determines that the voter's identity cannot be verified from the identification provided, the voter will be offered a provisional ballot.  As detailed in the answer to Interrogatory No. 10, the voter will be provided a "Notice to Provisional Voter" with more details on the location of the Voter Registrar and procedure for "curing" their ballot.  Further, under 1 TAC §81.71, the voter may bring to the Voter Registrar a letter from a licensed physician stating that the voter has changed their appearance, allowing the Voter Registrar to confirm the identity of the voter.  Finally, the voter may execute an affidavit stating that they are the same person as named on the identification provided.

7.  While the voter is casting his ballot, the voter should see a "Voter's Information" poster that contains information about their rights under the law, and lists the voting rights hotline telephone number for the Texas Secretary of State and procedures for filing an election complaint.

**12.      Identify all actions taken by the Office of the Texas Secretary of State and any other Texas state official, from August 30, 2012, to the present, to inform and train county election officials and poll officials regarding the implementation of SB 14, including identifying all in-person and remote training sessions (by date, location, names and titles of the presenters, and attendees) and the amount of money budgeted and spent for this training.**

Defendants' Objections and Responses to Plaintiffs and Plaintiff-Intervenors'
First Set of Interrogatories

**OBJECTION:**  Defendants object to this interrogatory as being overly broad, unduly burdensome, not reasonably specific, and vague.  By asking the Defendants to "identify all actions taken," the interrogatory fails to define or set any limitations or parameters as to the type of information that is being sought.    Further, the interrogatory fails to define "other Texas state official" or identify the "official" from whom the interrogatory seeks to gain information. Defendants further object that this interrogatory seeks information that is not relevant and is not likely to lead to the discovery of relevant or admissible evidence.  Defendants further object to the extent the interrogatory seeks disclosure of information subject to the attorney-client privilege, legislative privilege, deliberative process privilege, and attorney work-product doctrine.  Defendants further object to the extent it seeks information protected from disclosure by Texas Government Code §323.017.  Defendants further object to this interrogatory to the extent it seeks information not personally known or controlled by the Defendants but is known or controlled by third parties, including independent officers of the State and local governments. Defendants further object to this interrogatory to the extent it seeks information that is publicly available or equally accessible to plaintiffs and plaintiff-intervenors.

Subject to and without waiving the foregoing objections, the Defendants respond generally as follows:  The Office of The Texas Secretary of State has an existing poll worker tool which was revised to incorporate instruction on voter ID requirements.  The training can be accessed here: http://www.texaspollworkertraining.com/. The update for voter ID was released and made available for training of poll workers prior to the November 2013 uniform election date.  These changes were done within the existing agency budget, i.e., no additional funds were needed to accommodate voter ID requirements.   The Secretary of State also

provided training at the annual seminars to the county election officials as well as the election officials from cities, school districts and other political subdivisions. The materials for these conferences are available here: http://www.sos.state.tx.us/elections/laws/seminars/speakers/. The county election official seminar was held on July 29-31, 2013 and the city/school/other seminar was held on December 4, 2013. In between these two seminars, the Secretary of State held the 16th biennial seminar for county party chairs on October 4, 2013 where we also discussed the changed voter ID requirements. The presentations for that seminar are also available here: http://www.sos.state.tx.us/elections/laws/seminars/speakers/. Again, no additional funding was budgeted to accommodate voter ID. The Secretary of State also provided power point training materials to be used in lieu of the online poll worker training for counties that preferred this method. These materials were provided to counties holding elections during the summer and fall prior to the uniform election date in November 2013. All of the posters, power points, seminar materials and other training materials provided by the Secretary of State did not require any additional funding or budget. The Director of Elections also has spoken to regional groups of election officials about the changed voter ID requirements including the Central Texas Elections administrator group in August 2013 and the South Central Tax Assessor Collector group later in the fall of 2013. The Director and several election division attorneys spoke to the Election Administrators annual meeting in January 2014 where we discussed the implementation of voter ID in the November 2013 election and things to keep in mind as we go forward including making provisional ballots available to all voters, that the address on the ID provided does not need to match the voter registration address, and that voters can be offered the opportunity to change their voter

Defendants' Objections and Responses to Plaintiffs and Plaintiff-Intervenors'
First Set of Interrogatories

registration name, but that the opportunity needs to be clearly voluntary.

The Texas Department of Public Safety, Driver License Division, developed a training plan to present all necessary information and issuance procedures to county officials assigned to the Election Identification Card (EIC) mobile stations statewide. Documents regarding the plan, training presentation and all logs of the trainer(s) and county official(s) receiving training as well as the locations of training are included with these responses and attached hereto as TEX I.R. 000262 through TEX I.R. 000404.

There is no budget specified for this training to be conducted. Any costs associated with the training are included in the overall costs associated with the EIC processes for the division. The training costs are not categorized separately and cannot be provided separately.

**13.     Identify all actions taken by the Office of the Texas Secretary of State and any other Texas state official, from August 30, 2012, to the present, to inform the general public or  any segment thereof of the requirements of SB 14, including identifying all writings and  recordings transmitted to or otherwise made available to the general public or to any segment  thereof (including the date or dates on which this occurred), and specifying the amount of money  budgeted and spent on this activity.**

**OBJECTION:**     Defendants object to this interrogatory as being overly broad, unduly burdensome, not reasonably specific, and vague. By asking the Defendants to "identify all actions taken," the interrogatory fails to define or set any limitations or parameters as to the type of information that is being sought.   Further, the interrogatory fails to define "other Texas state official" or identify the "official" from whom the interrogatory seeks to gain information.

Defendants further object that this interrogatory seeks information that is not relevant and is not likely to lead to the discovery of relevant or admissible evidence. Defendants further object to the extent the interrogatory seeks disclosure of information subject to the attorney-client privilege, legislative privilege, deliberative process privilege, and attorney work-product doctrine. Defendants further object to the extent it seeks information protected from disclosure by Texas Government Code §323.017. Defendants further object to this interrogatory to the extent it seeks information not personally known or controlled by the Defendants but is known or controlled by third parties, including independent officers of the State and local governments. Defendants further object to this interrogatory to the extent it seeks information that is publicly available or equally accessible to plaintiffs and plaintiff-intervenors.

Subject to and without waiving the foregoing objections, the Defendants generally respond as follows: Since photo ID requirements went into effect in Texas, The Office of the Texas Secretary of State has embarked on two major voter education campaigns. The first, implemented to educate voters in time for the 2013 constitutional amendment election employed television, radio, print, and digital advertising generating more than 30 million impressions and reaching 252 out of Texas' 254 counties. The amount for the 2013 campaign that was budgeted and spent was $400,000. In addition to advertising our office implemented a full-scale, state-wide public relations campaign that included numerous press availabilities, press releases, op-eds from the Secretary, social media campaigns, media interviews, updates to the Vote Texas mobile app, and working with county officials to help spread the word about photo ID requirements. The Secretary of the State also promoted the 25 mobile EIC stations which were dispatched throughout the state to issue election identification certificates. In 2014,

Defendants' Objections and Responses to Plaintiffs and Plaintiff-Intervenors'
First Set of Interrogatories

The Secretary of the State is in the middle of voter education in which the agency will spend $2 million. A large part of that campaign will focus on educating voters about the photo ID requirement and use similar paid and earned media strategies from the 2013 campaign. In addition to the actions set out in the response to Interrogatory Number 12, the Secretary of State's office changed the form of the voter registration certificate in order to note a disability exemption from showing identification. All counties received notice of this change and are able to comply. This information has been incorporated into all of our training of election officials and poll worker training. Further, the Secretary of State's office provided the wording of the information contained on the reverse side of the voter registration certificate to include the photo ID requirement. Such language provides each registered voter personal notice of the photo ID requirements, potential exemptions, and the website and toll free telephone number for the Secretary of State if the voter needs additional information.

The Texas Department of Public Safety, through the Driver License Division and the DPS Media and Communications Office provides information to the general public regarding the Election Identification Card (EIC) process statewide. Information is provided on the department's website and is available by visiting the link at http://www.dps.texas.gov/Driver License/electionID.htm. This page provides the locations and times for EIC mobile stations in counties statewide and is routinely updated. In addition, see the documents attached hereto and provided at TEX I.R. 000001 through TEX I.R. 000228 and TEX I.R. 000262 through TEX I.R. 000404. Information is also available to the public through the DPS customer service line. There is a menu tree option specific to EIC issuance. A copy of the script for the information on the menu tree has been provided at TEX I.R. 000019 through TEX I.R. 000022.

The Driver License Division developed door signs for the driver license offices and banners for the mobile locations. The door signs were printed and the banners requisitioned from local printers by the local driver license management for distribution. Representative copies of the door signs and banners have been provided at TEX I.R. 000013 through TEX I.R. 000018.

The Department of Public Safety's Media and Communications Office has engaged in a comprehensive media campaign related to the EIC issuance program. A listing of all press releases and relevant information has been provided at TEX. I.R. 000023 through TEX I.R. 000026.

There is no budget specified for public outreach. Any costs associated with public outreach are included in the overall costs associated with the EIC processes for the agency and in the standard operating costs for the agency. Public outreach costs are not categorized separately and cannot be provided separately.

**14. Describe in detail all categories of information relating to provisional balloting that are tracked in the Texas Election Administration Management (TEAM) database, including whether, and if so, how, the reason or reasons for issuance of any provisional ballot is recorded; whether and if so, how the disposition of any provisional ballot (*e.g.*, accepted or rejected) is recorded; whether and if so, how, the reasons for rejection of any provisional ballot are recorded; and when in relation to each election date information relating to provisional ballots and their disposition is recorded in TEAM. If more or less information on provisional balloting is tracked depending on the election type (*e.g.*,**

federal, statewide, or municipal election), or if provisional balloting information in TEAM varies by Texas county, please identify all such differences.

**OBJECTION:** Defendants object to this interrogatory as being vague, not reasonably specific, overly broad and unduly burdensome as it calls upon the Defendants to "describe in detail" technical information that would be more appropriately explored by deposition. Defendants further object to the extent this interrogatory seeks information that is not relevant and is not likely to lead to the discovery of relevant or admissible evidence.

Subject to and without waiving the foregoing objections, the Defendants respond generally as follows:    TEAM does not differentiate provisional ballot tracking availability based on election type, nor do those counties using TEAM to enter provisional ballot information vary in process. Counties are not, however, required to track provisional ballots within the TEAM database and many elect not to do so. Neither are counties required to report to the state whether or not a voter's ballot was cast provisionally.

In addition, TEAM does not differentiate the reason the ballot was cast provisionally. The only option for entering a provisional ballot is to designate an accepted ballot as a Provisional Ballot using the Record Voting Activity feature. In such cases, the tracking number must be recorded. The user will enter a random Provisional tracking number of their choice. This random Provisional tracking number is automatically assigned to the voter/ballot. The number is used for tracking purposes and to record the vote at step (2) two. The date that the registrar enters as the date of the voting history activity taking place is retained, as well as Party Affiliation for the ballot if applicable.

Once the ballot board has made a determination regarding the ballot, the registrar will

record the action taken on the ballot as either "Accepted or Rejected" by using the Record Provisional Voting History option. The user only has the option at this point to accept or reject the ballot. Should the user choose to reject the ballot, he or she must designate a rejection reason. The following reasons are currently available for ballot rejection in the TEAM system:

- Already Voted
- Incomplete Application Received
- Improper Identification
- Incorrect Precinct
- Moved
- No identification
- Not in the Political Subdivision
- No voter Registration
- Registered less than 30 days
- Registration cancelled
- Voter rejected due to ineligibility

Regarding the time frame for recording provisional ballots and their disposition, Texas Election Code mandates that "no later than the 30[th] day after the date of the primary, runoff primary, or general election or any special election ordered by the governor, the registrar shall electronically submit to the secretary of state the record of each voter participating in the election" [18.069]. Thus, during these types of elections, provisional ballot results are traditionally provided within 30 days. It should be noted, however, that Provisional Voting may be captured for those voters who are already registered to vote within the TEAM system. For those who are not registered to vote, Provisional Voting may be captured post-election.

**15.    Identify any study or analysis (past, current, or proposed, regardless of the author)**

of which Defendants are aware that undertook or is undertaking to review, analyze, determine, or document the effect of SB 14, or any other photographic voter identification proposal in Texas, on Texas citizens, registered or unregistered (including, but not limited to, financial effects, lack of access to identification, the number of Texas **citizens who do not possess the specific forms of identification included in SB 14, and the effect of implementation SB 14 in 2013 elections), and include a description of each such study or analysis's structure and methodology, along with all results and conclusions. In answering this interrogatory, please construe effect to include polling place delays, individuals turned away from the polling place without casting a ballot, casting of provisional ballots (both those eventually counted and those that were not), and mail balloting by individuals eligible to do so.**

**OBJECTION:** Defendants object to this interrogatory on the ground that it contains at least two separate interrogatories. By asking the Defendants to "identify any study or analysis" [hereafter Interrogatory 15a] and then asking the Defendants to "include a description of each study and analysis's structure and methodology, along with all results and conclusions" [hereafter Interrogatory 15b] the interrogatory introduces a line of inquiry that is separate and distinct from the inquiry made by the portion of the interrogatory that precedes it". *Willingham v. Ashcroft*, 226 F.R.D. 57, 59 (D.D.C. 2005) (internal quotations and citations omitted). Defendants will therefore construe Interrogatory 15 as two separate interrogatories.

Further, Defendants object to both interrogatories as being vague, not reasonably specific, overly broad and unduly burdensome as they fail to identify any particular "study or analysis" for which they seek information. Further, they fail to identify any particular author

or category of authors that created a "study or analysis" for which they seek information. Further, they fail to identify what is meant by "study or analysis" and do not inform the Defendants if they seek information concerning a "study or analysis" that has been published or otherwise reduced to writing or if they are calling upon the Defendants to produce information concerning an informal or internal "study or analysis", etc. Defendants further object to these interrogatories to the extent they seek information not personally known or controlled by the Defendants but is known or controlled by third parties, including private individuals or groups and independent officers of the state and local governments. Defendants further object to these interrogatories to the extent they seek information that is publicly available or equally accessible to the plaintiffs and plaintiff-intervenors. Defendants further object to the extent these interrogatories seek disclosure of information subject to the attorney-client privilege, legislative privilege, deliberative process privilege, and attorney-work product doctrine. Defendants further object to the extent they seek information protected from disclosure by Texas Government Code §323.017. Defendants further object to the extent these interrogatories call upon the Defendants to disclose information concerning expert witnesses in this litigation. Defendants will disclose expert witnesses pursuant to the court's scheduling order.

Subject to and without waiving the foregoing objections, the Defendants respond as follows:

**Interrogatory 15a**

Defendants are not aware of any "study or analysis" as specifically described in this interrogatory.

Defendants' Objections and Responses to Plaintiffs and Plaintiff-Intervenors'
First Set of Interrogatories

Interrogatory 15b

Defendants are not aware of any "study or analysis" as specifically described in this interrogatory.

16. **Describe in detail each legislative, executive, or regulatory action or guideline, whether proposed, promulgated, issued, or enacted, from August 30, 2012, to the present, that relates in whole or in part to SB 14 or to a voter's ability to obtain one of the required forms of identification under Texas Election Code § 63.0101 (as amended by SB 14).**

**OBJECTION:** Defendants object to this interrogatory as being vague, overly broad, unduly burdensome and not reasonably specific as it fails to identify the "legislative, executive, or regulatory action or guideline" that it requires the Defendants to "describe in detail". Further, describing the "action" or "guideline" as being those that "relates in whole or part to SB14 or to a voter's ability to obtain one of the required forms of identification" also fails to be reasonably specific as to the information sought by the interrogatory. Further, Defendants object to the extent it seeks information that is not relevant and is not likely to lead to the discovery of relevant or admissible evidence. Defendants further object to the extent it seeks information not personally known or controlled by the Defendants but is known or controlled by third parties, including private individuals, groups and independent officers of state and local governments. Defendants further object to the extent it seeks information that is publicly available or equally accessible by the plaintiffs and plaintiff-intervenors. Defendants further object to the extent this interrogatory seeks disclosure of information subject to the attorney-client privilege, legislative privilege, deliberative process privilege, and attorney work-product

doctrine. Defendants further object to the extent these interrogatories seek information protected from disclosure by Texas Government Code §323.017.

Subject to and without waiving the foregoing objections, the Defendants respond as follows: See the 1 TAC §81.71 and 25 TAC §181.22(t). Further, Plaintiff and Plaintiff-Intervenors are referred to the "Texas Legislature online – Bill Search Results" provided with these responses and attached hereto as TEX I.R. 000405.

**17. Describe in detail each request made, either before or after legislative passage of SB 14, to the Office of the Governor, Office of the Lieutenant Governor, Office of the Secretary of State, Office of the Attorney General, the Department of Public Safety, or to any legislator or their staff or agents about the number or demographic characteristics of Texas registered voters who did not possess or do not possess one of the required forms of photographic identification set out in Texas Election Code § 63.0101 (as amended by SB 14), including but not limited to the person or persons who requested the information, the specific information requested, the date of the request, the response to the request, the person who responded, the date of the response, and the results or conclusions set forth in the response.**

**OBJECTION:** Defendants object to this interrogatory as being vague, overly broad, unduly burdensome and not reasonably specific. The interrogatory fails to define "request" or place any limitations or parameters as to the type of "request" that it is asking the Defendants to "describe in detail". Further, the interrogatory fails to define "demographic characteristics". Further, the interrogatory is not limited to a specific time period. Further, the interrogatory

seeks information that is not relevant to this cause of action and is not likely to lead to the discovery of relevant or admissible evidence. Defendants further object to the extent it seeks information not personally known or controlled by the Defendants but is known or controlled by third parties, including private individuals, groups and independent officers of the state and local governments. Defendants further object to the extent it seeks information that is publicly available or equally accessible by the plaintiffs and plaintiff-intervenors. Defendants further object to the extent these interrogatories seeks disclosure of information subject to the attorney-client privilege, legislative privilege, deliberative process privilege, and attorney work-product doctrine. Defendants further object to the extent it seeks information protected by the Texas Government Code §323.017.

Subject to and without waiving the foregoing objections, the Defendants respond generally as follows:

Defendants are not aware of any requests that specifically asked "about the number or demographic characteristics of Texas registered voters who did not possess or do not possess one of the required forms of photographic identification set out in Texas Election Code §63.0101." However, see the Defendants response to Interrogatory Numbers 18 and 19 with respect to the Department of Justice requests. In addition, see the spread sheets reflecting Public Information Requests made to the Secretary of State and attached to this response as TEX I.R. 000406 through TEX I.R. 000410.

**18.** **Describe in detail each instance since January 1, 2000, in which individuals in the Office of the Governor, the Office of the Lieutenant Governor, the Office of the Secretary of State, the Office of the Attorney General or any other state official or their agents have**

---

matched information from any database maintained by any Texas State agency to any other state or federal database, including, but not limited to, matches of DPS databases conducted pursuant to 42 U.S.C. § 15483(a)(5)(B). Please include in your description the full names and employers of the persons who conducted the match, which databases were matched, the date or dates of the match, the purpose of the match, and the results or conclusions derived from the match.

**OBJECTION:** Defendants object to this interrogatory as vague, overly broad, unduly burdensome and not reasonably specific. It fails to identify what is meant by "matched", fails to specify any particular "database", and fails to identify the "matched information" that is being sought. Further, it fails to identify the "other state official or their agents" from whom the interrogatory requires information. Defendants further object to this interrogatory to the extent it seeks information not personally known or controlled by the Defendants but is known or controlled by third parties, including private individuals or groups and independent officers of the state and local governments. Defendants further object to this interrogatory to the extent it seeks information that is publicly available or equally accessible to the plaintiffs and plaintiff-intervenors. Defendants further object to the extent this interrogatory seeks disclosure of information subject to the attorney-client privilege, legislative privilege, deliberative process privilege, and attorney-work product doctrine. Defendants further object to the extent it seeks information protected from disclosure by Texas Government Code §323.017. Defendants further object to the extent the interrogatory calls upon the Defendants to disclose information concerning expert witnesses in this litigation. Defendants will disclose expert witnesses pursuant to the court's scheduling order.

---

Defendants' Objections and Responses to Plaintiffs and Plaintiff-Intervenors'
First Set of Interrogatories

Subject to and without waiving the foregoing objections, the Defendants respond generally as follows: Most of the matching performed by the Secretary of State with other databases or information obtained from other databases is an automatic process that occurs on a daily, weekly or quarterly basis. Once each week, the Bureau of Vital Statistics submits a file to the Secretary of State containing available information relating to deceased residents of the state. Matching for files received occurs immediately. Up until 2007, all matches, except for duplicates, were treated as "potential matches." With the inception of TEAM in 2007, strong match criteria was developed for deceased matches, and other matches became known as "weak matches." The result has been that deceased persons have been regularly removed from the voter registration list. In addition, the Social Security Administration's death master file matching began in June 2012 and has continued quarterly since that time for the purpose of removing deceased persons from the voter registration list. That purpose has been accomplished.

In 2002, the Help America Vote Act, also known as HAVA, was passed by Congress and is applicable to voters registering for or participating in federal elections. Part of this act deals with the identification of new voters by comparing the person's Driver License/Identification Number or Social Security Number against the issuing authority. Language was added to the Texas Election Code by the 79th Legislature and went into effect on January 1, 2006. In this way, what is commonly referred to amongst voter registrars as Live Check was born. Live Check is the process by which the Secretary of State's office verifies information in accordance with State and Federal law. If a person's information is able to be verified by DPS or the Social Security Administration, then the voter is moved into Active