**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | |
|---|---|
| TEXAS STATE CONFERENCE OF NAACP BRANCHES; and the MEXICAN AMERICAN LEGISLATIVE CAUCUS OF THE TEXAS HOUSE OF REPRESENTATIVES, <br><br> Plaintiffs, <br><br> v. <br><br> JOHN STEEN, in his official capacity as Secretary of State of Texas; and STEVE McCRAW, in his official capacity as Director of the Texas Department of Public Safety, <br><br> Defendants. | ) <br> ) <br> ) Case No. <br> ) <br> ) COMPLAINT FOR <br> ) DECLARATORY AND <br> ) INJUNCTIVE RELIEF <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

The Texas State Conference of NAACP Branches and the Mexican American Legislative Caucus of the Texas House of Representatives, for their Complaint against John Steen, Secretary of State of Texas, and Steve McCraw, Director of Public Safety of Texas, allege as follows:

**PRELIMINARY STATEMENT**

1.     This is an action to declare unlawful and enjoin the photo identification requirements for voting of Texas Senate Bill 14 of the 82nd Legislative Session, 2011 ("SB 14"), specifically §§ 1, 2, 4, 9-15, and 17-21 of SB 14, on the grounds that they: (a) have a discriminatory result in violation of Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973 ("Section 2"); (b) were enacted with a racially discriminatory purpose in violation of Section 2 and the Fourteenth and Fifteenth Amendments to the United States Constitution; and (c) impose substantial and unjustified burdens on the fundamental right to vote in violation of the Fourteenth Amendment.



EXHIBIT
2

2:13-cv-193
09/02/2014
DEF0613

2.      The photo identification requirements of SB 14 disproportionately prevent Latino and African-American citizens in Texas from voting in person and, in the totality of the circumstances, deny Latino and African American citizens an equal opportunity to participate in the political process and were enacted for that purpose.

## PARTIES

3.      Plaintiff Texas State Conference of NAACP Branches ("Texas NAACP") is a subsidiary organization of the National Association for the Advancement of Colored People, Inc. ("NAACP"), a national non-profit, non-partisan organization.  The Texas NAACP was founded in 1936, and is the oldest and one of the largest and most significant organizations promoting and protecting the civil rights of African-Americans in Texas.  It is headquartered in Austin and has over sixty branches across the State, as well as members in almost every Texas county.

a.      The Texas NAACP's organizational objectives include pursuing the elimination of all racial discrimination in the democratic process, and seeking enforcement of federal laws and constitutional provisions securing voting rights.  The Texas NAACP's support of the Voting Rights Act has been central to this mission, and the Texas NAACP has participated in numerous lawsuits to enforce the provisions of the Voting Rights Act, including as a defendant-intervenor in *Texas v. Holder*, 888 F. Supp. 2d 113 (D.D.C. 2012), *vacated and remanded*, 133 S. Ct.  2886 (2013), to oppose preclearance under Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, of the photo ID requirements enacted by SB 14.  The Texas NAACP also engages in efforts to register African-American citizens to vote and to encourage African-American voter registrants to turn out to vote.

b.      SB 14 is causing and will continue to cause the Texas NAACP to divert a portion of its financial and other organizational resources to educating Texas citizens about the

photo ID requirements of SB 14, and assisting voters in casting in-person ballots in compliance with SB 14. As a result, the Texas NAACP is limited, and will continue to be limited, to devoting fewer resources to its other organizational activities, including voter registration drives and get-out-the-vote efforts.

c. Upon information and belief, the Texas NAACP includes members who are registered voters but do not possess any of the forms of photo identification required by SB 14 for voting in person on Election Day or in early voting.

4. Plaintiff Mexican American Legislative Caucus of the Texas House of Representatives ("MALC") is the nation's oldest and largest Latino legislative caucus. MALC is a non-profit organization established to serve the members of the Texas House of Representatives in matters of interest to Texas' Latino community, including matters relating to the voting rights of Latino citizens residing in Texas.

a. MALC plays an active role in both legislative and legal initiatives, including participating as a defendant-intervenor in *Texas v. Holder, supra*, to oppose preclearance under Section 5 of the Voting Rights Act of the photo ID requirements of SB 14.

b. MALC's forty members are registered voters in Texas and most are elected from districts that are majority Latino in citizen voting age population and in registered voters. The large majority of MALC members are Latinos.

c. SB 14 is causing and will continue to cause MALC to divert a portion of its financial and other organizational resources to educating Texas citizens about the photo ID requirements of SB 14, and assisting voters in casting in-person ballots in compliance with SB 14. As a result, MALC is limited, and will continue to be limited, to devoting fewer resources to its other organizational activities.

5.      Defendant John Steen is the Secretary of State of the State Texas and is sued in his official capacity.  The Secretary of State is the State's chief election officer, Tex. Elect. Code § 31.001, and as such is responsible for "obtain[ing] and maintain[ing] uniformity in the application, operation, and interpretation of [Texas election laws]," and for "prepar[ing] detailed and comprehensive written directives and instructions relating to and based on [Texas election laws]."  Texas Elect. Code § 31.003.

6.      Defendant Steve McCraw is the Director of the Texas Department of Public Safety ("DPS") and is sued in his official capacity.  DPS is responsible for issuing all of the forms of photographic identification which Texas registered voters may use under SB 14 for in-person voting and which are issued by the State of Texas (*i.e.*, a Texas driver's license, personal identification card, election identification certificate, and a license to carry a concealed handgun).

## JURISDICTION AND VENUE

7.      This case arises under the Constitution and laws of the United States.  This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. § 1973j.  This Court has jurisdiction to grant both declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

8.      Venue is proper in this judicial district of Texas, pursuant to 28 U.S.C. § 1391(b), because a substantial part of the claims or omissions giving rise to Plaintiffs' claims have occurred, and are occurring, in the Southern Judicial District of Texas.

## STATEMENT OF FACTS

### A.      Pre-Existing Texas Law

9.      Under the law in force at the time of the enactment of SB 14, a registered voter in Texas was permitted to vote a regular ballot in person (either on Election Day or during the early

voting period) after presenting her or his voter registration certificate to an election officer at the voter's assigned Election Day polling place or at an early-voting site in the voter's county. A voter registration certificate is a postcard that Texas election officials are required to deliver to every registered voter as proof that the individual is properly registered to vote in the State. The certificate includes identifying information about the voter, including the voter's name, address, and birthdate.

10.    In addition, under the law in force when SB 14 was enacted, Texas registered voters listed in their precinct registers who sought to vote in person, at their assigned polling place or at an early-voting site in their county, but who did not have their voter registration certificate, were permitted to cast a regular ballot so long as they: (a) executed an affidavit stating that they did not have their certificate; and (b) presented one of eight categories of documentation of identification. Satisfactory documentation included the following: (i) a Texas driver's license or personal identification card, current or expired, or similar document from another State; (ii) a form of identification containing a photograph that establishes a person's identity (such as an employee identification card); (iii) a birth certificate or other document confirming birth that is admissible in a court of law and establishes a person's identity; (iv) United States citizenship papers; (v) a United States passport; (vi) official mail addressed to the person by name from a governmental agency; (vii) a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter; or (viii) any other form of identification approved by the Secretary of State's office.

11.    The voter identification procedures described in the previous two paragraphs did not apply to persons voting absentee by mail and, under the law in force when SB 14 was

enacted, persons voting absentee by mail were not required to provide any documentation of their identity. Texas law restricts eligibility for voting absentee by mail to the following persons: (a) those absent from their residence county on Election Day and during early in-person voting; (b) certain persons with disabilities or physical conditions; (c) persons 65 or older; and (d) certain persons confined in jail.

12.     In order to register to vote in Texas, a citizen is required to file an application in writing with the registrar of the county within which she or he resides. The application requires the following identifying information: the individual's name, date of birth, address, and a statement affirming United States citizenship and residency in Texas. There is no fee for a voter registration application or certificate. Texas residents may register using a variety of means and at a variety of locations, including: (a) at the county registrar's office; (b) when applying for or renewing a driver's license or other identification card at a DPS office; (c) when applying for, recertifying, or changing an address for the receipt of public assistance, or when obtaining service at certain other state agency offices; and (d) by mail using the state registration form or the national registration form issued by the United States Election Assistance Commission pursuant to the National Voter Registration Act of 1993, 42 U.S.C. § 1973gg *et seq.*

### B.     SB 14's New Photo Identification Requirements

13.     In 2011, the Texas Legislature enacted SB 14, which substantially alters the previous voter identification requirements described above. SB 14 significantly restricts the forms of acceptable identification required to vote in person on Election Day or in early voting. Under SB 14, every voter, subject to three limited exceptions, must present one of six forms of government-issued photo identification in order to vote at the polls on Election Day or in early voting, regardless of whether she or he has, or presents, a voter identification certificate. SB 14's new voter identification requirements do not apply to absentee voting by mail.

6

14.     The forms of photo identification required by SB 14 for in-person voting are:

        a.     a driver's license or personal identification card issued by DPS that has not expired or is not more than 60 days expired;

        b.     a license to carry a concealed handgun issued by DPS that has not expired or is not more than 60 days expired.

        c.     a new form of identification created by SB 14, known as an Election Identification Certificate ("EIC"), issued by DPS, that has not expired or is not more than 60 days expired;

        d.     a United States military identification card that contains the voter's photo and has not expired or is not more than 60 days expired;

        e.     a United States citizenship certificate that contains the voter's photo; and

        f.     a United States passport that has not expired or is not more than 60 days expired.

15.     An EIC may be obtained only at DPS offices, may be issued only to persons who are already registered to vote or who are registering in conjunction with applying for an EIC, and may be issued only to persons who lack all of the other forms of photo identification required by SB 14 for in-person voting. An EIC may be obtained only by presenting proof of citizenship and one piece of "primary identification," two pieces of "secondary identification," or one piece of secondary identification and two pieces of "supporting identification." Although DPS does not charge a fee for an EIC, voters who lack the required underlying identification must bear any costs associated with obtaining those documents.

16.     SB 14 includes three narrow exceptions to the requirement that government-issued photo identification be presented in order to vote at the polls on Election Day or in early voting:

a.      First, a voter with a disability, who does not have the photo identification required by SB 14, may apply to the county registrar for an exemption from the photo identification requirement by providing specified written documentation from the Social Security Administration or Department of Veterans Affairs regarding the individual's disability.   This must be done prior to an election in order to assert this exception when seeking to vote in person.

b.      Second, a voter with a religious objection to being photographed, who does not have the identification required by SB 14, may cast a provisional ballot at the polls on Election Day or in early in-person voting, however, that ballot will be counted only if the voter subsequently appears in person before the registrar within six days after the election and executes an affidavit swearing to the religious objection.   There is no option to execute this affidavit contemporaneously with appearing to vote in person, nor is there an option for the affidavit to apply to future elections.

c.      Third, a voter who as the result of a natural disaster has lost a document which constitutes photo identification within the meaning of SB 14 – provided that the disaster was declared by the President or by the Texas Governor, and occurred within 45 days of the election – and who does not otherwise have the identification required by SB 14, may cast a provisional ballot at the polls on Election Day or during early voting.  That ballot will be counted, however, only if the voter subsequently appears in person before the registrar within six days after the election and executes an affidavit swearing that the disaster caused the identification to be destroyed, or otherwise prevented the voter from accessing that identification.

17.      Under SB 14, a voter who does not have any of the six forms of photo identification required by SB 14, and who does not satisfy any of the three noted exceptions, may complete a provisional ballot at the polls on Election Day or  during early voting, but the voter's

ballot will be counted only if the voter subsequently presents one of the six forms of photo identification required by SB 14 to the registrar within six days after the election.

18.     Additionally, SB 14 requires that, for in-person voters, their name on the voter registration list either match exactly or is "substantially similar" to their name on the photo identification that the voter presents.  If the names do not match exactly, it is the responsibility of the election officer to decide whether the names are "substantially similar."  That determination requires discretionary, subjective assessments by election officials.  If the election officer concludes that non-exact names are "substantially similar," the voter must complete an affidavit stating that she or he is the person on the registration list before being allowed to cast a regular ballot.  If the election officer decides that the names are not exact matches and not "substantially similar," the registered voter is allowed to cast a provisional ballot, and the voter's ballot will be counted only if the voter subsequently presents one of the forms of photo identification required by SB 14 to the registrar within six days after the election and the registrar concludes that the names are "substantially similar."

### C.     Related Proceedings

19.     Pursuant to amendments enacted to the Voting Rights Act in 1975, Texas was subject to the preclearance requirements of Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, and accordingly was required to submit for federal preclearance review (by the Attorney General or the United States District Court for the District of Columbia) all changes in voting practices and procedures different from those in force or effect on November 1, 1972.

20.     The photo identification requirements of SB 14 were voting changes subject to Section 5 and, as such, Texas was precluded by Section 5 from enforcing those changes unless and until federal preclearance was obtained.

21.     On January 24, 2012, Texas filed suit against the Attorney General in the United States District Court for the District of Columbia requesting a declaratory judgment granting Section 5 preclearance to the photo identification changes enacted by SB 14.

22.     On August 30, 2012, following a week-long trial, the United States District Court for the District of Columbia, sitting as a three-judge court, denied preclearance to the photo identification changes enacted by SB 14.  Preclearance was denied because Texas failed to demonstrate that the changes would not "'lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise.'"  888 F. Supp. 2d at 115 (quoting *Beer v. United States*, 425 U.S. 130, 141 (1976)).

23.     The district court found that SB 14 "is the most stringent [voter ID law] in the country" and "will almost certainly have [a] retrogressive effect." *Id.* at 144.  The court explained that  SB 14 "imposes strict, unforgiving burdens on the poor, and racial minorities in Texas are disproportionately likely to live in poverty." *Id.*  In this regard, the court found that it was "undisputed by Texas" that "a substantial subgroup of Texas voters, many of whom are African American or Hispanic, lack [the] photo ID" required by SB 14, *id.* at 138, that the uncontested facts also showed that "the burdens associated with obtaining ID will weigh most heavily on the poor," *id.*, and that  "undisputed U.S. Census data" showed that " in Texas . . . the poor are disproportionately racial minorities." *Id.* at 140.

24.     On June 25, 2013, the Supreme Court ruled, by a 5-4 vote in *Shelby County v. Holder*, 133 S. Ct. 2612, that the provisions of Section 4(b) of the Voting Rights Act, 42 U.S.C. § 1973b(b), which set forth the criteria for determining which jurisdictions are subject to the preclearance requirements of Section 5, are unconstitutional insofar as they identify the

jurisdictions subject to Section 5. Accordingly, the State of Texas is not presently required to comply with Section 5.

25.  On June 27, 2013, pursuant to an appeal filed by Texas of the district court's decision in *Texas v. Holder*, the Supreme Court vacated the district court judgment and remanded for consideration in light of *Shelby County*. On August 27, 2013 the district court dismissed the lawsuit at the request of the State of Texas.

26.  Immediately following the Supreme Court's decision in *Shelby County*, the State of Texas announced that it will enforce the photo identification requirements of SB 14 in all future elections in the State.

### D.  Texas Population & Registered Voters

27.  According to the 2010 Census, the population of the State of Texas is over one-third Hispanic and over a tenth African-American. The 2010 Census reported that Texas has a total population of 25,145,561 persons, including 11,397,345 non-Hispanic White persons (45%), 9,460,921 Hispanic persons (38%), 2,975,739 non-Hispanic black persons (12%), and 1,027,956 non-Hispanic Asian persons (4%).

28.  According to the 2010 Census, the State of Texas has a voting-age population that is one-third Hispanic and over one-tenth African-American. The 2010 Census reported that Texas has voting-age population of 18,279,737, including 9,074,684 non-Hispanic White persons (50%), 6,143,144 Hispanic persons (34%), 2,102,474 non-Hispanic black persons (12%), and 758,636 non-Hispanic Asian persons (4%).

29.  The Hispanic population of Texas has grown substantially since 2000. According to the 2000 Census, Hispanics constituted 29% of the State's population and 22% of the State's voting age population (compared to the 2010 Census figures of 38% and 34%, respectively).

According to the 2000 and 2010 Censuses, the State's total population grew by 4,293,741 persons in that ten-year period, of whom 2,791,255 (65%) are Hispanic.

30.     According to the 2008-2010 American Community Survey ("ACS") prepared by the U.S. Census Bureau, the State of Texas has a citizen voting-age population of 15,564,014 persons, including 8,871,710 non-Hispanic White citizens (57%), 4,032,800 Hispanic citizens (26%), 2,006,756 non-Hispanic Black citizens (13%), and 449,648 non-Hispanic Asian citizens (3%).

31.     According to the 2008-2010 ACS, Hispanics and African-Americans in Texas are disproportionately poorer and unemployed compared to white persons.  The ACS reports that non-Hispanic White persons in Texas have a poverty rate of 9%; Hispanic persons, 26%; non-Hispanic Black persons, 23%; and non-Hispanic Asian persons, 12%.

32.     The 2008-2010 ACS further reports that the median household income is $60,856 for non-Hispanic White persons in Texas, $36,957 for Hispanic persons, $36,731 for non-Hispanic Black persons, and $64,245 for non-Hispanic Asian persons.

33.     According to the 2008-2010 ACS, the  unemployment rate was 6% for non-Hispanic White persons in Texas, 8% for Hispanic persons, 12%, for non-Hispanic Black persons, and 6%, for non-Hispanic Asian persons.

34.     According to the 2008-2010 ACS, Hispanics and African-Americans in Texas also disproportionately have a lower level of education than white persons.  Among Texans 25 years of age and older, 8% of Non-Hispanic White persons lack a high school diploma, whereas 41.5% of Hispanic persons, 15% of non-Hispanic Black persons, and 13% of non-Hispanic Asian persons lack a high school diploma.

35.     According to the 2008-2010 ACS, 4% of Non-Hispanic White households do not have a vehicle available to them compared to 7% of Hispanic households, 13% of non-Hispanic Black households, and 5% of non-Hispanic Asian households.

36.     According to the 2008-2010 ACS, 72% of non-Hispanic White persons reside in an owner-occupied unit compared to 58% of Hispanic persons, 45% of non-Hispanic Black persons, and 62% of non-Hispanic Asian persons.

37.     According to the 2008-2010 ACS, ("SNAP") benefits. 5% of non-Hispanic White households receive Supplemental Nutrition Assistance Program benefits compared to 19% of Hispanic households, 19.5% of non-Hispanic Black households, and 5.5% of non-Hispanic Asian households.

38.     The lower socioeconomic status of Hispanic and African-American residents of Texas, as compared to that of white Texas residents, hinders the ability of Hispanic and African-American citizens to participate equally in the political process.

39.     According to records maintained by the Texas Secretary of State, approximately 13.6 million people were registered to vote in Texas at the time of the 2012 presidential election, representing approximately 75% of the voting age population.  Figures reported by the Census Bureau indicate that 67 percent of eligible Texans were registered to vote for that election.

40.     As of April 2012, individuals who have Spanish surnames made up 22.5% of the registered voters in Texas.

### E.     SB 14's Effect on Minority Citizens in Texas

41.     The photo ID requirements of SB 14 disproportionately and negatively affect Latino and African-American citizens residing in Texas.  At the time when elections are conducted in Texas, Latino and African-American citizens are, and will be, substantially less likely than white citizens to be able to present the photo identification required by SB 14 for in-

person voting because Latino and African-American citizens are, and will be, substantially less likely to possess that photo identification at the time elections are conducted.  This effect is not, and will not be, mitigated by SB 14's limited exceptions to the photo ID requirements for in-person voting.

42.     Thousands of Texas citizens are eligible and qualified to register to vote, but currently lack the forms of photo identification required by SB 14 for voting in person on Election Day or in early voting.  Upon information and belief, the percentage of Latino citizens who currently lack the required forms of photo ID and the percentage of African-American citizens who currently lack the required forms of photo ID are significantly higher than the percentage of white citizens who currently lack the required forms of photo ID.

43.     Among the thousands of Texas citizens who lack the forms of photo identification required by SB 14, the percentages of Latino and African-American citizens who encounter (and will continue to encounter) substantial burdens in obtaining the required identification are significantly higher than the percentage of white citizens who encounter such burdens.  As a result of these differential burdens, the racial impact reflected in the current photo ID ownership rates (alleged in the previous paragraph) is not being mitigated, and will not be mitigated, by the possibility that Texas citizens without the required photo ID may obtain such photo ID in the future.  Moreover, these differential burdens, by race, themselves have (and will continue to have) a racial impact by increasing the disproportion, by race, in the rates of ownership of the photo identification required by SB 14.

44.     The differential burdens, by race, alleged in the previous paragraph arise because Latino and African-American citizens disproportionally have a low socioeconomic status

compared to white citizens, and because it is substantially more burdensome for persons with a low socioeconomic status to obtain any of the forms of photo identification required by SB 14.

45.     The factors that contribute to making it more burdensome for persons with a low socioeconomic status to obtain any of the forms of photo identification required by SB 14 include, but are not limited to, the following:

a.     All of the forms of photo identification required by SB 14 for in-person voting, except the EIC, require the payment of a fee in order to obtain the identification. Although no fee is charged by Texas for obtaining an EIC, the EIC is not free because voters bear all costs of obtaining the documentation necessary to qualify for an EIC.

b.     There are numerous practical obstacles to obtaining an EIC, driver's license, state identification card, or concealed-carry license from DPS because of the limited availability of DPS offices and the limited DPS office hours.  As of June 2012, 81 Texas counties had no DPS office, and in 34 additional counties DPS offices are open two days per week or less.  No DPS office is open on weekends or after 6 p.m. on weekdays.  Wait times in DPS offices in metropolitan areas can be as long as three hours during busy months of the year.

c.     SB 14 does not mandate paid leave to obtain photo identification required for in-person voting, and many Texans who are without such identification are likely to have to leave work in order to obtain the identification.

46.     The actions of Texas election officials to publicize the photo identification requirements of SB 14 do not, and will not, mitigate the racially disparate and negative impact of these requirements.

47.     The provisions of Texas law pursuant to which certain registered voters may vote absentee by mail do not, and will not, mitigate the racially disparate and negative impact of the photo identification requirements of SB 14.

48.     Upon information and belief, there also are hundreds of thousands of registered voters in Texas who, although they possess one of the six forms of photo identification required by SB 14 for in-person voting, will not have their name on that identification match exactly with their name on the registration list.  These individuals are allowed to vote a regular ballot only if an election official decides that the names are "substantially similar," and, upon information and belief, being subject to this discretion by election officials will result in the application of differential standards that disproportionately disadvantage Latino and African-American voters as compared to white voters.

### F.     Texas' History of Discrimination in Voting

49.     Texas has a long history of widespread and persistent discrimination in voting against African-American and Latino citizens who reside in the State.  This history includes actions to exclude minority citizens from the franchise and, when minority citizens became enfranchised, to substantially impede minority voters from having the opportunity to register and vote.  This history also includes the enactment and enforcement of election methods and redistricting plans whose purpose and effect were to dilute the voting strength of minority voters.

50.     The actions taken by Texas to restrict and impede minority voters' access to the ballot have included: use of all-white primary elections, struck down in *Smith v. Allright*, 321 U.S. 649 (1944), and *Terry v. Adams*, 345 U.S. 461(1953); use of a discriminatory poll tax as a prerequisite to voting, struck down in *United States v. Texas*, 252 F. Supp. 234 (W.D. Tex. 1966), *aff'd*, 384 U.S. 155 (1966) (per curiam), after the Voting Rights Act was adopted; and the enactment, after the poll tax was invalidated, of a series of voter registration procedures which

16

would have significantly minimized minority political participation, and which were struck down first on constitutional grounds, *Beare v. Smith*, 321 F. Supp. 1100 (S.D. Tex. 1971), *aff'd sub nom.*, *Beare v. Briscoe*, 498 F.2d 244 (5th Cir. 1974) (per curiam), and then were barred pursuant to an objection interposed under Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c.

  51. The actions taken by the State of Texas and its subjurisdictions to minimize and dilute the voting strength of minority voters have included the following:  at least one of the State's statewide redistricting plans enacted following each Census, beginning with the 1970 Census and continuing through the 2010 Census, was denied preclearance under Section 5 of the Voting Rights Act because of its discriminatory purpose and/or effect; in *LULAC v. Perry*, 548 U.S. 399 (2006), the Supreme Court held that a congressional redistricting plan enacted by the Texas Legislature in 2003 violated Section 2 of the Voting Rights Act, and found that the plan bore "the mark of intentional discrimination that could give rise to an equal protection violation," *id.* at 440; in the past three decades, there were more successful suits against Texas subjurisdictions filed under Section 2 of the Voting Rights Act, challenging discriminatory election methods and redistricting plans, than in any other State in the country; and, in the past three decades, Texas had the second-highest number of Section 5 objections (which concerned dilutive voting changes as well as other discriminatory changes).

  52. The history of voting discrimination in Texas continues to diminish the ability of Latino and African-American citizens to participate equally with white citizens in the political process.

  53. Elections at the state and local level in Texas are characterized by racially polarized voting.

G.    **Voter Identification Legislation and the Legislative Process**

54.    SB 14 was enacted as the result of an unusual and irregular legislative process. That process, and the legislative history underlying the process, provide substantial indicia that SB 14 was motivated, at least in part, by an intent to discriminate against Latino and African-American voters.

55.    The legislative process that culminated in the enactment of SB 14 in 2011 included consideration, in the three preceding regular legislative sessions, of bills to substantially alter the voter identification requirements for in-person voting.  Such bills passed in the state House in 2005 and 2007 but did not pass in the state Senate, and then passed in the state Senate in 2009 but did not pass in the House.

56.    During the Texas Legislature's consideration of photo identification legislation from 2005 to 2011, the Legislature was informed of concerns that restricting the forms of identification required for in-person voting would have a discriminatory impact on minority voters because minority voters would have less access than white voters to the limited forms of identification to be required.  The information provided to the Legislature in this regard included information about the financial costs involved in obtaining the forms of photo identification required by these bills.

57.    Notwithstanding the expressed concerns regarding the discriminatory nature of the proposed changes to the in-person voter identification requirements, the voter identification bills that passed one house of the Texas Legislature from 2005 to 2009 became increasingly more restrictive and stringent with regard to the voter identification to be required for in-person voting, and SB 14 is more restrictive and stringent than those bills.  The Texas Legislature did not investigate the concerns regarding the discriminatory nature of the voter identification changes,

18

and did not rely on any analysis or study, or any event or occurrence, as a basis for passing, and ultimately approving, increasingly restrictive photo identification bills.

58.     At the beginning of the 2009 legislative session, following the failure of the House-passed photo identification legislation in the Senate in 2005 and 2007, the Senate amended its rules so as to create an exception to the rules that govern when legislation may be considered in that legislative body, which exception specifically was limited to the consideration of photo identification legislation.

59.     In the Senate, bills typically are considered out of the regular order of business, however, the Senate rules provide that an "out-of-order" bill may be brought up for consideration only pursuant to a two-thirds vote. This procedure has been in place for decades.

60.     At the start of the 2009 session, the Senate amended its rules to remove the two-thirds requirement solely as it would apply to voter identification legislation, thereby allowing such legislation to be brought for consideration out of order pursuant to a simple majority vote. The Senate voted to consider the 2009 photo identification bill by a majority vote, and passed the bill by another majority vote. All eight members of the Senate who are African-American or Latino voted against the bill. Without the rules change, the Senate would not have had the two-thirds majority needed to vote to suspend the usual order of business to consider this photo identification bill.

61.     The photo ID bill that passed the Senate in 2009 did not reach the House floor for a vote because of a late-session filibuster by members of the House who argued that the bill would discriminate against minority voters.

62.     At the beginning of the 2011 regular legislative session, Governor Perry, on January 20, 2011, designated voter identification legislation as an "emergency matter." This

enabled the legislation to be excepted from the provision of the Texas Constitution that otherwise prohibits the passage of legislation within the first 60 days of each legislative session.  The Governor's designation did not rest upon any actual emergency, but was made solely to bypass procedural obstacles to passage of this highly controversial legislation.

63.    As in 2009, the photo ID legislation (SB 14) was first considered in the Senate. On January 19, 2011, the Senate adopted its rules for the 82nd Legislature, and voted (as in 2009) to except photo identification legislation from the normal two-thirds rule, thus allowing SB 14 to be considered out of order on a simple majority vote.  Two days later, on January 21, 2011, Lieutenant Governor Dewhurst notified the Senate that the Committee on the Whole would take up SB 14 on January 24, 2011, despite protests by senators that this was insufficient notice to prepare and secure witnesses for the hearing.  On January 26, 2011, the Senate passed SB 14.  All Senators present who had been elected as candidates of choice by racial and ethnic minority voters voted against SB 14.

64.    SB 14 was received by the House on January 27, 2011.  Rather than following regular procedure which would have sent the bill to the House Committee on Elections for consideration, the House created a special Select Committee on Voter Identification and Voter Fraud and sent SB 14 to that committee.  This was the only committee given "fast track" designation, and, SB 14 was the only piece of legislation considered by the Select Committee.  It is unusual for any committee in the Texas House, regular or select, to be convened solely to consider one piece of legislation.  The Select Committee held only one hearing before approving SB 14.  At the hearing, expert witnesses explained that SB 14's restrictive ID requirements would adversely impact minority voters.  The Select Committee did not hear any expert testimony on voter fraud in Texas, notwithstanding that the committee had been empaneled, in

part, to address voter fraud and proponents of SB 14 argued that the legislation was needed to address voter fraud.  The House passed SB 14, with all African-American and most Latino House members opposed.

65.     During the Senate and House floor debates, Senators and Representatives raised concerns regarding SB 14's negative impact on minority voters.  The Senate and House sponsors, however, refused to provide direct answers to questions about the bill's impact on minority voters, asserting only that they were "not advised" of information on this issue.

66.     During the debate on SB 14, Senators and House members proposed numerous amendments to address or ameliorate the discriminatory impact of SB 14.  The defeated amendments included: a requirement that the Secretary of State analyze SB 14's impact on minority voters; a requirement that DPS offices remain open on evenings and weekends to allow for broader access to the identification required by SB 14; a provision that EICs could be obtained at government offices in addition to DPS offices; provisions allowing for additional forms of photo identification, including a Medicare identification card, a student photo identification, and additional types of federal and state photo identification cards; a prohibition on charging a fee for the underlying identification needed to obtain the photo identification required by SB 14; and a provision allowing for reimbursement of the costs to indigent voters of travelling to obtain the photo identification required by SB 14.

67.     The same legislature that passed SB 14 also enacted decennial redistrictings plans for Congress, the state Senate, and the state House that were discriminatory in purpose and/or effect.  *Texas v. United States*, 887 F. Supp. 2d 133 (D.D.C. 2012) (three-judge court), *vacated on other grounds*, 133 S. Ct. 2885 (2013).

68.     Governor Perry signed SB 14 on May 27, 2011.  The bill analysis prepared in his office included no analysis of the bill's impact on minority voters.

### H.     SB 14's Tenuous Justification

69.     The policy justifications offered in support of SB 14 are unsupported, which provide a further indicia that SB 14 was motivated, at least in part, by an intent to discriminate against Latino and African-American voters.

70.     During the time period identified above during which voter identification legislation was considered by the Texas Legislature (2005-2011), there were repeated claims by members of the Legislature, other Texas officials, and private individuals that Texas needed to revise the pre-existing voter identification requirements in order to prevent non-citizens from voting and to address immigration by undocumented persons.

71.     Prior to the passage of SB 14, elected public officials in the State of Texas — including Texas State Senators and Representatives, the Secretary of State, the Lieutenant Governor, and the Governor — received a substantial number of letters and emails from constituents that characterized voter identification legislation as legislation regarding illegal immigration, often urging them to enact stricter voter identification requirements to stop undocumented immigrants from voting, and often using inflammatory references to "criminal aliens," "wetbacks," and similar derogatory phrases and racial epithets to refer to unqualified voters who allegedly needed to be prevented from voting by new voter identification requirements.  Rhetoric within the Legislature regarding voter identification legislation also included racially-tinged statements.

72.     SB 14 allows for use of forms of photo identification that legally may be obtained by residents of Texas who are not U.S. citizens, as did each of the bills that passed one house of the Legislature in 2005, 2007, and 2009.

73.     Following Senate passage of SB 14, Lieutenant Governor Dewhurst issued a press release stating that SB 14 will increase voter confidence "by ensuring only U.S. citizens – who are legally eligible – vote in Texas elections."

74.     There was minimal or no documented evidence presented to the Legislature from 2005 to 2011 of voting by non-citizens in Texas, either currently or in recent history.

75.     The claims that the photo identification requirements of SB 14 are necessary to prevent voting by non-citizens are pretextual, and have an anti-Latino animus.

76.     The only form of voter fraud plausibly addressed by SB 14's photo identification requirements is in-person voter impersonation. This is the situation where an individual might seek to vote on Election Day or in early voting by falsely identifying herself or himself to election officials as another individual who is registered to vote. SB 14 does not address fraud that sometimes occurs in absentee balloting by mail.

77.     The type of in-person voter impersonation fraud described in the preceding paragraph occurs very rarely. In 2011, the House Elections Committee reported that "Texas and other states appear to have had very infrequent prosecution of in-person voter fraud." In 2010, the House Committee on Elections convened a hearing on voter fraud at which the Director of the Secretary of State's Elections Division testified that the Division had referred 24 potential violations of the election code to the Office of the Attorney General in the prior two years, of which only two involved allegations of in-person voter impersonation. In 2008, the House Elections Committee reported that "most election fraud happening in Texas occurs within the absentee or mail-in ballot system," and that "the committee found the chances of an illegal alien actually voting are very slim."

23

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
**(Discriminatory Result in Violation of Section 2 of the Voting Rights Act)**

78.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

79.    Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, in relevant part, provides:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United State to vote on account of race or color, or [membership in a language minority group].

> (b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

80.    As a result of SB 14's new voter photo identification requirements, and under the totality of circumstances, the political process in Texas is not equally open to participation by Latino and African-American citizens in that such citizens have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

81.    SB 14's photo identification requirements for in-person voting on Election Day or in early voting constitute a qualification or prerequisite to voting within the meaning of Section 2 of the Voting Rights Act, and result in the denial or abridgement of the right to vote of U.S. citizens who are residents of Texas on account of their race or color, or membership in a language minority group, in violation of Section 2 of the Voting Rights Act.

## SECOND CLAIM FOR RELIEF
**(Discriminatory Purpose in Violation of Section 2 of the Voting Rights Act,
and the Fourteenth and Fifteenth Amendments to the United States Constitution)**

82.     Plaintiffs re-allege and incorporate by reference each and every allegation

contained in the preceding paragraphs as if set forth fully herein.

83.     Section 1 of the Fourteenth Amendment to the United States Constitution provides

that:

> No state shall make or enforce any law which shall abridge the privileges or
> immunities of citizens of the United States; nor shall any state deprive any person
> of life, liberty, or property, without due process of law; nor deny to any person
> within its jurisdiction the equal protection of the laws.

84.     Section 1 of the Fifteenth Amendment to the United States Constitution provides

that:

> The right of citizens of the United States to vote shall not be denied or abridged
> by the United States or by any State on account of race, color, or previous
> condition of servitude.

85.     SB 14 was adopted, at least in part, because its photo identification requirements

have, and will continue to have, a discriminatory impact on Latino and African-American

citizens of Texas.  Applying the framework established by the Supreme Court for analyzing

discriminatory purpose, *Village of Arlington Heights v. Metro. Housing Devel. Corp.*, 429 U.S.

252, 266-268 (1977), to SB 14, the indicia of discriminatory purpose include (but are not limited

to):  SB 14 bears more heavily on Latino and African-American citizens of Texas;  SB 14 was

adopted in the context of a long, persistent, and ongoing history of racial discrimination in voting

in Texas; SB 14 was enacted through a process marked by numerous departures from normal

legislative procedures; the sequence of events leading to the enactment of SB 14 included the

passage of increasingly restrictive photo ID requirements in the Legislature, notwithstanding the

absence of any basis for that progression and notwithstanding the concerns raised throughout the

process about the discriminatory impact of restrictive photo ID requirements on minority voters;
the legislative history of SB 14 includes the rejection of amendments to SB 14 which could have
ameliorated its impact on minority voters, and statements and debate reflecting a racial purpose;
and there is no legitimate non-discriminatory justification for SB 14's specific photo
identification requirements.

86.     SB 14 was enacted with a racially discriminatory purpose in violation of Section 2
of the Voting Rights Act, and the Fourteenth and Fifteenth Amendments.

### THIRD CLAIM FOR RELIEF
**(Undue Burden on the Right to Vote in Violation of the Fourteenth Amendment to the
United States Constitution)**

87.     Plaintiffs re-allege and incorporate by reference each and every allegation
contained in the preceding paragraphs as if set forth fully herein.

88.     The photo identification requirements contained in SB 14 for voting in person on
Election Day or in early voting impose a substantial burden on the fundamental right to vote of
Texas citizens, and are neither justified by, nor necessary to promote, interests put forward by the
State that were not already being adequately protected by pre-existing criminal laws and election
procedures.

WHEREFORE, Plaintiffs respectfully pray that the Court:

(a) enter a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 declaring that
the photo identification requirements of Senate Bill 14, as specifically identified in paragraph 1
of this Complaint, violate Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, and the
Fourteenth and Fifteenth Amendments, and therefore are unlawful, null, and void, or, in the
alternative, are unlawful, null, and void consistent with the scope of the violation;

(b) enjoin Defendants, their agents, employees, and those persons acting in concert with them, from enforcing the photo identification requirements of Senate Bill 14, as specifically identified in paragraph 1 of this Complaint, in any election conducted in the State of Texas or, in the alternative, entering an injunction that is consistent with the scope of the violation;

(c) enter an order pursuant to Section 3(c) of the Voting Rights Act, 42 U.S.C. § 1973a(c), retaining jurisdiction for such period of time as may be appropriate, and requiring preclearance of voting changes that the State of Texas enacts or seeks to administer, as specified in Section 3(c);

(d) enter an order awarding Plaintiffs their reasonable attorneys' fees and costs; and

(e) enter an order granting Plaintiffs such other and further relief as may be just and equitable.

Respectfully submitted this 17th day of September, 2013.

/s/ Amy L. Rudd
Steven B. Weisburd
State Bar No. 24054515
S.D. Tex. ID 1691215
Amy L. Rudd
State Bar No. 24043561
S.D. Tex. ID 1149768
Lindsey B. Stelcen
State Bar No. 24083903
Dechert LLP
500 W. 6th Street, Suite 2010
Austin, Texas 78701
Telephone:  (512) 394-3000
Facsimile:  (512) 394-3001
lindsey.stelcen@dechert.com

Ezra D. Rosenberg
Dechert LLP
902 Carnegie Center, Suite 500
Princeton, New Jersey  08540-6531
Telephone:  (609) 955-3222
Facsimile:  (609) 955-3259
ezra.rosenberg@dechert.com

Robert A. Kengle
Mark A. Posner
Sonia Kaur Gill
Erandi Zamora
Lawyers' Committee for Civil Rights Under Law
1401 New York Avenue, N.W., Suite 400
Washington, D.C. 20005
Telephone:  (202) 662-8389
Facsimile:  (202) 628-2858
mposner@lawyerscommittee.org

27

Robert Notzon
The Law Office of Robert Notzon
State Bar No. 00797934
1502 West Avenue
Austin, Texas 78701
Telephone:  (512) 474-7563
Facsimile:  (512) 474-9489
Robert@NotzonLaw.com

Gary Bledsoe
State Bar No.: 02476500
PotterBledsoe, L.L.P.
316 West 12th Street, Suite 307
Austin, Texas 78701
Telephone:  (512) 322-9992
Facsimile:  (512) 322-0840
garybledsoe@sbcglobal.net

Wendy Weiser
Myrna Pérez
State Bar No. 24041676
Vishal Agraharkar
Jennifer Clark
The Brennan Center for Justice at NYU Law
School*
161 Avenue of the Americas, Floor 12
New York, New York 10013-1205
Telephone:  (646) 292-8329
Facsimile:  (212) 463-7308
wendy.weiser@nyu.edu
myrna.perez@nyu.edu
vishal.agraharkar@nyu.edu
jennifer.clark@nyu.edu

*This complaint has been prepared by an institute
affiliated with New York University School of Law,
but does not purport to present the school's
institutional views, if any.

Kim Keenan
Marshall Taylor
Victor Goode
State Bar No. 08145525
NAACP
4805 Mt. Hope Drive
Baltimore, Maryland 21215
Telephone:  (410) 580-5120
Facsimile:  (410) 358-9350
kkeenan@naacpnet.org
mtaylor@naaacpnet.org
vgoode@naacpnet.org

Jose Garza
Law Office of Jose Garza
State Bar No. 07731950
7414 Robin Rest Drive
San Antonio, Texas 98209
Telephone:  (210) 392-2856
garzapalm@aol.com

Clay Bonilla
State Bar No. 24055193
S.D. Tex. ID 596241
Daniel G. Covich
State Bar No. 04906500
S.D. Tex. ID 10706
The Law Offices of William Bonilla, P.C.
2727 Morgan Ave.
Corpus Christi, Texas  78405
Telephone:  (361) 882-8284
Facsimile:  (361) 881-1031
claybonilla@hotmail.com
Daniel@bonillalaw.com