JANICE MCCOY                                                                MAY 16, 2012



**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,

                    Plaintiff,

VS.

ERIC H. HOLDER, JR. in his
official capacity as Attorney
General of the United States,

                    Defendant,

ERIC KENNIE, et al.,

        Defendant-Intervenors,

TEXAS STATE CONFERENCE OF          CASE NO. 1:12-CV-00128
NAACP BRANCHES,                    (RMC-DST-RLW)
                                   Three-Judge Court
        Defendant-Intervenors,

TEXAS LEAGUE OF YOUNG VOTERS
EDUCATION FUND, et al,

        Defendant-Intervenors,

TEXAS LEGISLATIVE BLACK
CAUCUS, et al,

        Defendant-Intervenors,

VICTORIA RODRIGUEZ, et al.,

        Defendant-Intervenors.

................................................
                ORAL DEPOSITION OF
                  JANICE McCOY
                  MAY 16, 2012
................................................

**Page 2**

1       ORAL DEPOSITION OF JANICE McCOY, produced as a
2   witness at the instance of the Defendant, was duly
3   sworn, was taken in the above-styled and numbered cause
4   on the MAY 16, 2012, from 9:39 a.m. to 6:24 p.m., before
5   Chris Carpenter, CSR, in and for the State of Texas,
6   reported by machine shorthand, at the offices of The
7   United States Attorney's Office, 816 Congress Avenue,
8   Suite 1000, Austin, Texas 78701, pursuant to the Federal
9   Rules of Civil Procedure and the provisions stated on
10  the record or attached hereto.

**Page 3**

1
2
3               A P P E A R A N C E S
4   FOR THE PLAINTIFF, STATE OF TEXAS
5       Matthew Frederick
        Patrick K. Sweeten
6       OFFICE OF THE ATTORNEY GENERAL OF TEXAS
        P.O. Box 12548
7       Austin, TX 78711-2548
        209 West 14th Street
8       8th Floor
9       Austin, TX 78701
        (512) 936-1307
10      matthew.frederick@texasattorneygeneral.gov
11
12  FOR THE DEFENDANT, HOLDER, ET AL:
13      Jennifer Maranzano
        Elizabeth S. Westfall
14      U.S. DEPARTMENT OF JUSTICE
        950 Pennsylvania Avenue, NW
15      NWB - Room 7202
        Washington, DC 20530
16      (202) 305-7766
        jennifer.maranzano@usdoj.gov
17      elizabeth.westfall@usdoj.gov
18  FOR THE DEFENDANT-INTERVENOR TEXAS STATE CONFERENCE OF
    NAACP BRANCHES AND THE MEXICAN AMERICAN LEGISLATIVE
19  CAUCUS:
20      Ezra D. Rosenberg
        DECHERT, LLP
21      Suite 500
        902 Carnegie Center
22      Princeton, NJ 08540-6531
        (609) 955-3200
23      ezra.rosenberg@dechert.com
24
25

**Page 4**

1   FOR THE KENNIE INTERVENORS:
2       Chad W. Dunn
        BRAZIL & DUNN, LLP
3       4201 Cypress Creek Parkway
        Suite 530
4       Houston, TX 77068
        (281) 580-6310
5       chad@brazilanddunn.com
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

EXHIBIT
2
McCoy

2:13-cv-193
09/02/2014
DEF0626

JANICE MCCOY                                                    MAY 16, 2012

---

5

INDEX

1
2   Appearances.......................................2
3   JANICE McCOY
4       Examination by Ms. Maranzano...............7
        Examination by Mr. Dunn...............227
5
    Signature and Changes.........................286
6
    Reporter's Certificate........................288
7
            EXHIBITS
8
    NO. DESCRIPTION                    PAGE MARKED
9
    28   HB No. 218, Filed 2007           41
10
    29   SB No. 362                       79
11
    30   Notice of Deposition             14
12
    31   Press Release From the Office of State   97
13       Senator Troy Fraser
14   32   Senate Rules Adopted by the 81st   119
         Legislature, Jan. 14, 2009
15
    33   Senate Journal, March 18, 2009    132
16
    34   Transcript, March 10, 2009, Committee of   134
17       the Whole Senate
18   36   SB No. 363                       139
19   37   Declaration of Janice McCoy, March 30,   161
         2012
20
    38   Senate Rules Adopted by 82nd Legislature   196
21
    39   Transcript, Jan. 25, 2011, Committee of   204
22       the Whole Senate
23   40   Transcript, Jan. 26, 2011, Committee of   206
         the Whole Senate
24
    41   Transcript Excerpt: Senate Bill 14, Jan.   208
25       26, 2011

---

6

1   42   Transcript Excerpt: Senate Bill 14, Jan.   213
         26, 2011, CD 1, Section II

---

7

1               JANICE McCOY,
2   having been first duly sworn to testify the truth, the
3   whole truth, and nothing but the truth, testified as
4   follows:
5               EXAMINATION
6   BY MS. MARANZANO:
7       Q.   Good morning.
8       A.   Good morning.
9       Q.   My name is Jennifer Maranzano.  I'm
10  representing the Defendant, Eric Holder, in this matter.
11          Can you please state your full name for
12  the record?
13      A.   Janice Steffes McCoy.
14          MS. MARANZANO:  And can we have everybody
15  go around and identify themselves, please?
16          MR. ROSENBERG:  Ezra Rosenberg from
17  Dechert LLP on behalf of the Texas State Conference of
18  NAACP Branches and MALC.
19          MR. DUNN:  Chad Dunn on behalf of the
20  Kennie Intervenors.
21          MR. ROSENBERG:  And let me see if we're
22  having a telephone guest today.
23          MR. FREDERICK:  Matthew Frederick for the
24  State of Texas.
25          MS. MARANZANO:  Let's just continue while

---

8

1   they are doing that.
2       Q.   (By Ms. Maranzano) Ms. McCoy, have you ever
3   been known by any other names?
4       A.   My maiden name is Janice Steffes.
5       Q.   Have you ever been deposed before?
6       A.   No.
7       Q.   Let me go over some ground rules with you.  You
8   have been placed under oath today, so it's important to
9   testify truthfully, accurately, and completely.
10          The court reporter is taking down a
11  transcript of everything that we say, and so it's
12  important to answer my questions verbally, not with
13  shaking your head or nodding.  It's important for you to
14  wait until I finish a question before you answer.  We
15  shouldn't talk over each other, and that way, the record
16  will be clear.  If you wish to stop and take a break at
17  any point, go ahead and let me know, and I will do my
18  best to accommodate you.
19          From time to time, your attorney may make
20  an objection to a question that I ask.  He is doing this
21  for the record, and unless he instructs you not to
22  answer, you can go ahead and answer my question.  If he
23  counsels you to answer only to the extent that
24  information is not privileged, I'd ask you to clarify
25  whether you're not answering based on that ground, so

JANICE MCCOY                                                    MAY 16, 2012

## 9

1    that we have a clear record.
2          Do you have any questions based on these
3    instructions?
4          A.   I do not.
5          Q.   Are you on any medication today that would
6    affect your ability to testify?
7          A.   No.
8          Q.   Is there any other reason why you can't testify
9    truthfully, accurately, and completely today?
10         A.   No.
11         Q.   I may use some shorthand today.  If I say "the
12   Senator," I'm referring to Senator Fraser or anyone who
13   is acting on his behalf.  Do you understand that?
14         A.   Yes.
15         Q.   I may use the terms "voter ID" and "photo ID"
16   interchangeably during this deposition.  I'd like you to
17   interpret those words broadly to include any photo
18   identification -- I'm sorry -- any voter identification
19   requirement, whether it had a photo or not, that a voter
20   needs to present in order to vote in person.
21         A.   Okay.
22         Q.   If I use the term "minority voters," I'm
23   referring to voters who are not white, nonAnglo.
24         A.   Okay.
25         Q.   Do you understand all those terms?

## 10

1          A.   Yes.
2          Q.   If I ask any questions today that you do not
3    understand, please let me know.
4          A.   I will.
5          Q.   Are you represented by counsel today?
6          A.   I am.
7          Q.   And who is that?
8          A.   Matthew Frederick.
9          Q.   And when did that representation begin?
10         A.   I think when I started working for the
11   state.  I mean, in terms of this case?
12         Q.   In terms of -- you're being represented by
13   Mr. Frederick today in this deposition?
14         A.   Yes.
15         Q.   And when did that representation start, to the
16   best of your knowledge?
17         A.   When the case was brought before the court.
18         Q.   How did you come to be informed that you were
19   being represented by Mr. Frederick?
20         A.   The Attorney General's Office called me.
21         Q.   Have you ever been a party in litigation?
22         A.   No.
23         Q.   Have you ever been involved in a case in which
24   Texas was the -- was a party?
25         A.   No.

## 11

1          Q.   What did you do to prepare for today's
2    deposition?
3          A.   I reviewed the bill, and I looked at some
4    minutes of the Committee of the Whole and the Floor
5    debate.
6          Q.   And when you say "the bill," can you tell me
7    what bill you're referring to?
8          A.   The enrolled version of Senate Bill 14.
9          Q.   And minutes of the Committee of the Whole
10   debate was for Senate Bill 14?
11         A.   Senate Bill 14, yes, ma'am.
12         Q.   Okay.  Did you review anything else?
13         A.   No, ma'am.
14         Q.   Did you meet with your attorneys prior to this
15   deposition?
16         A.   Yes, ma'am.
17         Q.   And who did you meet with?
18         A.   I met with Matt Frederick and Stacey Napier.
19         Q.   And when was that?
20         A.   I met with Matt and Stacey three or four weeks
21   ago.  I don't know the exact date.  And I talked with
22   Matt on the phone last evening.
23         Q.   How long did you meet with Mr. Frederick and
24   Ms. Napier three to four weeks ago?
25         A.   Hour, hour and a half.

## 12

1          Q.   And was anybody else present?
2          A.   No, ma'am.
3          Q.   And how long did you talk to Mr. Frederick last
4    night?
5          A.   About an hour.
6          Q.   Did you bring any documents with you today?
7          A.   No, ma'am.
8          Q.   Other than your attorneys, did you speak to
9    anybody about today's deposition?
10         A.   I talked to Colby on Tuesday afternoon about
11   the length of his deposition.
12         Q.   Did you talk to -- and I'm sorry, you're
13   referring to Colby Beuck?
14         A.   Is that how you say his last name?  Yes.  From
15   Representative Harless's Office, yes.
16         Q.   Did you talk to about him anything else from
17   his deposition?
18         A.   No, ma'am.  Just the length.
19         Q.   Did you talk to Senator Fraser about your
20   deposition?
21              MR. FREDERICK:  Let me interject here and
22   say, as I think will not come as a surprise to anybody,
23   the State of Texas will be asserting legislative
24   privilege throughout the deposition.  I will be
25   instructing Ms. McCoy not to answer questions that seek

13

1   to discover thoughts or mental impressions of herself or
2   Senator Fraser about pending legislation, or
3   communications about pending legislation with
4   legislators, staffs, state agencies, the Texas
5   Legislative Council, and constituents.
6           So I will instruct you, I think you can
7   answer the question to the extent it asks for whether a
8   conversation occurred, who was party to the conversation
9   and how long it took, when it occurred, but I want to
10  instruct you not to reveal the substance of any
11  conversation that you had with the Senator.  But you may
12  answer her question.
13      A.  The Senator and I did speak about the
14  depositions.
15      Q.  (By Ms. Maranzano) And when was that?
16      A.  We have talked about the deposition when they
17  were trying to get scheduled, and we talked about
18  scheduling and the timing of those depositions.  And
19  then this week, we talked several times Tuesday.  Is
20  today Wednesday?  We talked several times on Tuesday
21  strictly about the length of the depositions that have
22  occurred so far this week, and about the fact that I'm
23  probably going to be out of the office all day today.
24      Q.  Anything else that you discussed with the
25  Senator?

14

1       A.  I would probably assert legislative privilege
2   at this point.
3       Q.  Was anybody else present during these
4   conversations?
5       A.  No.
6       Q.  Did these conversations take place in person?
7       A.  No.
8       Q.  On the phone?
9       A.  Yes.
10      Q.  Okay.
11      A.  I'm sorry.  Jennifer, we -- the Senator and I
12  also spoke this morning as I was coming over here, so
13  yesterday and this morning.
14      Q.  And did you speak on the phone this morning?
15      A.  Yes, ma'am.
16      Q.  For about how long?
17      A.  Five, ten minutes.
18      Q.  Was that also about the length of time of the
19  deposition?
20      A.  Yes.
21          (Exhibit 30 marked for identification.)
22      Q.  (By Ms. Maranzano) I'm showing you what we've
23  marked as Deposition Exhibit 30.  Can you take a look at
24  it and tell me if you recognize this document?
25      A.  I do.

15

1       Q.  And what is it?
2       A.  It's the Notice of Deposition for -- for me to
3   appear.
4       Q.  And can I direct your attention to the third
5   page of this document.  Do you see that there's a list
6   of documents there?
7       A.  Yes, ma'am.
8       Q.  Did you undertake a search for these documents?
9       A.  Yes, ma'am.
10      Q.  Can you describe that search to me?
11      A.  I searched -- well, it wasn't very hard,
12  because I had a box marked Voter ID, and everything that
13  I had ever produced was in that box.  And then I did the
14  -- I did a search of my e-mail, and I did a search of my
15  computer files, which also, I had specific files marked
16  as Voter ID in folders, and went through there.
17      Q.  The box that was marked Voter ID, did you
18  say --
19      A.  Uh-huh.
20      Q.  -- can you tell me:  When did you compile
21  documents and put them in that box?
22      A.  I started compiling the box in 2009, when we
23  were debating the legislation then.
24      Q.  Uh-huh.
25      A.  And just continued it through 2011.

16

1       Q.  And what documents would go in that box?
2       A.  Studies, polls, information from agencies,
3   constituent letters, documents related to the
4   legislative process.
5       Q.  Does that box contain all of your documents
6   about voter ID?
7       A.  That box contains all of my documents about
8   voter ID from 2009 forward.
9       Q.  Did you collect documents prior to 2009?
10      A.  In 2007, Senator Fraser was the Senate sponsor
11  of a House bill related to voter ID, and that particular
12  bill folder has been archived, and those documents were
13  provided to the Attorney General electronically, not in
14  written form.
15      Q.  And when you say that you -- well, let me ask
16  you this:  About how many documents are in that box?
17      A.  Hundreds.
18          (Mr. Patrick Sweeten joins the
19  deposition.)
20      Q.  (By Ms. Maranzano) And then you said you
21  searched your e-mail and computer files?
22      A.  Yes, ma'am.
23      Q.  How did you search your e-mail?
24      A.  The Legislative Council provided a list of
25  terms to search on, and so I searched on those terms.



17

1     Q. And how did you search your computer files?

2     A. Again, all of my voter ID stuff was in the same

3   folders. I created specific folders for voter ID. And

4   so other than looking in, potentially, the media folder,

5   I just -- actually just went and grabbed those files and

6   provided them to the Attorney General.

7     Q. So all the documents you found, you provided to

8   the Office of the Attorney General?

9     A. Yes, ma'am.

10    Q. Can I direct your attention particularly to

11  Number 5, Request Number 5? Can you read that for me

12  please.

13    A. "All documents and communications, including

14  but not limited to those among and between staff,

15  members of the Texas Legislature, the Texas Legislative

16  Council, and other Texas State executive offices and

17  agencies relating to any calculations, reports, audits,

18  estimates, projections, assessments, or other analysis

19  of the effect that SB 14 will impose upon minority

20  voters."

21    Q. Did you search for documents responsive to

22  Request Number 5?

23    A. I searched for all documents related to voter

24  ID.

25    Q. Did you have any documents responsive to

18

1   Request Number 5?

2     A. No.

3     Q. Can I direct your attention to Request

4   Number 8? Did you search for documents responsive to

5   Request Number 8?

6     A. Yes.

7     Q. Did you find any responsive documents?

8     A. Yes.

9     Q. Can you tell me how many?

10    A. No.

11    Q. Because you don't know?

12    A. Because I didn't count them.

13    Q. Can you approximate how many?

14         MR. FREDERICK: For the record, I'll

15  object to the extent it calls for speculation. But if

16  you can approximate, you may answer the question.

17    A. I mean, I'm just trying -- the guess that I

18  would make, if you're talking about things the Senator

19  said publicly that I actually wrote and did a public --

20  a press release on, was probably four or five a session

21  that we would write a public statement.

22    Q. (By Ms. Maranzano) Okay. And you mentioned the

23  Senator's involvement in the 2007 legislation. Was he

24  also involved in the 2005 legislation?

25    A. No, ma'am.

19

1     Q. Can I direct your attention to -- let me ask

2   you this about Request Number 8: Where were those

3   documents?

4     A. The public statements that I wrote for the

5   Senator on voter ID were stored on my computer.

6     Q. Now, when you say the public statements that

7   you wrote, are there public statements that you did not

8   write that the Senator made?

9     A. Potentially, yes.

10    Q. And is there a reason you didn't search for

11  those, too?

12         MR. FREDERICK: Objection to the extent it

13  misstates the testimony.

14    Q. (By Ms. Maranzano) Did you search for -- I

15  understood you to say that --

16    A. I did not search newspaper articles for

17  comments that the Senator made.

18    Q. And -- okay. Just so I'm understanding you, do

19  you keep newspaper articles --

20    A. No.

21    Q. -- in which the Senator makes comments?

22    A. No.

23         MR. FREDERICK: Let her finish the

24  question.

25         THE WITNESS: Oh, okay.

20

1     Q. (By Ms. Maranzano) Can I direct your attention

2   to Request Number 11. Can you take a look at that? Did

3   you search for documents that were responsive to Request

4   Number 11?

5     A. Yes.

6     Q. Did you have any documents that were responsive

7   to Request Number 11?

8     A. No.

9     Q. Ms. McCoy, can you tell me a little bit about

10  your educational background?

11    A. I graduated from a Texas public high school out

12  of Houston and went to Texas A&M University and got a

13  bachelor of science degree awarded in 1991 in political

14  science.

15    Q. Any other schooling?

16    A. No, ma'am.

17    Q. What's your -- what's your job title?

18    A. Chief of staff.

19    Q. For?

20    A. I'm sorry.

21    Q. For who?

22    A. Senator Troy Fraser.

23    Q. What was your job prior to working for Senator

24  Fraser?

25    A. I worked for the Republican Party of Texas.

JANICE MCCOY                                                      MAY 16, 2012

21

1    Q.  How long did you work for the Republican Party
2    of Texas?
3        A.  Twelve and a half, 13 months.
4    Q.  And what was your title with them?
5        A.  Coalitions Director.
6    Q.  And when did you start working for them and
7    when did you complete your time there?
8        A.  I started working for the Republican Party in
9    August of 1997, and it ended in September of 1998.
10   Q.  When did you start working for Senator Fraser?
11       A.  September of 1998.
12   Q.  What does it mean to be a coalitions director?
13       A.  The chairwoman who hired me wanted to try and
14   be more inclusive and bring different types of
15   coalitions to the Republican Party.
16   Q.  What coalitions did she want to bring to the
17   Republican Party?
18       A.  We tried to create a Hispanic Business
19   Council.  Now you're testing my memory.  I don't know if
20   that's the exact title or not.  But there was a couple
21   -- there was another group, but I can't remember.  I'm
22   sorry.
23   Q.  There was another -- another group that you
24   formed with the Republican --
25       A.  Yes.

22

1    Q.  The Republican Party of Texas?
2        A.  Yes.
3    Q.  How did you get your job with Senator Fraser?
4        A.  The current chief of staff and I had met, and
5    he interviewed me and offered me a position.
6    Q.  Did you start working for Senator Fraser as
7    chief of staff or as something else?
8        A.  Something else.
9    Q.  And what was that position?
10       A.  Legislative assistant.
11   Q.  And what did you do as a legislative assistant?
12       A.  I did policy work, reviewed bills, answered
13   constituent inquiries.
14   Q.  Any areas of legislative specialty as a
15   legislative assistant?
16       A.  No.
17   Q.  And just so I'm clear, I meant, did you have
18   any areas of --
19       A.  Right.  I -- I was assigned to the State
20   Affairs Committee.  Senator Fraser sat on that
21   committee, and I worked that committee.
22   Q.  And what --
23       A.  I think.  I'm sorry.  I don't remember.
24   Q.  Okay.  What issues does the State Affairs
25   Committee deal with?

23

1        A.  In 1999, they did transportation.  They did
2    elections.  They did tort reform.
3    Q.  Anything else that you can remember?
4        A.  I can't remember.
5    Q.  Are those the same issues that they do now?
6        A.  They do -- State Affairs no longer does
7    transportation.
8    Q.  Okay.  How long were you a legislative
9    assistant for Senator Fraser?
10       A.  I think in 2000, I became legislative
11   director.  In or around the year 2000, I became
12   legislative director, and then I became chief of staff
13   in December of 2004.
14   Q.  What did you do as Senator Fraser's legislative
15   director?
16       A.  Similar things; legislative assistant, policy
17   work, constituent work, bill analysis.  But I also
18   directed the other legislative staff in their work.
19   Q.  Did you have the same legislative areas that
20   you worked on when you were the legislative director as
21   when you were a legislative assistant, or did you change
22   your area of focus?
23       A.  I think in the 2001 session, I worked on
24   business and commerce issues and in the 2003 session.
25   No, that's not right.  It all runs together.  I'm

24

1    sorry.  It seems like it should have been yesterday, and
2    it wasn't.  At some point, State Affairs was my focus,
3    and at some point, State Affairs, workers' comp -- no
4    business and commerce became my focus, and I started
5    doing workers' comp issues.  And then in 2003, Senator
6    Fraser became Chair of Business and Commerce.  So in
7    2001, I did Business and Commerce.  2003, I think I went
8    back to State Affairs.
9    Q.  Can you describe for me all of your experience
10   that relates to election law?
11       A.  My experience related to election law is
12   related to when I staffed State Affairs and monitoring
13   and analyzing the legislation that impacted the election
14   code.
15   Q.  And you staffed State Affairs as a legislative
16   assistant, correct?
17       A.  Yes, ma'am.  And then again in 2003, as
18   legislative director.  In 2005 as well, I think.
19   Q.  And do you staff State Affairs as the chief of
20   staff?
21       A.  No, ma'am.
22   Q.  Do you have any experience related to election
23   administration?
24       A.  Yes, ma'am.
25   Q.  What's that experience?

25

1    A.  In 1998, when I worked for the Republican Party
2  of Texas, I was also, in addition to being coalitions
3  director, they asked me to help their primary
4  administrator with some of her job.
5    Q.  And what was that job?
6    A.  To help coordinate the county chairs and get
7  them the information they needed to run their election,
8  the primary election, and then get that information back
9  so it could get certified by the chairman of the
10  Republican Party.
11    Q.  Have you ever worked at a polling place on
12  election day?
13    A.  Yes, ma'am.
14    Q.  In what capacity?
15    A.  Election judge.
16    Q.  And can you describe for me what an election
17  judge does?
18    A.  The election judge helps run the primary in
19  terms of getting the ballots in the ballot box to the
20  polling location, ensuring that the voters are voting in
21  the correct location and that they're eligible to vote
22  at that location, and then when the polls close, getting
23  the ballots back to the county.
24    Q.  Have you ever witnessed any problems at a
25  polling place while you were serving as election judge?

26

1    A.  No, ma'am.
2        MR. FREDERICK:  Objection, vague.
3        THE WITNESS:  Sorry?
4        MR. FREDERICK:  It's okay.  You can
5  answer.
6    A.  No.
7    Q.  (By Ms. Maranzano) Did you ever witness anyone
8  trying to impersonate another voter while you were
9  serving as election judge at a polling place?
10    A.  No.
11    Q.  Can you describe all of your current
12  responsibilities as chief of staff for Senator Fraser to
13  me, please.
14    A.  I'm responsible for managing the office in
15  terms of just Senate paperwork, time sheets, travel
16  vouchers, general day-to-day business of making sure the
17  Senate office runs.  I'm responsible for overseeing and
18  directing six staff people, in terms of giving them
19  advice about issues that they see or are dealing with in
20  their roles working for the Senator.  I handle the
21  Senator's media relations, and I continue to work policy
22  and legislative issues for the Senator.
23    Q.  Do you assist with drafting legislation?
24    A.  Yes, ma'am.
25    Q.  In what capacity?  What role do you play in

27

1  drafting legislation?
2    A.  There's several ways you can draft
3  legislation.  Once an idea is -- once it's determined
4  that the Senator wants to carry legislation, we
5  typically make a request to either the Texas Legislative
6  Council or Senate Engrossing and Enrolling and we just
7  send them -- or the Texas Legislative Council with just,
8  you know, general two, three lines, this is what we'd
9  like to see the law do, and then they draft it.  And
10  during session, occasionally we will draft -- I will
11  draft amendments to various legislation, if they're in
12  order to facilitate movement.
13    Q.  If a Senator -- if the Senator has proposed
14  legislation, do you work on trying to ensure that
15  legislation gets passed?
16    A.  Yes.
17    Q.  Can you describe that process for me?
18        MR. FREDERICK:  I'll object, and to the
19  extent that it calls for communications that you might
20  have had with legislators, staff, state agencies, the
21  TLC, or constituents about pending legislation, I'll
22  instruct you not to answer on the basis of privilege.
23  But to the extent you can answer without relying on
24  that, you're free to answer the question.
25    Q.  (By Ms. Maranzano) And I'm asking you right now

28

1  in a general sense what your role is in that capacity.
2    A.  In a general sense, once a piece of legislation
3  has been drafted by whomever drafted it, as staff, we
4  get the bill filed with the calendar clerk, and then it
5  goes through a general process that every bill goes
6  through, and once it gets referred to a committee, we
7  make the bill hearing request.  Along with the bill
8  hearing request, we will do a bill analysis, or provide
9  information to the committee so that they can have a
10  bill analysis prepared.  Once the bill is set for a
11  hearing, we will help the Senator with talking points.
12        If the bill makes it out of committee, we
13  will -- in the Senate, we have what's called an intent
14  calendar, so it's my job to -- once when we're ready to
15  move something on the Floor, we will notify the intent
16  calendar, essentially, and we will do talk -- and once
17  we're going to be recognized on the Floor, we'll do
18  talking points for the Floor.  And then if it passes the
19  Senate, we will provide that information to -- the same
20  sort of talking points and data that we have to whoever
21  will pick up the bill in the House.
22    Q.  What is a bill analysis?  I think you mentioned
23  that in regards to the committee portion of the bill.
24    A.  The Senate rules require that every bill have
25  an analysis attached to it.  The committees are

JANICE MCCOY                                      MAY 16, 2012

|  | 29 |
| --- | --- |
| 1 | responsible for -- in the Senate, the committees are |
| 2 | responsible for putting that bill analysis together. |
| 3 | The Senate Research Center helps with that; it's an arm |
| 4 | of the Senate, and it basically provides a general |
| 5 | description of the bill, and then it will provide a |
| 6 | section-by-section analysis. |
| 7 | Q.  Do you have -- do you personally have |
| 8 | communications with other legislators? |
| 9 | A.  Yes. |
| 10 | Q.  Regularly about legislation? |
| 11 | A.  I mean, regularly is an interesting term. |
| 12 | During session? |
| 13 | Q.  Uh-huh. |
| 14 | A.  Yes.  During the interim, no. |
| 15 | Q.  Are your communications with other legislators |
| 16 | usually related to bills that Senator Fraser is |
| 17 | sponsoring or authoring? |
| 18 | A.  Yes. |
| 19 | Q.  What else would communications with other |
| 20 | legislators be about? |
| 21 | A.  Potentially, it could be about that |
| 22 | legislator's legislation, if I have a question about it. |
| 23 | Q.  Okay. |
| 24 | A.  I don't -- |
| 25 | Q.  About how many times -- during the legislative |

|  | 31 |
| --- | --- |
| 1 | Q.  Is communicating with interest groups or |
| 2 | advocacy groups one of your responsibilities? |
| 3 | A.  Yes. |
| 4 | Q.  And you said that you had a role in drafting |
| 5 | legislation.  Do you have a role in researching issues |
| 6 | that might be related to legislation? |
| 7 | A.  Yes. |
| 8 | Q.  When Senator Fraser is taking a vote on a bill, |
| 9 | what's your role in regards to that legislation?  Do you |
| 10 | make a recommendation to him? |
| 11 | A.  Yes, ma'am.  We do. |
| 12 | Q.  You do.  Does that role change if the Senator |
| 13 | is the sponsor of a bill? |
| 14 | A.  No. |
| 15 | Q.  Can you tell me, I think you said the Senator |
| 16 | has six staff people? |
| 17 | A.  Well, I'm seven.  Yeah. |
| 18 | Q.  Can you tell me their names and their titles? |
| 19 | A.  We have three people working in the district. |
| 20 | They're all called district coordinators.  Mel Ferguson, |
| 21 | Blake Woodall, Ralph Gauer, G-a-u-e-r.  And then |
| 22 | currently in Austin, in addition to myself, we have |
| 23 | three people, and Terri Mathis is scheduler.  Will |
| 24 | McAdams, policy analyst.  I think that's his title, |
| 25 | legislative analyst, policy analyst, something like |

|  | 30 |
| --- | --- |
| 1 | session, about how many times in a given week would you |
| 2 | talk to another legislator?  Not Senator Fraser, a |
| 3 | different legislator. |
| 4 | A.  I talk to other legislators pretty much every |
| 5 | day during session. |
| 6 | Q.  Do you communicate with the Executive Branch |
| 7 | about legislation? |
| 8 | A.  Yes. |
| 9 | Q.  About how frequently during a legislative |
| 10 | session do you communicate with the Executive Branch? |
| 11 | A.  Infrequently.  It depends on the bill.  I mean, |
| 12 | if it's something that is changing the way an agency |
| 13 | does business, it could be every day.  If it's a bill |
| 14 | that doesn't do that, then maybe never.  I mean... |
| 15 | Q.  About how frequently do you communicate with |
| 16 | the Governor's Office about legislation? |
| 17 | A.  Two, three times a session. |
| 18 | Q.  About how frequently do you communicate with |
| 19 | the Lieutenant Governor's Office about legislation? |
| 20 | A.  Every day.  During session.  I'm sorry. |
| 21 | Q.  Yeah.  When we were talking about your |
| 22 | responsibilities as chief of staff, did you say |
| 23 | communicating with constituents was one of your |
| 24 | responsibilities? |
| 25 | A.  I might not have said it, but it would be, yes. |

|  | 32 |
| --- | --- |
| 1 | that.  And then Whitney Smith-Nelson, administrative |
| 2 | assistant. |
| 3 | Q.  Do the staff people in the district office have |
| 4 | any role in legislative efforts the Senator makes? |
| 5 | A.  No. |
| 6 | Q.  Does your office have a records retention |
| 7 | policy? |
| 8 | A.  No. |
| 9 | Q.  None? |
| 10 | A.  Our specific office does not have a records |
| 11 | retention policy. |
| 12 | Q.  When you say "our specific office," you mean |
| 13 | Senator Fraser's office? |
| 14 | A.  Yes, ma'am. |
| 15 | Q.  Do you retain records? |
| 16 | A.  No, not -- |
| 17 | Q.  What prompted you to save certain files from |
| 18 | 2009 voter ID? |
| 19 | A.  I knew that the Senator would want to try again |
| 20 | in 2011. |
| 21 | Q.  How often do you communicate with Senator |
| 22 | Fraser? |
| 23 | A.  During the interim?  Two or three times a week. |
| 24 | Q.  I'm sorry.  During the interim, can you |
| 25 | describe what you mean by that? |

33

1    A.   The Texas legislature is in regular session for
2    140 days in odd-numbered years.  The rest of the time,
3    it's called the interim.  And that's the period we're in
4    right now, and I speak with him two or three times a
5    week during the interim.
6         Q.   And by what means do you communicate with him,
7    usually, during the interim?
8         A.   Phone.
9         Q.   Just phone?
10        A.   (Witness nods head yes.)
11        Q.   And do you speak on the phone, or do you text
12   message each other?
13        A.   Both.
14        Q.   Is that on the Senator's personal phone or an
15   official government phone?
16        A.   Personal phone.
17        Q.   Is that on your personal phone or an official
18   government phone?
19        A.   Both, depending on what time of day it is.
20        Q.   Do you save those messages on your phone?
21        A.   No.
22        Q.   Not at all, or not for any length of time at
23   all?
24        A.   I don't save anything.
25        Q.   Do you delete them, meaning, if they're not on

34

1    your phone now, is that because they weren't archived in
2    some manner or --
3         A.   Right.  I delete them.
4         Q.   Okay.  So other than the phone during the
5    interim, do you communicate with the Senator in any
6    other ways?
7         A.   I will, if I'm writing a speech or if he needs
8    some information, I fax things to his home.  But other
9    than that, I do not communicate with him in any other
10   way.
11        Q.   When you're in the legislative session --
12        A.   Yes, ma'am.
13        Q.   -- how often do you communicate with the
14   Senator?
15        A.   Every day.
16        Q.   And how do you usually communicate with him?
17        A.   Verbally.
18        Q.   Do you and the Senator ever exchange e-mails?
19        A.   I have sent him e-mail.  He does not respond.
20        Q.   Do you send e-mail to his personal account or
21   to a government account?
22        A.   Personal.
23        Q.   During the time that you worked for Senator
24   Fraser, how many election-related bills has the Senator
25   authored?

35

1    A.   I don't know.
2         Q.   Can you give me an estimate?
3         A.   The Senator typically does not author election-
4    related legislation.  He sponsors it.  So typically, I
5    would say, because of his seat on State Affairs, House
6    members will ask him to pick up their election bills,
7    and it could be 10 or 15 a session.  That's not to say
8    that he hasn't authored election related, other than,
9    obviously, voter ID, I just -- I don't -- I don't know.
10        Q.   So as you sit here, you can't think of other
11   election-related bills that Senator Fraser has authored
12   other than voter ID bills?
13        A.   That's correct.
14        Q.   And he has sponsored about 10 to 15 election-
15   related bills in those legislative sessions that you
16   worked in?
17        A.   That's a good guess.
18        Q.   During the time that you've worked for Senator
19   Fraser, how many immigration-related bills has Senator
20   Fraser authored?
21        A.   I don't know.
22        Q.   Can you give me an approximation?
23        A.   My guess would be none.
24        Q.   How about how many immigration-related bills
25   has Senator Fraser sponsored or co-sponsored?

36

1    A.   Again, my guess would be none, but I don't
2    know.
3         Q.   Are you familiar with Section 5 of the Voting
4    Rights Act?
5         A.   I know what it is.
6         Q.   What's your understanding of the requirements
7    of Section 5?
8         A.   My understanding is that Section 5 of the
9    Voting Rights Act requires the Department of Justice to
10   review election-related legislation for nine specific
11   states and a few other entities, and to ensure that
12   those election changes don't discriminate against
13   minorities.
14        Q.   Did you think it was important to save your
15   voter ID files because of Section 5 of the Voting Rights
16   Act?
17        A.   No.
18        Q.   How does the Legislature ensure that an
19   election-related change complies with Section 5 of the
20   Voting Rights Act?
21             MR. FREDERICK:  Let me interpose an
22   objection.  To the extent that the question seeks
23   information that reflects thoughts or mental impressions
24   about pending legislation or privileged communications,
25   I'll instruct you not to answer.  I think that the

JANICE MCCOY                                                    MAY 16, 2012

37

1    question is more general.  And to the extent it doesn't
2    call for privileged information or communications, you
3    may answer the question.
4        A.  Can you ask the question again?
5        Q.  (By Ms. Maranzano) Yes.  How does the Texas
6    Legislature ensure that an election-related change to
7    the law complies with Section 5 of the Voting Rights
8    Act?
9        A.  I don't know.
10       Q.  Do you believe that compliance with the Voting
11   Rights Act is important?
12           MR. FREDERICK:  Object to relevance.
13       Q.  (By Ms. Maranzano) You can answer.
14       A.  No.
15       Q.  Why not?
16       A.  I don't believe it's fair that nine states --
17   personally don't believe it's fair that nine states are
18   singled out in 2012.
19       Q.  To your knowledge, does Senator Fraser believe
20   that compliance with the Voting Rights Act is important?
21       A.  I don't speak to the Senator's beliefs.
22       Q.  In regards to your files on voter ID, did
23   anybody instruct you not to save those files?
24       A.  No.
25       Q.  Did anybody instruct you to delete your text

38

1    messages?
2        A.  No.
3        Q.  Can you tell me, describe for me, the current
4    system in Texas by which a voter's identity is verified
5    at the polls?
6        A.  Under current law, the voter who does not show
7    up with a voter registration card -- well, under current
8    law, if a voter shows up with a voter registration card
9    and they're on the rolls, gets to vote.  That's all they
10   need is the card.  If you don't have a card, under
11   current law, you can show several different forms of
12   ID:  Photo, one photo, with several options, or two
13   nonphoto.
14       Q.  Are you aware of any problems with the system?
15           MR. FREDERICK:  Objection, vague, but you
16   may answer.
17       A.  I think that the system works mostly, but it's
18   open to fraud.
19       Q.  (By Ms. Maranzano) Why do you say that?
20       A.  Because the voter registration card doesn't
21   necessarily have to be the person who is standing there
22   with it.
23       Q.  Are you aware of instances of voter fraud?
24       A.  No, ma'am.
25       Q.  Are you aware of any instances of voter fraud?

39

1        A.  I think in -- are we talking about in-person
2    voter fraud or voter fraud?
3        Q.  Well, let's talk generally first.
4        A.  I mean, I think, yes, there are instances of
5    voter fraud in that we know that there is some being
6    prosecuted.  Particularly, mail-in ballots are probably
7    the worst offenders, where we actually have the tools to
8    catch fraud.  In-person voter fraud, I'm not personally
9    aware of any.
10       Q.  When you said earlier that this -- the current
11   system, I think you said, it left -- it left open the
12   possibility of in-person voter fraud?  Is that a correct
13   summary of your testimony?
14       A.  Yes, ma'am.
15       Q.  What would somebody need to do to commit
16   in-person voter fraud under the current system?
17           MR. FREDERICK:  Objection to the extent it
18   calls for speculation, but you may answer, if you can.
19       Q.  (By Ms. Maranzano) What did you mean by it
20   leaves open the possibility?
21       A.  You could register yourself five times, five
22   different names, go vote five times.  You could steal
23   someone's voter registration card and go vote.  You
24   could, you know, borrow.  Like, I don't have time to
25   vote, you go vote for me.  Someone could go vote twice.

40

1        Q.  Are you familiar with the voter registration
2    application in Texas?
3        A.  Generally.
4        Q.  Does somebody have to make certain attestations
5    on that voter registration application?
6        A.  Yes, ma'am.
7        Q.  And what are those?
8        A.  I think that you are who you say you are, and
9    you live where you say you live, but I don't know for
10   sure.
11       Q.  Does somebody have to swear that they are a
12   citizen on the voter registration application?
13       A.  I think so.
14       Q.  When was SB 14 signed into law?
15       A.  Around the end of May 2011.
16       Q.  Have there been elections since the time that
17   SB 14 was signed into law?
18       A.  Yes, ma'am.
19       Q.  Was SB 14 enforced in those elections?
20       A.  No, ma'am.
21       Q.  Are you aware of any in-person voter fraud that
22   occurred in any of those elections?
23       A.  No, ma'am.
24       Q.  I believe you testified earlier that there was
25   a photo ID bill introduced in 2007; is that correct?

JANICE MCCOY                                                    MAY 16, 2012



41

1    A. Yes, ma'am.
2         MS. MARANZANO: Can I get that marked?
3    We can do 28.
4         (Exhibit 28 marked for identification.)
5    Q. (By Ms. Maranzano) Can you take a look at that
6    exhibit that has been marked for the record as
7    Deposition Exhibit 28?
8    A. (Viewing document.)
9    Q. Do you recognize this?
10   A. Yes, ma'am.
11   Q. What is it?
12   A. It looks like the filed version of House Bill
13   218 from 2007.
14   Q. Can you tell me what forms of identification
15   were permitted under House Bill -- is this House Bill
16   218?
17   A. Yes, ma'am.
18   Q. Can you tell me what forms of identification
19   this bill would have permitted?
20        MR. FREDERICK: And take your time. If
21   you need a minute to review.
22   A. Oh, no, I just to find it. Under Section 11 of
23   the bill --
24   Q. (By Ms. Maranzano) Uh-huh.
25   A. -- it shows eight different forms of photo ID

42

1    that were acceptable: Driver's license, ID card,
2    military card, employee ID card, citizen's certificate
3    that has a photo, passport, student ID card, concealed
4    handgun license, or a valid ID card issued by a
5    government institution, federal or local.
6         And then if you didn't have photo ID, the
7    bill would allow two forms. Well, I thought it was two,
8    but I don't see that in here. The bill would allow for
9    some forms of nonphoto ID, which is also in Section 11:
10   Utility bills, bank statements, official mail, birth
11   certificate, citizenship papers, marriage license,
12   divorce decree, court records.
13   Q. So under HB 218, am I correct that a voter
14   could show either a form of photo identification or
15   forms of nonphoto identification?
16   A. Yes, ma'am.
17   Q. Does nonphoto verification verify a voter's
18   identity?
19   A. Most of the time, yes.
20   Q. Is there something about the forms of nonphoto
21   identification in HB 218 that you think verifies an
22   identity in a more secure fashion than a voter
23   registration card?
24        MR. FREDERICK: Object to the extent that
25   this seeks information of thoughts or mental impressions

43

1    about pending legislation or requires information that
2    would reflect communications with legislators, staff,
3    state agencies, the Texas Legislative Council,
4    constituents, I'll instruct you not to answer on the
5    basis of privilege. If you are able to answer without
6    relying on privileged matters, you may do so.
7    A. Can you ask the question again?
8    Q. (By Ms. Maranzano) Yeah. My question is: Do
9    you think HB 218 would have made an improvement on the
10   current system that you described to me, where a voter
11   shows their voter registration card or other forms of ID
12   when they show up to vote?
13        MR. FREDERICK: Same objection and
14   objection. But you may answer if you can.
15   Q. (By Ms. Maranzano) Do you have an answer to
16   that, ma'am? Thinking?
17   A. Yeah. My personal opinion is no.
18   Q. What's Senator Fraser's opinion on that?
19        MR. FREDERICK: Object to the extent it
20   calls for a legislator's thoughts and mental impressions
21   about pending legislation, and I'll instruct you not to
22   answer that question.
23   A. I choose not to answer.
24   Q. (By Ms. Maranzano) Would HB 218 prevent a voter
25   from voting multiple times?

44

1         MR. FREDERICK: I'll make the same
2    objection. To the extent it calls for privileged
3    information, thoughts or mental impressions or
4    privileged communications. But to the extent you can
5    answer without relying on privileged matters, you may do
6    so.
7    A. I have no answer.
8    Q. (By Ms. Maranzano) Have you no answer because
9    of the instruction?
10   A. Yes, ma'am.
11   Q. Okay. What was the purpose of including two
12   forms of photo identification at HB 1218?
13        MR. FREDERICK: Objection to the extent it
14   seeks thoughts or mental impressions or Senator
15   Fraser may have had about pending legislation or
16   communications that are privileged. To the extent that
17   you can answer without relying on privileged matters,
18   you may answer the question.
19   Q. (By Ms. Maranzano) And for the record, this is
20   about the legitimate purpose of part of this bill.
21   A. I think you are better off asking
22   Representative Betty Brown.
23   Q. Betty Brown. Did the Senator bring HB 218 to
24   the Senate Floor?
25   A. He did.

45

1   Q.  And did you have a role in that?
2   A.  I did.
3   Q.  Do you know what the purpose of including two
4   forms of nonphoto ID in HB 218 was?
5        MR. FREDERICK:  I'll make the same
6   objection.
7        But I think she's just asking just a
8   yes-or-no question, so you may answer whether or not you
9   know.
10  A.  I was not part of how House Bill developed in
11  the House.  My personal belief is that they included two
12  forms of voter ID in order to get the necessary votes to
13  move it out of the House.
14  Q.  Okay.
15       MS. MARANZANO:  And just to clarify the
16  record, it's my understanding that Mr. Sweeten has
17  actually alerted the court that you all are going to
18  allow witnesses to answer questions about legislative
19  purpose.  I missed the e-mail, but that's my
20  understanding of what has happened, so...
21       MR. FREDERICK:  No.  Consistent, I think,
22  with what we have tried to convey yesterday and today,
23  we will permit testimony about legislative purpose to
24  the extent that is available from nonprivileged sources.
25       MS. MARANZANO:  Okay.  This might be

46

1   something that we discuss with the court later.
2   Q.  (By Ms. Maranzano) Did Senator Fraser have any
3   role in the development of HB 218?
4   A.  No.
5   Q.  Did the Senator take a public position on HB
6   218?
7   A.  Yes.
8   Q.  What position was that?
9   A.  In favor.
10  Q.  Did you play any role with regard to advising
11  the Senator on that position?
12  A.  Yes.
13  Q.  Did you recommend that he support the bill?
14  A.  Yes.
15  Q.  And what was that recommendation based upon?
16       MR. FREDERICK:  Object to the extent the
17  question calls for thoughts and mental impressions about
18  pending legislation or asks for the substance of
19  communications of legislators' staff, state agencies,
20  TLC and constituents.  I will instruct you not to
21  answer.  If you can answer without relying on that
22  material, you may do so.
23  A.  I cannot answer.
24  Q.  (By Ms. Maranzano) Okay.  And just so we have a
25  clear record, you cannot answer because of the privilege

47

1   being asserted?
2   A.  Yes.
3   Q.  Did you have any conversations with
4   constituents about HB 218?
5   A.  Yes.
6   Q.  How many?
7   A.  How many conversations or how many
8   constituents?  Sorry.
9   Q.  That's an important distinction.  Let's start
10  with how many constituents.
11  A.  Verbally, I probably spoke to five to ten
12  constituents.
13  Q.  Did you speak to any of these constituents on
14  multiple occasions?
15  A.  Yes.
16  Q.  About how many did you speak to on multiple
17  occasions?
18  A.  How many constituents?
19  Q.  Uh-huh.
20  A.  One.
21  Q.  And was this a conversation on the phone?  In
22  person?  In another means?
23  A.  Most of the time, the conversations with this
24  one constituent were in person.
25  Q.  Have -- I'm sorry.

48

1   A.  Otherwise, I might have spoken to him once or
2   twice on the phone.
3   Q.  Was anybody else party to the conversations
4   that occurred in person?
5   A.  The Senator may or may not have been part of
6   the conversations.  I don't remember 2007 very well.
7   Q.  Does the Senator meet with any constituent who
8   comes to his office if he's in the office?
9   A.  If the Senator is in the office, in a meeting
10  or on the phone, he will visit with constituents.
11  Q.  Do you recall if he met with anybody, any
12  constituent about HB 218?
13  A.  The same constituents that I met with on
14  several occasions, I think the Senator met with.
15  Q.  Who was this constituent?
16  A.  Skipper Wallace.
17  Q.  Why was he particularly interested in HB 218?
18       MR. FREDERICK:  Object to the extent that
19  calls for the substance of communications with a
20  constituent or a legislator or staff for the thoughts
21  and mental impressions about pending legislation; I
22  instruct you not to answer.
23  A.  I can't answer because of privilege.
24  Q.  (By Ms. Maranzano) Did these conversations all
25  take place in the Senator's office?



49

1    A. I don't remember, but probably, yes. By
2    "office," you mean our general office because I have a
3    -- so there's three rooms, so in that space?
4    Q. In Senator Fraser's office complex --
5    A. Yes. Okay. Right.
6    Q. -- in the Capitol.
7    A. Okay.
8    Q. Okay. Thank you for clarifying that.
9         Did either you or the Senator ask
10   Mr. Wallace to comment, to speak about HB 218?
11   A. No. Are we still talking about 2007?
12   Q. We're still talking about 2007 right now.
13   A. Thank you. No.
14   Q. We'll get to the other bills at some point.
15        What was the nature of your conversation
16   with Mr. Wallace?
17        MR. FREDERICK: I'll object and instruct
18   you not to answer to the extent that you would reveal
19   the substance of the conversation. You may testify as
20   to the general subject matter only, and to the extent
21   you can do that, you may answer. Otherwise, I instruct
22   you not to answer the question.
23   Q. (By Ms. Maranzano) And are you going to --
24   A. I'm going to assert privilege.
25   Q. All right.

50

1         MS. MARANZANO: So that I'm clear,
2    Mr. Frederick, is your position that unsolicited
3    conversations with constituents are also covered by
4    privilege?
5         MR. FREDERICK: Yes.
6    Q. (By Ms. Maranzano) Did you or Senator Fraser
7    communicate with any members of the Executive Branch
8    about HB 218?
9    A. I don't remember. I'm sorry. I'm probably
10   sure that I talked to Ann McGeehan in the Secretary of
11   State's Office. Other than that, I don't remember.
12   Q. What did you talk to Ann McGeehan about?
13        MR. FREDERICK: I'll object again, and
14   instruct you not to answer to the extent it requires you
15   to disclose the substance of your conversation with
16   Ms. McGeehan about pending or proposed legislation. To
17   the extent you can answer by giving the general subject
18   matter, you may do so.
19   A. Generally, I'm sure you've heard Ann. Ann was
20   responsible for the Elections Division. Generally, we
21   spoke of how they would implement the bill.
22   Q. (By Ms. Maranzano) About how many times did you
23   speak with Ms. McGeehan?
24   A. I don't remember.
25   Q. Do you remember whether those were

51

1    conversations or e-mails or other written
2    communications?
3    A. I would assume in 2007, most of our
4    conversations were verbal, either on the phone or in
5    person.
6    Q. Did Senator Fraser have any communications with
7    the Executive Branch about HB 218?
8    A. I don't know.
9    Q. Did you communicate with any interest groups or
10   lobbyists about HB 218?
11   A. I don't remember.
12   Q. Did you communicate with any election officials
13   about HB 218?
14   A. Election officials outside of the Secretary of
15   State's Office?
16   Q. Yes, that's right. NonExecutive Branch
17   election officials.
18   A. Yes.
19   Q. Who did you communicate with?
20   A. Well, Skipper as County Chair. I think that I
21   also spoke with the Republican Party of Texas.
22   Q. How many times did you speak with the
23   Republican Party of Texas?
24   A. Probably once.
25   Q. Who from the Republican Party of Texas did you

52

1    speak with?
2    A. I don't know.
3    Q. Was that an in-person conversation or a
4    conversation by phone, e-mail?
5    A. Most likely, it was by phone.
6    Q. And when was that?
7    A. It was sometime in May, April May of 2009.
8    2007. I'm sorry.
9    Q. Anyone else a party to that conversation?
10   A. No.
11   Q. Did the Republican Party of Texas also speak to
12   Senator Fraser about HB 218?
13   A. No.
14   Q. And how do you know that?
15   A. Because the Senator doesn't speak to the
16   Republican Party of Texas. I do.
17   Q. What was the nature of your conversation with
18   the Republican Party of Texas?
19   A. I might have been asking about witnesses and
20   testifying and just generally about the bill.
21   Q. When you say witnesses and testifying, are you
22   talking about for --
23   A. For the State Affairs Committee.
24   Q. Did you talk to the Republican Party of Texas
25   about the substance of HB 218?

53

1    A. I don't remember. I don't think so, but I
2    don't remember.
3        Q. Did you have any communications or -- well, let
4    me: Are there any other election officials that you
5    spoke with about HB 218?
6        A. Not that I know of.
7        Q. Did you have any conversations with any groups
8    representing minority voters about HB 218?
9        A. I don't remember.
10       Q. Did you have any conversations with the
11   Lieutenant Governor's Office about HB 218?
12       A. Yes.
13       Q. How many?
14       A. I don't remember. A dozen, two dozen.
15       Q. Who did you have those conversations with?
16       A. His executive staff, Julia Rathgeber. I'm
17   trying to remember if Blaine Brunson was chief of staff
18   then or not. I can't remember if Blaine was or not.
19   And then whoever staffed State Affairs for Lieutenant
20   Governor, and I don't know who was at the time, either.
21       Q. Did you say his executive staff? Is that what
22   you said initially?
23       A. Yeah.
24       Q. Does he have --
25       A. Well -- go ahead.

54

1        Q. I was going to ask: Does he have an executive
2    staff that's distinguishable from legislative staff?
3        A. No. I said executive staff because there's
4    like three or four people that sit upstairs with him. I
5    just classified them that way.
6        Q. Okay. So you believe that you spoke with Julia
7    Rathgeber potentially?
8        A. It's Rathgeber.
9        Q. And you said Blain Brunson possibly?
10       A. If he was chief of staff in 2007, then, yes.
11       Q. And potentially whoever was staffing his State
12   Affairs issues?
13       A. Uh-huh.
14       Q. And when were these conversations?
15       A. I would have to look at the record of when the
16   bill made it to the Senate. April, May time frame of
17   2007.
18       Q. Were these conversations in person, over the
19   phone, e-mail? How did you communicate with the
20   Lieutenant Governor's Office?
21       A. Primarily in person.
22       Q. Were they in the Capitol offices?
23       A. Yes.
24       Q. What was the nature of your conversations with
25   Lieutenant Governor's staff?

55

1            MR. FREDERICK: I'll give you the same
2    instruction. I instruct you not to answer to the extent
3    that it would reveal thoughts and mental impressions
4    about pending legislation or the substance of
5    conversations between you and Senator Fraser or members
6    of the Lieutenant Governor's staff or the Lieutenant
7    Governor. But to the extent you can identify the
8    subject matter without revealing the substance of the
9    conversations, you may answer the question.
10       Q. (By Ms. Maranzano) Can you answer?
11       A. I'm trying to decide if I can.
12       Q. Okay.
13       A. We generally spoke about the process of moving
14   the bill in the Senate.
15       Q. Did you have any discussions with anyone in the
16   Lieutenant Governor's Office about the impact of HB 218
17   on minority voters?
18       A. No.
19       Q. Did you have conversations with anybody about
20   the impact of HB 218 on minority voters?
21       A. I don't remember.
22       Q. Do you keep any record of meetings that you
23   have?
24       A. No.
25       Q. None?

56

1        A. Not from 2007.
2        Q. How about from 2009?
3        A. No.
4        Q. How about from 2011?
5        A. There might be some stuff on my calendar from
6    2011.
7        Q. Do you keep any record of meetings or
8    conversations the Senator has?
9        A. No.
10       Q. Does the Senator keep such a record?
11       A. Of meetings that he's had in the past, only to
12   the extent that his calendar is stored electronically,
13   and if that meeting made it to the calendar.
14       Q. Who keeps that calendar in your office? Does
15   the Senator keep his own calendar?
16       A. The scheduler.
17       Q. Did you turn that calendar over to counsel?
18       A. No, I didn't. I'm sorry.
19       Q. Do you believe that's responsive to the
20   requests that were propounded on your office?
21       A. I suppose not.
22       Q. You don't believe that was?
23       A. Well, I mean, I guess if -- I didn't search the
24   calendar. So then the answer is no, it was not
25   responsive.

57

1   Q.  Am I understanding that you didn't turn -- you
2   didn't search it because it was --
3   A.  I forgot to search it.  And so now that you've
4   brought it up, it's not responsive, and I can search for
5   it.
6   Q.  Okay.  Yeah.  I think we're going to ask you to
7   make that search and turn it over to counsel.
8          MR. FREDERICK:  And just for the record,
9   I'll object to the request.
10         MS. MARANZANO:  On what grounds?
11         MR. FREDERICK:  On the grounds that it's
12  privileged and not relevant and not reasonably
13  calculated to lead to discovery of relevant evidence.
14         MS. MARANZANO:  Okay.  But I'm asking her
15  to turn it over to you.  I mean, you can still do a
16  privilege review.
17         MR. FREDERICK:  Fair enough.  Fair enough.
18  That's fine.  I understand.
19         MS. MARANZANO:  Okay.  For the record, our
20  position is who the Senator met with on the dates is not
21  actually privileged.  The substance, we understand
22  you're asserting privilege over.  But we would ask that,
23  at the very least, she'd turn that information over to
24  you.
25         MR. FREDERICK:  And we understand.

58

1          MS. MARANZANO:  Yeah.
2   Q.  (By Ms. Maranzano) Did Senator -- yes.
3   A.  Just so we can be clear, the Senator meets with
4   people unexpectedly, and it doesn't make to it his
5   calendar.
6   Q.  Okay.
7   A.  So there may have been meetings that have took
8   place that will not reflected on his calendar.
9   Q.  Okay.  And are there any documents that reflect
10  those meetings?
11  A.  Again, the meetings that just took place
12  unexpectedly, no, ma'am.
13  Q.  Okay.  Did you review any studies that would be
14  related to HB 218?
15  A.  No.
16  Q.  Did anyone in your office?
17  A.  No.
18  Q.  Did the Senator -- did you or the Senator make
19  any attempt to determine who among registered voters did
20  not possess one of the forms of identification listed in
21  HB 218?
22  A.  No.
23  Q.  Why not?
24         MR. FREDERICK:  Object to the extent it
25  calls for thoughts, mental impressions, or

59

1   communications between you and the Senator or you and
2   the Senator and the legislative staff, state agencies,
3   TLC, and constituents.  If you can answer without
4   revealing privileged matters, you may do so.
5   A.  Generally, when you pick up a bill from the
6   other chamber, you assume most of the work was done in
7   the other chamber.
8   Q.  (By Ms. Maranzano) Did you feel you had any
9   obligation to analyze the bill prior to recommending to
10  your boss that he take a position on it?
11         MR. FREDERICK:  I think I'll make the same
12  instruction:  Don't reveal thoughts, mental impressions,
13  or communications that are privileged.  But if you can
14  answer without doing, so you may answer the question.
15  A.  I did review the bill prior to making a
16  recommendation.
17  Q.  (By Ms. Maranzano) And did you feel that you
18  needed to do anything in addition to reviewing the bill
19  prior to making a recommendation to the Senator?
20  A.  No.
21  Q.  Were you aware that if this bill had been
22  passed, it would have been subject to Section 5 of the
23  Voting Rights Act?
24  A.  Yes.
25  Q.  And did you believe that includes any

60

1   obligation to take any additional steps before
2   recommending a position to Senator Fraser?
3   A.  No.
4   Q.  Are you aware of whether the House analyzed the
5   impact of HB 218?
6   A.  I'm not aware.
7   Q.  Do you know whether there was any attempt in
8   the House to analyze whether HB 218 would have a
9   disproportionate impact on minority voters?
10  A.  I'm not aware.
11  Q.  Who would know that information?
12  A.  The House author.
13  Q.  And that was?
14  A.  Representative Betty Brown.
15  Q.  What was the purpose of HB 218?
16         MR. FREDERICK:  Object on grounds of
17  privilege.  To the extent the question calls for
18  thoughts or mental impressions of you, Senator Fraser,
19  or communications that you or the Senator have had with
20  other legislators, staff, agencies, TLC, or
21  constituents, I instruct you not to answer.  But to the
22  extent that you are able to identify the purpose of the
23  bill without relying on privileged matters, you are free
24  to answer the question.
25  A.  I think the record from the State Affairs

61

1    Committee hearing on House Bill 218 will show that the
2    Senator said the intent was to stop in-person voter
3    fraud.
4        Q.  (By Ms. Maranzano) And how does this bill stop
5    in-person voter fraud?
6            MR. FREDERICK:  Object to the extent it
7    calls for speculation and object to the extent it calls
8    for thoughts, mental impressions, or privileged
9    communications.  But to the extent you can answer
10   without relying on privileged matters, you may do so.
11       A.  What was the question?
12       Q.  (By Ms. Maranzano) How does HB 218 solve
13   in-person -- or help with in-person voter fraud?  Is
14   that what -- what did you say the purpose of the bill
15   is?  Why don't you repeat that?
16       A.  If you look at the record from the State
17   Affairs Committee hearing, the Senator said that the
18   intent of a voter ID bill was to stop in-person voter
19   fraud.
20       Q.  And so my question is:  How does this bill do
21   that?
22           MR. FREDERICK:  Same instruction.
23       A.  I'll assert privilege.
24       Q.  (By Ms. Maranzano) Is that the only purpose of
25   HB 218?

62

1            MR. FREDERICK:  Same objection and
2    instruction.  Don't reveal thoughts, mental impressions
3    or communications with legislative staff, agencies, TLC
4    or constituents.  If you are able to answer without
5    doing so, you may.
6        A.  Again, according to the record, if you look at
7    what Senator Fraser said in the State Affairs Committee
8    hearing, his only intent is to stop in-person voter
9    fraud.
10       Q.  (By Ms. Maranzano) Can you describe to me the
11   procedural history of after HB 218 was introduced, what
12   happened?
13           MR. FREDERICK:  I'll object on grounds of
14   vagueness, but you can answer if you can.
15       A.  I cannot --
16       Q.  (By Ms. Maranzano) I'm looking for a general
17   summary of what happened with the bill.
18       A.  I mean, the House process is the House
19   process.  The bill gets filed, gets sent to committee,
20   gets voted out of committee, it goes to calendars, goes
21   the Floor, gets passed.  In the Senate, it gets -- comes
22   to over to the Senate, then just like every bill,
23   Lieutenant Governor reviews it, refers it to a
24   committee, committee chairman decides to give it a
25   hearing or not, and the bill has a hearing in committee,

63

1    and the bill gets voted out of committee, and Senator
2    places the bill on the intent calendar.
3        Q.  Can I stop for a second.
4        A.  Uh-huh.
5        Q.  I'm asking you particularly about HB 218, not
6    about a general description.
7        A.  House Bill 218 was voted out of the House, and
8    I can't speak to how it got out of the House.  You need
9    to go back and talk to Betty Brown about that.  House
10   Bill 218 showed up in the Senate, was read, Lieutenant
11   Governor referred it to the Senate State Affairs
12   Committee.  The Senate State Affairs Committee had the
13   bill.  Senator Fraser notified the Senate State Affairs
14   Committee that he wanted to sponsor HB 218 and requested
15   a hearing.  The bill was set for a hearing by the
16   Chairman of Senate State Affairs.  The bill had a
17   hearing.  I don't remember if this bill sat in State
18   Affairs or if it was voted out the same day it was
19   heard.  You'd have to look at the record.  But the bill
20   was voted out of committee.
21           And Senator Fraser decided to move forward
22   with the bill, and so he notified, via the intent
23   calendar notification process, the other senators that
24   he wanted to hear the bill, and we had the bill in
25   Intent for quite a while.

64

1            This particular bill, we tried to move one
2    day, when we thought we had the necessary votes, and we
3    were not successful, and the bill died.
4        Q.  Okay.  So I'm going to ask you a couple of
5    questions about that process as you've described it.
6            I believe that you testified that the
7    Lieutenant Governor reviews a bill, after it gets voted
8    out of the House, and than refers it to committee?
9        A.  Yes, ma'am.
10       Q.  Does every bill that gets voted out of the
11   House get referred to some Senate committee?
12       A.  Yes, ma'am.
13       Q.  And does the Lieutenant Governor solely -- is
14   that decision of which committee to refer it to solely
15   that of the Lieutenant Governor's?
16       A.  Based on the current Senate rules, yes.
17       Q.  And you mean the 2011 rules?
18       A.  2007, but even now in 2011, yes, ma'am.
19       Q.  Okay.  And you said that the Senator, Senator
20   Fraser notified the committee on State Affairs that he
21   wanted to sponsor this bill?
22       A.  Yes, ma'am.
23       Q.  Why did he do that?
24           MR. FREDERICK:  Well, object to the extent
25   it calls for the Senator's thoughts, mental impressions,

65

1   or any communications that you had with him, and I will
2   instruct you not to answer.
3       A. I'll assert privilege.
4           MR. FREDERICK: Okay.
5           Jennifer, sometime soon, if we could take
6   a quick break.
7           MS. MARANZANO: Yeah, just give me a
8   couple of minutes.
9           MR. FREDERICK: Sure. Sure.
10      Q. (By Ms. Maranzano) And you said the committee
11  held hearings on HB 218? The Committee on State Affairs
12  held hearings on HB 218?
13      A. Held a hearing. I don't think they had
14  multiple. I think they had one.
15      Q. Who invited the witnesses to testify at that
16  committee hearing?
17          MR. FREDERICK: I'm going to object to
18  that, and to the extent it calls for communications that
19  any legislator had or that you or Senator Fraser had
20  with legislators, staff, agencies, TLC, constituents, or
21  potential witnesses, I'll instruct you not to answer.
22  To the extent you can answer without revealing the
23  substance of conversations, you can do so.
24      A. I don't remember that there was an invited
25  panel. It was just the process of laying out a bill by

66

1   the Senator and then the public testifying.
2       I earlier said that I think I talked to
3   the Republican Party of Texas about coming and
4   testifying, so I may have called a few people that I
5   thought would be helpful to the passage of the bill
6   besides the Republican Party of Texas. I'm not sure.
7   And then the one constituent that we talked to quite a
8   bit about this bill. Other than that, I don't think
9   there was invited to testimony.
10      Q. (By Ms. Maranzano) So the one constituent was
11  Skipper Wallace?
12      A. Yes.
13      Q. And are you saying that you may have invited
14  him to testify as well?
15      A. I think I didn't invite him to testify. I
16  think I was more making sure he knew that the bill had
17  been scheduled for hearing.
18      Q. Do you remember about how many members of the
19  public testified at that hearing?
20      A. I do not.
21      Q. Can you approximate?
22      A. I cannot. It's in the record, however.
23      Q. Okay. Did anybody raise any concerns about 218
24  during this committee hearing?
25      A. My recollection is yes.

67

1       Q. What were those concerns?
2       A. I cannot -- I cannot speak to what they
3   actually said.
4       Q. Did anybody raise any concerns about the impact
5   HB 218 might have on minority voters?
6           MR. FREDERICK: Well, object and instruct
7   you not answer to the extent that the question calls for
8   communications that you had or Senator Fraser had with
9   legislators or legislative staff, agencies, TLC, or
10  constituents. But to the extent you can answer without
11  revealing.
12      A. I mean, the record is there. The hearing was
13  videotaped. I think that you could watch it. I don't
14  remember specifically.
15      Q. (By Ms. Maranzano) Okay. Did the bill change
16  at all in committee?
17      A. I don't think so, but -- yeah, I don't think
18  so. I don't remember. I mean, we might have made minor
19  tweaks, but I don't think so.
20      Q. Okay.
21          MS. MARANZANO: Let's take a five-minute
22  break.
23          (Recess from 11:11 a.m. to 11:32 a.m.)
24      Q. (By Ms. Maranzano) Ms. McCoy, before the break,
25  we were talking about HB 218. Who brought HB 218 to the

68

1   Floor of the Senate?
2       A. Senator Fraser.
3       Q. Did anyone ask the Senator to bring it to the
4   Floor?
5           MR. FREDERICK: Object to the extent that
6   calls for communications with other legislative staff in
7   this case the legislators or staff members that's not on
8   the public record, I will instruct you not to answer.
9   If you can answer without revealing that, you may
10  answer.
11      A. I'll assert privilege.
12      Q. (By Ms. Maranzano) Why was Senator Fraser
13  playing a leadership role in HB 218?
14          MR. FREDERICK: I'll object to the extent
15  that calls for thoughts or mental impressions of Senator
16  Fraser about HB 218 or communications with other
17  legislators, staff, or state agencies. If you can
18  answer without revealing subjective mental impressions
19  or you may do so.
20      A. I'll assert privilege.
21      Q. (By Ms. Maranzano) When HB 218 was brought at
22  the time Floor of the Senate, what was your role?
23      A. My role with House Bill 218 at that point was
24  to help the Senator with his talking points, and that's
25  it.

## 69

1  Q. Did you draft his talking points?
2  A. Yes.
3  Q. Did you save those talking points?
4  A. Yes.
5  Q. Do you still have them?
6  A. Yes.
7  Q. Were those turned over to your counsel?
8  A. Yes.
9  Q. Did you do any research prior to drafting those
10 talking points?
11 A. I read the bill book that Representative Brown
12 provided to us.
13 Q. And what does the bill book include?
14 A. I don't remember what the bill book included
15 specifically. Typically, a bill book has copies of the
16 legislation, copies of the bill analysis, copies of the
17 fiscal note, and occasionally, supporting documents.
18 This bill book had all of those things. I do not
19 remember what those supporting documents were.
20 Q. Did you do any additional research other than
21 read the bill book?
22 A. No.
23 Q. Why not?
24     MR. FREDERICK: I'll object. I believe
25 that question calls for your mental impressions about

## 70

1  pending legislation. I'll instruct not to answer.
2  Q. (By Ms. Maranzano) Are you going to follow your
3  counsel's instruction not to answer the question?
4  A. Yes, ma'am.
5  Q. Okay. When HB 218 was brought to the Floor of
6  the Senate, did -- or did HB 218 require the support of
7  two-thirds of the senators to bring bill to the Floor
8  for a vote?
9  A. Yes.
10 Q. When Senator Fraser brought HB 218 to the
11 Floor, how many senators were present at that time?
12 A. I don't recall exactly. Either 29 or 30.
13 Q. I believe you testified earlier that the
14 Senator brought the bill to the Floor when he -- he
15 tried to move this bill on a day when you thought it
16 would pass?
17 A. Yes, ma'am.
18 Q. What did you mean by that?
19 A. We knew that a particular Senator was absent.
20 Q. Which Senator was absent?
21 A. Senator Uresti.
22 Q. Why was Senator Uresti absent?
23 A. If you look at the record from that day, I
24 think he was excused because he was sick.
25 Q. Did you know Senator Uresti's position on HB

## 71

1  218?
2      MR. FREDERICK: I'll object to the extent
3  it calls for thoughts or mental impressions of any
4  legislators or staff of pending legislation or
5  communications with other legislators of Senator Fraser
6  or staff. But if you can answer without revealing
7  privileged matters, you may do so.
8  A. After the bill moved, Senator Uresti voted no.
9  Q. Can you --
10 A. So I did not know how he was going to vote
11 prior to the bill moving. After he voted, he voted
12 no. After we voted, he voted no.
13 Q. Well, why did you bring the bill to the Floor
14 when he was absent?
15     MR. FREDERICK: Object to the extent the
16 question calls for thoughts and mental impressions about
17 pending legislation or communications indications that
18 are privileged. I instruct you not to answer. If you
19 can answer without revealing privileged matters, you may
20 do so.
21 A. I'll assert privilege.
22 Q. (By Ms. Maranzano) Do you think it's important
23 to give every Senator a chance to weigh in on a bill
24 like HB 218?
25     MR. FREDERICK: I'll object as

## 72

1  argumentative, but you may answer if you can.
2  Q. (By Ms. Maranzano) Are you able to answer that,
3  Ms. McCoy?
4  A. No.
5  Q. No, you're not able to answer or --
6  A. I'm sorry.
7  Q. -- no, you don't think it's important to --
8  A. No, I don't think it's important that every
9  Senator vote on every specific piece of legislation,
10 including House Bill 218.
11 Q. Do you know Senator's Uresti's ethnicity?
12 A. Yes.
13 Q. What ethnicity is he?
14 A. He's Hispanic.
15 Q. Do you know anything about the district that he
16 represents?
17 A. Not specifically.
18 Q. Do you know if he made any comments about
19 HB 218 and the impact it would have on his constituents?
20 A. I do not know.
21 Q. Would that impact your thoughts on whether it
22 was important to give him an opportunity to vote on
23 HB 218?
24     MR. FREDERICK: Objection, calls for
25 speculation.

JANICE MCCOY                                                                MAY 16, 2012

73

1    Q.   (By Ms. Maranzano) You can ahead and answer.
2    A.   I'm sorry. You need to ask the question
3    again. I don't know what you're asking me.
4    Q.   I'm asking if you thought that Senator Uresti
5    believed that HB 218 would impact his constituents,
6    would you think it was important that he be given an
7    opportunity to take a vote on that bill?
8              MR. FREDERICK: Same objection. You can
9    answer.
10   A.   I think, again, generally, every bill impacts
11   every Senators' constituents. And generally, Senators
12   should on the Floor to vote, but not -- we don't have a
13   31 -- we don't always 31 Senators on the Floor to vote.
14   And so with Senator Uresti, I can't speak to Senator
15   Uresti's constituents what they think is important or
16   not important for him to vote on.
17   Q.   (By Ms. Maranzano) But am I understanding you
18   correctly that your position is, you don't think every
19   Senator needs to vote on every bill, including HB 218?
20   A.   That's correct.
21   Q.   And did you say that the bill -- well, after
22   the first vote was taken on HB 218, was there
23   verification of the vote that was taken?
24   A.   I think that's what it's called, yes. I think
25   of we -- they voted again. I don't know if it was a

74

1    verification or if they just chose to vote again. I'm
2    not really sure how that worked. But there was a second
3    vote.
4    Q.   And did you say Senator Uresti arrived for that
5    vote?
6    A.   He did.
7    Q.   And what happened to HB 218?
8    A.   It failed to suspend the regular order of
9    business rule.
10   Q.   Was that because it did not have a two-thirds
11   majority --
12   A.   That's correct.
13   Q.   Two-thirds majority support?
14   A.   That's correct.
15   Q.   What is the purpose of the two-thirds rule?
16   A.   There is not a rule that's the two-thirds
17   rule. The rule is the regular order of business rule,
18   and that rule says that as a bill comes out of the
19   calendar, it's placed on the regular order of business,
20   and you're supposed to vote in that order. So there is
21   no two-thirds rule.
22   Q.   So to vote on a bill out of order, does that
23   require two-thirds majority support?
24   A.   You have to suspend the regular order of
25   business rule, and that requires a two-thirds vote of

75

1    the members present.
2    Q.   What do you think the purpose of that
3    requirement is?
4    A.   I can't speak to the purpose. It's just the
5    way the Senate has done business.
6    Q.   But as somebody who has worked there since
7    1992, do you have any thoughts on what you think the
8    purpose of that is?
9    A.   General consensus on bills.
10   Q.   Are most bills brought to the Floor by getting
11   two-thirds majority support?
12   A.   Yes.
13   Q.   After HB 218 failed to get two-thirds majority
14   support, did anything further happen to that bill?
15   A.   No.
16   Q.   Who were the main supporters of HB 218?
17             MR. FREDERICK: I'll object to the extent
18   that it calls for communications that you or Senator
19   Fraser might have had with legislators, staff, agencies,
20   or constituents or thoughts and mental impressions. But
21   if you can answer without that, I think you're free to
22   answer.
23   A.   Well, I think the record will show, if you look
24   at the vote in the Senate, you're talking about who the
25   supporters were in the Senate; Republican Senators

76

1    supported it, Democrat Senators did not.
2    Q.   (By Ms. Maranzano) How about, were there any --
3    would you consider anybody from the Executive Branch to
4    be a main supporter of HB 218?
5              MR. FREDERICK: Same objection. To the
6    extent it calls for communications between you or
7    Senator Fraser and a member the Executive Branch or
8    their thoughts or mental impressions, I instruct you not
9    to answer. If you can answer without revealing that,
10   you can answer.
11   A.   I'll assert purchase.
12   Q.   (By Ms. Maranzano) Was there any outside groups
13   or advocacy groups that you would consider to be in the
14   group of the main supporters of HB 218?
15             MR. FREDERICK: Again, I'll instruct you
16   not to answer and object on privilege, to the extent
17   that it would require you to reveal the substance of any
18   conversation. But to the extent it's just seeking
19   identity, then you may identify.
20   A.   I honestly don't remember who testified for and
21   against the bill. Republican Party, I think, was for
22   it.
23   Q.   (By Ms. Maranzano) And did you say -- you said
24   most of the legislators who supported the bill were in
25   the Republican Party?

77

1    A.  Yes, ma'am.
2    Q.  Do you believe any part of the purpose of
3  HB 218 was partisan?
4         MR. FREDERICK:  I'll object and assert
5  privilege to the extent that the question seeks thoughts
6  or mental impressions about pending legislation or the
7  substance of communications with legislators, staff,
8  agencies, TLC, or constituents.  But, I mean, to the
9  extent that you can identify -- to the extent you're
10  able to identify a purpose without relying on those
11  matters, you're free to answer the question.
12    A.  I think the purpose of the bill, from Senator
13  Fraser and our office's perspective, was to stop
14  in-person voter fraud.  It wasn't partisan.
15    Q.  (By Ms. Maranzano) Who were the main opponents
16  to HB 218?
17    A.  I don't remember.
18    Q.  You don't remember any of them?
19    A.  I don't.
20    Q.  Do you believe that HB 218 would have had a
21  discriminatory impact on minority voters?
22         MR. FREDERICK:  I'll object to the extent
23  it calls for your thoughts and mental impressions about
24  pending legislation and communications, and based on
25  that, I will instruct you not to answer the question.

78

1    A.  I'll assert privilege.
2    Q.  (By Ms. Maranzano) Are you familiar with
3  Section 2 of the Voting Rights Act?
4    A.  No.
5    Q.  Not at all?
6    A.  Not at all.
7    Q.  Would it surprise you if I told you that
8  Section 2 includes an antidiscrimination provision that
9  applies to all 50 states?
10    A.  I don't know anything about Section 2, so...
11    Q.  So you've never made any effort to ensure that
12  legislation you worked on complied with Section 2 of the
13  Voting Rights Act?
14         MR. FREDERICK:  Objection, argumentative.
15  Objection, assumes facts not in evidence.
16    A.  I don't know anything about Section 2.
17    Q.  (By Ms. Maranzano) Do you think a federal law
18  is required to make sure a piece of legislation doesn't
19  discriminate against minorities?
20    A.  No.
21    Q.  Do you make any attempts to make sure that
22  legislation you work on doesn't discriminate against
23  minorities?
24         MR. FREDERICK:  I object, to the extent it
25  calls for you to reveal thoughts, mental impressions, or

79

1  communications relating to specific legislation.  To the
2  extent you can answer without relying on privileged
3  matters, you may do so.
4    A.  I assert privilege.
5    Q.  (By Ms. Maranzano) Was Senator Fraser involved
6  in a photo identification bill in 2009?
7    A.  Yes, ma'am.
8         (Exhibit 29 marked for identification.)
9    Q.  (By Ms. Maranzano) Ms. McCoy, I'm showing you
10  what has been marked as Deposition Exhibit 29.  Do you
11  recognize this?
12    A.  Yes, ma'am.
13    Q.  And what is this?
14    A.  I think it's the filed version of Senate Bill
15  362.
16    Q.  Can you take a look at it and tell me what
17  forms of identification would be allowed in this bill?
18    A.  Section 10 of the bill shows six different
19  forms of photo ID that would be acceptable, including a
20  driver's license or ID card, a military card, a citizen
21  certificate that has a photograph, a passport, a
22  concealed handgun license, and a valid ID card from a
23  federal or local government, or two forms of nonphoto
24  ID, including registration cards, utility bills,
25  official mail, birth certificates, marriage license or

80

1  divorce decrees, court records.
2    Q.  Is -- I think I didn't ask you this question.
3  Is this the bill that Senator Fraser introduced in 2009?
4    A.  I think I said it was the filed version, yes,
5  ma'am.
6    Q.  Okay.
7    A.  I don't know that to be exact, but based on the
8  title of the bill, it looks like it's the filed version.
9    Q.  Okay.  And this bill would allow for a voter to
10  show one form of photo identification or two forms of
11  nonphoto identification?
12    A.  That's correct.
13    Q.  I believe you testified earlier that two forms
14  of nonphoto identification would verify a voter's
15  identity in both instances?
16    A.  Uh-huh.
17    Q.  What are the instances --
18         MR. DUNN:  Was that a yes?
19         THE WITNESS:  Yes.
20    Q.  (By Ms. Maranzano) What are the instances that
21  a nonphoto ID would not verify a voter's identity?
22         MR. FREDERICK:  Objection to the extent it
23  calls for speculation, but you can answer.
24    A.  Again, if someone is trying to cheat the
25  system, they can -- nonphoto IDs can be reproduced and

JANICE MCCOY                                                          MAY 16, 2012

81

1    manipulated.
2        Q.  (By Ms. Maranzano) Can photo IDs be reproduced
3    and manipulated?
4            MR. FREDERICK:  Objection to the extent it
5    calls for speculation, but you can answer if you know
6        A.  Some can.
7        Q.  (By Ms. Maranzano) Can you tell me what your
8    involvement was in the development of SB 362?
9        A.  Senate Bill 362 as filed was the legislation
10   that the House sent to us from House Bill 218.  So
11   Exhibit 28 is not the bill the Senate was debating,
12   because this is the filed version.  So after the House
13   manipulated it a while, this is the language they sent
14   us.  So we refiled the bill that had passed the House
15   from 2007.  We refiled it in 2009.
16       Q.  Why did Senator Fraser decide to file the bill
17   in the Senate in 2009?
18           MR. FREDERICK:  Object.  That question
19   seeks thoughts or mental impressions of Senator Fraser.
20   I'll instruct you not to answer on the basis of
21   privilege.
22       A.  I'll assert privilege.
23       Q.  (By Ms. Maranzano) So you filed -- I'm sorry.
24   Senator Fraser filed a bill that was -- that had been
25   previously filed in the House; is that correct?  And SB

82

1    362 was a version of a previously-filed bill in the
2    House?
3        A.  Senate Bill 362 was the version of House Bill
4    218 that the House sent us, the engrossed version of
5    House Bill 218 from 2007.
6        Q.  Okay.  And you did not make any changes to the
7    bill prior to filing SB 362?
8        A.  I think Senate Bill 362, as filed, was exactly
9    the language that was House Bill 218 as it came out of
10   the Senate committee on State Affairs.
11       Q.  Did you do any -- we've talked a little bit
12   about what you did in relation to House Bill 218.  Did
13   you take any additional steps, in terms of developing or
14   working on SB 362, with regards to any research you did
15   any studies you looked at?
16       A.  Yes, ma'am.
17       Q.  And what did you do?
18           MR. FREDERICK:  I'll object to the extent
19   this calls for you to reveal thoughts or mental
20   impressions, any communications with legislators, staff,
21   agencies, TLC, or constituents, I instruct you not to
22   reveal the substance of those communications or your
23   thoughts or mental impressions.  If you can answer
24   without revealing those matters, you may do so.
25       A.  I gathered more poll data.  I gathered more

83

1    research reports, and compiled that information for the
2    Senator.
3        Q.  (By Ms. Maranzano) What poll data did you
4    gather?
5            MR. FREDERICK:  Object.  That calls for
6    you to reveal your thoughts or mental impressions.  I
7    will instruct you not to answer on the basis of
8    privilege.
9        Q.  (By Ms. Maranzano) Are you following your
10   counsel's instruction not to answer that question?
11       A.  Yes, ma'am.
12       Q.  What research reports did you gather?
13           MR. FREDERICK:  Object on the basis that
14   calls for thoughts or mental impressions.  I'm going to
15   instruct you not to answer on the basis of privilege.
16       A.  I'll assert privilege, yes, ma'am.
17       Q.  (By Ms. Maranzano) All right.  Why did you
18   decide to look at poll data when you were doing research
19   on this question?
20           MR. FREDERICK:  I object.  That answer
21   calls for your thoughts or mental impression on pending
22   legislation.  I instruct you not to answer on the basis
23   of privilege.
24       A.  I'll assert privilege.
25       Q.  (By Ms. Maranzano) Did the Senator cite any of

84

1    the poll data or reports that you had gathered on the
2    public record?
3        A.  Yes.
4        Q.  Which polls or reports did he cite?
5        A.  In 2009, he cited Rasmussen Poll on the
6    record.  He cited the Carter-Baker Commission report on
7    the record.  And I don't know that I can recall more
8    than those two on the record.
9        Q.  Were there any polls that you had found in
10   doing your research that the Senator did not cite on the
11   public record?
12           MR. FREDERICK:  I object on the basis that
13   that calls for your thoughts or mental impression,
14   communications.  I instruct you not to answer on the
15   basis of privilege, except to the extent that you can
16   answer yes or no if there are such reports.
17       A.  No.
18       Q.  (By Ms. Maranzano) Were there any studies that
19   you had found or other research you had found that the
20   Senator did not cite on the public record?
21           MR. FREDERICK:  Same objection, same
22   instruction.  You may answer yes or no.
23       A.  Yes.
24       Q.  (By Ms. Maranzano) And what were those?
25           MR. FREDERICK:  I object on the basis that

JANICE MCCOY                                                    MAY 16, 2012

85

1   seeks thoughts or mental impressions and communications
2   that are privileged. I instruct you not to answer on
3   the basis of privilege.
4       A.   But I can answer because I don't remember the
5   names of those reports.
6       Q.   (By Ms. Maranzano) Do you remember how many
7   there were?
8       A.   Four or five. Three, four, five, something
9   like that.
10      Q.   Do you remember what they were about?
11      A.   Voter identification.
12      Q.   Anything more specific than voter
13  identification?
14          MR. FREDERICK: I'll object. That seeks
15  thoughts and mental impressions, communications. I
16  object and instruct you not to answer on the basis of
17  privilege.
18      A.   I'll assert privilege.
19      Q.   (By Ms. Maranzano) When you were working on SB
20  362, did you study any other state's identification
21  requirements?
22          MR. FREDERICK: I'll object to the extent
23  that calls for your thoughts or mental impressions or
24  communications with legislators, staff, agencies, TLC,
25  or constituents, instruct you not to answer on the basis

86

1   of privilege. However, if you can answer without
2   revealing privileged matters, you may do so.
3       A.   On the record, Senator Fraser said that he had
4   looked at how Indiana was working.
5       Q.   (By Ms. Maranzano) Did you look at any
6   information or study information from any interest
7   groups in relation to SB 362?
8           MR. FREDERICK: I'll make the same
9   objection that this question calls for thoughts or
10  mental impressions about pending legislation and your
11  investigative process. I instruct you not to answer on
12  the basis of privilege, except to the extent you can
13  answer without revealing privileged matters, you may do
14  so.
15      A.   I don't remember.
16      Q.   (By Ms. Maranzano) Did you have any
17  communications about SB 362 with other legislators?
18      A.   Yes.
19      Q.   Which ones?
20          MR. FREDERICK: I'll just issue a
21  cautionary instruction. I don't think that this
22  question is seeking the content of those communications,
23  so I would instruct you not to reveal the content, but
24  you may identify people with whom you spoke.
25      A.   Can we just on the record say that I was four

87

1   months pregnant with twins when we were debating Senate
2   Bill 362, so I don't remember a lot.
3           I probably spoke to a dozen Senators about
4   Senate Bill 362. And as the bill moved through the
5   Senate, Senator Williams, Senator Ellis, Senator West,
6   Senator Duncan, Senator Van de Putte, Senator Whitmire.
7   2009, Senator Huffman, was she in the Senate? Senator
8   Harris. Generally, I mean, a lot of senators I --
9       Q.   (By Ms. Maranzano) Uh-huh. So is it fair to
10  say that you spoke to senators who -- those senators who
11  voted for and against SB 362?
12      A.   Yes, ma'am.
13      Q.   Did you speak to the Lieutenant Governor's
14  Office about SB 362?
15      A.   Yes, ma'am.
16      Q.   How many times?
17      A.   I mean, I probably spoke to them every day as
18  the bill was being scheduled for hearing and being
19  heard, and then probably not at all until the House was
20  done with it, and it was moving back over, and then
21  again every day until we voted on it again.
22      Q.   Can you tell me, generally, what those
23  conversations, the nature of those conversations?
24          MR. FREDERICK: I'll object to the extent
25  it asks you to reveal the substance or content of those

88

1   conversations, which are subject to privilege. However,
2   to the extent you're able to identify a general subject
3   matter, you may answer.
4       A.   We generally spoke about the legislative
5   process and we generally spoke about the bill itself.
6       Q.   (By Ms. Maranzano) The legislative process, do
7   you mean how the bill would get passed?
8           MR. FREDERICK: I'll object to the extent
9   that seeks the content of privileged communications and
10  instruct you not to answer.
11      A.   I'll assert privilege.
12      Q.   (By Ms. Maranzano) Were those conversations by
13  phone or in person?
14      A.   I spoke to Lieutenant Governor's Office. I
15  generally spoke to them in person.
16      Q.   Is there anybody from the Lieutenant Governor's
17  Office who you spoke to who you haven't already
18  testified about?
19      A.   In 2009?
20      Q.   Uh-huh.
21      A.   I would add Bryan Hebert to the list.
22      Q.   And who is Bryan Hebert?
23      A.   He was Lieutenant Governor's primary staff
24  person for State Affairs in 2009.
25      Q.   Do you know when Bryan Hebert started working

JANICE MCCOY                                                    MAY 16, 2012

89

1    for the Lieutenant Governor?
2        A.  No, ma'am.
3        Q.  He was not the Lieutenant Governor's staff
4    person on voter ID issues in 2007?
5        A.  I don't remember.  He might have been.
6        Q.  Was he the Lieutenant Governor's staff person
7    on voter ID issues in 2011?
8        A.  Yes, ma'am.
9        Q.  Did you have communications with officials from
10   other states about SB 362?
11       A.  Yes, ma'am.
12       Q.  And who was that?
13       A.  When I was looking to get witnesses to testify,
14   I spoke to somebody in Indiana.  I don't recall who.  I
15   think from the Secretary of State's Office.  And they
16   were not able to come.  And then I spoke with someone in
17   Georgia.  And I don't remember his name, although it's
18   in the record, because he did come testify.
19       Q.  Did anyone ask you to contact these
20   individuals?
21              MR. FREDERICK:  Object that the question
22   asks you to reveal the substance of communications with
23   legislators, staff or agencies or constituents.  To the
24   extent that you can answer without revealing those
25   privileged conversations, you may do so.

90

1        A.  Senator Fraser.
2        Q.  (By Ms. Maranzano)  Why did you think, or why
3    did the Senator think that individuals from Georgia or
4    Indiana would be helpful in terms of the testimony about
5    SB 362?
6              MR. FREDERICK:  I object, based that that
7    seeks thoughts or mental impressions of Senator Fraser
8    and communications between Senator Fraser and his
9    staff.  I instruct you not to answer on the basis of
10   privilege.
11       A.  I'll assert privilege.
12       Q.  (By Ms. Maranzano)  Do you remember either of
13   these individuals' names who you talked to in Indiana
14   and Georgia?
15       A.  No.
16       Q.  Did anyone from Indiana come and testify during
17   the hearings on SB 362?
18       A.  No.
19       Q.  Did anyone from Georgia come testify?
20       A.  Yes, ma'am.  He was very nice.  I just can't
21   remember his name.
22       Q.  Did you have communications about SB 362 with
23   any interest groups?
24       A.  I don't remember.
25       Q.  Did you have communications about SB 362 with

91

1    any groups representing minority voters?
2        A.  I don't remember.
3        Q.  Is there anything that would help you remember
4    whether you had any communications about SB 362 with any
5    interest groups?
6        A.  No.
7        Q.  Did you consider adding any additional forms of
8    identification to SB 362?
9              MR. FREDERICK:  Object.  That question
10   seeks thoughts or mental impressions about pending
11   legislation.  I instruct you not to answer on the basis
12   of legislative privilege.
13       A.  I'll assert privilege,
14       Q.  (By Ms. Maranzano)  Can you look at Exhibit 29
15   and Exhibit 28, I believe, HB 218 and SB 362, and look
16   at forms of ID that are allowed in each bill.
17       A.  (Viewing documents.)
18       Q.  What was the purpose of excluding from 362 the
19   student ID as a form of allowable identification even
20   though it was allowed in HB 218?
21              MR. FREDERICK:  I object to the extent
22   this question seeks your thoughts or mental impressions
23   about pending legislation or thoughts of any other
24   legislator, including Senator Fraser or their staff or
25   to the extent it requires communications with

92

1    legislators, staff, agencies, TLC, and constituents, I
2    instruct you not to answer on the basis of legislative
3    privilege.  To the extent you are able to identify the
4    purpose of any part of the bill without relying on those
5    privileged matters, you may do so.
6        A.  Again, this version of House Bill 218 is not
7    the version that came to the Senate.  I think that the
8    student ID was pulled out by the House, not by the
9    Senate.
10       Q.  (By Ms. Maranzano)  I believe that the bill that
11   I have introduced as evidence was actually the bill that
12   was engrossed.  Does that seem correct to you?
13       A.  It does not.
14       Q.  Okay.
15       A.  I'd have --
16       Q.  And you think that the student ID was pulled
17   out of SB 362 in the House?
18              MR. FREDERICK:  I just object to the
19   extent it mischaracterizes the testimony, but you can
20   answer.
21       Q.  (By Ms. Maranzano)  Okay.  Can you describe to
22   me what you --
23       A.  My understanding --
24       Q.  Uh-huh.
25       A.  My recollection, Senate Bill 362 should be the