93

1   engrossed version of House Bill 218.  So I what I see in
2   front of me with House Bill 218 is not the bill that the
3   Senate debated.  So I don't know what this version is
4   without -- it's saying that it's the engrossed version.
5   I think it's the filed version.
6        Q.   Okay.  Well.  Let me ask you this:  Did SB 362
7   allow, as a form of acceptable identification, student
8   identifications?
9        A.   No, ma'am.
10       Q.   What was the purpose of excluding that from the
11   bill?
12            MR. FREDERICK:  I object to the extent
13   this seeks thoughts or mental impressions from you,
14   Senator Fraser, or other legislators or staff or to the
15   extent it requires you to reveal the substance of
16   communications with legislators, staff, state agencies,
17   TLC, and constituents, I instruct you not to answer on
18   the basis of privilege.  However, to the extent that you
19   are able to identify the purpose of that portion of the
20   bill without relying on those privileged matters, you
21   can do so.
22       A.   I'll assert privilege.
23       Q.   (By Ms. Maranzano) Did you ever look or do any
24   research into who among registered voters would be most
25   likely to have a student identification card?

94

1            MR. FREDERICK:  Object.  The question
2   calls for your thoughts, mental impressions about
3   pending legislation.  I instruct you not to reveal --
4   not to reveal the substance of your efforts.  However,
5   to the extent that you can answer whether you did or
6   not, you may answer.
7        A.   Ask the question again.
8            MS. MARANZANO:  Can you read back the
9   question.
10           (The requested portion read back by the
11   court reporter.)
12       A.   No.
13       Q.   (By Ms. Maranzano) Why not?
14           MR. FREDERICK:  I'll object on the ground
15   that that calls for your subjective mental impressions
16   and thoughts about pending legislation and instruct you
17   not to answer on the basis of privilege.
18       A.   I'll assert privilege.
19       Q.   (By Ms. Maranzano) Did you have any
20   communications with anyone about the forms of
21   identification, what forms of identification to include
22   in SB 362?
23       A.   No, ma'am.
24       Q.   Did you do any analysis to determine who among
25   registered voters possessed the forms of identification

95

1   included in SB 362?
2            MR. FREDERICK:  I'll object to the
3   question on the ground that it seeks thoughts and mental
4   impressions and investigative efforts related to pending
5   legislation, and instruct you not to answer to the
6   extent that it would disclose the substance or -- the
7   substance or nature of the process you engaged in.
8   However, you may answer to the extent that you can do so
9   without revealing those matters.
10       A.   I'm sorry.  I'm having some brain fatigue.  You
11   have to read the question again.
12            MS. MARANZANO:  Can you read the question?
13            (The requested portion was read back by
14   the court reporter.)
15       A.   No.
16       Q.   (By Ms. Maranzano) Were you ever instructed not
17   to look at who among registered voters possessed one of
18   the forms of identification included in SB 362?
19            MR. FREDERICK:  I object on the grounds
20   that that seeks communications between legislators,
21   staff, and state agencies.  I instruct you not to answer
22   on the basis of privilege.
23       A.   I'll assert privilege.
24       Q.   (By Ms. Maranzano) If SB 362 had passed the
25   Texas Legislature, would it have been subject to the

96

1   requirements of Section 5?
2        A.   Yes.
3        Q.   Are you familiar with the concept of a Spanish
4   surname voter registration match?
5        A.   No.
6        Q.   Have you ever heard of a Spanish surname
7   analysis being conducted on a voter registration list?
8        A.   No.
9        Q.   Have you ever heard of a Spanish surname list
10   that's put together by the U.S. Census?
11       A.   No.
12       Q.   What's the purpose of SB 362?
13            MR. FREDERICK:  I'll object to the extent
14   that the question calls for thoughts or mental
15   impressions about pending legislation, or to the extent
16   it seeks the substance of communications from
17   legislators, staff, state agencies, TLC, and
18   constituents.  To the extent, however, that you can
19   identify the purpose of the bill without relying on
20   privileged matters, you may do so.
21       A.   Senator Fraser's stated purpose on the record
22   about Senate Bill 362 is to prevent in-person voter
23   fraud.
24       Q.   (By Ms. Maranzano) Any other purposes?
25       A.   No, ma'am.

97

1    Q. Did he state on the record any evidence that
2    in-person voter fraud exists?
3       A. No.
4       Q. Why was SB 362 a better way to deter in-person
5    voter fraud than through the current system?
6          MR. FREDERICK: Object to the extent this
7    question seeks thoughts and mental impressions or
8    communications that are privileged about pending
9    legislation. To the extent that you can answer without
10   relying on those matters, you can do so.
11      A. I'll assert privilege.
12      Q. (By Ms. Maranzano) Did anyone ask Senator
13   Fraser to introduce SB 362?
14      A. No.
15      Q. And how do you know that?
16         MR. FREDERICK: I object to the extent it
17   calls for the substance of any privileged
18   communications, and I instruct you not to answer on the
19   basis of privilege.
20      A. I'll assert privilege.
21         MS. MARANZANO: Can I have this marked as
22   Exhibit 31?
23         (Exhibit 31 marked for identification.)
24      Q. (By Ms. Maranzano) Ms. McCoy, I'm showing you
25   what we are marking as Deposition Exhibit 30. Do you

98

1    recognize -- I'm sorry, 31. Do you recognize this
2    document?
3       A. Yes, ma'am.
4       Q. What is this?
5       A. This is a press release that Senator Fraser
6    issued when he filed Senate Bill 362.
7       Q. And can I direct your attention to the second
8    to last paragraph there. Do you see that there is a
9    quote that says -- it's a quote by Fraser, by Senator
10   Fraser. It says, "In no way am I trying to prevent any
11   legal citizen from voting. Instead, I want to ensure
12   that illegal aliens, noncitizens, and people otherwise
13   not qualified do not dilute the legitimate votes cast by
14   citizens." Do you know see which paragraph I'm talking
15   about?
16      A. You have a different one.
17         MR. FREDERICK: Okay. You're sorry. Can I
18   stop you real quick? I think I may have the wrong
19   one. Oh, okay. That one is right, December 15th.
20   Thanks. She wrote -- do you want to mark a different
21   one for the record?
22         (Brief discussion held off the record.)
23         MR. RODRIGUEZ: That's 30, not 31.
24         (Brief discussion held off the record.)
25         MS. MARANZANO: We accidentally took this

99

1    the other day. That's an original exhibit.
2          MR. FREDERICK: Just so the record
3    reflects that we have marked a nonmarked copy of the
4    exhibit.
5          MS. MARANZANO: Are we -- we're on the
6    record?
7          THE REPORTER: Yes.
8          MS. MARANZANO: Okay.
9       Q. (By Ms. Maranzano) Do you see that paragraph
10   that I just read?
11      A. Yes, ma'am.
12      Q. And can you tell me what the Senator meant by,
13   "I want to ensure that illegal aliens, noncitizens, and
14   people otherwise not qualified do not dilute the
15   legitimate votes cast by citizens." What does that
16   mean?
17         MR. FREDERICK: I'll object to the
18   question to the extent it seeks mental impressions of
19   the thought process regarding pending legislation. But
20   to the extent that -- and I'll also object to the extent
21   it calls for speculation. To the extent that you think
22   you can answer without relying on privileged matters,
23   you may do so.
24      A. I'll assert privilege.
25      Q. (By Ms. Maranzano) Ms. McCoy, did you write

100

1    this press release?
2       A. Yes, ma'am.
3       Q. And are you the contact person for any
4    inquiries from --
5       A. Yes, ma'am.
6       Q. -- the press release?
7       A. Yes, ma'am.
8       Q. And it's your position that you can't testify
9    as to what he meant because it's privileged? Is that --
10         MS. MARANZANO: I mean, Mr. Frederick,
11   this is public document.
12         MR. FREDERICK: Yeah. Yeah. Sure. And
13   let me clarify. I think we need to be clear on my
14   instruction. I'm objecting to the extent that it seeks
15   thoughts or mental impressions of Senator Fraser. To
16   the extent that Ms. McCoy sitting here can -- to the
17   extent that she can tell you in her personal knowledge
18   what she thinks this means sitting here today, then that
19   would not be privileged. And communications with Fraser
20   would be privileged. But I mean, the words are on the
21   page, and to the extent that she can tell you what she
22   thinks they mean today, I think that that's fine.
23         MS. MARANZANO: And just to be clear, she
24   did just testify that she wrote the words, so...
25         MR. FREDERICK: Right.

JANICE MCCOY                                                    MAY 16, 2012

101

1    Q.  (By Ms. Maranzano) Okay.  So to the extent that
2    you --
3        A.  Would you like to ask the question again?
4        Q.  Yes.  I'm interested in what -- the sentence
5    that starts with, "Instead, I want to ensure that
6    illegal aliens, noncitizens, and people otherwise not
7    qualified, do not dilute the legitimate votes cast by
8    citizens, said Fraser."  What does that mean?
9        A.  I think it means that he wants to ensure that
10   the person who shows up at the polls is the person who
11   is supposed to be voting under that name.
12       Q.  Was a part of the purpose of SB 262 related to
13   illegal aliens voting?
14           MR. FREDERICK:  Let me just interpose a
15   objection to the extent that seeks thoughts, mental
16   process, or privileged communications that would be
17   privileged, and I would instruct you not to answer.  But
18   to the extent that you can identify the purpose or
19   whether that's a purpose, you may answer.
20       A.  The purpose of Senate Bill 362 was to stop
21   in-person voter fraud, and that would entail anybody not
22   voting legally, including illegal aliens who are not
23   allowed to vote.
24       Q.  (By Ms. Maranzano) So if a noncitizen votes,
25   you define in-person voter fraud to include a noncitizen

102

1    voting as themselves?  Am I understanding you correctly?
2        A.  Because they're committing fraud, yes, ma'am.
3        Q.  Okay.  So when you said the purpose of SB 362
4    was to deter in-person voter fraud, you also are
5    including in that category deterring noncitizens from
6    voting in elections; is that correct?
7            MR. FREDERICK:  I'll just object to the
8    extent it mischaracterized the testimony.  But to the
9    extent we're talking about the purpose of the bill, you
10   may answer the question.
11       A.  The purpose of the bill was to ensure that
12   citizens, registered -- were voting -- were not
13   committing fraud.  There was no in-person voter fraud.
14   So whatever that constitutes, this bill was trying to
15   prevent.
16       Q.  (By Ms. Maranzano) Okay.  So what I'm asking
17   you now is:  What do you believe that that constitutes?
18   As somebody who was the chief of staff for the author of
19   the bill, what do you think that constitutes?
20           MR. FREDERICK:  I will object, based on
21   privilege, the extent that this seeks a subjective
22   motivation, a subjective thought or a mental impression
23   somehow incorporated in the text of the bill.  And I
24   would instruct you not to answer on the basis of
25   privilege.  To the extent that sitting here today, you

103

1    can explain your understanding of the terms at issue
2    that would not be privileged, then you may answer.
3        A.  I don't know that I understand your question.
4        Q.  (By Ms. Maranzano) Okay.  What I'm trying to do
5    is, you have testified earlier today that the purpose of
6    both SB 362 and HB 218 was to detect in-person voter
7    impersonation.  And I want to be clear for the record as
8    to how you define that term, the term in-person voter
9    impersonation.
10       A.  Someone who is not authorized to vote by our
11   constitution who is voting in person.  Someone who is
12   cheating the system by voting under a different name.
13   Someone who is cheating the system by voting more than
14   once in an election.
15       Q.  So is part of the purpose of SB 362 to prevent
16   noncitizens from voting?
17           MR. FREDERICK:  Same objection.  But you
18   can answer subject to my previous instruction.
19       A.  Okay.  Can we back up?  Because I just reread
20   this press release.
21       Q.  (By Ms. Maranzano) Uh-huh.
22       A.  Senator Fraser filed two bills in 2008 -- 2008,
23   Senate Bill 362 and Senate Bill 363?
24       Q.  Uh-huh.
25       A.  Senate Bill 363 was talking about -- more about

104

1    the illegal immigrant issue.  Senate Bill 362 was about
2    in-person voter fraud.  This quote probably relates more
3    to Senate Bill 363 than it does to Senate Bill 362.  So,
4    I mean, we have to read the whole press release in
5    context.
6        Q.  Uh-huh.
7        A.  I mean, but in-person voter fraud is someone
8    showing up who's not supposed to be there, who is not a
9    citizen of our country, who has someone else's ID, who
10   has falsified voter records and is voting fraudulently,
11   and that's what Senate Bill 362 was trying to do.
12       Q.  Okay.  So how does Senate Bill 362 deter
13   noncitizens from voting?
14           MR. FREDERICK:  I object to the extent it
15   calls for speculation.  You may answer if you can.
16       A.  By requiring someone to show ID, if they're not
17   a legal citizen, they wouldn't have that ID,
18   necessarily, and then they wouldn't be able to vote.
19       Q.  (By Ms. Maranzano) Do you know how many forms
20   of ID listed in SB 362 a noncitizen is able to obtain?
21       A.  I do not.
22       Q.  Did you look into that when you were working on
23   SB 362?
24           MR. FREDERICK:  I object to the extent it
25   calls for mental impressions, thought process,

105

1    privileged communications. But subject to that
2    instruction, if you can answer without revealing that,
3    you may answer.
4        A.  No.
5        Q.  (By Ms. Maranzano) No, you didn't look into it?
6        A.  I did not.
7        Q.  Do you think that would be an important issue
8    to look into, if part of the goal of the bill is to
9    prevent noncitizens from voting?
10       A.  The goal of the bill was to prevent in-person
11   voter fraud.
12       Q.  Okay.  I thought you testified earlier that
13   that included anyone who was not legally permitted to
14   vote.  Is that not correct?
15       A.  The goal of Senate Bill 362 was to prevent
16   in-person voter fraud.  Whether it was by legal citizens
17   or illegal citizens, we were trying to create a tool to
18   prevent in-person voter fraud.
19       Q.  Okay.  And to be clear, you did not look into
20   whether noncitizens could obtain the forms of
21   identification required by SB 362?
22       A.  I did not.
23           MR. FREDERICK:  If we can take a break
24   soon.
25           MS. MARANZANO:  Do you want to go like

106

1    another 15 minutes and break for lunch?  That's fine.
2            MR. FREDERICK:  Sure.
3            MR. DUNN:  But then we'll have to do the
4    hearing.
5            MR. ROSENBERG:  Yeah, that would fit in
6    with the hearing.
7            MS. MARANZANO:  Okay.
8        Q.  (By Ms. Maranzano) Did the Senator consider any
9    alternative legislative measures that would have
10   accomplished the goal of deterring in-person voter
11   impersonation.
12           MR. FREDERICK:  Object on the ground that
13   it seeks thoughts, mental impressions, and privileged
14   communications, and I instruct you not to answer the
15   question based on privilege.
16       A.  I'll assert privilege.
17       Q.  (By Ms. Maranzano) Did the Senator make any
18   promises to anyone concerning alternative legislative
19   measures that would have accomplished the goal of
20   deterring in-person voter impersonation?
21           MR. FREDERICK:  I'll object to the extent
22   that calls for thoughts, mental impressions, or
23   communications with other legislators or legislative
24   staff members, other privileged communications.  To the
25   extent you can answer without revealing privileged

107

1    communications, you may do so.
2        A.  I'll assert privilege.
3        Q.  (By Ms. Maranzano) Ms. McCoy, is it your
4    position that promises that the Senator makes about
5    legislation are covered by the privilege, the
6    legislative privilege?
7            MR. FREDERICK:  Yes, to the extent -- I
8    mean, I guess promises, I'm not entirely clear on what a
9    promise would entail, but I think to the extent that it
10   would include a discussion with another legislator or
11   discussions between legislative staff members about
12   pending legislation.  I mean, I think promise could be
13   construed to include ordinary legislative discussions
14   and, you know, policy discussions and compromises.  I
15   think that kind of thing is an integral part of the
16   legislative process in determining votes to get
17   legislation passed.
18           MS. MARANZANO:  Is it also your position
19   that promises to constituents or groups would be covered
20   by the privilege?
21           MR. FREDERICK:  It's my understanding that
22   a promise to somebody outside the Legislature, I think,
23   would not fall under the privilege.
24           MS. MARANZANO:  That's my understanding,
25   too.

108

1            MR. FREDERICK:  Yeah.  Yeah.  And I think
2    to the extent it's not an -- to the extent it's a
3    nonconfidential or an external communication, I think
4    that's not what I intend to object to.
5            MS. MARANZANO:  Okay.
6        Q.  (By Ms. Maranzano) Ms. McCoy let me rephrase
7    that question.  Did the Senator make any promises to
8    constituents or outside groups related to SB 362?
9        A.  In what way?
10       Q.  Did the Senator make any promises to bring a
11   bill to the Senate Floor that would require photo
12   identification in 2009?
13       A.  The Senator committed, after the legislation
14   failed in 2007, to constituents that he would try again.
15       Q.  Which constituents did he commit to?
16       A.  Skipper Wallace.
17       Q.  Can you tell me who Skipper Wallace is?
18       A.  He's a constituent from Lampasas.
19       Q.  Why is he so interested in photo identification
20   bills?
21           MR. FREDERICK:  I'll object to the extent
22   that calls for privileged communications between Senator
23   Fraser, Ms. McCoy, and privileged communications between
24   either and Mr. Wallace, and as well as to the extent it
25   calls for thought process, mental impressions.  If you

## 109

1    can answer without revealing thoughts or privileged
2    communications, you can do so. Otherwise, I instruct
3    you not to answer on the basis of privilege.
4        A. I mean, Skipper has been a long-time election
5    worker and judge, and I think he just advocates for
6    election law change.
7        Q. (By Ms. Maranzano) He's an election worker and
8    judge. What is his profession, if you know?
9        A. He's a businessman.
10       Q. So he is a volunteer election judge, and what
11   was the first thing you said?
12       A. Election worker, election judge.
13       Q. Does he have any role in the government
14   structure of the county?
15       A. Skipper, I think, used to be city manager in
16   Lampasas, I think.
17       Q. Does he have any role with a political party?
18   Any political party?
19       A. Yes.
20       Q. Which one?
21       A. Republican.
22       Q. And what's his role?
23       A. He's Chair of the Lampasas Republican Party.
24       Q. Ms. McCoy, you testified earlier that there was
25   no partisan purpose to SB 362. So now that you've

## 111

1    communications between Senator Fraser and
2    constituents. To the extent you can answer without
3    revealing the substance of those conversations, you may
4    do so.
5        A. The Senator has met with constituents about
6    voter ID.
7        Q. (By Ms. Maranzano) How many times?
8        A. The Senator mentions voter ID when he speaks
9    and when he gets invited to go speak to different
10   chambers and groups. Pretty much every time he speaks
11   to a group like that, he'll mention it. And in office,
12   half dozen.
13       Q. Would you say that voter ID was one of the
14   Senator's key legislative accomplishments?
15           MR. FREDERICK: I'll object to the extent
16   to calls for mental impressions or thoughts. However,
17   to the extent you can answer, based on -- to the extent
18   you can answer without relying on privileged
19   information, you can do so.
20       A. Yes.
21       Q. (By Ms. Maranzano) Who besides Senator Fraser
22   were the main proponents of SB 362?
23       A. Other members?
24       Q. Well, presumably. Well, why don't we start
25   with: Were there any members who voted for the bill who

## 110

1    testified that the Senator made a promise to a person
2    who was affiliated with a political party, the Chair of
3    a political party, do you wish to change your testimony
4    from earlier today?
5        A. No, ma'am.
6        Q. Did your office have any communications about
7    the purpose of SB 362?
8            MR. FREDERICK: Object as vague, also
9    object on grounds of privilege to the extent it calls
10   for the substance of confidential communications, I
11   instruct you not to answer. To the extent you can
12   answer without revealing confidential communications,
13   you may.
14       A. I'm going to assert privilege.
15       Q. (By Ms. Maranzano) Did your office have any
16   communications in response to a -- did you -- did your
17   office ever get a Texas public records request regarding
18   SB 362?
19       A. We have received public information requests
20   about voter ID. I do not recall if they were in post
21   2009 session or post 2011. Probably both.
22       Q. Has Senator Fraser had any meetings with
23   constituents where the purpose of 362 was discussed?
24           MR. FREDERICK: I'll object to the extent
25   it calls for the content of communications, privileged

## 112

1    were strong proponents of it?
2            MR. FREDERICK: I'll just interpose, I
3    don't think that this question is asking for the
4    substance of communications, so I would admonish you not
5    to reveal the substance of any privileged communications
6    in answering, but I think that you can do that.
7        A. I mean, I think that all the members that
8    signed on as co-authors would consider themselves strong
9    proponents of the bill.
10       Q. (By Ms. Maranzano) Were there others in the
11   Texas government who were strong proponents of SB 362?
12           MR. FREDERICK: Same instruction.
13       A. I don't think so. I don't know.
14       Q. (By Ms. Maranzano) Was 362 a priority for the
15   Governor?
16           MR. FREDERICK: I'll object on the same
17   grounds. To the extent it seeks thoughts, mental
18   impressions of the Governor or communications between
19   Senator Fraser's office and the Governor, I will
20   instruct you not to answer. I mean, if you know.
21       A. I don't know the Governor's priorities from
22   2009.
23       Q. (By Ms. Maranzano) Was SB 362 a priority for
24   the Lieutenant Governor?
25           MR. FREDERICK: The same instruction. To

JANICE MCCOY                                                        MAY 16, 2012

113

1   the extent it seeks thoughts or mental impressions of
2   the Lieutenant Governor or confidential communications
3   between Senator Fraser's office and the Lieutenant
4   Governor's Office, I would instruct you not to answer.
5   If you're able to answer, you may do so.
6       A.  I don't know -- I don't know the Lieutenant
7   Governor's priorities from 2009.
8       Q.  (By Ms. Maranzano) Was SB 36 a priority for
9   anyone outside of the Texas government?
10          MR. FREDERICK:  I'll object as vague, but
11  you can answer if you know.
12      A.  I don't.  I don't know.
13      Q.  (By Ms. Maranzano) How often did you say that
14  you talked to Lieutenant Governor's Office during the
15  consideration of SB 362?
16      A.  I probably talked to them every day while we
17  were scheduling the bill and during the hearing.
18      Q.  And you have no idea whether it was priority
19  for their office?
20          MR. FREDERICK:  Object, argumentative.
21      Q.  (By Ms. Maranzano) You can answer.
22      A.  That process was about six days long, so to
23  talk to them for six days.  But again, I don't speak for
24  the Lieutenant Governor, so I don't know his priorities.
25      Q.  Were there any groups that represented minority

114

1   voters who supported SB 362?
2           MR. FREDERICK:  I'll just object to the
3   extent this calls for the substance of confidential
4   communications between any constituents and Senator
5   Fraser's office, I would instruct you not to answer.
6   But to the extent that you can answer without revealing
7   the substance of any conversation, you can do so.
8       A.  I don't know.
9       Q.  (By Ms. Maranzano) Ms. McCoy, who would know
10  the Lieutenant Governor's priorities?
11          MR. FREDERICK:  Object as vague and calls
12  for speculation.  You can answer if you know.
13      A.  The Lieutenant Governor and his staff.
14      Q.  (By Ms. Maranzano) Who on his staff?
15          MR. FREDERICK:  Same objection.
16      A.  His chief of staff, Blaine Brunson.
17      Q.  (By Ms. Maranzano) Who were the main opponents
18  to SB 362?
19      A.  I don't recall.
20      Q.  Do you recall having communications with
21  constituents who opposed SB 362?
22      A.  No.
23      Q.  Do you recall having -- do you recall having
24  communications with outside groups that opposed SB 362?
25          MR. FREDERICK:  I'll object to the extent

115

1   it seeks the substance of any privileged communication
2   between a constituent and Senator Fraser's office, but
3   to the extent it doesn't require you to reveal the
4   substance, you may answer the question.
5       A.  I don't recall.
6       Q.  (By Ms. Maranzano) Do you recall that there was
7   opposition to SB 362?
8       A.  Yes, ma'am.
9       Q.  What was the basis of that opposition?
10          MR. FREDERICK:  I'll object to the extent
11  it calls for speculation.  Also object to the extent it
12  seeks the substance of any privileged communications
13  between other legislators and staff or constituents and
14  Senator Fraser and Ms. McCoy.  To the extent that you
15  know independent of privileged sources or you don't have
16  to reveal any, you may answer.
17      A.  I think if you look at the record, that the
18  people that testified against Senate Bill 362 believed
19  that it would disenfranchise voters.
20      Q.  (By Ms. Maranzano) What do you think about that
21  testimony?
22          MR. FREDERICK:  I'll object to the extent
23  it calls for thoughts or mental impressions about
24  pending legislation.  I also object to relevance.
25      A.  I'll assert privilege.

116

1       Can I do that?
2           MR. FREDERICK:  Yeah.
3       Q.  (By Ms. Maranzano) Did the Senator take any
4   steps with regard to SB 362 to address any of these
5   concerns that were raised by opponents to SB 362?
6           MR. FREDERICK:  Objection, vague.
7   Objection, seeks thoughts and mental impressions of the
8   Senator.  It also seeks the substance of confidential
9   communications and privileged communications with the
10  Senator.  To the extent that you can answer without
11  revealing the substance of confidential communications
12  or the Senator's thought process or the thought
13  processes of you or any other legislator, you may do so.
14      A.  I don't think we amended the bill, so the
15  answer would be no.
16      Q.  (By Ms. Maranzano) Just to be clear, you don't
17  think you amended the bill at all throughout the entire
18  Senate process?
19      A.  I don't think we did.  Maybe on the margins,
20  but -- so, we did not take any action to make changes
21  either direction.
22      Q.  Is there a reason you didn't take any action to
23  respond to the concern of opponents?
24          MR. FREDERICK:  Objection, it seeks
25  thoughts and mental impressions.  I instruct you not to

117

1    answer on the basis of privilege.
2        A.  I'll assert privilege.
3        Q.  (By Ms. Maranzano) Did anybody raise any
4    concerns that SB 362 would disenfranchise minority
5    voters?
6            MR. FREDERICK: I'll object to the extent
7    it calls for privileged communications between
8    constituents, legislators, staff, and you or Senator
9    Fraser.  To the extent you can answer without relying on
10   privileged communications, you may do so.
11       A.  And on the record, during the debate, several
12   members testified that way, and then we had witnesses
13   that testified in the same manner.
14       Q.  (By Ms. Maranzano) And do you recall what the
15   basis of their testimony was?
16       A.  No, ma'am.
17       Q.  Did you take any steps to determine whether
18   SB 362 would disenfranchise minority voters?
19           MR. FREDERICK: Object to the extent it
20   seeks thought process -- thought processes and mental
21   impressions and confidential communications with
22   legislators and legislative staff.  I would instruct you
23   not to answer that question on the basis of privilege.
24       A.  I'll assert privilege.
25           MS. MARANZANO: I think that I'm a point

118

1    where it might make sense to stop for lunch.  And maybe
2    we can start back up after the call to the court?  Does
3    that make sense?
4            MR. SWEETEN: That's fine.
5            With respect to letting Janice go, I'm
6    going to let her go for a while.  Let's probably have
7    you come back at two o'clock.  I mean, I don't think she
8    needs to be here before 2:00 for any reason.
9            MS. MARANZANO: Yeah, I think that's
10   right.
11           MR. DUNN: That's fine.  The only thing
12   I'll add is that I invoked the rule, and under the
13   Federal Rules of Procedure you're not to talk to anybody
14   about your testimony other than your lawyers.
15           THE WITNESS: That's fine.
16           (Lunch recess from 12:46 p.m. to
17   2:15 p.m.)
18           MS. MARANZANO: Let's go back on the
19   record.
20       Q.  (By Ms. Maranzano) Before the break, we were
21   talking about SB 362, and I'd like to continue talking
22   about SB 362.
23           Ms. McCoy, what was your role in trying to
24   get SB 362 passed?
25       A.  My role in trying to get 362 passed was to

119

1    navigate the legislative process for the Senator in
2    terms of the behind-the-scenes staff work that takes
3    place.
4        Q.  And can you describe that to me?
5        A.  Filing the bill.  Filing the bill and
6    requesting hearings, prepping talking points.
7        Q.  Did you have any role in determining how
8    different senators would vote on SB 362?
9        A.  No.
10       Q.  Did Senator Fraser have any idea of how many
11   senators would support SB 362 when he introduced it?
12           MR. FREDERICK: Object.  The question
13   calls for thought process and mental impressions of
14   Senator Fraser.  It may also call for communications
15   with legislators and staff that are privileged.  I would
16   instruct you not to answer on the basis of privilege.
17       A.  I'll assert privilege.
18           (Exhibit 32 marked for identification.)
19       Q.  (By Ms. Maranzano) Okay.  Can you take a look
20   at what we've marked as Deposition Exhibit 32?  In
21   particular, can you look at Rule 5.11, which is on Page
22   24.  Do you see Provision D under 5.11?
23       A.  Yes.
24       Q.  When was that provision added to the rules?
25       A.  January 14th, 2009.

120

1        Q.  And how was -- was there a resolution to
2    specifically add Subsection D to Rule 5.11?
3        A.  Yes.
4        Q.  Who introduced that resolution?
5        A.  Senator Williams.
6        Q.  Did Senator Fraser ask Senator Williams to
7    exempt voter ID requirements from the two-thirds Rule?
8            MR. FREDERICK: I object on the grounds
9    that it seeks confidential communications related to
10   pending legislation, and I'm going to instruct you not
11   to answer on the basis of privilege.
12       A.  I'll assert privilege.
13       Q.  (By Ms. Maranzano) How was the resolution
14   brought up in the Senate to add Subsection D to 5.11?
15       A.  I don't remember.
16       Q.  During the time that you have worked for
17   Senator Fraser, have you ever seen another category of
18   legislation exempted from the two-thirds rule?
19           MR. FREDERICK: I'll object just on -- to
20   the extent that it mischaracterizes the testimony in the
21   record, but you can answer.
22       A.  I don't recall the Committee of the Whole
23   meeting, except for 2009 and 2011, since I've worked for
24   Senator Fraser.
25       Q.  (By Ms. Maranzano) So am I understanding you

JANICE MCCOY                                                MAY 16, 2012

121

1    correctly that there has not been, to the best of your
2    recollection, another category of legislation that's
3    been written into the rules as exempted from the
4    two-thirds vote requirement under Rule 5.11?
5              MR. FREDERICK:  The same objection, but
6    you can answer.
7        A.  Can you repeat the question?
8        Q.  (By Ms. Maranzano) I just want to make sure I
9    understood the answer that you gave, because you
10   mentioned the Committee of the Whole.  But am I
11   understanding you correctly that it's your recollection,
12   as you sit here, that during the time you worked for
13   Senator Fraser, there has not been another category of
14   legislation carved out of Rule 5.11 as voter
15   identification requirements are carved out in
16   Subsection D in the 2009 rules?
17       A.  Yes.
18       Q.  Okay.  What was the purpose of carving out the
19   voter ID identification requirement from the two-thirds
20   rule?
21       A.  I don't know.
22       Q.  Did the Senator have any concerns about
23   exempting SB 362 from the requirement that legislation
24   get two-thirds support in the Senate?
25             MR. FREDERICK:  Object on the grounds that

122

1    it seeks the thought process and mental impressions of
2    Senator Fraser about pending legislation, and I instruct
3    you not to answer on the basis of privilege.
4        A.  I'm going to assert privilege.
5        Q.  (By Ms. Maranzano) Did the Senator have any
6    concerns that by exempting legislation from the
7    two-thirds rule requirement, it would appear to be a
8    very partisan-supported piece of legislation?
9              MR. FREDERICK:  I object on the grounds
10   that it seeks the mental impressions and thought
11   processes of Senator Fraser on pending legislation.  I
12   instruct you not to answer on grounds of privilege.
13       A.  I'll assert privilege.
14       Q.  (By Ms. Maranzano) If SB 362 had not been
15   exempt from the two-thirds rule requirement, would it
16   have passed the Senate?
17             MR. FREDERICK:  Object to the extent it
18   calls for speculation.
19       A.  I don't know.
20       Q.  (By Ms. Maranzano) Well, SB 362 was voted on,
21   did two-thirds of the members support it?
22       A.  No.
23       Q.  Did you have any communications with Senator
24   Williams about the resolution that led to Subsection D
25   of Rule 5.11 in the 2009 rules?

123

1              MR. FREDERICK:  I object to the question
2    to the extent it calls for the substance of confidential
3    communications between Ms. McCoy and Senator Williams,
4    so it's subject to legislative privilege.  I'm going to
5    instruct you not to answer on that basis.
6        Q.  (By Ms. Maranzano) Are you following your
7    counsel's instruction not to answer that question?
8        A.  I never spoke to Senator Williams about this
9    resolution.
10       Q.  Did you speak to anybody at Senator Williams's
11   office about this resolution?
12       A.  No.
13       Q.  Did you speak to anybody in the Lieutenant
14   Governor's Office about the resolution that led to the
15   suspension of the two-thirds rule?
16       A.  No.
17       Q.  Did you speak to anybody in the Governor's
18   Office?
19       A.  No.
20       Q.  What was the reaction from senators on the --
21   well, let me ask you this first:  Are you familiar with
22   the testimony that occurred when Senator Williams
23   introduced the resolution to suspend the two-thirds
24   rule?
25       A.  No.

124

1        Q.  Can you also take a look at Rule 16.07?  It's
2    on Page 106 and 107.
3        A.  Which rule did you want me to look at?
4        Q.  16 -- hold on.
5        A.  07?
6        Q.  16.07.
7        A.  Okay.
8        Q.  Actually, you know what; let's do 16.06 and 07,
9    which relate to matters regarding -- 16.06 is matters
10   requiring a vote of two-thirds of the members present,
11   and 16.07 is Matters of Requiring Vote of Majority
12   Members of the Senate.  Were these rules also impacted
13   by Senator Williams's resolution?
14       A.  I don't know.
15       Q.  Can you look at Section 7, Subsection 7 of Rule
16   16.07, matters -- and 16.07, again, is Matters Requiring
17   Vote of Majority of Members of the Senate.  And
18   Subsection 7 says, "Set voter identification requirement
19   bills for special order."  Does that refresh your
20   recollection as to whether that was something that was
21   impacted by Senator Williams's resolution?
22       A.  I never read Senator Williams's resolution, so
23   I would assume yes, it was in there.
24       Q.  So these changes in the rules directly impacted
25   SB 362, did they not?

JANICE MCCOY                                              MAY 16, 2012

---

125

1    A.  Yes.
2    Q.  So you never read Senator Williams's
3  resolution, but are you familiar with the impact that
4  his resolution on the rules?
5    A.  Yes.
6    Q.  Did Senator Fraser have any concerns about
7  suspending the two-thirds rule for SB 362?
8        MR. FREDERICK:  I object on the grounds
9  that it seeks the mental impressions and thought
10  processes of Senator Fraser as well as privileged
11  communications of the staff, and I instruct you not to
12  answer on the basis of privilege.
13    A.  I'll assert privilege.
14    Q.  (By Ms. Maranzano)  Were there any other changes
15  in the rules in 2009 from previous Senate rules that --
16    A.  I don't recall.  I'm sorry.  I thought you were
17  done.  I'm sorry.
18    Q.  No, it was just a pause.
19        That were related only to voter
20  identification requirements?
21    A.  I don't recall.
22    Q.  Was there any consideration of changing any
23  other Senate rules in 2009 to ensure that SB 362 would
24  get passed in the Senate?
25        MR. FREDERICK:  I object to the extent the

---

126

1  question calls for thought process, mental impressions
2  of legislators and for confidential communications,
3  privileged communications among legislators and
4  staff.  I would instruct you not to answer on the basis
5  of privilege, except to the extent there is something
6  nonprivileged you can point to answer.
7    A.  I don't know.
8    Q.  (By Ms. Maranzano)  Was SB 362 considered by any
9  Senate committees?
10    A.  Senate committee on the whole.
11    Q.  Is that the only one?
12    A.  Yes, ma'am.
13    Q.  Is it unusual for a bill to go straight to
14  Senate Committee of the Whole?
15    A.  Yes.
16    Q.  Have you seen that happen with other
17  legislation during the time you have worked for Senator
18  Fraser?
19    A.  I don't recall it happening since I've worked
20  for Senator Fraser.
21    Q.  What was your role during the Floor
22  consideration of SB 362?
23    A.  I sat with Senator Fraser as he laid out the
24  bill, and when he asked me to produce documentation, I
25  would give it to him.

---

127

1    Q.  What kind of documentation did you have with
2  you?
3        MR. FREDERICK:  I object on the ground
4  that it seeks thought process and mental impressions
5  that may reflect confidential communications.  I would
6  instruct you not to answer on the basis of privilege.
7    A.  I will answer, because I will tell you the same
8  things that we've talked about earlier:  The poll data,
9  the studies, the Carter-Baker Commission report.  Just
10  those two.
11        MS. MARANZANO:  I'm going to ask, if it's
12  possible, Mr. Frederick, can you shorten your objections
13  just so that we can --
14        MR. FREDERICK:  Yeah.
15        MS. MARANZANO:  I mean, you know, since
16  it's the same objection, that will maybe save us some
17  time.
18        MR. FREDERICK:  Absolutely.
19        MS. MARANZANO:  Thank you.
20        MR. FREDERICK:  If y'all are willing to --
21  you know, to stipulate that when I make a shorter
22  objection, it covers all the matters, I am happy to
23  shorten it.
24        MS. MARANZANO:  Great.  Thank you.
25        MR. FREDERICK:  Can I propose "Objection,

---

128

1  legislative privilege"?
2        MS. MARANZANO:  That's sounds --
3        MR. FREDERICK:  Is that good enough?
4        MS. MARANZANO:  That's great.  And you
5  will understand what he means overall.
6        THE WITNESS:  And then I may not forget
7  your question.
8        MR. FREDERICK:  Yeah.  Thanks.
9        MS. MARANZANO:  Okay.  Terrific.
10    Q.  (By Ms. Maranzano)  During the Floor debate on
11  SB 362, did anyone raise concerns about the impact that
12  the bill might have on minority voters?
13    A.  Yes.
14    Q.  What concerns were those?
15    A.  I can't speak to specific concerns.
16    Q.  Who raised those concerns?
17    A.  Democrats and the senators.
18    Q.  Were they minority senators?
19    A.  Some of them were.
20    Q.  Do you know if they were senators who
21  represented minority voters?
22    A.  Yes.
23    Q.  What was the Senator's response to these
24  concerns?
25    A.  His response was that he disagreed.

JANICE MCCOY                                                    MAY 16, 2012

129

1    Q. What was that disagreement based upon?
2         MR. FREDERICK: Object on legislative
3    privilege, but matters in the public record you may
4    address.
5    A. He referenced election data in both Georgia and
6    Indiana that showed that their voter ID laws did not
7    impact minority voters on the record.
8    Q. (By Ms. Maranzano) What was that election data?
9    A. Data from Indiana and Georgia's elections that
10   were held after they voted -- after they had a voter ID
11   law, that showed that the turnout increased.
12   Q. So the data you referenced was about turnout?
13   A. Yes, ma'am.
14   Q. Was it solely about turnout?
15   A. Yes, ma'am.
16   Q. And was it about turnout of minority voters in
17   particular?
18   A. All voters.
19   Q. All voters?
20   A. By I think the data he showed did have
21   minority -- I think the data he referenced in his
22   testimony did show that minority voters increased as
23   well.
24   Q. And what years were those studies run?
25   A. I don't remember.

130

1    Q. Do you know if he looked into whether other
2    issues might have had any impact on that turnout?
3         MR. FREDERICK: Objection, legislative
4    privilege. To the extent there's material on the
5    record, you may answer.
6    A. I'll assert privilege.
7    Q. (By Ms. Maranzano) Did any of those studies
8    record any information about voter registration rates in
9    Indiana and Georgia?
10   A. The data -- I'm sorry. The data that I
11   mentioned was not a study. It's actual voter turnout
12   from those states' Secretaries of State. So I want to
13   be real clear that they're not studies. We're talking
14   about actual turnout.
15   Q. Okay. I got you. So did the Senator do any
16   research to determine whether voter registration rates
17   changed in those states during the years in which there
18   was an increase in voter turnout?
19        MR. FREDERICK: Objection, legislative
20   privilege. Instruct you not to answer.
21   A. I'll assert privilege.
22   Q. (By Ms. Maranzano) Did the Senator do any
23   research to determine whether there were any close
24   elections during those years?
25        MR. FREDERICK: Objection, legislative

131

1    privilege. Instruct you not to answer.
2    A. Assert privilege.
3    Q. (By Ms. Maranzano) Did the Senator do any
4    research to determine whether there were any high
5    profile elections during those years?
6         MR. FREDERICK: Objection, legislative
7    privilege. Instruct you not to answer.
8    A. I assert privilege.
9    Q. (By Ms. Maranzano) Did the Senator do any
10   additional research about turnout and Georgia and
11   Indiana?
12        MR. FREDERICK: Objection, legislative
13   privilege. Instruct you not to answer.
14   A. Assert privilege.
15   Q. (By Ms. Maranzano) Did SB 362 change at all in
16   response to the concerns that were raised on the Senate
17   Floor?
18        MR. FREDERICK: Objection, legislative
19   privilege, to the extent it calls for actual thought
20   process, but I think to the extent there's anything on
21   the record, you're free to testify about that.
22   A. So I went and looked over at the break, while
23   y'all were doing your conference, about the process,
24   because I don't recall, didn't recall, and Senate Bill
25   362, there was a committee substitute in committee. But

132

1    I don't think it changed on the Floor after the Floor
2    debate.
3    Q. (By Ms. Maranzano) What were the changes that
4    occurred in committee?
5    A. I didn't -- I don't recall, and I didn't have
6    time to review it.
7    Q. I just want to go back to finish what you were
8    talking about earlier, and just make sure. You said the
9    Senator disagreed with the opposition that was brought
10   up on the Floor, and then we talked about turnout.
11   A. Uh-huh.
12   Q. Were there any other bases from the Senator's
13   disagreement with the concerns that were raised on the
14   Floor?
15        MR. FREDERICK: Object on the legislative
16   privilege only to the extent those bases were not
17   disclosed. But if there's anything else on the record,
18   you're free to address it.
19   A. I don't remember if he had any other arguments.
20        (Exhibit 33 marked for identification.)
21   Q. (By Ms. Maranzano) Okay. Ms. McCoy, I'm
22   showing you what we're marking for the record as
23   Deposition Exhibit 33, and it's Bates labeled U.S.
24   00005599 through U.S. 00005615. And I'd like to turn
25   your attention to Page 5607 at the bottom and 5608.

133

1          Do you recognize this, sort of, the
2     overall document?
3          A. Yes, ma'am.
4          Q. Is it the Senate Journal from March 18th, 2009?
5          A. Yes, ma'am.
6          Q. And do you see on the pages I've directed you
7     to, there's a letter that was submitted by Senator West?
8          A. The letter was submitted by Senator Van de
9     Putte. Senator West had comments further down the page.
10         Q. Gotcha.
11         A. Is that the letter you're referring to?
12         Q. Yes, the letter that -- well, I'm referring to
13    the letter the starts out by saying, "Senator West
14    submitted the following statement."
15         A. Oh, that's not a letter. That's his statement.
16         Q. Okay.
17         A. Uh-huh.
18         Q. And then on the next page, if you see, it was
19    signed off by Senators West, Ellis, Gallegos, Lucio,
20    Shapleigh, Uresti, Van de Putte, Watson, Whitmire and
21    Zaffirini?
22         A. Yes, ma'am.
23         Q. And can you look at Paragraph Number 8, and
24    there's a sentence in there that says, "No Senator who
25    is an ethnic minority has voted in favor of such

134

1     legislation," and it's talking about voter ID
2     legislation. Why do you think these senators felt the
3     need to put in the record the fact that no ethnic
4     minority had voted in favor of voter ID legislation?
5              MR. FREDERICK: Objection, legislative
6     privilege to the extent it calls for the thought process
7     of these senators. If you can answer on a nonprivileged
8     basis, you can.
9          A. I cannot.
10         Q. (By Ms. Maranzano) Did Senator Fraser place any
11    significance on the fact that there was such unified
12    opposition from the minority members of the Senate?
13             MR. FREDERICK: Objection, legislative
14    privilege. Instruct you not to answer.
15         A. I'll assert privilege.
16         Q. (By Ms. Maranzano) Why do you think there was
17    such strong opposition to SB 362?
18             MR. FREDERICK: Objection, legislative
19    privilege. Objection, calls for speculation. I
20    instruct you not to answer.
21         A. I'll assert privilege.
22             (Exhibit 34 marked for identification.)
23         Q. (By Ms. Maranzano) Okay. I'm showing you what
24    we're marking as Deposition Exhibit 34.
25             For the record, it's labeled Texas, Bates

135

1     range Texas, underscore, 00003857 through 00003920.
2              And I'd like to direct your attention to
3     Page 3911. It's the second page of this.
4              Do you recognize -- first of all, do you
5     recognize this document?
6          A. I don't think I've seen the whole document, but
7     I recognize it what it is.
8          Q. Is it a transcript -- does it appear to be a
9     copy of a transcript from the Committee of the Whole on
10    March 10th, 2009?
11         A. Yes, ma'am.
12         Q. Is that when you considered SB -- when the
13    Senate considered SB 362?
14         A. Yes.
15         Q. Can you look at the bottom of 3911. It's a
16    statement from Senator Fraser. And if you see at the
17    bottom of the page, the statement says, "And I actually
18    came back, and sat down, and I've got probably,
19    interestingly, more research and more reading and debate
20    on this bill maybe than one that I've ever done."
21             Can you tell me what reading and research
22    the Senator is referring to in that?
23             MR. FREDERICK: Objection, legislative
24    privilege. Instruct you not to answer.
25         A. Again, I mean, the same reports and polls that

136

1     I referenced earlier would be what he was referencing
2     there.
3          Q. (By Ms. Maranzano) Nothing in addition to what
4     you've already testified about?
5          A. No, ma'am.
6              (Exhibit 35 marked for identification.)
7          Q. (By Ms. Maranzano) Okay. We marked this as
8     Deposition Exhibit 35. It's TX underscore 00 --
9          A. It's the same one you just gave us.
10         Q. Oh, okay. Well, we have two copies. I'm going
11    to -- all right. Let's just use the same exhibit, then.
12             I'm going to direct your attention
13    Page 3940.
14         A. Uh-huh.
15         Q. And do you see there is a comment from Senator
16    Watson?
17         A. Oh, maybe it is different. Uh-huh. Yes.
18         Q. Yes. Okay. And do you see that he asks a
19    question: "Are you familiar with any data or study
20    that's been done with regard to some sort of statistical
21    analysis concerning the effect of the new requirements
22    of Senate Bill 362?" And then on the next page, you see
23    Senator Fraser has an answer, and at the end of that,
24    that paragraph, he says, "I think you're asking a
25    subjective question that we have objective data that is

137

1    available that the witnesses are going to lay out.
2    You're asking have I done that? The answer is no." Do
3    you see all that?
4        A. Uh-huh.
5        Q. Do you recall this testimony?
6        A. Not specifically, but...
7        Q. Did Senator Fraser ever do any research on how
8    SB 362 would impact minority voters?
9            MR. FREDERICK: Objection, legislative
10   privilege. Instruct you not to answer.
11       Q. (By Ms. Maranzano) Was there any testimony
12   presented during the debate of SB 362 by Senator Fraser
13   about any analysis related to the impact that the bill
14   would have on minority voters?
15       A. I think the only testimony that Senator Fraser
16   might have talked about, in terms of voter turnout,
17   minority or not, was the election results from Indiana
18   and Georgia.
19       Q. Did SB 362 pass the Senate?
20       A. Yes.
21       Q. Did Senator Fraser have any role with regard to
22   SB 362 once it was referred to the House?
23       A. No.
24       Q. Did you have any role?
25       A. I met with Representative Todd Smith once.

138

1        Q. Anybody else?
2        A. No.
3        Q. What was your meeting with Representative Smith
4    about?
5            MR. FREDERICK: Object, legislative
6    privilege to the extent it seeks the substance of the
7    communications, but you are free to describe general
8    subject matter of the meeting, if you can.
9        A. Senate Bill 14. I mean, specifically the
10   provisions in Senate Bill 14.
11       Q. (By Ms. Maranzano) And did Representative Smith
12   carry Senate Bill -- oh, wait. Did you say Senate Bill
13   14?
14       A. Oh, I'm sorry. Senate Bill 362. I'm sorry.
15       Q. Did Representative Smith carry Senate Bill 362
16   in the House?
17       A. Yes.
18       Q. And did the bill pass the House?
19       A. No.
20       Q. Why not?
21       A. It ran out of time.
22       Q. Was it essentially filibustered in the House?
23       A. I don't really remember how that worked, but I
24   think it -- yes. No. That's the wrong term. The
25   calendar was filibustered.

139

1        Q. Okay. All right. Thank you for the
2    distinction.
3        A. Yeah. I don't -- yeah.
4        Q. You testified earlier about Senate Bill 363.
5    Do you recall that --
6        A. Yes, ma'am.
7        Q. -- when we read the news article?
8            Can we have this marked as Exhibit 36?
9            (Exhibit 36 marked for identification.)
10       Q. (By Ms. Maranzano) Does this appear to be a
11   copy of Senate Bill 363 that you referred to earlier?
12       A. Yes, ma'am.
13       Q. What are the general requirements of this
14   legislation in regard to voter registration applicants?
15       A. Honestly, without reading it again, I can't
16   tell you.
17       Q. Would it sound correct to you if I said that
18   this requires voter registration applicants to prove
19   citizenship?
20           MR. FREDERICK: And take your time to read
21   it, if you need to.
22       A. (Viewing documents.) Yes.
23       Q. (By Ms. Maranzano) What was the purpose of
24   Senate Bill 363?
25           MR. FREDERICK: I object to legislative

140

1    privilege to the extent that it seeks mental
2    impressions, thought process, or confidential
3    communications, but to the extent that the question just
4    seeks the purpose of the bill, then you may answer, if
5    you know.
6        A. I don't remember.
7        Q. (By Ms. Maranzano) Was this filed at the same
8    time as Senate Bill 362?
9        A. Yes, ma'am.
10       Q. Were they filed -- would you say these bills
11   were filed in conjunction with each other?
12       A. Yes, ma'am.
13       Q. Why would it be necessary for a voter
14   registration applicant to prove their citizenship?
15           MR. FREDERICK: Objection, calls for
16   speculation.
17       A. I don't remember this bill.
18       Q. (By Ms. Maranzano) Did you work on this bill,
19   Ms. McCoy?
20       A. Not since it was filed in November of 2008.
21       Q. Do you recall that press release that we looked
22   at earlier today?
23       A. Yes, ma'am.
24       Q. And did it mention Senate Bill 363?
25       A. Yes, ma'am.

JANICE MCCOY                                                    MAY 16, 2012

141

1    Q.   And didn't you testify that you had written
2    that press release?
3    A.   Yes, ma'am.
4    Q.   Are you aware of any evidence that noncitizens
5    register to vote?
6        MR. FREDERICK:   I'll object, legislative
7    privilege, to the extent this seeks your thought
8    process, mental impressions or those of Senator Fraser
9    related to this pending legislation.   To the extent you
10   can answer just based on general knowledge, if you can,
11   you're free to do so.
12   A.   I don't know.
13   Q.   (By Ms. Maranzano)   You don't know of any
14   evidence?
15   A.   I do not.
16   Q.   Did you look into any such evidence when you
17   were working on Senate Bill 363?
18       MR. FREDERICK:   Objection, legislative
19   privilege.   Instruct you not to answer.
20   A.   I don't recall.
21   Q.   (By Ms. Maranzano)   Are you familiar with a
22   federal law called the Help America Vote Act?
23   A.   Yes.
24   Q.   Does HAVA, the Help America Vote Act, implement
25   certain identification requirements for voter

142

1    registration applicants?
2    A.   Yes.
3    Q.   Is there any reason to think that those forms
4    of identification wouldn't be sufficient?
5        MR. FREDERICK:   Objection, calls for
6    speculation.   You can answer if you can.
7    A.   Well, my understanding is, HAVA requires your
8    driver's license or your social security card number.
9    Those are the photo -- those are the IDs.
10   Q.   And if a person does not list those forms of
11   identification on their voter registration application,
12   are you familiar with any additional requirements?
13   A.   When they go to vote the first time, they're
14   supposed to show some form of ID.
15   Q.   And do you know what forms of ID are acceptable
16   HAVA?
17   A.   I do not.
18   Q.   Do you know if it's only photo identification?
19   A.   I think it's more than that, but I don't know
20   specifically.
21   Q.   Did you look into the requirements of HAVA when
22   you were working on any voter identification bills?
23       MR. FREDERICK:   Object, legislative
24   privilege.   Instruct you not to answer.
25   A.   I'll assert privilege.

143

1    Q.   (By Ms. Maranzano)   Do you know what ethnic
2    group makes up the largest percentage of the noncitizen
3    population in Texas?
4    A.   The noncitizen --
5    Q.   Uh-huh.
6    A.   -- population in Texas?   No.
7    Q.   How long have you lived in Texas?
8    A.   My whole life.
9    Q.   And you have no idea what ethic group makes up
10   the largest -- percentage of the noncitizen population?
11   A.   Do you want me to guess?
12       MR. FREDERICK:   Objection, argumentative.
13   Q.   (By Ms. Maranzano)   You can make an educated
14   guess.
15   A.   Hispanic.
16   Q.   And what's your educated guess based on?   Your
17   time in Texas?
18   A.   We're close to Mexico.
19   Q.   Okay.   Let's talk about Senate Bill 14.   When
20   did Senator Fraser introduce Senate Bill 14?
21   A.   In November of 2010, Senator Fraser filed a
22   piece of legislation -- and I don't recall the bill
23   number -- that was essentially Senate Bill 14.   When
24   session started, we refiled that legislation as Senate
25   Bill 14, so it was right January of 2011.

144

1    Q.   Would it sound correct to you if I say:   Did he
2    introduce a bill that's called Senate Bill 178?
3    A.   That's it.   Yes, ma'am.
4    Q.   And that was the one that was introduced prior
5    to the session beginning?
6    A.   Yes, ma'am.
7    Q.   Was that the same as Senate Bill 14 as it was
8    introduced?
9    A.   No, ma'am.
10   Q.   What were the changes?
11   A.   There was a provision added to Senate Bill 14
12   to exempt certain elderly people from the provisions of
13   voter ID.
14   Q.   And how did that get added?
15       MR. FREDERICK:   Object, legislative
16   privilege.   If you can answer without revealing
17   confidential communications or thought processes, you
18   may.
19   A.   I'll assert privilege.
20   Q.   (By Ms. Maranzano)   Did anyone ask Senator
21   Fraser to introduce Senate Bill 14?
22       MR. FREDERICK:   Object, legislative
23   privilege.   Instruct you not to answer.
24   A.   I'll assert privilege.
25   Q.   (By Ms. Maranzano)   Did Senator Fraser ever make



145

1  any public commitments to introduce Senate Bill 14 after
2  Senate Bill 362 did not get enacted?
3      A. Probably, but I can't definitively say.
4      Q. Was Senate Bill 14 given a designation by
5  Governor Perry as emergency legislation?
6      A. Governor Perry designated photo ID as an
7  emergency. I don't think that order specifically said
8  that bill number.
9      Q. What does it mean to be designated emergency
10 legislation?
11     A. According to the constitution, the Legislature
12 can't do anything substantive for 60 days unless the
13 Governor says it's an emergency.
14     Q. How did photo ID come to be included in the
15 Governor's designation?
16     A. I don't know. I'll just tell you. I mean...
17     Q. Did you have any conversations with anyone in
18 the Governor's Office about the emergency designation?
19     A. No.
20     Q. Did the Senator?
21     A. I don't know.
22     Q. Why would photo ID requirements need to be
23 considered within the first 60 days of the legislative
24 session?
25          MR. FREDERICK: Objection, calls for

146

1  speculation. You can answer if you know.
2      A. I don't know.
3      Q. (By Ms. Maranzano) Were there any elections
4  scheduled within the first 60 days of 2011, of the 2011
5  legislative session?
6      A. I don't think so, but I can't speak to every
7  election that local governments or...
8      Q. What other categories of -- what other topics
9  were given emergency designation in 2011?
10     A. I don't remember.
11     Q. Does legislation automatically get considered
12 within the first 60 days if it's designated as emergency
13 legislation?
14     A. No.
15     Q. Who makes the decision whether or not the
16 legislation will be heard within the first 60 days?
17     A. My guess is leadership, Lieutenant Governor or
18 the Speaker. They set the calendars.
19     Q. Did you have any conversations with anybody in
20 the Lieutenant Governor's Office about SB 14 getting
21 heard within the first 60 days of the 2011 legislative
22 session?
23          MR. FREDERICK: Object, legislative
24 privilege.
25     A. Yes.

147

1          MR. FREDERICK: I think that's calls
2  for --
3          THE WITNESS: Sorry.
4          MR. FREDERICK: Just let me finish my
5  objection, please.
6          THE WITNESS: Okay.
7      Q. (By Ms. Maranzano) Who in the Lieutenant
8  Governor's Office did you have a conversation with?
9      A. Julia Rathgeber and Blaine Brunson.
10     Q. How many conversations did you have with them?
11     A. Probably two on that issue.
12     Q. How many conversations did you have with the
13 Lieutenant Governor's Office about SB 14?
14     A. I probably spoke to them once or twice a day
15 during the whole process until voter ID left the Senate.
16     Q. And is there anybody, other than the people
17 that you've already testified to from the Lieutenant
18 Governor's Office, who you were communicating with?
19     A. In the Lieutenant Governor's Office?
20     Q. Uh-huh.
21     A. No.
22     Q. So am I correct that it was Julia Rathgeber,
23 Blaine Brunson and Bryan Hebert?
24     A. Uh-huh.
25          (Brief discussion held off the record.)

148

1      Q. (By Ms. Maranzano) Okay. Ms. McCoy, I'm
2  showing you what we've marked as Deposition Exhibit 5
3  for the record. Do you recognize what this is?
4      A. It's the enrolled version of Senate Bill 14.
5      Q. And can you look at Section 14 of the bill and
6  tell me what forms of identification are permitted under
7  Senate Bill 14?
8      A. A driver's license, an election ID certificate,
9  an ID card by DPS, a military ID card, a citizens
10 certificate, a passport, and a license to carry a
11 concealed handgun.
12     Q. What is a military identification card?
13     A. My understanding is it's a card issued by the
14 Department of Defense.
15     Q. Is it your understanding that only the
16 Department of Defense issues military IDs that would be
17 acceptable under SB 14?
18     A. Yes.
19     Q. And what's that understanding based on?
20          MR. FREDERICK: We'll object on
21 legislative privilege, only to the extent it would
22 require you to disclose confidential communications or
23 thought process. If it's based on something outside of
24 that, then you're free to answer.
25     A. I'll assert privilege.

149

1   Q.  (By Ms. Maranzano) Have you ever seen a
2   military ID card?
3        A.  No.
4        Q.  Do you know if veterans ID -- a veterans
5   identification is an acceptable form of military
6   identification under SB 14?
7        A.  I don't believe that it is.
8        Q.  And what is that based on?
9        A.  The Department of Veterans Affairs is not a
10  military. It's an executive branch agency.
11       Q.  Do you know if any Department of Homeland
12  Security identifications would be considered acceptable
13  under SB 14?
14       A.  Again, I would say no.
15       Q.  And what is that based on?
16       A.  That they're not also not military. They're
17  not under the Department of Defense.
18       Q.  What is a citizenship certificate?
19       A.  My understanding is when someone becomes a
20  citizen of the United States, they are issued a
21  certificate showing that they are now a citizen.
22       Q.  Do you know how much it costs to get a
23  citizenship certificate?
24       A.  No.
25       Q.  Do you know how much is costs to get a United

150

1   States passport?
2        A.  No.
3        Q.  Did you look into the cost of obtaining these
4   IDs when you were working on SB 14?
5        A.  No.
6        Q.  Can you look at Page 11, Section 16 of the
7   bill?  Does SB 14 increase criminal penalties for a
8   person who impersonates a voter?
9        A.  Yes.
10       Q.  Were you involved in the drafting of SB 14?
11       A.  Yes.
12       Q.  What involvement did you have?
13       A.  I presented options to Senator Fraser, and when
14  he determined what he wanted included in the bill, I had
15  it drafted by Senate Engrossing and Enrolling.
16       Q.  Who is Senate Engrossing and Enrolling?
17       A.  It's an administrative arm of the Senate that
18  works on -- it's a group of lawyers that help us with
19  bill drafts and amendments.
20       Q.  What options did you present to Senator Fraser?
21           MR. FREDERICK:  Objection, legislative
22  privilege.  Instruct you not to answer.
23       A.  I'll assert privilege.
24       Q.  (By Ms. Maranzano) Does Senate Engrossing and
25  Enrolling -- did you say that was a committee?

151

1        A.  No, ma'am. It's an administrative arm of the
2   Senate.
3        Q.  Do they provide legal advice about whether a
4   law complies with federal law?
5        A.  No.
6        Q.  Are they connected at all to the Texas
7   Legislative Council?
8        A.  No.
9        Q.  How are those two bodies different?
10       A.  The Texas Legislative Council -- well, Senate
11  Engrossing and Enrolling is strictly a body that's
12  designed to assist the senators, but they do the same
13  essential work. They work just for the Senate.
14           MS. MARANZANO:  Mr. Frederick, have you
15  produced any documents from the Engrossing and Enrolling
16  branch that Ms. McCoy is testifying about?
17           MR. FREDERICK:  I am not aware at this
18  time whether or not we have.
19           MS. MARANZANO:  Have you reached out to
20  them in terms of the document requests that were
21  propounded on the State of Texas?
22           MR. FREDERICK:  I'm not aware that we
23  have.
24           MS. MARANZANO:  It sounds to me like they
25  might have relevant documents, so I'd request that you

152

1   all do that.
2        Q.  (By Ms. Maranzano) Did you also work with the
3   TLC, Ms. McCoy, in developing SB 14?
4        A.  Yes.
5        Q.  And what was the TLC's role?
6        A.  I'm trying to remember if we did substitutes or
7   amendments. But they assisted me with either a
8   substitute or potential amendments. And then at the
9   end, they also assisted me with the conference committee
10  reports.
11       Q.  When you say -- all right. So the substitute,
12  can you tell me what the substitute was?
13       A.  I don't remember how we moved this bill through
14  the process. I don't remember if we had a substitute.
15  I don't remember if we had amendments. So once we filed
16  the bill with the E & E draft, I used the Legislative
17  Council, as we moved forward, with whatever drafting
18  needs I had. But I don't remember what those drafting
19  needs are -- were.
20       Q.  So just so I'm clear, what -- how do you
21  distinguish between the drafting E & E does versus the
22  drafting that Texas Legislative Council does? Is it the
23  process that the bill is in, or is there another
24  distinction?
25       A.  Senate Engrossing and Enrolling moves a lot



153

1    faster, so when we need quick drafts, we tend to use
2    them. Legislative Council is a little bit slower, but
3    they review all of the sections of the code to make sure
4    that we're -- if something needs to get changed for
5    compliance -- not -- compliance is not the right word,
6    but settle up reasons, they'll say, "Hey, if you're
7    amending this section of code, you need to address this
8    section, too." And so sometimes we go through Leg
9    Council, even though we know it's going slower, to make
10   sure that we've hit every part of the code or statute
11   that we need to.
12       Q. And does Leg Council also look at how
13   legislation interacts with federal law?
14       A. I don't know.
15       Q. So did you go through the Engrossing and
16   Enrolling with the initial draft of SB 14 because you
17   were on an expedited -- because you were -- it was
18   because the bill was given emergency designation?
19       A. No. We used Engrossing and Enrolling in
20   November because we wanted to get the bill filed as
21   close to the first day of filing as we could.
22       Q. And why was that?
23       A. The Senator just wanted to.
24       Q. Were there multiple drafts of SB 14 prior to it
25   being introduced?

154

1        A. Yes.
2        Q. And would E & E, Engrossing and Enrolling, be
3    the -- would they be the holders of those drafts?
4        A. No.
5        Q. Who would?
6        A. Me.
7        Q. And did you keep them?
8        A. Yes.
9        Q. And did you turn them over to your counsel?
10       A. Yes.
11       Q. Did Senate Engrossing and Enrolling draft
12   SB 362 as well?
13       A. Yes.
14       Q. Did they draft HB 218 as well?
15       A. Oh, I'm sorry. No, no, no. I'm sorry. I got
16   confused. Senate Bill 362 in 2009 was drafted by
17   Legislative Council.
18       Q. And why was that one drafted by Legislative
19   Council?
20       A. Because it was -- I think what I filed as
21   Senate Bill 362 was the Senate Committee report of House
22   Bill 218. So that's all I asked them to do. was, like
23   would you just make this document ready to file, and
24   they did.
25       Q. Who from -- if I say E & E, can we agree that

155

1    that's this Engrossing and Enrolling?
2        A. Yes, ma'am. That's how we call them.
3        Q. Okay. Who from E & E did you work with on
4    Senate Bill 14?
5        A. Mardi, M-a-r-d-i, Alexander was my contact.
6        Q. Anybody else?
7        A. She was head of E & E. I think she assigned it
8    to a lawyer, but she's who I dealt with.
9        Q. How did you communicate with Ms. Alexander?
10       A. E-mail.
11       Q. Did you save those e-mails?
12       A. If I printed out the e-mail, I saved it. If it
13   was not printed out, then it was not saved.
14       Q. And would those be in your files if you printed
15   out the e-mails?
16       A. Yes, ma'am.
17       Q. And that's the files that we talked about
18   earlier that you kept of SB 362 and SB 14?
19       A. Yes, ma'am.
20       Q. Do you know about how many e-mails you
21   exchanged Ms. Alexander?
22       A. Three or four.
23       Q. For the whole process of drafting SB 14?
24       A. Yes, ma'am.
25       Q. Was there anything you looked at, when you were

156

1    developing SB 14, that you haven't already testified to,
2    when we were talking about other bills?
3            MR. FREDERICK: Object, legislative
4    privilege. Instruct you not to answer.
5        A. I'll assert privilege.
6        Q. (By Ms. Maranzano) Did you have any
7    communications about SB 14 with other legislators?
8        A. Yes.
9        Q. Which legislators?
10       A. Throughout the process?
11       Q. Uh-huh.
12       A. I would say probably 90 percent of the
13   senators. Representative Harless.
14       Q. Anyone else?
15       A. I'm trying to think. That's -- I mean, those
16   are the ones I can remember. House members. Other
17   House members potentially, but it was probably more of
18   size than substantive.
19       Q. Did you have communications with any
20   individuals from the Governor's Office about SB 14?
21       A. Yes.
22       Q. And who was that?
23       A. Michael Scofield.
24       Q. When was that?
25       A. Throughout the legislative session.

157

1   Q.  Were those communications verbal or written?
2   A.  Verbal.
3   Q.  By phone or in person?
4   A.  Both.
5   Q.  Was Senator Fraser involved in those
6   communications?
7   A.  Yes.
8   Q.  In none of them?
9   A.  No.
10  Q.  What was the nature of those communications?
11      MR. FREDERICK:  I'll object, legislative
12  privilege.  Instruct you not to answer.
13  A.  I'll assert.
14  Q.  (By Ms. Maranzano) Did you have communications
15  about SB 14 with any interest groups or lobbyists?
16  A.  Yes.
17  Q.  What groups?
18  A.  I talked to AARP a couple of times.  I'm pretty
19  sure the Disability Coalition, although I'm not sure
20  that's how they're known, came in a time or two, and
21  that group out of Houston, the Patriots or the -- I
22  can't think of what their name is.
23  Q.  Does the King Street Patriots sound correct?
24  A.  Yes, ma'am.  The King Street Patriots.  I think
25  they came in once.  Other than that, I can't think of

158

1   any particular interest group that came in.
2   Q.  Did you have any communications with a group by
3   the name of American Legislative Exchange Council, or
4   ALEC, about SB 14?
5   A.  I did not.
6   Q.  Did the Senator?
7   A.  Not to my recollection.
8   Q.  Did you have any communications with an
9   individual by the name of Catherine Engelbrecht about SB
10  14?
11  A.  I did not, but I think she testified.  Did she
12  testify in the Senate?  I can't remember.  I'm sorry.
13  Q.  Did you have any communications with an
14  individual by the name of Paul Bettencourt about SB 14?
15  A.  Yes.
16  Q.  How many?
17  A.  Maybe two.
18  Q.  And do you remember when -- when were those
19  communications?
20  A.  I do not recall.
21  Q.  Were they in person or by phone?
22  A.  By phone.
23  Q.  Were you and he the only parties to those
24  conversations?
25  A.  As far as I know, yes.

159

1   Q.  What was the nature of those conversations?
2       MR. FREDERICK:  Object on legislative
3   privilege and instruct you not to answer.
4   A.  I'll assert.
5   Q.  (By Ms. Maranzano) Can you tell me the general
6   nature of your conversation with Mr. Bettencourt in
7   terms of a --
8   A.  I generally am having a hard -- I think -- I
9   know I talked to him.
10  Q.  Uh-huh.
11  A.  And generally, I'm -- I honestly don't recall
12  that he was helpful to me.  I don't really remember.  We
13  generally talked about Senate Bill 14.
14  Q.  How about the general nature of your
15  conversation with the King Street Patriots?
16      MR. FREDERICK:  To the extent it's a
17  general subject matter, I'll permit you to answer.
18      THE WITNESS:  Right.  Okay.
19  A.  I think generally, they came in to talk about
20  their history of monitoring elections in Harris County.
21  Q.  (By Ms. Maranzano) Did they bring up any
22  in-person voter impersonation?
23      MR. FREDERICK:  Object, legislative
24  privilege and instruct you not to answer.
25  A.  I'll assert.

160

1   Q.  (By Ms. Maranzano) Did you say there was a
2   disability group that came in, disability advocate?
3   A.  I don't -- I think that the disability
4   lobbyists, interest group came in as we were in
5   conference committee to talk to me about the language
6   that was added -- that was amended by the House.
7   Q.  And what was that amendment?
8   A.  It was the Section 1 of the bill.
9   Q.  And were they concerned about that?
10      MR. FREDERICK:  Objection, legislative
11  privilege.  Instruct you not to answer.
12  Q.  (By Ms. Maranzano) Did you have any
13  communications about SB 14 with an individual by the
14  name of Hans von Spakovsky?
15  A.  No.
16  Q.  Did you have any communications with any local
17  election officials about SB 14?
18  A.  I don't recall.
19  Q.  Did you have any communications with the Texas
20  Republican Party about SB 14?
21  A.  I don't think so, but I don't recall.
22  Q.  Did Senator Fraser exchange drafts of SB 14
23  with anyone other than Engrossing and Enrolling or TLC?
24      MR. FREDERICK:  We'll object on
25  legislative privilege to the extent that it seeks the

161

1    substance of those drafts, but the fact that drafts were
2    exchanged, you can testify if you remember.
3         A.  No.
4         Q.  (By Ms. Maranzano)  Did he discuss drafts of the
5    bill with anybody other than E & E or the Legislative
6    Council?
7              MR. FREDERICK:  Same objection and
8    instruction.  The fact of the communications you can
9    identify.
10        A.  I don't think so.
11             (Discussion held off the record.)
12             (Exhibit 37 marked for identification.)
13        Q.  (By Ms. Maranzano)  Can you take a look at --
14   and what exhibit number is -- 23?  Okay.  So I'm showing
15   what we're marking as Deposition Exhibit 37, along with
16   what's been previously marked as Deposition Exhibit 23.
17             And can you look at 37 for a moment and
18   tell me if you recognize that document?
19        A.  I do.
20        Q.  What is that?
21        A.  That's a declaration.
22        Q.  And is that your declaration?
23        A.  Yes, ma'am.
24        Q.  Did you sign that in response to providing
25   information that's contained in Interrogatory Response

162

1    Number 1 in Deposition Exhibit 23?
2         A.  Yes, ma'am.
3         Q.  What did you do to compile the list of names
4    that's included in Response Number 1?
5              MR. FREDERICK:  I'm going to object to
6    that on grounds of work product.
7              MS. MARANZANO:  But she's verifying the
8    names.  I'm just asking her what she did to compile the
9    information.  Is that --
10             MR. ROSENBERG:  Whose work product?
11             MR. FREDERICK:  Well, she compiled the
12   information at the direction of an attorney, namely
13   me.  I mean...
14             MS. MARANZANO:  I mean, I'm interested in
15   what she did to come up with the information of who
16   participated in the process of putting SB 14 together.
17   Did she talk to people?  Did she go through records?  Is
18   that, in your mind, work product?
19             MR. FREDERICK:  Hmm.  I mean, if she can
20   answer without waiving the objection.
21             MS. MARANZANO:  What about this:  What did
22   you do to make sure this was a complete list of
23   individuals responsive to Interrogatory Number 1?  Does
24   that alleviate your concerns, Mr. Frederick?  I mean,
25   she did verify in a sworn declaration that she was

163

1    supplying this information.
2              MR. FREDERICK:  Okay.  Yeah.  You can
3    answer.
4         A.  Okay.  Well, I worked with the Attorney
5    General's Office and Colby in Representative Harless's
6    office to try and remember who helped in developing and
7    analyzing Senate Bill 14, and amongst three offices,
8    this is the list we produced.
9         Q.  (By Ms. Maranzano)  Did you review any documents
10   when you were compiling this list?
11        A.  No.
12        Q.  Did you review any e-mails when you were
13   compiling this list?
14        A.  No.
15        Q.  Did you review anything, or is this solely from
16   your memory and Mr. Beuck's memory?
17        A.  I can't speak for Mr. Beuck in terms of how he
18   developed.
19        Q.  Okay.  Good point.  The names that you provided
20   here, are they solely from your memory?
21        A.  Yes, ma'am.
22        Q.  With regard to Page 3 and 4, do you see there's
23   a list of several legislators:  Representative Pena,
24   Representative Gonzalez, Representative Aliseda, and
25   they are described as co-sponsors and joint sponsors?

164

1         A.  Uh-huh.
2         Q.  Are there additional joint sponsors and
3    co-sponsors of SB 14?
4         A.  There's additional co-authors.  All of the 18
5    Senate Republicans signed on as co-authors.  I do not
6    know if there were additional co-sponsors in the House.
7         Q.  You know, I'm going to show you what we've
8    marked -- what was this -- this has been previously
9    marked as Deposition Exhibit 8.
10        A.  Uh-huh.
11        Q.  Can you look at that and tell me if it
12   refreshes your recollection as to are there other
13   co-sponsors of SB 14?
14        A.  Like I said, all the other 18 Republicans and
15   apparently, quite a few House members also were
16   co-sponsors.
17        Q.  So why are only these three of the co-sponsors,
18   these three legislators who co-sponsored or joint
19   sponsored the bill, listed in response to Interrogatory
20   Number 1?
21             MR. FREDERICK:  You know, I let you ask
22   her a little bit.  I'm very uncomfortable with this line
23   of questioning, because I think it invades attorney work
24   product that goes to the process of answering discovery,
25   and I object to the question on grounds of work product

165

1    privilege, the work product immunity.
2         MS. MARANZANO: Okay. I mean, our
3    position is she signed a sworn declaration that this is
4    complete and accurate information.
5         MR. FREDERICK: I would disagree.
6         MS. MARANZANO: True and correct.
7         MR. FREDERICK: Yes, that I would agree
8    to.
9         MS. MARANZANO: And so our position is
10   that we should be able to question her about what she
11   did to make sure it was true and correct and what she
12   meant, you know, by listing these as the individuals who
13   are responsive to the request. It's about the three.
14        The question remains about the three
15   co-sponsors and joint -- and the -- about Representative
16   Aliseda, Representative Gonzalez, Representative Pena,
17   and why those three individuals are listed in response
18   to Interrogatory Number 1 and why the other co-sponsors
19   are not listed. So let's just, you know, be clear. Are
20   you going to instruct her not to answer that question?
21        MR. FREDERICK: No. I'll permit her to
22   respond subject to my objection.
23        Q. (By Ms. Maranzano) So the question is about why
24   Representative Pena, Gonzalez and Aliseda are listed
25   here, and the description provided for them is that they

166

1    were co-sponsors and joint sponsors. But my
2    understanding is that there a number of other co-
3    sponsors and joint sponsors who are not listed here.
4         A. And those names were provided by Representative
5    Harless's Office as people that were instrumental in
6    specifically drafting, proposing, and developing Senate
7    Bill 14. My assumption, when I signed this, was that
8    the other members that supported the legislation didn't
9    draft, propose, develop, or analyze the bill. They
10   supported it, but they didn't do those fours things.
11   And so that's, I think, probably how these members got
12   on the list and not every member.
13        Q. And was the person who provided these names to
14   you, Mr. Beuck?
15        A. Yes.
16        Q. And do you see that on Page 5, Mr. Beuck is,
17   is also listed?
18        A. Yes, ma'am.
19        Q. Would it surprise you to learn that
20   Representative Harless testified yesterday that
21   Mr. Beuck was not instrumental in drafting, developing,
22   and passing SB 14?
23        MR. FREDERICK: Object, mischaracterizes
24   the testimony and assumes facts not in evidence.
25        Q. (By Ms. Maranzano) Would you like to me to read

167

1    you testimony from yesterday?
2         A. Sure.
3         Q. The question was: "And the State of Texas has
4    indicated that Mr. Beuck assisted with the drafting,
5    development, and passage of SB 14 in the Texas House of
6    Representatives. Are you aware of any assistance that
7    Mr. Beuck provided concerning the drafting of SB 14?"
8         Representative Harless said, "I have no
9    idea."
10        "Were you aware of any assistance he
11   provided in the development of SB 14?"
12        Representative Harless said, "I have no
13   idea."
14        MR. FREDERICK: Can I get page and line
15   cite for that?
16        MS. MARANZANO: Yes. That is, of the
17   dirty transcript, at Page 201, Line -- I think I started
18   reading -- I read Line 12 through Line 20. And that's
19   of the transcript that we were sent last night, not the
20   final.
21        MR. FREDERICK: Thank you.
22        Q. (By Ms. Maranzano) Would that surprise you
23   Ms. McCoy?
24        A. That she didn't remember?
25        Q. That she has no idea if Mr. Beuck was involved

168

1    in the development, drafting, and passing of SB 14?
2         A. Yes.
3         Q. Can you look at -- below Mr. Beuck's name on
4    the interrogatories, Bryan Hebert and Julia Rathgeber?
5         A. Uh-huh.
6         Q. Can you tell me what Mr. Hebert's role was in
7    the drafting of SB 14?
8         MR. FREDERICK: Object on the grounds of
9    legislative privilege. To the extent you can answer
10   without revealing -- no, I'm going to object. I'm going
11   to object to that on legislative privilege and instruct
12   you not to answer.
13        A. I'll assert privilege.
14        Q. (By Ms. Maranzano) Can you tell me what
15   Mr. Hebert's role was in analyzing SB 14?
16        MR. FREDERICK: Object, legislative
17   privilege. Instruct you not to answer.
18        A. I'll assert privilege.
19        Q. (By Ms. Maranzano) Can you tell me what
20   Ms. Rathgeber's role was in assisting with the
21   development of SB 14?
22        MR. FREDERICK: Objection, legislative
23   privilege. Instruct you not to answer.
24        A. I'll assert privilege.
25        Q. (By Ms. Maranzano) And at the bottom of Page 5,

JANICE MCCOY                                        MAY 16, 2012

169

1   the top of Page 6, do you see Mr. Battle is listed as
2   somebody who assisted with the analysis of legal
3   questions relating to SB 14. Can you tell me what legal
4   questions Mr. Battle analyzed?
5        MR. FREDERICK: Objection, legislative
6   privilege. Instruct you not to answer.
7        A. I'll assert privilege.
8        MS. MARANZANO: And is that even on what
9   issues he was looking at Mr. Frederick, what legal
10  issues he --
11       MR. FREDERICK: Yeah, that reflects the
12  thought process in mental impressions.
13       Q. (By Ms. Maranzano) And below Mr. Battle,
14  Mr. Brunson is listed as involved in the development of
15  SB 14. Can you tell me what his role was in the
16  development of SB 14?
17       MR. FREDERICK: Objection, legislative
18  privilege. Instruct you not to answer.
19       A. I'll assert privilege.
20       Q. (By Ms. Maranzano) Can you turn to Page 7, and
21  there's two individuals who are listed as staff members
22  for Senator Tommy Williams, both Amanda Montague and
23  Ryan Larue. Can you tell me why these two staffers are
24  listed here, but Senator Williams is not?
25       MR. FREDERICK: Again, this whole line of

170

1   questioning I object to. I object to that question on
2   the grounds of work product immunity.
3        Q. (By Ms. Maranzano) Why don't we do this,
4   Ms. McCoy. Can you just look through the list and tell
5   me, as you sit here today, if this looks like a true and
6   correct list of individuals involved in the drafting,
7   development -- drafting, proposing, development or
8   analysis of SB 14?
9        MR. FREDERICK: May I also note for the
10  record that the State -- I mean, as reflected in the
11  exhibit, the State made numerous objections to the
12  request, including overbreadth, undue burden.
13       But you may answer to the extent you can.
14       A. I think that potentially you could have listed
15  every elected official and every legislator in this
16  document. But I think this list is pretty complete,
17  given that Senate Bill 14 and how it was developed.
18       Q. (By Ms. Maranzano) Every -- every legislator in
19  the Texas Senate could be listed as being involved in
20  the drafting, development --
21       A. Or analysis.
22       Q. -- or analysis?
23       A. They all had a thought. They all had talked
24  about it. And if you wanted to just...
25       Q. Did you consider listing every legislator in

171

1   response to Interrogatory Number 1?
2        A. No.
3        Q. Why not?
4        MR. FREDERICK: I object. It's attorney
5   work product. I instruct you not to answer that
6   question.
7        Q. (By Ms. Maranzano) Are you following your
8   counsel's advice not to answer?
9        A. Yes.
10       Q. In drafting SB 14, did you or the Senator
11  review any studies or reports or analysis that you
12  haven't already testified about today?
13       MR. FREDERICK: You may testify to the
14  fact of yes or no whether you did.
15       A. Yes.
16       Q. (By Ms. Maranzano) What were those?
17       MR. FREDERICK: Objection, legislative
18  privilege. Instruct you not to answer.
19       Q. (By Ms. Maranzano) How many --
20       A. Well, except that in the record, we referenced
21  more recent polls, more recent public opinion polls.
22  Those types of things weren't -- and they're in the
23  record, so I'll tell you that they were there.
24       Q. Were there any polls or reports or studies or
25  analysis that you reviewed that are not in the public

172

1   record?
2        MR. FREDERICK: Again, I'll instruct you
3   that you may answer to the question posed, which is a
4   yes-or-no question.
5        A. Yes.
6        Q. (By Ms. Maranzano) And for the record, what
7   were those?
8        MR. FREDERICK: Objection, legislative
9   privilege. Instruct you not to answer.
10       A. I'll assert privilege.
11       Q. (By Ms. Maranzano) How many were there?
12       MR. FREDERICK: You know what, I'm going
13  to object to that on legislative privilege and instruct
14  you not to answer as well. That goes to thought
15  processes and mental impressions.
16       A. I'll assert privilege.
17       Q. (By Ms. Maranzano) Who were the authors or who
18  conducted these reports or studies?
19       MR. FREDERICK: Objection, legislative
20  privilege. Instruct you not to answer except to the
21  extent that the question includes matters that are on
22  the public record.
23       A. The one in particular that's on the record is
24  the one led by Lighthouse.
25       Q. (By Ms. Maranzano) Ms. McCoy, did you consider

173

1    including any additional forms of identification in
2    SB 14?
3               MR. FREDERICK: Objection, legislative
4    privilege. Instruct you not to answer the question.
5        A.   I'll assert privilege.
6        Q.   (By Ms. Maranzano) Did you consider including
7    identification forms that had expired?
8               MR. FREDERICK: Objection, legislative
9    privilege. Instruct you not to answer.
10       A.   Except that -- the answer is yes, and there's
11   an amendment where we -- the original bill required it
12   to be valid and the amendment allowed expired photo IDs
13   to be used.
14       Q.   (By Ms. Maranzano) And under SB 14, are you
15   allowed to use identification that has expired for a
16   length of time that is greater than 60 days?
17       A.   No.
18       Q.   So you're referring to the amendment that
19   allowed for identification, certain forms of
20   identification in SB 14 to be expired for 60 days --
21       A.   Yes, ma'am.
22       Q.   -- prior to the presentation? Thank you.
23            What was the purpose of excluding from
24   SB 14 the option that a voter could present two forms of
25   nonphoto ID?

174

1               MR. FREDERICK: Objection, legislative
2    privilege. Instruct you not to answer.
3        Q.   (By Ms. Maranzano) What changed between 2009
4    and 2011 that would impact what forms of voter -- what
5    forms of identification would verify a voter's identity?
6               MR. FREDERICK: I object on legislative
7    privilege. To the extent there are matters in the
8    record that you can identify, you're free to do so, but
9    don't go beyond that.
10       A.   On the record, Senator Fraser said he thought
11   the additional two years from 2009 to 2011 provided us
12   the opportunity to see that the states that had voter ID
13   were not -- that it was working.
14       Q.   (By Ms. Maranzano) What do you mean by that?
15       A.   That people were still voting, that turnout was
16   still fine, that there hadn't been any voter had come
17   forward that had been unable to vote.
18       Q.   And are you referring to anything other than
19   what we already talked about with the Senator having
20   presented the actual turnout rates from Georgia and
21   Indiana?
22       A.   No.
23       Q.   And so I believe we discussed that the Senator
24   didn't do any -- whether the Senator did any additional
25   research other than looking at the turnout rates?

175

1        A.   That's correct.
2        Q.   Okay. Ms. McCoy, how often does a driver's
3    license photo need to be renewed?
4        A.   I don't know.
5        Q.   Do you know how often a driver's license needs
6    to be renewed?
7        A.   Six years.
8        Q.   Did you think it was an important consideration
9    to look into whether -- how recent a photo would be on
10   one of the forms of identification that you were
11   requiring under SB 14?
12              MR. FREDERICK: Objection, legislative
13   privilege. Instruct you not to answer.
14       A.   I'll assert.
15       Q.   (By Ms. Maranzano) Pursuant to SB 14, who will
16   be verifying the voter's identity when they -- well, who
17   looks at the --
18       A.   The election worker.
19       Q.   And how would they do that?
20              MR. FREDERICK: Objection to the extent it
21   calls for speculation. If you know, you can answer.
22       A.   I think the legislation is designed for the
23   Secretary of State to write rules to implement that
24   provision.
25       Q.   (By Ms. Maranzano) Do you know if there's going

176

1    to be additional training given to poll workers on that
2    topic?
3        A.   I think under Senate Bill 14, the Secretary of
4    State is instructed to provide additional training.
5        Q.   Did you discuss any of these regulations with
6    the Secretary of State's Office?
7               MR. FREDERICK: I'll object on legislative
8    privilege. To the extent it calls for communications
9    between you, Senator Fraser, and the Secretary of
10   State's Office about SB 14 or any other pending
11   legislation.
12       A.   I'll assert privilege.
13              MS. MARANZANO: And just for the record to
14   be clear, are you asserting privilege over the fact of
15   whether or not she had a conversation with the Secretary
16   of State's Office?
17              MR. FREDERICK: I did not intend to, so if
18   you want to reask the question, I'm not intending to
19   prevent you from discovering that.
20       Q.   (By Ms. Maranzano) Did you have conversations
21   with the Secretary of State's Office about SB 14?
22       A.   Yes.
23       Q.   How many?
24       A.   Five or six.
25       Q.   And when were those?

177

1    A. After the bill was filed, but prior to it being
2    heard in committee.
3        Q. Were those conversations in writing or verbal?
4        A. Verbal.
5        Q. Was anybody else a party to those
6    conversations?
7        A. Yes.
8        Q. And who was that?
9        A. Bryan Hebert.
10       Q. Anyone else?
11       A. I'm trying to think. It all runs together.
12   Ryan Larue, I think, was in on one of those meetings.
13   Amanda Montague, I think, was in on one of those
14   meetings.
15       Q. Anyone else?
16       A. I don't think so.
17       Q. And were those meetings about how SB 14 would
18   be implemented?
19           MR. FREDERICK: I want to just caution the
20   witness, the question asked, you may answer, but please
21   don't reveal the substance of any communication.
22           THE WITNESS: Right.
23       A. Yes.
24       Q. (By Ms. Maranzano) And what were the nature of
25   those conversations?

178

1           MR. FREDERICK: Object on the basis of
2    legislative privilege. Instruct you not to answer.
3        A. I'll assert privilege.
4        Q. (By Ms. Maranzano) Ms. McCoy, wouldn't it be
5    fair to say that the standards by which a poll worker is
6    going to verifying the identity of a voter is pretty
7    central to the purpose of SB 14?
8            MR. FREDERICK: Objection. Objection,
9    calls for speculation. Objection to the extent it calls
10   for thoughts and mental impressions about SB 14. I
11   object on the basis of legislative privilege and
12   instruct you not to answer.
13       A. I'll assert privilege.
14           MS. MARANZANO: Let's take a break.
15           (Recess from 3:46 p.m. to 3:56 p.m.)
16           MS. MARANZANO: Back on the record.
17       Q. (By Ms. Maranzano) Ms. McCoy, you testified
18   earlier that under SB 362, a voter could show a state or
19   a federal-issued photo ID; is that correct?
20       A. Yes, ma'am.
21       Q. What was the purpose of removing that form of
22   photo identification from the required forms of ID
23   allowed under SB 14?
24           MR. FREDERICK: Objection, legislative
25   privilege. Instruct you not to answer.

179

1        Q. (By Ms. Maranzano) What was the purpose of
2    removing from SB 14 the option for voters to show a
3    valid employee ID?
4            MR. FREDERICK: Objection, legislative
5    privilege. Instruct you not to answer.
6        Q. (By Ms. Maranzano) Did any legislators express
7    concern to Senator Fraser that the election
8    identification certificate pursuant to SB 14 would be
9    difficult for their constituents to obtain?
10           MR. FREDERICK: I'll object on legislative
11   privilege. However, to the extent any concerns were
12   raised on the Floor in committee, you may testify about
13   that.
14       A. I don't recall. Yeah. That was added by the
15   conference committee, and so I -- the debate on the bill
16   at that point, I don't think anybody raised it on the
17   Floor.
18       Q. (By Ms. Maranzano) Prior to the addition of
19   the election identification certificate, was there a
20   provision that allowed for a different sort of
21   pre-identification in SB 14?
22       A. Yes.
23       Q. And was that a form of identification that
24   needed to be obtained at driver's license offices?
25       A. Yes, ma'am.

180

1        Q. And does the election identification
2    certificate also need to be obtained at driver's license
3    offices?
4        A. Yes, ma'am.
5        Q. Did anybody testify on the Floor about the
6    distance their constituents would need to travel to get
7    to a driver's license office?
8        A. Yes, ma'am.
9        Q. Did anybody testify on the Floor about the lack
10   of public transportation options available to driver's
11   license offices?
12       A. I don't specifically remember that point being
13   raised, but I'm sure it was.
14       Q. Did anybody testify on the Floor about the wait
15   times at driver's license offices?
16       A. Yes.
17       Q. Did anybody testify on the Floor about the cost
18   of obtaining the required underlying documentation to
19   obtain the identification that needed to be issued free
20   of charge under SB 14?
21       A. I don't specifically recall, but I assume yes.
22       Q. What was the Senator's response to these
23   concerns that were raised on the Floor?
24           MR. FREDERICK: I'll just object,
25   legislative privilege, only to the extent the question