JANICE MCCOY                                                    MAY 16, 2012

181

1    could be construed to ask for confidential privileged
2    communications, but anything on the Floor, you may
3    testify about.
4        A.  I don't remember how he responded to those
5    particular complaints on the Floor specifically.
6        Q.  (By Ms. Maranzano)  Did he conduct any
7    analyses, or did you conduct any analysis at his request
8    on any of these issues?
9            MR. FREDERICK:  Objection, legislative
10   privilege.  Instruct you not to answer.
11       A.  I'll assert.
12       Q.  (By Ms. Maranzano)  You'll assert the
13   privilege?
14       A.  Yes, ma'am.
15       Q.  What were the circumstances by which the
16   license to carry a concealed handgun were included in SB
17   14?
18           MR. FREDERICK:  Object on the grounds of
19   legislative privilege, to the extent it seeks thoughts,
20   mental impressions or confidential communications among
21   legislators or staff or agencies.  To the extent you can
22   answer without revealing any of that, you may.
23       A.  It was added as an amendment by Senator
24   Hinojosa.
25       Q.  Do you know the racial composition of license

182

1    to carry license holders?
2        A.  No.
3        Q.  Is it disproportionately white relative to
4    Texas registered voters?
5        A.  I do not know.
6        Q.  Are you aware of whether any staff or
7    legislator investigated the racial composition of
8    license to carry holders?
9            MR. FREDERICK:  I'll object only to the
10   extent that it seeks the substance or nature of the
11   investigations, whether or not you were aware, you may
12   answer.
13       A.  I am not aware.
14       Q.  (By Ms. Maranzano)  Was there any discussion
15   expressing concern that this form of identification
16   might disproportionately favor white voters?
17           MR. FREDERICK:  Object on the grounds of
18   legislative privilege, to the extent there was
19   discussion on the Floor and committee on the record, you
20   may answer.
21       Q.  (By Ms. Maranzano)  Are you asserting
22   privilege?
23       A.  Well, Senator Hinojosa offered the amendment,
24   so I think -- I don't -- I can't speak to his research
25   on the bill or on his amendment.

183

1        Q.  Was there any discussion expressing concern
2    that this form of ID might disproportionately favor
3    white voters?
4            MR. FREDERICK:  Same objection,
5    legislative privilege, only to the extent it seeks
6    confidential communications, but to the extent that
7    there were.
8        A.  Not that I know of.
9        Q.  (By Ms. Maranzano)  How did the exception for
10   individuals with disabilities come to be included in SB
11   14?
12           MR. FREDERICK:  Object on legislative
13   privilege, only to the extent it seeks confidential
14   communications and thought processing and mental
15   impressions.  To the extent it seeks information about
16   the legislative process or testimony, you may answer.
17       A.  Senator Patrick offered an amendment, and
18   Senator Fraser accepted it.
19       Q.  (By Ms. Maranzano)  What was the purpose of
20   this provision?
21           MR. FREDERICK:  Object to the legislative
22   privilege.  I instruct you not to answer.
23       A.  I think that the record -- Senator Patrick
24   probably on the record said why he wanted to include
25   it.  I don't recall what he said.

184

1        Q.  (By Ms. Maranzano)  Was this amendment in
2    response to concerns by any particular groups or
3    constituencies?
4            MR. FREDERICK:  Object on the basis of
5    legislative privilege.  To the extent there's -- you
6    have any nonprivileged basis to answer, you may.
7        A.  I think that -- well, again, I don't want to
8    speak for Senator Patrick because I -- I don't want to
9    speak for Senator Patrick.  But there was an individual
10   that testified on the Floor during the Senate committee
11   debate that was fairly moving, and I think Senator
12   Patrick wanted to do something to help him.
13       Q.  (By Ms. Maranzano)  What was the general nature
14   of that testimony?
15       A.  I don't know.  I didn't listen to it.
16       Q.  Was there any testimony on the Floor related to
17   difficulties other individuals might have obtaining
18   identification?
19       A.  I don't know.  I didn't listen to the
20   testimony.
21       Q.  What -- what was your -- your role during the
22   Floor consideration of SB 14?
23           MR. FREDERICK:  I would just caution you
24   not to reveal any confidential communications or mental
25   impressions or thought process, but as to your -- the

185

1  process, you may answer.
2      A. It was the same as what we had testified
3  earlier, I think, on the Senate bill 362, and I sat next
4  to the Senator and helped him with his debate and
5  providing him information that he asked me to provide
6  him during the debate.
7      Q. (By Ms. Maranzano) So you were on the Floor
8  with him during the debate?
9      A. During the Committee of the Whole, yes, ma'am.
10     Q. And when you say this individual testified with
11  moving testimony that potentially led Senator Patrick to
12  include this exemption, was that during the Committee of
13  the Whole?
14     A. Yes, ma'am.
15     Q. How did the exception for individuals with
16  religious objections to being photographed come to be
17  included in SB 14?
18         MR. FREDERICK: I'll object only to the
19  extent that it seeks confidential communications,
20  thought processes or mental impressions. But to the
21  extent it seeks the process or public discussion, you
22  may answer.
23     A. I'll assert privilege. I don't -- yeah.
24         MR. FREDERICK: I mean, just -- I want to
25  be clear with you. I'm not instructing her not to

186

1  answer about when it was introduced or how it became
2  part of the bill. And so I think if you want to probe
3  that further, I'm not objecting to that part.
4         MS. MARANZANO: Okay.
5      Q. (By Ms. Maranzano) Was that provision added in
6  response to any particular concern, Ms. McCoy?
7         MR. FREDERICK: I'll just -- only to the
8  extent it seeks mental impressions, communications, but
9  if there's testimony, Floor testimony, and if you know,
10  you may answer.
11     A. There was not Floor testimony on that issue.
12     Q. (By Ms. Maranzano) During the drafting of the
13  legislator's consideration of SB 14, was there analysis
14  of the cost that a voter would need to take -- the cost
15  or the steps the voter would need to take to obtain an
16  election identification certificate?
17         MR. FREDERICK: Objection, legislative
18  privilege. Instruct you not to answer.
19     A. I'll assert privilege.
20     Q. (By Ms. Maranzano) What documents are needed
21  to obtain an election identification certificate?
22     A. I don't know.
23     Q. Was that something that you -- I'm sorry. You
24  can finish your answer.
25     A. I used to know, but I don't know now.

187

1      Q. Was that something that you looked into while
2  developing SB 14?
3      A. Yes, ma'am.
4      Q. And were the costs, in particular, something
5  that you looked into while developing SB 14?
6         MR. FREDERICK: Object on the grounds of
7  legislative privilege. Instruct you not to answer.
8      A. I'll assert privilege.
9      Q. (By Ms. Maranzano) If there are costs to
10  obtaining underlying documentation for the election
11  identification certificate, is it fair to say the
12  election identification certificate is not actually
13  free?
14         MR. FREDERICK: Object to the form of the
15  question. Object, it calls for speculation. And object
16  to relevance. If you -- if you have an opinion, you may
17  answer.
18     Q. (By Ms. Maranzano) Do you have an opinion?
19     A. I do not.
20     Q. You have no opinion on that?
21     A. I don't know which documents are required to
22  get an ID at this point. I don't remember. And so I
23  don't recall why people wouldn't or would not have
24  them. So my opinion, I mean, I'd have to go back and
25  kind of look.

188

1      Q. If -- if you were to determine that there were
2  costs to obtaining those underlying documentations for
3  an individual who did not have them --
4      A. Right.
5      Q. -- would you say it would be fair to
6  characterize the election identification certificate as
7  free?
8         MR. FREDERICK: Objection to the form of
9  the question. You can answer if you can.
10     A. I suppose not.
11     Q. (By Ms. Maranzano) Do you know when driver's
12  license offices are open in Texas?
13     A. I do not.
14     Q. Does SB 14 require employers to provide paid
15  leave to obtain an ID?
16     A. No.
17     Q. Do some individuals in Texas live at least 50
18  miles from a driver's license office?
19     A. I think there was testimony to that effect,
20  yes.
21     Q. How much does gas cost in Texas?
22     A. Texas is a big state. It varies. I think in
23  Austin right now it's 3.55 a gallon.
24     Q. So how much would it cost for somebody to drive
25  a hundred miles round trip?

JANICE MCCOY                                                    MAY 16, 2012

189

1       MR. FREDERICK: Objection, calls for
2   speculation.
3       A.   Depends on their car, how they drive.
4       Q.   (By Ms. Maranzano) Do you know whether any
5   racial or ethnic group is more likely than not have the
6   necessary ID to obtain the election identification
7   certificate?
8       MR. FREDERICK: I'll object only to the
9   time extent that this can be construed to seek
10  information related to the development of SB
11  14. Insofar as you can answer based on your knowledge,
12  sitting here today, you may answer.
13      A.   Can you repeat the question?
14      Q.   (By Ms. Maranzano) Is there any racial or
15  ethnic group that is more likely to not possess the
16  underlying documentation needed to obtain election
17  identification certificate?
18      A.   I do not know.
19      Q.   Is that something that you ever looked into
20  during the development of SB 14?
21      MR. FREDERICK: Objection, legislative
22  privilege.  I instruct you not to answer.
23      A.   I'll assert privilege.
24      Q.   (By Ms. Maranzano) Did you ever look into or
25  analyze who among registered voters would be -- might

190

1   not have the forms of identification included in SB 14?
2       MR. FREDERICK: Objection, legislative
3   privilege.  I instruct you not to answer, except to the
4   extent you can do so based on nonconfidential matters or
5   nonprivileged matters.
6       A.   The specific question again was?
7       Q.   (By Ms. Maranzano) Did you ever research or
8   analyze who among registered voters in Texas would be
9   more likely or less likely to have the required forms of
10  identification under SB 14?
11      A.   No.
12      Q.   No, you never looked into that?
13      A.   That is correct.
14      Q.   Why not?
15      MR. FREDERICK: Objection, legislative
16  privilege.  Instruct you not to answer.
17      A.   I'll assert privilege.
18      Q.   (By Ms. Maranzano) Would you agree that that
19  might be a relevant inquiry pursuant to Section 5?
20      MR. FREDERICK: Objection, calls for
21  speculation.  Objection, calls for a legal opinion.  You
22  can answer if you can.
23      A.   As I testified earlier, I didn't really
24  consider Section 5 when I was helping the Senator
25  develop this bill.

191

1       Q.   (By Ms. Maranzano) Did the Senator seek legal
2   advice from anybody about to ensure that Senate Bill 14
3   would comply with Section 5?
4       MR. FREDERICK: I'm going to object on the
5   grounds that it seeks information within the attorney-
6   client privilege.  I think the fact that he might have
7   sought some legal would not itself be privileged, but
8   the question -- the question entails the substance of
9   the advice that he may or may not have sought, so I
10  object on that ground.
11      MS. MARANZANO: And you're instructing
12  Ms. McCoy not to answer?
13      MR. FREDERICK: Yes.  Yes.
14      Q.   (By Ms. Maranzano) Are you going to follow
15  your counsel's advice?
16      A.   Yes, ma'am.
17      Q.   Was the passage of SB 14 a priority for Senator
18  Fraser?
19      MR. FREDERICK: I'll object on legislative
20  privilege and instruct you not to answer as to the
21  extent it calls for confidential communications, but to
22  the extent it's in a public statement or testimony, you
23  can answer.
24      A.   I think the answer is he consistently told his
25  constituents that he thought voter ID needed to be

192

1   passed.
2       Q.   (By Ms. Maranzano) Did his constituents ask
3   for him to pass some sort of voter ID law?
4       MR. FREDERICK: We'll object to the extent
5   that seeks -- to the extent it seeks the substance of
6   any particular constituent communication.  If you can
7   answer based on nonconfidential communications from
8   constituents, you may answer.
9       A.   I assert the privilege.
10      Q.   (By Ms. Maranzano) Was passage of SB 14 a
11  priority for Governor Perry?
12      A.   He declared it an emergency.  I can't speak
13  further than that.
14      Q.   Was passage of the SB 14 a priority for any
15  interest groups that you're aware of?
16      A.   Not that I'm aware of, no.
17      Q.   What was the purpose of SB 14?
18      MR. FREDERICK: I'm just going to give a
19  cautionary instruction.  You may testify about the
20  purpose of SB 14 to the extent you know.  I would only
21  caution you not to reveal the substance of the
22  confidential communications between yourself and the
23  legislature or any legislative thought process or mental
24  impressions.  But as to the purpose of the bill, you may
25  testify.

JANICE MCCOY                                                                MAY 16, 2012

193

1      A.  Senator Fraser consistently said on the record
2   that his purpose was to stop in-person voter fraud.
3      Q.  (By Ms. Maranzano)  Were there any additional
4   purposes to SB 14?
5      A.  Election integrity.
6      Q.  What does that mean?
7      A.  It means -- it means that elections are valid
8   and true and there isn't fraud.
9      Q.  Any other purposes?
10     A.  (Witness shakes head no.)  No.  I'm sorry.
11     Q.  Thank you.  Were there any purposes of SB 14
12  that were not stated on the public record?
13          MR. FREDERICK:  Object, legislative
14  privilege.  Instruct you not to answer.
15     Q.  (By Ms. Maranzano)  Are you following your
16  counsel's advice?
17     A.  I am.
18     Q.  Was any part of the purpose of SB 14 to
19  decrease the number of Hispanic voters?
20          MR. FREDERICK:  Object, legislative
21  privilege.  Instruct you not to answer.
22     A.  I'll assert privilege.
23     Q.  (By Ms. Maranzano)  Was any part of the purpose
24  of SB 14 to decrease the number of any group of minority
25  voters?

194

1          MR. FREDERICK:  Objection, legislative
2   privilege.  I'll instruct you not to answer.
3      A.  I'll assert.
4      Q.  (By Ms. Maranzano)  Was any part of the purpose
5   of SB 14 to discriminate in any way against any group of
6   minority voters?
7          MR. FREDERICK:  Objection, legislative
8   privilege.  Instruct you not to answer.
9      A.  Assert the privilege.
10     Q.  (By Ms. Maranzano)  Was any part of the purpose
11  of SB 14 for partisan purposes?
12          MR. FREDERICK:  Objection, legislative
13  privilege.  I'll instruct you not to answer.
14     A.  Assert the privilege.
15     Q.  (By Ms. Maranzano)  Did the purpose of photo ID
16  in Texas evolve over time in legislative sessions?
17          MR. FREDERICK:  Object on the basis of
18  legislative privilege.  Instruct you not to answer
19  unless you can do so based on public statements or
20  testimony.
21     A.  Senator Fraser's stated purpose has always been
22  to be prevent in-person voter fraud across the sessions.
23     Q.  (By Ms. Maranzano)  Have you ever heard of a
24  voter who decides not to vote on election day because
25  they're worried their vote will be diluted by a

195

1   nonlegitimate voter?
2      A.  No.
3      Q.  Who are the main opponents of SB 14?
4      A.  I think the Senate Democrats, Democrat
5   members.  I think the Texas Democratic party.
6      Q.  Did any minority members of the Senate support
7   SB 14?
8          MR. FREDERICK:  Object on legislative
9   privilege, only to the extent that support or opposition
10  was expressed confidentially by a legislator or staff
11  member to you.
12     A.  No minority senator voted for the bill.
13     Q.  (By Ms. Maranzano)  Did any groups representing
14  minority voters support SB 14?
15          MR. FREDERICK:  Same cautionary
16  instruction.  You may answer to the extent that you know
17  from public statements or the legislative record, but
18  caution you not to reveal any privileged matter
19  communicated to you by a constituent.
20     A.  I don't know.
21     Q.  (By Ms. Maranzano)  Did the Senator consider
22  any alternative legislative measures that would have
23  deterred voter fraud?
24          MR. FREDERICK:  Objection, legislative
25  privilege, and instruct you not to answer.

196

1      A.  I'll assert.
2      Q.  (By Ms. Maranzano)  What was the Senator's
3   strategy to ensure that Senate Bill 14 was passed?
4          MR. FREDERICK:  Objection, legislative
5   privilege.  Instruct you not to answer.
6      A.  I'll assert.
7          (Exhibit 38 marked for identification.)
8      Q.  (By Ms. Maranzano)  Ms. McCoy, I'm showing you
9   what we marked as Deposition Exhibit 38.  Do you
10  recognize what this -- what this is?
11     A.  Yes.
12     Q.  What is it?
13     A.  It's the Senate Rules Adopted by the 82nd
14  Legislature.
15     Q.  And this, what I've given you is actually the
16  table of contents and some portion of the rules.  It's
17  not the entire set of Senate rules.  Can you look at the
18  table of contents and tell me what procedural rules are
19  implicated by the consideration of SB 14, what
20  procedural rules were applied to SB 14's consideration?
21          MR. FREDERICK:  Objection, vague.  You can
22  answer if you can.
23     A.  I'm not sure.
24     Q.  (By Ms. Maranzano)  Oh, you know what, that
25  looks like it's highlighted.

197

1    A. It is highlighted. Is that the one you want?
2        MS. MARANZANO: Why don't we mark a clean
3    one for the record.
4        MR. FREDERICK: Here, that one's got a
5    mark on it. I've got a clean one right here.
6        MS. MARANZANO: Thank you.
7        MR. FREDERICK: Here's your highlighted
8    one.
9        (Clean copy Exhibit 38 exchanged for
10   highlighted copy originally marked.)
11   A. I don't --
12   Q. (By Ms. Maranzano) If you look -- let's look
13   at Rule 5.11.
14   A. Yes, ma'am.
15   Q. Subsection D of 5.11. Is that the same
16   provision that we talked about earlier that was included
17   in the 2009 rules that carves out voter identification
18   requirements from the two-thirds rule?
19   A. Yes, ma'am.
20   Q. And can you look at Rule 16 for me?
21       You can scratch looking at Rule 16.
22       THE REPORTER: I'm sorry. I didn't get
23   that.
24       MS. MARANZANO: I said she could scratch
25   reviewing Rule 16.

198

1    Q. (By Ms. Maranzano) Can you look at Rule 12.03
2    about conference committees?
3    A. Yes, ma'am.
4    Q. And do you see that Section 4 states -- well,
5    can you read Section 4 for me and tell me what your
6    understanding of that subsection of the rule is?
7    A. "Add text on any matter which is not included
8    in either the House or Senate version of the bill or
9    resolution."
10   Q. What's your understanding of what this rule
11   does?
12   A. That rule says that when a bill is in
13   conference committee, they -- the conference committee
14   should not consider including provisions that weren't in
15   either of the House or Senate passed versions.
16   Q. How many times have you seen that section of
17   the rule disregarded while you've worked for Senator
18   Fraser?
19   A. Probably happens 20 to 30 times a session.
20   Q. What type of bills does that happen on?
21   A. All types.
22   Q. Was SB 14 considered by any -- you know what,
23   scratch that. I think we've talked about that already.
24       What did you do to ensure that Senator
25   Fraser was prepared for Floor consideration of SB 14?

199

1        MR. FREDERICK: Object based on
2    legislative privilege, to the extent it calls for
3    substance of any communication or your thought process
4    or Senator Fraser's thought process. However, to the
5    extent you can answer without revealing that, you may
6    describe your preparation.
7    A. Typically, when we do floor prep for Senate
8    Bill 14 or any bill, we put together a bill book, which
9    includes the bill, the bill analysis, the fiscal notes,
10   any supporting documentation and talking points. And
11   that's what I did for Senate Bill 14.
12   Q. (By Ms. Maranzano) And do you write the
13   talking points?
14   A. Yes. Or -- not for every bill. I did for
15   Senate Bill 14.
16   Q. And is the bill analysis what we've previously
17   discussed, a section-by-section analysis of the bill?
18   A. Yes, ma'am.
19   Q. And do you write that?
20   A. No, ma'am.
21   Q. Who does?
22   A. Those are prepared through the committee
23   process, and I think the Senate Research Center prepares
24   those.
25   Q. Are you familiar with this Floor testimony on

200

1    SB 14?
2    A. Generally.
3    Q. And I believe you testified earlier you were
4    with the Senator, correct?
5    A. For some of it. I don't -- I think I got up
6    and left for part of it. Actually, I know I got up and
7    left for part of it.
8    Q. During the Floor consideration of SB 14, did
9    Senator Fraser answer any questions about SB 14 by
10   saying he was not advised?
11   A. Can we be clear when we're talking about Floor
12   consideration, Committee of the Whole consideration
13   or Floor? Specifically when we talk about the Floor,
14   it's when they're actually in session on the Floor. The
15   Committee of the Whole meets on the senate Floor, just
16   because there's no other place for them to meet.
17       So during the Committee of the Whole
18   debate, there were times that Senator Fraser said "I'm
19   not advised."
20   Q. What does that mean, "I'm not advised"?
21       MR. FREDERICK: Object, based on
22   legislative privilege, only to the extent it asks for
23   Senator Fraser's thought process or mental impressions.
24   To the extent you can answer from your own personal
25   knowledge of what "I'm not advised" means, you may.

JANICE MCCOY                                                MAY 16, 2012

201

1    A.  Typically, when a senator says that, it means
2  they don't know.
3    Q.  (By Ms. Maranzano)  About how many questions
4  did he answer by saying "I'm not advised"?
5    A.  I don't know.
6    Q.  Can you approximate?
7    A.  No.
8    Q.  Would you say it was hundreds?
9    A.  I don't remember.
10   Q.  Isn't it part of the Senator's role as author
11 of the bill to answer questions about the bill?
12        MR. FREDERICK:  Objection, argumentative.
13 You may answer.
14   A.  The Senator offered his colleagues that he
15 didn't know the answer to some questions and that
16 resource and expert witnesses were going to testify
17 later during the committee, and those questions would be
18 better addressed to those resource expert witnesses.
19   Q.  (By Ms. Maranzano)  Did anyone instruct Senator
20 Fraser not to answer substantive questions about SB 14
21 during the Committee of the Whole?
22        MR. FREDERICK:  Objection, legislative
23 privilege.  Instruct you not to answer.
24   A.  I'll assert privilege.
25   Q.  (By Ms. Maranzano)  During -- during the

202

1  Committee of the Whole's consideration of SB 14, did
2  anyone raise concerns about the impact of SB 14 on
3  minority voters?
4    A.  Yes.
5    Q.  What was the Senator's response?
6    A.  I don't remember.
7    Q.  You don't recall how he responded?
8    A.  (Witness shakes head no.)
9    Q.  Did numerous senators raise concerns about the
10 impact of SB 14 on minority voters?
11        MR. FREDERICK:  Objection, legislative
12 privilege, only to the extent it calls for confidential
13 communications.  Anything on the committee or on the
14 Floor, you may testify about.
15   A.  I think that 10 of the 12 Democrat senators
16 testified against the bill during the Committee of the
17 Whole.  May have been 9.  May have been 11.  It wasn't
18 all 12.
19   Q.  (By Ms. Maranzano)  But my question was about
20 testimony related to concerns about the impact of SB 14
21 on minority voters.  It not about --
22   A.  I don't recall what they said.  I know that
23 many senators testified against the bill, but I can't
24 recall what each of them said.  So I cannot answer that
25 question.

203

1    Q.  Was that testimony that you would consider to
2  be important?
3        MR. FREDERICK:  Objection, vague.  You may
4  answer.
5    A.  To some people, yes.
6    Q.  (By Ms. Maranzano)  How about to you?
7    A.  No.
8    Q.  Why not?
9    A.  I just work for the Senator.  I don't --
10   Q.  Well, part of your job in working for the
11 Senator is giving him advice on this bill, is it not?
12   A.  Yes.
13   Q.  And so the impact of this bill on minority
14 voters is a relevant consideration, is it not?
15   A.  Yes.
16   Q.  So I'm just wondering why that wasn't an
17 important testimony to you.
18        MR. FREDERICK:  Object to the extent it
19 mischaracterizes the testimony, but you may answer if
20 you can.
21   A.  I think that the position that the Senator had
22 relative to this bill wasn't going to change because of
23 testimony we heard in January of 2011, because we heard
24 the same testimony in January of 2009, and we heard the
25 same testimony in May of '07.

204

1        So the testimony is important to the
2  people that were giving it, mainly, I think, because
3  they were trying to put it on the record for you guys,
4  but it wasn't going to change my recommendations to the
5  Senator on how to proceed with this legislation.
6    Q.  (By Ms. Maranzano)  Did you take any actions
7  with regard to Senate Bill 14 in response to those
8  concerns?
9        MR. FREDERICK:  Objection, legislative
10 privilege.  Instruct you not to answer.
11   A.  I'll assert privilege.
12        (Exhibit 39 marked for identification.)
13   Q.  (By Ms. Maranzano)  I'm showing you what we've
14 marked for the record as Deposition Exhibit 39.  Can you
15 turn to the label at the bottom, Texas 00000098, and
16 look at the portion of the print?
17        Well, let me ask you first, do you
18 recognize this document, or can you tell me what this
19 document is?
20   A.  I've never seen this document, but it is a
21 transcript of the Committee of the Whole from Tuesday,
22 January 25, 2011.
23   Q.  Can you look at the transcript Page 168.  And
24 do you see that there's a question posed by Senator Wes
25 as to whether the forms of identification that are

205

1  listed in the bill are the least restrictive options in
2  order to achieve the goal of avoiding what you have said
3  is voter identification fraud?
4      A.  Uh-huh.  Yes.
5      Q.  And can you look at Senator Fraser's answer to
6  that?
7      A.  (Witness complies.)
8      Q.  Is that a topic that you looked into prior to
9  introducing Senate Bill 14 of whether this was the least
10  restrictive way to achieve the Senator's goal?
11         MR. FREDERICK:  Objection, legislative
12  privilege.  Instruct you not to answer.
13      A.  I'll assert privilege.
14      Q.  (By Ms. Maranzano)  Can you tell me anything
15  about that topic based on the comments that were made in
16  public during the Committee of the Whole, Ms. McCoy?
17         MR. FREDERICK:  Object to the form, but
18  you may answer.
19      A.  Well, I can speak to what Senator Fraser said.
20  The Secretary of State had provided us information,
21  which he referenced here, showing that people -- 91
22  percent of voters registered with their driver's license
23  under HAVA.
24      Q.  (By Ms. Maranzano)  90 percent of the -- of
25  voter registration applicants registered with their

207

1  the top?  Actually, the quote starts -- I'm sorry.  The
2  quote starts on Page 188 from Senator Fraser.  If you
3  can just take a look at that.
4         Does that appear to be saying that there
5  are very small differences between Texas's bill and
6  Indiana and Georgia's bill?
7      A.  That does what it seems to be saying.
8      Q.  Are you familiar with the Indiana and Georgia
9  photo identification requirement?
10      A.  No.
11      Q.  Didn't you testify earlier that you had looked
12  at those two states when you were developing SB 14 362?
13      A.  We looked at voter turnout from those two
14  states.  I never looked at the legislation.
15      Q.  So, Ms. McCoy, you've never looked at either
16  Indiana or Georgia's photo identification requirements?
17      A.  I might have printed out a copy of Indiana's,
18  and I might have seen a table that included the
19  different IDs that allowed under every state's photo ID
20  law, but I've never looked at Indiana or Georgia's
21  legislation in depth, no.
22      Q.  So do you have any position on whether the
23  Indiana and Georgia identification requirements are
24  similar to SB 14?
25      A.  I do not have a position, no.

206

1  driver's license number?
2      A.  Under the HAVA requirement.
3      Q.  And do you know when HAVA started requiring
4  people to write down their driver's license number?
5      A.  Texas passed its version of HAVA in 2005, so I
6  would assume it took a while to make sure -- it started
7  probably that fall of 2005 or 2006.  Sometimes we start
8  things in January of the next year.
9      Q.  And did anybody ever -- or did you or the
10  Senator ever conduct any analysis of who those 10
11  percent, approximately 10 percent of registered voters
12  without driver's license numbers might be and whether or
13  not they might have any other forms of identification?
14         MR. FREDERICK:  Objection, legislative
15  privilege, and instruct you not to answer.
16      A.  I'll assert privilege.
17      Q.  (By Ms. Maranzano)  Okay.  I'm going to have
18  this marked.
19         (Exhibit 40 marked for identification.)
20      Q.  (By Ms. Maranzano)  I'm showing you what we are
21  marking as Deposition Exhibit 40, which is a transcript
22  of another transcript of the Committee of the Whole from
23  Tuesday, January 26, 2011.
24         Can you look at the second page of this
25  document that's labeled on the transcript as Page 189 at

208

1         (Exhibit 41 marked for identification.)
2      Q.  (By Ms. Maranzano)  Okay.  I'm showing you what
3  we've marked as Deposition Exhibit --
4         MR. FREDERICK:  Do you have one for me?
5         MS. MARANZANO:  Sorry.  I only have one
6  copy.
7         MS. WESTFALL:  Can you look on with the
8  witness?
9         MR. FREDERICK:  Oh, yeah, yeah, I'll look
10  at this one.
11      Q.  (By Ms. Maranzano)  Ms. McCoy, this is a
12  transcript from July 26, 2011.  The Committee of the
13  Whole's consideration of SB 14.  I'm going to direct you
14  to certain pages, but I want to say at the beginning,
15  this transcript has two sets of pagination.  On the
16  left-hand side, it says "CD Number" and "Section
17  Number," and then it also has a page.  So I will give
18  you both of those, because it has -- the pagination
19  restarts with every CD and section number.
20      A.  Okay.  But I want to clarify this isn't from
21  the Committee of the Whole.  This is from when the
22  Senate was actually in session as the Senate.
23      Q.  Okay.  Thank you for that clarification.
24      A.  You're welcome.
25      Q.  Can you turn to Page 34 on CD 1, Section 1?

JANICE MCCOY                                              MAY 16, 2012

209

1    A.  Hold on.  Okay.
2    Q.  Were you on the Floor with the Senator during
3    -- during the Floor consideration on January 26th of SB
4    14?
5    A.  Yes, but --
6    Q.  Yes, but?
7    A.  Can I just clarify?
8    Q.  Yes, please.
9    A.  During the Committee of the Whole, I could
10   actually be inside the rail right next to the Senator.
11   When the Senate was in full session, I had to be outside
12   the rail away from the Senator's desk.
13   Q.  Okay.  Did you communicate with the Senator
14   during that time?
15   A.  As much as you can if they turn around and look
16   at you.
17   Q.  You didn't -- you didn't communicate by a
18   Blackberry or cell phone?
19   A.  No, ma'am.
20   Q.  Okay.  Can you take a look at on Page 34, where
21   it starts with the testimonies by Davis?  Can you just
22   take a look at that?
23   A.  I think I'm on the wrong page.
24       MR. FREDERICK:  I think you're on Section
25   2.  Got Section 1.

210

1    A.  Okay.
2        MR. FREDERICK:  Yeah.
3    A.  Okay.
4    Q.  (By Ms. Maranzano)  Can you just take look at
5    that amendment which starts with Davis?  And then the
6    action that's taken on that amendment is lower on the
7    page.  Do you recall this amendment being offered?
8        MR. FREDERICK:  Just to clarify, is
9    this -- is it Floor Amendment 12 we're talking about?
10       MS. MARANZANO:  Yes.  I think that's
11   right.
12   A.  I don't recall, because I'm not seeing the text
13   of the amendment.
14   Q.  (By Ms. Maranzano)  Uh-huh.
15   A.  So I don't -- I don't recall.
16   Q.  Do you recall that Senator Davis introduced an
17   amendment to prohibit state agencies from charging fees
18   for the issuance of any acceptable ID under SB 14?
19   A.  Not really, no.
20   Q.  Do you recall that Senator Fraser moved to
21   table that amendment?
22   A.  I mean, I can see that he did.  I don't recall
23   this particular part of the debate.
24   Q.  Did you have any role in recommending to him
25   how to handle amendments to SB 14?

211

1        MR. FREDERICK:  Well, you may answer the
2    question whether or not you had a role.
3    A.  Yes.
4    Q.  (By Ms. Maranzano)  What was your role?
5        MR. FREDERICK:  I'll object to legislative
6    privilege, to the extent it seeks confidential
7    communications, thought processes or mental
8    impressions.  But to the extent you can describe your
9    role without going into that, then you may answer the
10   question.
11   A.  I provided the Senator with some thoughts on
12   what he could say if certain amendments that we thought
13   were going to be introduced were introduced.
14   Q.  (By Ms. Maranzano)  And did you provide him
15   with a recommendation on how to vote on certain
16   amendments?
17       MR. FREDERICK:  Just caution you, I mean,
18   you can answer the question as phrased, whether or not
19   you offered a recommendation.
20   A.  I did not.
21   Q.  (By Ms. Maranzano)  Why -- well, how would this
22   amendment introduced by Senator Davis have interfered
23   with the Senator's goals of deterring voter fraud?
24       MR. FREDERICK:  Object on legislative
25   privilege.

212

1    Q.  (By Ms. Maranzano)  Ms. McCoy, as you're
2    sitting here today, are you aware of any ways in which
3    not charging for the acceptable forms of identification
4    under SB 14 would interfere with the goal of deterring
5    in-person voter impersonation?
6    A.  No.
7    Q.  Can you turn to what's labeled as CD-1, Section
8    2, Page 28 through 30?
9    A.  (Witness complies.)
10   Q.  You see that this testimony is related to an
11   amendment proposed by Senator Ellis that would have
12   required the Secretary of State to conduct a study
13   including information about the number of eligible
14   voters who are prevented from voting or have to vote
15   provisionally because they lacked an ID?
16   A.  Yes.
17   Q.  And do you recall that amendment being offered?
18   A.  Yes, ma'am.
19   Q.  Did you provide a recommendation to Senator
20   Fraser as to how to handle that amendment?
21       MR. FREDERICK:  I'll caution.  You can
22   answer the question as phrased, as long as you don't
23   reveal the substance of any confidential communication.
24   A.  No.
25   Q.  (By Ms. Maranzano)  Did Senator Fraser move to

213

1    table that amendment?
2         A.  Yes.
3         Q.  And how would conducting a study about who was
4    impacted by SB 14 have interfered with the Senator's
5    goals of deterring in-person voter impersonation?
6              MR. FREDERICK:  Objection, legislative
7    privilege.  Instruct you not to answer.
8         A.  I'll assert privilege.
9         Q.  (By Ms. Maranzano)  Was Senator Fraser
10   concerned that such a study would show that minorities
11   are disproportionally impacted by Senate Bill 14?
12             MR. FREDERICK:  Objection, legislative
13   privilege.  Instruct you not to answer.
14        A.  I'll assert privilege.
15        Q.  (By Ms. Maranzano)  Can I have you turn to --
16   I'm going to actually get out another exhibit.
17             (Exhibit 42 marked for identification.)
18        Q.  (By Ms. Maranzano)  I'm showing you what we're
19   marking as Deposition Exhibit 42.  If you could look at
20   the side of the page that has 28 at the top.  Actually,
21   I'm sorry.  It starts on the bottom of 27.  There's an
22   amendment presented by Senator Gallegos that goes to the
23   top.
24             Do you see that Senator Gallegos offered
25   an amendment that would have required driver's license

214

1    offices to be open until 7 p.m. on one weekend and
2    during four or more hours on at least two Saturdays per
3    month?
4         A.  Yes.
5         Q.  Did you provide a recommendation to Senator
6    Fraser as to how to vote on this bill -- on this
7    amendment?
8              MR. FREDERICK:  I just caution.  You may
9    answer the question as phrased.  I advise you not to
10   reveal the substance of any communication.
11        A.  No.
12        Q.  (By Ms. Maranzano)  Did Senator Fraser move to
13   table this amendment?
14        A.  Yes.
15        Q.  How would keeping driver's license offices open
16   longer interfere with deterring in-person voter
17   impersonation?
18             MR. FREDERICK:  Objection, legislative
19   privilege.  I instruct you not to answer.
20        A.  I'll assert privilege.
21        Q.  (By Ms. Maranzano)  Did Senator Fraser have any
22   concern that any individuals who work at hourly wage may
23   have a difficult time making it to a driver's license
24   office while it's open?
25             MR. FREDERICK:  Objection, legislative

215

1    privilege.  I'll instruct you not to answer.
2         A.  I'll assert privilege.
3         Q.  (By Ms. Maranzano)  Did Senator Fraser
4    acknowledge on the Floor that a person needed to work to
5    make sure that a driver's license office was open?
6         A.  Can you repeat that question?
7         Q.  Do you recall the Senator acknowledging on
8    the -- during the consideration of SB 14, that people
9    needed to work to make sure that a driver's license
10   office was open?
11        A.  I do not recall.
12        Q.  Were there any other amendments that you
13   haven't testified about that were offered that would
14   have mitigated the impact of SB 14 on minority voters?
15             MR. FREDERICK:  Objection, assumes facts
16   not in evidence.  Also object on legislative
17   privilege.  Instruct you not to answer.
18        A.  I'll assert privilege.
19        Q.  (By Ms. Maranzano)  Based on the public record,
20   are there any amendments that we haven't discussed that
21   you believe would have mitigated the impact of SB 14 on
22   minority voters?
23             MR. FREDERICK:  Objection, assumes facts
24   not in evidence.  You -- otherwise, you may answer if
25   you can.

216

1         A.  I don't recall every amendment offered.
2         Q.  (By Ms. Maranzano)  Do you recall any amendment
3    that you believe would have mitigated the impact of SB
4    14 on minority voters?
5              MR. FREDERICK:  Again, object, assumes
6    facts not in evidence.  You may answer.
7         A.  I don't know how to answer, because I don't
8    know that Senator Fraser or I think the bill impacted
9    minority voters negatively.  So the amendment -- I don't
10   know that the -- the answer then is no, because I don't
11   know that they would have added to what we already
12   believe the bill did.
13        Q.  (By Ms. Maranzano)  When did the Senate pass SB
14   14 and refer it to the House?
15        A.  It was either January 26th or 27th when we
16   passed it to engrossment.  I don't recall exactly which
17   day that occurred.
18        Q.  Is it unusual for the Senate to pass
19   legislation within the first two weeks of a session?
20        A.  Yes.
21        Q.  Has that ever happened before during the time
22   that you've worked for Senator Fraser?
23        A.  I don't recall.
24        Q.  Did the Senator have any role with regard to SB
25   14 once it was referred to the House?

JANICE MCCOY                                                    MAY 16, 2012

217

1     MR. FREDERICK: Object only to the extent
2  it seeks privileged matters as to the fact, whether or
3  not he had a role. You may answer.
4     A. Yes.
5     Q. (By Ms. Maranzano) What role was that?
6     MR. FREDERICK: And I'll object on the
7  basis of legislative privilege and instruct you not to
8  answer to the extent that your answer would reveal
9  his -- the Senator's or your thought process, mental
10 impressions or disclose the substance of any privileged
11 conversation. But to the extent you can describe his
12 role without divulging that, you may answer.
13    A. It was limited in that once Representative
14 Harless was determined to be the House sponsor, we
15 provided her the information that we had that she could
16 move forward.
17    Q. (By Ms. Maranzano) Was the Senator concerned
18 about any of the changes to SB 14 that occurred in the
19 House?
20    MR. FREDERICK: Objection, legislative
21 privilege. Instruct you not to answer.
22    A. I'll assert privilege.
23    Q. (By Ms. Maranzano) Was the Senator on the
24 conference committee?
25    A. Yes.

218

1     Q. Did the conference committee change the
2  structure of the identification card that was required
3  to be issued free of charge?
4     A. Yes.
5     Q. Did they insert a new provision into the bill
6  on that topic?
7     A. Yes.
8     Q. Is that unusual?
9     MR. FREDERICK: Objection, vague. You may
10 answer.
11    A. As I testified earlier, the conference
12 committees, 20, 30 times during a session, we'd go
13 outside the bounds.
14    Q. (By Ms. Maranzano) What was the purpose of the
15 conference committee removing the provision of SB 14
16 that would have allowed a tribal identification to be
17 used by a voter?
18    MR. FREDERICK: Objection, legislative
19 privilege. Instruct you not to answer.
20    A. I'll assert privilege.
21    Q. (By Ms. Maranzano) What was the purpose of the
22 conference committee removing a provision that would
23 require the voter education that was required in SB 14
24 be targeted at low income and minority voters?
25    MR. FREDERICK: Objection, legislative

219

1  privilege. Instruct you not to answer.
2     A. I'll assert privilege.
3     Q. (By Ms. Maranzano) What was the purpose of the
4  conference committee removing the provision of SB 14
5  that would have exempted from the photo ID requirement
6  individuals whose ID had been stolen and who certified
7  that in an affidavit?
8     MR. FREDERICK: Objection, legislative
9  privilege. Instruct you not to answer.
10    A. I'll assert privilege.
11    Q. (By Ms. Maranzano) Did the Senator ever
12 discuss whether SB 14 might disproportionately impact
13 minority voters?
14    MR. FREDERICK: I'm sorry, Jennifer. You
15 said did the Senate ever discuss --
16    MS. MARANZANO: Senator. I'm sorry.
17    Q. (By Ms. Maranzano) Did Senator Fraser ever
18 discuss whether SB 14 might disproportionately impact
19 minorities voters?
20    MR. FREDERICK: Objection, legislative
21 privilege, and instruct you not to answer, except to the
22 extent that you recall public statements or statements
23 on the Floor in the committee.
24    A. He had discussions in the Committee of the
25 Whole and on the Floor with other members about their

220

1  impressions of the bill that it would impact minority
2  voters.
3     Q. Did he have discussions about this topic that
4  are not included in the public record?
5     MR. FREDERICK: I'll object, vague, object
6  to form, and object on the legislative privilege, to the
7  extent that it seeks the substance of any nonpublic
8  conversation. To the extent you were aware of it, the
9  fact of the conversation, you may testify to.
10    A. I can't speak to the Senator's private
11 conversations. I wasn't privy to them.
12    Q. (By Ms. Maranzano) Are you aware of any
13 legislators making any statements about illegal alien
14 voting?
15    A. Yes.
16    Q. Who was that?
17    A. I just know it happened. I don't remember who
18 said it.
19    Q. What was the statement?
20    A. I don't know the specifics of it. I remember
21 reading about it in the newspaper, but I don't remember
22 who said it.
23    Q. When -- when did you read about the statement?
24    A. I want to say there was something in 2009, but
25 I'm not -- I don't recall.

221

1     Q.  What newspaper was that in?
2     A.  I do not recall.
3     Q.  What was the general subject of the statement?
4     A.  I don't recall.  Generally, I remember hearing
5     that somebody said something in a committee hearing on
6     public record, but that's the extent of what I know.
7     Q.  Somebody said something in a committee meeting
8     that somebody being one of the legislators?
9     A.  Yes.  I'm sorry.
10    Q.  Okay.  Thank you.  Have you ever heard any
11    Texas state legislator who voted in favor of SB 14 say
12    that it would prevent a legitimately registered voter
13    from voting in Texas?
14          MR. FREDERICK:  I object on privilege, to
15    the extent it calls for confidential privileged
16    communications, but other than that, you may answer.
17    A.  That specific statement, no.  That general
18    idea, yes.
19    Q.  (By Ms. Maranzano)  Who said that?
20    A.  The general thought that a legitimate voter
21    might not be able to vote was generally said by the
22    Democrat senators who testified against the bill.
23    Q.  Okay.  I'm sorry.  My question was any
24    legislator who voted in favor of SB 14 saying that?
25    A.  Then the answer is no.  I'm sorry.

222

1     Q.  Have you ever heard any Texas state legislator
2     who voted in favor of SB 14 say that it would prevent
3     racial or ethnic minorities from voting in Texas?
4     A.  No.
5     Q.  Are you familiar with a public letter from the
6     Lieutenant Governor in 2007 about photo ID requirements?
7     A.  No.
8     Q.  This has been previously marked as -- as
9     Exhibit 3.  This has been previously marked as
10    Deposition Exhibit 3.  Have you seen this before,
11    Ms. McCoy?  I'm sorry.  I'm showing you what has been
12    marked as Deposition Exhibit 3, previously marked.  And
13    if you can tell me if you've seen it before.
14    A.  I don't specifically remember reading this, but
15    I'm sure I did.
16    Q.  Do you see that there's a sentence that 8 to 12
17    million illegal aliens currently living in the U.S. --
18    wait, I'm sorry.  Let me find the exact sentence.
19          Can you look at the second paragraph?  Do
20    you see that -- do you see that that sentence says that
21    "Yesterday, Senator Troy Fraser brought up in the Senate
22    consideration of House Bill 218 by Representative Betty
23    Brown, which simply requires voters to present a
24    driver's license or some other common form of
25    identification at the election polls to prove they are

223

1     who they say they are, U.S. citizens"?
2     A.  Yes.
3     Q.  Was that part of the purpose of House Bill 218?
4     A.  No.
5     Q.  Any reason that the Lieutenant Governor would
6     assert that that is the purpose of House Bill 218?
7           MR. FREDERICK:  Objection, calls for
8     speculation.  You can answer.
9     A.  I can't speak to what Lieutenant Governor wrote
10    in 2007.
11    Q.  (By Ms. Maranzano)  Ms. McCoy, at any time
12    since the passage of Senate Bill 14, have you come to
13    believe that it was passed with any discriminatory
14    purpose?
15          MR. FREDERICK:  I'll object on the basis
16    of legislative privilege.  I mean, to the extent -- and
17    I'll object to the extent that the question seeks your
18    thought processes, based on information gathered during
19    consideration of SB 14.  And otherwise, you can answer
20    if you won't reveal that.
21          MS. MARANZANO:  My question is, post
22    enactment, did she come to believe it was passed with
23    discriminatory purpose?
24    A.  No.
25    Q.  (By Ms. Maranzano)  At any time since the

224

1     passage of SB 14, have you come to believe that SB 14
2     will have a discriminatory effect on minority voters?
3           MR. FREDERICK:  Same objection, but you
4     can answer.
5     A.  No.
6     Q.  (By Ms. Maranzano)  Ms. McCoy, can you give me
7     about two minutes?  I'm just about done.
8     A.  Sure.
9     Q.  We'll go off the record for about two minutes.
10    A.  Yeah.  Uh-huh.
11          (Recess from 5:03 to 5:11 p.m.)
12    Q.  (By Ms. Maranzano)  Ms. McCoy, do you know what
13    percentage of Senator Fraser's district was made up of
14    Latinos?
15    A.  No.
16    Q.  You testified earlier that minority legislators
17    made statement on the Floor to -- statements on the
18    Floor for the benefit of I believe you said, "of you."
19    Did you mean the Department of Justice?
20    A.  I meant -- yes, yes.
21    Q.  What's the basis of that statement?
22    A.  Personal opinion.
23    Q.  What's your personal opinion based on?
24    A.  Their opposition to the bill and the fact that
25    they thought maybe y'all could help kill it.

225

1    Q.  Did any of them say anything like that to you?
2         MR. FREDERICK:  Object, based on
3    legislative privilege, to the extent there was any
4    confidential communication between a specific legislator
5    and you or Senator Fraser, I'll instruct you not to
6    answer.  Otherwise, to the extent you can answer, you
7    may.
8    Q.  (By Ms. Maranzano)  Can you answer this
9    question?
10   A.  I cannot.
11   Q.  Ms. McCoy, if you're called to testify at
12   trial, will you testify that SB 14 has no discriminatory
13   purpose?
14   A.  Yes.
15   Q.  If you're called to testify at trial, will you
16   testify that SB 14 has no discriminatory effect?
17   A.  Yes.
18        MS. MARANZANO:  Well, to be clear for
19   Mr. Frederick, it's our position that if she's taking
20   that position, we have a right to explore the basis of
21   that under our motion to compel.
22        MR. FREDERICK:  I'm sorry.  Just so I'm
23   clear, to explore what?
24        MS. MARANZANO:  To explore the -- I mean,
25   there's a number of questions that are related to that,

226

1    that y'all have not permitted her to answer.  So we
2    would reserve our right -- we're going to leave this
3    deposition open.  I'd like to say that for the record.
4    And you know, we believe that we have a right to ask her
5    and get answers on a number of questions that you've
6    instructed her not to answer, if she's taking the
7    position that she will offer these opinions if she's
8    called to testify at trial.
9         MR. DUNN:  Intervenors join.
10        MR. FREDERICK:  Okay.  I understand.
11   Q.  (By Ms. Maranzano)  Ms. McCoy, are there any
12   answers that you've provided today that you now wish to
13   change?
14   A.  Yes.
15   Q.  What's that?
16   A.  When we took our break.
17   Q.  Uh-huh.
18   A.  I went back and tried to look at the record of
19   when things passed or didn't pass.
20   Q.  Uh-huh.
21   A.  And I didn't have a lot of time, because there
22   was someone in my office on an unrelated issue for most
23   of the hour.  But you -- the Senate did remove the
24   provision on student ID's, not the House.  I think I had
25   testified that the House removed it, but we ended up

227

1    taking it out at some point.  I don't recall really when
2    that came out just because I was kind of hurriedly
3    looking through the versions.  And I think the House did
4    send it to us with it in and we had taken out.
5    Q.  Thank you for that clarification.
6    A.  You're welcome.
7    Q.  Anything else?
8    A.  That's -- that's it.
9    Q.  Any -- I'm sorry.
10   A.  So that was the only thing that I wasn't sure
11   about when I answered earlier.
12   Q.  Is there any information that you didn't recall
13   earlier that you now recall?
14   A.  No.
15        MS. MARANZANO:  Well, as I said, we're
16   leaving this deposition open, and I will now hand it
17   over to Chad.
18                  EXAMINATION
19   BY MR. DUNN:
20   Q.  Good afternoon.
21   A.  Hi.
22   Q.  Hi.  My name is Chad Dunn.  I don't think we've
23   ever met before, have we?
24   A.  I don't think so.
25   Q.  All right.  Well, I know you've been here for

228

1    quite a while today, so I'm not going to, you know, try
2    to waste your time.  I've got a few issues that I want
3    to ask you about.  And I'm going to jump around a little
4    bit, all right?  I'm going to do my best to not ask you
5    anything that's already been asked.
6    A.  Okay.
7    Q.  But in order to get done with you as soon as I
8    can, I may end up having to overlap just a little bit,
9    and for that I apologize.  All right.
10        I'm going to start a little bit with some
11   of your earlier testimony.  As I understand it, you used
12   to be an election judge; is that true?
13   A.  One election I served as election judge.
14   Q.  Which election was that?
15   A.  Maybe 2000.  I don't really recall.  It's been
16   a while.
17   Q.  Was that in Travis County?
18   A.  Yes, sir.
19   Q.  And were you appointed as the actual election
20   judge, or you served as a volunteer?
21   A.  I was not precinct chair.
22   Q.  Okay.
23   A.  I -- they called and asked me, it was a
24   November election, the local party called and said we
25   need a Republican, because they had -- they wanted a

JANICE MCCOY                                                          MAY 16, 2012



229

1   Democrat and a Republican. And I lived in the precinct,
2   and they asked me to do it, and I said yes. I don't
3   know if they had to actually turn my name in or not.
4       Q. Okay. And I'm not trying to quarrel with you,
5   but it sounds more like you were an election observer or
6   a poll watcher than an election judge.
7       A. No, sir. I was an election -- or the assistant
8   election -- I don't think I was the election judge. I
9   was the assistant election judge. I mean, I actually
10  had the title.
11      Q. Okay. And what were you responsibilities there
12  at the polling location?
13      A. I was -- what was it? I was -- I -- served as
14  the election judge, assistant election judge. So I
15  monitored the election. If there were any issues that
16  came up, I was there to resolve them. There were not.
17  And then at the end of the night, I do remember taking
18  the box. They used -- they used to take the boxes to --
19      Q. Central tabulation?
20      A. Yeah. Well, you know where Palmer Event
21  Center -- there used to be a building next to Palmer
22  Event Center, but they tore it down. Whatever that
23  building was, I took the box there and had to turn it in
24  official. And then by election code, you have to keep
25  the documents for two years. And so I was the custodian

230

1   of the documents for that precinct for two years.
2       Q. All right. Were you actually assigned the
3   responsibility of enrolling voters as they came in?
4       A. I did not sit there and check the voters.
5   That, the election workers did that.
6       Q. And did you do that during early vote or
7   election day or both?
8       A. It was only on election day.
9       Q. Do you remember the precinct?
10      A. No. The precinct number, no, sir.
11      Q. Do you remember the actual location?
12      A. There was a church just at 45th and Medical
13  Parkway.
14      Q. While there, did you observe any activity that
15  you were concerned might be election fraud?
16      A. No.
17      Q. Have you served in an election judge or
18  election official capacity any other time than we just
19  spoke about?
20      A. No.
21      Q. Now, you said somebody called you and asked you
22  to do this. Do you remember who that was?
23      A. No, sir.
24      Q. Was it a party official or a county official?
25      A. I think it was a party official. Travis County

231

1   Republican party official.
2       Q. Was it the chairman?
3       A. I don't recall.
4       Q. I assume that you vote in most elections?
5       A. Yes, sir.
6       Q. Do you vote in both nonpartisan and partisan
7   elections?
8       A. Yes, sir.
9       Q. And you're going to hate me for asking this,
10  but it's important for several questions, what year were
11  you born?
12      A. 1969.
13      Q. All right. I tried to do it as gingerly as I
14  could.
15      A. I'm not embarrassed.
16      Q. So I assume since you turned 18 and since then,
17  you have more or less consistently voted?
18      A. Yes, sir.
19      Q. Whenever you have voted in Texas, have you ever
20  observed activity that made you concerned it would be
21  voter fraud?
22      A. No, sir.
23      Q. Have you ever voted in an election and observed
24  discriminatory behavior by an election clerk?
25      A. No, sir.

232

1       Q. I think you also testified that you've lived in
2   Texas your whole life; is that true?
3       A. Yes, sir.
4       Q. Have you, during that time, ever witnessed an
5   act of discrimination against a minority citizen in
6   Texas?
7           MR. FREDERICK: Object as vague. Object
8   to relevance. But you can answer.
9       A. Yeah. I don't -- I don't know that I can
10  answer that question because it's vague. I mean --
11      Q. (By Mr. Dunn) Well, I'll do -- I'll see if I
12  can do better. All right?
13      A. Okay.
14      Q. Have you ever seen a government official deny a
15  benefit or service to a minority citizen?
16      A. No, sir.
17      Q. Have you ever seen another citizen in Texas
18  treat a minority citizen with some degree of disrespect?
19      A. Another citizen?
20      Q. Yes, ma'am.
21      A. So one citizen treating somebody else with
22  disrespect? Yes, sir.
23      Q. And was that an Anglo to an African-American or
24  an Anglo to a Latino or something different?
25      A. I think in all instances I have seen people

JANICE MCCOY                                          MAY 16, 2012

233

1  treat people poorly, whether it's minority on minority
2  or Anglo on minority or minority on Anglo, I've seen it
3  all. And I've lived 43 years, you see a lot of
4  disrespect.
5      Q.  So, in your opinion, there's not a higher
6  degree of discrimination amongst the citizenry between
7  Anglos and minority population in Texas anyway?
8      A.  In my opinion, that's correct.
9      Q.  Have you always lived in Austin?
10     A.  No, sir.
11     Q.  Where else have you lived in the state?
12     A.  Houston, in College Station, Bryan/College
13  Station when I was at A&M.
14     Q.  You went to school at A&M?
15     A.  Yes, sir.
16     Q.  Where did you grow up?
17     A.  Houston.
18     Q.  So is it fair to say that you've more or less
19  split your life in-between Houston and Travis County?
20     A.  Yes, sir.
21     Q.  Now, I'm going to move to a different topic, so
22  I'm trying not to lose you here. But you were asked a
23  number of questions about the various photo voter ID
24  bills over the last several sessions about documents
25  prepared as part of the legislative process. Okay.

234

1  That's where I'm going now.
2      A.  Yes, sir.
3      Q.  And you were asked some questions about bill
4  analysis that were prepared. And I want to focus on SB
5  14 for a minute. The bill analysis prepared for SB 14
6  was created by whom?
7      A.  The bill analysis that was created by Senate
8  Bill 14 as it came out of Senate, as it was filed, as it
9  came out of Senate committee as it was grossed,
10  engrossed, was prepared by Senate Research Center,
11  essentially, via the Senate administrative process.
12          The House, when it made it over there,
13  their processes developed their own bill analysis for
14  use. I don't really recall -- I don't know who does
15  theirs.
16     Q.  All right.
17     A.  They probably base it on ours, but they do
18  their own.
19     Q.  And I want to focus on the Senate report
20  first. The Senate report was prepared by Senate
21  Research, if I understood your answer right.
22     A.  That's -- yes.
23     Q.  Okay. And I want to make sure we're being very
24  specific about that.
25     A.  Right.

235

1      Q.  Was it completely created by and put out by
2  Senate Research, or did it include language provided by
3  you or somebody in your office?
4      A.  Senator Fraser, through me, provides language
5  to the committee chair and their staff, and in this
6  case, Senator Duncan chaired Senate State Affairs. They
7  then take that information and submit it to Senate
8  Research Center. I don't know for sure if they used my
9  language verbatim. Sometimes they do. Sometimes they
10  don't. And on this instance, I do not recall if they
11  used any of my language verbatim.
12     Q.  And so just to be clear in our record, do you
13  recall whether or not the language your office submitted
14  to Senator Duncan's staff was changed at all when it was
15  submitted by Senator Duncan's staff to Senate research?
16     A.  I do not recall.
17     Q.  Who was it with Senator Duncan's staff you
18  would have coordinated on the research analysis?
19     A.  Jennifer Fagan.
20     Q.  Was any convincing or cajoling necessary to
21  convince Senator Duncan's staff to support this bill?
22          MR. FREDERICK:  Object, legislative
23  privilege. Instruct you not to answer.
24     A.  I'll assert privilege.
25     Q.  (By Mr. Dunn)  With respect to the -- in

236

1  addition to the bill analysis, a fiscal note was also
2  prepared; is that true?
3      A.  Yes, sir.
4      Q.  And was that prepared by the Legislative Budget
5  Board?
6      A.  Yes, sir.
7      Q.  Can you recall if, and I'm not asking for the
8  numbers, but from the various sessions you've been asked
9  about photo ID bills today, can you recall if there were
10  any changes to the fiscal note of the bill in its
11  various iterations?
12     A.  I don't recall what the fiscal note was in
13  2007. I think in 2009 the number stayed somewhere in
14  the 2 to 4 million dollar range.
15     Q.  Do you remember who the analyst at LBB was on
16  these bills?
17     A.  I did not know the analyst at LBB.
18     Q.  Did you ever communicate with the analyst at
19  LBB?
20     A.  No, sir.
21     Q.  Did you ever provide LBB any estimates as to
22  your belief as to the fiscal impact of the bill?
23     A.  No, sir.
24     Q.  Did you ever do or conduct any research as to
25  what the fiscal impact of the bill would be?

JANICE MCCOY                                                                    MAY 16, 2012

237

1       MR. FREDERICK: Object, based on
2  legislative privilege. Instruct you not to answer to
3  the extent it reveals the substance of any research. I
4  instruct you not to answer.
5       A. I'll assert privilege.
6       Q. (By Mr. Dunn) Stepping way from this bill for
7  a minute, is it generally important that a bill in the
8  legislature not have a fiscal impact or have a minimal
9  fiscal impact in order to pass?
10       MR. FREDERICK: Object, vagueness, but you
11  can answer.
12       MR. DUNN: I'll strike the question and
13  rephrase. How about that?
14       Q. (By Mr. Dunn) Is it -- bills with a large
15  fiscal impact, do they typically get defeated or fail?
16       A. They take longer to pass.
17       Q. And they -- and because the bill involves a
18  larger fiscal impact, that means the state has to divert
19  financial resources to the bill's tenants; is that true,
20  if it were to pass?
21       A. No.
22       Q. Well, I assume that in all these years that
23  you've worked for Senator Fraser and perhaps others, you
24  have prepared a lot of bills and received a lot of
25  fiscal impacts on bills; is that true?

238

1       A. Yes, sir.
2       Q. Is it not typically bad news when you received
3  a fiscal impact statement from LBB that puts money on
4  the cost of a bill?
5       MR. FREDERICK: Object to vagueness. You
6  can answer.
7       A. Well, I think I need you to ask the question
8  better. I don't -- can you ask the question again?
9       Q. (By Mr. Dunn) Uh-huh. Is it more difficult to
10  pass a piece of legislation when it has a fiscal impact
11  statement from LBB that it costs a considerable amount
12  of money?
13       A. Not always, but the majority of the time, yes,
14  you'd rather have a zero fiscal note than not. Or have
15  a low fiscal note than not.
16       Q. And just so our court, which may not understand
17  the process here in Texas, our budget here in the state
18  is prepared either by the House Appropriations Committee
19  or the Senate Finance Committee in alternating sessions;
20  is that true?
21       A. That's true.
22       Q. And so if a member wants to pass a bill that
23  has a fiscal impact, they typically have to go to either
24  the Appropriations or Finance Committee and work out an
25  arrangement to pay for the bill; is that also true?

239

1       A. Yes.
2       Q. All right. What efforts were made -- is it
3  true then that Senate Bill 14 had a fiscal impact
4  according to the LBB?
5       A. Yes.
6       Q. What steps were taken to make sure the funding
7  would be available for the bill?
8       A. In 2007, no, I'm sorry. I get my years -- in
9  2009 -- well, let's back up.
10       So when a bill has a fiscal impact, you
11  need a Finance Committee member to propose an amendment
12  to the budget or a rider or some sort of mechanism to
13  get that included, a contingency rider, sometimes. In
14  2007, I want to say that -- I can't remember if I did
15  one of those or not. In 2009, I'm sorry. Sorry.
16  2009. In 2007, I don't -- I didn't do anything with the
17  budget of the bill. I don't remember that.
18       In 2009, I think we prepared a contingency
19  rider, and I think we asked another senator who was on
20  the committee to move that forward, who was a supporter
21  of the bill.
22       In 2011, I don't recall that I did any
23  work on trying to -- on behalf of Senator Fraser in
24  trying to get money in the budget.
25       Q. Is the short answer with respect to Senate Bill

240

1  14, in 2011, you can't recall what, if anything, you did
2  to get the bill funded?
3       A. I don't recall that I did anything to get the
4  bill funded --
5       Q. All right.
6       A. -- on behalf of Senator Fraser.
7       Q. Senator Fraser has served on the Finance
8  Committee before, has he not?
9       A. Yes, he has.
10       Q. When did that service stop?
11       A. I don't recall. 2005 or 2007.
12       Q. Do you recall the senator you approached in
13  2009 to hold the contingency rider on the committee?
14       A. I do not.
15       Q. Do you know who carried it in 2011?
16       A. I do not.
17       Q. Just for our record, which -- was the
18  appropriation bill in '11 out of the house or out of the
19  Senate? Or do you remember?
20       A. I don't remember.
21       Q. I don't either so I was hoping you did.
22       A. I try to forget.
23       Q. All right. As part of the fiscal analysis for
24  the bill, did you participate in trying to determine
25  what it would cost to fully fund antifraud technologies

241

1  in voting locations?
2        MR. FREDERICK: I'm going to object on the
3  basis of privilege, to the extent it calls for the
4  substance of any communications or your thought process,
5  mental impressions, but the question as phrased, you may
6  answer it as long as you don't reveal those matters.
7        A.  Senator Fraser and I didn't do any work on
8  developing what the fiscal note looked like or what the
9  agency said it would cost them or not cost them.  So we
10  did nothing on the fiscal impact.
11       Q.  (By Mr. Dunn)  All right.  Fair enough.  So
12  I'll ask this question:  Did you, though, in working on
13  the bill, in any session, come to learn of various
14  technologies that have been developed or being developed
15  that can be used in polling locations to stop voter
16  fraud?
17       MR. FREDERICK: Object to legislative
18  privilege.  Instruct you not to answer.
19       A.  I'll assert privilege.
20       Q.  (By Mr. Dunn)  With respect to Senate Bill 14,
21  do you know which legislator or which legislator's staff
22  was the point person for the fiscal impact of the bill,
23  if it wasn't you?
24       A.  I mean --
25       MR. FREDERICK: If you know.

242

1        A.  When a bill moves to the legislative process,
2  the committee staff in the committee is responsible for
3  asking LBB for a fiscal note.  LBB then asks the
4  different agencies that are impacted how much it will
5  cost.  That comes back, gets attached to the bill, and
6  we move forward.
7        I mean, I don't -- I mean, I think -- I
8  mean, I don't know that I can be responsive to your
9  question, because I don't know that any legislative
10  staff directed anybody to provide that type -- those
11  numbers.  It's just that's what happened.  That's what
12  we got back from legislative budget board.
13       Q.  (By Mr. Dunn)  Let me try a different way of
14  phrasing the question.  Do you know and can you name for
15  us any staffer that was involved in formulating the
16  fiscal impact of this bill or coordinating with LBB?
17       A.  No.
18       Q.  Okay.  As I understand your description earlier
19  of your job responsibilities, you principally handle the
20  Capitol office for Senator Fraser and his legislative
21  priorities; is that true?
22       A.  Yes.
23       Q.  Do you have any district office
24  responsibilities?
25       A.  Only insomuch as I oversee the same

243

1  administrative functions for those three employees, and
2  they call me and bounce things off me about meetings or
3  issues or case work that they're working on.
4        Q.  Do you go out into the district?
5        A.  I have.  I haven't done it in the last couple
6  of years.
7        Q.  Senator Fraser's district is, gross
8  generalization, but more or less northwest of the Austin
9  area; is that true?
10       A.  He would categorize it as the Hill Country from
11  Kerr County to Abilene, from Belton to Menard.
12       Q.  All right.
13       A.  Junction.
14       Q.  Where are his district offices?
15       A.  Abilene, Belton and Marble Falls.
16       Q.  Is there an area in the district that has a
17  high degree of African-American, Latino or Asian
18  population?
19       A.  I would assume Bell County probably has our
20  largest minority population because it's our largest
21  county.
22       Q.  How would you describe that minority?  I mean,
23  is it Latino, African-American mixed?
24       A.  African-American.
25       Q.  I think you were asked earlier if you knew the

244

1  percentage of Latinos you have in your district.  I
2  think you said you didn't know; is that true?
3        A.  That's true.
4        Q.  Do you have an estimate?
5        A.  No, sir.
6        Q.  Do you have an estimate for the number of
7  African-Americans in your district?
8        A.  No, sir.
9        Q.  Do you have an estimate for the number of
10  Asians in your district?
11       A.  No, sir.
12       Q.  You've been with Senator Fraser for 10 years.
13  Did I hear that right?
14       A.  Since 1998.
15       Q.  '98.  All right.  So about 14 years?
16       A.  Yes, sir.
17       Q.  In the 14 years, what activities have you taken
18  or Senator Fraser taken to support the minority
19  community in his district?  Any bills, business,
20  meetings, or legislative business undertaken for those
21  groups?
22       MR. FREDERICK: I'll object on legislative
23  privilege, only to the extent that your answer would
24  require you to reveal thought process, mental
25  impressions or confidential communications related to

245

1  pending legislation. To the extent you can answer
2  without revealing that, you may answer.
3      A.  Senator Fraser votes and promotes and works
4  with every constituent equally.
5      Q.  (By Mr. Dunn) And I appreciate that. I'm just
6  trying to find out, can you name for us some bills or
7  meetings or sort of administrative lobbying he's done on
8  of behalf of the minority constituents in his district?
9      A.  No.
10     Q.  Now, with regard to your district
11 responsibilities, do you ever go out and take the place
12 of the Senator at an event or speak to group because
13 he's unavailable?
14     A.  I have in the past. I have not done it in
15 about three years.
16     Q.  What sort of events would you go speak to?
17     A.  They weren't necessarily speaking events where
18 it was a public forum. They typically would just be
19 meetings with various constituency groups that wanted to
20 express concerns or opinions to our office.
21     Q.  Are there -- if I understand the testimony
22 earlier, there's sort of a schedule kept by your office
23 of where the Senator goes and does. It doesn't have
24 everything, but it has some things; is that right?
25     A.  Yes, sir.

246

1      Q.  Would it also include the events that you
2  attended or another staff attended on his behalf?
3      A.  No, sir.
4      Q.  Those would be kept on the staffer's private
5  calendar?
6      A.  That's correct.
7      Q.  Can you recall ever have gone to an event in
8  place of Senator Fraser and speaking with a group of
9  African-Americans or Latinos?
10     A.  I've gone to events where African-Americans and
11 Latinos were present but nothing specific to those
12 groups.
13     Q.  Not a group or event where they made up the
14 predominant population in the attendees?
15     A.  That's correct. I have not.
16     Q.  Have you attended any public meetings in
17 Senator Fraser's district as it relates to photo ID?
18     A.  I've attended meetings with the Senator where
19 he has -- speaking to a group where he brings up the
20 topic of photo ID in terms of the legislation that he
21 passed or didn't pass, given whatever year it was, but
22 nothing specific for the meeting specifically about
23 voter ID.
24     Q.  In other words, you didn't go to any rallies or
25 events put together by certain political groups who were

247

1  pushing photo ID?
2      A.  No, sir.
3      Q.  It would just come up as a part of more general
4  political discussion?
5      A.  Yes, sir.
6      Q.  My question earlier was limited to events in
7  the district. Now I'm going to ask you about anywhere.
8  Have you been to such events?
9      A.  No, sir.
10     Q.  When is it that photo ID became something you
11 started working on in your office?
12     A.  The spring of 2007.
13     Q.  What caused that project to develop?
14         MR. FREDERICK:  Object, based on
15 legislative privilege. To the extent you can answer
16 without revealing communications with the Senator,
17 legislators, constituents, or thoughts or mental
18 impression, you can answer.
19     A.  When the Senator agreed to be the House sponsor
20 to House Bill 218.
21     Q.  (By Mr. Dunn) Prior to agreeing to be the
22 sponsor of House Bill 218, you hadn't researched,
23 drafted bill language or otherwise worked on the photo
24 ID issue?
25         MR. FREDERICK:  Objection, legislative

248

1  privilege. Instruct you not to answer.
2      A.  I'll assert privilege.
3      Q.  (By Mr. Dunn) The impetus to your office
4  beginning to deal with photo ID, did it have anything to
5  do with a specific event or events actually involving
6  voter impersonation?
7          MR. FREDERICK:  Object on the basis of
8  legislative privilege. Instruct you not to answer.
9      A.  I'll assert privilege.
10     Q.  (By Mr. Dunn) Why is it that Senator Fraser,
11 after having been asked in 2007 to carry House Bill 218,
12 why is it that he continued to hold the issue and push
13 it in future sessions?
14         MR. FREDERICK:  Object on the basis of
15 legislative privilege. To the extent that it -- that
16 the question calls for subjective mental impressions,
17 thought process or confidential communications, I
18 instruct you not to answer. If you can answer based on
19 nonprivileged matters including public statements or
20 core testimony, you can do so.
21     A.  I think I can say that Senator Fraser has said
22 consistently, public record or public meetings, that he
23 believes that the issue of in-person voter fraud and
24 protecting the integrity of our elections was important,
25 and he wanted to continue to fight.

JANICE MCCOY                                               MAY 16, 2012

249

1    Q.  (By Mr. Dunn)  And he came to that conclusion
2    sometime in or around the spring of 2007 when he was
3    asked to support House Bill 218?
4         MR. FREDERICK:  Objection to the extent it
5    mischaracterizes the prior testimony.  Also object on
6    legislative privilege.  I instruct you not to answer.
7    A.  I'll assert privilege.
8    Q.  (By Mr. Dunn)  Is it true that Senator Fraser's
9    issue in the photo ID matter -- strike that.
10        Senator Fraser's interest in the photo ID
11   matter did not develop until he was approached by a
12   member of the House?
13        MR. FREDERICK:  Objection, legislative
14   privilege.  Instruct you not to answer.
15   A.  I'll assert privilege.
16   Q.  (By Mr. Dunn)  You were asked some testimony
17   about Section 5 of the Voting Rights Act.  I'm just
18   telling you that to sort of get you to where I'm going
19   now.
20   A.  Yes, sir.
21   Q.  All right.  And you mentioned something that
22   nine states and some territories are subject to Section
23   5.  Did I hear you correctly?
24   A.  That was my comment.  Yes, sir.
25   Q.  Do you know how it is that those nine states

250

1    and territories were made subject to Section 5?
2    A.  My understanding is that it was part of -- back
3    when LBJ was president, but that's as much I could speak
4    to.
5    Q.  In other words, you don't know if there was a
6    formula or some kind of basis used to select the areas
7    subject to Section 5, you're not familiar with it?
8    A.  That's correct.
9    Q.  Are you aware that Section 5 was applied to
10   certain areas because of the history of discrimination?
11   A.  It's my understanding that that was the
12   intent.  Yes, sir.
13   Q.  And do you deny that there's a history of
14   discrimination in Texas?
15   A.  No, sir.
16   Q.  When is it that you think, if you do, that the
17   discrimination in Texas stopped?
18   A.  I don't recall that there being discrimination
19   in my life -- well, in my adult lifetime.
20   Q.  So sometime in your adolescence is when that
21   problem was solved in your view?
22        MR. FREDERICK:  Objection, to the extent
23   misstates the testimony.  You can answer.
24        MR. DUNN:  I'll rephrase.
25   Q.  (By Mr. Dunn)  When in your view was racial

251

1    discrimination in Texas resolved?
2    A.  I don't know.
3    Q.  Okay.  But in any event, in your opinion, we're
4    at the point now where federal laws are not required to
5    protect minority citizens in Texas?
6         MR. FREDERICK:  You may answer to the
7    extent that --
8    A.  My personal opinion is federal law is not
9    necessary to protect minority voters in Texas.
10   Q.  (By Mr. Dunn)  But you believe that minority
11   citizens have an equal opportunity to vote as Anglos or
12   anyone else?
13   A.  That they do?
14   Q.  Yes, ma'am.
15   A.  Yes, sir.
16   Q.  Okay.  That is -- that sort of belief, the
17   belief that everybody that's an American citizen has an
18   equal vote is also part of the law in the constitution,
19   the federal constitution; is that true?
20   A.  Yes, sir.
21   Q.  All right.  So when you draft legislation,
22   whether it's on elections or anything else for the
23   Senator, do you keep that concern in mind to make sure
24   you're complying with that provision of the
25   constitution?

252

1    A.  I --
2         MR. FREDERICK:  Object on the basis of
3    legislative privilege, and instruct you not to answer.
4    A.  I'll assert privilege.
5    Q.  (By Mr. Dunn)  Do you believe that -- this
6    is -- I'm going to make sure I'm clear about this.  If
7    you're confused, ask me.  But do you believe that
8    government, whether it's state or federal, is capable of
9    disenfranchising a citizen?  I beg your pardon?
10   A.  I'm sorry.  I'm just thinking in my head.
11   Q.  Oh.
12   A.  What do you mean by "disenfranchising"?
13   Q.  Well, let's say the federal government passed a
14   law that said that people with blue eyes can't vote any
15   longer.
16   A.  So we're specifically talking about elections?
17   Q.  Yes.  Uh-huh.  Such a law would disenfranchise
18   voters.  Would you agree?
19   A.  If you had blue eyes, yes, sir.
20   Q.  All right.  You and I share that trait.  That's
21   why I picked that one.
22   A.  Maybe we shouldn't be voting.
23   Q.  Well, we probably -- well, I won't even say.
24        All right.  With respect to -- there have
25   been laws over the years that have caused voters to be



253

1   disenfranchised; would you agree?
2       A.  Previous, yes.
3       Q.  For example, requiring a voter to pay a poll
4   tax.  Would you agree that resulted in disenfranchise?
5       A.  Yes.
6       Q.  Laws that require voters to take a literacy
7   test.  Would you agree that was disenfranchising?
8       A.  Yes.
9       Q.  Do you believe that government can make voting
10  so onerous that it becomes a disenfranchisement?
11          MR. FREDERICK:  Object as vague, but if
12  you have an opinion, you can answer it.
13      A.  I don't believe the government would do that.
14      Q.  Fine.  But if it did, it could become
15  disenfranchising?
16      A.  I think the government could do a lot of things
17  that are bad and does.
18      Q.  So is it your opinion that Senate Bill 14 as
19  passed has no effect on the difficulty in voting in
20  Texas?
21          MR. FREDERICK:  I'll object only to the
22  extent that the question seeks your mental impressions,
23  thought processes related to the development of SB 14
24  and any confidential communications.  As you sit here
25  today, you may answer based on personal knowledge or

254

1   opinion.
2       A.  I do not believe Senate Bill 14 disenfranchises
3   voters.
4       Q.  (By Mr. Dunn)  All right.  And that's fair
5   enough, but that's a slightly different answer to a
6   different question.
7           I'm asking:  Do you believe that Senate
8   Bill 14 puts some burden on voting that wasn't there
9   before?
10          MR. FREDERICK:  Same objection and
11  instruction.
12      A.  I'll assert privilege.
13          THE WITNESS:  Can I?  Is that what --
14          MR. FREDERICK:  No.  Let me repeat it just
15  so I'm clear to you.
16          THE WITNESS:  Okay.
17          MR. FREDERICK:  I object based on
18  legislative privilege, only to the extent the question
19  seeks your thoughts or Senator Fraser's thoughts or
20  mental impressions about SB 14 during the process of
21  development and passage or any confidential
22  communications --
23      A.  Okay.
24          MR. FREDERICK:  -- related to it.  To the
25  extent that you have a personal opinion or personal

255

1   knowledge, as you sit here today, not based on that, you
2   may answer.
3       A.  So the question is?
4       Q.  (By Mr. Dunn)  The question is, what is your
5   opinion as to whether or not Senate Bill 14 places some
6   burden on voting?
7       A.  I don't believe it imposes an additional burden
8   on voting that makes it hard for anybody to vote.
9       Q.  And so I just want to make sure I understand.
10  You don't think that there's any burden, or you think
11  that the burden is insignificant?
12      A.  I think the burden is insignificant.
13      Q.  All right.  And so whereas a burden that would
14  come from a poll tax or a literacy test is some degree
15  higher -- well, let me just strike that.
16          Where do you draw the line between the
17  burden of a poll tax, for example, and the burden
18  created by the photo ID requirement?
19          MR. FREDERICK:  Object as vague.
20      A.  I don't know that I personally believe that the
21  burden of having a photo ID is a burden or having a
22  photo ID is a burden.
23      Q.  (By Mr. Dunn)  I see.  All right.  Well, have
24  you worked on -- you staffed State Affairs for some
25  period of time I think you said, right?

256

1       A.  Yes, sir.
2       Q.  And State Affairs in the Senate is where most
3   election bills go through unless --
4       A.  Yes.
5       Q.  -- there's a special rule set up?
6       A.  Yes, sir.
7       Q.  All right.  In this case, Senate Bill 14 didn't
8   go through State Affairs because the Committee of the
9   Whole was created; is that true?
10      A.  That's true.
11      Q.  But typically, the committee with senators who
12  have the background and knowledge about election matters
13  are in State Affairs?
14      A.  Yes, sir.
15      Q.  There have been a number of bills that have
16  been passed by the state legislature in the last several
17  sessions that relate to election laws; is that true?
18      A.  Yes, sir.
19      Q.  There have also been a number that relate to
20  voter registration; is that true?
21      A.  Yes, sir.
22      Q.  Are you familiar with bills that have created
23  new requirements for deputy voter registrars in Texas?
24      A.  Not specifically, no.
25      Q.  All right.  Are you familiar with any bills

257

1   that create additional burdens in order to become
2   registered to vote in Texas?
3       A.  I don't recall that we passed anything about
4   registering to vote since HAVA or that doesn't comply
5   with HAVA.
6       Q.  So if things have been passed since then, you
7   just don't recall it?
8       A.  That's correct.
9       Q.  Now, could you see a scenario where the -- and
10  I'm using your language, the insignificant burden of SB
11  14 added on to a burden of voter registration, added on
12  to a burden of deputy registrars, could add up to
13  disenfranchisement in time?
14          MR. FREDERICK:  Objection, calls for
15  speculation.  You can answer if you can.
16      A.  I don't know what the changes were to voter
17  registration and deputies, so I cannot answer the
18  question.
19      Q.  (By Mr. Dunn)  But you would agree that if we
20  take stacks of hairs and we continue to stack the hairs,
21  sooner or later we'll get to the thickness of a quarter?
22          MR. FREDERICK:  Objection, vague.  You can
23  answer if you can.
24      A.  I don't believe that Senate Bill 14 was passed
25  in a vacuum, and I think we recognized what the rest of

258

1   the election code did when we passed it.
2       Q.  (By Mr. Dunn)  So it's your testimony then that
3   whatever burden, if there is one on Senate Bill 14, does
4   not add into other burdens if there are in state law to
5   the right to vote?
6           MR. FREDERICK:  Object to the extent it
7   mischaracterizes prior testimony, but you can answer.
8       A.  I don't know that I said there were other
9   burdens.  So, I mean.
10      Q.  All right.  What burdens are there, if any, to
11  the voting in Texas?
12      A.  I don't believe there are any burdens currently
13  to voting in Texas.
14      Q.  Are you familiar with new regulations adopted
15  by the Department of Public Safety relating to documents
16  required to be presented in order to get an ID or
17  driver's license?
18      A.  I have recently read news clips saying they did
19  that.  Yes, sir.
20      Q.  These are new regulations that came out May the
21  1st; is that true?
22      A.  I don't know the date, but recent, yes, sir.
23      Q.  Very recently?
24      A.  Yes, sir.
25      Q.  DPS also adopted some new regulations shortly

259

1   in advance of the last legislative session, did they
2   not, with respect to information that had to be provided
3   to get a driver's license or ID?
4       A.  I think that's correct.  Yes.
5       Q.  So is it your opinion that as DPS continues to
6   add requirements to getting a driver's license or an ID,
7   that doesn't create a burden, even so slight, to
8   voting?
9       A.  Well, Senate Bill 14 provides with other forms
10  of ID, so you could use one of those forms, those five
11  other forms, four other forms, to vote if you didn't
12  want to get a driver's license.
13      Q.  So if the state, whether it be through the
14  legislature, the agency makes it extremely difficult to
15  get a driver's license, that's not a burden, in your
16  view, because there are other IDs that can be obtained.
17  Do I have that right?
18          MR. FREDERICK:  Object to the extent it
19  misstates prior testimony.  You can answer.
20      A.  I don't -- can you say that, can you repeat
21  your question?
22          MR. DUNN:  Sure.  Would you mind reading
23  that one?
24          (Requested portion read back by the court
25  reporter.)

260

1           MR. FREDERICK:  Object, again, as
2   vague.  Object to the extent it mischaracterizes the
3   prior testimony.  And object, it calls for speculation.
4   But you can answer.
5           (Cell phone buzzes.)
6       Q.  (By Mr. Dunn)  Do you need to deal with that?
7       A.  I need to just turn it off.
8       Q.  I know you have twins.  If you need to get it.
9       A.  No.  My husband has them.
10          I don't know that what we -- what DPS has
11  done is created a burden in terms of getting a driver's
12  license.  And I believe that Senate Bill 14 provided
13  with other mechanisms if you didn't want to use a
14  driver's license as a photo ID to vote.
15      Q.  All right.  Well, did you or anybody in your
16  office have any coordination with DPS and its adoption
17  of regulations relating to obtaining a driver's license
18  or ID?
19      A.  No.
20      Q.  Are you aware of any impediments to DPS through
21  its rule-making authority to create other requirements
22  for folks to bring in order to obtain one of these state
23  IDs?
24      A.  No.
25      Q.  So then it would be true that even under the

261

1  current sort of situation and regulation in which we're
2  judging Senate Bill 14, that could easily change should
3  DPS decide to alter its regulations?
4        MR. FREDERICK:  Objection, calls for
5  speculation, but you can answer.
6        A.  I don't think I can answer the question.  I
7  can't speculate what DPS will or won't do.
8        Q.  (By Mr. Dunn)  I don't think I was asking you
9  to speculate.
10       A.  Okay.
11       Q.  I guess all I was asking is since DPS
12  regulations are as fluid as DPS wants to create rules,
13  you would agree with me the effect of Senate Bill 14
14  will change as those requirements change?
15       A.  I disagree because DPS has to operate within
16  statute, and if statute is clear, then DPS rules can't
17  go beyond that.
18       Q.  Was there anything in Senate Bill 14 that
19  authorized DPS to require documentation of 30-day
20  residency in order to get a voter ID or a driver's
21  license?
22       A.  No, sir.
23       Q.  So do you know what their statutory authority
24  was for doing that?
25       A.  No, sir.

262

1        Q.  If there was statutory authority, it would have
2  had to come from someplace other than Senate Bill 14?
3        A.  That's correct.
4        Q.  All right.  Now, I'd like to ask you a little
5  bit about the 21-vote rule.  And I understand that you
6  say it's not a rule, so I'm not trying to put the word
7  "rule."  How do you want to refer to it, the 21-vote
8  tradition?
9        A.  We can call it a rule if you'd prefer, if that
10  makes it easier for you.
11       Q.  All right.  A bill or measure in the Senate in
12  order to pass out of the body under typical rules and
13  traditions requires 21 votes, if all 31 senators are
14  present?
15       A.  It requires -- yes, sir, if all 31 senators are
16  present.  Yes, sir.
17       Q.  All right.  And if there's some number below 31
18  senators, then two-thirds of the number who are present
19  is required, so long as there's a quorum; is that true?
20       A.  Yes, sir.
21       Q.  What measures can you recall in your 14 or so
22  years of experience have been passed out of the Senate
23  without complying with the two-thirds tradition?
24       A.  Besides photo ID, I don't know of any.
25       Q.  Now, you gave some testimony earlier -- well,

263

1  strike that.
2        The 31 senators who are in the Senate are
3  the only people eligible to vote in the Senate.  Seems
4  like a silly question, but that's true; is that right?
5        A.  That's true.
6        Q.  All right.  So you either have to convince the
7  requisite number of those senators to support your
8  measure or you have to somehow change the electorate; is
9  that true?
10       A.  Change the electorate.  I don't understand.
11       Q.  These 31 senators.  You either got to convince
12  --
13       A.  Right.
14       Q.  -- two-thirds or a majority, whatever you
15  need --
16       A.  Right.
17       Q.  -- or you got to beat a senator or two in an
18  election?
19       A.  That's correct.
20       Q.  As I understand earlier forms of photo ID,
21  because there wasn't the two-thirds vote in the Senate,
22  the maneuver then was to have the vote when one senator
23  who opposed the bill was missing; is that true?
24       A.  Yes.
25       Q.  And that happened on at least one occasion when

264

1  Senator Uresti was not around?
2        A.  In terms of voter ID, yes.
3        Q.  And it was senators, I'm not asking you to
4  identify whom, but it was senators who came up with this
5  maneuver of trying to get a bill through when there
6  wasn't two-thirds of the -- when you didn't have a
7  senator present.
8        MR. FREDERICK:  I'll object on legislative
9  privilege.  Instruct you not to answer it.
10       MR. DUNN:  Okay.  And I'm not talking
11  about Senate Bill 14.  I'm talking about process in
12  general in the Senate.  So is it your -- is it your
13  instruction to her, she can't talk about the two-thirds
14  rule in general?
15       MR. FREDERICK:  No.  That's not my
16  instruction to her.
17       MR. DUNN:  Oh, okay.  All right.  I just
18  didn't want to keep asking the same question.
19       MR. FREDERICK:  No, no, I hear you.
20       Q.  (By Mr. Dunn)  All right.  So -- let me just
21  start over.
22       Your experience there in the Senate is
23  that senators occasionally will wait for an opponent
24  senator to not be in the chamber in order to push a
25  bill?

265

1    A. Yes, sir.
2    Q. All right. And the hope then is to get the
3  bill passed and get two-thirds while this other senator
4  is out of the room?
5    A. Yes, sir.
6    Q. And sometimes it might take a couple of
7  senators out of the room; is that true?
8    A. Yes.
9    Q. There's a tradition in the Senate, though, on
10  big and large and hot button measures that senators ask
11  the chair that a bill not come up when they have to be
12  away from the Senate; is that true?
13        MR. FREDERICK: Objection, vague. You may
14  answer.
15    A. It has been done, to my knowledge, yes.
16    Q. (By Mr. Dunn) And now here's where I'll get
17  his objection. All right.
18        Do you know if Senator Uresti asked
19  whoever was in the Lieutenant Governor's chair, don't
20  bring up this bill while I'm out of the chamber?
21        MR. FREDERICK: I'll object on legislative
22  privilege, to the extent it calls for a confidential
23  communication from a legislator or staff, or -- yeah,
24  but to the extent it's in the public record or the
25  Senate, you may answer.

266

1    A. I don't know Senator Uresti's discussions with
2  Governor Dewhurst's office.
3    Q. (By Mr. Dunn) Now, senators who have it in
4  their intent when they pass a bill, to try to get the
5  bill passed without another member present, that senator
6  could also have the intent to conduct elections in Texas
7  where certain members can't participate?
8        MR. FREDERICK: Objection, calls for
9  speculation.
10    A. I disagree.
11    Q. (By Mr. Dunn) Have you ever done any research
12  or been presented any data as to whether or not there's
13  racially polarized voting in Texas?
14        MR. FREDERICK: I'll object, legislative
15  privilege, to the extent that you have performed any
16  such research in connection with pending legislation.
17  I'm instructing you not to answer on the basis of
18  legislative privilege.
19    A. I'll assert privilege.
20        MR. DUNN: So even sitting -- not talking
21  about Senate Bill 14, just in general, are you familiar
22  with whether or not there's racially polarized voting in
23  Texas, you're instructing her not to answer on that?
24        MR. FREDERICK: No.
25        MR. DUNN: Okay.

267

1        MR. FREDERICK: If you're asking her, in
2  general, is she aware of whether or not there's racially
3  polarized voting, that's different. If you're asking
4  her whether she's performed research in her role as the
5  senate staffer, that I would object to.
6        MR. DUNN: I see.
7    Q. (By Mr. Dunn) Are you aware of whether or not
8  there's racially polarized voting in Texas?
9    A. I am not aware.
10    Q. Do you know what racially polarized voting is?
11    A. Not necessarily.
12    Q. Have you ever worked on campaign staff?
13    A. No. I'm sorry. When I first got out of
14  college, I worked for a political consultant, but we had
15  several campaigns, and I never actually staffed a
16  campaign.
17    Q. Do you play any role in Senator Fraser's
18  reelection campaign?
19    A. I do Senator Fraser's campaign books. Senator
20  Fraser hasn't had a campaign for several years. So I
21  have helped him develop press releases saying he's
22  running for reelection, but that's the extent of it.
23    Q. All right. When you say his books, are you
24  talking about the Ethics Commission reports?
25    A. Yes, sir.

268

1    Q. All right. But you don't actually direct
2  political strategy for him?
3    A. No, sir.
4    Q. Do you do that for any other candidate?
5    A. No, sir.
6    Q. Did you have any involvement in redistricting
7  this last election cycle?
8    A. No, sir.
9    Q. Did you make any recommendations to
10  redistricting members or their staff as it related to
11  the makeup or the shape of Senator Fraser's district?
12        MR. FREDERICK: I'll object on privilege,
13  only to the extent that your answer would reveal
14  confidential communications or thought processes, the
15  fact of whether or not you did. You may answer.
16    A. Yes.
17    Q. (By Mr. Dunn) Who was it that you spoke with
18  about Senator Fraser's district?
19    A. Senator Seliger.
20    Q. He was the chairman of the redistricting effort
21  in the Senate; is that true?
22    A. Yes, sir.
23    Q. Anyone else?
24    A. His aides, probably other staff, legislative
25  staff, other senators, members, staffs.