JANICE MCCOY                                                                                   MAY 16, 2012

269

1  Q. What was the characteristic of the changes
2  Senator Fraser wanted to his district?
3        MR. FREDERICK: Objection, legislative
4  privilege. I'm instructing you not to answer.
5  A. I'll assert privilege.
6  Q. (By Mr. Dunn) All right. Earlier we asked, I
7  asked you about discrimination in Texas. Are you aware
8  of any courts in Texas finding that legislative acts
9  have a discriminatory effect or purpose?
10 A. Not specifically, no.
11 Q. Are you aware that in this most recent
12 redistricting cycle, a panel of judges in San Antonio
13 unanimously found that parts of the redistricting plan
14 in Texas either had a discriminatory effect or purpose?
15       MR. FREDERICK: Object to the extent it
16 assumes facts not in evidence.
17 A. I didn't follow.
18 Q. (By Mr. Dunn) You didn't follow?
19 A. No, sir.
20 Q. Did you follow the United States Supreme Court
21 opinion in 2003 where a majority of that court found
22 that Texas legislature had been racially discriminatory
23 in redistricting?
24 A. No, sir.
25 Q. At least with respect to the legislators that

270

1  passed Senate Bill 14, the vast majority of them were
2  the same ones that passed the legislative redistricting
3  in both 2003 and the most recent set; is that true?
4  A. I'm sorry. I don't know the votes of
5  redistricting in 2003. The votes of the redistricting
6  bill in 2011, I think only two senators voted against
7  it, and those two senators also voted against voter ID.
8        MR. DUNN: All right. So I object to the
9  responsiveness.
10 Q. (By Mr. Dunn) I guess all I'm asking, though,
11 is that the senators that voted in support of
12 redistricting in 2011 were the same body of senators
13 that voted on Senate Bill 14?
14       MR. FREDERICK: Object to the extent it
15 assumes facts not evidence, but you can answer if you
16 know.
17 A. Yes.
18 Q. Is it also true that the champions, so to
19 speak, the people who were pushing the redistricting
20 effort in the Senate, were also the same senators that
21 were pushing Senate Bill 14?
22       MR. FREDERICK: Objection, assumes facts
23 not in evidence. Object, vague. You can answer if you
24 can.
25 A. I really honestly didn't work on redistricting.

271

1  Q. (By Mr. Dunn) All right. I'm going to move to
2  a new topic. You spoke with Ann McGeehan about Senate
3  Bill 14, if I recall?
4  A. Yes, sir.
5  Q. And she was -- she left the Secretary of
6  State's office, what, in January of this year; is that
7  true?
8  A. She left sometime this -- in the last couple of
9  months. I don't know exactly when.
10 Q. Have you had -- and the person that replaced
11 her is a gentleman named Ingram; is that right?
12 A. Keith Ingram. Yes, sir.
13 Q. Keith Ingram. Have you spoken with him at all
14 about Senate Bill 14's implementation?
15 A. About Senate Bill 14's implementation. I
16 talked -- I don't recall. I know I think I've talked to
17 him. I don't know if it's specifically about Senate
18 Bill 14.
19 Q. Turning back to Ms. McGeehan, did she testify
20 in either the House or the Senate committee as a whole
21 on Senate Bill 14?
22 A. She testified on Senate Bill 14, yes, in the
23 Senate. Yes, sir.
24 Q. Did she testify in favor or opposition to it?
25 A. She testified on as a resource witness.

272

1  Q. In other words, she didn't express an opinion
2  on behalf of the Secretary of State as to whether or not
3  Senate Bill 14 was a good idea?
4  A. Not that I recall.
5  Q. Was there any effort by you to encourage
6  Ms. McGeehan to get behind the bill in her testimony?
7        MR. FREDERICK: Objection, legislative
8  privilege. I would instruct you not to answer.
9  A. I'll assert privilege.
10 Q. (By Mr. Dunn) In your -- I'm going to do
11 several questions. He's going to object, and you're
12 going to answer, but I just want to get these out here.
13       In your conversations with Ms. McGeehan,
14 did you ask her to provide you data on election returns
15 and how they might be impacted by the photo ID
16 requirement?
17       MR. FREDERICK: Objection, legislative
18 privilege. I'll instruct you not to answer.
19 A. I'll assert.
20 Q. (By Mr. Dunn) Did you provide Ms. McGeehan any
21 data or research that you had performed on the effect of
22 the photo ID requirement on turnout?
23       MR. FREDERICK: Objection, legislative
24 privilege. I'll instruct you not to answer.
25 A. I'll assert.

JANICE MCCOY                                                                    MAY 16, 2012

273

1  Q. (By Mr. Dunn) Did you request at any time that
2  the Secretary of State's office prepare research or
3  analysis on whether or not the photo ID requirement
4  would have a disparate impact on minority citizens?
5       MR. FREDERICK: Objection, legislative
6  privilege. Instruct you not to answer.
7  A. I'll assert.
8  Q. (By Mr. Dunn) Are you aware -- this one ought
9  to get past the bully here.
10      Are you aware that the Secretary of
11 State's office has data and computer staff that might be
12 capable of performing an analysis about the impact of a
13 particular legislation on minority citizens?
14 A. I've seen the data that they prepared for the
15 Department of Justice, so yes, I know that now.
16 Q. You know that they are capable of doing that?
17 A. Yes, sir.
18 Q. The data, though, that's been prepared for the
19 Department of Justice, all that came about after Senate
20 Bill 14 had been passed by legislature and signed by the
21 Governor, true?
22 A. True.
23 Q. Other than the resource of the Secretary of
24 State's office, are you familiar with any other
25 organization that you had sort of access to that could

274

1  have performed an analysis, what I would call an
2  analytical analysis of whether or not Senate Bill 14
3  would have disparate impact on minorities?
4       MR. FREDERICK: I'll object on the basis
5  of legislative privilege, only to the extent that it
6  seeks thought process or mental impressions during the
7  development and passage of SB 14, to the extent it --
8  he's asking you as you sit here today, are you aware.
9  Q. Let me fix the question.
10      What resources other than Secretary of
11 State did you have to consult about doing data type
12 analysis on the effect of SB 14 on minorities?
13      MR. FREDERICK: I'm sorry. Could you
14 read -- read the question back, sir?
15      (Requested portion read back by the court
16 reporter.)
17      MR. FREDERICK: I'm going to object on
18 legislative privilege. I think that gets into thoughts
19 and mental impressions. I'll instruct you not to
20 answer.
21 A. I'll assert.
22      MR. DUNN: All right. And I just want to
23 make sure. So she's not allowed to tell me what
24 agencies or groups could have performed this analysis
25 that she's aware of?

275

1       MR. FREDERICK: To the extent you're
2  asking her during -- during the development and passage
3  of SB 14, what she thought at the time was available to
4  her to perform specific subject matter, subject matter
5  specific analysis, yes, I believe that's a thought,
6  mental impression, that's protected by legislative
7  privilege.
8  Q. (By Mr. Dunn) Is it your opinion that this
9  bill will not have the effect of discouraging even one
10 voter?
11      MR. FREDERICK: That's -- cautionary
12 instruction, I mean, I think as phrased, to the extent
13 the question seeks your opinion, as you sit here, you
14 may answer.
15 A. My opinion is that it will not impact one voter
16 negatively.
17 Q. (By Mr. Dunn) All right. If you could go with
18 me to US-31. Right here on the top.
19 A. Oh, yes.
20 Q. I'd like to go with you to the last paragraph,
21 and if I remember your testimony from earlier, you at
22 least prepared the initial draft of 31; is that true?
23 A. Yes, sir.
24 Q. All right. The first sentence of --
25 A. The first phrase.

276

1  Q. And I told you the last paragraph. I really
2  meant the next to the last one that begins with "voting
3  is"?
4  A. Okay.
5  Q. The sentence reads: "Voting is one of our most
6  important rights as Americans, but it is also a
7  responsibility." Do you see that?
8  A. Yes, sir.
9  Q. In my reading, I don't understand, and I don't
10 think it's defined in the writing here what it was meant
11 be responsibility. Is there a sentence that informs
12 what that phrase, "but it is also a responsibility," in
13 this document?
14 A. No, sir.
15 Q. All right. So what is it that you meant, at
16 least when you drafted this, about voting is a
17 responsibility? I mean, why was that in here?
18      MR. FREDERICK: I object on the basis of
19 legislative privilege, to the extent that it seeks a
20 thought or mental impression about pending legislation
21 that goes -- that -- underlying a public statement. So
22 I -- as phrased, I would instruct you not to answer the
23 question.
24 A. I'll assert.
25 Q. (By Mr. Dunn) Do you believe that members who

JANICE MCCOY                                                                 MAY 16, 2012

277

1  don't have a significant population of minority citizens
2  in their district still have to take care to make sure
3  the minority citizens elsewhere in the state are
4  protected under the law?
5     A.  Yes.
6     Q.  In other words, if there's a member that -- and
7  I know this doesn't happen, but if there's a member that
8  just represented 100 percent African-Americans, would it
9  be fair for that member to just ignore the needs of
10 Anglos and Latinos?
11    A.  No.
12    Q.  So when you prepare legislation or help Senator
13 Fraser with legislation, do you consider it one of your
14 responsibilities to make certain that that legislation
15 doesn't have a disparate impact on minority citizens or
16 majority citizens?
17        MR. FREDERICK:  Objection, legislative
18 process.  Instruct you not to answer.
19    A.  I'll assert.
20    Q.  (By Mr. Dunn)  Is there any -- have there ever
21 been situations where you've been working on bills where
22 you believe there was a conflict in your duties under
23 the state constitution and the federal constitution?
24        MR. FREDERICK:  Objection, legislative
25 process privilege.  Legislative privilege.  Instruct you

278

1  not to answer.
2     A.  I'll assert.
3     Q.  (By Mr. Dunn)  Do you believe that federal law
4  is supreme to state law?
5         MR. FREDERICK:  Objection, relevance.
6  Objection, vague.  I would also object on the basis of
7  legislative privilege, to the extent it's asking for
8  what she believes in her role as a role in the Senate.
9  If he's asking for your opinion or belief as you sit
10 here today, not based on confidential matters, you can
11 answer if you can.
12    A.  I do -- I believe that the state -- that the
13 federal government is not superior to the states.
14    Q.  (By Mr. Dunn)  All right.  And that's not what
15 I thought my question was.
16    A.  Okay.
17    Q.  So, but I may have done a bad job of wording
18 it.
19        Really what I'm asking is, to the degree
20 there's conflict between federal law and state law,
21 which one controls, if one does?
22        MR. FREDERICK:  Objection, asks for legal
23 opinion.
24    A.  I don't think I can answer that question.
25    Q.  (By Mr. Dunn)  Well, as you helped Senator

279

1  Fraser prepare legislation, do you have to consider how
2  that legislation will interact with federal law?
3     A.  In some cases, yes.
4     Q.  And do you think the state is authorized to
5  pass statutes that conflict with the federal law?
6         MR. FREDERICK:  Objection, relevance.
7  Objection, legislative privilege, to the extent it seeks
8  her opinion with respect to specific legislation.  To
9  the extent it just asks for your opinion, you can answer
10 if you can.
11    A.  I don't think I have an opinion.
12    Q.  (By Mr. Dunn)  All right.  I'm going to switch
13 gears on you now and go to the ID requirements
14 themselves.  You were asked some questions about
15 nonphoto IDs?
16    A.  Yes, sir.
17    Q.  And as I understand your testimony, without
18 going through it all, but under current state law, a
19 voter can arrive at the polling location without a photo
20 ID and rely on some nonphoto IDs; is that right?
21    A.  That's my understanding, yes.
22    Q.  And some of those things are like utility
23 bills, for example?
24    A.  Yes.
25    Q.  Do you have an opinion as to whether or not a

280

1  nonphoto ID is as effective as a photo ID in
2  discouraging voter fraud?
3         MR. FREDERICK:  Just caution to the extent
4  it asks for your opinion as you sit here today, based on
5  nonprivileged matters, you can answer if you have an
6  opinion.
7     A.  My opinion is the photo ID is a better
8  mechanism to prevent fraud.
9     Q.  (By Mr. Dunn)  Now, do you believe that photo
10 identification can be sort of manufactured?
11        MR. FREDERICK:  Objection, vague.  I'll
12 caution you to the extent you can answer based on
13 personal opinion, not based on privileged information,
14 you may answer if you have an opinion.
15    Q.  (By Mr. Dunn)  Have you ever heard of a fake
16 ID?
17    A.  When I was in college, yes, sir.
18    Q.  All right.  People had fake driver's license?
19    A.  A lot of people had fake driver's licenses,
20 yes, sir.
21    Q.  And they would use them to go into bars and
22 convince the bartender they were 21 and get an alcoholic
23 beverage; is that right?
24    A.  Yes, sir.  Back when we are younger, yes, sir.
25    Q.  You don't think people fake IDs any longer?

JANICE MCCOY                                                            MAY 16, 2012

### 281

1   A. I think it's a lot harder to fake IDs these
2   days.
3   Q. What do you think makes it harder about faking
4   IDs today?
5   A. I think that the provisions of real ID -- the
6   federal provisions of real IDs that Texas has enacted to
7   make driver's licenses harder to fake make it harder.
8   Q. Like, for example, a driver's license now have
9   like a black light insignia; is that right?
10  A. Yes, sir.
11  Q. And there's other things that when you put the
12  ID in a certain type of viewing device, you can see
13  whether it's genuine; is that true?
14  A. That's my understanding. Yes, sir.
15  Q. And you see these devices at the airport, you
16  know, occasionally at the bank; is that right?
17  A. I haven't seen them at a bank but --
18  Q. You've seen them at the airport?
19  A. I don't know that I've seen them at an
20  airport. I haven't flown in over three years.
21  Q. With twins?
22  A. Yes, sir.
23  Q. All right. Well, was there ever any discussion
24  about funding technology of polling locations that would
25  allow the staff to determine whether or not a particular

### 282

1   photo ID was genuine?
2         MR. FREDERICK: Objection, legislative
3   privilege. To the extent you can answer based on
4   discussions on the Floor or any public statements or
5   testimony, you may do so.
6   A. I don't recall any public discussions about
7   that --
8   Q. (By Mr. Dunn) Was there any --
9   A. -- issue.
10  Q. Do you recall any private discussions without
11  giving me the details?
12        MR. FREDERICK: Objection, legislative
13  privilege. Instruct you not to answer that.
14        MR. DUNN: She doesn't even have to admit
15  whether the discussion happened.
16        MR. FREDERICK: I think with the lead up,
17  I believe that the question implies the substance of a
18  conversation. I'm not trying to prevent you from asking
19  if a conversation ever took place, generally, but I
20  think the subject matter was drawn too specifically to
21  lead up.
22  Q. (By Mr. Dunn) Are you aware of any
23  conversations in the consideration of Senate Bill 14
24  relating to technology at the polling location to
25  determine the genuineness of a photo ID?

### 283

1   A. No.
2   Q. Do you know why not?
3   A. Why people didn't have discussions about that
4   issue? No, sir.
5   Q. Now, would you agree that nonphoto ID, if you
6   required a number of them, might be accurate to confirm
7   the identity of a voter?
8         MR. FREDERICK: Objection, calls for
9   speculation. Objection, vague. But you may answer.
10  A. Nonphoto ID, a number of nonphoto ID could
11  confirm the identity of someone, yes.
12  Q. (By Mr. Dunn) Do you know why that wasn't
13  included in the bill?
14        MR. FREDERICK: Objection, legislative
15  privilege. Instruct you not to answer.
16  A. I'll assert privilege.
17  Q. (By Mr. Dunn) Did you have any senators come
18  to you and tell you or in your presence that they were
19  voting against this bill but they really supported it?
20        MR. FREDERICK: Objection, legislative
21  privilege. To the extent that calls for communication
22  between a senator and you, that would be privileged, and
23  I instruct you not to reveal it.
24  A. I'll assert.
25  Q. (By Mr. Dunn) When was the last time you

### 284

1   renewed your driver's license? Ballpark. You don't
2   need to look it up.
3   A. I don't know.
4   Q. Oh, okay. Has it been a while?
5   A. It's been -- yeah. I think I'm due next year.
6   Q. All right.
7   A. So five or six years.
8   Q. Do you use the private DPS office here
9   available to Capitol staff members?
10  A. I think I do it online.
11  Q. Okay. Each time you do it, you do it online?
12  A. The last time I renewed online. I think I
13  renewed when I got married in 2006, or I went in 2006,
14  because I had to actually show my marriage -- my new
15  Social Security card. And since then, I've done it
16  online if I had to do it. I guess, probably, I haven't
17  had to do it since 2006.
18  Q. Are you aware of there being a DPS office
19  available for Capitol employees and state employees?
20  A. If you're speaking of the office at 15th and
21  Congress, I thought that was open to the public.
22  Q. All right. Are you aware of an office that is
23  open to the public but is not advertised to the public
24  for DPS driver's license?
25  A. I didn't know that it wasn't advertised.


JANICE MCCOY                                                                MAY 16, 2012

### 285

1  Q. Did you ever go to a DPS office for a driver's
2  license in the Clement's building?
3  A. No.
4  Q. So if there's an office that is available to
5  the public but isn't otherwise made known to the public
6  for obtaining a driver's license, you wouldn't know
7  about it?
8  A. That's correct.
9  (Recess from 6:20 to 6:23 p.m.)
10  MR. DUNN: I'm going to say the thing
11  today that you're going be the most happy to hear:
12  There are no more questions for you.
13  THE WITNESS: Woo-hoo.
14  MR. DUNN: However -- there's my however
15  -- however, we join in the United States' position we're
16  leaving the deposition open, after the court rules on
17  some issues, and we may have to ask you more questions
18  later on.
19  THE WITNESS: Yes, sir.
20  MR. DUNN: Thank you for your time.
21  (Deposition concludes at 6:24 p.m.)
22
23
24
25

### 286

1  CHANGES AND SIGNATURE
2  RE: TEXAS VS. HOLDER, ET AL
3  PAGE  LINE  CHANGE       REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20  I, JANICE McCOY, have read the foregoing deposition
21  and hereby affix my signature that same is true and
22  correct, except as noted above.
23
24         _____
25                 JANICE McCOY

### 287

1  THE STATE OF _____)
2  COUNTY OF_____)
3
4       Before me,_____, on this day
5  personally appeared JANICE McCOY, known to me (or proved
6  to me under oath or through_____
7  (description of identity card or other document) to be
8  the person whose name is subscribed to the foregoing
9  instrument and acknowledged to me that they executed the
10 same for the purposes and consideration therein
11 expressed.
12      Given under my hand and seal of office
13 this_____day of_____, 2012.
14
15
16                  _____
17                  NOTARY PUBLIC IN AND FOR
18                  THE STATE OF _____
19
20
21
22
23
24
25

### 288

1       IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF COLUMBIA
2
     STATE OF TEXAS,        )
3                           )
        Plaintiff,           )
4                           )
     VS.                    )
5                           )
     ERIC H. HOLDER, JR. in his  )
6    official capacity as Attorney )
     General of the United States, )
7                           )
        Defendant,          )
8                           )
     ERIC KENNIE, et al,    )
9                           )
     Defendant-Intervenors,  )
10
     TEXAS STATE CONFERENCE OF   ) CASE NO. 1:12-CV-00128
11   NAACP BRANCHES,       ) (RMC-DST-RLW)
                           ) Three-Judge Court
12   Defendant-Intervenors,  )
                           )
13   TEXAS LEAGUE OF YOUNG VOTERS )
     EDUCATION FUND, et al,  )
14                          )
     Defendant-Intervenors,  )
15                          )
     TEXAS LEGISLATIVE BLACK   )
16   CAUCUS, et al,         )
                           )
17   Defendant-Intervenors,  )
                           )
18   VICTORIA RODRIGUEZ, et al., )
                           )
19   Defendant-Intervenors.  )
20       REPORTER'S CERTIFICATION
         DEPOSITION OF JANICE McCOY
21           MAY 16, 2012
22      I, Chris Carpenter, Certified Shorthand Reporter in
23  and for the State of Texas, hereby certify to the
24  following:
25      That the witness, JANICE McCOY, was duly sworn by

JANICE MCCOY

MAY 16, 2012

289

1  the officer and that the transcript of the oral
2  deposition is a true record of the testimony given by
3  the witness;
4      That the deposition transcript was submitted on the
5  _____ day of _____, 2012, to the witness or to the
6  attorney for the witness for examination, signature and
7  return to_____, by
8  _____, 2012; and if returned, the original
9  transcript will forwarded to Jennifer Maranzano, the
10 custodial attorney;
11     That the amount of time used by each party at the
12 deposition is as follows:
13     Ms. Maranzano: 5 hours, 28 minutes
14     Mr. Rosenberg: 1 hour, 6 minutes
15     I further certify that I am neither counsel for,
16 related to, nor employed by any of the parties or
17 attorneys in the action in which this proceeding was
18 taken, and further that I am not financially or
19 otherwise interested in the outcome of the action.
20     Certified to by me this 18th day of May, 2012.
21
22     _____
        Chris Carpenter, Texas CSR 1151
23      Expiration Date: 12/31/2012
        100 Congress Avenue, Suite 2000
24      Austin, TX 78701
        (512)328-5557
25      Firm Registration No. 283