1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS           )
                         )
                         )
VS.                      )   NO. 12-CV-128
                         )   (DST, RMC, RLW)
                         )
ERIC H. HOLDER, JR.,     )
In his official              )
Capacity as Attorney     )
General of the United        )
States, ET AL            )

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
ORAL DEPOSITION OF MAJOR FORREST MITCHELL
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

    ANSWERS AND DEPOSITION OF MAJOR FORREST MITCHELL, a
witness called by the United States taken before Janalyn
Reeves, Certified Shorthand Reporter for the State of
Texas, on the 15th day of June, 2012, between the hours
of 9:30 a.m. and 5:46 p.m., in the offices the United
States Department of Justice, 816 Congress Street, Suite
1000, Austin, Texas, pursuant to the agreement of
counsel for the respective parties as hereinafter set
forth.

2:13-cv-193
09/02/2014
DEF0709



Major Forrest Mitchell                          June 15, 2012

```
                                                             2
 1                  A P P E A R A N C E S

 2   FOR THE PLAINTIFF, STATE OF TEXAS:
          OFFICE OF THE ATTORNEY GENERAL:
 3          By:  MR. PATRICK SWEETEN
                    - and -
 4              MR. REYNOLDS BRISSENDEN
          209 West 14th Street
 5          Austin, Texas  78701
            PH:  (512) 936-6432
 6
     FOR THE DEFENDANT:
 7        DEPARTMENT OF JUSTICE
            By:  MR. BRUCE GEAR
 8              - and -
            MR. VICTOR WILLIAMSON
 9        950 Pennsylvania Avenue, NW
          Room 7161 NWB
10        Washington, DC  20530
            PH:  (202) 305-0185
11
     FOR THE INTEVENORS:
12        DECHERT, LLP
            By:  MR. EZRA ROSENBERG
13        902 Carnegie Center
          Suite 500
14        Princeton, New Jersey 08540
            Ph:  (609)) 955-3259
15

16

17

18

19

20

21

22

23

24

25
```

3

1                            INDEX

2                                              PAGE

3       Appearances                              2

4       MAJOR FORREST MITCHELL
             Examination by Mr. Gear Maranzano ....      5
5            Clarifying Examination by Mr. Rosenberg     146
             Further Examination by Mr. Gear.......      147
6            Examination by Mr. Rosenberg..........      210
             Examination by Mr. Sweeten............       215
7            Further Examination by Mr. Gear.......      225
             Further Examination by Mr. Rosenberg..      238
8

9       Signature and Changes                245

10      Reporter's Certificate                   247

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Major Forrest Mitchell                                    June 15, 2012

4

1                                    EXHIBITS

2          NO.              DESCRIPTION                          PAGE
           580              Notice of Deposition                  16
3          581              Letter                         20
           582              Objections and to Notice              27
4          583              Election Code Prosecution             59
           584              Press Release                  98
5          585              Spreadsheet                    99
           586              Press Release                  108
6          587              Press Release                  109
           588              Press Release                  115
7          589              Press Release                  120
           590              Press Release                  128
8          591              Report                           177
           592              Article                        177
9          593              Article                        196
           594              Resource Witness Testimony         204
10         595              Document                                205

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        MAJOR FORREST MITCHELL,

2        having being first duly sworn, testified as follows:

3                            EXAMINATION

4        BY MR. GEAR:

5            Q.   This is the deposition of Major Forrest Mitchell

6        in the matter of Texas V Holder, US DC for DC docket No.

7        1:11 CV 128.  Good morning, Major Mitchell.

8            A.   Good morning.

9            Q.   Could you state your name and spell your name for

10       the record?

11           A.   My name is Forrest Mitchell, F-O-R-R-E-S-T,

12       M-I-T-C-H-E-L-L.

13           Q.   My name is Bruce Gear.  I'm with the Department

14       of Justice.  I represent Eric Holder who is the United

15       States Attorney General.  And could everybody else

16       introduce themselves?

17                   MR. SWEETEN:  Patrick Sweeten with the Texas

18       Attorney General's office on the behalf of the State of

19       Texas and on behalf of the witness, Forrest Mitchell.

20                   MR. BRISSENDEN:  Reynolds Brissenden for the

21       State of Texas and the witness.

22                   MR. ROSENBERG:  Ezra Rosenberg from

23       Dechert LLP representing the Legislative Conference of

24       NAACP branches and the Mexican American legislative

25       caucus.

6

1                    MR. WILLIAMSON:  Victor Williamson from the

2       US Department of Justice.

3       BY MR. GEAR:

4           Q.   Now, you've been sworn in under oath.  You

5       understand that you've been sworn in?

6           A.   Yes, sir.

7           Q.   That you are under oath.  That you're here today

8       to provide testimony and that you're expected to testify

9       completely and as fully as possible.  You understand

10      that?

11          A.   Yes, sir, I do.

12          Q.   Okay.  So I just want to start off with a couple

13      of ground rules so that we understand exactly what we're

14      doing.  I'm going to be asking you questions.  You're

15      going to be providing the answers and so it's very

16      important that during the course of the deposition you

17      allow me to get out my question and then I will allow

18      you to get out your answer completely and fully.  And at

19      anytime during this deposition if you believe you recall

20      something or you stated something in accurately, let me

21      know and I'll allow do you correct that on the record.

22      Do you understand?

23          A.   Yes, sir.

24          Q.   Okay.  You know, so it's important that you allow

25      me to finish my questions and I'll allow you to finish

7

1    your answers.  It's important to answer verbally because
2    a nonverbal answer is hard to catch on a record and the
3    court reporter needs to hear your response.  Do you
4    understand that?
5         A.  Yes, sir.
6         Q.  Okay.  So -- which may happen during this
7    deposition if I ask you a question you don't understand,
8    then, you know, don't hesitate to ask me to repeat it or
9    don't hesitate to ask me to try to restate it so that
10   you can understand it.  This is my opportunity to
11   understand what you know.  So I'm going to be asking a
12   lot of questions, none of them are intended to be
13   personal.  It's intended to get to exactly that, what do
14   you know.  Do you understand that?
15        A.  Yes, sir.
16        Q.  All right.  Is there any reason you think you may
17   not be able to answer completely and truthfully today?
18        A.  No, sir.
19        Q.  Are you taking any type of drugs or medication
20   that may affect your ability to understand the questions
21   that I ask or provide answers today?
22        A.  No, sir.
23        Q.  At any point during this deposition, if you would
24   like to take a break, just what I would ask you to do is
25   work through the question that's before you, complete

8

1     that, let me know that you need to take a break and then

2     I'll allow you do to that.  Is that understandable?

3          A.  Yes, sir.

4          Q.  Okay.  And what may happen during the course of

5     this deposition, there may be objections, there may be

6     discussions between the attorneys.  I just ask that if

7     there's a question before you that you answer that

8     question unless you're directed otherwise by your

9     attorney.  Do you understand that?

10         A.  Yes, sir.

11         Q.  Okay.  Now, during the course of this deposition,

12    we're going to be talking about voter ID, photo ID.  And

13    I would ask that you consider those terms

14    interchangeably throughout this deposition.  I want you

15    to interpret those terms broadly, to mean that the

16    requirement that a voter present a form of

17    identification, whether it has a photo or otherwise,

18    when voting in person before being permitted to vote

19    with a regular ballot.  Do you understand that?

20         A.  Yes, sir.

21         Q.  If I refer to you, I'm asking you a question

22    about you as a member of the special investigations unit

23    of the law enforcement division of the office of the

24    Texas Attorney General's office.  Do you understand

25    that?

9

1          A.   Yes, sir.

2          Q.   Okay.  If I refer to you, I'm also including any

3     staff that you may supervise, but before your attorney

4     objects to this because we've gone down this road

5     before, I am going to do my best during the course of

6     this deposition to identify when I'm referring to you in

7     your capacity in the special investigations unit or when

8     I'm broadening that definition to include others that

9     may be underneath you or within your office.  Do you

10    understand that?

11         A.   Yes, sir.

12         Q.   Okay.  If I say the Texas Attorney General, I

13    mean the Attorney General Greg Abbott.  Do you

14    understand that?

15         A.   Yes, sir.

16         Q.   All right.  And we may, as we get into this

17    deposition, we may be talking about the special

18    investigations unit or the office of the attorney

19    general I may use those interchangeably.  So would you

20    mind if I use the term SIU for the special

21    investigations unit at times and would you understand

22    that?

23         A.   That would be fine, sir.  Yes, I will.

24         Q.   Okay.  So do you understand everything that we've

25    talked about so far?

Major Forrest Mitchell                              June 15, 2012

10

1         A.   Yes, sir, I do.

2         Q.   All right.  And are you represented by counsel

3    today?

4         A.   Yes, sir.

5         Q.   And who is your counsel?

6         A.   Patrick Sweeny and -- I'm sorry.

7              MR. BRISSENDEN:   Reynolds.

8         A.   Reynolds.

9         Q.   Have you ever been deposed before?

10        A.   No, sir.  This is the first time.

11        Q.   Have you ever provided testimony at trial?

12        A.   Yes, sir.

13        Q.   And I know you're an investigator and you

14   probably have provided quite a bit of testimony.  But

15   generally, talk to me and tell me about what type of

16   testimony you provided in the past?

17        A.   Well, for the first year -- first eight years

18   with the Texas Attorney General's office I worked in the

19   prosecutor assistance division.  And one of my charges

20   was to investigate capital murder cases which occurred

21   in the State of Texas.  And so I would testify about my

22   investigative work on those kinds of cases.

23        Q.   And those dealt specifically with capital murder

24   cases?

25        A.   Yes, sir.  During that time I also worked other

11

1      types of cases including public integrity cases, fraud
2      cases, other index crimes and I would testify in
3      criminal proceedings about whatever investigative work
4      that I had done on those cases.
5          Q.  And you said, "during your first eight years"?
6          A.  Correct.
7          Q.  How long have you been with the office of the
8      attorney general?
9          A.  In September I will have been there 15 years.
10         Q.  15 years.  Okay.  So after your first eight
11     years, where did you go?
12         A.  I became the lieutenant of the special
13     investigations unit.
14         Q.  And that was what time period?
15         A.  In 2005.
16         Q.  And the title you just told me you became the?
17         A.  I became the lieutenant.
18         Q.  Lieutenant.  And was that the lead investigator?
19         A.  No.  It was a supervisory position.
20         Q.  Supervisor.  Okay.  So let's focus on 2005.  We
21     were still talking about the types of testimony you may
22     have provided.  So from 2005 forward, have you been
23     involved in trials where you provided testimony under
24     oath?
25         A.  I haven't really testified much up until 2010.

Major Forrest Mitchell                                    June 15, 2012

12

1      Q.   2010.   Okay.   And in 2010 can you tell me a

2  little bit about that testimony?

3      A.   Yes, sir.   I was one of the investigators who

4  assisted on the YFZ case, which occurred out in

5  Schleicher County.

6      Q.   YFZ?

7      A.   YFZ.

8      Q.   Is that short for something else?

9      A.   Yearning for Zion.

10     Q.   Yearning for Zion, okay.   And tell me a little

11  bit about that case?

12     A.   That was a case involving men who had married

13  under age women and had fathered children with those

14  under age women.   And had married multiple women in

15  Schleicher County.

16     Q.   And so as I understand your testimony, that did

17  not involve election code violations?

18     A.   No, sir.

19     Q.   Something completely different?

20     A.   Yes, sir.

21     Q.   Have you testified on any matters that involved

22  election code violations?

23     A.   No, sir.

24     Q.   So other than the YFZ in 2010, have you provided

25  any other testimony at trial, 2005 forward?

13

1        A.    There was one other case that I testified in, but
2    it was in a suppression hearing.
3        Q.    And when you say suppression hearing, what do you
4    mean?
5        A.    It was a suppression hearing on a search warrant
6    that was run.
7        Q.    And did that have anything to do with election
8    code violations?
9        A.    No, sir.
10       Q.    And for the record, what was the issue on the
11   suppression hearing?
12       A.    The scope of the search warrant and items seized.
13       Q.    And you had to appear in court and provide
14   testimony?
15       A.    Yes, sir.
16       Q.    And about what time period was that?
17       A.    I would say it's -- it was either 2006 or 2007.
18       Q.    Okay.  And just so I'm clear now, from 2005
19   forward, I've asked you if you've provided any testimony
20   regarding election code violations.  I believe the
21   answer has been no?
22       A.    That's correct, sir.
23       Q.    Okay.  All right.  And so what did you do to
24   prepare for the deposition today?
25       A.    I reviewed my spread sheets that I prepared.

14

1          Q.   Okay.  And were you -- did you review those with
2     anyone else present?
3          A.   I reviewed those with counsel here.
4          Q.   Anyone else?
5          A.   Huh-uh.  Oh, I'm sorry.  John McKenzie as well.
6          Q.   John McKenzie is also counsel?
7          A.   Yes, sir.
8          Q.   When did you review the spread sheets?
9          A.   Last night and part of last week.
10         Q.   Did you have any other material with you while
11    reviewing the spread sheets?
12         A.   Well, yes.  Indictments and judgments and
13    sentences.
14         Q.   And did you produce the indictments, judgments
15    and sentences to your counsel?
16         A.   Yes, sir.
17         Q.   And when did you produce these?
18         A.   I believe last week.
19         Q.   And any other material that you reviewed while
20    looking at the spread sheets?
21         A.   Are we talking about preparing or providing
22    discovery?
23         Q.   Well, let's start with preparing for the
24    deposition.
25         A.   No, it was just really the spread sheets.

15

1        Q.   In addition to the indictments, judgments and
2    statements?
3        A.   Yes.
4        Q.   Okay.  And when you were talking about preparing
5    or discovery, what were you referencing?
6        A.   The discovery order asked for all documents
7    dealing with voter fraud.
8        Q.   Okay.  And what did you do in response to the
9    discovery?
10       A.   I reviewed my personal e-mail, my work e-mail and
11   documents that I had electronically saved on our
12   network.
13       Q.   Did you produce any of those to your attorney?
14       A.   Yes, sir.
15       Q.   And when did you produce those?
16       A.   It's been an ongoing process.  I started
17   producing them early part of last week.
18            MR. GEAR:  Patrick, do you know if these
19   have been produced to us at this point?
20            MR. SWEETEN:  I know that we produced
21   sentences, judgments, indictments, his spread sheet,
22   everything that was discussed there.  And I think what
23   we've set forth in our objections, whatever we've set
24   forth in our objections we produced all that.
25            MR. GEAR:  Okay.  Because I don't actually

```
                                                                    16
 1        recall ever seeing any e-mails.
 2                    MR. SWEETEN:  I can check on that at a
 3        break.
 4        BY MR. GEAR:
 5            Q.  So we talked about, and we'll get into that a
 6        little bit later, but we talked about documents that you
 7        reviewed in response to the discovery.  Anything else
 8        that you may have reviewed?
 9            A.  I can't think of anything else right now.
10            Q.  Okay.
11                    (Exhibit No. 580 was marked.)
12        BY MR. GEAR:
13            Q.  I'm showing you what's been marked as
14        Exhibit 580.  I ask you to just take a look at that.
15                    MR. SWEETEN:  I would note for the record,
16        that the Attorney General has filed objections and
17        responses to these.
18        BY MR. GEAR:
19            Q.  Just let me know when you've had a chance to look
20        at it.
21            A.  Yes, sir.  Okay, sir.
22            Q.  All right.  I turn your attention to what I
23        believe is Page 5, they're unnumbered, but it starts
24        with documents.  Do you see that?
25            A.  Yes, sir.
```

17

```
 1        Q.  Okay.  And have you reviewed this before, this
 2   document?
 3        A.  I do not believe I've seen the one for June 15th.
 4        Q.  All right.  You saw an earlier version?
 5        A.  Yes, sir.
 6        Q.  And you reviewed the earlier version?
 7        A.  Yes, sir.
 8        Q.  Would you say that this is substantially similar
 9   but for the date, June 15th?
10        A.  Yes, sir, it looks similar.
11        Q.  Okay.  So directing your attention to paragraph 1
12   under documents, it indicates all documents and
13   communications including but not limited to those among
14   and between the office of the Texas Attorney General.
15   And I goes on to say more.  Do you see that paragraph
16   that I'm referring to?
17        A.  Yes, sir.
18        Q.  What, if anything, did you do to respond to
19   paragraph 1?
20        A.  Knowing that --
21             MR. SWEETEN:  Hold on a minute.  When you're
22   answering the question don't reveal communications that
23   you've had with attorneys of our office.  Okay?  So
24   don't reveal matters of attorney/client privilege.  But
25   you can answer otherwise.
```

1      BY MR. GEAR:

2          Q.   And I'm not asking you to reveal communications

3      at this point.  I'm just asking you what, if anything,

4      you or anyone else in your office did to determine if

5      there were responsive documents to paragraph 1?

6          A.   Reviewed my saved files to see if I had anything

7      responsive to SB 14.

8          Q.   Did you have any documents that were responsive

9      to paragraph 1, communications including but not limited

10     to the office of the Secretary of State, division of

11     elections, members of the Texas Legislature?

12         A.   Yes, sir.  I mean, I didn't have anything

13     responsive to that.

14              MR. SWEETEN:  Bruce, let me just tell you

15     I've gotten an e-mail from counsel.  You asked about, I

16     think there was one remaining document or type of

17     documents you asked about, which was e-mails.  I just

18     got an e-mail that indicated that was uploaded last

19     night.  So we have produced some e-mails to you from

20     Mitchell and then all the other areas that we talked

21     about have been provided.

22              MR. GEAR:  Do you know about what time they

23     were uploaded?

24              MR. SWEETEN:  I don't have that.  The

25     attorney was communicating with us in another one of

19

```
1     these depositions.  And so he just indicated it was
2     produced to us last night.  I don't have the time.
3                   MR. GEAR:  Okay.
4     BY MR. GEAR:
5         Q.  All right.  And so I believe your response was
6     that you did not have documents responsive to paragraph
7     No. 1 when it came to communications between the
8     attorney general's office, Secretary of State's office;
9     is that correct?
10        A.  Yes, sir.
11        Q.  And you also indicated that you did not have
12    documents responsive to the members of the Texas
13    legislature; is that correct?
14                  MR. SWEETEN:  I'm sorry.
15    BY MR. GEAR:
16        Q.  Paragraph 1; is that correct?
17        A.  No, sir, I don't have any responsive documents to
18    that.
19                  MR. SWEETEN:  Bruce, I think it's fair to
20    show him his responses when you're going through these.
21    We formally responded to this and I think it would be
22    helpful to him and I think it would make this go faster
23    if you provide him a copy of how we responded because we
24    have listed some documents.
25    BY MR. GEAR:
```

```
 1        Q.   Did you prepare any written response to this
 2   notice of deposition?
 3        A.   I think I prepared an e-mail that said, yes, no,
 4   yes, no, yes, no.
 5              MR. SWEETEN:   Don't reveal the subject of
 6   any e-mails you sent to me or John or Mr. Bruce.  Okay?
 7   BY MR. SEAR:
 8        Q.   Did your assistant prepare any written
 9   communication or document to the Department of Justice?
10        A.   No.
11              (Exhibit No. 581 was marked.)
12   BY MR. SEAR:
13        Q.   I'm showing you what's been marked as
14   Exhibit 581.  I'll give you a chance to look at that.
15        A.   Okay.
16        Q.   Have you seen Exhibit 581 before?
17        A.   No, sir.
18        Q.   Did you assist in preparing Exhibit 581?
19              MR. SWEETEN:   Do you mean the actual
20   drafting?  He's not going to talk about communications
21   we've had regarding documents.  So he's not going to
22   answer substantive communications you've had.  If you're
23   asking about the drafting, I'll let him answer questions
24   as posed.
25   BY MR. SEAR:
```

Major Forrest Mitchell                          June 15, 2012

21

1       Q.  You indicated that you sent an e-mail saying yes,

2   no, yes, no in response to the notice of depositions and

3   I don't want do you get into privileged communication

4   with your counsel.  But was that e-mail sent to your

5   counsel?

6       A.  Yes, sir.

7       Q.  And when was that e-mail sent?

8       A.  Sometime last week.

9       Q.  And who was it sent to?

10      A.  John McKenzie.

11      Q.  Turning your attention to Page 2, last full

12  paragraph where it indicates, "Mr. Mitchell will produce

13  the -- to the Department of Justice convictions and

14  indictments for voter fraud for the time period

15  identified in Exhibit A to Mr. Mitchell's notice by

16  6:00 p.m. on June 8, 2012."  It also goes on to say

17  that, "Mr. Mitchell will produce another spread sheet,

18  redacted of personal identifying information, for the

19  309 voter fraud investigations that he maintains in the

20  ordinary course of duties."  Do you see that?

21      A.  Yes, sir.

22      Q.  It also indicates that, "we continue to assert

23  our objections as to the production of over 10,000 pages

24  of largely irrelevant documents and maintain our belief

25  that a request calling for such as production far

Major Forrest Mitchell                                    June 15, 2012

22

1     exceeds the scope of discovery."  Do you see that?

2         A.  Yes, sir.

3         Q.  Now, when you talk about "10,000 pages of

4     irrelevant documents," can you give me an idea of what

5     you're actually referring to?

6         A.  Case files.

7         Q.  And those are case files that regard the spread

8     sheets that you've provided to the defendant, Eric

9     Holder, in this case?

10        A.  Yes, sir.

11        Q.  And those case files include conviction records,

12    if any?

13        A.  Correct.

14        Q.  They include testimony, if any?

15        A.  I do not believe the case files would include

16    testimony.

17        Q.  Okay.  Why don't we do it this way.  Generally

18    what would the case files include?

19        A.  The case file would generally contain a referral

20    document from an outside agency.

21        Q.  Okay.

22        A.  Such as the Secretary of State's office, a local

23    district attorney's office or county attorney's office.

24        Q.  Which would initiate the action in the attorney

25    general's office?

23

1       A.   Correct.

2       Q.   Okay.  What else would it include?

3       A.   It also could include affidavits from

4    complainants --

5       Q.   Okay.

6       A.   Who forwarded that information to whatever

7    referral agency.  It may contain documents such as voter

8    registration records or mail-in ballot applications or

9    poll place combination forms.

10      Q.   And those documents would have come from the?

11      A.   Referring agency.

12      Q.   Referring agency.  Okay.  Anything else that

13   would be in the files, generally?

14      A.   In the entire case file would be investigative

15   work product, such as interviews of witnesses.

16      Q.   Notes?

17      A.   Notes.  Suspect interviews, audio recordings,

18   personal identifying information of witnesses or

19   suspects contacted, additional election records

20   obtained.  And each one will generally contain an open

21   case form and a closed case form, along with any sorts

22   of court pleadings such as, indictments or information

23   or the final disposition of the case.

24      Q.   Okay.  And do you agree with what's stated here

25   that these would be irrelevant; in particular,

24

1     irrelevant to understanding your spread sheet?

2              MR. SWEETEN:  That's communication that we

3     provided to you on behalf of the witness.  He's not

4     going to comment on what he thinks of the words on the

5     page.

6              MR. GEAR:  Well, I'm asking you --

7              MR. SWEETEN:  That's a legal term.

8     "Relevance" is a legal term.  We're his legal counsel.

9     We represent Mr. -- Major Mitchell.  And we provided to

10    you what our belief is and his position is.  That

11    continues to be his position for you to ask him to

12    characterize our legal interpretation of his words would

13    invade the attorney/client privilege and frankly, is

14    irrelevant.  We're representing him in this case.  So I

15    object to the question.

16    BY MR. GEAR:

17         Q.   You can answer.

18         A.   Can you repeat that, sir.

19         Q.   Can you read back?

20              (Requested question was read.)

21              MR. SWEETEN:  Objection; calls for a legal

22    conclusion.  Objection; relevance.  You can go ahead and

23    answer.

24         A.   There are many documents in these case files that

25    don't deal with SB 14 at all.

Major Forrest Mitchell                                    June 15, 2012

25

1      Q.   But they deal with the issue of -- in this case

2    referring to your spread sheet, which we'll get to

3    later, refer to the issue of voter fraud?

4      A.   In the broad sense, yes.

5      Q.   Well, they're from the referring agency, correct?

6      A.   Correct.

7      Q.   And they're regarding election code violations?

8      A.   Correct.

9      Q.   And in that, when you say, "the broad sense,"

10   they're referring to election code violations referred

11   from a particular agency?

12     A.   Correct.

13     Q.   To the attorney general's office?

14     A.   Yes, sir.

15     Q.   And did you complete your answer?  I'm sorry.

16     A.   I apologize.

17     Q.   You were answering and I interrupted you, I

18   think.  So were you able to complete your answer on

19   that?

20     A.   The large volume of documents deals with all of

21   the election code referrals that this office has

22   received over the years.

23     Q.   Okay.  And am I understanding correctly that

24   there's also and off-site location where files are

25   maintained?

Major Forrest Mitchell                           June 15, 2012

26

1        A.   Multiple.

2        Q.   Okay.  And did you search those off-site

3   locations in response to the notice of deposition?

4        A.   Electronically.

5        Q.   So they are both electronic files and paper

6   files.  Is that your testimony?

7        A.   Yes, sir.  If I could clarify?

8        Q.   Sure, please.

9        A.   We have a case management system and what we did

10   was try to determine the location of the closed case

11   files, all of the election code case files which are

12   maintained off-site.

13        Q.   So it's the closed case files that are maintained

14   off-site?

15        A.   Yes, sir.  If I could clarify that as well?

16        Q.   Please.

17        A.   Due to the large volume of documents, some open

18   case files require that we store them off-site as well.

19        Q.   So they're both open and closed files?  And would

20   all those -- would the information in those files be

21   maintained both by paper and electronically?

22        A.   Only a small portion is maintained

23   electronically.

24        Q.   Okay.  And so my original question was, did you

25   search those files in response to the notice of

27

1     deposition, you indicated electronically, correct?

2          A.   Correct.

3          Q.   So am I -- is it fair to say that you did not

4     search the paper files to determine if there were any

5     responsive documents?

6          A.   I did not search paper files.

7          Q.   Okay.   And I want to be clear on this when I'm

8     saying "you," I mean you or anyone else within your

9     office?

10         A.   Correct.

11              (Exhibit No. 582 was marked.)

12    BY MR. GEAR:

13         Q.   Okay.   I'm showing you what's been marked as

14    Exhibit 582.   I'll give you a chance to take a look at

15    that.   Have you had a chance to look at Exhibit 582?

16         A.   Yes, sir.

17         Q.   And have you seen that exhibit before?

18         A.   Yes, sir.

19         Q.   Did you assist in preparing the answers on

20    Exhibit 582?

21         A.   Can you explain, "prepare"?

22         Q.   Did you provide any input on Exhibit 582?

23              MR. SWEETEN:   Don't reveal anything you said

24    to us, not one word.   You can just say if you've had any

25    effort in drafting that or not and this's all -- that's

1      all we're going to give them.

2           A.   I did not provide any effort in drafting this

3      document.

4           Q.   (By Mr. Gear)  Okay.  And that -- okay.  Your

5      counsel referred to a document that would provide a

6      clearer understanding of what you did to respond to the

7      notice of deposition.  Would that be the document

8      that --

9                MR. SWEETEN:  Feel free to review the

10     document to the extent you need to.

11     BY MR. GEAR:

12          Q.   I mean, if your testimony is that you didn't

13     provide any assistance or input into the drafting of

14     that particular document, I understand that and we can

15     move on.  Is that your testimony?

16               MR. SWEETEN:  No.  What I said earlier is I

17     think it would be fair if you're going to ask him about

18     the categories of documents that you show him the

19     official responses that we submitted to you a week ago.

20     And so he's -- now that he has that in front of him, I'm

21     going to advise him to review it to the extent he needs

22     to in order to answer your question.

23          A.   I apologize, again.  Can you restate your

24     question one more time?

25          Q.   Well, let me actually ask you a different

1    question.  Did you search open files as you've testified
2    to in response to the notice of deposition?
3         A.   No, I did not.
4         Q.   So I'm trying to understand where files are
5    maintained in your office.  I understand there's an
6    off-site location that contains both open and closed
7    files.  In your -- in your physical office where you
8    work on a day-to-day basis, can you describe to me the
9    file system there?
10        A.   Investigators who work in the special
11   investigations unit will have a case file at their
12   actual desk.
13        Q.   And is that paper, is that electronic or both?
14        A.   It would be predominantly a paper file.  There
15   will also be an electronic report that is maintained
16   through our report writing system.
17        Q.   And so in addition to the paper file on your
18   desk, you would have a computer, is my understanding?
19        A.   Yes.
20        Q.   Okay.  Where your electronic files would be
21   maintained?
22        A.   Yes, sir.
23        Q.   And when I asked you, did you search the open
24   files, let me include that to the -- the question to ask
25   you, did you search the paper files that you maintain in

Major Forrest Mitchell                          June 15, 2012

                                                          30

1        your office?

2            A.   Yes, sir.

3            Q.   And those would be open files, closed files or

4        both?

5            A.   Both.

6            Q.   And I believe you also testified that you

7        searched your electronic files?

8            A.   Yes, sir.

9            Q.   And would those contain the open files?

10           A.   And when I say "open," it could be a case that

11       has not been finally adjudicated so it could include

12       that, yes.

13           Q.   Could "open" mean anything else because I would

14       like to understand what you mean by open?

15           A.   We consider a case still open if it's still

16       pending trial and there's not been a final disposition

17       in the case.  And so electronically I would look for

18       indictments, for instance.

19           Q.   Is there a record retention policy in your

20       office?

21           A.   I believe so, yes.

22           Q.   Do you know what that is?

23           A.   Well, it depends on the category of file.

24           Q.   Well, when we're talking about election code

25       violations, are we talking about -- are we always

                                                                    31
1        talking about a criminal investigation?

2             A.   Yes, sir.

3             Q.   So in terms of criminal investigations, is there

4        a retention policy in your office?

5             A.   Yes.

6                  MR. SWEETEN:   Are you asking about SIU or

7        are you asking about the office of the Attorney General?

8                  MR. CEAR:   And that's a good point.

9        BY MR. CEAR:

10            Q.   So let's talk about the SIU first.  Is there a

11       specific retention policy for criminal investigations,

12       the files in your office?

13            A.   Our policy is that once the case is closed and

14       adjudicated or closed unfounded, that the files are

15       given to our records manager.

16            Q.   And who is your records manager?

17            A.   For SIU the records manager would be Sherry

18       Patke.

19            Q.   Can you spell the last name for me?

20            A.   P-A-T-K-E.

21            Q.   And once they've reached the final adjudication,

22       I believe that's how you stated it, what would Sherry do

23       with the files?

24            A.   Sherry would update our mainframe system and then

25       prepare the files for storage.

32

1      Q.   And when you talk about updating the mainframe
2   system, what do you mean by that?
3      A.   Each of our cases is -- each case is assigned a
4   case number through our OAG mainframe.  And each case
5   has a status, open/closed.  And so upon receiving the
6   file, she will update the mainframe to indicate the case
7   is closed.
8      Q.   Okay.  And so when we're talking about a file, do
9   those files include e-mail communications?
10      A.   Only if that e-mail was printed by the
11   investigator.
12      Q.   Do they include correspondence?
13      A.   Yes.
14      Q.   I believe you testified that they would include
15   the investigator's notes?
16      A.   Yes.
17      Q.   Would they include any other type of analysis or
18   report?
19      A.   They would include a narrative report of the
20   investigation.
21      Q.   Generally, any other documents that you would
22   find in one of these files?
23      A.   These files contain lots of documentary items.
24      Q.   Okay.  So once there's a final adjudication, you
25   indicated Sherry would upload it to the mainframe --

33

1       update it to the mainframe.  And then would they be sent

2       to the off-site location?

3            A.   Just the status is updated in mainframe.

4            Q.   Okay.

5            A.   All the documentary files are placed in a box or

6       boxes.  And prepared for long-term storage.

7            Q.   And long-term storage is as we talked about at

8       off-site locations?

9            A.   We keep them in our division for a short period

10      of time.

11           Q.   Is there a determination that certain time period

12      that you keep them there?

13           A.   I don't really know what that is.

14           Q.   And after that short period of time what happens?

15           A.   They're sent to, I believe a warehouse.

16           Q.   And so you indicated there were multiple

17      locations.  Can you tell me how many different locations

18      there are off-site?

19           A.   I do not know how many warehouses we have for the

20      State records system.

21           Q.   Okay.

22           A.   We do have a couple of cases that have large

23      volumes of documentary evidence or records.  And we have

24      those stored in off-site location.  That would be just

25      one location.

1          Q.   And what's the name of that location, if you
2      know?
3          A.   I don't really know the name of it.
4          Q.   Is it here in Austin?
5          A.   Yes, sir, it is.
6          Q.   Okay.  Let me change the subject for a minute and
7      talk about your background.  Could you tell me what your
8      educational background is?
9          A.   I graduated from Southwest Texas State University
10     in 1997 with a bachelor's degree in criminal justice and
11     a minor in sociology.  And then I have attended graduate
12     level courses at the University of Virginia at the FBI
13     academy and then also through Sam Houston State
14     University in Huntsville Texas for the leadership
15     command college.
16         Q.   So the graduate level courses, what was the
17     subject matter of the study?
18         A.   I attended the 233rd FBI national academy in
19     Quantico, VA in 2008.  And while you're attending the
20     academy, you can take graduate level classes through
21     University of Virginia.  I took courses in
22     organizational communication.  I took courses in
23     intelligence, in law enforcement, organizational change,
24     ethics and integrity in law enforcement and forensics
25     for supervisor?

35

1       Q.   Okay.  So as I understand your testimony, you
2   have an undergraduate degree in criminal justice?
3       A.   Yes, sir.
4       Q.   And do you currently hold a master's in any
5   field?
6       A.   No, sir.
7       Q.   Okay.  Any other education generally?
8       A.   Well, yes, sir.  I attended basic peace officer
9   academy in 1993 through the San Antonio College in
10  San Antonio, Texas.  And then over the course of my
11  20 years of public service, I have taken many
12  investigative courses.
13      Q.   Continuing education?
14      A.   Yes, sir.
15      Q.   I understand that.  So you do not hold a law
16  license, correct?
17      A.   No, sir, I do not.
18      Q.   Are there any privileges that you're asserting
19  today?
20              MR. SWEETEN:  I'll assert the privileges as
21  they may come up.  It depends on what you ask him.  If
22  you ask him about his doctor/patient relationship, we'll
23  assert the privilege there.  With respect to -- he's
24  going to assert as to any attorney/client privilege.
25  There also may be occasion wherein the event it comes

1      up, the law investigatory privilege.  And that's a

2      privilege that would -- if in the event he were asked to

3      reveal a law enforcement investigatory technique, that

4      we would assert as to that.  Otherwise, it will depend

5      on the questions that are asked.  Thus far, he hasn't

6      asserted any privilege other than the discussions he's

7      had with us.

8      BY MR. GEAR:

9          Q.   I promise you I won't ask you about your

10     doctor/client privilege?

11               MR. SWEETEN:  That was sort of in gest.

12               MR. GEAR:  I know.

13     BY MR. GEAR:

14         Q.   Are you a member of any organizations?

15         A.   Currently I'm a member of the FBI national

16     academy graduate.

17         Q.   Anything else?

18         A.   No, sir.

19         Q.   Have you ever heard of the Austin Area Chapter

20     Association of Certified Fraud Examiners?

21         A.   Yes, sir, I have.

22         Q.   Is that an organization with a membership?

23         A.   Yes, sir.

24         Q.   Are you a member of that organization?

25         A.   No, sir.

37

1     Q.   Have you ever presented for that organization,

2     provided any speeches, information related to what you

3     do in the office of the Attorney General?

4        A.   Yes, sir.

5        Q.   Okay.  Do you know how often you do presentations

6     in front of this organization?

7        A.   I believe I've done two presentations for the

8     Austin chapter.

9        Q.   And do you recall when those presentations were?

10       A.   They were a few years ago.

11       Q.   General time period?

12       A.   I would say between 2006 and maybe 2010.

13       Q.   And you indicated that that particular

14    organization, The Association of Certified Fraud

15    Examiners, has a membership?

16       A.   Yes, sir.

17       Q.   Okay.  And have you ever been a member?

18       A.   I don't believe -- no, I have not.

19       Q.   All right.  Any other -- let's talk a little bit

20    about your work experience.  So you indicated that

21    you're currently with the SIU division.  Can we walk

22    that back a little bit and tell me about your work

23    experience?

24       A.   Well, if I could clarify, I now also supervise

25    the fugitive apprehension unit or the sex apprehension

                                                              38
1       unit as well.  Those are the two units that I'm

2       responsible for supervising, SIU and the fugitive

3       apprehension unit.

4          Q.  And just briefly, for the fugitive apprehension

5       unit, when did you become a supervisor?

6          A.  May 1st.

7          Q.  Does that have anything to do with election code

8       violations?

9          A.  No, sir.

10         Q.  Okay.  So turning your attention back to the SIU,

11      when did you become a supervisor there?

12         A.  In 2005.

13         Q.  And prior to 2005, were you in the office of the

14      Attorney General?

15         A.  Yes, I was.

16         Q.  And can you tell me a little bit about what you

17      did prior to 2005?

18         A.  I was hired with the Texas Attorney General's

19      office the Fall of 1997.  I was an investigator assigned

20      to the prosecutor assistance division in special

21      investigations for -- I'm sorry.  From 1997 to 2003, I

22      worked in that division.  As I stated previously, a good

23      portion of that was working on capital murder

24      investigations throughout the state.  We also did other

25      types of investigations at the request of local district

39

1    county attorneys.  These could be any kind of case from

2    an aggravated robbery to a public integrity

3    investigation.

4        Q.   When you say, "public integrity," what are you

5    referring to?

6        A.   This -- a typical case would involve a local

7    official who could be in law enforcement or an elected

8    official or an appointed official who engages in any

9    kind of criminal misconduct associated with their office

10   or while in office.

11       Q.   So you were with -- you were with this particular

12   division from 1997 to 2003, correct?

13       A.   With an exception of about two and a half weeks.

14   I left the office of the Attorney General and went to

15   the Texas Department of Insurance for about two and a

16   half weeks.

17       Q.   And the Texas Department of Insurance has nothing

18   to do with election code violations?

19       A.   That's correct.

20       Q.   All right.  And so let's just focus on the 1997

21   to 2003.

22       A.   Okay.

23       Q.   Did you -- did you ever have an occasion during

24   that time period to work on election code violation

25   referrals, allegations?

1    A.   One.

2    Q.   One.   Can you tell me about that?

3    A.   There was -- and I can't give you the date.   But

4    it was when I came on as a new investigator, there was

5    an allegation of election misconduct in the handling of

6    ballot boxes in Liberty County.

7    Q.   Do you recall who was the alleged wrong doer in

8    that case?

9    A.   No, sir, I don't.

10   Q.   Do you recall any specifics about the

11   investigation?

12   A.   No, sir.   By the time I got the case the statute

13   of limitations expired.

14   Q.   And the overall allegation was, could you say

15   that again?

16   A.   I believe the handling of the ballot boxes.

17   Q.   Was that misconduct by an official?

18   A.   I don't remember.

19   Q.   Is it fair to say that -- that the one case that

20   you dealt with between 1997 and 2003 did not deal with

21   voter impersonation?

22   A.   Yes, sir, that's fair.

23   Q.   So between 2003 to 2005, what responsibilities

24   did you have within the attorney general's office?

25   A.   I was assigned as a long-term case investigator.

Major Forrest Mitchell                                    June 15, 2012

41

1      Q.   And tell me what the responsibilities are and

2   what division you were in?

3      A.   In 2003, all of the investigators with the office

4   of the Attorney General merged into the criminal

5   investigations division.  Previously we had been

6   assigned to specific divisions that handled specific

7   types of cases.  The prosecutor assistance division did

8   any type of case that a local district or county

9   attorney needed assistance on or had been recused in.

10   And so again, I could work any type of case.  And there

11   were other divisions that had like financial crimes,

12   they had investigators as well.  And the cyber crimes

13   was another particular unit.  In 2003 all of the

14   investigators were merged into one division focusing the

15   same in units of specialization.

16      Q.   Okay.  So I think I understand that.  So between

17   2003 and 2005, did you ever have an occasion to work on

18   an election code violation case?

19      A.   In mid-2005 I did when I became the lieutenant.

20      Q.   And when you say, "when you became the

21   lieutenant," were you part of the SIU at this time?

22      A.   Yes, sir.

23      Q.   So between 2003, 2005 until you became the

24   lieutenant in the SIU, you did not work on any election

25   code violation cases?

Major Forrest Mitchell                          June 15, 2012

42

1          A.   That's correct.

2          Q.   Okay.  So let's move forward then, regarding --

3     actually, I would like to back up.  I'm sorry.  You were

4     talking about the records that are maintained in your

5     office.  Do the electronic records contain scans of

6     every hard copy document in storage?

7          A.   No, sir.

8          Q.   They do not.  Moving forward to 2005 when you

9     became the lieutenant in the SIU, how did you become the

10    lieutenant for that particular position?

11         A.   I believe we submitted our names for

12    consideration and the supervisor of the division

13    reviewed memos and our personnel files and then made a

14    selection.

15         Q.   And who did you submit your -- did you say letter

16    of recommendation?  I'm sorry.

17         A.   I'm sorry.  We submitted our names for

18    consideration and we submitted those to David Boatright.

19         Q.   David Boatright.  And who is David Boatright?

20         A.   He was the division chief at the time and was

21    later my Major.

22         Q.   And he was the division chief for the SIU?

23         A.   For the entire criminal investigations division.

24         Q.   And obviously you were selected?

25         A.   Yes, sir.

43

1      Q.   So when you were selected, was that automatically
2   a supervisory position?
3      A.   Yes, sir.
4      Q.   And I believe you said you held the rank of
5   lieutenant?
6      A.   Yes, sir.  If I could clarify?
7      Q.   Please.
8      A.   It was an investigator supervisor.  Because we're
9   so small, I still had to work some cases.
10     Q.   So in 2005 you became the investigative
11  supervisor.  Can you tell me how many people you
12  supervised, if any?
13     A.   I think it was a small group of maybe -- it
14  varied over the years.  But anywhere between 8 and 12.
15     Q.   And we're talking about 2005 at this point?
16     A.   Yes, sir.
17     Q.   Between 8 and 12.  Can you tell me generally what
18  the responsibility of the -- were they all
19  investigators?
20     A.   Yes, sir.
21     Q.   Of the investigators you supervised, what was
22  their responsibility?
23     A.   What was their responsibility or mine?
24     Q.   What was their responsibility?
25     A.   To conduct investigations that were referred to

1    our office.

2         Q.   And am I accurate to say that the SIU does not

3    only deal with election code violations, it deals with a

4    broad variety of different violations?

5         A.   That would be accurate.  We deal with a wide

6    variety of criminal investigations.

7         Q.   And generally, can you tell me the types of

8    investigations that the SIU deals with?

9         A.   Public integrity, election violations, white

10   color crimes such as fraud.  And are you talking 2005 or

11   all the way to present, now?

12        Q.   Let's start off in 2005, just so we're clear.

13   When you started off in 2005, what was the

14   responsibility of the SIU?

15        A.   I would say fraud, election fraud, public

16   integrity and whatever type of case needed additional

17   investigative assistance.  An example, around that time

18   there were many death penalty cases that were under

19   review for consideration of mental retardation.  So some

20   of our investigators had to go back and examine those

21   cases to determine whether or not there was evidence of

22   mental retardation.

23        Q.   Okay.  So you started off as a lieutenant.  Can

24   you tell me how -- the time periods of which you gained

25   your promotion to a different rank?

45

1        A.   I was promoted to captain of the special

2   investigations unit in, I believe the Fall of 2007.

3        Q.   And you just recently became a major?

4        A.   Yes, sir.

5        Q.   In 2012?

6        A.   Yes, sir.

7        Q.   And I believe, off the record you said May of

8   2012?

9        A.   Yes, sir, May of 2012.

10        Q.   Now, does the increase in rank does that give you

11   any additional responsibility?

12        A.   Yes, sir.

13        Q.   It does.  Okay.  So as a lieutenant in the SIU,

14   can you tell me what your identified responsibilities

15   were?

16        A.   Was to supervise the daily and weekly

17   investigative activity of the investigators in my unit.

18   That would include reviewing case reports, and providing

19   them assistance or guidance as needed.  In many cases, I

20   would also actually accompany the investigators out into

21   the field if they needed additional manpower.

22        Q.   Would you sign off on the case reports?  Was that

23   part of your responsibility?

24        A.   Either I would or my captain at the time.

25        Q.   Who was your captain at the time?

1          A.   In 2005 it would be Greg Lucus.

2          Q.   Is he still there with you now?

3          A.   Yes.

4          Q.   Still a captain?

5          A.   Yes.  He is not a part of the special

6     investigations unit, however.

7          Q.   From 2005 to the present, has the size of the

8     investigators underneath you changed?

9          A.   Substantially.

10         Q.   Okay.  And so I understand in 2005 there were

11    between 10 to 12.  Can you tell me how the growth has

12    occurred within your office?

13         A.   Well, I believe it was in 2008, the money

14    laundering unit was absorbed into the special

15    investigations unit.  And that area of responsibility

16    was added.

17         Q.   How many investigators came along with that?

18         A.   I would say about eight or nine.

19         Q.   Any other units that have been absorbed into the

20    SIU?

21         A.   Also the -- what we call the criminal litigation

22    unit, which would be the group of investigators who

23    assist prosecutors in the prosecution of cases.  That's

24    about six.

25         Q.   About six.  Any other units?

Major Forrest Mitchell                                   June 15, 2012

47

1     A.  I have a group that is assigned to the joint

2  terrorism task force.  And that has a ranged between two

3  and three employees.

4     Q.  So is that it?  Are there any other units?

5     A.  Well, in May of 2012, I also was added to the --

6  the fugitive apprehension was added to my

7  responsibility.

8     Q.  And they were absorbed into the SIU?

9     A.  No, sir, it's a separate group, but it's about 24

10 or 25 employees.

11    Q.  Okay.  Do their responsibilities cross over?

12    A.  No, sir, they do not.

13    Q.  Okay.  So if my calculations are correct, there

14 are approximately 30 investigators underneath you from

15 the various units that have been absorbed?

16    A.  I think it would be a more accurate statement to

17 say between -- I think there's 40 commissioned state

18 police officers in special investigations unit and about

19 24 in the fugitive apprehension unit.

20    Q.  So 40 in SIU?

21    A.  Correct.

22    Q.  And you said "commissioned police officers," what

23 does that mean?

24    A.  Investigators who are commissioned through the

25 State law enforcement.

Major Forrest Mitchell                                      June 15, 2012

48

1      Q.   And they all carry badges?

2      A.   Yes, sir.

3      Q.   They are police officers?

4      A.   Yes, sir.

5      Q.   Okay.  And you indicated that there was a captain

6   underneath you.  Did you say Greg Russ?

7      A.   I'm sorry.  His name -- he is not part of my

8   unit.  But he was my captain back in 2006.

9      Q.   Okay.  Do you have -- I'm trying to understand

10   the structure.  I know you've got 40 commissioned police

11   officers, investigators that work underneath you and

12   that you supervise.  Is there another structure?  Are

13   there other managers within your unit?

14      A.   Yes, sir there are.

15      Q.   Okay.

16      A.   There are two captains.

17      Q.   Two captains.

18      A.   One for the special investigations unit and one

19   for the sex offender apprehension unit, fugitive unit.

20      Q.   And the name of the captain that's in the SIU

21   unit?

22      A.   Would be Daniel Guajardo.

23      Q.   And Daniel reports directly to you?

24      A.   That is correct, sir.

25      Q.   What about the other captain?

49

1      A.   He reports to me as well.  And his name is Bruce

2   Cook.

3      Q.   Does Bruce Cook's responsibilities cross over

4   into the SIU unit?

5      A.   No, sir.

6      Q.   Okay.  So as I understand the structure of the

7   SIU, you are the lead investigator, the supervisor.

8   There's one captain, Daniel?

9      A.   Guajardo.

10     Q.   Guajardo.  And then there are 40 police officers,

11  investigators that are underneath you, correct?

12     A.   Yes, sir.

13     Q.   Okay.  And do you have general staff that

14  assists, supports -- support staff?

15     A.   Yes, we do.

16     Q.   And generally how large is your support staff?

17     A.   I believe we have four auditors.

18     Q.   What does that mean, "auditors"?

19     A.   These are, in some cases they're CFEs or CPAs who

20  assist in the investigation that we conduct.  They're

21  noncommissioned personnel.

22     Q.   CPA's?

23     A.   Certified public accountants.

24     Q.   Accountants.  They would be assisting with

25  white-collar crimes?

50

1       A.   Correct.

2       Q.   Okay.  Do you have any other support staff that

3   would actually go out into the field?  And I'm just

4   speaking specifically about the election code violations

5   to assist with investigations?

6       A.   No.  Civilians wouldn't go in the field.

7       Q.   Okay.  What are the names of the auditors?

8       A.   Kyle Swihart, Roxanne Mendoza, Rebeka Rutland,

9   Kim Holderread.

10      Q.   And would any of the individuals that you just

11  mentioned, would they be involved in election code

12  violations?

13      A.   The only way they would be involved in election

14  code violations is if we were conducting an

15  investigation of campaign finance violations or the

16  improper use of government monies for political

17  purposes.

18      Q.   Have you had those types of investigations within

19  your office?

20      A.   Yes, sir.

21      Q.   All right.  And can you tell me how many of those

22  types of investigations you've conducted within your

23  office?

24      A.   I would -- to give you a firm number I would have

25  the review my spread sheet.  But if I were to hazard a

51

1    guess it would be half a dozen or so.

2        Q.    One more time focusing on your promotion, what is

3    the process of moving from lieutenant to major?    What is

4    the process that you had to go through for your

5    promotions?

6        A.    We generally prepare a memo involving our core

7    competencies in the identified areas for the position.

8    And this could be a two to three page memorandum, along

9    with a resume.    And then there is a board review.

10       Q.    Okay.    And after each board review, you're told

11   of the determination, if you've been promoted.    Would

12   that be fair to say?

13       A.    Yes, sir.    You are scored by the board and then

14   you're advised of the promotion.

15       Q.    Okay.    And so you indicated previously that there

16   are additional responsibilities that are added with each

17   promotion.    So as a major, is there any other

18   responsibilities that we haven't discussed here?    I

19   mean, I understand the structure of your office.    I

20   understand that there have been units that have been

21   added to your office.    Is there anything else that is

22   of -- that I should know about the structure or your

23   responsibilities?

24       A.    Since I've been promoted to major, I think one of

25   the more substantial responsibilities is now budget, is

52

1    dealing with budgets and hiring.

2        Q.   And when you say budgets, generally what do you

3    mean by that?

4        A.   Both general revenue funding and then grants that

5    we may have through the attorney general's office.

6        Q.   Okay.  So again, I understand the structure of

7    your office now, but what is the special investigations

8    unit?  What are the specific responsibilities of that

9    unit?

10       A.   Currently there is an election team, a fraud

11   team, a public integrity team, a human trafficking team,

12   a financial investigations team, a money laundering team

13   and a prosecution assistance team.  There is also a

14   group of auditors who assist those different teams and a

15   group of analysts who assist those teams.

16       Q.   And what are the responsibilities of the

17   analysts?

18       A.   The analysts would assist investigators in

19   obtaining contact information regarding witnesses.

20       Q.   Do they help maintain the files?

21       A.   No.

22       Q.   Is it the investigator's responsibility to

23   maintain the individual file?

24       A.   Yes, until it's finally done.

25       Q.   Okay.  And then at that point it would go to

53

1    Sherry, if I understand correctly?

2         A.   Yes, sir it would.

3         Q.   Okay.  What else do the analysts do?  You said

4    they assist with contact information?

5         A.   They would help prepare any kind of charts, if

6    there were any kind of charts developed.  They would

7    search criminal history information.

8         Q.   And they're civilians, correct?

9         A.   Yes, sir, that's correct.

10        Q.   All right.  And so out of all these teams that

11   you have described, which ones would deal with election

12   code violations?

13        A.   Just the elections team.

14        Q.   So you have an elections team and a fraud team.

15   Does the fraud team deal with election code violations?

16        A.   If I could clarify?

17        Q.   Sure.

18        A.   It depends on the volume of cases that we have or

19   the volume of work required for any of the

20   investigations.

21        Q.   Okay.

22        A.   I would have a public integrity investigator

23   assist the elections team or I could have a human

24   trafficker investigator assist so long as it's not

25   prohibited by their grants or anything like that.

54

1          Q.   Okay.

2          A.   So there have been some investigations which have

3     required more investigators than what are currently

4     assigned to the elections team.

5          Q.   So as I understand it, the area of concentration

6     for the elections team is election code violations?

7          A.   Correct.

8          Q.   But other teams can assist when necessary or

9     individuals from those teams?

10         A.   Yes, sir.

11         Q.   How many individuals do you have working on the

12    elections team?

13         A.   I think there are three right now.

14         Q.   Three.  And who are those individuals?

15         A.   It would be Stormy Jackson, Wayne Rubio and

16    Jeanette.  I'm sorry.  Oh, gosh.

17         Q.   Take your time.  That's a lot of people you

18    supervise.

19         A.   It's Jeanette, I can't remember her -- I'm sorry.

20    Jeanette -- Josephine Smith.

21         Q.   And did any of these individuals, Jackson, Rubio

22    or Smith, assist you in searching documents for the

23    notice of deposition?

24         A.   No.  The only instruction I gave them was to get

25    their investigative files in order.

55

1          Q.   And that's both paper and electronic?

2          A.   I just said investigative case files.

3          Q.   Okay.  And what does that mean?

4          A.   It would mean their actual paper files.

5          Q.   Okay.  That would not include the electronic

6     files -- strike that.  Do they maintain electronic

7     files?

8          A.   Through our case reporting system.

9          Q.   When was the special investigations unit formed?

10         A.   I believe in June of 2005.

11         Q.   And how was it formed?

12         A.   I don't know.

13         Q.   Why was it formed?

14         A.   I don't really know.

15         Q.   Was it in response to any particular concerns

16    that you're aware of?

17         A.   I don't know.

18         Q.   Was it the subject of a grant?

19         A.   At some point in time, SIU has had, and still

20    does today, have investigators who are grant funded

21    positions.

22         Q.   Where would those grants come from?

23         A.   I don't know much about the grants reporting back

24    in 2005, but I do know that the grants that we currently

25    have are typically through the governor's office.

56

1       Q.   Do you know the amount of the grants that have
2    come from the governor's office?
3       A.   In total or the ones we currently -- the ones we
4    currently have.
5       Q.   Are you aware of the grant coming from the
6    governor's office in 2005?
7       A.   Yes, I'm somewhat aware of it.
8       Q.   What was the amount of that grant?
9       A.   I would say it's in excess of probably a million
10   dollars.
11      Q.   A million dollars.  And when you say "in total,"
12   do you mean that there have been a series of grants from
13   the governor's office?
14      A.   Yes.  Because we also have grants that are
15   through the -- for instance, an example would be the
16   HIDTA task forces.
17      Q.   HIDTA stands for?
18      A.   High intensity drug trafficking area.
19      Q.   Okay.
20      A.   So we have grants through there.
21      Q.   Okay.  So let me see if I can ask this in a way
22   that it makes sense.  In total, how much in the form of
23   grants from the governor have been dedicated to the SIU
24   division?
25      A.   I don't think I have that answer.

57

1          Q.   In total, how much in grants from the governor's

2     office have been dedicated to dealing with the issue of

3     election code violation?

4          A.   It would only be a portion of the grants that we

5     receive.

6          Q.   Okay.  And can you give me a general total as to

7     what we're talking about?

8          A.   Well, in -- if I could.  In 2005, I think we did

9     get a Burns Grant from the governor's office.  And

10    that's the grant I think that was in excess of a million

11    dollars.

12         Q.   Okay.

13         A.   Out of that grant the OAG hired a number of

14    investigators.  A portion of which served in the special

15    investigations unit.

16         Q.   Now, when these grants are issued, is there an

17    indication of the purpose or the reason for the grants?

18         A.   Yes.

19         Q.   Okay.  And so you talked about the Burns Grant in

20    2005.  What was the reason for the Burns Grant?

21         A.   To conduct criminal investigations.  I believe,

22    if my memory is correct, it was for money laundering,

23    sex offender apprehension, cyber crimes, public

24    integrity and election code violations and white-collar

25    crimes.

58

1      Q.   So it was not just election code.  It was a
2   series of different responsibilities that the SIU had at
3   the time.
4      A.   I'm sorry.  Could you restate that one more time?
5      Q.   Sure.  The grant that was in excess of a million
6   dollars was -- was that for the SIU unit or was that for
7   the OAG's office in general, and it was disbursed
8   amongst the various units?
9      A.   It was a grant for the entire criminal
10   investigations division and it was disbursed between the
11   various units.
12      Q.   Okay.  Can you tell me, either specifically or
13   generally, how much money has been dedicated to election
14   code violations in the State of Texas at this point?
15   And I'm talking about the SIU unit.
16      A.   I really don't have that number.
17      Q.   You give me a general ball park?
18      A.   I believe we only had that grant for one or
19   two years.
20      Q.   Okay.
21      A.   And I want to say that -- my memory is that about
22   $90,000 of that grant was used for the investigation and
23   prosecution of election code offenses.
24      Q.   And you're talking about the 2035 grant?
25      A.   Yes, sir.

```
                                                            59
 1              (Exhibit No. 583 was marked.)
 2      BY MR. GEAR:
 3         Q.   I'm showing you what's been marked as Exhibit 583
 4      and I'll give you a chance to take a look at that.
 5         A.   Okay, sir.
 6         Q.   Okay.  Have you seen this document before, sir?
 7         A.   No, sir.
 8         Q.   Okay.  Can you tell me what it?
 9         A.   It is titled election code -- election code
10      resolve prosecutions by the office of the Attorney
11      General.
12         Q.   Okay.  And can you tell me what this is in
13      reference to?
14    ' A.   It indicates the number of cases, criminal
15      investigation division case hours, criminal prosecution
16      division case hours, criminal investigation division
17      cost, criminal prosecutions division cost and then a
18      combined cost.
19         Q.   And have you prepare add similar form in
20      functions of your duties?
21         A.   No, sir.
22         Q.   This indicates -- and if you look at the bottom
23      right-hand corner, it indicates January 23, 2011.   Do
24      you see that?
25         A.   Yes, sir.
```

Major Forrest Mitchell                                    June 15, 2012

                                                                      60

1          Q.   And it says, "as of January 25, 2011?"

2          A.   Yes, sir.

3          Q.   So as of January 25, 2011 it indicates that -- up

4     at the top, "resolved prosecutions."  Do you see that?

5          A.   Yes, sir.

6          Q.   And it says, "number of cases."  Do you see that?

7          A.   Yes, sir.

8          Q.   And what's that number of cases?

9          A.   62.

10         Q.   And would that be accurate as of January 25,

11    2011?

12         A.   I believe that would be representative of that

13    time.

14         Q.   It says, "criminal investigation division case

15    hours."  And do you see the number there?

16         A.   Yes, sir.

17         Q.   And how many number -- what is that number?

18         A.   10,649.

19         Q.   Do you believe that that would be accurate

20    representation?

21         A.   I don't know if that number deals with just those

22    specific prosecutions or if it's actually larger.

23         Q.   And when you say, "specific prosecutions," you're

24    talking about if it just deals with election code

25    violations?

Major Forrest Mitchell                                    June 15, 2012

61

1      A.   Yes, sir.

2      Q.   Okay.  So it could be more or it could be less,

3   if I understand your testimony?

4      A.   Correct.

5      Q.   Do you know who prepared -- who prepared this

6   form?

7      A.   I don't know who prepared the form.

8      Q.   Do you know who would be responsible for

9   preparing this form?

10      A.   I believe it would be our budget or accounting

11   division.

12      Q.   Okay.  And if I understood your testimony, you

13   are now in charge of budgeting aspects?

14      A.   No, sir, not completely.  We have a budget and

15   accounting division and I would work with them on

16   various issues.

17      Q.   Does that have a supervisor?

18      A.   Budget has a supervisor and I think accounting

19   has a supervisor as well.

20      Q.   And who would that supervisor be for budgeting,

21   first?

22      A.   I've met a lot of new people in the last month

23   and a half.  I don't know who's in charge of the budget

24   right now.

25      Q.   Okay.  And the other division that you --

62

1          A.   The other would be accounting division.

2          Q.   And do you know who the supervisor for accounting

3     is?

4          A.   I believe that's Greg Herbert.

5          Q.   Greg Herbert.  Okay.  All right.  So essentially

6     this goes through -- and again, the title of this

7     document is election code resolve prosecutions.  And it

8     goes through number of cases, the number of hours,

9     criminal prosecution division case hours.  Why would

10    that be distinguished between investigation division

11    case hours and prosecution division case hours?

12         A.   I believe internally within the OAG they have

13    divided budgets.

14         Q.   Okay.  And so who would be the supervisor of the

15    budget division in 2011, if you know?

16         A.   I don't know.

17         Q.   It says, "combined CID, CPD hours."  Do you know

18    what that stands for?

19         A.   Combined CID and CPD hours I believe would

20    represent a total of the hours worked by the criminal

21    investigations division or the criminal prosecutions

22    division.

23         Q.   Okay.  And that number is 16,952?

24         A.   Yes, sir.

25         Q.   And then its goes on to indicate, "criminal

63

1    investigation division costs:"  Do you see that?

2         A.   Yes, sir.

3         Q.   And what is that cost?

4         A.   $792,217.

5         Q.   Okay.  And then, the next line is, "criminal

6    prosecution division cost."  Do you see that?

7         A.   Yes, sir.

8         Q.   All right.  And do you see what the number is?

9         A.   $483,258.

10        Q.   And the combined cost of both?

11        A.   $1.275475.

12        Q.   All right.  And then in -- at the bottom of this

13   sheet it indicates, "statistics on this sheet relate to

14   election code prosecutions during the Abbott

15   Administration as of January 21, 2010," correct?

16        A.   Yes, sir.  That's what it says.

17        Q.   Okay.  And so it also includes a total direct

18   expense such as travel, court cost and other case fees.

19   Do you see that?

20        A.   Yes, sir.

21        Q.   All right.  Any reason to dispute the numbers

22   that are indicated on this exhibit?

23        A.   No, sir.

24        Q.   All right.  Do you know how much has been

25   expended for election code violation prosecutions from

64

1      January of 2010 to the present?

2          A.   No, sir, I do not.

3          Q.   So what is the purpose of the, I believe you

4      said, "election team," what is the purpose of the

5      election team?

6          A.   The elections team responsibility would be to

7      conduct criminal allegations of election code offenses.

8      These are typically referred by the Secretary of State,

9      local, district county attorneys, local elections

10     administrators or local law enforcement.

11         Q.   Okay.  And I believe I asked you this before, but

12     let me make it more specific to the elections team.  Was

13     the elections team formed in response to any concerns

14     that you're aware of?

15         A.   It's my understanding that since 1985 the office

16     of the Attorney General has had jurisdiction in election

17     code offenses or concurrent jurisdiction.  So the office

18     of the Attorney General conducts those kinds of

19     investigations.

20         Q.   And do you have knowledge of election code

21     prosecutions, investigations going back to 1985?

22         A.   No, sir, I do not.

23         Q.   Would those records be maintained somewhere?

24         A.   I don't know what the records retention is for

25     those.

                                                              65

1           Q.    How far back does your knowledge extend?

2           A.    I would say it goes back to, I think, 2002.

3           Q.    Are you aware of any voter impersonation

4     investigations, prosecutions, that occurred prior to

5     2002?

6           A.    No, sir.

7           Q.    You talked a little bit about the jurisdiction of

8     the SIU.  What jurisdiction does the special

9     investigations unit have in the State of Texas?

10          A.    Do you mean specifically towards elections or in

11    the broader sense?

12          Q.    Elections.

13          A.    Chapter 273 of the Texas Elections Code discusses

14    the investigations of election code violations.  If you

15    have a single jurisdictional election, the jurisdiction

16    may rest with the local district or county attorney.  If

17    you have multi-jurisdictional elections, then the

18    jurisdiction may rest with the Texas Attorney General's

19    office.  Chapter 273 authorizes the Texas Attorney

20    General's office to conduct investigations and

21    prosecutions of either type, working in conjunction with

22    local DAs or law enforcement.

23          Q.    So when you say, "it authorizes them," does that

24    mean they have direct jurisdiction?

25          A.    Yes, I believe the statutory language says they

1    have concurrent jurisdiction.

2        Q.   Are they authorized to take the lead on any of

3    these particular investigations, prosecutions?

4        A.   I believe that in the case of

5    multi-jurisdictional elections, the answer would be yes.

6        Q.   All right.  And I believe you've answered this in

7    a general way.  Does the SIU prosecute the cases that it

8    investigates?

9        A.   Oh, no, sir.

10       Q.   So let's talk about that structure a little bit.

11   Your unit, the SIU, conducts the investigations.  How

12   does it then, shift to the prosecution stage?

13       A.   At the completion of our investigation, we would

14   prepare an investigative packet with statements,

15   reports, supporting documentation, it could be recorded

16   interviews, those kinds of things.  And that would be

17   presented to the local district attorney, county

18   attorney or to the criminal prosecutions division.

19       Q.   And did you produce these election investigation

20   packets to your attorney, to your attorney in this case?

21       A.   In the scope of this?

22       Q.   Yes.

23       A.   No.

24       Q.   All right.  And you said something in your

25   answer, and I want to kind of flesh that out a little

67

1    bit.   The investigations packet would be then, turned

2    over to -- can you go through those again for me?

3         A.   It would be either the criminal prosecutions

4    division, or a local district or county attorney.

5         Q.   Okay.   And so the criminal prosecutions division

6    is within the office of the Attorney General, correct?

7         A.   Yes, sir.

8         Q.   Okay.   And they would be the ones that would be

9    primarily responsible for prosecutions within your

10   office, the OAG's office?

11        A.   Unless it was the joint prosecution with the

12   local DA.

13        Q.   Okay.   And is there a supervisor in the criminal

14   prosecutions division?

15        A.   Yes, sir.

16        Q.   And do you know who that is?

17        A.   Adrian McFarland.

18        Q.   And how long -- and is that a he or she?

19        A.   It's a she.

20        Q.   And do you know how long Ms. McFarland has been

21   the director of that -- of the criminal prosecution

22   division?

23        A.   I don't know.

24        Q.   So other than providing the investigations

25   packet, are there communications regarding -- that

1    you're -- the SIU would engage in regarding the contents
2    of the investigations package?  I'm talking about with
3    the criminal prosecutions division.  How does the
4    package get delivered?  I mean, is there -- is it simply
5    the package is prepared and passed off and that's the
6    end of your role?  Do you understand what I'm trying to
7    ask you?
8         A.   Yes, sir.
9         Q.   Okay.
10        A.   And I would have to say it depends.  Over the
11   years it has changed.  And it does not end our role.
12   Frequently, the prosecutors identify additional
13   witnesses they want interviewed or additional documents
14   they want obtained.  And so they might ask the
15   investigators to do additional work.
16        Q.   So is it fair to say the investigator would stay
17   with the case through the prosecution, the process of
18   prosecution to assist when necessary?
19        A.   Ideally, yes.
20        Q.   Okay.  Are the investigators called to testify at
21   all in these election code violation prosecutions?
22        A.   Yes, sir.
23        Q.   Have you ever been called to testify during any
24   of the election code prosecutions?
25        A.   I have been subpoenaed, however, never had to

69

1       testify.

2           Q.   How often has that happened, subpoenaed?

3           A.   I would say once or twice -- I would say twice.

4           Q.   Do you recall the specific case?

5           A.   It would be the State of Texas versus Anita

6       Baeza.

7           Q.   BI?

8           A.   B-A-E-Z-A.

9           Q.   Okay.

10          A.   There was another case that was -- I don't

11      remember the defendant's name, but it was out of Hidalgo

12      County and was prosecuted in Brooks County?

13          Q.   Do you remember the time period on that one?

14          A.   I would say it was probably a case we

15      investigated in 2008 or 2009.  I was summons down

16      probably about 2010.

17               MR. GEAR:  We've been going for a while.  Do

18      you guys want to take a break?

19               THE WITNESS:  Yes, please.

20               MR. GEAR:  Let's take a little short break.

21      Ten minutes.

22               MR. SWEETEN:  That's fine.

23               (Brief recess.)

24      BY MR. GEAR:

25          Q.   Back on the record.  We talked a little bit about

                                                                      70

1       what the -- actually we talked a lot about what the SIU
2       does, what their responsibilities are.  I just wanted to
3       circle back to get a clear understanding, the SIU
4       conducts criminal investigations?
5            A.   For the most part, yes.
6            Q.   And let's narrow that even more and talk about
7       election code violations.  Are those always criminal
8       investigations?
9                    MR. SWEETEN:   That he conducted?
10      BY MR. SEAR:
11           Q.   The SIU that you conduct as a supervisor?
12           A.   I would say the vast majority are criminal.
13           Q.   And when you say, "vast majority," the other
14      portion of it, when would that cross over, or why would
15      that cross over into the civil realm?
16           A.   Can I give you an example?
17           Q.   Please.
18           A.   We were referred a criminal case from the
19      Secretary of State's office from Waller County and it
20      involved allegations of voters not being allowed to vote
21      in an election.  I think it was the 2006 general
22      election.  And there's a particular university there
23      named Prairie View University, Prairie View A&M
24      University.  And there were allegations that the
25      elections department did not process their voter

71

1      registration applications.  And consequently, when the
2      voters went to the polls, they weren't allowed to vote.
3      So our office worked on the investigation of the
4      potential criminal misconduct for unlawfully rejecting
5      voters.  But we also assisted the Department of Justice,
6      I think it was a civil rights division, in the analysis
7      of the data regarding the voter registration and what --
8      why voters weren't processed properly and what were the
9      reasons.  So many were -- because the address wasn't
10     complete, so many didn't provide necessary -- so we did
11     a statistical analysis during that investigation, which
12     was then used, I believe civilly in action by the
13     Department of Justice against Waller County.
14         Q.  So your overall responsibilities in SIU have also
15     involved both communications and in conjunction with
16     working with the Department of Justice?
17         A.  Occasionally, yes.
18         Q.  So for the vast majority of the criminal
19     investigations, what is the standard that these cases
20     would ultimately have to be prosecuted by?  Is it beyond
21     a reasonable doubt?
22         A.  Yes, sir.
23         Q.  Okay.  So it's also fair to say that just because
24     you receive a referral does not mean that that person is
25     guilty of what the allegation is.  There's an

72

1    investigation and until proven guilty, it's simply a

2    referral?

3         A.   That's correct.

4         Q.   Okay.  And so we spoke a little bit about fraud

5    in the State of Texas.  So I would like to define that a

6    little bit more.  How do you define voter fraud?

7              MR. SWEETEN:  Do -- let me make sure I'm

8    clear.  Do you mean how does the SIU?  Because that was

9    in your definition.

10             MR. GEAR:  Yes.  Yes.

11             MR. SWEETEN:  Okay.

12        A.   We would define it as a violation of election

13   code offenses or other penal code offenses associated

14   with elections.

15        Q.   (By Mr. Gear)  And there are two chapters that

16   deal with election code violations, if I'm correct or

17   multiple?

18        A.   Oh, no.  Yeah, there's multiple chapters that

19   deal with violations.

20        Q.   Okay.  Let me try my hand at this.  Chapter 68

21   deals with what type of election code violations?

22        A.   I don't think chapter 68 deals with election code

23   violations.  64 deals with some.

24        Q.   64?

25        A.   63, 84, 86, 253, and I know there are others.

73

1         Q.   And I'm not going to ask you to identify and
2    define each of these chapters.  Which of these chapters
3    deals with voter impersonation?
4         A.   That would be the -- it could potentially be the
5    voter registration.  And that would be in, I believe
6    Chapter 13.  And then also, it could also be during the
7    early voting which is covered in 86 or 84.  And it also
8    could be during a poll place violation which is, I think
9    in 64.
10        Q.   You said 86 or 84?
11        A.   Yes, sir.  I'm not sure I know -- I'm not sure I
12   remember perfectly.
13        Q.   Okay.
14        A.   If I could just say that we have different
15   categories.  We have early voting.  We have -- which
16   early voting also includes mail-in ballot.  And then, we
17   also have poll place violations.
18        Q.   And poll place violations would be chapter 64, if
19   I understood you correctly?
20        A.   Some of the early voting can also involve poll
21   place violations.  But I think predominantly 64 is poll
22   place.
23        Q.   Okay.  So early voting involves both by mail and
24   poll place?
25        A.   Yes, sir.

74

1          Q.   Okay.   And I threw out the term "voter
2    impersonation."   What is voter impersonation?   How do
3    you define that?
4          A.   Voter impersonation is either someone who is not
5    registered to vote or has -- is registered to vote and
6    has already voted and using somebody else's voters
7    registration certificate to vote again.
8          Q.   When you say, "not register to vote," what do you
9    mean by that?
10         A.   This could be a person who has not gone through
11   the process of registering to vote, but is using
12   somebody else's certificate to vote.
13         Q.   So the underlying premise, for lack of better
14   words, is they are using somebody else's identity to
15   cast a ballot?
16         A.   Correct.
17         Q.   Now, are you familiar at all with SB 14?
18         A.   Some of it.
19         Q.   Were you involved in any communications during
20   the legislative debates on SB 14?
21         A.   No, I wasn't involved in the communication.
22         Q.   Okay.   And let me be more specific on that.   Were
23   you involved in, for instance, communicating with the
24   governor's office regarding voter ID during the
25   legislative debates on SB 14?

75

1          A.   No, sir.

2          Q.   All right.  And again, were you involved in any

3     communication with any of the State agencies regarding

4     SB 14 during the legislative debates?

5          A.   No, sir.

6          Q.   And so how did you become familiar with SB 14?

7          A.   One of our responsibilities at the attorney

8     general's office is to review, you know, statutes.

9          Q.   Okay.

10         A.   So obviously, as kind of a criminal investigator

11    with -- that's charged with the responsibility of

12    looking at election laws, I looked at that one.

13         Q.   And so when you say, "review statutes," can you

14    tell me what you mean.  And specifically in terms of

15    voter ID legislation or SB 14, what would -- what would

16    your responsibility be in that respect?

17         A.   Just reviewing the proposed statutes.

18         Q.   Do you provide an analysis?  Do you provide a

19    summary of the -- of your review of SB 14?

20         A.   No.  I did not.

21         Q.   So help me understand.  Other than it being a

22    provision that deals with election code, what other

23    reasons would you have to look at it?

24         A.   And this is more broad.  In some cases we are

25    asked to do a bill analysis and assess a fiscal impact.

76

1      Q.  Were you asked to do a bill analysis for SB 14?

2      A.  No, sir.

3      Q.  Was anyone within your office asked to do a bill

4   analysis?

5      A.  I don't know.

6      Q.  Is that something that you would generally do

7   for -- let me narrow this down so it's easier.  Would

8   that be something that your office has done in the past

9   for voter ID legislation?

10     A.  I don't know if we have been asked to do that.

11     Q.  Who would be the entity that would make that

12  request?

13     A.  I believe it would come from our governmental

14  relations division.

15     Q.  And where is that division located within the

16  structure of the government?

17     A.  I mean, it would be within the intergovernmental

18  relations division within the office of the attorney

19  general.

20     Q.  Okay.  And so tell me a little bit about that

21  particular division, what do they do?

22     A.  They deal with other branches of State

23  government.

24     Q.  Specifically as it relates to voter ID

25  legislation, what would they -- what would their

77

1    responsibilities be?

2         A.    They would serve as a liaison, I believe, between

3    the legislative branch and the office of the attorney

4    general.   But I don't know their specific -- their

5    specific duties.

6         Q.    So the intergovernmental division?

7         A.    Intergovernmental relations division.

8         Q.    Relations division.   Did you have any

9    communications with that division regarding SB 14?

10        A.    I don't believe so.

11        Q.    And when I say, "you," I mean anyone within the

12   SIU.   Are you aware of anyone who had communications

13   with the intergovernmental division?

14        A.    Like I said, I would like to make a

15   clarification.

16        Q.    Sure.

17        A.    I think I may have been asked to provide my

18   spread sheets, at some point in time.

19        Q.    And who asked you to provide the spread sheets?

20        A.    I don't remember if it was my division chief or

21   someone within the intergovernmental relations division.

22        Q.    Did you provide the spread sheets?

23        A.    Yes, sir.

24        Q.    When did you provide the spread sheets?

25        A.    I routinely update those on about a monthly

1    basis.  So I just provided them as requested.

2        Q.  Okay.  So help me understand.  You said, "you

3    provide them as requested."  You testified that you

4    recall being asked to provide your spread sheets,

5    correct?

6        A.  Uh-huh.

7        Q.  Were you asked to provide them on a monthly

8    basis?

9        A.  I generally am asked almost on a monthly basis to

10   provide these.  It could be for a public information

11   request.  It could be a specific legislative request

12   or...

13       Q.  Do you track who makes a request for your spread

14   sheets?

15       A.  I don't.  I -- public information request would

16   be tracked through our public information officer.

17       Q.  What about request from legislatures?

18       A.  Do I track that?

19       Q.  Do you track that?  "You," being you or your

20   office staff in your office?

21       A.  Well, I would believe that the intergovernmental

22   relations division would track it.

23       Q.  Do you track from your office, SIU, how many

24   times you produce the spread sheet?

25       A.  No.

79

1       Q.   Are you aware of any legislators that the spread

2   sheet had been provided to?

3       A.   Yes.

4       Q.   All right.  And who was your spread sheet

5   provided to?

6            MR. SWEETEN:  Okay.  Here we're getting into

7   a potential area of privilege.  I think the court's

8   order has said the transmission of information is fine,

9   but as to the identity of a legislator it -- he wouldn't

10  reveal that.  So I think that would be subject to the

11  court's order on privilege.

12           MR. GEAR:  And that's not my understanding

13  of the court's order.  I think we've been asking,

14  generally through all these depositions the who, what,

15  when, where.  It's the substance of that communication

16  that may be privileged.

17           MR. SWEETEN:  Yeah.

18           MR. GEAR:  Is my understanding.

19           MR. SWEETEN:  But I think there's a separate

20  issue on -- and Risa and I discussed this yesterday.  I

21  believe it is on Page 7 of the court's order.  That

22  would prevent -- let me see if I can find that.  Let me

23  go off the record.

24           MR. GEAR:  Go ahead.

25           (Discussion off the record.)

1   BY MR. GEAR:

2       Q.   So off the record we had a brief discussion of

3   privilege.  There's been a determination that the

4   individual who requested the spread sheet from you has

5   waived that privilege.  So let me go back to the

6   question.  What was the name of the legislator that

7   requested the spread sheet?

8       A.   First let me say that I don't communicate

9   directly with them at all.  They communicate through our

10  intergovernmental relations division.

11      Q.   Okay.

12      A.   I was advised that Representative, I think his

13  name is Raphael Anchia, requested the spread sheet.

14      Q.   Did you receive that request by e-mail?  How does

15  that request come to you?

16      A.   I don't specifically recall exactly how that one

17  request came in.  It could have been through e-mail.  It

18  could have been on the phone.  I could have been

19  directed by my division chief.  Most times it's either

20  on the phone or by e-mail.

21      Q.   Do you recall when that request was made?

22      A.   He's requested my spread sheets multiple times so

23  I don't know.

24      Q.   Well, let's kind of break that down.  Can you

25  give me a general time period for when he's requested

81

1    your spread sheets?
2         A.   He's requested updates on election
3    investigations.   I think dating back to like 2006 and
4    2007, all the way to the present.
5         Q.   Did you ever have any direct contact or
6    communication with Representative Anchia?
7         A.   No, sir.
8         Q.   Did anyone within your office have any direct
9    contact or communication with Representative Anchia
10   regarding the spread sheets?
11        A.   I don't know.
12        Q.   How would you produce those spread sheets to
13   Representative Anchia?
14        A.   I would send them electronically, via e-mail.   In
15   a PDF format.
16        Q.   Did you search your electronic files for any
17   e-mails dealing with your communications or dealing with
18   the production of the spread sheets that were given to
19   Representative Anchia?
20        A.   Yes, sir.
21        Q.   Did you find those?
22        A.   I found some.
23        Q.   And did you produce those to your attorney?
24        A.   Yes.
25        Q.   And are you aware of whether or not your office,

1    the SIU, or the attorney general's office for that

2    matter, had any communications with Representative

3    Anchia regarding SB 14?

4        A.   I did not have any communication with

5    Representative Anchia and I do not believe that anybody

6    in the special investigations unit had any

7    communications with Representative Anchia.

8        Q.   Are you aware of any communications with the

9    OAG's office with Representative Anchia?

10       A.   Yes, I am aware of communications between the two

11   offices.

12       Q.   Regarding SB 14?

13            MR. SWEETEN:   Don't speculate.  If you don't

14   know.

15       A.   I don't know for sure.

16       Q.   (By Mr. Gear) Do you know when that communication

17   took place?  Was it during the legislative session,

18   2011?

19       A.   Yes, sir, I believe so.

20       Q.   Do you know who initiated that communication?

21       A.   No, sir.

22       Q.   Do you know who that communication was with out

23   of the OAG's office?

24       A.   Again, it would be someone in our

25   intergovernmental relations division.  And potentially

83

1     also our public information division.

2          Q.   Are you aware of any communication with

3     Representative Anchia regarding any voter ID

4     legislation?  And I'm talking about from the SIU

5     division.

6          A.   Can you say that one more time?

7          Q.   Are you aware of any communication from the SIU

8     division, and of the -- from either you or any of your

9     staff to Representative Anchia regarding any of the

10    voter ID legislation.

11         A.   We don't communicate with the representatives.

12         Q.   So the answer to that is no?

13         A.   No.

14         Q.   Are you aware of any communications from the

15    intergovernmental -- is it special division?

16         A.   Intergovernmental relations division.

17         Q.   Relations division with Representative Anchia

18    regarding any of the voter ID legislation?

19              MR. SWEETEN:  Objection; asked and answered.

20    Go ahead.

21    BY MR. GEAR:

22         Q.   You can answer.

23         A.   I don't know.

24         Q.   Was that it?

25         A.   Yeah.  I don't know.

Major Forrest Mitchell                              June 15, 2012

84

1          Q.   Okay.  Can you tell me what version of the spread
2     sheet was produced to Representative Anchia?
3          A.   The most current at the time.  As I said, I
4     update it montnly or as new referrals come in or as we
5     obtain new indictments new or judgments and sentences, I
6     update them at that time.
7          Q.   And when you say, "at the time," I'm trying to
8     get an idea of the time frame you're talking about here.
9     It was during the 2011 legislative session?
10         A.   I'm sorry.  What 2000 what.
11         Q.   '11 I believe you said?
12         A.   Yes, sir.  2011.
13         Q.   Okay.  And you said there were also periods prior
14    to that.  I think you said 2006, 2007, that you provided
15    him, "you," being your spread sheet has been provided to
16    Representative Anchia?
17         A.   If I could clarify?
18         Q.   Please do.
19         A.   Back in 2006 and 2007 it wasn't -- it wasn't a
20    spread sheet.  It was just a little summary of where we
21    got our referrals from.
22         Q.   Okay.  Did you produce that to your attorneys?
23         A.   Yes, sir.
24         Q.   Any other representatives or senators that you're
25    aware of that received a copy of the spread sheet?

85

1     A.   Not that I recall.

2     Q.   So I was asking you about voter impersonation.

3  And I believe you said that was -- one of which was at

4  the poles.  And it was under Chapter 64.  Chapter 64,

5  does it cover more than just voter impersonation?

6     A.   Yes, sir.

7     Q.   Can you give me a general idea of the types of

8  violations covered under chapter 64?

9     A.   64 contains the illegal voting statute, which

10  there are four different types of illegal voting in the

11  State of Texas.

12           THE REPORTER:  Are you saying legal or

13  illegal?

14     A.   Illegal, sorry.  Chapter 64 contains the four

15  different types of illegal voting.  It also contains

16  other provisions such as unlawful assistance and

17  prohibited conduct in polling places, such as

18  electioneering, lawyering, I believe candidate in a

19  polling place.

20     Q.   When you say, "illegal voting," can you identify

21  that a little bit more?

22     A.   Yes, sir.  There are different elements to

23  illegal voting.

24     Q.   Okay.

25     A.   One form of illegal voting is voter

Major Forrest Mitchell                          June 15, 2012

                                                              86

1    impersonation.

2         Q.   Okay.

3         A.   Another form of illegal voting is a person who

4    votes more than once in an election.  Another type is a

5    person who is ineligible for election.  And the final

6    type is a person who marks a ballot contrary to the

7    instructions of the voter.

8         Q.   So based on your familiarity with SB 14, what

9    type of violation would be covered under SB 14, the

10   provisions of SB 14?

11        A.   The voter impersonation.

12        Q.   Anything else?

13        A.   I think that would be it.

14        Q.   Has the Texas Attorney General made investigating

15   voter fraud one of his top priorities?

16        A.   It is one of the -- on of our investigative

17   functions in our office.

18        Q.   And the question was, is it a priority within

19   your office?

20        A.   As much as any other priority.  And we have

21   multiple priorities.

22        Q.   So is your answer, yes, it is one of the AG's

23   priorities?

24        A.   I would say yes.

25             MR. SWEETEN:   Objection; asked and answered.

87

1      BY MR. GEAR:

2          Q.   Can you tell me how long it's been one of the

3      priorities of the Texas Attorney General?

4          A.   That, I don't know.

5          Q.   Investigating election code violations, is it one

6      of the primary responsibilities of the special

7      investigation unit?

8          A.   It's one of the investigative responsibilities of

9      the special investigations unit.

10         Q.   But it would be the primary responsibility of the

11     elections team?

12         A.   Correct.

13         Q.   I want to change your focus about the referral

14     process and how that actually comes into the attorney

15     general's office.  Is there a provision of the Texas

16     election code that allows -- that sets out the process

17     for referrals?

18         A.   Yes, sir, there are.

19         Q.   And can you tell me generally what those are?

20         A.   There's -- it's found in two places in the Texas

21     election code.  One indicates a direct referral from the

22     elections administrator themselves.  If they have reason

23     to believe that a voter has committed illegal voting.

24         Q.   Okay.

25         A.   The second is found in chapter 273 of the

1     election code, which talks about the investigations of
2     election code violations.  And it indicates that the
3     Secretary of State may refer a case to our office.  It
4     indicates that two voters themselves who file an
5     affidavit, sworn affidavit, can refer to our office.
6     And also local district attorneys and county attorneys
7     can file it with our office.
8         Q.   So let me just kind of summarize that, if I can.
9     So there are referrals that come from the Secretary of
10    State's office?
11        A.   That's correct.
12        Q.   There are referrals that come from citizens and
13    local election officials?
14        A.   Yes.
15        Q.   There are referrals that come from law
16    enforcement agencies?
17        A.   Yes.
18        Q.   Including local DA's or local prosecutors?
19        A.   Yes, sir.
20        Q.   Are -- SIU, are they limited to election codes in
21    the State of Texas?  Do they investigate outside of the
22    state?
23        A.   Oh, no, sir.
24        Q.   So other than what we've just summarized about
25    how referrals come in, are there any other ways that

89

1       referrals could be received by the OAG's office?

2           A.   No, sir.

3           Q.   And who in the OAG's office is in charge of

4       receiving and maintaining election code violation

5       referrals?

6           A.   It depends on the source of the referral.

7           Q.   So there are various sources that you've

8       testified to?

9           A.   Correct.

10          Q.   So is there a different person responsible for

11      each source of referral?

12          A.  Yes, sir.  If it comes from the Secretary of

13      State's office, it currently goes to the director of law

14      enforcement.  If it comes from a local DA or prosecutor,

15      it would generally go to the criminal prosecutions

16      division.  If it comes from a direct referral from law

17      enforcement agency, it could come to the director of law

18      enforcement or it could come in to our peace officer

19      liaison.

20          Q.   Do you supervise all of these various entities?

21          A.   No.

22          Q.   Would you know when a referral has come into the

23      OAG's office?  Is there a way for you to keep track of

24      the various forms of referrals?

25          A.   Yes, sir.

Major Forrest Mitchell                                    June 15, 2012

90

1        Q.   And how do you do that?

2        A.   Through the spread sheet.

3        Q.   Okay.  And so who actually maintains that spread

4   sheet?

5        A.   I do.

6        Q.   So in order to maintain that spread sheet, if it

7   comes in, for instance through the director of law

8   enforcement, how would you actually know it came into

9   the office?

10       A.   He provides it to me.

11       Q.   Okay.  And so that's what I was trying to get at.

12  So there are various entities or sources that it would

13  come to.  They provide you with an electronic version of

14  the referral or do they provide you with paper copy or

15  both?

16       A.   I would say sometimes both.  They definitely

17  provide me with a written copy.

18       Q.   And is there a specific process in your office

19  for making sure you're provided with copies of the

20  referrals that come in?

21       A.   Yes, sir.

22       Q.   And what is that process?

23       A.   We have an internal computer system which is

24  called Webpass, which tracts referrals.

25       Q.   Webpass?

Major Forrest Mitchell                                    June 15, 2012

91

1          A.   Yes, sir, W-E-B-P-A-S-S.

2          Q.   Is there a specific program that you use to

3     maintain the spread sheet?

4          A.   I maintain the spread sheet through Excel.

5          Q.   Excel.  Does anyone else, or is anyone else

6     responsible within your office that maintains the spread

7     sheet?

8          A.   No, I'm the one who maintains the spread sheet.

9          Q.   And you've been doing that since 2005?

10          A.   No.  I want to say 2007, 2008, somewhere around

11     there.

12          Q.   So when you talked about Representative Anchia

13     back in 2006, that wouldn't have been the spread sheet

14     in the version that you're currently maintaining?

15          A.   That's correct.

16          Q.   And I believe you indicated -- I believe you

17     indicated that it was a summary.  And can you describe

18     what that summary would have looked like?

19          A.   Yes, sir.  It was a -- I believe it was a

20     WordPerfect document.  And it would identify the county

21     of the offense, the referral source, and then the

22     allegation.

23          Q.   At some point, was your spread sheet updated to

24     include violations from 2002?

25          A.   Yes.

Major Forrest Mitchell                          June 15, 2012

92

1          Q.   And when did that happen?

2          A.   I would say the spread sheet, the information we

3     obtained on the 2002 cases, was probably around 2005.

4          Q.   I'm not sure I understand your testimony now,

5     because you said in 2003 -- 2006 when there was

6     communication with Representative Anchia there was no

7     spread sheet in the current form, correct?

8          A.   Correct.

9          Q.   And so that would have been in the form of a

10    WordPerfect summary of referrals that have come into the

11    OAG's office.  Is that fair to say?

12         A.   Yes, sir.

13         Q.   Okay.  And so you believe that -- now you're

14    saying that in 2005, the spread sheet would have been

15    updated?

16         A.   If I could clarify.

17         Q.   Please.

18         A.   I found -- or obtained the information in 2005

19    about the 2002 cases, but it was for a different

20    purpose.

21         Q.   And what was that purpose?

22         A.   It was to identify the geographical regions in

23    Texas that had election code violations.

24         Q.   And when you say you, "found or obtained the

25    information," what do you mean by that?

93

1         A.    I queried our mainframe system to determine the
2    election cases that we had on file.
3         Q.    And why were you trying to determine the
4    geographical area of violations?
5         A.    To conduct -- to do a geographic analysis to
6    determine where we would conduct training.
7         Q.    Okay.  And we'll get into the training a little
8    bit later.
9         A.    Yes, sir.
10        Q.    So I think I understand the process by which
11   referrals come into your office.  They come into
12   different sections depending on the source of the
13   referral, correct?
14        A.    Yes, sir.
15        Q.    Is there a specific individual that conducts the
16   intake of these referrals?  Does that make sense?
17        A.    There are different people conducting the intake,
18   depending on where the referral source is.
19        Q.    And you've testified to that already, correct?
20        A.    When it comes -- when it's identified as an
21   election violation referral, it comes to me and then I
22   conduct an intake.
23        Q.    And what is your intake process?
24        A.    I obtain and review the referral packet and I
25   identify the county of the offense, the election

94

1     involved, the referral source and the nature of the

2     allegation.

3         Q.   And you also update your spread sheet, as I

4     understand it?

5         A.   That's correct.

6         Q.   Do referrals -- are they automatically given a

7     complaint number or a tracking number?

8         A.   They are given -- yes, they are given what we

9     call a call for service number.

10        Q.   And at that point, are they considered an

11    official investigation or is that just simply to track

12    the file as it moves through the system?

13        A.   It's to track the file.

14        Q.   Are there -- is it -- or has it occurred within

15    your office where a referral has been given a call for

16    service number, but it didn't actually generate into an

17    official investigation?

18        A.   Yes, sir.

19        Q.   Who makes the actual decision to investigate or

20    not to investigate?

21        A.   It's a multi-person decision.

22        Q.   Help me understand it.

23        A.   Okay.  The division chief or the major is

24    required to approve it.

25        Q.   Is that you?

95

1      A.    That would be me now.  The captain, the

2    lieutenant, and then the director of law enforcement as

3    well.

4      Q.    So does that occur during a meeting or is there

5    e-mail communication that's passed between the

6    individuals you just testified about?  How is that

7    decision actually made?

8      A.    It's generally meetings.

9      Q.    Okay.  And so is that a weekly meeting, monthly

10   meeting, how do these meetings occur?

11     A.    Generally as referrals come in.

12     Q.    Okay.  Do you wait until you have a certain

13   number of referrals or is it each referral?

14     A.    It's generally each referral.

15     Q.    All right.  And so during this meeting what is

16   actually discussed regarding the referral?

17     A.    The first thing that's discussed and evaluated is

18   what -- what kind of offenses are they.  We have a

19   practice that some of the referrals that we get are

20   class C misdemeanors.

21     Q.    Okay.

22     A.    And those are fine-only offenses.  And all

23   election cases are labor intensive and so we generally

24   discuss the fact that this is a class C misdemeanor and

25   so we don't investigate those.

1    Q.   And who would investigate the class C

2    misdemeanors, if anyone?

3    A.   The local jurisdictions like sheriff's

4    departments, police departments, local county attorneys.

5    Q.   So is there a determination made at that meeting

6    whether or not to refer it back to the referring source?

7    A.   Right.  If we determine that it's a class C

8    misdemeanor then we will say we do not have the

9    resources to investigate this.  Suggest contacting your

10   county attorney or local law enforcement officials.

11   Q.   Does your spread sheet indicate which ones are

12   referred back or whether there was a determination not

13   to investigate?

14   A.   No, sir.

15   Q.   Do you keep a separate tracking system of what

16   has been closed, essentially in your office and referred

17   back to the referring source?

18   A.   Webpass may have that indication in it.

19   Q.   Did you produce that information to your

20   attorney?

21   A.   No, I did not.

22   Q.   So as I understand it, Webpass would indicate the

23   determination on how that case would be handled within

24   the OAG's office or the SIU's office; is that correct?

25   A.   If we advised that we were not going to

Major Forrest Mitchell                                    June 15, 2012

97

1    investigate a class C misdemeanor, yes.

2         Q.   Okay.   Once it's referred back, is there any

3    additional tracking down by your office?

4         A.   No, sir.

5         Q.   Does the Texas OAG's office ever initiate its own

6    investigations of alleged election code violations?

7         A.   No, sir.

8         Q.   It's 100 percent referral based?

9         A.   It is referral driven.

10        Q.   Are the referrals in the Texas OAG's office or

11   the SIU maintained by subject matter or category?

12        A.   No, sir.

13        Q.   Are they maintained by county or by agency

14   referring agency?

15        A.   We generally maintain them by county and whether

16   or not there's SOS referrals or whether or not they're

17   other referrals.

18        Q.   Is it possible to search within your mainframe

19   database to determine the exact number of referrals from

20   the SOS, for instance?

21        A.   Yes, sir.

22        Q.   And then it -- if I understood you correctly, the

23   other search would be for others.   And is it possible to

24   determine the other source for referrals?

25        A.   Yes, sir.

Major Forrest Mitchell                              June 15, 2012

                                                          98

1        Q.   Okay.

2        A.   If I could clarify?

3        Q.   Please.

4        A.   The ability to search all of the election

5   violations will require like a -- it will just

6   categorize it as an election violation and I will have

7   to go through manually and determine whether or not it

8   was an SOS or a other referral.

9        Q.   So it would require manual search?

10       A.   Right.

11       Q.   Okay.

12            (Exhibit No. 584 was marked.)

13   BY MR. GEAR:

14       Q.   I've shown you what has been marked as

15   Exhibit 584.  Take your time and take a look at this.

16       A.   Yes, sir.

17       Q.   So first of all, I want to see if -- have you

18   reviewed these types of documents before?

19       A.   These types of documents, but not specifically

20   this document.

21       Q.   Okay.  And what is this?

22       A.   This is a -- I would call this a press release.

23       Q.   And it comes directly out of the attorney

24   general's office?

25       A.   That's correct.

99

 1          Q.   All right.  And when I say the attorney general,

 2     I mean Greg Abbott in 2005?

 3          A.   Yes, sir.

 4          Q.   Okay.  And do you see the date on this, Friday

 5     June 3, 2005?

 6          A.   Yes, sir.

 7          Q.   All right.  This indicates -- actually let me do

 8     something else just to make this go a little smoother.

 9     You've testified routinely about the existence of a

10     spread sheet, correct?

11          A.   Yes, sir.

12          Q.   All right.  Let me mark this, please.

13               (Exhibit No. 585 was marked.)

14     BY MR. GEAR:

15          Q.   I'm showing you what's been marked as

16     Exhibit 585.  And I just asked you to take a look at

17     that and identify it for the record, please.

18               MR. SWEETEN:  Bruce, can I get a copy of

19     that?

20               MR. GEAR:  I do not have an extra copy of

21     that.  I don't not, sorry.  I can make a copy if you

22     want to do that.

23               MR. SWEETEN:  Let's just do it at the break.

24     BY MR. GEAR:

25          Q.   Is this the spread sheet that you've been

1    referring to?  And to be fair, this may be a series of

2    spread sheets and I'm just trying to understand what

3    exactly they are.

4         A.   If you could just give me a moment.

5         Q.   Sure.

6         A.   Yes, sir.  They appear to be the spread sheet

7    I've been referencing.

8         Q.   Okay.  Now, are all of these maintained by you,

9    created by you?

10        A.   Yes, sir.

11        Q.   And this would be a version that was if I'm

12   correct, and correct me if I'm wrong, that was printed

13   in 2012.  Do you see the date on the bottom of the

14   spread sheet?

15        A.   Yes, sir.

16        Q.   And to be accurate, it was March 12th of 2012?

17        A.   Yes, sir.

18        Q.   And there's also another version here that was

19   printed on March 9th of 2012.  And it would be the

20   election code referrals to the office of the attorney

21   general August 2002 to the present.  Do you see that

22   particular version they I'm talking about?

23        A.   Yes, sir.

24        Q.   And would these have been printed by you?

25        A.   They would be electronically published by me.

101

1        Q.   Okay.  And when you say, "electronically

2   published," do you publish these spread sheets on any

3   particular system?  Do you make them publicly available?

4        A.   If I could explain?

5        Q.   Sure.

6        A.   I maintain an Excel spread sheet that has three

7   different books.  One book is specifically for

8   referrals.  One book is specifically for prosecution

9   resolved.  And one book is for charges pending.  And

10  then I publish to a PDF any one of those three books or

11  a combination of all three or all three.

12       Q.   And when you say, "publish to a PDF," where does

13  that go?

14       A.   It could go to somebody in our open records

15  division who has requested a copy.  It could go to our

16  intergovernmental relations division.

17       Q.   So if a news agency wanted a copy of your spread

18  sheets, then that would be published and released to the

19  news agency?

20       A.   Yes, sir.

21       Q.   Okay.  When news -- have news agencies made

22  request for your spread sheets in the past?

23       A.   Yes, sir.

24       Q.   And other than the spread sheet, do you provide

25  them with any additional information?

1       A.   No, sir.

2       Q.   So it's generally the spread sheet that is

3   publicly released when requested?

4       A.   Yeah.   If I could clarify.

5       Q.   Please.

6       A.   Unless they specifically asked for another

7   document, such as a charging instrument or indictment or

8   judgments or sentence.

9       Q.   And those --

10      A.   In some cases they do ask for those as well as

11  the spread sheets.

12      Q.   Okay.   All right.   So now you have your spread

13  sheet in front of you that you've identified.   And let

14  me actually clarify something.   You said there were

15  three different versions of the spread sheet or three

16  different books:   The referrals, the prosecutions and

17  pending.   Can you identify for me, are there three

18  different versions here or three different books or is

19  this all from one of these versions of the spread sheets

20  that you have testified?

21      A.   This is one spread sheet which contains three

22  books.

23      Q.   Okay.   And so looking at the spread sheet, it

24  starts with TX 000036816.   Could you -- I'm trying to

25  get you to identify the books for me that are contained

103

1     within the spread sheet?

2          A.   Referral TX 0056816, contains the charges pending

3     resolution.

4          Q.   And how far does that -- how many pages is that?

5          A.   It's two-pages, sir.

6          Q.   Okay.  So the next set of spread sheet would be

7     TX 0056818.   And that indicates election code referrals

8     to the office of the attorney general, prosecutions

9     resolved.  Is that accurate?

10         A.   My Bates stamp is cut off on that.  But this

11    document contains the prosecutions resolved.

12         Q.   And how many pages is that?

13         A.   Contains five pages, sir.

14         Q.   Okay.  And then the -- there's another spread

15    sheet that indicates on -- starts with TX 0056823.  It

16    indicates on the top, election code referrals to the

17    office of the attorney general, August 2002 to the

18    present.  Do you see that one?

19         A.   Yes, sir.

20         Q.   And which one would this represent?

21         A.   This one represents the referrals.

22         Q.   And so I see that this is 2002 to 2012.  Is that

23    accurate?

24         A.   Yes, sir.

25         Q.   So during the 2011 session, this would not have

104

1       been the spread sheet that was provided to

2       Representative Anchia?

3           A.   Yes, that would be incorrect.

4           Q.   That would be incorrect?

5           A.   I'm sorry.  This would not be the spread sheet

6       that was provided to Representative Anchia.

7           Q.   It would have only included the 2011 referrals?

8           A.   Up to the most current, at the time of the

9       request.

10          Q.   And I believe I asked you and I'm sorry if I did,

11      do you recall when you provided him a copy -- there were

12      multiple occasions, but in 2011, do you recall the time

13      period you provided to him these spread sheets?

14          A.   It may have preceded the legislative session and

15      it would have -- but we can provide him continuous

16      updates.  So he made multiple request.

17          Q.   And you said, "it may have preceded the

18      legislative session."  Could it have been during the

19      legislative session?

20          A.   Yes, sir.

21          Q.   Okay.  All right.  Do you know if he got a copy

22      of the March 12, 2012 version?

23          A.   I don't know.

24          Q.   You don't know.  Okay.  So turning your attention

25      back to Exhibit 384, I believe, which is the press

105

1     release from Attorney General Greg Abbott.  It indicates

2     on here that the attorney general's office announced the

3     first indictments for alleged voter fraud in Texas.

4     Would 2005 be the -- be the time period in which the

5     first indictments were issued from regarding voter

6     fraud?

7          A.   I don't know that.

8          Q.   Okay.  And 2005 would have been when you came on

9     board for the SIU?

10         A.   That's correct.

11         Q.   Do you know how these press releases are created,

12    how they're generated?

13              MR. SWEETEN:  Objection; calls for

14    speculation.

15    BY MR. GEAR:

16         Q.   Go ahead.  Do you know how?

17         A.   No, not really.

18         Q.   Okay.  Are you involved in the information that's

19    contained within this particular press release?

20         A.   No.

21         Q.   Would you ever be asked for information prior to

22    the release of these particular press releases?

23         A.   Occasionally, yes.

24         Q.   So the information that these -- that at least

25    the 2005 press release is addressing, is election code

1       violations, correct?

2           A.   Yes, sir, it is.

3           Q.   And would you have provided information regarding

4       these election code violations?

5           A.   Not for this press release.

6           Q.   Okay.  So the first violation that's referenced

7       in here is the Hardeman County, Precinct 1, Commissioner

8       Johnny Akers, do you see that?

9           A.   Yes, sir, I do.

10          Q.   All right.  And looking at Exhibit 385, which is

11      your spread sheet, do you see that referenced in --

12      within your spread sheet?

13          A.   Yes, sir, I do.

14          Q.   And specifically turning your attention to

15      TX 0056818, is that the page that you're looking at?

16          A.   Again, the Bates stamp is cut off on this one.

17      But it is Page 1 of the prosecutions resolved.

18          Q.   All right.  And can you tell me what happened

19      with the -- what were the facts of the Johnny Akers

20      case?

21          A.   He was -- the allegation is that he was handling

22      mail-in ballots during the course of the election.  And

23      he was charged with six counts of possession of official

24      ballot or carrier envelope of another.  And then he

25      plead guilty to one count of possession of an official

107

1     ballot or carrier envelope of another.

2          Q.   And that's indicated in the press release as

3     well, Exhibit 584?

4          A.   In the press release it does not indicate that he

5     has plead guilty.  It only indicates that he has been

6     charged with possession of a mail-in ballot.

7          Q.   And just so that we clarify this as we move

8     along, would this have been chapter 64 or would it have

9     been a different chapter?

10         A.   This would have been chapter 86 or 84.

11         Q.   And that would not have involved voter

12    impersonation, correct?

13         A.   No, it would not have involved voter

14    impersonation.

15         Q.   There is a second indictment that's discussed

16    here on May 27, Beeville resident, Melva Kay Ponce, do

17    you see that?

18         A.   Yes, sir, I do.

19         Q.   And generally, can you tell me, does this

20    allegation involve voter impersonation?

21         A.   Yes, sir, it does.

22         Q.   And looking at Exhibit 584, can you explain to me

23    what the facts are?

24         A.   Melva Kay Ponce utilized her mother's mail-in

25    ballot to cast a vote in the 2004 general election.

108

```
 1         Q.   So that's a by mail violation?
 2         A.   It's a by mail voter impersonation, yes, sir.
 3         Q.   Would that have been covered under the provisions
 4    of SB 14?  Would it have been prevented if SB 14 was in
 5    place?
 6         A.   No, sir.
 7              (Exhibit No. 586 was marked.)
 8    BY MR. GEAR:
 9         Q.   Just so I'm clear, both Akers and Ponce dealt
10    with by mail ballot fraud?
11         A.   Yes, sir.
12         Q.   I'm showing you what's been marked as
13    Exhibit 586.  And take your time and take a look at
14    that.  Generally, just so we can move along, you
15    indicated that Mr. Akers plead to the charge?
16         A.   Yes, sir.
17         Q.   Do you know what he plead to?
18         A.   Plead guilty to one count of possession of
19    official ballot or carrier envelope of another.
20         Q.   And the Exhibit I just handed you, the press
21    release from Greg Abbott indicates what he plead to?
22         A.   Yes, sir.
23         Q.   Okay.  And again, just so I'm clear on the
24    record, this is another press release from the attorney
25    general's office?
```

                                                               109
1          A.   Yes, sir.
2          Q.   And the date of the press release is
3     November 7th, 2005?
4          A.   Yes, sir.
5          Q.   All right.
6               (Exhibit No. 587 was marked.)
7     BY MR. GEAR:
8          Q.   All right.  So I'm showing you what's been marked
9     as Exhibit 587.  Take your time and then identify what
10    it is for me, please.
11         A.   Okay, sir.
12         Q.   Can you identify that for me, please?
13         A.   This appears to be a press release regarding
14    indictments against four Nueces County voters.
15         Q.   And the date of the press release?
16         A.   Would be December 19, 2005.
17         Q.   Okay.  And it indicates who was indicted within
18    the press release?
19         A.   Yes, sir, it does.
20         Q.   And can you tell me who was indicted?
21         A.   Elida Garza Flores, Isabel Rios Gonzales,
22    Josefina Marinas Suarez and Virginia Ramos Garza.
23         Q.   And so either looking at your spread sheet or at
24    Exhibit 587, can you tell me what the facts of that
25    indictment were?

1       A.   Okay.   This case was a 2005 school district
2   election.   And it would have been referred to our office
3   by the Secretary of State's office.   And it involved
4   mail-in ballot fraud.   And when I mean mail-in ballot
5   fraud, it involves the unlawful handling of the mail-in
6   ballots and also unlawful assistance in assisting the
7   voter in the preparation of those ballots or the
8   application to obtain those ballots.
9       Q.   So if I'm correct, this would not have been
10   chapter 64, which deals with voter impersonation,
11   correct?
12       A.   It potentially could have been.
13       Q.   Turning your attention to Exhibit 587, do you see
14   where it says the indictments apply to violations of
15   chapter 86?
16       A.   Yes.
17       Q.   Any reason to dispute that?
18       A.   No, sir.
19       Q.   Okay.   And turning to your spread sheet, do you
20   see those individuals indicated on your spread sheet?
21       A.   Yes, sir, I do.
22       Q.   And can you tell me, ultimately, what the
23   determination was on these cases, were they resolved?
24       A.   Yes, they were resolved.   Virginia Ramos Garza
25   accepted a one-year pretrial diversion, which involved

Major Forrest Mitchell                              June 15, 2012

111

1    12 months of community supervision.  Elida Garza Flores

2    also accepted a one-year pre-trial diversion in which

3    she received 12 months of community supervision.

4    Isabel Lisa Rios Gonzalez pleaded no contest to two

5    counts of possession of an official ballot or carrier

6    envelop of another, and received one-year deferred

7    adjudication.

8        Q.  All right.  And so I want to ask you, there's a

9    couple of things that you said that I didn't completely

10   understand.  A class C or class E misdemeanor, what does

11   that actually mean?

12       A.  We have three claims of misdemeanor offenses in

13   the State of Texas.  We have a class C misdemeanor, a

14   class B misdemeanor and a class A misdemeanor.  A class

15   C is punishable by fine only.  And I believe the fine is

16   $500 or less.  A class B is punishable by up to six

17   months in a county correctional facility and a fine, I

18   think $2,000 or less.  And then a class A misdemeanor is

19   punishable by up to one year in a county correctional

20   facility and a fine of $4,000 or less.

21       Q.  So class C and class E, they non-criminal

22   offenses?

23       A.  We don't have a class E.  Class B, as in Brava.

24       Q.  Okay.  Class B, is that a non-criminal offense?

25       A.  No, sir, that's a criminal offense.

Major Forrest Mitchell                          June 15, 2012

                                                              112

1          Q.   So focusing on class C then, you previously

2     testified that if there was a determination that it was

3     a class C offense, it would be referred back to the

4     referring agency?

5          A.   Yes, sir.

6          Q.   So would that then, be a non-criminal offense or

7     is it just -- you tell me.

8          A.   It's a criminal offense.   However, it's only

9     punishable by fine only.

10         Q.   Okay.   Would that be considered an ordinance

11    under Texas law?

12         A.   Ordinances passed by city councils or county

13    commissioner's courts are also potential class C's only.

14    They don't involve jail time.

15         Q.   And those would also be referred back if they

16    came to your office?

17         A.   We wouldn't investigate municipal or county

18    ordinances.

19         Q.   Okay.   But local election officials could refer

20    various allegations to you regarding election code

21    violations; isn't that correct?

22         A.   Local officials could refer election cases to us.

23         Q.   Okay.   Do they ever refer allegations that would

24    fall under the class C or ordinance type violations?

25         A.   Yes, they do.

113

1    Q.   Okay.  And those would not be investigated by

2    your office?

3    A.   Not now, no.

4    Q.   Okay.  When you say, "not now," let me understand

5    that.  Was there ever a time when you actually

6    investigated class C or ordinance-type violations?

7    A.   When -- in some of these referrals that come into

8    our office, they include a whole host of allegations.

9    Q.   Okay.  Including class Cs?

10   A.   Including class Cs.  And so if we were already

11   there investigating other offenses, we would address the

12   class C, but we would not initiate a case just off of a

13   class C.

14   Q.   Okay.  That's understandable.  All right.  And so

15   turning back to, I believe it's Exhibit 387, with the

16   four indictments, that was indictments for chapter 86,

17   and that's by mail ballot or fraud; is that correct?

18   A.   That's correct.

19   Q.   And that would not have included voter

20   impersonation?

21   A.   It potentially could have.

22   Q.   But again, the press release indicates that the

23   violations apply to chapter 86?

24   A.   The press release does say that they were

25   indicted for mail-in ballot, yes.

Major Forrest Mitchell                          June 15, 2012

114

1       Q.  And so when you keep -- you testified several

2   times that it potentially could have.  What do you mean

3   by that?

4       A.  I mean that one of the schemes of conduct that we

5   have seen in mail-in ballot fraud, and examples by

6   Melva Kay Ponce, is that she impersonated her mother.

7   And some cases, some of the mail-in ballot case that we

8   examined, campaign workers will obtain a blank ballot

9   from the voter and then cast those ballots as if they

10   were the voter.

11       Q.  And again, that's through the by mail ballot

12   system?

13       A.  That is correct.

14       Q.  And that would not have, as I understand your

15   testimony, been covered by -- if SB 14 was implemented?

16              MR. SWEETEN:  Objection; calls for

17   speculation.

18       A.  That is also correct.

19       Q.  (By Mr. Gear)  And your answer was?

20       A.  No, it would not.

21       Q.  Okay.  And I'm sorry if I got off track.  Can you

22   tell me, did you testify to what the conviction was, if

23   any?

24       A.  I got the -- I got the first two down.  The final

25   two Isabel Lisa Rice Gonzales pled no contest.  And was,

115

1       on two counts of possession of an official ballot or

2       carrier envelope of another, received one year

3       adjudication, a $500 fine and 12 months community

4       supervision.  Josefina Suarez also pled guilty to one

5       count of illegally possession of an official ballot or

6       carrier envelope of another, received one year

7       adjudication, a $500 fine and was sentenced to 12 months

8       community supervision.

9            Q.   What does deferred -- retrial diversion mean?

10           A.   Pretrial diversion is an agreement between the

11      defense attorney and the prosecuting attorney to some

12      sort of alternative punishment without any finding of

13      guilt.

14           Q.   So in the case of Ms. Garza, Ms. Flores,

15      Ms. Gonzales, there was no finding of guilt?

16           A.   With Garza and Flores, they both accepted a

17      pretrial diversion so there was no court finding.

18           Q.   And then for Ms. Gonzales?

19           A.   She plead no contest.

20           Q.   Which is not an admission of guilt, correct?

21           A.   Correct.

22           Q.   And for Ms. Suarez, she pled guilty?

23           A.   That's correct.

24                    (Exhibit No. 588 was marked.)

25      BY MR. GEAR:

116

1        Q.   Showing you what's been marked as 588.  Take your
2    time and then identify that document for me, please.
3        A.   Okay, sir.  This document appears to be a press
4    release that was issued in Friday -- on Friday
5    January 13, 2006 by the office of the attorney general.
6        Q.   Okay.  And do you see the individual who was
7    indicted in this press release?
8        A.   Yes, sir, I do.
9        Q.   You say the name for the record?
10       A.   There were actually two persons indicted in this
11   case.  That would be Anita Baeza and Trinidad
12   Villalobos.
13       Q.   Okay.  So starting with Ms. Baeza, indicates that
14   she's a 68-year old mother of the sheriff's officer
15   candidate Jeffery Baeza.  Can you tell me what the
16   allegation is for her?
17       A.   This move involved mail-in ballot fraud.
18       Q.   And I just say for the record, you refer to your
19   spread sheet?
20       A.   Correct.
21       Q.   So again, this is mail-in ballot fraud?        .
22       A.   Yes, sir.  In the 2006 primary election.  No.
23   I'm sorry.  Incorrect.  The 2004 primary election.
24       Q.   And there was another individual that you
25   indicated, Villalobos?

117

1          A.   Yes, sir.   Trinidad Villalobos.

2          Q.   And can you tell me what the allegation for that

3     was?

4          A.   Also mail-in ballot fraud.

5          Q.   From the same election?

6          A.   Referring to my spread sheet, it was the 2004

7     primary election yes, sir.

8          Q.   So both were the 2004 primary election.  Can you

9     tell me generally what the allegations of this

10    indictment were?

11         A.   This again, goes to persons who were assisting in

12    the application for mail-in ballots during the early

13    voting in that election.  And then also, once early

14    voting started assisted in either the completion of the

15    ballot or the handling of the ballot.

16         Q.   And if I'm correct, these would have been under

17    chapter 86, dealing with mail-in ballot fraud?

18         A.   Yes, sir 86006.

19         Q.   And do you know what the outcome of these

20    indictments were?

21         A.   Trinidad Villalobos was found guilty by a jury on

22    four counts of possession of mail-in ballot or carrier

23    of another.  She received ten days in jail.  And she was

24    sentenced to six months of probation.  And then Anita

25    Baeza accepted six months of pretrial diversion.

                                                                    118

1        Q.   And again, neither of those dealt with voter
2    impersonation.  Or let me put it a different way so it's
3    easier for you to understand, perhaps.  Both of those
4    dealt with chapter 86 of the election codes?
5        A.   Yes, sir, that's what they were charged with.
6        Q.   And neither of them pled to a charge of voter
7    impersonation?
8        A.   That's correct, sir.
9        Q.   Okay.  It also says at the bottom of, I believe
10   Exhibit 588, that in December, four individuals were
11   indicted for illegally possessing and transporting
12   election ballots following the 2005 ISD election in, is
13   it Nueces County?
14       A.   Yes, sir, that's correct.
15       Q.   And that's what we've previously referred to in
16   your testimony?
17       A.   Yes, sir, the 2005 Robstown independent school
18   district election.  On the chart, it's listed as the
19   2005 school district election.
20       Q.   Okay.  And it also says, the paragraph underneath
21   that attorney general obtained a guilty plea from Bee
22   County woman accused of voter fraud.  And the Bee County
23   woman this is referring to would be Melva Ponce, is that
24   accurate?
25       A.   Yes, sir.  Melva Kay Ponce.

119

1          Q.   Okay.  So far is, it fair to say that all of

2    these violations dealt with by mail ballot fraud?

3               MR. SWEETEN:   Objection; asked and answered.

4    Objection; compound.  You can answer.

5          A.   These all involved mail-in ballot fraud, which

6    could potentially include voter impersonation.

7          Q.   You keep indicating that, but these were charged

8    under chapter 86, correct?

9               MR. SWEETEN:   Objection; argumentative.

10   BY MR. GEAR:

11         Q.   Well, were they charged under chapter 86?

12         A.   They were charged under chapter 86.  Yes, sir.

13         Q.   Chapter 86 does not include voter impersonation,

14   correct?

15         A.   Well Melva Kay Ponce was charged with voter

16   impersonation.

17         Q.   But it was through the by mail ballot system?

18         A.   That's correct.

19         Q.   And again, I believe you testified that that

20   would not have been prevented if SB 14 was in place?

21               MR. SWEETEN:   Objection; calls for

22   speculation.

23   BY MR. GEAR:

24         Q.   You can answer.

25         A.   I don't believe it would have.

1                    (Exhibit No. 589 was marked.)

2        BY MR. GEAR:

3            Q.   Showing you what's been marked as Exhibit 589.

4        Take a second to look at this, please.

5            A.   Okay, sir.

6            Q.   Can you tell me what this?

7            A.   Sir, appears to be a press release issued by the

8        Texas Attorney General's office regarding a training

9        initiative our office was conducting.

10           Q.   And the date of the press release?

11           A.   Wednesday January 25, 2006.

12           Q.   And before we talk about this, I would like to

13       talk about your spread sheet.  From -- the SIU was

14       established in 2005, correct?

15           A.   Yes, sir.

16           Q.   And what month in 2005?

17           A.   I want to say June.

18           Q.   June of 2005.  So between June 2005 to

19       January 25th of 2006, how many referrals did the OAG's

20       office receive?

21           A.   I'm sorry.  Could you repeat that one more time?

22           Q.   Between June of 2005, the establishment of SIU,

23       to January of 2006, the date of this press release, how

24       many referrals were received by the OAG office?  And can

25       you tell that based on your spread sheet?

Major Forrest Mitchell                              June 15, 2012

121

1        A.   Yes, sir I could tell the referral that we

2   received from the SOS.

3        Q.   Okay.  And how many referrals were those?

4        A.   To January 2006?

5        Q.   Yes, sir.

6        A.   Six, sir, in the Secretary of State's office.

7        Q.   And I believe that you said -- do one of these

8   spread sheets show the other referrals?

9        A.   Yes, sir, it does.

10       Q.   And which portion of the spread sheet or which

11  Bates stamp number would that be?

12       A.   My Bates stamp number is partially cut off.

13       Q.   And I apologize for that.

14       A.   But it would start on Page 6 with a title heading

15  selection code referrals of the office of the

16  attorney general -- August 2, 2002 to present.

17       Q.   What's the Bates stamp number on the bottom?

18       A.   I have, it starts with TX 3005632.

19       Q.   And the top is election code referrals to the

20  office of the attorney general, prosecutions revolved,

21  or am I looking at the wrong one?

22       A.   I believe you're looking at the wrong one.  It

23  would be election code referrals to the office of the

24  attorney general, August 2, 2002 to the present, Page 6.

25  It was published 3/9/2012.

Major Forrest Mitchell                          June 15, 2012

122

1      Q.  All right.  And so I believe your testimony was
2  there were six referrals from the Secretary of State's
3  office.  Between that time period, how many from other
4  sources?
5      A.  I wouldn't be able to determine this off the
6  spread sheet.
7      Q.  How would you make that determination then?
8      A.  I would have to go back and look at the call for
9  service.
10      Q.  Okay.  Does this give you a general ball park of
11  the number of referrals?
12      A.  I would say yes, because there were only two
13  elections that occurred in -- based off this document in
14  2005.
15      Q.  Okay.  And so how many referrals are we talking
16  about then, in a general ball park basically?
17      A.  It would be two.
18      Q.  Two.  So we're talking about a total of seven
19  referrals from the date of the establishment of the SIU
20  to the date of this press release, which is January 25,
21  2006.  Is that fair to say?
22      A.  I believe I said there were six referrals from
23  the Secretary of State's office.
24      Q.  Okay.
25      A.  And then there appears to be two from other

123

1    sources.

2         Q.   Eight?

3         A.   Eight.

4         Q.   Okay.  Turning your attention back to 589,

5    indicates that, "the Attorney General Greg Abbott

6    launches initiative training -- training initiative to

7    identify, prosecute, prevent voter fraud."  Was that

8    initiative launched in 2005 or was it launched in 2006?

9         A.   It was initiated in late 2005 and finalized in

10   the first part of 2006.

11        Q.   Okay.  And so the initiative -- what did the

12   initiative involve?  And you can refer to 589 if you

13   would like to.

14        A.   It involved developing, first of all, identifying

15   geographical regions in the State of Texas where the

16   office had previously investigated and prosecuted

17   allegations of election misconduct.  It involved the

18   development of a law enforcement outreach training

19   program.  And then it involved scheduling and conducting

20   training to law enforcement officers in Texas.

21        Q.   Before we get into the various categories, were

22   there training materials produced or created as a result

23   of this initiative?

24        A.   Yes, sir.

25        Q.   And were those training materials specific to the

124

1          different agencies that you were focusing on or was
2          there just one general training -- source of training
3          material?
4               A.   Just one source of training.
5               Q.   Okay.  And were these training materials turned
6          over or provided to the different agencies that the
7          training was conducted?
8               A.   I believe a -- I believe a copy of the PowerPoint
9          presentation would have been provided as an instructor
10         note -- or class notes.
11              Q.   Who created the PowerPoint presentation?
12              A.   It was a combined effort of multiple
13         investigators.
14              Q.   Including yourself?
15              A.   Yes.
16              Q.   Were you in charge of the ultimate message or the
17         material that was produced in the PowerPoint
18         presentation?
19              A.   No, I was not in charge at the time.
20              Q.   Now, this training initiative in Exhibit 589, it
21         indicates that it targeted 44 key counties that either
22         have a history of voter fraud or the population of which
23         exceeds 100,000.  Do you see that?
24              A.   Yes, sir.
25              Q.   Can you tell me, as of this date, how many

125

1     different counties have been provided training by the

2     attorney general's office?

3          A.   As of today's date?

4          Q.   As of today's date.

5          A.   I couldn't -- I don't know.

6          Q.   More than 44 counties?

7          A.   I don't recall.

8          Q.   Okay.  And just to be fair, and I'm trying to

9     understand this initiative.  You were the lead

10    investigator of the supervisor of the SLU, correct?

11         A.   At the time I was the lieutenant and Greg Lucus

12    was the captain over the unit.

13         Q.   Okay.  Would you have been involved in any

14    aspects of the training?

15         A.   Yes, I was involved in some of the training.

16         Q.   And that would have been to go out into the field

17    and provide the training?

18         A.   Yes, sir.

19         Q.   All right.  And how many investigators were

20    involved in providing training?

21         A.   I don't recall.

22         Q.   Do you have a general idea of the number of

23    investigators?

24         A.   It would just be a guess.  And it would be,

25    perhaps ten.

Major Forrest Mitchell                          June 15, 2012

126

1      Q.   Okay.  And so when we're talking about 44

2   counties and populations of 100,000 or more, can you

3   tell me the different types of agencies that were

4   targeted?

5      A.   We conducted a total of, I believe, approximately

6   80 presentations through out the state.  And in those

7   presentations would have been police departments,

8   sheriff's departments, Texas highway patrol, local

9   district attorney investigators or county attorney

10  investigators or anybody who was a Texas peace officer.

11     Q.   Would that have involved local DAs or local

12  county attorneys as well?

13     A.   Yes, sir.

14     Q.   What about election officials?

15     A.   No, sir.

16     Q.   So local election officials were not invited to

17  the training?

18     A.   This was a TCLEOSE, which is our State law

19  enforcement regulatory agency.  It was designed to be a

20  peace officer presentation for training on election code

21  offenses.

22     Q.   Was there a training initiative established for

23  local election officials?

24     A.   No, not that I'm aware of.

25     Q.   Okay.  And maybe I should be clearer on that.

                                                                127

1    Through the SIU or through the OAG's office, was there a

2    training established for local election officials?

3         A.   No, sir.

4         Q.   Do you see in the fourth paragraph again, where

5    it's talking about 44 key counties including 18 cities

6    where the attorney general has previously investigated

7    or prosecuted alleged election code violations, do you

8    see that paragraph?

9         A.   Yes, sir.

10        Q.   The 44 counties contain 78 percent of eligible

11   registered voters in Texas.  Do you see that?

12        A.   Yes, sir.

13        Q.   Any reason to dispute that?

14        A.   No, sir.

15        Q.   Underneath it indicates that, "earlier this

16   month, two Reeves County women were indicted on charges

17   of illegally possessing an transporting election ballots

18   of several voters."  Do you see that?

19        A.   Yes, sir.

20        Q.   Looking at your spread sheet, can you identify

21   who the two women were?

22        A.   That would be Anita Baeza and Trinidad

23   Villalobos.

24        Q.   And you testified to that already, correct?

25        A.   Yes, sir.

Major Forrest Mitchell                           June 15, 2012

128

1       Q.   Okay.  So is this training initiative still in
2    place?
3       A.   No, sir.
4       Q.   And I believe I asked you what the number of
5    counties that actually received training was, and I
6    can't recall your answer?
7       A.   I don't recall.
8       Q.   And so generally would it have been -- how long
9    did this training initiative last?
10      A.   About a month.
11      Q.   Were there any other versions of this training
12   initiative that were put in place after this particular
13   training initiative?  We're talking about, I believe
14   between 2005 and 2006.
15      A.   No, sir.
16      Q.   And the answer is no, no other training?
17      A.   No other training initiatives.
18      Q.   Okay.
19              (Exhibit No. 590 was marked.)
20   BY MR. GEAR:
21      Q.   Go ahead and take a look at Exhibit 590.  When
22   you've had a chance we'll talk about it.
23      A.   Okay, sir.
24      Q.   Okay.  The fourth paragraph, "and the fraud
25   continues since last summer.  My office has been

129

1     involved in several voter fraud cases across the state."

2     Are there any -- from 2002 to 2006, March 1st 2006 the

3     date of this article, are there any additional voter

4     fraud prosecutions or convictions that you're aware of,

5     based on this spread sheet?

6          A.   I think there were three additional persons

7     charged with election misconduct.

8          Q.   And which three are you referring to?

9          A.   Willie Howard Ray, Jamillah Johnson and Melinda

10    Hunter.

11         Q.   And they're in -- is it Bowie County?

12         A.   Bowie County.

13         Q.   Bowie County.  Thank you.  So let's talk about

14    them real quick.  Can you tell me what the allegation

15    for Willie Ray, Jamillah Johnson and Melinda Hunter are?

16         A.   Yes, sir.  This case was referred by the

17    Secretary of State's office.

18         Q.   Okay.

19         A.   It involved the 2004 primary election.  And the

20    allegations were unlawfully obstructing a poll watcher,

21    unlawfully witnessing the application of more than one

22    application, unlawful assistance, security of ballots,

23    ballot boxes and envelopes.

24         Q.   And would this have been a charge under chapter

25    86 or chapter 64?

1         A.   These -- the allegations involved multiple

2    chapters of the Texas election code.

3         Q.   Okay.  And would any of these allegations have

4    involved a charge of voter impersonation?

5         A.   The mail-in ballot applications and the unlawful

6    assistance could lead to potential illegal voting

7    charges under 64.  However, only charges that were filed

8    were under chapter 86.

9         Q.   Okay.  So is it fair to say there were no charges

10   filed under chapter 64 for any of the individuals who

11   were indicted that you just identified?

12        A.   That is correct.

13        Q.   And ultimately, was there a conviction?

14        A.   Willie Ray pled to one count of possession of an

15   official ballot or carrier envelope of another, which is

16   a class B misdemeanor.  She received a fine.  I'm sorry.

17   I'm having a hard time reading it.

18        Q.   It's small print.

19        A.   And then Jamillah Johnson was -- received

20   six months deferred adjudication and a $200 fine.

21        Q.   And again, that's not a criminal conviction?

22        A.   No.  For the purpose it's not a final conviction.

23        Q.   Okay.

24        A.   And then Melinda Hunter received six months

25   pretrial diversion.

131

1          Q.   And again, these were by mail ballot violations?

2          A.   Yes, sir, 86006 is possession of a mail-in

3     ballot.

4          Q.   Turning your attention back to Exhibit 590, there

5     are a number of different discussions of indictments

6     here.  Reeves County, the mother of the 2004 primary

7     candidate I believe you already testified that, correct?

8          A.   Yes, sir.

9          Q.   Nueces County, the four women allegedly targeting

10    elderly voters during last year's local school board

11    election, I believe you testified to that?

12         A.   Yes, sir.

13         Q.   Hardeman County commissioner pled guilty to

14    illegally collecting mail-in ballots during the 2004

15    election.  And that would have been Johnny Wayne Akers,

16    correct, for Hardeman County?

17         A.   Yes, sir.

18              MR. SWEETEN:  Bruce, we're getting close to

19    1:15, so if you get to a logical stopping point.

20              MR. GEAR:  Did you want to go to 1:30?

21              MR. SWEETEN:  Well, we were going to try

22    to -- we've got to be somewhere at 1:30.  It's short,

23    but yeah.  Just, I mean, I don't want to stop you I'm

24    just letting you know.

25              MR. GEAR:  I'll finish this and then we can

132

```
 1      take a break.
 2                  MR. SWEETEN:  Sure.  That's fine.
 3      BY MR. GEAR:
 4         Q.  There's another indication here about, "I know
 5      local prosecutor's are dealing with voter fraud, too.
 6      The week before Christmas."  And they talk about
 7      Hidalgo.  Did I pronounce that correct?
 8         A.  Yes, sir.  Hidalgo County.
 9         Q.  "Hidalgo County district attorney's office
10      obtained indictments against nine people in connection
11      with the McAllen City election in May of 2005."  Would
12      that be included on your spread sheet?
13         A.  No, sir.  It's included on our spread sheet in
14      referrals.
15         Q.  Okay.
16         A.  But not in prosecutions.
17         Q.  So is this one that you would have worked in
18      conjunction with the local prosecutor.  How does that
19      work?
20         A.  Yes, sir.  The Secretary of State's office
21      referred it to us, as well as the Texas Ranger assigned
22      to that jurisdiction.  And then also the district
23      attorney.  So all three requested assistance.
24         Q.  Okay.  Can you tell me on the referrals where
25      these nine individuals would be identified?
```

                                                                    133

1          A.   I would only have listed it once.

2          Q.   Okay.

3          A.   And it would be listed on Page 1 of election code

4     referrals to the office of the attorney general,

5     August 2007 to present.  And it would be Page 1.  And it

6     would be Hidalgo 2005 municipal election with the SOS

7     date of 6/16/2005.  And the office was method of

8     returning marked ballot, unlawful assistance and

9     assisting voter.

10         Q.   And that would have included the nine individuals

11    that the allegations pertained to?

12         A.   Yes, sir.

13         Q.   And this is -- the allegation at least is, method

14    of returning marked ballots, unlawful assistance,

15    assisting voter, illegal voting.  Can you tell me what

16    the result of these allegations were?

17         A.   I believe nine defendants were charged with a

18    variety of those offenses.

19         Q.   Okay.

20         A.   By the grand jury.  They were indicted.  And the

21    district attorney prosecuted that case.

22         Q.   Go ahead.

23         A.   I believe each of the indictments were

24    subsequently dismissed by the local district attorney in

25    the interest of justice or for insufficient evidence.

Major Forrest Mitchell                                    June 15, 2012

134

1      Q.   Okay.   So there were no convictions regarding

2   this matter?

3      A.   I don't believe so.

4      Q.   Okay.

5           MR. GEAR:   I think this is a good place to

6   stop.

7           MR. SWEETEN:   Okay.   Very good.

8           (Brief recess.)

9   BY MR. GEAR:

10      Q.   Back on the record.   Back from lunch.   All right.

11   I think we ended with Exhibit 590, which takes us up to

12   March 1st of 2006.   So I just want to ask you some

13   general questions about your spread sheet.   From 2002 to

14   March 1st of 2006, how many referrals, total, were

15   received in the office of the Attorney General?

16      A.   From 2002 to 2006?

17      Q.   Yes, sir.

18      A.   18 SOS referrals.

19      Q.   And what about other?

20      A.   That's not going to be as good of a number

21   because I can only distinguish elections prior to 2006,

22   so on the others, it would be two elections.

23      Q.   So 20 referrals between 2002 to 2006.   Is that a

24   fair estimate?

25      A.   Yes, sir.

135

1        Q.   Okay.  Out of those 20 referrals -- and that

2   would have included referrals from the Secretary of

3   State's office, as well as other sources as you've

4   testified here.  How many of those dealt with voter

5   impersonation?

6        A.   The one that I can definitely say dealt with

7   voter impersonation would be Melva Kay Ponce, through

8   Bee County.

9        Q.   And we've talked about that, correct?

10       A.   Yes, sir.  On the other cases that involved

11  mail-in ballot fraud, there were no other persons

12  charged with voter impersonation.

13       Q.   Okay.  Which leads me to my next question

14  between -- other than Ms. Ponce who, I understand your

15  testimony about.  Between 2002 and 2006, were there any

16  charges of voter impersonation?

17       A.   No, sir.

18       Q.   Were there any investigations of voter

19  impersonation?

20       A.   When we examine allegations of mail-in ballot

21  fraud, we sometimes have allegations that the voter

22  didn't cast the mail-in ballot and that someone assisted

23  them with their mail-in ballot or took their blank

24  mail-in ballot.  So there are potential cases that were

25  there.

136

1          Q.   And those, again, would have been under

2     chapter 86, not chapter 64 because they're dealing with

3     mail-in ballots?

4          A.   If you had a suspect who assisted a voter with

5     the mail-in ballot application and also the completion

6     of the ballot, and marked the ballot contrary to the

7     voter's intent or marked the ballot as if they were

8     themselves the voter as in the case of Melva Kay Ponce,

9     that would be under 64.

10         Q.   Okay.  And again, the question I have for you is,

11    that would have fallen under the by mail ballot system,

12    however?

13         A.   Yes.  You can commit illegal voting by -- you can

14    commit illegal voting by -- in the early voting mail-in

15    ballot portion, early voting polling place or actually

16    on election day itself.

17         Q.   Okay.  And so from 2002 to 2006 dealing with

18    early voting at the polling place, were there any

19    charges, referrals or allegations of voter

20    impersonation?

21         A.   No, sir.

22         Q.   Were there any prosecutions of voter

23    impersonation, either early voting, by mail ballot or at

24    the polling place between 2002 and 2006?

25         A.   By our office or the State of Texas as a whole?

137

1      Q.   Start with your office.

2      A.   No, sir.

3      Q.   Are you aware of any in the State of Texas as a

4   whole?

5      A.   No, sir.  Our data only represents what was

6   referred to the Attorney General's office.

7      Q.   Okay.  And as I understand your testimony, the

8   referrals come from a variety of sources?

9      A.   That's correct.

10      Q.   So going forward from 2006 to the end of 2011,

11   can you tell me how many referrals you received in your

12   office between 2006 to 2011?

13      A.   If you give me just a moment.

14      Q.   Sure.  I know it's going to take a little time.

15   Just for the record, I would indicate that the witness

16   is referring to his spread sheet.

17      A.   Did you say the end date was 2011?

18      Q.   Yes, sir.

19      A.   100 from the Secretary of State's office.

20      Q.   And other?

21      A.   Okay.  Since 2006, we each received approximately

22   160 allegations of misconduct in elections in that time

23   frame.

24      Q.   Total?

25      A.   168 from other sources outside of the SOS.

                                                            138

 1                    MR. ROSENBERG:   168?
 2        A.   168.
 3        Q.   So total would be, if I'm counting correctly, 268
 4   referrals between 2006 to 2011.  Is that yes?
 5        A.   Of elections from that time frame -- in that time
 6   frame, yes, sir.
 7        Q.   And I assume you -- counting on your spread sheet
 8   you counted to the end of 2011?
 9        A.   I counted to 2010, 2009, 2008, 2007 elections.
10        Q.   And you counted 2011 elections, correct?
11        A.   The -- on the other category in the other sources
12   outside of the SOS, we didn't have any in 2011.
13        Q.   Okay.  Did you have any in 2011 for SOS?
14        A.   Yes, sir.  But I didn't count those.
15        Q.   You did not count those.  Go ahead and count
16   those as well?
17        A.   Eight SOS referrals in 2011.
18        Q.   So what does that take our total to, 268 plus
19   eight?
20        A.   268 plus eight?
21        Q.   Uh-huh.
22        A.   276.
23        Q.   276.  And that would represent all of the
24   referrals from any source to the OAG's office from 2006
25   to the end of 2011?

Major Forrest Mitchell                                    June 15, 2012

139

1          A.   Yes, sir, I believe so.

2          Q.   Did I state that right, because I'm just trying

3     to make sure I'm clear on it?

4          A.   There are some, if I may clarify?

5          Q.   Please.

6          A.   There are some elections, which I'm unable the

7     determine exactly what election actually it involved.

8     There were complaints about unspecified elections.  And

9     I did not include those.

10         Q.   Okay.  And where in the spread sheet are you

11    referring to?

12         A.   If you would look at Page 11 of the election code

13    referrals office of the Attorney General, 2002 to the

14    present.

15         Q.   Okay.

16         A.   Undetermined in Nueces County, undetermined in

17    Duval County.

18         Q.   I see what you're referring to.  So there are two

19    referrals that are undetermined?

20         A.   Well, on other pages there are as well, sir.

21         Q.   Why don't you go ahead and add those in as well.

22    As far as referrals are concerned.  I see one on

23    Page 10.

24         A.   Looks like it would be, maybe five.

25         Q.   Five?

Major Forrest Mitchell                                June 15, 2012

1         A.   Yes, sir.

2         Q.   So adding those five to the 276, what is your

3    total?

4         A.   It would be 281.

5         Q.   So the 281 referrals, as I understand it,

6    represent all of the referrals from any source from 2006

7    to 2011, including undetermined election dates?

8         A.   That were received by the Texas Attorney

9    General's office, yes, sir.

10        Q.   Okay.  Out of those 281, can you tell me how in

11   were actually investigated?

12        A.   I can tell you that when I reviewed the number of

13   investigations that we conducted in the period from 2004

14   to present, the number is 186.

15        Q.   The present, including 2012?

16        A.   Correct, sir.

17        Q.   Okay.  So let's go with that for a minute.  You

18   said from 2002 or 2004 to the present?

19        A.   2004 to the present.

20        Q.   Okay.  So from 2004 to the present, kind of

21   throws off our other estimate of referrals, but there

22   have been 186 that have been investigated?

23        A.   Yes, sir.

24        Q.   How many of those have resulted in -- of the 186

25   resulted in charges?

141

1          A.    We referred 62 cases for prosecution.

2          Q.    Out of the 186 from 2004 to the present, how many

3     of those referrals dealt with voter impersonation?

4          A.    I have to go and count them on the spread sheet.

5          Q.    Please do.

6                MR. SWEETEN:    Can you read the question back

7     while he's doing that?

8                (Requested question was read.)

9     BY MR. GEAR:

10         Q.    I should be clear, how many of those were

11    allegations of voter impersonation?

12               MR. SWEETEN:    Same thing.  Do you understand

13    what he wants?

14         A.    Of the prosecutions?

15         Q.    (By Mr. Gear)  Of the -- of the 186 that were

16    received as -- I'm sorry.  I'm confused myself now.

17               MR. SWEETEN:    Investigations.

18    BY MR. GEAR:

19         Q.    Yeah.  Of the 186 investigations, how many of

20    those were allegations of voter impersonation?

21         A.    On the spread sheet that I maintain, voter

22    impersonation is included in the allegation of illegal

23    voting.  I would have to go through and count those as

24    well.

25         Q.    Help me understand when you're talking about

1      "illegal voting," that's under chapter 64?

2          A.   Yes, sir.

3          Q.   And chapter 64 has a multitude of different

4      potential violations.

5          A.   Yes, sir.

6          Q.   And is illegal voting a general term or is it a

7      specific allegation.

8          A.   It is a -- it is an offense title that includes

9      four different elements of -- four different ways to

10     commit that offense title.

11         Q.   Okay.   Is there any way to distinguish between

12     allegations of illegal voting versus allegations of

13     voter impersonation?

14              MR. SWEETEN:   On the spread sheet, Bruce?

15              MR. GEAR:   Well, I'm asking him in general.

16     BY MR. GEAR:

17         Q.   I'm just trying to understand how this is

18     inputted.

19         A.   It only is inputted if that clearly is

20     articulated in the referral source.   In many cases, the

21     Secretary of State's office just refers a case to us and

22     says here is an allegation of -- a violation of 64012,

23     illegal voting.   And some other referrals they break it

24     down exactly how the offense is committed, either

25     through voter impersonation, voting twice, being an

143

1    ineligible voter.  In other cases, especially those that

2    are referred to the DA or other persons, they don't

3    break that down in the referral document.  So this is

4    created off that referral document.

5        Q.   Okay.  So trying to move forward from the

6    referral, because we're talking about 2004 to the

7    present, correct?

8        A.   Yes, sir.

9        Q.   At some point is there a charging decision from

10   the OAG's office?

11       A.   Yes, sir.

12       Q.   How many of the -- this might be one step before

13   that.  But how many of the 186 referrals were

14   investigated as voter impersonation?  And let me narrow

15   that down even farther.  Were investigated as voter

16   impersonation at the polling place.  Can you identify

17   that?

18       A.   I can identify that the defendants who have been

19   charged for that are Jack Carol Crowder out of Harris

20   County.  Reyna Almanza out of Hidalgo County.  Lorenzo

21   Antonio Almanza out of Hidalgo County.  And I believe

22   Mary Comparin out of Bexar County.

23       Q.   So as I understand your testimony, there are four

24   individuals that have been charged with voter

25   impersonation between -- are you limiting this testimony

144

1      to 2004 to the present or are you going from 2002 to the

2      present?

3          A.   I'm going to from 2004 to the present.

4          Q.   Okay.  And so since we're going down this road,

5      were there any charged with voter impersonation at the

6      polling place between 2002 to the present?  And I

7      understand there are four that you already identified.

8      So I'm trying to get the total number of individuals

9      that were charged with voter impersonation at the

10     polling place between 2002 to the present.

11         A.   Of the cases that were referred to our office and

12     the Attorney General's office, yes.  I believe there are

13     four.

14         Q.   Okay.

15         A.   Total.

16         Q.   And those are the four you just identified?

17         A.   Yes, sir.

18         Q.   Would you say that the majority of the referrals

19     that come to your office are based on the by mail ballot

20     system?

21         A.   I wouldn't say majority, no.

22         Q.   What percentage would you say?

23         A.   I know that illegal voting represents -- I'm

24     sorry.  I did the numbers.  I remember that 133 of the

25     Secretary of State's referrals, approximately 60 dealt

145

1      with illegal voting of any type.

2          Q.   That's out of the 186 referrals?

3          A.   Well, the 133 would be part of the 186.

4          Q.   Okay.  Let's see if we can clarify this.

5          A.   Sorry.

6          Q.   We're getting into the numbers now.  So you said

7      133 and 186 would be part -- 133 would be part of 186.

8      What time period are we talking about?

9          A.   Of the spread sheet, would be 2002 to present.

10         Q.   And so the total number of referrals between 2002

11     to the present that were received by the OAG's office

12     would have been what number?

13         A.   The total number of SOS referrals in that time

14     frame was 133.

15         Q.   Okay.  And that's where the 133 came from.  And

16     then the total number of other referrals?

17         A.   I believe that number was 2 --

18         Q.   You gave me a number earlier of 276?

19         A.   Yeah.  That would be pretty close.

20              MR. SWEETEN:  I'm sorry.  What is 276?

21              MR. ROSENBERG:  Can we clear this up or

22     we'll go crazy.

23              MR. GEAR:  Yeah, I know.  Right.  I know.

24              MR. ROSENBERG:  Do you mind if I just -- to

25     get the numbers here's --

146

1              MR. SWEETEN:  I don't mind.

2              MR. GEAR:  Go ahead.  That's fine.

3              CLARIFYING EXAMINATION.

4    BY MR. ROSENBERG:

5        Q.  The 133 include -- from the Secretary of State,

6    includes 100 from 2006 to 2011; am I correct?  Just from

7    the Secretary of State.

8        A.  I believe the question earlier was 2006 to

9    present or to 2011?

10             MR. GEAR:  Yes.

11       A.  And I think that number I gave was, I believe

12   100.

13       Q.  (By Mr. Rosenberg)  Right.  The 133 is from 2002

14   to the present just from the Secretary of State?

15       A.  I believe that's correct, sir.

16       Q.  There were an additional 178 referrals that

17   weren't from the Secretary of State from 2002 forward,

18   which were based on two between 2002 and 2006?

19       A.  In 2005 there were two referrals from another

20   source.

21       Q.  168 between 2006 and 2011.  Non-referrals -- let

22   me say, not from the Secretary of State, not referrals

23   from the Secretary of State.

24       A.  As I can determine.

25       Q.  Eight from the 2011 election?

147

1       A.    Those would be SOS referrals.

2       Q.    Those were within the SOS. Okay. And five that

3   were undetermined?

4       A.    Yes, sir, I believe so.

5       Q.    So the total referrals from 2002 to 2000 -- to

6   date are 301?

7       A.    The number that I have in my head is, I think

8   around 320.

9       Q.    Okay. So we're missing some. That's the best I

10  can do. I turn it back.

11              MR. SWEETEN:  Ezra, you were supposed to

12  clear this up.

13              BY MR. ROSENBERG:  I tried. I tried.

14              FURTHER EXAMINATION

15  BY MR. CEAR:

16      Q.    So 320 is the number that is in your head, would

17  represent all referrals from any source that were

18  received from the OAG's office. Is that accurate?

19      A.    One more time. I'm sorry.

20      Q.    The 320 number that you said you had in your head

21  would be reflective of all of the referrals from any

22  source that were received by the OAG's office regarding

23  election code violations?

24      A.    Yes, sir.

25      Q.    And that would have been from 2002 to the

1    present, 2012?

2        A.   Yes, sir.

3        Q.   And so let's start from there since we've got

4    that number down.  So we've got 320 total referrals.  Of

5    those 320, how many were investigated?

6        A.   That's where the number -- I have to clarify.  I

7    have 186 investigations from 2004 to present.  And the

8    reason for that is the report system that we used.  I'm

9    able to query our report system that only goes back to

10   2004.

11       Q.   So then based on your testimony, is it fair to

12   say that you do not know the number of investigations

13   between 2002 up to 2004?  Let me ask that a different

14   way.  Are there files maintained somewhere that would

15   tell us what happened between 2002 and 2004 regarding

16   referrals?

17        .A.   I believe that the records retention for election

18   code offense, I believe is like five years.  And so I

19   only can give you a number of the number of

20   investigations that we conducted based on our report

21   writing system that goes from 2004 to present.

22       Q.   So again, not to belabor the point, I'm just

23   trying to make sure I understand your testimony.  If I

24   was to ask you or anyone within your office to go back

25   and look at either electronic files or paper files for

149

1    investigations between 2002 to 2004, you would not be
2    able to do that?
3         A.   I don't know.
4         Q.   Is it fair to say that in preparation for this
5    deposition you didn't look at any files, either
6    electronic or paper, between 2002 up to 2004?
7         A.   I was able to query all of our election cases
8    which was through our system -- which showed me cases
9    from 2004 to present.
10        Q.   So is that a yes or no?  I'm sorry.
11        A.   I did not look at any files -- investigative case
12   files from 2002 to present -- or to 2004.
13        Q.   So we're still working with the 320 number, which
14   would be reflective of 2004 to the present, correct?
15        A.   No.  Actually that number would be -- that time
16   frame -- the 320 encompasses --
17        Q.   2002?
18        A.   2002 to the present.
19        Q.   Now, I'm sorry.  I talked over you.  That was
20   2002 to the present?
21        A.   Yes, sir.
22        Q.   I think we're getting there.  All right.  So of
23   the 320 referrals from all sources to the OAG's office
24   from 2002 to the present, how many of those were
25   investigated?

150

1      A.  I believe 186.

2      Q.  Okay.  Of those 186 referrals that were

3  investigated from 2002 to the present, how many of those

4  dealt with voter impersonation at the polling place?

5      A.  I can clearly identify four.

6      Q.  And you've done that already on the record?

7      A.  Yes, sir.

8      Q.  Other than those four, are you aware of any

9  others?

10         MR. SWEETEN:  And you're asking allegations,

11  just so I'm clear.

12         MR. GEAR:  No.  I'm asking about

13  investigations.

14         MR. SWEETEN:  Investigations.  Okay.

15     A.  There are more.  But those four are the ones that

16  were charged.  I do not know the number off the top of

17  my head for the other ones that weren't charged.

18     Q.  (By Mr. Gear)  And as we've -- as you've

19  testified before, that a referral can come into your

20  office and not result in a charge, correct?

21     A.  That's correct.

22     Q.  And that they can come in your office and not be

23  supported by, either the facts of the law, would that be

24  accurate?

25     A.  That's correct.

151

1          Q.   Which would be a reason not to charge?

2          A.   That's correct.

3          Q.   Okay.  So -- and now you've used the term "those

4     are the four, "and you're talking about Mr. Crowder,

5     Mary Comparin and can you remind me of the other two

6     names?

7          A.   Reyna Almanza and Lorenzo Antonio Almanza.   I

8     think his name was junior.

9          Q.   Okay.  Let's first start with Mr. Crowder.  Can

10    you tell me when that investigation occurred?  For the

11    record, the witness is referring to his spread sheet.

12    And I just direct your attention to Page 3 of the Texas

13    code of referrals to the office of Attorney General

14    prosecutions resolved, Bates stamped TX 00056820.   I

15    believe it's the third.

16         A.   Right.  This case was referred to our office by

17    the Secretary of State's office.

18         Q.   And when was it referred?

19         A.   It would have been -- the SOS document date was

20    1/14/09.  I mean, the date of the referral from the

21    Secretary of State's office was January 14, 2009.

22         Q.   2099.  What election --

23         A.   I'm sorry.

24         Q.   Go ahead.

25         A.   It involved the 2008 and 2000 -- primary and

152

1     general elections.

2         Q.   From the spread sheet referring to Page 3, I see

3     it indicates the primary election.  Where do you pick up

4     the general election?

5         A.   Because that's the actual election that he was

6     charged for illegally voting in and impersonating in.

7         Q.   In the general election?

8         A.   The actual referral indicates there were deceased

9     voters voting both the general and primary elections.

10        Q.   And is that indicated in the spread sheet?

11        A.   It's indicated -- yes, sir.  In the referral

12    spread sheet.

13        Q.   And which page is that?

14        A.   That would be Page 3 of the referral sheet,

15    spread sheet.

16        Q.   Can you tell me which --

17        A.   The -- eight from the bottom.  And it says,

18    "Harris 2008, primary and general elections, 1/14/09,

19    deceased voters voting."

20        Q.   And how do you know that this deals with

21    Mr. Crowder?

22        A.   Because that -- I just know that that's the

23    referral that we got which we initiated the

24    investigation at which Jack Carol Crowder was

25    subsequently charged.

153

1      Q.   Okay.  And so can you tell me what the facts are
2   for that case?
3      A.   A group of citizens had obtained voter
4   registration records and then compared that to the
5   actual voting records in those two elections.  And they
6   had come up with a list of names that they suspected
7   were potential dead persons voting.  They then presented
8   that information to the Secretary of State's office who
9   evaluated and then sent it to us for investigation.
10     Q.   And the group of citizens that you're referring
11  to?
12     A.   I'm sorry.  I don't know their name.
13     Q.   Was it an actual group that made this referral or
14  was it -- or are you just referring to that, generally a
15  group of citizens?
16     A.   I believe the SOS referral itself actually says
17  the name of the group.
18     Q.   Is that indicated anywhere in your spread sheet?
19     A.   No, sir.
20     Q.   Do you know if that name would have been the King
21  Street Patriots?
22     A.   No, I don't believe that was it.
23     Q.   But as you sit here today, you don't know the
24  name of the group?
25              MR. SWEETEN:  Objection' asked and answered.

1         A.   No, sir, I do not know the name of the group.

2         Q.   (By Mr. Gear)   So they conducted their own, I

3    guess informal investigation, and referred it on to the

4    Secretary of State's office.   Can you tell me what the

5    facts are of the case?

6         A.   Yes, I can.   Jack Carol Crowder -- Jack Carol

7    Crowder's father died preceding the election and his

8    son, Jack Carol Crowder also, used his voter

9    registration card to vote in that election.   The

10   investigation revealed that at no time did Jack Carol

11   Crowder attempt to register to vote, either through the

12   signing up for his Texas driver's license or by actually

13   completing a voter registration card.   And he was

14   interviewed and advised that he didn't complete a voter

15   registration card.   He thought that he had asked to be

16   registered on his Texas driver's license.

17        Q.   So let me flesh out the facts now.   Jack Carol

18   Crowder, the individual who voted, has the same last

19   name as his father who was deceased?

20        A.   That is correct.

21        Q.   And the same first name as well?

22        A.   That's correct.

23        Q.   Is there any difference in the Jack Carol

24   Crowder, Jr., Jack Carol Crowder the third --

25        A.   I think Jack Carol Crowder the actual suspect is

155

1    the third.

2         Q.   Okay.  And do you know if the father has -- what

3    is the suffix on his last name?

4         A.   I don't remember.

5         Q.   Okay.  And you said that he presented some form

6    of identification when he voted?

7         A.   No, sir.  He presented his deceased father's

8    voter registration certificate.

9         Q.   And is that indicated anywhere here on your

10   spread sheet?

11        A.   No, sir.

12        Q.   And how would I know -- how would I determine

13   exactly what happened on the day of that election?  Are

14   there documents, reports that are available that would

15   clarify that?

16        A.   Yes, sir.  The combination form that was used at

17   the polling place indicates the kind of documentation

18   that the voter used to sign up at the polling place.  It

19   generally indicates if they presented a voter

20   registration certificate or some other form of ID.  I

21   believe the charging document itself, the indictment

22   that Jack Carol Crowder -- it actually mentions that he

23   used his father's voter registration certificate to cast

24   a ballot in that election as well.

25        Q.   Did you actually conduct this investigation?

Major Forrest Mitchell                          June 15, 2012

156

1       A.   No, but I assisted in it.

2       Q.   What was the basis of the group believing or

3   attempting to determine that Mr. Crowder may have been

4   using a deceased voter certificate, in this case his

5   father's?

6       A.   I don't know what the group -- or why they did

7   what they did.

8       Q.   And he was ultimately indicted?

9       A.   Yes, sir.

10      Q.   What was he indicted for?

11      A.   The Harris County district attorney's office

12   indicted him for illegal voting, for impersonating his

13   deceased father.

14      Q.   Was there a resolution to the case?

15      A.   Yes, sir, there was.

16      Q.   And what was the resolution?

17      A.   He pled guilty to one count of fraudulent use of

18   identifying information and received one-year deferred

19   adjudication and a $200 fine.

20      Q.   Fraudulent use of -- did you say of information?

21      A.   Fraudulent use of identifying information.

22      Q.   What chapter would that have been under?

23      A.   That's actually in our Texas penal code.

24      Q.   And can you explain that for those of us who

25   don't know?

Major Forrest Mitchell                                    June 15, 2012

157

1        A.   Yes, sir.  If a person possesses identifying

2    information of another and uses it with intent to harm

3    or defraud, they can be charged under the penal code as

4    well.  And identifying information under Texas law would

5    be a unique identifying number to that person, such as a

6    Texas driver's license, voter identification number, a

7    Texas voter ID, a social security number or a date of

8    birth.

9        Q.   So as I understand it, there was no conviction

10   under chapter 64, which as I understand it, identifies

11   voter impersonation?

12       A.   No, sir.  He pled guilty to possession and use of

13   identifying information.

14       Q.   And again, would that have been under chapter 64?

15       A.   No, sir.  That's a penal code offense.

16       Q.   This may be a silly question, but I'm just trying

17   to understand the range of this.  What would be the

18   basis of pleading under the penal code versus pleading

19   under the election code?

20       A.   It would be speculation on my part.  I don't know

21   why Harris County made the decision to reduce the

22   offense.  But illegal voting is a third degree felony

23   and -- which is punishable by up to two to 10 years in

24   the State penitentiary.  And a person who has no

25   criminal history whatsoever, might be charged for a

Major Forrest Mitchell                                    June 15, 2012

                                                                   158

1      lesser offense for reduced punishment based on the fact

2      that they had no prior criminal history?

3          Q.  Okay.  So it was the result of a plea agreement,

4      essentially?

5          A.  I believe so, yes, sir.

6          Q.  Do you know what the punishment or the penalty

7      was for his violation?

8          A.  He pled to one year deferred adjudication and a

9      $200 fine.  So with that one year deferred adjudication

10     he probably had to report to a community supervision

11     department for the period of a year.

12         Q.  So the deferred adjudication means there was no

13     actual conviction?

14         A.  At the successful completion of a deferred

15     adjudication there's no final conviction; that's

16     correct.

17         Q.  Did he successfully complete his period of

18     deferred adjudication?

19         A.  I'm sorry.  I don't know that, standing here

20     today.  I don't know.

21         Q.  If he didn't successfully complete it, what would

22     have happened?

23         A.  If he didn't successfully complete it, he would

24     have been adjudicated and he could be forced to serve

25     the entire year in the county jail.

159

1     Q.  Are you aware of whether or not Mr. Crowder ended
2  up serving any time in jail?
3     A.  I'm not aware.
4     Q.  So the end result in this is, if I understand
5  your testimony, if he successfully completed the
6  deferred adjudication, then he would not have been
7  convicted of a crime?
8     A.  That's correct.
9     Q.  You also said Mary Comparin.  Can you tell me,
10  based on your spread sheet, when that referral came into
11  the office?
12     A.  This referral is going to be found in the other
13  category, as it was referred by law enforcement.  And so
14  I don't have a date in the spread sheet that says the
15  actual date of the referral.
16     Q.  What page are you referring to, if any?
17     A.  If you'll just give me a moment I'll look for it.
18     Q.  Sure.
19     A.  I believe I'm referring to Page 9 of the election
20  code referrals of the office of Attorney General, 2002
21  to present.  That says, "Bexar multiple primary and
22  general elections, other illegal voting."
23     Q.  And again, how do you know that this particular
24  referral deals with Mary Comparin?
25     A.  Because the DPS trooper who discovered this case

1       referred it directly to me.

2           Q.   Which county did this come out of?

3           A.   Bexar County.

4           Q.   And again, we don't know which election?

5           A.   It was multiple elections.

6           Q.   Do you know the year of these elections?

7           A.   If I could explain the facts, I probably could.

8           Q.   Go ahead, please.

9           A.   Mary Comparin was discovered by the Texas

10      Department of public safety, as through the Texas

11      driver's license image system had developed multiple

12      identities in her own name.  And the DPS trooper who

13      discovered this also discovered that in the -- in those

14      identities, she was voting in multiple elections.  Every

15      election that basically took place she would vote two to

16      three times.

17          Q.   You're saying, "every election that took place."

18      I'm trying to understand the time frame in which you're

19      talking about.  Do you know the elections she allegedly

20      voted in?  And I understand the spread sheet to say,

21      "multiple primary and general elections."  But do you

22      know the actual elections that she allegedly voted in?

23          A.   I know what we charged her for.  And I believe it

24      was the -- based off the spread sheet, she was charged

25      for voting in the 2008 general election.

Major Forrest Mitchell                                    June 15, 2012

161

1        Q.   You said, "2008 general"?

2        A.   Yes.

3        Q.   And you refer to your spread sheet.  Do you see

4   Ms. Comparin's name on here anywhere?

5        A.   Yes, sir.  It's on Page 1 of charges pending

6   resolution.

7        Q.   Would this charge still be pending at this point?

8        A.   Yes, sir, it is.

9        Q.   And she was charged with illegal voting?

10       A.   Yes, sir, in that election.

11       Q.   And is this set for trial?  Can you tell me where

12  it is in the process?

13       A.   I think she's currently been found by the court

14  as -- I don't know exactly the term.  But she's --

15       Q.   Give it a shot.

16       A.   Mentally incompetent.

17       Q.   That would be a legal term.  Do you know if this

18  case -- if there's any intention to proceed to trial in

19  this case?

20       A.   I think that we have to -- the State has to find

21  that she is competent through a court before it can

22  proceed to trial.  I think they have regular settings to

23  determine that.

24       Q.   And have you gone through that process?

25       A.   I personally haven't.  But I believe that the

Major Forrest Mitchell                    June 15, 2012

                                                          162

1      prosecutor assigned has.

2          Q.  What was the end result of that?

3          A.  I think she's been found incompetent.

4               MR. SWEETEN:  Bruce, I'm going to, at this

5      point, I'm going to designate any discussion of an

6      active case, Ms. Comparin's case as under the protective

7      order, just this section related to questioning on her.

8      BY MR. GEAR:

9          Q.  Let's move forward to the next -- there's two

10     left, correct?

11         A.  Yes, sir, I believe so.

12         Q.  And did you say Almanza?

13         A.  Almanza.

14         Q.  Almanza.  Can you tell me when that referral came

15     into your office?

16         A.  I believe it was in 2009.

17         Q.  Can you tell me what page you're referring to on

18     your spread sheet?

19         A.  It would be Page 10 of the election code

20     referrals of the office of the Attorney General, 2002 to

21     the present.  And it would be the first entry, Hidalgo

22     2009 school district election, voter -- illegal voting.

23         Q.  Is this case still pending?

24         A.  There are actually two cases.  One of the cases

25     is pending.

163

1          Q.   Okay.  Well, let's break that out.  You said
2     there's two cases.  Did both of them deal with the 2009
3     school district election?
4          A.   Yes, sir, they did.
5          Q.   And they both deal with Mr. Almanza?
6          A.   Lorenzo Antonio Almanza, Jr.
7          Q.   Junior, okay.
8          A.   And his mother, Reyna Almanza.
9          Q.   And what are the facts for that case or those
10    cases, I guess properly stated?
11         A.   Lorenzo Almanza and his mother went into the
12    Progresso school district to vote in that election.
13    Lorenzo Almanza had already voted days prior to that
14    election and used his brother's voter registration
15    certificate to cast a second ballot in that election.
16    His brother was an ineligible voter because he was
17    incarcerated in San Antonio for a felony offense at the
18    time.
19         Upon presenting the card to the elections
20    official, a poll watcher who was present recognized the
21    name of the person who was presenting themselves to vote
22    with the card and said that's not that person.  The
23    election judge actually contacted the county elections
24    department to determine what to do because he wasn't
25    familiar what to do in such a circumstance.  And the

Major Forrest Mitchell                           June 15, 2012

164

1    elections department told the election judge at the

2    polling place, since he's presented a lawful voting

3    registration certificate he must be allowed to vote.

4          The poll watcher was emphatic that he wasn't the

5    person and Reyna Almanza, the mother, interjected

6    herself and vouched for his identity as being Lorenzo

7    Antonio -- or Orlando Almanza, his brother.

8          Q.   So Reyna Almanza, the mother, has not been

9    charged with voter impersonation?

10         A.   No.  She was charged as a party to and illegal

11   voting impersonation.

12         Q.   So as far as -- as for as Mr. Almanza, that's

13   still an allegation at this point, correct?

14         A.   Yes, sir.  He was indicted and he is currently

15   awaiting trial.

16         Q.   Do you know the trial date?

17         A.   No, sir.  He was subsequently rearrested for a

18   federal violation.  And so I think he's in the custody

19   of the US government at this time.

20         Q.   Is there a scheduled trial date that you're aware

21   of?

22         A.   No, not that I'm aware of.

23         Q.   When you say, "he's in the custody of the US

24   government," is he in state, out of state?

25         A.   I believe he is, the last check I heard, he was

165

1      in the South Texas federal detention facility.

2                  MR. SWEETEN:  Again, because this is an open

3      case, I'm going to designate this portion of the

4      testimony, the specifics about it as eyes only,

5      protective order.

6      BY MR. GEAR:

7          Q.  At this point I think we went through all four.

8      But let me just if back to the mother.  And her first

9      name, again, was?

10         A.  Reyna Almanza.

11         Q.  Okay.  So she was charged as a party to, but did

12     not actually, based on the allegations, cast a vote in

13     someone else's name.  Is that accurate?

14         A.  Yes.  She did not cast a ballot in that election.

15         Q.  She didn't vote at all in that election?

16         A.  I don't know at this time, sir.

17         Q.  Did she attempt to vote at all during that

18     election?

19         A.  I'm not sure she's a US citizen.

20         Q.  I don't know if that answers the question.  Are

21     you aware of whether or not she attempted to vote?

22         A.  I didn't look.  I don't know.

23         Q.  So in summary, I believe you said the total from

24     2002 to the present is 320 referrals, correct?

25         A.  Yes, sir, I believe that's correct.

166

1          Q.   And out of those 320 referrals, there have been
2     four charges of voter impersonation at the polls, if I
3     understand your testimony correctly?
4          A.   Yes, sir.   I believe there have been four charges
5     at the polling place.
6          Q.   And actually, one of those charges was a party
7     to, and that person did not, in fact, attempt to cast a
8     ballot as you know, as you sit here?
9          A.   I don't know if she did or not.
10         Q.   Out of the four charges, how many convictions
11    have there been for voter impersonation at the poles?
12              MR. SWEETEN:   Does that include pleas or are
13    you talking about convictions only by jury?
14              MR. GEAR:   Let's make it a general question
15    including pleas.
16    BY MR. GEAR:
17         Q.   How many of the four charges have actually
18    resulted in a conviction, including a plea of voter
19    impersonation at the polling place?
20         A.   The only person that comes to mind is Reyna
21    Almanza as voter impersonation.
22         Q.   Has that gone to trial?
23         A.   Oh, yes, sir.
24         Q.   What was the result of that trial?   I'm sorry.   I
25    might have glazed over that one?

Major Forrest Mitchell                                June 15, 2012

167

1      A.   She was convicted by a jury in Brooks County on

2   November 16, 2011 and sentenced to two years in prison,

3   which was suspended for five years of probation.  And as

4   a condition of the punishment, she was ordered to serve

5   90 days in jail, and as a condition of the probation

6   just pay $313 in court costs.

7      Q.   Which page of the spread sheet are you referring

8   to?

9      A.   I'm referring to the election code referrals

10   office of the Attorney General's prosecution resolve.

11   And I'm referring to Page 4, Reyna Almanza is the third

12   from the bottom.

13      Q.   I apologize.  Can you tell me the facts of this

14   case?

15      A.   That is the mother who interjected herself on

16   behalf of her son who was committing the voter

17   impersonation.

18      Q.   And she was charged as party to?

19      A.   Yes, sir.  And if I may clarify one thing.

20      Q.   Please.

21      A.   I left off Delores McMillian.  She, too, was

22   charged with voter impersonation or attempted voter

23   impersonation.

24      Q.   And she appears on Page 4 of your spread sheet

25   for --

Major Forrest Mitchell                          June 15, 2012

168

1       A.  Yes, sir.

2       Q.  Prosecutions resolved?

3       A.  Yes, sir.

4       Q.  Can you tell me, just so we're clear, Delores

5   McMillian, was the election that the referral came from

6   is the 2010 primary election?

7       A.  In Dallas County.  Correct, sir.

8       Q.  In Dallas County.  Actually, Dallas

9   County/Rockwell as I see it here?

10      A.  The two counties, under Texas State law, when you

11  prosecute an election code offense, you can take it to

12  an adjoining county.

13      Q.  Okay.  And so can you tell me exactly what the

14  charges were for Delores McMillian?

15      A.  She was charged for attempted voter imperson --

16  she was charged for attempted illegal voting, voter

17  impersonation.

18      Q.  All right.  And can you tell me what the facts of

19  this case are?

20      A.  Delores McMillian and her mother, who is now

21  deceased, are both elections officials working at a

22  polling place in Dallas County during that election.

23  Both Delores and her mother used other voter's

24  information to cast ballots on behalf of those -- on

25  behalf of these other people.

Major Forrest Mitchell                                    June 15, 2012

169

1          Q.   Are we talking about at the polls or by mail?

2          A.   At the polls.

3          Q.   Okay.  I'm not clear on the facts.  You say,

4     "they used other people's information to cast ballots at

5     the poles."  Can you clarify that for me?

6          A.   Yes.   Their voter -- their voter registration

7     numbers.

8          Q.   And how did they -- how did they do this?

9          A.   I don't know off the top of my head.

10         Q.   Is there a file that would clarify that?

11         A.   Yes, sir.  There's an investigative file that

12    would be able to clarify that.

13         Q.   And was there a plea in this case?

14         A.   Yes, sir, I believe so.

15         Q.   And what was the plea?

16         A.   She pled guilty to one count of attempted illegal

17    voting and served -- was sentenced to one year probation

18    and paid $227 in court costs.

19         Q.   So you said they used other people's voter

20    registration -- their registration information.  Am I

21    saying that correctly?

22         A.   Yes, sir, I believe so.

23         Q.   How many people are we talking about that were

24    involved in this?

25         A.   I believe Delores used one person's identity.

Major Forrest Mitchell                          June 15, 2012

170

1   And I do not remember how many her deceased mother used.

2   She died during the course of the investigation.

3        Q.   So that allegation was never proven?

4        A.   She was never charged for it.

5        Q.   Do we know the name of the voter that Delores

6   allegedly used?

7        A.   I don't know the name today.

8        Q.   Do you know how she obtained the voter

9   registration information or the voter's information?

10       A.   I'm sorry.  I don't know right now.

11       Q.   And when you say, "attempted illegal voting," do

12   you know if she actually cast a ballot?

13       A.   It was actually stopped by a fellow elections

14   worker.

15       Q.   And can you tell me the facts behind that?

16       A.   No, sir, I can't.  Other than to say that I

17   believe the other elections worker discovered that these

18   names appeared on the list prior to the opening of the

19   polling place.

20       Q.   When you say, "the list," are you talking about

21   the voter registration polls?

22       A.   No, sir.  The combination form at each polling

23   place.  And in Texas when a voter presents themselves to

24   vote, there is a combination form which election

25   officials complete and then the voter has to sign.  And

Major Forrest Mitchell                                   June 15, 2012

171

1      you either have to provide the certificate or some other

2      form of identification for that purpose.  So I'm

3      referring to the combination form.

4          Q.  So in the case where you have an election

5      official using -- impersonating another voter, is that

6      something that would be prevented by -- if SB 14 was

7      implemented?

8                MR. SWEETEN:  Objection; calls for

9      speculation.  You can answer.

10     BY MR. GEAR:

11         Q.  You can answer.

12         A.  I don't know.

13         Q.  But when you've got the election official who is

14     in charge of attempting to identify and prevent voter

15     impersonation, actually engaging in the voter

16     impersonation, who, if anyone, is left to prevent that

17     from happening?

18                MR. SWEETEN:  Same objection.

19         A.  I don't really know.

20         Q.  (By Mr. Gear)  Delores pled guilty to illegal

21     voting.  Do you know what chapter she entered a plea

22     under?

23         A.  64012.

24         Q.  So was the ultimate conviction voter

25     impersonation?

Major Forrest Mitchell                              June 15, 2012

172

1      A.  It's attempted illegal voting, voter
2   impersonation.  I'm sorry.  If I could clarify.  The
3   judgments -- the judgments sometimes say the entire
4   title of the offense or sometimes just give the title.
5   In other words, illegal voting chapter 64012.  Didn't
6   break it down to Section 1, an ineligible voter,
7   Section 2, voting twice in an election, Section 3,
8   marking a ballot contrary.  So I believe the judgment
9   says attempted illegal voting.
10      Q.  Are there any of the four that you've actually
11   identified here today that actually have a judgment that
12   indicates voter impersonation?
13      A.  I would have to looking back at the judgments and
14   sentence.
15      Q.  Of the five.  I'm sorry.  Of the five you added
16   additional?
17      A.  I'm sorry, sir.  I would have to go back and look
18   at the judgments and sentences.
19      Q.  So as you sit here today, you don't know?
20      A.  Yes, sir.
21      Q.  Why don't we take a quick break if you don't
22   mind?
23          MR. SWEETEN:  In the break, can we get a
24   copy of this?  So I can look at it, too.
25          MR. GEAR:  Sure.

Major Forrest Mitchell                                    June 15, 2012

173

1              (Brief recess.)

2      BY MR. GEAR:

3          Q.   Back on the record.  Does the OAG's office have

4      primary jurisdiction or direct jurisdiction over voter

5      impersonation cases?

6          A.   I believe it has, going back to what I kind of

7      testified earlier, it depends on the type of election

8      that's conducted.  A single jurisdiction versus a

9      multi-jurisdiction case.  I think the attorney general's

10     office, under the Texas election code, can advise a

11     district attorney that they would be conducting the

12     prosecution.  I think that the attorney general's

13     office, under the chapter 273, can direct a DA or county

14     attorney to assist in the prosecution of the case as

15     well.

16         Q.   So as I understand your testimony, out of all of

17     the referrals that have been received by the OAG's

18     office, there have been five that were in some form

19     voter impersonation?

20         A.   Yes, sir.

21         Q.   At the poles; is that correct?

22         A.   Yes, sir.

23         Q.   Are you aware of any investigations of voter

24     impersonation that did not -- that were not referred to

25     the OAG's office?

Major Forrest Mitchell                              June 15, 2012

174

1        A.   Yeah.   I'm only aware of cases that were referred

2    to our office.

3        Q.   And again, when we're talking about referrals,

4    we're talking about from multiple sources?

5        A.   Yes, sir.

6        Q.   Including police departments, correct?

7        A.   Yes, sir.

8        Q.   Local election officials?

9        A.   Yes, sir.

10       Q.   Local DA's and prosecutor's?

11       A.   Yes, sir.

12       Q.   Are you aware of any convictions of voter

13   impersonation other than the five cases that we've --

14   you've talked about here today, on the record?

15       A.   Yeah.   I don't really think there is a way to

16   know because I don't think -- you know, DA's offices

17   across the state don't report their -- don't report

18   their prosecutions to our office.   So I don't know any

19   other cases in Texas.

20       Q.   Well, let me explore that for a second.   At some

21   point there was an initiative that reached out to at

22   least 44 different counties or populations over 100,000

23   or more, correct?

24       A.   Yes, sir.

25       Q.   And did you -- "you," meaning your office.   Did

Major Forrest Mitchell                                    June 15, 2012

175

1        you create a referral system with the 44 different
2        counties?  Did you set up a way to communicate with them
3        regarding voter fraud in the State of Texas?
4             A.   If my memory serves me correctly, we took a look
5        at the referrals that our office had and then looked at
6        them geographically and divided the state based upon the
7        council of government divisions.  Because our hope was
8        to utilize the council of governments to help facilitate
9        the training.
10            Q.   And so just so I'm clear, on the record, "the
11       council of governments," what is that?
12            A.   Council of government is -- I don't know if it's
13       an actual political subdivision of the State.  But it is
14       a -- it is a group of counties and municipalities that
15       work together through a council of governments to share
16       resources.
17            Q.   And when you talked -- or when you discussed the
18       initiative, was there any specific training given to the
19       council of governments?
20            A.   No.  When I mentioned the council of governments,
21       we were hoping to -- council of governments provide a
22       lot of law enforcement training throughout the state.
23       And many of them actually have their own police
24       academies.
25            Q.   Okay.

Major Forrest Mitchell                          June 15, 2012

176

1       A.   Which are State subsidized.  So we were hoping to
2  utilize their academies to help facilitate the training.
3       Q.   And did you?
4       A.   Yes, sir.
5       Q.   So as you sit here today, other than the five
6  that you've testified about, the five voter
7  impersonation cases that you've testified about, you're
8  unaware of any others?
9       A.   Yes, sir.  I don't have any knowledge of any
10  cases that the local DA's have prosecuted.
11       Q.   Have you attempted to determine if there's been
12  any prosecutions by local DA's regarding voter
13  impersonation claims?
14       A.   No, sir.
15       Q.   Have you attempted, and "you," being your office,
16  have you attempted to set up a system by which the local
17  DA's and prosecutors report to your office regarding
18  voter claims in general?
19       A.   No, sir, not that I'm aware of.  I would say that
20  it's statutorily required that if a DA's office is going
21  to do an investigation, that they notice the Secretary
22  of State's office if it involves a case.
23       Q.   Okay.  And so when the Secretary of State's
24  office is noticed, that may, in fact, result in a
25  referral to your office?

                                                              177

 1         A.   No, it wouldn't.

 2         Q.   Can you tell me what the process is?

 3         A.   If a local DA advises the Secretary of State's

 4    office that they're going to investigate and prosecute a

 5    case, it wouldn't generate a referral.  Because we limit

 6    to those cases that -- the SOS, I believe, would refer a

 7    case to us if the local jurisdiction wasn't going to

 8    handle it.

 9         Q.   Would -- I understand that it may not necessarily

10    generate a referral.  Would it generate communication

11    between the Secretary of State's office and your office

12    regarding that potential prosecution?

13         A.   No, sir, I don't believe so.

14              (Exhibit No. 591-592 was marked.)

15    BY MR. GEAR:

16         Q.   I'm showing you what's been marked as

17    Exhibit 591.  Take a look at it and then once you've had

18    a chance to review it, we can talk about it.

19         A.   Do you want me to read the whole thing.

20         Q.   No.  And actually, why don't I ask you the

21    question.  Have you seen this report before?

22         A.   No, sir.

23         Q.   Do you know what this is?

24         A.   It's titled the House Committee on elections

25    Texas House of representative interim report.  A report

1    to the Texas House of -- to the House of

2    Representatives, 81st Legislature.

3        Q.   And I direct your attention to Page 37, where it

4    says prosecution rates and fraud in Texas.

5                MR. SWEETEN:  Counsel, is this excerpted.

6    This isn't the full thing; is that right.

7                MR. GEAR:  I do not believe it's the full

8    thing.

9                MR. SWEETEN:  So we've got an excerpted.

10   Okay.  Page 37, now.  Is that what you said.

11               MR. GEAR:  Yes.

12   BY MR. GEAR:

13       Q.   Who is Eric Nichols?

14       A.   Eric Nichols used to be the deputy for the office

15   of the Attorney General.

16       Q.   Have you ever had any communications with Eric

17   Nichols regarding voter fraud?

18       A.   Oh, yes, sir.  He would have been my supervisor.

19   He supervised all criminal justice divisions within the

20   office of the attorney general.

21       Q.   And he supervised prosecutions of voter fraud

22   claims?

23       A.   Yes, sir.

24       Q.   And when would he have been your supervisor, if

25   you can give me the dates?

Major Forrest Mitchell                                    June 15, 2012

179

1          A.   I believe he would have been the Deputy Attorney

2     General for the office of the attorney general from 2013

3     to 2007, is my best guess.

4          Q.   Were you aware that he provided testimony in 2008

5     before the House Committee on elections?

6          A.   I wasn't aware that he provided testimony to the

7     House Committee.

8          Q.   Were you aware that he provided testimony

9     regarding prosecution rates of voter fraud in the State

10    of Texas?

11         A.   I know that he provided testimony to the Senate

12    Committee in 2009.

13         Q.   Okay.   Not so much asking you about the -- have

14    you seen this document.   I really want to focus on the

15    substance of his testimony and ask you a few questions

16    about that.   On the -- in the second paragraph,

17    prosecution rates and fraud in Texas, do you see where

18    it says, "that what the committee found is most election

19    fraud happened in Texas occurs with the absentee or

20    mail-in ballot system."   Do you agree with that

21    statement?

22         A.   I would -- actually, I don't know that I can

23    totally agree with that statement.

24         Q.   Why not?

25         A.   Because that's just the offenses that we have

Major Forrest Mitchell                        June 15, 2012

180

1    detected and prosecuted.

2        Q.   So specifically dealing with referrals to the

3    OAG's office, would you agree that the majority of the

4    referrals deal with the by mail ballot system?  And I

5    understand that there could be a variety of violations

6    within that system.

7        A.   To me, a majority means more than 50 percent.

8    And I don't know that the main-in ballot fraud

9    represents 50 percent or more of our election code

10   referrals.  I do believe that it is a significant

11   portion of the referrals.

12       Q.   Well and you -- you maintain the spread sheets?

13       A.   Yes, sir.

14       Q.   You update it whenever a referral comes in, and I

15   believe you testified to monthly?

16       A.   Yes, sir.

17       Q.   If you looked at your spread sheet, could you

18   tell me what percentage of the cases involved deal with

19   the by mail ballot system?

20       A.   Yeah.  I could go through and do a quick analysis

21   or an analysis.  I don't know how quick.

22       Q.   Well, in looking at your spread sheet, could you

23   give me a general number, percentage?

24       A.   I would say it's probably close to 50 percent.

25   It's not a majority, but it's close.

181

1      Q.   Okay.  And so the other 50 percent, what would
2   you say that...
3      A.   That comprises illegal voting as a whole.  And
4   then other types of poll place violations.  And then
5   election misconduct by actual elections officials,
6   campaign finance violations, those kinds of things.
7      Q.   So the charge of voter impersonation at the
8   polling place, what percentage would you say that makes
9   up of the 320 referrals that you've received in the
10  CAG's office?
11     A.   A small portion.
12     Q.   Five to be exact?
13     A.   Five.
14     Q.   Do you see the very next paragraph, "another
15  highly controversial topic brought up during the hearing
16  was the debate of whether or not illegal aliens or
17  illegal non-citizens were voting?"  And again, that's
18  Page 37.
19     A.   Yes, sir.
20     Q.   Were you aware of this controversy?
21     A.   Yes, sir.
22     Q.   Were you involved in any communications regarding
23  the controversy that illegal aliens -- illegal
24  non-citizens were voting?
25     A.   Could you repeat that one more time?

182

1      Q.   Were you involved in any communications regarding
2   the controversy as to whether or not illegal aliens or
3   legal non-citizens were voting?
4            MR. SWEETEN:  Objection; foundation.
5   Objection; scope.  Go ahead.  You can answer.
6      A.   I guess you would have to ask me communications
7   with who.
8      Q.   (By Mr. Gear)  Well, and that's why I
9   intentionally stated it broadly.  To find out if you
10  were first involved in any communications regarding this
11  topic.  And then if it will help, I will narrow that
12  down.
13     A.   Our investigations have revealed non-citizens and
14  illegal aliens casting ballots in elections.
15     Q.   Okay.  And so based on your referrals, can you
16  tell me, out of the 320, how many dealt with
17  non-citizens voting or illegal non-citizens voting?
18     A.   I do know that -- I do know that in the Dallas
19  2010 election that was referred to our office from the
20  Secretary of State, there was a non-citizen who voted in
21  that election.  I do know that in the Debra Briseno
22  case, which is a prosecution, that there were
23  non-citizens who voted in that election.  I am also
24  aware that in the Hidalgo County elections that there
25  were non-citizens who voted in those elections as well.

183

1      Q.   And Hidalgo County, what time period are we

2   talking about?

3      A.   I want to say that was the 2008 time frame.

4      Q.   Let's start with Hidalgo County 2008.  Is that

5   reflected in your spread sheet?

6      A.   I believe that would be on Page 3 of the election

7   code referrals office of Attorney General 2002 to

8   present.  And I believe it would be Hidalgo County

9   2008 municipal election, unlawfully rejecting voters,

10   illegal voting and unlawfully accepting voters.

11      Q.   What are the facts of that case?

12      A.   That was the City of Progresso municipal

13   election.  And our office assisted a portion of the

14   investigation that was conducted by the local district

15   attorney's office.

16      Q.   What did the facts show?

17      A.   I believe there was a Mexican national who voted

18   in that election.

19      Q.   And who was that, based on your spread sheet?

20      A.   It's not one of our prosecutions.  We just

21   assisted in the investigation.  It's not reflected in

22   our spread sheet.

23      Q.   And what was the end result of -- first of all,

24   was that referred to your office?

25      A.   It was referred to our office.  However, the

Major Forrest Mitchell                              June 15, 2012

                                                              184

1    district attorney's office was prosecuting it already.

2        Q.   Did you work in conjunction with the district

3    attorney's office on that investigation?

4        A.   Yes, sir.  We helped out on the mail-in ballot

5    portion of that case because many of the mail-in ballots

6    were outside Hidalgo County.  We assisted them in

7    interviewing voters and checking addresses in other

8    parts of Texas.

9        Q.   So again, and I'm sorry.  I'm trying to

10   understand what the facts are of this case.  So did this

11   case deal with a mail-in ballot system, if you know?

12       A.   That I don't know.  The ADA, I believe, told me

13   that a non-citizen had voted in the election.  I don't

14   think she clarified whether it was in person voting or

15   mail-in ballot fraud.

16       Q.   And that was the allegation.  Was there a

17   conviction in this case?

18       A.   I down know.

19       Q.   Were these cases dismissed?

20       A.   I don't know.

21       Q.   So as you sit here today, you don't know if -- do

22   you know if those went into prosecution?

23       A.   Yes, sir.  I believe that -- I don't know for

24   sure.

25       Q.   And as you sit here today, you don't know the

185

1       extent of the facts involving those cases, correct?

2            A.   No, sir.   I only know a portion of the case.

3            Q.   And they would not be reflected in your spread

4       sheet?

5            A.   No, sir.

6            Q.   All right.   Let's see.   The other case that you

7       mentioned was Dallas County in 2010?

8            A.   Yes, sir.

9            Q.   Was that referred to the OAG's office?

10           A.   Yes, sir it was.

11           Q.   And can you show me on the spread sheet where

12      that is?

13           A.   That would be on Page 4 of the election code

14      referrals of the office of the Attorney General 2002 to

15      the present.   It would be, I believe was sixth case

16      down.   And it says, "Dallas 2010 primary elections.

17      Unlawfully obstructing watcher.   Illegal voting,

18      unlawful assistance, failure to witness application,

19      unlawfully witnessing more than one application.

20      Providing false information on application, possession

21      of mail-in ballots.   Unlawful assistance in bribery."

22      And the referral date was 4/20/2010.

23           Q.   So I see it here.   I don't see any names

24      indicated on Page 4, as you're testifying to.   Would it

25      be in any other portion of your spread sheet?

Major Forrest Mitchell                                June 15, 2012

186

1       A.   No, sir.  She was not prosecuted.

2       Q.   So the allegation was not substantiated?

3       A.   No, sir.  She is a non-citizen.  However, we

4   didn't think that she had the mens rea.  Because someone

5   led her to believe that as a resident she could vote in

6   an election.

7       Q.   So tell me what the facts are.  What did you

8   find?  Did you investigate the case?

9       A.   I didn't personally.  But one of my investigators

10  did.

11      Q.   And who was the investigator?

12      A.   Sergeant Jennifer Bloodworth.

13      Q.   And can you tell me what the facts of the

14  investigation found?

15      A.   Specific to that non-citizen or generally as a

16  whole?  Because it's a substantial case.

17      Q.   Let's talk about the substantial case.  And we're

18  talking about, just so this is clear, we're talking

19  about Dallas County, the 2010 primary election, correct?

20      A.   Yes, sir.

21      Q.   And there was one individual that was ultimately

22  investigated?

23      A.   No, sir.  There were multiple individuals that

24  were investigated.  And those -- many of those

25  individuals are indicated in the prosecution's and

187

1    charges pending spread sheet.

2         Q.   Okay.  So you seem to have in mind one

3    individual?

4         A.   Yes, sir.

5         Q.   And you mentioned mens rea, which is, did not

6    have the intent, essentially?

7         A.   Correct.

8         Q.   Okay.  Can you tell me what the facts -- the

9    overall facts are of the case that you're talking about?

10        A.   Yes, sir.  She was approached by someone who was

11   canvassing her neighborhood.  And she wasn't certain

12   about when the time frame was, but that person assisted

13   her in the completion of a mail-in ballot application --

14   I'm sorry.  Correction.  Of a voter registration

15   certificate.

16        Q.   Okay.

17        A.   And on that voter registration certificate,

18   indicated that she had checked she was US citizen when

19   indeed she was not.  So therefore, the elections office

20   processed her voter registration application and she was

21   issued a voter registration certificate.  And so she had

22   voted in an election.

23        Q.   And when you say that "she did not have the men

24   rea," can you tell me what you mean in the context of

25   the facts?

1          A.   Yes, sir.   The actual person who helped her
2     register was a deputy voter registrar who was sworn by
3     the county to help her -- to help voters fill out their
4     registration cards.
5          Q.   Okay.
6          A.   And the deputy voter registrar checked that she
7     was a US citizen and told her that she could vote.   And
8     so she believed she actually could vote in an election.
9          Q.   Do you know the name of the deputy registrar?
10         A.   No, sir, I do not.
11         Q.   And now, you seem to suggest that there were
12    other individuals involved in this?
13         A.   Yes, sir.   This case was one of the largest cases
14    that we have investigated over the years.   It had
15    multiple allegations.   And we charged multiple
16    defendants, Delores McMillian was part of this referral.
17         Q.   Okay.   And you've testified to Ms. McMillian?
18         A.   Correct.   Another defendant in the spread sheet
19    who was identified during that investigation was Sylvia
20    Medrano, whose case is currently pending?
21         Q.   And that would be on page -- the first page of
22    the exhibit?
23         A.   Yes, sir.
24         Q.   And Sylvia Medrano was charged with what?
25         A.   Seven counts of illegal voting, ineligible voter.

Major Forrest Mitchell                                    June 15, 2012

189

1      Q.   And would this be by absentee ballot?

2      A.   I don't know for sure.

3      Q.   Well, tell me what you know about the facts for

4   Sylvia Medrano.

5      A.   This case involves a very contentious justice of

6   the peace election in the Dallas County area.  I think

7   the election was decided by a little more than 100

8   votes.  And a long serving justice of the peace was --

9   lost the election to a challenger.  The investigation

10  revealed that many people who were family members and

11  friends of the challenger had just changed their voter

12  registration to addresses within the precinct for the

13  purposes of registering to vote in just that election

14  and to cast ballots.

15     Q.   But as you sit here today, you don't know if it

16  was ballots by mail or ballots cast in person?

17     A.   I don't know specifically which voters cast in

18  person.  I do remember that a number of the family

19  members went together to the polling place on the same

20  day and voted in that precinct.

21     Q.   And again, looking at the spread sheet, the

22  charges are unlawfully obstructing a watcher, what does

23  that mean?

24     A.   A poll watcher is allowed to witness the

25  activity.  And I think each candidate who's running for

Major Forrest Mitchell                          June 15, 2012

190

1      office in Texas can designate a poll watcher.  And it is

2      a criminal offense in the State of Texas for an

3      elections official to obstruct the poll watcher from

4      generally observing what kind of conduct is occur.

5          Q.  Sylvia Mendrano was an election official?

6          A.  No, sir, I don't believe so.

7          Q.  Was she a candidate?

8          A.  I don't believe she was a candidate in that

9      election.

10         Q.  But she's charged with unlawfully obstructing a

11     watcher?

12         A.  No, sir.  I think you're looking at the

13     allegation portion and not the actual charge.

14         Q.  Sure.  But as I understood your testimony,

15     unlawfully obstructing a watcher is generally a charge

16     or allegation that's levied against an election

17     official?

18         A.  Yes, sir.  If I would clarify.

19         Q.  Please.

20         A.  When -- the design of the spread sheet is that we

21     take all of the allegations that are contained in the

22     referral for that specific election.  So the spread

23     sheet shows all of the allegations that were logged in

24     that case or in that referral.

25         Q.  Against the individual?

Major Forrest Mitchell                          June 15, 2012

191

1        A.   Against -- in that election.  And then what we do

2   is we actually show that the actual charge -- I guess

3   maybe I'm not making myself clear.

4        Q.   Well, if I understood you correctly, you're

5   telling me that there may be multiple defendants -- and

6   we'll stay with Sylvia Medrano for a second.  There may

7   be multiple defendants in the allegations.  Are all of

8   the potential charges against all of the defendants?

9        A.   No, sir.

10       Q.   Okay.  Then I didn't understand you.

11       A.   If I can kind of explain the mechanics of how I

12  do it.  You know, I do have three books in the Excel

13  spread sheet.  And as somebody is charged, I cut and

14  paste all of the allegations contained in the referral

15  into the charging book so that it shows the county and

16  all of the allegations that were in that election.  And

17  then the election itself and then the cause number of a

18  charging instrument.  And then the actual charge.

19       Q.   So ultimately she was charged with four counts of

20  illegal voting.  Sorry.  Looking at the wrong one.  She

21  was charged with seven counts of illegal voting?

22       A.   Yes, sir.

23       Q.   And you're not -- as you testify today, you're

24  not saying that she voted seven times in a polling

25  place?

Major Forrest Mitchell                          June 15, 2012

192

1      A.   I don't know how many times that she voted in a

2   polling place.

3      Q.   Is it fair to say that this charge is addressing

4   the issue of by mail ballots?

5      A.   I don't know if it was a poll place violation, in

6   person voting or mail-in ballots.

7      Q.   You don't know.

8      A.   Not off the top of my head, no, sir?

9      Q.   I believe you also said Ms. Briseno?

10      A.   Yes, sir.

11      Q.   Can you tell me what the facts of that were?

12      A.   This case was referred to our office by the

13   district attorney of, I believe it was Lavaca County.

14      Q.   Port Lavaca?

15      A.   Port Lavaca.  And he requested investigative

16   assistance from our office in determining allegations of

17   illegal voting and misconduct in the election.  It was a

18   very heated contested election.  And I think three

19   candidates emerged with a very close margin in that

20   election.  I think there were about 19 votes that

21   separated the three candidates.  And I think Debra

22   Briseno was the winning candidate.

23      Q.   Can you tell me what the facts of the case are?

24      A.   Debra Briseno signed up as a deputy voter

25   registrar.  So she assisted in the voter registration of

Major Forrest Mitchell                                    June 15, 2012

193

1    citizens in the county.  She additionally registered

2    non-citizens to vote during that election and informed

3    them that they could indeed vote in that election

4    despite the fact that they were not citizens in the US.

5         Q.   And Ms. Briseno was the only one charged in that

6    case?

7         A.   That's correct.

8         Q.   And was there a determination as to why not to

9    charge the non-citizens who had registered?

10        A.   Again, you have a person who is sworn as a deputy

11   voter registrar by the elections department who the

12   voters -- the non-citizens perceived to be as a

13   representative of the government.  At the time, she was

14   actually a city council person for the City of Port

15   Lavaca.  So these voters believed that what they were

16   telling -- what she was telling them, that they could

17   vote in the election, they took at face value.

18        Q.   And again, in this case there would have been no

19   mens rea?

20        A.   I believe that is why they were not charged in

21   this case.

22        Q.   Okay and so I believe we've gone through the

23   cases where non-citizens were alleged to have voted,

24   Dallas 2010, Ms. Briseno and Hidalgo County.  Were there

25   any others that you're aware of on these spread sheets?

Major Forrest Mitchell                              June 15, 2012

194

1       A.   I remember a case in Culberson County where
2   allegations were made, but they were unsubstantiated.
3       Q.   Did that result in an investigation?
4       A.   Yes it did.
5       Q.   Did it result in any charges?
6       A.   No, sir, it did not.
7       Q.   So other than the -- the three distinct cases,
8   Dallas County, Ms. Briseno and Hidalgo, are you aware of
9   any others?
10      A.   No, sir.  Not that resulted in criminal charges.
11      Q.   So out of the 320 referrals that came into your
12  office, are you aware of any others that alleged
13  non-citizens voting?
14      A.   Not of the cases that were referred to our
15  office.
16      Q.   Referring back to the 2008 report, page -- Page
17  37, paragraph 3, after prosecution rates and fraud in
18  Texas, it says, "through talking with our county
19  election officials and other experts the committee found
20  the chance of a legal alien -- of an illegal alien
21  actually voting are very slim."  Based on your
22  experience as an investigator who's been in the OAG's
23  office for -- since prior to 2005 and been with the SIU
24  the entire time of its creation, would you agree with
25  this statement?

Major Forrest Mitchell                              June 15, 2012

195

1            MR. SWEETEN:  Can you read the question

2    back?

3    BY MR. GEAR:

4       Q.   And I can try to pose it again.  It was kind of a

5    long, run-on question.  Would you agree that based on

6    your experience in the -- as an investigator and

7    supervisor in the SIU, would you agree that the chance

8    of an illegal alien actually voting in an election in

9    the State of Texas, are very slim?

10           MR. SWEETEN:  Objection; calls for

11   speculation.  You can answer.

12      A.   I don't believe it's very slim.  It all depends

13   on the motivation to do so.  Through my investigations

14   over the years that I have worked with the Texas

15   Attorney General's office, it has come to our attention

16   that in some elections officials have told us, people

17   working in the voter registration departments, that

18   non-citizens have gotten voter identification cards to

19   try to develop -- to try to validate -- to validate

20   themselves inside Texas or the United States.  That it

21   is one of the precursor documents that they can obtain

22   to try to obtain other things like a Texas driver's

23   license, so they can remain here illegally.

24           So it really depends on the motivation.  If the

25   motivation to obtain a voter registration certificate is

Major Forrest Mitchell                                June 15, 2012

196

1      simply to try to get documents, then I would say it is

2      not very likely.  But our investigations have also

3      revealed in certain areas of the state, that voters are

4      paid to vote.  And they might be persuaded to vote in an

5      election.

6          Q.   (By Mr. Gear)  Okay.  And so let me break that

7      down a little bit, because my question was voting.  Is

8      the chance slim?  So I understand your testimony that

9      there may be other motivations for them to obtain a

10     voter registration card.  But in your experience in the

11     SIU and based on the referrals that you've seen, is the

12     occurrence of an illegal alien or illegal non-citizen,

13     is that type of referral rare to your office?

14         A.   When I look at the 320 referrals that we have,

15     the allegations of a non-citizens voting in an election,

16     the number is small.

17         Q.   And "small," meaning three distinct cases that

18     you've identified here on the record?

19         A.   Yes, sir.  I can think of three to come to mind.

20              (Exhibit No. 593 was marked.)

21     BY MR. GEAR:

22         Q.   Let me know when you've had a chance to review

23     the document.

24         A.   Yes, sir.

25         Q.   Can you tell me what this is?

Major Forrest Mitchell                                    June 15, 2012

197

1        A.   This appears to be an article out of the Dallas

2    Morning News.   It's dated May 18, 2008, and it's titled

3    Abbott GOP Pressing For Required Photo ID.

4        Q.   Do you see the paragraph that indicates,

5    "Republicans say that the mere possibility of illegal

6    voting merits changes.   Particularly with the rising

7    illegal immigration population and that the photo ID

8    requirement is not onerous."   Do you see that?

9        A.   I'm sorry.   Okay.   Yes, sir, I see that.

10       Q.   As a supervisor in the SIU, were you aware of any

11   debate regarding the rise of -- rising illegal immigrant

12   population in reference to photo ID?

13       A.   You mean globally as a --

14       Q.   State of Texas.

15       A.   As a citizen of the State of Texas or...

16       Q.   Yes.   Well, no.   As your -- as the supervisor in

17   the SIU, were you aware of this debate?

18            MR. SWEETEN:   Assumes facts not in evidence.

19   Objection.

20       A.   I'm aware of the debate as a whole of this issue.

21   But not in the special investigations unit.

22       Q.   (By Mr. Gear)   Were you involved in any

23   communications with either the Attorney General or the

24   Secretary of State's office that -- where the topic of

25   rising illegal immigrant population was the topic of

Major Forrest Mitchell                                              June 15, 2012

198

1    discussion?

2          A.   No, sir.

3          Q.   During the consideration of the referrals or

4    investigations, were you ever asked to give special

5    attention or focus on illegal aliens or non-citizens

6    voting?

7          A.   No, sir.  I was never asked to give any special

8    consideration to that.  At some point in time, I had

9    been asked, "Hey, are there any cases on your spread

10   sheet?"  And in those circumstances I identified the

11   ones on the spread sheet, as I have done today.

12         Q.   Who made this request?

13         A.   I don't remember.

14         Q.   Well, let's see if we can flesh this out.  When

15   were you asked to identify these types of cases on your

16   spread sheet?

17         A.   I don't remember.

18         Q.   Was it during the 2011 legislative session?

19         A.   I couldn't say for certain.

20         Q.   Was it by a legislator?

21         A.   Oh, no, sir.

22         Q.   Was it by someone in the Secretary of State's

23   office?

24         A.   I don't believe so, no.

25         Q.   Do you recall which office the request came from?

199

1      A.   I would believe it came from -- internally within
2   the law enforcement division.
3      Q.   Internally from which division?
4      A.   Well, the special -- I would say that it came
5   from either my division chief or my, at the time, who
6   would have been Major Boatright or the Deputy Attorney
7   General for criminal justice Eric Nichols.
8      Q.   Do you know what the reason for that request was?
9      A.   No, sir.
10      Q.   And did you respond to that request?
11      A.   I would presume so, yes.
12           (Exhibit No. 593 was marked.)
13   BY MR. GEAR:
14      Q.   I'm showing you what's been marked as Exhibit 593
15   and give you a chance to look at that.  Have you had a
16   chance to review the document?
17      A.   I'm almost done.  Sorry.
18      Q.   Take your time.
19      A.   Okay, sir.
20      Q.   Can you tell me what this is?
21      A.   This document appears to be a clipping of the
22   Dallas Morning News, dated May 18, 2008.  And it is
23   titled AG Fails to Uncover Major Voting Fraud.
24      Q.   Have you seen this newspaper article before?
25      A.   Not to my memory.

Major Forrest Mitchell                                    June 15, 2012

                                                                    200

1        Q.  Focusing on the article itself, by May 18, 2008
2   it indicates that, "Mr. Abbott has prosecuted 26 cases."
3   Would that be accurate based on your spread sheet?
4        A.  I think about that time that would be pretty
5   close.
6        Q.  Okay.  Is it also accurate to say that in 18 of
7   the 26 cases the voters were eligible voters with -- the
8   votes were properly cast and no vote was changed, 18 of
9   the 26?
10       A.  I do know that no vote was changed, but I don't
11   know that it was properly cast.
12       Q.  It also goes on to say, "but people who collected
13   the ballots for mail-in were prosecuted."  Would that be
14   fair to say?
15       A.  Yes, sir.  If I could clarify.
16       Q.  Please.
17       A.  If someone assists in the completion of a mail-in
18   ballot, someone assists the voter, fails to sign as
19   assisting the voter and -- or possesses the ballot, they
20   would be prosecuted for the position of the ballot or
21   carrier of envelope of another.  Many of these cases
22   also involve unlawful assistance.  And if a voter was
23   unlawfully assisted in the completion of a mail-in
24   ballot or any other type of ballot, under State law that
25   ballot would be stricken.

201

1      Q.   Okay.  And it says, in 593, that "the State law

2   makes it a crime to carrier someone else's filled out

3   ballot to the ballot box."  Is that fair?

4      A.   It is a crime unless they identify themselves on

5   the carrier envelope.

6      Q.   Unless the carrier puts his or her own name on

7   the -- and address on the envelope?

8      A.   Yes, sir.  I believe there are also defenses to

9   prosecution to that.

10      Q.   In the middle column of Exhibit 593, I think it's

11   the third paragraph in the bottom, "when an attorney

12   general makes certain cases a priority, you can dispatch

13   investigators, assign teams of State lawyers and direct

14   millions of dollars from federal grants and the agency

15   budget, such assistance helps bolster action in counties

16   especially where local prosecutor's lack the resources."

17   Is that a fair statement?  And let me -- why don't you

18   strike that.  Is it accurate that when an attorney

19   general, in this case Attorney General Abbott, makes

20   voter fraud a priority, he can do the types of things

21   described here?

22            MR. SWEETEN:  Assumes facts not in evidence.

23   Calls for speculation.  Objection.

24   BY MR. GEAR:

25      Q.   Well, let me see if I can come at that a little

202

1      bit differently then.  Is it accurate to say that

2      Attorney Abbott dispatched investigators throughout the

3      state to root out and prosecute voter fraud cases?

4           A.   No, I wouldn't say that's an accurate statement.

5           Q.   What would you say is an accurate statement?

6           A.   I would say that our office receives referrals

7      from third parties, such as the Secretary of State or

8      the DA's offices or local law enforcement, asking us to

9      help them in the investigation of election code

10     violations.  And that we have a group of investigators

11     who perform their duty in that regard.

12          Q.   Does he have an authority to assign teams of

13     State lawyers?

14               MR. SWEETEN:  Objection; calls for

15     speculation.  You can answer.

16          A.   I don't think the Attorney General would direct

17     the assignment of prosecutor's to cases.  I think that

18     we have a number of prosecutor's within our office who

19     handle a wide variety of cases, some which include

20     election cases.

21          Q.   (By Mr. Gear)  Is it accurate in this article

22     that there was a $1.4 million federal crime fighting

23     grant?

24          A.   As I think I previously discussed in my

25     testimony, I think the criminal investigations division,

Major Forrest Mitchell                                          June 15, 2012

203

1    just the criminal investigations division, got a $1.4

2    million grant.  And of that grant, a portion of

3    investigators were hired and the special investigations

4    unit, the money laundering unit, the cyber crimes unit

5    and the fugitive apprehension unit.

6         Q.   Previously you testified to a case regarding

7    Hidalgo County.  If you look at paragraph 3, second

8    paragraph I believe, from the top, it says, "in another

9    case, three Hidalgo County women were indicted on

10   charges.  They illegal assisted elderly voters and

11   mishandled the mail-in ballots in 2005, McAllen mayor's

12   race."  Was that the Hidalgo case that you were

13   referencing that was handled by a different agency?

14        A.   No.  This is actually a different case.

15        Q.   It is a different case?

16        A.   Yes, sir.  And I think in that case there were --

17             MR. SWEETEN:  Just answer his question.

18        A.   I'm sorry.

19        Q.   (By Mr. Gear)  And the answer was this is a

20   different case?

21        A.   This is a different case.

22        Q.   And in this case in 2005, the judge dismissed the

23   allegations.  Is that accurate?

24        A.   Yes, sir, I believe so.

25        Q.   And is this particular case referenced in your

Major Forrest Mitchell                              June 15, 2012

204

1      spread sheet?

2           A.   Yes, sir.  It's referenced in the referrals.

3           Q.   I think I'm almost done.  Let me kind of go

4      through my notes here?

5           A.   Yes, sir.

6           Q.   Are you aware of any testimony during the 2011

7      legislative session where SB 14 was discussed where your

8      spread sheet was the topic of discussion?

9           A.   I believe I was present when Deputy Director

10     David Maxwell testified, but I don't recall which

11     session -- which House.

12          Q.   And he testified in 2011?

13          A.   Yes, sir, I believe so.

14               (Exhibit No. 594 was marked.)

15     BY MR. GEAR:

16          Q.   I'm going to show you what's been marked as

17     Exhibit 594 and give you a chance to look at that.  You

18     indicated that David Maxwell provided testimony.  And

19     the question is, is that what you were referring to?

20          A.   Yes, sir, I believe so.

21          Q.   Do you see any reference to a spread sheet in his

22     testimony, more specifically, to your spread sheet?

23          A.   I don't see anything that says my spread sheet.

24          Q.   Okay.  Does anything he testified to in 2011

25     change any of the answers that you gave here today?

Major Forrest Mitchell                          June 15, 2012

                                                          205

1          A.   No, sir, I don't believe so.

2               MR. SWEETEN:   I'm going to object to the

3    question as compound.   But he's answered it.

4               (Exhibit No. 595 was marked.)

5    BY MR. GEAR:

6          Q.   Did you still want the take some time to review

7    that?

8          A.   I don't believe Mr. Maxwell's testimony will

9    change my testimony.

10         Q.   Okay.   Take some time to review that exhibit and

11   then we can talk about it.

12         A.   This one right here, sir?

13         Q.   Yes.   And specifically, just so we can move this

14   forward a little bit, I think it's Page 7, do you see

15   your name indicated?

16         A.   Yes, sir, I do.

17         Q.   Have you seen this document before?

18         A.   No, sir.

19         Q.   And for the record, this is the plaintiffs

20   supplemental initial disclosures pursuant to federal

21   rules of civil procedure 26 A.   Were you involved in any

22   aspect of preparing this particular document?

23         A.   No, sir.

24         Q.   All right.   And I ask you, did you see your name

25   indicated in it under, I believe No. 12, it indicates

Major Forrest Mitchell                        June 15, 2012

                                                                    206

1        Captain Forrest Mitchell.  That's actually Major

2   Mitchell at this point, correct?

3        A.  Yes, sir.

4        Q.  All right.  And it says, "Captain Mitchell is a

5   member of the special investigations unit of the law

6   enforcement division of the office of the Texas Attorney

7   General," which is accurate, correct?

8        A.  Yes, sir.

9        Q.  "Captain Mitchell or Major Mitchell, has

10  knowledge regarding election fraud in the State of

11  Texas."  Other than the testimony that you provided

12  today, is there any additional knowledge that may be

13  relevant to voter fraud in the State of Texas?

14            MR. SWEETEN:  Counsel, I'm going to the

15  object to the question as vague.  We've provided a

16  description of his areas of testimony.  Obviously you've

17  had the opportunity to, now for six hours, to question

18  him on that.  We intend to ask him questions, and in

19  relation to the substance of the matters here.  So I

20  think the question is -- I think it's unfair.

21            MR. GEAR:  I withdraw the question.

22  BY MR. GEAR:

23       Q.  Other than what you've testified to here today,

24  are you aware of any other cases of voter impersonation

25  in the State of Texas?

207

1      A.   No.  I'm only aware of the ones that were
2   referred to our office.
3      Q.   Other than what you testified to here today, are
4   you aware of any other cases where the allegation was
5   illegal aliens or illegal non-citizens voting?
6      A.   No, sir.
7      Q.   Other than what you testified to here today, are
8   you aware of any other investigations regarding voter
9   impersonation?
10      A.   Could you repeat that one more time?
11      Q.   Other than what you testified to here today, are
12   you aware of any other investigations involving voter
13   impersonation in the State of Texas?
14      A.   I am aware of one.
15      Q.   And what would that be?
16      A.   I read an article about a case that's ongoing now
17   in Tarrant County where the -- a son used his father's
18   voter registration card to cast a ballot in an election.
19   But I just read that in the open source newspaper.
20      Q.   So you gained that knowledge from the newspaper?
21      A.   Uh-huh.
22      Q.   Has any allegation been referred to the OAG's
23   office?
24      A.   No, sir.  That's being conducted by the Tarrant
25   County district attorney's office.

208

1         Q.   Has there been any communication with the Tarrant

2    County district attorney's office regarding that

3    allegation?

4         A.   No, I haven't talked to them at all.

5         Q.   Do you know the name of the alleged?

6         A.   No, sir, I'm sorry.

7         Q.   Perpetrator, for lack of a better word?

8         A.   No, sir, I'm sorry.

9         Q.   Do you know the election that it allegedly

10   occurred?

11        A.   I want to say it was this primary election.

12        Q.   2012?

13        A.   Uh-huh.

14        Q.   And that occurred on?

15        A.   I think it would be May 29th.

16        Q.   May 29 primary election.  And other than what you

17   read from the newspaper, are you aware of any other

18   facts pertaining to that?

19        A.   No, sir.

20        Q.   Can you investigate alleged voter fraud without a

21   referral?

22        A.   The Texas election code does say that if we had

23   reason to believe that a violation occurred, that the

24   attorney general's office could investigate.

25        Q.   Have you ever investigated a voter fraud case

Major Forrest Mitchell                              June 15, 2012

209

1    without an official referral?

2         A.  No, sir.  We generally -- we request a referral

3    before we initiate an investigation.

4         Q.  Have you requested a referral for the case which

5    you just referenced?

6         A.  No, sir.

7         Q.  Other than what you testified today, are you

8    aware of any prosecutions for voter impersonation in the

9    State of Texas?

10        A.  I believe the DA has indicted that case in

11   Tarrant County, the one I said regarded voter

12   impersonation.

13        Q.  Is the OAG's office involved in that case in any

14   aspect?

15        A.  No, sir.

16        Q.  I believe you testified that you have not

17   requested a referral?

18        A.  No, sir.

19        Q.  Why not request a referral for that particular

20   case?

21        A.  Because we have plenty of work to do on our own.

22        Q.  Fair answer.  I think I am done.

23             MR. GEAR:  And I will pass the questioning

24   to Ezra.

25             MR. ROSENBERG:  Thanks.

Major Forrest Mitchell                    June 15, 2012

210

1          EXAMINATION
2     BY MR. ROSENBERG:
3       Q.   And I will be very short, Major.  Thanks for your
4     time today.
5       A.   Yes, sir.
6       Q.   Just a couple of questions.  You testified that
7     statutorily required for the district attorneys to
8     notice the Secretary of State when they are charging
9     someone with election fraud.  Is that what the
10    requirement is?
11      A.   I believe the statutory language says if they are
12    going to initiate an investigation of prosecution.
13      Q.   And I think you also testified then, that the
14    Secretary of State maintains a list of those instances
15    when it has been notified?
16      A.   I don't remember that.
17      Q.   Have you ever seen a list that's maintained by
18    the Secretary of State of investigations that were
19    initiated by the district attorney?
20      A.   No, I've never seen such a list.
21      Q.   Do you know if any such list has been produced in
22    this litigation?
23      A.   No, sir, I do not.
24      Q.   Other than the spread sheet that you maintained,
25    have you ever created any reports related to voter

211

1       fraud?

2           A.   As I previously testified, sir, preceding the --

3       preceding the creation of the spread sheet, I was

4       required to produce a WordPerfect document that talked

5       about the types of cases that we would referred and the

6       referral sources and the allegations contained.

7           Q.   And has that document been produced in this

8       litigation?

9           A.   I provided it to counsel.

10          Q.   Other than that WordPerfect document, have you

11      ever created any other report related to voter fraud?

12          A.   No, sir.

13          Q.   Have you ever done any specific analysis of in

14      person voter fraud, other than the spread sheet and the

15      WordPerfect document?

16          A.   One time in, I want to say 2006, I looked at the

17      incidents of mail-in -- not mail-in ballot fraud, but

18      the proportion of mail-in ballots received by a county.

19          Q.   And what was your purpose in doing that?

20          A.   I wanted to see what the typical average is in

21      the State of Texas for an elections office to receive --

22      for the number of registered voters to the number of

23      mail-in ballots cast.

24          Q.   Did you draw any conclusions in that report?

25          A.   If memory serves me correctly, I think it was,

212

1    the average county might receive two to three percent of

2    their registered voters for mail-in applications.

3        Q.   Did you break down that percentage by any

4    demographics?

5        A.   No.

6        Q.   Other than that report and the spread sheet and

7    the WordPerfect document, have you done any specific

8    analysis of in person voter fraud?

9        A.   No, sir.

10       Q.   Have you ever been asked to do any specific

11   analysis of in person voter fraud?

12       A.   No, sir.

13       Q.   To your knowledge, has anyone in your office ever

14   been asked to do any specific analysis of in person

15   voter fraud?

16       A.   No, sir.

17       Q.   To your knowledge, has anyone in your office ever

18   been asked to do an analysis of how various forms of

19   voter identification would affect the level of voter

20   fraud?

21       A.   No, sir.

22       Q.   I would like to talk, very briefly about the four

23   instances of voters who tried to impersonate -- who are

24   alleged to have tried to impersonate others.  And by

25   that -- I said four.  You can correct me if I'm wrong.

213

1    As I understand it, it is only four instances of persons

2    trying to impersonate others.  The fifth person was

3    charged with trying to help one of these four people

4    impersonate someone else.  Is that correct?

5        A.   That's correct.

6        Q.   So it is four instances where a person tried to

7    impersonate someone else.  One of those instances was

8    McMillian.  And as I understand that, that was an

9    election official; is that correct, McMillian?

10       A.   Yes, sir.  Delores McMillian was an elections

11   worker in Dallas County.

12       Q.   And somehow, prior to the polls opening, she had

13   somehow signed herself up as someone else?

14       A.   Yes, sir, that's my understanding.

15       Q.   So that wasn't a situation where

16   Delores McMillian walked into the polling place and

17   pretended, to the election official, that she was

18   someone else; is that correct?  She was basically

19   cooking the books because she was the election official

20   herself, right?

21       A.   My understanding is that she marked that voter on

22   the ballot before the polls were even opened.

23       Q.   Without having to interact with any other

24   election official, right?

25       A.   I believe that she was interacting with her

1      mother who was doing the same thing.

2          Q.   So it's not a situation where she presented an

3      identification to someone and said I'm someone else.

4      She just manufactured this along with her mother because

5      she was the election official, correct?

6          A.   That's my understanding, yes, sir.

7          Q.   Now, you also talk about a Mary Comparin.  And

8      did you say that that was a situation where

9      Ms. Comparin, and I know this is -- I've only,

10     Mr. Sweeten, because it's a company situation.  But

11     she's alleged to have gotten, I think you used the term

12     "various images of driver's licenses, et cetera?"

13         A.   It's my understanding that Mary Comparin had

14     obtained three or four Texas driver's licenses in

15     different names.

16         Q.   With her photo on them?

17         A.   Yes, sir.

18         Q.   So if she were to produce those driver's licenses

19     at the polling place, the photo would match her face,

20     correct?

21         A.   Yes, sir.

22         Q.   So SB 14 would not really help that situation; is

23     that correct?

24              MR. SWEETEN:   Objection; calls for legal

25     conclusions, speculation.  But you can answer.

215

1      A.   It depends on whether she used her voter

2   registration certificate to come to the polling place to

3   cast her ballot, or whether she used her Texas driver's

4   license.   That suspect had obtained four different voter

5   registrations that were mailed to her residence.

6      Q.   (By Mr. Rosenberg)   Right.   But for terms of the

7   photo ID that she had, there was three different photos

8   of her, but under three different names; is that

9   correct?

10      A.   Yes.   She had three different IDs in different

11   names.

12      Q.   Are you aware of anyone more knowledgeable than

13   yourself in the SUI or the OAG who has knowledge of

14   voter fraud?

15      A.   No, sir.

16      Q.   I didn't think so.

17            MR. ROSENBERG:   And I think I don't have any

18   further questions.

19            MR. SWEETEN:   I'm probably going to have a

20   short redirect.   So I'm going to speak with counsel

21   about it so let's take about a 5-minute break.

22            (Brief recess.)

23            EXAMINATION

24   BY MR. SWEETEN:

25      Q.   Major Mitchell, you have been asked a number of

                                                                216

1    questions today about voter fraud.  And I want to ask

2    you a few questions based upon your experience as an

3    investigator.  What types of cases do you work on in

4    addition to voter fraud?

5              MR. GEAR:  I just object; asked and

6    answered.  But go ahead.

7        A.    Currently, I don't do any investigations myself.

8    I'm just a supervisor investigator at this point in

9    time.  But historically, I have worked capital murder

10   investigations, public integrity investigations, money

11   laundering investigations, fraud investigations.

12   Citizen investigation, administrative investigations.

13   And a wide variety of criminal offense.

14       Q.    (By Mr. Sweeten)  How long have you worked

15   specifically on the issue of investigating voter fraud

16   as part of the many things you do?

17       A.    I would say since 2005.

18       Q.    Now, with respect to the issue of in person voter

19   fraud, can you tell us how difficult is in person voter

20   fraud to defect as a general matter?

21       A.    It is incredibly difficult to detect.

22       Q.    Why is that?

23       A.    Because the only way that -- it's my experience

24   that the only way that you would detect in person voter

25   fraud is if someone inside the polling place personally

217

1    knows the person who's presenting the fraudulent voter
2    registration certificate. And additionally, there is an
3    absence of a positive identification in that regard, in
4    that it's difficult, many times when we get these cases
5    referred to us, that they are coming months after the
6    fact. And many cases, it could be there's already
7    another election that has taken place.
8         And when I interview witnesses or any one of my
9    investigators interview witnesses it's very difficult
10   for voters to identify a potential suspect, if there was
11   one, through conventional photo line-ups or that regard.
12   So it is very hard to detect unless someone in the
13   actual polling place knows that person personally.
14        Q.   Okay. How difficult is in person voting fraud to
15   detect as compared to other types of crimes, such as
16   white-color crime that you investigate?
17              MR. ROSENBERG:  I'm going to object to form.
18              MR. GEAR:  I would object; calls for
19   speculation.
20   BY MR. SWEETEN:
21        Q.   Just based upon your experience as an officer,
22   can you compare as far as detecting in person voter
23   fraud, how it compares to other types of crimes that you
24   investigate?
25              MR. SWEETEN:  I will also object to

1    relevance.

2              MR. ROSENBERG:   And compound.   Go ahead.

3         A.   I believe that in person voter fraud is very

4    difficult to detect in comparison to other cases because

5    in other cases I have, in many cases, forensic evidence

6    that I can rely upon to detect a potential suspect that

7    do not exist in in person voter fraud.

8         Q.   (By Mr. Sweeten)   Okay.   Now, when we talked --

9    we talked about, I think to a large degree, about the

10   sources of referrals that the office of attorney general

11   received.   You talked about referrals from the Secretary

12   of State from local election officials and from local

13   law enforcements.   Let me ask you, when the district

14   attorney's office is prosecuting an election fraud case,

15   do you -- are you aware of that?   Are you made aware of

16   that?

17        A.   Not necessarily.

18        Q.   Okay.   And in the three most popular counties in

19   the State of Texas would Harris County.   When the Harris

20   County DA prosecutes a voter fraud case, is that

21   something you're made aware of?

22        A.   No, sir.

23        Q.   Do you have any access to statistics about how

24   often voter fraud is prosecuted by that agency?

25        A.   No, sir.

219

1        Q.   What about the Harris County attorney, same set

2   of questions.  Are you given the -- do you have access

3   to data regarding how much in person voter fraud they

4   prosecute in a given year?

5        A.   No, sir.

6        Q.   Are you necessarily made aware of any in person

7   voter fraud case that's occurring by the Harris County

8   attorney?

9        A.   No, sir.

10       Q.   What about Bexar County?  What about the Bexar

11  County district attorney.  Are you made aware

12  specifically of instances of in person voter fraud or

13  prosecutions?

14             MR. GEAR:  Are you saying bare or bared.

15             MR. SWEETEN:  Its' B-E-X-A-R, Bexar.  It's

16  San Antonio.

17       A.   No, sir.

18       Q.   (By Mr. Sweeten)  Okay.  With -- if the -- if a

19  county attorney prosecutes a case of voter fraud, are

20  you made aware of that?

21       A.   No, sir.

22       Q.   How about Dallas County, same question, are you

23  made aware when the Dallas County district attorney is

24  prosecuting a case of in person voter fraud?

25       A.   No, sir.

1          Q.   Do you have access to statistics related to that?

2          A.   No, sir.

3          Q.   What about if a county attorney is prosecuting a

4     case, do you have access to that information?

5          A.   No, sir.

6          Q.   Data regarding that?

7          A.   No, sir.

8          Q.   What about as to any other county in the State of

9     Texas, do you get automatically -- are you given data

10    regarding those prosecutions?

11         A.   No, sir.

12         Q.   Now, we've talked about other prosecutorial

13    entities within the State of Texas that prosecute.   Are

14    there other law enforcement agencies that prosecute in

15    person voter fraud?

16         A.   I believe there could be more.

17         Q.   Okay.  Does the federal -- does federal law

18    enforcement refer or do they investigate allegations of

19    voter fraud?

20         A.   I believe the FBI and the Department of Justice

21    could investigate allegations of in person voter fraud

22    if it was a national election.

23         Q.   From 2002 through 2011, did any federal law

24    enforcement agency refer any cases to your office?

25         A.   Would you repeat that one more time?

221

1      Q.   From 2002 through 2011, did any federal law

2   enforcement agency refer any voter fraud cases to your

3   office?

4      A.   No, sir, not voter fraud.

5      Q.   Does your spread sheet include any cases

6   investigated by federal law enforcement officials?

7      A.   No, sir.

8      Q.   Does your spread sheet include any entries

9   related to district attorneys or county attorneys that

10  have prosecuted voter fraud?

11     A.   Only the ones that we cooperated with or assisted

12  them on the investigation.

13     Q.   Okay.  If you wanted to find out what federal law

14  enforcement agencies have prosecuted voter fraud in this

15  State, who would you ask?

16     A.   I would think I would have to ask the four

17  different US districts department of justice.

18     Q.   Does -- let me ask you the question.  Does the

19  fact that the office of the attorney general, and you

20  testified earlier that the office of the attorney

21  general received approximately 320 referrals from 2002

22  to the present for alleged election code violations.  Do

23  you recall that testimony?

24     A.   Yes, sir, I do.

25     Q.   Does the fact that your list contains 320

222

1       entries, does that mean since 2002 there have been 320

2       voter fraud cases in Texas?

3                   MR. ROSENBERG:  Objection; leading.

4       BY MR. SWEETEN:

5           Q.  Does it mean that?

6                   MR. GEAR:  Same objection.

7                   MR. ROSENBERG:  Same objections.

8       BY MR. SWEETEN:

9           Q.  You can answer.

10          A.  I do not believe that the 320 referrals listed on

11      my spread sheets are representative of the actual

12      misconduct that's occurring in the State of Texas.  I

13      believe that there's many that go undetected.

14          Q.  And so is it your belief that in addition to the

15      320 referrals, what is your belief as to whether there

16      are additional cases of voter fraud that go undetected?

17          A.  I believe that there are cases of voter fraud

18      that go undetected and unreported.

19          Q.  Okay.  Let me ask you, does the fact that the

20      office of attorney general receive more referrals

21      related to mail-in voting fraud, meaning that it is any

22      less serious of -- actually that it's less serious a

23      crime than mail-in ballot fraud?

24                  MR. ROSENBERG:  Objection; leading.

25                  MR. GEAR:  Objection; leading.

223

1       A.    I'm sorry.  Could you restate the question?

2       Q.    (By Mr. Sweeten)  Yeah.  Does the fact that the

3   office of the attorney general received 3 -- I think you

4   testified, received more mail-in ballot fraud

5   allegations and referrals than in person mail-in

6   referrals, does that make it a less serious crime under

7   the Texas statutes of the penal code?

8               MR. ROSENBERG:  Same objection; leading.

9               MR. GEAR:  Also same objection.

10      A.    No, sir.

11      Q.    (By Mr. Sweeten)  In your experience as a law

12  enforcement officer, does increasing the severity of

13  criminal penalties act as a deterrent to those intends

14  to commit a criminal act?

15      A.    Yes, sir I believe so.

16      Q.    Does Senate Bill 14 increase criminal penalties

17  for attempts?

18      A.    Yes, sir I believe it does.

19      Q.    And what about for actual voter fraud?

20      A.    I think it increases the penalty.

21      Q.    Between mail-in voter fraud and in person voting

22  fraud, which of those two crimes is, as an investigator

23  more difficult to investigate?

24              MR. GEAR:  Objection; vague.  Objection;

25  calls for speculation.

224

1    BY MR. SWEETEN:

2         Q.   You can answer.

3         A.   It has been my experience that the most difficult

4    case to investigate would be in person voter fraud.

5         Q.   I'm going to read a statement to you and I'm

6    going to ask you if you agree with this.  "The well

7    publicized fact that voter registration lists

8    fraudulent, deceased or otherwise invalid names

9    undermines the public confidence in the electoral

10   process that is the life blood of Democratic

11   institutions."  As your experience as an investigator,

12   would you agree with this statement?

13             MR. ROSENBERG:  Objection; leading.

14             MR. GEAR:  Same objection.

15   BY MR. SWEETEN:

16        Q.   Would you agree with this statement?

17        A.   I absolutely believe so.

18        Q.   "Particularly given that in person voter fraud is

19   difficult to detect without rigorous ID requirements and

20   that as a practical matter, it is important for the

21   State to deter and not just detect and punish voter

22   fraud."  Do you agree that, the first part of that, that

23   in person voter fraud is difficult to detect without

24   rigorous ID requirements?

25             MR. ROSENBERG:  Objection; extraordinarily

Major Forrest Mitchell                              June 15, 2012

225

1    leading.

2              MR. GEAR:  Objection; leading.

3        A.   I believe that in person voter fraud is difficult

4    to detect absent a photo ID requirement.

5        Q.   (By Mr. Sweeten)  Is that statement consistent or

6    inconsistent with your experience?

7              MR. ROSENBERG:  Same objection.

8              MR. GEAR:  Same objection.

9        A.   I believe that that statement is consistent with

10   my experience.

11             MR. ROSENBERG:  Why don't we take a couple

12   of minutes and we'll probably have a little redirect or

13   recross.

14             MR. GEAR:  We will have a redirect.

15             (Brief recess.)

16             FURTHER EXAMINATION

17   BY MR. GEAR:

18       Q.   You were asked a question by your counsel

19   regarding whether or not SB 14, the penalties in SB 14,

20   would act as a deterrent to voter fraud.  Do you recall

21   those questions?

22       A.   Yes, sir, I do.

23       Q.   Do you believe that the current laws as they are

24   in the State of Texas act as a deterrent to voter fraud?

25       A.   I believe they act as somewhat of a deterrent.

Major Forrest Mitchell                           June 15, 2012

226

1        Q.   Do you believe that the current laws are

2   sufficient to act as a deterrent to voter fraud?

3        A.   It is my opinion that I believe that they're

4   insufficient in the penalty to deter voter fraud.

5        Q.   And what are the current penalties as they are

6   for voter fraud in the State of Texas?

7        A.   Currently an attempt is -- an attempt to commit

8   voter fraud or voter impersonation as characterized

9   would be a class A misdemeanor, which is punishable by

10   only up to a year in jail and a fine of $4,000.

11        Q.   And an actual act of voting -- voter

12   impersonation?

13        A.   I believe it's only, and I believe right now it's

14   only a third degree penalty.  Only two to three years in

15   the State of Texas and up to a $10,000 fine.

16        Q.   You're saying only two to 10 years.  Would you

17   consider that a significant amount of time for the act

18   of voter impersonation?

19        A.   And this is my opinion.  We have a statute in the

20   State of Texas which says that if you tamper with an

21   electronic voting device, in other words an electronic

22   E-machine, that is a first degree felony which is punish

23   able by up to five to 99.  I think tampering with an

24   electronic voting machine or illegal voting, in my mind

25   are not dissimilar.  So I think it should be more

Major Forrest Mitchell                                    June 15, 2012

227

1    severe.

2        Q.   So are you suggesting that a voter who commits

3    voter impersonation at the polls should be subject to up

4    to 99 years in prison?

5        A.   I think that's a very serious offense and that

6    elections in Texas are decided, in some cases, in small

7    rural jurisdictions by a handful of votes and just one

8    vote can swing an election.

9        Q.   Under the current law, non-citizens if they

10   voted, there's an enhancer penalty, correct?

11       A.   I can't remember all the laws.  I don't recall

12   that specific one right now.

13       Q.   Are the penalties specific to non-citizens

14   voting?

15       A.   I would think it would be just under 64012, which

16   would be illegal voting.

17       Q.   If a non-citizen represents that they're a

18   citizen when they register to vote, is there an

19   additional penalty to that?

20       A.   Yes, sir.  There is an offense for providing

21   false information on the voter registration application.

22       Q.   That would be perjury, correct?

23       A.   Under the Texas election code it could be

24   prosecuted either way.  As perjury or the false

25   statement on the voter registration application.

Major Forrest Mitchell                                June 15, 2012

228

1          Q.   And that would be an additional penalty to the
2     other penalties you've discussed?
3          A.   Yes, sir.
4          Q.   And a voter, a non-citizen, who votes at a
5     polling place would also be subject to deportation if
6     they were discovered?
7          A.   It's my understanding that the only way someone
8     would be deported at this time is if they were convicted
9     of a felony criminal offense.
10         Q.   And what are you basing that on?
11         A.   Articles I've read in the newspaper.
12         Q.   So as the supervisor for the SIU, are you aware
13    of what the penalties are for an illegal alien or
14    non-citizen voting?  And that would be an illegal
15    non-citizen voting.
16         A.   Federally or State?
17         Q.   State.
18         A.   I would think it would be -- I don't know exactly
19    what the penalties are.  I believe illegal voting is a
20    third degree felony.
21         Q.   And you mentioned federal.  There are additional
22    federal penalties for illegal aliens voting.  Would that
23    be correct?
24         A.   I don't know, sir.
25         Q.   You were asked a question about whether or not

229

1    you knew if there were additional allegations or

2    investigations of voter fraud in Harris County, Dallas

3    County, Bexar County.  Do you recall that testimony?

4        A.  Yes, sir, I do.

5        Q.  In fact, you received, you being the office of

6    the attorney general, has received referrals from all of

7    those counties, Harris County, Dallas and Bexar County;

8    isn't that correct?

9        A.  I do not think we have received any referrals

10   from the district attorney's office in Dallas County.

11   We have received allegations -- we have received

12   referrals from the Secretary of State referencing Dallas

13   elections.

14       Q.  And the initiative that you engaged in to train

15   various, I believe you said peace officers, that

16   included Harris, Dallas and Bexar County?

17       A.  I don't recall the exact specific locations that

18   we trained.  I do know that we enlisted the support of

19   the councils of government in geographical areas.  I

20   don't remember if Dallas or Houston were specific

21   locations that we trained.  I do know that we trained

22   all over Texas.

23       Q.  Specifically cities that had 100,000 or more?

24       A.  No, we trained in locations that were actually

25   even smaller than that.  The training that I personally

Major Forrest Mitchell                                    June 15, 2012

230

1    conducted was in deep East Texas, Smith County and Bowie

2    County.

3        Q.  Now, you've relied on your spread sheet for

4    various aspects of voter fraud in the State of Texas;

5    isn't that correct?

6        A.  Yes, sir, I have.

7        Q.  In fact, you relied on that to determine the

8    geographical areas of the violations were occurring in.

9    I believe that was your testimony?

10        A.  Yes, sir.

11        Q.  And so as you sit here today, you're aware of 320

12    referrals that came to the office of the Attorney

13    General, correct?

14        A.  Yes, sir.

15        Q.  And I believe I asked you during the initial part

16    of your testimony whether or not you were aware of any

17    other allegations of voter impersonation or

18    investigations of voter impersonation in the State of

19    Texas and I believe your answer was no; is that correct?

20              MR. SWEETEN:  I think that misstates the

21    testimony.

22    BY MR. GEAR:

23        Q.  Well, are you aware of any other investigations

24    of voter impersonation in the State of Texas, other than

25    the ones that have been investigated by the attorney

231

1    general's office?

2         A.   I believe I mentioned the fact that I was aware

3    of one that occurred in Tarrant County as well.

4         Q.   Other than Tarrant County?

5         A.   No, sir.

6         Q.   So your opinion that there are many and they are

7    undirected is just that, an opinion; is that correct?

8         A.   Yes, sir it is an opinion based upon

9    investigation that we've conducted and witnesses we've

10   interviewed and allegations that we've reviewed.

11        Q.   And based on investigations that you've

12   conducted, you would have pursued those if the facts and

13   the law warranted a charge of voter impersonation.  Is

14   that fair to say?

15             MR. SWEETEN:  Objection; compound.

16        A.   There are many reasons why we may not pursue

17   allegations or prosecute somebody for voter

18   impersonation.  We have the proof of -- we have the

19   burden of proof of beyond the reasonable doubt.

20        Q.   (By Mr. Gear)  Correct, because it's a criminal

21   offense.

22        A.   And there are cases where we may not have felt

23   that we had proof beyond the reasonable doubt to

24   prosecute somebody.

25        Q.   Are there cases that you believed you had proof

232

1      beyond a reasonable doubt that you determined not to

2      prosecute?

3          A.   No.   I don't believe that we had proof beyond a

4      reasonable doubt that we chose not to prosecute.

5          Q.   And as you sit here today, are you aware of

6      any -- are you aware of any cases that have not been

7      prosecuted for voter impersonation that should have

8      been?

9          A.   No, sir.

10          Q.   You were asked a question about the federal law

11      enforcement having the ability to prosecute voter

12      impersonation and investigating and prosecute voter

13      impersonation in the State of Texas.  Do you recall that

14      question?

15          A.   Yes, sir.

16          Q.   Are you aware of any investigations conducted by

17      federal law enforcement between 2002 and 2012 that

18      involved voter impersonation?

19          A.   Yes, sir, I'm aware that in the Dallas 2010

20      investigation that the FBI was also involved.

21          Q.   And you've testified to that particular case in

22      2010, correct?

23          A.   Yes, sir.

24          Q.   In any event, would you agree that if there was

25      federal investigation in the State of Texas that they

Major Forrest Mitchell                                    June 15, 2012

233

1    would communicate with the State of Texas Attorney

2    General before conducting an investigation in your

3    jurisdiction?

4                    MR. SWEETEN:  Objection; it calls for

5    speculation.

6    BY MR. GEAR:

7       Q.  Well, I mean, based on your experience as a

8    supervisor, a police officer, the supervisor of the SIU,

9    are you aware of any cases where the federal government

10   has investigated without first informing you of the

11   investigation?

12      A.  No, I'm not aware of any.  I would hope that the

13   FBI would communicate with us.  But I know that that's

14   not always the case.

15      Q.  Regarding your opinion that there are cases that

16   have gone undetected, which investigations, if any, are

17   you referring to and which witnesses are you referring

18   to that lead you to this opinion?

19                   MR. SWEETEN:  Objection; compound.

20   BY MR. GEAR:

21      Q.  Well, let's start with investigations.  Are you

22   aware of any investigations that lead you to the opinion

23   that there are cases that have gone undetected?

24      A.  I believe that there was a case in Progresso

25   which is Hidalgo County.

Major Forrest Mitchell                          June 15, 2012

                                                              234

1        Q.   Does that appear on your spread sheet?

2        A.   Yes.

3        Q.   And can you show me where it appears on your

4    spread sheet?

5        A.   I believe it appears on Page 3 of election code

6    referrals, office of the attorney general, August 2002

7    to present.  It is approximately.

8        Q.   What was the date of the alleged election?

9        A.   It was the 2008 municipal election.

10       Q.   What are the facts of that case?

11       A.   This is a case that was referred to our office,

12   but also the local district attorney, I believe, got the

13   referral as well.

14       Q.   Okay.  And what are the facts of the case?

15       A.   We had witnesses who informed us that some

16   suspects were outside of the polling place and that they

17   were handing out voter registration cards to vote, to go

18   cast votes in that election.

19       Q.   Those were the allegations?

20       A.   Those were the allegations.

21       Q.   Did your office handle the investigation?

22       A.   We investigated that, yes.

23       Q.   What was the outcome of that investigation?

24       A.   No criminal charges were filed.

25       Q.   And what was the reason no criminal charges were

Major Forrest Mitchell                                    June 15, 2012

235

1   filed?

2       A.   The witness who gave us that information had

3   inconsistent statements between interviews.

4       Q.   Are there any other cases that you're basing your

5   opinion on, the opinion that there are cases that go

6   undetected?

7       A.   Well, if I could go back to the Harris County

8   case from the 2008 primary election, which I previously

9   testified to.

10      Q.   Can you tell me which case that is, who was

11  involved in that?

12      A.   That would be Jack Carol Crowder.

13      Q.   Okay.  Mr. Crowder who was ultimately convicted?

14      A.   Yes, sir.

15      Q.   Based on a plea?

16      A.   Yes, sir.  The group that did the analysis

17  comparing Harris County voters to deceased voters had --

18  and I don't remember the exact number, but I want the

19  say it was hundreds, if not thousands of voters who they

20  believed were deceased and who actually voted.

21      Q.   Did you investigate that?

22      A.   We could only -- we only have the resources to

23  investigate a small portion of that allegation.

24      Q.   Other than Mr. Crowder, are there any other open

25  investigations on your spread sheet?  Were there any

1    other investigations based on what the group presented

2    on your spread sheet?

3         A.   No.  I mean.

4         Q.   So you're saying hundreds if not thousands of

5    possible dead people that have voted, wouldn't that be

6    something that your office would investigate?

7         A.   I only have a limited number of investigators and

8    the ability to investigate all of the names on that list

9    was not feasible.

10        Q.   And isn't it a fact that there are people who

11   have passed away that are still on a voter registration

12   role and that's not -- that's because the roles have not

13   been updated to remove them?

14        A.   One of the difficulties in the State of Texas is

15   that there are multiple jurisdictions that have voter --

16   each county has their own voter registration department.

17   It could be based as an election office or it could be

18   based in a county clerk's office to handle the voter

19   registration.  So there's 254 different ways.  Not all

20   of them share the same systems.  And it's my experience

21   as an investigator, that many of the counties, the way

22   they purge their roles of deceased voters is by looking

23   at obituaries.  And in some cases they obtain the social

24   security death index, which could take months to do if

25   that's what they're relying on.  So there could be a

237

1     number of voters who are deceased.

2          Q.   So ultimately, the answer to my question is yes?

3          A.   Yes, sir.

4          Q.   And the fact that there is a person who is

5     deceased on the voter registration role does not mean

6     that there is an incident of voter fraud, does not

7     necessarily mean that there's any type of fraud going

8     on?

9          A.   Well, there's the opportunity for fraud.

10         Q.   You said that you based your opinion that there

11    are undetected cases on speaking with witnesses, can you

12    name the witnesses who you're referring to?

13         A.   No, I don't know their names today.

14         Q.   And they would have been in connection with the

15    group that you've been speaking about?

16         A.   No.  I was mentioning witnesses down in the

17    Progresso case.

18         Q.   And you've testified about that case, correct?

19         A.   Yes, sir.

20              MR. GEAR:   I don't think I have any further

21    questions.   I am going to leave the deposition open.

22              MR. SWEETEN:   I have a few follow-ups.

23              MR. ROSENBERG:   If you're going to go I'll

24    go after you.

25              MR. SWEETEN:   Okay.  That's fine.

238

1              MR. ROSENBERG:  You go first.

2              BY MR. ROSENBERG:  It's your turn and then I

3     get it back.  Go ahead.

4              FURTHER EXAMINATION.

5     BY MR. ROSENBERG:

6         Q.   Major, just because a crime may be difficult to

7     detect doesn't mean the crime has necessarily been

8     committed, does it.

9         A.   I'm sorry.  Would you repeat that one more time?

10        Q.   Sure.  Just because a crime may be difficult to

11    detect doesn't mean that it's being committed, does it?

12        A.   That's correct.

13        Q.   Okay.  And also you testified in response to

14    questions from Mr. Sweeten about the fact that he didn't

15    have access to the data from other counties, correct?

16        A.   That's correct.

17        Q.   But you have no basis upon which to quantify any

18    additional instances of in person voter impersonation,

19    other than those which you testified today, correct?

20        A.   I have no other means to identify additional

21    cases.

22        Q.   And you would also agree, wouldn't you, that if a

23    crime, in fact, even if it were difficult to detect

24    became more prevalent, the more prevalent it became the

25    more easy it would be to detect it.  Isn't that a fact?

239

1              MR. SWEETEN:  Objection; calls for

2     speculation.

3        A.   I don't believe just because it's prevalent that

4     it's easier to detect.

5        Q.   (By Mr. Rosenberg)  The more prevalent it

6     becomes, isn't this what happens in your police work,

7     that more people know about things, more people talk

8     about things.  More people may know the person who walks

9     into a polling place, isn't that likely to happen if it

10    were very much more prevalent and than it is according

11    to your statistics?

12             MR. SWEETEN:  Objection; assumes facts not

13    in evidence.  Objection; calls for speculation.  You can

14    answer.

15       A.   I believe that even if it's more prevalent in a

16    jurisdiction like Harris County or Dallas County or

17    Bexar County that it would still be very difficult to

18    defect because the key to detecting voter impersonation

19    fraud is that someone in the polling place must be able

20    to identify the person whose name appears in the voter

21    registration certificate as the system is currently

22    designed.

23       Q.   (By Mr. Rosenberg)  And the more prevalent in

24    person voter fraud was, the more likely it would be that

25    someone would be identifying someone; isn't that

240

```
 1      correct?
 2                  MR. SWEETEN:   Same objection.
 3      BY MR. ROSENBERG:
 4        Q.   Common sense tells you that.
 5        A.   I don't believe so because there is a limited
 6      number of people inside the polling place.  It's limited
 7      to the number of election officials working there and
 8      limited to pole watchers who are there.
 9        Q.   That's correct, but the more people there are the
10      more likely there are going to be connections.  Isn't
11      that just a matter of common sense?
12                  MR. SWEETEN:   Same objection.  And asked and
13      answered, by the way.
14        A.   You're talking about polling places which process
15      thousands of people a day for elections.  And absent
16      some sort of ID requirement, it would -- the likelihood
17      that they themselves know the voters representing
18      themselves is very slim.  In fact, some elections
19      officials I don't think even necessarily work or live in
20      the precincts where they're assigned.
21        Q.   (By Mr. Rosenberg)  But the more it happens, the
22      more likely it is people would recognize people, isn't
23      that correct?
24                  MR. SWEETEN:   Asked and answered.
25      Objection.
```

Major Forrest Mitchell                               June 15, 2012

                                                             241

1        A.   I don't believe that's case.

2        Q.   (By Mr. Rosenberg)  Let me ask another question.

3    You have no basis on which to say whether there's one

4    more instance of in person voter fraud or five more;

5    isn't that correct?

6             MR. SWEETEN:  Objection; argumentative.

7        A.   I believe with a fact that we have thousands of

8    people who are deceased on our pole lists, who every

9    year voter registration cards get mailed out, I believe

10   that's an incredible opportunity to commit fraud and

11   that the government has a responsibility to stop that.

12       Q.   (By Mr. Rosenberg)  But you have no basis upon

13   which to quantify it whatsoever?

14            MR. SWEETEN:  Objection; asked and answered.

15   Objection; argumentative.

16       A.   The basis I would have to argue that would be

17   that we know there are thousands and tens of thousands

18   of deceased voters on our roles in the State of Texas

19   and that opportunity exist.

20       Q.   (By Mr. Rosenberg)  But you cannot identify any

21   instances of voter fraud, other than those that you've

22   identified in your in person voter fraud, other than

23   those you've identified in your spread sheet?

24            MR. SWEETEN:  Objection; asked and answered.

25   Go ahead.  Objection; argumentative.

Major Forrest Mitchell                                June 15, 2012

242

1            A.  It's a very difficult crime to detect.

2                    BY MR. ROSENBERG:  Pass to Mr. Sweeten.

3                    MR. SWEETEN:  I have no further question

4       thank you.

5                    MR. GEAR:  Again, I'm going to hold this

6       deposition open.

7                    MR. SWEETEN:  Let's talk about that.  What

8       you're talking about.  What is your specific complaint,

9       Mr. Gear.

10                   MR. GEAR:  Well, my specific complaint is

11      that your client has testified on numerous occasions

12      during this deposition that there are other documents

13      that are available that may provide support to his

14      testimony.  These documents, as I know, have not been

15      produced.  And there are multiple documents that we have

16      gone through.  I believe I have a right to hold this

17      deposition open based on that.  And that's what I intend

18      to do.

19                   MR. SWEETEN:  Well, let me give you a brief

20      response on the record.

21                   MR. GEAR:  Sure.

22                   MR. SWEETEN:  First of all, you requested

23      documents from us and I -- your request has been

24      objected to, both in the request to produce which was

25      answered on March 30th where we objected that it was

1    overly broad, unduly burdensome. And then we also have

2    requested to the deposition notice. I'll also say that

3    we have offered the Department of Justice and we've

4    provided you the indictments, the convictions, we

5    provided you a stack of documents. You have not --

6    we've also attempted to discuss with you and your office

7    in particular, the -- what it is specifically you're

8    looking for because if you're request really is that you

9    want every single case file underlying the 320

10   investigations on this spread sheet, it is an

11   extraordinarily difficult request based upon those

12   documents. I have not gotten any sense from you-all

13   that you want anything less than everything, and so

14   we've objected we're standing by that objection. We

15   stand ready to discuss the matter if with you. In light

16   of -- if you want to discuss this issue, we will do

17   that. But we've provided you -- and we've maintained

18   our objection throughout and we still maintain that

19   objection based upon the breadth of the request that

20   have been made.

21            MR. GEAR: And I respect that. And part of

22   that conversation has been with me. And part of that

23   conversation has essentially said -- asked me to

24   identify what I believe I need in response to the spread

25   sheet and I've said I could not do that. I believe I

Major Forrest Mitchell                                    June 15, 2012

244

1        said that both in writing and orally.  And again,

2        there's no need to argue this much farther on the

3        record.

4                    MR. SWEETEN:  I agree.

5                    MR. GEAR:  But I intend on holding this

6        deposition open.

7                    MR. SWEETEN:  Okay.  We can go off the

8        record.

9                    (Deposition concluded)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Major Forrest Mitchell                                    June 15, 2012

245

1                      CHANGES AND SIGNATURE

2                  RE:  STATE OF TEXAS VS. HOLDER

3

4        PAGE    LINE    CHANGE              REASON

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

246

1        I, MAJOR FORREST MITCHELL, have read the
foregoing deposition and hereby affix my signature that
2   same is true and correct, except as noted above.

3
                        MAJOR FORREST MITCHELL
4   THE STATE OF TEXAS        )
                                              )
5   COUNTY OF _____  )
             Before me,                    , on this day
6   personally appeared MAJOR FORREST MITCHELL, known to me
    (or proved to me under oath or through
7   (description of identity card or other document) to be
    the person whose name is subscribed to the foregoing
8   instrument and acknowledged to me that they executed the
    same for the purposes and consideration therein
9   expressed.

10       Given under my hand and seal of office this ____
    day of            ,        .
11

12                        NOTARY PUBLIC IN AND FOR
                          THE STATE OF
13

14

15

16

17

18

19

20

21

22

23

24

25

Major Forrest Mitchell                                    June 15, 2012

247

1                    IN THE UNITED STATES DISTRICT COURT
                          FOR THE DISTRICT OF COLUMBIA
2
     STATE OF TEXAS              )
3                                )
                                 )
4    VS.                         )   NO. 12-CV-128
                                 )   (DST, RMC, RLW)
5                                )
     ERIC H. HOLDER, JR.,        )
6    In his official                              )
     Capacity as Attorney            )
7    General of the United           )
     States, ET AL                )
8    * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
9                         CERTIFICATE FROM THE
                          ORAL DEPOSITION OF
10            MAJOR FORREST MITCHELL
                         JUNE 15, 2012
11   * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
12              I, Janalyn Reeves, a Certified Shorthand Reporter

13   in and for the State of Texas, do hereby certify that

14   the foregoing deposition is a full, true and correct

15   transcript;

16        That the foregoing deposition of MAJOR FORREST

17   MITCHELL, the Witness, hereinbefore named was at the

18   time named, taken by me in stenograph on June 15, 2012,

19   the said Witness having been by me first duly cautioned

20   and sworn to tell the truth, the whole truth, and

21   nothing but the truth, and the same were thereafter

22   reduced to typewriting by me or under my direction.  The

23   charge for the completed deposition is $ _____ due

24   from Defendant.

25        () That pursuant to the Federal Rules of Civil

Major Forrest Mitchell                              June 15, 2012

248

1    Procedure, the Witness shall have 30 days after being

2    notified by certified mail, return receipt requested, by

3    the deposition officer that the original deposition

4    transcript is available in her office for review and

5    signature by the Witness and if any corrections made are

6    attached hereto;

7         () That by agreement of counsel, a reading condensed

8    copy of the deposition transcript along with the

9    full-size original changes and Signature Sheet has been

10   sent to_____ on_____          for review and

11   signature within 30 days and if any corrections returned

12   are attached hereto;

13        () That by agreement of counsel, the deposition

14   officer is instructed to release the original deposition

15   transcript to _____ on_____, for review and

16   signature, and the deposition officer is thereafter

17   released of any further responsibility with regard to

18   the original.

19        () That the Witness shall have thirty (30) days for

20   review and signature of the original transcript and if

21   any corrections returned are attached hereto.

22        () That the signed transcript () was () was not

23   received from the Witness within 30 days.

24        () That the examination and signature of the Witness

25   is waived by the Witness and the parties;

249

1          That the amount of time used by each party at the

2     deposition is as follows:

3                    Mr. Bruce Gear - 5 hours 46 minutes

4                    Mr. Ezra Rosenberg - 16 minutes

5                    Mr. Patrick Sweeten - 14 minutes

6          I further certify that I am neither counsel for,

7     related to, nor employed by any of the parties in the

8     action in which this proceeding was taken, and further

9     that I am not financially or otherwise interested in the

10    outcome of the action.

11                    WITNESS MY HAND, this the_____ day

12    of          , A.D., 2012.

13
                          JANALYN REEVES
14                        Cert. No. 3631
                          Expires Dec. 12
15                        100 Congress Avenue
                          Suite 220
16                        Austin, Texas  78701
                          (512)634-1980
17                        Firm Registration No. 283

18

19

20

21

22

23

24

25