UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| STATE OF TEXAS, | : | Docket No. CA 12-128 |
| | : | |
| Plaintiff | : | |
| v. | : | |
| | : | |
| ERIC H. HOLDER, JR., in his | : | Washington, D.C. |
| Official Capacity as | : | Monday, July 9, 2012 |
| Attorney General of the | : | P.M. SESSION |
| United States, | : | |
| | : | |
| Defendant, and | : | |
| | : | |
| ERIC KENNIE, et al., | : | |
| | : | |
| Intervenor-Defendants | : | 2:00 p.m. |

. . . . . . . . . . . . . . . . . : . . . . . . . . . . . . . .

TRANSCRIPT OF BENCH TRIAL
DAY 1 - P.M. SESSION
BEFORE THE HONORABLE DAVID S. TATEL
UNITED STATES CIRCUIT JUDGE
THE HONORABLE ROSEMARY M. COLLYER
THE HONORABLE ROBERT L. WILKINS
UNITED STATES DISTRICT JUDGES

APPEARANCES:

For the Plaintiff:          PATRICK K. SWEETEN
                            JOHN WILLIAM MCKENZIE
                            MATTHEW H. FREDERICK
                            STACEY NAPIER
                            OFFICE OF THE ATTORNEY GENERAL
                            OF TEXAS
                            209 West 14th Street
                            7th Floor (MC-059)
                            Austin, TX 78701
                            (512) 936-1695

                            ADAM K. MORTARA
                            ASHA L. I. SPENCER
                            JOHN M. HUGHES
                            BARTLIT BECK HERMAN
                              PALENCHAR & SCOTT, LLP
                            54 West Hubbard Street
                            Suite 300
                            Chicago, IL.  60654
                            (312) 494-4469





For the Defendant:             ELIZABETH STEWART WESTFALL
                               MEREDITH BELL-PLATTS
                               JENNIFER MARANZANO
                               DANIEL J. FREEMAN
                               RISA BERKOWER
                               BRUCE I. GEAR
                               SPENCER R. FISHER
                               U.S. DEPARTMENT OF JUSTICE
                               Civil Rights Division,
                               Voting Section
                               950 Pennsylvania Avenue, NW
                               NWB-Room 7202
                               Washington, DC 20530
                               (202) 305-7766


For the Intervenor            EZRA D. ROSENBERG
Defendants:                    DECHERT LLP
                               902 Carnegie Center
                               Suite 500
                               Princeton, NJ  08540-6531
                               (609) 955-3200

                               JOSEPH GERALD HEBERT
                               J. GERALD HEBERT, P.C.
                               191 Somervelle Street
                               Suite 405
                               Alexandria, VA  22304
                               (703) 628-4673

                               CHAD W. DUNN
                               BRAZIL & DUNN
                               4201 FM 1960 West
                               Suite 530
                               Houston, TX 77068
                               (281) 580-6310

                               ADAM M. HARRIS
                               FRIED, FRANK, HARRIS, SHRIVER &
                                 JACOBSON LLP
                               One New York Plaza
                               24th Floor
                               New York, NY 10004
                               (212) 859-8953

JORGE SANCHEZ
MEXICAN AMERICAN LEGAL DEFENSE &
  EDUCATIONAL FUND, INC
11 East Adams Suite #700
Chicago, IL 60603
(312) 427-0701

NANCY G. ABUDU
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, INC.
230 Peachtree Street, NW
Suite 1440
Atlanta, GA  30303
(404) 523-2721

Court Reporter:                REBECCA STONESTREET, RPR, CRR
                               Official Court Reporter
                               Room 6511, U.S. Courthouse
                               Washington, D.C.  20001
                               (202) 354-3249


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

C O N T E N T S

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JOSE ALISEDA | | | | |
| By Mr. Freeman | 5 | -- | -- | -- |
| By Mr. Sanchez | -- | 31 | -- | -- |
| | | | | |
| FORREST MITCHELL | | | | |
| By Mr. Sweeten | 33 | -- | 69 | -- |
| By Mr. Gear | -- | 49 | -- | -- |
| | | | | |
| SENATOR THOMAS WILLIAMS | | | | |
| By Mr. Frederick | 69 | -- | -- | -- |
| By Mr. Fisher | -- | 100 | -- | -- |
| By Ms. Abudu | -- | 129 | -- | -- |
| | | | | |
| THOMAS SAGER | | | | |
| By Mr. Mortara | 135 | -- | -- | -- |

E X H I B I T S

| NUMBER | ADMITTED |
|---|---|

(NO EXHIBITS MOVED INTO EVIDENCE.)

```
 1    purpose.  Through lunch -- not counting the cross-examinations
 2    of Representative Aliseda, through lunch Texas had used 12.5 of
 3    its hours, the United States had used 41 minutes, and the
 4    intervenors had used 13 minutes.
 5              Go right ahead, sir.  Nice to see you again.
 6              MR. SWEETEN:  Good afternoon, Your Honor.  Thank you.
 7    Patrick Sweeten on behalf of the State of Texas.  The State of
 8    Texas calls Major Forrest Mitchell.
 9              (Oath administered by Courtroom Clerk.)
10    (FORREST MITCHELL, PLAINTIFF witness, having been duly sworn,
11                       testified as follows:)
12                         DIRECT EXAMINATION
13    BY MR. SWEETEN:
14    Q.   Good afternoon, Major Mitchell.
15    A.   Good afternoon, sir.
16    Q.   Can you introduce yourself to the court, please?
17    A.   Yes.  My name is Forrest Andrew Mitchell and I am a major
18    with the law enforcement division of the Attorney General's
19    Office for the State of Texas.
20    Q.   What is it you do for the Texas Attorney General's Office?
21              JUDGE COLLYER:  Excuse me.  Is major a title?  Is major
22    a rank or is major a name?
23              THE WITNESS:  Major is a rank that I hold.
24              THE COURT:  Thank you, sir.  Go ahead.
25    BY MR. SWEETEN:
```

1    Q.   What is it that you do for the Texas Attorney General's

2    Office?

3    A.   I'm a state criminal investigator with supervisory

4    responsibility.

5    Q.   And where do you currently live?

6    A.   I live in Austin, Texas with my wife and children.

7    Q.   How long have you worked for the Office of Attorney General

8    in Austin?

9    A.   Since -- in September it will be 15 years.

10   Q.   And what did you do when you first joined the office?

11   A.   When I first joined the office, I was assigned to the

12   prosecution assistance division, and our job was to travel

13   around the state and help smaller rural jurisdictions in the

14   capital murder prosecutions.

15   Q.   And what was your next position with the Office of Attorney

16   General after that?

17   A.   In June of 2005 I was promoted to the rank of lieutenant

18   within the Special Investigations Unit.

19   Q.   Can you tell the Court what it is that the Special

20   Investigations Unit does?

21   A.   Yes.   The Special Investigations Unit is a team of -- or has

22   teams of investigators that conduct criminal investigations in a

23   wide variety of areas.   Some of these areas include money

24   laundering, human trafficking, public integrity, white collar

25   crime, and election violations.   I also have a team of

1    investigators who assist local DA's with criminal cases as well.

2    Q.   When was this unit formed, sir?

3    A.   It was formed in the summer of 2005.

4    Q.   And how many law enforcement officers do you supervise total

5    within the SIU?

6    A.   There are 40 investigators in the Special Investigations

7    Unit.

8    Q.   How, do all of those work on elections investigations?

9    A.   No, sir, only a portion.

10   Q.   And in fact, of the 64 officers under your charge, how many

11   work on elections violations?

12   A.   We currently have three investigators assigned to work

13   election cases in the State of Texas.

14   Q.   And how do you refer to that subgroup of the SIU?

15   A.   We refer to them as the elections team.

16   Q.   Now, what are the types of election code violations that the

17   election team investigates?

18   A.   It would be illegal voting and other violations of the Texas

19   election code, or Penal Code offenses surrounding elections.

20   Q.   And let's focus on the illegal voting cases for a moment.

21   Are there different types of illegal voting cases that you

22   investigate?

23   A.   Yes, sir.  Under Chapter 64 of the Texas Election Code, the

24   offense of illegal voting is kind of broken into four

25   categories:  The first category would be an ineligible voter

1    casting a ballot in an election; another would be voter

2    impersonation; another example is a voter who votes more than

3    once in an election; and then the final type of illegal voting

4    is a person who marks a ballot contrary to the instructions of a

5    voter.

6    Q.  Okay.  Now, one of the things you said is "voter

7    impersonation."  What is that?

8    A.  Voter impersonation is when someone uses another's identity

9    to cast a ballot in an election, either to vote again or to vote

10   in an election they're not eligible to vote in.

11   Q.  Now, I want to talk first before we go into that in more

12   detail about the referral investigation process.  How does the

13   SIU learn of potential cases of election violations?

14   A.  The Office of the Attorney General receives investigative

15   referral requests from a wide variety of sources.  The first

16   would be the Texas Secretary of State's Office; another source

17   would be the local district and county attorneys, and then also

18   from elections administrators and then from local law

19   enforcement.  And then when the Attorney General's Office

20   receives these referrals, they're routed to the Special

21   Investigations Unit.

22   Q.  So we're clear, does the Office of Attorney General ever

23   initiate investigations on its own without a referral?

24   A.  By our policy, we're referral driven.

25   Q.  Are all election violation referrals to the Office of

1    Attorney General typically routed to the SIU office?

2    A.   Yes, sir.

3    Q.   Does the SIU or the Office of Attorney General's office have

4    sole jurisdiction over election violation cases within the

5    State of Texas?

6    A.   No, sir.  Local district and county attorneys have

7    concurrent jurisdiction on elections, and also the federal

8    government has jurisdiction in, I would presume, national

9    elections.

10   Q.   Now, are those county DA's or county attorneys, are they

11   required to refer to the Office of Attorney General cases to

12   you, or can they prosecute those on their own?

13   A.   There's no legal requirement for the local county and

14   district attorneys to refer a case to us.  They have concurrent

15   jurisdiction and they're capable of investigating and

16   prosecuting those on their own.

17   Q.   In addition to your supervisory responsibilities, have you

18   personally been assigned to investigate election violations?

19   A.   Yes, sir.  I have been assigned cases and I have assisted in

20   investigation of election code offenses.

21   Q.   And do you keep track of all election violation cases that

22   are referred to your office?

23   A.   Yes, sir, I do.

24   Q.   And how do you do that?

25   A.   I maintain an Excel spreadsheet which is divided into three

 1    books.  The first book would be all of the election code

 2    referrals that come into our office; and the second book would

 3    be the prosecutions resolved; and then the third book of the

 4    spreadsheet would be the charges pending.

 5    Q.  So when the SIU receives a referral, what do you do with

 6    respect to the spreadsheet?

 7    A.  The first thing that we do is that we assign the referral a

 8    tracking number, and then we examine the allegations and record

 9    them on our spreadsheet.

10    Q.  And how do you maintain those spreadsheets?

11            JUDGE COLLYER:  Isn't this already addressed in the

12    record and ruled on by the court?

13            MR. SWEETEN:  Yes, Your Honor.  I'm just laying

14    foundation for the spreadsheets that I'm going to talk about.

15            JUDGE COLLYER:  Yes, but we've already ruled on the

16    spreadsheets, didn't we?  Wasn't there an objection to the

17    spreadsheets because the government didn't see the underlying

18    documentation, and I ruled it was a business record?

19            MR. SWEETEN:  Yes, i think that's right.

20            THE COURT:  So why don't we just move on?

21            MR. SWEETEN:  Yes, ma'am.

22            THE COURT:  Great.  Good thinking.

23    BY MR. SWEETEN:

24    Q.  So let's talk about the spreadsheets, and in particular I'm

25    going to show you what's been marked as PX-41.  Can you see

1    that?

2    A.  Yes, sir, I can.

3    Q.  Can you identify for us what is PX-41?

4    A.  This is the election code violation spreadsheet that I

5    maintain as the supervisor of the Special Investigations Unit,

6    and it contains the referrals that our office receives.

7    Q.  And can you tell us what data that you input into this

8    spreadsheet?

9    A.  In this spreadsheet I input the county of the alleged

10   violation, and then also the election involved, and then the

11   Secretary of State's Office referral date, and then also the

12   allegations that were made.  I also, if the source is from a

13   local DA or a local law enforcement officer or local elections

14   administrator, I'll record that.

15   Q.  And you update this how frequently?

16   A.  Monthly.

17   Q.  I'm going to show you what's been marked as Plaintiff's

18   Exhibit 42.  Can you tell the Court what this spreadsheet is,

19   PX-42?

20   A.  This is the spreadsheet that I maintain as the supervisor of

21   the Special Investigations Unit, and it contains the

22   prosecutions that the Attorney General's Office has either

23   prosecuted or worked with a local district attorney or county

24   attorney to prosecute.

25          JUDGE COLLYER:  What is the title of this document at

```
 1    the top?

 2            THE WITNESS:   The title says "Election Code Referrals

 3    of the Office of the Attorney General, Prosecutions Resolved."

 4            JUDGE COLLYER:   Thank you.  And that's PX-42?

 5            THE WITNESS:  Yes, Your Honor.

 6            JUDGE COLLYER:   Thank you, sir.

 7    BY MR. SWEETEN:

 8    Q.   And can you tell us just generally what's contained in this

 9    document?

10    A.   This document is going to contain the county of the offense,

11    the county where it was prosecuted, the name of the defendant,

12    the allegations that were made in that election, the election

13    involved, the cause number of the case, and then the charge that

14    was filed by indictment, and then also the resolution date, the

15    relevant statute under the Election Code or Penal Code, and then

16    finally what the disposition of the case is.

17    Q.   And I'll show you one more document --

18            JUDGE COLLYER:   Mr. Sweeten, I'm sorry to interrupt

19    you.  Do you know how to operate that well enough to just blow

20    up a little bit of that last exhibit?

21            MR. SWEETEN:   No, I'm afraid I don't, but someone at my

22    table can.

23            THE COURT: All lawyers need friends.

24            MR. HUGHES:   Is that too close, Your Honor?

25            THE COURT:   Oh, no, not for me.
```

1          MR. SWEETEN:  Your Honor, I can give the court paper

2     copies if the court wants it.

3          JUDGE COLLYER:  No, I got it.  I just actually wanted

4     to see how it was because I couldn't see it.  Thank you, sir.

5     Thank you, Mr. Sweeten.

6     BY MR. SWEETEN:

7     Q.  And I'm going to show you the third document, the last one,

8     and I'll try to center it so Your Honor can see it.  Okay.  And

9     there's the title of that document is "Election Code Referrals

10    to the Office of Attorney General, Charges Pending Resolution."

11    Can you tell the court briefly what this document shows?

12         JUDGE WILKINS:  What is the exhibit number, sir?

13         MR. SWEETEN:  It's PX-43.

14    A.  Exhibit 43 represents the cases which are currently pending

15    resolution.  These are cases that have been indicted and are

16    currently awaiting trial.

17    BY MR. SWEETEN:

18    Q.  And these last two, PX-42 and 43, how often are they

19    updated?

20    A.  I maintain those or update those as there's some sort of

21    resolution or disposition in the case.

22    Q.  Now, after you receive the referral and enter it on your

23    spreadsheet, what do you do after that?

24    A.  Well, we evaluate the case and make sure that the criminal

25    investigation is warranted, and then it would be approved -- or

1    it would be assigned to a member of the elections team to
2    investigate.
3    Q.  Now, is every case that's referred to SIU, is that
4    investigated?
5    A.  No, sir, there are certain circumstances where the cases
6    aren't investigated.  One example may be that the statute of
7    limitations has expired; it could also be that it is not really
8    a criminal offense; or it could be that it's a Class C
9    misdemeanor, which is the lowest level of criminal offense in
10   the State of Texas which is punishable by a fine only.  Because
11   we have a limited amount of resources, we wouldn't investigate
12   those.
13   Q.  When you refer an election violation for additional
14   investigation, what do you do after that?
15   A.  It would go to a member of the special investigations
16   election team.
17   Q.  And does SIU actually handle the prosecution of cases?
18   A.  No, sir.  Upon the completion of a criminal investigation
19   where we believe that there's sufficient evidence to charge a
20   case, we would refer that to the criminal prosecutions of the
21   Office of Attorney General, or a local district or county
22   attorney.
23   Q.  Do your spreadsheets, PX-41 through 43, do they contain any
24   entries related to cases that are investigated by county
25   district attorneys or county attorneys?

1    A.  If and only if the Special Investigations Unit or the

2    criminal prosecutions division has been involved in the case.

3    Q.  Does your spreadsheet contain federal investigations of

4    election violations?

5    A.  No, sir, we don't have information on federal prosecutions

6    or investigations.

7    Q.  All right.  Now, in terms of referrals of election

8    violations to SIU for investigation, how many have been

9    referred?

10   A.  Since approximately 2002, there have been 320 referrals made

11   to the Office of the Attorney General.

12   Q.  And of those 320 referrals, how many different Texas

13   counties does that represent?

14   A.  I believe it represents 97 of the 254 counties.

15   Q.  Now, you talked about the referral process and sometimes you

16   don't proceed with it.  So let me ask you, of the 320 referrals,

17   how many has the SIU actually investigated?

18   A.  Since 2004, we've investigated a total of 186 cases.

19   Q.  So of the 186 investigated cases that SIU has investigated,

20   in general terms, the types of election code violations, what

21   types of election code violations do those involve?

22   A.  These could be illegal voting or other violations of the

23   Texas Election Code or Penal Code offenses.

24   Q.  Of the 186 cases, how many of those have been referred for

25   prosecution?

1   A.   62.

2   Q.   Of the 62 cases that have been referred to prosecution, how

3   many have resulted in positive outcomes or convictions?

4   A.   I believe that number is 50.

5   Q.   One of the areas you described earlier is illegal voting,

6   and I think one of those types is in-person voter fraud.  So I

7   want to ask you, of the 62 cases referred for prosecution, how

8   many of those involved voter impersonation?

9   A.   There are a total of six cases that involved voter

10   impersonation that were prosecuted.

11   Q.   And of the 62 cases referred for prosecution, how many

12   involve in-person voter impersonation?

13   A.   There have been five cases that have been sent for

14   prosecution involving in-person voter impersonation.

15   Q.   Does this tally include any referrals from the May

16   primaries?

17   A.   No, sir.

18   Q.   Is there any case that you've investigated that comes to

19   mind that involves in-person voter impersonation?

20   A.   Yes, sir, there is a case.

21   Q.   Can you tell the Court the general facts of that case?

22   A.   This case involved the 2009 Progreso Independent School

23   District election down in Hidalgo County and this case involved

24   two brothers and their mother who went to the polling place.

25   One brother -- I'm sorry, if I may clarify.  One brother was

1       actually incarcerated in the state penitentiary in San Antonio;
2       the other brother went to the polling place with the
3       incarcerated brother's voter registration certificate and he
4       presented himself as if he were his brother.
5               This was discovered by a poll worker inside the
6       location, and she alerted the election judge.  However, since
7       the voter had a lawful voter registration certificate, the
8       elections department let him proceed to vote.
9       Q.   Now, were there -- other than the two -- other than the
10      brother who attempted to vote on behalf of the other brother,
11      was there another defendant involved in that case?
12      A.   Yes, there was.  The other defendant, Reyna Almanza, is the
13      mother of the two sons, and she was actually present with
14      Lorenzo Antonio Almanza, and she interjected with the election
15      judge and vouched for the identity of her son who was using the
16      impersonation -- the impersonated voter registration
17      certificate.
18      Q.   How was it that case was discovered and brought to the
19      attention of the authorities?
20      A.   The case was brought to light through the poll worker who
21      was present at the polling place.
22      Q.   And the poll worker, did she know both brothers?
23      A.   Yes, she did.  The poll worker actually went to high school
24      with the incarcerated brother.
25      Q.   As a supervisor or an investigator with SIU, you've worked

1    on cases involving voter impersonation at the polling place?

2    A.   That's correct.

3    Q.   From your experience, can you tell us how difficult it is to

4    detect in-person voter impersonation at the polling place?

5    A.   I would say it's very difficult to detect.

6    Q.   Why is that?

7    A.   Because it would require somebody at the polling place

8    actually having personal knowledge of the voter who is

9    presenting themselves as the impersonated voter, and then they

10   would also additionally have to be able to observe how that

11   person is checked in during the accepting a voter process.

12   Q.   As compared to mail-in voting fraud, how difficult is

13   in-person voter impersonation to detect or investigate?

14              MR. GEAR:  Objection.  Calls for speculation.

15              JUDGE COLLYER:  I think that adds not quite

16   speculation, given the witness' experience.  I don't know that

17   it has a whole lot of foundation, but that goes to weight, not

18   admissibility, so we'll let him answer the question.

19              Go ahead, sir.

20   A.   I believe in-person voter impersonation is more difficult to

21   detect than mail-in ballot, for instance, voter impersonation.

22   And it really deals with the amount of time that the suspect

23   spends with the voters.  In mail-in ballot cases, they spend a

24   great deal of time with the voters, and use their mail-in

25   ballots to cast the election.  In voter impersonation cases

1   there's very little interaction with the witnesses, so

2   frequently they're unable to identify the suspects through a

3   conventional photo array.

4   BY MR. SWEETEN:

5   Q.   In addition to this case, have you -- are you aware of any

6   other additional pending voter impersonation cases within the

7   State of Texas?

8   A.   Pending criminal cases?

9   Q.   Yeah, currently.

10  A.   We have currently two pending criminal cases in the State of

11  Texas right now with the Attorney General's Office that involve

12  voter impersonation.  One is the Mara Comparion (ph) case out of

13  Bexar County, and then the second case is Lorenzo Antonio

14  Almanza, the one in Hildago County.

15  Q.   Are you aware of any others that your office is not pursuing

16  or investigating?

17  A.   No, I'm not aware.

18  Q.   Are you familiar --

19  A.   I apologize.

20  Q.   Okay.

21  A.   I am aware of another case that is being investigated by a

22  local district attorney up in Tarrant County, where a mother had

23  her son vote in an election.

24  Q.   Are you familiar with a voter ID bill at issue in this case,

25  Senate Bill 14, just generally the terms?

1    A.   Yes, I am.

2    Q.   Does Senate Bill 14 increase the penalties for voter

3    impersonation?

4    A.   Yes, sir, it does.  It affects all types of illegal voting,

5    not just voter impersonation.  It enhances the penalty for a

6    criminal attempt from a Class A misdemeanor to a state jail

7    felony, and then it also it enhances the actual offense of

8    illegal voting from a third degree felony to a second degree

9    felony.  And that would apply to all four types of illegal

10   voting.

11   Q.   As a law enforcement officer, do you have an opinion whether

12   requiring identification at the polling places will be helpful

13   with your investigative efforts?

14   A.   I do.

15            MR. GEAR:  Objection.

16            THE COURT:  Objection sustained.  The witness' answer

17   will be stricken.

18            MR. SWEETEN:  I pass the witness.  Thanks.

19            THE COURT:  Thank you, Mr. Sweeten.

20            MR. GEAR:  My name is Bruce Gear.  I represent

21   Eric Holder in this case.

22                        **CROSS-EXAMINATION**

23   BY MR. GEAR:

24   Q.   Major Mitchell, isn't it true that you did not testify

25   before the legislature during the 2011 legislative session?

1    A.   That is correct, I did not testify.

2    Q.   During your direct testimony you identified five cases of

3    voter impersonation, and I assume, that's five cases of voter

4    impersonation at the polling place?

5    A.   Yes, sir, there are five cases of in-person voter

6    impersonation at the polling place.

7    Q.   And then you identified a second -- or a sixth case, and I

8    believe, you identified that as Tarrant County?

9    A.   Well, sir, I identified a case that we were also involved in

10   which was the Melvin K. Ponce (ph) investigation, which was a

11   mail-in ballot voter impersonation.

12   Q.   And the Melvin K. Ponce case, that would not have been

13   covered by SB14 had it been in place.  Isn't that correct?

14   A.   Into what regard?

15   Q.   In regards SB14 would not have stopped the Melvin K. Ponce

16   case.  Isn't that correct?

17   A.   It could have had a deterrent effect.

18   Q.   It's a by mail ballot case.  Correct?

19   A.   Yes, sir, it is.

20   Q.   It is not a case where Melvin K. Ponce appeared in person

21   and pretended to be someone else at the polling place.  Correct?

22   A.   Yes, sir, you are correct.

23   Q.   And just so I'm clear, SB14, as it's drafted, deals

24   specifically with voter impersonation at the polling place.

25   Isn't that your understanding?

```
 1    A.   No, sir, it is drafted in that one of the portions of SB14
 2    deals with the offense of illegal voting, and there are four
 3    categories of that.  And it enhances the penalty range for all
 4    four types of the offense.
 5    Q.   You had a deposition in this case.  Correct?
 6    A.   Yes, sir.
 7    Q.   And we discussed Melvin K. Ponce.  Correct?
 8    A.   Yes, sir, we did.
 9    Q.   And didn't I ask you the question whether or not SB14 would
10    have prevented voter fraud in that case as it applies to SB14?
11    A.   For the purposes of the voter ID requirement at a polling
12    place, that case would not have -- it would not have prevented
13    it.
14    Q.   Now, the other case that you spoke about was Reyna Almanza.
15    Is that correct?
16    A.   Yes, sir.
17    Q.   And isn't it true that Reyna Almanza did not cast a ballot
18    during the 2009 school district election?
19    A.   I do not believe that Reyna Almanza cast a ballot in that
20    election.
21    Q.   The second case that you talked about was Lorenzo Antonio
22    Almanza.  Correct?
23    A.   Yes, sir.
24    Q.   Isn't it true that there's no conviction in this case?
25    A.   Yes, sir, that case is currently pending.
```

```
 1   Q.  The third case that you talked about was Delores McMillan.

 2   Or you didn't actually identify that, but do you understand

 3   Delores McMillan as being one of the voter impersonation cases

 4   that you've identified here today?

 5   A.  Yes, sir, it is one of the five.

 6   Q.  And Delores Millan (sic) was an election worker.  Correct?

 7   A.  Yes, sir, she was an election worker in the 2010 primary

 8   elections in Dallas County.

 9   Q.  Now, the election code violation that you're referencing

10   regarding Delores McMillan was one that occurred before the

11   polling place even opened.  Isn't that accurate?

12   A.  Yes, sir, that is my understanding of the case facts.

13   Q.  This is not a case where she presented an identification to

14   someone and pretended to be someone else.  Isn't that accurate?

15   A.  That's correct.

16   Q.  SB14 would not have prevented the case of Delores McMillan

17   because it occurred before the polls opened.  Isn't that

18   correct?

19   A.  Again, I believe there could have been a deterrent effect

20   based upon the statute, but it would not have prevented her from

21   doing so.

22   Q.  And you also mentioned, and I believe you mentioned her by

23   name, but I'm going to use the initials M.C.  If I do that,

24   would you understand who I'm talking about?

25   A.  Yes, sir, I would.
```

1    Q.   And there's no conviction in the M.C. case, is there?

2    A.   No, that case is currently pending as well, sir.

3    Q.   And M.C. has been found mentally incompetent.  Isn't that

4    correct?

5    A.   I believe so, yes, sir.

6    Q.   And under the charge of voter impersonation, there would

7    need to be a finding of intent, that that person intended to

8    violate the law.  Isn't that correct?

9    A.   The elements of the offense, I believe, are intentionally or

10   knowingly.

11   Q.   And then finally, the last case that you mentioned was --

12   and actually didn't mention it by name, but Jack Crowder, III.

13   Would that be one of the voter impersonation cases that you're

14   identifying here today for the judges?

15   A.   Yes, sir, that is Jack Carol Crowder and that was the 2008

16   general elections in Harris County, Houston, Texas.

17   Q.   Now, the allegation for the Jack Carol Crowder case is that

18   he voted on behalf of his deceased father.  Is that accurate?

19   A.   Yes, sir, he presented his deceased father's voter

20   registration certificate and cast a ballot in that election.

21   Q.   And how do you know he presented his father's voter

22   registration card?

23   A.   I believe he told me that, and he provided the voter

24   registration certificate to us during an interview.

25   Q.   Again, you had a deposition in this case.  Correct?

1    A.  Yes, sir.

2    Q.  And you believe it's important to tell the truth, or you did

3    tell the truth during your deposition.  Correct?

4    A.  Yes, sir, I did.

5    Q.  And during the deposition didn't you tell me that you

6    learned that information by looking at the indictment papers,

7    that it would be included in the indictment papers that he used

8    his father's voter registration card?

9    A.  You could find -- yes, I believe I did say that.

10          MR. GEAR:  Permission to hand something to the other

11   counsel.

12          THE COURT:  Yes, go right ahead.  Thank you, sir.

13          MR. GEAR:  Could you present Exhibit 240, please?

14          JUDGE WILKINS:  Whose Exhibit 240?

15          MR. GEAR:  It's DE 240.

16   BY MR. GEAR:

17   Q.  I'll give you a chance to look at this document before I ask

18   you any questions.

19   A.  Yes, sir.

20   Q.  Is this the indictment document that you were referring to

21   regarding Jack Carol Crowder?

22   A.  Yes, sir, I believe it is.

23          MR. GEAR:  Could you pull up the last paragraph,

24   please.

25

1    BY MR. GEAR:

2    Q.  I would ask you to take a look at the paragraph that's been

3    called up and tell me if you see anywhere in that paragraph that

4    he used his father's voter registration card to vote?

5    A.  No, sir, I don't see it in there.

6    Q.  So you could be incorrect on that point.  Right?

7    A.  As far as my deposition, I was incorrect.  I said that I

8    thought the one place it may be would be in the indictment.

9    Q.  But it's your testimony today that he told you that?

10   A.  It is my testimony today that we interviewed Jack Carol

11   Crowder during this investigation, and Jack Carol Crowder

12   advised us that he --

13   Q.  Can you --  I'm sorry.  Were you done?

14        MR. SWEETEN:  Your Honor, the witness wasn't finished

15   responding t0 --

16        THE COURT:  He's letting him finish, I promise,

17   Mr. Sweeten.

18   A.  Yes, sir, during the investigation, he advised us that he

19   used his father's voter registration certificate and he gave it

20   to us.

21   BY MR. GEAR:

22   Q.  Now, you've referenced your spreadsheet, which is

23   Exhibit 41, I believe?

24   A.  41, 42, and 43.

25   Q.  That information is not contained anywhere within your

1    spreadsheet, is it?

2    A.  No, sir.

3    Q.  During your direct testimony you also talked about

4    noncitizen voting.  Do you recall that?

5    A.  In today's?

6    Q.  Yes.

7    A.  I don't believe I've discussed noncitizens voting today.

8    Q.  Let me ask you this question:  Based on the referrals to the

9    Office of the Attorney General, between 2002 and 2012, how many

10    cases of noncitizen voting can you identify?

11    A.  I can think of a few, probably three or four.

12    Q.  During your deposition did you indicate that you had three

13    that you could call to mind?

14    A.  That seems correct.

15    Q.  In discussing specifically those three cases, the first case

16    would be Debra Briseno, which was a 2006 primary election.

17    Isn't that correct?

18    A.  Yes, sir, Debra Briseno was a defendant that was charged as

19    a result of elections misconduct in the 2008 primary election.

20    Q.  And she was a voter registrar during that election, wasn't

21    she?

22    A.  Yes, sir.  She was a city councilperson for the City of

23    Port Lavaca, and had signed up as a deputy voter registrar for

24    the 2008 primary.

25    Q.  And that case did not result in any charges to noncitizens.

1    Isn't that accurate?

2    A.  No, sir, no noncitizens were charged in that criminal

3    investigation.

4    Q.  The second case that, I believe, you have in mind is the

5    2008 Hidalgo County election.  Is that accurate?

6    A.  I believe so, yes.

7    Q.  And you don't actually know the facts of that case, do you,

8    all of the facts?

9    A.  I'm not aware of all of the facts because our office only

10    assisted in a portion of the investigation that was conducted by

11    the local district attorney's office.

12    Q.  And as you sit here today, you can not testify before the

13    court that there were any noncitizens charged in that case, can

14    you?

15    A.  No, sir.

16    Q.  The third case, and I believe this is the final case that

17    you are able to identify, is the 2010 Dallas County election.

18    Isn't that right?

19    A.  That is correct, sir.  That was the 2010 primary election in

20    Dallas, Dallas County.

21    Q.  And that case involved by-mail ballot fraud.  Correct?

22    A.  That case involved a number of allegations, I think, maybe

23    10 allegations of different types.  One of the allegations was

24    mail-in ballot fraud; others were illegal voting.

25    Q.  Well, it's true, is it not, that there were no noncitizens

1     charged in the 2010 Dallas County election?

2     A.   That is correct.   There were no charges of noncitizen

3     illegal voting.

4     Q.   And you have no knowledge of any other cases where

5     noncitizens were alleged to have voted.   Isn't that correct?

6     A.   I really only know the cases that are referred to our

7     office.

8              JUDGE COLLYER:   But the answer to the question is no,

9     you know of none?

10             THE WITNESS:   Yes, Your Honor, I don't know of any

11    others.

12             JUDGE COLLYER:   No, you don't know of any involving

13    noncitizen illegal voting?

14             THE WITNESS:   Yes, Your Honor, I do not know of any

15    others involving noncitizen U.S. -- or noncitizens voting.

16             JUDGE COLLYER:   Let me back up.   The 2010 Dallas

17    primary, you just said that didn't include any charge of

18    noncitizen voting.   Right?

19             THE WITNESS:   That is correct, Your Honor.

20             JUDGE COLLYER:   And the 2008 Hidalgo County election,

21    you said you can't say that there was any noncitizen voting in

22    that case?

23             THE WITNESS:   That's correct, Your Honor.

24             JUDGE COLLYER:   And the voter registrar case involving

25    somebody named Briseno, that didn't include any charge about

```
 1    noncitizens?
 2            THE WITNESS:  No, noncitizens were charged in that
 3    case.
 4            JUDGE COLLYER:  Okay.  So those are the three cases I
 5    thought you identified during your deposition as possibly
 6    involving noncitizens.
 7            THE WITNESS:  Yes, Your Honor.
 8            JUDGE COLLYER:  Are there others?
 9            THE WITNESS:  There are others that we conducted
10    investigations, but the allegations were unsubstantiated.
11            JUDGE COLLYER:  Okay.  So there are no noncitizen
12    voting cases in which the allegations were substantiated?
13            THE WITNESS:  If I may, Your Honor, in the Dallas 2010
14    case, and in the Hidalgo County case -- I'm sorry, the
15    Calhoun County case involving deputy voter registrar, it was
16    determined that noncitizens had voted in those elections;
17    however, they lacked the mens rea, the intentionally or
18    knowingly, for them to be criminally charged.
19            JUDGE COLLYER:  Okay.  Go ahead.
20    BY MR. GEAR:
21    Q.  So to sum that up, as far as the Attorney General's Office
22    is concerned of Texas, there's been no cases where noncitizen
23    voters have been charged for voter impersonation.  Isn't that
24    accurate?
25    A.  Yes, sir.
```

1    Q.   Now, the Attorney General's Office for Texas has had

2    jurisdiction over Election Code violations since --

3              JUDGE WILKINS:   I'm sorry, I need to interrupt for a

4    second.   When you said that there was a lack of *mens rea* and so

5    there were no charges brought, what did you mean by "a lack of

6    *mens rea*"?

7              THE WITNESS:   The noncitizens in this case were

8    approached by deputy voter registrars and told that if they had

9    a driver's license, that they were eligible to vote in an

10   election.   And these deputy voter registrars, for the purposes

11   of Texas law, are considered public servants.   So the voters

12   were unaware that they were not eligible to vote in the election

13   as defined in the illegal voting statute.

14             JUDGE WILKINS:   So they did not intend to break the

15   law, is what you're saying?

16             THE WITNESS:   Yes, Your Honor.

17             JUDGE WILKINS:   All right.   Thank you.

18   BY MR. GEAR:

19   Q.   Are you aware of whether or not the noncitizens that were --

20   the allegations of noncitizens in those cases, are you aware of

21   whether or not those noncitizens had driver's licenses?

22   A.   I can say in the Debra Briseno case, I believe they did have

23   Texas driver's licenses.   I'm not certain about the Dallas case.

24   Q.   So the previous question I asked, and I'm sorry, I didn't

25   hear the answer, the Office of the Attorney General had

1    jurisdiction, or has jurisdiction, and has had jurisdiction over

2    Election Code violations since 1985.  Correct?

3    A.  Yes, sir, I believe the Office of the Attorney General has

4    that concurrent jurisdiction with local prosecutors for quite

5    some time.

6    Q.  And the Office of the Attorney General has made

7    Election Code violations a priority of the office.  Isn't that

8    correct?

9    A.  Yes, sir, it is a priority amongst many.

10   Q.  And isn't it a fact that pursuant to Texas Election Code

11   annotated 273.001, local prosecutors and DA's are required to

12   deliver notice to the Secretary of State within 30 days of

13   beginning an Election Code investigation?  Isn't it true?

14   A.  I believe that's correct.

15   Q.  And that notice also requires that they include the date on

16   which the election was held.  Isn't that also true?

17   A.  I would have to look at the statute to be absolutely

18   certain.

19   Q.  You were asked about the referral system, but isn't it, in

20   fact, true that the Office of the Attorney General has the

21   authority to investigate an Election Code on their own

22   initiative?

23   A.  Yes, sir, if we have reason to believe an offense occurred.

24   However, our policy, we restrict ourselves to just referrals.

25   Q.  And they have the authority to do that even without a

1  referral if they believe a violation has occurred.  Isn't that

2  correct?

3  A.  We have the legal authority under Chapter 273 to do so, yes,

4  sir.

5  Q.  Pursuant to Texas Election Code annotated 273.001, again,

6  the Office of the Attorney General has the authority to direct

7  county and district attorneys to conduct or assist the Office of

8  the Attorney General in investigations.  Isn't that correct?

9  A.  I believe that's the statute, yes, sir.

10  Q.  The Office of the Attorney General even has the authority to

11  direct the Department of Public Safety to conduct investigations

12  if they so choose.  Isn't that correct?

13  A.  Yes, sir, I believe, that's accurate.

14  Q.  You indicated during your direct that voter impersonation at

15  the polls is difficult to detect.  Do you recall that testimony?

16  A.  Yes, sir, I do.

17  Q.  Voter impersonation is similar to any other crime, in that

18  it involves proof beyond a reasonable doubt.  Correct?

19  A.  Yes, sir.

20  Q.  You would agree that anyone at the polling place has the

21  ability to detect in-person voter impersonation.  Correct?

22  A.  I'm sorry, could you ask the question again?

23  Q.  There are a lot of people in the polling place on election

24  day generally.  Correct?

25  A.  No, sir, there's a restricted number.  Only the voters

1    representing themselves to vote, and then also the poll workers

2    who are present during that election.

3    Q.  Let me rephrase that question for you.  There are poll

4    workers?

5    A.  Yes, sir.

6    Q.  Poll watchers?

7    A.  Yes, sir.

8    Q.  Voters?

9    A.  Yes, sir.

10   Q.  And there's any other host of individuals that may come and

11   go from the polling place at any given time.  Correct?

12   A.  Yes, sir.

13   Q.  And so my question to you was:  Any of those individuals

14   have the ability to detect in-person voter impersonation.

15   Correct?

16   A.  I think I said in my deposition and also here today that I

17   think the only way it will be detected is if the person actually

18   has a personal relationship and knows the voter who is

19   presenting the false documents.

20   Q.  Well, in fact, one of the voter impersonation cases that you

21   have before the Office of the Attorney General was detected by a

22   DPS trooper who was not in the polling place at the time.

23   Correct?

24   A.  Yes, sir, it was detected sometimes afterwards.

25   Q.  And there's also another in-person voter impersonation case

1    that was detected by a citizen group who was not necessarily in

2    the polling place at the time.  Correct?

3    A.  Yes, sir, it was.

4    Q.  And regarding the evidence in a polling place, isn't it a

5    fact that by statutory law, the Office of the Attorney General

6    has the ability to impound evidence following an election?

7    A.  Yes, sir.  The Texas Attorney General's Office or local

8    district or county attorney may request from a district judge in

9    state court the ability to impound election records.

10   Q.  And I also want to ask you, isn't it a fact that the Office

11   of the Attorney General has a long-standing policy of working

12   with local law enforcement, district attorneys, and county

13   attorneys, in investigating Election Code violations?

14   A.  We try to work with local law enforcement and local

15   prosecutors on all types of cases, including election cases.

16   Q.  And you often work in conjunction with local attorneys and

17   DA's in investigating and sometimes prosecuting Election Code

18   violations.  Isn't that correct?

19   A.  Yes, sir.  The Jack Carol Crowder is an example of that

20   case.  That was actually prosecuted with the assistance of the

21   Harris County District Attorney's Office.

22   Q.  So the answer to that was yes?

23   A.  Yes, sir.

24         MR. GEAR:  If I could have one moment, please.

25         JUDGE COLLYER:  Yes, sir.

1    BY MR. GEAR:

2    Q.   Isn't it true that the criminal charges or the criminal

3    portion of SB14 has already been precleared and is currently in

4    effect?

5    A.   I don't know that, sir.

6    Q.   Would you agree that the current laws as they're in place

7    act as a deterrent in preventing in-person voter impersonation?

8         MR. SWEETEN:   Objection, Your Honor.   Outside the

9    scope, and the court didn't allow me to ask this question.

10        JUDGE COLLYER:   Yeah, I think more the latter, but I

11   think this witness can't make that conclusion.

12        MR. GEAR:   I have nothing further.

13        JUDGE COLLYER:   Thank you very much, Mr. Gear.   Oh I'm

14   sorry, sir, go right ahead.

15        MR. ROSENBERG:   Thank you.   I'll be very quick.

16   Ezra Rosenberg for the intervenor defendants.

17   BY MR. ROSENBERG:

18   Q.   Major Mitchell, nice to see you again.

19   A.   Yes, sir.

20   Q.   Very quickly, you started out -- in response to

21   Mr. Sweeten's questions you said there were six cases of voter

22   impersonation.   But just to make sure we all know what we're

23   talking about, one was Ponce, which was an absentee ballot case.

24   Right?

25   A.   That is correct, sir.

1  Q.  One of them was Ms. Almanza, the mother who, herself, didn't

2  try to impersonate anyone.  Right?

3  A.  No, sir, she was charged as a party to the offense of

4  illegal voter.

5  Q.  Right.  But that's one of your five?

6  A.  Yes, sir.

7  Q.  But she, herself, didn't try to impersonate anyone.  She

8  aided and abetted, allegedly, her son.  Is that correct?

9  A.  Well, she's been convicted of that, yes, sir.

10  Q.  But again, so we're really dealing with four allegations of

11  individual people who went to a polling booth, supposedly - I'll

12  get to two more - and tried to impersonate someone else, not

13  five.  Isn't that correct?  Because Mrs. Almanza didn't do that?

14  A.  That's correct.

15  Q.  Then of the four, we have Ms. McMillan, who was the election

16  worker herself, who kind of cooked the books before the polls

17  opened.  Right?

18  A.  Yes, sir, that's correct.

19  Q.  So then we're down to three.  And the other one, M.C., we've

20  been calling her, is a woman who has been declared mentally

21  incompetent and used photo IDs that she had to identify herself

22  at the polling place.  So she didn't try to impersonate anyone

23  but herself.  Right?

24  A.  She used multiple identities, including her deceased sister.

25  Q.  But they were all photo IDs with her photo on it.  Correct?

```
 1    A.   I'm not sure which type of document she used at the polling
 2    place.  She had driver's license and she also had voter
 3    registration certificates and all the different identities.
 4    Q.   But sitting here today, you can't say one way or the other.
 5    A.   No, sir.
 6    Q.   Then we're down to two, Crowder and Mr. Almanza.  Correct?
 7    A.   Yes, sir.
 8    Q.   And that's over 10 years from 2002 to 2011, two people whom
 9    you're saying might have been prevented from impersonating
10    someone else by SB14's photo ID requirements.  Right?
11    A.   These are two cases of the cases that have been referred to
12    our office.
13    Q.   And those are the only ones you know of that you've
14    testified to.  Is that correct?
15    A.   With the exception of the case I've become aware of in
16    Tarrant County.
17    Q.   I understand.  The one you read about in the newspaper.
18    Correct?
19    A.   Yes, sir.
20    Q.   Then prior to 2002, you're not aware of any others.  Isn't
21    that correct?
22    A.   That's correct, sir.
23    Q.   And just because a crime is difficult to detect doesn't
24    necessarily mean people are committing it.  Isn't that correct?
25    A.   I'm sorry, could you state that one more time?
```

1    Q.   Sure.   Just because a crime may be difficult to detect

2    doesn't necessarily mean that people are committing it.   Isn't

3    that correct?

4    A.   I would agree.

5    Q.   And in fact, in-person voter impersonation in the polling

6    booth is a crime that, by definition, is committed in broad

7    daylight in front of people.   Right?

8    A.   In-person voter impersonation would be in front of somebody,

9    that's correct.

10   Q.   And in fact, it's committed, if committed at all, in front

11   of people who are looking out for that kind of thing, isn't it?

12   A.   Well, I don't know if I would agree with that statement

13   completely.

14   Q.   Well, poll watchers, election workers, aren't they supposed

15   to be looking out for that sort of thing?

16   A.   The job of a poll worker who is accepting voters is to

17   verify the voter's eligibility to vote in an election.   They do

18   not have the ability to verify their identity.   An example would

19   be if someone came into the polling place with a bank statement,

20   which is currently authorized under Texas law.

21   Q.   But in fact, you've already talked about at least one of

22   your cases that was, in fact, spotted by a poll worker.   Wasn't

23   that so?

24   A.   That is correct, sir.

25        MR. ROSENBERG:   I have no further questions.   Thank

```
 1   you.
 2              JUDGE COLLYER:  Thank you, sir.  Is there any redirect?
 3              MR. SWEETEN:  Yes, Your Honor, short redirect.
 4                        REDIRECT EXAMINATION
 5   BY MR. SWEETEN:
 6   Q.  Of all the types of voter fraud that you investigate as an
 7   investigator, which is the most difficult to detect?
 8   A.  I would think in-person voter impersonation.
 9   Q.  With respect to the Almanza case, can you tell us who has
10   been charged in that fact pattern that you described earlier in
11   your testimony?
12   A.  Both Lorenzo Almanza and Reyna Almanza were charged with
13   illegal voter impersonation, and then Reyna Almanza has been
14   convicted by Brooks County court for illegal voting, voting
15   impersonation.
16   Q.  And the other case is pending.  Is that correct?
17   A.  Yes, sir.
18              MR. SWEETEN:  No further questions.
19              JUDGE COLLYER:  Well, all right, then, you are excused.
20   Thank you very much, Major.
21              MR. FREDERICK:  Matthew Frederick for the State of
22   Texas.  The State calls Senator Thomas Williams.
23              (Oath administered by Courtroom Clerk.)
24   (SENATOR THOMAS WILLIAMS, PLAINTIFF witness, having been duly
25                   sworn, testified as follows:)
```