**Colby Beuck**

| | |
|---|---|
| From: | Ann McGeehan [AMcGeehan@sos.state.tx.us] |
| Sent: | Friday, February 25, 2011 1:24 PM |
| To: | Patricia Harless; Colby Beuck |
| Cc: | John Sepehri |
| Attachments: | Senator Fraser 1-25-11.pdf; EAC letter on informal advice0001.pdf; Indiana EAC Letter0001.pdf |

| | |
|---|---|
| Follow Up Flag: | Follow up |
| Flag Status: | Flagged |

| | |
|---|---|
| Categories: | ORR |

Dear Representative Harless:

Attached are the three letters that we mentioned concerning the availability of federal HAVA dollars for a statewide voter education effort on the new ID requirements. The two other items you asked about was numbers of complaints we have received about possible voter fraud, and the number of registered voters that do not have a driver's license or personal identification card issued by DPS.

We are currently compiling copies of all written complaints, complaints registered by phone and by email and we expect to be able to deliver them to your office before COB today. The complaints by phone and email are considerably more informal than the written complaints we receive so it is harder to categorize them. However, we can tell you that since 2007, this office has referred 72 complaints to OAG. Of those referrals, 9 involved potential voter impersonation. However, please note that even if one assumes voter impersonation efforts would be readily detected, we cannot meaningfully draw any conclusions from our referrals because election fraud may be reported directly to local prosecutorial authorities or the OAG.

Lastly, concerning the numbers of voters who have not been issued TDL/personal id cards by DPS, we are still working with our IT Dept to analyze that data, and hope to have an analysis by Monday.

I hope this is helpful to you, and if you need to reach me over the weekend, you can call my personal cell phone, which is 512-619-7587.

Ann


Ann McGeehan
Director of Elections
Office of the Texas Secretary of State
amcgeehan@sos.state.tx.us
512-463-9871



92

2:13-cv-193
09/02/2014
DEF0871
exhibitsticker.com

TX_00007187



**Esperanza "Hope" Andrade**
SECRETARY OF STATE
State of Texas

January 25, 2011

The Honorable Troy Fraser
Texas Senate
PO Box 12068-Capitol Station
Austin, Texas 78711

Dear Senator Fraser:

You have inquired about the availability of Help America Vote Act (HAVA) federal funds to implement the statewide voter education program that Senate Bill 14 requires my office to undertake. As you know, my office has estimated that an educational program would cost $2,000,000. Please be advised that the state has sufficient HAVA funds allocated for voter education and poll worker training that would cover this estimated expenditure.

Based on conversations that my staff has had with the United States Election Assistance Commission (EAC), which oversees state HAVA spending, EAC would approve the use of the state's HAVA funds for a statewide effort to inform voters of the proposed SB 14 photo identification standards. While we have received this informal guidance, we are also seeking a formal opinion from the EAC for further confirmation.

Please do not hesitate to contact me should you have any further questions.

Respectfully,

Hope Andrade

Post Office Box 12697, Capitol Station
Austin, Texas 78711-2697
512-463-5770

HIGHLY CONFIDENTIAL

TX_00007188



**U.S. ELECTION ASSISTANCE COMMISSION**
1201 New York Ave. NW – Suite 300
Washington, DC 20005

February 7, 2011

Hope Andrade, Secretary of State
Office of the Secretary of State
P.O. Box 12887
Austin, TX 78711-2887

Dear Secretary Andrade:

Your staff recently contacted the U.S. Election Assistance Commission (EAC) to inquire about the availability of Help America Vote Act (HAVA) funds to educate voters concerning voting procedures. In response to these questions. EAC cited statutorily allowable uses of two main types of HAVA funds. I have provided more information about these statutorily allowable uses below.

EAC's citation to statutorily allowable uses was not intended to be a legal analysis or interpretation and may not be relied upon should the proposed use be questioned during an audit. The sole means for EAC to issue funding guidance concerning specific funding questions is through EAC's Advisory Opinion Process. Should you wish to request an advisory opinion, you can find the procedures for doing so at www.eac.gov.[1]

For your information. generally, the two main sources of HAVA funds available to States are section 101 funds and section 251 funds.[2] Allowable uses of section 101 funds include: (1) complying with the requirements under title III; (2) improving the administration of elections for Federal office; (3) educating voters concerning voting procedures, voting rights. and voting technology; (4) training election officials, poll workers, and election volunteers; (5) developing the State plan for requirements payments to be submitted under part 1 of subtitle D of title II; (6) improving, acquiring, leasing, modifying. or replacing voting systems and technology methods for casting and counting votes; (7) improving the accessibility and quantity of polling places, including providing physical access for individuals with disabilities, proving nonvisual access for individuals with visual impairments, and providing assistance to Native Americans, Alaska Native citizens, and to individuals with limited proficiency in the English language; and (8) establishing toll-free telephone hotlines that voters may use to report

---

[1] Because we are currently without a quorum, EAC is unable to issue a formal advisory opinion at this time. Requests for advisory opinions may be submitted and will be considered when a quorum is reestablished. A requested expenditure. if not a capital improvement, does not require pre-approval. but may be subject to an audit.

[2] Section 102 funds were provided to replace punch card and lever voting machines. These funds are no longer available for use.

HIGHLY CONFIDENTIAL

TX_00007189

possible voting fraud and voting rights violations, to obtain general election information, and to access detailed automated information on their own voter registration status, specific polling place locations, and other relevant information. Allowable uses of section 251 funds include meeting the requirements of title III. A State may use a requirements payment to carry out other activities to improve the administration of elections for Federal office if the State certifies to the Commission that the State has implemented the requirements of title III; or the amount expended with respect to such other activities does not exceed an amount equal to the minimum payment amount applicable to the State under section 252(c).

I hope this clarifies the informal and non-binding nature of any discussion concerning allowable uses EAC may have had with your staff. If I can provide any additional information, please feel free to contact me at (202) 566-3113 or mevans@eac.gov.

Sincerely,

Monica Holman Evans,
Acting Director
Grants Management and Payments

TX_00007190



U.S. ELECTION ASSISTANCE COMMISSION
1225 New York Ave. NW – Suite 1100
Washington, DC 20005

December 20, 2005

Mr. Joseph E. McLain
HAVA Administrator
Office of the Secretary of State
The State House
Indianapolis, IN 46204

RE:   Request for guidance on the use of Help America Vote Act (HAVA) funds

Dear Mr. McLain:

Thank you for your letter of September 26, 2005 asking various questions regarding the
use of HAVA funds.  As you can imagine, several of your questions required research
and thus resulted in the delay of this response.  Your letter asked questions concerning
five situations or scenarios.  Each will be addressed in turn, below.

In many of your questions, you asked whether the proposed uses of HAVA funds would
result in federal audit findings. As you are aware, there are different audits authorized by
Section 902 of HAVA. EAC is responsible for only the regular audits and special audits
authorized under that Section.  Generally, audits performed for the Election Assistance
Commission (EAC) will determine (1) if a state used the funds distributed under HAVA
for purposes authorized by HAVA and in accordance with Office of Management and
Budget Circular A-87, *Cost Principles for State, Local, and Indian Tribal Governments*,
and (2) whether the state managed HAVA funds in accordance with the Common Rule,
*Uniform Administrative Requirements for Grants and Cooperative Agreements to State
and Local Governments.*  Thus, EAC can not prejudge whether even the allowable use of
HAVA funds would result in an audit finding.  However, to the extent possible, we have
commented on whether the uses of funds as described in your request are allowable under
HAVA and applicable federal guidelines.

1.   *De minimus* use of HAVA Office Equipment

In this section of the letter, you identified certain situations in which equipment would be
purchased by the State to fulfill HAVA requirements and that the same equipment might
be used from time to time to fulfill other non-HAVA related duties of the Office of the

HIGHLY CONFIDENTIAL

TX_00007191

Mr. Joseph E. McLain
Page 2 of 6

Secretary of State. There are actually two issues related to this question. First, the issue of approval of the use of HAVA funds for capital expenditures. And, second, whether the use of HAVA funds is appropriate to support even de minimus uses of such equipment by the State for non-HAVA related purposes.

Pursuant to OMB Circular A-87, the cognizant agency for the funding program, in this case EAC, has the authority to preapprove or waive the right to preapprove the purchase of any capital equipment (generally equipment with a unit cost of $5,000 or more) with grant funds. (See Attachment B, 15. Equipment and other capital expenditures). I will assume that by your asking about the use of funds for the purchase of equipment that this is also a request for either preapproval or waiver. In keeping with its previous policy, EAC waives its right to preapprove the purchase of equipment.

OMB Circular A-87 also makes it clear that all costs associated with the funding program must be both allowable and allocable to the program. In this case, the purchase of equipment is clearly allowable as it necessary to meet your HAVA requirements. However, the question is whether the entire cost of the equipment is allocable to the HAVA program. From your description, if the equipment may/will be used for other purposes, the entirety of this cost is not allocable to the HAVA funding program. The State has two options at this point. The State can allocate only that portion of the equipment purchase cost that will go to benefit the state's HAVA program.

Alternatively, the state may submit an indirect cost rate proposal in which it identifies and supplies information regarding direct and indirect costs of operation. Circular A-87 and ASMB C-10, *Cost Principles and Procedures for Developing Cost Allocation Plans and Indirect Cost Allocation Plans and Indirect Cost Rates for Agreements with the Federal Government*, provide guidance on negotiating indirect costs rates. An indirect cost rate provides a state with the basis for allocating administrative costs that are inextricably linked to other services provided by the Secretary of State such that they cannot easily be segregated into those costs that directly benefit the HAVA funding program and those that do not. For example, the cost of printers and copy machines that are used for both Federal and State election activities and that are below the State's threshold for capitalization may be expensed and included in the indirect cost pool. On the other hand, if you include an asset in the fixed capital assets section of your balance sheet and depreciate the asset, you should consider the asset as a capital expenditure and include only depreciation expense in the pool.

If the State desires to submit an indirect cost proposal, I would ask you to contact Peggy Sims, Election Research Specialist, to obtain further information on how to submit an indirect cost proposal.

2.     **Indiana Election Worker Training and Voter Education Programs concerning Indiana election laws applicable to federal elections, but not necessarily specifically related to HAVA.**

HIGHLY CONFIDENTIAL

TX_00007192

Mr. Joseph E. McLain
Page 3 of 6

In this section, you inquired about the use of HAVA funds for voter education and election administrator training regarding Indiana's new statute concerning voter identification. You specifically stated that you intend to use payments from Title I, Section 101 and Title III, Section 251 for this purpose.

Before I answer the specific question at hand, let me provide some background information on the sources and uses of HAVA funds. There are three sources of funding provided by HAVA for use to improve the administration of federal elections and to meet the requirements of Title III of HAVA (specifically to implement provisional voting, to improve voting technology, to develop and implement at voter registration database, to provide information to voters, and to verify and identify voters according to the procedures set forth in HAVA). Those sources are Section 101, Section 102 and Section 251 funds. The funds received by a state under Section 101 can be used for the following purposes:

A. Complying with the requirements under Title III.
B. Improving the administration of elections for Federal office.
C. Educating voters concerning voting procedures, voting rights, and voting technology.
D. Training election officials, poll workers, and election volunteers.
E. Developing the State plan for requirements payments to be submitted under part 1 of subtitle D of Title II.
F. Improving, acquiring, leasing, modifying, or replacing voting systems and technology and methods for casting and counting votes.
G. Improving the accessibility and quantity of polling places, including providing physical access for individuals with disabilities, providing nonvisual access for individuals with visual impairments, and providing assistance to Native Americans, Alaska Native citizens, and to individuals with limited proficiency in the English language.
H. Establishing toll-free telephone hotlines that voters may use to report possible voting fraud and voting rights violations, to obtain general election information, and to access detailed automated information on their own voter registration status, specific polling place locations, and other relevant information.

Section 102 funds can be used ONLY for the purposes of replacing punch card and lever voting systems with voting systems that comply with Section 301(a) of HAVA. Last, Section 251 funds can be used to implement any of the Title III requirements, and to improve the administration of elections for Federal office when one of two conditions is met: (1) the state has met the requirements of Title III; or (2) the state notifies EAC of its intention to use an amount not to exceed the amount of the minimum payment that the state either did or could have received under the Section 252 formula for that purpose. The uses of Section 251 funds must also be accounted for in the state's plan as originally submitted or later amended.

HIGHLY CONFIDENTIAL

TX_00007193

Mr. Joseph E. McLain
Page 4 of 6

The facts presented suggest that the funds would be used to educate voters concerning one element of the procedure for voting, that is the provision of an approved form of identification. This would be allowable using Section 101 funds. Similarly, Section 101 funds can be used to train election officials, poll workers and election volunteers concerning this procedure for voting. However, the use of Section 251 (Title III Requirements Payments) for this purpose is much more limited. First, Section 251 funds are limited to meeting the requirements of Title III and improving the administration of federal elections, after the requirements of Title III are met or when the amount is less than the minimum payment that the State would have received. If Indiana intends to use Section 251 funds, it must certify that intention to EAC and make any necessary changes to its state plan that are created by this distribution of funds. Even then, Indiana can only use Section 251 funds to finance education efforts that will *improve the administration of elections for federal office.* Thus, to the extent that the educational efforts would benefit the administration of a state or local election they cannot be financed with Section 251 funds.

### 3.     Voting system reimbursements

### A.     State Reimbursements to Counties for Voting System Purchases to Comply with HAVA Section 301(a).

In this section, you requested any guidance that EAC could provide with regard to whether the use of HAVA funds for the purchase of the AutoMARK voting system would raise an issue concerning compliance with HAVA or for federal audit purposes. As far as compliance with HAVA Section 301(a) is concerned, EAC has issued guidance which you have identified that presents EAC's position on this matter. The Department of Justice is responsible for enforcing compliance with this provision of HAVA. I would refer you to Mr. Hans von Spakovsky of the Department of Justice, Civil Rights Division, for additional information on compliance efforts.

### B.     County use of funds following state reimbursement.

All HAVA funds disbursed under Title II, specifically sections 251 et seq., must be used to meet the requirements of Title III (purchasing compliant voting equipment, establishing and implementing a statewide voter registration list, implementing provisional voting, providing voter information, and identifying and verifying voters pursuant to the requirements of section 303) or to improve the administration of elections for federal office. Your question sets forth the specific circumstance that a county has already made purchases of voting equipment prior to receiving the payment of HAVA funds distributed by the state. Furthermore, the county has fully satisfied the payment obligation to the voting system vendor.

HAVA contemplates reimbursement payments to states that acted proactively to acquire voting systems that meet the requirements of HAVA prior to the availability of funding under HAVA. This concept of reimbursement applies to the county or other local

HIGHLY CONFIDENTIAL

TX_00007194

Mr. Joseph E. McLain
Page 5 of 6

government unit that purchases voting equipment in lieu of such purchases on a state level. HAVA funds may reimburse and replace county funds that were obligated after October 29, 2002, (or obligated prior to January 1, 2001 under a multi-year contract) in advance of the receipt of federal funds. Thus, if the county has already earned those reimbursement payments, it can re-appropriate the funds to uses it deems proper, subject to any conditions established by the State in granting funds to counties.

### C.    County Reimbursement for Vendor Voting System "Maintenance Fees."

In this section, you question whether maintenance fees are allowable expenses under HAVA. We have previously considered this question and found that either Section 101 or Section 251 funds can be used for expenses related to maintenance of voting systems. The only limitation is that Section 251 funds can be used only in an amount that would be allowable to "improve the administration of elections for federal office." Under Section 251(b), a state is limited to the amount that it would have been entitled to as a minimum payment until the state meets the requirements of Title III.

### D.    County Reimbursement from both Section 102 and Title III monies for "accessible voting systems."

In this section, you explain that there are two tiers of counties under the HAVA funds distribution plan. Counties that replaced punch card or lever voting systems and have received payments from the state for the purchase of optical scan voting equipment. Some of those counties have also purchased DRE voting equipment and have received additional funds for the purchase of those systems.

You ask whether additional payments to other counties, particularly those that have not purchased DREs, would raise an issue under HAVA or federal audit guidelines. HAVA Section 251 funds can be used to purchase voting equipment that meets the requirements of Section 301(a). There are two considerations as to whether Section 251 funds can be used to purchase these optical scan voting systems. First, do the systems meet the requirements of Section 301(a)(1), (2), (4) and (5)? While HAVA requires at least one accessible voting system per polling place, it is permissible to use HAVA funds to purchase systems that meet the other requirements of Section 301(a) to serve as the non-accessible systems that will be used in the polling places. This does not in any way alter or alleviate the responsibility to have a disabled accessible voting system in each polling place. The second consideration is whether the distribution of these funds is in keeping with Indiana's state plan currently on file with EAC. If the payments do not comport with the current state plan and such payments would constitute a material change to the plan as adopted, the plan must be altered in keeping with the process set forth in HAVA prior to making the proposed payments.

### 4.    Affirmative Action Plan Requirements for Federal Grant Recipients

In this section, you request an opinion as to whether the affirmative action provisions of Executive Order 11246 apply to the State of Indiana by virtue of the fact that it received

TX_00007195

Mr. Joseph E. McLain
Page 6 of 6

more than $65 million from the federal government under HAVA. The provisions of Executive Order 11246 apply to contractors and subcontractors with the federal government. The funds provided by EAC under HAVA do not meet the definition of a contract as stated in the Federal Acquisition Regulations, Part 2.101, and as defined by the General Accountability Office in its Principles of Federal Appropriations Law (GAO Red Book, Volume II, page 10-10).

**5.      Local Jurisdiction non-compliance with federal HAVA requirements**

In this section, you request an opinion as to what types of penalties might be imposed against the State of Indiana if a county were found as non-compliant with HAVA. The Department of Justice is given enforcement authority over Title III of HAVA. Thus, to the extent that any claim, law suit, or request for remedies including penalties would be sought against the State of Indiana for its failure or one of its county's failure to comply with HAVA, that action would be brought by the Department of Justice. I would refer you to Mr. Hans von Spakovsky with the Department of Justice for information regarding enforcement actions for non-compliance with Title III of HAVA.

To the extent that there are noncompliant precincts after the deadline for replacement of punch card and lever voting systems under Section 102 of HAVA, the remedy would be enforced by the EAC. The state would be required to repay a pro rata portion of the funds received by the state. That pro rata portion would be determined by multiplying the percentage of noncompliant precincts with the amount of funding originally received under Section 102.

Thank you for your efforts to implement HAVA's election reforms. If you have any additional questions regarding the use of HAVA funds, please feel free to contact me.

Sincerely,

Juliet E. Thompson
General Counsel

cc:      Gracia Hillman, Chair                    Paul DeGregorio, Vice Chairman
         Ray Martinez, Commissioner              Donetta Davidson, Commissioner
         Tom Wilkey, Executive Director          Peggy Sims, Election Research Specialist

HIGHLY CONFIDENTIAL

TX_00007196

## Colby Beuck

| | |
|---|---|
| From: | Ann McGeehan [AMcGeehan@sos.state.tx.us] |
| Sent: | Friday, February 25, 2011 4:47 PM |
| To: | Colby Beuck |
| Subject: | FW: Number of voters that do not have an associated TDL/SSN |

| | |
|---|---|
| Follow Up Flag: | Follow up |
| Flag Status: | Flagged |

Categories:    ORR

**Question: What is the number of voters that do not have a Texas Drivers License/Personal Identification Number or Social Security Number in the statewide voter database?**

Prior to 1/1/2006, drivers license and social security numbers were optional fields on the voter registration application. Since HAVA became effective on 1/1/2006, all new voter applicants must provide a driver's license or personal id number issued by DPS or if they have not been issued a driver's license or personal identification card, then they must provide the last four digits of their social security number. If the applicant has neither the drivers license, personal identification card or the SSA number, then they must state that fact and they are flagged as having to present ID when they present themselves for voting. Below are two sets of numbers. The first set of numbers reflects new registrations since January 2006 and shows what identification number that new applicants provided. The second set of numbers reflects the entire statewide file of registered voters and shows which identification numbers were provided by applicants before and after January 2006.

**January 1, 2006 through December 31, 2010**

| | |
|---|---|
| Number of voters who registered with a TDL/ID: | 2,334,281 |
| Number of voters who registered with a SSN: | 294,142 |
| Number of voters who registered with both: | 1,312,638 |
| Number of voters who registered without either: | 34,506 |

**All voters in the state:**

| | |
|---|---|
| Number of voters with a TDL/ID: | 5,215,386 |
| Number of voters with a SSN: | 2,124,570 |
| Number of voter with both: | 4,624,334 |
| Number of voters with neither number: | 690,887 *** |

*** This number represents all the voters that do not have a TDL or SSN associated with their voter record. It is possible that one of these persons does in fact have a TDL or SSN and they simply did not provide it when they registered to vote (such numbers were optional prior to Jan 2006).

Ann McGeehan
Director of Elections
Office of the Texas Secretary of State



90

HIGHLY CONFIDENTIAL

TX_00007185