

September 14, 2011

Mr. T. Christian Herren
Chief, Voting Section
Civil Rights Division
Room 7254-NWB
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

      RE:    Comment under Section 5, Submission No. 2011-2775

Dear Mr. Herren:

      The Brennan Center for Justice and the Lawyers' Committee for Civil Rights Under Law, on behalf of the Texas State Conference of the NAACP, submit this comment letter opposing preclearance of a recently enacted set of changes to the State of Texas's Election Code. We respectfully request that the Department deny Section 5 preclearance to this legislation because these changes, which are set forth in Senate Bill 14, will disproportionately impact African-American and Latino citizens and have a retrogressive effect on minority voting strength across the State of Texas.

      This comment letter summarizes the new voter identification requirements contained in Senate Bill 14 and outlines the special burdens—both financial and logistical—that these provisions will impose upon African-American and Latino voters in Texas. The letter also reviews some of the legislative history behind Senate Bill 14, which demonstrates that the new voter ID provisions may have been enacted with discriminatory intent. In light of this evidence of Senate Bill 14's discriminatory effects and potentially discriminatory purpose, and the State of Texas's failure to provide adequate information disproving both discriminatory effects and intent, Texas has failed to meet its burden under Section 5 of the Voting Rights Act. Accordingly, the Department should deny preclearance for Senate Bill 14.

### I. Overview of Senate Bill 14

      Senate Bill 14,[1] which was signed by Texas Governor Rick Perry on May 27, 2011, and submitted for preclearance on July 25, 2011, requires that voters show photo identification at the polls in order to cast a ballot. Although Texas law already requires voters to produce identification at the polls, Senate Bill 14 would limit the acceptable forms of voter identification to one of the following types of photo identification:

---

[1] Act of May 27, 2011, Senate Bill 14, Chapter 123, 82nd Legislature (2011) ("Senate Bill 14").

1

2:13-cv-193 09/02/2014 DEF0957

Δ π EXHIBIT 12
Deponent William
Date 7/29/14 Rptr.
WWW.DEPOBOOK.COM

NAACP-00005248

- A Texas driver's license;
- A personal identification card issued by the Texas Department of Public Safety and featuring the voter's photograph;
- An election identification certificate (this is a new form of state photo identification created by the legislation);
- A U.S. military identification card featuring the voter's photograph;
- A U.S. citizenship certificate featuring the voter's photograph;
- A U.S. passport; or
- A concealed handgun permit issued by the Texas Department of Public Safety.[2]

The new law would remove several types of documents from the list of valid forms of voter identification. The documents no longer accepted include birth certificates, bank statements, and utility bills.[3]

Notably, Senate Bill 14 does not permit voters to use state or federal government employee identification cards as an acceptable form of photo identification. This distinguishes Texas's voter identification requirements from those in other states such as Alabama,[4] Georgia,[5] Kansas,[6] and Tennessee.[7] Texas is also the only one of these states other than Tennessee that refuses to recognize any valid student ID card issued by a state university as an acceptable form of voter identification. In sum, Senate Bill 14's narrow list of acceptable forms of voter identification makes it one of the most restrictive pieces of voter ID legislation in the country.

Senate Bill 14's plan for educating voters about the new voter identification requirements is also severely limited. While Senate Bill 14 includes some provisions requiring that county clerks, voter registrars, and the Secretary of State engage in voter education and outreach, these requirements are primarily web-based.[8] The bill's voter education provisions delegate primary responsibility for education to the Secretary of State's office for implementing a program but provide minimal details about what the program will ultimately entail. Beyond the web-based component of the campaign and the requirement that county clerks post written notices about the new identification requirements in their offices and at the polls, the legislation provides no guidance as to how voters will be informed of the new requirements.

---

[2] Senate Bill 14, at § 14 (amending TEX. ELEC. CODE § 63.0101).
[3] *Id.*
[4] *See* ALA. CODE § 17-9-30(a)(4) (permitting voters to use "valid employee identification card containing the photograph of the [voter] and issued by any branch, department, agency, or entity of the United States government, this state, or any county, municipality, board, authority, or other entity of this state").
[5] *See* GA. CODE ANN. § 21-2-417(a)(4) (permitting voters to use a "valid employee identification card containing a photograph of the elector and issued by any branch, department, agency, or entity of the United States government, this state, or any county, municipality, board, authority, or other entity of this state").
[6] *See* KAN. STAT. ANN. § 25-2908(h)(1)(E) (permitting voters to use "an employee badge or identification document issued by a municipal, county, state, or federal government office or agency").
[7] *See* TENN. CODE ANN. § 2-7-112(c)(5) (effective Jan. 1, 2012) (permitting voters to use "valid employee identification card issued by a branch, department, agency or entity of the State of Tennessee, any other state, or the United States authorized by law to issue employee identification, provided that such identification card contains a photograph of the voter").
[8] *Id.* at § 5 (amending TEX. ELEC. CODE § 31.012).

2

NAACP-00005249

## II. Senate Bill 14's photo identification requirements for in-person voting will have a retrogressive effect on African-American and Latino citizens' ability to vote.

Under Section 5 of the Voting Rights Act, any jurisdiction that seeks preclearance for a change in its voting laws must demonstrate that the proposed change is not motivated by a discriminatory purpose and will not have a "retrogressive effect" on the voting rights of racial and language minority groups. 42 U.S.C. § 1973c; 28 C.F.R. § 51.55. The Supreme Court has made clear that the covered jurisdiction "bears the burden of providing the Attorney General information sufficient to make that proof." *Branch v. Smith*, 538 U.S. 254, 263 (2003). Although we believe the Department has sufficient information to interpose an objection to Senate Bill 14, the Department may initially issue a request to the jurisdiction for "any omitted information necessary for evaluation of the submission." 28 C.F.R. §§ 51.37. However, the jurisdiction ultimately bears the burden of proof. 28 C.F.R. § 51.52.

Racial and language minority citizens in Texas have historically been subject to discrimination at the polls, which is one of the reasons why Section 5 coverage was expanded to include Texas in 1975.[9] The effects of this discrimination remain visible today. According to the November 2008 Current Population Survey, 54.3% of voting-eligible Latinos in Texas said that they were registered to vote, compared to 73.6% of voting-eligible whites and 73.7% of voting-eligible African Americans. This data suggest that voting-eligible Latinos in Texas are significantly less likely to be registered than whites.[10] Moreover, documented instances of discriminatory voter intimidation and vote suppression continue to be recorded during Texas elections in the twenty-first century.[11]

The ongoing discrimination against African-American and Latino voters in the state heightens concerns over the new obstacles to voting created by Senate Bill 14. Since Texas has failed to prove that Senate Bill 14 will not have a retrogressive effect on minority voting rights and was not motivated by a discriminatory intent, the Justice Department should deny its request for preclearance.

---

[9] *See Section 5 of the Voting Rights Act, Introduction to Section 5*, U.S. DEP'T OF JUSTICE (last visited Sept. 2, 2011), http://www.justice.gov/crt/about/vot/sec_5/about.php; *see also* NINA PERALES, LUIS FIGUEROA, AND CRISELDA G. RIVAS, MALDEF, VOTING RIGHTS IN TEXAS, 1982-2006, at 8-30 (2006) (documenting the history of discrimination against minority voters in Texas after the 1982 amendments to the Voting Rights Act).

[10] The difference in self-reported Latino and white registration rates is significant at the 5% level, using a Fisher's exact test for differences in sample proportions. U.S. CENSUS BUREAU, *November 2008 Current Population Survey* (last visited Sept. 13, 2011), available at http://www.census.gov/hhes/www/socdemo/voting/publications/p20/2008/tables.html. We use data from the *2008 Current Population Survey* because the *2010 Current Population Survey* provides anomalous data on voter registration rates in Texas: the 2010 data suggest that just 35% of eligible Texas voters were registered. This is dramatically different from the *2008 Current Population Survey* estimates for Texas and from the Election Assistance Commission's state-level estimates for voter registration rates in the rest of the country. *See id.*; ELECTION ASSISTANCE COMMISSION, THE IMPACT OF THE NATIONAL VOTER REGISTRATION ACT OF 1993 ON THE ADMINISTRATION OF ELECTIONS FOR FEDERAL OFFICE 2009-2010, at 34-35 (2011), *available at* http://www.eac.gov/assets/1/Documents/2010%20NVRA%20FINAL%20REPORT.pdf.

[11] *See* PERALES ET AL., *supra* note 9, at 30-31 (recounting various examples of discriminatory vote suppression in Texas during the 2004 election cycle).

3

NAACP-00005250

### A. Available data show that African-American and Latino citizens are less likely than white citizens to possess a form of identification required by Senate Bill 14.

At the outset, it is our understanding that no reliable data are available which indicate the number of citizens or registered voters in Texas, by race, who possess the existing types of photo identification which will be valid under Senate Bill 14 for identification at the polls, except for data regarding concealed handgun permits, discussed below. Certainly, Texas does not include any such data in its Section 5 submission, and the Department would be well-justified in requesting it. Nonetheless, there is a variety of evidence which uniformly indicates that minority citizens in Texas likely possess the forms of identification that are valid under the new legislation at far lower rates than whites. Moreover, it is also important to note that certain minority groups have higher in-person voting rates than white voters in Texas and will therefore be disproportionately burdened by Senate Bill 14's new in-person voting requirements.[12]

#### 1. National data demonstrate the disproportionate impact of photo ID requirements.

Substantial empirical evidence demonstrates that minority voters are less likely than whites to possess a government-issued photo ID.[13] According to one recent national survey of registered voters conducted following the 2008 election cycle, 10.6% of registered African-American voters, 5.8% of Asian-American voters, and 5.5% of Latino voters did not own any form of government-issued photo identification.[14] In contrast, only 5.2% of white voters lacked a valid form of photo ID.[15] Another national survey of voting-age citizens conducted after the 2006 election cycle found that 25% of voting-age African Americans do not have a current government-issued photo ID, compared to just 8% of voting-age whites.[16]

The data from national voter surveys creates a reasonable presumption that black and Latino voters in Texas will be disproportionately affected by Senate Bill 14's new photo ID requirements. Applying national rates to the Texas registered voter data, we estimate that roughly 152,000 African-American registered voters and 129,000 Latino registered voters in the state do not own a government-issued photo ID. Applying these rates to Texas's voting-eligible population, we

---

[12] A 2008 survey of voters revealed that 66.01% of Latino voters cast their ballots in person at the polls, compared to 62.98% of white voters. LORRIE FRASURE ET AL., 2008 COLLABORATIVE MULTI-RACIAL POST-ELECTION STUDY (2009), *available at* http://cmpstudy.com/index.html. While this difference is not statistically significant, it nevertheless demonstrates the risk of discriminatory impact that Senate Bill 14 creates.

[13] *See, e.g.*, FRASURE ET AL., *supra* note 12 (concluding that African-Americans were half as likely as whites to possess state-issued photo ID); MATT A. BARRETO, STEPHEN A. NUÑO, & GABRIEL R. SANCHEZ, VOTER ID REQUIREMENTS AND THE DISENFRANCHISEMENTS OF LATINO, BLACK, AND ASIAN VOTERS 10 (2007) ("For five out of six types of voter identification, Latinos, Asians, Blacks and immigrants were statistically less likely to have access to ID, as compared to Whites and the native born."), *available at* http://brennan.3cdn.net/63836ccea55aa81e4f_hlm6bhkse.pdf.

[14] *See* FRASURE ET AL., *supra* note 12.

[15] *Id.* The difference between photo ID ownership rates among registered white voters and registered black voters is statistically significant.

[16] BRENNAN CTR. FOR JUSTICE, CITIZENS WITHOUT PROOF: A SURVEY OF AMERICANS' POSSESSION OF DOCUMENTARY PROOF OF CITIZENSHIP AND PHOTO IDENTIFICATION 2 (2006), *available at* http://www.brennancenter.org/page/-/d/download_file_39242.pdf (noting that "[m]inority citizens are less likely to possess government-issued photo identification"). The same survey found that 16% of Latino voting-age citizens do not have a current government-issued photo ID but this result was not statistically significant due to the relatively small sample size of the survey. *Id.*

NAACP-00005251

estimate that roughly 207,000 African-American voting-age citizens, 33,000 Asian-American voting-age citizens, and 237,000 Latino voting-age citizens do not have government-issued photo ID.[17] Since the state has failed to provide any information about photo ID ownership rates among minority voters in Texas, the state has failed to meet its burden under Section 5.

### 2. Senate Bill 14's limited list of acceptable forms of photo ID disadvantages African-American voters by excluding student IDs but including concealed handgun licenses.

Senate Bill 14 permits voters to use a concealed handgun license (CHL) as proof of identity but precludes voters from using a student ID, even if the student ID was issued by a state university. This will most likely have a retrogressive effect on African-American voting strength in Texas and exacerbate existing disparities in voter ID ownership rates between blacks and whites.

As the Texas Department of Public Safety (DPS) has recently noted, African Americans are significantly underrepresented among the state's CHL holders. According to DPS, of the more than 100,000 concealed handgun licenses issued in Texas last year, only 7.69% were issued to African Americans.[18] Since African Americans constitute 12.1% of Texas's voting age population, the DPS figures suggest that blacks are significantly underrepresented among the state's CHL holders. These data, alone, raise concerns about the inclusion of the CHL as a valid means of voter identification at the polls and counsel against preclearance of this provision in the absence of additional information.

Furthermore and in contrast, African Americans are more likely to be attending a public university in Texas than are whites, but student IDs were not included as an acceptable form of identification in Senate Bill 14. According to the 2009 American Community Survey, 8.0% of voting-age African Americans in Texas were attending a public university compared with only 5.8% of voting-age whites.[19] These data also reveal that African Americans constitute 17.2% of Texas's total university student population and 16.9% of the state's public university students despite representing a smaller share of Texas's overall voting age population.[20] By denying these students the opportunity to use their student ID cards to satisfy the new voter identification law—as several

---

[17] U.S. CENSUS BUREAU, *2010 Current Population Survey* (last visited Sept. 7, 2011), *available at* http://dataferrett.census.gov (data obtained by creating custom table from Current Population Survey's *Internet and Computer Use Supplement* with the U.S. Census Bureau's *Data Ferrett*). These figures are conservative estimates that may even underestimate the total number of voting-age citizens in Texas who do not have a government-issued photo ID. Since these numbers were obtained by applying the ID ownership rates observed for registered voters, *see* FRASURE ET AL., *supra* note 12, rather than ID ownership rates for all eligible voters, they likely overstate the number of people who actually own a government-issued photo ID among the population of all eligible voters.

[18] TEX. DEP'T OF PUBLIC SAFETY, CONCEALED HANDGUN LICENSING BUREAU, *Demographic Information by Race/Sex*, http://www.txdps.state.tx.us/administration/crime_records/chl/PDF/2010Calendar/ByRace/CY10RaceSex LicAppIssued.pdf (last visited Sept. 6, 2011). Although DPS does not keep data on how many CHLs are issued to Latinos, the available data nevertheless make clear that African-Americans are significantly less likely to obtain a CHL than are other groups. In 2010, only 0.26% of African-Americans received CHLs compared to 0.49% of whites. *See id.*

[19] U.S. CENSUS BUREAU, *2009 American Community Survey* (last visited Sept. 7, 2011), *available at* http://dataferrett.census (demonstrating significance at the 5% level, using a Z test for a single sample proportion) (data obtained by creating a custom table from the *2009 American Community Survey* one-year estimates in the U.S. Census Bureau's *Data Ferrett*).

[20] *Id.*

NAACP-00005252

other states with photo ID laws permit[21]—Senate Bill 14 exacerbates the racial disparities in voting opportunities created by the new photo ID requirements.[22]

### B. Texas's African-American and Latino citizens face greater financial and logistical barriers than white citizens in obtaining a form of photo identification required by Senate Bill 14.

#### 1. The cost of obtaining the necessary identification will disproportionately limit minorities' ability to obtain such identification.

With over four million people living below the poverty line, Texas has one of the highest poverty rates in the nation[23]—one that has continued to rise in recent years.[24] This poor population is disproportionately made up of African Americans and Latinos, who constitute roughly three-quarters of all poor people in Texas.[25] While only 11% of white Texans live below the poverty line, roughly 30% of African Americans and 34% of Latinos in Texas live in poverty.[26]

As a result, the various costs associated with obtaining a form of photo identification required by Senate Bill 14 will most likely burden African-American and Latino voters disproportionately. Of the various forms of acceptable photo identification listed in Senate Bill 14, only the newly-created "election identification certificate" is issued to voters free of charge.[27]

---

[21] ALA. CODE § 17-9-30(a); GA. CODE ANN. § 21-2-417(a); KAN. STAT. ANN. § 25-2908(h)(1).

[22] As the Department is fully aware, students of color have long been affected by discriminatory voting laws in Texas. *See United States v. State of Texas*, 445 F. Supp. 1245, 1248-53 (S.D. Tex. 1978) (documenting the long history of discrimination against African-American student voters at Prairie View A&M University). These student voters continue to face barriers to voting today. Indeed, as recently as 2008, the Department filed a complaint against Waller County, TX, for impermissible registration practices that hindered student voting at Prairie View A&M University, one of Texas's nine historically black colleges and universities. That suit ultimately led to a consent decree issued just two weeks before the 2008 election. *See United States v. State of Texas*, 445 F. Supp. 1245, 1248-53 (S.D. Tex. 1978) (documenting the long history of discrimination against student voters at Prairie View A&M). *United States v. Waller Cnty.*, No. CV 4:08-cv-03022 (S.D. Tex. Oct. 17, 2008), *available at* http://www.justice.gov/crt/about/vot/sec_5/waller_cd.pdf.

[23] *See* STATE HEALTH FACTS, *Texas: Poverty Rate by Race/Ethnicity, States* (2008-09), http://www.statehealthfacts.org/profileind.jsp?ind=14&cat=1&rgn=45 (last visited Sept. 1, 2011).

[24] Robert T. Garrett & Kim Horner, *Texas Seeks Answers to Rising Poverty Rate*, DALLAS MORNING NEWS (Sept. 17, 2010, 7:38am ), http://www.dallasnews.com/news/nation-world/nation/20100916-Texas-seeks-answers-to-rising-poverty-4755.ece ("The government announced Thursday[, September 16, 2010,] that nearly 4.3 million Texans lived in poverty last year, a whopping 11 percent increase.").

[25] *See* STATE HEALTH FACTS, *supra* note 23.

[26] *See id.*

[27] The State of Texas charges its citizens $25 for a driver's license ($9 for people over age 85), $16 for a personal ID card ($6 for people over age 60), $140 for a concealed handgun license, and $22 for a birth certificate, which is required documentation for many of the forms of identification listed in Senate Bill 14. TEX. DEP'T OF PUB. SAFETY, *Driver License Division Fees* (last visited Sept. 1, 2011), http://www.txdps.state.tx.us/DriverLicense/dlfees.htm; TEX. DEP'T OF STATE HEALTH SERVICES, *Certified Copy of a Birth Certificate* (last visited Sept. 1, 2011), http://www.dshs.state.tx.us/vs/reqproc/certified_copy.shtm. The U.S. State Department charges a $55 fee for a passport card and $135 for a passport book. U.S. DEP'T OF STATE, *Passport Fees* (last visited Sept. 1, 2011), http://travel.state.gov/passport/fees/fees_837.html. The citizenship documents accepted under Senate Bill 14 cost even more—typically, between $325 and $365. U.S. CITIZENSHIP & IMMIGRATION SERVICES, *Check Filing Fees* (last visited Sept. 1, 2011), http://www.uscis.gov/portal/site/uscis/menuitem.eb1d4c2a3e5b9ac89243c6a7543f6d1a/?vgnextoid=b1ae408b1c4b3210VgnVCM100000b92ca60aRCRD&vgnextchannel=b1ae408b1c4b3210VgnVCM100000b92ca60aRCRD.

6

NAACP-00005253

Moreover, even this "free" certificate has the potential to impose burdensome costs on the State's poor voters. These costs would not only include the expense of traveling to and from the regional Driver's License Offices (DLOs) where the certificates will presumably be issued,[28] but also the expense of furnishing any information and documents necessary to obtain the certificate itself. Since Senate Bill 14 permits DPS to ask certificate applicants to furnish the same information required on a driver's license application,[29] applicants for an election identification certificate could potentially be required to produce a wide array of identification documents that are not freely available, such as birth certificates, which cost $22 in Texas.[30]

Thus, despite Senate Bill 14's command that DPS "may not collect a fee for an election identification certificate," the bill does not eliminate the various costs that its photo identification requirement would impose upon Texas's poor voters—the large majority of whom are African-American or Latino.

### 2. African-American and Latino citizens have less access to both public transportation and private vehicles than whites and therefore face greater obstacles in obtaining photo identification from DPS's Driver's License Offices.

Individuals who need to obtain an election identification certificate, personal identification card, or driver's license in order to vote under Senate Bill 14 must travel to a Driver's License Office in order to obtain one.[31] This requirement imposes disproportionate costs on Texas's minority citizens who not only have less access to private vehicles than whites but also have limited access to the regional transit systems that they would need in order to reach their nearest DLO office.

The latest census data reveals that African-American and Latino citizens in Texas are less likely than whites to own a car. Among voting-age citizens, 9.8% of African Americans and 4.3% of Latinos do not have access to a personal vehicle.[32] This totals over 300,000 minority citizens who

---

[28] The Department of Public Safety issues driver's licenses at its Driver's License Offices. Since Senate Bill 14 does not specify where voters might obtain the newly-created "election identification certificate," *see* § 14, we have assumed that DPS will issue these certificates at Driver's License Offices.

[29] Senate Bill 14, § 20, permits the department to "require each applicant for an original or renewal election identification certificate to furnish to the department the information required by Section 521.142" of the Transportation Code. Section 521.142 of the Transportation Code includes a provision that gives the department broad discretion to impose additional requirements on applicants ("The application must include any other information the department requires to determine the applicant's identity, competency, and eligibility."). TEX. TRANSP. CODE ANN. § 521.142(e).

[30] *See* TEX. DEP'T OF STATE HEALTH SERVICES, *Certified Copy of a Birth Certificate* (last visited Sept. 1, 2011), http://www.dshs.state.tx.us/vs/reqproc/certified_copy.shtm. Voters born outside of Texas may face additional hurdles to obtaining a birth certificate. For instance, voters who were born in Arkansas—a neighboring state of Texas—must not only pay $12 for a birth certificate but, in addition, must produce government-issued photo ID with their application. ARKANSAS DEP'T OF HEALTH, *Birth Records* (last visited Sept. 13, 2011), http://www.healthy.arkansas.gov/programsServices/certificatesVitalRecords/Pages/BirthRecords.aspx.

[31] Senate Bill 14, § 20.

[32] U.S. CENSUS BUREAU, *2000 Census* (last visited Sept. 7, 2011), *available at* http://factfinder.census.gov/servlet/CustomTableServlet?_ts=333464746305. It is important to note that these figures are based on U.S. Census data that document vehicle access at the household—rather than individual—level. As a result, this Census data will include an individual who does not own a driver's license within the population of people who have access to a private vehicle if anyone in that individual's household has access to a private vehicle. Thus, the U.S. Census data, which indicate that 90.2% of African Americans in Texas have access to a private

7

NAACP-00005254

would need to access a public or regional transit system in order to obtain an election identification certificate or other acceptable identification issued by DPS. Since Texas's white citizens have greater access to private transportation options—nearly 98% have access to a personal vehicle—Senate Bill 14's requisite process for obtaining an election identification certificate places a disproportionate burden on the state's minority voters.[33]

Texas citizens without access to a private vehicle do not always have access to public transit alternatives. In fact, public and regional transportation quality varies widely across the state and features many geographic gaps in access. At least twelve of the state's 38 regional public rural transit providers do not offer weekend service.[34] Twenty-three of these rural transit providers require individuals to call ahead in order to schedule transport, often a full 24 hours in advance.[35] The other 15 transit providers employ fixed routes, which would likely be difficult to access for individuals who do not live along those routes and lack access to private vehicles.[36]

Newton County provides a stark example of the shortcomings in Texas's public transit system. The county, which has the highest rate of Latino households in Texas without access to a private vehicle,[37] has no public or regional transit system whatsoever.[38] Many African Americans in the county are similarly placed at a disadvantage since 22% of black households there have no access to a private vehicle.[39] These figures offer a telling contrast to the more than 93% of white households in Newton County that enjoy access to a private vehicle.[40] This discrepancy illustrates the unequal burdens that traveling to obtain photo identification will place on African-American and Latino voters in Texas.

In sum, the limited public transit options in Texas may pose a significant obstacle for voters who must travel to obtain photo identification—particularly African Americans and Latinos.

### 3. Minority citizens must travel farther distances than whites to obtain photo identification.

Not only do Texas's minority citizens have less access to transportation than whites but they must also travel farther distances in order to reach a Driver's License Office operated by DPS. An analysis of census block populations from the 2010 U.S. Census reveals that nearly one million

---

vehicle, remains consistent with studies that find that only about 75% of African Americans own a driver's license, *see* CITIZENS WITHOUT PROOF *supra* note 15 and accompanying text,
[33] *Id.*
[34] *See* TEX. DEP'T OF TRANSP., *Rural Transit Systems Contacts* (last visited Sept. 12, 2011), http://www.dot.state.tx.us/drivers_vehicles/public_transit/contacts.htm?type=rural (listing contact information for rural public transit systems in Texas).
[35] *Id.*
[36] *Id.*
[37] U.S. CENSUS BUREAU, *2000 Census* (last visited Sept. 7, 2011), *available at* http://factfinder.census.gov/servlet/CustomTableServlet?_ts=333464746305.
[38] TEX. DEP'T OF TRANSP., *Rural Public Transportation Systems Map* (last visited September 7, 2011), *available at* http://ftp.dot.state.tx.us/pub/txdot-info/ptn/rural_map.pdf.
[39] U.S. CENSUS BUREAU, *2000 Census* (last visited Sept. 7, 2011), *available at* http://factfinder.census.gov/servlet/CustomTableServlet?_ts=333464746305.
[40] *Id.*

8

NAACP-00005255

African-American and Latino voting-age citizens would have to travel more than 10 miles in order to reach the closest DLO location to their home.[41]

In particular, relative to other ethnic groups in Texas, Latino citizens are more likely to have to travel this distance in order to reach their nearest DLO location.[42] This disparity is even greater when assessing the population of Texas citizens who must travel 20 miles or more to reach their nearest DLO location. The relative concentration of Latino voting-age citizens in these areas is 85.6% greater than it is in the rest of Texas.[43] In contrast, the relative concentration of white voting-age citizens is 34.3% less than in the rest of Texas.[44] These figures demonstrate that the obstacles to obtaining an election identification certificate fall disproportionately on Texas's Latino citizens, thus seriously undermining the accessibility and effectiveness of this "free" identification option. Since Latinos in Texas have less access to reliable transportation than whites, the added burden of traveling farther than others to obtain an election identification certificate makes it particularly likely that Senate Bill 14 will have a retrogressive effect on Latino voting strength.

### C. Senate Bill 14 grants broad discretion to polling place officials and thereby creates new opportunities for discrimination against minority voters.

The Department should take note of the potential for discriminatory application of the provision that allows polling place officials to determine whether the name on the identification document provided by the voter matches the voter's name on the registration rolls.[45] Under this provision, if the two name entries do not "match exactly," the individual will be allowed to vote only if the name that appears on the identification document is "substantially similar" to the name that appears on the registration list and "the voter submits an affidavit stating that the voter is the person on the list of registered voters."[46] But the legislation is silent as to what happens when a person presents identification that an election official refuses to accept as "substantially similar." This suggests that the person would either be precluded from casting a ballot or would be subject to the provisional balloting requirements requiring presentation of identification after the election, which could be futile given that the person's proof of identification was already rejected.[47]

Empowering election officials with this level of discretion creates a substantial risk that Senate Bill 14 will be enforced in a racially discriminatory manner. In particular, this discretion may

---

[41] Statistics were obtained by using ArcMap10 software to tabulate the total population living in Census block groups that were in their entirety at least ten miles from the nearest DLO location. DLO locations were obtained from the Texas Department of Public Safety's *Texas Driver's License Office Map*, available at http://www.txdps.state.tx.us/administration/driver_licensing_control/rolodex/search.asp; 2010 Census block group population data were obtained from the Texas Legislative Council, available at ftp://ftpgis1.tlc.state.tx.us/2011_Redistricting_Data/2010Census/Population/. For a more detailed explanation of this analysis with accompanying graphics, see Sundeep Iyer, *Voter ID in Texas: The Accessibility of DLO Location*, BRENNAN CTR. FOR JUSTICE, (last visited Sept. 13, 2011), http://www.brennancenter.org/blog/archives/the_accessibility_of_texas_dlo_locations.

[42] Iyer, *supra* note 41.

[43] *Id.* (using ArcMap10 software to tabulate the total population living in Census block groups that were in their entirety at least twenty miles from the nearest DLO location).

[44] *Id.*

[45] Senate Bill 14, § 9 (amending TEX. ELEC. CODE § 63.001).

[46] *Id.*

[47] In this regard, if more persons need to vote challenged ballots, the NAACP has identified concerns with the manner in which officials decide whether to count challenged ballots after an election.

9

make it more difficult for Latino and Asian-American voters to satisfy the bill's requirement that the name entries be identical or "substantially similar."

First, it is more likely that Latino and Asian-American voters will have name entries that do not "match exactly," and thus will be subject to a determination by polling officials as to whether the names are "substantially similar." For Latino voters, name discrepancies may result from the occasional use of anglicized nicknames or different notations of maternal and paternal surnames.[48] Asian-American voters often have common English names on some forms of identification that differ from their legal transliterated names on other forms of identification.[49] The Texas House of Representatives heard testimony on this very point with regard to Asian-American voters during a 2009 hearing on an earlier version of the photo ID bill.[50] Special problems will also likely arise for other voters whose names differ from the names on their IDs, such as women who have changed their names after marriage. There is evidence that indicates that minority women are more likely to change their names after marriage than white women,[51] further raising the possibility that Senate Bill 14 will have a greater impact on minority voters.

Second, there is a valid concern that polling place officials will use the discretion delegated to them to conclude that names that do not "match exactly" are also not "substantially similar," which, as indicated would likely result in voters being precluded from casting ballots that will be counted. For example, studies have documented the inconsistent application of voter ID laws in recent election cycles. One 2009 study, for instance, documented the "persistence of differential treatment of racial groups at polling places."[52] The study found that, nationally, 71% of African-American voters and 65% of Latino voters were asked to show photo ID at the polls compared to only 51% of white voters during the 2008 election cycle.[53] The researchers who conducted this analysis ultimately concluded that "there were large differences across racial groups in whether poll workers' requested voter identification."[54] Another recent study confirmed that these disparities in application remain even when controlling for differences in voter ID requirements across states. In

---

[48] Latino voters' high rates of in-person voting, *see supra* note 12, also demonstrates how Senate Bill 14's "substantially similar" provision creates new opportunities for polling place discrimination.

[49] R.G. Ratcliffe, *Texas Lawmaker Suggests Asians Adopt Easier Names*, HOUS. CHRON. (Apr. 8, 2009, 5:30am), http://www.chron.com/news/houston-texas/article/Texas-lawmaker-suggests-Asians-adopt-easier-names-1550512.php (summarizing the testimony of Ramey Ko, a representative of the Organization of Chinese Americans, before the House Elections Committee).

[50] *Id.*

[51] There is no one study that establishes this specific conclusion; however, there is good reason to believe this is true. *See* Richard E. Kopelman et al., *The Bride Is Keeping Her Name: A 35-Year Retrospective Analysis of Trends and Correlates*, 37 SOC. BEHAV. & PERSONALITY 687, 694 (2009) (concluding that 22% of women with graduate degrees kept their name when they got married; just 14% of women without graduate degrees kept their name) and U.S. CENSUS BUREAU, *March 2010 Current Population Survey* (last visited Sept. 7, 2011), *available at* http://dataferrett.census.gov (data were obtained by creating a custom table from *Current Population Survey* microdata in U.S. Census Bureau's *Data Ferrett*) (revealing that 3.3% of voting-eligible Latino women in Texas who have been or are currently married have a graduate degree, compared to 8.0% of similarly situated black women and 10.4% of similarly situated white women).

[52] R. MICHAEL ALVAREZ ET AL., 2008 SURVEY OF THE PERFORMANCE OF AMERICAN ELECTIONS: FINAL REPORT 40-42 (2009), *available at* http://www.pewcenteronthestates.org/uploadedFiles/Final%20report20090218.pdf.

[53] *Id.*

[54] *Id.* at 42.

10

NAACP-00005257

states whose laws mention photo identification, 96% of African-Americans and 91% of Latinos are asked to produce an ID at the polls.[55] Only 85% of whites in these states are asked for ID.[56]

Since Texas's submission to the Department fails to address—or even acknowledge—any of the new risks that Senate Bill 14 creates with respect to polling place discrimination against both Latino and Asian-American voters, the Department should deny its request for preclearance.

### D. Senate Bill 14's voter education and outreach program is less likely to reach Texas's African-American and Latino citizens since they have lower literacy rates and less internet access than whites.

Senate Bill 14's inadequate plan for educating voters about the new photo identification requirement will only exacerbate its retrogressive effect on minority voting strength. Courts have recognized that whenever a state creates new requirements for voting, potential voters must be notified and informed about those new voting requirements so that they have a reasonable opportunity to satisfy them.[57] Local election officials play a critical role in this process. While Senate Bill 14 includes a provision for voter education and outreach, the only specific mandates that this provision places on voter registrars in each county is to update their existing websites with information about the new requirement. Senate Bill 14 does not even require voter registrars in counties without informational websites to create such websites. Rather, the bill limits its educational mandate to "the voter registrar of each county that maintains a website."[58]

This limitation will severely undermine the voter education plan set forth in Senate Bill 14. Although some county clerks in Texas provide hyperlinks on their webpages to the Secretary of State's website, many of these counties do not maintain separate webpages for their registrars of voters. For instance, none of the voter registrars in the eight Texas counties with the highest percentages of voting-age Latinos currently maintains its own website (in each of these counties, Latinos constitute 90% or more of the voting-age population). Furthermore, only three of the voter registrars in the eight Texas counties with the highest percentages of voting-age African Americans currently maintain their own websites. Of these sixteen counties, only three currently have functioning links to a relevant county website on the Texas Secretary of State's "Links of Interest" webpage, where individual counties' voting websites are listed.[59] Thus, Senate Bill 14's limited online notice requirements are poorly suited to educate voters in black and Latino communities across the state.

This plan is also unlikely to benefit the large number of Texans who do not have access to the internet. According to the 2010 Current Population Survey, white voting-age citizens in Texas are much more likely to have internet access than African-American and Latino voting-age citizens,

---

[55] Charles Stewart, III, *Racial Differences in Election Administration* 25 (CalTech/MIT Voting Technology Project, Working Paper No. 82, 2009), *available at* http://www.vote.caltech.edu/drupal/files/working_paper/WP_82.pdf.
[56] *Id.*
[57] *See. e.g., Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1348 (11th Cir. 2009) (describing the lower court's "concern," following the enactment of a new voter ID law, "about the lack of knowledge among voters that photo identification was needed for in-person voting").
[58] Senate Bill 14, § 5.
[59] The webpage displays links to websites for Houston County and Bowie County but the links provided to these websites are currently dead. *See* TEXAS SECRETARY OF STATE, LINKS OF INTEREST, *County Sources* (last visited Sept. 12, 2011), http://www.sos.state.tx.us/elections/voter/links.shtml#County.

11

NAACP-00005258

whose respective rates of internet access both fall below the national average.[60] Only 58.7% of Texas's Latino voting-age citizens and an even smaller percentage of the state's African-American voting-age citizens—just 55.1%—have internet access. In raw population numbers, this amounts to over two and a half million minority voters who would not benefit from Senate Bill 14's web-based voter education program. Since 78.3% of Texas's white voting-age citizens have internet access—a rate just above the national average—the online component of Senate Bill 14's voter education plan is much more likely to reach white voters than minority voters.

The other components of Senate Bill 14's voter education plan—such as the mandate that county clerks post notices of the new photo identification requirements in their offices and at the polls[61]—will similarly have a diminished effect in minority communities relative to white communities. The best available data on literacy rates across Texas reveal that the counties with the highest rates of Level 1 literacy also have the highest minority voting-age populations.[62] Since individuals with a Level 1 literacy level cannot identify or enter background information on a social security card, they would not benefit from written notices describing the various forms of photo identification now required for voting under Senate Bill 14. In any event, it seems very unlikely that posting notices about the new photo identification requirements in clerks' office will reach many people at all and, of course, providing information at the polls is too late to help citizens vote who are without the requisite identification.

Although Senate Bill 14 delegates primary responsibility to the Secretary of State for designing the other components of the voter education and outreach campaign, neither the legislation nor the State's submission for administrative preclearance provides any additional guidance as to what that program might entail. In the absence of this information, and in light of the stark racial disparities in both internet access and adult literacy rates across the state, Texas has failed to demonstrate that its voter education plan will avoid a retrogressive effect on minority voting strength. Accordingly, DOJ should deny the state's request for preclearance with regards to Senate Bill 14.

---

[60] U.S. CENSUS BUREAU, *2010 Current Population Survey* (last visited Sept. 7, 2011), *available at* http://dataferrett.census.gov (data obtained by creating custom table from Current Population Survey's *Internet and Computer Use Supplement* with the U.S. Census Bureau's *Data Ferrett*).

[61] Senate Bill 14, § 5.

[62] *See* NATIONAL INSTITUTE FOR LITERACY, THE STATE OF LITERACY IN AMERICA: ESTIMATES AT THE STATE, LOCAL, AND NATIONAL LEVELS 243-53 (1998), *available at* http://www.eric.ed.gov/PDFS/ED416407.pdf. The report states that Dimmit, Duval, Cameron, Brooks, and El Paso Counties have the highest rates of Level 1 literacy in Texas. According to the 2010 U.S. Census, the voting-age population in all of these counties is greater than 84% non-white. U.S. CENSUS BUREAU, *2010 Census* (last visited Sept. 7, 2011), *available at* http://factfinder.census.gov/servlet/CustomTableServlet?_ts=333464942224.

12

NAACP-00005259

III. **The Legislature's failure to take precautions against minority disenfranchisement in Senate Bill 14, despite its knowledge that the new photo identification requirements would disproportionately burden minority voters, suggests that the law may have been enacted for a discriminatory purpose.**

A. **The Texas Legislature was presented with ample evidence of the discriminatory effects that Senate Bill 14 would have on minority voters prior to passed the bill.**

During the hearings and floor debates on Senate Bill 14, several witnesses and legislators testified about the likely discriminatory impact that the new photo identification requirement would have on Texas voters. Some also openly voiced their opinions about the discriminatory purpose behind Senate Bill 14.

- At a hearing before the Senate Committee of the Whole on January 25, 2011 Gary Bledsoe, President of the Texas State Conference of the NAACP, testified against Senate Bill 14. He recounted the long history of discrimination against African-American voters in Texas and compared Senate Bill 14 to less restrictive voter ID laws around the country, concluding, "[i]t's very clear that the Texas law will impair and have a clearly disparate disadvantage on people of color."[63] Responding to questions from the committee after his testimony, Bledsoe stated that he knew of no black elected officials in the entire State of Texas who supported Senate Bill 14.

- At the same Senate hearing, two past national presidents of the League of United Latin American Citizens (LULAC), Hector Flores and Rosa Rosales, testified that Senate Bill 14 would have a discriminatory impact on Latino voters. They cited the recent history of discrimination against Latino voters in Texas and argued that the new photo ID requirement would create yet another "obstacle . . . for minorities, who may not have ID to begin with."[64] Another LULAC representative testified that the legislation would "continue the tradition . . . . of keeping Mexican[-Americans] from voting."[65]

- In 2009, during a hearing in the Texas House of Representatives on an earlier piece of voter identification legislation, Representative Betty Brown told one witness that

---

[63] *Act Relating to Requirements To Vote, Including Presenting Proof of Identification; Providing Criminal Penalties: Hearing on S.B. 14 Before the S. Comm. of the Whole*, 2011 Leg., 82nd Sess. (Tex. 2011) (testimony of Gary L. Bledsoe, Texas State Conference of the NAACP).

[64] *Act Relating to Requirements To Vote, Including Presenting Proof of Identification; Providing Criminal Penalties: Hearing on S.B. 14 Before the S. Comm. of the Whole*, 2011 Leg., 82nd Sess. (Tex. 2011) (testimony of Hector Flores, LULAC of San Antonio, TX). Since a full transcript of the January 25th hearing is not available, the quotes set forth in this section were transcribed by the Brennan Center after watching videos of the hearing on the Texas State Senate's website, available at http://www.senate.state.tx.us/avarchive/?yr=2011.

[65] *Act Relating to Requirements To Vote, Including Presenting Proof of Identification; Providing Criminal Penalties: Hearing on S.B. 14 Before the S. Comm. of the Whole*, 2011 Leg., 82nd Sess. (Tex. 2011) (testimony of Fidel Acevedo, LULAC of Austin, TX).

NAACP-00005260

Asian Americans should adopt names that are "easier for Americans to deal with."[66] Her comment was in response to a witness's testimony about the difficulties that Asian-American voters would face if forced to show identification at the polls.

- At another 2009 hearing in the House on the same piece of legislation, Justin Levitt of the Brennan Center testified about the numerous research studies that have documented racial disparities in the rates of photo ID ownership.[67] This testimony—along with all of the expert testimony offered on the proposed 2009 voter ID legislation—was entered into the record during the Senate debates on Senate Bill 14 earlier this year.

- During a House floor debate on March 23, 2011, the House of Representatives rejected an amendment that would have added at least some precautions to Senate Bill 14. Representative Marc Veasey, an African-American legislator who sits on the House Elections Committee, offered an amendment that would have required the Secretary of State to determine at the next statewide election whether racial and language minority voters had been disproportionately burdened by the new photo ID requirement.[68] If the Secretary concluded that the new photo identification requirement had led to minority disenfranchisement, the amendment would have required that the list of acceptable forms of voter ID be expanded for future elections. The House voted down the amendment 99-48.[69]

- During the same floor debate, Representative Richard Peña Raymond proposed an amendment to Senate Bill 14 to address his specific concerns about the bill's discriminatory impact on minority voters.[70] His amendment would have provided travel reimbursements to people who live below the federal poverty line and incur travel expenses while travelling to obtain photo identification for voting. Representative Raymond explained that the amendment would help poor voters who have to travel vast distances—upwards of more than thirty miles, in some cases—to reach a DPS office, where they can obtain a photo identification. The lack of such a provision in Senate Bill 14, he noted, supported his view that Senate Bill 14 was motivated by discrimination. He explained that "of the four million poor people in the State of Texas . . . nearly three-fourths [] are minority. And that's why I believe this aimed at minorities."[71] The amendment was voted down 100-46.

---

[66] Ratcliffe, *supra* note 48.

[67] *Act Relating to Relating to Requiring a Voter To Present Proof of Identification: Hearing on S.B. 362 Before the H. Comm. on Elections*, 2009 Leg., 81st Sess. (Tex. 2009) (testimony of Justin Levitt of the Brennan Center for Justice), *available at* http://brennan.3cdn.net/6672fa43792018edac_jpm6bxr6c.pdf.

[68] *Id.* at 1016-19, *available at* http://www.journals.house.state.tx.us/hjrnl/82r/pdf/82RDAY40FINAL.PDF#page=74.

[69] *Id.*

[70] *Id.* at 1009-12, *available at* http://www.journals.house.state.tx.us/hjrnl/82r/pdf/82RDAY40FINAL.PDF#page=67.

[71] *Id.*

14

NAACP-00005261

- Later that day, after recounting the history of voting discrimination in Texas and describing Senate Bill 14's likely impact on minority voters, Representative Lon Burnam said that "this [legislative] session was shaping up to be the most overtly racist session that I have witnessed in 25 or 30 years." Another legislator, Representative Armando Martinez agreed that Senate Bill would undermine minority voting rights and stated that he viewed the bill as "a personal attack on minorities."[72]

Despite this evidence and testimony, the Legislature nevertheless voted in favor of Senate Bill 14 without taking any precautions against minority disenfranchisement.

### B. The Legislature's proffered justification for Senate Bill 14, namely to prevent voter fraud, is pretextual and lacks substantive support in the legislative record.

Proponents of Senate Bill 14 repeatedly identified the elimination of voter fraud as their primary justification for enacting the new photo identification requirement. However, the Bill's lengthy legislative record contains no concrete evidence of in-person voter fraud—the only kind of voter fraud that the new photo ID requirement would prevent[73]—occurring anywhere in Texas. The committee reports from both houses of the Legislature make no reference to any officially-documented cases of in-person voter fraud and neither does the House Research Organization's analysis of the final bill. Likewise, the written documents included in the legislative record are wholly devoid of any specific evidence of such voter fraud occurring in Texas.

The dearth of evidence supporting the allegations of Senate Bill 14's proponents is not surprising. Several recent analyses of voter fraud have concluded that in-person voter fraud is extremely rare in the United States.[74] As a 2006 study conducted by the Election Assistance Commission explained, "impersonation of voters is probably the least frequent type of fraud because it is the most likely type of fraud to be discovered, there are stiff penalties associated with this type of fraud, and it is an inefficient method of influencing an election."[75] Indeed, some of the most highly publicized allegations of polling place fraud in recent Texas elections were later proven unfounded.[76]

The scant evidence of in-person voter fraud, both in Texas and around the country, indicates that the Legislature's proffered justifications for Senate Bill 14 are merely pretextual. The legislative

---

[72] TEX. HOUSE OF REPRESENTATIVES, *Texas House Journal*, 82nd Leg., 2011 Reg. Sess. No. 40, at 1031-32 (Tex. 2011), *available at* http://www.journals.house.state.tx.us/hjrnl/82r/pdf/82RDAY40FINAL.PDF#page=90.
[73] *See* JUSTIN LEVITT, BRENNAN CTR. FOR JUSTICE, THE TRUTH ABOUT VOTER FRAUD 6 (2007), *available at* http://www.truthaboutfraud.org/pdf/TruthAboutVoterFraud.pdf.
[74] *See* ELECTION ASSISTANCE COMMISSION, ELECTION CRIMES: AN INITIAL REVIEW AND RECOMMENDATIONS FOR FUTURE STUDY 9 (2006) ("ELECTION CRIMES"), *available at* http://www.eac.gov/assets/1/workflow_staging/Page/57.PDF; LEVITT, *supra* note 72, at 4-6.
[75] *See* ELECTION CRIMES, *supra* note 73, at 9.
[76] *See* Kristen Mack, *In Trying To Win, Has Dewhurst Lost a Friend?*, HOUS. CHRON., May 18, 2007, http://www.chron.com/news/article/In-trying-to-win-has-Dewhurst-lost-a-friend-1815569.php ("Remember that in the 2005 election contest between Hubert Vo and Talmadge Heflin, Heflin questioned more than 250 votes cast in the state House race. But a Republican lawmaker who investigated the contest concluded that Heflin produced "no evidence of any intentional voter fraud" that would have affected the outcome.").

15

NAACP-00005262

history provides further evidence that Senate Bill 14's proponents were not motivated by a legitimate desire to eliminate voter fraud. During the March 23rd floor debate on Senate Bill 14 in the House, Representative Martinez cited the lack of evidentiary support for other legislators' voter fraud allegations, asserting that the bill was "written and fortified on pure speculation" and that it would "undermine[] every civil rights movement, the work of every civil rights leader and, most of all, undermine[] every minority in this State."[77]

Several other legislators shared this sentiment. Fifteen members of the House—all but two of whom were members of either the Black Legislative Caucus or the Mexican-American Legislative Caucus—highlighted the Legislature's weak justifications for Senate Bill 14. In a joint statement articulating their reasons for voting against the bill, they wrote that "[i]n the absence of evidence of voter fraud of a type that would be prevented by the provisions in this bill, it is clear that this bill would do more harm than good to the integrity of elections."[78]

## IV. Conclusion

The State of Texas has failed to demonstrate that Senate Bill 14 will not have a retrogressive effect on African-American and Latino voting rights and has failed to show that the bill was not motivated by a discriminatory purpose. The State has, therefore, has not met its burden under Section 5 of the Voting Rights Act. Accordingly, we urge the Justice Department to deny preclearance of the voting changes occasioned by Senate Bill 14.

Respectfully submitted,

Gary Bledsoe, President
Robert Notzon, Legal Redress Chair
Howard Jefferson, Political Action Chair
Texas State Conference of the NAACP

Wendy Weiser
Nic Riley
Brennan Center for Justice
161 Avenue of the Americas, 12th Floor
New York, NY 10013

Mark Posner
Lawyers' Committee for Civil Rights Under Law
1401 New York Avenue, NW, Suite 400
Washington, DC 20005

---

[77] TEX. HOUSE OF REPRESENTATIVES, *Texas House Journal*, 82nd Leg., 2011 Reg. Sess. No. 40, at 1032-33 (Tex. 2011), *available at* http://www.journals.house.state.tx.us/hjrnl/82r/pdf/82RDAY40FINAL.PDF#page=91.
[78] *Id.* at 1040-41, *available at* http://www.journals.house.state.tx.us/hjrnl/82r/pdf/82RDAY40FINAL.PDF#page=98.

NAACP-00005263