

2:13-cv-193
09/02/2014

DEF1057

# The Effects of Photographic Indentification on Voter Turnout in Indiana: A County-Level Analysis

Jeffrey Milyo

Report 10–2007
Revised December 2007

*A publication from:*
*Institute of Public Policy*
*University of Missouri*
*137 Middlebush Hall*
*Columbia, MO 65211*



INSTITUTE *of* PUBLIC POLICY

*Harry S Truman School of Public Affairs*

LEG00003533

# The Effects of Photographic Indentification on Voter Turnout in Indiana: A County-Level Analysis

Jeffrey Milyo

## 1. Introduction

This study evaluates the effects of photographic voter identification requirements implemented in Indiana prior to the 2006 general election. Previous studies have examined the effects of voter identification laws more generally, but none of these separately analyzes the effects of so-called "mandatory photo ID" (hereafter simply, "photo ID") on turnout in Indiana.[1] Nevertheless, the existing scholarly literature on voter identification does strongly suggests that photo ID requirements are likely to have only a negligible impact on overall voter turnout; further, previous studies indicate that photo ID is unlikely to reduce the relative participation of minorities (e.g., Alvarez et al. 2007 and Mycoff et al. 2007). Given that these lessons from social science research run counter to the conventional wisdom, at least that espoused in some quarters,[2] I first review the most recent and relevant literature on the effects of voter identification on turnout, then present the findings from my empirical analysis of turnout in Indiana.

The change in voter turnout from the 2002 to 2006 general elections provides a nearly ideal natural experiment for estimating the effects of photo ID on voter turnout across the 92 counties in Indiana. Both years were midterm election years and in neither year was there a major contested statewide race (i.e., for governor or U.S. Senate); however, 2006 was the first general election year in which Indiana's photo ID law was actually implemented. I exploit this natural experiment to identify the effects of photo ID on turnout in counties with a greater percentage of minority, poor, elderly, or less educated populations.

I examine a variety of models of voter turnout and control for the influence of several other factors that may influence turnout. Overall, voter turnout

in Indiana increased about two percentage points from 2002 to 2006; however, in counties with greater percentages of minority or poor voters, turnout increased by even more, although this increase is not statistically significant. For counties with greater percentages of elderly or less educated voters, results are more mixed, but not consistently significant or negative. The only consistent and frequently significant effect of voter ID that I find is a positive effect on turnout in counties with a greater percentage of Democrat-leaning voters.

## 2. Voter ID and Turnout: Lessons from the Social Science Literature

The public debate over photo identification requirements for voters has been marked by oft-repeated concerns about the possible dramatic and detrimental effects of state voter identification requirements on voter turnout. The political rhetoric has become so super-heated that recent attempts to reform voter identification laws have been met with explicit accusations of racism on the part of reformers, dire warnings of a coming "disenfranchisement," and assertions that such reforms, though popular across party lines, are a "thinly veiled" attempt to prevent Democrats from voting.

In contrast, political theory suggests that the effects of voter identification laws on voter turnout are ambiguous. Such reforms increase the effort required to vote for some persons without proper identification (at least one time, anyway). Of course, some of these persons may be eligible voters and others will be ineligible voters. However, voter identification reforms may also instill greater confidence in the electoral process among eligible voters, making them more willing to participate in elections. Consequently, the actual impact of voter identification on turnout is an



studies that have received the most coverage in the press (Eagleton 2006 and Vercellotti and Anderson 2006; hereafter, the "Rutgers studies") are fatally flawed on several counts.[9] For example, several authors note that these studies examine only a single cross-section of turnout data from 2004, so cannot properly estimate the treatment effect of state voter identification laws; nor can these studies properly estimate the effects of mandatory photo ID requirements (Alvarez, et al 2007, Mycoff, et al 2007 and Muhlhausen and Sikich 2007). Further, the Rutgers studies miscode several state identification laws (Mycoff, et al. 2007 and Muhlhausen and Sikich 2007). Finally, the findings reported in the Rutgers studies are not robust to reasonable changes in their statistical model (Alvarez, et al. 2007 and Muhlhausen and Sikich 2007).

The flawed Rutgers studies are also the only systematic studies of voter identification for which the authors conclude that ID laws have strong or consistently negative consequences for voter turnout overall, and especially for minorities. However, even ignoring the methodological problems with the Rutgers studies, the authors do an additional disservice to the public debate by mischaracterizing their own findings. For example, taken at face value, the results presented in the Rutgers studies imply that the most strict forms of voter identification laws examined in their data (voluntary photo ID) are associated with higher voter turnout among Black, Hispanic and Asian minorities than are the next most strict category of identification laws that they examine (non-photo ID). Further, the Rutgers studies also find that voluntary photo ID requirements yield no difference in overall turnout compared to non-photo ID requirements. The authors of the Rutgers studies fail to note any of these findings; this is a serious error that leads them to make conclusions that are not supported by their own evidence.

In contrast to the Rutgers studies, more recent studies stand out for both their methodological rigor and the fact that they examine voter turnout through the 2006 general elections (Alvarez, et al. 2007 and Mycoff, et al 2007). However, both of these studies are work in progress, so results must be interpreted with care.

Mycoff et al. (2007) examine the effects of voter identification laws on state level voter turnout, as well as individual-level self-reported voter turnout from the National Election Studies (a large national survey that is conducted each election year). The authors examine turnout from 2000 to 2006 using a random-effects model; they find that voter ID laws are not significantly related to turnout in either the aggregate state data or the individual level data. The individual-level analysis in Mycoff et al. is a particularly valuable innovation, since it allows the researchers to more confidently discuss the impacts of voter identification on minorities, the poor, the elderly, etc. However, the original analysis in Mycoff et al. does not examine these differential effects, nor do the authors separately investigate the effects of photo ID apart from other voter identification requirements.

More recently, however, Mycoff et al. have analyzed the effects of mandatory photo ID on individual level turnout after controlling for state fixed effects. In this most recent analysis, Mycoff et al. cannot reject the null hypothesis that the within state effects of photo ID on overall turnout are zero; likewise, the null of zero effect cannot be rejected for turnout across race, ethnicity, income or age categories.[10] Overall, Mycoff et al. (2007) find that idiosyncratic factors, such as an individual's interest in politics, are far more important determinants of turnout than are institutional factors like voter identification.

The most recently available study of the effects of voter identification on voter turnout is by Alvarez, et al. (2007); these authors also examine the effects of voter identification on both state-level turnout and individual level turnout (from the Current Population Survey). Alvarez et al. control for state fixed effects in their analysis, but they fail to control for the presence and competitiveness of statewide races in the different states and years in their study. This unfortunate oversight should be corrected in future iterations of the study, but for now this shortcoming undermines the usefulness of the authors' findings. Ignoring this methodological problem, Alvarez et al. (2007) report that voter ID laws are associated with higher (albeit not significant) voter turnout in the analysis of state-level turnout from 2000-2006. The individual-level analysis suggests that voter identification requirements have a modest negative impact on overall turnout, no differential impacts by race or ethnicity and a slightly more negative impact on elderly or poor voters.



Highly Confidential                                                                      LEG00003535

turnout in counties with greater percentages of those groups as a percent county population. However, these demographic variables do not vary over time, since they are taken from the 2000 U.S. Census. This means that it is not possible to control for county-fixed effects when estimating the effects of photo ID on these particular demographic groups. For this reason, I account for differences in the demographic composition of counties by including control variables for per capita income and the percent of county population by several categories, including: age, education, ethnicity, female labor force participation, military status, non-citizens, party, poverty, race, and rural status (see Appendix). I also check the sensitivity of results when this list of control variables is pared down to just age, education, ethnicity, income and race.

Despite the plethora of county-level control variables described above, it is possible that there remain some unobserved county-level phenomena that may bias the estimated effects of photo ID on turnout in some unknown way. For this reason, I also examine the effects of photo ID on the within-county change in voter turnout since the most recent general election (i.e., the change in voter turnout from 2004 to 2006 compared to the change from 2000 to 2002). This alternative model effectively purges voter turnout of the county-specific factors mentioned above and so provides an important check on the estimates obtained form the basic model. Finally, because repeated observations at the county-level over time are not necessarily independent observations, I also control for clustering of standard errors by county in every regression model.

While most authors examine the effects of voter identification on voter turnout, some (e.g., Alvarez et al. 2007) look at the effects on the natural logarithm of voter turnout (i.e. "log turnout"); for this reason, I use both of these measures in my analysis. Therefore, in the next section I present estimates for four basic statistical models, where the dependent variable is i) turnout, ii) log turnout, iii) change in turnout, and iv) change in log turnout. I also discuss the sensitivity of these results to different measures of turnout, time periods or sets of control variables; for the most part, the key findings are quite robust to these alternative specifications.

## 4. Results

Voter turnout as a percentage of VAP in Indiana was about 2 percentage points higher in 2006 compared to 2002. This increase in turnout was fairly uniform across all counties; the mean within-in county change in turnout was +1.76% (p<.001). However, it is not possible to discern how much of this increase in turnout is attributable solely to the effects of photo ID; this is because there was also an uncompetitive Senate race in 2006. For example, the presence of a U.S. Senate election in 2006 might have led to an increase in turnout above what it would have been otherwise. On the other hand, the fact that there was no Democrat candidate in the 2006 Senate race might have led to lower turnout than otherwise. In fact, my examination of historical Senate election data does indeed suggest that state voter turnout tends to be lower when there is an uncompetitive Senate election at the top of the state ticket, all else constant. Assuming that this phenomenon occurred in 2006 in Indiana, then the photo ID likely led to an even greater increase in voter turnout than the 2% observed in the raw data.

Even so, I prefer to err on the side of caution in this report, so I focus only on the differential impact of photo ID across Indiana counties. In contrast to the situation for overall turnout in 2006, there is no a priori reason to believe that the uncompetitive 2006 Senate election influenced voter turnout in some counties more than others. Consequently, the effects of photo ID on turnout across counties with differing populations of minority, poor, low education, elderly voters, or Democrat voters can be identified and estimated in the available election data.

In Table 1A, I report the estimated effects of photo ID on both turnout and the change in turnout for counties with higher proportions of minority population. The table is divided into two panels; one for each model. For example, the results in the top panel of the table under column one indicate that photo ID increased voter turnout in counties with higher percentage of black population, albeit this estimate is not statistically significant (t=1.23). However, the estimated magnitude of this effect is quite large; for each percentage point increase in black population in a county, voter turnout increases by 0.1 percentage points. Looking to the bottom panel of Table 1A under the same column, the estimated effect



pattern; it is negative and insignificant in panel one, but closer to zero and less precisely estimated in panel two. Further, these three demographic variables are jointly insignificant in both models. Finally, all of the race, ethnicity and demographic variables examined to this point are also not jointly significant when they are all simultaneously included in these turnout models.

As was the case for the race and ethnicity variables, the same general pattern of qualitative effects are observed in the log turnout and change in log turnout models (Table 2B); in addition, the demographic variables (poverty, no high school and elderly) are not jointly significant, nor is the combination of these demographic variables with the race and ethnicity variables examined in Table 1A and 1B. Re-estimating these four models for additional years, and\or substituting CVAP for VAP likewise yields no major changes, although the estimated effects of photo ID on counties with more elderly or low-education population become more positive and less precisely estimated.

The final variable examined is the extent of Democrat voting preferences in a county; this is measured using a common proxy in the political science literature, the county vote percentage for the Democrat presidential candidate in 2004 (John Kerry). The results for this variable are found in column four of Tables 2A and 2B. In all but one case, the effect of voter ID on turnout in highly Democrat-leaning counties is statistically significant or marginally so (p<.10 or better). In every case examined in Tables 2A and 2B, photo ID is associated with higher turnout in counties with a greater share of Democrat leaning voters. The magnitude of this estimated effect is about 0.1 percentage points higher voter turnout in 2006 per percentage point increase in John Kerry's 2004 vote percentage in the county. [This result holds up even when the model is estimated using additional election years or citizen voting age population, as above.]

I have also estimated all of the models described above with a more sparse set of control variables, only including controls for age, education, ethnicity, income, and race. However, the choice of these control variables does not yield any notable changes in the pattern of results discussed here.

As a final sensitivity check, all of the models above have been estimated without the adjustment for

clustering of observations at the county level. This does not affect the estimated coefficients in these models but in general will affect the standard errors of the estimates. The effect of the cluster-adjustment to standard errors is to make some of the key estimates described above more precise; without the cluster-adjustment, none of the coefficients on percent elderly or percent poor remain even marginally statistically significant (i.e., p>.10 in every case). The only coefficient estimates that remain statistically significant without the cluster-adjustment are those for the percent Democrat in the county.

## 5. Discussion

Given the context of the existing research on voter turnout, my findings for Indiana are completely unsurprising. Despite the attention-grabbing and often strident claims that voter identification is the modern version of the poll tax and the like, nothing could be further from the truth. Existing theory and evidence from decades of social science research do not support the contention that photo ID requirements are likely to have a large and detrimental impact on turnout; nor does the previous empirical evidence find any significant impact of photo identification on racial or ethnic minorities. Further, the best previous evidence to date also finds no significant impact of photo ID on the poor or the elderly.

In this study, I exploit the existence of a natural experiment on the impact of photo ID: the change in turnout between the 2002 and 2006 midterm elections in Indiana. My analysis is novel not only for its focus on the effects of photo ID in Indiana, but because I subject my findings to a battery of sensitivity checks. This is also the first study to analyze the differential impact of photo ID requirements on turnout among more Democrat-leaning voters.

The findings that emerge from my analysis are that photo ID is associated with: i) an overall county-level turnout increase of almost two percentage points, ii) an insignificant increase in relative turnout for counties with a greater percentage of minority and poor population, iii) no consistent or significant impact on relative turnout in counties with a greater percentage of less educated or elderly voters, and iv) a significant relative increase in turnout for counties with a higher percentage of Democrat voters.



LEG00003537

Eagleton Institute 2006. "Report to the U. S. Election Assistance Commission: Best Practices to Improve Voter Identification Requirements," Eagleton Institute of Politics (Rutgers University: New Brunswick, NJ).

Gerber, Alan and Donald Green 2000. "The Effect of a Non-Partisan Get-Out-the-Vote Drive: An Experimental Study of Leafletting," Journal of Politics, 62(3): 846-857.Hood, M.V. and Charles Bullock 2007. "Worth a thousand Words?: An Analysis of Georgia's Voter Identification Statute," working paper (University of Georgia: Athens, GA).

Lott, John R. 2006. "Evidence of Voter Fraud and the Impact that Regulations to Reduce Fraud have on Voter Participation Rates" working paper (University of Maryland: College Park, MD).

Matsusaka, John and Filip Palda 1999. "Voter Turnout: How Much Can We Explain?" Public Choice 98: 431-446

Muhlhausen, David B. and Keri Weber Sikich 2007. "New Analysis Shows Voter Identification Laws Do Not Reduce Turnout." (Heritage Foundation: Washington, D.C.).

Mycoff, Jason, Michael W. Wagner and David C. Wilson 2007. "Do Voter Identification Laws Affect Voter Turnout?" working paper (University of Delaware: Newark, DE).

Powell, G. Bingham, Jr. (1986). "American Voter Turnout in Comparative Perspective." American Political Science Review 80: 17-44.

Primo, David, Matthew L. Jacobsmeier and Jeffrey Milyo 2007. "Estimating the Effects of State Policies and Institutions with Mixed Level Data," State Politics and Policy Quarterly, 7(4): 447-461.

Primo, David and Jeffrey Milyo 2006a. "Campaign Finance Laws and Political Efficacy: Evidence from the States," Election Law Journal, 5(1): 23-39.

Primo, David and Jeffrey Milyo 2006b. "The Effects of State Campaign Finance Laws on Voter Turnout," working paper (University of Missouri: Columbia, MO).

Putnam, Robert 2000. Bowling Alone: The Collapse and Revival of American Community. (Simon and Schuster: New York).

Schulz, David 2007. "Less than Fundamental: The Myth of Voter Fraud and the Coming of the Second Great Disenfranchisement," working paper (Hamline University: St Paul, MN).

Vercelli, Timothy and David Anderson 2006. "Protecting the Franchise, or Restricting It? The Effects of Voter Identification Requirements on Turnout," working paper (Rutgers university: New Brunswick, NJ).



Highly Confidential

LEG00003538

### Table 1B: Effects of Photo ID by Race and Ethnicity
### (Natural Logarithm of County Turnout in 2002 and 2006)

|  | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| *Panel One: Log of % Voting Age Pop. (%VAP)* | | | | |
| %Black*PhotoID | .003 |  | .004 |  |
|  | (1.42) |  | (1.50) |  |
| %Hispanic*PhotoID |  | .000 | -.003 |  |
|  |  | (0.08) | (0.82) |  |
| %Minority*PhotoID |  |  |  | .002 |
|  |  |  |  | (1.55) |
| | | | | |
| *Panel Two: Change in Log of % Voting Age Pop.* | | | | |
| %Black*PhotoID | .002 |  | .002 |  |
|  | (0.67) |  | (0.58) |  |
| %Hispanic*PhotoID |  | .002 | -.000 |  |
|  |  | (0.55) | (0.00) |  |
| %Minority*PhotoID |  |  |  | .002 |
|  |  |  |  | (0.82) |

NOTES: Absolute values of t-statistics in parentheses (adjusted for clustering by counties). The estimated effects of photo ID interacted with percent Black and Hispanic are also not jointly significant in either panel above. All models include controls for year and characteristics of county population, including: age, education, ethnicity, female labor force participation, income per capita, military status, non-citizens, party, poverty, race, and rural status.



*The Effects of Photographic Identification on Voter Turnout in Indiana: A County-Level Analysis*    Report 10-2007

### Table 2B: Effects of Photo ID by Poverty, Education, Age, and Party
### (Naural Logarithm of County Turnout in 2002 and 2006)

|  | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| *Panel One: Log of % Voting Age Pop. (%VAP)* | | | | |
| %Poverty*PhotoID | .007 | | | |
|  | (1.56) | | | |
| %NoHighSchool*PhotoID | | -.003 | | |
|  | | (1.60) | | |
| %Elderly*PhotoID | | | -.011 | |
|  | | | (2.08) | |
| %Democrat*PhotoID | | | | .003 |
|  | | | | (2.28) |
| *Panel Two: Change in Log of % Voting Age Pop.* | | | | |
| %Poverty*PhotoID | .004 | | | |
|  | (0.88) | | | |
| %NoHighSchool*PhotoID | | -.001 | | |
|  | | (1.05) | | |
| %Elderly*PhotoID | | | -.005 | |
|  | | | (0.99) | |
| %Democrat*PhotoID | | | | .003 |
|  | | | | (1.87) |

NOTES: Absolute values of t-statistics in parentheses (adjusted for clustering by counties). The estimated effects of photo ID interacted with percent poverty, no high school degree and elderly are also not jointly significant in either panel above. All models include controls for year and characteristics of county population, including: age, education, ethnicity, female labor force participation, income per capita, military status, non-citizens, party, poverty, race, and rural status.



## TESTIMONY OF HANS A. von SPAKOVSKY

### LEGAL SCHOLAR
### CENTER FOR LEGAL AND JUDICIAL STUDIES
### THE HERITAGE FOUNDATION[*]
### 214 Massachusetts Avenue, NE
### Washington, DC 20002

### BEFORE THE TEXAS SENATE
### March 10, 2009

### REQUIRING IDENTIFICATION BY VOTERS, S.B. 362

I appreciate the invitation to be here today to discuss the importance of states such as Texas requiring individuals to authenticate their identity at the polls through photo and other forms of identification.

By way of background, I have extensive experience in voting matters, including both the administration of elections and the enforcement of federal voting rights laws. Prior to becoming a Legal Scholar at the Heritage Foundation, I was a member for two years of the Federal Election Commission. I spent four years at the Department of Justice as a career lawyer, including as Counsel to the Assistant Attorney General for Civil Rights. I also spent five years in Atlanta, Georgia, on the Fulton County Board of Registration and Elections, which is responsible for administering elections in the largest county in Georgia, a county that is almost half African-American. I have published extensively on election and voting issues, including on the subject of voter ID.

Guaranteeing the integrity of elections requires having security throughout the entire election process, from voter registration to the casting of votes to the counting of ballots at the end of the day when the polls have closed. For example, jurisdictions that use paper ballots seal their ballot boxes when all of the ballots have been deposited, and election officials have step-by-step procedures for securing election ballots and other materials throughout the election process.

I doubt any you think that it would be a good idea for a county to allow world wide Internet access to the computer it uses in its election headquarters to tabulate ballots

---

[*] The title and affiliation are for identification purposes. The staff of The Heritage Foundation testify as individuals. The views expressed here are my own, and do not reflect an institutional position for The Heritage Foundation or its board of trustees, and do not reflect support or opposition for any specific legislation. The Heritage Foundation is a public policy, research, and educational organization. It is privately supported and receives no funds from government at any level; nor does it perform any government or other contract work. Heritage is also the most broadly supported think tank in the United States, with over 400,000 supporters in every state, 67% of whom are individuals.

1

Highly Confidential

there is no way to know how many others slipped through. In states without identification requirements, election officials have no way to prevent bogus votes from being cast by unscrupulous individuals based on fictitious voter registrations.

The problem of possible double voting by someone who is registered in two states is illustrated by one of the Indiana voters who was highlighted by the League of Women Voters in their amicus brief before the Supreme Court in the Indiana case. After an Indiana newspaper interviewed her, it turned out that the problems she encountered voting in Indiana stemmed from her trying to use a Florida driver's license to vote in Indiana. Not only did she have a Florida driver's license, but she was also registered to vote in Florida where she owned a second home. In fact, she had claimed residency in Florida by claiming a homestead exemption on her property taxes, which as you know is normally only available to residents. So the Indiana law worked perfectly as intended to prevent someone who could have illegally voted twice without detection.

I don't want to single out Texas, but just like Indiana, New York, and Illinois, Texas has a long and unfortunate history of voter fraud. In the late 1800's, for example, Harrison County was so infamous for its massive election fraud that the phrase "Harrison County Methods" became synonymous with election fraud. From Ballot Box 13 in Lyndon Johnson's 1948 Senate race, to recent reports of voting by illegal aliens in Bexar County, Texas does have individuals who are willing to risk criminal prosecution in order to win elections. I do not claim that there is massive voter fraud in Texas or anywhere else. In fact, as a former election official, I think we do a good job overall in administering our elections. But the potential for abuse exists, and there are many close elections that could turn on a very small number of votes. There are enough incidents of voter fraud to make it very clear that we must take the steps necessary to make it hard to commit. Requiring voter ID is just one such common sense step.

Not only does voter ID help prevent fraudulent voting, but where it has been implemented, it has **not** reduced turnout. There is no evidence that voter ID decreases the turnout of voters or has a disparate impact on minority voters, the poor, or the elderly -- the overwhelming majority of Americans have photo ID or can easily obtain one.

Numerous studies have borne this out. A study by a University of Missouri professor of turnout in Indiana showed that turnout actually increased by about two percentage points overall in Indiana after the voter ID law went into effect. There was no evidence that counties with higher percentages of minority, poor, elderly or less-educated populations suffered any reduction in voter turnout. In fact, "the only consistent and statistically significant impact of photo ID in Indiana is to increase voter turnout in counties with a greater percentage of Democrats relative to other counties."

The Heritage Foundation released a study in September of 2007 that analyzed 2004 election turnout data for all states. It found that voter ID laws do not reduce the turnout of voters, including African-Americans and Hispanics – such voters were just as likely to vote in states with ID as in states where just their name was asked at the polling place.

3

LEG00003542

I should point out that the Georgia voter ID law was upheld in final orders issued by every state and federal court in Georgia that reviewed the law, including most recently by the Eleventh Circuit Court of Appeals. Just as in Texas, various organizations in Georgia made the specious claims that there were hundreds of thousands of Georgians without photo ID. Yet when the federal district court dismissed all of their claims, the court pointed out that after two years of litigation, none of the plaintiff organizations like the NAACP had been able to produce a single individual or member who did not have a photo ID or could not easily obtain one. The district court judge concluded that this "failure to identify those individuals is particularly acute in light of the Plaintiffs' contention that a large number of Georgia voters lack acceptable Photo ID...the fact that Plaintiffs, in spite of their efforts, have failed to uncover anyone who can attest to the fact that he/she will be prevented from voting provides significant support for a conclusion that the photo ID requirement does not unduly burden the right to vote."

In Indiana, which the Supreme Court said has the strictest voter ID law in the country, turnout in the Democratic presidential preference primary in 2008 quadrupled from the 2004 election when the photo ID law was not in effect – in fact, there were 862,000 more votes cast in the Democratic primary than the Republican primary. In the general election in November, the turnout of Democratic voters increased by 8.32 percentage points over 2004, the largest increase in Democratic turnout of any state in the nation. The neighboring state of Illinois, with no photo ID requirement and President Obama's home state, had an increase in Democratic turnout of only 4.4 percentage points – nearly half of Indiana's increase.

Just as in the federal case in Georgia, the federal court in Indiana noted the complete inability of the plaintiffs in that case to produce anyone who would not be able to vote because of the photo ID law:

> Despite apocalyptic assertions of wholesale vote disenfranchisement, Plaintiffs have produced not a single piece of evidence of any identifiable registered voter who would be prevented from voting pursuant to [the photo ID law] because of his or her inability to obtain the necessary photo identification.

One final point on the claims that requiring an ID, even when it is free, is a "poll tax" because of the incidental costs like possible travel to a registrar's office or obtaining a birth certificate that may be involved. That claim was also raised in Georgia. The federal court dismissed this claim, pointing out that such an "argument represents a dramatic overstatement of what fairly constitutes a 'poll tax'. Thus, the imposition of tangential burdens does not transform a regulation into a poll tax. Moreover, the cost of time and transportation cannot plausibly qualify as a prohibited poll tax because those same 'costs' also result from voter registration and in-person voting requirements, which one would not reasonably construe as a poll tax."

We are one of only about one hundred democracies that do not uniformly require voters to present photo ID when they vote. All of those countries administer that law without any problems and without any reports that their citizens are in any way unable to

5

LEG00003543

## TESTIMONY OF FRANK B. STRICKLAND
## TEXAS STATE SENATE
### March 10, 2009

Senator Duncan, members of the Senate, my name is Frank Strickland. I am a partner in the law firm of Strickland Brockington Lewis LLP in Atlanta, Georgia, a firm which together with its predecessors, dates back to 1971. My experience with elections comes primarily from two sources: serving as a member of the election board for the largest county in Georgia and litigating various election and other political cases over a period of many years.

Although I am not here in an official capacity, I am one of five members of the Fulton County Board of Registration and Elections (the "Election Board"), a bipartisan board appointed by the Board of Commissioners of Fulton County, which has general supervision of all voter registration and election processes in Georgia's largest county. I previously served on the Election Board from 1971 to 1977. Substantially all of the City of Atlanta is located in Fulton County. The Election Board is independent in that it does not report to the Board of Commissioners, and its decisions on registration and election matters in Fulton County, including the appointment of the department director, are final.

Fulton County is Georgia's largest county with a population of approximately 850,000. There are 552,559 registered voters in Fulton County.

In 2005 Georgia first adopted a law requiring a form of photo identification when voting. A substantial number of persons over age 18 already had a Georgia driver's license, which was one of the acceptable forms of identification. The 2005 statute provided for issuance of a state photo ID card for a nominal fee to persons who did not have a driver's license or another acceptable form of photo ID such as a government

1

Highly Confidential

LEG00003544

"**As the Rokita court noted, voters who lack Photo ID undoubtedly exist somewhere, but the fact that Plaintiffs, in spite of their efforts, have failed to uncover anyone "who can attest to the fact that he/she will be prevented from voting" provides significant support for a conclusion that the Photo ID requirement does not unduly burden the right to vote.**"

Judge Murphy further stated "**Plaintiffs have failed to produce any evidence of any individual ... who would undergo any appreciable hardship to obtain photo identification in order to be qualified to vote.**"

The plaintiffs' inability to produce a <u>single</u> voter who would be adversely impacted by the law was important to Judge's Murphy's determination that there was no significant burden posed by the photo ID law and should also be a very important consideration for the Texas State Senate. Of the two individual plaintiffs named in the Common Cause case, one individual testified that she did not mind getting a photo identification and did not think it would be hard to get one. The other Plaintiff said that he thought he could get a photo ID and that it would probably "help a lot." Interestingly, the **same lawyers** who argued that Plaintiff simply could not find a way to travel seven miles to his registrar's office to get a photo ID also drove that Plaintiff nearly 200 miles to testify at trial – past many locations where he could have obtained a free photo ID.

Likewise, the other witnesses relied upon by the lawyers for the Plaintiff to establish that obtaining a photo ID was too burdensome ultimately agreed that, in fact, they were perfectly capable of obtaining the ID. One woman who signed an affidavit prepared by the Plaintiffs' counsel asserting that it was too far to go to the county courthouse and get a photo ID from the registrar, freely admitted on her deposition that

3

Highly Confidential

LEG00003545

Most importantly, in the 2008 General Election – with the highest turnout ever seen in Georgia (>3.9 million) – the photo ID law posed no problem. That fact is particularly important because of the 3.9 million votes cast, **92 percent** were cast in person, meaning that the voter had to show a proper form of photo ID. Again, no problems. Although the turnout was much lighter for the December 2 runoff, the fact remained constant that the photo ID requirement did not result in any disenfranchisement statewide.

From the perspective of an elections administration official in Fulton County, I can also say without hesitation that county-wide, the photo ID requirement did not result in the mass disenfranchisement its opponents predicted. The requirement did not result in any disenfranchisement at all. Focusing on the general election in November 2008, the voter turnout was 405,628 out of 552,559 registered voters, a turnout of approximately 73 percent, a record for Fulton County both in terms of the number of registered voters and voter turnout. Only 93 voters did not have an acceptable form of photo ID. Each such voter was given a provisional ballot and in accordance with the statute was instructed to present a valid photo ID within 48 hours. While only one did so, there is no way to know why the others did not. Maybe the voter was an imposter. Maybe in the age of instant information, the voter knew the result and also knew that returning to have one more vote counted would not make a difference. We don't know the answer to why people did not return but we do know this: not one person filed a complaint regarding the photo ID requirement.

We also know that the overwhelming majority of people had and showed their photo IDs. Why was that? Well, even before the adoption of the current photo ID law in

5

LEG00003546

  
administered in a racially discriminatory fashion, there is absolutely no support for that allegation, just as there is no support for the notion that requiring a photo ID is unconstitutionally burdensome.

The Georgia experience is useful for any number of reasons but I'll leave you with three:

1.  Although the charge was made that "hundreds of thousands" of voters would be disenfranchised, in the end – when put to the proof and cross examination – the Plaintiffs could not show that even one person was unable to obtain a photo ID if he or she so desired.

2.  The educational program is a must for any photo ID law – in addition to making sure that people know the requirements for voting, the educational pieces are also an opportunity for election officials to remind voters to vote.

3.  The debate over photo ID has been hijacked by politics.  However, if one were to peel back the onion, the issue is this:  Should you have to prove who you are when you vote?  Who can really argue with the answer to that?

7

Highly Confidential

LEG00003547



# Voter Identification Fact Sheet
## *Voter ID Will Help to Detect and Deter Fraud in Texas Elections*

Texans expect and deserve secure and fair elections that ensure eligible voters cast only one ballot and that every person eligible to vote is not overly burdened by the voting process.

> **Secure Elections:** Making sure that Texans who vote have the right to vote.
> **Fair Elections:** Making sure that Texans who have the right to vote are able to vote.

A critical means to secure and fair elections in Texas is by requiring identity verification to vote:

## Why Texas Needs Voter ID Legislation:
- The Attorney General's office has received over 50 cases of voter fraud since 2004.
- Voter fraud is difficult to detect and prove under current laws.
- Requiring voter ID is a proven way to deter ineligible voters from casting a ballot and will help to catch and prosecute those who fraudulently vote.
- Texas currently does not require a potential voter to verify their identity at the polls – a would-be voter only has to show a voter registration card.

## Most Comprehensive Voter ID States Saw Increased Voter Turnout in 2008:
- Georgia experienced record-setting voter turnout in the 2008 election.
  - Overall turnout increased 6.7 percent; Democratic turnout increased 6.1 percent
- Indiana has the most comprehensive voter ID law.
  - Overall voter turnout was the fifth highest in the country; Democratic turnout increased 8.32 percent
- Comparable states without voter ID had markedly lower turnout increases.

## Texans **Strongly** Support Voter ID:
- 88 percent of likely Texas voters – 95 percent of Republicans and 80 percent of Democrats agree voters should be required to have photo ID to vote.  (October '08 Rasmussen survey)
- 73 percent of Caucasians, 68 percent of African Americans, and 65 percent of Hispanics agree Texas voters should be required to show a photo ID to vote. (July '08 Texas Politics Project, Univ. of Texas)

## Voter ID will help to prevent voter fraud in Texas:
- Modeled on Indiana's voter photo ID law which was upheld 6-3 by the U.S. Supreme Court, including liberal-leaning Justices John Paul Stevens and Anthony M. Kennedy.
- Common sense solution that allows a voter to show two, readily available, non-photo documents if they do not have a photo ID, and balances the need for security in the voting process with minimal burden.
- Deters people from misrepresenting their identity or fraudulently voting with someone else's registration card.

*Prepared by Secure and Fair Elections Texas (SAFE.Texas@yahoo.com)   815A Brazos St. #417, Austin, Texas 78701*

Highly Confidential



214 Massachusetts Ave. N.E. Washington, D.C. 20002 (202) 546-4400 www.heritage.org

## LEGISLATIVE TESTIMONY

**Statement of**
**David B. Muhlhausen, Ph.D.**
**Senior Policy Analyst**
**Center for Data Analysis**
**The Heritage Foundation**

**Before the Committee on**
**Elections of the**
**Texas House of Representatives**

**Delivered April 6, 2009**

### Introduction

My name is David Muhlhausen. I am Senior Policy Analyst in the Center for Data Analysis at The Heritage Foundation. I thank Chairman Todd Smith and the rest of the committee for the opportunity to testify today. The views I express in this testimony are my own and should not be construed as representing any official position of The Heritage Foundation.

### Voter ID Laws Pass Constitutional Muster

On April 28, 2008, the U.S. Supreme Court's *Crawford v. Marion County Election Board* decision ruled that on its face Indiana's photo-ID law did not pose an unconstitutional burden on voters.[1] Associate Justice John Paul Stevens concluded that a state may put into effect "even handed restrictions" to protect the "integrity and reliability of the electoral process itself."[2] For those without valid photo documentation, the Indiana Bureau of Motor Vehicles (BMV) offers a free photo identification card that can be used for voting. Associate Justice Stevens's ruling opinion noted that "For most voters who need them, the inconvenience of making a trip to the BMV, gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting."[3]

LEG00003549

strengthening of voter identification requirements to reduce fraud suppresses minority voter turnout.[12] Despite the findings of the Eagleton Institute study, new studies indicate that voter ID laws do not suppress voter turnout.

**Heritage Foundation Research.** A reanalysis of the individual-level data used in the Eagleton Institute study I coauthored with Keri Weber Sikich was published by the Heritage Foundation Center for Data Analysis in September 2007.[13] My report suggests that caution is needed in interpreting the Eagleton Institute's findings for at least three reasons.

*First,* their study used one-tailed significance tests instead of the more commonly accepted two-tailed tests. The one-tailed test allows researchers to double their chances of finding statistically significant results.

*Second,* the voter identification laws for two states, Arizona and Illinois, were incorrectly classified. From our modeling, this misclassification leads to a negative and statistically significant relationship between photo identification requirements and voter turnout for all registered voters. When Arizona and Illinois are correctly classified, the relationship in our modeling is statistically indistinguishable from zero.

*Third,* the findings for photo identification requirements are sensitive to model specification. Using the Eagleton Institute's state voter identification classifications and controlling for marriage with a married or not dichotomous variable, our analysis of overall voter turnout finds that photo identification requirements have a negative and statistically significant relationship with overall voter turnout. However, when additional marital status variables—widowed, divorced, separated—are included, the statistically significant relationship for photo identification requirements disappears.

After addressing these issues, our reanalysis finds that some of the original findings of the Eagleton Institute study are unfounded. Controlling for factors that influence voter turnout, voter identification laws largely do not have the negative impact on voter turnout that the Eagleton Institute suggests. When statistically significant and negative relationships are found, the effects are so small that the findings offer little policy significance. For example, our analysis indicates that:

- White survey respondents in photo identification states are 0.002 percent less likely to report voting than white respondents from states that only required voters to state their name.

- African-American respondents in non-photo identification states are 0.012 percent less likely to report voting than African-American respondents from states that only required voters to state their name.

In other cases, no effect was found.

3

LEG00003550

[5]Stephen Dinan, "Voter ID Rule Finds Support," *The Washington Times*, January 22, 2008, at *http://www.washingtontimes.com/article/20080122/NATION/667807970* (January 28, 2008).

[6]Stephen Ansolabehere, "Access Versus Integrity in Voter Identification Requirements," Department of Political Science, Massachusetts Institute of Technology, February 2007, at *http://web.mit.edu/polisci/portl/cces/material/NYU_Identification1.pdf* (July 24, 2007).

[7]Robert Pastor, Robert Santos, Alison Prevost, and Vassia Gueorguieva, "Voter Ids Are Not the Problem: A Survey of Three States," Center for Democracy and Election Management, American University, January 9, 2008, p. 8, at *http://www1.american.edu/ia/cdem/csae/pdfs/csae080109.pdf* (March 30, 2009).

[8]*Ibid.*, p. 9.

[9]*Ibid.*

[10]Cynthia Tucker, "Voter ID Law an Ugly Effort to Subvert Ballot," *The Atlanta Journal-Constitution*, January 13, 2008, at *http://www.ajc.com/opinion/content/opinion/tucker/stories/2008/01/11/tucked_0113.html* (January, 29, 2008).

[11]Timothy Vercellotti, "Appendix C: Analysis of Effects of Voter ID Requirements on Turnout," in *Report to the U.S. Election Assistance Commission on Best Practices to Improve Voter Identification Requirements Pursuant to the Help America Vote Act of 2002*, Eagleton Institute of Politics, Rutgers, The State University of New Jersey, and Moritz College of Law, Ohio State University, June 28, 2006; and Timothy Vercellotti and David Anderson, "Protecting the Franchise, or Restricting It? The Effects of Voter Identification Requirements on Turnout," American Political Science Association conference paper, Philadelphia, Pa., August 31–September 3, 2006.

[12]Christopher Drew, "Lower Voter Turnout Is Seen in State that Require ID," *The New York Times*, February 21, 2007, p. A16; Richard Wolf, "Study: Stricter Voting ID Rules Hurt '04 Turnout," *USA Today*, February 19, 2007, p. A5; Matthew Murray, "EAC Blasted Again for Burying Study," *Roll Call*, April 9, 2007; Tom Baxter and Jim Galloway, "Wonk Alert: Study Says the Heavier the Voter ID Requirements, the Lower the Turnout," *Atlanta Journal-Constitution*, February 21, 2007, Metro News.

[13]David B. Muhlhausen and Keri Weber Sikich, "New Analysis Shows Voter Identification Laws Do Not Reduce Turnout," Heritage Foundation *Center for Data Analysis Report* No. CDA07–04, September 11, 2007, at *http://www.heritage.org/Research/LegalIssues/upload/cda_07-04.pdf*.

[14]Jeffrey Milyo, "The Effects of Photographic Identification on Voter Turnout in Indiana: A County Level Analysis," Institute of Public Policy Report 10-2007, University of Missouri, November 10, 2007, at *http://truman.missouri.edu/uploads/Publications/Report%2010-2007.pdf* (January 29, 2008).

[15]Jason D. Mycoff, Michael W. Wagner, and David C. Wilson, "The Empirical Effects of Voter-ID Laws: Present or Absent," *PS: Political Science & Politics*, 42 (2009), pp, 121-126. An earlier version of this paper appeared as Jason D. Mycoff, Michael W. Wagnor, and David C. Wilson, "Do Voter Identification Laws Affect Voter Turnout?" Working Paper, Department of Political Science and International Relations, University of Delaware, 2007.

[16]Henry E. Brady, Sidney Verba, and Kay Lehman Schlozman, "Beyond SES: A Resource Model of Political Participation," *The American Political Science Review*, Vol. 89, No. 2 (June 1995), pp. 271-294.

[17]Mycoff et al., "The Empirical Effects of Voter-ID Laws: Present or Absent," p. 124.

[18] *Ibid.*, p. 121.

Highly Confidential

LEG00003551



FOR IMMEDIATE RELEASE                          CONTACT: Bill Noble
April 6, 2009                                              512-474-2005

# Voter ID Legislation Testimony Given in Texas House

### *Voter ID Moves Forward: Expert Witnesses Testify in House Elections Committee*

AUSTIN – Today, expert witnesses from both sides of the voter photo ID argument presented testimony and fielded questions in front of the Texas House Committee on Elections. Witnesses testifying in support of voter photo ID laws highlighted documented instances of increased voter turnout in spite of strict voter photo ID laws, noted the Supreme Court found no proven cases of voter disenfranchisement due to an inability to obtain or verify their identity, and explained how statewide enforcement of voter photo ID laws can increase voter trust in the election process and help deter voter fraud and impersonation.

David Muhlhausen, Senior Policy Analyst in the Center for Data Analysis at The Heritage Foundation testified that, "Americans support voter ID laws for good reasons. First, there is little evidence to suggest that these laws disenfranchise voters. Second, voter ID laws are a common sense policy to help ensure the integrity of elections."

Opponents of voter ID claim it will deter minorities and the elderly from voting, but many studies have shown this theory is inaccurate. In an analysis of voter turnout after Indiana implemented the most progressive photo ID laws in the country, Professor Jeffrey Milyo at the University of Missouri found that statewide turnout increased by two percentage points with no adverse effect on turnout in counties with higher concentrations of minorities, poor, elderly, or less educated voters. In fact, the study showed turnout increased more steeply in Democratic counties than it did in others.

Indiana Secretary of State Todd Rokita concurred that Indiana experienced increased voter turnout after they successfully enacted photo ID laws beginning in 2007. "I come from a state with great success and support for voter ID and making sure people are who they say they are at the polls. For far too long, we have used technology from the 1800s when it came to voting. Now with computers and electronic voting files, it's time we used at least 20th century technology, like a color photo, to protect the voting process."

Voter ID instills trust in voters that the election process is fair and accurate and that everyone's vote is counted. "Another kind of disenfranchisement that occurs is when those honest voters...are cheated, are diluted by those who would cheat the system. Photo ID makes sure that can't happen," Rokita said during testimony.

-more-

**Secure and Fair Elections Texas**
**News Release on Voter ID hearing in House Elections Committee**
**April 6, 2009**
**Page 2 of 2**

Most Americans and Texans see photo ID as common sense. 88 percent of likely voters, 95 percent of Republicans and 80 percent of Democrats agreed voters should be required to have photo ID to vote in a Texas October 2008 Rasmussen survey.

The Texas Senate already passed Senate Bill 362, which is similar to Indiana's constitutionally approved voter ID legislation. The Senate's version strikes an additional balance between fairness and security by allowing for exceptions for people without photo IDs, such as showing two forms of non-photo identification. (The Texas House is likely considering other options.)

The Committee heard testimony from officials from states with successful voter ID laws, including Georgia, Indiana, and Florida. John Fund, Wall Street Journal columnist and author of the book "Stealing Elections: How Voter Fraud Threatens Our Democracy" also testified.

On committing voter fraud, Fund said, "I can give you ten different ways to do it, with almost no way of being detected." Fund listed a few of the many examples of voter fraud that is easily committed: "You can vote in someone else's name, you can vote for someone who is dead, or you can create a completely fictitious person and vote fraudulently."

"But when voters are disenfranchised by the counting of improperly cast ballots or outright fraud, their civil rights are violated just as surely as if they were prevented from voting," said Fund on voter disenfranchisement. "The integrity of the ballot box is just as important to the credibility of elections as access to it."

Supporters of voter ID legislation agree that voter ID is the best way of ensuring the accuracy of our election process and is a practical way of making sure voters are who they say they are. Tomorrow, the House Elections Committee will take testimony from the public.

# # #

*SAFE Texas is a coalition of Texans dedicated to ensuring security and fairness in our election process. Visit us online at www.SafeTexas.org.*

Highly Confidential

LEG00003553



· **April 29, 2008**

OPINION

**DOW JONES REPRINTS**

# A Victory Against Voter Fraud

**By JOHN FUND**
*April 29, 2008; Page A13*

In ruling on the constitutionality of Indiana's voter ID law – the toughest in the nation – the Supreme Court had to deal with the claim that such laws demanded the strictest of scrutiny by courts, because they could disenfranchise voters. All nine Justices rejected that argument.

Even Justice Stephen Breyer, one of the three dissenters who would have overturned the Indiana law, wrote approvingly of the less severe ID laws of Georgia and Florida. The result is that state voter ID laws are now highly likely to pass constitutional muster.

But this case, *Crawford v. Marion County Election Board*, also revealed a fundamental philosophical conflict between two perspectives rooted in the machine politics of Chicago. Justice John Paul Stevens, who wrote the decision, grew up in Hyde Park, the city neighborhood where Sen. Barack Obama – the most vociferous Congressional critic of such laws – lives now. Both men have seen how the Daley machine has governed the city for so many years, with a mix of patronage, contract favoritism and, where necessary, voter fraud.

That fraud became nationally famous in 1960, when the late Mayor Richard J. Daley's extraordinary efforts swung Illinois into John F. Kennedy's column. In 1982, inspectors estimated as many as one in 10 ballots cast in Chicago during that year's race for governor to be fraudulent for various reasons, including votes by the dead.

Mr. Stevens witnessed all of this as a lawyer, special counsel to a commission rooting out corruption in state government, and as a judge. On the Supreme Court, this experience has made him very mindful of these abuses. In 1987, the high court vacated the conviction of a Chicago judge who'd used the mails to extort money. He wrote a stinging dissent, taking the rare step of reading it from the bench. The majority opinion, he noted, could rule out prosecutions of elected officials and their workers for using the mails to commit voter fraud.

Three years later, Justice Stevens ordered Cook County officials to stop printing ballots that excluded a slate of black candidates who were challenging the Daley machine. The

LEG00003554

All of this may be smart politics, but it is far removed from Mr. Obama's call for transcending the partisan divide. Then again, Mr. Obama's relationship to reform has always been tenuous. Jay Stewart, the executive director of the Chicago Better Government Association, notes that, while Mr. Obama supported ethics reforms as a state senator, he has "been noticeably silent on the issue of corruption here in his home state, including at this point, mostly Democratic."

So we have the irony of two liberal icons in sharp disagreement over yesterday's Supreme Court decision. Justice Stevens, the real reformer, believes voter ID laws are justified to prevent fraud. Barack Obama, the faux reformer, hauls out discredited rhetoric that they disenfranchise voters.

Acorn's national political arm has endorsed Mr. Obama. And its "nonpartisan" voter registration affiliate has announced plans to register hundreds of thousands of voters before the November election. An election in which Mr. Obama may be the Democratic candidate.

**Mr. Fund is a columnist for WSJ.com. His book on voter fraud will be published in July by Encounter.**

Highly Confidential

# The Effects of Photographic Indentification on Voter Turnout in Indiana: A County-Level Analysis

Jeffrey Milyo

Report 10–2007
Revised December 2007

*A publication from:*
*Institute of Public Policy*
*University of Missouri*
*137 Middlebush Hall*
*Columbia, MO 65211*



LEG00003556

# The Effects of Photographic Indentification on Voter Turnout in Indiana: A County-Level Analysis

## Jeffrey Milyo

### 1. Introduction

This study evaluates the effects of photographic voter identification requirements implemented in Indiana prior to the 2006 general election. Previous studies have examined the effects of voter identification laws more generally, but none of these separately analyzes the effects of so-called "mandatory photo ID" (hereafter simply, "photo ID") on turnout in Indiana.[1] Nevertheless, the existing scholarly literature on voter identification does strongly suggests that photo ID requirements are likely to have only a negligible impact on overall voter turnout; further, previous studies indicate that photo ID is unlikely to reduce the relative participation of minorities (e.g., Alvarez et al. 2007 and Mycoff et al. 2007). Given that these lessons from social science research run counter to the conventional wisdom, at least that espoused in some quarters,[2] I first review the most recent and relevant literature on the effects of voter identification on turnout, then present the findings from my empirical analysis of turnout in Indiana.

The change in voter turnout from the 2002 to 2006 general elections provides a nearly ideal natural experiment for estimating the effects of photo ID on voter turnout across the 92 counties in Indiana. Both years were midterm election years and in neither year was there a major contested statewide race (i.e., for governor or U.S. Senate); however, 2006 was the first general election year in which Indiana's photo ID law was actually implemented. I exploit this natural experiment to identify the effects of photo ID on turnout in counties with a greater percentage of minority, poor, elderly, or less educated populations.

I examine a variety of models of voter turnout and control for the influence of several other factors that may influence turnout. Overall, voter turnout in Indiana increased about two percentage points from 2002 to 2006; however, in counties with greater percentages of minority or poor voters, turnout increased by even more, although this increase is not statistically significant. For counties with greater percentages of elderly or less educated voters, results are more mixed, but not consistently significant or negative. The only consistent and frequently significant effect of voter ID that I find is a positive effect on turnout in counties with a greater percentage of Democrat-leaning voters.

### 2. Voter ID and Turnout: Lessons from the Social Science Literature

The public debate over photo identification requirements for voters has been marked by oft-repeated concerns about the possible dramatic and detrimental effects of state voter identification requirements on voter turnout. The political rhetoric has become so super-heated that recent attempts to reform voter identification laws have been met with explicit accusations of racism on the part of reformers, dire warnings of a coming "disenfranchisement," and assertions that such reforms, though popular across party lines, are a "thinly veiled" attempt to prevent Democrats from voting.

In contrast, political theory suggests that the effects of voter identification laws on voter turnout are ambiguous. Such reforms increase the effort required to vote for some persons without proper identification (at least one time, anyway). Of course, some of these persons may be eligible voters and others are ineligible voters. However, voter identification reforms may also instill greater confidence in the electoral process among eligible voters, making them more willing to participate in elections. Consequently, the actual impact of voter identification on turnout is an



studies that have received the most coverage in the press (Eagleton 2006 and Vercellotti and Anderson 2006; hereafter, the "Rutgers studies") are fatally flawed on several counts.[9] For example, several authors note that these studies examine only a single cross-section of turnout data from 2004, so cannot properly estimate the treatment effect of state voter identification laws; nor can these studies properly estimate the effects of mandatory photo ID requirements (Alvarez, et al 2007, Mycoff, et al 2007 and Muhlhausen and Sikich 2007). Further, the Rutgers studies miscode several state identification laws (Mycoff, et al. 2007 and Muhlhausen and Sikich 2007). Finally, the findings reported in the Rutgers studies are not robust to reasonable changes in their statistical model (Alvarez, et al. 2007 and Muhlhausen and Sikich 2007).

The flawed Rutgers studies are also the only systematic studies of voter identification for which the authors conclude that ID laws have strong or consistently negative consequences for voter turnout overall, and especially for minorities. However, even ignoring the methodological problems with the Rutgers studies, the authors do an additional disservice to the public debate by mischaracterizing their own findings. For example, taken at face value, the results presented in the Rutgers studies imply that the most strict forms of voter identification laws examined in their data (voluntary photo ID) are associated with higher voter turnout among Black, Hispanic and Asian minorities than are the next most strict category of identification laws that they examine (non-photo ID). Further, the Rutgers studies also find that voluntary photo ID requirements yield no difference in overall turnout compared to non-photo ID requirements. The authors of the Rutgers studies fail to note any of these findings; this is a serious error that leads them to make conclusions that are not supported by their own evidence.

In contrast to the Rutgers studies, more recent studies stand out for both their methodological rigor and the fact that they examine voter turnout through the 2006 general elections (Alvarez, et al. 2007 and Mycoff, et al 2007). However, both of these studies are work in progress, so results must be interpreted with care.

Mycoff et al. (2007) examine the effects of voter identification laws on state level voter turnout, as well as individual-level self-reported voter turnout from the National Election Studies (a large national survey that is conducted each election year). The authors examine turnout from 2000 to 2006 using a random-effects model; they find that voter ID laws are not significantly related to turnout in either the aggregate state data or the individual level data. The individual-level analysis in Mycoff et al. is a particularly valuable innovation, since it allows the researchers to more confidently discuss the impacts of voter identification on minorities, the poor, the elderly, etc. However, the original analysis in Mycoff et al. does not examine these differential effects, nor do the authors separately investigate the effects of photo ID apart from other voter identification requirements.

More recently, however, Mycoff et al. have analyzed the effects of mandatory photo ID on individual level turnout after controlling for state fixed effects. In this most recent analysis, Mycoff et al. cannot reject the null hypothesis that the within state effects of photo ID on overall turnout are zero; likewise, the null of zero effect cannot be rejected for turnout across race, ethnicity, income or age categories.[10] Overall, Mycoff et al. (2007) find that idiosyncratic factors, such as an individual's interest in politics, are far more important determinants of turnout than are institutional factors like voter identification.

The most recently available study of the effects of voter identification on voter turnout is by Alvarez, et al. (2007); these authors also examine the effects of voter identification on both state-level turnout and individual level turnout (from the Current Population Survey). Alvarez et al. control for state fixed effects in their analysis, but they fail to control for the presence and competitiveness of statewide races in the different states and years in their study. This unfortunate oversight should be corrected in future iterations of the study, but for now this shortcoming undermines the usefulness of the authors' findings. Ignoring this methodological problem, Alvarez et al. (2007) report that voter ID laws are associated with higher (albeit not significant) voter turnout in the analysis of state-level turnout from 2000-2006. The individual-level analysis suggests that voter identification requirements have a modest negative impact on overall turnout, no differential impacts by race or ethnicity and a slightly more negative impact on elderly or poor voters.



LEG00003558

turnout in counties with greater percentages of those groups as a percent county population. However, these demographic variables do not vary over time, since they are taken from the 2000 U.S. Census. This means that it is not possible to control for county-fixed effects when estimating the effects of photo ID on these particular demographic groups. For this reason, I account for differences in the demographic composition of counties by including control variables for per capita income and the percent of county population by several categories, including: age, education, ethnicity, female labor force participation, military status, non-citizens, party, poverty, race, and rural status (see Appendix). I also check the sensitivity of results when this list of control variables is pared down to just age, education, ethnicity, income and race.

Despite the plethora of county-level control variables described above, it is possible that there remain some unobserved county-level phenomena that may bias the estimated effects of photo ID on turnout in some unknown way. For this reason, I also examine the effects of photo ID on the within-county change in voter turnout since the most recent general election (i.e., the change in voter turnout from 2004 to 2006 compared to the change from 2000 to 2002). This alternative model effectively purges voter turnout of the county-specific factors mentioned above and so provides an important check on the estimates obtained form the basic model. Finally, because repeated observations at the county-level over time are not necessarily independent observations, I also control for clustering of standard errors by county in every regression model.

While most authors examine the effects of voter identification on voter turnout, some (e.g., Alvarez et al. 2007) look at the effects on the natural logarithm of voter turnout (i.e. "log turnout"); for this reason, I use both of these measures in my analysis. Therefore, in the next section I present estimates for four basic statistical models, where the dependent variable is i) turnout, ii) log turnout, iii) change in turnout, and iv) change in log turnout. I also discuss the sensitivity of these results to different measures of turnout, time periods or sets of control variables; for the most part, the key findings are quite robust to these alternative specifications.

## 4. Results

Voter turnout as a percentage of VAP in Indiana was about 2 percentage points higher in 2006 compared to 2002. This increase in turnout was fairly uniform across all counties; the mean within-in county change in turnout was +1.76% (p<.001). However, it is not possible to discern how much of this increase in turnout is attributable solely to the effects of photo ID; this is because there was also an uncompetitive Senate race in 2006. For example, the presence of a U.S. Senate election in 2006 might have led to an increase in turnout above what it would have been otherwise. On the other hand, the fact that there was no Democrat candidate in the 2006 Senate race might have led to lower turnout than otherwise. In fact, my examination of historical Senate election data does indeed suggest that state voter turnout tends to be lower when there is an uncompetitive Senate election at the top of the state ticket, all else constant. Assuming that this phenomenon occurred in 2006 in Indiana, then the photo ID likely led to an even greater increase in voter turnout than the 2% observed in the raw data.

Even so, I prefer to err on the side of caution in this report, so I focus only on the differential impact of photo ID across Indiana counties. In contrast to the situation for overall turnout in 2006, there is no a priori reason to believe that the uncompetitive 2006 Senate election influenced voter turnout in some counties more than others. Consequently, the effects of photo ID on turnout across counties with differing populations of minority, poor, low education, elderly voters, or Democrat voters can be identified and estimated in the available election data.

In Table 1A, I report the estimated effects of photo ID on both turnout and the change in turnout for counties with higher proportions of minority population. The table is divided into two panels; one for each model. For example, the results in the top panel of the table under column one indicate that photo ID increased voter turnout in counties with higher percentage of black population, albeit this estimate is not statistically significant (t=1.23). However, the estimated magnitude of this effect is quite large; for each percentage point increase in black population in a county, voter turnout increases by 0.1 percentage points. Looking to the bottom panel of Table 1A under the same column, the estimated effect



pattern; it is negative and insignificant in panel one, but closer to zero and less precisely estimated in panel two. Further, these three demographic variables are jointly insignificant in both models. Finally, all of the race, ethnicity and demographic variables examined to this point are also not jointly significant when they are all simultaneously included in these turnout models.

As was the case for the race and ethnicity variables, the same general pattern of qualitative effects are observed in the log turnout and change in log turnout models (Table 2B); in addition, the demographic variables (poverty, no high school and elderly) are not jointly significant, nor is the combination of these demographic variables with the race and ethnicity variables examined in Table 1A and 1B. Re-estimating these four models for additional years, and\or substituting CVAP for VAP likewise yields no major changes, although the estimated effects of photo ID on counties with more elderly or low-education population become more positive and less precisely estimated.

The final variable examined is the extent of Democrat voting preferences in a county; this is measured using a common proxy in the political science literature, the county vote percentage for the Democrat presidential candidate in 2004 (John Kerry). The results for this variable are found in column four of Tables 2A and 2B. In all but one case, the effect of voter ID on turnout in highly Democrat-leaning counties is statistically significant or marginally so (p<.10 or better). In every case examined in Tables 2A and 2B, photo ID is associated with higher turnout in counties with a greater share of Democrat leaning voters. The magnitude of this estimated effect is about 0.1 percentage points higher voter turnout in 2006 per percentage point increase in John Kerry's 2004 vote percentage in the county. [This result holds up even when the model is estimated using additional election years or citizen voting age population, as above.]

I have also estimated all of the models described above with a more sparse set of control variables, only including controls for age, education, ethnicity, income, and race. However, the choice of these control variables does not yield any notable changes in the pattern of results discussed here.

As a final sensitivity check, all of the models above have been estimated without the adjustment for clustering of observations at the county level. This does not affect the estimated coefficients in these models but in general will affect the standard errors of the estimates. The effect of the cluster-adjustment to standard errors is to make some of the key estimates described above more precise; without the cluster-adjustment, none of the coefficients on percent elderly or percent poor remain even marginally statistically significant (i.e., p>.10 in every case). The only coefficient estimates that remain statistically significant without the cluster-adjustment are those for the percent Democrat in the county.

## 5. Discussion

Given the context of the existing research on voter turnout, my findings for Indiana are completely unsurprising. Despite the attention-grabbing and often strident claims that voter identification is the modern version of the poll tax and the like, nothing could be further from the truth. Existing theory and evidence from decades of social science research do not support the contention that photo ID requirements are likely to have a large and detrimental impact on turnout; nor does the previous empirical evidence find any significant impact of photo identification on racial or ethnic minorities. Further, the best previous evidence to date also finds no significant impact of photo ID on the poor or the elderly.

In this study, I exploit the existence of a natural experiment on the impact of photo ID: the change in turnout between the 2002 and 2006 midterm elections in Indiana. My analysis is novel not only for its focus on the effects of photo ID in Indiana, but because I subject my findings to a battery of sensitivity checks. This is also the first study to analyze the differential impact of photo ID requirements on turnout among more Democrat-leaning voters.

The findings that emerge from my analysis are that photo ID is associated with: i) an overall county-level turnout increase of almost two percentage points, ii) an insignificant increase in relative turnout for counties with a greater percentage of minority and poor population, iii) no consistent or significant impact on relative turnout in counties with a greater percentage of less educated or elderly voters, and iv) a significant relative increase in turnout for counties with a higher percentage of Democrat voters.



Highly Confidential

Eagleton Institute 2006. "Report to the U. S. Election Assistance Commission: Best Practices to Improve Voter Identification Requirements," Eagleton Institute of Politics (Rutgers University: New Brunswick, NJ).

Gerber, Alan and Donald Green 2000. "The Effect of a Non-Partisan Get-Out-the-Vote Drive: An Experimental Study of Leafletting," Journal of Politics, 62(3): 846-857. Hood, M.V. and Charles Bullock 2007. "Worth a thousand Words?: An Analysis of Georgia's Voter Identification Statute," working paper (University of Georgia: Athens, GA).

Lott, John R. 2006. "Evidence of Voter Fraud and the Impact that Regulations to Reduce Fraud have on Voter Participation Rates" working paper (University of Maryland: College Park, MD).

Matsusaka, John and Filip Palda 1999. "Voter Turnout: How Much Can We Explain?" Public Choice 98: 431-446

Muhlhausen, David B. and Keri Weber Sikich 2007. "New Analysis Shows Voter Identification Laws Do Not Reduce Turnout." (Heritage Foundation: Washington, D.C.).

Mycoff, Jason, Michael W. Wagner and David C. Wilson 2007. "Do Voter Identification Laws Affect Voter Turnout?" working paper (University of Delaware: Newark, DE).

Powell, G. Bingham, Jr. (1986). "American Voter Turnout in Comparative Perspective." American Political Science Review 80: 17-44.

Primo, David, Matthew L. Jacobsmeier and Jeffrey Milyo 2007. "Estimating the Effects of State Policies and Institutions with Mixed Level Data," State Politics and Policy Quarterly, 7(4): 447-461.

Primo, David and Jeffrey Milyo 2006a. "Campaign Finance Laws and Political Efficacy: Evidence from the States," Election Law Journal, 5(1): 23-39.

Primo, David and Jeffrey Milyo 2006b. "The Effects of State Campaign Finance Laws on Voter Turnout," working paper (University of Missouri: Columbia, MO).

Putnam, Robert 2000. Bowling Alone: The Collapse and Revival of American Community. (Simon and Schuster: New York).

Schulz, David 2007. "Less than Fundamental: The Myth of Voter Fraud and the Coming of the Second Great Disenfranchisement," working paper (Hamline University: St Paul, MN).

Vercelli, Timothy and David Anderson 2006. "Protecting the Franchise, or Restricting It? The Effects of Voter Identification Requirements on Turnout," working paper (Rutgers university: New Brunswick, NJ).



Highly Confidential                                                    LEG00003561

| | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| **Table 1B: Effects of Photo ID by Race and Ethnicity (Natural Logarithm of County Turnout in 2002 and 2006)** | | | | |
| *Panel One: Log of % Voting Age Pop. (%VAP)* | | | | |
| %Black*PhotoID | .003 | | .004 | |
| | (1.42) | | (1.50) | |
| %Hispanic*PhotoID | | .000 | -.003 | |
| | | (0.08) | (0.82) | |
| %Minority*PhotoID | | | | .002 |
| | | | | (1.55) |
| | | | | |
| *Panel Two: Change in Log of % Voting Age Pop.* | | | | |
| %Black*PhotoID | .002 | | .002 | |
| | (0.67) | | (0.58) | |
| %Hispanic*PhotoID | | .002 | -.000 | |
| | | (0.55) | (0.00) | |
| %Minority*PhotoID | | | | .002 |
| | | | | (0.82) |

NOTES: Absolute values of t-statistics in parentheses (adjusted for clustering by counties). The estimated effects of photo ID interacted with percent Black and Hispanic are also not jointly significant in either panel above. All models include controls for year and characteristics of county population, including: age, education, ethnicity, female labor force participation, income per capita, military status, non-citizens, party, poverty, race, and rural status.



### Table 2B: Effects of Photo ID by Poverty, Education, Age, and Party
### (Naural Logarithm of County Turnout in 2002 and 2006)

|  | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| **Panel One: *Log of % Voting Age Pop. (%VAP)*** | | | | |
| %Poverty*PhotoID | .007 | | | |
|  | (1.56) | | | |
| %NoHighSchool*PhotoID | | -.003 | | |
|  | | (1.60) | | |
| %Elderly*PhotoID | | | -.011 | |
|  | | | (2.08) | |
| %Democrat*PhotoID | | | | .003 |
|  | | | | (2.28) |
| **Panel Two: *Change in  Log of % Voting Age Pop.*** | | | | |
| %Poverty*PhotoID | .004 | | | |
|  | (0.88) | | | |
| %NoHighSchool*PhotoID | | -.001 | | |
|  | | (1.05) | | |
| %Elderly*PhotoID | | | -.005 | |
|  | | | (0.99) | |
| %Democrat*PhotoID | | | | .003 |
|  | | | | (1.87) |

**NOTES:** Absolute values of t-statistics in parentheses (adjusted for clustering by counties). The estimated effects of photo ID interacted with percent poverty, no high school degree and elderly are also not jointly significant in either panel above. All models include controls for year and characteristics of county population, including: age, education, ethnicity, female labor force participation, income per capita, military status, non-citizens, party, poverty, race, and rural status.



# TESTIMONY OF HANS A. von SPAKOVSKY

## LEGAL SCHOLAR
## CENTER FOR LEGAL AND JUDICIAL STUDIES
## THE HERITAGE FOUNDATION*
### 214 Massachusetts Avenue, NE
### Washington, DC 20002

## BEFORE THE TEXAS SENATE
## March 10, 2009

## REQUIRING IDENTIFICATION BY VOTERS, S.B. 362

I appreciate the invitation to be here today to discuss the importance of states such as Texas requiring individuals to authenticate their identity at the polls through photo and other forms of identification.

By way of background, I have extensive experience in voting matters, including both the administration of elections and the enforcement of federal voting rights laws. Prior to becoming a Legal Scholar at the Heritage Foundation, I was a member for two years of the Federal Election Commission. I spent four years at the Department of Justice as a career lawyer, including as Counsel to the Assistant Attorney General for Civil Rights. I also spent five years in Atlanta, Georgia, on the Fulton County Board of Registration and Elections, which is responsible for administering elections in the largest county in Georgia, a county that is almost half African-American. I have published extensively on election and voting issues, including on the subject of voter ID.

Guaranteeing the integrity of elections requires having security throughout the entire election process, from voter registration to the casting of votes to the counting of ballots at the end of the day when the polls have closed. For example, jurisdictions that use paper ballots seal their ballot boxes when all of the ballots have been deposited, and election officials have step-by-step procedures for securing election ballots and other materials throughout the election process.

I doubt any you think that it would be a good idea for a county to allow world wide Internet access to the computer it uses in its election headquarters to tabulate ballots

---

* The title and affiliation are for identification purposes. The staff of The Heritage Foundation testify as individuals. The views expressed here are my own, and do not reflect an institutional position for The Heritage Foundation or its board of trustees, and do not reflect support or opposition for any specific legislation. The Heritage Foundation is a public policy, research, and educational organization. It is privately supported and receives no funds from government at any level; nor does it perform any government or other contract work. Heritage is also the most broadly supported think tank in the United States, with over 400,000 supporters in every state, 67% of whom are individuals.

1

LEG00003564

there is no way to know how many others slipped through. In states without identification requirements, election officials have no way to prevent bogus votes from being cast by unscrupulous individuals based on fictitious voter registrations.

The problem of possible double voting by someone who is registered in two states is illustrated by one of the Indiana voters who was highlighted by the League of Women Voters in their amicus brief before the Supreme Court in the Indiana case. After an Indiana newspaper interviewed her, it turned out that the problems she encountered voting in Indiana stemmed from her trying to use a Florida driver's license to vote in Indiana. Not only did she have a Florida driver's license, but she was also registered to vote in Florida where she owned a second home. In fact, she had claimed residency in Florida by claiming a homestead exemption on her property taxes, which as you know is normally only available to residents. So the Indiana law worked perfectly as intended to prevent someone who could have illegally voted twice without detection.

I don't want to single out Texas, but just like Indiana, New York, and Illinois, Texas has a long and unfortunate history of voter fraud. In the late 1800's, for example, Harrison County was so infamous for its massive election fraud that the phrase "Harrison County Methods" became synonymous with election fraud. From Ballot Box 13 in Lyndon Johnson's 1948 Senate race, to recent reports of voting by illegal aliens in Bexar County, Texas does have individuals who are willing to risk criminal prosecution in order to win elections. I do not claim that there is massive voter fraud in Texas or anywhere else. In fact, as a former election official, I think we do a good job overall in administering our elections. But the potential for abuse exists, and there are many close elections that could turn on a very small number of votes. There are enough incidents of voter fraud to make it very clear that we must take the steps necessary to make it hard to commit. Requiring voter ID is just one such common sense step.

Not only does voter ID help prevent fraudulent voting, but where it has been implemented, it has **not** reduced turnout. There is no evidence that voter ID decreases the turnout of voters or has a disparate impact on minority voters, the poor, or the elderly -- the overwhelming majority of Americans have photo ID or can easily obtain one.

Numerous studies have borne this out. A study by a University of Missouri professor of turnout in Indiana showed that turnout actually increased by about two percentage points overall in Indiana after the voter ID law went into effect. There was no evidence that counties with higher percentages of minority, poor, elderly or less-educated populations suffered any reduction in voter turnout. In fact, "the only consistent and statistically significant impact of photo ID in Indiana is to increase voter turnout in counties with a greater percentage of Democrats relative to other counties."

The Heritage Foundation released a study in September of 2007 that analyzed 2004 election turnout data for all states. It found that voter ID laws do not reduce the turnout of voters, including African-Americans and Hispanics – such voters were just as likely to vote in states with ID as in states where just their name was asked at the polling place.

3

Highly Confidential

I should point out that the Georgia voter ID law was upheld in final orders issued by every state and federal court in Georgia that reviewed the law, including most recently by the Eleventh Circuit Court of Appeals. Just as in Texas, various organizations in Georgia made the specious claims that there were hundreds of thousands of Georgians without photo ID. Yet when the federal district court dismissed all of their claims, the court pointed out that after two years of litigation, none of the plaintiff organizations like the NAACP had been able to produce a single individual or member who did not have a photo ID or could not easily obtain one. The district court judge concluded that this "failure to identify those individuals is particularly acute in light of the Plaintiffs' contention that a large number of Georgia voters lack acceptable Photo ID...the fact that Plaintiffs, in spite of their efforts, have failed to uncover anyone who can attest to the fact that he/she will be prevented from voting provides significant support for a conclusion that the photo ID requirement does not unduly burden the right to vote."

In Indiana, which the Supreme Court said has the strictest voter ID law in the country, turnout in the Democratic presidential preference primary in 2008 quadrupled from the 2004 election when the photo ID law was not in effect – in fact, there were 862,000 more votes cast in the Democratic primary than the Republican primary. In the general election in November, the turnout of Democratic voters increased by 8.32 percentage points from 2004, the largest increase in Democratic turnout of any state in the nation. The neighboring state of Illinois, with no photo ID requirement and President Obama's home state, had an increase in Democratic turnout of only 4.4 percentage points – nearly half of Indiana's increase.

Just as in the federal case in Georgia, the federal court in Indiana noted the complete inability of the plaintiffs in that case to produce anyone who would not be able to vote because of the photo ID law:

> Despite apocalyptic assertions of wholesale vote disenfranchisement, Plaintiffs have produced not a single piece of evidence of any identifiable registered voter who would be prevented from voting pursuant to [the photo ID law] because of his or her inability to obtain the necessary photo identification.

One final point on the claims that requiring an ID, even when it is free, is a "poll tax" because of the incidental costs like possible travel to a registrar's office or obtaining a birth certificate that may be involved. That claim was also raised in Georgia. The federal court dismissed this claim, pointing out that such an "argument represents a dramatic overstatement of what fairly constitutes a 'poll tax'. Thus, the imposition of tangential burdens does not transform a regulation into a poll tax. Moreover, the cost of time and transportation cannot plausibly qualify as a prohibited poll tax because those same 'costs' also result from voter registration and in-person voting requirements, which one would not reasonably construe as a poll tax."

We are one of only about one hundred democracies that do not uniformly require voters to present photo ID when they vote. All of those countries administer that law without any problems and without any reports that their citizens are in any way unable to

Highly Confidential

TESTIMONY OF FRANK B. STRICKLAND
TEXAS STATE SENATE
March 10, 2009

Senator Duncan, members of the Senate, my name is Frank Strickland. I am a

partner in the law firm of Strickland Brockington Lewis LLP in Atlanta, Georgia, a firm

which together with its predecessors, dates back to 1971. My experience with elections

comes primarily from two sources: serving as a member of the election board for the

largest county in Georgia and litigating various election and other political cases over a

period of many years.

Although I am not here in an official capacity, I am one of five members of the

Fulton County Board of Registration and Elections (the "Election Board"), a bipartisan

board appointed by the Board of Commissioners of Fulton County, which has general

supervision of all voter registration and election processes in Georgia's largest county. I

previously served on the Election Board from 1971 to 1977. Substantially all of the City

of Atlanta is located in Fulton County. The Election Board is independent in that it does

not report to the Board of Commissioners, and its decisions on registration and election

matters in Fulton County, including the appointment of the department director, are final.

Fulton County is Georgia's largest county with a population of approximately

850,000. There are 552,559 registered voters in Fulton County.

In 2005 Georgia first adopted a law requiring a form of photo identification when

voting. A substantial number of persons over age 18 already had a Georgia driver's

license, which was one of the acceptable forms of identification. The 2005 statute

provided for issuance of a state photo ID card for a nominal fee to persons who did not

have a driver's license or another acceptable form of photo ID such as a government

1

Highly Confidential

LEG00003567

"As the Rokita court noted, voters who lack Photo ID undoubtedly exist somewhere, but the fact that Plaintiffs, in spite of their efforts, have failed to uncover anyone "who can attest to the fact that he/she will be prevented from voting" provides significant support for a conclusion that the Photo ID requirement does not unduly burden the right to vote."

Judge Murphy further stated "Plaintiffs have failed to produce any evidence of any individual ... who would undergo any appreciable hardship to obtain photo identification in order to be qualified to vote."

The plaintiffs' inability to produce a <u>single</u> voter who would be adversely impacted by the law was important to Judge's Murphy's determination that there was no significant burden posed by the photo ID law and should also be a very important consideration for the Texas State Senate. Of the two individual plaintiffs named in the Common Cause case, one individual testified that she did not mind getting a photo identification and did not think it would be hard to get one. The other Plaintiff said that he thought he could get a photo ID and that it would probably "help a lot." Interestingly, the same lawyers who argued that Plaintiff simply could not find a way to travel seven miles to his registrar's office to get a photo ID also drove that Plaintiff nearly 200 miles to testify at trial – past many locations where he could have obtained a free photo ID.

Likewise, the other witnesses relied upon by the lawyers for the Plaintiff to establish that obtaining a photo ID was too burdensome ultimately agreed that, in fact, they were perfectly capable of obtaining the ID. One woman who signed an affidavit prepared by the Plaintiffs' counsel asserting that it was too far to go to the county courthouse and get a photo ID from the registrar, freely admitted on her deposition that

3

Highly Confidential

LEG00003568

Most importantly, in the 2008 General Election – with the highest turnout ever seen in Georgia (>3.9 million) – the photo ID law posed no problem. That fact is particularly important because of the 3.9 million votes cast, 92 percent were cast in person, meaning that the voter had to show a proper form of photo ID. Again, no problems. Although the turnout was much lighter for the December 2 runoff, the fact remained constant that the photo ID requirement did not result in any disenfranchisement statewide.

From the perspective of an elections administration official in Fulton County, I can also say without hesitation that county-wide, the photo ID requirement did not result in the mass disenfranchisement its opponents predicted. The requirement did not result in any disenfranchisement at all. Focusing on the general election in November 2008, the voter turnout was 405,628 out of 552,559 registered voters, a turnout of approximately 73 percent, a record for Fulton County both in terms of the number of registered voters and voter turnout. Only 93 voters did not have an acceptable form of photo ID. Each such voter was given a provisional ballot and in accordance with the statute was instructed to present a valid photo ID within 48 hours. While only one did so, there is no way to know why the others did not. Maybe the voter was an imposter. Maybe in the age of instant information, the voter knew the result and also knew that returning to have one more vote counted would not make a difference. We don't know the answer to why people did not return but we do know this: not one person filed a complaint regarding the photo ID requirement.

We also know that the overwhelming majority of people had and showed their photo IDs. Why was that? Well, even before the adoption of the current photo ID law in

5

Highly Confidential

administered in a racially discriminatory fashion, there is absolutely no support for that allegation, just as there is no support for the notion that requiring a photo ID is unconstitutionally burdensome.

The Georgia experience is useful for any number of reasons but I'll leave you with three:

1. Although the charge was made that "hundreds of thousands" of voters would be disenfranchised, in the end – when put to the proof and cross examination – the Plaintiffs could not show that even one person was unable to obtain a photo ID if he or she so desired.

2. The educational program is a must for any photo ID law – in addition to making sure that people know the requirements for voting, the educational pieces are also an opportunity for election officials to remind voters to vote.

3. The debate over photo ID has been hijacked by politics. However, if one were to peel back the onion, the issue is this: Should you have to prove who you are when you vote? Who can really argue with the answer to that?

Highly Confidential

LEG00003570



# Voter Identification Fact Sheet
## *Voter ID Will Help to Detect and Deter Fraud in Texas Elections*

Texans expect and deserve secure and fair elections that ensure eligible voters cast only one ballot and that every person eligible to vote is not overly burdened by the voting process.

**Secure Elections:** Making sure that Texans who vote have the right to vote.
**Fair Elections:** Making sure that Texans who have the right to vote are able to vote.

A critical means to secure and fair elections in Texas is by requiring identity verification to vote:

## Why Texas Needs Voter ID Legislation:
- The Attorney General's office has received over 50 cases of voter fraud since 2004.
- Voter fraud is difficult to detect and prove under current laws.
- Requiring voter ID is a proven way to deter ineligible voters from casting a ballot and will help to catch and prosecute those who fraudulently vote.
- Texas currently does not require a potential voter to verify their identity at the polls – a would-be voter only has to show a voter registration card.

## Most Comprehensive Voter ID States Saw Increased Voter Turnout in 2008:
- Georgia experienced record-setting voter turnout in the 2008 election.
    - Overall turnout increased 6.7 percent; Democratic turnout increased 6.1 percent
- Indiana has the most comprehensive voter ID law.
    - Overall voter turnout was the fifth highest in the country; Democratic turnout increased 8.32 percent
- Comparable states without voter ID had markedly lower turnout increases.

## Texans <u>Strongly</u> Support Voter ID:
- 88 percent of likely Texas voters – 95 percent of Republicans and 80 percent of Democrats agree voters should be required to have photo ID to vote. (October '08 Rasmussen survey)
- 73 percent of Caucasians, 68 percent of African Americans, and 65 percent of Hispanics agree Texas voters should be required to show a photo ID to vote. (July '08 Texas Politics Project, Univ. of Texas)

## Voter ID will help to prevent voter fraud in Texas:
- Modeled on Indiana's voter photo ID law which was upheld 6-3 by the U.S. Supreme Court, including liberal-leaning Justices John Paul Stevens and Anthony M. Kennedy.
- Common sense solution that allows a voter to show two, readily available, non-photo documents if they do not have a photo ID, and balances the need for security in the voting process with minimal burden.
- Deters people from misrepresenting their identity or fraudulently voting with someone else's registration card.

*Prepared by Secure and Fair Elections Texas (SAFE.Texas@yahoo.com)   815A Brazos St. #417, Austin, Texas 78701*

Highly Confidential



214 Massachusetts Ave. N.E. Washington, D.C. 20002 (202) 546-4400  www.heritage.org

## LEGISLATIVE TESTIMONY

**Statement of**
**David B. Muhlhausen, Ph.D.**
**Senior Policy Analyst**
**Center for Data Analysis**
**The Heritage Foundation**

**Before the Committee on**
**Elections of the**
**Texas House of Representatives**

**Delivered April 6, 2009**

### Introduction
My name is David Muhlhausen. I am Senior Policy Analyst in the Center for Data Analysis at The Heritage Foundation. I thank Chairman Todd Smith and the rest of the committee for the opportunity to testify today. The views I express in this testimony are my own and should not be construed as representing any official position of The Heritage Foundation.

### Voter ID Laws Pass Constitutional Muster
On April 28, 2008, the U.S. Supreme Court's *Crawford v. Marion County Election Board* decision ruled that on its face Indiana's photo-ID law did not pose an unconstitutional burden on voters.[1] Associate Justice John Paul Stevens concluded that a state may put into effect "even handed restrictions" to protect the "integrity and reliability of the electoral process itself."[2] For those without valid photo documentation, the Indiana Bureau of Motor Vehicles (BMV) offers a free photo identification card that can be used for voting. Associate Justice Stevens's ruling opinion noted that "For most voters who need them, the inconvenience of making a trip to the BMV, gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting."[3]

Highly Confidential

strengthening of voter identification requirements to reduce fraud suppresses minority voter turnout.[12] Despite the findings of the Eagleton Institute study, new studies indicate that voter ID laws do not suppress voter turnout.

**Heritage Foundation Research**. A reanalysis of the individual-level data used in the Eagleton Institute study I coauthored with Keri Weber Sikich was published by the Heritage Foundation Center for Data Analysis in September 2007.[13] My report suggests that caution is needed in interpreting the Eagleton Institute's findings for at least three reasons.

*First,* their study used one-tailed significance tests instead of the more commonly accepted two-tailed tests. The one-tailed test allows researchers to double their chances of finding statistically significant results.

*Second,* the voter identification laws for two states, Arizona and Illinois, were incorrectly classified. From our modeling, this misclassification leads to a negative and statistically significant relationship between photo identification requirements and voter turnout for all registered voters. When Arizona and Illinois are correctly classified, the relationship in our modeling is statistically indistinguishable from zero.

*Third,* the findings for photo identification requirements are sensitive to model specification. Using the Eagleton Institute's state voter identification classifications and controlling for marriage with a married or not dichotomous variable, our analysis of overall voter turnout finds that photo identification requirements have a negative and statistically significant relationship with overall voter turnout. However, when additional marital status variables—widowed, divorced, separated—are included, the statistically significant relationship for photo identification requirements disappears.

After addressing these issues, our reanalysis finds that some of the original findings of the Eagleton Institute study are unfounded. Controlling for factors that influence voter turnout, voter identification laws largely do not have the negative impact on voter turnout that the Eagleton Institute suggests. When statistically significant and negative relationships are found, the effects are so small that the findings offer little policy significance. For example, our analysis indicates that:

- White survey respondents in photo identification states are 0.002 percent less likely to report voting than white respondents from states that only required voters to state their name.

- African-American respondents in non-photo identification states are 0.012 percent less likely to report voting than African-American respondents from states that only required voters to state their name.

In other cases, no effect was found.

3

Highly Confidential

LEG00003573

[5]Stephen Dinan, "Voter ID Rule Finds Support," *The Washington Times*, January 22, 2008, at *http://www.washingtontimes.com/article/20080122/NATION/667807970* (January 28, 2008).

[6]Stephen Ansolabehere, "Access Versus Integrity in Voter Identification Requirements," Department of Political Science, Massachusetts Institute of Technology, February 2007, at *http://web.mit.edu/polisci/portl/cces/material/NYU_Identification1.pdf* (July 24, 2007).

[7]Robert Pastor, Robert Santos, Alison Prevost, and Vassia Gueorguieva, "Voter Ids Are Not the Problem: A Survey of Three States," Center for Democracy and Election Management, American University, January 9, 2008, p. 8, at *http://www1.american.edu/ia/cdem/csae/pdfs/csae080109.pdf* (March 30, 2009).

[8]*Ibid.*, p. 9.

[9]*Ibid.*

[10]Cynthia Tucker, "Voter ID Law an Ugly Effort to Subvert Ballot," *The Atlanta Journal-Constitution*, January 13, 2008, at *http://www.ajc.com/opinion/content/opinion/tucker/stories/2008/01/11/tucked_0113.html* (January, 29, 2008).

[11]Timothy Vercellotti, "Appendix C: Analysis of Effects of Voter ID Requirements on Turnout," in *Report to the U.S. Election Assistance Commission on Best Practices to Improve Voter Identification Requirements Pursuant to the Help America Vote Act of 2002*, Eagleton Institute of Politics, Rutgers, The State University of New Jersey, and Moritz College of Law, Ohio State University, June 28, 2006; and Timothy Vercellotti and David Anderson, "Protecting the Franchise, or Restricting It? The Effects of Voter Identification Requirements on Turnout," American Political Science Association conference paper, Philadelphia, Pa., August 31–September 3, 2006.

[12]Christopher Drew, "Lower Voter Turnout Is Seen in State that Require ID," *The New York Times*, February 21, 2007, p. A16; Richard Wolf, "Study: Stricter Voting ID Rules Hurt '04 Turnout," *USA Today*, February 19, 2007, p. A5; Matthew Murray, "EAC Blasted Again for Burying Study," *Roll Call*, April 9, 2007; Tom Baxter and Jim Galloway, "Wonk Alert: Study Says the Heavier the Voter ID Requirements, the Lower the Turnout," *Atlanta Journal-Constitution*, February 21, 2007, Metro News.

[13]David B. Muhlhausen and Keri Weber Sikich, "New Analysis Shows Voter Identification Laws Do Not Reduce Turnout," Heritage Foundation *Center for Data Analysis Report* No. CDA07–04, September 11, 2007, at *http://www.heritage.org/Research/LegalIssues/upload/cda_07-04.pdf*.

[14]Jeffrey Milyo, "The Effects of Photographic Identification on Voter Turnout in Indiana: A County Level Analysis," Institute of Public Policy Report 10-2007, University of Missouri, November 10, 2007, at *http://truman.missouri.edu/uploads/Publications/Report%2010-2007.pdf* (January 29, 2008).

[15]Jason D. Mycoff, Michael W. Wagner, and David C. Wilson, "The Empirical Effects of Voter-ID Laws: Present or Absent," *PS: Political Science & Politics*, 42 (2009), pp, 121-126. An earlier version of this paper appeared as Jason D. Mycoff, Michael W. Wagner, and David C. Wilson, "Do Voter Identification Laws Affect Voter Turnout?" Working Paper, Department of Political Science and International Relations, University of Delaware, 2007.

[16]Henry E. Brady, Sidney Verba, and Kay Lehman Schlozman, "Beyond SES: A Resource Model of Political Participation," *The American Political Science Review*, Vol. 89, No. 2 (June 1995), pp. 271-294.

[17]Mycoff et al., "The Empirical Effects of Voter-ID Laws: Present or Absent," p. 124.

[18]*Ibid.*, p. 121.

5

Highly Confidential

LEG00003574