

# VOTER ID TRIAL FACT SHEET

## DOJ: 50,000 DEAD VOTERS LACK PHOTO ID

*During the opening statement supporting Attorney General Holder's decision to prevent Texas from implementing its voter ID law, the Justice Department told the Court—and the public—that its expert witness' "analysis showed that at least 1.4 million registered voters in Texas lack any form of state-issued ID."[1] Consequently, the Justice Department argued, the State's voter ID law will have the effect of "potentially disenfranchising up to 1.4 million Texas voters."[2] So who is included in that list of 'potentially disenfranchised' voters? The Justice Department's list includes dead voters, failed to exclude non-Texas residents, and did not even attempt to match voters who have federally-issued photo IDs—such as a passport from the State Department or a military ID. By rejecting requests for access to federal photo identification databases from both the State and their own expert witnesses, DOJ demonstrated that it had no interest in accurate information and instead simply wanted the largest possible no-match list.*

### DOJ'S LIST OF REGISTERED VOTERS WHO LACK PHOTO ID INCLUDES:

| | |
|---|---|
| 50,000 | Dead Voters[3] |
| 330,377 | Voters over the age of 65 (who can vote by mail without ID)[4] |
| 261,887 | Voters who included a DL number on their voter registration form[5] |
| 800,000 | Voters successfully matched by the State to DPS-issued photo IDs[6] |
| Countless | Voters who actually have a government-issued photo ID—but who were improperly included on the DOJ's no-identification list, including: |

- Director of Elections Keith Ingram—not once, but *twice*.[7]
- U.S. Senator Kay Bailey Hutchison[8]
- Former U.S. Senator Phil Gramm[9]
- State Senator Leticia Van de Putte[10]
- State Representative Aaron Peña[11]
- Former President George W. Bush[12]

### DOJ'S LIST OF 'NO-IDENTIFICATION' VOTERS FAILED TO EXCLUDE:

- Dead Voters (who have not been removed from the Voter Registration list).[13]
- Voters who have passports and military IDs.[14]
- Former Texans who moved to other states and are ineligible to vote in Texas.[15]
- Exempt voters who have been certified disabled by the federal agencies.[16]
- Non-citizens who are improperly registered to vote.[17]

2:13-cv-193
09/02/2014
DEF2208
exhibitsticker.com

A University of Texas professor retained by the State conducted a telephone survey that sampled *actual Texans on the DOJ's no-identification list*—and found that, contrary to DOJ's claims, more than 90% of those on DOJ's no-match reported having a government-issued photo ID. Thus, the survey reveals that 90% of *all* voters, 92% of black voters, and 93% of Hispanic voters on DOJ's no-match list have a photo ID. [18]

MALC00009213

**DOJ'S FLAWED ANALYSIS FAVORED LARGE NUMBERS OVER ACCURATE RESULTS**

*While the Justice Department speaks of its no-identification list in terms of actual voters who will be impacted by SB 14, the Harvard professor who actually produced the list acknowledged under oath that he was simply attempting to match state voter registration records to DPS photo ID records—and conceded that he could not even opine on whether the individuals included on the DOJ's list will be prevented from voting. Consequently, Professor Stephen Ansolabehere's no-identification list has no bearing on the number of actual, registered voters SB 14 could impact because the list includes individuals who are not actually eligible to vote, fails to exclude deceased individuals and does not account for individuals who have photo IDs that were issued by the federal government. As Professor Ansolabehere confirmed in sworn testimony, individuals who fall into these categories were nonetheless improperly included or excluded from the DOJ's list because his analysis was limited to simply matching voter registration records to DPS photo identification databases. In other words, while the DOJ lawyers stand up in court and make headline-grabbing claims about purportedly 'disenfranchised' voters, the DOJ's expert witness testified that he did not even consider whether any voters would actually be 'disenfranchised.'*

Although the Justice Department claims that its expert witness' no-match list reveals how many Texas voters will be impacted by the voter ID law, **Professor Ansolabehere** conceded during his deposition that he did not analyze how many actual, registered voters would be affected by the law—and cannot even offer an opinion about whether anyone on the list will actually be unable to vote:

> "I was not asked to weigh-in on the question of whether or not they would be able to vote."[13]

> "We are trying to determine who has an ID, not who is an actual eligible voter."[20]

During the trial, Professor Ansolabehere was questioned about the methodology he relied upon to produce the list that the DOJ used to claim Texas voters would be harmed by the Voter ID law. That testimony demonstrates why the Justice Department's expert was unable to offer opinions supporting Attorney General Holder's contention that the individuals on the DOJ's list will be unable to vote:

> STATE:          "And you did not engage in any effort to identify records on the voter registration database of people who were ineligible?"
>
> DOJ EXPERT:     "Correct."[21]
>
> STATE:          "And you did not remove noncitizens from the driver's license database did you?"
>
> DOJ EXPERT:     "I don't think we did."[22]

Examples of individuals who may have registered to vote—and are therefore included on the DOJ's no-identification list—but that are not legally authorized to vote include: convicted felons, non-citizen resident aliens, undocumented immigrants, and anyone who is not a Texas resident. Although these individuals are not legally authorized to vote in Texas elections, the DOJ made no effort to exclude them and the result was an inflated, inaccurate list of both eligible and ineligible voters who the Justice Department's expert did not match to a state-issued photo ID.

Page 2

The fact that the DOJ also made no effort to account for individuals who have photo IDs issued by federal agencies further inflated its no-identification list.  But Attorney General Holder did not merely *forget* to account for passports, military IDs, and citizenship certificates issued by federal agencies—which Professor Ansolabehere could have attempted to match with the State's voter registration records.  Indeed, Professor Ansolabehere testified that he wanted to include federally-issued photo identifications in his analysis, but that when he sought access to federal passport and military identification databases, his request was rejected by the Justice Department:

> "I did not have access to any of the federal identification data set—databases such as the military database or the social security database.  We *inquired about getting access* to those databases but could not."[23]

Referring to his client's refusal to make federal databases available to him, Professor Ansolabehere further testified:

> "It would be great to know those other ID forms, but we were not allowed access to those databases."[24]

### DC COURT TO DOJ: NO-MATCH LIST SO FLAWED "IT DOESN'T TELL US MUCH"

*At the conclusion of Professor Ansolabehere's testimony, the Court pointedly questioned the DOJ's expert witness about the legitimacy of his no-identification list and therefore his conclusions in the Texas Voter ID case—asking how a list that included deceased voters and failed to account for federally-issued IDs could possibly produce a reliable estimate of Texas voters who lack photo identification.*

| | |
|---|---|
| THE COURT: | "You pointed out both in your report and earlier today that the Justice Department never gave you access to the federal databases; you know, U.S. military IDs, citizenship certificates, or passports. Correct?" |
| DOJ EXPERT: | "Correct."[25] |
| | |
| THE COURT: | "For people in your no-match category, who don't have it, if they have one of the three federal IDs, SB14 will not have an adverse effect on them. Correct? |
| DOJ EXPERT: | "That's my understanding." |
| THE COURT: | "[W]hat does your study tell us about the legal question we have to ask?[26] |
| | |
| DOJ EXPERT: | "The study has no information on who on the [DOJ's no-identification list]...really, has—or the likelihood that somebody has one of these other federal IDs in the State of Texas." |
| THE COURT: | "Right. So can we really tell anything?..How do we use your study in our thinking about the legal questions this court has to decide?"[27] |
| | |
| THE COURT: | "Suppose your study had been based only on driver's licenses, not license to carry. It's essentially the same question. Right?" |
| DOJ EXPERT: | "Correct." |

MALC00009215

```
THE COURT:          "It wouldn't tell us much about the legal question
                    this court has to resolve."
DOJ EXPERT:         "Correct."[28]

DOJ Expert:         "There were 778,000 change records that were
                    indicated deceased, but in terms of people who for
                    that reason ended up in the VRNID, only 50,000."
THE COURT:          "[I]f those people were in fact dead, then SB14
                    doesn't have any impact on them. Right?"[29]
```

---

**Citing Unreliable Expert Witness Reports, Supreme Court Rejected Challenge to Indiana Voter ID Law:**

*"Petitioners urge us to ask whether the State's interests justify the burden imposed on voters who cannot afford or obtain a birth certificate and who must make a second trip to the circuit court clerk's office after voting. But on the basis of the evidence in the record it is not possible to quantify either the magnitude of the burden on this narrow class of voters... [T]he evidence in the record does not provide us with the number of registered voters without photo identification; Judge Barker found petitioners' expert's report to be 'utterly incredible and unreliable.'...In sum, on the basis of the record that has been made in this litigation, we cannot conclude that the statute imposes 'excessively burdensome requirements' on any class of voters."*

SOURCE: Crawford v. Marion Co. Election Board, 553 U.S. 181, 200-202 (2008).

---

# DOJ EXPERT: VOTER ID LAWS PREVENT "ALMOST NO ONE" FROM VOTING

*Under the voter ID law, any Texan who lacks a photo ID can obtain one free of charge from the Texas Department of Public Safety. Nonetheless, partisans who oppose a photo identification requirement for voters have repeatedly claimed that the law will somehow 'disenfranchise' Texas voters. After a weeklong trial, both the DOJ—and voter ID opponents who intervened in the case—failed to produce a single Texan who will be unable to vote because of the photo ID requirement. Further, when the State questioned Professor Ansolabehere about his failure to include his own academic research in his expert report, the DOJ's star witness conceded that he omitted two academic research studies he published in 2008 and 2009, both of which concluded voter ID laws prevent "almost no one" from voting.*

### AFTER WEEK-LONG TRIAL, DOJ & CO. FAIL TO PRESENT A SINGLE WITNESS WHO CANNOT GET A FREE PHOTO ID—OR WILL BE PREVENTED FROM VOTING

During the 2011 legislative session and in public pronouncements since then, **State Rep. Trey Martinez Fischer** has repeatedly stated that his 73-year-old mother did not have a driver's license—and cited her as anecdotal evidence of a Texan who the voter ID law would adversely impact. Under oath at trial, however, Rep. Fischer acknowledged that his mother has a Texas Driver's License and conceded that she renewed it as recently as August, 2011:

```
"I mischaracterized the fact that she didn't have a driver's
license."[30]
```

Another prominent legislative opponent of the Texas voter ID law, **State Rep. Rafael Anchia**, testified that he has studied voter identification requirements extensively as a member of the House Elections Committee in 2005, 2007, and 2009—and participated in interim legislative studies "on the issue of photo identification."[31] Despite his vigorous opposition to the voter ID law and his extensive study of the issue, during his deposition testimony, Rep. Anchia conceded that he did not know of a single registered voter in the

MALC00009216

State of Texas who lacks the photo identification necessary to vote under the voter ID law.[32]

<table>
<tr><td><strong>The DOJ on the Indiana Challengers' Failure to Produce a Single Voter Who Would Be Unable to Vote</strong>:</td></tr>
<tr><td><em>"The fact is that '[d]espite the apocalyptic assertions of wholesale voter disenfranchisement, [petitioners] have produced not a single piece of evidence of any identifiable registered voter who would be prevented from voting...'"</em></td></tr>
<tr><td>SOURCE: Amicus Brief of the United States at p. 20, Crawford v. Marion Co. Election Board, 553 U.S. 181 (2008).</td></tr>
</table>

When the Texas Senate Committee of the Whole debated SB 14, **Lydia Camarillo, Vice President of the Southwestern Voter Education Project**, submitted written testimony stating: "*We firmly believe that SB 14 will disenfranchise hundreds of thousands of Texas voters.*"[33]

During the nearly 18 months that passed between the legislative debate and the first day of the voter ID trial, political organizations that opposed the law were intensely focused on identifying any voters that might be adversely impacted by the photo ID requirement. Documents obtained by the State during discovery reveal that these organizations even formed a "**Voter ID Task Force**" to help coordinate their statewide search for a voter who would be unable to vote under SB 14. The following is an email that a MALDEF official sent to Task Force members detailing the groups' strategy:

<u>DECEMBER 1, 2011 VOTER ID TASK FORCE EMAIL</u>

"The Voter ID Task Force met earlier this week to strategize a response to the Photo ID legislation passed by the Legislature that is pending preclearance by the Department of Justice."

"[T]he Task Force has decided on a multi-faceted approach that starts with identifying potentially affected individuals that may be disenfranchised. MALDEF with input from many of you has designed the attached questionnaire to assist in that process. Spanish translation pending."

"We need your help in reaching out to communities that have historically been disenfranchised including college students that lack Texas licenses, elderly communities, poor communities, and disabled communities. Please have your volunteers and outreach coordinators use this form in reaching out to individuals that may be disenfranchised due to a lack of photo identification."

"[P]lease return the form to MALDEF we will contact the person. With the information gathered, we can provide the DOJ valuable information."[34]

Despite the well-orchestrated, months-long effort to locate the frustratingly elusive voter who would be "potentially disenfranchised," when the Southwestern Voter Education Project's **Lydia Camarillo** took the witness stand at the federal courthouse in Washington DC, she proved to be the proverbial Senate witness who cried wolf. Indeed, Camarillo's trial testimony reveals that she could only identify two voters in the entire State of Texas who do not have state-issued photo identifications: "*the Rodriguez sisters.*"[35]

One of the two "Rodriguez sisters," **Victoria Rodriguez,** is a college student from San Antonio and the only voter (out of 13 million in Texas) that either the intervenors—or the

MALC00009217

DOJ—produced at trial to support their contention that voters who lack photo IDs will be unable to vote.  But the argument fell apart for the DOJ and their partisan allies when Ms. Rodriguez took the witness stand and testified that she possesses a "birth certificate," a "voter registration card," and a "social security card."[36]

Although she had the necessary supporting documentation to obtain a free Election Identification Certificate, Rodriguez claimed that she could not obtain a photo ID because she does not own a vehicle and her parents are too busy to take her to the local DPS office.  Ironically, however, Rodriguez' testimony explained that she had no trouble securing transportation to the San Antonio airport, flying more than 1,500 miles to Baltimore, catching a train to Washington DC, checking-in at her hotel, and making her way to the federal courthouse in a distant city—so that she could testify about her inability to get to the DPS office back in San Antonio. [37]

---

**The Supreme Court Rejected Claims that Obtaining a Photo ID Imposed a Burden on Indiana Voters:**

*"For most voters who need them, the inconvenience of making a trip to the [Bureau of Motor Vehicles], gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burden of voting."*

Source: Crawford v. Marion Co. Election Board, 553 U.S. 181, 198 (2008).

---

## DOJ'S EXPERT WITNESS ACKNOWLEDGES HIS OWN ACADEMIC RESEARCH SHOWS PHOTO ID LAWS PREVENT "ALMOST NO ONE" FROM VOTING

The DOJ's own expert witness, **Professor Stephen Ansolabehere**, has extensively studied the impact of voter ID laws as a professor of political science—and his published academic research found that voter ID laws prevent "almost no one" from voting.[38] Citing a nationwide survey of 36,500 adults that was conducted by 30 universities— along with a subsequent survey of an additional 4,000 adults—Professor Ansolabehere's published researched included the following conclusions about voter ID laws:

> "But the actual denials of the vote in these two surveys suggest that photo-ID laws may prevent almost no one from voting."[39]

> "Although the debate over this issue is often draped in the language of the civil and voting rights movements, voter ID appears to present no real barrier to access."[40]

> "Voter identification is the controversy that isn't. Almost no one is excluded by this requirement."[41]

> "Over 70% of whites, blacks, and Hispanics support the requirement. Black and Hispanic voters did not express measurably less support for voter ID requirements than whites."[42]

> "These findings undercut much of the heated rhetoric that has inflated the debate over voter ID requirements in the United States."[43]

> "That almost no one is prevented from voting because of voter ID requirements casts doubt on arguments from the

MALC00009218

```
left that this amounts to a new poll tax or literacy
test."44

"The poll tax, literacy test, and other tools of the Jim
Crow laws are powerful metaphors derived from a very ugly
period in American history, but ID requirements in practice
today bear only the palest resemblance to such
discriminatory practices."45
```

# BLOATED VOTER ROLLS, CLOSE ELECTIONS ...AND MORE DEAD VOTERS

*When the U.S. Supreme Court agreed to hear a case challenging the constitutionality of Indiana's voter ID law in 2007, the U.S. Department of Justice argued that state laws requiring voters to present a photo identification at the polling place are perfectly constitutional. In its brief to the Supreme Court, the Justice Department argued that the law was justified, in part, because Indiana "WAS EXPERIENCING HIGHLY INFLATED VOTER REGISTRATION ROLLS, THUS CREATING A RISK OF...VOTER FRAUD. INDEED, A REPORT SHOWS THAT MORE THAN 35,000 DECEASED INDIVIDUALS WERE ON THE ROLLS STATEWIDE."46 Voter registration lists with deceased and ineligible voters, the DOJ explained, "UNDERMINES THE PUBLIC CONFIDENCE IN THE ELECTORAL PROCESS THAT IS THE LIFEBLOOD OF DEMOCRATIC INSTITUTIONS."47*

*In a 2008 decision authored by Justice John Paul Stevens, the U.S. Supreme Court ruled that Indiana's voter ID law was constitutional. Justice Stevens' decision specifically noted that "INDIANA'S VOTER REGISTRATION ROLLS INCLUDE A LARGE NUMBER OF NAMES OF PERSONS WHO ARE EITHER DECEASED OR NO LONGER LIVE IN INDIANA."48 The decisions also found that "INDIANA'S OWN EXPERIENCE WITH FRAUDULENT VOTING—THOUGH PERPETRATED USING ABSENTEE BALLOTS AND NOT IN-PERSON FRAUD—DEMONSTRATES THAT NOT ONLY IS THE RISK OF VOTER FRAUD REAL, BUT THAT IT COULD AFFECT THE OUTCOME OF A CLOSE ELECTION."49*

*Evidence presented in the Texas voter ID case leaves no doubt that the Lone Star State suffers from the very same dead voters, bloated registration rolls, election rigging schemes, and close elections that Justice Stevens invoked in his decision upholding the Indiana law. If anything, the State showed that the situation in Texas is worse because even the DOJ's list of purportedly disenfranchised voters, ALONE, contains 57,000 dead voters—which is 12,000 more dead voters than the 35,000 that the Supreme Court relied upon to justify the Indiana law.*

### INELIGIBLE VOTERS ON THE STATE'S VOTER REGISTRATION LIST

During the voter ID trial, the **Texas Secretary of State's Director of Elections** testified that, as recently as the May 2012 elections, hundreds of votes may have been cast in the name of voters who are deceased:

```
"We believe 239 folks voted in the recent election after
passing away."50
```

In response to a question asking how many of the 239 deceased voters' ballots were cast by someone who appeared *in person* at the polling place, the Director of Elections replied:

```
"Two hundred and thirteen."51
```

MALC00009219

Further, the Director of Elections explained that the Secretary of State's Office recently learned that thousands of deceased individuals are still registered to vote in Texas:

> "We learned that there was a list of 50,000 [deceased] voters that were registered with active voter unique identification numbers."[52]

During his voter ID trial testimony, **State Sen. Tommy Williams** testified that his grandfather died in 1935—but that ballots continued to be cast in his name more than 60 years later.[53]

**State Rep. Aaron Peña** testified that a staff member's deceased father continued to vote five years after his death:

> "One of my staff members told me that his father had voted against me, and I said, 'Why?' He said, 'Well, he's been dead for five years.' So somebody impersonated him."[54]

Although Texas counties are legally required to maintain up-to-date voter registration rolls, testimony by the **Director of Elections** revealed that:

- 18 Texas counties have more people on the voter rolls than actually reside in the county.[55]

- 394 persons have been removed from the voter rolls for non-citizenship since September 1, 2011.

- 5 years have passed since Travis County complied with the Secretary of State's 'strong match' deceased voter cancellation orders.[56]

**State Rep. Jose Aliseda**, a former County Attorney who has personally prosecuted election fraud cases, testified about inflated voter registration rolls in his district:

- "McMullen County has an excess of a hundred percent registration. Jim Wells [County], which is the home of the infamous Box 13...had an excess of 90 percent registration."[57]

---

## CLOSE ELECTIONS: WHERE VOTER FRAUD AFFECTS THE OUTCOME OF ELECTIONS

The **Director of Elections** testified that close elections are most likely to occur in local races for municipal offices:

> "Generally lower turn out elections such as municipal elections have much closer vote margins. [I]n the May 12th local elections we had a tie vote in the city council race up in north Texas and that race was eventually decided by a coin flip."[58]

Testimony was also provided about the potential for thin margins in elections for state office:

Page 8

> "[W]e had a state House race a couple of years ago, Dan Neal and Donna Howard in Travis County that was decided by a 30 some odd vote margin."[59]

The State's evidentiary record indicates that in the last decade multiple Texas House of Representatives elections have been decided by a margin of less than 50 votes:

> "Since 2004, six Texas House elections have been decided by less than 50 votes."[60]

Those six elections were:[61]

- 2010 General Election:        Rep. Donna Howard won by **12 votes**.
- 2010 Democratic Primary:      Rep. Boris Miles won by **8 votes**.
- 2008 General Election:        Rep. Linda Harper-Brown won by **19 votes**.
- 2008 Republican Primary:      Rep. Doug Miller won by **17 votes**.
- 2006 Republican Primary:      Rep. Nathan Macias won by **46 votes**.
- 2004 General Election:        Rep. Hubert Vo won by **33 votes**.

**Major Forrest Mitchell** of the Texas Attorney General's Office testified about an election fraud investigation involving **Debra Briseno**, a primary candidate for Justice of the Peace in rural **Calhoun County**. A deputy voter registrar, Briseno illegally registered foreign nationals to vote in an effort to secure victory in a three-way primary election. Major Mitchell's testimony described how the defendant approached foreign nationals who were legally present in the United States and falsely convinced those individuals that they were eligible to vote:

> "She was a city council person for the City of Port Lavaca, and had signed up as a voter registrar for the 2008 primary...The noncitizens in this case were approached by deputy voter registrars and told that...they were eligible to vote in an election."[62]

During his deposition testimony, **Major Mitchell** explained that the three-way primary contest was closely contested and that—with the help of the unauthorized votes that were cast on her behalf by ineligible voters—Briseno ultimately won the election:[63]

> "It was a very heated contested election. And I think three candidates emerged with a very close margin in that election. I think there were about 19 votes that separated the three candidates...Debra Briseno signed up as a deputy voter registrar. So she assisted in the voter registration of citizens in the county. She additionally registered non-citizens to vote during that election..."[64]

As the **Deputy Attorney General for Criminal Justice** testified to the Texas Senate in 2009, the Calhoun County case illustrates how election fraud can undermine the integrity of elections—particularly in local races—because the trial record in that case illustrates how Briseno's illicit conduct affected the outcome of the election:

> "[T]he testimony at trial showed that the noncitizen votes did affect the outcome of the election. In that case, it was a three-way race. The defendant received 229 votes. Her

MALC00009221

```
runners up received 211 and 210 respectively. And after the
count was had, the two lower tallied candidates had to do a
coin flip in order to determine who was going to be in the
runoff."[65]
```

### ELECTION FRAUD INVESTIGATED BY THE TEXAS ATTORNEY GENERAL'S OFFICE

Unlike other criminal investigations that originate internally within the agency—such as Internet crimes against children or money laundering—the Attorney General's Office only conducts election fraud investigations after receiving a referral from authorized state or local law enforcement and elections officials.  During his testimony to the federal court, **Major Mitchell** confirmed the agency's referral requirement for election fraud cases, stating: "By our policy, we're referral driven."[66]

Major Mitchell's testimony during the voter ID trial detailed the following about election fraud investigations conducted by the Texas Attorney General's Office since 2002:

- 97 of Texas' 254 counties have been the source of Election Code referrals.[67]
- 186 Criminal investigations involving alleged Texas Election Code violations.[68]
- 62 Election fraud investigations led to criminal prosecutions.[69]
- 50 Convictions (or otherwise positive outcomes for the prosecution).[70]
- 3 State police officers are assigned to handle Election Code cases.[71]

The following are examples of actual election fraud cases successfully investigated by the Texas Attorney General's Office:

- A Bee County woman who **illegally cast her deceased mother's ballot**.[72]
- A Hardeman County Commissioner who pled guilty to **ballot harvesting**.[73]
- A Corpus Christi political operative who **illegally cast ballots for two elderly voters** the operative claimed to be helping.[74]
- A Starr County man who **voted twice in the 2006 general election**.[75]
- An ineligible voter in Houston who **used his deceased father's voter registration card to cast an illegal vote** at the polling place.[76]
- A San Antonio woman who **voted more than once**—in multiple elections.[77]
- A Dallas elections worker who **pled guilty after attempting to illegally cast other voters' ballots** while working at the polling place.[78]

In response to questions about detecting voter fraud, Major Mitchell explained why it is difficult to identify and investigate in-person voter impersonation:

```
"I would say it's very difficult to detect...Because it
would require somebody at the polling place actually having
personal knowledge of the voter who is presenting
themselves as the impersonated voter, and then they would
also additionally have to be able to observe how that
person is checked in during the accepting a voter
process...In voter impersonation cases there's very little
interaction with the witnesses, so frequently they're
unable to identify the suspects through a conventional
photo array."[79]
```

MALC00009222

Illustrating one of the few instances where a local elections official actually managed to identify an individual illegally posing as another voter at a polling place, Major Mitchell testified about election fraud during the 2009 Progreso ISD Board elections:

> "[T]his case involved two brothers and their mother… One brother was actually incarcerated in the state penitentiary in San Antonio; the other brother went to the polling place with the incarcerated brother's voter registration certificate and he presented himself as if he were his brother. This was discovered by a poll worker inside the location, and she alerted the election judge. However, since the voter had a lawful voter registration certificate, the elections department let him proceed to vote..."[80]

Major Mitchell's deposition testimony provided additional details about the Progreso ISD case, including the fact that defendant **Lorenzo Almanza** had already cast his own ballot—so when he appeared at the polling place, he not only illegally impersonated his brother, he also voted a second time:

> "Lorenzo Almanza and his mother went into the Progresso school district to vote in that election. Lorenzo Almanza had already voted days prior to that election and used his brother's voter registration certificate to cast a second ballot in that election. His brother was an ineligible voter because he was incarcerated in San Antonio for a felony offense at the time."[81]

---

## "HEATED RHETORIC HAS INFLATED THE DEBATE OVER VOTER ID" --DOJ'S EXPERT WITNESS

*In his 2008 study concluding that Voter ID laws prevent "almost no one" from voting, Harvard Professor Stephen Ansolabehere wrote: "Voter identification is the controversy that isn't. Almost no one is excluded by this requirement...These findings undercut much of the heated rhetoric that has inflated the debate over voter ID requirements in the United States."[82] In the context of Texas' voter ID case, Professor Ansolabehere is not just any academic—he is an expert witness who the Justice Department paid $400 per hour to provide testimony supporting Attorney General Holder's opposition to Texas' voter ID law.[83]*

*As the research he published in 2008 and 2009 indicates, long before Professor Ansolabehere was hired to provide opinions supporting the Justice Department's case against Texas, he concluded that voter ID laws prevent "almost no one from voting." Further, Professor Ansolabehere revealed that survey research shows "[o]ver 70% of whites, blacks and Hispanics support the [voter ID] requirement....Such findings suggest the Congressional Black Caucus and the Democratic Party leadership may have been wholly out of step with the analogous segments of the electorate on this issue." And it was based upon that very research that Professor Ansolabehere cautioned against "heated rhetoric" inflaming the debate over voter ID laws. Despite Professor Ansolabehere's admonition, Attorney General Holder and the partisans who oppose SB 14 have resorted to "heated rhetoric" of their own in an apparent attempt to distract from the real facts—and obscure inaccurate, manufactured, and questionable statements they made on their way to the courthouse.*

Page 11

MALC00009223

*AG HOLDER: VOTER ID = POLL TAX*
*HOLDER'S EXPERT: VOTER ID ≠ POLL TAX*
*U.S. SUPREME COURT: VOTER ID ≠ POLL TAX*

**AG Holder's Rhetoric:**

AG HOLDER:                "We call those [voter ID laws] poll taxes."[84]

**Reality:**

HOLDER'S EXPERT:          "That almost no one is prevented from voting
(PROF. ANSOLABEHERE)      because of voter ID requirements casts doubt on
                         arguments from the left that this amounts to a
                         new poll tax or literacy test."[85]

                         "The poll tax, literacy test, and other tools
                         of the Jim Crow laws are powerful metaphors
                         derived from a very ugly period in American
                         history, but ID requirements in practice today
                         bear only the palest resemblance to such
                         discriminatory practices...However, voter ID
                         requests today result in almost no exclusions
                         from the political process...These facts
                         strongly suggest that there may be little or no
                         voting rights issue involved in the dispute
                         over voter ID rules, and no question of fraud
                         either. This is hardly the stuff of the Civil
                         Rights Movement."[86]

U.S. SUPREME COURT:       "The fact that most voters already possess a
                         valid driver's license or some form of
                         acceptable identification would not save the
                         statute under our reasoning in *Harper* [a
                         Supreme Court case striking down a poll tax in
                         Virginia], if the State required voters to pay
                         a tax or fee to obtain a new photo
                         identification.  But just as most States
                         provide free voter registration cards, the
                         photo identification cards issued by Indiana's
                         BMV are also free."[87]

*AG HOLDER PRAISES LBJ FOR PROTECTING
THE "INTEGRITY" OF THE DEMOCRATIC PROCESS?*

**LBJ AND THE INTEGRITY OF ELECTIONS**

**How Election Fraud Propelled Political LBJ's Career**:

*"Lyndon Johnson had something else on his side in Texas.  His investment in George Parr was paying off...Between 1948 and 1960 little had changed.  In the latter election, as in the former, George Parr counted them for Lyndon Johnson.  The first sign was the pace of the counting...Then, finally, came the vote itself...Then there was Jim Wells County, or to be precise, the county's precinct Thirteen: "Box 13," the precinct already legendary in Texas political history, that in 1948 had provided the decisive margin for Lyndon Johnson by giving him two hundred new votes—the votes were cast in alphabetical order and all in the same handwriting six days after the polls had closed."*

Source: ROBERT CARO, THE PASSAGE OF POWER (Alfred A. Knopf 2012) at p. 150-152.

Page 12

MALC00009224

**AG Holder's Rhetoric:**

| | |
|---|---|
| AG HOLDER: | "[H]onor the life and legacy of our 36th Commander-in-Chief [President Lyndon Johnson]...and build upon his historic efforts to ensure, strength, integrity, and the future of our democracy..."[88] |

**Reality:**

| | |
|---|---|
| FEDERAL LAWSUIT FILED AGAINST LYNDON JOHNSON SEEKING TO ENJOIN LBJ's CERTIFICATION AS THE 1948 DEMOCRATIC PARTY NOMINEE FOR THE U.S. SENATE: | "Plaintiff Coke R. Stevenson was a candidate for nomination by the Democratic party for United States Senator from Texas...At the time the polls were closed and the count of the votes in [Jim Wells County] precinct no. 13 had had been completed, only 841 votes had been cast in said precinct.  In the few days following there were added to the list of persons voting in said precinct 200 additional names and 200 votes which had never been cast were fraudulently credited to Lyndon B. Johnson.[89] |
| THE U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, IN AN ORDER FINDING VOTER FRAUD BENEFITTED LBJ'S IN HIS 1948 CAMPAIGN FOR THE U.S. SENATE: | "There was evidence of fraud in the official returns from certain election officials in Jim Wells, Zapata, and possibly other Counties in the State Democratic Executive Committee, without which there would have been a change in official certification by the Officers of the State Convention as to who the Democratic nominee for the Office of United States Senator."[90] |

---

**The Department of Justice on Voter Fraud in 2007:**

*"Voter fraud itself constitutes an impairment of the right to vote.  In a close race, even a handful of fraudulent votes could invalidate the entire election..."*

SOURCE: Amicus Brief of the United States at p. 18-19, Crawford v. Marion Co. Election Board 553 U.S. 181 (2008).

---

## AG Holder Says Partisanship Shouldn't Influence Oversight of Elections—Then Hires Partisans to Influence Case Against Texas

**AG Holder's Rhetoric:**

| | |
|---|---|
| AG HOLDER: | "We need election systems that are free from fraud, discrimination, and partisan influence."[91] |

**Reality:**

| | |
|---|---|
| STATE: | "[T]he United States taxpayers paid for you to use Catalist to try to ferret out the race of about 1.9 million individuals listed in the Texas voter registration database, correct?" |
| HOLDER EXPERT ANSOLABEHERE: | "Correct" |
| STATE: | "Now you know that Catlist is affiliated with the Democratic Party, unions, and left-of-center groups, right?" |
| ANSOLABEHERE: | "They are, yeah. They're affiliated with unions, left-of-center interest groups..." |

MALC00009225

| STATE: | "But you, in fact, know that they sell their data to the Democratic Party unions and left-of-center interest groups, right?" |
| ANSOLABEHERE: | "Correct." |
| STATE: | "When you describe Catalist to your colleagues in the academic world, you thought it was important to mention that Catalist works with the Democratic Party, unions and left-of-center interest groups, right?" |
| ANSOLABEHERE: | "Correct." |
| STATE: | "When you submitted your sworn testimony to this court, you nowhere mentioned those affiliations, did you?" |
| ANSOLABEHERE: | "No, I did not."[92] |
| HOLDER EXPERT KOUSSER: | "I'm a Democrat." |
| STATE: | "Do you make donations to Democrat candidates? |
| KOUSSER: | "I make donations to Democratic candidates." |
| STATE: | "Do you have a political philosophy?" |
| KOUSSER: | "I would generally characterize myself as liberal." |
| STATE: | "Did you make a donation to President Obama? |
| KOUSSER: | "Yes." |
| STATE: | "[B]oth the initial cycle and this election cycle?" |
| KOUSSER: | "Yes."[93] |

---

**The Supreme Court Upholds Indiana Voter ID Law, Rejects Partisan Opposition Spilling Into Court**:

"*[The Indiana] litigation was the result of a partisan dispute that had 'spilled out of the state house into the courts.'...[P]artisan considerations may have played a significant role in the decision to enact [the law]. If such considerations had provided the only justification for a photo identification requirement, we may also assume that [the law] would suffer the same fate as the poll tax... But if a nondiscriminatory law is supported by valid neutral justifications, those justifications should not be disregarded simply because partisan interests may have provided one motivation for the votes of individual legislators...The application of the statute to the vast majority of Indiana voters is amply justified by the valid interest in protecting 'the integrity and reliability of the electoral process.'*"

--Source: CRAWFORD V. MARION CO. ELECTION BOARD, 553 U.S. 181, 203-204 (2008).

---

### *UNDER OATH, REP. TREY MARTINEZ FISHER CONFESSES: MOTHER DOES NOT ACTUALLY LACK DRIVER'S LICENSE*

**Rep. Fisher's Rhetoric:**

| | Legislative Debate (3/27/2011) |
| REP. FISHER: | "My mother's over the age of seventy, she doesn't drive, she has Parkinson's disease. Now she has to go out and get a free ID if she's gonna vote. She doesn't have a passport. She doesn't have a national birth certificate with her picture on it.  Now she has to get a free ID... And all of the sudden those volunteers and election judges that know her by name…are now going to have to tell her to go to DPS."[94] |

Page 14

MALC00009226

|  | Deposition Testimony (6/15/12) |
|---|---|
| REP. FISHER: | "I have a mother who has Parkinson's Disease. She doesn't drive. Until very recently, I didn't think she had a driver's license because she medically is not able to drive, but lo and behold she does, and I can imagine when it expires, which I think is in the very near future, we have no compelling reason to renew her driver's license..."[95] |

## Reality:

|  | Trial Testimony (7/10/12) |
|---|---|
| REP. FISHER: | "I, in my mind, believed that she did not have a driver's license…and I did not know until I asked my mom to see her wallet.  And so when I learned that her license was still active and not being used, I corrected myself...because I mischaracterized the fact she didn't have a driver's license."[96] |
| STATE: | "And if the official records of Texas…show that she renewed it in 2011, you have no reason to dispute that. Right?" |
| REP. FISHER: | "Absolutely not."[97] |

### SEN. ELLIS TESTIFIED HE DIDN'T COORDINATE WITH DOJ ON THE VOTER ID CASE—BUT A DAY LATER THE TRUTH COMES OUT

## Sen. Ellis' Rhetoric:

|  | Deposition Testimony (6/22/12) |
|---|---|
| STATE: | "So, are you indicating that the Department of Justice did not assist you in drafting this declaration?" |
| SEN ELLIS: | "That's correct." |
| STATE: | "Okay. Did they -- did they coordinate the filing of this document?" |
| SEN ELLIS: | "Not to my knowledge. You know, I know them. I'm close to them but I'm not that close." |
| STATE: | "[T]he Department of Justice did not draft this affidavit and did not send it to you ultimately for your signature; is that correct?" |
| SEN ELLIS: | "That's Correct."[98] |

## Reality:

|  | Deposition Testimony (6/23/12) |
|---|---|
| SEN ELLIS: | "Upon reflection, I would say that on my affidavit—that I did talk with the DOJ on putting it together."[99] |

### SEN. URESTI: 'I DON'T THINK I SAID THAT...'

## Sen. Uresti's Rhetoric:

|  | Sworn Declaration of Sen. Carlos Uresti (4/9/12) |
|---|---|
| SEN. URESTI: | "For thousands of constituents who live in Ozona, Presidio, and Sierra Blanca, the average travel time to the nearest driver license |

Page 15

office is approximately three hours round trip."[100]

**Reality:**

|  | Recorded Trial Testimony (7/11/12) |
|---|---|
| STATE: | "[A]re you aware that there's a DPS driver's license office in Presidio as of January 2011?..[T]here is a DPS office in Presidio; is that correct?" |
| SEN URESTI: | "Yes, sir." |
| STATE: | "So when you said that there's not one in Presidio, you—that's not a correct statement, correct?" |
| SEN. URESTI: | "I don't think I said there's not one in Presidio." |

*SEN. ELLIS: I LIED*

**Sen. Ellis' Rhetoric:**

|  | Senate Committee of the Whole (1/25/11) |
|---|---|
| SEN FRASER: | "I want to make sure that the groups you're talking about, you know, women, minority, elderly, that they all have the right to vote; and I believe my bill does that." |
| SEN ELLIS: | "Okay.  And I know that's your intent."[101] |

**Reality:**

|  | Deposition Testimony (6/22/12) |
|---|---|
| STATE: | "[S]o, you said on the Senate floor on January 25th, 2011 that you knew that Senator Fraser's intent was to not impact the groups including women, minority, elderly and reserving their right to vote?" |
| SEN ELLIS: | "I did say that but I didn't mean it." |
| STATE: | "So, you were lying when you said that?" |
| SEN ELLIS: | "Yes, I was."[102] |

|  | Trial Testimony (7/11/12) |
|---|---|
| STATE: | "When you gave your sworn testimony in this case to my colleague Mr. Sweeten, you told him that what you said in the Committee of the Whole to Senator Fraser was a lie. Right?" |
| SEN ELLIS: | "That's correct."[103] |

# DOJ EXPERT:  I SHOULDN'T HAVE TRUSTED WIKIPEDIA; JUSTICE O'CONNOR PROMOTED WHITE SUPREMACY

*J. Morgan Kousser, a Californian with no professional experience in the Texas Legislature or Texas elections, was hired by Attorney General Holder to serve as an expert witness on the Texas Legislature's purported intent when SB 14 was passed. The DOJ's controversial expert provided testimony that was riddled with errors—at least one of which Kousser conceded resulted from his use of Wikipedia to prepare his expert report for the Justice Department—and*

MALC00009228

*included 'findings' based on his 1999 book, Colorblind Justice, which concluded that U.S. Supreme Court Justice Sandra Day O'Connor sought to "redeem" white supremacy in a 1993 decision. The controversial conclusions in Kousser's book are relevant to the Texas voter ID case because, as Attorney General Holder's expert witness, he relied on the analytical framework he created for Colorblind Justice to support the DOJ's claims about Texas' voter ID law. Specifically, Kousser invokes the ten so-called 'factors' delineated in his 1999 book to justify his conclusion that the Texas Legislature acted with a purported discriminatory purpose.[104]*

### KOUSSER: JUSTICE SANDRA DAY O'CONNOR PROMOTED WHITE SUPREMACY

When Kousser testified during the voter ID trial, counsel for the State of Texas asked about his conclusion in *Colorblind Justice*, where Kousser argues that **Justice O'Connor's** *Shaw v. Reno* opinion—which was joined by **Chief Justice Rehnquist**, **Justice Kennedy**, **Justice Scalia**, and **Justice Thomas**—had the effect of promoting white supremacy:

| STATE: | "And the opinion you're expressing at the end of your book, the book that's cited in your report in this case, is that Justice O'Connor authored, and that Chief Justice Rehnquist, Justices Kennedy, Scalia, and Thomas joined an opinion that employed colorblind rhetoric that had the effect of promoting white supremacy. Right?" |
| KOUSSER: | "That's correct."[105] |

Although the Supreme Court's decision upholding Indiana's voter ID law—which was written by **Justice John Paul Stevens**—governs the federal court's decision in the Texas voter ID case, Attorney General Holder's expert witness in Texas' voter ID case stated that he objects to the high court's ruling:

| STATE: | "And of course you think *Crawford* was wrongly decided. Right?" |
| KOUSSER: | "I agree with you...I do not like the Crawford decision.[106]" |

### EXCERPTS FROM KOUSSER'S TESTIMONY ON BEHALF OF THE JUSTICE DEPARTMENT

As an expert witness for Attorney General Holder, Kousser testified:

- SB 14's proponents used "*elite deception*" to support the "*myth of voter fraud*," and as a result, the public accepts voter fraud "*rumors*" just as it accepts "*conspiracies*" about "*the destruction...on 9/11*" and "*President Obama's citizenship*."[107]

- Republican African-American and Hispanic legislators are not "*legitimate representatives*" of minority communities.[108]

- "*But he's white*"—after learning that an Anglo Democrat who represents a majority-Hispanic House District voted *for* the voter ID law.[109]

- All legislators who voted for SB 14—including 5 Hispanics and 2 African-Americans—were motivated by "*racially discriminatory purposes*."[110]

MALC00009229

- There could be states that could enact voter ID laws without a discriminatory purpose, but "*Texas is not one of those places.*"[111]

- The Texas Attorney General should ignore documented evidence of voter fraud and instead "*spend all his time*" prosecuting environmental violations.[112]

- "*Even if a majority of Hispanics support voter ID, it has a discriminatory purpose.*"[113]

- To the extent African-Americans and Hispanics support voter ID laws, it is only because they were manipulated and misled by Republicans.[114]

## KOUSSER'S FALSE STATEMENTS

*Repeatedly questioned at trial about false and inaccurate statements, Kousser conceded that he had relied on research from Wikipedia when he prepared his expert report for the Department of Justice.*

| | |
|---|---|
| Testimony: | Senator Leticia Van de Putte was "*Senate Minority Leader.*"[115] |
| Fact: | The Texas Senate does not have a Majority Leader or a Minority Leader. |
| | |
| Testimony: | Rep. Patricia Harless was Chair of the Elections Committee in 2011.[116] |
| Fact: | In 2011, the House Elections Committee Chair was Larry Taylor. |
| Response: | "*Seems I was wrong. Sorry.*"[117] |
| | |
| Testimony: | Rep. Harless represented an "*overwhelmingly*" white district.[118] |
| Fact: | 42.9% of the voters in Rep. Harless' district were white. |
| Response 1: | "*I tell my students not to trust Wikipedia. I should not have.*"[119] |
| Response 2: | "*Wikipedia said that it was overwhelmingly white...*"[120] |
| Response 3: | "*I did not look up the ethnic composition of her district.*"[121] |
| | |
| Testimony: | Republican "*majorities*" forced rules changes to stop chubbing.[122] |
| Fact: | HR 4 enacting the anti-chubbing rules passed unanimously 143-0.[123] |
| Response: | "*In the 2009 chub...some Democrats...were quite put off.*"[124] |
| | |
| Testimony: | Lt. Gov. Dewhurst vacated the Chair so he could vote for SB 362.[125] |
| Fact: | Senate Rule 13.02 requires the Lt. Gov. to vacate the Chair.[126] |
| | |
| Testimony: | In 2010, zero Black Republicans were elected to the Texas House.[127] |
| Fact: | Rep. Stefani Carter and Rep. James White were both elected in 2010.[128] |
| | |
| Testimony: | SB 14 placed "*vastly underestimated burdens*" on "*the disabled.*"[129] |
| Fact: | Disabled voters are exempt from SB 14's photo ID requirement.[130] |
| | |
| Testimony: | SB 14 placed "*vastly underestimated burdens*" on "*the old.*"[131] |
| Fact: | Elderly voters can vote by mail, which does not require photo ID.[132] |
| | |
| Testimony: | The OAG used HAVA funds to investigate election fraud.[133] |
| Fact: | A Governor's Office grant—not HAVA—initially funded the SIU.[134] |

MALC00009230

# POLITICAL MACHINES, LOCAL BOSSES & VOTER FRAUD

*State Rep. Jose Aliseda, a former prosecutor who represents seven South Texas counties—including Jim Wells County, which is home to the infamous Box 13 that delivered the 200 fraudulent votes necessary to ensure Lyndon Johnson's infamous victory in the 1948 U.S. Senate election—testified about the prevalence of voter fraud and the corrupting influence of local political machines in his district. The following are excerpts from Rep. Aliseda's sworn testimony in the voter ID case.*

**EXCERPTS FROM REP. JOSE ALISEDA'S TESTIMONY:**

### Voter Fraud's Corrupting Influence in Local Elections, Governments:

"[W]e're talking about commissioners races, school board elections, primarily county-wide elections. And we had unusual things going on in in that you would have, for example, a commissioners' race being decided by maybe five, six hundred votes passed and two or three hundred of those were mail-in ballots. So I tried to get the sheriff's department and the police department to look into it. It's a political hot potato, they weren't interested."[135]

### How Local Political Machines Control Territory, Rig Elections:

"It's—in Bee County we had political bosses, and they controlled who ran, they also controlled these people called politiqueros, politiqueras...And what these individuals would do, they were vote harvesters. They would go out and find elderly people, get them to sign an application for a mail-in ballot. When the ballot would go out of the county clerk's office they literally follow the—the postman to the elderly person's home, enter the home, and then suggest by word sign or gesture how that individual should vote. And in some cases I believe that there was actually no voter voting the ballot or if they voted the ballot wrong somehow that ballot would disappear. Those were things that were discovered in the course of the investigation... They're vote harvesters. And it's a fairly common practice in Bee County and throughout south Texas."[136]

"McMullen County has an excess of a hundred percent registration. Jim Wells, which is the home of the infamous Box 13, has an excess of, I believe at the time that I testified before the election -- not testified, argued on behalf of voter ID in front of legislature, it had an excess of 90 percent registration. Now it looks like it's in the high eighties."[137]

### Election Fraud Enables Political Bosses, Protects Corrupt Patronage:

MALC00009231

"I believe that the goal was for local elections, that's where the contracts came out of, for example, the school board election to build a brand-new school. That's where the jobs came out for—doling out jobs to your friends and maybe not so close relatives because of the—the laws were—involving nepotism, but it -- the power at least that I saw the effort was to try to control the local elections."[138]

## Targeting Elderly Voters:

"I had an elderly person call my office and say that at one of the polling places, which was a senior citizens' meal center and recreation center, they were being told that they had to vote a certain way or their benefits would be lost."[139]

## Documented Election Fraud:

"[T]here was just a lot of controversy, and there was a time where actually impounded—asked the district judge to impound eighteen hundred ballots, and she did...there was an allegation that one of the seals was broken on one of the boxes."[140]

"I proved that…money actually changed hands in the case of a vote, a mail-in vote, and I proved that because there were outside witnesses around the area that actually saw what happened to their loved one with respect to that ballot."[141]

"And one of the problems that we have in south Texas is that sometimes these elected officials or election administrators are[] in cahoots with some of the stuff that's going on. We have judges being thrown out of the polling place by the primary judge. We have poll workers getting thrown out."[142]

"I am aware that we have had non-citizens voting in Bee County elections."[143]

## Why Election Fraud is Difficult to Detect and Prosecute:

"How do you catch it? How do you catch someone coming in using somebody else's certificate and leaving, that vote counts. It cancels out somebody else's good vote."[144]

## Why Risk Political Peril to Prosecute and Prevent Election Fraud?:

"Because my citizens wanted me to. They were tired of hearing how corrupt their system was, and they wanted somebody to do something about it. And most of the crimes fell under my jurisdiction as the county attorney."[145]

"[I]n my county the people were clambering for somebody to do something, they didn't trust the system. Some would say,

MALC00009232

you know, what's the point of voting if my vote is going to be canceled out by one of these mail-in ballot fraud votes. So as a whole, the reason I did what I did was to give people back the confidence in the system."[146]

"[M]y service in the United States Navy...I didn't do that so that people that were registered—specifically Mickey Mouse…by Acorn could vote or that dead people could vote... But most importantly I said that the people that are Americans in 2012, well…expect to show an ID for just about everything that they do of even semi-importance including renting a movie and that the public expected us to pass this legislation to give them confidence in the system."[147]

"Eventually, I believe that SB14 will help clean up the mail-in ballot process as well. As individuals become older, they will all have identification as they pass that magic threshold of 65, and I think, at that point, that we can go backwards as an investigator and find out what's going on."[148]

### EXCERPTS FROM REP. AARON PEÑA'S TESTIMONY:

*State Rep. Aaron Peña, a veteran member of the House Elections Committee and sponsor of SB 14, testified extensively about the prevalence of voter fraud in his community. In his testimony, Rep. Peña explained that local political bosses in South Texas maintain political control over their territory by hiring professional ballot harvesters—known as politiqueras—purchasing votes, misusing taxpayer resources, controlling local elections offices, and targeting elderly voters. The following are excerpts from Rep. Peña's sworn testimony in the voter ID case.*

<u>How Candidates Secure the Political Bosses' Support:</u>

"[T]he traditional method of campaigning is you go to the political bosses in the community…[Y]ou kiss their ring and you ask for their blessing. They usually want money. It's either said or inferred, okay? They want to hire their ladies…which means hire their crew of politiqueras. Once you get the blessings of certain people, then other sub bosses fall in line. Then you look to the dominant families of the community…In the Delta area, we have competing clubs. We now have three, where we used to have two during my period, the TACO and the BEE Club. And you go and you pitch yourself to them. And they typically want money in exchange…. And then they have their ladies that go out and gather people together."[149]

<u>How Local Political Machines Control Territory, Rig Elections:</u>

"Corruption."[150]

"The use of politiqueras…the abuse of the use of them. [Y]ou know, constitutionally and from a good government

MALC00009233

perspective, it's important to get people out to vote. It's when they cross the line, that's it's offensive."[151]

"Paying the voters, paying the voters to vote."[152]

"People walk in with ballots in their hands and say, 'Hey, you want to buy these from me?' And I'd said, 'This can't be legal.'"[153]

"Using government vans, school district vans to haul voters to the polls. The emptying of day care—adult day care centers, and paying off the manager of the center; things of that nature."[154]

"In order to get elected in Hidalgo County, everybody looks the other way or is a participant…I'm talking about elected officials."[155]

### Local Elections Officials Controlled by Political Machines:

"[A]t the elections office…individuals would know who did not vote or whose ballot has not been cast, and they somehow would get those votes or ballots to somebody else to cast in those persons' names… The people in office are part of the political process, and they are part of the machine many times, so they have people in there, so that they won't get screwed from the other side who's got people in there… [T]hey looked for people who hadn't voted, and then they passed out ballots…"[156]

### Targeting Elderly Voters:

"[T]here are certain people you can go to, to buy elderly day care centers. By "buy" I mean you hire the leader who leads the ladies to go in to vote. And they strongly suggest, in the past, now they just do it there with them with assisted voting – but in the past, it was, they would say, 'This is who you're voting for'…Today, though, assisted voting is the crime, the voter fraud of choice…They go in and say, 'Hey, we want to assist you. You need to ask for us to assist you.' And they will say yes because they want to continue their employment or their family's employment with some of the local government jobs, usually a school district. And if you refuse, well, you're deemed not to be loyal.  You're too independent for them."[157]

### How to Commit Voter Impersonation in South Texas:

"If I was in the Valley, I'd find a polling place that is rarely used probably one out in a small little colonia that nobody goes to, and I'd make sure that the campaign workers were my campaign workers. And then I'd figure out the people who had not voted, especially on the last day. And I'd say, 'These people haven't voted. Come on in and vote,' and they would simply come in and vote."[158]

MALC00009234

<u>Widespread Corruption</u>:

"[T]here are many people serving in office who ought to be in jail today where I live. But there's very little accountability except through the federal system, and they can't be watching us all of the time. This corruption is a tax on the very poor people I represent…[But] the federal level has more important things to deal with, the cartels and smuggling and murder and kidnapping. And on the state level, I think you'll find this across the board, that the DAs are not going to get involved. They think it's too hard to prosecute or it's inconvenient for them, politically speaking."[159]

<u>Political Bosses' Reaction when Rep. Peña Took On Fraud, Corruption</u>:

"So when I spoke up, I was generally met with resistance from the elected politicians who said, 'What are you doing? We've got a good thing going here. Why are you doing this?'"[160]

<u>Constituents' Frustration with Corruption and Fraud</u>:

"I think the general public is frustrated.  And they're frustrated with government in general. They're frustrated with our institutions. They're frustrated with a lot of things, and they want to have a solution, and this is one they've latched on to, for whatever reason…[I]f this [SB 14] is what they want—and even if it's a piece of symbolism, it has value. Now, I would say it goes beyond symbolism, because it does have value. So I do think it's important that we stand up… And this is what people want. If you look at the polls, this is what people want. Now, knowing all the type of voter fraud that I encounter back home, I realize, and I have publicly stated, that this was simply a good start. But the injection of confidence that somebody is actually doing something matters."[161]

"And I come from a Hispanic community, and those people want honest elections. And that's why I sincerely come here and have advocated for that position. And voter ID was a starting point, okay? It's not the final solution, as I've stated many times."[162]

<u>Why Attorney General Holder is Wrong About Voter ID</u>:

"Many people don't have the experience that I have down there, okay? They don't live with the day to day. It's like a cancer that's growing. And I'm not sure they understand the priorities. So I think these are well-meaning people; they just don't have the daily experience like I do, or other people along the border do, where we have a well-

MALC00009235

honed system of corruption going back to the boss era at the turn of the last century."[163]

"But as to Mr. Holder…that was political.  He has made this issue a seemingly campaign issue, where he goes around the country, and he seems to be whipping up support for him. That's perfectly good and fine. As an American citizen, he can do it. But that being so close to the election, when the swing states involved are places like Colorado and some of the western states, where there's a high Hispanic percentage, seems to me to be blatantly political…. I don't know why he came to Austin to give that speech. He seems to be making a point of it. The administration seems to be making a point of this, and I think it's to create a wedge issue between Hispanics and the conservative movement."[164]

[1] Statement of Elizabeth Westfall, Trial Transcript, Monday, July 9, 2012 at p. 42.

[2] Statement of Elizabeth Westfall, Trial Transcript, Monday, July 9, 2012 at p. 43.

[3] Deposition of Stephen Ansolabehere, June 22, 2012 at p. 97.

[4] Testimony of Prof. Thomas Sager, Trial Transcript, Tuesday, July 10, 2012, Vol. I at p. 25

[5] Testimony of Prof. Thomas Sager, Trial Transcript, Tuesday, July 10, 2012, Vol. I at p. 26.

[6] Testimony of Prof. Thomas Sager, Trial Transcript, Tuesday, July 10, 2012, Vol. I at p. 26.

[7] Testimony of B. Keith Ingram Trial, Transcript, Monday, July 9, 2012, Vol. I at p. 74.

[8] Testimony of Stephen Ansolabehere, Trial Transcript, Thursday, July 12, 2012 at p. 50.

[9] Testimony of Stephen Ansolabehere, Trial Transcript, Thursday, July 12, 2012 at p. 53.

[10] Testimony of Stephen Ansolabehere, Trial Transcript, Thursday, July 12, 2012 at p. 55.

[11] Testimony of Stephen Ansolabehere, Trial Transcript, Thursday, July 12, 2012 at p. 59.

[12] Testimony of Stephen Ansolabehere, Trial Transcript, Thursday, July 12, 2012 at p. 70.

[13] Deposition of Stephen Ansolabehere, June 22, 2012 at p. 97.

[14] Deposition of Stephen Ansolabehere, June 22, 2012 at p. 18.

[15] Deposition of Stephen Ansolabehere, June 22, 2012 at p. 159.

[16] Deposition of Stephen Ansolabehere, June 22, 2012 at p. 109.

[17] Deposition of Stephen Ansolabehere, June 22, 2012 at p. 276.

[18] Testimony of Prof. Daron Shaw, Trial Transcript, Wednesday, July 11, 2012, Vol. I, at p. 35.

[19] Deposition of Stephen Ansolabehere, June 22, 2012 at p. 161.

[20] Deposition of Stephen Ansolabehere, June 22, 2012 at p. 92.

[21] Testimony of Stephen Ansolabehere, Trial Transcript, Thursday, July 12, 2012 at p. 42.

[22] Testimony of Stephen Ansolabehere, Trial Transcript, Thursday, July 12, 2012 at p. 275.

[23] Deposition of Stephen Ansolabehere, June 22, 2012 at p. 19.

[24] Deposition of Stephen Ansolabehere, June 22, 2012 at p. 109.

[25] Testimony of Stephen Ansolabehere, Trial Transcript, Thursday, July 12, 2012 at p. 108-109.

[26] Testimony of Stephen Ansolabehere, Trial Transcript, Thursday, July 12, 2012 at p. 109-110.

[27] Testimony of Stephen Ansolabehere, Trial Transcript, Thursday, July 12, 2012 at p. 110.

[28] Testimony of Stephen Ansolabehere, Trial Transcript, Thursday, July 12, 2012 at p. 112.

[29] Testimony of Stephen Ansolabehere, Trial Transcript, Thursday, July 12, 2012 at p. 112.

[30] Testimony of Rep. Trey M. Fischer, Trial Transcript, July 10, 2012, at p. 15.

[31] Testimony of Rep. Rafael Anchia, Trial Transcript, Tuesday, July 10, 2012, Vol. II at p. 23.

[32] Testimony of Rep. Rafael Anchia, Trial Transcript, Tuesday, July 10, 2012, Vol. II at p. 44.

[33] Testimony of Lydia Camarillo, Debate on Tex. S.B. 14 Before the Senate Committee of the Whole 82nd R.S. (January 25, 2011) (Hearing Transcript, Vol. II at p. 495).

[34] State of Texas v. Holder, Trial Appendix 02648.

[35] Testimony of Lydia Camarillo, Trial Transcript, Wednesday, July 11, 2012, Vol. I at p. 145.

[36] Testimony Victoria Rodriguez, Trial Transcript, Wednesday, July 11, 2012, Vol. I at p. 9.

[37] Testimony Victoria Rodriguez, Trial Transcript, Tuesday, July 10, 2012, Vol. II at p. 130-131.

MALC00009236

[38] Stephen D. Ansolabehere, *Effects of Identification Requirements on Voting: Evidence from the Experiences of Voters on Election Day*, POLITICAL SCIENCE (January, 2009) at p 127.

[39] Stephen D. Ansolabehere, *Effects of Identification Requirements on Voting: Evidence from the Experiences of Voters on Election Day*, POLITICAL SCIENCE (January, 2009) at p 127.

[40] Stephen D. Ansolabehere, *Effects of Identification Requirements on Voting: Evidence from the Experiences of Voters on Election Day*, POLITICAL SCIENCE (January, 2009) at p 127.

[41] Stephen D. Ansolabehere, *Access Versus Integrity in Voter Identification Requirements*, 63 N.Y.U. ANNUAL SURVEY OF AMERICAN LAW 613 (2008).

[42] Stephen D. Ansolabehere, *Access Versus Integrity in Voter Identification Requirements*, 63 N.Y.U. ANNUAL SURVEY OF AMERICAN LAW 613 (2008).

[43] Stephen D. Ansolabehere, *Access Versus Integrity in Voter Identification Requirements*, 63 N.Y.U. ANNUAL SURVEY OF AMERICAN LAW 613 (2008).

[44] Stephen D. Ansolabehere, *Access Versus Integrity in Voter Identification Requirements*, 63 N.Y.U. ANNUAL SURVEY OF AMERICAN LAW 613 (2008).

[45] Stephen D. Ansolabehere, *Access Versus Integrity in Voter Identification Requirements*, 63 N.Y.U. ANNUAL SURVEY OF AMERICAN LAW 613 (2008).

[46] Brief for the United States as Amicus Curiae at 3, Crawford v. Marion County Election Bd, 553 U.S. 181 (2008) (Nos. 07-21 and 07-25)

[47] Brief for the United States as Amicus Curiae at 10, Crawford v. Marion County Election Bd, 553 U.S. 181 (2008) (Nos. 07-21 and 07-25)

[48] Crawford v. Marion County Election Bd, 553 U.S. 181, 191 (2008).

[49] Crawford v. Marion County Election Bd, 553 U.S. 181, 195-196 (2008).

[50] Testimony of B. Keith Ingram Trial Transcript, Monday, July 9, 2012, Vol. I at p. 66.

[51] Testimony of B. Keith Ingram Trial Transcript, Monday, July 9, 2012, Vol. I at p. 66.

[52] Testimony of B. Keith Ingram Trial Transcript, Monday, July 9, 2012, Vol. I at p. 65.

[53] Testimony of Sen. Tommy Williams, Trial Transcript, Monday, July 9, 2012, Vol. II at p. 100.

[54] Deposition of State Rep. Aaron Peña, June 11, 2012 at p. 123.

[55] Testimony of B. Keith Ingram Trial Transcript, Monday, July 9, 2012, Vol. I at p. 55.

[56] Testimony of B. Keith Ingram, Trial Transcript, Monday, July 9, 2012, Vol. I at p. 53.

[57] Testimony of Rep. Jose Aliseda, Trial Transcript, Monday, July 9, 2012, Vol. I at p. 145.

[58] Testimony of B. Keith Ingram Trial Transcript, Monday, July 9, 2012, Vol. I at p. 64-65.

[59] Testimony of B. Keith Ingram Trial Transcript, Monday, July 9, 2012, Vol. I at p. 64-65.

[60] State's Response to the Attorney General's Proposed Findings of Fact & Conclusions of Law, July 1, 2012, at p. 27.

[61] Texas Secretary of State's Office, Historic Election Results, *available at:* http://elections.sos.state.tx.us/elchist.exe.

[62] Testimony of Major Forrest Mitchell, Trial Transcript, Monday, July 9, 2012, Vol. II at p. 56, 60.

[63] Deposition of Major Forrest Mitchell, June 15, 2012, at p. 192.

[64] Deposition of Major Forrest Mitchell, June 15, 2012, at p. 192-193.

[65] Testimony of Deputy Attorney General Eric Nichols, Debate on Tex. S.B. 362 Before the Senate Committee of the Whole 81st R.S. (March 11, 2009) (Hearing Transcript, Vol. II at p. 758).

[66] Testimony of Major Forrest Mitchell, Trial Transcript, Monday, July 9, 2012, Vol. II at p. 37.

[67] Testimony of Major Forrest Mitchell, Trial Transcript, Monday, July 9, 2012, Vol. II at p. 44.

[68] Testimony of Major Forrest Mitchell, Trial Transcript, Monday, July 9, 2012, Vol. II at p. 44.

[69] Testimony of Major Forrest Mitchell, Trial Transcript, Monday, July 9, 2012, Vol. II at p. 45.

[70] Testimony of Major Forrest Mitchell, Trial Transcript, Monday, July 9, 2012, Vol. II at p. 45.

[71] Testimony of Major Forrest Mitchell, Trial Transcript, Monday, July 9, 2012, Vol. II at p. 36.

[72] Deposition of Major Forrest Mitchell, June 15, 2012, at p. 108.

[73] Deposition of Major Forrest Mitchell, June 15, 2012, at p. 106, 108.

[74] Deposition of Major Forrest Mitchell, June 15, 2012, at p. 109.

[75] Deposition of Major Forrest Mitchell, June 15, 2012, Exhibit 585 at p. 5.

[76] Deposition of Major Forrest Mitchell, June 15, 2012, at p. 143, 154.

[77] Deposition of Major Forrest Mitchell, June 15, 2012, at p. 160.

[78] Deposition of Major Forrest Mitchell, June 15, 2012, at p. 168, 170.

Page 25

MALC00009237

[79] Testimony of Major Forrest Mitchell, Trial Transcript, Monday, July 9, 2012, Vol. II at p. 47-48.
[80] Testimony of Major Forrest Mitchell, Trial Transcript, Monday, July 9, 2012, Vol. II at p. 45-46.
[81] Deposition of Major Forrest Mitchell, June 15, 2012, at p. 163.
[82] Stephen D. Ansolabehere, *Access Versus Integrity in Voter Identification Requirements*, 63 N.Y.U. Annual Survey of American Law 613 (2008).
[83] Deposition of Stephen Ansolabehere, June 22, 2012 at p. 283.
[84] Attorney General Eric Holder, Speech to the NAACP, Houston, Texas, July 10, 2012.
[85] Stephen D. Ansolabehere, *Access Versus Integrity in Voter Identification Requirements*, 63 N.Y.U. ANNUAL SURVEY OF AMERICAN LAW 613, (2008).
[86] Stephen D. Ansolabehere, *Access Versus Integrity in Voter Identification Requirements*, 63 N.Y.U. ANNUAL SURVEY OF AMERICAN LAW 613, (2008).
[87] Crawford v. Marion County Election Bd, 553 U.S. 181, 198 (2008).
[88] Attorney General Eric Holder, Speech to the LBJ Library & Museum, Austin, Texas, December 12, 2012.
[89] Plaintiff's Original Complaint, *Coke R. Stevenson v. Vann M. Kennedy and Lyndon B. Johnson*, Civil No. 1640, Northern District of Texas, Fort Worth Division (September 14, 1948), at p. 2-4.
[90] Johnson v. Stevenson (N.D. Tex. Sept. 23, 1948).
[91] Attorney General Eric Holder, Speech to the LBJ Library & Museum, Austin, Texas, December 12, 2012.
[92] Deposition of Stephen Ansolabehere, June 22, 2012 at p. 100-102.
[93] Deposition of J. Morgan Kousser, June 20, 2012 at p. 32.
[94] *OnPolitix* (KXAN television broadcast, March 27, 2011), *available at*: http://texas.onpolitix.com/news/41154/session-11-martinez-fischer-aliseda.
[95] Deposition of Rep. Trey M. Fischer, June 15, 2012 at p. 122-123.
[96] Testimony of Rep. Trey M. Fischer, Trial Transcript, July 10, 2012, at p. 15.
[97] Testimony of Rep. Trey M. Fischer, Trial Transcript, July 10, 2012, at p. 17.
[98] Deposition of Rep. Sen. Rodney Ellis, June 22, 2012 at p. 19-20.
[99] Deposition of Rep. Sen. Rodney Ellis, June 23, 2012 at p. 244.
[100] Declaration of Sen. Carlos Uresti, April 9, 2012, at p. 4.
[101] S.J. of Tex., 82nd Leg. R.S. (Jan. 25, 2011) *available at* The Transcript of Proceedings Before the Senate of the State of Texas, p. 201.
[102] Deposition of Rep. Sen. Rodney Ellis, June 22, 2012 at p. 80-81.
[103] Trial Testimony of Sen. Rodney Elllis, July 11, 2012 at p. 37.
[104] Trial Transcript, Tuesday, July 10, 2012, Vol. II at p. 82.
[105] Testimony of J. Morgan Kousser, Trial Transcript, Tuesday, July 10, 2012, Vol. II at p. 87-88.
[106] Testimony of J. Morgan Kousser, Trial Transcript, Tuesday, July 10, 2012, Vol. II at p. 91.
[107] Expert Rebuttal Report of J. Morgan Kousser, June 1, 2012, at p. 5.
[108] Testimony of J. Morgan Kousser, Trial Transcript, Tuesday, July 10, 2012, Vol. II at p. 103.
[109] Testimony of J. Morgan Kousser, Trial Transcript, Tuesday, July 10, 2012, Vol. II at p. 104.
[110] Testimony of J. Morgan Kousser, Trial Transcript, Tuesday, July 10, 2012, Vol. II at p. 88.
[111] Deposition of J. Morgan Kousser, June 20, 2012 at p. 87.
[112] Deposition of J. Morgan Kousser, June 20, 2012 at p. 211.
[113] Deposition of J. Morgan Kousser, June 20, 2012 at p. 269.
[114] Deposition of J. Morgan Kousser, June 20, 2012 at p. 280.
[115] Testimony of J. Morgan Kousser, Trial Transcript, Tuesday, July 10, 2012, Vol. II at p. 64.
[116] Testimony of J. Morgan Kousser, Trial Transcript, Tuesday, July 10, 2012, Vol. II at p. 99.
[117] Testimony of J. Morgan Kousser, Trial Transcript, Tuesday, July 10, 2012, Vol. II at p. 100
[118] Testimony of J. Morgan Kousser, Trial Transcript, Tuesday, July 10, 2012, Vol. II at p. 100.
[119] Testimony of J. Morgan Kousser, Trial Transcript, Tuesday, July 10, 2012, Vol. II at p. 99-100.
[120] Testimony of J. Morgan Kousser, Trial Transcript, Tuesday, July 10, 2012, Vol. II at p. 100.
[121] Testimony of J. Morgan Kousser, Trial Transcript, Tuesday, July 10, 2012, Vol. II at p. 99-101.
[122] Expert Report of J. Morgan Kousser, June 1, 2012, at p. 8.
[123] H.J. of Tex., 82nd Leg. R.S. 232-233 (Jan. 24, 2011).
[124] Deposition of J. Morgan Kousser, June 20, 2012 at p. 269.
[125] Expert Report of J. Morgan Kousser, June 1, 2012, at p. 34.

MALC00009238

[126] Tex. Sen. Rule 13.02, 82nd Leg., R.S. 2011, *available at*:
http://www.senate.state.tx.us/rules/SenateRules82.pdf.
[127] Expert Report of J. Morgan Kousser, June 1, 2012, at p. 70.
[128] Historic Election Results, 2010 General Election, Office of the Texas Secretary of State, *available at*:
http://elections.sos.state.tx.us/elchist.exe.
[129] Expert Report of J. Morgan Kousser, June 1, 2012, at p. 87.
[130] Tex. S.B. 14, Sec. 2, 82nd R.S. (2011)
[131] Expert Report of J. Morgan Kousser, June 1, 2012, at p. 87.
[132] Tex. Elec. Code Sec. 82.003.
[133] Expert Report of J. Morgan Kousser, June 1, 2012, at p. 54.
[134] Deposition of Major Forrest Mitchell, June 15, 2012, Exhibit 590.
[135] Testimony of Rep. Jose Aliseda, Trial Transcript, Monday, July 9, 2012, Vol. I at p. 130.
[136] Testimony of Rep. Jose Aliseda, Trial Transcript, Monday, July 9, 2012, Vol. I at p. 131.
[137] Testimony of Rep. Jose Aliseda, Trial Transcript, Monday, July 9, 2012, Vol. I at p. 145..
[138] Testimony of Rep. Jose Aliseda, Trial Transcript, Monday, July 9, 2012, Vol. I at p. 137.
[139] Testimony of Rep. Jose Aliseda, Trial Transcript, Monday, July 9, 2012, Vol. I at p. 130.
[140] Testimony of Rep. Jose Aliseda, Trial Transcript, Monday, July 9, 2012, Vol. I at p. 131.
[141] Testimony of Rep. Jose Aliseda, Trial Transcript, Monday, July 9, 2012, Vol. I at p. 138.
[142] Testimony of Rep. Jose Aliseda, Trial Transcript, Monday, July 9, 2012, Vol. I at p. 138-139.
[143] Testimony of Rep. Jose Aliseda, Trial Transcript, Monday, July 9, 2012, Vol. I at p. 140-141.
[144] Testimony of Rep. Jose Aliseda, Trial Transcript, Monday, July 9, 2012, Vol. I at p. 140.
[145] Testimony of Rep. Jose Aliseda, Trial Transcript, Monday, July 9, 2012, Vol. I at p. 137
[146] Testimony of Rep. Jose Aliseda, Trial Transcript, Monday, July 9, 2012, Vol. I at p. 131.
[147] Testimony of Rep. Jose Aliseda, Trial Transcript, Monday, July 9, 2012, Vol. I at p. 151-152.
[148] Testimony of Rep. Jose Aliseda, Trial Transcript, Monday, July 9, 2012, Vol. II at p. 19.
[149] Deposition of Rep. Aaron Peña, June 11, 2012, at p. 117-120.
[150] Deposition of Rep. Aaron Peña, June 11, 2012, at p. 112.
[151] Deposition of Rep. Aaron Peña, June 11, 2012, at p. 113.
[152] Deposition of Rep. Aaron Peña, June 11, 2012, at p. 113.
[153] Deposition of Rep. Aaron Peña, June 11, 2012, at p. 114.
[154] Deposition of Rep. Aaron Peña, June 11, 2012, at p. 113.
[155] Deposition of Rep. Aaron Peña, June 11, 2012, at p. 114.
[156] Deposition of Rep. Aaron Peña, June 11, 2012, at p. 125-126.
[157] Deposition of Rep. Aaron Peña, June 11, 2012, at p. 117-120.
[158] Deposition of Rep. Aaron Peña, June 11, 2012, at p. 130.
[159] Deposition of Rep. Aaron Peña, June 11, 2012, at p. 135, 139-140.
[160] Deposition of Rep. Aaron Peña, June 11, 2012, at p. 122.
[161] Deposition of Rep. Aaron Peña, June 11, 2012, at p. 132-133.
[162] Deposition of Rep. Aaron Peña, June 11, 2012, at p. 212-213.
[163] Deposition of Rep. Aaron Peña, June 11, 2012, at p. 219.
[164] Deposition of Rep. Aaron Peña, June 11, 2012, at p. 174-175.

MALC00009239