# State Politics & Policy Quarterly

http://spa.sagepub.com/

**Much Ado About Nothing? An Empirical Assessment of the Georgia Voter Identification Statute**

M. V. Hood III and Charles S. Bullock III

*State Politics & Policy Quarterly* 2012 12: 394 originally published online 15 October 2012
DOI: 10.1177/1532440012452279

The online version of this article can be found at:
http://spa.sagepub.com/content/12/4/394

Published by:

**SAGE**

http://www.sagepublications.com

On behalf of:
American Political Science Association

STATE POLITICS
AND POLICY
An Organized Section of the
American Political Science Association

2:13-cv-193
09/02/2014

**DEF2476**

exhibitsticker.com

**Additional services and information for *State Politics & Policy Quarterly* can be found at:**

**Email Alerts:** http://spa.sagepub.com/cgi/alerts

**Reprints:** http://www.sagepub.com/journalsReprints.nav

**Permissions:** http://www.sagepub.com/journalsPermissions.nav

**Citations:** http://spa.sagepub.com/content/12/4/394.refs.html

>> Version of Record - Nov 13, 2012

OnlineFirst Version of Record - Oct 15, 2012

Downloaded from spa.sagepub.com at UNIV OF GEORGIA LIBRARIES on August 21, 2014

What is This?

# Much Ado About Nothing? An Empirical Assessment of the Georgia Voter Identification Statute

State Politics & Policy Quarterly
12(4) 394–414
© The Author(s) 2012
Reprints and permission:
sagepub.com/journalsPermissions.nav
DOI: 10.1177/1532440012452279
http://sppq.sagepub.com



## M. V. Hood III[1] and Charles S. Bullock III[1]

## Abstract

Voter identification (ID) policies, especially those of the photo ID variety, have been hotly contested over the last few years. The primary concern surrounding these statutes amounts to lower turnout, especially among certain groups in the electorate, such as racial/ethnic minorities. In 2007, the way was cleared for Georgia to implement a new statute requiring registrants to present a government-issued photo ID to vote. Using population data on registrants from two election cycles coupled with information on a subgroup of registrants known to lack photo ID, we conduct a policy impact analysis of the Georgia voter ID law. We find that the new law did produce a suppression effect among those registrants lacking proper ID. Substantively, the law lowered turnout by about four-tenths of a percentage point in 2008. However, we find no empirical evidence to suggest that there is a racial or ethnic component to this suppression effect.

## Keywords

voter identification, election administration, Georgia

The framers of the U.S. Constitution intentionally left the question of voter qualifications to the states, and within the framework of constitutional amendments and federal statutes this matter still resides at the same level today. This situation has produced an ongoing tension between the goal of expansion of suffrage rights usually represented

---

[1]University of Georgia, Athens, USA

**Corresponding Author:**
M. V. Hood III, Department of Political Science, University of Georgia, 104 Baldwin Hall, Athens, GA 30602, USA
Email: th@uga.edu

Downloaded from spa.sagepub.com at UNIV OF GEORGIA LIBRARIES on August 21, 2014

by the federal government and protection of the voting franchise more typically associated with the states. The contemporary debate over voter identification (ID) requirements finds itself squarely within this same context of access versus ballot security and, like most changes dealing with election administration, matters quickly devolve into partisan politics as one side typically sees an advantage while the other side cries foul.

More stringent voter ID statutes have typically been favored by Republican state legislators who view such safeguards as a necessary hedge against the possibility of voter fraud. Requiring voters to provide evidence of their identity, however, has generated far more controversy in the public arena than scholarly research on the topic. Critics of more demanding standards for ID point to research showing that *any* additional requirement reduces participation. On the other side of the debate, opponents claim that demands for more extensive documentation before giving a ballot to a prospective voter tend to depress participation by minorities and the less affluent (Sobel and Smith 2009). Evidence of selective enforcement of ID requirements, with minorities more frequently asked to provide documentation than whites (Atkeson et al. 2010), has bolstered claims of discrimination.

In 2008, the Supreme Court upheld the constitutionality of what was characterized as the most stringent ID requirement, Indiana's photo ID statute, in *Crawford v. Marion County Election Board*. The trial court and Supreme Court pointed to everyday situations that require a photo ID. A challenge to Georgia's photo ID requirement, which is similar to the Indiana law litigated in *Crawford*, failed when the plaintiffs could not identify a single prospective voter who either did not have an acceptable ID or testified that it would be impossible to acquire the needed document which the state provides at no cost (*Common Cause v. Billups*, 2007).[1] In addition to approval by state and federal courts, pursuant to Section 5 of the Voting Rights Act, the U.S. Department of Justice reviewed Georgia's requirement for a government-issued photo ID and found it not to be racially discriminatory.[2]

In this article, we make use of a unique natural experiment that occurred in Georgia between the 2004 and 2008 election cycles, which involved implementation of the state's new photo ID statute. We attempt to answer three primary research questions: (a) What is the extent to which the new law may have suppressed voter turnout? (b) Is there a disparate impact of the new law in reference to racial minorities? and (c) Are there any age-specific effects produced by the photo ID statute?

## Literature Review

Political scientists have explored whether the type of documentation required from a prospective voter affects turnout and, if it does, what kind of voters are most likely to feel the impact. The guiding theoretical perspective for this research comes from Anthony Downs' (1957) proposition that prospective voters will participate if the benefits they derive from the activity exceed the costs. Requiring the presentation—and perhaps the acquisition—of some form of ID to vote constitutes a cost as an

Downloaded from spa.sagepub.com at UNIV OF GEORGIA LIBRARIES on August 21, 2014

additional burden and, in some instances, may also involve the expenditure of time and money if it necessitates the acquisition of documentary evidence.

In a similar vein, Rosenstone and Hansen (1993) indicate that states can produce institutional barriers to political participation by mandating regulations, such as those governing the voter registration process. On this matter, they state that

> the legal restrictions on the exercise of the franchise adopted in the early part of the [20th] century and maintained to the present day place significant burdens on American citizens and lower the probability they will participate in political life. (Rosenstone and Hansen 1993, 209)

Such legal restrictions, in turn, are more likely to affect those in society with fewer resources as posited by the socioeconomic status (SES) model of participation (see, for example, Wolfinger and Rosenstone 1980, or for a general overview, Leighley 1995). Again, opponents of photo ID laws contend that possession of the proper ID will be inversely related to one's level of resources, thus leading to voter suppression.

Although litigation has focused on government-issued photo IDs, all states require some method of ID. At a minimum, voters must state their names. Currently, 30 states require voters to present some form of ID to accompany stating or writing one's name, with 14 of these specifically requiring photo ID.[3] Alvarez, Bailey, and Katz (2007) identify seven different types of requirements including a signature match, presentation of a registration card or other form of ID, and the need for a photo ID.[4] Most states accept a Social Security card, a birth certificate, or a utility bill for purposes of ID.

One line of scholarly research has examined the distribution of acceptable means of ID across the population. Using exit poll data from three western states, Baretto, Nuno, and Sanchez (2007) examine the correlates of having six different types of ID. They report positive relationships between having the kinds of documents that states require to establish identity and socioeconomic measures, such as higher income and education levels. They also observe racial and ethnic differences with blacks and Latinos less likely to have five of the items, with a significant exception being a driver's license. Asians were significantly less likely to have a driver's license and other types of documentation with the exception of a passport.

Other research using individual-level data of registrants who specifically lacked a driver's license or state-issued ID card found that a larger percentage of blacks and Hispanics compared with Anglos did not possess these types of ID. Age was also inversely related to possession of a driver's license; however, no income-related effect was found (Hood and Bullock 2008). A study in Indiana found that 83.2% of whites, but only 71.7% of blacks, met that state's photo ID criteria (Baretto, Nuno, and Sanchez 2009). In addition, Baretto et al. (2009) find that younger Indianans, those with less education, the less affluent, and Democrats are less likely to possess an acceptable photo ID. A growing body of scholarly research indicates that those more likely to be adversely affected by the adoption of photo ID requirements include minorities, the elderly, the poor, and Democrats.

Downloaded from spa.sagepub.com at UNIV OF GEORGIA LIBRARIES on August 21, 2014

A second body of research has sought to determine whether turnout declines as the type of ID required becomes more restrictive, with government-issued photo IDs considered the most demanding ID level. Researchers probing this question have used two types of data. One approach has analyzed data aggregated to the state (Alvarez et al. 2007) or county level (Vercellotti and Anderson 2006). An alternative approach uses individual data from the Census Bureau's Current Population Survey (CPS; Alvarez et al. 2007; Erikson and Minnite 2009; Vercellotti and Anderson 2006), public opinion polls (Mycoff et al. 2009), or exit polls (Baretto et al. 2007).

The results of these analyses have been quite mixed in terms of whether the overall turnout rate is affected and which set of specific registrants is affected. One analysis of CPS data from 2000 through 2006 found no relationship between ID requirements and turnout at the aggregate level. Using individual-level data, the authors find an inverse relationship between stricter ID and turnout in general. This effect is magnified for those of lower SES (income and education). The observed SES effect, however, was in no way amplified by race or ethnicity (Alvarez, Bailey, et al. 2008).

Vercellotti and Anderson (2009) study the impact of heightened ID requirements on 2004 turnout using CPS data. Although they found no relationship between ID requirements and turnout for the entire electorate, they uncovered effects for certain groups. Specifically, they find that states that adopted new standards had lower turnout among Hispanics, but not among African American or Asians. They also reported lower turnout among voters younger than 25 years of age in states with new requirements.

Similarly, other researchers also fail to find evidence that heightened ID requirements depress turnout levels in general. Using 2004 CPS data, Muhlhausen and Sikich (2007) do not find any effect for voter ID requirements related to turnout in general or racial/ethnic minorities in particular. Erikson and Minnite (2009, 97) use CPS data from the 2002 and 2006 elections to examine change over time as related to alterations in state ID requirements. They report that moving from lenient to strict ID requirements appears to dampen turnout by a few percentage points; however, they also point out that this relationship is *statistically inconclusive*. They strongly urge caution in the use of CPS data to make inferences about the effects of voter ID requirements and voter turnout.

Using the Cooperative Congressional Election Study (CCES) from 2006 to 2008, Ansolabehere (2009) finds virtually no respondents who went to the polls, but were prohibited from casting a ballot because they lacked required ID. Furthermore, this research also attempts to examine whether ID requirements deter some from even attempting to vote by probing registrants who did not vote in 2008 as to why they chose not to turn out. Altogether, the findings from these surveys indicate that only 0.18% of respondents were in part deterred from voting due to voter ID requirements.

Mycoff, Wagner, and Wilson (2009) report similar results using the 2006 CCES where they estimate a series of models using a Guttman scale designed to measure the stringency of state ID requirements and a measure to denote the presence of a photo ID law in particular. Using two sets of models, an individual-level CCES analysis and an aggregate state-level analysis (2000–06), these researchers find no statistically significant relationship between voter ID statutes and turnout.

Downloaded from spa.sagepub.com at UNIV OF GEORGIA LIBRARIES on August 21, 2014

To determine what effect adoption of a photo ID law may have on voter turnout and which groups may be affected, we need relevant data coupled with an appropriate research design. With the exception of exit polls, issues related to turnout inflation argue against the use of survey data like the CPS. However, aggregate-level data do not provide the degree of leverage necessary to make appropriate causal inferences concerning the individual-level act of voting. Not only is validated data at the individual level necessary to answer questions of turnout, but it is also necessary to be able to categorize registrants based on whether they need a government-issued photo ID and, thus, may face an additional hurdle to voting. Finally, as Erikson and Minnite (2009) point out, we need to assess any effect related to turnout based on a *difference-in-differences* analysis where we can compare the effect of the changes in voter ID laws before and after implementation.

Fortunately, Georgia provides us with just such a case to test the effects of changing to a more stringent photo ID requirement. We also have the proper data from which to draw such inferences: population-level data on individual registrants across two presidential election cycles, which contain validated turnout and segmentation based on possession of a photo ID. Georgia, unlike Indiana, also contains a large minority population, which allows for a more stringent test of hypotheses related to the effect of photo ID requirements and minority voters. In 2008, 30.0% of registrants in Georgia were African American (Georgia Secretary of State). In addition, like other Southern states, Georgia has a past history of disenfranchising minority voters and also a colorful record of fraud related to the electoral process as well (see Key 1949 for examples of voter fraud and disenfranchisement).

Although our analysis is of a single state, we are dealing with over-time individual-level population data, a fact that should give us some degree of confidence about drawing inferences concerning the effects of photo ID in Georgia. Furthermore, we would argue that the circumstances in Georgia offer one of the best possible opportunities to study the *before and after* effects of implementation of an Indiana-style voter ID statute in a context with a sizable presence of minority registrants. Our test of the Georgia statute should also be generalizable to other states moving from an ID statute requiring the presentation of some form of ID to vote in-person to a highly restrictive law allowing only for the presentation of a government-issued photo ID.

## The Georgia Context

In 2008, Georgia voters confronted changes, which included one modification that arguably facilitated voting but another that added a new cost to casting a ballot. In addition, Georgians like other Americans acted in an environment that provided a unique stimulus, the candidacy of the charismatic Barack Obama. Obama's candidacy had an especially great impact on African Americans, a group usually classified among those less inclined to participate. In November 2008, African Americans cast a slightly larger share of the votes in Georgia (30.06%) than their share of registrants (30.01%). This was unprecedented as the gap between the percentage of black registrants

Downloaded from spa.sagepub.com at UNIV OF GEORGIA LIBRARIES on August 21, 2014

and the percentage of black voters is usually about five percentage points. From 1998 through 2006, blacks cast between 23% and 25% of Georgia's ballots.

Georgia made casting a ballot more convenient by extending the period prior to election day for in-person voting from 5 to 45 days. However, after a protracted legal battle, federal and state courts approved a reduction in the number and types of ID required of prospective voters. Previously, a voter could present any of 17 types of documentation including a bank statement, utility bill, or Social Security card.

The voter ID statute requiring a photo ID to vote in-person was first passed by the General Assembly in 2005. Almost immediately opponents filed suit in federal and state courts to block its implementation. Judge Harold Murphy, U.S. District Court for the Northern District of Georgia, issued a temporary injunction on the grounds that the law was tantamount to a poll tax for those who did not already possess a government-issued photo ID.

The legislature modified the statute in 2006 to provide no-cost photo ID cards for the purpose of voting at all 159 county voter registrars offices. In addition, no-excuse absentee voting by mail, which does not require photo ID, was also allowed for the first time. Again, Judge Murphy issued a temporary injunction on the basis of the 1st and 14th Amendments. In 2007, the injunction was lifted when Judge Murphy ruled in a trial on the merits that the amended law did pass constitutional muster. Efforts to block the law in state courts and subsequent appeals to the 11th Circuit Court of Appeals failed, thus clearing the law for full implementation for the 2008 election cycle.

Beginning in 2008, voters must present a government-issued photo ID to vote in-person, with a driver's license the most prevalent form of ID for most voters.[5] Other acceptable forms of ID include a passport, a student ID from a public institution, a state-issued ID card from the Department of Motor Vehicles (DMV), or a military ID. In addition, following an earlier injunction issued by a federal court in the *Common Cause v. Billups* case, registrants could receive an ID card valid for voting at no cost from their county registrar. The Georgia statute is very similar to the Indiana law in terms of the requirement and acceptable types of photo ID. Voters who do not present a government-issued photo ID card, like in Indiana, can cast a provisional ballot. This ballot is only counted if the voter presents proper ID prior to the official vote canvass.[6]

## Data and Method

The data for this project come from two primary sources: the voter registration and history databases maintained by the Georgia Secretary of State and a report produced by the State of Georgia in the course of defending the voter ID statute. This report was designed to determine the number of registrants who lacked a valid Georgia driver's license or state ID card. The work was carried out by the Georgia DMV in August of 2007 and cross-referenced its database with the voter registration database maintained by the Secretary of State.[7] This report indicated that 289,622 Georgia registrants had neither a valid driver's license nor state ID card. At the time the report was released,

Downloaded from spa.sagepub.com at UNIV OF GEORGIA LIBRARIES on August 21, 2014

this represented 5.66% of the total registrants in the state or 6.65% of the total active registrants.

Using archived copies of the voter registration files for the state gives some degree of leverage over other types of data. These files provide snapshots of the electorate as it existed around the time of the 2004 and 2008 general elections and include individual-level information on the population of registrants. In fact, without historical copies of the voter registration database, comparisons such as ours would be impossible as states constantly update their registration rolls to ensure accuracy. There is no incentive, therefore, for the states themselves to maintain historical records of their voter registration databases, and few do. First, although never providing complete coverage, using population-level data does make generating inferences about specific groups all the more straightforward. Second, we do not have to worry about questions related to the inflation of self-reported turnout, which have made using survey data to gauge turnout very problematic.

We have a unique opportunity to study the effect of the Georgia photo ID statute from the vantage point of a traditional policy impact model. Contrary to much of the previous research examining the effects of voter ID laws, we do not have to rely on contextual data (e.g., presence of a specific requirement) or on self-reports on the part of survey respondents (e.g., type of ID possessed). This list allows us to examine the turnout behavior for a set of registrants lacking photo ID before and after the implementation of the Georgia statute. In this manner, we can determine whether stricter ID requirements actually deterred some registrants from voting. Stated otherwise, we can empirically determine whether the law produced a suppression effect and, in addition, calculate the size of such an effect. In 2004, this group of registrants could vote in-person without photo ID. In 2008, however, these registrants could vote only after obtaining some form of government-issued photo ID.[8] If those registrants lacking photo ID prior to the law's implementation did vote in the 2008 general election, one has to conclude that in the intervening time period they obtained some form of valid photo ID (i.e., driver's license or ID card issued by county registrar) or voted absentee by mail (see endnote 8).

To our knowledge, this is the first study that tracks a group of registrants who lack photo ID and studies their voting behavior prior to, and following, implementation of a photo ID statute. In addition, we also have a ready comparison group, all other Georgia registrants, who it is assumed possess some form of photo ID. Using these two groups, we can study turnout across subsequent presidential election cycles to gauge the extent to which the voter ID statute may have suppressed turnout. We can determine not only if turnout rose or fell among registrants lacking photo ID but we can also compare the shift in turnout that may have occurred with the change in turnout for registrants with proper ID.

More specifically, with the data at hand, we can estimate what is known as a random-comparison-group model of comparative change, as we have an experimental group (those registrants lacking ID) and a control group (all other registrants), which are simultaneously exposed to the same treatment—the implementation of the Georgia

Downloaded from spa.sagepub.com at UNIV OF GEORGIA LIBRARIES on August 21, 2014

photo ID statute (Mohr 1995). Using this design, we have a baseline for voter turnout prior to implementation of the photo ID statute for each of these groups. Therefore, noted shifts in voter turnout, if any, between the control and experimental groups should be related to the implementation of the law.

Although we cannot randomize assignment to the treatment group, we can manipulate assignment to the control group, helping to minimize what is known as selection-Q bias (defined as a difference in outcome between the experimental and control groups caused by some causal factor or factors but falsely associated with the treatment effect; Mohr 1995). In our case, instead of choosing a random sample to act as a control group, we used the entire population minus the treatment group as our comparison group. In using the remaining population of registrants as our comparison group, the only group that could be said to be potentially unrepresentative is, therefore, the treatment group whose membership cannot be controlled.

This design also helps to mitigate the threat to internal validity from external events or history. Thus, this type of research design helps control for a number of external factors, such as changes related to the context of an election. For example, should the Obama candidacy in 2008 have an impact on black turnout as compared with the 2004 presidential election? The answer is yes, but with this model we have a set of black registrants with and without photo ID who are being exposed to the same set of electoral circumstances. Any divergence in behavior should again be due to the introduction of the treatment and not to external events (see Mohr 1995 for a discussion of impact analysis models for policy implementation).

Using copies of the state's voter registration database to represent the pool of registrants following the 2004 and 2008 general elections, we added a field to represent those registrants lacking photo ID from the report generated for the state by the DMV. As each Georgia registrant has a unique eight-digit voter registration number and this information was also included in the report produced by DMV, it was a straightforward process to match registrants using this field. For the database to represent registrants from the 2004 election, we achieved a match rate of 78.5% (227,455 of the 289,622 registrants detailed on the report above), and for 2008, our match rate was 98.2% (274,356 of 289,622). In 2004, this represented 4.99% of total registrants and in 2008, 4.74%.[9] Almost four out of five from this identified group then were in the electorate and eligible to vote in the 2004 general election.

To study the effects of Georgia's photo ID law, we specify three models where the dependent variable is turnout (1 = *voted*, 0 = *did not vote*). All three models pool the population of registrants in Georgia from 2004 to 2008 providing just under 10.2 million cases for analysis. Our primary variable of interest, *no driver's license*, is a binary measure where those registrants who do not possess a valid driver's license or state-issued ID card are coded 1 while all other registrants are coded 0.

Georgia is one of five states that officially collect racial and ethnic data on registrants and we use this information from the registration database to create a series of dummy variables designed to measure a registrant's race or ethnicity.[10] These variables include *black, Hispanic, Asian*, and a residual category labeled *other race/ethnicity*.[11]

Downloaded from spa.sagepub.com at UNIV OF GEORGIA LIBRARIES on August 21, 2014

**Table 1.** Voter Turnout in the 2004 and 2008 Georgia General Elections by ID Status

|  | 2004 Election | | 2008 Election | |
| --- | --- | --- | --- | --- |
|  | No ID | ID | No ID | ID |
| Voted | 47.6% (170,547) | 72.9% (3,138,397) | 39.6% (108,376) | 70.0% (3,819,971) |
| Did not vote | 52.4% (118,492) | 27.1% (1,166,816) | 60.4% (165,171) | 30.4% (1,640,138) |

*Notes*: ID = identification. Entries are column percentages, and frequency counts are given in parentheses.

In both models, white (Anglo) registrants are used as the excluded racial category. In addition, we also include variables for sex (1 = *female*, 0 = *male*) and registrant age in years. A contextual variable, *per capita income*, measuring the 2004 or 2008 per capita income by residential zip code is incorporated in the model as well.[12] To differentiate the effects of the two election cycles, we created a dummy variable where the registrant pool from the 2004 election is coded 1. Finally, to distinguish the effects of not having ID across the two elections, an interactive term was computed by multiplying the ID status indicator by the 2004 election cycle indicator.

We also specified a second model designed to parse the effects of ID status by race/ethnicity and a third model designed to test age-related effects. It includes all the variables described in the first model along with a full set of interactive terms where ID status is multiplied by all included racial categories, the election cycle indicator is multiplied by all included racial categories, and ID status is multiplied by all racial categories and the election cycle dummy. A third model includes the requisite set of interactive terms to test for age-related effects. All models are estimated using logistic regression with robust standard errors clustered by zip code due to the inclusion of the contextual income variable previously described.[13]

## Findings

Before delving into the results of our multivariate models, we present some simple descriptive statistics on turnout by election cycle and ID status in Table 1. In 2004, those registrants lacking photo ID had a turnout rate of 47.6% compared with other registrants with a 72.9% rate of turnout. In 2008, the turnout rate for those registrants lacking ID drops to 39.6%, whereas for those with photo ID the rate falls to 70.0%. Although turnout falls in general from 2004 to 2008, one can note that the gap for those lacking ID is much wider, at 8 points, than that for our comparison group at 2.9 points. This cursory evidence indicates that those registrants without ID may have been more adversely affected by implementation of the new law compared with other registrants. To provide a greater degree of substantiation, however, we need to test this hypothesis within the context of a multivariate model where adequate control measures can be employed.

The results of our logistic regression model designed to study the impact of Georgia's voter ID law are found in the first column of Table 2. The *no driver's license*

Downloaded from spa.sagepub.com at UNIV OF GEORGIA LIBRARIES on August 21, 2014

**Table 2.** Models Predicting Voter Turnout in the 2004 and 2008 General Elections in Georgia

| Variable | Model 1 | Model 2 | Model 3 |
|---|---|---|---|
| No driver's license | −1.2158*** (.0120) | −1.3128*** (.0119) | −0.7360*** (.0175) |
| Black | −0.0167 (.0267) | 0.1574*** (.0249) | −0.0156 (.0267) |
| Hispanic | −0.5278*** (.0203) | −0.4932*** (.0183) | −0.5265*** (.0203) |
| Asian | −0.6268*** (.0353) | −0.7147*** (.0391) | −0.6252*** (.0354) |
| Other race/ethnicity | −0.6363*** (.0164) | −0.5528*** (.0172) | −0.6350*** (.0164) |
| Female | 0.2079*** (.0065) | 0.2101*** (.0065) | 0.2099*** (.0065) |
| Age | 0.0219*** (.0003) | 0.0220*** (.0003) | 0.0228*** (.0003) |
| Per capita income | 0.0000095*** (.0000019) | 0.0000095*** (.0000019) | 0.0000095*** (.0000019) |
| 2004 election | 0.1370*** (.0112) | 0.2655*** (.0088) | 0.1558*** (.0172) |
| 2004 election × No driver's license | 0.2270*** (.0208) | 0.3163*** (.0120) | |
| Black × No driver's license | | 0.0898*** (.0229) | |
| Hispanic × No driver's license | | −0.0692 (.0435) | |
| Asian × No driver's license | | 0.3900*** (.0548) | |
| Other race/ethnicity × No driver's license | | 0.3185*** (.0263) | |
| Black × 2004 election | | −0.4169*** (.0127) | |
| Hispanic × 2004 election | | −0.0407 (.0233) | |
| Asian × 2004 election | | 0.2678*** (.0225) | |
| Other race/ethnicity × 2004 election | | −0.2629*** (.0196) | |
| Black × No driver's license × 2004 election | | 0.0094 (.0409) | |
| Hispanic × No driver's license × 2004 election | | 0.0796 (.0560) | |
| Asian × No driver's license × 2004 election | | .0478 (.0739) | |
| Other race/ethnicity × No driver's license × 2004 election | | −0.0222 (.0369) | |
| Age × No driver's license | | | −0.0110*** (.0004) |
| Age × 2004 election | | | −0.0004 (.0002) |
| Age × No driver's license × 2004 election | | | 0.0046*** (.0003) |
| Constant | −0.4432*** (.0593) | −0.5022*** (.0592) | −0.4802*** (.0590) |
| Percentage correctly predicted | 70.8% | 70.8% | 70.8% |
| Null prediction | 69.9% | 69.9% | 69.9% |
| Proportional reduction in error | 3.0% | 3.0% | 3.0% |
| N | 10,189,755 | 10,189,755 | 10,189,755 |

*Notes*: Entries are logistic regression coefficients with robust standard errors in parentheses. Dependent variable: 1 = *voted*, 0 = *did not vote*.
\*$p < .05$. \*\*$p < .01$. \*\*\*$p < .001$.

coefficient is negative and statistically significant, indicating that Georgia registrants lacking photo ID were less likely to turn out in the 2008 general election. The interactive term designed to measure the probability of turnout in the 2004 election for registrants lacking ID was positive and significant. Turnout for those lacking photo ID was

Downloaded from spa.sagepub.com at UNIV OF GEORGIA LIBRARIES on August 21, 2014



**Figure 1.** Georgia turnout by identification status

higher in 2004 as compared with 2008. The dummy variable for the 2004 election cycle indicates that turnout was higher for registrants possessing photo ID as well as in the 2004 general.

The other findings from the model indicate that Hispanics, Asians, and those of another race/ethnicity were significantly less likely to vote compared with white registrants. For black registrants, the coefficient is not statistically significant indicating turnout for blacks is indistinguishable from that of white registrants. Female registrants, older registrants, and those registrants residing in more affluent areas were also more likely to turn out to vote.

In Figure 1, we convert the model coefficients into probabilities by manipulating the variables for ID status and election cycle.[14] In 2004, registrants in Georgia lacking photo ID were predicted to turn out at .542 compared with other registrants at .761. The difference of .219 is statistically significant. Although there is a large gap in turnout between these two groups, what we are interested in detecting is not whether a turnout gap between these groups of registrants exists but whether the gap in 2004 has expanded or contracted relative to the gap present in the 2008 general election.

In 2008, turnout among the group without photo ID dropped to .451, whereas turnout for other registrants fell to .735. The difference in probabilities for turnout is .284, which is statistically significant. Although turnout for both groups of registrants

Downloaded from spa.sagepub.com at UNIV OF GEORGIA LIBRARIES on August 21, 2014

**Table 3.** Probability Differences by ID Status, Race, and Election Cycle

| Race/ethnicity | Election | Intraelection difference | Interelection difference |
|---|---|---|---|
| All registrants | 2004 | .219* | |
| | 2008 | .284* | |
| | | | −.065* |
| White | 2004 | .216* | |
| | 2008 | .310* | |
| | | | −.095* |
| Black | 2004 | .207* | |
| | 2008 | .280* | |
| | | | −.073* |
| Hispanic | 2004 | .239* | |
| | 2008 | .329* | |
| | | | −.089* |
| Asian | 2004 | .131* | |
| | 2008 | .224* | |
| | | | −.094* |
| Other | 2004 | .173* | |
| | 2008 | .243* | |
| | | | −.070* |

*Notes*: ID = identification. Intraelection difference = turnout probability of registrant with ID − turnout probability of registrant without ID; interelection difference = intraelection difference, 2004 − intraelection difference, 2008.
*$p < .05$.

declined over this time period, one can see that the gap between these two groups widened from 2004 to 2008. The interelection difference, calculated as the 2004 intraelection difference minus the 2008 intraelection difference, at −.065, is also statistically significant (see Table 3). This difference of the difference is one estimate of a suppression effect induced by the full implementation of the voter ID statute in Georgia, as this measure takes into account the effect of ID status on turnout comparing the 2004 election (pre implementation) with the 2008 election (post implementation).[15]

A second model further refines the effects of the voter ID statute by racial and ethnic classifications for Georgia registrants. By producing an exhaustive set of interactive terms, we are able to separate the impact of the law by race/ethnicity, ID status, and election cycle. In this manner, we can gain insight into the manner in which the photo ID law may disproportionately have affected registrants of various races/ethnicities. The full model is presented in the second column of Table 2. As an alternative to discussing the model coefficients directly, we transpose the coefficients into a set of predicted probabilities which are presented in Table 3 and Figure 2.

Figure 2 decomposes the effects on turnout by ID status and racial category across the 2004 and 2008 general elections. For those Georgians who lacked proper photo ID

Downloaded from spa.sagepub.com at UNIV OF GEORGIA LIBRARIES on August 21, 2014



**Figure 2.** Georgia turnout by race and identification status

turnout across all racial categories falls from 2004 to 2008. For white registrants in this category, turnout declined from .56 in 2004 to .41 in 2008—a 15-point fall-off. The largest drop occurred among Asian registrants where turnout declined 22 points. The smallest decline was witnessed among black registrants who only fell 5 points. Those registrants with valid photo ID, with two exceptions, also witnessed a decrease in turnout over the same period. White and Hispanic turnout for these registrants fell 5 points from 2004 to 2008, whereas Asian turnout dropped from .69 to .56, or 13 points. Turnout for those in the residual *other* category stayed exactly the same from 2004 to 2008 at .60, whereas turnout among black registrants actually ticked up 2 points during this time from .73 to .75.

Probability differences by race/ethnicity, ID status, and election cycle are highlighted in Table 3. Again, these predicted probabilities are generated from the coefficients presented in the second column of Table 2. For each racial category, intraelection difference measures are calculated for the 2004 and 2008 general elections, as well as the interelection difference between the two election cycles. The combination of these calculations takes into account the known fact that those without ID are already less prone to participate compared with those who possess photo ID.

The largest effect is actually observed among white registrants. For this group, the interelection difference is .216 in 2004 and .310 in 2008. The difference of these differences or the interelection difference is −.095, indicating that the turnout gap between

Downloaded from spa.sagepub.com at UNIV OF GEORGIA LIBRARIES on August 21, 2014



**Figure 3.** Georgia turnout by age and identification status

registrants with and without photo ID widened by almost 10 points between the two election cycles. Again, we would argue that the interelection difference is evidence of a possible suppression effect produced by the implementation of the Georgia voter ID statute.

It should be noted that the interelection difference for all racial/ethnic categories is negative and fairly sizable, with a .025 point range from the highest to lowest measure. In addition, as indicated in the table, difference measures across all racial/ethnic groups are statistically significant. It is interesting to note that although the interelection difference for Asians is extremely close to that for white registrants ($-.094$ vs. $-.095$), no minority group saw a bigger gap than that produced by the state's racial majority. The interelection difference for black registrants, at $-.073$, was just over 2 points less than that for whites. Although there appears to be credible empirical evidence that Georgia's voter ID law lowered turnout, the law does not appear to have disproportionately affected minority registrants.

We also analyze the voter ID statute and its interaction with registrant age in Model 3 of Table 2. Again, using a set of interactive terms, we can separate effects by age category, ID status, and election cycle to determine the extent to which the statute may have altered the probability of turnout. As age is measured in a continuous manner, we transpose the effects of Model 3 into a graphical format. Figure 3 plots the turnout

Downloaded from spa.sagepub.com at UNIV OF GEORGIA LIBRARIES on August 21, 2014

*State Politics & Policy Quarterly 12(4)*

probability by age beginning at 18 years and continuing in 5-year increments through the age of 93. A total of four lines is plotted representing Georgia registrants who do, and do not, possess ID for the 2004 and 2008 election cycles.

As the political participation literature has long indicated, age should be positively related to the probability of turnout. Across the four groups plotted, this pattern is indeed evident; however, the intercepts and slopes across these four groups vary markedly. Registrants with ID are slightly less likely to turn out in 2008 compared with 2004 across the entire age spectrum. For example, registrants with photo ID who were 18 had a turnout probability of .64 in 2004 compared with .60 in 2008. At the other end of the spectrum, the intraelection difference for those 93 years of age had narrowed to 1 point (.90 vs. .89). For registrants lacking photo ID, there is a larger gap between turnout in 2004 and 2008, and this gap is positively related to age. The predicted turnout probability for 18-year-old registrants is .43 in 2004 and .37 in 2008, producing a drop of 6 points. For those 93 years of age, the gap from 2004 to 2008 has more than doubled at more than 12 points (.71 vs. .59).

As with the prior analyses presented, it is critical that not only the turnout differential be calculated for those without photo ID pre- and post implementation but also that any difference be compared with those registrants who do possess photo ID. The same interelection difference measure described previously is again calculated for each age category used. This measure is plotted as a series of bars across the bottom of Figure 3. Looking at Figure 3, one can see that the interelection difference for those 18 years of age is −.02. This measure increases across the age spectrum to −.11 by the age of 83 years. As the figure clearly shows, age is definitely a mediating factor related to ID status and turnout.[16]

## Discussion and Conclusion

What can we conclude from the results of the analyses presented? Using a traditional policy impact model to ascertain the effects of the Georgia voter ID statute leads to a number of generalizations. First, there is a suppression effect among those lacking this form of ID. The analysis presented yields different results than earlier cross-sectional studies, which generally concluded that more demanding ID standards do not negatively affect participation. Our study demonstrates an across-the-board drop in turnout for Georgians lacking photo ID that is 6.5 points higher than the decline witnessed for the remainder of the voting population. We should also note that this decline occurred in an election cycle that generated greater voter interest, with approximately 650,000 more votes cast in the Peach State in 2008 compared with 2004.

A related observation concerns the level of such suppression. Using some basic mathematics, we estimate the extent to which the Georgia voter ID statute may have affected turnout in the 2008 election. Assuming 274,356 registrants (again, this is the number of matches generated from the 2008 voter registration database) were still on the roll without valid photo ID in 2008, we can estimate the number of registrants in Georgia adversely affected by the law. Our model estimates that prior to the new

Downloaded from spa.sagepub.com at UNIV OF GEORGIA LIBRARIES on August 21, 2014

Georgia law, the turnout rate for this group was .54, whereas after implementation turnout fell to .45 (see Table 3). In the absence of the new law, we would estimate that 148,152 of these registrants would have voted in 2008. In actuality, 123,460 of this group of registrants voted producing a difference of 24,692. Total turnout in 2008 was 3,928,348, or 67.84% of all registrants. Adding the 24,692 registrants estimated to be deterred by the new law, would have increased turnout to 3,953,040, equating to a turnout rate of 68.27%. The difference, −.43, could be considered one measure of the suppressive effect of the new law. Stated succinctly, we estimate turnout in Georgia in 2008 would have been about four-tenths of a percentage point higher had the courts blocked the photo ID statute.[17]

Second, although the law does slightly depress overall turnout, this effect does not disproportionately affect racial or ethnic minority groups. Although the extent of the fall-off in participation among those lacking necessary ID varied across racial/ethnic groups, it affected all groups, including whites. In fact, white Georgians were actually the most likely to be affected by the new law. Again, our findings stand in contrast to other researchers who have concluded that voter ID laws disproportionately affect racial or ethnic minorities (Baretto et al. 2009; Vercellotti and Anderson 2009). A more likely explanation for the drop in turnout among those lacking photo ID is a link-age of the law with SES, which cuts across racial and ethnic lines in roughly the same manner. This was one of the conclusions reached by Alvarez, Bailey, et al. (2008) in research involving CPS data.

Third, registrant age was also found to be an important mediating agent in relation to ID status. Older registrants lacking photo ID were much more likely to be affected by the voter ID statute in 2008 compared with their counterparts. The interelection difference for those at the upper end of the age spectrum was 11 points compared with only a 2-point differential for the youngest registrants. The effect uncovered for age then, eclipses those related to race and ethnicity where the maximum interelection difference was calculated to be 9.5 points.

From a policy perspective, states that implement more stringent voter ID laws must view the potential drop in turnout against the stated intent of such statutes. The federal courts have, indeed, recognized the compelling interest of states to prevent fraud in the electoral process. In Georgia, the stated legislative intent among Republican lawmakers who crafted the legislation was the reduction of in-person voting fraud.[18] It is unclear, however, just how much voter fraud, much less the in-person variety, has been committed in Georgia lately.[19] In the *Common Cause* proceedings, Cathy Cox testified that during her tenure as Secretary of State (1997–2007) no cases of in-person voter fraud had been reported to her office.[20] In addition, to make the statute more legally palatable, the state implemented no-excuse absentee voting by mail in 2007. The small body of scholarly research conducted on voter fraud indicates that mail absentee balloting is more susceptible to fraud than in-person voting methods.[21] In summation, the statute strengthens controls over voting methods not as prone to contemporary fraud, while relaxing standards over an area currently more susceptible to malfeasance.[22]

Downloaded from spa.sagepub.com at UNIV OF GEORGIA LIBRARIES on August 21, 2014

Voter ID requirements have been a lightning rod topic inside and outside of academia. As with other subjects, such as gun control or abortion, many come to the debate with a preconceived opinion of the effects and merits of voter ID laws. It is the job of social scientists to use real-world observations combined with statistical techniques to produce unbiased inferences concerning various phenomena. To that end, we present an empirical assessment related to the effects rendered by the implementation of Georgia's photo ID statute. Our pre- and post-implementation research design, which uses individual-level population data on registrants in Georgia, provides a great deal of leverage in generating a number of causal statements related to the impact of the change in the state's election laws. From empirical observation, we now know that the requirement suppressed turnout and we can estimate the size of the effect. Whether one views this negative externality of the law as an unacceptable disenfranchisement of voters, as plaintiffs have argued, or as acceptable for ballot security concerns, as the courts have held, is a normative judgment. As such, we leave it to readers to make their own decisions concerning the merits of photo ID laws.

## Declaration of Conflicting Interests

The author(s) declared no potential conflicts of interest with respect to the research, authorship, and/or publication of this article.

## Funding

The author(s) received no financial support for the research, authorship, and/or publication of this article.

## Notes

1. 4:05-CV-00201-HLM (N.D. Ga., 2007).
2. As a jurisdiction subject to Section 5 of the Voting Rights Act, Georgia has to secure federal approval before implementing changes related to the election process. Eggen reports that Department of Justice approval came when political appointees overruled objections registered by the professional staff (Dan Eggen. "Politics Alleged in Voting Case." *Washington Post*, January 23, 2006).
3. A detailed listing of voter identification (ID) requirements by state has been compiled by the National Council of State Legislatures and is available on their website: www.ncsl.org
4. Vercellotti and Anderson (2006) describe five types of ID requirements. Baretto, Nuno, and Sanchez (2007) consider six types of ID exclusive of a photo ID.
5. Unlike other states, *every* registrant in Georgia who shows up to vote in-person, either early or on election day, is required to present proper photo ID.
6. Some have argued that examining provisional ballots might be one method of determining the impact of photo ID laws. Following this line of reasoning, we were able to collect some data from the Georgia Secretary of State relating to provisional ballots. In 2004 (pre implementation), there were a total of 12,895 provisional ballots cast in the general election of which 30.8% were eventually counted. In the 2008 general election (post implementation), there were a total of 17,365 provisional ballots cast, half (48.2%) of which were counted.

Downloaded from spa.sagepub.com at UNIV OF GEORGIA LIBRARIES on August 21, 2014

If we take overall turnout into account, however, the percentage of provisional ballots cast drops from .49% of the total vote in 2004 to .44% in 2008. Although studying provisional ballots is one method of trying to gauge the effect of photo ID laws, this metric does not capture voter suppression that may be associated with implementation of such a statute. In other words, provisional ballots are only a measure of those registrants who may have shown up to the polls lacking proper photo ID. Those lacking photo ID who may have been deterred from attempting to cast an in-person ballot are not captured by this measure. In addition, we should note that other issues (i.e., registration) may force a voter to cast a provisional ballot. Unfortunately, the data we received from the *Secretary of State* do not delineate provisional votes by cause, so we have no way of determining just how many of these provisional votes were specifically linked to ID issues.

7. This report was subsequent to an earlier one which was requested by the State Election Board in June of 2006 and was used to create a mailing list to inform registrants who were thought to lack proper photo ID about the new statute. See Carlos C. Campos, "Fight over Photo ID Resumes," *Atlanta Journal-Constitution*, September 2, 2006.

8. These registrants might also have voted using the state's new no-excuse absentee mail ballot which could be requested by registrants without photo ID. For our purposes, we are interested only in whether this group of registrants voted in 2008, not the voting method used.

9. Calculated as 227,455/4,560,309 and 274,356/5,790,570. Voter registration databases are constantly being updated by states to ensure accuracy. The fact that we were not able to match the entire list of 289,622 registrants lacking photo ID in 2007 to our historical copies of the registration database could stem from a variety of reasons. Most of this loss is certainly attributable to the natural addition and subtraction of registrants carried out for a variety of reasons, such as death, movement in and out of the state, and other eligibility requirements (i.e., legal age for registration, obtaining citizenship through naturalization, and criminal disenfranchisement among others).

10. The other states are Florida, Louisiana, North Carolina, and South Carolina.

11. This category includes those registrants who were classified as other, unknown, or American Indian.

12. Data Source: *Community Sourcebook of Zip Code Demographics* (18th and 22nd ed., 2004 and 2008). Vienna, VA: ESRI Press.

13. Models estimated using the logit command in Stata 10. See Primo, Jacobmeier, and Millyo (2007) for discussion of using mixed-level data.

14. The remaining variables in the model were set at their mean or modal values. Our *average* Georgia registrant is a white female of mean age residing in a zip code with average per capita income. Probability simulations are produced using *Clarify 2.0*.

15. Our interelection difference measure is one estimate of a suppression effect produced by Georgia's photo ID statute as it assumes that implementation of the new law will not alter the turnout rate for those registrants who already possess photo ID. Although we view this as a reasonable assumption, some opponents of photo ID laws argue that such laws may even deter those registrants with the proper ID credentials from voting for a variety of reasons. Unfortunately, we are unable to test any of these claims empirically.

Downloaded from spa.sagepub.com at UNIV OF GEORGIA LIBRARIES on August 21, 2014

16. Some opponents of photo ID statutes have argued that older blacks may be more affected by these laws than elderly white registrants. To test this claim, we subset the data set by race and estimated two additional models to isolate the effects of ID status and age for white and black registrants. Using the ages 18 and 75, we again calculated the interelection difference for white and black registrants, comparing those with and without ID across the 2004 and 2008 election cycles. For those registrants 18 years of age, the interelection difference for whites is −.037 compared with −.031 for black registrants. The interelection difference for registrants 75 years of age is −.105 for whites and −.069 for blacks. Counter to some claims that have been made then, the effect of age and ID status on turnout is more pronounced for white registrants than black registrants. The results of these analyses are available on request.

17. Again, we acknowledge the possibility that some registrants who previously possessed photo ID may have been deterred from voting in 2008. Our calculation is based solely on turnout rates pre- and post implementation for those registrants identified as lacking photo ID. Given this, four-tenths of a percentage point decline in turnout we attribute to implementation of the new law can be viewed as a conservative estimate of voter suppression.

18. The Speaker of the House in the Georgia General Assembly stated that actions to block the statute in court "clearly reveal the intent of the Georgia Democrats to secure voting rights for dead people, felons, and illegal immigrants." Carlos Campos. "Voter ID Law on Hold." *Atlanta Journal-Constitution*, July 8, 2006.

19. It should be noted that scientific studies related to the prevalence of voter fraud are very sparse. Although there continue to be numerous anecdotal examples of fraud reported in journalistic sources (many of which are not actual cases of fraud), few studies have been undertaken by social scientists to offer a systematic method(s) for discovering and measuring the extent to which voter fraud exists in contemporary elections. Some notable examples of scholarly research on this topic include Alvarez, Hall, and Hyde (2008) and Minnite (2010).

20. Sonji Jacobs and Carlos Campos. "Voter Bill Stirs Furor." *Atlanta Journal-Constitution*, March 30, 2005.

21. See, for example, U.S. Election Assistance Commission. 2006. *Status Report on the Voting Fraud-Voter Intimidation Research Project*. Washington, DC.

22. One of the more recent cases of voter fraud in Georgia involved a state court judge tampering with absentee ballots. Although certainly fraudulent in nature, this type of activity could not have been prevented by the state's voter ID statute. Todd South. "Defense Focuses on Investigators During Second Trial Day." *Chattanooga Times-Free Press*, March 30, 2009.

## References

Alvarez, R. Michael, Delia Bailey, and Jonathan Katz. 2008. *The Effect of Voter Identification Laws on Turnout*. Pasadena, CA: CalTech/MIT Voting Technology Project.

Alvarez, R., Michael, Thad E. Hall, and Susan D. Hyde, eds. 2008. *Election Fraud*. Washington, DC: Brookings Institution Press.

Ansolabehere, Stephen. 2009. "Effects of Identification Requirements on Voting: Evidence from the Experiences of Voters on Election Day." *PS: Political Science & Politics* 42(January): 127–30.

Downloaded from spa.sagepub.com at UNIV OF GEORGIA LIBRARIES on August 21, 2014

Atkeson, Lonna Rae, Lisa Ann Bryant, Thad E. Hall, Kyle Saunders, and Michael Alvarez. 2010. "A New Barrier to Participation: Heterogeneous Application of Voter Identification Policies." *Electoral Studies* 29(1): 66–73.

Baretto, Matt A., Stephen A. Nuno, and Gabriel R. Sanchez. 2007. "Voter ID Requirements and the Disenfranchisements of Latino, Black and Asian Voters." Prepared for the Annual Meeting of the American Political Science Association.

Baretto, Matt A., Stephen A. Nuno, and Gabriel R. Sanchez. 2009. "The Disproportionate Impact of Voter-ID Requirements on the Electorate—New Evidence from Indiana." *PS: Political Science & Politics* 42 (January): 111–6.

*Common Cause v. Billups*. 2007. United States District Court, Northern District of Georgia.

Downs, Anthony. 1957. *An Economic Theory of Democracy*. New York: Harper and Row.

Erikson, Robert S., and Lorraine C. Minnite. 2009. "Modeling Problems in the Voter Identification—Voter Turnout Debate." *Election Law Journal* 8(2): 85–101.

Hood, M. V., III, S. Charles, and Bullock, III. 2008. "Worth A Thousand Words? An Analysis of Georgia's Voter Identification Statute." *American Politics Research* 36(June): 555–79.

Key, V. O. 1949. *Southern Politics in State and Nation*. New York: Alfred A. Knopf.

Leighley, Jan E. 1995. "Attitudes, Opportunities, and Incentives: A Field Essay on Political Participation." *Political Research Quarterly* 48:191–209.

Minnite, Lorraine C. 2010. *The Myth of Voter Fraud*. Ithaca, NY: Cornell University Press.

Mohr, Lawrence B. 1995. *Impact Analysis for Program Evaluation*. Newbury Park, CA: Sage Publications, Inc.

Muhlhausen, David B., and Keri Weber Sikich. 2007. *New Analysis Shows Voter Identification Laws Do Not Reduce Turnout*. A Report of the Heritage Center for Data Analysis. www.heritage.org/Research/LegalIssues/cda07-04.cfm (Accessed June 18, 2012).

Mycoff, Jason D., Michael W. Wagner, and David C. Wilson. 2009. "The Empirical Effects of Voter-ID Laws: Present or Absent?" *PS: Political Science & Politics* 42(January): 121–6.

Primo, David M., Matthew L. Jacobmeier, and Jeffrey Millyo. 2007. "Estimating the Impact of State Policies and Institutions with Mixed-Level Data." *State Politics and Policy Quarterly* 7(4): 446–59.

Rosenstone, Steven J., and John Mark Hansen. 1993. *Mobilization, Participation, and Democracy in America*. New York: Macmillan Publishing Company.

Sobel, Richard, and Robert Ellis Smith. 2009. "Voter-ID Laws Discourage Participation, Particularly among Minorities, and Trigger a Constitutional Remedy in Lost Representation." *PS: Political Science & Politics* 42(January): 107–10.

Vercellotti, Timothy, and David Anderson. 2006. *Protecting the Franchise or Restricting It? The Effects of Voter Identification Requirements on Turnout*. Presented at the Annual Meeting of the American Political Science Association, Philadelphia, PA.

Vercellotti, Timothy, and David Anderson. 2009. "Voter-Identification Requirements and the Learning Curve." *PS: Political Science & Politics* 42(January): 117–20.

Wolfinger, Raymond E., and Steven J. Rosenstone. 1980. *Who Votes?* New Haven, CT: Yale University Press.

Downloaded from spa.sagepub.com at UNIV OF GEORGIA LIBRARIES on August 21, 2014

## Bios

**Charles S. Bullock, III**, is the Richard B. Russell Chair in Political Science and Josiah Meigs Distinguished Teaching Professor at the University of Georgia. His teaching and research interests include Southern and legislative politics, redistricting and voting rights. He is the author, co-author, editor, or co-editor of 28 books and more than 150 articles. His most recent books are *Redistricting: The Most Political Activity in America, The Oxford Handbook of Southern Politics, The Triumph of Voting Rights in the South and Key States, High Stakes: Sarah Palin, the Tea Party and the 2010 Elections.*

**M.V. Hood, III**, is an associate professor of political science at the University of Georgia, where he conducts research in American politics and policy. He is coauthor of *The Rational Southerner: Black Mobilization, Republican Growth, and the Partisan Transformation of the American South* (Oxford University Press).

Downloaded from spa.sagepub.com at UNIV OF GEORGIA LIBRARIES on August 21, 2014