# VOTER ID REQUIREMENTS AND THE DISENFRANCHISEMENTS OF LATINO, BLACK AND ASIAN VOTERS[1]

September 1, 2007

Matt A. Barreto
*University of Washington, Seattle*

Stephen A. Nuño
*University of California, Irvine*

Gabriel R. Sanchez
*University of New Mexico, Albuquerque*

Prepared for presentation at:
2007 American Political Science Association Annual Conference

---

[1]This manuscript is a working draft. Please direct all questions to Matt Barreto at mbarreto–at–washington–dot–edu



2:13-cv-193
09/02/2014

DEF2484

## 1   Introduction

**Voter ID Requirements**

In 2004 Arizona voters approved Proposition 200, which among other things, strictly enforced new requirements that identification be shown at the polling place before a citizen could vote. Similar laws have since been proposed and passed in many other states, typically related to charges of vote fraud, and often times tied into the divisive debate regarding undocumented immigrants. Changes like these to electoral laws are central to many long-standing theories in the political participation literature. However, very little is known about the effects of voter identification (ID) laws. Our manuscript analyzes the impact that new voter identification laws may have on both the participation rates of particular segments of the electorate, as well as on election outcomes in the United States.

Specifically, through the use of a unique dataset from the 2006 elections, we analyze the impact that voter identification laws have on immigrant and minority voters in California, New Mexico and Washington. Exit polls in each state asked voters to check which forms of identification they would be able to provide if voter ID laws were passed in their state. Controlling for age, income, and education, we find that immigrant and minority voters are significantly less likely to be able to provide multiple forms of identification, such as a copy of their original birth certificate, or a recent bank statement. In full, we asked respondents about their ability to provide approximately six unique forms of identification, and immigrant and minority voters were consistently less likely to have each form of identification. Because our data reflects the identification trends of actual voters, not just adult citizens, the findings go far to suggest that voter identification laws could immediately disenfranchise many Latino, Asian and African American citizens.

## 2   Background and Utility of Voter ID Laws

Manufacturing barriers to specific segments of voters is not a new phenomenon in U.S. history. Race, gender and property requirements were part of our nations history with democracy, and barriers to voting were slow to change. In 1965, after two centuries of discriminatory voting practices, the Voting Rights Act brought an end to literacy tests, poll taxes, and unreasonable identification policies. In this paper, we take up the contemporary debate over voter ID laws and examine the current legislation which is being passed in the name of electoral integrity and deemed non-discriminatory on its face. Before we examine the implications of voter ID requirements on the electorate, it is necessary to first review the rationale behind such laws, and to assess their current status. If electoral institutions lack public confidence due to widespread voter fraud, implementing new and strict identification requirements may be warranted to return integrity to the ballot box. However, it is equally important to examine the impact that more rigorous and demanding identification requirements may have on the ordinary voting public that is not engaging in fraud, and how such requirements may prevent some from voting simply because of the more strict guidelines.

Federal concern over electoral integrity reemerged after the disputed Presidential election in 2000 and produced the Help America Vote Act (HAVA) of 2002. HAVA sought to replace punch card

voting systems, assist in the administration of federal elections and to establish minimum election administration standards for States and units of local government... in the administration of federal elections (Pub.L.107-252 §208.b.2). Although HAVA requires that identification be used by first time voters, identification does not need to contain a photograph.

In the same year that HAVA passed, the U.S. Department of Justice implemented a new program called the Ballot Access and Voting Integrity Initiative (BAVII), intended to track cases of voter fraud. With the 2000 election coming down to a handful of votes in Florida and New Mexico, each and every vote is now taken much more seriously by the candidates, political parties and their teams of lawyers. Despite new interest in vote fraud, BAVII investigations have been difficult to follow and have published very little information on their results. From 2002-2005, only 24 cases of fraud were successfully prosecuted. Surprisingly, with so much attention paid to voter fraud by both political parties, there is no state which compiles or publishes data on voter fraud (Minnite, 2007, pg. 9).

Following HAVA and BAVII, twenty-four states expanded the voter identification laws. Among the earliest, voter ID laws were passed by Alabama, Colorado, Montana, North Dakota, South Dakota in 2003 as HAVA regulations were becoming more clear (See Table 1).

The different types of identification that are acceptable are broad. However, the identification-laws in HAVA are designed for the purpose of establishing that the voter at the polling booth is the person on the roll. The more stringent laws, such as in Arizona, are meant to establish proof of citizenship at the voting booth regardless of whether or not that person is on the roll. For example, even though U.S. passports contain a photo of the individual they are not an acceptable form of identification in Arizona by themselves because passports do not include current addresses. Passports are acceptable in most other states, including Georgia because they provide proof of citizenship.

Several significant court cases have resulted from the new voter identification laws. The *Perdue et al. v. Lake et al.*, case was based on a woman who was a first time voter who moved to Georgia from Florida and was a legal resident who was registered to vote. She claimed that the new laws violated Article II §1.2 of the Georgia constitution, guaranteeing every registered voter the right to vote. Prior to the more stringent laws, voters who could not present one of the seventeen forms of identification were allowed to swear by written oath that they were the person identified on the rolls. The suit resulted in a preliminary injunction enjoining the State of Georgia from enforcing the identification laws prior to the 2006 Congressional election. However, the court has since ruled that the plaintiff lacked standing because she possessed a state identification card for public transportation offered to her pursuant to the American with Disabilities Act. With similar results in Arizona, injunctive relief at the federal level was denied by the 9th Circuit Court in *Gonzalez v. Yes on Proposition 200*, with the district court stating that the appellants failed to prove that there would be an undue hardship on voters caused by Proposition 200.

Since HAVA was passed, voter identification laws have been a source of rancorous political debate with a prescient understanding by both parties as to who would be affected by these stringent laws. A sponsor of the new Georgia voter identification law, Representative Sue Burmeister, stated that "if there are fewer black voters because of this bill, it will only be because there is less opportunity for fraud" (*Perdue et al. v. Lake et al*). When injunctive relief was denied in *Gonzalez v. Yes on Proposition 200* the headline from the Arizona Secretary of States press release read, "Sec. of State Brewer Gets ID at Polls Reinstated: Voters Prevail in Having ID at Polls and Proof of Citizenship Upheld".

Yet concern over fraud for the Republican Party in Georgia, and by the Republican Party in general, fails to extend to absentee voters. Georgia Republicans intentionally left out the more stringent identification requirements for absentee voters, residents who are more likely to be established voters. The elections code states that the application for absentee voters "shall be in writing and shall contain sufficient information for proper identification of the elector" (O.C.G.A §21-2-381), whereas an in-person voter needs to provide photo-identification (O.C.G.A. §21-2-417(c)). In the U.S. Senate Republican Policy Committee executive summary, Republicans recommend that the "plague" of election fraud be addressed with a policy of requiring photo identification for voters who show up at the polling booth, but extending these policies to absentee voters should await further examination.[2] While there are a broad number of acceptable IDs, either alone or in conjunction with another form of identification, the difference in barriers between established and non-established voters is quite striking.

We argue that barriers to voting affect voters disproportionately across various demographic and partisan characteristics. Further, increased barriers to voting could have an important impact on elections in states with a high number of new voters, such as those with a high number of immigrant voters, or states with demographics that are disproportionately affected by more stringent voting laws. The elusiveness of hard evidence that voter fraud is rampant, however, has not prevented it from developing into an important political issue, and as both parties examine the effects of various voter laws, battle lines are being drawn in a highly charged battlefield of unsubstantiated rhetoric.

The strongest argument among proponents of these changes to election laws is that more stringent voting procedures will strengthen voting officials ability to prevent voter fraud. Over the past few years there has been a growing concern among government officials and political pundits that voter fraud is rampant and is threatening the integrity of U.S. elections. For example, a 2005 U.S. Senate policy committee report claimed that voter fraud continues to plague our nations federal elections, diluting and canceling out the lawful votes of the vast majority of Americans.[3] Those in favor of tighter regulation of the electoral process contend that this effort will decrease voter fraud and improve the electorates trust and confidence in the system. Although very salient recently, this argument is nothing new. In the late 1890s as the demographics of the electorate rapidly changed,

---

[2]U.S. Senate Republican Policy Committee, "Putting an end to Voter Fraud,"(February 15, 2005)

[3]U.S. Senate Republican Policy Committee, Putting an end to Voter Fraud, (February 15, 2005)

seeing an increase in immigrant and working class voters, elites pushed for personal voter registration systems based on the argument that these changes would prevent voter fraud and protect the system (Piven and Cloward, 2000). However, attempts to quantify voter fraud in U.S. elections with objective evidence and scientific methods has indicated that voter fraud and corruption are not rampant, but instead rare and isolated.

Assessing the prevalence of voter fraud is daunting due to the lack of official federal or even state level statistics on voter fraud.[4] A recent Project Vote report however provides a comprehensive review of extant data and concludes that all available evidence suggests voters rarely commit voter fraud in the United States (Minnite, 2007). In 2002 the U.S. Department of Justice began BAVII to investigate voter fraud and prosecute offenders. However, government records show that only 24 people have been convicted or have pleaded guilty to illegal voting between 2002 and 2005 nationally (Minnite, 2007). At the state level, reviews of newspaper coverage, court proceedings, and interviews indicate that voter fraud in state elections is also negligible (Minnite and Callahan, 2003). This is exasperated by evidence uncovered by reviewing hundreds of media reports on voter fraud that many voting fraud allegations are false claims made by losers of close elections (Minnite, 2007). At the end of the day, scholars have had a hard time finding examples of verified voting fraud cases.

Despite the clear lack of convincing evidence to support the claim that voting fraud is occurring at rates high enough to dilute "the lawful votes of the vast majority of Americans", it appears as though voter fraud exemplifies the notion of perception being reality. Recent public opinion polls have indicated that a large segment of the American population believes that voting fraud is prevalent, and lacks confidence in our election systems. Specifically, a Rasmussen Report poll found that 58 percent of Americans believed that there was a lot or some fraud in American elections, while 67 percent of respondents to a 2000 Gallup poll had only some or very little confidence in the way votes are cast and counted in our county (Wang, 2006). Therefore, regardless of concrete evidence, it appears as though public opinion will continue to support efforts to tighten election laws, including the implementation of photo or multiple forms of identification at the polls. However, strategies to implement greater regulation of the voting process may negatively impact the participation levels of large segments of the American electorate. Although very little research exists on voter ID laws, there is a preponderance of scholarship on electoral rules, institutional regulations, and voter participation from which we draw.

# 3   The Impact of Electoral Rules on the Electorate (Theory and Hypotheses)

The notion of voter registration developed in the nineteenth century with the objective of controlling election fraud by preventing people from voting more than once or voting outside of their jurisdiction of residence (King 1994). Although the ability of registration to prevent fraud is debatable, scholars have found evidence that registration requirements limit citizen participation in the

---

[4]U.S. Senate Republican Policy Committee, Putting an end to Voter Fraud, (February 15, 2005

electoral process (Harris 1929; Merriam and Gosnell 1924; Piven and Cloward 2000; King 1994). For example, the move to personal voter registration systems in the late 1890s effectively de-mobilized the poor and working classes (Piven and Cloward 2000). While many legal requirements for registration such as poll taxes, literacy tests, and grandfather clauses have been removed by case law - *Smith vs. Allright* (which eliminated white primaries) - or constitutional amendments, several restrictive registration regulations remain in place in many states, including early closing dates for registration, purging of registration rolls, and the limiting of voter registration to specific times and places (King 1994).

There have been several studies interested in the relationship between voter registration laws and voter turnout. The rational choice model of Anthony Downs has provided a theoretical framework to evaluate the effect of registration laws on voter turnout. Derived from economics, Downs theory is based upon the ideal that every rational man decides whether to vote just as he makes all other decisions: if the returns outweigh the costs, he votes; if not, he abstains (Downs 1957: 60). The registration process is one of the largest sources of cost to rational minded voters. Therefore, the more permissive registration laws are, the lower the time, energy, and informational costs of voting (Wolfinger and Rosenstone 1980). Attempts to analyze the impact of restrictive laws on voter registration have consistently concluded that turnout rates are higher when costs associated with registration are low (Campbell et al. 1960; Wolfinger and Rosenstone 1980; Katosh and Traugott 1982; Jackson 1993; Blank 1974; Kim, Perocik and Enokson 1975; Bauer 1990).

The relationship between voting requirements and turnout becomes more complex with the recognition that political resources play a major role in determining political participation rates. According to the Civic Volunteerism model of participation (Verba, Schlozman and Brady 1995), individuals with greater resources, skills, and political orientations are more likely to participate in political activities like voting. This perspective suggests that voting may be less costly for those with greater levels of political resources such as money, time, English language abilities and education. Therefore, any increases in costs associated with voting should have the greatest impact on those with the fewest political resources  racial and ethnic minorities, the less educated, immigrants, and the less affluent to name a few.

Research in this area has supported the notion that changes to election rules and procedures have a disproportionate impact on the electorate. For example, some have argued that registration laws are the primary source of socioeconomic differences in voting rates among Americans (Powell 1986; Piven and Cloward 1988; Cunningham 1991). According to Cunningham (1991), race and class disparities in rates of voter registration in this country are not inevitable. Rather, they are the product of historical and continuing racial and socioeconomic bias in the operation of our registration laws (1991: 372). The implementation of the poll tax and literacy tests are the most direct examples of how voting procedures can disproportionately impact the electorate. By comparing turnout rates with and without these obstacles, it is clear that literacy tests and poll taxes decreased turnout overall in the South (Rusk 1974). However, these factors disproportionately impacted Black voters. Similarly, state registration laws (early registration deadlines, limited

registration office hours) decreased turnout in the 1972 election by about nine percentage points. The impact of these laws was heaviest in the South among the less educated and among African Americans (Rosenstone and Wolfinger 1978).

Scholars have also found that minority participation increases when revisions are made that reduce the costs associated with voting. The most prominent example of this trend was the removal of discriminatory voter registration laws directed toward African Americans with the implementation of the Voting Rights Act of 1965. Rosenstone and Hansen (1993) estimate that the African American turnout increased by nearly 16% as a result of the combined impact of the elimination of legal barriers that had been used to exclude Blacks from the political process (poll taxes, literacy tests, move to permanent registration systems). More recently, the National Voter Registration Act (NVRA) of 1993 was designed to reduce the cost of voting by incorporating registration with a public agency that potential voters would utilize for other purposes. As part of the NVRA, citizens were offered the opportunity to become registered while at any state office that provided public assistance. This program seemed to have effectively increased registration for minorities by reducing the cost of voting, as 7% of Blacks and 6% of Latinos registered in public assistance offices prior to the 1996 election, compared to only 3% of Whites (Wolfinger 2001).

The extant literature clearly indicates that when changes are made to electoral rules, including registration requirements, turnout is affected significantly. In short, when costs associated with voting are reduced turnout increases, when costs are increased turnout decreases. Further, due to varying levels of political resources (time, money, political sophistication etc.) the impact of these changes is typically most pronounced on specific segments of the electorate, including; racial and ethnic minorities, immigrants, and those with less educational attainment and lower incomes. This trend motivates the following hypothesis;

*Disproportionate Impact Hypothesis:*

H1: Racial and ethnic minorities (Latinos, African Americans, Asians, foreign-born) are significantly less likely to have various forms of voter identification.

H2: Those with lower socioeconomic levels (education, income) are significantly less likely to have various forms of voter identification.

## 4   Voter ID Laws on Election Outcomes

It is well established that partisanship is a valuable psychological tool that helps people understand a complex political system and to make political decisions. Parties help reduce information costs by providing cues to voters regarding candidates and policy issues, and partisanship has been identified as the dominant factor impacting vote choice (Campbell et. al. 1960). Therefore, identifying the party identification among segments of the electorate can tremendously aid in the prediction of how these communities will vote in future elections. This information can then be

**Voter ID Requirements**

used to help predict if voter photographic identifications impact on the electorate can have electoral consequences.

Generally speaking, racial and ethnic minorities in the U.S. tend to identify with the Democratic Party in large numbers. This attachment to the Democratic Party is most prevalent among African Americans, who consistently exhibit near monolithic support for the Party and its candidates (Dawson 1994; Tate 1993). Similarly, Latinos - particularly Mexican Americans and Puerto Ricans have also consistently identified with the Democratic Party (de la Garza and Brischetto 1983; Uhlaner and Garcia 1998; Hero et. al 2000).[5] Other minority populations, including Asian and Native Americans also tend to be more Democratic in their political behavior (Cain, Kiewiet and Uhlaner 1991; Lien et. al. 2001; MacPherson 2004). Finally, socioeconomic factors such as income and education impact party identification and voting behavior, with those with lower educational attainment and incomes being more likely to be Democrat (Stonecash et al. 2000; Siegel and Hodge 1968; Cassel 1982).

In short, Democratic Party attachment is greatest among those segments of the electorate who are most likely to be negatively impacted by increased standards in voter identification laws. As a result, it is likely that changes to voter identification laws will impact political outcomes, especially in the most competitive districts and states. The Democratic Party is likely to lose votes in states where strict identification laws are enacted. A story in the Washington Post noted the partisan implications during the 2006 election: Republicans and their allies assert that the identification requirements and other rules will lessen voting fraud. Democrats and their supporters contend the changes are ploys to suppress voting among poor, elderly, minority and disabled citizens, who are prone to support Democratic candidates (Goldstein 2006). Rather than asserting or contending, this research is one of the first to empirically test the relationship;

*Election Outcome Hypothesis:*

H3: Voters with less access to multiple forms of identification are significantly more likely to vote Democrat.

## 5   Data and Methods

To assess the impact that strict voter identification regulations would have on participation rates by race and class, and the resulting influence on electoral outcomes we rely on a unique exit poll of election day voters during the November 2006 election. The exit poll was implemented in California, New Mexico and Washington state and contained questions about which form of identification voters could readily provide, or had access to. Because the survey was an exit poll among actual voters, we should anticipate that resources and access to identification would be relatively high, especially as compared to the eligible non-voting population. All participants in the survey have already gone through the process in their respective state to register to vote, and now, interviewing

---

[5]We note however that scholars have consistently found that Cuban Americans identify and vote as Republican.

them on election day, by definition they are among the small minority that votes in a midterm election. This is all to say, that the deck is stacked against us. If we find statistically significant differences in access to forms of voter identification, we can be certain that those differences are real.

Further, the three states in which the exit poll was conducted have somewhat lax voter identification regulations, or do not strictly enforce those standards1. This is an ideal environment to test the possible disenfranchising effects of voter identification laws, because in most cases, the voter (or potential voter) experiences a change from few requirements to significant ID requirements. Had we conducted the exit poll in Arizona or Indiana, states that already have quite strict requirements, our entire sample would be biased in favor of having the appropriate identification, or else they would not have been allowed to vote (and therefore not in our sample). Thus, the best way to approximate the impact of stricter voter identification laws is to examine states with relatively few requirements such as California, New Mexico and Washington.

The exit poll surveys were administered throughout the day from the time the polls opened until they closed, so that all voters had an equal chance to be interviewed. Voters were randomly selected to participate, using a traditional exit poll skip pattern, and filled out a self-administered survey that was available in multiple languages. In full, 4,346 interviews were collected across the three states.

In addition to questions about their vote preference, most important issue, and other standard political questions, voters were asked to select which forms of identification they would be able to provide the next time they voted, if their state were to ask for identification before they could vote. Respondents could check a box yes or no for whether they had each of the following types of identification: state drivers license, U.S. passport, bank statement, original birth certificate, utility bill, state ID card, naturalization card, or property tax statement. This list was selected based on the valid forms of voter identification under current regulations in states such as Arizona and Georgia.

To examine access to each form of identification, we model six dichotomous probit regressions for six of the eight forms of identification in which all voters may have access (naturalization card and state ID card were not considered in this first set of models). Next, we created a variable called license plus 1 which closely resembles many of the proposed voter identification requirements being considered in the fifty states. This variable takes on a value of 1 only if the respondent has access to a drivers license (or state ID card), and at least one additional form of identification. If the voter only had a license, or only a passport, the value is a zero. Finally, we create a six-item index of the items above (substituting state ID card if the voter has no drivers license, and including naturalization card only for immigrants). The index has a Cronbach alpha reliability coefficient of .7937, and ranges from 0 to 6. Because the index is a count of the total pieces of identification the voter has access to, we rely on poisson regression to estimate the relationship (Cameron and Trivedi 1998).

After presenting the results for access to voter identification, and the potential for voter disenfranchisement, we want to know whether electoral outcomes might change under more strict regulations. In the final set of models, the dependent variable is vote choice in the recent 2006 midterm election. While the candidates differed in three states, the choices are relatively similar and we create a variable called Vote GOP which is set to 1 if the respondent voted for the Republican candidate for US Senate or House, and 0 if they voted for the Democratic candidate. During the vote choice analysis 378 voters who declined to state their preference, or who supported a third-party candidate were dropped from this analysis, leaving us with a sample of 3,800 for the vote choice models.

Our main independent variables are individual level demographics, that may correlate with both access to voter identification, and also vote choice. These variables are coded in a traditional manner and an appendix provides full detail for each independent variable.

# 6    The Findings

Depending on how voter identification laws are implemented, a substantial amount of current voters could be disenfranchised. While 88% of the sample stated they did have a valid state drivers license, only 56% stated that they had a drivers license and at least one additional form of identification. Further, access to identification varied considerably by race, class and immigrant status. Table 2 presents bivariate correlation statistics for several demographic variable of interest and access to a valid form of identification. Table 3 presents the regression results predicting access to each of the six types of identification a voter may be asked for. In addition, we present results for the two combined ID measures, license plus 1 and the 6-item index. To estimate the degree to which a voter of a certain demographic group was more or less likely to have the form of ID, we transformed the coefficients into predicted probabilities, which can be found in Table 4.

[ Tables 2, 3 and 4 about here ]

## 6.1   *Bivariate Results*

The first state in our analysis is a brief bivariate investigation of the relationships between some of our key independent variables and access to a drivers license. As Table 2 indicates, race impacts access to a drivers license, as white voters are approximately 10% more likely to have this primary form of valid identification than non-whites. In addition to racial and ethnic minorities, foreign-born voters are also less likely to have a drivers license. There also appears to be a socioeconomic bias associated with having a drivers license, as those with higher educations and incomes are more likely to have this specific form of valid identification. Finally, older voters are less likely to have a drivers license. So overall, our bivariate results indicate that individuals who are racial and ethnic minorities, foreign-born, of a lower socioeconomic status, and are older all are less likely to have a drivers license. This is critical to our discussion, as a drivers license is the primary valid form of identification accepted for voting purposes. The next stage of our analysis will determine if these

factors continue to be relevant when accounted for in a multivariate context.

### 6.2   *Race and Immigrat Status*

For five out of six types of voter identification, Latinos, Asians, Blacks and immigrants were statistically less likely to have access to ID, as compared to Whites and the native born (see Table 3). In the two combined measures, minorities and immigrants were again significantly less likely to have multiple forms of the acceptable identification. While Latinos and Blacks were not less likely to have a state drivers license, Latinos, Blacks, Asians and immigrants were all significantly less likely to have at least a drivers license and one additional form of identification. The changes in predicted probability reported in Table 4 suggest that these differences are profound. Asians and Blacks were over 20% less likely to have a driver's license plus another form of identification, as compared to Whites, while Latinos were 13% less likely. Immigrants were about 6.5% less likely to be able to provide two forms of ID compared to native born.

Further, considerable group differences exist even for forms of identification that might be considered very basic or accessible. With regard to a recent bank statement, Asians were almost 24% less likely to have access, Blacks about 17% less likely, Latinos 15% less likely, and immigrants 7% less likely. Similarly, Blacks were 20% less likely to have access to a recent utility bill that would contain their name and current address, while Asians were 18% less likely, Latinos 14% less likely and immigrants 10% less likely to be able to present a utility bill. Although these two forms of identification are often cited as easily accessible, our findings demonstrate clearly that racial and ethnic minorities do not have access to the same types of identification as Whites. Our findings are supported by extant research in the fields of economics and sociology, where scholars have found that minorities and immigrants have much lower rates of access to bank checking and credit accounts (Hogarth et. al. 2003; Rhine and Toussaint 1999). Further, minorities are less likely to own their home, and therefore may not have a full range of utility bills in their name (Flippen 2001). Or in the case of multiple family households, the bills may be in the sole name of the male head of household, leaving three other adults in the household without proof of their residency in that household, at least by way of utility bill (Angel and Tienda 1982; Glick et. al. 1997). It is clear that imposing stricter voter identification requirements would disproportionately impact Latino, Black, Asian and immigrant voters.

### 6.3   Socioeconomic status and Age

In addition to race, the main social cleavage in the United States continues to be social class, and our results suggest that class is a major factor related to voter identification laws. Having higher levels of education and income make a voter statistically more likely to have valid forms identification (see Table 2 and Table 3). More educated voters were significantly more likely to have five of the six types of identification (no effect for birth certificate). Likewise, higher income voters were significantly more likely to have five of the six types of identification (no effect for utility bill). In the two combined dependent variable models, income and education demonstrate an important role with low-income voters about 8% less likely to have two forms of identification, and the least

educated voters 18% less likely (see Table 3).

It is important to note that the results for race and class are consistent even as both sets of independent variables are introduced to the model. Because of the well documented correlation between race and class, this is often not the case. While race may show significant effects in a model by itself, those effects may evaporate once class is controlled for, or vice versa. Here, we demonstrate that minorities, across income groups, are less likely to have access to identification. Similarly, it can be stated that low-income, low-education voters, minority and White alike, are statistically less likely to have multiple forms of voter identification.

The final demographic group we are interested in examining is the elderly. During the debate on voter identification laws, advocacy groups such as the AARP stated that elderly voters would face undue discrimination if voter identification laws were put in place. Our results only partially support this claim. Voters over the age of 65 were less likely to have access to a drivers license (the source of contention in Georgia  see Goodman 2006), and also less likely to be able to provide a utility bill. Specifically, elderly voters were 8% less likely to have a drivers license and 6% less likely to have a utility bill, both of which could lead to lower rates of participation among voters over 65. However, there was no statistical difference with respect to birth certificate, bank statement, passport, or property tax for elderly voters. Further, we find no statistically significant differences by age in our two combined measures.

## 7   Voter ID Requirements and Electoral Outcomes

To this point, the findings provide strong evidence that a large number of voters could be disenfranchised with the passage and enforcement of stricter voter identification laws. From a democratic standpoint, new barriers to voting raise many concerns. However, it is unclear whether or not voters with access to identification vote differently than those without. Given the results above with respect to race, income, and education we suspect partisan differences exist as well. To test the premise that voters with less access to multiple forms of ID are more likely to vote Democrat, we modeled vote choice in the November 2006 election. While a very strong bivariate relationship exists between having access to ID and voting Republican, it is important to ensure that this is not an artifact of race or income, thus we present a multivariate analysis, controlling for the best known predictors of vote choice: partisanship, race, income and a host of other factors.

[ Table 5 about here ]

As indicated in Table 5, after controlling for partisanship, race, and income, we find that voters with more access to identification are more likely to vote Republican. This suggests, at least in our sample, that strict voter ID regulations would eliminate more Democratic than Republican votes from the final tally. The changes in predicted probability, reported along with the probit coefficients, suggest that voters with access to multiple forms of ID who would remain largely unaffected by strict ID laws are between $3\% - 5\%$ more likely to vote Republican. In jurisdictions with

competitive elections and close outcomes, this could easily change the final vote results in favor of Republican candidates.

For example, among the 32 House seats that changed hands from Republican to Democrat control in 2006, our data suggest that 12 of these outcomes would have been reversed under strict voter ID regimes, with an additional 6 elections being too close to call and headed for recounts. In addition, Democratic victories in the U.S. Senate in Montana, Virginia and Missouri would have been reversed. The political context therefore becomes extremely important to note when discussing our findings here. Table 6 lists the most competitive races in the House of Representatives going into the 2006 Congressional Elections, including the thirty seats that were picked up by House Democrats. The electoral results show that forty elections were won within a 7% margin of victory. More than a third, or fifteen, of these contests ultimately switched from a Republican to a Democrat seat. In total more than half of these closely contested districts, twenty-three in all, were in states with election laws that were extended beyond HAVA requirements in 2003 and 2005, and fifteen of those twenty-three seats switched from Republican to Democrat in the 2006 election. It is also important to note that each of the states requiring photo identification are in heavily competitive presidential elections with a substantial number of minority and immigrant voters, such as Ohio, Florida, Arizona, Georgia and Louisiana.

[Table 6 about here]

## 8  Discussion and Conclusions

We began with a discussion on the utility of voter identification laws and the lack of empirical evidence to justify the social cost to our democratic system that would result from creating higher barriers to voter participation. Several states have recently enacted new laws that require citizens to provide photo identification, or multiple forms of identification to be shown at the polling place before being able to vote. Despite the growing discussion of whether or not these laws decrease voter fraud, surprisingly little is known about the effects of voter identification ID laws. We intended to shed some light on this issue by analyzing the impact that new voter identification laws may have on both the participation rates of particular segments of the electorate, as well as on election outcomes in the United States. Our results clearly suggest that voting laws which require specific or multiple forms of identification will disproportionately impact racial and ethnic minorities, immigrant populations, and those with lower incomes. These results are compelling due to the nature of our data and the established literature on the impact increased costs has on voter turnout. Because we analyze the impact of these laws on voters from the 2006 Election, our results provide a clear diagnosis of how voter ID laws will impact voter turnout even among the most active participants in our political system.

With the inability of scholars or political pundits to provide clear evidence that these laws decrease vote fraud, we should be very concerned with the potential negative impact these laws will have on the electorate. Further, our results suggest that the implementation of voter ID laws could

**Voter ID Requirements**

have major implications to party politics. We find compelling evidence that those less likely to have access to multiple forms of identification are disproportionately Democrat. To determine the possible electoral consequences of this trend, we isolate the congressional districts that moved from Republican to Democratic control in addition to the tightest races in 2006. Our results suggest that seats that were picked up by Democrats, as well as other tight races, could have been substantially impacted by more stringent voter ID laws. The use of common sense mechanisms to secure the democratic process is necessary, but without an established record of widespread voter fraud to justify the suppressive impact we know to exist as a result of increased voting barriers, we encourage a greater examination into secure but non-discriminatory voting procedures.

**References**

Angel, Ronald and Marta Tienda. 1982. "Determinants of Extended Household Structure: Cultural Pattern or Economic Need?" *American Journal of Sociology.* 87(6): 1360–83.

Bauer, John R.. 1990. "Patterns of Voter Turnout in the American States." *Social Science Quarterly,* 71: 824–834.

Blank, Robert H. 1974. "Socio-Economic Determinism of Voting Turnout: A Challenge." *Journal of Politics,* 36: 731–752;

Cain, Bruce E., D. Roderick Kiewiet, and Carole J. Uhlaner. 1991. "The Acquisition of Partisanship by Latinos and Asian Americans. *American Journal of Political Science* 35(2):390-422.

Campbell, Angus, Converse, Philip E., Miller, Warren E., and Stokes, Donald E. (1960). *The American Voter.* Chicago: University of Chicago Press.

Cameron, A. Colin and Pravin Trivedi. 1998. *Regression Analysis of Count Data.* Econometric Society Monograph No. 30. Cambridge: Cambridge University Press.

Cassel, Carol A. 1982. "Predicting Party Identification, 1956–80: Who Are the Republicans and Who are the Democrats?" *Political Behavior* 4: 265–81.

Cunningham, Dayna L. 1991. "Who Are to be the Electors? A Reflection on the History of Voter Registration in the United States." *Yale Law and Policy Review* 9:370–404.

Dawson, Michael C. 1994. *Behind the Mule: Race and Class in African-American Politics.* Princeton, NJ: Princeton University Press.

de la Garza and Brischetto 1983

Downs, Anthony, 1957: *An Economic Theory of Democracy.* New York: Harper & Row.

Flippen, C.A. 2001. "Residential Segregation and Minority Home Ownership." *Social Science Research.* 30 (Sept): 337-362.

Glick, Jennifer, Frank Bean, Jennifer Van Hook. 1997. "Immigration and Changing Patterns of Extended Family Household Structure in the United States: 1970-1990." *Journal of Marriage and the Family.* 59(Feb): 177–191.

Goldstein, Amy. 2006. "Democrats Predict Voter ID Problems." Washington Post. Nov 3.

Goodman, Brenda. 2006. "Judge Blocks Requirement in Georgia for Voter ID." New York Times. July 8.

Harris, Joseph. 1929. *The Registration of voters in the U.S.* Baltimore: The lord Baltimore Press.

Hero, Rodney, F. Chris Garcia, John Garcia, and Harry Pachon. 2000. "Latino Participation, Partisanship, and Office Holding." PS: Political Science & Politics 33(3):529-34.

Hogarth, Jeanne, Christoslav Anguelov, and Jinhook Lee. 2003. "Who Has a Bank Account? Exploring Changes Over Time, 1989-2001." *Journal of Family and Economic Issues.* 26(Spring): 7–31.

Jackson, Robert A. 1993. "Voter Mobilization in the 1986 Midterm Election." *Journal of Politics*, 55 :1081–1099.

Katosh, John P., and Traugott, Michael W. (1982). "Costs and values in the calculus of voting." *American Journal of Political Science* 26: 361.

Kim, Jae-On, Petrocik, John R., and Enokson, Stephen N. (1975). "Voter turnout among the American states: Systemic and indibidual components." *American Political Science Review* 69: 107–131.

King, James. 1994. "Political Culture, Registration Laws, and Voter Turnout among the American States." *Publius*, 24 (4): 115–127.

Lien, P. T., Collet, C.,Wong, J.,  Ramakrishnan, K. (2001). "Asian Pacific American politics symposium: Public opinion and political participation." *PS:Political Science & Politics*, 34, 625–630.

MacPherson, Karen. 2004. *American Indians flex political muscle.* Pittsburgh Post–Gazette. Feb 1.

Merriam, C., and H. Gosnell (1924). *Non-Voting: Causes and Methods of Control.* Chicago: Chicago University Press.

Minnite, Lorraine. 2007. "The Politics of Voter Fraud." *A Project Vote Report*, March 5, 2007. Report available at; http://projectvote.org/publications/reports-guides.html

Minnite, Lori and David Callahan. 2003. *Securing the vote: an analysis of Election Fraud.* New York: de–mos: network for ideas and Action.

Piven, Frances Fox, and Cloward, Richard A. (1988). *Why Americans Don't Vote.* New York: Pantheon Books. CALLED 1989 in text  check on this.

Piven, Frances Fox, and Richard A. Cloward. 2000. *Why Americans still don't vote : and why politicians want it that way.* Boston, MA: Beacon Press.

Powell, 6. Bingham, Jr. (1986). "American voter turnout in comparative perspective." *American Political Science Review* 80: 17–43.

Rhine, S. and M. Toussaint. 1999. "The use of formal and informal financial markets among black households." *Consumer Interest Annual*, 45: 146–151.

Rosenstone, Steven J., and Hansen, John Mark. (1993). *Mobilization, Participation, and Derrocrucy in America*. New York: Macmillan Publishing.

Rosenstone, Steven and Raymond Wolfinger. 1978. "The Effect of Registration on Voter Turnot." *The American Political Science Review*, 72 (1), 22–45.

Rusk, Jerrold. 1974. "Comment: The American Electoral Universe: Speculation and Evidence." *American Political Science Review* 68: 102849.

Siegel, Paul M., and Robert W. Hodge (1968). "A Causal Approach to the Study of Measurement Error." In Hubert M. Blalock, Jr., and Ann B. Blalock (eds.),*Methodology in Social Research*. New York: McGraw-Hill.

Stonecash, Jeffrey M., Brewer, Mark D., McGuire, Mary P., Petersen, R. Eric, and Way, Lori Beth (2000). "The survival of Democrats: secular realignment outside the South." *Political Research Quarterly* 53: 731–752.

Tate, Katherin.1993. *From Protest to Politics: The New Black Voters in American Elections*. New York: Russell Sage Foundation.

Uhlaner, Carole Jean, and F. Chris Garcia. 1998. "Foundations of Latino Party Identification: Learning, Ethnicity, and Demographic Factors among Mexicans, Puerto Ricans, Cubans, and Anglos in the United States." Irvine, CA: *Center for the Study of Democracy*, Research Monograph Series.

Verba, Sidney, Kay Schlozman, and Henry Brady. 1995. *Voice and Equality: Civic Voluntarism in American Politics*. Cambridge, MA: Harvard University Press.

Wang, Tova Andrea. 2006. "Voter Fraud: A Deafening Silence." *An Ascribe Report*, December 5, 2006.

Wolfinger, Raymond, and Jonathan Hoffman. 2001. "Registering and Voting with Motor Voter." *PS Political Science and Politics*, 34 (1), 85–92.

Wolfinger, Raymond E., and Rosenstone, Steven J. (1980). *Who Votes?* New Haven, CT: Yale University Press.

**Tables**

*Table 1: Photo ID Laws Among States with Voter ID Laws*

| States That Request Photo ID at Polls | |
|---|---|
| Arizona | Louisiana |
| Florida | Ohio |
| Hawaii | South Dakota |
| Indiana | Georgia[1] |
| **States that Require ID (photo not required)** | |
| Alabama | Montana |
| Alaska | New Mexico |
| Arkansas | North Dakota |
| Colorado | South Carolina |
| Connecticut | Tennessee |
| Delaware | Texas |
| Kentucky | Virginia |
| Missouri | Washington |

Source: National Conference of State Legislatures, 2007

Table 2: *Bivariate Relationship Between Demographic Factors and Access to License*

| Variable | Coefficient | % Change in Predicted Probabilty |
|---|---|---|
| Race – White | .510*** | .098 |
| Nativity | -.392*** | -.081 |
| Income | .194*** | .035 |
| Education | .194*** | .035 |
| Age | -.083*** | -.015 |

---

[1]   Georgia's law requiring photo identification has been upheld, but is still meeting heavy legal resistence.

Table 3: *Regression Results Predicting Access to Various Forms of Voter Identification*

| Variables | Driver's License | Birth Certificate | Bank Statement | Passport | Utility Bill | Property Tax Statement | License Plus 1 | 6-item Index |
|---|---|---|---|---|---|---|---|---|
| | Coef. | Coef. | Coef. | Coef. | Coef. | Coef. | Coef. | Coef. |
| Latino | -0.044 | -0.227 *** | -0.403 *** | -0.370 *** | -0.383 *** | -0.402 *** | -0.342 *** | -0.548 *** |
| | (.084) | (.065) | (.065) | (.068) | (.066) | (.083) | (.062) | (.085) |
| Asian | -0.376 ** | -0.543 *** | -0.693 *** | -0.158 | -0.536 *** | -0.629 *** | -0.514 *** | -0.837 *** |
| | (.127) | (.131) | (.120) | (.110) | (.120) | (.161) | (.109) | (.149) |
| Black | 0.032 | -0.262 ** | -0.463 *** | -0.390 *** | -0.597 *** | -0.433 *** | -0.507 *** | -0.707 *** |
| | (.136) | (.102) | (.101) | (.103) | (.106) | (.131) | (.097) | (.134) |
| Foreign born | -0.386 *** | -0.477 *** | -0.190 * | 0.198 * | -0.272 ** | 0.003 | -0.164 † | -0.315 ** |
| | (.108) | (.098) | (.092) | (.089) | (.094) | (.113) | (.088) | (.119) |
| 3rd generation | -0.091 | 0.084 | 0.035 | -0.121 * | 0.022 | -0.002 | -0.013 | -0.005 |
| | (.085) | (.062) | (.061) | (.062) | (.062) | (.076) | (.061) | (.083) |
| Age 18-29 | -0.015 | 0.002 | -0.023 | 0.141 * | -0.304 *** | -0.469 *** | -0.011 | -0.116 |
| | (.079) | (.063) | (.062) | (.063) | (.064) | (.107) | (.061) | (.083) |
| Age over 65 | -0.408 *** | 0.079 | -0.106 | 0.075 | -0.165 * | 0.003 | -0.110 | -0.126 |
| | (.088) | (.073) | (.073) | (.073) | (.073) | (.081) | (.072) | (.098) |
| Education | 0.080 ** | 0.013 | 0.140 *** | 0.206 *** | 0.141 *** | 0.092 *** | 0.116 *** | 0.211 *** |
| | (.029) | (.023) | (.022) | (.023) | (.023) | (.027) | (.022) | (.030) |
| Income | 0.049 * | 0.035 * | 0.026 † | 0.067 *** | 0.012 | 0.054 ** | 0.039 ** | 0.071 *** |
| | (.020) | (.015) | (.015) | (.015) | (.015) | (.018) | (.015) | (.02) |
| Female | 0.067 | 0.195 *** | 0.202 *** | 0.173 *** | 0.189 *** | 0.079 | 0.222 *** | 0.307 *** |
| | (.056) | (.041) | (.041) | (.041) | (.041) | (.049) | (.041) | (.055) |
| Years in county | 0.048 * | 0.019 | -0.035 * | -0.081 *** | -0.017 | 0.041 † | -0.016 | -0.022 |
| | (.024) | (.018) | (.017) | (.018) | (.018) | (.022) | (.018) | (.024) |
| Home owner | 0.159 * | -0.011 | -0.050 | 0.142 ** | 0.090 † | 1.301 *** | 0.010 | 0.332 *** |
| | (.070) | (.054) | (.054) | (.055) | (.054) | (.086) | (.053) | (.072) |
| New Mexico | 0.037 | -0.226 *** | -0.427 *** | -0.590 *** | -0.298 *** | -0.289 *** | -0.434 *** | -0.635 *** |
| | (.071) | (.052) | (.051) | (.052) | (.051) | (.061) | (.05) | (.069) |
| California | -0.163 † | -0.019 | -0.220 *** | -0.194 ** | -0.226 *** | -0.218 ** | -0.254 *** | -0.331 *** |
| | (.085) | (.069) | (.068) | (.068) | (.069) | (.085) | (.066) | (.091) |
| Constant | 0.753 *** | -0.639 *** | -0.492 *** | -0.854 *** | -0.638 *** | -2.302 *** | -0.101 | 1.823 *** |
| | (.169) | (.131) | (.129) | (.132) | (.13) | (.173) | (.127) | (.173) |
| PPC | .902 | .658 | .631 | .661 | .644 | .776 | .642 | .124 |
| LR Chi2 | 130.5 | 193.5 | 398.9 | 529.9 | 393.9 | 809.2 | 365.1 | 558.1 |

*** p < .001   ** p < .010   * p < .050   † p < .100      Sample size for all models = 4,118

*Table 4: Changes in Predicted Probability of Having Voter Identification*

*Given change in independent variable from its minimum to maximum*

| Variables | Driver's License | Birth Certificate | Bank Statement | Passport | Utility Bill | Property Tax | License Plus 1 | 6-item Index |
|---|---|---|---|---|---|---|---|---|
| Latino | ns | -0.0799 | -0.1507 | -0.1365 | -0.1391 | -0.0814 | -0.1348 | -0.5480 |
| Asian | -0.0756 | -0.1712 | -0.2365 | ns | -0.1829 | -0.1054 | -0.2029 | -0.8367 |
| Black | ns | -0.0900 | -0.1674 | -0.1401 | -0.2004 | -0.0808 | -0.2001 | -0.7067 |
| Foreign born | -0.0762 | -0.1560 | -0.0727 | 0.0775 | -0.0998 | ns | -0.0645 | -0.3147 |
| 3rd generation | ns | ns | ns | -0.0468 | ns | ns | ns | Ns |
| Age 18-29 | ns | ns | ns | 0.0547 | -0.1117 | -0.0924 | ns | Ns |
| Age over 65 | -0.0813 | ns | ns | ns | -0.0615 | ns | ns | Ns |
| Education | 0.0560 | ns | 0.2099 | 0.2964 | 0.2061 | 0.0801 | 0.1812 | 0.8428 |
| Income | 0.0400 | 0.0642 | 0.0513 | 0.1274 | ns | 0.0622 | 0.0765 | 0.3534 |
| Female | ns | 0.0710 | 0.0786 | 0.0665 | 0.0722 | ns | 0.0861 | 0.3069 |
| Years in county | 0.0319 | ns | -0.0545 | -0.1249 | ns | 0.0378 | ns | Ns |
| Home owner | 0.0266 | ns | ns | 0.0542 | 0.0341 | 0.2441 | ns | 0.3320 |
| New Mexico | ns | -0.0804 | -0.1614 | -0.2152 | -0.1109 | -0.0629 | -0.1702 | -0.6345 |
| California | -0.0285 | ns | -0.0838 | -0.0729 | -0.0839 | -0.0466 | -0.1001 | -0.3309 |

\* ns denotes that the independent variable was not significant in the given model (see table 2)

*Table 5: Access to Voter ID and Vote Choice in Nov 2006*

| Variables | Vote GOP | | Vote GOP | |
|---|---|---|---|---|
| | Coef. | Chg. PP | Coef. | Chg. PP |
| ID index | 0.042 * | 0.0462 | -- | |
| | (.017) | | -- | |
| Birth certificate | -- | | 0.165 ** | 0.0309 |
| | -- | | (.065) | |
| Latino | -0.238 * | -0.0393 | -0.247 * | -0.0407 |
| | (.100) | | (.100) | |
| Asian | -0.035 | -0.0063 | -0.041 | -0.0073 |
| | (.169) | | (.168) | |
| Black | -0.147 | -0.0246 | -0.159 | -.0246 |
| | (.182) | | (.181) | |
| Foreign born | -0.064 | -0.0112 | -0.061 | -0.0107 |
| | (.142) | | (.142) | |
| 3rd generation | 0.005 | 0.0010 | 0.000 | -0.001 |
| | (.095) | | (.095) | |
| Age 18-29 | -0.055 | -0.0097 | -0.064 | -0.0113 |
| | (.095) | | (.095) | |
| Age over 65 | 0.187 † | 0.0372 | 0.177 † | 0.0351 |
| | (.104) | | (.104) | |
| Education | -0.110 *** | -0.0877 | -0.104 *** | -0.0825 |
| | (.034) | | (.033) | |
| Income | 0.032 | 0.0291 | 0.033 | 0.0301 |
| | (.022) | | (.022) | |
| Female | -0.150 * | -0.0271 | -0.150 * | -0.0272 |
| | (.063) | | (.063) | |
| Years in county | 0.014 | 0.0101 | 0.012 | 0.0086 |
| | (.026) | | (.026) | |
| Home owner | -0.004 | -0.0007 | 0.009 | 0.0016 |
| | (.082) | | (.082) | |
| New Mexico | -0.260 *** | -0.0444 | -0.271 *** | -0.0461 |
| | (.075) | | (.075) | |
| California | 0.023 | 0.0043 | 0.016 | 0.0030 |
| | (.100) | | (.100) | |
| Party ID | 1.259 *** | 0.6726 | 1.253 *** | 0.6695 |
| | (.038) | | (.038) | |
| Constant | -2.951 *** | | -2.899 *** | |
| | (.206) | | (.204) | |
| PPC | .890 | | .890 | |
| LR Chi2 | 1706.6 | | 1707.2 | |

*** p < .001   ** p < .010   * p < .050   † p < .100
Sample size = 3,740
Note: only Dem/GOP votes included in this model
378 declined to state or votes for third party were dropped

Table 6: Closest Districts In Nov 2006 Congressional Election

| State | District | Dem Margin | Dem Pickup | New ID Laws |
|-------|----------|------------|------------|-------------|
| IL | 10 | -6.75% | | |
| OH | 1 | -5.64% | | Photo required |
| NV | 2 | -5.46% | | |
| ID | 1 | -5.13% | | |
| CT | 4 | -3.38% | | ID w/o photo |
| CA | 4 | -3.18% | | |
| NY | 29 | -3.07% | | |
| VA | 2 | -2.84% | | |
| IL | 6 | -2.70% | | |
| CO | 4 | -2.49% | | ID w/o photo |
| WA | 8 | -2.19% | | ID w/o photo |
| NY | 25 | -1.89% | | |
| NV | 3 | -1.88% | | |
| NJ | 7 | -1.67% | | |
| PA | 6 | -1.28% | | |
| OH | 2 | -1.06% | | Photo required |
| WY | 1 | -0.52% | | |
| OH | 15 | -0.48% | | Photo required |
| NM | 1 | -0.42% | | ID w/o photo |
| FL | 13 | 0.00% | | Photo required |
| CT | 2 | 0.03% | Pickup | ID w/o photo |
| GA | 12 | 0.61% | | Photo required |
| PA | 8 | 0.61% | Pickup | |
| GA | 8 | 1.10% | | Photo required |
| FL | 16 | 1.89% | Pickup | Photo required |
| WI | 8 | 2.14% | Pickup | |
| KY | 3 | 2.44% | | ID w/o photo |
| NH | 1 | 2.63% | Pickup | |
| IA | 2 | 2.85% | Pickup | |
| KS | 2 | 3.46% | Pickup | |
| FL | 22 | 3.76% | Pickup | Photo required |
| PA | 4 | 3.86% | Pickup | |
| AZ | 5 | 3.97% | Pickup | Photo required |
| IN | 9 | 4.39% | Pickup | |
| IA | 3 | 5.20% | | |
| MN | 1 | 5.61% | Pickup | |
| PA | 10 | 5.89% | Pickup | |
| NY | 24 | 5.98% | Pickup | |
| CA | 11 | 6.53% | Pickup | |
| IL | 8 | 6.89% | | |
| NH | 2 | 7.10% | Pickup | |
| NC | 11 | 7.52% | Pickup | |
| IN | 2 | 7.89% | Pickup | Photo required |
| TX | 23 | 8.57% | Pickup | ID w/o photo |
| VT | 1 | 8.71% | Pickup | |
| NY | 20 | 8.92% | Pickup | |
| NY | 19 | 9.82% | Pickup | |
| TX | 22 | 10.01% | Pickup | ID w/o photo |
| CT | 5 | 10.27% | Pickup | ID w/o photo |
| IA | 1 | 11.85% | Pickup | |
| AZ | 8 | 12.16% | Pickup | Photo required |
| PA | 7 | 12.76% | Pickup | |
| CO | 7 | 12.87% | Pickup | ID w/o photo |
| IN | 8 | 22.03% | Pickup | Photo required / Photo required |
| OH | 18 | 24.12% | Pickup | Photo required |

## Appendix – Coding of Variables

| Dependent variables | Coding |
|---|---|
| Driver's license | 0,1 whether or not respondent has state driver's license |
| Birth Certificate | 0,1 whether or not respondent has original birth certificate |
| Bank statement | 0,1 whether or not respondent has bank statement |
| Passport | 0,1 whether or not respondent has U.S. passport |
| Utility bill | 0,1 whether or not respondent has utility bill |
| Property tax statement | 0,1 whether or not respondent has property tax statement |
| License Plus 1 | 0,1 respondent has state driver's license plus one additional form of ID[2] |
| 6-item index | 0 – 6 index of the six forms of identification |
| Vote GOP | 0,1 vote choice in 2006 Senate or House, 0=Dem, 1=GOP |

| Independent variables | Coding |
|---|---|
| Age 18-29 | 0,1 where 1 = 18-29 age group |
| Age over 65 | 0,1 where 1 = over 65 age group |
| Education | 1=less than HS; 2=HS grad; 3=Some college; 4=College; 5=Grad school |
| Income | 1=less $20K; 2=20 to 39K; 3=40 to 59K; 4=60 to 79K; 5=80 to 100K 6= over 100K |
| Female | 0,1 where 1 = female |
| Latino | 0,1 where 1 = Latino |
| Asian | 0,1 where 1 = Asian |
| Black | 0,1 where 1 = Black |
| Foreign born | 0,1 where 1 = foreign born |
| 3rd generation | 0,1 where 1 = third generation (i.e. U.S. born with U.S. born parents) |
| Years in county | 1=less 5 years; 2=5 to 10 yrs; 3=11 to 20 yrs; 4=20 to 40 yrs; 5= more 40 yrs |
| Home owner | 0,1 where 1 = home owner |
| New Mexico | 0,1 where 1 = New Mexico (Bernalillo County) |
| California | 0,1 where 1 = California (Orange County) |
| Party ID | 1=Democrat; 2=Independent/Other; 3=Republican |

---

[2]   If the respondent does not have a driver's license, but does have a state ID card, in addition to a second form of identification, they were similarly coded as 1.  This was most common among some elderly respondents, and in most states a state ID card can be substituted for a driver's license as a valid form of identification.