# REPORT TO CONGRESS

# ON THE ACTIVITIES AND OPERATIONS

# OF THE

# PUBLIC INTEGRITY SECTION

# FOR 2010



**Public Integrity Section**
**Criminal Division**
**United States Department of Justice**

**Submitted Pursuant to**
**Section 603 of the Ethics in Government Act of 1978**

2:13-cv-193
09/02/2014

DEF2536



DEPOSITION
EXHIBIT
Susher 14
Sylvia Kerr, CSR, CRR, RPR, TCRR

# INTRODUCTION

This Report to Congress is submitted pursuant to the Ethics in Government Act of 1978, which requires the Attorney General to report annually to Congress on the operations and activities of the Justice Department's Public Integrity Section. The Report describes the activities of the Public Integrity Section during 2010. It also provides statistics on the nationwide federal effort against public corruption during 2010 and over the previous two decades.

The Public Integrity Section was created in 1976 in order to consolidate the Department's oversight responsibilities for the prosecution of criminal abuses of the public trust by government officials into one unit of the Criminal Division. Section attorneys prosecute selected cases involving federal, state, or local officials, and also provide advice and assistance to prosecutors and agents in the field regarding the handling of public corruption cases. In addition, the Section serves as the Justice Department's center for handling various issues that arise regarding public corruption statutes and cases.

An Election Crimes Branch was created within the Section in 1980 to supervise the Department's nationwide response to election crimes, such as voter fraud and campaign-financing offenses. The Branch reviews all major election crime investigations throughout the country and all proposed criminal charges relating to election crime.

During the year, the Section maintained a staff of approximately twenty-eight attorneys, including experts in extortion, bribery, election crimes, and criminal conflicts of interest. The section management included: Jack Smith, Chief; Raymond N. Hulser, Principal Deputy Chief; Peter J. Ainsworth, Senior Deputy Chief for Litigation; Justin V. Shur, Deputy Chief; and Richard C. Pilger, Director, Election Crimes Branch.

Part I of the Report discusses the operations of the Public Integrity Section and highlights its major activities in 2010. Part II describes significant cases prosecuted by the Section in 2010. Part III presents nationwide data based on the Section's annual surveys of United States Attorneys regarding the national federal effort to combat public corruption from 1990 through 2010 and data specific to the Public Integrity Section for 2010.

# TABLE OF CONTENTS

## PART I

### OPERATIONAL RESPONSIBILITIES OF
### THE PUBLIC INTEGRITY SECTION

A.  RESPONSIBILITY FOR LITIGATION. ............................... 1
    1.  Recusals by United States Attorneys' Offices. ...................... 1
    2.  Sensitive and Multi-District Cases. ............................... 2
    3.  Federal Agency Referrals. ....................................... 3
    4.  Requests for Assistance/Shared Cases. ............................ 3

B.  SPECIAL SECTION PRIORITIES. .................................. 3
    1.  Election Crimes. ............................................... 4
    2.  Conflicts of Interest Crimes. ..................................... 7

C.  LEGAL AND TECHNICAL ASSISTANCE. .......................... 8
    1.  Training and Advice. ............................................ 8
    2.  Advisor to the President's Council on Integrity and Efficiency
        and the Executive Council on Integrity and Efficiency. ............... 8
    3.  Member of the Board Advisors of the Election Assistance Commission. . 9
    4.  Legislative Activities. ........................................... 9
    5.  Case Supervision and General Assistance. .......................... 9
    6.  International Advisory Responsibilities. ........................... 10

## PART II

### PUBLIC INTEGRITY SECTION INDICTMENTS AND
### PROSECUTIONS IN 2010

INTRODUCTION. ................................................... 11
FEDERAL JUDICIAL BRANCH. ...................................... 12
FEDERAL LEGISLATIVE BRANCH. .................................. 14
FEDERAL EXECUTIVE BRANCH. ................................... 16
STATE AND LOCAL GOVERNMENT. ............................... 21
FEDERAL ELECTION CRIMES. .................................... 25

ii

## PART III

## NATIONWIDE FEDERAL PROSECUTIONS
## OF CORRUPT PUBLIC OFFICIALS

INTRODUCTION............................................... 27
LIST OF TABLES. ............................................. 27

TABLE I:    Nationwide Federal Prosecutions of Corrupt Public Officials
            in 2010................................................. 28

TABLE II:   Progress Over the Past Two Decades:
            Nationwide Federal Prosecutions of Corrupt Public Officials..... 29

TABLE III:  Federal Public Corruption Convictions by District
            Over the Past Decade..................................... 31

TABLE IV:   Public Integrity Sections's Federal Prosecutions of
            Corrupt Public Officials in 2010. ......................... 35

iii

**PART I**

**OPERATIONAL RESPONSIBILITIES OF
THE PUBLIC INTEGRITY SECTION**

**A.    RESPONSIBILITY FOR LITIGATION**

The work of the Public Integrity Section focuses on public corruption, that is, crimes involving abuses of the public trust by government officials. Most of the Section's resources are devoted to the supervision of investigations involving alleged corruption by government officials and to prosecutions resulting from these investigations. Decisions to undertake particular matters are made on a case-by-case basis, given Section resources, the type and seriousness of the allegation, the sufficiency of factual predication reflecting criminal conduct, and the availability of federal prosecutive theories to reach the conduct.

Cases handled by the Section generally fall into one of the following categories: recusals by United States Attorneys' Offices, sensitive cases, multi-district cases, referrals from federal agencies, and shared cases. These categories are discussed below.

**1. Recusals by United States Attorneys' Offices**

The vast majority of federal corruption prosecutions are handled by the local United States Attorney's Office for the geographic district where the crime occurred, a fact demonstrated by the statistical charts in Part III of this Report. At times, however, it may be inappropriate for the local United States Attorney's Office to handle a particular corruption case.

Public corruption cases tend to raise unique problems of public perception that are generally absent in more routine criminal cases. An investigation of alleged corruption by a government official, whether at the federal, state, or local level, or someone associated with such an official, always has the potential of becoming a high-profile case simply because its focus is on the conduct of a public official. In addition, these cases are often politically sensitive because their ultimate targets tend to be politicians or government officials appointed by politicians.

A successful public corruption prosecution requires both the appearance and the reality of fairness and impartiality. This means that a successful corruption case involves not just a conviction but public perception that the conviction was warranted, not the result of improper motivation by the prosecutor, and is free of conflicts of interest. In a case in which the local conflict of interest is substantial, the local office is removed from the case by a

1

procedure called recusal. Recusal occurs when the local office either asks to step aside, or is asked to step aside by Department headquarters, as primary prosecutor. Federal cases involving corruption allegations in which the conflict is substantial are usually referred to the Public Integrity Section either for prosecution or direct operational supervision.

Allegations involving possible crimes by federal judges almost always require recusals of the local offices for significant policy as well as for practical reasons. Having the case handled outside the local offices eliminates the possible appearance of bias, as well as the practical difficulties and awkwardness that would arise if an office investigating a judge were to appear before the judge on other matters. Thus, as a matter of established Department practice, federal judicial corruption cases generally are handled by the Public Integrity Section.

Similar concerns regarding the appearance of bias also arise when the target of an investigation is a federal prosecutor, a federal investigator, or other employee assigned to work in or closely with a particular United States Attorney's Office. Thus, cases involving United States Attorneys, Assistant United States Attorneys (AUSAs), or federal investigators or employees working with AUSAs in the field generally result in a recusal of the local office. These cases are typically referred to the Public Integrity Section.

## 2. Sensitive and Multi-District Cases

In addition to recusals, the Public Integrity Section handles other special categories of cases. At the request of the Assistant Attorney General for the Criminal Division, the Section handles cases that are highly sensitive and cases that involve the jurisdiction of more than one United States Attorney's Office.

Cases may be sensitive for a number of reasons. Because of its importance, a particular case may require close coordination with high-level Department officials. Alternatively, the case may require substantial coordination with other federal agencies in Washington. The latter includes cases involving classified information that require careful coordination with intelligence agencies. Sensitive cases may also include those that are so politically controversial on a local level that they are most appropriately handled in Washington, DC.

In addition to sensitive cases, this category encompasses multi-district cases, that is, cases that involve allegations that cross judicial district lines and hence fall under the jurisdiction of two or more United States Attorneys' Offices. In these cases the Section is occasionally asked to coordinate the investigation among the various United States Attorneys'

Offices, to handle a case jointly with one or more United States Attorneys' Offices, or, when appropriate, to assume operational responsibility for the entire case.

### 3. Federal Agency Referrals

In another area of major responsibility, the Section handles matters referred directly by federal agencies concerning possible federal crimes by agency employees. The Section reviews these allegations to determine whether an investigation of the matter is warranted and, ultimately, whether the matter should be prosecuted.

Agency referrals of possible employee wrongdoing are an important part of the Section's mission. The Section works closely with the Offices of Inspector General (OIGs) of the executive branch agencies, as well as with other agency investigative components, such as the Offices of Internal Affairs and the Criminal Investigative Divisions. In addition, the Section invests substantial time in training agency investigators in the statutes involved in corruption cases and the investigative approaches that work best in these cases. These referrals from the various agencies require close consultation with the referring agency's investigative component and prompt prosecutive evaluation.

### 4. Requests for Assistance/Shared Cases

The final category of cases in which the Section becomes involved are cases that are handled jointly by the Section and a United States Attorney's Office or other component of the Department. At times the available prosecutorial resources in a United States Attorney's Office may be insufficient to undertake sole responsibility for a significant corruption case. In this situation the local office may request the assistance of an experienced Section prosecutor to share responsibility for prosecuting the case. On occasion, the Section may also be asked to provide operational assistance or to assume supervisory responsibility for a case due to a partial recusal of the local office. Finally, the Public Integrity Section may be assigned to supervise or assist with a case initially assigned to another Department component.

## B.    SPECIAL SECTION PRIORITIES

In addition to the general responsibilities discussed above, in 2010 the Public Integrity Section continued its involvement in a number of additional priority areas of criminal law enforcement.

## 1. <u>Election Crimes</u>

One of the Section's law enforcement priorities is its supervision of the Justice Department's nationwide response to election crimes. Under the Department's ongoing Ballot Access and Voting Integrity Initiative, the prosecution of all forms of election crime is a high Departmental priority, and headquarters' oversight in this area is designed to ensure that the Department's nationwide response to election crime matters is uniform, impartial, and effective. In 1980 an Election Crimes Branch was created within the Section to handle this supervisory responsibility. The Branch is headed by a Director, assisted by a senior Section prosecutor, and staffed by other Section attorneys on a case-by-case basis.

The Election Crimes Branch oversees the Department's handling of all election crime allegations other than those involving federal voting rights, which are handled by two Sections of the Civil Rights Division: Voting and Criminal Sections. Specifically, the Branch supervises three types of election crime cases: (1) vote frauds, such as vote buying and absentee ballot fraud; (2) campaign-financing crimes, most notably under the Federal Election Campaign Act (FECA); and (3) patronage crimes, such as political shakedowns and misuse of federal programs for political purposes. Vote frauds and campaign-financing offenses are the most significant as well as the most common types of election crimes.

The election-related work of the Section and its Election Crimes Branch falls into the following categories:

a. <u>Consultation and Field Support</u>. Under long-established Department procedures, the Section's Election Crimes Branch reviews all major election crime investigations, including all proposed grand jury investigations and FBI full-field investigations, and all election crime charges proposed by the various United States Attorneys' Offices for legal and factual sufficiency. (United States Attorneys' Manual (U.S.A.M.) 9-5.210.) The Branch is also often consulted before a United States Attorney's Office opens a preliminary investigation into a vote fraud allegation, although this is not required.

In the area of campaign-financing crimes, Department procedures require consultation with Main Justice before any investigation, including a preliminary investigation, is commenced by a United States Attorney's Office. (U.S.A.M. 9-85-210.) The increased coordination with the Section at the initial stage of a criminal investigation of a FECA matter is the result in part of the complexity of the campaign-financing statutes. Another reason is that the Department coordinates and shares jurisdiction over willful violations of these statutes with another federal agency, the Federal Election Commission (FEC), which has civil enforcement authority over FECA violations.

4

The Section's consultation responsibility for election matters includes providing advice to prosecutors and investigators regarding the application of federal criminal laws to vote fraud, patronage crimes, and campaign-financing crimes, and the most effective investigative techniques for particular types of election offenses. This consultation also includes supervising the Department's use of the federal conspiracy and false statements statutes (18 U.S.C. §§ 371 and 1001) to address schemes to subvert the federal campaign financing laws. In addition, the Election Crimes Branch helps draft election crime charges and other pleadings when requested.

The majority of the Branch's consultations are in the following two categories:  vote fraud, also known as election fraud or ballot fraud; and campaign financing crimes arising under the FECA.  During 2010, the Branch assisted in evaluating allegations, helping to structure investigations, and drafting charges for United States Attorneys Office's around the country in these areas of law enforcement.

b.  <u>Litigation</u>. On occasion the Section may be asked to supervise the handling of a case in the event of a partial recusal of the local United States Attorney's Office. Section attorneys also prosecute selected election crimes, either by assuming total operational responsibility for the case or by handling the case jointly with a United States Attorney's Office or other Department component.

c.  <u>District Election Officer Program</u>.  The Branch also assists in implementing the Department's long-standing District Election Officer (DEO) Program. This Program is designed to ensure that each of the Department's ninety-four United States Attorneys' Offices has a trained prosecutor available to oversee the handling of election crime matters within the district and coordinate district responses with Department headquarters regarding these matters.

The DEO Program involves appointing an Assistant United States Attorney in each federal district to serve a two-year term as a DEO and providing periodic training for the DEOs in the handling of election crime and voting rights matters.

The DEO Program is also a crucial feature of the Department's nationwide Election Day Program, which takes place during the federal general elections that are held in November of even-numbered years. The Election Day Program ensures that federal prosecutors and investigators are available both at Department headquarters in Washington, DC, and in each district to receive complaints of election irregularities while the polls are open. As part of the Program, press releases are issued in Washington and in each district before the November federal elections that advise the public of the Department's enforcement interests in deterring and prosecuting election crimes and protecting voting rights. The press

5

releases also provide contact information for the DEOs, local FBI officials, and Department officials in the Criminal and Civil Rights Divisions at headquarters who may be contacted on election day by members of the public who have complaints of possible vote fraud or voting rights violations.

d.  Ballot Access and Voting Integrity Initiative. During 2010, the Public Integrity Section continued to assist in the implementation of the Department's Ballot Access and Voting Integrity Initiative. This ongoing law enforcement initiative was established in 2002 to enhance the Department's criminal and civil rights enforcement efforts against vote fraud and voting rights violations.  The initiative includes annual training for the Assistant United States Attorneys serving as DEOs and preelection coordination by each United States Attorney's Office with state law enforcement and election officials before the federal general elections regarding the handling of election crime matters in their respective districts.

On August 31 and September 1, 2010, prosecutors and senior attorneys from the Public Integrity Section and the Civil Rights Division's Voting and Criminal Sections conducted presentations for the Department's ninth annual election crimes and voting rights training. The event was hosted by the Department's National Advocacy Center in Columbia, South Carolina, and was attended by approximately 100 Assistant United States Attorneys and 25 FBI special agents. Topics addressed by the panels included the types of conduct prosecutable as federal election crimes, the federal statutes available to prosecute vote fraud and campaign financing offenses, the federal voting rights statutes and their enforcement, recent discovery and ethics issues, and updates on campaign financing and voting rights cases.

e.  Inter-Agency Liaison with the Federal Election Commission. The Election Crimes Branch is the formal liaison between the Justice Department and the Federal Election Commission (FEC), an independent federal agency that shares enforcement jurisdiction with the Department over willful violations of the Federal Election Campaign Act. The FEC has exclusive civil jurisdiction over all FECA violations, while the Department has exclusive criminal jurisdiction over FECA crimes.

f.  Inter-Agency Liaison with the Office of Special Counsel. The Branch also serves as the Department's point of contact with the United States Office of Special Counsel (OSC). The OSC has jurisdiction over noncriminal violations of the Hatch Act, 5 U.S.C. §§ 7321-7326, §§ 1501-1508, which may also involve criminal patronage crimes that are within the Department's jurisdiction.

## 2. __Conflicts of Interest Crimes__

Conflicts of interest is a wide-ranging and complex area of law, with many layers of administrative and oversight responsibility. Moreover, the federal criminal conflicts of interest laws overlap to some extent with the sometimes broader ethics restrictions imposed by civil statutes, agency standards of conduct, Presidential orders, and, in the case of attorneys, bar association codes of conduct.

The Public Integrity Section's work in the conflicts area falls into the following categories:

a. Criminal Referrals from Federal Agencies and Recusals. The Section's criminal enforcement role comes into play with respect to a narrow group of conflicts of interest matters, namely, those that involve possible misconduct proscribed by one of the federal conflicts of interest statutes, 18 U.S.C. §§ 203-209. These crimes are prosecuted either by a United States Attorney's Office or by the Public Integrity Section. Conflicts of interest matters are often referred to the Section by the various federal agencies. If investigation of a referral is warranted, the Section coordinates the investigation with the Inspector General for the agency concerned, the FBI, or both. If prosecution is warranted, the Section prosecutes the case.  If a civil remedy may be appropriate in lieu of criminal prosecution, the Section or the Inspector General may refer the case to the Civil Division of the Department of Justice for its review. On occasion the Section is also asked to handle recusals and special assignments regarding conflicts matters.

b. Coordination. The Public Integrity Section works with the United States Office of Government Ethics (OGE) in order to coordinate conflicts of interest issues with OGE and other executive branch agencies and offices. The purpose of this coordination is to ensure that the overall legislative and enforcement efforts in this area are both complementary and consistent. OGE has broad jurisdiction over noncriminal conduct by executive branch personnel, as well as the authority to provide guidance concerning the coverage of the federal criminal conflicts of interest statutes. The Section's coordination with OGE ensures that consistent guidance is provided with respect to the overlapping criminal, civil, and administrative interests implicated by the statutory and regulatory restrictions on federal personnel.

C.    LEGAL AND TECHNICAL ASSISTANCE

### 1. Training and Advice

The Public Integrity Section is staffed with specialists who have considerable experience investigating and prosecuting corruption cases. Section attorneys participate in a wide range of formal training events for federal prosecutors and investigators. They are also available to provide informal advice on investigative methods, charging decisions, and trial strategy in specific cases. Over the course of 2010, Section attorneys provided over a hundred consultations to United States Attorneys' Offices and various other agencies.

The Section also conducts the annual public corruption seminar at the National Advocacy Center. Speakers at this seminar typically include both the Section's senior prosecutors and Assistant United States Attorneys from the field who have handled significant corruption cases. The seminars provide training for federal prosecutors and FBI agents regarding the statutes most commonly used in corruption cases, guidance in the use of the complex and difficult investigative techniques necessary to investigate government corruption, and advice from experienced prosecutors on conducting corruption trials.

### 2. Advisor to the President's Council on Integrity and Efficiency and the Executive Council on Integrity and Efficiency

Pursuant to the Inspector General Reform Act of 2008, Pub. L. No. 110-409, 122 Stat. 4302 (Oct. 14, 2008), the Public Integrity Section serves as a legal advisor to the Integrity Committee of the President's Council on Integrity and Efficiency (PCIE) and the Executive Council on Integrity and Efficiency (ECIE).  The PCIE/ECIE is a body consisting of the Inspectors General of the various agencies of the executive branch of the federal government. The Integrity Committee of the PCIE/ECIE is charged with handling allegations against Inspectors General and senior members of their staffs.

In addition, the Integrity Committee is charged with establishing policies and procedures to ensure consistency in conducting administrative investigations. The Committee's procedures, drafted with the assistance of the Public Integrity Section, provide a framework for the investigative function of the Committee. Allegations of wrongdoing by Inspectors General and their senior staff are initially reviewed by the Public Integrity Section for potential criminal prosecution. In noncriminal matters, the procedures guide the Committee's discretion to investigate the alleged misconduct and to report on its findings. The Public Integrity Section also advises the Integrity Committee on matters of law and policy relating to its investigations.

### 3. Member of the Board of Advisors of the Election Assistance Commission

Pursuant to the Help America Vote Act of 2002 (HAVA), the Chief of the Public Integrity Section, or his or her designee, is a member of the Board of Advisors of the Election Assistance Commission (EAC). 42 U.S.C. § 15344(a)(12). The Commission was created to serve as a national clearinghouse for information and procedures relating to the administration of federal elections and is responsible for adopting voluntary voting system guidelines, testing and certification of voting system hardware and software, conducting studies regarding the effective administration of elections, and training on the management of federal grants to the states under HAVA. The Director of the Section's Election Crimes Branch serves by statutory designation of the Chief as a Member of the Board of Advisors to the United States Election Assistance Commission, and participated in its 2010 annual meeting in Washington, DC.

### 4. Legislative Activities

An important responsibility of the Public Integrity Section is the review of proposed legislation that may affect, directly or indirectly, the investigation and prosecution of public officials and those who seek to corrupt these officials. The Section is often called upon to comment on legislation proposed by Congress, the Administration, or other departments of the executive branch; to draft or review testimony for congressional hearings; and to respond to congressional inquiries concerning legislative proposals. On occasion, the Section drafts legislative proposals relating to various corruption matters. For example, in 2010 the Section drafted, reviewed, and commented on a number of legislative proposals addressing public corruption. During the year, the Section also commented on proposed legislation on the topics of ethics in government, legislative transparency and accountability, jurisdiction over American Samoa, federal advisory committees, and bribery statutory coverage, among other subjects.

### 5. Case Supervision and General Assistance

Public corruption cases are often controversial, complex, and highly visible. These factors may warrant Departmental supervision and review of a particular case. On occasion Section attorneys are called upon to conduct a careful review of a sensitive public corruption case, evaluating the quality of the investigative work and the adequacy of any proposed indictments. Based on its experience in this area, the Section can often identify tactical or evidentiary problems early on and either provide needed assistance or, if necessary, assume operational responsibility for the prosecution.

The Section also has considerable expertise in the supervision of the use of undercover operations in serious corruption cases. The Section serves on the FBI's Criminal

9

Undercover Operations Review Committee.  A number of the Section's senior prosecutors have experience in the practical and legal problems involved in such operations and have the expertise to employ this sensitive investigative technique effectively and to advise law enforcement personnel on its use.

### 6. **International Advisory Responsibilities**

The Public Integrity Section actively participates in the area of international law enforcement. The Section regularly provides briefings and training on United States public corruption issues to visiting foreign delegations and continues the efforts of the United States to assist foreign countries in their quest to combat public corruption and election crime in their respective countries. This assistance includes participation in international proceedings and coordination with other components of the Justice Department and the State Department on the Administration's positions in this area.

Section experts continue to address visiting foreign officials in investigations and prosecutions of public corruption. These presentations are generally conducted under the auspices of the State Department's Foreign Visitor Program and the Justice Department's Office of Overseas Prosecutorial Development Assistance and Training.  During 2010, the Section made presentations to officials from Afghanistan, Albania, Angola, Bahrain, Bangladesh, Benin, Bosnia-Herzegovina, Botswana, Brazil, Bulgaria, Cambodia, Cameroon, Cape Verde, Chad, Chile, China, Cote d'Ivoire, Croatia, Djibouti, El Salvador, Estonia, Finland, Gabon, Ghana, Greece, Guinea, Hong Kong, Hungary, Indonesia, Iraq, Italy, Ivory Coast, Jordan, Kenya, Kosovo, Liberia, Lithuania, Madagascar,  Malaysia, Malawi, Mozambique, Namibia, Niger, Nigeria, People's Republic of China, Philippines, Poland, Romania, Sao Tome & Principe, Senegal, Seychelles, Sierra Leone, Slovakia, Slovenia, South Africa, Sudan, Swaziland, Sweden, Tajikistan, Togo, Turkey, and United Kingdom.

# PART II

## PUBLIC INTEGRITY SECTION
## INDICTMENTS AND PROSECUTIONS
## IN 2010

### INTRODUCTION

As described in Part I, the Public Integrity Section's role in the prosecution of public corruption cases ranges from sole operational responsibility for the entire case to approving an indictment or to providing advice on the drafting of charges. Part II of the Report provides examples of noteworthy public corruption cases for which the Section had either sole or shared operational responsibility during 2010. A "case" involves a person who has been charged by indictment or information; a "matter" is an investigation that has not resulted in a criminal charge. Part II also provides statistics on the number of matters closed by the Section without prosecution during 2010 and the number of matters pending at the end of the year in each category.

The descriptions of the Section's significant cases for calendar year 2010 are separated into categories, based on the branch or level of government affected by the corruption. Election crime cases are grouped separately. Related cases are grouped together and unrelated cases are separated by triple lines. Those cases for which a conviction but not a sentence is reported, the sentencing did not take place in 2010 and will be reported in a later year's report.

## FEDERAL JUDICIAL BRANCH

**As of December 31, 2010, one matter involving allegations of corruption affecting the federal judicial branch was pending in the Public Integrity Section. During 2010, the Section also closed five matters involving crimes affecting the judicial branch. Set forth below are examples of the Section's 2010 casework in this area.**

The Public Integrity Section has sole responsibility for the investigation and prosecution of federal judges due to the potential appearance issues that might arise if a local United States Attorney's Office were to investigate an allegation of wrongdoing by a judge before whom that United States Attorney's Office appears on a regular basis. The investigation of allegations of criminal wrongdoing in the federal judicial branch is a very sensitive matter. These investigations may involve intrusions into pending federal cases, cooperation from parties or witnesses who are appearing before the court, or potential disruption of the normal judicial process. In addition, the Section must coordinate closely with supervisory judges and the Administrative Office of United States Courts to facilitate the assignment of magistrates and judges from outside of the judicial district to handle requests during the investigation, such as grand jury supervision, or applications for warrants or electronic surveillance. The Public Integrity Section has developed substantial experience and expertise in these matters over the years.

In 2010, the Section assisted the U.S. House of Representatives and the U.S. Senate in the impeachment and trial of former U.S. District Court Judge G. Thomas Porteous, Jr. In response to a complaint filed by the Department of Justice, the U.S. Judicial Conference certified to the House of Representatives numerous misconduct allegations concerning the former judge for possible impeachment. The Section provided significant support to the efforts of the Department, through its Office of Legislative Affairs, to convey information, guidance, and evidence obtained during the Section's criminal investigation of Porteous to the members of the investigative team of the House of Representatives, and subsequently to the Senate. The House proceedings resulted in a vote to impeach then-Judge Porteous on four Articles of Impeachment, and the Senate proceedings resulted in his conviction on each of those Articles.

The Section also handled the following case in 2010.

12

<u>United States v. Camp</u>, Northern District of Georgia

Former Senior U.S. District Court Judge Jack T. Camp, Jr. pleaded guilty on November 19, 2010, to an information charging him with one count of unlawful possession of controlled substances, one count of aiding and abetting the unlawful possession of controlled substances by a previously convicted drug felon, and one count of conversion of government property.

As part of his plea, Camp admitted that between May 2010 and October 1, 2010, he unlawfully used and possessed cocaine, marijuana, and Roxycodone, a Schedule II controlled substance. Camp also admitted to giving an individual, whom he knew had a prior felony drug conviction, money to purchase cocaine, Roxycodone, and marijuana for their joint use. Camp admitted that he unlawfully gave the individual a U.S. District Court laptop computer for her personal use. Camp was arrested on October 1, 2010, after attempting to purchase drugs from an undercover FBI agent posing as a drug dealer. Camp resigned his commission as Senior U.S. District Judge, and subsequently surrendered his license to practice law in the state of Georgia voluntarily. He was sentenced to one month in prison, a $1,000 fine, and the costs of prosecution ($13,063.56).

## FEDERAL LEGISLATIVE BRANCH

**As of December 31, 2010, eight matters involving allegations of corruption in or affecting the federal legislative branch were pending in the Public Integrity Section. During 2010 the Section closed 13 such matters. Also during 2010 the Section handled several significant cases involving the federal legislative branch, as described below.**

The Public Integrity Section plays a central role in the effort to combat corruption in the federal legislative branch. These cases raise unique issues of inter-branch comity, and they are always sensitive given the high-profile stature of elected officials. The Section has developed substantial expertise regarding the unique protections provided to Members of Congress and their staff by the Speech or Debate Clause set forth in Article I of the Constitution, and has worked closely and effectively with House and Senate counsel and the Ethics Committees in both houses. In addition to handling its own cases, the Section routinely provides advice and guidance to prosecutors across the country regarding these sensitive investigations.

In 2010, the Section continued its long-running probe into the activities of former Washington lobbyist Jack Abramoff. As a result of this wide-ranging investigation, more than 20 defendants have been convicted of substantial public corruption charges, and the House and Senate have revamped their rules regarding the activities of lobbyists on Capitol Hill. The convictions in the case include Abramoff himself, former Congressman Bob Ney, and former Deputy Secretary of the Interior Steven Griles.

The following are examples of the Section's legislative branch cases in 2010.

### United States v. Ring

Abramoff colleague Kevin A. Ring was convicted by a federal jury in Washington, DC, on November 15, 2010, of conspiracy, honest services fraud, and paying gratuities related to an illegal lobbying scheme. Ring, a former lobbyist who was one of the core members of Abramoff's corrupt lobbying team, was convicted on five counts relating to a scheme to corrupt public officials by providing numerous things of value to the officials. Two of the other members of the team, Todd Boulanger and Neil Volz, pled guilty and testified at Ring's trial.

The jury found Ring guilty on one count of conspiring to corrupt congressional and executive branch officials by providing things of value to them and their staff in order to

14

The jury found Ring guilty on one count of conspiring to corrupt congressional and executive branch officials by providing things of value to them and their staffs in order to induce or reward those who took official actions benefitting Ring and his clients. In addition, Ring was convicted of one count of paying a gratuity to a public official and three counts of honest services wire fraud for engaging in a scheme to deprive U.S. citizens of their right to the honest services of certain public officials. The jury acquitted Ring on three counts of honest services fraud. A previous federal jury had failed to reach a verdict in the case and the court declared a mistrial.

According to evidence presented at trial, Ring and his co-conspirators identified public officials who would perform official actions that would assist Ring and his clients, and then groomed those public officials by providing things of value with the intent of making those public officials receptive to requests on behalf of Ring's clients. Trial evidence showed that Ring and his co-conspirators provided things of value as a means of influencing, inducing, and rewarding officials actions, and in exchange for official actions. These things of value included all-expenses-paid travel, golf outings, tickets to professional sporting events and concerts, and an employment opportunity for the wife of a congressman. Evidence established that Ring and his co-conspirators engaged in this illegal conduct with current and former congressional staff members, including chiefs of staff, as well as officials at the Department of Justice and the White House. Evidence at trial showed that Ring's corrupt actions resulted in his clients receiving, among other things, $14 million in congressional transportation appropriations and an additional $7 million from the Department of Justice to build a jail.

## United States v. Zachares, District of Columbia

Mark Dennis Zachares, a former high-level staffer on the Transportation & Infrastructure Committee of the U. S. House of Representatives, was sentenced on November 22, 2010, after pleading guilty in 2007 to honest services wire fraud. Zachares conspired with Jack Abramoff and others by soliciting and receiving a stream of things of value from Abramoff and his colleagues in exchange for agreeing to take, and taking, official action to benefit Abramoff and his clients. His sentence included twenty-four days of imprisonment, 200 hours of community service, and a $4,000 fine. As part of the plea agreement, Zachares cooperated in the further investigation of two congressmen. The government subsequently moved to reduce his sentence because of his substantial cooperation, and the court departed downward from the U.S. Sentencing Guidelines.

## FEDERAL EXECUTIVE BRANCH

**As of December 31, 2010, 26 matters involving allegations of corruption within the federal executive branch were pending in the Public Integrity Section. During 2010 the Section closed 47 such matters. Also during 2010, the Section handled a number of cases involving executive branch corruption, several of which are described below.**

The Public Integrity Section frequently receives allegations of corruption in the executive branch from federal law enforcement agencies, including the FBI, the Inspectors General for the various departments and agencies, and United States military investigators. These matters involve a careful balancing of the requirements of a criminal investigation and the operational needs of the executive offices involved.

### Corruption Related to United States Military Efforts in Iraq and Kuwait

In 2010, the Section continued its investigation into fraud and corruption by Department of Defense officials and contractors in connection with U.S. military operations in the Middle East. To date, more than two dozen individuals have been convicted of offenses ranging from bribery and theft to money laundering and conspiracy. The Section prosecuted several defendants for their roles in a multi-million dollar theft and bribery scheme in Al-Hillah, Iraq, and another group of defendants were convicted for their multi-million dollar bribery scheme in the contracting Army office at Camp Arifjan in Kuwait.

The following events relating to corruption in Iraq and Kuwait took place in 2010.

### United States v. Hall, Northern District of Alabama

Former military contractor Terry Hall pleaded guilty on February 17, 2010, to conspiracy to pay more than $3 million in bribes to U.S. Army contracting officials stationed at Camp Arifjan, an Army base in Kuwait, and to money laundering conspiracy.

Hall was indicted in 2009, along with U.S. Army Major Eddie Pressley and his wife, Eurica Pressley. Hall's companies received approximately $21 million between 2005 and 2007 in connection with contracts his companies received. To obtain the contracting business and facilitate unlawful payments by other contractors, Hall admitted he made more than $3 million in unlawful payments and provided other valuable items and services to U.S. Army

16

and facilitate unlawful payments by other contractors, Hall admitted he made more than $3 million in unlawful payments and provided other valuable items and services to U.S. Army contracting officials stationed at Camp Arifjan, including U.S. Army Major Eddie Pressley, and former Majors John Cockerham, James Momon, and Christopher Murray, among others.

Hall owned and operated several companies, including Freedom Consulting and Catering Co. and Total Government Allegiance, which provided goods and services to the U.S. Department of Defense in connection with Operation Iraqi Freedom. Former Major Cockerham arranged for Hall's companies to receive bottled water orders worth more than $2.6 million, as a result of which Hall paid Cockerham approximately $800,000. Former Major Momon arranged for Hall's companies to receive bottled water orders worth approximately $6.4 million, for which Hall paid him over $300,000.

Cockerham previously pled guilty and was sentenced to 210 months of imprisonment. Momon also pleaded guilty previously to receiving bribes from various contractors at Camp Arifjan, including Hall, and is awaiting sentencing.

---

## United States v. Ellis, Southern District of Texas

Dorothy Ellis, a former senior employee of former U.S. military contractor Terry Hall, pleaded guilty on September 2, 2010, to conspiracy to pay $360,000 in bribes to U.S. Army contracting officials stationed at Camp Arifjan, Kuwait. Ellis was Hall's most senior employee, with responsibilities that included serving as the liaison between Hall and U.S. Army contracting officials stationed at Camp Arifjan.

Ellis admitted that she participated in the bribery scheme by providing former Majors James Momon and Christopher Murray access to secret bank accounts established on their behalf in the Philippines, which enabled Hall and others to transfer bribe payments to them. Ellis also admitted that she obtained confidential Army contract pricing information from Momon that was designed to give Hall an unlawful advantage in the bidding process for an ice contract from the Department of Defense. In exchange for her assistance in the bribery scheme, Ellis received a $100,000 "bonus" from Hall in August 2006. Under the plea agreement, Ellis agreed to forfeit $360,000 to the government.

---

17

**United States v. Birjas, Southern District of Indiana**

Wajdi Birjas, a former contract employee of the Defense Department, pleaded guilty on August 11, 2010, to conspiracy to bribe U.S. Army contracting officials stationed at Camp Arifjan, a military base in Kuwait, and to money-laundering conspiracy.  He also agreed to forfeit $675,000 to the government.

Birjas, acting at the direction of a contractor working in Kuwait, developed corrupt relationships with certain Army contracting officials, including Major Christopher Murray, Major James Momon, and Richard Evick, a sergeant first class deployed to Camp Arifjan as a senior procurement non-commissioned officer, who was subsequently indicted.  By bribing these Army contracting officials in 2005 and 2006, the contractor ultimately received more than $1.7 million in connection with contracts to provide various goods and services to the U.S. military.  In exchange for his assistance in the bribery scheme, Birjas received a share of the profits that the contracts generated.

---

**United States v. Wheeler, District of New Jersey**

Michael Wheeler, a former lieutenant colonel in the U.S. Army Reserves, was sentenced on January 21, 2010, to 42 months' imprisonment for his participation in a wide-ranging bribery conspiracy involving the U.S. government, the Republic of Iraq, and the Coalition Provisional Authority - South Central Region (CPA-SC) in Al-Hillah, Iraq.  At his 2009 trial, Wheeler was convicted of conspiracy to commit bribery, honest services wire fraud, interstate transport of stolen property, and possession of unregistered firearms.

Wheeler, an advisor for CPA reconstruction projects, had been charged along with former U.S. Army Colonel Curtis G. Whiteford, former Lt. Col. Debra M. Harrison, and two civilians with conspiracy to rig the bids on contracts being awarded by the CPA-SC so that more than 20 contracts were awarded to a co-conspirator.  Trial testimony revealed that Wheeler and others received in return more than $1 million in cash and other items of value.  Whiteford was previously convicted at trial and was sentenced to five years of imprisonment; Harrison previously pled guilty in connection with the scheme and was sentenced to 30 months in prison and ordered to pay $366,640 in restitution.

**United States v. Bazan**, District of Columbia

Ramon Bazan, a former Special Agent of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), pleaded guilty on April 14, 2010, to a one-count criminal information charging him with making false statements in connection with a series of fraudulent visa referrals. He was sentenced on July 9, 2010, to 100 hours of community service and a $1,000 fine.

Bazan served as the ATF Assistant Country Attaché at the U.S. Embassy in Mexico City, Mexico, from 2003 to 2008. During this time, the Embassy maintained a visa referral program that helped expedite the processing of nonimmigrant visa applications for Mexican nationals and other foreign citizens whose travel to the United States would advance the national interests of the United States or U.S. diplomacy efforts in Mexico. As the ATF Assistant Country Attaché, Bazan had the authority to make visa referrals through this program. Bazan submitted fraudulent visa referrals on behalf of Mexican nationals who were friends or relatives of Bazan's colleagues. Bazan admitted that in connection with these referrals, he falsely represented that the visa applicants were official ATF contacts and that the applicants provided assistance necessary to the ATF.

---

**United States v. Scott and Scott**, District of Maryland

Donna J. Scott, a former Department of Energy (DOE) employee, pleaded guilty on March 26, 2010, to a criminal conflict of interest offense for participating in DOE's purchase of furniture when she knew her husband had a financial interest in the deals. Scott's husband, Timothy Scott pleaded guilty on March 26, 2010, to making a false statement to federal agents when he denied having a financial interest in the furniture purchases.

Donna Scott coordinated the use and renovation of DOE office spaces. In 2006 she was tasked with overseeing the renovation of a lobby and a conference room, including the acquisition of new furniture for these spaces, and recommended that a co-worker obtain price quotes for furniture from her husband, Timothy Scott. Timothy Scott provided two price quotes, both of which referenced Timothy Scott as the manufacturer's representative. Subsequent price quotes that were submitted by Timothy Scott were higher and did not reference him by name. The DOE ultimately purchased the furniture using the original price quote provided by Timothy Scott. In another transaction, Donna Scott selected furniture worth approximately $300,000 from particular manufacturers for the renovation of a cafeteria, knowing that these manufacturers' representatives planned to use her husband as their dealer for these transactions, thus earning her husband a commission of over $24,000.

19

Subsequently, both Donna and Timothy Scott were each sentenced to 36 months' probation, $5,000 fine, 50 hours' community service, and are barred from seeking employment or business with the federal government for 3 years.

## STATE AND LOCAL GOVERNMENT

**At the end of 2010, 39 matters of alleged corruption involving state or local government were open in the Public Integrity Section.  In 2010 the Section closed 13 matters.  Also during 2010, the Section prosecuted a number of cases involving state or local corruption.**

The Public Integrity Section plays a major role in combating corruption at all levels of government, including corruption relating to state or local public officials.  The following are examples of corruption cases handled by the Section involving state and local officials in 2010.

### United States v. McGregor, Gilley, Coker, Geddie, Massey, Means, Preuitt, Ross, Smith, Walker, and Crosby, Middle District of Alabama

One of the Section's most significant corruption probes resulted in the indictment of 11 individuals on October 4, 2010, on 39 counts of corruption-related offenses.  The defendants included four Alabama state legislators, three lobbyists, two business owners and one of their employees, and an employee of the Alabama legislature.  The defendants were charged with a variety of corruption offenses, including conspiracy, federal programs bribery, extortion, money laundering, honest services mail and wire fraud, obstruction of justice, and making a false statement for their roles in a conspiracy to bribe legislators for their votes and influence on proposed pro-gambling legislation in return for millions of dollars.  These 11 individuals formed a corrupt network to buy and sell votes to directly benefit the business interests of two defendants, Milton McGregor and Ronald Gilley.

Milton McGregor owned a controlling interest in Macon County Greyhound Park, Inc. and Jefferson Country Racing Association, as well as ownership interest in other entertainment and gambling facilities in Alabama that offered or sought to offer electronic bingo gambling machines to the public.  Ronald Gilley owned a controlling interest in the Country Crossing real estate, entertainment and gambling development in Alabama, which also sought to offer electronic bingo gambling machines to the public.

From February 2009 through August 2010, McGregor, Gilly and their co-defendants allegedly conspired to commit federal program bribery by corruptly giving money and other things of value to Alabama state legislators and staff with the intent to influence and reward

21

them in connection with their support of pro-gambling legislation. Alabama state legislators, including co-defendants State Senator Larry P. Means, State Senator James E. Preuitt, State Senator Quinton T. Ross, Jr., and State Senator Harri Anne Smith, were charged with corruptly soliciting and accepting money and things of value from their co-conspirators, intending to be influenced in connection their official acts on pro-gambling legislation.

One of these 11 defendants, former Alabama state lobbyist Jared D. Massey, pleaded guilty on October 20, 2010, to conspiring to bribe legislators in exchange for their favorable votes on pro-gambling legislation. He also pleaded guilty to conspiracy to commit federal program bribery and five counts of federal program bribery. During his plea, Massey admitted that he was involved with numerous bribe payments to State Senator Larry P. Means, State Senator Quinton T. Ross, Jr., and State Senator Harri Anne Smith. Massey also admitted that he offered former State Senator James E. Preuitt $1 million in return for support of pro-gambling legislation. Massey also admitted that he authorized former employee and lobbyist Jennifer Pouncy to offer Preuitt substantial assistance in his reelection campaign, including telling Pouncy that they had up to $2 million of Gilley's money to use in obtaining Preuitt's vote on the pro-gambling legislation.

Prior to the indictment, Jennifer D. Pouncy pleaded guilty on Sept. 28, 2010, to one count of conspiracy for her role in the scheme. Pouncy admitted that she offered State Senator Preuitt $2 million for his vote on the pro-gambling legislation, based on orders from Massey. Preuitt, a five-term senator who owns a car and truck dealership, was also promised the possibility that a country music star would come to his dealership to buy trucks. Pouncy also admitted that Massey and Gilley authorized her to offer $100,000 to State Senator Means in return for his support for the pro-gambling legislation.

## United States v. Wagner, Eastern District of Missouri

David Wagner was the former acting executive director of U'una'i Legal Services Corporation (ULSC) in American Samoa. On March 11, 2010, Wagner pleaded guilty to a one-count criminal information charging him with theft of federal grant funds for stealing over $30,000 from the federally funded organization.

ULSC was a nonprofit organization operating in American Samoa. During this period, ULSC was the only nonprofit organization in American Samoa dedicated to providing free legal services to victims of domestic violence, dating violence, stalking, and sexual abuse. ULSC relied on various sources of federal grant funding, including funding from the Legal

Services Corporation and the Department of Justice's Office of Violence Against Women (OVW).

In pleading guilty, Wagner admitted that from approximately November 2005 through December 2006 he stole $31,292 in federal grant funds from ULSC and OVW.

---

**United States v. Plowman, Southern District of Indiana**

Lincoln Plowman, former Indianapolis and Marion County City-County Councilman, was charged on September 16, 2010, by a grand jury with extortion and soliciting a bribe. Plowman was a member of the Council's Metropolitan Development Committee. He was also a major with the Indianapolis Metropolitan Police Department. The indictment alleges that between August 2009 and December 2009, while a member of the City-County Council, Plowman solicited an undercover FBI agent to pay $5,000 in cash and to make a $1,000 campaign contribution for Plowman's benefit. In exchange for the payments, Plowman allegedly would use his official actions and influence to facilitate the opening of a strip club in Indianapolis.

---

**United States v. Sherfick, Southern District of Indiana**

Michael S. Sherfick, a former local law enforcement official, pleaded guilty on April 21, 2010, to a criminal information charging him with conspiracy to commit bribery concerning programs receiving federal funds. He was sentenced on this date to 14 months in prison and was also ordered to pay a $35,750 fine.

Sherfick was an employee of the Perry Township Constable's Office (PTCO), a local law enforcement department in Marion County, Indiana. Sherfick held numerous positions and ranks, including executive assistant, captain, and major, during the relevant period. From 2005 until his employment was terminated in 2007, Sherfick admitted that he used his official position to solicit and accept $30,000 in bribe payments in exchange for PTCO deputy constable badges, identification cards, and parking placards to various individuals. Sherfick admitted that he advised these individuals that they would receive numerous benefits and privileges by displaying the law enforcement credentials, including the ability to park their vehicles in restricted areas, evade traffic tickets, obtain free access to sports events, and receive other discounts for goods and services.

Sherfick also admitted that he instructed individuals to whom he sold law enforcement credentials to lie to investigators and the grand jury concerning his involvement in the scheme.

23

**United States v. Martinez Maldonado and Bravo Fernandez**, Puerto Rico

Puerto Rican Senator Hector Martinez Maldonado and Juan Bravo Fernandez, the former president of one of the largest private security firms in Puerto Rico, were indicted on June 22, 2010, for their alleged roles in a bribery scheme involving legislation beneficial to Bravo Fernandez's business. Martinez Maldonado and Bravo Fernandez were each charged with one count of conspiracy to commit bribery and conspiracy to travel in interstate commerce in aid of racketeering, one count of interstate travel in aid of racketeering, and one count of bribery. Martinez Maldonado was also charged with one count of obstruction of justice for threatening a former staffer to make false statements to the FBI.

Bravo Fernandez allegedly conspired to secure the passage of two bills favorable to his business interests by bribing Martinez Maldonado and Jorge De Castro Font, a former Puerto Rican senator who served as chair of the Committee on Rules and Calendars, the committee with control over the timing of bills brought to the floor of the Senate for a vote. Martinez Maldonado served as chair of the Public Safety Committee, exercising significant control over legislation related to the security and general welfare of Puerto Rico. In order to secure passage of the two bills, Bravo Fernandez, Martinez Maldonado, and De Castro Font allegedly agreed that Martinez Maldonado and De Castro Font would take official acts supporting the bills in exchange for things of value provided by Bravo Fernandez, including numerous cash payments and an all-expenses-paid trip to Las Vegas for a boxing championship fight. De Castro Font previously pled guilty.

## FEDERAL ELECTION CRIMES

As described in Part I, during 2010 the Public Integrity Section continued its nationwide oversight of the handling of election crime investigations and prosecutions. In addition, the Section prosecuted a number of election crime cases. The Section also continued to assist in the implementation and execution of the Department's Ballot Access and Voting Integrity Initiative. The purposes of this ongoing Initiative are to increase the Department's efforts to deter and prosecute election crimes and to protect voting rights. As of December 31, 2010, eight matters involving possible election crimes were pending in the Public Integrity Section.

Set forth below is an example of the Section's 2010 casework in this area.

### United States v. Magliocchetti, Eastern District of Virginia

Paul Magliocchetti, the founder and president of a lobbying firm called PMA Group Inc. (PMA), pleaded guilty on September 24, 2010, to making hundreds of thousands of dollars in illegal campaign contributions in order to enrich himself by increasing his firm's influence, power, and prestige among elected public officials. He had been charged in an indictment unsealed on August 5, 2010, with four counts of making illegal campaign contributions in the name of another; four counts of making illegal campaign contributions from a corporation; and three counts of causing federal campaigns to unwittingly make false statements to the Federal Election Commission (FEC). He pled guilty to three counts: making false statements, making contributions in the name of another, and making corporate contributions.

Magliocchetti admitted that from 2005 through 2008 he made illegal contributions through straw donors to scores of federal campaign committees, which in fact were actually paid for by Magliocchetti or PMA, rather than the named donor. Magliocchetti concealed from the FEC and the public the fact that he and PMA were the true source of the funds for these illegal federal campaign contributions, thus causing the recipient campaigns to unwittingly file false reports with the FEC. At the same time, Magliocchetti ensured that he and PMA received credit for these contributions from the campaigns and candidates by using

family members, PMA employees, and others associated with Magliocchetti as the conduits, and by hosting fund-raising events in which he or his associates delivered the contributions.

Paul Magliocchetti subsequently was sentenced to 27 months in prison and a $75,000 fine.

In connection with this investigation, Mark Magliocchetti, Paul Magliocchetti's son, pleaded guilty on August 5, 2010, to making illegal corporate campaign contributions. Mark Magliocchetti admitted to receiving payments from an individual and a company (subsequently identified as Paul Magliocchetti and PMA) with the understanding that those monies were to be used for federal campaign contributions. The amount of contributions made by Mark Magliocchetti and his wife, and funded by the individual and the company, exceeded $120,000. He was sentenced on November 16, 2010, to 14 days of imprisonment plus five and a half months of home confinement.

26

## PART III

## NATIONWIDE FEDERAL PROSECUTIONS
## OF CORRUPT PUBLIC OFFICIALS

### INTRODUCTION

The tables in this section of the Report reflect data that is complied from annual nationwide surveys of the United States Attorneys' Offices by the Public Integrity Section.

As discussed in Part I, most corruption cases are handled by the local United States Attorney's Office in the district where the crime occurred. However, on occasion outside prosecutors are asked either to assist the local office on a corruption case, or to handle the case entirely as a result of recusal of the local office due to a possible conflict of interest. The figures in Tables I through III include all public corruption prosecutions within each district. The figures in Table IV reflect the Public Integrity Section's public corruption prosecutions for 2010 that were discussed in Part II of this report.

### LIST OF TABLES

**TABLE I:**   Nationwide Federal Prosecutions of
Corrupt Public Officials in 2010

**TABLE II:**   Progress Over the Past Two Decades:
Nationwide Federal Prosecutions of
Corrupt Public Officials

**TABLE III:**   Federal Public Corruption Convictions by District
Over the Past Decade

**TABLE IV:**   Public Integrity Section's Federal Prosecutions
of Corrupt Public Officials in 2010

## TABLE I

### NATIONWIDE FEDERAL PROSECUTIONS
### OF CORRUPT PUBLIC OFFICIALS
### IN 2010

| Federal Officials | |
|---|---|
| Charged | 422 |
| Convicted | 397 |
| Awaiting Trial | 103 |

| State Officials | |
|---|---|
| Charged | 168 |
| Convicted | 108 |
| Awaiting Trial | 105 |

| Local Officials | |
|---|---|
| Charged | 296 |
| Convicted | 280 |
| Awaiting Trial | 146 |

| Others Involved | |
|---|---|
| Charged | 298 |
| Convicted | 251 |
| Awaiting Trial | 200 |

| Totals | |
|---|---|
| Charged | 1,184 |
| Convicted | 1,036 |
| Awaiting Trial | 554 |

28

TABLE II

PROGRESS OVER THE LAST TWO DECADES:
FEDERAL PROSECUTIONS BY UNITED STATES ATTORNEY'S OFFICES
OF CORRUPT PUBLIC OFFICIALS

| | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|---|---|---|---|---|
| **FEDERAL OFFICIALS** | | | | | | | | | | |
| Charged | 803 | 624 | 627 | 571 | 527 | 456 | 459 | 442 | 480 | 441 |
| Convicted | 665 | 532 | 595 | 488 | 438 | 459 | 392 | 414 | 460 | 422 |
| Awaiting Trial as of 12/31 | 149 | 139 | 133 | 124 | 120 | 64 | 83 | 85 | 101 | 92 |
| **STATE OFFICIALS** | | | | | | | | | | |
| Charged | 115 | 81 | 113 | 99 | 61 | 109 | 51 | 91 | 115 | 92 |
| Convicted | 77 | 92 | 133 | 97 | 61 | 83 | 49 | 58 | 80 | 91 |
| Awaiting Trial as of 12/31 | 42 | 24 | 39 | 17 | 23 | 40 | 20 | 37 | 44 | 37 |
| **LOCAL OFFICIALS** | | | | | | | | | | |
| Charged | 242 | 232 | 309 | 248 | 236 | 219 | 255 | 277 | 237 | 211 |
| Convicted | 180 | 211 | 272 | 202 | 191 | 190 | 169 | 264 | 219 | 183 |
| Awaiting Trial as of 12/31 | 88 | 91 | 132 | 96 | 89 | 60 | 118 | 90 | 95 | 89 |
| **PRIVATE CITIZENS INVOLVED IN PUBLIC CORRUPTION OFFENSES** | | | | | | | | | | |
| Charged | 292 | 252 | 322 | 247 | 227 | 200 | 292 | 364 | 302 | 256 |
| Convicted | 272 | 246 | 362 | 182 | 188 | 170 | 243 | 278 | 306 | 242 |
| Awaiting Trial as of 12/31 | 67 | 126 | 99 | 95 | 91 | 80 | 106 | 128 | 89 | 109 |
| **TOTALS** | | | | | | | | | | |
| Charged | 1,452 | 1,189 | 1,371 | 1,165 | 1,051 | 984 | 1,057 | 1,174 | 1,134 | 1,000 |
| Convicted | 1,194 | 1,081 | 1,362 | 969 | 878 | 902 | 853 | 1,014 | 1,065 | 938 |
| Awaiting Trial as of 12/31 | 346 | 380 | 403 | 332 | 323 | 244 | 327 | 340 | 329 | 327 |

TABLE II (continued)

| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **FEDERAL OFFICIALS** | | | | | | | | | | | |
| Charged | 502 | 478 | 479 | 424 | 445 | 463 | 426 | 518 | 425 | 422 | 10,012 |
| Convicted | 414 | 429 | 421 | 381 | 390 | 407 | 405 | 458 | 426 | 397 | 8,993 |
| Awaiting Trial as of 12/31 | 131 | 119 | 129 | 98 | 118 | 112 | 116 | 117 | 107 | 103 | |
| **STATE OFFICIALS** | | | | | | | | | | | |
| Charged | 95 | 110 | 94 | 111 | 96 | 101 | 128 | 144 | 93 | 168 | 2,067 |
| Convicted | 61 | 132 | 87 | 81 | 94 | 116 | 85 | 123 | 102 | 108 | 1,810 |
| Awaiting Trial as of 12/31 | 75 | 50 | 38 | 48 | 51 | 38 | 65 | 61 | 57 | 105 | |
| **LOCAL OFFICIALS** | | | | | | | | | | | |
| Charged | 224 | 299 | 259 | 268 | 309 | 291 | 284 | 287 | 270 | 296 | 5,253 |
| Convicted | 184 | 262 | 119 | 252 | 232 | 241 | 275 | 246 | 257 | 280 | 4,429 |
| Awaiting Trial as of 12/31 | 110 | 118 | 106 | 105 | 148 | 141 | 127 | 127 | 148 | 146 | |
| **PRIVATE CITIZENS INVOLVED IN PUBLIC CORRUPTION OFFENSES** | | | | | | | | | | | |
| Charged | 266 | 249 | 318 | 410 | 313 | 295 | 303 | 355 | 294 | 298 | 5,855 |
| Convicted | 261 | 188 | 241 | 306 | 311 | 266 | 249 | 302 | 276 | 251 | 5,140 |
| Awaiting Trial as of 12/31 | 121 | 126 | 139 | 168 | 136 | 148 | 179 | 184 | 161 | 200 | |
| **TOTALS** | | | | | | | | | | | |
| Charged | 1,087 | 1,136 | 1,150 | 1,213 | 1,163 | 1,150 | 1,141 | 1,304 | 1,082 | 1,184 | 23,187 |
| Convicted | 920 | 1,011 | 868 | 1,020 | 1,027 | 1,030 | 1,014 | 1,129 | 1,061 | 1,036 | 20,372 |
| Awaiting Trial as of 12/31 | 437 | 413 | 412 | 419 | 453 | 439 | 487 | 489 | 473 | 554 | |

TABLE III

UNITED STATES ATTORNEY'S OFFICES'
FEDERAL PUBLIC CORRUPTION CONVICTIONS
BY DISTRICT OVER THE PAST DECADE

| U.S. Attorney's Office | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Alabama, Middle | 9 | 7 | 6 | 7 | 9 | 11 | 8 | 3 | 5 | 1 | 66 |
| Alabama, Northern | 15 | 11 | 6 | 4 | 17 | 33 | 39 | 17 | 18 | 11 | 171 |
| Alabama, Southern | 2 | 10 | 2 | 2 | 0 | 7 | 5 | 0 | 5 | 3 | 36 |
| Alaska | 6 | 5 | 0 | 0 | 1 | 3 | 15 | 8 | 1 | 9 | 48 |
| Arizona | 1 | 4 | 10 | 9 | 48 | 16 | 32 | 20 | 19 | 16 | 175 |
| Arkansas, Eastern | 0 | 0 | 18 | 18 | 4 | 8 | 8 | 4 | 2 | 11 | 73 |
| Arkansas, Western | 0 | 3 | 1 | 0 | 0 | 2 | 0 | 1 | 1 | 6 | 14 |
| California, Central | 33 | 35 | 45 | 22 | 42 | 36 | 55 | 41 | 43 | 29 | 381 |
| California, Eastern | 18 | 20 | 20 | 39 | 30 | 18 | 13 | 9 | 15 | 12 | 194 |
| California, Northern | 3 | 4 | 5 | 14 | 3 | 4 | 2 | 3 | 2 | 3 | 43 |
| California, Southern | 12 | 5 | 5 | 2 | 10 | 7 | 6 | 5 | 9 | 0 | 61 |
| Colorado | 22 | 16 | 7 | 8 | 11 | 4 | 3 | 4 | 14 | 6 | 95 |
| Connecticut | 14 | 3 | 12 | 8 | 24 | 11 | 17 | 5 | 2 | 4 | 100 |
| Delaware | 8 | 7 | 3 | 5 | 2 | 7 | 5 | 7 | 1 | 1 | 46 |
| District of Columbia | 43 | 44 | 20 | 33 | 15 | 25 | 22 | 66 | 28 | 41 | 337 |
| Florida, Middle | 8 | 9 | 14 | 10 | 13 | 39 | 28 | 51 | 30 | 18 | 220 |
| Florida, Northern | 5 | 5 | 4 | 2 | 5 | 17 | 19 | 3 | 27 | 13 | 100 |
| Florida, Southern | 83 | 38 | 37 | 78 | 24 | 27 | 22 | 12 | 12 | 21 | 354 |
| Georgia, Middle | 11 | 1 | 8 | 4 | 7 | 3 | 0 | 7 | 3 | 0 | 44 |
| Georgia, Northern | 10 | 26 | 12 | 9 | 21 | 6 | 7 | 15 | 21 | 32 | 159 |
| Georgia, Southern | 3 | 6 | 1 | 0 | 4 | 0 | 1 | 2 | 1 | 5 | 23 |
| Guam & NMI | 19 | 13 | 16 | 9 | 5 | 2 | 0 | 3 | 6 | 3 | 76 |
| Hawaii | 2 | 10 | 4 | 14 | 4 | 5 | 1 | 2 | 1 | 0 | 43 |

**TABLE III (continued)**

| U.S. Attorney's Office | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Idaho | 4 | 7 | 4 | 3 | 1 | 1 | 1 | 1 | 1 | 0 | 23 |
| Illinois, Central | 2 | 5 | 5 | 14 | 3 | 6 | 8 | 6 | 6 | 0 | 55 |
| Illinois, Northern | 24 | 19 | 54 | 22 | 51 | 30 | 28 | 43 | 47 | 46 | 364 |
| Illinois, Southern | 4 | 6 | 1 | 6 | 20 | 2 | 6 | 7 | 5 | 6 | 63 |
| Indiana, Northern | 4 | 4 | 10 | 13 | 9 | 5 | 15 | 9 | 10 | 4 | 83 |
| Indiana, Southern | 2 | 2 | 10 | 4 | 5 | 4 | 9 | 5 | 8 | 8 | 57 |
| Iowa, Northern | 0 | 1 | 1 | 1 | 3 | 0 | 0 | 0 | 0 | 0 | 6 |
| Iowa, Southern | 0 | 2 | 8 | 1 | 1 | 2 | 9 | 9 | 4 | 11 | 47 |
| Kansas | 5 | 6 | 0 | 5 | 3 | 0 | 2 | 5 | 4 | 5 | 35 |
| Kentucky, Eastern | 15 | 25 | 22 | 27 | 10 | 23 | 33 | 22 | 22 | 28 | 227 |
| Kentucky, Western | 2 | 2 | 4 | 1 | 4 | 4 | 6 | 6 | 19 | 6 | 54 |
| Louisiana, Eastern | 20 | 19 | 17 | 29 | 26 | 26 | 29 | 26 | 20 | 26 | 238 |
| Louisiana, Middle | 6 | 2 | 2 | 0 | 8 | 13 | 6 | 3 | 10 | 4 | 54 |
| Louisiana, Western | 6 | 9 | 6 | 1 | 4 | 10 | 7 | 10 | 14 | 25 | 92 |
| Maine | 2 | 0 | 5 | 2 | 3 | 4 | 4 | 8 | 5 | 1 | 34 |
| Maryland | 8 | 6 | 12 | 28 | 17 | 36 | 21 | 39 | 32 | 21 | 220 |
| Massachusetts | 15 | 8 | 22 | 17 | 15 | 28 | 29 | 19 | 28 | 27 | 208 |
| Michigan, Eastern | 18 | 14 | 10 | 17 | 11 | 13 | 7 | 20 | 7 | 14 | 131 |
| Michigan, Western | 9 | 10 | 14 | 13 | 11 | 12 | 5 | 13 | 11 | 16 | 114 |
| Minnesota | 8 | 8 | 3 | 9 | 3 | 6 | 3 | 7 | 13 | 6 | 66 |
| Mississippi, Northern | 5 | 7 | 14 | 9 | 5 | 5 | 18 | 13 | 13 | 9 | 98 |
| Mississippi, Southern | 19 | 13 | 13 | 5 | 0 | 2 | 7 | 4 | 2 | 15 | 80 |
| Missouri, Eastern | 4 | 10 | 3 | 4 | 8 | 12 | 12 | 22 | 16 | 11 | 102 |
| Missouri, Western | 6 | 3 | 7 | 6 | 13 | 8 | 8 | 9 | 8 | 14 | 82 |
| Montana | 3 | 13 | 2 | 7 | 1 | 8 | 0 | 8 | 7 | 10 | 59 |

**TABLE III (continued)**

| U.S. Attorney's Office | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Nebraska | 0 | 1 | 2 | 2 | 4 | 3 | 0 | 8 | 2 | 4 | 26 |
| Nevada | 5 | 6 | 6 | 0 | 0 | 3 | 4 | 0 | 7 | 4 | 35 |
| New Hampshire | 0 | 5 | 3 | 0 | 2 | 0 | 0 | 4 | 1 | 1 | 16 |
| New Jersey | 28 | 28 | 41 | 44 | 39 | 47 | 62 | 49 | 44 | 47 | 429 |
| New Mexico | 2 | 2 | 2 | 5 | 3 | 6 | 3 | 6 | 9 | 7 | 45 |
| New York, Eastern | 10 | 38 | 7 | 25 | 31 | 20 | 26 | 14 | 12 | 12 | 195 |
| New York, Northern | 11 | 5 | 22 | 16 | 11 | 9 | 7 | 10 | 2 | 3 | 96 |
| New York, Southern | 34 | 33 | 28 | 28 | 28 | 16 | 9 | 9 | 9 | 12 | 206 |
| New York, Western | 13 | 6 | 6 | 7 | 12 | 6 | 2 | 15 | 15 | 10 | 92 |
| North Carolina, Eastern | 7 | 4 | 9 | 18 | 2 | 20 | 18 | 4 | 4 | 9 | 95 |
| North Carolina, Middle | 5 | 12 | 6 | 0 | 3 | 2 | 5 | 1 | 3 | 7 | 44 |
| North Carolina, Western | 1 | 3 | 5 | 7 | 8 | 2 | 3 | 12 | 2 | 2 | 45 |
| North Dakota | 2 | 5 | 16 | 5 | 9 | 2 | 6 | 4 | 0 | 6 | 55 |
| Ohio, Northern | 34 | 29 | 28 | 32 | 28 | 31 | 37 | 29 | 49 | 65 | 362 |
| Ohio, Southern | 17 | 21 | 9 | 26 | 21 | 12 | 12 | 8 | 7 | 0 | 133 |
| Oklahoma, Eastern | 10 | 0 | 0 | 0 | 2 | 5 | 3 | 8 | 0 | 3 | 31 |
| Oklahoma, Northern | 2 | 5 | 3 | 0 | 2 | 3 | 3 | 3 | 12 | 2 | 35 |
| Oklahoma, Western | 0 | 2 | 1 | 4 | 17 | 10 | 3 | 11 | 10 | 9 | 67 |
| Oregon | 3 | 1 | 3 | 0 | 4 | 6 | 11 | 3 | 5 | 1 | 37 |
| Pennsylvania, Eastern | 36 | 57 | 57 | 26 | 26 | 30 | 19 | 15 | 20 | 23 | 309 |
| Pennsylvania, Middle | 20 | 9 | 13 | 12 | 19 | 27 | 16 | 16 | 16 | 25 | 173 |
| Pennsylvania, Western | 5 | 6 | 4 | 3 | 11 | 10 | 5 | 5 | 5 | 6 | 60 |
| Puerto Rico | 9 | 101 | 24 | 31 | 6 | 20 | 2 | 37 | 28 | 17 | 275 |
| Rhode Island | 2 | 6 | 0 | 2 | 4 | 2 | 1 | 2 | 1 | 3 | 23 |

**TABLE III (continued)**

| U.S. Attorney's Office | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| South Carolina | 8 | 5 | 8 | 8 | 0 | 3 | 4 | 8 | 7 | 2 | 53 |
| South Dakota | 2 | 4 | 3 | 2 | 3 | 13 | 4 | 11 | 8 | 9 | 59 |
| Tennessee, Eastern | 2 | 9 | 8 | 6 | 9 | 7 | 12 | 6 | 7 | 4 | 70 |
| Tennessee, Middle | 0 | 4 | 6 | 8 | 5 | 9 | 6 | 1 | 4 | 3 | 46 |
| Tennessee, Western | 13 | 8 | 11 | 16 | 22 | 19 | 24 | 5 | 10 | 14 | 142 |
| Texas, Eastern | 14 | 5 | 5 | 8 | 5 | 3 | 4 | 10 | 5 | 4 | 63 |
| Texas, Northern | 3 | 13 | 33 | 14 | 22 | 16 | 6 | 23 | 41 | 17 | 188 |
| Texas, Southern | 30 | 10 | 17 | 11 | 25 | 21 | 34 | 64 | 26 | 23 | 261 |
| Texas, Western | 15 | 21 | 16 | 27 | 17 | 9 | 11 | 15 | 27 | 27 | 185 |
| Utah | 2 | 8 | 5 | 0 | 6 | 1 | 7 | 5 | 3 | 1 | 38 |
| Vermont | 2 | 0 | 3 | 0 | 2 | 0 | 1 | 5 | 0 | 2 | 15 |
| Virgin Islands | 4 | 6 | 2 | 2 | 2 | 8 | 3 | 2 | 0 | 7 | 36 |
| Virginia, Eastern | 22 | 17 | 8 | 21 | 23 | 38 | 23 | 72 | 57 | 60 | 341 |
| Virginia, Western | 3 | 13 | 3 | 16 | 2 | 13 | 13 | 2 | 5 | 2 | 72 |
| Washington, Eastern | 0 | 3 | 2 | 3 | 6 | 1 | 4 | 5 | 0 | 0 | 24 |
| Washington, Western | 10 | 3 | 1 | 15 | 7 | 1 | 5 | 7 | 3 | 8 | 60 |
| West Virginia, Northern | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 2 | 2 | 6 | 13 |
| West Virginia, Southern | 3 | 4 | 8 | 10 | 14 | 9 | 2 | 4 | 2 | 3 | 59 |
| Wisconsin, Eastern | 10 | 10 | 8 | 10 | 18 | 11 | 7 | 6 | 4 | 5 | 89 |
| Wisconsin, Western | 3 | 0 | 3 | 3 | 2 | 5 | 5 | 0 | 5 | 2 | 28 |
| Wyoming | 0 | 0 | 2 | 1 | 8 | 0 | 1 | 1 | 2 | 1 | 16 |

TABLE IV

**PUBLIC INTEGRITY SECTION'S**
**FEDERAL PROSECUTIONS**
**OF CORRUPT PUBLIC OFFICIALS**
**IN 2010 \***

|  | Charged | Convicted | Awaiting Trial |
|---|---|---|---|
| FEDERAL OFFICIALS | 20 | 20 | 10 |
| STATE OFFICIALS | 6 | 0 | 7 |
| LOCAL OFFICIALS | 6 | 1 | 5 |
| PRIVATE CITIZENS INVOLVED IN PUBLIC CORRUPTION OFFENSES | 24 | 19 | 15 |
| **TOTALS** | **56** | **40** | **37** |

\*  Includes cases shared with United States Attorneys' Offices.